# EXHIBIT JJ

Biomaterials 73 (2015) 131–141



Contents lists available at ScienceDirect

# Biomaterials

journal homepage: www.elsevier.com/locate/biomaterials



# *In vivo* oxidative degradation of polypropylene pelvic mesh



Adam Imel [a], Thomas Malmgren [a], Mark Dadmun [a], Samuel Gido [b, **], Jimmy Mays [a, *]

[a] Department of Chemistry, University of Tennessee, Knoxville, TN 37996, USA
[b] Department of Polymer Science and Engineering, University of Massachusetts, Amherst, MA 01003, USA

## ARTICLE INFO

*Article history:*
Received 3 May 2015
Received in revised form
3 September 2015
Accepted 9 September 2015
Available online 11 September 2015

*Keywords:*
Polypropylene
Oxidation
Degradation
SEM (scanning electron microscopy)
Molecular weight

## ABSTRACT

Commercial polypropylene pelvic mesh products were characterized in terms of their chemical compositions and molecular weight characteristics before and after implantation. These isotactic polypropylene mesh materials showed clear signs of oxidation by both Fourier-transform infrared spectroscopy and scanning electron microscopy with energy dispersive X-ray spectroscopy (SEM/EDS). The oxidation was accompanied by a decrease in both weight-average and z-average molecular weights and narrowing of the polydispersity index relative to that of the non-implanted material. SEM revealed the formation of transverse cracking of the fibers which generally, but with some exceptions, increased with implantation time. Collectively these results, as well as the loss of flexibility and embrittlement of polypropylene upon implantation as reported by other workers, may only be explained by *in vivo* oxidative degradation of polypropylene.

© 2015 Elsevier Ltd. All rights reserved.

## 1. Introduction

Polypropylene has been used as a mesh for hernia repair since 1958 [1], as well as in a wide variety of other biomaterials applications [2]. Because polypropylene is a hydrophobic polymer with no readily hydrolyzable bonds, surgeons have traditionally viewed it as an inert material *in vivo* [3]. However, as a member of the alkane family, with tertiary hydrogens on every other carbon in the backbone, polypropylene is susceptible to oxidative degradation [4]. In 1976, Liebert et al. studied *in vivo* degradation of polypropylene sutures in hamsters and using Fourier Transform infrared spectroscopy (FTIR), gel permeation chromatography (GPC), and mechanical properties measurements, saw clear evidence for oxidative degradation for polypropylene containing only a trace of antioxidant [5]. When higher loadings of a hindered phenolic antioxidant and a sulfur containing synergist were used, oxidation was suppressed on the time frame of the experiments (up to 100 days) [5]. Importantly, degradation of the polypropylene with trace antioxidant occurred at a much faster rate than one would expect for thermo-oxidative degradation under physiological conditions. Leibert et al. speculated that trace metals, enzymes

or other chemicals present in the fluids might be responsible for the accelerated oxidative degradation [5]. It is now well-known that strong oxidizing agents such as hypochlorous acid and hydrogen peroxide are generated as byproducts of the inflammatory response of the body to an implant, and these agents can degrade and embrittle polypropylene, with a loss of flexibility due to oxidation selectively removing the less dense amorphous regions of the material [6]. These agents are believed to be responsible for the much faster than expected degradation of polypropylene *in vivo*. Polyethylene in orthopedic applications is also known to undergo degradation by an oxidative mechanism [7].

Recently several groups have reported *in vivo* degradation of polypropylene hernia meshes [8−10] and pelvic meshes [11]. Based on experiments in which degraded explanted polypropylene PP fibers in hernia meshes from various manufacturers were extracted with hexane, Bracco et al. [8] postulated that the primary cause of the cracked and degraded morphology of the fibers was their absorption of small organic molecules of biological origin including cholesterol, squalene, and esterified fatty acids. Referring to SEM images that showed obvious transverse cracking, they concluded that "In all the PP excised mesh fragments listed in Table 1 (Fig. 2 and Fig. 3), independently of the manufacturer or the implantation time, the filaments appear badly damaged."

All figures are plotted as percent transmission (%T) as a function of wavenumbers (400 to 800 $cm^{-1}$). Costello et al. [9,10] studied explanted polypropylene hernia meshes (from C. R. Bard and Ethicon) by a variety of techniques and concluded that cracks and

---

* Corresponding author.
** Corresponding author.
E-mail addresses: gido@mail.pse.umass.edu (S. Gido), jimmymays@utk.edu (J. Mays).

http://dx.doi.org/10.1016/j.biomaterials.2015.09.015
0142-9612/© 2015 Elsevier Ltd. All rights reserved.

A. Imel et al. / Biomaterials 73 (2015) 131–141

**Table 1**
Average molecular weights and polydispersity indices for polypropylene meshes.[a]

| PP mesh | $M_z \times 10^{-5}$ | $M_w \times 10^{-5}$ | $M_w/M_n$ |
|---|---|---|---|
| Advantage | 10.2 | 3.87 | 3.90 |
| Lynx | 10.1 | 3.72 | 4.28 |
| Obtryx | 10.0 | 3.85 | 4.06 |
| Pinnacle | 11.3 | 3.98 | 5.58 |
| Prefyx | 11.1 | 3.91 | 4.32 |
| Solyx | 10.9 | 3.98 | 4.42 |
| Uphold | 9.53 | 3.77 | 3.96 |

[a] Averages from triplicate runs using triple detection (DRI, light scattering, viscometer).

other surface degradations such as peeling of the fibers were indicative of the oxidation of the polypropylene. They also remarked "Polypropylene is highly susceptible to the oxidative effects of the metabolites produced by phagocytic cells during the inflammatory response" and "… polypropylene is susceptible to oxidation, resulting from exposure to strong oxidants such as hydrogen peroxide and hypochlorous acid. These byproducts of the inflammatory response may degrade and embrittle the material, causing it to become rigid." Degradation causes surface cracking, mesh contraction, loss of mass, embrittlement, decreased melting temperature, foreign body reactions and reduced compliance of the material. They observed the explanted polypropylene fibers using scanning electron microscopy (SEM) and noted that micrographs of 79% of all explanted specimens exhibited cracks in the transverse or longitudinal direction. Clave et al. [11] studied explanted polypropylene pelvic meshes, observed degradation and cracking of the fibers, and concluded that polypropylene as a reinforcement in pelvic surgery is not inert. Their work was with 71 different explanted PP meshes of various types from various manufacturers. These included low density monofilament, high density monofilament, multifilament, non-knitted non-woven, and composite PP meshes. All these different types showed cracking by SEM after implantation. However, their FTIR results neither confirmed nor excluded oxidation of polypropylene as the cause of the degradation.

Lefranc et al. [12] concluded that PP fiber meshes degrade when implanted for pelvic wall support, and cited transverse cracking as observed by SEM on explants as a characteristic identifier of this degradation. Lefranc [Ref. 12, Fig. 25.9] published a dramatic image of this cracking in explanted PP fibers, which he attributes to Clave, but which was not published in Clave's study [11].

Thus, while it is now becoming clear that polypropylene hernia and pelvic meshes, from a variety of manufacturers and of various types, are not inert *in vivo*, there still appears to be some uncertainty in the clinical community regarding the mechanism of degradation. The purpose of this study is to characterize explanted



**Fig. 1.** A) SEM image of Pinnacle Control 2. B) SEM image of Obtryx exemplar control. C) SEM image of Obtryx exemplar control showing abraded region. D) Locations for EDS Spectra. E) EDS Spectrum from region 1 in Fig. 1D. F) EDS Spectrum from region 2 in Fig. 1D.

A. Imel et al. / Biomaterials 73 (2015) 131–141



**Fig. 2.** A) FTIR of Pinnacle control. B) FTIR of Obtryx control. C) FTIR spectrum of XP-8 explant. D) FTIR spectrum of XP-3 explant. E) FTIR spectrum of XP-10 explant. F) FTIR spectrum of XP-7 explant.

polypropylene pelvis meshes and compare their structure and properties with those of equivalent non-implanted materials. A combination of FTIR, GPC, SEM with energy dispersive X-ray spectroscopy (EDS), transmission electron microscopy (TEM), and thermogravimetric analysis (TGA) is used for this purpose.

## 2. Materials and methods

### 2.1. Materials

Testing was performed to examine properties of explanted



**Fig. 3.** A) TGA overlay of all polypropylene samples. B) Thermal comparison on the effect of antioxidant on the stability of Pinnacle polypropylene.

*A. Imel et al. / Biomaterials 73 (2015) 131—141*

Boston Scientific Corporation Pinnacle and Obtryx pelvic repair meshes. Explanted samples of polypropylene mesh removed from 11 patients were received from Steelgate Inc. The samples were preserved in glass jars of formalin. Only 4 of the specimens contained sufficient amounts of polypropylene mesh to allow for GPC and FTIR testing. However, SEM and EDS was performed on all 11 samples.

The properties of non-implanted samples of the Pinnacle and Obtryx products were compared to explanted samples of the same products to determine how polymer molecular weight, polymer chemical structure, polymer elemental composition, and the physical appearance of the fibers changed during implantation. Five other Boston Scientific pelvic meshes were also characterized via FTIR and GPC: Advantage Fit Transvaginal Mid-Urethral Sling System, Lynx Suprapubic Mid-Urethral Sling System, Prefyx PPS Pre-Pubic System, Solyx SIS System, and Uphold Vaginal Support System. Four commercial polypropylene resins, Exxon Achieve 6936G1, Exxon PP3155, Metocene 500 MFR, and Metocene MF6504, used to make polypropylene fibers and non-woven fabrics were obtained from Dr. Gajanan Bhat in the Textiles and Nonwovens Development Center (TANDEC) at the University of Tennessee.

### 2.1.1. Fourier Transform Infrared Spectroscopy (FTIR)

FTIR spectra were obtained on PP meshes using a Thermo-Scientific Nicolet iS10 instrument. The PP meshes were folded (using gloves) and placed directly on top of the IR beam for scanning. Pellets of commercial resins were placed directly on the beam for scanning. Background was measured and subtracted.

Four explanted specimens, all Pinnacles, were cleaned of residual biological material by soaking 24 h at room temperature in a sodium hypochlorite solution (7.85% available chlorine), followed by rinsing extensively with water and drying in a vacuum oven at room temperature. It should be noted that ISO 12891, which describes recommended protocols for retrieval analysis of surgical implants including removal of biological tissue, does not list a protocol for cleaning polypropylene, but it does recommend sodium hypochlorite for cleaning the closely related polyolefin, ultra-high molecular weight polyethylene.

### 2.1.2. Molecular Weight Comparisons/Gel Permeation Chromatography (GPC)

The high temperature GPC protocol used in our work closely follows that described in ASTM D6474-12, Standard Test Method for Determining Molecular Weight Distribution and Molecular Weight Averages of Polyolefins by High Temperature GPC. Solutions of the polypropylene meshes for GPC analysis were prepared by weighing out about 20 mg of the sample and adding sufficient 1,2,4-trichlorobenzene (TCB) to give a concentration of about 1.5 mg/ml. Solutions of the explanted polypropylene meshes were prepared by weighing out 5—19 mg of the sample (depending upon how much was available) and adding 8—13 ml of 1,2,4-trichlorobenzene (TCB) to give a concentration ranging from 0.55 to 1.55 mg/ml. Each sample was heated for approximately 4 h at 160 °C using a PL-SP 260 High Temperature Sample Preparation instrument. After 1 h of heating, the samples were shaken for 30 min. After the 4 h of heating, the samples were transferred to autosampler vials using a pipettor equipped with a 1 μm glass fiber filter.

The samples were analyzed using a Polymer Labs GPC-220 gel permeation chromatograph. The instrument was controlled by a Dell computer system and contained three detectors: Precision Detector PD2040 (static light scattering-two angles of 15° and 90°), Viscotek 220 Differential Viscometer, and a Polymer Labs differential refractometer. The analysis of the light scattering data was performed using Precision Detectors software. The triple detection

analysis was done using Polymer Labs Cirrus software. The GPC-220 contained three PLGel Mixed B-LS 10 μm columns + a 10 μm guard column with TCB as the solvent at a flow rate of 1 ml/min at 145 °C. The TCB contained 0.01% BHT (butylated hydroxytoluene) as a stabilizer.

### 2.1.3. Thermogravimetric Analysis (TGA)

TGA was performed using a Discovery Series TGA from TA Instruments. The runs involved a 10 °C per minute ramp from room temperature up to 600 °C under air (flow rate 25 ml/min). Sample masses used were typically about 3 mg. To observe the effect of anti-oxidant on thermo-oxidative stability, anti-oxidant was removed from a sample of Pinnacle mesh so that its thermal stability could be compared with that of Pinnacle with anti-oxidant present. The protocol for removing the antioxidant was as follows: The Pinnacle mesh was weighed out using the laboratory balance (about 0.2 g). It was placed in a vial with 12 ml of TCB as solvent. The solution was heated to 160 °C for 1 h (no agitation), then agitated for 30 min still at 160° C and with no agitation kept at 160 °C for another hour. The hot PP solution was slowly poured into room temperature ethanol, which is a solvent for the anti-oxidant but a non-solvent for polypropylene. The precipitate was filtered using a Buchner funnel under vacuum with a 0.2 micron pore size PTFE filter. The filtered precipitate was re-dissolved in 10 ml of TCB at 160 °C for 1 h and then agitated for 30 min still at 160 °C. The newly dissolved solution was treated as before to recover the PP.

### 2.1.4. Scanning Electron Microscopy (SEM) testing

SEM was used to take highly magnified images of pelvic repair meshes. The sample preparation for the exemplar control samples consisted of removing the Pinnacle and Obtryx devices from their original packaging and cutting an approximately 1 cm$^2$ patch of mesh with fine laboratory shears and mounting this patch onto an approximately 1 cm diameter SEM sample holder, which is a flat disk of aluminum. The samples were adhered to the aluminum holders with a double sided, electrically conductive tape made specifically for that purpose. The explanted samples were contained in jars of formalin solution. Previous published work has shown that preservation of explanted samples in formalin solution did not alter the structure and chemistry of the mesh fibers [8]. Explanted samples were rinsed in ultrapure (deionized) water and then allowed to air dry. After drying, the explanted samples were mounted on aluminum SEM sample holders with double sided, conductive tape.

Traditional SEM testing would require these samples to be coated with a very thin layer of gold, platinum or carbon to increase their electrical conductivity. This was not necessary and was not done in our testing because we employed the FEI Magellan 400, a state of the art SEM instrument in the W. M. Keck Electron Microscopy Center at the University of Massachusetts Amherst. SEM images were taken in secondary electron imaging mode using an Everhart-Thornley detector. Images were taken at 1 kV accelerating voltage and a beam current of 3.1 pA.

In the preparation for SEM testing sample XP-11 and only XP-11 was treated with sodium hypochlorite solution for the removal of biological tissue using the published procedure of Bracco [8], i.e. 6—14% active chlorine for 24 h, followed by washing in pure water.

### 2.1.5. Energy Dispersive X-Ray Spectroscopy (EDS)

EDS testing is performed inside the SEM instrument on the same samples and at the same time as SEM imaging. The Magellan SEM was equipped with an Oxford Instruments X-MAX EDS detector. When the electrons used in the imaging process of the SEM interact with the sample material, X-rays are generated, which have energies specific to the types of atoms that compose the sample. EDS detects

A. Imel et al. / Biomaterials 73 (2015) 131–141

these X-ray energies and provides information about the atomic composition of the sample [13,14]. Because EDS is performed in conjunction with SEM imaging, it is possible to select specific locations in the highly magnified image of the sample and then use EDS to obtain composition information at that precise location.

EDS was used to look for the presence of oxygen in polypropylene fibers, which would indicate that degradation due to oxidation has occurred. In the explanted samples, in which biological tissue is also present, EDS can be used to distinguish clean polypropylene fibers from biological tissue or fibers coated with biomaterial. We must base our conclusions related to fiber degradation on clean polypropylene fibers and make sure we are not looking at biological films coating the fibers. Polypropylene fibers damaged by oxidation and biological material contain both carbon and oxygen; however, only biological materials contain nitrogen. The presence or absence (or near absence) of nitrogen as detected by EDS is the key discriminator between clean polypropylene fibers from which valid conclusions can be drawn or biomaterial covered fiber from which conclusions are less straightforward. To obtain a good EDS signal we needed to increase SEM accelerating voltage to 3 kV and the beam current to 50 pA. This means that the images that accompany the EDS spectra show some charging (analogous to glare in optical photographs).

## 3. Results

### 3.1. Characterization of non-implanted polypropylene mesh, and polypropylene resins

#### 3.1.1. SEM and EDS of non-implanted mesh

The Pinnacle exemplar (non-implanted) mesh was observed from two locations: the central area (Pinnacle Control 1), and one of the branches (Pinnacle Control 2).

Fig. 1A shows a representative SEM image from Pinnacle Control 2. The fibers are clean and free of horizontal cracking. There are rough spots and minor abrasions on the fibers, which are not associated with oxidative degradation. The fibers also display faint striations along the length of the fibers. These striations are characteristic of the bare polypropylene fiber surface. EDS spectra on these PP fibers show only one spectroscopic peak, corresponding to carbon. Pure polypropylene is composed of only two elements - carbon and hydrogen, but hydrogen produces no signal in EDS. Thus, these spectra are consistent with pure polypropylene, which has not undergone oxidative degradation. The results for Pinnacle Control 1 are similar to those for Pinnacle Control 2.

Fig. 1B shows a representative SEM image from the Obtryx exemplar control. The fibers are clean and free of horizontal cracking, and display faint striations along the length of the fibers, characteristic of the bare polypropylene fiber surface. Fig. 1C shows a region of the Obtryx control with an abraded region of fiber. Fig. 1D shows an image of the same area as Fig. 1C but taken at the higher beam current and higher accelerating voltage conditions used for EDS. There are two numbered, boxed regions overlaid on this image, one on smooth fiber and one on the abraded region. EDS spectra were recorded for the material inside each of these boxes and the results are shown in Fig. 1E and F. Both of these regions show only a carbon peak, no oxygen is detected. The absence of oxygen in the abraded region of the fiber shows that this type of damage is not associated with oxidative degradation.

#### 3.1.2. TEM of non-implanted mesh

Fig. S1 shows a TEM image of the internal structure of polypropylene fibers from the non-implanted Pinnacle control sample;

the TEM method is described in the Supplementary Material. Results for the Obtryx control are the same as for Pinnacle. The darker regions of the sample are amorphous and are more susceptible to damage from oxidation than the lighter, crystalline regions. In order to obtain the light–dark contrast observed in this TEM image, the sample has been stained by exposure to ruthenium tetroxide (RuO₄) vapors [15–20]. This stain is an oxygen containing compound, which reacts with the polypropylene material by oxidation chemistry similar to the oxidation of polypropylene in air or in the body [17]. The difference, however, is that the oxidizing stain carries along ruthenium metal that gets deposited at the site of oxidation and shows up as dark in the TEM imaging. Thus the amorphous regions of the internal fiber structure are dark in the TEM image precisely because they are more susceptible to oxidation. The dappled texture of this TEM image is consistent with the presence of crystalline and amorphous regions. The size scale of the dark and light patches in this TEM image is approximately 10 nm, consistent with what is known about polyolefin semicrystalline morphology [15].

#### 3.1.3. FTIR of non-implanted mesh

The FTIR spectra of non-implanted Pinnacle and Obtryx are given in Fig. 2A and B. For all seven polypropylene mesh samples the FTIR spectra are nearly identical to each other (see Supplementary Data, Figs. S2–S6) and to those of the four commercial isotactic polypropylene (Figs. S7–S10) and show the absorption peaks expected for polypropylene (alkyl C–H stretching peaks between about 2850 and 2960 cm⁻¹ and at 1450 and 1375 cm⁻¹). There is no evidence of oxidation in these materials, which would be seen by a broad absorption peak centered around 3400 cm⁻¹ for hydroxyl and hydroperoxide groups and peaks between about 1700 and 1750 cm⁻¹ corresponding to ketones, aldehydes, and carboxylic acids.

To confirm that bleach cleaning of the explants did not cause oxidation of the specimens, we also carried out FTIR analysis of bleach treated non-implanted Pinnacle (Fig. S11). Consistent with published literature (8) and the known chemical compatibility of polypropylene, no evidence of oxidation is seen and the spectrum is essentially identical to the spectrum obtained for non-implanted Pinnacle prior to the bleach treatment.

#### 3.1.4. GPC of non-implanted mesh

GPC was used to characterize the average molecular weights and polydispersities of the polypropylene comprising the various non-implanted polypropylene meshes. The GPC chromatograms, obtained in triplicate for the various meshes using differential refractometry (DRI), a 15° light scattering detector, a 90° light scattering detector, and a viscosity detector, are shown in Fig. S12–S39. The high level of reproducibility of the GPC data obtained with the various detectors can be seen in these figures. The elution behavior of all seven of the polypropylene mesh exemplar materials is very similar, as seen in Figs. S40–S43, where the 2nd runs of each are compared. The very similar nature of the chromatograms show that the polypropylene molecules that make up these seven meshes are very similar in their molecular weight characteristics.

A comparison of calculated weight-average ($M_w$) and z-average ($M_z$) molecular weights and polydispersity indices ($M_w/M_n$) of the seven mesh materials is shown in Table 1.

$M_z$ and $M_w$ values for all the resins are identical within experimental error. Number-average molecular weights for six of the seven samples are also identical within experimental error with only Pinnacle showing a lower value (outside one standard deviation and just within two standard deviations from the mean for the

A. Imel et al. / Biomaterials 73 (2015) 131—141

seven samples). These small differences could reflect different lots of Marlex polypropylene being used in their manufacture or variations in the processing conditions.

### 3.1.5. TGA of non-implanted mesh

Commercial polypropylene resins almost always contain antioxidants to retard the well-known thermo-oxidative degradation of polypropylene [4]. In order to determine whether or not the polypropylene used to make the various meshes contain antioxidants, we compared their degradation behavior in air using TGA to that of four commercial polypropylene resins, which all contain various proprietary stabilizer packages. The TGA results, obtained in triplicate for the four commercial polypropylenes, Exxon Achieve 6936G1, Exxon PP3155, Metocene 500 MFR, and Metocene MF6504, are shown in Figs. S44—S47, respectively. It can be seen from these triplicate runs that, while the TGA results are highly reproducible for a particular sample in terms of the temperature at which degradation begins, they do show some run-to-run variability. This likely reflects the fact that the dispersion of anti-oxidant in the polymer is not completely homogeneous, resulting in some variations in anti-oxidant content for the extremely small samples analyzed in TGA — typically about 3 mg.

Triplicate TGA runs of the seven polypropylene meshes are shown in Figs. S48—S54. As with the commercial polypropylene resins, there is some run to run variability in these experiments, but overall the degradation profiles for each sample are quite reproducible. An overlay of the first TGA runs for all eleven polypropylenes (commercial resins and meshes) is shown in Fig. 3A.

From Fig. 3A it is clear that the thermo-oxidative degradation behavior of six of the seven polypropylene meshes are very similar to that of three of the four commercial polypropylene resins. Lynx shows slightly better thermal stability than the other mesh samples, which is surprising since all seven meshes are made from the same Marlex polypropylene. This could, again, reflect lot to lot variations in Marlex or a change in the stabilizer package. Exxon PP3155 is more stable than all the other polypropylene materials likely reflecting a different stabilizer package or increased concentration(s) of stabilizer(s).

To show the effect of anti-oxidant on the degradation of PP, we compare the degradation behavior of Pinnacle mesh with that of Pinnacle with the anti-oxidant removed (as described above). Fig. S55 shows triplicate TGA runs of Pinnacle without stabilizer, and Fig. 3B compares the TGA behavior of Pinnacle with and without anti-oxidant. It can be seen in Fig. S55 that a small amount of mass loss occurs on heating from room temperature to 150 °C. This is due to the loss of a small amount of residual TCB solvent that was used during anti-oxidant removal process and which was not completely eliminated by overnight vacuum drying at room temperature. Thermo-oxidative degradation begins at about 200 °C and is quite reproducible in the three runs.

The difference in thermo-oxidative stability between Pinnacle PP with and without anti-oxidant is clearly seen in Fig. 3B. The Pinnacle 2 Filters samples are those where the anti-oxidant was removed, and the data are the same as in Fig. S55. The three Pinnacle runs represent the actual Pinnacle mesh as received with anti-oxidant present, and the data are the same as in Fig. S51. Whereas the PP samples without anti-oxidant start to thermo-oxidatively degrade at about 200 °C, the Pinnacle with anti-oxidant starts to degrade only at higher temperature (about 240 °C). The effect of antioxidant is also to shift the entire thermo-oxidative degradation process to higher temperatures. Note that polypropylene always undergoes thermo-oxidative degradation in these experiments; the effect of antioxidant is only to delay the process. Likewise, the degradation of polypropylene exposed to an oxidative environment, such as the human body, can be delayed but

not prevented through use of antioxidants.

### 3.2. Characterization of explanted polypropylene mesh

#### 3.2.1. SEM and EDS results

SEM imaging of explanted PP-mesh samples showed various degrees of cracking transverse to the fiber axis. We have defined a numerical scale to quantify the degree of visible transverse cracking of the polypropylene fibers: 0 (no cracking); 1 (a few small cracks); 2 (numerous small cracks); 3 (significant cracking); 4 (severe cracking); 5 (very severe cracking). Examples of these different levels of damage are shown in the SEM images of Fig. 4.

#### 3.4.3.4 XP-3: Short time explant Pinnacle, cracking level 0.

Fig. 5 shows representative SEM images of a Pinnacle mesh which was explanted after 1 year and 7 months. The fibers are mostly clean of biological material and no horizontal cracking is evident. Fig. 5B is a higher magnification view of a section of the field of view of Fig. 5A.

Fig. 5C shows an image of the same region as Fig. 5B taken under conditions for EDS. Fig. 5D and E shows the EDS spectra taken from boxed Regions 1 and 2. Region 1 on the clean fiber shows peaks for carbon and oxygen indicating polypropylene that been damaged by oxidation. Region 2 yields a spectrum with significant nitrogen as well as sodium, another element associated with biological material, but not with polypropylene. These findings demonstrate that we are able to locate clean fiber in this sample and that oxidation of these fibers has occurred even before horizontal cracks appear. We are able to use a combination of SEM imaging and EDS to clearly distinguish between PP-fiber and biological material.

#### 3.4.3.8 XP-7: Intermediate time explant Pinnacle, cracking level 4.

Fig. 6 shows representative SEM images of a Pinnacle mesh explanted after 3 years and 3 months. Fibers were found that were largely clean of biological material and displayed severe horizontal cracking. In Fig. 6C, the fiber on the left is clean of biological material while the fiber on the right is encrusted with biological material.

Fig. 6D shows an image of the same region as Fig. 6C taken under conditions for EDS. Fig. 6E and F shows the EDS spectra taken from boxed Regions 1 and 2. Region 1 on the clean fiber shows peaks for carbon and oxygen indicating polypropylene that been damaged by oxidation. A trace of nitrogen is also present indicating that a very small amount of biological material may be present, but not enough to obscure the polypropylene fiber surface. Region 2, on the biomaterial coated fiber, yields a spectrum with significant nitrogen and sodium consistent with biological material. These findings show that we are able to locate clean fiber in this sample and that oxidation of these fibers has occurred and is accompanied by severe horizontal cracking.

#### 3.4.3.11 XP-10: Long time explant Pinnacle, cracking level 3.

Fig. 7D—F shows representative SEM images of a Pinnacle mesh explanted after 4 years and 5 months. Fibers were found that were largely clean of biological material and displayed significant horizontal cracking.

Fig. 7A shows an image of the same region as Fig. 7F taken under conditions for EDS. Fig. 7B and C show the EDS spectra taken from boxed Regions 1 and 2. Region 1 on the clean fiber shows peaks for carbon and oxygen indicating polypropylene that been damaged by oxidation. There is a trace amount of nitrogen present indicating the presence of some biological material but not enough to obscure the view of the horizontally cracked polypropylene surface. Region 2 yields a spectrum with significant nitrogen as well as some sodium, consistent with the presence of biological material.

The complete SEM and EDS data for all 11 explanted samples are given in the Supplementary Material (S56—S111).



**Fig. 4.** A) SEM image of polypropylene mesh fibers with a cracking level 0 (no cracking). [Pinnacle Control 1]. B) SEM image of polypropylene mesh fiber with cracking level 1 (a few small cracks) Cracks are visible near base of fiber in image. [XP-5]. C) SEM image of polypropylene mesh fiber with cracking level 2 (numerous small cracks) [XP-1]. D) SEM image of polypropylene mesh fiber with cracking level 3 (significant cracking) [XP-4]. E) SEM image of polypropylene mesh fiber with cracking level 4 (severe cracking) [XP-7]. F) SEM image of polypropylene mesh fiber with cracking level 5 (very severe cracking) [XP-8].

Four explanted specimens, all Pinnacles, were cleaned of residual biological material by soaking 24 h at room temperature in a sodium hypochlorite solution and drying in a vacuum oven at room temperature. Their FTIR spectra are given in Fig. 2B–F. All four explants (XP-8, XP-3, XP-10, and XP-7) are Pinnacles. Clear signs of oxidation are seen in the FTIR spectra of all four implants as evidenced by broad peaks centered around 3400 cm$^{-1}$ (hydroxyl and peroxide) and between 1700 and 1750 cm$^{-1}$ (carbonyl). These data are consistent with the study of Liebert et al. [5], who detected both hydroxyls and carbonyl in their infrared studies of polypropylene filaments explanted from hamsters after various periods of time.

The GPC chromatograms, obtained in triplicate for sample XP-3 using differential refractometry, a 15° light scattering detector, a 90° light scattering detector, and a viscosity detector, are shown in Figs. S112–S115 in blue and compared with the corresponding GPC traces (in red) of non-implanted Pinnacle (Pinnacle was also run in triplicate but only a single trace is shown in these figures because of their high reproducibility and to avoid clutter in the figures).

The high level of reproducibility of the triplicate runs is evident from the blue curves. It is apparent from all the chromatograms that the highest molecular weight components present in the non-implanted Pinnacle (those appearing at the smallest retention time) are lost upon implantation. The loss of the highest molecular weight components upon implantation is especially apparent with the light scattering and viscosity detectors, which are more sensitive to the higher molecular weight components in the sample. Preferential degradation of the highest molecular weight polymer chains is expected for a random degradation process; since higher molecular weight chains contain more bonds they are more likely to be broken. The loss of high molecular weight components may be quantified by comparing the weight-average molecular weights, Mw, and z-average molecular weights, Mz, for the two materials. Using a triple detector analysis, which takes into account results from RI, LS, and viscosity detectors, the non-implanted Pinnacle has Mz = 1,151,000 and Mw = 388,000 while the XP-3 explanted sample has Mz = 648,000 and Mw = 291,000. In addition, the

A. Imel et al. / Biomaterials 73 (2015) 131–141



**Fig. 5.** A) SEM of explanted Pinnacle Mesh fibers [XP-3]. B) SEM of explanted Pinnacle Mesh fibers [XP-3]. C) SEM image with regions selected for EDS. D) EDS Spectra from region 1 in C. E) EDS Spectra from region 2 in C

breadth of the molecular weight distribution is decreased for the XP-3 sample as compared to the non-implanted Pinnacle (Mw/Mn = 5.97 (Mn is number-average molecular weight)) for Pinnacle as compared to Mw/Mn = 3.44 for XP-3. This is also indicative of a chain scission process occurring during implantation; chain scission by "visbreaking" is commonly used in the polypropylene industry to reduce the breadth of the molecular weight distribution by selectively breaking longer chains [21]. Any random chain degradation process will eventually yield a most probable molecular weight distribution characterized by Mw/Mn = 2 [22].

The three other Pinnacle explants of adequate quantity for GPC analysis were also analyzed by SEC and the results are presented in the Supplementary Materials (S116–S127). These materials also showed clear evidence of chain scission: reduced Mz and Mw and narrowing of the polydispersity upon implantation.

## 4. Discussion

FTIR, SEM and EDS testing shows that the Pinnacle and Obtryx non-implanted control meshes reveal no signs of degradation and contain no oxygen, or only trace amounts, as one would expect from the chemical structure of pure polypropylene, which contains no oxygen bearing chemical functionality.

All the explanted samples, spanning the range from short to long implant times, show the presence of oxygen in the polypropylene fibers indicating that oxidation chemistry has occurred. FTIR shows peaks resulting from hydroxyl and hydroperoxide groups and from ketone, aldehyde, and carboxylic acids. All of these

chemical functionalities are oxygen containing products formed by the oxidative degradation of polypropylene. The oxidative degradation of polypropylene is also known to cleave polymer chains which reduces molecular weight and narrows the polydispersity of the molecular weight distribution. GPC testing shows reductions in z-average (Mz) and weight average (Mw) molecular weights and a narrowing in polydispersity (Mw/Mn) for the four explant samples tested. These included both Obtryx and Pinnacle meshes and included short intermediate and implantation times.

EDS also shows the presence of oxygen in all the explanted mesh samples. This oxidative degradation of explanted fibers is accompanies by cracking transverse to the fiber axis as observed by SEM. The cracking looks similar to that observed in previous SEM studies of degraded, explanted PP fibers from hernia and pelvic meshes produced by a number of manufacturers [8–11]. Our results show that cracking generally becomes progressively more severe with increasing length of implantation. Two out of four short time explants show no visible cracking of the fibers, but EDS indicates that oxidative degradation has already started to occur. Clearly, significant oxidation damage occurs in the fibers before the first cracks become visible.

These results are summarized in Table 2 and in Fig. 8.

Collectively, the testing results provide a consistent picture of polypropylene mesh fibers, which become oxidized upon implantation into the human body. This oxidation produces oxygen containing chemical functionalities that are detected by FTIR and EDS. All explanted samples show the presence of oxygen either by EDS, FTIR, or a combination of the two. Oxidative degradation of the

A. Imel et al. / Biomaterials 73 (2015) 131–141



**Fig. 6.** A) SEM of explanted Pinnacle Mesh fibers [XP-7]. B) SEM of explanted Pinnacle Mesh fibers [XP-7]. C) SEM of explanted Pinnacle Mesh fibers [XP-7]. D) SEM image with regions selected for EDS. E) EDS Spectra from region 1 in D. F) EDS Spectra from region 2 in D.

polypropylene results in a decrease in polypropylene molecular weight, which is known to reduce the strength of the fibers and can eventually lead to fiber failure. The degradation of the structure of the fibers due to oxidation and reduction in molecular weight eventually results in the appearance of horizontal cracking on the fiber surfaces, which becomes more severe at longer implantation times. This cracking is consistent with weakening of the implanted fibers. This overall picture of oxidative degradation of implanted PP fibers is consistent with previous studies on explanted PP fibers using the same and similar analytical techniques, as reviewed above.

Based on experiments in which degraded explant PP fibers were only extracted with hexane (i.e. no bleach treatment to remove biological material), Bracco [8] postulated that the primary cause of the cracked and degraded morphology of the PP fibers was their absorption of small organic molecules of biological origin including cholesterol, squalene, and esterified fatty acids. Subsequent researchers (Clave [11]; Lefranc [12]) have mentioned Bracco's small organic molecule hypothesis but have generally attributed degradation of the explanted PP fibers primarily to oxidation. It is our opinion that Bracco has shown that some small, biologically derived

organic molecules can be absorbed into the outer layers of implanted PP fibers. His study has not shown, however, that this process is the direct cause of fiber degradation, although it very well could be a contributing factor that aids oxidation. In the last paragraph of the *Discussion* section of their paper Bracco et al. [8] try to explain their idea as to how absorption of small organic molecules could contribute to fiber degradation. The phenomenon that they are trying to explain is well known to polymer scientists and is referred to as plasticization [23,24]. Plasticizers are small organic molecules that are absorbed into a solid polymer and soften it. The mechanism of this softening involves increasing the free volume space in amorphous regions of a solid polymer structure. The amorphous regions of the PP semicrystalline structure are susceptible to plasticization by absorption of the types of biological, small organic molecules that Bracco observed. In particular esterified fatty acids are well known to plasticize polymers [25–27]. It is likely that an increase in free volume of the amorphous regions of implanted PP fibers due to plasticization from the absorption of small, biological organic molecules facilitates increased penetration into the PP fibers by oxygen and other oxidizing chemical species, thus accelerating PP

*A. Imel et al. / Biomaterials 73 (2015) 131–141*



**Fig. 7.** A) SEM image of XP-10 with regions selected for EDS. B) EDS Spectra from region 1 in Figure 13A. C) EDS Spectra from region 2 in Fig. 7A. D) SEM of explanted Pinnacle Mesh fibers [XP-10]. E) SEM of explanted Pinnacle Mesh fibers [XP-10]. F) SEM of explanted Pinnacle Mesh fibers [XP-10].

fiber degradation due to oxidation.

## 5. Conclusions

The overall degradation process of PP pelvic meshes may be summarized as follows. The implant causes increased activity by oxidative enzymes in the vicinity of the implant. This leads to an oxidative degradation process that is evidenced by appearance of hydroxyl and then carbonyl groups in the polypropylene, as observed by infrared spectra. There is accompanying degradation of the polypropylene molecular weight, and this process may be delayed, but not prevented, by the presence of antioxidants in the polypropylene. Antioxidants are preferentially consumed by the

oxidizing species and finally the concentration falls below a level required to protect the polymer and oxidative degradation occurs [28]. This degradation is accompanied by a decrease in mechanical properties (embrittlement, loss of mass, decreased melting temperature, reduced compliance) of the polypropylene [9,28]. In particular, the surface and amorphous regions of the polypropylene are selectively degraded, resulting initially in cracks and, on longer exposure, fragmentation of the implant. In Figs. S102 and S103 the fact that the cracks actually penetrate into the body of the fiber is very evident. If a crack penetrates an entire fiber, then by definition the fiber is broken. Our SEM images (Fig. 4E and F, S74, S87, S91) show broken fiber ends in conjunction with surface cracking. Cracks, such as those visible in Fig. S103, result in a stress

A. Imel et al. / Biomaterials 73 (2015) 131–141                                                                                                                                    141

**Table 2**
Summary of testing results.

| Sample | Length of time implanted | Implant time Classification | Model | Cracking observed by SEM | Oxidation in fibers observed by EDS | Oxidation in fibers observed by FTIR | Mz from GPC | Mw from GPC | Mw/Mn from GPC |
|---|---|---|---|---|---|---|---|---|---|
| Obtryx Control | – | None | | 0 | no | no | 1,030,000 | 377,000 | 4.26 |
| Pinnacle Control 1 | – | None | | 0 | trace amounts | no | 1,151,000 | 388,000 | 5.97 |
| Pinnacle Control 2 | – | None | | 0 | no | not tested | | | |
| XP-1 | 1 YR, 4 MOS. | Short | Obtryx Halo | 2 | yes | not tested | | | |
| XP-2 | 1 YR, 6.5 MOS. | Short | Pinnacle | 0 | yes | not tested | | | |
| XP-3 | 1 YR, 7 MOS. | Short | pinnacle | 0 | yes | yes | 648,000 | 291,000 | 3.44 |
| XP-4 | 1 YR, 10 MOS. | Short | Pinnacle | 3 | yes | not tested | | | |
| XP-5 | 2 YRS, 2.5 MOS. | Intermediate | Pinnacle | 1 | yes | not tested | | | |
| XP-6 | 2 YRS, 11 MOS. | Intermediate | Pinnacle | 0 | yes | not tested | | | |
| XP-7 | 3 YRS, 3 MOS. | Intermediate | Pinnacle | 4 | yes | yes | 847,000 | 344,000 | 3.95 |
| XP-8 | 4 YRS, 1 MO. | Long | Pinnacle | 5 | not tested | yes | 735,000 | 326,000 | 3.53 |
| XP-9 | 4 YRS, 4 MOS. | Long | Pinnacle | 4 | yes | not tested | | | |
| XP-10 | 4 YRS, 5 MOS. | Long | Pinnacle | 4 | yes | yes | 742,000 | 314,000 | 3.91 |
| XP-11 | 4 YRS, 9 MOS. | Long | Obtryx Halo | 5 | yes | not tested | | | |



Fig. 8. Cracking seversity as a function of implanted time.

concentration and thus weaken the fiber, resulting in a tendency for cracks to deepen and fibers to fail. Costello (Reference 10) discusses PP fiber fragmentation as a result of implantation.

### Acknowledgments

This study was initially conducted in litigation and sponsored by claimants against Boston Scientific Corporation.

### Appendix A.  Supplementary data

Supplementary data related to this article can be found at http://dx.doi.org/10.1016/j.biomaterials.2015.09.015.

### References

[1] F.C. Usher, J. Ochsner, L.L. Tuttle, Use of Marlex mesh in the repair of incisional hernias, Am. Surg. 24 (1958) 969–974.

[2] B. Ratner, A.S. Hoffman, F.J. Schoen, J.E. Lemons, Biomaterials Science, Academic Press, 1996.

[3] D.F. Williams, Biodegradation of surgical polymers, J. Mater Sci. 17 (1982) 1233–1246.

[4] C. Vasile, Degradation and Decomposition, in: Handbook of Polyolefins, 2000. Ch. 17.

[5] T.C. Liebert, R.P. Chartoff, S.L. Cosgrove, R.S. McCluskey, Subcutaneous Implants of Polypropylene, J. Biomed. Mater Res. 10 (1976) 939–951.

[6] F.C. Usher, J. Ochsner, L.L. Tuttle, Use of Marlex mesh in the repair of incisional hernias, Am. Surg. 24 (1958) 969–974.

[7] L. Costa, M.P. Luda, L. Trossarelli, E.M. Brach del Prever, M. Crova, P. Gallinaro, In vivo UHMWPE biodegradation of retrieved prosthesis, Biomaterials 19 (1998) 1371–1385.

[8] P. Bracco, V. Brunella, L. Trossarelli, A. Coda, F. Botto-Micca, Comparison of polypropylene and polyethylene terephthalate (Dacron) meshes for abdominal wall hernia repair: A chemical and morphological study, Hernia 9 (2005) 51–55.

[9] C.R. Costello, S.L. Bachman, B.J. Ramshaw, S.A. Grant, Materials Characterization of Explanted Polypropylene Hernia Meshes, J. Biomed. Mater Res. Part B Appl. Biomat 83 (2007) 44–49.

[10] C.R. Costello, S.L. Bachman, S.A. Grant, D.S. Cleveland, T.S. Loy, B.J. Ramshaw, Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants from a Single Patient, Surg. Innov. 14 (2007) 168–176.

[11] A. Clave, H. Yahi, J.-C. Hammon, S. Montanari, P. Gounon, H. Clave, Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants, Int. Urogynecol. J. 21 (2010) 261–270.

[12] Olivier Lefranc, Yves Bayon, Suzelei Montanari, Philippe Gravagna, Michel Therin, Reinforcement Materials in Soft Tissue Repair: Key Parameters Controlling Tolerance and Performance – Current and Future Trends in Mesh Development, New Tech. Genit. Prolapse Surg. (2011). http://dx.doi.org/10.1007/978-1-84882-136-1_25.

[13] J.I. Goldstein, D.E. Newbury, P. Echlin, D.C. Joy, A.D. Romig Jr., C.E. Lyman, C. Fiori, E. Lifshin, Scanning Electron Microscopy and X-ray Microanalysis: A Text for Biologists, Materials Scientists, and Geologists, second ed., 1992. Chapters 5–9.

[14] M.J. Dykstra, Biological Electron Microscopy: Theory, Techniques, and Troubleshooting, 1992, p. 236.

[15] J.X. Li, W.L. Cheung, RuO4 Staining and Lamellar Structure of α- and β-PP, J. Appl. Polym. Sci. 72 (1999) 1529–1538.

[16] G.M. Brown, J.H. Butler, New method for the characterization of domain morphology of polymer blends using ruthenium tetroxide staining and low voltage scanning electron microscopy (LVSEM), Polymer 38 (1997) 3937–3945.

[17] John S. Trent, Jerry I. Scheinbeim, R. Peter, Couchman Ruthenium Tetraoxide Staining of Polymers for Electron Microscopy, Macromolecules 16 (1983) 589–598.

[18] S. Hong, A.A. Bushelman, W.J. MacKnight, S.P. Gido, D.J. Lohse, L.J. Fetters, Morphology of semicrystalline block copolymers: polyethylene-b-atactic-polypropylene, Polymer 42 (2001) 5909–5914.

[19] J.H. Lee, M.L. Ruegg, N.P. Balsara, Y. Zhu, S.P. Gido, R. Krishnamoorti, M. Kim, Phase Behavior of Highly Immiscible Polymer Blends Stabilized by Balanced Surfactants, Macromolecules 36 (2003) 6537–6548.

[20] Shujun Chen, Souvik Nandi, H. Henning Winter, Samuel P. Gido, Oriented lamellar structure and pore formation mechanism in CSX-processed porous high-density polyethylene, Macromolecules 39 (2006) 2849–2855.

[21] C. Grein, Toughness of Neat, Rubber Modified and Filled and Nucleated Polypropylene: From Fundamentals to Applications. In Intrinsic Mobility and Toughness of Polymers II, Adv. Polym. Sci. 188 (2005) 43–104.

[22] P.J. Flory, Principles of Polymer Chemistry, Cornell University Press, Ithaca, 1953, p. 321.

[23] I.M. Ward, Mechanical Properties of Solid Polymers, 2nd edition, John Wiley and Sons, New York, 1983, p. 174.

[24] J.J. Aklonis, W.J. MacKnight, Introduction to Polymer Viscoelasticity, second ed., John Wiley and Sons, New York, 1983, pp. 64–65.

[25] Frank P. Greenspan, Ralph J. Gall, Epoxy Fatty Acid Ester Plasticizers, Ind. Eng. Chem. 45 (1953) 2722–2726.

[26] Frank P. Greenspan, Ralph J. Gall, Epoxy Fatty Acid Ester Plasticizers. Preparation and Properties, J. Am. Oil Chem. Soc. 33 (1956) 391–394.

[27] E.M. Sadek, A.M. Motawie, A.M. Hassan, E.A. Gad, Synthesis and evaluation of some fatty esters as plasticizers and fungicides for poly(vinyl acetate) emulsion, J. Chem. Technol. Biotechnol. 63 (2) (1995) 160–164.

[28] C. Vasile, Degradation and Decomposition, in: C. Vasile (Ed.), Handbook of Polyolefins, second ed., Marcel Dekker, , New York, 2000. Ch. 20.

# EXHIBIT KK

J Mater Sci: Mater Med (2013) 24:1113–1122
DOI 10.1007/s10856-013-4872-y

# Materials characterization and histological analysis of explanted polypropylene, PTFE, and PET hernia meshes from an individual patient

A. J. Wood · M. J. Cozad · D. A. Grant ·
A. M. Ostdiek · S. L. Bachman · S. A. Grant

Received: 19 September 2012 / Accepted: 18 January 2013 / Published online: 31 January 2013
© Springer Science+Business Media New York 2013

**Abstract** During its tenure in vivo, synthetic mesh materials are exposed to foreign body responses, which can alter physicochemical properties of the material. Three different synthetic meshes comprised of polypropylene, expanded polytetrafluoroethylene (ePTFE), and polyethylene terephthalate (PET) materials were explanted from a single patient providing an opportunity to compare physicochemical changes between three different mesh materials in the same host. Results from infrared spectroscopy demonstrated significant oxidation in polypropylene mesh while ePTFE and PET showed slight chemical changes that may be caused by adherent scar tissue. Differential scanning calorimetry results showed a significant decrease in the heat of enthalpy and melt temperature in the polypropylene mesh while the ePTFE and PET showed little change. The presence of giant cells and plasma cells surrounding the ePTFE and PET were indicative of an active foreign body response. Scanning electron micrographs and photo micrographs displayed tissue entrapment and distortion of all three mesh materials.

**Keywords** Polypropylene · ePTFE · PET · FT-IR · DSC · Histology

## 1 Introduction

Abdominal wall hernias are a significant concern in the United States, with an estimated 800,000 new cases every year, which amounts to one new case every minute [1]. This number will likely increase as obesity (BMI $\geq$ 30) continues to rise in the United States. In 2008 the obesity prevalence for men was 32.2 and 35.5 % for women overall, while the prevalence of obesity in the U.S. grew approximately 5 % in all age categories for men and

A. J. Wood
Department of Biological Engineering, University
of Missouri-Columbia, 162 Agricultural Engineering Building,
Columbia, MO, USA
e-mail: Ajwq48@mail.missouri.edu

M. J. Cozad · A. M. Ostdiek
Department of Biological Engineering, University
of Missouri-Columbia, Room 148 Agricultural
Engineering Building, Columbia, MO 65211, USA
e-mail: mjcozad@mail.missouri.edu

A. M. Ostdiek
e-mail: ostdieka@missouri.edu

D. A. Grant
Department of Biological Engineering, University
of Missouri-Columbia, Room 210 Agricultural
Engineering Building, Columbia, MO 65211, USA
e-mail: grantdav@missouri.edu

S. L. Bachman
Department of General Surgery, University
of Missouri-Columbia, Mc423 McHaney Hall,
Columbia, MO 65211, USA
e-mail: bachmans@health.missouri.edu

S. A. Grant (✉)
Department of Biological Engineering, University
of Missouri-Columbia, Room 250 Agricultural
Engineering Building, Columbia, MO 65211, USA
e-mail: grantsa@missouri.edu



J Mater Sci: Mater Med (2013) 24:1113–1122

approximately 2–3 % in all age categories for women from 1999 to 2008 [2].

Since the mid-nineties, the most common method of repairing abdominal hernias has been the "tension-free" repair using a variety of synthetic mesh such as polyethylene, heavy weight polypropylene, expanded polytetrafluoroethylene (ePTFE), polyethylene terephthalate (PET), lightweight polypropylene, and even resorbable mesh materials [3]. But despite being a very common surgery, there is still a high percentage of primary hernia recurrence with the tension-free repair (10.1 % laparoscopic and 4 % open repair) and recurrent hernia repair (10.0 % laparoscopic and 14.1 % open repair) [4]. A large subset of recurrence surgeries may be due to the lack of mesh inertness in vivo. These materials result in a large foreign body response that some thought was necessary to repair the defect [3]. In recent years, there has been new evidence that a large foreign body response can result in physicochemical changes in the mesh material, which may lead to poor patient outcomes and recurrences [5–7].

While synthetic mesh is frequently utilized to repair hernias, these materials are also being utilized as pelvic slings for urogynecologic applications. Unfortunately, these mesh materials, also composed of polypropylene, PET, and ePTFE, are experiencing biocompatibility problems which are resulting in groin pain and prolapse [8, 9]. On July 13, 2011, the FDA issued a statement warning surgeons and patients about the complications associated with surgical mesh. More recently, the FDA is considering reclassifying urogynecologic surgical mesh used to repair pelvic organ prolapsed from Class II to Class III [10].

Synthetic meshes are recognized as foreign bodies and thus, are subjected to various enzymatic attacks by the body. The primary attack on the material is from neutrophils and macrophages, which are stimulated upon injury or implantation. The cells release lysosomal enzymes and oxidants that can actively break down some of the mesh materials [11]. The resulting degradation inflicted on the mesh and the resulting effect on the patient is a subject which requires more investigation in order to understand the mesh material-patient interactions and ultimately improve future mesh-material designs. However a difficulty faced in these studies are the individual patient responses (or subset population responses). A variety of patient factors, such as BMI and diabetes, can influence the wound healing response in patients. This diversity in patient populations makes it difficult to draw conclusions on the mechanism of mesh degradation and thus makes it difficult to predict the overall effectiveness of a mesh material in patient populations. In this paper, we present a materials study where a single patient received three different hernia mesh materials: ePTFE, PET, and heavy weight polypropylene. The study provides insight on how

three different materials reacted in the same biological environment. By understanding the materials-tissue responses in subset populations, the guesswork of material selection can be reduced and better patient outcomes will be achieved.

## 2 Materials and methods

### 2.1 Explanted hernia meshes

The patient was a 55-year-old white male who presented to the surgical clinic in June of 1974 with the chief complaint of a ventral hernia and obstruction. The patient came to the hospital after experiencing severe pain at the hernia site. His medical history was positive for gout, morbid obesity (BMI = 37.4), and sleep apnea. A previous user of tobacco products, the patient's surgical history also included a cholecystectomy. The patient had a total of three recurrent ventral hernia repairs. The dates for each surgery were June 2006, June 2007, and June 2009. Polypropylene and PET meshes were implanted in the June 2006 surgery. ePTFE was implanted in the June 2007 surgery. Three meshes of different materials (polypropylene, ePTFE, and PET) were explanted on the third recurrent hernia repair surgery in June 2009. The hernia meshes were removed due to ventral hernia recurrence and pain.

The hernia mesh specimens were removed from the patient according to an approved IRB protocol. Implantation time for the meshes were 3 years for the polypropylene and PET meshes and 2 years for the ePTFE mesh. Pristine samples of polypropylene, PET, and ePTFE meshes were utilized as a control comparison to the explants.

Upon removal from the patient, the explants were placed in a 10 % v/v formalin solution at room temperature. This was followed by a 2 h immersion in sodium hypochlorite (13 % active chlorine, Acros Organics, Morris Plains, NJ) to remove residual tissue from the mesh. Distilled water was then used to remove the sodium hypochlorite solution through a series of four rinses. Pristine samples were also subjected to this cleaning protocol before characterization. Our previous, unpublished studies show that the cleaning process does not induce any damage to the pristine mesh materials nor the explanted mesh.

### 2.2 Digital images

After cleaning, digital images were taken of the explants. Figure 1 shows an example of each pristine mesh and the corresponding explanted meshes. The pristine meshes are shown at a higher magnification so that the structure/ porosity of the mesh can be observed. The explanted meshes are shown at a lower magnification so that

J Mater Sci: Mater Med (2013) 24:1113–1122



**Fig. 1** Pristine samples of **a** polypropylene, **b** ePTFE, and **c** PET hernia mesh. Samples of explanted **d** polypropylene, **e** ePTFE, and **f** PET hernia mesh

discoloration and distortion of the mesh can be observed. In some locations on the explanted mesh, the distortion is permanent.

### 2.3 Scanning electron microscopy (SEM)

SEM was conducted to visually observe the surface morphology. Uncoated material samples from the hernia mesh explants and pristine specimens were viewed using a Quanta 600F Environmental SEM (FEI Company, Hillsboro, OR). Secondary electron images were taken using an accelerating voltage of 10 kV, 0.38 torr chamber pressure, and a 10–11.3 mm working distance.

### 2.4 Attenuated total reflectance fourier transform infrared spectroscopy (ATR-FTIR)

ATR-FTIR uses the absorption of infrared light due to the vibration characteristics of different bonds to identify chemical functional groups in a sample. Utilizing the ATR-FTIR, the specimens were analyzed to determine if any

surface chemical changes (absence or presence of functional groups) occurred during their in vivo tenure. The ATR crystal was utilized in order to perform surface scans which have a penetration depth of 2–4 μm. Spectra of polypropylene, PET, and ePTFE samples ($n = 6$) and corresponding pristine samples ($n = 6$) were collected by averaging 32 scans completed by a Nicolet 6700 FTIR spectrometer (Thermo Scientific, Waltham, MA) with a 4 cm$^{-1}$ resolution at ambient temperature. To determine if oxidation occurred in the polypropylene mesh, a quantitative comparison between samples and pristine was performed by integrating the carbonyl peak at 1,740 cm$^{-1}$ from the ATR-FTIR spectrum over the range 1,780–1,690 cm$^{-1}$. For ePTFE, CF=CF/C=O peaks were integrated over the range 1,770–1,690 cm$^{-1}$, and for ePTFE, the change in the 1,720 cm$^{-1}$ C=O over the range 1,790–1,650 cm$^{-1}$ was examined. Additionally, integration was also performed on the peaks at 1,450 and 1,339 cm$^{-1}$ for ePTFE and PET to determine the formation of additional surface hydrocarbons [12]. The first ePTFE peak at 1,450 cm$^{-1}$ was integrated between 1,490 and 1,430 cm$^{-1}$.



J Mater Sci: Mater Med (2013) 24:1113–1122

The second ePTFE peak at 1,339 cm$^{-1}$ was integrated between 1,390 and 1,330 cm$^{-1}$. The first PET peak at 1,450 cm$^{-1}$ was integrated between 1,490 and 1,420 cm$^{-1}$. The second PET peak at 1,339 cm$^{-1}$ was integrated between 1,350 and 1,310 cm$^{-1}$.

The 1740, 1450, and 1,339 cm$^{-1}$ peak areas from each mesh were divided by a reference peak area located at 2,720 cm$^{-1}$ for polypropylene, 2,366 cm$^{-1}$ for ePTFE, and 1,410 cm$^{-1}$ for PET. This was performed to normalize the peak areas and obtain peak indices. The indexed peak areas for the pristine and explanted samples were compared using GraphPad Prism v4.0 (GraphPad Software, San Diego, CA) to obtain percent differences between the means. To eliminate any pressure positioning errors with the ATR crystal, six measurements were taken and averaged for each specimen. The specimen holder on the ATR-FTIR applies consistent pressure, thus reducing errors.

### 2.5 Modulated differential scanning calorimetry (MDSC)

MDSC provides thermochemical data of bulk materials and thus can be used to determine a wide range of physical properties of materials, such as the heat of enthalpy ($\Delta H$) and the melting temperature $T_m$. Heat of enthalpy is defined as heat flow (energy) into a system which alters the materials molecular structure while the melt temperature is defined as the temperature at which the rigid structure of the molecules breaks down into a less ordered state. There is a phase change from solid to liquid. Samples ($n = 3$) from all three mesh types (PP, PET, and ePTFE) and corresponding pristine samples ($n = 3$) were prepared for MDSC to create thermal stability profiles. Samples ($5 \times 5$ mm) were obtained from the most "pristine-like" locations on the meshes to avoid the possibility of microscopic tissue adhesion. The samples were then hermetically-sealed in aluminum pans and subjected to MDSC under nitrogen flow using a Q2000 DSC (TA Instruments, New Castle, DE). Testing parameters included a ramp rate of 3 °C min$^{-1}$, a modulation of ±64 °C every 80 s, an initial temperature of −90 °C, and a final temperature of 220, 300, and 425 °C for PP, PET, and ePTFE, respectively. Results were returned in the form of thermograms with a plot of total heat flow (W/g) versus temperature (°C) from which $\Delta H$ and $T_m$ were determined.

### 2.6 Histology

Histological analysis was performed on representative samples from the ePTFE and PET meshes. Polypropylene mesh was not discovered in the patient explants until after the cleaning process, thus rendering the PP mesh ineligible for histology. The inability to detect polypropylene before the cleaning process can be attributed to a large amount of fatty and scar tissue encompassing the meshes. Samples of the ePTFE and PET meshes were fixed in 10 % formalin. They were embedded in paraffin, cut in 5 μm-thick sections, and processed for staining with hematoxylin and eosin (H&E). Viewing was done on a Zeiss Axiophot (Carl Zeiss Microimaging, Inc., Thornwood, NY) and photographs were taken using an Olympus DP70 (Olympus America Inc., Center Valley, PA) camera with DP Manager Version 1.21.107 as the acquisition software. Initially the slides were viewed at 10× and 20× to obtain an overall sense of the tissue reaction. Reactive areas were then examined and photographed at a magnification of 40×.

### 2.7 Statistical analyses

Experimental data was analyzed using GraphPad Prism v4.0 (GraphPad Software, San Diego, CA). One-way analysis of variance with a 95 % confidence interval was conducted. This was followed by a Dunnett's multiple comparison post-test to determine significant differences between the mean of the pristine group and the means of each of the experimental groups.

## 3 Results

### 3.1 SEM

SEM micrographs can be seen in Fig. 2. Micrographs of the pristine polypropylene mesh displayed relatively smooth surfaces with signs of extrusion while explanted polypropylene showed significant crazing/surface cracking which is indicative of oxidation [13]. ePTFE did not show any signs of surface degradation, but did show some shrinkage and tissue entrapment. The average pore size in the pristine sample (Fig. 2b) was measured to be between 150 and 200 μm while the explant (Fig. 2e) had significantly smaller pore sizes at 20–50 μm. PET fibers did not show any morphological alteration in vivo; the fibers were still intact without any crazing or cracking.

### 3.2 ATR-FTIR

Figure 3 shows a representative spectrum collected from the explanted polypropylene mesh along with a spectrum of a pristine polypropylene mesh. The scans revealed a large peak at ∼1,740 cm$^{-1}$, indicative of carbonyl groups (C=O), that was not evident in the pristine sample. This correlates with free radical formation and oxidation of the polypropylene mesh while in vivo [14–16]. The indexed area under the carbonyl peak for the explant was statistically higher ($p < 0.05$) than the pristine sample.

🖄 Springer

J Mater Sci: Mater Med (2013) 24:1113–1122                                                    1117



**Fig. 2** SEM images of pristine **a** polypropylene, **b** ePTFE, and **c** PET hernia mesh as well as explanted **d** polypropylene, **e** ePTFE, and **f** PET hernia mesh

**Fig. 3** ATR-FTIR scans of pristine polypropylene and a representative polypropylene explant illustrating the carbonyl (C=O) peak



Figure 4 shows a representative spectrum collected from the explanted ePTFE mesh along with a spectrum of a pristine ePTFE mesh. The results of the scan showed the presence of a peak at $\sim 1,740$ cm$^{-1}$ that was not present in the pristine ePTFE samples. This peak could represent CF=CF bonds or a carbonyl group [17, 18]. Additionally, the explanted ePTFE samples demonstrated peaks at $\sim 1,450$ and $\sim 1,339$ cm$^{-1}$, indicative of surface hydro-carbon formation, which could indicate the presence of scar tissue and/or chemical degradation [12]. The area under each peak was measured and compared to the pristine ePTFE samples. It was found that the indexed area under the $\sim 1,740$ cm$^{-1}$ peak was statistically higher ($p < 0.05$) than the pristine samples. The indexed area under the $\sim 1,450$ and $\sim 1,339$ cm$^{-1}$ peaks were also statistically higher ($p < 0.05$) than the pristine samples.

Figure 5 shows a representative spectrum collected from the explanted PET mesh along with a spectrum of a pristine

 Springer

J Mater Sci: Mater Med (2013) 24:1113–1122

**Fig. 4** ATR-FTIR scans of pristine ePTFE and a representative ePTFE explant illustrating the carbonyl (C=O) peak and two C–H stretching peaks



**Fig. 5** ATR-FTIR scans of pristine PET and a representative PET explant illustrating the carbonyl (C=O) peak and two C–H stretching peaks



PET mesh. The scans revealed peaks in the explant spectrum at $\sim 1720$, $\sim 1410$, and $1{,}339$ cm$^{-1}$ that were larger than the peaks in the pristine sample scans. The peak at $\sim 1{,}720$ cm$^{-1}$ in the pristine sample is primarily caused by terephthalic esters present in the PET backbone [14]. The increased peak area in the explant samples at $\sim 1{,}720$ cm$^{-1}$ can be attributed to oxidation/hydrolysis in the form of carbonyl bonds and/or scar tissue trapped in the PET fibers that was not removed in the cleaning step. The indexed peak area at $\sim 1{,}720$ cm$^{-1}$ was statistically higher ($p < 0.05$) than the pristine. The indexed peak area at the $\sim 1{,}410$ cm$^{-1}$ peak was statistically higher than the pristine ($p < 0.05$).

### 3.3 MDSC

Figure 6 shows the statistical results from the MDSC data for all pristine and explanted samples. Polypropylene demonstrated a 58 % decrease ($p < 0.05$) in the heat of

enthalpy and 3 % decrease ($p < 0.05$) in melt temperature as compared with pristine. There were no significant difference between the ePTFE explants and the pristine ePTFE samples or between the PET explants and the pristine PET samples.

### 3.4 Histology

H&E stained sections of ePTFE showed the host tissue had not penetrated the material, but there were several reactive areas clinging to the periphery of the ePTFE. Figure 7 shows the presence of Langhan's- type giant cells and lymphocytes next to the ePTFE (as denoted by the arrows). Langhans-type giant cells are large cells that are formed by the fusion of macrophages, resulting in an arcuate arrangement of nuclei. The lymphocytes are white blood cells that carry out the responsibilities of the immune system. There was a small pocket of neutrophils present in

🎄 Springer

J Mater Sci: Mater Med (2013) 24:1113–1122

1119



**Fig. 6** MDSC results **a** heat of enthalpy, and **b** melt temperature for pristine and explanted polypropylene (PP), ePTFE, and PET samples. Statistical difference (*$p < 0.05$)



**Fig. 7** Histology slide of ePTFE explants with H&E staining at 40×. The *arrows* are pointing at the Langhans-type giant cells, which are indicative of a continuous foreign body response (**a**) and at a lymphocyte (**b**)



**Fig. 8** Histology slide of PET explant with H&E staining at 40×. The mesh is shown as cylinders surrounded by tissue. The arrow is pointing at one of the Langhans-type giant cell (**a**), at one of the PET fibers (**b**), at the location of neovascularization (**c**), and one of the lymphocytes (**d**)

another view of the slide (not shown), but no signs of bacterial infection. Overall, the presents of these cells indicate a moderate granulomatous inflammatory reaction with occasional neutrophils, which is indicative of a chronic foreign body response. Figure 8 shows that PET is more integrated with the host tissue than ePTFE and has more fibrous tissue present. As denoted by the arrows, the PET is shown in the form of cylinders surrounded by tissue. There are signs of a chronic moderate granulomatous inflammatory reaction including several Langhans-type giant cells, lymphocytes, an occasional plasma cell and fibrous tissue interspersed with the PET fibers. Mild neovascularization was found to have taken place throughout the sections studied.

## 4 Discussion

A common factor demonstrated by all the explanted meshes was the permanent distortion of the mesh dimensions. As seen in Fig. 1d–f, the PP, ePTFE, and PET meshes have permanently deformed, either puckering at the

edges as in ePTFE or contracting and twisting with entwined tissue as with PP and PET. The cause for the distortion could be due to the inherent response of the body to foreign materials and the continual mechanical stresses encountered by the materials. During the foreign body response, scar tissue is deposited and fibrous encapsulation may occur. This can be compounded if there is continuous movement of the mesh due to normal physical activities of the patient. The laying down of myofibroblasts onto the mesh can result in contraction at the tissue-mesh interface resulting in the distortion of the mesh material and entrapment of tissue. In some cases, this tissue entrapment

is so dense that it is difficult to locate the mesh. Responses to the mesh such as these can result in recurrences. Additionally, enzymes and oxidants are also attacking the mesh which could result in chemical degradation of the mesh materials and thus permanent deformation. While the three different mesh materials showed similar visual responses with respect to distortion of mesh and tissue entrapment, they presented different mesh degradation responses.

### 4.1 Polypropylene

Polypropylene is a thermoplastic polymer; hence, it can be re-melted and reformed. Typically, polypropylene fibers are extruded in monofilament form and then woven into a particular monofilament or multi-filament design. With its methyl side groups off of the carbon backbone, polypropylene is hydrophobic, and it is usually resistant to many chemical solvents, bases and acids. Unfortunately, polypropylene will degrade in an oxidizing environment, such as the environment during a foreign body response. Because of this, polypropylene has been shown to oxidize in vivo [19]. Oxidization of polypropylene results in surface crazing and cracking, changes in mechanical strength, and increased brittleness. The SEM image shown in Fig. 2d demonstrates obvious crazing and cracking of the explanted polypropylene specimen as compared to the pristine mesh (Fig. 2a). Additionally, ATR-FTIR spectra in Fig. 3 confirmed the presence of carbonyl peaks which are indicative of surface oxidation. Previous studies have also shown the tendency of polypropylene to oxidize, which can be confirmed by the presence of the carbonyl peak [20].

Both the SEM and ATR-FTIR provide characterization of the surface morphology and surface chemistry, respectively, but it is also necessary to determine if the bulk properties of the polypropylene material also changes. Figure 6 displayed MDSC data which showed a significant difference in $\Delta H$ and $T_m$ between the explant and the pristine samples. In both cases, the explanted samples displayed a lower heat of fusion and lower melt temperature. This is indicative of chemical changes within the bulk structure of the material. During thermo-mechanical stress, chain scission can occur in polypropylene [20]. Chain scission results in shortening of the polymer chains which results in decreased mechanical strength of the mesh that may lead to rupture and tearing of the mesh.

### 4.2 ePTFE

Expanded PTFE is one of the most chemically stable materials. With its carbon backbone and fluorine side chains, it is also a highly hydrophobic material. Its material inertness makes it difficult to chemically modify its surface and thus it is very resistant to enzymatic attack

by the foreign body response. However, ePTFE still has a less than ideal response when utilized as a hernia mesh. Literature has shown ePTFE to undergo significant shrinkage and distortion resulting in recurrences [21]. In Fig. 1e, the ePTFE sample also shows the characteristic distortion and discoloration. The microstructure of ePTFE provides an ideal environment for myofibroblast cells to reside and contract resulting in shrinkage and distortion of the mesh. The SEM micrograph in Fig. 2e confirms that some shrinkage occurs; however, very little if any degradation of the ePTFE is noted microscopically. Histology confirmed the presence of chronic phase inflammatory cells, such as the giant cells and lymphocytes with some acute phase neutrophils present. These results indicate the lack of long-term biocompatibility. FTIR results confirmed the presence of functional groups not present on the pristine. These groups can be indicative of some slight chemical changes, but most likely are due to the scar tissue entrapment within the microscopic structure of the ePTFE. Thermal data seems to confirm the results of the SEM. MDSC data displayed no significant difference between the explanted and pristine ePTFE samples in terms of melt temperature and heat of enthalpy, indicating that the bulk chemical structure of the ePTFE did not change while in vivo.

### 4.3 PET

PET or better known as Dacron or polyester is processed in the form of a multi-filament fabric for hernia mesh materials as well as for other medical applications such as artificial vascular grafts. While still classified as hydrophobic, PET is more hydrophilic than PP. PET is susceptible to hydrolysis and has failed in vivo [22]. As a hernia mesh, PET also demonstrates scar tissue entrapment and distortion of the mesh as shown in Fig. 1f. Like ePTFE, PET did not display any morphological changes on the surface of the fibers as indicated in Fig. 2f. However, FTIR did demonstrate an increase C=O peak index over pristine, which is indicative of slight chemical modifications. The thermal data, MDSC, displayed no significant changes in the explanted PET compared to the pristine PET; however, the average heat of enthalpy and melt temperature were higher for the explants. These higher values can indicate that the material has undergone some type of crosslinking. Under mechanical stress, polyethylene will commonly undergo branching and chain crosslinking which changes the material properties [20]. As shown in the histology, the PET explants were integrated with the host tissue and showed more fibrous tissue formation and neovascularization. Like ePTFE, the mesh showed signs of chronic inflammation. These findings suggest the lack of long-term biocompatibility of synthetic materials.

J Mater Sci: Mater Med (2013) 24:1113–1122

All three mesh materials did not demonstrate tissue inertness. The mesh materials were distorted and/or contracted, along with tissue entrapment. The distortion appeared permanent in the PP mesh most likely due to changes in the materials properties caused by oxidation, while for the ePTFE and PET meshes, the distortion appears permanent as well but most likely due to scar tissue becoming entrapped within the mesh structure resulting in contraction. The continuous movement of the mesh during normal physical activities may have contributed to a continuous foreign body response, resulting in scar tissue. Mechanical stress and strain have been shown to affect the functionality of mesh materials [7, 23, 24]. Since all three mesh materials, PP, ePTFE, and PET, were implanted in a single patient, all three mesh experienced similar stresses on the abdominal wall that can be transferred to the mesh material. During the course of a normal day, the pressure within the abdomen can be elevated as during exercise or reduced as during periods of relaxation. This results in repetitious changes in stress and strain experienced by the mesh material. It is not conclusive whether this continuous loading and unloading results in reduced tensile strength or increase the strain of the mesh materials. However, a recent in vitro study demonstrated that the tensile strength of e-PTFE and polypropylene mesh was significantly reduced when undergoing continuous loading (1,000 cycles) while the strain increased [23]. These findings suggested that repetitious loading may lead to deterioration of the mechanical properties of the mesh material, which can lead to increase foreign body response and poor functional results.

## 5 Conclusion

Three different mesh materials were explanted from a single patient so that a side-by-side materials characterization could be performed. The polypropylene mesh demonstrated chemical degradation via oxidation, permanent distortion of the mesh, and changes in thermal properties. While chemical degradation was not conclusively evident in PET and ePTFE, the presence of scar tissue, the histology results, and contraction/distortion of the material were indicative of lack of long-term biocompatibility and lack of inertness. While the results of the characterization study showed that polypropylene will undergo oxidation, ePTFE and PET appeared to be more chemically resistant to the enzymatic attack from the foreign body response. However, this study showed that chemical resistance is not enough to ensure biocompatibility. Mesh distortion and scar formation were evident for all the materials. The next generation of mesh materials needs to promote new tissue regeneration and integration while avoiding scar tissue formation and fibrous encapsulation.

**Acknowledgments** This research was supported in part by the University of Missouri Life Sciences Predoctoral Fellowship, the University of Missouri F21C, and BICAM (Biomaterials Innovation, Characterization, and Analysis of Missouri) laboratory at the University of Missouri.

## References

1. Everhart JE, editors. Digestive diseases in the united states: epidemiology and impact. Washington, DC: U.S. Government Printing Office 2004. National Institute of Health Publication No. 94-1447.

2. Flegal KM, Carroll M, Ogden C, Curtin L. Prevalence and trends in obesity among US adults: 1999–2008. JAMA. 2010;303(3): 235–1.

3. Iqbal Y. Controversies in inguinal hernia repair. Outpatient Surg Mag. 2000;1(8). http://www.outpatientsurgery.net/issues/2000/08/controversies-in-inguinal-hernia-repair.

4. Neumayer l, Giobbie-Hurder A, Jonasson O, Fitzgibbons R, Dunlop D, Gibbs J, Reda D, Henderson W. Open mesh versus laparoscopic mesh repair of inguinal hernia. N Engl J Med. 2004; 350:1819–7.

5. Cozad M., Ramshaw BR, Grant DN, Bachman SL, Grant DA, Grant SA. Materials characterization of explanted polypropylene, polyethylene terephthalate, and expanded polytetrafluoroethylene composites: spectral and thermal analysis. J Biomed Mater Res B. 2010;49B:455–2.

6. Costello CR, Bachman SL, Ramshaw BR, Grant SA. Materials characterization of explanted heavyweight polypropylene hernia meshes. J Biomed Mater Res B. 2007;83B:44–9.

7. Deeken CR, Abdo MS, Frisella MM, Matthews BD. Physico-mechanical evaluation of polypropylene, polyester, and polytetrafluoroethylene meshes for inguinal hernia repair. J Am Coll Surg. 2011;212(1):68–79.

8. Laurikainen EH, Valpas A, Kivela A, Kalliola T, Rinne K, Takala T, Nilsson CG. Retropubic compared with transobturator tape placement in treatment of urinary incontinence: a randomized controlled trial. Obstet Gynecol. 2007;109:4–11.

9. Rehder P, Glodny B, Richler R, Mitterberger MJ. Massive retropubic hematoma after minimal invasive mid-urethral sling procedure in a patient with a corona mortis. Eur Urol. 2008;53: 288–308.

10. U.S. Food and Drug Administration. Urogynecologic Surgical Mesh Implants. http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/ImplantsandProsthetics/UroGynSurgicalMesh/default.htm. Accessed 1 April 2012.

11. Costello CR, Bachman SL, Cleveland DS, Loy TS, Grant SA, Ramshaw BR. Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient. Surg Innov. 2007;14:168–76.

12. Mihaly J, Sterkel S, Ortner H, Kocsis L, Hajba L, Furdyga E, Mink J. FTIR and FT-Raman spectroscopic study on polymer based high pressure digestion vessels. Croat Chem Acta. 2006;79:497–501.

13. Ratner B, Hoffman AS, Schoen FJ, Lemons JE, editors. Biomaterials science. London: Elsevier Academic Press; 1996. p. 243–4.

14. Bracco P, Brunella V, Trossarelli L, Coda A, Botto-Micca F. Comparison of polypropylene and polyethylene terephthalate (Dacron) meshes for abdominal wall hernia repair: a chemical and morphological study. Hernia. 2005;9:51–5.

15. Fayolle B, Audouin L, Verdu J. Oxidation induced embrittlement in polypropylene—a tensile testing study. Polym Degrad Stab. 2000;70:333–40.



J Mater Sci: Mater Med (2013) 24:1113–1122

16. He P, Xiao Y, Zhang P, Xing C, Zhu N, Zhu X. Thermal degradation of syndiotactic polypropylene and the influence of stereoregularity on the thermal degradation behavior by in situ FTIR spectroscopy. Polym Degrad Stab. 2005;88:473–9.

17. Lappan U, Geibler U, Lunkwitz K. Electron beam irradiation of polytetrafluoroethylene in vacuum at elevated temperature: an infrared spectroscopic study. J Appl Polym Sci. 1999;74:1571–6.

18. Pugmire DL, Wetteland CJ, Duncan WS, Lakis RE, Schwartz DS. Cross-linking of polytetrafluoroethylene during room-temperature irradiation. Polym Degrad Stab. 2009;94:1533–41.

19. Clave A, Yahi H, Hammou JC, Montanari S, Gounon P, Clave H. Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J. 2010;21:261–70.

20. Waler C, Sigbritt K. Assessment of thermal and thermo-oxidative stability of multi-extruded recycled PP, HDPE and a blend thereof. Polym Degrad Stab. 2002;78:385–91.

21. Burger JWA, Halm JA, Wijsmuller AR, ten Raa S, Jeekel J. Evaluation of new prosthetic meshes for ventral hernia repair. Surg Endosc Other Interv Tech. 2006;20(8):1320–5.

22. Riepe G, Loos J, Imig H, Schroder A, Schneider E, Petermann J, Rogge A, Ludwig M, Schenke A, Nassutt R, Chakfe N, Morlock M. Long-term in vivo alterations of polyester vascular grafts in humans. Eur J Vasc Endovasc Surg. 1997;13:540–8.

23. Elison BJ, Frisella MM, Matthews BD, Deeken CR. Effect of repetitive loading on the mechanical properties of synthetic hernia repair materials. J Am Coll Surg. 2011;213(3):430–5.

24. Hernández-Gascón B, Peña E, Melero H, Pascual G, Doblaré M, Ginebra MP, Bellón JM, Calvo B. Mechanical behavior of synthetic surgical meshes: finite element simulation of the herniated abdominal wall. Acta Biomater. 2011;7:3905–13.



# EXHIBIT LL

# Materials Characterization of Explanted Polypropylene Hernia Meshes

C. R. Costello,[1] S. L. Bachman,[2] B. J. Ramshaw,[2] S. A. Grant[1]

[1] Department of Biological Engineering, University of Missouri-Columbia, Columbia, Missouri

[2] Department of General Surgery, University of Missouri-Columbia, Columbia, Missouri

*Received 18 September 2006; revised 9 November 2006; accepted 20 November 2006*
*Published online 6 February 2007 in Wiley InterScience (www.interscience.wiley.com). DOI: 10.1002/jbm.b.30764*

**Abstract:  Hernia repair with prosthetic mesh significantly decreases the rate of recurrence compared with traditional, primary suture repair by reducing the tension on the edges of the wound. However, there are several complications associated with the use of mesh that may be due to the chronic inflammatory reaction to the mesh or a loss of compliance after degradation of the material. Mesh contraction and migration can also occur, sometimes resulting in a recurrent hernia. Based on the chemical structure of the polypropylene mesh material and the physiological conditions to which it is subjected, it is possible that oxidation is responsible for these changes in material properties. Oxidation would result in surface cracking, decreased melting temperature, loss of mass, and reduced compliance of the material. The objective of this study was to identify physiochemical changes in the surface and bulk properties of explanted polypropylene hernia meshes compared to pristine polypropylene mesh materials. Several characterization techniques were utilized, including scanning electron microscopy, differential scanning calorimetry, thermogravimetric analysis, and compliance testing. Overall, the results supported our hypothesis that oxidation is involved with the degradation of polypropylene hernia mesh materials.** © 2007 Wiley Periodicals, Inc. J Biomed Mater Res Part B: Appl Biomater 83B: 44–49, 2007

**Keywords:  differential scanning calorimetry (DSC); hernia meshes; oxidation; polypropylene; scanning electron microscopy (SEM); thermogravimetric analysis (TGA)**

## INTRODUCTION

Over 20 million hernia repairs are performed worldwide each year using a variety of surgical techniques.[1] Historically, hernia repairs were accomplished by approximating the edges of the abdominal fascial defect using wire, and later polypropylene permanent sutures.[2] Unfortunately, this type of repair places a great deal of tension on the wound, leading to tissue ischemia, wound dehiscence, and a recurrence rate of up to 63%.[2] During the past 50 years, several techniques for both open and laparoscopic hernia repair have been developed, including underlay (intraperitoneal and preperitoneal), onlay, and inlay placement of a mesh material to repair the defect. These techniques have been shown to reduce recurrence rates to 32% or less for open repair[3] and less than 5% for laparoscopic repair.[4]

Despite this tremendous decrease in the hernia recurrence rate, which prosthetic implants have made possible, these materials can be problematic. In 2002, Kumar et al. reported that approximately 30% of patients experience pain or discomfort following inguinal hernia repair, and more than half of those patients are unable to participate in daily, physical or athletic activities due to the severity of the pain.[5] There are many potential sources of chronic pain, including stiffening of the abdominal wall due to an intense inflammatory reaction to the mesh material. In addition, nerve damage may result from entrapment in this scar tissue or from the mesh fixation method utilized in the surgical procedure. It is possible that an ongoing inflammatory response to the permanent implant is responsible for these complications.

Despite the potential for improvement in recurrence rates and wound complications, a laparoscopic hernia repair still involves implantation of a foreign body, and mesh fixation causes injury to the surrounding tissue. This activates phagocytic cells such as neutrophils, monocytes, and macrophages to respond to the injury, where their primary roles are to degrade debris and foreign materials prior to wound healing, as well as to recruit more inflammatory cells to the site. To accomplish this, these cells metabolize oxygen and secrete lysosomes containing radicals such as superoxide anions, as well as very strong oxidants such as hydrogen peroxide and

*Correspondence to:* S. A. Grant (e-mail: grantsa@missouri.edu)
Contract grant sponsors: National Science Foundation Graduate Research Fellowship; the University of Missouri-Columbia Food for the 21st Century (F21C)

© 2007 Wiley Periodicals, Inc.





**Figure 1.** Kugel Composix hernia mesh immediately after explantation.

hypochlorous acid.[6] In the case of a large, permanent implant such as a hernia mesh, the material will never be completely degraded and removed from the body. This results in continuous activation of phagocytic cells and generation of oxidants. Histological studies have documented this prolonged inflammatory reaction over the lifetime of the implant. In a study of several types of explanted materials, including polypropylene, expanded polytetrafluoroethylene, and polyester terephthalate, Klinge et al. reported that cells such as macrophages, polymorphonuclear leukocytes, and lymphocytes are present at the tissue-mesh interface even up to 8 years after the surgery.[7] Specialized cells called foreign-body giant cells begin to populate the surface of the mesh, and can lead to granuloma formation.[8] This prolonged inflammatory response is thought to cause fibrosis and a rigid scar plate to form around the mesh material, particularly in the case of polypropylene meshes, leading to chronic pain and reduced mobility.[8,9]

As a result of this chronic inflammatory response, the mesh material is exposed to a continuous bath of oxidants. Aliphatic hydrocarbons such as polypropylene are known to be highly susceptible to oxidative attack. These materials contain functional groups that are easily cleaved, which then produces a resonance stabilized free radical.[6] Continuous exposure of polypropylene to these oxidants may lead to chain scission, production of free radicals, and overall degradation of the material, both physically and chemically.[10–13] This degradation is evidenced by fissures, microcracks with a build-up of hydroxyl and carbonyl groups on the surface of the material, changes in thermal properties such as decreased glass transition and melting temperatures, weight loss, and changes in mechanical properties such as embrittlement and reduced compliance.[10–13]

Because of the susceptibility of polypropylene to oxidation and the evidence of embrittlement and reduced compliance of the material *in vivo*, it is our hypothesis that oxidation is responsible for the some of the complications associated with polypropylene hernia repair materials. We expect that the physiochemical changes that are indicative of oxidation will be apparent after characterization of explanted mesh materials via scanning electron microscopy (SEM), differential scanning calorimetry (DSC), thermogravimetric analysis (TGA), and compliance testing.

## MATERIALS AND METHODS

### Explanted Hernia Meshes

Polypropylene hernia repair materials were removed from patients requiring revision surgery due to chronic pain, recurrence, infection, adhesions, or other complications. An example of an explanted mesh is shown in Figure 1, and the contraction and embrittlement of the material are evident. The study was approved by the University of Missouri-Columbia's IRB committee, and each explant was given a sequential specimen number unrelated to any identifiable patient data. All 14 samples included in this study were the polypropylene components from polypropylene/expanded polytetrafluoroethylene composite hernia mesh such as Composix E/X or Kugel Composix (C.R. Bard, Cranston, RI), shown in Figure 2.

### Tissue Removal

After explantation, the meshes were immersed in a 10% v/v formalin solution and stored at room temperature. Prior to testing, any adherent tissue was removed from the meshes by soaking in a sodium hypochlorite solution for 2 h at 37°C (6–14% active chlorine, Sigma Aldrich, St. Louis, MO). Each mesh was then rinsed several times with distilled water to remove any residual sodium hypochlorite solution and allowed to dry overnight. The explanted mesh shown earlier



**Figure 2.** Pristine Kugel Composix hernia mesh.

*Journal of Biomedical Materials Research Part B: Applied Biomaterials*
DOI 10.1002/jbmb

46                                                                                COSTELLO ET AL.



**Figure 3.** Explanted Kugel Composix hernia mesh after tissue removal.

is now shown in Figure 3 after the tissue has been removed. The mesh remains contracted, suggesting a permanent deformation of the material while *in vivo*. Pristine samples of a Composix E/X mesh (C.R. Bard, Cranston, RI) were also subjected to the same cleaning process and used in all subsequent tests for comparison with explanted samples.

### Scanning Electron Microscopy

Micrographs of each explanted mesh, as well as those from a pristine Composix E/X mesh, were obtained using a Hitachi S-4700 Scanning Electron Microscope with a secondary electron detector operated at an accelerating voltage of 5 keV. Prior to imaging, all samples were mounted and sputter-coated with platinum for 120 s at 20 mA (Emitech K575X Peltier Cooled Sputter Coater, Emitech Products, Houston, TX).

### Differential Scanning Calorimetry

DSC was performed in order to identify changes in melting temperature and heat of fusion. Mesh samples having a mass of 1–3 mg were hermetically sealed in aluminum pans, and an empty pan was used as a reference. A PyrisTM1 Differential Scanning Calorimeter with TAC 7/PC Thermal Analysis Controller (Perkin-Elmer, Norwalk, CT) was programmed to heat the sample from 50 to 400°C at 10°C/min under the flow of nitrogen and record changes in heat flow as a function of temperature.

### Thermogravimetric Analysis

TGA was carried out in order to measure chemical changes in the explanted mesh materials such as decomposition of the material. This was quantified as the percent of weight lost during the thermal event. Samples of both explanted and pristine meshes were cut to fit within the sample pan of the TGA (approximately 5 mm × 5 mm). A Q Series

Thermogravimetric Analyzer, TGAQ50 (TA Instruments, New Castle, DE), was programmed to heat the sample from ambient temperature to 600°C at 10°C/min under the flow of nitrogen and record the weight lost as a function of temperature.

### Compliance Test

Prior to performing compliance testing, each explanted mesh, as well as a pristine Composix E/X, were cut into three squares (6.45 cm$^2$ each) and soaked overnight in 1× phosphate-buffered saline (pH 7.4) at 37°C to allow for equilibration at physiological conditions. A Texture Analyzer, TA.XT2, with XTRA Dimension software (Texture Technologies, Scarsdale, NY) was then programmed to simulate the physiological conditions of bending at the waist or abdominal crunch exercises. This was accomplished by using a rounded blade to bend the mesh in half and push it through a 2.92 cm$^2$ slot at a rate of 0.2 mm/s. The total work in Joules was recorded and analyzed as a measure of the compliance of the material.

### Statistical Analyses

All statistical analyses were carried out using GraphPad Prism version 4.0 (GraphPad Software, San Diego, CA). A one-way analysis of variance with a 95% confidence interval and Dunnett's post-test was used to determine whether the differences in the means of the explanted materials versus a pristine sample were significant ($n = 3$, $p < 0.05$).

## RESULTS

### Scanning Electron Microscopy

As shown in Figure 4, SEM micrographs of the polypropylene component of a pristine Composix E/X mesh revealed smooth fibers without any evidence of surface degradation



**Figure 4.** SEM of the polypropylene component of a pristine Composix E/X mesh.



**Figure 5.** SEM of an explanted polypropylene mesh with transverse cracks.

such as cracks or fissures. Conversely, as shown in Figures 5–7, the explanted polypropylene specimens appeared badly degraded, including cracks, fissures, and increased surface roughness. Micrographs of 79% of all explanted specimens exhibited cracks in the transverse or longitudinal direction, 57% showed what appeared as a peeling of the fiber surface, and 64% displayed a rough, blistered surface. Overall, 85% of the explanted specimens possessed at least two or more of these types of surface structures.

### Differential Scanning Calorimetry

Figure 8 depicts the results of DSC for two explanted specimens versus the pristine polypropylene specimen. Although this graph depicts only two explanted specimens, it is representative of the results obtained for all 14 explants. All explants displayed a lower melting temperature of approximately 163°C on average as compared to 166°C for the pristine, with five of the 14 explants having a $p$-value $< 0.05$. Half of the explants exhibited broader melting peaks, and the majority possessed a smaller area under the curve.

### Thermogravimetric Analysis

After TGA, each thermogram was integrated to obtain the area under the curve. This provided a quantitative analysis of the entire thermal event of each explant, rather than just an analysis of the conditions at the peak temperature. Figure 9 depicts the resulting thermograms for two explanted specimens versus the pristine polypropylene specimen. All explanted specimens exhibited a shift in the peak temperature from 458°C for pristine materials to a higher temperature of approximately 465°C on average for the explanted meshes. The majority of the explants had a $p$-value $< 0.05$, and nearly all displayed a smaller mean area under the curve of 9.67% versus 12.04% for pristine materials.

### Compliance Test

The mean value for the total work required to fold each mesh in half and push it through the slot is shown in Figure 10. Nearly all explanted materials required more work than the pristine Composix E/X mesh, with values ranging from 4 times the work required for a pristine mesh to nearly 30 times this value, indicating an overall decrease in the compliance of these materials.

### DISCUSSION

The objective of this study was to determine whether oxidation plays a role in the degradation of polypropylene hernia materials while *in vivo*. Thus, physiochemical analysis was performed on 14 explanted specimens as well as pristine specimens. The results from SEM, DSC, TGA, and compliance testing provided strong support that oxidative degradation was occurring *in vivo*.

The SEM micrographs displayed images of materials that were vastly different in topology than the pristine materials. The micrographs of explanted polypropylene materials exhibited cracks, surface roughness, and peeling indicative of surface degradation,[6,10,12] while the pristine materials appeared smooth.

DSC results displayed melting temperatures and heat of fusion in explanted materials that were lower than the pristine values. The melting peak of the explanted materials was also broader; most likely due to increased polydispersity of the material. The majority of the explanted polypropylene mesh samples displayed a change from the pristine for all three of these effects, indicating that oxidation of the material may have occurred while *in vivo*; however, not all of these effects were considered statistically significant. The lack of statistical significance for all the samples may be due to the shorter implantation times experienced by some of the explants.



**Figure 6.** SEM of an explanted polypropylene mesh with blisters on the fibers.

48                                                    COSTELLO ET AL.



**Figure 7.** SEM of an explanted polypropylene mesh with "peeling" fibers.

Oxidized materials are expected to undergo some degree of weight loss as the material is degraded by the body.[10,12] Thus oxidized materials should have less weight available to be lost during TGA. Weight loss during TGA is reflected in the area under the curve, and so oxidized materials should display less area under the curve. As expected, the majority of the explanted polypropylene specimens showed significantly less weight loss during TGA as compared to the pristine Composix E/X specimen, further strengthening the argument that these materials underwent oxidation *in vivo*.

The results of the compliance test on explanted polypropylene materials indicate reduced compliance in all but one explant, which is evidence of oxidation[11,13] as well as a potential explanation for decreased abdominal wall function and chronic pain. Welty et al. examined patients using 3D stereography to measure the stiffness of the abdominal wall following hernia repair with a polypropylene mesh material. The results of this study indicated that patients complained of paresthesia 4–58% of the time, depending on the "*weight*" (g/m²) of the polypropylene material and had



**Figure 8.** DSC thermograms of explanted and pristine specimens.



**Figure 9.** TGA thermograms of explanted and pristine specimens.

*Journal of Biomedical Materials Research Part B: Applied Biomaterials*
DOI 10.1002/jbmb



**Figure 10.** Total work required for compliance testing of explanted and pristine specimens.

difficulty performing daily tasks up to 17% of the time. Three-dimensional stereography of three types of polypropylene revealed decreased abdominal wall curvature and decreased height. These findings correspond to increased abdominal wall stiffness and patient complaints of pain and restricted mobility.[8]

During the implantation period, the surface of the explanted materials stimulated the foreign body response that, in turn, produced oxidants such as hydrogen peroxide and hypochlorous acid. Polypropylene is susceptible to oxidation due to its chemical structure. During oxidation of polypropylene, the C—H bonds along the polymer backbone are broken, leading to bulk degradation of the polymer.[10,12] While the analysis of the physiochemical factors of the explanted and pristine specimens provided evidence of oxidation, there are many factors that will affect the severity of oxidation. Since the explants were removed from the patients due to complications of the mesh, the explanted materials have a variety of implantation times ranging from months to years. The severity of the oxidation of the polypropylene material is likely affected by the implantation time, as well as other unique, patient factors such as age, history of smoking, body mass index (BMI), pulmonary disease, diabetes, and potential genetic variation, including variable inflammation and collagen defects. Because all 14 explanted specimens had different implantation times and different patient histories, not all of the findings were statistically significant. Future studies will focus on these factors that may contribute to the rate of degradation, and currently, a manuscript is in progress that correlates many of these factors to the rate of material degradation. In addition, other tests will be performed, such as chemical analyses using Fourier transform infrared spectroscopy (FTIR). FTIR would provide information about the chemical species present on the surface of the materials, further strengthening the evidence of oxidation. Future tests may also include molecular weight determination, which was not performed here due to the difficulty in determining the molecular weight of a 2 component (polypropylene and expanded polytetrafluoroethylene) composite hernia mesh.

## CONCLUSION

An investigative study was performed to identify physiochemical changes in the surface and bulk properties of explanted polypropylene hernia meshes compared to pristine samples. Our results supported our hypothesis and indicated that the explanted polypropylene meshes did undergo degradation while *in vivo*, most likely due to oxidation.

The authors thank David Grant, Phillip Kelchen, Jill Jouret, Dan Christiansen, Dr. Dava Cleveland, René Blagg, Darcy Lichlyter, and Harold Huff for their contributions to this study.

## REFERENCES

1. Kingsnorth A. Introduction to current practice of adult hernia repair. World J Surg 2005;29:1044–1045.
2. Read RC. The contributions of Usher and others to the elimination of tension from groin herniorrhaphy. Hernia 2005;9: 208–211.
3. Burger JWA, Luijendijk RW, Hop WCJ, Halm JA, Verdaasdonk, EFF, Jeekel J.  Long-term follow-up of a randomized controlled trial of suture versus mesh repair of incisional hernia. Ann Surg 2004;240:578–585.
4. Heniford BT, Park AE, Ramshaw BJ, Voeller G. Laparoscopic repair of ventral hernias nine years' experience with 850 consecutive cases. Ann Surg 2003;238:391–400.
5. Kumar S, Wilson RG, Nixon SJ, Macintyre IMC. Chronic pain after laparoscopic and open mesh repair of groin hernia. Br J Surg 2002;89:1476–1479.
6. Ratner B, Hoffman AS, Schoen FJ, Lemons JE. Biomaterials Science. San Diego, CA: Academic Press; 1996. pp 243–254.
7. Klinge U, Klosterhalfen B, Muller M, Schumpelick V. Foreign body reaction to meshes used in the repair of abdominal wall hernias. Eur J Surg 1999;165:665–673.
8. Welty G, Klinge U, Klosterhalfen B, Kasperk R, Schumpelick V. Functional impairment and complaints following incisional hernia repair with different polypropylene meshes. Hernia 2001;5:142–147.
9. Cobb WS, Kercher KW, Heniford BT. The argument for lightweight polypropylene mesh in hernia repair. Surg Innov 2005;12:63–69.
10. Kausch HH. The effect of degradation and stabilization on the mechanical properties of polymers using polypropylene blends as the main examples. Macromol Symp 2005;225:167–178.
11. Fayolle B, Audouin L, Verdu J. Oxidation induced embrittlement in polypropylene-a tensile testing study. Poly Deg Stab 2000;70:333–340.
12. Yakimets I, Lai D, Guigon M. Effect of photo-oxidation cracks on behavior of thick polypropylene samples. Poly Deg Stab 2004;86:59–67.
13. Fayolle B, Audouin L, Verdu J. Initial steps and embrittlement in the thermal oxidation of stabilized polypropylene films. Poly Deg Stab 2002;75:123–129.

# EXHIBIT MM

Original Articles

# Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants From a Single Patient

Surgical Innovation
Volume 14 Number 3
September 2007  168-176
© 2007 Sage Publications
10.1177/1553350607306356
http://sri.sagepub.com
hosted at
http://online.sagepub.com

C. R. Costello, BSBE, S. L. Bachman, MD, S. A. Grant, PhD,
D. S. Cleveland, DO, T. S. Loy, MD, and B. J. Ramshaw, MD

Although polypropylene has been used as a hernia repair material for nearly 50 years, very little science has been applied to studying the body's effect on this material. It is possible that oxidation of mesh occurs as a result of the chemical structure of polypropylene and the physiological conditions to which it is subjected; this leads to embrittlement of the material, impaired abdominal movement, and chronic pain. It is also possible that lightweight polypropylene meshes undergo less oxidation due to a reduced inflammatory reaction. The objective of this study was to characterize explanted hernia meshes using techniques such as scanning electron microscopy, differential scanning calorimetry, thermogravimetric analysis, and compliance testing to determine whether the mesh density of polypropylene affects the oxidative degradation of the material. The hypothesis was that heavyweight polypropylene would incite a more intense inflammatory response than lightweight polypropylene and thus undergo greater oxidative degradation. Overall, the results support this theory.

**Keywords:** hernia mesh; inflammation; lightweight; materials characterization; oxidation; polypropylene

## Introduction

Dr Francis Usher first published the use of polypropylene mesh as a hernia repair material in 1958.[1] At the time, polypropylene presented a significant improvement over the metal materials and the sutures that had been used to repair hernia defects since the late 1800s.[2] In the past 45 years,

however, heavyweight polypropylene has been used almost without question, and it is still the most commonly used prosthetic of the 1 million meshes that are implanted worldwide each year in ventral and inguinal hernia repair.[3]

Although a considerable number of studies have focused on improving the surgical techniques of mesh hernia repair, only a small fraction of the clinical literature has addressed the performance of hernia repair materials in vivo and the response of the body to these foreign materials. The dense scar tissue formed by the chronic inflammatory response of the body to polypropylene was initially viewed as beneficial to a satisfactory repair. Although this tissue response leads to the incorporation of the material within a dense scar plate, it is also the source of potential complications associated with heavyweight polypropylene. The incorporation of surrounding tissues leads to problematic adhesions when the mesh is placed intraperitoneally, and the material comes in direct contact with the viscera. Ingrowth of bowel

From the Departments of Biological Engineering (CRC, SAG), General Surgery (SLB, BJR), and Pathology and Anatomical Sciences (DSC, TSL), University of Missouri–Columbia, Columbia, Missouri.

The authors thank David Grant, Phillip Kelchen, Jill Jouret, Dan Christiansen, René Blagg, Darcy Lichlyter, and Harold Huff for their contributions to this study. This research was supported in part by a National Science Foundation Graduate Research Fellowship and funding from the University of Missouri–Columbia Food for the 21st Century (F21C) grant.
Address correspondence to: B. J. Ramshaw, Department of General Surgery, University of Missouri–Columbia, Mc414 McHaney Hall, Columbia, MO 65212; e-mail: ramshawb@health .missouri.edu.

Downloaded from sri.sagepub.com at EAST TENNESSEE STATE UNIV on September 15, 2011

to the mesh can lead to abscess and fistulization, and the robust fibrotic response may cause chronic pain associated with either nerve entrapment in the scar plate or mesh contraction and stiffness (decreased compliance).

Surgeons have also historically considered polypropylene to behave as an inert material while in vivo. However, polypropylene is susceptible to oxidation, resulting from exposure to strong oxidants such as hydrogen peroxide and hypochlorous acid. These by-products of the inflammatory response may degrade and embrittle the material, causing it to become rigid.[4] Materials used for other types of medical implants (polyethylene in orthopedics and polyurethane in pacemaker leads) have also demonstrated degradation secondary to oxidation.[5,6]

Recently, a theory has emerged relating the inflammatory response to the density of polypropylene and the interstices of the mesh. The creation of lightweight polypropylene mesh materials was driven by the hypothesis that decreasing the diameter and surface area of the fibers and increasing the interstices reduce the amount of implanted foreign material, leading to a less severe chronic inflammatory response. It has been theorized that if chronic inflammation could be decreased, many of the long-term complications of mesh placement could be reduced, including chronic pain, nerve entrapment, and reduced abdominal mobility following mesh hernia repair. Additionally, fewer oxidants would be produced and therefore less degradation would be observable on the polypropylene mesh fibers.

The results of the studies thus far on lightweight polypropylene meshes demonstrate less postoperative complaints of paresthesia, improved abdominal wall mobility, and less difficulty participating in daily activities compared with heavyweight polypropylene materials.[7] However, Klinge et al[8] reported that in addition to the weight of the material, the foreign body reaction to polypropylene is also dependent on the genetics of the individual in whom the mesh is implanted. Phagocytic cells at the tissue–mesh interface release cytokines to direct the wound healing response. Schachtrupp et al[9] investigated whether this response to hernia repair materials such as polypropylene and expanded polytetrafluoroethylene (ePTFE) differed among individuals. Their results of histology indicated that there are a broad range of cytokine responses to hernia mesh materials depending on the individuals, with individuals showing

extreme responses to biomaterials termed "high responders" and "low responders."[9]

Characterization of both heavyweight and lightweight polypropylene mesh materials explanted from the same patient would remove the confounder of variable genetics from the analysis of the oxidative effects of the body on the polypropylene. Therefore, the objective of this case study was to characterize the explanted mesh materials from the same patient to determine whether there are differences in the oxidation between lightweight polypropylene and heavyweight polypropylene while in vivo. The characterization methods included scanning electron microscopy, differential scanning calorimetry (DSC), thermogravimetric analysis (TGA), and compliance testing. We hypothesized that the heavyweight materials would display a more pronounced degradation due to a more intense inflammatory response and greater production of oxidants, resulting in greater surface cracking, decreased melting temperature, weight loss, and reduced compliance of the material. The lightweight meshes were still expected to undergo oxidative attack due to the chemical susceptibility of polypropylene to oxidation but to a lesser extent.

## Case Description

The patient was a 47-year-old white female who presented to the surgical clinic in the fall of 2005 with the chief complaint of a recurrent incisional hernia with resultant abdominal bulge, pain, tenderness, and nausea. Her discomfort increased with ambulation, and the nausea was the main source of her distress. She had no significant episodes of vomiting or frank obstruction. Her medical history was positive for non–insulin dependent diabetes mellitus, obesity, hyperlipidemia, hypertension, hypothyroidism, and migraine headaches. She denied tobacco or alcohol use. She was taking several oral hypoglycemics, cholesterol-reducing medication, and medication for thyroid replacement.

Her surgical history was significant for multiple procedures including cesarean section 4 times, laparoscopic cholecystectomy, and tubal ligation 2 times. Her incisional hernia first developed at the site of her cesarean section and recurred despite primary repairs at the time of her 3rd and 4th cesarean sections. In 1997, she had an open repair with ePTFE mesh (Gore-Tex Dualmesh; W.L. Gore, Newark, Delaware) placement; this mesh was removed in 2000,

Downloaded from sri-sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

170   *Surgical Innovation* / Vol. 14, No. 3, September 2007



**Figure 1.** Abdominal computed tomography scan depicting recurrent hernia.

**Figure 2.** Exposed hernia defect after lysis of adhesions. Recurrence is located at the superior border of the old mesh (bottom left).

secondary to becoming infected with methicillin-resistant *Staphylococcus aureus* (MRSA). In October 2001, a 14 × 18-cm heavyweight polypropylene-ePTFE composite mesh (Kugel Composix Mesh; Bard, Cranston, Rhode Island) was placed to repair a 10- × 14-cm central fascial defect.

Her physical examination revealed a pleasant, obese white female with a body mass index of 46.8. Her abdominal examination confirmed the presence of a 2- to 3-cm reducible mass in her epigastrium, which was tender to palpation. This was also noted on an abdominal computed tomography (CT) scan (Figure 1).

In November 2005, she underwent an elective laparoscopic lysis of adhesions and repair of her recurrent incisional hernia. Initial examination of the peritoneal cavity revealed an old composite mesh that had pulled away from its anchoring tacks superiorly. Along the edges of the mesh, the polypropylene underside had retracted and everted, exposing itself to the omentum, which adhered to the polypropylene surface. Old sutures were also noted. Once the lysis of adhesions was completed, the hernia defect was clearly seen at the disrupted superior aspect of the old mesh (Figure 2). A section of the in situ mesh was excised and saved for materials analysis (specimen 1). The hernia repair then used placement of a 15- × 20-cm, oxidized cellulose-coated lightweight polypropylene (Proceed; Ethicon Inc, Somerville, New Jersey) mesh, with 8 Gore-Tex transabdominal fixation sutures and circumferential tacking of the perimeter of the mesh. The lightweight



**Figure 3.** Abdominal computed tomography scan depicting a 7.4-cm abscess cavity above the mesh.

polypropylene mesh was placed superior to the old mesh but overlaid the superior border of the original mesh.

The patient was readmitted in January 2006 for percutaneous drainage of a 7.4-cm abscess cavity (Figure 3) in the midline at the old hernia repair site. Culture of the abscess grew MRSA. An additional drain was placed to completely decompress the collection. She was soon discharged home on intravenous vancomycin, and the drains were removed after outputs were negligible.

She was readmitted 2 weeks later for a recurrent abscess, which was drained for 60 cc of fluid. Due

Downloaded from sri.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

to the persistence of infection around the mesh, the decision was made to treat it surgically.

In mid-February 2006, the patient was brought to the operating room for excision of her prosthetic material. The entirety of the old composite mesh (specimen 2), as well as a central, unincorporated section of the coated lightweight polypropylene mesh, was excised (specimen 3); the remaining mesh and fascia were then closed primarily. Although she experienced some localized pain likely associated with the transabdominal fixation sutures, a follow-up CT scan, performed postoperative month 5, demonstrated no collection, abscess, or recurrence of hernia.

## Materials and Methods

### Explanted Hernia Meshes

After intraoperative removal, all explants were immediately stored at room temperature in a 10% v/v buffered zinc formalin solution.

### Tissue Removal

Adherent tissue was removed from all 3 explanted meshes by soaking in a solution of sodium hypochlorite containing 6% to 14% active chlorine (Sigma Aldrich, St. Louis, Missouri). The explants were soaked in sodium hypochlorite for 2 hours at 37°C and then rinsed several times with distilled water to remove any residual sodium hypochlorite solution. Figure 4 shows the explanted composite mesh and how it has contracted and delaminated while in vivo. The explanted lightweight polypropylene mesh was flat and almost pristine in gross appearance. The heavyweight polypropylene component of a pristine Composix E/X (C.R. Bard) and that of a pristine Prolene Soft Mesh (Ethicon) were subjected to the same cleaning process and used for comparison with the heavyweight polypropylene component of the explanted composite mesh (specimens 1 and 2) and the lightweight polypropylene component of the explanted oxidized regenerated cellulose (ORC)/lightweight polypropylene hernia mesh (specimen 3), respectively.

### Scanning Electron Microscopy

The surface of each explant, as well as a pristine sample of each type of mesh, was examined for cracks and fissures indicative of oxidation using a



**Figure 4.** Explanted Kugel Composix mesh that has become contracted and delaminated while in vivo.

Hitachi S-4700 Scanning Electron Microscope and secondary electron detector. (Prolene Soft Mesh is identical to Proceed mesh without the monocryl and ORC components, which would have absorbed in vivo.) Each explant was sputter coated with platinum at 20 mA for 2 minutes (Emitech K575X Peltier Cooled Sputter Coater; Emitech Products Inc, Houston, Texas), and micrographs were obtained at an accelerating voltage of 5 keV.

### Differential Scanning Calorimetry

Physical changes in the explanted materials that are characteristic of oxidation, namely decreased melting temperature and heat of fusion, were identified using DSC. Samples of both explanted and pristine meshes having a mass of 1 to 3 mg were hermetically sealed in aluminum pans. A PyrisTM1 Differential Scanning Calorimeter with TAC 7/PC Thermal Analysis Controller (Perkin-Elmer Corp, Norwalk, Connecticut) was programmed to test each sample under the flow of nitrogen from 50°C to 400°C at a rate of 10°C/min. An empty aluminum pan was used as a reference for all tests.

### Thermogravimetric Analysis

Because the mass of the explanted meshes is expected to decrease as a result of oxidation, each specimen was subjected to TGA to measure the percent weight lost as a function of temperature. Both pristine and explanted mesh samples were cut into 5 × 5-mm squares to fit within the sample pan of the TGA, and a Q Series Thermogravimetric Analyzer,

Downloaded from sn.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

TGAQ50 (TA Instruments, New Castle, Delaware), heated each sample under the flow of nitrogen from ambient temperatures to 600°C at a rate of 10°C/min.

### Compliance Test

To simulate the physiological conditions of bending at the waist or abdominal crunch exercises, each explanted mesh was bent in half and pushed through a 2.92-cm$^2$ slot using a rounded blade. Prior to testing, each explanted mesh, along with a pristine sample of the same type of mesh, was cut into 3 squares (6.45 cm$^2$ each) and soaked overnight in 1× phosphate-buffered saline (pH 7.4) at 37°C for equilibration to physiological conditions. A Texture Analyzer, TA.XT2, with XTRA Dimension software (Texture Technologies, Corp, Scarsdale, New York) was then programmed to test the sample in compression at a rate of 0.2 mm/s and record the total work required to push the material through the slot.

### Histology

Histological analysis was performed on representative sections of the specimens submitted in 10% formalin. The specimens with embedded mesh were sectioned with 2-mm cuts. The representative sections were embedded in paraffin, cut with a microtome at 3 µm, placed on slides, and stained with hematoxylin and eosin (H&E). The slides were reviewed simultaneously by 2 pathologists using a multiheaded microscope. The pathologists were blinded to the type of mesh and to the duration of implantation. Fibrosis and inflammation or foreign body reaction was assessed based on the criteria listed in Table 1. The presence of giant cell or histiocytic reaction was also noted separately for each specimen.

### Statistical Analyses

All statistical analyses were carried out using GraphPad Prism (Version 4.03). San Diego, CA: GraphPad Software, Inc; 2005. A 1-way analysis of variance with a 95% confidence interval and a Dunnett's posttest were used to evaluate differences in the means between pristine materials and explanted materials (n = 3) when there was more than 1 specimen (heavyweight polypropylene meshes). A two-tailed, nonparametric $t$ test with a 95% confidence interval and a Welch's correction factor were

**Table 1.**
**Scoring System for Histological Analysis**

| Score | Fibrosis | Inflammation/Foreign Body Reaction |
|---|---|---|
| 0 | No fibrosis present | No inflammation present |
| 1 | Up to 0.5-mm area of fibrosis | Minimal inflammation/ foreign body reaction present |
| 2 | 0.6- to 1.0-mm area of fibrosis | Mild inflammation/foreign body reaction present |
| 3 | 1.1- to 2.0-mm area of fibrosis | Moderate inflammation/ foreign body reaction present |
| 4 | >2.0-mm area of fibrosis | Severe inflammation/ foreign body reaction present |

used to evaluate differences in the means between pristine materials and explanted materials (n = 3) when there was only 1 specimen (lightweight polypropylene meshes).

## Results

### Explanted Hernia Meshes

Specimen 1 (a piece of bonded composite heavyweight polypropylene-ePTFE mesh) remained in vivo for 4 years and 11 months. Specimen 2 is the remainder of the same mesh, but it remained in vivo for an additional 5 months for a total of 5 years 4 months and was exposed to local infection. Specimen 3 is the center portion of a lightweight polypropylene mesh that remained in vivo for 5 months and was potentially exposed to infection.

### Scanning Electron Microscopy

Micrographs of the heavyweight polypropylene component of a pristine Composix E/X mesh (Figure 5) and of a pristine Prolene Soft Mesh exhibited smooth fibers without increased surface roughness, cracks, or other surface modifications indicative of oxidation.[4] Micrographs of the lightweight polypropylene component of the explanted ORC/lightweight polypropylene mesh revealed features identical to those of the pristine sample. However, micrographs of both heavyweight polypropylene components of the explanted composite mesh revealed microcracks in the transverse direction, as well as peeling of the top layer of the fibers (Figure 6).

Downloaded from sri.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011



**Figure 5.**   Scanning electron micrograph of heavyweight polypropylene from a pristine Composix E/X mesh.



**Figure 7.**   Differential scanning calorimetry thermogram for heavyweight polypropylene explants compared to a pristine mesh.



**Figure 6.**   Scanning electron micrograph of heavyweight polypropylene from an explanted Kugel Composix mesh (specimen 2, which remained in vivo for an additional 5 months compared with specimen 1).

**Table 2.**   Results of Differential Scanning Calorimetry

| Sample | Peak (°C) | $P < .05$ | Width (°C) | $P < .05$ |
|---|---|---|---|---|
| Pristine Composix E/X | 165.88 | NA | 12.94 | NA |
| Specimen 1 | 158.25 | Yes | 16.10 | No |
| Specimen 2 | 164.13 | No | 20.38 | Yes |
| Pristine Prolene Soft | 170.21 | NA | 7.69 | NA |
| Specimen 3 | 167.82 | No | 4.92 | No |

Abbreviation: NA, not available.

## Differential Scanning Calorimetry

Figure 7 shows the results of DSC performed on the heavyweight polypropylene mesh materials. The melting peak for the heavyweight polypropylene specimens showed a shift toward a lower melting temperature (158°C and 164°C) with a broader melting peak (16.10°C and 20.38°C) than that of the pristine heavyweight polypropylene mesh (166°C and 12.94°C, respectively), with the difference in the location of the melting temperature peak for specimen 1 and the width of the peak for specimen 2 having a *P* value <.05. The melting peak was shifted toward a lower temperature and was slightly narrower (4.92°C) in the explanted lightweight polypropylene sample (specimen 3) than in the pristine mesh (7.69°C). However, neither of these changes was considered statistically significant for the lightweight polypropylene explant. Mean values of both the melting temperature and the width of the peaks are shown in Table 2.

## Thermogravimetric Analysis

The mean weight lost (%) during the TGA of each mesh is shown in Table 3. Thermograms from the TGA of each mesh were integrated to obtain the area under the curve, which allowed the entire thermal event to be analyzed rather than just the conditions at the peak temperature. Figure 8 shows the resulting thermograms for the explanted heavyweight

Downloaded from sm.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

174   *Surgical Innovation* / Vol. 14, No. 3, September 2007



**Figure 8.** Thermogravimetric analysis thermogram for heavyweight polypropylene explants compared to a pristine mesh.

**Table 3.** Results of Thermogravimetric Analysis

| Sample | Weight Lost (%) | $P < .05$ |
|---|---|---|
| Pristine Composix E/X | 12.03 | NA |
| Specimen 1 | 9.16 | Yes |
| Specimen 2 | 8.40 | Yes |
| Pristine Prolene Soft | 8.55 | NA |
| Specimen 3 | 8.84 | No |

Abbreviation: NA, not available.

polypropylene meshes compared with the heavyweight polypropylene component of a pristine Composix E/X mesh. Both heavyweight polypropylene explants showed significantly less area under the curve than the pristine sample ($P < .05$). In contrast, TGA of the lightweight polypropylene explant resulted in values that were almost identical to those of the pristine Prolene Soft Mesh sample.

## Compliance Test

The mean value for the total work required to bend each mesh in half and push it through a slot in a metal plate is shown in Table 4. Specimen 1, a composite of heavyweight polypropylene and ePTFE, required nearly 30 times the work required for a pristine Composix E/X. Although the work required for specimen 2 was 4 times greater than that for a pristine Composix E/X, it was not statistically significant ($P > .05$). Specimen 3, a lightweight polypropylene mesh, required approximately 25% the work required for a pristine Prolene Soft Mesh. This corresponds to an increase in the compliance of the material while in the body, although not statistically significant.

**Table 4.** Results of Compliance Test

| Sample | Work (J) | $P < .05$ |
|---|---|---|
| Pristine Composix E/X | 0.1285 | NA |
| Specimen 1 | 3.6322 | Yes |
| Specimen 2 | 0.5173 | No |
| Pristine Prolene Soft | 0.0071 | NA |
| Specimen 3 | 0.0021 | No |

Abbreviation: NA, not available.

**Table 5.** Results of Histological Analysis

| Sample ID | Fibrosis Score | Inflammation/Foreign Body Reaction Score | Giant Cell/Histiocytic Reaction |
|---|---|---|---|
| 1 | 4 | 3 | Present |
| 2 | 4 | 3 | Present |
| 3 | 1 | 3 | Present |

## Histology

Review of the H&E-stained specimens revealed multinucleated giant cells in all 3 specimens, indicative of a foreign body reaction. All 3 specimens also demonstrated an inflammatory response. The cell types in specimens 1 and 2 were indicative of chronic inflammation, with large populations of macrophages and lymphocytes. The third specimen demonstrated an inflammatory response, with many neutrophils, consistent with acute inflammation. The heavyweight polypropylene samples had extensive collagen deposition and fibrosis. The lightweight polypropylene sample demonstrated minimal fibrotic tissue around the mesh. There was also evidence of neovascularization in the tissues around the mesh. All histological findings are tabulated in Table 5.

## Discussion

Traditionally, surgeons believed that heavyweight polypropylene was an inert substance. When this material was initially popularized in the 1960s as an implantable prosthetic for hernia repair, the cellular responses to inflammation that we are familiar with today were still in the early stages of discovery; lysosomes were known to contain at least 30 different enzymes, but their function was still unclear.[10] The powerful oxidants secreted by macrophages are now well characterized, and the potential degradative

Downloaded from sn.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

effects of these chemicals on polypropylene are now beginning to be documented.

Cracks and other surface degradations such as peeling of the fibers are indicative of the oxidation of polymeric materials.[4] Polypropylene is highly susceptible to the oxidative effects of the metabolites produced by phagocytic cells during the inflammatory response. For this reason, it is not surprising that the micrographs of both heavyweight polypropylene specimens revealed this type of degradation on the surface of the mesh fibers. The lightweight polypropylene specimen did not possess any visible surface degradation, which may support the hypothesis that less foreign body leads to reduced inflammatory response and reduced oxidation of the material. However, it cannot be ignored that this specimen was only in vivo for approximately 5 months, whereas the other 2 specimens were in vivo for approximately 5 years.

When a material such as polypropylene has undergone oxidation, bonds between the functional groups and the polymer backbone may be broken, leading to a bulk degradation of the material. If the material has been fragmented in this way, it may be possible for it to melt at a lower temperature and display a broader melting peak due to the increased polydispersity of the material.[11,12] All 3 explanted samples displayed this shift in their melting temperature, which indicates that oxidation of the materials may have occurred. However, the lightweight polypropylene displayed a narrower melting peak than the heavyweight polypropylene samples.

If a material has undergone oxidation while in vivo, we would expect some weight to be lost as the materials were degraded by the body.[11,12] Oxidized materials would therefore have less weight available to be lost during the TGA. This is indeed what we observed in the TGA results for the heavyweight polypropylene explants. Both explanted heavyweight polypropylene specimens showed significantly less weight loss during TGA than their pristine counterpart. In addition, there was no significant difference between the thermal events for the 2 heavyweight polypropylene specimens, indicating that the difference of 5 extra months of implantation did not affect the amount of weight lost from the heavyweight polypropylene material. In contrast, the explanted lightweight polypropylene specimen showed weight loss almost identical to that of its pristine counterpart, suggesting that weight was not lost while in vivo.

Another hallmark of an oxidized material is reduced compliance and embrittlement of the material.[13,14] This result was evident in both heavyweight polypropylene explants as an increase in total work, corresponding to the reduced compliance of the material. Conversely, the lightweight polypropylene explant was more compliant than its pristine counterpart, although it was not considered significant.

Several recent studies have addressed the issue of heavyweight versus lightweight hernia meshes. Cobb et al[15] reported that the number of inflammatory cells present at the mesh–tissue interface is significantly higher for a heavyweight polypropylene mesh (Marlex) than for a lightweight mesh (Vypro). A greater incidence of scar plate formation was also observed in the heavyweight polypropylene mesh group than in the lightweight mesh group.[15] Another study compared cellular responses to ePTFE, polyester terephthalate, and heavyweight polypropylene. All 3 types of meshes produced a chronic inflammatory response; however, the heavyweight polypropylene contained the most inflammatory cells and the least neovascularization compared with the other 2 materials.[8] In addition, the heavyweight polypropylene meshes contained twice as many macrophages at the mesh–tissue interface, which suggests that these meshes were exposed to the greatest number of oxidants during phagocytosis.[8] Histological studies have revealed that there is an increased apoptosis and proliferation of cells at the interface of the tissue with heavyweight polypropylene materials compared with the interface of the tissue with lightweight materials. This indicates that heavyweight polypropylene meshes induce a faster cellular turnover, whereas lightweight materials incite a more muted response.[15]

In our evaluation of meshes removed from 1 patient, the foreign body response to polypropylene was similar in both the lightweight and heavyweight meshes. The foreign body response is triggered by the synthetic mesh material and is part of a stereotyped reaction by the white cells to any foreign body. This reaction has been classified as having 4 distinct phases: acute inflammation, chronic inflammation, foreign body reaction with development of granulation tissue and giant cells, and fibrosis.[16] In all 3 samples, the mesh–tissue interface was interspersed with highly cellular regions, whose population included many large, multinucleated giant cells, indicative of active foreign body reaction (Figure 9). The age of the inflammatory response varied, however; 2 of our samples (specimens 1 and 2) are from the same mesh, and although removed at varying times, both had been implanted for years. Thus, it is not surprising that both displayed a chronic inflammatory response. The youngest mesh, specimen 3,

Downloaded from sri.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

176   *Surgical Innovation* / Vol. 14, No. 3, September 2007



**Figure 9.**   Hematoxylin and eosin staining of explanted sample of heavyweight polypropylene. A moderate chronic inflammatory response is visible adjacent to heavyweight polypropylene mesh ghosts. The majority of cells are lymphocytes and macrophages. Numerous multinucleated giant cells demonstrate a foreign body reaction. Fibrosis and collagen deposition are also seen adjacent to the mesh region.

demonstrated a cellular response more consistent with acute inflammatory reaction and the accompanying neovascularization of granulation tissue.

There was a varying degree of fibrosis, with more than 2.0 mm of collagen deposition adjacent to all the heavyweight samples. Less than 0.5 mm of collagen was adjacent to the lightweight mesh; as this was also the youngest explant, it is impossible to predict whether the lightweight mesh would have had an equal amount of fibrosis if it had remained in vivo for an equivalent time period. As it was implanted for only 5 months, compared with almost 5 years, there was only a short period of time for fibroblasts to secrete collagen. Others have shown that lightweight mesh explants (Vypro) have, on average, half of the connective tissue formation and inflammatory infiltrate of heavyweight mesh.[17]

## Conclusion

Overall, the results support our hypothesis that in vivo oxidation plays a role in the degradation of polypropylene hernia mesh materials and that there may be a difference in the degree of oxidation between a heavyweight material and a lightweight material because of a reduced inflammatory response. Further studies including a greater number of human explants and studies of meshes implanted for a controlled implantation time in animals are required.

## References

1. Usher FC, Ochsner J, Tuttle LL. Use of Marlex mesh in the repair of incisional hernias. *Am Surg.* 1958;24:969-974.
2. Read RC. The contributions of Usher and others to the elimination of tension from groin herniorrhaphy. *Hernia.* 2005;9:208-211.
3. Junge K, Rosch R, Krones CJ, et al. Influence of polyglecaprone 25 (Monocryl) supplementation on the biocompatibility of a polypropylene mesh for hernia repair. *Hernia.* 2005;9:212-217.
4. Ratner B, Hoffman AS, Schoen FJ, Lemons JE. *Biomaterials Science.* San Diego, CA: Academic Press; 1996:243-254.
5. Costa L, Luda MP, Trossarelli L, Brach del Prever EM, Crova M, Gallinaro P. In vivo UHMWPE biodegradation of retrieved prosthesis. *Biomaterials.* 1998;19:1371-1385.
6. Christenson EM, Anderson JM, Hiltner A. Oxidative mechanisms of poly(carbonate urethane) and poly(ether urethane) biodegradation: *in vivo* and *in vitro* correlations. *J Biomed Mater Res A.* 2004;70:245-255.
7. Welty G, Klinge J, Klosterhalfen B, et al. Functional impairment and complaints following incisional hernia repair with different polypropylene meshes. *Hernia.* 2001;5:142-147.
8. Klinge U, Klosterhalfen B, Muller M, et al. Foreign body reaction to meshes used in the repair of abdominal wall hernias. *Eur J Surg.* 1999;165:665-673.
9. Schachtrupp A, Klinge U, Junge K, et al. Individual inflammatory response of human blood monocytes to mesh biomaterials. *Br J Surg.* 2003;90:114-120.
10. Schilling JA. Wound healing. *Physiol Rev.* 1968;48:374-423.
11. Kausch, HH. The effect of degradation and stabilization on the mechanical properties of polymers using polypropylene blends as the main examples. *Macromol Symp.* 2005; 225:167-178.
12. Yakimets I, Lai D, Guigon M. Effect of photo-oxidation cracks on behavior of thick polypropylene samples. *Polym Degrad Stab.* 2004;86:59-67.
13. Fayolle B, Audouin L, Verdu J. Oxidation induced embrittlement in polypropylene—a tensile testing study. *Polym Degrad Stab.* 2000;70:333-340.
14. Fayolle B, Audouin L, Verdu J. Initial steps and embrittlement in the thermal oxidation of stabilised polypropylene films. *Polym Degrad Stab.* 2002;75:123-129.
15. Cobb WS, Kercher KW, Heniford BT. The argument for lightweight polypropylene mesh in hernia repair. *Surg Innov.* 2005;12:63-69.
16. Offner FA. Pathophysiology and pathology of the foreign-body reaction to mesh implants. In: Schumpelick V, Nyhus LM, eds. *Meshes: Benefits and Risks.* New York, NY: Springer; 2004:161-169.
17. Klosterhalfen B, Junge K, Klinge U. The lightweight and large porous mesh concept for hernia repair. *Expert Rev Med Devices.* 2005;2:1-15.

Downloaded from sn.sagepub.com at EAST TENNESSEE STATE UNIV on September 16, 2011

# EXHIBIT NN



**ELSEVIER**

Polymer Degradation and Stability 70 (2000) 333–340

**Polymer Degradation and Stability**

www.elsevier.nl/locate/polydegstab

# Oxidation induced embrittlement in polypropylene — a tensile testing study

B. Fayolle, L. Audouin *, J. Verdu

*ENSAM, 151 Boulevard de l'Hôpital, 75013 Paris, France*

Received 14 June 2000; accepted 27 June 2000

**Abstract**

The thermal oxidation of polypropylene films (100 μm) in air at 90°C was studied by IR spectroscopy, rheometry at 210°C and tensile testing. Tensile testing reveals a sudden embrittlement before the end of the induction period determined from carbonyl build up curves. Embrittlement occurs at a very low conversion of the chain scission process (only 1 chain scission per 3 initial chains) and it can be demonstrated that it results from a decrease in polymer toughness rather than from the build up of defects linked to a presumed heterogeneity of the oxidation process. Tensile testing is not necessarily a good tool to characterize embrittlement given that phenomena such as necking and crack initiation at geometric defects are not taken into account with the usual measuring methods. The sudden drop of ultimate elongation could be, at least partly, an artifact. © 2000 Published by Elsevier Science Ltd. All rights reserved.

*Keywords:* Polypropylene; Oxidation; Embrittlement; Lifetime; Chain scission

## 1. Introduction

Tensile testing is widely used to monitor the ageing of initially ductile polymers such as polyolefins [1,2]. A change of tensile properties can result from two main causes: (i) "annealing" effects linked to the fact that the polymer is initially out of equilibrium: post crystallization, orientation relaxation, etc. These effects occur generally shortly after the beginning of exposure and can affect the small strain properties (modulus, yield point). (ii) Ageing effects are essentially linked to modifications of the macromolecular skeleton (crosslinking, chain scission). These effects are generally responsible for long term embrittlement, and they practically do not affect the small strain properties.

This article deals with the ageing effects associated with the thermal oxidation of polypropylene films and we try to answer the following questions: is it possible to establish a link between the change of tensile properties and the structural changes in the polymer, in particular the amount of chain scission or the conversion of the oxidation process? Is it appropriate to use tensile properties as chemical variables in kinetic modelling? Is tensile testing the most pertinent mechanical testing method?

Indeed, two cases are to be distinguished: thin samples in which ageing is not controlled by the diffusion of oxygen, so that degradation is homogeneous and embrittlement results directly from structural changes, and bulk samples in which ageing takes place mainly at a superficial layer, so that damage may result from density gradients. The present work is devoted to the first case, i.e. to the "intrinsic" effect of ageing in polymer embrittlement.

A relatively well known case, i.e. polypropylene thermal oxidation, has been chosen. The advantage of PP is that it oxidises relatively fast in solid state and it predominantly undergoes chain scission.

## 2. Experimental

Experiments were made on 100±2 μm extruded films of stabilised isotactic polypropylene supplied by Atochem. Steric exclusion chromatographic (SEC) measurements after extrusion gave average molar mass values of $M_n = 55$ kg mol$^{-1}$ and $M_w = 266$ kg mol$^{-1}$. The additives

---

\* Corresponding author. Tel.: +33 1 4424 6413; fax: +33 1 4424 6382.

*E mail address:* ltvp@paris.ensam.fr (L. Audouin).

were extracted for 30 h in a Soxhlet extractor using a ternary solvent mixture (hexane/chloroform/ethanol 4:1:1) [3]. The films were then dried for 48 h at 40°C under vacuum. Thermal ageing was studied in air at 90°C using a ventilated oven regulated at ±1°C.

Dogbone samples were cut with a MTS H2 stamp after ageing. They had a calibrated length of 25 mm and a width of 4 mm. A good quality of cutting is necessary to avoid the presence of defects capable of initiating cracks.

Tensile tests were performed on an Instron 4502 dynamometer with a strain rate of 50 mm min$^{-1}$ ($33\times 10^{-3}$ s$^{-1}$) using a measurement cell of 1 kN full range with a relative error of 0.5%. Only engineering stresses and strains will be reported here; no corrections will be made for thickness and width changes.

IR spectroscopic measurements were made on a Brucker IFS 28 spectrophotometer with a resolution of 4 cm$^{-1}$.

The zero shear viscosity $\eta_0$ was obtained in dynamic oscillatory mode with a Rheometrics Scientific ARES rheometer using parallel plate geometry (plate diameter 25 mm and gap 0.5 mm). The tests were performed under nitrogen at 210°C with frequencies ranging between 0.05 and 512 rad s$^{-1}$ and with a maximum strain amplitude optimised to measure reliable torque values (in the linear viscoelastic domain). In order to avoid secondary thermolysis in the rheometer cell, the films were previously treated with sulfur dioxide to destroy hydroperoxides. After a 24 h treatment at ambient temperature, no subsequent thermal degradation was observed during rheometric measurements. Molar mass was determined at 210°C according to: $\eta_0 = K.M_w^{3,4}$ where $\eta_0$ is in Pa s and $M$ in g mol$^{-1}$. The constant $K$ value of $1.072\ 10^{-15}$ was determined by SEC and viscosity measurements performed on the virgin polymer.

## 3. Results

### 3.1. Yield stress

Yield stress ($\sigma_y$) remains constant as long as it can be observed. After 150 h of exposure embrittlement occurs: the yield vanishes and brittle fracture takes place (see Fig. 1; ductile–brittle transition is indicated by dashed line). It can be thus concluded, that the yield stress is not very sensitive to structural changes in the polymer induced by the oxidation process. This is not surprising since it is well known that, in polyolefins, the yield stress depends essentially on the crystallinity ratio, especially through the crystallite thickness [4]. If the oxidation takes place only in the amorphous phase, it is expected to have little or no influence on the yield properties except when extensive chain scissions result in chemicrystallisation [5]. In this case, some increase of yield stress could be

expected but in our case such phenomenon was undetectable. It can be concluded that yield properties are not a convenient means of evaluating polymer ageing.

### 3.2. Ultimate elongation

The change of ultimate elongation ($\varepsilon_R$) during ageing is presented in Fig. 2. The ultimate elongation ($\varepsilon_R$) remains almost constant at 800% during the initial period of exposure and decreases abruptly after 150±30 h to reach a value close to the initial yield strain of 13%. An induction time may thus be defined as the time elapsed from the beginning of exposure to this ductile–brittle transition. The kinetic curve of carbonyl build-up has been also included in Fig. 2. It displays an induction time $t_{iCO} = 250\pm10$ h determined by intersection between tangent at inflexion point and time axis. These results call for the following comments.

(a) Embrittlement is a catastrophic process that can be described as a relatively sharp transition between a ductile and a brittle state.

(b) For the polymer under study embrittlement occurs at a very low conversion of the oxidation, as seen from the fact that the induction time, $t_{iCO}$, determined from spectrophotometric measurements is significantly longer than the induction time determined from the variations of ultimate strain with time, i.e. less than 150 h against 250 h for $t_{iCO}$. Although this fact has been already reported [6] it has never been, to our knowledge, quantitatively studied. After 250 h exposure at 90°C, the concentration of carbonyl groups (the main oxidation products) is less than $5\times10^{-3}$ mol kg$^{-1}$. Since the monomer unit concentration is about 24 mol kg$^{-1}$, we can reasonably estimate that at the moment of brittle failure the conversion of the oxidation reaction is lower than $5\times10^{-4}$ (0.05%). It is worth mentioning that the initial chain concentration is $M_{n0}^{-1} = 0.018$ mol kg$^{-1}$. Thus, even if the chain scission yield would have been very high (i.e. one chain scission per carbonyl group), we would have still had less than one chain scission per initial polymer chain at the embrittlement point.

### 3.3. Ultimate stress

The failure envelope: ultimate stress ($\sigma_R$) against ultimate strain ($\varepsilon_R$) for every individual tests is presented in Fig. 3. As previously found for many polymers in the case of photo-oxidation [7], this curve corresponds to the virgin polymer tensile curve, a fact that calls for the following comments:

(i) Changes of sample cross-section are not taken into account in the usual procedure thus the failure

B. Fayolle et al. / Polymer Degradation and Stability 70 (2000) 333–340

335

envelope can not be considered as an intrinsic property of the material.

(ii) The stress values, even after correction for cross-section area, are representative of the average stress state on the whole sample volume whereas rupture is a local phenomenon initiated at pre-existing defects on the edges of the sample. These defects concentrate stresses so that the true stress responsible for rupture is always higher than the measured "average" stress.

(iii) As evidenced in Figs. 2 and 3, the ultimate elongation ($\varepsilon_R$) varies monotonically with ageing time and displays an abrupt change indicative of a ductile–brittle transition. So it can be thus used as an ageing function whereas the ultimate stress ($\sigma_R$) varies non-monotonically with ageing time, increasing after embrittlement (Figs. 1 and 3). This latter depends of the shape of the tensile curve $\sigma = f(\varepsilon)$. It could be schematically written:



Fig. 1. Evolution of yield stress ($\mathcal{L}$) and ultimate stress ($\bigcirc$) during exposure, ductile brittle transition is indicated by dashed line.



Fig. 2. Evolution of ultimate elongation ($\blacklozenge$) during exposure and kinetic curves of carbonyl at 1710 cm[-1] ($\blacksquare$) and of OH groups at 3410 cm[-1] ($\blacktriangle$) build up.

*B. Fayolle et al. / Polymer Degradation and Stability 70 (2000) 333–340*



Fig. 3. Failure envelope ($\sigma_R$ vs $\varepsilon_R$ during exposure) (■) and tensile curve of unaged specimen in nominal strain–stress coordinates (  ).

$$\frac{d\sigma_R}{dt} = \frac{d\sigma_R}{d\varepsilon_R}\frac{d\varepsilon_R}{dt}$$

where $\frac{d\varepsilon_R}{dt}$ depends essentially on ageing time and is always negative whereas $\frac{d\sigma_R}{d\varepsilon_R}$ depends on mechanical behaviour of the sample and can be positive or negative depending on the predominating deformation process (plastic instability at the yield point, orientation hardening, etc.). These observations are valid in the case of thermal oxidation [8] as well as in the case of photo-oxidation [7].

### 3.4. Viscosity measurements

The effect of ageing time on the viscosity curves of the oxidized polymer is illustrated in Fig. 4. The observed decrease in the Newtonian viscosity of the polymer as well as an extension of the Newtonian region clearly indicate a narrowing of the molecular weight distribution with ageing time [9]. The change of weight average molar mass $M_w$ (calculated with scaling law at 210°C: $\eta_0 = 1.072 \times 10^{-15}\ M^{3,4}$ after an ageing time of 100 h indicates that the chain scission process begins far before the end of the classical induction period $t_{iCO}$ of 250 h (Fig. 5).

### 4. Discussion

It is clear from the above results that as a consequence of ageing the PP oxidized samples reached a critical state where there is a sudden change from ductile to brittle behaviour. From simple fracture mechanics considerations one can derive the following questions:

- Is tensile testing a pertinent tool to study embrittlement before PP oxidized is completely brittle, i.e. $\varepsilon_R > \varepsilon_y$?
- Does the sudden change of ductile to brittle behaviour result from the existence of a critical structural state? The first structural variable which comes to mind is, indeed, the molar mass. Or does the change result from the existence of a critical defect size? This hypothesis would apparently agree with the theories according to which oxidation is highly heterogeneous [10].

Let us now address the first question relative to the validity of tensile testing as a tool to study PP ageing before the ductile-brittle transition, i.e. $\varepsilon_R > \varepsilon_y$. To answer this question we need first to describe the mechanical behaviour of the polymer at large strains. A first problem comes obviously from the fact that the values of ultimate stress and elongation cannot be entirely considered as intrinsic material's property given that failure always occurs at a defect whose the nature and geometry are expected to play an important role in the fracture process. Let us recall the shape of the tensile curve in nominal strain-stress coordinates and the main steps of the deformation process (Fig. 3).

Between $\varepsilon_y$ (yield strain) and $\varepsilon_h$ (onset of the hardening process) necking propagates along the calibrated sample section. The draw ratio in the necking zone is constant so that the nominal strain at this stage of deformation is proportional to the size of plastic

*B. Fayolle et al. / Polymer Degradation and Stability 70 (2000) 333–340*

337

instability. Thus, comparing the true strain $\varepsilon_{tr}$ and the nominal strain $\varepsilon_{nom}$, it can be seen that they will be equal only when necking covers the whole calibrated length [11], i.e. when $\varepsilon_{nom} = \varepsilon_h$. Thus $\varepsilon_h$ appears as the only strain value having a clear sense. It corresponds to the homogeneous draw ratio in the necking zone.

If failure occurs at a strain lower than $\varepsilon_h$ (460% in our case, see Fig. 3), the corresponding strain value $\varepsilon_R$ lacks

a physical meaning from the point of view of structure-property relationships, because fracture necessarily occurs at defects on the edges of the sample activated by the passage of the necking. Indeed, it is not possible to completely suppress such defects.

For strains higher than $\varepsilon_h$ ($\varepsilon_{nom} > 460\%$) hardening occurs in the calibrated part of the sample. This process is not homogeneous since there are hyper orientated



Fig. 4. Evolution of viscosity curves during exposure.



Fig. 5. Change of average molar mass weight $M_W$ (●) during exposure and kinetic curves of carbonyl at 1710 cm$^{-1}$ (■) and of OH groups at 3410 cm$^{-1}$ (▲) build up.

338          *B. Fayolle et al. / Polymer Degradation and Stability 70 (2000) 333 340*

domains which transmit loads to less orientated domains through a decrease of the cross sectional area. Fracture occurs when a hyper orientated domain contains a critical size defect. This is the reason why two tensile curves of the same material are almost identical except for the location of the rupture point (Fig. 3). At this stage of deformation, the behaviour is brittle, a defect creates a stress concentration and the material reaches locally its true ultimate stress. The fracture event would thus corresponds to the probability of an encounter between a hyper oriented domain and a defect on sample edges. This mechanism explains why the rupture points (coordinates $\varepsilon_R$ and $\sigma_R$) are always located on a master curve which is in fact the material's tensile curve. Thus neither $\varepsilon_R$ nor $\sigma_R$ may be considered as intrinsic material properties closely linked to the polymer structure. In fact, if we imagine an ageing process in which the true ultimate strain $\varepsilon_{Rtr}$ would vary monotonically (Fig. 6a), we could expect a non monotonic variation of the nominal ultimate strain $\varepsilon_{Rnom}$ as a result of the above described discontinuities (Fig. 6b).

It thus appears that the "transfer function" between the change of polymer structure due to the process of ageing and the change of its tensile properties (in nominal strain-stress coordinates) is relatively complex, tensile testing not being a pertinent experimental tool to study ageing of initially ductile polymers.

The answer to the second question seems quite straightforward in the case of amorphous polymers, or semi-crystalline polymers with low crystallinity ratio, for which it is well known [12,13] that the ductile-brittle transition corresponds to a critical structural state related to the entanglement threshold, the order of magnitude of the critical molar mass being generally $M_C \approx 10$ kg mol$^{-1}$. It has been shown, for instance, that in the case

of polycarbonate hydrolysis embrittlement always occurs at $M_C \approx 14$ kg mol$^{-1}$ whatever the exposure conditions [14]; a value close to 16 kg mol$^{-1}$ has been also found in the case of polyamide 11 [15].

The case of semi-crystalline polymers is somewhat more complicated owing to the important role of morphology. The toughness of virgin polymers represented by the critical rate of elastic energy release $G_{IC}$, increases with the molar mass but it does not display a catastrophic transition as in the amorphous polymers [12,16]. It is observed, for instance, that the crystallinity ratio of virgin polymers decreases when the chain length increases [16]. We can conclude that these virgin polymers with different chain length cannot be necessarily considered as good models of aged polymers of same molar mass.

This different behaviour can be attributed to differences in the molecular mechanisms of yielding: in amorphous polymers plastic deformation is directly linked to chain drawing through the entanglement network; in semi-crystalline polymers tie molecules interconnecting lamellae play a crucial role in process of yielding [17]. Thus in semi-crystalline polymers the critical structural variable could be the tie chain density (TCD) rather than the entanglement density (ED). The TCD depends of both morphology and molar mass [18,19] which in turn complicates the analysis.

There is an abundant literature on deformation mechanisms of semi-crystalline polymers [20] but the great diversity of cases makes difficult the drawing of a coherent synthesis. What seems clear, however, is that the tie chains present in the amorphous interlamellar zones play a key role in the plastic deformation by allowing load transfer between crystallites and the ensuing destruction of lamellar structure by chain slip and lamellar break-up [4]. The following causal chain may be thus proposed:



Fig. 6. (a) Hypothetical monotonic variation of the true ultimate strain $\varepsilon_{Rtr}$ ;(b) expected non monotonic variation of nominal ultimate strain $\varepsilon_{Rnom}$.

B. Fayolle et al. / Polymer Degradation and Stability 70 (2000) 333 340

Oxidation in the amorphous phase $\Rightarrow$ chain scission

$\Rightarrow$ rupture of tie chains

$\Rightarrow$ loss of plasticity/ductility potential.

According to this causal chain and in order to predict ageing induced embrittlement we would need:

(i) A kinetic model for oxidation.
(ii) The identification of the chain scission mechanism and its yield in the corresponding elementary step of the mechanistic scheme.
(iii) The structure of tie chains in order to determine/estimate the probability of chain scission on a tie chain (a part of chain scissions can occur in mechanically inactive chains).
(iv) A criterion for the ductile–brittle transition, such as a critical fraction or concentration of residual tie chains.

Practically all these points remain at present time widely open research areas. Concerning the specific case of PP, an interesting characteristic which should orientate the discussion on points (iii) and (iv) above is the very high value of the "critical molar mass" for embrittlement: at the end of ductile-brittle transition ($\sim 200$ h) $M_{DB} \approx 200$ kg mol$^{-1}$ (see Figs. 2 and 5), a value that is one or two orders of magnitude higher than the entanglement threshold [25] ($M_C = 2M_E \approx 7$ kg mol$^{-1}$). Two ways may in principle be envisaged for explaining this result.

(a) Oxidation is highly heterogeneous and creates mechanically active defects, i.e. oxidized domains having a size greater than a critical value and capable of initiating cracks at a stress close to the initial yield stress [10]. In this case the material's toughness would remain almost constant, since there would be only very small structural (molar mass) changes in the whole polymer. There are, however, two strong arguments against this hypothesis: first SEC measurements do not allow us to observe the expected heterogeneity [21,22]. Second, let us also recall that virgin PP being relatively tough, its embrittlement would need the build-up of large visible defects. Such defects have never been observed in PP at low conversions of oxidation process (fortunately, relatively large scratches don't lower significantly the impact resistance of PP bumpers for instance !).

(b) Embrittlement results from a homogeneous or pseudo-homogeneous polymer degradation process leading to a considerable decrease in toughness. The fact that embrittlement occurs at very low conversion could be then linked to some peculiar character of the tie chains. Let us for instance suppose that interlamellar ties consist of many entangled chains [23,24]. In this case, the critical molar mass for embrittlement ($M_{DB}$) could be schematically expressed as a function of the molar mass between entanglements ($M_E$), close to 3.5 kg mol$^{-1}$ for PP [25]:

$$M_{DB} = b\lambda M_E$$

where $b$ and $\lambda$ are factors greater than one and related respectively to the number of entanglement strands in a given tie chain and to the critical fraction of ties chain allowing plastic deformation. A large value of the product $b\lambda$, on the order of 50, could then explain the high value of 200 kg mol$^{-1}$ observed for $M_{DB}$ in the case of PP. Can a critical molar mass of 200 kg mol$^{-1}$ be generalized to all PP samples? Or is this value dependent on the initial PP structure (morphology, molar mass distribution)? Further research work is needed to answer these questions.

## 5. Conclusions

The thermo-oxidation of polypropylene films at 90°C has been studied by physico-chemical methods and by tensile testing. It displays the following main characteristics.

(i) Ageing does not bring about significant changes in the low strain characteristics (yield point).
(ii) The ultimate elongation drops suddenly from its initial value ($\sim$800%) to the yield value (13%).
(iii) Embrittlement occurs at very low conversion of the oxidation, when the molar mass is about 200 kg mol$^{-1}$, i.e. far above the entanglement critical molar mass.

Some practical and theoretical implications of these results have been discussed. It appears that classical methods for monitoring the process of ageing such as IR spectrophotometry and tensile testing in nominal strain-stress value are not necessarily the best tools to determine the polymer lifetime.

## References

[1] Oswald J, Turi J. Polym Eng Sci 1965;5:152.
[2] Wyzgoski MG. J Appl Polym Sci 1981;26:1689.
[3] Zahradnickova A, Sedlar J, Dastych D. Polym Degrad Stab 1991;32:155.
[4] Schultz JM. Polym Eng Sci 1984;24:770.
[5] Mathur AB, Mathur GN. Polymer 1982;23:54.
[6] Gensler R, Plummer CJG, Kausch HH, Kramer E, Pauquet JR, Zweifel H. Polym Degrad Stab 2000;67:195.
[7] Pabiot J, Verdu J. Polym Eng Sci 1981;21:32.
[8] Langlois V, Audouin L, Courtois P, Verdu J. Angew Makromol Chem 1993;208:47.
[9] Bersted BH. J Appl Polym Sci 1975;19:2067.
[10] Celina M, George GA, Billingham NC. Polym Degrad Stab 1993;42:335.
[11] De Candia F, Romano R, Russo R, Vittoria V. Colloid Polym Sci 1987;265:696.
[12] Greco R, Ragosta G. Rubb Plast Process Applic 1987;7:163.
[13] Kausch H H. Polymer fracture. 2nd ed. Berlin/Heidelberg: Springer Verlag, 1987.

[14] Gardner RJ, Martin JR. J Appl Polym Sci 1979;24:1269.

[15] Driancourt A, Dalmaso F, Chaupart N. Modelization degradation mechanisms in aqueous environment of PA11 and criterion of lifetime. Colloque JSTMM 97, Durabilité des matériaux de structure. Nabeul, Tunisie, 3 4 November 1997.

[16] Avella M, dell'Erba R, Martuscelli E, Ragosta G. Polymer 1993;34:2951.

[17] Peterlin A. J Mater Sci 1971;6:490.

[18] Keith HD, Padden Jr FJ, Vadimsky GJ. Polym Sci A 2 1966;4: 267.

[19] Ishikawa M, Ushui K, Kondo Y, Hatada K, Gima S. Polymer 1996;37:5375.

[20] Lin L, Argon AS. J Mater Sci 1994;29:294.

[21] Girois S, Audouin L, Verdu J, Delprat P, Marot G. Polym Degrad Stab 1996;51:125.

[22] Achimsky L, Audouin L, Verdu J. Polym Degrad Stab, in press.

[23] Flory PJ, Yoon DJ, Dill KA. Macromolecules 1984;17:862.

[24] Plummer CJG, Kausch HH. Macromol Chem Phys 1996;197:2047.

[25] Van Krevelen DW. Properties of polymers. 3rd ed. Amsterdam: Elsevier, 1990 p. 465.

# EXHIBIT OO

Scott A. Guelcher, Ph.D.

Page 1

FOR THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

_____

IN RE:  ETHICON, INC.,
PELVIC REPAIR SYSTEMS
PRODUCTS LIABILITY LITIGATION
Master File No. 2:12-MD-02327
MDL NO. 2327

_____

THIS DOCUMENT RELATES TO:

TONYA AND GARY EDWARDS
vs.
ETHICON, INC., ET AL.,          JOSEPH R. GOODWIN
(Case No. 2:12-cv-09972)        U.S. DISTRICT
                                JUDGE

and

JO HUSKEY AND ALLEN HUSKEY
vs.
ETHICON, INC., ET AL.,
(Case No. 2:12-cv-05201)

_____

DEPOSITION OF SCOTT A. GUELCHER, PH.D.

Nashville, Tennessee

March 25, 2014

Reported by Marilyn Morgan, LCR #235, CCR #0174

Golkow Technologies, Inc.
877.370.3377 ph|917.591.5672 fax
deps@golkow.com

Scott A. Guelcher, Ph.D.

Page 2

APPEARANCES:
ON BEHALF OF PLAINTIFFs
   Tim E. Jackson, Esq.
   Michael H. Bowman, Esq.
   WEXLER WALLACE, LLP
   55 West Monroe Street, Suite 3300
   Chicago, Illinois  60603
   (312) 346-2222
   tej@wexlerwallace.com
   mhb@wexlerwallace.com
and
   Christina Lewis, Esq.  (by telephone)
   MUELLER LAW
   404 West 7th Street
   Austin, Texas  78701
   (512) 478-1236
ON BEHALF OF DEFENDANT:
   David B. Thomas, Esq.
   THOMAS, COMBS & SPANN, PLLC
   300 Summers Street, Suite 1380
   Charleston, West Virginia  25338
   (304) 414-1807
   dthomas@tcspllc.com

Page 4

I N D E X
WITNESS                                        PAGE
SCOTT A. GUELCHER, PH.D.
  Examination by Mr. Thomas . . . . . . . .  5

E X H I B I T S

Number          Description          Page

Exh.1     Report                           6

Exh.2     Notebook                         8

Exh.3     Notebook                         8

Exh.4     Notice of Deposition             9

Exh.5     Rebuttal Report                 60

Exh.6     Anderson Study                  71

Exh.7     1976 Study                      73

Exh.8     Fayolle Study                   93

Exh.9     Clave Article                  102

Exh.10    Letter                         165

Page 3

    The deposition of SCOTT A. GUELCHER,
PH.D., taken on behalf of the Defendant and
taken pursuant to notice on March 25, 2014,
beginning at approximately 9:19 a.m., at 150
3rd Avenue, South, Nashville, Tennessee,
pursuant to stipulations of counsel.
    S T I P U L A T I O N S
    It is agreed that the court reporter,
being a notary public for the State of
Tennessee, may swear the deponent, take the
deposition on the Stenograph shorthand machine
and afterwards reduce the same to typewriting
when it may be used for all purposes provided
by the Federal Rules of Civil Procedure
governing depositions.

Page 5

    SCOTT A. GUELCHER, PH.D.,
after having been first duly sworn, was
examined and testified as follows:
    DIRECT EXAMINATION
BY MR. THOMAS:
   Q.   Good morning, Dr. Guelcher.  It's
Guelcher; is that correct?
   A.   That's right.
   Q.   I introduced myself to you before the
deposition.  My name is David Thomas.  I
represent Ethicon.  I'm going to ask you a
number of questions today about your expert
reports in the Ethicon matters; fair enough?
   A.   Yes.
   Q.   I see that you have before you two
notebooks.  What's in the notebooks?
   A.   So one of these notebooks is the
report with -- the first report that was filed
with the reliance documents from that.  And the
second notebook is another notebook of support
documents.
   Q.   We'll both be doing that today so
take your time and don't worry about it.
    The second notebook that you referred

Scott A. Guelcher, Ph.D.

Page 6

1    to is additional support documents?
2        A.   Yes, that's right.
3        Q.   Do the additional support documents
4    in the second notebook relate to the first
5    report?
6        A.   Yes.
7        Q.   Do the two notebooks that you have in
8    front of you represent the total of the
9    reliance materials for the reports that you've
10   provided in this matter?
11       A.   Yes.
12           (Exhibit 1 was marked.)
13       Q.   (By Mr. Thomas)  Let me show you what
14   I've marked as deposition Exhibit No. 1.
15   Deposition Exhibit No. 1 is what was provided
16   to us as the Rule 26 expert report for you in
17   this matter.
18           When you referred to your first
19   notebook as having the report and reliance
20   materials, is Exhibit No. 1 the report to which
21   you're referring?
22       A.   Yes.
23       Q.   On -- at the end -- I'm sorry.
24   Exhibit B to Exhibit No. 1 is a list of

Page 7

1    reliance materials attached to your report?
2        A.   Yes.
3        Q.   Do you have that?
4        A.   Yes.
5        Q.   Is everything that is in the two
6    notebooks that you've just identified for the
7    record contained within the reliance materials,
8    to your knowledge?
9        A.   Yes, I believe so.
10       Q.   Are there documents in this reliance
11   list that are not contained in the two
12   notebooks that you brought with you today?
13       A.   I don't think so.
14       Q.   Okay.  Was it your intention when you
15   brought the two notebooks that you've
16   identified earlier today that you brought with
17   you all the documents upon which you relied for
18   the formulation of your opinions in the case?
19       A.   Yes.
20       Q.   Just for the record, the first
21   notebook that you identified it has a title on
22   it that says In Re: Boston Scientific
23   Corporation, Product Liability Litigation,
24   Expert Report of Scott Guelcher, Ph.D.

Page 8

1        A.   Yes.
2            MR. THOMAS:  We'll mark that as
3    Exhibit No. 2.
4            (Exhibit 2 was marked.)
5        Q.   (By Mr. Thomas)  This was the first
6    notebook to which you referred for your expert
7    report and your reliance materials; fair?
8        A.   Yes.
9            (Exhibit 3 was marked.)
10       Q.   (By Mr. Thomas)  Deposition Exhibit
11   No. 3 is a second notebook of documents that
12   you brought with you that are your reliance
13   materials for your expert report in the Ethicon
14   case?
15       A.   Yes.
16       Q.   It's your testimony that the
17   documents in Exhibits 2 and 3 are the total of
18   the reliance materials for your expert report
19   which we've marked as Exhibit 1?
20       A.   Yes.
21       Q.   All right.  Did you bring with you
22   any other materials for your deposition today?
23       A.   No.
24       Q.   Did you bring any billing records

Page 9

1    with you today?
2        A.   No.  Dr. Dunn has those.  That's
3    subcontracted through Dr. Dunn.
4        Q.   Did you prepare billing records that
5    you gave to Dr. Dunn?
6        A.   I have sent him some billing records,
7    yeah.  But I don't have those with me.
8    Dr. Dunn has them.
9        Q.   Is there a reason why you didn't
10   bring those with you here today?
11       A.   I haven't been bringing them to
12   depositions.  So everything is billed through
13   him.  So I don't have them with me.
14           MR. THOMAS:  Is there a reason why he
15   hasn't produced those today?
16           MR. JACKSON:  It was my understanding
17   he didn't have them, that they were all in
18   the custody of Dr. Dunn.
19           (Exhibit 4 was marked.)
20       Q.   (By Mr. Thomas)  Let me show you
21   what's been marked as deposition Exhibit No. 4.
22   Deposition Exhibit No. 4 is a notice of your
23   deposition for today as well as a document
24   rider that requests that you bring certain

3  (Pages 6 to 9)

Scott A. Guelcher, Ph.D.

Page 10

1  documents with you to the deposition. Did you
2  review that in advance of your deposition?
3      A.  Briefly.
4      Q.  What did you do when you reviewed it?
5  For what purpose did you review it?
6      A.  To pull the documents together.
7      Q.  And I believe you've told me the only
8  documents that you've brought with you to the
9  deposition today are the ones that we've marked
10 in the notebooks of Exhibits Nos. 2 and 3?
11     A.  That's right.
12     Q.  Were there other documents that are
13 responsive to Schedule A on Exhibit No. 4 that
14 you didn't bring with you?
15     MR. JACKSON:  I'm just going to note
16     that we have pending objections to several
17     of these scheduling requests.
18     MR. THOMAS:  That's fine.
19     A.  Let me look at this for a minute.
20     So I have provided an opinion on
21 other pelvic mesh cases, but I did not bring
22 that information with me because of the
23 consulting with the attorneys.  I think
24 everything else is here, just looking at this.

Page 11

1      Q.  (By Mr. Thomas)  Let's look at
2  Paragraph 1 of Exhibit 1, Schedule A, all
3  documents related to fees, billing, and/or time
4  spent in connection with your opinions.
5      How do you keep your time in this
6  case?
7      A.  I send activity reports to Dr. Dunn,
8  and then he -- I must have misunderstood this.
9  It's all billed through Dr. Dunn's company.  So
10 I send everything to him in the form of weekly
11 activity reports and monthly invoices.
12     Q.  Tell me the form that the weekly
13 activity reports take.
14     A.  It's a table that lists the hours
15 that I worked per day, the specific time of the
16 day that I worked on it, and then a brief
17 description of the activity.
18     Q.  And is this a report that you submit
19 to Dr. Dunn on a weekly basis?
20     A.  Usually.  The reports are all -- it's
21 a weekly summary.
22     Q.  Is this a computer-generated report
23 or a hand-generated report?
24     A.  It's a -- I do it in Microsoft Word.

Page 12

1      Q.  Do you have notes of the time that
2  you spent that you transfer over to Microsoft
3  Word?
4      A.  I keep it on my calendar.
5      Q.  And is your calendar a hard copy
6  calendar?
7      A.  It's electronic on my phone.
8      Q.  And the time that you have on your
9  electronic calendar on your phone is
10 transferred over to your Microsoft Word report
11 that you send to Dr. Dunn on a weekly basis?
12     A.  That's right.  Yes.
13     Q.  And the report that you provide to
14 Dr. Dunn identifies the day that you worked?
15     A.  It identifies the day, the time of
16 day, and the number of hours and the activity.
17     Q.  Is that a form that you prepared or a
18 form that Dr. Dunn provided to you?
19     A.  It's a form that I had from other
20 cases, other consulting, I should say.
21     Q.  Other consulting with Dr. Dunn or
22 consulting you've done individually?
23     A.  Consulting I've done individually
24 with other companies.

Page 13

1      Q.  Are the weekly activity reports that
2  you submitted to Dr. Dunn on your computer
3  presently?
4      A.  I think so.  I don't think I deleted
5  those off my computer.
6      Q.  Is that something you could have sent
7  to us today so we could --
8      A.  I can.  Like I said, in the past,
9  I've not -- Dr. Dunn just had those, and I just
10 missed it.
11     Q.  Okay.
12     A.  I can send them to you.
13     Q.  Yeah.  I would like to be able to ask
14 questions about those today.  So to the extent
15 we can get those sent over here and printed out
16 and used in the deposition --
17     A.  I can do that.
18     MR. JACKSON:  Do you have somebody
19     who can log into your computer and get
20     these?  It might be easier just to have
21     Dr. Dunn produce everything today.  I can
22     probably have them do that.
23     MR. THOMAS:  That would be great.
24     THE WITNESS:  I would be more

4 (Pages 10 to 13)

Scott A. Guelcher, Ph.D.

Page 14

1  comfortable for him doing that because he
2  does the actual billing. That's why I was
3  confused. But I think if he can send the
4  reports, it would be better because I don't
5  know that I've -- I mean, I send them to
6  him and I --
7      MR. JACKSON: It may be that he was
8  deposed prior to you previously, so it
9  didn't matter.
10     THE WITNESS: That would be the most
11 accurate version of what's available.
12     MR. THOMAS: Let's go off the record
13 a second.
14     (Discussion off the record)
15     (Ms. Lewis joined the deposition by
16 teleconference.)
17     MS. LEWIS: This is Christina Lewis.
18 I'm with the Mueller Law Office, and we
19 represent Mr. and Mrs. Edwards in this
20 case.
21     And I would like an agreement from
22 defense counsel that all objections by
23 counsel for Huskey are the same as us. If
24 we can have that agreement, I'll put my

Page 15

1  phone on mute so that I don't disrupt the
2  deposition too much.
3      MR. THOMAS: That's fine with me.
4      MS. LEWIS: Thank you so much, and I
5  apologize for the confusion.
6      MR. THOMAS: Not a problem.
7      Q.  (By Mr. Thomas) Have you requested
8  that Dr. Dunn supply those activities records?
9      A.  Yes. He's not in his office, but
10 he's going to call me when he gets there. If
11 he'll e-mail them to me, I can get them printed
12 out.
13     Q.  Very good.
14     Dr. Guelcher, you testified a moment
15 ago that you have consulted with attorneys on
16 matters involving other mesh products; is that
17 fair?
18     A.  Yes.
19     Q.  How many?
20     A.  Three other products.
21     Q.  And what are the manufacturers of
22 those products?
23     A.  American Medical Systems and Boston
24 Scientific.

Page 16

1      Q.  Okay. And then you've consulted with
2  attorneys with respect to Ethicon products?
3      A.  Yes.
4      Q.  For a total of three?
5      A.  Ethicon would be the fourth product.
6  There are two AMS products.
7      Q.  Okay. And have you given deposition
8  testimony in the AMS cases?
9      A.  One of the AMS cases and the Boston
10 Scientific case.
11     Q.  So have you given a total of two
12 depositions?
13     A.  Yes.
14     Q.  What is the product at issue in the
15 AMS case where you've given a deposition?
16     A.  I believe it was the SUI.
17     Q.  And what is the product at issue in
18 the Boston Scientific case where you've given a
19 deposition?
20     A.  There were several products. I can't
21 remember the names right now. Pinnacle maybe.
22 There were five of them, but I can't remember
23 all the names.
24     Q.  For what application were those

Page 17

1  products used? For the same application?
2      A.  Same application.
3      Q.  For stress urinary incontinence?
4      A.  Yes, I believe so.
5      Q.  When were you first contacted about
6  providing expert opinion with respect to
7  Ethicon?
8      A.  With respect to Ethicon would have
9  been -- I don't remember the exact date. Maybe
10 a month ago.
11     Q.  How were you contacted?
12     A.  By the attorneys at Wexler.
13     Q.  Prior -- is it your practice when you
14 get contacted to make notations in your
15 activity log about contacts with counsel?
16     A.  I'm not sure what you mean.
17     Q.  Would we be able to go back and look
18 at your activity reports that you have already
19 identified that Dr. Dunn is going to give to us
20 to find out when you were first contacted about
21 this litigation?
22     A.  In this case, I believe that would
23 be -- that information would be in the activity
24 report.

5 (Pages 14 to 17)

Scott A. Guelcher, Ph.D.

Page 18

```
 1      Q.   Okay.
 2      A.   I believe.
 3      Q.   Were you contacted directly about
 4   providing expert opinions with respect to
 5   Ethicon, or did they go through Dr. Dunn?
 6      A.   It came through Dr. Dunn.
 7      Q.   And were you on a conference call
 8   with Dr. Dunn and counsel for plaintiffs in the
 9   case? Is that how you first got brought into
10   the case?
11      A.   No.  Dr. Dunn called me in the
12   evening and we discussed it.
13      Q.   And what did Dr. Dunn tell you?
14      A.   That the attorneys at Wexler Wallace
15   wanted us to write an expert report for the
16   Ethicon case.
17      Q.   And did you and Dr. Dunn discuss the
18   details of the scope of the expert report that
19   you were preparing for the Ethicon case?
20      A.   Yes.
21      Q.   And tell me what you discussed during
22   that call about the scope of the report.
23      A.   Well, the scope of the report would
24   primarily be teaching with respect to the
```

Page 19

```
 1   oxidation of polypropylene.  We didn't have any
 2   samples.  So it was all -- the report was
 3   essentially based on literature and documents
 4   from Ethicon about the oxidation of
 5   polypropylene.
 6      Q.   Did you divide responsibilities for
 7   the report during the call?
 8      A.   Dr. Dunn and I wrote separate
 9   reports.  My report focused more on oxidation
10   of polypropylene, particularly the response in
11   the body.
12           Dr. Dunn's area of expertise is in
13   product design, polymer science.  So he
14   addressed issues more related to safety
15   analysis, those types of questions.
16      Q.   Prior to the conversation that you
17   had with Dr. Dunn about a month ago concerning
18   this potential expert report, had you studied
19   Ethicon mesh products at all?
20      A.   No, I wouldn't say studied.  I was
21   familiar that the products existed because of
22   the other litigation, but I had not studied
23   Ethicon products in particular.
24      Q.   So is it fair to understand that when
```

Page 20

```
 1   Dr. Dunn contacted you about preparing this
 2   expert report for use in this litigation, that
 3   you then began to -- your understanding of the
 4   Ethicon mesh products used to treat stress
 5   urinary incontinence?
 6      A.   A detailed understanding -- I had
 7   been studying the effects of in vivo
 8   polypropylene oxidation for some time, maybe
 9   six months prior to that.  But the details of
10   the Ethicon mesh started at the time I talked
11   to Dr. Dunn.
12      Q.   And the work that you did on the --
13   the six months work that you just discussed
14   that you did was with respect to the meshes of
15   other manufacturers?
16      A.   With respect to the meshes of other
17   manufacturers and also the oxidative
18   degradation of polypropylene in general.
19      Q.   Was the work that you did with
20   respect to the Ethicon SUI mesh products
21   different from the work that you did analyzing
22   the AMS products or the Boston Scientific
23   products?
24      A.   It was different in the sense that we
```

Page 21

```
 1   didn't have samples, either materials as made
 2   or materials that had been explanted from the
 3   body.  We didn't have those samples.
 4           So we focused in the reports more on
 5   the literature, internal documents, more on the
 6   oxidative degradation of polypropylene.
 7      Q.   Have you ever analyzed an Ethicon
 8   mesh used for the treatment of stress urinary
 9   incontinence?
10      A.   I have not.  I don't have the sample.
11      Q.   Have you ever analyzed an explant of
12   mesh manufactured by Ethicon for the treatment
13   of stress urinary incontinence?
14      A.   No, not to my knowledge.
15      Q.   Have you ever requested to analyze a
16   mesh manufactured by Ethicon for the treatment
17   of stress urinary incontinence?
18      A.   Not to my knowledge.  But a lot of
19   the product testing was done by Dr. Dunn.
20      Q.   Have you ever requested to a mesh
21   explant manufacturer for Ethicon, for the
22   treatment of stress urinary incontinence, for
23   the purposes of your own analysis?
24      A.   I have not done that directly.
```

6 (Pages 18 to 21)

Scott A. Guelcher, Ph.D.

Page 22

1  Dr. Dunn had some materials from manufacturers
2  and I don't remember exactly what.  But
3  personally I have not requested samples.
4      Q.   Did you have conversations with
5  Dr. Dunn about the availability of mesh samples
6  for testing?
7      A.   I think in this case, to the extent
8  that we didn't have them.
9      Q.   My question was, did you have
10 conversations with Dr. Dunn about the
11 availability of mesh samples for testing?
12     A.   I mean, we discussed it.  But the
13 problem was we didn't have the samples.  So
14 they weren't available.
15     Q.   Did you request samples to conduct
16 testing?
17     A.   I did not.  I don't know what he did.
18 But I know that the time was short between when
19 we had to get the report submitted and when the
20 request came.  So there was also a time
21 constraint.  There wasn't time to do it.
22     Q.   Now, did the work that you did in the
23 AMS and Boston Scientific litigation follow the
24 same pattern in terms of what you did for those

Page 23

1  cases?
2      A.   Well, in the AMS and Boston
3  Scientific studies, we had exemplars and we had
4  in some cases explanted materials.  There may
5  have been materials from Ethicon.  I just don't
6  remember because it wasn't part of that
7  specific case.  And Dr. Dunn did that testing,
8  and he would know.
9      Q.   Okay.  In the AMS litigation, what
10 kind of testing did you conduct on AMS exemplar
11 mesh?
12     A.   So can I talk with -- this or other
13 cases, I don't know how much detail I can
14 disclose on this.  These are other cases that
15 are by protective court order, so I don't know
16 what I can say or not say in terms of the
17 details.
18     Q.   I'm asking now only what kind of
19 testing that you performed, not what the
20 results of those tests were.
21     A.   Right.  But I don't know that --
22 because it's a protective order, I don't know
23 that I could even disclose the tests that we
24 did because it was somebody else's material on

Page 24

1  a different case.  So I guess I'm concerned
2  about disclosing something I'm not allowed to
3  disclose.
4      Q.   Would you like to consult with
5  counsel?
6      A.   I would, if that would be okay.
7      Q.   Just for the record, just for your
8  benefit, I'm going to want to know all the
9  kinds of tests that were conducted on the AMS
10 and Boston Scientific meshes and the purposes
11 of those tests.
12          If he's not going to be permitted to
13 answer that, then we'll figure out the next
14 path to take.
15          MR. JACKSON:  The question is
16 how far the protective orders go in the
17 state courts that are involved.  So Boston
18 Scientific state court litigation was in
19 Delaware and Massachusetts.  And the AMS
20 litigation was at the MDL level.
21          MR. THOMAS:  Just so you know, I'm
22 not going to argue with you about it.
23 Either you're going to let him answer or
24 you're not.  I am going to go to court and

Page 25

1  seek to get the answers because I think
2  it's very important to what's going on
3  here.
4          So either he's going to answer or
5  he's not.  I'm not going to argue with you
6  about it.
7          MR. JACKSON:  I think the questions
8  he's asked, you need to answer them at this
9  point.
10     A.   Okay.  So could you repeat it?  I
11 have lost track.
12     Q.   (By Mr. Thomas)  What kinds of tests
13 did you conduct on the exemplar meshes for AMS?
14     A.   So for AMS, we did gel permeations
15 chromatography, GPC.  I should say Dr. Dunn did
16 all the testing.  I'm telling you what I
17 remember.  So in some of this would be my
18 report so it's not an all inclusive list, but
19 it's what I remember.
20     Q.   Very good.
21     A.   We did GPC.  I know he took a number
22 of photographs under the microscope.
23     Q.   Light microscopy or SCN?
24     A.   Light microscopy.  I think there was

7 (Pages 22 to 25)

Scott A. Guelcher, Ph.D.

Page 26

1    -- well, I don't know about the SCN.  I can't
2    remember.
3          We also did x-ray photoelectron
4    spectroscopy or XPS.  That's a surface method
5    where we can detect products of oxidative
6    degradation on the surface.
7          We also did FTIR.  Again, Dr. Dunn
8    did all of these studies I know for the AMS, I
9    believe for the Boston Scientific as well.
10   Ethicon, I can't remember.  It's not in my
11   report so I don't -- and Dr. Dunn did it.  So I
12   don't remember what we did there.
13       Q.   The purpose of the GPC testing is to
14   do what?
15       A.   Measure the molecular weight.
16       Q.   What does molecular weight tell you
17   in the context of oxidation?
18       A.   Well, if the oxidation is
19   sufficiently severe.  So oxidation comes from
20   the surface inward.  If the oxidative
21   degradation is severe enough, say during
22   processing or after implantation, you could see
23   a reduction in molecular weight which can
24   correlate with reduction in ductility and

Page 27

1    embrittlement.  So that was the GPC
2    measurement.
3        Q.   For what purposes did you take the
4    photographs by light microscopy?
5          MR. JACKSON:  Object to the form.
6        A.   Just a visual representation of the
7    mesh.
8        Q.   (By Mr. Thomas)  For what purpose was
9    the XPS testing conducted?
10       A.   The purpose of the XPS was to look
11   for carbonyl and hydroxyle groups on the
12   surface which are products of oxidative
13   degradation.
14       Q.   What is FTIR?
15       A.   Fourier transform infrared
16   spectroscopy.
17       Q.   And I believe you testified that
18   Dr. Dunn conducted FTIR testing on both AMS and
19   Boston Scientific meshes?
20       A.   I believe that he did, but I'm more
21   confident in the XPS data because that's what I
22   specifically used in my reports.  Dr. Dunn can
23   speak to all the testing that was done.  Those
24   were all done by him.

Page 28

1        Q.   In addition to the tests conducted on
2    the exemplar meshes, were the same tests
3    conducted on explanted meshes?
4        A.   Only for one of the AMS cases.  We
5    had some explanted mesh and we did XPS on that
6    mesh.
7        Q.   For what purpose did you conduct XPS
8    testing on the AMS explanted mesh?
9        A.   To identify the presence of carbonyl
10   and hydroxyle groups similar to the exemplars.
11       Q.   When you tested the explanted mesh
12   from AMS, was it necessary to prepare that mesh
13   explant for testing?
14       A.   The preparation of the explant was
15   done by Dr. Iakovlev, who is at the University
16   of Toronto.
17       Q.   Did you or Dr. Dunn have any
18   involvement in consulting with Dr. Iakovlev
19   about the preparation of the explant for XPS
20   testing?
21       A.   We did.
22       Q.   And tell me about your conversations
23   with Dr. Iakovlev about the appropriate way to
24   prepare this sample for analysis.

Page 29

1        A.   Well, we had it shipped to us wet.
2    Dr. Iakovlev --
3        Q.   Let me stop you there.  When you say
4    shipped wet, what do you mean by that?
5        A.   It was in buffer, I believe, saline
6    buffer.  I can't remember the details.
7        Q.   Was the mesh when you received wet in
8    Formalin?
9        A.   No, I don't think so.
10       Q.   Was there a reason why you did not
11   want it in Formalin?
12       A.   Well, some of Dr. Iakovlev's samples
13   were processed in Formalin for histology.  Now
14   formalin is compatible with polypropylene.  It's
15   known that you can look it up.  Dr. Iakovlev
16   has run controls on pristine meshes, but we
17   felt for this purpose to have it in saline
18   would introduce less questions regarding the
19   analysis.
20       Q.   Why did you use saline instead of
21   Formalin?
22       A.   Saline is typical physiological.
23   It's a buffer that's used often to mimic body
24   fluids.

8 (Pages 26 to 29)

Scott A. Guelcher, Ph.D.

Page 30

1    Q.   What concerns did you have about any
2  impact Formalin may have on the sample that you
3  were going to test?
4    A.   We didn't have any concerns because
5  polypropylene and Formalin are compatible.
6    Q.   At the time that you analyzed the
7  mesh explant from AMS that you had shipped in
8  saline, did you analyze the extent to which
9  Formalin would interact with proteins on the
10  surface of the mesh explant?
11    A.   No.  Dr. Iakovlev desiccated the
12  explants manually, from what I remember.  He
13  removed extra tissue that he could find and
14  then shipped them to us dry for the XPS
15  testing.
16    Q.   I'm sorry.  I misunderstood your
17  answer.  I thought you told me a minute ago
18  that you received the mesh explant wet.
19    A.   Dr. Iakovlev did.  He received the
20  mesh explant from the hospital.  He prepared
21  the sample for XPS then shipped it to us
22  dry after he had removed the tissue from the
23  sample.
24    Q.   I see.  Did -- how did Dr. Iakovlev

Page 31

1  clean the sample?
2    A.   I can't remember the details.  It was
3  a different case, so I didn't review this.  So
4  how much detail again should I --
5        MR. JACKSON:  If you can, answer the
6    question.
7    A.   In this case, I really can't remember
8  exactly how he -- he did it.  I know that he
9  had some mesh samples that he had scraped and
10  some that he had manually dissected just to
11  remove the tissue.  But it was all done in
12  things like saline or dry.
13        To my knowledge, I can't remember any
14  processing of Formalin.  But I'm going on my
15  memory, and it was a different case.
16    Q.   All right.  Was there any effort to
17  test explanted meshes from the Boston
18  Scientific litigation?
19    A.   I'm not sure what you mean by "any
20  effort."  We didn't have the explant, so we
21  couldn't do it.
22    Q.   Did you request explants from Boston
23  Scientific to conduct tests?
24    A.   I believe we did.  But then again,

Page 32

1  Dr. Dunn has been handling those types of
2  requests.
3    Q.   Going back to the AMS explant you and
4  Dr. Dunn analyzed, you said you conducted XPS
5  testing.  Any other testing you conducted on
6  that AMS explant?
7    A.   No.  I mean, the amount of sample is
8  very small.  Dr. Dunn may have done -- he may
9  have done FTIR.  I can't remember.  But I think
10  the samples are very small.  That's one
11  advantage of XPS, is that we can probe a very
12  small surface.
13        So to my knowledge, what I can
14  remember is we only did XPS on those.
15    Q.   What was the goal of conducting the
16  testing on the AMS explanted mesh?
17    A.   It was to look for presence of
18  hydroxyle and carbonyl groups on the surface
19  that are associated with polypropylene
20  degradation.
21    Q.   And what do the hydroxyle and
22  carbonyl groups tell you if you find them on
23  these explanted meshes?
24        MR. JACKSON:  Object to the form.

Page 33

1    A.   Well, you can do a similar approach
2  using FTIR that's in the literature where it
3  tells you that -- polypropylene is a
4  hydrocarbon.  So there shouldn't be any
5  carbonyl and hydroxyle groups.  So if you see
6  these species, it's an indication of oxidation
7  of the surface.
8        This has been done by FTIR, also, in
9  the past.  But XPS, we believe, is more
10  sensitive.
11    Q.   More sensitive than what?
12    A.   FTIR.
13    Q.   In what respect is XPS more sensitive
14  than FTIR?
15    A.   XPS gives atomic percents, so percent
16  carbon, percent oxygen, percent nitrogen.  And
17  it also provides details about the state of the
18  bonding.  So it can tell you whether there's
19  bound oxygen on the surface.
20    Q.   Why wasn't GPC testing conducted on
21  the AMS mesh explant?
22    A.   There wasn't enough material, and GPC
23  takes quite a bit more material.
24    Q.   In the hierarchy of tests, it

Scott A. Guelcher, Ph.D.

Page 34

1    provides you helpful information to understand
2    the extent to which degradation may have
3    occurred, where does GPC fit?
4         MR. JACKSON:  Object to the form.
5         A.   Well, I believe the GPC would be
6    below XPS in priority because GPC is a bulk
7    measurement.  XPS is a surface measurement.
8    Oxidative degradation proceeds from the surface
9    inward.  So XPS is going to provide more
10   detailed information.
11        Q.   (By Mr. Thomas)  How does GPC compare
12   to FTIR?
13        A.   FTIR is also a method primarily for
14   looking at the oxidized species on the surface.
15   GPC is measuring the bulk molecular weight of
16   the polymer.
17        Q.   Which is more sensitive, FTIR or GPC?
18        A.   I don't know if I could answer that.
19   They measure different things.  GPC measures
20   molecular weight and FTIR is measuring chemical
21   composition.
22        Q.   Is it fair to understand that a
23   molecular weight analysis is going to be more
24   accurate than an FTIR analysis to understand

Page 35

1    the extent to which polypropylene is degraded?
2         A.   I wouldn't agree with that -- the
3    only way you could support that statement is if
4    you could measure GPC of that actual degraded
5    layer.  But, again, that's going to be
6    difficult.
7         GPC is essentially a volume average
8    over the entire fiber.  So it doesn't really
9    tell you what's going on on the surface because
10   it's averaged over the entire volume.
11        Q.   Have you ever testified that
12   molecular weight analysis is more sensitive to
13   look at degradation than FTIR?
14        A.   They measure different things.  So
15   GPC measures molecular weight.  FTIR measures
16   the surface composition.  And FTIR is, I don't
17   think is, as sensitive as XPS, but they just
18   measure different things.
19        I think GPC is an important
20   measure -- if you see degradation by GPC, that
21   means it's even -- it's fairly degraded, if
22   you're seeing loss in molecular weight.
23        But I wouldn't use the word
24   sensitive.  I would say XPS can tell you what's

Page 36

1    happening at earlier time points before you
2    have a lot of molecular weight loss, and then
3    GPC would actually measure that loss in
4    molecular weight.  So it's measuring something
5    different.
6         Q.   Do you agree with this statement:  A
7    molecular weight analysis is really going to be
8    more accurate, I think, than to try to look for
9    degradation than with the FTIR for these
10   explanted meshes?
11        A.   It depends on the context of the
12   statement.  I mean -- like I said, GPC is going
13   to tell you whether there's a loss of molecular
14   weight in the material.  FTIR -- the problem
15   with FTIR is it could be looking at -- you
16   can't interpret it as directly as XPS in terms
17   of the source of the carbonyl or the hydroxyle
18   groups.  And it has to be fairly far along in
19   the degradation before you can see it.
20        Q.   What has to be fairly far along in
21   the degradation before you can see it?  I'm
22   didn't understand your answer.  I'm sorry.
23        A.   Well, I'm saying that FTIR, I think
24   is -- XPS, you can see what's happening, I

Page 37

1    believe, at earlier time points than you could
2    with FTIR because the peaks aren't always as
3    resolved as well.  XPS is, I think more precise.
4         Q.   So is it your position that XPS is
5    the best test method to understand the extent
6    to which oxidation occurs on the surface of
7    explanted meshes?
8         A.   I would say that XPS can -- I think
9    the advantage of XPS is it can predict what's
10   happening at very early time points before
11   there's molecular weight loss.
12        Molecular weight loss happens later
13   in the process.  Those carbonyl and hydroxyle
14   groups will form on the surface earlier.  So
15   GPC is very effective for measuring molecular
16   weight loss.  I think what I'm saying here is
17   that XPS can predict those events at very early
18   time points before there's molecular weight
19   loss.  That's what I'm saying.
20        Q.   What kind of equipment is necessary
21   to conduct XPS testing?
22        A.   Well, there's a specific instrument
23   in XPS that's a high vacuum device.  So you
24   have to -- it's a fairly expensive instrument.

10 (Pages 34 to 37)

Scott A. Guelcher, Ph.D.

Page 38

1      Q.   And how is that test conducted?
2          MR. JACKSON:  Object to the form.
3          A.   Dr. Bridget Rogers at Vanderbilt did
4    the XPS testing.  That's her area of expertise.
5    The actual details of how the test is
6    performed, she would be -- she's the one that
7    did the testing for this.  I basically talked
8    with her about interpretation of the data.
9          Q.   (By Mr. Thomas)  Okay.  How is XPS
10   testing different from EDX testing?
11         A.   Well, EDX, in my understanding, is
12   more like SCM where you would look for specific
13   atoms in the background.  But my understanding
14   is that XPS is more sensitive than EDX.  That's
15   why we used XPS.
16         Q.   Did you conduct any EDX testing on
17   any of the meshes you analyzed?
18         A.   Not to my knowledge, but Dr. Dunn
19   would be able to speak to that.
20         Q.   The reason why you and Dr. Dunn
21   conducted the tests that you did on the AMS and
22   Boston Scientific meshes was to understand the
23   extent to which these meshes may undergo
24   oxidative degradation?

Page 39

1          A.   Yes.  We were looking for evidence of
2    oxidative degradation.  The advantage of XPS is
3    that you can see what's happening at early time
4    points, and it doesn't require a lot of
5    sampling.  And you can probe the surface with
6    it.  That's really the advantages of it.
7          Q.   Okay.  Dr. Guelcher, go back to a
8    month ago or so when you were first contacted
9    by Dr. Dunn about your work in this case, and
10   you had this conversation with Dr. Dunn you
11   just told me about, and you decided what work
12   you were going to do and you didn't have any
13   exemplars and you didn't have any explanted
14   meshes.  What did you do to acquaint yourself
15   with the Ethicon product?
16         MR. JACKSON:  Object to the form.
17         A.   We reviewed papers on it, internal
18   documents, published papers describing the
19   product.
20         Q.   (By Mr. Thomas)  Are all the
21   documents that you reviewed to familiarize
22   yourself with the product in Exhibits 2 and 3?
23         A.   Yes.
24         Q.   Did you conduct your own literature

Page 40

1    search?
2          A.   So I've conducted my own literature
3    search on -- I have done my own searches for
4    oxidative degradation of polypropylene.
5          For the internal documents, we were
6    provided with documents by the attorneys.  We
7    didn't have access to those through literature.
8          Q.   Is it fair to understand, though,
9    specifically for the Ethicon mesh, that you
10   didn't conduct an internal -- strike that.
11         Is it fair to understand with respect
12   to the Ethicon mesh that you didn't conduct a
13   new literature search about the oxidative
14   effects on polypropylene?
15         A.   Not for specific Ethicon products.  I
16   was focusing more on the mechanisms of
17   oxidative polypropylene in general.
18         Q.   As a part of your work and your
19   opinions in this case, did you ever focus on
20   the mechanisms of oxidation of polypropylene
21   for Ethicon products specifically?
22         A.   Could you repeat that?
23         Q.   Doctor, you testified -- strike that.
24   Doctor, in the course of your work in this

Page 41

1    case, did you ever analyze the extent to which
2    Ethicon mesh specifically degrades?
3          A.   There was some internal documents
4    that there were references in one of these is
5    addressed in the rebuttal report.  We just
6    received a document.
7          There was a 1987 study.  There was a
8    human study and a study in dogs that were done
9    by Ethicon that discussed oxidative degradation
10   of polypropylene.  These were with Prolene
11   sutures, I believe, and not the mesh.  It was
12   the sutures.
13         Q.   Other than the internal documents
14   that you described, did you conduct any
15   investigation to determine the mechanism of any
16   oxidative degradation that Prolene mesh
17   undergoes?
18         A.   Not specific to Prolene.  I think in
19   some of the literature studies, Prolene or TVT
20   Ethicon meshes were reviewed.  But it's
21   polypropylene, so we were focusing really on
22   the oxidation of the polypropylene molecule.
23         Q.   What did you do in formation of your
24   opinions in this case to understand the history

11  (Pages 38 to 41)

Scott A. Guelcher, Ph.D.

Page 42

1  of Prolene?
2      A.   I reviewed the documents that are in
3  the reference materials.
4      Q.   Do you know how long Prolene has been
5  in the market?
6      A.   I believe since the 1960s.
7      Q.   Do you know the application for
8  Prolene since the 1960s?
9      A.   I know it's used in sutures and
10  hernia mesh and in the pelvic floor meshes.
11      Q.   Do you know how Prolene happened to
12  be introduced as a medical device in the 1960s?
13      A.   I don't remember the history of that.
14      Q.   Are you familiar with a term known as
15  a new drug application, NDA?
16      A.   That's a regulatory term, I presume.
17      Q.   What's your understanding of what a
18  new drug application is?
19      A.   I don't know that I'm familiar with
20  the new drug application.  My work is more in
21  devices where we're dealing with PMAs and
22  510Ks.  And a new drug application I'm not as
23  familiar with.
24      Q.   What's your general understanding of

Page 43

1  what that is, to the extent that you have one?
2      A.   I would presume that when a company
3  develops a new drug, they submit a new drug
4  application.  But that specific term, I don't
5  know the details of it.
6      Q.   In learning about the polypropylene
7  used in Prolene, did you review any of the
8  testing conducted by Ethicon since the 1960s in
9  connection with the safety and efficacy of the
10  polypropylene used in Prolene?
11      A.   Primarily, the dog study and human
12  study were the primary documents that I
13  reviewed.
14      Q.   And the dog study would be the
15  seven-year dog study?
16      A.   The seven-year dog study published in
17  1992.
18      Q.   What was the human study you referred
19  to?
20      A.   I wouldn't call it a human study.  It
21  was sutures explanted from vascular grafts in
22  human patients.  That one was done in 1987.
23      Q.   That must be in your rebuttal report?
24      A.   It is.

Page 44

1      Q.   I'll get it here in a minute.  No
2  problem.
3           Were those the only two studies
4  you've looked at to understand specifically the
5  testing done by Ethicon on the safety and
6  efficacy of the polypropylene used in Prolene
7  since its introduction in the '60s?
8      A.   There was a 17-year study done by
9  Nielson published about maybe 2011, I think,
10  2013.
11      Q.   You've opened your book.
12      A.   That's this one.
13      Q.   You obviously have that in your
14  notebook there?
15      A.   Yes.
16      Q.   I didn't see that referenced in your
17  report.  For what purpose did you look at the
18  17-year Nielson study?
19      A.   Well, it was a long-term study on the
20  TVT device, not the TVT-O but the TVT device.
21      Q.   Do you understand that the mesh used
22  in the Nielson study for the 17-year data
23  that's contained in that study is the same mesh
24  that's used in TVT-O?

Page 45

1      A.   Yes.
2      Q.   Are you able in your area of
3  expertise to use the results from the Nielson
4  study that you have in front of you?  Can you
5  transfer those to TVT-O?
6           MR. JACKSON:  Object to the form.
7      A.   There are differences in my
8  understanding between TVT and TVT-O in the
9  approach and the instruments.
10           The mesh is the same, is also
11  polypropylene.  But whether or not you can
12  translate this to TVT-O, I don't know.  I'm not
13  a surgeon.  But I know it's also polypropylene
14  mesh.
15      Q.   Of what significance to you is the
16  Nielson study that you have in front of you,
17  the 17-year data?
18      A.   Well, it's not that many patients and
19  they -- a fraction of them, they followed --
20  maybe 60 percent they followed out to 17 years.
21  One of them had a complication, an erosion.
22  But I think it's just another piece of data.
23           I mean, Dr. Nielson is -- I think it
24  says in the back here that he's a consultant

12 (Pages 42 to 45)

Scott A. Guelcher, Ph.D.

1  for Ethicon. So, you know, he has interest in
2  success of the material. It's one study done
3  by a clinician who is pretty connected to the
4  material.
5      Q.   Do the findings in the Nielson study,
6  the 17-year data support your opinions in this
7  case?
8          MR. JACKSON: Object to the form.
9      A.   There was an erosion in one of the
10  meshes that would be consistent with my opinion
11  that polypropylene undergoes surface oxidation
12  which leads to embrittlement, can lead to
13  erosion and other types of complications.
14     Q.   There's nothing in that study to
15  suggest that there's degradation leading to
16  the one erosion that's there, is there?
17     A.   I don't think they looked at that.
18     Q.   Is that the only point in the Nielson
19  study upon which you rely to support your
20  opinions, the fact that an erosion occurred?
21     A.   There wasn't a lot of -- I mean, the
22  examinations that these women received, some of
23  them they talked to over the phone. It was a
24  quality-of-life survey in older women. So to

1  me, it's a bit difficult to interpret. Were
2  there other types of complications? It's hard
3  to say.
4          The data just aren't that -- they say
5  in here that a lot of the patients didn't want
6  these invasive evaluations. So it's very
7  qualitative. It's difficult for me to take
8  much away from it. It's just another piece of
9  information.
10     Q.   All I'm trying to understand is
11  you've obviously pointed this out to me as
12  something in your file that's of significance
13  to you, and I need to know the significance of
14  it to your opinions in the case.
15     A.   So, I mean, I thought I answered it.
16  There was one patient had an erosion. And it's
17  difficult for me to rely heavily on this
18  document just because of the types of data that
19  was collected. It wasn't specific to the types
20  of questions that we're asking. I would say it
21  was more inconclusive, if that's what you're
22  asking.
23     Q.   Okay. So have we identified now the
24  studies that you looked at specific to Ethicon

1  mesh or suture in connection with your opinions
2  in the case?
3      A.   I believe so. Well, yeah, for
4  specific -- yes, I believe so, for specific
5  Ethicon products that I can remember.
6      Q.   Right. Dr. Guelcher, have you ever
7  used the term "gold standard"?
8      A.   I think a lot of people use this
9  term. It can apply to a lot of -- it depends
10  on the context of what you mean.
11     Q.   How do you use the term "gold
12  standard" in your work?
13     A.   I don't think I use it very much. It
14  can be used in the context of almost like a
15  clinical control. So in my work in bone
16  grafting, a lot of people refer to autograft
17  bone as the gold standard. It's the most
18  successful approach for healing bone.
19         That doesn't necessarily mean it's
20  preferred or the best way to do it. It's just
21  what's known to be the most effective. So
22  autograft bone has its deficiencies. People
23  still refer to it as the gold standard because
24  it's the best known approach basically.

1      Q.   And in the bone graft context,
2  there's no perfect bone graft procedure; fair?
3      A.   Well, the problem with autograft is
4  that you have to get it from somewhere. That
5  introduces a lot of limitations. And so
6  there's a number of different approaches that
7  can be used.
8      Q.   At least that is -- the autograft
9  bone procedure is known as the gold standard
10  in your area of expertise because it's the
11  best that you-all have available at this
12  time; is that fair?
13     A.   That's the way a lot of -- I think
14  that's -- I mean, understanding within the
15  field is that autograft is the gold standard
16  in terms of healing.
17     Q.   Have you made any investigation to
18  determine the extent to which the use of
19  polypropylene in tissue repair has been
20  considered the gold standard since the '60s?
21     A.   Well, I don't know that I would agree
22  with that statement. I think some of Ethicon's
23  own documents and e-mails say that they're
24  moving toward these PVDF meshes because the

Scott A. Guelcher, Ph.D.

Page 50

1    inflammatory response is less severe.
2        Q.   My question is very simple:  Have you
3    made any investigation to determine the extent
4    to which polypropylene has been considered the
5    gold standard in tissue repair since the 1960s?
6        A.   Well, I think I just said other
7    people may consider it the gold standard.  I
8    looked into these documents, and I don't
9    consider it the gold standard.  It's an
10   unstable material in my opinion.
11       It may have been the best one
12   available in 1960, but I think recent evidence
13   points to the contrary that there are
14   alternative materials available.
15       I think even Ethicon's own e-mails
16   there are statements that we need to move to a
17   different material because of problems with
18   polypropylene.
19       Q.   And what material -- do you have an
20   opinion that there's a better material than
21   polypropylene in the treatment of stress
22   urinary incontinence?
23       A.   That opinion really wasn't the
24   subject of my report.  I can say that in the

Page 51

1    documents that I reviewed, there were Ethicon
2    employees and I believe even consultants
3    pointing out that PVDF, for example -- there
4    are some papers that have pointed out that PVDF
5    would be a better choice, but I didn't look at
6    that specifically in my report.
7        Q.   Do you know what PVDF is?
8        A.   Polyvinylidene fluoride.
9        Q.   Have you ever studied the use of
10   polyvinylidene fluoride in the context of
11   tissue repair?
12       A.   No.  Like I said, that's outside the
13   context of my report.  I'm just noting that
14   even Ethicon employees are doubting this notion
15   that polypropylene is the only thing available.
16       Q.   Do you know of any PVDF mesh
17   available for sale in the United States?
18       A.   No.  It would require another
19   regulatory filing.
20       Q.   Now, at what point, to your
21   knowledge, was PVDF available as an
22   alternative?
23       A.   I believe -- let me look at the
24   document.

Page 52

1        Q.   Are you referring to Ethicon
2    documents now?
3        A.   Yes.
4        Q.   Are you looking at the seven-year dog
5    study?
6        A.   I am.  So they were looking at
7    alternatives.  One of the alternatives was
8    Ethylon, Novafil, Prolene, and they point out
9    that -- let me look at this for a minute.
10       So in this dog study, some of the
11   dogs were implanted with PTVF sutures in 1987,
12   and I believe the -- so this report is
13   basically saying PVF and Novafil did not show
14   the surface cracks and surface oxidation that
15   Prolene was showing.  So this would be 1992, I
16   think this was published.  Yeah.
17       Q.   Is it your understanding that the
18   Ethicon dog study was published?
19       A.   I mean published internally.  It
20   looks like it's an internal report to me.
21   That's what I meant by published.  Submitted, I
22   should say.
23       Q.   Doctor.  Is there any significance to
24   your opinions in this case, whether you are

Page 53

1    looking at Prolene that's sutured or Prolene in
2    mesh, in terms of the oxidative degradation
3    issues?
4        A.   Well, there's a number of comments in
5    the internal Ethicon documents about moving
6    from heavy-weight to light-weight mesh, the
7    notion being just having less polypropylene has
8    been associated with a reduced inflammatory
9    response.
10       Mesh is different than sutures.  It's
11   implanted in a different anatomic site where
12   there could be differences in load-bearing.
13   There could be differences in the cellular
14   infiltrate.  There's many types of differences.
15       So I don't know that -- you can learn
16   some things from the suture studies, but it's
17   not necessarily representative of how much
18   degradation you would see in a mesh.  I would
19   think you would see more in a mesh.
20       Q.   Why?
21       A.   Because there's more polypropylene
22   there.  It's -- especially in the pelvic floor,
23   it's bearing a load, so it's under a different
24   types of stresses and strains.  So the

14  (Pages 50 to 53)

Scott A. Guelcher, Ph.D.

Page 54

1  consequences of those, oxidative degradation
2  could be different in a mesh than you would see
3  in a suture.
4       Q.   Are your opinions in this case
5  specific to meshes?
6       A.   Well, I think my opinions relate to
7  oxidative degradation of polypropylene and then
8  how that can affect the mesh.  That's my --
9       Q.   I understand that.  But are your
10  opinions in this case specific to meshes and
11  not sutures?
12       A.   Yes.  I'm not here to testify about
13  polypropylene sutures.  I was looking at the
14  suture studies because it was the data that was
15  available to evaluate the body's response to
16  polypropylene.
17       Q.   And are your opinions in this case
18  specific to the polypropylene mesh used for the
19  treatment of stress urinary incontinence?
20            MR. JACKSON:  I'm going to object to
21       form.
22       A.   So, again, my opinions are generally
23  to oxidative degradation of polypropylene and
24  how that can affect its performance in the SUI

Page 55

1  application.
2       Q.   (By Mr. Thomas) You've not looked at
3  the extent to which oxidative degradation of
4  polypropylene can impact the performance of
5  Prolene in other applications?
6       A.   Like hernia or something?
7       Q.   Correct.
8       A.   That's not what I'm saying in the
9  report or testifying to.  It's the meshes and
10  the SUI.
11            MR. JACKSON:  We've been going for
12       about a hour.  Do you think it's time for a
13       break?
14            MR. THOMAS:  That's fine.
15            (A break was taken from 10:26 a.m.
16       until 10:39 a.m.)
17       Q.   (By Mr. Thomas) Doctor, I want to
18  move to your report which we've marked as
19  Exhibit No. 1.
20       A.   Okay.
21       Q.   Go to page 4 of your report, please.
22  The second paragraph on page 4, you talk
23  about -- you make the statement, Although
24  polypropylene can never be considered inert.

Page 56

1  Is there any material that can be used for
2  medical implants that can be considered inert?
3       A.   Some are less active than others.  I
4  don't know if it's anything that's completely
5  inert.
6       Q.   You continue and say, It's often
7  stabilized against the threat of oxidation by
8  adding antioxidants to the molten polymer.
9  These antioxidants are supposed to act as
10  scavengers that will react with any oxidative
11  species.
12            Do you know how, if at all, Ethicon
13  stabilized Prolene against the threat of
14  oxidation by adding antioxidants?
15       A.   So there's some information in the
16  internal documents I know they made some
17  changes to stabilizer levels.  The stabilizer
18  levels that I saw were reported as ranges.
19            In the 1987 human explants, it was
20  noted that the antioxidant was depleted in the
21  surface oxidized layer on the polypropylene.
22            My understanding was the oxidants
23  were added to protect against oxidation during
24  thermal processing.  But to dose an antioxidant

Page 57

1  over the lifetime of the device in vivo would
2  be -- I don't know if that can be done.  That's
3  what I'm saying in this paragraph.
4       Q.   What did Ethicon do to stabilize its
5  polypropylene against oxidation?
6       A.   In the human study -- not the human
7  study.  The human explanted materials, they
8  were using --
9       Q.   I need you to identify what you're
10  reading now.
11       A.   Oh, this is the report issued on
12  human explants from human vascular graft,
13  Prolene sutures removed from human vascular
14  graft.
15            MR. JACKSON:  Is there a Bates number
16       at the bottom of that?
17            THE WITNESS:  Ethicon mesh 12831391.
18       Q.   (By Mr. Thomas) It's dated September
19  30, 1987?
20       A.   Yes.
21       Q.   And it's an Ethicon document?
22       A.   Yes.
23       Q.   It says, IR microscopy of explanted
24  Prolene received from professor R. Guidoin?

15 (Pages 54 to 57)

Scott A. Guelcher, Ph.D.

Page 58

1    A.   Yes.
2    Q.   When did you first see those
3  documents?
4    A.   Yesterday, I believe.
5    Q.   And how did you obtain those
6  documents?
7    A.   Dr. Dunn asked for this document, I
8  believe.  I got it from him.  I believe he
9  asked the attorneys for it.
10    Q.   And what does --
11    A.   You asked about the antioxidants.
12    Q.   Correct.
13    A.   I believe that this report -- I need
14  to find it.  Dilauryl thiodipropionate, DLTDP,
15  is what I believe -- I believe they were using
16  this as antioxidant in the suture at this time.
17  It appears reduced in the two-year sample
18  spectra and further reduced in the eight-year
19  sample spectra.  And in the material they
20  scraped off the surface, they did not find any
21  of it.  That's what the report says.
22    Q.   Okay.  Just for the record, that's
23  marked as document No. 18?
24    A.   Yes.

Page 59

1    Q.   In Exhibit No. 3; is that right?
2    A.   Yes, that's right.
3    Q.   And you received that document
4  yesterday.  Any other documents that you
5  received yesterday that you rely on for your
6  opinions in the case?
7    A.   Well, they're in this notebook.
8    Q.   This is the new binder?
9    A.   Yes.  So this was one that I brought
10  with me.  These are some --
11    Q.   I see.
12    A.   Most of this I got from Dr. Dunn.  He
13  had requested a number of these documents, and
14  he got them from attorneys and we reviewed them
15  yesterday.
16    Q.   I see.  So the documents in Exhibit
17  No. 3 go with the rebuttal report that you were
18  served yesterday?
19    A.   They do, yeah.
20    MR. THOMAS:  For the record, I'm
21  going to mark as Exhibit No. 5 -- Exhibit
22  No. 5 is an expert rebuttal report from
23  Scott Guelcher, Ph.D., that I received for
24  the first time this morning.  And the

Page 60

1  documents -- I guess there are 20 documents
2  in a notebook which we've marked earlier as
3  Exhibit No. 3.
4    (Exhibit 5 was marked.)
5    Q.   (By Mr. Thomas) Those 20 documents
6  are the documents upon which you rely for the
7  substance of your rebuttal report, Exhibit 5?
8    MR. JACKSON:  Object to the form.
9    A.   Well, the rebuttal report also
10  includes the documents submitted.  The rebuttal
11  report also includes documents in the first
12  report.
13    Q.   Okay.  But the new documents for the
14  rebuttal report are contained in the notebook,
15  Exhibit 3, that you brought here with you this
16  morning?
17    MR. JACKSON:  Object to the form.
18    A.   I believe that they are.
19    Q.   (By Mr. Thomas) Other than document
20  No. 18 in Exhibit No. 3, do you have any other
21  documents to support your opinion that the
22  antioxidants in the Prolene mesh were not
23  sufficient to stabilize against the threat of
24  oxidation?

Page 61

1    A.   This is the only document that has
2  the in vivo analysis of that.
3    Q.   Okay.  Going back to my original
4  question, what did you do to understand how
5  Ethicon used antioxidants to stabilize Prolene
6  against the threat of oxidation?
7    A.   So Dr. Dunn was looking at this more
8  in his report.  I discussed this topic with
9  Dr. Dunn.  He showed me some documents
10  providing ranges of the antioxidant that were
11  provided.
12    There were some changes made to the
13  antioxidant levels as well.  I'm not sure that
14  we were able to identify what those were.  But
15  I do believe there were some documents stating
16  that the antioxidant levels were changed, but
17  Dr. Dunn was looking at that.  I discussed it
18  with him.
19    Q.   Do you have an opinion that you're
20  prepared to offer to a reasonable degree of
21  scientific certainty that the antioxidant
22  package used by Ethicon for Prolene is
23  inadequate to protect against oxidation in
24  vivo?

16 (Pages 58 to 61)

Scott A. Guelcher, Ph.D.

Page 62

1     A.   My opinion is that the antioxidant
2  used cannot protect against oxidation in vivo.
3  I believe that because of the teachings of Jim
4  Anderson that this chronic inflammatory
5  response foreign body reaction is ongoing and
6  will continue to oxidize material and deplete
7  the antioxidant.
8         That observation is basically
9  supported by these studies on the sutures from
10 the human explants and, you know, consistent, I
11 think, with the field that you simply can't
12 protect a device over its lifetime.  It's going
13 to be implanted in a patient over the patient's
14 lifetime with an antioxidant.  Eventually, it
15 will be depleted.
16    Q.   Can you tell me today what the
17 antioxidant package that Ethicon used to
18 protect the Prolene polypropylene from
19 oxidation was?
20    A.   I don't know what it is today.  In
21 this report in 1987, it was DLTDP.
22    Q.   Is that all it was?
23    A.   That's what it says in this report.
24    Q.   Have you tried to determine the

Page 63

1  specific antioxidant package Ethicon used to
2  stabilize Prolene against the threat of
3  oxidation?
4     A.   Dr. Dunn and I looked at this.  Like
5  I said, our conclusion was that the documents
6  provided a range of antioxidant.  It didn't
7  provide a specific dose.
8     Q.   Can you tell me today as you sit here
9  in this chair the antioxidant package Ethicon
10 used to stabilize Prolene against the threat of
11 oxidation?
12    A.   I don't remember what it was.
13    Q.   Is it your opinion, Doctor, that
14 there is no antioxidant package available that
15 can effectively stabilize polypropylene against
16 the threat of oxidation?
17    A.   I don't believe it's possible to
18 stabilize an implant against oxidation over its
19 entire lifetime.  I don't know that there's
20 much data on what the dosing should be.  If
21 it's dosed too high, that could cause problems.
22 There's papers that have noted that.
23        The problem is it's an inherently
24 unstable material, and stabilizing it is going

Page 64

1  to be very difficult.  No matter what
2  antioxidant is added, it's going to be
3  gradually depleted over time.
4     Q.   What's the basis for your opinion
5  that whatever antioxidant is available is going
6  to be depleted over time?
7     A.   Well, the paper by Jim Anderson and
8  other papers that have shown that this foreign
9  body reaction is continuous and ongoing and
10 it's going to continue as long as the material
11 is there.  Eventually, that antioxidant is
12 going to be depleted.
13        I suppose you could put it in at very
14 high doses, but then you're going to have
15 toxicity concerns.  To my knowledge, nobody has
16 studied that, what's the amount of antioxidants
17 to add to protect it over its lifetime.
18    Q.   Is it your opinion that the
19 antioxidant package Ethicon used is inadequate
20 or that it can't be done?
21    A.   Well, my opinion is that the
22 antioxidant used in 1987 is inadequate.  That
23 opinion is supported by Ethicon's own data.
24        I don't know what -- I don't remember

Page 65

1  what the antioxidant is that's being used
2  today, but my opinion would be that that would
3  also be inadequate.  Over time, it's just going
4  to be depleted and you can't guarantee that
5  it's going to stay there.
6     Q.   Okay.  And the same would be true for
7  any polypropylene used as a medical device;
8  fair?
9         MR. JACKSON:  Objection to form.
10    A.   I don't believe polypropylene can be
11 stabilized effectively over its lifetime when
12 implanted in a human or animal.
13    Q.   (By Mr. Thomas)  What's the risk when
14 you're unable to stabilize the polypropylene
15 used as a medical implant over the life of the
16 implant?
17        MR. JACKSON:  Object to the form.
18    A.   Well, the risk is exactly what's
19 pointed to in this Ethicon study.  At two
20 years, I don't believe they saw --
21    Q.   This is Tab 18 again, the Guidoin
22 study?
23    A.   Yes.  I need to review this again for
24 just a minute.  There are a lot of documents.

17 (Pages 62 to 65)

Scott A. Guelcher, Ph.D.

Page 66

1    So I can say that as you go from two
2    to eight years, the amount of DLTP -- DLTDP was
3    reduced, and in that surface oxidized layer it
4    was gone.
5        So I think this study supports the
6    idea that stabilizing polypropylene against in
7    vivo degradation permanently for the lifetime
8    of the patient is going to be very difficult.
9    Eventually, the material will oxidize and
10   become embrittled.
11       And those are the consequences, I
12   believe, to not being stable.
13   Q.   Okay.  Are you aware of any study
14   published in peer-reviewed literature which
15   suggests that Ethicon Prolene loses its
16   antioxidant package such that it oxidizes and
17   becomes embrittled, as you've described it?
18   A.   I'm not aware of a published study
19   that's shown that.  But, then again, Ethicon's
20   internal study reported that.
21   Q.   What have you done to understand the
22   circumstances of the study that's in Tab 18 of
23   Exhibit 3?
24   A.   I've read the study, and then there

Page 67

1    were some minutes that were issued to schedule
2    a meeting to -- I think at the meeting, they
3    talked about the implications of the study
4    where they were going to measure -- there was
5    concern about how deep are these surface
6    cracks.  And I think Dr. Dunn was trying to
7    find additional information, SCM.  We couldn't
8    find that information.  So this was all we
9    could get on this particular study.
10       But there was a follow-up meeting.
11   We have some minutes from that, but we don't
12   have much additional -- they measured some
13   crack depths.  But I believe it was the SCM
14   images that we didn't have.  We have FTIR data
15   here for no SCM.
16   Q.   Okay.  Is it your opinion that the
17   DLTDP is the only antioxidant in Prolene?
18       MR. JACKSON:  Objection to form.
19   A.   Well, I think I've already answered
20   that.  In 1987, this report refers to the DLTDP
21   stabilizer antioxidant.  I can't remember what's
22   used today.  I know there was a range of doses
23   in the material.  That range is pretty broad.
24   But I don't remember what the current

Page 68

1    antioxidant is.
2    Q.   (By Mr. Thomas)  Do you know whether
3    there's more than one in 1987?
4    A.   In 1987, I don't know.  This report
5    just refers to DLTDP.  That's -- it doesn't say
6    whether there's another one.  It just talks
7    about DLTDP.
8    Q.   Have you made any effort to
9    understand how Ethicon arrived at the
10   antioxidants that it uses to stabilize Prolene
11   against the threat of oxidation?
12       MR. JACKSON:  Object to the form.
13   A.   Again, there were a limited number of
14   references that we talked about.  I believe
15   reviewing some of those documents with
16   Dr. Dunn, there was a change made in the
17   antioxidant levels, and we were trying to find
18   additional documents to explain that change,
19   why it was made.  And I don't believe that was
20   successful.
21   Q.   (By Mr. Thomas)  Is Tab 18 in this
22   document the extent of Exhibit 3, the extent of
23   your knowledge of what you believe to be
24   depletion of the antioxidants in Prolene?

Page 69

1    A.   This is the only study that I'm aware
2    of that we found that addressed the antioxidant
3    question directly.
4    Q.   In your review of documents in
5    connection with this case, are you aware of any
6    other documents that you've reviewed which
7    address the depletion of antioxidants in
8    Prolene suture or Prolene mesh?
9    A.   This is the only one that we could
10   find that directly addressed the antioxidant
11   question, how much antioxidant is left.
12   Q.   So if I'm going to ask you the
13   question on what documents you rely to support
14   your opinion that the antioxidants in Prolene
15   suture are depleted over time, you would point
16   to Tab 18 in Exhibit 3?
17   A.   Well, there's indirect information in
18   the dog study because the dog study observed
19   surface cracking that would also be a
20   consequence of oxidative degradation and
21   embrittlement.  But they didn't -- I don't
22   believe in this study they actually looked at
23   the amount of antioxidant remaining.
24   Q.   Anything else?

18 (Pages 66 to 69)

Scott A. Guelcher, Ph.D.

Page 70

1    A.   Those are the two studies that I'm
2  aware of that looked specifically at this
3  question.
4    Q.   Let's go back to your report on page
5  4 again.  In the middle of the second
6  paragraph, it says, Nor is this stabilization
7  permanent.  The purpose of using antioxidants
8  is to react with any oxidated species that
9  threaten the molecular structure of the
10  polypropylene chain.  You cite to footnote 4,
11  but there's no footnote 4.
12    A.   I'm not sure what happened there.  It
13  must be an oversight.
14    Q.   Do you recall the paper upon which
15  you relied for that statement?
16    A.   I don't recall the paper for that
17  one.  But I think the point of this statement
18  is really in my experience, antioxidants are
19  added to protect for a certain shelf life.  So
20  you would add an antioxidant to protect a
21  polymer for a three-year shelf life.
22         These types of studies can be done in
23  the known.  That type of dosing can be done.
24  What I'm saying is that trying to determine the

Page 71

1  dosing to protect against in vivo degradation
2  is another question.
3    Q.   Let me ask you this question:  Is it
4  your belief that the antioxidants that are
5  added to Ethicon prolene polypropylene are
6  merely for shelf life consideration?
7    A.   There was a statement that I read in
8  one of the documents.  I can't remember which
9  one it was.  But there was an Ethicon document
10  that made the statement that the stabilizer was
11  added to protect against mechanical and thermal
12  processing.
13    Q.   Is it your opinion that the
14  antioxidants added to Prolene polypropylene are
15  only to extend the shelf life of that product?
16    A.   The only evidence I have for the
17  purpose of adding antioxidants was to stabilize
18  it against manufacturing shelf life in the box
19  before it's implanted.  I didn't see any
20  evidence in the documents that I reviewed where
21  antioxidants were added dosed for the purposes
22  of in vivo stability.
23         (Exhibit 6 was marked.)
24    Q.   (By Mr. Thomas) A minute ago, you

Page 72

1  discussed the Anderson article.  Let me hand
2  you what I've marked as deposition Exhibit
3  No. 6 and ask you if Exhibit No. 6 is the
4  Anderson study to which you've cited in your
5  paper.
6    A.   Yes.
7    Q.   And I believe I heard you say that
8  you cite Anderson for the proposition that over
9  the life of the material, that antioxidants
10  will be depleted.  Did I hear that correctly?
11         MR. JACKSON:  Object to the form.
12    A.   I think what I said was this foreign
13  body reaction will continue as long as the
14  material was present.
15    Q.   (By Mr. Thomas) Okay.  Does the
16  Anderson article speak to the issue of the
17  extent to which antioxidants added to
18  polypropylene will be depleted over time?
19    A.   Not directly.  I was using Anderson
20  to support the notion that the foreign body
21  response is ongoing.
22    Q.   Are there any of the studies that
23  you've cited in your report, Exhibit No. 1,
24  that support the proposition that antioxidants

Page 73

1  added to polypropylene deplete over time and
2  create a risk of degradation?
3    A.   As I said before, the only study that
4  looked at specific questions of antioxidant
5  loss would be the human explants from 1987.
6    Q.   That's Tab 18 in Exhibit No. 3?
7    A.   Yes.
8         (Exhibit 7 was marked.)
9    Q.   (By Mr. Thomas) Let me show you
10  what's been marked as deposition Exhibit No. 7.
11  Deposition Exhibit No. 7 is a study, 1976,
12  titled Subcutaneous Implants of Polypropylene
13  Filaments, lead author Liebert.  You cite this
14  in your paper, don't you?
15    A.   Yes.
16    Q.   This is a 1976 study that compares
17  polypropylene implanted in animals with
18  antioxidants and without antioxidants; correct?
19    A.   Yes.
20    Q.   The Liebert study finds that the
21  polypropylene treated with antioxidants does
22  not degrade?
23    A.   In this particular study in this
24  implantation site for this period of time, they

19 (Pages 70 to 73)

Scott A. Guelcher, Ph.D.

Page 74

1    were able to protect it from degradation. Let
2    me look -- I need to look at this for a minute.
3        So they went out to an implantation
4    time of 160 days. I think that's five or six
5    months.
6        So I'm not saying that you can't
7    protect it for a period of time. I mean, even
8    the human explants showed some antioxidant
9    after eight years. I'm saying it's reduced.
10   So this is five months. But if you go out
11   years, these devices are made to be implanted
12   in humans for their lifetime.
13       If you go out for very long periods
14   of time, I don't think you can guarantee that
15   these antioxidants -- they didn't even measure
16   the anti -- I don't think they did. I would
17   have to look at it again.
18       So I'm not saying that you can't
19   protect it for some period of time. I'm just
20   saying that I doubt whether you can protect it
21   over the lifetime of the device on every
22   patient, that you can protect it from
23   oxidation. This is only five months.
24       At eight years in these sutures

Page 75

1    explanted from humans, they saw loss of
2    antioxidant.
3        Q.   When you talk about the sutures at
4    eight years, again, you're talking about Tab 18
5    in Exhibit 3 of your rebuttal report?
6        A.   Yes.
7        Q.   So you would suggest that Tab 18 of
8    Exhibit 3, the suture study, is inconsistent
9    with the findings in Exhibit 7 in Liebert?
10       A.   No. I think they're consistent.
11   Liebert only went out five months. What this
12   study is saying -- let me read the findings
13   again.
14       Q.   Just for your benefit, I don't have
15   that study.
16       A.   I understand.
17       Q.   I'll get that, but I don't have that.
18       A.   I understand that. But what this
19   study is saying is -- I need to find it.
20       So the DLTDP appears reduced at two
21   years. Two years is longer than five months.
22   And at eight years, it's further reduced. And
23   then in the oxidized material that they scraped
24   off, they didn't find it.

Page 76

1        So I see this study as being
2    consistent with Liebert. I think Liebert was
3    asking a different question. I think Liebert
4    was saying, Well, for five months, I can add
5    enough antioxidant to stabilize the
6    polypropylene. So I want to compare stabilized
7    polypropylene -- it's like a control -- versus
8    unstabilized polypropylene.
9        So Liebert was going after a
10   different question, but he just didn't go out
11   as far as this study did. So I don't really
12   see any consistencies between these two
13   studies.
14       Q.   Are you aware of any studies in the
15   peer-reviewed literature that support your
16   position that stabilizers used to protect
17   against oxidation in polypropylene deplete over
18   time and create a risk of the oxidative
19   degradation of polypropylene?
20       A.   There's no studies that have
21   specifically shown that. But I think from what
22   we know about the foreign body response, that
23   the oxidative attack is continuous and ongoing.
24       What we know from the human explants,

Page 77

1    initially that antioxidant is going to be
2    depleted. That's what I think we know.
3        Q.   We know from your earlier testimony
4    that polypropylene has been used in tissue
5    repair for 50 years now; correct?
6        A.   Yes.
7        Q.   Wouldn't you expect that to be an
8    issue of significance in the medical and
9    scientific literature if polypropylene used for
10   the last 15 years loses antioxidants and poses
11   a risk to the patients?
12       A.   I don't know if -- the papers I'm
13   actually familiar with that I reviewed are not
14   specifically looking at the question of
15   antioxidant depletion, but they do show signs
16   of oxidation.
17       So if there's signs of oxidation,
18   this study confirms it. And you would
19   anticipate that if it's oxidizing, the
20   antioxidant is not protecting it.
21       Q.   That's something that could be
22   tested, though, couldn't it?
23       A.   Well, they tested it here.
24       Q.   You're talking about the Ethicon --

20 (Pages 74 to 77)

Scott A. Guelcher, Ph.D.

Page 78

1    A.   In the human explants, yeah.
2    Q.   I'm talking about in the peer-
3  reviewed literature to the extent that was a
4  phenomenon going on, that was something that
5  could be presented in a controlled scientific
6  test that could be subject to peer-review and
7  published in the literature?
8    A.   They should be able to do that.
9  That's just not what those studies did.  They
10  were looking more at signs of surface oxidation
11  like Liebert did.  They were looking at the
12  phenomenon of surface oxidation.
13    Q.   The Anderson paper that we just
14  discussed, the Anderson paper you've cited for
15  the proposition of the continuous foreign body
16  reaction to the life of the explant; is that
17  fair?
18    A.   Yes.
19    Q.   Any other purpose?
20    A.   General background on the nature of
21  the inflammatory response that was in the
22  report.
23    Q.   Dr. Guelcher, your education is what?
24    A.   So I have a bachelor's degree and

Page 79

1  master's degree and Ph.D. in chemical
2  engineering.
3    Q.   And you've not studied polypropylene
4  before your work in this case; correct?
5    A.   No.  But I've studied oxidative
6  degradation of other polymers.
7    Q.   And polyurethane is an issue of your
8  interest?
9    A.   Yes.
10    Q.   Does polyurethane degrade in vivo?
11    A.   Polyurethane is a broad term.  So
12  part of my research, we design lysine-derived
13  polyurethane grafts that we published a couple
14  of papers reporting that they undergo oxidative
15  degradation.  But those polymers are the tissue
16  grafts, so they're designed to degrade
17  oxidatively.
18        The other side would be biostable
19  polyurethane implants.  They are designed to be
20  be biostable.  Jim Anderson did a lot of work
21  over the years investigating the oxidative
22  degradation of polyether urethanes.  So other
23  materials such as polycarbonate urethanes have
24  have been studied that are more exidatively

Page 80

1  stable.  But the polyethers are known to undergo
2  oxidative degradation.
3    Q.   Is there any material of which you're
4  aware that you could use for a medical device
5  implant that is not subject to oxidative
6  degradation?
7    A.   Every material is going to -- the
8  foreign body response is going to happen when
9  you implant a foreign material.  So the
10  difference is materials -- materials respond
11  differently to that foreign body reaction.  And
12  I think Ethicon's data points to polymers like
13  PVDF as being more resistant to oxidative
14  degradation.  So some are more resistant than
15  others.
16    Q.   Are you saying that PVDF does not
17  degrade by oxidation in vivo?
18    A.   What I'm saying is, in the dog study,
19  the PVDF sutures didn't show evidence of
20  surface cracking.  Now, whether there's
21  oxidative degradation, you would have to use
22  more sensitive techniques like XPS to actually
23  characterize a surface.
24        At seven years in this dog study,

Page 81

1  they were not seeing the same amount of
2  cracking that they saw in the polypropylene.
3    Q.   Do you have an opinion, Dr. Guelcher,
4  that there's any polymer that can be implanted
5  in the human body that is not subject to
6  oxidative degradation?
7    A.   That's not really within the scope of
8  my report.  I mean, my report is focusing on
9  oxidative degradation of polypropylene.  I'm
10  just noting observations that there are
11  polymers that appear to undergo less oxidative
12  degradation.
13    Q.   Whether it's in the scope of your
14  report or not, do you have an opinion in that
15  regard?
16    A.   I have an opinion that some materials
17  are going to degrade more slowly in response to
18  that foreign body reaction than others.  But I
19  don't know that it's been shown conclusively
20  that they do or don't.  The data aren't there.
21    Q.   So is it fair to understand that you
22  do not have an opinion as to whether there's
23  any polymer that's available for implantation
24  as a medical device that does not undergo

21  (Pages 78 to 81)

Scott A. Guelcher, Ph.D.

Page 82

1    oxidative degradation?
2        A.   I mean, I wouldn't say does not.  I
3    would just say it's much more stable than
4    polypropylene.  There are polymers that are
5    more oxidatively stable than polypropylene.
6        Q.   What are those?
7        A.   Well, the PVDF and --
8        Q.   What else?  We've talked about PVDF.
9    Anything else?
10       A.   What else did I look at?  I said
11   polycarbonate urethanes are more stable
12   against oxidative degradation than polyethers.
13   Those would be a few.
14           Again, I'm not -- I'm focusing in my
15   report my opinions on that polypropylene
16   degrades oxidatively in a significant rate.
17       Q.   Going back to your report, page 4,
18   note 4, do you know what site is appropriate
19   there that is left out in footnote 4?
20       A.   I don't.  I don't have that with me.
21       Q.   The next paragraph says, The
22   oxidation of the polymer on the tertiary
23   hydrogen bond is the rate controlling step in
24   this process, and it will result in the

Page 83

1    polypropylene's molecular chain being broken
2    and the reaction repeating until no more
3    polypropylene can be broken down.  What does
4    that mean?
5        A.   I think that statement is referring
6    to this autocatalytic effect.  Once you start
7    to form these reactive species on the surface,
8    it just continues to react.  There's no reason
9    for it to stop.  It will continue to react and
10   in later stages of degradation, there could be
11   molecular weight loss and embrittlement.
12       Q.   At what stage would there be
13   molecular weight loss?
14       A.   That's addressed by this concept of
15   the induction time.  So the paper by Fayolle
16   and Liebert, these papers together are
17   suggesting -- there's a -- Fayolle put out the
18   notion that embrittlement can happen -- this is
19   in figure 1.
20           So the induction time that's measured
21   by, in this case, the FTIR measurements, the
22   induction time is where there's this sharp
23   change in the slope of the curve.  So the
24   concentration of hydroxyle and carbonyl groups

Page 84

1    is relatively -- it's a very small slope.
2            And then at some point when that
3    induction time is reached, it becomes
4    autocatalytic, and the concentration of those
5    groups increases.
6            What Fayolle is saying is that
7    critical molecular weight for embrittlement in
8    the materials he looked at, he was reporting a
9    molecular weight of 200,000 grams per mole.
10   And he noted that that embrittlement on the
11   basis of mechanical testing, that embrittlement
12   is happening prior to the induction time
13   measured by spectroscopy.
14       Q.   I'm going to need you to help me
15   understand these charts.
16       A.   Okay.
17       Q.   We're on page 5 now of Exhibit No. 1.
18       A.   Right.
19       Q.   And these are charts that you
20   borrowed from Dr. Fayolle's paper?
21       A.   They were published in the Fayolle
22   study from 2000.
23       Q.   At the top of (a), it says
24   spectrophotometric induction time.  What does

Page 85

1    that mean?
2        A.   The spectrophotometric induction time
3    is the time at which there's that change in the
4    slope of concentration of hydroxyle groups and
5    carbonyl groups.  So that line is almost flat,
6    so there's very small change.
7            And then at some point, it becomes
8    autocatalytic.  The concentration of these
9    groups on the surface is high enough that now
10   the rate at which the oxidation reaction is
11   happening is much faster.  That's the induction
12   time.
13       Q.   Just for my benefit, the
14   spectrophotometric induction time is
15   represented in figure A as the triangles and
16   squares at the bottom?
17       A.   Yes.
18       Q.   And so at the point at about, oh, 250
19   to 260 is where there's a change in the
20   hydroxyle groups and carbonyl groups which
21   reflects a chemical change in the
22   polypropylene?
23       A.   That's right.
24       Q.   So the embrittlement induction time

22  (Pages 82 to 85)

Scott A. Guelcher, Ph.D.

Page 86

1    means what?
2        A.   This is a nice part of the work that
3    Fayolle did. He was measuring ultimate
4    elongation here by this. So embrittlement
5    induction time, that's where the axis on the
6    left with the curves with the hash lines, as you
7    can see, the elongation is relatively constant.
8    Then when you reach this embrittlement
9    induction time, the material becomes highly
10   brittle and less elongation.
11       Q.   What does elongation mean?
12       A.   That's the amount that you can
13   stretch it. Out here, it's 800 percent. You
14   can stretch it to eight times its initial
15   length. When it becomes brittle, that number
16   drops below -- then even small amounts of
17   strain cause the material to fail.
18       Q.   Now, is it fair to understand --
19   again, me trying to understand this chart --
20   that at the beginning of the study, the range
21   of the elongation is around 750 to 900?
22       A.   Right.
23       Q.   And then over time, it decreases and
24   then drops off rather dramatically at about 125

Page 87

1    to 175 hours. Am I reading that correctly?
2        A.   Yes.
3        Q.   So after that period of time, you
4    have a reduction in elongation and increase in
5    embrittlement. And then about 75 hours later,
6    you have an increase in the hydroxyle and the
7    carbonyl groups. Is that fair?
8        A.   That's right.
9        Q.   Each one of these changes that are
10   shown in Exhibit A amount to a change in the
11   chemical structure of the polypropylene;
12   correct?
13       A.   Well, the hydroxyle and carbonyl
14   groups, that's the introduction of bound
15   oxygen. The embrittlement is a mechanical
16   property. That's not a -- the structure of the
17   polymer is changing. It's becoming brittle.
18       Q.   But the chemical structure of the
19   polymer does not change in figure A until you
20   get to the formation of the hydroxyle groups
21   and the carbonyl groups?
22       A.   The chemical structure is breaking,
23   and Fayolle explains the details. And there's
24   some explanations for what could be happening

Page 88

1    there.
2            These concepts of tie chains and
3    amorphous chains that connect crystalline
4    regions are breaking and that can lead to
5    embrittlement. So what Fayolle is saying is
6    that changes in the polymer that lead to
7    embrittlement happen before large
8    concentrations of hydroxyle and carbonyl
9    groups, which has been the traditional way.
10   Even XPS would measure formation of hydroxyle
11   and carbonyl groups on the surface.
12           What Fayolle is saying is that
13   embrittlement happens you can really -- before
14   that becomes appreciable. It becomes this
15   autocatalytic increase.
16       Q.   Now, figure B uses axes of molecular
17   weight, time, and concentration moles per
18   kilogram; correct?
19       A.   Yes.
20       Q.   Is B appropriate to overlay on A?
21       A.   So my comments, my notations, on
22   Panel B were designed to kind of interpret A
23   especially in light of Liebert.
24           So Fayolle reports a critical

Page 89

1    molecular weight for embrittlement in the
2    polymers he was looking at 200,000 grams per
3    mole. The polypropylene samples he was using
4    became embrittled when the molecular weight
5    dropped to 200,000 grams per mole. That's what
6    that critical molecular weight -- that's what
7    Fayolle was saying.
8        Q.   It starts at about 225,000?
9        A.   That's when the material becomes
10   sufficiently brittle that it's -- the material
11   is basically brittle.
12       Q.   This shows the change in molecular
13   weight over time?
14       A.   Yes.
15       Q.   And at about 210 hours is when you
16   reach a reduction in molecular weight from
17   about 260 to about 200,000?
18       A.   That's how Fayolle defined it, as
19   embrittlement at that 200,000 molecular weight.
20       Q.   The molecular weight then continues
21   to become reduced until at about 260 hours the
22   molecular weight of the polypropylene or
23   whatever substance you're measuring at that
24   point is down around 75,000; correct?

23 (Pages 86 to 89)

Scott A. Guelcher, Ph.D.

Page 90

1    A.   That's right.
2    Q.   Now, the hydroxyle group and the
3    carbonyl groups are the same graphs that are on
4    figure A; correct?
5    A.   Yes.
6    Q.   So at the bottom where you have time
7    and days and subcutaneous implantation, what
8    does that mean?
9    A.   So I added the line -- the red line
10   at the bottom is a way to interpret the data
11   from Liebert.  So what Liebert was teaching was
12   that -- he reported an induction time of 108
13   days by his own -- he did very similar measures
14   on explanted materials of hydroxyl and carbonyl
15   groups.
16        And he reported in vivo induction
17   time of 108 days.  And then he notes if you
18   consider molecular oxygen as the source and
19   physiological temperatures, there should be an
20   induction time of 20 years, and yet we're
21   measuring 108 days.  Clearly, there has to be
22   some sort of reactive oxygen within the body.
23        Based on the work of Anderson and
24   others, we know now that that's associated with

Page 91

1    the foreign body response.  That's where the
2    208 days come from.  That's the induction time
3    measured by Liebert for unstabilized
4    polypropylene explanted from the sutures in the
5    films -- explanted from the hamsters.
6        So the 90 days is an approximation of
7    this concept of Fayolle that it basically
8    becomes embrittled before this induction time,
9    and he's basically saying -- you can deduce
10   from this as around 90 or a hundred days it's
11   becoming embrittled, unstabilized polypropylene
12   in vivo.  That's what this is saying.
13   Q.   And figure A is all Fayolle; correct?
14   A.   Both of those plots, the plots
15   themselves came from Fayolle.  Everything in
16   black came from Fayolle.
17   Q.   All I have is black and white.
18   A.   All right.  So I used a different
19   font.  You can probably tell a difference in
20   the fonts that I used.
21   Q.   The time (days) subcutaneous
22   implantation, where does that come from?
23   A.   That is the time scale that Liebert
24   measured.  So what this plot is trying to do is

Page 92

1    pull together the auto-oxidation that's
2    observed in air at elevated temperatures with
3    what happens in the body.  It's just a
4    different source of oxygen, reactive oxygen in
5    the body.
6    Q.   So in the Fayolle part of figure B on
7    page 5 where it shows at 210 hours there's the
8    critical molecular weight for embrittlement,
9    you drop down and get at about 90 days.  How do
10   those two -- 210 hours, which is less than ten
11   days, and 90 days -- how can you draw those
12   together?
13   A.   Well, that's what I was saying.  So
14   the hours axis is that's the auto-oxidation
15   that just happens with molecular oxygen as an
16   oxygen source at elevated temperatures.
17        What Liebert is saying is this
18   process happens over this time of about 100
19   days in vivo because there's a different source
20   of reactive oxygen.  It's the reactive oxygen
21   species secreted by the inflammatory cells.
22   That's why -- that's the difference in the time
23   scale.
24   Q.   Okay.  And so the time scale for

Page 93

1    Liebert, where you say that the embrittlement
2    will occur at about 90 days, is based upon
3    Liebert's study of polypropylene without
4    antioxidants?
5    A.   Right.
6    Q.   And the Fayolle study is based upon
7    testing of polypropylene with the antioxidants
8    removed; correct?
9    A.   Let me look at the Fayolle study
10   again to make sure.
11   Q.   Do you recall that without looking?
12   A.   Let me look at it for a minute.
13   Q.   I have it for you here if that's
14   easier.
15   A.   I've got it.
16        MR. THOMAS:  Let me mark it anyway as
17   a deposition exhibit.  It's deposition
18   Exhibit 8, a copy of the Fayolle study.
19        (Exhibit 8 was marked.)
20   Q.   (By Mr. Thomas)  Exhibit 8 is a study
21   titled Oxidation Induced Embrittlement in
22   Polypropylene, a tensile testing study June
23   2000 by B. Fayolle, F-a-y-o-l-l-e.
24   A.   So he says in the experimental

24 (Pages 90 to 93)

Scott A. Guelcher, Ph.D.

Page 94

1    section, The additives, I'm presuming the
2    stabilizers, antioxidants were extracted in a
3    soxhlet extractor in chloroform hexane ethanol.
4    I would interpret that statement as saying
5    that there was also unstabilized polypropylene.
6        Q.  Have you seen any testing of
7    stabilized polypropylene to support the
8    positions that you take on page 5 of Exhibit
9    No. 1?
10       A.  No.  These data were the data that I
11   had for unstabilized polypropylene.
12       Q.  Let's take a quick break please.
13           (A break was taken from 11:31 a.m. to
14   11:41 a.m.)
15       Q.  (By Mr. Thomas)  Let's go back to
16   page 5 of Exhibit No. 1.  Is it fair to
17   understand, based upon your analysis of Liebert
18   and Fayolle as depicted in these two graphs on
19   page 5, that there is no embrittlement without
20   a loss of molecular weight?
21       A.  I don't know that I would say it that
22   way.  I would say that loss in molecular weight
23   leads to embrittlement.
24       Q.  Okay.  The tests that we've just

Page 95

1    discussed -- strike that.  The papers that
2    we've just discussed by Fayolle and Liebert
3    where you used test data from polypropylene
4    without antioxidants, these same tests could be
5    used for testing polypropylene with
6    antioxidants, couldn't they?
7        A.  These tests?
8        Q.  Yes.
9        A.  Yes.  You have to go out to longer
10   time points, but they could be used.
11       Q.  Right.  And to your knowledge, none
12   of that testing has been done?
13       A.  Not using this specific approach.  I
14   mean, there are papers where people have looked
15   at explants and noted evidence of surface
16   oxidation, but not this type of time course.  A
17   mechanistic study that would have to be done
18   in vitro.
19       Q.  The studies that you're referring to
20   are the Clave and Costello articles that you
21   referred to elsewhere in your report?
22       A.  Yes.
23       Q.  But in terms of the types of studies
24   conducted by Liebert and by Fayolle that are

Page 96

1    discussed on page 5 of your report, to your
2    knowledge, this type of analysis has not been
3    done for polypropylene with antioxidant
4    packages?
5            MR. JACKSON:  Objection to form.
6        A.  I don't know that this particular
7    test has been done for polypropylene with the
8    antioxidant.
9        Q.  Okay.  Now, the Fayolle paper,
10   Exhibit No. 8, also deals with thermal
11   oxidation of polypropylene films.  Do you see
12   that?
13       A.  Yes.
14       Q.  Does the fact that they're testing
15   polypropylene films as opposed to polypropylene
16   sutures or mesh have any impact on your
17   opinions?
18       A.  Let me look at this for just a
19   minute.
20           I'm just looking to see if he -- they
21   don't report film thicknesses.
22       Q.  Look at the very beginning in the
23   abstract.  They talk about a hundred microns.
24   Is that the thickness of the film?

Page 97

1        A.  Okay.  Yeah.  I see a hundred
2    microns.  For some reason it's not in the
3    experimental.
4            So my -- why I believe they used
5    hundred micron films is because these films are
6    very thin.  So because they're so thin, these
7    changes in the surface are going to result in
8    molecular weight degradation because the
9    sutures are much thicker.  So -- they're on the
10   millimeter scale.
11           Basically, because they're using
12   these thin films, that allows them to measure
13   these changes in molecular weight more
14   accurately, because molecular weight is a
15   volume average property.  So if you use a very
16   thin film, then surface degradation is going to
17   contribute more to molecular weight loss of the
18   bulk polymer.
19       Q.  How big are sutures, did you say?
20       A.  Three or five -- let me just look.
21   It was in one of these studies.  Let me find
22   it.  I thought it was.  I can't seem to find
23   it.
24       Q.  It's not really important to my

Scott A. Guelcher, Ph.D.

Page 98

1  question.
2      A.   Okay.
3      Q.   Is there a difference between the use
4  of a film and the use of a suture for purposes
5  of this analysis done by Fayolle?
6      A.   You would see the same changes on the
7  surface of a suture that you would see on the
8  surface of a film.  But you might not see the
9  same changes in molecular weight because with
10  the film, the surface is a larger -- well,
11  okay.
12     Q.   The oxidation that Fayolle studies is
13  thermal oxidation, isn't it?
14     A.   It's thermal oxidation.  That was the
15  point of figure 1 in my report of page 5 was to
16  connect the time scales.  What Liebert was
17  saying is thermal oxidation under physiological
18  conditions, molecular oxygen, 37 c. would take
19  20 years, but he observes 108 days.  That
20  points to a much more reactive source of oxygen
21  in the body.
22         So they're similar processes.  It's
23  just the difference in the source of the
24  oxygen.  Fayolle was looking at sort of

Page 99

1  thermally-induced where you heat it up, and
2  molecular oxygen is actually the source of
3  oxygen that causes reaction.
4      Q.   Thermal oxidation, is at 90 degrees
5  c.?
6      A.   I don't know what temperature he
7  used.
8      Q.   First page of the abstract.
9      A.   90 c.
10     Q.   And normal body temperature is 37 c.?
11     A.   Yeah.  But I was saying that Liebert
12  noted that thermal oxidation in the body is
13  much slower, but there's another source of
14  reactive oxygen.  That's the reactive oxygen
15  secreted by the inflammatory cells in the body.
16         The purpose of that figure was to
17  show that -- Liebert has a similar plot of
18  hydroxyl and carbonyl groups from the explants.
19  It's the same reaction.  It's just a different
20  source of reactive oxygen.
21     Q.   So the conclusions that you reached
22  with respect to opinion No. 1 in your report
23  are based upon your review of the literature
24  that you've discussed and not on any testing

Page 100

1  that you conducted yourself; true?
2      A.   Yes.  These are literature data.  As
3  I said earlier, we didn't even have materials
4  to test for this sort of work.
5      Q.   Paragraph 2 on page 6 titled
6  Polypropylene Degradation In Vivo, the second
7  full paragraph says, Macrophages and FBGCs
8  attached to biomaterials are known to lead to
9  degradation and device failure.
10         There's no cite there.  Do you know
11  what cite is appropriate there?
12     A.   Which paragraph is this again?
13     Q.   Right in the middle of the page,
14  adhesion of macrophages.  The last sentence
15  reads, Macrophages and FBGCs attached to
16  biomaterials are known to lead to degradation
17  and device failure?
18     A.   I believe Anderson discusses this
19  point.  In my own research, we've shown that
20  macrophages attached to the scaffolds lead to
21  active degradation.  We published that in 2011.
22     Q.   With what material?
23     A.   With the polyurethane.
24     Q.   Have you found any kind of literature

Page 101

1  which supports the proposition that macrophages
2  and FBGCs attached to polypropylene are known
3  to lead to degradation and device failure?
4      A.   Well, some of the clinical studies
5  report the presence of an inflammatory
6  infiltrate in these cells, and some of these
7  materials extruded or became affected.
8      Q.   My question is simpler than that.  My
9  question is whether you're aware of any peer-
10  reviewed literature which finds that
11  macrophages and FBGCs attached to polypropylene
12  are known to lead to degradation and device
13  failure?
14     A.   For polypropylene, it's not been
15  studied specifically.  But, again, in those
16  images, it shows -- the ones that are more
17  where you see these inflammatory cells, it's
18  associated with oxidative degradation.
19     Q.   Just so we're clear, though, you've
20  not found any peer-reviewed literature that
21  finds that macrophages and FBGCs attached to
22  polypropylene lead to device failure?
23     A.   I mean, that's a very narrowly worded
24  statement.  I don't want to be boxed in by

26 (Pages 98 to 101)

Scott A. Guelcher, Ph.D.

Page 102

1    that.
2        Q.   Is it true?
3        A.   I'm going to stick by my answer.
4    There are inflammatory cells present, and he's
5    explaining samples that failed.
6        Q.   Is there any report in the peer-
7    reviewed literature that any polypropylene mesh
8    or suture failed due to macrophages and FBGCs
9    attaching to polypropylene?
10        A.   Let me look at Clave again.
11            (Exhibit 9 was marked.)
12        Q.   (By Mr. Thomas)  For the record,
13    you're referring to Exhibit No. 9, which is the
14    Clave article.  So Clave reports two types of
15    responses, a Type 1 and a Type 2 reaction
16    characteristic of an infection.  A majority
17    of altered polymorphonuclear neutrophils
18    were found; suggested an infectious process.
19    This is on page 263 under the histological
20    analysis.
21            He also reports a Type 2 reaction is
22    chronic inflammation rich in giant cells and
23    mononuclear cells.  And then he also sees
24    these -- evidence of what could be oxidative

Page 103

1    degradation.  He sees evidence of cracking.
2            These are basically supporting his
3    conclusions that these polypropylene implants
4    are altered in vivo.
5        Q.   *  But there's nothing in Clave's
6    article, Exhibit No. 9, that discusses device
7    failure, is there?
8        A.   Let me read what he wrote again.
9    Well, I mean, these are a hundred implants,
10    explanted from patients due to complications.
11    So I would say that the device failed if they
12    had to take it out because of complications.
13        Q.   When you're talking about
14    degradation, you're talking about the
15    polypropylene being degraded to the point where
16    it breaks or fails; correct?
17        A.   No.  I think that's discussed in my
18    report, is where you have surface oxidation
19    that can lead to molecular weight loss,
20    embrittlement, cracking, is a whole chain of
21    events that happens.
22            What I'm saying is that Clave took a
23    hundred explants from patients that had
24    complications that had problems with the mesh.

Page 104

1    And many of those explants, he saw inflammatory
2    reactions associated with infection or a
3    chronic inflammatory response.
4            He saw cracking on the surface which
5    is consistent with oxidative degradation as
6    even pointed out in Ethicon's studies, the dog
7    study and the human explants.
8            He sees evidence by FTIR of carbonyl
9    groups that are associated with oxidative
10    degradation.  Now he comments that he can't say
11    whether it's oxidative degradation or whether
12    it's something else, but it's consistent with
13    the notion of oxidative degradation.
14            So when you take Clave plus Ethicon's
15    own data that oxidation can lead to surface
16    cracking and embrittlement, I think Clave is
17    teaching that meshes that were explanted
18    because of complications because they failed
19    showed this inflammatory response and surface
20    oxidation.  That's the way that I would answer
21    your question.
22        Q.   Is Clave the only support that you
23    have that macrophages and FBGCs attached to
24    biomaterials are known to lead to degradation

Page 105

1    and device failure?
2        A.   Let me look at Costello as well.
3        Q.   Is Costello the only other one that
4    you would look to?  That's not an Ethicon mesh,
5    by the way, is it?
6        A.   No.  But it does have a polypropylene
7    component, I believe.
8        Q.   Does it have a polypropylene
9    component with the Ethicon added effect?
10        A.   I don't know.  Let me just see what
11    he says.  Yeah, these were the Bard
12    composites.  But he discusses oxidation.  He
13    has some SCM images showing surface effects,
14    effects of surface oxidation.
15        Q.   You're in the Costello study now?
16        A.   Yes.
17        Q.   Is polypropylene ever appropriate to
18    use in a medical device?
19            MR. JACKSON:  Objection to form.
20        A.   I'm not really here to speak to that.
21    I was looking at suitability for polypropylene
22    in these pelvic floor-type applications.
23        Q.   (By Mr. Thomas)  For the pelvic
24    floor, is polypropylene ever appropriate to use

27 (Pages 102 to 105)

Scott A. Guelcher, Ph.D.

Page 106

1   in a medical device?
2       A.   Not saying whether it's appropriate
3   to use or not.  I'm saying that it can undergo
4   surface oxidation due to the foreign body
5   reaction that can lead to changes in the
6   polypropylene, and those changes are not fully
7   understood.
8           They're observed by Ethicon in their
9   own studies.  They were never really followed
10  up on or understood.  And so the long-term
11  behavior of the device is unpredictable.  I'm
12  not saying that it can never be used.  I'm
13  saying because of these changes due to foreign
14  body reaction, its performance can be
15  unpredictable.
16      Q.   You say it's unpredictable.  Does
17  that mean you do not have an opinion as to what
18  will happen to the device over the life of its
19  implantation?
20      A.   I believe that over the life of its
21  implantation, the polymer will change in
22  response to the foreign body reaction.  Well,
23  specific changes would be loss of molecular
24  weight, embrittlement.  In some patients, that

Page 107

1   can lead to extrusion, pain.  It's consistent
2   with those adverse events in patients.
3           And I believe that the instability of
4   the polymer can contribute to those adverse
5   events.
6       Q.   Okay.  What is it that allows you to
7   offer the opinion that the surface oxidation of
8   polypropylene that you've described leads to
9   extrusions?
10      A.   Well, I think Ethicon even noted in
11  some of their documents the importance of
12  matching the properties of the mesh to the
13  properties of the host tissue.  This is known,
14  it's true just -- it's important to match the
15  properties of the implant to that of the
16  tissue.
17          So if you have an implant that now is
18  becoming very brittle, it's no longer
19  comparable to the tissue that it's surrounded
20  by.
21      Q.   Is this something you're just
22  deducing and piecing together or something
23  that's based upon any kind of medicine or
24  science?

Page 108

1       A.   Well, I think that these papers are
2   showing there is surface oxidation that we know
3   leads to embrittlement.  Then these devices that
4   are extruded are infected as a complication.
5           So I think that these papers are
6   showing the connection between the two.
7       Q.   Are there any papers in the medical
8   or scientific literature that suggest that
9   surface oxidation of polypropylene mesh can
10  lead to extrusion?
11      A.   I think Clave is suggesting this, as
12  I was explaining.  He sees these hundred meshes
13  where there were problems.  He sees evidence of
14  surface oxidation.  He sees inflammatory cells
15  and the infiltrate infection.
16      Q.   Is that the sole basis for your
17  opinion that surface oxidation of polypropylene
18  mesh can lead to extrusions, the Clave article?
19      A.   Clave would probably be the one.
20      Q.   Anything about your own work that
21  you've done in your training, education, and
22  experience outside of Clave that leads you to
23  conclude that surface oxidation of
24  polypropylene mesh can lead to extrusion?

Page 109

1       A.   Not that I'm aware of.
2       Q.   What is the basis for your opinion
3   that surface oxidation on polypropylene mesh
4   leads to pain?
5       A.   I think if you have a brittle piece
6   of plastic embedded in soft tissue, it's going
7   to be painful.
8       Q.   Is this based upon what you know or
9   based upon any scientific literature to support
10  your position?
11      A.   I would have to look for some papers
12  on this.  But, I mean, I think it's obvious if
13  you have brittle plastic in your body, it's
14  going to hurt.
15      Q.   It's based on that obviousness as
16  opposed to your review of any scientific
17  literature; is that fair?
18      A.   I can't think of a paper right now
19  that explicitly says that.
20      Q.   Just so we understand, you don't know
21  whether the mesh in Ms. Edwards was brittle, do
22  you, to use the term as you've used it?
23          MS. LEWIS:  Objection:  Form.
24      A.   We didn't have an opportunity to

Scott A. Guelcher, Ph.D.

Page 110

1    measure that.
2        Q.   (By Mr. Thomas)  The same is true
3    with the mesh of Ms. Edwards, you don't have
4    any idea whether the mesh in Ms. Edwards was
5    brittle, using the term as you've used it?
6        MS. LEWIS:  Objection:  Form.
7        MR. JACKSON:  I'm going to object
8    too.  You brought two names in there.
9        MR. THOMAS:  Let me start over again.
10   I want to get a clean question.
11       Q.   (By Mr. Thomas)  It's fair to
12   understand, Dr. Guelcher, that you don't know
13   whether the mesh in Ms. Huskey was brittle
14   using the term as you've used it here today.
15       MR. JACKSON:  Object to the form.
16       A.   Without the explant materials, we
17   couldn't do that assessment.
18       Q.   It's fair to understand that you
19   don't know as you sit here today whether the
20   mesh in Ms. Edwards was brittle using that term
21   as you've used it here today?
22       MS. LEWIS:  Objection:  Form.
23       A.   Without the explants, we can't do the
24   measurement.

Page 111

1        Q.   (By Mr. Thomas)  On page 6 of your
2    report, you again identify examples of
3    polyurethanes which have degraded over time.
4    Did you try to identify any polypropylene
5    products that had degraded over time that led
6    to device failures?
7        A.   Well, I mean, again, I think Clave
8    addresses this point of connecting surface
9    degradation with failure of a mesh.
10       Q.   Okay.  Other than Clave, did you find
11   any other evidence of device failure using
12   polypropylene?
13       MR. JACKSON:  Object to the form.
14       A.   That's the one I can think of right
15   now.
16       Q.   (By Mr. Thomas)  Okay.  What is
17   toughness?
18       MR. JACKSON:  Object to the form.
19       A.   Well, toughness is typically
20   associated with the area under the stress/
21   strain curve.
22       Q.   What does it mean?
23       A.   It's a measure of how much energy a
24   material can absorb before it fails.  So a

Page 112

1    brittle material would not be very tough
2    because if you take it out to small strains, it
3    fails.
4        Q.   Okay.  Do you know whether Ethicon
5    Prolene after implantation is more or less
6    tough after seven years?
7        MR. JACKSON:  Object to the form.
8        A.   Well, I think that question is rather
9    complicated.  Let me find the data.
10       Q.   (By Mr. Thomas)  Are you looking in
11   the seven-year dog study now?
12       A.   Yes.  I'm trying to find the data.  I
13   don't know.  I'm not finding the data here.
14       Q.   Do you have a recollection of looking
15   at the toughness data in the Ethicon studies?
16       A.   From what I remember, there was the
17   elongation was either the same after a year or
18   even got a little worse after two years.  And
19   all of a sudden in seven years, it becomes much
20   more ductile.
21       So I had questions about the
22   methodology used to do those measurements.  All
23   the materials that were tested showed that same
24   trend.  All four of them, the Ethilon, Novafil,

Page 113

1    Prolene, they all showed that same trend.
2        So this report in the expert report
3    focused on seven-year data.  But if this were
4    really going on, why aren't you seeing it in
5    the one- or two-year data.  It just seems
6    strange to me.
7        Q.   Have you seen other studies conducted
8    on Ethicon prolene polypropylene analyzing
9    the extent to which the implanted polypropylene
10   is more tough than the pristine polypropylene.
11       A.   The only data I've seen on Ethicon
12   polypropylene is the dog study where they did
13   mechanical testing on the sutures.
14       Q.   And increased toughness and increased
15   embrittlement are polar opposites of each
16   other; is that fair?
17       A.   Yeah.
18       Q.   And if something became more tough,
19   by definition, it becomes less brittle?
20       A.   But that's if you believe those
21   seven-year data.  They seem flawed to me.  The
22   methodology in the report is not -- there's not
23   a lot of details, and something seems wrong.
24       I don't understand why you can see

29 (Pages 110 to 113)

Scott A. Guelcher, Ph.D.

Page 114

1   this elongation, this increase in ductility in
2   seven years and one and two years you're not
3   seeing it.
4       Q.   You've not conducted your own tests
5   to determine whether these polypropylene
6   sutures become more tough after implantation,
7   have you?
8       A.   No.
9       Q.   On page 6 of Exhibit No. 1 in your
10  report, you're talking about failure mechanisms
11  that you've observed in connection with
12  polyether urethanes and polyester urethanes.
13  Do you see that?
14      A.   Yes.
15      Q.   Is this work that you've been
16  involved in?
17      A.   So the environmental stress cracking
18  of biostable polyether urethanes is primarily
19  the work of Dr. Anderson.
20      Q.   Have you done any work in that
21  regard?
22      A.   We've done -- in the papers I've
23  published, we've shown that these materials
24  degrade in vitro -- they degrade in vivo due to

Page 115

1   oxidative degradation, and they degrade in
2   vitro using a macrophage pocket simulating
3   fluid developed by Dr. Anderson.  We see a
4   connection between those rates of degradation
5   in vitro and in vivo that led us to conclude
6   they're degrading by oxidation.
7       Q.   Is the mechanism of oxidation that
8   you've observed in the polyurethanes the same
9   as the mechanism that you've suggested occurs
10  with polypropylene?
11          MR. JACKSON:  Object to the form.
12      A.   The difference between the two
13  polymers would be where the oxidative attack
14  takes place in the chain.  So in the
15  polypropylene, it's the hydrogen on the
16  tertiary carbon that's being -- that
17  hydrogen-carbon bond is being attacked.
18      Q.   (By Mr. Thomas)  So the polyether
19  urethanes would undergo environmental stress
20  cracking, and then you would have subsequent
21  loss of molecular weight?
22      A.   The idea is similar to what we saw in
23  the SCM images of the cracked polypropylene.
24  Once the surface starts to crack, that

Page 116

1   generates new surface that oxidated species can
2   use and cells can migrate into and continue
3   this process of oxidative degradation.  That's
4   what that's referring to.
5       Q.   When you look at, under scan
6   electronic microscopy, environmental stress
7   cracking of these polyurethanes, what do you
8   see?
9       A.   You see cracks in the material.  I
10  don't know what you mean.
11      Q.   Does it flake off?  Does it break?
12  Does it propagate throughout the center of the
13  fiber?
14          MR. JACKSON:  Objection to form.
15      A.   It can.  They're not typically
16  fibers.  These are more bulk material.
17          Yeah, pacemaker lead insulation.  So
18  it's a different form of the material.  It's
19  not necessarily a fiber.
20      Q.   (By Mr. Thomas)  When you have
21  oxidative degradation in the surface of the
22  polyurethane in what you mentioned on page 6
23  of your report, does the material flake off?
24      A.   It can. I don't know that it always

Page 117

1   does. That can be an outcome. Particulates.
2       Q.   Does it crack down through the entire
3   body of the implant?
4           MR. JACKSON:  Object to the form.
5       A.   I don't know if it goes through the
6   entire body.  The surface cracks, and then the
7   cracks can grow.
8       Q.   (By Mr. Thomas)  Does the material
9   flake off and cleave off so that you have a
10  smooth surface underneath?
11      A.   I don't know.  I mean -- what I'm
12  saying here is that it cracks, and then the
13  cracks generate new surface that can lead to
14  more oxidation.  If pieces become embrittled,
15  it can slough off like they saw in the dog study
16  or the human explants where you end up with the
17  layer of degraded material.
18      Q.   What is crack propagation?
19      A.   If the crack grows.
20      Q.   It's like when you put a crack in a
21  windshield and you press on it, it spreads
22  across the windshield?  That's crack
23  propagation?
24          MR. JACKSON:  Object to the form.

30 (Pages 114 to 117)

Scott A. Guelcher, Ph.D.

Page 118

1     A.   I think that's a little different.  I
2  think crack propagation would be the crack into
3  the surface can deepen.  It can widen.  Again,
4  once it cracks, there's two things that can
5  happen.  It becomes mechanically compromised,
6  and then it generates new surface for oxidative
7  attacks.  So the crack can grow and propagate
8  through the material.
9     Q.   (By Mr. Thomas)  In what direction
10 does the crack propagate?  Does it matter?
11    A.   You know, I would think it would be
12 inclined to propagate in the direction of the
13 stress.  But it just depends on the loading, on
14 the type of material.
15    Q.   Something that could be tested, of
16 course?
17    A.   I think Ethicon looked at this too.
18    Q.   I'm talking about you now, whether
19 you could test --
20    A.   I haven't done these studies.  These
21 are published studies.  The materials that I
22 work with are designed to be resorbable, so
23 they don't typically crack.  They're resorbed
24 and replaced with new tissues.

Page 119

1     I haven't actually done experiments
2  of measuring crack propagation.
3     Q.   So you don't know how crack
4  propagation would manifest itself in
5  polypropylene which had undergone surface
6  oxidation?
7     MR. JACKSON:  Object to the form.
8     Q.   (By Mr. Thomas)  Is that fair?
9     A.   Let me look at this document for a
10 minute.
11    Q.   What are you looking at now?
12    A.   This would be a memo on crack depth
13 in explanted prolene polypropylene sutures.
14    Q.   This is another document that you've
15 brought here today, Tab 19 in Exhibit No. 3
16 dated June 15, 1982?
17    A.   Yes.  So in this study, they were
18 measuring the depth of the crack.  They
19 concluded that the sutures had crack depths
20 varying from .5 to 2 microns.  The diameter of
21 the suture in this case was 25 microns.
22    Crack depth does not vary
23 systematically with implantation time.  It
24 varies significantly from point to point along

Page 120

1  the fiber length.  So they report measurements
2  of crack depth.  But there's no pictures.  They
3  just report the numbers.
4     These were materials that were
5  implanted anywhere from two to seven and a half
6  years.
7     Q.   Is that the only information that you
8  have to look to to determine the extent to
9  which cracks will propagate in polypropylene?
10    A.   Let me look at the other one, the
11 human explants.
12    Q.   That's Tab 18 in Exhibit 3?
13    A.   Yeah.  So, again, they don't provide
14 a lot of details.  This is one of the documents
15 Dr. Dunn was trying to get.  We don't have SEM
16 images.  They have microscopy observations by
17 -- I think this is Mr. Schiller who did SEM.
18    At two years, he notes no cracking.
19 At eight years, he notes severe cracking.
20 Without the pictures, we don't know what that
21 means.  But he basically says that at eight
22 years, they're severely cracked.
23    So these are the two documents that
24 I'm aware of where Ethicon was looking at

Page 121

1  cracking of polypropylene sutures.
2     Q.   My question, Doctor, are those two
3  documents, 18 and 19 in Exhibit No. 3, the sole
4  source of your understanding of what happens to
5  polypropylene when there's cracking?
6     A.   Well, I think Clave also addressed
7  this, that cracking was associated with these
8  failed meshes that were either infected or
9  extruded or had other complications.
10    Q.   Right.  But we've covered now the
11 source of your knowledge of what happens to
12 polypropylene when it cracks.  That's Clave,
13 and that's documents 18 and 19 in Deposition
14 Exhibit 3?
15    A.   Those are the studies that I'm aware
16 of.
17    Q.   On page 7 of your report in the
18 middle of the page, there's a paragraph that
19 begins, While the addition of stabilizers to
20 polypropylene.  You reference a figure 2(a).
21    A.   That should be figure 1(a).  I think
22 that's an error.  I don't know that I have a
23 figure 2 in this report.
24    Q.   So figure 1(a) goes back to page 5?

31 (Pages 118 to 121)

Scott A. Guelcher, Ph.D.

Page 122

1    A.    That's right.
2    Q.    All right.  At this embrittlement stage,
3    paragraph begins, At this embrittlement stage,
4    the elongation of the polymer decreases
5    substantially.  Does that mean the fiber itself
6    shrinks?
7    A.    No.  The elongation is the Y axis on
8    this plot.  So the percent elongation is the
9    longest distance you can stretch it before it
10   breaks.  So it starts off around 800 percent
11   elongation.  You could stretch it out to eight
12   times its initial length.
13         So then when it becomes embrittled
14   even at very small strains, the material fails
15   because it's become embrittled.
16   Q.    Which leads to adverse events after
17   implantation such as extrusion and chronic pain
18   caused by sclerosis.  What is sclerosis?
19   A.    Sclerosis would be hardening of the
20   implant in the tissue.
21   Q.    This is the same phenomenon we talked
22   about a few minutes ago?
23   A.    Yes.
24   Q.    Dr. Guelcher, if there's no reduction

Page 123

1    in molecular weight, would you agree that
2    there's no degradation of the polypropylene?
3         MR. JACKSON:  Object to the form.
4    A.    Again, I think this is a more complex
5    question.  When you measure the molecular
6    weight, you're measuring the molecular weight
7    of the entire material.  So if the degradation
8    is occurring at the surface, you may not see
9    it.
10        It's difficult to probe.  So I guess
11   the way I want to answer that is if I go back
12   to the -- if I go back to the Ethicon human
13   implant results where they noted --
14   Q.    That's Tab 18?
15   A.    I believe it's Tab 18.  If I go back
16   to that one, they mentioned the cracked
17   surfaces were easily wiped off and deposited on
18   a KBR window for IR.  The surface scrapings had
19   the handling consistency of a waxy snow.
20        Then they noted that the surface
21   scrapings were melted at 147 and 156 degrees on
22   a hot stage, and this is the melting range
23   previously observed for oxidatively degraded
24   polypropylene.

Page 124

1         So what I would say is if you took
2    the entire suture and measured -- it depends on
3    what you're probing and measuring.  If you're
4    measuring the molecular weight of the entire
5    suture, because the surface layer doesn't
6    represent the entire volume, you may not see a
7    difference.
8         But by actually probing that surface
9    layer like they did in this experiment, you
10   would see that it has a lower molecular weight.
11   But if you measure the bulk molecular weight,
12   you may not see it.
13        That's what I was saying is you would
14   use -- molecular weight measurements are very
15   effective and useful.  It's just you have to
16   make sure you're sampling the degraded region
17   of the polymer correctly.
18   Q.    If you go back to page 5 of your
19   report --
20   A.    Right.
21   Q.    -- you have more than a 20 percent
22   reduction in molecular weight before you have
23   embrittlement, don't you?
24   A.    Yes.  That was a film, you know, so

Page 125

1    it's a different -- it's different than -- I
2    mean, these experiments were specifically
3    designed to test this idea.  So I don't know
4    that you would necessarily see the same thing
5    in a suture.
6    Q.    Okay.  You've not tested it in a
7    suture?
8    A.    No.  I guess what I'm saying is
9    molecular weight -- to clear up what I was
10   saying earlier, molecular weight is very
11   important.  It's just sampling that degraded
12   layer by molecular weight analysis can be very
13   difficult to do.  That's why we like methods
14   like XPS because you can use smaller amounts.
15        MR. THOMAS:  Let's go off the record
16   for a second.
17        (A break was taken from 12:27 to 1:43
18   p.m.)
19   Q.    (By Mr. Thomas) Dr. Guelcher, has
20   Dr. Dunn submitted any invoices for your time
21   in this case yet?
22   A.    I don't know if he's submitted
23   invoices to the attorneys.  I've submitted
24   invoices to him, but I don't know that he's

32 (Pages 122 to 125)

Scott A. Guelcher, Ph.D.

Page 126

1    submitted them to the attorneys.
2         Q.   How many invoices have you submitted?
3         A.   I believe one.
4         Q.   Okay.
5         A.   I can't remember.
6         Q.   If you look at Exhibit No. 1, which
7    is your expert report in this case, how much
8    time did you have in this case prior to the
9    time that you completed Exhibit No. 1?
10             MR. JACKSON:  Object to the form.
11        A.   I don't remember.
12        Q.   (By Mr. Thomas)  The time that you
13   have in this case prior to the time that you
14   completed Exhibit No. 1 would be reflected in
15   your billing records?
16        A.   I believe it would.
17        Q.   Okay.  From the time that you
18   completed Exhibit No. 1, what additional work
19   have you done in this matter since that time?
20        A.   I reviewed the documents.  I wrote
21   the rebuttal report.  I met with the attorneys
22   and Dr. Dunn to discuss the documents.
23        Q.   Now, the documents that you've
24   reviewed after Exhibit No. 1, what documents

Page 127

1    were those?
2         A.   Well, the ones in Exhibit No. 3, I
3    guess.  Yeah, this one.
4         Q.   The documents that are in Exhibit
5    No. 2 are the documents that go with your first
6    report; correct?
7         A.   Yes.  I reviewed those again too.
8         Q.   Did you review those before you did
9    your report?
10        A.   Yeah.  I mean, I wrote the report
11   from those documents.  I can't remember how
12   much I reviewed every one, but they were all
13   part of the --
14        Q.   Again, the goal of the deposition
15   Exhibit No. 2 is to capture all the documents
16   upon which you relied for the opinions you
17   express in your original report; correct?
18             MR. JACKSON:  Object to the form.
19        A.   Yes.
20        Q.   (By Mr. Thomas)  After you completed
21   your original report, reviewed the documents
22   that were in Exhibit No. 2, you said you
23   reviewed additional documents.  We've talked
24   earlier today about the documents in Exhibit

Page 128

1    No. 3.  When did you review the documents in
2    Exhibit No. 3?
3         A.   Last week.
4         Q.   Okay.  And the documents in Exhibit
5    No. 3 is your best effort at identifying all
6    the documents upon which you rely for your
7    rebuttal report which is Exhibit No. 5 that I
8    got this morning; correct?
9         A.   Right.
10        Q.   All right.  Now, other than reviewing
11   the documents for Exhibit No. 2 and the
12   documents for Exhibit No. 3, what other work
13   have you done in this case?
14        A.   Well, I wrote the reports.
15        Q.   Right.
16        A.   I reviewed the documents.  I --
17        Q.   When you say you reviewed the
18   documents, is your review limited to the
19   documents in Exhibits 2 and 3?
20        A.   There were other documents I went
21   through as well.  They're all listed -- all the
22   reliance documents that are listed in the
23   report.  I mean, they're all --
24        Q.   That's where I want to ask you about

Page 129

1    it.  If you go to page 11 of Exhibit No. 1, it
2    says in the second sentence, In addition to my
3    knowledge, skill, training, and experience as
4    an engineer, the following depositions of
5    Ethicon employees and the exhibits thereto were
6    supplied to me.  And then there's a list of
7    people.
8              Did you read all those depositions?
9         A.   No.  I didn't read all of them.
10        Q.   Do you know of any of them that you
11   read?
12        A.   I reviewed parts of Dr. Burkley's.  I
13   think that's the main one I reviewed.
14        Q.   Any others in the first paragraph
15   there that you recall reviewing?
16        A.   Not that I can remember.
17        Q.   The reason why you reviewed
18   Dr. Burkley was to understand the work he did
19   on the seven-year dog study?
20        A.   Primarily, yeah.
21        Q.   Any other reason that you can recall?
22        A.   He was the scientist at Ethicon that
23   had done most of the work on in vivo
24   performance of the polypropylene, the dog

33 (Pages 126 to 129)

Scott A. Guelcher, Ph.D.

Page 130

1    study.
2       Q.   The next paragraph says, I've also
3    considered the following material identified in
4    Exhibit B.
5            Again, there are documents in
6    Exhibit B that aren't in your two notebooks;
7    correct?
8       A.   Yeah, I think so.
9       Q.   And is it fair to understand that to
10   the extent you identified documents that were
11   important to your opinions, you put those in
12   your notebooks, Exhibits 2 and 3?
13      A.   Right.
14      Q.   In addition, the following Rule 26
15   reports were supplied to me, and a list of
16   people.  These reports were provided after we
17   had reached my opinions in this case.
18           Did you review any of those Rule 26
19   reports?
20      A.   No, not much, I don't think.
21      Q.   There's nothing in those Rule 26
22   reports that have any bearing on the opinions
23   that you're giving today as far as you know?
24      A.   No.

Page 131

1            MR. JACKSON:  Objection to form.
2       Q.   (By Mr. Thomas)  Down in heading
3    No. 5, it talks about exhibits which I plan to
4    use as a summary of or in support of opinions?
5       A.   Right.
6       Q.   What photographs do you plan to use?
7       A.   Yeah.  I don't have any photographs.
8    I don't have FTIR studies, and I don't have
9    exemplar TVT.  Dr. Dunn may have.  I don't have
10   those.  I didn't rely on those for this report.
11           It was the Ethicon documents and the
12   papers that we've been talking about, but not
13   the first two.
14      Q.   Other than the graphics in your
15   report, are there any other exhibits extracted
16   from the materials that you reviewed or
17   excerpts from learned treatises and literature
18   that you know that you'll use as an exhibit at
19   trial in this case?
20      A.   I don't know.  I mean, I haven't
21   thought about preparing for trial.  So I don't
22   know what -- I mean, I could use information in
23   those papers to prepare slides.  It's hard to
24   say, not having done that.

Page 132

1       Q.   Do you know when trial is scheduled
2    in this case?
3       A.   I don't.
4       Q.   Compensation is listed at $275 an
5    hour for review and study, $350 per hour for
6    deposition and trial testimony time.
7            How much time have you billed
8    Dr. Dunn for, as of today?
9       A.   I don't remember how many it's been.
10      Q.   Have you been paid yet?
11      A.   I can't remember when I submitted the
12   reports.  I may have been paid something for
13   writing a report, but I can't remember when
14   those invoices were submitted.
15      Q.   Are you paid yourself $275 an hour,
16   or is that time that's billed to Dr. Dunn's
17   company and you're paid something different?
18      A.   So Dr. Dunn bills all the effort at
19   275 or 350 through his company, and he pays me
20   200 as a subcontractor through his company.  So
21   I'm not an employee, but I'm a subcontractor of
22   his company.
23      Q.   Okay.  So you receive $200 an hour
24   whether it's review and study or whether it's

Page 133

1    deposition and trial time?
2       A.   It's $200 for review and study and
3    275 for deposition and trial testimony.
4       Q.   When you and Dr. Dunn discussed
5    working on the Ethicon mesh cases, and you
6    decided between the two of you the scope of the
7    work that you would do, what was the scope of
8    the work that Dr. Dunn would do?
9            MR. JACKSON:  I'm going to object as
10   asked and answered.
11      A.   I can't speak for Dr. Dunn, but
12   certainly he has expertise in polymer science.
13   So I think he's speaking to the auto-oxidation
14   of polypropylene.
15           He has expertise in product design.
16   So he was looking at failure modes and effects
17   analysis.  He was looking more at those
18   questions.
19      Q.   (By Mr. Thomas)  Did you share your
20   report with Dr. Dunn before you finalized it?
21      A.   I don't remember.  I know I sent him
22   a copy of the final one.  We've discussed it,
23   but I don't know if I sent a draft or something
24   to him.

34 (Pages 130 to 133)

Scott A. Guelcher, Ph.D.

Page 134

1      Q.   Did you discuss your work on your
2  initial report with Dr. Dunn as you were doing
3  the work?
4      A.   I believe so.  I don't quite remember
5  what we talked about prior to writing the
6  report.
7      Q.   When you wanted materials to review
8  in connection with the work that you were doing
9  in this project, did you speak with Dr. Dunn or
10  to counsel?
11      A.   I spoke with Dr. Dunn.  Dr. Dunn,
12  through his company, handles all those types of
13  transfers with counsel.
14      Q.   Are you currently engaged in any
15  projects with Dr. Dunn and any other expert in
16  this litigation that is a research project on
17  meshes used in the pelvic floor?
18      A.   So are you talking expert witness in
19  litigation, or are you talking about research
20  projects?
21      Q.   Research projects.
22      A.   We are.
23      Q.   And how many projects?
24      A.   With Dr. Dunn, there's one.

Page 135

1      Q.   And are there projects with other
2  experts?
3      A.   There is.  There's a project with
4  Dr. Iakovlev.
5      Q.   What is the project with Dr. Dunn?
6      A.   The project with Dr. Dunn is looking
7  at the characterization of explanted mesh and
8  also the in vitro degradation of mesh for
9  polypropylene.
10      Q.   In vitro degradation?
11      A.   Right.
12      Q.   And what kind of explanted mesh are
13  you characterizing?
14      A.   Well, it's from one of the AMS cases.
15  It's polypropylene mesh.  I don't remember the
16  exact name of it, but it's a name that's broad.
17      Q.   What's the nature of the work that
18  you're doing?
19      A.   We're characterizing the surface of
20  the material by XPS.
21      Q.   How many explanted meshes do you
22  have?
23      A.   There are several.  I don't remember
24  the exact number.

Page 136

1      Q.   Are they all AMS meshes?
2      A.   I believe they are.
3      Q.   And where did you obtain the meshes?
4      A.   From Dr. Iakovlev.
5      Q.   Do you know where he obtained them?
6      A.   I'm not exactly sure.  I mean, they
7  came from the hospital, I believe, that treated
8  the patient.  But I don't know exactly which
9  hospital.  I don't remember.
10      Q.   Are you and Dr. Dunn in possession of
11  the explants now?
12      A.   I don't know.  Dr. Bridget Rogers at
13  Vanderbilt ran the XPS maybe a month ago.  I
14  don't know who has them now, if we still have
15  them or if he sent them back.
16      Q.   Who handled the meshes when they were
17  here at Vanderbilt?
18      A.   I believe Dr. Rogers.
19      Q.   Do you know how the explants were
20  received, in what form?
21      A.   They were received as dried fibers.
22      Q.   Do you know who was responsible for
23  the preparation of the explanted mesh samples?
24      A.   Dr. Iakovlev.

Page 137

1      Q.   Did you have any -- do you and
2  Dr. Dunn have any involvement in how those
3  samples will be prepared for XPS testing?
4      A.   Yes.  We discussed that with
5  Dr. Iakovlev.
6      Q.   What kind of parameters did you
7  discuss with Dr. Iakovlev about preparation of
8  these samples?
9      A.   We talked about this earlier.  I
10  believe they were shipped in saline and then
11  desiccated by Dr. Iakovlev.  And then one group,
12  he sent desiccated; another group, he scraped
13  off the degraded material on the surface.
14      Q.   What is the question that you and
15  Dr. Dunn are trying to answer by characterizing
16  these explanted meshes?
17      A.   We're looking for evidence of bound
18  oxygen on the surface that would be indicative
19  of oxidation of the polypropylene mesh.
20      Q.   Is XPS the only test that you're
21  conducting on these explanted meshes?
22      A.   That's all we've done so far.  We're
23  considering others.  But so far, we've done
24  XPS.

35 (Pages 134 to 137)

Scott A. Guelcher, Ph.D.

Page 138

1    Q.   And what will the XPS hopefully show?
2    What will this test tell you about the
3    explanted meshes?
4         MR. JACKSON: Object to form.
5    A.   Well, it would tell you whether
6    there's oxygen bound with carbon on the
7    surface.
8    Q.   (By Mr. Thomas) Is it able to
9    quantify or just detect presence?
10   A.   Quantify.
11   Q.   And in what amounts or quantification
12   would the oxygen bound to carbon be significant
13   in the analysis of oxidation of explanted mesh?
14   A.   Any oxygen would be significant. As
15   Fayolle teaches, it doesn't take much on the
16   surface to catalyze the oxidation of the
17   material.
18        Oxygen shouldn't be there. It's a
19   hydrocarbon. So any bound oxygen in the
20   material would have to be a result of
21   oxidation. So anything that we found would be
22   significant.
23   Q.   What efforts were made to clean the
24   mesh prior to the XPS testing to remove any

Page 139

1    other materials that didn't belong there?
2    A.   Well, we discussed that too. So
3    Dr. Iakovlev mainly desiccated the residual
4    tissue. And then one group he sent that had
5    just been desiccated, and the other group he
6    scraped to make sure that all the tissue was
7    gone.
8    Q.   I believe you also said that you were
9    looking at in vitro degradation as part of this
10   project?
11   A.   Yes.
12   Q.   Tell me how that fits into your work.
13   A.   I've published two papers on
14   biomaterials in the last several years where
15   we -- Dr. Anderson reported a number of years
16   ago of fluid that's used to simulate the
17   macrophage pocket. So you can immerse the
18   biomaterial in this fluid, and it's similar to
19   essentially bathing the material in the
20   macrophage. So we're considering doing those
21   experiments as well.
22        I've published a couple of papers on
23   that with polyurethane where we're able to show
24   that it degrades in vitro.

Page 140

1    Q.   Is that the full scope of the work
2    that you and Dr. Dunn are doing?
3    A.   As of right now.
4    Q.   Do you have plans to do additional
5    work?
6    A.   I don't know. We're still discussing
7    it.
8    Q.   Who was involved in this project
9    other than you and Dr. Dunn?
10   A.   Dr. Iakovlev.
11   Q.   Who is funding this project?
12   A.   We're discussing that right now.
13   Q.   Is anybody funding it now?
14   A.   The explant work was paid for by the
15   litigation.
16   Q.   Does that mean you've received
17   payment from counsel for the plaintiffs in the
18   AMS litigation?
19   A.   Dr. Rogers did for the XPS
20   experiments.
21   Q.   Any other source of payments? Have
22   you received any compensation for your work on
23   this project?
24   A.   Yes. I mean, it's billed, but I

Page 141

1    didn't actually do the XPS experiments. I've
2    discussed them with Dr. Rogers and Dr. Dunn,
3    and I included it in other reports. So I've
4    been paid for that part of it.
5    Q.   Okay. And is the research project
6    that you're doing with Dr. Iakovlev different
7    than the one you're doing with Dr. Dunn?
8    A.   Dr. Iakovlev's project relates to a
9    number of polypropylene explant materials.
10   They come from a variety of sources like hernia
11   mesh, pelvic floor mesh, where he sees the
12   surface degradation, primarily focusing on
13   histology and microscopic assessment. So it's
14   more qualitative pathology-focused.
15   Q.   Who is working with you and
16   Dr. Iakovlev on that project?
17   A.   Dr. Dunn is involved as well, not as
18   much.
19   Q.   And how many explants are involved in
20   this project?
21   A.   I'm not sure. It's more than ten, I
22   think. I don't remember the number.
23   Q.   Do you know whether any Ethicon
24   explants are involved?

36 (Pages 138 to 141)

Scott A. Guelcher, Ph.D.

Page 142

1    A.   I don't.
2    Q.   What is Dr. Dunn doing on this
3    project?
4         MR. JACKSON:  Object to the form.
5    A.   Mostly consulting.
6    Q.   (By Mr. Thomas)  What are you doing
7    on this project?
8    A.   I had some discussions with
9    Dr. Iakovlev about staining for things like
10   myeloperoxidase to show evidence of active
11   macrophages at the site, similar to what I've
12   done with the other materials I've worked with.
13   Q.   What would the staining of the meshes
14   to show active macrophages at the site show
15   you?
16   A.   It would show that there's secretion
17   of myeloperoxidase, which is an enzyme that is
18   involved in these reactive oxygen species.  So
19   it would show the presence of that enzyme and
20   provide evidence that macrophages are at the
21   material surface secreting these reactive
22   oxygen species that can promote oxidation of
23   the polymer.
24   Q.   What's the status of the work that

Page 143

1    you're doing with Dr. Iakovlev on these
2    polypropylene explant materials?
3    A.   He submitted a presubmission inquiry
4    to Nature Biotech.
5    Q.   I'm sorry, I don't know what that
6    means.
7    A.   Nature Biotechnology is a scientific
8    journal.  Dr. Iakovlev submitted a
9    presubmission inquiry regarding its suitability
10   for publication in that journal.  As far as I
11   know, he's waiting to hear from the editor.
12   Q.   Has any work been conducted on this
13   project while this request is pending?
14   A.   Not in the past week or two.  We've
15   been waiting to hear back.
16   Q.   Prior to that time, had you done any
17   initial work on analyzing these polypropylene
18   explant materials?
19   A.   No.  I assisted Dr. Iakovlev with
20   writing, editing the draft.
21   Q.   The draft request?
22   A.   The manuscript, yeah, the
23   presubmission inquiry.
24   Q.   Is there a manuscript in draft?

Page 144

1    A.   It's a presubmission inquiry, so it's
2    basically an abstract of figures.
3    Q.   So there has been work conducted and
4    data collected so far?
5    A.   Yes.
6    Q.   That's what I want to know.  What
7    kind of work have you done and data you've
8    collected for this project?
9    A.   Well, so Dr. Iakovlev did the data
10   collection.  There's histological staining,
11   staining of histological sections.  There's
12   microscopy showing the presence of a degraded
13   layer on the surface.
14   Q.   Is that light microscopy or SCM?
15   A.   Both, polarized light microscopy,
16   SCM.  There's another type of imaging technique
17   he used as well.  It's all imaging in
18   histology.
19   Q.   What is the question that this paper
20   seeks to answer?
21        MR. JACKSON:  Object to the form,
22   asked and answered.
23   A.   Well, the paper is directed toward
24   providing evidence that polypropylene degrades

Page 145

1    in vivo by an oxidative mechanism.
2    Q.   (By Mr. Thomas)  And who has funded
3    the project with Dr. Iakovlev?
4    A.   I don't know.  I think some of the
5    samples have been evaluated in the course of
6    the litigation.  So certainly his time would be
7    paid for by the attorneys, plaintiffs'
8    attorneys.  But I don't know the details of
9    that.
10   Q.   How much time have you spent on this
11   project with Dr. Iakovlev?
12   A.   Maybe ten hours or so.  It's hard to
13   say.
14   Q.   Have you been paid for your time in
15   that project?
16   A.   For parts of it.  So I visited
17   Dr. Iakovlev in Toronto as part of the pending
18   litigation.  I was paid for that.  But for
19   writing the paper, I can't remember if I
20   charged for that or not.
21   Q.   What responsibility did you have for
22   the writing of the paper?
23   A.   Well, Dr. Iakovlev wrote the draft.
24   I edited it.  It talks more specifically about

37 (Pages 142 to 145)

Scott A. Guelcher, Ph.D.

Page 146

1    surface degradation. Dr. Iakovlev is a
2    pathologist, so my contribution is more on the
3    material science, chemistry, the things
4    described in my report.
5        Q.  The work that you and Dr. Dunn are
6    doing with the AMS polypropylene explants where
7    you're analyzing the surface of the material by
8    XPS, are there plans to publish that research?
9        A.  We would like to publish it, but
10   we're not as far along as Dr. Iakovlev is.
11       Q.  What laboratory is doing the imaging
12   that Dr. Iakovlev is doing for the
13   polypropylene explant materials?
14       A.  I don't know where he's doing it. I
15   presume he's doing it at his university in
16   Toronto.
17       Q.  Is any of the work on the explanted
18   meshes in the polypropylene explant study by
19   Dr. Iakovlev being done at Vanderbilt?
20       A.  No.
21       Q.  And the XPS work and the work with
22   Dr. Dunn has been done by Dr. Rogers at
23   Vanderbilt?
24       A.  Yes, that's right.

Page 147

1        Q.  Are you involved in any research or
2    projects to identify a better material for use
3    as a medical device in the pelvic floor?
4        A.  No.
5        Q.  Have you done any work in this
6    litigation about a suitable alternative device
7    for the treatment of stress urinary
8    incontinence that is equally safe and effective
9    as the Ethicon TVT device?
10       MR. JACKSON:  Objection to form.
11       A.  Again, I was -- my report, my intent
12   was to review the in vivo performance of
13   polypropylene and not look at alternative
14   devices.
15       MR. THOMAS:  Am I going to get the
16   time sheets today?
17       MR. JACKSON:  I'm actually waiting on
18   a response to my e-mail.  But the last I
19   heard is that these were included in our
20   objections to the request for production
21   attached to the deposition.
22       MR. THOMAS:  Really?
23       MR. JACKSON:  That's the last
24   response I got, but I am actually waiting

Page 148

1    on another one.  But that's what I've got
2    at this point.
3        Q.  (By Mr. Thomas)  Let's go back to
4    your original report, page 8, the paragraph
5    that begins, Finally with respect to the idea,
6    the next sentence reads, These stresses cannot
7    only act as catalysts for oxidative
8    degradation, they can alter the properties of
9    the mesh itself.
10       What properties of the mesh are
11   changed by the stresses that you discuss in
12   that paragraph?
13       A.  I'm just going to read it again.
14       Q.  Sure.
15       A.  I think what I'm saying here is that
16   the antioxidants basically guard against --
17   antioxidants are designed to protect against
18   oxidation.  So mechanical stresses on the
19   material can sort of exacerbate these effects.
20       Mechanical loading of the mesh pelvic
21   floor environment is different, say, than the
22   suture.  That can cause changes in the
23   degradation and response of the material.
24   That's what I'm really trying to say there.

Page 149

1        Q.  Help me out a little bit.  I don't
2    really understand that.  They can alter the
3    properties of the mesh.  What properties of the
4    mesh can be altered?
5        A.  Strength.  It's elongation.  These
6    changes in the polypropylene are happening over
7    time.  They can change as mechanical properties
8    which is toughness, embrittleness, these things
9    we've been talking about.
10       Q.  Does it include tensile strength?
11       A.  Yeah.  Tensile strength would be
12   another mechanical property that could change
13   over time due to oxidative changes.
14       Q.  Okay.  So you have tensile strength,
15   you have elongation, you have toughness.  What
16   other physical properties of the mesh can be
17   altered by oxidative degradation?
18       A.  I think basically it's the
19   embrittlement -- it's going to become more
20   brittle, less tough.  The strength could
21   change.  Those are the -- that's what I think
22   of when I think of embrittlement.
23       Q.  Are those the results of the
24   oxidative degradation that you discuss in this

38 (Pages 146 to 149)

Scott A. Guelcher, Ph.D.

Page 150

1  paper?
2      A.  Yes.
3      Q.   It's those changes in the physical
4  properties that you just identified that
5  compromise the ability of the mesh to perform
6  its function in the body; is that fair?
7      A.  Yes.  I believe that those changes
8  in -- the changes in the composition of the
9  polymer due to the oxidation combined with
10  mechanical forces in the environment of the
11  pelvic floor can cause the mesh to change over
12  time.
13      Q.   And it's those changes in strength,
14  elongation, toughness, embrittlement that you
15  conclude compromise the ability of the mesh to
16  perform its function in the pelvic floor?
17      A.  I think that's part of it.
18      Q.   What else is there?
19      A.  I think as I've been saying in the
20  report, it's really the embrittlement of the
21  mesh is what's causing it to change over time
22  and lead to extrusion and these types of
23  problems.
24      Q.   Anything else?

Page 151

1      A.  I think that's . . .
2      Q.   Let's go to page 10 of your report,
3  please.  When you're considering the use of a
4  biomaterial for implantation in a human body,
5  do you consult that material safety data sheet?
6      A.   That's one piece of information.  The
7  materials that I'm making, we don't -- they're
8  experimental.  So we don't have material safety
9  data sheets.
10      But for an established material like
11  polypropylene, that's one factor I would look
12  at, is what the MSDS is saying about the
13  material.
14      Q.   Is it normally part of your business
15  when you start working with a material that's
16  going to be implanted in the human body, is it
17  your practice to go to the material safety data
18  sheet to see what it says about that material?
19      MR. JACKSON:  Object to the form.
20      A.   That's typically what we do whether
21  it's in the human body or not.  If we're using
22  it in the laboratory if there's a possibility
23  of someone being exposed to it, we keep a file
24  of the MSDSs for all the materials we're using

Page 152

1  in the lab.
2      Q.   The reason why you keep MSDS sheets
3  for materials in the lab is in the event
4  somebody in the lab is exposed to that material
5  while handling it; correct?
6      MR. JACKSON:  Objection to form.
7      Q.   (By Mr. Thomas)  Is that true?
8      A.  Yeah.  That's why we have them.
9      Q.   The reason why you have the material
10  safety data sheets is not to determine what the
11  clinical impact of implanting those materials
12  may be in the human body?
13      A.  I think it's something that should be
14  considered.  I mean, if it says on the MSDS
15  it's incompatible with strong oxidizers and you
16  know that part of the cellular response is
17  materials that secrete strong oxidizers, that's
18  something that should be considered.
19      Q.   In your judgment, what does a strong
20  oxidizer mean?  What's relevant in terms of
21  strong for purposes of degradation to
22  polypropylene mesh?
23      A.  Well, molecular oxygen will oxidize
24  polypropylene at elevated temperatures.

Page 153

1  Stronger oxidizers such as hypochloric acid and
2  peroxides listed here are stronger oxidizing
3  agents than chlorine.
4      These are all stronger oxidizing
5  agents than molecular oxygen.  That's what I'm
6  referring to when I say reactive oxygen
7  species.
8      Q.   What strength chlorine is required to
9  degrade polypropylene that has antioxidants
10  added to it?
11      MR. JACKSON:  Objection to form.
12      A.   I mean, that's the problem with
13  designing these implants for permanent
14  implantation.  It's very difficult to predict
15  what dose of antioxidant is going to be
16  required to protect every patient from this
17  oxidation.
18      Q.   (By Mr. Thomas)  Do you have an
19  opinion about how much chlorine would be
20  required to degrade Prolene polypropylene
21  that's been treated with an antioxidant
22  package?
23      MR. JACKSON:  Objection to form.
24      A.   I think you can't just parse out.

39 (Pages 150 to 153)

Scott A. Guelcher, Ph.D.

Page 154

1    These are reactive oxygen species. There's a
2    number of different molecules that are secreted
3    by inflammatory cells that have been shown in
4    Ethicon studies and in published papers to
5    cause surface degradation of polypropylene.
6         So we know that what the cells
7    secrete is enough to oxidize the propylene.
8    It's been observed in several studies.
9    Q.   My question is a little different.
10   Do you have an opinion as to the amount of any
11   of these materials, strong oxidizers such as
12   chlorine, peroxides, etc., that are necessary
13   and sufficient to cause the oxidation of
14   Prolene polypropylene?
15        MR. JACKSON:  Objection to form.
16   A.   My answer would be that macrophages
17   secrete sufficient amounts of these molecules.
18   I mean, we know this because it's been
19   observed.
20        I don't know that anybody has
21   measured or I don't know how you would measure
22   the exact concentration. It's really
23   irrelevant. It's not being done outside the
24   body. It's being -- you know, Dr. Anderson has

Page 155

1    published this solution that's been shown to
2    simulate the composition of that macrophage
3    pocket.
4         But, again, it's a very complex
5    reaction. There's a number of species
6    involved.
7    Q.   One of the things you would like to
8    know is the amount of oxidizers that may
9    compromise polypropylene so that you can modify
10   your additive package to resist that oxidation;
11   fair?
12        MR. JACKSON:  Object to the form.
13   A.   Dr. Anderson has come the closest to
14   describing it as a mixture of cobalt and
15   peroxide that simulates -- I've published a few
16   papers on this.
17   Q.   (By Mr. Thomas) You have or he has?
18   A.   Well, I have. I don't know if my
19   paper is in here or not. It may not be.
20   Dr. Anderson is the first to publish it. It's
21   not in here. Let's see if it's in the other
22   one.
23        MR. JACKSON:  Are you looking for
24   your publications?

Page 156

1         THE WITNESS:  Yeah. It's in my
2    paper.
3         MR. JACKSON:  It's referenced as
4    footnote 9.
5         THE WITNESS:  Yeah. It says
6    "document not available."
7    A.   I'm just checking Anderson's review
8    to see if he tells what it is in here as well.
9         Well, I don't remember the exact
10   composition of the solution. But he's
11   published a number of papers, and we've used it
12   as well. It's a fluid that can be used to
13   simulate the macrophage pocket in vitro.
14   Q.   (By Mr. Thomas) That's in the
15   context of the polypropylene?
16   A.   No. Other people have cited this as
17   well. It's an in vitro model for oxidative
18   degradation.
19   Q.   You've talked about Dr. Anderson many
20   times. The one study that we've marked -- is
21   it cited in your paper?
22   A.   It's No. 8.
23   Q.   Is it Exhibit 8?
24   A.   I don't know what the exhibit is.

Page 157

1    It's No. 6.
2    Q.   Have you worked with Dr. Anderson
3    before?
4    A.   I've not worked with him. I know him
5    professionally.
6    Q.   Okay. So when you cite to
7    Dr. Anderson, it's based on your knowledge of
8    his studies and conversations that you've had
9    with him personally as opposed to work that
10   you've done with him on studies?
11   A.   It's mostly through citations. He's
12   very well known in this area of foreign body
13   response. That's his area of expertise. He's
14   very well known in that field.
15   Q.   Now, we talked about Exhibit No. 6
16   earlier, and I understood that the reason why
17   you cited that paper was for discussion of the
18   foreign body response to implanted materials;
19   correct?
20   A.   Yes.
21   Q.   What specifically is it about the
22   Anderson paper that's important to your
23   opinions?
24   A.   There's a number of papers by other

40 (Pages 154 to 157)

Scott A. Guelcher, Ph.D.

Page 158

1  researchers as well. This is, I think, a
2  particularly well written concise review
3  summarizing his 30 years of work in this area.
4  So it's -- I would say that he's a key thought
5  leader in the field, and this is a very nicely
6  written paper and it's useful for citing.
7      Q.  Let's go to 2.4 of Exhibit 6 which is
8  the Anderson paper.
9      A.  Okay.
10     Q.  And the heading is Consequences of
11 Foreign Body Giant Cell Formation.
12     A.  Right.
13     Q.  Right in the middle of that
14 paragraph, it says, For example, additional
15 polymers such as polypropylene used in
16 artificial joints or polypropylene used as a
17 suture material may undergo surface oxidation
18 by the ROIs.
19     A.  Yes.
20     Q.  Medical devices and prostheses
21 composed of addition polymers usually contain
22 small amounts of antioxidants to inhibit this
23 oxidative processes.  Do you see that?
24     A.  Yes.

Page 159

1      Q.  Has Dr. Anderson, to your knowledge,
2  ever written that adding small amounts of
3  antioxidants to inhibit this oxidative process
4  is not sufficient to protect against the
5  degradation of polypropylene?
6      A.  I don't think he's saying here that
7  it works or doesn't work.  I just think he's
8  saying that this is what people do.
9      Q.  My question is, are you aware of him
10 writing anywhere that the use of antioxidants
11 doesn't work?
12     A.  Again, he's not saying it works here
13 either.  He's not saying it works or doesn't
14 work.
15     Q.  If you go to the next page under
16 figure 3, it says again that these studies
17 clearly identify the importance of the use of
18 antioxidants in these polymers to inhibit the
19 oxidation process that occurs with the foreign
20 body reaction.
21     A.  It says that in the text?  Where does
22 it say --
23     Q.  It's under "device failure."
24     A.  Yeah.  Which paragraph?

Page 160

1      Q.  It's the paragraph that begins "these
2  studies."
3      A.  Oh.
4      Q.  The paragraph ends with, The chemical
5  and molecular composition of the primary
6  structure of the polyurethane polymer is known
7  to modulate or inhibit the process of
8  environmental stress cracking and degradation.
9  And that's by adding these antioxidants;
10 correct?
11     A.  No.  That's not what he's saying at
12 all.  I think you're misreading this paragraph.
13     So he says, These studies identify
14 the importance of the use of antioxidants to
15 inhibit the oxidation process.  Okay.  So he's
16 saying that people use it.
17     Then he says, The persistence of the
18 foreign body reaction and the fact that it is
19 present at the interface between the tissue and
20 the device for the lifetime suggests that the
21 oxidation process is continuous albeit at low
22 levels.  In general, chemical degradation and
23 physical damage in pacemaker leads most
24 probably have a synergistic effect on the

Page 161

1  failure of the insulation.
2      What he's saying in the last
3  paragraph is -- this is what I was talking
4  about earlier.  When he says the chemical and
5  molecular composition of the primary structure,
6  "primary structure" refers to the backbone of
7  the polymer.
8      So a polyether urethane is known to
9  be very sensitive to oxidative degradation and
10 its consequent environmental stress cracking.
11 Polycarbonates or polysiloxane urethanes are
12 less sensitive.
13     So he's saying that the structure of
14 the urethane backbone, whether it's a polyether
15 or polycarbonate in the polyurethane backbone
16 is a contributing factor to this.  He's not
17 talking about antioxidants there.
18     Q.  Is it fair to understand that you
19 consider Dr. Anderson to be one of the leading
20 authorities in understanding the extent to
21 which a foreign body reaction to biomaterials
22 may impact oxidation?
23     A.  I wouldn't say it that way.  I would
24 say that Dr. Anderson spent a very long career

41 (Pages 158 to 161)

Scott A. Guelcher, Ph.D.

Page 162

1  studying the response to the body through the
2  foreign body reaction to implanted
3  biomaterials. That's what this paper is
4  talking about.
5      Q.  Have you ever had discussions with
6  Dr. Anderson about whether antioxidants added
7  to polypropylene can sufficiently inhibit
8  oxidation of the polypropylene to allow the
9  medical device to perform its intended
10  function?
11     A.  I've not discussed that with
12  Dr. Anderson, but he's not saying that in this
13  statement. He's saying you can add
14  antioxidants to try to help it, but the problem
15  is that reaction is never going to stop. So
16  how do you know how much to add?
17         Ethicon's own data showed that when
18  they add antioxidants, it's depleted after
19  seven or eight years. So it didn't totally
20  work.
21     Q.  That's in that one study we talked
22  about?
23     A.  Yeah. And I haven't seen any other
24  studies -- in one of the memos, they said that

Page 163

1  they were looking at this. What reference is
2  that?
3     Q.  It was 18, 19, and 20.
4     A.  I think it was No. 20. They said --
5  there's a memo, a follow-up to -- I think this
6  was a -- well, the meeting minutes from the
7  Prolene explants.
8         And, basically, it's summarizing
9  those human explants that I was talking about
10  earlier. And then there's a point on here at
11  the top of page 2, it says, Mr. Burkley is
12  planning to look at the remaining dry explants
13  by IOR. He will also try to see the
14  relationship between the amount of stabilizers
15  added to the polymer and degradation and
16  cracking.
17         You know, we never -- we couldn't
18  find anything further on that. In a number of
19  these presentations that I have also from
20  Ethicon -- I can pull some of these up. This
21  would be --
22     Q.  That's your rebuttal report. I'm not
23  there yet.
24     A.  I know. But you're asking me

Page 164

1  about -- what I'm saying is, I'm not seeing any
2  evidence here even in this presentation --
3  they're talking about oxidation, and there's
4  really nothing here that suggests that these
5  studies, looking at a dose response, how much
6  do you have to dose the polypropylene to
7  protect it from oxidation?
8         There's no evidence that this was
9  looked at after this document in 1987. We
10  couldn't find anything.
11     Q.  Did you ask anybody?
12     A.  We did. Well, Dr. Dunn, like I said,
13  we talked about it. He talked with the
14  attorneys requesting, but I don't think these
15  documents could be found.
16     Q.  Okay.
17     A.  That's what I know. So the only
18  thing that I know about it is what's in these
19  memos and these presentations where basically
20  they're recognizing that there's oxidative
21  degradation.
22         But there's really no discussion of,
23  Hey, let's do a dose response study. There's
24  e-mails that say should we look at this. And,

Page 165

1  again, there's no evidence that I've seen that
2  it's being looked at.
3         I guess I'm just saying it's unknown
4  and, to my knowledge, it's not been looked at.
5     Q.  Did you ask to see all of the
6  degradation work that Ethicon has in its files
7  related to polypropylene?
8     A.  I believe that Dr. Dunn did. I even
9  think Dr. Burkley was asked -- and I don't know
10  if I have that deposition in front of me.
11        But I believe that in Dr. Burkley's
12  deposition, he really was talking about the dog
13  study. To our knowledge, there weren't other
14  studies.
15        (Exhibit 10 was marked.)
16     Q.  (By Mr. Thomas) Let me show you
17  what's been marked as deposition Exhibit
18  No. 10. Deposition Exhibit 10 is a letter from
19  me to counsel in this case enclosing a list of
20  studies about which Ethicon testified at what's
21  known as a Rule 30(b)(6) deposition on various
22  studies that were conducted by Ethicon over the
23  years.
24        And if you look at page 3 of Exhibit

42 (Pages 162 to 165)

Scott A. Guelcher, Ph.D.

Page 166

1    No. 10, there is a topic known as
2    "degradation."
3        A.   Uh-huh.
4        Q.   And I take it that other than the dog
5    study, you've not seen any of these degradation
6    studies where Ethicon has looked at to the
7    extent to which these -- the Ethicon
8    polypropylene degrades in vivo?
9        MR. JACKSON:  Objection to form.
10       A.   I haven't seen these studies.
11       Q.   (By Mr. Thomas)  Okay.
12       A.   This is just a list of --
13       Q.   They're available.
14       MR. THOMAS:  Let's go off the record,
15   please.
16       (A break was taken from 2:41 p.m.
17   until 3:09.)
18       MR. THOMAS:  While at recess, I've
19   had a number of conversations with counsel
20   for the plaintiff about the unavailability
21   of the time records that are the subject of
22   the deposition as well as the late service
23   of the rebuttal report and the anticipated
24   production of a rebuttal report for Dr. Dunn

Page 167

1    whose deposition is scheduled for tomorrow.
2        Counsel and I have agreed that we
3    will stop the deposition of Dr. Guelcher
4    today to resume at a later date; at which
5    point, I will be able to inquire about the
6    billing records which will be produced as
7    well as the scope of the rebuttal report.
8        In addition, counsel has agreed to
9    talk to me tomorrow about a date for
10   Dr. Dunn; at which time, we will find a
11   date hopefully to resume Dr. Guelcher and
12   to complete Dr. Dunn in a day, the goal
13   being that we only have one day for
14   Dr. Dunn for both his initial report and
15   whatever rebuttal report he prepares so
16   that we get this done as efficiently as we
17   can.  I think that's the scope of the
18   agreement.
19       MR. JACKSON:  You have represented it
20   as I understand it.
21       MR. THOMAS:  That's all.  Thank you,
22   Dr. Guelcher.
23       FURTHER THIS DEPONENT SAITH NOT.
24       (Deposition adjourned at 3:10 p.m.)

Page 168

1    CERTIFICATE OF COURT REPORTER
2        I, Marilyn Morgan, Licensed Court
3    Reporter and Notary Public for the State of
4    Tennessee, do certify that the above deposition
5    was reported by me and that the foregoing
6    transcript is a true and accurate record to the
7    best of my knowledge, skills, and ability.
8        I further certify that I am not an
9    employee of counsel or any of the parties, nor
10   a relative or employee of any attorney or
11   counsel connected with the action, nor
12   financially interested in the action.
13       I further certify that I am duly
14   licensed by the Tennessee Board of Court
15   Reporting as a Licensed Court Reporter as
16   evidenced by the LCR number and expiration date
17   following my name below.
18       Subscribed and sworn to before me when
19   taken, this 25th day of March, 2014.
20
21       _____
22       MARILYN MORGAN, LCR #235
     Expiration Date:  6/30/14
     Notary Public, State of Tennessee
23   Commission expires:  6/18/17
24

Page 169

1    INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8        After doing so, please sign
9    the errata sheet and date it.  It will be
10   attached to your deposition.
11       It is imperative that you
12   return the original errata sheet to the
13   deposing attorney within thirty (30) days
14   of receipt of the deposition transcript
15   by you.  If you fail to do so, the
16   deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

43 (Pages 166 to 169)

Scott A. Guelcher, Ph.D.

Page 170

```
 1        - - - - - -
            E R R A T A
 2        - - - - - -
 3    PAGE  LINE  CHANGE
 4    ____ ____ _____
 5    REASON: _____
 6    ____ ____ _____
 7    REASON: _____
 8    ____ ____ _____
 9    REASON: _____
10    ____ ____ _____
11    REASON: _____
12    ____ ____ _____
13    REASON: _____
14    ____ ____ _____
15    REASON: _____
16    ____ ____ _____
17    REASON: _____
18    ____ ____ _____
19    REASON: _____
20    ____ ____ _____
21    REASON: _____
22    ____ ____ _____
23    REASON: _____
24    ____ ____ _____
```

Page 171

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3         I,_____, do
      hereby certify that I have read the
 4    foregoing pages, and that the same
      is a correct transcription of the answers
 5    given by me to the questions therein
      propounded, except for the corrections or
 6    changes in form or substance, if any,
      noted in the attached Errata Sheet.
 7
      _____
 8    SCOTT A. GUELCHER, PH.D.      DATE
 9
10
11
12
13
14
      Subscribed and sworn
15    to before me this
      _____ day of _____, 20____.
16
      My commission expires:_____
17
18    _____
      Notary Public
19
20
21
22
23
24
```

44 (Pages 170 to 171)

# EXHIBIT PP



Society For Biomaterials

# Degradation of polypropylene *in vivo*: A microscopic analysis of meshes explanted from patients

**Vladimir V. Iakovlev,[1] Scott A. Guelcher,[2] Robert Bendavid[3]**

[1]Laboratory Medicine and Pathobiology, Division of Pathology and Keenan Research Centre of the Li Ka Shing Knowledge Institute, University of Toronto, St. Michael's Hospital, Toronto, Canada
[2]Department of Chemical and Biomolecular Engineering, School of Engineering, Vanderbilt University, Nashville, Tennessee
[3]Department of Surgery, Shouldice Hospital, Thornhill, Canada

Received 3 April 2015; revised 21 June 2015; accepted 30 July 2015
Published online 00 Month 2015 in Wiley Online Library (wileyonlinelibrary.com). DOI: 10.1002/jbm.b.33502

**Abstract:** Polypropylene meshes, originally introduced for hernia repair, are presently utilized in several anatomical sites. Several million are implanted annually worldwide. Depending on the device, up to 10% will be excised to treat complications. The excised meshes can provide material to study the complications, however, they have remained underutilized over the last decades and the mechanisms of complications continue to be incompletely understood. The fundamental question as to whether polypropylene degrades *in vivo* is still debated. We have examined 164 excised meshes using conventional microscopy to search for features of polypropylene degradation. Four specimens were also examined by transmission electron microscopy. The degraded material, detected by its ability to absorb dyes in the degradation nanopores, formed a continuous layer at the surface of the mesh fibers. It retained birefringence, inclusions of non-degraded poly-propylene, and showed ability to meld with the non-degraded fiber core when heated by the surgical cautery. Several features indicated that the degradation layer formed *in vivo*: inflammatory cells trapped within fissures, melting caused by cautery of excision surgery, and gradual but progressive growth of the degradation layer while in the body. Cracking of the degraded material indicated a contribution to clinically important mesh stiffening and deformation. Chemical products of degradation need to be analyzed and studied for their role in the mesh-body interactions. The described methods can also be used to study degradation of other materials. © 2015 Wiley Periodicals, Inc. J Biomed Mater Res Part B: Appl Biomater 00B: 000–000, 2015.

**Key Words:** polypropylene, mesh, degradation, pathology, microscopy, hernia, vaginal

**How to cite this article**: Iakovlev VV, Guelcher SA, Bendavid R. 2015. Degradation of polypropylene *in vivo*: A microscopic analysis of meshes explanted from patients. J Biomed Mater Res Part B 2015:00B:000–000.

## INTRODUCTION

Polypropylene meshes were introduced in the late 50s for hernia repair.[1] Over the next decades, their use spread to other anatomical sites. Presently, they are employed in millions of surgeries worldwide and this expansive use has been catalyzed by the rapid proliferation of new and minimally invasive surgical techniques.[2,3] Depending on the anatomical site, in published reports to date, 2–10% of implanted meshes are explanted or partially excised for complications such as pain, infection, erosion through the vaginal mucosa and other adjacent structures, urinary symptoms or recurrence of a herniation.[4–9] These excision specimens generate a large, but underutilized body of study material. Surprisingly, there are very few studies reporting findings of polypropylene explants from patients. A small number of animal studies, which are more expensive to conduct, have been published; however these had the obvious limitations associated with animal experiments. This has created a paradoxical situation in which despite the long history of use and the large volume of explanted polypropylene devices, the causes and mechanisms of complications associated with the mesh remain incompletely understood. For example, the fundamental question as to whether polypropylene degrades *in vivo* is still unresolved 50 years after its introduction as an implantable material.[10,11]

Degradation of polymers and polypropylene more specifically has been studied outside the medical field. The typical features of changing appearance of degrading polymers are cracks and irregularity of the surface.[12–14] Polymer breakdown can be caused by physical factors, such as high temperature and ultraviolet light, as well as chemical factors, such as oxidation. Biodegradation, a form of chemical degradation, has been studied outside of medical settings as bacterial degradation of polypropylene discarded in the environment. The study revealed polypropylene surface changes similar to those induced by the physical factors.[15] In animals, the initial experiments which used mechanical and spectral methods of testing, showed that polypropylene fibers underwent oxidative degradation when implanted in mammals. The detected changes were similar to autoxidation of the polymer at elevated temperatures.[16] In that study chemical induction of the surface was observed at 108 days for unstabilized polypropylene, while induction was delayed by the addition of antioxidants during the

**Correspondence to:** V. Iakovlev; e-mail: iakovlev.v@gmail.com and R. Bendavid; e-mail: rbendavid@sympatico.ca

**TABLE I. Sample and Patient Data**

| Transvaginal | | Patient Age Years, Median (Range) | Mesh *In Vivo* Months, Median (Range) | Symptoms (%) | | |
|---|---|---|---|---|---|---|
| | | | | Pain, Dyspareunia | Erosion | Urinary Symptoms |
| **Slings, *n*** | | 52 (25–71) | 48 (10–108) | 57 | 38 | 33 |
| AMS[a] Sparc/Monarc | 21 | 69 | | | | |
| BSC[b] Obtryx/Adv. | 16 | | | | | |
| Ethicon TVT/TVT-O | 28 | | | | | |
| Bard Align | 4 | | | | | |
| | | | | | | |
| **Pelvic organ prolapse, *n*** | | | | | | |
| AMS Apogee/Perig. | 16 | 42 | | | | |
| BSC pinnacle/uphold | 8 | | | | | |
| Ethicon prolift | 4 | | | | | |
| Bard avaulta | 9 | | | | | |
| Undetermined | 5 | | | | | |
| | | | | Symptoms (%) | | |
| **HERNIA** | | | | Pain | Recurrence | Infection | Migration into organs |
| **Inguinal, *n*** | | 47 (24–82) | 36 (3–169) | 48 | 52 | 10 | 6 |
| Ethicon Prolene | 3 | 37 | | | | |
| Bard Marlex | 5 | | | | | |
| Undetermined | 29 | | | | | |
| | | | | | | |
| **Ventral, *n*** | | | | | | |
| Undetermined | | 16 | | | | |

[a] American Medical Systems.
[b] Boston Scientific.

manufacturing process. In the body, oxidative degradation facilitated by macrophages surrounding the mesh fibers was thought to be the major contributor.[17–20] When scanning electron microscopy was introduced into the field, the studies focused on surface changes of explanted polypropylene.[21–29] These reports showed cracking and scaling of the surface, both of which became the subject of interpretation and speculation. Alternative explanations were either cracking of a biological material formed by deposited proteins, or polypropylene degradation induced by chemical and physical factors of specimen handling after excision. The explanted material from humans is usually fixed in formalin. Additionally, to expose the surface, the mesh needed to be cleaned to remove ingrown tissue, which was done using chemical methods. These aspects have been points of criticism and it has been questioned whether the methodology could fully exclude artefacts of exposure to chemicals, intra/postoperative handling and residual tissue or biological films. We employed a different methodology by studying cross sections of explanted mesh, without its separation from tissues. This approach allowed us to avoid possible artefacts associated with tissue removal and enabled side-by-side comparison of degraded and non-degraded polypropylene as well as the surrounding tissue components.

## MATERIALS AND METHODS
### Specimens
After approval of the St. Michael's Hospital Research Ethics Board, 164 consecutive explanted knitted polypropylene mesh specimens received at the pathology department were reviewed. The specimens were from St. Michael's and Shouldice hospital inpatients and outside referrals. Approximately 70% of specimens were potential or active medico-legal cases. More details are provided in Table I.

### Specimen processing
The specimens were received as tissue in formalin in 128 cases and paraffin embedded tissue in 36 cases. Tissue received in formalin was processed using Leica TP1020 tissue processor. For all specimens, either received in formalin or paraffin, exposure to formalin was assessed as <72 h in 18 cases, between 72 h and 1 month for 16 specimens, and >1 month for the remaining specimens.

### Staining
Tissue was sectioned at 4 μm and all sections were initially stained by haematoxylin and eosin (H&E, Harris haematoxylin). Additionally, 3 random hernia and 7 transvaginal specimens were stained by Masson trichrome and Von Kossa calcium (counterstain neutral red), 10 other random cases stained in combination by Gomori trichrome, Movat, Van Gieson elastin, Ziehl–Neelsen and Grocott's methenamine silver stains.[30,31] Sections of another 5 random explants were stained by immunoperoxidase technique for IgG (DAKO, 1:50 enzyme digestion for 4 min) and 10 explants for myeloperoxidase (DAKO, 1:200 without retrieval) using Ventana Benchmark XT, Gill's haematoxylin.



**FIGURE 1.** Surface of the mesh fibers immediately after explantation from the body, transvaginal sling explanted due to pain 9 years after implantation, light microscope, ×20 objective with image crop. Mesh fibers at the specimen edges had no covering tissue and could be examined as they were in the body, avoiding possible artifacts of tissue removal, drying or contact with formalin. Both blue (a) and clear (b) fibers showed surface cracking. [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

### New mesh control

Portions of pristine transvaginal sling devices of three different manufacturers were placed in 10% buffered formalin. The mesh was then sampled for light microscopy at 2 weeks and 1, 2, and 4 months in two separate experiments. Tissue processing, embedding, sectioning (charged coated slides) and staining (manual on horizontal tray) were carried out according to the same protocols as for the mesh samples explanted from the patients.

### Measurement of degradation layer thickness

Clinical information was reviewed to identify groups of samples from the same manufacturer, the same mesh design, and verified implantation and excision dates. A set of 23 midurethral slings was the largest uniform group that fulfilled these criteria. The sections were examined to find mesh fibers sectioned perpendicularly to their long axis with a cross section close to a near perfect circle to reduce the measurement error of angular orientation. Staining and refractile properties were used to define the edges of degraded material. The thickness of the stained layer was measured with an eyepiece micrometer in at least two fibers with two measurement sites per fiber. The micrometer scale was 1.0 µm at 100× objective with oil immersion and the measurements were rounded to the closest whole number. A median value per specimen was recorded.

### Transmission electron microscopy

Subsamples of 1 fresh transvaginal, 6 formalin fixed transvaginal and 1 formalin fixed hernia explant tissue were transferred into glutaraldehyde, then postfixed in osmium tetroxide, dehydrated through a graded series of ethanol, and embedded in a mixture of Epon 812 and Araldite 502. Blue sections were cut and assessed for the presence of mesh fibers in the microblocks. The following 4 samples contained the fibers and were

examined using transmission electron microscopy: 1 sample of transvaginal explant fixed fresh in glutaraldehyde, 2 samples of transvaginal explants of another manufacturer transferred from formalin, and 1 sample of hernia explant transferred from formalin. Thin sections were stained with uranyl acetate and lead citrate and examined with a Hitachi 7650 electron microscope.

### RESULTS

### Light microscopy

In one case the mesh fibers could be assessed immediately after explantation, before tissue drying or fixation in formalin. The transvaginal sling was excised because of chronic pain 9 years after implantation. Mesh fibers at the specimen edges were free of tissue and could be examined in a conventional microscope after a rinse in saline and without additional preparation (Figure 1). There were transverse cracks at the bending points [Figure 1(a)] and patches of haphazard cracks on straighter portions of the fibers [Figure 1(b)].

Microscopic examination of mesh fibers cross-sectioned in the histological slides showed a circumferential outer layer of degraded polypropylene in 162 of 164 examined explants [Figure 2(a)]. Polypropylene degradation was observed across a large range of devices, produced by different manufacturers, explanted from different anatomical locations and due to different clinical complications (Table I). The only two specimens where the degradation layer was not visible were a hernia mesh and a transvaginal sling removed 3 and 10 months, respectively after implantation. As shown further the degradation layer is difficult to detect by light microscopy within the first year after implantation.

The degradation layer was detectable as a rim of purple material in the H&E stained sections while the central core of the fibers remained clear and colorless (except manufacturer's dye). The layer also showed variable staining by other histological stains indicating non-specific trapping of the dyes by



**FIGURE 2.** Histological sections, H&E stain, ×100 objective with oil immersion. The same cross section of a clear mesh fiber in regular (a) and polarized (b) light. The fiber has a layer of staining degraded polypropylene at the surface (between arrowheads). This layer has refractile properties of polypropylene in polarized light (b). In some areas the non-degraded core of the fibers detaches during histological processing while segments of the degraded layer stay attached to the tissue. Separated degradation layer in regular (c) and polarized (d) light. At sites like this, intensity of light passing through the degraded layer cannot be attributed to light scatter from the core. Note that tissue components including collagen have a much weaker birefringence than polypropylene (b and d). [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

van der Waals forces and/or ionic binding. The latter appeared to need a mordant where the alum, but not the iron mordant retained haematoxylin in the layer of degraded polypropylene.

At optical resolution of light microscopy the stainable outer (degradation) layer was homogeneous, without detectable fibrillation. It was of a relatively uniform thickness within individual fibers and of approximately the same thickness between the fibers in the same sample. The layer showed cracks and ability to detach from the non-staining fiber core. It also showed adherence to the tissues. Where the core detached from the glass slide, the outer layer either remained on the fiber or detached from it and stayed adherent to the tissue [Figure 2(c)]. For descriptive purpose, the uniform circumferential nature, fissuring and partial peeling of the layer resembled a tree bark.

We used polarized light microscopy[32] as a routine tool for all 164 specimens to confirm that the stained material was polypropylene. In polarized light, both the central core of the fibers and the outer layer showed similar refractile properties [Figure 2(b)]. The light intensity was uniform within the core while the outer layer had gradual reduction of the refractile ability toward the surface. Birefringence of the outer layer was also observed in the segments of the "bark" separated from the core [Figure 2(c,d)]. At these sites, the light brightness in the "bark" layer was due to its internal properties and could not be attributed to the scatter of light from the core. The adjacent tissue components containing collagen also showed birefringence, however of a much lower intensity. The tissue components also had a different structure and coloration.

Several mesh designs on the market are knitted using a combination of clear and blue fibers. In our pool of specimens, at least 50 explants showed blue fibers. Blue polypropylene fibers incorporated a blue dye as granules introduced



**FIGURE 3.** Degradation "bark" of the blue fibers manufactured with inclusion of blue dye granules, H&E stain, ×100 objective with oil immersion: (a) and (b) non-degraded core (left half of the images) and the degraded layer (between arrowheads). Note that the blue granules are retained in the layer of degraded polypropylene. Within the degraded "bark," the granules degrade and loose color toward the surface. In (c) and (d) the non-degraded core detached from the slides similarly to Figure 2(c,d). At these sites, presence of the granules in the separated "bark" cannot be attributed to an overlap with the core. [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

into the material during its manufacture (Figure 3). The granules were seen in the non-degraded core of the fibers as well as to a variable degree in the outer degradation layer. In the latter, they were detected within the "bark" remaining on the core [Figure 3(a,b)] as well as in the segments of the "bark" separated from the core [Figure 3(c,d)]. The granules were mainly seen in the deeper layers of the "bark" and were not as frequent closer to the surface, which suggests that they also undergo degradation and lose color. The finding was a direct confirmation that the "bark" originated from the same material as the core of the fibers.

The brittleness, staining and birefringence characteristics of the "bark" were similar to those of calcium salts which are commonly deposited in degenerating tissues. Von Kossa stain was used for a sample set of 10 specimens to rule out presence of calcium salts in the outer "bark." No calcium salts were detected in the brittle outer layer of the 10 specimens tested [Figure 4(a)].

The Masson trichrome technique was used to analyze porosity characteristics of the degraded layer in a representative sample of 10 specimens. The trichrome techniques are based on competitive staining by dyes of different molecular



**FIGURE 4.** Additional stains, all images taken with 100x oil immersion objective and cropped to a different magnification, polypropylene degradation layer is pointed between arrowheads: (a) Von Kossa stain is negative for calcium in the brittle "bark" (would stain calcium black), (b) trichrome stain shows that the deeper parts of the "bark" have smaller staining porosity (red) than those close to the surface (green) which correlates with TEM findings [Figure 6(b)], (c) immunohistochemical stain for immunoglobulin G (IgG, stained brown). IgG is present in almost all human tissues and fluids. It is deposited on the surface of degraded polypropylene but is not mixed within it. (d) Immunostain for the oxidizing enzyme of inflammatory cells myeloperoxidase (stains brown). [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

size and penetration ability. A dye (red for Masson) of a smaller molecular size and higher penetration is used in combination with a dye of larger molecular size (green). The stain showed that the deeper parts (close to the core) of the degradation layer had a finer porosity than the more superficial parts [Figure 4(b)]. This was consistent with the findings of transmission electron microscopy demonstrating a network of nanocracks/nanopores expanding toward the surface.

To test whether the outer layer contained proteins, we used immunohistochemical stain for the ubiquitous serum and tissue protein immunoglobulin G (IgG). There was no detectable level of IgG in the bark layer while the immunoglobulin was deposited at its surface [Figure 4(c)]. The finding indicated that IgG came in contact with the fibers; however it was not a component of the "bark" layer as would be expected in a biological film formed by serum proteins.

Myeloperoxidase is an oxidative enzyme expressed by the inflammatory cells together with an array of other oxidative substances. Staining for myeloperoxidase revealed an appearance similar to that of immunoglobulin: the enzyme was detected deposited on the surface of the "bark," but was not observed mixed within it [Figure 4(d)]. This finding further indicated incompatibility of the "bark" material with water-soluble proteins. It also indicated an oxidative environment immediately around the fibers.

### Analysis of the effect of surgical cautery on polypropylene

Surgical cautery instruments cause heating of the tissues to a wide range of temperatures. There is usually a narrow zone of high temperature immediately at the tip of the instruments with a sharp drop in temperature in the deeper tissue further away. In excised specimens cautery changes (darkening and nuclear streaming) are seen within 1–2 mm from the cauterized surface. In these areas, mesh fibers showed sites where both the outer degraded polypropylene "bark" phase and the inner non-degraded polypropylene phase melted and mixed to form a single homogeneous phase (Figure 5). The phase-mixed regions did not absorb histological dyes, thereby showing that they lack porosity observed in the degraded polypropylene. The fact that the "bark" was melted during excision surgery indicated that the degradation layer was formed in the body before the excision surgery. The finding also revealed that the fiber core and the outer "bark" are composed of materials with similar chemical compositions that are miscible with each other when heated.

### Transmission electron microscopy (TEM)

We used TEM to study the ultrastructural organisation of the degraded layer in cross sections. The mesh fibers showed an outer "bark" similar to that seen by light microscopy [Figure 6(a)]. There were no fibrillar (collagen, amyloid etc.) or other structures of connective tissue matrix within the "bark". Material composition of the outer layer and the core showed similar electron density; however, at high magnification the outer "bark" was noticeably more granular, especially toward the surface [Figure 6(a), insert].

The "bark" material had a lattice of fine branching cracks (nanocracks). This network of nanocracks was sparse closer to the core and expanded toward the surface [Figure 6(b)]. As seen in Figure 6(b) in addition to the nanocracks there were also occasional larger cracks occurring at random. These larger cracks seen by TEM corresponded to the cracks seen by light microscopy either on the surface (Figure 1) or in cross sections (Figure 2).

The "bark" either had a gradual transition into the core [Figure 6(b)] or showed a zone of circumferential fissuring partially separating it from the core [Figure 6(a)]. The mechanisms of "bark" separation from the core and formation of the larger cracks are likely linked since the cracks tended to turn at the interface between the "bark" and the core [Figure 6(b)]. The forces which produced the transverse (radial) cracks also acted as shear forces between the "bark" and the core.

An important finding was the detection of inflammatory cells partially migrated into and trapped within the fissures as shown in Figure 6(c). The shape of widened crevices and the depth of penetration indicated an active *in vivo* cellular migration. This phenomenon was observed at two separate sites.

For better demonstration of the degradation "bark" we used light microscopic and TEM images to generate a 3-dimensional restoration of a mesh fiber (Figure 7).

### Thickness of degradation layer versus *in vivo* and *in vitro* intervals

Out of all the specimens, 23 samples of explanted midurethral slings formed the largest group of meshes from the same manufacturer, of identical mesh type and with reliable records of implantation and excision dates. The range of *in vivo* interval (between implantation and excision) in the group was 18–97 months (mean 53). There was a good correlation (Pearson = 0.73) between the thickness of the degradation layer and the duration of *in vivo* exposure indicating that the thickness of degraded material grows while the mesh is in the body [Figure 8(a,b)]. There was a trend for a more rapid initial growth with gradual plateau subsequently.

The "bark" thickness was also analyzed in relation to polypropylene exposure to formalin. Duration of storage of the specimens in formalin ranged from 3 to 32 months (mean 19) for the group. There was no correlation between the thickness of degradation layer and the duration of mesh exposure to formalin (Pearson = −0.06).

### Testing of pristine mesh

Samples of three pristine midurethral slings were subjected to formalin fixation followed by tissue processing and H&E staining to reproduce the exposure of explant specimens to the potential factors of postoperative polypropylene degradation *in vitro*. There was no detectable degradation of polypropylene exposed to formalin up to 4 months followed by routine histological processing. This testing showed that exposures to formalin up to 4 months and to the chemical and temperature factors of histological processing do not affect polypropylene to a degree detectable by light microscopy. In comparison, in our pool of mesh explants, 27



**FIGURE 5.** Melting of both non-degraded and degraded polypropylene caused by the surgical cautery, H&E, ×100 oil immersion: (a) and (b) the same site of fiber melting in regular and polarized light, (c) and (d) another site showing melding point. While molten the non-degraded core and the degradation "bark" formed a common pool of material. [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

specimens had exposure to formalin of <1 month. The findings were in keeping with wide acceptance of polypropylene resistance to formalin for industrial purposes.[33]

## DISCUSSION

Previous studies focused on examination of the surface and mechanical properties of explanted fibers and have indicated that polypropylene degrades when exposed to the physiological environment.[16,21–29] These conclusions have been questioned recently,[10,11] while the expanding clinical use and increasing burden of litigation dictated the need to study the mechanisms of complications. Surprisingly, the main source of information, the pathology specimens explanted because of these complications, have not been duly investigated. Using a cross-sectional microscopy approach, we found that the degradation layer is visible in light microscope from a medium magnification power as a rim of stained material around the mesh fibers. In polarized light, the bright curvilinear particles of separated "bark" can be seen from even low magnification. A number of features confirmed that the "bark" is degraded polypropylene (Table II) and that the degradation occurred *in vivo* (Table III). Although the mesh has been in use for several decades, we found no description of these findings in published literature after a search through online and printed sources.

Surface cracking of explanted polypropylene devices has been shown by several reports using scanning electron microscopy.[21–29] In these previous studies, transverse cracks in the direction perpendicular to the axis of the fiber were observed, similar to those observed in the explanted meshes from the present study (Figure 1). We found that these



**FIGURE 6.** Transmission electron microscopy. (a) Low power magnification of a cross-sectioned mesh fiber shows the degradation layer similarly to light microscopy, the insert shows an image composed of three high power fields to reconstruct the transition between the non-degraded core and the degradation "bark." Note the fine nanocracks/nanopores in the degraded material. (b) Outer part of the fiber with gradual transition between the non-degraded core and the degraded polypropylene at the surface. The lattice of nanocracks expands toward the surface (left to right). There are also two larger cracks which start perpendicular to the surface but then turn at the interface between the core and the degraded layer. (c) A part of inflammatory cell (labeled C in insert) is trapped in a fissure within the degraded polypropylene (PP). Higher magnification (insert) shows cellular membrane at the cell-polypropylene interface (left wall of the fissure) and cellular organelles in the cell (chains of rounded structures, likely ribosomes).

cracks can also be observed and studied by light microscopy, which allows for examination of the surface of the fibers immediately after excision, thereby avoiding possible artifacts of drying and chemical treatments.

Previous studies utilizing SEM to characterize surface degradation have been challenged on the basis of the cracks being biological in origin.[11,34] The advantage of cross-sectional analysis by light microscopy and TEM used in the present study is that the degraded "bark," the non-degraded polypropylene core, and the surrounding tissue can be examined in the same section. A variety of histochemical and immunohistochemical stains were utilized to show by light microscopy that the interfacial "bark" layer between the polypropylene core and adjacent tissue was degraded polypropylene. The "bark" layer was further studied using TEM and the examination revealed ultrastructural features



**FIGURE 7.** A three-dimensional restoration of a cross sectioned mesh fiber.

**TABLE II. Features Confirming Polypropylene Degradation**

| Evidence that the outer "bark" is degraded polypropylene |
| --- |
| Surface cracking observed in fresh specimen immediately after excision |
| Birefringence of the "bark" is the same as of the fiber core |
| Sites of gradual transition between the core and the "bark" |
| Retention of blue dye granules (introduced during manufacturing) in the "bark" |
| Sharp demarcation between body proteins and the "bark" |
| Ability of the "bark" material to meld with non-degraded core at high temperatures |
| No detectable levels of calcium salts as commonly seen in brittle biological materials |
| Increasing degree of porosity/degradation toward the surface |
| No elements of tissue matrix in the "bark" by TEM |

of degradation. Thus, our findings support the notion that the transverse cracks observed in previous preclinical and clinical studies represent surface degradation of polypropylene.

We observed degradation in all except two explants, one of which was implanted for 3 months and another for 10 months. Thus, the degraded layer does not become reliably visible by light microscopy until about a year after implantation. Similarly, a previous study has reported that polypropylene pelvic meshes explanted from patients <3 months after implantation showed no observable evidence of degradation by SEM.[24] Another study found that unstabilized polypropylene sutures implanted subcutaneously in guinea pigs became chemically induced, which initiates the degradation process after 108 days.[16] For light microscopy, an additional lag time of several months is required for the degraded layer to become detectable in cross-sections and this needs to be considered in future studies.

Several studies indicated that polypropylene degradation is likely mediated by the foreign body reaction, which is ongoing until the device is removed.[35] Our observations of adherent macrophages on the polypropylene surface are consistent with the previous studies reporting chronic inflammation in explanted polypropylene mesh several years after implantation.[23,24,27,36] We observed strong staining for oxidative enzyme myeloperoxidase produced by the macrophages in the tissue surrounding the mesh fibers. This indicated that, the surface of the polypropylene was exposed to reactive oxygen species (ROS) while oxidation of polypropylene as a result of the foreign body reaction has been suggested as the mechanism of degradation by earlier reports.[24–27,29,36] For many polymers, the rate of oxidation is controlled by the rate of diffusion of molecular oxygen into the polymer.[37–39] We have proposed a mechanism of polypropylene oxidation under simulated *in vivo* conditions



**FIGURE 8.** Duration of *in vivo* exposure versus thickness of degraded layer in a group of explants of the same manufacturer and the same mesh design. (a) Thickness of the degradation "bark" increased over the years *in vivo* (Pearson correlation = 0.73). Note the trend of plateauing after 5–6 years. There was no correlation of the thickness with the duration of specimen storage in formalin (not shown, Pearson = −0.06). (b) Comparison of the "bark" in meshes explanted after 12 and 72 months in the body, H&E, ×100 objective with oil immersion, images cropped to the same magnification factor. [Color figure can be viewed in the online issue, which is available at wileyonlinelibrary.com.]

**TABLE III. Features Confirming That Degradation Occurs *In Vivo***

| Evidence that polypropylene degradation occurs *in vivo* |
| --- |
| No detectable degradation of pristine meshes after exposure to formalin and tissue processing |
| Surface cracking observed in fresh specimen immediately after excision |
| Gradual increase in "bark" thickness during the years in the body |
| No correlation between the "bark" thickness and duration of storage in formalin |
| Entrapment of inflammatory cells and tissue matrix in the "bark" fissures |
| Melting of the "bark" by surgical cautery (presence before excision surgery) |

in which oxidation is initiated by ROS attack on the tertiary hydrogen on the polypropylene surface followed by diffusion of molecular oxygen into the polymer (Talley et al. submitted). In the present study, using a subset of 23 midurethral slings from the same manufacturer, we showed that the thickness of the "bark" layer increased with time, in a manner consistent with a reaction-diffusion mechanism.[37]

## Clinical significance of polypropylene degradation

It is important to know the effect of degradation of an implanted material on the body and on the long-term performance of the device. When physical and chemical characteristics of a material undergo changes in the body its applications should include planning for safe and complete removal with minimal tissue damage. This exit-strategy is especially important in younger patients, proximity to organs and large vessels, and anatomical sites which are difficult to reach.

The clinical descriptions provided with the specimens indicated that in many cases mesh-related complications develop several years after mesh implantation. The exact mechanisms of these late complications are yet to be understood, however factors accumulating over time need to be considered as primary contributors. As we showed, the degraded layer becomes thicker over time while its cracking indicated brittleness and loss of flexibility. Although the degraded layer is thin in relation to the fiber diameter, its circumferential distribution provides the highest mechanical effect on the mesh fibers. Degradation related stiffening of the mesh is expected to increase over time.

Another clinically important aspect of degradation is the potential for bacterial colonization of the fissures within the degraded material. It is known that irregularities of polymer surface promote bacterial adherence.[40,41]

A described effect of degradation and wear of medical devices is the release of material particles. The debris from prosthetic joints is well known to cause tissue necrosis, inflammation and fibrosis around the joints.[42–44] For polypropylene meshes, we observed occasional particles of degraded polypropylene in the surrounding tissue and macrophages. The load of these visible particles was limited; however we could not test for the presence of smaller particles, not detectable by light microscope, and chemical products of degradation. Outside the body, thermal degradation of polypropylene produces an array of organic molecules such as acids, ketones, ethers, aldehydes, alcohols and smaller hydrocarbons.[45] The conditions of thermal degradation of polypropylene do not match those of degradation in the body; however the results can be used to estimate the range of chemicals that can be potentially produced in the tissue. Additionally, if additives are used to stabilize the polymer or improve its other characteristics, they can also leach into the tissue. Recently, additives leaching from polypropylene labware were shown to affect cultured cells *in vitro*.[46] A systemic effect on humans was detected when intravenous injections of saline from prefilled and stored polypropylene syringes were found to alter smell and taste in pediatric patients.[47] Locally, the molecules released from

polypropylene mesh may play role in direct and inflammation-mediated tissue damage with subsequent repair. It has been shown recently that the scar around mesh fibers undergoes a continuous remodelling.[48]

A potential adverse effect of implantable devices is oncogenesis. Oncogenic mechanisms may be related to chemical composition of the device or other factors of device-body interactions. A complicating aspect of studying mutagens is the length of the latency period. For example, radiation induced sarcomas have a median latency period of 10 years with a range 2–50 years.[49]

Because of different developmental pathways, the potential tumorigenic effects need to be analyzed separately for mesenchymal neoplasms, lymphomas, and carcinomas (epithelial tumors). A number of mesenchymal neoplasms have been reported in association with breast and joint prostheses with the latency period of up to 33 (mean 11) years.[50,51] In relation to polypropylene mesh, one case of myofibroblastic tumor has been reported recently.[52]

With regards to lymphoid cells, specific lymphomas associated with breast implants have been categorized as an entity since primary breast lymphomas are extremely rare without implants.[53,54] The neoplasms develop in association with either saline or silicone filled implants and the exact source of carcinogenicity is not known presently. It may be related to a higher turnover of inflammatory cells surrounding the implants. Median latency period was reported 9 years (range 1–32).[54] There have been no reports of a lymphoma at a site of polypropylene mesh implantation.

Few carcinomas have been reported in association with implantable devices. This risk appears to be related to chronic irritation and inflammation as it is known that the long-standing non-healing wounds are a risk factor for squamous cell carcinoma. Individual cases of squamous cell carcinomas have been reported developing in the chronic wounds of exposed hernia mesh.[55] There appears to be no specific risk for squamous or other type of carcinoma without mesh exposure through the skin.

Based on the analysis of published literature and considering the long term clinical use of polypropylene mesh, the oncogenic risks, if present, are very low. However, continuous introduction of new designs and possible changes of the sources of the raw material pose a potential problem with respect to the variation of chemical composition and new effects on the body.

## CONCLUSIONS

The expanded use of polypropylene mesh in clinical practice and the subsequent increase in the number and nature of complications necessitate the study of the mechanisms of those complications. Explants from patients are the primary source of information regarding these mechanisms; however the material has been largely underutilized. We have shown that a focused examination of explanted specimens can reveal features which have been overlooked for decades. Specifically, polypropylene degradation can be detected by readily available conventional light microscopy. A number of

features indicated that polypropylene degrades while in the body. Both physical and chemical aspects of polypropylene degradation need to be studied more extensively for their roles in the development of these complications. The described methods of light microscopy can also be used to study degradation of other materials.

## ACKNOWLEDGMENTS

Authors provided expert opinions for medico-legal cases on matters related to polypropylene mesh.

## REFERENCES

1. Usher FC, Cogan JE, Lowry TI. A new technique for the repair of inguinal and incisional hernias. Arch Surg 1960;81:847.
2. Klinge U, Klosterhalfen B, Birkenhauer V, Junge K, Conze J, Schumpelick V. Impact of polymer pore size on the interface scar formation in a rat model. J Surg Res 2002;103:208–214.
3. Sanders DL, Kingsnorth AN. Prosthetic mesh materials used in hernia surgery. Expert Rev Med Devices 2012;9:159–179.
4. Bontje HF, van de Pol G, van der Zaag-Loonen HJ, Spaans WA. Follow-up of mesh complications using the IUGA/ICS category-time-site classification. Int Urogynecol J 2014;25:817–822.
5. Bontinck J, Kyle-Leinhase I, Pletinckx P, Vergucht V, Beckers R, Muysoms F. Single centre observational study to evaluate the safety and efficacy of the Proceed™ Ventral Patch to repair small ventral hernias. Hernia 2014;18:671–680.
6. Albino FP, Patel KM, Nahabedian MY, Sosin M, Attinger CE, Bhanot P. Does mesh location matter in abdominal wall reconstruction? A systematic review of the literature and a summary of recommendations. Plast Reconstr Surg 2013;132:1295–1304.
7. Ellington DR, Richter HE. Indications, contraindications, and complications of mesh in surgical treatment of pelvic organ prolapse. Clin Obstet Gynecol 2013;56:276–288.
8. Van Geelen JM, Dwyer PL. Where to for pelvic organ prolapse treatment after the FDA pronouncements? A systematic review of the recent literature. Int Urogynecol J 2013;24:707–718.
9. Maher C, Feiner B, Baessler K, Schmid C. Surgical management of pelvic organ prolapse in women. Cochrane Database Syst Rev 2013;4:CD004014.
10. Sternschuss G, Ostergard D, Patel H. Post-implantation alterations of polypropylene in the human. J Urol 2012;188:27–32.
11. Keys T, Aboushwareb T, Badlani G. Re: Post-implantation alterations of polypropylene in the human. J Urol 2013;189:1996–2000.
12. Rosa DS, Angelini JMG, Agnelli JAM, Mei LHI. The use of optical microscopy to follow the degradation of isotactic polypropylene (iPP) subjected to natural and accelerated aging. Polym Test 2005; 24:1022–1026.
13. Schmidt H, Witkowska B, Kamińska I, Twarowska-Schmidt K, Wierus K, Puchowicz D. Comparison of the rates of polypropylene fibre degradation caused by artificial light and sunlight. Fibres Text Eastern Eur 2011;4:53–58.
14. Blais P, Carlsson DJ, Clark FRS, Sturgeon PZ, Wiles DM. The photo-oxidation of polypropylene monofilaments: Part II: Physical changes and microstructure. Text Res J 1976;46:641–664.
15. Longo C, Savaris M, Zeni M, Brandalise RN, Grisa AMC. Degradation study of polypropylene (PP) and bioriented polypropylene (BOPP) in the environment. Mater Res 2011;14:442–448.
16. Liebert TC, Chartoff RP, Cosgrove SL, McCuskey RS. Subcutaneous implants of polypropylene filaments. J Biomed Mater Res A 1976;10: 939–951.
17. Bertin D, Leblanc M, Marque S, Siri D. Polypropylene degradation: Theoretical and experimental investigations. Polym Degrad Stabil 2010;95:782–791.
18. Ali SAM, Doherty P J, Williams DF. The mechanisms of oxidative degradation of biomedical polymers by free radicals. J Appl Polym Sci 1994;51:1389–1398.
19. King RN, Lyman DJ. Polymers in contact with the body. Environ Health Perspect 1975;11:71–74.
20. Williams DF. Review: Biodegradation of surgical polymers. J Mater Sci 1982;17:1233.
21. Jongebloed WL, Worst JF. Degradation of polypropylene in the human eye: A SEM-study. Adv Ophthalmol 1986;64:143–152.
22. Costello CR, Bachman SL, Grant SA, Cleveland DS, Loy TS. Characterization of heavyweight and lightweight polypropylene prosthetic mesh explants from a single patient. Surg Innov 2007;14: 168–176.
23. Costello CR, Bachman S, Ramshaw BJ, Grant SA. Materials characterization of explanted polypropylene hernia meshes. Mater J Biomed Mater Res B Appl Biomater 2007;838:44–49.
24. Clave A, Yahi H, Hammou J, Montanari S, Gounon P, Clave H. Polypropylene as a reinforcement in pelvic surgery is not inert comparative analysis of 100 explants. Int Urogynecol J 2010;21: 261–270.
25. Cozad M, Grant D, Bachman SL, Grant DN, Ramshaw BJ, Grant SA. Materials characterization of explanted polypropylene, polyethylene terephthalate and expanded polytetrafluoroethylene composites: Spectral and thermal analysis. J Biomed Mater Res 2010;94B:455–462.
26. Ostergard D. Degradation, infection and heat effects on polypropylene mesh for pelvic implantation: What was known and when it was known. Int Urogynecol J 2011;22:771–774.
27. Wood AJ, Cozad MJ, Grant DA, Ostdiek AM, Bachman SL, Grant SA. Materials characterization and histological analysis of explanted polypropylene, PTFE, and PET hernia meshes from an individual patient. J Mater Sci Mater Med 2013;24:1113–1122.
28. Coda A, Bendavid R, Botto-Micca F, Bossotti M, Bona A. Structural alterations of prosthetic meshes in humans. Hernia 2003;7: 29–34.
29. Mary C, Marois Y, King MW, Laroche G, Douville Y, Martin L, Guidoin R. Comparison of the in vivo behaviour of polyvinylidene fluoride and polypropylene sutures used in vascular surgery. ASAIO J 1998;44:199–206.
30. Bancroft J, Gamble M. Theory and Practice of Histological Techniques, 5th ed. Edinburgh: Churchill Livingston; 2002.
31. Carson F, Hladik C. Histotechnology: A Self-instructional Text, 3rd ed. Chicago, IL: ASCP Press; 2009.
32. Stewart MJ. On the use of polarized light in the detection and investigation of suture materials embedded in the tissues. Br Med J 1920;1:663–665.
33. Available at: http://www.hmcpolymers.com/uploads/files/resources/hmc-pp-chemical-resistance.PDF;a. Available at: http://www.gilsoneng.com/reference/ChemRes.pdf b. Available at: https://plasticpipe.org/pdf/tr-19_thermoplastic_pipe_for_transport_of_chemical.pdf. c. Available at: http://www.quickcutgasket.com/pdf/Chemical-Resistance-Chart.pdf. d. Available at: http://www.reln.com.au/site/DefaultSite/filesystem/documents/PP_Chemical_Resistance.pdf
34. de Tayrac R, Letouzey V. Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery. Int Urogynecol J 2011;22:775–780.
35. Anderson JM, Rodriguez A, Chang DT. Foreign body reaction to biomaterials. Semin Immunol 2008;20:86–100.
36. Huber A, McCabe GP, Boruch AV, Medberry C, Honerlaw M, Badylak SF. Polypropylene-containing synthetic mesh devices in soft tissue repair: A meta-analysis. J Biomed Mater Res B Appl Biomater 2012;100:145–154.
37. Schubert MA, Wiggins MJ, Anderson JM, Hiltner A. The effect of strain state on the biostability of a poly(etherurethane urea) elastomer. J Biomed Mater Res 1997;35:319–328.
38. Popov A, Rapoport N, Zaikov G. Oxidation of Stressed Polymers. New York: Gordon and Breach Science Publishers; 1991.
39. Cunliffe AV, Davis A. Photo-oxidation of thick polymer samples—Part II: The influence of oxygen diffusion on the natural and artificial weathering of polyolefins. Polym Deg Stabil 1982;4:17–37.
40. An YH, Friedman RJ. Concise review of mechanisms of bacterial adhesion to biomaterial surfaces. J Biomed Mater Res 1998;43: 338–348
41. Katsikogianni MI, Missirlis YF. Concise review of mechanisms of bacterial adhesion to biomaterials and of techniques used in estimating bacteria-material interactions. Eur Cell Mater 2004 7;8:37–57.
42. Gallo J, Goodman SB, Konttinen YT, Wimmer MA, Holinka M. Osteolysis around total knee arthroplasty: A review of pathogenetic mechanisms. Acta Biomater 2013;9:8046–8058.

43. Del Bravo V, Graci C, Spinelli MS, Muratori F, Maccauro G. Histological and ultrastructural reaction to different materials for orthopaedic application. Int J Immunopathol Pharmacol 2011;24(1, Suppl 2):91–94.

44. Revell PA. The combined role of wear particles, macrophages and lymphocytes in the loosening of total joint prostheses. J R Soc Interface 2008;5:1263–1278.

45. Frostling H, Hoff A, Jacobsson S, Pfaffli P, Vainiotalo S, Zitting A. Analytical, occupational and toxicologic aspects of the degradation products of polypropylene plastics. Scand J Work Environ Health 1984;10:163–169.

46. Lee TW, Tumanov S, Villas-Bôas SG, Montgomery JM, Birch NP. Chemicals eluting from disposable plastic syringes and syringe filters alter neurite growth, axogenesis and the microtubule cytoskeleton in cultured hippocampal neurons. J Neurochem 2014; 133(1):53–65.

47. Mancini D, Vaillancourt R, Pouliot A, Lin A, Sharp D. Taste and odour disturbances in pediatric patients undergoing IV flush with normal saline administered by prefilled or freshly prepared syringes: Randomized single-blind study. Can J Hosp Pharm 2014;67:353–357.

48. Junge K, Rosch R, Bialasinski L, Klinge U, Klosterhalfen B, Schumpelick V. Persistent extracellular matrix remodelling at the interface to polymers used for hernia repair. Eur Surg Res 2003; 35:497–504.

49. Patel SR. Radiation-induced sarcoma. Curr Treat Options Oncol 2000;1:258–261.

50. Balzer BL, Weiss SW. Do biomaterials cause implant-associated mesenchymal tumors of the breast? Analysis of 8 new cases and review of the literature. Hum Pathol 2009;40:1564–1570.

51. Keel SB, Jaffe KA, Petur Nielsen G, Rosenberg AE. Orthopaedic implant-related sarcoma: A study of twelve cases. Mod Pathol 2001;14:969–977.

52. Kwon SY, Latchamsetty KC, Benson J, Carreno M. Inflammatory myofibroblastic tumor of the urinary tract following a TVT. J Pelvic Med Surg 2012;18:249–251.

53. Taylor CR, Siddiqi IN, Brody GS. Anaplastic large cell lymphoma occurring in association with breast implants: Review of pathologic and immunohistochemical features in 103 cases. Appl Immunohistochem Mol Morphol 2013;21:13–20.

54. Thompson PA, Prince HM. Breast implant-associated anaplastic large cell lymphoma: A systematic review of the literature and mini-meta analysis. Curr Hematol Malig Rep 2013;8:196–210.

55. Birolini C, Minossi JG, Lima CF, Utiyama EM, Rasslan S. Mesh cancer: Long-term mesh infection leading to squamous-cell carcinoma of the abdominal wall. Hernia 2014;18:897–901.

# EXHIBIT QQ

J. BIOMED. MATER. RES.          VOL. 10, PP. 939–951 (1976)

# Subcutaneous Implants of Polypropylene Filaments

TIMOTHY C. LIEBERT,* RICHARD P. CHARTOFF, and STANLEY L. COSGROVE, *Department of Chemical and Nuclear Engineering*, and ROBERT S. McCUSKEY, *Department of Anatomy, College of Medicine, University of Cincinnati, Cincinnati, Ohio 45221*

## Summary

Extruded filaments of unmodified polypropylene (PP) with and without antioxidant were implanted subcutaneously in hamsters in order to determine their rate of degradation. Specimens were removed periodically during a 5 month test period and analyzed by infrared spectroscopy and dynamic mechanical testing. The analyses show that degradation begins to occur after only a few days. Although the reaction sequence is not known, several factors suggest that the *in vivo* degradation process is similar to autoxidation which occurs in air or oxygen.

The infrared data indicate that the hydroxyl content of the implants increases at a rate of 0.061 mg/g polypropylene per day during the initiation phase of the reaction. An induction time of 108 days was established. Carbonyl bonds appear after an implantation time of 50–90 days and increase thereafter. Mechanical tests indicate a decrease in the dynamic loss tangent, tan $\delta$, during the first month of implantation for unmodified polypropylene. No change in the infrared spectra or tan $\delta$ was observed, however, for implants containing an antioxidant.

Thus, it is apparent that polypropylene filaments implanted subcutaneously in hamsters degrade by an oxidation process which is retarded effectively by using an antioxidant. While the findings reported are specific to subcutaneous polypropylene implants, they suggest that degradation of other systems may involve similar processes. This notion suggests directions for further research on increasing the *in vivo* stability of synthetic polymers.

Long-term effects of polymer implantation upon tissue were not studied in this work.

## INTRODUCTION

Because synthetic polymeric materials are now widely being used for the repair or replacement of diseased or destroyed parts of the

---

* Present address: Phillips Petroleum Company, Bartlesville, Oklahoma 74004.

939

© 1976 by John Wiley & Sons, Inc.

body, there is considerable interest in the design of polymers for specific replacement tasks.    In order to design and evaluate candidate materials for implantation, there are three major factors which must be considered,[1] namely: 1) matching the engineering properties of the candidate material with those of the tissues which it is to replace; 2) the effect of the implant on the biological environment; and 3) the effect of the biological environment on the properties of the implant material.    The first of these deals with selecting a replacement material which has the same strength, flexibility, and other physical properties as the original material.    Techniques for systematically matching properties for a desired replacement task are just now being developed.[2,3]

Studies of the effects of the biological system upon polymers are relatively sparse.    It has been shown that the tensile properties of polymers change after implantation for prolonged periods.[4-7]    It is also known that chain scission begins to occur in polymers shortly after implantation, though its affect upon mechanical properties may not be observed for much longer times.[8]    Very little is known about the mechanisms for change in the polymers.    Certainly, a number of possibilities must be considered, depending on the specific polymer. Hydrolysis in polyesters and polyurethanes is possible due to presence of hydrogen ions and water in both body tissues and fluids.[9] Also, the presence of oxygen in various forms makes the body a potentially powerful oxidizer to polymers which are susceptible to oxidation.

In this paper, we report on a study which was conducted to examine the role of oxygen in the reaction between a typical hydrocarbon-type polymer and the body.    The objectives of the study were to determine 1) the length of time required for observable degradation to occur; 2) the type of degradation products formed; 3) the rate of degradation; and 4) the effect of the presence of an antioxidant on degradation and the rate of degradation.

## MATERIALS AND METHODS

### Choice of Polymer

Polypropylene (PP) was chosen as a representative polymer for this study for several reasons.    Chemically, it is a simple carbon-backbone polymer, since it is composed solely of carbon and hydrogen.

SUBCUTANEOUS IMPLANTS OF PP FILAMENTS     941

It is readily available as a pure material free of contaminants. It has excellent mechanical properties and it withstands steam sterilization. It contains no plasticizers which could react harmfully with the body or which might be lost during steam sterilization.

The most important property of polypropylene for this study, however, is that it is easily oxidized in its pure form. By studying any chemical and physical changes which the polymer undergoes with implantation, one can begin to relate the degree to which oxygen is involved in *in vivo* degradation of the polymer.

### Polymer Preparation

Two samples of polypropylene were obtained from Hercules Company (Wilmington, Delaware). Both of them are basically the same with B a processed form of A, blended with an FDA-approved proprietary stabilizer system. The specifications of the samples are listed in Table I.

The polymer samples were fabricated into monofilaments by using an Instron capillary extrusion rheometer at an extrusion temperature of 200°C and an ambient quench temperature of approximately 25°C. The polymer melt resided in the rheometer for approximately 5 min before extrusion began. During this time, air bubbles were displaced from the melt by the force of a ram in order to minimize bulk thermal autoxidation which could have occurred due to the presence of air trapped in the melt. The filaments were drawn to the desired diameters by attaching the extrudate to a spool which was turned manually at various speeds until the required amount of filament was obtained. Total extrusion time for each of the samples was approxi-

TABLE I
Polypropylene Sample Specifications

| Specification | A | B |
|---|---|---|
| $M_w$ | 314,000 | 280,000 |
| $(M_w/M_n)$ | 7.85 | 7 |
| Isotacticity (%) | 96–97.5 | 96–97.5 |
| Crystallinity (%) | 50–65% | 50–65 |
| Stabilizer | Phenolic antioxidant (trace) | Hindered phenolic antioxidant and sulfur-containing synergist |

942                    LIEBERT ET AL.

mately 20 min.   Intrinsic viscosities and infrared spectra of the polymer were obtained before and after extrusion to determine if molecular weight changes and/or autoxidation had occurred.   Diameters for both A and B filaments were in the range of 0.1–0.3 mm, depending on the draw rate.   Crystallinity of the extruded filament was not determined.   All filaments were stored in a vacuum desiccator prior to use in order to prevent oxidation.   Prior to implantation, the filaments were sterilized by exposure to an atmosphere of ethylene oxide for a period of 1 hr.

The Syrian golden hamster was chosen as the host animal for the implantation studies.   The implants were made subcutaneously by the following surgical technique.   A filament was threaded through the eye of a needle which was then drawn under the skin of the back of the hamster.   The filament was cut from the needle so that, upon spreading the skin across the back of the hamster, the ends of the filament were drawn inside the skin.   Filaments implanted by this technique remained undisturbed in the hamster for periods as long



Fig. 1.   Photograph of a PP filament being implanted subcutaneously in a Syrian golden hamster.

as the life-span of the animal.    Figure 1 illustrates the method which was used.

Infrared spectroscopy of KBr pellets containing polypropylene was used to measure any increase in hydroxyl or carbonyl content which might occur in the polymer.  The polymer samples were prepared for infrared spectroscopy by chopping the filaments into thin slices.  A weighed amount of KBr was thoroughly mixed with the PP and subsequently transferred to a pellet die.  The die had been previously heated in an oven to remove adsorbed water vapor.

The pellets were formed by connecting the die to a vacuum pump and subjecting the KBr–PP mixture to approximately 20,000 lb ram force in a laboratory press for approximately 1 min.  The pellets were then removed from the die and stored in a vacuum disiccator until the infrared scans were made.  A Perkin-Elmer model 180 spectrophotometer was used for obtaining the infrared spectra. Reference pellets for each sample were pressed immediately after the sample pellets were made.  The same procedure was used in both cases, and an identical amount of KBr was used for the reference as for the sample.

The Rheovibron Dynamic Viscoelastometer Model DDV II (Vibron) was used to test mechanical properties.  The purpose of the Rheovibron is to measure the temperature-dependence of the complex modulus of polymers at four fixed frequencies, 3.5, 11, 35, and 110 Hz.[10]  A sinusoidal tensile strain is applied at one end of the sample and a sinusoidal stress is generated at the other end. The phase angle, $\delta$, between the applied strain and the resultant stress is measured and read off directly on a meter.  The tangent of the phase angle, $\delta$, was measured over a temperature range of 22–50°C. To illustrate concisely the trends observed, only the tan $\delta$ data for 37°C and 3.5 Hz are included in this paper.

Gel-permeation chromatography (GPC) analyses of selected filaments were conducted using a Waters Model 200 gel-permeation chromatograph operating at 140°C using 1,3,5- trichlorobenzene as a solvent.   Solutions of the samples were prepared having a concentration of approximately 0.1 wt %; 2 cc of this solution were used to perform analyses.  From the GPC analyses, weight-average molecular weight, $\bar{M}_w$, number-average molecular weight, $\bar{M}_n$, and the molecular weight distribution curves were obtained for implanted and nonimplanted filaments.

LIEBERT ET AL.

## RESULTS

Molecular weights of the polymer determined before and after extrusion showned no change in molecular weight. Infrared spectra showed no differences in hydroxyl content between the initial samples and the extruded filaments.

Figure 2 shows a plot of hydroxyl concentration [OH] versus implant time for A and B filaments. As shown in Figure 2, for the A filaments [OH] increases rapidly during the preinitiation period, then increases linearly with implantation time up to an implantation time of about 100 days. At this point, the slope changes and [OH] increases at a greater rate. Figure 3 shows carbonyl absorbance plotted versus implantation time for each of the A implants. It can be seen from Figure 3 that a time of 50–90 days passed before any measurable carbonyl formed. The exact length of this time is only estimated, since no data were taken between 49 and 99 days.

As shown in Figure 2, the value of [OH] for the B filaments did not change significantly. Similarly, no increase in carbonyl was observed for B filaments following implantation.

The results of dynamic mechanical testing of implanted filaments are shown in Figure 4, which is a plot of tan $\delta$ versus implantation time for both A and B filaments. Tan $\delta$ decreased initially for the A filaments and then stabilized. No change was found for B filaments.



Fig. 2.   Plot of hydroxyl concentration [OH] vs. implantation time for A and B filaments.

SUBCUTANEOUS IMPLANTS OF PP FILAMENTS        945



Fig. 3.   Plot of carbonyl absorbance vs. implantation time for pure PP implants.



Fig. 4.   Plot of tan $\delta$ vs. implantation time for A and B filaments.   Temperature, 37°C; frequency, 3.5 Hz.

GPC analyses were performed on two samples of PP.   The first sample was a 48 mg PP filament which had not been implanted. The second was prepared by combining three filaments implanted subcutaneously in separate hamsters for 70 days.   Figure 5 shows the GPC molecular weight distribution curves obtained for both samples.   From the GPC analyses shown in Figure 5, it can be seen that a slight shift in molecular weight distribution occurred.   At the high molecular weight end of the curve, a decrease in the amount of very large molecules ($>3 \times 10^6$) resulted in an increase in the



Fig. 5. Molecular weight distribution curves for A filaments: (——) before implantation; (- - -) after implantation.

amount of medium-range molecules ($3 \times 10^5$ to $3 \times 10^6$). At the lower end of the curve, an increase in the number of smaller molecules ($10^3$ to $10^4$) corresponded to a decrease in the molecules of intermediate size ($10^4$ to $3 \times 10^5$).

## DISCUSSION

Polypropylene degrades at high temperatures in the presence of oxygen by a free-radical mechanism similar to that proposed by Bolland for the oxidative degradation of carbon-backbone polymers.[11] The exact mechanism is still a matter of speculation, but the following steps are considered to be important in the overall scheme:[12–14]

Initiation:

$$RH + O_2 \rightarrow ROOH$$

$$RH + O_2 \rightarrow R \cdot + HO_2 \cdot$$

$$ROOH \rightarrow RO \cdot + HO \cdot$$

$$R \cdot + O_2 \rightarrow ROO \cdot$$

Propagation:

$$ROO \cdot + RH \rightarrow ROOH + R \cdot$$

$$RO \cdot + RH \rightarrow ROH + R \cdot$$

Radical transfer:

$$HO \cdot + RH \rightarrow H_2O + R \cdot$$

Termination by coupling:

$$\left.\begin{array}{l} 2R\cdot \\ R\cdot + ROO\cdot \\ 2ROO\cdot \end{array}\right\} \rightarrow \text{Products}$$

The initiation step has an activation energy of 31 kcal/mole,[14] and is generally discussed in terms of an induction time $\theta$ which is a function of temperature and oxygen concentration. During this period, hydroperoxides (ROOH) are formed. When the hydroperoxides begin to decompose, chain scission occurs, causing carbonyl groups to form. Rapid oxidation then follows, causing a sharp increase in carbonyl content and a significant loss of tensile properties.[15] The activation energy of this secondary oxidation has been found to be 22 kcal/mole.[14] By plotting mg $O_2$ absorbed versus time, the induction time can be found by locating the intersection of the initiation and the autocatalytic portions of the curve.

Oswald and Turi[15] found that at 75°C and in the presence of a 100% oxygen atmosphere, polypropylene tensile specimens degraded according to the same thermal oxidative degradation scheme proposed by others as a result of studies at higher temperatures.[14] Provided that the oxidation data of other researchers may be extrapolated to body temperature, 37°C, an estimate of the induction time for the gas–solid phase oxidation of PP may be calculated. For PP oxidation at 37°C in 100% $O_2$, this procedure predicts an induction time of 242 days and an initiation rate of 0.0089 mg OH/ g PP/day.

Although tissue oxygen concentration was not measured, based on measurements by others of the $p_{O_2}$ in the hamster cheek pouch membrane,[16] an approximate value of 25 mm Hg for the $p_{O_2}$ of oxygen in subcutaneous tissue is useful for comparative purposes. Since the antoxidation reaction is proportional to oxygen concentration,[14] the predicted initiation rate for oxidation of PP at 37°C in 3.3% $O_2$ is approximately $2.9 \times 10^{-4}$ mg OH/g PP/day, and the induction time is estimated to be 20 years.

The gradual increase in hydroxyl (or hydroperoxide) content which occurs in the case of thermally autoxidized PP was also found to occur in the implanted filaments studied in this work. The presence of an induction time $\theta$ was also observed. The induction time corresponds to the intersection of the two lines approximating the initiation and propagation steps involved in the formation of hydroperoxide (meas-

ured by hydroxyl), as shown in Figure 2. Using this criterion, an induction time of 108 days was found for the pure PP filaments implanted in this work. In addition, from the slope of the first line which represents the initiation step (determined by a least-squares fit), a rate of formation of hydroxyl of 0.061 mg OH/g PP/day was found.

Figure 6 shows the differences between the observed oxidation reaction for implanted filaments and the autoxidation reaction predicted by extrapolating the thermal autoxidation data to 37°C for 100% $O_2$ and for 3.3% $O_2$. The superposition of the three curves shown in Figure 6 illustrates the greater oxidation rate which occurs for the implanted filaments.

These differences are probably due to some extent to the effect of surrounding fluids in the case of the implanted filaments. It is possible that trace amounts of metallic ions, enzymes, and other chemicals presented in the fluids surrounding the implanted tissue accelerate the oxidation reaction. However, it also has been stated by others[15] that extrapolation of thermal autoxidation data to temperatures below 50°C is unwarranted. This is based on the fact that PP oxidizes in air at 25°C faster than extrapolation of thermal autoxidation data predicts. This may result from oxygen being more effective in producing chain scission at lower temperatures.[15]

Autoxidation occurs by the diffusion of oxygen into the amorphous interlamellae regions of the polymer. Scission of the interlamellae



Fig. 6.   Plot of [OH] vs. implantation time.

molecules which join the crystalline regions caused the polymer to become brittle and ultimately fail with applied stress.[15,17]   It has been shown[14] that PP autoxidation is a diffusion-controlled process for films of thickness greater than 0.13 mm.   Since the filaments used in this study were thicker than the minimum thickness for diffusional control, it is reasonable to argue that the effects observed in this study were surface effects only.   Further work is necessary to determine the importance of diffusion, and hence of crystallinity and orientation on the heterogeneous degradation of polypropylene implants.

The decrease in tan $\delta$ with implantation time implies an increase in rigidity of the filament, a fact which verifies in mechanical terms the oxidation observed by infrared spectroscopy.   The work of other researchers indicates that significant embrittlement does not occur during the initial phase of the oxidation process.   Chain scission and embrittlement should occur only during the later stages of oxidation and have been found to be a function of the number of carbonyl groups formed.[17,18]   For the case of implanted A filaments, such a theory predicts a decrease in tan $\delta$ coinciding with the first appearance of carbonyl groups.   The curve in Figure 3 indicates that formation of carbonyl occurred between 50 and 90 days of implantation.   However, no decrease in tan $\delta$ was observed during that period.

Several reasons can be advanced to account for these differences. Certainly, experimental error cannot be discounted, since insufficient data points were taken to completely affirm the statistical significance of the results.   Differences between the oxidation mechanisms could account for the observed behavior of tan $\delta$ with time.   Possibly, the filaments were stretched or otherwise physically altered during the implantation and removal phases of the experiments, causing the value of tan $\delta$ to decrease.

The differences between the two molecular weight distribution curves in Figure 5 appear to be minor.   However, the sensitivity of the GPC is such that slight differences such as those shown may be significant.   The shifts to lower molecular weights observed are consistent with the view that some chain scission has occurred during the first 70 days of implantation.   According to the infrared results shown in Figure 3, the amount of chain scission caused by carbonyl formation should be slight.   Some measurable change in molecular weight distribution is not unexpected, however, since the time at which time carbonyl formed was only estimated by interpolation.

GPC analyses of filaments implanted for longer periods are necessary to confirm the results suggested here.

No changes in mechanical properties or infrared spectra were observed for any of the filaments containing antioxidant which were implanted. This indicates that the effects observed for the pure filament were not due to diffusion of chemical or fluids into the filaments. Since the antioxidant specifically prevents the oxidation of the filament, the lack of observable changes in B filaments compared to the A filaments is also evident of oxidation in the unstabilized PP.

## CONCLUSIONS

The following is a summary of the findings of this study of degradation in polypropylene surgical impants.

1) Infrared spectra show that pure polypropylene filaments implanted subcutaneously in hamsters degrade by an oxidation mechanism similar to that which has been found by others by the autoxidation of PP at elevated temperatures.

2) The initiation rate for the degradation process was found to be 0.061 mg OH/g PP/day. This compared with a calculated rate of $2.9 \times 10^{-4}$ mg OH/g PP/day for the gas–solid phase reaction between $3.3\%$ $O_2$ and PP film at $37°C$.

3) Carbonyl groups were observed to form after 99 days of implantation. The induction time was determined to be approximately 108 days, using the criteria of the intersection of the lines approximating the initiation and propagation portions of the oxidation curve.

4) Dynamic mechanical tests of implanted filaments show that the rigidity increases during the first 30 days of implantation, but remains constant thereafter up to the test limit of 150 days.

5) Infrared spectra and mechanical testing of implanted and nonimplanted filaments containing an antioxidant show no changes in chemical or physical properties as a result of implantation. These results support the view that the changes observed for pure implanted filaments are due to oxidation rather than diffusional or other unknown effects, since the antioxidant specifically inhibits and/or retards oxidation.

SUBCUTANEOUS IMPLANTS OF PP FILAMENTS        951

6) GPC analyses indicate that some chain scission occurs during the first 70 days of implantation, a fact which is further evidence in support of a *in vivo* autoxidative mechanism.

## References

1. R. J. Hegyeli, *J. Biomed. Mater. Res. Symp. No. 1,* 1 (1971).
2. D. J. Lyman, *Ann. N.Y. Acad. Sci.,* **146,** 30 (1968).
3. Y. C. B. Fung, *Appl. Mech. Rev.,* **21,** 1 (1968).
4. J. H. Harrison, *Surg. Gynecol. Obstet.,* **108,** 433 (1959).
5. B. Dreyer, *J. Appl. Physiol.,* **15,** 18 (1961).
6. G. E. Moloney, *Br. J. Surg.,* **48,** 528 (1960).
7. R. I. Leininger and V. Mirkovitch, *Trans. Amer. Soc. Artif. Organs,* **10,** 320 (1964).
8. B. S. Oppenheimer, E. T. Oppenheimer, I. Danishefsky, A. P. Stout, and F. F. Eirich, *Cancer Res.,* **15,** 333 (1955).
9. S. N. Levine, *Ann. N.Y. Acad. Sci.,* **146,** 3 (1968).
10. M. Takayanagi, in *Proc. Fourth Int. Congr. Rheology* (Part I), Interscience, New York, 1965, pp. 161–187.
11. J. L. Bolland, *Quart. Rev.* (London), **3,** 1 (1949).
12. J. C. W. Chien and C. R. Boss, *J. Polym. Sci. A-1,* **5,** 3091 (1967).
13. N. Grassie, *The Chemistry of High Polymer Degradation Processes,* Interscience, New York, 1956, pp. 175–190.
14. S. S. Stivela, L. Reich, and P. G. Kelleher, *Makromol. Chem.,* **59,** 28 (1963).
15. H. J. Oswald and E. Turi, *Polym. Eng. Sci.,* **5,** 3, 152 (1965).
16. B. R. Duling and R. M. Berne, *Circ. Res.,* **28, 29** (**suppl.**), 65 (1971).
17. A. V. Tobolsky, P. M. Norling, N. H. Frick, and H. Yu, *J. Amer. Chem. Soc.,* **86,** 3925 (1964).
18. S. S. Stivela, R. J. Valles, and D. W. Levi, *J. Appl. Polym. Sci.,* **7,** 97 (1963).

Received July 24, 1975
Revised December 15, 1975

# EXHIBIT RR

0022-5347/04/1724-1374/0
The Journal of Urology®
Copyright © 2004 by American Urological Association

Vol. 172, 1374–1378, October 2004
Printed in U.S.A.
DOI: 10.1097/01.ju.0000138460.03758.5e

# TRANSVAGINAL SLING USING ACELLULAR HUMAN DERMAL ALLOGRAFT: SAFETY AND EFFICACY IN 253 PATIENTS

S. CRIVELLARO, J. J. SMITH,* E. KOCJANCIC AND J. F. BRESETTE

*From the Clinica Urologica, Università Del Piemonte Orientale (SC, EK), Novara, Italy, and Urological Department, Lahey Clinic (JJS, JFB), Burlington, Massachusetts*

ABSTRACT

**Purpose:** We evaluated the safety and efficacy of using human dermal allograft material for transvaginal slings to treat female stress urinary incontinence (SUI).

**Materials and Methods:** We present a prospective series of 253 patients with SUI treated with a transvaginal sling using a Repliform cadaveric human dermal allograft (LifeCell Corp., The Woodlands, Texas) and a bone anchor fixation kit. Clinical history, urogynecologic examination and videourodynamics were performed preoperatively. Results were assessed by a third party through validated quality of life questionnaires (Incontinence Impact Questionnaire and Urogenital Distress Inventory), overall impression and percent of improvement as perceived by the patients, and pad use. Scheduled followup examination were performed to rule out erosion, infection, obstruction, pain or recurrent incontinence.

**Results:** Complete followup was available on 234 of 253 patients. Average followup was 18 months. Of the patients 78% were cured or improved according to the questionnaires. The average improvement was 80%. At 18 months of followup incontinence average distress and scores decreased 10 and 7 points, respectively. Complications were de novo urgency in 5% of cases, recurrent SUI in 15% with no cases of persistent SUI, retention in 2% and slow vaginal wall healing in 1.7%. Of 156 patients 51 (22%) had persistent urgency. There were no cases of vaginal or urethral erosion, osteitis pubis or osteomyelitis.

**Conclusions:** Our data indicate that use of human dermal allograft for transvaginal slings is associated with low complication rates and favorable outcomes at an average of 18 months of followup.

KEY WORDS: urethra; transplantation, homologous; urinary incontinence, stress; vagina

Sling surgery has evolved in many ways during the last decade. The original indications for the sling procedure were incontinence associated with poor urethral sphincter function[1] and the original purpose of the sling procedure was to increase urethral resistance by elevating the urethra toward the pubic bone. The procedure was effective for restoring continence but at the cost of increased urinary obstruction and urgency symptoms. Attempts to limit obstructive voiding problems while treating intrinsic sphincter deficiency included tying attachment sutures loosely, the development of injectable materials,[2] the use of artificial urinary sphincter[3] and more recent tension-free techniques, such as a TVT (tension-free vaginal tape), SPARC (suprapubic arc restoration of continence (American Medical Systems, Minneapolis, Minnesota) or transobturator tape procedure. Tension-free techniques move the sling position to mid urethra and extend indications to patients with hypermobility. Sling attachment varies from rectus fascial fixation, various bone anchors and the newer tension-free self-anchoring sling. Sling material varies from anterior vaginal wall, autologous or homologous fascia, cadaveric dermal graft to xenograft (intestinal submucosa or porcine skin) and a plethora of synthetic materials,[4–7] but the ideal material remains debatable. We present our prospective series of 253 patients treated with a transvaginal sling using Repliform cadaveric human dermal allograft and a bone anchor fixation kit (Boston Scientific Corp., Watertown, Massachusetts) to evaluate the safety and efficacy of this material.

Accepted for publication May 14, 2004.
* Financial interest and/or other relationship with Medtronic and Uromedica.

## MATERIAL AND METHODS

From June 1998 to April 2003, 253 patients with stress urinary incontinence (SUI) who had received a Repliform transvaginal sling were evaluated prospectively. All patients completed validated quality of life questionnaires, namely the Urogenital Distress Inventory (UDI) and Incontinence Impact Questionnaire (IIQ) (see Appendix)[8] before surgery and postoperatively at each visit. In addition to a detailed history, complete physical examination and a 24-hour voiding diary, all patients underwent videourodynamics. The number of daily incontinent pads used was noted before and after surgery.

*Operative technique.* Two surgeons performed the transvaginal sling procedures using Repliform. All patients received preoperative antibiotics (cephazolin or fluoroquinolone). Patients were placed in the lithotomy position after satisfactory general or epidural anesthesia was established. A 20Fr Foley catheter was inserted and the labia were sutured laterally for better exposure. After hydrodissection of the anterior vaginal wall with saline a midline anterior incision was made. The vaginal mucosa was dissected from the periurethral and perivesical fascia on each side and the retropubic space was entered and digitally dissected.

The sling was rehydrated in normal saline for 3 to 5 minutes. The $2 \times 4$ cm graft was used most often. Using permanent polypropylene sutures the graft was anchored to the pubic bone using the bone anchor kit.[9] Graft edges were fixed to the proximal urethra using 4, 3-zero polyglactin sutures. The distal edge of the graft was sutured at the mid urethra and the proximal edge was sutured at the bladder neck. Following sling placement the polypropylene sutures were

tied against a 20Fr cystoscope placed in the urethra at a 45-degree angle to the horizontal operative table. Cystoscopy was performed to rule out bladder or ureteral injuries after indigo carmine was administered. Concomitant cystocele, rectocele, enterocele or sacrospinal suspension procedures were then performed. If vaginal hysterectomy were required, a gynecologist performed it before the sling. Intraoperative and in hospital complications, estimated blood loss and inpatient days were noted. All patients received antibiotics and catheter drainage for 3 to 7 days depending on the extent of surgery. Patients were encouraged to continue behavioral technique and Kegel exercises.

*Patient characteristics* (table 1). Between June 1998 and April 2003, 253 patients underwent a transvaginal sling procedure with Repliform, bone anchors and concomitant vaginal reconstructive procedures. Complete followup was available on 234 patients. Average patient followup was 18 months (range 6 to 54), including 100 patients (42%) with a followup lower and 134 (58%) with a followup higher than 12 months. Average patient age was 58.3 years. Average parity was 3. Of 234 patients 133 (57%) had undergone previous pelvic procedures. This group had undergone a total number of 241 pelvic procedures, of which 100 (42%) were anti-incontinence procedures and 80 (33%) were retropubic (table 1). All except 10 patients had stress urinary incontinence by history and confirmed by videourodynamic studies. The average cough leak point pressure was 65.7 cm $H_2O$ (range 9 to 210) and the average Valsalva leak point pressure was 64.4 cm $H_2O$ (range 9 to 183). The urodynamic classification of SUI using a Valsalva leak point pressure of 60 cm $H_2O$ as the cutoff point revealed that 112 patients had type III SUI, while 156 (61.6%) had a history of urgency or urge incontinence preoperatively, 79 (35.2%) had preoperative detrusor instability and 182 (77%) underwent a total of 302 concomitant procedures, including hysterectomy, cystocele, rectocele and enterocele repair, sacrospinous suspension and urethrolysis (table 1). Of the 234 patients 211 (90.1%) used pads before surgery (average 3 daily).

*Postoperative followup.* Routine followup consisted of visits at 3 to 7 days (voiding trial), 1 and 3 months, and every 6 months thereafter. Patients were asked by a third party to complete validated quality of life questionnaires that addressed self-reported continence and voiding status. Questions regarding pad use, dyspareunia, prolapse, improvement or worsening of incontinence, urgency and obstructive symptoms were asked. In addition, at 1 and 2 years patients received mailed questionnaires to complete privately at home. Overall patient satisfaction for stress and urge incontinence was assessed by questions 2 and 3 on the UDI questionnaire. The questions had a 4-point scale of severity, including 0—dry (cured), 1—slight leakage (improved), 2—moderate leakage (failure) and 3—severe leakage (failure). Early and late postoperative complications were recorded.

## RESULTS

*Intraoperative complications* (table 2). Intraoperative complications were 5 small bladder perforations (2.1%) and 2 small bowel perforations during enterocele repair. All complications were recognized intraoperatively and repaired immediately without sequelae.

*Early complications* (table 2). Early complications were perioperative bleeding in 3 patients, while 2 with hysterectomy required transfusions. Urinary retention requiring catheterization for 7 to 10 days occurred in 20 patients (8.5%), while the average number of days of postoperative catheter drainage was 4 in all patients. The 5 patients with bladder perforation were in this group and they underwent catheter drainage for 10 to 15 days. One perirectal abscess due to spontaneous defecation during surgery developed in a patient with a transvaginal sling, anterior and posterior repair, vaginal hysterectomy and sacrospinous suspension. Drainage at the bedside was successful. Remarkably the Repliform site used for the sling and anterior repair healed normally. There was 1 postoperative cerebrovascular accident within 30 days of surgery without permanent deficit.

*Late complications* (table 2). Late complications were transient dyspareunia in 20 cases (8.5%), of which 4 were successfully treated with removal of the ends of polypropylene sutures protruding in the vaginal wall. At 6 months postoperatively the remaining patients denied pain during intercourse. A total of 11 patients (6%) complained of postoperative pain (suprapubic in 5, vaginal in 5 and sciatica-type in 1). Most complaints ceased in 3 months and at 6 months all patients denied pain. Two patients (0.8%) complained of new constipation during 2 months, which gradually cleared. Five of the 20 patients (2.1%) requiring prolonged catheterization eventually complained of obstructive urinary symptoms, including 2 with neurogenic bladder and 1 with poor bladder sensation who occasionally used intermittent self-catheterization. Symptoms cleared in all patients except those with neurogenic bladder. There were 13 patients with new urgency (5.5%) and all used anticholinergics at last followup. Of 156 patients with preoperative urgency 51 (22%) had persistent urgency after the procedure. In 4 patients (1.7%) there was slow healing of the anterior vaginal wall over small areas of Repliform associated with vaginal infection, which was managed conservatively by antibiotic cream. Complete healing occurred within 8 weeks.

*Outcomes.* To evaluate outcomes as completely as possible certain parameters were completed, namely preoperative and postoperative IIQ and UDI scores (see Appendix), overall patient impression of results (dry or cured, slight or improved leakage, moderate leakage or failure, severe leakage or failure) for stress and urge incontinence, percent of improvement and pad use after surgery. Pad weight was not measured. The average recorded score on the IIQ questionnaire (maximum score 21) was 13.7 before surgery, 2.7 at 9 months

TABLE 1. *Previous surgery and concomitant procedures*

| Procedures | No. Pts (%) | Type |
|---|---|---|
| Previous: | 241 | |
|   Bulking agents | 40 (17) | 18 D, 22 C, # 2.15 |
|   Hysterectomy | 105 (44) | 45 VH, 60 AH |
|   Prolapse repair | 36 (14) | 16 AR, 3 PR, 17 BOTH |
|   Sling + suspension | 60 (25) | 13 PVS, 44 AS, 3 BOTH |
| Concomitant: | 302 | |
|   Anterior repair | 101 (33) | Repliform in 81 |
|   Posterior repair | 3 (1) | Repliform in 2 |
|   Anterior + posterior repair | 79 (26) | Repliform in 40 |
|   Sacrospinous suspension | 59 (19) | Bilat in 38, rt in 20, lt in 1 |
|   Transvaginal hysterectomy | 22 (7) | — |
|   Enterocele repair | 18 (6) | — |
|   Urethrolysis | 13 (4) | — |
|   Uterosuspension | 7 (2) | — |

TABLE 2. *Intraoperative, early and late complications*

| Complication | No. Pts (%) | Comment |
|---|---|---|
| Intraop: | 234 | |
|   Bladder injury | 5 (2.1) | — |
|   Bowel injury | 2 (0.9) | — |
| Early: | 234 | |
|   Periop bleeding | 3 (1.3) | After hysterectomy |
|   Periop retention | 20 (8.5) | Catheter for 7–10 days |
|   Periop infection | 1 (0.8) | Perirectal abscess |
|   Periop vascular accident | 1 (0.8) | Stroke |
| Late: | 234 | |
|   Dyspareunia | 20 (8.5) | Transient |
|   Pain | 11 (4.7) | Suprapubic in 5, vaginal in 5, sciatica type in 1 |
|   Constipation | 2 (0.9) | |
|   Obstructive symptoms | 5 (2.1) | Neurogenic bladder in 2 |
|   New urgency | 13 (5.5) | |
|   Slow vaginal wall healing | 4 (1.7) | Vaginal infection |

of followup and 3.5 at 18 months (fig. 1). The average UDI score (maximum score 18) was 11.6 before surgery, 3.1 at 9 months of followup and 4.3 at 18 months (fig. 2).

Figures 3 and 4 list overall patient impressions of results of surgery at a mean 18-month followup for stress and urge incontinence. The average percent improvement at 9 months was 85% and at 18 months it was 80%. Prior to surgery 90% of patients used an average of 3 pads daily. At 9 and 18 months after surgery pad use had decreased to 0.5 and 0.8 pads daily, respectively. The Table 3 lists the results of type II vs III SUI.

### DISCUSSION

It appears that hypermobility of the bladder neck and a weak proximal complex are present in most women with stress incontinence and continence is probably achieved by supporting these 2 structures by creating a stable layer against which the urethra is compressed during stress.[10] This explains the current trend toward sling procedures throughout the world. While the pubovaginal sling has become the prominent surgical treatment for SUI, the ideal sling material remains debatable. Desirable qualities of sling materials are availability, durability, affordability, lack of immune response, resistance to infection and no potential for disease transmission. Autologous fascia offers biocompatibility and durability. Nevertheless, a second operative field is necessary with an attendant increase in postoperative pain and infection risk. Various cadaveric allograft fascia avoid the morbidity present with autologous fascia but some defects have been attributed to this material. Long-term successful treatment is questionable. Fitzgerald et al reported greater than 20% material failure.[11] Secondary vaginal erosion of cadaveric fascia lata used for abdominal sacrocolpopexy and suburethral sling procedures was reported in 25% of patients by Kammerer-Doak et al.[12]

The advantages of synthetic materials over autologous grafts for the surgical treatment of stress urinary incontinence are the avoidance of an additional incision to harvest fascia lata or rectus muscle fascia, a decrease in operative time, consistent material strength, high cure rates and decreased postoperative pain.[13] While cure rates and durability seem promising, several serious complications are concerning. Synthetic grafts are associated with a risk of rejection or erosion, most commonly into the vagina. The average reported erosion rate of synthetic grafts used for abdominal sacrocolpopexy is 2.7% and for suburethral slings it is 7.3% (range 3% to 34%).[14] Polytetrafluoroethylene slings have erosion and infection rates as high as 23%.[15] The ProteGen sling (Boston Scientific, Watertown, Massachusetts) was associated with infection or erosion and it was voluntarily recalled.[16] More recently, polypropylene material has been used in sling procedures, such as TVT and transvaginal obturator tape.[17] While short-term followup studies show high



Fig. 1. IIQ results. *Av*, average. *PRE*, preoperative. *m*, months



Fig. 2. IIQ results. *Av*, average. *PRE*, preoperative. *m*, months



Fig. 3. UDI results. *Av*, average. *PRE*, preoperative. *m*, months



Fig. 4. Stress incontinence at 18-month followup

TABLE 3. *Type II vs III*

| Type | II | | III | |
|---|---|---|---|---|
| Mos followup | 21 | | 18 | |
| IIQ score decrease (pts) | 11 | | 10.2 | |
| UDI | 8.3 | | 7.3 | |
| No. overall stress incontinence impression (%): | | | | |
| Dry (cured) | 64 | (57) | 62 | (55.2) |
| Improved (slight leakage) | 42 | (37) | 48 | (43) |
| Failure (moderate + severe leakage) | 6 | (6) | 2 | (1.8) |
| % Improvement | 83 | | 79 | |
| Difference in No. pads daily preop to postop | 2.1 | | 2.2 | |

Total of 112 patients.

success with a low complication rate, several complications not fully reported in the literature have been identified. A search through the Food and Drug Administration adverse product reporting website (www.fda.gov/cdrh) revealed notable complications of the TVT procedure, including erosion, retention, bladder perforation, and major complications of vascular and bowel injuries, sepsis and rarely death. While these complications are probably not material related, caution is necessary in the use of TVT.

Repliform acellular human dermal allograft consists of

human cryopreserved allogenic dermis from which the epidermal and dermal cellular components have been removed, leaving the basement membrane complex, which is rapidly revascularized following placement. In addition, the material is carefully screened in accordance with the American Association of Tissue Banks. Although some groups have speculated about the influence of different processing technique on the outcomes of the facia lata sling,[18] to our knowledge no prospective randomized trial have been reported and no data are available in the literature on this issue about the cadaveric dermis. Because it is acellular, it is biologically inert and less likely to induce an immune response. To our knowledge there has been no disease transmission to recipient patients to date.

We chose Repliform for use in transvaginal slings because it combines the desirable qualities of autologous and synthetic materials without the disadvantages of the increased failure rates of allograft fascia lata and the rejection or infection of synthetic materials. Repliform offers advantages over autologous tissue because of availability, ease of handling, a long shelf life and decreased donor site morbidity. Furthermore, it has limited immunogenicity and in theory it is less likely to cause inflammation and erosion than synthetic materials used for pubovaginal slings. In addition, this material offers the possibility of using a single piece of graft for concomitant pubovaginal sling placement and cystocele repair, which is the technique used in our series and described in literature.[19]

The efficacy and durability of this material has not often been reported. The few available reports of the use of freeze-dried irradiated allograft fascia sling indicate a failure rate of greater than 25%. In patients undergoing a second operation

grossly degenerated allografts or a complete absence of allograft was found.[11] Therefore, it remains important to investigate the reliability and reproducibility of the material used in any sling procedure, a fact that partly prompted the current study.

We noted a 2.1% rate of intraoperative bladder perforation, which was due in all 5 cases to adherences secondary to previous transvaginally anti-incontinence procedures that made dissection difficult. We found an overall high success rate in our patients. At 18 months 78% of patients reported significant improvement in stress incontinence symptoms with 52% completely dry 100% of the time. These results were comparable for types II and III SUI. To date there have been no cases of urethral or vaginal erosion of the allograft but 4 of slow healing of the anterior vaginal wall over the Repliform graft, which resolved spontaneously within 8 weeks on conservative intravaginal antibiotic therapy. There were no cases of bone pain, osteitis pubis or osteomyelitis despite the use of bone anchors. Our high success rate at an average of 18 months of followup is comparable to that of most nonautologous sling materials and attests to the efficacy of treating hypermobility and intrinsic urethral deficiency with pubovaginal slings.

## CONCLUSIONS

The use of Repliform processed human cadaveric allograft skin for the transvaginal sling procedure for SUI is effective and safe at an average intermediate followup of 18 months. Longer followup and a randomized trial comparing Repliform to other materials used in sling procedures are needed to evaluate further efficacy, durability and late complications.

### APPENDIX: IIQ AND UDI

Respond to the questions below using the following scores. The score you select should reflect your PRESENT condition/situation. Please be sure to choose one number between 0 and 3.

0 = NOT AT ALL      1 = SLIGHTLY      2 = MODERATELY      3 = GREATLY

Incontinence Impact Inventory

Has urine leakage and/or prolapse affected your:
1. Ability to do household chores (cooking, laundry, housecleaning, etc.)?   _____
2. Physical recreation (walking, swimming or exercise, etc.)?   _____
3. Entertainment activities (movies, concerts, etc.)?   _____
4. Ability to travel by car or bus more than 30 minutes from home?   _____
5. Participation in social activities outside your home   _____
6. Emotional health (nervousness, depression, etc.)?   _____
7. Feeling frustrated?   _____
    Total   _____

Urogenital Distress Inventory

Do you experience, and if so, how much are you bothered by:
1. Frequent urination?   _____
2. Urine leakage related to the feeling of urgency?   _____
3. Urine leakage related to physical activity, coughing, or sneezing, etc.?   _____
4. Small amounts of urine leakage (drops)?   _____
5. Difficulty emptying your bladder?   _____
6. Pain of discomfort in the lower abdominal or genital area?   _____
    Total   _____

What percentage do you think you have improved since your surgery?
    Circle one:   0%  10%  20%  30%  40%  50%  60%  70%  80%  90%  100%

### REFERENCES

1. McGuire, E. J. and Lytton, B.: Pubovaginal sling procedure for stress incontinence. J Urol, 119: 82, 1978
2. Appell, R. A.: Collagen injection therapy for urinary incontinence. Urol Clin North Am, 21: 177, 1994
3. Parulkar, B. G. and Barrett, D. M.: Application of the AS-800 artificial sphincter for intractable urinary incontinence in females. Surg Gynecol Obstet, 171: 131, 1990
4. McGuire, E. J. and O'Connell, H. E.: Surgical treatment of intrinsic urethral dysfunction. Slings. Urol Clin North Am, 22: 657, 1995
5. Litwiller, S. E., Nelson, R. S., Fone, P. D., Kim, K. B. and Stone, A. R.: Vaginal wall sling: long-term outcome analysis of factors contributing to patient satisfaction and surgical success. J Urol, 157: 1279, 1997
6. Wright, E. J., Iselin, C. E., Carr, L. K. and Webster, G. D.: Pubovaginal sling using cadaveric allograft fascia for the treatment of intrinsic sphincter deficiency. J Urol, 160: 759, 1998
7. Morgan, J. E., Heritz, D. M., Stewart, F. E., Connolly, J. C. and

Farrow, G. A.: The polypropylene pubovaginal sling for the treatment of recurrent stress urinary incontinence. J Urol, **154:** 1013, 1995

8. Uebersax, J. S., Wyman, J. F., Shumaker, S. A., McClish, D. K. and Fantl, J. A.: Short forms to assess life quality and symptom distress for urinary incontinence in women: the Incontinence Impact Questionnaire and the Urogenital Distress Inventory. Continence Program for Women Research Group. Neurourol Urodyn, **14:** 131, 1995

9. Payne, C. K.: A transvaginal sling procedure with bone anchor fixation. Urol Clin North Am, **26:** 423, 1999

10. Zivkovic, F. and Tamussino, K.: Mechanism of postoperative urinary continence. Int Urogynecol J Pelvic Floor Dysfunct, **12:** 199, 2001

11. Fitzgerald, M. P., Mollenhauer, J. and Brubaker, L.: Failure of allograft suburethral slings. BJU Int, **84:** 785, 1999

12. Kammerer-Doak, D. N., Rogers, R. G. and Bellar, B.: Vaginal erosion of cadaveric fascia lata following abdominal sacrocolpopexy and suburethral sling urethropexy. Int Urogynecol J Pelvic Floor Dysfunct, **13:** 106, 2002

13. Kaplan, S. A., Santarosa, R. P. and Re, A. E.: Comparison of fascial and vaginal wall slings in the management of intrinsic sphincter deficiency. Urology, **47:** 885, 1996

14. Iglesia, C. B., Fenner, D. E. and Brubaker, L.: The use of mesh in gynecologic surgery. Int Urogynecol J Pelvic Floor Dysfunct, **8:** 105, 1997

15. Bent, A. E., Ostergard, D. R. and Zwick-Zaffuto, M.: Tissue reaction to expanded polytetrafluoroethylene suburethral sling for urinary incontinence: clinical and histologic study. Am J Obstet Gynecol, **169:** 1198, 1993

16. Kobashi, K. C., Dmochowski, R., Mee, S. L., Mostwin, J., Nitti, V. W., Zimmern, P. E. et al: Erosion of woven polyester pubovaginal sling. J Urol, **162:** 2070, 1999

17. Ulmsten, U., Falconer, C., Johnson, P., Jomaa, M., Lanner, L., Nilsson, C. G. et al: A multicenter study of tension-free vaginal tape (TVT) for surgical treatment of stress urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct, **9:** 210, 1998

18. Wright, E. J.: Current status of fascia lata allograft slings treating urinary incontinence: effective or ephemeral? Tech Urol, **7:** 81, 2001

19. Chung, S. Y., Franks, M., Smith, C. P., Lee, J. Y., Lu, S. H. and Chancellor, M.: Technique of combined pubovaginal sling and cystocele repair using a single piece of cadaveric dermal graft. Urology, **59:** 538, 2002

# EXHIBIT SS

0022-5347/00/1645-1633/0
THE JOURNAL OF UROLOGY®
Copyright © 2000 by AMERICAN UROLOGICAL ASSOCIATION, INC.®

Vol. 164, 1633–1637, November 2000
Printed in U.S.A.

# CADAVERIC VERSUS AUTOLOGOUS FASCIA LATA FOR THE PUBOVAGINAL SLING: SURGICAL OUTCOME AND PATIENT SATISFACTION

SCOTT L. BROWN AND FRED E. GOVIER*

*From the Department of Urology and Renal Transplantation, Virginia Mason Medical Center, Seattle, Washington*

ABSTRACT

Purpose: We report our initial experience with cadaveric fascia lata in pubovaginal sling procedures.

Materials and Methods: We compared 121 consecutive women who underwent a sling procedure using cadaveric fascia lata from February 1997 through June 1999 (group 1) with 46 consecutive women who underwent a sling procedure using autologous fascia lata from May 1994 through July 1997 (group 2).

Results: Mean followup was longer in group 2 (44 versus 12 months). A total of 104 of the 121 group 1 patients (86%) responded to the questionnaire, of whom 85% were cured of stress incontinence, 83% reported overall improvement in urinary control and 74% had no or minimal leakage not requiring pads. Median catheterization time was 9 days (range 4 to 120). Overall 89% of the women were satisfied with the results and 83% would recommend this surgery. A total of 30 of the 46 group 2 patients (65%) responded to the questionnaire, of whom 90% were cured of stress incontinence, 90% reported overall improvement in urinary control and 73% had no or minimal leakage not requiring pads. Median catheterization time was 14 days (range 6 to 180). Overall 90% of the women were satisfied with the results and 83% would recommend this surgery.

Conclusions: Cadaveric fascia lata pubovaginal slings appear to be safe. Early experience suggests that cadaveric fascia lata may be considered an alternative to autologous fascia. Cadaveric and autologous fascia lata appear to have a high success rate.

KEY WORDS: lata, fascia; urinary incontinence; bladder; cadaver; transplantation, autologous

The pubovaginal sling procedure has become the gold standard for treating intrinsic sphincteric deficiency and stress urinary incontinence in women.[1] Initially described in 1907, the first sling procedure used gracilis muscle to encircle the urethra[2] but the procedure was extensively modified with time. As the procedures have evolved, so has the choice of sling materials. Current options include autologous rectus fascia or fascia lata, synthetic materials such as polytetrafluoroethylene, silicone, polypropylene and polyester, and cadaveric fascia lata, dura and dermis.

Each material harbors certain risks and benefits. When harvested from the abdominal wall or thigh of the patient, autologous fascia adds to operative time and incurs a risk of hematoma, wound infection, herniation and patient discomfort.[3] Synthetic materials are associated with erosion and an infection rate as high as 23% with polytetrafluoroethylene slings.[4] Chronic local complications, including sinus tracts, fistulas and wound infection, have also been reported with synthetic materials.[5]

Allografts are tissues harvested from a human donor, usually a cadaver, and transplanted into a human recipient. They have been used in clinical practice for more than 20 years and are safe and stable with time.[6] After implantation the local response to allogenic cadaveric fascia is no different than that to autologous fascia.[7] Therefore, cadaveric fascia should provide the same advantages as autologous fascia in pubovaginal sling procedures but without the potential complications and morbidity associated with the intraoperative harvesting of autologous fascia.

We report our early experience with consecutive patients who received cadaveric fascia lata and compare those results to those in an earlier consecutive group in which we used autologous fascia. This interim review may guide our choice of graft material in the future. As with other sling materials, we believe that most local complications[4] and failures[8] should be apparent within the initial 6 to 12 months.

## MATERIALS AND METHODS

We compared 121 consecutive women who underwent a pubovaginal sling procedure using cadaveric fascia lata from February 1997 through June 1999 (group 1) to 46 consecutive women who underwent such a procedure using autologous fascia lata from May 1994 through July 1997 (group 2). There were no selection criteria in the 2 groups other than the gradual change to cadaveric fascia lata in early 1997. Each patient was evaluated by a focused history and physical examination, voiding diary, cystoscopy and video urodynamic study. We reviewed the hospital and clinical records. In addition, we mailed a detailed survey questionnaire to all patients that was similar to a previously published questionnaire of Haab et al (see Appendix).[9]

We compared preoperative parameters in groups 1 and 2, including patient age, the incidence of previous incontinence procedures and associated pelvic surgery using the same anesthetic, the severity and type of incontinence, and abdominal leak point pressure (see table). The technique used to determine abdominal leak point pressure was unchanged from that of an earlier study.[10] In 112 cases (93.5%) the pubovaginal sling was constructed using a continuous 2 × 24

Accepted for publication June 23, 2000.
* Requests for reprints: Department of Urology and Renal Transplantation, Virginia Mason Medical Center, 1100 Ninth Ave., P. O. Box 900 (C7-URO), Seattle, Washington 98111.

*Preoperative patient characteristics*

|  | Group 1 | Group 2 |
|---|---|---|
| Mean pt. age (yrs.) | 62 | 62 |
| % Previous incontinence procedures | 42 | 73 |
| % Associated pelvic surgery | 34 | 10 |
| % Incontinence degree: |  |  |
|   Mild | 31 | 12 |
|   Moderate | 36 | 24 |
|   Severe | 33 | 64 |
| % Incontinence type: |  |  |
|   Pure stress | 50 | 35 |
|   Mixed | 50 | 65 |
| Mean leak point pressure (cm. water) | 42 | 29 |

to 28 cm. strip of cadaveric fascia lata obtained from our local tissue bank. In 9 cases (7.5%) the fascial strip was too short to construct a continuous sling, and so we suspended a 2 × 9 cm. strip from the rectus fascia with No. 1 polypropylene sutures.

Figure 1 shows our standard procedure for constructing a pubovaginal sling using autologous fascia lata, as reported previously.[10] However, we have modified the technique. In all patients a 12Fr suprapubic catheter was placed at surgery, which was used until post-void residual urine volume was less than 100 cc. We also modified our earlier method of adjusting sling length or tension. With all vaginal retractors removed but a urethral Foley catheter in place and 2 small self-retaining retractors remaining in the suprapubic region, we elevated each end of the sling, let them fall into a neutral position and tacked them to each other with 2 interrupted polypropylene sutures. If lifting the sling from above and releasing it revealed any tension on the anterior abdominal wall or traction on the Foley catheter demonstrated that the urethra was fixed too high, the sutures were cut and the sling adjusted with less tension (fig. 1, *A*). When the proper length was achieved, the sling was tacked to itself with 4 polypropylene sutures (fig. 1, *B*). Postoperatively we mailed all patients a detailed survey questionnaire adapted from Haab et al (see Appendix).[9] Chart review and patient survey were done by a physician not associated with the original procedures.

### RESULTS

We noted no significant difference in surgical outcome and the patient satisfaction in cadaveric fascia lata and autologous fascia lata groups. However, mean followup was shorter in group 1 (12 months versus 44 months). Of the 121 group 1 patients 104 (86%) responded to the questionnaire, including 88 (85%) who were cured of stress incontinence and 86 (83%) with overall improvement in urinary control. Based on questionnaire results 77 of the 104 cases (74%) were considered cured, defined as no or minimal leakage not requiring pads; 20 (19%) improved, defined as 1 to 3 pads used daily; and 7 (7%) failed, defined as more than 3 pads used daily. Figure 2 shows the results of the patient survey questionnaire in group 1. Median duration of clean intermittent catheterization or suprapubic tube drainage postoperatively was 9 days (range 4 to 120). Complications in group 1 were rare, involving prolonged urinary retention in 2 cases, a suprapubic abscess in 2, lower extremity neuropathy in 1 and suprapubic hematoma in 1. Overall 93 of the 104 women (89%) who underwent a cadaveric fascia lata pubovaginal sling procedure were satisfied with urinary control and would undergo the procedure again, while 86 (83%) would recommend this surgery to a friend.

Of the 46 group 2 patients 30 (65%) responded to the questionnaire, including 27 (90%) who were cured of stress incontinence, 27 (90%) with overall improvement in urinary control, 22 (73%) considered cured with no or minimal leakage not requiring pads and 8 (27%) improved. There were no failures, defined as more than 3 pads used daily (fig. 3). Median duration of catheterization or suprapubic tube drainage was 14 days (range 6 to 180). Complications in group 2 involved prolonged urinary retention in 3 cases, a cerebrovascular accident in 1 and persistent thigh pain at 6 weeks in 5 (11%). One woman in prolonged urinary retention required urethrolysis. Overall 27 of the 30 patients (90%) who underwent the pubovaginal sling procedure using autologous fascia lata were satisfied with urinary symptoms and would undergo the procedure again, while 25 (83%) would recommend this surgery to a friend. As expected, mean operative time was significantly shorter in group 1 (82 versus 129 minutes) because fascia was not harvested and patients were not repositioned.

Although no objective instruments were used to measure pain postoperatively, the difference in the 2 groups was dramatic. Virtually all patients in the autologous group had thigh pain at 1 to 2 weeks and 5 (11%) described persistent thigh pain at 6 weeks. No thigh pain was noted in the cadaveric group and only 1 patient (0.9%) had persistent suprapubic pain at 6 weeks.

### DISCUSSION

Soft tissue allografts have been placed for many years but allogenic tissue initially gained acceptance in clinical practice in the early 1980s.[6] The most established use of fascia lata allografts is in reconstructive orthopedic procedures.[6] Cadaveric donor fascia is processed by licensed tissue banks regulated by the Food and Drug Administration.[11] The antigenicity of soft tissue allografts is eliminated by freezing and freeze-drying,[6] so



FIG. 1. *A*, adjusting sling tension. *B*, sling attached to itself. Reprinted with permission[10]



FIG. 2. Results of group 1 patient survey questionnaire



FIG. 3. Results of group 2 patient survey questionnaire

that donor and recipient matching is not needed. To our knowledge no rejection response has been reported after frozen or freeze-dried allograft transplantation.

An important issue concerning the use of cadaveric fascia lata is the potential for transmitting infectious disease, such as hepatitis and HIV. All licensed tissue banks are required to screen donors for HIV and other viruses. To minimize risk allograft fascia is carefully sterilized and processed to reduce the graft to an acellular fibrous mesh, which is sufficient to inactivate known viruses. The risk of HIV transmission from soft tissue allografts has been estimated as 1/8 million cases.[12] Simonds et al documented the only known case of HIV transmission due to tissue transplantation, which developed in a woman after she received a bone allograft from a seronegative tissue donor.[13]

Another potential risk of cadaveric fascia transplantation is the transmission of so-called prion disease. Prions are proteinaceous infectious particles that harbor infection within a host protein. Prions do not illicit a host response but they are believed to elicit a response in recipients. Prions may be the causative agent of transmissible spongiform encephalopathy, of which the most common is Creutzfeldt-Jakob disease. The prion agent is highly resistant to treatment that damages or destroys nucleic acids, such as ultraviolet radiation and nuclease, but it may be inactivated by exposure to treatment that destroys or denatures protein, such as chaotropic ions or denaturing detergents.[14] Although the risk of prion disease from blood products or other biological agents is now a focus of worldwide concern,[14] our extensive review of the literature failed to document any transmissible spongiform encephalopathy associated with cadaveric fascia lata.

Cadaveric fascia seems to be a welcome addition to the many materials used for pubovaginal slings since allografts have been shown to be safe and efficacious in orthopedic studies. Cadaveric fascia lata is reliably robust with acceptable quality. No additional surgery is necessary to obtain the graft, which saved 47 minutes of operative time per patient in our cadaveric group. Because there was no thigh dissection, we noted a dramatic decrease in postoperative pain early and at 6 weeks. Wright et al also reported decreased operative time and morbidity as well as an outcome similar to that of autologous fascia slings after changing from autologous rectus fascia to autologous fascia lata.[15]

We hypothesized that the cure rate of the cadaveric fascia lata pubovaginal sling would be similar to that in our previous experience with the autologous fascia lata pubovaginal sling. In our comparative study 85% of women were cured of stress incontinence in the cadaveric fascia lata group compared with 90% in the autologous fascia lata group. Furthermore, the overall 74% cure rate in the cadaveric fascia lata group was almost identical to the 73% overall cure rate in the autologous fascia lata group. The cure rate in each group is similar to those previously published for autologous and synthetic materials.[8,9,15-19] The finding that causes some concern is the 7% failure rate in the cadaveric versus 0% in the autologous group.

The table shows that groups 1 and 2 patients were different. Group 2 patients had undergone more anti-incontinence procedures, and had more severe incontinence, more mixed incontinence and lower leak point pressure. Our initial experience with the pubovaginal sling procedure using autologous fascia lata in group 2 primarily involved the treatment of incontinence secondary to intrinsic sphincteric deficiency. More straightforward stress incontinence was managed by modified Pereyra needle suspension. As more data became available on the success of the pubovaginal sling procedure and the poor long-term results of needle suspension, we began to create slings in women with each type of incontinence.[16,18] Thus, group 1 comprised more women with genuine stress incontinence, higher leak point pressure and more associated pelvic procedures for relaxation.

Although mean followup was shorter in the cadaveric than in the autologous fascia lata group (12 versus 44 months), most failures[8] and local complications[4] associated with other sling materiels manifested within this postoperative window. As others reported,[18,19] we also observed that most surgical failures for stress incontinence after a sling procedure presented within the initial 3 months. Patients in whom slings failed often never achieved dryness or reported feeling something come loose within month 1 postoperatively.[18] Slings typically fail due to too much or too little tension, suture breakage, disruption of the sling or failure to place the sling into the retropubic space, where it becomes fixed. Such problems present soon after surgery before the sling scars in the retropubic space.[18] Of our 7 patients in whom a cadaveric fascia lata pubovaginal sling failed 5 were never dry and 2 were dry for only 1 month, while treatment was not considered to have failed in any of the autologous fascia lata group.

Many variables must be considered in regard to the 7% failure rate in our cadaveric group. As our series progressed and more patients with pure anatomical descent versus intrinsic sphincteric deficiency were treated, we placed less tension on the sling. Did we err by making the slings too loose? FitzGerald et al reported cadaveric sling autolysis.[20] To date reoperation has not been performed in any of our failed cadaveric cases. Instead we have opted to treat them with periurethral injection. Baseline urinary leakage in the cadaveric group was less severe. Is the failure rate in this group a factor of how improvement and failure were defined? In groups 1 and 2 the cure rate was identical at 74% and 73%, respectively. At this time we believe that our numbers are too small and variability too great to make a definitive statement. Longer followup, larger numbers and better matched control groups may answer this question in the future.

Prolonged urinary retention, defined as greater than 50 days, developed in 2 women who received a cadaveric fascia lata graft. Urodynamics revealed an areflexic detrusor in 1

woman, who voided by abdominal straining. Of the 3 patients in the autologous fascia lata group with prolonged urinary retention 2 had low and 1 elevated detrusor pressure, requiring sling incision. We discharged patients home early on the morning after surgery, and so all had a suprapubic tube indwelling to measure post-void residual urine. When post-void residual urine volume was less than 100 cc, suprapubic tube was typically removed at the 1-week followup visit. Thus, many patients who recorded suprapubic drainage for 1 week may have used the suprapubic tube for only 1 or 2 days. Nevertheless, in our study the median duration of suprapubic catheterization and the number of patients in prolonged urinary retention compare favorably with the results of other published series.[8,9,18,21] Although cost was not specifically evaluated, the cost of cadaveric fascia lata obtained from our local tissue bank is approximately $220 to $400 for a piece large enough to fashion a $2 \times 24$ to 28 cm. graft. This cost is somewhat higher than that of synthetic material[21] but less than that of commercially available cadaveric fascia.

Patient questionnaires have been shown to indicate a worse outcome than chart review for various reasons, including incomplete followup, physician and/or patient bias, and patient and physician perception or misperception of the definition of a successful result.[10] Haab et al reported that administering a patient questionnaire facilitates the accurate assessment of outcome after anti-incontinence procedures but to our knowledge there is no suitable validated patient questionnaire for assessing results and patient satisfaction after pubovaginal sling procedures.[9] We administered a questionnaire similar to that previously used by Haab et al, and believe that it is reliable and accurate.

## CONCLUSIONS

Cadaveric fascia lata pubovaginal slings appear to be safe and are associated with no risk of disease transmission. Until we can definitively test for prion disease we continue to counsel all patients in regard to the theoretical risk of disease transmission. The early failure rate in a small number of cadaveric fascia lata cases requires further study. However, overall surgical results and patient satisfaction with cadaveric fascia lata appear equal to those of autologous fascia. Operative time and postoperative pain were significantly decreased in the cadaveric group. If these results remain consistent at longer followup, we believe that cadaveric fascia lata may become the material of choice for constructing pubovaginal slings.

## APPENDIX: QUESTIONNAIRE

1. Had you undergone previous operations to correct urinary incontinence or lift the bladder prior to your sling operation?
   A. Yes
   B. No
2. If yes, how many? _____
3. How much leakage did you have before the sling operation?
   A. Leakage on rare occasion, no pads
   B. 1 to 3 small pads per day
   C. Several small to medium pads per day
   D. Multiple large pads or diapers
4. How much leakage of urine do you have now?
   A. None
   B. Very little (leak on rare occasions not requiring pads)
   C. Moderate (1–3 pads/day)
   D. Severe
5. If you do leak urine, how does it usually occur?
   A. Mostly with coughing, sneezing, or physical activity
   B. Usually not with physical activity, but leakage occurs suddenly before it can be controlled

C. Leakage of urine often occurs in both the situations described
   D. Not sure when leakage occurs
6. How much improved is your urine leakage now compared to before the surgery?
   A. 100% better
   B. 90% better
   C. 80% better
   D. 70% better
   E. 60% better
   F. 50% better
   G. 40% better
   H. 30% better
   I. 20% better
   J. 10% better
   K. The same
   L. Worse than before surgery
7. Do you now wear any protection from urine leakage (pads and so forth)?
   A. Yes
   B. No
8. If you are wearing pads, how many do you use in a 24 hour period? _____
9. What type of pads?
   A. Small (liner)
   B. Moderate (Kotex)
   C. Large (Attends)
10. How often do you urinate during the day?
    A. More often than once every hour
    B. Every 1–2 hours
    C. Every 3–4 hours
    D. Less often than once every 4 hours
11. How many times per night do you wake from sleep to urinate?
    A. None
    B. 1
    C. 2
    D. 3
    E. More than 3
12. Pick the response that best describes "how you start your flow."
    A. Easy
    B. Sometimes difficult
    C. Wait less than one minute to start flow
    D. Wait more than one minute to start flow
    E. Have to push or strain
    F. Impossible
13. Do you currently use a catheter to empty the bladder?
    A. Yes
    B. No
14. If your incontinence returned after sling surgery, how long were you dry?
    _____ months
15. Overall, how satisfied are you with the results of your sling surgery?
    0 1 2 3 4 5 6 7 8 9 10
    Not satisfied Very satisfied
16. Knowing what you know now, would you have the sling surgery again?
    A. Yes
    B. No
17. Would you recommend the sling surgery to a friend?
    A. Yes
    B. No
    C. Not sure

## REFERENCES

1. McGuire, E. J. and O'Connell, H. E.: Surgical treatment of intrinsic urethral dysfunction. Slings Urol Clin North Am, **22:** 657, 1995

2. Hohenfellner, R. and Petrie, E.: Sling procedures in surgery. In: Surgery of Female Incontinence. Edited by S. L. Stanton and E. Tanagho. Berlin: Springer-Verlag, pp. 105–113, 1986

3. Wheatcroft, S. M., Vardy, S. J. and Tyres, A. G.: Complications of fascia lata harvesting for ptosis surgery. Br J Ophthal, **81:** 581, 1997

4. Bent, A. E., Ostergard, D. R. and Zwick-Zaffuto, M.: Tissue reaction to expanded polytetrafluoroethylene suburethral sling for urinary incontinence: clinical and histologic study. Am J Obstet Gynecol, **169:** 1198, 1993

5. Weinberger, M. W. and Ostergard, D. R.: Long-term clinical and urodynamic evaluation of the polytetrafluoroethylene suburethral sling for treatment of genuine stress incontinence. Obstet Gynecol, **86:** 92, 1995

6. Cooper, J. L. and Beck, C. L.: History of soft-tissue allografts in orthopedics. Sports Med Arthrosc Rev, **1:** 2, 1993

7. Merritt, W., Peacock, E. E., Jr. and Chvapil, M.: Comparative biology of fascial autografts and allografts. Surg Forum, **25:** 524, 1974

8. Beck, R. P., McCormick, S. and Nordstrom, L.: The fascia lata sling procedure for treating recurrent genuine stress incontinence of urine. Obstet Gynecol, **72:** 699, 1988

9. Haab, F., Trockman, B. A., Zimmern, P. E. et al: Results of pubovaginal sling for the treatment of intrinsic sphincteric deficiency determined by questionnaire analysis. J Urol, **158:** 1738, 1997

10. Govier, F. E., Gibbons, R. P., Correa, R. J. et al: Pubovaginal slings using fascia lata for the treatment of intrinsic sphincter deficiency. J Urol, **157:** 117, 1997

11. Buck, B. E. and Malinin, T. I.: Human bone and tissue allografts. Preparation and safety. Clin Orthop, **303:** 8, 1994

12. Buck, B. E., Resnick, L., Shah, S. M. et al: Human immunodeficiency virus cultured from bone. Implications for transplantation. Clin Orthop, p. 249, 1990

13. Simonds, R. J., Holmberg, S. D., Hurwitz, R. L. et al: Transmission of human immunodeficiency virus type 1 from a seronegative organ and tissue donor. N Engl J Med, **326:** 726, 1992

14. Cashman, N. R.: A prion primer. CMAJ, **157:** 1381, 1997

15. Wright, E. J., Iselin, C. E., Carr, L. K. et al: Pubovaginal sling using cadaveric allograft fascia for the treatment of intrinsic sphincter deficiency. J Urol, **160:** 759, 1998

16. Blaivas, J. G. and Jacobs, B. Z.: Pubovaginal fascial slings for the treatment of complicated stress urinary incontinence. J Urol, **145:** 1214, 1991

17. Morgan, J. E., Farrow, G. A. and Stewart, F. E.: The Marlex sling operation for the treatment of recurrent stress urinary incontinence: a 16-year review. Am J Obstet Gynecol, **151:** 224, 1985

18. Cross, C. A., Cespedes, R. D. and McGuire, E. J.: Our experience with pubovaginal slings in patients with stress urinary incontinence. J Urol, **159:** 1195, 1995

19. Raz, S., Stothers, L., Young, G. P. H. et al: Vaginal wall sling for anatomical incontinence and intrinsic sphincter dysfunction: efficacy and outcome analysis. J Urol, **156:** 166, 1996

20. FitzGerald M. P., Mollenhauer, J., Bitterman, P. et al: Functional failure of fascia lata allografts. Am J Obstet Gynecol, **181:** 1339, 1999

21. Handa, V. L., Jensen, J. K., Germain, M. M. et al: Banked human fascia lata for the suburethral sling procedure: a preliminary report. 88(6): 1045, 1996

## EDITORIAL COMMENTS

Clearly the pubovaginal sling is the most successful and durable treatment modality for women with type II or III stress urinary incontinence. What remains unclear is whether success depends on the material chosen for the sling. Initially many were led to believe that minimally invasive techniques using a synthetic would provide an equal outcome while decreasing the morbidity associated with autologous fascia harvesting. Due to an unacceptably high incidence of complications most have abandoned the use of synthetic material for pubovaginal sling.

In a nonrandomized retrospective manner the authors compared their short-term 12-month experience with cadaveric versus autologous fascia lata. Cadaveric fascia decreased operative time and postoperative pain, while providing comparable questionnaire generated cure and satisfaction rates. Appropriately and concisely the authors reviewed the proved safety record of cadaveric tissue yet it is imperative to counsel our patients regarding the long-term uncertainty of potentially undetectable infectious agents.

The authors noted with only mild concern that patients who received cadaveric fascia had a significantly higher short-term complete failure rate of greater than 3 pads daily. This difference of 7% versus 0% is worrisome and it occurred although those patients had less severe preoperative incontinence and higher leak point pressure. Does this finding add to the theory of early autolysis of donor fascia or are patients with hypermobility better served by autologous fascia, which may provide more strength in the immediate 1 to 3 months postoperatively?

Based on previous studies of autologous fascia it appears that patients with no stress incontinence 1 year after a pubovaginal sling procedure rarely have recurrence in the subsequent 10 years.[1,2] Therefore, the opinion of the authors that comparable outcome in the groups at 1 year predict a comparable long-term outcome may be justifiable. Before accepting this opinion as a conclusion we should wait for the maturity of these data and those of similar series.

*Ted O. Morgan, Jr.*
*Urology Service*
*Tripler Army Medical Center*
*Honolulu, Hawaii*

The acceptance of slings for stress incontinence has accelerated in recent years. This series exemplifies the trend toward an increasing use of slings in all such cases. The authors report a nonrandomized, retrospective, questionnaire based control study comparing cadaveric with autologous fascia lata as the sling material. The groups compared were relatively unselected since the fascia lata series was an earlier consecutive series than the cadaveric fascia group. The data indicate that a less morbid technique may be associated with similar efficacy.

Thigh pain was a problem in the fascia lata group. Most patients had short-term pain and a small group had pain for longer than 6 weeks. Harvesting fascia lata added a significant time burden. Low wound related morbidity in the cadaveric group encouraged the authors to abandon the use of autologous fascia.

Other studies comparing cadaveric to autologous fascia have shown comparable results (reference 15 in article). Are we ready to discard autologous fascia and move to cadaveric fascia exclusively? Cadaveric fascia appears to be promising but there is some cause for concern. In this series a group of outright failures is unexplained. Short-term failure is rare in series in which native tissue is used. Whether the processing of the cadaveric fascia, performed to decrease its infective risk, also decreases its effectiveness as a pseudo-ligament remains to be determined. Further laboratory based and clinical research is required to answer such a question. Especially if the morbidity rate with autologous fascia is low, the small but uncertain risk of entities such as prion infection and concerns about efficacy support the ongoing use of a minimally morbid autologous technique. The thigh complications reported in this study would appear to be unique to fascia lata grafts. When small rectus fascia grafts are harvested, it appears that no such complications occur.[1] Some patients do not have suitable rectus fascia because mesh was used to repair an abdominal hernia or because of other factors. Cadaveric fascial slings appear to be safe, reasonably effective and particularly useful when an autologous graft is likely to be difficult to obtain.

*Helen E. O'Connell*
*Royal Melbourne Hospital*
*Private Medical Centre*
*Parkville, Victoria 3050*
*Australia*

1. Morgan, T. O., Jr., Westney, O. L. and McGuire, E. J.: Pubovaginal sling: 4-year outcome analysis and quality of life assessment. J Urol, **163:** 1845, 2000

2. Chaikin, D. C., Rosenthal, J. and Blaivas, J. G.: Pubovaginal fascial sling for all types of stress urinary incontinence: long-term analysis. J Urol, **160:** 1312, 1998

# EXHIBIT TT

0022-5347/02/1672-0608/0
THE JOURNAL OF UROLOGY®
Copyright © 2002 by AMERICAN UROLOGICAL ASSOCIATION, INC.®

Vol. 167, 608–612, February 2002
Printed in U.S.A.

# PUBOVAGINAL SLING USING ALLOGRAFT FASCIA LATA VERSUS AUTOGRAFT FASCIA FOR ALL TYPES OF STRESS URINARY INCONTINENCE: 2-YEAR MINIMUM FOLLOWUP

BRIAN J. FLYNN AND WEN T. YAP

*From the Department of Urology, Geisinger Health System, Danville, Pennsylvania*

### ABSTRACT

Purpose: Allografts have been substituted for autografts as a pubovaginal sling to decrease postoperative morbidity, although to our knowledge their long-term durability is unknown. Since 1997, we have offered allograft fascia lata as an alternative to autograft fascia in women undergoing the pubovaginal sling procedure. We describe our continued experience with those with a minimum 2-year followup.

Materials and Methods: We retrospectively reviewed the records of 134 consecutive women with all types of stress urinary incontinence but without neurovesical voiding dysfunction or a significant degree of pelvic prolapse who underwent pubovaginal sling (allografts in 63 and autografts in 71) performed by a single surgeon. Rectus abdominis or fascia lata autograft and freeze-dried, $\gamma$ irradiated allograft slings were placed using identical techniques and a $2 \times 12$ cm. piece of fascia. Outcome analysis included a chart review, third party telephone interview and selective videourodynamics. Surgical outcome was categorized by daily pad use as cured—0, improved—1 or failed—greater than 1 pad.

Results: Of 140 women who received a pubovaginal sling 134 were still evaluable. Preoperative parameters were similar in each group. Mean followup plus or minus standard deviation was less in the allograft group ($29 \pm 3$ versus $44 \pm 7$ months, $p < 0.05$). There was no statistical difference in the overall stress and urge incontinence cure rate in the allograft and autograft groups (45 of 63 cases and 55 of 71, $p = 0.42$), nor was there a difference in the total number with recurrent stress urinary incontinence (8 and 7, respectively, $p = 0.58$). In 24% and 16% of cases postoperative incontinence was due to urge incontinence in the allograft and autograft groups, respectively. Using allografts instead of autografts resulted in a significantly decreased postoperative pain and disability ($p < 0.05$).

Conclusions: Using allograft fascia lata as an alternative to autologous fascia for a pubovaginal sling significantly decreases postoperative pain and disability without compromising efficacy at 2 years. Therefore, we believe that allograft fascia should remain a suitable alternative to autografts for pubovaginal slings.

KEY WORDS: bladder; urinary incontinence, stress; transplantation, homologous; fascia lata

The pubovaginal sling is recognized as effective treatment for stress urinary incontinence.[1] Before gaining this recognition it has undergone considerable modifications since 1907, when it was initially described.[2] Initially autologous gracilis or pyramidalis muscle was used to treat urinary incontinence.[2] In 1914 Frangenheim modified the Goebell procedure using a composite autograft of pyramidalis or rectus abdominis muscle with overlying fascia.[2] In 1942 Aldridge noted that the previous success of the Goebell procedure was achieved by improved suburethral support and not by a "sphincterlike action of contracting muscle," and so used hinged rectus fascia without a muscular backing to support the urethra.[2] Although the pubovaginal sling of autologous fascia effectively cured stress urinary incontinence, it fell out of favor due its complexity and associated morbidity.[3]

The pubovaginal sling was reintroduced with modifications in 1978 by McGuire and Lytton, who used a hinged rectus fascial sling to achieve continence in 80% of patients with intrinsic sphincter deficiency.[4] In 1991 Blaivas and Jacobs modified the procedure further by using unattached rectus fascia, which decreased the tendency for sling over tightening, which may result in urinary retention or de-

trusor instability.[3] Recently the autograft pubovaginal sling has been used effectively as a primary treatment for stress urinary incontinence due to urethral hypermobility.[5,6] This expanded use is supported by the premise that all patients with stress urinary incontinence would have some degree of intrinsic sphincter deficiency and would benefit from suburethral support.[7]

The choice of sling material continues to evolve as investigators seek the ideal material that would obviate the need for fascial harvest, thereby, decreasing forever the morbidity and complexity of the procedure without compromising efficacy and safety. Our preliminary report and those of others show decreased postoperative morbidity when using allograft fascia, which did not occur at the expense of efficacy or safety at less than 1 year.[8–10] However, there are also reports of early sling failure due to allograft autolysis.[11,12] This disagreement prompted us to review our continued experience with the same cohort of women with a minimum 2-year followup.

### MATERIALS AND METHODS

We performed a retrospective continued review of consecutive women who received an allograft or autograft pubovaginal sling for all types of stress urinary incontinence from December 1995 to August 1998. All procedures were done at

Accepted for publication September 28, 2001.

our institution by a single surgeon (W. T. Y.). Patients with incontinence due to neurovesical dysfunction or those with concomitant pelvic surgery were excluded from analysis.

Preoperative evaluation included a voiding history, urogynecologic examination, urinalysis and single channel cystometrography with abdominal leak point pressure. Indications for detailed videourodynamics were stress urinary incontinence not readily demonstrable, previous anti-incontinence surgery, obstructive voiding symptoms and moderate to severe pelvic prolapse. Types II, III (intrinsic sphincter deficiency) and II-III stress urinary incontinence were defined as bladder neck hypermobility with abdominal leak point pressure greater than 90 cm. water, and abdominal leak point pressure less than 60 and 61 to 90 cm. water, respectively.

From December 1995 to August 1997 only autografts were available for patients undergoing the pubovaginal sling procedure. Since then, allograft fascia lata as well as autografts have been available. Other than the use of allografts beginning in August 1997 no selection criteria differed in the groups. After informed consent was obtained detailing the risks and benefits of the available procedures, patients selected the sling material. The allograft discussion included the potential risk of viral transmission with a theoretical risk of HIV transmission of 1/1,667,600 cases and unknown longterm durability.[9,13]

Fascial autografts were rectus fascia or fascia lata. The pubovaginal sling using rectus fascia was placed using the techniques described by Cross[5] and Chaikin[6] et al. The only difference in our technique was that autografts were $2 \times 12$ cm., folded and bound on each end with a long 2-zero nonabsorbable polypropylene suture. The autologous fascia lata sling procedure was done in a similar manner with the left thigh serving as the harvest site, permitting the use of a smaller 2 to 3 cm. suprapubic transverse incision instead of the customary Pfannenstiel incision. Exception for not harvesting fascia our allograft sling procedure was performed in identical manner fashion. Cadaveric fascia lata was obtained from 3 licensed regional tissue banks (81% from 1 source) using similar processing techniques, including freeze-drying and $\gamma$ irradiation with a terminal dose of 15 to 25 kGy. Allografts were rehydrated in gentamicin impregnated 0.9% normal saline at room temperature for a minimum of 30 minutes before insertion.

The urethral catheter was removed on postoperative day 1. Urinary retention was managed by clean intermittent catheterization. If a suprapubic catheter had been inserted, a practice that was discontinued in November 1997, it was removed after a successful voiding trial, usually at the end of postoperative week 1. Followup pelvic examination was performed at 1 and 4 weeks, 3 and 6 months, and as needed thereafter.

For outcome analysis we reviewed the medical record to determine operative time, postoperative pain score and all complications. A third party telephone interview using our questionnaire was used to screen for urinary incontinence, and record postoperative pad use and patient satisfaction (see appendix). A detailed urogynecologic examination and videourodynamics were then performed if patients complained of stress, urge or mixed incontinence and were dissatisfied. Postoperative incontinence with 1 or more pads used daily was classified as recurrent stress urinary incontinence related to stress, persistent or new onset urge incontinence. These conditions were not mutually exclusive. Overall stress and urge incontinence outcomes were categorized by 24-hour pad use as cured—0, improved—1 and failed—more than 1 pad. Statistical analysis included the incidence, mean plus or minus standard deviation and range. We used 2-sample t, Fisher's exact chi-square and Fisher's exact tests when appropriate to examine the associations of sling material with outcomes with $p < 0.05$ considered significant.

## RESULTS

Our initial analysis of this cohort was done in 1999.[10] From this preliminary study 134 of 140 women were still available for evaluation in our continued analysis, including 63 with an allograft and 71 with an autograft (rectus fascia in 49 and fascia lata in 22). When the 2 grafts were available to patients, 63 of 74 (85%) elected an allograft. Preoperative parameters were similar in the 2 groups (table 1). Previous anti-incontinence surgery included a Marshall-Marchetti-Krantz procedure in 9 cases, Burch calposuspension in 7, Raz procedure in 6, Stamey needle suspension in 4, Kelly plication in 4 and a ProtoGen sling (Boston Scientific, Natick, Massachusetts) in 1. Mean followup plus or minus standard deviation was less in the allograft group ($29 \pm 3$ versus $44 \pm 7$ months, $p < 0.05$). However, all patients were followed a minimum of 24 months. In our preliminary study mean followup was 8 months (range 3 to 15) in the allograft and 24 months (range 9 to 35) in the autograft group, which increased to 29 (range 24 to 36) and 44 months (30 to 56), respectively, in our current study.

There was no statistical difference in the overall stress and urge incontinence cure rate in the allograft and autograft groups (45 of 63 and 55 of 71 cases, see figure), nor was there a difference in the total number with recurrent stress urinary incontinence (8 and 7, respectively, table 2). In addition mean postoperative daily pad use was similar ($0.7 \pm 1.3$ and $0.4 \pm 0.8$ pad, respectively). Most postoperative incontinence in the 2 groups was due to urge incontinence (table 2). Overall patient satisfaction was less in the allograft group (49 of 63 patients versus 64 of 71, $p = 0.05$). Using allografts instead of autografts resulted in significantly decreased operative time, postoperative pain, hospital stay and time lost from work (table 1). The site of autograft harvest (rectus abdominis or fascia lata) did not have a significant effect on postoperative pain or convalescence.

In the allograft group 18 of the 63 patients (29%) still required 1 or more pads daily, including 3 with recurrent

TABLE 1. *Comparison of preoperative patient characteristics, operative time, postoperative pain and convalescence*

| No. Pts. | Allograft (63) | Autograft (71) | p Value (2 = sample t or Fisher's exact test) |
|---|---|---|---|
| Mean age (range) | 54 (21–77) | 53 (33–76) | 0.65 |
| Mean pads used/day $\pm$ SD | $3.3 \pm 2.2$ | $3.8 \pm 2.1$ | 0.32 |
| No. previous anti-incontinence surgery (%) | 12 (19) | 18 (25) | 0.41 |
| No. preop. urge incontinence (%) | 38 (60) | 32 (45) | 0.09 |
| No. stress urinary incontinence type (%): | | | |
| II | 14 (22) | 34 (48) | <0.05 |
| III | 20 (32) | 15 (21) | 0.17 |
| II/III | 29 (46) | 22 (31) | 0.08 |
| Mean operative time $\pm$ SD (mins.) | $69 \pm 17$ | $116 \pm 23$ | <0.05 |
| Mean postop. verbal numerical pain scale $\pm$ SD (range 0–10)[14] | $2.0 \pm 2.4$ | $5.8 \pm 2.0$ | <0.05 |
| Mean hospital stay $\pm$ SD (days) | $1.2 \pm 0.4$ | $1.9 \pm 0.6$ | <0.05 |
| Mean wks. lost from work $\pm$ SD | $3.4 \pm 2.2$ | $6.4 \pm 2.6$ | <0.05 |

610            PUBOVAGINAL SLING FOR STRESS URINARY INCONTINENCE



Comparison of overall stress and urge incontinence cure, improvement and failure rates after allograft and autograft pubovaginal sling at minimum 2-year followup by Fisher's exact chi-square test.

stress urinary incontinence, 10 with urge incontinence, and 5 with stress urinary incontinence and urge incontinence. Stress urinary incontinence recurred in 8 cases, including less than 6 months and more than 2 years after surgery in 2 and 6, respectively. Recurrent stress urinary incontinence was due to persistent intrinsic sphincter deficiency with minimal or no hypermobility in all 8 patients. In this subgroup the average decrease in daily pad use was 1.8 while 2 of the 8 patients remained satisfied. Transurethral collagen injection was done initially for recurrent stress urinary incontinence in 3 patients, while 5 refused further therapy. A single injection achieved dryness in 1 patient, while 2 who received multiple injections without any significant improvement subsequently underwent autologous pubovaginal sling and became dry.

Similarly, in the autograft group 16 of the 71 patients (23%) still required 1 or more pads daily, including 5 with recurrent stress urinary incontinence, 9 with urge incontinence, and 2 with stress urinary incontinence and urge incontinence. Stress urinary incontinence recurred in 7 cases, including less than 12 months and more than 3 to 4 years after surgery in 1 and 6, respectively. Recurrent stress urinary incontinence was due to persistent intrinsic sphincter deficiency with minimal or no hypermobility in all 7 patients. In this subgroup the average decrease in daily pad use was 3.2 while 3 of the 7 patients remained satisfied. Transurethral collagen injection was done initially for recurrent stress urinary incontinence in 2 cases, while 5 refused further therapy. A single injection achieved dryness in 1 patient, while the other had no improvement after multiple injections.

Significant perioperative complications, such as hemorrhage requiring transfusion, death, ureteral injury, vaginal wound infection or urethral erosion, did not occur in either group. The 2 bladder perforations healed without consequences after 1 week of continuous bladder drainage. Infectious complications, such as urinary tract and abdominal wound infection were greater in the autograft than in the allograft group (19 and 4 cases versus 4 and 0, respectively). This result was attributable to routine suprapubic cystostomy tube placement in the autograft group before 1997. Pelvic prolapse did not develop during routine postoperative 0 through 6-month followup. Of the patients who were examined beyond this period for reported urinary incontinence only 1 with prolapse was noted in either group, involving a large cystocele associated with mixed incontinence after an autograft sling. Urinary retention beyond 30 days was rare in each group. Prolonged retention resolved spontaneously in 1 of 1 case in the allograft group after 56 days compared within 2 of 3 in the autograft group (1 after 45 and 1 after 90 days), while 1 of 3 patients in the autograft group required transvaginal urethrolysis 1 week after surgery for urethral obstruction on physical examination. The patient began to void 1 week after urethrolysis and remained continent.

DISCUSSION

The periodic change in sling material is intended to simplify the procedure, making it more reproducible while decreasing morbidity. Current alternatives to autografts include synthetic and allogenic materials, although each has distinct drawbacks. Synthetic slings are effective for curing stress urinary incontinence but an unacceptable incidence of local complications, such as urethral and/or vaginal erosion, requiring sling removal has decreased their use 1% to 23%.[1,15] Nevertheless, the early success of tension-free vaginal tape, which is composed of polypropylene mesh enclosed in a plastic sheath, has generated renewed interest.[16] Conversely allograft slings avoid urethral and vaginal complications but have unknown long-term durability.[8,9] In addition, the transplantation of any allograft causes a risk of viral transmission.

The risk of viral transmission after placing soft tissue allografts is almost eliminated by combining donor screening and testing with a multistep sterilization processes before use.[8,9,17] In fact, the risk of acquiring HIV from a properly screened but infected donor of 1/1,667,600 to 1/8,000,000 is significantly less than the 1/440000 to 1/600,000 risk of acquiring HIV infection from blood transfusion.[9,13,17,18] Nevertheless, the potential risk of transmission of other infectious agents, such as prions, may still exist.[17,19] Although the sterilization process effectively eliminates viruses from the allograft, it may potentially compromise its future stability.

In 1996 Handa et al first reported the use of allograft fascia lata for a pubovaginal sling as an alternative graft that would avoid the morbidity of fascial harvest.[8] Although this application is relatively new, extensive evidence in the orthopedic and opthalmological literature supports the safety and long-term stability of allografts in reconstructive surgery.[8,9,17,20] However, the success of allografts in other specialties may not necessarily translate into successful pubovaginal sling surgery. Difficulty in projecting success exists because of wide variations in allograft type, thickness, length and processing.

Preliminary reports show that using allografts for a pubovaginal sling can result in significantly decreased operative time and hospital stay without compromising efficacy at less than 1 year (79% to 98%) or safety.[8,9] We reported similar results in our initial review and also objectively identified a significant 83% decrease in median postoperative pain using a nonvisual analog scale as well as a significant 50% decrease in the median time to normal activity.[10] Despite these early successes there continues to be uncertainty about the usefulness of allografts for pelvic reconstructive surgery. Skepticism is due to reports of a 20% early failure rate of allograft pubovaginal slings[11] and 38% for transvaginal slings with bone anchors.[12] Fitzgerald[11] and Carbone[12] et al attributed these disappointing results to cadaveric fascia and, therefore, abandoned its use.

In response to this controversy we evaluated the pubovaginal sling outcome in our patients with a minimum 2-year followup. We compared our continued experience with the same cohort of patients in our initial report who underwent an allograft or autograft pubovaginal sling procedure. There was no statistical difference in overall (71% and 77%) or stress urinary incontinence cure (87% and 90%) cure in the allograft and autograft groups, respectively. It is generally accepted that most sling failures due to recurrent stress urinary incontinence occur within year 1.[5] However, there were only a few failures in our review in either group during year 1. The majority of failures presented 2 to 3 years after the pubovaginal sling procedure. The significant increase in recurrent stress urinary incontinence in the 20-month period between reviews was similar in the allograft and autograft groups (10% and 9%, respectively, p = 0.76, table 2). Similarly, Amundsen et al recently reported a 16% incidence of

TABLE 2. *Comparison of incontinence outcomes after allograft and autograft pubovaginal sling in preliminary and current reports*

| | No. Pts./Total No. (%) | | p Value (Fisher's exact test) |
|---|---|---|---|
| | Allograft | Autograft | |
| Preliminary data:[10] | | | |
| Recurrent stress urinary incontinence | 2/63 (3) | 1/71 (1) | 0.46 |
| Urge incontinence | 6/63 (10) | 7/71 (10) | 0.84 |
| Persistent urge incontinence | 5/38 (13) | 6/32 (19) | 0.50 |
| New onset urge incontinence | 1/25 (4) | 1/39 (3) | 0.53 |
| Current data: | | | |
| Recurrent stress urinary incontinence | 8/63 (13) | 7/71 (10) | 0.58 |
| Urge incontinence | 15/63 (24) | 11/71 (16) | 0.23 |
| Persistent urge incontinence | 8/38 (21) | 9/32 (28) | 0.48 |
| New onset urge incontinence | 7/25 (28) | 2/39 (5) | <0.05 |

recurrent stress urinary incontinence in patients with a freeze-dried nonirradiated allograft pubovaginal sling at 19.4 months, which is more than the 2% in their initial report (table 3).[9,19] A summary of contemporary pubovaginal sling results shows that our mean followup and overall cure rate in each group are similar to respective allograft and autograft pubovaginal sling outcomes (table 3).[5,6,17,21,22]

We observed a disturbing incidence of postoperative urge incontinence in each group that increased with time. This finding explained most overall failures and was the primary cause of patient dissatisfaction. This disturbing trend was also reported in other allograft as well as autograft pubovaginal sling studies (table 3).[6,19] It is unknown whether urge incontinence after pubovaginal sling placement was related to prolonged bladder outlet obstruction or to an aging detrusor.

The successful allograft pubovaginal sling outcome in our review and in other reports was achieved using fascia lata slings that were at least 12 cm. long and without bone anchors (table 3).[9,17,19,22] In contrast, the disappointing allograft transvaginal sling results of Carbone et al involved a 7 cm. strip of cadaveric fascia that was transfixed with bone anchors.[12] Therefore, differences in sling length and the fixation technique may have explained the conflicting outcomes. However, Fitzgerald et al used a 10 cm. strip of freeze-dried γ irradiated cadaveric fascia without bone anchors and noted an early failure rate of 20%.[11] Therefore, other factors, such as outcome measures, allograft thickness and proprietary differences in manufacturer processing and storage techniques, may explain dissimilar results. Furthermore, differences in patient demographics, estrogen status and concomitant pelvic surgery can be confounding variables. Biomechanical analysis designed to eliminate or control these factors has also shown conflicting results.[19]

In 1997 clinical guidelines were established for the surgical management of stress urinary incontinence.[1] A shortcoming noted in this analysis was the wide variability in how groups defined cure, ranging from completely dry to improved.

Whether cure refers to absent stress and urge incontinence or just stress urinary incontinence was not always apparent. In addition, the long-term cure rate often includes recent results at 1 to 24 months. Furthermore, it is often difficult to contact patients who participated in a preliminary study for subsequent reviews. To avoid these problems we used our autograft data for comparison as well as identical outcome measures. We excluded all patients who received a pubovaginal sling in the last 2 years and contacted 96% of those in our initial analysis. Using these guidelines we did not observe any difference in efficacy for the allograft and autograft pubovaginal slings at 2 years.

A drawback of our study was the difference in followup in the 2 groups, which may have created a lead-time bias for detecting recurrent stress urinary incontinence. Another issue is that allografts were obtained from 3 tissue banks due to the allograft shortage when we began to use this material. Although we attempted to minimize these drawbacks, only a prospective randomized trial would avert all of these impediments. Nevertheless, due to individual reservations concerning cadaveric tissue not all patients may agree to randomization.

The goals of improving any standard surgical procedure or creating a completely new operation customarily involve alterations in technique that would create a less complex procedure with decreased morbidity. These modified or new procedures initially create enthusiasm, although with time they often lose favor due to unanticipated complications or lack of durability. An example is the ProteGen sling (Boston Scientific, Natick, Massachusetts), which was withdrawn by the manufacturer due to an unacceptable incidence of urethral-vaginal erosion as late as 7 years after implantation.[15] Recently tension-free vaginal tape has created tremendous interest after Ulmsten et al reported an 86% cure rate with no vaginal complications at 3 years.[16] However, in addition to bladder or urethral injuries that can occur in many anti-incontinence procedures, there are also unique complications of tension-free vaginal tape, such as external

TABLE 3. *Contemporary allograft and autograft pubovaginal sling outcomes*

| References | Sling Type | No. Evaluable Pts. | Mean Mos. Followup (range) | No. Cure (%)* | | No. Persistent + New Onset Urge Incontinence (%)* |
|---|---|---|---|---|---|---|
| | | | | Overall | Stress Urinary Incontinence | |
| Beck et al[21] | Autograft fascia lata | 170 | 25   (1–120) | 157 (92) | 167 (98) | 10  (6) |
| Cross et al[5] | Autograft rectus fascia | 134 | 22   (6–42) | 121 (90) | 124 (93) | 38 (28) |
| Chaikin et al[6] | Autograft rectus fascia | 251 | 37 (12–180) | 183 (73) | 237 (94) | 45 (18) |
| Elliot and Boone[22] | Allograft fascia lata | 26 | 15  (12–20) | 20 (77) | | 11 (42) |
| Brown and Govier[17] | Allograft fascia lata, autograft fascia lata | 104, 30 | 12, 44 | 77 (74), 22 (73) | 88 (85), 27 (90) | |
| Wright et al[9] | Allograft fascia lata, autograft rectus fascia-fascia lata | 59, 33 | 10 (1–20), 16 (15–28) | | 58 (98), 31 (94) | 15 (25), 7 (21) |
| Amundsen et al[19] | Allograft fascia lata | 91 | 19   (3–37) | 68 (75) | 76 (84) | 49 (54) |
| Present series | Allograft fascia lata, autograft rectus fascia-fascia lata | 63, 71 | 29 (24–36), 44 (30–56) | 45 (71), 55 (77) | 55 (87), 64 (90) | 15 (24), 11 (16) |

* Definitions varied widely among series. For example, Amundsen et al included patients who reported an occasional episode of urge incontinence,[19] while we counted only those using 1 or more pads daily.

iliac vein perforation by the trocar used to insert the tape.[23] Therefore, changes in sling material or surgical technique from the gold standard autograft pubovaginal sling should proceed judiciously until long-term data are available and reproducible by multiple groups.

CONCLUSIONS

Using allograft fascia lata as an alternative to autograft fascia for a pubovaginal sling results in a minimally invasive ambulatory procedure for stress urinary incontinence due to a significant decrease in postoperative pain and disability. In addition, using allograft fascia for the pubovaginal sling continues to provide efficacy comparable to that of autograft fascia at 2 years. Therefore, we believe that allograft fascia should remain a suitable alternative to autografts when performing the pubovaginal sling procedure.

APPENDIX: QUESTIONNAIRE

1. Do you leak urine when you cough, strain or during physical activity?

2. Do you have any urgency to void? Meaning, once you need to urinate, do you leak urine if you do not do so immediately? If yes, are you being treated with medication, biofeedback or other devices for this problem?

3. Do you wear a pad because of leakage? If yes, how many?

4. If your incontinence returned after surgery, when did this first occur?

5. Have you had any additional procedures performed for leakage (i. e. transurethral collagen injection, repeat pubovaginal sling)?

6. Have you noticed any bulge in your vagina since the surgery?

7. Knowing what you know now, if you were able to make the decision over again about having sling surgery, would you make the same choice?

8. Would you recommend sling surgery to a friend with a similar incontinence problem?

9. How long after the surgery was it before you were capable of resuming full activity?

REFERENCES

1. Leach, G. E., Dmochowski, R. R., Appell, R. A. et al: Female stress urinary incontinence clinical guidelines panel summary report on surgical management of female stress urinary incontinence. J Urol, 158: 875, 1997

2. Aldridge, A. H.: Transplantation of fascia for relief of urinary stress incontinence. Am J Obstet Gynecol, 44: 398, 1942

3. Blaivas, J. G. and Jacobs, B. Z.: Pubovaginal fascial sling for the treatment of complicated stress urinary incontinence. J Urol, 145: 1214, 1991

4. McGuire, E. J. and Lytton, B.: Pubovaginal sling procedure for stress incontinence. J Urol, 119: 82, 1978

5. Cross, C. A., Cespedes, R. D. and McGuire, E. J.: Our experience with pubovaginal slings in patients with stress urinary incontinence. J Urol, 159: 1195, 1998

6. Chaikin, D. C., Rosenthal, J. and Blaivas, J. G.: Pubovaginal fascial sling for all types of stress urinary incontinence: long-term analysis. J Urol, 160: 1312, 1998

7. Appell, R. A.: Argument for sling surgery to replace bladder suspension for stress urinary incontinence. Urology, 56: 360, 2000

8. Handa, V. L., Jensen, J. K., Germain, M. M. et al: Banked human fascia lata for the suburethral sling procedure: a preliminary report. Obstet Gynecol, 88: 1045, 1996

9. Wright, E. J., Iselin, C. E., Carr, L. K. et al: Pubovaginal sling using cadaveric allograft fascia for the treatment of intrinsic sphincter deficiency. J Urol, 160: 759, 1998

10. Flynn, B. J., Marinkovic, S. P. and Yap, W. T.: Risks and benefits of using allograft fascia lata for pubovaginal slings. J Urol, suppl., 161: 310, abstract 1195, 1999

11. Fitzgerald, M. P., Mollenhauer, J. and Brubaker, L.: Failure of allograft suburethral slings. BJU Int, 84: 785, 1999

12. Carbone, J. M., Kavaler, E., Hu, J. C. et al: Pubovaginal sling using cadaveric fascia and bone anchors: disappointing early results. J Urol, 165: 1605, 2001

13. Buck, B. E., Malinin, T. and Brown, M. D.: Bone transplantation and human immunodeficiency virus. An estimate risk of acquired immunodeficiency syndrome (AIDS). Clin Orthop, 240: 129, 1989

14. Murphy, D. F., McDonald, A., Power, C. et al: Measurement of pain: a comparison of the visual analog with a nonvisual analog scale. Clin J Pain, 3: 197, 1988

15. Kobashi, K. C., Dmochowski, R. and Mee, S. L. et al: Erosion of woven polyester pubovaginal sling. J Urol, 162: 2070, 1999

16. Ulmsten, U., Johnson, P. and Rezapour, M.: A three-year follow up of tension free vaginal tape for surgical treatment of female stress urinary incontinence. Br J Obstet Gynaecol, 106: 345, 1999

17. Brown, S. L. and Govier, F. E.: Cadaveric versus autologous fascia lata for the pubovaginal sling: surgical outcome and patient satisfaction. J Urol, 164: 1633, 2000

18. Buck, B. E., Resnick, L. and Shah, S. M. et al: Human immunodeficiency virus cultured from bone. Implications for transplantation. Clin Orthop, 251: 249, 1990

19. Amundsen, C. L., Visco, A. G., Ruiz, H. et al: Outcome in 104 pubovaginal slings using freeze-dried allograft fascia lata from a single tissue bank. Urology, 56: 2, 2000

20. Cooper, J. L. and Beck, C. L.: History of soft-tissue allografts in orthopedics. Sports Med Arthrosc Rev, 1: 2, 1993

21. Beck, R. P., McCormick, S. and Nordstrom, L.: The fascia lata sling procedure for treating recurrent genuine stress incontinence of urine. Obstet Gynecol, 72: 699, 1988

22. Elliot, D. S. and Boone, T. B.: Is fascia lata allograft material trustworthy for pubovaginal sling repair? Urology, 56: 772, 2000

23. Primicerio, M., DeMatteis, G., Montanino, O. M. et al: Use of the TVT (tension-free vaginal tape) in the treatment of female urinary stress incontinence. Preliminary results. Minerva Ginecol, 51: 355, 1999

# EXHIBIT UU

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC.,<br>**PELVIC REPAIR SYSTEM PRODUCTS**<br>**LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*Wave 4 Cases* | **Master File No. 2:12-MD-02327**<br>**MDL 2327**<br><br>**JOSEPH R. GOODWIN**<br>**U.S. DISTRICT JUDGE** |

**EXPERT REPORT OF BRIAN J. FLYNN, M.D.**

Nils Burton Snell
Burt.Snell@butlersnow.com
Attorney Identification No. 89455
BUTLER SNOW LLP
500 Office Center Dr., Suite 400
Fort Washington, PA 19034
Telephone: (267) 513-1884
Facsimile: (267) 513-1701

Kenneth A. Murphy
  kenneth.murphy@dbr.com
  Attorney Identification No. 58162
Melissa A. Graff
  melissa.graff@dbr.com
  Attorney Identification No. 90363
Molly E. Flynn
  molly.flynn@dbr.com
  Attorney Identification No. 205593
Andrew P. Reeve
  andrew.reeve@dbr.com
  Attorney Identification No. 309232
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone: (215) 988-2700
Facsimile: (215) 988-2757
*Attorneys for Defendants*
*Ethicon, Inc., and Johnson & Johnson*

James M. Campbell (admitted *pro hac vice*)
  jmcampbell@campbell-trial-lawyers.com
CAMPBELL CAMPBELL EDWARDS &
CONROY, P.C.
One Constitution Center
Boston, MA 02129
Telephone: (617) 241-3000
Facsimile: (617) 241-5115

Julie A. Callsen (admitted *pro hac vice*)
  julie.callsen@tuckerellis.com
Rita A. Maimbourg (admitted *pro hac vice*)
  rita.maimbourg@tuckerellis.com
TUCKER ELLIS LLP
950 Main Ave., Suite 1100
Cleveland, OH 44113
Telephone: (216) 592-5000
Facsimile: (216) 592-5009

| | |
|---|---|
| ***IN RE:  PELVIC MESH LITIGATION***<br><br>Margaret Engleman,<br><br>          Plaintiff,<br><br>     v.<br><br>Ethicon Inc., et al,<br><br>          Defendants. | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION**<br><br>     **MARCH TERM 2014 No. 5384** |

## EXPERT REPORT OF BRIAN FLYNN, M.D., FACOG

**Expert Overview of TVT**

The following is my expert report for the Ethicon TVT Retropubic (TVT) product. The report is based on my education, training, and experience, literature reviews, journal articles, textbooks, and materials provided to me by counsel for Ethicon and Johnson & Johnson, including: company documents, reports of plaintiffs' experts and the literature and documents cited and discussed therein, and other company witness depositions. All of my opinions in this report are expressed to a reasonable degree of medical probability or certainty.

My C.V. includes a list of publications that I have authored over the past 15 years. A list of materials that I reviewed in forming my opinions is attached. I am currently being paid $500/hour to prepare a written report, $600/hour for depositions, and $725/hour for trial testimony.

## I.      BACKGROUND AND QUALIFICATIONS

### A.      Education, Scholarly Activity, and Teaching

I, Dr. Brian J. Flynn, attended the University of Rochester in Rochester, New York from 1987-1991. I graduated with a Bachelor of Science degree in Electrical Engineering with a concentration in Biomedical Engineering. I attended medical school from 1991-1995 at Temple University School of Medicine, Philadelphia, Pennsylvania and graduated with a Doctor of Medicine degree in May of 1995. I next attended Geisinger Health System, Danville, Pennsylvania for my internship and residency from 1995-2001. I completed a six-year residency in Urology. I then performed a fellowship in Reconstructive Urology, Urogynecology, and Urodynamics from July 2001-June 2002 at Duke University Medical Center under the directorship of Dr. George D. Webster. I became a faculty member at the University of Colorado School of Medicine in June 2002, where I have been  employed since that time.  In 2016, I was promoted to Professor of Surgery/Urology.

I became a diplomate of the American Board of Urology in March 2004 and became subspecialty certified in Female Pelvic Medicine and Reconstructive Surgery (FPMRS) in August 2014. I have had a Colorado Medical License continuously for the past 14 years. My hospital affiliations include University of Colorado Hospital, Denver Health Medical Center, Children's Hospital of Colorado, and Veteran's Administration Medical Center in Denver. My administrative activities include being the president and program chair of the South Central Section of the American Urological Association. I am the president-elect of the Rocky Mountain Urological Society. I have been the Director of a Fellowship in Genitourinary Reconstructive Surgery at the University of Colorado School of Medicine since 2008.  I am the Co-Practice Director of Women's Pelvic Health and Surgery at the University of Colorado Hospital since June 2013.  I was the Assistant Residency Director of Urology at University of Colorado School of Medicine from July

2006-June 2010. I am an active member of the American Urological Association, South Central Section of the American Urological Association, Rocky Mountain Urological Society, Society of Genitourinary Reconstructive Surgeons, Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction, and International Urogynecological Association. This includes attendance at annual meetings and subscription to the associations' journals.

I review articles for the *Journal of Urology, International Urogynecology, Urology and Neurourology*, and *Urodynamics*. I have published scientific articles in peer review journals on male and female Reconstructive Urologic Surgery. I have authored instructional videos on the TVT Secur™, TVT Abbrevo™, as well as the Gynecare Prolift™ System. I have been invited to speak at a number of scientific meetings throughout the world on urogynecologic issues including incontinence, prolapse, neuromodulation, transvaginal mesh, and other female urology and urogynecology topics.

As a core faculty member of the University of Colorado School of Medicine Urology Division since 2002, I have instructed twenty-eight residents on urinary incontinence and pelvic organ prolapse. Additionally, as the founder and current fellowship director at the University of Colorado in Genitourinary Reconstructive Surgery, I have trained eight fellows in this specialty.

I spend 85% of my time in a clinical practice and 15% of my time in clinical research, teaching, administrative activities, medicolegal consultation, and quality improvement projects (e.g., improving bladder control and continence in multiple sclerosis patients).

I have extensive experience with transvaginal mesh and have published and presented numerous times on that topic. I am very familiar with the 2008 FDA Public Health Notification regarding transvaginal placement of surgical mesh and the FDA's 2011 update. In fact, the AUA (American Urological Association) asked me to write an update for practicing urologists on the implications of the FDA notification, as well as technical considerations of transvaginal pelvic reconstruction with polypropylene mesh. I have offered insight into prevention and management of mesh-related complications. I have proposed indications for mesh in stress urinary incontinence (SUI) and pelvic organ prolapse (POP) surgery. As a result of my education in engineering, I am familiar with the biomechanical properties of polypropylene mesh. I have been invited to speak by many professional societies including the AUA, SUFU, and IUGA on the technical considerations and clinical considerations associated with transvaginal mesh.

## B.    Relevant Surgical Experience

I perform approximately 400 surgical cases per year, primarily at the University of Colorado Hospital. More than 50% of my practice involves Female Pelvic Medicine (FPM). In the past 13 years, I have performed more than 1,100 procedures for SUI. I have

used a polypropylene mesh kit in more than 800 of these cases, including more than 500 cases using the TVT family of products.

I began assisting in incontinence procedures in 1997 when I was a urology resident. I performed a wide variety of SUI procedures, including transurethral bulking agents, Burch colposuspension, and pubovaginal sling with autografts and allografts. During my fellowship in 2001, I began performing mid-urethral slings (MUS) with polypropylene mesh under the direction of George Webster, M.D. I began my practice at the University of Colorado in 2002 and used primarily American Medical Systems Sling products. In 2004, I started using primarily Ethicon's TVT product line including TVT, TVT Obturator, TVT Secur, TVT Abbrevo, and the TVT Exact.

## II.    URINARY INCONTINENCE (UI)

For patients to remain continent, there must be a balance between detrusor muscle activity and urethral closure. The urethral pressure will exceed bladder pressure resulting in a continent patient, and when abdominal pressures are transmitted to the urethra and bladder, the pressure differential remains favorable, leaving patients continent. Loss of support of the urethra or the disruption between the normal relationship between the lower urinary tract components leads to incontinence. SUI may be caused by pregnancy and childbirth, general loss of pelvic muscle tone (often with aging), hysterectomy, nerve and muscle damage as result of (birth) injury or surgical trauma, obesity, menopause, chronic coughing due to smoking and lung disease, anatomical predisposition, and repeated heavy lifting or activities causing impacts.

There are different forms of urinary incontinence. Stress urinary incontinence (SUI) is the most common type. SUI is the complaint of involuntary leakage of urine with activity such as sneezing, coughing, or aerobic activity such as walking, running, etc. Urodynamic stress incontinence is the involuntary loss of urine from the urethra noted during a urodynamic study during increases in abdominal pressure, in the absence of a detrusor (bladder wall muscle) contraction or an over-distended bladder. Essentially, the abdominal pressure exceeds the resistance produced by the muscles surrounding the urethra or the resistance produced by the urethral closure mechanism. Two mechanisms for stress incontinence are well-recognized: *urethral hyper-mobility* or significant displacement of the urethra and bladder neck during exertion, and *intrinsic urethral sphincter deficiency (ISD)*. These mechanisms may coexist in certain cases.

*Urethral hypermobility* results from the loss of the normal pelvic support mechanism of the bladder. The bladder neck support is weakened, the increase in intra-abdominal pressure is no longer transmitted equally to the bladder outlet, and instantaneous leakage occurs. This may result from the trauma and stretching associated with vaginal delivery, hysterectomy, hormonal changes, pelvic denervation, or congenital weakness. Urethral hypermobility causes genuine SUI (GSUI) in most patients. The urinary sphincter is a muscle within the urinary system that allows the body to hold in

4

urine. If the sphincter stops working, is paralyzed, or damaged, urine leakage may result, and this is known as intrinsic sphincter deficiency (ISD). It may result from prior operations, trauma, neurogenic changes, or atrophic changes. The goal of repairing SUI from urethral hypermobility or ISD is to support the urethra and sphincteric unit. Symptoms of SUI include the sudden loss of urine during maneuvers that increase intra-abdominal pressure, such as coughing, laughing, sneezing, bending, straining, lifting, jumping, running, etc. SUI can be so severe often the patient will soak a pad or even need to change her underpants or clothing.

Urinary urgency refers to a sudden, compelling desire to pass urine that is difficult to defer, or a strong need to pass urine for fear of leakage. Urge urinary incontinence commonly known as overactive bladder (OAB) is defined as involuntary leakage accompanied by (or immediately proceeded by) urgency. Patients with OAB will have a sudden desire to void (urgency). This may trigger urinary frequency, and if the patient is unable to reach the bathroom in time, she will have urge incontinence.

Mixed UI is a combination of SUI and OAB. Overflow incontinence occurs when the bladder doesn't completely empty. Dysfunctional nerves or urethra obstruction that impedes the flow of urine may cause overflow incontinence.

UI is diagnosed by history, physical examination, bladder log, questionnaires, and a pad test. Demonstration of urine loss per urethra on physical exam during an increase in intra-abdominal pressure is diagnostic of SUI. In more complicated cases, urodynamics and/or cystoscopy may be necessary to diagnose UI and to differentiate SUI from OAB. During the evaluation of UI, it is important to identify and determine the nature of the incontinence, the duration, the impact on quality of life and activities, prior treatments (medical, behavioral, and surgical) and predisposing and complicating factors. This will allow the practitioner to direct appropriate and effective treatment.

Urinary Incontinence can significantly impact a patient's physical and psychological quality of life. UI may lead to social isolation and withdrawal from an active lifestyle, resulting in weight gain and depression. Patients may withdraw from interaction with friends and family. Patients may be afraid to leave home or to participate in family events, religious services, or sporting activities. Intimacy is often adversely affected by UI. Hence the burden on women is significant, and this leads to a desire by patients and physicians to find effective, durable treatments to alleviate UI and allow the patient to return to an active lifestyle.

Urinary incontinence is an important medical problem for women in both the reproductive and menopausal phases of life. Urinary incontinence affects an estimated 15 to 50% of women, resulting in significant medical, social, and economic burden. Among women with incontinence, 50 to 80% are identified as having stress urinary incontinence or involuntary leakage of urine resulting from physical exertion or sneezing and coughing. By 2007 it was noted that, "an estimated 4 to 10% of women in the United

States undergo surgery intended to restore continence, and this rate has increased steadily during the past 20 years.[1] Urinary incontinence has been estimated to have a total annual cost as high as $32 billion in the United States.[2]

## III.    TREATMENT OPTIONS FOR SUI

### A.    Behavioral and Non-Surgical Treatments

There are several non-surgical treatment options for SUI. In my experience, conservative treatment options are effective only in cases of mild SUI, and even then in only a minority of women. Conservative treatments include behavioral therapy or what is sometimes referred to as self-care, physical therapy, bio-feedback, electrical stimulation, devices, and medications. Behavioral modification or self-care includes weight loss, pelvic muscle exercises, smoking cessation, and timed voiding. Weight loss and smoking cessation can reduce the factors that aggravate incontinence. Pelvic floor exercises such as Kegel exercises or vaginal weights can improve the strength of the pelvic floor to the bladder and urethra and improve mild urinary incontinence. Bio-feedback allows for sensors to be placed by the pelvic muscles to see which muscles are being used. This is designed to help recruit and strengthen the proper muscles in the pelvic floor responsible for continence. Electrical stimulation can stimulate and strengthen the pelvic muscles. External stimuli will make the muscles contract and assist in the strengthening of the appropriate muscles. A pessary is a device that comes in a variety of shapes and sizes and is placed in the vagina. Pessaries are used primarily for pelvic organ prolapse, but they also can be used as urethral support for treatment of incontinence. In my experience, they are often ineffective.

As it relates to medication, there is no FDA-approved pharmaceutical medication to treat SUI. Topical estrogen cream after menopause may contribute to a restoration of the vaginal wall and in some patients may improve continence to some extent.

Transurethral bulking agents may be injected to augment the urethral mucosal coaptation and seal effect to provide continence. The FDA has only approved bulking agents for SUI due to ISD. The success rate with bulking agents is often low and requires repetitive procedures; therefore, bulking agents have a limited role in the treatment of SUI. For more moderate to severe forms of SUI, non-surgical treatments have not been shown to provide favorable long-term results.[3]

---

[1] Albo, et al., Burch Colposuspension versus Fascial Sling to Reduce Urinary Stress Incontinence. N Engl J Med 2007;356:21.
[2] Wood LN and Anger JT, Urinary incontinence in women. BMJ 2014;349:g4531.
[3] Schiotz JA, Ten-year follow-up after conservative treatment of stress urinary incontinence. Int Urogynecol J 2008;19:911-915.

**B.      Traditional Surgical Options**

Prior to the development of mid-urethral slings, there was no one procedure that was the standard of care. Many different surgeons performed a variety of procedures in an attempt to correct SUI. These procedures included anterior plication, needle suspension, Marshall-Marchetti-Krantz (MMK), and open and laparoscopic Burch colposuspension. These procedures are considered native tissue repairs, but do require the use of a permanent suture such as Prolene or Gore-Tex. The pubovaginal facial sling is a sling procedure with native fascia and permanent sutures. I will address each of these procedures and its advantages and disadvantages.

<u>Marshall-Marchetti-Krantz Procedure</u>

The MMK procedure is also known as the retropubic suspension or bladder neck suspension surgery. The patient is placed under general anesthesia, and a long, thin, flexible tube (catheter) is inserted into the bladder through the narrow tube (urethra) that drains the body's urine. An incision is made in the lower abdomen, and the bladder is exposed. The bladder is separated from surrounding tissues. Permanent stitches (sutures) such as Prolene are placed in these tissues near the bladder neck and urethra. The urethra is then lifted, and the sutures are attached to the pubic bone itself, or to tissue (fascia) behind the pubic bone. The sutures support the bladder neck, helping the patient gain control over urine flow. In addition to general anesthesia, the MMK requires the patient to spend two-to-six days in the hospital. The MMK is not a procedure of choice today, as it leads to a high rate of bony complications and inferior long-term efficacy.[4]



<u>Burch Procedure</u>

The Burch procedure began being performed in the 1960s. Initially, this procedure was described by attaching the paravaginal fascia to the arcus tendineus. However, he

---

[4] Wu JY, Surgical therapies of female stress urinary incontinence: experience in 228 cases. Int Urogynecol J 2010;21:645-649; Chaliha C, Stanton SL, Complications of surgery for genuine stress incontinence. Br J Obstet Gynaecol. 1999 Dec;106(12):1238-45.

later changed the point of attachment to Cooper's ligaments because these were believed to provide more secure fixation points, and less chance of infection as seen with the prior MMK procedure. In the Burch colposuspension, permanent sutures such as Prolene are placed in the anterior vaginal wall at the level of the bladder neck and proximal urethra and are then sutured to the Cooper's ligament. The Burch returns the urethra to its anatomic location, which allows it to function more effectively in cases of GSUI. However, the Burch procedure is indicated only for GSUI, and is not a treatment for ISD, as success rates have been unacceptably low in this population. Since SUI due to ISD is often hard to detect, the Burch procedure fell out of favor with urologists. Also, the procedure requires an abdominal incision, is time-consuming, and requires a prolonged convalescence. Because of the significant post-operative morbidity, voiding difficulty, de novo pelvic organ prolapse, pain, and delayed failures, the Burch procedure has also lost popularity with surgeons.[5]

In two long-term studies, the effectiveness of Burch colposuspension has been shown to be time dependent, in that success rates have dropped significantly after 10 years. Further, pre-operative weight greater than 176 pounds has significantly affected cure rates. In the Kjolhede long-term study on Burch procedures, subjectively significant urinary incontinence was experienced by 56% of the patients.[6] While the study suffered from more than 60% loss to follow-up, the Burch further demonstrated decline in cure rates, with only 19% of patients reporting no incontinence episodes.[7] In the Alcalay study, the Burch procedure was also shown to have significant morbidity, urinary tract symptoms were experienced by 75% of patients, recurrent UTI in 4.6%, de novo detrusor instability in 14.7% of patients, long-term voiding difficulty in 22% of patients, and high rates of pelvic organ prolapse resulted from the Burch (37% in this study[8]).  Similar trends in a drop-off in efficacy have been documented at 2 or more years as reported by Demirci, along with late complications in 220 women including cystocele in 18, rectocele in 32, enterocele in 35, dyspareunia in 6, and groin or suprapubic pain in 15 patients.[9]

---

[5] Wu (2011): Trends in inpatient urinary incontinence surgery in the USA, 1998-2007; Nager (2012): A Randomized Trial of Urodynamic Testing before Stress-Incontinence Surgery; Chughtai (2013): Midurethral Sling Is the Dominant Procedure For Female Stress Urinary Incontinence: Analysis of Case Logs From Certifying American Urologists; Suskind (2013): Effectiveness of Mesh Compared with Nonmesh Sling Surgery in Medicare Beneficiaries; Rogo-Gupta (2013): Trends in the Surgical Management of Stress Urinary Incontinence Among Female Medicare Beneficiaries, 2002-2007; Wu (2014): The surgical trends and time-frame comparison of primary surgery for stress urinary incontinence, 2006-2010 vs 1997-2005: a population-based nation-wide follow-up descriptive study

[6] Kjolhede P, Long-term efficacy of Burch colposuspension: a 14-year follow-up study, Acta Obstet Gynecol Scand 2005, 84:767-772.

[7] Kjolhede P, Long-term efficacy of Burch colposuspension: a 14-year follow-up study, Acta Obstet Gynecol Scand 2005, 84:767-772.

[8] Alcalay M, et al., Burch colposuspension: a 10-20 year follow up, Br J Obstet and Gynaecol, 1995 Sept.;102:740-45.

[9] Demirci F, et al., Long-term results of Burch colposuspension. Gynecol Obstet Invest. 2001;51(4):243-



The decision to perform an open versus laparoscopic procedure depends on the skill set of the surgeon. Moehrer, et al., published a systematic review of laparoscopic colposuspension using the Cochrane Incontinence Review Groups' registry of randomized controlled trials, including four studies in the meta-analysis.[10] The meta-analysis demonstrated that subjective perception of cure was no different between the groups. When urodynamics were used to measure outcome, the success rate for the laparoscopic approach was significantly lower than that for the open procedure with an additional 9% risk of failure for laparoscopic versus open colposuspension. The laparoscopic procedure is not widely accepted by surgeons due to the steep learning curve required for laparoscopic suturing. It also requires abdominal entry and general anesthesia. The 2012 Cochrane Review by Lapitan concluded that there was not enough evidence to judge whether laparoscopic colposuspension has an advantage or disadvantage compared to the open Burch procedure in terms of subjective and objective cure rates, safety, longer-term complications, quality of life, and cost-effectiveness.[11] The 2016 Cochrane Review by Lapitan noted that "[l]aparoscopic colposuspension should allow speedier recovery [than open colposuspension] but its relative safety and long-term effectiveness is not yet known."[12]

The Ward Hilton study is a RCT of TVT versus Burch with 5-year follow-up. The TVT had similar efficacy and patient satisfaction and less voiding dysfunction.[13] Similarly, a Cochrane review of TVT versus Burch showed that TVT appeared to be as effective as open Burch colposuspension but with fewer complications, less voiding dysfunction, shorter operative times, and higher safety.[14] This benefit of TVT was also

---

[10] Moehrer, B., Carey, M., Wilson, D., Laparoscopic colposuspension: a systematic review. BJOG. 2003;23(3):277-283.

[11] Lapitan MC, Cody JD. Open retropubic colposuspension for urinary incontinence in women. Cochrane Database Syst Rev. 2012 Jun 13.

[12] Lapitan MCM, Cody JD, Open retropubic colposuspension for urinary incontinence in women. Cochrane Database Syst Rev. 2016 Feb 15;2:CD002912. Doi: 10.1002/14651858.CD002912.pub6.

[13] Ward, K., Hilton, P., Tension-free vaginal tape versus colposuspension for primary urodynamic stress incontinence: 5-year follow up. BJOG 2008;115:226-233.

[14] Ogah, J., Cody, JD, Rogerson, L., Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2009, Issue 4. Art. No.: CD006375. DOI:10.1002/14651848.CD006375.pub2.

seen in Lapitan's 2012 Cochrane Review mentioned above.  Lapitan's 2016 Cochrane Review noted that "[n]ew techniques, particularly sling operations (including the use of tapes to lift up the urethra) and keyhole (laparoscopic) colposuspension, look promising but need further research particularly on long-term performance."  But Lapitan also noted that "[p]rocedures involving surgery to insert a tape under the urethra showed better cure rates in the medium and long term, compared to open colposuspension."[15]  A meta-analysis by Novara found that patients receiving midurethral tapes, particularly TVT, had significantly higher overall (odds ratio [OR]: 0.61; confidence interval [CI]: 0.46–0.82; p = 0.00009) and objective (OR: 0.38; CI: 0.25–0.57; p < 0.0001) cure rates than those receiving Burch colposuspension, although they had a higher risk of bladder perforation.[16]

Pubovaginal Sling Procedure

The pubovaginal sling procedure (PVS) places graft material directly under the urethra and attaches it to the connective tissue (fascia) of the abdominal muscles. The graft rests under the urethra like a firm hammock. When a cough or sneeze pushes the urethra down, it is forced against the sling, and the urethra is closed off.  The sling procedure is often used for women who have had previous incontinence surgery. It also is recommended for women with a weakened urethral sphincter (ISD) that does not close properly. There are a number of materials that can be used to make the sling. Some doctors prefer to use a synthetic, nylon-like material, while others choose fascia—the strong tissue that surrounds muscle, removed either from the patient's abdomen (rectus fascia) or outer thigh (fascia lata) (autograft) or sterilized, irradiated fascia from a cadaver donor (allograft) or from an animal (xenograft).

The success rate of the sling is good, but long-term success rates may show some decline. In the SISTEr trial at seven years, the urinary continence rate (no reported leakage by the patient) was only 13% for the Burch procedure and 27% in the pubovaginal sling group.[17] However, both procedures showed decline in the long-term follow-up; 27% of patients required treatment for postoperative urge incontinence. In comparison to the Burch, the fascial sling has a higher rate of UTI, urge incontinence, voiding dysfunction, and the need for surgical revision to improve voiding. The increased

---

[15] Lapitan MCM, Cody JD, Open retropubic colposuspension for urinary incontinence in women. Cochrane Database Syst Rev. 2016 Feb 15;2:CD002912. Doi: 10.1002/14651858.CD002912.pub6.

[16] Novara G, et al., Updated systematic review and meta-analysis of the comparative data on colposuspensions, pubovaginal slings, and midurethral tapes in the surgical treatment of female stress urinary incontinence. Eur Urol 2010 Aug;58(2):218-38.

[17] Richter HE, et al., Patient Related Factors Associated with Long-Term Urinary Continence After Burch Colposuspension and Pubovaginal Fascial Sling Surgeries, Urology 2012;188:485-489; Albo, ME, et al., Burch Colposuspension versus Fascial Sling to Reduce Urinary Stress Incontinence, N Engl J Med 2007;356:2143-2155.

efficacy but greater morbidity of the fascial sling is echoed in other systematic reviews and in my own practice and experience.[18]

One potential but relatively uncommon problem with this surgery is that the sling may compress the urethra and block the flow of urine, leading to urinary retention, incomplete bladder emptying, or de novo urgency. A major disadvantage of the autologous sling is the morbidity associated with fascial harvest including wound complications, infection, pain, nerve entrapment and necessity of an additional surgical site if fascia lata is obtained with attendant complications and decreased mobility, and the associated hospital stay and convalescence of the procedure. Allografts and xenografts avoid the abdominal incision and the morbidity of fascial harvest, but can be associated with rejection, disease transmission, and expense. There are also occasional religious and cultural objections from patients with respect to donor and xenograft tissue. Moreover, allografts and xenografts do not have the long-term durability of synthetic material. They have been shown to degrade and decompose in patients on follow up.

It is my opinion that anterior plications, needle suspension (such as the Raz procedure), paravaginal defect repair, and the MMK should not be offered as treatment options for SUI. The success rates are unacceptably low and the benefits do not outweigh the risks. My opinion is in agreement with the 2013 National Institute for Health and Care Excellence (NICE) guidance.[19]

Today, the traditional operations have been in part replaced in general practice by retropubic or transobturator midurethral synthetic slings, which includes the TVT, TVT-O, and TVT Abbrevo. TVT, TVT-O, and TVT Abbrevo are synthetic mid-urethral slings which are used by more than 95% of pelvic floor surgeons. A recent survey of the members of the International Urogynecological Association (IUGA) found that mid-urethral slings are the preferred surgical treatment for uncomplicated SUI for more than 90% of the 564 IUGA members who responded to the survey.[20] While the 2016 IUGA survey found that transobturator slings are preferred among IUGA members, it is my overall impression based on the the literature, conversations with colleagues, and my experience show that most pelvic floor surgeons prefer TVT to the traditional procedures,

---

[18] Richter HE, et al., Patient Related Factors Associated with Long-Term Urinary Continence After Burch Colposuspension and Pubovaginal Fascial Sling Surgeries, Urology 2012;188:485-489; Albo ME, et al., Burch colposuspension versus Fascial Sling to Reduce Urinary Stress Incontinence, N Engl J Med 2007;356:2143-2155; Brubaker L, 5-Year Continence Rates, Satisfaction and Adverse Events of Burch Urethropexy and Fascial Sling Surgery for Urinary Incontinence, Urology 2012;187:1324-1330; Rehman H, et al. Traditional suburethral sling operations for urinary incontinence in women. Cochrane Database Syst Rev. 2011 Jan 19.

[19] National Institute for Health and Care Excellence, Urinary incontinence: The management of urinary incontinence in women, Sept. 2013 at guidance.nice.org.uk/cg171.

[20] Kammerer-Doak D, Svabik K, and Bazi T, Variability in practice patterns in stress urinary incontinence and pelvic organ prolapse: results of an IUGA survey. Int Urogynecol J. 2016 Oct 17. DOI 10.1007/s00192-016-3174-6.

with the exception of a few select circumstances.  Additionally, native tissue procedures are rarely taught in medical school or residency.[21]

## IV.    TVT AND THE MIDURETHRAL SLING

### A.    TVT History and Clinical Results

The Gynecare TVT mesh is made from a polypropylene mesh, more specifically the Prolene mesh.  Polypropylene mesh has been used as a permanent human implant for decades.  The first polypropylene meshes were developed and used by hernia surgeons in the 1950s.  In the early 1970s, Ethicon developed Prolene mesh for hernia surgery.  The Prolene mesh was made from the same material in Prolene sutures (polypropylene and certain additives), which had been used since the 1960s as well. The Prolene sutures have been used for cardiovascular repairs, plastic surgery, hernia repairs, and pelvic floor repairs.  Before it was used for treatment of SUI, the inflammatory response and appropriateness of Prolene in the body was widely known.

In the early 1990s, Dr. Ulmsten, a physician in Sweden, was working on a new way to treat SUI.  At the time, there was no standard, widely accepted method of repair; therefore, surgeons were using a variety of methods.  All of the methods at the time had high recurrence rates, significant morbidity, substantial complications, long hospital stays, and substantial recovery times.

In the 1980s to mid-1990s, Dr. Ulmsten and Dr. Petros began to use several different types of meshes and placed them under the mid-urethra.[22]  They found that the Prolene mesh had the best results.  Dr. Ulmsten was seeking to determine if the support was more appropriate at the bladder neck or if it was in the mid-urethral section, which was a newer concept.  After years of research, he established the integral theory, and began placing meshes under the mid-urethra tension-free—that is, not chronically kinking the urethra as was done with the Burch, MMK, and other procedures.[23]

---

[21] Nager CW, et al., A Randomized Trial of Urodynamic Testing before Stress-Incontinence Surgery. N Engl J Med 366;21:1987–1997; Clemons JL, et al., Impact of the 2011 FDA Transvaginal Mesh Safety Update on AUGS Members' Use of Synthetic Mesh and Biologic Grafts in Pelvic Reconstructive Surgery. Female Pelvic Med Reconstr Surg 2013;19:191-198, Chughtai BI, et al., Midurethral Sling Is the Dominant Procedure for Female Stress Urinary Incontinence: Analysis of Case Logs From Certifying American Urologists. Urology 2013.

[22] Petros PE, Ulmsten UI, An integral theory and its method for the diagnosis and management of female urinary incontinence. Scand J Urol Nephrol Suppl. 1993;153:1-93; Ulmsten U, et al., A multicenter study of tension-free vaginal tape (TVT) for surgical treatment of stress urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct 1998;9(4):210-3; Petros P., Creating a gold standard surgical device: scientific discoveries leading to TVT and beyond: Ulf Ulmsten Memorial Lecture 2014. Int Urogynecol J 2015 Apr;26(4):471-6.

[23] Ulmsten U, et al., An Ambulatory Surgical Procedure Under Local Anesthesia for Treatment of Female Urinary Incontinence, Int Urogynecol J (1996) 7:81-86; Ulf Ulmsten, Intravaginal Slingplasty (IVS): An

As Dr. Ulmsten determined the location of the mesh, he was also assessing the appropriate tools and size of the tools to place the mesh.  He determined that a retropubic pass with 6 mm needle would be appropriate, as it was large enough to palpate to allow safe passage without causing significant effect on the surrounding tissue.

Dr. Ulmsten then had to determine what type of mesh would be left behind that would integrate well, not cause infections, provide the appropriate support, but also adapt to the stresses in the body.  Dr. Ulmsten used the meshes that were available on the market such as Mersilene, Gore-Tex, Marlex, Prolene, and others.  He found that the Prolene mesh provided the key qualities needed for a permanent mesh for incontinence repair.  Prolene was not rejected by the body, did not cause defective healing, provided the appropriate support, and significantly improved both subjective and objective cure and comfort rates.  Then it had to be determined what size mesh would be used. Dr. Ulmsten determined that a 1 centimeter wide and 40 centimeter long Prolene Mesh would work best.  The mid-urethral complex (continence zone) measures 1 cm in length, hence the TVT mesh is able to support the entire mid-urethra.  The length of the mesh was moved to 45 cm to allow treatment of even obese women and the width to 1.1 cm.  The actual length of the mesh that is implanted averages 15 cm (range 12-30).

The Prolene mesh also has strong adhesive (friction) properties that makes suture fixation unnecessary.  A plastic sheath surrounds the TVT mesh and facilitates placement of the sling into the correct position below the urethra.  The plastic sheath also prevents contamination at the time of sling placement.  Hence the design of the instrument and the surgical technique enabled the sling not only to be located in a correct anatomical position, but also to be firmly secured immediately.  The friction prevents sliding of the mesh that can result in loosening and a failed operation.

By 1996, Dr. Ulmsten completed his first trial, which included 75 patients with two-year follow-up.  92% of the patients were cured or significantly improved, with no tape rejection, no defective healing, no intra-operative complications, and no post-operative complications.[24]

During the mid-1990s, Ethicon began discussing with Dr. Ulmsten his approach to correct SUI.  Dr. Arnaud went to visit Dr. Ulmsten and had an opportunity to watch multiple surgeries and to speak with the patients.  Dr. Arnaud brought in outside physicians who specialized in urinary incontinence repair to view the procedure. Based upon seeing the procedure and the clinical results, Ethicon determined that this procedure

---

ambulatory surgical procedure for treatment of female urinary incontinence. Scand J Urol Nephrol 1995;29:75-82.

[24] Ulmsten U, et al., An Ambulatory Surgical Procedure Under Local Anesthesia for Treatment of Female Urinary Incontinence. Int Urogynecol J 1996;7:81-86.

could change the way SUI repair was performed and could be a significant benefit to patients.[25]

In 1997, Ethicon began to sell TVT in Europe. In 1998, a prospective randomized study with six centers was carried out in Scandinavia and tested the safety and efficacy of the TVT device. A compilation of the data that was published in 1998 showed 91% cure rates, with another 7% significantly improved.[26] The results demonstrated the procedure was safe, effective, and less invasive than prior anti-incontinence procedures. There was a clear benefit to patients that no other procedure was providing.

The results of the trial were about the same as earlier reports by Dr. Ulmsten. That is, less-experienced surgeons were able to replicate the continence outcomes of experienced surgeons without compromising patient safety. This was attributed to the unique design of the mesh and the use of a specific trocar to place the mesh. Furthermore, the TVT procedure could be performed as an outpatient procedure, with less peri-operative morbidity and convalescence when compared to prior SUI procedures such as the Burch, MMK, or Pubovaginal Sling. With the tremendous results from these clinical trials and others, as well as the wide acceptance in Europe, Ethicon began to sell the TVT in the United States in 1998.

Considering how prevalent SUI is in the female population, it is not possible for all women with this condition to be treated by specialists. Rather, it is important that a procedure can be performed by a wide-variety of urologists and gynecologists who practice in various communities. It is unrealistic to expect that all women with SUI can be treated at tertiary care centers in metropolitan areas. As a result of its success and relative ease of use, the minimally invasive mid-urethral sling has been widely adopted, and is successfully used throughout the world in the surgical treatment of stress urinary incontinence. The ability of many surgeons to obtain great results was demonstrated in a study where over 7,000 Medicare patients were assessed, with 93.8% receiving a mesh repair with superior results compared to non-mesh repairs.[27] This was also demonstrated in hundreds of studies, systematic reviews, and meta-analyses. This is why tension-free mid-urethral slings have become the gold standard for treatment of SUI.

The Prolene mesh Dr. Ulmsten used in his first studies was the same mesh that Ethicon has used in the TVT, with the exception that a blue dye was added and, beginning in 2006, TVT offered a laser-cut or mechanical-cut mesh.[28] I have used both mechanical-cut and laser-cut mesh, and clinically there is no difference between the two. This is further confirmed in the literature. The earlier literature discussing complication

---

[25] History of TVT, ETH.MESH.03932912-03932914.
[26] Ulmsten U, A Multicenter Study of Tension-Free Vagina Tape (TVT) for Surgical Treatment of Stress Urinary Incontinence. Int Urogynecol J 1998;9:210-213.
[27] Suskind AM, et al., Effectiveness of Mesh Compared With Nonmesh Sling Surgery in Medicare Beneficiaries. Obstet Gynecol 2013 Sep;122(3):546-52.
[28] ETH.MESH.9275943-45.

rates and success rates with the TVT are the same for the more recent literature when laser-cut mesh is made. This makes sense because there is simply a change in the method of cutting the mesh. Any difference in the stiffness of the two types of mesh is not clinically significant. Prestretching the mesh to 50% elongation and bench testing without the sheath and trocars is not how one actually uses the TVT mesh in the operating suite.

In 2006, Ethicon used a study by Alex Tong-Long Lin to determine the forces on the mesh.[29] Those forces were applied and the mesh was tested for flexural rigidity and elongation, and there were no significant differences. This was performed because some physicians were concerned that there were mesh particles, known as fraying, coming from the mechanically cut mesh. The overall clinical literature and my experience do not show that any particles of the Prolene polypropylene have a clinical effect in patients. The literature shows that clinically the TVT mesh is well-tolerated by patients.

In short, both mechanical and laser-cut TVT meshes are appropriate for use in the body, and are both safe and efficacious as demonstrated by the literature and as evidenced in my practice.

The mesh in TVT was and is state of the art and the most commonly used mesh for stress urinary incontinence. It is a Type 1 macroporous monofilament mesh that has shown the best tolerability for use in stress urinary incontinence in its 1.1 cm size and configuration. Among the SUI meshes, it has the largest pore size, which is clearly over 1 millimeter, even assessed, as I have done, by putting the mesh next to a millimeter ruler. It has also been confirmed by third-party testing of the pore size.[30] The Cochrane Review by Ogah found that TVT has better efficacy and lower erosion rates than multifilament non-Type 1 meshes.[31] Falconer also found minimal inflammation with the Prolene mesh and practically no tissue reaction even out to two years, while there was no difference between paraurethral connective tissue in biopsies from patients operated on with Prolene tape and in controls two years after surgery.[32] The TVT mesh has the optimal weight for long lasting continence and tolerability, as shown by the numerous long-term studies discussed in my report.

---

[29] Lin AT, et al., In Vivo tension sustained by Fascial Sling in Pubovaginal Sling Surgery for Female Stress urinary Incontinence. Urol 2005 Mar;173(3):894-7; ETH.MESH.01784823-28 (CER Laser Cut Mesh); ETH.MESH.01222075-79 (Elongation Characteristics of Laser Cut Prolene Mesh for TVT); ETH.MESH.06696367-79 (Performance Evaluation of TVT U Prolene Mesh).

[30] ETH.MESH.02211911.

[31] Ogah J, Cody DJ, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women: a short version Cochrane review. Neurourol Urodyn. 2011 Mar;30(3):284-91.

[32] Falconer C, et al. Influence of different sling materials on connective tissue metabolism in stress urinary incontinent women. Int Urogynecol J Pelvic Floor Dysfunct. 2001;12 Suppl 2:S19-23.

15

More than 100 randomized controlled trials have assessed the TVT and approximately 1,000 studies have addressed the TVT mesh.[33] Put simply, it is the most studied SUI device ever sold, and more data is available for the TVT device than for any other SUI treatment. Every major professional medical society that serves the needs of women with SUI has endorsed the TVT (as well as a few similar MUS) as being the standard of care for treatment of SUI.

The American Urogynecologic Society (AUGS) is the largest professional society representing the medical specialty of urogyencology.  The AUGS consists of more than 1,900 members.  The AUGS has adopted a position statement that full-length mid-urethral slings such as the TVT (both retropubic and transobturator) have been extensively studied, and are safe and effective relative to other treatment options.  The TVT remains the leading treatment option and current gold standard of care for stress incontinence surgery.  This most-highly-respected organization has determined the standard of care today is the TVT and similar mid-urethral slings. In other words, women with SUI that have failed non-surgical options are offered the TVT, unless there are significant patient factors prohibiting such.[34]

In January 2014, AUGS and the Society of Urogynamics, Female Pelvic Medicine & Urogenital Reconstruction (SUFU) issued their Position Statement on Mesh Midurethral Slings for Stress Urinary Incontinence.  The Board of Directors of each organization approved the position statement.  In their position statement, the organizations noted that "[t]he polypropylene mesh midurethral sling is the recognized worldwide standard of care for the surgical treatment of stress urinary incontinence.  The procedure is safe, effective, and has improved the quality of life for millions of women."[35]  In 2016, AUGS and SUFU published an updated Position Statement on Mesh Midurethral Slings for Stress Urinary Incontinence, which was developed by a joint task force between the two organizations.  Like the 2014 AUGS/SUFU statement, the 2016 statement supports the use of mesh midurethral slings, noting that polypropylene material is safe and effective, and the monofilament polypropylene mesh midurethral sling is "the most extensively studied anti-incontinence procedure in history."[36]  Several organizations signed on to the 2016 updated position statement as Supporting Organizations—namely, the American Association of Gynecological Laparoscopists (AAGL), The American College of Obstetricians and Gynecologists (ACOG), The National Association for Continence, The Society of Gynecologic Surgeons (SGS), and Women's Health

---

[33] A Systematic review of patient-years of experience in prospective randomized controlled trials (RCTS) in incontinence, ETH.MESH 07246690-719; CER TVT Family of Products, ETH.MESH.10178882-10179216.

[34] Position Statement on Restriction of Surgical Options for Pelvic Floor Disorders, American Urogynecologic Society, 2013.

[35] AUGS & SUFU Position Statement on Mesh Midurethral Slings for SUI, 2014 Jan.

[36] AUGS & SUFU Position Statement, Mesh Midurethral Slings for Stress Urinary Incontinence 2016 Jun.

Foundation (WHF)—following those Supporting Organizations conducting their own thorough review of the statement.[37]

In November 2015, ACOG and AUGS released a practice bulletin containing clinical management guidelines of obstetricians and gynecologists on the subject of urinary incontinence in women.  The bulletin noted that synthetic mid-urethral slings have similar efficacy to traditional sub-urethral fascial slings, open colposuspension, and laparoscopic colposuspension, but fewer adverse events occur with synthetic mesh mid-urethral slings than with fascial sub-urethral slings.  The bulletin also notes that "[v]oiding dysfunction is more common with open colposuspension than with synthetic midurethral slings."  As a result, "midurethral synthetic mesh slings have become the primary surgical treatment for stress urinary incontinence in women."[38]

The American Urological Association (AUA) is the largest professional organization for urologists.  The AUA has also provided a position statement on the use of transvaginal mesh for the surgical treatment of SUI.  "*Suburethral synthetic polypropylene mesh sling placement is the most common surgery currently performed for SUI.  Extensive data exist to support the use of synthetic polypropylene mesh suburethral slings for the treatment of female SUI, with minimal morbidity compared with alternative surgeries.*"[39] The AUA believes the data uniformly and overwhelmingly supports the use of mid-urethral slings (TVT) for the treatment of SUI, and as a result, it is the most commonly used procedure.  As a long-term AUA member, I fully agree with and endorse this position statement, which echoes my own medical opinion.

The National Institute of Health and Care Excellence (NICE) in the United Kingdom has published 2013 guidelines for The Management of Urinary Incontinence in Women.  NICE states that "When offering a synthetic mid-urethral tape procedure, physicians are only to use procedures and devices for which there is current high quality evidence on efficacy and safety."  NICE then defines five procedures as meeting this standard, including TVT.  NICE further states that devices for SUI should use Type 1 macroporous polypropylene tape.  Type 1 mesh, as defined by the Amid classification, includes TVT mesh.

It is interesting that plaintiffs' experts would contradict the NICE statement and claim that Prolene mesh in TVT is not Type 1, and therefore inappropriate for SUI surgery.  These opinions are clearly contrary to the current medical literature and accepted medical practice. TVT mesh is macroporous (Amid, >75 microns).  TVT mesh has a pore size of more than 1,300 microns, and is among the largest-pore-size SUI mesh.

---

[37] Hale DS, Organizations Lend their Support to Mid-urethral Slings, Jun 23, 2016, AUGS Blog (available at http://www.augs.org/p/bl/et/blogaid=257).
[38] ACOG & AUGS Practice Bulletin No. 155, Urinary Incontinence in Women, Nov. 2015.
[39] AUA Position Statement on the Use of Vaginal Mesh for the Surgical Treatment of Stress Urinary Incontinence, 2011.

TVT mesh is also lightweight (100 g/m$^2$) for SUI application.  The mesh is only 1.1 cm wide.  It has the greatest elasticity when compared to similar products.  The TVT mesh's pore size is 18 times larger than the pore size required to be considered macroporous mesh.  Most reasonable surgeons would agree that TVT is the prototypical lightweight Type 1 mesh in the SUI application that has been copied by multiple manufacturers around the world.

Plaintiffs' experts have made unsubstantiated claims that Dr. Ulmsten's data may be tainted with bias, and that his long-term data cannot be relied upon.  However, Dr. Ulmsten's data has been widely accepted by the medical community of physicians who treat SUI.  Dr. Ulmsten's early studies in 1998 were assessing not only his center, but also five other centers.  If Dr. Ulmsten was getting good results but the others were not, statistically you could not have an overall 90% success rate with no mesh rejection or serious complications.  Unfortunately, Dr. Ulmsten is unable to defend himself, as he is deceased.  The opinions of plaintiffs' experts are contrary to the opinions expressed by multiple major medical professional societies and the peer reviewers of numerous publications.   Nonetheless, the findings of his studies have been replicated time and time again by other surgeons and centers and these results have been published in virtually every medical journal concerning urinary incontinence.  The efficacy and safety of the TVT has also been assessed and acknowledged by numerous Cochrane Reviews by Ford, Ogah, and Lapitan, the AUA in its SUI Guidelines, the SGS in its systematic review and recommendations, and the EUA in its SUI Guidelines.

Dr. Ulmsten's 17-year data was recently published by Dr. Nilsson.[40]  The study showed that there was a 91.3% objective cure rate, no clinically significant contracture, no tape rejection and one mesh exposure, which was asymptomatic and due to vaginal atrophy in the elderly patient who was satisfied.  This study demonstrated the TVT is safe and effective after 17 years.

In 2010, Dr. Olsson, et al., also published the clinical results of 11.5 years of follow-up with the TVT procedure.  In this study, 147 women were assessed.  The objective cure rate was 84%, with 95% of patients being subjectively cured or improved.  Of note, bladder perforations were 2.7%, urethral injury 1.4%, and urinary infection was 7.2%.  There was one healing defect at two months post-op and no late tape rejection.  At follow-up, none of the patients had voiding difficulties.  The authors' conclusion was that the procedure was safe and effective after more than 10 years.[41]

Dr. Serati, et al., published another long-term study on TVT in 2012. This group studied patients for 10 years, and the first sentence of his report says it all—the TVT is

---

[40] Nilsson CJ, Seventeen years' follow-up of the tension-free vaginal tape procedure for female stress urinary incontinence. Int Urogynecol J, 2013.
[41] Olsson I, et al., Long-term efficacy of the tension-free vaginal tape procedure for the treatment of urinary incontinence. Int Urogynecol J 2010;21:679-683.

one of the most effective surgical treatments for SUI.  The 10-year subjective, objective, and urodynamic cure rates were 89.7%, 93.1%, and 91.4% respectively.  Ten years after surgery, no significant deterioration of either subjective or objective outcomes was observed.  As it related to complications, bladder perforations occurred in 3.8% of the cases.  In both situations, the bladder lesion was identified during the operation, and the tape was promptly removed and replaced.  No severe bleeding or other intraoperative complications occurred.  No postoperative complications requiring surgical intervention occurred.  Voiding difficulties were reported in two patients. No patient required tape release or resection during the 10-year follow-up.  No significant POP, vaginal, bladder, or urethral erosion, or de novo dyspareunia were noted in the remaining 58 patients.[42] TVT consistently shows in many long-term trials that it is safe and effective, and is the standard of care for SUI.[43]

SUI, as stated above, affects patients' sexual dysfunction. Sutherst and Brown found that 43% of patients felt their urinary disorder adversely affected sexual relations.[44] TVT has demonstrated good results as it relates to sexual function after TVT is implanted.[45]  In the Shah study, there was no negative effect on sexual function with the

---

[42] Serati M, Tension-free Vaginal Tape for the Treatment of Urodynamic Stress Incontinence: Efficacy and Adverse Effects at 10-Year Follow-Up. Eur Urol 2012;61:939-946.

[43] Laurikainen E, et al., Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence. Eur Urol. 2014 Jun;65(6):1109-14; Svenningsen R, et al., Long-term follow-up of the retropubic tension-free vaginal tape procedure. Int Urogynecol J 2013 Aug;24(8):1271-8; Heinonen P, et al., Tension-free vaginal tape procedure without preoperative urodynamic examination: long-term outcome. Int J Urol 2012 Nov;19(11):1003-9; Aigmueller T, et al., Ten-year follow-up after the tension-free vaginal tape procedure. Am J Obstet Gynecol 2011 Nov;205(5):496.e1-5; Bjelic-Radisic V, Patient related outcomes and Urinary Continence Five Years after the Tension-Free Vaginal Tape Operation. Neurourology and Urodynamics 2011;30:1512-1517; Wu J, Surgical therapies of female stress urinary incontinence: experience in 228 cases. Int Urogynecol J 2010;21:645-649; Hil Song P, The 7-year outcome of the tension-free vaginal tape procedure for treating female stress urinary incontinence. 2009 BJU Int, 104, 1113-1117; Christian J, et al., Long-term outcomes of TVT and IVS operations for treatment of female stress urinary incontinence: monofilament vs. multifilament polypropylene tape. Int Urogynecol J 2009;20:703-709; Celebi I, Results of the tension-free vaginal tape procedure for treatment of female stress urinary incontinence: a 5 year follow-up, Arch Gynecol Obstet 2009;279:463-467; Liapis A, Long-term efficacy of tension-free vaginal tape in the management of stress urinary incontinence in women: efficacy at 5 and 7 year follow-up. Int Urogynecol J 2008;19:1509-1512; Jelovsek JE, et al, Randomized trial of laparoscopic Burch colpususpension versus tension-free vaginal tape: long-term follow up. BJOG 2008;115:219-225; McCracken GR, Five Year Follow-up Comparing Tension-Free Vaginal Tape and Colposuspension. Ulster Med J 2007;76 (3) 146-149; Chene G, Long-term results of tension-free vaginal tape (TVT) for the treatment of female urinary stress incontinence. European Journal of Obstetrics and Gynecology and Reproductive Biology, 2007;134:87-94; Kuuva N, et al., Long-term results of the tension-free vaginal tape operation in an unselected group of 129 stress incontinent women. Acta Obstetricia et Gynecologica 2006;85:482-487.

[44] Sutherst J, Sexual dysfunction associated with Urinary Incontinence. Urol Int 1980; 35:414-416.

[45] Jha S, Impact of Incontinence Surgery on Sexual Function: A Systematic Review and Meta-Analysis. J Sex Med 2012;9:34-43.

TVT.[46]  In another study, only 3.8% reported intercourse to be worse after TVT.  In Maaita, when sexual function was again assessed, there was no dyspareunia and the conclusion was that "patients can be reassured that this operation [TVT] will not affect their sex life."[47]  In a prospective study of women undergoing TVT surgery, which was published in 2016, Inger Lindquist and colleagues found that, post-operatively, women experienced less negative emotional reactions during intercourse, less coital incontinence, and less fear of being incontinent during intercourse.[48]  In my practice, it is uncommon for the TVT to adversely affect a patient's sexual function, and very rare to have pain with intercourse as related to the TVT.  Traditional procedures such as the Burch can also adversely affect sexual function. In a study, by Zimmern and Lemack after the Burch was used, 20% of patients reported intercourse to be worse.[49]

TVT has further shown good results in obese patients.  Most studies have shown there is no significant difference in success rates depending on BMI index.[50]  TVT has also shown very good results in women with pure ISD.[51]

Advantages of TVT include shorter operative time, lower anesthetic requirement, reduced peri-operative morbidity, reduced surgical pain, reduced hospitalization, reduced convalescence, and reduced voiding dysfunction. Mesh-related complications can occur

---

[46] Shah SM, et al., Impact of Vaginal Surgery for Stress Urinary Incontinence on Female Sexual Function: Is the Use of Polypropylene Mesh Detrimental, Urology 2005.

[47] Maaita M, et al., Sexual function after using tension-free vaginal tape for the surgical treatment of genuine stress incontinence. BJU Intl 2002;90, 540-543.

[48] Inger Lindquist AS and Glavind K, Long-term follow-up of sexual function in women before and after tension-free vaginal tape operation for stress urinary incontinence. Int Urogynecol J 2016 Oct;27(10):1571-6.

[49] Lemack, et al., Sexual function after vaginal surgery for stress incontinence: results of a mailed questionnaire. Urol 56:223-227, 2000.

[50] Greer WJ, Obesity and Pelvic Floor Disorders: A Review of Literature, Obstet Gynecol, 2008 August, 112 (2 Pt 1): 341-349; Osborn DJ, Obesity and Female Stress Urinary Incontinence, Urology 2013;82:759-763, 2013; Revicky V, et al., Obesity and the Incidence of Bladder Injury and Urinary Retention Following Tension-Free Vaginal Tape Procedure: Retrospective Cohort Study, Obstet and Gynecol Int 2011.

[51] Ghezzi F, Tension-free vaginal tape for the treatment of urodynamic stress incontinence with intrinsic sphincteric deficiency, Int. Urogynecol J 2006;17:335-339; Rezapour M, Tension-Free Vaginal Tape (TVT) in Stress Incontinent Women with Intrinsic Sphincter Deficiency (ISD)-A Long Term Follow-up, Int. Urogynecol J 2001;(Suppl 2):S12-S14; Bai S, Treatment outcome of tension-free vaginal tape in stress urinary incontinence: comparison of intrinsic sphincter deficiency and nonintrinsic sphincter deficiency patients, Int. Urogynecol J 2007;18:1431-1434; Choo G, et al., Long-term Outcomes of Tension-free Vaginal Tape Procedure for Treatment of Female Stress Urinary Incontinence with Intrinsic Sphincter Deficiency, Int Neurourol J 2012;16:47-50; De Souza A, Sexual function following retropubic TVT and transobturator Monarc sling in women with intrinsic sphincter deficiency: a multicenter prospective study, Int Urogynecol J 2012;23:153-158.

following polypropylene sling placement, but the rate of these complications is acceptably low.[52]

Furthermore, it is important to recognize that many sling-related complications are not unique to mesh surgeries, but are known to occur with non-mesh sling procedures as well. It is the AUA's opinion that any restriction of the use of synthetic polypropylene mesh suburethral slings would be a disservice to women who choose surgical correction of SUI: "Multiple case series and randomized controlled trials attest to the efficacy of synthetic polypropylene mesh slings at 5-10 years. This efficacy is equivalent or superior to other surgical techniques. There is no significant increase in adverse events observed over this period of follow-up."[53]  Based on this data, the AUA Guideline for the Surgical Management of Stress Urinary Incontinence (2009) concluded that synthetic slings are an appropriate treatment choice for women with stress incontinence, with similar efficacy but less morbidity than conventional non-mesh sling techniques.  This is consistent with my medical opinion and experience, and with the medical literature.  This systematic review and meta-analysis also found lower rates of pain and sexual dysfunction with the miduretheral sling as compared to the Burch and autologous sling without bone anchors. The SGS systematic review and meta-analysis also found lower rates of dyspareunia with the retropubic TVT compared to the Burch and pubovaginal sling.[54]

The SGS's 2014 systematic review and metaanalysis found that retropubic midurethral slings had more favorable objective and subjective cure rates than transobturator midurethral slings, but not significantly so.[55]  A 2015 systematic review and metaanalysis, on the other hand, found similar objective cure rates between retropubic and transobturator midurethral slings, but higher subjective cure rates in retropubic slings.[56]  A long-term study published in 2014 comparing retropubic and transobturator slings found comparable objective and subjective cure rates between the two devices with low complication rates.[57]

In summary, 17 years ago when surgery was recommended for patients who had bothersome stress urinary incontinence (SUI), they were offered operations such as suburethral (Kelly) plication, needle urethropexy, open or laparoscopic Burch procedure,

---

[52] Aigmueller T, et al., Reasons for dissatisfaction ten years after TVT procedure. Int Urogynecol J 2014;25:213-217.

[53] AUA Position Statement on the Use of Vaginal Mesh for the Surgical Treatment of Stress Urinary Incontinence, 2011.

[54] Schimpf MO, et al., Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol 2014;210:1.e1-1.e27.

[55] Schimpf MO, et al., Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol 2014;210:1.e1-1.e27.

[56] Tommaselli GA, et al., Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis. Int Urogynecol J 2015.

[57] Laurikainen E, Five-year Results of a Randomized Trial Comparing Retropubic and Transobturator Midurethral Slings for Stress Incontinence. Eur Urol 2014;

and pubovaginal fascial sling procedure. Today, the overwhelming majority of operations for SUI have been replaced in general practice by retropubic or transobturator midurethral synthetic slings, which includes the TVT and TVT-O. It has been reported that there have been more than 3 million mesh slings sold since the mid-1990s. The TVT mid-urethral slings have been studied more than any other incontinence surgery and are safe and effective.[58] The Burch and the PVS are more invasive and have greater peri-operative morbidity than midurethral slings. They cause more voiding dysfunction and have significantly greater convalescence, making them less attractive for most primary cases of SUI. These procedures are generally reserved for patients with risk factors for mesh implantation and those that have failed TVT. In fact, many of the traditional procedures for SUI such as the Burch colposuspension and the pubovaginal sling procedure are rarely performed and few Urologists, Gynecologists, or Urogynecologists are proficient at these procedures.[59]

## B.    Benefits of TVT

Stress urinary incontinence is a symptom of urine loss due to events that result in increased abdominal pressure such as sneezing, coughing, physical exercise, lifting, bending, or even changing positions. Approximately 50% of all women experience SUI and seek treatment. Surgery to treat SUI is discussed in women who have failed non-operative measures. The AUA defines the index patient with SUI as an otherwise healthy woman who has elected surgical therapy for the correction of SUI. Placement of sub-urethral synthetic polypropylene mesh slings such as the TVT is the most common surgery performed for SUI.[60]

Extensive data exist to support the use of synthetic polypropylene mesh sub-urethral slings for the treatment of female SUI, with minimal morbidity compared with alternative surgeries such as Burch, MMK, or PVS. Advantages include shorter operative time/anesthetic need, reduced surgical pain, reduced hospitalization, and reduced voiding dysfunction, higher long-term success rates, and low complications. Mesh-related complications can occur following polypropylene sling placement, but the rate of these complications is acceptably low in the index patient and the rate of reoperation for

---

[58] Schimpf MO, et al., Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol 2014;210:1.e1-1.e27; Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3.

[59] Walters MD, Which Sling for which SUI patient?, OBG Management, Vol. 24 No. 5, May 2012; Clemons JL, et al., Impact of the 2011 FDA transvaginal mesh safety update on AUGS members' use of synthetic mesh and biologic grafts in pelvic reconstructive surgery. Female Pelvic Med Reconstr Surg 2013 Jul-Aug;19(4):191-8. doi: 10.1097/SPV.0b013e31829099c1; Chughtai BI, et al., Midurethral sling is the dominant procedure for female stress urinary incontinence: analysis of case logs from certifying American Urologists. Urol 2013 Dec;82(6):1267-71.

[60] Kammerer-Doak D, Svabik K, and Bazi T, Variability in practice patterns in stress urinary incontinence and pelvic organ prolapse: results of an IUGA survey. Int Urogynecol J. 2016 Oct 17. DOI 10.1007/s00192-016-3174-6.

voiding dysfunction and exposure has been consistently reported to be around 2-5% out to a decade or more in the various studies, metaanalyses, and database reviews.[61] Surgery due to pain is less than 1% per these data.[62]   Additionally, it is important to note that most sling-related complications such as urinary retention, UTI and pelvic pain are not unique to transvaginal mesh, and can occur with non-mesh sling procedures as well.

In 2015, a Cochrane review of midurethral sling (MUS) operations for SUI in women was published.  The review noted that the MUS, a word that is often used interchangeably with TVT, is the most extensively researched surgical treatment for stress urinary incontinence (SUI) in women and has a good safety profile.  Irrespective of the routes traversed, they are highly effective in the short and medium term, and accruing evidence demonstrates their effectiveness in the long term.  Midurethral slings have a positive impact on improving the quality of life of women with SUI.  When comparing retropubic techniques, the bottom-to-top route was more effective than top-to-bottom route.[63]

A 2013 article in *Nature* stated that "[t]he traditional gold standards of Burch retropubic colposuspension and pubovaginal slings are still appropriate treatment options for some patients, but randomized controlled trials have demonstrated that synthetic midurethral slings are just as effective as these traditional procedures but with less associated morbidity.[64]   Thus, midurethral slings—inserted via a retropubic or transobturator approach—have become the new gold standard first-line surgical treatment

---

[61] Welk B, et al., Removal or Revision of Vaginal Mesh Used for the Treatment of Stress Urinary Incontinence. JAMA Surg 2015; Dec;150(12):1167-75; Unger CA, et al., Indications and risk factors for midurethral sling revision. Int Urogynecol J. 2016 Jan;27(1):117-22; Schimpf MO, et al., Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol 2014;210:1.e1-1.e27; Laurikainen E, et al., Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence. Eur Urol. 2014 Jun;65(6):1109-14; ; Jonsson Funk M, et al., Sling revision/removal for mesh erosion and urinary retention: long-term risk and predictors. Am J Obstet Gynecol. 2013 Jan;208(1):73.e1-7; Svenningsen R, et al., Long-term follow-up of the retropubic tension-free vaginal tape procedure. Int Urogynecol J 2013 Aug;24(8):1271-8; Nguyen JN, et al., Perioperative Complications and Reoperations After Incontinence and Prolapse Surgeries Using Prosthetic Implants, Obstet & Gynecol 2012 Mar;119(3):539-46; Ogah, J., Cody, JD, Rogerson, L., Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2009, Issue 4. Art. No.: CD006375. DOI:10.1002/14651848.CD006375.pub2; Novara G, et al., Complication Rates of Tension-Free Midurethral Slings in the Treatment of Female Stress Urinary Incontinence: A Systematic Review and Meta-Analysis of Randomized Controlled Trials Comparing Tension-Free Midurethral Tapes to Other Surgical Procedures and Different Devices. Eur Urol 2008;53:288-309.

[62] Unger CA, et al., Indications and risk factors for midurethral sling revision. Int Urogynecol J. 2016 Jan;27(1):117-22.

[63] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3.

[64] Cox A, Herschorn S, Lee L, Surgical management of female SUI: is there a gold standard? Nature 2013;10:78-89.

for women with uncomplicated SUI.  Pubovaginal slings remain an effective option for women with SUI who have failed other procedures, have had mesh complications, or who require concomitant urethral surgery. . . .  Based on the literature a new gold standard first-line surgical treatment for women with SUI is the synthetic midurethral sling inserted through a retropubic or transobturator approach."[65]

Based on this data, the AUA Guideline for the Surgical Management of Stress Urinary Incontinence (2009) concluded that synthetic slings are an appropriate treatment choice for women with stress incontinence, with similar efficacy but less morbidity than conventional non-mesh sling techniques.[66]  The 2012 Update reconfirms these results and shows that TVT has lower adverse events like pain and sexual dysfunction, less voiding dysfunction, similar bladder injury as Burch, and is less invasive, with decreased morbidity and limitations.

The Ethicon TVT mesh has favorable biomechanical properties.  I have used both mechanically-cut and laser-cut mesh, and in my opinion, both products are safe and effective.  I feel comfortable implanting the TVT mesh, as it has over 17 years of data to support its use in women with SUI. This efficacy is equivalent or superior to other surgical techniques.

There is no clinically significant difference in laser-cut versus mechanically cut mesh.  Data shows they perform the same.  The data from 1998 to 2006 (before laser-cut mesh was available) is consistent with the data from 2006 to the present (when laser-cut mesh was available), showing similar efficacy and safety in hundreds of studies, RCTs, and reviews.  The data show no difference in exposures over time.  Clinically they are the same.  In the physiologic range, there is similar and equivalent distensibility. The available medical literature does not show any distinction between mechanically cut mesh and laser-cut mesh.  Contrary to the testimony by plaintiffs' experts, there was no statistically significant difference in exposure rates.  In the Hinoul 2011 study, it was noted that post-op pain and recovery were quicker with the laser-cut TVT Secur.  In a single-center randomized clinical trial, after a 3-year minimum follow-up, the TVT-Abbrevo (laser-cut mesh) procedure with a shorter tape and reduced dissection was found to be as safe and efficient as the TVT-Obturator procedure (mechanical-cut mesh) for treating female SUI, with less severe and frequent groin pain in the immediate postoperative period.[67]  Similarly, Tommaselli showed that both TVT-Abbrevo and TVT-

[65] Cox A, Herschorn S, Lee L, Surgical management of female SUI: is there a gold standard? Nature 2013;10:78-89.
[66] Dmochowski RR, Update of AUA Guideline on the Surgical Management of Female Stress Urinary Incontinence. Urology 2010;183:1906-1914.
[67] Waltregny D and de Leval J, New Surgical Technique for Treatment of Stress Urinary Incontinence TVT-Abbrevo: From Development to Clinical Experience. Gynecology – Surgical Technology International XXII 2012:1-9.

Obturator are effective and safe for the surgical management of SUI.[68]  TVT-Abbrevo is associated with less post-operative pain.  Other data do not show a difference in exposure rates.

The TVT device is truly a transformational device in SUI surgery for two reasons:

(1)     The location of the sling at the mid-urethra rather than the bladder neck. Sling location at the mid-urethra has allowed a more straightforward dissection and less urethral obstruction;

(2)     Placement of the sling in a "tension-free" manner (that is, not using any sutures or bone-anchor to set the sling in a fixed location). The sling is placed loosely, without elevation of the urethra. This device was designed to allow a procedure that could be replicated by a wide variety of surgeons throughout the world. Dr. Ulmsten's concept of a loosely applied sling at the mid-urethra resulted in less urethral obstruction without compromising efficacy.  It is also revolutionary in that it is an effective SUI treatment out to long term, while minimally invasive compared to Burch and pubovaginal slings.

I have been using both the TVT-Obturator since 2004 and the TVT retropubic kits since 2001.  I have performed more than 500 TVT procedures.  I have an approximate 85-90% success rate and less than a 2% complication rate.  These complications include an approximate 0.5% perforation rate to the bladder or urethra and an approximate 1.5% incidence of mesh exposure. In patients with mesh exposure, some may be treated with estrogen creams.  Others may need a partial mesh excision to resolve the mesh-related complication.[69]

I am aware of the Public Health Notifications in regards to transvaginal mesh. These notifications initially included prolapse mesh and mesh slings.  The second notification, however, excluded meshes for SUI, which was the correct decision.  The FDA in 2013 published the update on SUI slings and found that multi-incision slings such as the TVT are safe and effective, as had been done in 2011 by the FDA Advisory Panel.  Further, despite legal issues pertaining to transvaginal mesh, the TVT procedure remains an integral component of my practice as well as the practices of most pelvic surgeons.  I feel confident recommending this product to women in my practice, or to a friend or a family member.  I have personally performed the TVT procedure on women from 18 to 88 years of age.  I have personally witnessed the dramatic return of my patients to active lifestyles, with significant improvement in their quality of life.

---

[68] Tommaselli GA, et al., Comparison of TVT-O and TVT-Abbrevo for the Surgical Management of Female Stress Urinary Incontinence: a 12-Months Preliminary Study. Intl J of Gynecol & Obstet 2012 (Abs. 0692).
[69] Shah K, et al., Surgical management of lower urinary mesh perforation after mid-urethral polypropylene mesh sling: mesh excision, urinary tract reconstruction and concomitant pubovaginal slings with autologous rectus fascia. Int Urogynecol J 2013.

Because I practice in a tertiary care center and I am a national expert in SUI surgery, I see a disproportionate number of women with complex SUI (failed surgery, neurogenic dysfunction, fistula) that may not be appropriate for the TVT.  I use biological graft material in 50% of cases.  This case distribution would be different if I worked in a community practice.  For example, 99% of the 507 AUGS members (which amounted to 53% of the AUGS members overall) who responded to a survey regarding mesh use before and after the 2011 FDA safety update used synthetic mesh slings before the FDA statement's publication.  After the FDA statement, respondents reported an overall decrease in the percent of mesh used in POP cases, but no change in synthetic mesh sling use.[70]  Physicians who treat SUI should be well-versed in a wide variety of treatments for SUI, and should individualize the treatment based on what is best for that particular patient.

I agree with the AUA that patients should be counseled regarding the surgical and nonsurgical options, including benefits and risks.  Choice of the procedure should be a collaborative decision between the surgeon and patient, and should consider patient preferences as well as surgeon experience and judgment.  The decision to use mesh should be based on the judgment of the surgeon and made in the best interests of the patient.  After a thorough discussion with the index patient with SUI, I enthusiastically recommend the TVT to most of the patients in my practice with SUI that failed non-operative measures.  I make this recommendation based on the high success rate demonstrated in more than a thousand studies in the peer-reviewed literature.  Even though the Burch and pubovaginal sling have been around for decades more than the TVT, the data on them is more limited and lacking, as noted in the first systematic review performed back in 1996 by Black and Downs, who concluded that the data were very poor to the effect that recommendations as to the best clinical practice could not be based on scientific evidence.[71]  Luckily, we have come a long way, as the TVT is revolutionary also in its breadth, type, and duration of study.  The TVT is minimally invasive, can be performed as an outpatient procedure with minimal anesthetic requirements, and has minimal convalescence.  There is always a chance of a delayed complication, especially in patients with adverse characteristics for transvaginal mesh surgery.

Intraoperative cystourethroscopy and a thorough physical examination should be performed in all patients undergoing sling surgery.  This should be performed in the operating room at the time of mesh insertion to assure that the mesh was placed properly and did not injure the urinary tract or vaginal wall.  I share the AUA's opinion that "any restriction of the use of synthetic polypropylene mesh suburethral slings would be a disservice to women who choose surgical correction of SUI."

---

[70] Clemons JL, et al., Impact of the 2011 FDA Transvaginal Mesh Safety Update on AUGS Members' Use of Synthetic Mesh and Biologic Grafts in Pelvic Reconstructive Surgery. Female Pelvic Med & Reconstr Surg 2013 Jul/Aug;19(4):191–198.
[71] Black NA, Downs SH. The effectiveness of surgery for stress incontinence in women: a systematic review. Br J Urol 1996 Oct;78(4):497-510.

### C.    Mesh Characteristics and Response to Claims that There Are Better Alternatives

Plaintiffs' experts have attempted to come up with a classification system suggesting that one needs pore sizes of over 1,000 microns in all directions for tissue incorporation.  It must be noted that this position is not held by AUGS, AUA, SUFU, ICS, IUGA, SGS, or NICE, or any other major medical society in this field.  This is because this belief is solely a theory with no clinical support.

First, it is widely accepted that a Type 1 macroporous mesh is the appropriate mesh for SUI repair.  This was specifically stated by NICE and the clinical data in women show that the TVT device has the optimal mesh characteristics.  The Amid mesh classification published in 1997 defined the classification system as a Type 1 macroporus mesh.[72]  A polypropylene mesh that is over 75 microns is a Type 1 macroporous mesh.  Amid further did not assess simply infection, but also tissue integration to determine the appropriate pore size.  Additionally, any notion that this classification was based upon the meshes available at the time and that a different classification should apply based upon the body's response to meshes again has no clinical support.  The human body reacted to mesh the same way in the late 1990s as it does today.

In short, the TVT mesh is a Type 1 macropous mesh.  Type 1 meshes have been the standard mesh used in SUI repair for the last 15 years.  The pore size of the TVT mesh is approximately 1,379 microns.  One can see through the mesh in clinical application, and the pores are clearly large enough for tissue ingrowth, as the clinical data shows long-term efficacy.[73]  I have seen this in my practice, the literature supports it, and if it were not the case, you would not see the substantial number of published articles showing that the TVT is the gold standard for SUI repair.

Furthermore, if a mesh implant does not incorporate, it may encapsulate and behave similar to a silicone or Gore-Tex implant.  These implants are easily removed, as there is a capsule surrounding the material, as it never integrates into the native tissue.  Encapsulation does not occur following implantation of the TVT; rather, I note it to be consistently incorporated on revision cases that I have performed.

Based on short-term animal studies, some plaintiffs' experts have claimed that PVDF is a possible alternative to polypropylene.  No professional associations have endorsed PVDF as an alternative to polypropylene.  Further, there are no mid-term or long-term studies on PVDF used in the pelvic floor for the treatment of urinary incontinence.  I am not aware of any hospitals in the United States using this material, and until there is clinical evidence to support its use, it would be irresponsible for

---

[72] P.K. Amid, Classification of biomaterials and their related complications in abdominal wall hernia surgery, Hernia 1997;1:15-21.

[73] Pamela A. Moalli, et al., Tensile properties of five commonly used mid-urethral slings relative to the TVT, Int. Urogynecol J 2008;19:655–663.

physicians to change to a completely different material. Others have also suggested the move to Ultrapro mesh for SUI. There are currently no manufacturers using a lighter-weight mesh with significantly larger pores for the treatment of SUI, and there is no short-term, medium-term, or long-term studies to support the use of Ultrapro mesh use over Prolene mesh for TVT. The single paper by Okulu cited by plaintiffs' experts as purportedly demonstrating the feasibility of the use of Ultrapro mesh in the SUI context does not even compare Ultrapro to TVT mesh. It does not look at any mid-urethral sling kit, and seems to be a modification of the earlier vaginal patch sling procedures that are no longer clinically relevant. The technique bears no resemblance to the TVT sling. The dissection involves a larger, inverted A incision, the mesh is transfixed to a vaginal island of tissue, passed using Prolene sutures that are then tied together over the rectus fascia. This is not a "tension-free" design. The mesh is hand-cut to varying sizes, and there is no sheath protecting the mesh. The sheath is a very important component to the TVT. Ultrapro is not compatable with a sheath, as it sticks and loses integretity during sheath removal. In this study, it is not directly stated that the mesh is even placed mid-urethrally. The extrusion rates are likely related to the type of incision and fixation of the mesh to the vaginal wall, neither of which are pertinent to TVT. It is my opinion that this study is irrelevant to the context of the TVT. Moreover, it pales in comparison to the volume and length of study of TVT. The urethra must have sufficient support, which is provided by the Prolene mesh. No other mesh with significantly different bio-material characteristics has been shown to have such good success rates and low complications for SUI treatment.

### D.    Infection After TVT

Ethicon further warns of the possibility of infections. Infections occur as often with native tissue repairs as they do with the TVT mesh. Further, because the TVT mesh has large pores and is made from polypropylene mesh, if an infection occurs, it can be treated most of the time without removal of the mesh, because the mesh does not potentiate infection and has pores large enough for the body to clean out the infection. Ethicon warns that in some cases of persistent infection, mesh removal may be necessary. Removal of foreign bodies because of SUI surgery is not isolated to the TVT or mid-urethral slings in general. It can occur when surgeons place non-absorbable sutures, as even sutures can become contaminated. Again, infection is not uncommon following incontinence surgery and is not necessarily a result of the mesh but of the patient's wound healing characteristics.

Implantation of synthetic mesh mid-urethral slings transvaginally in a clean-contaminated space does not pose a higher risk of infection than any other trans-vaginal surgery. As Ford and colleagues noted in their 2015 Cochrane review, "Type 1 mesh has the highest biocompatibility with the least propsensity for infection. . . . Macroporous meshes (pore size in excess of 75 μm) easily allow macrophages, leukocytes, fibroblasts, blood vessels and collagen to transverse the pores: thus macroporous meshes promote

tissue host ingrowth with resultant biocompatibility and low risk of infection (Amid 1997)."[74]  If there was a biofilm being produced that produced chronic infections, erosions, and contraction, the published data would reflect increased rates of infections, erosions, chronic pain, and retention, but the published data does not reflect that.

In 2013 our group performed an analysis of explanted transvaginal meshes at presented this at the American Urological Association Meeting.[75]  Overall, 80% of the explanted meshes had a postitive culture with Enteococcus being the most common organism.  Contrary to what Dr. Rosenzweig states in his TVT-Secur report, this was not a peer-reviewed journal article; rather it was merely an abstract reporting a retrospective case series, which is one of the lowest levels of scientific evidence.  A complete manuscript was never published, as the scientific methods were not rigorous.  The study by Shah et al. does not speak to whether there were clincical signs of infection.  It is commonly accepted that coloninization of the mesh occurs following mesh exposure.  Morevover, the mesh may be contaminated during mesh removal, as more than 50% of the vaginal fields would be expected to have bacteria present despite aspetic technique, intra-operative antibiotics, and skin preparation.  In order to standardize the bacterial analysis, aerobic and anaerobic bacterial cultures need to be obtained immediately before and throughout the surgery to determine if the bacteria in the mesh were merely a reflection of the vaginal flora.[76]  For example in the Culligan study 52% (16/31) of the surgical fields were contaminated with bacteria.  Finally, Vollebregt reported that low-grade colonization occurs during surgery frequently.  However, if a causal relationship exists between colonization and exposure, we would expect much more problems of infection or erosion.[77]  Currently, the use of a type 1 monofilament macroporous (>75 μm) polypropylene mesh has the lowest infection and erosion rate in any kind of reconstructive surgery.[78]

## E.    Inflammation After TVT and Claim of Cytotoxicity

Plaintiffs' experts have suggested that there may be an inappropriate inflammatory response with the TVT mesh, which results in increased erosions and chronic pain.  This has not been the case in my practice, nor is there any literature from peer-reviewed urology, urogynecology, or gynecology journals that have demonstrated this to be the

---

[74] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3.

[75] Shah, K, Nikolavasky, D, and Flynn, BJ, Bacteriological analysis of explantedtransvaginal meshes. Poster presentation, Annual Meeting of the AUA, San Diego, CA, May 2013. Abstract ID: 13-5902.

[76] Culligan P, et al, Bacterial colony counts during vaginal surgery, Infect Dis Obstet Gynecol 2003;11(3):161–165.

[77] Vollebregt A, et al., Bacterial colonization of collagen-coated polypropylene vaginal mesh: are additional intraoperative sterility procedures useful? Int Urogynecol J 2009 Nov; 20(11):1345–1351.

[78] Birch C, The use of prosthetics in pelvic reconstructive surgery. Best Pract Res Clin Obstet Gynaecol 2005 Dec;19(6):979-91.

case. (See long-term studies referenced above, over 100 RCTs on the mesh do not demonstrate this. Professional statements do not support this.) In a study by Falconer, et al., the TVT was implanted and after two years a biopsy was performed. It revealed that there was practically no tissue reaction to the TVT mesh.[79] This is consistent with what I have observed in my clinical practice. Erosion rates with the TVT mesh range from 1-3%,[80] and the rate of chronic pain following implantation of mid-urethral slings like the TVT family of products are also low. If the TVT mesh produced an excessive foreign body reaction resulting in increased erosions and chronic pain, one would not see such low rates of erosion and chronic pain.

Chronic inflammation and chronic inflammatory cells can be seen in vaginal tissue in the absence of mesh or another foreign body. The presence of chronic inflammatory cells does not mean that those cells are active. They can be quiescent. Plaintiffs' experts' claims that the mesh is continuously subjected to peroxides and other substances produced by chronic inflammatory cells are not accurate. If their contention was true, we would not see the superior cure, efficacy, and tolerability rates that have been shown in the literature and my personal experience. There would be essentially death of the tissues around this theoretical peroxide-exposed area with tissue necrosis in all TVT patients. The same can be said for claims that the mesh in TVT is cytotoxic in women. There is no reliable scientific clinical data that shows that TVT is cytotoxic in women. Ethicon conducted a Cytotoxicity Risk Assessment for the TVT device and correctly concluded that the clinical data on the device shows that any in vitro tests suggesting that the polypropylene mesh may have cytotoxic potewntitial does not translate into any clinical significance or adverse patient outcomes.[81] The vast majority of patients have demonstrated efficacy with low complications. Mesh exposure occurs at a rate of approximately 1-3% in TVT patients as earlier noted in the Novara 2008 metaanalysis (1.1% vaginal erosion), Cochrane reviews such as Ogah 2011 (1.3% monofilament versus 6% multifilament) and Ford 2015 (2.1%), Tommaselli 2015 systematic review and meta-analysis of medium and long term complications (Fig. 6, 2.1%) and the 2014 SGS systematic review by Schimpf, et al. (1.4%). The long-term data do not show cytotoxicity, and their results are contrary to plaintiffs' experts' theories. If the mesh

[79] Falconer C, Influence of Different Sling Materials on Connective Tissue Metabolism in Stress Urinary Incontinent Women. Int Urogynecol J 2001;(Suppl 2):S19-S23.

[80] Ogah J, Cody DJ, Rogerson L. Minimally invasive synthetic suburethral sling operations for stress urinary incontinence in women: a short version Cochrane review. Neurourol Urodyn. 2011 Mar;30(3):284-91; Schimpf MO, et al., Sling surgery for stress urinary incontinence in women: a systematic review and metaanalysis. Am J Obstet Gynecol 2014;210:1.e1-1.e27; Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3; Walsh CA, TVT-Secur mini-sling for stress urinary incontinence: a review of outcomes at 12 months. BJUI 2011; 108: 652–657; Tommaselli GA, et al., Medium-term and long-term outcomes following placement of midurethral slings for stress urinary incontinence: a systematic review and metaanalysis. Int Urogynecol J 2015.

[81] ETH.MESH.00349228-37.

were cytotoxic, the tape would be rejected in all of the women and the tissue would die, becoming necrotic.  This is not relected in the medical literature.

In the actions section in the IFU, Ethicon informs physicians that the mesh elicits a minimal inflammatory reaction in tissues that is transient.  This is consistent with the FDA approval of the Prolene Suture labeling in 1969, which noted that "[m]inimum transitory reactions have been reported," the 1973 request by the FDA to add language to the Prolene suture IFU noting that "transitory local inflammatory reactions have been reported," and the 1988 FDA-approved labeling changes warning of a "minimal, transient acute inflammatory reaction" with the Prolene suture.[82]  From a physician's standpoint, I am concerned about a persistent acute inflammatory response that has a clinical effect on patients. The Ethicon IFU tells me that there will be an acute inflammatory response to insure the tissue integrates into the mesh, but that this acute inflammatory response is transient. On a microscopic level, there will be a minimal-to-mild chronic inflammatory response, but as this has no clinical effect on patients, it is not a concern for me or any other reasonable physician. This section properly tells physicians about the clinical implications of the inflammatory response. It also tells physicians that the tissue will incorporate into the mesh; therefore, if removal is necessary, it is explicit that you will have to cut around the tissue to explant the mesh. This tells an incontinence surgeon exactly what would be necessary to remove the mesh and the implications for the patient.

## F.    Claims of Contracture After TVT

TVT mesh does not curl, contract, or experience pore collapse when placed in vivo in accordance with the IFU.  The sheath protects against tissue trauma and helps the mesh slide through the tissue while keeping its shape.  The mesh itself does not contract. Scar tissue contracts in any pelvic surgery.  The design of the mesh allows incorporation of tissue and reduces the risk of infection.[83]  Surgeons are aware, as with any implantation of a foreign body, there are acute and chronic inflammatory cells.  The inflammation with TVT is minimal. Inflammation is a normal and necessary part of tissue in growth and wound healing.

Plaintiffs' experts have indicated that contracture may occur with transvaginal mesh, leading to side effects. If the TVT mesh had significant contracture, then you would expect to see uniformly the mesh contracting, chronically elevating the bladder and almost all patients with voiding dysfunction. The clinical literature again does not support these propositions. Clinically significant tissue contraction is a rare complication.

---

[82] 10/23/15 Declaration of Reynaldo Librojo.
[83] Ford AA, Rogerson L, Cody JD, Ogah J. Mid-urethral sling operations for stress urinary incontinence in women. Cochrane Database of Systematic Reviews 2015, Issue 7. Art. No.: CD006375. DOI: 10.1002/14651858.CD006375.pub3.

31

## G.     Claims of Degradation After TVT

Clinical evidence does not show that the TVT mesh degrades or that if it did it leads to a clinically significant effect.  Long-term clinical studies show lasting success, low to no late-term complications, and are inconsistent with the degradation theory. Studies like Clavé 2010[84] do not account for handling and alteration during processing prior to analysis.  Clavé 2010 is unreliable and fails to show degradation.  The sample analyzed in that study was less than 1/3 of the overall cohort (32 out of 100) and no selection criteria was described.  The authors also failed to discuss whether any damage to the mesh occurred during surgical explantation.  The SEMs showing surface cracking could be from biologic material and handling, as well as preservation. Moreover, the chemical analyses performed do not show degradation.  Likewise, the Costello study[85] sometimes relied upon by plaintiffs' experts was a case report, which is unreliable and concerned a Bard mesh.  Studies by de Tayrac and Ong have shown that the surface cracking seen on scanning electron microscope photos in their studies was not degraded polypropylene, but a cracked biofilm or protein coating.[86]  One must also remember that biologic materials in slings, as well as autologous and cadaveric fascia are known to degrade.[87]

Plaintiffs' experts indicate degradation may take place with the TVT, and that the IFU's statement indicating that Prolene is not "subject to degradation or weakening by the action of tissue enzymes" is false.  From a clinical standpoint, I have never seen the TVT mesh degrade or cause any clinical effect. I have not witnessed any gross evidence of mesh degradation on surgical revision cases. If somehow the mesh did microscopically degrade, there has been no clinical effect. Moreover, I have never read or seen a single peer-reviewed published article (or seen any cited by plaintiffs' experts) that showed any clinical effect of degradation.  Based on my clinical experience using the TVT mesh and the data regarding the TVT family of products, it is my opinion that the IFU statement indicating that the Prolene material the TVT family of products is composed of is "not subject to degradation or weakening by the action of tissue enzymes" is accurate.  Indeed, the FDA approved a labeling change to Prolene sutures indicating that Prolene is not "subject to degradation or weakening by the action of tissue enzymes."[88]

---

[84] Clavé A, et al., Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J 2010;21:261–270.

[85] Costello CR, et al., Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants From a Single Patient. Surgical Innovation 2007;14(3):168–176.

[86] De Tayrac R and Letouzey V, Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery. Int Urogynecol J 2011;22:775-80; Ong KL, White J, and Thames SF, The Myth: In Vivo Degradation of Polypropylene Meshes. Int Urogynecol J 2016;27(Suppl. 1):S19-S149.

[87] Woodruff A, et al., Histologic Comparison of Pubovaginal Sling Graft Materials: A Comparative Study. Urology 2008;72:85–89.

[88] 10/23/15 Declaration of Reynaldo Librojo.

### H.    Claims of Cancer After TVT

There is no reliable scientific information to support the claim that polypropylene can cause cancer or sarcoma.  I have not personally witnessed cancer from mesh in any patient that I have implanted with polypropylene in 15 years, and after more than 1,000 surgical implants.  My experience is consistent with the clinical literature.[89]  Moreover, the scientific data does not support plaintiffs' experts' contention that the TVT presents a risk of sarcomas or cancer.  There are no reports in the medical literature of tumors related to the implantation of surgical-grade polypropylene for midurethral slings, and there is no evidence suggesting any carcinogenicity in humans related to polypropylene despite hundreds of millions of individuals being implanted with the material in various forms for well-over a half century.[90]  The Prolene material that the TVT mesh is comprised of has been used for decades, and studies do not show a statistically significant risk.  There was no need for Ethicon to warn of this alleged risk in the TVT IFU.[91]

The rate of late complications and erosion with TVT device is very low, and the long-term data demonstrates that the TVT mesh has long-term biocompatibility.  Thus, plaintiffs' experts' contentions and theories regarding the weight and pore size of the mesh, the way it is cut, its purported tendency to degrade, cause inflammation, and be cytotoxic are not scientifically reliable and contrary to the clinical data.[92]

---

[89] King AB, et al. Is there an association between polypropylene midurethral slings and malignancy? Urology. 2014 Oct;84(4):789-92; King AB, Goldman HB. Current controversies regarding oncologic risk associated with polypropylene midurethral slings. Curr Urol Rep. 2014 Nov;15(11):453

[90] AUGS & SUFU, Frequently Asked Questions by Providers—Mid-urethral Slings for Stress Urinary Incontinence.  (available at http://www.augs.org/p/bl/et/blogaid=194); Dwyer PL and Riss P, Carcinogenicity of implanted synthetic grafts and devices. Int Urogynecol J 2014 May;25(5):567–568.

[91] Moalli P, et al., Polypropylene mesh: evidence for lack of carcinogenicity. Int Urogynecol J 2014, DOI 10.1007/s00192-014-2343-8; King A, et al, Current Controversies Regarding Oncologic Risk Associated with Polypropylene Midurethral Slings. Curr Urol Rep 2014;15:453; Sunoco MSDS; AUGS & SUFU, Frequently Asked Questions by Providers—Mid-urethral Slings for Stress Urinary Incontinence. (available at http://www.augs.org/p/bl/et/blogaid=194).

[92] Laurikainen E, et al., Five-year results of a randomized trial comparing retropubic and transobturator midurethral slings for stress incontinence. Eur Urol 2014 Jun;65(6):1109-14; Svenningsen R, et al., Long-term follow-up of the retropubic tension-free vaginal tape procedure. Int Urogynecol J 2013 Aug;24(8):1271-8; Heinonen P, et al., Tension-free vaginal tape procedure without preoperative urodynamic examination: long-term outcome. Int J Urol 2012 Nov;19(11):1003-9; Aigmueller T, et al., Ten-year follow-up after the tension-free vaginal tape procedure. Am J Obstet Gynecol. 2011 Nov;205(5):496.e1-5; Serati M, Tension-free Vaginal Tape for the Treatment of Urodynamic Stress Incontinence: Efficacy and Adverse Effects at 10-Year Follow-Up, European Urology 2012;61:939-946; Olsson I, et al., Long-term efficacy of the tension-free vaginal tape procedure for the treatment of urinary incontinence, Int Urogynecol J 2010;21:679-683; Liapis A, Long-term efficacy of tension-free vaginal tape in the management of stress urinary incontinence in women: efficacy at 5 and 7 year follow-up, Int. Urogynecol J 2008;19:1509-1512.

## V.    INSTRUCTIONS FOR USE

### A.    Overview

In my medical training, I have been trained on risks associated with incontinence repairs. In addition to this training, I have performed hundreds of incontinence repairs and keep apprised of the current literature; therefore, I know the risks associated with the TVT and other incontinence repairs. The risks with the TVT are common to other incontinence SUI procedures with the exception of mesh erosion. Based upon my training, education, experience, and review of literature, the instructions for use (IFU) for the TVT device appropriately warns surgeons of the risks reasonably associated with the TVT without unnecessarily warning of many complications that are commonly known by pelvic floor surgeons.[93]   The most common risk of all SUI surgeries is urethral obstruction leading to urinary retention. This is also the most common risk with TVT, and can occur regardless of graft material.

As a urologist, I review IFUs for devices that may be used in the pelvic floor and other areas in my practice.  I have reviewed many IFUs for different devices used in my medical practice.  From a physician's perspective, it is my opinion that the IFU for TVT appropriately sets out the indications, warnings, and precautions, adverse reactions, and contraindications associated with the use of the device.

It is important that the IFU indicate both the ideal patient for the TVT procedure as well as the type of surgeon who could perform this procedure.  After the paragraph that says "Please read all information carefully," there is a section identified as being "Important."  In this paragraph, Ethicon informs physicians "this device should be used only by physicians trained in the surgical treatment of Stress Urinary Incontinence and specifically implanting the Gynecare TVT device." Under the "Warnings and Precautions" section, the third bullet again warns, "Users should be familiar with surgical technique for bladder neck suspensions and should be adequately trained in implanting the Gynecare TVT System before employing the Gynecare TVT Device."  As a physician, this signifies that this device is intended, not just for just any surgeon, but only those surgeons who have experience with SUI repairs.  The IFU specifically tells physicians that they should be trained on the device.  This additional training may come from Ethicon or from other surgeons experienced with the TVT or similar midurethral slings.

From a surgeon's perspective, the warnings in the IFU are appropriate and include all necessary warnings.  I will specifically note a few of them.  Ethicon informs

---

[93] 21 C.F.R. Pt. 801, Sec. 801.109(c); Ethicon Procedure re Creating and Revising Labeling, § 6.1.2 HMESH_ETH_11642462–81 (noting that a device's "Labeling must convey the information that end-users need to safely use the device as intended by the manufacturer, taking into account the conditions of use and any issues that may be specific to the type of device."); Device Labeling Guidance #G91-1 ("An adverse reaction is an undesirable effect, reasonably associated with the use of the device . . . .").

physicians to manage infections with regard to their normal practice. The TVT mesh is made with a material that does not promote infection, and it will allow the body the opportunity to resolve mesh infection without removal in most cases. However, Ethicon does warn that should persistent mesh infection occur, mesh removal could be necessary in a small number of cases.

As with other incontinence procedures, Ethicon warns that de novo detrusor instability may occur following the TVT procedure, but to minimize this risk, the surgeon should ensure the tape is tension-free. With any surgical procedure for incontinence, detrusor instability can occur. It will occur more often with the Burch or MMK than with midurethral slings because of the chronic tension on the urethra inherent in the Burch and MMK procedures. The TVT is superior to most incontinence procedures with respect to reducing the risk of detrusor instability due to urethral obstruction due to the tension-free nature of the device.

The TVT IFU specifically discusses the adverse reactions associated with the TVT. In my opinion, the IFU appropriately identifies the adverse events associated with the TVT. The adverse reactions section identified those potential adverse events that are directly associated with the product. It is my opinion that Ethicon has properly warned physicians of the adverse events that can result from a TVT procedure.

Ethicon enumerates adverse reactions, including laceration of vessels, nerves, bladder, or bowel may occur during needle passage, and may require surgical repair. Ethicon has previously warned physicians that the TVT procedure should be performed with care to avoid large vessels, nerves, bladder, and bowel. Attention to local anatomy and proper passage of needles will minimize risks. With any procedure in the pelvic floor, there is the risk of nerve injury, and with many procedures the risk of bladder and bowel injury. Ethicon informs physicians that they must understand the pelvic anatomy to avoid such injuries. Ethicon informs the surgeon that is imperative to follow the IFU when performing the TVT procedure to avoid such injuries in most cases.

Ethicon warns that erosion, extrusion, and fistula may occur following TVT. Mesh exposure is uncommon with midurethral slings such as TVT, and occurs in only 1-3% of patients. Usually, exposure can be successfully managed with estrogen cream or by trimming of the exposed portion of the sling. For some small asymptomatic mesh exposures, observation is even an option. Pelvic pain from an exposed mesh will usually resolve following trimming or partial excision.

Intra-operative bladder perforation from the trocar has been shown to occur in approximately 4-7% of patients with the TVT; however, the clinical significance of a recognized bladder perforation is minimal. It is imperative that the physicians perform a careful cystoscopy. Cystoscopy is a crucial step when performing the TVT procedure and there is an additional warning that cystoscopy should be performed. Cystoscopy will recognize bladder perforation, and allows for the repositioning of the trocar and mesh

35

into the proper position.  This is specifically identified as a proper procedural step and identified in the warnings as bladder perforations can occur, but when performing cystoscopy they can be properly identified and then corrected intra-operatively with no clinical harm to the patient.

Chronic urinary tract perforations or fistulae from TVT are uncommon.  They do require more advanced reconstruction in many instances, and are almost always the result of mesh that was placed with an undue amount of tension and a delay in TVT lysis.  Mesh erosion (perforation) into the bladder is usually due to an unrecognized bladder perforation at the time of mesh implant or mesh that was inadvertently tunneled in the wall of the urinary tract.  These complications can be resolved either using an endoscopic, laparoscopic, or open approach.

Bowel and major vessel injuries can be more significant, but very rarely occur.  Bowel perforations may occur more commonly in patients with a history of peritonitis, bowel surgery, ruptured appendix, or known extensive pelvic adhesions.  Hematomas that occur from a lacerated vessel are rare (1-2%) and usually not life-threatening.  Major vascular injury occurs in less than 0.5% of patients.  It should be noted that laceration of vessels, nerves, bladder, or bowel might occur with any urinary incontinence procedure.

Nerve pain is usually a result of nerve entrapment or irritation, but can occur if a nerve is lacerated.  These can occur if the mesh is placed too close to a nerve.  This usually results from misplacement of the mesh in too lateral of a location.  Most nerve pain is treated with medication, trigger point injection, and physical therapy, and does not require surgical intervention.  Chronic pelvic pain from nerve injury occurs more commonly as result of traditional SUI procedures.  When you chronically elevate the urethra and attach sutures to a bone anchor, there is an increased risk of pain from tension and bone irritation.

Plaintiffs' experts' reports and/or depositions indicate that pain and dyspareunia are not addressed in the IFU.  I disagree with this opinion, as a reasonable surgeon would understand that pain and dyspareunia are potential symptoms of many of the adverse events that are listed in the IFU, including puncture or lacerations of vessel, nerves, bowel or bladder, fistula, inflammation, erosion, infection, and over-tensioning of the mesh.  Any of these adverse events may cause pain.  Pain and dyspareunia are commonly known by both experienced and new surgeons to occur following incontinence procedures.[94]  Similarly, Ethicon does not warn physicians of bleeding, because any

---

[94] ABOG & ABU Guide to Learning in Female Pelvic Medicine and Reconstructive Surgery 2012 (noting that fellows must be able to perform and describe the indications, intra and postoperative complications, and success following continence procedures including synthetic sling procedures, autologous fascial slings procedures, the MMK procedure, and the Burch procedure); ACGME Program Requirements for Graduate Medical Education in Female Pelvic Medicine and Reconstructive Surgery, sec. IV.A.5.b).(3) ("[C]ompleting the F3 year must demonstrate competence in their knowledge of: . . . indications, contraindications, limitations, complications, techniques, and interpretation of results of screening,

surgeon knows that lacerating a vessel can cause bleeding.  The IFU also does not assert that the nerve puncture or laceration, fistula, or other adverse events are only temporary, but says they can occur, which means they can be short-term or long-term.  It is commonly known by physicians that when you implant a permanent medical device that the complications can occur in the short or long term.  It is my opinion that most adverse events listed in the IFU resolve, although long-term complications may occur in rare and uncommon situations.

There was no need for Ethicon to warn of this alleged risk of cancer in the TVT IFU, as this is not supported by the medical literature.

Professional education supplements the IFU.  Both teach of risks and avoidance of complications as well as specific steps of performance. Professional education included discussion of complication management.  Furthermore, the Patient Brochure for the TVT device is a resource for additional information.  But it is not meant to supplant the informed consent process.  It includes information on complications.  I have conducted numerous professional education activities including proctorships, cadaver labs, and lectures where I taught based on the IFU and provided information regarding device usage, potential complications, and the management of those complications to hundreds of surgeons around the country.  This would include TVT, TVT-Obturator, and TVT Abbrevo.

In summary, the TVT is safe and effective.  Serious complications are uncommon and major intraoperative complications are rare.  The IFU, patient brochure, professional education, medical literature, and the FDA Public Health Notification of 2008 discuss potential complications, including exposure and pain/dyspareunia.  There is no medical device that is without any potential complications, and SUI devices like the TVT are not exceptions to this rule.  With that said, there is no alternative procedure for SUI that has a superior risk-to-benefit ratio compared to the TVT device.  For that reason, the TVT device remains the procedure of choice and the gold standard for physicians and patients with SUI.

## B.     TVT Tensioning Discussion in IFU

The IFU states that the TVT is intended for the treatment of SUI for female urinary incontinence resulting from urethral hypermobility and/or intrinsic sphincter

---

diagnostic, and therapeutic procedures including surgery for: . . . urinary incontinence . . . ."); Drutz HP and IUGA Education Committee, IUGA guidelines for training in female pelvic medicine and reconstructive surgery (FPM-RPS), Updated Guidelines 2010, App'x 3.3 ("The trainee should receive experience in the theory, practice, and performance of the procedures listed below.  Trainees are not expected to gain expertise in all these techniques, but should achieve proficiency in commonly used procedures [including but not limited to] minimally invasive slings . . . [and] mesh use in repairs, use of various graft materials.").

deficiency.  The TVT is an appropriate device for both of these indications, and is able to correct the mechanisms of each, as described above.

Ethicon warns that putting too much tension on the tape may cause temporary or permanent lower urinary tract obstruction.  This is simply saying that too much tension can cause temporary or permanent urinary voiding dysfunction.  Cystitis and temporary voiding difficulties are the most common problems after an incontinence procedure.  This temporary voiding issue is at least partially related to the surgery itself and the duration of postoperative catheterization. In most cases, normal voiding resumes within a few days.  This is why it is important to follow the IFU and ensure there is a drop or two of urine when the TVT is placed.  This helps to ensure that voiding dysfunction is limited. Voiding dysfunction is a much larger issue with the Burch and MMK because the urethra is chronically elevated.  Long-term voiding dysfunction is rare with TVT, but if it does occur, it is because the TVT was not placed in the right location on most occasions.  If it needs to be treated, then one can likely cut the mesh to relieve the tension.  On extremely rare occasions, mesh removal is indicated.

The IFU describes how to maintain the appropriate tension on the tape for support for the urethra to prevent SUI.  The surgeon is informed to fill the bladder to approximately 300 ml and use patient feedback to determine tension, i.e. a cough test. Ethicon specifically describes how to also ensure the tape is placed tension-free. This means the tape is not chronically elevating the urethra as is done with the Burch colposuspension.  To avoid putting tension on the tape, a blunt instrument (scissors or forceps) should be placed between the urethra and the tape during removal of the plastic sheaths.

## VI.    TVT PATIENT BROCHURES

The purpose of the patient brochure is to facilitate a conversation between the patient and her physician.  The brochure properly identifies the disease state, options for women, and the potential complications.  The brochure makes it clear that this surgery should be performed only after a complete physical examination.

The patient brochure serves to merely introduce the TVT device. It is not a substitute for a consultation with the surgeon.  It is the surgeon's job to inform the patient of the risks and benefits of the procedure.  It is the surgeon's responsibility to answer the patient's questions and decide if the patient is an appropriate candidate for TVT after discussing the risks, benefits and alternatives.  A brochure is never a substitute for this discussion.

From my review of the brochures for TVT, TVT-Obturator, TVT-Secur and TVT-Abbrevo, I can see that options including non-surgical treatments are discussed.  Ethicon provides detail on risks and benefits for the procedure.  Again, it is emphasized in the brochure that you should consult with your physician to discuss the risks and benefits,

and only after this discussion should the device be implanted.  The brochure provides an overview of the procedure in layman's terms, but never is a subsitute for informed consent.

## VII.   PROFESSIONAL EDUCATION

### A.   Introduction

I became familiar with the Ethicon Professional Education Program when I attended a course on the TVT-Obturator in San Francisco on March 23, 2004.  This was a lecture session.  The course faculty reviewed the proper patient selection, indications for the procedure, and surgical dissection.  Afterwards, there was a laboratory session at a nearby facility where physicians were instructed on how to use the device on a cadaver. This was a hands-on laboratory session, where experts on the procedure who were preceptors for Ethicon instructed physicians.  The preceptors guided the new users on how to properly perform the procedure.

In December of 2004, I became a preceptor for Ethicon on the TVT procedure. I functioned as a preceptor for Ethicon from 2004-2011.  I have personally instructed physicians on how to perform the TVT, TVT-Obturator, TVT-Abbrevo and TVT-Secur on numerous occasions in small group settings referred to as preceptorships or proctorships by Ethicon Professional Education Department.  I have also been one of three-to-five faculty members at Ethicon-sponsored didactic/cadaver courses where typically 10-20 physicians would attend and be instructed by a small group of faculty members.

### B.   Phases of Program

The Ethicon professional education program involves a didactic portion where physicians attend a course with the designated topic such as incontinence, prolapse, or both. This includes 3-4 hours of didactics overviewing patient selection, surgical technique, and long-term data on the device.  Surgeons may then attend a cadaver lab, direct observation in the operating room where surgeons will be invited into the OR and observe an experienced surgeon perform the TVT procedure (preceptorship), or attend a proctorship where the proctor for Ethicon would be a guest in another surgeon's operating room and directly observe a TVT procedure to serve as a reference on how to properly use the surgical kit provided by Ethicon.

In my experience as an attendee, preceptor, and proctor, I never observed or experienced "pressure" by Ethicon to convince attendees that their products should be placed without preexisting knowledge of pelvic anatomy or without regard to individual patient characteristics.  I observed that the courses simply taught physicians how to use the kit properly.  The preceptorships allow new users to witness experts placing the

device.  Proctorships provide an opportunity for new users to have their initial cases overseen by an expert.

### C.    Complication Prevention and Management

There was a continuous and collaborative effort to identify and implement ways to avoid complications.  There was review of how and why complications occur. At bi-annual meetings and summits, the education panel would receive information on complications and then provide feedback to TVT users on how to prevent these complications.  The group also made presentations on complications and algorithms to manage adverse events.  This allowed for improvement in surgical techniques and helped better identify who was an appropriate candidate for the procedure.  There was significant education provided on how to recognize and treat mesh-related complications such as exposure, erosion, and pain.

Preceptors, as well as Ethicon professional education staff, were available to their trainees to discuss complications and provide advice on how to effectively manage complications.  This close network allowed rapid bi-directional feedback from the company to the physicians.

### D.    Credentialing

The Ethicon Profession Education Program is not a credentialing process. Although Ethicon provided attendance certificates, this certificate did not purport to "certify" the physician as being proficient at performing the procedure.

The certificate from the program simply documents the surgeon's attendance at an Ethicon Professional Education Event. It shows that the physician made an attempt to be educated on the procedure.  The actual credentialing for performing any surgical procedure should always occur at the hospital level, and it is up to the physicians on an appropriate hospital committee to decide which procedures the surgeon is capable of performing.  Moreover, certification of skills and knowledge is done in education, professional training like residencies and fellowship, and later in the Board Certification process.  Pelvic anatomy, patient treatment and selection, risks of pelvic surgery, and the use and risks of grafts and biomaterials are part of this basic and elemental knowledge and training.

Furthermore, it is the physician's responsibility to know the pelvic anatomy, to understand biomaterials, and to properly select patients for the procedure.  TVT is merely a kit to help the surgeon place a mesh graft in the vagina using a trocar system for anchoring.  Tunneling the trocar decreases the amount of dissection required and allows a reliable anchoring mechanism for the graft. The TVT system does not in any way make the surgeon competent in anatomy, proper dissection, tunneling, graft deployment, or

wound closure.  Credentialing is done at the level of the hospital by a review board.  It is not the responsibility of Ethicon to credential surgeons on TVT.

## VIII.  PRODUCT DESIGN

Design of the mesh and TVT are suitable for use in SUI mesh repair.  The mesh used in TVT is state of the art and considered the gold standard for first line treatment of SUI.  It has the most RCT data and long-term data supporting safety and efficacy to 17 years.  Efficacy in these studies is generally consistently in the 80-90% range, with low complications and very few late-term complications.[95]

TVT is an important SUI device that has ideal design features.  It is an extremely useful device to treat stress urinary incontinence. It is a Type 1 large-pore-size polypropylene mesh, and is the most commonly used mesh in the history of incontinence surgery.  The design of the mesh, the surrounding plastic sheath, the trocar, and the tension-free system has offered a minimally invasive approach to stress urinary incontinence surgery, which is of benefit to patients and surgeons.  The large pore size of the mesh reduces the risk of infection.  The Prolene mesh is the most widely used in the world.  The mesh allows tissue incorporation while suspending the urethra and providing a backboard of support, which is consistent with the Ulmsten theory of stress urinary incontinence surgery.  And because the mesh is made of a synthetic material, it avoids cultural or religious objections that some patients have to the use of xenografts or allografts.  This attribute also leads to high efficiency and longevity while xenografts and allografts can be resorbed by the body.  The device's utility is also seen in the fact that it is comprised of a material that has been in use in various applications for several decades and the body's reaction to it is well-known.

Additionally, the sheath on the mesh is useful in that it carries the load of implanting the mesh, allows the placement to be optimized, and reduces the risk of infection.  Once it serves those functions, it can then be removed once the mesh is properly placed.

Since stress urinary incontinence is such a prevalent condition, a device was needed to treat this problem safely, efficiently, and effectively.  Previously, incontinence surgeries were performed by only a select number of surgeons.  The TVT device has been shown to be safe and effective in not only expert hands, but also in the hands of general urologists and gynecologists in a community setting.  Considering the prevalence of stress urinary incontinence, it would be impossible for a few experts around the country to meet the needs of society.  As the TVT device standardized stress urinary incontinence surgery and allowed tensioning of the mesh in a straightforward manner, this allowed for

---

[95] Nilsson CG, Eleven years prospective follow-up of the tension-free vaginal tape procedure for treatment of stress urinary incontinence. Int Urogynecol J 2008;19:1043-1047.

greater applicability of the device, making it extremely useful in the community. The TVT device allowed patients to be treated locally, and no longer did they need to travel long distances to a university or a tertiary setting in order to have the gold standard procedure for stress urinary incontinence.

The utility of the TVT device is also seen in that it can be implanted in an outpatient procedure in as little as 20-30 minutes using very small incisions. Most patients can drive a car the next day and resume working within two days. They can return to normal exercise in just one week. The open procedures are more morbid and require longer convalescence. Such factors are important considerations with respect to the direct costs of longer operative times and postoperative hospitalization, as well as the indirect costs related to loss of work due to a comparatively longer convalescence.

TVT is a safe product that is no more likely to cause injury to surrounding structures such as the bladder, the ureter, the intestine, or nerves than traditional native tissue repairs for incontinence such as the pubovaginal sling or Burch procedure. All SUI surgeries—including native tissue repairs—can have side effects such as bleeding, infection, pain, and dyspareunia. None of these complications are unique to transvaginal mesh used in the TVT system. The mesh-related complications that occur with TVT can occur with biological tissues such as allograft and xenograft. Additionally, permanent features such as Ethibond, Prolene, and Gore-Tex have been shown to have a risk to become exposed overtime. Again, this is not a unique complication to polypropylene mesh.

The TVT kit was designed with a narrow trocar that can be tunneled through the retropubic space and has a surrounding plastic sheath. These features allow safe placement of the polypropylene mesh. Plaintiffs' experts may argue that this procedure is done blindly. But the TVT procedure is no more blind than a needle carrier being passed across the retropubic space during a traditional sling procedure. It is no more blind than a trocar placed in the abdomen during laparoscopic surgery. It is no more blind than a Foley catheter being placed in the urethra or an intravenous catheter. It is common in medicine for a physician to pass a medical device through tissue when the surgeon is familiar with the anatomy. The advantage of this passage is that it minimizes the dissection, which minimizes time, bleeding, postoperative pain, and the significant risks and morbidity that arise with an open procedure. Moreover, cystoscopy is recommended, and when there is a bladder perforation noted, it is not a significant complication, as the trocar can be repassed and the bladder will heal on its own.

Additionally, the TVT has a unique way of allowing a tension-free support to the urethra. The tension-free concept had never existed in surgery before the TVT device. The most common complication with the traditional SUI procedures is urethral obstruction leading to incomplete bladder emptying and urinary retention. This occurred in as many as 10 to 20% of patients and led to re-operation to loosen the suspension sutures or to cut the sling.

Finally, autografts need to be harvested from the patient's abdomen or leg and may lead to harvest site complications such as abdominal wall hernia, wound complications, infection, nerve injury, and leg pain. Finally, the severity of TVT complications is usually minor. In fact, if there is an exposure, many are managed medically. Where needed, such as in the case of a larger exposure, most can be treated with minor excision of exposed mesh. If the complication is managed properly, it should not result in multiple operations.

Pelvic surgeons, investigators, and industry have been interested in graft material for stress urinary incontinence for many years in efforts to improve the outcomes in SUI surgery. This process has evolved over 20 years. TVT has the ideal balance of large pore size to allow tissue ingrowth and local tissue tolerance. It has been cleared by the FDA since 1998, and is the most common SUI procedure performed to date. In order to best understand the value of the TVT device, we need to recall the history of SUI surgery. There have been many synthetic materials that have been used in SUI surgery dating back to the 1960s, with Muir reporting on use of Mersilene and Morgan reporting on the use of Marlex.[96] However, these and other meshes were not tolerated to the extent that TVT was, which is why all of the pertinent professional societies, SUI guidelines, and Cochrane reviews recognize the type 1 TVT macroporous mesh as being the best-suited for SUI. Plaintiffs' experts contend that TVT mesh is a heavyweight mesh. However, the literature, my personal experience, and those of other experts clearly show that TVT is not a heavyweight mesh, nor does it behave like one. It is specifically recognized that the TVT mesh in the SUI application is "macroporous, monofilament, light weight polypropylene" and it has demonstrated long term durability, safety, and efficacy in several studies as I earlier referenced, up to 17 years.[97]

Allografts and xenografts may be considered for SUI surgery. However, allografts can weaken with time leading to delayed failures. Additionally, these materials are rejectionable due to cultural and religious beliefs. For example, patients who are Jehovah's Witnesses or Native Americans refuse to allow tissue transfer from the deceased. Xenografts offer an alternative to allografts as they avoid disease transmission and the cultural concerns of cadaveric tissue. However, they have been shown to cause an intense immune reaction that can lead to extrusion and healing abnormalities. Bovine products have largely replaced porcine products and are interesting, but the data currently does not exist in SUI surgery. Rather, bovine products have only been studied in prolapse cases. The TVT mesh does not transmit disease, nor does it cause an immune reaction, and it is less expensive than allografts or xenografts, and remains the gold standard material for SUI surgery. The general public, pelvic surgeons, and others are very familiar and widely accept polypropylene mesh for the use in hernia surgery.

---

[96] Moir JC. The gauze-hammock operation. (A modified Aldridge sling procedure). J Obstet Gynaecol Br Commonw. 1968 Jan;75(1):1-9; Morgan JE. A sling operation, using Marlex polypropylene mesh, for treatment of recurrent stress incontinence. Am J Obstet Gynecol. 1970 Feb 1;106(3):369-77.

[97] AUGS-SUFU Position Statement on Mesh Midurethral Slings for SUI, 2014 Jan.

Similarly, it is not surprising that women are readily accepting of transvaginal polypropylene mesh for SUI surgery.

Alternatives to mesh and alternative trocar designs:

- Other Trocars or Instruments—TVT Exact trocars are functional, but not overall safer.

The TVT Exact trocar is slightly smaller than the classic TVT trocar, but performs in a similar manner. There is no data to suggest the smaller trocar is safer.

- Transobturator Slings—these are good to have in the surgeon's armamentarium, but there is not as much data on them compared to the TVT retropubic sling, and they carry a higher risk of temporary groin pain compared to retropubic slings.

The advantage of the TVT-Obturator kit is that it allows mesh to be placed with avoidance of the retropubic space.  The TVT-Obturator procedure has a decreased risk of urinary retention due to urethral obstruction and bladder injury when compared to TVT.  However, TVT-Obturator has been shown to cause more short-term groin pain, and is not as effective in treating patients if they have a low leak-point pressure.[98] Moerover, it is not as effective for patients with more severe incontinence due to intrinsic sphincter defeincy.[99]

While transobturator and mini slings are available to surgeons, the overall data do not show they are superior to the TVT.  And like all SUI surgeries, they have potential complications including potentially more early groin pain for the transobturator route and potentially decreased efficacy in some surgeons' hands for mini slings, which has been reported.  The overall data show that the rate of serious complications with the TVT such as ureteral or bowel injury is rare, and while there are higher rates of bladder perforation with the TVT, with cystoscopy performed as recommended by the IFU this complication is easily managed and does not lead to any long-term effect.

---

[98] Fong EDM and Nitti VW, Mid-urethral synthetic slings for female stress urinary incontinence. Br J Urol Int 2010;106:596–608; Latthe PM, et al., Two routes of transobturator tape procedures in stress urinary incontinence: a meta-analysis with direct and indirect comparison of randomized trials. Br. J Urol Int 2009;106:68–76.
[99] Miller JJ, et al., Is transobturator tape as effective as tension-free vaginal tape in patients with borderline maximum urethral closure pressure? Am J Obstet Gynecol 2006;195:1799–1804.

- No sheath—mesh would drag and stretch too much, placement adjustment would be more difficult, mesh would not be protected during passage.

If there was no plastic sheath covering the polypropylene mesh it would create greater friction when placing the mesh. Potentially, this can lead to displacement or improper tensioning on a full-length sling. Additionally, tensioning and minor adjustemtns after tunneling the mesh would be more difficult.

- Multi-filament mesh—increased immediate inflammatory reaction, increased risk of infection

Multifilament meshes (Amid Type 2 and 3) have been used in the past and have been shown to have more compications when compared to a Type 1 polypropylene mesh. Type 2 multi-filament meshes have small pore size and result in increased inflammation and carry an increased risk of infection. They do not incorporate into the surrounding tissue and can encapsulate and behave like a foreign body.[100] In vivo, the Gore-Tex sling (Type 2) becomes covered with a pseudocapsule, which significantly deters tissue integration and propagation of cell growth. Rates of rejection appear to be directly related to sling length because full-length slings have been associated with excision rates exceeding 30%.[101] Therefore, multifilament mesh should not be used for SUI and POP surgery.

- Extra-large-pore mesh—no good data supporting this, would have more recurrences, not tested to 17 years, still would have risk of exposure

According to Amid, a macroporous mesh such as TVT has a pore size > 0.75 mm. Extra-large-pore size mesh such as those used in prolapse surgery in general have a pore size of 2.5 mm or greater. Unlike the TVT family of products, extra-large-pore mesh such as an Ultrapro does not have any short, intermediate, or long-term data to support its use for SUI. In theory, it may sound attractive, but it has not been tested in SUI surgery for 17 years like TVT. Additionally, pore size of 2.5 mm would not eliminate the risk of exposure, as most mesh exposures are related to wound healing abnormalities and technical failures.

---

[100] Kobashi KC, et al., Erosion of woven polyester pubovaginal sling. J Urol 1999 Dec;162(6):2070–2072.
[101] Weinberger MW and Ostergard DR, Postoperative catheterization, urinary retention, and permanent voiding dysfunction after polytetrafluoroethylene suburethral sling placement. Obstet Gynecol 1996 Jan;87(1):50–54.

- Laser-cut mesh—no difference in clinical and physiologic range, just an aesthetic difference, any particles from MCM do not cause harm—it's the same Prolene as one puts in in much greater volume for suspensions and other surgeries

There is no differemce between laser-cut mesh and mechanically cut mesh in the clinical or physiologic range; the stiffness of the mesh is the same for both products. Laser-cut mesh has less fraying of particles upon implantation but the effect of fraying is not clinically relevant based on my own personal observation and review of the literaure.

Any suggestion that the TVT device should undergo continuous modification is completely unrealistic, unnecessary, and ill-advised. If the TVT product was constantly altered in terms of pore size, length, or other design characteristics, it would be impossible to collect long-term data on these products. Instead, it was robustly studied, and continued to show efficacy and safety year after year. That is why it became the gold standard mesh in the SUI application, and as more and more data were published and presented, it became clear that the 1.1 cm strip of mesh was optimal for its intended use to support the midurethra and treat stress urinary incontinence. The TVT product has been performed in more than 3 million patients worldwide since 1998. The mesh was initially produced by mechanically cutting the product. In 2006, the mesh was laser cut. The literature clearly shows that there is no difference in the performance of the mesh regardless of how it was cut in the factory. My own personal experience with the device both before 2006 and after 2006 is consistent with this statement in that I have not noticed any appreciable outcome difference in terms of complications, fraying, stiffness, tolerability, tensioning, or efficacy.

The pelvic surgeon's ability to avoid danger by exercising care and the use of the TVT product is dependent on the surgeon's medical school education, residency training, and clinical experience. In order to avoid danger, the pelvic surgeon needs to have familiarity with the anatomy in order to avoid complications to surrounding structures. This knowledge is necessary when performing any type of stress urinary incontinence procedure, and is not a knowledge base that needs to be developed or is unique to the TVT product. It is expected of pelvic surgeons to know the anatomy in which they choose to operate. Rather, once the surgeon has a fundamental knowledge of the anatomy, then the TVT device can be used safely. In order to exercise care in using the device, the surgeon should be familiar with the IFU included in the surgical packaging. Also, the surgeon should be intimately familiar with the medical literature, the information provided by professional education, and should network with pelvic floor surgeon colleagues. There are a number of important professional education events including cadaveric labs, surgical videos and animations, PowerPoint presentations, and

46

most importantly, closed discussion with colleagues, mentors, and partners that allow the surgeon to exercise caution when placing the TVT device.

The surgeon's anticipated awareness of the dangers inherent to the TVT product and the surgeon's ability to avoid danger is part of the general knowledge of pelvic floor surgeons or contained in the device's IFU. Surgeons that have experience with traditional native tissue repairs should be aware of the pelvic anatomy and the steps necessary to perform SUI surgery safely. These surgeons would and should be aware of the complications with potential SUI surgery that are taught in their medical school, residency, and fellowship, and are obvious based on their base knowledge as surgeons, as well as their clinical experience performing colposuspension and sling procedures. These are basic / elemental surgical risks:

a. Damage to bladder, bowel, ureter, nerves and vessels

b. Infection

c. Inflammation and scarring

d. Wound complications like exposure, erosion, wound dehiscence, wound herniation, hematoma, seroma, pelvic abscess

e. Pain, pelvic pain/groin pain and dyspareunia

f. Bowel or bladder dysfunction

g. Fistula

h. Anesthetic risks

i. Need for reoperation and/or further treatment like catheterization or surgical revision

j. Failure of the operation requiring reoperation

k. PE, DVT, MI, pneumonia and death

l. Bleeding

Further, complications are known to occur and range from not troubling, mild, moderate or severe, temporary or chronic. This is basic surgical knowledge that all pelvic floor surgeons would know or would be expected to know. There is no need to warn of these elemental and basic risks, complications and the need for additional

47

treatment and surgery.[102]  Risks of stress incontinence surgery are also a topic of testing in the various board certifications and the FPMRS subspecialty board.  Moreover, experience with polypropylene mesh and with trocars has become commonplace in the last 20 years, as these procedures are now commonly taught in residency and fellowship training programs. It has become a core procedure and something that graduates should have a basic foundation in and understanding of both from their familiarity with pelvic anatomy from medical school and from their instructors during residency and fellowship.

I have read the IFU and have used it to help instruct residents, fellows, and physicians in practice on the proper use of the TVT. The IFU is a useful tool for surgeons in their practice, as it provides more specific detail about the TVT product, and is accurate.  There is a separate IFU for each one of the TVT devices. Each device has its own unique safety profile, warnings for surgeons, and information on proper patient selection.  However, the IFU should never substitute for surgical knowledge when selecting an appropriate patient and performing the procedure properly.  This again is more reflective of the surgeon's skill set, training, and fund of knowledge.  The IFU is merely a small portion of information that becomes part of the overall level of awareness of the dangers of the surgical procedure being performed.  The most important component of the surgeon's awareness is their overall familiarity with pelvic anatomy and incontinence surgery.

There is a section on indications specifically for the treatment of SUI in women resulting from urethral hypermobility and intrinsic sphincter deficiency. The IFU outlines the key procedural steps including how to tension the mesh. There is a section on "Contraindications" within the "Warnings and Precautions" section. This section provides some guidance on proper patient selection, but does not substitute for the

---

[102] 21 C.F.R. Pt. 801, Sec. 801.109(c); Ethicon Procedure re Creating and Revising Labeling, § 6.1.2 HMESH_ETH_11642462–81 (noting that a device's "Labeling must convey the information that end-users need to safely use the device as intended by the manufacturer, taking into account the conditions of use and any issues that may be specific to the type of device."); Device Labeling Guidance #G91-1 ("An adverse reaction is an undesirable effect, reasonably associated with the use of the device . . . ."); ABOG & ABU Guide to Learning in Female Pelvic Medicine and Reconstructive Surgery 2012 (noting that fellows must be able to perform and describe the indications, intra and postoperative complications, and success following continence procedures including synthetic sling procedures, autologous fascial slings procedures, the MMK procedure, and the Burch procedure); ACGME Program Requirements for Graduate Medical Education in Female Pelvic Medicine and Reconstructive Surgery, sec. IV.A.5.b).(3) ("[C]ompleting the F3 year must demonstrate competence in their knowledge of: . . . indications, contraindications, limitations, complications, techniques, and interpretation of results of screening, diagnostic, and therapeutic procedures including surgery for: . . . urinary incontinence . . . ."); Drutz HP and IUGA Education Committee, IUGA guidelines for training in female pelvic medicine and reconstructive surgery (FPM-RPS), Updated Guidelines 2010, App'x 3.3 ("The trainee should receive experience in the theory, practice, and performance of the procedures listed below.  Trainees are not expected to gain expertise in all these techniques, but should achieve proficiency in commonly used procedures [including but not limited to] minimally invasive slings . . . [and] mesh use in repairs, use of various graft materials.").

surgeon's experience or judgment. The IFU provides a list of adverse reactions. It discusses the possible puncture or laceration of vessels, nerves, bowel, or bladder, inflammation, erosion, infection and over-tensioning. It is common surgical knowledge that any injury to these structures can result in pain. Ethicon warns in the IFU that these adverse reactions can be both short- as well as long-term complications.  The TVT IFU and professional education are helpful to inform pelfic surgeons and warn of the device risks.

## IX.   SUMMARY OF OPINIONS

### A.    Summary of my opinions is as follows:

- SUI is a widespread disease that affects many women.  It has significant impact on patients' quality of life physically, emotionally, and socially. Surgical options are required for more severe forms of SUI.

- Traditional surgical options such as MMK and Burch are no longer the gold standard procedure for SUI today because they require abdominal incision, are time-consuming, have prolonged convalescence, have significant morbidity, higher rates of voiding difficulty, high rates of de novo pelvic organ prolapse, pain, and deteriorating results over the long term.  Level 1 scientific data such as the Cochrane reviews, meta-analyses, the AUA SUI guidelines and the SGS systematic review all show that the TVT is effective, safe, and preferable to Burch and autologous slings.  These data show that wound complications and sling exposures occur with these procedures and the rates of voiding dysfunction, pain, sexual dysfunction, and dyspareunia are lower with TVT than with the Burch and autologous slings.

- In most studies, fascial autologous slings generally do not show a success rate as high as TVT, and they have increased morbidity, operative time, pain, hospital stays, and convalescence when compared to TVT. The fascial sling is reserved for salvage situations and those with concomitant urethral pathology. Unlike TVT, fascial slings are only performed by a very small number of surgeons—mostly urologists—which would be incapable of treating the millions of women with SUI.

- Native tissue SUI procedures have been replaced in most community practices by retropubic or transobturator midurethral synthetic slings, which includes the TVT, TVT-Obturator, and TVT Abbrevo. TVT, TVT-Obturator, and TVT Abbrevo are synthetic mid-urethral slings which are used by more than 95% of pelvic floor surgeons.

- TVT is a truly revolutionary surgical procedure that changed the way SUI was treated.  Dr. Ulmsten invented a procedure that allowed for mesh to be placed tension-free under the mid-urethra.  This device has become the gold standard and the worldwide standard of care for treatment of this condition.

- The TVT is the procedure of choice for pelvic surgeons including urologists, urogynecologists, and gynecologists worldwide due to its reproducibility, safety, and efficacy.

- The TVT multi-incision SUI products are the gold standard and standard of care for the surgical treatment of SUI and have been since 1998. The TVT is indicated for primary as well as many secondary cases of SUI due to urethral hypermobility and intrinsic deficiency. TVT is commonly performed in women following failed colposuspensions and fascial slings. There is good long-term efficacy and safety. The mesh used in the TVT is the most studied of any of the meshes used in stress incontinence surgery. It has been reported that there have been more than 3 million mesh slings sold since the mid-1990s. The TVT midurethral slings have been studied more than any other incontinence surgery. They have been assessed in both Ethicon-funded and independent studies.

- The TVT has significant benefits for the patient. Seventeen years of data, over 100 RCTs, and approximately 1,000 studies have shown that the TVT is safe and effective.  The advantages over other procedures are that it has shorter operative time, reduced surgical pain, decreased hospitalization, reduced voiding dysfunction, quick recovery, extremely high success rates, and low complication rates.  Further, long-term severe complications are extremely rare.

- All major professional organizations have declared that the TVT, both retropubic and transobturator, and similar midurethral slings are the standard of care for the repair of SUI.  The AUA states that the data uniformly and overwhelming supports the use of midurethral slings (TVT) for the treatment of SUI, and as a result, it is the most commonly used procedure.  I am a member of the AUA, and fully agree with this position statement as it reflects my personal experience.

- TVT is the standard of care for SUI. Along with similar midurethral slings, TVT is the recognized procedure of choice for SUI.  Without this device and others like it, women's quality of health would be significantly diminished.

- TVT is not a heavyweight mesh, nor does it have small pore size.  TVT is a Type 1 mesh and has pore size larger than and weight similar to other

popular MUS such as Boston Scientific Advantage Fit and AMS Monarc. The AUA, AUGS, SUFU, and NICE all recognize that TVT is a macroporous, light-weight mesh (Amid Type 1).

- The TVT has an appropriate inflammatory response, integrates well in the body, provides the necessary support to the urethra, and adapts well. It is not cytotoxic in women. Other meshes that have good quality evidence to support their uses have similar pore sizes, weight, and compliance for the intended use of treating stress urinary incontinence. Non-Type 1 meshes have been shown to be inferior to TVT macroporous mesh in the SUI application.

- Plaintiffs' experts reliance on animal, hernia, and prolapse documents and literature do not reflect the use of the 1.1cm strip of tape with the sheath in the configuration of the TVT placed under the midurethra in women, which is the TVT's intended use. These data are not reliable in the context of the TVT's use to treat SUI.

- TVT mesh does not degrade. The reliable scientific literature fails to show that the TVT degrades or that even if the surface cracking was degradation, that there is a clinically significant effect.

- TVT mesh does not cause cancer or sarcomas. The reliable scientific literature fails to show that the TVT mesh causes cancer or sarcomas.

- There is no clinical difference between mechanically-cut and laser-cut mesh employed in the TVT device.

- Pelvic surgeons who may use a TVT are expected to know the anatomy and potential risks due to their knowledge of fundamental and elemental risks with SUI and vaginal surgery. Risks with the TVT such as potential injury to organs, exposure of the mesh, voiding dysfunction, pain, and the need to potentially operate to treat complications are obvious based on a surgeon's fundamental knowledge and use of surgical instruments, the anatomy, wound healing, wound complications that can arise regardless of the type of SUI surgery employed, and other complications. The IFU is appropriate, accurate, and helpful. It indicates risks and avoidance of complications as well as details key procedural steps. The adverse reactions are the specific adverse events that could occur with the TVT, and the IFU tells physicians that pain can occur because pain is a symptom of the adverse events.

- The IFU for TVT appropriately indicates when it should be used as well as contraindications. In the IFU, Ethicon appropriately tells physicians how to

tension the device and provides professional education on how to tension the TVT as well.

- Professional education supplements the IFU.

- Ethicon has a robust professional education program that addresses the procedure, clinical data, complication intervention and management. Ethicon had several phases of professional education for physicians. They may attend cadaver labs, preceptorship, proctorship, or several of these educational events. The professional education does not certify the competency of a physician.

- Professional education included discussion of complication management.

- The patient Brochure is not meant to supplant the informed consent process, but rather is a resource for additional information. It includes appropriate information on proper use, instructions, and adverse reactions.

- The patient brochure is a tool to facilitate a discussion with the patient and is not a substitute for the discussion between the patient and the physician. The 2009 patient brochure appropriately discusses the disease state, options, informs patients to consult with their physician, and identifies the necessary complications.

- Hospitals, professional organizations, and physicians are responsible for the credentialing of physicians. Knowledge of anatomy, SUI surgery and risks, and surgical skills are formed, developed, and tested in medical school, residency, fellowship, professional training and experience, and in connection with board certification.

_____
Brian J. Flynn, M.D.


Dated: 12/4/2016

# EXHIBIT VV

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: ETHICON, INC.,**<br>**PELVIC REPAIR SYSTEM PRODUCTS**<br>**LIABILITY LITIGATION** | **Master File No. 2:12-MD-02327**<br>**MDL 2327** |
| **THIS DOCUMENT RELATES TO:**<br><br>*Wave 4 Cases* | **JOSEPH R. GOODWIN**<br>**U.S. DISTRICT JUDGE** |

<u>**EXPERT REPORT OF BRIAN J. FLYNN, M.D.**</u>

# Expert Report re
# Gynecare Prolift™ Pelvic Floor Repair System

## I.      Introduction

This report contains my opinions regarding the design, safety, and efficacy of the Gynecare Prolift™ Pelvic Floor Repair System, as well as the bases for my opinions.  It also contains a summary of my qualifications, training, education, and experience, each of which forms a basis for my opinions.  In preparation of this report, I have reviewed and considered published medical literature, literature reviews, journal articles, textbooks, and materials provided to me by counsel for Ethicon and Johnson & Johnson, including: company documents, reports of plaintiffs' experts and the literature and documents cited and discussed therein, and other company witness depositions on pelvic floor repair surgeries, including but not limited to that dealing with the Prolift™ system.

The materials that support my opinions are either identified in this report or contained on my reliance list.  I hold all of the opinions set forth in this report to a reasonable degree of medical certainty.  If I receive additional information prior to trial, I reserve the right to add to or change my opinions.

My C.V. includes a list of publications that I have authored over the past 15 years.  I am currently being paid $500/hour to prepare a written report, $600/hour for depositions, and $725/hour for trial testimony.

## II.      Background

### A.      Education

I, Dr. Brian J. Flynn, attended the University of Rochester in Rochester, New York from 1987-1991. I graduated with a Bachelor of Science degree in Electrical Engineering with a concentration in Biomedical Engineering. I attended medical school from 1991-1995 at Temple University School of Medicine, Philadelphia, Pennsylvania and graduated with a Doctor of Medicine degree in May of 1995. I next attended Geisinger Health System, Danville, Pennsylvania for my internship and residency from 1995-2001. I completed a six-year residency in Urology. I then performed a fellowship in Reconstructive Urology, Urogynecology, and Urodynamics from July 2001-June 2002 at Duke University Medical Center under the directorship of Dr. George D. Webster. I became a staff faculty member at the University of Colorado School of Medicine in June 2002, where I have been employed since that time.  In 2016 I was promoted to Professor of Surgery/Urology.

1

I became a diplomate of the American Board of Urology in March 2004 and became subspecialty certified in Female Pelvic Medicine and Reconstructive Surgery (FPMRS) in August 2014. I have had a Colorado Medical License continuously for the past 14 years. My hospital affiliations include University of Colorado Hospital, Denver Health Medical Center, Children's Hospital of Colorado, and Veteran's Administration Medical Center in Denver. My administrative activities include being the president and program chair of the South Central Section of the American Urological Association. I am the president-elect of the Rocky Mountain Urological Society. I have been the Director of a Fellowship in Genitourinary Reconstructive Surgery at the University of Colorado School of Medicine since 2008.  I am the Co-Practice Director of Women's Pelvic Health and Surgery at the University of Colorado Hospital since June 2013.  I was the Assistant Residency Director of Urology at University of Colorado School of Medicine from July 2006-June 2010. I am an active member of the American Urological Association, South Central Section of the American Urological Association, Rocky Mountain Urological Society, Society of Genitourinary Reconstructive Surgeons, Society of Urodynamics, Female Pelvic Medicine & Urogenital Reconstruction, and International Urogynecological Association. This includes attendance at annual meetings and subscription to the associations' journals.

I review articles for the *Journal of Urology, International Urogynecology, Urology and Neurourology*, and *Urodynamics*. I have published scientific articles in peer review journals on male and female Reconstructive Urologic Surgery. I have authored instructional videos on the TVT Secur™, TVT Abbrevo™, as well as the Gynecare Prolift™ System and Prolift +M™ System. I have been invited to speak at a number of scientific meetings throughout the world on urogynecologic issues including incontinence, prolapse, neuromodulation, transvaginal mesh, and other female urology and urogynecology topics.

As a core faculty member of the University of Colorado School of Medicine Urology Division since 2002, I have instructed twenty-eight residents on urinary incontinence and pelvic organ prolapse. Additionally, as the founder and current fellowship director at the University of Colorado in Genitourinary Reconstructive Surgery, I have trained eight fellows in this specialty.

I spend 85% of my time in a clinical practice and 15% of my time in clinical research, teaching, administrative activities, medicolegal consultation, and quality improvement projects (e.g., improving bladder control and continence in multiple sclerosis patients).

I have extensive experience with transvaginal mesh and have published and presented numerous times on that topic.  I am very familiar with the 2008 FDA Public Health Notification regarding transvaginal placement of surgical mesh and the FDA's 2011 update. In fact, the AUA (American Urological Association) asked me to write an update for practicing urologists on the implications of the FDA notification, as well as technical considerations of

transvaginal pelvic reconstruction with polypropylene mesh. I have offered insight into prevention and management of mesh-related complications. I have proposed indications for mesh in stress urinary incontinence (SUI) and pelvic organ prolapse (POP) surgery. As a result of my education in engineering, I am certainly familiar with the biomechanical properties of polypropylene mesh. I have been invited to speak by many professional societies including the AUA, SUFU, and IUGA on the technical considerations and clinical considerations associated with transvaginal mesh.

### B. Relevant Surgical Experience

I perform more than 400 surgical cases per year, primarily at the University of Colorado Hospital, and have done so for more than ten years. More than 50% of my practice involves Female Pelvic Medicine and Reconstructive Surgery. In the past 13 years, I have used polypropylene in pelvic floor repair of female SUI or prolapse in more than 1,000 cases. With respect to pelvic organ prolapse, I performed approximately 200 cases involving the Gynecare Prolift™ and Prolift + M System™ from 2006 until July 2012.

In 2012, I did my last Prolift + M case, but would have continued using Prolift and Prolift + M to this day if it was available.

## II. Incidence of Pelvic Organ Prolapse (POP), Description, Effect on Quality of Life

### A. What Is Prolapse?

Pelvic organ prolapse (POP) occurs when a pelvic organ such as the bladder descends (prolapses) from its normal anatomic location in the vagina. It can be so severe that the organ prolapses outside of the vagina. POP can happen when the pelvic floor muscles that hold the pelvic organs in place are weakened or torn from aging, childbirth, or surgery. Many women will have pelvic organ prolapse. It can be uncomfortable or even painful.

More than one pelvic organ can prolapse at the same time. Organs that can be involved when you have pelvic prolapse include the: bladder (cystocele), rectum (rectocele), small bowel (enterocele), and uterus (uterine prolapse).

3



Normal
female pelvic anatomy



Cystocele

Bladder prolapse

© Healthwise, Incorporated

   A bladder prolapse (cystocele) occurs when the tissues and muscles that hold the bladder in place are stretched or weakened. This causes the bladder to move from its natural position and press against the wall of the vagina, forming a bulge.



Rectocele

© Healthwise, Incorporated

4

A rectocele occurs when the tissues and muscles that hold the end of the rectum in place are stretched or weakened. This can allow the rectum to press against the back wall of the vagina. Sometimes the tissues separating the two are so weak that the rectum bulges into the back wall of the vagina.





**Vaginal Fault Prolapse with Enterocele**

A small bowel prolapse (enterocele) occurs when the tissues and muscles that hold the small bowel in place are stretched or weakened. This can cause the small bowel to move from its natural position and press against the wall of the vagina.



A uterine prolapse occurs when a woman's pelvic muscles and ligaments become weak, causing the uterus to drop from its usual position. This allows the neck of the uterus (cervix) to bulge down into the vagina.

## B.    Etiology

POP is most often linked to strain during childbirth. During childbirth, pelvic floor muscles can get weak or stretched. If they do not recover, pelvic organ prolapse may develop. Surgery to remove your uterus (hysterectomy) can sometimes leave other organs in the pelvis with less support.  Pelvic organ prolapse can be made worse by anything that puts pressure on the pelvis, such as obesity, lifting, chronic cough, and constipation. Older women are more likely to have pelvic organ prolapse. POP can be hereditary and related to connective tissue disorders.

## C.    POP Symptoms/Negative Effect on Quality of Life

The burden of urinary incontinence and prolapse on women is significant. POP affects almost half of all women over 50 years of age, with a lifetime prevalence of 30-50%.  The estimated annual cost in the United States of POP is more than one billion dollars.[1]

Approximately 11% of American women will have an operation for incontinence and/or prolapse in their lifetime.[2]  As many as 300,000 Pelvic floor reconstructive surgeries per year occur in the United States.  As many as 29-40% of women will have the prolapse reoccur within three years of surgery.[3]

Symptoms of POP include: a sensation of pressure or fullness from pelvic organs pressing against the vaginal wall, a feeling that something is falling out of the vagina, a pulling sensation in the groin area, or pain in the lower back.  POP may also cause incontinence or urinary frequency.  POP may also cause vaginal or pelvic pain, or pain during sex, which is known as dyspareunia.  Rectocele commonly results in severe constipation.

These symptoms may lead to social isolation and withdrawal from an active lifestyle.  Patients withdraw from friends and family due to fear and embarrassment that POP and incontinence can cause.  Patients often are afraid to leave home and do not go to family events, religious services, or sporting activities.  They no longer perform physical exercise.  Intimacy is often lost in a relationship due to painful sex that can result from POP.  Hence, the burden on

---

[1] Subak LL, et al., Cost of pelvic organ prolapse surgery in the United States. Obstet Gynecol 2001 Oct;98(4):646–651.

[2] Fialkow MF, et al., Lifetime risk of surgical management for pelvic organ prolapse or urinary incontinence. Int Urogynecol J Pelvic Floor Dysfunct 2008 Mar;19(3):437–440.

[3] Olsen AL, et al., Epidemiology of surgically managed pelvic organ prolapse and urinary incontinence. Obstet Gynecol 1997 Apr;89(4):501–506; Marchionni M, et al., True incidence of vaginal vault prolapse. Thirteen years of experience. J Reprod Med 1999 Aug;44(8):679–684.

women is significant, and this leads to a desire by patients and physicians to find effective, durable treatment that would restore the normal pelvic anatomy and hence alleviate the symptoms that would then allow the patient to return to an active lifestyle.

## III.    Treatment Options for POP

Decisions on how to treat POP will be based on which pelvic organs have prolapsed and how bad the symptoms are. If the symptoms are mild, lifestyle changes may relieve many symptoms by adopting new, healthy habits. Pelvic floor exercises (called Kegels) that make the pelvic muscles stronger, weight loss, changes in diet, and avoidance of heavy lifting may help. A pessary is a vaginal support device that may help with the pain and pressure of pelvic organ prolapse. It is a removable device that holds the pelvic organs in place. In cases of severe prolapse, it may be hard to keep a pessary in place.

Surgery is another treatment option for serious symptoms of pelvic organ prolapse. Women will have surgery if:

- The prolapsed organ is causing significant pelvic pain;
- There are significant bladder or bowel problems;
- The prolapse is making it hard to do daily activities;
- Symptoms are affecting quality of life; or
- Prolapse makes it hard or impossible to have sex.

Incontinence and prolapse surgery can be done using native tissue; what we refer to as traditional repairs.  This includes using sutures to suspend the urethra, the bladder, or the vaginal apex, or plicating tissue over the organ to reduce the prolapse.

Surgery for POP can be performed by:

- Transvaginal approach;
- Open abdominal approach; or
- Laparoscopic/Laparoscopic-assisted robotic approach.

Other classifications include:

- Native tissue repair with or without permanent sutures;
- Surgery to close the opening of your vagina (colpocleisis);
- Surgery to remove the uterus (hysterectomy);
- Reinforced (augmented) repair with biological graft; and
- Reinforced repair with mesh graft with or without a "surgical kit."

### A.    Native Tissue Repairs

7

### 1.   Anterior Vaginal Wall Native Tissue Repair

The purpose of anterior vaginal repair, or anterior colporrhaphy, is to plicate the vaginal fascia overlying the bladder (pubocervical fascia) to diminish the bladder and anterior vaginal protrusion. Anterior colporrhaphy is indicated especially for patients with a central vaginal defect. Several layers of interrupted delayed absorbable or permanent sutures are placed laterally on the pubocervical fascia in a mattress fashion. Excess vaginal mucosa is trimmed and the resulting vaginal mucosa is closed. Paravaginal defect repair may be performed laparoscopically, abdominally, or vaginally. In this procedure, the retropubic space of Retzius is entered to reattach the anterolateral vaginal sulcus with its overlying endopelvic fascia to the obturator internus and pubococcygeus muscles and fascia, thereby restoring the lateral vagina to its normal place of attachment.

### 2.   Posterior Vaginal Wall Native Tissue Repair

Posterior vaginal repair (posterior colporrhaphy) is performed to repair the posterior vaginal defect—usually a rectocele. Traditionally, posterior colporrhaphy has been performed via a transvaginal approach and involves posterior colpoperineorrhaphy with levator ani muscle plication. In this surgery, the rectovaginal fascia is plicated in the midline, thus eliminating the posterior vaginal protrusion, and the excess vaginal mucosa is excised and repaired with absorbable sutures.

Richardson introduced defect-specific—or site-specific—defect repair in 1972. It attempts to identify and repair specific areas of deficiency in the rectovaginal fascia. This type of repair does not attempt to plicate the levator ani fascia, and thus may be associated with a lower incidence of postoperative morbidity.

### 3.   Apical Vaginal Prolapse and Uterine Prolapse, Native Tissue Repair

Many surgeons prefer vaginal surgery because the patient may have a shorter recovery time and it may take less intraoperative time compared with abdominal surgery. The most common vaginal procedures to suspend the prolapsed vaginal apex are sacrospinous ligament fixation (SSLF), modified McCall culdoplasty, iliococcygeus suspension, and high uterosacral ligament suspension.

Sacrospinous ligament fixation is usually performed on the patient's right side to avoid rectum and sigmoid colon injury. The ischial spine is palpated with the index finger and two pulley sutures of permanent or delayed absorbable material are placed through the sacrospinous ligament, two fingerbreadths medial to the ischial spine to avoid injury to the pudendal neurovascular bundle.

The sacrospinous ligament pulley sutures are then attached to the vaginal vault and tied to pull up the vaginal cuff.

Vaginal obliterative procedures—partial (LeFort) colpocleisis and total colpocleisis—are indicated for patients who are not able to tolerate general anesthesia or long surgical procedures, and who are not contemplating future sexual activity. These procedures do not intend to correct an enterocele since they are both extraperitoneal procedures. Also, these procedures carry risk of postoperative de novo stress urinary incontinence, and thus a concomitant anti-incontinence procedure may be performed in at-risk patients prior to closing the vagina.

### 4.      Surgical Outcome of Native Tissue Repairs

Native tissue repairs in the anterior compartment have a high failure rate (40-60%).  According to a 2013 Cochrane review, Maher et al. reported that traditional anterior repair was associated with more anterior compartment prolapse on examination than for any polypropylene (permanent) mesh repair (RR 3.15, 95% CI 2.50 to 3.96). Awareness of prolapse was also higher after the anterior native tissue repair as compared to polypropylene mesh repair (28% versus 18%, RR 1.57, 95% CI 1.18 to 2.07). Moreover, the anterior polypropylene mesh repair showed no difference in quality of life or de novo dyspareunia.[4] In the 2016 Cochrane review, Maher et al. reported that awareness of prolapse at 1–3 years post-surgery was less likely after mesh repair based on moderate-quality evidence, and rates of repeat surgery for prolapse repair were lower in the mesh group than in the native tissue group.[5]

Native tissue repairs fare better in the posterior compartment (5-25% failure rate). Barber in the OPTIMAL trial showed that success rate with USL and SSLF were approximately equal at 60%.  This is much lower than the success rate of 70-90% generally reported in the literature for these procedures.  Barber's results are consistent with other multicenter surgical trials where the treatment success rates were typically lower when combined by composite outcomes.[6] Posterior vaginal wall repair may be better than transanal repair. Adequately powered randomized, controlled clinical trials with blinding of assessors are urgently needed on a wide variety of issues, and they particularly need to include women's perceptions of prolapse symptoms.  Although the success rate is high with respect to resolution of apical prolapse, new onset of prolapse may occur in the anterior compartment in as many as 8% of patients undergoing sacrospinous

---

[4] Maher C, et al., Surgical management of pelvic organ prolapse in women, Cochrane Review 2013.
[5] Maher C, et al., Transvaginal mesh or grafts compared with native tissue repair for vaginal prolapse. Cochrane Database Syst Rev. 2016 Feb 9;2:CD012079.
[6] Barber MD, et al., Comparison of 2 Transvaginal Surgical Approaches and Perioperative Behavioral Therapy for Apical Vaginal Prolapse – The OPTIMAL Randomized Trial. J Am Med Assoc 2014;311(10):1023–1034.

ligament fixation.[7]  Therefore, it is common to prophylactically perform a concomitant anterior repair at the time of sacrospinous ligament fixation in efforts to avoid de novo prolapse in the anterior compartment.

Native tissue repairs often fail due to premature absorption of the sutures. Permanent sutures may break or pull through weakened degenerative tissue and this will lead to recurrent POP.  As many as 40% of women will require a re-operation for recurrent prolapse.[8]  Women often do not want to have the same surgery repeated, as they expect the same failed result.  This leads to a feeling of despair and hopelessness.  Hence, POP reoccurrence is a significant issue, as women will often not pursue further surgery and will have to learn how to live with POP.  There are no longitudinal studies of native tissue repair with follow-up greater than five years.  Most experts would agree that success rates of native tissue repair would be even lower if patients were followed for more than five years.

## 5.      Complications of Native Tissue Repairs

Anterior colporrhaphy carries a risk of direct injury to the bladder, urethra, and ureters.  Rates of ureteral damage are 0-2%.  Injury to the urethra and the bladder neck is rare but may lead to intrinsic sphincteric deficiency. Voiding difficulty may occur after anterior colporrhaphy, and may require chronic catheterization.  New-onset sexual dysfunction after anterior colporrhaphy occurs in up to 16% of women.[9]  The 2016 Cochrane review found no evidence of a difference between the mesh group and the native tissue group in the rates of de novo dyspareunia.[10]

Posterior colporrhaphy has a risk of rectal injury (1-3%) and dyspareunia (5-45%).[11]

Sacrospinous ligament fixation carries an approximate risk of buttock pain in 6%, de novo cystocele in 20%, new-onset stress urinary incontinence in 2.6%, and new-onset fecal incontinence in 4% of patients.

---

[7] Cespedes RD, Anterior approach bilateral sacrospinous ligament fixation for vaginal vault prolapse. Urol 2000 Dec;4;56(6 Suppl 1):70–75.

[8] Olsen AL, et al., Epidemiology of surgically managed pelvic organ prolapse and urinary incontinence. Obstet Gynecol 1997 Apr;89(4):501–506; Marchionni M, et al., True incidence of vaginal vault prolapse. Thirteen years of experience. J Reprod Med 1999 Aug;44(8):679–684.

[9] Weber AM, et al., Anterior colporrhaphy: a randomized trial of three surgical techniques. Am J Obstet Gynecol 2001 Dec;185(6):1299–1304.

[10] Maher C, et al., Transvaginal mesh or grafts compared with native tissue repair for vaginal prolapse. Cochrane Database Syst Rev. 2016 Feb 9;2:CD012079.

[11] Karram M and Maher C, Surgery for posterior vaginal wall prolapse. Int Urogynecol J 2013;24:1835–1841.

Uterosacral ligament suspension also carries a risk of ureteral injury as high as 11%.[12]

Both sacrospinous ligament fixation and uterosacral ligament suspension can lead to wound complications including suture erosion at reported rates of more than 15% in the OPTIMAL trial and up to more than 30% by others.[13]  They can lead to dyspareunia as well, as shown in the Lowman 2008[14] study, which assessed rates of dyspareunia across numerous POP procedures:

**TABLE 4**
**De novo dyspareunia after prolapse surgery**

| Dyspareunia | ASC N = 224 (148)[a] Handa et al[21] | SSLF N = 287 (106)[a] Maher et al[6] | USS N = 110 (34)[a] Silva et al[27] | APR N = 165 (81)[a] Weber et al[18] | Prolift N = 129 (57)[a] |
|---|---|---|---|---|---|
| Baseline (preop) dyspareunia (%) | 40.5 (60/148) | Unknown | 20.6 (7/34) | 8.0 (6/81) | 36.8 (21/57) |
| De novo (postop) dyspareunia (%) | 14.5 (11/76) | 36.1 (22/61) | 25.9 (7/27) | 19.0 (14/75) | 16.7 (6/36) |

[a] Number sexually active preop.

*Lowman. Does the Prolift system cause dyspareunia? Am J Obstet Gynecol 2008.*

In summary, native tissue repairs can cause numerous complications such as bleeding, infection, dyspareunia and pain, injury to surrounding organs including the bladder, bowel, rectum, or ureter.  Nerve damage or entrapment can occur, leading to chronic groin or buttock pain.  Native tissue repairs do not use transvaginal graft material, so they do avoid the risk of graft-related complications such as graft exposure.  However, native tissue repairs often use permanent material such as sutures to plicate or suspend the prolapsed organ. These can lead to wound complications and suture erosion.  For example, in a RCT of Prolift versus native tissue, there was a 15% rate of mesh exposure with Prolift and a 15% rate of suture erosion (apical Gore-Tex sutures) in the native tissue arm (n=5 for both).[15]  Permanent sutures placed in the sacrospinous ligament should be done with caution, as they can cause pudendal nerve entrapment and chronic buttock pain.  So, often the term "native tissue repair" is really a misnomer, and does not truly represent the entire concept of the repair.

---

[12] Barber MD, et al., Bilateral uterosacral ligament vaginal vault suspension with site-specific endopelvic fascia defect repair for treatment of pelvic organ prolapse. Am J Obstet Gynecol 2000 Dec;183(6):1402–1410.

[13] Barber MD, et al., Comparison of 2 Transvaginal Surgical Approaches and Perioperative Behavioral Therapy for Apical Vaginal Prolapse – The OPTIMAL Randomized Trial. J Am Med Assoc 2014;311(10):1023–1034; Yazdany T, et al., Suture complications in a teaching institution among patients undergoing uterosacral ligament suspension with permanent braided suture. Int Urogynecol J 2010;21:813–818; Toglia MR and Fagan MJ, Suture erosion rates and long-term surgical outcomes in patients undergoing sacrospinous ligament suspension with braided polyester suture. Am J Obstet Gynecol 2008;198:600.e1–600.e4.

[14] Lowman JK, et al., Does the Prolift system cause dyspareunia? Am J Obstet Gynecol 2008;199:707.e1–707.e6.

[15] Sokol AI, et al., One-year objective and functional outcomes of a randomized clinical trial of vaginal mesh for prolapse. Am J Obstet Gynecol 2012 Jan;86:e1–e9.

### B.   Reinforced Repairs with Biological Graft (Allografts and Xenografts)

#### 1.   Use and Outcome

With advances in surgical biosciences, biological repairs evolved in the '70s and '80s.  Graft material may be harvested from a cadaver such as fascia or dermis—known as an allograft—or using the same materials in animals such as a porcine or bovine graft—known as xenograft.  These grafts are processed and packaged for distribution and use in multiple surgical sites including the pelvic floor.  These grafts can be used as a sling in incontinence surgery, or they may be used to augment an anterior or posterior repair in prolapse surgery. They can also be used to suspend the apex of the vagina in sacrocolpopexy. Biomaterials seem to work by providing a scaffold for host tissue in-growth.

#### 2.   Complications

Complications with reinforced repairs with biological grafts are similar to those seen in native tissue repair, and include injury to surrounding structures, dyspareunia, and suture exposure.  In the systematic review by Abed et al. in 2011, exposure, wound complications, and dyspareunia were found to occur with biologics as well.  There, 110 studies reported on erosions with an overall rate, by meta-analysis, of 10.3%, (95% CI, 9.7 – 10.9%; range, 0 – 29.7%; synthetic, 10.3%; biological, 10.1%); 16 studies reported on wound granulation for a rate of 7.8%, (95% CI, 6.4 – 9.5%; range, 0 – 19.1%; synthetic, 6.8%; biological, 9.1%); and dyspareunia was described in 70 studies for a rate of 9.1%, (95% CI, 8.2 – 10.0%; range, 0 – 66.7%; synthetic, 8.9%; biological, 9.6%).[16]

There are also unique complications with biografts such as tissue rejection and infectious disease transmission (Hepatitis, HIV, prions, etc.).  Disease transmission can occur despite extensive steps to eliminate exposure.  For instance, the risk of prions and HIV transmission is estimated to be about 1 in 1.7 million.[17]  Tissue rejection leads to an exaggerated inflammatory response by the host.  This leads to an inflamed, painful vaginal wall with vaginal discharge and pelvic pain/dyspareunia.  There is also a significant expense associated with the processing, packaging, and storage of the graft material.  Finally, there are religious and cultural reasons why many women simply object to the idea of having another human's or animal's tissue inside their vagina.  For the above reasons, biologicals fell out of favor in the '90s and were replaced by synthetic material.

---

[16] Abed H, et al., Incidence and management of graft erosion, wound granulation, and dyspareunia following vaginal prolapse repair with graft materials: a systematic review. Int Urogynecol J 2011 Jul;22(7):789–798.

[17] Flynn BJ, et al., Pubovaginal sling using allograft fascia lata versus autograft fascia for all types of SUI: 2-year minimum follow-up. J Urol 2002 Feb;167(2 Pt 1):608–612.

## C.    Abdominal Approach

### 1.    Use and Outcome

The main abdominal operations performed for apical vaginal prolapse and uterine prolapse are abdominal sacrocolpopexy and total abdominal hysterectomy with high uterosacral ligament suspension. These operations allow fixation of the upper vagina or the uterus to the sacrum, with the help of grafts and sutures through the anterior sacral ligament (presacral fascia) at the level of the sacral promontory.  The abdominal approach allows a higher vaginal fixation in the pelvis and provides durable repairs with an adequate vaginal length.

Sacrocolpopexy repair for apical vaginal prolapse is a procedure that may be performed by an open laparotomy or laparoscopic approach with or without robotic assistance. Grafts are placed from the vaginal cuff, or the amputated cervical stump, to the presacral fascia with permanent suture in a tension-free fashion. In 1962, Lane first described the use of graft material for sacrocolpopexy procedures (e.g., harvested fascia lata, abdominal fascia, cadaveric fascia lata, Marlex,™ Prolene,™ Gore-Tex,™ Mersilene,™ Vypro-II™) with variable success rates.

Sacrocolpopexy has superior outcomes to a variety of vaginal procedures including sacrospinous colpopexy, uterosacrocolpopexy, and transvaginal mesh. These benefits must be balanced against a longer operating time, longer time to return to activities of daily living, and increased cost of the abdominal approach.[18] During seven years of follow-up, abdominal sacrocolpopexy failure rates increased in both groups. By year 7, the estimated probabilities of anatomic failure were 22-27% and symptom failure was 24-29%.[19] Abdominal sacrocolpopexy effectiveness should be balanced with long-term risks of mesh or suture erosion.[20]

Although the objective success rate of sacrocolpopexy is greater than sacrospinous ligament fixation (76% vs. 69%), sacrocolpopexy is associated with a longer operating time, a slower return to activities of daily living, and a greater cost.[21]

### 2.    Complications

Abdominal sacrocolpopexy carries a risk of several complications,

---

[18] Maher C, et al., Surgical management of pelvic organ prolapse in women, Cochrane Review 2013.
[19] Nygaard I, et al., Long-term Outcomes Following Abdominal Sacrocolpopexy for Pelvic Organ Prolapse. J Am Med Assoc 2013 May;309(19):2016–2024.
[20] Nygaard I, et al., Long-term Outcomes Following Abdominal Sacrocolpopexy for Pelvic Organ Prolapse. J Am Med Assoc 2013 May;309(19):2016–2024.
[21] Maher C, et al., Surgical management of pelvic organ prolapse in women. Cochrane Database Syst Rev 2004 Oct 18;(4):CD004014.

including new onset of stress urinary incontinence in up to 77%[22] and de novo dyspareunia in 5%.[23]  Unfortunately, many large prospective randomized trials such as Nygaard in 2013 fail to report the incidence of dyspareunia. Vaginal mesh erosion rates vary from 6.9-27% with the probability of mesh erosion at 7 years of 10.5% (95% CI, 6.8% to 16.1%).[24]

A review of more current studies from 2011 and 2012 suggest that transvaginal mesh placed by experienced mesh surgeons may have mesh erosion rates comparable to abdominally placed mesh.[25]

Unlike vaginal approaches, abdominal sacrocolpopexy has a significant risk of small bowel injury, ileus, hernia, and major hemorrhage due to injury to the middle sacral artery.  There is also longer anesthesia time, convalescence, increased post-operative pain, and an unsightly abdominal scar when performed by an open approach.  Laparoscopic and robotic approaches improve convalescence when compared to an open abdominal approach, but were not a widely available option in 2005 at the time Prolift was launched.  Also, there is tremendous expense with laparoscopic and especially robotic-assisted approaches that many community and public hospitals cannot afford and the learning curve has been reported to be very steep.  Finally, since 2004, there has been training and credentialing issues with both laparoscopic and robotic surgery.

## D.    Mesh Evolution and Development

The use of surgical mesh began with abdominal hernia repair.  Much of the technology, development, and lessons learned in this area inspired use and innovation in transvaginal surgery.  In the 1950s, Lane first recognized the need for graft augmentation for prolapse to improve the disappointing surgical outcomes that existed at the time.  In 1962, sacrocolpopexy began to be performed. In the 1960s, Moir introduced Mersilene mesh as sling material for stress urinary incontinence surgery.  In 1970, Morgan reported on the use of Marlex polypropylene for SUI.  In 1998, the TVT™ device, which uses Type 1 macroporous Prolene polypropylene, was introduced and quickly became the gold standard procedure for stress urinary incontinence.  The material is excellent and the most suitable for use.  Polypropylene became the preferred graft material for a reinforced pelvic floor repair in 2002 after the introduction of Gynemesh PS, which also uses macroporous Prolene polypropylene. The well-recognized advantages of a mesh-reinforced repair are the low failure rate in

---

[22] Nygaard I, et al., Long-term Outcomes Following Abdominal Sacrocolpopexy for Pelvic Organ Prolapse. J Am Med Assoc 2013 May;309(19):2016–2024.

[23] Maher C, et al., Surgical management of pelvic organ prolapse in women. Cochrane Database Syst Rev 2004 Oct 18;(4):CD004014.

[24] Nygaard I, et al., Long-term Outcomes Following Abdominal Sacrocolpopexy for Pelvic Organ Prolapse. J Am Med Assoc 2013 May;309(19):2016–2024.

[25] Krlin RM, et al., Pro: the contemporary use of transvaginal mesh in surgery for pelvic organ prolapse. Curr Opin Urol 2012 Jul;22(4):282–286.

incontinence and prolapse surgery.  Mesh grafts are especially valuable to patients with recurrent POP.  However, the trade-off can be a mesh-related complication such as vaginal mesh exposure or extrusion, although wound complications and erosion also frequently occur with native tissue repair.

The Amid mesh classification published in 1997 for hernia mesh has been used to classify vaginal meshes as well.  It primarily separates materials based on mesh pore size that has been related to infectious risk and tissue integration.  In general, a pore size of >75 μm is considered macroporous and is desirable, as it allows passage of leukocytes and macrophages 9–20 μm in size.  The problem with woven (as opposed to knitted) meshes and meshes with smaller pore sizes (< 75 μm) was that bacteria—which are very small (on the order of <1 micron in size)—can pass into the material, but the host's defense mechanisms, which are leukocytes and macrophages (9–20 μm in size), cannot.  Interstices between multifilament fibers are also important, and those less than 10 μm may further perpetuate the problem.  A pore size of >75 μm also allows capillary growth and the integration of tissue into the pores, prohibiting encapsulation and promoting support to the prolapsed organ.

Type 1 mesh is a macroporous (pore size > 75 μm), monofilamentous polypropylene mesh.  Gynemesh PS™, the mesh used in the Prolift™ kit, is a type 1 mesh.  The pore size of Gynemesh PS is about 2.5 mm or 2,500 μm, which easily accommodates the cells and small blood vessels needed to access the pores, promote tissue integration, and reduce the risk of infection. Type 1 meshes have been the standard mesh used in pelvic floor prolapse.  Gynemesh PS is state of the art, and polypropylene monofilament macroporous mesh is the overwhelming choice of mesh for pelvic floor surgeons for the treatment of both prolapse and stress urinary incontinence.

Type 2, 3, and 4 meshes such as Gore-Tex™ and Mersilene™, are microporous (pore size < 75 μm), multifilament meshes and are prone to infection.  They are no longer used in transvaginal surgeries due to their lack of incorporation into the native tissue and their tendency to become infected.  Their use in sacrocolpopexy has also been abandoned.

**Type I:  Knitted**



**Type II:  Woven**



Other mesh considerations for POP are that the mesh should be lightweight, flexible, and elastic.  Large pore-size in meshes such as Prolift™ enables a compliant, flexile scar that mimics natural tissue mobility.

Synthetic mesh has been shown to be superior to allografts, xenografts, and even autografts in terms of strength.  Polypropylene mesh is constructed of monofilament material.  Type 1 mesh like Gynemesh PS produces an acute local inflammatory reaction and formation of fibrous tissue, but this decreases with time.  Chronic inflammatory cells, which are commonly seen in vaginal tissues, may be seen near the mesh, but this is a normal foreign body response.  The presence of chronic inflammatory cells is not indicative of an adverse biologic reaction or that the cells are actively trying to digest the foreign body.  These cells can be in a quiescent state, essentially present but not activated.  Moreover, mesh with large pore size (>75 µm) allows ingrowth of fibroblast, collagen, and blood vessels, and allows for macrophage and leukocyte infiltration and passage, thus decreasing the chance of mesh infection and mesh extrusion.

In 2008, another generation of meshes was introduced such as Prolift + M™ (monocryl/Prolene) mesh, which has an absorbable and non-absorbable component composed of Prolene.  These meshes have a lighter weight and a similar pore size at the time of implantation with a somewhat larger pore size post-absorption (2.5 mm and 3.5 mm).  There is no difference in exposure rates or dyspareunia rates between the two meshes in my opinion.  Overall clinical data on the compatibility of Gynemesh PS and the mesh in Prolift + M™ show that both are effective and suitable for use in prolapse repair as further described below.  Prolift, however, has a broader set of clinical data on its use.

**E.     Prolift**

**1.     Introduction of the Transvaginal Mesh Kit**

16

The seven-year success of the TVT midurethral slings for management of stress urinary incontinence supported the use of polypropylene mesh for treatment of POP as well as the decades of use of mesh to treat POP. The polypropylene mesh and trocars like that used in TVT-O were partially incorporated into the use of the Prolift device. Specially designed devices are used to attach a preconfigured mesh to the pelvic sidewall, using the transobturator approach, or to the sacrospinous ligament. The transobturator approach entails the use of suspension arms passed through the obturator foramen, which suspend the graft through the arcus tendineus fascia pelvis ("ATFP"). Reported benefits of mesh kits over sutured mesh placement include decreased operative time, less extensive dissection, and more precise mesh tensioning.

The Prolift kit is a pre-cut piece of Type 1 Prolene polypropylene mesh with trocars used to insert the mesh. The trocars were useful in allowing fixation to structures that are ordinarily difficult to access. Critics will often state the tunneling device is placed blindly. However, surgeons that have actually used Prolift effectively in their practice know this is a misrepresentation of the facts. The tunneling trocar is placed under finger guidance (i.e., tactile guidance) as is done in other urogynecologic procedures, through reproducible and predictable anatomic landmarks. Placement of the trocar by tunneling through tissue is no different than placing other types of catheters in the human body such as placing an intravenous catheter, central line, or suprapubic cystotomy catheter.

Prolift was designed by a group of surgeons over four years to standardize a surgical technique for reinforced pelvic floor repair.[26] Standardization is an important step in improving and equalizing surgical outcomes achieved by pelvic floor surgeons. Standardization facilitates the ability of the technique to be safely replicated by other surgeons. The developers used well-known anatomic points that had previously been used for POP repair—the ATFP for paravaginal repair and sacrospinous ligament for sacrospinous ligament fixation. Both have been in use by pelvic floor surgeons for decades. The device was state of the art. The developers also assessed different meshes, and decided to use Gynemesh PS because of its characteristics and performance.

## 2.    Pre-USA-Launch Clinical Data

Ethicon had the appropriate data to market and sell Prolift. Prior to Prolift being launched, mesh had been used in abdominal repairs since the 1950s and in sacrocolpopexy and stress urinary incontinence since the late 1960s. In the 1990s, surgeons began using mesh in vaginal prolapse repairs. Prolene sutures, which the mesh is essentially knitted from, have been in use by surgeons for decades, as well in various applications including prolapse and incontinence suspension repairs. Ethicon's Prolene mesh has been in use for over 40 years,

---

[26] Berrocal J, et al., Conceptual advances in the surgical management of genital prolapse. J Gynecol Obstet Biol Reprod 2004;33:577–587.

and in the late 1990s, Ethicon manufactured and sold Prolene soft mesh for hernia use.  Prolene Soft mesh is the identical mesh used in Prolift.  Prolene Soft mesh's extensive use in hernia repair demonstrated that it provided better success rates than native tissue repairs, and it was a bio-compatible mesh that had good properties for successfully treating hernia repairs, and that it adequately supported the herniated organs and tissue.  This data was very helpful, as POP is essentially a hernia in the pelvic floor.

In 1998, Ethicon began manufacturing and selling TVT, which is a 1.1-cm-wide piece of macroporous Prolene polypropylene mesh for SUI repairs.  These repairs occur transvaginally.  This procedure has now become the gold standard for SUI repair.  There are numerous studies with 5, 10, even up to 17 years of data showing that TVT, a macroporous Prolene polypropylene mesh, has very high success rates, compatibility, and very low complications.  This information was very helpful in determining the role of polypropylene mesh for pelvic floor repair.

Gynemesh PS became available in 2002—this was the Prolene Soft mesh for use in the pelvic floor.  A one-year study showed that Gynemesh PS implanted transvaginally had similar success rates to the gold standard of ASC; however, without the morbidity of an abdominal surgery.  Further, the complication rates examined showed it to be a safe product.  Gynemesh PS was further used from 2002 through 2005, and Ethicon continued to receive and review the reporting on the safety and efficacy of mesh used in the pelvic floor.

Nine accomplished French surgeons formed a study group to evaluate the potential for incorporating an adjustable delivery system into the grafted approach to overcome the inherent weakness in suture-fixated transvaginal grafts.  The physicians engaged in one of the largest trials at that time to look at the safety and efficacy of the Prolift procedure with a TVM study on over 300 patients treated since 2002.[27]  The study would grow and was reported in 2005 by Cosson et al. to include 687 patients, an unheard of number of patients at the time, and very large by even today's standards.  No mesh kit had been studied nearly as much.  This degree of study was revolutionary for POP mesh products and well beyond any POP industry standard.  This study showed high success rates with minimal complications, similar to other transvaginal pelvic floor repairs.  This study clearly showed that the benefits of a reinforced polypropylene mesh repair outweighed the risks.  The TVM Group also assessed the use of Vypro, a larger-pore multifilament mesh, and determined that it was not suitable for use in pelvic floor kits.[28]

Ethicon then sponsored a prospective trial that would look at the results of

---

[27] Berrocal J, et al., Conceptual advances in the surgical management of genital prolapse. J Gynecol Obstet Biol Reprod 2004;33:577–587.
[28] Denis S, et al., Pelvic Organ Prolapse Treatment by the Vaginal Route Using a Vypro Composite Mesh: Preliminary Results About 106 Cases. ICS IUGA 2004;(Abs. 620).

Prolift over a 1-, 3- and 5-year period.  After approximately 6 months of data collection by Ethicon, Prolift was noted to be a safe and effective product in women.[29] Table 1 in the Jacquetin study also demonstrates that in multiple randomized controlled trials (RCTs) the use of trans-vaginal synthetic mesh or mesh kits was superior to traditional procedures for the treatment of POP in multiple studies.[30]

Int Urogynecol J

Table 1  Randomised controlled trials comparing polypropylene mesh with traditional native vaginal tissue repairs

| Reference | Total number patients | Follow up (months) | Compartment studied | Anatomic cure mesh (%) | Anatomic cure traditional (%) | $p$ |
|---|---|---|---|---|---|---|
| Hiltunen et al. [9] | 104 | 12 | Anterior | 93 | 62 | <0.04 |
| Sivaslioglu et al. [10] | 90 | 12 | Anterior | 91 | 72 | <0.05 |
| Nieminen et al. [11] | 105 | 24 | Anterior | 89 | 59 | <0.05 |
| Nguyen and Burchette [12] | 75 | 12 | Anterior | 87 | 55 | <0.05 |
| Carey et al. [13] | 139 | 12 | Anterior Posterior | 81 | 65.6 | 0.07 |
| Nieminen et al. [14] | 202 | 36 | Anterior | 87 | 59 | <0.0001 |
| Withagen et al. [15] | 194 | 12 | All | 90 | 55 | <0.001 |
| Altman et al. [16] | 389 | 12 | Anterior | 82 | 48 | 0.008 |
| Sokol et al. [17] | 65 | 12 | All | 38 | 30 | 0.45 |

As noted, the predicate TVM device was widely studied in Europe, and the data in over 600 patients was presented in 2005 at the International Continence Society (ICS) in Montreal, Canada, which was well-received.

This data is significant, as most complications occur within the first year. In summary, the multiple clinical trials, with over 687 women treated, showed that Prolift was a safe and effective procedure.  Specifically, ranges of success were approximately 89% percent and exposure rates were approximately 13.3%, with dyspareunia almost non-existent.[31]  Ethicon's decision that Prolift was safe and effective has been further confirmed with multiple clinical trials after launch, long-term studies, and my own clinical practice.

3.    **Post-Launch Clinical data**

Prolift and Gynemesh PS have been the most extensively studied pelvic organ prolapse graft products.  In this section, I will review this extensive data that clearly shows the superior success rates in mesh-augmented repairs when compared to native tissue.  Also, this section will demonstrate that pelvic pain and dyspareunia improves in most patients following Prolift, and the incidence of de novo dyspareunia is no greater following Prolift when compared to native

---

[29] Jacquetin B, et al., Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 5-year prospective follow-up study. Int Urogynecol J 2013 Oct;24(10):1679–1686.
[30] Jacquetin B, et al., Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 5-year prospective follow-up study. Int Urogynecol J 2013 Oct;24(10):1679–1686.
[31] Cosson M, et al., Prolift (Mesh (Gynecare) for Pelvic Organ Prolapse Surgical Treatment Using the TVM Group Technique: A Retrospective Study of 687 Patients. ICS 2005; Abs. 121.

tissue.  Much of the data is from multicenter randomized trials, which is one of the highest levels of scientific evidence.[32]

In a multicenter randomized prospective controlled study of 168 patients comparing sacrospinous fixation and transvaginal mesh, patients receiving transvaginal mesh were noted to have less recurrence of their prolapse (17%) when compared to native tissue repair (40%).  Patients had significant improvements in quality of life as reflected by UIQ, CRAIQ, and POPIQ scores and sacrospinous fixation had lower improvement of bowel symptoms as reflected by the CRAIQ questionnaire.  This was balanced against an exposure rate of 20.8%. There was not a statistically significant difference between sacrospinous ligament fixation and Prolift in dyspareunia or pelvic pain in this study.[33]

Da Silviera, in a multicenter randomized trial comparing native vaginal tissue repair and synthetic mesh repair for genital prolapse, demonstrated an 88% cure rate for Prolift versus 81% for traditional repair.
Moreover, Prolift patients had significantly better quality of life improvements (PQoL p = 0.008). There was not a statistically significant difference in the rate of dyspareunia between native tissue repairs (6%) and Prolift (3%), nor was there a statistically significant difference in the rate of pelvic pain between native tissue repairs (8.6%) and Prolift (2.3%). Finally, there was not a statistically significant difference in sexual function scores per QS-F questionnaire answers.  Of the eighteen patients who developed a mesh exposure, fifteen of the patients had their erosions treated with topical estrogen and clinical observation.[34]

Svabik reported a significantly better cure rate of prolapse when comparing Prolift (97%) versus traditional repair (38%).  There was minor mesh exposure at the 3-month follow up in the Prolift group in three (8%) cases; two of these were resected, while the third was asymptomatic and treated conservatively. There was no additional case of protrusion at the 1-year follow-up. There were five (15%) patients with vaginal blood spotting due to granulation tissue in the SSF group, all of whom were treated on an outpatient basis. Additionally, there was not a statistically significant difference in dyspareunia and PISQ scores between sacrospinous ligament fixation and Prolift.[35]

De Landsheere, in a retrospective trial of 524 patients from a single center

---

[32] Oxford Levels of Evidence for Practitioners.

[33] Halaska M, et al., A multicenter, randomized, prospective, controlled study comparing sacrospinous fixation and transvaginal mesh in the treatment of posthysterectomy vaginal vault prolapse. Am J Obstet Gynecol 2012;207:301.e1–7.

[34] da Silveira S, et al., Multicenter, randomized trial comparing native vaginal tissue repair and synthetic mesh repair for genital prolapse surgical treatment. Int Urogynecol J 2015 Mar;26(3):335–342.

[35] Svabik K, et al., Comparison of vaginal mesh repair with sacrospinous vaginal colpopexy in the management of vaginal vault prolapse after hysterectomy in patients with levator ani avulsion: a randomized controlled trial. Ultrasound Obstet Gynecol 2014 Apr;43(4):365–371.

with a median follow-up of 3 years, showed that the global reoperation rate was 11% (urinary incontinence 7%, mesh-related complications 4%, or prolapse recurrence 3%).[36]  Notably, surgery due to symptomatic mesh retraction was very rare at 0.4% (2/524), and surgery due to mesh infection was only 0.2% (1/524).

In 2013, Dietz and Maher examined the effects of pelvic organ prolapse on sexual function.  With regard to the anterior compartment, the use of mesh is associated with neither a worsening in sexual function by PISQ nor an increase in de novo dyspareunia compared with traditional anterior colporrhaphy. There is insufficient information to provide evidence-based recommendations on sexual function after new lightweight or absorbable meshes.[37]  As shown in my report, in the Prolift RCTs which included treatment of the posterior compartment or total Prolift, there are no significant differences in dyspareunia or sexual function.

In a randomized trial, Withagen examined the effects of a trocar-guided mesh compared with conventional vaginal repair in patients with recurrent prolapse.  Anatomic failure in the treated compartment was observed in 38 of 84 patients (45.2%) in the conventional group and in eight of 83 patients (9.6%) in the mesh group (P<.001).  Subjective improvement was also seen.  Pelvic pain and dyspareunia decreased at a similar rate at 1 year compared to baseline, in both groups. De novo dyspareunia was reported in 10% in the mesh group, and 8% in the Prolift group.  There was a 16.9% rate of mesh exposure (n=14) with nine being asymptomatic.  There were five exposures that required excision and they resolved.[38]

Sokol examined the objective and functional outcomes of randomized clinical trial of vaginal mesh for prolapse at 1-year. He noted that at 12 months, both groups had improvement of pelvic organ prolapse-quantification test points to similar recurrence rates. The quality of life improved and did not differ between groups: 96% mesh versus 91% no-mesh subjects reported a cure of bulge symptoms.  There was not a statistical difference between the no-mesh group (21%) and the Prolift group (10%) with respect to new-onset dyspareunia or sexual function.  As noted earlier, there were an equal number of Prolift mesh exposures and suture erosions in the no-mesh subjects.[39]

In 2009, Carey reported the results of a randomized controlled trial comparing vaginal repair with Gynemesh PS mesh versus colporrhaphy for

---

[36] de Landsheere L, et al., Surgical intervention after transvaginal Prolift mesh repair: retrospective single-center study including 524 patients with 3 years' median follow-up. Am J Obstet Gynecol 2012 Jan;206(1):83.e1–7.

[37] Dietz V and Maher C, Pelvic organ prolapse and sexual function. Int Urogynecol J 2013;24:1853–1857.

[38] Withagen MI, et al., Trocar-Guided Mesh Compared With Conventional Vaginal Repair in Recurrent Prolapse: A Randomized Controlled Trial. Obstet Gynecol 2011 Feb;117(2):242–250.

[39] Sokol AI, et al., One-year objective and functional outcomes of a randomized clinical trial of vaginal mesh for prolapse. Am J Obstet Gynecol 2012 Jan;86:e1–e9.

prolapse.  Success at 1-year in the mesh group was 81% compared with 65% in the no mesh group.  A high level of satisfaction with surgery and improvements in symptoms and quality-of-life data were observed in both groups.  De novo dyspareunia was reported in 16% sexually active women in the mesh group versus 15% in the no mesh group.  Most disturbing was the fact that two women in the no-mesh group required vaginoplasty for vaginal stenosis.[40]

In 2011, Altman published the results of a randomized trial of anterior colporrhaphy versus transvaginal mesh for pelvic organ prolapse in the New England Journal of Medicine.  In this study of 389 evaluated at 1 year, the success rate was significantly more common in the women treated with transvaginal mesh repair (61%) than in those who underwent colporrhaphy (35%).  More importantly, the mesh-based repair lasted longer.  Surgical reintervention to correct mesh exposure during follow-up occurred in only 3% of patients in the mesh-repair group.  There was not a statistically significant difference in pelvic or genital pain at 2 months or 12 months between the colporrhaphy and mesh groups.  In fact PISQ-12 scores improved by 2% in native tissue repairs and 2.8% in Prolift repairs.  Dyspareunia was reported "usually" or "always" by 2% of the women following colporrhaphy and by 7.3% after transvaginal mesh surgery, but the rates were not statistically significantly different.  Finally, patient sexual satisfaction was 48% in the Prolift group compared to only 40% in the colporrhaphy group.[41]

The Society of Gynecologic Surgeons Systematic Review Group published a systematic review of literature regarding graft and mesh use in transvaginal prolapse repair in 2016.  They found that, in the anterior compartment, "synthetic nonabsorbable mesh consistently showed improved anatomic and bulge symptom outcomes compared with native tissue repairs based on meta-analyses."  They found that other subjective outcomes like dyspareunia and urinary incontinence generally did not differ between the two groups.  In the posterior compartment, they found that synthetic mesh use did not improve success.  Mesh erosion rates ranged from 1.4–19% in the anterior compartment, and between 3–36% when mesh was placed in multiple compartments.  Operative mesh revision rates ranged from 3–8%.[42]

A 2016 retrospective, population-based cohort study of 5,488 women who underwent a mesh-based prolapse procedure between 2002 and 2013 in Ontario, Canada showed that approximately 5% of women who underwent a mesh-based prolapse surgery required reoperation for a mesh complication

[40] Carey M, et al., Vaginal repair with mesh versus colporrhaphy for prolapse: a randomised controlled trial. Br J Obstet Gynecol 2009 Sep;116(10):1380–1386.
[41] Altman D, et al., Anterior Colporrhaphy versus Transvaginal Mesh for Pelvic-Organ Prolapse. N Engl J Med 2011;364:1826–1836.
[42] Schimpf MO, et al., Graft and Mesh Use in Transvaginal Prolapse Repair, Obstet Gynecol. 2016 Jul;128(1):81-91.

within ten years.[43]

Because of the high rate of baseline dyspareunia in patients with pelvic floor dysfunction, large, prospective, multicenter trials have been recommended by Lowman, et al.  Lowman showed that POP repair, whether performed via an abdominal or vaginal approach, appears to have a high rate of associated dyspareunia.[44] The Prolift procedure has a de novo dyspareunia rate comparable to traditional repairs.

In summary, Prolift studies have more patients and longer follow-up than native tissue repair.  The clinical data is clear that Prolift can be performed safely and effectively with results that approach the gold standard procedure abdominal sacrocolpopexy with Prolene mesh.  Moreover, these randomized controlled trials show that the vast majority of patients do not have dyspareunia or unprovoked pelvic pain after undergoing transvaginal mesh surgery.  It is also important to note just how prevalent pelvic pain and dyspareunia are in women with prolapse who have never had any pelvic surgery.  Many of these women have improvement in their pelvic pain as a result of Prolift effectively resolving their prolapse.  As with all prolapse surgeries, wound complications such as suture erosion and granulation tissue are known risks that can occur in native tissue procedures, while mesh exposure is a known risk of using mesh whether transvaginally or abdominally.

### 4.    Benefits and Risks

Like all surgical techniques, the incorporation of mesh into surgical POP repair has potential advantages and disadvantages. Mesh may improve long-term anatomic results of surgery as compared to non-mesh repairs for some types of prolapse.[45]  Like with all surgeries, complications such as erosion, pain, urinary tract injury, and sexual dysfunction may be due to surgical technique, the materials utilized, patient anatomy, or a combination of factors.  It is also important to recognize these complications are not unique to mesh surgeries, and are known to occur with non-mesh-based repairs. There is no convincing evidence that transvaginal mesh can cause an autoimmune response, and there is no reason to remove vaginal mesh in asymptomatic patients.  In patients who have had vaginal mesh surgery for POP and are satisfied with their results, there is no need to take any action other than routine check-ups and follow-up care.[46]

In some circumstances, transvaginal mesh for pelvic organ prolapse may

---

[43] Kelly EC, Winick-Nj J, Welk B, Surgeon Experience and Complications of Transvaginal Prolapse Mesh. Obstet Gynecol. 2016 Jul;128(1):65-72.

[44] Lowman JK, et al., Does the Prolift system cause dyspareunia? Am J Obstet Gynecol 2008;199:707.e1–707.e6.

[45] AUA Position Statement on the Use of Vaginal Mesh for the Repair of Pelvic Organ Prolapse, 2011.

[46] AUA Position Statement on the Use of Vaginal Mesh for the Repair of Pelvic Organ Prolapse, 2011.

be the most appropriate surgical option.[47]  There are certain clinical situations where many would agree the use of transvaginal mesh is not only acceptable, but preferred.  Examples of these clinical situations include: patients with recurrent prolapse after a non-mesh, native tissue repair; or patients in whom an abdominal approach may pose additional and potentially more significant surgical risks, such as patients with pulmonary co-morbidities or patients with known significant intra-abdominal adhesions. It is AUGS's "strong opinion . . . that there are subsets of women with prolapse, and in some cases those with the most advanced disease, in whom the benefits of transvaginal mesh outweigh the risks and a blanket ban on the use of these products compromises patient care."[48]

Prolift provides many unique benefits to women, in that it has minimal recovery times, brief operative time, is durable, has high success rates, and low complications rates.[49]  The rates of pain and dyspareunia and changes in vaginal length and caliber are not significantly different than those seen with non-mesh native tissue repairs.  Contraction of tissue and dyspareunia are long-known risks of vaginal surgery.[50]

The risks specific to Prolift are identified in the IFU and Professional Education materials, and are well-known to surgeons who perform prolapse surgery.  The most common risk is a graft-related complication, which is mesh exposure.  Mesh exposure is warned of in the IFU.  These exposures can be treated in most instances with excision of the exposed material.  The outcome is usually good once the complication has been addressed appropriately.  Long-term serious adverse mesh-related events are uncommon.  Prolift has essentially the same risks factors and complications as other transvaginal repairs, such as traditional native tissue repairs or reinforced biological repairs that use a permanent suture for fixation.  For instance, injury to surrounding structures such as the bladder, urethra, ureter, bowel, rectum, nerve, or vaginal wall resulting in a fistula, bleeding, infection, pelvic pain, or dyspareunia can occur from dissection in a native tissue repair, or from dissection in a Prolift case.  Foreign body reaction, rejection, infection, exposure/erosion of synthetic material, and other wound complications can occur from a transvaginal native tissue repair or reinforced biological repair as well.

Tissue contraction is a potential risk well-known to surgeons who perform prolapse surgery.  Vaginal tissue contracture, which is warned of in the Prolift IFU and in Professional Education materials, can occur from a native tissue repair, colporrhaphy, or Prolift.  However, if Prolift is placed tension-free as described in the IFU and as can be seen in Professional Education materials, it is rarely clinically significant.

---

[47] AUGS Position Statement on Restriction of Surgical Options for Pelvic Floor Disorders, 2013.
[48] AUGS Position Statement on Restriction of Surgical Options for Pelvic Floor Disorders, 2013.
[49] Benbouzid S, et al., Pelvic organ prolapse transvaginal repair by the Prolift system: Evaluation of efficacy and complications after a 4.5 years follow up. Int J Urol 2012;19:1010–1016.
[50] Francis WJA and Jeffcoate TNA, Dyspareunia Following Vaginal Operations. J Obstet Gynecol Br Commonwealth 1961 Feb;68(1):1–10.

Prolift is an important treatment option for many women with POP.  For instance, women with weak tissue and/or severe forms of prolapse may especially benefit from a reinforced mesh repair.  When Prolift was available and I was having a conversation with a patient with an anterior/apical compartment prolapse about which procedure to choose, I would patients that some native tissue repairs have a low risk of re-operation for a foreign body complication, but a 40% risk of re-operation for recurrent POP.  Conversely, if they chose Prolift, it would be rare that the POP would ever return in the treated compartment, but there would be a 5-15% risk of mesh-related complication leading to re-operation.  After the surgeon makes a detailed consultation considering the history, physical, past medical and surgical history, the surgeon makes a recommendation on the approach that is best for that individual.  The informed consent process that occurs between the surgeon and patient should discuss the risks, benefits, and expected convalescence with each of the commonly performed repairs.  Ultimately, the patient decides how to proceed, and if the surgeon agrees, then the operation is performed.

Many critics of the use of transvaginal mesh kits feel these procedures are never indicated.  They favor abdominal sacrocolpopexy for all patients.  However, there are many patients such as elderly patients that simply will not tolerate an abdominal approach due to co-morbid conditions.  Abdominal sacrocolpopexy, even when performed laparoscopically, has significant peri-operative morbidity such as hemorrhage, bowel injury, and obstruction.  It also can be difficult to perform in patients with multiple prior abdominal surgeries due to adhesions.  It does not address rectocele very well, and can cause de novo stress urinary incontinence.[51]  Moreover, there is a risk of suture and mesh exposure with sacrocolpopexy, and in a large study performed by the Pelvic Floor Disorders Network, the probability of mesh erosion was reported to be 10.5%.  Like Prolift, this may require surgical treatment, and having to abdominally reoperate to treat these complications poses greater risks and morbidity to the patient.  Critics may offer an obliterative transvaginal procedure known as colpocleisis in such patients.  However, many elderly women, even if no longer sexually active, do not want an obliterative procedure that negatively affects body image.

### 5.    Inflammation After Prolift and Claim of Cytotoxicity

Plaintiffs' experts have suggested that there may be an inappropriate inflammatory response with the Prolift. This has not been the case in my practice, nor is there any literature from peer-reviewed urology, urogynecology, or gynecology journals that have demonstrated this to be the case. (See studies referenced above, which do not support this. Professional statements do not support this.)

---

[51] Nygaard I, et al., Long-term Outcomes Following Abdominal Sacrocolpopexy for Pelvic Organ Prolapse. J Am Med Assoc 2013 May;309(19):2016–2024.

In the actions section in the IFU, Ethicon informs physicians that the mesh elicits a minimum to slight inflammatory reaction in tissues that is transient. From a physician's standpoint, I am concerned about a persistent acute inflammatory response that has a clinical effect on patients. The Ethicon IFU tells me that there will be an inflammatory response to insure the tissue integrates into the mesh, but that this inflammatory response is transient. On a microscopic level, there will be a minimal-to-mild chronic inflammatory response, but as this has no clinical effect on patients, it is not a concern for me or any other reasonable physician. This section properly tells physicians about the clinical implications of the inflammatory response. It also tells physicians that the tissue will incorporate into the mesh; therefore, if removal is necessary, it is explicit that you will have to cut around the tissue to explant the mesh. This tells an incontinence surgeon exactly what would be necessary to remove the mesh and the implications for the patient.

### 6.      Claims of Degradation After Prolift

Clinical evidence does not show that the Prolift mesh degrades or that if it did it leads to a clinically significant effect.  The clinical studies discussed above show lasting success, low late-term complications, and are inconsistent with this degradation theory. Studies like Clavé 2010[52] do not account for handling and alteration during processing prior to analysis. Clavé 2010 is unreliable and fails to show degradation. The sample analyzed in that study was less than 1/3 of the overall cohort (32 out of 100) and no selection criteria was described. The authors also failed to discuss whether any damage to the mesh occurred during surgical explantation. The SEMs showing surface cracking could be from biologic material and handling, as well as preservation. Moreover, the chemical analyses performed do not show degradation. Likewise, the Costello study[53] sometimes relied upon by plaintiffs' experts was a case report, which is unreliable and concerned a Bard mesh. One must also remember that biologic materials, as well as autologous and cadaveric fascia are known to degrade.[54]

Plaintiffs' experts indicate degradation may take place with the Prolift. From a clinical standpoint, I have never seen the Prolift mesh degrade or cause any clinical effect.  I have not witnessed any gross evidence of mesh degradation on surgical revision cases. If somehow the mesh did microscopically degrade, there has been no clinical effect. Moreover, I have never read or seen a single peer-reviewed published article (or seen any cited by plaintiffs' experts) that showed any clinical effect of degradation.  Furthermore, I am aware of literature that indicates that surface cracking seen on polypropylene or Prolene examined

---

[52] Clavé A, et al., Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants. Int Urogynecol J 2010;21:261–270.

[53] Costello CR, et al., Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants From a Single Patient. Surgical Innovation 2007;14(3):168–176.

[54] Woodruff A, et al., Histologic Comparison of Pubovaginal Sling Graft Materials: A Comparative Study. Urology 2008;72:85–89.

under scanning electron microscope is not degraded polypropylene but rather cracking in a protein-based biofilm.[55]

### 7. Claims of Cancer After Prolift

There is no reliable scientific information to support the claim that polypropylene can cause cancer or sarcoma. I have not personally witnessed cancer from mesh in any patient that I have implanted with polypropylene in 15 years, and after more than 1,000 surgical implants. My experience is consistent with the clinical literature.[56] Moreover, the scientific data does not support plaintiffs' experts' contention that the Prolift presents a risk of sarcomas or cancer. There are no reports in the medical literature of tumors related to the implantation of surgical-grade polypropylene for midurethral slings or prolapse mesh kits, and there is no evidence suggesting any carcinogenicity in humans related to polypropylene despite hundreds of millions of individuals being implanted with the material in various forms for well-over a half century.[57] The Prolene material that the Prolift mesh is comprised of has been used for decades, and studies do not show a statistically significant risk. There was no need for Ethicon to warn of this alleged risk in the Prolift IFU.[58]

## IV. Prolift™ Instructions for Use (IFU)

### A. Product Description, Warnings and Adverse Reactions

Ethicon's IFU for Prolift properly provides the indications for use, contraindications, warnings, and adverse reactions. The adverse reactions section in the IFU that was used in 2005 through 2009 properly warns of the complications that are associated with the mesh, and the tools for implementing the mesh in Prolift. It warns of the only unique complication with the device—

---

[55] de Tayrac R and Letouzey V, Basic science and clinical aspects of mesh infection in pelvic floor reconstructive surgery, Int Urogynecol J. 2011 Jul;22(7):775-80; Ong KL, White J, and Thames SF, The Myth: In Vivo Degradation of Polypropylene Meshes, IUGA Abs. PP 19, 2016.

[56] King AB, et al. Is there an association between polypropylene midurethral slings and malignancy? Urology. 2014 Oct;84(4):789-92; King AB, Goldman HB. Current controversies regarding oncologic risk associated with polypropylene midurethral slings. Curr Urol Rep. 2014 Nov;15(11):453; Linder BJ, et al., Evaluation of the local carcinogenic potential of mesh used in the treatment of female stress urinary incontinence. Int Urogynecol J. 2016 Sep;27(9):1333-6; Moalli P, et al., Polypropylene mesh: evidence for lack of carcinogenicity. Int Urogynecol J. 2014 May;25(5):573-6.

[57] AUGS & SUFU, Frequently Asked Questions by Providers—Mid-urethral Slings for Stress Urinary Incontinence. (available at http://www.augs.org/p/bl/et/blogaid=194); Dwyer PL and Riss P, Carcinogenicity of implanted synthetic grafts and devices. Int Urogynecol J 2014 May;25(5):567–568.

[58] Moalli P, et al., Polypropylene mesh: evidence for lack of carcinogenicity. Int Urogynecol J 2014, DOI 10.1007/s00192-014-2343-8; King A, et al, Current Controversies Regarding Oncologic Risk Associated with Polypropylene Midurethral Slings. Curr Urol Rep 2014;15:453; Sunoco MSDS; AUGS & SUFU, Frequently Asked Questions by Providers—Mid-urethral Slings for Stress Urinary Incontinence. (available at http://www.augs.org/p/bl/et/blogaid=194).

mesh exposure.  Although as noted above, suture exposure and other wound complications can occur with non-mesh prolapse repairs.

When Ethicon or any corporation drafts an IFU, its intended audience is the physician. Importantly, the IFU provides that "*users should be familiar with surgical procedures and techniques involving pelvic floor repair and nonabsorbable meshes before employing the Gynecare Prolift Pelvic Floor Systems.™*"  "*Acceptable surgical practices should be followed in the presence of infected or contaminated wounds.*"  This is very important, because physicians who have this type of experience are knowledgeable of the anatomy, complications, and how to handle complications.

Plaintiffs' experts' reports indicate that pain, pain with sexual intercourse, and voiding dysfunction should have been listed in the Prolift IFU.  I disagree, as my personal experience and the medical literature does not support this statement.   In a study report from 2007, Fatton described their preliminary Prolift results and noted that among the 30 patients known to be sexually active, 76.6% had resumed sexual intercourse at 3 months follow-up, while only three patients complained of dyspareunia.[59]  Paplomata noted only 2 patients of 56 that underwent prolapse repair with Gynemesh or Prolift developed dyspareunia during 21-month follow-up.[60]  In a 5-year prospective study of Prolift, Jacquetin et al. noted de novo dyspareunia in 10% of cases, while only 1 patient had unprovoked pelvic pain following Prolift at the 5-year endpoint.[61]

Any pelvic floor surgery can cause pain, pain with sexual intercourse, or voiding dysfunction, so all physicians who are familiar with surgical procedures for pelvic floor repair know this based upon their common and basic surgical knowledge.  When IFUs are drafted, commonly held surgical knowledge must be taken into consideration.  Any physicians familiar with pelvic floor repair would understand that pain or pain with sexual intercourse could occur with any pelvic floor repair, including Prolift. Further, the IFU states that scarring, infection, contracture, erosion, and nerve injury can take place, which would obviously result in pelvic pain and pain with sexual intercourse.  All pelvic floor surgeons know this based upon their common and basic surgical knowledge.[62]  Ethicon is

---

[59] Fatton B, et al., Transvaginal repair of genital prolapse: preliminary results of a new tension-free vaginal mesh (Prolift™ technique)—a case series multicentric study. Int Urogynecol J 2007;18:743–752.

[60] Paplomata E, et al., Genital Floor Repair Using Polypropylene Meshes: a Comparative Study. 2007 (Abs. 482).

[61] Jacquetin B, et al., Total transvaginal mesh (TVM) technique for treatment of pelvic organ prolapse: a 5-year prospective follow-up study. Int Urogynecol J 2013 Oct;24(10):1679–1686.

[62] ABOG & ABU Guide to Learning in Female Pelvic Medicine and Reconstructive Surgery 2012 (noting that fellows must be able to perform and describe the alternatives, risks, benefits, complications, success rates, and levels of evidence for prolapse procedures); ACGME Program Requirements for Graduate Medical Education in Female Pelvic Medicine and Reconstructive Surgery, sec. IV.A.5.b).(3)  ("[C]ompleting the F3 year must demonstrate competence in their knowledge of: . . . indications, contraindications, limitations, complications, techniques, and interpretation of results of screening, diagnostic, and therapeutic procedures including surgery

responsible for identifying the complications, but not the implications of each complication; otherwise the IFU would become a treatise.  Ethicon was no more required to identify pain or pain with sexual intercourse than it would have been to say inflammation can cause swelling, a laceration of a vessel can cause bleeding, bleeding can lead to shock, and shock can lead to death.

With respect to voiding dysfunction, this occurs as a result of the dissection, and not as a result of the mesh itself or the device.  Therefore, it is my opinion that it was not necessary for Ethicon to include voiding dysfunction in the Prolift IFU.  Voiding dysfunction can result from any pelvic floor surgery, and the possibility of its occurrence is common surgical knowledge for surgeons familiar with pelvic floor procedures.

Furthermore, it is not necessary to identify patient selection factors any further than Ethicon did.  Ethicon identified its indications for use and the contraindications.  All areas in between are to be determined by the patient and physician.

Some physicians state that mesh should only be used for recurrent prolapse.  This is not the case, and is not supported by the data.  This is a decision that a physician and patient must make together, as there are forms of severe prolapse for which a transvaginal mesh would be useful.  Further, some physicians state transvaginal mesh may not be used on younger sexually active women.  This statement is not supported by data, and therefore I disagree with the statement that it should have been in the IFU.  Only the patients and physicians together may determine if its use on a young sexually active patient is appropriate.  For instance, in a young sexually active woman with weak tissue, it may be likely that a native tissue repair would fail and necessitate a secondary repair.  And there are no statistically significant differences in the rates of pain, de novo dyspareunia, or changes in vaginal caliber and length when one examines the randomized controlled trials comparing Prolift to native tissue repair.  Therefore, the surgeon may recommend a more durable repair such as Prolift even where the patient is not suffering from recurrent prolapse.

## V.     Prolift™ Pelvic Floor Repair System, Surgical Technique

---

for: . . . pelvic organ prolapse . . . ."); Drutz HP and IUGA Education Committee, IUGA guidelines for training in female pelvic medicine and reconstructive surgery (FPM-RPS), Updated Guidelines 2010, App'x 3.3 ("The trainee should receive experience in the theory, practice, and performance of the procedures listed below.  Trainees are not expected to gain expertise in all these techniques, but should achieve proficiency in commonly used procedures [including but not limited to] vaginal repair of genital tract prolapse . . . [and] mesh use in repairs, use of various graft materials.").

This is a 30-page comprehensive document overviewing total pelvic floor repair, anterior pelvic floor repair, and posterior pelvic floor repair. Important principles of the procedure, product description, preoperative preparation, and patient positioning are included, as well as a discussion of a potentially higher-risk of mesh erosion with concomitant hysterectomy, as seen by the TVM Group. The document reviews the contents of the kit (Guide, cannula, retrieval device, anterior implant, posterior implant, and total implant).

The surgical technique guide for physicians contains general guidelines, and is not a substitute for training and experience. The physician is to take these general guidelines along with using his skill to see how these guidelines apply to the individual patients' anatomy.

Critics have stated that more information should be provided on how to trim the mesh. The IFU states that physicians are to be familiar with pelvic floor repair with meshes, and such physicians are to know how to trim the mesh appropriately for their patient. A guideline cannot outline the individual anatomy for each patient. Further, such physicians must know how and where to place such meshes appropriate for their patients, and to be able to place items tension-free.

## VI.   Prolift™ Patient Brochures

I have reviewed the patient brochures that were in effect in 2005, 2006 through approximately November 2008, and the subsequent November 2008 patient brochure. The purpose of the patient brochure is to facilitate a conversation with the patient and the physician. All these brochures properly identify the disease state, options for women, and the complications. And most importantly, the brochures tell women that this surgery should be performed only after a complete physical examination.

The first two brochures review what pelvic organ prolapse is, what the symptoms are, how it is diagnosed, and how it is treated. The brochure reviews surgical procedures for POP. It describes the product Prolift and how it is different from other surgical procedures. The brochure describes how Prolift works, how long the surgery takes, and the expected convalescence. The brochure states the all surgical procedures have some risks. *"Although rare, complications associated with the procedure include injury to blood vessels of the pelvis, nerve damage, difficulty urinating, bladder and bowel injury. There is also a small risk of the mesh material becoming exposed into the vaginal canal."* It mentions only a complete physical exam and consultation with the physician can determine which procedure is right for you.

With regard to the brochures before November 2008, it is my opinion that describing the perioperative complications as "rare" is correct, and that erosion rates are small compared to the large number of patients—85 to 95% of whom

30

do not have erosions.  Further, the inclusion of pain or pain with sexual intercourse is not necessary, and would not elicit a conversation that would not already be elicited by the complications identified in the patient brochure, the IFU, and the physician's surgical knowledge, as all surgical options to treat prolapse carry this risk, and the risk is no higher with Prolift.  It must be understood that the patient brochure is not designed to identify all complications, but to facilitate a conversation with the physician so that the physician can discuss the complications and rates based upon his/her practice and the individual characteristics of the patient.

More recent brochures, such as the November 2008 Prolift brochure and the brochure for Prolift + M also mention the risk of scarring, pain during intercourse, or pain for the partner.  It mentions that exposure of the mesh may require surgical removal.  The brochure mentions that synthetic mesh is a permanent medical device implant.  "*Therefore, you should carefully discuss the decision to have surgery with your doctor and understand the benefits and risks of mesh implant surgery before deciding to how to treat your condition.*"

The patient brochure serves to merely introduce the Prolift device.  It is not intended in any way to substitute for a consultation and informed consent with their pelvic surgeon.  It is the surgeon's job to inform the patient of the risks and benefits of the procedure.  It is the surgeon's responsibility to answer the patient's questions and decide if the patient is an appropriate candidate for Prolift after discussing the risks, benefits, and alternatives.

## VII.   Ethicon Professional Education on Prolift™

### A.   Introduction

The Prolift IFU recommends that surgeons attend professional education.  Thus, in my opinion, the Ethicon Professional Education Program supplements the IFU.  I became familiar with the Ethicon Professional Education Program when I attended a course on the TVT-O in San Francisco on March 23, 2004.  This was a didactic session at a hotel near the San Francisco airport.  The course faculty overviewed the proper patient selection, indications for the procedure, and surgical dissection.   Afterwards, there was a laboratory session at a nearby facility where physicians were instructed on how to use the device on a cadaver.  This was a hands-on laboratory session, where experts on the procedure who were preceptors for Ethicon instructed physicians.  The preceptors guided the new users on how to properly perform the procedure.  In December of 2004, I became a preceptor for Ethicon on the TVT™ procedure.

I attended a course on the Prolift in Milwaukee, WI in 2005.  This was a proctorship that Dr. Dennis Miller directed.  Dr. Miller overviewed the proper patient selection, indications for the procedure, and surgical dissection.  In 2006, I became a preceptor on Prolift™.

I functioned as a preceptor for Ethicon from 2004 until 2011. I have personally instructed physicians on how to perform the TVT™ procedure, TVT Obturator,™ TVT Secur,™ TVT Abbrevo,™ TVT Exact™ as well as Prolift™ and Prolift +M.™

### B.    Phases of Professional Education Program

Ethicon Professional Education Program involves three phases. The first phase is a preceptorship where physicians will attend a course with the designated topic of incontinence, prolapse, or occasionally both. This will include 3-4 hours of didactics overviewing patient selection, surgical technique, and long-term data on the device. The second half of the day is spent in a hands-on cadaver lab. Another form of education is direct observation in the operating room, where surgeons will be invited into the OR and will watch an experienced surgeon perform the Prolift™ or TVT™ procedure. The third phase of education would be a proctorship, where the preceptor for Ethicon would be a guest in another surgeon's institution and directly observe them performing the TVT™ or Prolift™ procedure to serve as a reference on how to properly use the surgical kit provided by Ethicon.

After having participated in the Ethicon Professional Education Program for eight years both as an attendee and as a preceptor, I feel that the program has high ethical standards and there was no pressure from the company to convince attendees that their products could be placed without preexisting knowledge of pelvic anatomy. The courses were provided to help educate the physician on how to use the kit properly and to practice on a cadaver. The preceptorships allow new users to witness experts placing the device. Proctorships provide an opportunity for new users to have their initial cases observed by an expert.

### C.    Complication Prevention and Management

The professional education department actively worked on how to prevent and manage complications. The group included senior Ethicon staff. The Ethicon USA and worldwide product manager, research and development staff, medical director, and professional education managers were among members of the panel. The physicians on the panel were preceptors that had a vast personal experience with pelvic reconstructive surgery and intimate knowledge of the Prolift™ system.

There was a continuous and collaborative effort to identify and implement ways to avoid complications. There was review of how and why complications occur. At bi-annual meetings and summits, the education panel would receive information on complications, and then provide feedback to Prolift™ users on how to prevent these complications. The group also made presentations on complications and algorithms to manage adverse events. This allowed for

improvement in surgical techniques and helped better identify who was an appropriate candidate for the procedure.  There was significant education provided on how to recognize and treat mesh-related complications such as exposure, erosion, and pain.

Preceptors and Ethicon professional education staff were available to their trainees to discuss complications and provide advice on how to effectively manage complications.  This close network allowed rapid bi-directional feedback from the company to the physicians.

Preceptors recommend using the following techniques to avoid complications associated with Prolift™: (1) performing an initial full-thickness vaginal wall dissection, (2) placement of the mesh graft in a tension-free fashion, (3) avoiding trimming of the vaginal epithelium, and (4) proper postoperative follow-up to ascertain whether long-term complications have developed.

### D.     Prolift Surgeon's Resource Monograph

In 2007, Ethicon produced and began distributing the Prolift Surgeon's Resource Monograph at professional education events and other meetings.  This monograph provides a unique opportunity for surgeons have access to the experience of pelvic surgeons from around the world who have performed a large number of Prolift Pelvic Floor Repair System procedures.  The document was an open exchange of ideas representing the most up-to-date information possible.  The perspective that must be kept in mind was that it was information that was not available on most procedures.  All surgical procedures have complications, and experience-related consequences are seen in even the most basic urogynecologic surgeries.  This monograph was published after 35,000 Prolift procedures worldwide. The report is a summary of the collective experiences of the most experienced Prolift users who were invited to attend one of five Prolift user forums held throughout the world. The comments and opinions contained within the document represent the experiences of the ten authors, as well as over 200 participating international prolapse surgeons.

The monograph provided expert opinions on the use of the Prolift (Total, Anterior, and Posterior) Pelvic Floor System.  There are fifteen sections: Introduction, patient selection, preparation, surgical technique, anesthesia and hydrodissection, incisions, additional sutures, mesh handling, complications, hemorrhage, visceral injury, infection, mesh complications (erosion, exposure, and extrusion), dyspareunia and vaginal pain, clinical data summary, and appendix.  Each section provides personal insight from some of the most experienced pelvic surgeons in the world.  In my opinion, the monograph is the most comprehensive, detailed, practical document on a single pelvic surgery I have read in my career.  The document is not meant to replace the surgeon's thoughts and skills obtained in medical school, residency, fellowship, and practice, as these attributes are irreplaceable.  Rather, the monograph provided feedback from some of busiest pelvic surgeons in the world on a procedure used

to repair prolapse on more 35,000 women at the time of publication.

Plaintiff's experts will argue that the monograph should have been provided at the launch of the procedure.  This of course would not have been possible; as such insight is only gained through introduction, development, and extensive utilization of a procedure.  The monograph did provide meaningful feedback to less experienced surgeons around the world, and it advised of device use as well as complications and their management.

## CLINICAL DATA Summary

| Author | Patients | Follow-up | Exposure* | Success | Complications | |
|--------|----------|-----------|-----------|---------|---------------|---|
| Cosson et al | 90 | 12 mo | 9 (10%) 5 (5.6%) | 74 (81.6%) | Rectal injury Bleeding Fistula (VV) | 1 2 1 |
| Fatton et al | 110 | 3 mo | 5 (4.7%) | 105 (95.3%) | Cystotomy Hematoma Retention | 1 2 6 |
| Murphy et al | 89 | 5 mo | 0 (0%) | 84 (94.4%) | Cystotomy | 2 |
| Hinoul et al | 29 | 6 mo | 2 (6.9%) | 28 (96.5%) | Cystotomy | 1 |
| Withagen et al | 43 | 6 mo | 2 (4.7%) | 35 (81.4%) | Rectal injury Cystotomy Retention | 1 2 1 |
| Groenen et al[1] | 26 | 2 mo | 1 (3.8%) | 26 (100%) | Retention | 5 |
| Perscheler et al[1] | 80 | N/A | 8 (10%) 5 (6.25%) | N/A | Hematoma Cystotomy | 2 2 |
| Rivera et al[2] | 82 | 3 mo | 7 (11.7%) | N/A | Hematoma Bleeding | 1 1 |
| **Total** | 549 | 6 mo | 34 (6.2%) 12 (2.6%) | 81.4-100% | Rectal injury Bleeding Retention Cystotomy | 1.7% 1.3% 6.7% 1.7% |

\* second figure is exposures requiring intervention
[1] All abstracts 2006 IUGA : Int Urogynecol J 2006;17(s.2):S212(abstracts)
[2] All abstracts 2006 AUGS : Int Urogynecol J 2006;17(S.3):S460(abstracts)

| Author | Patients | Follow-up | De Novo Sexual Limitaion |
|--------|----------|-----------|--------------------------|
| Murphy et al[1] | 89 | 5 mo | 2/38  (5.3%) |
| Fatton et al[2] | 90 | 3 mo | 3/35  (8.5%) |

[1] Murphy et al. Int Urogynecol J 2006;17(s.2):S212(abstracts)
[2] Fatton et al. Int Urogynecol J 2006;17(s.2):S273(abstracts)

## E.    Credentialing

The Ethicon Profession Education Program is not a credentialing process. Ethicon did provide a certificate noting that a surgeon did attend their course on a particular product like Prolift.  But this certificate by no means verifies that the physician is proficient at performing the procedure.

The certificate from the program simply documents the surgeon's attendance at an Ethicon Professional Education Event.  It shows that the physician made an attempt to be educated on the procedure and Ethicon's efforts to provide exposure to their products. The actual credentialing should always occur at the hospital level and is up to the physicians on the committee to decide which procedures the surgeon is capable of performing.  It is the physician's responsibility to know the pelvic anatomy, understand biomaterials, and properly select patients for the procedure.  Prolift is merely a kit to help the surgeon place a mesh graft in the vagina using a trocar system for anchoring that decreases the amount of dissection required and allows a reliable anchoring mechanism for the graft.  The Prolift system does not in any way make the surgeon competent in anatomy, proper dissection, tunneling, graft deployment, and wound closure.  AUGS has recently issued a credentialing recommendation regarding transvaginal and abdominal prolapse mesh usage.  Many of the recommendations for ways that a surgeon could gain further knowledge were encompassed years ago, beginning in 2005, by the Prolift professional education program and materials which were then and are today state of the art.  The importance of these materials was set forth in the IFU, which advised surgeons of their existence and recommended that they take the opportunity to receive professional education.  This education included models, surgical videos, cadaver labs, proctoring, handouts and other information which was more than adequate and very helpful.

## VIII.  Product Design

### A.    The Usefulness and Desirability of the Product

Prolift has a number of useful and desirable features.  Prolift is a type 1 large-pore-size polypropylene mesh.  It is the most common mesh used in incontinence and prolapse surgery.  The trocar system is unique in that it offers a minimally invasive approach for graft augmentation in prolapse surgery.  The trocar allows the surgeon to suspend the vagina to deep structures, including the sacrospinous ligament, that are often difficult to access with traditional fixation techniques such as suturing.  This is a desirable feature for surgeons when performing prolapse surgery, as it allows for an improved prolapse outcome due to the improved reduction of the prolapse when compared to native tissue repair.

The utility of this product to the surgeon and to the public is that it allows the surgeon to place polypropylene mesh via a vaginal incision using a minimally invasive approach.  Patients with recurrent prolapse especially benefit from a transvaginal polypropylene mesh placed with trocars.  Moreover, there are many patients that are not appropriate candidates for mesh placement using an abdominal approach due to comorbid conditions such as abdominal adhesions, morbid obesity, and pulmonary disease.  Patients with pulmonary disease or morbid obesity do not tolerate laparoscopic surgery very well.  The steep Trendelenburg position and the $CO_2$ insufflation required in laparoscopic and

robotic surgery impair mechanical ventilation and hence oxygenation. This often prohibits laparoscopic and robotic surgery. Also, patients with abdominal adhesions are at risk for bowel injury from a laparoscopic trocar or from the dissection in an open abdominal approach. These distinct and common patient populations certainly benefit from a vaginal approach as it obviates the need for Trendelenburg, $CO_2$ insufflation, and lysis of abdominal adhesions. Its standardized nature allowed the mass accumulation of clinical data that could be assessed including level 1 studies and trials across the various countries. Before Prolift there were many POP procedures that have been studied far less yet were in practice, with many existing for decades without RCTs, as compared to Gynemesh PS and Prolift, which were quickly assessed in RCTs according to practice in the POP field. This is another feature that makes the design state of the art, ahead of prior practice, desirable, and useful.

### B.    The Safety of the Product

Prolift is a safe product that is no more likely to cause injury to surrounding structures such as the bladder, ureter, rectum, or nerves than traditional native tissue repair. All prolapse surgeries—including native tissue repair—can cause bleeding, infection, pain, and dyspareunia. None of these complications are unique to transvaginal mesh kits such as Prolift.

There are graft-related complications when using augmentation—either biological or synthetic grafts, or synthetic sutures. Any foreign body has the potential for graft exposure which may need surgical treatment. These well-recognized safety concerns, which were taught to surgeons in basic training and discussed in the medical literature and at conferences well before Prolift, are not unique to Prolift. These potential risks are obvious to the surgeon. The kit was designed with a narrow trocar and a surrounding plastic sheath with a lightweight, large-pore-size mesh. These features result in a favorable safety profile.

The severity of complications from the Prolift kit is usually minor. In fact, the most common complication is vaginal mesh exposure. Graft exposure can usually be managed with minor surgical excision, and usually does not require multiple operations. Some patients are also managed medically with success, as reflected in the clinical literature.

Many of the sexual side effects that occur after prolapse surgery are related to the concomitant hysterectomy or oophorectomy. Specifically, oophorectomy leads to menopause. The post-menopausal symptoms such as anorgasmia and decreased libido are a direct result of menopause. These symptoms are often incorrectly attributed to prolapse surgery or the mesh graft. The risks of vaginal and prolapse surgery to lead to tissue contraction, pain, and dyspareunia were also well known, taught, and discussed in the literature and

other venues long before Prolift.  These potential risks are obvious to the surgeon.

Pelvic surgeons, investigators, and industry have been interested in using graft material to augment surgical repair of prolapse in efforts to improve the outcome when compared to native tissue repairs.  The search for the ideal graft material in prolapse surgery has evolved over the past 25 years.  The results have shown that Gynemesh PS has the best balance of graft characteristics when compared to FDA-approved alternatives.

Current options for graft augmentation when performing prolapse surgery include allografts, xenografts, and synthetic materials such as polypropylene mesh.   Allograft material such as cadaveric skin or fascia has been used in prolapse surgery for many years.  However, allograft strength weakens with time, leading to a failed repair.  Moreover, not unlike polypropylene, these grafts can become exposed postoperatively.  Many patients, including Jehovah's Witnesses and Native Americans, refuse tissue transfer from the deceased.  Also, many patients have strong reservations about disease transmission with soft-tissue allografts.  Xenografts offer an alternative to allografts and are less expensive and more readily available.  Xenografts avoid the risk of disease transmission and cultural concerns of using cadaveric tissue, but can lead to an immune reaction leading to tissue rejection, extrusion, and other healing abnormalities.  Bovine products have largely replaced porcine grafts.  However, unlike Prolift, the medical literature regarding safety and efficacy of bovine grafts is scarce.

Gynemesh PS does not transmit disease, does not cause an immune reaction, is less expensive than allografts and xenografts, and is widely familiar and accepted by the public.  Surgeons and the public are familiar and have widely accepted polypropylene mesh for use in hernia and incontinence surgery.  Consequently, it is not surprising that pelvic surgeons prefer polypropylene.

Gynemesh PS is a lightweight, large-pore, monofilament mesh that allows tissue compatibility.  These mesh design features allow for tissue incorporation while incurring an expected level of native tissue reaction.

Some have argued that polypropylene mesh grafts for prolapse surgery can have an even greater pore size and be even lighter in weight.  However, at some point the ultra-lightweight graft material will no longer support the prolapse, and the outcome will then approximate that of native tissue repair.  This is a direct result of pore sizes that are too large, and fibers that are too thin to support pelvic organs.  The mesh will eventually break, resulting in a failed operation.  The expected outcome of ultra-lightweight polypropylene grafts is reduced efficacy or durability when compared to Prolift.  The ultra-lightweight mesh would not eliminate the added time, expense, and graft-related risks when compared to native tissue repair.  In the use of Ultrapro in the Prolift +M device, mesh exposures also occurred at comparable rates, as did dyspareunia.  There is

37

much more data on Prolift given its long use, which shows it is safe and effective. A larger pore lighter weight mesh—Vypro—was tried by the TVM Group, but it had many complications and was found not suitable for use in the pelvic floor.

There are limits on continuous modifications of existing surgical products. For instance, if a surgical product such as Prolift was constantly altered as new design features evolve based on recent discovery of new technologies, it would be impossible to collect long-term data on the changing products. Each alteration in graft material can result in unexpected outcomes that are difficult to detect when products are continuously modified. Moreover, should a negative outcome become apparent, it would be impossible to detect which alteration led to the negative outcome, as there would be multiple confounding variables. This is a common, well-understood scientific concept.

Avoiding danger by the exercise of care in the use of the Prolift is readily achievable and is primarily the responsibility of the surgeon. In order to avoid danger in pelvic surgery, the surgeon needs to have the proper medical school education, residency training, and experience in clinical practice. The surgeon should be extremely knowledgeable with pelvic anatomy in order to avoid complications inherent to pelvic surgery. Once the surgeon has a fundamental knowledge of pelvic surgery, he/she can then exercise care in the use of the mesh kit. In order to exercise care in the use of a mesh kit, the surgeon should become keenly familiar with the kit's Instructions for Use (IFU), which is included in the surgical packaging. Also, Prolift surgeons should become intimately familiar with the Prolift monograph, attend professional education events as recommended, and network with colleagues to allow an understanding of the product and the capacity to exercise care in placement of a transvaginal mesh kit.

The Prolift monograph, professional education events, cadaver labs, video and PowerPoint presentations, and close discussion with experts in pelvic surgery are important educational formats that are readily available to the surgeon.

Responsible pelvic floor surgeons would be aware of the potential complications involved with the use of the Prolift device due to their medical education, residency training fellowship training if any, and clinical experience. They would be aware of the potential complications involved with the use of the Prolift device due to the obvious condition of the device, with its trocars, mesh, and routes of placement, given decades of knowledge, reporting, and literature on prolapse surgical instruments, the surgical routes, and the use of mesh as earlier described. It is known and obvious that the use of trocars or any surgical instruments passing through the pelvis can cause injury. Trocars and surgical instruments had been in use long before Prolift, and were frequently employed in other procedures like laparoscopic surgeries as well. It is obvious to a surgeon that incisions and transvaginal surgery to correct prolapse can lead to pain and

dyspareunia.  It is also obvious and well-known that tissue contracts after surgery, that wound complications, delayed healing, and graft complications are a risk.   Moreover, responsible pelvic floor surgeons would be aware of the potential complications involved with the use of the Prolift device due to any product-specific training they have undertaken, their review of pertinent medical literature, and their review of the Prolift monograph and IFU, which also make these risks obvious.

Additionally, having had experience with traditional native tissue repair should provide the surgeon with the awareness of the pelvic anatomy and prolapse surgery and its attendant risks.   Experience from using polypropylene mesh and trocars during stress urinary incontinence surgery and prolapse surgery will also serve as a foundation for the understanding of the inherent risks of a transvaginal mesh kit.

The Instructions for Use (IFU) also serves as a guideline for the surgeon. It provides detailed instructions for the surgeon.  Also, it serves as a suitable warning for surgeons and information on proper patient selection.  However, the IFU, Professional education, and Prolift monograph are never a substitute for the surgeon's knowledge of pelvic anatomy or surgical training and skill.   Rather, those materials would be expected to comprise a small portion of the surgeon's overall level of awareness of the dangers of surgical products and Prolift's proper application and use.

Date: ____**1/25/2017**____       _____
                                         Brian J. Flynn, M.D.