# EXHIBIT D

John R. Wagner, M.D.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

```
------------------------------:
IN RE ETHICON, INC., PELVIC  :
REPAIR SYSTEM PRODUCTS        : MASTER FILE
LIABILITY LITIGATION          : No. 2:12-MD-02327
_____:
                              :
THIS DOCUMENT RELATES TO      : MDL 2327
                              :
GENERAL DEPOSITION            : JOSEPH R. GOODWIN
RE:  TVT                      : US DISTRICT JUDGE
------------------------------
```

- - -

March 13, 2017

- - -

Deposition of JOHN R. WAGNER, M.D.,
held at Marriott Melville, 1350 Old Walt
Whitman Road, Melville, New York,
commencing at 9:04 a.m., on the above
date, before Marie Foley, a Registered
Merit Reporter, Certified Realtime
Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 917.591.5672 fax

Deps@golkow.com

John R. Wagner, M.D.

Page 2

```
 1    A P P E A R A N C E S :
 2
 3    AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
 4    BY: BRYAN F. AYLSTOCK, ESQUIRE
 5       17 East Main Street
 6       Suite 200
 7       Pensacola, Florida  32502
 8       850.202.1010
 9       baylstock@awkolaw.com
10       Representing the Plaintiff
11
12
13    RIKER, DANZIG, SCHERER,
14    HYLAND, PERRETTI, LLP
15    BY: MAHA M. KABBASH, ESQUIRE
16       Headquarters Plaza
17       One Speedwell Avenue
18       Morristown, New Jersey  07962-1981
19       973.538.0800
20       mkabbash@riker.com
21       Representing the Defendant
22
23    ALSO PRESENT:
24       Ted J. Tanenbaum, Esq.
```

Page 3

```
 1                - - -
 2            TRANSCRIPT INDEX
 3                  PAGE
 4    APPEARANCES...................... 2
 5    INDEX OF EXHIBITS................ 4, 5
 6    EXAMINATION OF JOHN WAGNER, M.D.:
 7    BY:  MR. AYLSTOCK................ 7, 196
 8    BY:  MS. KABBASH................ 174
 9    REPORTER'S CERTIFICATE........... 201
10    SIGNATURE PAGE................... 199
11    ERRATA........................... 200
12
13    EXHIBITS WITH ORIGINAL TRANSCRIPT
14
15                - - -
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                - - -
 2            E X H I B I T S
 3                - - -
 4    NO.      DESCRIPTION           PAGE
 5    Wagner 1  Notice to Take Deposition      8
 6       of John Wagner, M.D.,
 7       dated March 1, 2017
 8    Wagner 2  Flash drive containing       9
 9       documents
10    Wagner 3  John Wagner, M.D., invoice      9
11       December 2016/January 2017
12    Wagner 4  John Wagner General         10
13       Reliance List in Addition
14       to Materials Referenced in
15       Report MDL Wave 4
16    Wagner 5  John Wagner Supplemental      10
17       General Reliance List in
18       Addition to Materials
19       Referenced in Report MDL
20       Wave 4
21    Wagner 6  Expert Report of John R.      15
22       Wagner, M.D., dated
23       January 31, 2017
24
```

Page 5

```
 1                - - -
 2            E X H I B I T S
 3                - - -
 4    NO.      DESCRIPTION           PAGE
 5    Wagner 7  Curriculum Vitae of John      27
 6       R. Wagner, M.D.
 7    Wagner 8  Wagner article titled       47
 8       Vaginal Repair of
 9       Symptomatic Pelvic Organ
10       Prolapse Using Polypropylene
11       Mesh
12    Wagner 9  Gynecare TVT Instructions     86
13       for Use
14    Wagner 10  Expert Report of John R.     158
15       Wagner, M.D. regarding
16       Gynecare TVT Products
17
18
19
20
21
22
23
24
```

2 (Pages 2 to 5)

John R. Wagner, M.D.

Page 6

1    DEPOSITION SUPPORT INDEX
2
3    DIRECTION TO WITNESS NOT TO ANSWER
4     Page  Line
5     --none--
6
7
8    REQUEST FOR PRODUCTION OF DOCUMENTS
9     Page  Line
10     14  9
11     15  1
12     26  6
13     85  14
14
15
16    STIPULATIONS
17     Page  Line
18     --none--
19
20
21    QUESTIONS MARKED
22     Page  Line
23     --none--
24

Page 7

1                 - - -
2              9:04 a.m.
3           Melville, New York
4                 - - -
5    JOHN R. WAGNER, M.D., the Witness herein,
6       having been first duly sworn by a
7       Notary Public in and of the State of
8       New York, was examined and testified as
9       follows:
10    EXAMINATION BY
11    MR. AYLSTOCK:
12      Q.   Good morning, Dr. Wagner.  How
13    are you?
14      A.   Good morning.
15      Q.   Have you ever given a deposition
16    before?
17      A.   Yes.
18      Q.   So you're familiar with the
19    general principles of it.  I'll ask a
20    question and you'll answer it to the best
21    of your ability?
22      A.   Yes.
23      Q.   If you don't understand a
24    question, please let me know so I can

Page 8

1    rephrase the question because that way I
2    can get clear answers to hopefully clear
3    questions, okay?
4      A.   Okay.
5      Q.   I'm going to hand you first
6    Exhibit 1 to the deposition.  It's the
7    notice.
8           (Exhibit Wagner 1, Notice to
9       Take Deposition of John Wagner, M.D.,
10       dated March 1, 2017, was marked for
11       identification, as of this date.)
12    BY MR. AYLSTOCK:
13      Q.   Have you seen that document
14    before, Doctor?
15      A.   I may have.  Not that I recall
16    though.
17      Q.   If you turn a few pages, you'll
18    see a list of things that are requested to
19    be brought to the deposition.
20           Are you familiar with that list?
21      A.   Yes.
22      Q.   Have you brought documents
23    responsive to the deposition notice with
24    you today?

Page 9

1           MS. KABBASH:  Bryan, I'll just
2       represent to you that we have brought
3       on the flash drive that I've provided
4       to you all the materials listed on Dr.
5       Wagner's reliance list, and we also
6       have for you an invoice from December
7       2016 and January 2017 which is the
8       only invoice that Dr. Wagner has
9       provided to us so far.
10           MR. AYLSTOCK:  Okay.  We'll mark
11       the flash drive as Exhibit 2 to the
12       deposition and the invoice as
13       Exhibit 3 to the deposition.
14           (Exhibit Wagner 2, flash drive
15       containing documents, was marked for
16       identification, as of this date.)
17           (Exhibit Wagner 3, John Wagner,
18       M.D., invoice December 2016/January
19       2017, was marked for identification,
20       as of this date.)
21    BY MR. AYLSTOCK:
22      Q.   So, it's been represented to me
23    by counsel that on the flash drive are the
24    documents on your reliance list?

3  (Pages 6 to 9)

John R. Wagner, M.D.

Page 10

1      A.   Yes.
2      Q.   Did you save this to the flash
3  drive, or did counsel save this to the
4  flash drive?
5      A.   Counsel did.
6           MR. AYLSTOCK:  Mark as Exhibit 4
7  to the deposition a document entitled
8  "John Wagner General Reliance List."
9           (Exhibit Wagner 4, John Wagner
10      General Reliance List in Addition to
11      Materials Referenced in Report MDL
12      Wave 4, was marked for identification,
13      as of this date.)
14  BY MR. AYLSTOCK:
15      Q.   Are you familiar with that
16  document?
17      A.   I think I am.
18      Q.   And then as Exhibit 5 there's a
19  supplemental general reliance list.  That
20  was also provided to me by counsel.
21           Are you familiar with that
22  document?
23      A.   Yes.
24           (Exhibit Wagner 5, John Wagner

Page 11

1      Supplemental General Reliance List in
2      Addition to Materials Referenced in
3      Report MDL Wave 4, was marked for
4      identification, as of this date.)
5  BY MR. AYLSTOCK:
6      Q.   Let me ask you do you know why
7  your reliance list was supplemented?
8      A.   No.
9      Q.   Do you know the differences
10  between Exhibit 4 and Exhibit 5?
11      A.   One is the original, one is the
12  supplement.
13      Q.   Okay.  But do you know what is
14  different between the two documents?
15      A.   No, I don't.
16      Q.   Were you involved in what was
17  added or supplemented on Exhibit 5 from
18  Exhibit 4?
19      A.   No.
20      Q.   Did you have any involvement
21  whatsoever in creating the reliance list
22  or the supplemental general reliance list?
23      A.   I was basically involved in
24  creating my reliance list as also -- as it

Page 12

1  relates to my general report, and I'm more
2  familiar with the studies that are cited
3  in my general report.  And having looked
4  at quickly what's on the supplement list,
5  and I didn't look at what was on the
6  original, but what's on the supplement
7  list, I have reviewed some of those
8  documents.
9      Q.   Okay.  By calling it a reliance
10  list, I take it these are the documents,
11  studies and materials that you rely upon
12  for your opinions in this case?
13      A.   This is part of the literature
14  that I'm relying on, yes.
15           MR. AYLSTOCK:  Let me just make
16  a statement for the record.
17           Before the deposition started,
18  Ms. Kabbash and I had a conversation,
19  and just so it's clear to anybody
20  reading it, this deposition is going
21  to be related to the TVT Retropubic
22  portions of your report and those are
23  the questions that I'll be focusing on
24  today.

Page 13

1           MS. KABBASH:  Correct, that's
2  our understanding.
3  BY MR. AYLSTOCK:
4      Q.   Let me go back to your invoice.
5           According to Exhibit 3, you have
6  billed and been paid thus far $10,850 by
7  Ethicon; is that correct?
8      A.   Yes.
9      Q.   Have you provided any further
10  invoices since January of 2017 to Ethicon
11  or its counsel?
12      A.   I provided an invoice for the
13  first two weeks of February, and I have
14  not provided an invoice for the last two
15  weeks of February.
16      Q.   Do you recall how much you
17  billed for the first two weeks of
18  February?
19      A.   The hours were approximately
20  ten, somewhere in the range of ten, I
21  believe.
22      Q.   Okay.  And then how many hours
23  have you spent on any of these cases
24  listed here on Exhibit 3 since your last

4 (Pages 10 to 13)

John R. Wagner, M.D.

Page 14

1    invoice?
2        A.   I would say roughly, and this is
3    roughly 'cause I have not added it up, but
4    probably the last two weeks of February,
5    maybe eight hours.  And I would estimate
6    the first 12 days of March here, probably
7    about 12 to 15, but I haven't added them
8    up.  I have a record at home that I keep.
9            MR. AYLSTOCK:  Counsel, I
10   request both the invoice that wasn't
11   provided as well as the record that
12   he's keeping.
13           MS. KABBASH:  To be clear, it
14   was sort of an e-mail with some hours
15   in it.  It has not yet been put into a
16   formal invoice like that, and we were
17   planning on generating one after we
18   had the remainder of February hours.
19   So that's why you don't have an
20   invoice for the first part of
21   February, but I think he's provided
22   the best estimate he can.
23           When we get another invoice,
24   we'll provide it to you.

Page 15

1            MR. AYLSTOCK:  I'd request the
2    e-mail which reflected it as well that
3    you referenced.
4            MS. KABBASH:  Okay.
5    BY MR. AYLSTOCK:
6        Q.   In Exhibit 3 you note that you
7    spent six hours drafting and editing the
8    expert report.
9            Do you see that?
10       A.   Yes.
11           MR. AYLSTOCK:  Let me mark
12   Exhibit 6 I believe is your expert
13   report provided for the Wave 4 cases.
14           (Exhibit Wagner 6, Expert Report
15   of John R. Wagner, M.D., dated January
16   31, 2017, was marked for
17   identification, as of this date.)
18   BY MR. AYLSTOCK:
19       Q.   The six hours that you spent
20   drafting and editing the report for it
21   says "general" here on Exhibit 3, is that
22   the time and effort reflected in
23   Exhibit 6, your Expert Report of John R.
24   Wagner?

Page 16

1        A.   In a sense.  It was actually the
2    time I spent specifically related to that
3    document.
4        Q.   Okay.
5        A.   I had done reviews of cases
6    prior to that and had done some general
7    reviews of the literature given to me as
8    sort of background 'cause I was just
9    starting out.  I was trying to generate
10   some background information.  So, some of
11   that effort went into this product.  But
12   specifically what, if anything else,
13   billing for in that was actually the time
14   it took to create this product after doing
15   that review.
16       Q.   And by "this product," you're
17   talking about Exhibit 6, Expert Report of
18   John R. Wagner; is that correct?
19       A.   Yes.
20       Q.   You mentioned reviewing some
21   other cases.
22       A.   Yes.
23       Q.   You have three other cases
24   reflected in Exhibit 3, your invoice:

Page 17

1    Judy Stahl, Kim Adkins and Tammy Mayes.
2            Are those the cases that you're
3    referring to?
4        A.   Yes, it is.
5        Q.   Have you reviewed any other
6    individual cases with regard to your work
7    as an expert for Ethicon?
8        A.   No.
9        Q.   Did you bill for your time in
10   reviewing the general literature that you
11   referred to earlier in preparation for the
12   drafting and editing of your general
13   report as reflected in Exhibit 6?
14       A.   It would be best described by me
15   as trying to get a handle on what the
16   issues were, and they were more focused on
17   the specific cases than my general report
18   initially.  I could have organized it
19   differently, but I think that my edit
20   expert report was the time spent actually
21   doing that expert report.
22       Q.   And so, is it fair to say that
23   your general literature review would be
24   reflected in the hours spent for in the

5 (Pages 14 to 17)

John R. Wagner, M.D.

Page 18

1  Tammy Mayes case, Kim Adkins case and Judy
2  Stahl case?
3     A.   Yes, I was reviewing those cases
4  and the literature that was associated
5  with them, which overlapped some of the
6  literature in my expert report?
7     Q.   In other words, Exhibit 3
8  reflects, at least as of the end of
9  January '17, all of the time that you
10  spent reviewing general literature,
11  reviewing any of the materials on your
12  reliance list or supplemental reliance
13  list, and reviewing the specific cases
14  that Ethicon asked you to review; is that
15  correct?
16     A.   Up to that point, correct.
17     Q.   And you billed for all of your
18  time with that, correct?
19     A.   Yes.
20     Q.   How much do you charge an hour?
21     A.   I believe it's 350 an hour, yes.
22     Q.   How much time did you spend
23  preparing for today, this deposition
24  today?

Page 19

1     A.   I would say that most of the
2  hours that I spent in the last two weeks
3  are geared towards preparing for this
4  deposition today.
5     Q.   Okay.  And you had mentioned
6  that you've given previous depositions; is
7  that correct?
8     A.   Correct.
9     Q.   Have you ever given any previous
10  depositions for Johnson & Johnson or
11  Ethicon in the capacity of an expert
12  witness?
13     A.   No.
14     Q.   When were you first retained by
15  Ethicon to give testimony in the pelvic
16  mesh litigation?
17     A.   I was first contacted in
18  mid-December and agreed to become an
19  expert for them shortly thereafter.
20     Q.   Mid-December 2016; is that
21  correct?
22     A.   Correct.
23     Q.   Who contacted you?
24     A.   Ms. Kabbash.

Page 20

1     Q.   Have you given depositions in
2  any other pelvic mesh cases as a treating
3  physician?
4     A.   Yes.
5     Q.   What case or cases?
6     A.   I don't remember the patient's
7  name, but it was a case from about four or
8  five years ago, maybe less, maybe four
9  years ago, that went to trial and we were
10  successful.  It was a case involving
11  placement of a Prolift mesh.
12        MS. KABBASH:  Could I just
13  clarify one thing?
14        Can you just clarify if that was
15  a case in this pelvic mesh litigation?
16  Because I don't know.
17        MR. AYLSTOCK:  Yes, I was going
18  to follow up.
19  BY MR. AYLSTOCK:
20     Q.   So, you said "we were
21  successful."
22        Were you a defendant in that
23  case?
24     A.   I was.

Page 21

1     Q.   And was that a medical
2  malpractice case?
3     A.   It was.
4     Q.   Where did it go to trial?
5     A.   In -- in Queens.  It wasn't
6  Riverhead.
7     Q.   Who was your lawyer?
8     A.   I don't remember.
9        And I should probably correct my
10  last answer.  I think this did go to trial
11  in Riverhead.  I had another case that was
12  tried in Queens which involved a baby.  I
13  think that the mesh case was in Riverhead.
14  I don't remember my attorney.
15     Q.   Were you sued personally?
16     A.   Yes.  Well, my corporation was
17  sued, or -- correct.
18     Q.   What is your corporation?
19     A.   WGM Obstetrics and Gynecology.
20     Q.   Is that a New York corporation?
21     A.   Yes.
22     Q.   I guess the W stands for Wagner?
23     A.   Yes.
24     Q.   And G and M are your partners in

6 (Pages 18 to 21)

John R. Wagner, M.D.

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  the OB-GYN practice?
2      A.   The initial partners, correct.
3      Q.   Who was G and who was M?
4      A.   Goldman is the G and Morris was
5  the M.
6      Q.   Do you know who the plaintiff's
7  lawyer was?
8      A.   No.
9      Q.   Was he from New York?
10     A.   I believe so.
11     Q.   Do you have a copy of your
12  deposition from that case?
13     A.   No.
14     Q.   Was it your corporate lawyer who
15  defended you in that case, or did you have
16  an insurance lawyer?
17     A.   It was a lawyer assigned by my
18  insurance company.
19     Q.   Who was your insurance company
20  at the time?
21     A.   At the time of the lawsuit, I
22  believe it was MLIMIC, but that wasn't my
23  insurance company at the time, but I was
24  covered under MLIMIC at the time of the

**Page 23**

1  occurrence.
2      Q.   Was Ethicon also a defendant in
3  that case, or was it solely you or your
4  practice?
5      A.   It was solely myself and my
6  practice.
7      Q.   And what were the allegations
8  against you in that case?
9      A.   That the mesh was placed in an
10  improper anatomic location.
11     Q.   Was it a total Prolift or an
12  anterior or posterior?
13     A.   It was a total Prolift.
14     Q.   Were they alleging that you did
15  not do a full thickness dissection?
16     A.   No.
17     Q.   What was the nature of the
18  allegation as far as placement?
19     A.   They were alleging that it was
20  placed in the abdominal cavity and not the
21  retroperitoneal cavity.
22     Q.   Did you perform that
23  implantation procedure in accordance with
24  the Prolift instructions for use?

**Page 24**

1      A.   I believe so.  Although there
2  might be some minor surgical modifications
3  that I would have made individually in
4  terms of trimming the mesh and other areas
5  that might not be in the specific
6  instructions for use.
7      Q.   What was the approximate date
8  you placed the Prolift?
9      A.   Probably about seven or eight
10  years ago, but that truly is my best
11  guess.
12     Q.   And your best estimation as to
13  when it went to trial in Riverhead?
14     A.   About four to five years ago.
15  And again, I really have to hesitate that
16  that's a bit of a guess.
17     Q.   Was it before or after the July
18  13th, 2011 FDA safety alert on Prolift?
19     A.   I believe the surgery was
20  probably performed before that time, and
21  the lawsuit commenced and the trial took
22  place after that time, but I have to
23  hesitate that my dates on that are not
24  certain.

**Page 25**

1      Q.   Would you be able to give me a
2  better answer if you were able to look at
3  your files in your office on that case?
4      A.   No.
5      Q.   Why is that?
6      A.   I don't keep any files on those
7  cases once they are adjudicated.
8      Q.   Okay.  How would you find out
9  who the patient was?
10     A.   I'd probably have to call
11  MLIMIC.
12     Q.   Who is your contact at MLIMIC?
13     A.   Wait, that's not exactly --
14  that's not true.
15          I do keep a copy of a summary of
16  my malpractice history that I update
17  periodically that I give to insurance
18  companies every year, and that would
19  include that case, at least by initials.
20  It would have the patient's initials in
21  it.
22     Q.   And the date that it was
23  adjudicated and so forth?
24     A.   Roughly, yes.  That would be my

7 (Pages 22 to 25)

John R. Wagner, M.D.

