# EXHIBIT G

John R. Wagner, M.D.

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

```
-----------------------------:
IN RE ETHICON, INC., PELVIC    :
REPAIR SYSTEM PRODUCTS         : MASTER FILE
LIABILITY LITIGATION           : No. 2:12-MD-02327
_____ :
THIS DOCUMENT RELATES TO ALL   : MDL 2327
WAVE 6 AND SUBSEQUENT WAVE     : JOSEPH R. GOODWIN
CASES AND PLAINTIFFS:          : US DISTRICT JUDGE
                               :
Sylvia Davis                   :
Case No. 2:13-cv-00574         :
Laurine Goulette               :
Case No. 2:13-cv-01776         :
Theresa Wilson                 :
Case No. 2:13-cv-00823         :
-----------------------------
```

September 25, 2017

Deposition of JOHN R. WAGNER, M.D.,

held at Marriott Melville, 1350 Old Walt

Whitman Road, Melville, New York,

commencing at 8:30 a.m., on the above

date, before Marie Foley, a Registered

Merit Reporter, Certified Realtime

Reporter and Notary Public.

-  -  -

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

Deps@golkow.com

John R. Wagner, M.D.

Page 2

```
 1    A P P E A R A N C E S :
 2
 3    WAGSTAFF & CARTMELL, LLP
 4    BY: ANDREW N. FAES, ESQUIRE,
 5       4740 Grand Avenue,
 6       Suite 300
 7       Kansas City, MO 64112
 8       850.202.1010
 9       afaes@wcllp.com
10       Representing the Plaintiff
11
12
13    RIKER, DANZIG, SCHERER,
14    HYLAND, PERRETTI, LLP
15    BY: MAHA KABBASH, ESQUIRE
16       Headquarters Plaza
17       One Speedwell Avenue
18       Morristown, New Jersey  07962-1981
19       973.538.0800
20       mkabbash@riker.com
21       Representing the Defendant
22
23
24
```

Page 3

```
 1                - - -
 2          TRANSCRIPT INDEX
 3                PAGE
 4    APPEARANCES...................... 2
 5    INDEX OF EXHIBITS................. 4 - 5
 6    EXAMINATION OF JOHN R. WAGNER, M.D.:
 7    BY:  MR. FAES.................... 7
 8    BY:  MS. KABBASH................. 113
 9    SIGNATURE PAGE................... 130
10    ERRATA........................... 131
11    REPORTER'S CERTIFICATE........... 132
12
13    EXHIBITS WITH ORIGINAL TRANSCRIPT
14
15                - - -
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1                - - -
 2            E X H I B I T S
 3                - - -
 4    NO.      DESCRIPTION          PAGE
 5    Wagner     Notice to Take Deposition    8
 6    Exhibit 1  of John Wagner, M.D.,
 7              dated September 18, 2017
 8    Wagner     Flash drive              9
 9    Exhibit 5
10    Wagner     Invoice of John Wagner, M.D.,  10
11    Exhibit 6  dated July - August 2017
12    Wagner     Expert Report of John R.      11
13    Exhibit 2  Wagner, M.D., dated August
14              16, 2017
15    Wagner     John Wagner General          20
16    Exhibit 3  Reliance List in Addition
17              to Materials Referenced in
18              Report MDL Wave 6
19    Wagner     Curriculum Vitae of John     30
20    Exhibit 4  R. Wagner, M.D.
21
22
23
24
```

