# EXHIBIT C

John R. Wagner, M.D.

```
 1           UNITED STATES DISTRICT COURT

 2         SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    AT CHARLESTON

 4    ------------------------------:

      IN RE ETHICON, INC., PELVIC   :
 5    REPAIR SYSTEM PRODUCTS        : MASTER FILE
      LIABILITY LITIGATION          : No. 2:12-MD-02327
 6    _____:
                                    :
 7    THIS DOCUMENT RELATES TO      : MDL 2327
                                    :
 8    GENERAL DEPOSITION            : JOSEPH R. GOODWIN
      RE:  TVT                      : US DISTRICT JUDGE
 9    ------------------------------

10                       -  -  -

11                  March 13, 2017

12                       -  -  -

13         Deposition of JOHN R. WAGNER, M.D.,

14    held at Marriott Melville, 1350 Old Walt

15    Whitman Road, Melville, New York,

16    commencing at 9:04 a.m., on the above

17    date, before Marie Foley, a Registered

18    Merit Reporter, Certified Realtime

19    Reporter and Notary Public.

20                       -  -  -

21             GOLKOW TECHNOLOGIES, INC.

22        877.370.3377 ph | 917.591.5672 fax

23                 Deps@golkow.com

24
```

Page 42

1  lower?
2      MS. KABBASH: Objection to form.
3      You can answer.
4   A.  Again, I think that it depends
5  on whether the patient needs mesh or not.
6  I think when I think about these terms, I
7  think does this patient need a mesh or not
8  or can she get by with a traditional
9  repair. And then if I decide that yes,
10 she's at high risk for some reason and
11 needs a mesh implant, should I place it
12 vaginally or abdominally has a number of
13 factors.
14     If I think a patient requires a
15 very large mesh implant of the anterior
16 apical and posterior walls, I would prefer
17 to place that abdominally if she is a
18 candidate for abdominal surgery.
19   Q.  And that's because in your
20 experience, the rate of adverse events is
21 lower abdominally as opposed to
22 transvaginally, correct?
23   A.  In my experience, and as well
24 as, you know, the experience I think of

Page 43

1  others in the literature and colleagues,
2  by avoiding vaginal incisions, you seem to
3  minimize the risk of complications related
4  to the mesh.
5   Q.  Can you do a -- you mentioned a
6  patient not being a candidate for
7  traditional repair.
8      Do you still do traditional
9  repair for stress urinary incontinence?
10     MS. KABBASH: Objection to form.
11     You can answer.
12  A.  If by traditional you mean a
13 Burch colposuspension or an MMK or a
14 pubovaginal sling or a Pereyra or a
15 Stamey, by and large, no. I think that I
16 used to do a lot Burches and Pereyra's.
17 Those were my procedures of choice, but
18 the TVT product and line of products has
19 really revolutionized that procedure.
20   Q.  Let me just ask you directly.
21     You still do Burch procedures
22 from time to time, correct?
23   A.  I think I've done one Burch in
24 the last two years or three years.

Page 44

1   Q.  And what other non-mesh
2  procedures can be done for the treatment
3  of SUI?
4   A.  Well, traditionally, we used to
5  do anterior repairs with a Kelly
6  plication. We would do a Burch procedure.
7  For recurrent stress incontinence, we
8  would often do a pubovaginal sling
9  retropubically with either autologous
10 graft or synthetic material. And then you
11 had your needle suspension procedures,
12 like the Pereyra and the Stamey.
13   Q.  You can do a Burch procedure
14 laparoscopically, correct?
15  A.  No, I've never done that.
16   Q.  You haven't seen it done?
17  A.  I've seen it done. I've never
18 done one.
19   Q.  But it's possible, doctors can
20 do them, correct?
21  A.  You can do a Burch procedure
22 laparoscopically or robotic or via an open
23 incision.
24   Q.  Let's move now to your

Page 45

1  publications on your CV.
2      How many of these, when you say
3  publications or national presentations,
4  how many articles have you had published
5  in the peer-reviewed medical literature?
6   A.  Four, I think.
7   Q.  Does that include abstracts that
8  were presented via poster at a conference?
9   A.  No.
10   Q.  And then you've had a number of
11 presentations in addition to the
12 peer-reviewed publications, correct?
13  A.  Correct.
14   Q.  Do any of these publications or
15 presentations involve the treatment of
16 stress urinary incontinence?
17  A.  No.
18   Q.  So you've never had a
19 publication or presentation on the
20 treatment of stress urinary incontinence,
21 correct?
22  A.  Not at a national meeting.
23   Q.  And the other ones you've had
24 were as a consultant or a proctor for

Page 86

1  materials is reflected in Exhibit 3,
2  correct?
3     A.   No.  Most of the time we just
4  talked about I reviewed recently.
5     Q.   So that would be in either the
6  invoice that I wasn't provided yet or the
7  e-mail or would be reflected in a future
8  invoice?
9     A.   Or the invoice that I haven't
10 provided her with yet.
11    Q.   Right, okay.
12        MR. AYLSTOCK:  Let me hand you
13    Exhibit 9.
14        (Exhibit Wagner 9, Gynecare TVT
15    Instructions for Use, was marked for
16    identification, as of this date.)
17 BY MR. AYLSTOCK:
18    Q.   Do you recognize Exhibit 9,
19 Doctor?
20    A.   I do.
21    Q.   You recognize that as the
22 instructions for use for the TVT
23 Retropubic product, correct?
24    A.   Yes.

