# EXHIBIT D

John R. Wagner, M.D.

```
 1              UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF WEST VIRGINIA
 3                      AT CHARLESTON
 4       -------------------------------:
         IN RE ETHICON, INC., PELVIC    :
 5       REPAIR SYSTEM PRODUCTS         : MASTER FILE
         LIABILITY LITIGATION           : No. 2:12-MD-02327
 6       _____:
         THIS DOCUMENT RELATES TO ALL   : MDL 2327
 7       WAVE 6 AND SUBSEQUENT WAVE     : JOSEPH R. GOODWIN
         CASES AND PLAINTIFFS:          : US DISTRICT JUDGE
 8                                      :
         Sylvia Davis                   :
 9       Case No. 2:13-cv-00574         :
         Laurine Goulette               :
10       Case No. 2:13-cv-01776         :
         Theresa Wilson                 :
11       Case No. 2:13-cv-00823         :
         -------------------------------
12
                       September 25, 2017
13
14              Deposition of JOHN R. WAGNER, M.D.,
15       held at Marriott Melville, 1350 Old Walt
16       Whitman Road, Melville, New York,
17       commencing at 8:30 a.m., on the above
18       date, before Marie Foley, a Registered
19       Merit Reporter, Certified Realtime
20       Reporter and Notary Public.
21                         - - -
22                GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
24                   Deps@golkow.com
```

Page 14

1  to cite the articles that you did?
2  A. I decided to cite the articles
3  that I felt best represented the opinion I
4  was trying to make at that point in the
5  report.
6  Q. And in terms of gathering the
7  articles that you reviewed and relied on
8  for your report, what was your process for
9  that?
10  A. My process was to look at the
11  articles that I maintained myself. Most
12  of the articles that I maintain, with a
13  few exceptions, are from the American
14  Journal of Obstetrics and Gynecology, the
15  OB-GYN Green Journal, the Journal of
16  Minimally Invasive Gynecology, the Journal
17  of Female Pelvic Medicine and Surgery, and
18  then I have a few articles that I maintain
19  in my library that I've secured from more
20  international journals.
21  And then beyond that was added
22  by counsel and providing more
23  international journal citations that would
24  support the opinions that I was setting

Page 15

1  forth.
2  Q. Did counsel provide you any
3  journals that didn't support the opinions
4  you set forth in the report?
5  A. There were citations from, let's
6  say, Clave talking about mesh properties
7  that comes from the international journal
8  that don't support the opinions that I put
9  forth. There was citations from Otto in
10  2003 that don't support the opinions that
11  I put forth. But I also provided opinions
12  from other sources and citations to refute
13  those studies.
14  So yes, I was provided with
15  studies that don't support my opinions
16  necessarily, and I actually have some
17  articles, particularly from Cheryl
18  Iglesias, in my own library that don't
19  necessarily support the opinions that I
20  put forth here.
21  Q. So, in terms of writing your
22  report and forming your opinions, did you
23  ever go out and try to find the materials
24  and literature out there that didn't

Page 16

1  support the opinions that you're offering
2  in this case, as well as find materials
3  that did support the opinions?
4  A. I think in my --
5  MS. KABBASH: Objection to form.
6  A. I think in my role as a pelvic
7  surgeon, I'm always looking to read
8  anything that I can about the subject, and
9  sometimes those articles, particularly if
10  they're good quality, will change my
11  opinion one way or the other. So as a
12  function of what I do, I'm always looking
13  for more information and more up-to-date
14  information and the highest quality data
15  that I can get to -- to do the best job
16  that I could do in terms of clinically
17  treating my patients.
18  Q. So, in terms of materials that
19  didn't support some of the opinions that
20  you're offering in this case, you
21  specifically mentioned the Clave study,
22  right?
23  A. Yes, I did.
24  Q. So you'd agree with me that

Page 17

1  there are articles out there in the
2  peer-reviewed literature that do not
3  support your opinion that polypropylene
4  mesh does not degrade, correct?
5  A. I think that article is one.
6  I'm not sure that I would agree with the
7  concept that there's articles. Certainly
8  there's not an abundance. I think the
9  vast majority of peer-reviewed literature,
10  particularly from the major medical
11  journals, as well as the opinions from
12  major medical societies like AUGS and
13  SUFU, don't agree with Clave and his
14  conclusions. So, I think there's a vast
15  amount of literature that doesn't support
16  his opinions, and it's a vast amount of
17  opinion from medical societies that I
18  subscribe to and respect that don't
19  support his opinions.
20  Q. And one of the other articles
21  that you mentioned is the Iglesias
22  article, correct?
23  A. Yeah. I don't know if I can
24  quote an article on her, but I have some

Page 30

1  you didn't go back afterwards and review
2  Dr. Barbolt's deposition to see who Dr.
3  Barbolt was and what he testified about?
4     A.   What I testified about or what
5  he testified?
6     Q.   No, what Dr. Barbolt testified
7  about.
8     A.   I don't recall doing that.
9     Q.   Okay. Are you aware of whether
10 or not Dr. Barbolt was in fact a company
11 designated witness, a person who was
12 designated to testify on behalf of the
13 company regarding certain matters?
14    A.   I don't recall. If I ever was
15 aware, I don't remember it.
16    Q.   Doctor, I'm going to hand you
17 what's been marked as Exhibit Number 4 to
18 your deposition.
19        (Wagner Exhibit 4, Curriculum
20    Vitae of John R. Wagner, M.D., was
21    marked for identification, as of this
22    date.)
23 BY MR. FAES:
24    Q.   That's just your CV, right?

