# Exhibit A

```
 1              UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     AT CHARLESTON

 4    ------------------------------:
      IN RE ETHICON, INC., PELVIC   :
 5    REPAIR SYSTEM PRODUCTS        : MASTER FILE
      LIABILITY LITIGATION          : No. 2:12-MD-02327
 6    _____:
                                    : MDL 2327
 7    THIS DOCUMENT RELATES TO ALL  : JOSEPH R. GOODWIN
      WAVE 6 AND SUBSEQUENT WAVE    : US DISTRICT JUDGE
 8    CASES AND PLAINTIFFS:         :
                                    :
 9    Beth Ann Bradley              :
      Case No. 2:13-cv-02058        :
10    Naomi Shelton                 :
      Case No. 2:12-cv-09250        :
11    Patricia Volpe                :
      Case No. 2:13-cv-02051        :
12    ------------------------------

13                  October 11, 2017

14                       -  -  -

15          Deposition of LAWRENCE LIND, M.D.,

16    held at The Inn at Great Neck, 90 Cutter

17    Mill Road, Great Neck, New York, commencing

18    at 7:30 a.m., on the above date, before

19    Marie Foley, a Registered Merit Reporter,

20    Certified Realtime Reporter and Notary

21    Public.

22                       -  -  -
                 GOLKOW LITIGATION SERVICES
23          877.370.3377 ph | 917.591.5672 fax
                    Deps@golkow.com
24
```

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   RESTAINO LAW, LLC
 4   BY: JOHN M. RESTAINO, ESQUIRE
 5      1011 S. Josephine St.
 6      Denver, CO 80209
 7      800.487.9030
 8      www.restainolawfirmpc.com
 9      Representing the Plaintiff
10
11
12
13
14   RIKER, DANZIG, SCHERER,
15   HYLAND, PERRETTI, LLP
16   BY: DIANA KATZ GERSTEL, ESQUIRE
17      Headquarters Plaza
18      One Speedwell Avenue
19      Morristown, New Jersey  07962-1981
20      973.538.0800
21      dgerstel@riker.com
22      Representing the Defendant
23
24
```

Page 3

```
 1               - - -
 2           TRANSCRIPT INDEX
 3                              PAGE
 4   APPEARANCES...................... 2
 5   INDEX OF EXHIBITS................ 4 - 7
 6   EXAMINATION OF LAWRENCE LIND, M.D.:
 7   BY:  MR. RESTAINO................ 9
 8   BY:  MS. GERSTEL................. 184
 9   SIGNATURE PAGE................... 200
10   ERRATA........................... 201
11   REPORTER'S CERTIFICATE........... 202
12
13   EXHIBITS WITH ORIGINAL TRANSCRIPT
14
15               - - -
```

Page 4

```
 1                 - - -
 2               E X H I B I T S
 3                 - - -
 4   NO.        DESCRIPTION            PAGE
 5   Lind       Notice to Take Deposition  9
 6   Exhibit 1  of Lawrence Lind, M.D.,
 7              dated September 21, 2017
 8   Lind       Envelope containing flash  13
 9   Exhibit 2  drive
10   Lind       Five invoices of Lawrence  14
11   Exhibit 3  Lind
12   Lind       Curriculum vitae of        16
13   Exhibit 4  Lawrence Lind, M.D.
14   Lind       Expert Report of Lawrence  36
15   Exhibit 5  Lind, M.D.
16   Lind       Lawrence Lind General      41
17   Exhibit 6  Reliance List in Addition
18              to Materials Referenced in
19              Report MDL Wave 6
20   Lind       Lawrence Lind Supplemental 41
21   Exhibit 7  Reliance List in Addition
22              to Materials Referenced in
23              Report MDL Wave 6
24
```

Page 5

```
 1                 - - -
 2               E X H I B I T S
 3                 - - -
 4   NO.        DESCRIPTION            PAGE
 5   Lind       Cochrane Library Maher     49
 6   Exhibit 8  article excerpt
 7   Lind       Benbouzid article Pelvic   63
 8   Exhibit 9  Organ Prolapse Transvaginal
 9              Repair By the Prolift
10              System: Evaluation of
11              Efficacy and Applications
12              After a 4.5 Years Follow Up
13   Lind       Barber article Defining    66
14   Exhibit 10 Success: After Surgery For
15              Pelvic Organ Prolapse
16   Lind       Quemener article Rate of   73
17   Exhibit 11 Re-Interventions After
18              Transvaginal Pelvic Organ
19              Prolapse Repair Using
20              Partially Absorbable Mesh:
21              20 Months Median Follow
22              Ups Outcomes
23
24
```

Page 18

1  A. It's LIJ.
2  Q. And that's Long Island Jewish?
3  A. Correct.
4  Q. Okay.
5  A. And they have, for the record,
6  changed their name to Northwell Health.
