# EXHIBIT B

Terence J. Colgan, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                    CHARLESTON DIVISION

 4      ------------------------------)

 5      IN RE: ETHICON, INC. PELVIC     ) Master File

 6      REPAIR SYSTEM PRODUCTS          ) No. 2:12-MD-02327

 7      LIABILITY LITIGATION            ) MDL 2327

 8                                      )

 9      THIS RELATES TO ALL WAVE 6      )

10      AND SUBSEQUENT WAVE CASES       ) JOSEPH R. GOODWIN

11      AND PLAINTIFFS:                 ) U.S. DISTRICT

12                                      ) JUDGE

13      Jerene Maxwell                  )

14      Case No. 2:13-cv-01703          )

15                                      )

16      Patricia Smith                  )

17      Case No. 2:12-cv-09857          )

18      ------------------------------)

19

20

21

22         --- Teleconference Deposition upon Oral

23      Examination of TERENCE J. COLGAN, M.D. called for

24      examination in the above titled action by the

25      Plaintiffs, by and through their attorneys,
```

Terence J. Colgan, M.D.

Page 2

1  conducted in accordance with Rule 30 of the Federal
2  Rules of Civil Procedure and the procedures set
3  forth in In Re: Ethicon Inc., Pelvic Repair System
4  Products Liability Litigation, MDL No. 2327, taken
5  before me, the undersigned, Bonnie Lynn van der
6  Meer, C.S.R. (Ontario), Certified Shorthand
7  Reporter and Commissioner of Oaths within and for
8  the Province of Ontario, at the law offices of
9  Blake, Cassels & Graydon LLP, 199 Bay Street
10  Suite 4000, Commerce Court West, Toronto, Ontario,
11  Canada, M5L 1A9, on Thursday, the 21st day of
12  September, 2017, commencing at 8:59 a.m. (EST) and
13  concluding the same day.
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2      I N D E X   O F   P R O C E E D I N G S
3
4  WITNESS:  TERENCE J. COLGAN, M.D.
5                              PAGE
6  EXAMINATION BY MR. RESTAINO....................8
7  EXAMINATION BY MR. DAVIS......................156
8  EXAMINATION BY MR. RESTAINO (CONT'D)..........162
9          -----------------------------
10
11  ---[ Reporter's note:  The following indices of
12  undertakings and refusals are provided for the
13  assistance of counsel and do not purport to be
14  complete or binding on the parties herein. ]
15
16          INDEX OF UNDERTAKINGS
17  The questions/requests refused are noted by U/T and
18  appear on the following pages:  12:10, 15:2.
19          --------------------
20
21
22          INDEX OF REFUSALS
23  The questions/requests refused are noted by R/F and
24  appear on the following pages:  (None).
25          --------------------

Page 3

1          A P P E A R A N C E S:
2  (REPORTER'S NOTE:  There were no remote attendees.)
3
4  FOR PLAINTIFFS:
5  RESTAINO LAW LLC
6  BY:  JOHN M. RESTAINO JR., ESQ., DPM, JD, MPH
7  1011 S. Josephine St.
8  Denver, Colorado 80209
9  Phone:  303-839-8000
10  Fax:   720-221-0449
11  Email:  JRestaino@Restainolawfirmpc.com
12
13  FOR DEFENDANTS, JOHNSON & JOHNSON
14  AND ETHICON, INC.:
15  BUTLER SNOW LLP
16  BY:  PAUL N. DAVIS, ESQ.
17  1020 Highland Colony Parkway, Suite 1400
18  Ridgeland, Mississippi 39157
19  Phone:  601-948-5711
20  Fax:   601-985-4500
21  Email:  paul.davis@butlersnow.com
22
23  COURT REPORTER:  Bonnie Lynn van der Meer, CSR
24          Commissioner of Oaths
25          (Commission Expires August 4, 2019)

Page 5

1          INDEX OF EXHIBITS
2
3  EXHIBIT NUMBER      DESCRIPTION      PAGE/LINE
4  1:  Notice to Take Deposition of Dr. Terry
5  Colgan with respect to Case 2:12-MD-02327
6  on September 21, 2017, pages 2 to 9,
7  electronically filed on September 19, 2017
8  by D. Renée Baggett of Aylstock, Witkin.......10:18
9  2:  A USB thumb drive containing case-related
10  electronic documents connected to a key fob
11  labelled "General - Dr. Colgan"...............13:21
12  3:  Academic Curriculum Vitae of Dr. Terence
13  (Terry) J. Colgan, dated November 14, 2016, pages
14  1 to 60......................................14:11
15  4:  Document entitled Terence Colgan, General
16  Reliance List in Addition to Materials
17  Referenced in Report, MDL Wave 6.............17:18
18  5:  A printout of a web page pertaining to
19  Terence Colgan, MD, FRCPC, from the website of
20  University of Toronto Laboratory Medicine &
21  Pathobiology Faculty Research Database........30:19
22  6:  Expert Report of Terence J. Colgan, MD,
23  dated June 19, 2017, with attached references,
24  pages 1 to 25................................39:24
25  7:  A printout of the University of Toronto

Terence J. Colgan, M.D.

Page 22

1  pathology?
2       A.  I think if one isn't in an
3  academic pathology environment and is restricted to
4  clinical practice only, then it would be the
5  diagnosis of disease through tissues and fluids.
6       Q.  And is your... (Clearing throat)
7  Excuse me.  I'm sorry.
8       Is it your academic interest, as a
9  pathologist, to look into the -- to gain insight
10  into the etiology of disease?
11       A.  Yes, within the time allotted in
12  my position.
13       Q.  What do you mean by that?
14       A.  I spend most of my time doing
15  diagnosis through the examination of tissues.
16       Q.  Okay.  So tissue that comes to you
17  say, for example, from the Operating Room?
18       A.  That's right.
19       Q.  Okay.  And in your role as a
20  pathologist, do you seek to determine how the body
21  responds to and repairs injury?
22       A.  On a daily basis, I don't seek to
23  identify how the body responds to injury.
24       Q.  Okay.
25       A.  I use what is available in the

Page 23

1  published surgical pathology literature.
2       Q.  Okay.  Now, are you a
3  gynecologist?
4       A.  No, I am not.
5       Q.  Are you a uro-oncologist?
6       A.  No, I am not.
7       Q.  And are you a urogynecologist?
8       A.  No, I am not.
9       Q.  Okay.  When was the last time you
10  took a history from a living patient?  And this
11  could be one of those estimate questions.  I don't
12  need the day.
13       A.  I have been practicing pathology
14  for over 25 years and during that time, I -- it has
15  not been my role to interact directly with patients
16  and to take clinical histories.
17       Q.  Okay.  And if I was to ask you,
18  when was the last time you performed a physical
19  examination on a patient, would your answer be the
20  same?
21       A.  Yes, it would.
22       Q.  If I was to ask you, when was the
23  last time you listened to subjective complaints of
24  a patient, would your answer be the same?
25       A.  No.  I do, on occasion, have

Page 24

1  patients call me about cases, sometimes at the
2  request of the gynecologist or treating surgeon,
3  and so I do, on occasion, speak to patients and
4  hear their concerns.
5       Q.  And while you are hearing of their
6  concerns, are you listening both for the subjective
7  complaints and listening for objective findings?
8       A.  This would usually be over the
9  phone, so I think by your question, these would be
10  qualified as subjective and not verified by
11  objective examination.
12       Q.  I guess I was thinking along the
13  lines of, if a patient called you up and said, 'I'm
14  doing well after surgery, but I have a
15  temperature,' and then you say, 'Well, what is your
16  -- have you taken your temperature?'
17       'Yes.  It's 101.'
18       The complaint of a temperature would be
19  subjective.  The reading of 101 would be objective.
20  Would you agree?
21       A.  I agree.
22       Q.  And so that's why I was asking if,
23  in your conversations, do you attempt to ascertain
24  objective data from a patient?
25       A.  My conversations with patients are

Page 25

1  on occasion and are very brief.
2       If, in fact, the patient had a concern
3  of that magnitude, I would direct them to their
4  treating surgeon.
5       Q.  Okay.  Fair enough.
6       Prior to reviewing any pathological
7  material that may be sent to you, when is the last
8  time that you have listened to the complaints of a
9  woman who was having mesh - and for purposes of
10  today's deposition, we'll be talking about the
11  mid-urethral sling and the other mesh that is used
12  for stress incontinence.
13       So when is the last time you listened
14  to complaints of a patient pre surgical excision?
15       A.  I cannot recall a time when I had,
16  in fact, spoken to a patient pre surgical excision.
17       Q.  Okay.  Now, you have examined mesh
18  that had been removed from women?
19       A.  Yes, I have.
20       Q.  Can you estimate for us
21  approximately how many times you have reviewed --
22  you have examined mesh?
23       A.  Over the 25-plus years of my
24  practice, there would be dozens of times.
25       Q.  Okay.  Have you had occasions in

Terence J. Colgan, M.D.

Page 26

1  the past where a surgeon sends to you, from the
2  Operating Room, polypropylene sutures that have
3  been removed because of a painful suture reaction?
4         A.  I cannot recall a time when we've
5  had a -- such a specimen.
6         Q.  Have you heard of the term
7  "spinning suture"?
8         A.  No, I have not.
9         Q.  Perhaps there's another way of
10  describing it.  When a -- when the body forms a
11  granuloma around an irritating suture and begins to
12  try to move it out.
13         And the surgeon will see a nodule, take
14  it out, and therein is a piece of suture.
15         Have you encountered that?
16         A.  I do not recall seeing such a
17  specimen, but I would wonder if such a specimen
18  would necessarily be submitted to the pathology lab
19  if it consisted of a single suture thread removed,
20  say, in the Emergency Room or Outpatient Clinic.
21         There are guidelines in our province
22  for which specimens do and do not have to be
23  submitted to Pathology.
24         Q.  So if I understand you correctly,
25  if a surgeon removes a simple piece of suture, that

Page 27

1  may not be sent to Pathology.
2         But if he excised a granuloma with the
3  suture inside, would you expect that tissue to be
4  sent to Pathology?
5         A.  If there has been a biopsy, as you
6  -- I think you're describing, yes, it would be sent
7  to Pathology.
8         Q.  And have you had an opportunity to
9  examine such material and see a suture within it?
10         A.  I can't recall a specimen which
11  has been removed purely for the suture.
12         We do see suture in specimens which
13  have been subjected to previous surgeries.  So for
14  example, ovarian cystectomy in a remote time
15  followed up by an excision of the ovary and
16  fallopian tube of the same side.
17         Q.  Okay.  In such a situation, have
18  you had the opportunity to see an allergic or
