EXHIBIT C

2

```
 2           IN THE COURT OF COMMON PLEAS
 3        FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 4               CIVIL TRIAL DIVISION
 5                     - - -
 6   MARGARET ENGLEMAN        :
 7        VS.    : MARCH TERM, 2014
 8   ETHICON, INC., ET AL.    : No. 05384
 9                     - - -
10            THURSDAY, APRIL 13, 2017
11              AFTERNOON SESSION
12                     - - -
13                    TRIAL
14                     - - -
15                COURTROOM 436
16                  CITY HALL
17           PHILADELPHIA, PENNSYLVANIA
18                     - - -
19   B E F O R E:  THE HONORABLE ANN M. BUTCHART, J.
20          AND A JURY
21
22
23
24
25
```

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

```
 2   APPEARANCES:
 3
 4   ERIK WALKER, ESQUIRE
     Justinian & Associates
 5   8770 Research Boulevard
     Austin, TX 78758
     (512)980-0000
 6
 7   BEN ANDERSON, ESQUIRE
     Anderson Law Offices
 8   17138 Lorain Avenue, Suite 211
     Cleveland, OH 44111
 9   (216)589-0256
10
     DANIEL THORNBURGH, ESQUIRE
11   BRYAN AYLSTOCK, ESQUIRE
     BOBBY J. BRADFORD, ESQUIRE
12   Aylstock, Witkin, Kreis & Overholtz, PLLC
     17 East Main Street, Suite 200
13   Pensacola, FL 32502
     (850)202-1010
14
15   CHRISTOPHER A. GOMEZ, ESQUIRE
     Kline & Specter, PC
16   1525 Locust Street
     Philadelphia, PA 19102
17   (215)772-1000
18
19   Counsel for Plaintiff
20
21
22
23
24
25
```

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

3

```
 2   APPEARANCES CONT'D:
 3
 4   JAMES M. CAMPBELL, ESQUIRE
     Campbell Campbell Edwards & Conroy, PC
 5   One Constitution Plaza
     Boston, Massachusetts 02129
 6   (617)241-3060
 7
 8   RITA A. MAIMBOURG, ESQUIRE
     Tucker Ellis, LLP
 9   950 Main Avenue, Suite 1100
     Cleveland, Ohio 44113-7213
10   (216)696-3219
11   NILS B. SNELL, ESQUIRE
     PAUL S. ROSENBLATT, ESQUIRE
12   Butler Snow, LLP
     500 Office Center Drive, Suite 400
13   Fort Washington, PA 19034
     (267)513-1885
14
15   MELISSA MERK, ESQUIRE
     Drinker Biddle & Reath, LLP
16   One Logan Square, Suite 2000
     Philadelphia, PA 19103-6996
17   (215)988-2700
18
19   Counsel for Defendants
20
21
22
23
24
25
```

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

4

```
 2
 3              W I T N E S S   I N D E X
 4
 5           PLAINTIFF'S EVIDENCE
 6   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
     Dr. Rosenzweig      7
 7
 8
 9
10
11
12
13
14
15           DEFENSE'S EVIDENCE
16   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
17
18
19
20
21
22
23
24
25
```

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

5

```
2        THE COURT:   Good afternoon.  If
3   defense would put the form of the objection
4   on the record and please be seated.  Thank
5   you.  I believe that the issue was
6   Dr. Rosenzweig was about to offer testimony
7   with regard to an article that has been
8   identified as P-2557 in plaintiff's
9   evidence binder.
10        Do you want to proceed with the nature
11   of your objection?
12        MR. CAMPBELL:   The objection, Your
13   Honor, is based upon the Pennsylvania Rule
14   of Evidence and the Aldridge case, and it's
15   Pennsylvania Rule of Evidence 803(18).
16        On direct examination, the rule seems
17   quite clear that an expert can't bolster
18   his or her opinion by making reference to
19   the content of a learned treatise.  The
20   expert is, as I understand the rule and the
21   interpreting cases, is entitled to identify
22   the basis of his or her opinion to the
23   extent it is a learned treatise.  They can
24   state the title of it, the author of it,
25   and subject matter.
```

6

DIRECT - ROSENZWEIG

```
2        And, after that, I believe one of the
3   cases says neither counsel may ask an
4   expert witness to read a learned treatise
5   to the jury under the guise of a
6   permissible purpose, and there is no excuse
7   for this improper approach.  That's out of
8   the Bernstein volume.  So that would be the
9   basis of the objection.  It's not permitted
10   by the rule and it's hearsay.
11        THE COURT:   Do you have a response?
12        MR. ANDERSON:   No more than I already
13   had this morning through my arguments, Your
14   Honor, so I stand on that.
15        THE COURT:   We're going to overrule
16   this objection.  A close reading of
17   Aldridge and my learned colleague Mark
18   Bernstein's treatise indicates to me that
19   the Court has some leeway in this.
20        I have, however, spoken to counsel and
21   advised that any testimony proffered by
22   Dr. Rosenzweig with regards to this
23   particular article will be brief and will
24   not go beyond the confines that Aldridge
25   has expressed.  He may state the basis of
```

7

DIRECT - ROSENZWEIG

```
2   his opinion and he may testify briefly as
3   to how his opinion was formed by this.
4   Thank you.
5        MR. CAMPBELL:   Understood, Your Honor.
6   Thank you.
7        MR. ANDERSON:   Thank you.
8        THE COURT OFFICER:   All rise as the
9   jury enters the room.
10        (The jury enters the courtroom at
11                  1:13 p.m.)
12        THE COURT:   Please be seated.  Welcome
13   back.  Dr. Rosenzweig is still on the
14   stand.
15        MR. ANDERSON:   Thank you, Your Honor.
16                  - - -
17            DIRECT EXAMINATION
18                  - - -
19   BY MR. ANDERSON:
20        Q.   Referring now to tab 6, P-2557, do you have
21   that in front of you?
22        A.   Yes.
23        Q.   Is this something that you reviewed in
24   forming your opinions in this case, Dr. Rosenzweig?
25        A.   Yes.
```

8

DIRECT - ROSENZWEIG

```
2        Q.   Did you rely upon it in forming your
3   opinions?
4        A.   Yes.
5        Q.   Is it significant to your opinions?
6        A.   Yes.
7        Q.   Is this an authoritative text?
8        A.   Yes.
9        Q.   Okay.  If you would just briefly tell us
10   what this article is entitled and what year it was
11   and the authors?
12        A.   This is a research paper by Dr. Susan Ross
13   from Canada.  It was published in 2014.  The title
14   is:  Single incision TVT Secur versus retropubic
15   tension-free tape for the management of stress
16   urinary incontinence in women:  A randomized clinical
17   trial.
18        Q.   Briefly, how did this inform your opinions
19   in this case?
20        A.   The study was designed to start in 2007.
21   It was concluded in 2011.  What they wanted to do is
22   get 300 women in the study.  They could only get 70
23   women in the study and they stopped the study.
24        Q.   How does that inform your opinions or
25   support the opinions that you've offered here this
```

9

DIRECT - ROSENZWEIG

2  morning?
3      A.  Well, one of the difficulties that they had
4  in getting patients is that the doctors did not have
5  confidence in the TVT Secur.
6      Q.  Thank you very much.  Now, let's move on,
7  if we could, to tab 7, and this is P-2531.
8          Is this a document that you reviewed and
9  relied upon in forming your opinions in this case?
10     A.  Yes, I did.
11     Q.  Is it significant to your opinions?
12     A.  Yes, it is.
13     Q.  Is it authoritative?
14     A.  Yes.
15     Q.  Please briefly discuss what this paper is
16  and how it informed your opinions, briefly?
17     A.  This is a position statement from the
18  National Institute for Health and Clinical Education,
19  which is a group in England that looks at medical
20  issues.  This came out in 2008.  And what the
21  position statement states is that the short,
22  single-incision slings should only be used in
23  research purposes or as part of a large registry.
24     Q.  How does that inform the opinions that
25  you've already offered here this morning?

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

---

10

DIRECT - ROSENZWEIG

2      A.  That this device needed to have been
3  studied prior to launch so that any of the defects of
4  the device would have been known prior to launch and
5  doctors would have known about it.
6      Q.  Thank you, Doctor.  Moving to tab 8,
7  Exhibit P-0732, is this a document that you reviewed
8  and relied upon in coming to your opinions in this
9  case?
10     A.  Yes.
11     Q.  And is it significant to your opinions?
12     A.  Yes.
13     Q.  Please explain to the jury what P-0732 is.
14     A.  This is an internal Ethicon document.  This
15  is from a comparison of the stiffness of the
16  laser-cut mesh versus the way the mesh was cut
17  before, which is mechanical-cut mesh.
18     Q.  Just one second.  Let me ask you this.  I
19  apologize.  I forgot to ask.
20          Who are the authors and recipients here?
21     A.  This is from Becky Leibowitz, a scientist
22  at Ethicon, to Paul Parisi and Dan Smith.  Dan Smith
23  is an engineer.  He is one of the co-patent holders
24  of the TVT Secur.
25     Q.  Now, before we get into the actual content

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

---

11

DIRECT - ROSENZWEIG

2  of the document, let me ask you, it says:  Laser-cut
3  and machine-cut TVT meshes.
4          Do you see that?
5      A.  Yes.
6      Q.  Please briefly explain to the jury the
7  difference between a laser-cut mesh and a
8  mechanical-cut mesh.
9      A.  Prior to the design of the TVT Secur, the
10  mesh, the full-length mesh that had 18 centimeters in
11  the body, was cut with a guillotine or a machine.
12  The Secur, which is only 8 centimeters, was now cut
13  with a laser.
14     Q.  And in terms of the physical
15  characteristics of the mesh, what, if anything,
16  according to your review of the records and the
17  depositions in this case, what, if anything, does
18  laser-cutting the mesh, the edges of the mesh, do to
19  the mesh?
20     A.  What this document shows, which is an
21  internal study that was done by Ethicon, is that the
22  mesh became three times stiffer by using a laser to
23  cut the mesh into 1 centimeter strips than using the
24  guillotine to mechanically cut the mesh.
25     Q.  Is this what we're seeing on the screen

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

---

12

DIRECT - ROSENZWEIG

2  here in this December 14, 2004 e-mail?
3      A.  Correct.
4      Q.  Thank you.  Moving on to tab 9, Plaintiff's
5  P-1676, is this something that you reviewed and
6  relied upon in forming your opinions in this case?
7      A.  Correct.
8      Q.  Is it significant to your opinions?
9      A.  Yes.
10     Q.  Can you please explain what we have here?
11     A.  This is an e-mail from Dan Smith, again,
12  engineer and one of the co-patent holders on the
13  Secur device.  It's from November 13, 2008.
14          THE COURT:  One second, please.
15          MR. ANDERSON:  Oh, wait.  I think you
16     have the wrong one, P-1676.
17          THE WITNESS:  Yes.  Page 4 describes
18     the author of this is Dan Smith and the
19     date.
20          THE COURT:  Just a second.
21  BY MR. ANDERSON:
22     Q.  You said internal e-mail.  Did you mean
23  internal document?  Maybe that's where we got lost.
24     A.  It was part of an e-mail, but I guess it's
25  better to say that it was an internal document.

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

13

DIRECT - ROSENZWEIG

2  Q.  Explain why this internal Ethicon document
3  forms your opinions in this case.
4  A.  Dan Smith is discussing the rigidity and
5  stiffness of short laser-cut mesh and states that it
6  is more stiff and rigid than the full-length
7  mechanical-cut mesh.
8  Q.  How does that inform or instruct the
9  opinions you've already provided to the jury today?
10  A.  That one of the defects of the mesh in the
11  8-centimeter short TVT Secur mesh is stiffer.
12  Q.  Going to tab 10, Plaintiff's P-2563, is
13  this something you reviewed and relied upon in
14  forming your opinions in this case?
15  A.  Yes.
16  Q.  Is it significant to your opinions in this
17  case?
18  A.  Yes.
19  Q.  Please identify what the document is and
20  then tell us why it informs your opinions.
21  A.  This is an e-mail from Michelle Irvin, who
22  is a sales representative from Illinois on the 9th of
23  December 2010.  She states that stiffer mesh leads to
24  more tissue breakdown, tissue degradation, and more
25  complications.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

14

DIRECT - ROSENZWEIG

2  Q.  How does that inform the opinions with
3  regard to the Secur device?
4  A.  That Ethicon had scientific knowledge that
5  a stiffer mesh like the short mesh in the TVT Secur
6  was stiffer.  It leads to more risk to the patient.
7  One of those risks and one of those harms is the
8  breakdown of tissue, which we described as far as
9  erosion, and more complications.
10  Q.  Have you reviewed internal documents
11  regarding Ethicon's relationship between stiff and
12  rigid mesh in the vagina and injuries to women?
13  A.  Yes.
14  Q.  Let me ask you if you will turn to tab 11,
15  Exhibit P-705.
16  Did you use this to form your opinions in
17  this case?
18  A.  Yes, I did.
19  Q.  Significant?
20  A.  Yes.
21  Q.  Can you please tell us what this is?
22  A.  This is another internal document from
23  Jürgen Trzewik, a scientist and engineer at Ethicon,
24  who describes on the last page of the document that
25  mesh softness is something that doctors want for

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

15

DIRECT - ROSENZWEIG

2  their patients, and it enhances the biological -- the
3  way that the mesh interacts with the body.  So a
4  stiffer mesh is going to have more of a negative
5  impact on a woman's body than the softer mesh.
6  Q.  How does that inform or instruct your
7  opinions as to whether or not the mesh in the TVT
8  Secur is effective or not?
9  A.  This shows that the shorter stiffer mesh in
10  the TVT Secur is defective, and the harm is damage to
11  the delicate tissue of a vagina.
12  Q.  With regard to scar plating that you
13  mentioned earlier to the jury, does this instruct or
14  inform your opinions as to whether scar plating in
15  the tissue of the Secur can cause injury to women?
16  A.  Yes.
17  Q.  How so?
18  A.  This describes that when the holes in the
19  mesh are small, it increases the risk of scar
20  plating.  Scar plating makes the mesh stiffer, and,
21  as we said, stiffness leads to more harm in women.
22  Q.  Tab 12, please, Plaintiff's P-1102, is this
23  something that you reviewed in forming your opinions
24  in this case?
25  A.  Yes.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

16

DIRECT - ROSENZWEIG

2  Q.  Is it significant to your opinions?
3  A.  Yes, it is.
4  Q.  Okay.  Please identify the document.
5  A.  This is an interview with a key opinion
6  leader, that's what KOL means, key opinion leader.
7  In this case it's Dr. Carl Nilsson.
8  Q.  Sorry, 1128.
9  THE COURT:  What number again, please,
10  Counsel?
11  MR. ANDERSON:  Sorry, Your Honor.
12  It's tab 12, P-1128.
13  THE COURT:  Thank you.
14  MR. ANDERSON:  Thank you, Your Honor.
15  THE WITNESS:  Internal Ethicon
16  document.  It is a transcript of an
17  interview with Dr. Carl Nilsson.  Carl
18  Nilsson is a very well-known pelvic
19  surgeon.  He's also one of the co-inventors
20  of the TVT Retropubic.  The date of this is
21  6/18/2008.
22  BY MR. ANDERSON:
23  Q.  What part of it would be instructive to
24  your opinions in this case, Doctor?
25  A.  First is the second paragraph where

