EXHIBIT D

Bruce Alan Rosenzweig, M.D.

Page 1

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

```
------------------------    ) FEBRUARY TERM 2014
IN RE:  PELVIC MESH          )
LITIGATION                   )
                             )
MASTER DOCKET                ) NO. 829
------------------------    ) ------------------
                             )
ELLA EBAUGH and              ) COURT OF COMMON
MARVIN EBAUGH                ) PLEAS
                             )
              Plaintiffs,    ) PHILADELPHIA COUNTY
                             )
     -vs-                    )
                             )
ETHICON WOMEN'S HEALTH       ) JULY TERM 2013
AND UROLOGY, A DIV. OF       )
ETHICON, INC., ET AL.,       ) NO. 00866
                             )
              Defendants.    )
                             )
------------------------    )
```

The videotaped de bene esse deposition of
BRUCE ALAN ROSENZWEIG, M.D., called for
examination, taken before CORINNE T. MARUT, C.S.R.
No. 84-1968, Registered Professional Reporter and a
Certified Shorthand Reporter of the State of
Illinois, at the JW Marriott Chicago, 151 West
Adams Street, Chicago, Illinois, on July 14, 2017,
commencing at 9:10 a.m.

Bruce Alan Rosenzweig, M.D.

## Page 2

```
1    APPEARANCES:
2      ON BEHALF OF THE PLAINTIFFS:
3        AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         17 East Main Street, Suite 200
4        Pensacola, Florida  32502
         850-202-1010
5        BY:  DANIEL THORNBURGH, ESQ.
             dthornburgh@awkolaw.com
6            BRAD BRADFORD, ESQ.
             bbradford@awkolaw.com
7
8      ON BEHALF OF THE DEFENDANTS:
9        BUTLER SNOW LLP
         500 Office Center Drive, Suite 400
10       Fort Washington, Pennsylvania  19034
         267-513-1885
11       BY:  NILS B. (BURT) SNELL, ESQ.
             Burt.Snell@butlersnow.com
12
13       BUTLER SNOW LLP
         1020 Highland Colony Parkway, Suite 1400
14       Ridgeland, Mississippi  39158
         601-985-4596
15       BY:  PAUL S. ROSENBLATT, ESQ.
             Paul.Rosenblatt@butlersnow.com
16
17
     ALSO PRESENT:
18
         RAQUEL LaPOINTE, Paralegal,
19           Anderson Law Offices;
20       THOMAS BODYZIAK, Trial Technician.
21
22
     VIDEOTAPED BY:  MILO SAVICH
23
     REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
24
```

## Page 3

```
1            I N D E X
2    BRUCE ALAN ROSENZWEIG, M.D.       EXAMINATION
3        BY MR. THORNBURGH............  12
4
5
     CONFERENCE CALL WITH JUSTICE GREENSPAN
6             Pages 102 to 112
7
             E X H I B I T S
8
     BR-Secur EXHIBIT            MARKED FOR ID
9
     No. 1   "Summary of Opinions" slide      30
10
     No. 2   "Materials Reviewed" slide       32
11
     No. 3   "Testimony Reviewed by           35
12           Dr. Rosenzweig" slide
13   No. 4   "TVT-Secur" slide        39
14   No. 5   Binder of various Plaintiffs'    78
             Exhibits referred to by
15           deponent
             (see First Referred to
16           Exhibits below)
17
18
19
20
21
22
23
24
```

## Page 4

```
1            E X H I B I T S (Continued)
2
     EXHIBITS PREVIOUSLY MARKED  --  FIRST REFERRED TO
3
     P0127......................  290
4    P0274......................  285
     P0279......................  176
5    P0542......................  186
     P0619......................  301
6    P0716......................  191
     P0732......................  130
7    P0784......................  320
     P0842......................  200
8    P0871......................  164
     P0933......................   78
9    P1080......................   74
     P1096......................  288
10   P1100......................  314
     P1177......................  151
11   P1318......................  134
     P1352......................  237
12   P1403......................  259
     P1437......................  327
13   P1452......................  277
     P1553......................   61
14   P1572......................   84
     P1801......................   48
15   P2225......................  337
     P2377......................  165
16
17
18
19
20
21
22
23
24
```

## Page 5

```
1        THE VIDEOGRAPHER:  We are now on the record.
2    My name is Milo Savich and I am a videographer for
3    Golkow Technologies.
4        Today's date is July 14, 2017 and the
5    time is 9:10 a.m.
6        This video deposition is being held in
7    Chicago, Illinois in the matter of Ella
8    Cederberg-Ebaugh vs. Ethicon, Inc. et al., which is
9    being heard in the Court of Common Pleas of
10   Philadelphia County, Pennsylvania.  The case number
11   is 1307-00866.
12       The deponent is Dr. Bruce Rosenzweig.
13       Will counsel please identify themselves
14   for the record.
15       MR. THORNBURGH:  Daniel Thornburgh for the
16   Plaintiff.
17       MR. SNELL:  Burt Snell for the Defendants
18   Ethicon and Johnson & Johnson.
19       MR. ROSENBLATT:  Paul Rosenblatt for the
20   Defendants Johnson & Johnson and Ethicon, Inc.
21       THE VIDEOGRAPHER:  The Court Reporter is Corey
22   Marut who will now swear in the witness and we may
23   then proceed.
24       (WHEREUPON, the witness was duly
```

Bruce Alan Rosenzweig, M.D.

Page 6

1      sworn.)
2      MR. SNELL:  This is counsel for Ethicon and
3  Johnson & Johnson.  Mr. Thornburgh and I had a
4  discussion before the deposition and I advised that
5  I had an objection to put on the record, so I'd
6  like to do that now.
7      I want to put an objection on the record
8  to the use of this de bene esse deposition taken in
9  the Ebaugh case in Pennsylvania State Court from
10  being used in any Federal MDL trials.
11      To date, no Plaintiff in the Federal MDL
12  has yet attempted to use Dr. Rosenzweig's
13  Pennsylvania TVT Carlino deposition in lieu of a
14  live trial appearance in Federal Court.
15      To the extent that any Plaintiff
16  attempts to use in a federal trial the Carlino or
17  Ebaugh deposition transcript in lieu of a live
18  appearance, Defendants will move to strike and
19  quash the use of these depositions.
20      Plaintiffs' cross-notice of
21  Dr. Rosenzweig's deposition is improper because the
22  Ebaugh deposition is a Pennsylvania de bene esse
23  deposition for many reasons.
24      The Ebaugh deposition of Dr. Rosenzweig

Page 7

1  is a de bene esse deposition, also known as a trial
2  deposition.  A de bene esse deposition is a
3  substitute for live testimony at trial and is
4  conducted under the Trial Rules of Evidence rather
5  than as a discovery deposition.
6      Thus, the Ebaugh deposition will be
7  conducted pursuant to the Pennsylvania Trial Rules
8  of Evidence, not the Federal Rules for discovery.
9  There are significant differences between the
10  Pennsylvania Rules of Evidence and procedure which
11  will govern the de bene esse deposition in the
12  Ebaugh trial case as compared to the Federal Rules,
13  and these differences can affect lines of
14  questioning, including strategic cross-examination
15  decisions.
16      There are other significant evidentiary
17  differences between Federal Court and Pennsylvania
18  with regard to the use of learned treatises and
19  expert reliance materials.
20      Also, the Fourth Circuit, as noted in
21  Tatman v. Collins, the Federal Rules of Civil
22  Procedure do not distinguish between depositions
23  taken for discovery and depositions taken for
24  trial, rather.  A deposition may be used at trial

Page 8

1  in Federal Court subject to the restrictions of the
2  Federal Rules, including Rule 32.
3      Also in federal practice under
4  FRCP 26(b), the scope of a deposition is
5  concomitant with the scope of discovery.
6      Objections are typically limited to
7  those that might be waived if not made at the time
8  under Rule 32(d)(3), i.e., objections to the manner
9  of taking the deposition, the form of a question or
10  answer, the oath or affirmation, a party's conduct
11  and other matters that might be immediately
12  corrected.
13      With the knowledge that it will be a
14  de bene esse deposition for Ebaugh, Ethicon's
15  attorneys will have different strategic
16  considerations for Dr. Rosenzweig's Ebaugh
17  deposition than it would in a typical Federal Court
18  deposition.
19      It's inherently fair -- unfair and
20  prejudicial for Ethicon to be forced to compromise
21  its strategy for the de bene esse deposition for
22  the purposes of a Federal Court discovery
23  deposition or vice versa, for example, Ethicon may
24  choose to forego certain objections.  Ethicon

Page 9

1  should not be forced into this dilemma by
2  Plaintiffs' improper cross-notice.
3      Additionally and finally,
4  Dr. Rosenzweig, the witness, is not unavailable in
5  the federal cases.  He has testified before in the
6  federal trials.  He's typically paid, upon my
7  information, approximately $10,000 a day to testify
8  at trial and he has testified in numerous MDL cases
9  as well as other State Court cases around this
10  country for this litigation as well as other
11  manufacturers litigation.
12      MR. THORNBURGH:  Are you done?
13      MR. SNELL:  Finally, Ethicon should not be
14  forced to refrain -- reframe their de bene esse
15  deposition to focus on federal Daubert issues as
16  opposed to the Frye issues in Pennsylvania.
17      In sum, the Ebaugh deposition has
18  different -- a different purpose, different issues
19  and will be taken under different rules of
20  evidence, subject to different pretrial rulings and
21  falls under a different expert standard.
22      Plaintiffs' improper cross-notice
23  seeking to have this deposition apply to all cases
24  in the MDL should be rejected.

3 (Pages 6 to 9)

Bruce Alan Rosenzweig, M.D.

Page 10

1       For the reasons just discussed, in the
2   event that any Federal MDL Plaintiff attempts to
3   use Dr. Rosenzweig's TVT de bene esse deposition
4   taken in the Carlino Pennsylvania case or his
5   TVT-Secur de bene esse deposition taken in the
6   Ebaugh Pennsylvania State Court case in lieu of
7   live testimony, Ethicon will move to strike and
8   quash the use of the designations.
9       And I thank you for your indulgence.
10      MR. THORNBURGH:  First of all, this is Dan
11  Thornburgh for the Plaintiff.
12      This is the first time that I'm being
13  made aware of an objection, a quite lengthy
14  objection, by Defendants being made with respect to
15  the current Notice in the Ebaugh matter as well as
16  the cross-notice that was filed several weeks ago.
17      So, we obviously haven't had an
18  opportunity to read the brief or motion that was
19  just read into the record at length for the first
20  time, just for the very first time right before
21  this deposition is about to begin.
22      So, our position is that we can handle
23  this objection later, but we also should be able to
24  handle quite efficiently the issues that were

Page 11

1   addressed by cross-counsel by editing video and
2   cutting video so that it complies with either the
3   Federal Rules or with the Pennsylvania State Rules.
4   And that's it.
5       MR. SNELL:  I'll just reply that these issues
6   were initially raised before the Carlino TVT trial
7   deposition of Dr. Rosenzweig by the defense where
8   there it was noticed by Plaintiffs to be a TVT,
9   TVT-O and TVT-Secur deposition and these issues
10  were raised and objections were filed and as I
11  understand the judge held a hearing and did not
12  reach all those issues.
13      The judge's ruling at the hearing was to
14  the parties to just go forward at that time and
15  proceed and do Dr. Rosenzweig's de bene esse TVT
16  Carlino deposition, which we accomplished in
17  December 2015 and January 2016 as I recall.
18      MR. THORNBURGH:  And I appreciate that
19  position, but obviously there was no formal
20  objection filed with respect to the Notice of
21  Deposition and Cross-Notice of Deposition for which
22  brings us here today for the deposition,
23  preservation deposition of Dr. Rosenzweig.
24      Anything further, counsel?

Page 12

1       MR. SNELL:  No.  Thank you very much.
2       BRUCE ALAN ROSENZWEIG, M.D.,
3   called as a witness herein, having been first duly
4   sworn, was examined and testified as follows:
5           DIRECT EXAMINATION
6   BY MR. THORNBURGH:
7       Q.   Good morning, Dr. Rosenzweig.
8       A.   Good morning.
9       Q.   How are you doing?
10      A.   Fine, thank you.
11      Q.   Good.  Would you please briefly -- would
12  you please state your name to the ladies and
13  gentlemen of the jury.
14      A.   Bruce Alan Rosenzweig.
15      Q.   Now, Dr. Rosenzweig, you've already
16  provided trial testimony concerning the TVT-R and
17  TVT-O devices, correct?
18      A.   Correct.
19      Q.   And those have been preserved, to the
20  best of your understanding, by video?
21      A.   Yes.
22      Q.   And as defense counsel alluded to before
23  we -- on the record, we have an agreement that we
24  will not, at least in the Ebaugh case, but I think

Page 13

1   that agreement should extend beyond that, to not
2   cover old ground or cover your trial testimony that
3   you've provided in the prior preservation
4   videotaped depositions in Carlino and so forth.
5       MR. SNELL:  Since you do raise that, I will
6   make a statement with regards to --
7       MR. THORNBURGH:  You did already.
8       MR. SNELL:  With regard to the TVT-O.  I think
9   you threw in TVT-O.  And it's my position as I've
10  indicated to Plaintiffs' counsel that I do not
11  believe the TVT-O deposition in the Ramirez Texas
12  case, State Court case, was a part of that
13  continuation.
14      But counsel and I have agreed that for
15  Pennsylvania, and my position is for Pennsylvania
16  obviously only, for the Pennsylvania mass tort
17  program that we both agree we don't have to recover
18  issues covered in Carlino and that both sides can
19  designate testimony from the Carlino TVT deposition
20  and each side maintains its objections, and that's
21  my position to your position.
22      MR. THORNBURGH:  We obviously have a different
23  position.  We believe that Ramirez and Carlino
24  preservation depos can be used as preservation

4 (Pages 10 to 13)

Bruce Alan Rosenzweig, M.D.

Page 14

1　depos, depositions for the purposes of cutting
2　video for either Ebaugh or other cases.
3　　　　MR. SNELL:  Okay.  I understand your position.
4　I just want to make sure mine was clear so that we
5　understood.
6　　　　And I don't plan to be duplicative, but
7　there are some things that I will have to get into
8　that have been covered in Carlino because of the
9　nature of this and I'm sure your examination.
10　BY MR. THORNBURGH:
11　　　Q.　The point is, Doctor, you've already
12　provided preservation testimony in the Ramirez and
13　Carlino matters, correct?
14　　　A.　Correct.
15　　　Q.　And we -- I will attempt not to cover
16　the issues or testimony that you've already
17　provided in those other cases?
18　　　A.　Thank you.
19　　　　MR. THORNBURGH:  And, counsel, because no
20　formal objection was made with respect to these two
21　Notices in this case, the Notice in Ebaugh for the
22　deposition and the Cross-Notice in the MDL, I've
23　prepared under the assumption that we would be able
24　to use some of the testimony from those prior

Page 15

1　preservation cases.
2　　　　MR. SNELL:  Okay.  And I understand that.  And
3　as you know, just so the record is clear, I did
4　e-mail you and Ms. Baldwin who is Pennsylvania
5　counsel about this issue and I raised that with
6　regard to the TVT-O, that was a Ramirez Texas State
7　Court case and did not fall under this agreement.
8　　　　But I did also say I am fine with both
9　sides agreeing and being able to designate from the
10　TVT Carlino deposition in Pennsylvania for this
11　case.
12　　　　MR. THORNBURGH:  I didn't see any e-mail from
13　you.  I'm not saying you didn't.  You don't have to
14　go find it.
15　　　　MR. SNELL:  Okay.
16　　　　MR. THORNBURGH:  I didn't see any e-mail from
17　you that explicitly argued or held the position
18　that the Ramirez preservation deposition would not
19　be -- that we would not be -- or that you were
20　objecting to the use of that at other trials.
21　　　　MR. SNELL:  Okay.  Well, July 12, 2017, 2:15
22　p.m. is when I sent that e-mail and then my
23　follow-up to it where I stated I am okay with
24　agreeing that in the Pennsylvania cases that either

Page 16

1　side can designate from the TVT Carlino
2　de bene esse deposition, so we don't have to redo
3　everything previously covered with him in this
4　TVT-Secur de bene esse deposition, is okay.  And I
5　said both parties preserve their objections.  Okay?
6　　　　And I didn't hear back from
7　Mrs. Baldwin.  And I did copy her.  So I appreciate
8　that.  That last e-mail was July 12, 7:52 p.m.
9　　　　MR. THORNBURGH:  Which my interpretation of
10　that is that you weren't objecting.  But anyway.
11　We can take that up later on.
12　BY MR. THORNBURGH:
13　　　Q.　So, Dr. Rosenzweig, you've already
14　provided prior testimony, and I will not attempt to
15　ask you questions that you've already been asked at
16　those prior depositions.  Okay?
17　　　A.　Thank you.
18　　　Q.　But we are here regarding the TVT-Secur,
19　is that correct?
20　　　A.　Correct.
21　　　Q.　And are you prepared to offer your
22　expert opinions concerning the TVT-Secur device?
23　　　A.　Correct.
24　　　Q.　How did you become familiar -- strike

Page 17

1　that.
2　　　　Are you familiar with the TVT-Secur
3　system?
4　　　A.　Yes.
5　　　Q.　And how did you first become familiar
6　with the TVT-Secur system?
7　　　　MR. SNELL:  Can I interrupt you and ask you
8　one question just for clarity.  So, are you relying
9　on his qualifications back in TVT Carlino --
10　　　　MR. THORNBURGH:  Yeah.  I am.
11　　　　MR. SNELL:  -- for the basis of this?
12　　　　MR. THORNBURGH:  I am.
13　　　　MR. SNELL:  For this.
14　　　　MR. THORNBURGH:  I am.  Do you have an
15　objection to relying --
16　　　　MR. SNELL:  Yes.
17　　　　MR. THORNBURGH:  -- on his testimony about his
18　qualifications?
19　　　　MR. SNELL:  No, I don't have any -- I don't
20　have any objection to you relying on those
21　qualifications.
22　　　　MR. THORNBURGH:  Are you going to have any
23　objection --
24　　　　MR. SNELL:  We very well may have an objection

5 (Pages 14 to 17)

Bruce Alan Rosenzweig, M.D.

Page 18

1  at trial.
2      MR. THORNBURGH: Here's the problem. Here's
3  where I am prejudiced because I have prepared to
4  ask questions today and rely on the testimony
5  concerning his qualifications --
6      MR. SNELL: I'm fine with that.
7      MR. THORNBURGH: -- so we don't have to cover
8  the same background, training and experience he's
9  already testified to in other cases.
10     MR. SNELL: And I'm okay with that. I just
11 want to understand and make sure that that's what
12 you were doing because you kind of jumped into
13 substantive things.
14     MR. THORNBURGH: That's the next thing I was
15 going to say, so we won't cover your background,
16 knowledge and training.
17     MR. SNELL: As you know, in Pennsylvania you
18 actually have to formally take the step and qualify
19 an expert before.
20     MR. THORNBURGH: I understand that. But we
21 are not going on -- we are relying on the testimony
22 he's provided --
23     MR. SNELL: Got you.
24     MR. THORNBURGH: -- concerning his knowledge,

Page 19

1  training and experience in the prior cases.
2      Now, we will also talk about his
3  qualifications today to talk about the TVT-Secur
4  device.
5      So, it's sort of two steps, right. He's
6  given a background, training -- he's testified
7  about his background, training and experience and
8  qualifications in prior preservation depositions.
9  Right?
10     MR. SNELL: Yes.
11     MR. THORNBURGH: On the TVT-O and
12 TVT Retropubic devices. This is a TVT-R, so I'm
13 going to briefly talk about his experience with the
14 TVT-Secur.
15     MR. SNELL: Okay. Okay.
16     MR. THORNBURGH: But I understand that you're
17 going to object later on to us playing video from
18 the -- either the Carlino or Ramirez cases with
19 respect to his testimony about his qualifications?
20     MR. SNELL: No.
21     MR. THORNBURGH: Okay.
22     MR. SNELL: I don't have a problem with
23 Carlino, as I've stated, right. I do have a
24 problem with Ramirez. Ramirez I don't believe is

Page 20

1  properly before us within even Pennsylvania.
2      But I just want to understand if you
3  were going to -- if you weren't going to do
4  anything on qualifications and you were going to go
5  right to substance. That's all I was trying to
6  understand.
7      MR. THORNBURGH: I'm going to try to jump
8  mostly into substance. I am going to talk a little
9  bit about his qualifications with Secur with an
10 understanding that we can at least use the Carlino
11 testimony concerning his background and
12 qualifications.
13     MR. SNELL: Yes. And I am totally fine with
14 that.
15     MR. THORNBURGH: Okay. Hopefully we won't
16 have interruptions and objections throughout the
17 rest of this de bene esse deposition because it's
18 going to take us a week to finish.
19     MR. SNELL: I didn't mean to. I mean, it's
20 because of the unique way that Pennsylvania does it
21 versus MDL and because I thought you were just
22 jumping, that's the only reason I wanted to make
23 sure I understood.
24     As I said, your qualifications, I

Page 21

1  understand you are using that from Carlino. I
2  don't have a problem with that. If we have
3  objections to that part, they will be objections
4  that we've always had just like you would have
5  objections to our qualifications cross of him if
6  you had it.
7      MR. THORNBURGH: Right.
8      MR. SNELL: That's the reason I butted in.
9  I'm sorry.
10     MR. THORNBURGH: Just to make one quick
11 statement. It's our position that we can use
12 Carlino and Ramirez. You said Carlino, but we will
13 handle that -- we will take that up later on.
14 BY MR. THORNBURGH:
15     Q. All right, Doctor. How did you first
16 become familiar with the TVT-Secur system?
17     A. I was first introduced to the TVT-Secur
18 by Ethicon sales representatives. They showed me
19 promotional material and that's how I first became
20 introduced to the TVT-Secur.
21     Q. And when approximately did you first
22 become introduced and familiar with the TVT-Secur
23 system?
24     A. If I recall, it was probably late 2006,

6 (Pages 18 to 21)

Bruce Alan Rosenzweig, M.D.

Page 22

1    but it might have been early 2007.
2        Q.   Okay.   And you've testified previously
3    about the TVT Retropubic and the TVT-Obturator
4    devices.   But the TVT-Secur system, can you briefly
5    explain what it is and what it is intended to
6    treat?
7        A.   The TVT-Secur system is a device that is
8    used to treat stress urinary incontinence.   I've
9    already described for the jury stress urinary
10   incontinence and the concept of a midurethral sling
11   used for stress urinary incontinence.
12           The TVT-Secur device is what's known as
13   a single-incision sling meaning that there's a
14   vaginal incision and there are no exit points as I
15   described for the other what's called full-length
16   sling.   So, this is a shorter sling.
17           It's still made out of the same
18   polypropylene.   It still has the same
19   characteristics that I've described as being
20   heavy-weight, small-pore polypropylene.   It is used
21   to treat the same condition which is stress urinary
22   incontinence and it's placed in the same position,
23   which is the midurethra.
24           However, those are where the

Page 23

1    similarities between what I have described before
2    as the full-length midurethral sling such as the
3    TVT and the TVT-Obturator is that it is a
4    heavier -- excuse me -- a stiffer, shorter sling
5    that had never been used before.
6            The length is 8 centimeters.   That
7    length had never been used before in a midurethral
8    sling.
9            It was cut by a laser.   I've already
10   given testimony about the difference between
11   mechanical-cut and laser-cut.   And that had never
12   been used before.
13           It has an arrowhead introducer to get
14   the short, rigid mesh into the position to act as
15   part of the midurethra.   That had never been used
16   before.
17           And the ends of the short, rigid mesh
18   have a dissolvable fleece tip.   That had never been
19   used before.
20       Q.   And we're going to get into more
21   specifics of those design characteristics
22   throughout the day.   But did you ever -- can you
23   tell the ladies and gentlemen of the jury whether
24   or not you've ever implanted a TVT-Secur device

Page 24

1    into any of your patients?
2        A.   I have not used the TVT-Secur device on
3    one of my patients.
4        Q.   And why is that?
5        A.   When I was first introduced to it,
6    frankly, I didn't think it would work.
7        Q.   And is that after you had an opportunity
8    to speak with the sales representatives and look at
9    the actual physical device?
10           MR. SNELL:   Object; leading.
11   BY MR. THORNBURGH:
12       Q.   What led you to that conclusion, Doctor?
13       A.   Not only looking at the promotional
14   material but also looking at the device.
15       Q.   And as part of your treatment of
16   patients, did you ever treat any patients who
17   experienced complications as a result of the
18   TVT-Secur device?
19       A.   Yes, I have.   I've previously described
20   for the jury my experience in treating
21   complications of midurethral slings and that
22   includes also treating complications of the
23   TVT-Secur device.
24           MR. SNELL:   Object.   Non-responsive.

Page 25

1    BY MR. THORNBURGH:
2        Q.   And with respect to those complications,
3    could you briefly -- I know you've testified about
4    complications associated with these -- with the
5    full-length midurethral slings like the
6    TVT Retropubic and TVT-Obturator, but how are those
7    complications impacted, if at all, by the TVT-Secur
8    device?
9        A.   I've treated complications associated
10   with the TVT-Secur device both surgically by
11   removing either a portion of the device when they
12   cause complications or the majority of the device.
13           I also treat complications without
14   surgery using modalities such as therapies inside
15   the vagina to treat pain, pain with intercourse,
16   also doing blocking nerves that can treat the pain
17   associated with the midurethral slings including
18   the Secur and pain with intercourse.
19           I've also treated patients with things
20   like biofeedback, electrical stimulation, physical
21   therapy for problems with voiding dysfunction
22   meaning that they can't empty their bladder
23   completely or from entities such as overactive
24   bladders, which the patient has an irritation of

Bruce Alan Rosenzweig, M.D.

Page 26

1  their bladder which makes them need to void
2  frequently, urgently or get up at night to void.
3      Q.   Now, as part of your treatment of
4  patients who were experiencing complications from a
5  Secur device, TVT-Secur device, did you have to
6  become familiar with the TVT-Secur system?
7      A.   Yes.
8      Q.   And what did you do to become familiar
9  with the TVT-Secur system?
10     A.   I looked at again the promotional
11 brochures.  I reviewed the Instructions for Use,
12 which is a pamphlet that comes with each device.  I
13 discussed this with colleagues of mine.
14         Also, I have looked at internal Ethicon
15 documents, internal -- or deposition testimony from
16 key Ethicon employees, both scientists and Medical
17 Directors, and a review of the scientific
18 literature.
19     Q.   Did you have an opportunity to see if
20 the IFU or the Information for Use for the Secur
21 device -- strike that.
22         In your private practice did you have an
23 opportunity, I think you've testified to this
24 already, but did you have an opportunity to review

Page 27

1  the Information for Use related to the TVT-Secur
2  device?
3      MR. SNELL:  Object; leading.
4  BY THE WITNESS:
5      A.   Yes.
6  BY MR. THORNBURGH:
7      Q.   Because I got an objection, let me ask
8  again.
9          What is a -- the IFU?
10     A.   The IFU is what's called the
11 Instructions for Use.  It is a pamphlet that comes
12 with the medical device, the TVT-Secur.
13         It contains the indications to use --
14 for the use of the device, which is the treatment
15 of stress urinary incontinence, which I've
16 previously described for the jury; the
17 contraindications, which are the women that you
18 should not use the device on; how to implant the
19 device, to use the device; what are the adverse
20 reactions; what are the risks associated with the
21 device; and what is the description of the device.
22     Q.   Okay.  And when you are treating your
23 patients who had complications from the TVT-Secur
24 device, did you have an opportunity to review the

Page 28

1  IFU?
2      A.   Yes.
3      Q.   And was your review of the Information
4  for Use for the TVT-Secur helpful to you in
5  treating the complications that your patients were
6  experiencing?
7      A.   Well, the Instructions for Use, again,
8  gives information about how to use the device, how
9  to implant the device.  But it does not contain
10 information on how to treat complications or how to
11 remove the device.
12     Q.   And have you been qualified as an expert
13 witness in any federal courts in the United States?
14     A.   Yes.
15     Q.   And have you been -- where have you been
16 qualified, if you can recall?
17     A.   In West Virginia and North Carolina.
18     Q.   And have you been qualified as an expert
19 to offer opinions on the same topics that we're
20 speaking about here today in any State Court in the
21 United States?
22     A.   Yes.
23     Q.   And what courts specifically?
24     A.   In California, Missouri, Texas and here

Page 29

1  in Philadelphia.
2      Q.   And have you been qualified as an expert
3  witness to offer expert opinion testimony with
4  respect to the TVT-Secur device specifically?
5      A.   Yes.
6      Q.   In what courts?
7      A.   In Philadelphia.
8      Q.   Now, Doctor, in the course of the
9  testimony that you'll be providing today, do you
10 understand that if you offer an opinion that it
11 must be to a reasonable degree of medical
12 certainty?
13     A.   Yes.
14     Q.   And so that I don't have to keep
15 repeating myself over and over throughout the day,
16 can we have an agreement that if you offer any
17 opinion that you will offer it to a reasonable
18 degree of medical certainty?
19     A.   Yes.
20     Q.   And if you have any opinions that are
21 not to a reasonable degree of medical certainty,
22 will you let us know?
23     A.   Yes.
24     Q.   We are going to spend most of the day

8 (Pages 26 to 29)

Bruce Alan Rosenzweig, M.D.

Page 30

1   discussing many of the materials that you reviewed
2   in this case. But before we do that, can you tell
3   the jury whether or not you came to any conclusions
4   or opinions about the TVT-Secur device?
5       A. Yes, I did.
6       Q. And did you prepare a slide summarizing,
7   briefly summarizing, those opinions that will help
8   you explain those opinions to the jury?
9       A. Yes, I did.
10      MR. THORNBURGH: Tom, can we go ahead and show
11  Slide No. 1.
12      MR. SNELL: Do you have a copy, counsel?
13      MR. THORNBURGH: Yes, I do.
14  BY MR. THORNBURGH:
15      Q. I will go ahead and mark as I think we
16  will call it R -- I'm sorry -- BR-Secur 1, which is
17  the summary of your opinions in this slide.
18          (WHEREUPON, a certain document was
19          marked as BR-Secur Exhibit No. 1:
20          Summary of Opinions slide.)
21      MR. SNELL: Are you intending at trial to put
22  this up as basically as it looks or bullet points
23  as we go along?
24      MR. THORNBURGH: We intend to do it a number

Page 31

1   of ways, but at this point in the video we would
2   put this slide up as it is.
3       MR. SNELL: Okay.
4       MR. THORNBURGH: This exhibit up as it is.
5       MR. SNELL: So I object to that, failing Rule
6   705 under Pennsylvania. Go ahead.
7   BY MR. THORNBURGH:
8       Q. And can you provide the ladies and
9   gentlemen of the jury with a brief summary of the
10  opinions that will be expressed throughout today.
11      A. Yes. The Defendants -- excuse me.
12          The Defendants failed to adequately test
13  the TVT-Secur device.
14          The Defendants failed to provide proper
15  training to physicians on the TVT-Secur device.
16          The Defendants failed to provide proper
17  instructions to physicians.
18          The Defendants failed to provide
19  adequate warnings to physicians.
20          The TVT-Secur device is not effective.
21          The TVT-Secur device is unreasonably
22  dangerous.
23          The TVT-Secur device's risks outweigh
24  its benefits.

Page 32

1       The Defendants defectively designed the
2   TVT-Secur system.
3       Q. Now, in -- can you explain to the ladies
4   and gentlemen -- strike that.
5       Can you explain to the ladies and
6   gentlemen of the jury what you were asked to do in
7   this case?
8       A. I was asked to review materials and
9   deposition testimony, the literature, to review the
10  design, the development and the testing of the
11  TVT-Secur device.
12      Q. And did you prepare a slide that would
13  assist you in explaining to the jury the materials
14  that you reviewed and relied upon in offering your
15  opinions?
16      A. Yes.
17      Q. Let's go ahead and mark as Exhibit --
18  and we'll call it BR-Secur 2. But this is the
19  slide that you prepared.
20          (WHEREUPON, a certain document was
21          marked as BR-Secur Exhibit No. 2:
22          Materials Reviewed slide.)
23  BY MR. THORNBURGH:
24      Q. And what materials did you review in

Page 33

1   preparation for this case and offering the opinions
2   that you have related to the TVT-Secur device?
3       MR. SNELL: Quick objection to the slide,
4   violates Rule 705 facts and bases under
5   Pennsylvania law.
6   BY THE WITNESS:
7       A. I reviewed the medical literature from
8   various sources, including PubMed.
9           I reviewed Ethicon and J&J internal
10  documents, videos, training videos and surgical
11  videos.
12          I reviewed Ethicon and Johnson & Johnson
13  labeling and marketing documents like the
14  Instructions for Use.
15          I reviewed a significant number of
16  depositions of Ethicon and Johnson & Johnson
17  current and former employees including scientists
18  and Medical Directors.
19          I reviewed depositions of Ethicon's
20  experts retained in this -- in these matters.
21      Q. Okay. And are we going to discuss your
22  opinions today and the materials that you reviewed
23  and relied upon in coming to your expert
24  conclusions?

9 (Pages 30 to 33)

Bruce Alan Rosenzweig, M.D.

Page 34

```
 1      A.   Yes.
 2      Q.   And will our discussion include your
 3  opinions and the support for those opinions from --
 4  that are derived from the medical publications?
 5      A.   Yes.
 6      Q.   And will we discuss today the opinions
 7  that you have related to the TVT-Secur device and
 8  the basis for those opinions and support for those
 9  opinions that are derived from the internal Ethicon
10  company documents?
11      A.   Yes.
12      Q.   And will you offer opinions today
13  concerning the TVT-Secur device that are supported
14  by the depositions of Ethicon and Johnson & Johnson
15  current and former employees?
16      A.   Yes.
17      MR. SNELL:  Object; leading.  Go ahead.
18  BY MR. THORNBURGH:
19      Q.   And with respect to the testimony
20  reviewed by you, did you provide a slide or create
21  a slide that would assist the jury in understanding
22  the number of depositions or at least the witnesses
23  for whom you've read and reviewed and rely upon
24  their testimony?
```

Page 35

```
 1      A.   Yes.
 2      MR. THORNBURGH:  I will go ahead and mark as
 3  BR-Secur 3 a slide presentation.
 4          (WHEREUPON, a certain document was
 5           marked as BR-Secur Exhibit No. 3:
 6           Testimony Reviewed by Dr.
 7           Rosenzweig slide.)
 8  BY MR. THORNBURGH:
 9      Q.   Is this the PowerPoint slide that you
10  helped create?
11      A.   Yes.
12      Q.   And does this provide a list of the
13  witnesses for whom you've reviewed their deposition
14  testimony and relied upon their -- at least in
15  part, for rendering your opinions in this case?
16      A.   Yes.
17      Q.   And do you have an estimate, Doctor, of
18  how many of those -- the Ethicon internal documents
19  that you've reviewed -- strike that.
20          Do you have an estimate of how many
21  pages of Ethicon documents you reviewed in this
22  litigation?
23      A.   Tens of thousands.
24      Q.   And do you have an estimate of how many
```

Page 36

```
 1  pages of witness testimony you've reviewed in
 2  rendering your opinions in this case?
 3      A.   Thousands.
 4      Q.   Now, let me ask you this question,
 5  Doctor:  Were -- prior to your involvement in this
 6  litigation had you ever had an opportunity to
 7  review Ethicon's internal company documents?
 8      MR. SNELL:  Objection; form.  This is a --
 9  this is a backwards way of going at the
10  confidentiality agreement that the parties entered
11  into with regard to the designation of company
12  documents as confidential.
13      MR. THORNBURGH:  No, it's not.
14      MR. SNELL:  That's my position.
15      MR. THORNBURGH:  It's not.
16      MR. SNELL:  That's my position.  Go ahead.
17      MR. THORNBURGH:  So, let me ask the question
18  again.  I understand the objection, so we don't
19  interrupt again.
20  BY MR. THORNBURGH:
21      Q.   Now, before you were retained as an
22  expert witness in this case, did Ethicon and
23  Johnson & Johnson make available to you their
24  internal company documents?
```

Page 37

```
 1      MR. SNELL:  Same objection.  Go ahead.
 2  BY THE WITNESS:
 3      A.   No.
 4  BY MR. THORNBURGH:
 5      Q.   In your practice as a treating physician
 6  did you ever have access to Ethicon or
 7  Johnson & Johnson's internal company documents?
 8      A.   No.
 9      MR. SNELL:  Object; relevance.  Go ahead.
10  BY THE WITNESS:
11      A.   No.
12  BY MR. THORNBURGH:
13      Q.   Why is that?
14      A.   They're not available to me.
15      Q.   Now, what types of literature have
16  you -- strike that.
17          Does Ethicon make available -- does
18  Ethicon make their internal company documents
19  publicly available to treating physicians,
20  urogynecologists, gynecologists such as yourself?
21      MR. SNELL:  Objection; outside the scope of
22  his expert report.  Also objection insofar as it is
23  not a proper expert basis under Pennsylvania law.
24  BY THE WITNESS:
```

10 (Pages 34 to 37)

Bruce Alan Rosenzweig, M.D.

Page 38

1    A.  No.
2  BY MR. THORNBURGH:
3    Q.  And what types of literature have you
4  reviewed in forming your opinions in this case,
5  Doctor?
6    A.  As I've described earlier in prior
7  testimony, I've reviewed the lion's share of the
8  literature on midurethral slings in general and
9  also the TVT-Secur.
10   Q.  Did you use the same methods in this
11 case in reaching your expert conclusions as you use
12 in your private practice?
13   A.  Yes.
14   Q.  Are you familiar with how the TVT-Secur
15 device is designed and how it's supposed to be
16 placed in the human body?
17   A.  Yes.
18   Q.  And did you help prepare a slide that
19 illustrates the TVT-Secur device implant locations?
20   A.  Yes.
21   Q.  And would that assist, help you -- help
22 you assist the jury in understanding more about the
23 TVT-Secur procedure?
24   A.  Yes.

Page 39

1    MR. THORNBURGH:  I will go ahead and mark as
2  BR-Secur 4 the slide entitled "TVT-Secur."
3    (WHEREUPON, a certain document was
4    marked as BR-Secur Exhibit No. 4:
5    "TVT-Secur" slide.)
6  BY MR. THORNBURGH:
7    Q.  Do you recognize this document?
8    A.  Yes.
9    Q.  Is this the slide that you created?
10   A.  I did not create the graphics, but I put
11 it together as a slide.
12   Q.  Okay.  And what is the jury seeing in
13 this screen, Doctor?
14   A.  Well, the TVT-Secur can be placed in two
15 different fashions, one to resemble the
16 TVT Retropubic that I've described earlier, which
17 is called the U position, and the other -- the same
18 device can be placed in a different fashion so it
19 more resembles the TVT-Obturator, which is called
20 the hammock position.
21   Q.  Now, Doctor, you've testified about the
22 dates of launch of the first and second generation
23 TVT devices, the TVT Retropubic and the TVT-O, but
24 could you just remind us just briefly when did the

Page 40

1  TVT Retropubic device come to market?
2    A.  Either the end of 1997 or very early in
3  1998.  The TVT-O came to market in early 2004.
4  TVT-Secur was launched towards the end of
5  September of 2006, if I recall correctly was
6  September 20, 2006.
7    Q.  Thank you, Doctor.
8    Now, Doctor, would it assist you in
9  describing the procedure and the device to actually
10 have the device and show it to the jury?
11   A.  Yes.
12   Q.  Okay.
13   MR. THORNBURGH:  Can we go off the record
14 really quick.
15   THE VIDEOGRAPHER:  The time is 9:52 a.m. and
16 we are going off the video record.
17    (WHEREUPON, discussion was had off
18    the record.)
19   THE VIDEOGRAPHER:  The time is 9:52 a.m. and
20 we're back on the video record.
21 BY MR. THORNBURGH:
22   Q.  Doctor, I'm going to hand you the
23 TVT-Secur device in the box that it was sold in.
24   A.  Thank you.

Page 41

1    Q.  And can you go ahead and open that
2  device and let's talk about it briefly.
3    A.  The first thing that's in the device is
4  what's called the Instructions for Use, which we've
5  described earlier.  This contains information about
6  the proper patient that it should be used on or
7  what its indications are, who it should not be used
8  on, which is contraindications.  It describes the
9  adverse events and warnings associated with the
10 device.
11   The TVT-Secur then comes out of the
12 package.  First, there are guards that are placed
13 over the sharp introducer so that the implanting
14 surgeon does not get stuck.  As you can see on this
15 side, it is removed on this end.
16   First we see the mesh itself, which is
17 the blue mesh.  I've described the characteristics
18 of the mesh.  It is a heavy-weight, small-pore
19 mesh, which I've described earlier.  The edges are
20 cut with the laser, which makes it stiffer and more
21 rigid.
22   The length is 8 centimeters, which is
23 different from the full-length midurethral slings.
24   These are the fleece ends that hold the

11  (Pages 38 to 41)

Bruce Alan Rosenzweig, M.D.

Page 42

1    sling in place to provide support for the
2    midurethra.
3         These are the introducers, which are
4    attached to the sharp arrowhead. These are removed
5    by disengaging the introducer system so that just
6    the fleece tip and the polypropylene material is
7    left in place.
8         Q.   Other than the polypropylene material
9    that you've just discussed, had the other design
10   characteristics of the TVT-Secur device ever been
11   used by Ethicon or any company in the world,
12   Doctor?
13        MR. SNELL: Objection; asked and answered.
14   BY THE WITNESS:
15        A.   The length of the sling had not been
16   used before. The laser cutting had not been used
17   before. The sharp arrowhead introducers had not
18   been used before and the fleece tips had not been
19   used before.
20   BY MR. THORNBURGH:
21        Q.   Now, would it assist you in describing
22   the procedure and the device to look at a pelvic
23   model?
24        A.   Yes.

Page 43

1         Q.   Going to hand you a female pelvic model.
2         A.   Thank you.
3         Q.   Can you just describe to the ladies and
4    gentlemen of the jury briefly what you're showing
5    and what you have in your hands.
6         A.   Well, this is what's described as the
7    bony pelvis, and these are what are called the
8    wings of or the iliac crest. This is the pubic
9    bone. These are the pubic rami. These are
10   actually the bones that we sit on.
11        Inside we have the uterus, the bladder
12   and way back here is the rectum. We are going to
13   kind of take this out for the points or the -- for
14   the rest of our discussion about how the TVT-Secur
15   device is placed.
16        Looking -- these would represent the
17   lips of the vagina. This is the opening of the
18   vagina. And this would be the urethral opening
19   right here.
20        So, the TVT-Secur device is placed in
21   through a small incision made inside the vagina
22   underneath the urethra and then if we look from
23   this angle, when it's in place, it can either be
24   in -- around the urethra in a U-shaped, and it's

Page 44

1    kind of difficult with all the ends attached. I
2    don't want to take them off -- but in a U-shaped
3    like this, which is very similar to the -- the
4    final position of the TVT Retropubic or out towards
5    the sides.
6         And this muscle here is called the
7    obturator internus muscle. The muscle below it is
8    called the levator ani muscle.
9         Q.   Let me just stop you real quick.
10        A.   Yes.
11        Q.   Are the obturator internus muscle and
12   the levator ani muscles that you just described
13   connected in the pelvic floor?
14        A.   Yes, they are. There is a line of
15   connective tissue that goes between the two of
16   them, which is called the arcus tendinea linea
17   pelvis. Above that is the obturator internus
18   muscle. Below that is the levator muscle.
19        The fleece tip goes out towards this
20   obturator internus muscle but does not actually
21   puncture that obturator internus muscle.
22        However, this structure right here is
23   called the urogenital diaphragm, and that is
24   actually pierced when this is going into the U

Page 45

1    position to sit right behind the pubic bone.
2         Q.   Okay. And if you turn the model around
3    at the front, where does, on the front view, where
4    does the -- can you show the ladies and gentlemen
5    of the jury where the Secur device is implanted
6    using the U and the H?
7         A.   So --
8         Q.   By "H," I mean the hammock approach.
9         A.   It's difficult with this. But the U
10   would be going in and up and would stay behind the
11   pubic bone. The H, it would go in and out and
12   would go out towards the obturator internus muscle.
13        Q.   Now, you -- sorry.
14        You had discussed the IFU or the
15   Information for Use and you showed that to the
16   jury. Can you show them that again, please?
17        A.   Yes.
18        Q.   Okay. And does the TVT-Secur IFU or
19   Information for Use, does that come included in
20   every box that is shipped to a doctor?
21        A.   Yes.
22        MR. SNELL: Objection. Hold on. Objection;
23   foundation, ship to doctor. Go ahead.
24   BY THE WITNESS:

12 (Pages 42 to 45)

Bruce Alan Rosenzweig, M.D.

Page 46

1      A.  It's shipped to the hospital.
2   BY MR. THORNBURGH:
3      Q.  Shipped to the hospital.  So, is it
4   included -- is the TVT IFU booklet included within
5   the box that is shipped to every hospital?
6      A.  Yes.  To be used by the doctor in the
7   operating room.
8      Q.  And does it stay with the TVT-Secur
9   product until the doctor opens the TVT-Secur box?
10     MR. SNELL:  Object; foundation.
11  BY THE WITNESS:
12     A.  Correct.
13  BY MR. THORNBURGH:
14     Q.  In your experience with the TVT devices,
15  family of devices, you've implanted some of the
16  full-length devices, correct?
17     A.  Correct, as I've testified to
18  previously.
19     Q.  And did the -- did the IFUs or
20  Information for Use related to those devices, were
21  those included in the boxes that came from Ethicon?
22     A.  Yes.
23     Q.  Did Ethicon ever attach, to your
24  knowledge, based on your review of the internal

Page 47

1   documents and your experience, did they ever attach
2   any other warnings or instructions other than the
3   IFU to the -- to the boxes?
4      MR. SNELL:  Object; leading.  Go ahead.
5   BY THE WITNESS:
6      A.  Not that is not contained in the
7   Instructions for Use.
8   BY MR. THORNBURGH:
9      Q.  So, is there any other instruction or
10  warnings that come with these products other than
11  the IFU?
12     A.  No.
13     MR. SNELL:  Objection; overbroad now.
14  BY THE WITNESS:
15     A.  No.
16  BY MR. THORNBURGH:
17     Q.  And we are going to talk about the
18  Information for Use and labeling and warnings
19  throughout today.  Okay?
20     A.  Yes.
21     Q.  Now, Doctor, in coming here today and in
22  forming your opinions, have you also reviewed a
23  training video produced by Ethicon on how to
24  implant a TVT-Secur in a woman's vagina?

Page 48

1      MR. SNELL:  Object; leading.  Go ahead.
2   BY THE WITNESS:
3      A.  Yes, I have.
4   BY MR. THORNBURGH:
5      Q.  Did you review any other materials
6   concerning the implantation of the TVT-Secur
7   device?
8      A.  Yes, I reviewed a training video.
9      Q.  And would it help you in explaining the
10  procedure and the device if we viewed the TVT-Secur
11  implant training video?
12     A.  Yes.
13     MR. SNELL:  Object; leading.  Go ahead.
14  BY THE WITNESS:
15     A.  Yes, I think that it would be important
16  for the jury to be able to understand how the
17  device is implanted to be able to see the video.
18     MR. THORNBURGH:  And let's go ahead and play
19  the video.  It's Exhibit P1801.  But before we do
20  that, I'm going to ask --
21     MR. SNELL:  1801.
22     MR. THORNBURGH:  1801.  If the videographer
23  could turn the camera and zoom in on the screen so
24  that we can view this on video.

Page 49

1      THE VIDEOGRAPHER:  I just need a moment to
2   focus.
3      MR. THORNBURGH:  No problem.
4      MR. SNELL:  Perfect.  While you're doing that,
5   I will put an objection on the record.
6         I will object to the showing of the
7   video to the jury for the reasons articulated in
8   previous trials, including the TVT-Secur trial,
9   wherein, one, it's overly graphic and it's not the
10  type of material that's intended to be viewed by
11  the layperson.
12        These are, as I believe the witness
13  testified, part of the professional education
14  training program for doctors.  So they're intended
15  for doctors.  A jury --
16     MR. THORNBURGH:  Can I just say -- I'm sorry.
17     MR. SNELL:  No.
18     MR. THORNBURGH:  I think the rules say you can
19  object.  But no speaking objections.  I understand
20  what you're doing.  We understand your position.
21     MR. SNELL:  I'm laying the foundation.
22     MR. THORNBURGH:  I'm not saying you are
23  waiving your objections.  I just want to be able to
24  move on and get through this.

Bruce Alan Rosenzweig, M.D.

Page 50

1    MR. SNELL:  As long as you are saying I am not
2  waiving it.  I was just stating the bases.
3    MR. THORNBURGH:  I know.  I don't think that's
4  appropriate in either Federal Court or
5  Pennsylvania.
6    MR. SNELL:  Oh, no, it is, because if this
7  was -- this is a trial deposition.  If we were
8  before the judge, I'd ask for a sidebar and I'd
9  make this record right now.  But you're saying if
10  I'm not waiving it --
11    MR. THORNBURGH:  Note the objection but you're
12  not waiving it if you don't give the basis for your
13  objection on this video.  Okay?
14    MR. SNELL:  Okay.
15    MR. THORNBURGH:  All right.
16  BY MR. THORNBURGH:
17    Q.   Okay.  So, now, is this the video that
18  you review and rely upon in part in formulating
19  your opinions in this case?
20    A.   Yes.
21    Q.   Now, you testified that one of the
22  things that were provided to you when you were
23  first introduced to the TVT-Secur product was a
24  promotional piece?

Page 51

1    A.   Correct.
2    Q.   And we're going to look at a lot of
3  documents throughout today.  But what did Ethicon
4  represent to doctors concerning the ease of
5  implantation of the TVT-Secur device.
6    MR. SNELL:  Object to the preface.  Objection;
7  improper subject matter as to what Ethicon
8  represented.  This is not an expert on state of
9  mind.
10    Secondly, this is the material that the
11  jury --
12  BY MR. THORNBURGH:
13    Q.   What was your understanding --
14    MR. SNELL:  -- can consider for themselves.
15    MR. THORNBURGH:  Okay.  So, you're going to
16  give speaking objections rather than just object
17  and handle them later on?
18    I'm just trying to get through the day
19  without having to spend a lot of time listening to
20  your -- the basis for your objection.
21    MR. SNELL:  Yeah, but this is a trial
22  deposition.  You noticed it as a trial deposition.
23  I am giving the basis that I would give to the
24  judge.

Page 52

1    MR. THORNBURGH:  Just say "Objection" and we
2  can deal with it later on with the judge.
3    MR. SNELL:  The problem is I know the bases
4  that I'm prepared to assert under Pennsylvania law
5  right here and now, and I want to make sure they're
6  on the record as opposed to somebody else trying to
7  figure out what I was objecting to.
8    MR. THORNBURGH:  We have done this time and
9  time again on videos.  We just object and we deal
10  with the objections later on.  We have this
11  agreement, the stipulation in every case.
12    MR. SNELL:  Actually, we didn't.  If you had
13  read the Carlino TVT deposition, you saw Mr. Freese
14  and I both provided our objections.
15    MR. THORNBURGH:  Okay.  I will just -- I will
16  provide long speaking objections on your cross.  If
17  we're not going to reach an agreement, that's what
18  I'll do too.
19    MR. SNELL:  Okay.  You can do whatever you
20  want to do.
21  BY MR. THORNBURGH:
22    Q.   Doctor, based -- based on your
23  discussion and your introduction to the TVT-Secur
24  device, what was your understanding of the implant

Page 53

1  technique?
2    A.   That it was easy to use and minimally
3  invasive.
4    Q.   And based on your review of the internal
5  documents -- strike that.
6    Do you have an opinion whether or not
7  those representations were accurate?
8    A.   I do have an opinion.
9    Q.   What is that opinion, Doctor?
10    A.   They are not accurate.
11    Q.   And what's the basis for that opinion,
12  Doctor?
13    A.   The internal documents that I reviewed,
14  the training videos that I've looked at and also
15  the deposition testimony.
16    Q.   Okay.
17    MR. THORNBURGH:  Tom, can you go ahead and hit
18  play.
19    (Video played.)
20    MR. THORNBURGH:  Now, go ahead and pause it,
21  Tom.
22  BY MR. THORNBURGH:
23    Q.   Doctor, what are we seeing here?
24    A.   This is the initial incision that's made

14 (Pages 50 to 53)

Bruce Alan Rosenzweig, M.D.

Page 54

1  at the level of the midurethra. It is made
2  approximately 1 centimeter below the opening of the
3  urethra and a cut is made down in through a full
4  thickness passage through both the vaginal
5  epithelium, the subepithelial tissue into a plane
6  that is a full thickness below the vagina and
7  before you actually hit the urethral tissue or the
8  bladder tissue in a level called the deep
9  endopelvic fascia.
10      MR. THORNBURGH: Go ahead, Tom.
11  BY THE WITNESS:
12      A.   At this point the surgeon is using
13  scissors to create a tunnel. Here the sharp
14  arrowhead introducer is being placed into the
15  tunnel path that has been created.
16          It is being pushed out towards the side.
17  This is representing the hammock approach or the H
18  approach. And the surgeon is pushing the
19  introducer system with the arrowhead on the end out
20  towards the obturator internus muscle.
21  BY MR. THORNBURGH:
22      Q.   So, is the doctor who is implanting this
23  device pushing the sharp arrowhead introducers
24  through the tissue?

Page 55

1      A.   Yes.
2      Q.   And through muscle?
3      A.   No, not through muscle. Actually, it's
4  going out towards the muscle of the obturator
5  internus muscle.
6      Q.   Okay.
7      A.   This is when both sides are placed.
8          Now, the introducer system is going to
9  be removed.
10         Right now the doctor is tensioning the
11  or attempting to tension the TVT-Secur device at
12  the level of the midurethra.
13      Q.   We're going to talk about tensioning
14  throughout today.
15      MR. SNELL: Object to counsel's statement. Go
16  ahead.
17  BY THE WITNESS:
18      A.   At this point the device is being placed
19  in a position to, quote-unquote, "give the proper
20  tension" to be able to support the urethra to
21  accomplish the action that the device is intended
22  to do to stop stress urinary incontinence.
23         Now, the introducer is being released.
24  This is on the patient's right side.

Page 56

1  BY MR. THORNBURGH:
2      Q.   And, so, we are -- that's it. We're
3  good there.
4          Now, the introducers, they don't get
5  left in the device -- in the body permanently?
6      A.   No, they do not.
7      Q.   Okay. Does the Prolene polypropylene
8  mesh and fleece mesh remain in the body -- strike
9  that.
10         Is the TVT-Secur Prolene polypropylene
11  mesh material supposed to be left permanently
12  inside the human body?
13      A.   Yes.
14      Q.   And was the Secur meant to be a
15  permanently implanted medical device?
16      A.   Yes.
17      THE VIDEOGRAPHER: Excuse me, counselor. I
18  can -- I can photograph capture other exhibits that
19  you have on screen if you want them.
20      MR. THORNBURGH: Okay.
21      THE VIDEOGRAPHER: You can just let me know.
22      MR. THORNBURGH: Okay. Thank you. Appreciate
23  that.
24      MR. SNELL: I think we have an agreement that

Page 57

1  we can put them up when the witness is testifying.
2  That's what Rich -- Mr. Freese and I agreed in
3  Carlino.
4      MR. THORNBURGH: We are going to put them up
5  live at trial.
6      MR. SNELL: Exactly.
7      MR. THORNBURGH: Yeah, that's right.
8      MR. SNELL: Okay.
9  BY MR. THORNBURGH:
10      Q.   Now, Dr. Rosenzweig, when you treated
11  the -- your patients with complications from the
12  TVT-Secur device, did you ever have to surgically
13  remove the Secur device?
14      MR. SNELL: Object; asked and answered,
15  repetition.
16  BY THE WITNESS:
17      A.   Yes, I did.
18  BY MR. THORNBURGH:
19      Q.   Does the removal of a mesh or TVT-Secur
20  mesh that is causing complications in a patient
21  always resolve the problems that the women are
22  experiencing?
23      MR. SNELL: Objection; compound.
24  BY THE WITNESS:

15 (Pages 54 to 57)

Bruce Alan Rosenzweig, M.D.

Page 58

1      A.  No, it does not.
2  BY MR. THORNBURGH:
3      Q.  Even when you remove all the mesh?
4      A.  Yes.
5      Q.  Why is that?
6      A.  As I have described earlier, there is
7  often scarring that takes place due to the chronic
8  foreign body reaction, chronic inflammatory
9  reaction, scar that grows around the mesh that is
10  left behind.
11          There are nerves that grow through the
12  mesh that are injured as the mesh undergoes the
13  contraction process that I've described previously.
14  Those nerves are permanently injured.  And, so, the
15  removal of a piece or all of the mesh device does
16  not always treat pain, pain with intercourse,
17  difficulty voiding, which are the common
18  indications for removing the device as I've
19  testified to earlier.
20          And it's supported in the literature
21  that even with complete removal of the device,
22  those indications for removing the devices, those
23  complications are not always resolved.
24      Q.  Now, at this point, Doctor, I'd like to

Page 59

1  discuss some of Ethicon's internal company
2  documents that you reviewed and relied upon in
3  forming your opinions in this case.  Okay?
4      A.  Yes.
5      Q.  Did you create a binder of the documents
6  that you wanted to discuss with the jury?
7      A.  Yes, I did.
8      MR. SNELL:  Object; leading.  Go ahead.
9          This is improper under Pennsylvania
10  procedure.  Go ahead.
11      MR. THORNBURGH:  What's improper?
12      MR. SNELL:  Giving the witness a binder,
13  having him take a binder and just start walking
14  through.
15      MR. THORNBURGH:  Both sides did it in both
16  prior trials in Pennsylvania.
17      MR. SNELL:  And I'm sure there were
18  objections.
19      MR. THORNBURGH:  No, no objections.
20      MR. SNELL:  Yes.  In Pennsylvania you ask an
21  expert their opinion and then you ask them the
22  facts and bases.  I shouldn't have to tell you
23  that, but that's how it's done.
24  BY MR. THORNBURGH:

Page 60

1      Q.  Doctor, do you have an opinion --
2  Doctor, what are your opinions about the TVT-Secur
3  device?
4      MR. SNELL:  Objection; repetition.
5  BY THE WITNESS:
6      A.  I have already outlined my opinions
7  about the TVT-Secur device.
8  BY MR. THORNBURGH:
9      Q.  And what is the basis for those
10  opinions?
11      A.  One of the bases for those opinions are
12  the internal Ethicon documents.
13      Q.  And did you bring some of those
14  documents with you today?
15      A.  Yes, I did.
16      Q.  And are those in front of you?
17      A.  Yes, they are.
18      Q.  And would those assist the jury in
19  understanding your opinions in this case?
20      A.  Yes.
21      MR. SNELL:  Object; leading.
22  BY MR. THORNBURGH:
23      Q.  What is the first internal company
24  document that you'd like to discuss with the jury

Page 61

1  today?
2      MR. SNELL:  Object; leading, improper
3  Pennsylvania procedure.
4  BY THE WITNESS:
5      A.  This is an e-mail from October 2002 from
6  an Ethicon employee Laura Angelini.
7      MR. SNELL:  Object.
8      MR. THORNBURGH:  Hold on one second.
9  BY MR. THORNBURGH:
10      Q.  Is it P1553, Doctor?
11      A.  Yes.
12      MR. SNELL:  Can I get a copy.
13  BY MR. THORNBURGH:
14      Q.  I am going to hand defense counsel a
15  copy of the exhibit.
16          Okay.  And how does -- how does
17  Exhibit P1553 -- strike that.
18          First of all, what is the date of the
19  e-mail that's Exhibit P1553?
20      A.  October of 2000.
21      Q.  Okay.  And who is having a discussion
22  within this e-mail?
23      A.  This is from -- to an Ethicon employee,
24  Laura Angelini, to other Ethicon employees

16  (Pages 58 to 61)

Bruce Alan Rosenzweig, M.D.

Page 62

1  including Dr. Brigitte Hellhammer.
2      Q.   And how is this document significant to
3  your opinions?
4      A.   This document is significant to my
5  opinions as it describes that Ethicon employees did
6  not envision ever needing to remove the TVT -- or
7  the Prolene mesh after it was placed in the human
8  body, first, as an embodiment of the
9  TVT Retropubic.  Obviously this predates the
10 TVT-Secur.
11     Q.   Okay.
12     MR. SNELL:  Object.  Move to strike.
13 Improper -- improper state of mind opinion as to
14 what Ethicon people thought.
15 BY MR. THORNBURGH:
16     Q.   What was your understanding when you
17 read this document concerning the removal of the
18 TVT device and -- and publications concerning the
19 removal of the TVT device?
20     MR. SNELL:  Object; vague.
21 BY THE WITNESS:
22     A.   Well, this is regarding a doctor who is
23 going to be writing a paper about needing to remove
24 the entire TVT device.  Ms. Angelini states, "I do

Page 63

1  not envision any need to explant the TVT."
2  BY MR. THORNBURGH:
3      Q.   Based on your knowledge, training and
4  experience, your review of materials that you
5  testified you reviewed in this case, is it correct
6  that there would not be a need, a clinical -- a
7  medical clinical need for the removal of a TVT
8  Prolene polypropylene sling device?
9      MR. SNELL:  Object; leading.
10 BY THE WITNESS:
11     A.   No.
12 BY MR. THORNBURGH:
13     Q.   And who is Dr. Klutke?
14     A.   Dr. Klutke is a urogynecologist, a
15 well-known pelvic surgeon.
16     Q.   And Dr. Brigitte Hellhammer.  Do you
17 know who she is?
18     A.   Yes.  She is a scientist at Ethicon.
19     Q.   And who is Ms. Angelini?
20     A.   She's in marketing.
21     Q.   If you turn with me to Exhibit 1553, the
22 first e-mail from Brigite Hellhammer at the bottom
23 of the first page.  The subject is "Professor
24 Klutke" and then it says "Confidential."

Page 64

1      Do you see that?
2      A.   Yes.
3      Q.   And it's from Brigitte Hellhammer sent
4  to an Ethicon employee, a Ms. Waljii and cc'd to
5  Dr. Engel Dieter.
6      Do you see that?
7      A.   Yes.
8      Q.   And it says, "Dear Zenobia," and this is
9  Brigitte Hellhammer writing.  "Dear Zenobia.
10 During his recent visit with us, Professor Klutke
11 explained a simple technique to use how to explant
12 a Prolene mesh tape, namely by using a normal
13 electrocautery device with cutting (not
14 coagulating) current."
15     Do you see that?
16     A.   Yes.
17     Q.   It goes on to say, "The procedure is
18 dissect the tape free is simple and quick according
19 to Professor Klutke.  Although the necessity to
20 dissect the tape is extremely rare, this particular
21 procedure is interesting, as in early conversation
22 with gynecologic surgeons, they told me that
23 dissection would be tedious and requires long
24 operation time."

Page 65

1      Did I read that correctly?
2      A.   Yes.
3      Q.   Okay.  And if you -- what is your
4  understanding of what was occurring here in 2002
5  concerning what Professor Klutke was working on?
6      MR. SNELL:  Objection; vague.
7  BY THE WITNESS:
8      A.   What Dr. Klutke is describing is a
9  technique for being able to remove the mesh that he
10 felt would be much quicker and easier, both using
11 electrocautery, which is an energy system which not
12 only can cut tissue but seal blood vessels, and
13 cutting.
14     Q.   Now, if you turn to the next e-mail in
15 this exhibit, Dr. -- there is a Zenobia Waljii.
16     Do you see that?
17     A.   Yes.
18     Q.   Who responds to Brigitte Hellhammer and
19 she writes, "Dear Briggite, Thanks for your
20 thoughts below.  In principle I am comfortable with
21 you contacting any of the US clinicians.  However,
22 before you do so, I would really like to understand
23 the value of capturing the technique versus some
24 potential 'backfire' of this publication."

17 (Pages 62 to 65)

Bruce Alan Rosenzweig, M.D.

Page 66

1          Do you see that?
2     A.   Yes.
3     Q.   Is it ever okay for -- in your opinion,
4  is it ever okay -- do you have an opinion one way
5  or the other whether it's okay for medical device
6  manufacturers of permanently implantable devices to
7  withhold a publication because the publication
8  could cause a repercussion or consequences to the
9  bottom line of the financial stability of the
10  product?
11     MR. SNELL:  Object; improper subject matter.
12  That opinion that you're seeking to elicit is not
13  explicitly in his Pennsylvania report.
14     MR. THORNBURGH:  Let me ask a better way.
15     MR. SNELL:  Secondly --
16     MR. THORNBURGH:  I'm going to withdraw it.  I
17  withdraw the question.
18     MR. SNELL:  Secondly, I object to you reading
19  e-mails.  That's not how you examine on direct an
20  expert in Pennsylvania.
21     MR. THORNBURGH:  I'm going to withdraw the
22  last question.  Let me restate it.
23  BY MR. THORNBURGH:
24     Q.   Doctor, do you have an opinion whether

Page 67

1  companies such as Ethicon and Johnson & Johnson
2  should put patient safety before profit?
3     A.   Yes.
4     Q.   Why is that?
5     A.   Because patient safety is paramount.
6     Q.   And do you have an opinion whether or
7  not companies like Ethicon and Johnson & Johnson
8  should disclose the good, the bad and the ugly
9  concerning products it's selling as permanent
10  implantable devices?
11     MR. SNELL:  Objection; argumentative, outside
12  the scope of his expert report as well now.
13  BY THE WITNESS:
14     A.   Yes, I have an opinion.
15  BY MR. THORNBURGH:
16     Q.   What's that opinion?
17     MR. SNELL:  This is a jury question too.  Go
18  ahead.
19  BY THE WITNESS:
20     A.   Yes, they should.
21  BY MR. THORNBURGH:
22     Q.   Why is that?
23     A.   Because that is information that both
24  doctors and patients need in order to be able to

Page 68

1  decide on whether or not they will use a specific
2  product.
3     Q.   And how did -- if you look at
4  Exhibit 1553, how did Laura Angelini respond to the
5  possibility of Dr. Klutke publishing his technique
6  for the removal of TVT midurethral sling?
7     MR. SNELL:  Object.  Reading e-mails by an
8  expert, improper subject matter.  Jury can read the
9  e-mail themselves.
10  BY THE WITNESS:
11     A.   She states, "Frankly, I do not want to
12  dig my own grave."
13     Q.   How is that, if at all, significant to
14  your opinions, Doctor?
15     A.   It's significant to my opinions in that
16  a medical device company should want all the
17  information, both the good information that
18  supports their product plus also the bad
19  information that might not support their product or
20  does not support their product, to be known by
21  doctors so doctors can make informed decisions
22  about the use of a product to be able to give that
23  information to patients.
24     Q.   Is Laura Angelini a medical doctor?

Page 69

1     A.   No.
2     MR. SNELL:  Object; asked and answered.
3  Covered earlier.
4  BY MR. THORNBURGH:
5     Q.   What is Laura -- what was Laura
6  Angelini's position at Ethicon?
7     MR. SNELL:  Objection; covered earlier.  Go
8  ahead.
9  BY THE WITNESS:
10     A.   Marketing.
11  BY MR. THORNBURGH:
12     Q.   So, are you telling the ladies and
13  gentlemen of the jury that Laura Angelini, a
14  marketing person, is concerned about providing
15  safety information to physicians?
16     MR. SNELL:  Objection; improper state of mind.
17  This is outside the scope of his report too.  He
18  does not --
19     MR. THORNBURGH:  Just object.  Just object.
20     MR. SNELL:  No, I'm not.  I am giving a proper
21  trial objection.
22     MR. THORNBURGH:  What time is it?
23     THE VIDEOGRAPHER:  10:24.
24     MR. THORNBURGH:  Can you look up the

18 (Pages 66 to 69)

Bruce Alan Rosenzweig, M.D.

Page 70

1    Court's -- Judge Greenspan's telephone number?  We
2    are going to call if we have to.  We've done this
3    before.  You're wasting time.
4        MR. SNELL:  I'm not wasting your time.  I am
5    giving a proper objection.  You are the one that
6    noticed a trial deposition.
7        MR. THORNBURGH:  Just get Judge Greenspan's
8    office, please.
9    BY MR. THORNBURGH:
10       Q.   Doctor, do you have an opinion about
11   whether or not the marketing person should be
12   calling the shots on what safety information is
13   provided to physicians?
14       MR. SNELL:  Object; leading, foundation,
15   outside the scope, improper expert subject matter
16   now.
17   BY THE WITNESS:
18       A.   I do have an opinion.
19   BY MR. THORNBURGH:
20       Q.   What is that?
21       A.   They should not.
22       Q.   Doctor, do you know whether or not
23   Ethicon ever provided instructions or training on
24   how to remove a -- any of its TVT products in the

Page 71

1    event of a complication?
2        A.   No, they did not.
3        Q.   And is that significant at all to your
4    opinions?
5        A.   Yes.
6        Q.   What is that?
7        A.   That if a device is being placed in the
8    body permanently, there should be a known,
9    reliable, tested method for not only implanting the
10   device but also removal of the device.
11       Q.   Dr. Klutke, is he a medical doctor?
12       A.   Yes.
13       Q.   Dr. Hellhammer, is she a medical doctor?
14       MR. SNELL:  Object; covered.
15   BY THE WITNESS:
16       A.   No.
17   BY MR. THORNBURGH:
18       Q.   Ms. Angelini, is she a medical doctor?
19       MR. SNELL:  Objection; asked and answered
20   three times.
21   BY THE WITNESS:
22       A.   No.
23   BY MR. THORNBURGH:
24       Q.   Do you have an opinion whether or not

Page 72

1    it's appropriate for a person in marketing to
2    control the information being published to
3    physicians?
4        MR. SNELL:  Object; leading, foundation,
5    outside the scope.
6    BY THE WITNESS:
7        A.   Yes, I have an opinion.
8    BY MR. THORNBURGH:
9        Q.   What's that opinion?
10       A.   That is inappropriate.
11       Q.   Doctor, was the need for a complete
12   removal of a TVT device ever common knowledge?
13       MR. SNELL:  Object.  I believe that's outside
14   the scope of his report, unless you want to show me
15   that opinion.
16   BY MR. THORNBURGH:
17       Q.   Do you know, Doctor?
18       A.   No, it was not common knowledge.
19       Q.   Was the ability to surgically remove
20   these TVT devices ever commonly known?
21       MR. SNELL:  Same objection; outside the scope.
22   BY THE WITNESS:
23       A.   No.
24   BY MR. THORNBURGH:

Page 73

1        Q.   Were the -- was it a technique for the
2    removal of these TVT products, including the
3    TVT-Secur, ever commonly known?
4        MR. SNELL:  Same objection.  Dr. Rosenzweig
5    does not have common known opinions in his report.
6    Go ahead.
7    BY THE WITNESS:
8        A.   No.
9    BY MR. THORNBURGH:
10       Q.   Were you ever trained by Ethicon on the
11   proper technique needed to safely remove its TVT
12   line of products in the event of complications?
13       A.   No.
14       Q.   Prior to your involvement in this
15   litigation, were you ever shown this internal
16   company document?
17       A.   No.
18       Q.   Were doctors in the community, to the
19   best of your knowledge and based on your review of
20   the internal documents, ever provided with this
21   internal Ethicon communication?
22       MR. SNELL:  Object; outside the scope.
23   BY THE WITNESS:
24       A.   No.

19 (Pages 70 to 73)

Bruce Alan Rosenzweig, M.D.

Page 74

1    BY MR. THORNBURGH:
2        Q.   What's the next exhibit in your binder
3    that you'd like to discuss with the jury?
4        A.   It's an e-mail from Dr. Axel Arnaud, who
5    is a Medical Director, to Dr. Martin Weisberg, also
6    a Medical Director, from October of 2002.
7        MR. SNELL:  Object; improper Pennsylvania
8    procedure.
9    BY MR. THORNBURGH:
10       Q.   And is this P1080?
11       A.   Correct.
12       Q.   And what is the significance of --
13       MR. SNELL:  Can I have a copy, counsel.
14       MR. THORNBURGH:  I'm sorry.
15   BY MR. THORNBURGH:
16       Q.   How is this e-mail between Axel Arnaud
17   and Marty Weisberg significant, if at all, to your
18   opinions in this case?
19       A.   They're discussing a complication of the
20   Prolene mesh called an erosion.  I've described
21   that earlier for the jury what an erosion is, but
22   basically it's when the -- the vagina that is
23   covering the mesh dies away and the mesh is now --
24   exposes an ulcer into the vagina.

Page 75

1            And what Dr. Arnaud is stating, that it
2    might be wise to be more elusive about this topic
3    of mesh erosion.
4        Q.   Okay.  And for the record who is Axel
5    Arnaud?
6        A.   A Medical Director and also a doctor.
7        Q.   And who is Martin Weisberg?
8        A.   A Medical Director and also a doctor.
9        Q.   Do you have an opinion whether or not it
10   is okay -- strike that.
11           Do you have an opinion whether or not
12   being elusive about safety information is proper?
13       A.   I do have an opinion.
14       Q.   What's that opinion?
15       A.   It is not proper.
16       Q.   And go ahead and highlight for us the
17   first paragraph here.
18           It says, "Dear Doctor, I reviewed your
19   draft report.  Apart from minor corrections
20   concerning typing errors, it is perfect for me.  I
21   just had a concern about your statement concerning
22   potential complications/fistula and erosions.  This
23   is a problem which arises rather commonly in
24   practice even with polypropylene and it might be

Page 76

1    wise to be more elusive on this."
2            Did I read that correctly?
3        A.   Yes.
4        Q.   How does that support your opinion,
5    Doctor?
6        A.   It is --
7        MR. SNELL:  Object; asked and answered.  Go
8    ahead.
9    BY THE WITNESS:
10       A.   -- improper to be elusive about
11   complications associated with a medical device.
12   BY MR. THORNBURGH:
13       Q.   Why is it improper to be elusive about
14   complications associated with a medical device,
15   Doctor?
16       A.   Because doctors need to be informed
17   about that.  The manufacturer is the one that has
18   the most information, the most resources to know
19   about complications associated with their devices
20   and they should be frank about discussing that with
21   physicians so that physicians know about the
22   complications associated with their device.
23       Q.   Why should physicians know about
24   complications associated with medical devices?

Page 77

1        A.   So that they can discuss that with their
2    patients so that the patient can ultimately make an
3    informed decision about the treatment that they
4    get, the devices that are being used.  It's
5    ultimately up to the patient to make the decision
6    about the treatment that she has and which devices
7    will be used to accomplish that treatment.
8        Q.   Do you have an opinion about whether or
9    not -- do you have an opinion about what could
10   happen to patients if medical device companies are
11   elusive about safety information?
12       MR. SNELL:  Objection; outside the scope of
13   his report.  Not an opinion he's expressed.
14   BY THE WITNESS:
15       A.   That patient safety is compromised.
16   BY MR. THORNBURGH:
17       Q.   What does that mean, "patient safety is
18   compromised"?
19       MR. SNELL:  Same objection.
20   BY THE WITNESS:
21       A.   That patients unfortunately would be
22   exposed to complications that they might not be
23   exposed to.  Quite frankly, the patients would end
24   up getting the short end of the stick.

Bruce Alan Rosenzweig, M.D.

Page 78

1  BY MR. THORNBURGH:
2      Q.  What's the next document you'd like to
3  discuss with the jury today?
4      MR. SNELL:  Object; improper Pennsylvania
5  procedure.  Can I have a copy?
6  BY THE WITNESS:
7      A.  This is an e-mail from Medical Director
8  Axel Arnaud to several key Ethicon employees,
9  including engineer Gene Kammerer.
10     MR. SNELL:  Give me a second, Doctor.  Before
11 we go reading.  Okay.
12     MR. THORNBURGH:  I don't know if I did this.
13 But let's go ahead and mark the entire binder as
14 Exhibit BR-Secur 5.
15         (WHEREUPON, a binder was marked as
16          BR-Secur Exhibit No. 5:  Binder of
17          various Plaintiffs' Exhibits
18          referred to by deponent.)
19 BY MR. THORNBURGH:
20     Q.  Okay.  So, you were discussing
21 Exhibit P933, which is within Exhibit 5, the
22 binder.
23         How is Exhibit P0933 -- strike that.
24         Is -- did you rely on Exhibit -- strike

Page 79

1  that.
2          Did you rely on Exhibit P0933?
3      A.  Yes.
4      Q.  And how does Exhibit P0933 support your
5  opinions in this case?
6      A.  This document describes e-mail between
7  key Ethicon employees and it documents that
8  Dr. Axel Arnaud knew that mesh contracted or shrank
9  30%.
10     MR. SNELL:  Object; improper state of mind
11 opinion.
12 BY MR. THORNBURGH:
13     Q.  And how is shrinkage, a 30% shrinkage --
14 strike that.
15         How is the fact that Axel Arnaud writes
16 or agrees that shrinkage can occur up to 30% of an
17 implanted TVT mesh relevant to your opinions?
18     A.  I've already described the importance of
19 mesh contraction, deformation caused by the chronic
20 foreign body reaction, chronic inflammatory
21 reaction.
22         A 30% shrinkage is a significant degree
23 of shrinkage and will lead to complications that
24 I've described before, such as pain, pain with

Page 80

1  intercourse, obstruction of voiding and mesh
2  erosion.
3      Q.  Now, we'll get to the Information for
4  Use in a little bit in greater detail.  But did
5  Ethicon ever indicate in the Information for Use
6  for the TVT-Secur device that the TVT-Secur device,
7  once implanted, could shrink up to 30%?
8      A.  No, they did not.
9      Q.  Doctor, based on your review of the
10 internal documents, did Ethicon -- strike that.
11         Did Ethicon -- do you have an opinion --
12 strike that.
13         Do you have an opinion whether or not
14 Ethicon ever disclosed to the world or to
15 physicians that their TVT line of products could
16 shrink up to 30%?
17     A.  No.
18     MR. SNELL:  Objection; outside the scope of
19 the report.
20 BY THE WITNESS:
21     A.  No.
22 BY MR. THORNBURGH:
23     Q.  What's the basis for that opinion,
24 Doctor?

Page 81

1      A.  The review of internal documents and
2  deposition testimony.
3      Q.  Doctor, when was the first time you
4  learned that the TVT products, including the TVT-R,
5  Retropubic, the TVT-O, Obturator, or the TVT-S, the
6  Secur, could shrink up to 30% after implant in the
7  human body?
8          Did you know this before you became
9  involved as an expert in this litigation?
10     A.  I understood that from the literature
11 that there could be mesh contraction.
12     Q.  Did you understand that Ethicon was
13 aware that up to 30% of its meshes -- 30% of the
14 TVT device -- devices could retract or shrink?
15     MR. SNELL:  Objection; misstates the evidence,
16 state of mind as to Ethicon.
17 BY THE WITNESS:
18     A.  I had not seen this e-mail prior to
19 becoming involved in this litigation.
20 BY MR. THORNBURGH:
21     Q.  Did Ethicon share this e-mail with
22 anybody outside of Ethicon?
23     MR. SNELL:  Objection; improper opinion.
24 BY THE WITNESS:

21 (Pages 78 to 81)

Bruce Alan Rosenzweig, M.D.

Page 82

1      A.  No.
2      MR. SNELL:  Outside the scope.
3   BY MR. THORNBURGH:
4      Q.   Was it common knowledge in the medical
5   community that the TVT devices, including the
6   TVT-Secur, could shrink up to 30%?
7      MR. SNELL:  Object; outside the scope.
8   BY THE WITNESS:
9      A.  No.
10  BY MR. THORNBURGH:
11     Q.   Was it disclosed outside of Ethicon by
12  Ethicon to physicians that their TVT devices,
13  including the TVT-Secur, could shrink up to 30%?
14     MR. SNELL:  Objection; outside the report.
15  BY THE WITNESS:
16     A.  No.
17  BY MR. THORNBURGH:
18     Q.   How is this document significant to your
19  opinions?
20     A.   That this describes the scientific
21  knowledge of the Medical Director and the
22  discussion among key Ethicon employees regarding
23  the rate of shrinkage or the degree of shrinkage of
24  a TVT device.

Page 83

1      MR. SNELL:  Improper state of mind.  Object.
2   BY MR. THORNBURGH:
3      Q.   What can happen to patients if the mesh
4   shrinks up to 30%?
5      A.   As I've described in prior testimony,
6   mesh contraction up to this degree can lead to
7   complications such as pain, pain with intercourse,
8   mesh erosion, and obstructed voiding.
9      MR. THORNBURGH:  Take a quick break.
10     THE VIDEOGRAPHER:  Okay.  The time is 10:39
11  a.m.  This is the end of Tape 1 and we are going
12  off the video record.
13        (WHEREUPON, a recess was had
14         from 10:39 to 10:48 a.m.)
15     THE VIDEOGRAPHER:  The time is 10:48 a.m.
16  This is the beginning of Tape 2 and we're back on
17  the video record.
18  BY MR. THORNBURGH:
19     Q.  Doctor, before we went off the record we
20  were talking about your opinions, summary of
21  opinions that you provided earlier and the bases
22  for those opinions including the internal documents
23  that you have shown us so far?
24     A.  Yes.

Page 84

1      Q.   What is the next document that you'd
2   like to discuss with the ladies and gentlemen of
3   the jury and how does it support your opinions?
4      MR. SNELL:  Object; improper Pennsylvania
5   procedure.  Go ahead.
6   BY THE WITNESS:
7      A.   This is an e-mail which is from
8   December of 2004.
9   BY MR. THORNBURGH:
10     Q.   And for the record just identify the
11  exhibit number.
12     MR. SNELL:  Can I get a copy too.
13     MR. THORNBURGH:  I'm sorry.
14  BY THE WITNESS:
15     A.   It is P1572.
16  BY MR. THORNBURGH:
17     Q.   Okay.  And what is this document?
18     A.   It is an e-mail.  Attached to it is
19  what's called the charter document which -- for
20  what was described as the TVT X.  TVT X is the code
21  name, if you will, during the development phase of
22  the TVT-Secur before it became the TVT-Secur.
23        And it is -- the charter document is a
24  document to describe to management why they should

Page 85

1   go forward with the TVT X project.
2      Q.   Okay.  And how does this document --
3   strike that.
4         What is significant about Exhibit P1527?
5      A.   Well, this is from the project leader
6   Dan Smith.  Dan Smith is an engineer at Ethicon.
7   And this describes the annual sales for the current
8   products, the TVT and the TVT-O.  It's estimated to
9   reach 100 million by the end of 2004 with a 91%
10  profitability, that the new product that is being
11  described in this charter document, the TVT X,
12  which ultimately became the TVT-Secur, will help
13  Gynecare and Ethicon maintain their market
14  dominance.  However, it is important for them to
15  stay ahead of --
16     Q.   Go ahead.
17     A.   -- the competition and that being the
18  first to market with a new device such as the TVT X
19  would be quote-unquote, "priceless."
20     Q.   Now --
21     MR. SNELL:  Object.  Object.  Move to strike
22  the entire answer as non-responsive and improper
23  subject matter.
24  BY MR. THORNBURGH:

22 (Pages 82 to 85)

Bruce Alan Rosenzweig, M.D.

Page 86

1      Q.   Now, Doctor, is it improper for a
2  medical device company to want to be first to
3  market?
4      MR. SNELL:  Object; state of mind, outside the
5  scope of the report.
6  BY THE WITNESS:
7      A.   It is not improper to want to be the
8  first to market.
9  BY MR. THORNBURGH:
10     Q.   And -- and when does it become improper?
11     MR. SNELL:  Same objection.
12  BY MR. THORNBURGH:
13     Q.   Does it ever -- strike that.
14         Does it ever become improper?
15     MR. SNELL:  Same objections, requires --
16  sorry.  Lacks foundation.
17  BY THE WITNESS:
18     A.   Yes, it does.
19  BY MR. THORNBURGH:
20     Q.   And when is that?
21     A.   When a product is not adequately tested
22  prior to it being launched to be able to understand
23  the safety and efficacy of the product prior to
24  being launched.

Page 87

1      Q.   Fair enough.  So, it's -- I think if I
2  understand you correctly, it's okay to be first to
3  market with your product as long as you do it in an
4  appropriate way?
5      MR. SNELL:  Objection; leading.
6  BY MR. THORNBURGH:
7      Q.   Is that correct?
8      A.   Correct.
9      MR. SNELL:  Leading, repetition.
10  BY MR. THORNBURGH:
11     Q.   And to do it, what needs to be done in
12  order to become -- to bring your product and be the
13  first to market in a way that also provides safety
14  for patients?
15     MR. SNELL:  Overbroad.
16  BY MR. THORNBURGH:
17     Q.   That also considers safety for patients?
18     MR. SNELL:  Object; overbroad.
19  BY THE WITNESS:
20     A.   Product has to be designed, evaluated
21  and tested in order to make sure that the
22  characteristics of the device are safe and that the
23  device performs as it's intended.
24  BY MR. THORNBURGH:

Page 88

1      Q.   What, if anything, should a company do
2  if it determines prior to launch that its product
3  is not efficacious or is unsafe?
4      A.   They should not launch the product.
5      Q.   Is it ever okay for a company such as
6  Ethicon and Johnson & Johnson to be motivated by
7  profits over providing safe and effective care and
8  treatment to patients?
9      MR. SNELL:  Object; improper expert opinion,
10  state of mind.
11  BY THE WITNESS:
12     A.   No, it is not.
13  BY MR. THORNBURGH:
14     Q.   Why is that?
15     A.   Because then patient safety is
16  compromised and patients would be exposed to an
17  undue amount of complications.
18     Q.   Okay.  And so, if we look at the
19  Exhibit P1527 and go to ETH.MESH.07898854, which is
20  the first page of the attachment of the e-mail.
21         And I think this describes some of what
22  you've just testified about.  This is the charter
23  document, is that correct?
24     A.   Correct.

Page 89

1      Q.   And who is Dan Smith?
2      A.   Dan Smith is an engineer and the project
3  leader for the TVT X project, which ultimately
4  became the TVT-Secur.
5      Q.   Was Dan Smith a medical doctor?
6      A.   No.
7      Q.   Was Dan Smith a gynecologist?
8      A.   No.
9      Q.   Was Dan Smith a urogynecologist?
10     A.   No.
11     Q.   Who invented the TVT-Secur?
12     A.   Dan Smith was one of the -- was the lead
13  engineer on the TVT-Secur project.
14     Q.   And this document says that the "annual
15  sales of the Gynecare TVT brand (TVT and TVT-O) in
16  the direct markets is estimated to reach somewhere
17  around $100 million by the end of 2004 with a
18  profitability of around 91%."
19         Did I read that correctly?
20     MR. SNELL:  Objection.
21  BY THE WITNESS:
22     A.   Yes.
23     MR. SNELL:  Leading and improper expert
24  subject matter.  The jury can read an e-mail for

23 (Pages 86 to 89)

Bruce Alan Rosenzweig, M.D.

Page 90

1   themselves.
2   BY MR. THORNBURGH:
3       Q.   If you go down to the last sentence in
4   the first -- in this first section it says, "It
5   remains strongly recognized that Gynecare developed
6   this market and coupled with the skills,
7   competencies and capabilities within the
8   organization, such market dominance can be
9   sustained.  However, product innovation and
10  advancement is required in order to stay ahead of
11  the competition."
12       Did I read that correctly?
13      A.   Yes.
14      MR. SNELL:  Object; leading, improper expert
15  subject matter.  The jury can read documents
16  themselves.
17  BY MR. THORNBURGH:
18      Q.   And is it improper to try to stay ahead
19  of competition?
20      A.   No.
21      Q.   Does it ever become improper?
22      A.   If --
23      MR. SNELL:  Object; vague, overbroad.
24  BY THE WITNESS:

Page 91

1       A.   If a device is not properly tested to
2   assure that it is safe and effective.
3   BY MR. THORNBURGH:
4       Q.   And what can happen to patients if
5   devices aren't properly tested?
6       A.   Patients are exposed --
7       MR. SNELL:  Objection; requires speculation
8   without foundation.
9   BY THE WITNESS:
10      A.   Patients are exposed to risks of safety
11  or in -- or lack of efficacy of the product that
12  they are being used that is permanently implanted
13  product that is supposed to be in them for the rest
14  of their lives.
15      Q.   This is a permanent -- TVT-Secur is a
16  permanent implantable device, right?
17      A.   Right.
18      MR. SNELL:  Object.  Hold on.  Leading.
19      MR. THORNBURGH:  He already testified --
20      MR. SNELL:  Leading, asked and answered three
21  times.  Go ahead.
22      MR. THORNBURGH:  It's not leading if he's
23  already testified to it.
24      MR. SNELL:  No, it's leading.  You're stating

Page 92

1   it and it's asked and answered, repetition.
2       MR. THORNBURGH:  Could you try not to speak
3   over me or object over the question or the answer.
4       MR. SNELL:  I'm not trying to object over the
5   answer.
6       MR. THORNBURGH:  We have to cut this later on.
7       MR. SNELL:  I know.  I'm trying to wait for
8   you to finish.  But please give me a break, sir.
9       THE WITNESS:  Yes, sir.
10      MR. SNELL:  I know.  I don't mean to step on
11  you at all.  I just need to -- I have to get my
12  objection in.
13      I'll try to wait until you finish, Dan.
14  BY MR. THORNBURGH:
15      Q.   Is the TVT-Secur a permanent implantable
16  device?
17      MR. SNELL:  Object; repetition, asked and
18  answered.
19  BY THE WITNESS:
20      A.   Yes.
21  BY MR. THORNBURGH:
22      Q.   In light of that fact, would it be
23  proper for Ethicon to rush a product to the
24  market --

Page 93

1       MR. SNELL:  Object.
2   BY MR. THORNBURGH:
3       Q.   -- without properly testing it?
4       A.   No.
5       Q.   This is serious business, isn't it?
6       MR. SNELL:  Object; leading, argumentative.
7   BY MR. THORNBURGH:
8       Q.   Is this serious business?
9       A.   Yes.
10      Q.   This is a serious issue that we are
11  talking about here?
12      A.   Yes.
13      Q.   Is the health and well-being of women
14  important?
15      A.   Yes.
16      Q.   Should companies consider the health and
17  well-being to be important?
18      MR. SNELL:  Object; repetition.
19  BY MR. THORNBURGH:
20      Q.   Strike that.
21      Should companies like Ethicon and
22  Johnson & Johnson who develop medical devices for
23  women consider the safety and well-being of women
24  to be important?

24 (Pages 90 to 93)

Bruce Alan Rosenzweig, M.D.

Page 94

1    A.   Yes.
2         MR. SNELL:  Object; repetition.
3    BY MR. THORNBURGH:
4         Q.   What happens if a company like Ethicon
5    and Johnson & Johnson doesn't consider the health
6    and well-being of women to be important?
7         MR. SNELL:  Object; state of mind, repetition.
8    BY THE WITNESS:
9         A.   Women suffer.
10   BY MR. THORNBURGH:
11        Q.   Should the health and well-being of
12   women be more important than beating your
13   competition to market --
14        MR. SNELL:  Object.
15   BY MR. THORNBURGH:
16        Q.   -- with a product?
17        MR. SNELL:  Object; repetition.
18   BY THE WITNESS:
19        A.   Yes.
20   BY MR. THORNBURGH:
21        Q.   Should the health and well-being of
22   women be more important to a company like Ethicon
23   and Johnson & Johnson than how much money you're
24   going to make on a given product in a given year?

Page 95

1         MR. SNELL:  Object; improper expert opinion.
2    Outside the scope of this medical doctor's report.
3    BY THE WITNESS:
4         A.   Yes.
5    BY MR. THORNBURGH:
6         Q.   Why is that, Doctor?
7         A.   Because the safety of the patient is
8    paramount.
9         Q.   Do you have an opinion based on your
10   review -- do you have an opinion whether or not
11   Ethicon put patient safety before profits?
12        MR. SNELL:  Objection; state of mind, improper
13   expert testimony, outside the scope.
14   BY THE WITNESS:
15        A.   For the TVT-Secur, yes.
16   BY MR. THORNBURGH:
17        Q.   What's that opinion?
18        MR. SNELL:  Same.
19   BY THE WITNESS:
20        A.   They put profits before patient safety.
21   BY MR. THORNBURGH:
22        Q.   What's the basis for that opinion?
23        A.   The internal documents, the testimony of
24   key Ethicon employees.

Page 96

1         Q.   Now, in this charter document, if you
2    turn to -- if you go to the last bullet point on
3    ETH.MESH ending in 854, it says, "Being first to
4    market with a superior less-invasive TVT product
5    and protecting our market share could be
6    priceless."
7         Did I read that correctly?
8         A.   Yes.
9         Q.   And is that what you testified to
10   earlier?
11        A.   Yes.
12        Q.   And if we turn to ETH.MESH.07898856 of
13   Exhibit P1527, is there anything significant about
14   this next page?
15        A.   This is a page has a graphic that
16   describes what Gynecare or -- Gynecare is a
17   division of Ethicon -- what their market share
18   would be without having the TVT X as part of their
19   sales armamentarium.
20        Q.   And if you look at the second bullet
21   point, there is a graph underneath that second
22   bullet point.  Is that the graph that you're
23   referring to?
24        A.   Yes.

Page 97

1         Q.   And what does it show would happen to
2    the Gynecare market share without the TVT-Secur?
3         MR. SNELL:  Object; improper expert testimony.
4    BY THE WITNESS:
5         A.   There would be --
6         MR. SNELL:  The jury can discern this for
7    themselves.
8    BY THE WITNESS:
9         A.   There would be a steady decline in their
10   market share from approximately the high 60s to the
11   low teens.
12   BY MR. THORNBURGH:
13        Q.   And just above this graph it says, the
14   last sentence, "It is anticipated that there will
15   be at least two competitor mini-type devices
16   launched in 2006."
17        Did I read that correctly?
18        MR. SNELL:  Object; leading, reading document.
19   BY THE WITNESS:
20        A.   Yes.
21   BY MR. THORNBURGH:
22        Q.   What's the significance of that
23   statement with respect to your opinions?
24        MR. SNELL:  Object; undisclosed opinion,

25 (Pages 94 to 97)

Bruce Alan Rosenzweig, M.D.

Page 98

1   outside the scope, improper expert opinion under
2   Pennsylvania Rule 702.
3   BY MR. THORNBURGH:
4       Q.   Go ahead, Doctor.
5       A.   If there are competitors that are on the
6   market, they -- the competitors would take market
7   share away from Ethicon's devices.
8       Q.   And if you turn to -- it's page 4 of the
9   attachment to Exhibit P27 or ETH.MESH.07898857, and
10  tell us what is significant to your opinions on
11  this page, if anything.
12      A.   These are -- this page describes
13  critical assumptions that were made during the
14  planning to decide if they are going to actually go
15  ahead and make the device which ultimately became
16  the TVT-Secur.  These critical assumptions, if they
17  are found to be incorrect during the design, the
18  development and the testing of the product, would
19  mean that this would be a, quote, "no-go decision"
20  or they would decide against bringing this product
21  to market.
22          And this is a list of what would be, if
23  these assumptions are wrong, they would not go
24  ahead with the product.

Page 99

1       MR. SNELL:  Object; improper state of mind,
2   improper expert opinion.
3   BY MR. THORNBURGH:
4       Q.   So, if we look at the third bullet point
5   on this page ending in 857 of Exhibit 1527, it
6   says, "Critical Assumptions," and I think this is
7   what you just summarized.  What are the assumptions about
8   Assumptions.  What are the assumptions about the
9   project, which if incorrect, could result in a
10  no-go decision?"
11          Did I read that correctly?
12      A.   Yes.
13      MR. SNELL:  Object; leading, reading
14  documents.
15  BY MR. THORNBURGH:
16      Q.   And the first assumption, first bullet
17  point under this list says, "Shorter mesh implanted
18  will provide equivalent efficacy compared to
19  current mesh length and position in both the
20  retropubic and obturator direction."
21          Did I read that correctly?
22      MR. SNELL:  Objection; leading, reading
23  document to an expert on direct, improper.
24  BY THE WITNESS:

Page 100

1       A.   Yes.
2   BY MR. THORNBURGH:
3       Q.   And how is that statement, if at all,
4   important to your opinions?
5       A.   That the decision that was made in
6   December of 2004 was that if the TVT X, which
7   ultimately became the TVT-Secur, if it was found to
8   have a lower effectiveness as compared to the
9   full-length TVT products, then they would not go
10  ahead with the project.
11      MR. SNELL:  Objection.
12  BY THE WITNESS:
13      A.   And they would not launch the product.
14      MR. SNELL:  Object.  Sorry, Doctor.
15      THE WITNESS:  It's okay.
16      MR. SNELL:  Object.  Move to strike.
17  Misstates the evidence and the document itself.
18  Improper opinion.
19  BY MR. THORNBURGH:
20      Q.   Let me understand this correctly,
21  Doctor.
22          Are you telling me and the ladies and
23  gentlemen of this jury that Ethicon -- that it was
24  Ethicon's position that if they had found or

Page 101

1   determined that the TVT-Secur was not as effective
2   as their full-length midurethral slings like the
3   TVT or the TVT-O that were already on the market
4   before they launched it, that Ethicon would not
5   launch the TVT-Secur device?
6       MR. SNELL:  Objection; improper, state of mind
7   opinion, outside the scope of his report and also
8   misstates the document itself.  Go ahead.
9       MR. THORNBURGH:  You know what?  Hold on a
10  second.  Call the judge.  I am tired of every
11  objection -- every question you have objected to.
12  I am tired of it.
13      MR. SNELL:  That's okay.
14      MR. THORNBURGH:  You're wasting my time and
15  you're interfering with the flow of the deposition
16  and they are improper objections.  So, let's get
17  the judge on the phone.
18          Is there a conference phone?
19      MS. LaPOINTE:  No.
20      THE VIDEOGRAPHER:  Shall I stay on the record
21  or go off?
22      MR. THORNBURGH:  You can go off until we get
23  her on.  We will keep the Court Reporter on the
24  record.

26 (Pages 98 to 101)

Bruce Alan Rosenzweig, M.D.

Page 102

1    THE WITNESS:  I will step out of the room.  I
2    think it's probably more appropriate if I do.
3        THE VIDEOGRAPHER:  The time is 11:06 a.m. and
4    I'm going off the video record.
5           (WHEREUPON, the deponent exited the
6           proceedings.)
7           (WHEREUPON, Bobby (Brad) Bradford,
8           Esq. entered the proceedings.)
9           (WHEREUPON, the following
10          proceedings were had off the video
11          record in a conference call with
12          Justice Greenspan:)
13       HUNTER:  Thank you for calling JAMS.  This is
14   Hunter.
15       MR. THORNBURGH:  Hi, Hunter.  My name is Dan
16   Thornburgh.  I'm here in a deposition with defense
17   counsel in the matter of Ebaugh vs. Ethicon and
18   Johnson & Johnson and we have kind of a discovery
19   issue or dispute that I'd like to, if possible, get
20   some guidance from Judge Greenspan.
21       HUNTER:  Okay.  Just one second.  I will see
22   if I can get ahold of her.
23       MR. THORNBURGH:  Thank you.  I appreciate it.
24       HUNTER:  You're welcome.

Page 103

1        JUSTICE GREENSPAN:  Hello.
2        MR. THORNBURGH:  Hi.  Is this Justice
3    Greenspan?
4        JUSTICE GREENSPAN:  This is she.
5        MR. THORNBURGH:  Hi, Justice Greenspan.  This
6    is Dan Thornburgh with Aylstock, Witkin, Kreis &
7    Overholtz.
8        JUSTICE GREENSPAN:  Hi Dan, how are you?
9        MR. THORNBURGH:  Good.  How are you doing?
10       JUSTICE GREENSPAN:  Okay.
11       MR. THORNBURGH:  Good.  I am here with defense
12   counsel for Ethicon.
13       MR. SNELL:  Hi, Justice Greenspan.  It's Burt
14   Snell from Butler Snow.
15       MR. THORNBURGH:  The reason for the call, your
16   Honor, is we are in a de bene esse preservation
17   trial deposition and with every question that I
18   ask, I get a -- to the witness, I get a speaking
19   objection from defense counsel, almost every single
20   question, 99% of the questions.  And I tried to
21   reach an agreement --
22       JUSTICE GREENSPAN:  I'm sorry.  Dan, run that
23   by me again.  You are in a deposition.
24       MR. THORNBURGH:  Yes.

Page 104

1        JUSTICE GREENSPAN:  Right now?
2        MR. THORNBURGH:  In a deposition right now in
3    the matter of Ebaugh vs. Ethicon and
4    Johnson & Johnson.  It's another TVT-Secur case.
5        JUSTICE GREENSPAN:  Right.  One of the pelvic
6    mesh cases.
7        MR. THORNBURGH:  Yes, correct.
8        JUSTICE GREENSPAN:  And somebody -- who is the
9    witness?  What's his position?
10       MR. THORNBURGH:  The witness is Dr. Bruce
11   Rosenzweig.  He is --
12       JUSTICE GREENSPAN:  I know, yes.
13       MR. THORNBURGH:  He's Plaintiffs' general
14   liability and causation expert witness and we are
15   at a preservation --
16       JUSTICE GREENSPAN:  Right, I know
17   Dr. Rosenzweig.
18       MR. THORNBURGH:  We are at this preservation
19   deposition and with every question that I ask, and,
20   look, I'm doing my best to ask the best questions I
21   can, but every question I get I'm getting objected
22   to, not just an objection, but a speaking objection
23   by defense counsel and it's interrupting the flow
24   of the deposition.

Page 105

1        It's interrupting the way I want, you
2    know, I want this deposition to move forward
3    quickly and as efficiently as possible.  I have
4    tried to reach an agreement with counsel that they
5    can just object without speaking objection without
6    waiving, other than leading.
7        Generally how we do this is if there is
8    an objection, you say "Objection" without giving
9    the basis for the objection so that it doesn't
10   interrupt or interfere with the flow of the
11   deposition, the questions that are being asked by
12   counsel, the strategies that are involved.  And
13   those issues can be resolved later on.
14       But I am getting interruption with these
15   speaking objections almost every single question I
16   ask.  And all I'm saying, all I'm asking is counsel
17   just say "Objection" unless it's leading.  Then he
18   can say "Objection; leading," which is the way we
19   have done this in other case.  And he's refused to
20   do that and it's interrupting the flow.
21       JUSTICE GREENSPAN:  Who is defense counsel?
22       MR. SNELL:  Judge, it's Burt Snell.  You and I
23   know each other very well.  I am the one who
24   crossed Dr. Rosenzweig --

27 (Pages 102 to 105)

Bruce Alan Rosenzweig, M.D.

1    JUSTICE GREENSPAN:  Okay.
2    MR. SNELL:  -- in his prior de bene esse.
3    JUSTICE GREENSPAN:  What's going on here?  Why
4  can't you just make an objection and leave it at
5  that?
6    MR. SNELL:  Well, one, Justice, that's not how
7  we did this.  This is a trial de bene esse
8  deposition.  This is not some discovery deposition.
9    I took his de bene esse TVT deposition,
10  and I made these similar type objections when there
11  was improper questioning as to expert subject
12  matter.
13    To put things into context, Justice
14  Greenspan, I'm not objecting to every question but
15  when the Plaintiffs' counsel is asking
16  Dr. Rosenzweig "What was Ethicon thinking" and
17  "Would it be right for a manufacturer to ever think
18  this," that's all improper expert subject matter
19  and state of mind.
20    So, the majority of my opinions have
21  been on state of mind, expert improper opinion; and
22  this is basically an exam that's not comporting
23  with the Pennsylvania rules from my perspective.
24    So, that's where these objections are

1  coming from.  Plaintiffs' counsel reading sentences
2  from a document.
3    JUSTICE GREENSPAN:  Why don't you -- Burt,
4  Burt, why don't you just say, "I have a standing
5  objection based on the following."  Put it on the
6  record and then, you know, as the deposition
7  continues on, just make your -- you don't have
8  to -- unless it's something very different like
9  it's leading or something like that where you can
10  say "Objection; leading," why don't you just say
11  "Objection" and that objection will hold for your
12  standing objection.
13    MR. SNELL:  If --
14    JUSTICE GREENSPAN:  Do you understand what I'm
15  saying?
16    MR. SNELL:  I think I do, your Honor.  If
17  that's the agreement, and there is absolutely --
18  and I don't want to hear any argument of waiver
19  because, your Honor, my big concern is they are
20  going to try to say there is some waiver because I
21  made these types of objections, your Honor, if you
22  will recall, in his TVT de bene esse deposition
23  when Mr. Freese was examining him because there are
24  several things I think are improper.

1    But if the Plaintiffs' counsel just
2  wants me to object, then I will do that.  That's
3  fine.
4    JUSTICE GREENSPAN:  I think you should put the
5  basis as sort of -- as you explained it to me, I am
6  sure you will do a beautiful job putting it on the
7  record.  But once you do that, unless there is an
8  objection based on something different, that
9  objection will, you know -- there can be an
10  agreement that just placing the objection will
11  preserve that as the basis.
12    MR. THORNBURGH:  Yeah, your Honor, and this is
13  Dan Thornburgh.
14    I've already agreed that all he has to
15  do is object.  He doesn't have to give a basis and
16  it won't be a waiver of any objection later on.  I
17  have already agreed to that with the exception of
18  leading, because I need to know, if I asked it
19  improperly, I need to know that I need to go back
20  and correct the answer.
21    But all he's got to do is say
22  "Objection."  We can handle the basis for the
23  objection later on so that it doesn't interrupt the
24  flow of this deposition.

1    JUSTICE GREENSPAN:  Okay.  Is that okay, Burt?
2  Can we agree there?
3    MR. SNELL:  Yeah, yes, I guess we can, your
4  Honor.  I just really have a real concern about
5  waiver issues.
6    MR. THORNBURGH:  I am telling you.
7    JUSTICE GREENSPAN:  Okay.  You may have a
8  valid, very valid basis to object.  But, you know,
9  as long as you state it on the record and, you
10  know, it's going to be preserved.
11    MR. SNELL:  Okay.
12    JUSTICE GREENSPAN:  Just state that "When I
13  say an objection, it's going to be -- that will be
14  the basis unless I say otherwise, you know, unless
15  there is some other basis, in which case I will
16  make that clear."
17    MR. SNELL:  Okay.  I think --
18    JUSTICE GREENSPAN:  How about that?
19    MR. SNELL:  I think I am understanding your
20  Honor.
21    MR. THORNBURGH:  I think you're saying here
22  are the objections I may have -- I have, I may have
23  throughout the deposition, reading of documents,
24  improper expert opinion testimony.

Bruce Alan Rosenzweig, M.D.

Page 110

1       I think the best way to handle this is
2   he can just object without giving a basis with the
3   exception of leading, and it's not -- won't be a
4   waiver of his objection if he doesn't give a basis.
5       MR. BRADFORD:  Of any basis.
6       JUSTICE GREENSPAN:  That's generally --
7   generally that's true unless a basis is requested,
8   unless the judge, and usually it's in the trial,
9   the judge asks for a basis.
10      MR. SNELL:  That's what I am doing, your
11  Honor, because this is a trial deposition just like
12  Dr. Rosenzweig is before a jury.  So, that was --
13  that's my heightened sense.  Obviously if it was a
14  discovery depo, that's different.
15      And your Honor has seen the types of
16  objections I made in his first trial de bene esse
17  deposition.  They are like this:  Objection;
18  improper subject matter of an expert, you know,
19  lacks facts or bases, state of mind.  That's what
20  I'm doing.
21      MR. THORNBURGH:  The difference here than a
22  trial deposition is obviously we don't have a judge
23  here, but what I'm -- what we are going to have is
24  we are going to have arguments in front of probably

Page 111

1   your Honor or before the trial judge on this, you
2   know, the admissibility of these questions and
3   answers and what I'm saying is he is not going to
4   waive an objection if he doesn't give a basis.
5       That will be taken up in front of your
6   Honor or in front of the Trial Court prior to the
7   trial.  The problem with the way it's going on
8   right now is it's interrupting the flow of the
9   questions and answers.
10      JUSTICE GREENSPAN:  Okay.  Well, let's try to
11  get through it so that the interruptions are, you
12  know, as minimal as possible.
13      MR. SNELL:  Okay.
14      JUSTICE GREENSPAN:  And we should -- that
15  should work hopefully.  I will keep my fingers
16  crossed.  Okay.
17      MR. SNELL:  Thank you for your guidance, your
18  Honor.  So I will just object.
19      JUSTICE GREENSPAN:  Thank you.
20      MR. SNELL:  Unless it's to leading and then I
21  will say --
22      JUSTICE GREENSPAN:  I'm sorry?
23      MR. SNELL:  I will just object and it will
24  preserve all my objections, whatever it is,

Page 112

1   including violating PA procedure, with the
2   exception of leading.  I'll tell Mr. Thornburgh if
3   it's actually leading as the basis.  That's the
4   agreement I guess.
5       MR. THORNBURGH:  Yes.
6       MR. SNELL:  Okay.
7       JUSTICE GREENSPAN:  Okay.  Is that the
8   agreement?  Okay.
9       MR. THORNBURGH:  Yes.
10      JUSTICE GREENSPAN:  Make sure that goes on the
11  record.
12      MR. THORNBURGH:  It is.  And thank you so
13  much.  Thank you so much, your Honor.  Appreciate
14  it.
15      MR. SNELL:  Agreed.  Thank you for your
16  guidance.
17      JUSTICE GREENSPAN:  Okay.  That's fine.  Okay.
18      MR. SNELL:  Have a great day.
19      JUSTICE GREENSPAN:  Very good.  Thank you.
20      MR. SNELL:  Bye.
21      JUSTICE GREENSPAN:  Bye.
22      (WHEREUPON, the conference call with
23          Justice Greenspan was concluded.)
24

Page 113

1       (WHEREUPON, the following further
2           proceedings were had off the video
3           record:)
4       MR. SNELL:  If it's leading, I got to tell you
5   leading.  Otherwise I just object.
6       MR. BRADFORD:  Leading, you know, if
7   there's --
8       MR. SNELL:  No, no, no.  Don't come in here --
9   no, Brad.
10      MR. BRADFORD:  To the form of the question,
11  leading, compound.  If there is a form problem with
12  the question that can be fixed, that's different
13  than a substantive objection.  Leading, compound,
14  something like that that can be fixed.
15      MR. SNELL:  "Something like that."  This is
16  the slippery slope, "something like that," Brad.
17      MR. THORNBURGH:  No, listen, what he is saying
18  is if your objection is to something that I can fix
19  like --
20      MR. SNELL:  You can fix a lot, all this stuff.
21  You can fix a lot of it.
22      MR. THORNBURGH:  No.
23      MR. SNELL:  I thought our agreement was as to
24  leading.  Otherwise I just say "Objection."  Now we

29 (Pages 110 to 113)

Bruce Alan Rosenzweig, M.D.

Page 114

 1    are changing? I'm not changing that.
 2          MR. THORNBURGH: It's okay. Just -- it's to
 3    leading. I don't care.
 4          I don't ask compound questions.
 5             (WHEREUPON, the deponent entered the
 6             proceedings.)
 7             (WHEREUPON, the following
 8             proceedings were had on the video
 9             record:)
10          THE VIDEOGRAPHER: The time is 11:20 a.m. and
11    we're back on the video record.
12    BY MR. THORNBURGH:
13       Q.   Doctor, before we went off the record,
14    we were discussing Exhibit P1527 and we were on
15    page 4 of the document that was attached, the
16    charter agreement, Bates number ending in 857.
17    Okay?
18       A.   Yes.
19       Q.   Are you there? And we were discussing
20    the "Critical Assumptions" section, is that
21    correct?
22       A.   Yes.
23       Q.   Okay. And what does the critical --
24    what does that sentence under "Critical

Page 115

 1    Assumptions" say?
 2          MR. SNELL: Object.
 3    BY THE WITNESS:
 4       A.   "What are the assumptions about the
 5    project, which if incorrect, could result in a
 6    no-go decision?"
 7    BY MR. THORNBURGH:
 8       Q.   And what is the first bullet point that
 9    was a critical assumption that if incorrect would
10    result in a no-go decision?
11       A.   "Shorter" --
12          MR. SNELL: Object.
13    BY THE WITNESS:
14       A.   "Shorter mesh implanted will provide
15    equivalent efficacy compared to current mesh length
16    and position in both the retropubic and obturator
17    direction."
18    BY MR. THORNBURGH:
19       Q.   And what's your understanding of that --
20    that assumption that if incorrect would result in a
21    no-go decision?
22          MR. SNELL: Object.
23    BY THE WITNESS:
24       A.   That if the equivalency -- if the

Page 116

 1    shorter mesh was not found to have equivalent
 2    efficacy, that would lead to a no-go decision.
 3    BY MR. THORNBURGH:
 4       Q.   Equivalent efficacy to what products?
 5       A.   The full-length TVT and TVT-O products.
 6       Q.   Okay. In layman -- in layperson terms,
 7    what does it mean to -- what does "equivalent
 8    efficacy" mean?
 9       A.   If -- that means that it works to treat
10    the condition, which is incontinence, to about the
11    same level.
12       Q.   Okay. So, if -- if it was determined
13    before they launched the product that the TVT-Secur
14    did not work as well as the TVT Retropubic or the
15    TVT-Obturator, the TVT-O, what is your
16    understanding as to what this no-go decision would
17    require?
18          MR. SNELL: Object.
19    BY THE WITNESS:
20       A.   That they not launch the product.
21    BY MR. THORNBURGH:
22       Q.   And is that an appropriate decision to
23    make under such circumstances?
24          MR. SNELL: Object.

Page 117

 1    BY THE WITNESS:
 2       A.   Yes.
 3    BY MR. THORNBURGH:
 4       Q.   And do you know whether or not, and
 5    we'll talk about it in greater detail, do you know
 6    whether or not Ethicon ever determined before they
 7    launched the TVT-Secur product that the TVT-Secur
 8    was less effective than the other devices that they
 9    had in their playground such as the TVT Retropubic
10    and the TVT-Obturator?
11          MR. SNELL: Object.
12    BY THE WITNESS:
13       A.   Yes.
14    BY MR. THORNBURGH:
15       Q.   And what was their -- what was the
16    finding?
17       A.   That it was less effective.
18       Q.   And, so, based on this critical
19    assumption, what could Ethicon have done when they
20    determined that?
21       A.   Not launch the product.
22       Q.   And do you have an opinion whether or
23    not Ethicon should or should not have launched the
24    TVT-Secur product after they determined that it

30 (Pages 114 to 117)

Bruce Alan Rosenzweig, M.D.

Page 118

1  lacked equivalent efficacy to the TVT Retropubic or
2  TVT-Obturator products?
3      A.   Yes, I have an opinion.
4      Q.   What's that opinion?
5      A.   That they should not have launched it.
6      Q.   If we turn to the page ending in
7  ETH.MESH.07898861 of Exhibit P1527, could you tell
8  us what part of this page is important to your
9  opinions?
10      MR. SNELL:  Object; leading.
11  BY MR. THORNBURGH:
12      Q.   What's the next page that you'd like to
13  discuss with the ladies and gentlemen of the jury?
14      A.   The -- it's marked as page 8 in the
15  document.
16      Q.   And what's the significance of this
17  page with respect to your opinions in this case?
18      A.   There is a discussion about how the
19  TVT X, which ultimately became the TVT-Secur, would
20  prevent the erosion of the pricing of the current
21  slings and would help prevent loss of market share,
22  but that some of the current users of their
23  products would then switch to using the TVT-Secur.
24      Q.   Okay.  And if we -- is there any other

Page 119

1  section on this page that you'd like to discuss
2  with the jury?
3      A.   Yes.
4      Q.   And what's that?
5      A.   That they are going to state that the
6  product characteristics or claims about the product
7  will be similar to the current TVT products.
8      Q.   And if we just pull up that paragraph
9  that you're at.  Are you at the second-to-last
10  bolded section on this page?
11      A.   The last bolded section, "What claims
12  will we make for the proposed solution?"
13      Q.   Okay.  And it says, "Product claims will
14  be similar to our classic TVT products, but we will
15  add additional claims of being less invasive, which
16  should not require a study to validate."
17      Did I read that correctly?
18      A.   Yes.
19      Q.   And how is that important, if at all, to
20  your opinions?
21      A.   Well, they're going to state that the
22  product characteristics of this new product that
23  had never been used before, never been tested, have
24  device characteristics such as the short, stiff,

Page 120

1  laser-cut, rigid mesh, the sharp arrow tip
2  introducer and the fleece tips that would hold the
3  sling in place to treat stress urinary
4  incontinence, those had never been used before but
5  they are going to claim that it is similar to the
6  products that had already been on the market.
7      Q.   And is it appropriate for a company to
8  make claims that are unproven?
9      MR. SNELL:  Object.
10  BY THE WITNESS:
11      A.   No.
12  BY MR. THORNBURGH:
13      Q.   Why is that?
14      Let me ask a better question.
15      Do you have an opinion whether or not it
16  is appropriate for a medical device company to make
17  claims about their products that are not proven?
18      MR. SNELL:  Same objection.
19  BY THE WITNESS:
20      A.   I do have an opinion.
21  BY MR. THORNBURGH:
22      Q.   What's that opinion?
23      A.   It is not appropriate.
24      Q.   Why not?

Page 121

1      A.   Because one should make claims about a
2  product that is based on -- on evidence derived
3  from clinical testing.
4      Q.   Do you have an opinion about whether or
5  not Ethicon or at least Ethicon's employees had an
6  understanding that the TVT-Secur was different, a
7  different device than the TVT Retropubic or the
8  TVT-Obturator?
9      MR. SNELL:  Objection.
10  BY THE WITNESS:
11      A.   Yes.
12  BY MR. THORNBURGH:
13      Q.   And what's that opinion?
14      A.   That they knew it was a different
15  device.
16      Q.   And what's the basis for that opinion?
17      A.   Internal documents and deposition
18  testimony.
19      Q.   And will we discuss some of those
20  documents today?
21      A.   Yes.
22      Q.   What's the next page that you'd like to
23  discuss in this exhibit?
24      A.   Page 15.

31 (Pages 118 to 121)

Bruce Alan Rosenzweig, M.D.

Page 122

1      Q.   Is that ETH.MESH ending in 868 of
2  Exhibit P1527?
3      A.   That is correct.
4      Q.   And what section or what section of this
5  page do you want to discuss?
6      A.   It's called "Risk Assessment."  It is
7  the "Assumptions to Achieve Commitment," commitment
8  meaning the commitment to proceed with the -- with
9  the project.
10      Q.   Okay.  And how is or what is significant
11  on this page with respect to the opinions you are
12  offering?
13      MR. SNELL:  Object.  Go ahead.
14  BY THE WITNESS:
15      A.   That one of the assumptions is that
16  there will be no significant design changes at the
17  start of a study that is being planned to be done
18  before the device is marketed.
19  BY MR. THORNBURGH:
20      Q.   Okay.  And -- and what's the next bullet
21  point you'd like to discuss, if any?
22      A.   That the timeline assumes that there
23  will be no design changes and the start of the
24  study assumes that there will be no design changes

Page 123

1  in the characteristics of the device, that the
2  design is frozen meaning that there will be no
3  changes made to the device.
4      Q.   All right.  Let me -- let's look at the
5  second bullet point.  It says, "Timeline assumes
6  results of the pre-market study does not require
7  design changes."
8           What does that mean?  What's your
9  understanding of that?  How is that specific bullet
10  point significant to your opinions?
11      A.   It's significant that this assumes that
12  a study that is done in live women prior to the
13  device being put on the market will not require any
14  changes in the design characteristics of the
15  device.
16      Q.   Okay.  In other words, are you telling
17  the ladies and gentlemen of the jury that if a
18  pre-market study had found that there were problems
19  with the design of the device, does this -- would
20  this have required the company to go back and fix
21  those design issues before they launched the
22  product?
23      MR. SNELL:  Objection, including leading on
24  that one.

Page 124

1  BY THE WITNESS:
2      A.   Yes.
3  BY MR. THORNBURGH:
4      Q.   Let me ask a better way.
5           If Ethicon, based on your review of the
6  documents, including this document in particular,
7  if Ethicon had performed a pre-market study, in
8  other words, a study before they launched the
9  TVT-Secur, that determined that there were issues
10  with the device in terms of its design
11  characteristics, what would occur?
12      A.   Those --
13      MR. SNELL:  Same objection.
14  BY THE WITNESS:
15      A.   Those design characteristics should be
16  changed to make the device either safer or more
17  effective.
18  BY MR. THORNBURGH:
19      Q.   And what would -- how would that impact,
20  if at all, the -- Ethicon's timeline for launching
21  the product?
22      A.   It would make the timeline longer.  The
23  current timeline assumes that they -- that the
24  pre-market study will find neither an effectiveness

Page 125

1  issue or a safety issue that would require changes
2  in the design characteristics.
3      Q.   And we had looked at a number of
4  sections of this document, including a section that
5  had discussed Ethicon's desire to become first to
6  market, the mini-sling.  Do you recall that --
7      MR. SNELL:  Objection.
8  BY MR. THORNBURGH:
9      Q.   -- testimony?
10      MR. SNELL:  Objection including leading.
11  BY THE WITNESS:
12      A.   Yes.
13  BY MR. THORNBURGH:
14      Q.   And how could this -- how could a
15  negative result in the pre-market studies that
16  would require a design change of the TVT-Secur, how
17  could that impact Ethicon's desire, if at all, to
18  become first to market?
19      MR. SNELL:  Object.
20  BY THE WITNESS:
21      A.   If a design change was found to be
22  warranted, that would prolong the timeline and
23  would more likely make being first to market
24  impossible.

32 (Pages 122 to 125)

Bruce Alan Rosenzweig, M.D.

Page 126

1   BY MR. THORNBURGH:
2       Q.   And how would that -- a negative finding
3   in their pre-market study that required a design
4   change, how would that negative result and design
5   change potentially impact Ethicon's market share?
6       MR. SNELL:  Object.
7   BY MR. THORNBURGH:
8       Q.   Based on your review of these documents?
9       MR. SNELL:  Object.
10  BY THE WITNESS:
11      A.   It would negatively impact their market
12  share as being first to market and is important to
13  establish a market share.
14  BY MR. THORNBURGH:
15      Q.   Okay.  Would Ethicon, based on your
16  review of this document or these documents, lose
17  money if -- if the pre-market study resulted in a
18  negative finding that required a design change that
19  resulted in a delay of launching the product which
20  resulted in a competitor bringing their product to
21  the market first?
22      MR. SNELL:  Object.
23  BY THE WITNESS:
24      A.   Yes, they would lose money.

Page 127

1   BY MR. THORNBURGH:
2       Q.   Is there any other section or page of
3   this exhibit that you'd like to discuss?
4       A.   It is page 17 or ETH.MESH ending in
5   8870.
6       Q.   Okay.  And what is significant on this
7   page of Exhibit P1527?
8       A.   It describes critical assumptions that
9   are fundamental for the project to be successful
10  but outside the control of the team that is
11  responsible for the design, development and testing
12  of the device characteristics.
13      Q.   And what section are you speaking about
14  on this page?
15      A.   It is under "Critical Assumptions."
16      Q.   And it says, "Critical Assumptions.
17  Identify critical assumptions fundamental to
18  success but outside the control of the team."
19          And there is a list of those critical
20  assumptions, is that correct?
21      A.   Correct.
22      Q.   Okay.  And No. 2 says, "New discoveries
23  drive the need for a clinical trial prior to
24  launch."

Page 128

1           What's your understanding of that
2   critical assumption and how does that, if at all,
3   support your opinions?
4       A.   Well, that -- this document shows that
5   or this document describes that as of December of
6   2004 it was a new discovery that they would need to
7   do a clinical trial prior to the launch of the
8   product.
9       Q.   And it says, "Pre-Market study outcomes
10  that drive design changes."
11          Did I read that correctly?
12      A.   Yes.
13      Q.   And how, if at all, does that critical
14  assumption support your opinions?
15      A.   Well, this supports my opinions that a
16  pre-market study is important to test the safety
17  and efficacy of a product and in -- and,
18  particularly, the design characteristics of that
19  product that would make it either less effective or
20  less safe and that a pre-market study that
21  determines if there are design characteristics that
22  make it unsafe or less effective would then drive
23  changes in those design characteristics to make it
24  more effective and more safe.

Page 129

1       Q.   And is -- let me ask you this question:
2   Do you have an opinion whether or not companies who
3   should perform adequate testing -- strike that.
4           Do you have an opinion whether or not
5   Ethicon should have performed adequate pre-market
6   studies before launching the TVT-Secur product?
7       A.   Yes, I have an opinion.
8       Q.   What's that opinion?
9       A.   They should have performed testing.
10      Q.   And if Ethicon had performed pre-market
11  human studies and found that the product lacked
12  efficacy or had safety issues, do you have an
13  opinion what Ethicon should have done?
14      MR. SNELL:  Objection.
15  BY THE WITNESS:
16      A.   Yes, either not launched the product or
17  defined what are those design characteristics that
18  either are leading to less efficacy or less -- or
19  impaired safety and changed those design
20  characteristics to improve efficacy and improve
21  safety.
22  BY MR. THORNBURGH:
23      Q.   And why, if at all, is that important?
24      A.   It's important because that impacts

33 (Pages 126 to 129)

Bruce Alan Rosenzweig, M.D.

Page 130

1    patient safety.
2        Q.   What do you mean it "impacts patient
3    safety"?
4        A.   Well, if it -- if there are
5    characteristics of the device that are unreasonably
6    unsafe, then the patient is exposed to design
7    characteristics that are unreasonably unsafe.  It
8    leads to complications.
9        A less effective device means that the
10   patient is not treated for stress urinary
11   incontinence and then would require additional
12   treatment or additional surgery to treat their
13   remaining or recurrent stress urinary incontinence.
14       Q.   What's the next exhibit that you'd like
15   to discuss?
16       A.   It is marked P0732.  It is an e-mail
17   between Ethicon employees, including Dan Smith,
18   lead engineer and patent holder, one of the patent
19   holders for the TVT-Secur.  It's from December 14,
20   2004, and it is describing the comparison between
21   laser-cut mesh and mechanical-cut mesh.
22       Q.   Okay.  And how does this Exhibit 732
23   support your opinions, if at all?
24       A.   It supports my opinions that laser-cut

Page 131

1    mesh is three times stiffer than mechanical-cut
2    mesh, making the short TVT-Secur stiffer than the
3    full-length TVT devices that were on the market in
4    2004 through the time of launch in 2006.
5        Q.   Does that matter?
6        MR. SNELL:  Objection.
7    BY MR. THORNBURGH:
8        Q.   Do you have an opinion whether or not it
9    matters that the TVT laser-cut mesh was more stiff
10   than laser-cut mesh?
11       MR. SNELL:  Objection.
12   BY MR. THORNBURGH:
13       Q.   Does that -- is there -- let me ask a
14   better question.
15       Do you have an opinion whether or not
16   there is any clinical significance to a -- having a
17   stiffer mesh device?
18       A.   Yes.  A stiffer mesh device is a design
19   characteristic that increases harm to women.
20   Stiffness of the mesh increases the chronic
21   inflammation, chronic foreign body reaction, the
22   degree of scar-plating that occurs which results in
23   the injuries, mesh erosion, mesh contraction, which
24   can obstruct the urethra, and can lead to pain and

Page 132

1    pain with intercourse.
2        Q.   What's the basis for that opinion,
3    Doctor?
4        A.   The medical literature.
5        Q.   And will we -- will we review some of
6    those medical literature today?
7        MR. SNELL:  Objection; leading.
8    BY MR. THORNBURGH:
9        Q.   Let me say it a better way.  We'll
10   discuss some of those later on.
11       Is it fair to say that we will discuss
12   some of those supporting --
13       A.   That is --
14       Q.   -- medical literature later today?
15       MR. SNELL:  Objection; leading.
16   BY THE WITNESS:
17       A.   That has been described in my prior
18   testimony, yes.
19       I'd also like to point out that this
20   document also found that at one inch of stress,
21   laser-cut mesh was three times stiffer than
22   mechanical-cut mesh.
23       However, attached to this document is a
24   comparison with other competitors which showed that

Page 133

1    laser-cut mesh was less stiff and establishing a
2    lower resistance load to competitor mesh.
3        Q.   Okay.  And is that important at all in
4    your opinions?
5        A.   Yes.  Those other slings are -- have
6    design characteristics that make them unreasonably
7    unsafe.
8        Q.   So, do you have an opinion whether or
9    not because of the mesh characteristics or the
10   stiffness of the TVT laser-cut mesh, whether or not
11   those characteristics make the TVT laser-cut
12   devices unreasonably unsafe as well?
13       MR. SNELL:  Object.
14   BY THE WITNESS:
15       A.   Yes.
16       MR. SNELL:  Go ahead.
17   BY MR. THORNBURGH:
18       Q.   What's that opinion?
19       A.   That it -- the laser cutting makes the
20   TVT-Secur, the short TVT-Secur mesh unreasonably
21   unsafe due to the stiffness and rigidity associated
22   with the short mesh and compounded by the laser
23   cutting of the short mesh.
24       Q.   What's the next exhibit that you'd like

34 (Pages 130 to 133)

Bruce Alan Rosenzweig, M.D.

Page 134

1  to discuss with the ladies and gentlemen of the
2  jury?
3      A.   It's ETH.MESH ending in 9108.
4      Q.   Is there a P number, an Exhibit number?
5      A.   P1318.
6      MR. SNELL:  While you are looking, I'm just
7  going to object on P1527.  That was not on the
8  doctor's reliance list.  So, I move to strike any
9  and all testimony about that exhibit.
10     MR. THORNBURGH:  Hold on a second.  P what?
11 The last exhibit?  I'm sorry.  P1318?
12     MR. SNELL:  P1527.
13     MR. THORNBURGH:  1527.  What is that one?  The
14 charter agreement?
15     MR. SNELL:  Yes.
16     MR. THORNBURGH:  He's testified about the
17 charter agreement in multiple trials.  I think it's
18 on his reliance list, as well as the deposition
19 testimony of people who have testified about that
20 document like Renee Selman and he disclosed all
21 exhibits with respect to those witnesses that were
22 on -- attached to those transcripts as you guys
23 know.
24         So, we can resolve that issue.

Page 135

1      MR. SNELL:  It's okay.  Mr. Thornburgh made
2  his position clear.
3  BY MR. THORNBURGH:
4      Q.   I'm sorry.  Just back to where we were.
5          What exhibit do you want to discuss with
6  the ladies and gentlemen of the jury next?
7      A.   1318.
8      Q.   And I'll hand defense counsel a copy of
9  that exhibit.
10         What is that exhibit?  What is this
11 document?
12     A.   It's an e-mail string between Gary
13 Borkes, who is design quality engineer, and other
14 key Ethicon employees, including Dan Smith, who is
15 an engineer and lead engineer on the TVT-Secur
16 project, Mark Weisberg, Allison London Brown, who
17 is the worldwide project leader for the TVT-Secur,
18 discussing the design validation process.
19     Q.   Okay.  So, let me just try to understand
20 some things and orient the jury a little bit as
21 well.
22         What is a -- it says, "Des Val."  What
23 is design validation?
24     A.   It is the process by which a medical

Page 136

1  product is designed, developed and tested and the
2  steps taken to validate the design and development
3  and testing of the product.
4      Q.   And have you reviewed the TVT
5  internal -- strike that.
6          Have you reviewed the internal Ethicon
7  company documents concerning the design validation
8  of the TVT-Secur?
9      A.   Correct.
10     Q.   And is this one of those documents?
11     A.   Yes.
12     Q.   And what part of this e-mail string do
13 you want to discuss that support your opinions?
14     A.   Well, this document is discussing one of
15 the design processes, which is the -- included a
16 cadaver or series of cadaver labs where doctors and
17 surgeons were invited to come and place the device
18 in cadavers.
19         And there was a degree of difficulty,
20 which is described in the beginning of the e-mail
21 string, of -- that these doctors were having
22 trouble with the introducers and passing the device
23 in a certain -- in the appropriate place during
24 these cadaver studies, which then led to one of the

Page 137

1  people observing this, Dan Smith, coming in and
2  explained to them the way to do it.
3          And what Gary Borkes is describing is
4  that design validation is not just a box to check
5  off or, as he describes in the e-mail, a hurdle to
6  pass, but the way things should be done.
7          It's important to get this right so that
8  any characteristics of the device that make it
9  unreasonably unsafe or unreasonably less effective
10 can be discovered so that those characteristics can
11 be changed to make the device more effective and
12 more safe.
13     Q.   Okay.  So, let me break that down a
14 little bit because that was a lot of information.
15         You had indicated that design validation
16 is a tool for understanding potential issues with a
17 device or with the IFU?
18     MR. SNELL:  Object and leading.
19 BY MR. THORNBURGH:
20     Q.   What is the purpose of design
21 validation?
22     A.   Well, to validate all of the
23 characteristics of the device, which includes the
24 device, would include the Instructions for Use, the

35 (Pages 134 to 137)

Bruce Alan Rosenzweig, M.D.

Page 138

1    technique to implant the device, and the training
2    on how to implant the device.
3        Q.   And at this point in time, in 2005, with
4    respect to the design validation, what was Ethicon
5    attempting to do?
6        MR. SNELL:  Object.
7    BY MR. THORNBURGH:
8        Q.   What, if anything, was Ethicon
9    attempting to do?
10       A.   Well, this is describing cadaver labs
11   that were being done.  This is to see how doctors
12   are able to use the device albeit in a dead body or
13   a cadaver.
14       Q.   And are these -- is this design
15   validation process an important process to the
16   ultimate development and launch of products?
17       A.   Yes.  This helps the design team
18   discover characteristics of the device that either
19   make it unreasonably unsafe or make it ineffective.
20       Q.   What, if anything, can happen to
21   patients if design validation protocols aren't
22   followed?
23       MR. SNELL:  Object.
24   BY THE WITNESS:

Page 139

1        A.   A device that has device characteristics
2    that make it unreasonably unsafe or make it
3    ineffective in treating the condition that it is
4    being used for, if the design validation process is
5    not done completely, accurately and effectively,
6    would mean that those characteristics get into a
7    device and women are exposed to the design
8    characteristics that make it unreasonably unsafe or
9    less effective.
10   BY MR. THORNBURGH:
11       Q.   Do you have an opinion whether or not
12   companies should take their time in performing
13   design validation studies?
14       MR. SNELL:  Object.
15   BY THE WITNESS:
16       A.   Yes.
17   BY MR. THORNBURGH:
18       Q.   What's that opinion?
19       MR. SNELL:  Same objection.
20   BY THE WITNESS:
21       A.   That they should take their time and
22   know -- both clinically test and test in the design
23   validation process all the characteristics of a
24   medical device to determine whether they are

Page 140

1    unreasonably unsafe or if they impact the
2    effectiveness of the device.
3    BY MR. THORNBURGH:
4        Q.   Now, I just want to have you orient this
5    for the jury, ladies and gentlemen of the jury.
6            If we look at ETH.MESH.05559109 of
7    Exhibit 1318, there is a discussion that's
8    occurring with Gary Borkes to a number of other
9    Ethicon employees, is that correct?
10       MR. SNELL:  Object; leading.
11   BY THE WITNESS:
12       A.   Yes.
13   BY MR. THORNBURGH:
14       Q.   And without having to run through all of
15   this lengthy sort of -- these lengthy comments, the
16   first bullet point says, "He commented that
17   (somehow) he was shown how to attach the needle
18   holder prior to starting the training; and if it
19   wasn't for that, in his opinion the technique was
20   not clearly defined via the draft IFU verbiage or
21   the picture."
22           Did I read that correctly?
23       MR. SNELL:  Object and leading.
24   BY THE WITNESS:

Page 141

1        A.   Yes.
2    BY MR. THORNBURGH:
3        Q.   And do you have any opinions about that
4    issue, in other words -- said, in other words --
5    strike that.
6            Do you have any opinions whether or not,
7    with respect to this TVT-Secur design validation,
8    it would have been appropriate for an Ethicon
9    employee to show one of the physicians who were
10   participating in this design validation how to
11   perform the technique without letting the doctor
12   try to figure out based on his or her review of the
13   IFU how to do the procedure with only using the
14   IFU?
15       MR. SNELL:  Object.
16   BY THE WITNESS:
17       A.   I do have an opinion.
18   BY MR. THORNBURGH:
19       Q.   And what's that?
20       A.   That would not be appropriate.
21       Q.   And why is that?
22       A.   Because the Instructions for Use is the
23   one document that the manufacturer knows that every
24   physician has at the most crucial time of placing

36 (Pages 138 to 141)

Bruce Alan Rosenzweig, M.D.

Page 142

1    the device, which is at the time that the device is
2    being placed.  The Instructions for Use should be
3    able to describe how a device is implanted.
4         If this doctor, who is described in this
5    e-mail, could not clearly -- if the technique could
6    not be clearly defined via the draft of the IFU
7    verbiage, then that shows that the IFU verbiage has
8    characteristics of it that make it unreasonably
9    unsafe or defective.
10        Q.  In this first bullet point what was
11   being recommended?
12        A.  That there might be or there would be
13   benefit for making the steps that are described in
14   the procedural steps more clear and accurate so
15   that a doctor would be able to use the Instructions
16   for Use in a safe and effective way to implant the
17   device in women.
18        Q.  Okay.  And does Dan Smith respond to the
19   comments that Gary Borkes shared?
20        A.  Yes.
21        Q.  And what was Dan Smith's response?
22        MR. SNELL:  Object.
23   BY THE WITNESS:
24        A.  Basically he states that "I am through

Page 143

1    making non-value added changes to a document," and
2    that document is the Instructions for Use.
3    BY MR. THORNBURGH:
4         Q.  Dan Smith a doctor or not doctor?
5         MR. SNELL:  Objection.
6    BY THE WITNESS:
7         A.  He is not a doctor.
8    BY MR. THORNBURGH:
9         Q.  Is it appropriate, in your opinion, for
10   Ethicon to allow non-doctors to make decisions
11   about information that should be shared with
12   doctors?
13        MR. SNELL:  Objection.
14   BY MR. THORNBURGH:
15        Q.  About the proper implantation technique
16   for the TVT-Secur device?
17        MR. SNELL:  Same objection.
18   BY THE WITNESS:
19        A.  That should be the Medical Affairs
20   purview.
21   BY MR. THORNBURGH:
22        Q.  And so, if we look at 1318, the first
23   page, Dan Smith writes, "Gary, please find my
24   comments below and do not take this the wrong way,

Page 144

1    but I am through making non-value added changes to
2    a document that is 1,000 times more accurate and
3    complete than TVT."
4         Did I read that correctly?
5         A.  Yes.
6         MR. SNELL:  Objection and leading.
7    BY MR. THORNBURGH:
8         Q.  Dan Smith goes on and says or writes, "I
9    have drawn the line, unless someone can demonstrate
10   a 'real' deficiency in the document.  This is a
11   waste of time and it is holding up the project in
12   many ways."
13        Did I read that correctly?
14        MR. SNELL:  Object and leading.
15   BY THE WITNESS:
16        A.  Yes.
17   BY MR. THORNBURGH:
18        Q.  And is it appropriate for Dan Smith, the
19   inventor or co-inventor of the TVT-Secur device,
20   who is a non-doctor, to be pushing back on whether
21   or not the IFU should be changed to make it more
22   accurate so that physicians can safely implant the
23   TVT-Secur device?
24        MR. SNELL:  Object.

Page 145

1    BY THE WITNESS:
2         A.  Yes, I have an opinion.
3    BY MR. THORNBURGH:
4         Q.  What's that opinion?
5         A.  No, it is not appropriate.
6         Q.  And Gary Borkes responds.  Do you see
7    that?
8         A.  Yes.
9         Q.  And Gary Borkes is -- who is Gary
10   Borkes?  Is he another employee of Ethicon?
11        A.  He is a design quality engineer.
12        Q.  Okay.  And Gary Borkes responds and
13   says, "Please don't take this the wrong way...but
14   why do you think we are doing design validation
15   exercises?"
16        Did I read that correctly?
17        A.  Yes.
18        MR. SNELL:  Objection and leading.
19   BY MR. THORNBURGH:
20        Q.  He goes on and writes, "It is not just
21   another hurdle to 'pass,' although I get the
22   impression that some might feel that way."
23        Did I read that correctly?
24        MR. SNELL:  Object and leading.

37 (Pages 142 to 145)

Bruce Alan Rosenzweig, M.D.

Page 146

1   BY THE WITNESS:
2       A.   Yes.
3   BY MR. THORNBURGH:
4       Q.   Do you agree with Gary Borkes?
5       A.   Yes.
6       Q.   He writes, goes on and writes towards
7   the end of this second paragraph, "I believe the
8   timeline pressures are recognized and felt by
9   everyone - believe me, Dan, the overwhelming load
10  (even me - how about that). But we also have to
11  properly evaluate user input, or it could bite the
12  product down the road."
13           Did I read that correctly?
14      MR. SNELL:  Object and leading.
15  BY THE WITNESS:
16      A.   You missed one line that says, "Everyone
17  I talk to says how under the gun they are and how
18  much they are trying to push to support you and the
19  project despite the overwhelming load."
20           But beside that, yes, you read that
21  correctly.
22  BY MR. THORNBURGH:
23      Q.   And do you have any opinions about this
24  response by Gary Borkes?

Page 147

1       MR. SNELL:  Object.
2   BY THE WITNESS:
3       A.   Yes, I do have an opinion.
4   BY MR. THORNBURGH:
5       Q.   What's the opinion?
6       MR. SNELL:  Same.
7   BY THE WITNESS:
8       A.   That if the design validation process is
9   not done in the appropriate manner, then
10  characteristics of the device that make it
11  unreasonably unsafe or make it unreasonably less
12  effective will not be identified prior to the
13  launch of the product and that women will be
14  exposed to a device that has design characteristics
15  that make it unreasonably unsafe or unreasonably
16  uneffective.
17  BY MR. THORNBURGH:
18      Q.   Do you have an opinion whether or not
19  Ethicon properly performed its design validation of
20  the TVT-Secur device?
21      MR. SNELL:  Object.
22  BY THE WITNESS:
23      A.   I do have an opinion.
24  BY MR. THORNBURGH:

Page 148

1       Q.   What's that opinion?
2       A.   They did not.
3       Q.   And do you have an opinion whether or
4   not Ethicon's failure to properly perform the
5   TVT-Secur design validation ended up as, using Gary
6   Borkes' words, biting the product down the road?
7       MR. SNELL:  Object and leading.
8   BY THE WITNESS:
9       A.   I do have an opinion.
10  BY MR. THORNBURGH:
11      Q.   And what's that?
12      MR. SNELL:  Same.
13  BY THE WITNESS:
14      A.   That that is a correct statement by Gary
15  Borkes.
16  BY MR. THORNBURGH:
17      Q.   And we will get into this in more --
18  more detail later on.
19           But do you have an opinion whether or
20  not the TVT-Secur ultimately was a failed product?
21      A.   Yes, I do have an opinion.
22      Q.   And what's that opinion?
23      A.   That it was a failed product.
24      Q.   And what's the basis for that opinion?

Page 149

1       A.   Internal Ethicon documents, particularly
2   a document from Dan Smith, the inventor.
3       Q.   And ultimately did -- let me ask this
4   question:  Is the TVT-Secur still on the market?
5       A.   No, it is not.
6       Q.   And do you have an understanding as to
7   why?
8       A.   It was removed from the market in 2012.
9       Q.   And do you have an understanding as to
10  whether or not the safety or efficacy of the
11  TVT-Secur product led to that determination?
12      MR. SNELL:  Object.
13  BY MR. THORNBURGH:
14      Q.   Do you have an opinion based on your
15  review of the internal documents and the medical
16  literature?
17      MR. SNELL:  Object.
18  BY THE WITNESS:
19      A.   Yes, I do.
20  BY MR. THORNBURGH:
21      Q.   What's that opinion?  What's that
22  opinion?
23      A.   That the inferior efficacy and the
24  higher adverse event profile led to it being

38 (Pages 146 to 149)

Bruce Alan Rosenzweig, M.D.

Page 150

1   removed -- was one of the issues that led to it
2   being removed from the market.
3       MR. THORNBURGH: Okay. Let's go ahead and
4   take a break.
5       THE VIDEOGRAPHER: Okay. The time is 12 noon
6   and we're going off the video record.
7           (WHEREUPON, the following
8            proceedings were had off the video
9            record:)
10      MR. SNELL: Before we go off the steno record,
11  I would note we have been unable to locate P1318 on
12  the reliance list. I move to strike any and all
13  testimony regarding P1318.
14      MR. THORNBURGH: I will show you now or I will
15  show you later. We can deal with it.
16      MR. SNELL: I'm just saying Paul has checked
17  and checked and checked. He doesn't have Borkes'
18  depo. He doesn't have this document on his
19  reliance list.
20      MR. THORNBURGH: I don't want to show him
21  Borkes' deposition. Borkes wasn't deposed.
22      MR. SNELL: It's not on his reliance list as
23  far as I can tell.
24      MR. BRADFORD: He's making an objection.

Page 151

1       MR. SNELL: I'm just making an objection. No
2   big deal.
3       MR. THORNBURGH: That's fine.
4       MR. SNELL: If I'm wrong, I'm wrong. I will
5   freely say I'm wrong. But we checked and checked.
6   I asked Paul to check four different ways.
7       THE WITNESS: I will be a witness. Burt has
8   said, "I was wrong."
9       MR. SNELL: Yes, I will freely admit when I am
10  totally wrong.
11          (WHEREUPON, a recess was had
12           from 12:00 to 1:07 p.m.)
13      THE VIDEOGRAPHER: The time is 1:07 p.m. and
14  we're back on the video record.
15  BY MR. THORNBURGH:
16      Q.  Good afternoon, Doctor.
17      A.  Good afternoon.
18      Q.  Dr. Rosenzweig, what's the next exhibit
19  in your binder, which is I think we've marked as
20  Exhibit No. 5, that you'd like to discuss?
21      A.  P number 1177. It's the Clinical Expert
22  Report for the TVT-Secur device authored by
23  Dr. Martin Weisberg and dated December 2, 2005.
24      Q.  And who is Dr. Weisberg?

Page 152

1       A.  Dr. Weisberg is a Senior Medical
2   Director at Ethicon.
3       Q.  And what is the title of this document?
4       A.  It's the Clinical Expert Report for the
5   TVT-Secur.
6       Q.  And you testified just a moment ago this
7   was dated December 2, 2005?
8       A.  Correct.
9       Q.  And when was the TVT-Secur product
10  launched?
11      A.  September --
12      MR. SNELL: Object.
13  BY THE WITNESS:
14      A.  September 20, 2006.
15  BY MR. THORNBURGH:
16      Q.  Okay. And was this document signed a
17  little less than a year prior to the launch of the
18  TVT-Secur product?
19      A.  Yes.
20      Q.  And you've testified previously about
21  randomized controlled trials and what they are. Is
22  that correct?
23      A.  Yes.
24      Q.  And I don't want to go into great

Page 153

1   detail, but what is a randomized controlled trial?
2       A.  Randomized controlled trials are high
3   level evidence, some of the highest level of
4   evidence in a single clinical study where a
5   hypothesis is generated, a method of looking at
6   that hypothesis is created, and patients are put in
7   either one group getting treatment or another
8   group, which is called the control group.
9           They're randomly assigned, which should
10  make the groups equal in their similarity as far as
11  medical conditions, age, and the like, and then the
12  data is collected and analyzed.
13      Q.  Did Ethicon -- do you know whether or
14  not Ethicon had conducted a randomized controlled
15  trial prior to launching or selling to patients or
16  doctors the TVT-Secur device?
17      MR. SNELL: Object.
18  BY THE WITNESS:
19      A.  They did not.
20  BY MR. THORNBURGH:
21      Q.  Let me ask that a better way since I got
22  an objection.
23          Do you know whether or not Ethicon
24  deducted a randomized controlled trial prior to

Bruce Alan Rosenzweig, M.D.

Page 154

1   launching the TVT-Secur product?
2       A.   They did not.
3       Q.   Do you know whether or not Ethicon had
4   initially planned on conducting a randomized
5   controlled trial before launching the TVT-Secur?
6       MR. SNELL:  Object.
7   BY THE WITNESS:
8       A.   Yes, I saw documents that discussed
9   conducting a randomized controlled trial.
10  BY MR. THORNBURGH:
11      Q.   And do you have an understanding as to
12  the reason why Ethicon chose not to conduct a
13  randomized controlled trial prior to launching the
14  product?
15      MR. SNELL:  Object.
16  BY THE WITNESS:
17      A.   Yes.
18  BY MR. THORNBURGH:
19      Q.   And what's that understanding?
20      A.   Due to budget constraints.
21      Q.   And what's the basis for that opinion,
22  that testimony?
23      A.   Internal Ethicon documents.
24      Q.   And ultimately did Ethicon conduct any

Page 155

1   study in humans before they launched the TVT-Secur
2   product?
3       A.   There was a study that was started, if I
4   recall, in April of 2006 and prior to launch they
5   had data, five-week data on 31 patients.
6       Q.   Okay.  And, so, this document, dated
7   December 2, 2005, was signed prior to the beginning
8   of the clinical study that was done by Ethicon?
9       A.   Yes, based on my understanding.
10      Q.   Okay.  And the clinical study that was
11  done prior to launch, can you just briefly describe
12  what kind of study that was, how many patients and
13  the duration of the available data at launch?
14      A.   Well, it was a prospective study that
15  was done at several centers and they had data on 31
16  patients that had been treated with the TVT-Secur
17  and had the TVT-Secur in them for five weeks.
18      Q.   Okay.  And did you also read the
19  testimony of Dr. Martin Weisberg?
20      A.   Yes.
21      Q.   And did you rely at least in part on the
22  testimony of Dr. Martin Weisberg for your opinions?
23      A.   Yes.
24      Q.   And if you just turn with me to Bates

Page 156

1   No. from P1177 ending in 243, and just let me know
2   when you're there.
3       A.   Yes.
4       Q.   What's the significance, if any, of this
5   page from Exhibit P1177?
6       A.   Well, as of December 2, 2005,
7   Dr. Weisberg concluded that additional clinical
8   studies to support the safety and effectiveness are
9   not necessary prior to releasing the product.
10      Q.   Did -- do you know whether or not
11  Dr. Weisberg had signed off on the safety and
12  efficacy of the TVT-Secur product prior to launch?
13      A.   Yes.
14      Q.   Is that what this document is?
15      A.   Yes.
16      Q.   How does this document support your
17  opinions with respect to the clinical control
18  studies or the First Human Use Study that we'll
19  talk about later on that were done -- that was done
20  by Ethicon in April, began in April of 2006?
21      MR. SNELL:  Object.
22  BY MR. THORNBURGH:
23      Q.   Let me ask a better question.
24          How does this document or this section

Page 157

1   of the document support your opinions?
2       A.   As of December 2, 2005, Dr. Weisberg had
3   already concluded -- Dr. Weisberg, the Medical
4   Director at Ethicon, had already concluded that
5   additional clinical studies were not necessary to
6   determine safety and efficacy of the product prior
7   to release.
8       Q.   Do you agree with that determination by
9   Dr. Weisberg?
10      A.   No.
11      Q.   Did Dr. Weisberg sign off on the safety
12  and efficacy of the TVT-Secur product before the
13  clinical data had ever been analyzed?
14      MR. SNELL:  Object.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. THORNBURGH:
18      Q.   And I want to talk about this in greater
19  detail later on, but the First Human Use Study or
20  the first human study that Ethicon did, when was
21  the interim data available to Ethicon?
22      A.   The interim data was looked at two weeks
23  prior to launch.
24      Q.   And do you have an opinion whether or

40 (Pages 154 to 157)

Bruce Alan Rosenzweig, M.D.

Page 158

1    not the first human clinical data interim analysis
2    supported the safety and efficacy of the TVT-Secur
3    product?
4        A.   Yes, I do have an opinion.
5        Q.   What's that opinion?
6        A.   It did not support the safety and
7    efficacy of the TVT-Secur.
8        Q.   Do you have an opinion whether or not
9    Ethicon should have conducted a randomized
10   controlled trial before signing off on the safety
11   and efficacy of the TVT-Secur product?
12       A.   Yes, I do have an opinion.
13       Q.   What's that opinion?
14       A.   They should have done a randomized
15   controlled trial before signing off on the safety
16   and efficacy of the product.
17       Q.   Do you have an opinion whether or not
18   Ethicon should have at least waited for the
19   five-week 31 patient interim data before signing
20   off on the safety and efficacy of the Ethicon
21   TVT-Secur product?
22       MR. SNELL:  Object.
23   BY THE WITNESS:
24       A.   Yes, I do have an opinion.

Page 159

1    BY MR. THORNBURGH:
2        Q.   And what's that opinion?
3        A.   That the safety and efficacy -- the data
4    from the five-week 31 patients should have been an
5    important consideration to look at prior to signing
6    off on the Clinical Expert Report and deeming that
7    no further safety and efficacy data is necessary
8    prior to launch.
9        Q.   And did the interim data from the First
10   Human Use Study, was that available prior to
11   launch?
12       A.   The interim data, yes.
13       Q.   When did that data become available?
14       MR. SNELL:  Object.
15   BY THE WITNESS:
16       A.   Again, it was looked at two weeks prior
17   to launch.
18   BY MR. THORNBURGH:
19       Q.   And do you have an opinion whether or
20   not the interim data supported the safety and
21   efficacy of the TVT-Secur product?
22       MR. SNELL:  Object; repetition.
23   BY THE WITNESS:
24       A.   I do have an opinion.

Page 160

1    BY MR. THORNBURGH:
2        Q.   What's that opinion?
3        A.   That it did not support the safety and
4    efficacy of the TVT-Secur.
5        Q.   And why not?
6        MR. SNELL:  Object.
7    BY THE WITNESS:
8        A.   The failure rate was approximately 30%
9    and the complication rate was approximately 60%.
10   BY MR. THORNBURGH:
11       Q.   Based on your review of Dr. Weisberg's
12   Clinical Expert Report and the other interim -- and
13   the other internal documents that we'll discuss
14   today, do you have an opinion whether or not the
15   clinical study that was done by Ethicon mattered to
16   Dr. Weisberg or the Medical Affairs department in
17   terms of determining whether the TVT-Secur product
18   was safe and effective?
19       MR. SNELL:  Object.
20   BY THE WITNESS:
21       A.   Yes, I do.
22   BY MR. THORNBURGH:
23       Q.   What's that opinion?
24       A.   That it did not seem to be important --

Page 161

1    that that data did not seem to be important in the
2    decision whether or not to launch the product.
3        Q.   Other than the five-week 31 patient
4    First Human Use interim data, what other studies
5    did Ethicon do in humans, live humans, prior to
6    launching the TVT-Secur product?
7        MR. SNELL:  Object.
8    BY MR. THORNBURGH:
9        Q.   Go ahead.
10       A.   None.
11       Q.   Did Ethicon do any studies of the
12   TVT-Secur product prior to launch other than the
13   interim First Human Use Study?
14       A.   There was a sheep study that was done in
15   live sheep that was done in 2004.  There was a
16   sheep cadaver study that was performed in 2005.
17   And then there were human cadaver studies that
18   were -- that were performed.
19       Q.   Now, the live sheep study, was that done
20   on -- was that study performed using the TVT-Secur
21   product in final form as it was sold to doctors for
22   implantation into patients?
23       A.   No, it was not.
24       Q.   What was that -- what was the -- strike

Bruce Alan Rosenzweig, M.D.

Page 162

1    that.
2         What was the test or tested product in
3    the TVT -- strike that.
4         What product was tested in the sheep
5    study on live sheep?
6         A.   It was called the TVT X, which was at
7    that point 12 centimeters long and had a different
8    fleece end.  The original embodiment had four
9    finger projections.  During the study they changed
10   that to three finger projections.
11        Q.   Do you have an opinion whether or not
12   the TVT X live sheep study supported the safety and
13   efficacy of the TVT-Secur product?
14        A.   Yes, I do have an opinion.
15        Q.   What is that opinion?
16        A.   No, it did not support it.
17        Q.   Did any of the animal studies, the live
18   sheep study or the study that was done in these
19   cadavers, and by cadavers, you understand I mean
20   dead sheep, did any of those -- either of those
21   studies support the safety or efficacy of the
22   TVT-Secur product to be used in human patients?
23        A.   No, it did not.
24        Q.   Why not?

Page 163

1         A.   It was not designed to look at safety
2    and effectiveness in the humans of the final
3    product that was sold starting September 20, 2006.
4         Q.   Turning back to P1177, if you turn with
5    me to Bates number ending in 5241, there is a list
6    of potential complications that are identified.
7         Do you see that?
8         A.   Yes.
9         Q.   And did Ethicon have any human data
10   related to or specifically related to the TVT-Secur
11   product prior to identifying these potential
12   complications with the TVT-Secur product?
13        MR. SNELL:  Object.
14   BY THE WITNESS:
15        A.   No, they did not.
16   BY MR. THORNBURGH:
17        Q.   Did Ethicon identify these potential
18   complications prior to ever conducting a human
19   study?
20        A.   A live human study?  No.
21        Q.   And have you also reviewed -- strike
22   that.
23        You testified that you reviewed the
24   testimony of Dr. David Weisberg?

Page 164

1         A.   Martin Weisberg.
2         Q.   Mark Weisberg.  Thank you.
3         You've reviewed the testimony of
4    Dr. Mark --
5         A.   Martin.
6         Q.   -- Martin Weisberg?
7         A.   Yes.
8         Q.   And did you review -- strike that.
9         Do you have an understanding based on
10   your review of Dr. Martin Weisberg's deposition
11   whether or not he understood what the risks were
12   associated with the TVT-Secur product prior to
13   launch?
14        MR. SNELL:  Object.
15   BY THE WITNESS:
16        A.   Yes.
17   BY MR. THORNBURGH:
18        Q.   I want to do a side-by-side of
19   Exhibit P0871.  Do you have P0871?
20        A.   Yes.
21        Q.   That's the TVT-Secur IFU?  Do you have
22   that in front of you?
23        A.   Yes.
24        Q.   Okay.  And if you turn to the -- to

Page 165

1    ETH.MESH.02340589 of Exhibit P871, you'll see a
2    "Adverse Reactions" section?
3         A.   Yes.
4         Q.   And does the potential complications
5    that were listed by Martin Weisberg in his Clinical
6    Expert Report dated December 2, 2005 match the
7    "Adverse Reactions" section which made it into the
8    final TVT-Secur IFU?
9         A.   Yes.
10        Q.   Do you have an opinion whether or not
11   the "Adverse Reactions" section in the IFU contains
12   a complete and accurate disclosure of the risks
13   that Ethicon knew or should have known about prior
14   to launching the TVT-Secur product?
15        MR. SNELL:  Object.
16   BY THE WITNESS:
17        A.   Yes, I do have an opinion.
18   BY MR. THORNBURGH:
19        Q.   And what's that opinion?
20        A.   It is an incomplete list of all the
21   adverse reactions that are associated with the
22   TVT-Secur device.
23        Q.   I'm going to hand you P2377.  Do you
24   have P2377 in your binder?

42 (Pages 162 to 165)

Bruce Alan Rosenzweig, M.D.

Page 166

1    A.   Yes.
2       MR. THORNBURGH:  I will hand defense counsel
3    P2377.  Thank you.
4       And if you can, put P2377 side by side
5    on the screen with Exhibit P1177, ETH.MESH ending
6    in 241, and the "Adverse Reactions" section in P871
7    of the IFU ending in Bates No. 589.  Can you put
8    all three of those documents up.
9       MR. SNELL:  Note my objection to P1640.
10   BY MR. THORNBURGH:
11      Q.   Doctor, what is P2377?
12      A.   It is an exhibit from Dr. Weisberg's
13   testimony.
14      Q.   What did Dr. Weisberg testify to
15   concerning Exhibit P2377?
16      MR. SNELL:  Object.
17   BY THE WITNESS:
18      A.   That these were adverse reactions that
19   were known since the time of launch of the TVT
20   device.
21   BY MR. THORNBURGH:
22      Q.   And when was the TVT device launched?
23      A.   Either the end of -- very end of 1997 or
24   very early in 1998.

Page 167

1       Q.   And, so, this was six years or eight
2    years prior to launching the TVT-Secur product?
3       A.   Correct.
4       Q.   And what did Dr. -- so, I think you
5    testified -- I'm going to read back, make sure I've
6    got it here -- but you've testified that
7    Exhibit 2377 reflects the adverse reactions that
8    were known since the time of launch of the
9    TVT-Secur device.  Is that your testimony?
10      MR. SNELL:  Object.
11   BY THE WITNESS:
12      A.   If I recall Dr. Weisberg's testimony,
13   that is what I think he testified to.
14   BY MR. THORNBURGH:
15      Q.   So, based on your review of
16   Dr. Weisberg's testimony, did Dr. Weisberg admit
17   that he had an understanding that these risks
18   identified in P2377 were known by him?
19      MR. SNELL:  Object.
20   BY THE WITNESS:
21      A.   Yes.
22   BY MR. THORNBURGH:
23      Q.   And what did Dr. Weisberg testify with
24   respect to whether or not these adverse reactions

Page 168

1    identified in 2377, which were known by him in --
2    prior to launching the TVT product, could have been
3    added to the TVT IFUs?
4       MR. SNELL:  Object.  Object.  Go ahead.
5    BY THE WITNESS:
6       A.   These additional adverse reactions could
7    have been added to the Instructions for Use.
8    BY MR. THORNBURGH:
9       Q.   Do you have an opinion whether or not it
10   would have been reasonable and feasible for Ethicon
11   to disclose in the TVT-Secur IFU the adverse
12   reactions that are identified in 2377?
13      MR. SNELL:  Object.  Go ahead.
14   BY THE WITNESS:
15      A.   Yes, I have an opinion.
16   BY MR. THORNBURGH:
17      Q.   What's that opinion?
18      A.   That it would have been reasonable and
19   feasible to add these to the Instructions for Use.
20      Q.   And the -- did Ethicon include the
21   adverse reactions that Weisberg testified he knew
22   of and were -- would have been feasible and
23   reasonable in to add to -- strike that.
24      Did Dr. -- did Ethicon include the

Page 169

1    adverse reactions identified in P2377 within the
2    TVT-Secur IFU?
3       A.   No, they never did.
4       Q.   And are the -- if we look at P871, which
5    is the TVT-Secur IFU, Bates No. 589, are these the
6    adverse reactions that Ethicon put into the
7    TVT-Secur IFU back in 2006 when they launched the
8    TVT-Secur product?
9       A.   Yes.
10      Q.   Did Ethicon ever change the IFU section
11   on adverse reactions from the time they launched
12   the TVT-Secur product until the time that they
13   stopped selling the product in 2012?
14      A.   No, they did not.
15      Q.   Do you have an opinion whether or not
16   Ethicon should have included the adverse reactions
17   that are identified in 2377 in their IFU for the
18   Secur product?
19      A.   Yes, I do have an opinion.
20      Q.   What's that opinion?
21      A.   That these should have been included in
22   the Instructions for Use.
23      Q.   And why should they have included the
24   adverse reactions identified in 2377?

43 (Pages 166 to 169)

Bruce Alan Rosenzweig, M.D.

Page 170

1    MR. SNELL:  Object.
2  BY THE WITNESS:
3      A.   Because these are adverse reactions that
4  are -- have been known to be associated with the
5  TVT-Secur device.  That information should be given
6  to physicians in the Instructions for Use.  The
7  Instructions for Use should include all of the
8  known risks associated with the device.
9      The Instructions for Use should not
10  downplay the risks associated with the device or
11  obscure risks that are associated with the device
12  because doctors have different treatments and
13  devices that they can use to treat a particular
14  condition and patients have choices about the type
15  of surgeries they have and the type of devices that
16  are used to treat medical conditions and doctors
17  cannot have an informed decision with a -- with a
18  woman if they are not aware of all the potential
19  adverse reactions associated with the device.
20  BY MR. THORNBURGH:
21      Q.   Did Ethicon ever change the list of
22  potential complications that they identified in the
23  December 2005 Clinical Expert Report until the date
24  that they launched the TVT-Secur on the product --

Page 171

1  on to the market in September of 2006?
2      A.   No, they did not.
3      Q.   Would it have been reasonable and
4  feasible for Ethicon to make revisions to those
5  potential complications?
6      MR. SNELL:  Object.  Go ahead.
7  BY THE WITNESS:
8      A.   Yes.
9  BY MR. THORNBURGH:
10      Q.   Did Ethicon have human data from their
11  First Human Use Study that they could have looked
12  at to determine whether or not changes could
13  have -- could or should have been made to the
14  TVT-Secur "Adverse Reactions" section in the IFU?
15      A.   Yes.
16      Q.   And what was that exactly?
17      MR. SNELL:  Object.
18  BY THE WITNESS:
19      A.   They had the First Human Use data,
20  again, that showed a 30% failure rate and a 60%
21  complication rate.
22  BY MR. THORNBURGH:
23      Q.   Do you have an opinion whether or not
24  Ethicon should have provided the information or the

Page 172

1  data from the First Human Use Study in the
2  "Warnings" section of the IFU for the TVT-Secur
3  before they launched the product?
4      MR. SNELL:  Object.
5  BY THE WITNESS:
6      A.   Yes, the Instructions for Use should
7  include the frequency, severity, treatability and
8  permanency of adverse reactions that were
9  associated with a device.
10  BY MR. THORNBURGH:
11      Q.   If manufacturing companies like
12  Ethicon -- do you have an opinion whether or not
13  manufacturers -- do you have an opinion whether or
14  not medical device manufacturers such as Ethicon
15  and Johnson & Johnson should be complete and
16  accurate in their disclosure of safety information?
17      A.   Yes, I have an opinion.
18      Q.   Do you have an opinion whether or not
19  manufacturers like Ethicon and Johnson & Johnson
20  should be complete and accurate in their disclosure
21  of efficacy information?
22      A.   Yes, I have an opinion.
23      Q.   And what are the -- what are your
24  opinions with respect to both safety and efficacy?

Page 173

1      A.   That they should --
2      MR. SNELL:  Object.  Go ahead.
3  BY THE WITNESS:
4      A.   They should disclose all the safety and
5  efficacy information that they have available to
6  them.
7  BY MR. THORNBURGH:
8      Q.   As a physician treating patients and
9  discussing with patients surgical options for the
10  treatment of stress urinary incontinence, would you
11  have expected Ethicon to disclose to you in their
12  IFU or otherwise that their First Human Use Study
13  demonstrated that 60% of the patients could
14  experience or were at risk of experiencing
15  complications?
16      MR. SNELL:  Object.
17  BY MR. THORNBURGH:
18      Q.   From the TVT-Secur product.
19      A.   Yes, I would have expected them to
20  disclose that.
21      Q.   As a physician treating patients and
22  discussing with patients surgical options for the
23  treatment of stress urinary incontinence, would you
24  have expected Ethicon to disclose to you in their

44 (Pages 170 to 173)

Bruce Alan Rosenzweig, M.D.

Page 174

1     IFU or otherwise that the First Human Use Study
2     demonstrated a 30% failure rate?
3          MR. SNELL:  Object.
4     BY THE WITNESS:
5          A.   Yes.
6     BY MR. THORNBURGH:
7          Q.   And what is that opinion?
8          A.   I would have expected that they would
9     have disclosed that.
10         Q.   Why would you have expected as a doctor
11    treating patients that Ethicon would disclose that
12    information to you?
13         MR. SNELL:  Continuing objection.
14    BY THE WITNESS:
15         A.   Because that is information that is
16    important for me to have so I can have a discussion
17    with the patient regarding the safety and efficacy
18    of a given device because doctors have multiple
19    devices at their disposable -- at their disposal to
20    treat conditions or have different surgical
21    procedures that can treat a medical condition and
22    they need all the information about a particular
23    device or procedure at their disposal to decide
24    whether or not they are going to offer that to an

Page 175

1     individual patient and the individual patient needs
2     that information to decide if they want that
3     individual treatment.
4     BY MR. THORNBURGH:
5          Q.   Why does any of this matter, Doctor?
6          A.   It matters for patient --
7          MR. SNELL:  Objection.
8     BY THE WITNESS:
9          A.   It matters for patient safety.
10    BY MR. THORNBURGH:
11         Q.   What can happen to patients if companies
12    like Ethicon and Johnson & Johnson are not complete
13    and accurate about the safety and efficacy of
14    permanent implantable devices that they're selling?
15         MR. SNELL:  Objection.
16    BY THE WITNESS:
17         A.   Patients can get harmed.
18    BY MR. THORNBURGH:
19         Q.   Do you have an opinion whether or not
20    Johnson & Johnson and Ethicon's failure to disclose
21    the safety and efficacy data from the First Human
22    Use Study put patients at risk of suffering harm?
23         MR. SNELL:  Objection.
24    BY MR. THORNBURGH:

Page 176

1          A.   Yes, I have an opinion.
2     BY MR. THORNBURGH:
3          Q.   What's that opinion?
4          A.   It put patients at risk.
5          Q.   Do you have an opinion whether or not it
6     was appropriate for Ethicon or Johnson & Johnson to
7     withhold the safety and efficacy data from
8     physicians concerning the data they had prior to
9     launch that they received from the First Human Use
10    Study?
11         MR. SNELL:  Object.
12    BY THE WITNESS:
13         A.   Yes, I have an opinion.
14    BY MR. THORNBURGH:
15         Q.   What's that opinion?
16         A.   That that information should not have
17    been withheld from physicians.
18         Q.   What's the next document in your binder,
19    Dr. Rosenzweig, that you'd like to discuss?
20         A.   P0279.
21         Q.   And can you identify what P0279 is?
22         A.   Yes.
23         MR. SNELL:  Can I have a copy.
24    BY THE WITNESS:

Page 177

1          A.   It is an e-mail between Gary Borkes, who
2     we've discussed earlier, and Mark Yale, who is a
3     safety officer at Ethicon, describing the TVT
4     design review, design validation from February 9,
5     2006.
6     BY MR. THORNBURGH:
7          Q.   And how is P0279 significant, if
8     at all, to your opinions in this case?
9          A.   It is a discussion between key Ethicon
10    employees regarding the design validation process
11    and the -- about the pressure that they're under to
12    get the design validation process done and that if
13    the design validation process is not done
14    completely, appropriately and accurately, that
15    there can be significant consequences associated
16    with that.
17         Q.   What are some of the reasons why design
18    validation process may not be done appropriately?
19         A.   Can you repeat the question?
20         Q.   Yes, sure.  What are some of the reasons
21    why a design validation process or study may not
22    get done appropriately?
23         MR. SNELL:  Objection.
24    BY THE WITNESS:

45 (Pages 174 to 177)

Bruce Alan Rosenzweig, M.D.

Page 178

1       A.   If there's pressure to get a project
2   completed quickly, then a design validation process
3   might not be done as completely and accurately due
4   to time constraints.
5   BY MR. THORNBURGH:
6       Q.   Do you have an opinion whether or not
7   Ethicon's design validation process was done
8   appropriately?
9       A.   Yes, I have an opinion.
10      Q.   What's that opinion?
11      MR. SNELL:  Object.
12  BY THE WITNESS:
13      A.   It was not done completely and
14  appropriately.
15  BY MR. THORNBURGH:
16      Q.   Do you have an opinion whether or not
17  Ethicon's -- do you have a -- strike that.
18          Do you have an opinion why that
19  occurred, based on your review of Ethicon's
20  documents?
21      A.   That there was immense pressure to move
22  the process along so that they could get the
23  product launched as quickly as they -- as they
24  could.

Page 179

1       Q.   And if we look at Exhibit P0279, I want
2   to look -- direct your attention to the bottom half
3   of the first page, the e-mail from Mark Yale.
4          Do you see that?
5       A.   Yes.
6       Q.   And is this part of the e-mail that you
7   just discussed?
8       A.   Yes.
9       Q.   And you'll see it says, "Can you give me
10  insight into where Raimo and Dan are at.  For the
11  last two days at the leadership meeting I had
12  everyone from Renee Selman on down pulling me
13  'aside' asking me how the proverbial 'we' get this
14  project done.  There is immense political pressure
15  here and I need to actively manage the overall QE
16  response."
17          Did I read that correctly?
18      A.   Yes.
19      MR. SNELL:  Object; leading.
20  BY MR. THORNBURGH:
21      Q.   First of all, who is Renee Selman?
22      A.   The president of Ethicon.
23      Q.   And how does this statement here by Mark
24  Yale support your opinions in this case?

Page 180

1       MR. SNELL:  Object.
2   BY THE WITNESS:
3       A.   This supports my opinions that the
4   design validation process was rushed; that all the
5   characteristics of the TVT-Secur device that were
6   unreasonably unsafe, which led to complications,
7   adverse events and harm to patients, were not
8   identified prior to launch; that the design
9   characteristics that made it unreasonably
10  ineffective and led to recurrence or inability to
11  treat stress incontinence were not found before
12  launch; and that there was intense pressure from
13  the president down through the ranks to speed the
14  process along as quickly as possible to get the
15  product on the market.
16      Q.   You just said a lot.  So, I want to
17  break that down, and here's how I want to do it.
18          How would you describe the opinion that
19  you just expressed in one sentence?
20      MR. SNELL:  Objection.
21  BY THE WITNESS:
22      A.   There was intense pressure to get the
23  product to market.
24  BY MR. THORNBURGH:

Page 181

1       Q.   And the e-mail goes on by Mark Yale and
2   says, "Bottom line if there is a big steaming pile
3   here (as I suspect), I need to know ASAP and push
4   back hard on whomever to fix."
5          Did I read that correctly?
6       MR. SNELL:  Object and leading.
7   BY THE WITNESS:
8       A.   Yes.
9   BY MR. THORNBURGH:
10      Q.   How, if at all, does this statement by
11  Mark Yale support your opinions in this case?
12      MR. SNELL:  Object.
13  BY THE WITNESS:
14      A.   As of February 9, 2006, it was suspected
15  that there could be design characteristics
16  associated with the device that either made it
17  unreasonably unsafe or led it to be unreasonably
18  ineffective in treating the device; that the head
19  of -- of quality wanted to know that as soon as
20  possible so that they could find out what those
21  design characteristics were to try to fix those
22  design characteristics to try to make a reasonably
23  safe and effective device.
24  BY MR. THORNBURGH:

46 (Pages 178 to 181)

Bruce Alan Rosenzweig, M.D.

Page 182

1    Q.  Do you have an opinion whether or not
2  women deserve better conduct from medical device
3  companies like Ethicon and Johnson & Johnson than
4  what is being described here in this document?
5       MR. SNELL:  Object.
6  BY THE WITNESS:
7       A.  Yes.
8  BY MR. THORNBURGH:
9       Q.  What's that opinion?
10      A.  That they do deserve better
11 consideration than just top executives at Ethicon
12 discussing that there are more likely than not big
13 problems associated with the device design,
14 characteristics that are unreasonably unsafe or
15 make it unreasonably ineffective, and that they
16 are -- those are being ignored and a product is
17 being rushed to market.
18      Q.  Did Ethicon ever fix any of the problems
19 with their design validation?
20      MR. SNELL:  Objection.
21 BY THE WITNESS:
22      A.  No, they did not.
23 BY MR. THORNBURGH:
24      Q.  Based on your review of the documents,

Page 183

1  did Ethicon ever change its design before they
2  launched the product on the market from
3  February 2006 until September of 2006?
4       A.  No, they did not.
5       Q.  And why is that important?  Is that
6  important to your opinion?
7       A.  Yes, it is.
8       Q.  Why is that?
9       A.  In February 9, 2006, there were -- was
10 discussion about design characteristics that made
11 it unreasonably unsafe or unreasonably ineffective.
12 Those characteristics were not identified.
13      The product was placed on the market.
14 It was found to be unreasonably unsafe or
15 unreasonably ineffective in treating stress urinary
16 incontinence and led to complications in women
17 which could have and should have been identified
18 during this time period and either fixed prior to
19 launch or launch either stopped completely and the
20 product never put on the market or at least
21 addressed and identified.
22      Q.  Do you have an opinion whether or not
23 medical device companies like Ethicon and
24 Johnson & Johnson should ever put immense political

Page 184

1  pressure on their employees in order to rush a
2  product through to get it launched?
3       MR. SNELL:  Objection.
4  BY THE WITNESS:
5       A.  Yes, I have an opinion.
6  BY MR. THORNBURGH:
7       Q.  What's that opinion?
8       A.  They should not be doing that.
9       Q.  Do you have an opinion based on your
10 review of the medical -- review of Ethicon's
11 internal documents the purpose for putting
12 political pressure on employees in order to get the
13 TVT-Secur launched?
14      MR. SNELL:  Objection.
15 BY THE WITNESS:
16      A.  Can you repeat the question again.
17 BY MR. THORNBURGH:
18      Q.  Yeah, no problem, no problem.  That's
19 probably why it was objected to.
20      Do you know whether or not the documents
21 that we had reviewed previously, whether or not the
22 need to get a mini-sling to the market first played
23 a role in Ethicon's executives putting political
24 pressure on its employees to get the TVT-Secur

Page 185

1  product launched?
2       MR. SNELL:  Objection, now including leading.
3  BY THE WITNESS:
4       A.  Yes.
5  BY MR. THORNBURGH:
6       Q.  And what's that opinion?
7       A.  That the main purpose of putting the
8  intense political pressure to get the product
9  launched was to stay ahead of the competition and
10 be the first to market.
11      Q.  And if you look at the first sentence in
12 the e-mail response from Gary Borkes on February 9,
13 2006, he writes, "Mark - yes - we should talk -
14 there's a great deal of spin happening at this
15 point, unfortunately."
16      Do you see that?
17      A.  Yes.
18      MR. SNELL:  Object; leading.
19 BY MR. THORNBURGH:
20      Q.  How is, if at all, that statement from
21 Gary Borkes relevant or significant to your
22 opinions?
23      MR. SNELL:  Object.
24 BY THE WITNESS:

47 (Pages 182 to 185)

Bruce Alan Rosenzweig, M.D.

Page 186

1      A.   It is important that any characteristics
2  of a device that are found to be unreasonably
3  unsafe or make a device unreasonably ineffective
4  are described in detail and not spun in a way that
5  makes it more palatable.
6          Those characteristics should be
7  described and fixed and either the device not
8  launched or those characteristics fixed before a
9  product is launched.
10  BY MR. THORNBURGH:
11      Q.   Okay.  And what is -- is there anything
12  else relevant to that last exhibit we were looking
13  at to your opinions?
14      A.   No.
15      Q.   What's the next exhibit that you want to
16  discuss with the jury?
17      A.   P0542.
18      Q.   And can you explain to the ladies and
19  gentlemen of the jury what P0542 is?
20      A.   It is an e-mail from Allison London
21  Brown, who is the worldwide launch coordinator for
22  the TVT-Secur, and Dan Smith, the lead engineer and
23  co-patent holder for the TVT-Secur, discussing the
24  TVT-Secur device as a new product or technique and

Page 187

1  has little relationship with the data that had been
2  obtained from the full-length retropubic sling that
3  I discussed earlier in my testimony.
4      Q.   How, if at all, is Exhibit P0542
5  relevant to your opinions in this case?
6      A.   This is relevant to my opinions that --
7  that the data on the full-length TVT Retropubic
8  cannot be used to justify how the TVT-Secur will
9  react inside of a woman as far as safety and
10  efficacy goes.
11      Q.   So, if Ethicon or if at least if Allison
12  London Brown felt that Ethicon could not rely on
13  the data from the other TVT Retropubic full-length
14  product on the market, do you have an opinion as to
15  what Ethicon could have done?
16  MR. SNELL:  Objection.  Go ahead.
17  BY THE WITNESS:
18      A.   Ethicon could have done studies that
19  could get the database that they had for the TVT,
20  full-length TVT for the TVT-Secur to know how it
21  would perform in women from a safety and efficacy
22  perspective.
23  BY MR. THORNBURGH:
24      Q.   Based on Exhibit P4 -- sorry.

Page 188

1          Based on Exhibit P0542, do you have an
2  opinion whether or not Ethicon knew or should have
3  known that it would be inappropriate for Ethicon to
4  rely on data from its other TVT products?
5  MR. SNELL:  Objection.
6  BY THE WITNESS:
7      A.   Yes, I do have an opinion.
8  BY MR. THORNBURGH:
9      Q.   And what is that opinion?
10      A.   Yes, it would -- this communication
11  between key Ethicon employees does show an
12  understanding that the TVT-Secur is a new product
13  and therefore the data from their other full-length
14  products would not be applicable to the -- the
15  short, stiff, rigid mesh that had never been used
16  before, the fleece tips that had never been used
17  for, the sharp arrowhead introducer that had never
18  been used before.
19      Q.   Let me just make sure I understand
20  really quick.  If we look at P0542.
21  MR. THORNBURGH:  Tom, if you could blow up the
22  section under "TVT-Secur."
23  BY MR. THORNBURGH:
24      Q.   It says, "TVT-Secur is a new

Page 189

1  product/technique and therefore there is little
2  relationship to the TVT 7-year data."
3          Did I read that correctly?
4  MR. SNELL:  Objection; leading.
5  BY THE WITNESS:
6      A.   Yes.
7  BY MR. THORNBURGH:
8      Q.   Let me just make sure I ask it again.
9          This statement here that Tom has blown
10  up under the "TVT-Secur" section says, "TVT-Secur
11  is a new product/technique and therefore there is
12  little relationship to the 7-year database other
13  than it is the same Prolene mesh."
14          Did I read that correctly?
15  MR. SNELL:  Same objection.
16  BY THE WITNESS:
17      A.   Yes.
18  BY MR. THORNBURGH:
19      Q.   And do you agree with that statement?
20      A.   Yes.
21      Q.   Now, I understand you're a paid expert
22  for the Plaintiffs, is that correct?
23      A.   Correct.
24      Q.   And you hold this same opinion, is that

48 (Pages 186 to 189)

Bruce Alan Rosenzweig, M.D.

Page 190

1    correct?
2        A.   Correct.
3        Q.   So, these aren't your words, right?
4        MR. SNELL:  Objection.
5    BY MR. THORNBURGH:
6        Q.   Are these your words?
7        MR. SNELL:  Same objection.
8    BY MR. THORNBURGH:
9        Q.   Let me ask again.
10           Are the words that we see on page -- the
11   first page of P0542, are those your words?
12       MR. SNELL:  Objection.
13   BY THE WITNESS:
14       A.   No.  This comes from an internal Ethicon
15   document.
16   BY MR. THORNBURGH:
17       Q.   And are those words that you agree with?
18       A.   Yes.
19       Q.   And how many years were those written,
20   those words written by Ethicon's employees before
21   you were ever involved in this litigation?
22       A.   This is from 2006.
23       Q.   Are the words in any of these documents
24   that we're looking at, are those your words?

Page 191

1        MR. SNELL:  Objection.
2    BY THE WITNESS:
3        A.   No, these are from internal Ethicon
4    documents.
5    BY MR. THORNBURGH:
6        Q.   And do you agree with some of the words
7    and opinions that are being expressed in the
8    documents that we're looking at?
9        MR. SNELL:  Same objection.
10   BY THE WITNESS:
11       A.   Yes.
12   BY MR. THORNBURGH:
13       Q.   What's the next exhibit you'd like to
14   discuss with the ladies and gentlemen of the jury?
15       A.   P0716.
16       MR. SNELL:  Just for the record I didn't see
17   P0279 on his exhibit list.  We have been checking.
18   So, I move to strike all testimony about it.
19       MR. THORNBURGH:  And just for the record it's
20   on there.  We can address this later on.
21       MR. SNELL:  Oh, yeah.
22       MR. THORNBURGH:  So were the other documents
23   that you guys identified.  We went and looked at
24   lunch.  Those other documents are also on the

Page 192

1    reliance list.
2        MR. SNELL:  That's fine.  Then I'll say I'm
3    wrong.  We are trying to run word searches on this
4    large reliance list and number searches and it's
5    just not showing up.
6        MR. THORNBURGH: Gotcha.
7    BY MR. THORNBURGH:
8        Q.   Sorry, Doctor.  What's the next exhibit
9    that you'd like to discuss with the ladies and
10   gentlemen of the jury?
11       A.   P0716.
12       Q.   And what's the date of this document?
13       A.   This is an e-mail string from June 20,
14   2006.
15       Q.   Is this before or after the TVT-Secur
16   product was launched?
17       A.   It is approximately three months prior
18   to launch.
19       Q.   And do you -- strike that.
20           How does Exhibit P0716 support, if at
21   all, your opinions in this case?
22       A.   This supports my opinion that the
23   TVT-Secur device should have been studied in
24   randomized controlled trials before launch and

Page 193

1    doing so did not allow doctors and scientists to
2    know the device characteristics that made it
3    unreasonably unsafe and also unreasonably
4    ineffective.
5        Q.   What part of this document supports your
6    opinion that Ethicon should have studied in
7    randomized controlled trials the TVT-Secur before
8    they launched it?
9        A.   Well, this e-mail describes that two
10   very well-known doctors and Key Opinion Leaders,
11   Dr. Nilsson and Dr. Artibani, expressed their
12   worries about Ethicon launching TVT-Secur with no
13   clinical data other than 50 patients with five
14   weeks of follow-up.
15       Q.   And let me stop you right there for a
16   moment.
17           Who is Professor Nilsson?
18       A.   Dr. Nilsson is one of the co-inventors
19   of the TVT Retropubic, probably has the most
20   experience with midurethral slings and is a Key
21   Opinion Leader for Ethicon.
22       Q.   So, Dr. Nilsson was the co-inventor of
23   the TVT-Secur retropubic device?
24       A.   Correct.

49 (Pages 190 to 193)

Bruce Alan Rosenzweig, M.D.

Page 194

1       MR. SNELL:  Objection.
2       MR. THORNBURGH:  Sorry.  Strike that.  Let me
3   strike that.  Withdraw that.
4   BY MR. THORNBURGH:
5       Q.   Who was Dr. Nilsson?
6       A.   Dr. Nilsson was a contemporary with the
7   inventor of the TVT Retropubic.  From my
8   understanding, he was with Dr. Ulmsten during the
9   early -- the earliest clinical trials with the
10   TVT Retropubic.
11       Q.   And did he publish -- was he a
12   co-publisher of data concerning the TVT Retropubic,
13   the first generation TVT device?
14       A.   Yes.
15       Q.   And who is Dr. Professor Artibani?
16       A.   Dr. Artibani is a pelvic surgeon from
17   Italy who is also a Key Opinion Leader for Ethicon,
18   very well-known pelvic surgeon.
19       Q.   Both of them -- are both Professor
20   Nilsson and Professor Artibani licensed medical
21   doctors?
22       A.   Yes.
23       Q.   Or were they when they were alive?  Were
24   they medical doctors, based on your understanding?

Page 195

1       A.   Yes.
2       Q.   And as we see on page 2 of this
3   Exhibit 716, Bates number ending in 851, midway
4   through this page it says, "Regarding the proposed
5   RCT," and that's randomized controlled trial, is
6   that correct?
7       A.   Yes.
8       Q.   "Both Professor Nilsson and Professor
9   Artibani expressed their worries about us launching
10   TVT-Secur with no clinical data (other than the 50
11   patients, 5 week follow-up)."
12       Did I read that correctly?
13       MR. SNELL:  Object; leading.
14   BY THE WITNESS:
15       A.   Yes.
16   BY MR. THORNBURGH:
17       Q.   And do you agree or disagree with the
18   concerns that are being expressed by Professor
19   Nilsson and Professor Artibani concerning releasing
20   the TVT-Secur with no randomized controlled trial
21   or clinical data other than the 50 patient,
22   five-week follow-up study?
23       MR. SNELL:  Object.
24   BY THE WITNESS:

Page 196

1       A.   I agree.
2   BY MR. THORNBURGH:
3       Q.   And are those your words?
4       A.   No.  Those are the concerns expressed by
5   Dr. Nilsson and Dr. Artibani.
6       MR. THORNBURGH:  And if we go further down on
7   Bates number 851, Tom, if you can blow up where it
8   begins with "I'm a bit concerned."
9   BY MR. THORNBURGH:
10       Q.   Harel Gadot.  Who is Harel Gadot?
11       A.   He is the European marketing manager.
12       Q.   And for Ethicon?
13       A.   Yes.
14       Q.   And Harel Gadot writes, "I'm a bit
15   concerned that by canceling the RCT we will hurt
16   our image in their eyes, especially after we've
17   communicated this to them and worked with them to
18   resolve any concerns they had associating with
19   TVT-Secur.  I believe the success of the launch of
20   TVT-Secur across EMEA" -- do you understand what
21   EMEA stands for?
22       A.   Yes.  It's Europe Middle East and
23   Africa.
24       Q.   "And probably other parts WW."  Is that

Page 197

1   worldwide?
2       A.   Yes.
3       Q.   "Will depend heavily on those two Key
4   Opinion Leaders and their willingness to assist us
5   with our future communication plans.  Therefore I
6   would strongly recommend to find a way not to
7   cancel completely the proposed RCT."
8       Did I read that correctly?
9       MR. SNELL:  Objection; leading.
10   BY THE WITNESS:
11       A.   Yes.
12   BY MR. THORNBURGH:
13       Q.   And how, if at all, does -- do those
14   statements from Dr. Harel Gadot support your
15   opinion?
16       A.   They support my opinion that randomized
17   controlled trials should have been done prior to
18   launch of the TVT-Secur so that the design
19   characteristics that made it unreasonably unsafe
20   and unreasonably ineffective would have been known
21   prior to launch and either the product not launched
22   or the design characteristics fixed to make it
23   reasonably safe and reasonably effective.
24       Q.   Do you know whether or not Ethicon

50 (Pages 194 to 197)

Bruce Alan Rosenzweig, M.D.

Page 198

1    ultimately at least sponsored randomized controlled
2    trials?
3         A.   There were initiator -- excuse me --
4    investigator-initiated studies that were co-funded
5    by Ethicon.
6         Q.   And do you know whether or not those
7    investigator-initiated studies that were sponsored
8    at least financially by Ethicon supported or didn't
9    support the safety and efficacy of the TVT-Secur
10   product?
11        A.   There are studies that were
12   investigator-initiated studies that did not support
13   the safety and efficacy of the TVT-Secur.
14        Q.   And we will talk about some of those
15   studies, but we've got to take a break for changing
16   the tape.
17        THE VIDEOGRAPHER:  Okay.  The time is 2:02
18   p.m.  This is the end of Tape 2 and we're going off
19   the video record.
20            (WHEREUPON, a recess was had
21             from 2:02 to 2:13 p.m.)
22        THE VIDEOGRAPHER:  The time is 2:13 p.m.  This
23   is the beginning of Tape 3 and we're back on the
24   video record.

Page 199

1    BY MR. THORNBURGH:
2         Q.   Doctor, before we went off for break and
3    throughout the vast majority of this deposition, we
4    have been discussing your binder that you brought
5    with you today, is that correct?
6         A.   Yes.
7         Q.   And did you put together that binder?
8         A.   Yes.
9         Q.   Did you highlight the portions of the
10   document that you felt were important for purposes
11   of providing your opinions today?
12        A.   Yes.
13        Q.   And if I didn't ask you this already,
14   maybe I thought it went without saying, but did you
15   review and rely on all of those documents that are
16   in your binder?
17        A.   Yes.
18        Q.   Doctor, what is the next exhibit you
19   would like to discuss with the jury?
20        A.   This is a PowerPoint presentation, an
21   internal Ethicon document, regarding the reasons
22   for development of the TVT-Secur.
23        MR. THORNBURGH:  Okay.  And let me give
24   co-counsel a copy.  Co-counsel.  I take that back.

Page 200

1         MR. SNELL:  Opposing.
2         MR. THORNBURGH:  Opposing counsel.
3         MR. SNELL:  Opposing by stipulation.
4    BY MR. THORNBURGH:
5         Q.   Doctor, Exhibit P842, did you review and
6    rely on that document before or that exhibit in
7    rendering your opinions?
8         A.   Yes.
9         Q.   And what about Exhibit P842 did you rely
10   upon?
11        A.   Again, this is a PowerPoint presentation
12   which discusses the reasons for development, the
13   needs for the TVT-Secur device.  This is important
14   in my opinions that the need for the device was not
15   based on a -- safety and efficacy.  These were
16   based on financial decisions.
17            There was a rush to market to fill a gap
18   that competition to the products that Ethicon had
19   on the market, and they felt -- Ethicon felt that
20   if they did not have a TVT-Secur device on the
21   market as soon as possible, they would lose market
22   share.
23        MR. SNELL:  Object.  Move to strike the state
24   of mind.  Go ahead.

Page 201

1    BY MR. THORNBURGH:
2         Q.   And, Doctor, can you walk us through the
3    different slides that you believe support your
4    opinions and explain how those slides support your
5    opinions, please.
6         A.   Yes.  This is the fourth slide.  It has
7    a graph that we had looked at previously in the
8    charter document showing the proposed decrease --
9    it's actually the next page.
10        Q.   Okay.  So, slide 5, is that where you're
11   at?
12        A.   Correct.
13        MR. SNELL:  Let me just put an objection.  I
14   just want to object to the document on the record
15   and I'll be quiet.
16   BY THE WITNESS:
17        A.   Actually let's go back to the one before
18   that.
19   BY MR. THORNBURGH:
20        Q.   Slide 4 for the record.
21        A.   Yes.
22        Q.   Okay.
23        A.   What this shows is --
24        Q.   The fourth slide.  They are not

51 (Pages 198 to 201)

Bruce Alan Rosenzweig, M.D.

Page 202

1  numbered, but it's the fourth slide in
2  Exhibit P842.
3       I'm sorry.  Go ahead, Doctor.
4       A.  Correct.  What this document shows is a
5  projection of what is happening with the market for
6  the TVT Retropubic which continues to shrink.
7  However, Gynecare will maintain the vast majority
8  of that market.
9       However, the obturator market is going
10  to continue to grow and in order to be able to
11  compete with their competitors, Gynecare needs to
12  have a product that will be able to compete with
13  this expanding market and the loss of the market of
14  the retropubic slings.
15       Q.  Now, you've talked about the obturator
16  and competition and market share.  But can you
17  explain for the ladies and gentlemen of the jury
18  your understanding, based on your knowledge,
19  training and experience as well as your review of
20  Ethicon's documents, sort of what was going on at
21  this time period with the different synthetic
22  midurethral slings that were on the market and how
23  that may or may not have impacted Ethicon's market
24  share?

Page 203

1       MR. SNELL:  Object.  Go ahead.
2  BY THE WITNESS:
3       A.  Well, as this graphic shows is that the
4  retropubic sling market, the one that goes behind
5  the pubic bone that I've discussed earlier in
6  testimony, was becoming a less significant part of
7  the marketplace.
8       The obturator sling, which I've
9  discussed in earlier testimony, was becoming a
10  larger part of the midurethral sling market.
11  However, the portion of that market for Ethicon was
12  not growing in the same proportion as the market
13  was growing.
14  BY MR. THORNBURGH:
15       Q.  Let me stop you right there for a
16  minute.
17       Was Ethicon -- so, at this point in
18  time, there was the retropubic slings that were on
19  the market, is that correct?
20       A.  Correct.
21       Q.  Was there also the obturator slings that
22  were on the market?
23       A.  Correct.
24       Q.  And do you know whether or not Ethicon

Page 204

1  was the first to come to -- bring -- to bring a
2  synthetic polypropylene mesh to the market for use
3  in the retropubic approach?
4       A.  Yes.  They were the first retropubic
5  full-length polypropylene midurethral sling.
6       Q.  And do you know whether or not Ethicon
7  was the first company to market a midurethral
8  synthetic polypropylene sling to be implanted
9  through the obturator approach?
10       A.  No, they were not.
11       Q.  They were not the first to come to
12  market on the obturator, is that correct?
13       A.  Correct.
14       Q.  And did that -- do you have an
15  understanding as to whether or not the fact that
16  they were not the first to market the obturator
17  device, how or if at all that impacted Ethicon's
18  market share?
19       MR. SNELL:  Objection.
20  BY THE WITNESS:
21       A.  They were losing market share to the
22  obturator market prior to them putting a obturator
23  sling on the market.
24  BY MR. THORNBURGH:

Page 205

1       Q.  Is this kind of what we were talking
2  about earlier in the charter document?
3       A.  Yes.
4       Q.  And do you know or have an opinion as to
5  how, based on your review of the records -- strike
6  that.
7       And, so, if we look at this slide,
8  slide 4, it shows a "Past," "Now" and "Future"
9  columns.  Do you see that?
10       A.  Yes.
11       Q.  And is that what you sort of explained
12  that in the past where it says, it says Gynecare,
13  they -- for the retropubic space, they had a -- the
14  vast majority of the market share?
15       A.  Yes.
16       Q.  And you'll see that there is these sort
17  of pie graphs are depicted in several different
18  ways, either by color or by size, and you'll see in
19  the "Past" that the size of the circle or pie is
20  larger for Gynecare Retropubic than it is in the
21  "Current" or "Future" columns.
22       Do you see that?
23       MR. SNELL:  Object; leading.
24  BY THE WITNESS:

Bruce Alan Rosenzweig, M.D.

Page 206

1      A.   Correct.
2   BY MR. THORNBURGH:
3      Q.   And because I got an objection, can you
4   describe sort of the past, current at the time of
5   this PowerPoint, and future projection concerning
6   the market share and how they're depicted in this
7   document?
8      A.   The retropubic market will continue to
9   decrease though Ethi -- Gyne -- Ethicare (sic) will
10  maintain its large portion of that market.  The
11  obturator market continues to grow, however
12  Ethicon's share of that market is not -- is
13  actually shrinking in the future.
14     Q.   Okay.  And there is a little sort of --
15  how do you describe that?  A text bubble.  What
16  does that text bubble say and does or does that
17  have any import or relevance to your opinions?
18     A.   What this says is that the obturator
19  market will become a larger share of the
20  midurethral sling market and because there are many
21  competitors, it might be difficult to get customers
22  back.
23     Q.   Are there any other slides in this
24  exhibit that are relevant to your opinions?

Page 207

1      A.   The next slide, which shows without the
2   TVT-Secur what would -- is projected to happen to
3   Gynecare's, which is a division of Ethicon's,
4   market share, again, with the same tag bubble that
5   we saw before.
6           The next slide is a projection --
7      Q.   And do you have an understanding of what
8   was expected to happen to Gynecare market share
9   without the TVT-Secur?
10     A.   Yes, it was projected to decrease as
11  what's seen in this slide.
12     Q.   And is there any other relevant slides
13  that you want to discuss concerning your opinions?
14     A.   Yes.  The next slide is a projection
15  of -- with the single-incision or mini-sling or
16  TVT-Secur, that Ethicon would grow that market and
17  be the major -- have the -- the major share in that
18  market.
19     Q.   And so -- and just want to understand
20  some terminology a little bit.
21          Are there sort of three or -- three
22  different segments of the midurethral sling
23  segment?  Does that make sense?  Maybe I should ask
24  that in a better way.

Page 208

1           The retropubic, see where it says
2   "Retropubic," if I describe that as one sandbox and
3   the obturator as another sandbox and the mini-sling
4   as a third sandbox, does that make sense to you?
5      MR. SNELL:  Objection; form, leading.
6   BY THE WITNESS:
7      A.   Whether it's a sandbox or a category
8   or --
9   BY MR. THORNBURGH:
10     Q.   Three different categories.
11          What were the three different
12  categories -- what were the three different
13  categories of products or future products that are
14  being described here?
15     A.   There were -- was the retropubic
16  category, the transobturator category and the
17  mini-sling or single-incision sling category, which
18  the Secur fell under.
19     Q.   And based on your review of this
20  document and the documents -- internal documents,
21  do you have an opinion as to whether or not Ethicon
22  was attempting to maintain its market share by
23  developing the third category of retro -- of
24  midurethral slings in order to preserve its market

Page 209

1   share?
2      MR. SNELL:  Objection.
3   BY THE WITNESS:
4      A.   Yes.
5   BY MR. THORNBURGH:
6      Q.   Have you seen Ethicon refer to these
7   three different categories as sandboxes?
8      MR. SNELL:  Objection; leading.
9   BY THE WITNESS:
10     A.   Yes, I have in internal documents.
11  BY MR. THORNBURGH:
12     Q.   So, when we talk about sandboxes later
13  on and so that no one gets confused, we know that
14  sandbox 1 would be the retropubic midurethral sling
15  products, sandbox 2 would be the obturator sling
16  products and sandbox 3 would be the mini-slings.
17  Is that fair?
18     A.   Yes.
19     MR. SNELL:  Objection; leading.
20  BY MR. THORNBURGH:
21     Q.   Since I got a leading objection.
22          How did some of Ethicon's employees
23  describe these three different categories?
24     A.   As three different sandboxes.

Bruce Alan Rosenzweig, M.D.

1      Q.   Are there any other relevant slides that
2   you'd like to discuss that support your opinions?
3      A.   Yes.  There's a summary slide that
4   describes the need for the TVT-Secur to reclaim
5   market share and to protect revenue.
6      Q.   Is that the slide that says "Summary"
7   right there?
8      A.   Yes.
9      Q.   And these slides aren't numbered so for
10   the record it says "Summary" and has two boxes,
11   "The TVT-Secur reclaims our market share," and "The
12   TVT-Secur protects our revenue," is that correct?
13      MR. SNELL:  Objection; leading.
14   BY MR. THORNBURGH:
15      Q.   I think it's Slide No. 8.
16      A.   Yes.
17      Q.   And are there any other slides that
18   support your opinion?
19      A.   Yes.  "Unmet Needs."  The next slide
20   after that is called "Needs" for the TVT-Secur.
21   Next slide, please.  Is -- one of the needs is
22   "Maximum safety."
23      Q.   And is it important for companies -- do
24   you have an opinion whether or not it's important

1   for companies to maximize safety?
2      A.   Yes, it is important.  It's important
3   for patients to have the devices that are going to
4   be permanently implanted in them to have
5   characteristics that maximize safety and maximize
6   efficacy.
7      Q.   Now, I want to talk to you real briefly
8   about the third bullet point that says, "Less
9   material left behind in the patient."  Do you see
10   that?
11      A.   Yes.
12      Q.   Isn't it true, Doctor, that if you
13   create a mini-sling, a shorter sling, that you're
14   leaving less foreign body, less synthetic material
15   behind in a patient's body?
16      MR. SNELL:  Objection; leading.
17   BY THE WITNESS:
18      A.   There would be the same amount of
19   material in the vagina, but there will be no
20   foreign material in areas where the sling is not.
21   BY MR. THORNBURGH:
22      Q.   Do you have an opinion whether or not
23   Ethicon's mini-sling, the TVT-Secur, resulted in
24   the implantation of less -- of a sling device with

1   less material that would be left behind in the
2   patient?
3      A.   At the time of implant or throughout the
4   rest of a woman's life?
5      Q.   Well, what matters the most?
6      A.   Throughout the rest of a woman's life.
7      Q.   So, do you have an opinion whether or
8   not the TVT-Secur, mini-sling, offered patients a
9   synthetic polypropylene material that would result
10   in less material being left behind in the patient?
11      A.   Well, when we look at the success rate
12   of the mini-sling, it is -- has design
13   characteristics that make it unreasonably not
14   effective and, therefore, they would have a
15   recurrence of their stress incontinence and,
16   therefore, would have the risk of having another
17   polypropylene sling placed that would make it that
18   they had even more polypropylene left behind.
19      Q.   So --
20      MR. SNELL:  Objection.  Move to strike,
21   non-responsive.
22   BY MR. THORNBURGH:
23      Q.   So, what's the basis -- what's the
24   support or basis for that opinion, Doctor?

1      A.   The success rate for the mini-slings.
2      Q.   Would it be accurate for Ethicon to
3   represent to physicians or make a claim to
4   physicians that if you used the TVT-Secur device,
5   less foreign body material will be left behind in
6   your patients?  Would that be accurate?
7      MR. SNELL:  Objection.
8   BY THE WITNESS:
9      A.   It is not completely accurate because of
10   the failure rate increases the risk of having
11   another surgery to treat the recurrence or the
12   continuation of incontinence, and that increases
13   the risk of another midurethral sling being placed,
14   which increases the risk or increases the amount of
15   polypropylene that is left in their body.
16   BY MR. THORNBURGH:
17      Q.   We are going to get to this in a little
18   bit, but do you have an opinion about what the
19   efficacy rate or the failure rate was for the
20   TVT-Secur product?
21      A.   Well, there are some studies that show a
22   better efficacy rate.  There are many studies that
23   show an accumulative efficacy rate of 75% or less.
24      Q.   And did you review any long-term studies

Bruce Alan Rosenzweig, M.D.

Page 214

1    that looked at efficacy?
2        A.   Yes.
3        Q.   And what was the longest term study that
4    you looked at regarding efficacy of the TVT-Secur
5    product?
6        A.   Five years.
7        Q.   And what study was that?
8        A.   There are two.   One is the Tommaselli
9    study and one is the Haab study.
10       Q.   And did the -- how does or does the Haab
11   study or how does the Haab study support, if at
12   all, your opinion that patients who have the
13   TVT-Secur device are at risk of having failure and
14   more polypropylene material implanted to treat the
15   failed procedure?
16       MR. SNELL:  Object; leading.
17   BY THE WITNESS:
18       A.   The Haab study showed a 30% success rate
19   after four and a half years and, therefore, those
20   patients would be at risk for requiring another
21   surgery to treat their recurrent stress urinary
22   incontinence.
23   BY MR. THORNBURGH:
24       Q.   So, a 30% success rate?

Page 215

1        A.   30% success rate.
2        Q.   So, what's that failure rate?
3        A.   70%.
4        Q.   So, does that mean -- what does that
5    mean if we're talking about real patients?  If
6    there are ten patients who were going to undergo a
7    procedure to put the TVT-Secur device in their
8    bodies, how many of those ten patients were at risk
9    of suffering a failure if they underwent TVT-Secur
10   surgery?
11       MR. SNELL:  Object.
12   BY THE WITNESS:
13       A.   Seven.
14   BY MR. THORNBURGH:
15       Q.   So, seven out of ten?
16       A.   Correct.
17       Q.   And how many of those patients were at
18   risk of having to undergo a second operation to
19   implant more synthetic material to treat their
20   stress urinary incontinence?
21       A.   Potentially seven out of ten.
22       Q.   So, we have these "Needs" here, and are
23   these claims that Ethicon are making or made to
24   physicians, do you know?

Page 216

1        MR. SNELL:  Object.
2    BY THE WITNESS:
3        A.   No, they were not made to physicians.
4    BY MR. THORNBURGH:
5        Q.   Did Ethicon ever -- I'm just trying to
6    understand this exhibit slide that says "Needs."
7    It says the needs -- and they're talking about the
8    third generation mini-slings, right?
9        A.   The third generation slings, yes.
10       Q.   Okay.  And it says, "Needs.  Maximize
11   safety.  Minimal passage through tissues.  Less
12   material left behind in the patient.  No exit.
13   Versatility," and then the last one says, "But same
14   great efficacy."
15            Did I read that correctly?
16       A.   Yes.
17       Q.   Do you know based on your review of
18   Ethicon's internal documents whether they had made
19   the claim to physicians that the TVT-Secur would
20   have the same or equivalent efficacy as its other
21   TVT first and second generation products?
22       MR. SNELL:  Object.  Go ahead.
23   BY THE WITNESS:
24       A.   Yes, they did.

Page 217

1    BY MR. THORNBURGH:
2        Q.   And was that claim correct?
3        A.   No, it was not.
4        Q.   And what's the basis for your opinion?
5        A.   The review of the literature.
6        Q.   Are there any other slides you'd like to
7    discuss with respect to Exhibit P04 -- 0842 that
8    you believe support your opinions?
9        A.   The "Testing to Date."
10       MR. THORNBURGH:  And what slide is this, Tom,
11   for the record?  So people could find it.
12       MR. BODYZIAK:  I believe it's 16.
13   BY MR. THORNBURGH:
14       Q.   Slide 16.  It says "Testing to Date" at
15   the top?
16       A.   Yes.
17       Q.   Okay.  And how does this slide support
18   your opinions, if at all?
19       A.   This supports my opinions that the
20   TVT-Secur was not adequately tested prior to
21   launch.
22            It describes that there was an animal
23   study which only looked at pull-out forces, an
24   animal histology study which looked at the size of

55 (Pages 214 to 217)

Bruce Alan Rosenzweig, M.D.

Page 218

1     the anchors and the pull-out force of the anchors,
2     cadaver labs, an infection analysis, a second
3     animal study was underway and there was some
4     testing between mechanical-cut and laser-cut --
5     laser cutting that was underway at the time of this
6     PowerPoint presentation.
7          Q.   Okay.  And Tom has the slide pulled up
8     real quick, but I just want to ask really quick.
9          The first two bullet points that say
10    "Animal - Pull out force studies, Animal histology
11    studies," was that the first animal study that you
12    had discussed earlier?
13         A.   Yes.
14         Q.   And that was -- what product did that
15    study test?
16         MR. SNELL:  Object.
17    BY THE WITNESS:
18         A.   The TVT X, which was 12 centimeters and
19    did not have the final embodiment of the fleece
20    ends that ultimately are in the TVT-Secur.
21    BY MR. THORNBURGH:
22         Q.   Would it be appropriate, do you have an
23    opinion -- strike that.
24         Do you have an opinion whether or not it

Page 219

1     would be appropriate for Ethicon to represent to
2     the world or to physicians that the TVT X studies
3     or the results from the TVT X studies supported the
4     efficacy or safety of the TVT-Secur product?
5          MR. SNELL:  Object.
6     BY THE WITNESS:
7          A.   I do have an opinion.
8     BY MR. THORNBURGH:
9          Q.   What's that opinion?
10         A.   It does not support the safety and
11    efficacy of the TVT-Secur.
12         Q.   Was the TVT X even the same product at
13    all?
14         A.   No.
15         Q.   The next -- third bullet point says,
16    "9 cadaveric labs (sizing/pull out)."
17         Do you see that?
18         A.   Yes.
19         Q.   Is this the design validation studies
20    that you discussed earlier with the jury?
21         A.   Yes.
22         Q.   Is this the same design validation
23    studies --
24         A.   Well -- yes, yes.

Page 220

1          Q.   Is this the same design validation
2     studies -- are you aware whether or not this is the
3     same design validation studies that Mark Yale wrote
4     about being concerned that there was a steaming
5     pile of blank?
6          A.   Yes.
7          MR. SNELL:  Objection.
8     BY MR. THORNBURGH:
9          Q.   Did the cadaveric lab, any cadaveric
10    lab, including the labs that were done in the
11    design validation phase, did any of those support
12    the safety and efficacy of the TVT-Secur product?
13         A.   No.
14         Q.   The next bullet point says, "Infection
15    risk analysis."  Are you aware of that study?
16         A.   I recall seeing the data from that.
17         Q.   Did the infection risk analysis support
18    the safety or efficacy of the TVT-Secur product as
19    for treatment of stress urinary incontinence in
20    live human women?
21         A.   No.
22         Q.   Why is that?
23         A.   It was not done in live human women.
24         Q.   Was it done in animals, an animal?

Page 221

1          A.   It was done in a laboratory setting.
2          Q.   And the next bullet point says, "Second
3     animal study underway."
4          Are you aware what animal study that
5     was?
6          A.   A -- if I recall, that was another sheep
7     cadaver study.
8          Q.   And did the second sheep cadaver study
9     support the safety or efficacy of the TVT-Secur
10    product for permanent implantation in women?
11         A.   No.
12         Q.   The last bullet point says, "Laser
13    versus mechanical testing underway."
14         Did any of the laser versus mechanical
15    testing support the safety of the TVT-Secur as a
16    permanent implant in the female woman -- female
17    body?
18         A.   No.
19         Q.   What's the next slide in your
20    presentation that you want to discuss?
21         A.   The slide of the competitor mini-slings
22    that were either launched or proposed to be
23    launched in the near future.
24         Q.   And do you have an understanding as to

56 (Pages 218 to 221)

Bruce Alan Rosenzweig, M.D.

Page 222

1    whether or not these were some of the competitors
2    of Ethicon?
3        A.   Yes.
4        Q.   What's the next slide you'd like to
5    discuss?
6        A.   The "Product Strategy."
7        Q.   Okay.  And it's a slide called "Product
8    Strategy," and how does this document support your
9    opinions, if at all?
10       A.   Well, it shows that the last phase of
11   their product strategy is obtaining clinical data,
12   and that supports my opinion that the TVT-Secur
13   device was not adequately tested prior to launch.
14       Q.   Wait.  Now, hold on a second.  Let's
15   look at these phases really quickly, okay.
16            What was Phase 1 for Ethicon's product
17   strategy concerning the TVT-Secur device?
18       A.   Actively convert the obturator users,
19   also approach the low hanging retropubic users.
20       Q.   So, would Phase 1 occur after launch of
21   the product?
22       A.   Yes.
23       Q.   What about Phase 2, would that be after
24   launch of the product?

Page 223

1        A.   Yes.
2        Q.   And what was Phase 2?
3        A.   Convert the remaining of the obturator
4    users and actively convert all retropubic users.
5        Q.   Now, was Phase 3 also after the launch
6    of the product?
7        A.   Yes.
8        Q.   So, hold on a second.
9            Ethicon has, "Protect market share
10   through Key Opinion Leaders, KOLs, and clinical
11   data."  That was their third phase.  Am I reading
12   that correctly?
13       MR. SNELL:  Objection; leading.
14   BY THE WITNESS:
15       A.   Yes.
16   BY MR. THORNBURGH:
17       Q.   Let me rephrase because I got an
18   objection.
19            Phase 3 was to protect market share
20   through KOLs and clinical data, is that correct?
21       MR. SNELL:  Leading.
22   BY THE WITNESS:
23       A.   Yes.
24   BY MR. THORNBURGH:

Page 224

1        Q.   And would Phase 3 occur after the
2    TVT-Secur was launched on the market?
3        A.   Yes.
4        Q.   Doctor, have you ever heard of the
5    acronym R & D?
6        A.   Yes.
7        Q.   What does R & D stand for, Doctor?
8        A.   Research and development.
9        Q.   Based on your knowledge, training and
10   experience, your review of these company documents
11   and the peer-reviewed publications, do you have an
12   opinion whether or not a company should research
13   products before they develop and launch products as
14   permanent implant devices for human use?
15       MR. SNELL:  Object.
16   BY THE WITNESS:
17       A.   Products should be researched prior to
18   launch for human use.
19   BY MR. THORNBURGH:
20       Q.   Did Ethicon appropriately research the
21   TVT-Secur product before they launched it on to the
22   market?
23       MR. SNELL:  Object.
24   BY THE WITNESS:

Page 225

1        A.   No, they did not.  There was not
2    appropriate testing prior to launch.
3    BY MR. THORNBURGH:
4        Q.   Because I got an objection, let me
5    reask.
6            Because -- do you have an opinion
7    whether or not Ethicon appropriately researched its
8    product, the TVT-Secur, before they launched it?
9        A.   Yes, I have an opinion.
10       MR. SNELL:  Objection.
11   BY MR. THORNBURGH:
12       Q.   What's that opinion?
13       MR. SNELL:  Same objection.  Go ahead.
14   BY THE WITNESS:
15       A.   It was not appropriately researched or
16   tested prior to launch.
17   BY MR. THORNBURGH:
18       Q.   In your opinion is it ever appropriate
19   for companies such as Ethicon who are selling
20   patients permanent implantable medical devices to
21   develop and market products before they conduct the
22   appropriate research?
23       MR. SNELL:  Object.
24   BY THE WITNESS:

57 (Pages 222 to 225)

Bruce Alan Rosenzweig, M.D.

Page 226

1      A.   No, that is never appropriate.
2   BY MR. THORNBURGH:
3      Q.   Is it appropriate for companies to put
4   the D before the R --
5      MR. SNELL:  Object.
6   BY MR. THORNBURGH:
7      Q.   -- in R & D?
8      MR. SNELL:  Object:  Leading as well.
9   BY THE WITNESS:
10     A.   It is not appropriate to launch a
11  product without it being adequately tested.
12  BY MR. THORNBURGH:
13     Q.   Do you have an opinion whether or not
14  the conduct of Ethicon in developing this product
15  strategy was appropriate?
16     MR. SNELL:  Object.
17  BY THE WITNESS:
18     A.   It was not appropriate.
19  BY MR. THORNBURGH:
20     Q.   Do you have an opinion whether or not
21  conducting business in this manner places women at
22  risk of suffering harm or injuries?
23     MR. SNELL:  Object.
24  BY THE WITNESS:

Page 227

1      A.   Yes, it puts women at risk of harm and
2   injury.
3   BY MR. THORNBURGH:
4      Q.   Is there another slide you'd like to
5   discuss with us?
6      A.   Yes.  Pre-launch marketing budget for
7   2005.
8      Q.   Try to find it, Doctor.
9         And what is the significance of this
10  slide, Doctor?
11     A.   Well, it supports my opinion that there
12  was no clinical testing prior to launch of the
13  TVT-Secur.
14     Q.   Now, let's look at this.  It says,
15  "Gynecare TVT-Secur Pre-Launch Marketing 2005
16  Budget."
17         Did I read that correctly?
18     A.   Yes.
19     Q.   How much, according to this budget, did
20  Ethicon budget for developing or for conducting
21  randomized controlled trials?
22     A.   Zero.
23     Q.   Do you have an opinion whether or not a
24  company who is selling a new device and technique

Page 228

1   that had never been used before should dedicate
2   some of its budget pre-launch to testing their
3   products and conducting adequate testing of their
4   products in humans?
5      MR. SNELL:  Object.
6   BY THE WITNESS:
7      A.   Yes.  The product should be adequately
8   tested prior to launch and adequate budget should
9   be set aside to conduct testing prior to launch.
10  BY MR. THORNBURGH:
11     Q.   Do you have an opinion whether or not
12  medical device companies should budget more
13  money -- more money to conducting randomized
14  controlled trials or adequate testing than they do
15  in marketing?
16     MR. SNELL:  Object.
17  BY THE WITNESS:
18     A.   Yes.
19  BY MR. THORNBURGH:
20     Q.   What's that opinion?
21     A.   That they should allocate more money for
22  adequately testing a product prior to launch than
23  they should allocate towards marketing.
24     Q.   Have you reviewed any internal Ethicon

Page 229

1   documents that discuss a reason why randomized
2   controlled trials were not conducted by Ethicon?
3      MR. SNELL:  Object; leading.
4   BY THE WITNESS:
5      A.   Yes.
6   BY MR. THORNBURGH:
7      Q.   And what is your opinion as to why
8   Ethicon chose not to conduct randomized controlled
9   trials prior to launching the TVT-Secur product?
10     MR. SNELL:  Object.
11  BY THE WITNESS:
12     A.   Budget constraints.
13  BY MR. THORNBURGH:
14     Q.   Based on your review of this slide, the
15  pre-launch marketing 2005 budget, with a total
16  budget of 80 -- $800 million, is there any
17  indication that Johnson & Johnson or Ethicon did
18  not have enough money to conduct adequate testing?
19     MR. SNELL:  Objection.
20  BY THE WITNESS:
21     A.   That would not appear that way from that
22  slide.
23  BY MR. THORNBURGH:
24     Q.   Are there any other slides you'd like to

58 (Pages 226 to 229)

Bruce Alan Rosenzweig, M.D.

Page 230

1    discuss with respect to Exhibit P842?
2        A.   Yes.  It's called "Potential Marketing
3    Claims."
4        Q.   And what, if anything, is relevant with
5    this slide and how does it support your opinions?
6        A.   This is a slide of what they will be
7    claiming as a TVT-Secur device.  They would --
8    wanted to claim that it had the same equivalence as
9    the TVT.  The data show that it was not equivalent
10   to the TVT.
11            That the length was acceptable to all
12   patients.  The 8 centimeter length did not stay in
13   place in all patients and therefore the failure
14   rate was high.
15            They wanted to claim that laser-cut mesh
16   was the same as the mechanical-cut mesh.  However,
17   the laser-cut mesh was found to be three times
18   stiffer than mechanical-cut laser and stiffness
19   leads to the harms that I've described previously.
20       Q.   What's your basis for that last
21   statement, that the stiffness or rigidity of a mesh
22   leads to harms that you've described previously?
23       A.   The medical literature.
24       MR. SNELL:  Objection.  I'm sorry.  Object and

Page 231

1    move to strike as non-responsive.
2    BY MR. THORNBURGH:
3        Q.   And we'll talk about those in greater
4    detail.  But what medical literature are you
5    referring to?
6        A.   The work done by the Feola group in
7    Pittsburgh.  Excuse me.  The Moalli group in
8    Pittsburgh.
9        Q.   And this slide -- and I didn't mean to
10   interrupt you.  If you weren't done, keep on going,
11   Doctor.
12       A.   No.  I'm finished with this.
13       Q.   And this particular slide shows
14   potential marketing claims and there are a number
15   of bullets, some of which are in black font, some
16   of which are in red font, and there is a double
17   asterisk.  What does that double asterisk indicate?
18       A.   Well, it indicates what the potential
19   marketing claims in red signify, and what that
20   signifies is that this will be found on later
21   clinical trials.
22       Q.   So, hold on a second.  Trying to
23   understand this.
24            Does this indicate that Ethicon would

Page 232

1    make certain marketing claims that they wouldn't
2    prove until they conducted later clinical trials?
3        MR. SNELL:  Object and leading.
4    BY THE WITNESS:
5        A.   That's what this document states.
6    BY MR. THORNBURGH:
7        Q.   What does this document and the red and
8    black font indicate to you and how does it support
9    your opinions?
10       MR. SNELL:  Objection.
11   BY THE WITNESS:
12       A.   The red font is claims that would be
13   later proven from either clinical data or clinical
14   experience.  Therefore, that supports my opinion
15   that the TVT-Secur was not adequately studied prior
16   to launch.
17       Q.   Is it -- in your opinion, is it ever
18   appropriate for a company to make marketing claims
19   that are unproven?
20       MR. SNELL:  Objection.
21   BY THE WITNESS:
22       A.   That should not be done.
23   BY MR. THORNBURGH:
24       Q.   And what can happen if companies like

Page 233

1    Ethicon make unproven marketing claims?
2        MR. SNELL:  Objection.
3    BY THE WITNESS:
4        A.   That women will have the device
5    implanted that have design characteristics that
6    make it either unreasonably unsafe or unreasonably
7    ineffective and will suffer harm from that.
8    BY MR. THORNBURGH:
9        Q.   Is it -- are there any -- any more
10   slides or data or information from this Exhibit
11   No. 842 that support your opinions that you want to
12   discuss today?
13       A.   No.
14       Q.   What's the next slide that you want to
15   discuss?
16       A.   This is a brochure that the marketing
17   people, particularly if I recall the ones that came
18   to my office, presented regarding the TVT-Secur.
19       Q.   Doctor, is it reasonable for physicians
20   who are trying to make treatment options or
21   navigate the treatment options available to their
22   patients to rely on the marketing claims of medical
23   device companies?
24       MR. SNELL:  Objection.

59 (Pages 230 to 233)

Bruce Alan Rosenzweig, M.D.

Page 234

1  BY MR. THORNBURGH:
2      Q.  Let me ask it a better way.
3          Is it unreasonable for medical doctors
4  to rely on the marketing claims made by medical
5  device companies like Ethicon who are promoting
6  medical devices for the permanent implantation into
7  patients?
8      MR. SNELL:  Objection.
9  BY MR. THORNBURGH:
10     Q.  Is it unreasonable to rely on company
11 representations about their devices?
12     MR. SNELL:  Same.
13 BY THE WITNESS:
14     A.  It is not unreasonable to rely on claims
15 that are made by the company.
16 BY MR. THORNBURGH:
17     Q.  Do you have an opinion whether or not
18 medical device companies like Ethicon and
19 Johnson & Johnson should not only disclose the
20 benefits of their products, but also safety or
21 efficacy problems with their products?
22     A.  Yes.
23     Q.  And why is that important?
24     A.  It is important so that doctors know all

Page 235

1  of the risks associated with the device so the
2  doctor can make a decision whether or not they will
3  use that device in their patients so they can give
4  that information to the patients so the patient can
5  ultimately make an informed decision about their
6  treatment.
7      Q.  How do doctors make a decision about
8  treatment options for their patients?
9      MR. SNELL:  Objection.
10 BY THE WITNESS:
11     A.  Based on information that is provided by
12 the manufacturer, what's in the literature, and
13 from their clinical experience.
14 BY MR. THORNBURGH:
15     Q.  I've heard the phrase before
16 "risk/benefit assessment."  Have you heard -- am I
17 using that phrase correctly?
18     A.  Yes.
19     Q.  Doctor, what is a risk/benefit
20 assessment?
21     A.  It is an assessment that is made where
22 the risks associated with an individual device,
23 procedure or treatment is weighed against the
24 utility or benefits to the patient.

Page 236

1      Q.  Is that a method used by the medical
2  community when determining what treatment options
3  would be appropriate for their patients, one of the
4  methods?
5      MR. SNELL:  Objection.
6  BY THE WITNESS:
7      A.  Yes.
8  BY MR. THORNBURGH:
9      Q.  And is it important -- do you have an
10 opinion whether or not it's important that doctors
11 are provided with the complete and accurate
12 information concerning the risks as well as the
13 complete and accurate information concerning
14 benefits?
15     A.  Yes.
16     MR. SNELL:  Objection.
17 BY MR. THORNBURGH:
18     Q.  If -- if medical device companies like
19 Ethicon and Johnson & Johnson do not provide
20 complete and accurate information concerning both
21 the risks and the benefits of medical devices that
22 they're promoting, can that impact patient safety?
23     MR. SNELL:  Objection.
24 BY THE WITNESS:

Page 237

1      A.  Yes.
2  BY MR. THORNBURGH:
3      Q.  Can that impact the decision-making
4  process of physicians?
5      MR. SNELL:  Object.
6  BY THE WITNESS:
7      A.  Yes.
8  BY MR. THORNBURGH:
9      Q.  How so?
10     A.  If all the information regarding the
11 characteristics of a device that make it
12 unreasonably unsafe or unreasonably ineffective are
13 not shared with doctors, doctors cannot make an
14 accurate risk/benefit analysis and have a proper
15 risk discussion with their patients.
16     Q.  Okay.  And let's discuss Exhibit P1352.
17 Did you review and rely on this document in
18 rendering your opinions in this case?
19     A.  Yes.
20     Q.  And I think you testified earlier that
21 you had seen this document before you were retained
22 as an expert in this litigation?
23     A.  Yes.
24     Q.  Is it fair to say that of all the

60 (Pages 234 to 237)

Bruce Alan Rosenzweig, M.D.

Page 238

1  documents we've looked at so far, internal company
2  documents, other than this document and the
3  TVT-Secur IFU that we looked at earlier, were any
4  of those other documents disclosed to you or to the
5  medical community?
6      MR. SNELL:  Objection.
7  BY THE WITNESS:
8      A.   Not that I recall.
9  BY MR. THORNBURGH:
10      Q.   Okay.  And what about Exhibit 1352 is
11  relevant to your opinions?  And if you could
12  explain briefly how this information or what
13  information you rely on to support those opinions.
14      A.   I rely on -- relied on the entire
15  document to support my opinions that the TVT-Secur
16  data -- there was no data on the TVT-Secur at the
17  time of launch.
18          Therefore, these brochures that talk
19  about a 97% overall success rate, that it had
20  been -- that there was a low complication rate and
21  that it had been in over a million -- used in over
22  a million women worldwide and that there is
23  seven-year proven efficacy, is not data that is
24  applicable to the TVT-Secur.

Page 239

1      Q.   Okay.
2      MR. SNELL:  Objection.  Move to strike.
3  Non-responsive.
4  BY MR. THORNBURGH:
5      Q.   Okay.  And this document, the very
6  first -- the title of this promotional piece says
7  "No bigger than your palm.  No less than a
8  revolution."
9          Do you see that?
10      A.   Yes.
11      Q.   Did you read the deposition testimony of
12  Axel Arnaud?
13      A.   Yes.
14      Q.   Do you know whether or not based on your
15  review of Axel Arnaud's testimony -- and before we
16  get there.  So, strike the last question.
17          Who is Dr. Axel Arnaud?
18      A.   One of the Medical Directors at Ethicon.
19      Q.   Do you know whether or not Dr. Axel
20  Arnaud agreed or disagreed that the TVT-Secur was a
21  revolution?
22      A.   He disagreed.
23      Q.   Now, if we look at -- and do you agree
24  with Dr. Arnaud?

Page 240

1      MR. SNELL:  Object.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MR. THORNBURGH:
5      Q.   Do you agree or disagree with
6  Dr. Arnaud?
7      A.   I --
8      MR. SNELL:  Same.
9  BY THE WITNESS:
10      A.   I agree with Dr. Arnaud that it is not a
11  revolution.
12  BY MR. THORNBURGH:
13      Q.   What's the next part of Exhibit P1352
14  that is relevant and that you rely on for your
15  opinions?
16      A.   The statement that it is less
17  complicated.
18      Q.   And how does that support your opinion?
19      A.   This statements that the TVT-Secur is
20  designed to reduce the number of procedural steps.
21  From the cadaver studies and the design validation,
22  it was found to be more complicated to insert with
23  more difficulty inserting than the prior TVT
24  devices.

Page 241

1      Q.   So, is this statement by Ethicon that
2  the TVT-Secur was less complicated true or
3  incorrect?
4      MR. SNELL:  Object.
5  BY THE WITNESS:
6      A.   Incorrect.
7  BY MR. THORNBURGH:
8      Q.   And what's the support for that opinion?
9      A.   The design validation which showed that
10  it was much more complicated to put in.
11      Q.   If we look at -- strike that.
12          What is the next relevant information
13  you'd like to discuss?
14      A.   The next page, the "Novel Instrument
15  Design, Stable."  The absorbable fleece tips
16  provide mechanical fixation until tissue ingrowth
17  can occur.
18          The fleece tips were shown by the
19  literature not to hold, which allowed the mesh to
20  move and migrate, which decreased the efficacy of
21  the procedure and increased the harm, such as
22  erosion and pain.
23      Q.   So, is this an incorrect or correct
24  statement by Ethicon that the TVT-Secur was indeed

61 (Pages 238 to 241)

Bruce Alan Rosenzweig, M.D.

Page 242

1    or in fact secure?
2        MR. SNELL: Objection.
3    BY THE WITNESS:
4        A.   Incorrect.
5    BY MR. THORNBURGH:
6        Q.   Do you have an opinion whether or not it
7    would be a misrepresentation for Ethicon to
8    represent to physicians that the TVT-Secur was
9    secure and would stay in place?
10       MR. SNELL: Objection.
11   BY THE WITNESS:
12       A.   I do have an opinion.
13   BY MR. THORNBURGH:
14       Q.   What's that opinion?
15       A.   That that would be a misrepresentation.
16       Q.   And by -- by marketing this product and
17   naming it the TVT-Secur, is that -- do you have an
18   opinion whether or not the name that Ethicon gave
19   it was a misrepresentation?
20       MR. SNELL: Objection.
21   BY THE WITNESS:
22       A.   Yes, I have an opinion.
23   BY MR. THORNBURGH:
24       Q.   What's that opinion?

Page 243

1        A.   It was a misrepresentation.
2        Q.   And what's the basis for that opinion?
3        MR. SNELL: Same.
4    BY THE WITNESS:
5        A.   The literature.
6    BY MR. THORNBURGH:
7        Q.   Did Ethicon know or should they have
8    known based on your review of the internal company
9    documents by 2006 when they launched this product
10   that the TVT-Secur was a more complicated
11   procedure?
12       MR. SNELL: Objection.
13   BY THE WITNESS:
14       A.   Yes.
15   BY MR. THORNBURGH:
16       Q.   Than the TVT-O or TVT Retropubic?
17       A.   Yes.
18       Q.   Did Ethicon know before they launched
19   the TVT-Secur in September of 2006 that the mesh
20   would not stay in place?
21       MR. SNELL: Objection.
22   BY THE WITNESS:
23       A.   Yes.
24   BY MR. THORNBURGH:

Page 244

1        Q.   What's the basis for that opinion?
2        A.   Based on the design validation cadaver
3    studies.
4        Q.   And did Ethicon conduct any human
5    studies before they launched it that suggested that
6    the TVT-Secur would not -- would or would not be
7    effective?
8        A.   Yes.  The five-week data on 31 patients
9    which showed a failure rate of 30%.
10       Q.   The next -- what's the next page that
11   you'd like to discuss?
12       A.   "Innovative tension-free fixation
13   technology keeps the mesh in place."
14       Q.   We haven't really talked about this.  I
15   think we brought it up just briefly during the
16   implant training video.
17            But what does it mean to be
18   tension-free?
19       A.   There is no accurate way to describe the
20   amount of tension that should be placed on a
21   midurethral sling during the implantation.
22       Q.   And if we look at the TVT-Secur box
23   really quick, the box that the TVT-Secur came in.
24            Hold that up for the ladies and

Page 245

1    gentlemen of the jury.
2        THE VIDEOGRAPHER: Let me focus.  Hold on.
3        Okay.  I got it.
4    BY MR. THORNBURGH:
5        Q.   And what were you showing the ladies and
6    gentlemen of the jury?
7        A.   It says, "Tension-free support for
8    incontinence."
9        Q.   Was it an accurate statement or
10   representation that the Gynecare TVT-Secur system
11   was tension-free support for incontinence?
12       MR. SNELL: Object.
13   BY THE WITNESS:
14       A.   Inaccurate.
15   BY MR. THORNBURGH:
16       Q.   And what's the basis for that opinion?
17       A.   The internal documents and the
18   literature.
19       Q.   And did Ethicon know before they
20   marketed and sold this product that it would be a
21   misrepresentation to claim that the Gynecare
22   TVT-Secur system was tension-free support for
23   incontinence?
24       MR. SNELL: Object.

62 (Pages 242 to 245)

Bruce Alan Rosenzweig, M.D.

Page 246

1    BY THE WITNESS:
2        A.   They should have known, yes.
3    BY MR. THORNBURGH:
4        Q.   And what's the next page you'd like to
5    discuss?
6        A.   The "Materials, Dependable, Reliable."
7        Q.   Do you have an opinion whether or not --
8    strike that.
9            How does these statements by Ethicon
10   that the TVT-Secur is dependable and reliable
11   support your opinions?
12       A.   Well, the Prolene mesh in the short
13   length with laser cutting had never been used
14   before so, therefore, it could not be known to be
15   dependable because it had not been studied in
16   the -- in the humans prior to launch except in 31
17   women for five weeks.
18           The reliability of the fleece tips had
19   never been used before in women.  The only data
20   that they had was on 31 women for five weeks.  So,
21   to be able to say that the short mesh with
22   laser-cut and the fleece tips were dependable and
23   reliable, the only human data was on 31 women for
24   five weeks.

Page 247

1        Q.   And did the human data on 31 women for
2    five weeks, did that demonstrate or prove that the
3    TVT-Secur would be dependable?
4        MR. SNELL:  Object.
5    BY THE WITNESS:
6        A.   No, there is a failure rate of 30%.
7    BY MR. THORNBURGH:
8        Q.   Did it prove or demonstrate that the
9    TVT-Secur would be reliable?
10       A.   No, there was a 60% complication rate.
11       Q.   What is the next --
12       MR. SNELL:  Object.  Move to strike.
13   Nonresponsive.  Go ahead.
14   BY MR. THORNBURGH:
15       Q.   What is the next -- is there any other
16   information you'd like to discuss from
17   Exhibit P1352?
18       A.   Yes.  The next page, which describes the
19   seven-year data.  We've already seen e-mail
20   statements from key Ethicon employees noting that
21   the seven-year data would not be reliably
22   translatable to the TVT-Secur.
23       MR. SNELL:  Object; misstates.  Move to
24   strike.

Page 248

1    BY MR. THORNBURGH:
2        Q.   We had just looked at some claims
3    that -- that -- a moment ago we looked at
4    Exhibit 842 for some claims that Ethicon would use
5    to market the TVT-Secur product.  Do you recall
6    that?
7        A.   Yes.
8        Q.   And I want to first go to a side-by-side
9    of this statement or this data that is reflected in
10   the promotional piece of Exhibit 1352 and compare
11   it to the claims that Ethicon wanted to make with
12   respect to the TVT-Secur system.
13       MR. SNELL:  Object.
14       MR. THORNBURGH:  And what slide is that again,
15   Tom?  Could you just pull it up.
16       MR. BODYZIAK:  It's the last one.  So, it's --
17       MR. THORNBURGH:  The last slide of
18   Exhibit P842.
19       MR. BODYZIAK:  Slide 40, page 41 of the
20   document.
21   BY MR. THORNBURGH:
22       Q.   And you'll see, again, we looked at this
23   earlier, but it says red would be "Later from
24   clinicals."

Page 249

1            Do you see that?
2        A.   Yes.
3        Q.   And the claim that Ethicon was going to
4    market to promote the TVT-Secur says, or one of the
5    claims, is "Equivalent efficacy to TVT or TVT-O."
6            Do you see that?
7        MR. SNELL:  Object.
8    BY THE WITNESS:
9        A.   Yes.
10   BY MR. THORNBURGH:
11       Q.   Based on Ethicon's own internal document
12   from the potential marketing claims, was that claim
13   proven or unproven?
14       MR. SNELL:  Objection.
15   BY THE WITNESS:
16       A.   Unproven.
17   BY MR. THORNBURGH:
18       Q.   And yet despite that, if we go and
19   compare that to the -- the data that was being
20   provided to doctors in P1352, what was Ethicon
21   representing to physicians who were considering
22   whether or not to implant the TVT-Secur permanently
23   in their patients?
24       A.   That the --

63 (Pages 246 to 249)

Bruce Alan Rosenzweig, M.D.

Page 250

1     MR. SNELL: Objection.
2   BY THE WITNESS:
3     A.   That the overall success rate was 97%.
4   BY MR. THORNBURGH:
5     Q.   Were they suggesting that the success
6   rate of the TVT-Secur was equivalent to the
7   efficacy of the TVT and TVT-O?
8     MR. SNELL: Objection.
9   BY THE WITNESS:
10     A.   Yes.
11   BY MR. THORNBURGH:
12     Q.   Was that a misrepresentation?  Strike
13   that.
14        Do you have an opinion whether or not
15   that was a true claim?
16     MR. SNELL: Objection.
17   BY THE WITNESS:
18     A.   Yes, I have an opinion.
19   BY MR. THORNBURGH:
20     Q.   What's the opinion?
21     MR. SNELL: Same.
22   BY THE WITNESS:
23     A.   That was not a true claim.
24   BY MR. THORNBURGH:

Page 251

1     Q.   Do you have an opinion whether or not
2   that was a proven claim?
3     A.   Yes, I have an opinion.
4     MR. SNELL: Same objection.
5   BY MR. THORNBURGH:
6     Q.   What's that opinion?
7     A.   That it was not a proven claim.
8     Q.   Do you have an opinion whether or not it
9   was appropriate for Ethicon to represent to
10   physicians that the TVT-Secur had equivalent
11   efficacy or worked just as well as the TVT-Secur --
12   TVT -- strike that.  Let me reask because I messed
13   up.
14        Do you have an opinion whether or not it
15   was appropriate for Ethicon to represent to
16   physicians that the TVT-Secur was equivalent in
17   efficacy as the TVT Retropubic or TVT-Obturator?
18     MR. SNELL: Same objection.
19   BY THE WITNESS:
20     A.   Yes, I have an opinion.
21   BY MR. THORNBURGH:
22     Q.   What is that opinion?
23     A.   That that would be a misrepresentation.
24     Q.   Did Ethicon tell physicians in this

Page 252

1   marketing piece that this was an unproven claim?
2     MR. SNELL: Objection.
3   BY THE WITNESS:
4     A.   No, they did not.
5   BY MR. THORNBURGH:
6     Q.   Would it have been reasonable for
7   physicians who were provided this marketing piece
8   to believe based on the information Ethicon was
9   providing to them that the TVT-Secur was as
10   efficacious as the TVT Retropubic device?
11     MR. SNELL: Objection.
12   BY THE WITNESS:
13     A.   It would not be an unreasonable
14   assumption.
15   BY MR. THORNBURGH:
16     Q.   Would it be reasonable for consumers to
17   expect that the TVT-Secur would perform at least as
18   well as the TVT Retropubic or TVT-Obturator
19   devices?
20     MR. SNELL: Objection.
21   BY THE WITNESS:
22     A.   Based on this brochure, one would --
23   could make that assumption.
24   BY MR. THORNBURGH:

Page 253

1     Q.   Any other information that you'd like to
2   discuss concerning the information in this exhibit,
3   Exhibit P1352?
4     A.   The next page, it states, "Gynecare's
5   commitment to evidence-based medicine, ongoing
6   studies with the TVT-Secur, a post-market
7   evaluation of 50 patients and a prospective
8   multi-center study with 300 patients."
9     Q.   Based on your review of, in this case,
10   of Ethicon's internal documents, was Gynecare
11   committed to evidence-based medicine?
12     A.   They did not sponsor a prospective or
13   they did not perform their own prospective
14   randomized multi-center trial of 300 patients.
15     MR. SNELL: Objection. Non-responsive. Move
16   to strike.
17   BY MR. THORNBURGH:
18     Q.   Hold on a second.  This is a marketing
19   piece that Ethicon would use after the TVT-Secur
20   was on the market?
21     A.   Correct.
22     Q.   After -- by the time Ethicon had brought
23   the TVT-Secur to market and had begun to sell it,
24   had they already looked at the interim data for

64 (Pages 250 to 253)

Bruce Alan Rosenzweig, M.D.

Page 254

1    this first study that they discuss here under the
2    statement that Gynecare was committed to
3    evidence-based medicine?
4        A.   Yes.
5        Q.   And did the interim data that Ethicon
6    reviewed from the First Human Use Study, did that
7    demonstrate that the evidence supported the safety
8    or efficacy of Ethicon's Secur product?
9        MR. SNELL:  Object.
10   BY THE WITNESS:
11       A.   That study did not.
12   BY MR. THORNBURGH:
13       Q.   Is this statement something that would
14   have been reasonable for doctors to rely on?
15       MR. SNELL:  Objection.
16   BY THE WITNESS:
17       A.   It --
18   BY MR. THORNBURGH:
19       Q.   Strike that.  Let me ask a better
20   question.
21            Rather than tell doctors that you are as
22   a company committed to evidence-based medicine,
23   would it have been appropriate instead for Ethicon
24   to disclose in this promotional piece the interim

Page 255

1    data from the First Human Use Study?
2        MR. SNELL:  Object.
3    BY THE WITNESS:
4        A.   That would have been appropriate.
5    BY MR. THORNBURGH:
6        Q.   Did they do that?
7        MR. SNELL:  Same.
8    BY THE WITNESS:
9        A.   No, they did not.
10   BY MR. THORNBURGH:
11       Q.   Could they have?
12       MR. SNELL:  Same.
13       A.   Yes.
14   BY MR. THORNBURGH:
15       Q.   Should they have?
16       MR. SNELL:  Same objection.
17   BY THE WITNESS:
18       A.   Yes.
19   BY MR. THORNBURGH:
20       Q.   What is the risk -- is there a risk of
21   harm to patients if companies like Ethicon don't
22   completely and accurately disclose the safety or
23   efficacy information that they have?
24       MR. SNELL:  Object.

Page 256

1    BY THE WITNESS:
2        A.   Yes.
3    BY MR. THORNBURGH:
4        Q.   Do you have an opinion whether or not
5    the data from the interim First Human Use Study
6    would have -- would have been beneficial to
7    implanting physicians when performing their
8    risk/benefit assessment?
9        MR. SNELL:  Object.
10   BY THE WITNESS:
11       A.   Yes.
12   BY MR. THORNBURGH:
13       Q.   Why is that?
14       MR. SNELL:  Same.
15       A.   Doctors need all the information
16   available to them about the success and the
17   complications associated with a medical device in
18   order to make an accurate risk/benefit analysis to
19   determine whether or not they would use a
20   particular device to treat a particular condition.
21   BY MR. THORNBURGH:
22       Q.   Based on your review of Ethicon's
23   internal company documents, did it ever edit this
24

Page 257

1    brochure that it provided to doctors?
2        MR. SNELL:  Objection.
3    BY THE WITNESS:
4        A.   No, they did not.
5    BY MR. THORNBURGH:
6        Q.   Did Ethicon ever edit this promotional
7    marketing piece that it provided to doctors to
8    disclose the interim data from the First Human Use
9    Study?
10       A.   No, they did not.
11       Q.   Did Ethicon ever edit this brochure or
12   provide an updated brochure or create a new
13   brochure that disclosed to implanting physicians
14   the final results from the 12 -- 12-month First
15   Human Use Data Study?
16       A.   No, they did not.
17       Q.   Could they have?
18       A.   Yes.
19       Q.   Should they have?
20       A.   Yes.
21       MR. SNELL:  Object.
22   BY MR. THORNBURGH:
23       Q.   We are going to talk about the 12-month
24   data here in a little bit, but what was the outcome

65 (Pages 254 to 257)

Bruce Alan Rosenzweig, M.D.

Page 258

1    of that study?
2        A.   That the success rate was less than 70%
3    and the complication rate was 60%.
4        Q.   Did that company -- did that 12-month
5    study pass -- or strike that.
6            Did that 12-month study support the
7    safety or efficacy of the TVT-Secur product?
8        A.   No, it did not.
9        Q.   Did that study fail or pass, in other
10   words, did the study results demonstrate safety and
11   efficacy?
12       MR. SNELL:  Object.
13   BY THE WITNESS:
14       A.   No, it did not.
15   BY MR. THORNBURGH:
16       Q.   Did the study fail to meet its primary
17   endpoints for safety?
18       A.   Yes.
19       Q.   Did the study fail to meet its primary
20   endpoints for efficacy?
21       A.   Yes.
22       Q.   Did Ethicon ever disclose that to any
23   doctors in the community?
24       A.   No.

Page 259

1        Q.   What's the next exhibit you'd like to
2    discuss, Doctor?
3        A.   P1403.
4        MR. THORNBURGH:  One moment.
5    BY MR. THORNBURGH:
6        Q.   And what is Exhibit --
7        THE VIDEOGRAPHER:  Your microphone.
8    BY MR. THORNBURGH:
9        Q.   Doctor, did you review and rely upon
10   P1403?
11           (Clarification requested by the
12            reporter.)
13   BY MR. THORNBURGH:
14       Q.   Did you review and rely on
15   Exhibit P1403?
16       A.   Yes.
17       Q.   And what is Exhibit P1403?
18       A.   It's an e-mail string between David
19   Robinson, Allison London Brown and other Ethicon
20   employees.
21       Q.   And how, if at all, does this exhibit
22   support your opinions?
23       A.   This is an e-mail string regarding the
24   interim data from the first five-week data on 31

Page 260

1    patients, and it -- the discussion shows that the
2    interim data is not good.  It showed the higher
3    failure rate that was the primary endpoint.  It
4    also showed a higher complication rate.
5        Q.   Okay.  So, let me try to dissect this a
6    little bit.
7            Was -- it's dated August 26, 2006 --
8        A.   Correct.
9        Q.   -- is that correct?
10           And how many months before the launch of
11   the TVT-Secur?
12       A.   This is less than one month.
13       Q.   So, less than one month before Ethicon
14   launched the TVT-Secur, is that correct?
15       A.   Correct.
16       Q.   And -- and you've already testified that
17   the only relevant human data that was available to
18   demonstrate safety or efficacy of the TVT-Secur
19   device was this First Human Use Study, is that
20   correct?
21       MR. SNELL:  Objection and leading.
22   BY THE WITNESS:
23       A.   Correct.
24   BY MR. THORNBURGH:

Page 261

1        Q.   Was there any other human study that
2    demonstrate or that was available to demonstrate
3    safety or efficacy of the TVT-Secur device at this
4    time other than this First Human Use Study of 31
5    patients for five weeks?
6        MR. SNELL:  Object.
7    BY THE WITNESS:
8        A.   No.
9    BY MR. THORNBURGH:
10       Q.   And Allison London Brown in this e-mail
11   is writing to David Robinson who is the Medical
12   Affairs person, is that correct?
13       A.   He is Medical Director, yes.
14       Q.   And she writes in this e-mail in the
15   very bottom of the first page, "Anna and David,
16   First, thanks for getting this so quickly - you've
17   done a great job here.  The data looks really
18   promising."
19           Did I read that correctly?
20       A.   Yes.
21       MR. SNELL:  Objection; leading.
22   BY MR. THORNBURGH:
23       Q.   Okay.  And did the -- and Allison London
24   Brown again is marketing?

66 (Pages 258 to 261)

Bruce Alan Rosenzweig, M.D.

Page 262

```
1        A.   She was the worldwide launch coordinator
2   for the TVT-Secur.
3        Q.   Okay.  And was she a medical doctor?
4        A.   No.
5        Q.   And she is -- is she discussing here the
6   results of the interim data?
7        A.   Yes.
8        Q.   And she writes here that "How best do
9   you think we need to show the data?"
10            It's the first -- she is directing this
11  question to Dave Thomas -- Dave Robinson at the
12  bottom of this page.
13            "Dave - How best do you think we need to
14  show the data?  Right now it seems like it's a bit
15  passive - text and numbers on the page, but is that
16  what is needed at these meetings?"
17            And then another question, "Do you think
18  we can jazz it up a bit?"
19            Did I read that correctly?
20       MR. SNELL:  Objection; leading.
21  BY THE WITNESS:
22       A.   Yes.
23  BY MR. THORNBURGH:
24       Q.   First of all, is it ever okay or
```

Page 263

```
1   appropriate for a medical device company to jazz up
2   safety or efficacy information?
3        MR. SNELL:  Object.
4   BY THE WITNESS:
5        A.   No.
6   BY MR. THORNBURGH:
7        Q.   Why not?
8        A.   Because a company should represent the
9   accurate safety and efficacy data.
10       Q.   Okay.  And David Robinson responds back
11  to Allison.  You've already testified about this,
12  but I want to talk about it a little bit in greater
13  detail.  "I am not sure I agree the data looks
14  good."
15            Is that correct?
16       A.   Correct.
17       MR. SNELL:  Leading.  Object.
18  BY MR. THORNBURGH:
19       Q.   "You are talking about a 10% failure
20  rate in the primary endpoint and eight out of 31
21  positive cough tests in our secondary endpoints."
22            Did I read that correctly?
23       MR. SNELL:  Object; leading.
24  BY THE WITNESS:
```

Page 264

```
1        A.   Correct.
2   BY MR. THORNBURGH:
3        Q.   And do you understand what a -- what
4   does a positive cough test mean?  What is that?
5   Explain to the ladies and gentlemen of the jury
6   what that test is and what the significance of that
7   test is, if any.
8        A.   A cough stress test is performed with a
9   patient, most reliably in a standing position with
10  at least 200, 250 cc's of fluid in their bladder.
11  When they cough, if leakage is noted, that means
12  that there is a positive cough stress test.  That
13  is a sign of stress urinary incontinence.
14       Q.   And eight out of 31 had positive cough
15  tests?
16       A.   Correct.
17       Q.   And what does that mean, that eight out
18  of 31 had positive cough tests?
19       A.   That 26% of women leaked when they were
20  asked to cough.
21       Q.   If there were four women in the room who
22  underwent this procedure, how many of those women
23  would have leaked?
24       MR. SNELL:  Objection.
```

Page 265

```
1   BY THE WITNESS:
2        A.   One of them.
3   BY MR. THORNBURGH:
4        Q.   If there were 100 patients at 100 -- at
5   31 days of the five-week period and they coughed,
6   how many of them would have leaked?
7        A.   26.
8        Q.   Is that a high number in your opinion,
9   Doctor?
10       A.   Yes.
11       Q.   At five weeks?
12       A.   Yes.
13       Q.   Is a 26% failure rate at five weeks good
14  or bad for patients?
15       MR. SNELL:  Objection.
16  BY THE WITNESS:
17       A.   That is not a positive result.
18  BY MR. THORNBURGH:
19       Q.   Do you have an opinion whether or not a
20  26% failure rate was a good or bad result in this
21  study?
22       MR. SNELL:  Objection.
23  BY THE WITNESS:
24       A.   It was a bad result.
```

67 (Pages 262 to 265)

Bruce Alan Rosenzweig, M.D.

Page 266

BY MR. THORNBURGH:
    Q.   Do you agree with David Robinson that
the results of the TVT-Secur five-week study in 31
patients did not look good?
    MR. SNELL:  Object; misstates.
BY THE WITNESS:
    A.   I agree with that statement.
BY MR. THORNBURGH:
    Q.   Are those your words?
    A.   Those are Dr. Robinson's words.
    Q.   Do you agree with Dr. Robinson?
    A.   That the data does not look good, yes.
    Q.   Now --
    MR. SNELL:  Move to strike.
BY MR. THORNBURGH:
    Q.   Dr. Robinson goes on and says,
"I believe these numbers will improve as the other
half of the patients get done.  But these first 31
include everyone's learning curve."
         Did I read that correctly?
    A.   Yes.
    Q.   What's a learning curve?
    A.   It is the amount of time that it takes
for someone to become proficient at a surgical

Page 267

technique.
    Q.   What is Dr. Robinson --
    THE WITNESS: Can we take a break?
    MR. THORNBURGH:  Yes.
    THE VIDEOGRAPHER:  The time is 3:30 p.m. and
we're going off the video record.
         (WHEREUPON, a recess was had
          from 3:30 to 3:45 p.m.)
    THE VIDEOGRAPHER:  The time is 3:45 p.m. and
we're back on the video record.
BY MR. THORNBURGH:
    Q.   Doctor, before we went off the record we
were talking about Exhibit P1403, right?
    A.   Yes.
    Q.   And in the first part of David -- in the
second sentence of David Robinson's response to
Allison London Brown on August 26, 2006, he
writes, "I believe these numbers will improve as
the other half of the patients get done but these
first 31 include everyone's learning curve."
         Did I read that correctly?
    MR. SNELL:  Object.
BY THE WITNESS:
    A.   Yes.

Page 268

BY MR. THORNBURGH:
    Q.   Does that statement have any
significance to your opinions?
    MR. SNELL:  Objection.
BY THE WITNESS:
    A.   Yes.
BY MR. THORNBURGH:
    Q.   And what is that?
    MR. SNELL:  Same.
BY THE WITNESS:
    A.   That -- well, first the learning curve,
again, is the amount of time it takes a physician
to feel -- to be able to reliably perform a
procedure to get the best possible results.
         It was initially anticipated that the
learning curve would be much shorter than it
actually turned out to be.  The learning curve was
initially anticipated to be maybe five to ten
cases, but was found by the opinions and internal
documents from Key Opinion Leaders to be over 50
and closer to 100.
    Q.   Do you have an opinion whether or not a
learning curve of 50 to 100 is a reasonable
learning curve for a medical device product?

Page 269

    MR. SNELL:  Object.
BY THE WITNESS:
    A.   It is an unreasonable learning curve.
In fact, there were doctors that stated that even
with training and re-training, they could still not
get the same -- the results that they were striving
for.
BY MR. THORNBURGH:
    Q.   And how is the fact that there was a 50
to 100 patient learning curve significant, if at
all, to your opinions in this case?
    A.   It is significant for my opinions that
the Instructions for Use is defective.
    Q.   And what about the product?
    A.   It is also my opinion that it shows that
there are characteristics of the device that make
it unreasonably unsafe.  Therefore, defective.
    Q.   And, now, Dr. Robinson is saying that --
he writes here that the results should get better
after the physicians who are part of the research
had gotten past their learning curve in the second
half of the study.  Is that correct?
    MR. SNELL:  Object; leading.
BY THE WITNESS:

Bruce Alan Rosenzweig, M.D.

Page 270

1      A.   That's what Dr. Robinson is saying.
2    BY MR. THORNBURGH:
3      Q.   Since I got an objection.
4          What is your understanding of what
5    Dr. Robinson is suggesting with respect to the
6    learning curve and the additional patients that
7    would be added to the study?
8      A.   He is stating that he believes that the
9    numbers will get better in the second half of the
10   study.  The study was to look at 60 women.
11   Ultimately 72 women were in the final analysis of
12   the First Human Use data, and he was anticipating
13   that the success rates would go up and the
14   complication rate would go down.
15     Q.   Now, was Dr. Robinson correct that after
16   the learning curve had been achieved, that the
17   results would get better?
18     A.   No, he was not.
19     Q.   And how do you know that?  What's the
20   basis for your opinion?
21     A.   The final data from the First Human Use
22   Study.
23     Q.   Now, do medical device companies have
24   choices?

Page 271

1      MR. SNELL:  Objection.
2    BY THE WITNESS:
3      A.   Yes.
4    BY MR. THORNBURGH:
5      Q.   Do the employees that work for medical
6    device companies have choices?
7      MR. SNELL:  Objection.
8    BY THE WITNESS:
9      A.   Yes.
10   BY MR. THORNBURGH:
11     Q.   Did David Robinson have a choice in
12   August -- on August 26, 2006 with respect to the
13   data he had available to him prior to launch?
14     MR. SNELL:  Objection.
15   BY THE WITNESS:
16     A.   Yes.
17   BY MR. THORNBURGH:
18     Q.   What choices did he have?
19     A.   He could say that this data does not
20   look good and we should delay the launch or even
21   not continue the product line because the data
22   was -- showed a high failure rate and a high
23   complication rate.
24     Q.   Now, if instead of David Robinson

Page 272

1    sitting in New Jersey making a decision about what
2    to do with this information, instead of
3    Dr. Robinson, it was you, Dr. Rosenzweig, faced
4    with the same facts and the same data, what would
5    Dr. Rosenzweig have decided to do?  What choice
6    would you have made?
7      MR. SNELL:  Object.
8    BY THE WITNESS:
9      A.   I would not have launched the TVT-Secur
10   on September 20, 2006.
11   BY MR. THORNBURGH:
12     Q.   And did you read the trial testimony of
13   Dr. Sepulveda?
14     A.   Yes.
15     Q.   And what did Dr. Sepulveda testify to
16   with respect to the same question I asked him, if
17   it were Dr. Sepulveda with this information in
18   August of 2006, what would he have done, what did
19   he testify to?
20     A.   If --
21     MR. SNELL:  Object.
22   BY THE WITNESS:
23     A.   If I recall correctly, he said he would
24   delay the launch too.

Page 273

1    BY MR. THORNBURGH:
2      Q.   So, do you agree with Dr. Sepulveda on
3    that issue?
4      A.   Yes.
5      Q.   Do you agree -- and what decision did
6    Dr. David Robinson choose?
7      A.   To continue with the launch of the
8    TVT-Secur on September 20, 2006.
9      Q.   Was that an appropriate choice?
10     A.   No.
11     Q.   Did -- do you have an opinion whether or
12   not Dr. Sepulveda's choice to continue with the
13   launch of the product in light of the data he had
14   available to him before launch --
15     A.   Dr. Robinson.
16     Q.   Sorry.  Strike that.
17         Do you have an opinion whether or not
18   Dr. Robinson's choice to continue to launch --
19   continue with the launch of the TVT-Secur product
20   in light of this data was appropriate?
21     MR. SNELL:  Object.
22   BY THE WITNESS:
23     A.   Yes, I have an opinion.
24   BY MR. THORNBURGH:

69 (Pages 270 to 273)

Bruce Alan Rosenzweig, M.D.

Page 274

1     Q.   What is that opinion?
2     MR. SNELL: Same.
3  BY THE WITNESS:
4     A.   It was not appropriate.
5  BY MR. THORNBURGH:
6     Q.   And why wasn't it appropriate?
7     A.   Because the device was shown to have
8  characteristics that made it unreasonably unsafe
9  and unreasonably ineffective.
10    Q.   And did this decision -- do you have an
11 opinion whether or not the decision to launch this
12 product impacted the safety of patients?
13    A.   Yes.
14    Q.   And what is that opinion?
15    A.   That it negatively impacted the safety
16 of women.
17    Q.   In what way?
18    A.   It had an unreasonably high failure rate
19 and an unreasonably high complication rate.
20    Q.   What's the next document you want to
21 discuss with the jury?
22    A.   It is an e-mail from September 25, 2006.
23    Q.   Well, hold on one second. Before we do
24 that really quick.

Page 275

1          Did you read and rely on the testimony
2  of Dr. Robinson?
3     A.   Yes.
4     Q.   And did Dr. Robinson -- what did
5  Dr. Robinson testify with respect to the final
6  results from the -- that short-term, five-week, 31
7  patient interim data that he had available to him?
8     MR. SNELL: Objection.
9  BY MR. THORNBURGH:
10    Q.   Prior to launch.
11    MR. SNELL: Sorry. Objection.
12 BY THE WITNESS:
13    A.   The final 12-month analysis after the
14 study was completed?
15 BY MR. THORNBURGH:
16    Q.   Yeah, let me ask a better question.
17         Did you read and rely on Dr. Robinson's
18 testimony concerning the final results of the
19 interim First Human Use data?
20    A.   Yes.
21    Q.   And what did Dr. Robinson testify to
22 with respect to the failure rate, if any, of the
23 TVT-Secur device as found in the final interim
24 data?

Page 276

1     A.   The data did not get better. In fact,
2  it got worse.
3     Q.   And what --
4     A.   The failure data.
5     Q.   And what was the failure rate?
6     A.   Above 30%, if I recall.
7     Q.   And is it fair to say approximately 30%
8  of the patients who were treated with the TVT-Secur
9  in the First Human Use Study failed the procedure
10 to treat their stress urinary incontinence?
11    A.   Correct.
12    MR. SNELL: Object and leading.
13 BY MR. THORNBURGH:
14    Q.   And what was -- what did Dr. Robinson
15 testify to with respect to the complication rate
16 seen by him in the final interim data of the First
17 Human Use Study?
18    A.   That the complication data did not go
19 down either.
20    Q.   And do you recall what the complication
21 rate was, approximately?
22    A.   Approximately 60%.
23    Q.   Did the First Human Use final interim
24 analysis of 31 patients at five weeks demonstrate

Page 277

1  safety or efficacy of the TVT-Secur product?
2     MR. SNELL: Object.
3  BY THE WITNESS:
4     A.   No, it did not.
5  BY MR. THORNBURGH:
6     Q.   What's the next document you have with
7  you?
8          (Reporter note: Exhibit P1452.)
9  BY THE WITNESS:
10    A.   It is an e-mail from -- between David
11 Robinson and Harel Gadot. It is regarding an
12 e-mail from an Israeli physician Dr. Flam regarding
13 defects associated with the TVT-Secur.
14    Q.   And what is the date of this e-mail?
15    A.   September 25, 2006.
16    Q.   In terms of the date that the TVT-Secur
17 was launched, how close in time was this e-mail
18 sent?
19    A.   Five days after launch.
20    Q.   Okay. And did you review and rely on
21 this exhibit in forming your opinions in this case?
22    A.   Yes.
23    Q.   And what about this exhibit did you rely
24 on in forming your opinions in this case?

Bruce Alan Rosenzweig, M.D.

Page 278

1    A.   I relied on the fact that a physician
2 who was using this device at the time who was a
3 skilled pelvic surgeon communicated with Ethicon
4 that the device was defective.
5    Q.   Is it fair to say that -- strike that.
6    If we can, go ahead and just pull up
7 this exhibit on the screen and go to the full
8 e-mail from Dr. Suchard or Mr. Suchard.  Very
9 bottom part.
10   And what is occurring in this
11 conversation with Dr. Suchard to Dr. Flam Folke?
12   MR. SNELL:  Objection.
13 BY MR. THORNBURGH:
14   Q.   What part of this -- what part of this
15 e-mail conversation is relevant to your opinions?
16   A.   Well, first, Dr. Flam is being invited
17 to some professional education events for TVT-Secur
18 and Prolift from the Gynecare team leader from
19 Johnson & Johnson medical in Israel.
20   Q.   Did -- I'm sorry.  Go ahead.  Go ahead.
21   A.   And then Dr. Flam responds back that he
22 has concerns regarding the TVT-Secur.  He feels
23 that the product needs to be adjusted before he's
24 willing to demonstrate it.  He describes that there

Page 279

1 are defects that have to be attended to.
2    Q.   And did -- do you agree --
3    MR. SNELL:  I'm sorry.  Move to strike.
4 BY MR. THORNBURGH:
5    Q.   Do you agree -- based on your review of
6 the -- strike that.
7    Do you agree with Dr. Flam Folke or
8 Folke?
9    A.   Yes.
10   Q.   And what part of Dr. Flam Folke's e-mail
11 do you agree with?
12   MR. SNELL:  Object.
13 BY THE WITNESS:
14   A.   That there are defects associated with
15 the TVT-Secur.
16 BY MR. THORNBURGH:
17   Q.   And how did Ethicon or Ethicon's
18 employees respond to this comment by Dr. Folke that
19 the TVT-Secur had some defects that needed to be
20 attended to?
21   A.   When it went up to --
22   MR. SNELL:  Object.
23 BY THE WITNESS:
24   A.   -- a member or Dr. Gadot forward this

Page 280

1 off to Dr. Robinson and said, "Please do not
2 distribute."
3 BY MR. THORNBURGH:
4    Q.   And what is the significance of that
5 response from Dr. Gadot saying, "FYI - please do
6 not distribute"?
7    A.   Well, if this information about the
8 defects associated with the TVT-Secur device are
9 not distributed to -- to others, then it would be
10 difficult or impossible for doctors to know about
11 the defects, the characteristics of the device that
12 make it defective and that make it unreasonably
13 unsafe or unreasonably ineffective and therefore
14 cannot pass that information on to their patients
15 to have an adequate, informed discussion about the
16 risks associated with the TVT-Secur device.
17   Q.   Do you have an opinion about whether or
18 not Ethicon appropriately responded to the concerns
19 being raised by Dr. Flam Folke?
20   MR. SNELL:  Object.
21 BY THE WITNESS:
22   A.   I do have an opinion.
23 BY MR. THORNBURGH:
24   Q.   What's that opinion?

Page 281

1    A.   They did not.
2    Q.   And how so?
3    A.   They did not distribute this information
4 from a surgeon who noted that there were defects
5 associated with the TVT-Secur.
6    Q.   Do you have an opinion whether or not
7 Ethicon had enough information at this point in
8 time to take proper action and, as Dr. Folke
9 writes, address or attend to some of the defects?
10   MR. SNELL:  Object.
11 BY THE WITNESS:
12   A.   Yes, they did have enough information.
13 BY MR. THORNBURGH:
14   Q.   What information did they have?
15   A.   The data from the First Human Use Study.
16   Q.   And did Ethicon attempt in any way to
17 correct or address the physical characteristics of
18 the TVT-Secur device from the date that they
19 launched it until they finally stopped selling the
20 product in 2012?
21   MR. SNELL:  Object.
22 BY THE WITNESS:
23   A.   No, they did not.
24 BY MR. THORNBURGH:

Golkow Litigation Services - 1.877.370.DEPS

Bruce Alan Rosenzweig, M.D.

Page 282

1      Q.   And do you have an opinion about whether
2  or not that was appropriate?
3      A.   I do have an opinion.
4      Q.   And what's that opinion?
5      MR. SNELL:  Object.
6  BY THE WITNESS:
7      A.   It is inappropriate.
8  BY MR. THORNBURGH:
9      Q.   And what should the company do?
10     MR. SNELL:  Same objection.
11 BY THE WITNESS:
12     A.   Stop selling the device.
13 BY MR. THORNBURGH:
14     Q.   How many years did it take after
15 Dr. Folke's or Folke's e-mail with the comment that
16 there were some defects that needed to be attended
17 to before Ethicon stopped selling the device?
18     A.   Six years.
19     Q.   And all this time, the six-year period,
20 did doctors continue to implant the TVT-Secur
21 product into patients?
22     A.   Yes.
23     Q.   Did Ethicon's failure to properly
24 respond to the data from their First Human Use

Page 283

1  Study and to the concerns of Dr. Folke put patients
2  at risk?
3      MR. SNELL:  Object and leading.
4  BY THE WITNESS:
5      A.   Yes.
6  BY MR. THORNBURGH:
7      Q.   Do you have an opinion whether or not
8  Ethicon's failure to respond by attending to the
9  defects put patients at risk of harm?
10     MR. SNELL:  Object.
11 BY THE WITNESS:
12     A.   Yes, I have an opinion.
13 BY MR. THORNBURGH:
14     Q.   What's that opinion?
15     MR. SNELL:  Same.
16 BY THE WITNESS:
17     A.   That my opinion is that that -- not
18 attending to the defects associated with the device
19 put patients at harm.
20 BY MR. THORNBURGH:
21     Q.   What types of harm are patients put at
22 risk of suffering from?
23     A.   Failure of the device --
24     MR. SNELL:  Object.

Page 284

1  BY THE WITNESS:
2      A.   -- to treat their stress urinary
3  incontinence and the complications associated with
4  the device, including erosion, pain, pain with
5  intercourse, obstructed voiding, irritative voiding
6  symptoms that I've described earlier in prior
7  testimony.
8  BY MR. THORNBURGH:
9      Q.   Could Ethicon have taken action,
10 different action?
11     MR. SNELL:  Object.
12 BY THE WITNESS:
13     A.   Yes.
14 BY MR. THORNBURGH:
15     Q.   Should Ethicon have responded and
16 attended to the defects?
17     A.   Yes.
18     MR. SNELL:  Object.
19 BY MR. THORNBURGH:
20     Q.   Is there anything else significant from
21 that exhibit?
22     A.   No.
23     Q.   What's the next exhibit that you have
24 and wish to discuss with the jury?

Page 285

1      A.   It is an e-mail string between Ethicon
2  employees Carolyn Brennan and Mark Yale discussing
3  the learning curve and complications that are being
4  reported to Ethicon.
5      Q.   Okay.  And can you identify the exhibit
6  number for the ladies and gentlemen of the jury?
7      A.   P0274.
8      Q.   Okay.  And what's the date of this
9  e-mail string?
10     A.   November 3, 2006.
11     Q.   And did you review and rely on this
12 exhibit?
13     A.   Yes.
14     Q.   And what, if anything, is significant to
15 your opinions in Exhibit 274?
16     A.   Based on the complications and
17 difficulties that surgeons are having, one of the
18 Ethicon employees who's Project Manager, Worldwide
19 Customer Quality, Cary Brennan, is raising concerns
20 about whether it is the surgeon's learning curve,
21 it is the technique of insertion or is it an inmate
22 problem with the device, a defect with the device
23 that is leading to the difficulties that the
24 doctors are having.

72 (Pages 282 to 285)

Bruce Alan Rosenzweig, M.D.

Page 286

1    Q.   And do you -- what was the subject that
2  Ethicon employees were discussing in this e-mail?
3    A.   Difficulties with insertion of the
4  device.
5    Q.   Okay.  And the -- I think the question
6  that you discussed was, if you look at Exhibit 274,
7  it says, "Our concern is whether this is the
8  surgeon's learning curve, technique issue or a
9  problem with the device."
10       Did I read that correctly?
11     MR. SNELL:  Objection; leading too.
12  BY THE WITNESS:
13    A.   Correct.
14  BY MR. THORNBURGH:
15    Q.   And how many months after the TVT-Secur
16  product had already been launched into the
17  worldwide market to be implanted permanently in
18  women did people or employees at Ethicon discuss
19  these concerns?
20    A.   Approximately six weeks after launch.
21    Q.   Do you have an opinion whether or not
22  these concerns should have been discussed and
23  determined and attended to before the product had
24  ever been launched?

Page 287

1    A.   Yes, I have an opinion.
2     MR. SNELL:  Objection; leading.
3  BY MR. THORNBURGH:
4    Q.   What's that opinion?
5     MR. SNELL:  Same.
6  BY THE WITNESS:
7    A.   That these issues should have been
8  attended to prior to launch.
9  BY MR. THORNBURGH:
10    Q.   And what could Ethicon have done
11  differently to attend to these issues to determine
12  whether or not what is being reported here were a
13  result of the learning curve, technique issue or
14  problem with the device?
15     MR. SNELL:  Object.
16  BY THE WITNESS:
17    A.   Studying the device in a prospective
18  randomized controlled fashion or in other human use
19  studies would have demonstrated the characteristics
20  of the device that make it either difficult to
21  insert or unreasonably unsafe for patients or
22  unreasonably ineffective for patients.
23       Those could have been identified and
24  changed or if those could not have been changed,

Page 288

1  then the device not continued or removed from the
2  market.
3  BY MR. THORNBURGH:
4    Q.   What's -- is there anything else
5  significant about that last exhibit?
6    A.   No.
7    Q.   What's the next exhibit that you'd like
8  to discuss?
9    A.   Again, it is Exhibit P1096.  It is an
10  e-mail string between key Ethicon employees, Dr. --
11  excuse me -- Harel Gadot of marketing and Ralf
12  Felix Gotter, who is the country director of
13  Ethicon in Germany.
14    Q.   And what -- what was the subject of the
15  discussion being held between these Ethicon
16  employees on November 30 of 2006?
17    A.   Yes.  More procedures, more problems.
18    Q.   And how is this document relevant, if at
19  all, to your opinions in this case?
20    A.   This is documenting the defects
21  associated with the device, which are leading to
22  harm in women, which are now being reported to
23  Ethicon.
24       The more procedures that are being done,

Page 289

1  the more complications that are occurring,
2  demonstrating the characteristics of the device
3  that are unreasonably unsafe.
4    Q.   And was it appropriate -- strike that.
5       Is there anything else relevant to this
6  exhibit or significant to your opinions with
7  respect to this exhibit?
8    A.   No.
9    Q.   What's the next document in your binder?
10    A.   It is an e-mail string between David
11  Robinson, Medical Director, and other key Ethicon
12  employees regarding concerns about the
13  effectiveness of the device as seen by doctors who
14  are teaching the procedure to other doctors, which
15  are called preceptors, and also from the interim
16  analysis of the First Human Use Study,
17  demonstrating the characteristics of the device
18  that make it unreasonably ineffective and leading
19  to the harm of either not treating the stress
20  urinary incontinence or recurrence of stress
21  urinary incontinence.
22    Q.   How many months after Ethicon had
23  already launched this product into the worldwide
24  market did Ethicon --

73 (Pages 286 to 289)

Bruce Alan Rosenzweig, M.D.

Page 290

1     MR. SNELL:  I'm sorry.  I have to actually
2  object to as non-responsive and well beyond the
3  question for the last answer.
4  BY MR. THORNBURGH:
5     Q.   Let me ask you this question, Doctor.
6  What is the significance, if any, of this
7  Exhibit P127 to your opinions?
8     A.   This e-mail string demonstrates that
9  Ethicon had information regarding the poor efficacy
10  in treating stress urinary incontinence or
11  effectiveness in treating stress urinary
12  incontinence of the TVT-Secur device within two
13  months of launch.
14     Q.   Okay.  And if we look at -- what
15  paragraph or part of Exhibit P127 supports your
16  opinions?
17     A.   The e-mail states, "It is apparent that
18  there is some level of concern re efficacy seen by
19  the preceptors," again, which are doctors that are
20  training other doctors to do the technique, "as
21  well as within the interim analysis of the First
22  Human Use Trials."
23     Q.   Okay.  And where were these physicians
24  located who were raising concerns about the

Page 291

1  TVT-Secur device and its efficacy?
2     A.   Both U.S. preceptors and European,
3  Middle East and Africa preceptors.
4     Q.   Okay.  If Ethicon were to represent
5  that -- assume with me that at trial Ethicon, their
6  experts or through argument, represents to the
7  ladies and gentlemen of the jury that the problems
8  with the TVT-Secur device with respect to its
9  efficacy were isolated to Australia or Germany,
10  would that be an accurate statement?
11     MR. SNELL:  Object.
12  BY THE WITNESS:
13     A.   No.
14  BY MR. THORNBURGH:
15     Q.   Why not?
16     A.   What we're seeing here is concern from
17  preceptors, both in the United States and in
18  Europe, Middle East and Africa, about concerns
19  regarding the effectiveness in treating stress
20  urinary incontinence of the product.
21     Q.   And, in fact, if we look at this first
22  paragraph, it's Dr. Robinson writing to Dharini, is
23  that correct?
24     MR. SNELL:  Object; leading.

Page 292

1  BY MR. THORNBURGH:
2     Q.   Who is -- who is -- in the first -- who
3  is being addressed in this document?
4     A.   Dharini Amin who is an Ethicon employee
5  of Johnson & Johnson.
6     Q.   Okay.  And David Robinson writes,
7  "Dharini, on another note, I think Marketing (and
8  you in particular) need to think about some issues
9  that are going to come forth with Secur."
10     Did I read that correctly?
11     MR. SNELL:  Object; leading.
12  BY THE WITNESS:
13     A.   Yes.
14  BY MR. THORNBURGH:
15     Q.   What, if any, significance does that
16  sentence have with respect to your opinions?
17     A.   That sentence demonstrates that Ethicon
18  had knowledge as early as November 14, 2006 about
19  concerns with the TVT-Secur regarding its
20  effectiveness and characteristics of the device
21  that made it unreasonably unsafe.
22     MR. SNELL:  Object.  Move to strike.  State of
23  mind.
24  BY MR. THORNBURGH:

Page 293

1     Q.   And he -- Dr. Robinson goes on and says
2  or writes, "After listening to the U.S. preceptors
3  and also going to the EMEA," which we've already
4  established was the European -- Europe, Middle East
5  and Africa, "preceptor/early use meeting this
6  weekend in Paris, it is apparent that there is some
7  level of concern regarding efficacy seen by
8  preceptors as well as within the interim analysis
9  of the First Human Use Trial."
10     Did I read that correctly?
11     MR. SNELL:  Object and leading.
12  BY THE WITNESS:
13     A.   Yes.
14  BY MR. THORNBURGH:
15     Q.   What is significant, if any, with
16  respect to that statement by Dr. Robinson?
17     MR. SNELL:  Same objection and leading.
18  BY THE WITNESS:
19     A.   That statement describes concern about
20  the effectiveness of the TVT-Secur both as noted by
21  doctors that are using it and also in the first
22  study, Human Use Study conducted by Ethicon.
23  BY MR. THORNBURGH:
24     Q.   Dr. Rosenzweig, is Dr. Robinson

Bruce Alan Rosenzweig, M.D.

Page 294

```
 1    reporting that after the device was launched on to
 2    the market doctors throughout the world were having
 3    the same problems that Ethicon, particularly
 4    Dr. David Robinson, was made aware of prior to
 5    launching the product when he looked at the First
 6    Human Use data.
 7         MR. SNELL:  Objection and leading.
 8    BY THE WITNESS:
 9         A.   Yes.
10    BY MR. THORNBURGH:
11         Q.   What, if anything, is significant about
12    Dr. Robinson's statements here concerning the
13    problems that are being reported by Ethicon's
14    preceptors around the world in relationship to what
15    was seen before the product was launched by
16    Dr. Robinson in the First Human Use interim data?
17         MR. SNELL:  Objection.
18    BY THE WITNESS:
19         A.   Dr. Robinson is reporting that doctors
20    who are trying to implant the device are
21    experiencing the same degree of inability of the
22    product to treat the stress urinary incontinence as
23    was known from the First Human Use Study prior to
24    launch of the product.
```

Page 295

```
 1    BY MR. THORNBURGH:
 2         Q.   And you testified earlier about choices,
 3    about how Ethicon and David Robinson in particular
 4    had a choice when he looked at the first interim
 5    use data.  Do you recall that?
 6         A.   Yes.
 7         MR. SNELL:  Objection; leading.
 8    BY MR. THORNBURGH:
 9         Q.   And do you recall the testimony about
10    why those choices that he had were important?
11         A.   Yes.
12         Q.   And what was your statement?
13         MR. SNELL:  Objection.
14    BY THE WITNESS:
15         A.   That it is important to look at the data
16    to determine whether or not to go ahead with the
17    launch of the product and based on the data, the
18    product should not have been launched.
19    BY MR. THORNBURGH:
20         Q.   And the problems that were being
21    expressed by Ethicon's preceptors both in the
22    United States and in other parts of the world,
23    could those problems have been avoided?
24         MR. SNELL:  Object.
```

Page 296

```
 1    BY THE WITNESS:
 2         A.   Yes, by not launching the product or
 3    removing the product from the market.
 4    BY MR. THORNBURGH:
 5         Q.   I mean, we're not just talking about
 6    doctors having problems, are we?
 7         MR. SNELL:  Objection; leading, argumentative.
 8    Sorry.  Go ahead.
 9    BY THE WITNESS:
10         A.   No.
11    BY MR. THORNBURGH:
12         Q.   What are we talking about here?
13         A.   The safety --
14         MR. SNELL:  Same.
15    BY THE WITNESS:
16         A.   -- of patients.
17    BY MR. THORNBURGH:
18         Q.   And, so, when Dr. Robinson is talking
19    about these preceptors who were reporting their
20    concerns, is he -- is it your understanding that
21    he's -- that these concerns are with respect to
22    actual people?
23         MR. SNELL:  Object.
24    BY THE WITNESS:
```

Page 297

```
 1         A.   Yes.
 2    BY MR. THORNBURGH:
 3         Q.   And, so, when you testified earlier that
 4    Ethicon and David Robinson in particular had a
 5    choice and that they could have chosen to delay the
 6    launch to fix the problems or not to launch the
 7    product at all and that by making the choice to put
 8    the product on the market despite the First Human
 9    Use data and how that could impact patient safety,
10    is that what we're actually seeing in the real
11    world?
12         MR. SNELL:  Object and leading.
13    BY THE WITNESS:
14         A.   Yes.
15    BY MR. THORNBURGH:
16         Q.   Doctor, I got a leading objection.
17         How does this document, Exhibit P127,
18    support the prior testimony from you that it was
19    inappropriate for Ethicon to release or launch the
20    TVT-Secur data in light of the First Human Use
21    Trial?
22         MR. SNELL:  Same objection.  No leading.
23    BY THE WITNESS:
24         A.   This demonstrates that doctors were
```

75 (Pages 294 to 297)

Bruce Alan Rosenzweig, M.D.

Page 298

1    having problems with the device and it was putting
2    patients at harm.
3         THE VIDEOGRAPHER:  Counsel, can I end?
4         MR. THORNBURGH:  We have to take a break for a
5    tape change.
6         THE VIDEOGRAPHER:  The time is 4:21 p.m.  This
7    is the end of Tape 3 and we're going off the video
8    record.
9              (WHEREUPON, a recess was had
10                  from 4:21 to 4:31 p.m.)
11        THE VIDEOGRAPHER:  The time is 4:31 p.m.  This
12   is the beginning of Tape 4 and we are back on the
13   video record.
14   BY MR. THORNBURGH:
15        Q.   Dr. Rosenzweig, before we went off the
16   record we were discussing Exhibit P127, and we're
17   almost through with this exhibit, but I want to
18   take you back in time just a little bit.
19             This is November of 2006 when this
20   discussion is occurring and, again, you testified
21   that was just a couple months after Ethicon had
22   launched the product?
23        A.   Correct.
24        Q.   Now, you also testified earlier that

Page 299

1    shortly after the launch of the TVT-Secur, either
2    at the end of 2006 or beginning of 2007, you were
3    introduced to the TVT-Secur through Ethicon's sales
4    representative?
5         A.   Correct.
6         MR. SNELL:  Object.
7    BY MR. THORNBURGH:
8         Q.   And did Ethicon sales representative
9    ever inform you that Ethicon's internal first human
10   interim data showed 60% complication rate or 30%
11   failure rate?
12        A.   No.
13        Q.   Did Ethicon ever through its sales
14   representative when she met with you at the end of
15   2006 or 2007 ever inform you that physicians around
16   the world were experiencing problems with the
17   efficacy of the TVT-Secur device?
18        MR. SNELL:  Object.
19   BY THE WITNESS:
20        A.   No.
21   BY MR. THORNBURGH:
22        Q.   Is that the type of information that is
23   important to implanting physicians?
24        MR. SNELL:  Same.

Page 300

1    BY THE WITNESS:
2         A.   Yes.
3    BY MR. THORNBURGH:
4         Q.   Would that type of information have been
5    important to you?
6         A.   Yes.
7         Q.   In what way?
8         A.   It would have been important to know
9    whether a device is safe and effective to be used
10   in humans in order to decide what is the most
11   appropriate therapy to use in an individual
12   patient.
13        Q.   Is that the type of information that
14   physicians use in the method that we discussed
15   earlier of the risk/benefit assessment when
16   deciding which surgical or treatment options should
17   be made available to their patients?
18        MR. SNELL:  Object.
19   BY THE WITNESS:
20        A.   Yes.
21   BY MR. THORNBURGH:
22        Q.   Is there anything else relevant that you
23   want to speak with the jury about concerning
24   Exhibit 127?

Page 301

1         A.   No.
2         Q.   What's the next document that you want
3    to discuss?
4         A.   It is an e-mail string between Medical
5    Directors Dr. Robinson, Dr. Arnaud and Dan Smith.
6         Q.   And what is the exhibit number, if you
7    can identify that for the ladies and gentlemen of
8    the jury?
9         A.   P0619.
10        Q.   And can you describe to the ladies and
11   gentlemen of the jury what P619 is?
12        A.   It is an e-mail string from Medical
13   Directors and also Dan Smith, who was the lead
14   engineer and also co-inventor of the TVT-Secur,
15   regarding putting together what was called a
16   cookbook to help physicians overcome their
17   difficulties with implanting the device and in
18   order to try to improve the success rate.
19             What this document demonstrates is that
20   the Instructions for Use was defective because it
21   could not be used by a physician to effectively,
22   accurately and reliably insert the TVT-Secur
23   device.
24        MR. SNELL:  Object; beyond the question.  Move

76 (Pages 298 to 301)

Bruce Alan Rosenzweig, M.D.

Page 302

1    to strike.
2    BY MR. THORNBURGH:
3        Q.   So, what is the significance, if
4    anything, of Exhibit P619 to your opinions?
5        A.   It demonstrates that the IFU is
6    defective.
7        Q.   Now, Doctor, I thought you testified
8    that Ethicon had performed design validations to
9    validate the information and instructions they were
10   providing to physicians in the TVT-Secur IFU?
11       MR. SNELL:  Object; leading.
12   BY THE WITNESS:
13       A.   Yes.
14   BY MR. THORNBURGH:
15       Q.   Is it correct or incorrect that Ethicon
16   performed design validations to determine the
17   validity and accuracy of the information they were
18   providing concerning the proper implantation
19   technique to be used when implanting patients with
20   the TVT-Secur device?
21       A.   Yes.
22       Q.   And in this case you just testified a
23   moment ago that this Exhibit 619 demonstrates that
24   the IFU is defective?

Page 303

1        A.   Correct.
2        MR. SNELL:  Objection; leading.
3    BY MR. THORNBURGH:
4        Q.   First of all, it would be that the IFU
5    was defective, is that correct?
6        A.   Correct.
7        MR. SNELL:  Same objection.
8    BY MR. THORNBURGH:
9        Q.   Because Ethicon is no longer selling the
10   Secur device, is that correct?
11       MR. SNELL:  Same objection.
12   BY THE WITNESS:
13       A.   Correct.
14   BY MR. THORNBURGH:
15       Q.   Is Ethicon still selling the Secur
16   device?
17       MR. SNELL:  Object.
18   BY THE WITNESS:
19       A.   It is not in the United States.
20   BY MR. THORNBURGH:
21       Q.   Okay.  And how does this exhibit
22   support, if at all, your opinion that the TVT
23   IFU -- Secur IFU was defective?
24       A.   Well, this is an e-mail from the 19th of

Page 304

1    December 2006.  They are already having discussions
2    about trying to put a reference guide or what's
3    called a cookbook to help doctors place the device
4    safely, effectively or reliably in women because
5    the Instructions for Use was not adequate in order
6    to accomplish that.
7        Q.   Do you have an opinion whether or not
8    Ethicon should have or could have -- strike that.
9        Do you have an opinion whether or not
10   Ethicon could have -- strike that.
11       Do you have an opinion whether or not
12   Ethicon could have slowed down the launch of this
13   product, taken its time in design validation to
14   provide more accurate, clear information in its
15   IFU?
16       MR. SNELL:  Objection.
17   BY THE WITNESS:
18       A.   Yes.
19   BY MR. THORNBURGH:
20       Q.   What's that opinion?
21       MR. SNELL:  Same.
22   BY THE WITNESS:
23       A.   That they could have slowed the process
24   down.

Page 305

1    BY MR. THORNBURGH:
2        Q.   And do you have an opinion whether or
3    not the defects that you describe with respect to
4    the IFU -- strike that.
5        Do you have an opinion whether or not
6    the defects you describe with respect to the IFU
7    were caused by the conduct of Ethicon or its
8    employees?
9        MR. SNELL:  Objection; leading.
10   BY THE WITNESS:
11       A.   I don't understand the question.
12   BY MR. THORNBURGH:
13       Q.   Yeah.  Sorry.
14       Do you have an opinion one way or the
15   other how the TVT-Secur IFU became defective?
16       MR. SNELL:  Objection.
17   BY MR. THORNBURGH:
18       Q.   Let me ask a better question.
19       You just testified a moment ago that
20   this document supports your opinion that the
21   TVT-Secur IFU was defective?
22       A.   Correct.
23       Q.   Do you have an opinion about why it was
24   defective or how it became defective?

77 (Pages 302 to 305)

Bruce Alan Rosenzweig, M.D.

Page 306

1    MR. SNELL: Objection. Same objection.
2  BY THE WITNESS:
3    A.   The TVT-Secur device is inherently
4  defective.  The TVT-Secur IFU is inherently
5  defective.
6  BY MR. THORNBURGH:
7    Q.   Was there any --
8    MR. SNELL: I'm going to move to strike as
9  non-responsive.
10  BY MR. THORNBURGH:
11    Q.   You had testified earlier about
12  Ethicon's concern about getting the TVT-Secur on
13  the market first before its competitors released
14  their mini-sling.  Do you recall that testimony?
15    A.   Yes.
16    Q.   Do you have an opinion whether or not
17  their decision to move quickly to launch the
18  TVT-Secur product had any or played any role in the
19  information or the lack of accurate information
20  that made its way or failed to make its way into
21  the TVT-Secur IFU?
22    MR. SNELL: Object; leading.
23  BY THE WITNESS:
24    A.   Yes.

Page 307

1  BY MR. THORNBURGH:
2    Q.   And what is that opinion?
3    A.   That that contributed to the IFU being
4  defective.
5    Q.   All right.  Now, what part of
6  Exhibit 619 support your opinions?
7    MR. SNELL: Object.
8  BY THE WITNESS:
9    A.   This e-mail string goes through a
10  discussion between Medical Directors and Dan Smith
11  regarding that the cookbook was different from the
12  Instructions for Use; that if they decide to do a
13  cookbook, they would need to validate a new IFU,
14  which a cookbook cannot do.
15    Q.   Now, did Ethicon ever --
16    MR. SNELL: I'm sorry.  Object.  Move to
17  strike.  Reading.  Go ahead.
18  BY MR. THORNBURGH:
19    Q.   Did Ethicon ever update its -- the
20  TVT-Secur IFU?
21    A.   No, they did not.
22    Q.   Did the learnings from this time period
23  where Axel Arnaud and David Robinson were drafting
24  a TVT-Secur cookbook, did that information ever

Page 308

1  make its way into the TVT-Secur IFU?
2    MR. SNELL: Object.
3  BY THE WITNESS:
4    A.   No, it did not.
5  BY MR. THORNBURGH:
6    Q.   And is it appropriate -- do you have an
7  opinion whether or not it's appropriate for a
8  company to fail to update the Information for Use
9  that they provide with medical devices if they
10  determine that the Information for Use was
11  inaccurate or unclear?
12    MR. SNELL: Objection and leading.
13  BY THE WITNESS:
14    A.   If the Instructions for Use are deemed
15  to be inaccurate or unclear, then the Instructions
16  for Use need to be changed to make it accurate and
17  clear.
18  BY MR. THORNBURGH:
19    Q.   Could Ethicon have -- could Ethicon --
20  did Ethicon have a choice in whether or not to
21  update the TVT-Secur IFU?
22    MR. SNELL: Object.
23  BY THE WITNESS:
24    A.   Yes.

Page 309

1  BY MR. THORNBURGH:
2    Q.   Was it -- do you have an opinion whether
3  or not it was appropriate or inappropriate for
4  Ethicon to fail to update its IFU?
5    MR. SNELL: Object and leading.
6  BY THE WITNESS:
7    A.   It was inappropriate to not update the
8  IFU.
9  BY MR. THORNBURGH:
10    Q.   Why is that?
11    A.   Because if the IFU is defective, it
12  needs to be changed to make it not defective or the
13  product needs to be removed from the market.
14    Q.   And if we turn to ETH.MESH.01000734 of
15  Exhibit 619, there's an e-mail from Dan Smith to
16  Axel.
17      Do you see that?
18    A.   Yes.
19    Q.   Okay.  And what is Dan Smith telling
20  Axel Arnaud concerning the draft IFU that
21  Dr. Arnaud had distributed or sent to Dan Smith and
22  David Robinson?
23    MR. SNELL: Object and leading.
24  BY THE WITNESS:

78 (Pages 306 to 309)

Bruce Alan Rosenzweig, M.D.

Page 310

1      A.   He is stating, "I have major
2  difficulties with this document.  I don't know
3  where to start.  I have not even looked at the U.
4  It cannot go out like this, nor do I believe this
5  is what is needed.  Everything in the blue shade is
6  either wrong or needs much work to align with the
7  Instructions for Use and I'm not writing another
8  Instructions for Use.  The Instructions for Use
9  contains detailed information that they must
10  follow.  This document should be a cheat sheet and
11  not another IFU."
12      Q.   Now, Axel Arnaud is the Medical
13  Director?
14      A.   Yes.
15      Q.   And Dan Smith is an engineer?
16      A.   Correct.
17      Q.   Based on your review of the internal
18  documents, did Dan Smith have any formal medical
19  training?
20      MR. SNELL:  Objection.
21  BY THE WITNESS:
22      A.   No.
23  BY MR. THORNBURGH:
24      Q.   In your opinion based on your review of

Page 311

1  Ethicon's internal documents, was it appropriate
2  for Dan Smith to push back against the possibility
3  to update or draft a new TVT-Secur IFU?
4      MR. SNELL:  Object.
5  BY THE WITNESS:
6      A.   No, it was not.
7  BY MR. THORNBURGH:
8      Q.   Why not?
9      A.   Because if the IFU is defective, it
10  needs to be changed, if it could be changed, or the
11  product needs to be removed from the market.
12      Q.   If you move to ETH.MESH number ending in
13  733, there is a response from Dr. Arnaud to
14  Dan Smith.  And can you -- what, if anything, is
15  significant about this response?
16      MR. SNELL:  Object; leading.
17  BY THE WITNESS:
18      A.   Dr. Arnaud is writing, "I've had a hard
19  time to understand how you can state what is wrong
20  or what is right, what must be followed or not,
21  what is needed or not, when many of our customers
22  themselves do not know after their initial
23  experience" -- "our customers themselves still do
24  not know after their initial experience with Secur.

Page 312

1  They have a hard time to achieve consistently good
2  results with the device."
3  BY MR. THORNBURGH:
4      Q.   And, now, if you go down to the next
5  paragraph, there's a statement by Dr. Axel Arnaud
6  that "The answers to the surgeon's questions not
7  being in the IFU, there is a need for what made the
8  reproducibility and success of both TVT and TVT-O,
9  i.e., a 'cookbook.'"
10      He goes on to write, "The documents I
11  sent you are based on the opinion of numerous
12  European experts and pearls from U.S. surgeons."
13      What does that statement by Dr. Arnaud
14  indicate to you?
15      MR. SNELL:  Objection; leading.
16  BY THE WITNESS:
17      A.   That the IFU is defective because it --
18  there are surgeons' questions that are not answered
19  by the Instructions for Use.
20  BY MR. THORNBURGH:
21      Q.   And how does Dr. Dan Smith respond?
22      A.   Mr. --
23      Q.   I'm sorry.  Strike that.
24      How does Mr. Dan Smith, the engineer at

Page 313

1  Ethicon, respond?
2      MR. SNELL:  Object and leading.
3  BY THE WITNESS:
4      A.   That they would have to validate that
5  with a new Instructions for Use.
6  BY MR. THORNBURGH:
7      Q.   And if we show that real quick on the
8  page beginning on ETH.MESH ending in 732.  The very
9  last sentence.
10      A.   "If you choose to go down that path as
11  you have written, you must assemble a team and
12  follow the U.S. design control procedures to
13  validate a new Instructions for Use as we can NOT
14  have a cookbook which differs from the package
15  insert."
16      Q.   Did Ethicon ever go back to the drawing
17  board and validate a new TVT-Secur IFU?
18      MR. SNELL:  Object; leading.
19  BY THE WITNESS:
20      A.   No.
21  BY MR. THORNBURGH:
22      Q.   Do you have an opinion whether or not
23  Ethicon could have done that?
24      A.   Yes, I do have an opinion.

79 (Pages 310 to 313)

Bruce Alan Rosenzweig, M.D.

Page 314

1    Q.   Do you have an opinion whether or not
2  Ethicon should have done that?
3    A.   Yes, I have an opinion.
4    Q.   And what are those opinions?
5    A.   They could have done that and should
6  have done that.
7    Q.   Is there anything else you'd like to
8  discuss with respect to Exhibit 619?
9    A.   No.
10   Q.   What's the next document you'd like to
11 discuss?
12   A.   It is an e-mail on -- from January 16,
13 2007 from key Ethicon employees, including Harel
14 Gadot, Axel Arnaud, discussing the French TVT-Secur
15 data.
16   Q.   And what's the exhibit number?
17   A.   P1100.
18   Q.   And what, if anything, is significant to
19 your opinions with respect to Exhibit 1100?
20   A.   This e-mail also confirms that doctors
21 in France were having concerns about the efficacy
22 of the TVT-Secur.
23   Q.   Can you direct us to the part or parts
24 of this exhibit that you rely on for -- to support

Page 315

1  your opinion?
2    A.   Yes.   "I was with Dr. Jacquetin today.
3  He is currently collecting data on Secur.  My main
4  concern is the outcome of their data, the success
5  rate following TVT-Secur" -- excuse me --
6  "implementation is way below TVT-O or TVT around 80
7  to 85%."
8    Q.   And what, if anything, is significant
9  about that part of this e-mail?
10   MR. SNELL:  Objection.
11 BY THE WITNESS:
12   A.   It is confirmed -- it confirms that
13 doctors are having concerns about the success rate
14 for the TVT-Secur.
15 BY MR. THORNBURGH:
16   Q.   And is there anything else -- are there
17 any other portions of this exhibit that you rely on
18 to support your opinions?
19   A.   Yes.
20   Q.   Can you direct us there?
21   A.   It is the follow-up to that.
22     "This is for sure a big concern.  I
23 would recommend to have your support as well as
24 Axel's, potentially review the patients to be

Page 316

1  included and/or stop for a while such publication
2  that could compromise the future."
3    Q.   And what opinion does that statement by
4  Dr. Buchon or Xavier Buchon support?
5    A.   That Ethicon was not sharing negative
6  information with doctors.  It is -- this e-mail is
7  stating that they would rather stop publication
8  that would compromise the future of the TVT-Secur.
9    Q.   And is it appropriate for medical device
10 companies to attempt to stop medical publications
11 concerning the safety of their products?
12   A.   No.
13   Q.   Is it appropriate for companies to
14 attempt to manipulate data related to safety or
15 efficacy of their permanent medical device
16 products?
17   MR. SNELL:  Object.
18 BY THE WITNESS:
19   A.   No.
20 BY MR. THORNBURGH:
21   Q.   So, if we just break this down really
22 quick, on page -- on the first page of this
23 exhibit, the response to Fabrice's concerns, it
24 states, "This is for sure a big concern and I would

Page 317

1  recommend we have your support as well as Axel,
2  potentially review the patients to be included
3  and/or stop for a while such publications
4  that could compromise the future.  No way to hide the
5  truth but to make sure it has been done correctly
6  in terms of procedure and inclusion.  What do you
7  think?  We may even ask advice from F Haab who is a
8  great support?"
9      Did I read that correctly?
10   MR. SNELL:  Object and leading.
11 BY THE WITNESS:
12   A.   Yes.
13 BY MR. THORNBURGH:
14   Q.   Is it ever okay for a company to go and
15 actually review what types of patients or who --
16 strike that.
17     Is it ever appropriate for a company
18 like Ethicon to go and review the raw data to
19 determine whether or not the publication was
20 appropriately including the appropriate candidates?
21   MR. SNELL:  Objection.
22 BY MR. THORNBURGH:
23   Q.   Strike that.  Let me ask you a better
24 question.

80 (Pages 314 to 317)

Bruce Alan Rosenzweig, M.D.

Page 318

1        Are there ways to manipulate scientific
2    data?
3        A.   Yes.
4        Q.   What are some of those ways?
5        MR. SNELL:  Objection.
6    BY THE WITNESS:
7        A.   Fail to include patients that have an
8    outcome that is not favorable to the conclusions
9    that you are looking to draw.
10   BY MR. THORNBURGH:
11       Q.   Is it appropriate for medical device
12   companies like Ethicon to interfere with the
13   publication of safety data?
14       MR. SNELL:  Objection.
15   BY THE WITNESS:
16       A.   No.
17   BY MR. THORNBURGH:
18       Q.   Why not?
19       A.   Because that data is important for
20   doctors to know so they can have the full view of
21   what the experience is with scientists and other
22   doctors so they can make an informed decision about
23   using a product.
24       Q.   And does the interference of medical

Page 319

1    device companies like Ethicon and Johnson & Johnson
2    with respect to scientific publications impact the
3    knowledge of physicians in a negative way
4    concerning products that they may choose to implant
5    in their patients?
6        MR. SNELL:  Objection and leading.
7    BY THE WITNESS:
8        A.   Yes.
9    BY MR. THORNBURGH:
10       Q.   And how so?
11       MR. SNELL:  Same.
12   BY THE WITNESS:
13       A.   If information is not being -- accurate
14   information is not being put in the literature,
15   doctors cannot have knowledge of that information
16   in order to be able to share it with patients in
17   order to determine what is the best therapy for the
18   patient.
19       Q.   Is there anything else relevant with
20   respect to Exhibit 1100 that you want to discuss?
21       A.   No.
22       Q.   What's the next document?
23       A.   It's an internal Ethicon document.  It
24   is a presentation from Harel Gadot, marketing

Page 320

1    manager, regarding the incontinence platform,
2    worldwide marketing team update, August 19, 2007,
3    if I believe.
4        Q.   And what -- what, if anything -- what,
5    if anything, did you rely on from this exhibit to
6    support your opinions?
7        A.   This document supports my opinions
8    regarding the defects associated with the TVT-Secur
9    that were leading to complications.  It also
10   supports the -- my opinions that the Instructions
11   for Use was defective and that even a cookbook
12   could not help with the defects of the Instructions
13   for Use, that the training associated with the
14   TVT-Secur device was not adequate and there was no
15   clinical data at the time of launch of the
16   TVT-Secur product.
17       Q.   Can you walk us through Exhibit P0784
18   and identify what parts of this exhibit support
19   your opinions and describe for the ladies and
20   gentlemen of the jury what significance, if any,
21   this document has for those opinions?
22       A.   On TVT-Secur year-to-date findings.  It
23   would be the I think about the 10th or so page in.
24       "Main Difficulties and Complications.

Page 321

1    Insertion difficulties, releasing difficulties,
2    fixation tips not staying in place."
3        One of the defects that I described is
4    that the fleece tips did not -- did not hold the
5    device in place so the device -- the stiff, rigid
6    mesh would migrate and move which would increase
7    the failure rate and also increase the
8    complications associated with the device.
9        "Bladder perforation, excessive bleeding
10   and failures in tensioning," which is a defect in
11   the Instructions for Use, trying to describe for
12   physicians how to tension.
13       On the next page, under No. 7, "Not
14   well-defined cookbook procedures" -- "cookbook
15   procedure leads to differences in technique between
16   surgeons.  The learning curve is longer than
17   expected.  There's a lack of the right training.
18   Lack of well-known Key Opinion Leaders advocating
19   for the Secur and lack of clinical data."
20       Q.   Let me just talk about No. 10 really
21   quick.
22       We had briefly discussed Professor
23   Nilsson and Professor Artibani.  Do you recall
24   that?

81 (Pages 318 to 321)

Bruce Alan Rosenzweig, M.D.

Page 322

1    A.  Yes.
2    Q.  And do you know whether or not
3  Dr. Nilsson or Dr. Artibani had any involvement in
4  the First Human Use Study?
5    A.  If I recall, at least Dr. Nilsson was
6  part of the First Human Use Study.
7    Q.  Okay.  And by the date or drafting of
8  this exhibit of August 19, 2007, what does the
9  statement number in No. 10 reflect with respect to
10  Dr. Nilsson and Dr. Artibani?
11    A.  They are not support --
12    MR. SNELL:  Object.  Go ahead.
13  BY THE WITNESS:
14    A.  They are not supporting the TVT-Secur.
15  BY MR. THORNBURGH:
16    Q.  And we talked earlier about Dr. Nilson
17  and Dr. Artibani and their concerns with Ethicon
18  launching the TVT-Secur product without conducting
19  randomized controlled trials.
20    Do you recall that?
21  A.  Yes.
22    MR. SNELL:  Object and leading.
23  BY MR. THORNBURGH:
24    Q.  Okay.  And let me ask you this question:

Page 323

1  Do you have an opinion whether or not Dr. Nilsson
2  and Dr. Artibani were correct in their concern
3  about releasing the TVT-Secur on the market without
4  first conducting the appropriate randomized
5  controlled trials?
6    MR. SNELL:  Objection.
7  BY THE WITNESS:
8    A.  They were correct.
9  BY MR. THORNBURGH:
10    Q.  And do you -- is there anything else
11  with respect to this page of the slide that's
12  relevant to your opinions?
13    A.  That other Key Opinion Leaders are
14  insisting on clinical data first.
15    Q.  Okay.  Can you direct us to the next
16  part of this exhibit that you rely on would support
17  your opinions?
18    A.  Yes.  The "TVT-Secur, Lucente experience
19  at 6 weeks follow-up."
20    MR. THORNBURGH:  And let's go ahead and turn
21  there, Tom.
22    Tom, what page is that shown for the
23  record?  What page are we on?
24    MR. BODYZIAK:  This is page 16 of the

Page 324

1  document, slide 15.
2    MR. THORNBURGH:  No, he wants to go here.
3    MR. BODYZIAK:  This is page 20 of the
4  document.  Is that the correct one?
5    MR. THORNBURGH:  For the record it's page 20
6  of the document.
7  BY MR. THORNBURGH:
8    Q.  And how does page 20 of Exhibit 784
9  support your opinions, if at all?
10    A.  It shows the learning curve, that it
11  takes a significant number of procedures to, at
12  least six weeks of follow-up, which is an
13  exceedingly short follow-up, get an adequate
14  efficacy from the product.
15    Q.  Okay.  So, let's break this down for a
16  little bit.
17    Dr. Artibani discusses the success rate
18  of the first 25 patients.
19    Do you see that?
20    MR. SNELL:  Objection.
21  BY THE WITNESS:
22    A.  Dr. Lucente.
23  BY MR. THORNBURGH:
24    Q.  Dr. Lucente.  Strike that.

Page 325

1    So, on page 20 is Dr. Lucente discussing
2  his experience at six weeks follow-up?
3    A.  Correct.
4    Q.  And in the first 25 patients what were
5  Dr. Lucente's results?
6    A.  The failure rate was 40%.
7    Q.  And is that an appropriate failure rate?
8    A.  No, it is not.
9    Q.  Now, Dr. Artibani then has the "First 77
10  Patients," and he writes that there were --
11    MR. SNELL:  You got to reread it.  You keep
12  saying Artibani.
13  BY MR. THORNBURGH:
14    Q.  Dr. Lucente then has the results for his
15  first 77 patients.
16    Do you see that?
17  A.  Yes.
18    Q.  And what does Dr. Lucente report?
19    A.  A 31% failure rate.
20    Q.  And what does Dr. Lucente report for all
21  136 patients with respect to failure rate?
22    A.  A 23% failure rate.
23    Q.  Now, did Dr. Lucente actually continue
24  to look at his patients and follow his patients?

Bruce Alan Rosenzweig, M.D.

Page 326

1     A.   Yes.
2     Q.   And did you review and rely on
3  Dr. Lucente's other data concerning his patients?
4     A.   Yes.
5     Q.   And who is Dr. Lucente?
6     A.   Dr. Lucente is a well-known
7  urogynecological surgeon, Key Opinion Leader for
8  Ethicon.
9     Q.   And did Dr. Lucente have any involvement
10 in the First Human Use Study?
11    A.   Yes.
12    Q.   What involvement, if any, did
13 Dr. Lucente have there?
14    A.   He was one of the surgeons that was
15 involved in the First Human Use Study.
16    Q.   Okay.  And what's the next document you
17 want to discuss?
18    A.   The next page, the "TVT-Secur take-home
19 message."
20    MR. THORNBURGH:  Hold on one second,
21 Dr. Rosenzweig.
22 BY MR. THORNBURGH:
23    Q.   I want to just go back a little bit to
24 page 20 of this exhibit, Exhibit 784, and talk to

Page 327

1  you some more about Dr. Lucente.
2         And I'll represent to you that the --
3  that the metadata on Exhibit 784 shows that it was
4  created August 19 of 2007.
5     A.   Okay.
6     Q.   Okay.  Did you also -- go ahead and mark
7  actually as Exhibit P1437, and I think you may have
8  it in your binder.
9     A.   I would not know where it is.
10    MR. THORNBURGH:  Here.  Let me just hand
11 you -- go ahead and pull up 1437.
12 BY THE WITNESS:
13    A.   Okay.  I found it.
14 BY MR. THORNBURGH:
15    Q.   Okay.  And so we're looking at -- what
16 is it?
17    A.   P1437.
18    Q.   And that's in your binder?
19    A.   Yes.
20    Q.   Exhibit 5.  Yes.  And the tab number is
21 32?
22    A.   31.
23    Q.   31.  Okay.  If we look at Exhibit P1437,
24 and let me just ask you quickly, did you review and

Page 328

1  rely on this document?
2     A.   Yes.
3     Q.   And what is this document?
4     A.   It is an e-mail from Stephanie Molden,
5  which is a -- she is a partner of Dr. Lucente, and
6  it's regarding the TVT-Secur, their TVT-Secur data.
7     Q.   And you say she was a partner with
8  Dr. Lucente.  Like Dr. Lucente, do you know whether
9  or not she is a urogynecologist?
10    A.   Yes.
11    Q.   And does this exhibit, an e-mail
12 concerning Dr. Lucente, support any of your
13 opinions?
14    A.   Yes.
15    Q.   What opinions does it support?
16    A.   That the design characteristics of the
17 TVT-Secur device makes it unreasonably ineffective.
18    Q.   Okay.  And if we look at -- what section
19 of this e-mail specifically supports those
20 opinions?
21    A.   The bottom half of the e-mail string is
22 a representation of Dr. Lucente's data.  We saw in
23 the previous slide that at six weeks he was
24 reporting a 22% failure rate.  Here he has a 14%

Page 329

1  failure rate at six weeks.
2         However, when they look at their
3  patients out to one year, their failure rate is
4  over 60%.
5     Q.   Now, what does Stephanie Molden write
6  with respect to these results?
7     A.   "I'm not really looking too much at one
8  year patients since we know they are worse.  But
9  excluding those, our rates are steadily decreasing
10 with longer follow-up in a cohort of 247 patients."
11    Q.   And she goes on to say, "Not sure why
12 the 3 to 4 month rate is lower than the 6 months,
13 but Secur appears not to hold up with time."
14         Did I read that correctly?
15    A.   Yes.
16    Q.   Does that support any of your opinions?
17    MR. SNELL:  Object; leading.
18 BY THE WITNESS:
19    A.   Yes.
20 BY MR. THORNBURGH:
21    Q.   What about this -- this statement from
22 Ms. Molden support your opinions and what opinions
23 specifically does it support?
24    A.   It supports my opinions that there are

83 (Pages 326 to 329)

Bruce Alan Rosenzweig, M.D.

Page 330

1 characteristics of the device that make it
2 unreasonably uneffective to treat stress urinary
3 incontinence.
4 Q. Now, Dr. Molden says that when they
5 exclude the one year -- strike that.
6 Dr. Molden states that "I'm not really
7 looking too much at the one year patients since we
8 know they were worse."
9 Do you have any understanding as to why
10 they knew the one-year patients would be worse?
11 MR. SNELL: Objection and leading.
12 BY THE WITNESS:
13 A. Well, since this is from January of
14 2008, those patients were done before January of
15 2007.
16 BY MR. THORNBURGH:
17 Q. Would that -- first -- would those be
18 the earlier patients?
19 MR. SNELL: Objection.
20 BY THE WITNESS:
21 A. Potentially.
22 BY MR. THORNBURGH:
23 Q. Would those patients potentially be part
24 of the learning curve?

Page 331

1 A. Potentially.
2 Q. And if Dr. Molden is -- she says, even
3 if we exclude those first patients from the
4 one-year data, did that have any impact on the
5 success over time of the TVT-Secur product?
6 MR. SNELL: Object and leading.
7 BY THE WITNESS:
8 A. No, because the success does not hold up
9 with time.
10 BY MR. THORNBURGH:
11 Q. So, if we look at the data, you'll see
12 that at one year at January 18, 2008, what was the
13 failure rate?
14 A. Over 60%.
15 Q. Are those good results?
16 A. No.
17 Q. And if you look at the six-month data,
18 what was the failure rate?
19 A. Over 25%.
20 Q. If you look at the three-to-four-month
21 data, what was the success rate?
22 A. The --
23 Q. The failure rate. I'm sorry.
24 A. Over 33%.

Page 332

1 Q. Are those good results, Doctor?
2 A. No.
3 Q. By -- by the -- that three-to-four month
4 period, do you have an understanding of whether or
5 not Dr. Lucente would have overcome the learning
6 curve?
7 MR. SNELL: Objection.
8 BY THE WITNESS:
9 A. Yes.
10 BY MR. THORNBURGH:
11 Q. And what's that opinion?
12 A. He would have overcome the learning
13 curve.
14 Q. Did the learning curve have any impact
15 on the -- strike that.
16 Does that -- does that fact or issue
17 support any of your opinions and, if so, what
18 opinions?
19 MR. SNELL: Objection.
20 BY THE WITNESS:
21 A. That the TVT-Secur is not effective in
22 treating stress urinary incontinence. There are
23 design characteristics that make it unreasonably
24 ineffective in treating stress urinary

Page 333

1 incontinence.
2 BY MR. THORNBURGH:
3 Q. Okay.
4 MR. SNELL: While they are conferring I will
5 put an objection. P1437 not on reliance list.
6 MR. THORNBURGH: Yes, it is.
7 MR. SNELL: I know it's on the one you just
8 served, but it wasn't on the one that led to him
9 drafting and formulating his opinions, putting them
10 to paper, et cetera. So, that's all. I'm not
11 trying to argue with you.
12 BY MR. THORNBURGH:
13 Q. Now, let's go back to P1437 really
14 quick. What is Vincent Lucente's response?
15 MR. SNELL: Object; reading.
16 BY MR. THORNBURGH:
17 Q. Is there anything relevant or
18 significant to Dr. Lucente's response that you'd
19 like to discuss with the jury?
20 If we just orient ourselves really
21 quick, did Dr. Lucente respond to the data that was
22 forwarded by his partner Dr. Molden?
23 MR. SNELL: Objection.
24 BY THE WITNESS:

84 (Pages 330 to 333)

Bruce Alan Rosenzweig, M.D.

Page 334

1     A.  Yes.
2 BY MR. THORNBURGH:
3     Q.  And what does Dr. Lucente indicate with
4 respect to his concern about the TVT-Secur efficacy
5 when compared to Ethicon's other TVT Retropubic and
6 TVT-O devices?
7     MR. SNELL:  Objection; leading.
8 BY THE WITNESS:
9     A.  He states that "It may be our 'hard
10 line' definition of 'dry' versus 'success.' As you
11 know for SUI in Hilton-Ward randomized controlled
12 trial Burch v TVT, the TVT success rate was 58%."
13 BY MR. THORNBURGH:
14     Q.  And then he says -- what's the next
15 sentence after that?
16     MR. SNELL:  Same.
17 BY THE WITNESS:
18     A.  "Nonetheless, very concerning when
19 compared to our TVT and TVT-O long-term dryness
20 rates."
21 BY MR. THORNBURGH:
22     Q.  And what is the significance, if
23 anything, with respect to Dr. Lucente's response?
24     MR. SNELL:  Object.

Page 335

1 BY THE WITNESS:
2     A.  It shows that the TVT-Secur has a lower
3 success rate than TVT and TVT-O.
4 BY MR. THORNBURGH:
5     Q.  Now, Dr. Ciarrocca responds.  Do you see
6 that?
7     MR. SNELL:  Object.
8 BY THE WITNESS:
9     A.  I don't know if Scott Ciarrocca is a
10 doctor.
11 BY MR. THORNBURGH:
12     Q.  I'm sorry. Mr. Ciarrocca. Scott
13 Ciarrocca. Is he an Ethicon employee?
14     A.  Yes.
15     Q.  And what does Mr. Ciarrocca respond?
16     A.  "I think we need to probe this data with
17 him."
18     Q.  Did Dr. Lucente end up publishing his
19 data, his one-year data?
20     A.  Not that I specifically recall.
21     Q.  Do you know whether or not there is any
22 abstracts from Dr. Molden or Dr. Lucente
23 concerning -- not published in a peer-reviewed
24 setting but any abstracts that were presented?

Page 336

1     A.  I do recall an abstract from Stephanie
2 Molden.
3     MR. THORNBURGH:  Just give me one second.
4     Can we go off the record real quick.
5     THE VIDEOGRAPHER:  The time is 5:18 p.m. and
6 we are going off the video record.
7     (WHEREUPON, a recess was had
8     from 5:18 to 5:26 p.m.)
9     THE VIDEOGRAPHER:  The time is 5:26 p.m. and
10 we're back on the video record.
11 BY MR. THORNBURGH:
12     Q.  Okay.  Dr. Rosenzweig, before we went
13 off the record to break, we were looking at two
14 exhibits, one was P1437, which was the e-mail that
15 contained Dr. Lucente's data and dated January 21
16 of 2008, and the other exhibit that we had looked
17 at was Exhibit P784, which had just the six-week
18 data from Dr. Lucente's experience with the
19 TVT-Secur.
20     Do you recall that?
21     A.  Yes.
22     Q.  Okay.  Now, if we look at 1437, you'll
23 see that after Stephanie Molden circulates their
24 one-year data, that there's a discussion by

Page 337

1 Dr. Lucente about the data concerning when compared
2 to the TVT and TVT-O data and then if you look at
3 the very top of this exhibit, Scott Ciarrocca of
4 Ethicon says, "Guys, I think we need to probe this
5 data with him."
6     Do you see that?
7     A.  Yes.
8     Q.  Okay.  And then I gave you
9 Exhibit P2225.  Had you seen Exhibit P2225 before?
10     MR. SNELL:  I'm going to object.  It's not on
11 his reliance list as far as we can tell.
12 BY MR. THORNBURGH:
13     Q.  Do you recall being questioned about it
14 at the last trial?
15     A.  I do recall that, yes.
16     Q.  Do you recall William Gage
17 cross-examined you at length concerning P2225?
18     A.  I do recall that, yes.
19     Q.  Okay.  And what does -- what does -- and
20 is P2225 the one-year outcome abstract, published
21 abstract concerning Dr. Lucente and Molden's
22 one-year data?
23     MR. SNELL:  Object to the document still and
24 leading now. Go ahead.

85 (Pages 334 to 337)

Bruce Alan Rosenzweig, M.D.

Page 338

1    BY THE WITNESS:
2       A.   Yes.
3    BY MR. THORNBURGH:
4       Q.   What is Exhibit P2225?
5       A.   It is an abstract regarding the one-year
6    outcome data for TVT-Secur.
7       Q.   And if you turn to the last page of
8    Exhibit P2225, you'll see there is a date that
9    says, "Here is updated Secur data as of April 8,
10   2008." Do you see that?
11      A.   Yes.
12      Q.   Okay. Now, Scott Ciarrocca writes to
13   his colleagues within Ethicon in P1437 and says,
14   "I think we need to probe this data with him," on
15   January 21, 2008. Do you see that?
16      A.   Yes.
17      Q.   Okay. And what ultimately gets reported
18   as the one-year data a few months later in P2225
19   concerning the one-year data that's discussed
20   initially in P1437?
21      MR. SNELL: Objection. Go ahead.
22   BY MR. THORNBURGH:
23      Q.   Side by side, but go to page 1.
24         If you just look at -- if you look at --

Page 339

1    I'm trying to streamline this because I know
2    opposing counsel has to leave.
3         If you go to under the "Results"
4    section, beginning with, "There was significant
5    decrease in dryness."
6       A.   Yes.
7       MR. THORNBURGH: Go ahead and blow that up,
8    Tom.
9    BY MR. THORNBURGH:
10      Q.   And highlight beginning with midway
11   through where it says, "There was significant
12   decrease in dryness rate from two weeks 91.3% to
13   one year postoperatively 69%."
14         Do you see that?
15      A.   Yes.
16      MR. SNELL: Object; leading.
17   BY MR. THORNBURGH:
18      Q.   So, behind closed doors -- strike that.
19         Do you see any differences between what
20   was being discussed internally in Ethicon's e-mails
21   with Dr. Lucente versus what ultimately got
22   published?
23      MR. SNELL: Object.
24   BY MR. THORNBURGH:

Page 340

1       Q.   Are there any differences in the data?
2       A.   Yes.
3       MR. SNELL: Same.
4    BY MR. THORNBURGH:
5       Q.   What are the differences?
6       A.   The dryness rate that is reported in the
7    abstract is close -- is approximately 70% where it
8    is less than 40% in the internal e-mail.
9       Q.   Does that -- those -- does this have any
10   significance or importance with respect to your
11   opinions?
12      MR. SNELL: Object.
13   BY THE WITNESS:
14      A.   We see that Scott Ciarrocca states that
15   "We will need to probe this data with him," and we
16   see differences even on the last page of this
17   document where they -- Stephanie Molden's name is
18   below that -- their one-year completely dry rate is
19   reported here as 51%, here it's 70%, and in the
20   e-mail it's 40%.
21      Q.   Is it --
22      A.   So, there are a variety of different
23   numbers at the same time frame for the one-year
24   dryness rate.

Page 341

1       Q.   Doctor, I didn't create these exhibits,
2    did I?
3       A.   No.
4       MR. SNELL: Objection.
5    BY MR. THORNBURGH:
6       Q.   Whose exhibits do they belong to? Whose
7    documents do these belong to?
8       A.   These are internal Ethicon documents.
9       Q.   Doctor, is it ever appropriate --
10      MR. SNELL: Objection; misstates the evidence.
11   BY MR. THORNBURGH:
12      Q.   Is it ever appropriate for a medical
13   device company who receives concerning information
14   about the efficacy of its medical devices to
15   intervene with the researchers of the data and get
16   that data changed?
17      MR. SNELL: Objection and misstates the
18   evidence.
19   BY THE WITNESS:
20      A.   No.
21   BY MR. THORNBURGH:
22      Q.   Why not?
23      A.   Because doctors should be given complete
24   and accurate information regarding the efficacy and

86 (Pages 338 to 341)

Bruce Alan Rosenzweig, M.D.

Page 342

1    complications associated with the medical device.
2        Q.   If the one-year data showed a failure
3    rate of greater than 60%, should Ethicon have
4    described or should these -- strike that.
5            If the -- if the accurate information at
6    one year for Dr. Molden and Lucente's data was a
7    failure rate of or success rate of only 38.5%, is
8    that the data that should have been disclosed to
9    physicians?
10       MR. SNELL:  Objection and misstates the
11   evidence.
12   BY THE WITNESS:
13       A.   That would have been important data to
14   disclose to physicians.
15   BY MR. THORNBURGH:
16       Q.   And by disclosing data that shows a
17   higher efficacy rate, does that or does that --
18   does that in any way impact potentially the
19   risk/benefit assessment that physicians perform
20   when deciding which treatment options to recommend
21   to their patients?
22       MR. SNELL:  Object.
23   BY THE WITNESS:
24       A.   It would be difficult for a doctor to

Page 343

1    accurately give a risk/benefit analysis to their
2    patient if they're not provided with accurate
3    information regarding the risks and benefits
4    associated with a medical device.
5    BY MR. THORNBURGH:
6        Q.   Now, did Dr. -- based on the exhibits
7    that we just looked at, P2225, P1437, and P1437,
8    did Dr. Molden and Dr. Lucente's data get better or
9    worse after Mr. Ciarrocca of Ethicon said that they
10   needed to probe Dr. Lucente's data with him?
11       MR. SNELL:  Object.
12   BY THE WITNESS:
13       A.   Looking at the numbers, there is a
14   change in the dryness rate from 38.5% that is in
15   one document to 51% in another document to 69% in
16   another document.
17       Q.   Does that suggest anything to you?
18       MR. SNELL:  Objection.
19   BY MR. THORNBURGH:
20       Q.   Let me ask a better question.
21           Do you have an opinion whether or not
22   this evidence suggests anything -- is there
23   anything significant about that issue -- strike
24   that.

Page 344

1            Is there anything significant with that
2    fact to your opinions?
3        MR. SNELL:  Object.
4    BY THE WITNESS:
5        A.   Well, in the e-mail they're talking
6    about 247 patients.  In this document from
7    Stephanie Molden the N is 267 patients.  And in the
8    abstract, which seems to have included another
9    physician beside Dr. Lucente's data, Dr. Olson,
10   because you see that this is data collected at two
11   different hospitals, the total number of patients
12   that underwent the Secur were 349 patients but only
13   149 were evaluated at one year.
14           So, it's really difficult to say the
15   exact data set that they're looking at, but there
16   are differences in the numbers that are reported.
17       Q.   And are there ways to pull data that
18   could provide inaccurate information?
19       MR. SNELL:  Objection.
20   BY THE WITNESS:
21       A.   Correct.
22   BY MR. THORNBURGH:
23       Q.   In other words, if you -- if you knew
24   that your results were poor and you had a 30 --

Page 345

1    only a 38% success rate, could you add some other
2    doctors' patients to your pool who had a better
3    success rate to increase your numbers, to make your
4    numbers look better?
5        MR. SNELL:  Objection.
6    BY THE WITNESS:
7        A.   Possibly.
8        MR. THORNBURGH:  I think -- did you guys want
9    to break now?
10       MR. SNELL:  Yes, it's 5:40.
11   BY THE WITNESS:
12       A.   There is one last thing that we wanted
13   to talk about on this.
14   BY MR. THORNBURGH:
15       Q.   I'm sorry.  You're right.
16       MR. THORNBURGH:  Go back on the record.
17       THE VIDEOGRAPHER:  I didn't go off.
18   BY THE WITNESS:
19       A.   And it's the take-home message from
20   TVT-Secur.
21       MR. SNELL:  Are you on this part, Doctor?
22       THE WITNESS:  Yes, the next -- the next page.
23   BY THE WITNESS:
24       A.   And just to complete this one exhibit,

87 (Pages 342 to 345)

Bruce Alan Rosenzweig, M.D.

Page 346

1    the take-home message from TVT-Secur, "It is
2    completely different from TVT and TVT-O." The --
3    you have to "live through the learning curve of 20
4    cases," and the learning curve can be as long as 5
5    to 20 weeks.
6    BY MR. THORNBURGH:
7        Q.   And why are those -- those issues that
8    you identified significant to your opinions?
9        A.   It is completely different from the TVT
10   and TVT-O.  Therefore, you cannot use the TVT and
11   TVT-O data to state that the TVT-Secur will have
12   the same data because it is a completely different
13   product and the length of the learning curve shows
14   that there is a defect in the Instructions for Use.
15       Q.   Any other significant information from
16   Exhibit 784 that you want to discuss?
17       A.   No.
18       MR. THORNBURGH:  I think that concludes the
19   day.
20       MR. SNELL:  All right.
21       MR. THORNBURGH:  Thank you, Doctor.
22       THE VIDEOGRAPHER:  Okay.  Shall I go off the
23   record?
24       MR. THORNBURGH:  Sure.

Page 347

1        THE VIDEOGRAPHER:  Okay.  The time is 5:39
2    p.m. and we're going off the video record.
3            (WHEREUPON, at 5:39 p.m. the
4            videotaped de bene esse deposition
5            of BRUCE ALAN ROSENZWEIG, M.D. was
6            adjourned, to be reconvened at 9:00
7            a.m., on Saturday, July 15, 2017.)

Page 348

1        I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2    Registered Professional Reporter and Certified
     Shorthand Reporter, do hereby certify:
3        That previous to the commencement of the
     examination of the witness, the witness was duly
4    sworn to testify the whole truth concerning the
     matters herein;
5        That the foregoing deposition transcript
     was reported stenographically by me, was thereafter
6    reduced to typewriting under my personal direction
     and constitutes a true record of the testimony
7    given and the proceedings had;
         That the said deposition was taken
8    before me at the time and place specified;
         That the reading and signing by the
9    witness of the deposition transcript was agreed
     upon as stated herein;
10       That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
11   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in
12   the outcome of this action.
         It was requested before completion of
13   the deposition that the witness, BRUCE ALAN
     ROSENZWEIG, M.D., have the opportunity to read and
14   sign the deposition transcript.
15

16       CORINNE T. MARUT, Certified Reporter
17
         (The foregoing certification of this
18   transcript does not apply to any
     reproduction of the same by any means, unless under
19   the direct control and/or supervision of the
     certifying reporter.)
20
21
22
23
24

Page 349

1            INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7        After doing so, please sign the errata
8    sheet and date it.
9        You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12       It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the
15   deposition transcript by you.  If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

88  (Pages 346 to 349)