Page 26

1   only record.
2       Q.   And that would be something easy
3   for you to ascertain?
4       A.   Yes, it would be very easy for
5   me to ascertain that.
6           MR. AYLSTOCK:  For the record,
7       I'd request a copy of that document to
8       be provided.
9   BY MR. AYLSTOCK:
10      Q.   All right.  Just so the record
11  is clear, the Prolift is a pelvic mesh
12  polypropylene device, correct?
13      A.   Yes, it is.
14      Q.   And it's a polypropylene device,
15  it's made out of polypropylene?
16      A.   It's made out of polypropylene,
17  yes.
18      Q.   Was this the regular Prolift or
19  the Prolift+M?
20      A.   If my memory serves correctly, I
21  believe it was the regular Prolift.
22      Q.   Did you use both products?
23      A.   I did.
24      Q.   We'll get to that at some later

Page 27

1   point.
2           MS. KABBASH:  Not today.
3           MR. AYLSTOCK:  I'm trying to
4       focus on the retropubic, and I'm going
5       down things I didn't expect to go in.
6       So I'll try to get back to my outline
7       here.
8   BY MR. AYLSTOCK:
9       Q.   Was there any other depositions
10  you've given as simply a treating
11  physician for any of the pelvic mesh cases
12  anywhere;  in other words, not as a
13  defendant, but just as a treating doctor?
14      A.   No.
15      Q.   I hand you Exhibit 7 which is
16  your CV.
17          (Exhibit Wagner 7, Curriculum
18      Vitae of John R. Wagner, M.D., was
19      marked for identification, as of this
20      date.)
21  BY MR. AYLSTOCK:
22      Q.   Is this a copy of your current
23  CV, Dr. Wagner?
24      A.   Yes.

Page 28

1       Q.   Is it accurate and up to date?
2       A.   Yes.
3       Q.   There's some blacked out items
4   here.
5           I don't need phone numbers,
6   personal cellphones or so forth, but what
7   was blacked out?
8       A.   It was my office address and
9   phone numbers, my date of birth, and
10  personal information about marital status
11  and number of children.
12      Q.   Got it.
13          So, what is your date of birth?
14      A.   July 2nd, 1961.
15      Q.   You're board certified in two
16  different specialties; is that correct?
17      A.   Yes.
18      Q.   Did you pass those board
19  certification exams the first time?
20      A.   Yes.
21      Q.   It shows here I guess you
22  completed your residency in 1991; is that
23  right?
24      A.   Yes.

Page 29

1       Q.   And you have privileges at what
2   hospitals?
3       A.   I have privileges at Huntington
4   Hospital and Winthrop University Hospital.
5       Q.   Have you ever had any privileges
6   suspended or denied?
7       A.   No.
8       Q.   It says here you also work with
9   Hofstra University; is that right?
10      A.   Yes.
11      Q.   And what is your role, what do
12  you do for them?
13      A.   The role is technically clinical
14  associate professor, and essentially what
15  that involves is mentoring a medical
16  student on a yearly basis.
17      Q.   So this is a medical student
18  that comes to your office here on Long
19  Island?
20      A.   Yes, and to the hospital and to
21  the operating room.
22      Q.   Do you go into Hofstra and teach
23  students in a classroom setting?
24      A.   No.

8 (Pages 26 to 29)

John R. Wagner, M.D.

Page 30

1    Q.   Have you ever done that?
2    A.   I've taught students and
3  residents in a classroom setting at my
4  hospital.
5    Q.   How long ago was that?
6    A.   Within the last two years.
7  They've had a more robust family practice
8  medical student presence, and they have a
9  series of lectures that are given to them,
10 and I participate in that lecture series.
11   Q.   So you'll just give a lecture
12 from time to time to students who come to
13 the hospital?
14   A.   And family practice residents.
15   Q.   Okay.
16   A.   Correct.
17   Q.   Is that the extent of your
18 involvement with Hofstra University as
19 clinical associate professor?
20   A.   It is.
21   Q.   Next on your CV you list
22 "Consultant/Proctor."
23       Do you see that?
24   A.   Yes.

Page 31

1    Q.   It looks like right after your
2  residency, you began as a consultant for
3  Wyeth-Ayerst, a pharmaceutical company; is
4  that right?
5    A.   Correct.
6    Q.   That lasted for about ten years?
7    A.   It did.
8    Q.   And then in 2002, it looks like
9  as that was winding down you started as a
10 consultant/proctor for Ethicon Gynecare;
11 is that right?
12   A.   Correct.
13   Q.   And that lasted for 12 years,
14 right?
15   A.   Yes.
16   Q.   Just ended a couple years ago?
17   A.   Correct.
18   Q.   Why did that end?
19   A.   I don't think there's a
20 particular reason that I'm aware of.
21   Q.   Did they just let you know that
22 they weren't going to need your services
23 anymore?
24   A.   This was more of an ad hoc thing

Page 32

1  with Ethicon and Gynecare.  I would be
2  called upon occasionally to teach a
3  surgeon who was brought to my hospital or
4  to go to another hospital to assist a
5  surgeon who was learning one of -- to use
6  one of their products.
7        I recall once that I was
8  involved in a cadaver course, involved
9  more teaching the TVT Obturator, the TVT
10 Secur, and the TVT Retropubic.  It was --
11 wasn't a -- it was more of a as-needed
12 relationship.
13   Q.   Who was your contact at Ethicon?
14   A.   It was Edward Lynch.
15   Q.   Do you know what department he
16 was in?
17   A.   He was my sales rep.
18   Q.   Would an Ethicon sales rep
19 attend these surgeries with you for the
20 pelvic -- Ethicon pelvic mesh products,
21 including the TVT Retropubic?
22   A.   He might be there sort of
23 shepherding the doctor, but he was not
24 necessarily in the operating room.

Page 33

1    Q.   Okay.  Shepherding the doctor,
2  what do you mean by that?
3    A.   Bringing -- bringing them into
4  the hospital, introducing them to me.
5    Q.   Okay.  What about when you were
6  just doing your own implantations of the
7  TVT products, would there be a sales rep
8  in the operating room for that?
9    A.   At the very beginning when I
10 first put a Prolift in, I do remember him
11 being there for the first couple of cases,
12 but not after that.
13   Q.   The malpractice case against you
14 involving the Prolift, what were the
15 injuries that were suffered by that
16 patient of yours?
17       MS. KABBASH:  Objection to form.
18 You can answer.
19   A.   She had a Prolift placed and
20 postoperatively developed an acute small
21 bowel obstruction, and she was
22 re-explored.  At the time of the
23 re-exploration, the top of the vagina had
24 a loop of small bowel that was adherent to

9 (Pages 30 to 33)

John R. Wagner, M.D.

Page 34

1  it, and when the Prolift was placed, it
2  re-oriented the top of the vagina back to
3  its normal anatomic position, and that
4  re-orientation caused a kink in the small
5  bowel that obstructed it.  So she required
6  surgery to unkink the small bowel, or
7  essentially lyse that adhesion that was on
8  the abdominal side of the vagina.
9      Q.   Did you perform that subsequent
10 surgery?
11     A.   I assisted at the subsequent
12 surgery.
13     Q.   Was there mesh involved?
14     A.   There was mesh placed with the
15 Prolift.
16     Q.   And when the subsequent surgery
17 had to unkink the bowel, did you see mesh
18 involved?
19     A.   We did see mesh because we took
20 a dime-sized, nickel-sized segment of
21 vaginal epithelium off the top of the
22 vagina and left it attached to the bowel
23 so that when we were done lysing that
24 adhesion and freeing up that small bowel,

Page 35

1  there was a circular defect at the top of
2  the vagina and that piece of vaginal
3  epithelium was still attached to the
4  bowel.
5      Q.   Did you remove mesh in that
6  surgery?
7      A.   No.
8      Q.   Would you consider that an
9  adverse event from the Prolift?
10     MS. KABBASH:  Objection to form.
11     A.   I considered that an adverse
12 event from her repair.
13     Q.   And her repair using the
14 Prolift, correct?
15     MS. KABBASH:  Objection.
16     THE WITNESS:  Would you like me
17 to answer?
18     MS. KABBASH:  You can answer it.
19     A.   The question was what again?
20     Q.   You said an adverse event from
21 the repair, and I'm just trying to clarify
22 from the repair in correcting her pelvic
23 organ prolapse, correct?
24     A.   Correct.

Page 36

1      Q.   With the Prolift?
2      A.   We used Prolift to fix the
3  support defect, but based on what happened
4  with her, anything that we had done to
5  replace the vagina to its normal position
6  probably would have kinked that bowel.
7      Q.   Did you report that adverse
8  event to Ethicon?
9      A.   No.
10     Q.   Did you report it to the FDA?
11     A.   No.
12     Q.   Back to your CV.
13          It looks like you've also been
14 consultant or proctor to various other
15 pharmaceutical medical device companies
16 continuously since the end of your
17 residency, correct?
18     A.   Yes.
19     Q.   And the other companies you've
20 consulted for include GlaxoSmithKline,
21 correct?
22     A.   Some of these were not surgical
23 consults.  I was part of their expert
24 panels for giving lectures.

Page 37

1          So for instance, Wyeth was -- I
2  was generally one of their experts on
3  hormone replacement.  At GlaxoSmithKline,
4  I was their expert on medical management
5  of herpes.  Genetech it was osteoporosis
6  management.  Same with Warner Chilcott.
7          So really the only surgical
8  companies involved were Ethicon, Covidien,
9  and Intuitive Surgical.
10     Q.   And for all of these engagements
11 with the pharmaceutical and medical device
12 industry since 1992 you've been paid by
13 them, correct?
14     A.   For work that was done, correct.
15     Q.   Initiative Surgical, what is
16 that?
17     A.   That is a typographical error
18 that I just noticed.  It should be
19 Intuitive Surgical.
20     Q.   And what kind of company is
21 that?
22     A.   That is the company that makes
23 the surgical robot.
24     Q.   Did you ever, with Covidien, did

10 (Pages 34 to 37)

John R. Wagner, M.D.

Page 38

1  you ever implant any of their pelvic mesh
2  products?
3      A.   I don't think so.  I wasn't
4  really aware that Covidien had a pelvic
5  mesh product, but I may be wrong on that.
6      Q.   You mentioned the robotic
7  surgery with Intuitive.
8          Do you do robotic surgeries to
9  fix pelvic floor defects?
10     A.   Yes.
11     Q.   Do you do them to fix stress
12 urinary incontinence with pelvic mesh?
13         MS. KABBASH:  Objection to form.
14         You said "with pelvic mesh" at
15 the end.  I'm sorry, I just need a
16 clarification.
17         Do you mean does he use robotic
18 surgery to implant pelvic mesh?
19         MR. AYLSTOCK:  That's a better
20 question than I just asked.
21         MS. KABBASH:  I just wanted to
22 make sure.
23         MR. AYLSTOCK:  So I'll restate
24 it.

Page 39

1          MS. KABBASH:  Okay.
2  BY MR. AYLSTOCK:
3      Q.   Do you use this robotic surgery
4  to implant pelvic mesh?
5      A.   Yes.
6      Q.   And with the robot, you don't go
7  through the vagina, correct?
8      A.   Correct.
9      Q.   You go through the abdomen?
10     A.   Correct.
11     Q.   And the robotic surgery is a
12 minimally invasive surgery, correct?
13     A.   Yes.  Although minimally
14 invasive is sort of a relative term.
15     Q.   Agreed.
16         When did you start doing robotic
17 surgeries to implant pelvic mesh?
18     A.   Probably about 2014.  I was
19 doing laparoscopic surgery to implant
20 pelvic mesh prior to that.
21     Q.   And that's the Covidien notation
22 on your CV?
23     A.   No.  Covidien is more -- it was
24 a single incision laparoscopy.  I was

Page 40

1  involved with them teaching single port
2  laparoscopic surgery.
3      Q.   Okay.  Why did you begin
4  implanting pelvic mesh either
5  laparoscopically or using the robotic
6  surgery?
7      A.   Because relatively speaking, it
8  was much more minimally invasive than
9  doing it through an open abdominal
10 incision.
11     Q.   Did you do the robotic or
12 laparoscopic mesh surgery in situations
13 where another method of implantation could
14 have been through the vagina?
15     A.   If I could answer that in a
16 general, I'll try.
17         You can place mesh
18 transvaginally or transabdominally, and
19 there are situations where I think the
20 transvaginal approach might be best and
21 situations where the transabdominal
22 approach might be best for a given
23 patient.
24     Q.   What things go into your

Page 41

1  determination as to whether you recommend
2  transabdominal as opposed to transvaginal
3  for a mesh implantation?
4      A.   In general, and this would be my
5  current thinking, in someone who requires
6  a mesh implant, we would probably prefer
7  to place it abdominally because the
8  complication rate is probably lower.
9          On the other hand, there are
10 people who can't tolerate an abdominal
11 operation, because of patient factors or
12 it might be particularly high risk for an
13 abdominal risk because of patient factors,
14 who need to have that mesh placed and
15 therefore need to have it placed
16 vaginally.  And then there are people who
17 may have a very small isolated recurrent
18 vaginal defect who might be a good
19 candidate to approach it vaginally because
20 the defect is relatively small.
21     Q.   So, all else being equal, you
22 prefer the abdominal approach to placement
23 of pelvic mesh because, in your
24 experience, the rate of adverse events is

11 (Pages 38 to 41)

John R. Wagner, M.D.

Page 42

1 lower?
2         MS. KABBASH:  Objection to form.
3     You can answer.
4     A.   Again, I think that it depends
5 on whether the patient needs mesh or not.
6 I think when I think about these terms, I
7 think does this patient need a mesh or not
8 or can she get by with a traditional
9 repair.  And then if I decide that yes,
10 she's at high risk for some reason and
11 needs a mesh implant, should I place it
12 vaginally or abdominally has a number of
13 factors.
14         If I think a patient requires a
15 very large mesh implant of the anterior
16 apical and posterior walls, I would prefer
17 to place that abdominally if she is a
18 candidate for abdominal surgery.
19     Q.   And that's because in your
20 experience, the rate of adverse events is
21 lower abdominally as opposed to
22 transvaginally, correct?
23     A.   In my experience, and as well
24 as, you know, the experience I think of

Page 43

1 others in the literature and colleagues,
2 by avoiding vaginal incisions, you seem to
3 minimize the risk of complications related
4 to the mesh.
5     Q.   Can you do a -- you mentioned a
6 patient not being a candidate for
7 traditional repair.
8         Do you still do traditional
9 repair for stress urinary incontinence?
10        MS. KABBASH:  Objection to form.
11    You can answer.
12    A.   If by traditional you mean a
13 Burch colposuspension or an MMK or a
14 pubovaginal sling or a Pereyra or a
15 Stamey, by and large, no.  I think that I
16 used to do a lot Burches and Pereyra's.
17 Those were my procedures of choice, but
18 the TVT product and line of products has
19 really revolutionized that procedure.
20    Q.   Let me just ask you directly.
21        You still do Burch procedures
22 from time to time, correct?
23    A.   I think I've done one Burch in
24 the last two years or three years.

Page 44

1     Q.   And what other non-mesh
2 procedures can be done for the treatment
3 of SUI?
4     A.   Well, traditionally, we used to
5 do anterior repairs with a Kelly
6 plication.  We would do a Burch procedure.
7 For recurrent stress incontinence, we
8 would often do a pubovaginal sling
9 retropubically with either autologous
10 graft or synthetic material.  And then you
11 had your needle suspension procedures,
12 like the Pereyra and the Stamey.
13    Q.   You can do a Burch procedure
14 laparoscopically, correct?
15    A.   No, I've never done that.
16    Q.   You haven't seen it done?
17    A.   I've seen it done.  I've never
18 done one.
19    Q.   But it's possible, doctors can
20 do them, correct?
21    A.   You can do a Burch procedure
22 laparoscopically or robotic or via an open
23 incision.
24    Q.   Let's move now to your

Page 45

1 publications on your CV.
2         How many of these, when you say
3 publications or national presentations,
4 how many articles have you had published
5 in the peer-reviewed medical literature?
6     A.   Four, I think.
7     Q.   Does that include abstracts that
8 were presented via poster at a conference?
9     A.   No.
10    Q.   And then you've had a number of
11 presentations in addition to the
12 peer-reviewed publications, correct?
13    A.   Correct.
14    Q.   Do any of these publications or
15 presentations involve the treatment of
16 stress urinary incontinence?
17    A.   No.
18    Q.   So you've never had a
19 publication or presentation on the
20 treatment of stress urinary incontinence,
21 correct?
22    A.   Not at a national meeting.
23    Q.   And the other ones you've had
24 were as a consultant or a proctor for

12 (Pages 42 to 45)

John R. Wagner, M.D.

Page 46

1    Ethicon or Johnson & Johnson, correct?
2        A.    Either in that role or giving
3    grand rounds at other institutions, I
4    would have the opportunity to talk about
5    stress incontinence and the placement of
6    slings.
7        Q.    But in none of those instances
8    did you feel it appropriate that the level
9    of the presentation rose to put on your
10   CV, correct?
11           MS. KABBASH:  Objection to form.
12           You could answer.
13       A.    Well, I started recording
14   lectures and presentations in that regard
15   only since 2014.
16       Q.    And none of them are reflected
17   on your CV, correct?
18       A.    No, they are reflected on my CV.
19       Q.    None of the presentations
20   involving stress urinary incontinence that
21   you gave in grand rounds are, correct?
22       A.    That is correct.
23       Q.    And describe for the jury what
24   you mean by "grand rounds."

Page 47

1        A.    Typically most hospitals and
2    most departments have monthly or
3    twice-monthly or weekly formal lectures
4    that take place for education purposes,
5    and various people are invited to give
6    these talks.
7        Q.    Are they recorded?
8        A.    Sometimes.
9        Q.    They're not peer-reviewed talks,
10   correct?
11       A.    They are not peer-reviewed
12   talks.
13       Q.    Let me show you Exhibit 8,
14   please.
15           (Exhibit Wagner 8, Wagner
16       article titled Vaginal Repair of
17       Symptomatic Pelvic Organ Prolapse
18       Using Polypropylene Mesh, was marked
19       for identification, as of this date.)
20   BY MR. AYLSTOCK:
21       Q.    Okay. This is I think reflected
22   on your CV of your presentation at the
23   American College of Obstetrics and
24   Gynecology, the meeting in 2006, right?

Page 48

1        A.    Yes.  I haven't seen this for a
2    while.
3        Q.    Well, we'll go through it.
4            This is your -- I guess this was
5    a poster presentation at that meeting,
6    correct?
7        A.    Correct.
8        Q.    And a poster is not a
9    peer-reviewed publication, correct?
10       A.    It's peer-reviewed in the sense
11   that people submit these things to an
12   annual meeting and they have to be
13   selected by the people running the
14   meeting, the people that are in charge.
15       Q.    But it's not subject to the
16   typical peer review of a journal or
17   anything like that?
18       A.    It is not, no.
19       Q.    Did you present on this poster
20   that you gave or you --
21           MR. AYLSTOCK:  Let me strike
22       that.
23       Q.    Was this poster presented at
24   this meeting in 2006?

Page 49

1        A.    Yes.
2        Q.    And did you present on your
3    findings at that meeting?
4        A.    Yes.
5        Q.    Do you know whether that was
6    recorded?
7        A.    I don't believe that it was.
8        Q.    Was this a situation where you
9    kind of stood by the poster and anybody
10   that showed up could ask you questions and
11   you talked about it, or did you actually
12   present this in a meeting more formal way?
13       A.    No, this was more the former,
14   not the latter.
15       Q.    In other words, this was a
16   poster that you -- I've been to some of
17   these meetings.  So, there are lots of
18   posters and then the author of the
19   presentation stands by the poster and if
20   doctors are interested, they can come ask
21   questions and you can talk about the
22   poster, correct?
23       A.    Correct.
24       Q.    This wasn't something where you

John R. Wagner, M.D.

Page 50

1  stood up in front of hundreds of doctors
2  at a meeting and gave your findings,
3  correct?
4      A.   It was not that.
5      Q.   Now, the title of this is
6  "Initial Results of a Modified Proximal
7  Bladder Neck Sling in Patients At
8  Higher-Risk For Failure," correct?
9      A.   Correct.
10     Q.   You would agree that the TVT
11  Retropubic is made of polypropylene mesh,
12  correct?
13     A.   Correct.
14     Q.   Now, because this -- well, was
15  this article ever published in a peer
16  review journal?
17     A.   No.
18     Q.   Did you ever submit it for
19  publication?
20     A.   No.
21     Q.   Why not?
22     A.   Didn't have the time or want or
23  desire, I guess.
24     Q.   And at the time in 2006,

Page 51

1  according to your CV, you were a
2  consultant/proctor for Ethicon Gynecare,
3  correct?
4      A.   Correct.
5      Q.   Is there anywhere disclosed on
6  this poster?
7      A.   No.
8          MS. KABBASH: Objection to form.
9  BY MR. AYLSTOCK:
10     Q.   Had you submitted this for
11  publication in peer review journal, would
12  you have made that disclosure to the
13  journal?
14         MS. KABBASH: Objection.
15     A.   I'm not sure what the rules for
16  disclosure were back in 2006. I know that
17  if I submitted the same poster today, they
18  would require me to list my con -- my
19  possible conflicts of interest, and I'm
20  not sure that it was required of a written
21  article back then, and it certainly wasn't
22  a requirement that they asked for here in
23  2006.
24     Q.   Sure.