Page 5

```
 1                - - -
 2            E X H I B I T S
 3                - - -
 4    NO.      DESCRIPTION          PAGE
 5    Wagner     April 2006 Wagner article    32
 6    Exhibit 7  "Vaginal Repair of
 7              Symptomatic Pelvic Organ
 8              Prolapse Using
 9              Polypropylene Mesh
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 to 5)

John R. Wagner, M.D.

| Page 6 | Page 8 |
|---|---|

**Page 6**

1 DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4   Page  Line
5   - -none- -
6
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9   Page  Line
10   - -none- -
11
12
13 STIPULATIONS
14   Page  Line
15   - -none- -
16
17
18 QUESTIONS MARKED
19   Page  Line
20   - -none- -
21
22
23
24

**Page 7**

1        - - -
2        8:32 a.m.
3        Melville, New York
4        - - -
5 JOHN R. WAGNER, M.D., the Witness herein,
6   having been first duly sworn by a
7   Notary Public in and of the State of
8   New York, was examined and testified as
9   follows:
10 EXAMINATION BY
11 MR. FAES:
12   Q.   Good morning, Dr. Wagner.
13   A.   Good morning.
14   Q.   My name is Andy Faes, and I'm
15 here to take your deposition now regarding
16 the Prolift product and your opinions
17 regarding that product.
18        Do you understand that?
19   A.   Yes.
20   Q.   And you understand that you're
21 under oath and sworn to tell the truth,
22 right?
23   A.   Yes.
24   Q.   And you've been through this

**Page 8**

1 process before, so if I ask you a question
2 that you don't understand, please let me
3 know, okay?
4   A.   I will.
5   Q.   And if for some reason I --
6   MR. FAES:  Strike that.
7   Q.   If I ask you a question and you
8 answer it, I'll assume you understood the
9 question as asked.
10        Fair enough?
11   A.   Yes.
12   Q.   Doctor, I'm going to hand you
13 what's been marked as Exhibit Number 1 to
14 your deposition, and this is the notice of
15 your deposition.
16        (Wagner Exhibit 1, Notice to
17   Take Deposition of John Wagner, M.D.,
18   dated September 18, 2017, was marked
19   for identification, as of this date.)
20 BY MR. FAES:
21   Q.   Do you see that?
22   A.   Yes.
23   Q.   This has various document
24 requests that asks you to bring various

**Page 9**

1 things to your deposition.
2        Have you seen that before?
3   A.   I have seen this request before,
4 yes, this notice before.
5   Q.   Prior to the start of your
6 deposition, counsel produced a flash
7 drive, which I'm going to mark as Exhibit
8 Number 5, just because if I mark it
9 anything earlier it's going to mess up my
10 whole numbering system.
11        (Wagner Exhibit 5, flash drive,
12   was marked for identification, as of
13   this date.)
14 BY MR. FAES:
15   Q.   What's on this flash drive, do
16 you know?
17        MS. KABBASH:  I can make a
18   representation to you, Andy, that that
19   flash drive contains everything that's
20   on Dr. Wagner's general reliance list.
21   MR. FAES:  Okay.
22 BY MR. FAES:
23   Q.   Also counsel produced what I'll
24 mark as Exhibit Number 6 to your

3 (Pages 6 to 9)

John R. Wagner, M.D.

1  deposition.
2       (Wagner Exhibit 6, Invoice of
3  John Wagner, M.D., dated July - August
4  2017, was marked for identification,
5  as of this date.)
6  BY MR. FAES:
7       Q.   Can you tell me what that is?
8       A.   That is an invoice for the hours
9  spent on creating and finalizing this
10  expert report.  It doesn't include the
11  hours also spent preparing for this
12  deposition.
13       Q.   So this would include all of the
14  hours that were spent creating your
15  Prolift expert report that's dated August
16  16th of 2017, right?
17       MS. KABBASH:  The date's likely
18  on the back.
19       A.   Correct.
20       Q.   Approximately how many hours
21  would you say that you spent preparing for
22  your deposition here today?
23       A.   Probably an additional eight to
24  ten hours.

1       Q.   And how many days did you spend?
2       A.   Three.
3       Q.   Was that all with counsel, or
4  was some of that on your own?
5       A.   Some of that was on my own.
6  Approximately three hours was with
7  counsel.
8       Q.   Other than the flash drive
9  marked as Exhibit Number 5 and the invoice
10  marked as Exhibit Number 6, have you
11  brought any other documents or things with
12  you here today in response to the document
13  requests in the notice?
14       A.   No.
15       Q.   I'm going to hand you what's
16  been marked as Exhibit Number 2 to your
17  deposition.
18       (Wagner Exhibit 2, Expert Report
19  of John R. Wagner, M.D., dated August
20  16, 2017, was marked for
21  identification, as of this date.)
22  BY MR. FAES:
23       Q.   I think you've already got a
24  copy of it in front of you.

1       Can you tell me what that is?
2       A.   This is my expert report.
3       MR. FAES:  Do you need a copy,
4  Maha?
5       MS. KABBASH:  I have one.
6  BY MR. FAES:
7       Q.   This report is signed and dated
8  August 16th of 2017; is that right?
9       A.   Correct.
10       Q.   Does this report contain all the
11  opinions that you've reached regarding the
12  Prolift product?
13       A.   Yes.
14       Q.   Now, the title of this report on
15  page 1 is "Gynecare Gynemesh PS Prolift
16  and Prolift+M."
17       Do you see that?
18       A.   I do.
19       Q.   Is it your understanding at this
20  time that you've only been declared as a
21  general expert on the Prolift product?
22       A.   That is my understanding.
23       MR. FAES:  And just for the
24  record, counsel, is that correct, he's

1  only been declared at this point as a
2  general expert on the Prolift product?
3       MS. KABBASH:  That's correct.
4  He's only had the Prolift portion of
5  his general report designated in Wave
6  6 so far.
7       MR. FAES:  Okay.  I just wanted
8  to make sure that that's why we're
9  only doing the two hours today and
10  that if he were to be designated on
11  the Prolift+M or the Gynemesh PS at
12  some future point that we may ask to
13  re-depose him on those products.
14       Fair enough?
15       MS. KABBASH:  That's my
16  understanding.
17       MR. FAES:  Okay.
18  BY MR. FAES:
19       Q.   Now, Doctor, there are various
20  articles cited through your expert report
21  marked as Exhibit Number 2, correct?
22       A.   Yes, there are.
23       Q.   In terms of your decision-making
24  and writing the report, why did you decide

4 (Pages 10 to 13)

John R. Wagner, M.D.

Page 14

1    to cite the articles that you did?
2        A.   I decided to cite the articles
3    that I felt best represented the opinion I
4    was trying to make at that point in the
5    report.
6        Q.   And in terms of gathering the
7    articles that you reviewed and relied on
8    for your report, what was your process for
9    that?
10       A.   My process was to look at the
11   articles that I maintained myself.  Most
12   of the articles that I maintain, with a
13   few exceptions, are from the American
14   Journal of Obstetrics and Gynecology, the
15   OB-GYN Green Journal, the Journal of
16   Minimally Invasive Gynecology, the Journal
17   of Female Pelvic Medicine and Surgery, and
18   then I have a few articles that I maintain
19   in my library that I've secured from more
20   international journals.
21       And then beyond that was added
22   by counsel and providing more
23   international journal citations that would
24   support the opinions that I was setting

Page 15

1    forth.
2        Q.   Did counsel provide you any
3    journals that didn't support the opinions
4    you set forth in the report?
5        A.   There were citations from, let's
6    say, Clave talking about mesh properties
7    that comes from the international journal
8    that don't support the opinions that I put
9    forth.  There was citations from Otto in
10   2003 that don't support the opinions that
11   I put forth.  But I also provided opinions
12   from other sources and citations to refute
13   those studies.
14       So yes, I was provided with
15   studies that don't support my opinions
16   necessarily, and I actually have some
17   articles, particularly from Cheryl
18   Iglesias, in my own library that don't
19   necessarily support the opinions that I
20   put forth here.
21       Q.   So, in terms of writing your
22   report and forming your opinions, did you
23   ever go out and try to find the materials
24   and literature out there that didn't

Page 16

1    support the opinions that you're offering
2    in this case, as well as find materials
3    that did support the opinions?
4        A.   I think in my --
5            MS. KABBASH:  Objection to form.
6        A.   I think in my role as a pelvic
7    surgeon, I'm always looking to read
8    anything that I can about the subject, and
9    sometimes those articles, particularly if
10   they're good quality, will change my
11   opinion one way or the other.  So as a
12   function of what I do, I'm always looking
13   for more information and more up-to-date
14   information and the highest quality data
15   that I can get to -- to do the best job
16   that I could do in terms of clinically
17   treating my patients.
18       Q.   So, in terms of materials that
19   didn't support some of the opinions that
20   you're offering in this case, you
21   specifically mentioned the Clave study,
22   right?
23       A.   Yes, I did.
24       Q.   So you'd agree with me that

Page 17

1    there are articles out there in the
2    peer-reviewed literature that do not
3    support your opinion that polypropylene
4    mesh does not degrade, correct?
5        A.   I think that article is one.
6    I'm not sure that I would agree with the
7    concept that there's articles.  Certainly
8    there's not an abundance.  I think the
9    vast majority of peer-reviewed literature,
10   particularly from the major medical
11   journals, as well as the opinions from
12   major medical societies like AUGS and
13   SUFU, don't agree with Clave and his
14   conclusions.  So, I think there's a vast
15   amount of literature that doesn't support
16   his opinions, and it's a vast amount of
17   opinion from medical societies that I
18   subscribe to and respect that don't
19   support his opinions.
20       Q.   And one of the other articles
21   that you mentioned is the Iglesias
22   article, correct?
23       A.   Yeah.  I don't know if I can
24   quote an article on her, but I have some

5 (Pages 14 to 17)

John R. Wagner, M.D.

Page 18

1    articles.  She tends to be somebody that I
2    read who doesn't necessarily support the
3    use of mesh in some of the cases where I
4    believe it should be used.  I think she's
5    not as supportive of mesh implants in
6    general transvaginally, as a lot of
7    opinion leaders are.  So I think that it
8    provides me with a balance.
9        Q.   But you'd agree with me that
10   there are articles out there in the
11   peer-reviewed medical literature that
12   don't support the opinion that the Prolift
13   device is safe and effective, correct?
14       A.   Again, I don't agree with the
15   statement the way you worded that.  I have
16   trouble with that.
17       Q.   So you think that all of the
18   medical literature in the --
19           MR. FAES:  Strike that.
20       Q.   So you believe that all of the
21   peer-reviewed medical literature that
22   studied the Prolift device supports your
23   position that it's safe and effective?
24           MS. KABBASH:  Objection.

Page 19

1    BY MR. FAES:
2        Q.   Is that your opinion?
3            MS. KABBASH:  Objection to form.
4        A.   No, I don't agree with that
5    statement either.
6        Q.   I'm going a little bit out of
7    order, but I want to hit it and we'll get
8    into it a little bit later.  We talked a
9    little bit about articles on degradation,
10   and obviously you've been deposed before
11   and testified extensively on that issue,
12   right?
13       A.   I've been deposed before, and
14   I -- I have testified on one pelvic mesh
15   case as a expert witness for Ethicon.  I
16   don't know if that counts as extensive.  I
17   think I'm a -- would still consider myself
18   a relative novice at this.
19       Q.   So, would you say that your
20   opinion regarding polypropylene mesh is
21   that it doesn't degrade at all or that it
22   may degrade, but if it does, it's not
23   clinically significant?
24       A.   It is my opinion that

Page 20

1    polypropylene mesh is inert and does not
2    degrade.
3        Q.   Okay.  Now, in your report
4    marked as Exhibit Number 2, you also go
5    through various facts and you discuss
6    facts, right?
7        A.   Yes.
8        Q.   Did you discuss the facts in
9    your report that you felt were most
10   important to you in drawing your opinions
11   in this case?
12       A.   Yes, I tried to.
13       Q.   You've also got a reliance list
14   in this case, right?
15       A.   Yes.
16           MR. FAES:  And I'll mark that as
17   Exhibit Number 3 to your deposition.
18           (Wagner Exhibit 3, John Wagner
19   General Reliance List in Addition to
20   Materials Referenced in Report MDL
21   Wave 6, was marked for identification,
22   as of this date.)
23   BY MR. FAES:
24       Q.   I'll give you a copy of that

Page 21

1    (handing.)
2            Actually, let me back up a
3    little bit because I forgot to ask you a
4    question about your report.
5            Did you write your entire report
6    marked as Exhibit Number 2 on your own?
7        A.   Not the entire report, no.
8        Q.   So, there are portions of the
9    report marked as Exhibit Number 2 that you
10   didn't write on your own?
11       A.   There were portions of that
12   report where the -- with the aid of
13   counsel, counsel skeletonized some of it
14   and I helped fill in the body of the
15   report.
16           And, I should say that the
17   opinions in the report are all mine and
18   that I had complete control over the
19   contents of that report.  I had total
20   editorial control over that report.
21       Q.   But it's fair to say that you
22   were provided with a skeleton or outline
23   which suggested what your potential
24   conclusions may be?

John R. Wagner, M.D.

Page 22

1    A.  No.
2         MS. KABBASH:  Objection.
3    A.  That is not fair.  I would say
4  that significant part of that report was
5  taken verbatim from my previous TVT
6  report, certainly the introductory
7  portions, and that was completely written
8  by myself.
9         There are the opinion portions
10 of the report are really generated from my
11 own words and Dictaphone.
12        The skeletonizing that counsel
13 provided me with was primarily in
14 summarizing just conclusions of some of
15 the studies that I wanted to cite, but the
16 opinions in there are completely my own.
17   Q.  Is there any way for me to tell
18 which portions of this report were
19 actually not written by you?
20        MS. KABBASH:  Andy, I'm just
21    going to state an objection and
22    instruct Dr. Wagner not to answer any
23    questions that seek specifics
24    regarding what was written by him or

Page 23

1    not, beyond what he's already
2    testified to, based on the fact that
3    it violates the federal civil rules.
4         MR. FAES:  Okay.  Let me
5    withdraw that question and ask a new
6    one.
7  BY MR. FAES:
8    Q.  This quality of evidence pyramid
9  on page 18 of your report.
10   A.  Yes.
11   Q.  This is --
12        MR. FAES:  Well, strike that.
13 He's already answered that.  I don't
14 need to ask him again.
15   Q.  Going back to your reliance
16 list, Doctor.
17        This reliance list marked as
18 Exhibit Number 3, who prepared this
19 reliance list?
20   A.  Counsel prepared this reliance
21 list.
22   Q.  Does this reliance list marked
23 as Exhibit Number 3 contain all of the
24 materials you reviewed and relied upon in

Page 24

1  forming your opinions in this case
2  regarding the Prolift?
3    A.  Yes.
4    Q.  And is this reliance list the
5  same reliance list as you used for your
6  most recent TVT report?
7    A.  It includes more studies than my
8  most recent TVT report 'cause it includes
9  studies that involve Prolift which were
10 not included in the TVT report.
11   Q.  In forming your opinions
12 regarding the Prolift, do you rely on
13 midurethral slings in the TVT to form any
14 of your opinions regarding the safety and
15 efficacy of the Prolift?
16   A.  I think there are parts of my
17 Prolift report that do rely on some of the
18 literature from TVT, particularly as it
19 relates to issues of so-called contraction
20 of the mesh.  In my report I refer to TVT
21 in that regard.  There are other parts of
22 the report that talk about mesh properties
23 in general that I overlap with the TVT and
24 use the TVT as part of my supporting

Page 25

1  literature.
2    Q.  And have you reviewed all of the
3  materials that are listed in Exhibit 3,
4  which is your reliance list?
5    A.  I believe I've tried.  I think
6  that some of the mesh studies are studies
7  that I have just superficially reviewed,
8  but I've tried to review all of the
9  studies.
10        I think the things that I
11 haven't reviewed are some of the Ethicon
12 internal documents.  I haven't some of
13 those, but I tried to reviewed everything
14 that counsel sent to me, at least to be
15 able to say that yes, I have reviewed it,
16 some that I find more important than
17 others.
18   Q.  So if I heard you correctly,
19 there's at least some internal documents
20 listed on Exhibit Number 3 that you
21 haven't actually reviewed; is that
22 correct?
23   A.  It's hard for me to say because
24 I've tried to review everything, but if I

7 (Pages 22 to 25)

John R. Wagner, M.D.

Page 26

1    had to provide you with the most accurate
2    opinion, I think there's probably some
3    internal documents here that I have not
4    seen.  Although I have to say I made a
5    legitimate effort to try to review
6    everything that they sent to me.
7        Q.   And there's also two pages of
8    company witness depositions on your
9    reliance list.
10       A.   Yes.
11       Q.   Have you reviewed all of the
12   company witness depositions on your
13   reliance list?
14       A.   I'd have to give this -- I'd
15   have to give the same answer because I was
16   sort of lumping that together.  But I have
17   reviewed testimony from Piet Hinoul.  I've
18   reviewed testimony from Dr. Weissberg.
19          So again, I can't say that I
20   reviewed all of the testimony, but I have
21   made an effort to review part of it.
22       Q.   So it's fair to say that there
23   is some deposition testimony listed on
24   your reliance list that you haven't

Page 27

1    actually reviewed, right?
2        A.   I think that's probably a fair
3    statement, yes.
4        Q.   As you sit here today, do you
5    have any type of list that you could
6    provide that would give us all of the
7    deposition testimony and internal
8    documents that you have actually reviewed?
9        A.   That would be hard because I
10   believe that counsel sent me everything
11   that is on this list.  So if -- it would
12   be very hard for me to say yes, I looked
13   at that and I didn't look at this.  It's
14   very hard for me to separate out those
15   two.
16          I tried to read this when it's
17   provided to me and try to read the
18   literature when it's provided to me.  I
19   just don't think I've read all the
20   deposition testimony.  And I don't believe
21   I've read all of the internal documents.
22   I do believe I've tried to read all of the
23   articles that are provided to me.
24       Q.   For example, on your reliance

Page 28

1    list on the first page of the company
2    witness materials there's two depositions
3    for Thomas Barbolt.
4        Do you know who that is?
5        A.   Could you refer me to the page
6    again?  I'm sorry.
7        Q.   Well, if they had page numbers,
8    I could.
9          MR. FAES:  I think counsel
10   deliberately did that.
11         MS. KABBASH:  Off the record.
12         (Discussion held off the
13   record.)
14       A.   So, these two references to
15   Thomas Barbolt, I don't know that I have
16   or have not read that deposition
17   testimony.
18          I have read deposition testimony
19   for Arnaud above there, Piet Hinoul.  I
20   just don't know if I've read anything by,
21   is it Barbolt?
22       Q.   Yes.
23       A.   I don't know if I have or not.
24   I can't give a yes or no to that.

Page 29

1        Q.   Do you remember being asked
2    questions about Dr. Barbolt's testimony at
3    your Adkins deposition?
4        A.   No, I don't think that I do.
5    Although I could have.  I don't remember
6    it.
7        Q.   So it's fair to say that you
8    don't -- you didn't make any effort after
9    your Adkins deposition to go back and
10   review his testimony to see what he -- who
11   he was and what he might have testified
12   about with regards to Thomas Barbolt?
13         MS. KABBASH:  Objection; asked
14   and answered.
15       A.   Yeah, I'm not sure I understand
16   the question.
17          When you referred to "he," are
18   you referring to Thomas Barbolt?
19       Q.   Yes.
20         MR. FAES:  Let me restate the
21   question.
22   BY MR. FAES:
23       Q.   Is it fair to say that after
24   your testimony in the Adkins deposition,

8 (Pages 26 to 29)

John R. Wagner, M.D.

Page 30

1    you didn't go back afterwards and review
2    Dr. Barbolt's deposition to see who Dr.
3    Barbolt was and what he testified about?
4        A.   What I testified about or what
5    he testified?
6        Q.   No, what Dr. Barbolt testified
7    about.
8        A.   I don't recall doing that.
9        Q.   Okay.  Are you aware of whether
10   or not Dr. Barbolt was in fact a company
11   designated witness, a person who was
12   designated to testify on behalf of the
13   company regarding certain matters?
14       A.   I don't recall.  If I ever was
15   aware, I don't remember it.
16       Q.   Doctor, I'm going to hand you
17   what's been marked as Exhibit Number 4 to
18   your deposition.
19            (Wagner Exhibit 4, Curriculum
20       Vitae of John R. Wagner, M.D., was
21       marked for identification, as of this
22       date.)
23   BY MR. FAES:
24       Q.   That's just your CV, right?

Page 31

1        A.   Correct.
2        Q.   Have there been any changes to
3    the CV since your last deposition in March
4    of this year?
5        A.   I don't think so.
6        Q.   Is the typo still in there?