Page 87

1     Q.   In your report, you state that
2  you use the instructions for use for
3  educational purposes with your residents,
4  correct?
5     A.   I do.
6     Q.   Why is that?
7     A.   It goes to sort of what you
8  asked me about textbooks.  The surgery
9  that we do now is so different than the
10 surgery when I was trained.  When I was
11 trained, the operations we were doing had
12 been pretty much unchanged for 80 to a
13 hundred years, and we had atlases and
14 textbooks that reflected those operations.
15 I mean, our suture materials were better.
16 Our operating environments were better.
17 Our surgical techniques were better, but
18 our actual procedures were pretty much
19 unchanged.  And in today's world, whether
20 it's vaginal slings, vaginal mesh repairs,
21 whether it's single incision surgery,
22 whether it's robotic surgery, it's really
23 hard to find an up-to-date textbook to
24 describe these things.  And by the time

Page 88

1  you do, it's probably outdated within a
2  couple years.
3         So, I just found that when I
4  have a new resident or fellow and they
5  have not seen this operation before or
6  they've not handled a particular device
7  before, a stapler, a single incision, I
8  encourage them to take this with them and
9  look at it.
10    Q.   I think you even say you
11 encourage them to take it home and study
12 it, correct?
13    A.   Yes, I do.
14    Q.   And that's because what's in the
15 IFU should be the most up-to-date
16 information known to the company as to the
17 implantation procedure and how to perform
18 it, correct?
19    A.   Again, I have problems with that
20 term "up-to-date."
21        You know, I think that the IFU
22 reflects the company's obligation to
23 describe their product and to describe
24 adverse potential side effects related to

Page 89

1  their product.  And yes, I mean, you could
2  learn something tomorrow and it might take
3  an IFU a while to catch up.
4         I don't expect the IFUs to
5  replace surgical judgment or up-to-date
6  surgical management, but I do find it's a
7  very good way to introduce somebody to a
8  product, and that's really what I would
9  use them for.  Whether it's TVT or really
10 any other product, to introduce a resident
11 to that product.
12        And I might say to them look, it
13 says here that you can X, Y or Z, but we
14 found you could even do A, B and C with
15 this too and expand on it.  Or I might say
16 it says here you can do this, but some of
17 the recent data says you can't do that.
18        So again, it's a good stepping
19 stone to get off on teaching somebody how
20 to use a product, is how I would use the
21 IFU.
22    Q.   And you mentioned adverse events
23 are reflected in the IFU, correct?
24    A.   Yes, they are.

Page 94

1 TVT products even in the absence of doctor
2 error, correct?
3   A.   Yes.
4   Q.   Same question with regard to
5 recurrence of incontinence, correct?
6   A.   Correct.
7   Q.   And same with regard to
8 bleeding, including hemorrhage or
9 hematoma, correct?
10   A.   Correct.
11   Q.   And you would also agree that
12 following the implantation of the TVT
13 family of products, one or more revision
14 or surgeries may be necessary to treat
15 these adverse reactions, correct?
16   A.   Correct.
17   Q.   And that can occur even in the
18 absence of doctor error, correct?
19   A.   Correct.
20   Q.   And you would agree that the TVT
21 mesh -- well, you're aware, Doctor, are
22 you not, that in the TVT family of
23 products they're all the same
24 polypropylene mesh, correct?

Page 95

1   A.   Correct.
2   Q.   And that's Prolene mesh,
3 correct?
4   A.   Correct.
5   Q.   Do you agree that in some cases,
6 that Prolene mesh needs to be removed in
7 whole or in part and significant
8 dissection may be required of the tissue
9 to get to the mesh, correct?
10   A.   Correct.
11   Q.   And that can occur with the TVT
12 products even in the absence of doctor
13 error, correct?
14   A.   Correct.
15   Q.   Have you personally explanted
16 Prolene mesh in your practice?
17   A.   Yes.
18   Q.   How many times?
19   A.   I've explanted Prolene mesh in
20 suburethral slings probably four or five
21 times, but I've explanted mesh in other
22 parts of the vagina in the operating room
23 maybe 20 to 30 times and in the office
24 multiple times.

Page 96

1   Q.   Prolene mesh, correct?
2   A.   Prolene mesh like you'd see with
3 the Prolift system.  Typically that was my
4 main product, so it would be primarily the
5 Prolene mesh in the Prolift system.
6   Q.   Okay.  Where a patient presents
7 with the need for explantation of the
8 mesh, is that something you normally do
9 personally, or do you refer cases out for
10 treatment sometimes?
11   A.   No, I actually do that
12 personally.
13        I guess I should tell you too
14 that of the TVTs that I have treated, I
15 think only one of them was mine.  The
16 rest -- actually, two of them were mine.
17 The rest were referred to me.  So about
18 half of the four or five were referred to
19 me.  The other two were mine.
20   Q.   And by "mine" you mean --
21   A.   My patient.
22   Q.   -- you implanted the original
23 TVT device, correct?
24   A.   Yes, I implanted the original

Page 97

1 TVT device.
2        And I should say that on one of
3 them it's pretty clear that the patient
4 disrupted the repair 'cause she had sex
5 the next night and disrupted the repair,
6 so I don't think that was the fault of
7 anything other than the patient not
8 adhering to her restrictions.
9   Q.   In the other case, did the
10 patient adhere to the instructions and
11 refrain from sex for the appropriate time?
12   A.   As best as I know, yes.
13   Q.   And she still had suffered an
14 adverse event from the TVT product?
15   A.   She did.  She had a small mesh
16 erosion that I had to excise.
17   Q.   And that mesh erosion, I take
18 it, was not caused by your error, correct?
19   A.   Error's a funny word.  We do our
20 best to section, we place it where we like
21 to place it.  We keep our fingers crossed
22 that we haven't devitalized the tissue so
23 that it heals well, but it can occur
24 without any doctor error.  It's an