Page 31

1     A.   Correct.
2     Q.   Have there been any changes to
3  the CV since your last deposition in March
4  of this year?
5     A.   I don't think so.
6     Q.   Is the typo still in there?
7     A.   It probably is.
8     Q.   Now, Doctor, you've actually
9  published an abstract or article on the
10 Gynemesh PS mesh in the past, right?
11    A.   I have.
12    Q.   And you know that the Gynemesh
13 PS mesh is the same mesh that's used in
14 the Prolift device, right?
15    A.   Correct.
16        Although I should correct my
17 previous answer because you said
18 "published." I don't think I published
19 it. It was presented at an ACOG meeting
20 in 2006, I think.
21    Q.   And in that presentation of the
22 study that you did on 33 Gynemesh PS
23 patients, you followed those patients for
24 up to one year, right?

Page 32

1     A.   Yes. I have to go back and look
2  exactly, but that's my recollection is
3  about that time frame.
4     Q.   Did you follow those patients
5  beyond that time?
6     A.   I'm certain that I did because
7  they were my patients. I don't think they
8  were really patients that were referred to
9  me at the time and I'm certain that I did,
10 but I did not follow them in an organized
11 manner. I did not continue the study
12 beyond that period.
13    Q.   At that one-year follow-up, you
14 found that 8 of the 33 patients, or 15
15 percent, had an erosion or extrusion of
16 mesh of some kind during that follow-up,
17 right?
18    A.   Yes, that number seems correct
19 to me.
20    Q.   Just in case you need to refer
21 to it, I'm going to mark that article as
22 Exhibit Number 7 to your deposition.
23        (Wagner Exhibit 7, April 2006
24    Wagner article "Vaginal Repair of

Page 33

1     Symptomatic Pelvic Organ Prolapse
2     Using Polypropylene Mesh, was marked
3     for identification, as of this date.)
4  BY MR. FAES:
5     Q.   Doctor, do you intend to offer
6  any opinions in this case on what you feel
7  the overall erosion, extrusion, and
8  exposure rate of the Prolift mesh is in
9  patients?
10    A.   I think that I can offer an
11 opinion based on my experience over the
12 last 12 years, as well as the reported
13 experience from others in the
14 peer-reviewed literature.
15    Q.   And what is the opinion that you
16 intend to offer?
17    A.   That the mesh erosion rate, and
18 I'm going to include every type of visible
19 mesh in that heading, is probably on the
20 order of about 2 to 5 percent in general.
21 And there's variation in that based on, I
22 think, in my opinion, surgical experience
23 and variation in that as procedures have
24 been modified over the years.

Page 82

1  BY MR. FAES:
2    Q.   Doctor, we're back on the record
3  after a short break.
4         Are you ready to proceed?
5    A.   I am.
6    Q.   So, Doctor, on page 34 of your
7  report, you list a known body of potential
8  risk and adverse events that are common to
9  all forms of surgical treatment of
10 prolapse.  As you stated, and transvaginal
11 mesh is no exception.
12        Are you on that page?
13   A.   Yes, I am.
14   Q.   So, you list a litany of risks
15 and then you state that:  "These risks of
16 prolapse surgery are widely known by
17 surgeons based on their training and based
18 on the fact that they are reported in the
19 published medical literature."
20        Do you see that?
21   A.   I do.
22   Q.   Is that an opinion that you
23 intend to offer in this case?
24   A.   Yes.

Page 83

1    Q.   So, is your opinion that these
2  risks are widely known by surgeons at all
3  times during the marketing of the Prolift
4  between 2005 and 2012?
5    A.   Yes, and again we're talking
6  about pelvic reconstructive surgeons,
7  surgeons who do this type of surgery, yes.
8    Q.   Have you done any kind of study
9  or analysis to determine what percentage
10 of pelvic floor surgeons did in fact know
11 of all these risks between 2005 and 2012?
12   A.   That's a funny question because
13 it's an inherent part of the training.  I
14 mean, if you look at the surgical training
15 that we receive as residents and then as
16 fellows, people that do this type of
17 surgery, this is part of the training.
18 It's in the textbooks.  It's in, you know,
19 Te Linde's Operative Gynecology.  The
20 complication rates, wound healing, these
21 are all subjects that are part of normal
22 surgical training.  It's in Danforth's
23 books on operative gynecology.  So it's
24 part of our board questions.  It's part of