7  So that name North Shore/LIJ at present
8  doesn't exist. It's just a branding and
9  name change.
10 Q. The hospital that you're working
11 at at this point and where you're the
12 chief of the division of urogynecology and
13 pelvic reconstructive surgery, would you
14 describe that as a primary institution for
15 those conditions or a tertiary referral
16 hospital?
17 A. Tertiary.
18 Q. And what does that mean, for the
19 record?
20 A. It means it's an academic-based,
21 most highly trained location where doctors
22 from more than just the local community
23 would send patients for care. So it's the
24 go-to place for -- we receive patients

Page 19

1  from Manhattan, Pennsylvania, New Jersey,
2  and further. So by tertiary, it typically
3  means a center that is super specialized
4  and a go-to place for difficult cases and
5  that sort of thing.
6  Q. Look at your CV, I see that you
7  have contributed to the peer-reviewed
8  medical literature; is that correct?
9  A. Yes.
10 Q. And have you published any
11 peer-reviewed articles regarding Gynemesh
12 or Prolift mesh transvaginal mesh devices?
13 A. No.
14 Q. Have you been asked to give any
15 lectures to national societies on Gynemesh
16 or Prolift mesh?
17 A. No.
18 Q. Have you been invited to be a
19 visiting professor at any academic
20 institution previously?
21 A. I have.
22 Q. And what position or topic were
23 you appointed?
24 A. Those invites were all within

Page 20

1  state, one or two in New Jersey, and
2  typically the lecture titles are modern
3  approaches to incontinent surgery or
4  modern approaches to pelvic prolapse
5  surgery.
6  Q. With your contributions to the
7  medical literature, at some point in your
8  background, be as it may your undergrad,
9  pre-medical education, your medical
10 education, and/or your training and
11 experience, have you been taught to employ
12 what some people might call the scientific
13 method?
14 A. Yes.
15 Q. Would that consist of, for
16 example, a hypothesis formation, followed
17 by testing, followed by conclusions,
18 followed by peer review publication,
19 followed by replication of the method when
20 applicable?
21 A. Yes.
22 Q. Would you agree that if a
23 portion of the scientific method is
24 lacking, then the entire scientific method

Page 21

1  itself comes into question?
2  A. Not exactly.
3  Q. Well, let's try to use examples.
4  For example, let's hypothesize
5  that a new methodology is published in the
6  medical literature and no one else is able
7  to or attempts to replicate that
8  methodology.
9  Would you consider, without
10 replication, the scientific method to have
11 been fulfilled?
12 A. I would consider two
13 possibilities. One is that if this is,
14 for instance, a surgical execution, that
15 that person had methods that were
16 different than the population or that
17 there was a problem replicating it and
18 that those results couldn't be
19 generalized.
20 Q. Have you held yourself out to be
21 an expert in the implantation of Gynemesh
22 and/or Prolift mesh at any national
23 society meeting?
24 A. No.

Lawrence Lind, M.D.

Page 30

```
1   small number of patients involved, what
2   weight do you place upon that study?
3       A.   Well, you can have a small
4   number that's still powered adequately.
5   So the power has the tool of evaluating
6   certainly has significant value.  The
7   smaller the number, the harder it is to
8   power a study, but there's no absolute
9   number getting to on the smaller side that
10  has me -- gives me concern.  It's do those
11  numbers fit into a power analysis that
12  holds water.
13      Q.   When you're looking at studies
14  that you might review that are germane to
15  your area of specialty, do you look at the
16  follow-up as described within the study?
17      A.   Yes.
18      Q.   And how do you define
19  "follow-up"?
20      A.   Follow-up is how many months or
21  years have you looked at the data or
22  looked at the data a second or third time
23  to assess the medium- or long-term
24  efficacy.  Something that has follow-up of
```

Page 31

```
1   one month of course is somewhat
2   meaningless and follow-up of one year,
3   five years, ten years gets to increasing
4   value, of course at the challenge of
5   completing that follow-up because you have
6   to get them all to come back.
7       Q.   Do you have any formal training
8   in pathology beyond medical school
9   classes?
10      A.   Can you define "formal"?
11      Q.   Leading to a position or a
12  degree.
13      A.   I don't have a degree in
14  pathology.  I've not been trained to the
15  point to get a degree, but I routinely
16  read pathology reports and act on them to
17  the import of my patients' safety.