19  foreign body reaction to the suture material?
20         A.  Yes, I have -- I've seen a foreign
21  body reaction to suture material.
22         I wouldn't know how to identify an
23  allergic reaction.
24         Q.  Okay.  So now, I believe you
25  shared with us that you are in the Department of

Page 28

1  Laboratory Medicine and Pathobiology at the
2  university.  Is that correct?
3         A.  The University of Toronto is an
4  umbrella academic organization which embraces
5  several to multiple hospitals across Toronto.
6         So my clinical appointment is at the
7  Sinai Health System or Mount Sinai Hospital where I
8  conduct my clinical practice.
9         Q.  So it's one institution with
10  umbrella hospitals.  Is that correct?
11         A.  It's the umbrella university over
12  many different hospitals.
13         Q.  Okay.
14         A.  And my clinical practice would be
15  restricted to the one hospital system.
16         Q.  Okay.  Now, a colleague at the
17  University of Toronto in the Department of
18  Pathology is Dr. Vladimir - forgive me if I'm not
19  going to pronounce his last name correctly.  Is it
20  "Iakolev" (ph)?
21         MR. DAVIS:  "Iakolev" (ph).
22  "Iakovlev".
23         MR. RESTAINO:  "Iakolev"?
24         MR. DAVIS:  "Iakovlev".
25         BY MR. RAPHAEL:

Page 29

1         Q.  "Iakovlev".  Okay.  Yeah.
2         It's spelled I-a-k-o-v-l-e-v.
3         MR. DAVIS:  I have deposed him a number
4  of times and that's about as best I can say it is
5  "Iakovlev".
6         MR. RESTAINO:  "Iakovlev".  Okay.  We
7  will do our best.
8         BY MR. RESTAINO:
9         Q.  Do you know this physician?
10         A.  I only know him as a distant
11  colleague.  He did train through the university
12  program and moved through our hospital years ago.
13         But he is based at St. Michael's
14  Hospital and I do not work with him or interact
15  with him at all.
16         Q.  But it's fair to say he is in the
17  same institution, the University of Toronto, and in
18  the Department of Laboratory Medicine in
19  Pathobiology; correct?
20         A.  Correct.
21         Q.  Okay.
22         A.  You should understand that the
23  university department has over 300 appointees.
24         Q.  I understand.
25         Have you ever collaborated with him on

Terence J. Colgan, M.D.

Page 38

1      Q.  Okay.  Have you ever received
2  funding from Ethicon or any other manufacturer of
3  mesh, whether abdominal or pelvic, to conduct
4  research on?
5      A.  No, I have not.
6      Q.  From looking at your CV, you have
7  overseen the responsibilities of various visiting
8  scholars and fellows to Mount Sinai Hospital.  Is
9  that correct?
10      A.  This is correct.
11      Q.  And have you ever overseen a
12  visiting scholar or fellow conducting research into
13  vaginal mesh?
14      A.  No, I have not.
15      Q.  Or abdominal mesh?
16      A.  No, I have not.
17      Q.  Looking at your 2016 CV, I counted
18  that there were 152 articles, refereed or
19  peer-reviewed articles.
20          Is it your testimony today that the
21  latest or most current CV would contain more than
22  that 152.
23      A.  Yes.  It would probably be closer
24  to 160.
25      Q.  Okay.  Any of those, refereed or

Page 39

1  peer-reviewed articles published in the
2  peer-reviewed medicine deal with vaginal or -- or
3  abdominal mesh?
4      A.  No, they do not.
5      Q.  Now, again looking at papers that
6  have been presented to learned societies in your
7  CV, have you ever presented any papers to a learned
8  society on abdominal or vaginal mesh?
9      A.  No, I have not.
10      Q.  Looking at Dr. Iakovlev's CV, I
11  noticed that he lists a number of lectures,
12  workshops and visiting professorships where he has
13  lectured on the pathology associated with mesh.
14          To the best of your recollection, have
15  you ever attended any of those lectures?
16      A.  To my best of my recollection, no,
17  I have not attended any of those workshops.
18      Q.  Okay.
19          MR. RESTAINO:  I'm now going to ask the
20  court reporter to mark as Number 6 the expert
21  report that I have been provided with that is
22  authored by yourself.
23          ---(Discussion off the record.)
24          ---EXHIBIT NO. 6:  Expert Report of
25  Terence J. Colgan, MD, dated June 19, 2017, with

Page 40

1  attached references, pages 1 to 25.
2          BY MR. RESTAINO:
3      Q.  Dr. Colgan, do you recognize this
4  document?
5      A.  Yes, I do.
6      Q.  And on page 21 of the document
7  it's signed on June 19, 2017.
8          Do you see that?
9      A.  Yes.
10      Q.  That's your signature?
11      A.  That is my signature.
12      Q.  And above that, it indicates that
13  you haven't given any testimony in the last four
14  years.
15          Is that still accurate?
16      A.  This is still accurate.
17      Q.  And above that, it states that
18  your billing rate is $500 an hour.
19          Is that still accurate?
20      A.  That is still accurate.
21      Q.  Without being provided with any
22  invoices, this will be one of those estimate
23  questions.
24          Let me ask you this first:  When were
25  you first approached by anyone to provide an expert

Page 41

1  -- expert opinions regarding vaginal mesh and
2  pathology?
3      A.  It was late in 2016.
4      Q.  And who was it that contacted you
5  at that time?
6      A.  It was Mr. Andy Snowden.
7      Q.  And were you asked to do anything
8  at that time for Mr. -- well, let me ask you this:
9  Was Mr. Snowden a representative of Ethicon?
10      A.  He is a lawyer with Snow Butler.
11      Q.  Okay.
12      A.  At that time, I did not know who
13  he was representing.
14      Q.  Okay.
15          MR. DAVIS:  It's actually Butler Snow,
16  but that doesn't matter.
17          THE WITNESS:  Sorry.
18          MR. DAVIS:  That's all right.
19          BY MR. RESTAINO:
20      Q.  And at that time, did you hold
21  yourself out to be an expert in pathology
22  associated with vaginal mesh?
23      A.  I did not hold myself out to be an
24  expert in vaginal mesh.
25          He had called me because I have been

Terence J. Colgan, M.D.

Page 42

1 active and I would like to think somewhat prominent
2 in the gynecologic pathology community in North
3 America.
4     Q.  Okay.  Do you have any expertise
5 in the pathology associated with mesh utilized for
6 herniorrhaphy or abdominal repairs?
7     A.  No, I do not.
8     Q.  Okay.  If, tomorrow, when you are
9 in your real job, a general surgeon removes mesh
10 from the abdomen, would that be something that
11 would be sent to you or would that go to another
12 pathologist in your department?
13     A.  Until very recently, it would have
14 come to me.
15     Our hospital has recently adopted a
16 subspecialty practice model, so abdominal material
17 would move to another group of pathologists.
18     Q.  Okay.
19     If you look at page 3 -- first, on the
20 expert report, did you write this yourself?
21     A.  I did.
22     Q.  Is there any language in there
23 that was provided to you by anyone else?
24     A.  I had general discussions with
25 Mr. Snowden, but no, this is my work.

Page 43

1     Q.  Okay.  Not infrequently, in
2 academia, an author may utilize a resident, a
3 fellow, a research assistant to help them research
4 the topic and perhaps provide some outline work.
5     Did you utilize anyone like that in
6 writing this paper?
7     A.  No.  I did not use any other
8 writer or assistant, fellow or editorial assistant.
9     It is my work and I -- using references
10 and -- that I studied and general texts, and my own
11 25 years experience.
12     Q.  Now, you mentioned the word
13 "references".
14     In preparation for developing your
15 expert opinions that you will share today and in
16 writing your report, did you conduct any search of
17 medical literature through any database; for
18 example, PubMed?
19     A.  I did conduct research.  I did use
20 PubMed. I did use my generalized -- or my general
21 texts, as well.
22     Q.  What do you mean by "general
23 texts"?
24     A.  Gynecologic pathology texts.
25     Q.  So --

Page 44

1     A.  So, for example, Blaustein's is a
2 very standard text and it's called Blaustein's
3 Pathology of the Female Genital Tract, as I recall.
4     Q.  And what edition of Blaustein's do
5 you have?
6     A.  Well, I have several texts.  I
7 can't recall the number of every edition.
8     Q.  Okay.  Fair enough.
9     Would you agree that chapters in
10 medical textbooks, unlike articles in medical
11 journals, are not peer reviewed?
12     A.  This is a difficult question.
13     I think there are journals which
14 purport to be peer reviewed, but in fact have lax
15 standards and oversights.
16     Similarly, a good -- or in distinction,
17 a good text with a good editor can be considered to
18 be peer-reviewed because the editor had a rigorous
19 examination of each and every one of his chapters
20 author's product.
21     Q.  Okay.  Who should do that rigorous
22 examination of each chapter?
23     A.  It would be the editor of the --
24 of the textbook.
25     So, for example, Blaustein's Pathology

Page 45

1 may have 30 or 40 different chapter authors, but
2 there's only three editors-in-chief.  Their name
3 goes on the front.
4     Q.  So of those 30 or so authors, if
5 each had their own chapter - so let's just assume
6 for a moment there's 30 chapters - would you expect
7 those three editors to have that degree of
8 expertise to peer-review the subject matter in all
9 30 areas?
10     A.  The editors contribute in two
11 ways.  One is in substance and, as you suggest, the
12 chapter authors may have greater knowledge of that
13 particular area.
14     But the second duty an editor has is to
15 look at the rationale of arguments; has the
16 scientific proof been made, which is important to
17 the overall success of the text.
18     Q.  Okay.  Would you agree that peer
19 review is an important part of medical publication,
20 whether it's in textbooks and/or medical journals?
21     A.  The success of peer review has
22 come under scrutiny in the last ten years with the
23 rise of electronic publishing.
24     I think, years ago, scientists were
25 wedded to the concept that peer review was

Terence J. Colgan, M.D.

1 essential to a scientific article and provided good
2 scientific evidence.
3           What we are seeing now, though, with
4 the proliferation of journals and of electronic
5 media, is that quality of peer review can be very
6 spotty and, in fact, the best outcome or the best
7 way to judge the success and veracity of a paper is
8 its influence down the road.  Is it used?  Are its
9 findings duplicated or not?
10          Q.  If you would turn in your expert