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

17

DIRECT - ROSENZWEIG

2 Dr. Nilsson is describing that there must be clinical
3 data. Doctors need clinical data on a device in
4 order to allow them to use this in a patient. Later
5 on it's described that Dr. Nilsson told the
6 interviewer that the mini sling, the TVT Secur, would
7 never work.
8      Q.   Say that again. I'm sorry.
9      A.   That the TVT mini sling will never work,
10 and one of the reasons is that the laser-cut mesh is
11 too stiff.
12      Q.   And if we could go down to under "mesh
13 properties" also by Carl Nilsson.
14           THE COURT:   What page are we on?
15           MR. ANDERSON:   We are on the second
16      page, Your Honor, and it's about just over
17      halfway down you'll see CN and then "mesh
18      properties."
19           THE COURT:   Thank you.
20           MR. ANDERSON:   Thank you. Sorry. I
21      went too fast. If you could highlight
22      that.
23 BY MR. ANDERSON:
24      Q.   Does this instruct your opinions? How does
25 this support any of your opinions regarding the Secur

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

18

DIRECT - ROSENZWEIG

2 mesh?
3      A.   That one of the defects of the Secur mesh
4 is that it is too stiff, and the stiffness will
5 impact its ability to treat a woman's condition, in
6 this case, stress incontinence, which means that she
7 will have a recurrence of her stress incontinence and
8 require another surgical procedure to treat that.
9      Q.   Thank you, Doctor. Turning to Plaintiff's
10 P-1102, that is tab 13, Your Honor.
11           Is this a document that you also relied
12 upon in forming your opinions?
13      A.   Yes, it is.
14      Q.   Significant to your opinions?
15      A.   Yes, it is.
16      Q.   Please identify the document and then tell
17 the jury why this supports your opinions, please.
18      A.   Yes. This is an e-mail from two Ethicon
19 employees. It's describing an e-mail from a
20 Dr. Neuman, and Dr. Neuman is a well-regarded pelvic
21 surgeon. He's a scientist. He is also an Ethicon
22 consultant. He has studied the TVT Secur
23 extensively. If we go to the second page, bullet
24 point 5, he is describing that --
25      Q.   Second page, bullet point 5, let's slow

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

19

DIRECT - ROSENZWEIG

2 down a little bit and let everyone catch up to us.
3 You and I are off to the races.
4      A.   I wanted to get everybody home for the long
5 weekend.
6      Q.   Yes. All right. Let's do it as slowly as
7 we can, unfortunately.
8           All right. Now, we're there. Tell us why
9 this instructs your opinion.
10      A.   What Dr. Neuman, who, again, is a very
11 well-regarded pelvic surgeon, very knowledgeable, has
12 used the TVT Secur, is stating that the stiffness,
13 which is the defect of the short stiff TVT Secur, the
14 harm that causes in women is vaginal pain and erosion
15 of the tape through the vagina.
16      Q.   And this "too many undesired tape removals
17 are reported," how does that instruct your opinions,
18 if at all?
19      A.   One of the unfortunate consequences of the
20 complication, such as a tape protrusion, is that it
21 would require surgery to fix that.
22      Q.   Thank you, Doctor. Do you find that
23 opinion to relate to the TVT Secur mesh?
24      A.   Correct.
25      Q.   Does that further supplement your opinions

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

20

DIRECT - ROSENZWEIG

2 with regard to the stiffness of the mesh?
3      A.   Correct.
4      Q.   Turning now, please, to tab 14, P-2564, is
5 this something that you reviewed and relied upon in
6 forming your opinions?
7      A.   Correct.
8      Q.   And is that significant to your opinions?
9      A.   Correct.
10      Q.   If you'll look with me on page 2 to the
11 conclusions --
12           MR. CAMPBELL:   Excuse me.
13           THE COURT:   I don't believe this
14      should go up on your screen.
15           MR. ANDERSON:   It's an internal
16      document, Your Honor. It is a study.
17           (Sidebar discussion as follows:)
18           MR. ANDERSON:   I apologize. I
19      apologize. Once you pointed it out to me,
20      I realize, saw the dates and saw --
21           THE COURT:   What do you want to do?
22           MR. ANDERSON:   I'll pull it off the
23      screen. Thank you.
24           (End of sidebar discussion.)
25           THE COURT:   Members of the jury, this

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

21

DIRECT - ROSENZWEIG

2      entire trial is fueled by coffee.  Some
3      people have to watch their intake at lunch.
4      It's done so that as much information as
5      you need can be imparted to you in the most
6      efficient way.
7           Okay.  Please resume, Mr. Anderson.
8           MR. ANDERSON:   Thank you, Your Honor.
9           THE COURT:   Do you withdraw that last
10     exhibit?
11          MR. ANDERSON:   We will withdraw it
12     from publication, yes, Your Honor.
13          THE COURT:   Thank you.
14  BY MR. ANDERSON:
15     Q.    Is this an authoritative text?
16     A.    Yes, it is.
17     Q.    Okay.  Briefly, how did this form your
18  opinions in this case?
19     A.    This is an article that describes the
20  effect of stiff mesh on the tissue that surrounds it.
21  They describe a concept called stress shielding.  The
22  best way to describe that is when you put a cast on
23  your arm.  Your fingers are still moving, your
24  muscles are still moving, but six months later or six
25  weeks later, when the cast comes off --

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

22

DIRECT - ROSENZWEIG

2           MR. CAMPBELL:   Excuse me, Your Honor.
3      It's beyond the permitted scope of the use
4      of this type of document.
5           THE COURT:   If you could direct your
6      witness to summarize briefly.
7           MR. ANDERSON:   He mentioned stress
8      shielding.
9           May I offer what stress shielding is?
10          THE COURT:   Very briefly.
11  BY MR. ANDERSON:
12     Q.    Briefly, what is stress shielding?
13     A.    Stress shielding is when you put something
14  stiffer around the tissue.  The tissue thins out and
15  has a negative response.  It thins.  It becomes less
16  pliable.
17     Q.    How does this article address that,
18  quickly?
19     A.    This study looked at the stress shielding
20  in the vagina as a deleterious effect on the vaginal
21  tissue and the muscle around the vaginal tissue like
22  the urethra.
23     Q.    Thank you.  Plaintiff's 2499, tab 15, Your
24  Honor.
25          Is this an article that you reviewed and

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

23

DIRECT - ROSENZWEIG

2   relied upon in coming to your opinions in this case?
3      A.    Correct.
4      Q.    And does it support your opinions?
5      A.    Correct.
6      Q.    And is this an authoritative text?
7      A.    Yes.
8      Q.    Briefly describe what the document is, and
9   then we'll talk about how it informs your opinions.
10     A.    Yes.  This is another document that talks
11  about the stiffness of the mesh and the negative
12  effect it has on the vagina, that it causes the
13  vagina to thin out, it causes the muscles of the
14  urethra not to work as well.
15     Q.    What is the problem when they thin out and
16  the urethra doesn't work as well?
17     A.    Well, when the vagina thins out, that can
18  lead to the mesh protruding through the thinned-out
19  vagina, and it could lead to an erosion.
20     Q.    Do you have an opinion as to whether or not
21  the TVT Secur mesh acts in that fashion?
22     A.    Yes.
23     Q.    What is that opinion?
24     A.    That the TVT Secur mesh, because it's
25  stiffer and harder, causes deleterious effects on the

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

24

DIRECT - ROSENZWEIG

2   vagina, meaning the vagina is going to thin out over
3   time.  It will lead to more erosion, which is the
4   harm created by that defect.
5      Q.    Doctor, if you could turn to tab 17, which
6   is P-2309, is this something that you reviewed and
7   relied upon in forming your opinions in this case?
8      A.    Yes.
9      Q.    And is it an authoritative text?
10     A.    Yes.
11     Q.    Is it significant to your opinions in this
12  case?
13     A.    Yes.
14     Q.    Briefly describe what the article is and
15  how it informs your opinions.
16     A.    This is a randomized control trial
17  comparing TVT Secur to a full-length sling.  They
18  found that there was more pain with intercourse with
19  a TVT Secur, and the authors found that it was the
20  stiffness and rigidity of the mesh that was
21  responsible for the pain with intercourse.
22     Q.    Thank you.  Do you have an opinion as to
23  whether or not the stiffness and rigidity of the TVT
24  Secur mesh would have the results that we just saw in
25  2309?

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

25

DIRECT - ROSENZWEIG

2      A.    Yes.

3      Q.    What is that opinion?

4      A.    That the stiffness and rigidity of the TVT

5   Secur mesh, that is the characteristic that is

6   defective, the harm it would cause to a woman is pain

7   with intercourse.

8      Q.    Showing you Plaintiff's tab 18, Exhibit

9   P-0292, is this an article -- I'm sorry.  Is this a

10  document that you reviewed in forming your opinions

11  in this case?

12     A.    Yes, it is.

13     Q.    Is it significant to your opinions?

14     A.    Yes, it is.

15     Q.    Is it significant to your opinions

16  regarding design defect of the Secur mesh?

17     A.    Yes, it is.

18     Q.    Could you please tell the jury what we are

19  looking at?

20     A.    This is an e-mail from Dr. David Robinson.

21  Dr. Robinson is a pelvic surgeon.  At the time he was

22  also the medical director for Ethicon in the United

23  States.  He's sending this to a colleague and

24  describes that the increased rigidity, stiffness of

25  the mesh, causes the harm to women of impaired sexual

26

DIRECT - ROSENZWEIG

2   function.  Impaired sexual function means pain with

3   intercourse.

4      Q.    Anything further?

5      A.    And mesh that they make in the future

6   should be less stiff.

7      Q.    If you would please now go to tab 20, and

8   that is Plaintiff's P-2561, have you reviewed this

9   document?

10     A.    Yes.

11     Q.    Is it a scientific article that is

12  authoritative?

13     A.    Yes.

14     Q.    Does it form the basis of your opinions and

15  significant to your opinions?

16     A.    Yes.

17     Q.    First of all, just tell us the authors and

18  the journal and what the title is.

19     A.    The author is Krofta.  The journal is the

20  International Urogynecological journal.  The date of

21  publication is --

22     Q.    Slow down just a little bit.

23     A.    Date of publication is 2010.  The title is:

24  TVT-S for surgical treatment of stress urinary

25  incontinence:  Prospective trial, one-year follow-up.

27

DIRECT - ROSENZWEIG

2      Q.    Now, briefly tell us how this informs your

3   opinions in this case.

4      A.    They found that at one year, 50 percent of

5   women had failed.

6      Q.    What do you mean by "failed"?

7      A.    Meaning the device did not work to treat

8   their stress urinary incontinence.  They were still

9   leaking urine when they cough or sneeze.

10     Q.    Does this article further support your

11  opinions regarding the defective nature of the TVT

12  Secur device?

13     A.    Yes.  What they conclude is that the

14  anchoring system, the fleece ends of the mesh, did

15  not hold, and, therefore, the device failed.

16              MR. CAMPBELL:   Excuse me, Your Honor.

17  I object again.  Going beyond the scope of

18  Your Honor's ruling.

19              THE COURT:   I'm going to sustain the

20  objection.  I'm certain that this is the

21  last opinion on this subject that he's

22  giving.

23              Go ahead.  The anchoring system.  You

24  can continue your sentence.

25              THE WITNESS:  Yes, did not hold.

28

DIRECT - ROSENZWEIG

2              THE COURT:   Thank you.

3              MR. ANDERSON:   Thank you.

4   BY MR. ANDERSON:

5      Q.    Showing you now Plaintiff's P-2320, tab 21,

6   is this an article that you reviewed and relied upon

7   in forming your opinions in this case?

8      A.    Yes.

9      Q.    Is it significant to your opinions?

10     A.    Yes.

11     Q.    Is this an authoritative text?

12     A.    Yes.

13     Q.    Please describe, first of all, just what

14  the title is and the authors.

15     A.    Yes.  This is from Dr. Abdel-Fattah.  It

16  was published in 2011 in the European Urology

17  journal.  The title is:  Single-incision mini-slings

18  versus standard midurethral slings in surgical

19  management of female stress urinary incontinence:  A

20  meta-analysis of effectiveness and complications.

21     Q.    Before we get into why this is significant

22  to your opinions, if at all, what is a meta-analysis?