Page 52

1          How did this study come to be?
2  Was Ethicon involved in this at all?
3      A.   No.
4          MS. KABBASH: Objection; lack
5  of foundation.
6  BY MR. AYLSTOCK:
7      Q.   Did you discuss this study with
8  Mr. Lynch or anybody else at Ethicon
9  before presenting it?
10     A.   No.
11     Q.   What type of polypropylene mesh
12  did you use in this study?
13     A.   It was the Gynecare sheet of
14  mesh.
15     Q.   The Prolene Soft or Prolene?
16     A.   Prolene.
17     Q.   I take it you kept the materials
18  surrounding the study electronically or in
19  a folder or something?
20     A.   No.
21     Q.   To your knowledge, is there any,
22  other than this document, Exhibit 8 that
23  we just looked at that you hadn't seen in
24  a while, is there anywhere where the data

Page 53

1  that underlie the study was stored?
2      A.   I don't think I kept it for more
3  than about a year or so.
4      Q.   Okay. Did you ever undertake
5  any, or begin any other type of studies
6  involving the Prolene polypropylene mesh?
7      A.   No.
8      Q.   The Prolene mesh sheets that you
9  got, you understand Prolene's the same
10  mesh that's in the TVT Retropubic sling,
11  correct?
12     A.   Correct.
13     Q.   And the mesh, this was a flat
14  sheet of mesh that you used in this study?
15     A.   It was a flat sheet of mesh that
16  I used and then I cut out patches,
17  essentially, and place them in the various
18  compartments.
19     Q.   Okay. Who provided the Prolene
20  mesh that was used in this paper?
21     A.   My hospital.
22     Q.   Do you know whether it was paid
23  for by Ethicon, or they just gave you the
24  sheets of mesh to use?

14 (Pages 50 to 53)

John R. Wagner, M.D.

Page 54

1       A.   I'm sure the hospital paid for
2   the sheets of mesh.
3       Q.   Okay.  Did you ever submit to
4   Ethicon or any other mesh manufacturer a
5   proposal for study?
6       A.   No.
7       Q.   Okay.  So, this particular
8   poster was the result of just your
9   independent curiosity as to how the
10  Prolene mesh would perform in the human
11  body?
12      A.   Not exactly.  Back in 2005,
13  essentially, is when these cases were
14  done.  There just wasn't a lot of data on
15  using polypropylene mesh to repair other
16  vaginal defects.  There was data on using
17  polypropylene slings to treat
18  incontinence, but the data for other
19  defects wasn't there, and this was when we
20  were graduating into thinking that we
21  could repair other defects with mesh also.
22  And this represented, essentially, my
23  initial experience fixing 53 defects, it
24  says here, in 33 vaginal procedures.  It

Page 55

1   was publishing my initial experience is
2   essentially what it was, and there wasn't
3   a lot of data out there at that time.
4       Q.   Okay.  Before you go about
5   implanting a medical product in a man or a
6   woman, why is it important to you that
7   there be clinical data to support that
8   product?
9           MS. KABBASH:  Objection to form.
10          You can answer.
11      A.   There was -- I'm confused by
12  that question.  Could you repeat that
13  question to me again?
14      Q.   Sure.
15          You testified earlier that you
16  wanted to perform the study because there
17  wasn't a lot of clinical data out there on
18  the use of this Prolene polypropylene mesh
19  for the particular defects, and my
20  question was why is it important to you
21  that there be clinical data before you
22  implant a medical device in a woman in
23  this case?
24          MS. KABBASH:  Objection to form.

Page 56

1       A.   There wasn't a lot of published
2   data on using polypropylene mesh to fix
3   these types of defects, but these types of
4   defects were being fixed with
5   polypropylene mesh by a number of
6   different pelvic reconstructive surgeons
7   that I knew of personally, and none of
8   them had really published large volumes of
9   data at this point.  It was more case
10  reports and small series.  And this was
11  basically an attempt to publicize our
12  initial experience with this approach.
13      Q.   Okay.  And with the Prolene
14  polypropylene mesh, correct?
15      A.   Correct.
16      Q.   Now, your paper here looks at 31
17  patients, correct?
18      A.   Yes, 31 patients, yes.
19      Q.   And you report that the rate of
20  mesh erosion using this Prolene mesh was
21  3.7 percent, 2 out of the 53 had mesh
22  erosion, correct?
23      A.   Correct.
24      Q.   And then a mesh extrusion rate

Page 57

1   was 11.3 percent; 6 out of the 53 had
2   extrusion, correct?
3       A.   Correct.
4       Q.   What's the difference as it
5   relates in this paper between mesh erosion
6   and mesh extrusion?
7       A.   I define an erosion as visible
8   mesh with an epithelial defect and an
9   extrusion as visible mesh without an
10  obvious epithelial defect.  That -- the
11  definition of both of those remain
12  somewhat ill-defined even today, but that
13  was my opinion as to how to characterize
14  them back in 2006.
15      Q.   Okay.  And what do you mean by
16  "epithelial defect"?
17      A.   Essentially with these repairs,
18  sometimes you'll see normal vaginal
19  epithelial and a tuft of mesh protruding
20  through that, what appears to be an intact
21  epithelial.  In other words, you'll see a
22  true epithelial defect with a visible
23  patch of mesh, and I separated those two
24  out into an erosion and an extrusion.

15 (Pages 54 to 57)

John R. Wagner, M.D.

Page 58

1     I think based on today's
2 definition, we would call all of those
3 extrusions with an erosion referring more
4 to something that's more chronic and into
5 a hollow organ such as the bladder or the
6 urethra or something.
7     Q.   So, if you add up the two, as
8 you defined back then erosion and
9 extrusion, your overall erosion rate, as
10 you would call it today, was 15 percent
11 using the Prolene mesh, correct?
12     A.   Correct.
13     Q.   And you followed these patients,
14 this particular subset of 31 patients was
15 seen by you over 12 months?
16     A.   These were people that I had
17 followed over the last 12 months and
18 operated on during that 12-month period.
19     Q.   And then they came back to you
20 at some point during that 12-month period
21 for another examination to determine how
22 the mesh was performing?
23     A.   Yes.
24     Q.   Were they all seen at exactly

Page 59

1 one year, or were some seen before one
2 year was up?
3     A.   I think this was an average
4 amount of time of about a year-and-a-half.
5 So some were seen for shorter period of
6 time, some were seen for longer period of
7 time.
8     Q.   When you were presenting this
9 poster at the conference, did anybody from
10 Ethicon come and talk to you about it?
11     A.   Not that I recall, no.
12     Q.   And did anybody contact you
13 following that presentation from Ethicon
14 to discuss the findings that you had using
15 Prolene mesh?
16     A.   Not that I recall.  I would have
17 to imagine that my Ethicon rep at the time
18 was probably aware that I had presented
19 this, but I don't recall any specific
20 conversations.
21     Q.   Other than perhaps a comment
22 from your sales representative, no
23 scientist or medical doctor or
24 professional education person ever

Page 60

1 contacted you about your particular
2 results using the same Prolene mesh that's
3 in the TVT Retropubic, correct?
4     A.   Correct.
5     Q.   And since the study over 12
6 months, have you continued to follow
7 these, or did you continue the study
8 beyond the 12 months as reflected here, or
9 was that the last time you endeavored to
10 follow up on these particular patients for
11 publication purposes?
12     A.   I never followed up with those
13 patients for publication purposes.  Most
14 of them were patients that were in my
15 practice already, so I followed them for a
16 while.
17         Very shortly after that, I
18 stopped doing this and I started using the
19 Prolift system.
20     Q.   Okay.  And did you begin using
21 the Prolift system based in part on your
22 findings using the polypropylene mesh
23 here?  I'm sorry, here with the 31
24 patients reflected in this study?

Page 61

1     A.   No.  I think I started using the
2 Prolift system because I felt that it was
3 less invasive than what I was doing in
4 terms of these mesh patches, and it was
5 also a system that could be tightened or
6 loosened in the operating room to better
7 fit each patient's defect and set the mesh
8 in a tension-free manner.
9     Q.   Did the mesh you used in this
10 particular presentation have arms?  Or how
11 was it shaped?
12     A.   It was shaped the way I cut it.
13     Q.   Were they all shaped exactly the
14 same, or were there varying shapes?
15     A.   No, I cut three different kinds
16 of mesh: one for the anterior compartment,
17 one for the apical compartment, and one
18 for the posterior compartment.
19     Q.   And did any of those have arms
20 attached?
21     A.   No.
22     Q.   The results report on 31
23 patients.
24         Were there more than 31 patients

16 (Pages 58 to 61)

John R. Wagner, M.D.

Page 62

1  in your practice upon whom you operated
2  with this particular method of
3  implantation with the polypropylene sheet
4  mesh?
5      A.   Yes.
6      Q.   So how were these 31 selected?
7      A.   When I did the study, I just
8  went back to when I started doing my first
9  mesh repair.  Or I should say my first
10  mesh augmented repair, and I just took it
11  up to that current time, developed the
12  data, submitted it.  But I was still doing
13  those mesh repairs during the time I was
14  collecting the data and submitting it and
15  for a short period of time afterwards.
16      Q.   So, do you know whether any of
17  these have been lost to follow-up?
18      A.   I wasn't trying to follow up
19  with them.  So technically, I guess
20  they're all lost to follow-up.
21      Q.   Okay.  So you're in no position
22  to report on anything beyond the 12 months
23  reflected here as to whether they had
24  subsequently needed to have additional

Page 63

1  surgeries, revisions and so forth,
2  correct?
3      A.   I was not attempting to do a
4  long-term follow-up.
5          I can tell you the majority of
6  these patients, probably two-thirds to
7  three-quarters, were patients of my
8  practice and probably still are.
9      Q.   You'd be speculating about that?
10      A.   But I would be speculating.
11      Q.   Okay.  So, other than this
12  particular presentation given on a poster
13  at this meeting, have you done any other
14  studies on polypropylene mesh for use in
15  the female pelvis?
16      A.   No, nothing that's been
17  submitted.
18      Q.   Have you done them where it
19  hasn't been submitted?
20      A.   We are collecting data on
21  patients with anterior mesh repairs with
22  one of my residents now.
23      Q.   Are these repairs done
24  robotically?

Page 64

1      A.   No, these are vaginal mesh
2  repairs.
3      Q.   And why are you collecting that
4  data?
5      A.   Because we use a different
6  vaginal incision, a distal transverse
7  incision, to access the compartment in the
8  vagina where the bladder lies and lay the
9  mesh in through that incision, and the
10  advantage that we found is that the
11  incision is away from the location of the
12  mesh and we have not had an erosion or
13  extrusion of those mesh repairs to date.
14      Q.   That's a vaginal incision,
15  correct?
16      A.   It's a vaginal incision.
17      Q.   Are you doing that in
18  conjunction with any particular
19  manufacturer of mesh?
20      A.   No.
21      Q.   Have you submitted a request for
22  funding to any mesh manufacturer for your
23  efforts?
24      A.   No.

Page 65

1      Q.   Do you have any preliminary
2  finding based upon your review so far?
3      A.   My preliminary findings are
4  based on my surgical experience that we
5  haven't seen an anterior mesh erosion in
6  three or four years since we started doing
7  this approach.
8      Q.   And that particular mesh that's
9  being used that was used in those patients
10  was what?
11      A.   I don't believe it's uniform.
12  It was Prolift for a while.  We've had
13  some Coloplast products that we've put in.
14  I'm pretty sure that there's even some
15  Boston Scientific Uphold meshes that we've
16  placed.
17      Q.   You know that the Prolift mesh
18  that was used by Ethicon is not the same
19  mesh that's used in the TVT Retropubic,
20  correct?
21      A.   The Prolift mesh has -- you're
22  not just talking about straight Prolift.
23  You're talking about -- I mean, not
24  Prolift+M.  You're talking straight

17 (Pages 62 to 65)

John R. Wagner, M.D.

Page 66

1  Prolift.
2     Q.   I'm talking about the
3  polypropylene Prolift mesh.
4     A.   It's a different pore size, but
5  it's the same material.
6     Q.   It's made out of polypropylene,
7  but it's lighter weight, correct?
8        MS. KABBASH:  Objection to form.
9     A.   It has a larger pore size, but
10 the weight of the material is the same.
11    Q.   Do you know whether the
12 individual strands of polypropylene that
13 are woven are the same thickness or
14 diameter between the TVT Retropubic or
15 Prolift?
16    A.   I'm not aware of the size of the
17 actual strands.  I'm aware of the pore
18 size.
19    Q.   And the Prolift has a larger
20 pore size, correct?
21    A.   The Prolift has a larger pore
22 size, yes, it does.
23    Q.   Have you seen any studies or
24 materials that reflect the weight of the

Page 67

1  Prolift as it relates to the TVT
2  Retropubic polypropylene mesh?
3     A.   Weight would be a function of
4  how much polypropylene you have.  I mean,
5  if you have a small piece of it, the
6  weight of that's going to be small.  If
7  you have a large piece of it, the weight's
8  going to be large.
9        I'm not sure I understand the
10 question.
11    Q.   Okay.  We'll get back to that.
12       So, have we now -- you've also
13 submitted some other materials for peer
14 review that have been published in medical
15 journals, correct?
16    A.   I have.
17    Q.   Why is it important to disclose
18 any financial relationships with any
19 manufacturers when one is publishing in
20 peer-reviewed literature?
21    A.   People want to know what
22 potential biases somebody might have in
23 presenting data.  So the logic is to state
24 your potential conflicts of interest at

Page 68

1  the beginning of any talk you give now, as
2  well as any presentation, as well as any
3  publication.
4        I think that that is pretty much
5  a uniform standard that's come into play
6  in the last five years or so.
7     Q.   And that's because whenever
8  funding comes into play, there's at least
9  a potential for bias, correct?
10    A.   I'm not sure the exact reason
11 other than being up front and honest.  I
12 guess there must be funding involved.  It
13 always comes down to money at some point,
14 but I never been somebody who ever
15 requested funds for anything, but I do
16 like to know if somebody's talking to me
17 if they work for somebody.
18    Q.   And that's because that
19 introduces the potential for bias,
20 correct?
21    A.   It could.  Theoretically though
22 if you're putting it out there and
23 acknowledging it, you're allowing people
24 to question you on that and ultimately

Page 69

1  eliminating any specter of bias.  I think
2  the purpose of the conflict of interest is
3  to eliminate the specter of bias.
4     Q.   It's important to be up front
5  and honest when it comes to funding
6  sources and so forth when you're a study
7  author, correct?
8        MS. KABBASH:  Objection to form.
9     A.   It becomes important to be
10 up-front and honest, period.
11    Q.   I'd agree with that.
12    A.   It's the Ten Commandments.
13       MS. KABBASH:  Let's not get into
14 that today.
15 BY MR. AYLSTOCK:
16    Q.   But especially when it comes
17 into play with regard to medical journal
18 articles, correct?
19    A.   I think with any medical --
20       MS. KABBASH:  Objection to form.
21    A.   -- presentation it's important
22 to be up front and honest.
23    Q.   Now, have you ever been
24 involved, other than the materials

18 (Pages 66 to 69)

John R. Wagner, M.D.

Page 70

1  reflected in your CV, in a study design?
2       A.   No.
3       Q.   Do you consider yourself an
4  expert in designing studies?
5       A.   It was part of my board
6  certification in 2014.  It was like
7  one-sixth of what we were required to
8  know.  So I feel I have a lot more
9  knowledge of that than I did three or four
10 years ago.
11      Q.   Okay.  And in gaining that
12 knowledge, you've come to understand that
13 it's important when designing a study that
14 the study author should not have a
15 financial interest in the outcome of the
16 study, correct?
17           MS. KABBASH:  I just want to
18 state a standing objection that the
19 issue --
20           MR. AYLSTOCK:  You can object to
21 the form of the question.  Thank you,
22 counsel.
23           MS. KABBASH:  I just want to
24 state --

Page 71

1            MR. AYLSTOCK:  I'll give you a
2  standing objection.  I'd appreciate
3  you complying with the rules on this.
4            MS. KABBASH:  That's fine.  But
5  if you're going to give me a standing
6  objection, then I need to state the
7  basis of the objection that the
8  standards governing disclosures of
9  potential conflicts of interest are
10 beyond the scope of Dr. Wagner's
11 opinions.  That's my objection.
12           Go ahead.
13 BY MR. AYLSTOCK:
14      Q.   Do you need me to restate it?
15      A.   Yeah, that would help.
16      Q.   Okay.  You would agree with me,
17 Doctor, that when designing a study, it's
18 important that the study authors or
19 investigators do not have a financial
20 stake in the outcome of that study?
21           MS. KABBASH:  Objection.
22      A.   It's important that the
23 investigators be honest.
24           But let's say somebody has a

Page 72

1  great idea and they're inventing the next
2  new great thing, especially in medicine
3  you want to study it and prove it's the
4  next great best thing and you want to
5  present an honest study.  But that doesn't
6  mean you wouldn't benefit from being the
7  inventor of the next new great thing.  And
8  so technically, based on your question,
9  you could say that person's benefiting,
10 but I wouldn't call them dishonest, or I
11 wouldn't say that that's a bad thing, I
12 guess.
13      Q.   Well, let me give you an
14 example.
15      A.   Okay.
16      Q.   If you're approached as an
17 investigator for a study by a
18 pharmaceutical or medical device company
19 and they say, We want you to do this
20 study, Doctor.  We're going to pay for the
21 study.  But if it comes out in favor of my
22 particular product, I'm going to pay you
23 an extra $400,000, but if it comes out
24 where it's not in favor of our product or

Page 73

1  it doesn't meet some predefined goal, then
2  we're not going to pay you $400,000.
3            You would agree with me that you
4  wouldn't do that as a clinical
5  investigator, correct?
6            MS. KABBASH:  Objection to form.
7       A.   I think that goes back to what I
8  was saying in the sense that you have
9  something.  You want to test it to see if
10 it's good.  If it isn't good, why would
11 you pay somebody for it?  If it is good,
12 that person probably deserves some money
13 for coming up with a good idea.
14           And so, if the person who's
15 doing the testing is the investigator,
16 it's a -- and you're an investor.  Why
17 would you give or invest in something that
18 doesn't work or is proven not to work?
19 That doesn't make a lot of sense to me.
20      Q.   So in your world, Doctor, it's
21 perfectly fine to be paid more if the
22 outcome of a study is one way that favors
23 industry but be paid less if it doesn't
24 favor industry?  Is that what you're

19 (Pages 70 to 73)

John R. Wagner, M.D.

Page 74

1    testifying to --
2        MS. KABBASH:  Objection
3    mischaracterization.
4        Q.   -- or did I mischaracterize your
5    testimony?
6        A.   I think you mischaracterized it
7    because it doesn't sound good the way you
8    put it.  I think it sounds good the way I
9    put it.
10       Q.   Well, I'd like you to answer it
11   the way I put it.  So if I could have the
12   court reporter reread the question and you
13   can answer the question that I propose?
14           (The requested portion of the
15       record was read by the Court Reporter.)
16       A.   I see what I think I object to.
17   It's the "favors industry" part.
18           I'm not putting industry in
19   this.  I'm just saying if there's a good
20   idea and a novel therapy and somebody
21   proves it with a study, that is something
22   that people should rightly be reimbursed
23   for.  If they have an idea or thought or a
24   development or a product or a concept that

Page 75

1    doesn't pan out, there is no reason to
2    necessarily pay somebody beyond what the
3    initial investment might have been.  And
4    I'm thinking inventors, I'm thinking
5    doctors, I'm thinking industry, I'm
6    thinking of the whole gamut of that I
7    guess is my --
8        Q.   Let's take inventor out of it.
9            You're just an investigator.
10   You're doing a study for a company that's
11   paying for it.
12           Should you be paid more if the
13   study comes out one way than if the study
14   comes out the other way?
15       A.   I think an investigator should
16   just be honest.
17       Q.   So there shouldn't be an extra
18   payment one way or the other because that
19   introduces bias, correct?
20           MS. KABBASH:  Objection; beyond
21       the scope of opinions.
22           THE WITNESS:  Do you want me to
23       answer that?
24           MS. KABBASH:  You can answer as

Page 76

1        best you can.
2        A.   I have a tough time applying
3    that in a general way, I guess is the best
4    answer I can give you.  I understand the
5    notion of what you're saying, but what we
6    do goes beyond just money.  We're not in
7    this for the money.  We're in this to help
8    people and I guess that's my objection.
9    If somebody comes up with something that
10   really helps people and if an investigator
11   confirms that in an honest, open
12   peer-reviewed manner, God bless them and
13   make it widely available.
14           If somebody is behaving in a
15   manner that's falsifies data or hides
16   results or miss -- misleads people,
17   there's no excuse for that, but I --
18       Q.   And they should be held
19   accountable for that, correct?
20       A.   If people -- there are standards
21   that are set by people much smarter in the
22   ethics world than me.
23       Q.   Well, the jury's going to be one
24   of the bodies that will assess that.