7        A.   It probably is.
8        Q.   Now, Doctor, you've actually
9    published an abstract or article on the
10   Gynemesh PS mesh in the past, right?
11       A.   I have.
12       Q.   And you know that the Gynemesh
13   PS mesh is the same mesh that's used in
14   the Prolift device, right?
15       A.   Correct.
16            Although I should correct my
17   previous answer because you said
18   "published."  I don't think I published
19   it.  It was presented at an ACOG meeting
20   in 2006, I think.
21       Q.   And in that presentation of the
22   study that you did on 33 Gynemesh PS
23   patients, you followed those patients for
24   up to one year, right?

Page 32

1        A.   Yes.  I have to go back and look
2    exactly, but that's my recollection is
3    about that time frame.
4        Q.   Did you follow those patients
5    beyond that time?
6        A.   I'm certain that I did because
7    they were my patients.  I don't think they
8    were really patients that were referred to
9    me at the time and I'm certain that I did,
10   but I did not follow them in an organized
11   manner.  I did not continue the study
12   beyond that period.
13       Q.   At that one-year follow-up, you
14   found that 8 of the 33 patients, or 15
15   percent, had an erosion or extrusion of
16   mesh of some kind during that follow-up,
17   right?
18       A.   Yes, that number seems correct
19   to me.
20       Q.   Just in case you need to refer
21   to it, I'm going to mark that article as
22   Exhibit Number 7 to your deposition.
23            (Wagner Exhibit 7, April 2006
24       Wagner article "Vaginal Repair of

Page 33

1        Symptomatic Pelvic Organ Prolapse
2        Using Polypropylene Mesh, was marked
3        for identification, as of this date.)
4    BY MR. FAES:
5        Q.   Doctor, do you intend to offer
6    any opinions in this case on what you feel
7    the overall erosion, extrusion, and
8    exposure rate of the Prolift mesh is in
9    patients?
10       A.   I think that I can offer an
11   opinion based on my experience over the
12   last 12 years, as well as the reported
13   experience from others in the
14   peer-reviewed literature.
15       Q.   And what is the opinion that you
16   intend to offer?
17       A.   That the mesh erosion rate, and
18   I'm going to include every type of visible
19   mesh in that heading, is probably on the
20   order of about 2 to 5 percent in general.
21   And there's variation in that based on, I
22   think, in my opinion, surgical experience
23   and variation in that as procedures have
24   been modified over the years.

9 (Pages 30 to 33)

John R. Wagner, M.D.

Page 34

1    Q.   So, you believe, I just want to
2  make sure I have your opinion, that I
3  understand your opinion correctly.  You
4  believe that the overall combined erosion,
5  exposure, and extrusion rate for the
6  Prolift mesh is between 2 and 5 percent?
7    A.   I think in well-designed studies
8  by experienced surgeons who are
9  experienced with the device that that is
10 roughly my opinion, correct.
11   Q.   And is your opinion the same
12 with regard to the Gynemesh PS mesh, or do
13 you have an opinion?
14   A.   The Gynemesh PS that I was using
15 in 2006 were basically mesh patches that I
16 placed after performing a repair.  It's
17 the same mesh, but the technique is
18 different.  And with Gynemesh PS, it's
19 just a blank sheet of mesh that can be
20 used with different techniques.
21       So I'm not sure that I can apply
22 a mesh erosion, extrusion, or visible mesh
23 rate to the use of the mesh.  I think the
24 rate applies more towards how it's used

Page 35

1  and by whom.
2    Q.   So, I'm not sure if I understood
3  your opinion or not.
4        Do you have an opinion regarding
5  the overall mesh erosion, exposure, and
6  extrusion rate of the Gynemesh PS mesh,
7  which is the mesh used in the Prolift, or
8  not?
9    A.   I think let me restate my answer
10 to that maybe more clearly.
11       I think that the mesh itself is
12 just a sheet of mesh.  It can be applied
13 in different ways, cut different ways,
14 placed different ways through different
15 incisions by different surgeons for
16 different defects, and I think all those
17 factors would affect the rate of mesh
18 erosion.
19       And so, as a result, I don't
20 know if I can give you a specific number
21 that reflects just the mesh because it's
22 modified by all those other factors.
23   Q.   Okay.  So it's fair to say that
24 you don't intend to offer an opinion in

Page 36

1  this case regarding the overall mesh
2  erosion, exposure and extrusion rate of
3  the Gynemesh PS mesh specifically,
4  correct?
5        MS. KABBASH:  Objection.
6    A.   I have to go back on what I just
7  said.  I don't think I can give you an
8  opinion regarding the mesh itself and
9  erosion rate because there's too many
10 other factors that go into that.
11   Q.   Okay.  But your opinion
12 regarding the Prolift mesh is that it has
13 an erosion, exposure, and extrusion rate
14 of between 2 and 5 percent despite the
15 fact that your own personal experience in
16 33 patients using the same mesh in the
17 Prolift showed a 15 percent erosion,
18 exposure, and extrusion rate, right?
19       MS. KABBASH:  Objection to form.
20   A.   I think you're dealing with
21 apples and oranges here because the mesh
22 is the same, but all the other factors
23 that I stated affect the erosion rate.
24       And I think that if you look at

Page 37

1  from a overall perspective the history of
2  mesh implants in the vagina, that our
3  initial erosion rates for almost everybody
4  were higher when we first started and
5  lower as time went on because we all
6  learned techniques to minimize the risk of
7  erosions, whether it was not performing
8  hysterectomies, avoiding T-incisions,
9  making smaller incisions, doing different
10 dissections.  We all have developed
11 techniques to minimize erosion rates.
12       So, erosion rates in 2004, in my
13 opinion, are really not the same as they
14 are in 2014.  And to specifically compare
15 Gynemesh, which is just a blank sheet of
16 mesh that can be altered and placed in
17 many different ways and altered in many
18 different ways to a specific procedure
19 like the Prolift, I don't think is
20 accurate.  It's not -- it's not accurate.
21   Q.   So I --
22   A.   I don't think you can compare
23 those two erosion rates.
24   Q.   Right, I understand that you

10 (Pages 34 to 37)

John R. Wagner, M.D.

Page 38

1    don't think it's apples -- that you think
2    it's different, it's apples and oranges,
3    but if you could, Doctor, please just
4    focus on the question that I'm asking.
5         My question was you believe that
6    the overall erosion, exposure, and
7    extrusion rate of the Prolift mesh is
8    between 2 and 5 percent, and you believe
9    that despite the fact that your own
10   experience with the mesh in the Prolift,
11   the Gynemesh PS, was 15 percent in 33
12   patients that you followed.
13        Is that statement correct?
14        MS. KABBASH:  Objection.
15        A.   Yeah, it's correct based on my
16   experience with the Prolift, my clinical
17   experience with the Prolift and the
18   published studies and peer-reviewed
19   literature consistent with the Prolift.
20   So the literature supporting the Prolift
21   supports that number.  My experience with
22   the Prolift supports that number.
23        Q.   When is the last time you used
24   the Gynemesh PS mesh in your clinical

Page 39

1    practice?
2         A.   I think 2005 or 6.
3         Q.   And when is the last time that
4    you used the Prolift mesh in your clinical
5    practice?
6         A.   Probably one or two months after
7    Gynecare stopped producing it.
8         Q.   It's fair to say that the last
9    time that you used the pelvic mesh was in
10   2012, right?
11        A.   I think it was probably 2012,
12   mid-2012.
13        Q.   And you understand that the
14   Gynemesh PS mesh is still available by
15   Ethicon for the treatment of pelvic organ
16   prolapse, right?
17        A.   Yes.
18        Q.   But you, despite it being
19   available, you have opted to use the
20   Coloplast Restorelle mesh as your mesh of
21   choice for the treatment of pelvic organ
22   prolapse, right?
23        A.   I migrated to using that one
24   primarily because I was using their

Page 40

1    trocar-based vaginal mesh repair system,
2    and buying their products was my
3    hospital's choice.
4         Q.   Which trocar-based vaginal mesh
5    system are you referring to?  Is it the
6    Exair, Novasilk?
7         A.   Yes.
8         MS. KABBASH:  He couldn't
9    remember.
10        A.   I could not remember the name of
11   it, but it was the Exair.  So when the
12   Prolift was removed, I migrated to the
13   Exair because I liked the trocar-based
14   approach and I used that, and for reasons
15   that have to do with hospital purchasing,
16   we migrated to the Coloplast products.
17   But I've used Restorelle.  I've used Alyte
18   mesh.
19        I really think that almost all
20   the meshes -- let me rephrase that.
21        I think that all the meshes that
22   are available for sacrocolpopexy on the
23   U.S. market now are pretty much
24   interchangeable.  They're all -- they are

Page 41

1    all large pore, lightweight meshes.
2         Q.   Did I hear you say that you used
3    the Alyte mesh?
4         A.   I did.  I do.
5         Q.   And do you still use that
6    currently?
7         A.   I think my primary mesh is
8    probably still Restorelle, but I do use
9    the Alyte.  I think it also has to do with
10   which hospital I'm operating at.
11        But as I said before, I think
12   the meshes available for sacrocolpopexy on
13   the U.S. market are all interchangeable.
14        Q.   And the Alyte mesh is, you're
15   referring to the Y-mesh manufactured by
16   Ethicon and Johnson and Johnson, right?
17        A.   Yes.
18        Q.   And are you aware of whether or
19   not the Alyte mesh uses the same mesh that
20   was utilized in the Prolift+M?
21        A.   Not aware.
22        Q.   Do you know whether or not the
23   Restorelle mesh is in fact half the weight
24   of the Gynemesh PS mesh?

11 (Pages 38 to 41)

John R. Wagner, M.D.

Page 42

1    A.   Again, I consider them all large
2  pore, lightweight meshes.
3    Q.   That wasn't my question though.
4         My question was do you know
5  whether or not the Restorelle mesh made by
6  Coloplast is in fact half the weight of
7  the Gynemesh PS mesh or not?
8    A.   I'm not aware because I find it
9  clinically insignificant.  So it would not
10  be a fact that I would be aware of.
11  They're all large pore, lightweight.
12    Q.   So, the last time that you used
13  the Gynemesh PS mesh was in 2005 or 2006,
14  right?
15    A.   I believe so.  I can't say that
16  I've never, ever used it since, but if
17  it -- if I did, it was only once or twice.
18    Q.   Why did you stop using the
19  Gynemesh PS mesh for the repair of pelvic
20  organ prolapse?
21    A.   Because the Prolift system came
22  on the market.
23    Q.   And the last time you used the
24  Prolift mesh was in 2012, right?

Page 43

1    A.   Correct.
2    Q.   And why did you stop using the
3  Prolift mesh for the treatment of pelvic
4  organ prolapse?
5    A.   Because Gynecare removed it from
6  the market.
7    Q.   When the Prolift device was no
8  longer in the market, what product did you
9  go to for the treatment of pelvic organ
10  prolapse?  What did you start using at
11  that point?
12    A.   I'm not sure what I used
13  initially for the first few months, but I
14  quickly migrated to using the Exair
15  trocar-based system from Coloplast.
16    Q.   Why did you migrate to using the
17  Exair system as opposed to going back to
18  the Gynemesh PS mesh?
19    A.   Because the trocar system I
20  felt, and still feel, provides the best
21  option for treating pelvic prolapse.
22         And additionally, even without a
23  trocar-based system, I wouldn't migrate
24  back to the Gynemesh because it's not

Page 44

1  pre-cut.  So if I use a mesh implant
2  that's not trocar-based now, I use the
3  ones that are pre-cut and formed to fit
4  whatever vaginal compartment I'm
5  repairing.  Whereas the Gynemesh PS is
6  just a blank sheet.
7         So, for two reasons I didn't go
8  back to the Gynecare -- Gynemesh PS.  The
9  first reason was I wasn't going to use a
10  trocar-based system, I was going to use a
11  pre-cut mesh, and the second reason is I
12  prefer a trocar-based system than the
13  Gynemesh PS.
14    Q.   So, in your expert report on
15  page 12 you state that the Gynemesh PS is
16  a low-weight mesh.
17         Is that an opinion you tend to
18  offer in this case?
19    A.   Yes.
20    Q.   What standard are you applying
21  for your opinion in this case that the
22  Gynemesh PS is a low-weight mesh?
23    A.   The polypropylene mesh
24  properties that I'm most interested in are

Page 45

1  the pore size and its overall just sort of
2  weight.  Feel is a good term, is how I
3  would put it.  And most important is the
4  pore size.  And this has a light feel and
5  a large pore size.
6    Q.   Right, but my question is very
7  specific.
8         My question is what standard are
9  you applying for your opinion in this case
10  that the Gynemesh PS mesh, which is the
11  same mesh that's in the Prolift, is
12  low-weight?
13    A.   Just that the overall volume of
14  polypropylene is small.  It's a large
15  weave, large pore mesh.
16    Q.   So, you're not applying any
17  objective standard for your opinion in
18  this case that the Gynemesh PS mesh is a
19  low-weight mesh; is that accurate?
20         MS. KABBASH:  Objection.
21    A.   I'm applying a clinical standard
22  based on my experience with my patients,
23  and I'm applying a standard that's
24  reflected in the medical literature on the

John R. Wagner, M.D.

Page 46

1    repair of these patients, and in the
2    peer-review literature, these are
3    considered low-weight meshes.
4           The exact standard, I don't know
5    if I could cite you that as I could with
6    pore size, such as the Amid classification
7    on pore size, but the medical literature
8    in the peer review journals that talks
9    about the various meshes considers these
10   to be low-weight meshes.
11       Q.   Are you familiar with the Cobb
12   Heniford study?
13       A.   Without looking at it, I'm not
14   sure that I could tell you that I'm
15   familiar with it.
16          If you have a copy of it, I'd be
17   happy to look at it and see if it jogs my
18   memory.
19       Q.   Are you familiar with the fact
20   the Cobb Heniford study states that in
21   order for a weight to be considered
22   lightweight, it needs to be 35 grams per
23   meters squared or less, right?  Or are you
24   aware of that?

Page 47

1           MS. KABBASH:  Objection.
2       A.   I'm not aware of that study and
3    that standard.
4       Q.   So, are you aware of the
5    standards that the Achen [ph] Group came
6    out with with regard to whether or not a
7    weight is lightweight or not?
8       A.   I am not aware, as I sit here,
9    without looking at something that you
10   might give me to trigger my memory on
11   that, no.
12       Q.   Can you cite to me any specific
13   article or journal that states that a mesh
14   that is 45 grams per meter squared is
15   considered a lightweight mesh?
16       A.   I think that the large volume of
17   literature that's just out there on mesh
18   repairs vaginally considers that to be a
19   lightweight mesh.  I don't find any
20   literature in my peer review journals or
21   elsewhere that refers to polypropylene
22   mesh, such as Gynemesh or what's in
23   Prolift, to be considered anything more
24   than low-weight.

Page 48

1       Q.   But as you sit here today, you
2    can't cite or name any specific article
3    that specifically says that a mesh that is
4    44 grams per meter squared like the
5    Gynemesh PS is a low-weight mesh?
6       A.   I'm certain that I could go
7    through my reliance list and the articles
8    that I've cited in here and come up with
9    phrases talking about low-weight mesh
10   being consistent with Gynemesh PS.
11       Q.   So, what is your threshold in
12   terms of grams per meter squared between
13   what's -- what's the cutoff for a
14   low-weight mesh, or do you have an
15   objective number in mind that's a cutoff?
16       A.   I don't really have an objective
17   number in mind.  I think that the --
18   again, I go back to the volume of
19   literature that's out there talking about
20   low-weight meshes.
21          And I don't recall a specific
22   reference like we have with pore size and
23   Amid.  I don't recall specific reference
24   to that.  Just that the entire body of

Page 49

1    literature that is in my journals refers
2    to this as a low-weight mesh.
3       Q.   So in your mind, there's no
4    maximum number to be applied where you say
5    the weight has to be this number or below
6    in order for it to be a low-weight mesh;
7    is that correct?
8       A.   No, I don't have an absolute
9    number.
10       Q.   Would you agree that Ethicon and
11   Johnson and Johnson has not launched a
12   mesh for the repair of pelvic organ
13   prolapse that's heavier than 45 grams per
14   meter squared --
15          MR. FAES:  Well, strike that.
16       Q.   Would you agree with me that
17   Ethicon has not launched a mesh that is
18   heavier than the Gynemesh PS mesh since it
19   was launched in 2002?
20       A.   I don't think they have.  And my
21   only hesitation there is I'm not familiar
22   with all the products out there for the
23   general surgery mesh repairs and hernia
24   repairs.  But certainly in gynecology they

13 (Pages 46 to 49)

John R. Wagner, M.D.

Page 50

1  haven't launched a product that has a
2  higher grams per meter squared number.
3      Q.   Would you agree with me that
4  Ethicon and Johnson and Johnson doesn't
5  sell a mesh that's indicated for
6  transvaginal repair of pelvic organ
7  prolapse that's as heavy as the Gynemesh
8  PS or Prolift mesh?
9          MS. KABBASH:  Currently you
10 mean?
11         MR. FAES:  Yes.
12     A.   There's two questions in that
13 question.  The first is Gynecare Johnson
14 and Johnson doesn't market a mesh at all
15 for transvaginal mesh repairs, that I'm
16 aware of.  And they also -- so right
17 there, I think that ends the question.
18 And then because whatever weight after
19 that would be irrelevant.
20     Q.   So you'd agree that Ethicon and
21 Johnson and Johnson currently doesn't
22 market a mesh for the transvaginal repair
23 of pelvic organ prolapse, correct?
24     A.   Correct.

Page 51

1      Q.   And you'd agree with me that the
2  Gynemesh PS is no longer indicated for the
3  transvaginal repair of pelvic organ
4  prolapse, correct?
5      A.   It is not approved by the FDA
6  for transvaginal mesh repair.  It's
7  approved for transabdominal, but I have to
8  quantify that by saying that we use a lot
9  of drugs and devices for indications that
10 the FDA doesn't approve them for.
11         For example, every drug we use
12 to treat premature labor is not approved
13 as a premature labor drug, and the only
14 drug that is approved for premature labor
15 is ritodrine, which hasn't been used in
16 about 25 or 30 years.  So, FDA approval
17 for use doesn't translate into clinical
18 use in the hands of doctors with good peer
19 review studies.
20         So, this is sort of a
21 long-winded way of saying that the FDA's
22 approval is for transabdominal use, but
23 that doesn't mean it could not be
24 indicated for transvaginal use in the

Page 52

1  hands of a clinician with good supporting
2  data and experience in the proper
3  indication.
4      Q.   The Gynemesh PS has an IFU, or
5  instructions for use, that includes
6  indications, correct?
7      A.   It would include indications.
8  It would include FDA approved indications.
9  Again, I go back to my analogy with the
10 drugs that we use to treat preterm labor.
11 They have indications, but they're not
12 preterm labor, but once they're on the
13 market for one use, if there's good
14 clinical data and experience using them
15 for other uses, we can use them for those
16 purposes.
17     Q.   And you'd agree with me that the
18 IFU, or instructions for use, for the
19 Gynemesh PS currently does not have an
20 indication for transvaginal use, correct?
21     A.   It's not FDA approved for
22 transvaginal use.
23     Q.   I'm not asking about FDA
24 approval.  I'm just asking you what's in

Page 53

1  the instructions for use for the Gynemesh
2  PS.
3      A.   Well, I'm sure --
4      Q.   The Gynemesh PS IFU currently
5  does not have an indication for
6  transvaginal implantation, yes or no?
7      A.   It does not have an indication
8  per its IFU.  But again, I qualify that
9  answer by saying that there are lots of
10 things that aren't indicated that are used
11 for purposes than what they originally
12 were approved for by the FDA, and because
13 of the laws, the company can't indicate
14 that.
15     Q.   So, on page 16 of your report
16 you state that:  "Abdominal operation to
17 say repair pelvic organ prolapse such as
18 sacrocolpopexy have been associated with
19 higher morbidity compared to vaginal
20 procedures."
21         Do you see that?
22     A.   Yes, I do see that.
23     Q.   Is that an opinion that you
24 intend to offer in this case?

14 (Pages 50 to 53)

John R. Wagner, M.D.

Page 54

1    A.   Yes.
2    Q.   What do you mean by "higher
3  morbidity"?
4    A.   Abdominal procedures
5  historically are associated with an
6  increase risk of complications overall
7  compared to vaginal procedures.  The
8  higher morbidity refers to additional
9  complications that occur at a higher rate
10  with abdominal surgery, which is bowel
11  ileus, bowel complications, bowel
12  injuries, prolonged recoveries, increased
13  pain translates to increased risk for
14  pulmonary complications, thromboembolic
15  complications.  Historically, vaginal
16  surgery has a lower morbidity associated
17  with it than abdominal surgery.
18    Q.   Would you agree with me that in
19  general in someone who requires a mesh
20  implant, a surgeon would probably prefer
21  to place it abdominally because the
22  complication rate is probably lower?
23        MS. KABBASH:  Objection to form.
24    A.   I can't agree with that

Page 55

1  statement as a blanket statement.  There's