Page 106

1  Q.  Okay.
2  A.  And I think that as part of
3  that, you need an armorterium [sic], is
4  that the word I'm looking for, of tools.
5  Q.  And one of the tools is the IFU?
6  A.  Is an IFU.
7  Q.  Okay.
8  A.  So I would hold myself out as an
9  expert at teaching in that regard.
10  Q.  Okay.  But not with regard to --
11  A.  But not --
12  Q.  -- IFUs specifically, correct?
13      MS. KABBASH:  Objection to form.
14  A.  But not with the industry
15  standards for what goes into the IFUs.
16  Q.  Correct.
17      Is that correct?
18  A.  Correct.
19  Q.  Okay, thank you.
20      Now, the instructions for use on
21  the TVT products also have implantation
22  instructions for the physician, correct?
23  A.  Yes.
24  Q.  And similarly, would you agree

Page 107

1  that with regard to the manner of
2  implantations, it's important that the
3  physicians be told through the IFU the
4  correct manner of implantation of the
5  particular product?
6  A.  I think how a physician learns
7  to do this should not be just by reading
8  the IFU and doing this.  I think that if
9  somebody wants to expand their surgical
10  repertoire to anything, they should go to
11  postgraduate courses, be proctored, they
12  should learn -- if I'm understanding the
13  question, the question is can a surgeon
14  just read the IFU and do the surgery, I
15  would say no.
16  Q.  Yeah, that really wasn't my
17  question.
18      I guess my question relates back
19  to in your report on page 3, you would
20  agree that the IFU should be where the
21  physician -- one of the things that the
22  physician relies upon to look for the
23  correct manner of implantation of the
24  product, correct?

Page 108

1  A.  I think the IFUs provide a nice
2  written summary of standard use of the
3  product.
4  Q.  And because of that, because
5  doctors rely on it, it's important that
6  the IFUs be accurate, correct?
7  A.  I think the IFUs should be
8  accurate, yes.
9  Q.  Because if the IFU's not
10  accurate, a doctor may rely on it and give
11  bad information to a patient or implant it
12  incorrectly or do something else that's
13  wrong, correct?
14  A.  A doctor could implant something
15  incorrectly for a variety of reasons that
16  probably have nothing to do with the IFU.
17  Q.  Well, you agree if the IFU is
18  incorrect to the best manner of
19  implantation, or unclear, that can lead to
20  adverse consequences to the patient,
21  correct?
22      MS. KABBASH:  Objection to form.
23  A.  I would like the IFU to be as
24  clear as possible.

Page 109

1      Do I expect it to be a perfect
2  document?  No more than I expect,
3  necessarily, my textbook chapter to be a
4  perfect document.  But in general, they're
5  a good summary of whatever product it is
6  and what the company feels should be part
7  of its use and reactions and warnings and
8  side effects.
9  Q.  Okay.  Let's go now to your
10  expert report, Exhibit 6.
11      Did you write this report?
12  A.  I think that probably two-thirds
13  of this are my dictation and corrections
14  of my dictations.  Clearly these reflect
15  my opinions, but in terms of organizing
16  this, I clearly had help from counsel.
17  They helped me organize sections.  But
18  most of this is dictated by me and
19  corrected by me.
20  Q.  You said about two-thirds?
21  A.  About two-thirds is directly
22  from my Dictaphone.  The others are
23  paragraphs that I had editorial control
24  over and changed in certain ways, but

Page 118

1 regard to the Burch procedure, your
2 patients did well, did not suffer an
3 adverse event, correct?
4    A.   They had typical --
5         MS. KABBASH:  Objection.
6    A.   -- Burch outcomes.  You know,
7 there were times when it didn't work well.
8 There were times when they had catheters
9 for three or four weeks.  There were times
10 when it didn't tighten them enough.
11        You know, with the Burch it was
12 funny because you didn't have different
13 types of options.  It was one procedure.
14 So if somebody had intrinsic sphincter
15 deficiency, we would try to do a really
16 tight Burch.  If they just had
17 hypermobility, we wouldn't do a really
18 tight Burch.  There was a lot more
19 guesswork with Burches, and there was a
20 lot more involved in recovery and pain and
21 complications.
22    Q.   As far as long-term
23 complications from the Burch other than
24 those individuals who suffered from a

Page 119

1 recurrence, did you have particular
2 patients that had long-term consequences
3 following the Burch that you can recall?
4    A.   No, but I know I had patients
5 who needed a pubovaginal sling because
6 their incontinence wasn't better.  I
7 recall hematomas.  We were always worried
8 about bleeding.
9    Q.   Those would be transient
10 conditions, correct?
11   A.   Well, transient for months.
12 Yeah, they didn't -- if they had a Burch
13 when they were 60, they didn't have those
14 conditions when they were 80, but they may
15 linger for a long time.
16        One thing to also remember about
17 a Burch is that if you did have a
18 hysterectomy, the vessels in that
19 retropubic space were often huge too.  So
20 there was a significant risk of bleeding
21 with a dissection.  It was a much more
22 invasive operation.
23    Q.   One of the risks that's not
24 associated with the Burch, however, is

Page 120

1 erosion or extrusion, correct?
2    A.   That is correct.
3    Q.   That's a risk that's unique to
4 the TVT family of products or other mesh
5 involved in SUI?
6    A.   It's absolutely unique to
7 operations other than the Burch.  The
8 pubovaginal slings, synthetic material
9 could erode.  The Burch did not have
10 erosions.
11   Q.   If we turn to page 4 of your
12 report, you detail your experience with
13 the TVT products.  I'm going to focus on
14 the TVT Retropubic product for now.
15        It looks like you performed
16 about 600 to 800 procedures with the
17 device?
18   A.   Yeah, that's my best
19 recollection.  We started doing them
20 around 2000, and it became virtually
21 standard.  We used it for every patient.
22 That was really the only device on the
23 market for a while that we used.
24   Q.   I'm not going to mark it because