Page 84

1  our -- it's part of what we're tested on.
2         So, to have a study on something
3  that's supposed to be inherent to what you
4  know, so you're asking sort of the
5  question -- is the question is there
6  post-marketing surveillance on whether the
7  pelvic reconstructive surgeons have
8  learned what they're supposed to have
9  learned?  Is that what the question is, in
10 a way?
11   Q.   Well, my question is have you
12 ever done any kind of study or analysis to
13 determine what percentage of pelvic floor
14 surgeons did in fact know of all these
15 risks in, say, 2012?
16   A.   Again, that's such a funny
17 question.
18        No, I've never done a study that
19 looks at whether the pelvic floor surgeons
20 learned what they were supposed to learn
21 about pelvic floor surgery.  It just
22 doesn't make sense to me, that question.
23   Q.   So, when you say that they are
24 widely known by surgeons, is it your

Page 85

1  opinion that 100 percent of pelvic floor
2  surgeons know of all these risks, or not?
3         MS. KABBASH:  Objection.
4    A.   I would like to think that my
5  field is perfect, but I'm sure it's like
6  every other field.  There's probably not
7  competent people in my field, just like
8  there's not competent lawyers and not
9  competent firemen and not competent cops.
10 But what you're asking is part of our
11 inherent training, and so if I -- if I
12 could assert the word "competent" and
13 "well-trained," then yes, the answer would
14 be 100 percent.
15   Q.   So, it's your opinion that if a
16 physician in a particular case testified
17 that he didn't know of one or more of
18 these risks when he implanted the Prolift
19 that that physician wasn't competent?
20        MS. KABBASH:  Objection.
21   A.   I'm not sure what risk you're
22 referring to because our initial
23 discussion was talking about general risks
24 of vaginal surgery.  So if we're --

Page 86

1  Q.  I'm referring to any of the
2  risks that you have listed in paragraph 1
3  of page 34 of your report.
4  A.  Yes, I think that a pelvic
5  surgeon who does pelvic reconstructive
6  surgery realizes that that list of things
7  that I laid out there are potential
8  complications of pelvic repair surgery
9  with or without using mesh.  And I would
10 be surprised, and maybe I'm thinking too
11 highly of my own field, that if a board
12 certified urogynecologist in pelvic
13 reconstructive surgery didn't know those
14 things, I would certainly be disappointed.
15 Q.  But my question is specifically
16 if a pelvic floor surgeon testified that
17 prior to implanting the Prolift that he
18 didn't know one or more of these risks,
19 would it be your opinion that that
20 physician wasn't competent because he
21 didn't know one or more of these risks?
22     MS. KABBASH:  Objection.
23 A.  Again, I just go back to my
24 previous answer.  I think these are

Page 87

1  general risks that are well-known and I
2  would be surprised.
3      I think competency comes into
4  passing your boards, taking your tests,
5  being approved.  Competency is something
6  judged by the board, the American boards,
7  as well as the individual hospitals and
8  their credentialing.  But I would be
9  surprised if a board certified pelvic
10 surgeon didn't know those things.
11 Q.  Could a reasonable pelvic floor
12 surgeon not know of one of these risks
13 prior to implanting the Prolift?
14     MS. KABBASH:  Objection.
15 A.  I think these are
16 straightforward risks.
17     Again, I would be surprised.  I
18 mean, if you listed ten things and one
19 surgeon somewhere said "I didn't know
20 about urinary retention," I'd be like oh,
21 really? That's pretty common.  I'd be
22 surprised.  If he didn't know about nerve
23 damage, I'd be like really?  I'm
24 surprised.  Hematoma, I'd be like really?

Page 88

1  Any surgery causes hematoma.  I'd be
2  surprised.
3      I just -- I don't find this list
4  to be that hard.  So I would be surprised.
5  Q.  Have you made any kind of effort
6  to go out into the medical community or in
7  the literature and actually look at
8  surveys or studies of what physicians
9  actually did or didn't know of these risks
10 to see if your reaction of surprise is
11 justified or if there are in fact many
12 physicians who don't know all of these
13 risks?
14 A.  Again, if we're narrowing this
15 down to board certified, fellowship-trained
16 female pelvic reconstructive surgeons, I
17 had be surprised if they weren't familiar
18 with all of these complications with any
19 type of vaginal repair, be it mesh
20 augmented or not.
21 Q.  But you haven't specifically
22 studied that issue with regard to what
23 percentage of patients knew or didn't --
24     MR. FAES:  Strike that.