18      Q.   Now, when you say you read the
19  pathology reports, do you read the actual
20  histopathologist slides, or do you depend
21  upon the reading of the actual slides by
22  the pathologists?
23      A.   I read the reports.
24      Q.   Have you had any formal training
```

Page 32

```
1   in material science?
2       A.   Can I assume by that question
3   that you again would mean ending in a
4   degree?
5       Q.   Let's just ask if you had any
6   formal training first in material
7   sciences.
8       A.   I would say that I've had
9   numerous lectures and I've been working
10  with and listening to and reading
11  literature on material science as it
12  relates to pelvic prolapse surgery for 20
13  to 25 years.
14      Q.   Do you consider yourself an
15  expert in the field of material sciences?
16      A.   Yes.
17      Q.   Have you ever conducted any
18  animal research involving a material such
19  as mesh?
20      A.   Yes.  Actually, it's current,
21  not published, but at present we have a
22  grant for a mesh model in rats.
23      Q.   Is that polypropylene mesh?
24      A.   It's polypropylene and a couple
```

Page 33

```
1   of others that are being assessed as well.
2       Q.   This is one of those questions
3   that ends up in a list of stupid questions
4   that lawyers ask, but it's foundational.
5            And it's implanted within the
6   rat?
7       A.   Yes.
8       Q.   Is it implanted in the pelvis of
9   the rat or on the dorsum?
10      A.   Both.
11      Q.   Have you ever conducted any
12  animal research utilizing Prolift mesh?
13      A.   No.
14      Q.   Gynecare mesh?
15      A.   No.
16      Q.   Have you conducted an
17  epidemiological study utilizing Prolift
18  mesh?
19      A.   A study resulting towards a
20  publication, no, but I want to be careful
21  with that word since I've certainly
22  studied many things that would be called
23  epidemiology having to do with Prolift in
24  terms of studies, efficacy, safety.  So I
```

Page 46

1  undergo a native tissue surgical repair
2  (other than colpocleisis) will require
3  re-operation for re-prolapse."
4      Did I read that portion
5  correctly?
6    A.  Yes.
7    Q.  And then you state:  "The
8  success rates for native tissue surgical
9  repairs decline over time.  The failure
10 rate of native tissue surgical repairs is
11 widely reported to be about 40 percent."
12     Do you see where I was reading
13 from there, sir?
14   A.  Yes.
15   Q.  Now, the statement that
16 approximately 30 percent who undergo a
17 native tissue surgical repair will require
18 re-operation for re-prolapse, there isn't
19 a reference for that statement; is that
20 correct?
21   A.  No, but the subsequent sentences
22 describe, you know, from 40 to as high as
23 70.  So the 30 percent doesn't have a
24 specific reference there.

Page 47

1    Q.  And what is the basis for your
2  opinion that success rates for native
3  tissue surgical repairs decline over time?
4    A.  Multiple articles.  20 years of
5  experience.
6    Q.  Now, if you were submitting this
7  expert report for publication in the
8  peer-reviewed literature, would you agree
9  that a statement like that would require a
10 reference?
11   A.  So, a reference was missing and
12 I would fill it in.
13   Q.  Now, you're familiar with the
14 Cochrane database of systemic reviews; is
15 that correct?
16   A.  Yes.
17   Q.  In fact, on page 3 of your
18 report, you have a section 2 which is
19 titled "Materials Reviewed."
20     Is that correct?
21   A.  Page 3, section 2, yes.
22   Q.  In the paragraph that starts:
23 "I hold the opinions set forth in this
24 report to a reasonable degree of medical

Page 48

1  and scientific certainty and probability."
2      Down about four lines you write
3  that you "...place a special emphasis on
4  randomized control trials, systemic
5  reviews and meta-analyses which provide
6  the highest levels of scientific
7  evidence."
8      Do you see where I read from,
9  sir?
10   A.  Yes.
11   Q.  And that's what we discussed
12 earlier in the deposition about the
13 hierarchy of epidemiology, correct?
14   A.  Correct.
15   Q.  And you have read the systemic
16 review that's been published by Maher, et
17 al. in Cochrane that is titled
18 "Transvaginal mesh or graphs compared with
19 native tissue repair for vaginal prolapse
20 (review)"?
21   A.  I have read it, yes.
22   Q.  And you are relying upon it for
23 basis of several of your opinions in this
24 expert report; is that correct?

Page 49

1    A.  Yes.
2    Q.  When I downloaded this document,
3  I noted it to be 142 pages long with a lot
4  of material.
5      Did you read this systemic
6  review in its entirety?
7    A.  Every single word, no, but most
8  of it, yes.