11 report to page 3.  The fourth line down on the
12 right, you write:
13          "I see over 5,000 cases per
14      annum."
15      Do you see that, sir?
16      A.  Actually, I must be on the wrong
17 page.
18      Q.  Page 3.
19      A.  Yeah.  Sorry.
20      As chance would have it, I'm missing
21 page 3.
22      MR. DAVIS:  You know what?  The copy
23 you gave me has two page 3's.  It may have been --
24 it may have been that my copy --
25      MR. RESTAINO:  That was my stapling

1 last night.
2      MR. DAVIS:  Yeah.  That's all right.
3      MR. RESTAINO:  My apologies.
4      THE WITNESS:  Yes.  There were five
5 thou- -- yes.
6      BY MR. RESTAINO:
7      Q.  And I believe I have already asked
8 you this.  Forgive me.
9      Approximately, of those 5,000, can you
10 estimate how many of them involved mesh?
11      A.  It would be less than 1 per
12 percent.
13      Q.  Okay.  And are there other members
14 of the Department of Laboratory Medicine and
15 Pathobiology at the University of Toronto that also
16 see mesh, vaginal mesh that had been excised from
17 women?
18      A.  There are active women's programs
19 and gynecologic divisions in most of the university
20 hospitals and I wouldn't be surprised if some,
21 perhaps many of them do excise mesh and these
22 specimens would be submitted to the hospital's
23 pathology department.
24      Q.  Okay.  Do you have an estimate of
25 how many mesh are submitted to the Department of

1 Pathology at the University of Toronto in toto?
2      A.  I know of no database that would
3 tell you that number.
4      Q.  Okay.  Now still on page 3 which
5 you don't have and Paul has two copies of,
6 approximately at the middle of the page, you write
7 that, as you discuss having contributed to over 150
8 articles:
9          "Two of the papers examine the
10          inflammatory and healing reactions
11          in the gynecologic tract following
12          embolic therapy and hysteroscopic
13          surgery." [As read.]
14      With references 1 and 2.  Do you recall
15 that?
16      A.  Yes, I do.
17      Q.  Why did you include those
18 references in your report on the pathology
19 associated with mesh?
20      A.  I thought they were germane
21 because there are shared similarities in the
22 inflammatory reaction to post-embolic therapy and
23 to hysteroscopic surgery; that is, they elicit a
24 macrophage and foreign body giant cell reaction, as
25 one can see in mesh or one almost ubiquitously sees

1 in excised mesh specimens.
2      Q.  For the record and for whoever
3 else may be reviewing this transcript, first can
4 you define for us, when utilizing the term
5 "embolic", and the actual title of the article is
6 Pathologic Features of Uteri in Leiomyomas,
7 l-e-i-o-m-y-o-m-a-s, Following Uterine Artery
8 Embolization For Leiomyomas.
9          What aspect of embolism would initiate
10 a macrophage reaction?
11      A.  Uterine artery -- arterial
12 embolization is a technique that radiologists have
13 developed where, after catheterization, material is
14 injected into the uterine arteries in order to, if
15 you will, starve the uterine leiomyomas of blood
16 supply, inducing shrinkage and avoiding surgery --
17 any surgery, which would usually have been the
18 normal treatment.
19          So embolization is an attempt to treat
20 uterine fibroids or leiomyomas and avoid major
21 surgery.
22          Our study was looking at the
23 inflammatory response to that embolic material
24 within the uterine myometrium and adjacent tissues.
25          It was of interest to surgical

Terence J. Colgan, M.D.

Page 54

1    "...asked to review medical
2    literature, Dr. Iakovlev's research
3    and his written report in the matter
4    of allegations regarding possible
5    effects of the placement of
6    mid-urethral mesh slings in the
7    treatment of urinary stress
8    incontinence." [As read.]
9        Did I read that correctly, sir?
10       A.  Sorry.  I wasn't following with my
11   eye.  I was listening to you.
12       Q.  Okay.  Who asked you to conduct a
13   review of the medical literature, Dr. Iakovlev's
14   research, and his written report?
15       A.  Mr. Andy Snowden.
16       Q.  And did that occur back in 2016
17   when you first met?
18       A.  It occurred throughout the first
19   half of 2017.
20       Q.  Okay.  And as we had mentioned,
21   Dr. Iakovlev is a colleague of yours in the
22   University of Toronto Department of Laboratory
23   Medicines and Pathobiology; correct?
24       A.  Correct.
25       MR. RESTAINO:  I will go ahead and ask

Page 55

1    the court reporter to mark his web page as Number
2    7, I think.
3        THE COURT REPORTER:  Yes.
4        ---EXHIBIT NO. 7:  A printout of the
5    University of Toronto Laboratory Medicine &
6    Pathobiology faculty web page pertaining to Dr.
7    Vladimir Iakovlev.
8        BY MR. RESTAINO:
9        Q.  And again, I asked you, do you
10   know Dr. Iakovlev on a personal basis?
11       A.  I do not know him on a personal
12   basis.
13       Q.  Okay.
14       Now, one of the materials that you were
15   asked to review is a paper that is -- that was
16   co-authored by Dr. Iakovlev, titled Degradation of
17   polypropylene in vivo:  A microscopic analysis of
18   meshes explanted from patients.
19       Is that correct?
20       A.  That is correct.
21       Q.  And did you, in fact, review that
22   for purposes of your expert report?
23       A.  I did.
24       Q.  And do you consider yourself a
25   peer of Dr. Iakovlev in this area?

Page 56

1        A.  We are peer pathologists, but
2    clearly he has interests of a different nature than
3    I do.
4        Q.  Okay.  Now, his paper was
5    published in the Journal of Biomedical Research
6    Part B Applied Biomaterials, and this was in
7    February of 2017.
8        Did you review this paper when it was
9    published?
10       A.  No, I did not review -- I read it
11   after it was published.
12       Q.  Okay.
13       A.  When you say "review", I think of
14   prior to publication.
15       Q.  And let me strike that.  I
16   misspoke.
17       Did you read the paper when it was
18   published?
19       A.  I had read the paper.
20       Q.  Okay.  And you read it at the time
21   it came out, approximately?
22       A.  I read it earlier this year, so
23   yes, fairly soon after it appeared.
24       Q.  Okay.  Now, for purposes of your
25   expert report, you now, as a peer, have reviewed

Page 57

1    this paper and his expert report; correct?
2        A.  Correct.
3        Q.  Are you a peer reviewer for the
4    Journal of Biomedical Research, Part B, Applied
5    Materials?
6        A.  I am not.
7        Q.  Have you ever been?
8        A.  No.
9        Q.  Okay.  Now, in your role as both a
10   peer reviewer for the journals that you do conduct
11   peer review and have conducted peer review and in
12   your role of -- in your role as an associate
13   editor, you understand that there are certain
14   guidelines by which peer reviewers are selected;
15   correct?
16       A.  Yes, I do.
17       Q.  Do you understand that as a member
18   of the same institution, you would not be selected
19   to peer review this paper by Dr. Iakovlev because
20   of the appearance of conflict of interest?
21       A.  Not at all.
22       University of Toronto is such a large
23   institution, it wouldn't be unusual for me to
24   review a paper from another hospital--
25       Q.  Have you ever --

Terence J. Colgan, M.D.

Page 58

1    A.  --in my area.
2    Q.  Have you ever been asked to be a
3 peer reviewer for a colleague in the institution of
4 the University of Toronto?
5    A.  I can't recall a specific
6 instance, but I'm sure over my 20-plus years, I
7 have.
8    The University of Toronto is a very
9 large research institution.  Having or serving on a
10 few journals, I would expect, over the years, I
11 would have reviewed articles by colleagues with
12 appointments at the University of Toronto.
13    Q.  Would you agree that you would not
14 be asked to be a peer reviewer by any journal, to
15 peer review a paper by a fellow department member?
16    A.  It would -- it's customary not to
17 use somebody at the very same institution, so I
18 would not be asked, in all likelihood, to review
19 somebody at the Mount Sinai.
20    But it would not be unusual if the
21 paper came in from Sunnybrook Hospital, which is
22 distant, but still under the umbrella of University
23 of Toronto, to be asked to review a paper there.
24    Q.  Forgive me.  I think your answer
25 is a little different from what I was asking.

Page 59

1    Aside from the hospital itself, would
2 you agree that you would not be asked to be a peer
3 reviewer for anyone within the Department of
4 Laboratory Medicine and Pathobiology of the
5 University of Toronto?
6    A.  Could you clarify the question,
7 please?
8    Q.  As we established and as the pages
9 that I printed out establish, you and Dr. Iakovlev
10 are both members of the Department of Pathology at
11 University of Toronto; correct?
12    A.  Correct.
13    Q.  Would you agree that, (1), as an
14 associate editor when you select peer reviewers,
15 and, (2), when you're a peer reviewer yourself, you
16 would not be asked to peer review a paper by a
17 member in the same institution, let alone
18 department, because of actual or apparent conflict
19 of interest?
20    MR. DAVIS:  Object to the form and, I
21 believe, asked and answered.
22    But you can answer it.
23    THE WITNESS:  As I mentioned, it would
24 be extremely unusual or inappropriate to be asked
25 to review a paper of the same hospital institution.

Page 60

1    It would be acceptable and it may occur
2 to review a paper from another institution within
3 the University of Toronto system.
4    BY MR. RESTAINO:
5    Q.  And would your answer be the same
6 for the same department within an institution?
7    MR. DAVIS:  Object to the form.
8    THE WITNESS:  If what you're asking is,
9 would it be acceptable to review a paper from a
10 pathology department at Sunnybrook while I was
11 based at the Mount Sinai, that may occur and is
12 acceptable.
13    MR. RESTAINO:  I'm going to ask the
14 court reporter to mark next a paper published by
15 Human and Health Services Government, titled Ethics
16 of Peer Review:  A Guide for Manuscript Reviewers,
17 and we'll make this Number 8.
18    ---EXHIBIT NO. 8:  A paper published by
19 Human and Health Services Government, titled Ethics
20 of Peer Review:  A Guide for Manuscript Reviewers.
21    BY MR. RESTAINO:
22    Q.  It's a large document, so I've had
23 the court reporter mark the entire document.
24    To save trees, I've just made copies of
25 the pertinent areas.  And if you would slide down,