23     A.    A meta-analysis is a research study where,

24  instead of looking at individual patients, you're

25  looking at other research papers, taking the best

29

DIRECT - ROSENZWEIG

2    quality ones, analyzing them, taking the data out,
3    and then reporting that.
4         Q.   Over how many years was this meta-analysis?
5         A.   The meta-analysis was from 1996 through
6    2011.
7         Q.   And how does this inform your opinions at
8    all in this case?
9         A.   This found that there was a lower success
10   rate for the mini slings, and the TVT Secur in
11   specific, due to the fleece holding mechanism.
12        Q.   Does that instruct and inform and support
13   your opinions that you already offered to the jury
14   today?
15        A.   Yes.
16        Q.   Showing you now a tab 22, Plaintiff's
17   P-2281, is this an article that you relied on in this
18   case?
19        A.   Yes.
20        Q.   Is it instructive for your opinions and
21   significant to them?
22        A.   Yes.
23        Q.   Is it an authoritative text?
24        A.   Yes.
25        Q.   Again, as you've done before, tell us what

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

30

DIRECT - ROSENZWEIG

2    the title is and the authors first.
3         A.   The author is Dr. Mostafa.  It appeared in
4    European Urology in 2014.  The title is:
5    Single-incision mini-slings versus standard
6    midurethral slings in surgical management of female
7    stress urinary incontinence:  An updated systematic
8    review and meta-analysis of effectiveness and
9    complications.
10        Q.   And this meta-analysis, how many years did
11   it cover in terms of the breadth of the literature?
12        A.   From 1996 to 2013.
13        Q.   And, briefly, what are the things about
14   this article that inform your opinion?
15        A.   They discussed the fleece ends of the mesh
16   and that it leads to a lower --
17             MR. CAMPBELL:   Excuse me, Your Honor.
18             Again, it's being delivered in a way
19             contrary to Your Honor's ruling.
20             THE COURT:   If you could just
21             briefly -- well, repeat your question.
22   BY MR. ANDERSON:
23        Q.   How does this inform your opinions?
24        A.   They describe a lower success rate for
25   the --

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

31

DIRECT - ROSENZWEIG

2             MR. CAMPBELL:   Judge, excuse me, he's
3             repeating hearsay.
4             MR. ANDERSON:   Can I try again, Your
5             Honor?
6             THE COURT:   Please.
7    BY MR. ANDERSON:
8         Q.   Does this support the opinions you've
9    offered here today?
10        A.   Yes.
11        Q.   What opinions does it support?
12        A.   The fact that the fleece ends of the TVT
13   Secur do not hold, and, therefore, that defect leads
14   to the harm, recurrent stress urinary incontinence,
15   requiring another procedure.
16        Q.   Thank you.  Showing you what we have marked
17   as tab 23, Plaintiff's Exhibit 1185, is this an
18   article that you reviewed and relied upon in this
19   case?
20        A.   Yes.
21        Q.   Does it instruct your opinions and is it
22   significant to them?
23        A.   Yes.
24        Q.   Is this an authoritative text?
25        A.   Yes.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

32

DIRECT - ROSENZWEIG

2         Q.   First of all, what is the title of the
3    study?
4         A.   TVT Secur, in parentheses, hammock, versus
5    TVT Obturator:  A randomized trial of suburethral
6    sling operative procedures.
7         Q.   And the author?
8         A.   Dr. Hota.
9         Q.   And is there anything about this article
10   that supports your opinions?  What opinions of yours
11   does this article support?
12        A.   That the holding mechanism of the fleece
13   ends of the TVT Secur was defective.  It did not
14   hold, and women had recurrent stress urinary
15   incontinence.  They found 50 percent of women after
16   one year were still leaking urine.
17        Q.   Thank you.  Going back to Plaintiff's
18   P-1128, the article that we showed, the internal
19   document that we showed the jury a few minutes ago;
20   correct?
21        A.   Yes.
22        Q.   If we could just go to page 3 of this
23   document at the top, with regard to Professor
24   Nilsson's comments there about "no cutting edge,
25   blade, is a very good thing," and then underneath

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

33

DIRECT - ROSENZWEIG

2  that, under the handle prototype one, "inserter must
3  be stiff and rounded," do you see that?
4      A.   Yes.
5      Q.   Is that something you reviewed and relied
6  upon in this case?
7      A.   Yes.
8      Q.   Why is it significant, if at all, to your
9  opinions regarding the nature of the defective design
10  of the Secur?
11      A.   What this is discussing is the arrowhead
12  inserter.  It's too sharp.  Defective because it is
13  too sharp.  It drags across the delicate vaginal
14  tissue.  It harms the delicate vaginal tissue, which
15  could then lead to the tissue to break down and cause
16  an erosion.  Also leads to inflammation.  It starts
17  that process of chronic inflammation, chronic foreign
18  body reaction, more scarring.
19      Q.   What is significant, if anything, to the
20  fact that Dr. Nilsson said the inserter should not be
21  a cutting blade?
22      A.   That it should not be sharp and drag
23  against the tissue.
24      Q.   Turn with me, if you would, to tab -- if
25  you can go back to that, inserter must be stiff and

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

34

DIRECT - ROSENZWEIG

2  rounded, down further, if you could, under
3  criticality of proper assessment, do you see where it
4  says "learning curve for Nilsson was 100 patients
5  before he was very good with very dry results," do
6  you see?
7      A.   Yes.
8      Q.   You talked a little bit about learning
9  curve a little while ago.
10      A.   Yes.
11      Q.   Can you explain whether or not this is
12  significant to your opinions?
13      A.   Yes, it is.
14      Q.   Why?
15      A.   This is a very experienced surgeon, pelvic
16  surgeon, key opinion leader, consultant for Ethicon,
17  documenting that the learning curve is around 100
18  patients to be able to do this procedure safely and
19  effectively.
20      Q.   Thank you.  If we could go to Plaintiff's
21  tab 25, P-1063, tell us if you reviewed and relied
22  upon this internal Ethicon document in forming your
23  opinions in this case.
24      A.   Yes.
25      Q.   Was it significant to your opinions in this

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

35

DIRECT - ROSENZWEIG

2  case?
3      A.   Yes.
4      Q.   Why?
5      A.   This is an e-mail string between Ethicon
6  employees.  It is from Price St. Hilaire, marketing
7  director worldwide, and it's describing a survey of
8  doctors.  It's what's called a VOC, or voice of
9  consumers, consumers being doctors, and they're
10  giving feedback.  What the document shows is
11  67 percent of doctors felt that the inserter was too
12  sharp, that the arrowhead inserter was too sharp.
13      Q.   Thank you.  Does that further inform and
14  support the opinions as you've addressed them to the
15  jury here today?
16      A.   Yes.
17      Q.   This is tab 26, P-0842.  Is this a document
18  that you reviewed and relied upon?
19      A.   Yes.
20      Q.   Did you ask us to help create a slide with
21  the images of the TVT Secur?
22      A.   Yes.
23      Q.   What are we seeing here in this image?
24      A.   This is an image of the TVT Secur device,
25  and what is circled is the sharp arrowhead-like

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

36

DIRECT - ROSENZWEIG

2  scalpel-like inserter.
3      Q.   Do you have an opinion as to whether that
4  is safe or unsafe in women's tissue while inserting a
5  medical device?
6      A.   It is unsafe.
7      Q.   Do you have an opinion as to whether or not
8  that sharp arrowhead makes the TVT device, is one
9  other aspect of its defective nature?
10      A.   Yes.
11      Q.   What is that opinion?
12      A.   That that is one of the characteristics of
13  the TVT Secur device that makes it unsafe.  The
14  reason why it makes it unsafe is the harm to women is
15  that it can cause pain and it can cause the tissue to
16  break down, which leads to an erosion.
17      Q.   Going now to tab 27, Plaintiff's 1185, is
18  this an article that you reviewed and relied upon in
19  forming your opinions in this case?
20      A.   Yes.
21      Q.   Is it scientifically reliable and
22  authoritative?
23      A.   Yes.
24      Q.   Okay.  Tell us what the title is, what it
25  was designed to do at the top.

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

37

DIRECT - ROSENZWEIG

2      A.   Do you want me to identify it?

3      Q.   Yes.  We've already identified it.  This is

4  Hota, exactly.

5      A.   They found two things in the study.  One,

6  in one year, 50 percent of women were not cured.

7  They found a 19 percent erosion rate.

8      Q.   And do you have an opinion as to whether or

9  not a 19 percent erosion rate of the TVT Secur device

10  would be safe or unsafe for women?

11      A.   It is unsafe for women.

12      Q.   Do you have an opinion as to whether or not

13  a 19 percent erosion rate would be an unreasonably

14  unsafe device?

15      A.   It would be an unreasonably unsafe device.

16      Q.   Thank you.  And if we can turn back to

17  Plaintiff's Exhibit 2561, the Hota article, tab 18,

18  does this inform or instruct your opinions regarding

19  the scalpel-shaped tip?

20      A.   Yes.

21      Q.   Briefly, how so?

22      A.   They had at one year --

23      Q.   Doctor, does this support your opinions

24  regarding scalpel-shaped tip?

25      A.   Yes.

38

DIRECT - ROSENZWEIG

2      Q.   How does it support those opinions?

3      A.   Because the harm that the scalpel-shaped

4  tip created, which was dragging through the tissue of

5  the vagina, irritating the tissue, leading to the

6  tape becoming eroded through the vaginal tissue.

7      Q.   Thank you, Doctor.  Have you reviewed

8  internal Ethicon documents related to the reported

9  patient outcomes of the Secur device?

10      A.   Yes.

11      Q.   Turn, please, to tab 29, Plaintiff's

12  Exhibit 1327.  With regard to this Ethicon document,

13  please tell us how that is significant to your

14  opinions regarding reported patient outcomes of the

15  Secur device.

16      A.   This is an internal Ethicon report from

17  May 29, 2012.

18      Q.   Did the internal report include the Secur

19  device?

20      A.   The Secur device was associated with an

21  inferior patient reported cure rates and had a higher

22  reoperation rate when compared to the full-length

23  slings.

24      Q.   Is that what we are seeing on the screen

25  right now?

39

DIRECT - ROSENZWEIG

2      A.   Correct.

3      Q.   How is that significant to your opinions in

4  this case, if at all?

5      A.   One of the defects of the device is that

6  the fleece tips didn't hold.  If the fleece tips

7  don't hold, the mesh moves and migrates.  If it moves

8  and migrates, it's not there to hold up the middle

9  portion of the urethra.  The harm is that women will

10  then leak urine again and will need another surgery

11  to fix that leakage.

12      Q.   Thank you.  Going now to tab 30, can you

13  please identify this for the record?

14      A.   This is an abstract --

15      Q.   Let me ask you this.

16      A.   Yes.

17      Q.   Is it authoritative?

18      A.   Yes.

19           THE COURT:   P-0238?

20           MR. ANDERSON:   Yes, ma'am.

21           THE WITNESS:   This is another paper

22      from Krofta entitled:  One year prospective

23      follow-up of the TVT Secur for treatment of

24      stress urinary incontinence.

25  BY MR. ANDERSON:

40

DIRECT - ROSENZWEIG

2      Q.   How does this impact or inform your

3  opinions in this case?

4      A.   This shows that the fleece ends were

5  defectively designed.  They did not hold.  Therefore,

6  women had a higher rate of recurrence of stress

7  urinary incontinence and needed to have a second

8  surgical procedure, either a Burch procedure, like I

9  perform, or a retropubic sling, like was placed in

10  Ms. Engleman.

11      Q.   Going to Plaintiff's Exhibit P-2356, it is

12  tab 31, is this something you reviewed and relied

13  upon in forming your opinions in this case?

14      A.   Yes.

15      Q.   Is this significant to your opinions?

16      A.   Yes.

17      Q.   Is this an authoritative text?

18      A.   Yes.

19      Q.   Can you please explain what was being done

20  here and who the authors were, and then we'll get

21  into how it informs your opinions?

22      A.   This is from a Dr. Tommaselli.  The title

23  is:  Efficacy and safety of the TVT Secur in the

24  treatment of female stress urinary incontinence:  A

25  systematic review.

41

DIRECT - ROSENZWEIG

2    Q.   And does this support the opinions

3  regarding the defective nature of the design of the

4  TVT Secur device that you've offered here today?

5    A.   Yes.

6    Q.   Briefly, how so?

7    A.   That the fleece tips did not hold.

8  Patients had a higher rate of recurrence of their

9  stress incontinence.  The sharp introducer dragged

10  across tissue, and there was a high 15 percent or,

11  excuse me, 16 percent erosion rate showing the defect

12  of both the fleece tip and the sharp tip introducer.

13  The harm that it caused was recurrence of stress

14  urinary incontinence and damage to the vagina leading

15  to erosion in the vagina.

16    Q.   Thank you, Doctor.  Does that inform your

17  opinions that the TVT Secur is defective?

18    A.   Yes.

19    Q.   Okay.  Moving on to P-2362, Your Honor,

20  that's tab 32, did you review this in forming your

21  opinions in this case?

22    A.   Yes.

23    Q.   Is it significant to your opinions in this

24  case?

25    A.   Yes.

42

DIRECT - ROSENZWEIG

2    Q.   Is this an authoritative text?

3    A.   Yes.

4    Q.   Please describe for the jury the title and

5  the authors.

6    A.   The author is Dr. Andrada Hamer.  It was

7  published in the International Urogynecology journal

8  in 2013.  The title is:  One-year results of a

9  prospective randomized, evaluator-blinded,

10  multicenter study comparing TVT and TVT Secur.

11    Q.   Okay.  First of all, a lot of big words

12  there.  Randomized, evaluator-blinded, multicenter

13  study, break that down for me, please.

14    A.   Number one, they were looking forward, so

15  it was prospective.  They randomly assigned someone

16  to the treatment, and the doctor that was doing the

17  treatment did not know which treatment the patient --

18        MR. CAMPBELL:   Your Honor --

19        THE COURT:   If you could just advise

20  the way in which -- well, what your opinion

21  is that this addressed.

22  BY MR. ANDERSON:

23    Q.   What opinions does this address?

24    A.   That the design defects of the TVT Secur,

25  the sharp edge of the TVT Secur, the fleece holders

43

1           DIRECT - ROSENZWEIG

2  of the TVT Secur, the stiffness of the mesh of the

3  TVT Secur led to serious adverse events, and the

4  authors discouraged it from being used.

5        MR. CAMPBELL:   Excuse me, Your Honor.

6  I move to strike.  If we could be heard on

7  this?

8           (In-camera proceedings as

9           follows:)

10          (The court reporter reads back

11          the last question and answer.)

12        THE COURT:   You were fine until we got

13  into the authors.

14        MR. CAMPBELL:   Right.  He keeps doing

15  that every single time.

16        MR. ANDERSON:   Not every single time,

17  but if you would allow me to go up to him

18  and just to say do not say this is what it

19  said.  So he was fine until he crossed

20  that.  And you know, we are working under

21  a different set of rules here than he's

22  used to, and we're trying.  I will try to

23  back him off 20 feet from the line rather

24  than at the line, if I can, Your Honor.

25        THE COURT:   What time is it exactly?

44

1           DIRECT - ROSENZWEIG

2        MR. ANDERSON:   2:00.

3        THE COURT:   It's too early to take a

4  break.  I will permit you to approach the

5  witness and speak to him privately, and

6  then it should not happen again.

7        MR. ANDERSON:   Yes.

8        THE COURT:   Pretty simple thing.

9        MR. ANDERSON:   I agree.  I agree.  I

10  apologize, Your Honor.

11        THE COURT:   Anything else while we're

12  back here?

13        MR. CAMPBELL:   Yes, Your Honor, the

14  whole process, really it's, you know,

15  document after document and fleece tips and

16  sharp arrowheads.  You know, if these all

17  go to those opinions, then I think, as

18  Mr. Snell keeps whispering to me, the

19  proper way to do that is:  What is your

20  opinion?  What's the basis for it?  And the

21  articles can be stated.  You know, I

22  understand the issues in a case of this

23  nature, but, you know, at this point it's

24  cumulative.