Page 77

1            But you would agree if that
2    occurred, the hiding, the obfuscating, the
3    withholding data, that those folks should
4    be held accountable, correct?
5        A.   There are ethical guidelines for
6    all of this.  Yes, I don't think people
7    should falsify data, make up data.
8        Q.   Withhold data?
9        A.   It should be an honest --
10           MS. KABBASH:  Objection to form.
11       A.   It should be an honest and
12   forthright presentation of data and
13   studies.
14           MS. KABBASH:  How are you doing?
15       Do you want a break?  We've been going
16       about an hour and 20 minutes.  Or do
17       you want to keep going?
18           MR. AYLSTOCK:  We can take a
19       break.
20           (Recess taken from 10:23 a.m.
21       to 10:31 a.m.)
22   BY MR. AYLSTOCK:
23       Q.   We're back, Doctor, after a
24   quick break.

John R. Wagner, M.D.

Page 78

1    Quick follow-up on that medical
2 malpractice lawsuit against you.
3    Who was the judge in that?
4    A.  I don't remember.  I remember
5 his face, but not his name.
6    Q.  Male judge?
7    A.  Male judge.
8    Q.  If you would with me look at
9 Exhibit 5 just real quick, your reliance
10 list.
11    If you just go to the very first
12 article, it's the author is Abbott et al.,
13 "Evaluation and management of
14 complications from synthetic mesh after
15 pelvic reconstructive surgery multicenter
16 study."
17    I didn't note that article cited
18 in your expert report, correct?
19    A.  It is not.
20    Q.  Did you read that article?
21    A.  I think I have that article in
22 my own files at home.
23    Q.  Okay.
24    A.  I'd have to check to be sure,

Page 79

1 but any -- an article like that from the
2 American Journal on mesh is something I
3 would keep an updated file with at home.
4    Q.  Okay.  I take it then you'd
5 consider that article authoritative on the
6 subject?
7    MS. KABBASH:  Objection.
8    A.  I don't consider any single
9 article authoritative.
10    Q.  What about textbooks, do you
11 have any authoritative textbooks?
12    A.  No.
13    Q.  What textbooks do you keep in
14 your office?
15    A.  My office and home I keep the
16 Baggish and Karram textbooks, as well as
17 their surgical atlas, Te Linde's Operative
18 Gynecology, their old atlases, Wheeler's
19 atlas and a few others.  I have a couple
20 of surgical books from -- on
21 laparoscopically, Reich's books, Harry
22 Reich's books.
23    Q.  When residents come through your
24 practice, which books do you recommend

Page 80

1 them to review for materials related to
2 the pelvic floor?
3    A.  Actually, I recommend that they
4 review their anatomy more than anything
5 else.
6    Q.  Okay.  The next article on that
7 reliance list is what?
8    A.  An article in the British
9 Journal OB-GYN 2010 "Inside out versus
10 outside in obturator tapes."
11    Q.  Did you read that article?
12    A.  I don't think I recall reading
13 that article specifically beyond anything
14 that might be in the abstract?
15    Q.  So, as we sit here today, do you
16 know if anything in that article supports
17 or contradicts your opinions in your
18 expert report?
19    A.  Again, my expert report is a
20 summary of my opinions, and my opinions
21 are based on a lot.  They're based on my
22 training, they're based on my experience,
23 they're based on my review of the
24 literature, and there are parts of

Page 81

1 literature that contradict or don't
2 contradict each other sometimes.  It's
3 based in part on my interaction with other
4 doctors either at my hospital, at various
5 national meetings.  My opinions are in the
6 report, but they're my opinions based on
7 the totality of my medical training and
8 experience.
9    Q.  So as we sit here today, you're
10 not in a position to testify under oath
11 that you've reviewed each and every item
12 on your reliance or supplemental reliance
13 list, correct?
14    A.  I haven't reviewed every -- I
15 have not read every single word of every
16 article, no.
17    Q.  In fact, there are probably
18 articles on there you haven't reviewed at
19 all, correct?
20    A.  No, I think actually there are.
21 Counsel was good at providing me with
22 articles that I found very -- very nicely
23 augmented my own personal collection of
24 data.

21 (Pages 78 to 81)

John R. Wagner, M.D.

Page 82

1       So, I don't have the same access
2   to the same infrastructure that clearly
3   counsel has to do literature reviews.  So
4   I tend to rely on reading articles,
5   studying the bibliography, requesting more
6   articles.  It's sort of old-fashioned the
7   way I do it.
8       Q.   Did you do your own Pub Med
9   search in preparation of your report or
10  rely on what was provided to you by
11  counsel?
12      A.   I did not do a Pub Med search.
13  I tend to have files at home that I keep
14  and I supplement and update and go through
15  periodically.  Some of it matched up.  I
16  think I had out of the reports in my
17  expert report, half of them I already --
18  were in my library.
19      Q.   Now, toward the back of that
20  document there's deposition transcripts.
21      Have you read any depositions of
22  internal Ethicon personnel?
23      A.   Yes.
24      Q.   Okay.  Which ones did you read?

Page 83

1       A.   I read a couple of depositions.
2   They must be in here somewhere, but I read
3   depositions on a Dr. Elliot.  I read
4   depositions on Dr. Rosenzweig.  I read
5   depositions from Piet Hinoul.  I read
6   depositions on a gentleman named
7   Weissberg.  Weissberg, yeah, Martin
8   Weissberg.  His name's right here
9   (indicating).  And --
10      Q.   What about Dan Smith, did you
11  read his deposition?
12      A.   I may have.  I don't
13  specifically recall it.
14      Q.   Were you given the entire
15  deposition or excerpts of depositions?
16      A.   In the cases of Elliot and
17  Rosenzweig, I have their entire
18  depositions, general depositions, as well
19  as case specific depositions I've read.
20      In the cases of Piet Hinoul and
21  Martin Weissberg, I have partial
22  transcripts that I read.  I think they
23  were direct transcripts -- no, actually,
24  that's not true.  One of them also had

Page 84

1   their own counsel questioning them too.
2   In fact, it was Maha who was questioning
3   them.
4       Q.   So, with regard Dr. Elliot and
5   Dr. Rosenzweig you know are not Ethicon
6   personnel, they're --
7       A.   I do know that, yes.
8       Q.   They're urogynecologists,
9   correct?
10      A.   Yeah, I believe they are experts
11  for the plaintiffs.
12      Q.   And the other witnesses you
13  identified are internal Ethicon personnel,
14  correct?
15      A.   Yes.  I believe they're medical
16  doctors.
17      Q.   Okay.  And you were given not
18  their entire depositions, but excerpts; is
19  that correct?
20      A.   Yes, although I have to say that
21  there are flash drives I haven't
22  completely reviewed that might have their
23  whole depositions.
24      So, the question was was I given

Page 85

1   it?  I may have been given it, but I
2   haven't reviewed it.
3       Q.   But what you reviewed were the
4   excerpts provided to you by counsel --
5       A.   Yes.
6       Q.   -- for Ethicon, correct?
7       A.   Yes.
8       MR. AYLSTOCK:  I take it on the
9   flash drive are the excerpts, not the
10  entire depositions, Ms. Kabbash?
11      MS. KABBASH:  I don't know the
12  answer to that question.  It may be
13  the case.
14      MR. AYLSTOCK:  Okay.  If not,
15  I'd request the excerpts that were
16  provided to Dr. Wagner to review be
17  given to me, please.
18  BY MR. AYLSTOCK:
19      Q.   Were they highlighted or
20  comments made on those excerpts, or just
21  excerpts?
22      A.   No, they were just trial
23  testimony, no highlights and no comments.
24      Q.   Your time reviewing all of those

22  (Pages 82 to 85)

John R. Wagner, M.D.

Page 86

1  materials is reflected in Exhibit 3,
2  correct?
3      A.   No.  Most of the time we just
4  talked about I reviewed recently.
5      Q.   So that would be in either the
6  invoice that I wasn't provided yet or the
7  e-mail or would be reflected in a future
8  invoice?
9      A.   Or the invoice that I haven't
10 provided her with yet.
11     Q.   Right, okay.
12         MR. AYLSTOCK:  Let me hand you
13 Exhibit 9.
14         (Exhibit Wagner 9, Gynecare TVT
15     Instructions for Use, was marked for
16     identification, as of this date.)
17 BY MR. AYLSTOCK:
18     Q.   Do you recognize Exhibit 9,
19 Doctor?
20     A.   I do.
21     Q.   You recognize that as the
22 instructions for use for the TVT
23 Retropubic product, correct?
24     A.   Yes.

Page 87

1      Q.   In your report, you state that
2  you use the instructions for use for
3  educational purposes with your residents,
4  correct?
5      A.   I do.
6      Q.   Why is that?
7      A.   It goes to sort of what you
8  asked me about textbooks.  The surgery
9  that we do now is so different than the
10 surgery when I was trained.  When I was
11 trained, the operations we were doing had
12 been pretty much unchanged for 80 to a
13 hundred years, and we had atlases and
14 textbooks that reflected those operations.
15 I mean, our suture materials were better.
16 Our operating environments were better.
17 Our surgical techniques were better, but
18 our actual procedures were pretty much
19 unchanged.  And in today's world, whether
20 it's vaginal slings, vaginal mesh repairs,
21 whether it's single incision surgery,
22 whether it's robotic surgery, it's really
23 hard to find an up-to-date textbook to
24 describe these things.  And by the time

Page 88

1  you do, it's probably outdated within a
2  couple years.
3      So, I just found that when I
4  have a new resident or fellow and they
5  have not seen this operation before or
6  they've not handled a particular device
7  before, a stapler, a single incision, I
8  encourage them to take this with them and
9  look at it.
10     Q.   I think you even say you
11 encourage them to take it home and study
12 it, correct?
13     A.   Yes, I do.
14     Q.   And that's because what's in the
15 IFU should be the most up-to-date
16 information known to the company as to the
17 implantation procedure and how to perform
18 it, correct?
19     A.   Again, I have problems with that
20 term "up-to-date."
21     You know, I think that the IFU
22 reflects the company's obligation to
23 describe their product and to describe
24 adverse potential side effects related to

Page 89

1  their product.  And yes, I mean, you could
2  learn something tomorrow and it might take
3  an IFU a while to catch up.
4      I don't expect the IFUs to
5  replace surgical judgment or up-to-date
6  surgical management, but I do find it's a
7  very good way to introduce somebody to a
8  product, and that's really what I would
9  use them for.  Whether it's TVT or really
10 any other product, to introduce a resident
11 to that product.
12     And I might say to them look, it
13 says here that you can X, Y or Z, but we
14 found you could even do A, B and C with
15 this too and expand on it.  Or I might say
16 it says here you can do this, but some of
17 the recent data says you can't do that.
18     So again, it's a good stepping
19 stone to get off on teaching somebody how
20 to use a product, is how I would use the
21 IFU.
22     Q.   And you mentioned adverse events
23 are reflected in the IFU, correct?
24     A.   Yes, they are.

23  (Pages 86 to 89)

John R. Wagner, M.D.

Page 90

1    Q.   And warning and precautions and
2  contraindications, correct?
3    A.   Yes.
4    Q.   And you find and tell your
5  residents it's important that they review
6  those materials as well as the
7  implantation procedure to come to an
8  understanding as to what might result from
9  the implantation of this product, correct?
10   A.   Correct.
11   Q.   Now, if we look at this IFU, and
12 I'm referring now to the --
13   A.   The writing is so small.
14   Q.   I know.  It's how it was given
15 to me.  We can probably get a magnifying
16 glass if we need.
17      But, as far as the warnings or
18 adverse events reflected in this IFU, it
19 talks about mesh extrusion, exposure and
20 erosion into the vagina, correct?
21   A.   Yes, under the "adverse,"
22 because you said "warnings," but that's a
23 separate section.
24      So you were referring to the

Page 91

1  "Adverse Reaction" section?
2    Q.   Yes.
3    A.   Yes, it says bullet 4 says that.
4    Q.   And you would agree with me that
5  that is an event that can be caused from
6  the TVT device, the kit, correct?
7    A.   A mesh extrusion or exposure or
8  erosion is really an adverse reaction
9  that's common to all mesh procedures.
10   Q.   Okay.  And so, specific to the
11 TVT Retropubic, you would agree that it
12 has the capacity to cause those adverse
13 reactions, correct?
14   A.   Correct.
15   Q.   And it has the capacity to cause
16 those adverse reactions even in the
17 absence of doctor error, correct?
18   A.   Correct.
19   Q.   And another adverse reaction
20 listed here is acute and/or chronic pain.
21      You see that, correct?
22   A.   Yes, I do.
23   Q.   And again, the TVT Retropubic
24 has the capacity to cause that in certain

Page 92

1  women even in the absence of doctor error,
2  correct?
3      MS. KABBASH:  Objection to form.
4    A.   Yes.
5    Q.   And it also says voiding
6  dysfunction.
7      You see that, correct?
8    A.   Yes.
9    Q.   Again the TVT devices have the
10 capacity to cause voiding dysfunction in
11 women even in the absence of doctor error,
12 correct?
13   A.   Correct.
14   Q.   Pain with intercourse in which
15 some patients may not resolve.
16      Do you see that?
17   A.   Yes, I do.
18   Q.   You would agree that pain with
19 intercourse in some patients may not
20 resolve following implantation of the TVT
21 devices, correct?
22   A.   Correct.
23   Q.   And that can occur even in the
24 absence of doctor error, correct?

Page 93

1    A.   Correct.
2      (Phone rings.)
3      MR. AYLSTOCK:  Do you need to
4  get that, Doctor?  If you do, it's
5  fine.
6      MS. KABBASH:  If you do, it's
7  okay.
8      THE WITNESS:  Can I take like a
9  one minute break?
10      (Recess taken from 10:47 a.m. to
11 10:51 a.m.)
12      MR. AYLSTOCK:  Where were we?
13      (The requested portion of the
14 record was read by the Court Reporter.)
15 BY MR. AYLSTOCK:
16   Q.   Now, with regard to the TVT
17 products, you would agree with me, Doctor,
18 that implantation of those products can
19 result in neuromuscular problems including
20 acute and/or chronic pain in the groin,
21 leg, thigh, pelvic and/or abdominal
22 region, correct?
23   A.   Correct.
24   Q.   And those can be caused by the

24 (Pages 90 to 93)

John R. Wagner, M.D.

Page 94

1   TVT products even in the absence of doctor
2   error, correct?
3       A.   Yes.
4       Q.   Same question with regard to
5   recurrence of incontinence, correct?
6       A.   Correct.
7       Q.   And same with regard to
8   bleeding, including hemorrhage or
9   hematoma, correct?
10      A.   Correct.
11      Q.   And you would also agree that
12  following the implantation of the TVT
13  family of products, one or more revision
14  or surgeries may be necessary to treat
15  these adverse reactions, correct?
16      A.   Correct.
17      Q.   And that can occur even in the
18  absence of doctor error, correct?
19      A.   Correct.
20      Q.   And you would agree that the TVT
21  mesh -- well, you're aware, Doctor, are
22  you not, that in the TVT family of
23  products they're all the same
24  polypropylene mesh, correct?

Page 95

1       A.   Correct.
2       Q.   And that's Prolene mesh,
3   correct?
4       A.   Correct.
5       Q.   Do you agree that in some cases,
6   that Prolene mesh needs to be removed in
7   whole or in part and significant
8   dissection may be required of the tissue
9   to get to the mesh, correct?
10      A.   Correct.
11      Q.   And that can occur with the TVT
12  products even in the absence of doctor
13  error, correct?
14      A.   Correct.
15      Q.   Have you personally explanted
16  Prolene mesh in your practice?
17      A.   Yes.
18      Q.   How many times?
19      A.   I've explanted Prolene mesh in
20  suburethral slings probably four or five
21  times, but I've explanted mesh in other
22  parts of the vagina in the operating room
23  maybe 20 to 30 times and in the office
24  multiple times.

Page 96

1       Q.   Prolene mesh, correct?
2       A.   Prolene mesh like you'd see with
3   the Prolift system.  Typically that was my
4   main product, so it would be primarily the
5   Prolene mesh in the Prolift system.
6       Q.   Okay.  Where a patient presents
7   with the need for explanation of the
8   mesh, is that something you normally do
9   personally, or do you refer cases out for
10  treatment sometimes?
11      A.   No, I actually do that
12  personally.
13           I guess I should tell you too
14  that of the TVTs that I have treated, I
15  think only one of them was mine.  The
16  rest -- actually, two of them were mine.
17  The rest were referred to me.  So about
18  half of the four or five were referred to
19  me.  The other two were mine.
20      Q.   And by "mine" you mean --
21      A.   My patient.
22      Q.   -- you implanted the original
23  TVT device, correct?
24      A.   Yes, I implanted the original

Page 97

1   TVT device.
2           And I should say that on one of
3   them it's pretty clear that the patient
4   disrupted the repair 'cause she had sex
5   the next night and disrupted the repair,
6   so I don't think that was the fault of
7   anything other than the patient not
8   adhering to her restrictions.
9       Q.   In the other case, did the
10  patient adhere to the instructions and
11  refrain from sex for the appropriate time?
12      A.   As best as I know, yes.
13      Q.   And she still had suffered an
14  adverse event from the TVT product?
15      A.   She did.  She had a small mesh
16  erosion that I had to excise.
17      Q.   And that mesh erosion, I take
18  it, was not caused by your error, correct?
19      A.   Error's a funny word.  We do our
20  best to section, we place it where we like
21  to place it.  We keep our fingers crossed
22  that we haven't devitalized the tissue so
23  that it heals well, but it can occur
24  without any doctor error.  It's an

25 (Pages 94 to 97)

John R. Wagner, M.D.

Page 98

1    inherent part of any mesh procedure is the
2    risk for mesh erosion.
3        Q.   And in that particular case, you
4    have no reason to think that you placed it
5    improperly, correct?
6        A.   I like to think I did a good
7    job.
8        Q.   I'm not here to disagree with
9    you.
10           And yet she still suffered an
11   adverse outcome, correct?
12       A.   Correct.
13       Q.   Did you report that to the
14   company?
15       A.   No.
16       Q.   Did you report it to the FDA?
17       A.   No.
18       Q.   Why not?
19       A.   It happened about four years
20   ago, and maybe I wasn't as conscious back
21   then of these types of events being
22   reported. I think that's more of a modern
23   concept.
24           But I also think in general when

Page 99

1    we deal with mesh erosions, it's one of
2    those things we go into our surgery
3    counseling patients about knowing that it
4    can happen, knowing that occasionally we
5    have to revise it a little bit either in
6    the office or afterwards to make things
7    perfect. So, I'm not even sure that in
8    today's world I would report it.
9        Q.   Okay. Have you ever had
10   occasion to remove an entire TVT sling?
11       A.   Twice.
12       Q.   Were those under general
13   anesthesia, I take it?
14       A.   Yes, they were.
15       Q.   Did those involve surgeries?
16       A.   Did they involve surgeries, is
17   that the question?
18       Q.   Were they complicated surgeries?
19           MS. KABBASH: Objection to form.
20           You can answer.
21       A.   I don't think explanting the
22   mesh is terribly complicated. It's a
23   pretty simple proposition in the sense of
24   you're finding the mesh, dissecting it

Page 100

1    out, carrying it out as far as you can
2    laterally and excising it. It's not brain
3    surgery. But it tends to be mesh that's
4    been there for a while. It's surrounded
5    by normal scar tissue. There's no tissue
6    planes in that region, so it makes the
7    dissection tedious. I would describe it
8    as tedious, not difficult.
9        Q.   Okay. And tedious in that the
10   mesh can be encapsulated in that scar
11   tissue, correct?
12           MS. KABBASH: Objection to form.
13       A.   Well, you want the mesh to have
14   a scar tissue that fills it in.
15           It's like a -- it's like -- it's
16   like before they pour cement they've got
17   metal rods that sit there and they pour
18   the cement in there. You want the scar
19   tissue to be the cement that fills in
20   around the mesh. So you're trying to
21   dissect out the metal rods like a big
22   piece of concrete. But the concrete's
23   like normal scar, that's what you're
24   looking for.

Page 101

1        Q.   So it's tedious to get that mesh
2    out of the scar tissue --
3        A.   Yes.
4        Q.   -- or concrete, is what you're
5    saying?
6        A.   Yes, it's tedious.
7        Q.   Certainly more difficult taking
8    it out than putting it in; you'd agree
9    with that?
10       A.   I would agree with that.
11       Q.   So, other things that you agree
12   could be caused by the TVT family of
13   products even in the absence of doctor
14   error would include seroma, correct?
15       A.   Yes.
16       Q.   Urge incontinence, correct?
17       A.   Yes.
18       Q.   Urinary frequency, correct?
19       A.   Yes.
20       Q.   Urinary retention?
21       A.   Yes.
22       Q.   Adhesion formation?
23       A.   It's listed here. I guess yes,
24   I would agree I guess that's possible.