2  way too many caveats with that.  It
3  depends on the patient's ability to
4  withstand either open surgery or if you
5  perform it minimally invasively their
6  ability to withstand three hours in
7  Trendelenburg position.  They may have
8  medical comorbidity that does not allow
9  that that would make that unsafe.  And
10  then there are vaginal mesh repairs in
11  that patient that would be far less morbid
12  and have a far lower complication rate
13  than the transabdominal approach.
14        So as a blanket statement, I
15  don't think I can agree with that at all.
16    Q.   So you don't agree with that
17  statement; is that correct?
18    A.   Not the way it was phrased, no.
19    Q.   Do you remember testifying
20  earlier this year that in general it would
21  be your current thinking in someone that
22  requires a mesh implant we would probably
23  prefer to place it abdominally because the
24  complication rate is probably lower?

Page 56

1    A.   I think that statement with the
2  caveats that I just gave you is absolutely
3  true.  If there are patients who we lean
4  more towards doing abdominally and there
5  are patients we lean more towards doing
6  vaginally.  In a perfectly healthy
7  patient, with the advent of minimally
8  invasive techniques, robotic, laparoscopic
9  techniques, I would probably prefer to
10  place the mesh abdominally than vaginally,
11  but there are clearly indications in
12  situations where a vaginal mesh repair
13  would be less risky.
14        So, there are times when I do
15  vaginal mesh repairs today.  There are
16  times when I do abdominal mesh repairs
17  today.  But in general, I would say that
18  over the last ten years, I do more
19  abdominal mesh repairs because we can do
20  them minimally invasively than I used to
21  in the past.
22    Q.   So you'd agree that in a
23  perfectly healthy patient it's, in
24  general, your thinking that in a person

Page 57

1  who requires a mesh implant, you would
2  generally prefer to place it abdominally
3  because the complication rate is probably
4  lower?
5        MS. KABBASH:  Objection.
6    A.   Yes.  In a perfectly healthy
7  patient without contraindications to
8  surgery, that would make the abdominal
9  procedure more morbid.
10    Q.   And just to follow up on your
11  previous answer.
12        Did you say that there are still
13  patients that you place mesh
14  transvaginally in today?
15    A.   Absolutely.
16    Q.   What mesh do you use for
17  transvaginal -- for a transvaginal
18  placement when you do it that way?
19        Probably a terrible question.
20        MS. KABBASH:  Objection.
21    A.   Currently, without the Exair,
22  I've been using the Coloplast anterior and
23  posterior mesh implants and they are
24  sutured in place.  I've occasionally used

15 (Pages 54 to 57)

John R. Wagner, M.D.

Page 58

1    the Uphold, but there are hospital issues
2    that make it a lot easier to use the
3    Coloplast product, so I tend to use those
4    products when I do vaginal mesh repairs.
5        Q.   So, do you use the Restorelle L
6    or the Restorelle Flat Sheet for that?
7        A.   I'm not sure exactly the name of
8    it. I think it is Restorelle anterior or
9    Restorelle posterior, but I can't -- I
10   can't actually say I know the product
11   name, per se.
12       Q.   When was the last time you put
13   in an Exair?
14       A.   Just a week or two ago.
15       Q.   Is the Exair still available?
16       A.   Sorry, I misunderstood your
17   question.
18           I have not put in an Exair for a
19   while. I thought we were talking about
20   the Coloplast anterior repair.
21           I haven't used the Exair since
22   Coloplast removed it from the market when
23   the FDA switched it from a class II to a
24   class III device.

Page 59

1        Q.   So that was in 2016 some time?
2        A.   Roughly, yes.
3        Q.   Would you agree with me that
4    there are currently no trocar-based mesh
5    implantation systems available for the
6    treatment of pelvic organ prolapse,
7    correct?
8        A.   I would agree with you. At
9    least not in this country.
10       Q.   Would you agree with me that if
11   a patient requires a very large mesh
12   implant of the anterior --
13           MR. FAES: Well, strike that.
14       Q.   Would you agree with me that if
15   a patient requires very large transvaginal
16   mesh implant, you would prefer to place it
17   abdominally if that person is a candidate
18   for surgery?
19       A.   I -- I don't think that it's as
20   much the size of the defect as it is the
21   patient's candidacy for an abdominal
22   operation. The abdominal operations
23   require specific positioning. They
24   require much longer anesthesia. And

Page 60

1    they -- there are patients who have other
2    comorbidities, such as diverticulitis and
3    diverticulosis and abdominal adhesions
4    that make the abdominal approach not the
5    wisest. And I don't think the size of the
6    vaginal defect is as important to me as is
7    the patient's ability to withstand the
8    abdominal operation.
9            MR. FAES: Let me see if I can
10   rephrase the question.
11       Q.   Would you agree with me that if
12   a patient requires a very large mesh
13   implant for the treatment of pelvic organ
14   prolapse, you would prefer to place it
15   abdominally if that patient is a candidate
16   for abdominal surgery?
17       A.   Again, I think that I go back to
18   what I just answered.
19           To me, it's not as much the size
20   of the defect as the candidacy for
21   abdominal surgery. That trumps the size
22   of the defect. If that patient had a very
23   large vaginal defect, but was not a
24   candidate for abdominal surgery, then I

Page 61

1    would place the mesh vaginally.
2        Q.   How often would you say you
3    excise or implant --
4            MR. FAES: Strike that.
5        Q.   How often would you say that you
6    excise or explant transvaginal mesh in a
7    typical year?
8            MS. KABBASH: Prolapse only or
9        are you including slings?
10           MR. FAES: First let's go with
11       any kind of transvaginal mesh,
12       including slings or -- so let me
13       restate the question, since there's a
14       counsel objection, or I don't know if
15       that was an objection.
16           MS. KABBASH: Request for
17       clarification.
18           MR. FAES: Yes.
19   BY MR. FAES:
20       Q.   Doctor, how many times per year
21   would you say you explant a polypropylene
22   mesh from a patient, including prolapse
23   mesh and stress urinary incontinence mesh?
24       A.   At this point, not very often.

16 (Pages 58 to 61)

John R. Wagner, M.D.

Page 62

1    I would say that probably about twice a
2    year under anesthesia, maybe once or twice
3    a year in the office setting, but not very
4    often. And actually, I don't remember the
5    last time that I really explanted a piece
6    of mesh from a vaginal mesh repair. It
7    has to be over a year ago probably. The
8    recent explants are usually more TVT
9    slings.
10         Now, earlier on, if you go back
11   ten years, I was doing it much more
12   frequently. So I think that reflects what
13   I sort of alluded to before, which is that
14   as experience with transvaginal mesh
15   repairs developed, we developed techniques
16   surgically to minimize the risk of
17   erosions, and that's minimized then the
18   number of mesh explants that have been
19   necessary. So my surgical rate ten years
20   ago was much greater than it is now.
21   Q.   Would you agree with me that
22   there are currently no products on the
23   general market in the United States for
24   the treatment of pelvic organ prolapse

Page 63

1    that include a mesh arms like Prolift?
2    A.   Yes, I would agree with that in
3    the United States. I don't know about
4    elsewhere.
5    Q.   And you used the Prosima 20 to
6    30 times to treat pelvic organ prolapse,
7    correct?
8    A.   I did.
9    Q.   And you understood that that
10   device utilized the Gynemesh PS mesh,
11   which is the same mesh that's in the
12   Prolift device, correct?
13   A.   Correct.
14   Q.   And the Prosima device does not
15   include the use of mesh arms, correct?
16   A.   That is correct.
17   Q.   When you first started using the
18   Prosima device, was that sold or explained
19   to you as a potential benefit of the
20   Prosima device, the fact that it didn't
21   use arms or didn't include the use of mesh
22   arms?
23   A.   It was, quote, sold to me, end
24   quote, as just being different. I don't

Page 64

1    know if it was good or bad. And you could
2    make an argument that by not placing
3    trocars through the obturator foramen that
4    that required less surgical dissection and
5    intervention which would translate into
6    less risk. But one could also argue that
7    the lack of the arms would lend itself
8    towards a higher prolapse recurrence risk
9    and potentially increase the risk for
10   future surgery for a failed repair.
11        So, I think that it was, at
12   least in my opinion, marketed to me as
13   something different that might have a
14   place in our armamentarium of mesh
15   products, but not as necessarily obviously
16   better.
17   Q.   So you'd agree with me that a
18   mesh device that doesn't require the
19   passage of trocars through the obturator
20   foramen may have potential safety benefits
21   due to the lack of those passes, correct?
22   A.   Correct, I agree with that, but
23   that's just an isolated factor as one part
24   of the procedure. But I think that not

Page 65

1    passing the trocars eliminates any
2    potential risk of trocar-related injury.
3    Q.   Do you still, for the treatment
4    of pelvic organ prolapse, do you still do
5    native tissue repairs with sutures, or are
6    all of your repairs with mesh?
7    A.   No, I still do native tissue
8    repairs.
9    Q.   In what situations do you do
10   native tissue repairs with sutures as
11   opposed to using a mesh?
12   A.   If somebody has an isolated
13   defect in the vagina, just an isolated
14   cystocele or rectocele with good support
15   otherwise, I will certainly consider doing
16   a native tissue repair.
17        I think the one time that I will
18   always, 99.9 percent of the time use mesh
19   is with midurethral slings. I think the
20   role for native tissue repairs to treat
21   incontinence is very, very limited, close
22   to nonexistent. And I think that I will
23   do native tissue repairs of uterine
24   prolapse when I can palpate the ligaments

17 (Pages 62 to 65)

John R. Wagner, M.D.

Page 66

1    holding the uterus up and use them to
2    support the vaginal cuff.
3        Q.   When you did the Prolift
4    procedure, did you view native tissue
5    repairs with sutures as an alternative to
6    the Prolift and vice versa?
7        A.   Yes.
8        Q.   In terms of alternative
9    treatments for a patient, abdominal
10   sacrocolpopexy would be one of the
11   alternatives if in fact there were
12   prolapse in that part of the pelvis that
13   would be appropriate for treatment, right?
14       A.   Yes.
15       Q.   Just for the rest of the day
16   I'll probably use ASC for abdominal
17   sacrocolpopexy because I can't pronounce
18   it. It's a tongue twister.
19       A.   It will make it actually easier
20   for me if you do.
21       Q.   Other than the Exair and the
22   Prolift and the Prolift+M and the Prosima,
23   what other kits have you used for the
24   treatment of pelvic organ prolapse?

Page 67

1        A.   I have used the Uphold kit. I
2    have at least once or twice used Apogee
3    and Perigee very early on, which were the
4    AMS products. And as I said, I currently
5    use the Coloplast anterior and posterior
6    mesh implants.
7        Q.   And the Alyte, I forgot that.
8        A.   And the Alyte. Thank you.
9        Q.   Anything else that you used?
10       A.   I think that's it.
11       Q.   Have you ever used the Elevate
12   kit?
13       A.   Yes, I have used the Elevate
14   kit, very briefly. I would venture to say
15   maybe five to ten times, and if I had to
16   guess when, I would say like 2008 to 2010,
17   maybe in that range.
18       Q.   Do you recall that like the
19   Prosima, the Elevate doesn't have trocar
20   passes?
21       A.   I do recall that.
22       Q.   You would agree with me that
23   that's one significant difference between
24   the Elevate and the Prolift is that the

Page 68

1    Elevate doesn't have trocar passes,
2    correct?
3        A.   Yes, that's one difference.
4        Q.   The fact that there were no
5    external trocar passes with the Elevate,
6    did you see that as a potential benefit
7    from a safety perspective as compared to
8    the Prolift?
9        A.   No, because safety to me is
10   defined by more than just the trocars.
11   Safety to me is defined by the -- the
12   extent of the dissection, the extent of
13   mobilization of the bladder. Safety to me
14   is defined as avoiding bunching of the
15   mesh, placing the mesh on an appropriate
16   level of tension.
17            So it, in a way, the
18   trocar-based systems allowed you to place
19   the mesh in a minimally invasive way
20   through small incisions with less
21   dissection, and they were the only systems
22   out there that allowed you to place the
23   mesh on an appropriate level of tension to
24   minimize complications related to

Page 69

1    overtightening, and the benefits in that
2    regard outweighed the risk of the trocar
3    insertions which were, in my hands and in
4    the hands of other surgeons in the
5    literature, very minimal. The risk of
6    injury was quite small.
7            So that overall safety profile
8    of the trocar-based procedure, Prolift and
9    then Exair, but particularly Prolift which
10   was my primary repair, was much better
11   using a trocar-based system than not using
12   a trocar-based system.
13       Q.   You'd agree with me that one of
14   the risks of external trocar passes with
15   the Prolift is that nerves could be
16   damaged, correct?
17       A.   I would agree with you that any
18   pelvic operation could injure pelvic
19   nerves. Doesn't have to be trocar-based.
20   And quite frankly, you could say that the
21   risk of not using a trocar requires more
22   extensive dissection that might interfere
23   with more, let's say, nerves to the
24   bladder and result in more bladder

18 (Pages 66 to 69)

John R. Wagner, M.D.

Page 70

1    dysfunction than not using a trocar.
2         So, it's a different entity.  I
3    mean, surgery can increase the risk to
4    nerves.  The more extensive the surgery,
5    the more potential risks to nerves, blood
6    vessels and other structures.  The less
7    extensive surgery, the less risk to those
8    structures.
9         And to me, the Prolift trocars
10   and the trocar-based systems offered an
11   opportunity to do less invasive surgery.
12        Q.   My question is very specific
13   though.
14        My question is one of the risks
15   of the trocar passes with the Prolift is
16   that the nerves could be damaged from the
17   trocar passes, yes or no?
18        A.   Yeah, but I have to quantify
19   that by saying that overall the risk of
20   nerve injury with a trocar-based repair,
21   in my view, is less.
22        Q.   Okay.  Would you agree with me
23   that a trocar-less system, such as the
24   Prosima device or the Elevate device,

Page 71

1    eliminates the risk of nerve damage
2    specifically from trocar passes, correct?
3         And I'm just asking about trocar
4    passes.
5         A.   Again I will answer "yes" to
6    that question with the previous
7    qualifications in place.
8         Q.   Now, Doctor, I notice that your
9    expert report lists the clearance date for
10   the Gynemesh PS product, right?
11        A.   I believe it does.
12        Could you refer me to the page?
13        Q.   Maybe.
14        Page 5.
15        A.   I think it's 2000-2002, right?
16        Q.   Yeah.  I don't think you cited
17   the specific date.
18        It says:  "In 2000-2002 Gynemesh
19   PS received FDA clearance for use in
20   prolapse repairs."
21        Do you see that?
22        A.   Yes, I do.
23        Q.   Did you list anywhere in your
24   expert report the clearance date for the

Page 72

1    Prolift kit?
2         A.   I don't know if I did, but I
3    believe it was 2005.
4         Q.   It wasn't 2005.  It was 2008.
5    I'll represent that to you.
6         MS. KABBASH:  What's the year
7    you're representing on the record?
8         MR. FAES:  2008.
9         A.   And the question was?
10        Q.   Is there any particular reason
11   why you didn't note the clearance date of
12   the Prolift device in your expert report?
13        A.   No particular reason that I
14   know.
15        Q.   Were you aware that the Prolift
16   device was marketed without FDA clearance
17   between 2005 and May of 2008?
18        MS. KABBASH:  Let me just state
19   an objection first as to the form,
20   lack of foundation.
21        And also I'd just like to state
22   a standing objection to any
23   questioning with regard to the FDA
24   status, regulatory status, or 510(k)

Page 73

1    clearance process, as Judge Goodwin
2    has already ruled that all of such
3    issues are inadmissible at trial and
4    therefore should not be pursued at
5    this deposition.
6         I don't want to keep
7    interrupting you, so I'm going to
8    state that.
9         MR. FAES:  I'll just state for
10   the record that a lot of these cases
11   have been remanded and it's become
12   clear that not all judges agree with
13   Judge Goodwin's decision or feel bound
14   to follow them.  So I have to do it
15   just in case the trial judge doesn't
16   agree with Judge Goodwin.
17        MS. KABBASH:  Okay.  Well, I'm
18   just going to stand by my objection
19   based on the rulings we've received
20   and have been applied at all trials in
21   the federal courts thus far.
22   BY MR. FAES:
23        Q.   Doctor, when you use a -- well,
24   first of all, I'm not sure if I got the

19 (Pages 70 to 73)

John R. Wagner, M.D.

Page 74

1    answer to the question.
2         Were you aware that the Prolift
3    device was marketed without clearance by
4    the FDA between 2005 and May of 2008?
5         A.   I wasn't aware of it then.  I'm
6    aware of it now.
7         Q.   When you as a physician select a
8    medical device to implant in a patient, do
9    you do it with the assumption that the
10   device is being legally marketed by the
11   company?
12        MS. KABBASH:  Objection.
13        A.   Legally marketed by the -- yes,
14   I agree -- I put in devices or use
15   products that I believe have been legally
16   marketed.
17        Q.   If a physician were to use it,
18   knowingly use a device that they knew was
19   not legally cleared by the FDA, do you
20   believe that that would be below the
21   standard of care?
22        MS. KABBASH:  I just want to add
23   to my standing objection that this
24   line of questioning goes beyond the

Page 75

1    scope of Dr. Wagner's opinions.  He is
2    not offering opinions on compliance
3    with regulatory standards.  He's not
4    offering opinions on compliance with
5    standards of care of medical
6    malpractice.
7    BY MR. FAES:
8         Q.   Do you need the question
9    repeated?
10        A.   Please.
11        MR. FAES:  Can you read it back,
12   Court Reporter?
13        (The requested portion of the
14   record was read by the Court Reporter.)
15        A.   So, let me -- let me first state
16   I'm not a regulatory and I do not have an
17   in-depth knowledge of the regulatory
18   requirements from the FDA and the
19   companies.
20        If I'm using a device that's
21   brought on to the American market, I'm
22   using it with the assumption that either
23   the appropriate pre-market studies have
24   been done or it's based on a predicate

Page 76

1    device that has been approved by the FDA
2    and that the predicate device was
3    associated with appropriate pre-marketing
4    testing.
5         What qualifies something as
6    being eligible for 510(k) status or not is
7    not my area of expertise, and I would
8    leave it to the FDA, the companies, and
9    the regulators to sort out those
10   complicated issues.
11        Q.   Do you agree with the viewpoint
12   that there is a need for more rigorous
13   studies regarding the safety and efficacy
14   of mesh kits, like Prolift?
15        MS. KABBASH:  Objection to form.
16   You're referring to all
17   transvaginal prolapse mesh kits?
18        A.   I think there's always a desire
19   to improve upon our studies, and I think
20   when it comes to vaginal mesh repairs, I
21   understand the FDA's position that they
22   want more rigorous studies of these kits
23   and that that was their driving force
24   behind moving, changing the class II to

Page 77

1    class III.  I understand their position.
2    I think that it is always valuable to have
3    more data.
4         I also believe that not having a
5    trocar-based system on the market has been
6    an extreme detriment to my patients, and I
7    think people have probably unnecessarily
8    suffered as a result of not having that
9    option available.  So I think there's
10   always a balance, but I understand the
11   FDA's position and I understand why they
12   did what they did.  I just think that not
13   having a trocar-based system available is
14   not in the best interest of my patients.
15        Q.   Do you know why Ethicon removed
16   the Prolift from the market?
17        MS. KABBASH:  Object to the
18   form.
19        MR. FAES:  Strike that.  Let me
20   re-ask it.
21   BY MR. FAES:
22        Q.   Do you know why Ethicon stopped
23   selling the Prolift?
24        A.   Well, I think it was a business

20  (Pages 74 to 77)

John R. Wagner, M.D.

Page 78

1    decision.  I don't think it was -- it was
2    a business decision.
3        Q.   Do you know what the business
4    decision was based on?
5        A.   I think that, like most business
6    decisions, it's probably based on the
7    value of a product line and whether it's
8    worthwhile or not.
9            You know, I'll give you an
10   example that we've known for 30 years that
11   Diclegis is the best drug to treat
12   hyperemesis in pregnant ladies, but it's
13   been unavailable in the U.S. market