Page 121

1 I want to take it back, but I'm handing
2 you a TVT device box.
3        Do you recognize that?
4    A.   I do.  It brings back memories.
5    Q.   All right.  So, one of the
6 memories it brings back is that the TVT
7 has the polypropylene mesh, the Prolene
8 mesh we discussed, and it's actually fixed
9 to the instruments, correct?
10   A.   It is, yes.
11   Q.   So the device is not just the
12 mesh, it's the instrumentation and the
13 instructions for use, correct?
14   A.   Yes.  And I think the handles
15 were reusable.  They were separate.
16   Q.   Okay.  But the actual trocars
17 here attached?
18   A.   Yes, they were attached and the
19 handles, if I recall, screwed into the
20 bottom of the metal trocars.
21   Q.   So the trocars weren't reusable,
22 just the handles, correct?
23   A.   Just the handles, yes.
24   Q.   How much were you paid,

Page 130

1 exactly the original Retropubic that shows
2 any lower complication rate.
3   Q.  But in your experience, you
4 prefer the Exact because you find it to be
5 a superior device than the original
6 Retropubic, correct?
7       MS. KABBASH:  Objection; asked
8 and answered.
9       You can answer.
10  A.  In my hands, the way I feel my
11 way through the pelvis, I'm more confident
12 placing the Exact.  That's my -- that's my
13 best answer.
14      I don't have any peer-reviewed
15 objective data to tell you that it's
16 better.  I feel that I have a better feel
17 for where I'm guiding the trocars with the
18 Exact than I did with the original TVT.
19  Q.  So to you, you feel it's a
20 superior device?
21      MS. KABBASH:  Objection.
22 BY MR. AYLSTOCK:
23  Q.  The Exact.
24  A.  I just come back to in my hands,

Page 131

1 when I'm doing it, I feel more confident
2 doing it.
3   Q.  Okay.  When is the last time you
4 did an original TVT Retropubic
5 implantation, 2006?
6   A.  No.  I think I did one or two
7 recently when I was at a hospital, I can't
8 remember which hospital it was, and all
9 the TVT-Exacts had expired.  And so I
10 asked them if I could have the original
11 device and they gave it to me.
12  Q.  Okay.
13  A.  But I haven't seen that package
14 in a long time because they gave it to me
15 unwrapped and everything.
16  Q.  But absent an expiration on the
17 Exact, you don't use the TVT Retropubic
18 device anymore?
19  A.  That's correct.
20  Q.  When you were using the TVT
21 Retropubic device, did you use
22 mechanical-cut or laser-cut, or do you
23 know?
24  A.  I am pretty confident that when

Page 132

1 I used that, it was virtually all
2 mechanical-cut.  I don't recall being
3 familiar with the concept of laser-cut
4 until I used the TVT Secur.  So I'm fairly
5 confident that everything I used was
6 mechanical-cut.
7   Q.  Did your sales rep or anybody
8 from Ethicon ever explain to you what the
9 difference was?
10  A.  Not that I recall.
11  Q.  Do you know why Ethicon switched
12 to also creating a laser-cut TVT
13 Retropubic device?
14      MS. KABBASH:  Objection to form.
15  A.  I don't know why.
16  Q.  Did you ever ask them?
17  A.  No, I don't think I ever have.
18 I may have asked my rep when I had the TVT
19 Secur questions about the laser-cut, but
20 until recently, maybe four or five months
21 ago, I actually wasn't aware that you
22 could get the meshes in both ways.  That
23 was a relatively new discovery on my part.
24 I think I've always used the

Page 133

1 mechanical-cut except for the Secur
2 because I think the Secur only came
3 laser-cut.
4   Q.  When you did become aware of the
5 difference, what were you told about why
6 there was a difference?
7   A.  I recall, I think, having that
8 discussion with my GYN clinician in the
9 O.R., possibly when they were reordering,
10 and I remember thinking it didn't make any
11 difference to me.  I think I remember
12 saying whatever's cheapest, if there was a
13 difference.
14  Q.  Okay.  If you add up all of
15 these Ethicon devices over the years, it
16 looks like you've done 2,000, 2400 such
17 operations involving the TVT family of
18 products.
19      Is that about right?
20  A.  I think that's probably about
21 right.
22  Q.  Did you ever keep a registry for
23 your patients, given the large number that
24 you did?

Page 146

1  Q. Not for slings?
2  A. I haven't used Coloplast for
3  slings, no.
4  Q. Any other manufacturers -- have
5  you used any other manufacturers'
6  products, mesh products, for the treatment
7  of stress urinary incontinence other than
8  Johnson & Johnson?
9  A. I've used the Caldera slings a
10 few times.
11 Q. The Desara?
12 A. A Caldera I think is the name.
13 It's the preset ones that -- it's put out
14 by a company that basically mimics every
15 sling that's on the market. So the
16 advantage is a hospital can buy the
17 complete set and it sort of mimics the
18 Monarch, it mimics all the TVT products.
19 They have a mimic for everything.
20 Q. Have you used the AMS products
21 for SUI?
22 A. No, I don't think I have. If I
23 did, it was just once or twice. I don't
24 really recall. And if I did, it was

Page 147

1  probably in a cadaver lab setting
2  somewhere. I really don't have any
3  experience with AMS products.
4  Q. And Boston Scientific slings,
5  same thing?
6  A. I did not use their slings. I
7  used their Uphold for anterior and apical
8  support.
9  Q. In those times where you removed
10 mesh from women, TVT, Prolene mesh, did
11 you request any particular analysis of the
12 explanted mesh?
13 A. No.
14 Q. Did you personally review the
15 pathology reports for those?
16 A. I'm sure that I did, and I'm
17 sure that I probably sent it to pathology.
18 Q. Did you in that request a SEM
19 analysis?
20 A. No.
21 Q. Did you request any particular
22 analysis of those explanted meshes?
23 A. No, I did not.
24 Q. I take it you're not a