Page 89

1  Q.  You haven't specifically studied
2  the issue of what percentage of pelvic
3  floor surgeons did or didn't know of these
4  risks, say in 2005 when the Prolift was
5  launched?
6      MS. KABBASH:  Objection.
7  BY MR. FAES:
8  Q.  Correct?
9  A.  Well, I don't know of a
10 post-marketing surveillance study of
11 doctors.  By post-marketing, I mean like
12 I'm saying it almost in jest because it
13 would be post-marketing of their medical
14 training.  I just -- I don't know of -- I
15 don't know of any study, and I certainly
16 did not conduct a study to look at my
17 colleagues to see whether they understood
18 the basics of vaginal surgery.  I just --
19 it's a funny question, is my best answer.
20 Q.  Would you agree with me that
21 excessive contraction or shrinkage of the
22 tissue surrounding the mesh, vaginal
23 scarring, tightening, and/or shortening is
24 a potential adverse reaction of the

Page 98

1  have to list all 25 symptoms associated
2  with hematoma.
3     Q.   Well, you've offered the opinion
4  in this case that the IFU, the
5  professional education materials, and the
6  Prolift surgical guide, and the Prolift
7  surgeon's resource monograph --
8        MR. FAES:  Strike that.  It says
9     accurately, not adequately.
10    Q.   Would you agree with me that
11 scarring which results in implant
12 contraction is a potential adverse
13 reaction of the Prolift device?
14    A.   Yes.  And again I would quantify
15 that by saying that scarring that results
16 in contraction, with or without an
17 implant, can lead to significant problems.
18    Q.   Do you think that the fact that
19 there is an implant that actually
20 contracts within the scar presents unique
21 risks in a surgery involving transvaginal
22 mesh as opposed to one that doesn't?
23    A.   No, I don't think the -- the
24 implant is inert.  I don't think the

Page 99

1  implant contracts.  The scar tissue around
2  the implant can contract and cause
3  contracture that's abnormal, but the
4  implant itself is inert.  It doesn't
5  contract.
6     Q.   So you don't think that implant
7  contraction is a potential adverse
8  reaction of the Prolift mesh?
9     A.   No, that's not what I said.  I
10 said you can have contraction with an
11 implant in it, but the implant's inert.
12 It's not contracting.  The scar tissue
13 around it is contracting.  So you can have
14 scar contraction with an implant as a
15 complication, but it's not the fault of
16 the implant.  It's the scarring.
17    Q.   Doctor, on page 30 of your
18 report you state that you believe that
19 there's no credible body of evidence
20 published in the medical literature
21 that --
22       MR. FAES:  Strike that.  Let me
23    back up real quick.
24    Q.   On page 40 of your report you

Page 100

1  state that you believe that the documents,
2  the IFU, the professional education
3  materials, the Prolift surgical guide, and
4  the Prolift surgeon's resource monograph
5  accurately warn of the potential risk of
6  these devices; is that correct?
7     A.   Yes.
8     Q.   Is it your opinion in this case,
9  or are you offering an opinion in this
10 case that the IFU for the Prolift
11 adequately warns of the potential risk of
12 the device?
13    A.   Okay.  I have to give a two-part
14 answer to that.
15       First of all, as I read this, I
16 would have to expand this from the use of
17 these slings to include vaginal mesh
18 repairs because I think this was part
19 taken from my TVT expert report.  So I
20 would just amend that by adding vaginal
21 mesh repairs in there.
22       And adequate to me, again, I
23 think is a function of what the FDA and
24 the regulators want and what the company

Page 101

1  does to follow their guidelines.  I don't
2  determine adequacy in terms of the
3  documents.  I do think they're accurate,
4  but adequacy is determined by the
5  regulators, company, the FDA, the people
6  that are involved in regulating what
7  should be in an IFU or not.
8     Q.   So you'd agree with me that you
9  don't have the expertise necessary to
10 offer an opinion as to whether the
11 warnings in the IFU for the Prolift is
12 adequate, just whether they're accurate,
13 correct?
14       MS. KABBASH:  Objection.
15    A.   I think that I -- I can speak to
16 the fact that I think they accurately
17 reflect, in my opinion, basic surgical
18 risks involved with implanting the mesh
19 product.
20       But again I come back to the
21 definition of "adequate" is really based
22 on what the FDA, the regulators, and the
23 company decide is adequate.  I think that
24 the IFU for any product should certainly

Page 102

1  include risks that are known to occur with
2  that product, but what other risks might
3  be associated with it that might be common
4  knowledge in medical textbooks, amongst
5  surgeons, among the peer review
6  literature, that part of it I think is a
7  gray zone, and whether it's adequate to
8  include some of that or none of that to me
9  is a function of the regulators and the
10 company and the FDA.
11     Q.  Do you feel like you have an
12 expertise enough to offer an opinion as to
13 whether the warnings in the IFU for the
14 Prolift in this case are adequate?
15     A.  Again, I think they -- again,
16 adequacy is defined by other people, not
17 by me.  But I think from a clinical
18 perspective, I found that these warnings
19 accurately warned of the potential use,
20 the risk of the potential use of these
21 slings.  I think they were accurate and I
22 felt that they summarized the relevant
23 risk.  Whether it's adequate or not is a
24 function of the regulators.