9      MR. RESTAINO:  Now, in order to
10   save trees, I haven't printed out all
11   142 pages, but I've taken
12   representative sections and I've put
13   the cover page on each front.
14     So, for the first one that's
15   going to consist of the table of
16   contents and pages 1 and 2, I'll have
17   the court reporter mark this as
18   Exhibit 8.
19     (Lind Exhibit Lind Exhibit 8,
20   Cochrane Library Maher article
21   excerpt, was marked for
22   identification, as of this date.)
23 BY MR. RESTAINO:
24   Q.  And you have a seen this before,

Page 82

1  it not?
2  A. The study is randomized, which
3  as we both know is best designed to
4  minimize bias. Despite randomization, in
5  this study you have more people in one
6  group with a previous sacrocolpopexy than
7  the other.
8  If you look down further, you
9  have people, you have more patients with
10  more than one previous surgery in the
11  conventional group. So, you know, it goes
12  both ways.
13  I think to me the key element
14  for prolapse surgery is are the stages of
15  prolapse similar, which they are in this
16  study 'cause that's what you're starting
17  with. If you have a stage 3 prolapse of a
18  sacrocolpopexy, the bias that we're trying
19  to discuss for a group that would have had
20  more that would have had a previous
21  support procedure would mean, well, she
22  already has some support from the previous
23  surgery, so that would lead towards
24  possibly a better outcome for her having

Page 83

1  the second surgery 'cause she's having the
2  added help of the first surgery. But if
3  someone has a stage 2 or 3 prolapse, the
4  sacrocolpopexy has completely detached.
5  It cannot possibly be that low if it's
6  still attached.
7  So I would consider that to be
8  from a pure research design standpoint,
9  your point is reasonable, but if you apply
10  it to the actual clinical scenario, are
11  these patients the same, if a patient has
12  stage 2 or stage 3 prolapse, she doesn't
13  have a sacrocolpopexy anymore. The only
14  thing the sacrocolpopexy would do to bias
15  that group differently from an outcome
16  standpoint is that she's got a piece of
17  mesh on the other side of the vagina. So
18  hypothetically, she could have increased
19  risk of mesh problems because she has a
20  piece of mesh on the other side of the
21  vagina as well.
22  So, I think your point is valid
23  from a pure statistical design, but as you
24  apply it to urogynecology and prolapse, I

Page 84

1  think the fact that they're exactly
2  matched by their randomization in prolapse
3  stage makes that bias that you've pointed
4  out not clinically significant or
5  scientifically significant for me.
6  Q. Earlier we had discussed the
7  hierarchy of scientific evidence and you
8  had placed the meta-analysis and systemic
9  review at the top of that, correct?
10  A. Yes.
11  Q. And we've been talking about the
12  Cochrane 2016 study, which I have shared
13  with you that I did not print out all 142
14  pages.
15  MR. RESTAINO: I'm going to ask
16  the court reporter to now mark again
17  front page indicating that it is the
18  2016 Cochrane Review, but I only
19  printed out for these purposes pages
20  12, 13 and 14.
21  (Lind Exhibit 13, Cochrane
22  Library excerpt pages 12, 13 and 14,
23  was marked for identification, as of
24  this date.)

Page 85

1  BY MR. RESTAINO:
2  Q. If you would turn to page 14,
3  they have a paragraph on 14 that starts
4  off with: "We rated 18 studies."
5  Do you see that?
6  A. Which paragraph?
7  Q. I didn't write it down for
8  myself. You want to hand it to me. I'll
9  try to save you a little eye strain.
10  (Pause.)
11  It's the second paragraph under
12  "Allocation."
13  A. Okay.
14  Q. (Reading) "We rated 18 studies
15  that did not describe an adequate method
16  of allocation concealment as at unclear
17  risk in this domain, and we rated two
18  studies as at high risk of bias, as they
19  either did not use allocation concealment,
20  in Tamanini 2014, or we suspected a high
21  potential for bias (Withagen 2011.)"
22  Did I read that correctly?
23  A. Yes.
24  Q. And the Withagen 2011 is what we

Page 102

1  or all of the opinions there.  They may
2  agree with some, they may disagree with
3  some.  You have new information, so it
4  gets updated.
5         So, when things get pulled down,
6  it means that the committee has made a
7  topic paper or a committee opinion that's
8  more updated and then that one usually
9  replaces it.
10    Q.   Does the same apply for when
11  they withdraw committee opinions from the
12  Journal of Obstetrics and Gynecology?
13    A.   I don't know what those criteria
14  are.