Page 61

1 if you could see, on page 5, which I believe I've
2 highlighted under "Real or apparent conflicts of
3 interest", I have highlighted that:
4    "Most journals have policies
5    that require that potential
6    reviewers recuse themselves from
7    reviewing manuscripts if they have
8    real or apparent conflict of
9    interest that might compromise the
10    objectivity of the report or that
11    might appear to compromise its
12    objectivity."  [As read.]
13 Did I read that correctly?
14    A.  Mm-hmm.
15    ---(Court reporter appeals.)
16    MR. DAVIS:  Be sure to say --
17    THE WITNESS:  Yes.
18    BY MR. RESTAINO:
19    Q.  And then, if you would turn to
20 page 9 of the document --
21    MR. DAVIS:  We don't have page 9.
22    Do you have page 9?
23    THE WITNESS:  No.
24    MR. RESTAINO:  No?  Oh.  I'm sorry.
25 Forgive me.  I got ahead of myself.

Terence J. Colgan, M.D.

Page 66

1    Did I read that correctly?
2    A.  Yes, you did.
3    Q.  And once again, we have
4 established that not only are you in the same
5 institution, the University of Toronto, but both
6 you and Dr. Iakovlev are in the same Department of
7 Pathology; correct?
8    MR. DAVIS:  Object to the form.
9    THE WITNESS:  Yes.  I have said that we
10 are in the same university and, once again, I will
11 come back to the issue of what is an institution
12 under concern, whether it's a hospital, the
13 university or even a wider institution than that.
14    I will also note that it says
15 disclosure doesn't necessarily exclude the review.
16 It should be disclosed.
17    MR. RESTAINO:  Okay.  Why don't we go
18 ahead and take our first hourly break.
19    ---Recess at 10:09 a.m.
20    ---On resuming at 10:17 a.m.
21    MR. RESTAINO:  I'm going to go ahead,
22 then, and we've been talking a little bit about
23 Dr. Iakovlev's paper, so I will go ahead and have
24 Madam Court Reporter mark as 10 the actual paper
25 itself for you.

Page 67

1    ---EXHIBIT NO. 10:  A paper co-authored
2 by Dr. Iakovlev, titled Degradation of
3 polypropylene in vivo:  A microscopic analysis of
4 meshes explanted from patients, published in
5 Journal of Biomedical Materials Research, February
6 2017, Volume 105B, Issue 2.
7    BY MR. RESTAINO:
8    Q.  Okay.  Now, Dr. Colgan, I believe
9 you testified that you read this paper after its
10 publication.
11    Is that correct?
12    A.  I read it after its electronic
13 publication, yes.
14    Q.  And the electronic publication was
15 in August of 2015?
16    A.  Yes.
17    Q.  And when you read this paper --
18 well, with it being published in the Journal of
19 Biomedical Materials Research, do you subscribe to
20 this journal?
21    A.  I do not.
22    Q.  And why did you read this paper
23 when it came out online or electronically in 2015?
24    A.  It was brought to my attention by
25 Andrew Snowden--

Page 68

1    Q.  Okay.
2    A.  --after our discussions of late
3 2016.
4    Q.  Okay.  And once you read the
5 paper, did you have criticisms of the methodology
6 and/or conclusions in the paper?
7    A.  I did.
8    Q.  And at that time, did you attempt
9 to contact the member of your department,
10 Dr. Iakovlev, and discuss your criticisms?
11    A.  I did not.
12    Q.  Is there a reason why not?
13    A.  It was for two reasons at least.
14    (1), it's not my custom to contact
15 colleagues if I disagree with their paper.
16    And (2) is, it was a published paper
17 and it would be unlikely to come to any useful
18 conclusion, short of retracting the entire article.
19    Q.  And is it your understanding that
20 being published in the Journal of Biomedical
21 Materials Research Part B:  Applied Biomaterials,
22 it is a peer-reviewed paper?
23    A.  I would expect it to be.  I'm not
24 familiar with its editorial board.
25    Q.  In August of 2015, Richard Hegele,

Page 69

1 H-e-g-e-l-e, MD, was the Chair of the University of
2 Toronto Department of Pathology.
3    Is that correct?
4    A.  Yes.
5    Q.  Did you bring your criticisms of
6 this paper to your department chair, indicating
7 that a member of the department had published
8 something that you disagreed with?
9    A.  No, I did not.
10    Q.  And currently, it's Avrum,
11 A-v-r-u-m G-o-t-l-i-e-b, Gotlieb is...?
12    A.  Actually, he has stepped down.
13    There's a new chair now.  Her name is
14 Rita Kandel, K-a-n-d-e-l.  She took up her position
15 as of April 1st, I believe it was.
16    Q.  With the current chair and/or the
17 interim chair, Dr. Gotlieb, have you ever
18 approached them with your criticisms of
19 Dr. Iakovlev's paper?
20    A.  I did not.
21    Q.  When it came out, did you --
22    A.  Can I elaborate on that answer?
23    Q.  Of course.
24    A.  There is a university and
25 departmental promotions and appointments committee

Terence J. Colgan, M.D.

Page 70

1 whose duty it is to review the academic performance
2 of individuals.
3         It is -- I cannot think of an example
4 where an individual faculty member brought to the
5 departmental chair's attention an individual paper
6 as a criticism or as a red flag.
7         Q.  Okay.  Fair enough.
8         Did you, when it was published, to this
9 journal itself, the Journal of Biomedical Materials
10 Research, or any other medical journal, did you
11 write -- have you ever written a letter to the
12 editor, criticizing the methodology and/or results
13 of this paper?
14         A.  Could you clarify the question?  I
15 just -- have I ever written about this particular
16 paper to anybody?
17         Q.  Yes.
18         A.  No, I have not.
19         Q.  Okay.  Earlier, when I asked you
20 if you did your own research including PubMed, for
21 example, when you did your PubMed research, did
22 your search terms include those that would have
23 brought up this paper?
24         A.  My search would be at least three
25 months ago and I can't recall the exact terms that

Page 71

1 I used.
2         Q.  Okay.
3         A.  As I recall, I believe I used the
4 terms "vaginal mesh" and "mesh", and whether this
5 paper was brought up or not, I can't recall.
6         Q.  Fair enough.
7         At any time since this paper was
8 published online and you were writing your expert
9 report and preparing for today's deposition, have
10 you gone online to see how many papers have cited
11 Dr. Iakovlev's paper?
12         A.  No, I have not.
13         MR. DAVIS:  Object to the form.
14         BY MR. RESTAINO:
15         Q.  As you sit here today, do you have
16 an understanding of how many times this paper has
17 now been cited in the peer-reviewed medical
18 literature?
19         A.  I have not inquired about that.
20         Q.  As you sit here today, do you know
21 if anyone has written any letter to the editor of
22 the journal, criticizing Dr. Iakovlev's methodology
23 and/or work?
24         A.  I don't know of any such letter.
25         Q.  Have you had any discussions with

Page 72

1 any individuals that you would consider peers in
2 your specialty regarding Dr. Iakovlev's methodology
3 and conclusions?
4         A.  No, I have not.
5         Q.  Based upon all the negative
6 answers you have shared with me, would you agree
7 that the criticisms that you have of his
8 methodology and his conclusions are limited to your
9 expert report in this litigation and your testimony
10 today?
11         MR. DAVIS:  Object to the form.
12         THE WITNESS:  I have not expressed my
13 reservations or criticisms about his report outside
14 of this process.
15         BY MR. RESTAINO:
16         Q.  Okay.  If you would turn to your
17 expert report which has been marked as Exhibit
18 Number 6, and turn to page 4.
19         You have a section there, The Practice
20 of Surgical Pathology - Technical Aspects.  Do you
21 see that, sir?  And your second full paragraph
22 starts with:
23         "Resecting human tissues may
24         show some retraction following
25         resection."  [As read.]

Page 73

1         Is that correct?
2         A.  Mm-hmm.
3         ---(Court reporter appeals.)
4         MR. DAVIS:  Say 'yes'.
5         THE WITNESS:  Yes.
6         BY MR. RESTAINO:
7         Q.  Jeez.
8         A.  Sorry.
9         Q.  Now, you write -- well, is it true
10 that you wrote, "Resected human tissues may show
11 some retraction," utilizing "may show" because
12 human tissues don't always retract following a
13 retraction -- resection; correct?
14         A.  I think the nature of the resected
15 human tissue would influence the amount of
16 retraction that occurred following resection.
17         Q.  And you write "some retraction"
18 because different tissues retract to different
19 degrees.
20         And by meaning "different tissues",
21 dermatological tissue retracts diff- -- assuming
22 they are all handled in the same way at the -- in
23 the operating theatre, the surgeon removes it,
24 hands it to either the circulating nurse or the
25 scrub nurse, and it's dealt with in the same manner

Terence J. Colgan, M.D.

Page 86

1 foreign body reaction is virtually ubiquitous when
2 you implant something like mesh.
3         When you start to go beyond that and
4 say that varying degrees and individual, I don't
5 know of surgical pathologic data that supports
6 that; that somebody has set out to measure events
7 and correlate it with symptomatology in particular.
8         It's a statement.  May -- may or may
9 not be correct.
10        Q.   Are you familiar with published
11 literature wherein women have -- I guess it's
12 redundant for me to be saying women to have vaginal
13 mesh excised - but vaginal mesh is excised in some
14 women years after implantation because of foreign
15 body reaction?  Have you read that literature?
16        MR. DAVIS:  Object to the form.
17        THE WITNESS:  I'm sure there are women
18 who have had their vaginal mesh excised.
19        I am not sure if it was excised
20 precisely because there was a foreign body giant
21 cell reaction or because of other symptomatology.
22 More likely, the latter.
23        BY MR. RESTAINO:
24        Q.   Okay.  I think we can revisit that
25 with some of the later questions we have.

Page 87

1         If you would turn to page 13 of your
2 expert report, and there's a section there you
3 titled Response to Dr. Iakovlev's published Journal
4 Medical Materials Research Paper.
5         That's the paper we have been
6 discussing; correct, sir?
7         A.   Mm-hmm.
8         ---(Court reporter appeals.)
9         MR. DAVIS:  Be sure to say --
10        THE WITNESS:  Yes.
11        BY MR. RESTAINO:
12        Q.   Okay.  And you write in the first
13 section there:
14        "Research papers using surgical
15        pathology specimens are often
16        observational studies, and this
17        paper is no exception.