25        THE COURT:   Response?

45

DIRECT - ROSENZWEIG

2      MR. ANDERSON:   Yes.  He gave his
3   opinions at the beginning.  Now we're going
4   through each one of the design defects.
5   And so one of those design defects, we've
6   tried to cover chronic foreign body
7   reaction.  We've tried to cover all the
8   articles and documents.  We're checking off
9   everything he said was defective.  And this
10   is in regard to the fleece and the
11   arrowheads.  If we can get into the article
12   more, it wouldn't be that.  It would be
13   more in terms of failures and things like
14   that.  So I will try and we've tried.  We
15   have jumped a couple of documents to try to
16   not be repetitive because I felt it was
17   doing that.
18      THE COURT:   That's enough.  I
19   understand your objection.  I'm not going
20   to curb the plaintiff.
21      MR. CAMPBELL:   Okay.  I'm just curious
22   about the schedule.  I asked Mr. Anderson.
23   We've been very cooperative.
24      Just trying to for, for the afternoon,
25   you're going to finish the general

46

DIRECT - ROSENZWEIG

1   causation aspect of this?
2      MR. ANDERSON:   I doubt it.
3      MR. CAMPBELL:   I'm just asking.
4      MR. ANDERSON:   The defects take a
5   while because then we have the nature of
6   the defects of the mesh and the tools and
7   then the procedure.  So that takes a while.
8   Then we have to get into the IFU, and
9   there's three aspects of the IFU.  So, you
10   know, you're going to have a directed verdict motion
11   coming at me one of these days, and I want
12   to make sure I'm loaded for bear.
13      THE COURT:   I do feel as if I'm
14   watching two parties in an extended dance
15   performance and they've been dancing the
16   steps together, and I understand that.  I'm
17   anticipating also you are doing the best
18   you can, as you will, to see that this is
19   done as expeditiously as we can do it, but
20   you also can't cut corners.  Let's go back
21   on the record.
22      (End of in camera proceedings.)
23      THE COURT:   I believe that was P-2362;
24   is that correct?

47

DIRECT - ROSENZWEIG

2      MR. ANDERSON:   That is correct, Your
3   Honor, and it was tab 32.
4   BY MR. ANDERSON:
5      Q.   Okay.  One more study, then we will move on
6   to some internal documents.
7      Looking at Plaintiff's P-2310, tab 33, is
8   this something you reviewed and relied upon in coming
9   to your opinions in this case?
10      A.   Yes.
11      Q.   Is it significant to your opinions in this
12   case?
13      A.   Yes.
14      Q.   Is this an authoritative text?
15      A.   Yes.
16      Q.   Briefly describe what this is and how it
17   informs your opinions, very briefly?
18      A.   This is a systematic review, which
19   describes the results for mini slings, including the
20   TVT Secur.
21      Q.   And, briefly, how does it inform your
22   opinions?
23      A.   It showed that there was a low success
24   rate.
25      Q.   Doctor, moving on from that, what is a

48

DIRECT - ROSENZWEIG

1   systematic review?
2      A.   It is a review of literature that combines
3   all the studies together to draw a conclusion about a
4   specific topic.
5      Q.   And if we could now move on to Plaintiff's
6   Exhibit 34, 0842 -- actually, no, tab 35.
7      THE COURT:   What is the number,
8      please?  Mr. Anderson, I don't want to
9      interrupt, but the last number, P-2130, I
10      was unable to locate that.
11      MR. ANDERSON:   P-2310.
12      THE COURT:   P-2310, thank you.
13      MR. ANDERSON:   But now we are on tab
14      35, please.
15      THE COURT:   That number is?
16      MR. ANDERSON:   P-1677.
17      THE COURT:   Thank you.
18      MR. ANDERSON:   Thank you, Your Honor.
19   BY MR. ANDERSON:
20      Q.   Is this something that you have reviewed
21   and relied upon in coming to your opinions in this
22   case?
23      A.   Yes.
24      Q.   Is it significant to your opinions?

DIRECT - ROSENZWEIG

2   A.   Yes.

3   Q.   First of all, what is it?

4   A.   This is an internal Ethicon document.  It

5   is a PowerPoint presentation.

6   Q.   And what is significant to you, if at all,

7   about this communication?

8   A.   If we go to page 39.

9   Q.   Page 39 of the PowerPoint?

10  A.   Yes, entitled "watch out."

11  Q.   Okay.  Please explain why this is important

12  to your opinions in this case?

13  A.   It describes a risky situation when

14  launching a device without having data.

15  Q.   Under "after our risky situation with Secur

16  and increased demand for at least one-year data," is

17  that what you're referring to?

18  A.   Yes.

19  Q.   How does that inform your opinions in this

20  case?

21  A.   That there was insufficient data prior to

22  the launch of the product.

23  Q.   Turning your attention to tab 36, P-0241,

24  is this something that you've reviewed and relied

25  upon in this case?

---

DIRECT - ROSENZWEIG

2   A.   Yes.

3   Q.   And is it something significant to your

4   opinions?

5   A.   Yes.

6   Q.   Why is this significant to your opinions?

7   A.   This is an e-mail from Dr. Aaron Kirkemo,

8   who is a urologist, pelvic surgeon, and medical

9   director at Ethicon, to other medical directors, and

10  this e-mail is describing what damage will be done to

11  the brand if a product is released without data just

12  like the TVT Secur.

13  Q.   Does that inform your opinions in this

14  case?

15  A.   Yes.

16  Q.   What opinion does it inform?

17  A.   That there was not enough data on this

18  product to launch the product market.

19  Q.   Tab 38, Plaintiff's P-0286, is this a

20  document that you reviewed and relied upon in forming

21  your opinions in this case?

22  A.   Yes.

23  Q.   Is it significant to your opinions?

24  A.   Yes.

25  Q.   Explain to the jury what this is.

---

1              DIRECT - ROSENZWEIG

2   A.   This is an e-mail string --

3        MR. ANDERSON:   Oh, take it down,

4        please.

5   BY MR. ANDERSON:

6   Q.   Why is this important to your opinions?

7   A.   This is an internal Ethicon e-mail from the

8   medical director of Ethicon Australia, Dr. Aran

9   Maree.

10  Q.   How does this inform your opinions in this

11  case, if at all?

12  A.   It's describing the experience with doctors

13  in Australia using the TVT Secur device.

14  Q.   And what about their experience in

15  Australia using the Secur device?

16  A.   They were very concerned that there was a

17  high failure rate of the device, specifically at six

18  weeks.

19  Q.   If we could turn to P-1460, tab 37, is this

20  significant to your opinions in this case?

21  A.   Yes.

22  Q.   And is this something that you relied on in

23  forming your opinions in this case?

24  A.   Yes.

25       MR. ANDERSON:   Publish it, please.

---

1              DIRECT - ROSENZWEIG

2   BY MR. ANDERSON:

3   Q.   Who is this e-mail to and from?

4   A.   This is an e-mail from Dan Smith, engineer

5   and co-patent holder of the Secur to other key

6   Ethicon employees.

7   Q.   And if we turn to page 2, bullet point 2,

8   please, is this informative to your opinions?

9   A.   Yes.

10  Q.   Why?

11  A.   Dan Smith is writing that the TVT Secur

12  device is a failure and they should not continue the

13  product line.

14  Q.   Thank you.  Showing you what's been marked

15  as P-1962, is this a document that you've seen and

16  relied upon in forming your opinions in this case?

17  A.   Yes.

18  Q.   And is it significant to your opinions?

19  A.   Yes.

20  Q.   And what is this document and why is it

21  significant to your opinions?

22  A.   This is the Johnson & Johnson credo, and

23  what the credo states is that the first

24  responsibility is to doctors, nurses, and patients.

25  Q.   Anything else about this document that is

2  significant to your opinions?
3      A.   They also state that they pay for their
4  mistakes.
5      Q.   Is that significant to your opinions in
6  this case?
7      A.   Yes.
8      Q.   Do you agree with that?
9      A.   Yes.
10     Q.   Next document, tab 41, Your Honor, is
11  P-2321.
12          Is this a study that you reviewed in
13  forming your opinions in this case?
14     A.   Yes.
15     Q.   Was it significant to your opinions?
16     A.   Yes.
17     Q.   Is this authoritative text?
18     A.   Yes.
19     Q.   Briefly tell us what this was.
20     A.   This is a study by Dr. Haab, who is a
21  scientist, a pelvic surgeon.
22     Q.   Tell us how this instructs your opinions.
23     A.   This is a four-and-a-half year study that
24  found that only 31 percent of women were dry.
25          MR. CAMPBELL:   I object for the same

2  reasons and I move to strike.
3          THE COURT:   If you'll re-ask your
4  question, please.
5          MR. ANDERSON:   Okay, Your Honor.
6  BY MR. ANDERSON:
7      Q.   Does this support your opinions in this
8  case?
9      A.   Yes.
10     Q.   What opinions in this case that you have
11  does this support?
12     A.   That the TVT Secur has a very low success
13  rate.
14     Q.   How would you describe very low success
15  rate?
16     A.   Less than 50 percent.
17     Q.   Have you reviewed Plaintiff's P-2243, which
18  is tab 42?
19     A.   Yes.
20     Q.   Is this an article that you've reviewed in
21  this case?
22     A.   Yes.
23     Q.   Before we get into that, let me ask you
24  this:  We've talked a little bit about contraction
25  and shrinkage.

2          Does the event of mesh contraction and
3  shrinkage occur before or after the implantation of
4  mesh in a woman's body?
5      A.   After it's implanted.
6      Q.   Have you seen documents or read depositions
7  of employees at Ethicon regarding when the company
8  became aware of mesh contraction and mesh shrinkage?
9      A.   Yes.
10     Q.   Have you reviewed articles by their
11  consultants regarding when mesh contraction and
12  shrinkage first occurred?
13     A.   Yes.
14     Q.   Tab 42, P-2243, have you reviewed and
15  relied upon this?
16     A.   Yes.
17     Q.   Is it authoritative?
18     A.   Yes.
19     Q.   What opinions of yours does this support?
20     A.   That mesh contracts.
21     Q.   Okay.  And what year is this study?
22     A.   1998.
23     Q.   And who are the authors of the study?
24     A.   Dr. Klinge, Dr. Klosterhalfen.
25     Q.   In terms of in relation to Ethicon, do you

1  know who these consultants were?
2      A.   These were doctors working in Germany and
3  also they were Ethicon consultants.
4      Q.   And, again, the year of this is?
5      A.   1998.
6      Q.   Thank you.  Please tell us what it is about
7  shrinking -- strike that.
8          Do you have an opinion as to whether or not
9  the TVT Secur mesh shrinks?
10     Q.   Do you have opinions whether it shrinks in
11  the woman's tissue after it's implanted?
12     A.   Yes.
13     Q.   Do you have an opinion as to how much the
14  mesh shrinks once it's implanted?
15     A.   Yes.
16     Q.   How much is that?
17     A.   Approximately 30 to 50 percent.
18     Q.   What is your basis for that opinion?
19     A.   The scientific knowledge, from the
20  literature, and internal Ethicon documents.
21     Q.   Tab 43, P-1846, have you reviewed tab 43,
22  P-1846?
23     A.   Yes.

2      Q.     Okay.  And is it significant to your
3  opinions?
4      A.     Yes.
5      Q.     Okay.  And did you rely on it in forming
6  your opinions?
7      A.     Yes.
8      Q.     What is 1846?
9      A.     It is an e-mail from Dr. Holste, who is a
10  scientist at Ethicon, to another scientist at
11  Ethicon, Dr. Engel, including Dr. Boris Batke, who is
12  a scientist, and it's discussing mesh shrinkage.
13      Q.     With regard to these first statements back
14  in, I guess, this is March 13, 2006:  This was our
15  scientific statement on mesh shrinkage:  Basically
16  small pores, heavyweight meshes induce more fibrotic,
17  bridging tissue reaction causing more mesh shrinkage
18  during maturing of the collagenous tissue.  See my
19  presentation about biocompatibility.
20             Is that attached to this e-mail?
21      A.     Yes.
22      Q.     Does this inform your opinions regarding
23  the defective nature of the heavyweight, small-pore
24  mesh in the Secur device?
25      A.     Yes.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

2      Q.     How so, Doctor?
3      A.     That the characteristics of the mesh lead
4  to chronic foreign body reaction, scar plating, and
5  mesh contraction.
6      Q.     With regard to the internal report that's
7  attached to this e-mail, do you have that in front of
8  you?
9      A.     Yes.
10      Q.     Is that significant to your opinions?
11      A.     Yes.
12      Q.     How so?
13      A.     Further describes that the chronic foreign
14  body reaction, chronic inflammatory reaction, scar
15  plating leads to mesh shrinkage.
16      Q.     What year was this internal report done at
17  Ethicon?
18      A.     2006.
19      Q.     Do you have an opinion as to whether or not
20  a heavyweight, small-pore mesh that causes this mesh
21  shrinkage during maturing of collagenous tissue, is
22  that applicable to the Secur mesh?
23      A.     Yes.
24      Q.     Do you have an opinion as to whether that's
25  another defect of the Secur mesh?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

2      A.     Yes.
3      Q.     What is that opinion?
4      A.     That it is a defect of the mesh in the
5  Secur device.
6      Q.     And who wrote that internal report at
7  Ethicon?
8      A.     That is a scientist, Dr. Holste.
9      Q.     Showing you what's been marked as P-0791,
10  that's tab 44, Your Honor, have you reviewed and
11  relied upon this document?
12      A.     Yes.
13      Q.     Did it inform your opinions in this case?
14      A.     Yes.
15      Q.     Is this an authoritative text?
16      A.     Yes.
17      Q.     Who was this written by?
18      A.     Dr. Klosterhalfen.
19      Q.     Who is Dr. Klosterhalfen?
20      A.     He is a scientist in Germany and consultant
21  for Ethicon.
22      Q.     What year is this publication?
23      A.     2005.
24      Q.     And what opinions of yours does this
25  article support or not support?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

2      A.     That there is more fibrosis, scarring, and
3  contraction with heavy, stiff, small-pore mesh.
4      Q.     Okay.  Do you have an opinion as to whether
5  or not there were meshes available to Ethicon that
6  were not heavy, stiff, small-pore mesh as of
7  September 2006 when this product was launched?
8      A.     Yes.
9      Q.     And what are those?
10      A.     There are larger-pore, lighter-weight
11  meshes that were available.
12      Q.     And those lighter-weight, larger-pore
13  meshes that were available, were any of those
14  manufactured by Ethicon as of September 2006?
15      A.     Yes.
16      Q.     And what was the name of the lightweight
17  large-pore mesh that was available to Ethicon in 2006
18  that would have been lighter-weight, larger-pore,
19  less stiff and rigid than the heavyweight, small-pore
20  Prolene in the Secur?
21      A.     Yes.  There were two.  There was one called
22  Vypro, which was created in the late '90s, and
23  another called Ultrapro, which was created in the
24  early 2000s and was available in 2003.
25      Q.     Do you have an opinion as to whether those

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

61

DIRECT - ROSENZWEIG

2      were reasonable, economical, and feasible devices
3      instead of the heavyweight Prolene in the Secur
4      device?
5          A.   Yes.
6          Q.   What is that opinion?
7          A.   That it was reasonable to place that in
8      women's pelvises instead of the Prolene mesh.  It
9      would have been safer to place that.
10         Q.   Showing you now what we will mark as
11     Plaintiff's Exhibit 0933, which is tab 45, Your
12     Honor, you reviewed and relied upon this in forming
13     your opinions in this case?
14         A.   Yes.
15         Q.   Is it significant to your opinions?
16         A.   Yes.
17         Q.   Please explain what this is for the jury.
18         A.   This is an e-mail between medical
19     directors, Axel Arnaud, medical director,
20     Dr. Weisberg, medical director, discussing mesh
21     shrinkage.
22         Q.   What year is this e-mail sent discussing
23     mesh shrinkage?
24         A.   It was November 26, 2002.
25         Q.   If we can go down to the paragraph that has