26 (Pages 98 to 101)

John R. Wagner, M.D.

Page 102

1    I'm not sure where the adhesions would be
2    though.
3        Q.   Okay.  Atypical vaginal
4    discharge?
5        A.   Yes.
6        Q.   You would also agree that
7    exposed mesh from the TVT product can
8    cause pain or discomfort to the patient's
9    partner during intercourse, correct?
10       A.   Yes.
11       Q.   And death is also a potential
12   adverse reaction, correct?
13       A.   Yeah, it's listed here, but I
14   think that's an anesthetic reaction, not a
15   TVT adverse reaction.
16       Q.   You would agree though that all
17   of those things can be caused following --
18       MR. AYLSTOCK:  Strike that.
19       Q.   You would agree that all of the
20   aforementioned items can be caused from
21   the implantation of the TVT family of
22   devices even in the absence of doctor
23   error, correct?
24       A.   I think a lot of these things,

Page 103

1    as I look at them here, are related to
2    just any surgery to fix incontinence, but
3    I would agree that any of these are
4    possible with implanting TVT.  I guess if
5    you assume an anesthetic reaction, even
6    death is possible.  So I'll say yes, if
7    you're in the operating room putting in a
8    TVT, any of these things could happen.
9        Q.   Even in the absence of doctor
10   error?
11       A.   Even in the absence of doctor
12   error.
13       Q.   Now, if we go to page 3 of your
14   report, Doctor, you talk a little bit
15   about the TVT IFU.  And I think you would
16   agree with me that the IFU should be
17   providing the best description of the
18   current products, its use and its
19   complications and warnings, correct?
20       A.   I think that if you're referring
21   to my expert report, I'm talking there
22   about sort of what I said before about
23   giving a resident or a fellow a piece of
24   material that they can go home and

Page 104

1    introduce themselves to that will give
2    them that landscape of what this is all
3    about.
4        Q.   What you write on page 3 is that
5    you find that the IFU, and in this case
6    the TVT family of products IFUs, provide
7    the best description of the current
8    product, its use, potential complications,
9    and warnings, correct?
10       A.   Yes.  And I would go back to --
11   actually, I would go back to the sentence
12   before that.  I say as part of my resident
13   education, I guess I should say fellow
14   education, that's the context in which I
15   would make that statement.  It was
16   probably monographs and potentially -- and
17   disks and who knows what is better
18   description, but in terms of having
19   something that's right there that you can
20   teach people with, the IFU is something
21   I've used for years.  In that setting,
22   yeah, I think it provides me the best
23   information.
24       Q.   Okay.  And that's what you teach

Page 105

1    your residents, correct?
2        A.   Yes.
3        Q.   With regard to the instructions
4    for use, have you ever designed any
5    instructions for use?
6        A.   No.
7        Q.   Have you ever held yourself out
8    as an expert in what should or should not
9    be in instructions for use?
10       A.   No.
11       Q.   Are you familiar with what the
12   or have you ever studied what the industry
13   standards are with regard to what should
14   or should not be in the instructions for
15   use?
16       A.   No, I have to say I'm not aware
17   of the industry criteria for that.
18       Q.   So you're not holding yourself
19   out as an expert as to what should or
20   should not be in instructions for use,
21   correct?
22       MS. KABBASH:  Objection to form.
23       A.   I would hold myself out as an
24   expert in teaching residents.

27 (Pages 102 to 105)

John R. Wagner, M.D.

Page 106

1    Q.   Okay.
2    A.   And I think that as part of
3 that, you need an armorterium [sic], is
4 that the word I'm looking for, of tools.
5    Q.   And one of the tools is the IFU?
6    A.   Is an IFU.
7    Q.   Okay.
8    A.   So I would hold myself out as an
9 expert at teaching in that regard.
10   Q.   Okay. But not with regard to --
11   A.   But not --
12   Q.   -- IFUs specifically, correct?
13        MS. KABBASH:  Objection to form.
14   A.   But not with the industry
15 standards for what goes into the IFUs.
16   Q.   Correct.
17        Is that correct?
18   A.   Correct.
19   Q.   Okay, thank you.
20        Now, the instructions for use on
21 the TVT products also have implantation
22 instructions for the physician, correct?
23   A.   Yes.
24   Q.   And similarly, would you agree

Page 107

1 that with regard to the manner of
2 implantations, it's important that the
3 physicians be told through the IFU the
4 correct manner of implantation of the
5 particular product?
6    A.   I think how a physician learns
7 to do this should not be just by reading
8 the IFU and doing this. I think that if
9 somebody wants to expand their surgical
10 repertoire to anything, they should go to
11 postgraduate courses, be proctored, they
12 should learn -- if I'm understanding the
13 question, the question is can a surgeon
14 just read the IFU and do the surgery, I
15 would say no.
16   Q.   Yeah, that really wasn't my
17 question.
18        I guess my question relates back
19 to in your report on page 3, you would
20 agree that the IFU should be where the
21 physician -- one of the things that the
22 physician relies upon to look for the
23 correct manner of implantation of the
24 product, correct?

Page 108

1    A.   I think the IFUs provide a nice
2 written summary of standard use of the
3 product.
4    Q.   And because of that, because
5 doctors rely on it, it's important that
6 the IFUs be accurate, correct?
7    A.   I think the IFUs should be
8 accurate, yes.
9    Q.   Because if the IFU's not
10 accurate, a doctor may rely on it and give
11 bad information to a patient or implant it
12 incorrectly or do something else that's
13 wrong, correct?
14   A.   A doctor could implant something
15 incorrectly for a variety of reasons that
16 probably have nothing to do with the IFU.
17   Q.   Well, you agree if the IFU is
18 incorrect to the best manner of
19 implantation, or unclear, that can lead to
20 adverse consequences to the patient,
21 correct?
22        MS. KABBASH:  Objection to form.
23   A.   I would like the IFU to be as
24 clear as possible.

Page 109

1        Do I expect it to be a perfect
2 document? No more than I expect,
3 necessarily, my textbook chapter to be a
4 perfect document. But in general, they're
5 a good summary of whatever product it is
6 and what the company feels should be part
7 of its use and reactions and warnings and
8 side effects.
9    Q.   Okay. Let's go now to your
10 expert report, Exhibit 6.
11        Did you write this report?
12   A.   I think that probably two-thirds
13 of this are my dictation and corrections
14 of my dictations. Clearly these reflect
15 my opinions, but in terms of organizing
16 this, I clearly had help from counsel.
17 They helped me organize sections. But
18 most of this is dictated by me and
19 corrected by me.
20   Q.   You said about two-thirds?
21   A.   About two-thirds is directly
22 from my Dictaphone. The others are
23 paragraphs that I had editorial control
24 over and changed in certain ways, but

28 (Pages 106 to 109)

John R. Wagner, M.D.

Page 110

1  probably the scaffolding came from
2  counsel.  But I approved everything that
3  was in here and these opinions are mine.
4     Q.   Okay.  But as far as the text in
5  the report, about one-third was from
6  counsel and --
7     A.   At least the initial scaffolding
8  came from counsel.
9     Q.   Okay.  Did you review reports
10  from any other of Ethicon's experts?
11  Ethicon's experts.
12     A.   Did I review reports, I'm not
13  sure I understand, is that a general
14  question, like if I've seen any reports
15  from Ethicon at all?  Is that what the
16  question is?
17     Q.   No.  You understand you're not
18  the only expert hired by Ethicon Johnson &
19  Johnson to defend them in these lawsuits,
20  correct?
21     A.   I assume that, yes.
22     Q.   And have you reviewed reports
23  from other of Ethicon's experts in
24  preparation of your report?

Page 111

1     A.   No, I don't think I have.  No, I
2  have not.
3     Q.   Have you authored any other
4  previous expert reports for any mesh
5  devices?
6     A.   No.
7     Q.   Have you ever been an expert
8  witness before this case?
9     A.   Yes.
10     Q.   In what context?
11     A.   In malpractice context.
12     Q.   Was it involving a mesh product?
13     A.   No.
14     Q.   Were you involved with -- were
15  you hired by the defendant's lawyer in
16  that case?
17     A.   No.  I was hired by the
18  plaintiff's lawyer.
19     Q.   What was the nature of that
20  case?
21     A.   The nature was a patient of mine
22  who had gone to get a second opinion from
23  another physician.  She had
24  post-hysterectomy vaginal vault prolapse

Page 112

1  and was seeking a surgical repair.  This
2  was about 14 years ago.  And I recommended
3  she have a vaginal suspension, like a
4  sacrospinous fixation.  The second opinion
5  from the doctor in the city agreed, but
6  she also was requesting just removal of
7  her ovaries for sort of like no reason,
8  and I didn't think that that should be
9  done.
10        So, this other doctor agreed to
11  laparoscopically remove her ovaries.  She
12  had bad adhesions.  When he looked inside,
13  the ovaries looked normal, but they were
14  all bound down.  And in taking out the
15  ovaries, he injured the bladder.  In
16  repairing the bladder, he denervated the
17  bladder so that she was left with
18  basically very bad incontinence from
19  intrinsic sphincter deficiency.
20  Afterwards she had to fly out to
21  California.  Shlomo Raz put in a sling.
22  She ended up having a long, complicated
23  postoperative course.  And my opinion at
24  the time was that the removal of the

Page 113

1  ovaries was unindicated, particularly when
2  looking inside suggested that it would be
3  a very complicated procedure in what
4  otherwise was supposed to be elective.
5     Q.   So you were her treating
6  physician initially?
7     A.   Her initial treating physician
8  was my senior partner, and she was
9  referred to me for a consultation
10  interoffice when she developed
11  post-hysterectomy vault prolapse.
12     Q.   Do you know Shlomo Raz
13  personally?
14     A.   I do not.
15     Q.   And you recommended that she had
16  a pelvic repair without the use of mesh,
17  correct?
18     A.   We were not using mesh for those
19  repairs at that time vaginally.  We were
20  using mesh via laparotomy to do
21  sacrocolpopexies, but I felt that her
22  defect was primarily isolated to the apex
23  and she would do very well with the
24  sacrospinous fixation.

29 (Pages 110 to 113)

John R. Wagner, M.D.

Page 114

1    Q.   Turn with me to page 2 of your
2    report.
3         Since that case went back a
4    couple of decades, or I think you said 14
5    years.
6    A.   Actually, I know 'cause I missed
7    my son's -- oldest son's high school
8    senior prom party because I was testifying
9    and I got stuck in traffic coming home.
10   So I know he had to be 18 and he's 32 now.
11   So it had to be 14 years ago.
12        MR. AYLSTOCK: I think
13   Ms. Kabbash and I can relate.
14        MS. KABBASH: Yes, unfortunately
15   we can.
16   BY MR. AYLSTOCK:
17   Q.   So, in your report, you set
18   forth for the past 25 years you've been in
19   the same private practice, correct?
20   A.   Yes.
21   Q.   And your primary focus is
22   surgical gynecology for benign conditions,
23   correct?
24   A.   Correct.

Page 115

1    Q.   And that's been your primary
2    focus for the past 25 years, correct?
3    A.   Yes.
4    Q.   And you would agree with me that
5    stress urinary incontinence is generally
6    considered a benign condition, correct?
7    A.   Correct.
8    Q.   On the next page you discuss
9    your experience with the Burch procedure,
10   correct?
11   A.   Correct.
12   Q.   And did you generally have good
13   experience after performing the Burch
14   procedure to treat stress urinary
15   incontinence on your patients?
16   A.   I think I had typical Burch
17   outcomes.
18   Q.   And do you know what your
19   failure rate was following the Burch
20   procedure for SUI?
21   A.   I've actually never followed any
22   of my patients for their failure rates
23   prospectively. But my experience with the
24   Burch at the time, I mean, my counseling

Page 116

1    for the patient at the time was we're
2    going to spend three to five days in the
3    hospital. You're going to have a catheter
4    for five to seven days, and you could have
5    some prolonged bladder dysfunction, and
6    there is a fairly good chance we will cure
7    you, 70 to 80 percent cure rate, and about
8    a 50/50 lifetime cure rate. Those were
9    the statistics that I remember quoting the
10   patients back them.
11   Q.   With regard to the Burch
12   procedures, you would tell your patient
13   you could expect about a 70 to 80 percent
14   cure rate?
15   A.   80 percent cure rate.
16   Q.   And with regard to adverse
17   reactions with regard to the Burch
18   procedure, what would you tell your
19   patients?
20   A.   That it was abdominal surgery.
21   Although that it was outside the abdomen,
22   it required a C-section incision and the
23   risk of that would be related to bleeding,
24   infection and poor healing. There's a

Page 117

1    risk of bladder injury. There's a risk of
2    urethral injury. There's a risk of
3    failure. There's a risk of recurrence.
4    There's a risk of under-tightening or
5    overtightening, and then there's the
6    associated risks that go with any vaginal
7    surgery. You could have vaginal scarring,
8    strictures, pain. A lot of things are
9    listed in the IFU that we just went
10   through are symptoms of any vaginal
11   procedure.
12   Q.   What was your experience though
13   in your patients with the Burch procedure?
14   Did you have patients that experienced
15   chronic pain following your performing a
16   Burch procedure?
17   A.   But the number had to be low,
18   certainly under 10 percent. Chronic pain
19   is one of those things that you can see
20   almost any procedure, but it's not a
21   common side effect of any real procedure.
22   It's always just out there as a
23   possibility.
24   Q.   So, generally speaking, with

30 (Pages 114 to 117)

John R. Wagner, M.D.

Page 118

1  regard to the Burch procedure, your
2  patients did well, did not suffer an
3  adverse event, correct?
4      A.   They had typical --
5          MS. KABBASH:  Objection.
6      A.   -- Burch outcomes.  You know,
7  there were times when it didn't work well.
8  There were times when they had catheters
9  for three or four weeks.  There were times
10  when it didn't tighten them enough.
11         You know, with the Burch it was
12  funny because you didn't have different
13  types of options.  It was one procedure.
14  So if somebody had intrinsic sphincter
15  deficiency, we would try to do a really
16  tight Burch.  If they just had
17  hypermobility, we wouldn't do a really
18  tight Burch.  There was a lot more
19  guesswork with Burches, and there was a
20  lot more involved in recovery and pain and
21  complications.
22     Q.   As far as long-term
23  complications from the Burch other than
24  those individuals who suffered from a

Page 119

1  recurrence, did you have particular
2  patients that had long-term consequences
3  following the Burch that you can recall?
4      A.   No, but I know I had patients
5  who needed a pubovaginal sling because
6  their incontinence wasn't better.  I
7  recall hematomas.  We were always worried
8  about bleeding.
9      Q.   Those would be transient
10  conditions, correct?
11     A.   Well, transient for months.
12  Yeah, they didn't -- if they had a Burch
13  when they were 60, they didn't have those
14  conditions when they were 80, but they may
15  linger for a long time.
16         One thing to also remember about
17  a Burch is that if you did have a
18  hysterectomy, the vessels in that
19  retropubic space were often huge too.  So
20  there was a significant risk of bleeding
21  with a dissection.  It was a much more
22  invasive operation.
23     Q.   One of the risks that's not
24  associated with the Burch, however, is

Page 120

1  erosion or extrusion, correct?
2      A.   That is correct.
3      Q.   That's a risk that's unique to
4  the TVT family of products or other mesh
5  involved in SUI?
6      A.   It's absolutely unique to
7  operations other than the Burch.  The
8  pubovaginal slings, synthetic material
9  could erode.  The Burch did not have
10  erosions.
11     Q.   If we turn to page 4 of your
12  report, you detail your experience with
13  the TVT products.  I'm going to focus on
14  the TVT Retropubic product for now.
15         It looks like you performed
16  about 600 to 800 procedures with the
17  device?
18     A.   Yeah, that's my best
19  recollection.  We started doing them
20  around 2000, and it became virtually
21  standard.  We used it for every patient.
22  That was really the only device on the
23  market for a while that we used.
24     Q.   I'm not going to mark it because

Page 121

1  I want to take it back, but I'm handing
2  you a TVT device box.
3          Do you recognize that?
4      A.   I do.  It brings back memories.
5      Q.   All right.  So, one of the
6  memories it brings back is that the TVT
7  has the polypropylene mesh, the Prolene
8  mesh we discussed, and it's actually fixed
9  to the instruments, correct?
10     A.   It is, yes.
11     Q.   So the device is not just the
12  mesh, it's the instrumentation and the
13  instructions for use, correct?
14     A.   Yes.  And I think the handles
15  were reusable.  They were separate.
16     Q.   Okay.  But the actual trocars
17  here attached?
18     A.   Yes, they were attached and the
19  handles, if I recall, screwed into the
20  bottom of the metal trocars.
21     Q.   So the trocars weren't reusable,
22  just the handles, correct?
23     A.   Just the handles, yes.
24     Q.   How much were you paid,

31 (Pages 118 to 121)

John R. Wagner, M.D.

Page 122

1   approximately, for TVT Retropubic surgery?
2   Do you remember what your billing rate
3   was?
4       A.   We don't get paid a lot for
5   doing gynecologic surgery.
6       Q.   What's not a lot?
7       A.   Let me put it this way.  There's
8   most gynecologists over the last 15 years,
9   at least in this area, about 70, 80
10  percent of them have given up doing
11  gynecologic surgery for reimbursement
12  reasons, or they're not skilled in
13  minimally invasive approaches, but the
14  reimbursements for gynecologic surgery are
15  not that great.  And I'm sure my office
16  manager could give you a better idea what
17  we're reimbursed.
18          But if people were making a lot
19  of money pulling out TVT, then they
20  wouldn't be sending their patients to me
21  to have them done.  They could apparently
22  make more money in the office seeing
23  patients for annual visits than they can
24  taking them to the operating room, so.

Page 123

1       Q.   So, how long did it take you to
2   implant a TVT device?
3       A.   Fifteen, 20 minutes.
4       Q.   With regard to the billing rate,
5   was it a thousand dollars?
6       A.   It didn't matter what we billed.
7   We're HMOs.
8       Q.   So reimbursement rate?
9       A.   I could bill a million dollars
10  and they'll pay me 500.
11      Q.   Well, what's your best estimate
12  as far as the reimbursement rate for the
13  TVT?
14      A.   It's never been a lot.  If I had
15  to guess, it's really a guess, it's
16  certainly under 2,000.  It could be under
17  1500.  It could be some insurance plans
18  where it's only 500.  It would vary from
19  insurance plan to insurance plan.
20          We are a managed care dominated
21  environment.  So we can't set our fees.
22  We basically take whatever they pay us.
23      Q.   Somewhere between 500 and $2500?
24      A.   If I got $2500 regularly to do

Page 124

1   the TVT, I think I'd be on my sailboat
2   right now.
3       Q.   But that's a fair estimation --
4       A.   That would be the most I ever
5   got, I think.
6       Q.   So, you were also referred
7   patients to implant the TVT --
8       A.   Yes.
9       Q.   -- products, correct?
10      A.   For at least 15, 20 years,
11  probably the majority of patients I
12  operated on have been referred to me, yes.
13      Q.   Do you have an operating suite
14  in your office?
15      A.   No.
16      Q.   So where did you perform the
17  operations?
18      A.   In the operating room.
19      Q.   At the hospital?
20      A.   Yes.
21      Q.   Just one of the two hospitals
22  you had privileges in?
23      A.   Actually, I only had privileges
24  at Huntington until very recently.  I

Page 125

1   added privileges at Winthrop I think in
2   2012 or '13, '14, very recently.
3       Q.   I'm not going to ask you
4   questions about these other products yet.
5   I'll save that for later.
6           But you also detail other
7   Ethicon SUI products you used over the
8   years, correct?
9       A.   Correct.
10      Q.   And what you say in your report
11  is that it looks like after 2006, you
12  started using another Ethicon sling; is
13  that right?
14      A.   I did.
15      Q.   Why did you switch from the TVT
16  Retropubic to another sling?
17      A.   I found that it was a less
18  invasive operation, and I had very good
19  success with it.
20      Q.   Did you find that you had better
21  success with the next Ethicon device than
22  the TVT Retropubic?
23      A.   I had a better success setting
24  that tension exactly the way I wanted to

32 (Pages 122 to 125)

John R. Wagner, M.D.