14   because every single drug company made a
15   business decision that it would not be
16   profitable to market this drug, and it's
17   the only drug approved by the FDA to treat
18   hyperemesis in pregnancy.
19           So, companies make business
20   decisions based on the market, but also
21   the medical-legal market, and Diclegis is
22   a perfect example of that.  Great drug
23   that works beautifully, proven safe, and
24   nobody will market it because it's not a

Page 79

1    good business decision.
2        Q.   Would you agree with me that in
3    order to keep selling the Prolift in the
4    United States after 2012, Ethicon would
5    have been required to conduct more
6    rigorous studies regarding the safety and
7    efficacy of that device?
8            MS. KABBASH:  Objection to form.
9        A.   Again, I have trouble with the
10   term "more rigorous."
11           My understanding is that the FDA
12   wanted several years of clinical follow-up
13   on patients for the transvaginal mesh kits
14   and they were not satisfied with the years
15   of, five, seven years of follow-up that
16   currently existed in the medical
17   literature.
18           But again, I have a little
19   trouble answering the question because it
20   sort of requires that I get into the mind
21   of the regulators at the FDA.
22           There was five to seven year
23   data available on Prolift.  The FDA wanted
24   more data, is the best that I could

Page 80

1    summarize.
2        Q.   So, would you agree with me that
3    in order for Ethicon to continue selling
4    the Prolift after 2012, they would have
5    been required to collect additional
6    clinical data, correct?
7        A.   Yeah, or present additional
8    clinical data.  I don't know if -- again,
9    I'm not the regulator.  I don't know if
10   the FDA would have been happy for them to
11   re-analyze the clinical data that was out
12   there.  I just don't know.  I don't know
13   what the FDA was specifically looking for.
14   I don't know if they wanted prospective
15   data from that point forward or if they
16   were willing to look at studies that had
17   been done in the past.  But the FDA's
18   position was they wanted more data on
19   those products that were on the market and
20   they were not willing to allow a vaginal
21   mesh kit to come to the market without
22   pre-marketing data.
23       Q.   Do you know whether or not the
24   cost of collecting additional data on the

Page 81

1    Prolift in order to keep selling it in the
2    United States was one of the factors they
3    considered in making the decision to no
4    longer sell that product?
5            MS. KABBASH:  I'll object that
6    it goes beyond the scope of Dr.
7    Wagner's opinions.
8            You can answer if you can.
9        A.   I don't know that I'm qualified
10   to analyze the business plan of Gynecare
11   vis-a-vis the FDA, the U.S. market, the
12   medical-legal environment, and adding all
13   that up in terms of a business
14   proposition.
15       Q.   If the Prolift device --
16           MR. FAES:  Strike that.
17           MS. KABBASH:  Are you okay to
18   keep going without a break?
19           MR. FAES:  We've got about
20   half-hour left.  This would be a good
21   time for a break.
22           (Recess taken from 9:57 a.m. to
23   10:04 a.m.)
24

John R. Wagner, M.D.

Page 82

1  BY MR. FAES:
2      Q.  Doctor, we're back on the record
3  after a short break.
4          Are you ready to proceed?
5      A.  I am.
6      Q.  So, Doctor, on page 34 of your
7  report, you list a known body of potential
8  risk and adverse events that are common to
9  all forms of surgical treatment of
10  prolapse.  As you stated, and transvaginal
11  mesh is no exception.
12          Are you on that page?
13      A.  Yes, I am.
14      Q.  So, you list a litany of risks
15  and then you state that:  "These risks of
16  prolapse surgery are widely known by
17  surgeons based on their training and based
18  on the fact that they are reported in the
19  published medical literature."
20          Do you see that?
21      A.  I do.
22      Q.  Is that an opinion that you
23  intend to offer in this case?
24      A.  Yes.

Page 83

1      Q.  So, is your opinion that these
2  risks are widely known by surgeons at all
3  times during the marketing of the Prolift
4  between 2005 and 2012?
5      A.  Yes, and again we're talking
6  about pelvic reconstructive surgeons,
7  surgeons who do this type of surgery, yes.
8      Q.  Have you done any kind of study
9  or analysis to determine what percentage
10  of pelvic floor surgeons did in fact know
11  of all these risks between 2005 and 2012?
12      A.  That's a funny question because
13  it's an inherent part of the training.  I
14  mean, if you look at the surgical training
15  that we receive as residents and then as
16  fellows, people that do this type of
17  surgery, this is part of the training.
18  It's in the textbooks.  It's in, you know,
19  Te Linde's Operative Gynecology.  The
20  complication rates, wound healing, these
21  are all subjects that are part of normal
22  surgical training.  It's in Danforth's
23  books on operative gynecology.  So it's
24  part of our board questions.  It's part of

Page 84

1  our -- it's part of what we're tested on.
2          So, to have a study on something
3  that's supposed to be inherent to what you
4  know, so you're asking sort of the
5  question -- is the question is there
6  post-marketing surveillance on whether the
7  pelvic reconstructive surgeons have
8  learned what they're supposed to have
9  learned?  Is that what the question is, in
10  a way?
11      Q.  Well, my question is have you
12  ever done any kind of study or analysis to
13  determine what percentage of pelvic floor
14  surgeons did in fact know of all these
15  risks in, say, 2012?
16      A.  Again, that's such a funny
17  question.
18          No, I've never done a study that
19  looks at whether the pelvic floor surgeons
20  learned what they were supposed to learn
21  about pelvic floor surgery.  It just
22  doesn't make sense to me, that question.
23      Q.  So, when you say that they are
24  widely known by surgeons, is it your

Page 85

1  opinion that 100 percent of pelvic floor
2  surgeons know of all these risks, or not?
3          MS. KABBASH:  Objection.
4      A.  I would like to think that my
5  field is perfect, but I'm sure it's like
6  every other field.  There's probably not
7  competent people in my field, just like
8  there's not competent lawyers and not
9  competent firemen and not competent cops.
10  But what you're asking is part of our
11  inherent training, and so if I -- if I
12  could assert the word "competent" and
13  "well-trained," then yes, the answer would
14  be 100 percent.
15      Q.  So, it's your opinion that if a
16  physician in a particular case testified
17  that he didn't know of one or more of
18  these risks when he implanted the Prolift
19  that that physician wasn't competent?
20          MS. KABBASH:  Objection.
21      A.  I'm not sure what risk you're
22  referring to because our initial
23  discussion was talking about general risks
24  of vaginal surgery.  So if we're --

22 (Pages 82 to 85)

John R. Wagner, M.D.

Page 86

1    Q.   I'm referring to any of the
2  risks that you have listed in paragraph 1
3  of page 34 of your report.
4    A.   Yes, I think that a pelvic
5  surgeon who does pelvic reconstructive
6  surgery realizes that that list of things
7  that I laid out there are potential
8  complications of pelvic repair surgery
9  with or without using mesh.  And I would
10  be surprised, and maybe I'm thinking too
11  highly of my own field, that if a board
12  certified urogynecologist in pelvic
13  reconstructive surgery didn't know those
14  things, I would certainly be disappointed.
15    Q.   But my question is specifically
16  if a pelvic floor surgeon testified that
17  prior to implanting the Prolift that he
18  didn't know one or more of these risks,
19  would it be your opinion that that
20  physician wasn't competent because he
21  didn't know one or more of these risks?
22    MS. KABBASH:  Objection.
23    A.   Again, I just go back to my
24  previous answer.  I think these are

Page 87

1  general risks that are well-known and I
2  would be surprised.
3    I think competency comes into
4  passing your boards, taking your tests,
5  being approved.  Competency is something
6  judged by the board, the American boards,
7  as well as the individual hospitals and
8  their credentialing.  But I would be
9  surprised if a board certified pelvic
10  surgeon didn't know those things.
11    Q.   Could a reasonable pelvic floor
12  surgeon not know of one of these risks
13  prior to implanting the Prolift?
14    MS. KABBASH:  Objection.
15    A.   I think these are
16  straightforward risks.
17    Again, I would be surprised.  I
18  mean, if you listed ten things and one
19  surgeon somewhere said "I didn't know
20  about urinary retention," I'd be like oh,
21  really?  That's pretty common.  I'd be
22  surprised.  If he didn't know about nerve
23  damage, I'd be like really?  I'm
24  surprised.  Hematoma, I'd be like really?

Page 88

1  Any surgery causes hematoma.  I'd be
2  surprised.
3    I just -- I don't find this list
4  to be that hard.  So I would be surprised.
5    Q.   Have you made any kind of effort
6  to go out into the medical community or in
7  the literature and actually look at
8  surveys or studies of what physicians
9  actually did or didn't know of these risks
10  to see if your reaction of surprise is
11  justified or if there are in fact many
12  physicians who don't know all of these
13  risks?
14    A.   Again, if we're narrowing this
15  down to board certified, fellowship-trained
16  female pelvic reconstructive surgeons, I
17  had be surprised if they weren't familiar
18  with all of these complications with any
19  type of vaginal repair, be it mesh
20  augmented or not.
21    Q.   But you haven't specifically
22  studied that issue with regard to what
23  percentage of patients knew or didn't --
24    MR. FAES:  Strike that.

Page 89

1    Q.   You haven't specifically studied
2  the issue of what percentage of pelvic
3  floor surgeons did or didn't know of these
4  risks, say in 2005 when the Prolift was
5  launched?
6    MS. KABBASH:  Objection.
7  BY MR. FAES:
8    Q.   Correct?
9    A.   Well, I don't know of a
10  post-marketing surveillance study of
11  doctors.  By post-marketing, I mean like
12  I'm saying it almost in jest because it
13  would be post-marketing of their medical
14  training.  I just -- I don't know of -- I
15  don't know of any study, and I certainly
16  did not conduct a study to look at my
17  colleagues to see whether they understood
18  the basics of vaginal surgery.  I just --
19  it's a funny question, is my best answer.
20    Q.   Would you agree with me that
21  excessive contraction or shrinkage of the
22  tissue surrounding the mesh, vaginal
23  scarring, tightening, and/or shortening is
24  a potential adverse reaction of the

23  (Pages 86 to 89)

John R. Wagner, M.D.

1    Prolift mesh?
2        MS. KABBASH:  Objection to form.
3        A.   Yeah, I think that's on the --
4    could you repeat that question?
5        But I think you're reading from
6    the IFU, are you not?
7        Q.   Yeah.
8        A.   Yes.
9        Q.   First of all, would you agree
10   with me that excessive contraction or
11   shrinkage of the tissue surrounding the
12   mesh, vaginal scarring, tightening and/or
13   shortening is a potential adverse reaction
14   of the Prolift mesh?
15       A.   Yes.
16           MS. KABBASH:  Objection.
17       A.   I think it's listed in adverse
18   reactions.  But again, it's adverse
19   reactions and it's a potential
20   complication of Prolift surgery and it's a
21   potential complication actually of vaginal
22   surgery.
23       Q.   Do you think that adverse
24   reaction should be listed in the adverse

1    reaction section of the IFU for the
2    Prolift?
3            MS. KABBASH:  Objection;
4    compound.
5        A.   I think that -- I think that
6    what gets listed in the IFUs is sort of a
7    subject of debate among the FDA regulators
8    and the company, but I think that that
9    particular sentence that you read to me is
10   applicable to vaginal surgery with not
11   mesh, non-mesh operations also.
12       Q.   So you think that excessive
13   contraction or shrinkage of tissue
14   surrounding mesh is applicable to non-mesh
15   surgery?
16       A.   No.  I think everything that you
17   just said there subtracting the word
18   "surrounding mesh" is applicable to
19   non-mesh surgery.
20       Q.   Do you think that that adverse
21   reaction needs to be included in order for
22   the instructions for use, or the IFU, for
23   the Prolift to be adequate?
24       A.   Again, I fall back on the fact

1    that I'm not a regulator or responsible
2    for knowing what should be in an IFU.
3        And again, I think there's some
4    give-and-take between the regulatory
5    bodies and the companies on that.  But
6    that seems to be reasonable, but I would
7    preface it by saying that that is an
8    adverse reaction that can occur without a
9    mesh product.  So that entire statement
10   holds if you were just to remove the part
11   about the mesh, the two words that include
12   mesh.
13       Q.   Do you think it would be
14   reasonable for a physician, say in 2005
15   when the Prolift was launched, if that
16   physician said he didn't know that that
17   was a potential adverse reaction of the
18   Prolift mesh?
19       A.   Again, I don't see that as an
20   adverse reaction of the mesh as much as I
21   see that as an adverse reaction of vaginal
22   surgery, and in the case where you put the
23   mesh in, it involves the mesh.  But you
24   can have scar tissue retraction and things

1    that occur with just native tissue repairs
2    too.  They just wouldn't involve mesh.
3        So, I think that to turn that
4    around and say that we know you could have
5    excessive scarring and contraction with
6    non-mesh surgeries and to somehow think
7    that we wouldn't see that if we put a
8    piece of mesh in there is a little bit
9    hard to believe.
10       So, if a surgeon understands
11   that there's contractures that can occur
12   and contraction that occurs as part of
13   normal wound healing and to expect that
14   that wouldn't occur if you do a mesh
15   augmented operation, that doesn't make a
16   lot of sense to me.  Contraction's a
17   normal part of wound healing.
18   Contractures can occur when normal wound
19   healing gets out of hand.  You don't need
20   mesh there.  And to think that it wouldn't
21   happen just because I put a piece of mesh
22   in there, that it would change the wound
23   healing process, that doesn't make a lot
24   of sense to me.

24  (Pages 90 to 93)

John R. Wagner, M.D.

Page 94

1    Q.  Do you agree with me that
2  exposed mesh that causes pain to the
3  patient's partner during intercourse is a
4  potential adverse reaction of the Prolift
5  mesh?
6    A.  Yes, of any vaginal mesh repair,
7  period.
8    Q.  Would you agree that that's a
9  risk that's unique to repair with mesh
10 surgery?
11   A.  Yes, I would.
12   Q.  Do you think that all
13 physicians, well-trained pelvic floor
14 physicians, knew of that risk between 2005
15 and 2012 when the Prolift mesh was
16 marketed?
17   A.  It's hard for me to answer that.
18      MS. KABBASH:  Objection to form.
19   A.  But I would say that any
20 physician that was implanting vaginal
21 mesh, or for that matter abdominal mesh,
22 who wasn't aware of the risk of mesh
23 erosion in the small number of patients
24 probably didn't have a great handle on the

Page 95

1  medical literature and the complication
2  rate of the operation they were doing.
3    Q.  But I'm not just talking about
4  mesh erosion, Doctor.  I'm specifically
5  talking about exposed mesh causing pain or
6  discomfort for not the patient, but the
7  patient's partner during intercourse.
8      Do you think that all
9  well-trained physicians knew of that risk
10 between 2005 and 2012 when the Prolift
11 mesh was marketed?
12      MS. KABBASH:  Objection.
13   A.  I kind of consider that one in
14 the same.  I think if you know that there
15 is a risk of erosion, well, then you
16 probably know that erosions can cause
17 pain, can cause bleeding, can cause
18 dyspareunia for the patient and her
19 partner.  You know what erosions can do
20 and what the symptoms of an erosion can
21 be.  I kind of consider that one in the
22 same.
23      So it would be farfetched for me
24 to imagine that somebody can understand

Page 96

1  that there was a risk of erosion but not
2  understand what that meant in terms of
3  signs and symptoms.  Again, I would
4  struggle with that concept.
5    Q.  Have you ever studied the
6  question of what percentage or number of
7  well-trained pelvic floor surgeons knew
8  that exposed mesh could cause pain or
9  discomfort to the patient's partner during
10 intercourse, say in 2005 when the Prolift
11 was launched?
12   A.  Did I ever study that?
13   Q.  Correct.
14   A.  I didn't study that.
15   Q.  And I assume your answer is the
16 same with regard to the other years when
17 the Prolift was marketed, 2006 through
18 2012, correct?
19   A.  No, I didn't perform studies on
20 Prolift, period, or studies of the
21 surgeons who were implanting Prolift,
22 period.
23   Q.  Do you believe that that is a
24 adverse reaction that should be warned

Page 97

1  about in the IFU, or instructions for use?
2    A.  Again, I consider a mesh erosion
3  as a mesh erosion.
4      Do I think that it's necessary
5  to list all the symptoms of a mesh
6  erosion:  pain, bleeding, dyspareunia,
7  discharge, partner dyspareunia?  I don't
8  know that it's -- I don't know that that's
9  necessary, and I come back to I'm not the
10 regulator, I'm not the people doing this,
11 but it would sort of to me be like that I
12 would have to list all the symptoms of a
13 hematoma.  So you can say that you get
14 blood loss in hematomas, but do I have to
15 list, you know, nerve palsies, numbness,
16 tingling, motor dysfunction, transfusion,
17 blood loss, weakness, dizziness, syncope,
18 all the symptoms of a hematoma, or is it
19 just adequate to say hematoma?  I think
20 that in my opinion, and I'm not the
21 regulator or the people making the rules,
22 if you say mesh erosion, I don't think you
23 need to list all ten symptoms associated
24 with the mesh erosion any more than you

25 (Pages 94 to 97)

Golkow Litigation Services  - 877.370.3377

John R. Wagner, M.D.

Page 98

1    have to list all 25 symptoms associated
2    with hematoma.
3        Q.   Well, you've offered the opinion
4    in this case that the IFU, the
5    professional education materials, and the
6    Prolift surgical guide, and the Prolift
7    surgeon's resource monograph --
8            MR. FAES:  Strike that.  It says
9        accurately, not adequately.
10       Q.   Would you agree with me that
11   scarring which results in implant
12   contraction is a potential adverse
13   reaction of the Prolift device?
14       A.   Yes.  And again I would quantify
15   that by saying that scarring that results
16   in contraction, with or without an
17   implant, can lead to significant problems.
18       Q.   Do you think that the fact that
19   there is an implant that actually
20   contracts within the scar presents unique
21   risks in a surgery involving transvaginal
22   mesh as opposed to one that doesn't?
23       A.   No, I don't think the -- the
24   implant is inert.  I don't think the

Page 99

1    implant contracts.  The scar tissue around
2    the implant can contract and cause
3    contracture that's abnormal, but the
4    implant itself is inert.  It doesn't
5    contract.
6        Q.   So you don't think that implant
7    contraction is a potential adverse
8    reaction of the Prolift mesh?
9        A.   No, that's not what I said.  I
10   said you can have contraction with an
11   implant in it, but the implant's inert.
12   It's not contracting.  The scar tissue
13   around it is contracting.  So you can have
14   scar contraction with an implant as a
15   complication, but it's not the fault of
16   the implant.  It's the scarring.
17       Q.   Doctor, on page 30 of your
18   report you state that you believe that
19   there's no credible body of evidence
20   published in the medical literature
21   that --
22           MR. FAES:  Strike that.  Let me
23       back up real quick.
24       Q.   On page 40 of your report you

Page 100

1    state that you believe that the documents,
2    the IFU, the professional education
3    materials, the Prolift surgical guide, and
4    the Prolift surgeon's resource monograph
5    accurately warn of the potential risk of
6    these devices; is that correct?
7        A.   Yes.
8        Q.   Is it your opinion in this case,
9    or are you offering an opinion in this
10   case that the IFU for the Prolift
11   adequately warns of the potential risk of
12   the device?
13       A.   Okay.  I have to give a two-part
14   answer to that.
15           First of all, as I read this, I
16   would have to expand this from the use of
17   these slings to include vaginal mesh
18   repairs because I think this was part
19   taken from my TVT expert report.  So I
20   would just amend that by adding vaginal
21   mesh repairs in there.
22           And adequate to me, again, I
23   think is a function of what the FDA and
24   the regulators want and what the company

Page 101

1    does to follow their guidelines.  I don't
2    determine adequacy in terms of the
3    documents.  I do think they're accurate,
4    but adequacy is determined by the
5    regulators, company, the FDA, the people
6    that are involved in regulating what
7    should be in an IFU or not.
8        Q.   So you'd agree with me that you
9    don't have the expertise necessary to
10   offer an opinion as to whether the
11   warnings in the IFU for the Prolift is
12   adequate, just whether they're accurate,
13   correct?
14           MS. KABBASH:  Objection.
15       A.   I think that I -- I can speak to
16   the fact that I think they accurately
17   reflect, in my opinion, basic surgical
18   risks involved with implanting the mesh
19   product.
20           But again I come back to the
21   definition of "adequate" is really based
22   on what the FDA, the regulators, and the
23   company decide is adequate.  I think that