Page 148

1  pathologist?
2  A. No.
3  Q. And don't hold yourself out to
4  be an expert on pathology?
5  A. No.
6  Q. Same with you're not an
7  epidemiologist?
8  A. No, I'm not an epidemiologist.
9  Q. You're not a biomedical
10 engineer?
11 A. Not a bit.
12 Q. And you've never done a
13 comparison study of different mesh
14 designs?
15 A. No, I have not.
16 Q. And you don't hold yourself out
17 to be an expert in medical device design?
18     MS. KABBASH: Objection to form.
19 A. Not in the bench work of design,
20 but I think I have a handle on what seems
21 to work best for me and for other
22 physicians in the O.R. just based on
23 experience.
24 Q. But with regard to comparison of

Page 149

1  different designs, you don't have an
2  expertise on that?
3  A. Beyond my own surgical
4  experience, no.
5  Q. And you agree that would be
6  anecdotal experience, correct?
7      MS. KABBASH: Objection.
8  BY MR. AYLSTOCK:
9  Q. I mean, I guess you haven't done
10 a study on SUI. We've established that.
11 A. No, but the problem I have with
12 anecdotal would mean that there's a total
13 absence of any ergonomic literature
14 suggesting that one handle might be better
15 than another, and I'm not sure I could say
16 that. So I'd say that my migration to
17 certain products over my career probably
18 involves as much how I can handle the
19 device as what data may be out there
20 supporting a superior design or ergonomics
21 that agrees with what I'm feeling.
22 Q. So it's based upon your clinical
23 experience in treating particular
24 patients, correct?

Page 150

1    MS. KABBASH:  Objection.
2    A.   Supplemented with what I may be
3 exposed to at the time regarding design
4 advantages, et cetera.
5    Q.   In your opinion, should a
6 medical device company inform physicians
7 about potential complications associated
8 with its medical device?
9    A.   Yes.
10   Q.   And would you agree with me that
11 one of the ways to do that is through the
12 IFU for the medical device?
13   A.   Yes.
14   Q.   If you go to page 5 of your
15 report.  There's some information about
16 your payment at the time of a preceptor.
17       Do you see that?
18   A.   Yes.
19   Q.   And you list, you state that you
20 believe that Ethicon reimbursed you about
21 $50,000 for those -- for that time; is
22 that correct?
23   A.   Yes.
24       MS. KABBASH:  I apologize.  What

Page 151

1 page are we on?
2        MR. AYLSTOCK:  Page 5.
3        MS. KABBASH:  Thank you.
4 BY MR. AYLSTOCK:
5    Q.   Have you confirmed that, or is
6 that just your best estimate?
7    A.   That is -- I actually thought
8 that number was less, but apparently I
9 guess working for -- as a proctor or
10 preceptor for many years ago, it did total
11 that amount.  That number was actually
12 based on records from Ethicon.
13   Q.   Did you look at those records?
14   A.   No.  But I can recall that
15 standard rates for teaching somebody for
16 half-day or a full day were about either
17 $500 for a half-day and a thousand for a
18 full day, and if I acted as a preceptor
19 for a cadaver course, I think there was a
20 higher fee for that.  Those were pretty
21 standard rates.
22   Q.   Did they pay for your travel to
23 these courses?
24   A.   They probably would if I asked

Page 152

1 them, but I kind of just paid for my own
2 travel.
3    Q.   Did you receive any honoraria
4 from them?
5    A.   I'm probably misunderstanding
6 the question because I thought that's what
7 that was.  That five hundred or a
8 thousand, does that not qualify as an
9 honoraria?  I don't know.  I got paid.
10   Q.   You got paid for it, okay.
11       And I take it you've also got
12 paid by Wyeth and GlaxoSmithKline and all
13 of those other companies for your work for
14 them, correct?
15   A.   I got flat fees for giving
16 talks.  It was pretty much for the medical
17 aspect of that consulting.  It wasn't
18 any -- with the exception of Covidien, it
19 wasn't any involved with the company, per
20 se.  It was just flat fee.  I was on their
21 speaker panels, give talks.
22   Q.   And you're still on various
23 speaker panels and so forth, correct?
24   A.   I don't think so.  I think they

Page 153

1 outlawed those.  At least my hospital did.
2 You can't be on a speaker panel as of
3 about four years ago.
4    Q.   You're still being paid for
5 doing things for medical device and
6 pharmaceutical companies, correct?
7    A.   That is correct.
8    Q.   In addition to what you're doing
9 in this case for Ethicon, correct?
10   A.   Correct.
11   Q.   You mentioned some things you
12 reviewed, and that includes some
13 procedural videos.
14       Do you see that?
15   A.   You're down at the bottom of
16 that page?
17   Q.   Right in the middle "Materials
18 Reviewed."
19   A.   Yes.
20   Q.   What procedural videos did you
21 review?
22   A.   I had a TVT -- I had several TVT
23 videos -- "video" is a bad term.  I'm
24 probably dating myself.  Disks.  They

Page 162

1 track record.
2  Q. Okay. And the TVT Retropubic is
3 a midurethral sling, correct?
4  A. Correct.
5  Q. Are the other TVT products also
6 midurethral slings, or are there
7 differences?
8  A. Yes, they all are.
9  Q. Do you know whether Dr.
10 Ulmsten's, the type of product Dr. Ulmsten
11 used that then was followed up by Dr.
12 Nilsson was a TVT laser-cut or a TVT
13 mechanical-cut?
14  A. I always made the assumption it
15 was mechanical-cut. I thought a laser-cut
16 came along later, but I could be wrong on
17 that.
18  Q. You don't know as you sit here
19 today?
20  A. I don't know with a hundred
21 percent certainty, no.
22  Q. And with regard to the studies
23 you referenced that support the TVT
24 Retropubic device, do you know how many of