Page 103

1     Q.  So, can you answer this question
2  for me yes or no:  Are you offering an
3  opinion to a reasonable degree of medical
4  certainty in this case that the warnings
5  in the instructions for use for the
6  Prolift IFU are adequate?
7     A.  Again, I have to have you define
8  "adequate" for me.
9         Are you talking about basically
10 do they meet the standards of the FDA?
11 Did the FDA and the regulators sign off on
12 them?  Because then they're adequate.
13        Do I think from a clinical
14 perspective that they were accurate and
15 summarize the relevant risk?  Yes, I do.
16 But adequate is a governmental, regulatory
17 decision.
18        Accurate and reasonable summary
19 of the relative risks is a clinical
20 decision that I can make based on my
21 clinical experience and review of the
22 literature, and I think that they
23 accurately reflected a reasonable summary
24 of the risks.

Page 104

1     Q.  Doctor, on page 30 of your
2  report you state that you don't believe
3  that there's any evidence that the Prolene
4  mesh is cytotoxic; is that correct?
5     A.  Yes.
6        MS. KABBASH:  I'm sorry, which
7  page, 38?
8        MR. FAES:  30.
9        THE WITNESS:  30.
10       MR. FAES:  I may have the page
11 wrong.  It's 29 into 30.  My
12 apologies.
13       So, I guess let me restate the
14 question.
15 BY MR. FAES:
16    Q.  You state on pages 29 and 30
17 that you disagree that the Gynemesh PS
18 mesh is cytotoxic?
19    A.  I disagree with plaintiff's
20 assertions that it is cytotoxic, yes.
21    Q.  Would you agree that one of the
22 potential effects of exposure to a
23 cytotoxic compound is necrotized tissue
24 rounding the mesh?

Page 105

1     A.  No, not necessarily because you
2  could have necrotized tissue from just
3  lack of blood flow, peripheral damage,
4  heat, from cautery, from intrinsic disease
5  such as diabetes.  That's why people lose
6  their limbs with diabetes, their legs,
7  their toes get necrotic.  So that's not
8  due to mesh.  You could have cell death
9  from a lot of sources that's not --
10    Q.  Yeah, I understand all that,
11 Doctor.  But my question is is that the
12 tissue turning necrotic is one clinical
13 way that exposure to a cytotoxic substance
14 can manifest itself, right?
15    A.  Well, to the exclusion of all
16 the other things that I just said that
17 could potentially be causes.  So if you
18 want to exclude every other known cause of
19 necrotic tissue and say have I effectively
20 excluded everything that could cause this
21 and then you're in proximity with
22 something, you have to assume that
23 potentially that could cause it.  But
24 again, just proximity doesn't -- doesn't

Page 106

1  prove anything and it's -- I don't know
2  how you -- I don't know how you'd study
3  the -- I don't know how you'd eliminate
4  all the other causes that could cause
5  necrotic tissue there.  So I think
6  clinically that statement is way too broad
7  to accept as blanket, yes.
8      Q.   Would you agree with me that
9  every time that you'd been asked as an
10 expert witness to examine the safety and
11 efficacy of a mesh device for the
12 treatment of pelvic organ prolapse or
13 stress urinary incontinence you found that
14 that device was safe and effective?
15      MS. KABBASH:  Objection.
16      A.   Could you repeat that question
17 again, or have her read that back?
18      MR. FAES:  I'll just restate it.
19 BY MR. FAES:
20      Q.   You'd agree that every time
21 you've looked at a mesh device for the
22 treatment of stress urinary incontinence
23 or pelvic organ prolapse as an expert
24 witness you've concluded that that device

Page 107

1  is safe and effective, correct?
2      A.   No.
3      Q.   In what case did you serve as an
4  expert witness where you found that a mesh
5  device was not safe and effective?
6      A.   I apologize because I
7  misinterpreted your question.
8      In an expert witness capacity,
9  the answer is "yes."
10     As a general rule, the answer is
11 "no."  There are some implants,
12 classically Gore-Tex was an implant that
13 we used late '80s, early '90s that was not
14 good to neighboring tissues.  It didn't
15 allow the appropriate ingrowth and
16 promoted infection and breakdown and
17 erosion.
18     So, there are some implants that
19 lend themselves to higher complication
20 rates.  But as an expert witness
21 testifying for the meshes that I've been
22 asked to render an opinion on legally, the
23 answer is "yes."
24     Q.   So you'd agree with me that at

Page 108

1  least the Gore-Tex mesh to you had a
2  complication profile that was unacceptable
3  to you, correct?
4      A.   Yes, especially for
5  sacrocolpopexies.
6      Q.   How high would the complication
7  rate need to be on the Prolift before you
8  decide that its complication rate was
9  unacceptable to you?
10     MS. KABBASH:  Objection.
11     A.   That's a almost -- there's no
12 rate here.  It's almost impossible to --
13 to put a number like that.  This isn't a
14 number -- this isn't a number thing.
15     I can tell you that the use of
16 Gore-Tex for sacrocolpopexies was
17 associated in the literature with higher
18 rates of complications than other
19 products, and we have good meta-analysis,
20 good long-term data, high levels of the
21 pyramid data showing complication rates
22 associated with Prolift, and I'm happy
23 with that complication profile, and I
24 think for the appropriate selected