15        MR. RESTAINO:  I'm going to ask
16    the court reporter to mark page
17    documenting that this document has
18    been withdrawn or is no longer
19    available through the Journal of
20    Obstetrics and Gynecology.
21        (Lind Exhibit 16, American
22    College of Obstetricians and
23    Gynecologists Women's Health Care
24    Physicians document withdrawal, was

Page 103

1     marked for identification, as of this
2     date.)
3  BY MR. RESTAINO:
4     Q.   Sir, did you have a response?
5     A.   I do.  I do.
6         As of right now, you may or may
7  not know what the criteria are or reasons
8  for removing are.
9         In my world, I want to make sure
10  we're clear, and for the statement here on
11  the record that withdrawal here, at least
12  based on the information in this room,
13  doesn't confer anything that suggests that
14  the information that that contained as
15  published as of that time had any
16  problems, was thought to be incorrect or
17  withdrawn because it was inaccurate.  It's
18  going to be my suggestion, which is a
19  hypothesis, not truth, that these are
20  informational.  They're educational, and
21  when we have more information and we
22  update our education, ACOG tends to
23  replace things so that students, residents
24  are not reading older versions; they get

Page 104

1  the most up-to-date.
2         So I'm going to hypothesize that
3  this is removed simply because there was
4  something more up-to-date and it
5  doesn't -- and it probably, and again
6  opinion only, that it probably does not
7  carry any significance in terms of not
8  being accurate as of 2011.
9     Q.   Am I safe in understanding that
10  your hypothesis is also a form of
11  speculation as much as you don't know why
12  they pulled this article down, do you?
13     A.   I would say my hypothesis is
14  based on the fact that I get committee
15  opinions, and in committee opinions that
16  are newer it states, and I specifically
17  know, specifically it states this
18  committee opinion replaces number
19  so-so-so.  So, in 20 years of getting
20  committee opinions, I get replacements and
21  it says this replaces the previous one.
22         MR. RESTAINO:  I'm going to ask
23     the court reporter to mark as next the
24     ACOG Practice Advisory on the FDA's

Page 105

1     Reclassification of Mesh For Pelvic
2     Organ Prolapse dated January 6, 2016.
3         (Lind Exhibit 17, ACOG Practice
4     Advisory on the FDA's Reclassification
5     of Mesh For Pelvic Organ Prolapse
6     dated January 6, 2016, was marked for
7     identification, as of this date.)
8  BY MR. RESTAINO:
9     Q.   And you would agree that 2016,
10  sir, is after 2011, correct?
11     A.   Yes.
12     Q.   And in this practice advisory
13  dated January 6, 2016 on point number 1
14  they write:  "The FDA reclassified these
15  medical devices from Class 2, which
16  generally includes moderate-risk devices,
17  to Class 3, which generally includes high
18  risk devices."
19         Did I read that correctly?
20     A.   Yes.
21     Q.   Now, while mentioning the ACOG
22  committee opinion from 2011 in your expert
23  report, you do not mention in your expert
24  report that ACOG in 2016 notes that these

Page 110

1  interventional, which is a surgical
2  revision, whether it be in the office with
3  no anesthesia, in the office with local or
4  under general anesthesia.
5         MR. RESTAINO: I'm going to ask
6    the court reporter now to mark a paper
7    that's in your general reliance list,
8    lead author is Sarah Abbott,
9    A-B-B-O-T-T, and the article is
10   "Evaluation and Management of
11   Complications From Synthetic Mesh
12   After Pelvic Reconstructive Surgery:
13   A Multicenter Study."
14        (Lind Exhibit 18, Abbott article
15   Evaluation and Management of
16   Complications From Synthetic Mesh
17   After Pelvic Reconstructive Surgery:
18   A Multicenter Study, was marked for
19   identification, as of this date.)
20 BY MR. RESTAINO:
21   Q.   Sir, if you look at the abstract
22 under "Study Design For Foundational
23 Purposes" they write: "We conducted a
24 multicenter, retrospective analysis of

Page 111

1  women who attended four U.S. tertiary
2  referral centers for evaluation of
3  mesh-related complications after surgery
4  for SUI and/or POP from January 2006 to
5  December 2010."
6         And we discussed earlier what is
7  meant by a tertiary referral center; is
8  that correct, sir?
9    A.   Yes.
10   Q.   If you would turn to page 163.E6
11 of this Abbott study there's a top left
12 column that starts, continues over with
13 "Complication was 2 with a range of 1 to
14 9."
15        Do you see where I'm reading
16 from?
17   A.   Yes.
18   Q.   Basically at the bottom of that
19 paragraph they write: "Of the women who
20 initially had an in-office." So I'm at
21 the bottom of the first paragraph, upper
22 right-hand column -- or top of left
23 column.