18        Observational studies in surgical
19        pathology frequently consist of
20        reviewing a cohort of cases from
21        patients with a particular condition
22        or disease, and then seeking to make
23        correlations or associations with
24        clinical symptomatology, findings,
25        or outcome.  Since the research

Page 88

1         surgical pathology material is
2         derived from living human patients,
3         potential confounding variables can
4         rarely be fully controlled or
5         eliminated."
6         Did I read that correctly?
7         A.   Yes, you did.
8         Q.   And that is one of your criticisms
9 of Dr. Iakovlev's published paper; that it is, in
10 fact, an observational study; correct?
11        A.   Yes.  You could call it a
12 "criticism".  Perhaps a better word would be
13 "limitation".
14        Q.   Okay.  Do you feel that that
15 limitation decreases the value of the study?
16        A.   Since Dr. Iakovlev has gone on to
17 try and draw correlations between the surgical
18 pathologic findings and symptomatology, yes.
19        Q.   Okay.  Now if we could go back to
20 the Hill paper, the "Histopathology of excised
21 midurethral sling mesh", which is Exhibit 11.
22        A.   Yes.
23        Q.   This is also an observational
24 study, is it not?
25        A.   Yes, it is.

Page 89

1         Q.   If you look at "Methods" in the
2 abstract, they describe this as:
3         "...a retrospective
4         case-control study of women who
5         underwent excision of midurethral
6         sling mesh between 2008 and 2013."
7         Correct?
8         A.   Mm-hmm.  Correct.
9         Q.   Dr. Iakovlev's paper is a
10 retrospective study, also; correct?
11        A.   Correct.
12        Q.   Now, the utilizing your language
13 in your expert report that we just read from, the
14 same "potential confounding [factor] variables
15 which can rarely be fully controlled or
16 eliminated", as you apply to Dr. Iakovlev's paper,
17 also apply to the Hill paper which is your
18 reference 10 that you are relying upon for your
19 expert opinion; correct?
20        MR. DAVIS:  Object to the form.
21        THE WITNESS:  The Hill paper did go
22 further, though, and had good clinical data to put
23 together with their histopathologic obligations.
24        BY MR. RESTAINO:
25        Q.   And you understand that there are

Terence J. Colgan, M.D.

Page 90

1 experts on the other side who also believe that
2 Dr. Iakovlev's paper has good clinical data to go
3 with his results?
4         MR. DAVIS:  Object to the form.
5         THE WITNESS:  With respect to the paper
6 that we are discussing of his, I do not see
7 clinical data which is evident in the Hill paper.
8         BY MR. RESTAINO:
9     Q.  Okay.  You agree that they are
10 both retrospective analyses?
11    A.  Yes.
12    Q.  You agree that they both have
13 potential for confounding variables in that they
14 are, (a), observational studies; (b),
15 retrospective studies with all the epidemiological
16 biases that entails; correct?
17        MR. DAVIS:  Object to the form.
18        THE WITNESS:  They share
19 characteristics of observational and retrospective
20 studies, but the Hill paper has gone further and
21 collected clinical data and grouped them into three
22 groups, which is absent from Iakovlev's paper.
23        BY MR. RESTAINO:
24    Q.  Now, when you say that the Hill
25 paper also includes clinical data, the authors of

Page 91

1 the Hill paper did not have access to all of the
2 index surgical operative reports, did they?
3    A.  I can't recall that.
4    Q.  Would that be important to you?
5    A.  Sorry.  Can you repeat that
6 question again?
7    Q.  The authors of the Hill paper did
8 not have access to all of the index surgical
9 operative reports; therefore, they had to rely upon
10 subject recall, as documented in the electronic
11 medical record, for some of the data.
12        And that is a weakness and source of
13 bias in a retrospective case-control study, is it
14 not?
15        MR. DAVIS:  Object to the form.
16        THE WITNESS:  The... There are often
17 limitations in the amount of clinical data one can
18 obtain, either through a practical availability or
19 ethic board approval, but this doesn't change the
20 fact that they did get some clinical data which is
21 not present in Iakovlev's paper.
22        BY MR. RESTAINO:
23    Q.  In fact, they were able to obtain
24 only 55 percent of the index surgical operative
25 reports, and without the index operative surgical

Page 92

1 report, the authors are -- the authors were unable,
2 in 45 percent of the cases, to analyze potential
3 risk factors that may have led to increased levels
4 of inflammation, including the date of the index
5 mesh placement, because there's acute inflammation
6 associated with surgery; correct?
7        MR. DAVIS:  Object to the form.
8        THE WITNESS:  Acute inflammation is
9 usually seen upon initial insertion of the mesh,
10 yes.
11        BY MR. RESTAINO:
12    Q.  And the type of mesh utilized;
13 there are different inflammatory responses
14 dependent upon the type of mesh utilized.
15        Would you agree?
16    A.  I'm not an expert in the
17 examination of -- of mesh.
18    Q.  And there's --
19    A.  Research-wise.
20    Q.  Forgive me.  I'm sorry.  I didn't
21 mean to interrupt.
22        And the other potential risk factor is
23 the surgical approach that was utilized; whether it
24 was transobturator or retropubic can make a
25 difference.

Page 93

1        Wouldn't you agree?
2    A.  I'm not a urogynecologist, so I
3 defer that question.
4    Q.  Okay.  And additionally, not all
5 of the subjects who underwent revision of their
6 sling had pathological specimens for review,
7 introducing yet another form of bias.
8        Did you know that?
9        MR. DAVIS:  Object to the form.
10        THE WITNESS:  You're outlining a number
11 of concerns about the availability of clinical
12 data, but this doesn't change the basic underlying
13 fact that they did the best they could to get at
14 least some clinical data, which was not present at
15 all in Iakovlev's study.
16        BY MR. RESTAINO:
17    Q.  But the fact that they couldn't
18 get it all introduces bias, that you cannot sit
19 here and tell us how strong or important that bias
20 was.
21        Don't you agree?
22        MR. DAVIS:  Object to the form.
23        THE WITNESS:  There would be very few
24 clinicopathologic studies in the literature that
25 did not have some sort of bias.

Terence J. Colgan, M.D.

Page 94

1  Stating bias does not make this study
2  unique.
3     BY MR. RESTAINO:
4     Q.  And the fact that they rely upon
5  medical records in a retrospective fashion
6  introduces the potential for misclassification
7  bias, also, does it not?
8     A.  Yes.
9     Q.  So whereas you criticize
10 Dr. Iakovlev's paper in your report as being an
11 observational study with its weaknesses, you rely
12 upon Hill, yet your report does not inform the
13 judge that they didn't have 45 percent of the
14 operative reports, so therefore they didn't know
15 the index surgical date, so therefore they didn't
16 know if they were looking at acute postop
17 inflammation or inflammation secondary to a foreign
18 body reaction downstream, and the patients may have
19 had different surgical approaches.  And there are
20 differences in the literature between the
21 retropubic approach and the transobturator
22 approach.  And they had to rely strictly upon
23 medical records which could be incomplete and
24 introduce misclassification bias.
25     But your expert report does not state

Page 95

1  any of that, does it?
2     MR. DAVIS:  Object to the form.
3     THE WITNESS:  I did not go into the
4  Hill report in detail, but I would like to point
5  out some of the biases which are in Mr. -- or
6  Dr. Iakovlev's.
7     BY MR. RESTAINO:
8     Q.  And we're going to get to them and
9  you'll have your -- you will have an opportunity to
10 discuss them further, which you already have done
11 in your expert report.
12     Now, at the...  On page 13, at the end
13 of your first paragraph, you write:
14        "In surgical pathology research
15     papers observations must be reported
16     objectively in the 'results
17     section'.  Interpretation of the
18     results and hypotheses generated
19     from these interpretations must be
20     restricted to the subsequent
21     'discussion' section."
22     Did I read that correctly?
23     A.  Yes did you.
24     Q.  You then go on to say that:
25        "This paper by Dr. Iakovlev and

Page 96

1  colleagues does not adhere to good
2  scientific practice."
3     Did I read that correctly?
4     A.  Yes, you do.
5     Q.  This paper was peer-reviewed and
6  published in a peer-reviewed medical journal;
7  correct?
8     A.  And I've already expressed to you
9  that the issue around peer review and its quality
10 and success is under serious question in 2017.
11     Q.  Is there any question that you've
12 been aware of as to the quality of publications
13 from the Journal of Biomedical Materials Research
14 or --
15     A.  I'm not acquainted with the
16 journal, but I have great concerns about any
17 journal, which even in the Materials and Methods
18 section, allows a section to be called "Measurement
19 of degradation layer thickness" before the
20 presentation of any results whatsoever, which is in
21 flagrant violation of the initial question which is
22 being asked:  Is there degradation?
23     And then, within their "Materials and
24 methods" section, they have already concluded that
25 there is a degradation layer.

Page 97

1     Q.  Would you agree that within a
2  medical article submitted for peer review and then
3  publication to the general scientific medical
4  community, what is important in the scientific
5  method is the development of a hypothesis, the
6  testing of the hypothesis, the reporting of
7  conclusions, the peer review of those conclusions
8  in publication, and replication?
9     Would you agree that they are the
10 component parts of the scientific method?
11     MR. DAVIS:  Object to the form.
12     THE WITNESS:  Yes.  Having an initial
13 hypothesis, developing the methods, the results,
14 and then answering the question is important.
15     This paper mixes hypothesis, materials
16 and methods, and results.
17     BY MR. RESTAINO:
18     Q.  The paper reports data for the
19 general scientific and medical community, as a
20 whole, to look at, analyze, attempt to replicate if
21 the methods are appropriately described, and then
22 become generally accepted.
23     Why is it important to you where data
24 is presented?
25     MR. DAVIS:  Object to the form.

Terence J. Colgan, M.D.

| Page 98 |