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

62

DIRECT - ROSENZWEIG

2      been highlighted, is this instructive to your
3      opinions at all, Dr. Rosenzweig?
4          A.   Yes.
5          Q.   How so?
6          A.   This is discussing, first of all, that
7      there's a 30 percent shrinkage rate for mesh, and
8      there are various parameters that increase the risk
9      of shrinkage.
10         Q.   What parameters are those that increase the
11     risk of shrinkage?
12         A.   The material, the weave, the width.
13         Q.   What is it about, if anything, the
14     material, weave, and width of the Prolene mesh in the
15     TVT Secur that would lead to 30 percent shrinkage?
16         A.   The chronic foreign body reaction.
17         Q.   Do you have an opinion as to whether that
18     is a defect in the -- another defect in the TVT Secur
19     device?
20         A.   Correct.
21         Q.   Do you have an opinion as to whether or not
22     30 percent shrinkage of a heavyweight, small-pore
23     mesh, that has more chronic foreign body reaction in
24     a woman's vagina tissue, is a safe or unsafe device?
25         A.   It is unsafe.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

63

1                DIRECT - ROSENZWEIG
2          Q.   Do you have an opinion as to whether or not
3      that the Secur device, with the heavyweight,
4      small-pore, with 30 percent shrinkage, is a defect in
5      that mesh?
6          A.   Yes.
7          Q.   What is it?
8          A.   That is a defect.
9          Q.   Going now to tab 44, P-1235, is this
10     something that you have reviewed and relied upon in
11     forming your opinions in this case?
12         A.   Yes.
13         Q.   Is it significant to your opinions?
14         A.   Yes.
15         Q.   And can you please identify this document
16     for the jury?
17         A.   This is an internal Ethicon document from
18     December of 2006 from a Dr. Kerstin Spychag, and it
19     is:  State of the knowledge in mesh shrinkage - what
20     do we know?
21         Q.   What is it that Ethicon stated that mesh
22     shrinkage could lead to in patients?
23         A.   Discomfort, chronic pain, and recurrence.
24         Q.   If we look down to the first paragraph
25     under factors related to mesh shrinkage, if you could

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

64

1                DIRECT - ROSENZWEIG
2      look at that, please.
3          A.   Yes.
4          Q.   Is this significant to your opinions?
5          A.   Yes.
6          Q.   Before I go there, let me just ask you
7      this.  We saw the word hernia in there; right?
8          A.   Yes.
9          Q.   Have you reviewed documents, internal
10     documents, scientific literature, as well as
11     depositions of Ethicon employees with regard to the
12     Prolene mesh that's used in TVT Secur and its history
13     of use at Ethicon?
14         A.   Yes.
15         Q.   When was the Prolene mesh first put on the
16     market by Ethicon?  What you've described as this
17     heavyweight, small-pore, rigid mesh, when was that
18     first put on the market?
19         A.   In the '70s.
20         Q.   What application was that used for from the
21     '70s forward?
22         A.   Treatment of hernias.
23         Q.   And then did there come a point in time
24     where Ethicon developed a new mesh to replace this
25     hernia mesh from the '70s?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

65

DIRECT - ROSENZWEIG

2    A.    Yes.

3    Q.    At what point in time was that?

4    A.    Late '90s.

5    Q.    What mesh was that that they developed

6  after that?

7    A.    It was a lighter-weight, bigger-pore mesh

8  called Vypro.

9    Q.    You mentioned Vypro a few minutes ago.  You

10  said also there was an Ultrapro lightweight mesh.

11        When was that developed?

12    A.    In the early 2000s.  It became available in

13  approximately 2003.

14    Q.    So this article from December of 2006

15  talking about shrinking meshes and about the factors

16  related to mesh shrinkage, when did Ethicon first

17  know that these factors were related to heavyweight,

18  small-pore Prolene mesh used in the TVT Secur?

19    A.    In the '90s.

20    Q.    Does this inform your opinions in this

21  case?

22    A.    Yes.

23    Q.    How so?

24    A.    Well, it describes the factors that are

25  associated with mesh shrinkage.

66

DIRECT - ROSENZWEIG

2    Q.    Okay.  And what are those?

3    A.    The weight of the mesh, the density of the

4  mesh, the thickness of the individual fibers of the

5  mesh, the surface area of the mesh, the pore size of

6  the mesh, and the mesh architecture, such as how the

7  mesh is cut.

8    Q.    I'm sorry.

9    A.    Go ahead.

10    Q.    Do you have an opinion as to whether or not

11  the weight, surface area, pore size, and fiber

12  architecture of the Prolene mesh in the TVT Secur

13  device was safe or unsafe for patients?

14    A.    I have an opinion, yes.

15    Q.    What is it?

16    A.    That it's unsafe.

17    Q.    Why?

18    A.    Because of the contraction, chronic foreign

19  body reaction, chronic inflammation associated with

20  the stiff, heavy, small-pore, heavyweight mesh.

21    Q.    Thank you.  Going now to tab 47.

22        THE COURT:  P-0863?

23        MR. ANDERSON:  We're going to move on

24  from that one.

25        THE COURT:  All right.  Thank you.

67

1        DIRECT - ROSENZWEIG

2        MR. ANDERSON:  We've covered that.

3  BY MR. ANDERSON:

4    Q.    Before we move on, we were just talking

5  about stiff rigid mesh.  In your review of all the

6  documents and literature in this case and the

7  internal Ethicon studies and the depositions in this

8  case, were you able to determine whether or not

9  Ethicon ever did a long-term trial on the Secur mesh

10  to examine contraction of the stiff mesh like was

11  recommended in the 2002 internal communication that

12  we looked at?

13    A.    No, they did not.

14    Q.    I'll go through a series of opinions with

15  you now that we've covered this section of

16  contraction.

17        Do you have an opinion, Doctor, whether or

18  not shrinkage and contraction of the Secur mesh can

19  lead to chronic vaginal pain that cannot be cured or

20  effectively treated?

21    A.    Yes.

22    Q.    And what is that opinion?

23    A.    That contraction of the mesh can lead to

24  pain, pain with intercourse, that cannot be

25  successfully treated.

68

1        DIRECT - ROSENZWEIG

2    Q.    Do you have an opinion, Dr. Rosenzweig,

3  whether or not shrinkage and contraction of the Secur

4  mesh can lead to lifelong dyspareunia or lifelong

5  painful sexual relations?  Do you have an opinion?

6    A.    Yes.

7    Q.    What is that opinion?

8    A.    That mesh contraction can lead to lifelong

9  pain with sexual intercourse.

10    Q.    Do you have an opinion, Doctor, based on

11  all that you've reviewed in this case, whether or not

12  shrinkage and contraction of the Secur mesh can lead

13  to lifelong risk of recurrent erosions in the vaginal

14  tissue?

15    A.    Yes.

16    Q.    And what is that opinion?

17    A.    That shrinkage and contraction of the heavy

18  rigid stiff mesh can lead to lifelong risks of

19  erosion.

20    Q.    Do you have an opinion, Dr. Rosenzweig,

21  whether or not shrinkage or contraction of the Secur

22  mesh leads to chronic urinary problems for patients?

23    A.    Yes.

24    Q.    And please explain that opinion.

25    A.    When the mesh contracts, it can irritate

69

DIRECT - ROSENZWEIG

2  the urethra, and that can lead to urinary symptoms of

3  pain with urination and contract and obstruct the

4  urethra and make it difficult for a woman to empty

5  their bladder. Or it can contract, in the case of

6  the Secur, migrate away from the portion where it's

7  supposed to be, and not treat the stress urinary

8  incontinence and they start leaking again.

9      Q.  Have you seen contracted Prolene mesh, like

10 that used in the Secur mesh, associated with patient

11 complications in your practice?

12     A.  Yes, I have.

13     Q.  Have you seen them documented in Ethicon

14 reports, documents, and testimony?

15     A.  Yes.

16     Q.  Have you reviewed any literature or studies

17 regarding a relationship between increased fibrotic

18 reaction and patient complications like we talked

19 about a few moments ago?

20     A.  Yes.

21     Q.  Turn to tab 48, if you would, please. This

22 is Plaintiff's P-1712.

23         Is this something that you reviewed and

24 relied upon in coming to your opinions in this case?

25     A.  Yes.

---

70

DIRECT - ROSENZWEIG

2      Q.  Is this significant to your opinions in

3  this case?

4      A.  Yes.

5      Q.  Is it an authoritative text?

6      A.  Yes.

7      Q.  Okay. Please just give us the title and

8  the first author and then at least who these authors

9  are. Then we'll talk about if you have any opinions

10 that this supports.

11     A.  Yes. The title is: Host response to

12 synthetic mesh in women with mesh complications.

13         The lead author is Dr. Nolfi. One of the

14 other contributing authors is Dr. Moalli, and it was

15 published in 2016.

16     Q.  Okay. And does this article support any of

17 your opinions here today?

18     A.  Yes.

19     Q.  What opinions that you have here today does

20 this article support?

21     A.  That stiff mesh leads to deleterious

22 consequences for women. It can lead to erosions of

23 the mesh into the vagina or mesh contraction and

24 pain.

25     Q.  And this article supports those opinions in

---

71

DIRECT - ROSENZWEIG

2  this regard?

3      A.  Yes.

4      Q.  Okay. Doctor, I'm going to go through, now

5  that we've spent a good part of today talking about

6  your opinions about the defective nature of the Secur

7  mesh, I want to just ask you the following: Do you

8  have an opinion as to whether or not the Secur mesh

9  causes chronic foreign body inflammation?

10     A.  Yes.

11     Q.  Do you have an opinion as to whether or not

12 the Secur mesh causes chronic inflammation?

13     A.  Yes.

14     Q.  Do you have an opinion as to whether or not

15 the Secur mesh causes excessive scarring?

16         MR. CAMPBELL:  Excuse me, Your Honor.

17 I object. It's cumulative at this point.

18         THE COURT:  Overruled.

19 BY MR. ANDERSON:

20     Q.  Do you have an opinion as to whether or not

21 the Secur mesh causes fibrotic bridging, scar plate

22 encapsulation, and mesh shrinkage and contraction?

23     A.  Yes.

24     Q.  Do you have an opinion as to whether or not

25 Ethicon failed to adequately study the TVT Secur

---

72

DIRECT - ROSENZWEIG

2  mesh?

3      A.  Yes.

4      Q.  Do you have an opinion as to whether or not

5  the TVT Secur mesh is a defective implant procedure,

6  defective technique, and defective absorbable fleece

7  tips?

8      A.  Yes.

9      Q.  Do you have an opinion as to whether or not

10 the implanter mechanisms or instruments are

11 defective?

12     A.  Yes.

13     Q.  And do you have an opinion as to whether or

14 not TVT Secur should have even been marketed in the

15 first place?

16     A.  Yes.

17     Q.  And what is your opinion in this regard?

18     A.  That TVT Secur should not have been

19 marketed in the first place, that the introducer is

20 defective, that the arrow tip, sharp arrow tip

21 inserter is defective, that the fleece tip holding

22 mechanism is defective, and that the mesh itself,

23 being stiff and rigid, is defective.

24     Q.  Do you have an opinion as to whether or not

25 these design defects caused injury -- caused patient

73

2   complications?

3      A.   Yes.

4      Q.   What patient complications did these

5   defects in the Secur device cause for patient

6   complications?

7      A.   Chronic pain, chronic pain with

8   intercourse, recurrent and multiple erosions of the

9   mesh through the vagina or onto other organs, urinary

10  symptoms, recurrence of stress urinary incontinence,

11  and voiding symptoms.

12     Q.   Are these complications that you have

13  personally observed when cutting out heavyweight

14  mesh, including the Secur mesh, from women's vaginal

15  tissues?

16     A.   Yes.

17     Q.   And are these complications that you have

18  found when reviewing the literature, internal Ethicon

19  documents, and Ethicon employees' sworn testimony?

20     A.   Yes.

21     Q.   With regard to this last patient injury, do

22  you have an opinion as to whether or not the Secur

23  mesh increases the risk to women for the need for

24  multiple repeat surgeries to correct their

25  complications?

74

2      A.   Yes.

3      Q.   Okay.  Which of these complications can

4   require future surgery for Ms. Engleman and other

5   women?

6      A.   All the complications I've described,

7   erosion, pain, pain with intercourse, recurrence of

8   stress urinary incontinence, and other urinary

9   symptoms.

10     Q.   Doctor, you explained to the jury that week

11  in and week out in your practice that you treat women

12  from complications with mesh slings.

13      I want to ask you, with regard to these

14  additional surgeries, what is involved in an

15  additional surgery to remove the mesh like the Secur

16  mesh that you have in your patients?

17     A.   Well, those surgeries are often quite

18  difficult because of scarring that has taken place,

19  that these are women that have had not only a

20  procedure, but sometimes a secondary procedure.  So

21  they can be quite difficult and risky.  There's risk

22  of injury to adjacent structures like the bladder and

23  urethra.  So they are very difficult procedures.

24     Q.   Are you aware from literature as well as

25  your own personal experience that, when a doctor

75

1         DIRECT - ROSENZWEIG

2   intends to remove the mesh, the entirety of the mesh

3   cannot be removed physically?

4      A.   Yes.  I've seen that in the literature,

5   plus that is my personal experience.

6      Q.   Is it sometimes physically impossible to

7   remove all the mesh even if you wanted to?

8        MR. CAMPBELL:  Excuse me, Your Honor.

9       It's leading.

10       THE COURT:  Rephrase your question.

11  BY MR. ANDERSON:

12     Q.   Do you have an opinion, based upon your

13  experience, as to whether or not it can be physically

14  impossible to remove all the mesh?

15     A.   Yes, it is often impossible to remove all

16  the mesh.

17     Q.   Okay.  Shifting gears a little bit, Doctor,

18  have you arrived at some expert conclusions and

19  formed opinions as to whether there were alternatives

20  for treating stress urinary incontinence that would

21  have been safer than the Secur mesh in 2006?

22     A.   Yes.

23     Q.   Let's go through those and talk about each

24  one.

25      Have you asked me to prepare a slide in

76

1         DIRECT - ROSENZWEIG

2   this regard regarding what you believe the safer

3   alternatives are?

4      A.   Yes.

5        THE COURT:  Mr. Anderson, while you're

6       doing that, I'm just going to suggest our

7       jury stand up a little bit, stretch a

8       little bit.