Page 126

1    with that device.
2        Q.   So did you completely transition
3    from the Retropubic to the TVT Secur at
4    that time?
5        A.   Almost completely.
6        Q.   And because you had found it to
7    be a better product for you, correct?
8            MS. KABBASH: Objection to form.
9            Go ahead.
10       A.   I found that that product worked
11   very well for me and had advantages in
12   terms of less pain and pretty much
13   eliminated the risk of bladder injury and
14   retropubic hematoma in my hands.
15       Q.   So, one of the reasons you
16   stopped using the TVT Retropubic is
17   because you found a successor device had
18   less risk, correct?
19           MS. KABBASH: Objection to form.
20       A.   I found that I could use that
21   TVT device, the one that replaced the
22   retropubic, and get very good success
23   rates with it with less pain and fewer
24   complications.

Page 127

1        Q.   So you found the success rate to
2    be better for your patients, correct?
3            I'm sorry. You found the
4    successor product to the TVT Retropubic to
5    result in less complications for your
6    patients, correct?
7        A.   In my hands, I felt that way,
8    yes.
9        Q.   And then currently, do you use
10   the TVT Retropubic device at all?
11       A.   Yes.
12       Q.   When do you use it?
13       A.   Primarily when somebody has
14   stress incontinence with a minimal
15   hypermobility or urodynamically proven
16   intrinsic sphincter deficiency or when
17   they failed a prior transobturator sling
18   almost regardless of what I find on
19   physical exam or urodynamic studies.
20       Q.   Let me make sure I was clear in
21   my question because you do talk about the
22   TVT-Exact being your sling of choice for
23   the intrinsic sphincter deficiency,
24   correct?

Page 128

1        A.   Correct.
2        Q.   In your prior answer, were you
3    talking about the TVT-Exact or original
4    TVT Retropubic device that I have with me?
5        A.   I apologize. I miss -- I
6    misunderstood your question.
7            I don't use the original
8    Retropubic at all. That's why I kind of
9    enjoyed seeing that.
10       Q.   When is the last time you saw a
11   box like this, the TVT Retropubic?
12       A.   I haven't seen that box in
13   years.
14       Q.   And that's because you don't use
15   it anymore, right?
16       A.   I don't use it. I use the Exact
17   when I want a retropubic approach.
18       Q.   And that's because you find that
19   with the Exact, your patients have less
20   complications, correct?
21           MS. KABBASH: Objection to form;
22           lack of foundation.
23       A.   I think the big advantage for me
24   for the Exact one is the metal guides here

Page 129

1    are very firm and the Exact is a smaller
2    trocar, or guide, and it's also more of a
3    flexible guide. So I can feel my way up
4    the back of the pubic bone and through the
5    retropubic space more readily than I could
6    with the original TVT. To me there's more
7    of a tactile feedback that I get with the
8    Exact.
9            Also, there's one other
10   advantage of the Exact is that you could
11   place the trocars and they have a plastic
12   sheathe and you can leave the sheathe in
13   place and do one cystoscopy, which made it
14   easy to do.
15       Q.   So, in your experience, the
16   TVT-Exact, because of those advantages,
17   results in less complications for the
18   patient, correct?
19           MS. KABBASH: Objection.
20       A.   It makes a little quicker to do
21   the procedure because it only involves one
22   cystoscopy and I feel more confident in
23   when -- in how I place it. I'm not aware
24   of any literature or study that compares

33 (Pages 126 to 129)

John R. Wagner, M.D.

Page 130

1   exactly the original Retropubic that shows
2   any lower complication rate.
3       Q.   But in your experience, you
4   prefer the Exact because you find it to be
5   a superior device than the original
6   Retropubic, correct?
7           MS. KABBASH:  Objection; asked
8       and answered.
9           You can answer.
10      A.   In my hands, the way I feel my
11  way through the pelvis, I'm more confident
12  placing the Exact.  That's my -- that's my
13  best answer.
14          I don't have any peer-reviewed
15  objective data to tell you that it's
16  better.  I feel that I have a better feel
17  for where I'm guiding the trocars with the
18  Exact than I did with the original TVT.
19      Q.   So to you, you feel it's a
20  superior device?
21          MS. KABBASH:  Objection.
22  BY MR. AYLSTOCK:
23      Q.   The Exact.
24      A.   I just come back to in my hands,

Page 131

1   when I'm doing it, I feel more confident
2   doing it.
3       Q.   Okay.  When is the last time you
4   did an original TVT Retropubic
5   implantation, 2006?
6       A.   No.  I think I did one or two
7   recently when I was at a hospital, I can't
8   remember which hospital it was, and all
9   the TVT-Exacts had expired.  And so I
10  asked them if I could have the original
11  device and they gave it to me.
12      Q.   Okay.
13      A.   But I haven't seen that package
14  in a long time because they gave it to me
15  unwrapped and everything.
16      Q.   But absent an expiration on the
17  Exact, you don't use the TVT Retropubic
18  device anymore?
19      A.   That's correct.
20      Q.   When you were using the TVT
21  Retropubic device, did you use
22  mechanical-cut or laser-cut, or do you
23  know?
24      A.   I am pretty confident that when

Page 132

1   I used that, it was virtually all
2   mechanical-cut.  I don't recall being
3   familiar with the concept of laser-cut
4   until I used the TVT Secur.  So I'm fairly
5   confident that everything I used was
6   mechanical-cut.
7       Q.   Did your sales rep or anybody
8   from Ethicon ever explain to you what the
9   difference was?
10      A.   Not that I recall.
11      Q.   Do you know why Ethicon switched
12  to also creating a laser-cut TVT
13  Retropubic device?
14          MS. KABBASH:  Objection to form.
15      A.   I don't know why.
16      Q.   Did you ever ask them?
17      A.   No, I don't think I ever have.
18  I may have asked my rep when I had the TVT
19  Secur questions about the laser-cut, but
20  until recently, maybe four or five months
21  ago, I actually wasn't aware that you
22  could get the meshes in both ways.  That
23  was a relatively new discovery on my part.
24  I think I've always used the

Page 133

1   mechanical-cut except for the Secur
2   because I think the Secur only came
3   laser-cut.
4       Q.   When you did become aware of the
5   difference, what were you told about why
6   there was a difference?
7       A.   I recall, I think, having that
8   discussion with my GYN clinician in the
9   O.R., possibly when they were reordering,
10  and I remember thinking it didn't make any
11  difference to me.  I think I remember
12  saying whatever's cheapest, if there was a
13  difference.
14      Q.   Okay.  If you add up all of
15  these Ethicon devices over the years, it
16  looks like you've done 2,000, 2400 such
17  operations involving the TVT family of
18  products.
19          Is that about right?
20      A.   I think that's probably about
21  right.
22      Q.   Did you ever keep a registry for
23  your patients, given the large number that
24  you did?

34 (Pages 130 to 133)

John R. Wagner, M.D.

Page 134

1    A.   No.  I think that's my -- if I
2   had more time, I would do a lot more, but,
3   you know, I have a large surgical volume
4   and just taking care of people is pretty
5   much -- I'm pretty tired at the end of the
6   day.
7    Q.   But you've considered it?
8    A.   I would love to have maybe an
9   institutional affiliation where I could
10  have a research manager who could collate
11  data for me and things, but in private
12  practice, it becomes very difficult.
13   Q.   Did you ever ask your Ethicon
14  sales rep for anybody at Ethicon to help
15  you out with funding or personnel to do
16  such a registry?
17   A.   No.  But now that you bring it
18  up, I kind of wish I had.
19   Q.   I do too.
20   A.   I kind of wish I had.
21   Q.   Did you ever do any sort of
22  surveys, mail-outs or anything with regard
23  to complication rates with your patients?
24   A.   Once, a partial, and we

Page 135

1   abandoned it.  It was a project for one of
2   my residents regarding using the apilitis
3   [ph] for single site surgery and the risk
4   of hernias afterwards.  We were trying to
5   do a follow-up study on hernias, so it had
6   nothing to do with this type of thing.
7    Q.   And I take it, like many
8   physicians, the women you treat come and
9   go in your practice?
10       MS. KABBASH:  Objection to form.
11   A.   Roughly half of the people that
12  I operate on, probably fewer now, but over
13  the last 20 years, half the people I
14  operate on are my patients.  The other
15  half are referred and I send them back
16  when I'm done.
17   Q.   Okay.  So, with regard to
18  complications or things that may happen,
19  you wouldn't be in a position necessarily
20  to know unless they specifically came back
21  to you, correct?
22   A.   I would know about mesh
23  complications because they would all
24  rebound back to me.

Page 136

1    Q.   Who would?
2    A.   The referring doctor.  I mean,
3   if there's a mesh erosion on a Prolift or
4   something that they see on an annual
5   visit, they're going to send that patient
6   back to me, almost certainly.  Or the
7   patient themself is going to come back to
8   me.
9    Q.   There may be situations where
10  those patients move away?
11   A.   Absolutely.
12   Q.   And they might not even see the
13  doctor who sent them to you?
14   A.   That's correct.
15   Q.   With regard to complication
16  rates for those patients that are lost to
17  follow-up, you wouldn't have any way to
18  know?
19   A.   No, but it's probably balanced
20  by the patients who moved to Long Island,
21  had their surgery elsewhere and somebody
22  sees an erosion and sends them to me.
23   Q.   So you get those too?
24   A.   I get those too.

Page 137

1    Q.   How many of those have you done?
2    A.   I think that was the total I was
3   giving you before.  I think probably in
4   the operating room mesh excision for
5   Prolift, maybe 20 to 30 times, and for the
6   slings I think four or five times is all.
7    Q.   Okay.
8    A.   Those are my best guesses
9   though.
10   Q.   When you started using the TVT
11  Retropubic device, I take it you reviewed
12  the instructions for use prior to
13  implantation, as you would teach your
14  residents to do?
15   A.   I'm sure that I did.  Although I
16  probably didn't start teaching residents
17  'til 2004 or so.  But yes, I'm sure that I
18  did.
19       I was familiar with the IFUs,
20  and I tended to look at them myself.
21   Q.   Did you familiarize yourself
22  with the clinical data that supported the
23  TVT Retropubic device?
24   A.   Yes.

35 (Pages 134 to 137)

John R. Wagner, M.D.

Page 138

1    Q.   Was it important to you when you
2  were putting in this device that there be
3  clinical data?
4    A.   Yes.
5    Q.   Why is that?
6    A.   On a general perspective, I'd
7  like clinical data on anything that I'd
8  put in a patient.  But there are certainly
9  urogynecologic procedures for incontinence
10  that seem great and then the long-term
11  data wasn't as good.  The needle
12  suspension procedures, like Pereyra's and
13  Stamey's, would seem to be great and then
14  patients would quickly fail.  So,
15  historically, we had had issues with
16  procedures that seemed to work and then
17  didn't work as well.
18        The other example would be the
19  anterior repair and Kelly plication.
20        So, a lot of our urogynecologic
21  procedures up to the TVT didn't have a
22  great long-term track record, or even a
23  great short-term track record for that
24  matter.

Page 139

1    Q.   So, in your experience, clinical
2  data and having that clinical data prior
3  to bringing a product to market is
4  important to urogynecologic experts --
5        MR. AYLSTOCK:  Let me rephrase
6    that.  Strike that.
7    Q.   In your experience, in speaking
8  with other urogynecologists and
9  gynecologists, clinical data is important
10  to them when looking at whether a new
11  product should be used for the treatment
12  of stress urinary incontinence, correct?
13    A.   Yeah, I'd like to know what
14  clinical studies have been performed and
15  what their outcomes were and what the
16  follow-up was and the quality of the data.
17  It's all in -- it's a process of
18  evaluation.
19    Q.   If you had a product with no
20  clinical data behind it and it was an
21  experimental product basically, would you
22  try it on the patient without telling the
23  patient that there was no clinical data to
24  support it at this point?

Page 140

1        MS. KABBASH:  Objection to form.
2    A.   Well, I don't think I get that
3  past my hospital review committees or
4  anything like that.  I don't think it's a
5  question of -- I mean, I would not want to
6  do that, but I don't think I could get it
7  past my hospital ethics committee or
8  anything, rightly so.
9    Q.   That's because with regard to
10  products without credible clinical
11  research, those should be performed in an
12  experimental setting, not in a clinical
13  setting with patients?
14        MS. KABBASH:  Objection to form.
15  BY MR. AYLSTOCK:
16    Q.   Correct?
17    A.   Yeah.
18        You know what it reminds me of
19  is like the gentleman who invented the
20  coronary bypass, and they brought him
21  before Congress because he was working on
22  dogs and he presented his series.  He
23  said, My first series was 12 patients and
24  they all died.  He goes, My second series

Page 141

1  was 12 patients and six of them survived.
2  And he said, My third series was 12
3  patients and they all survived.  And he
4  said the first two series were with dogs,
5  the third series were with humans.
6        So I think that you want to do
7  some type of testing, whether it's animal
8  testing, whether it's product testing,
9  efficacy testing, before you put something
10  in people.
11    Q.   But with regard to bringing a
12  product to market and selling it to
13  surgeons across this country, do you
14  believe it's important that there be
15  clinical data to support the product?
16    A.   You'd like -- it's a funny
17  question for me to answer 'cause I don't
18  know how something would get to the market
19  unless somebody had 'I got an idea, let's
20  try this,' and I can't imagine anybody
21  would bring something to the market with
22  just 'Hey, I got an idea.  Fred said let's
23  try this.  Let's put it in 50 people and
24  see what works.'  That doesn't make sense

36  (Pages 138 to 141)

John R. Wagner, M.D.

Page 142

1  to me.
2       You're going to do some kind of
3  like cadaver testing, animal testing,
4  people testing, toxicology testing.
5       Q.   But before you start selling it
6  across this country, it's important that
7  there be some clinical studies, some
8  clinical data to support the product,
9  correct?
10      A.   I would like some scientific
11 data to back it up.  Clinical is a --
12 again, everything starts out, the best
13 cure of any disease starts out with a very
14 index patient using it for the first time,
15 and it has to have some data to back up
16 the rationale why we're going to use it.
17      Now, it might be classified as
18 experimental there, but the patient's
19 going to understand that it's experimental
20 and is willing to take those risks.
21      Q.   Exactly, but they --
22      A.   There always has to be one
23 patient who does something for the first
24 time.

Page 143

1       Q.   Of course.  But that patient
2  should be told that this is an
3  experimental, you're the first patient,
4  you're the fifth patient, it's not
5  released to the general public yet,
6  correct?
7       A.   I think that's a fair statement,
8  yes.
9       And you like to see some basic
10 science data, animal studies, cadaver
11 studies that back up what you do, whatever
12 may be appropriate.
13      Q.   Have you ever conducted any
14 bench or laboratory research yourself on
15 polypropylene mesh?
16      A.   I have not.
17      Q.   Have you ever tested different
18 mesh material for the treatment of stress
19 urinary incontinence?
20      MS. KABBASH:  Objection to form.
21      A.   I haven't done any formal
22 testing.  I've just used the different
23 products and felt that some of them worked
24 better for me.

Page 144

1       Q.   What other products have you
2  used other than the TVT family of products
3  for the treatment of stress urinary
4  incontinence?
5       A.   I used the IFS tunneler device
6  for a short period, and I used some
7  synthetic slings and autologous fascia for
8  pubovaginal slings early in my career as a
9  resident to treat stress incontinence.
10      Q.   Did you ever use a ProteGen
11 sling?
12      A.   No, thank goodness.
13      Q.   Why is that?  Why thank
14 goodness?
15      A.   That didn't end well for Boston
16 Scientific.
17      Q.   Do you know what the
18 similarities and differences are between
19 the ProteGen sling and the TVT slings?
20      A.   Well, the ProteGen sling was a
21 polyester weave with bovine collagen, and
22 it also had bone anchors.
23      Just a lot of bad things there.
24 Lot of bad potential complications with

Page 145

1  all of those things.
2       Q.   You mentioned the tunneler
3  device.
4       Did you have good experience
5  with the tunneler device?
6       A.   I did, but I felt uneasy with
7  the mesh.
8       Q.   You know that's not on the
9  market anymore?
10      A.   I know that.  Actually, but I'm
11 not as familiar with the IVF tunneler.
12      Q.   Do you know why it was pulled?
13      A.   No, I do not know.
14      Q.   Did you ever use Covidien mesh?
15      A.   I don't -- I wasn't aware that
16 Covidien made a TVT.  I think they make a
17 sacrocolpopexy mesh which I believe I've
18 used.
19      Q.   What about Coloplast, do you use
20 Coloplast slings?
21      A.   I've used Coloplast now for my
22 anterior and posterior vaginal mesh
23 repairs, and it's my predominant Y-mesh
24 for sacrocolpopexies.

37 (Pages 142 to 145)

John R. Wagner, M.D.

Page 146

1    Q.   Not for slings?
2    A.   I haven't used Coloplast for
3 slings, no.
4    Q.   Any other manufacturers -- have
5 you used any other manufacturers'
6 products, mesh products, for the treatment
7 of stress urinary incontinence other than
8 Johnson & Johnson?
9    A.   I've used the Caldera slings a
10 few times.
11    Q.   The Desara?
12    A.   A Caldera I think is the name.
13 It's the preset ones that -- it's put out
14 by a company that basically mimics every
15 sling that's on the market.  So the
16 advantage is a hospital can buy the
17 complete set and it sort of mimics the
18 Monarch, it mimics all the TVT products.
19 They have a mimic for everything.
20    Q.   Have you used the AMS products
21 for SUI?
22    A.   No, I don't think I have.  If I
23 did, it was just once or twice.  I don't
24 really recall.  And if I did, it was

Page 147

1 probably in a cadaver lab setting
2 somewhere.  I really don't have any
3 experience with AMS products.
4    Q.   And Boston Scientific slings,
5 same thing?
6    A.   I did not use their slings.  I
7 used their Uphold for anterior and apical
8 support.
9    Q.   In those times where you removed
10 mesh from women, TVT, Prolene mesh, did
11 you request any particular analysis of the
12 explanted mesh?
13    A.   No.
14    Q.   Did you personally review the
15 pathology reports for those?
16    A.   I'm sure that I did, and I'm
17 sure that I probably sent it to pathology.
18    Q.   Did you in that request a SEM
19 analysis?
20    A.   No.
21    Q.   Did you request any particular
22 analysis of those explanted meshes?
23    A.   No, I did not.
24    Q.   I take it you're not a

Page 148

1 pathologist?
2    A.   No.
3    Q.   And don't hold yourself out to
4 be an expert on pathology?
5    A.   No.
6    Q.   Same with you're not an
7 epidemiologist?
8    A.   No, I'm not an epidemiologist.
9    Q.   You're not a biomedical
10 engineer?
11    A.   Not a bit.
12    Q.   And you've never done a
13 comparison study of different mesh
14 designs?
15    A.   No, I have not.
16    Q.   And you don't hold yourself out
17 to be an expert in medical device design?
18         MS. KABBASH:  Objection to form.
19    A.   Not in the bench work of design,
20 but I think I have a handle on what seems
21 to work best for me and for other
22 physicians in the O.R. just based on
23 experience.
24    Q.   But with regard to comparison of

Page 149

1 different designs, you don't have an
2 expertise on that?
3    A.   Beyond my own surgical
4 experience, no.
5    Q.   And you agree that would be
6 anecdotal experience, correct?
7         MS. KABBASH:  Objection.
8 BY MR. AYLSTOCK:
9    Q.   I mean, I guess you haven't done
10 a study on SUI.  We've established that.
11    A.   No, but the problem I have with
12 anecdotal would mean that there's a total
13 absence of any ergonomic literature
14 suggesting that one handle might be better
15 than another, and I'm not sure I could say
16 that.  So I'd say that my migration to
17 certain products over my career probably
18 involves as much how I can handle the
19 device as what data may be out there
20 supporting a superior design or ergonomics
21 that agrees with what I'm feeling.
22    Q.   So it's based upon your clinical
23 experience in treating particular
24 patients, correct?

38 (Pages 146 to 149)

John R. Wagner, M.D.