24   the IFU for any product should certainly

26 (Pages 98 to 101)

John R. Wagner, M.D.

Page 102

1    include risks that are known to occur with
2    that product, but what other risks might
3    be associated with it that might be common
4    knowledge in medical textbooks, amongst
5    surgeons, among the peer review
6    literature, that part of it I think is a
7    gray zone, and whether it's adequate to
8    include some of that or none of that to me
9    is a function of the regulators and the
10   company and the FDA.
11       Q.   Do you feel like you have an
12   expertise enough to offer an opinion as to
13   whether the warnings in the IFU for the
14   Prolift in this case are adequate?
15       A.   Again, I think they -- again,
16   adequacy is defined by other people, not
17   by me. But I think from a clinical
18   perspective, I found that these warnings
19   accurately warned of the potential use,
20   the risk of the potential use of these
21   slings. I think they were accurate and I
22   felt that they summarized the relevant
23   risk. Whether it's adequate or not is a
24   function of the regulators.

Page 103

1        Q.   So, can you answer this question
2    for me yes or no: Are you offering an
3    opinion to a reasonable degree of medical
4    certainty in this case that the warnings
5    in the instructions for use for the
6    Prolift IFU are adequate?
7        A.   Again, I have to have you define
8    "adequate" for me.
9            Are you talking about basically
10   do they meet the standards of the FDA?
11   Did the FDA and the regulators sign off on
12   them? Because then they're adequate.
13           Do I think from a clinical
14   perspective that they were accurate and
15   summarize the relevant risk? Yes, I do.
16   But adequate is a governmental, regulatory
17   decision.
18           Accurate and reasonable summary
19   of the relative risks is a clinical
20   decision that I can make based on my
21   clinical experience and review of the
22   literature, and I think that they
23   accurately reflected a reasonable summary
24   of the risks.

Page 104

1        Q.   Doctor, on page 30 of your
2    report you state that you don't believe
3    that there's any evidence that the Prolene
4    mesh is cytotoxic; is that correct?
5        A.   Yes.
6            MS. KABBASH: I'm sorry, which
7    page, 38?
8            MR. FAES: 30.
9            THE WITNESS: 30.
10           MR. FAES: I may have the page
11   wrong. It's 29 into 30. My
12   apologies.
13           So, I guess let me restate the
14   question.
15   BY MR. FAES:
16       Q.   You state on pages 29 and 30
17   that you disagree that the Gynemesh PS
18   mesh is cytotoxic?
19       A.   I disagree with plaintiff's
20   assertions that it is cytotoxic, yes.
21       Q.   Would you agree that one of the
22   potential effects of exposure to a
23   cytotoxic compound is necrotized tissue
24   rounding the mesh?

Page 105

1        A.   No, not necessarily because you
2    could have necrotized tissue from just
3    lack of blood flow, peripheral damage,
4    heat, from cautery, from intrinsic disease
5    such as diabetes. That's why people lose
6    their limbs with diabetes, their legs,
7    their toes get necrotic. So that's not
8    due to mesh. You could have cell death
9    from a lot of sources that's not --
10       Q.   Yeah, I understand all that,
11   Doctor. But my question is that the
12   tissue turning necrotic is one clinical
13   way that exposure to a cytotoxic substance
14   can manifest itself, right?
15       A.   Well, to the exclusion of all
16   the other things that I just said that
17   could potentially be causes. So if you
18   want to exclude every other known cause of
19   necrotic tissue and say have I effectively
20   excluded everything that could cause this
21   and then you're in proximity with
22   something, you have to assume that
23   potentially that could cause it. But
24   again, just proximity doesn't -- doesn't

27 (Pages 102 to 105)

John R. Wagner, M.D.

Page 106

1  prove anything and it's -- I don't know
2  how you -- I don't know how you'd study
3  the -- I don't know how you'd eliminate
4  all the other causes that could cause
5  necrotic tissue there.  So I think
6  clinically that statement is way too broad
7  to accept as blanket, yes.
8     Q.   Would you agree with me that
9  every time that you'd been asked as an
10  expert witness to examine the safety and
11  efficacy of a mesh device for the
12  treatment of pelvic organ prolapse or
13  stress urinary incontinence you found that
14  that device was safe and effective?
15          MS. KABBASH:  Objection.
16     A.   Could you repeat that question
17  again, or have her read that back?
18          MR. FAES:  I'll just restate it.
19  BY MR. FAES:
20     Q.   You'd agree that every time
21  you've looked at a mesh device for the
22  treatment of stress urinary incontinence
23  or pelvic organ prolapse as an expert
24  witness you've concluded that that device

Page 107

1  is safe and effective, correct?
2     A.   No.
3     Q.   In what case did you serve as an
4  expert witness where you found that a mesh
5  device was not safe and effective?
6     A.   I apologize because I
7  misinterpreted your question.
8          In an expert witness capacity,
9  the answer is "yes."
10          As a general rule, the answer is
11  "no."  There are some implants,
12  classically Gore-Tex was an implant that
13  we used late '80s, early '90s that was not
14  good to neighboring tissues.  It didn't
15  allow the appropriate ingrowth and
16  promoted infection and breakdown and
17  erosion.
18          So, there are some implants that
19  lend themselves to higher complication
20  rates.  But as an expert witness
21  testifying for the meshes that I've been
22  asked to render an opinion on legally, the
23  answer is "yes."
24     Q.   So you'd agree with me that at

Page 108

1  least the Gore-Tex mesh to you had a
2  complication profile that was unacceptable
3  to you, correct?
4     A.   Yes, especially for
5  sacrocolpopexies.
6     Q.   How high would the complication
7  rate need to be on the Prolift before you
8  decide that its complication rate was
9  unacceptable to you?
10          MS. KABBASH:  Objection.
11     A.   That's a almost -- there's no
12  rate here.  It's almost impossible to --
13  to put a number like that.  This isn't a
14  number -- this isn't a number thing.
15          I can tell you that the use of
16  Gore-Tex for sacrocolpopexies was
17  associated in the literature with higher
18  rates of complications than other
19  products, and we have good meta-analysis,
20  good long-term data, high levels of the
21  pyramid data showing complication rates
22  associated with Prolift, and I'm happy
23  with that complication profile, and I
24  think for the appropriate selected

Page 109

1  patients, it's an excellent procedure, and
2  it was an excellent procedure.
3     Q.   So, what objective standard are
4  you applying to determine that the Prolift
5  is safe and effective while concluding
6  that the Gore-Tex is not safe and
7  effective?
8          MS. KABBASH:  Objection.
9     A.   The objective standard is -- is
10  the objective standards that form my
11  medical opinions:  my training, my
12  surgical training, my surgical experience,
13  my teaching, my review of the literature,
14  my attendance at conference, my review of
15  cases presented at conference.  The body
16  of medical literature that exists out
17  there is my objective standard.  And then
18  as I said in my expert report, rating that
19  body of literature based on quality of
20  evidence is my objective standard.
21     Q.   So, in terms of complication
22  rate, you'd agree with me that there's no
23  numerical number of complications that you
24  can give me to where you'd feel that the

28 (Pages 106 to 109)

John R. Wagner, M.D.

Page 110

1    Prolift device was not safe and effective,
2    right?
3         MS. KABBASH: Objection.
4         A.   I think that there are -- it's
5    hard to separate the individual from the
6    procedure.  There were clinical situations
7    where native tissue repairs are
8    appropriate, where mesh repair is
9    appropriate vaginally, where an abdominal
10   mesh repair is appropriate, and I don't
11   think we're trying to pound all patients
12   through the same operation.  If there's a
13   surgeon doing only one operation, then I
14   don't think they're serving their patients
15   well.
16        You know, it's like -- and in
17   terms of complication rates, you know, we
18   give poisons to people who have cancer
19   because -- because the complication rate
20   of the cancer is much greater than the
21   complication rate of the poison we're
22   giving them.  So it's always a measure of
23   what you're treating them versus the
24   complication rate.  I wouldn't give

Page 111

1    somebody, you know, Cytoxan, which is a
2    poison, even if it did treat pelvic
3    prolapse because I have much lower risk --
4    lower risk treatments for that, but if
5    they have breast cancer, yeah, I'm going
6    to give them that otherwise the breast
7    cancer's going to kill them.
8         So, we're always relating what
9    we're treating people with to the
10   underlying disease process and we're
11   looking to benefit the patient overall.
12        Q.   Well, here we're talking about
13   pelvic organ prolapse and the Prolift.
14        A.   Right.
15        Q.   So, how high would the
16   complication rate need to be for a device
17   to treat pelvic organ prolapse before
18   you'd say this isn't acceptable to me,
19   it's not safe and effective?
20        MS. KABBASH: Objection; asked
21   and answered.
22        A.   I agree.  I think I've answered
23   it.
24        Q.   So even if the complication rate

Page 112

1    were 100 percent, it could potentially be,
2    the Prolift could potentially be safe and
3    effective applying your standard?
4         MS. KABBASH: Objection.
5         A.   Again, I think we're looking at
6    the published literature, the rates of
7    complications as we know it compared to
8    other procedures, including non-treatment
9    and analyzing the patient and her disease
10   process in light of all of that and
11   providing options.
12        Q.   And there's no numerical
13   standard that you can articulate as you
14   sit here today to where you would
15   determine the Prolift or a device like the
16   Prolift to not be safe and effective?
17        A.   I don't think of it as just a
18   numerical standard like that.
19        MS. KABBASH: Objection.
20        A.   It's way too broad.  It's way
21   too -- it's clinically useless because
22   complications could be anything from, you
23   know, the most minor thing to
24   life-threatening.  So you can't even put a

Page 113

1    number on it 'cause complications could be
2    anything.  It's just not a credible --
3    it's not a realistic way to look at this.
4         MR. FAES: I'd love to keep
5    debating, but I think I'm out of time.
6         MS. KABBASH: Doctor, I just
7    have a few follow-ups for you.
8    EXAMINATION BY
9    MS. KABBASH:
10        Q.   If you could turn to page 45 of
11   your report.  It's actually the last page
12   with your signature.  And take a look at
13   opinion 8.
14        Do you have that, Doctor?
15        A.   I do.
16        Q.   You were asked several questions
17   earlier about whether it was your opinion
18   that the warnings and risk information
19   provided in the Prolift materials were
20   adequate.
21        Do you remember that line of
22   questioning?
23        A.   I do.
24        Q.   Okay.  Let me just read into the

29 (Pages 110 to 113)

John R. Wagner, M.D.

1    record the first line of opinion 8.  It
2    says: "The possible risks of Gynemesh PS
3    and the Prolift products are appropriately
4    described in their instructions for use,
5    the patient brochures for the Prolift
6    products, and in Ethicon's professional
7    education materials."
8         Do you see that?
9    A.   I do.
10    Q.   Does that continue -- is that
11    still currently your opinion as of today?
12         MR. FAES:  Object to form;
13    leading.
14    A.   Yes.
15    Q.   Do you hold that opinion to a
16    reasonable degree of medical certainty?
17         MR. FAES:  Object to form.
18    A.   Yes.
19    Q.   The next sentence says: "These
20    materials properly reflect the risks that
21    are reported in the high level medical
22    literature and appropriately account for
23    the common knowledge of trained
24    specialists."

1         Do you see that?
2    A.   Yes.
3    Q.   Is that your opinion as of the
4    time you wrote the report?
5         MR. FAES:  Object to form.
6    A.   Yes.
7    Q.   And does it continue to be your
8    opinion today?
9         MR. FAES:  Object to form.
10    A.   Yes.
11    Q.   Do you hold that opinion to a
12    reasonable degree of medical certainty?
13         MR. FAES:  Object to form.
14    A.   Yes.
15         MS. KABBASH:  Do you hold that
16    opinion to a reasonable degree of
17    medical certainty, object to form?
18    Do what you got to do.  Okay.
19         MR. FAES:  Leading.  It's a
20    continuation of the previous.
21         MS. KABBASH:  Okay.
22         MR. FAES:  Come on.  You guys
23    object to everything and I just ignore
24    it like buzzing in my ears.

1         MS. KABBASH:  I don't agree with
2    that, but whatever.  Let's move on.
3    BY MS. KABBASH:
4    Q.   You say these materials properly
5    reflect the risks that are reported in the
6    high level medical literature.
7         Can you just explain to me what
8    you're referring to when you opine that?
9    What process did you undertake to arrive
10    at that conclusion?  That's my question?
11    A.   That's what's referred to as the
12    Oxford Pyramid of Evidence.  It looks at
13    the quality of studies, ranks them in
14    terms of least valuable all the way up to
15    most valuable, anywhere from expert
16    opinion to meta-analysis, systemic
17    reviews, and the meta-analysis systemic
18    reviews represent what's thought to be the
19    highest quality evidence, especially when
20    they're well done.
21    Q.   In reviewing the IFUs for the
22    Prolift, did you review the language of
23    the IFUs in comparison to the clinical
24    literature on Prolift and Gynemesh PS?

1    A.   Yes, I did.
2    Q.   Did you find that the
3    materials --
4         MS. KABBASH:  Strike that.
5    Q.   Did you find that the Prolift
6    IFU appropriately and accurately reflected
7    the risks that were reported in the
8    medical literature?
9         MR. FAES:  Object to form.
10    A.   Yes, I did.
11    Q.   Did you also compare the
12    language of the warnings in the Prolift
13    IFU and the adverse events to your own
14    surgical experience with Prolift?
15         MR. FAES:  Object to form.
16    A.   I think that what's in the IFU
17    and what's in the medical literature does
18    so square nicely with my clinical
19    experience over the years.
20    Q.   Doctor, if you could go to page
21    34 of your report.  You have a discussion
22    there of mesh exposure and erosion.
23         Do you see that?
24    A.   Yes.

John R. Wagner, M.D.

Page 118

1    Q.   And you previously testified --
2        MS. KABBASH:  Strike that.
3    Q.   You were asked questions about a
4  mesh exposure rate with regard to the
5  Prolift, and I think that you offered the
6  range of 2 to 5 percent.
7        Do you recall that?
8    A.   I do.
9    Q.   What source were you, source or
10  sources, were you basing that on when you
11  offered that range?
12    A.   I think that's just my general
13  reading of the medical literature,
14  particularly the high quality literature.
15  And I also think it reflects a more
16  modern -- modern.  More recent studies
17  because I think that in general, and this
18  also correlates with my experience, as
19  surgeons get better doing vaginal mesh
20  repairs and develop techniques for doing
21  vaginal mesh repairs, our erosion rates
22  have decreased.  So there are erosion
23  rates in the literature that go up there,
24  they go up like 15, 18, 20 percent, in

Page 119

1  that range, but I think that overall it's
2  my reading of high quality medical
3  literature in conjunction with my
4  experience that an experienced pelvic
5  surgeon with experience with transvaginal
6  mesh probably has a significant erosion
7  rate of maybe 2 to 5 percent when dealing
8  with vaginal mesh repairs, not slings, but
9  vaginal mesh repairs.
10    Q.   In forming your opinions, did
11  you review and consider studies that
12  reported mesh exposure rates higher than 5
13  percent?
14    A.   Yes.
15    Q.   And here in your report on page
16  34, do you indicate that occurrence rates
17  of mesh exposure are typically under 18
18  percent?
19    A.   Yes.
20        MR. FAES:  Object to form.
21  BY MS. KABBASH:
22    Q.   If you look at page 35 in the
23  last sentence of the top paragraph, do you
24  discuss there what exposure rates are

Page 120

1  referenced in the Prolift surgeon's
2  resource monograph that was put forth by
3  Ethicon?
4    A.   Yes, I do.
5    Q.   And what exposure rates are
6  provided in that monograph?
7    A.   Between 3 and 17 percent.
8    Q.   And in forming your opinions
9  about the safety and efficacy of Prolift,
10  Dr. Wagner, did you take into
11  consideration studies that report exposure
12  rates higher than the 2 to 5 percent that
13  you discussed before?
14    A.   Yes.
15    Q.   If you turn to page 12 of your
16  report.
17        You were asked some questions
18  earlier about the weight of Gynemesh PS
19  and specifically I think on what
20  information you based your assessment that
21  Gynemesh PS was a low-weight mesh.
22        Do you recall that?
23    A.   Mm-hm.
24    Q.   Do you recall being asked if you

Page 121

1  could point to a source for that
2  information?
3        Do you recall that?
4    A.   Yes.
5    Q.   Okay.  Here in your report you
6  make the statement:  "Gynemesh PS is a
7  low-weight Amid type 1 polypropylene
8  mesh."
9        Is there an article that you've
10  cited for that proposition?
11    A.   Yes, the Jones article.
12    Q.   And is that the Jones article
13  called "Tensile properties of commonly
14  used prolapse meshes"?
15    A.   Yes.
16    Q.   Was that article published in
17  the International Urogynecology Journal?
18    A.   Yes.
19    Q.   Is the International
20  Urogynecology Journal a peer-reviewed
21  publication?
22    A.   Yes.
23    Q.   And is that one of the sources
24  that you were relying upon for your

31 (Pages 118 to 121)

John R. Wagner, M.D.

Page 122

1    assessment of Gynemesh PS as a low-weight
2    material?
3        A.   Yes.
4        Q.   In addition to what you
5    testified to earlier?
6        A.   Yes.  They describe it as
7    low-weight.
8        Q.   You testified earlier in
9    response to questioning from counsel
10   about, I'm paraphrasing this to some
11   extent, but you said that in a healthy
12   woman without certain comorbidities, and
13   in light of the advent of minimally
14   invasive techniques, you would opt to
15   perform an abdominal surgery versus a
16   vaginal surgery to treat prolapse.
17            Did I accurately summarize that?
18       A.   I think so, yes.
19       Q.   Within the context of your
20   answer, what minimally invasive abdominal
21   surgery are you referring to?
22       A.   Using the robotic or
23   laparoscopic approach to do a
24   sacrocolpopexy.

Page 123

1        Q.   And what is it about the --
2            MS. KABBASH:  Strike that.
3        Q.   At the time that Prolift was
4    introduced to the market, was that form of
5    minimally invasive abdominal surgery, in
6    particular the robotic surgery, available
7    at that period of time?
8        A.   If it was, it was only in one or
9    two centers.  It was basically in its
10   infancy.  Laparoscopic surgery had been
11   around for a while, but there were very
12   few surgeons capable of doing a
13   laparoscopic sacrocolpopexy.
14       Q.   You testified earlier that
15   native tissue repairs are an alternative
16   to Prolift.
17       A.   Correct.
18       Q.   Is a native tissue repair always
19   the best alternative to Prolift for a
20   given patient?
21           MR. FAES:  Object to form.
22       A.   Never always.  It's an
23   alternative.  In some people it might be
24   the best approach, but never is it always

Page 124

1    the best approach.
2        Q.   And why with some patients is
3    Prolift a better alternative to native
4    tissue repair?
5        A.   People who are at high risk for
6    recurrence, either based on their family
7    history, their personal health history,
8    such as the history of hernias, people
9    that have already had a vaginal repair
10   that has now failed, people with a global
11   defect across the whole vagina, people who
12   have -- who are of a young age with a
13   family history for prolapse, these are all
14   patients, to list a few, risk factors who
15   are at high risk for failure or recurrence
16   and those are people who may be best
17   served by a mesh augmented repair and not
18   a native tissue repair.
19       Q.   I think you also testified that
20   an abdominal sacrocolpopexy is an
21   alternative to Prolift.
22           Is abdominal sacrocolpopexy
23   always a better alternative to Prolift in
24   patients?

Page 125

1        A.   No.
2        Q.   And why is that?
3        A.   Because you can have patients
4    for whom a sacrocolpopexy is potentially a
5    much more risky procedure based on their
6    medical history, surgical history, their
7    age, their comorbidities, heart disease,
8    and the vaginal approach may make much
9    more sense in that particular patient
10   population.
11       Q.   I think you testified in
12   response to one question that you were
13   asked does eliminating trocars eliminate
14   the risk of injury associated with
15   trocars, and I believe you said yes.
16       A.   Yes.
17       Q.   Is there a downside from the
18   perspective of safety to eliminating
19   trocars such as the trocars used in the
20   Prolift device?
21       A.   Yes.  I think that if you look
22   at trocar-based repairs, in my opinion,
23   the advantage of the trocar systems, like
24   Prolift, like the Exair, are that you can

32 (Pages 122 to 125)

John R. Wagner, M.D.

Page 126