Page 163

1 them involved TVT mechanical-cut versus
2 TVT laser-cut?
3  A. No.
4  Q. Are you familiar with -- well, I
5 guess you've never actually implanted a
6 TVT laser-cut -- TVT Retropubic laser-cut,
7 to your knowledge, correct?
8   MS. KABBASH: Objection to form.
9  A. I actually don't know that. I
10 consider those slings interchangeable. I
11 know I've implanted the mechanical-cut,
12 but as far as I'm aware, I could have
13 easily implanted a laser-cut mesh. It
14 would have been the same to me.
15  Q. You wouldn't know the difference
16 if you held it?
17  A. I mean, if I really carefully
18 pulled on it and tugged on it and tried to
19 wreck it, I'd see the difference, but I'm
20 not trying to pull and tug it and wreck it
21 before I put it in. So to me they're
22 interchangeable.
23  Q. So you don't know the
24 biomechanical properties of each and

Page 164

1 whether they're the same or different?
2   MS. KABBASH: Objection to form.
3  A. To my mind, they're clinically
4 the same.
5  Q. Do you know whether or not the
6 TVT laser-cut is stiffer mesh than the TVT
7 mechanical-cut?
8  A. Again, I come back to clinically
9 to me, it makes no difference to me
10 whether it's laser-cut or mechanical-cut.
11  Q. You say clinically, but you
12 don't know as we sit here today whether
13 you've actually ever implanted a TVT
14 laser-cut retropubic, correct?
15   MS. KABBASH: Objection to form.
16  A. That is true. But it's not a
17 characteristic that I would ever insist
18 upon, and so I could have implanted
19 multiple laser-cuts. I'd actually have to
20 check the requisition office in our
21 hospital and in my other hospital to see
22 what they ordered. But I do know that I
23 have used the mechanical-cut mesh.
24  Q. And the reason you don't know

Page 165

1 the difference is because Ethicon never
2 explained to you as a doctor implanting
3 800 TVT Retropubic devices what the
4 reasonable differences are between the
5 laser-cut mesh and the mechanical-cut mesh
6 in the TVT-R, correct?
7   MS. KABBASH: Objection to form.
8  A. Actually, that's not exactly
9 true because I had a long discussions with
10 my rep regarding laser-cut with the TVT
11 Secur. So I was actually familiar with
12 the laser-cut and what it looked like.
13 And so, and I also know that if you put
14 excessive force on the mechanical-cut, it
15 looks different than if you put excessive
16 force on the laser-cut. I just don't
17 think that it has any clinical relevance
18 to me as the implanting surgeon on a
19 standard tension-free tape. I'm not
20 putting -- if I'm putting excessive force
21 on that tape and deforming it, then I'm
22 doing it wrong. It's not the tape, it's
23 the doctor.
24  Q. Okay. So you've observed in

Page 166

1 your experience with the TVT devices that
2 when you pull on the mechanical-cut mesh,
3 it has more deformation of the pores than
4 if you pull on mechanical-cut mesh, fair?
5      MS. KABBASH:  Bryan, in
6   fairness, I think you misstated a
7   word.  You might want to --
8      MR. AYLSTOCK:  I'll try again.
9   Thank you.
10     MS. KABBASH:  You're welcome.
11 BY MR. AYLSTOCK:
12   Q.   In your prior answer, you had
13 indicated that when you're putting force
14 on the mechanical-cut mesh to a certain
15 extent, it behaves differently than the
16 same amount of force on a laser-cut mesh,
17 correct?
18   A.   Yes.
19   Q.   And can you describe the
20 differences, please, as you've observed in
21 your clinical practice?
22   A.   What I've seen actually is two
23 observations.  One is if I'm teaching
24 somebody and they put way too much tension

Page 167

1 on the mesh, it tends to rope or band
2 maybe and not lie flat.  And in that
3 setting, you can also get some
4 irregularity of the edges.  And that's
5 clearly a tape that's been inappropriately
6 placed.
7      The other time that I've noticed
8 the properties of laser-cut versus
9 mechanical-cut is when I'm removing the
10 mesh that I don't like how it's been
11 placed.  I found that if I pulled out a
12 laser-cut TVT Secur, that it would
13 maintain its shape a lot better than if I
14 was tugging on mechanical-cut mesh in the
15 process of removing it.  I could never
16 really use that mesh again.  I'd have to
17 get a new product out of the box because
18 the process of extra tension had deformed
19 it.
20     But it wasn't -- basically from
21 a properly placed mesh to me, it makes no
22 difference to me whether it's
23 mechanical-cut or laser-cut.
24   Q.   Did you see when that force was

Page 168

1 applied to the mechanical-cut evidence of
2 fraying of the mesh?  Could you see that?
3 Could you see the fraying of the mesh if
4 the mechanical-cut was pulled?
5   A.   You could see irregularity in
6 the mesh.  I guess you would call that
7 fraying.  I just always thought of it as
8 an irregularity.  The edges were jagged if
9 you applied too much tension to it.
10   Q.   Like a barbed wire effect?
11     MS. KABBASH:  Objection.
12   A.   It would have -- it would
13 have -- I would describe not barbed wire.
14 As more like looking at a mountain range,
15 where you have the peaks and valleys of
16 the mountains.
17   Q.   A jagged edge?
18   A.   Yeah, like that.
19   Q.   Now, did you see evidence of
20 particle loss, or particles?
21   A.   Occasionally I would see -- my
22 clamp that I'm using to tug on the mesh
23 for whatever reason could rip the mesh,
24 tear the mesh, there might be a little

Page 169

1 particle here or there.
2   Q.   You mentioned the need to make
3 sure the mesh was lying flat under the
4 urethra?
5   A.   And without tension.
6   Q.   Why is it important that that
7 mesh be laid flat?
8   A.   I think there's two answers to
9 that question.  The first is that it
10 provides a slightly broader base of
11 support rather than a very narrow base of
12 support.
13     But the other answer to that
14 question, the reason it's important is
15 because if it's not lying like that,
16 somebody's over-tensioning it.
17   Q.   Okay.  Now, you agree that when
18 implanting a TVT device, really any of the
19 TVT family of products, but certainly the
20 TVT Retropubic, that it's a blind passage,
21 correct?
22   A.   Yes, it is.
23   Q.   And you as a physician can't
24 visualize that mesh lying under the