Page 109

1  patients, it's an excellent procedure, and
2  it was an excellent procedure.
3      Q.   So, what objective standard are
4  you applying to determine that the Prolift
5  is safe and effective while concluding
6  that the Gore-Tex is not safe and
7  effective?
8      MS. KABBASH:  Objection.
9      A.   The objective standard is -- is
10 the objective standards that form my
11 medical opinions:  my training, my
12 surgical training, my surgical experience,
13 my teaching, my review of the literature,
14 my attendance at conference, my review of
15 cases presented at conference.  The body
16 of medical literature that exists out
17 there is my objective standard.  And then
18 as I said in my expert report, rating that
19 body of literature based on quality of
20 evidence is my objective standard.
21     Q.   So, in terms of complication
22 rate, you'd agree with me that there's no
23 numerical number of complications that you
24 can give me to where you'd feel that the

Page 110

1  Prolift device was not safe and effective,
2  right?
3       MS. KABBASH:  Objection.
4    A.   I think that there are -- it's
5  hard to separate the individual from the
6  procedure.  There were clinical situations
7  where native tissue repairs are
8  appropriate, where mesh repair is
9  appropriate vaginally, where an abdominal
10 mesh repair is appropriate, and I don't
11 think we're trying to pound all patients
12 through the same operation.  If there's a
13 surgeon doing only one operation, then I
14 don't think they're serving their patients
15 well.
16      You know, it's like -- and in
17 terms of complication rates, you know, we
18 give poisons to people who have cancer
19 because -- because the complication rate
20 of the cancer is much greater than the
21 complication rate of the poison we're
22 giving them.  So it's always a measure of
23 what you're treating them versus the
24 complication rate.  I wouldn't give

Page 111

1  somebody, you know, Cytoxan, which is a
2  poison, even if it did treat pelvic
3  prolapse because I have much lower risk --
4  lower risk treatments for that, but if
5  they have breast cancer, yeah, I'm going
6  to give them that otherwise the breast
7  cancer's going to kill them.
8       So, we're always relating what
9  we're treating people with to the
10 underlying disease process and we're
11 looking to benefit the patient overall.
12   Q.   Well, here we're talking about
13 pelvic organ prolapse and the Prolift.
14   A.   Right.
15   Q.   So, how high would the
16 complication rate need to be for a device
17 to treat pelvic organ prolapse before
18 you'd say this isn't acceptable to me,
19 it's not safe and effective?
20      MS. KABBASH:  Objection; asked
21   and answered.
22   A.   I agree.  I think I've answered
23 it.
24   Q.   So even if the complication rate

Page 112

1  were 100 percent, it could potentially be,
2  the Prolift could potentially be safe and
3  effective applying your standard?
4       MS. KABBASH:  Objection.
5    A.   Again, I think we're looking at
6  the published literature, the rates of
7  complications as we know it compared to
8  other procedures, including non-treatment
9  and analyzing the patient and her disease
10 process in light of all of that and
11 providing options.
12   Q.   And there's no numerical
13 standard that you can articulate as you
14 sit here today to where you would
15 determine the Prolift or a device like the
16 Prolift to not be safe and effective?
17   A.   I don't think of it as just a
18 numerical standard like that.
19      MS. KABBASH:  Objection.
20   A.   It's way too broad.  It's way
21 too -- it's clinically useless because
22 complications could be anything from, you
23 know, the most minor thing to
24 life-threatening.  So you can't even put a

Page 113

1  number on it 'cause complications could be
2  anything.  It's just not a credible --
3  it's not a realistic way to look at this.
4       MR. FAES:  I'd love to keep
5    debating, but I think I'm out of time.
6       MS. KABBASH:  Doctor, I just
7    have a few follow-ups for you.
8  EXAMINATION BY
9  MS. KABBASH:
10   Q.   If you could turn to page 45 of
11 your report.  It's actually the last page
12 with your signature.  And take a look at
13 opinion 8.
14      Do you have that, Doctor?
15   A.   I do.
16   Q.   You were asked several questions
17 earlier about whether it was your opinion
18 that the warnings and risk information
19 provided in the Prolift materials were
20 adequate.
21      Do you remember that line of
22 questioning?
23   A.   I do.
24   Q.   Okay.  Let me just read into the

Page 118

1  Q.  And you previously testified --
2      MS. KABBASH:  Strike that.
3  Q.  You were asked questions about a
4  mesh exposure rate with regard to the
5  Prolift, and I think that you offered the
6  range of 2 to 5 percent.
7      Do you recall that?
8  A.  I do.
9  Q.  What source were you, source or
10 sources, were you basing that on when you
11 offered that range?
12 A.  I think that's just my general
13 reading of the medical literature,
14 particularly the high quality literature.
15 And I also think it reflects a more
16 modern -- modern.  More recent studies
17 because I think that in general, and this
18 also correlates with my experience, as
19 surgeons get better doing vaginal mesh
20 repairs and develop techniques for doing
21 vaginal mesh repairs, our erosion rates
22 have decreased.  So there are erosion
23 rates in the literature that go up there,
24 they go up like 15, 18, 20 percent, in