24   A.   Top of the left column?

Page 112

1    Q.   I think so.
2    A.   "Of those who were initially
3  treated non-surgically"?
4         "Of the women who initially had
5  in-office trimming"?
6    Q.   Yes.
7         "Of the women who initially had
8  in-office trimming of mesh, 73.3 percent
9  eventually went to the operating room."
10        Did you see that, sir?
11   A.   Yes.
12   Q.   Now, again your expert report
13 states the majority of exposures can be
14 treated conservatively, whether
15 expectantly or with topical estrogen
16 cream, but these surgeons from these four
17 medical centers found that 73.3 percent of
18 these patients who undergo an in-office
19 trimming ended up in the operating room,
20 did they not?
21   A.   The statements as they've
22 written statistically and their results
23 clearly are accurate. These are expert
24 researchers and expert surgeons.

Page 113

1         From a research design
2  standpoint and with your professional
3  background and as we are trying to be true
4  to each other on design, this is as biased
5  as could be with the worst of the worst
6  case scenarios going to not just tertiary
7  centers.
8         There are about 65 programs
9  training urogynecologists in the nation,
10 and you have four of the top, top, top
11 fly-across-the-country guys who are being
12 referred the worst of the worst of the
13 cases. So, from a numerator --
14 denominator standpoint, this is just a
15 case series. And yes, it's
16 multi-centered, but it's four case series
17 lumped together of the people who are
18 known nationally, send this guy your
19 toughest case. So we're describing the
20 patients who didn't get better, the
21 patients who got better from topical
22 estrogen didn't get referred to the
23 centers. So we have selected only for the
24 people who failed in the worst case

Lawrence Lind, M.D.

Page 118

1  Q. About five or six lines down
2  they start "First."
3      Do you see that?
4  A. Yes.
5  Q. (Reading) "First, approximately
6  one-half of the women (49.3 percent) who
7  sought treatment of a mesh related
8  complication at a tertiary referral center
9  actually underwent their index procedure
10 at a facility other than that tertiary
11 referral center."
12     And that's what you've been
13 saying, correct?
14 A. Yes.
15 Q. (Reading) "This trend has been
16 reported in other studies as well.
17 Reference 12. This raises the potential
18 concern that physicians who perform these
19 mesh procedures may not be aware of the
20 complications their patients experience
21 and that these providers may be
22 responsible for future mesh related
23 complications with no awareness of the
24 existing magnitude of the issue."

Page 119

1      Did I read that correctly?
2  A. Yes.
3  Q. Now, the impetus for this entire
4  line of questioning is you wrote in your
5  expert report that mesh complications are
6  typically mild and can be treated
7  expectantly, mesh erosion can be treated
8  expectantly and/or with estrogen cream,
9  but you don't put in your expert report
10 that there is a portion of women with the
11 same complications that undergo very
12 significant morbidity and surgical
13 correction, correct?
14     MS. GERSTEL: Object to form.
15 A. I think I do indicate in my
16 report that people do require surgery to
17 correct this. How detailed I get into on
18 how invasive the repairs are is not
19 detailed as specifically as the line of
20 questioning here. That's fair.
21 Q. Do you state for the judge the
22 percentage, almost 50 percent that have to
23 undergo a mesh excision in this situation?
24     MS. GERSTEL: Object to the

Page 120

1  form.
2  A. I strongly disagree with the 46
3  percent which you're quoting from this
4  article, as I've stated previously, is a
5  cross-sectional collection of four case
6  series lumped together referred to four of
7  the top people in the nation and does not
8  represent the -- any of the percentages of
9  requiring mesh complete removals as based
10 on the stronger studies, randomized
11 studies, and from a statistical design
12 standpoint, to be quoting these as the
13 risk of total removal rate of 46 percent
14 is dismissing everything that we have both
15 learned in terms of statistical design and
16 what is legitimate to state as an overall
17 risk.
18 Q. But it is data, correct?
19 A. It is data of the worst cases
20 sent to the surgeons who take the cases
21 that no one else can take. That's biased
22 data.
23     MS. GERSTEL: The time is at two
24 hours.

Page 121

1      MR. RESTAINO: Why don't we go
2  ahead and take a break and go off the
3  record at this point?
4      (Recess taken at 9:41 a.m. to
5  10:22 a.m.)
6  BY MR. RESTAINO:
7  Q. Doctor, we're going to shift
8  gears and talk a little bit about TVT.
9      MR. RESTAINO: Or is it
10 TVT-Exact, or does it matter?
11     THE WITNESS: My statement I
12 think is on the TVT-Exact.