|---|

1   THE WITNESS:  What's important to me is
2   that the data be presented in an objective fashion
3   and then the hypothesis tested in the discussion.
4       This paper seemingly sets out to prove
5   degradation by use of the term, not only within
6   "Results" section, but also in the "Materials and
7   methods".
8   BY MR. RESTAINO:
9       Q.  Did you review the abstract of the
10  paper?
11      A.  I did.
12      Q.  And does the abstract of the paper
13  itself lay out for the reader the hypothesis, the
14  methodology, the observations and the conclusions?
15      A.  I would have to reread it again,
16  but I would assume it would.
17      Q.  Okay.  And you write that:
18          "The authors are unable to
19      separate objective results from
20      subjective interpretations."
21  [As read.]
22  Do you recall that?
23      A.  Yes.
24      Q.  Is that your opinion today; that
25  Dr. Iakovlev and his colleagues are unable to

| Page 99 |
|---|

1   differentiate between objectivity and subjectivity?
2       A.  Yes.
3       I think when we get to the "Results"
4   section on page 3, in the very first sentence of
5   their second paragraph, they have already used the
6   -- the phrase "circumferential outer layer of
7   degraded polypropylene" before they presented the
8   rest of the results.
9       That statement, in my opinion, should
10  only have been made in the discussion.
11      You do not set out a hypothesis and
12  then conclude within the first sentence of your
13  second paragraph of results that your hypothesis
14  has been proven without first presenting the data.
15      Q.  By putting language in differing
16  sections of a peer-reviewed medical record --
17  medical article, in your expert opinion, does that
18  invalidate the data?
19      A.  It throws into question the
20  derivation and interpretation of the data.
21      Q.  A question which no letter to the
22  editor has yet to raise nor have you brought up
23  with any other colleague, your department chairman
24  or the journal itself.
25      The only time the criticism has come up

| Page 100 |
|---|

1   is in the context of your expert opinions in this
2   litigation.
3       Would you agree?
4       MR. DAVIS:  Object to the form.
5       THE WITNESS:  Yes, but let me
6   elaborate.
7       It's not uncommon for a critical
8   academic pathologist to have concerns about
9   published papers if -- and the methods that may
10  have been used.
11      We're all...
12      BY MR. RESTAINO:
13      Q.  You would agree that that would --
14      MR. DAVIS:  Wait.
15      MR. RESTAINO:  Oh.  I'm sorry.
16      MR. DAVIS:  Were you through with your
17  answer?
18      THE WITNESS:  There -- as my old
19  chairman used to say, there's never been a
20  perfectly published paper.
21      BY MR. RESTAINO:
22      Q.  Your statement about concerns,
23  though, would apply to other medical specialties,
24  would it not?
25      Let me elaborate.

| Page 101 |
|---|

1       Do you review, as part of your general
2   professional activity, surgical papers?
3       A.  I do not review surgical papers.
4   My reviews would largely be in surgical and
5   cytopathology.
6       Q.  Could you foresee a situation
7   where a new surgical procedure is published in the
8   peer-reviewed literature and a surgeon in that
9   specialty looks carefully at the methodology to
10  determine whether it makes sense and is a procedure
11  that he or she may want to try on his or her next
12  patient?
13      MR. DAVIS:  Object to the form.
14      THE WITNESS:  I am not sure I
15  understand what your question is.
16      BY MR. RESTAINO:
17      Q.  Going back to the statement that
18  you made as -- as why it's important for
19  pathologists to look for certain things in papers,
20  generally I'm asking, that applies to all medical
21  and scientific specialties, does it not?
22      A.  Yes.
23      Q.  And if the scientific method is
24  followed and if there's hypothesis and testing and
25  results and conclusions that undergoes peer review

Terence J. Colgan, M.D.

Page 102

1 and then subject to criticism by the general
2 scientific or medical community, then the
3 scientific method has been fulfilled, has it not?
4        A.   But that was not the case here.
5        This case did not follow the scientific
6 method.  It put forward a hypothesis and then
7 muddled the waters throughout the "Materials and
8 methods" and "Results" sections.
9        Q.   The paper, in your opinion, did
10 that, but the scientific method employed by the
11 researchers are the thinking of an hypothesis, the
12 actual testing of the hypothesis, the actual
13 observation of results, the actual deduction of
14 conclusions, then writing the paper for peer
15 review.
16        That scientific method has been
17 fulfilled in this paper.  It's just your criticism
18 of where they put the language; correct?
19        MR. DAVIS:  Object to the form.
20        THE WITNESS:  They did attempt to write
21 a scientific paper.
22        BY MR. RESTAINO:
23        Q.   And it was published in the
24 peer-reviewed medical literature?
25        A.   It was published in a

Page 103

1 peer-reviewed journal.
2        MR. RESTAINO:  Okay.  Let's go ahead
3 and take our next break.
4        ---Recess at 11:04 a.m.
5        ---On resuming at 11:11 a.m.
6        BY MR. RESTAINO:
7        Q.   Welcome back, Doctor.
8        A.   Thank you.
9        Q.   We could continue on page 14 of
10 your report, the section titled "Response to
11 Dr. Iakovlev's expert report".
12        You write:
13            "In the introduction of his
14        summary opinion, his expert report,
15        Dr. Iakovlev states that, 'The mesh
16        itself, as a foreign object, and the
17        body reaction to the mesh damaged
18        the tissues in a critical anatomical
19        location.'"  [As read.]
20        Do you agree with that statement?
21        MR. DAVIS:  Object to the form.
22        Do you mean, does he agree that
23 Dr. Iakovlev said that?
24        MR. RESTAINO:  Let me rephrase that.
25 That's an excellent objection.

Page 104

1        BY MR. RESTAINO:
2        Q.   Do you agree that the mesh itself,
3 as a foreign object, and the body's reaction to the
4 foreign object results in damage to tissue?
5        A.   The placement of the mesh and the
6 nature of the surgery does damage tissue, but
7 results in a healing process characterized by some
8 fibrosis and foreign body reaction to restore
9 tissue integrity.
10        Q.   And taking the mesh out of your
11 answer, that's the body's response to every
12 surgery, is it not?
13        A.   Correct.
14        Q.   The introduction of mesh adds a
15 second component to the healing process, and that's
16 the foreign body reaction.
17        Do you agree?
18        A.   Yes.
19        Q.   And a foreign body reaction is a
20 normal pathological response.
21        Is that a fair way of describing it?
22        A.   It's a ubiquitous pathologic
23 response to the foreign material, yes.
24        Q.   Okay.  And a foreign body reaction
25 -- I'm sorry.

Page 105

1        Inflammation following surgery is
2 typically acute in nature if there's isn't any
3 postoperative sequelae.
4        Would you agree?
5        A.   It initiates with acute and then
6 moves on to a chronic phase, as I outlined in my
7 report.
8        Q.   And acute inflammation following
9 surgery is normal pathology?
10        A.   It's a -- yes, normal pathologic
11 response.
12        Q.   Without that acute inflammation,
13 there truly isn't healing; correct?
14        A.   Correct.
15        Q.   Once the inflammation goes past a
16 certain point, it's now pathological inflammation,
17 chronic in nature.
18        Do you agree with that?
19        A.   I think you're drawing a
20 distinction which I'm uncertain about.
21        The chronic inflammation is as much a
22 normal part of the pathologic and healing reaction
23 as the acute.
24        Q.   Let me try to make it a little
25 clearer from my end and easier for you to answer

Terence J. Colgan, M.D.

Page 110

1  disappear.
2      BY MR. RESTAINO:
3      Q.  On page 14, right above the
4  section "Response to Dr. Iakovlev's Expert Report",
5  that one-sentence paragraph, you write:
6          "In this paper Dr. Iakovlev
7      concludes that the mechanism leading
8      to mesh-related complications is
9      unclear, through his statement,
10     '...the exact mechanisms of these
11     late complications are yet to be
12     understood,'."
13     Did I read that correctly?
14     A.  Yes, you did.
15     Q.  Now, in fact, if you turn to page
16  10 of Dr. Iakovlev's paper, there's a section on
17  the left column...  Are you there, sir?
18     A.  Yes.
19     Q.  Okay.  ...that says "Clinical
20  significance of polypropylene degradation".
21     Do you see that?
22     A.  Yes.
23     Q.  And in the second paragraph where
24  I believe you're attempting to quote from, he
25  writes:

Page 111

1          "The clinical descriptions
2      provided with the specimens
3      indicated that in many cases,
4      mesh-related complications develop
5      several years after mesh
6      implantation.  The exact mechanisms
7      of these late complications are yet
8      to be understood, however factors
9      accumulating over time need to be
10     considered as primary contributors."
11     Did I read that correctly?
12     A.  Yes, you did.
13     Q.  That's not what you quoted in your
14  paper.
15     A.  I quoted --
16     MR. DAVIS:  Object to form.
17     THE WITNESS:  I quoted partially.  I
18  didn't put in the entire sentence.
19     BY MR. RESTAINO:
20     Q.  Okay.  Now, the medical literature
21  itself is replete with reports of mesh-related
22  complications developing several years after
23  implantation, is it not?
24     A.  I have become aware of them.
25     Q.  And that literature includes both

Page 112

1  abdominal mesh and vaginal mesh that develop
2  complications years after implantation; correct?
3      A.  I accept that.
4      Q.  Page 15 of your report, as you
5  continue on, your very first sentence states:
6          "Tissue damage is a consequence
7      of any surgery, including
8      incontinence surgery, and would
9      occur with non-mesh surgery for
10     incontinence, as well."
11     Did I read that correctly?
12     A.  Yes, you did.
13     Q.  Surgery for incontinence which
14  does not involve mesh, though, would not have the
15  foreign body reaction to the mesh to contend with.
16     Wouldn't you agree?
17     A.  Correct.  I mean, the surgery
18  still involves an incision and all the acute
19  inflammation, granulation tissue, fibrosis that I
20  described earlier in my report.
21     Q.  Would you agree that the host