9       Members of the jury, you may be

10      wondering why we're continuing without a

11      break.  It's because we want to let you go

12      at 3:30 today.  We thought we would just go

13      straight through until 3:30 and let you go

14      a little bit earlier.  I didn't want you to

15      think we forgot what we promised, which is

16      a break in the afternoon.  We thought, it's

17      right before a holiday, let's see if we can

18      get you out of here a little earlier.

19      That's what we're doing.  It doesn't hurt

20      to stretch.  This is a long day in a warm

21      room.  Thank you.

22  BY MR. ANDERSON:

23     Q.   Okay.  Doctor, we were talking about safer

24  alternatives to treat stress urinary incontinence

25  than the Secur mesh; right?

2    A.    Yes.

3    Q.    Okay.  Could you please just list for the

4  jury what you believe the safer alternative products

5  would have been?

6                MR. CAMPBELL:   Excuse me, Your Honor.

7                THE COURT:   Yes?

8                MR. ANDERSON:   It wouldn't print.

9         This printer's down.  He didn't know he

10        wasn't supposed to publish that.

11                THE COURT:   Thank you for explaining.

12  BY MR. ANDERSON:

13    Q.    What are the safer alternatives that you

14  would propose?

15    A.    Well, one of the safer alternative designs

16  is using suture.  As I described before, sutures are

17  used when doing a Burch procedure or the pubovaginal

18  sling procedure.  The other alternative design is to

19  use a lightweight, large-pore, less-stiff mesh.

20                MR. ANDERSON:   If I may approach, Your

21        Honor, to hand this?

22                MR. CAMPBELL:   What is that?

23                MR. ANDERSON:   It's a suture.

24  BY MR. ANDERSON:

25    Q.    So, Doctor, let's go to your first safer

1  alternative with regard to a suture repair.

2         What is this?

3    A.    This is what a suture, the package that it

4  comes in.  They open it up in the operating room by

5  the scrub nurse and takes it out of the package.

6  It's a pretty small suture.  So this is what a piece

7  of suture looks like with a little needle on the end

8  in order to sew into tissue.

9    Q.    How much of that would be left in the body

10  after it is sewn and tied?

11    A.    Well, you would probably leave, depending

12  on how thick the tissue is that you're sewing, so if

13  this is the end right here, maybe an inch, maybe a

14  little bit longer.  Once you sew it into place, you

15  tie a knot, and you don't want to leave very much on

16  the ends of the knot.  So less than an inch.

17    Q.    How much of those less-than-an-inch sutures

18  would you use in your Burch procedures?

19    A.    Four.

20    Q.    And so how much total suture material would

21  that be for the Burch?

22    A.    4 to 6 inches.

23    Q.    How much suture material is woven into the

24  TVT Secur mesh?

1                DIRECT - ROSENZWEIG

2    A.    About 30 to 40 feet.

3    Q.    Okay.  Now, who are those sutures made by?

4    A.    Ethicon.

5    Q.    Were Ethicon sutures available in September

6  of 2006?

7    A.    Yes.

8    Q.    1996?

9    A.    Yes.

10    Q.    Even before?

11    A.    Yes.

12    Q.    Okay.  What sutures do you use in your

13  Burch patients?

14    A.    I mostly use a delayed absorbable suture.

15  There has been studies that have shown there's no

16  difference between the success rate when you use

17  delayed absorbable suture versus a permanent suture.

18    Q.    Move your microphone over a little bit.

19  She's straining.  Thank you.

20         In terms of efficacy, do you have the same

21  efficacy as Secur with the -- let me back up.

22         What kind of efficacy do you have with, in

23  other words, effectiveness do you have with your

24  Burch patients?

25    A.    The same or better than the Secur.

1                DIRECT - ROSENZWEIG

2    Q.    Okay.  Do you have an opinion as to whether

3  either the use of a suture in the Burch or the

4  pubovaginal sling would be a safer alternative for

5  stress urinary incontinence than the Secur product?

6                MR. CAMPBELL:   Judge, I object.  I

7        believe it was the subject of a motion, but

8        I'm not sure.

9                THE COURT:   Brief sidebar, please.

10                (In-camera proceedings as

11                follows:)

12                (The court reporter reads back

13                the last question.)

14                MR. CAMPBELL:   The alternative that's

15        required is a safer alternative design.

16        Burch procedures and sling procedures are

17        surgical procedures, and it's not a

18        product.

19                I would defer to others, but I thought

20        that was a motion that was filed in that

21        regard.  But I defer if it's not.  But in

22        any case, the issue is safer alternative

23        design, not some other surgical procedure

24        as opposed to the device.

25                MR. ANDERSON:   That was the

81

DIRECT - ROSENZWEIG

2      defendant's argument both in the last case,
3      and it was excluded there as well, and it
4      should be here.  New Jersey Products
5      Liability Act says that you can -- it has
6      to be a product that is a safer alternative
7      design.
8              This product, as is sitting up there
9      on the stand, is the Prolene product.  The
10     only difference between the Prolene product
11     up there is suture material, and the
12     Prolene product that's in the TVT Secur has
13     40 feet of it and is woven into a mesh and
14     has all these inserter tools and all these
15     other things.
16             We're saying this product is just as
17     fine when used with a surgical device to
18     pull the tissue up underneath the urethra.
19     One is a large piece of mesh; one is a
20     small piece of mesh.
21             THE COURT:   What is the product that
22     the witness has on the stand?
23             MR. ANDERSON:   Those are just Prolene
24     sutures like surgeons have in every
25     operating room in the world.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

82

DIRECT - ROSENZWEIG

2              MR. CAMPBELL:   If I may respond to
3      that, I would then say, if that's the
4      presentation of the evidence, to my
5      knowledge,
6      there's no disclosure that sutures are the
7      safer alternative design to the Secur.
8      That's just not been the statement.  I've
9      heard Dr. Rosenzweig say that he uses the
10     pubovaginal sling and the Burch procedure,
11     but I've never heard him say, either at
12     deposition in this case or in his reports,
13     that the suture is the safer alternative
14     design.
15             THE COURT:   He has just testified that
16     it is the suture that he uses when he does
17     the Burch; is that correct?
18             MR. ANDERSON:   No.  He said that is
19     available to be used by doctors when they
20     use the Burch.  Some use absorbable; some
21     use polypropylene synthetic
22     non-absorbables.  There's an array of
23     sutures that are available.  So this is
24     just one suture that's available to do that
25     procedure.  Different doctors use different
       things.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

83

DIRECT - ROSENZWEIG

2              THE COURT:   The question that you
3      asked this doctor, before he began
4      testifying as to the sutures, was what were
5      the surgical alternatives available in
6      2006; correct?
7              MR. ANDERSON:   That's correct.
8              THE COURT:   And that's the question
9      that he is answering.  Insofar as you
10     intend to use this testimony to support the
11     design defect, it won't work.  I agree with
12     counsel, with defense in this matter.  This
13     is not testimony that goes to design
14     defect.
15             MR. ANDERSON:   Respectfully, Your
16     Honor, we would like an opportunity to
17     brief that because that was exactly what
18     was decided in the Carlino case and the
19     post-trial motions and support for it.
20             THE COURT:   I'll look for your briefs
21     on Monday from both of you.
22             MR. CAMPBELL:   Thanks for the time.
23             (End of in camera proceedings.)
24             THE COURT:   Continue.
25             MR. ANDERSON:   Thank you, Your Honor.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

84

DIRECT - ROSENZWEIG

1      BY MR. ANDERSON:
2      Q.      Do you have an opinion, Doctor, as to
3      whether or not the Burch or the pubovaginal sling
4      procedures would have been safer procedures than the
5      Secur procedure as of September 2006?
6              MR. CAMPBELL:   Same objection, Your
7              Honor.
8              THE COURT:   So noted.
9              THE WITNESS:   Yes, they would be safer
10             alternative procedures.
11     BY MR. ANDERSON:
12     Q.      We talked a little bit about Ethicon meshes
13     that were available in September 2006 and before that
14     you believed would be softer and lighter.
15             Do you recall that part of your testimony?
16     A.      Yes.
17     Q.      In your review of the internal Ethicon
18     documents, did you come across any documents where
19     they did a side-by-side comparison between this stiff
20     rigid mesh used in the Secur and the lighter-weight
21     meshes that Ethicon began selling in the late '90s?
22     A.      Yes.
23     Q.      Handing you what we will mark as
24     Plaintiff's Exhibit 49, is this a document that you

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

85

2    have reviewed and relied upon in this case?

3         A.    Yes.

4         Q.    Is it informative to your opinions in this

5    case?

6         A.    Yes.

7         Q.    What about this is informative to your

8    opinions in this case?

9         A.    This is a PowerPoint presentation from an

10   Ethicon scientist. His name is Boris Batke. And it

11   is demonstrating the difference between heavyweight,

12   small-pore mesh and lightweight, large-pore mesh.

13        Q.    And if we could turn to the side-by-side,

14   did you find a slide that had a side-by-side

15   comparison?

16        A.    Yes.

17               MR. CAMPBELL:   Excuse me, Your Honor.

18        Again, I believe this is a disclosure

19        issue.

20               THE COURT:   I'm sorry?

21               MR. CAMPBELL:   I believe this is a

22        disclosure issue.

23               THE COURT:   Let's have a brief sidebar

24        on this.

25               (In-camera proceedings as

86

1    follows:)

2               THE COURT:   How is this a disclosure

3    issue?

4               MR. CAMPBELL:   Your Honor,

5    Dr. Rosenzweig has most definitely

6    identified Ultrapro as a safer alternative

7    design. No question. And when the

8    testimony came up about Vypro earlier,

9    Mr. Snell said, you know, that wasn't part

10   of his disclosure as an alternative design.

11   I had seen the documents on Vypro, but I

12   believe Mr. Rosenblatt has checked and it's

13   not in his report.

14               MR. ROSENBLATT:   Dr. Rosenzweig did

15   testify that he's not offering Vypro as a

16   safer alternative, and his basis was that

17   because it was a multifilament mesh.

18               MR. SNELL:   That's consistent with the

19   testimony he's given to me, Your Honor,

20   because I had deposed that witness on

21   multiple occasions. He has never

22   identified Vypro as a safer, feasible,

23   alternative design.

24               THE COURT:   What testimony has he

87

1               DIRECT - ROSENZWEIG

2    provided on Vypro in this case, if any?

3               MR. ANDERSON:   This is more

4    historical. I did not ask him if Vypro was

5    a safer alternative. We're jumping the

6    gun. This is historically when they first

7    developed and knew there was a need for

8    lightweight, large-pore meshes. This just

9    happened to be the first one, and it was

10   put out in 1998, which was the same year

11   they started to do the TVT. That's the

12   irony in the case and that's what we're

13   trying to prove. Over here they were doing

14   lighter-weight, large-pore mesh. This just

15   happens to be the first generation of them.

16   And as we develop the testimony, we'll say

17   this turned into Ultrapro, which was

18   available in 2003. So it is more the

19   historical perspective and at what time

20   points they knew that they needed

21   lighter-weight, larger-pore, less-stiff,

22   softer meshes.

23               THE COURT:   He's already provided some

24   testimony to that.

25               MR. ANDERSON:   That's right, Your

88

1               DIRECT - ROSENZWEIG

2    Honor. I just want to show that this is a

3    side-by-side comparison so they can see how

4    much larger these holes are than this other

5    mesh and how much more dense that mesh is

6    than this mesh.

7               MR. CAMPBELL:   So the reason why I

8    rose, and it was somewhat premature because

9    I did want to raise this issue to make sure

10   that we identified it, so that's why I rose

11   early. But I do believe that the testimony

12   from Dr. Rosenzweig has been in the plural,

13   meshes, safer alternative designs and the

14   meshes. I also believe that the question

15   that caused me to stand and object had to

16   do with safer alternative designs.

17               THE COURT:   This witness is going to

18   be available to you for cross. I'm going

19   to overrule you at this point on this, and

20   I'd like to finish this testimony today. I

21   appreciate the fact that you're a little

22   premature. I get it. But let's go back.

23   I'm overruling this.

24               MR. CAMPBELL:   If I could explore

25   then, if he says in the courtroom that

89

DIRECT - ROSENZWEIG

2    Vypro is a safer alternative design, Your

3    Honor, I have to object.

4        THE COURT:  I can understand why you

5    would at that point.

6        MR. ROSENBLATT:  Your Honor, the way I

7    heard the testimony, would you agree that

8    Vypro and Ultrapro would be a safer

9    alternative design?

10       THE COURT:  When did you ask that

11    question?

12       MR. ANDERSON:  I don't remember asking

13    that question.

14       THE COURT:  Mr. Rosenblatt, when did

15    you think that happened?

16       MR. ROSENBLATT:  It was a little

17    earlier on. I don't have the page and

18    line, Your Honor. I'm sorry.

19       MR. ANDERSON:  I'll out there and

20    say, what is this showing? It's showing a

21    lighter-weight, larger-pore. Are you

22    saying Vypro is a safer alternative design?

23    No. What's a safer alternative design?

24    Ultrapro. What was that? Next generation

25    after Vypro. I can do that.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

90

DIRECT - ROSENZWEIG

2       MR. SNELL:  That's totally within his

3    report and testimony. I don't have an

4    issue with that.

5       MR. ANDERSON:  I'll just compare these

6    two, and later on I'll ask him which one is

7    safer. He'll say Ultrapro.

8       THE COURT:  That's within his report.

9         (End of in camera proceedings.)

10       THE COURT:  Mr. Anderson?

11       MR. ANDERSON:  Thank you, Your Honor.

12    BY MR. ANDERSON:

13    Q.  Let's go back to where we were.

14    Have you reviewed tab 49, P-1274?

15    A.  Yes.

16    Q.  Okay. And have you looked at a

17    side-by-side comparison, at least as of the meshes

18    that were available in 1998 in Ethicon's inventory,

19    that would show a heavyweight, small-pore mesh next

20    to a lightweight, large-pore mesh?

21    A.  Yes.

22       MR. ANDERSON:  If we could show that.

23    BY MR. ANDERSON:

24    Q.  Okay. What are we seeing here on the left

25    and the right, just in general terms?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

91

DIRECT - ROSENZWEIG

2    A.  On the left-hand side is Vypro, which is a

3    lighter-weight mesh. The pore size is approximately

4    3 to 5 millimeters. And then the Prolene mesh on the

5    right side is about -- has a density of about 110

6    grams per meter squared and a pore size around a

7    millimeter.

8    Q.  After the Vypro mesh was on the market, did

9    Ethicon develop another lightweight, large-pore mesh

10    that would have been the second generation of these

11    types of meshes?

12    A.  Yes.

13    Q.  What was the name of that device?

14    A.  Ultrapro.

15    Q.  Do you have an opinion as to whether

16    Ultrapro would have been a safer alternative

17    lightweight large-pore mesh than Prolene for the

18    Secur device?

19    A.  Yes.

20    Q.  What is that opinion?

21    A.  That Ultrapro would have been a safer

22    alternative mesh than the Prolene mesh and the TVT

23    Secur.

24    Q.  And in general terms, why?

25    A.  Because the lighter-weight mesh, the

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

92

DIRECT - ROSENZWEIG

1    larger-pore mesh, creates less of a foreign body

2    reaction, creates less inflammation, creates less

3    fibrotic bridging, less scar plating, and less mesh

4    contraction.