Page 150

```
 1          MS. KABBASH:  Objection.
 2       A.   Supplemented with what I may be
 3    exposed to at the time regarding design
 4    advantages, et cetera.
 5       Q.   In your opinion, should a
 6    medical device company inform physicians
 7    about potential complications associated
 8    with its medical device?
 9       A.   Yes.
10       Q.   And would you agree with me that
11    one of the ways to do that is through the
12    IFU for the medical device?
13       A.   Yes.
14       Q.   If you go to page 5 of your
15    report.  There's some information about
16    your payment at the time of a preceptor.
17          Do you see that?
18       A.   Yes.
19       Q.   And you list, you state that you
20    believe that Ethicon reimbursed you about
21    $50,000 for those -- for that time; is
22    that correct?
23       A.   Yes.
24          MS. KABBASH: I apologize.  What
```

Page 151

```
 1    page are we on?
 2          MR. AYLSTOCK:  Page 5.
 3          MS. KABBASH:  Thank you.
 4    BY MR. AYLSTOCK:
 5       Q.   Have you confirmed that, or is
 6    that just your best estimate?
 7       A.   That is -- I actually thought
 8    that number was less, but apparently I
 9    guess working for -- as a proctor or
10    preceptor for many years ago, it did total
11    that amount.  That number was actually
12    based on records from Ethicon.
13       Q.   Did you look at those records?
14       A.   No.  But I can recall that
15    standard rates for teaching somebody for
16    half-day or a full day were about either
17    $500 for a half-day and a thousand for a
18    full day, and if I acted as a preceptor
19    for a cadaver course, I think there was a
20    higher fee for that.  Those were pretty
21    standard rates.
22       Q.   Did they pay for your travel to
23    these courses?
24       A.   They probably would if I asked
```

Page 152

```
 1    them, but I kind of just paid for my own
 2    travel.
 3       Q.   Did you receive any honoraria
 4    from them?
 5       A.   I'm probably misunderstanding
 6    the question because I thought that's what
 7    that was.  That five hundred or a
 8    thousand, does that not qualify as an
 9    honoraria?  I don't know.  I got paid.
10       Q.   You got paid for it, okay.
11          And I take it you've also got
12    paid by Wyeth and GlaxoSmithKline and all
13    of those other companies for your work for
14    them, correct?
15       A.   I got flat fees for giving
16    talks.  It was pretty much for the medical
17    aspect of that consulting.  It wasn't
18    any -- with the exception of Covidien, it
19    wasn't any involved with the company, per
20    se.  It was just flat fee.  I was on their
21    speaker panels, give talks.
22       Q.   And you're still on various
23    speaker panels and so forth, correct?
24       A.   I don't think so.  I think they
```

Page 153

```
 1    outlawed those.  At least my hospital did.
 2    You can't be on a speaker panel as of
 3    about four years ago.
 4       Q.   You're still being paid for
 5    doing things for medical device and
 6    pharmaceutical companies, correct?
 7       A.   That is correct.
 8       Q.   In addition to what you're doing
 9    in this case for Ethicon, correct?
10       A.   Correct.
11       Q.   You mentioned some things you
12    reviewed, and that includes some
13    procedural videos.
14          Do you see that?
15       A.   You're down at the bottom of
16    that page?
17       Q.   Right in the middle "Materials
18    Reviewed."
19       A.   Yes.
20       Q.   What procedural videos did you
21    review?
22       A.   I had a TVT -- I had several TVT
23    videos -- "video" is a bad term.  I'm
24    probably dating myself.  Disks.  They
```

39 (Pages 150 to 153)

John R. Wagner, M.D.

Page 154

1    weren't videos, they were disks.
2        Q.   Okay.
3        A.   That I used at the time.  I
4    haven't looked at them in a long time, but
5    a lot of the material I used in terms of
6    teaching, as well as educating myself,
7    involved some videos.
8        Q.   Where are those disks now?  At
9    your office?
10       A.   I gave them away to residents.
11       Q.   Were any provided to you by
12   counsel in preparation for this report?
13       A.   No.
14       Q.   What about the surgeon's
15   resource monograph, when is the last time
16   you looked at that?
17       A.   Recently.  They showed me that
18   and I recognized that.  I recall that
19   being my individual bible for doing a TVT
20   when it first came out.  I relied on that
21   a lot.
22       Q.   I'll skip over Secur because
23   we're not talking about that today.
24           Now, when you are consenting a

Page 155

1    patient to do a TVT surgery or one of
2    those family of products, would you agree
3    with me that it's a joint decision as to
4    whether or not that product should be
5    implanted in that particular patient?
6        A.   Yes.
7        Q.   In other words, you're not going
8    to implant it in a patient if the patient
9    doesn't want it, correct?
10       A.   That is very correct.
11       Q.   And you as a conscientious
12   doctor, you're going to make sure the
13   patient understands the risks and
14   potential benefits of the surgery,
15   correct?
16       A.   Yes.
17       Q.   And then leave it to the patient
18   to decide whether or not to go forward
19   with the surgery, correct?
20       A.   Correct.
21       Q.   With regard to the bottom of
22   page 10, you talk about in the presence of
23   other abdominal surgery, stress urinary
24   incontinence may be treated with a Burch

Page 156

1    procedure.
2            Do you see that at the bottom of
3    page 10?
4        A.   Yes.
5        Q.   You would agree with me that
6    performing a Burch procedure today is not
7    below the standard of care for a
8    physician, correct?
9        A.   No, but I think that it's become
10   so uncommon that the only time I've seen
11   it performed in the last 10 to 12 years is
12   in conjunction with an ongoing
13   intraabdominal operation.  I really don't
14   see people doing Burch procedures as first
15   line therapy for surgery for stress
16   incontinence.
17       Q.   Okay.  But you wouldn't consider
18   a Burch procedure below the standard of
19   care, correct?
20       A.   I think it's within the standard
21   of care, but it's a little bit unusual.  I
22   mean, there are -- I actually had a
23   urogynecology fellow who I was familiar
24   with when she was a resident who told me

Page 157

1    when she graduated her urogynecology
2    fellowship and she never saw a Burch.
3            So I think that it's probably
4    not below the standard of care, but it
5    would be unusual, extremely unusual for
6    someone to be offering multiple Burch
7    procedures for stress incontinence in lieu
8    of midurethral slings.
9        Q.   Go to page 11, if you would.
10           You're talking about the
11   development of the TVT Retropubic here,
12   and you cite to Professor Ulmsten and
13   Petros, correct?
14       A.   Correct.
15           What page are you on?
16       Q.   Page 11.
17       A.   I know it's in my report, but I
18   don't see it on page 11.
19           MS. KABBASH:  Let's make sure
20   we're in the same place.
21           Let's use the numbered exhibit.
22   Let's use Exhibit 6 to make sure you
23   guys are in the same place.
24           He brought a copy of his report

John R. Wagner, M.D.

Page 158

1  that he printed out.  The pagination
2  is a little bit different.
3       MR. AYLSTOCK:  Okay.  I would
4  like a copy of what he brought as
5  well.  So why don't we mark that as
6  Exhibit 10 just so we have it.
7       (Exhibit Wagner 10, Expert
8  Report of John R. Wagner, M.D.
9  regarding Gynecare TVT Products, was
10  marked for identification, as of this
11  date.)
12  BY MR. AYLSTOCK:
13  Q.   So, page 11 you talk about
14  Professor Ulmsten, correct, and his
15  development of the TVT?
16  A.   Yes.
17  Q.   Do you know how the product he
18  developed is different from the TVT
19  Retropubic sold in the United States?
20  A.   How the product he developed is
21  different?
22  Q.   Is it your understanding that he
23  used the exact same product that's in this
24  box of the TVT Retropubic that I brought?

Page 159

1  A.   He used, actually it's my
2  understanding that he used multiple
3  different meshes before deciding to settle
4  on the polypropylene mesh.  I'm not aware
5  that the device varied among those initial
6  trials, but I do know that he tried
7  different meshes.
8  Q.   Okay.  With regard to the
9  studies that you relied on and are relied
10  upon by Ethicon resulting from Dr.
11  Ulmsten's work that then got continued by
12  Dr. Nilsson after Dr. Ulmsten's death, do
13  you know whether or not those devices in
14  those studies are identical or in any way
15  different from the TVT device that I
16  brought with me here today, the retropubic
17  device?
18  A.   It's my understanding that the
19  original TVT devices are those devices.
20  Q.   And by "those" you mean the one
21  I brought with me in the box, the TVT
22  Retropubic device?
23  A.   Correct.
24  Q.   So it's your understanding that

Page 160

1  there's no differences whatsoever?
2       MS. KABBASH:  Objection to form.
3       You can answer.
4  A.   I'm not aware of any substantial
5  difference.  I don't know if maybe the
6  handle's different in one or another or
7  could it screw in with different, you
8  know, different -- I mean, it could be a
9  small difference, but I think the tape is
10  the same tape and I think the device is
11  generally the same device.  It's been my
12  understanding they're pretty much
13  interchangeable.
14  Q.   But as we sit here today, you
15  can't explain what the differences are, if
16  any?
17  A.   That's correct.
18  Q.   In fact, you don't even know
19  whether there are differences?
20  A.   That is correct.
21  Q.   You would agree with me that the
22  other manufacturers' mesh, AMS, Boston
23  Scientific, Caldera, Coloplast and so
24  forth that we talked about, are different

Page 161

1  formulations of mesh than the Prolene mesh
2  in the TVT family of products, correct?
3       MS. KABBASH:  Objection; beyond
4  the scope.
5       Go ahead.
6  A.   I'm aware, yes.
7  Q.   You mentioned here about TVT has
8  earned the reputation as the gold standard
9  of the treatment of SUI.
10       How do you define "gold
11  standard"?
12  A.   It's sort of like minimally
13  invasive.  It's a relative term, but I
14  think if you look in the literature,
15  particularly systemic reviews of the
16  literature, the primary midurethral sling
17  used worldwide is the TVT.  The vast
18  majority of literature available concerns
19  the TVT, and the longest follow-up we have
20  of any device with the TVT.
21  Q.   So I'm clear, when you say "TVT"
22  in your preceding answer, you're talking
23  about the TVT Retropubic device, correct?
24  A.   That's the one with the longest

John R. Wagner, M.D.

Page 162

1  track record.
2      Q.   Okay.  And the TVT Retropubic is
3  a midurethral sling, correct?
4      A.   Correct.
5      Q.   Are the other TVT products also
6  midurethral slings, or are there
7  differences?
8      A.   Yes, they all are.
9      Q.   Do you know whether Dr.
10  Ulmsten's, the type of product Dr. Ulmsten
11  used that then was followed up by Dr.
12  Nilsson was a TVT laser-cut or a TVT
13  mechanical-cut?
14     A.   I always made the assumption it
15  was mechanical-cut.  I thought a laser-cut
16  came along later, but I could be wrong on
17  that.
18     Q.   You don't know as you sit here
19  today?
20     A.   I don't know with a hundred
21  percent certainty, no.
22     Q.   And with regard to the studies
23  you referenced that support the TVT
24  Retropubic device, do you know how many of

Page 163

1  them involved TVT mechanical-cut versus
2  TVT laser-cut?
3      A.   No.
4      Q.   Are you familiar with -- well, I
5  guess you've never actually implanted a
6  TVT laser-cut -- TVT Retropubic laser-cut,
7  to your knowledge, correct?
8          MS. KABBASH:  Objection to form.
9      A.   I actually don't know that.  I
10  consider those slings interchangeable.  I
11  know I've implanted the mechanical-cut,
12  but as far as I'm aware, I could have
13  easily implanted a laser-cut mesh.  It
14  would have been the same to me.
15     Q.   You wouldn't know the difference
16  if you held it?
17     A.   I mean, if I really carefully
18  pulled on it and tugged on it and tried to
19  wreck it, I'd see the difference, but I'm
20  not trying to pull and tug it and wreck it
21  before I put it in.  So to me they're
22  interchangeable.
23     Q.   So you don't know the
24  biomechanical properties of each and

Page 164

1  whether they're the same or different?
2          MS. KABBASH:  Objection to form.
3      A.   To my mind, they're clinically
4  the same.
5      Q.   Do you know whether or not the
6  TVT laser-cut is stiffer mesh than the TVT
7  mechanical-cut?
8      A.   Again, I come back to clinically
9  to me, it makes no difference to me
10  whether it's laser-cut or mechanical-cut.
11     Q.   You say clinically, but you
12  don't know as we sit here today whether
13  you've actually ever implanted a TVT
14  laser-cut retropubic, correct?
15         MS. KABBASH:  Objection to form.
16     A.   That is true.  But it's not a
17  characteristic that I would ever insist
18  upon, and so I could have implanted
19  multiple laser-cuts.  I'd actually have to
20  check the requisition office in our
21  hospital and in my other hospital to see
22  what they ordered.  But I do know that I
23  have used the mechanical-cut mesh.
24     Q.   And the reason you don't

Page 165

1  the difference is because Ethicon never
2  explained to you as a doctor implanting
3  800 TVT Retropubic devices what the
4  reasonable differences are between the
5  laser-cut mesh and the mechanical-cut mesh
6  in the TVT-R, correct?
7          MS. KABBASH:  Objection to form.
8      A.   Actually, that's not exactly
9  true because I had a long discussions with
10  my rep regarding laser-cut with the TVT
11  Secur.  So I was actually familiar with
12  the laser-cut and what it looked like.
13  And so, and I also know that if you put
14  excessive force on the mechanical-cut, it
15  looks different than if you put excessive
16  force on the laser-cut.  I just don't
17  think that it has any clinical relevance
18  to me as the implanting surgeon on a
19  standard tension-free tape.  I'm not
20  putting -- if I'm putting excessive force
21  on that tape and deforming it, then I'm
22  doing it wrong.  It's not the tape, it's
23  the doctor.
24     Q.   Okay.  So you've observed in

42 (Pages 162 to 165)

John R. Wagner, M.D.

Page 166

1  your experience with the TVT devices that
2  when you pull on the mechanical-cut mesh,
3  it has more deformation of the pores than
4  if you pull on mechanical-cut mesh, fair?
5      MS. KABBASH:  Bryan, in
6  fairness, I think you misstated a
7  word.  You might want to --
8      MR. AYLSTOCK:  I'll try again.
9  Thank you.
10     MS. KABBASH:  You're welcome.
11 BY MR. AYLSTOCK:
12     Q.   In your prior answer, you had
13 indicated that when you're putting force
14 on the mechanical-cut mesh to a certain
15 extent, it behaves differently than the
16 same amount of force on a laser-cut mesh,
17 correct?
18     A.   Yes.
19     Q.   And can you describe the
20 differences, please, as you've observed in
21 your clinical practice?
22     A.   What I've seen actually is two
23 observations.  One is if I'm teaching
24 somebody and they put way too much tension

Page 167

1  on the mesh, it tends to rope or band
2  maybe and not lie flat.  And in that
3  setting, you can also get some
4  irregularity of the edges.  And that's
5  clearly a tape that's been inappropriately
6  placed.
7      The other time that I've noticed
8  the properties of laser-cut versus
9  mechanical-cut is when I'm removing the
10 mesh that I don't like how it's been
11 placed.  I found that if I pulled out a
12 laser-cut TVT Secur, that it would
13 maintain its shape a lot better than if I
14 was tugging on mechanical-cut mesh in the
15 process of removing it.  I could never
16 really use that mesh again.  I'd have to
17 get a new product out of the box because
18 the process of extra tension had deformed
19 it.
20     But it wasn't -- basically from
21 a properly placed mesh to me, it makes no
22 difference to me whether it's
23 mechanical-cut or laser-cut.
24     Q.   Did you see when that force was

Page 168

1  applied to the mechanical-cut evidence of
2  fraying of the mesh?  Could you see that?
3  Could you see the fraying of the mesh if
4  the mechanical-cut was pulled?
5      A.   You could see irregularity in
6  the mesh.  I guess you would call that
7  fraying.  I just always thought of it as
8  an irregularity.  The edges were jagged if
9  you applied too much tension to it.
10     Q.   Like a barbed wire effect?
11     MS. KABBASH:  Objection.
12     A.   It would have -- it would
13 have -- I would describe not barbed wire.
14 As more like looking at a mountain range,
15 where you have the peaks and valleys of
16 the mountains.
17     Q.   A jagged edge?
18     A.   Yeah, like that.
19     Q.   Now, did you see evidence of
20 particle loss, or particles?
21     A.   Occasionally I would see -- my
22 clamp that I'm using to tug on the mesh
23 for whatever reason could rip the mesh,
24 tear the mesh, there might be a little

Page 169

1  particle here or there.
2      Q.   You mentioned the need to make
3  sure the mesh was lying flat under the
4  urethra?
5      A.   And without tension.
6      Q.   Why is it important that that
7  mesh be laid flat?
8      A.   I think there's two answers to
9  that question.  The first is that it
10 provides a slightly broader base of
11 support rather than a very narrow base of
12 support.
13     But the other answer to that
14 question, the reason it's important is
15 because if it's not lying like that,
16 somebody's over-tensioning it.
17     Q.   Okay.  Now, you agree that when
18 implanting a TVT device, really any of the
19 TVT family of products, but certainly the
20 TVT Retropubic, that it's a blind passage,
21 correct?
22     A.   Yes, it is.
23     Q.   And you as a physician can't
24 visualize that mesh lying under the

43 (Pages 166 to 169)

John R. Wagner, M.D.

Page 170

1    urethra, correct?
2         MS. KABBASH:  Objection.
3    A.   Well, yes, you can because you
4    made an incision there.  So once you
5    placed it, you can see the mesh underlying
6    the urethra.
7    Q.   But the passages of the
8    polypropylene that are going through the
9    rest of her body via the tunnels created
10   by trocars, you can't visualize that mesh,
11   correct?
12   A.   No, you can only see the portion
13   of the mesh that's visible with your
14   suburethral dissection and obviously the
15   portion of the mesh that's sticking out of
16   the skin incision.
17   Q.   You mentioned earlier the words
18   "roping" and "banding."
19        Why is it important that the TVT
20   mesh not rope or band inside of a
21   patient's body?
22   A.   I think there's two answers to
23   that question.  The first answer is the
24   obvious.  If you see that, it's probably

Page 171

1    over-tensioned and it probably is going to
2    cause significant obstructive problems in
3    that patient postoperatively and it needs
4    to be loosened.
5    Q.   Can I stop you there?
6         Why would it cause significant
7    postoperative patients if it's roped or
8    band?
9    A.   Because it suggests it's too
10   lightly placed.  It's not tension free.
11   Q.   Okay.  And in that context,
12   would the problems that it could cause
13   include urinary obstruction?
14   A.   Yes.
15   Q.   Could lead to excessive scar
16   tissue around that banded mesh?
17   A.   No, I think it's just urinary
18   obstruction.  And I also think to, to
19   finish my answer, there's a second point
20   that I think is a problem.
21        If it bands, then the surface
22   area applied to the urethra is much
23   smaller and it's much easier potentially
24   for that mesh to cut into tissue or

Page 172

1    potentially erode into the urethra.  You
2    know, a small band could act like a sharp
3    suture or like a -- like a cheese cutter,
4    it can just kind of cut through, and you
5    wouldn't want to do that.
6         So, I think the other problem is
7    not that it's just too tight, but if it
8    bands like that, it potentially,
9    theoretically in my mind, could increase
10   risk for erosion.
11   Q.   Have you seen any studies that
12   have looked at whether one physician can
13   feel the palpable banding in patients and
14   to what -- at what rate following
15   implantation of the TVT family of products
16   device?
17   A.   I think banding is something
18   you'd have to see or feel almost
19   intraoperatively.  Once you get within a
20   few weeks of the surgery, any band is
21   potentially normal scar tissue that's
22   filling in there, not dissimilar to
23   somebody who, let's say, has an
24   obstetrical laceration and we do a vaginal

Page 173

1    repair and at the six week visit we feel a
2    dense band across the episiotomy or
3    laceration site where it healed that
4    normally.  So within four to six weeks,
5    anything you felt there is more likely to
6    be scar tissue and not the mesh itself.  I
7    think if you're going to feel band, it
8    would have to be right away.
9         So, I don't think I've seen any
10   literature that you can reliably count on
11   that says you can diagnose a band by a
12   palpation.  I think more often than not,
13   that's probably scar tissue.
14   Q.   Well, have you ever seen any
15   studies that looked at banding and whether
16   you can palpate banding following
17   implantation of the TVT device?
18   A.   I don't recall seeing any
19   studies like that.
20        MS. KABBASH:  I think we're
21   coming up on three hours very soon.
22        MR. AYLSTOCK:  Why don't we go
23   off the record then and add it up.
24        (Recess taken at 12:14 p.m. to

44 (Pages 170 to 173)

John R. Wagner, M.D.