```
 1    make smaller incisions, there's less
 2    dissection, less need for hysterectomies
 3    and other concomitant procedures and
 4    allows you to place the mesh in the
 5    appropriate compartment in a very
 6    minimally invasive way, and by doing it
 7    minimally invasively, you minimize local
 8    trauma such as bleeding, nerve damage.
 9    You minimize pain.  You speed the
10    recovery.
11            So, while the actual placement
12    of the trocar is potentially a surgical
13    maneuver that can add a unique risk, the
14    overall benefit of the trocar-based
15    systems is a much lower complication
16    profile and lower morbidity overall.
17       Q.   I just have one more area I want
18    to ask you about.
19            You were questioned earlier
20    about what risks were widely known among
21    surgeons, and you were asked if you had
22    performed any study to determine what
23    surgeons actually knew at a given time.
24            Do you recall that line of
```

Page 127

```
 1    questioning?
 2       A.   I do.
 3       Q.   Turn to page 38 of your report.
 4            In this part of your report, do
 5    you have a section called "Commonly Known
 6    Risks of Surgery"?
 7       A.   Yes.
 8       Q.   Did you perform an analysis of
 9    the published medical literature to assess
10    what risks were reported on and available
11    in the publicly available medical
12    literature?
13            MR. FAES:  Object to form.
14       A.   Yes.
15       Q.   Do you discuss studies that
16    discuss the risk of mesh erosion in this
17    section of your report?
18            MR. FAES:  Object to form.
19       A.   Yes.
20       Q.   Do you list here studies that
21    were published between 1997 and 2006 that
22    discuss the risk of mesh erosion?
23            MR. FAES:  Object to form.
24       A.   Yes.
```

Page 128