Page 178

1  A. Came in a flat sheet.
2      MR. AYLSTOCK: Objection to
3  form.
4  BY MS. KABBASH:
5  Q. Earlier plaintiff's counsel was
6  asking you about particular articles going
7  through your reliance list and you made a
8  statement something to the effect that "I
9  don't consider any particular article to
10 be authoritative."
11     Do you remember saying that?
12 A. Yes.
13 Q. What did you mean when you said
14 that?
15 A. That there's no one forever
16 unimpeachable authority really in anything
17 we do in medicine. There's no book
18 chapter. There's no article. There's no
19 opinion piece. There's no authority in
20 medicine that is unimpeachable.
21 Q. Your expert report on the TVT
22 products cites a lot of medical
23 literature, correct?
24 A. It does.

Page 179

1      MR. AYLSTOCK: Objection to
2  form.
3  BY MS. KABBASH:
4  Q. In stating your opinions or
5  formulating your opinions on TVT
6  Retropubic, did you rely on any one
7  article to the exclusion of others?
8  A. No.
9  Q. Were you relying on the body of
10 medical literature that has evolved on TVT
11 slings over time?
12 A. Yes.
13 Q. You were asked several questions
14 about a TVT IFU that was marked as
15 Exhibit 9. Can you pull that out? And I
16 think if you turn to page 5 of the IFU
17 that's where are listed several potential
18 adverse reactions that counsel was asking
19 you about.
20     Is that right?
21 A. Yes.
22 Q. And counsel asked you a series
23 of questions about whether certain risks
24 could be caused by TVT and if they could

Page 180

1  happen in the absence of doctor error.
2      Do you recall that line of
3  questioning?
4  A. Yes.
5  Q. One of the risks that you were
6  asked about was acute or chronic pain.
7      Do you recall that?
8  A. Yes.
9  Q. Is acute or chronic pain a
10 potential risk of any pelvic surgery?
11 A. Yes.
12 Q. Is it a potential risk of any
13 surgery to treat SUI irrespective of the
14 use of mesh?
15 A. Yes.
16 Q. You were also asked about the
17 potential risk of pain with intercourse
18 that may not resolve.
19     Do you recall that?
20 A. I do.
21 Q. Is that a potential risk of any
22 pelvic surgery?
23 A. Yes.
24 Q. Is it a potential risk of any

Page 181

1  surgery to treat SUI irrespective of the
2  use of mesh?
3  A. Yes.
4  Q. In other words, it's a potential
5  risk of SUI surgery that does not use mesh
6  also?
7      MR. AYLSTOCK: Objection to
8  form.
9  BY MS. KABBASH:
10 Q. Correct?
11 A. Correct.
12 Q. You were also asked about the
13 potential risk of voiding dysfunction.
14     Is voiding dysfunction a risk of
15 any pelvic surgery?
16 A. It's a risk of any pelvic
17 surgery, particularly those that are
18 involved with treating incontinence.
19 Q. Okay. Is voiding dysfunction a
20 potential risk of any surgery to treat SUI
21 that does not involve mesh?
22 A. Yes.
23 Q. You were also asked about
24 neuromuscular problems or pain.

Page 182

1  Do you recall that?
2  A. Yes.
3  Q. Is neuromuscular problems or
4  pain a potential risk of any surgery to
5  treat SUI that does not involve mesh?
6  A. Yes.
7  Q. You were asked about bleeding
8  including hemorrhage or hematoma.
9  Do you recall that?
10  A. Yes.
11  Q. Is that a potential risk of any
12  surgery to treat SUI that does not involve
13  mesh?
14  A. Yes.
15  Q. You were asked about the
16  potential risk that repeat surgeries may
17  be required.
18  Do you recall that?
19  A. I do.
20  Q. Is that a potential risk of
21  surgery to treat SUI that does not involve
22  mesh?
23  A. Yes.
24  Q. You were also asked about the

Page 183

1  potential risks of seroma, urge
2  incontinence, frequency and atypical
3  vaginal discharge.
4  Do you recall that?
5  A. Yes.
6  Q. Are all those potential risks of
7  surgery to treat SUI that do not involve
8  mesh?
9  MR. AYLSTOCK: Objection to
10  form.
11  A. Yes.
12  Q. You were asked earlier today
13  when was the last TVT Retropubic device
14  that you performed.
15  Do you recall that?
16  A. Yes.
17  Q. You currently use the TVT-Exact;
18  is that right?
19  A. Correct.
20  MR. AYLSTOCK: Objection to
21  form.
22  BY MS. KABBASH:
23  Q. Is the TVT-Exact similar to the
24  TVT original Retropubic?

Page 184

1  MR. AYLSTOCK: Objection to
2  form.
3  A. Yes.
4  Q. You previously described some of
5  the things that you liked about the
6  TVT-Exact, but is the --
7  MS. KABBASH: Strike that.
8  Q. Is the TVT-Exact a retropubic
9  approach to placement of a midurethral
10  sling?
11  A. Yes.
12  Q. Are the trocars, though they may
13  be a bit narrower, are they the same shape
14  as the trocars for the TVT Retropubic
15  sling?
16  MR. AYLSTOCK: Objection to
17  form.
18  A. Yes.
19  Q. Is the knit of the mesh in the
20  TVT-Exact the same knit as in the TVT
21  Retropubic sling?
22  A. Yes.
23  Q. You were asked earlier today
24  about whether you are a biomaterials

Page 185

1  engineer.
2  Do you recall that?
3  A. Yes.
4  Q. Have you studied, both in your
5  career and in preparing your expert
6  report, how the Prolene mesh in TVT has
7  performed after being implanted in women?
8  MR. AYLSTOCK: Objection to
9  form.
10  A. I've watched how it's performed
11  not only in my patients, but also how it's
12  performed through the vast years of
13  medical literature and studies have been
14  done on it.
15  Q. And is a lot of the medical
16  literature that you have studied in that
17  regard cited in your expert report?
18  MR. AYLSTOCK: Objection to
19  form.
20  A. Yes.
21  Q. How important is the clinical
22  literature, the medical literature as a
23  basis of your opinions about the safety of
24  the use of the TVT implant?