Page 119

1  that range, but I think that overall it's
2  my reading of high quality medical
3  literature in conjunction with my
4  experience that an experienced pelvic
5  surgeon with experience with transvaginal
6  mesh probably has a significant erosion
7  rate of maybe 2 to 5 percent when dealing
8  with vaginal mesh repairs, not slings, but
9  vaginal mesh repairs.
10 Q.  In forming your opinions, did
11 you review and consider studies that
12 reported mesh exposure rates higher than 5
13 percent?
14 A.  Yes.
15 Q.  And here in your report on page
16 34, do you indicate that occurrence rates
17 of mesh exposure are typically under 18
18 percent?
19 A.  Yes.
20     MR. FAES:  Object to form.
21 BY MS. KABBASH:
22 Q.  If you look at page 35 in the
23 last sentence of the top paragraph, do you
24 discuss there what exposure rates are

Page 120

1  referenced in the Prolift surgeon's
2  resource monograph that was put forth by
3  Ethicon?
4  A.  Yes, I do.
5  Q.  And what exposure rates are
6  provided in that monograph?
7  A.  Between 3 and 17 percent.
8  Q.  And in forming your opinions
9  about the safety and efficacy of Prolift,
10 Dr. Wagner, did you take into
11 consideration studies that report exposure
12 rates higher than the 2 to 5 percent that
13 you discussed before?
14 A.  Yes.
15 Q.  If you turn to page 12 of your
16 report.
17     You were asked some questions
18 earlier about the weight of Gynemesh PS
19 and specifically I think on what
20 information you based your assessment that
21 Gynemesh PS was a low-weight mesh.
22     Do you recall that?
23 A.  Mm-hm.
24 Q.  Do you recall being asked if you

Page 121

1  could point to a source for that
2  information?
3      Do you recall that?
4  A.  Yes.
5  Q.  Okay.  Here in your report you
6  make the statement:  "Gynemesh PS is a
7  low-weight Amid type 1 polypropylene
8  mesh."
9      Is there an article that you've
10 cited for that proposition?
11 A.  Yes, the Jones article.
12 Q.  And is that the Jones article
13 called "Tensile properties of commonly
14 used prolapse meshes"?
15 A.  Yes.
16 Q.  Was that article published in
17 the International Urogynecology Journal?
18 A.  Yes.
19 Q.  Is the International
20 Urogynecology Journal a peer-reviewed
21 publication?
22 A.  Yes.
23 Q.  And is that one of the sources
24 that you were relying upon for your

Page 122

1  assessment of Gynemesh PS as a low-weight
2  material?
3      A.   Yes.
4      Q.   In addition to what you
5  testified to earlier?
6      A.   Yes.  They describe it as
7  low-weight.
8      Q.   You testified earlier in
9  response to questioning from counsel
10 about, I'm paraphrasing this to some
11 extent, but you said that in a healthy
12 woman without certain comorbidities, and
13 in light of the advent of minimally
14 invasive techniques, you would opt to
15 perform an abdominal surgery versus a
16 vaginal surgery to treat prolapse.
17         Did I accurately summarize that?
18     A.   I think so, yes.
19     Q.   Within the context of your
20 answer, what minimally invasive abdominal
21 surgery are you referring to?
22     A.   Using the robotic or
23 laparoscopic approach to do a
24 sacrocolpopexy.

Page 123

1      Q.   And what is it about the --
2          MS. KABBASH:  Strike that.
3      Q.   At the time that Prolift was
4  introduced to the market, was that form of
5  minimally invasive abdominal surgery, in
6  particular the robotic surgery, available
7  at that period of time?
8      A.   If it was, it was only in one or
9  two centers.  It was basically in its
10 infancy.  Laparoscopic surgery had been
11 around for a while, but there were very
12 few surgeons capable of doing a
13 laparoscopic sacrocolpopexy.
14     Q.   You testified earlier that
15 native tissue repairs are an alternative
16 to Prolift.
17     A.   Correct.
18     Q.   Is a native tissue repair always
19 the best alternative to Prolift for a
20 given patient?
21         MR. FAES:  Object to form.
22     A.   Never always.  It's an
23 alternative.  In some people it might be
24 the best approach, but never is it always

Page 124

1  the best approach.
2      Q.   And why with some patients is
3  Prolift a better alternative to native
4  tissue repair?
5      A.   People who are at high risk for
6  recurrence, either based on their family
7  history, their personal health history,
8  such as the history of hernias, people
9  that have already had a vaginal repair
10 that has now failed, people with a global
11 defect across the whole vagina, people who
12 have -- who are of a young age with a
13 family history for prolapse, these are all
14 patients, to list a few, risk factors who
15 are at high risk for failure or recurrence
16 and those are people who may be best
17 served by a mesh augmented repair and not
18 a native tissue repair.
19     Q.   I think you also testified that
20 an abdominal sacrocolpopexy is an
21 alternative to Prolift.
22         Is abdominal sacrocolpopexy
23 always a better alternative to Prolift in
24 patients?