13     MS. GERSTEL: Yes, but the
14 deposition is on TVT.
15     MR. RESTAINO: Just TVT?
16     MS. GERSTEL: Yes.
17 BY MR. RESTAINO:
18 Q. When did you start using the TVT
19 product for the treatment of urinary
20 incontinence?
21 A. The late 1990s.
22 Q. Similarly as I asked you with
23 Gynemesh, have you ever had to remove a
24 TVT mesh from a woman in total?

Lawrence Lind, M.D.

Page 182

1  about the same in the literature as when
2  we're doing them with native tissue. So
3  we can't point to the sling as this evil
4  tightening agent. What we don't have is
5  high level data that proves that mesh in
6  and of itself shrinks.
7      Q.   So the record's clear, when you
8  say mesh in of itself shrinks --
9      A.   Does not shrink.
10     Q.   Does not shrink, it's not the
11 material that shrinks, as in like I put a
12 cotton shirt in the dryer on high and the
13 shirt itself shrinks, but it's the soft
14 tissue around the mesh that contracts, in
15 effect shrinking the mesh, correct?
16     A.   Even more to your side. You
17 can't tell what's what. They're in there
18 together all the time. The end result is
19 too tight. How much the -- is it the --
20 does the mesh get tighter on its own, does
21 the wound get tighter on its own? I can't
22 tell. They're in there together.
23     Q.   And have you looked at high
24 level RCTs and/or meta-analyses, systemic

Page 183

1  reviews comparing contracture, mesh
2  contracture incidence rates with tissue
3  incidence rates in the native tissue
4  repair?
5           That was a poorly-worded
6  question. Do you need me to repeat it?
7      A.   The contracture I haven't looked
8  at, but when we have an enormous abundance
9  of data in the randomized, highest level,
10 most voluminous data is the incidence of
11 voiding dysfunction retention, which is
12 the result of things being too tight. You
13 know, you can have -- you can
14 hypothetically have pain, but really the
15 most objective thing you can measure is
16 voiding dysfunction and retention and
17 those studies show that it's equal or
18 better than the Burch. It shows that it's
19 less retention than the fascial sling,
20 which is the patient's own tissue. It's a
21 really good procedure.
22          MR. RESTAINO: I don't have any
23     further questions, Doctor.
24          MS. GERSTEL: I'm just going to

Page 184

1  be a few minutes of redirect.
2  EXAMINATION BY
3  MS. GERSTEL:
4      Q.   Dr. Lind, I think we referenced
5  this earlier in your deposition.
6           You went to medical school at
7  Cornell; is that correct?
8      A.   Yes.
9      Q.   And you did your residency also
10 at Cornell; is that correct?
11     A.   Cornell was the medical school
12 in charge of the academics of North Shore
13 LIJ, so that would be correct, yes.
14     Q.   And then you did a fellowship in
15 urogynecology at UCLA; is that correct?
16     A.   Correct.
17     Q.   Doctor, can you tell us why you
18 decided to specialize in urogynecology?
19     A.   I was a resident and I was
20 staying up all night delivering babies and
21 everyone told me I had good hands and
22 there was this organ in the middle of my
23 surgical field called the bladder and I
24 was told to be careful with it, you can

Page 185

1  get into trouble, don't hurt it, stay away
2  from it, and there was a couple people I
3  had heard of in the nation and in our area
4  who had started working diligently in this
5  area on the first abdominal sacral
6  suspension in the world was done in room 8
7  where I operate every Monday, in the
8  world, Louis Lane, and it seemed very
9  clear that with an aging population, we
10 cured every other disease, people are
11 going to live longer, I have slides in my
12 lectures with old ladies working out, that
13 staying healthier and having pelvic organ
14 prolapse and incontinence was going to
15 become a much larger thing. I wanted to
16 use my hands. Oncology was too sad and
17 this was brand new, wide open field that
18 needed good people. When I applied, there
19 were five fellowships. Now there's 65.
20     Q.   Doctor, I want to ask you some
21 questions about Gynemesh PS and then I'll
22 ask you some questions about TVT.
23          When did you first use Gynemesh
24 PS to treat pelvic organ prolapse?

47 (Pages 182 to 185)

Golkow Litigation Services - 877.370.3377

Lawrence Lind, M.D.

Page 186

1    A.   In the early 2000s, 2003, 4.
2    Q.   How many times have you
3  implanted Gynemesh PS since then?
4    A.   Hundreds.
5    Q.   Do you have patients in whom you
6  have implanted Gynemesh PS whom you have
7  followed for years?
8    A.   Absolutely.
9    Q.   Have most of the patients in
10 whom you've implanted Gynemesh PS been
11 happy with the outcome of their surgeries?