22  reaction during a surgery that involves mesh is
23  different than the host reaction to surgery in the
24  pelvis that does not include mesh?
25     MR. DAVIS:  Object to the form.

Page 113

1      THE WITNESS:  Yes.  I think, by nature,
2  you do have a foreign body.  There is going to be a
3  different appearance by microscopy.
4      MR. RESTAINO:  I would like to mark as
5  the next exhibit - I think we're...
6      THE COURT REPORTER:  12.
7      MR. RESTAINO:  12?
8      THE COURT REPORTER:  Mm-hmm.
9      MR. RESTAINO:  Okay.  Article titled
10  Foreign Body Reaction to Biomaterials by James M.
11  Anderson, et al., published in Seminars of
12  Immunology in 2008.
13     ---EXHIBIT NO. 12:  Article entitled
14  Foreign Body Reaction to Biomaterials, by James M.
15  Anderson, et al., published in Seminars of
16  Immunology in 2008.
17     BY MR. RESTAINO:
18     Q.  I represent to you that I did not
19  find this referenced in your expert report, nor did
20  I find it in your general reliance list.
21     Do you recall seeing this paper?
22     A.  I do not.
23     Q.  In your search of PubMed and
24  writing for expert reports, would this not be a
25  paper that would come up using your keywords?

Terence J. Colgan, M.D.

Page 118

1      Does that sound familiar?
2      A.  I do not recall that.
3      I do recall -- I don't recall the
4  figures.  I remember a Canadian study.
5      Q.  Okay.  We'll get to that in a
6  moment and we'll discuss it.
7      You then write that:
8          "Dr. Iakovlev has identified no
9      histological feature unique to
10     certain complications, no matter
11     their frequency."  [As read.]
12     What unique histological feature would
13 you expect to see in a foreign body reaction?
14     In fact, it's typically a universal
15 reaction, whether it's a heart valve, an artificial
16 knee.  If it's mesh, wherever it is in the body,
17 there's a normal foreign body reaction; correct?
18     MR. DAVIS:  Object to the form.
19     THE WITNESS:  Yes.
20     BY MR. RESTAINO:
21     Q.  So I guess I'm confused in what
22 would you have liked to have seen described that
23 would be unique to a foreign -- to a mesh foreign
24 body reaction?
25     A.  I --

Page 119

1      MR. DAVIS:  Object to the form.
2      THE WITNESS:  I think the better
3  question is:  What -- why couldn't Dr. "I" find
4  something to explain the pain specifically instead
5  of hypothesizing, as he does without evidence, that
6  this reaction is necessarily the central event in
7  the development of symptomatology?
8      BY MR. RESTAINO:
9      Q.  It's widely reported that there's
10 a foreign body reaction to the mesh; agreed?
11     A.  Agreed.
12     Q.  And it's widely reported that the
13 foreign body reaction can be acute and/or chronic
14 in nature?
15     A.  By definition, a foreign body
16 reaction is chronic.
17     Q.  And there are patients who, with a
18 chronic foreign body reaction, develop pain years
19 after implantation to the point where the mesh has
20 to be removed; correct?
21     MR. DAVIS:  Object to the form.
22     THE WITNESS:  Yes.
23     BY MR. RESTAINO:
24     Q.  And in that situation, the
25 patients present with the normal or I think the

Page 120

1  word you used was the "ubiquitous" pathological
2  response, which is a pathological response, but
3  it's normal?
4      MR. DAVIS:  Object to the form.
5      BY MR. RESTAINO:
6      Q.  Is that correct?
7      A.  Yes.  We agree, it's a normal
8  pathologic response.
9      Q.  So I am confused where in that
10 continuum you would expect for Dr. "I" or any other
11 researcher to come up with a unique observation
12 that indicates, 'Aha.  This is a foreign body
13 reaction due to a mesh.'
14     MR. DAVIS:  Object to the form.
15     THE WITNESS:  He has not identified any
16 particular pathologic finding with symptomatology,
17 from my reading.
18     BY MR. RESTAINO:
19     Q.  Continuing on page 15, towards the
20 bottom -- oh, I'm sorry.  Let me back up and I will
21 preface it by saying that is your opinion:
22         "Dr. "I"'s opinion's are
23     counter to professional
24     organizations of physicians and
25     surgeons who treat stress urinary

Page 121

1      incontinence who have recently
2      reaffirmed their support for the use
3      of polypropylene mid-urethral
4      slings."
5      Is that your opinion?
6      A.  Yes.
7      Q.  Have you ever seen or heard
8  Dr. Iakovlev write or say that in his opinion,
9  these mesh devices should be taken off the market?
10     A.  No, I have not heard him say that.
11     Q.  Does he state that anywhere in his
12 expert report?
13     A.  Not that I'm aware of.
14     Q.  In fact, in his papers and in his
15 expert report, as a pathologist, Dr. Iakovlev
16 describes pathology which, as we started off the
17 deposition by saying, is the study of disease
18 hopefully in order to prevent or treat disease;
19 correct?
20     A.  Correct.
21     Q.  So in support of his opinion, you
22 reference in your expert report, the May 2017
23 position paper by the Royal Australian and New
24 Zealand College of Obstetricians and Gynecologists
25 known at RANZCOG, all capital, R-A-N-Z-C-O-G.

Terence J. Colgan, M.D.

Page 126

1  up with the term "foreign body reaction".  And
2  Dr. Iakovlev does not describe the incidence or
3  recommend removal of mesh.
4       Where do these two -- does this
5  organization and Dr. Iakovlev disagree?
6       MR. DAVIS:  Object to the form.
7       THE WITNESS:  My purpose in citing this
8  paper was to put the context of current mesh use
9  within the medical profession in order to give a
10  context to Dr. "I"'s research and opinions.
11       BY MR. RESTAINO:
12       Q.  You actually write:
13            "Dr. "I"'s opinions are counter
14       to professional organizations of
15       physicians and surgeons who treat
16       stress urinary incontinence."
17       [As read.]
18       Where are his opinions counter to
19  anything that's in that organization's position
20  statement?
21       MR. DAVIS:  Object to the form.
22       THE WITNESS:  I think if one reads his
23  -- some of his statements are sufficiently broad as
24  to give rise to the concern of use of mesh, at all.
25       BY MR. RESTAINO:

Page 127

1       Q.  Do you not believe that Dr. "I"
2  presents, with his coworkers, his basis for his
3  beliefs regarding the cause of pain that patients
4  experience with mesh?
5       A.  I believe he has attempted that,
6  yes.
7       Q.  And as a pathologist, the study of
8  the cause of disease is an important factor;
9  correct?
10       A.  When pursued in a scientifically
11  valid fashion, yes.
12       Q.  And have you -- you criticize his
13  paper that we have been discussing regarding the
14  language of -- the placement of certain language.
15       Have you reviewed all of his papers on
16  transvaginal mesh?
17       A.  I have not.
18       Q.  Now, if I can find it... Ah, yes.
19       On page 16, there's a full paragraph,
20  the very first full paragraph, and you indicate
21  there that:
22            "Dr. Iakovlev fails to
23       acknowledge the low complications
24       from mesh devices yet he himself
25       co-authored a review article that

Page 128

1  reported chronic pain to occur in
2  1.8 percent of patients receiving a
3  retropubic sling (such as TVT) and
4  in 4.3 percent of parents receiving
5  transobturator sling (such as
6  TVT-O). [Reference 19]
7            "Dr. Iakovlev also ignores a
8       recent population-based study
9       published from Ontario, Canada,
10       where both he and I work, showing
11       the overall rate of mesh removal or
12       revision of SUI slings to be 2.2
13       percent in the 59,887 women studied.
14       [Reference 23]."  [As read.]
15       Do you see that, sir?
16       A.  Yes.
17       Q.  Now, his expert report is on the
18  pathology of mesh, not on the incidence of mesh
19  excision.
20       Would you agree?
21       A.  Yes.
22       Q.  And his paper in the Journal of
23  Biomaterials Research also has to do with pathology
24  and not epidemiology.
25       Do you agree?

Page 129

1       A.  Yes.
2       Q.  And you're not -- are you saying
3  that with the population-based study that occurred
4  here in Canada, that there -- with the 2.2 percent
5  removal or revision rate, are you saying that
6  that's clinically insignificant?
7       A.  No, I'm not saying it's clinically
8  insignificant.
9       Quite to the contrary, I have
10  acknowledged that there are cases of removal and
11  re-excision of the mesh.
12       What I am suggesting is that by failing
13  to identify the incidence of serious complications,
14  Dr. "I" has not provided the context to place his
15  pathologic findings in the overall medical use and
16  picture of vaginal slings, and that the selective
17  use of data and the omission of data is, in my
18  opinion, not consistent with the best medical
19  papers.
20       Q.  In the context of the litigation
21  and his expert report, do you understand that there
22  are epidemiological experts for each side
23  presenting data on incidence and prevalence?
24       A.  I'm not surprised.  I wasn't aware
25  there was.

Terence J. Colgan, M.D.

Page 154

1  you ever look at a paper by Feiner, F-e-i-n-e-r,
2  and Maher, M-a-h-e-r, titled Vaginal mesh
3  contraction: Definition, clinical presentation, and
4  management, which I will ask the court reporter to
5  mark as the last exhibit.
6       MR. DAVIS:  Object to the form.
7       THE WITNESS:  I don't recall that.
8       ---EXHIBIT NO. 16:  A paper by Feiner
9  and Maher, titled Vaginal mesh contraction:
10  Definition, clinical presentation, and management.
11       BY MR. RESTAINO:
12       Q.  I will put to you that it's --
13  this paper is not listed in your expert report nor
14  is it in your general reliance list.
15       If I can direct your attention to the
16  conclusion of the abstract:
17            "Vaginal mesh contraction is a
18       serious complication after prolapse
19       repair with armed polypropylene mesh
20       that is associated with substantial
21       morbidity, frequently requiring
22       surgical intervention. Research and
23       development is urgently needed for
24       newer graft materials with
25       diminished shrinkage properties."

Page 155

1       [As read.]
2       Did I read that correctly?
3       A.  Yes, you did.
4       Q.  This is counter to your expert
5  opinion that there's no evidence that the mesh
6  contracts.
7       Would you agree?
8       MR. DAVIS:  Object to the form.
9       THE WITNESS:  Of course, I haven't read
10  this before, but I am struck by their "n" number is
11  only 17, which seems to contradict their statement