5    Q.  Earlier we looked at the Klosterhalfen

6    lightweight, large-pore concept article.

7    Do you recall that, Plaintiff's P-0791?

8    A.  Yes.

9    Q.  What opinions of yours with regard to

10    lightweight large-pore meshes does that article

11    support?

12    A.  Well, first of all, that lightweight,

13    large-pore mesh was available starting back in the

14    late '90s, that there was less inflammation, less

15    foreign body reaction, less scar plating, less mesh

16    contraction with the lightweight, large-pore mesh,

17    and, therefore, decreased the risk to patients of

18    pain and mesh erosion and recurrence.

19    Q.  Going to tab 50-1, Plaintiff's 2243, you

20    mentioned Ethicon's consultants in Germany who helped

21    them develop these less-stiff, softer meshes,

22    Drs. Klinge and Klosterhalfen?

23    A.  Yes.

24    Q.  Have you reviewed other studies than them

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

93

2    other than this lightweight, large-pore article
3    related to complications from stiff meshes?
4        A.    And what years were those studies by
5        Q.    And what years were those studies by
6    Ethicon consultants?
7        A.    1998, 2002, and 2005.
8        Q.    Look at tab 50-1 and 50-2, 50-2 being
9    P-1454.  Is this one of those articles?
10        A.    Yes.
11        Q.    And does this inform your opinions in this
12    case?
13        A.    Yes.
14        Q.    Is it authoritative?
15        A.    Yes.
16        Q.    Is it something you relied on?
17        A.    Yes.
18        Q.    And then we also looked at P-2243.  Is that
19    something that you reviewed and relied upon in this
20    case?
21        A.    Yes.
22        Q.    Are these the articles by Ethicon's
23    consultants you were just referring to?
24        A.    Correct.
25        Q.    Just in general terms, what opinions of

94

2    yours does this 1998, 2002, and the 2005 articles
3    support by these consultants for Ethicon?
4        A.    That a lighter-weight, larger-pore mesh has
5    less fibrosis, chronic foreign body reaction, chronic
6    inflammation, leads to less scar plating, less
7    contraction, which would cause less injuries to
8    patients such as pain, erosion, and recurrence.
9        Q.    Thank you, Doctor.
10              You mentioned Ultrapro.  Did Ethicon ever
11    incorporate this Ultrapro lightweight, large-pore
12    mesh into implantable pelvic products?
13        A.    Yes.
14        Q.    What products did they incorporate them
15    into?
16        A.    It was a product used to treat the prolapse
17    that we talked about earlier this morning, when the
18    support structures of the vagina become weakened, and
19    this is used to support them.  There was a product
20    called Prolift+M.  So it was a pelvic floor product
21    to treat prolapse.
22        Q.    And based upon your review of the
23    literature, your review of internal Ethicon
24    documents, your review of the deposition testimony of
25    Ethicon witnesses, as well as your own background,

95

DIRECT - ROSENZWEIG

2    training, and experience, do you have an opinion as
3    to whether or not the Ultrapro could have been used
4    instead of the Prolene in the TVT Secur mesh?
5        A.    Yes.
6        Q.    What is that opinion?
7        A.    That if Ultrapro had been used instead of
8    the Prolene mesh in the TVT Secur, it would have
9    mitigated, decreased, or stopped completely the
10    problems that we have been discussing of chronic
11    foreign body reaction, scar plating, mesh
12    contraction, which leads to pain, erosion, recurrence
13    of urinary symptoms.
14        Q.    Doctor, who is Dr. Piet Hinoul?
15        A.    Dr. Piet Hinoul is a medical director,
16    worldwide medical director at Ethicon.
17        Q.    Did you review his deposition testimony in
18    this case?
19        A.    Yes, I did.
20        Q.    Did you review testimony of Dr. Piet
21    Hinoul, the worldwide medical affairs director at
22    Ethicon, regarding whether his opinion of
23    lightweight, large-pore meshes would be softer in a
24    woman's tissue?
25        A.    Yes.

96

DIRECT - ROSENZWEIG

2        Q.    What did he say?
3        A.    It would be softer in a woman's tissue.
4        Q.    Do you recall from his testimony whether or
5    not he said that it could reduce pain in women?
6              MR. CAMPBELL:   Judge, I object.  It's
7        leading.
8              THE COURT:   Rephrase your question.
9    BY MR. ANDERSON:
10        Q.    With your review of Dr. Hinoul's sworn
11    deposition testimony, did he mention whether or not
12    pain could or could not be related to heavyweight
13    meshes?
14              MR. CAMPBELL:   Same objection, Your
15        Honor.
16              THE COURT:   Overruled.
17              THE WITNESS:   Yes.
18    BY MR. ANDERSON:
19        Q.    What did he say about the difference
20    between heavyweight and lightweight meshes with
21    regard to pain?
22        A.    That lightweight mesh decreases pain.
23        Q.    And was there any testimony one way or
24    another as to how long Dr. Hinoul testified that his
25    company knew about this?

97

DIRECT - ROSENZWEIG

2        MR. CAMPBELL:   Judge, I object.
3        THE COURT:   Restate your question.
4   BY MR. ANDERSON:
5        Q.   In your review of the testimony, the sworn
6   testimony of Ethicon's worldwide medical affairs
7   director, did you agree with or disagree with the
8   length of time that Ethicon may have known about
9   these products?
10        MR. CAMPBELL:   Judge, I object.
11        THE COURT:   Sustained.
12   BY MR. ANDERSON:
13        Q.   How long did Dr. Hinoul know that Ethicon
14   had known about this?
15        MR. CAMPBELL:   Judge, I object.  It's
16        taken out of context.  Dr. Hinoul is going
17        to testify, I believe, by deposition.
18        THE COURT:   I'll permit this.
19        THE WITNESS:   Since before the TVT
20        Secur was launched.
21   BY MR. ANDERSON:
22        Q.   When was that?
23        A.   In 2006, September 20.
24        Q.   Turning now to Exhibit P-1842, to further
25   this discussion a little longer about the

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

98

DIRECT - ROSENZWEIG

2   lightweight, large-pore Ultrapro mesh, that would be
3   tab 50-4.
4        THE COURT:   P-1842 did you say?
5        MR. ANDERSON:   Yes, Your Honor.
6        THE COURT:   Thank you.
7   BY MR. ANDERSON:
8        Q.   Is this something you reviewed in forming
9   your opinions in this case?
10        A.   Yes.
11        Q.   Is this article significant to your
12   opinions in this case?
13        A.   Yes.
14        Q.   Is it an authoritative text?
15        A.   Yes.
16        Q.   Okay.  Please first explain what this was
17   in terms of its title and author.  Then I'll ask you
18   if it supports your opinions.
19        A.   Yes.  It is from a Dr. Okulu from the
20   Scandinavian Journal of Urology in 2013.  The title
21   is:  Use of three types of synthetic material in
22   sling surgery:  A prospective randomized clinical
23   trial evaluating effectiveness and complications.
24        Q.   Was Ultrapro one of the meshes studied?
25        A.   Yes.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

99

DIRECT - ROSENZWEIG

2        Q.   What opinions of yours does this article
3   support in this case?
4        A.   That Ultrapro can be used as a sling to
5   treat stress urinary incontinence.  It is effective
6   and decreases complications.
7        Q.   How long was this study?
8        A.   It was four and a half years.
9        Q.   Thank you.  Do you have an opinion as to
10   whether or not, had Ethicon used the Ultrapro mesh in
11   its TVT Secur device, if it would have eliminated or
12   mitigated, lessened, the problems of chronic foreign
13   body reaction, chronic inflammation, and scar
14   plating?
15        A.   Yes.
16        Q.   What is that opinion?
17        A.   It would have lessened or obviated the
18   chronic foreign body reaction, chronic inflammation,
19   and scarring.
20        Q.   Do you have an opinion as to whether or not
21   the Ultrapro mesh, if used in the TVT Secur device,
22   would have lessened the multiple recurrent erosions,
23   the risk to patients of chronic pain, chronic vaginal
24   pain, and chronic urinary symptoms?
25        A.   Yes.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

100

DIRECT - ROSENZWEIG

2        Q.   What is that opinion?
3        A.   It would have lessened the risk of chronic
4   erosions, recurrent erosions, chronic pain, and
5   urinary symptoms.
6        Q.   Have you seen documents that we've either
7   looked at here today or deposition testimony that
8   would support the fact that stiff and rigid mesh
9   causes chronic long-term inflammation at or before
10   the first time?
11        MR. CAMPBELL:   Objection.
12        MR. ANDERSON:   Let me see if I can
13        rephrase it.
14   BY MR. ANDERSON:
15        Q.   With regard to the documents that you've
16   reviewed here today, do they support your opinion in
17   this regard that the stiff and rigid mesh causes less
18   chronic long-term inflammation?
19        MR. CAMPBELL:   Object.  It's
20        cumulative at this point.  It's also
21        leading.
22        THE COURT:   I'm going to sustain the
23        objection as to the cumulative nature of
24        the testimony.
25        MR. ANDERSON:   Okay.  That's fine,

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

101
DIRECT - ROSENZWEIG

2       Your Honor.
3  BY MR. ANDERSON:
4       Q.    Do you have an opinion to a reasonable
5  degree of medical certainty as to whether the stiff
6  and rigid mesh increases the risk to patients of
7  erosions, pain with sex, and urinary problems?
8              MR. CAMPBELL:   Same.
9              THE COURT:   Actually, this question is
10         slightly different and I'll permit it.
11         Overruled.
12             THE WITNESS:   Can you repeat the
13         question, please?
14  BY MR. ANDERSON:
15      Q.    Certainly.  Do you have an opinion within a
16  reasonable degree of medical certainty whether the
17  stiff and rigid mesh in the TVT Secur increases the
18  risk to patients of erosions, including multiple
19  erosions, pain with sex, and urinary problems,
20  including chronic urinary problems?
21      A.    Yes.
22      Q.    What is that opinion?
23      A.    That the rigid stiff mesh increases the
24  risk of erosions, pain, and urinary problems.
25      Q.    And was the Ultrapro mesh commercially

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

102
DIRECT - ROSENZWEIG

2  available and economically feasible to be used to
3  treat SUI at the time the Secur was launched in 2006?
4              MR. CAMPBELL:   I object. It's
5         leading.
6              THE COURT:   Overrule that objection.
7              THE WITNESS:   Yes, it was.
8  BY MR. ANDERSON:
9       Q.    Let me repeat the question.
10      A.    Thank you.
11      Q.    Was Ultrapro mesh commercially available
12  and economically feasible to be used to treat stress
13  urinary incontinence as of the time the Secur was
14  launched in September of 2006?
15      A.    Yes, it was both commercially available and
16  economically feasible in 2006.
17      Q.    Okay. Doctor, we talked earlier about the
18  IFU briefly; correct?
19      A.    Yes.
20      Q.    Okay. I want to talk a little bit more
21  specifically about it now.
22            You mentioned they come with all medical
23  devices; is that correct?
24      A.    That is correct.
25      Q.    Would that include the TVT Secur device?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

103
DIRECT - ROSENZWEIG

2       A.    Yes.
3       Q.    And have you had personal experience with
4  IFUs in your clinical practice?
5       A.    Yes, I have.
6       Q.    How many?
7       A.    Hundreds.
8       Q.    Okay. And do you have an opinion as to
9  whether or not it is an important document for
10  surgeons like yourself?
11      A.    Yes, it is.
12      Q.    Why?
13      A.    The instructions for use contain
14  information for doctors about how to use the device,
15  what patients they would be used for, what patients
16  it should not be used for, what are the risks, what
17  are the adverse events, and what are the warnings
18  associated with the device.
19      Q.    Do you as a doctor rely on the manufacturer
20  to inform you of all the risks and dangers of their
21  products in the IFU?
22      A.    Yes.
23      Q.    Okay. Doctor, what is a risk-benefit
24  analysis?
25      A.    Well, it's an analysis that one does, in

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

104
DIRECT - ROSENZWEIG

2  this case, myself as a doctor, when I am deciding on
3  a treatment or a procedure for a patient. I gauge
4  the risks of the procedure versus the benefits and
5  utility for the patient.
6       Q.    And do you know what an informed consent
7  is?
8       A.    Yes.
9       Q.    Can you please explain for the jury what an
10  informed consent is and why it's important?
11      A.    Informed consent is a process that the
12  doctor and the patient has whereby the doctor
13  describes to the patient the procedure or treatment
14  that he or she is recommending, what the benefits of
15  that procedure or treatment is, what the alternatives
16  are, and what the risks are so that the patient and
17  the doctor together can make a decision, based on
18  this information, whether or not this treatment or
19  procedure is right for the individual patient.
20      Q.    Have you seen documents and testimony in
21  this case that inform you of the standard that
22  Ethicon uses for what needs to be in an IFU?
23      A.    Yes.
24      Q.    Have you reviewed the deposition testimony
25  of Dr. Robinson?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

---

105

DIRECT - ROSENZWEIG

2   A.   Yes.

3   Q.   Who is Dr. Robinson?

4   A.   Medical director at Ethicon.

5   Q.   A surgeon like you?

6   A.   Yes.

7   Q.   What type of surgeon?

8   A.   A gynecologic surgeon.

9   Q.   Were doctors and surgeons at Ethicon

10  involved in drafting the warning labels at Ethicon?

11  A.   Yes.

12  Q.   Did you rely on Dr. Robinson's testimony in

13  forming your opinions in this case?

14  A.   Yes.

15  Q.   Did you reasonably rely on Dr. Robinson's

16  testimony to determine what Ethicon's internal

17  guidelines were for what should be in these IFUs?

18  A.   Yes.

19  Q.   Was his testimony regarding what Ethicon's

20  guidelines were significant to your opinions in this

21  case?

22  A.   Yes.

23  Q.   What did Dr. Robinson testify to what the

24  significant -- strike that.

25       Based on your review of his testimony, what

---

106

DIRECT - ROSENZWEIG

1   were Ethicon's internal guidelines for what should be

2   in an IFU?

3        Q.   in an IFU?

4   A.   All significant risks and adverse events

5   should be contained in the instructions for use.

6   Q.   Have you reviewed other documents and

7   depositions regarding what Ethicon's internal

8   requirements were for what needed to be in an IFU?

9   A.   Yes.

10  Q.   Who is Dr. Piet Hinoul?

11  A.   Worldwide medical director.

12  Q.   What of his deposition testimony, if any,

13  informed you as to what should be included in an

14  Ethicon IFU like the Secur?

15  A.   His deposition testimony?

16  Q.   Yes.

17  A.   He also stated that all known risks should

18  be in the IFU, and the instructions for use should

19  not downplay the significance or the propensity of

20  risks that are associated with the device.