Page 174

1        12:22 p.m.)
2    EXAMINATION BY
3    MS. KABBASH:
4        Q.   Doctor, I have some follow-up
5    questions for you.
6        Plaintiff's counsel asked you
7    some questions about a case of mesh
8    exposure and he specifically asked you if
9    you had reported that case where you
10   removed some mesh to Ethicon or the FDA.
11       Do you recall being asked that?
12       A.   Yes.
13       Q.   And I believe you answered "no."
14       Is that right?
15       A.   Correct.
16       Q.   Why did you not choose to report
17   that particular case to Ethicon or the
18   FDA?
19       A.   I've never reported any case of
20   mesh erosion to any company at all.
21       Q.   And why is that?
22       A.   We -- we -- that's basically
23   sort of a normal expected potential
24   complication of any mesh repair.  If I

Page 175

1    tell a patient or when I counsel a patient
2    regarding suburethral slings or any
3    vaginal mesh repair, I'm going to counsel
4    them regarding the risk of mesh
5    complications, is how I would put it, and
6    that would include erosion or, more
7    commonly, extrusions.  And extrusions is
8    usually what we see the more recent onset,
9    and those are either treated in the office
10   or in an outpatient surgery setting.
11       So what I tell patients is
12   basically this can happen.  It might
13   require something that we have to manage
14   here in the office.  At least half the
15   time or better we can just take care of it
16   in the office, and it might require a
17   return to the operating room for a small
18   procedure just to remove that little piece
19   of mesh and to put a couple stitches over
20   the repair.  I really -- when I talk to
21   patients about it, I don't describe it as
22   a major issue.
23       Q.   Is mesh exposure a known
24   potential risk of using a midurethral

Page 176

1    sling?
2        A.   Yes.
3        Q.   Is it reported in the medical
4    literature?
5        A.   Yes.
6        Q.   Is it reflected and warned about
7    in the TVT instructions for use?
8        A.   Yes.
9        Q.   If you could pull out Exhibit 8,
10   which is the abstract or the summary of
11   the vaginal repair of symptomatic pelvic
12   organ prolapse poster that you authored.
13       A.   Yes.
14       Q.   Plaintiff's counsel asked you
15   several questions about this abstract
16   before, this poster I should say, and in
17   particular with respect to the type of
18   mesh that was used in the study.
19       Do you recall that?
20       A.   I do.
21       Q.   At the time of the study, were
22   you using the Gynemesh PS polypropylene
23   mesh put out by Ethicon?
24       A.   Yes.

Page 177

1        Q.   Is that the type of mesh that
2    was used in this study?
3        A.   Yes.
4        Q.   To the extent that you earlier
5    indicated to Mr. Aylstock that you were
6    using a product called Prolene mesh, is
7    that something that you need to correct to
8    Gynemesh PS?
9        A.   Yes.  I actually thought those
10   two types were interchangeable.  So you
11   need to correct that.  I was using the
12   branded name is Gynecare PS that I used.
13       Q.   Was it Gynecare Gynemesh PS?
14       A.   I think it was Gynemesh PS.
15   Honestly, it's been a long time ago 'cause
16   I stopped using it ten years ago.  I think
17   it was Gynemesh PS.
18       Q.   Do you remember if it was the
19   same mesh that was later used in the
20   Prolift kit?
21       A.   Yes, I do remember that.  It was
22   the same mesh that was used in the Prolift
23   kit.
24       Q.   But it came in a flat sheet?

45 (Pages 174 to 177)

John R. Wagner, M.D.

Page 178

1    A.   Came in a flat sheet.
2         MR. AYLSTOCK:  Objection to
3    form.
4    BY MS. KABBASH:
5    Q.   Earlier plaintiff's counsel was
6    asking you about particular articles going
7    through your reliance list and you made a
8    statement something to the effect that "I
9    don't consider any particular article to
10   be authoritative."
11        Do you remember saying that?
12   A.   Yes.
13   Q.   What did you mean when you said
14   that?
15   A.   That there's no one forever
16   unimpeachable authority really in anything
17   we do in medicine.  There's no book
18   chapter.  There's no article.  There's no
19   opinion piece.  There's no authority in
20   medicine that is unimpeachable.
21   Q.   Your expert report on the TVT
22   products cites a lot of medical
23   literature, correct?
24   A.   It does.

Page 179

1         MR. AYLSTOCK:  Objection to
2    form.
3    BY MS. KABBASH:
4    Q.   In stating your opinions or
5    formulating your opinions on TVT
6    Retropubic, did you rely on any one
7    article to the exclusion of others?
8    A.   No.
9    Q.   Were you relying on the body of
10   medical literature that has evolved on TVT
11   slings over time?
12   A.   Yes.
13   Q.   You were asked several questions
14   about a TVT IFU that was marked as
15   Exhibit 9.  Can you pull that out?  And I
16   think if you turn to page 5 of the IFU
17   that's where are listed several potential
18   adverse reactions that counsel was asking
19   you about.
20        Is that right?
21   A.   Yes.
22   Q.   And counsel asked you a series
23   of questions about whether certain risks
24   could be caused by TVT and if they could

Page 180

1    happen in the absence of doctor error.
2         Do you recall that line of
3    questioning?
4    A.   Yes.
5    Q.   One of the risks that you were
6    asked about was acute or chronic pain.
7         Do you recall that?
8    A.   Yes.
9    Q.   Is acute or chronic pain a
10   potential risk of any pelvic surgery?
11   A.   Yes.
12   Q.   Is it a potential risk of any
13   surgery to treat SUI irrespective of the
14   use of mesh?
15   A.   Yes.
16   Q.   You were also asked about the
17   potential risk of pain with intercourse
18   that may not resolve.
19        Do you recall that?
20   A.   I do.
21   Q.   Is that a potential risk of any
22   pelvic surgery?
23   A.   Yes.
24   Q.   Is it a potential risk of any

Page 181

1    surgery to treat SUI irrespective of the
2    use of mesh?
3    A.   Yes.
4    Q.   In other words, it's a potential
5    risk of SUI surgery that does not use mesh
6    also?
7         MR. AYLSTOCK:  Objection to
8    form.
9    BY MS. KABBASH:
10   Q.   Correct?
11   A.   Correct.
12   Q.   You were also asked about the
13   potential risk of voiding dysfunction.
14        Is voiding dysfunction a risk of
15   any pelvic surgery?
16   A.   It's a risk of any pelvic
17   surgery, particularly those that are
18   involved with treating incontinence.
19   Q.   Okay.  Is voiding dysfunction a
20   potential risk of any surgery to treat SUI
21   that does not involve mesh?
22   A.   Yes.
23   Q.   You were also asked about
24   neuromuscular problems or pain.

46 (Pages 178 to 181)

John R. Wagner, M.D.

1          Do you recall that?
2     A.   Yes.
3     Q.   Is neuromuscular problems or
4  pain a potential risk of any surgery to
5  treat SUI that does not involve mesh?
6     A.   Yes.
7     Q.   You were asked about bleeding
8  including hemorrhage or hematoma.
9          Do you recall that?
10    A.   Yes.
11    Q.   Is that a potential risk of any
12 surgery to treat SUI that does not involve
13 mesh?
14    A.   Yes.
15    Q.   You were asked about the
16 potential risk that repeat surgeries may
17 be required.
18         Do you recall that?
19    A.   I do.
20    Q.   Is that a potential risk of
21 surgery to treat SUI that does not involve
22 mesh?
23    A.   Yes.
24    Q.   You were also asked about the

1  potential risks of seroma, urge
2  incontinence, frequency and atypical
3  vaginal discharge.
4          Do you recall that?
5     A.   Yes.
6     Q.   Are all those potential risks of
7  surgery to treat SUI that do not involve
8  mesh?
9          MR. AYLSTOCK:  Objection to
10 form.
11    A.   Yes.
12    Q.   You were asked earlier today
13 when was the last TVT Retropubic device
14 that you performed.
15         Do you recall that?
16    A.   Yes.
17    Q.   You currently use the TVT-Exact;
18 is that right?
19    A.   Correct.
20         MR. AYLSTOCK:  Objection to
21 form.
22 BY MS. KABBASH:
23    Q.   Is the TVT-Exact similar to the
24 TVT original Retropubic?

1          MR. AYLSTOCK:  Objection to
2  form.
3     A.   Yes.
4     Q.   You previously described some of
5  the things that you liked about the
6  TVT-Exact, but is the --
7          MS. KABBASH:  Strike that.
8     Q.   Is the TVT-Exact a retropubic
9  approach to placement of a midurethral
10 sling?
11    A.   Yes.
12    Q.   Are the trocars, though they may
13 be a bit narrower, are they the same shape
14 as the trocars for the TVT Retropubic
15 sling?
16         MR. AYLSTOCK:  Objection to
17 form.
18    A.   Yes.
19    Q.   Is the knit of the mesh in the
20 TVT-Exact the same knit as in the TVT
21 Retropubic sling?
22    A.   Yes.
23    Q.   You were asked earlier today
24 about whether you are a biomaterials

1  engineer.
2          Do you recall that?
3     A.   Yes.
4     Q.   Have you studied, both in your
5  career and in preparing your expert
6  report, how the Prolene mesh in TVT has
7  performed after being implanted in women?
8          MR. AYLSTOCK:  Objection to
9  form.
10    A.   I've watched how it's performed
11 not only in my patients, but also how it's
12 performed through the vast years of
13 medical literature and studies have been
14 done on it.
15    Q.   And is a lot of the medical
16 literature that you have studied in that
17 regard cited in your expert report?
18         MR. AYLSTOCK:  Objection to
19 form.
20    A.   Yes.
21    Q.   How important is the clinical
22 literature, the medical literature as a
23 basis of your opinions about the safety of
24 the use of the TVT implant?

47 (Pages 182 to 185)

John R. Wagner, M.D.

Page 186

1       MR. AYLSTOCK:  Objection to
2   form.
3       A.   How the mesh works in people and
4   how successful it is long-term and the
5   side effects long-term we measure
6   clinically in our reports to me is the
7   best evidence we have for safety and
8   efficacy.  We want to know how it actually
9   works in people and we want to know as
10  much as we can about that.
11      Q.   And is that why you've cited
12  that medical literature in your report?
13      A.   Yeah, the medical literature I
14  have in my report includes a tremendous
15  amount of clinical data on real life
16  people having real life mesh placed to
17  treat incontinence over many years.
18      Q.   If you turn to your report's
19  opinion number 2, which is towards the end
20  on page 52.
21          You have that?
22      A.   I think I do have it.
23      Q.   Opinion 2 says:  "The benefits
24  of these products far outweigh their risks

Page 187

1   in properly selected surgical candidates
2   based on their performance in thousands of
3   women.  As reflected in the medical
4   literature as well as my experience, they
5   are not defectively designed."
6          Do you see that?
7       A.   I do.
8       Q.   With respect to the TVT
9   Retropubic, does that continue to be your
10  opinion?
11      A.   Yes.
12      Q.   And do you hold that opinion to
13  a reasonable degree of medical certainty?
14      A.   Yes.
15      Q.   Is your opinion that the mesh in
16  TVT is not defectively designed based on
17  your review of the medical literature, as
18  well as your experience?
19      A.   Yes, as well as my interaction
20  with colleagues and opinions of surgeons
21  that I respect.  It's the entire body of
22  evidence in our urogynecologic community.
23      Q.   If you turn to opinion number 8,
24  which is on the last page of your report.

Page 188

1   It says:  "The possible risks of the TVT
2   family of products are appropriately
3   described in their instructions for use,
4   the patient brochures for the TVT family
5   of products, and in Ethicon's professional
6   education materials."
7          Do you see that?
8       A.   Yes.
9       Q.   What are the sources of
10  information that --
11          MS. KABBASH:  Well, first of
12  all, strike that.
13      Q.   Do you continue to hold that
14  opinion today?
15      A.   Yes.
16      Q.   Do you hold that opinion to a
17  reasonable degree of medical certainty?
18      A.   Yes.
19      Q.   And on what sources of
20  information do you base that opinion?
21      A.   I base it on pretty much the
22  same thing.  I base it on my training, my
23  experience, my interaction teaching
24  residents and fellows, interacting with

Page 189

1   other urogynecologists, the medical
2   literature, the extent of the medical
3   literature, the quality of the data, and
4   the quality of data that's presented at
5   national meetings and -- that I've
6   attended and read summaries of.
7       Q.   And have you assessed the
8   warnings of adverse reactions section of
9   the TVT IFU in relation to all those
10  sources of information that you just
11  mentioned right now?
12      A.   Yes, I have.
13      Q.   Do you recall if you used the
14  TVT Retropubic, the original, up until the
15  time that TVT-Exact came out on the
16  market?
17          In other words, I know that you
18  testified that you used TVT Secur, but
19  were there some patients in which you
20  would use TVT Retropubic up until the time
21  that Exact came out on the market?
22      A.   Typically, if they had failed a
23  mini sling, such as the Secur or there was
24  an Adjust, which is another mini sling

48 (Pages 186 to 189)

John R. Wagner, M.D.

Page 190

1    that I used occasionally, or if they were
2    referred to me and had failed a
3    transobturator sling, I might lean towards
4    a Retropubic TVT, but -- but those would
5    be the instances, but even in some of
6    those circumstances, I might still put a
7    Secur in.
8        Q.   If TVT-Exact came out on the
9    market in 2010, I'll ask you to assume
10   that.
11       A.   Okay.
12       Q.   If that's the case, would you
13   have continued to use TVT Retropubic in
14   certain patients, at least through that
15   period of time, 2010?
16           MR. AYLSTOCK: Objection to
17   form.
18       A.   If the TVT-Exact were not on the
19   market, I would be using the TVT
20   Retropubic every time I placed an Exact in
21   today's world.
22       Q.   Let me re-ask my question.  I
23   think we -- you might have answered a
24   different question than the one I asked

Page 191

1    you.
2            Assuming that the Exact came out
3    in 2010, would you have used the TVT
4    Retropubic, or did you use the TVT
5    Retropubic up until the time the TVT-Exact
6    came out in the patients in which you
7    wanted to use a full-length midurethral
8    sling?
9        A.   Yes, I did.
10       Q.   You were asked some questions
11   before about your use of laser-cut mesh.
12           Do you recall that?
13       A.   Can I go back to that last
14   question and just make sure that I
15   understood what your question was?
16       Q.   Okay.
17       A.   Which is is that -- and maybe I
18   can phrase it a different way so that I'm
19   clear on this.  When the TVT-Exact came
20   out, I did switch over to that relatively
21   quickly because I felt, as I said before,
22   just more comfortable with it.
23           Is that the question that you
24   were asking there?

Page 192

1        Q.   And up until the time that the
2    TVT-Exact came out, you would have been
3    using the TVT Retropubic in patients in
4    whom you wanted to do a full-length
5    retropubic approach sling?
6        A.   Yes, exactly.
7        Q.   You were asked some questions
8    about your use of laser-cut mesh.
9            You use TVT Secur, correct?
10       A.   Yes.
11       Q.   For several years?
12           MR. AYLSTOCK: Objection to
13   form.
14   BY MS. KABBASH:
15       Q.   Is that right?
16       A.   It is correct, yes.
17       Q.   And TVT Secur employed a
18   laser-cut mesh, right?
19           MR. AYLSTOCK: Objection to
20   form.
21       A.   Yes, it did.
22       Q.   And you also have used
23   TVT-Exact?
24           MR. AYLSTOCK: Objection to

Page 193

1    form.
2        A.   I have.
3        Q.   And were you aware that that
4    also employs a laser-cut mesh?
5            MR. AYLSTOCK: Objection to
6    form.
7        A.   I wasn't specifically aware of
8    that.  But as I think about it, it does
9    look laser-cut to me.
10       Q.   And you also currently use TVT
11   Abbrevo; is that right?
12       A.   I do.
13           MR. AYLSTOCK: Objection to
14   form.
15   BY MS. KABBASH:
16       Q.   And you've used Abbrevo for the
17   past six or seven years?
18           MR. AYLSTOCK: Objection to
19   form.
20   BY MS. KABBASH:
21       Q.   No, I'm sorry.  You've used
22   Abbrevo for the past five years?
23           MR. AYLSTOCK: Objection to
24   form.

49 (Pages 190 to 193)

John R. Wagner, M.D.

Page 194

```
1        A.    Four or five years, yes.
2        Q.    Okay.  Have you ever seen
3    evidence that the mesh in TVT would rope
4    or band in the absence of being overly
5    tensioned by the surgeon?
6              MR. AYLSTOCK:  Objection to
7    form.
8        A.    No.
9        Q.    Mr. Aylstock brought a sample of
10   the TVT device today, and the mesh implant
11   has a sheathe on it, does it not?
12       A.    Yes, it does.
13       Q.    A plastic see-through sheathe?
14       A.    Yes.
15       Q.    What is the purpose of that
16   sheathe?
17       A.    To aid in placement of the sling
18   by minimizing any local trauma that the
19   tape might cause as it's being put in
20   place, and also to minimize any risk of
21   infection.
22       Q.    When you're tensioning the TVT
23   sling, is it your practice to use any kind
24   of instrument in the tensioning process?
```

Page 195

```
1        A.    Typically I use a uterine
2    dilator, a number 8 dilator, number 10
3    dilator, somewhere in that range, but a
4    Hegar dilator to place between the tape
5    and the urethra while I'm tensioning it --
6    while I'm removing the plastic covers.
7        Q.    And why do you do that?
8        A.    To assure that it's not overly
9    tensioned.
10       Q.    And is that a well-known
11   technique to use some sort of instrument
12   to maximize the proper placement or proper
13   tensioning of the device?
14             MR. AYLSTOCK:  Objection to
15   form.
16       A.    Yeah, people use various
17   instruments just to assure the normal
18   tension -- the proper tension of the
19   sling.
20             MS. KABBASH:  I don't have any
21   more questions.
22             How much more time does Bryan
23   have?
24             THE COURT REPORTER:  If it's
```

Page 196

```
1    three hours, it's up.
2              THE WITNESS:  He's done.
3              MS. KABBASH:  Go ahead and have
4    a minute because I believe in
5    professional courtesy.
6              I've been held to a very tough
7    standard by some of your colleagues on
8    this.
9              MR. AYLSTOCK:  No, I understand.
10   FURTHER EXAMINATION BY
11   MR. AYLSTOCK:
12       Q.    Your opinion 8 in your report
13   about the IFU being properly describing
14   the risks, is that -- are you referring to
15   Exhibit 9 with regard to that report with
16   regard to the risks described?
17       A.    Yes.
18       Q.    And you changed your testimony,
19   or I guess you were asked questions about
20   the type of mesh in your study.
21             Do you recall those questions?
22       A.    Yes.
23       Q.    And I take it you discussed the
24   type of mesh in that study during break
```

Page 197

```
1    with counsel, correct?
2        A.    I did 'cause she asked me what
3    it looked like, what was the name of it,
4    and I was --
5        Q.    She was the one who suggested to
6    you that it was Prolene Gynemesh PS?
7              MS. KABBASH:  I'm going to
8    object to this line of questioning,
9    but you can go ahead and answer.
10       Q.    Not Prolene, correct?
11       A.    Actually, I remember the
12   Gynemesh PS as being the mesh.  That
13   wasn't the issue.  My mistake was thinking
14   that that was the same mesh as the TVT.
15   In fact, that mesh is the same as what's
16   in the Prolift in terms of its dime --
17   pore diameter and things like that.
18             So, actually it was my error.
19   It wasn't I didn't remember what I put in.
20   It's that I was under the impression that
21   that mesh pore size more reflected the TVT
22   pore size, not the -- but instead it
23   actually reflected the Prolift pore size.
24       Q.    Okay.  So you didn't know that
```

John R. Wagner, M.D.

Page 198

1   at the time we came in here?
2         MS. KABBASH:  Objection.
3      A.   I knew the mesh I put in.  I
4   didn't know the pore size of the -- I was
5   incorrect in stating -- in thinking and
6   alluding to the fact the Gynemesh PS
7   had the same pore size as the TVT.  I was
8   under that impression, and counsel
9   corrected me, that it was actually the
10  same as the Prolift pore size.
11       MR. AYLSTOCK:  Thank you.
12      Thank you, Maha.  I appreciate
13  that.
14      (Deposition adjourned at 12:45 p.m.)
15
16
17
18
19
20
21
22
23
24

Page 200

1         E R R A T A
2   PAGE / LINE / CHANGE  /  REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Page 199

1     A C K N O W L E D G M E N T
2
3  STATE OF      )
4            :ss
5  COUNTY OF     )
6
7     I, JOHN WAGNER, M.D., hereby
8  certify that I have read the transcript of
9  my testimony taken under oath in my
10  deposition of March 13, 2017; that the
11  transcript is a true and complete record
12  of my testimony, and that the answers on
13  the record as given by me are true and
14  correct.
15
16
17     _____
          JOHN WAGNER, M.D.
18
19  Signed and subscribed to before me this
20  _____ day of _____, 2017.
21
22  _____
23  Notary Public, State of
24

Page 201

1     C E R T I F I C A T E
2  STATE OF NEW YORK
3  COUNTY OF NEW YORK
4
5     I, Marie Foley, RMR, CRR, a
6  Certified Realtime Reporter and Notary
7  Public within and for the State of New
8  York, do hereby certify:
9     THAT JOHN WAGNER, M.D., the
10  witness whose deposition is hereinbefore
11  set forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14     I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I am
17  in no way interested in the outcome of
18  this matter.
19     IN WITNESS WHEREOF, I have
20  hereunto set my hand this 17th day of
21  March, 2017.
22
23     _____
24     MARIE FOLEY, RMR, CRR