```
 1       Q.   On the next page, on page 39, do
 2    you list studies that discuss the risk of
 3    pain with intercourse and sexual
 4    dysfunction that were available in the
 5    medical literature?
 6       A.   Yes.
 7       Q.   And with respect to the articles
 8    about pain with intercourse, were these
 9    articles that you reference, do they start
10    in 1961?
11       A.   Actually, they go back to 1961,
12    yes.
13       Q.   And do they go --
14            MS. KABBASH:  Strike that.
15       Q.   Doctor, is the published medical
16    literature information that is out in the
17    public and available for doctors to
18    access?
19       A.   Yes.
20       Q.   And is your review of the
21    published medical literature and the
22    testimony you gave before about what is
23    taught in surgical training the basis for
24    your opinion about what is widely known by
```

Page 129

```
 1    surgeons?
 2            MR. FAES:  Object to form.
 3       A.   Yes, including what's in
 4    textbooks, which would be part of normal
 5    medical and surgical training.
 6            MS. KABBASH:  I don't have
 7    anything else.  I think we're done.
 8    Thanks, Doctor.
 9            (Deposition adjourned at 10:55
10    a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

33 (Pages 126 to 129)

John R. Wagner, M.D.

| | Page 130 |
|---|---|
| 1 | A C K N O W L E D G M E N T |
| 2 | |
| 3 | STATE OF          ) |
| 4 |                  :ss |
| 5 | COUNTY OF        ) |
| 6 | |
| 7 |      I, JOHN R. WAGNER, M.D., hereby |
| 8 | certify that I have read the transcript of |
| 9 | my testimony taken under oath in my |
| 10 | deposition of September 25, 2017; that the |
| 11 | transcript is a true and complete record |
| 12 | of my testimony, and that the answers on |
| 13 | the record as given by me are true and |
| 14 | correct. |
| 15 | |
| 16 | |
| 17 |      _____ |
| |      JOHN R. WAGNER, M.D. |
| 18 | |
| 19 | Signed and subscribed to before me this |
| 20 | _____ day of _____, 2017. |
| 21 | |
| 22 | _____ |
| 23 | Notary Public, State of |
| 24 | |

| | Page 132 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | STATE OF NEW YORK |
| 3 | COUNTY OF NEW YORK |
| 4 | |
| 5 |      I, Marie Foley, RMR, CRR, a |
| 6 | Certified Realtime Reporter and Notary |
| 7 | Public within and for the State of New |
| 8 | York, do hereby certify: |
| 9 |      THAT JOHN R. WAGNER, M.D., the |
| 10 | witness whose deposition is hereinbefore |
| 11 | set forth, was duly sworn by me and that |
| 12 | such deposition is a true record of the |
| 13 | testimony given by the witness. |
| 14 |      I further certify that I am not |
| 15 | related to any of the parties to this |
| 16 | action by blood or marriage, and that I am |
| 17 | in no way interested in the outcome of |
| 18 | this matter. |
| 19 |      IN WITNESS WHEREOF, I have |
| 20 | hereunto set my hand this 29th day of |
| 21 | September, 2017. |
| 22 | |
| 23 |      _____ |
| |      MARIE FOLEY, RMR, CRR |
| 24 | |

| | Page 131 |
|---|---|
| 1 | E R R A T A |
| 2 | PAGE / LINE / CHANGE   /   REASON |
| 3 | _____ |
| 4 | _____ |
| 5 | _____ |
| 6 | _____ |
| 7 | _____ |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | _____ |

| | Page 133 |
|---|---|
| 1 | LAWYER'S NOTES |
| 2 | PAGE / LINE |
| 3 | ___ ___ _____ |
| 4 | ___ ___ _____ |
| 5 | ___ ___ _____ |
| 6 | ___ ___ _____ |
| 7 | ___ ___ _____ |
| 8 | ___ ___ _____ |
| 9 | ___ ___ _____ |
| 10 | ___ ___ _____ |
| 11 | ___ ___ _____ |
| 12 | ___ ___ _____ |
| 13 | ___ ___ _____ |
| 14 | ___ ___ _____ |
| 15 | ___ ___ _____ |
| 16 | ___ ___ _____ |
| 17 | ___ ___ _____ |
| 18 | ___ ___ _____ |
| 19 | ___ ___ _____ |
| 20 | ___ ___ _____ |
| 21 | ___ ___ _____ |
| 22 | ___ ___ _____ |
| 23 | ___ ___ _____ |
| 24 | ___ ___ _____ |