Page 186

1    MR. AYLSTOCK:  Objection to
2  form.
3    A.   How the mesh works in people and
4  how successful it is long-term and the
5  side effects long-term we measure
6  clinically in our reports to me is the
7  best evidence we have for safety and
8  efficacy.  We want to know how it actually
9  works in people and we want to know as
10 much as we can about that.
11   Q.   And is that why you've cited
12 that medical literature in your report?
13   A.   Yeah, the medical literature I
14 have in my report includes a tremendous
15 amount of clinical data on real life
16 people having real life mesh placed to
17 treat incontinence over many years.
18   Q.   If you turn to your report's
19 opinion number 2, which is towards the end
20 on page 52.
21       You have that?
22   A.   I think I do have it.
23   Q.   Opinion 2 says: "The benefits
24 of these products far outweigh their risks

Page 187

1  in properly selected surgical candidates
2  based on their performance in thousands of
3  women.  As reflected in the medical
4  literature as well as my experience, they
5  are not defectively designed."
6       Do you see that?
7    A.   I do.
8    Q.   With respect to the TVT
9  Retropubic, does that continue to be your
10 opinion?
11   A.   Yes.
12   Q.   And do you hold that opinion to
13 a reasonable degree of medical certainty?
14   A.   Yes.
15   Q.   Is your opinion that the mesh in
16 TVT is not defectively designed based on
17 your review of the medical literature, as
18 well as your experience?
19   A.   Yes, as well as my interaction
20 with colleagues and opinions of surgeons
21 that I respect.  It's the entire body of
22 evidence in our urogynecologic community.
23   Q.   If you turn to opinion number 8,
24 which is on the last page of your report.

Page 188

1  It says: "The possible risks of the TVT
2  family of products are appropriately
3  described in their instructions for use,
4  the patient brochures for the TVT family
5  of products, and in Ethicon's professional
6  education materials."
7       Do you see that?
8    A.   Yes.
9    Q.   What are the sources of
10 information that --
11   MS. KABBASH:  Well, first of
12 all, strike that.
13   Q.   Do you continue to hold that
14 opinion today?
15   A.   Yes.
16   Q.   Do you hold that opinion to a
17 reasonable degree of medical certainty?
18   A.   Yes.
19   Q.   And on what sources of
20 information do you base that opinion?
21   A.   I base it on pretty much the
22 same thing.  I base it on my training, my
23 experience, my interaction teaching
24 residents and fellows, interacting with

Page 189

1  other urogynecologists, the medical
2  literature, the extent of the medical
3  literature, the quality of the data, and
4  the quality of data that's presented at
5  national meetings and -- that I've
6  attended and read summaries of.
7    Q.   And have you assessed the
8  warnings of adverse reactions section of
9  the TVT IFU in relation to all those
10 sources of information that you just
11 mentioned right now?
12   A.   Yes, I have.
13   Q.   Do you recall if you used the
14 TVT Retropubic, the original, up until the
15 time that TVT-Exact came out on the
16 market?
17      In other words, I know that you
18 testified that you used TVT Secur, but
19 were there some patients in which you
20 would use TVT Retropubic up until the time
21 that Exact came out on the market?
22   A.   Typically, if they had failed a
23 mini sling, such as the Secur or there was
24 an Adjust, which is another mini sling

Page 198
1 at the time we came in here?
2         MS. KABBASH: Objection.
3    A.   I knew the mesh I put in. I
4 didn't know the pore size of the -- I was
5 incorrect in stating -- in thinking and
6 alluding to the fact that the Gynemesh PS
7 had the same pore size as the TVT. I was
8 under that impression, and counsel
9 corrected me, that it was actually the
10 same as the Prolift pore size.
11         MR. AYLSTOCK: Thank you.
12         Thank you, Maha. I appreciate
13 that.
14         (Deposition adjourned at 12:45 p.m.)

Page 200
1           E R R A T A
2 PAGE / LINE / CHANGE  /  REASON
3 _____
4 _____
5 _____
6 _____
7 _____
(lines 8–24 blank signature lines)

Page 199
1         A C K N O W L E D G M E N T
2
3 STATE OF         )
4                  :ss
5 COUNTY OF        )
6
7      I, JOHN WAGNER, M.D., hereby
8 certify that I have read the transcript of
9 my testimony taken under oath in my
10 deposition of March 13, 2017; that the
11 transcript is a true and complete record
12 of my testimony, and that the answers on
13 the record as given by me are true and
14 correct.
15
16
17     _____
             JOHN WAGNER, M.D.
18
19 Signed and subscribed to before me this
20 _____ day of _____, 2017.
21
22 _____
23 Notary Public, State of
24

Page 201
1           C E R T I F I C A T E
2 STATE OF NEW YORK
3 COUNTY OF NEW YORK
4
5      I, Marie Foley, RMR, CRR, a
6 Certified Realtime Reporter and Notary
7 Public within and for the State of New
8 York, do hereby certify:
9      THAT JOHN WAGNER, M.D., the
10 witness whose deposition is hereinbefore
11 set forth, was duly sworn by me and that
12 such deposition is a true record of the
13 testimony given by the witness.
14      I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I am
17 in no way interested in the outcome of
18 this matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 17th day of
21 March, 2017.
22
23      _____
24         MARIE FOLEY, RMR, CRR