Page 125

1      A.   No.
2      Q.   And why is that?
3      A.   Because you can have patients
4  for whom a sacrocolpopexy is potentially a
5  much more risky procedure based on their
6  medical history, surgical history, their
7  age, their comorbidities, heart disease,
8  and the vaginal approach may make much
9  more sense in that particular patient
10 population.
11     Q.   I think you testified in
12 response to one question that you were
13 asked does eliminating trocars eliminate
14 the risk of injury associated with
15 trocars, and I believe you said yes.
16     A.   Yes.
17     Q.   Is there a downside from the
18 perspective of safety to eliminating
19 trocars such as the trocars used in the
20 Prolift device?
21     A.   Yes.  I think that if you look
22 at trocar-based repairs, in my opinion,
23 the advantage of the trocar systems, like
24 Prolift, like the Exair, are that you can

Page 126

1  make smaller incisions, there's less
2  dissection, less need for hysterectomies
3  and other concomitant procedures and
4  allows you to place the mesh in the
5  appropriate compartment in a very
6  minimally invasive way, and by doing it
7  minimally invasively, you minimize local
8  trauma such as bleeding, nerve damage.
9  You minimize pain.  You speed the
10 recovery.
11      So, while the actual placement
12 of the trocar is potentially a surgical
13 maneuver that can add a unique risk, the
14 overall benefit of the trocar-based
15 systems is a much lower complication
16 profile and lower morbidity overall.
17     Q.  I just have one more area I want
18 to ask you about.
19      You were questioned earlier
20 about what risks were widely known among
21 surgeons, and you were asked if you had
22 performed any study to determine what
23 surgeons actually knew at a given time.
24      Do you recall that line of

Page 127

1  questioning?
2     A.  I do.
3     Q.  Turn to page 38 of your report.
4      In this part of your report, do
5  you have a section called "Commonly Known
6  Risks of Surgery"?
7     A.  Yes.
8     Q.  Did you perform an analysis of
9  the published medical literature to assess
10 what risks were reported on and available
11 in the publicly available medical
12 literature?
13     MR. FAES:  Object to form.
14     A.  Yes.
15     Q.  Do you discuss studies that
16 discuss the risk of mesh erosion in this
17 section of your report?
18     MR. FAES:  Object to form.
19     A.  Yes.
20     Q.  Do you list here studies that
21 were published between 1997 and 2006 that
22 discuss the risk of mesh erosion?
23     MR. FAES:  Object to form.
24     A.  Yes.

Page 128

1     Q.  On the next page, on page 39, do
2  you list studies that discuss the risk of
3  pain with intercourse and sexual
4  dysfunction that were available in the
5  medical literature?
6     A.  Yes.
7     Q.  And with respect to the articles
8  about pain with intercourse, were these
9  articles that you reference, do they start
10 in 1961?
11     A.  Actually, they go back to 1961,
12 yes.
13     Q.  And do they go --
14     MS. KABBASH:  Strike that.
15     Q.  Doctor, is the published medical
16 literature information that is out in the
17 public and available for doctors to
18 access?
19     A.  Yes.
20     Q.  And is your review of the
21 published medical literature and the
22 testimony you gave before about what is
23 taught in surgical training the basis for
24 your opinion about what is widely known by

Page 129

1  surgeons?
2     MR. FAES:  Object to form.
3     A.  Yes, including what's in
4  textbooks, which would be part of normal
5  medical and surgical training.
6     MS. KABBASH:  I don't have
7  anything else.  I think we're done.
8  Thanks, Doctor.
9      (Deposition adjourned at 10:55
10 a.m.)

Page 130

ACKNOWLEDGMENT

STATE OF      )
         :ss
COUNTY OF     )

    I, JOHN R. WAGNER, M.D., hereby certify that I have read the transcript of my testimony taken under oath in my deposition of September 25, 2017; that the transcript is a true and complete record of my testimony, and that the answers on the record as given by me are true and correct.

_____
JOHN R. WAGNER, M.D.

Signed and subscribed to before me this
_____ day of _____, 2017.

_____
Notary Public, State of

Page 131

ERRATA
PAGE / LINE / CHANGE / REASON

Page 132

CERTIFICATE
STATE OF NEW YORK
COUNTY OF NEW YORK

    I, Marie Foley, RMR, CRR, a Certified Realtime Reporter and Notary Public within and for the State of New York, do hereby certify:
    THAT JOHN R. WAGNER, M.D., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.
    I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.
    IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of September, 2017.

_____
MARIE FOLEY, RMR, CRR

Page 133

LAWYER'S NOTES
PAGE / LINE