12   A.   Yes.
13   Q.   And for most of them, has their
14 surgery with Gynemesh PS improved their
15 quality of life?
16   A.   Absolutely.
17   Q.   Would you use Gynemesh PS if
18 most patients in whom you implanted it did
19 not do well?
20   A.   No.
21   Q.   Doctor, is it your opinion that
22 Gynemesh PS is an important tool for
23 surgeons to have for repair of pelvic
24 organ prolapse?

Page 187

1    A.   Yes.
2    Q.   Why?
3    A.   It's got an expert's hands.
4  It's got, you know, some of the highest
5  volume of literature on use for pelvic
6  prolapse.  It's a type 1 mesh.  And
7  certainly, you know, 15 years later, I
8  live in Great Neck, I got the most
9  obnoxious complaining population in the
10 nation.  If it was causing trouble, it's
11 more important than any guideline in the
12 world if your patients, man, their five
13 sons are in your office breathing down
14 your neck, I can promise you on the record
15 here, there's powers much higher than any
16 of this legal stuff that seeing a family
17 upset on a bad outcome, it's not good in
18 this area.  And it's been working.
19   Q.   Doctor, can you tell us what is
20 evidence-based medicine?
21   A.   Rather than just using
22 word-of-mouth, reading haphazardly here or
23 there a throw-away journal, you are making
24 decisions based on the highest tiers of

Page 188

1  data, deciphering through the tiers of
2  data so you can decide what's more
3  reliable, less reliable, what's flawed,
4  what's not flawed, making sure you're
5  up-to-date on the scientific readings,
6  education, and staying in touch with your
7  highest level committees that guide you to
8  make your decisions based on objective
9  information, proven studies, and doing
10 without being influenced by other
11 motivations.
12   Q.   Do you practice evidence-based
13 medicine?
14   A.   Absolutely.
15   Q.   Can you explain how it's helpful
16 for your patients that you practice
17 evidence-based medicine?
18   A.   I think it's, you know, I went
19 to a school where the fourth year there
20 were no pens and pencils in most of the
21 classes.  You had to present yourself
22 verbally.  And I think my patients when
23 they're done getting my counseling believe
24 that they have someone that was trained at

Page 189

1  the highest level, who's honest, that's
2  making decisions based on really being
3  current with the literature and not being
4  influenced, and I think they feel very
5  confident.
6    Q.   Doctor, switching to TVT.
7         When did you first use TVT?  I
8  think you actually were asked this
9  earlier, but if you could just remind us.
10   A.   Late in the 1990s, '98, '99.
11   Q.   I believe you said you've
12 implanted approximately 3,000 TVTs since
13 then; is that correct?
14   A.   Three thousand midurethral
15 slings.
16   Q.   Are you able to say what
17 percentage of those were TVTs?
18   A.   About half of them were TVTs.
19   Q.   Do you have patients in whom
20 you've implanted TVT that you have
21 followed for years?
22   A.   Yes.
23   Q.   And have most of your patients
24 in whom you've implanted TVT been happy

48 (Pages 186 to 189)

Page 202

```
 1            C E R T I F I C A T E
 2   STATE OF NEW YORK
 3   COUNTY OF NEW YORK
 4
 5           I, Marie Foley, RMR, CRR, a
 6   Certified Realtime Reporter and Notary
 7   Public within and for the State of New
 8   York, do hereby certify:
 9           THAT LAWRENCE LIND, M.D., the
10   witness whose deposition is hereinbefore
11   set forth, was duly sworn by me and that
12   such deposition is a true record of the
13   testimony given by the witness.
14           I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage, and that I am
17   in no way interested in the outcome of
18   this matter.
19           IN WITNESS WHEREOF, I have
20   hereunto set my hand this 14th day of
21   October, 2017.
22
23         _____
             MARIE FOLEY, RMR, CRR
24
```

Page 203

```
 1            LAWYER'S NOTES
 2   PAGE / LINE
 3   ____ ____  _____
 4   ____ ____  _____
 5   ____ ____  _____
 6   ____ ____  _____
 7   ____ ____  _____
 8   ____ ____  _____
 9   ____ ____  _____
10   ____ ____  _____
11   ____ ____  _____
12   ____ ____  _____
13   ____ ____  _____
14   ____ ____  _____
15   ____ ____  _____
16   ____ ____  _____
17   ____ ____  _____
18   ____ ____  _____
19   ____ ____  _____
20   ____ ____  _____
21   ____ ____  _____
22   ____ ____  _____
23   ____ ____  _____
24   ____ ____  _____
```