12  that it causes substantial morbidity when we know
13  that there are tens of thousands of such mesh, if
14  not more, used each year in North America.
15       BY MR. RESTAINO:
16       Q.  But their "n" number deals with
17  their own particular study.
18       And before their study, they also have
19  a "Discussion" section where they review the
20  pertinent medical literature and the FDA
21  announcement in 2008, and then in 2008 when they
22  mention, where they describe complications;
23  correct?
24       A.  I don't know.  I -- you've only
25  just handed me this paper.

Page 156

1       Q.  And in your search for writing
2  your expert opinion where, in your opinion, there's
3  little to no evidence that mesh contracts, you did
4  not find the paper "Vaginal mesh contraction"; do
5  you agree?
6       A.  I must not have.
7       MR. RESTAINO:  I have no further
8  questions.
9       MR. DAVIS:  Okay.
10       MR. RESTAINO:  How's that for timing?
11       MR. DAVIS:  You did great.
12       Let's just take a break for a second.
13       ---Recess at 12:16 p.m.
14       ---On resuming at 12:20 p.m.
15       EXAMINATION BY MR. DAVIS:
16       Q.  Dr. Colgan, as you know, I'm Paul
17  Davis. I have just a few follow-up questions.
18       I don't know if I wrote this down
19  accurately or not, but early on in your deposition,
20  in an answer to one of John's questions, I believe
21  I heard you say something to the effect that, 'I
22  did not hold myself out to be an expert in the
23  pathology of vaginal mesh.'
24       Whether -- do you recall saying
25  something to that effect?

Page 157

1       A.  Yeah.  And I -- yeah, I remember
2  that question.
3       Q.  Can you just explain what you
4  meant by that?
5       A.  So what I meant was, I'm not a
6  research expert in vaginal mesh.  As has been
7  pointed out, I haven't published on it, I haven't
8  held contracts with it, I haven't done industry
9  contracts.
10       But I do -- I do have insights, as a
11  gynecologic pathologist, into foreign tissue
12  reactions and I am capable, as a 25-year-plus
13  gynecologic pathologist, to assess the validity of
14  histopathologic claims around vaginal mesh.
15       Q.  As far as examining the pathology
16  of explanted meshes or specimens that had mesh in
17  them, do you have an estimate of how frequently
18  over the years, how many a year you reviewed?
19       ---(Court reporter appeals.)
20       BY MR. DAVIS:
21       Q.  ...how many of those specimens
22  that you have reviewed on an annual basis,
23  approximately?
24       A.  Probably no more than a dozen a
25  year.  At our institution, there's three of us that

Terence J. Colgan, M.D.

Page 158

1  do gynecologic pathology and I do about 60 percent
2  of it, so...
3        Q.  And for how many years would that
4  -- has that been going on?
5        A.  Well, at least 10 years for the
6  explants, I would think.  Yeah.
7        Q.  Okay.  With respect to the report
8  you have written and issued in this case, were the
9  opinions that you express in that report within
10  your expertise?
11        A.  Absolutely.  I mean, many of those
12  opinions that I've written about is about the
13  practice of surgical pathology, histopathology in
14  general and gynecologic pathology specifically.
15        Q.  Then, with respect to your
16  opinions concerning what Dr. Iakovlev has written
17  in his report, are those opinions of yours in your
18  response to Dr. Iakovlev, are those within your
19  field of expertise?
20        A.  Yes.
21        Q.  Now, looking at your report, I
22  believe you were asked to look at page 16, at one
23  point, of your report, and where there was a
24  paragraph - I think it was the full first paragraph
25  on the page - where you pointed out that

Page 159

1  Dr. Iakovlev had ignored the fact that the reported
2  chronic pain occurs in about 1.8 percent of
3  patients receiving a TVT.
4        Can you explain to the jury why you
5  were critical of Dr. Iakovlev for not considering
6  that percentage as opposed to the large percentage
7  of ladies who have not reported pain?
8        A.  Well, I think when you read
9  Dr. "I"'s report, you're struck by its focus on why
10  mesh failed and symptomatology due to mesh failure,
11  if we call it that.
12        And I think, and I still think it's
13  important to place into context the number of women
14  or the low percentage of women who actually have
15  complications and pain in a very common surgical
16  procedure.
17        Q.  Okay.  In the field of pathology,
18  in order to establish a pathological correlate
19  between pain and something you're seeing in
20  pathology, is it customary to have a, you know,
21  comparison with some control group?
22        A.  Yeah.  Many... One has to
23  understand that Dr. "I"'s research is highly biased
24  to those cases which have failed by the nature that
25  the vaginal mesh has been excised.

Page 160

1        So when he makes statements about
2  "vascular compartments" or "edema can lead to", he
3  really doesn't have a control group when he has
4  looked at those features, "vascular compartments"
5  and "edema", to know whether to -- whether those
6  so-called descriptions of these areas are really
7  associated with the symptomatology that he
8  conjectures is ascribed to them.
9        He doesn't have a suitable alternative
10  group without failure.
11        Q.  As counsel opposite, I believe,
12  pointed out, that Dr. Iakovlev's report had a
13  number of photomicrographs attached to it.
14        Do you recall that?
15        A.  Yes.
16        Q.  In those -- do you recall having
17  looked at those photomicrographs?
18        A.  Yes.
19        Q.  Those photomicrographs, in general
20  - since we don't have them here as part of the
21  exhibit today, I'll just ask you in general - are
22  they depicting reactions, you know, acute
23  inflammation in some cases, chronic inflammation in
24  other cases, that are somehow significantly
25  different from what you would see in other

Page 161

1  specimens that don't have mesh in them?
2        A.  No.  I mean, many -- many of his
3  photomicrographs are not unexpected in a suture
4  granuloma or -- or another site of a foreign body.
5        His captions, when he -- I believe he
6  uses terms like "damaged vessels".  It indicates an
7  interpretation which would not normally be
8  justified.
9        Q.  I have one last area I want to
10  cover.
11        You were asked some questions about the
12  position statements the RANZCOG and the AUGS and
13  the SUFU.
14        Do you recall that in general?
15        A.  Yes.
16        Q.  And I believe counsel opposite
17  pointed out that those position statements did not
18  say anything about the subject matter of what
19  Dr. Iakovlev has opined about as far as pathology
20  associated with these slings; correct?
21        MR. RESTAINO:  Objection.
22        THE WITNESS:  Correct.
23        BY MR. DAVIS:
24        Q.  And so, can you just explain to
25  the jury why it's important, to you, to consider

Terence J. Colgan, M.D.

Page 162

1  those -- strike that.  Let me start over.
2      Can you explain to the jury why you
3  believe it's important that Dr. Iakovlev should
4  have considered these position statements, given
5  that they don't mention pathology?
6      A.  Again, I think it's important to
7  put the context of Dr. "I"'s work and conjectures
8  in the context of the overall success of slings and
9  it's... I...
10      Although these are clinical statements
11  and clinical assessments, I think we have to
12  realize that if concerns about Dr. "I"'s pathology
13  observations were widely shared, that they would
14  have been reflected, even though these were
15  clinical statements.
16      ---(Court reporter appeals.)
17      THE WITNESS:  ...even though these were
18  clinical statements.
19      MR. DAVIS:  That's all I have.
20      MR. RESTAINO:  Just one follow-up
21  question.
22      EXAMINATION BY MR. RESTAINO:  (CONT'D)
23      Q.  When you indicate - paraphrasing -
24  that you believe Dr. "I" should be taking into
25  consideration the overall success of these slings,

Page 163

1  in fact, it's the opposite.
2      Dr. "I", as a pathologist, is
3  interested in the overall failure of these slings.
4  Again, as we discussed, over 60,000 failures have
5  occurred and, as a pathologist, that's what
6  pathologists do; look at the cause of disease and
7  trauma; correct?
8      MR. DAVIS:  Object to the form.
9      THE WITNESS:  Dr. "I"'s work has one
10  central failure, is that he has only looked at
11  those specimens which have come to him as a result
12  of failures, of re-excision.
13      He has not been able to look at the
14  histopathology of all those 98 percent of the women
15  who would have done well with their sling.  And
16  without looking that group, his conjectures about
17  tissue compartmentalization and vascular this and
18  edema that can't be substantiated because he has no
19  comparative group.
20      BY MR. RESTAINO:
21      Q.  In your opinion, is there any
22  diagnostic modality that would allow a pathologist
23  to look for that presence or absence of pathology
24  in a living female who is not willing to undergo
25  surgical procedure just for the purpose of study?

Page 164

1      A.  You are suggesting ethically, it's
2  very hard to get ahold of those other specimens and
3  I'm suggesting until you have them through whatever
4  way - autopsy or whatever - you have to be very
5  circumspect about the conclusions you can draw from
6  a highly biased group of pathology specimens drawn
7  from failed slings.
8      Q.  And are you aware of any autopsy
9  studies that have been published where they've
10  looked at mesh during the autopsy in women who did
11  not have presenting symptomatology?
12      A.  I do not know of any.
13      MR. RESTAINO:  No further questions.
14      MR. DAVIS:  Thank you.
15      MR. RESTAINO:  Thank you.  Thank you
16  very much.
17      THE WITNESS:  Okay.
18      ---[ Ending time:  12:31 p.m. ]
19
20
21
22
23
24
25

Page 165

1      REPORTER'S CERTIFICATE
2
3      I, BONNIE LYNN VAN DER MEER, CSR,
4  Certified Shorthand Reporter, certify;
5      That the foregoing proceedings were
6  taken before me at the time and place therein set
7  forth, at which time the witness was put under oath
8  by me;
9      That the testimony of the witness
10  and all objections made at the time of the
11  examination were recorded stenographically by me
12  and were thereafter transcribed;
13      That the foregoing is a true and
14  correct transcript of my shorthand notes so taken.
15
16
17
18
19  _____
20  BONNIE LYNN VAN DER MEER, CSR
21  REAL-TIME REPORTER
22
23
24
25