21  Q.   Per Ethicon's own internal guidelines as

22  you've just mentioned, does the IFU for the Secur

23  need to say anything about the mesh itself?

24  A.   Yes.

25  Q.   Okay.  Why?

---

107

DIRECT - ROSENZWEIG

2   A.   Well, the mesh itself is a characteristic

3   of the device, and this character -- the instructions

4   for use should describe all the characteristics of

5   the device and the risks associated with that

6   specific characteristic of the device.

7   Q.   What is your opinion regarding the adequacy

8   of the warnings in this IFU for the Secur?

9   A.   The adequacy of the warnings is not

10  sufficient in the IFU.

11  Q.   Why is that?

12  A.   Because there are a number of warnings in

13  the instructions for use that are not contained in

14  the instructions for use.

15  Q.   With my assistance, did you prepare slides

16  that would contain your opinions as to what warnings

17  should have been in the IFU for the TVT Secur?

18  A.   Yes.

19  Q.   Are those approximately six slides?

20  A.   Yes, sir.

21       MR. CAMPBELL:   Your Honor, again, I

22       object.

23       THE COURT:   Basis of your objection?

24       MR. CAMPBELL:   It will produce a

25       leading response.  He should be asked his

---

108

DIRECT - ROSENZWEIG

2   opinions as to what the warnings should be.

3        THE COURT:   I'm going to permit this

4        to be introduced, and if you have an

5        objection as to going forward, please

6        present it at that time.

7   BY MR. ANDERSON:

8   Q.   With regard to the first warning

9   requirement that you believe should have been in the

10  IFU, could you publish that?

11  A.   The warning about foreign body reaction,

12  inflammatory reaction.

13  Q.   What do you believe that warning should

14  have said, Doctor?

15  A.   The TVT Secur has a chronic foreign body

16  reaction and chronic --

17  Q.   A little slower for her.

18  A.   -- inflammatory response in vaginal tissue

19  that persists over the life of the product.  This can

20  lead to excessive scarring causing the mesh to become

21  encapsulated in scar and to contract or shrink the

22  mesh up to an area of 50 percent.  This can cause

23  chronic recurrent erosions, chronic pain,

24  dyspareunia, and chronic urinary dysfunction.

25  Q.   Is this warning in the Secur IFU?

109

DIRECT - ROSENZWEIG

2    A.   No.

3    Q.   Do you have an opinion whether doctors like

4  yourself would have liked to have this warning in the

5  device?

6            MR. CAMPBELL:  Excuse me, Judge.  I

7        object to the form of that question.

8            THE COURT:  Please restate your

9        question.

10           MR. ANDERSON:  Sure.

11  BY MR. ANDERSON:

12    Q.   As a doctor who is deciding whether to

13  implant medical devices, would this warning have been

14  significant to you?

15           MR. CAMPBELL:  Objection. That's

16        irrelevant.

17            THE COURT:  I'm going to permit the

18        question.  Overruled.

19           THE WITNESS:  Yes.  This would be an

20        important warning for me to know prior to

21        having a discussion with my patient

22        regarding a treatment such as the Secur.

23  BY MR. ANDERSON:

24    Q.   Let's go to slide two, if we could.  What

25  is slide two?  Can you explain that to the jury?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

---

110

DIRECT - ROSENZWEIG

2    A.   This is a warning regarding heavyweight,

3  small-pore mesh.  The mesh in the Secur is

4  heavyweight, small-pore mesh.  Heavyweight,

5  small-pore mesh increases the risk of multiple

6  recurrent erosions and mesh exposure, chronic pain,

7  chronic dyspareunia, and chronic urinary dysfunction,

8  including frequency, urgency, and recurrent urinary

9  tract infections.

10    Q.   Was this warning or anything like it in the

11  TVT Secur IFU?

12    A.   No.

13    Q.   As a surgeon deciding whether to implant a

14  medical device, would this be important to you in

15  your practice?

16    A.   Yes.

17    Q.   Why?

18    A.   Because this is information that I would

19  want to know to be able to discuss this with my

20  patient when doing the informed consent process.

21    Q.   Did the IFU for Secur say it was a

22  heavyweight, small-pore mesh?

23    A.   No.

24    Q.   Did it say it increased the risk of

25  multiple recurrent erosions?

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

---

111

DIRECT - ROSENZWEIG

2    A.   No.

3    Q.   Did it say it increased the risk of chronic

4  pain?

5    A.   No.

6    Q.   Did it even mention chronic dyspareunia?

7    A.   No.

8    Q.   Let's go to the third slide, please.

9    A.   Warning regarding stiffness.  The TVT Secur

10  is more rigid and stiff than mesh used in other TVT

11  products.  Stiff or rigid mesh increases the risk of

12  multiple recurrent erosions and mesh exposure,

13  chronic pain, including chronic dyspareunia, chronic

14  urinary dysfunction, including urgency, frequency,

15  and recurrent urinary tract infections.

16    Q.   Was this in the TVT Secur or anything like

17  this in the TVT Secur IFU?

18    A.   No.

19    Q.   As a doctor who is trying to decide whether

20  to implant a medical device, would this have been

21  important to you in your practice?

22    A.   Yes.

23    Q.   Go to the next slide.  In terms of this

24  warning that you believe should have been in the

25  Secur, please explain it.

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

---

112

DIRECT - ROSENZWEIG

2    A.   The Secur uses a sharp introducer tool.

3  The sharp introducer tool increases the risk of

4  multiple recurrent erosions and mesh exposure,

5  chronic pain, including chronic dyspareunia, chronic

6  urinary dysfunction, including urgency, frequency,

7  and recurrent urinary tract infections.

8    Q.   Does the IFU for the TVT Secur talk at all

9  about the tissue damage that could be caused by these

10  sharp tools and lead to chronic issues for a woman?

11    A.   No.

12    Q.   Was there anything like this that was

13  included in the TVT Secur IFU?

14    A.   No.

15    Q.   As a doctor trying to decide with a patient

16  whether or not to implant the device, would this be

17  significant to you in your practice?

18    A.   Yes.

19    Q.   Go to the next slide, please.  Can you

20  explain why you believe or explain what you believe

21  should have been in with regard to this warning?

22    A.   The TVT Secur uses absorbable fleece tips

23  to hold the mesh in place.  Because of this, the

24  fleece tips can cause the mesh to move or migrate

25  after being placed in the body.  The movement of the

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

113

DIRECT - GAGLIARDI

2  stiff and rigid mesh increases the risk of multiple
3  recurrent erosions and mesh exposure, chronic pain,
4  including chronic dyspareunia, chronic urinary
5  dysfunction, including urgency, frequency, and
6  recurrent urinary tract infections.
7    Q.    Did this appear in the TVT Secur IFU?
8    A.    No.
9    Q.    Was there anything about the fleece tips
10  moving and migrating in the tissue after the woman
11  was sewn up, anything about that in the Secur
12  warning?
13    A.    No.
14    Q.    Would you as a doctor trying to decide
15  whether or not to implant a medical device
16  permanently in a woman's vagina have wanted to know
17  this type of information?
18    A.    Yes.
19    Q.    Go to the next slide, please.  Why do you
20  have this as a warning that you believe should have
21  been included in the Secur or something like it?
22    A.    Because the design features of the Secur
23  device were not adequately studied in women prior to
24  being sold.  The device was only studied in sheep and
25  cadavers.  The initial results of the Secur have

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

114

2  shown inferior patient outcomes compared to other
3  devices.
4    Q.    Was this included in the TVT Secur?
5    A.    No.
6    Q.    Do you believe it should have been?
7    A.    Yes.
8    Q.    Do you believe all of these should have
9  been included?
10    A.    Yes.
11    Q.    As a doctor, would you have liked to have
12  known that the Secur was only studied in sheep,
13  cadavers, and a few women at the time it was
14  launched?
15    A.    Yes.
16        MR. ANDERSON:   This is a good time.
17        THE COURT:   I think this might be an
18  appropriate time.  Thank you very much.
19        Doctor, you may step down.
20        THE WITNESS:   Thank you.
21        (The witness exits the stand.)
22        THE COURT:   Members of our jury, as
23  you prepare to take a three-day break from
24  our trial, I'd like you to remember a few
25  things.  First, if you recall, when we

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

115

C O L L O Q U Y

1
2    first spoke, I said you can't make any
3    decisions until you have all of the
4    evidence, and that's going to be another
5    several days.  So I'm going to caution you
6    not to think about this case in terms of
7    what you've already heard knowing that you
8    haven't heard everything.  Two sides to
9    every story.
10        Second, I want to remind you that it's
11    not advisable to really talk about this
12    case with anybody.  Generally, people will
13    not be very positive about their own
14    experiences with jury duty, and I don't
15    want that to affect your own perceptions.
16        And third, you cannot do any research
17    or in any way seek any information
18    whatsoever about the matters that we are
19    discussing in this room.  To do so will
20    prejudice the trial and can significantly
21    affect having a fair and impartial case,
22    which is what we're all here about.
23        Fourth, eat a lot.  It's one of those
24    weekends where we get to, a lot of us, and
25    don't ever pass up that opportunity,

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

116

C O L L O Q U Y

1
2    especially for the egg.
3        So you are a great jury.  We're very
4    grateful to you.  We understand it's not an
5    easy trial, but I don't think I've ever
6    known an easy trial on jurors.  Thank you
7    very much.  I'm going to ask everyone to
8    rise while the jury leaves the room.
9        (The jury exits the courtroom at
10    3:29 p.m.)
11        THE COURT:   Anything that we need to
12    put on the record?
13        MR. ANDERSON:   No.
14        MR. HIGGINBOTHAM:   Your Honor, Daniel
15    Higginbotham for the defendants.  Would it
16    be okay if I put on the record our
17    discussions this morning about the FDA
18    statement?
19        THE COURT:   Yes.
20        MR. HIGGINBOTHAM:   Your Honor, as you
21    recall, one day this week, you granted
22    Plaintiff's Motion in Limine No. 6, I
23    believe it was, to exclude evidence of the
24    FDA 510(k) and the advisory committee's
25    statements.  You also suggested to the

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

117

2 parties that we prepare a joint statement

3 regarding the FDA. The defendants have

4 done so, and if I can mark as a court

5 exhibit our proposal.

6       THE COURT: You may.

7       MR. HIGGINBOTHAM: May I approach to

8 hand it to Your Honor?

9       THE COURT: You may.

10       MR. HIGGINBOTHAM: How will that be

11 marked, Your Honor?

12       THE COURT: We're going to mark it

13 Court Exhibit A Defense.

14       MR. HIGGINBOTHAM: Court Exhibit A

15 entitled "Defendant's proposed statement

16 regarding FDA evidence," again, is

17 submitted in response to Your Honor's

18 directive that we provide some guidance to

19 the jury about the FDA.

20       Defendants don't intend to submit that

21 statement as a replacement for FDA

22 evidence. We still believe that evidence

23 is relevant and necessary but understand

24 Your Honor's ruling on that point.

25       We also wanted to make it clear for

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

118

2 the record that we're submitting that

3 statement for purposes of this case only

4 and certainly reserve our right in other

5 cases, both in Philadelphia and other

6 jurisdictions, to seek admission of FDA

7 evidence, Your Honor.

8       We talked this morning briefly about

9 why we think that statement should be read.

10 We think it should be read because the jury

11 comes in understanding that these products

12 are subject to regulation. We think that

13 reminding the jury that the FDA is out

14 there, that the TVT Secur was lawfully

15 marketed from 2006 to 2012, and reminding

16 the jury that they are not to speculate

17 about what the FDA did or did not do is

18 important to guard against the risk of

19 unfair speculation on the part of the

20 jurors as to what the FDA did.

21       THE COURT: Any response?

22       MR. BRADFORD: Brad Bradford for the

23 plaintiff. We spoke about this this

24 morning, Your Honor. The 4th Circuit

25 opinion regarding the Bard MDL trial, they

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

119

1       C O L L O Q U Y

2 affirmed the trial court, Judge Goodwin,

3 the MDL judge, keeping out the FDA in its

4 entirety on 403 as opposed to 402 because

5 of its prejudice.

6       In addition to the opening statements

7 made by both parties that were good and

8 thorough and I think the depth and breadth

9 of the plaintiff's opening statement in

10 this case, I don't think any juror that

11 thought the FDA did not approve its product

12 would have a doubt. That would have been

13 mentioned had it been true. Once the FDA

14 comes in, if you're in for a penny, you're

15 in for a pound, and it should stay out in

16 its entirety.

17       THE COURT: Thank you. The Court

18 notes that when I discussed this matter

19 with counsel today, there was a

20 reconsideration by the Court as to the

21 advisability including a statement

22 regarding the FDA.

23       I believe that having a statement

24 regarding the FDA read to the jury at this

25 time would be inconsistent with the ruling

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

120

1       C O L L O Q U Y

2 that I made in I believe it was Plaintiff's

3 Motion in Limine No. 6.

4       MR. HIGGINBOTHAM: That's correct,

5 Your Honor.

6       THE COURT: Accordingly, there will

7 not be any statement read to the jury with

8 regards to the FDA.

9       MR. BRADFORD: That's a nice memory

10 you have there.

11       MR. HIGGINBOTHAM: Thank you, Your

12 Honor.

13       MR. BRADFORD: The only other issue,

14 this weekend I'll be working on

15 Dr. Bolton's deposition transcript. We had

16 mentioned publishing your ruling. Both

17 sides have good notes. I think publishing

18 might be as easy as however you think would

19 be the best way just to provide us with a

20 copy of your notes to make sure ours match

21 each other's and yours. That's how I would

22 recommend doing it, if you're so inclined.

23       THE COURT: I think we should be able

24 to do that before you leave. We'll get

25 copies of that immediately. You can take a

SHANNAN GAGLIARDI, RDR, CRR, (215) 683-8014

121

2          look at them over the weekend.

3                  For those people who are traveling, I

4          hope you get to the airport quickly.  I

5          will be here at 8:00 on Monday morning if

6          anybody wishes to speak about anything.

7                  (Proceedings adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SHANNAN GAGLIARDI, RDR, CRR, (215)683-8014

CERTIFICATE

            I, Shannan Gagliardi,
Registered Diplomate Reporter in and for the
Commonwealth of Pennsylvania, do hereby certify that
the foregoing is a true and accurate transcript of
the notes of testimony of said witness who was first
duly sworn on the date and place hereinbefore set
forth.

            I further certify that I am
neither attorney nor counsel for, nor related to or
employed by any of the parties to the action in which
this trial was taken, and further, that I am not a
relative or employee of any attorney or counsel
employed in this action, nor am I financially
interested in this case.

SHANNAN GAGLIARDI
Registered Diplomate Reporter
Certified Realtime Reporter