EXHIBIT E

Bruce Alan Rosenzweig, M.D.

Page 353

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

```
------------------------  ) FEBRUARY TERM 2014
IN RE:  PELVIC MESH        )
LITIGATION                 )
                           )
MASTER DOCKET              ) NO. 829
------------------------  ) ------------------
                           )
ELLA EBAUGH and            ) COURT OF COMMON
MARVIN EBAUGH              ) PLEAS
                           )
           Plaintiffs,     ) PHILADELPHIA COUNTY
                           )
     -vs-                  )
                           )
ETHICON WOMEN'S HEALTH     ) JULY TERM 2013
AND UROLOGY, A DIV. OF     )
ETHICON, INC., ET AL.,     ) NO. 00866
                           )
           Defendants.     )
                           )
------------------------  )
```

VOLUME II

The resumption of the videotaped de bene esse

deposition of BRUCE ALAN ROSENZWEIG, M.D., called

for examination, taken before CORINNE T. MARUT,

C.S.R. No. 84-1968, Registered Professional

Reporter and a Certified Shorthand Reporter of the

State of Illinois, at the JW Marriott Chicago, 151

West Adams Street, Chicago, Illinois, on

July 15, 2017, commencing at 9:03 a.m.

Bruce Alan Rosenzweig, M.D.

Page 354

```
1   APPEARANCES:
2   ON BEHALF OF THE PLAINTIFFS:
3      AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         17 East Main Street, Suite 200
4        Pensacola, Florida  32502
         850-202-1010
5      BY:  DANIEL J. THORNBURGH, ESQ.
         dthornburgh@awkolaw.com
6        BRAD BRADFORD, ESQ.
         bbradford@awkolaw.com
7
8   ON BEHALF OF THE DEFENDANTS:
9      BUTLER SNOW LLP
         500 Office Center Drive, Suite 400
10       Fort Washington, Pennsylvania  19034
         267-513-1885
11     BY:  NILS B. (BURT) SNELL, ESQ.
         Burt.Snell@butlersnow.com
12
13     BUTLER SNOW LLP
         1020 Highland Colony Parkway, Suite 1400
14       Ridgeland, Mississippi  39158
         601-985-4596
15     BY:  PAUL S. ROSENBLATT, ESQ.
         Paul.Rosenblatt@butlersnow.com
16
17
18   ALSO PRESENT:
19      RAQUEL LaPOINTE, Paralegal,
           Anderson Law Offices;
20      THOMAS BODYZIAK, Trial Technician.
21
22
23   VIDEOTAPED BY:  MILO SAVICH
24   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
```

Page 356

```
1   E X H I B I T S (Continued)
2   EXHIBITS PREVIOUSLY MARKED  --  FIRST REFERRED TO
3   P1676............................  488
    P1677............................  510
4   P1962............................  376
    P2041............................  505
5   P2281............................  630
    P2282............................  656
6   P2309............................  621
    P2310............................  636
7   P2321............................  648
    P2342............................  599
8   P2356............................  626
    P2362............................  609
9   P2561............................  587
    P2670............................  513
10  P2684............................  557
    P2685............................  546
11  P2688............................  519
    P2691............................  542
12  P2707............................  484
    P2718............................  476
13  P2719............................  553
14
15
16
17
18
19
20
21
22
23
24
```

Page 355

```
1            I N D E X
2   BRUCE ALAN ROSENZWEIG, M.D.       EXAMINATION
3   BY MR. THORNBURGH (resumed)...  358
4
5          E X H I B I T S
6   BR-Secur DEPOSITION EXHIBIT        MARKED FOR ID
7   No. 6   "Design Defects" slide      438
8   No. 7   C0003, slide               583
9   No. 8   Article by Lim, et al.     592
10  No. 9   Binder containing articles  610
           relied on by deponent (See
11         First Referred to Exhibits
           below)
12
13
     EXHIBITS PREVIOUSLY MARKED  --  FIRST REFERRED TO
14
     P0086............................  506
15   P0286............................  382
     P0290............................  390
16   P0292............................  441
     P0429............................  358
17   P0523............................  405
     P0584............................  410
18   P0686............................  444
     P0706............................  412
19   P0934............................  524
     P0946............................  448
20   P1008............................  521
     P1102............................  424
21   P1128............................  455
     P1185............................  603
22   P1460............................  569
     P1464............................  501
23
24
```

Page 357

```
1       THE VIDEOGRAPHER:  We are now on the record.
2   My name is Milo Savich and I am the videographer
3   for Golkow Technologies.
4       Today's date is July 15, 2017 and the
5   time is 9:03 a.m.
6       This video deposition is being held in
7   Chicago, Illinois in the matter of Ella
8   Cederberg-Ebaugh vs. Ethicon, Inc., et al., which
9   is being held in the Court of Common Pleas of
10  Philadelphia County, Pennsylvania.  The case number
11  is 1307-00866.
12      The deponent is Dr. Bruce Rosenzweig and
13  this is Volume 2 of his deposition.
14      Will counsel please identify themselves
15  for the record.
16      MR. THORNBURGH:  Daniel Thornburgh with
17  Aylstock, Witkin, Kreis & Overholtz for the
18  Plaintiffs.
19      MR. SNELL:  Burt Snell from Butler Snow for
20  Defendants Ethicon and Johnson & Johnson.
21      MR. ROSENBLATT:  Paul Rosenblatt for
22  Defendants Ethicon, Inc. and Johnson & Johnson.
23      MR. BRADFORD:  Brad Bradford for the
24  Plaintiffs in the MDL.
```

2 (Pages 354 to 357)

Bruce Alan Rosenzweig, M.D.

Page 358

1    THE VIDEOGRAPHER:  The Court Reporter is Corey
2 Marut who will now swear in the witness and we may
3 then proceed.
4        (WHEREUPON, the witness was duly
5        sworn.)
6        BRUCE ALAN ROSENZWEIG, M.D.,
7 called as a witness herein, having been previously
8 duly sworn and having testified, was examined and
9 testified further as follows:
10       DIRECT EXAMINATION (Resumed)
11 BY MR. THORNBURGH:
12    Q.   Good morning, Doctor.
13    A.   Good morning.
14    Q.   Did you have a good night's rest?
15    A.   Yes, sir.
16    Q.   Good.  Doctor, yesterday we went over a
17 number of internal documents, and we are going to
18 continue to go through Ethicon's corporate
19 documents today.
20       Is there -- what's the next document in
21 your binder that you have selected to discuss with
22 the jury today?
23    A.   P0429.
24    Q.   And can you identify this exhibit for

Page 359

1 the ladies and gentlemen of the jury.
2    A.   Yes.  It is an e-mail string between
3 various Medical Directors and marketing personnel
4 at Ethicon, including Dr. Aran Maree, who is the
5 Medical Director for Ethicon in
6 Australia/New Zealand; Dr. Khoo, who was the
7 Medical Director Asia Pacific; Dr. Robinson, who is
8 the Medical Director; Kevin Mahar from marketing;
9 Ted Foltyn from marketing.
10    Q.   Okay.  If you can turn to Exhibit P429
11 ETH.MESH number 00642330.
12       And before we do, did you review and
13 rely on Exhibit -- this exhibit?
14    A.   Yes.
15    Q.   Okay.  And what about Exhibit 429 is
16 relevant to your opinions?
17    A.   Yes.  It supports my opinions that
18 Ethicon did not do adequate pre-market testing
19 prior to launch of the TVT-Secur; that the
20 TVT-Secur is, quote-unquote, "device onto itself,"
21 therefore the data from the other full-length
22 slings is not applicable for the TVT-Secur; and
23 that because of the improper pre-market testing,
24 that patients, quote-unquote, "received the short

Page 360

1 end of the stick."
2    Q.   Okay.  And, Doctor, can you briefly
3 explain to the ladies and gentlemen of the jury
4 sort of the situation that occurred in Australia?
5       MR. SNELL:  Object; form.
6 BY THE WITNESS:
7    A.   This e-mail is from October of 2007.
8 Doctors in Australia had voiced concerns about
9 their high failure rate and complications
10 associated with the TVT-Secur, and their Medical
11 Director is communicating that information to other
12 Medical Directors and marketing personnel at
13 Ethicon worldwide.
14 BY MR. THORNBURGH:
15    Q.   Okay.  And if you turn with me to
16 ETH.MESH.00642330.
17       Now, you see that this is an e-mail from
18 Aran Maree to a number of other Ethicon employees?
19       MR. SNELL:  Object; leading.
20 BY THE WITNESS:
21    A.   Correct.
22 BY MR. THORNBURGH:
23    Q.   What is this e-mail?
24    A.   It is an e-mail string, including an

Page 361

1 e-mail from Dr. Aran Maree, Medical Director for
2 Australia and New Zealand, to other Ethicon
3 employees, including marketing and Medical
4 Directors.
5    Q.   And what about this e-mail from Aran
6 Maree dated October 25, 2007 is relevant to your
7 opinion?
8       MR. SNELL:  Object.
9 BY THE WITNESS:
10    A.   Again, it describes the experience with
11 very experienced doctors in Australia and their
12 failure rates.  They had received training and then
13 had received additional training from Dr. Vince
14 Lucente, who we had previously talked about, a very
15 well-known urogynecologist/pelvic surgeon and a Key
16 Opinion Leader.
17       Even with the modified technique from
18 Dr. Lucente, doctors in Australia that were
19 performing the technique were not finding that it
20 had improved the results that they were expecting.
21 BY MR. THORNBURGH:
22    Q.   And how is that relevant to your
23 opinion?
24    A.   That is relevant to my opinion that the

3 (Pages 358 to 361)

Bruce Alan Rosenzweig, M.D.

Page 362

1  Instructions for Use is defective and that there
2  are design characteristics of the TVT-Secur that
3  make it unreasonably unsafe and unreasonably
4  ineffective.
5      Q.   And if we pull up the e-mail on the
6  screen, it's from Aran Maree again, as you
7  testified, to a number of employees at Ethicon and
8  the subject -- what is the subject of this e-mail?
9      A.   "TVT-O versus TVT-Secur efficacy and
10 safety rates."
11     Q.   Okay.  And Dr. Maree writes, "Dear TC
12 and Sateesh."  Do you see that?
13     A.   Yes.
14     Q.   Okay.  It says -- he writes that
15 "Following on from my regular Medical Affairs
16 update with TC in which I briefed you on matters
17 pertaining to Medical Affairs in Australia and
18 New Zealand, I want to just reiterate my concerns
19 regarding the high failure rates across multiple
20 centers that we are seeing with TVT-Secur when
21 compared to its predecessor TVT-O."
22     Did I read that accurately?
23     MR. SNELL:  Object; leading, improper direct.
24 BY THE WITNESS:

Page 363

1      A.   Correct.
2  BY MR. THORNBURGH:
3      Q.   And is this what you were summarizing
4  just a moment ago?
5      A.   Yes.
6      Q.   And he goes on and discusses the
7  experience with a number of physicians in
8  Australia, is that accurate?
9      A.   Yes.
10     MR. SNELL:  Object; leading again.
11 BY MR. THORNBURGH:
12     Q.   And is that what you testified to a
13 moment ago?
14     MR. SNELL:  Objection, leading again.
15 BY THE WITNESS:
16     A.   Correct.
17 BY MR. THORNBURGH:
18     Q.   And you see where it says Malcolm --
19 "Professor Malcolm Frazer performed"?  Do you see
20 that part?
21     A.   Yes.
22     Q.   And are you aware of from your work in
23 this litigation who Dr. Malcolm Frazer is?
24     A.   Dr. Frazer is a pelvic surgeon and Key

Page 364

1  Opinion Leader in Australia.
2      Q.   Okay.  And is he -- you say Key Opinion
3  Leader.  What does that mean?
4      A.   His -- he is someone whose opinion is
5  well respected in the field.
6      Q.   And do you know whether or not he had
7  any relationship with Ethicon?
8      A.   Yes.  If I do recall, that he does have
9  a relationship with Ethicon.
10     Q.   And it says that Malcolm Taylor had
11 approximately 20 cases of failure.
12     Do you see that?
13     MR. SNELL:  Objection.
14 BY MR. THORNBURGH:
15     Q.   Approximately.  Strike that.
16     It says Malcolm Taylor approximately 20
17 cases failure in approximately 13 cases.
18     Do you see that?
19     A.   That's --
20     MR. SNELL:  Objection.  Hold on.  Leading.
21 Improper direct.  Go ahead.
22 BY THE WITNESS:
23     A.   It's Dr. Malcolm Frazer who --
24 BY MR. THORNBURGH:

Page 365

1      Q.   Did I say Malcolm Taylor?
2      A.   Yes.
3      Q.   Sorry.
4      A.   Had performed 20 cases and had 13
5  failures.
6      Q.   Okay.  So, since I butchered that
7  question, what does this document indicate with
8  respect to Dr. Malcolm Frazer's experience?
9      A.   He had performed 20 cases, had 13
10 failures and he had performed over 700 of the
11 full-length TVT surgeries over the years, so he is
12 quite experienced in performing midurethral slings.
13     Q.   Okay.  And also it discusses Bruce --
14 Dr. Bruce Farnsworth and Dr. Marcus Carey.
15     Do you see that?
16     MR. SNELL:  Object; leading again.
17 BY THE WITNESS:
18     A.   Correct.
19 BY MR. THORNBURGH:
20     Q.   And are you aware -- do you know who
21 Dr. Bruce Farnsworth or Marcus Carey are?
22     A.   Both Dr. Farnsworth and Dr. Carey are
23 well-known pelvic surgeons.  Dr. Carey is a Key
24 Opinion Leader and has worked and invented pelvic

4 (Pages 362 to 365)

Bruce Alan Rosenzweig, M.D.

1    floor devices.
2        Q.    Okay.  And what does this document
3    indicate with respect to their experience with the
4    TVT-Secur product?
5        A.    They were experiencing lots of early
6    failures.
7        Q.    And if we go to the next paragraph, what
8    does the next paragraph indicate with respect to
9    how their early failures were addressed by Ethicon?
10       A.    Well, it states that Dr. Carey had
11   trained with Dr. Lucente in the United States and
12   was involved with training with two other surgeons;
13   that he then used a modified technique from the
14   original training as a result of his experience
15   early on, but that modified technique still did not
16   improve his success rate.
17       Q.    Okay.  And who trained him in the
18   modified technique?
19       A.    Dr. Lucente.
20       Q.    And who is Dr. Lucente?
21       A.    As we've discussed before, Dr. Lucente
22   is a urogynecologist in the United States, a Key
23   Opinion Leader for Ethicon, and very experienced
24   surgeon in midurethral slings.

1        Q.    Okay.  And do you know whether or not
2    Dr. Lucente was a paid consultant of Ethicon?
3        A.    Yes, he was.
4        Q.    And do you know what Dr. Lucente's role
5    was with respect to the TVT-Secur product?
6        A.    Dr. Lucente was part of the First Human
7    Use Study.  He was also a proctor, preceptor and
8    trainer of surgeons in the -- in how to perform the
9    TVT-Secur.
10       Q.    And do you have any opinion with respect
11   to this section of the e-mail that you just
12   reviewed with the jury concerning Dr. Lucente and
13   the modified technique that he was now using to
14   retrain physicians?
15       MR. SNELL:  Object; leading.
16       BY THE WITNESS:
17       A.    That even with the modified technique,
18   doctors were still having the same experience as
19   before the modified technique; that there were
20   characteristics of the device that made it
21   unreasonably unsafe and unreasonably ineffective.
22       BY MR. THORNBURGH:
23       Q.    Do you have any opinions one way or the
24   other with respect to Ethicon's training program?

1        A.    Yes.  The training program was
2    inadequate.
3        Q.    And what's the basis for that opinion?
4        A.    That doctors were experiencing
5    complications and failures from the original
6    training.  Even after the training was,
7    quote-unquote, "modified," doctors were still
8    experiencing failures and complications associated
9    with the TVT-Secur.
10       Q.    Is there any other section in this
11   e-mail from Aran Maree that is relevant to your
12   opinions and, if so, what is the significance of
13   that, if any?
14       A.    This current e-mail from Dr. Aran Maree
15   to the -- Dr. Khoo, who is the Medical Director for
16   Ethicon in the Asia Pacific, goes on to say that
17   "It is the responsibility to ensure that we are
18   diligent as a company in performing adequate
19   pre-market assessment on multiple dimensions before
20   launching the product," which supports my opinion
21   that there was inadequate testing in the design and
22   development stage prior to launch of the product to
23   identify the characteristics of the device that
24   made it unreasonably unsafe and unreasonably

1    ineffective.
2        Q.    And if you look at ETH.MESH again at
3    ending in 2330, do you see the concerns that
4    Dr. Aran Maree identify?
5        MR. SNELL:  Object; leading, improper direct
6    and expert opinion.
7    BY THE WITNESS:
8        A.    Yes.
9    BY MR. THORNBURGH:
10       Q.    What concerns did Dr. Aran Maree
11   identify that are relevant, if at all, to your
12   opinions?
13       MR. SNELL:  Object.
14   BY THE WITNESS:
15       A.    He states that "the original training
16   program may not result in competency in device
17   insertion or results in" -- "or result in clinical
18   efficacy.  There appears to be tricks to insertion
19   of the product and removal of the inserters which
20   prevent dislodging of the device in the process,
21   et cetera."
22   BY MR. THORNBURGH:
23       Q.    If you look at Concern No. 1.
24       MR. THORNBURGH:  If we can blow that up really

5 (Pages 366 to 369)

Bruce Alan Rosenzweig, M.D.

Page 370

 1   quick.  Go ahead and highlight that for us, Tom.
 2   BY MR. THORNBURGH:
 3      Q.   It says, "This product may have been
 4   launched as a substitute for TVT-O without enough
 5   clinical data to justify such a rollout."
 6           Did I read that correctly?
 7      MR. SNELL:  Object; leading as well.
 8   BY THE WITNESS:
 9      A.   Correct.
10   BY MR. THORNBURGH:
11      Q.   Does -- is Dr. Malcolm Taylor's concern
12   that he lists in No. 1, is that relevant, if at
13   all, to your opinions?
14      MR. SNELL:  Same objection.
15   BY THE WITNESS:
16      A.   This is actually from Dr. Aran Maree.
17   BY MR. THORNBURGH:
18      Q.   I don't know why I'm saying Taylor.  Let
19   me strike that.
20           With respect to Dr. Aran Maree's
21   concerns and specifically Concern No. 1, is that
22   significant at all to any of your opinions?
23      MR. SNELL:  Object and leading again.
24   BY THE WITNESS:

Page 371

 1      A.   Yes, this supports my opinions that the
 2   TVT-Secur device was launched without enough
 3   clinical data beside the -- there is only the
 4   five-week, 31 patient Human Use Trial to support
 5   its safety and efficacy to identify the design
 6   characteristics that make the device unreasonably
 7   unsafe and unreasonably ineffective.
 8      Q.   And is -- you had testified at length
 9   yesterday concerning the lack of adequate testing.
10           Is Dr. Aran Maree saying anything
11   different than what you have -- had opined to
12   yesterday?
13      MR. SNELL:  Object.
14   BY MR. THORNBURGH:
15      Q.   With respect to -- with respect to the
16   clinical data.
17      A.   No, this supports my opinion that the
18   device was rolled out without sufficient clinical
19   data to identify the device characteristics that
20   make it unreasonably unsafe and unreasonably
21   ineffective.
22      Q.   Aran Maree goes on to say -- it's
23   talking about his post-market surveillance
24   responsibilities.

Page 372

 1           Do you see that?  It goes on to
 2   page 331?
 3      MR. SNELL:  Object and leading.
 4   BY THE WITNESS:
 5      A.   Yes.
 6   BY MR. THORNBURGH:
 7      Q.   And it says -- it says, "A similar
 8   recent issue with the Depuy ASR prosthesis resulted
 9   in an international Safety Alert notice."
10           Did I read that correctly?
11      MR. SNELL:  Object and leading.
12   BY THE WITNESS:
13      A.   Yes.
14   BY MR. THORNBURGH:
15      Q.   Are you aware of the issues that
16   Ethicon's company or Johnson & Johnson's company
17   Depuy had experienced with respect to its
18   prosthetic hip implant?
19      MR. SNELL:  Object and leading.
20   BY THE WITNESS:
21      A.   Hip prostheses are not my area of
22   specialty.  I do recall that there were concerns
23   regarding lack of long-term stability of the hip,
24   which led to the device breaking and complications

Page 373

 1   for patients.
 2      MR. SNELL:  Object.  Move to strike.  Improper
 3   undisclosed expert opinion.
 4   BY MR. THORNBURGH:
 5      Q.   And what does Dr. Aran Maree write in
 6   the next paragraph, first sentence concerning the
 7   issues that were being experienced at Ethicon,
 8   Johnson & Johnson and Depuy at that time?
 9      A.   This issue regarding the TVT-Secur --
10      MR. SNELL:  Object as leading.  Sorry.
11           Dan, do you want to give me a running
12   objection on this document because in Pennsylvania
13   you don't walk an expert through a document.
14      MR. THORNBURGH:  He's already summarized the
15   document.
16      MR. SNELL:  And that's what he does.  But now
17   you are going through it, which is improper in
18   Pennsylvania.
19      MR. THORNBURGH:  It's not improper.  We did
20   this --
21      MR. SNELL:  Were you in Engleman?
22      MR. THORNBURGH:  I was in Engleman and Adkins.
23      MR. SNELL:  It didn't happen in Engleman.
24      MR. THORNBURGH:  It did.

6 (Pages 370 to 373)

Bruce Alan Rosenzweig, M.D.

Page 374

1      MR. SNELL: What's the opinion? What's the
2   basis? How does it support it?
3      MR. THORNBURGH: I was in Engleman.
4      MR. SNELL: And you don't move -- well, you're
5   leading the expert through it.
6      MR. THORNBURGH: You are incorrect. I will
7   give you a standing objection. I disagree with
8   your position. Go ahead.
9   BY MR. THORNBURGH:
10     Q.   Go ahead, Doctor.
11     A.   "This issue," regarding TVT-Secur, "as
12   well as the Depuy ASR issue are reminders that to
13   me that our first Credo responsibility to ensure
14   that we are diligent as a company performing an
15   adequate pre-market assessment on multiple
16   dimensions before launching a new product."
17     MR. SNELL: Object.
18   BY MR. THORNBURGH:
19     Q.   How, if at all --
20     MR. SNELL: Move to strike.
21   BY MR. THORNBURGH:
22     Q.   -- is that statement from Dr. Aran Maree
23   relevant to any of your opinions?
24     A.   Yes, it is.

Page 375

1      Q.   And what's the significance of that
2   statement?
3      A.   That supports my opinions that there was
4   inadequate pre-market testing on the device to
5   identify characteristics of the device that made it
6   unreasonably unsafe and unreasonably ineffective.
7      Q.   Doctor, have you read -- there is a
8   discussion here by Dr. Aran Maree about the Credo
9   responsibilities.
10        Do you see that?
11     A.   Yes.
12     Q.   Are you -- are you aware of what
13   Dr. Aran Maree is discussing here with respect to
14   the Credo?
15     MR. SNELL: Object.
16   BY THE WITNESS:
17     A.   Yes. The Johnson & Johnson's Credo says
18   that their first responsibility is to patients,
19   physicians, et cetera.
20   BY MR. THORNBURGH:
21     Q.   Doctor, do you have an opinion whether
22   or not a company such as Johnson & Johnson should
23   put patient safety before profit?
24     MR. SNELL: Object.

Page 376

1   BY THE WITNESS:
2      A.   Yes, I have an opinion.
3   BY MR. THORNBURGH:
4      Q.   What's that opinion?
5      A.   That they should put patient safety
6   ahead of profit.
7      Q.   I hand you what's been marked as P1962.
8      MR. THORNBURGH: I don't have an unhighlighted
9   copy.
10   BY MR. THORNBURGH:
11     Q.   Do you recognize Exhibit P1962?
12     A.   Yes.
13     Q.   And what is this exhibit?
14     A.   This is the Credo from
15   Johnson & Johnson.
16     MR. THORNBURGH: Tom, could you go ahead and
17   blow up the first paragraph.
18   BY MR. THORNBURGH:
19     Q.   And what is relevant -- what, if
20   anything, is relevant to your opinions with respect
21   to the Johnson & Johnson Credo?
22     MR. SNELL: Object. Object. We will have a
23   motion in limine on this for the record. But go
24   ahead.

Page 377

1   BY THE WITNESS:
2      A.   That they are stating that their
3   responsibility is to doctors, nurses, patients, to
4   mothers and fathers and all of those who use our
5   products and services.
6   BY MR. THORNBURGH:
7      Q.   Do you agree that medical device
8   companies like Johnson & Johnson should put patient
9   safety first?
10     MR. SNELL: Object.
11   BY THE WITNESS:
12     A.   Yes.
13   BY MR. THORNBURGH:
14     Q.   What are the potential issues, if any,
15   for patients if companies who develop medical
16   devices don't put patient safety as their top
17   priority?
18     MR. SNELL: Object.
19   BY THE WITNESS:
20     A.   Characteristics of a device that make it
21   unreasonably unsafe or unreasonably ineffective are
22   not identified and patients end up being harmed by
23   those products.
24   BY MR. THORNBURGH:

7 (Pages 374 to 377)

Bruce Alan Rosenzweig, M.D.

Page 378

1    Q.   Okay.  And if we turn back to P429.  Is
2  there anything else in P429 that you want to
3  discuss with the ladies and gentlemen of the jury?
4    A.   Again, this document contains a part of
5  an e-mail string from Dr. Khoo, Medical Director of
6  Johnson & Johnson Asia Pacific, to Dr. Robinson,
7  Medical Director, and Dr. Aran Maree, which agrees
8  that devices need to be properly evaluated prior to
9  launch so that the patients, quote-unquote, "do not
10  receive the short end of the stick," which means
11  that patients are not exposed to characteristics of
12  a device that are unreasonably unsafe or
13  unreasonably ineffective and therefore sustain harm
14  from that.
15    Q.   And you were -- were you referring to a
16  specific section in this e-mail string?
17    A.   Yes.  Again from Dr. Khoo to
18  Dr. Robinson.
19    Q.   Can you identify the Bates number for
20  the record?
21    A.   Yes.  It ends in 2327.
22    MR. THORNBURGH:  Tom, go ahead and pull that
23  up.
24  BY MR. THORNBURGH:

Page 379

1    Q.   Okay.  What is Dr. Khoo writing to his
2  colleague -- colleagues at Ethicon?
3    A.   "We want to eliminate any possibility of
4  product-related issues while considering the
5  adequacy of training and what is needed to properly
6  roll out a device such that patients receiving them
7  do not get the short end of the stick."
8    Q.   And how is that statement from Dr. Khoo
9  relevant or significant to your opinions?
10    MR. SNELL:  Object.
11  BY THE WITNESS:
12    A.   It supports my opinions that devices
13  need to be adequately tested and doctors need
14  adequate training on a device to be able to safely
15  and properly implant a device so the
16  characteristics of the device that are unreasonably
17  unsafe or make the device unreasonably ineffective
18  are identified prior to it being used in patients.
19  BY MR. THORNBURGH:
20    Q.   Okay.  Is there -- are you finished with
21  Exhibit 429?
22    A.   Yes.
23    Q.   Okay.  What's the next document that
24  you'd like to discuss with the jury?

Page 380

1    A.   This is an e-mail string from
2  October 30, 2007 from the Medical Affairs
3  Department in Australia to the Medical Director
4  Dr. Aran Maree, Medical Director in
5  Australia/New Zealand.
6    Q.   And what's the significance, if any, of
7  Exhibit 1063 with respect to your opinions in this
8  case?
9    MR. SNELL:  Can I get a copy before I hear his
10  answer?
11    MR. THORNBURGH:  Yes.
12    MR. SNELL:  Give me just one second.
13    Only objection, so I have an objection
14  on P1063, same as P0429 we just went through with
15  regard to other products.  The DePuy issue is
16  in both of them, and I'm sure that will be part of a
17  motion in limine as well as the foreign issue.  Go
18  ahead.
19  BY MR. THORNBURGH:
20    Q.   Okay.  Doctor, you had pointed us to
21  Exhibit P1063.  What, if anything, is significant
22  to your opinions from this document?
23    A.   This document discusses the analysis of
24  the data from the TVT-Secur by the Medical Affairs

Page 381

1  Department in Australia/New Zealand and that the
2  assessment is that because of the poor results from
3  the data of TVT-Secur, that the marketing tag line
4  that it is part of the TVT family and Secur is part
5  of that is inappropriate based on the actual
6  results from the doctors using the TVT-Secur; that
7  it does not function as a treatment for stress
8  urinary incontinence as the full-length products in
9  the TVT family.
10    Q.   And --
11    MR. SNELL:  Object.  Move to strike.  Go
12  ahead.
13  BY MR. THORNBURGH:
14    Q.   And is there a specific Bates number
15  that you're referencing with respect to that
16  opinion?
17    A.   Yes, it ends in 5447.
18    Q.   And how is that statement that you --
19  from Dr. Aran Maree relevant to your opinions, if
20  at all, in this case?
21    A.   It supports my opinions that the
22  TVT-Secur -- the results from the full-length TVT
23  devices cannot be used to justify the TVT-Secur's
24  performance in efficacy and safety.

8 (Pages 378 to 381)

Bruce Alan Rosenzweig, M.D.

Page 382

1    Q.   Okay.  Is there anything else relevant
2  about Exhibit 1063 that you want to discuss with
3  the ladies and gentlemen of the jury?
4        MR. SNELL:  Object.
5  BY THE WITNESS:
6        A.   No.
7  BY MR. THORNBURGH:
8        Q.   What is the next exhibit that you want
9  to discuss?
10       A.   P0286.
11       Q.   And, again, did you review and rely on
12  this exhibit?
13       A.   Yes.
14       Q.   Again, just so I don't have to keep on
15  saying it --
16       MR. SNELL:  Can I get --
17  BY MR. THORNBURGH:
18       Q.   -- did you review and rely on all of the
19  exhibits that are in your binder?
20       A.   Yes.
21       MR. SNELL:  Thank you.
22  BY MR. THORNBURGH:
23       Q.   What about P286 is relevant to your
24  opinions?

Page 383

1        MR. SNELL:  Object.
2  BY THE WITNESS:
3        A.   This is an e-mail string that started
4  from Dr. Aran Maree, Medical Director of Australia
5  and New Zealand, to other key Ethicon employees.
6  BY MR. THORNBURGH:
7        Q.   And what, if anything, is significant
8  about P286?
9        MR. SNELL:  Same objection.
10  BY THE WITNESS:
11       A.   It supports my opinion that there are
12  design characteristics of the TVT-Secur that make
13  it unreasonably unsafe and unreasonably effective
14  (sic).
15            It also supports that -- my opinion that
16  the TVT-Secur Instructions for Use are inadequate
17  and that even with modified training, doctors
18  cannot successfully place the TVT-Secur device and
19  that there was inadequate testing during the
20  design/development phase before the device was
21  launched to be able to identify the characteristics
22  of the device that make it unreasonably unsafe or
23  unreasonably ineffective.
24       Q.   To address the issues that Dr. Aran

Page 384

1  Maree were concerned about in Australia, what, if
2  any, action was planned?
3        A.   That the device would be withdrawn from
4  the market in Australia.
5        Q.   And what does that mean?
6        A.   That the device would no longer be sold
7  to hospitals for doctors to implant it in patients
8  to treat stress urinary incontinence.
9        Q.   And what section of Exhibit P286
10  supports that opinion?
11       A.   Bates stamp 6844.
12       MR. THORNBURGH:  Tom, if you can pull that up.
13  BY MR. THORNBURGH:
14       Q.   And can you direct us to that -- to the
15  section you're referencing?
16       A.   Well, the final conclusion is at the
17  bottom of the page under bullet point 3.  "We also
18  discussed the most appropriate customer-focused and
19  Credo-aligned position to take with regard to the
20  future use of this product in the Australian
21  market.  We feel that withdrawing the product from
22  the market here is currently the most appropriate
23  action for Australia."
24       Q.   And how -- what is the significance of

Page 385

1  that statement, if any, to your opinions?
2        MR. SNELL:  Object.
3  BY THE WITNESS:
4        A.   It discusses that the surgeons have
5  indicated that their success rate with the
6  TVT-Secur is substantially below their success rate
7  with other full-length products; that even with the
8  modified training, it did not improve their
9  results, which demonstrates or supports my opinions
10  that there are characteristics of the TVT-Secur
11  device that make it unreasonably ineffective to
12  treat stress urinary incontinence and have
13  characteristics that make it unreasonably unsafe.
14  BY MR. THORNBURGH:
15       Q.   And do you have an opinion one way or
16  the other with respect to the potential action
17  that's being discussed by Dr. Aran Maree concerning
18  withdrawing the TVT-Secur from the market in
19  Australia?
20       MR. SNELL:  Object and leading.
21  BY THE WITNESS:
22       A.   Yes.  There is a further discussion from
23  members of the Ethicon/Johnson & Johnson corporate
24  office, including the president of

9 (Pages 382 to 385)

Bruce Alan Rosenzweig, M.D.

Page 386

1   Johnson & Johnson, Renee Selman, that if this
2   information regarding Australia removing the
3   TVT-Secur from the market could cause problems in
4   other areas of the world.
5        MR. SNELL:  Object.  Move to strike.
6   Non-responsive.  Reading document.
7   BY MR. THORNBURGH:
8        Q.   And where -- what part of Exhibit 286
9   supports that opinion?
10       A.   P6842.
11       Q.   And you discussed, I think you mentioned
12  Renee Selman.  Again, can you remind the jury who
13  Renee Selman is?
14       A.   She's the president of Johnson & Johnson
15  and this is from Catherine Beath, who is in
16  regulatory at Johnson & Johnson.
17       Q.   And --
18       MR. SNELL:  Object.  Move to strike.
19  Misstates the evidence.
20  BY MR. THORNBURGH:
21       Q.   And do you -- there are some other
22  individuals that are on this e-mail, this e-mail
23  string with Renee Selman.  Can you identify who
24  those folks are?

Page 387

1        MR. SNELL:  Leading.
2   BY THE WITNESS:
3        A.   Sheri McCoy, who is from the corporate
4   office at Johnson & Johnson.  Mark Yale, if I
5   recall, is a safety officer at Johnson & Johnson.
6   BY MR. THORNBURGH:
7        Q.   And what concerns, if any, were being
8   discussed between these Ethicon employees?
9        MR. SNELL:  Object.  Leading as well.
10  BY THE WITNESS:
11       A.   The marketing problems that would happen
12  around the world if the information about Australia
13  removing the product from the market were made
14  known on an international basis.
15  BY MR. THORNBURGH:
16       Q.   Now, when you were practicing -- as a --
17  strike that.
18       As a practicing urogynecologist in
19  November of 2007 or after, were you ever made aware
20  of the issues that are being discussed within these
21  exhibits concerning Australia?
22       A.   No.
23       Q.   And just to sort of briefly summarize
24  these two documents.

Page 388

1        Aran Maree is the -- who is Aran Maree
2   again?
3        MR. SNELL:  Object.
4   BY THE WITNESS:
5        A.   Medical Director of
6   Australia/New Zealand.
7   BY MR. THORNBURGH:
8        Q.   And Sheri McCoy and Renee Selman, where
9   are they located?
10       A.   At the corporate office in, if I recall,
11  in New Jersey.
12       Q.   So, they are the United States
13  executives?
14       A.   Correct.
15       MR. SNELL:  Object; leading.
16  BY MR. THORNBURGH:
17       Q.   Okay.  And do you have any opinion with
18  respect to the concerns that you just discussed
19  that are being raised by Sheri McCoy in this
20  document?
21       MR. SNELL:  Object and leading.
22  BY THE WITNESS:
23       A.   Can you repeat the question, please.
24  BY MR. THORNBURGH:

Page 389

1        Q.   Yeah.  Do you have any opinions with
2   respect to the concerns of Sheri McCoy that you
3   identified earlier on Bates No. 6842?
4        MR. SNELL:  Object and leading.
5   BY THE WITNESS:
6        A.   Well, I have an opinion that Dr. Maree
7   made the right decision about removing the
8   TVT-Secur from the Australian and New Zealand
9   market, and I agree with the statement that was
10  made that this would absolutely cause problems in
11  other areas of the world.
12  BY MR. THORNBURGH:
13       Q.   Do you have any --
14       MR. SNELL:  Move to strike.  Non-responsive.
15  BY MR. THORNBURGH:
16       Q.   Do you have any opinions with respect to
17  what actions could have been taken by
18  Ethicon/Johnson & Johnson to alert physicians in
19  the United States concerning these issues?
20       MR. SNELL:  Object.
21  BY THE WITNESS:
22       A.   A letter could be sent to doctors
23  regarding the action that was being taken in
24  Australia regarding the TVT-Secur product.

10 (Pages 386 to 389)

Bruce Alan Rosenzweig, M.D.

Page 390

1    BY MR. THORNBURGH:
2       Q.   And did that ever happen?
3       A.   No.
4       MR. SNELL:  Same objection.
5    BY MR. THORNBURGH:
6       Q.   And by "letter," are you referring --
7    what type of letter should be sent?
8       MR. SNELL:  Same objection.
9    BY THE WITNESS:
10      A.   A Dear Doctor letter.
11   BY MR. THORNBURGH:
12      Q.   Okay.  And what's the next exhibit that
13   you want to discuss?
14      A.   P0290.
15      Q.   And what, if anything, from Exhibit 290
16   is significant to your opinions?
17      A.   This is --
18      MR. SNELL:  Object.  Go ahead.
19   BY THE WITNESS:
20      A.   This is an e-mail string between
21   Dr. Aran Maree and other Ethicon employees in
22   Australia and New Zealand.  Ultimately it is copied
23   to Dr. Robinson and Mark Yale.
24           It supports my opinions that the

Page 391

1    TVT-Secur device is a different -- is such a
2    different device from the other full-length slings
3    that the data from the other full-length slings
4    cannot be used to justify the TVT-Secur.
5           It supports my opinions that the
6    Instructions for Use were defective because they
7    were fundamentally misleading and that the training
8    on the TVT-Secur was inadequate.
9       Q.   And can you direct us to the portions of
10   this exhibit that support your opinions?
11      A.   Yes.  On ETH.MESH.7062.
12      Q.   And what part of that page supports your
13   opinion?
14      A.   Actually, it starts on ETH.MESH.7061 and
15   continues to the next page.
16           Dr. Maree, again, the Medical Director
17   Australia/New Zealand, is writing regarding the
18   Instructions for Use.
19           Dr. Frazer said it is his opinion that
20   the Instructions for Use is fundamentally
21   misleading.  "He described the blue diagrams as
22   'confusing' and 'contradictory or confusing
23   statements on tension.'"
24           Dr. Frazer also discussed with Dr. Maree

Page 392

1    that this isn't training.  "This is how things
2    should have been," the re-training that was done,
3    "This is how things should have been done and how
4    we should" -- "how we always should have been
5    trained.  Also nuances I have been learning over
6    the last two weeks were never what I thought in the
7    beginning.  Even so, he is not yet," with regard to
8    Dr. Frazer, "convinced that even with these changes
9    the device is going to be successful as the other
10   full-length devices and I haven't seen enough
11   evidence.  Even Vince Lucente's data is not
12   convincing to me...and that the TVT-Secur device is
13   so utterly different to the other TVT devices that
14   it should not be called a TVT and the speed to
15   market and the breadth of the launch did not take
16   this into account."
17      MR. SNELL:  Object.  Move to strike.  Reading.
18   BY MR. THORNBURGH:
19      Q.   And if you turn to page 061 that you had
20   referenced earlier.
21      MR. THORNBURGH:  Tom, go ahead and pull up
22   little (i), section (i).  Section 1.
23   BY MR. THORNBURGH:
24      Q.   And this says, "Regarding the

Page 393

1    Instructions for Use (IFU), Professor Frazer said
2    that this is his opinion that 'the IFU,'" and this
3    is in quotes, "'the IFU is fundamentally
4    misleading.  Tension-free, tension-less and
5    placement with no tension are complete misnomers."
6           Did I read that correctly?
7       MR. SNELL:  Object and leading.
8    BY THE WITNESS:
9       A.   Yes.
10   BY MR. THORNBURGH:
11      Q.   And this is the section of the -- this
12   exhibit that you had directed us to?
13      MR. SNELL:  Object and leading.
14   BY THE WITNESS:
15      A.   Correct.
16   BY MR. THORNBURGH:
17      Q.   And how does this section support your
18   opinion?
19      MR. SNELL:  Object.
20   BY THE WITNESS:
21      A.   It supports my opinion that the IFU is
22   defective.
23   BY MR. THORNBURGH:
24      Q.   Okay.  And if we go to Section (iii),

11 (Pages 390 to 393)

Bruce Alan Rosenzweig, M.D.

Page 394

1    Dr. Maree writes, "Regarding the revised Key
2    Technical Points document."
3          Do you see that?
4          A.   Yes.
5          Q.   What is the Key Technical Points
6    document?
7          A.   That would be the cookbook that we
8    discussed earlier.
9          Q.   It says, "Regarding the revised Key
10   Technical Points document, he said," referring to
11   Dr. Frazer, "that 'the section on tension-free is
12   inadequate' in his opinion.  It is 'still not as
13   clear as it could be.'  He described the blue
14   diagram as 'confusing' and said there appeared to
15   be 'contradictory or confusing statements on
16   tension' within the body of the text."
17         Did I read that correctly?
18         MR. SNELL:  Object and leading.
19   BY THE WITNESS:
20         A.   Yes.
21   BY MR. THORNBURGH:
22         Q.   How does that section support your
23   opinion, if at all?
24         MR. SNELL:  Object; leading.

Page 395

1    BY MR. THORNBURGH:
2          Q.   Let me ask a better question.
3          What, if anything, is significant about
4    that statement?
5          MR. SNELL:  Objection.
6    BY THE WITNESS:
7          A.   It supports my opinions that the
8    Instructions for Use is misleading and misleading
9    on the section on how to tension the device; that
10   the concept of tension-free, which we described
11   earlier is on the box, "Tension-free support for
12   incontinence," is inaccurate.
13   BY MR. THORNBURGH:
14         Q.   Doctor, yesterday you talked a little
15   bit about and offered opinions about the cookbook.
16   Do you recall that?
17         A.   Yes.
18         Q.   Did -- does it appear from this exhibit,
19   this internal company document, that the cookbook
20   addressed the issues with the TVT-Secur?
21         MR. SNELL:  Object; leading.
22   BY THE WITNESS:
23         A.   It did not.
24   BY MR. THORNBURGH:

Page 396

1          Q.   And do you have an opinion as to why
2    that -- the cookbook could not address or did not
3    address the issues of failure?
4          MR. SNELL:  Object.
5    BY THE WITNESS:
6          A.   Because the device has characteristics
7    that make it unreasonably ineffective and
8    unreasonably unsafe and the Instructions for Use is
9    defective in describing how to place the device.
10   BY MR. THORNBURGH:
11         Q.   When you say "because the device has
12   characteristics that make it unreasonably
13   ineffective and unreasonably unsafe," what do you
14   mean by that?
15         A.   One of the characteristics that makes it
16   unreasonably ineffective is that the fleece tips
17   that are used to hold the device into place to give
18   midurethral support are ineffective in doing that
19   because they are defectively designed.
20         The stiffness of the mesh being short
21   and laser-cut is -- has characteristics that had
22   been shown to make the smooth muscle of the urethra
23   not function as well, which makes either the
24   incontinence difficult to treat or will lead to a

Page 397

1    recurrence of incontinence.
2          The sharp arrow tip introducer drags
3    across vaginal tissue, which disrupts the vaginal
4    tissue, which will make the device either cause a
5    complication, therefore, making it unreasonably
6    unsafe, or will lead to a recurrence of
7    incontinence or not treat the incontinence to begin
8    with, making it unreasonably ineffective.
9          Q.   And if we look at the next section,
10   Section (iv), it says, "Regarding re-training on
11   key points, Professor Frazer said that he disagreed
12   with the company calling it re-training."
13         And then he's quoted as saying, "This
14   isn't re-training.  This is how things always
15   should have been done and how we always should have
16   been trained."
17         Do you see that?
18         A.   Yes.
19         MR. SNELL:  Object and leading.
20   BY MR. THORNBURGH:
21         Q.   Do you have any opinions with respect to
22   that statement from Dr. Frazer?
23         MR. SNELL:  Object and leading.
24   BY THE WITNESS:

12 (Pages 394 to 397)

Bruce Alan Rosenzweig, M.D.

Page 398

1        A.   Yes.  That supports my opinions that the
2   training given to doctors was inadequate and that
3   the Instructions for Use is defective.
4   BY MR. THORNBURGH:
5        Q.   And he goes on to say also in quotes,
6   "The nuances I have been learning in the last two
7   weeks were never what I was taught in the
8   beginning.'  Even so, he is 'not yet convinced,'"
9   referring to Dr. Lucente -- or referring to
10   Dr. Frazer -- "'not yet convinced that even with
11   these changes the device is going to be as
12   successful as TVT-O and TVT Retropubic.'"
13        Did I read that correctly?
14        MR. SNELL:  Object and leading.
15   BY THE WITNESS:
16        A.   Yes.
17   BY MR. THORNBURGH:
18        Q.   And what, if anything, about that
19   statement is significant to your opinions?
20        MR. SNELL:  Same objection.
21   BY THE WITNESS:
22        A.   That there are characteristics of the
23   device that make it unreasonably ineffective.
24   BY MR. THORNBURGH:

Page 399

1        Q.   And it goes on to say, "I haven't yet
2   seen enough evidence.  Even Vince Lucente's data
3   isn't yet convincing to me."
4        Do you see that?
5        A.   Yes.
6        MR. SNELL:  Objection; leading.
7   BY MR. THORNBURGH:
8        Q.   And we discussed Dr. Lucente's data
9   yesterday.  Do you recall that?
10        MR. SNELL:  Objection.
11   BY THE WITNESS:
12        A.   Correct.
13   BY MR. THORNBURGH:
14        Q.   And was Dr. Lucente's data convincing
15   that the re-training or the new techniques or the
16   learning curve would resolve the issues with the
17   TVT-Secur device?
18        MR. SNELL:  Object.
19   BY THE WITNESS:
20        A.   No.
21   BY MR. THORNBURGH:
22        Q.   And then you talked about the device
23   being utterly different than other TVTs.  If you --
24   if I can direct your attention to the last

Page 400

1   paragraph on Bates number ending in 062, it says,
2   discussing Professor Frazer, "that he still thinks
3   Ethicon 'does uro-gyne better than other companies'
4   but that TVT-Secur is so 'utterly different to the
5   other TVTs that it probably shouldn't be called a
6   TVT' and the speed to market and the breadth of the
7   launch did not take this into account, thus
8   requiring all this subsequent follow-up activity."
9        Did I read that correctly?
10        MR. SNELL:  Object and leading.
11   BY THE WITNESS:
12        A.   Yes.
13   BY MR. THORNBURGH:
14        Q.   And -- what, if anything, about that
15   section or statement in this document supports your
16   opinion?
17        MR. SNELL:  Same objection.
18   BY THE WITNESS:
19        A.   It supports my opinion that the data
20   from the other full-length TVT products cannot be
21   used to justify the TVT-Secur and that the
22   design/development and the rush to market was
23   inadequate to identify characteristics of the
24   device that make it unreasonably unsafe or

Page 401

1   unreasonably ineffective.
2   BY MR. THORNBURGH:
3        Q.   And is this statement -- these aren't
4   your words, are they?
5        A.   No.
6        Q.   Are these statements within Ethicon's
7   own document, which are being made by Dr. Frazer or
8   Dr. Aran Maree, consistent with your opinions?
9        MR. SNELL:  Objection and leading.
10   BY THE WITNESS:
11        A.   Yes.
12   BY MR. THORNBURGH:
13        Q.   Now, I want to turn your attention to
14   page -- the first page on Exhibit 290.
15        Do you see where -- what does Dr. --
16   strike that.
17        What does Dr. Robinson write to Dave --
18   sorry.
19        What does Dr. Robinson write to Mark
20   Yale?
21        MR. SNELL:  Object and leading now.
22   BY THE WITNESS:
23        A.   "Thanks for the follow-up.  We will
24   ultimately need to discuss Instructions for Use

13 (Pages 398 to 401)

Bruce Alan Rosenzweig, M.D.

Page 402

1    suggestions."
2    BY MR. THORNBURGH:
3        Q.   Now, do you have an opinion whether or
4    not the TVT-Secur IFU was, as using the words of
5    Dr. Frazer, was fundamentally misleading?
6        MR. SNELL:  Object and leading.
7    BY THE WITNESS:
8        A.   Yes.
9    BY MR. THORNBURGH:
10       Q.   And what's that opinion?
11       A.   That the Instructions for Use were
12   defective fundamentally and misleading is -- and an
13   indication that the Instructions for Use were
14   defective.
15       Q.   Now, with respect to David Robinson's
16   statement here that he and Mark would ultimately
17   need to discuss the IFU suggestions, do you know
18   whether or not Ethicon ever made any changes to its
19   IFU?
20       A.   They did not.
21       Q.   And do you have an opinion whether or
22   not -- strike that.
23           Is that significant in any way to your
24   opinion?

Page 403

1        A.   Yes.
2        Q.   In what way?
3        A.   If the Instructions for Use is
4    defective, it should be modified to find out the
5    characteristics of the Instructions for Use that
6    make it defective and thereby corrected or, if it
7    cannot be remedied, remove the product from the
8    market.
9        Q.   Do you have an opinion whether or not
10   the IFU could have been remedied in a way that
11   would have made the TVT-Secur safe?
12       MR. SNELL:  Object.
13   BY THE WITNESS:
14       A.   I do have an opinion.
15   BY MR. THORNBURGH:
16       Q.   What's that opinion?
17       MR. SNELL:  Same.  Carry on.
18   BY THE WITNESS:
19       A.   It could not.
20   BY MR. THORNBURGH:
21       Q.   What's the basis for that opinion?
22       MR. SNELL:  Same.
23   BY THE WITNESS:
24       A.   All of the internal documents and the

Page 404

1    medical literature that we are discussing.
2    BY MR. THORNBURGH:
3        Q.   Now, ultimately what happened in
4    Australia?
5        A.   The --
6        MR. SNELL:  Object.
7    BY THE WITNESS:
8        A.   The TVT-Secur was removed from the
9    market.
10   BY MR. THORNBURGH:
11       Q.   Did Ethicon or Johnson & Johnson
12   withdraw the TVT-Secur from the U.S. market?
13       A.   In 2012.
14       Q.   If the problems with the TVT-Secur were
15   isolated only to Australia, why, in your opinion,
16   would Ethicon pull the product from the market in
17   the United States in 2012?
18       MR. SNELL:  Object.
19   BY THE WITNESS:
20       A.   There are a number of internal documents
21   and medical literature that shows that the
22   characteristics of the TVT-Secur device that made
23   it unreasonably unsafe or unreasonably ineffective
24   were not just discovered in Australia.

Page 405

1        MR. SNELL:  Object.  Move to strike as
2    non-responsive.
3    BY MR. THORNBURGH:
4        Q.   I'm going to hand you -- what's the next
5    document that you want to discuss with the ladies
6    and gentlemen of the jury?
7        A.   P0523.
8        Q.   And what is significant with respect
9    to -- strike that.
10           Did you review and rely on P523?
11       A.   Yes.
12       Q.   And can you identify what this document
13   is for the ladies and gentlemen of the jury?
14       MR. SNELL:  Before you -- let me just look at
15   it real quickly.  Thank you.
16   BY THE WITNESS:
17       A.   It is an e-mail string starting from
18   Jonathan Meek, key Ethicon employee, to Renee
19   Selman who we have identified as the president of
20   Johnson -- excuse me -- of Ethicon and continued to
21   other key Ethicon personnel and Medical Directors.
22   BY MR. THORNBURGH:
23       Q.   Okay.  And what about Exhibit 523 is
24   significant, if anything, to your opinion?

14 (Pages 402 to 405)

Bruce Alan Rosenzweig, M.D.

Page 406

1    MR. SNELL: Object.
2    BY THE WITNESS:
3        A.   It's discussing Dr. Aran Maree's
4    decision in Australia/New Zealand and that this
5    will likely -- the likely outcome will be a safety
6    warning letter that will be recommended and cascade
7    around the world.
8    BY MR. THORNBURGH:
9        Q.   Okay.   Now, based upon your review of
10   Ethicon's documents, internal documents, did you
11   see any evidence that Ethicon or Johnson & Johnson
12   ever sent a Dear Doctor letter to U.S.,
13   United States, doctors?
14       A.   Regarding what was going on in Australia
15   and New Zealand?
16       Q.   With respect to either what was going on
17   in Australia or New Zealand or with respect to the
18   experiences that doctors around the world were
19   having with the TVT-Secur device?
20       MR. SNELL: Object.
21   BY THE WITNESS:
22       A.   In November of 2007, no.
23   BY MR. THORNBURGH:
24       Q.   Did you see any evidence that based

Page 407

1    on -- strike that.
2            Based on your review of Ethicon's
3    documents, did you see any evidence that Ethicon
4    ever sent a Dear Doctor letter to U.S. doctors?
5        A.   If I recall, there was a letter that was
6    sent to doctors in 2012.
7        Q.   And what did that -- and what was that
8    related to?
9        A.   The discussion of removing the TVT-Secur
10   from the market in the United States.
11       Q.   Do you have an opinion whether or not
12   Ethicon should have sent a letter to doctors in the
13   United States, or worldwide for that matter,
14   sometime before 2012?
15       A.   Yes.
16       MR. SNELL: Objection.
17   BY MR. THORNBURGH:
18       Q.   What's that opinion?
19       MR. SNELL: Same objection.
20   BY THE WITNESS:
21       A.   That the discussion in November of 2007
22   that I agree that a letter should have,
23   quote-unqte, "cascaded around the world."
24   BY MR. THORNBURGH:

Page 408

1        Q.   Do you have an opinion about whether or
2    not Dr. Aran Maree's action of withdrawing the
3    TVT-Secur from the market in Australia and
4    New Zealand was appropriate?
5        MR. SNELL: Objection and leading.
6    BY THE WITNESS:
7        A.   Yes, I do have an opinion.
8    BY MR. THORNBURGH:
9        Q.   What's that opinion?
10       MR. SNELL: Same.
11   BY THE WITNESS:
12       A.   It was an appropriate decision.
13   BY MR. THORNBURGH:
14       Q.   Do you have any understanding as to why
15   Renee Selman or Sheri McCoy didn't make the same
16   recommendations in the United States?
17       MR. SNELL: Objection.
18   BY THE WITNESS:
19       A.   I do not, but the prior document that we
20   looked at was discussing -- discussing marketing
21   implications.
22       MR. SNELL: Move to strike after "I do not."
23   BY MR. THORNBURGH:
24       Q.   What marketing implications are being

Page 409

1    discussed, Doctor?
2        A.   The negative impact of removal of the
3    TVT-Secur from the Australian and New Zealand
4    marketplace, the negative impact that would have on
5    marketing worldwide.
6        Q.   And by "marketing," do you mean
7    continuing to sell the product so that Ethicon and
8    Johnson & Johnson can continue to make a profit?
9        MR. SNELL: Objection and leading.
10   BY THE WITNESS:
11       A.   Correct.
12   BY MR. THORNBURGH:
13       Q.   In Australia did Aran Maree put patient
14   safety above profit?
15       MR. SNELL: Objection.
16   BY THE WITNESS:
17       A.   Yes.
18   BY MR. THORNBURGH:
19       Q.   In the United States, do you have an
20   opinion whether or not Sheri McCoy or Renee Selman
21   put patient safety above making a profit?
22       MR. SNELL: Objection.
23   BY THE WITNESS:
24       A.   I do have an opinion.

15 (Pages 406 to 409)

Bruce Alan Rosenzweig, M.D.

Page 410

1    BY MR. THORNBURGH:
2        Q.   What's that opinion?
3        MR. SNELL:  Same.
4    BY THE WITNESS:
5        A.   They put profit above patient safety.
6    BY MR. THORNBURGH:
7        Q.   What's the next document you'd like to
8    discuss with the ladies and gentlemen of the jury?
9        A.   P0584.
10       Q.   And what about P0584 is relevant to your
11   opinions in this case?
12       MR. SNELL:  Object.
13   BY THE WITNESS:
14       A.   It supports my opinions about the design
15   characteristics of the TVT-Secur that make it
16   unreasonably unsafe and unreasonably ineffective.
17   BY MR. THORNBURGH:
18       Q.   Okay.  And just identify for the record
19   what P584 is.
20       A.   It is an e-mail string between -- from
21   November 26, 2007 from Dan Smith to Mark Yale.  The
22   subject is "TVT-Secur update."
23       Q.   And what section of P584 are you
24   referring to?

Page 411

1        A.   The need to further -- "need for further
2    data to look" -- "to be looked at before and after
3    revised tips and tricks documents to see how
4    effective it is in regions of the world.  Question
5    to be answered is Australia different from the rest
6    of the world or is it possibly" -- "or is this
7    possible extension of issues in Germany."
8        MR. SNELL:  Object.  Move to strike.  Reading.
9    BY MR. THORNBURGH:
10       Q.   And how is Exhibit P84 (sic) relevant to
11   your opinions in this case?
12       MR. SNELL:  Object.
13   BY THE WITNESS:
14       A.   P -- this e-mail string is important for
15   my opinions that this was not just an isolated
16   occurrence of problems.  This is documenting the
17   design characteristics of the TVT-Secur that made
18   it unreasonably unsafe and unreasonably
19   ineffective.
20            This was not just isolated to Australia,
21   but this was experience that was seen around the
22   world.
23   BY MR. THORNBURGH:
24       Q.   Okay.  If we can look at P -- let's go

Page 412

1    to P706.
2        MR. SNELL:  On P0584 just note MIL, foreign
3    regulatory discussions, TGA, as well as Australia
4    issue.
5    BY MR. THORNBURGH:
6        Q.   Doctor, can you identify what P706 is
7    for the ladies and gentlemen of the jury?
8        A.   Yes.  This is an internal Ethicon
9    document.  It is a PowerPoint presentation from the
10   Quality Board.  If I recall, this is from 2008.
11       Q.   And did you review and rely on P706?
12       A.   Yes.
13       Q.   And what, if anything, is significant
14   from this document and what opinions does it
15   support?
16       MR. SNELL:  Object.
17   BY THE WITNESS:
18       A.   This document supports my opinions that
19   there was inadequate training of the TVT-Secur
20   device; that the Instructions for Use were
21   defective; and that there are design
22   characteristics of the TVT-Secur that make it
23   unreasonably unsafe and unreasonably ineffective.
24   BY MR. THORNBURGH:

Page 413

1        Q.   And can you just walk us through
2    Exhibit 706 identifying which slides you are
3    relying on and how the information on those slides
4    support your opinions.
5        MR. SNELL:  Object.
6    BY THE WITNESS:
7        A.   Page 10 of the document is called
8    "Revised Training."
9    BY MR. THORNBURGH:
10       Q.   Okay.  And what about page 10 is
11   significant to your opinions?
12       A.   Well, this document demonstrates that
13   re-training was not just isolated to Australia or a
14   single other country; that re-training was
15   happening in the United States, Germany, Finland,
16   showing that this was a -- the defects in the
17   Instructions for Use and the design characteristics
18   of the TVT-Secur making it unreasonably unsafe and
19   unreasonably ineffective were being experienced not
20   just in Australia and New Zealand but around the
21   world.
22       Q.   And what else -- is there anything else
23   significant from page 10?
24       A.   It -- this PowerPoint also shows that

16 (Pages 410 to 413)

Bruce Alan Rosenzweig, M.D.

Page 414

1 the defects in the Instructions for Use as
2 highlighted by "what surgeons said they were doing
3 and what we observed them doing were not the same
4 things," showing that the Instructions for Use was
5 defective.
6     Q.   Okay.  And what's the next slide?
7     A.   "Additional concerns with 'revised'
8 training."
9     Q.   And what about -- what's the slide
10 number?
11    A.   13.
12    Q.   And what about slide 13 is significant
13 to your opinions?
14    A.   That even an analysis of what would be
15 the root cause for the deficiencies in training and
16 the design characteristics that made it
17 unreasonably unsafe and the Instructions for Use
18 were not leading to improvements in the safety and
19 efficacy of the device.
20    Q.   Okay.  And what else is significant
21 about this document?
22    MR. SNELL:  Object; leading.
23 BY MR. THORNBURGH:
24    Q.   If any.

Page 415

1     A.   That surgeons in Australia were
2 receiving revised training from Dr. Lucente, that
3 Dr. Lucente is a Key Opinion Leader and one of the
4 original surgeons in the First Human Use Study.
5     Q.   Okay.  Are you finished with slide --
6 with that slide?
7     A.   Yes.
8     Q.   All right.  Take us to the -- walk us
9 through it, Doctor.
10    MR. SNELL:  Objection.
11 BY THE WITNESS:
12    A.   The next slide is page 16.
13 BY MR. THORNBURGH:
14    Q.   And what from page -- what, if anything,
15 from page 16 supports your opinions in this case?
16    A.   This supports my opinions that the
17 training was inadequate, the Instructions for Use
18 were defective and that the design characteristics
19 of the TVT-Secur made it unreasonably unsafe and
20 unreasonably ineffective.
21         Even with revised training, even with
22 revised training from an experienced surgeon, one
23 of the first users of the TVT-Secur device,
24 Dr. Lucente, failed to yield a success rate over

Page 416

1 50%.
2     Q.   So, even after Dr. Lucente retrained
3 using his modified technique Australian doctors,
4 this document on page 16, it says, "Revised Lucente
5 training still yields greater than 50% success
6 rate"?
7     MR. SNELL:  Object and leading.
8 BY MR. THORNBURGH:
9     Q.   Is that correct?
10    A.   Correct.
11    Q.   And it says, "Australian experiences
12 show 'revised' training still can be improved."
13         Did I read that correctly?
14    MR. SNELL:  Object and leading.
15 BY THE WITNESS:
16    A.   Correct.
17 BY MR. THORNBURGH:
18    Q.   What else in this exhibit supports -- is
19 relevant to your opinions?
20    A.   Page 26.  It is discussing medical
21 literature that was presented in an abstract form
22 at an international congress of urogynecologists,
23 and it highlights data from 5 to 20 weeks of
24 follow-up and that the range of improvement in

Page 417

1 symptoms was from 12 to 26%, which supports my
2 opinions that there are characteristics of the
3 device that make it unreasonably ineffective to
4 treat stress urinary incontinence.
5     Q.   And actually on page 26 --
6     MR. SNELL:  Move to strike.  Misstates the
7 evidence.
8 BY MR. THORNBURGH:
9     Q.   26 -- I think you read it wrong.  It
10 says, "Four abstracts with improved rate range from
11 12 to 86%."  You said 26.
12    A.   I'm sorry.
13    Q.   Okay.  And let me ask you this question,
14 Doctor:  It says, "Five abstracts with objective
15 cure rate range from 69 to 88%."
16         Did I read that correctly?
17    A.   Correct.
18    Q.   Is a cure rate using an objective test
19 of 69 to 88%, does that demonstrate an efficacious
20 product?
21    A.   Not with follow-up of only 5 to 20
22 weeks.
23    Q.   And what else in this slide deck do you
24 want to discuss?

17 (Pages 414 to 417)

Bruce Alan Rosenzweig, M.D.

Page 418

1    A.   The slide 27.
2    Q.   And what about slide 27 is significant
3  to your opinions?
4    A.   Well, this supports my opinion that the
5  design/development of the TVT-Secur device was
6  inadequate; that the device was rushed to market,
7  without identifying the design characteristics of
8  the device that made it unreasonably unsafe or
9  unreasonably ineffective; and that they are
10  reinventing the procedure.
11        This is in 2008, approximately two years
12  after the launch of the product.  This should have
13  been done during the design and development phase
14  of the product, not after it's been placed in
15  humans for two years.
16    Q.   Doctor, is it appropriate for companies
17  like Ethicon and Johnson & Johnson to treat
18  customers, patients as guinea pigs?
19    MR. SNELL:  Objection and leading.
20  BY THE WITNESS:
21    A.   No, it is not.
22  BY MR. THORNBURGH:
23    Q.   Is it ethical for companies like Ethicon
24  and Johnson & Johnson to release products without

Page 419

1  first adequately testing those products?
2    MR. SNELL:  Objection.
3  BY THE WITNESS:
4    A.   No, it is not.
5  BY MR. THORNBURGH:
6    Q.   Is it ethical for companies like Ethicon
7  and Johnson & Johnson to treat customers or
8  patients like test subjects?
9    MR. SNELL:  Objection and leading.
10  BY THE WITNESS:
11    A.   No, it is not.
12  BY MR. THORNBURGH:
13    Q.   Is it appropriate for companies like
14  Ethicon and Johnson & Johnson to treat women like
15  test subjects?
16    MR. SNELL:  Objection and leading.
17  BY THE WITNESS:
18    A.   No, it is not.
19  BY MR. THORNBURGH:
20    Q.   Is it appropriate for companies like
21  Ethicon and Johnson & Johnson to release products
22  into the market without providing or first
23  conducting adequate studies?
24    MR. SNELL:  Objection and leading.

Page 420

1  BY THE WITNESS:
2    A.   No, it is not.
3  BY MR. THORNBURGH:
4    Q.   Is there anything else from Slide No. 27
5  that is significant to your opinions?
6    A.   Yes.
7    Q.   What is that?
8    A.   Page 32.
9    Q.   What, if anything, from page 32 is
10  significant to your opinions?
11    A.   This supports my opinions that the
12  design/development of the TVT-Secur device was
13  inadequate and there was -- it also supports my
14  opinions that there was no -- was insufficient
15  clinical data in the use of the device in humans
16  prior to launch.
17    Q.   And on slide 32, do you see where it
18  says "Lessons Learned"?
19    A.   Correct.
20    Q.   What about slide 32 specifically is
21  relevant to your opinion?
22    MR. SNELL:  Objection.
23  BY THE WITNESS:
24    A.   Well, this is two years after the launch

Page 421

1  of the device, and the lesson that was learned was
2  not carrying out the First Human Use Trial and
3  launching a product at the same time.
4        The learning curve from First Human Use
5  Trial should be gathered, digested and the device
6  and training adjusted accordingly before launch.
7  That supports my opinion that the design and
8  development was inadequate to identify the
9  characteristics of the device that made it
10  unreasonably unsafe and unreasonably ineffective;
11  that this information should have been gathered.
12        There was insufficient testing in humans
13  prior to launch of the product; that this
14  information should have been gathered and design
15  characteristics that made it unreasonably unsafe or
16  unreasonably ineffective should have been found
17  prior to launch and either the device or the
18  Instructions for Use or the training corrected, if
19  possible, or the device not launched to the market.
20    Q.   Do you agree with the statement by
21  Ethicon on slide 32 that "The learnings from a
22  First Human Use Trial should be gathered, digested
23  and the device/training adjusted accordingly before
24  launch"?

18 (Pages 418 to 421)

Bruce Alan Rosenzweig, M.D.

Page 422

1     MR. SNELL:  Objection and leading.
2   BY THE WITNESS:
3     A.   Yes.
4   BY MR. THORNBURGH:
5     Q.   Are those your words or the words from
6   somebody at Ethicon?
7     A.   Those are the words from Ethicon.
8     Q.   And are we -- is this serious?
9     A.   Yes.
10    MR. SNELL:  Objection.
11  BY MR. THORNBURGH:
12    Q.   Ethicon puts a product on the market
13  without conducting appropriate tests and then
14  writes a slide about lessons it had to learn from
15  that conduct?
16    MR. SNELL:  Objection.
17  BY THE WITNESS:
18    A.   Yes.
19    MR. SNELL:  And leading.
20  BY MR. THORNBURGH:
21    Q.   This seems rather obvious to me.
22    MR. SNELL:  Leading.
23  BY MR. THORNBURGH:
24    Q.   I mean --

Page 423

1     MR. SNELL:  Objection as well, relevancy as to
2   Plaintiffs' counsel.
3   BY MR. THORNBURGH:
4     Q.   Is it appropriate for a company like
5   Johnson & Johnson to learn a lesson in 2007 for the
6   first time apparently that it's inappropriate to
7   put a product on the market without first testing
8   it?
9     MR. SNELL:  Objection and leading.
10  BY THE WITNESS:
11    A.   That is not appropriate.
12  BY MR. THORNBURGH:
13    Q.   Do you have an opinion with respect to
14  the conduct of Ethicon in releasing the TVT-Secur
15  product without receiving the final results from
16  the First Human Use Trial?
17    A.   Yes.
18    MR. SNELL:  Objection and leading.  Go ahead.
19  BY THE WITNESS:
20    A.   I have an opinion.
21  BY MR. THORNBURGH:
22    Q.   What's that opinion?
23    MR. SNELL:  Same objection.
24  BY THE WITNESS:

Page 424

1     A.   That is inappropriate.
2   BY MR. THORNBURGH:
3     Q.   Despite claiming in this PowerPoint
4   slide to have learned a lesson, what did Ethicon do
5   about the lesson it learned?
6     MR. SNELL:  Objection; leading.
7   BY THE WITNESS:
8     A.   They continued to sell the product in
9   the United States.
10  BY MR. THORNBURGH:
11    Q.   Was that appropriate?
12    MR. SNELL:  Objection.
13  BY THE WITNESS:
14    A.   No.
15  BY MR. THORNBURGH:
16    Q.   Is there anything else from
17  Exhibit P706?
18    A.   No.
19    Q.   What's the next document you want to
20  discuss with the jury?
21    A.   P1102.
22    Q.   And can you -- can you identify what
23  P1102 is?
24    A.   Yes.  It is an e-mail string from

Page 425

1   Dr. Neuman, who is a surgeon in Israel, a Key
2   Opinion Leader, someone who has experience with the
3   TVT-Secur device.
4     Q.   And what's the date of this e-mail
5   string?
6     A.   February 20, 2008.
7     Q.   And how long had the TVT-Secur been on
8   the market by this point?
9     A.   Approximately a year and a half.
10    Q.   And what is significant, if anything, in
11  Exhibit P1102?
12    MR. SNELL:  Objection.
13  BY THE WITNESS:
14    A.   This document supports my opinions about
15  the design characteristics of the TVT-Secur device
16  that make it unreasonably unsafe.
17        This is describing the stiffness of the
18  mesh that due to the laser cutting is responsible
19  for pain and the mesh eroding through the vaginal
20  tissues; that the edges of the device are too
21  sharp; and those design characteristics are leading
22  to the harm in women, which is pain and mesh
23  erosion.
24  BY MR. THORNBURGH:

19 (Pages 422 to 425)

Bruce Alan Rosenzweig, M.D.

Page 426

1      Q.   Who is Dr. Neuman?
2      A.   Dr. Neuman is a pelvic surgeon in
3   Israel, a Key Opinion Leader, a consultant for
4   Ethicon.
5      Q.   And what does Dr. Neuman state to
6   Dr. Robinson, Dr. Gadot, Mr. -- I'm sorry --
7   Mr. Gadot, Mr. Smith and Mr. Ciarrocca?
8      MR. SNELL:  Objection and leading.
9   BY THE WITNESS:
10      A.   He is describing "Due to the increase in
11   late failures and protrusion rate, I held now a
12   two-armed comparison of TVT-Secur versus TVT-O.
13   Actually, there were more postoperative
14   obstruction, vaginal pain and tape protrusion with
15   the TVT-Secur.  Most of the vaginal pain and
16   lateral protrusion is caused by the increased tape
17   stiffness - my feeling it is due to laser cutting.
18   The edges should be thinner and rounder.  There are
19   too many undesired tape removals are reported."
20      Q.   And does this document support your
21   opinions?
22      A.   Yes, about the design characteristics of
23   the device that make it unreasonably unsafe.
24      Q.   Doctor, what type of study is Dr. Neuman

Page 427

1   discussing in this e-mail?
2      A.   A prospective comparative trial.
3      Q.   Is that a randomized controlled trial,
4   do you know?
5      A.   It is not specifically discussed as a
6   randomized controlled trial.
7      Q.   Did Ethicon, before they launched the
8   TVT-Secur on the market, perform a prospective
9   comparative trial?
10      A.   Their initial Human Use Trial was a
11   prospective single-arm trial of just the TVT-Secur.
12      Q.   And Dr. Neuman is identifying -- do you
13   see -- strike that.
14      Do you see on No. 5 of Dr. Neuman's
15   list?
16      A.   Yes.
17      MR. SNELL:  Object; leading.
18      MR. THORNBURGH:  Can you go ahead and blow up
19   No. 5 for us.
20   BY MR. THORNBURGH:
21      Q.   What does Dr. Neuman state to Ethicon
22   employees in this section?
23      MR. SNELL:  Object; leading.
24   BY THE WITNESS:

Page 428

1      A.   That the vaginal pain and the lateral
2   protrusions are caused by the increased stiffness
3   of the mesh which is due to laser cutting, which
4   supports my opinion of the design defect of mesh,
5   short, stiff mesh increases the harm of pain and
6   mesh exposure into the -- or erosion into the
7   vagina or other pelvic structures.
8   BY MR. THORNBURGH:
9      Q.   Dr. Neuman goes on to say, "I do believe
10   that as soon as those points will be addressed, the
11   TVT-Secur may be able to be as efficient and user
12   friendly as the TVT and TVT-O."
13      Did I read that correctly?
14      A.   Yes.
15      MR. SNELL:  Objection and leading.
16   BY MR. THORNBURGH:
17      Q.   Did Ethicon ever address those points
18   that were outlined by Dr. Neuman?
19      MR. SNELL:  Objection; leading.
20   BY THE WITNESS:
21      A.   No.
22   BY MR. THORNBURGH:
23      Q.   Do you have an opinion whether or not
24   Ethicon should have addressed those points?

Page 429

1      MR. SNELL:  Same objection.
2   BY THE WITNESS:
3      A.   Yes.
4   BY MR. THORNBURGH:
5      Q.   What's that opinion?
6      A.   They should have addressed those design
7   characteristics that make the device unreasonably
8   unsafe.
9      Q.   Why?
10      A.   Because those are design characteristics
11   that lead to harm in women.
12      MR. THORNBURGH:  Let's go ahead and take a
13   break.
14      THE VIDEOGRAPHER:  Okay.  The time is 10:26
15   a.m.  This is the end of Tape 1 and we are going
16   off the video record.
17      (WHEREUPON, a recess was had
18      from 10:26 to 10:43 a.m.)
19      THE VIDEOGRAPHER:  The time is 10:43 a.m.
20   This is the beginning of Tape 2 and we are back on
21   the video record.
22   BY MR. THORNBURGH:
23      Q.   Now, Doctor, before we took a break we
24   were looking at Exhibit P1102 and that was an

20 (Pages 426 to 429)

Bruce Alan Rosenzweig, M.D.

Page 430

1    e-mail, as you recall, from Dr. Neuman to David
2    Robinson, Harel Gadot, Dan Smith and Scott
3    Ciarrocca, correct?
4        A.   Correct.
5        Q.   Okay.  Just want to walk through this
6    document with you really quick.
7            Do you see where it says, "Dear all,
8    Attached is my TVT-S complication summary"?
9        A.   Yes.
10       Q.   And if you look at No. 1, Dr. Neuman
11   writes, "Own surgical experience."
12           Do you see that?
13   MR. SNELL:  Object; leading.
14   BY THE WITNESS:
15       A.   Yes.
16   BY MR. THORNBURGH:
17       Q.   And you'll see that he lists the number
18   of patients he's implanted with different medical
19   devices for the treatment of either stress urinary
20   incontinence or prolapse?
21   MR. SNELL:  Object; leading.
22   BY MR. THORNBURGH:
23       Q.   Is that correct?
24       A.   Correct.

Page 431

1        Q.   And do you see -- how many -- how many
2    patients at this point in 2008 had Dr. Neuman
3    implanted with the TVT-Secur?
4        A.   447.
5        Q.   And how many does Dr. -- how many
6    patients does Dr. Neuman indicate he was part of
7    the training for these implantation of the
8    TVT-Secur device?
9        A.   229.
10       Q.   Would you consider Dr. Neuman to be an
11   experienced surgeon?
12       A.   Yes.
13       Q.   And do you see No. 2?  What does
14   Dr. Neuman write?
15       A.   "Due to slightly increased late failure
16   rate and protrusion rate I held now a two-armed
17   comparison of TVT-Secur versus TVT-O (Flam
18   method)."
19       Q.   Okay.  And just so we all understand in
20   lay terms.  What is your understanding of "late
21   failure"?
22       A.   That after the recovery period and more
23   likely than not after one year, that the device
24   failed.

Page 432

1        Q.   And can you explain to the ladies and
2    gentlemen of the jury your understanding of
3    protrusion rate?
4        A.   The -- that is the rate with which the
5    mesh erodes through the vaginal tissue.
6        Q.   Turn the page to Bates number ending in
7    3122.
8            What does Dr. Neuman write with respect
9    to No. 3?
10   MR. SNELL:  Object.
11   BY THE WITNESS:
12       A.   "There was no superiority for the
13   TVT-Secur over TVT-O in terms of safety, ease,
14   success, complications or pain.  Actually, there
15   were more postoperative obstruction, vaginal pain
16   and tape protrusion with the TVT-S."
17   BY MR. THORNBURGH:
18       Q.   And what's the significance, if any, of
19   that statement?
20       A.   It supports my opinions about the design
21   characteristics of the TVT-Secur that are
22   unreasonably unsafe.
23       Q.   And if you look at No. 4, what does
24   Dr. Neuman write?

Page 433

1    MR. SNELL:  Object.
2    BY THE WITNESS:
3        A.   "Having some experience with these three
4    different modalities of minimally invasive
5    anti-incontinence operations, it's become obvious
6    that the TVT and TVT-O were initiated by surgeons
7    while the TVT-S was designed purely by engineers.
8    The TVT-S is very smart, regarding mesh production
9    and even more with insertion mechanism.  At the
10   same time, the TVT-O" -- "the TVT and the TVT-O
11   were 'anatomical' and very 'surgical' or I may say
12   very 'surgeon friendly.'" (As read.)
13       Q.   And do you have an understanding as
14   to -- as to what Dr. Neuman -- what's your
15   interpretation of what Dr. Neuman is writing here
16   with respect to the TVT-Secur being designed purely
17   by engineers?
18   MR. SNELL:  Objection.
19   BY THE WITNESS:
20       A.   That being designed by an engineer, an
21   engineer would not understand the -- have the
22   training and experience of a medical doctor.
23   BY MR. THORNBURGH:
24       Q.   And who designed the TVT-Secur?

21 (Pages 430 to 433)

Bruce Alan Rosenzweig, M.D.

Page 434

1      MR. SNELL:  Objection.
2   BY THE WITNESS:
3      A.   Dan Smith.
4   BY THE WITNESS:
5      Q.   And what was Dan Smith's -- can you
6   remind -- strike that.
7         Can you remind us, what was Dan Smith's
8   background?
9      MR. SNELL:  Object.
10  BY THE WITNESS:
11     A.   Dan Smith is an engineer.
12  BY MR. THORNBURGH:
13     Q.   And what does Dr. Neuman write next?
14     MR. SNELL:  Object; leading.
15  BY THE WITNESS:
16     A.   "All the TVT-Secur weak points - as I
17  see them:  Most of the vaginal pain and lateral
18  protrusion - is caused by the increased tape
19  stiffness - my feeling is due to the laser
20  cutting."
21  BY MR. THORNBURGH:
22     Q.   Let's stop right there for a second.
23        What's the significance, if any, with
24  that statement by Dr. Neuman?

Page 435

1      MR. SNELL:  Object.
2   BY THE WITNESS:
3      A.   That demonstrates the design
4   characteristic of the short, stiff, rigid mesh that
5   it -- that is unreasonably unsafe and leads to the
6   harm of vaginal pain and erosion of the mesh
7   through the vagina.
8   BY MR. THORNBURGH:
9      Q.   And does that statement by Dr. Neuman
10  provide any support for your opinions?
11     A.   Yes.
12     Q.   What opinion?
13     A.   The laser-cut, stiff, rigid, short mesh
14  is a design characteristic of the TVT-Secur that is
15  unreasonably unsafe.
16     Q.   What do you mean by "unreasonably
17  unsafe"?
18     A.   It leads to the harm of vaginal pain and
19  erosion of the mesh into the vagina.
20     Q.   And what does Dr. Neuman next write?
21     A.   "The TVT" --
22     MR. SNELL:  Objection.
23  BY THE WITNESS:
24     A.   -- "Secur is attached in general to

Page 436

1   more" -- excuse me.
2         "The TVT-Secur is attached in general to
3   more operative bleeding than the TVT and the TVT-O
4   and requires more force for introduction.  The
5   edges should be thinner and rounder.  This will
6   reduce the vaginal injury ('button halls')," which
7   is a typographical error meaning button holes, "as
8   well.  The detachment is not smooth enough, too
9   many undesired tape removals are reported."
10     Q.   Okay.  What is your understanding as or
11  interpretation of this statement by Dr. Neuman?
12     A.   This statement supports my opinions of
13  the design characteristic of the TVT-Secur device.
14  The sharp introducer edges are too sharp, which
15  leads to the harm of injury to the vaginal wall,
16  which can lead to bleeding and pain and erosion of
17  the mesh in women.
18     Q.   Now, what are -- what is your opinion --
19  do you have an opinion with respect to the
20  different -- strike that.
21        What is your opinion with respect to the
22  Secur device and any defects that you've listed?
23  What are those defects, if you could just outline
24  them?

Page 437

1      MR. SNELL:  Objection.
2   BY MR. THORNBURGH:
3      Q.   Lay them out for us or tell us what they
4   are real quick.
5      A.   That the device was not studied prior to
6   release; that the training was not effective; that
7   the Instructions for Use is defective; that the
8   characteristics of the device that make it
9   unreasonably unsafe and unreasonably ineffective
10  include the sharp arrow tip introducer is too sharp
11  and drags across vaginal tissue.
12        The fleece ends do not hold the mesh in
13  place to support the urethra.
14        The tape being short and laser-cut is
15  too short and stiff, which leads to harm of the
16  vagina, the urethra, which leads to the harms of
17  pain, erosion and pain with intercourse, just to
18  name a few.
19     Q.   And did you create a PowerPoint slide
20  that summarizes those design characteristics?
21     A.   Yes.
22     Q.   And your opinions with respect to those
23  design characteristics?
24     A.   Yes.

22  (Pages 434 to 437)

Bruce Alan Rosenzweig, M.D.

Page 438

1      MR. THORNBURGH:  I'm going to mark as
2  Exhibit No. 6, and this would be I think -- we have
3  been calling them BR-Secur 6.
4          (WHEREUPON, a certain document was
5          marked as BR-Secur Exhibit No. 6:
6          "Design Defects" slide.)
7      MR. SNELL:  It's not the same thing you're
8  looking at.
9      MR. THORNBURGH:  It's the same one I marked.
10      MR. SNELL:  Okay.
11      MR. THORNBURGH:  If you can go ahead and pull
12  that up for us, Tom.
13  BY MR. THORNBURGH:
14      Q.   Does this PowerPoint slide that you
15  created, will it help the jury understand what your
16  opinions are with respect to the defects in the
17  design characteristics?
18      MR. SNELL:  Object.
19  BY THE WITNESS:
20      A.   Correct.
21  BY MR. THORNBURGH:
22      Q.   And can you identify those design
23  defects?
24      A.   Yes.  The stiff, rigid and dense mesh

Page 439

1  increases the risk for chronic foreign body
2  reaction, chronic inflammatory reaction, excessive
3  scarring, fibrotic bridging, scar-plating of the
4  mesh, encapsulation of the mesh, mesh shrinkage and
5  contraction; the failure to adequately study the
6  TVT-Secur system; the defective implant
7  procedure/technique and absorbable fleece tips; the
8  defective implanter mechanisms and instruments
9  including the sharp arrow tip introducer.
10      Q.   And are at least some of your opinions
11  that you've identified in Exhibit 6 consistent with
12  the concerns that are being raised by Dr. Neuman in
13  2008?
14      MR. SNELL:  Object.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. THORNBURGH:
18      Q.   Now, if we go back to the Neuman e-mail,
19  Exhibit P1102, does -- do you see the top of the
20  e-mail, the top of the exhibit?
21      A.   Yes.
22      Q.   Okay.  And what does Andrew Beveridge
23  write in response to the concerns that were
24  outlined by Dr. Neuman?

Page 440

1      MR. SNELL:  Object.
2  BY THE WITNESS:
3      A.   He states, "Let's discuss before taking
4  action."
5  BY MR. THORNBURGH:
6      Q.   Did Ethicon ever take any action?
7      MR. SNELL:  Objection.
8  BY THE WITNESS:
9      A.   No.
10  BY MR. THORNBURGH:
11      Q.   Do you have an opinion about whether or
12  not Ethicon should have taken action?
13      MR. SNELL:  Same.
14  BY THE WITNESS:
15      A.   Yes.
16  BY MR. THORNBURGH:
17      Q.   Do you have an opinion as to what action
18  Ethicon should have taken?
19      MR. SNELL:  Same.
20  BY THE WITNESS:
21      A.   The action that should have been taken
22  was to either resolve the defective design
23  characteristics of the device to make it reasonably
24  safe and reasonably effective or discontinue the

Page 441

1  product from the market.
2  BY MR. THORNBURGH:
3      Q.   And I'm going to ask this similarly but
4  in a different way.
5          Do you have an opinion about whether or
6  not Ethicon could have taken action?
7      MR. SNELL:  Objection.
8  BY THE WITNESS:
9      A.   Yes.
10  BY MR. THORNBURGH:
11      Q.   And what action in your opinion could
12  Ethicon have taken?
13      MR. SNELL:  Objection.
14  BY THE WITNESS:
15      A.   Ethicon could have identified the design
16  characteristics that make the TVT-Secur device
17  unreasonably unsafe or unreasonably ineffective and
18  corrected those or, if they could not, remove the
19  product from the market.
20  BY MR. THORNBURGH:
21      Q.   Okay.  What's the next exhibit you want
22  to discuss with the jury?
23      A.   P0292.
24      Q.   Can you identify Exhibit P290 (sic) to

23 (Pages 438 to 441)

Bruce Alan Rosenzweig, M.D.

Page 442

1  the jury?
2      A.   Yes, it is an e-mail from February of
3  2008 from Medical Director Dr. David Robinson to
4  other key Ethicon employees worldwide.
5      MR. THORNBURGH:  One second.
6      MR. SNELL:  While he is looking, can you tell
7  me the P number again, Doctor.
8      THE WITNESS:  Yes, it is P0292.
9      MR. SNELL:  Thank you very much.
10      MR. THORNBURGH:  Can we go off the record real
11  quick.
12      THE VIDEOGRAPHER:  The time is 10:58 a.m. and
13  we're going off the video record.
14          (WHEREUPON, a recess was had
15           from 10:58 to 11:03 a.m.)
16      THE VIDEOGRAPHER:  The time is 11:03 a.m. and
17  we're back on the video record.
18  BY MR. THORNBURGH:
19      Q.   Sorry about that, Doctor.
20          You just identified Exhibit 292 as the
21  next exhibit that you wanted to speak about, is
22  that correct?
23      A.   Correct.
24      Q.   Okay.  And can you identify this exhibit

Page 443

1  for the ladies and gentlemen of the jury.
2      A.   Yes, this is an e-mail string from
3  February 29, 2008 from Dr. David Robinson to other
4  key Ethicon employees around the world.
5      Q.   And what opinions does Exhibit 292
6  support, if any?
7      A.   This supports my opinion that the short,
8  stiff, laser-cut mesh in the TVT-Secur, the design
9  characteristics that make it unreasonably unsafe,
10  lead to the harm of pain with intercourse.
11      Q.   And how does this exhibit support that
12  opinion?
13      A.   It supports that opinion because this is
14  a statement from a Medical Director of Ethicon,
15  Dr. David Robinson, regarding increased stiffness
16  and rigidity of mesh is responsible for impaired
17  sexual function.
18      Q.   Okay.  And if we pull up Exhibit 292,
19  what page supports that opinion?
20      A.   8896.
21      MR. THORNBURGH:  Go ahead and pull up 8896 and
22  go ahead and blow up the middle.
23  BY MR. THORNBURGH:
24      Q.   What does Dr. David Robinson write to

Page 444

1  his colleagues?
2      A.   "Clinically, there may be an impact of
3  increased rigidity with any given mesh as it may
4  increase vaginal stiffness post-op with the
5  potential of impaired sexual function.
6  Unfortunately, to quantitate what represents a
7  meaningful difference in rigidity may be impossible
8  to define.  Suffice it to say, however, all meshes
9  we are working on for the future will be less rigid
10  than our current Gynemesh PS."
11      Q.   Okay.  And what is Gynemesh PS?
12      A.   Gynemesh PS is a larger pore,
13  lighter-weight mesh compared to the Prolene mesh in
14  the TVT-Secur.
15      Q.   So, was Gynemesh more rigid or less
16  rigid than the mesh used in the TVT-Secur?
17      A.   Gynemesh PS is less rigid and less stiff
18  than the Prolene mesh in TVT-Secur.
19      Q.   What's the next exhibit you want to
20  speak about, Doctor?
21      A.   P0686.
22      Q.   And can you identify P0686 for the
23  ladies and gentlemen of the jury?
24      A.   Yes, it is an e-mail string between key

Page 445

1  Ethicon employees, including Harel Gadot, marketing
2  director worldwide, from March 3, 2008.
3      Q.   And what opinion, if any, does P0686
4  support?
5      A.   That the TVT-Secur device is
6  effective -- excuse me -- is defective.  It has
7  design characteristics that make it unreasonably
8  ineffective in treating stress urinary
9  incontinence.
10      Q.   How does Exhibit P0686 support that
11  opinion?
12      A.   This document describes that Ethicon
13  must have an efficient mini-sling, which would mean
14  that their current mini-sling, which is the
15  TVT-Secur, is inefficient, therefore it has design
16  characteristics that make it unreasonably
17  ineffective to treat stress urinary incontinence.
18      Q.   Now, you identified the date as being
19  March 3 of 2008, is that correct?
20      A.   Correct.
21      Q.   Was the TVT-Secur already on the market
22  at this point?
23      MR. SNELL:  Objection.
24  BY THE WITNESS:

24 (Pages 442 to 445)

Bruce Alan Rosenzweig, M.D.

Page 446

1     A.  Yes.
2  BY MR. THORNBURGH:
3     Q.  Okay.  And was -- did Ethicon have any
4  other mini-sling on the market on March 3 of 2008?
5     A.  No.
6     Q.  Okay.  Now, can you direct us to the
7  portion of this exhibit that supports your opinion?
8     A.  Yes.  It's ETH.MESH number ending in
9  9976.
10     Q.  And how does the ETH.MESH number or that
11  page support your opinion?
12     A.  This document states, "If we want to
13  grow (and protect) our," in quotations, "'cash cow'
14  market share/potential, we must have an efficient
15  mini-sling.  If we do not do so, someone else
16  will."
17     Q.  Did Ethicon ever disclose to doctors --
18  strike that.
19        Based on your review of Ethicon's
20  internal documents, did they ever disclose to
21  physicians who were implanting patients with the
22  TVT-Secur device that they were looking for a more
23  efficient mini-sling?
24     A.  No.

Page 447

1     Q.  Is it appropriate for companies like
2  Johnson & Johnson or Ethicon to continue to sell
3  inefficient products or ineffective products in
4  order to protect their cash cow or to protect their
5  market share until they developed a more effective
6  product?
7     MR. SNELL:  Objection and MIL, cash cow.
8  BY THE WITNESS:
9     A.  No.
10  BY MR. THORNBURGH:
11     Q.  Why not?
12     MR. SNELL:  Same.
13  BY THE WITNESS:
14     A.  A device that has design characteristics
15  that make it unreasonably ineffective to treat
16  stress urinary incontinence must -- those
17  characteristics must be understood and either
18  corrected to make it an efficient treatment for
19  stress urinary incontinence or the product should
20  be removed from the market.
21  BY MR. THORNBURGH:
22     Q.  Any other -- anything else significant
23  from this exhibit?
24     A.  No.

Page 448

1     Q.  What's the next exhibit you want to
2  discuss?
3     A.  P0946.
4     Q.  What is P049 -- sorry -- 0946?
5     A.  It is an e-mail string from -- between
6  key Ethicon employees from April 16, 2008.
7     Q.  How does Exhibit P0 -- sorry.  Strike
8  that.
9     MR. SNELL:  Can I get a copy?
10  BY MR. THORNBURGH:
11     Q.  What opinion does Exhibit P0946 support?
12     A.  It supports my opinion that there are
13  design characteristics that make the TVT-Secur
14  device unreasonably unsafe and unreasonably
15  ineffective and that there was a failure to
16  adequately study the device before putting the
17  device on the market.
18     Q.  How does it support that opinion,
19  Doctor?
20     A.  This is an e-mail that is discussing
21  registry data that was collected that was from a
22  project called TVT-WORLD.  TVT-WORLD was a registry
23  that was collecting data on all of the TVT
24  products.

Page 449

1        This e-mail is discussing spinning the
2  data from the TVT-WORLD and if that is done, it
3  would lose its objectivity.
4     Q.  Doctor, what does "spin data" mean to
5  you?
6     A.  To manipulate the data to create more
7  favorable data.
8     Q.  Is it appropriate for companies like
9  Ethicon and Johnson & Johnson to spin data from
10  their studies?
11     MR. SNELL:  Objection.
12  BY THE WITNESS:
13     A.  No.
14  BY MR. THORNBURGH:
15     Q.  Why not?
16     MR. SNELL:  Same.
17  BY THE WITNESS:
18     A.  It is important to report accurate data,
19  whether it is favorable data or unfavorable data,
20  so that doctors have a clear understanding about
21  what the safety and efficacy is of a product in
22  order to be able to determine whether or not that
23  product is acceptable and appropriate for use in
24  the treatment of stress urinary incontinence for

25 (Pages 446 to 449)

Bruce Alan Rosenzweig, M.D.

Page 450

1    women.
2    BY MR. THORNBURGH:
3        Q.   What could happen to patients who get
4    implanted with a product that's based on or
5    supported by data that had been spun or
6    manipulated?
7        MR. SNELL:  Object.
8    BY THE WITNESS:
9        A.   They can be exposed to unreasonable
10   hazard.
11   BY MR. THORNBURGH:
12       Q.   Doctor, I got to ask you this question.
13           Have you ever -- strike that.
14           Before you got involved in this
15   litigation, did you have any expectation that
16   Johnson & Johnson or Ethicon would spin their data
17   in order for their data to look better than it
18   actually was?
19       MR. SNELL:  Object.
20   BY THE WITNESS:
21       A.   No.
22   BY MR. THORNBURGH:
23       Q.   I want to turn your attention to Bates
24   number ending in 6215.  Do you see the e-mail from

Page 451

1    Judi Gauld to David Robinson dated April 16, 2008?
2        A.   Yes.
3        Q.   And what does Judi Gauld write to David
4    Robinson?
5        MR. SNELL:  Object.
6    BY THE WITNESS:
7        A.   "I hear your frustration with this
8    situation and apologize if I continue to push back
9    on this.  However, I do feel very strongly about
10   this situation, and will continue to push back on
11   my own.  I am really concerned that the lines
12   between commercial and research need to be clear
13   cut, and in this company, am continually amazed and
14   surprised at our need to push back.  I understand
15   the need to keep our relationships good with
16   marketing, and believe it is possible if we are
17   trusted and respected in doing our jobs.  We" --
18   excuse me.  "More importantly for me is that we are
19   able to continue to work with the best
20   urogynecologists in a research setting and that
21   they see us as behaving in an objective and
22   scientifically robust manner."
23       Q.   Is it important -- do you have an
24   opinion whether or not it's important for medical

Page 452

1    device companies like Ethicon and Johnson & Johnson
2    to behave in an objective and scientifically robust
3    manner?
4        MR. SNELL:  Object.
5    BY THE WITNESS:
6        A.   Yes, I do have an opinion.
7    BY MR. THORNBURGH:
8        Q.   What's the opinion?
9        MR. SNELL:  Same.
10   BY THE WITNESS:
11       A.   That they should have behave in an
12   objective and scientifically robust manner.
13   BY MR. THORNBURGH:
14       Q.   Why is that?
15       A.   So that --
16       MR. SNELL:  Same.
17   BY THE WITNESS:
18       A.   The information regarding the risks and
19   benefits of the devices that they are producing to
20   be permanently implanted in a woman are known so
21   that doctors can make a decision about which
22   products they use for their patients and that
23   patients can make an informed decision about the
24   products that they're having permanently implanted

Page 453

1    in their body.
2    BY MR. THORNBURGH:
3        Q.   And if you turn to the first page of
4    P0946, do you see there is another response from
5    Judi Gauld to David Robinson?
6        A.   Yes.
7        Q.   And what does -- what does Judi Gauld
8    tell Dr. Robinson in this response?
9        MR. SNELL:  Object.
10   BY THE WITNESS:
11       A.   "I know what you're saying about HE&R -
12   my concern with Dhinagar is his closeness to EU
13   marketing and his constant wish to 'spin' data e.g.
14   TVT-WORLD interim - and therefore lose objectivity."
15   (As read.)
16   BY MR. THORNBURGH:
17       Q.   Have you seen -- have you seen
18   Dhinagar's name before?
19       A.   Yes.
20       Q.   And where have you seen Dhinagar's name?
21       A.   On other publications.
22       Q.   And are you aware whether or not
23   Dhinagar was involved in the publication of the
24   TVT-WORLD data?

26 (Pages 450 to 453)

Bruce Alan Rosenzweig, M.D.

Page 454

1    A.  Yes.
2    Q.  In what -- in what sense?
3    A.  As an investigator.
4    Q.  Do you agree with Dr. Gauld that it is
5  inappropriate to spin data?
6    MR. SNELL:  Object.
7  BY THE WITNESS:
8    A.  First, I don't think Ms. Gauld is a
9  physician.
10  BY MR. THORNBURGH:
11    Q.  Sorry.  Let me ask the question again.
12    Do you agree with Ms. Gauld that it is
13  inappropriate to spin data?
14    MR. SNELL:  Objection.  Go ahead.
15  BY THE WITNESS:
16    A.  Yes, I agree with that.
17    MR. SNELL:  Defense will object to P0946.  We
18  have been unable to locate it on Dr. Rosenzweig's
19  reliance list.  So, we will move to strike all
20  questioning about this document.
21    MR. THORNBURGH:  It's on there.
22  BY MR. THORNBURGH:
23    Q.  What's the next document you want to
24  discuss, Doctor.

Page 455

1    A.  It is P1128.
2    Q.  And can you identify for the jury what
3  P1128 is?
4    A.  Yes.  It is an interview with Dr. Carl
5  Nilsson with Dan Smith and several other key
6  Ethicon employees.
7    Q.  And what opinion --
8    MR. SNELL:  Can I get a copy.
9  BY MR. THORNBURGH:
10    Q.  What opinion, if any, does Exhibit P1128
11  support?
12    A.  It supports my opinions about the design
13  characteristics of the TVT-Secur device that make
14  it unreasonably unsafe or unreasonably ineffective.
15    Q.  How does P1128 support your opinions?
16    A.  It is an interview with Dr. Carl
17  Nilsson, again, one of the original users of the
18  TVT Retropubic, a Key Opinion Leader, Ethicon
19  consultant, and one of the surgeons that probably
20  has the most experience with midurethral slings.
21    Q.  And did Dr. Nilsson publish data
22  concerning the TVT Retropubic device?
23    A.  Yes.
24    Q.  And does Dr. Nilsson -- strike that.

Page 456

1    Does Ethicon often cite to Dr. Nilsson
2  as an expert in the field?
3    MR. SNELL:  Object.  Go ahead.
4  BY THE WITNESS:
5    A.  Yes.
6  BY MR. THORNBURGH:
7    Q.  Does -- in your view of Ethicon's
8  internal documents, did Ethicon hold Dr. Nilsson
9  out as an expert in the field of urogynecology?
10    MR. SNELL:  Object and leading.
11  BY THE WITNESS:
12    A.  Yes.
13  BY MR. THORNBURGH:
14    Q.  And we've heard about Dr. Nilsson
15  yesterday, is that correct?
16    A.  Correct.
17    Q.  And just to refresh the jury's
18  recollection, what was Dr. Nilsson's involvement
19  with the TVT-Secur product, if any?
20    MR. SNELL:  Objection.
21  BY THE WITNESS:
22    A.  Dr. Nilsson was one of the participants
23  in the First Human Use Study.
24  BY MR. THORNBURGH:

Page 457

1    Q.  And what did Dr. -- what types of
2  studies, if any, did Dr. Nilsson believe needed to
3  be conducted before TVT-Secur was launched?
4    MR. SNELL:  Objection.
5  BY THE WITNESS:
6    A.  Randomized controlled trials.
7  BY MR. THORNBURGH:
8    Q.  Okay.  Now, if we -- what's the title of
9  this document?  If you go ahead and look at the
10  first page of P1128, top left-hand corner.
11    A.  "KOL interview:  Carl G. Nilsson," dated
12  6/18/08.
13    Q.  July 18 of 2008, is Ethicon still
14  marketing and selling the TVT-Secur product?
15    MR. SNELL:  Objection.
16  BY THE WITNESS:
17    A.  Correct.
18  BY MR. THORNBURGH:
19    Q.  And what is -- do you see where it says
20  "Project Scion"?
21    A.  Yes.
22    Q.  Are you familiar with Project Scion?
23    A.  Somewhat, yes.
24    Q.  Was Project Scion another device that

27 (Pages 454 to 457)

Bruce Alan Rosenzweig, M.D.

Page 458

1    Ethicon was developing?
2        MR. SNELL:  Objection; leading.
3    BY MR. THORNBURGH:
4        Q.   I will ask a better question.
5            What was Project Scion?
6        MR. SNELL:  No objection.
7    BY THE WITNESS:
8        A.   Project Scion was another women's health
9    product that Ethicon was developing.
10   BY MR. THORNBURGH:
11       Q.   And who attended this meeting?
12       A.   Dr. Nilsson, Dan Smith, Susanne
13   Landgrebe, Jason Hernandez, Julie Hocknell and
14   Heather Nonnenmann.
15       Q.   Okay.  Now, Dan Smith, again, he was the
16   inventor of the TVT-Secur?
17       A.   Correct.
18       Q.   And if you -- let's look at the section
19   under "Scope Discussion and General Development
20   Considerations."
21           Do you see that?
22       A.   Yes.
23       Q.   Okay.  And what is noted next to
24   Dan Smith's initials?

Page 459

1        MR. SNELL:  Objection; leading.
2    BY THE WITNESS:
3        A.   "Intent for Next Generation Mini-Sling."
4    BY MR. THORNBURGH:
5        Q.   And what was your understanding of this
6    discussion and why it was occurring?
7        A.   To discuss the development of a new
8    mini-sling.
9        Q.   Do you see next to CN, the initials
10   CN -- strike that.
11           Who is -- do you see the initials CN?
12       A.   Yes.
13       Q.   Is that Carl Nilsson?
14       A.   Yes.
15       MR. SNELL:  Object; leading.  Go ahead.
16   BY MR. THORNBURGH:
17       Q.   Do you understand who the initials CN
18   stands for?
19       A.   Carl Nilsson.
20       Q.   And do you see where it says "Treatment
21   Requirements"?
22       A.   Yes.
23       Q.   What were Carl Nilsson's, based on this
24   record, what were Carl Nilsson's or what was his

Page 460

1    position for the treatment requirements necessary
2    for the next generation mini-sling?
3        MR. SNELL:  Object; leading.
4    BY THE WITNESS:
5        A.   It must be effective and must have
6    clinical data.
7    BY MR. THORNBURGH:
8        Q.   And if we go to -- if you go to the
9    section where Carl Nilsson discusses the efficacy
10   and complications.
11           Do you see that?
12       A.   Yes.
13       Q.   What does Dr. Nilsson write concerning
14   the efficacy and complications of the mini-slings?
15       MR. SNELL:  Object.
16   BY THE WITNESS:
17       A.   There is no documentation that the
18   mini-sling is safer and with equivalent efficacy of
19   the TVT-Secur.  It must get there, stay there and
20   be tensioned properly.
21   BY MR. THORNBURGH:
22       Q.   Now, you had discussed the section about
23   Carl Nilsson's treatment requirements that there
24   must -- that it must be effective, safe and easy to

Page 461

1    perform just a moment ago.
2            Do you recall that?
3        A.   Yes.
4        MR. SNELL:  Objection; leading, misstates the
5    testimony.
6    BY MR. THORNBURGH:
7        Q.   Was the TVT-Secur, in your opinion,
8    effective or ineffective?
9        MR. SNELL:  Object.
10   BY THE WITNESS:
11       A.   Ineffective.
12   BY MR. THORNBURGH:
13       Q.   Was the TVT-Secur safe or unsafe, in
14   your opinion?
15       A.   Unsafe.
16       Q.   Was the TVT-Secur easy to perform or
17   hard to perform?
18       A.   Hard to perform.
19       Q.   Did the TVT-Secur meet the treatment
20   requirements outlined by Carl Nilsson?
21       MR. SNELL:  Object.
22   BY THE WITNESS:
23       A.   No.
24   BY MR. THORNBURGH:

Bruce Alan Rosenzweig, M.D.

Page 462

1      Q.  Are -- now, if you go down to the
2  section that talks about Carl Nilsson and the
3  section is titled "Efficacy and Complications."
4         Do you see that section?
5      A.  Yes.
6      Q.  Was there -- do you see where it says,
7  "There is no documentation that mini-sling is safer
8  and with equal efficacy as TVT"?
9      A.  Yes.
10       MR. SNELL:  Object; leading.
11  BY MR. THORNBURGH:
12      Q.  Do you agree with Dr. Nilsson that the
13  mini-sling was not safer and specifically the
14  TVT-Secur was not safer and did not have equal
15  efficacy as the TVT?
16       MR. SNELL:  Object.
17  BY THE WITNESS:
18      A.  Yes.
19  BY MR. THORNBURGH:
20      Q.  What does Dr. Nilsson write with respect
21  to the hammock procedure or the hammock approach of
22  the TVT-Secur?
23       MR. SNELL:  Object.
24  BY THE WITNESS:

Page 463

1      A.  It "will never work."
2  BY MR. THORNBURGH:
3      Q.  Do you agree with Dr. Nilsson that the
4  TVT-Secur hammock approach would never work?
5       MR. SNELL:  Object.
6  BY THE WITNESS:
7      A.  Yes.
8  BY MR. THORNBURGH:
9      Q.  Did Ethicon ever tell -- based on
10  your -- strike that.
11       Based on your review of Ethicon's
12  internal documents, did Ethicon ever disclose to
13  the medical community that its Key Opinion Leader
14  Dr. Nilsson, who had published and had spent
15  considerable amount of his life researching the
16  TVT Retropubic, that it was his opinion that the
17  TVT-Secur mini-sling hammock approach would never
18  work?
19       MR. SNELL:  Object.
20  BY THE WITNESS:
21      A.  No.
22  BY MR. THORNBURGH:
23      Q.  What does Dr. Nilsson write after the
24  section that says "Get there, stay there, can be

Page 464

1  tensioned properly"?
2       MR. SNELL:  Object; leading.
3  BY THE WITNESS:
4      A.  He questions whether there will ever be
5  a mini-sling that will work.
6  BY MR. THORNBURGH:
7      Q.  If you go under "Model Development."  Do
8  you see that?
9      A.  Yes.
10      Q.  What does Dr. Nilsson say about cadaver
11  work?
12       MR. SNELL:  Object.
13  BY THE WITNESS:
14      A.  That it is okay "but it is not the same
15  as real tissue, resistance of the TVT-Secur is very
16  different."
17  BY MR. THORNBURGH:
18      Q.  Does that statement -- is there any
19  significance to that statement with respect to your
20  opinions?
21      A.  Yes.
22      Q.  What's that?
23      A.  That the design and development of the
24  TVT-Secur based on cadaver models and sheep

Page 465

1  cadavers was not the same as real tissue.  The
2  resistance of TVT-Secur is very different.
3      Q.  If you turn the page to ETH.MESH ending
4  in 516.  What does David Smith -- sorry.  Strike
5  that.
6       What does Dan Smith write concerning his
7  meeting there with Dr. Nilsson?
8       MR. SNELL:  Object; leading.
9  BY THE WITNESS:
10      A.  That with the next generation devices,
11  "maybe the timeline should not be launch but rather
12  run clinical trials 1, 2 and 3 before launch."
13  BY MR. THORNBURGH:
14      Q.  Does that statement by Dan Smith have
15  any significance to your opinions?
16      A.  Yes.
17      Q.  What?
18      A.  That there was inadequate clinical
19  studies prior to the launch of the TVT-Secur.
20      Q.  How long has Ethicon, to your knowledge,
21  and Johnson & Johnson been in business at this
22  point in 2008?
23       MR. SNELL:  Objection.
24  BY THE WITNESS:

29 (Pages 462 to 465)

Bruce Alan Rosenzweig, M.D.

Page 466

```
1         A.   That I don't specifically recall.
2         MR. SNELL:  Undisclosed.
3    BY MR. THORNBURGH:
4         Q.   Does it concern you at all that in 2008
5    Dan Smith writes that maybe next time we should do
6    studies before we launch the product?
7         MR. SNELL:  Objection and leading.
8    BY THE WITNESS:
9         A.   That would be concerning, yes.
10   BY MR. THORNBURGH:
11        Q.   Why would it be concerning, Doctor?
12        MR. SNELL:  Same objections.  Leading.
13   BY THE WITNESS:
14        A.   Because if the device is not studied
15   clinically, then design characteristics of the
16   device that make it unreasonably unsafe or
17   unreasonably ineffective would not be known and,
18   therefore, it would expose women to harms
19   associated with those design characteristics that
20   they would not be exposed to if the unsafe
21   characteristics were known prior to launch.
22   BY MR. THORNBURGH:
23        Q.   Does it appear to you that Dan Smith is
24   learning for the first time as an engineer that
```

Page 467

```
1    before you launch a medical device into the
2    worldwide market to be permanently implanted in
3    patients that maybe you should test it first and
4    make sure it's safe and effective?
5         MR. SNELL:  Objection and leading.
6    BY THE WITNESS:
7         A.   The statement is, "Maybe the timeline
8    should not be launch but rather, run clinicals 1, 2
9    and 3."
10   BY MR. THORNBURGH:
11        Q.   What does Carl Nilsson -- how does Carl
12   Nilsson respond to Dan Smith regarding the idea
13   that maybe you should do studies before you launch
14   a product?
15        MR. SNELL:  Objection and leading.
16   BY THE WITNESS:
17        A.   Carl Nilsson states people are allergic
18   to six-week to six-month data.  There should be a
19   minimum of one-year data.
20   BY MR. THORNBURGH:
21        Q.   What does the two -- do you see the two
22   asterisks in that section?
23        A.   Yes.
24        Q.   What does Carl Nilsson write in that --
```

Page 468

```
1    in that section?
2         MR. SNELL:  Object.
3    BY THE WITNESS:
4         A.   "Working to block marketing of MiniArc
5    in Finland for lack of clinical data - considered
6    unethical."
7    BY MR. THORNBURGH:
8         Q.   Do you agree that with -- do you agree
9    with this statement that it would be unethical to
10   launch a medical device without clinical data to
11   support the launch?
12        MR. SNELL:  Object.
13   BY THE WITNESS:
14        A.   Yes.
15   BY MR. THORNBURGH:
16        Q.   Do you agree that -- what's your
17   understanding of Dr. Nilsson's statement that
18   "People are allergic to six-week to six-month data,
19   one year minimum data required"?
20        MR. SNELL:  Object.
21   BY THE WITNESS:
22        A.   That six weeks or six months experience
23   is not enough to determine the safety and efficacy
24   of a medical device that is permanently implanted
```

Page 469

```
1    in a woman to treat stress urinary incontinence.
2    BY MR. THORNBURGH:
3         Q.   Do you agree with that statement?
4         A.   Yes.
5         Q.   If you go to the "Mesh Properties"
6    section.  Are you there?
7         A.   Yes.
8         Q.   Okay.  And is there anything significant
9    within this section with respect to your opinions?
10        A.   Yes.  Dr. Nilsson states he will not use
11   laser-cut mesh.  It does not have the same stretch
12   profile of mechanical-cut mesh, does not have -- it
13   has different elasticity and fixation requirements.
14        Q.   In fact, it says, "Will not use
15   laser-cut mesh!!"  Right?
16        A.   Correct.
17        MR. SNELL:  Objection; leading.
18   BY MR. THORNBURGH:
19        Q.   Okay.  Do you agree that laser-cut mesh
20   would not work in a mini-sling like the TVT-Secur?
21        MR. SNELL:  Objection.
22   BY THE WITNESS:
23        A.   Laser cutting short mesh makes the mesh
24   stiffer and more rigid and therefore is a design
```

30 (Pages 466 to 469)

Bruce Alan Rosenzweig, M.D.

Page 470

1    characteristic that makes it unreasonably unsafe.
2         MR. SNELL:  Objection.  Move to strike.
3    Non-responsive.
4    BY MR. THORNBURGH:
5         Q.  How does this statement by Dr. Nilsson
6    that he would not use laser-cut mesh support your
7    opinions, if at all?
8         A.  This supports my opinions that laser
9    cutting a short mesh makes it unreasonably -- is a
10   design characteristic that makes it unreasonably
11   unsafe.
12        Q.  Are there any other statements in this
13   document that support your opinions?
14        A.  Yes.  This document supports my opinion
15   that the training for the TVT-Secur device was
16   inadequate and defective.  Dr. Nilsson writes,
17   "Huge complications in Germany with TVT-Secur
18   because of training concerns and training is so
19   poor in so many countries."
20            It also supports my opinions about the
21   arrow tip introducers being a design characteristic
22   that is unreasonably unsafe.  Dr. Nilsson states
23   that "No cutting edge blade is a very good thing.
24   Just maintain a tissue separator."

Page 471

1            Dr. Nilsson also supports my opinion
2    that the IFU was defective and that the training
3    was inadequate, stating that the learning curve for
4    Dr. Nilsson was 100 patients before he was very
5    good with very dry results.
6         Q.  Have you ever heard of any other medical
7    device having a learning curve of 100 patients?
8         MR. SNELL:  Objection.  Undisclosed.
9    BY THE WITNESS:
10        A.  Not that I recall.
11   BY MR. THORNBURGH:
12        Q.  I mean, if ten -- there are more than
13   ten surgeons in -- let me ask this question.
14            Do you know how many urogynecologists
15   and gynecologists live just here in Chicago?
16        A.  There are quite a few.
17        Q.  If there were just --
18        MR. SNELL:  Object; non-responsive.
19   BY MR. THORNBURGH:
20        Q.  Were there are just ten urogynecologists
21   in one city, for example, who implant -- who
22   decided to implant a TVT-Secur device, how many
23   patients would they have to implant combined before
24   they got over their learning curve?

Page 472

1         MR. SNELL:  Objection; improper hypothetical,
2    undisclosed.  Go ahead.
3    BY THE WITNESS:
4         A.  Based on Dr. Nilsson's statement, 1,000.
5    BY MR. THORNBURGH:
6         Q.  Did, to your knowledge from your review
7    of the medical -- strike that.
8            To your knowledge from your review of
9    Ethicon's internal documents, did Ethicon ever
10   disclose to physicians who were deciding whether or
11   not to switch to the TVT-Secur product to begin
12   implanting patients with that new product that
13   there was a 100-patient learning curve?
14        MR. SNELL:  Objection.
15   BY THE WITNESS:
16        A.  No.
17   BY MR. THORNBURGH:
18        Q.  Based on your review of Ethicon's
19   internal documents, did Ethicon ever disclose to
20   patients -- to doctors that there was a 100-patient
21   learning curve?
22        MR. SNELL:  Same objection.
23   BY THE WITNESS:
24        A.  No.

Page 473

1    BY MR. THORNBURGH:
2         Q.  Did you review the IFU for the
3    TVT-Secur?
4         A.  Yes, I did.
5         Q.  Did Ethicon ever disclose in the
6    Instructions for Use that there would be a
7    100-patient learning curve?
8         A.  No.
9         MR. SNELL:  Objection.
10   BY MR. THORNBURGH:
11        Q.  Patients who are the first -- first 99
12   patients, are they at risk of experiencing adverse
13   events as a result of being part of this
14   100-patient learning curve?
15        MR. SNELL:  Objection.
16   BY THE WITNESS:
17        A.  Yes.
18   BY MR. THORNBURGH:
19        Q.  Let me ask this question, Doctor.
20            Do you have an opinion whether or not
21   Ethicon should have told physicians that there was
22   a 100-patient learning curve?
23        MR. SNELL:  Objection.  Undisclosed.
24   BY THE WITNESS:

31 (Pages 470 to 473)

Bruce Alan Rosenzweig, M.D.

Page 474

```
 1        A.   Yes, they should have.
 2   BY MR. THORNBURGH:
 3        Q.   Is it reasonable that the TVT-Secur,
 4   according to this document, had a 100-patient
 5   learning curve?
 6        A.   Can you repeat the question?
 7        Q.   Is it reasonable, is it reasonable to
 8   sell a product, a device like the TVT-Secur, if it
 9   took 100 patients to get over the learning curve?
10        MR. SNELL:  Objection.
11   BY THE WITNESS:
12        A.   For a device that treats stress urinary
13   incontinence, no.
14   BY MR. THORNBURGH:
15        Q.   Does the fact that there was a
16   100-patient learning curve have any significance to
17   your opinions with respect to the design
18   characteristics of the mesh -- of the TVT-Secur
19   product?
20        MR. SNELL:  Object; leading.
21   BY THE WITNESS:
22        A.   It supports my opinions that the
23   Instructions for Use was defective.  It supports my
24   opinions that the training was inadequate.  It
```

Page 476

```
 1        A.   It supports my opinions that one of the
 2   design characteristics of the device, the short
 3   mesh, is a characteristic that is defectively
 4   designed and leads to unreasonable harm and
 5   unreasonable effectiveness.
 6        Q.   Is there any other information in
 7   Exhibit 1128 that is significant to your opinions
 8   that you'd like to discuss with the ladies and
 9   gentlemen of the jury?
10        A.   No.
11        Q.   What's the next exhibit, Doctor?
12        A.   It is P2718.
13        Q.   And can you identify Exhibit P2718 to
14   the jury, please?
15        A.   Yes.  It is an e-mail string between key
16   Ethicon employees; the Medical Director of Canada;
17   David Robinson, Medical Director of the
18   United States; and other key Ethicon employees.
19        Q.   And what opinions does Exhibit P2718
20   support?
21        A.   It supports my opinions that the
22   TVT-Secur was inadequately tested prior to launch;
23   that there was inadequate study of the device
24   during the design and development phase.
```

Page 475

```
 1   supports my opinions that the device was not
 2   studied during the design and the development
 3   phase.  And it supports my opinions that there are
 4   design characteristics of the device that makes it
 5   unreasonably unsafe and unreasonably ineffective.
 6        MR. SNELL:  Objection.  Move to strike.
 7   Non-responsive, first two sentences of the answer.
 8        THE WITNESS:  You're going to strike the first
 9   two sentences or the?
10        MR. SNELL:  The first two.  I'm just moving on
11   the first two that didn't concern design
12   characteristics.
13        THE WITNESS:  Thank you.
14   BY MR. THORNBURGH:
15        Q.   What did -- what length did Dr. Nilsson
16   believe would be needed for a mini-sling that would
17   be implanted through using the hammock approach?
18        MR. SNELL:  Objection.
19   BY THE WITNESS:
20        A.   Longer than 8 centimeters and he states
21   ideally 14 centimeters.
22   BY MR. THORNBURGH:
23        Q.   How does that support your opinions in
24   this case, if at all?
```

Page 477

```
 1        Q.   How does this document support those
 2   opinions?
 3        A.   This is an e-mail regarding a
 4   notification of Johnson & Johnson by a Canadian
 5   newspaper about a story that they were going to
 6   write about the unethical issues regarding the new
 7   surgical device, the TVT-Secur.
 8        Q.   If we -- if you turn to ETH.MESH number
 9   ending in 3170.
10        MR. SNELL:  I have to move to strike that last
11   answer as non-responsive.  Sorry, Dan.
12   BY MR. THORNBURGH:
13        Q.   Turn with me to ETH.MESH number ending
14   in 3170.  Are you there?
15        A.   Yes.
16        Q.   Do you see the -- do you see the e-mail
17   from Russo-Jankewicz?
18        A.   Yes.
19        Q.   And is that an Ethicon employee in the
20   United States?
21        A.   Yes.
22        Q.   Okay.  And what does Jackie
23   Russo-Jankewicz write in this e-mail?
24        MR. SNELL:  Objection; leading.
```

32 (Pages 474 to 477)

Bruce Alan Rosenzweig, M.D.

Page 478

1    BY THE WITNESS:
2        A.   "Teresa, per our discussion, here's the
3    standby we suggest.  I'm copying David Robinson in
4    our Medical Affairs group.  David can you give this
5    a read.  Dave, I wanted to get this to Teresa
6    Forester, PR director at J&J medical/Canada ASAP.
7    We have been informed by our Canadian medical
8    device manufacturer trade association that the
9    National Post (Canadian newspaper) is working on a
10   story regarding an article/commentary in June issue
11   of Journal Obstetrics Gynecology Canada about
12   ethical issues with new surgical devices (TVT-Secur
13   is named)."
14       Q.   And if you go to the first page of 2718,
15   what does David Robinson circulate to the other
16   employees on this e-mail string?
17       A.   This is a standby statement to be given
18   to outside agencies including the press.
19       Q.   And if you -- can you tell us what the
20   standby statement says?
21       MR. SNELL:  Objection.  Reading.
22   BY THE WITNESS:
23       A.   "The TVT-Secur system is a midurethral
24   sling device that maintains many of the key

Page 479

1    elements that made the TVT the gold standard in SUI
2    surgery.  It optimizes safety and convenience
3    through an innovative design that allows for a less
4    invasive approach."
5    BY MR. THORNBURGH:
6        Q.   Is that a true or an untrue statement,
7    Doctor?
8        MR. SNELL:  Objection.
9    BY THE WITNESS:
10       A.   It is not a true statement.
11   BY MR. THORNBURGH:
12       Q.   Go on, Doctor.
13       A.   "The TVT-Secur system features a small,
14   compact design that facilitates an approach to
15   incontinence that does not require exit incisions
16   that can be performed under local anesthesia.  With
17   the device" -- excuse me.  "The device uses the
18   same unique Prolene polypropylene mesh proven safe
19   and effective with ten years of clinical data.  It
20   has been used in over 1 million Gynecare TVT
21   patients worldwide.  The product was launched in
22   September of 2006."
23       Q.   Let me stop you right there for a
24   moment.

Page 480

1        With respect to the statement, "The
2    device uses the same unique Prolene polypropylene
3    mesh proven safe and effective with ten years of
4    clinical data," is that a true or an untrue
5    statement?
6        MR. SNELL:  Objection.
7    BY THE WITNESS:
8        A.   It is the same Prolene polypropylene.
9    However, the mesh is different.  It is a shorter,
10   stiffer, rigid, laser-cut mesh compared to the
11   full-length TVT.
12   BY MR. THORNBURGH:
13       Q.   Go on, Doctor, to the next section.
14   What does that section state?
15       A.   "Prior to marketing the TVT-Secur
16   commercially available" -- excuse me.
17       "Prior to making the TVT-Secur
18   commercially available, we validated the safety of
19   the device in clinical protocol (humans) in six
20   sites in Europe and the U.S."
21       Q.   So, prior to -- did Ethicon -- strike
22   that.
23       Prior to making Gynecare TVT-Secur
24   commercially available, did Ethicon validate the

Page 481

1    safety of the device in a clinical protocol human
2    trial in six sites in Europe and the United States?
3        MR. SNELL:  Objection.
4    BY THE WITNESS:
5        A.   No.  They had data on 31 patients
6    with -- through five weeks with a failure rate of
7    approximately 30% and a complication rate of 60%.
8    BY MR. THORNBURGH:
9        Q.   Is that the first --
10       MR. SNELL:  Move to strike.  Non-responsive.
11   BY MR. THORNBURGH:
12       Q.   Is that the First Human Use Study that
13   we discussed yesterday?
14       A.   Correct.
15       Q.   Did the First Human Use Study validate
16   the safety of the device before the TVT-Secur was
17   launched?
18       MR. SNELL:  Object.
19   BY THE WITNESS:
20       A.   No, it did not.
21   BY MR. THORNBURGH:
22       Q.   So, is this a true or untrue statement,
23   Doctor?
24       A.   This is not an accurate statement.

33 (Pages 478 to 481)

Bruce Alan Rosenzweig, M.D.

Page 482

1      Q.   The next -- what does the next bullet
2  point say?
3      A.   "We sponsored the First Human Use Trial
4  of the TVT-Secur device. This is a prospective,
5  single-arm observational study of 70 patients with
6  12 months follow-up. We expect the study to
7  publish next year."
8      Q.   Is that the same study?
9      A.   Correct.
10      Q.   But the 12-month follow-up study instead
11  of the interim analysis, is that correct?
12      A.   Correct.
13      MR. SNELL:  Object; leading.
14  BY MR. THORNBURGH:
15      Q.   And did those results ultimately come
16  out? Strike that.
17          Did the 12 -- did Ethicon ultimately
18  have available to them the data from the final
19  12-month study?
20      A.   Ethicon had the data from the -- the
21  final data from the 12-month study, yes.
22      Q.   And when they finally looked at the data
23  from the 12-month study, did it validate the safety
24  and efficacy of the device even post-launch?

Page 483

1      MR. SNELL:  Object.
2  BY THE WITNESS:
3      A.   No, it did not.
4  BY MR. THORNBURGH:
5      Q.   And we'll talk about that in a little
6  bit.
7      MR. SNELL:  Move to strike attorney comment.
8  Go ahead.
9  BY MR. THORNBURGH:
10      Q.   Doctor, was this an opportunity that
11  Ethicon had to tell the world about the results it
12  had in the First Human Use Study before they
13  launched the product?
14      MR. SNELL:  Object; form.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. THORNBURGH:
18      Q.   If Ethicon wanted it to be true, how
19  would Ethicon have disclosed what the results were
20  in the First Human Use interim analysis?
21      MR. SNELL:  Objection.
22  BY MR. THORNBURGH:
23      Q.   In other words, if Ethicon wanted to
24  provide a standby statement that was accurate

Page 484

1  concerning the First Human Use Study data that was
2  available prior to launch, what would Ethicon need
3  to disclose?
4      MR. SNELL:  Objection and leading.
5  BY THE WITNESS:
6      A.   The data.
7  BY MR. THORNBURGH:
8      Q.   And what was that data?
9      A.   Prior to launch there was five-week data
10  on 31 patients.
11      Q.   And what did that data show or
12  demonstrate?
13      A.   A complication rate of approximately 60%
14  and an incontinence rate of approximately 30%.
15      Q.   What's the next document in your binder,
16  Doctor?
17      A.   This is an e-mail from Dan Smith dated
18  November 13, 2008.
19      Q.   Before we get there, let me just go
20  ahead and mark Exhibit 2707 for the record. Let me
21  hand that to you.
22      A.   Thank you.
23      MR. SNELL:  Thank you.
24  BY MR. THORNBURGH:

Page 485

1      Q.   Do you recognize that document?
2      A.   Yes.
3      Q.   What's that document?
4      A.   This is a --
5      MR. SNELL:  Hold on. I'm sorry. Which one
6  are we talking about?
7      MR. THORNBURGH:  Exhibit 2707.
8      MR. SNELL:  Okay.
9  BY THE WITNESS:
10      A.   This is a media standby statement with
11  the tag "Do Not Distribute."
12  BY MR. THORNBURGH:
13      Q.   Now, this is I think a final draft of
14  the standby statement that we just looked at so I'm
15  not going to go through the whole thing. There is
16  just an additional statement in this standby
17  statement that I want to discuss with you real
18  quick.
19          If you go down to the section that
20  says, "If pressed."
21      MR. SNELL:  Move to strike the lawyer
22  predicate.
23  BY MR. THORNBURGH:
24      Q.   Do you see that?

34 (Pages 482 to 485)

Bruce Alan Rosenzweig, M.D.

Page 486

1      MR. SNELL:  Leading.
2  BY MR. THORNBURGH:
3      Q.   What does Ethicon say that, if pressed
4  by the media, how they would respond further about
5  why Ethicon decided to launch the TVT-Secur prior
6  to the completion of the First Human Use clinical
7  trial?
8      MR. SNELL:  Object.  Sorry.  Object; reading.
9  Also this is not on his reliance list.  Move to
10  strike all questioning.  Go ahead.
11      MR. THORNBURGH:  It is.  Go ahead.
12  BY THE WITNESS:
13      A.   "We believe Secur offers a compelling
14  patient benefit - the potential for less
15  postoperative pain and the ability to avoid the
16  retropubic space.  Because of this we made the
17  decision to move forward" -- excuse me -- "to move
18  ahead with a controlled launch supported by strong
19  professional education programs."
20  BY MR. THORNBURGH:
21      Q.   Doctor, is that a true statement?
22      A.   No.
23      MR. SNELL:  Object.
24  BY MR. THORNBURGH:

Page 487

1      Q.   Based on your review of Ethicon's
2  internal documents, why did Ethicon launch the
3  TVT-Secur product prior to the completion of the
4  12-month First Human Use Study?
5      MR. SNELL:  Object.
6  BY THE WITNESS:
7      A.   To be the first to market to maintain
8  their market share.
9      MR. SNELL:  Move to strike.  Intent answer.
10  BY MR. THORNBURGH:
11      Q.   Do you have an opinion about whether or
12  not Ethicon was being truthful in its standby
13  statement that it prepared for the media?
14      MR. SNELL:  Objection.
15  BY THE WITNESS:
16      A.   Yes, I have an opinion.
17  BY MR. THORNBURGH:
18      Q.   What is that opinion?
19      MR. SNELL:  Same objection.
20  BY THE WITNESS:
21      A.   That it's not completely accurate.
22  BY MR. THORNBURGH:
23      Q.   What's the next document you'd like to
24  discuss, Doctor?

Page 488

1      A.   P1676.
2      MR. SNELL:  Can I get a copy.
3  BY MR. THORNBURGH:
4      Q.   Can you identify this document for the
5  ladies and gentlemen of the jury?
6      A.   Yes, this is an e-mail or a white paper
7  from Dan Smith dated November 13, 2008.
8      Q.   What opinion does this -- sorry.  What
9  was the date again?
10      A.   November --
11      Q.   13?
12      A.   -- 13, 2008.
13      Q.   Okay.  And this is Dan Smith who was the
14  project leader for the TVT-Secur?
15      A.   Correct.
16      Q.   And this is still while the TVT-Secur is
17  being marketed and sold to patients around the
18  world?
19      A.   Correct.
20      Q.   Including patients here in the Midwest?
21      MR. SNELL:  Object; leading.
22  BY THE WITNESS:
23      A.   Correct.
24  BY MR. THORNBURGH:

Page 489

1      Q.   Including patients who are in West
2  Virginia?
3      MR. SNELL:  Objection; leading.
4  BY THE WITNESS:
5      A.   Correct.
6  BY MR. THORNBURGH:
7      Q.   Including patients who are in
8  New Jersey?
9      MR. SNELL:  Objection; leading.
10  BY THE WITNESS:
11      A.   Correct.
12  BY MR. THORNBURGH:
13      Q.   Patients are still being implanted with
14  the TVT-Secur product in California?
15      MR. SNELL:  Objection; leading.
16  BY THE WITNESS:
17      A.   Correct.
18  BY MR. THORNBURGH:
19      Q.   Patients are still being implanted with
20  the TVT-Secur product in Philadelphia --
21      MR. SNELL:  Objection; leading.
22  BY MR. THORNBURGH:
23      Q.   -- at this time?
24      MR. SNELL:  Objection; leading.

35 (Pages 486 to 489)

Bruce Alan Rosenzweig, M.D.

Page 490

```
 1    BY THE WITNESS:
 2       A.  Correct.
 3    BY MR. THORNBURGH:
 4       Q.  What opinions does Exhibit P1676
 5    support?
 6       A.  It supports my opinions about the design
 7    characteristics of the TVT-Secur device that make
 8    it unreasonably unsafe or unreasonably ineffective.
 9       Q.  What's the title of this document?
10       A.  "Things to consider as we assess next
11    steps for a next generation sling."
12       Q.  Based on your review of Ethicon's
13    internal documents, do you have an understanding as
14    to why they were looking at things to consider as
15    they were assessing the development of their next
16    generation sling?
17       MR. SNELL:  Object.
18    BY THE WITNESS:
19       A.  Yes.  The internal documents that I
20    reviewed show that the TVT-Secur device at this
21    point was felt to be a failed product line.
22    BY MR. THORNBURGH:
23       Q.  Did they tell patients that the
24    TVT-Secur was a failed product line ever?
```

Page 491

```
 1       MR. SNELL:  Object.
 2    BY THE WITNESS:
 3       A.  No.
 4    BY MR. THORNBURGH:
 5       Q.  When patients in Philadelphia were being
 6    implanted with the TVT-Secur product at this time,
 7    did Ethicon say, "Hold on a second, patients.  You
 8    might want to understand that it's our belief
 9    internally at Ethicon that the TVT-Secur is a
10    failed product"?
11       MR. SNELL:  Object and leading.
12    BY THE WITNESS:
13       A.  No.
14    BY MR. THORNBURGH:
15       Q.  Did it tell patients in West Virginia at
16    this time, "Hold on, patients.  When you're
17    considering whether or not to undergo a procedure
18    to treat your stress urinary incontinence, you need
19    to know with respect to the TVT-Secur product we at
20    Ethicon and Johnson & Johnson believe it is a
21    failed product"?
22       MR. SNELL:  Objection and leading.
23    BY THE WITNESS:
24       A.  No.
```

Page 492

```
 1    BY MR. THORNBURGH:
 2       Q.  When doctors in Philadelphia at this
 3    time in 2008 were discussing options with their
 4    patients for treating their stress urinary
 5    incontinence, did Ethicon disclose to those doctors
 6    that internally Ethicon believed that the TVT-Secur
 7    was a failed product?
 8       MR. SNELL:  Objection and leading.  Go ahead.
 9    BY THE WITNESS:
10       A.  No.
11    BY MR. THORNBURGH:
12       Q.  In West Virginia when urogynecologists
13    and gynecologists were considering whether or not
14    to use the TVT-Secur product at this time in 2008,
15    did Ethicon ever disclose to those doctors that
16    they internally at Ethicon believed the TVT-Secur
17    was a failed product?
18       MR. SNELL:  Objection and leading.
19    BY THE WITNESS:
20       A.  No.
21    BY MR. THORNBURGH:
22       Q.  Do you have opinion whether or not
23    Ethicon and Johnson & Johnson should have disclosed
24    to these doctors who were making these treatment
```

Page 493

```
 1    considerations that they believed internally that
 2    the TVT-Secur was a failed product?
 3       MR. SNELL:  Objection; leading.
 4    BY THE WITNESS:
 5       A.  Yes, I have an opinion.
 6    BY MR. THORNBURGH:
 7       Q.  What's that opinion?
 8       MR. SNELL:  Same.
 9    BY THE WITNESS:
10       A.  That should have been disclosed.
11    BY MR. THORNBURGH:
12       Q.  What happens or what can happen to
13    patients in Philadelphia if companies like
14    Johnson & Johnson and Ethicon don't disclose
15    information like this about their products?
16       MR. SNELL:  Object.
17    BY THE WITNESS:
18       A.  Patients will be exposed to unreasonable
19    harm.
20    BY MR. THORNBURGH:
21       Q.  What can happen to patients in West
22    Virginia if Ethicon and Johnson & Johnson don't
23    disclose information like this?
24       MR. SNELL:  Object.
```

36 (Pages 490 to 493)

Bruce Alan Rosenzweig, M.D.

Page 494

1    BY THE WITNESS:
2        A.   Patients will be exposed to unreasonable
3    harm.
4    BY MR. THORNBURGH:
5        Q.   What can happen to patients in Florida
6    if Ethicon and Johnson & Johnson don't disclose
7    information like this?
8        MR. SNELL:  Object.
9    BY THE WITNESS:
10       A.   Patients will be exposed to unreasonable
11   harm.
12   BY MR. THORNBURGH:
13       Q.   What could happen to patients in
14   California and in Chicago and in Texas?
15       A.   They will be exposed to --
16       MR. SNELL:  Same.
17   BY THE WITNESS:
18       A.   -- unreasonable harm.
19   BY MR. THORNBURGH:
20       Q.   What about -- what opinions does
21   Exhibit P1676 support?
22       MR. SNELL:  Object; asked and answered.  Go
23   ahead.
24   BY THE WITNESS:

Page 495

1        A.   It supports my opinion that the
2    TVT-Secur mesh, the short, stiff, rigid mesh, is
3    too short; the Instructions for Use is defective;
4    that the training was inadequate.
5        Q.   How does Exhibit 1676 support that
6    opinion, Doctor?
7        A.   First, Dan Smith states, "Mini-slings
8    have the potential to own a large potential of the
9    market once surgeons understand how to set the
10   tension."
11           That supports my opinion that the
12   Instructions for Use is defective since it cannot
13   explain to surgeons how to tension the TVT-Secur
14   device.
15           Number two, the "TVT-Secur device should
16   have been launched as two separate products, the U
17   being 8 centimeters and the H being 10 centimeters
18   and having their own Instructions for Use."
19           This supports my opinion that the
20   Instructions for Use is defective and that the
21   TVT-Secur in the H position is too short, being a
22   design characteristic which makes it unreasonably
23   unsafe.
24           The -- Mr. Smith continues, "The tension

Page 496

1    of the mini-sling is sufficiently different than
2    what surgeons are used to," demonstrating that the
3    Instructions for Use is defective since it cannot
4    describe for physicians how to appropriately
5    tension the TVT-Secur.
6            "Although we told surgeons how the
7    TVT-Secur needed to be set, they just were not
8    ready to believe us, the sales force was not
9    confident due to early failures.  We did not have
10   data to support the thinking.  We (and Ethicon)
11   never before told surgeons how to set mesh tension
12   because there was no one setting."
13           This supports my opinions that the
14   Instructions for Use is defective because it cannot
15   accurately, reliably and reproducibly describe for
16   surgeons how to set the tension because, as
17   Dan Smith states, there is no one tension.
18           This supports my opinion that training
19   was defective.
20           As Dan Smith writes, "Most surgeons are
21   unfamiliar with the anatomy.  Most surgeons have no
22   idea as to the dynamics of the sling nor that TVT
23   (tension-free tape) is actually not tension-free
24   and never was."

Page 497

1        Q.   Hold on a second, Doctor.  Hold that box
2    up again for the ladies and gentlemen of the jury,
3    please.
4        MR. SNELL:  Before you ask the question, I
5    just need to move to strike part of the last answer
6    with regard to the undisclosed opinion about the
7    TVT hammock needing to be 10 centimeters.  That's
8    not in his report.  Go ahead.
9    BY MR. THORNBURGH:
10       Q.   Go ahead, Doctor.
11       A.   This describes the box that the
12   TVT-Secur comes in states that it is a tension-free
13   support for incontinence.
14       Q.   So, according to Ethicon Dan Smith's own
15   document, is this statement on Ethicon's -- on the
16   box that the TVT-Secur came in that the TVT-Secur
17   was tension-free support system, was that true?
18       A.   No.
19       MR. SNELL:  Objection.
20   BY MR. THORNBURGH:
21       Q.   How many untruths does there have to be
22   before we call Johnson & Johnson a liar?
23       MR. SNELL:  Objection; leading, argumentative,
24   undisclosed opinion, et cetera.  Go ahead.

37 (Pages 494 to 497)

Bruce Alan Rosenzweig, M.D.

Page 498

1    BY THE WITNESS:
2        A.   I don't think I can answer that
3    question.
4    BY MR. THORNBURGH:
5        Q.   Fair enough, Doctor.
6            If Ethicon knew that the TVT-Secur was
7    not tension-free, not a tension-free system, was it
8    appropriate for Ethicon to write on their -- on the
9    box that the product came in that the TVT-Secur was
10   a tension-free system?
11       MR. SNELL:  Objection.
12   BY THE WITNESS:
13       A.   That is not accurate.
14   BY MR. THORNBURGH:
15       Q.   Go ahead.
16       A.   The next that supports my opinion about
17   laser cutting.  "Most surgeons who use TVT products
18   do not know if what they use contains
19   mechanical-cut or laser-cut mesh.  Additionally,
20   they do not know we have laser-cut TVT and TVT-O
21   products on the market."
22       Q.   How does that support your opinion, if
23   at all?
24       A.   It supports my opinion that training was

Page 499

1    inadequate to disclose the differences between
2    laser-cut and mechanical-cut mesh to physicians.
3        Q.   Go ahead, Doctor.
4        A.   This also supports my opinions that
5    short laser-cut mesh is too stiff, which is a
6    design characteristic that leads to -- makes it
7    unreasonably unsafe.
8            The short laser-cut mesh does not have
9    the same stretch as the full-length mechanical-cut
10   TVT-O or as much as the full-length laser-cut
11   TVT-O.
12       Q.   Okay.  And if we -- can you just direct
13   us to where in this document you're referring to?
14       A.   That is on ETH.MESH.1297, "Discussion
15   regarding possible options using Mini-me."
16       MR. THORNBURGH:  And go ahead, Tom, if you can
17   pull that up.
18   BY MR. THORNBURGH:
19       Q.   Is that the second bullet point under
20   "Discussions regarding possible options using
21   Mini-me"?
22       A.   Yes.
23       Q.   And it says, "The shorter laser-cut mesh
24   does not stretch the same as the full-length

Page 500

1    mechanically-cut TVT-O or even as much as the
2    full-length laser-cut TVT-O meshes."
3            Did I read that correctly?
4        MR. SNELL:  Object; leading.
5    BY THE WITNESS:
6        A.   Yes.
7    BY MR. THORNBURGH:
8        Q.   And can you just explain just a little
9    bit slower how that statement by Dan Smith supports
10   your opinion?
11       MR. SNELL:  Objection.
12   BY THE WITNESS:
13       A.   This documents that the shorter
14   laser-cut TVT-Secur is stiffer, more rigid than
15   full-length laser-cut or mechanical-cut mesh.
16   BY MR. THORNBURGH:
17       Q.   And is Dan Smith's own statement here
18   consistent with your opinions?
19       MR. SNELL:  Objection.
20   BY THE WITNESS:
21       A.   Yes.
22   BY MR. THORNBURGH:
23       Q.   Go ahead, Doctor.
24           What does Dan Smith say about the length

Page 501

1    of the mesh -- what does Dan Smith say the length
2    of the mesh should be based on some cadaver works
3    that were done internally at Ethicon?
4        MR. SNELL:  Objection; leading.
5    BY THE WITNESS:
6        A.   That the mesh should be 12 centimeters
7    and that it should have some sort of fixation end
8    to reduce the possibility of movement prior to
9    tissue ingrowth.  That supports my opinion that one
10   of the design characteristics of the TVT-Secur,
11   being the short, stiff, rigid mesh, and the fleece
12   tips, were defectively designed and led to
13   unreasonable harm being -- increasing complications
14   or decreasing efficacy.
15   BY MR. THORNBURGH:
16       Q.   Anything else in this document, Doctor?
17       A.   No.
18       Q.   What's the next exhibit, Doctor?
19       A.   It is P1464.
20       Q.   And can you identify P1464 to the jury,
21   please.
22       A.   Yes.  It is an e-mail string from
23   January 28, 2009.
24       Q.   And what opinions does Exhibit P1464

38 (Pages 498 to 501)

Bruce Alan Rosenzweig, M.D.

Page 502

1  support?
2      A.  It supports my opinion that the
3  TVT-Secur was inadequately studied prior to launch.
4      Q.  And how does it support that opinion,
5  Doctor?
6      A.  This is an e-mail string between Piet
7  Hinoul, Medical Director in France, and Judi Gauld
8  from Ethicon in Great Britain; and it's discussing
9  the data from the TVT-WORLD study, which is a
10  registry that collected data on various
11  incontinence products from Ethicon, including the
12  TVT, the TVT-O and the TVT-Secur.
13      Q.  What does Dr. Hinoul write concerning
14  the adverse events that he received from the
15  TVT-WORLD?
16      MR. SNELL:  Move to strike prior answer as
17  non-responsive.
18  BY THE WITNESS:
19      A.  "This is pretty awful.  Obviously there
20  are a lot of investigators who mistake adverse
21  outcomes for adverse events.  Certain centers have
22  a very high erosion rate it appears for continence
23  tapes.  I would not ask investigators if they would
24  change, tell them you will change unless they

Page 503

1  object.  It seems a lot of work for a registry to
2  me, both for you and the investigators."
3  BY MR. THORNBURGH:
4      Q.  And who is Colin Urquhart?  Is Colin an
5  employee at Ethicon?
6      A.  Yes.  From Ethicon Great Britain.
7      Q.  Is it, in your opinion, appropriate for
8  employees of Ethicon to change clinical data
9  results in a registry without asking permission?
10      MR. SNELL:  Objection.
11  BY MR. THORNBURGH:
12      Q.  Strike that.
13      Is it okay for Ethicon employees to
14  themselves change the data in a registry without
15  having the doctors or the investigators do that on
16  their own?
17      MR. SNELL:  Objection.
18  BY THE WITNESS:
19      A.  No, it is not.
20  BY MR. THORNBURGH:
21      Q.  Why not?
22      A.  Because the information that is derived
23  from the clinical study must be presented and
24  published in its most complete and accurate status

Page 504

1  and the data should not be changed or manipulated
2  in any way.
3      MR. THORNBURGH:  Now is probably a good time
4  for a lunch break.
5      MR. SNELL:  I have to use the restroom.  I
6  was waiting.
7      THE VIDEOGRAPHER:  The time is 12:13 p.m.
8  This is the end of Tape 2 and we're going off the
9  video record.
10          (WHEREUPON, the following
11           proceedings were had off the video
12           record:)
13      MR. SNELL:  Before we go off the stenographic
14  record, just note on P2707, move to strike
15  undisclosed opinions regarding that document as
16  well.
17          (WHEREUPON, a recess was had
18           from 12:13 to 1:21 p.m.)
19          (WHEREUPON, the following
20           proceedings were had on the video
21           record:)
22      THE VIDEOGRAPHER:  The time is 1:21 p.m.  This
23  is the beginning of Tape 3 and we are back on the
24  video record.

Page 505

1  BY MR. THORNBURGH:
2      Q.  Good afternoon, Doctor.
3      A.  Good afternoon.
4      Q.  Doctor, what's the next tab in your
5  binder that you'd like to discuss with the ladies
6  and gentlemen of the jury?
7      A.  P2041.
8      Q.  What is P -- can you identify for the
9  ladies and gentlemen of the jury what P4021 is?
10      A.  2041.  It's an e-mail from Dr. Aaron
11  Kirkemo, a Medical Director at Ethicon, to other
12  Ethicon employees.
13      Q.  How does Exhibit 2041 support your
14  opinion?
15      MR. SNELL:  One second.  Can I get a copy.
16      MR. THORNBURGH:  I'm looking for my copy.
17  BY THE WITNESS:
18      A.  We can then skip that if people don't
19  have it and move on to the next exhibit.
20  BY MR. THORNBURGH:
21      Q.  Did you get the Bates number right?  Is
22  there two stickers on it maybe?
23      A.  0241, the Bates number ends in 1482.
24  But it's not an important document.

Q. What's the next one in your binder, next tab?
A. 0086.
Q. And can you identify Exhibit 0086 for the record, please?
A. Yes, this is a PowerPoint presentation from the TVT-WORLD registry presented on March 2, 2009.
Q. And what opinions does --
MR. SNELL: Can I get copy.
MR. THORNBURGH: Yes.
BY MR. THORNBURGH:
Q. What opinion does Exhibit 86 -- P0086 support?
A. Supports my opinion that there were no long-term -- there was no human data prior to the launch of the TVT-Secur.
Q. Well, there was the interim analysis, is that correct?
A. Correct. There was no long-term human data to support the launch of TVT-Secur.
Q. And how does Exhibit P0086 support that opinion?
A. Under the slide "Some history," it

describes that the TVT-Secur was launched in September of 2006.
Q. And what slide are you on?
A. Called "Some history." I think it's the second slide.
Q. And do you know the date of this document?
A. Yes. It is March 2, 2009.
Q. Okay. And go ahead, Doctor. How does this exhibit support your opinion?
A. The slide states that there was no long-term human use data to support the launch and the decision not to start a randomized controlled trial was due to budget constraints.
Q. And do you have any opinions with respect to the statement that there were no -- there was "no long-term human use data to support launch"?
MR. SNELL: Objection.
BY MR. THORNBURGH:
Q. Sorry. Do you have any opinions with respect to the statement in this document that there were "no long-term human use date to support launch"?

MR. SNELL: Same objection.
BY THE WITNESS:
A. Yes, that is an accurate statement.
BY MR. THORNBURGH:
Q. And the next -- I think you said the next statement on this slide was the decision not to start RCTs was due to budget constraints. Is that -- did I understand you correctly?
MR. SNELL: Leading. Go ahead.
BY THE WITNESS:
A. Correct.
BY MR. THORNBURGH:
Q. And how does that statement support your opinions?
A. That there was inadequate studies done prior to the launch of the device to be able to determine the characteristics of the device that were unsafe or made the device ineffective.
Q. And are there any other -- any other information in this exhibit that support your opinions?
A. Under "Commercial Summary." It's towards the end of the...
Q. And what about this slide under the

"Commercial Summary" section is significant to your opinions?
A. It supports my opinions that there are design characteristics of the TVT-Secur that make it unreasonably unsafe and unreasonably ineffective.
This states that the voice of consumers, which are doctors that are using the device, shows that barriers to the use of the TVT-Secur device include ease of use, meaning that it is not easy to use; that one of the complications that is seen is bleeding; and the final barrier is reproducibility, meaning that it is not effective in the treatment of stress urinary incontinence.
So, there are design characteristics that make it unreasonably ineffective for the treatment of stress urinary incontinence.
Q. Doctor, the fact that it was -- the fact that doctors were unable to reproduce the same results, does that indicate to you that the TVT-Secur was or was not defective?
MR. SNELL: Object.
BY THE WITNESS:
A. It demonstrates that both the device and

Bruce Alan Rosenzweig, M.D.

Page 510

1    the Instructions for Use were defective.
2    BY MR. THORNBURGH:
3        Q.   And what other slide in this exhibit
4    supports your opinions, if any?
5        A.   None.
6        Q.   Okay.  What's the next tab number that
7    you'd like to discuss?
8        A.   P1677.
9        Q.   What's the tab just so I know for the
10   record?
11       A.   45.
12       Q.   And did you say that was Exhibit P1677?
13       A.   Yes.
14       Q.   Can you identify for the ladies and
15   gentlemen of the jury what this exhibit is?
16       A.   Yes.  It's an internal Ethicon document.
17   It's a PowerPoint presentation regarding the next
18   generation slings.
19       Q.   How does this exhibit support your
20   opinions?
21       A.   It supports my opinion that the
22   TVT-Secur was not studied adequately prior to
23   launch.
24       Q.   And what slide in this exhibit, what

Page 511

1    slide are you referring to that supports that
2    opinion?
3        A.   It's a slide entitled "Watch Out."  And
4    it's about halfway down or maybe three-quarters of
5    the way down the slide deck, right before the
6    backup slides, almost the very end of the
7    presentation.
8        MR. THORNBURGH:  Okay.  And can you pull that
9    up.  You don't have it.  Okay.
10   BY MR. THORNBURGH:
11       Q.   What about this slide called "Watch Out"
12   supports your opinions?
13       A.   It documents that not having long-term
14   or even one-year randomized control data put the
15   TVT-Secur in a, quote-unquote, "risky situation."
16       Q.   And, so, if we look at this slide, what
17   does the first bullet point say?
18       A.   "Are we willing to go to market with 12
19   months of randomized controlled data from only the
20   inventor's site?"
21       Q.   And if you could read the second bullet
22   point under that bullet point, the hash mark.
23       MR. SNELL:  Object; leading, reading.  Go
24   ahead.

Page 512

1    BY THE WITNESS:
2        A.   Yes.  "What will be our position should
3    MiniArc (or any other exitless sling) get the same
4    efficacy as TVT-O, TVT."
5    BY MR. THORNBURGH:
6        Q.   Actually, if you go up to the first
7    bullet point.
8        A.   Okay.
9        Q.   And read the second hash mark.
10       MR. SNELL:  Same objections.
11   BY THE WITNESS:
12       A.   "After our 'risky' situation with
13   TVT-Secur and increased demand for one year data."
14   BY MR. THORNBURGH:
15       Q.   What's your understanding of that
16   statement?
17       MR. SNELL:  Object.
18   BY THE WITNESS:
19       A.   Not having data prior to the launch of
20   TVT-Secur put them in a risky situation or,
21   actually, put patients in a risky situation; that
22   all of the design characteristics that made the
23   TVT-Secur unreasonably unsafe or unreasonably
24   ineffective were not known due to the lack of

Page 513

1    adequate testing and studying of the device.
2        And the risky situation were that
3    patients were exposed to risks and harms that would
4    have been found, determined if the device had been
5    studied.
6        Q.   Is there any other slide in that exhibit
7    that you want to discuss?
8        A.   No.
9        Q.   What's the next tab in Exhibit 5 that
10   you want to discuss with the ladies and gentlemen
11   of the jury?
12       A.   Tab 46, P number 2670.
13       Q.   Can you identify that exhibit for the
14   ladies and gentlemen of the jury?
15       A.   It is an e-mail string between key
16   Ethicon employees, including David Robinson,
17   Medical Director; Piet Hinoul, Medical Director;
18   and Bart Pattyson, professional education director
19   worldwide.
20       Q.   And how does Exhibit 2670 support your
21   opinion?
22       A.   It supports --
23       Q.   Strike that.
24       What opinion does this exhibit support?

41 (Pages 510 to 513)

Bruce Alan Rosenzweig, M.D.

Page 514

1    A.   That the TVT-Secur was inadequately
2 studied prior to launch.
3    Q.   And what's the date of Exhibit 2670?
4    A.   May 13, 2009.
5    Q.   And what opinion does this exhibit
6 support?
7    A.   Well, this supports my opinions about
8 the design characteristics of the device that make
9 the TVT-Secur unreasonably unsafe or unreasonably
10 ineffective.
11    Q.   How does this exhibit support your
12 opinion?
13    A.   It is describing a slide deck that was
14 available for presentation and a discussion about
15 which doctors this slide deck would be appropriate
16 for.
17    Q.   Okay.  Now, if you go to
18 ETH.MESH.00815355.
19    A.   Yes.
20    Q.   And what does Piet Hinoul write in this
21 e-mail?
22    MR. SNELL:  Object.  Move to strike the prior
23 answer at 148:8.  Non-responsive.
24 BY THE WITNESS:

Page 515

1    A.   "I have a meeting with James Sepulveda
2 in two weeks in Europe for a couple of TVT-Secur
3 and Prolift prof ed events.  He asked if I can
4 share with him some numbers you shared with the
5 preceptors at the Pelvic Floor Summit.  I believe
6 he was specifically thinking about a very powerful
7 slide that you showed about how many Prolift
8 procedures have been performed versus other
9 devices, perhaps?"
10    Q.   How does -- what does Dr. Hinoul
11 respond?  What's Dr. Hinoul's respond to this
12 e-mail?
13    MR. SNELL:  Object; reading.
14 BY THE WITNESS:
15    A.   "I did not read the end of your mail.  I
16 thought you wanted to see the slides.  I'm not
17 happy for you to forward this slide deck to
18 Dr. Sepulveda.  I hope you understand."
19 BY MR. THORNBURGH:
20    Q.   And who is Dr. Sepulveda?
21    A.   Dr. Sepulveda is a pelvic surgeon and
22 Key Opinion Leader.
23    Q.   And are you aware that he's an expert in
24 this case?

Page 516

1    A.   I believe so.
2    Q.   And is it appropriate for companies like
3 Ethicon to withhold slide decks concerning risk
4 information of their products from Key Opinion
5 Leaders such as Dr. Sepulveda?
6    MR. SNELL:  Object; misstates evidence.
7 BY THE WITNESS:
8    A.   No.
9 BY MR. THORNBURGH:
10    Q.   And do you know whether or not
11 Dr. Sepulveda was at this point in time training
12 physicians on the TVT-Secur device?
13    A.   Yes.
14    Q.   And was he?
15    A.   Yes.
16    Q.   If Dr. Sepulveda is not provided with
17 important safety and efficacy information
18 concerning the TVT-Secur device, do you know
19 whether or not that impedes his ability to share
20 the information that Ethicon has internally with
21 the doctors that he's training?
22    MR. SNELL:  Object; misstates evidence.
23 BY THE WITNESS:
24    A.   That would impede his ability to share

Page 517

1 that information with doctors he is training.
2 BY MR. THORNBURGH:
3    Q.   Now, there's a response from Bart
4 Pattyson to Dr. Hinoul.  Do you see that?
5    A.   Yes.
6    Q.   And do you know who Bart Pattyson is?
7    A.   Yes.  He is the professional education
8 director worldwide for Ethicon.
9    Q.   And what does Bart Pattyson write to
10 Dr. Hinoul?
11    MR. SNELL:  Object; reading.
12 BY THE WITNESS:
13    A.   "I think we as a company are long
14 overdue in providing the world with a status check
15 on the TVT-Secur.  The good, the bad and the
16 (hopefully not too) ugly."
17 BY MR. THORNBURGH:
18    Q.   Is it important for companies such as
19 Ethicon to provide all the information about its
20 medical devices, including not only the good but
21 also the bad and the ugly?
22    MR. SNELL:  Object.
23 BY THE WITNESS:
24    A.   Yes.

42 (Pages 514 to 517)

Bruce Alan Rosenzweig, M.D.

Page 518

1    BY MR. THORNBURGH:
2        Q.   If Ethicon does not communicate with the
3    doctors who they are promoting the TVT-Secur to
4    about the good, the bad and the ugly, does that put
5    patients at risk?
6        MR. SNELL:  Object; leading.
7    BY THE WITNESS:
8        A.   Yes.
9    BY MR. THORNBURGH:
10       Q.   In what way?
11       MR. SNELL:  Same.
12   BY THE WITNESS:
13       A.   If doctors are not told about the risks
14   of the device, the characteristics of the device
15   that make it unreasonably unsafe or unreasonably
16   ineffective, they cannot make an appropriate
17   decision about using that device in the treatment
18   of patients.
19           They cannot also pass the information on
20   about the risks associated with the device to
21   patients in order for the patient to make an
22   informed decision.
23   BY MR. THORNBURGH:
24       Q.   Is there any other information in

Page 519

1    Exhibit 2670 that is relevant to your opinions?
2        A.   No.
3        Q.   And have you actually had an opportunity
4    to review the slide deck that was attached to
5    Exhibit 2670 to the e-mail exchange?
6        A.   Yes.
7        Q.   And did you review and rely on that
8    e-mail?
9        A.   Yes.
10       Q.   And what about Exhibit -- strike that.
11           What's the exhibit number?
12       A.   It is P28 -- excuse me.  2688.
13       Q.   And can you identify this document for
14   the ladies and gentlemen of the jury?
15       A.   It is a slide deck from Ethicon's
16   internal files.
17       Q.   And what opinions does this slide deck,
18   Exhibit 2688, support?
19       A.   This supports my opinions that there are
20   design characteristics of the TVT-Secur that make
21   it unreasonably unsafe and unreasonably ineffective
22   in treating women with stress urinary incontinence.
23       Q.   And what about Exhibit -- or how does
24   Exhibit 2688 support that opinion?

Page 520

1        A.   The slide deck under the title
2    page "TVT-Secur" lists the reasons why the success
3    rate was lower, which includes the shorter tape;
4    may impact the pull-out forces, which demonstrates
5    that the short stiff mesh; and the fleece tips, the
6    mesh was too short, the fleece tips were -- did not
7    hold; and that led to the harm of either not being
8    able to treat the stress incontinence or led to
9    recurrent stress incontinence.
10       Q.   Do you know whether or not -- do you
11   have an opinion whether or not it was appropriate
12   for Piet Hinoul at Ethicon to withhold from
13   Dr. Sepulveda information concerning the mesh
14   characteristics which were leading to a lower
15   success rate for the product?
16       MR. SNELL:  Object.
17   BY THE WITNESS:
18       A.   No.
19   BY MR. THORNBURGH:
20       Q.   Do you have a -- do you have an opinion?
21       A.   Yes, I have an opinion.
22       Q.   What's the opinion?
23       MR. SNELL:  Same objection.
24   BY THE WITNESS:

Page 521

1        A.   That they should not withhold that
2    information.
3    BY MR. THORNBURGH:
4        Q.   And is the information written here by
5    Dr. Hinoul concerning the design characteristics
6    consistent with your opinions about the design
7    defects with the TVT-Secur product?
8        MR. SNELL:  Object; leading.
9    BY THE WITNESS:
10       A.   Yes.
11   BY MR. THORNBURGH:
12       Q.   Is there any other information you'd
13   like to discuss at this time concerning
14   Exhibit 2688?
15       A.   Again, this describes the defects of the
16   short tape, the fleece tips, the wide, sharp arrow
17   tip introducer, the lack -- or the defect in the
18   Instructions for Use as there is no guide.  But
19   after that, no.
20       Q.   Okay.  What's the next document you'd
21   like to discuss?
22       A.   It is tab 48.  It is P1008.
23       Q.   And can you identify this document for
24   the ladies and gentlemen of the jury?

Bruce Alan Rosenzweig, M.D.

Page 522

1     A.   Yes.  It is an internal Ethicon
2  document.  It is a slide deck from the Women's --
3  Ethicon's Women's Health and Urology Brand Equity
4  Study from January of 2010.
5     Q.   What opinions does this exhibit support?
6     A.   It supports my opinions that Ethicon
7  failed to adequately study the TVT-Secur prior to
8  launch.
9     Q.   And how does it support that opinion?
10    A.   This document, one of the slides states,
11 "To some, Ethicon is guilty of two cardinal sins
12 relating to surgical products.  A rush to market in
13 the absence of sound data for the TVT-Secur."
14    MR. SNELL:  Object.  Move to strike.  Reading.
15    MR. THORNBURGH:  And if we can, go ahead and
16 go to that slide, Tom.  It starts with "To some,
17 Ethicon is guilty of two cardinal sins."
18 BY MR. THORNBURGH:
19    Q.   Go ahead, Doctor.  What does this slide
20 discuss with respect to the TVT-Secur?
21    MR. SNELL:  Object.
22 BY THE WITNESS:
23    A.   Number one, that the Secur was rushed to
24 market.  Number two, that there was no -- it was

Page 523

1  inadequately studied prior to launch.
2  BY MR. THORNBURGH:
3     Q.   Do you agree with this statement in this
4  Ethicon company document that "Ethicon is guilty of
5  two cardinal sins relating to surgical products, a
6  rush to market in the absence of sound data
7  regarding the TVT-Secur"?
8     MR. SNELL:  Object and leading.
9  BY THE WITNESS:
10    A.   Yes.
11 BY MR. THORNBURGH:
12    Q.   And are those your words, Doctor?
13    A.   No, those are the words of the key
14 Ethicon employee that put the data together.
15    Q.   Do you agree with those words?
16    A.   Yes.
17    Q.   Are those words from Ethicon's employee
18 who wrote this slide consistent with the opinions
19 you've been expressing throughout the last two
20 days?
21    A.   Yes.
22    Q.   Is there any other part of this exhibit
23 that you want to discuss with the ladies and
24 gentlemen of the jury?

Page 524

1     A.   No.
2     Q.   What's the next exhibit, Doctor?
3     A.   It is P0934.
4     MR. SNELL:  While Mr. Thornburgh is getting
5  that, I will just object to P2688 as not on the
6  reliance list produced for Dr. Rosenzweig with his
7  reports and, therefore, move to strike all
8  questions.
9     MR. THORNBURGH:  It is on his reliance list
10 and he has testified and was cross-examined on this
11 very document in two trials.
12 BY MR. THORNBURGH:
13    Q.   I'm sorry.  What was the next exhibit,
14 Doctor?
15    A.   P0934.
16    Q.   And can you identify for the jury what
17 this exhibit is?
18    A.   This is the First Human Use Trial, the
19 six and 12-month data, draft version of the
20 clinical summary from that data.
21    Q.   Okay.  And is this the First Human Use
22 Study?
23    A.   Yes.
24    Q.   And is this the study that we've been

Page 525

1  talking about throughout the last two days?
2     A.   Yes.
3     Q.   And is this the interim data or the
4  12-month data?
5     A.   The 12-month data.
6     Q.   Okay.  Now, before we get into this
7  document, did Ethicon ever publish to the medical
8  community the results from the 12-month First Human
9  Use Study?
10    A.   No.
11    Q.   And what opinions does the data from the
12 12-month First Human Use Study support?
13    A.   This supports my opinions that there are
14 design characteristics that are defective in the
15 TVT-Secur device that makes it unreasonably unsafe
16 and also unreasonably ineffective.
17    Q.   And how does it support those opinions?
18    A.   The data shows a high failure rate in
19 the first 12 months and a high complication rate.
20    Q.   This is kind of a pretty thick document,
21 but can you just walk us through it, the pages you
22 want to discuss with the jury.
23    MR. SNELL:  Object.
24 BY THE WITNESS:

44 (Pages 522 to 525)

Bruce Alan Rosenzweig, M.D.

Page 526

1        A.   On page 7, it discusses what the
2    efficacy was for the trial.
3    BY MR. THORNBURGH:
4        Q.   And what was the efficacy for this
5    study?
6        A.   The main endpoint was a greater than 50%
7    change from baseline in visual analog scores for
8    incontinence.
9        And while they were greater -- only 89%
10   of patients with the U and 86% of the patients with
11   the H had a greater than 50% change in their
12   variables of incontinence.
13       Objective positive stress test was
14   positive in 17% of the U and 32% of the -- of the H.
15       Q.   What does that mean?  Just stop there
16   for a second.
17       A.   That almost 20% of patients in the U and
18   over 30% of patients who had the H had positive
19   leakage.
20       Q.   And what does that mean in terms of
21   efficacy?
22       A.   That when added together, over 26% of
23   patients failed.
24       Q.   Are those results good outcomes for

Page 527

1    patients?
2        A.   No.
3        Q.   Did this study meet its primary endpoint
4    of or secondary endpoint of success or did it fail
5    its secondary endpoint for success?
6        A.   Well, again --
7        MR. SNELL:  Object.
8    BY THE WITNESS:
9        A.   I apologize.  That was five-week data
10   that I just discussed.
11       The 12-month data is actually even --
12   even worse.  The improvement rate was 80% for the U
13   and 60% for the H, a greater than 50% improvement,
14   and the positive stress test was positive in 25% of
15   the U and 47% of the H.
16   BY MR. THORNBURGH:
17       Q.   What was the failure rate?
18       A.   Approximately 35% or higher.
19       Q.   Did the efficacy for the TVT-Secur
20   device get better or worse since the interim data
21   was available to Ethicon back in September of 2006
22   before launch?
23       A.   It got worse.
24       Q.   And if you turn the page to page 8 of

Page 528

1    the report, unless you're not done.
2        A.   No, I was going to the adverse events
3    section.  There is a total of 51 adverse events
4    reported in 32 subjects during the 12-month study.
5    31% of subjects or 31% of the subjects considered
6    the adverse event to be related or possibly related
7    to the device.
8        There were close to 30% of patients that
9    had major device-related complications.  70% of
10   subjects had no major device-related complications,
11   meaning 30% of subjects had major device-related
12   complications.
13       Q.   And does that -- what does that mean in
14   lay terms?
15       A.   There's a significant number of adverse
16   events and a significant number of severe adverse
17   events.
18       Q.   And how does that information support
19   your opinion, if at all?
20       A.   This supports my opinion that there are
21   design characteristics of the TVT-Secur device that
22   make it unreasonably unsafe and unreasonably
23   ineffective in treating stress urinary
24   incontinence.

Page 529

1        Q.   What's the next page you'd like to
2    discuss, Doctor?
3        A.   It is P2691.
4        Q.   If we can, real quick, just turn to
5    page 16 just briefly.
6        A.   Of the previous document?
7        Q.   No.  Of the -- of Exhibit 934, P934.
8        A.   Okay.
9        Q.   Are you there?
10       A.   Yes.
11       Q.   And does this identify the surgeons who
12   participated in this research?
13       MR. SNELL:  Object; leading.
14   BY THE WITNESS:
15       A.   Yes.
16   BY MR. THORNBURGH:
17       Q.   Who were the doctors that participated
18   in this study?
19       A.   Dr. Nilsson, Dr. Artibani, Dr. Karram,
20   Dr. Lucente, Dr. Khandwala and Dr. Dmochowski.
21       Q.   And we looked at a document earlier
22   regarding whether or not Dr. Nilsson and Artibani
23   had continued to support the TVT-Secur.  Do you
24   recall that?

45 (Pages 526 to 529)

Bruce Alan Rosenzweig, M.D.

Page 530

1     A.  Yes.
2     Q.  Can you refresh the recollection for the
3  jury what that issue was?
4     MR. SNELL:  Objection.
5  BY THE WITNESS:
6     A.  That Dr. Nilsson and Artibani could not
7  support the TVT-Secur device because there were no
8  randomized controlled trials.
9     Q.  And they were also the two of the
10 investigators in the study, is that correct?
11    MR. SNELL:  Object; leading.
12 BY THE WITNESS:
13    A.  Correct.
14 BY MR. THORNBURGH:
15    Q.  And are the -- based on your knowledge,
16 training and experience, your review of the medical
17 literature and your review of the internal Ethicon
18 company documents, were these six surgeons
19 considered to be experienced in the treatment of
20 stress urinary incontinence?
21    A.  Yes.
22    Q.  And if you turn with me to page 80.  And
23 can you tell us what the first paragraph is stating
24 in this exhibit?

Page 531

1     MR. SNELL:  Object; reading.
2  BY MR. THORNBURGH:
3     Q.  On page 80.
4     MR. SNELL:  Sorry.  Object, reading.
5  BY THE WITNESS:
6     A.  This is describing the learning curve
7  that we discussed before.
8  BY MR. THORNBURGH:
9     Q.  And isn't it correct that we looked at a
10 document from David Robinson who -- that stated
11 that he felt that the data from the First Human Use
12 Study would get better after they enrolled more
13 patients into the longer follow-up 12-month study?
14 Do you recall that?
15    MR. SNELL:  Objection; leading.
16 BY THE WITNESS:
17    A.  Yes.
18 BY MR. THORNBURGH:
19    Q.  Did the data get better?
20    MR. SNELL:  Objection.
21 BY THE WITNESS:
22    A.  No.
23 BY MR. THORNBURGH:
24    Q.  Now, if you go down to the next

Page 532

1  paragraph, what does the next paragraph say?
2     A.  "There have been more reports of serious
3  complications with the TVT-Secur device and the
4  rates of minor complications seen in the study and
5  in those by Meschia and Martan are not very much
6  lower than the early reports of the TVT and TVT-O
7  procedures."
8     Q.  And what does this statement --
9     MR. SNELL:  Object; misstates.  Move to
10 strike.
11 BY MR. THORNBURGH:
12    Q.  What does this statement mean to you
13 that there have been reports of more serious
14 complications with the TVT-Secur devices?
15    A.  This shows the design characteristics of
16 the TVT-Secur device that make it unreasonably
17 unsafe and unreasonably ineffective.
18    Q.  And what's the next paragraph say?
19    MR. SNELL:  Object; reading.
20 BY THE WITNESS:
21    A.  "In the future, well-planned randomized
22 studies will have to be conducted in order to
23 discern if a new single-incision procedure can
24 achieve the same level of effectiveness as has been

Page 533

1  previously shown with the TVT procedure and (with
2  shorter follow-up) also with the TVT-O procedure."
3     MR. SNELL:  Object.  I'm sorry, Doctor.
4  You've misspoke.  Move to strike answer.
5  BY MR. THORNBURGH:
6     Q.  Go ahead and read it again just in case
7  there was an error.
8     A.  "In the future, well-planned randomized
9  studies will have to be conducted in order to
10 discern if the new single-incision procedures can
11 achieve the same level of effectiveness as has been
12 extensively shown with the TVT procedure and (with
13 shorter follow-up) also the TVT-O procedure."
14    Q.  Okay.  And go ahead and continue on,
15 Doctor.
16    A.  "Substantial effort has been channelled
17 into developing a design of a single-incision sling
18 that facilitates a safer and easier insertion.  As
19 long as complications occur at the rate seen in
20 this study and invasiveness is not much lower than
21 with traditional midurethra tension-free
22 operations, the single-incision procedure cannot be
23 recommended as a first-line treatment for stress
24 urinary incontinence."

Bruce Alan Rosenzweig, M.D.

Page 534

1  Q.  Dr. Rosenzweig, how does this
2  information support your opinion?
3  MR. SNELL: Object; leading.
4  BY THE WITNESS:
5  A.  This supports my opinion that the
6  TVT-Secur device was not adequately studied prior
7  to launch, that there are design characteristics
8  that make it unreasonably unsafe and make it
9  unreasonably in -- uneffective in treating stress
10  urinary incontinence.  And the statement that it
11  cannot be used for first-line treatment for stress
12  urinary incontinence supports those opinions.
13  BY MR. THORNBURGH:
14  Q.  And did Ethicon, to your knowledge,
15  based on your review of the internal documents,
16  ever disclose to physicians who were considering
17  treatment options to treat their patients who had
18  stress urinary incontinence that the TVT-Secur
19  could not be recommended for first-line treatment
20  of that condition?
21  A.  No.
22  Q.  Was it common knowledge based on your
23  review of the medical literature, your review of
24  the internal company documents and your knowledge,

Page 535

1  training and experience that the TVT-Secur should
2  not be used as first-line therapy for the treatment
3  of stress urinary incontinence?
4  MR. SNELL: Objection.
5  BY THE WITNESS:
6  A.  No, that was not common knowledge.
7  BY MR. THORNBURGH:
8  Q.  Do you have an opinion as to whether or
9  not Ethicon should have disclosed the conclusions
10  from their own internal study concerning whether or
11  not the Secur should be used as a first-line
12  treatment option?
13  MR. SNELL: Objection.
14  BY THE WITNESS:
15  A.  Yes.
16  BY MR. THORNBURGH:
17  Q.  What's that opinion?
18  A.  That it should have been disclosed.
19  Q.  What happens if Ethicon doesn't disclose
20  information like this to patients?
21  MR. SNELL: Object.
22  BY THE WITNESS:
23  A.  Patients can suffer harm.
24  BY MR. THORNBURGH:

Page 536

1  Q.  Do you have an opinion whether or not
2  patients did in fact suffer harm as a result of
3  Ethicon's failure to disclose this information?
4  MR. SNELL: Objection.
5  BY THE WITNESS:
6  A.  Yes, I do have an opinion.
7  BY MR. THORNBURGH:
8  Q.  And what's that opinion?
9  MR. SNELL: Same.
10  BY THE WITNESS:
11  A.  Yes, they did suffer harm.
12  BY MR. THORNBURGH:
13  Q.  And when it talks about the need for
14  randomized clinical controlled -- randomized
15  controlled trials in this -- on this page.  Do you
16  see that?
17  A.  Yes.
18  Q.  Are those the studies that Ethicon had
19  initially committed to do prior to launching the
20  TVT-Secur device?
21  MR. SNELL: Objection.
22  BY THE WITNESS:
23  A.  Yes.
24  BY MR. THORNBURGH:

Page 537

1  Q.  And what are Ethicon's Key Opinion
2  Leaders stating again about the need for randomized
3  controlled trials?
4  A.  That there's a need for randomized
5  controlled trials.
6  Q.  And do you agree with that?
7  A.  Yes.
8  Q.  If you had not been hired in this case
9  as an expert witness and had an opportunity to
10  review Ethicon's internal company documents, would
11  you have known about the results of this 12-month
12  First Human Use Study?
13  MR. SNELL: Objection.
14  BY THE WITNESS:
15  A.  No.
16  BY MR. THORNBURGH:
17  Q.  Would you have known that Ethicon's Key
18  Opinion Leaders who conducted this First Human Use
19  Study had concluded that the TVT-Secur had a higher
20  rate of complications than the other TVT products
21  that Ethicon had on the market at the time?
22  MR. SNELL: Objection.
23  BY THE WITNESS:
24  A.  No.

47 (Pages 534 to 537)

Bruce Alan Rosenzweig, M.D.

 1    BY MR. THORNBURGH:
 2        Q.   Would you have known, had you not been
 3    asked to serve as an expert in this case and had
 4    access to Ethicon's internal documents, that
 5    Ethicon's Key Opinion Leaders had recommended
 6    against the use of the TVT-Secur device as
 7    first-line therapy for the treatment of stress
 8    urinary incontinence?
 9        MR. SNELL:  Objection.
10    BY THE WITNESS:
11        A.   No.
12    BY MR. THORNBURGH:
13        Q.   Is Ethicon's failure to provide this
14    type of information to physicians who are
15    considering which treatment options are appropriate
16    for their patients the type of information that
17    should be shared with doctors?
18        A.   Yes.
19        Q.   Is it the type of information that could
20    be shared with doctors?
21        A.   Yes.
22        Q.   Is it the type of information that
23    doctors consider in their risk/benefit assessment?
24        MR. SNELL:  Objection.

 1    BY THE WITNESS:
 2        A.   Yes.
 3    BY MR. THORNBURGH:
 4        Q.   Is it the type of information that
 5    should be disclosed when Ethicon is promoting their
 6    products or giving the world an update on the good,
 7    the bad and the ugly?
 8        MR. SNELL:  Object and leading.
 9    BY THE WITNESS:
10        A.   Yes.
11    BY MR. THORNBURGH:
12        Q.   So, doctors were implanting the Secur
13    all across the country as first-line treatment for
14    stress urinary incontinence because Ethicon didn't
15    share with them what they knew internally?
16        MR. SNELL:  Objection, leading and lacks
17    foundation.
18    BY THE WITNESS:
19        A.   Correct.
20    BY MR. THORNBURGH:
21        Q.   Is it fair to say that women in
22    Pennsylvania continued to be implanted with the
23    stress -- with the TVT-Secur?
24        A.   Yes.

 1        Q.   And that their doctors were never made
 2    aware of what Ethicon knew internally, that the
 3    product should not be used as first-line therapy?
 4        MR. SNELL:  Objection.
 5    BY THE WITNESS:
 6        A.   Yes.
 7    BY MR. THORNBURGH:
 8        Q.   Same for women in Florida?
 9        MR. SNELL:  Same objection.
10    BY THE WITNESS:
11        A.   Yes.
12    BY MR. THORNBURGH:
13        Q.   Same for women in California?
14        MR. SNELL:  Same.
15    BY THE WITNESS:
16        A.   Yes.
17    BY MR. THORNBURGH:
18        Q.   Same for women in West Virginia?
19        MR. SNELL:  Same.
20    BY THE WITNESS:
21        A.   Yes.
22    BY MR. THORNBURGH:
23        Q.   Is it appropriate for companies like
24    Ethicon to withhold that type of information?

 1        MR. SNELL:  Object.
 2    BY THE WITNESS:
 3        A.   No.
 4    BY MR. THORNBURGH:
 5        Q.   What happens to patients -- what can
 6    happen to patients if Ethicon withholds important
 7    information such as this that their own Key Opinion
 8    Leaders who performed this internal study felt that
 9    the TVT-Secur should not be used for -- as therapy
10    for first -- first-line therapy for stress urinary
11    incontinence?
12        MR. SNELL:  Objection; leading.
13    BY THE WITNESS:
14        A.   Patients can suffer harm.
15    BY MR. THORNBURGH:
16        Q.   And do you have an opinion as to whether
17    or not patients did in fact suffer harm as a result
18    of Ethicon's failure to disclose this information,
19    that their Key Opinion Leaders felt that the
20    TVT-Secur should not be used as first-line
21    treatment for the treatment of stress urinary
22    incontinence?
23        MR. SNELL:  Objection; leading.
24    BY THE WITNESS:

48 (Pages 538 to 541)

Bruce Alan Rosenzweig, M.D.

Page 542

```
 1        A.   Yes, I have an opinion.
 2   BY MR. THORNBURGH:
 3        Q.   What's that opinion?
 4        MR. SNELL:  Same.
 5   BY THE WITNESS:
 6        A.   Yes, they did suffer harm.
 7   BY MR. THORNBURGH:
 8        Q.   What types of harm were women suffering?
 9        MR. SNELL:  Same.
10   BY THE WITNESS:
11        A.   The complications that I've described
12   previously, pain, pain with intercourse, mesh
13   erosion, voiding problems, irritative voiding
14   symptoms, erosion into the vagina, erosion into the
15   urethra, erosion into the bladder, among others.
16   BY MR. THORNBURGH:
17        Q.   What's the next document in your binder
18   that you'd like to discuss with -- strike that.
19             What's the next tab number that you'd
20   like to discuss with the jury?
21        A.   P2691.
22        Q.   Exhibit 2691?
23        A.   Yes.
24        Q.   What's the tab number in your binder?
```

Page 543

```
 1        A.   50.
 2        Q.   Okay.  And can you identify this exhibit
 3   for the ladies and gentlemen of the jury, please?
 4        A.   Yes, this is an e-mail string between
 5   Mark Yale and Bryan Lisa, key Ethicon employees,
 6   dated December 14, 2009.
 7        Q.   And what opinions does Exhibit 2691
 8   support?
 9        A.   That the TVT-Secur was not adequately
10   studied prior to launch.
11        Q.   And how does it support that opinion?
12        A.   This is an e-mail from Lesley Fronio to
13   Mark Yale, both key Ethicon employees, regarding an
14   article being published in a Danish -- in a Danish
15   publication from the experience of a physician who
16   felt it was unethical behavior on the part of
17   Ethicon to release the TVT-Secur without clinical
18   data.
19        Q.   Is this --
20        MR. SNELL:  Object.  I'm sorry.
21   BY MR. THORNBURGH:
22        Q.   Is this the first time --
23        MR. SNELL:  Object.  Move to strike.  Reading.
24   Go ahead.
```

Page 544

```
 1   BY MR. THORNBURGH:
 2        Q.   Is this the first time we've heard
 3   criticisms or seen criticisms being discussed in
 4   Ethicon's own documents about its decision to
 5   launch the TVT-Secur without having complete data?
 6        MR. SNELL:  Object.
 7   BY THE WITNESS:
 8        A.   No.
 9   BY MR. THORNBURGH:
10        Q.   Is this the first time that we've seen
11   the company discuss the possibility of publications
12   being written criticizing Ethicon for their
13   unethical behavior in launching the TVT-Secur
14   product?
15        MR. SNELL:  Object.
16   BY THE WITNESS:
17        A.   No.
18   BY MR. THORNBURGH:
19        Q.   And if you go on the first page to the
20   first e-mail from Mark Yale, what does that e-mail
21   say and who was it addressed to?
22        A.   It is from Mark Yale to Lesley Fronio
23   stating that "It seems that Danish marketing has
24   contacted Piet Hinoul about a physician (who worked
```

Page 545

```
 1   with Contoura) writing an article to be published
 2   tomorrow about unethical behavior in releasing the
 3   TVT-Secur without clinical data."
 4        MR. SNELL:  Move to strike.  Reading.
 5   BY MR. THORNBURGH:
 6        Q.   How does Lesley Fronio respond to Mark?
 7        MR. SNELL:  Same objection.
 8   BY THE WITNESS:
 9        A.   "I'm on the phone with Zeb.  Here's the
10   deal:  There is a surgeon who is upset with all
11   companies who put foreign material in the body,
12   specifically around the midurethral segment.  He
13   believes the TVT-Secur" --
14   BY MR. THORNBURGH:
15        Q.   Sorry.  I just want to back up.  I think
16   you read that wrong.  It says, "Mini-sling
17   segment."
18        A.   Mini-sling segment.
19        Q.   Go ahead.  Read that again, Doctor.
20        A.   "There is a surgeon who" -- "who upset
21   with all companies who put foreign material in the
22   body, specifically around the mini-sling segment.
23   He believes that the TVT-S was launched without
24   data so he is upset and is using this as an example
```

Bruce Alan Rosenzweig, M.D.

Page 546

1    to highlight all companies, not just ours."
2        Q.   And what did Ethicon do when they
3    learned about this additional publication that
4    might come out concerning the behavior or the
5    decision to launch the TVT-Secur without conducting
6    adequate studies?
7        MR. SNELL:  Object; form. I'm sorry. Not
8    form. Objection.
9    BY THE WITNESS:
10       A.   Nothing that I recall from reviewing the
11   internal documents.
12   BY MR. THORNBURGH:
13       Q.   And how did they -- what's the next
14   document you'd like to discuss with the ladies and
15   gentlemen of the jury?
16       MR. SNELL:  While the doctor is looking, I'll
17   just note P2691, objection as to foreign regulatory
18   concerning Danish regulator EUCOMED and FDA. Go
19   ahead.
20   BY MR. THORNBURGH:
21       Q.   Go ahead, Doctor.
22       A.   It is an e-mail string including Judi
23   Gauld, Jacqueline Russo and David Robinson.
24       Q.   And what opinions does Exhibit 2685

Page 547

1    support?
2        A.   My opinions of that Ethicon failed to
3    adequately study the TVT-Secur device before
4    launch.
5        Q.   And how does this document support that
6    opinion?
7        A.   There's an e-mail from Dr. Robinson to
8    Judi Gauld, "Did the human trial actually precede
9    launch or was it post-launch" -- "or was it
10   post-approval pre-launch?"
11           Then Judi writes to Jackie, "Just to
12   confirm that we conducted a post-CE mark /
13   post-510(k) clearance study with Secur.  By the
14   time of launch we had five-week interim data on 31
15   patients."
16       Q.   Okay.  Does this e-mail --
17       MR. SNELL:  Object.
18   BY MR. THORNBURGH:
19       Q.   -- also relate to that Danish article
20   that Ethicon had discussed in their last -- the
21   last exhibit we looked at?
22       A.   Yes.
23       Q.   And if you turn to page Bates number
24   ending in 5998.  Are you there?

Page 548

1        A.   Yes.
2        Q.   Okay.  And what does -- remember we
3    actually talked about Jacqueline Russo-Jankewicz
4    earlier, didn't we?
5        A.   Yes.
6        Q.   Was that in relation -- I can't
7    remember.  Was that with respect to the year prior
8    where Ethicon had drafted a different media
9    statement to respond to similar articles being
10   published?
11       MR. SNELL:  Objection.
12   BY THE WITNESS:
13       A.   Yes.
14   BY MR. THORNBURGH:
15       Q.   Now, what does Ms. Russo-Jankewicz write
16   to Aaron Kirkemo -- to Aaron and to Piet?
17       MR. SNELL:  Object.
18   BY THE WITNESS:
19       A.   "There was an unfavorable news story
20   about mini-slings on Danish television.
21   TVT-Secur/J&J was referenced even though we do not
22   market Secur in Denmark or Scandinavia.  The
23   commercial team there has requested a standby in
24   case we receive inquiries from the press."

Page 549

1    BY MR. THORNBURGH:
2        Q.   Okay.  Now, if you go again -- is this
3    similar to what we saw a year prior?
4        MR. SNELL:  Objection.
5    BY THE WITNESS:
6        A.   Yes.
7    BY MR. THORNBURGH:
8        Q.   And what does the second bullet point
9    say?
10       A.   "Prior to making TVT-Secur commercially
11   available, Ethicon validated the safety of the
12   device in a clinical protocol (humans) in six sites
13   in Europe and the United States."
14       Q.   Is that a correct statement?
15       A.   No.
16       Q.   Did the interim data from the First
17   Human Use Study validate the safety of the
18   TVT-Secur product?
19       MR. SNELL:  Object.
20   BY THE WITNESS:
21       A.   No.
22   BY MR. THORNBURGH:
23       Q.   And did the 12-month data that was
24   eventually published in 2000 -- not published.  Did

50 (Pages 546 to 549)

Bruce Alan Rosenzweig, M.D.

Page 550

1    the 12 -- strike that.
2         Did the 12-month data from the First
3    Human Use Study validate the safety or efficacy of
4    the TVT-Secur product?
5         MR. SNELL:  Object.
6    BY THE WITNESS:
7         A.   No.
8    BY MR. THORNBURGH:
9         Q.   Was this an opportunity for Ethicon to
10   tell the media that they released the TVT-Secur
11   product without validating the safety or efficacy
12   of the product before they launched it?
13        MR. SNELL:  Object.
14   BY THE WITNESS:
15        A.   Yes.
16   BY MR. THORNBURGH:
17        Q.   Did they disclose that information?
18        MR. SNELL:  Same.
19   BY THE WITNESS:
20        A.   No.
21   BY MR. THORNBURGH:
22        Q.   Could they have?
23        A.   Yes.
24        Q.   Should they have?

Page 551

1         MR. SNELL:  Objection.
2    BY THE WITNESS:
3         A.   Yes.
4    BY MR. THORNBURGH:
5         Q.   If you turn to page -- the next page in
6    P2685, there was a statement that you had discussed
7    a moment ago from Dr. David Robinson.
8         Do you see that?
9         A.   Yes.
10        Q.   And we know -- we have talked about
11   Dr. Robinson yesterday and throughout today.  But
12   just briefly remind the jury who he is and what
13   responsibility he had with respect to the launch of
14   the TVT-Secur product?
15        MR. SNELL:  Objection.
16   BY THE WITNESS:
17        A.   He was medical director.
18   BY MR. THORNBURGH:
19        Q.   Okay.  And is Dr. David Robinson the
20   Medical Affairs director at Ethicon who actually
21   analyzed the TVT-Secur interim data from the First
22   Human Use Trial before launch?
23        A.   Yes.
24        Q.   And Dr. Robinson writes to Judi with a

Page 552

1    question, "Did the human trial actually precede
2    launch?"
3         Do you see that?
4         A.   Yes.
5         MR. SNELL:  Object.  Go ahead.
6    BY MR. THORNBURGH:
7         Q.   This is the guy that looked at the
8    interim data, right?
9         MR. SNELL:  Object; leading.
10   BY THE WITNESS:
11        A.   Yes.
12   BY MR. THORNBURGH:
13        Q.   This is the guy that actually let the
14   product be launched on to the -- into the market?
15        MR. SNELL:  Object; leading.
16   BY MR. THORNBURGH:
17        Q.   After he looked at that data?
18        MR. SNELL:  Same.
19   BY THE WITNESS:
20        A.   Yes.
21   BY MR. THORNBURGH:
22        Q.   Yet he's asking other people at Ethicon
23   whether or not the human study was done before or
24   after the product had been launched?

Page 553

1         MR. SNELL:  Object; leading.
2    BY THE WITNESS:
3         A.   That's what the e-mail states.
4    BY MR. THORNBURGH:
5         Q.   Do you have an opinion whether or not
6    Ethicon's conduct was appropriate in launching the
7    TVT-Secur product based on the data they had
8    available to them in 2006?
9         MR. SNELL:  Objection.
10   BY THE WITNESS:
11        A.   I do not feel that the TVT-Secur should
12   have been launched with the data that was available
13   in 2006.
14   BY MR. THORNBURGH:
15        Q.   What's the next document in your tab,
16   Doctor?
17        A.   P2719.
18        Q.   And can you identify what P2719 is?
19        A.   It is a standby media statement from
20   December 16, 2009.
21        MR. THORNBURGH:  Tom, can you put side by side
22   the clinical study report, Exhibit 0934, which is
23   the report concerning the 12-month First Human Use
24   data.

51 (Pages 550 to 553)

Bruce Alan Rosenzweig, M.D.

Page 554

1    BY MR. THORNBURGH:
2        Q.   Now, Doctor, what was the date on the
3    draft report concerning the 12-month First Human
4    Use data?
5        A.   July of 2009.
6        Q.   And what is the date of the standby
7    statement?
8        A.   December of 2009.
9        Q.   Is it accurate, then, that Ethicon
10   actually had the data from the -- in a first draft
11   from the 12-month First Human Use Study prior to
12   writing this standby statement?
13       MR. SNELL:  Object.
14   BY THE WITNESS:
15       A.   Yes.
16   BY MR. THORNBURGH:
17       Q.   And by just a couple months in fact, is
18   that correct?
19       MR. SNELL:  Leading.  Object.
20   BY THE WITNESS:
21       A.   Yes.
22   BY MR. THORNBURGH:
23       Q.   And did Ethicon disclose in their
24   standby media statement that the 12-month data was

Page 555

1    available?
2        MR. SNELL:  Objection.
3    BY THE WITNESS:
4        A.   No.
5    BY MR. THORNBURGH:
6        Q.   Did Ethicon disclose in the standby
7    statement that the First Human Use data from the
8    12-month follow-up study demonstrated a lack of
9    efficacy and safety concerns?
10       MR. SNELL:  Objection; foundation.
11   BY THE WITNESS:
12       A.   That is not -- that is not in this
13   document.
14   BY MR. THORNBURGH:
15       Q.   Did Ethicon have an opportunity in the
16   standby statement of December 16 of 2009 to tell
17   the world that after reviewing the results from the
18   12-month First Human Use Study that it was
19   Ethicon's Key Opinion Leaders' conclusions that the
20   TVT-Secur should not be used for first-line therapy
21   to treat stress urinary incontinence?
22       MR. SNELL:  Objection.
23   BY THE WITNESS:
24       A.   That could have been included in this

Page 556

1    standby statement.
2    BY MR. THORNBURGH:
3        Q.   And was it?
4        A.   No.
5        MR. SNELL:  Same.
6    BY MR. THORNBURGH:
7        Q.   And if you look at Exhibit 2719, what
8    data does Ethicon discuss would be published -- was
9    recently published?
10       A.   The data from the TVT registry.
11       Q.   Is that the TVT-WORLD?
12       A.   Yes.
13       Q.   And is that the same study that we have
14   looked at earlier or the e-mails that related to
15   those studies that we looked at earlier that
16   discussed an employee by the name of Derringer or
17   Dhinagar?
18       A.   Yes.
19       MR. SNELL:  Objection; leading.
20   BY MR. THORNBURGH:
21       Q.   And what were -- and can you remind the
22   jury again what the issues were with respect to
23   Dhinagar and the TVT-WORLD interim analysis and
24   publication?

Page 557

1        MR. SNELL:  Objection and leading now.
2    BY THE WITNESS:
3        A.   That there were adverse events that were
4    potentially or were mischaracterizing that they
5    wanted to spin the data.
6        MR. SNELL:  Note my objection.  P2719,
7    Ethicon.MESH ending in 595165 not on reliance list.
8    Move to strike all questions about it.
9    BY MR. THORNBURGH:
10       Q.   What's the next tab in your binder that
11   you want to discuss?
12       A.   P2684.
13       Q.   What's the tab number, Doctor?
14       A.   Oh.  53.
15       Q.   And Exhibit -- did you say 2684?
16       A.   P2684.
17       Q.   Okay.  And can you identify Exhibit 2684
18   for the ladies and gentlemen of the jury?
19       A.   It is an e-mail string between key
20   Ethicon employees from March 10, 2010, including
21   Dan Smith, project leader and co-inventor of the
22   TVT-Secur, Aaron Kirkemo, Medical Director.
23       Q.   And what opinions does Exhibit 2684
24   support?

52 (Pages 554 to 557)

Bruce Alan Rosenzweig, M.D.

Page 558

1      A.   That there was a failure to adequately
2   study the TVT-Secur before launch.
3      Q.   And how does this exhibit support that
4   opinion, Doctor?  And you can walk us through the
5   document if you want.
6      MR. SNELL:  Objection.
7   BY THE WITNESS:
8      A.   It is -- part of the e-mail string is
9   from Ethicon employee Alyson Wess to other Ethicon
10  employees, including Dan Smith.
11       It states, "I would send you a note to
12  let you know that the marketing team has landed on
13  a commercial call for our product launch.  We want
14  to continue to pursue the Scion PA project
15  vigorously and do not wish to pursue the Scion PP
16  version.  TVT-Secur is weak and clearly not
17  competitive with the MiniArc or the Solyx."
18  BY MR. THORNBURGH:
19     Q.   Let's talk about this a little bit.
20       First off, what is --
21  MR. SNELL:  Object and move to strike.
22  Non-responsive.
23  BY MR. THORNBURGH:
24     Q.   Do you have an understanding what -- let

Page 559

1   me start again because I think there was -- we were
2   talking over each other.
3       What is Scion PA?
4      A.   It is a project to make a new generation
5   sling that is partially absorbable.
6      Q.   Partially, did you say partially
7   absorbable?
8      A.   Yes.
9      Q.   What was Scion PP?
10     A.   It is also another pelvic floor product
11  that was complete -- completely made of
12  polypropylene.
13     Q.   Now, you've testified previously about
14  some partially absorbable materials that Ethicon
15  had available to them, is that correct?
16  MR. SNELL:  Object; leading.
17  BY THE WITNESS:
18     A.   Correct.
19  BY MR. THORNBURGH:
20     Q.   And you've talked about the Ultrapro in
21  your prior testimony?
22     A.   Correct.
23     Q.   Now, I understand that the Scion PA
24  isn't exactly Ultrapro, but is it also, like

Page 560

1   Ultrapro, a partially absorbable material?
2      MR. SNELL:  Object; leading.
3   BY THE WITNESS:
4      A.   Correct.
5   BY MR. THORNBURGH:
6      Q.   Now, and how did Alyson Wess
7   characterize the TVT-Secur in this e-mail to her
8   colleagues?
9      MR. SNELL:  Object; reading.
10  BY THE WITNESS:
11     A.   "If TVT is dead and we will not play in
12  the single-incision sling space for four more years
13  assuming we have good data, how can we throw
14  dollars and shares into playing in two of the three
15  sandboxes?  I hear what they think via AW e-mail."
16  BY MR. THORNBURGH:
17     Q.   I just want to stop you real quick
18  because that's Dan Smith, but before we get to
19  Dan Smith's response, how did Alyson Wess or Wess
20  characterize the TVT-Secur?
21  MR. SNELL:  Move to strike the prior answer as
22  non-responsive to the question.
23  BY THE WITNESS:
24     A.   It is "weak and clearly not

Page 561

1   competitive."
2   BY MR. THORNBURGH:
3      Q.   And are those your words, Doctor?
4      MR. SNELL:  Object.
5   BY THE WITNESS:
6      A.   No.
7   BY MR. THORNBURGH:
8      Q.   Do you agree with those words?
9      A.   Yes.
10     Q.   And when is Alyson Wess writing to her
11  colleagues where she's categorizing the TVT-Secur
12  as weak?
13     A.   March of 2010.
14     Q.   Now, how did Dan Smith respond to Alyson
15  Wess?
16  MR. SNELL:  Objection.
17  BY THE WITNESS:
18     A.   "If TVT-Secur is dead and we will not
19  play in the single-incision sling space for four
20  more years assuming we get good data, how can we
21  grow dollars and shares by only playing in two of
22  three sandboxes?"
23  BY MR. THORNBURGH:
24     Q.   What's your interpretation of that,

53 (Pages 558 to 561)

Bruce Alan Rosenzweig, M.D.

Page 562

1  Doctor?
2       MR. SNELL:  Object.
3  BY THE WITNESS:
4       A.   That Dan Smith is acknowledging that the
5  TVT-Secur is a failed product.
6  BY MR. THORNBURGH:
7       Q.   Do you agree with that based on your
8  review of the internal documents and the published
9  peer-reviewed articles?
10      MR. SNELL:  Objection; misstates as well.
11 BY THE WITNESS:
12      A.   Yes.
13 BY MR. THORNBURGH:
14      Q.   And what else does Dan Smith say?
15      MR. SNELL:  Same objection.  Reading now.
16 BY THE WITNESS:
17      A.   "I hear what they think via AW e-mail
18 but what if Abbrevo can't play in the single
19 incision sandbox because it is simply not a
20 single-incision sling?  Per my earlier e-mail, it
21 is hard to see why needing one-year data would add
22 much more to the year and a half" -- "more than a
23 year and a half to the timeline, and if we truly
24 think six months is appropriate, which I think we

Page 563

1  do, then we are talking about adding a year."
2  BY MR. THORNBURGH:
3       Q.   Now, let's break this down a little real
4  quick.
5            What are the three sandboxes that Dr. --
6  that Dan Smith, Mr. Smith, is referring to here in
7  this e-mail?
8       A.   The three different categories of
9  products, the retropubic sling, the obturator sling
10 and the single-incision sling.
11      Q.   And what concerns is Dan Smith relaying
12 about the possibility that the TVT-Secur is dead?
13      MR. SNELL:  Objection.
14 BY THE WITNESS:
15      A.   That they will not have a sling in or a
16 product in the mini-sling category.
17 BY MR. THORNBURGH:
18      Q.   And what's your understanding of the
19 statement by Mr. Smith that "As per my earlier
20 e-mail, it is hard to see why needing one year of
21 data would add much more than 1.5 years to the
22 timeline, and if we truly think six months is
23 appropriate, which I think we do, then we are
24 talking adding a year"?

Page 564

1       MR. SNELL:  Objection.
2  BY THE WITNESS:
3       A.   That Dan Smith is implying that they
4  only need six months of data to launch the product
5  instead of one year of data.
6  BY MR. THORNBURGH:
7       Q.   Now, we saw in the interview with
8  Dr. Nilsson what Dr. Nilsson felt about short-term
9  data, didn't we?
10      MR. SNELL:  Object and leading.
11 BY THE WITNESS:
12      A.   Yes.
13 BY MR. THORNBURGH:
14      Q.   Can you remind the jury what Dr. Nilsson
15 had stated concerning this type of data?
16      MR. SNELL:  Same objections.
17 BY THE WITNESS:
18      A.   He stated that doctors and surgeons are
19 allergic to six-week and six-month data.
20      MR. THORNBURGH:  Now, if Tom can go ahead and
21 pull upside by side with this document
22 Exhibit P0706 and pull up the "Lessons Learned"
23 slide.
24 BY MR. THORNBURGH:

Page 565

1       Q.   While he is doing that, Doctor, at this
2  time in 2010 when they are talking about how
3  TVT-Secur is weak and how the TVT-Secur is dead,
4  did they continue to sell the TVT-Secur to
5  patients?
6       A.   Yes.
7       MR. SNELL:  Objection.
8  BY MR. THORNBURGH:
9       Q.   At this time when they're referring to
10 the TVT-Secur as weak or as dead, are they
11 continuing to promote the TVT-Secur as safe and
12 effective to physicians?
13      A.   Yes.
14      Q.   Do you have an opinion whether or not
15 that was appropriate?
16      MR. SNELL:  Objection.
17 BY THE WITNESS:
18      A.   Yes, I have an opinion.
19 BY MR. THORNBURGH:
20      Q.   Now, did Ethicon ever learn its lessons?
21          What's that opinion?  I'm sorry.
22      MR. SNELL:  Same objection.  Go ahead.
23 BY THE WITNESS:
24      A.   That was not appropriate.

54 (Pages 562 to 565)

Bruce Alan Rosenzweig, M.D.

Page 566

1  BY MR. THORNBURGH:
2      Q.   Did -- we talked about this document
3  from 2007, "Lessons Learned."  Does it appear to
4  you that Ethicon ever learned its lesson?
5          MR. SNELL:  Objection and leading.
6  BY THE WITNESS:
7      A.   No.
8  BY MR. THORNBURGH:
9      Q.   Why not?
10         MR. SNELL:  Same objection, speculation.
11 BY MR. THORNBURGH:
12     Q.   Or how so I should say?
13         MR. SNELL:  Same.
14 BY THE WITNESS:
15     A.   They're discussing in this e-mail that
16 they would only need six months' worth of data in
17 order to launch a new product.
18 BY MR. THORNBURGH:
19     Q.   Is it appropriate for a company like
20 Ethicon to continue or attempt to continue to keep
21 the TVT-Secur on the market so that it could
22 continue to earn money or protect its market share
23 by having a product within this third sandbox?
24         MR. SNELL:  Objection and leading.

Page 567

1  BY THE WITNESS:
2      A.   I don't understand the question.
3  BY MR. THORNBURGH:
4      Q.   Is it -- strike that.  I'll withdraw the
5  question.
6          Now, if you go down a little bit
7  further, do you see where it says, "As you know,
8  Scion retropubic was originally part of the Scion
9  project.  I separated it because of the difficulty
10 of consistent placement due to very limited tissue
11 in that area."
12         What's that next sentence say?
13         MR. SNELL:  Object; reading.
14 BY THE WITNESS:
15     A.   "This is a risky play given the market
16 requirements of short learning curve, consistent
17 placement and equal effectiveness to TVT."
18 BY MR. THORNBURGH:
19     Q.   What's your understanding of that
20 statement?
21         MR. SNELL:  Same.
22 BY THE WITNESS:
23     A.   That doctors who are using medical
24 devices are more favorable to devices with a short

Page 568

1  learning curve that are consistently placed and
2  that have an efficacy that would be similar to the
3  TVT.
4  BY MR. THORNBURGH:
5      Q.   Did the TVT-Secur have a short learning
6  curve?
7      A.   No.
8      Q.   Did the TVT-Secur have -- was it able to
9  be implanted consistently?
10     A.   No.
11     Q.   Was the TVT-Secur equally as effective
12 as the TVT or TVT-O?
13     A.   No.
14     Q.   Now, Dan Smith sends another e-mail
15 at -- on March 10, 2010 at it looks like -- I can't
16 tell what time that is on my copy.
17         What does Dan Smith say regarding how to
18 treat this sensitive information?
19         MR. SNELL:  Objection; reading.
20 BY THE WITNESS:
21     A.   "Please do not forward this (actually
22 delete it please)."
23 BY MR. THORNBURGH:
24     Q.   I guess somebody forgot to delete his

Page 569

1  e-mail, huh?
2          MR. SNELL:  Objection; leading, argumentative.
3  BY THE WITNESS:
4      A.   I'm reading the e-mail, so I don't know
5  if it was ever deleted.
6  BY MR. THORNBURGH:
7      Q.   And is there anything further that you
8  want to discuss regarding Dan Smith's e-mails in
9  Exhibit 2684?
10     A.   No.
11         MR. SNELL:  Take a break and use the restroom.
12         MR. THORNBURGH:  Yes.
13         THE VIDEOGRAPHER:  Okay.  The time is 2:33
14 p.m. and we're going off the video record.
15             (WHEREUPON, a recess was had
16              from 2:33 to 2:40 p.m.)
17         THE VIDEOGRAPHER:  The time is 2:40 p.m. and
18 we're back on the video record.
19 BY MR. THORNBURGH:
20     Q.   Doctor, what's the next exhibit you want
21 to discuss?
22     A.   P1460.
23     Q.   And can you identify P1460 to the jury?
24     A.   Yes.  It is an e-mail from Dan Smith

55 (Pages 566 to 569)

Bruce Alan Rosenzweig, M.D.

Page 570

1  dated March 19, 2010.
2       Q.   And what opinion does this exhibit
3  support?
4       A.   That the TVT-Secur device was a failed
5  product, had design characteristics that were
6  unreasonably unsafe and unreasonably ineffective in
7  treating stress urinary incontinence.
8       Q.   And how does this document support that
9  opinion?
10      A.   Dan Smith writes that the TVT-Secur
11 obturator only version could have been improved in
12 2008, but the TVT-Secur was considered a failure
13 and did not warrant line extensions.
14      Q.   So, according to Dan Smith when was the
15 TVT-Secur considered a failure?
16      MR. SNELL:  I'm sorry.  I have to object as
17 non-responsive to the last answer.  Go ahead.  Also
18 regulatory.  Apologies, Doctor.
19 BY THE WITNESS:
20      A.   In 2008.
21 BY MR. THORNBURGH:
22      Q.   So, and what's the date of this e-mail?
23      A.   March 19, 2010.
24      Q.   So, Ethicon, is it fair -- what did

Page 571

1  Ethicon do, if anything, after it determined in
2  2008 that the TVT-Secur was a failed product?
3       MR. SNELL:  Object.
4  BY THE WITNESS:
5       A.   They continued to commercialize the
6  product until 2012.
7  BY MR. THORNBURGH:
8       Q.   Do you have an opinion about whether or
9  not Ethicon's decision to continue to sell the
10 product, despite its determination that the
11 TVT-Secur was a failed product for four more years,
12 was appropriate or inappropriate?
13      MR. SNELL:  Objection.
14 BY THE WITNESS:
15      A.   It would not be appropriate to continue
16 to sell a product that was deemed a failure.
17 BY MR. THORNBURGH:
18      Q.   Now, if you -- what is this e-mail with
19 Dan Smith and his colleagues regarding?
20      A.   Information regarding the Scion project.
21      Q.   Okay.  And was this a follow-up
22 discussion from that last e-mail that we looked at
23 concerning whether or not to move forward with the
24 partially absorbable version of the Scion versus

Page 572

1  the polypropylene version of the Scion?
2       MR. SNELL:  Object; leading.
3  BY THE WITNESS:
4       A.   To my best understanding, yes.
5  BY MR. THORNBURGH:
6       Q.   And do you see at the bottom of the
7  page, the first page of Exhibit 1460, what does
8  Dan Smith write to David and Paul?
9       MR. SNELL:  Object; reading.
10 BY THE WITNESS:
11      A.   "Recently you just asked what could
12 increase speed to market.  What is frustrating to
13 me is that this project has been around long enough
14 to see three to five generations of top management
15 leadership, each bringing new ideas into play."
16 BY MR. THORNBURGH:
17      Q.   Stop right there for a second.
18      When Dan Smith writes, "Recently you
19 asked what could increase speed to market," does it
20 appear to you whether or not Dan Smith had learned
21 his lesson about rushing products to market?
22      MR. SNELL:  Objection and leading.
23 BY THE WITNESS:
24      A.   This is describing increasing speed to

Page 573

1  market.  We've seen one of the lessons learned from
2  a prior PowerPoint presentation about consequences
3  of rushing products to market.  So, even after that
4  PowerPoint they're still discussing increasing
5  speed to market.
6  BY MR. THORNBURGH:
7       Q.   All right.  What's the next document you
8  want to discuss?
9       Hold on one second, actually.
10      Let me just do -- let's talk about
11 one -- I skipped a document earlier.  I think this
12 could be the last document we discuss, internal
13 document.
14      A.   Okay.
15      Q.   Let me hand you what I've marked as
16 Exhibit P0241.  This is the document that -- I
17 didn't have a copy of it earlier.  You had a copy
18 of it earlier, though.  I think it was maybe tab 35
19 or --
20      MR. THORNBURGH:  Can you tell us, Raquel.
21 BY THE WITNESS:
22      A.   Okay.
23 BY MR. THORNBURGH:
24      Q.   Find it?

56 (Pages 570 to 573)

Bruce Alan Rosenzweig, M.D.

Page 574

1    A.  No.  But --
2    Q.  I need to get a copy.
3    MR. BRADFORD:  43.
4    BY MR. THORNBURGH:
5    Q.  This is a little bit out of the
6    chronological order, but what's the date of
7    Exhibit P0241?
8    A.  February 9, 2009.
9    Q.  And can you identify what this document
10   is?
11   A.  It's an e-mail from Aaron Kirkemo,
12   Medical Director, to key Ethicon employees,
13   including Harel Gadot in marketing.
14   Q.  And what opinion does this exhibit
15   support?
16   A.  That there were design characteristics
17   associated with the TVT-Secur device that made it
18   unreasonably unsafe.
19   Q.  How does Exhibit P0241 support that
20   opinion?
21   A.  Discusses the high complication rate
22   associated with the TVT-Secur.
23   Q.  And if you go to the last bullet or last
24   paragraph of the first page, you see where it

Page 575

1    says -- what does Aaron Kirkemo write concerning --
2    in that last sentence of that last paragraph?
3    MR. SNELL:  Object; reading.
4    BY THE WITNESS:
5    A.  "As a consequence of these observations,
6    many worried that the risk/benefit ratio could
7    produce a backlash against pelvic floor mesh that
8    would damage the entire pelvic floor platform.
9    They said that they were concerned that should
10   Prosima not work or have a high complication rate
11   it could damage the EWHU brand just a TVT-Secur
12   did."
13   Q.  Is that maybe a typo, "just as" --
14   A.  "As," yes.
15   Q.  -- "TVT-Secur did"?
16   MR. SNELL:  Leading.
17   BY MR. THORNBURGH:
18   Q.  Does this indicate to you that Aaron
19   Kirkemo was writing to his colleagues suggesting
20   that the TVT-Secur had a high complication rate and
21   did not work?
22   MR. SNELL:  Object.
23   BY THE WITNESS:
24   A.  Correct.

Page 576

1    BY MR. THORNBURGH:
2    Q.  And do you have an opinion whether or
3    not the high complication rate and lack of efficacy
4    made the TVT-Secur a failed product?
5    MR. SNELL:  Object.
6    BY THE WITNESS:
7    A.  Correct.
8    BY MR. THORNBURGH:
9    Q.  And are they talking about their concern
10   here that patients might get hurt or are they more
11   worried about their brand?
12   MR. SNELL:  Object; leading.
13   BY THE WITNESS:
14   A.  It states that they're concerned about
15   their brand.
16   BY MR. THORNBURGH:
17   Q.  And are these doctors in Australia or
18   are these doctors in the United States?
19   A.  Dr. Kirkemo is Associate Medical
20   Director worldwide in Somerville, New Jersey.
21   Q.  Does it appear that all of these people
22   are U.S. employees of Ethicon?
23   MR. SNELL:  Object; leading.
24   BY THE WITNESS:

Page 577

1    A.  Correct.
2    BY MR. THORNBURGH:
3    Q.  And is it more important that companies
4    make business decisions based on whether or not a
5    product will help or hurt patients rather than
6    whether or not the company's reputation could be
7    harmed?
8    MR. SNELL:  Objection.
9    BY THE WITNESS:
10   A.  Patient safety should be paramount.
11   MR. THORNBURGH:  We are going to switch gears
12   here.  If we can just take a quick break.  Let me
13   just get my folders together.
14   THE VIDEOGRAPHER:  Okay.  The time is 2:51
15   p.m. and we're going off the video record.
16   (WHEREUPON, a recess was had
17   from 2:51 to 3:03 p.m.)
18   THE VIDEOGRAPHER:  The time is 3:03 p.m. and
19   we're back on the video record.
20   BY MR. THORNBURGH:
21   Q.  Dr. Rosenzweig, I'd like to shift our
22   focus a little bit to some of your other opinions.
23   Okay?
24   A.  Okay.

57 (Pages 574 to 577)

Bruce Alan Rosenzweig, M.D.

Page 578

1      Q.   And the basis for your -- some of the
2   other support for your opinion.  Okay?
3          Dr. Rosenzweig, did you also review and
4   rely on published medical literature in reaching
5   your opinions in this case?
6      A.   Yes.
7      Q.   Did you put together a binder of the
8   published medical literature that you want to
9   discuss with the jury today?
10     A.   Yes.
11         MR. SNELL:  Object; leading.
12   BY MR. THORNBURGH:
13     Q.   Dr. Rosenzweig, can you just briefly
14   again -- I know we've done this before, but can you
15   just briefly describe what your opinions are with
16   respect to the TVT-Secur?
17         MR. SNELL:  Objection.
18   BY THE WITNESS:
19     A.   In what respect?
20   BY MR. THORNBURGH:
21     Q.   The design characteristics and the
22   complications and the efficacy, safety and efficacy
23   of the TVT-Secur device?
24         MR. SNELL:  Same objection.

Page 579

1   BY THE WITNESS:
2      A.   The design characteristics that I talked
3   about previously are the short, stiff, rigid
4   laser-cut mesh that had never been used before, the
5   arrow tip introducer that had never been used
6   before, the fleece tips to hold the short, stiff
7   mesh in place that had never been used before, and
8   the introduction system that had never been used
9   before.
10         Because of the short, stiff, rigid mesh,
11   it increases the risk of a chronic foreign body
12   reaction, chronic inflammatory reaction.  That
13   leads to fibrotic bridging, scarring, excessive
14   scarring.  That leads to mesh contraction, which
15   leads to pain.
16         The sharp introducer drags across tissue
17   of the vagina, which starts a greater inflammatory
18   reaction.  That leads to pain, erosion.
19         The fleece tips do not stay in place,
20   which leads to the mesh migration, which leads to
21   complications and lower efficacy.
22     Q.   And were those opinions that you just
23   expressed supported by any of the medical
24   literature?

Page 580

1      A.   Yes.
2      Q.   And what opinions -- how did -- how does
3   the medical literature support that opinion or
4   those opinions?
5          MR. SNELL:  Objection.  Go ahead.
6   BY THE WITNESS:
7      A.   I created a slide of the medical
8   literature that help support my opinions regarding
9   the design defects that are highlighted in the
10   medical literature.
11   BY MR. THORNBURGH:
12     Q.   Okay.  First let's go back.  I think we
13   already marked this slide, but I just want to get
14   it pulled up again really quick.  And I think it
15   was Exhibit No. 6, I believe.  Do you have 6 in
16   front of you?  Yeah, that's it right there.
17     A.   Yes.  The complications due to the
18   design defects, recurring mesh erosion, chronic
19   pelvic pain, chronic dyspareunia, chronic urinary
20   tract infections, recurrence of stress urinary
21   incontinence symptoms, need for multiple surgeries
22   which will be difficult, if not impossible to
23   perform safely.
24     Q.   Okay.

Page 581

1          MR. SNELL:  Going to object and move to
2   strike.  Repetition.  Go ahead.
3   BY MR. THORNBURGH:
4      Q.   And with respect to the design
5   characteristics of the mesh and your opinions
6   concerning the -- those characteristics, did you
7   also create a slide identifying those
8   characteristics and support provided for those
9   opinions from the medical literature?
10     A.   Correct.
11     Q.   Now, regarding the fleece tips, how are
12   the fleece tips, that design characteristic -- what
13   is your opinion about that and what complications
14   that design characteristic can lead to?
15     A.   The design characteristic of -- the
16   defect associated with the design characteristic of
17   the fleece tips is that the fleece tips do not hold
18   the midurethra in place.  That increases the risk
19   of recurrent stress urinary incontinence.
20         That also allows the mesh to migrate,
21   which increases the chronic inflammatory reaction,
22   chronic foreign body reaction.  It increases the
23   risk of, as I described on the previous slide,
24   pain, pelvic pain, pain with intercourse, mesh

Golkow Litigation Services - 1.877.370.DEPS

Bruce Alan Rosenzweig, M.D.

Page 582

1    erosion, chronic urinary issues, including
2    recurrence of stress urinary incontinence and the
3    need for surgeries.
4        Q.   And what -- were you done?  I'm sorry.
5    I wasn't sure.
6        A.   I was --
7        Q.   I didn't mean to interrupt you.
8        A.   There are three studies in particular
9    that talk about the fleece tips, if we could go to
10   slide C0003.
11       MR. SNELL:  Can we hold on one second.  Can we
12   get a copy of that?
13       MR. THORNBURGH:  I just gave you a copy.
14       MR. SNELL:  No, the slide that was up, and I'm
15   moving to strike that.
16       MR. THORNBURGH:  That was the old -- that was
17   the old slide that you already looked at.
18       MR. SNELL:  No, it wasn't.  It was something
19   different.
20       MR. THORNBURGH:  You've got that copy right
21   there.
22       MR. SNELL:  I don't have that.  I'm not trying
23   to be difficult.  I don't have the slide that was
24   up on the screen or the one that Dr. Rosenzweig is

Page 583

1    holding.
2        MR. THORNBURGH:  Let me see it.  I'm sorry.
3            I thought I gave that to you just a
4            moment ago.
5        MR. SNELL:  No, these are the ones I have.
6    Fleece tips.  I have this one.  You gave me two of
7    these.  You can have that one back.
8            (WHEREUPON, a certain document was
9            marked BR-Secur Exhibit No. 7,
10           C0003, slide of publication support
11           for opinions.)
12   BY MR. THORNBURGH:
13       Q.   And, Doctor, before we were interrupted,
14   can you just identify the medical publications that
15   support your opinion concerning the fleece tips?
16       A.   Yes.  There's a study by Hota from 2012,
17   a study by Hamer from 2012 and a study by Krofta
18   from 2012 that discuss the fleece tips not holding
19   and increasing the -- or being responsible for
20   failures to treat stress urinary incontinence and
21   pain with intercourse.
22       MR. SNELL:  I'm sorry.  What was the last
23   study?  If the doctor could tell us that.  I can't
24   read it on here.  I got Hota and Hamer.  I didn't

Page 584

1    get the third one.
2        THE WITNESS:  Krofta, K-r-o-f-t-a, from 2012.
3        MR. SNELL:  Thank you.  Sorry.
4    BY MR. THORNBURGH:
5        Q.   And regarding your opinions that the
6    mesh is too stiff and the stiffness can cause
7    dyspareunia and erosions, did you rely on any
8    medical publications for that opinion or those
9    opinions?
10       A.   Yes.  A publication by Neuman from 2011
11   and by -- by Neuman from 2011.
12       Q.   And how did the Neuman publication
13   support your opinion?
14       A.   It showed that the short -- excuse me --
15   the stiff rigid mesh was responsible for an
16   eightfold increase in dyspareunia compared to a
17   non-stiff, non-laser-cut mesh.
18       Q.   Okay.  And were there any other
19   publications that you used to support your opinion
20   that the mesh was too short, which led to erosions
21   or failures?
22       A.   Yes.  A publication by Dr. Hinoul in
23   2011 showed that the short mesh increased the
24   failure rate associated with the TVT-Secur and was

Page 585

1    associated with a high erosion rate.
2        Q.   And how did that publication support
3    your opinion?
4        A.   There was an eightfold increase in the
5    erosion rate associated with the TVT-Secur and a
6    higher failure rate.
7        Q.   And do you have any opinions with
8    respect to the rate of erosions associated with the
9    TVT-Secur device?
10       A.   Yes.  Based on a meta-analysis from
11   Tommaselli in 2012, the erosion rate was found to
12   be 15%.  The highest erosion rate I've seen in the
13   literature is in the Hota study of 19%.
14       Q.   And what -- do you have an opinion with
15   respect to what the rate of failure is for the
16   TVT-Secur?
17       A.   The Tommaselli meta-analysis showed that
18   the failure rate was approximately 25% measured
19   objectively.  In a five-year study by Tommaselli,
20   the failure rate was approximately 25%.  In a 4-1/2
21   year study by Dr. Haab, the failure rate was 70%.
22       MR. SNELL:  Do you know how to spell Haab?
23       THE WITNESS:  H-a-a-b.
24   BY MR. THORNBURGH:

Bruce Alan Rosenzweig, M.D.

Page 586

1    Q.   Now, you have a binder there in front of
2    you.  Are those the medical literature or some of
3    the medical literature that you brought with you
4    today?
5        A.   Yes.
6        Q.   And did you review and rely on those --
7    on the medical literature within that binder?
8        A.   Yes.
9        Q.   Is that all of the medical literature
10   you reviewed?
11       A.   No.
12       Q.   How much medical literature,
13   approximately how many different articles did
14   review in coming to your opinion?
15       A.   Specifically for TVT-Secur?
16       Q.   Yes.
17       A.   To date?
18       Q.   Approximately.
19       A.   Including abstracts, not just
20   publications?
21       Q.   Sure.
22       A.   I think in the neighborhood of 60 or so
23   that I've reviewed to date.  Possibly more.
24       Q.   And you -- what's the first article in

Page 587

1    your binder?
2        A.   It is P2561.  It's a study from 2010 in
3    the International Urogynecology Journal from
4    Dr. Krofta.
5        MR. SNELL:  Can I get a copy?
6    BY MR. THORNBURGH:
7        Q.   And what opinions did -- what opinions
8    are supported by the Krofta publication?
9        A.   That there are design characteristics of
10   the TVT-Secur device that make it unreasonably
11   ineffective.
12       Q.   And what are those design
13   characteristics?
14       A.   That the anchoring structure is not
15   present, meaning that the fleece tips did not hold,
16   and they report a one-year failure rate of
17   approximately 50%.
18       Q.   And do you have an opinion whether a 50%
19   failure rate at one year is a good or bad outcome
20   for patients?
21       MR. SNELL:  Objection.  Go ahead.
22   BY THE WITNESS:
23       A.   That is a negative outcome.
24            Another finding from the Krofta study is

Page 588

1    that the 8 centimeter tape is not appropriate for
2    all patients and that the sharp arrowhead,
3    quote-unquote, "scalpel-shaped tip of the inserter"
4    is too sharp, which leads to bleeding and excessive
5    movement from tearing of the muscle fibers.
6        MR. SNELL:  Object.  Improper use of a learned
7    treatise on direct.  The witness is not allowed to
8    read from it.  The witness must internalize it.
9    That article will not be shown on direct at trial.
10       MR. THORNBURGH:  Yeah, you can keep the
11   article down for now.
12       MR. SNELL:  So, move to strike the answer.
13   BY MR. THORNBURGH:
14       Q.   Doctor, do you have any -- how does the
15   Krofta article support your opinions concerning the
16   TVT-Secur efficacy rate?
17       A.   It supports my opinion that there are
18   design characteristics of the TVT-Secur device that
19   make it unreasonably ineffective to treat stress
20   urinary incontinence.
21       Q.   And are there any other opinions that
22   you want to discuss that are supported by the
23   Krofta article?
24       A.   Beside the anchoring fleece tips do not

Page 589

1    hold, which increases the failure rate, the
2    arrowhead introducer is too sharp so that it causes
3    increased complications, therefore it is a design
4    defect, and that the tape is too short, therefore
5    increasing the failure rate, those are the
6    opinions.
7        Q.   Okay.  And I just want to look at the
8    Krofta article with you really quick.
9            And you had testified about the Krofta
10   publication.  I just want to turn attention -- we
11   are not going to look at the entire publication.
12   But if you turn your attention really quick to
13   page 783.
14           And what did the Krofta authors report
15   concerning the rate of erosion in the TVT-Secur
16   device compared to the TVT-O device?
17       MR. SNELL:  Object; improper use of learned
18   treatise on direct, hearsay as to the authors'
19   statements.  No learned treatise exception to
20   hearsay in Pennsylvania.  Go ahead.
21   BY MR. THORNBURGH:
22       Q.   Go ahead, Doctor.
23       A.   They found a 5% rate of erosion.
24       Q.   If you look at page 783, it says, "Also,

60 (Pages 586 to 589)

Bruce Alan Rosenzweig, M.D.

Page 590

1   in our study, we observed," and this is on the
2   right-hand column, "Also, in our study, we observed
3   a relatively high risk of defective healing
4   (7.3%)."
5           The authors go on and write, "Recent
6   studies have suggested that TVT erosion ranges
7   between .04% and 1% and that the incidence of
8   vaginal erosion after TVT-O is less than 1% during
9   the first postoperative year." (As read.)
10          It goes on to write -- to state, that
11  "There are four cases of vaginal protrusion of the
12  tape in our study."
13          Did I read that correctly?
14      MR. SNELL:  Object.  Misstates the document.
15  Also object and leading.
16  BY MR. THORNBURGH:
17      Q.   Did I read that correctly?
18      A.   Correct.
19      Q.   And so -- and is that where you got
20  the -- it says 4.9% was the rate of erosion in
21  their study?
22      A.   Correct.
23      Q.   Is that accurate?
24      A.   Correct.  I was not counting the healing

Page 591

1   defects.  If one were to put those together, that
2   would mean that there was a 12% rate of healing
3   defects in mesh erosion.
4       MR. SNELL:  Object.  Move to strike.
5   Non-responsive beyond the question.
6   BY MR. THORNBURGH:
7       Q.   And what symptoms were reported by
8   patients who experienced erosions in the Krofta
9   study?
10      MR. SNELL:  Object.
11  BY THE WITNESS:
12      A.   Discharge and dyspareunia.
13  BY MR. THORNBURGH:
14      Q.   Now, did Ethicon warn in its IFU the
15  risk of dyspareunia?
16      A.   No.
17      Q.   And you had talked about the briefly
18  about the Hinoul study.  Is that the next article
19  in your binder?
20      A.   Actually I have the Lim study.
21      Q.   Okay.  Let's talk about the Lim study,
22  then.
23      A.   This is a study by --
24      Q.   Hold on a second.  What's the exhibit

Page 592

1   number for Lim if there is one?
2       A.   I don't think there is one.
3       MR. THORNBURGH:  Let's go ahead and mark the
4   Lim study.  And we will mark it as Exhibit 8.
5           (WHEREUPON, a certain document was
6           marked BR-Secur Exhibit No. 8,
7           Article by Lim, et al.)
8   BY MR. THORNBURGH:
9       Q.   And what's the date of the Lim study?
10      A.   2010.  It's in the Australia/New Zealand
11  Journal of Obstetrics and Gynecology.  I reviewed
12  and relied upon it and it --
13      MR. SNELL:  Can I get a copy before we have a
14  discussion about it?
15  BY MR. THORNBURGH:
16      Q.   Did you review and rely on the Lim
17  study?
18      A.   For my opinions, yes.
19      Q.   And what opinions did the Lim study
20  support?
21      A.   It supports my opinions that there are
22  design characteristics of the TVT-Secur device that
23  make it unreasonably ineffective in treating stress
24  urinary incontinence.

Page 593

1       Q.   How does the Lim study support that
2   opinion?
3       A.   They found an objective cure rate at six
4   months of less than 60%.
5       Q.   Is that a good result or a bad result
6   for patients?
7       MR. SNELL:  Object.
8   BY THE WITNESS:
9       A.   That is a negative result for patients
10  as it will expose them to the risk of having
11  additional surgery for their recurrence or
12  untreated stress urinary incontinence.
13      Q.   Okay.  Now, are there any other opinions
14  from the Lim study -- strike that.
15          Does -- are any of your other opinions
16  supported by the Lim study?
17      A.   Yes.  That there are design
18  characteristics of the TVT-Secur device, namely,
19  the sharp arrow tip introducer, the short, stiff,
20  rigid mesh that are -- lead to complications and
21  therefore are unreasonably unsafe.  They found a
22  20% groin pain and a tape erosion rate of close to
23  8%.
24      Q.   So, how does the Lim study support your

61 (Pages 590 to 593)

Bruce Alan Rosenzweig, M.D.

Page 594

1    opinion concerning the design characteristics of
2    the TVT-Secur?
3        MR. SNELL:  Objection.
4    BY THE WITNESS:
5        A.   It shows that the design characteristics
6    are unreasonably unsafe because of the
7    complications that patients who have had the
8    TVT-Secur implanted are experiencing within the
9    first six months after implant.
10   BY MR. THORNBURGH:
11       Q.   And you testified that the Lim study
12   found a rate of 20. -- 20% about.  Is that what you
13   testified to?
14       A.   Correct.
15       Q.   And how does that finding support your
16   opinions?
17       A.   A rate of 20% of groin pain within -- in
18   the first six months after the procedure supports
19   my opinion that there are design characteristics of
20   the device that make it unreasonably unsafe.
21       Q.   And --
22       A.   Including the short, stiff, rigid mesh.
23       Q.   And is a 20% rate of --
24       MR. SNELL:  Object.  Move to strike.

Page 595

1    Non-responsive.
2    BY MR. THORNBURGH:
3        Q.   -- groin pain a good result or good
4    outcome for patients?
5        A.   It is a negative result for patients.
6        Q.   And did -- were there any findings from
7    the Krofta study concerning the rate of erosions?
8        A.   The Lim study.
9        MR. SNELL:  Objection; leading.
10   BY MR. THORNBURGH:
11       Q.   Lim study.  I'm sorry.
12       A.   It showed an approximate 8% erosion
13   rate.
14       Q.   And is that a good result or a bad
15   result for patients?
16       MR. SNELL:  Objection.
17   BY THE WITNESS:
18       A.   That is a negative result for patients.
19       Also, the Lim study showed that there
20   was approximately 5% rate of tape dislodgement,
21   which supports my opinion that the fleece tips did
22   not hold the mesh in place and therefore the mesh
23   could migrate and increase the risk of failure and
24   complications.

Page 596

1        MR. SNELL:  What did we mark this?
2        MR. THORNBURGH:  We marked it as Exhibit 8.
3        MR. SNELL:  Okay.  BR-Secur 8?
4        MR. THORNBURGH:  Yes.  I forgot to bring the
5    one that was marked in September I guess.
6        MR. SNELL:  I'm going to move to strike all
7    questioning about it.  I don't see it on his
8    reliance list.  Maybe I'm wrong, but that's not
9    what -- we're not finding it.  So, go ahead.
10   BY MR. THORNBURGH:
11       Q.   Doctor, I just want to turn your
12   attention really quick to page 171.
13       And there's a -- the third full
14   paragraph, the authors write that "Although the
15   mesh erosion rate of 7.7% in our series was
16   considerably higher than the .4 to 4.1% reported in
17   the TVT and TVT-O" studies or products, "it was not
18   out of keeping with the 0.9 to 12% reported in
19   other studies investigating the TVT-Secur
20   procedure."
21       Did I read that correctly?
22       MR. SNELL:  Object and leading.
23   BY THE WITNESS:
24       A.   Yes.

Page 597

1    BY MR. THORNBURGH:
2        Q.   And what, if any, significance does that
3    finding suggest?
4        MR. SNELL:  Object and leading, improper
5    learned treatise, PA.
6    BY THE WITNESS:
7        A.   That demonstrates the design defect of
8    the TVT-Secur that makes it unreasonably unsafe.
9    The mesh is too rigid and stiff, which increases
10   the risk of erosion.  The fleece tips do not hold
11   the mesh in place.  Therefore, the mesh migrates,
12   which increases the risk of mesh erosion.  And the
13   sharp arrow tip introducer drags across the vaginal
14   tissue, which disrupts the tissue and increases the
15   risk of erosion.
16       Q.   And if you go to the "Conclusion"
17   section really quick, can you tell the ladies and
18   gentlemen -- of the Lim study.
19       Can you tell the ladies and gentlemen of
20   the jury what these researchers reported with
21   respect to the recommendations of the TVT-Secur
22   procedure?
23       MR. SNELL:  Object; improper learned treatise.
24   BY THE WITNESS:

Bruce Alan Rosenzweig, M.D.

Page 598

1      A.  Based on the limited study, "we would be
2  hesitant to recommend the TV" -- "the U
3  configuration of the TVT-Secur procedure over its
4  more established counterparts, the TVT and the
5  TVT-O."
6      BY MR. THORNBURGH:
7      Q.  And is there anything further you'd like
8  to discuss from the Lim publication?
9      A.  No.
10      MR. THORNBURGH:  We have to change tape.
11      THE VIDEOGRAPHER:  The time is 3:30 p.m.  This
12  is the end of Tape 3 and we're going off the video
13  record.
14          (WHEREUPON, a recess was had
15           from 3:30 to 3:47 p.m.)
16      THE VIDEOGRAPHER:  The time is 3:47 p.m.  This
17  is the beginning of Tape 4 and we are back on the
18  video record.
19      BY MR. THORNBURGH:
20      Q.  Doctor, what's the next study in your
21  binder?
22      A.  The study by Dr. Hinoul from 2011 in the
23  Journal of Urology.
24      Q.  And what's the exhibit number?

Page 599

1      A.  It is P2342.
2      Q.  And did you review and rely on the
3  Hinoul study?
4      A.  Yes.
5      Q.  And what is the Hinoul study?
6      A.  It is a prospective randomized trial
7  comparing the TVT-Secur with the TVT-Obturator.
8      Q.  And what was the duration of that study?
9      A.  It was a one-year study.
10      Q.  Is that considered a short-term or
11  long-term study?
12      MR. SNELL:  Object.
13      BY THE WITNESS:
14      A.  It is a short-term study.  A long-term
15  study would be a five-year study.
16      BY MR. THORNBURGH:
17      Q.  And what opinions does the Hinoul
18  randomized controlled trial support?
19      A.  The Hinoul study supports my opinion
20  that the design characteristics of the TVT-Secur
21  device, the short, stiff mesh with the arrow tip
22  introducer and the fleece tips lead to the harm of
23  an increased risk of the procedure failing and an
24  increased risk of mesh eroding into the vagina.

Page 600

1      Q.  And how does the Hinoul study support
2  those opinions?
3      A.  On the Hinoul study, there was an
4  approximately 25% failure rate at six months.  That
5  decreased to about a 16% failure rate after 12 months and
6  there was an eight-time risk of erosion compared
7  with the TVT-Obturator.
8      Q.  In lay terms, what does that mean?
9      A.  That there was a higher rate of failure
10  and a higher rate of mesh protruding into the
11  vagina for the TVT-Secur.
12      Q.  And you say "higher rate."  Let's back
13  up a little bit.
14      The randomized controlled trial, what
15  products did -- was Dr. Hinoul comparing?
16      MR. SNELL:  Object.
17      BY THE WITNESS:
18      A.  The TVT-Secur with the TVT-Obturator.
19      BY MR. THORNBURGH:
20      Q.  And in terms of that comparison, which
21  product performed better?
22      A.  The TVT-Obturator.
23      Also, one of Dr. Hinoul's conclusions
24  was that the short 8 centimeters of mesh was too

Page 601

1  short, which increased the failure rate associated
2  with the TVT-Secur.
3      MR. SNELL:  Object.  Move to strike.  Reading
4  from a learned treatise in Pennsylvania is
5  improper.
6      MR. THORNBURGH:  He is not reading from a
7  learned treatise.
8      BY MR. THORNBURGH:
9      Q.  Were you reading from the learned
10  treatise or were you --
11      A.  Summarizing.
12      Q.  -- summarizing?
13      A.  I was summarizing.
14      Q.  Okay.
15      MR. SNELL:  Still improper -- you are not
16  allowed to summarize the statement of another in
17  Pennsylvania through a learned treatise.
18      BY MR. THORNBURGH:
19      Q.  Doctor, how does --
20      MR. SNELL:  An expert must internalize it.
21      BY MR. THORNBURGH:
22      Q.  Doctor, how does the Hinoul study
23  support your opinion concerning the efficacy or
24  lack of efficacy of the TVT-Secur product?

63 (Pages 598 to 601)

Bruce Alan Rosenzweig, M.D.

Page 602

1        MR. SNELL:  Objection.
2    BY THE WITNESS:
3        A.   The Hinoul study supports my opinion
4    that one of the design defects of the TVT-Secur is
5    that the mesh is too short and therefore increases
6    the risk of failure.
7    BY MR. THORNBURGH:
8        Q.   And do you recall what the rate of
9    erosion was in the TVT-Secur arm compared to the
10   TVT-Obturator arm?
11       A.   Yes.  8% versus 0%.
12       Q.   And how does that finding support your
13   opinions?
14       A.   It supports my opinions that the design
15   defects from the TVT-Secur device, which are
16   unreasonably unsafe, is the short, stiff, rigid
17   mesh that is too stiff for the vagina and,
18   therefore, leads to complications in the vagina
19   such as mesh erosion; that the fleece tips do not
20   hold and therefore the mesh migrates, thereby
21   increasing the risk of erosion; and the sharp arrow
22   introducer is too sharp and it drags across the
23   vaginal tissue disrupting the vaginal tissue and
24   leading to erosion.

Page 603

1        Q.   And are there any other findings from
2    the Hinoul study that support your opinions?
3        A.   No.
4        Q.   What's the next study in your binder?
5        A.   It's a study by Dr. Hota from 2012 in
6    the journal Female Pelvic Medicine and
7    Reconstructive Surgery.
8        Q.   And what's the exhibit number for the
9    Hota study?
10       A.   P1185.
11       Q.   And when was the Hota study published?
12       A.   2012.
13       MR. SNELL:  Thank you.
14   BY MR. THORNBURGH:
15       Q.   What opinions does the Hota study
16   support?
17       A.   The Hota study supports my opinions that
18   there are design characteristics of the TVT-Secur
19   device that increases harm to women that are
20   unreasonably unsafe, including the short, stiff,
21   rigid mesh increased the erosion rate.
22           The erosion rate found in this study was
23   19%.  The success rate after one year was
24   approximately 50%.  So, the failure rate was almost

Page 604

1    50%, which means that the fleece tips did not hold
2    and the mesh migrated and did not support the
3    urethra.  So, the women had a recurrence of their
4    stress urinary incontinence.
5            The -- this study also supports my
6    opinion that the sharp arrow tip introducer is too
7    sharp.  It drags across the vaginal tissue which
8    disrupts the vaginal tissue and increases the harm,
9    including erosion and pain.
10       Q.   How does the Hota study support your
11   opinions concerning those design characteristics?
12       A.   The findings of the study of a 19%
13   erosion rate and an 50% failure rate.
14       Q.   And what type of study was the Hota
15   study?
16       A.   It was a prospective randomized trial.
17       Q.   That's what we have been talking about
18   throughout the last two days?
19       A.   Yes.
20       Q.   What we've abbreviated as RCTs?
21       A.   Correct.
22       Q.   Is this the type of study that Ethicon
23   had originally planned on doing before they
24   launched the TVT-Secur?

Page 605

1        A.   Correct.
2        Q.   And did -- is this the study that
3    Dr. Nilsson had recommended be done before the
4    Secur was launched?
5        MR. SNELL:  Objection.
6    BY THE WITNESS:
7        A.   This is the type of study that he
8    recommended.
9    BY MR. THORNBURGH:
10       Q.   And how long was the Hota study?
11       A.   If I recall, the Hota study was
12   discontinued early due to the findings of a lower
13   success rate than they had anticipated.
14       Q.   And how long did it -- what were their
15   final follow-up period?
16       A.   The patients were followed up for one
17   year.  However, the study was stopped early before
18   all the patients were randomized into the study.
19       Q.   Do you recall why the study was
20   terminated early?
21       MR. SNELL:  Objection.
22   BY THE WITNESS:
23       A.   Because of concerns about the higher
24   failure rate associated with the device.

64 (Pages 602 to 605)

Bruce Alan Rosenzweig, M.D.

Page 606

1  BY MR. THORNBURGH:
2      Q.   Is a 19% erosion rate a good outcome for
3  patients?
4      A.   No, it is not.
5      Q.   Is that -- is a 19% erosion rate
6  something that was commonly known by physicians to
7  be associated with the Secur product?
8      MR. SNELL:  Objection.
9  BY THE WITNESS:
10     A.   No, it was not.
11  BY MR. THORNBURGH:
12     Q.   Did Ethicon ever disclose to physicians
13  that the risk of erosions associated with the TVT
14  Secur product could be as high as 19%?
15     MR. SNELL:  Objection.
16  BY THE WITNESS:
17     A.   No, they did not.
18  BY MR. THORNBURGH:
19     Q.   Could Ethicon have disclosed that
20  information?
21     A.   Yes.
22     Q.   Should Ethicon have disclosed that
23  information?
24     MR. SNELL:  Object.

Page 607

1  BY THE WITNESS:
2      A.   Yes.
3  BY MR. THORNBURGH:
4      Q.   Had Ethicon performed a -- the
5  randomized controlled trial before they launched
6  the product, could they have learned that the risk
7  of erosion with the TVT-Secur could be as high as
8  19%?
9      MR. SNELL:  Objection; speculation.
10  BY THE WITNESS:
11     A.   If they had performed a randomized
12  controlled trial, they would have obtained data
13  regarding the safety and efficacy of their product.
14  BY MR. THORNBURGH:
15     Q.   And if we go to page 41.
16     MR. THORNBURGH:  Tom, can you blow this up.
17  Don't worry about it.
18  BY MR. THORNBURGH:
19     Q.   Go to page 41, Doctor.  And if you look
20  at Table 3.  Are you there?
21     A.   Yes.
22     Q.   Okay.  And what was the erosion rate --
23  strike that.  Before I go to Table 3.
24          What was the erosion rate of the

Page 608

1  TVT-Secur compared to the TVT-Obturator?
2      MR. SNELL:  Object.
3  BY THE WITNESS:
4      A.   19% versus 0%.
5  BY MR. THORNBURGH:
6      Q.   And what was the reoperation rate in the
7  TVT-Secur compared to the TVT-O?
8      MR. SNELL:  Object.
9  BY THE WITNESS:
10     A.   19% versus 0%.
11  BY MR. THORNBURGH:
12     Q.   Is a reoperation rate of 19 -- do you
13  have an opinion -- strike that.
14          Do you have an opinion whether or not a
15  19% erosion rate is unreasonably high?
16     A.   Yes, I have an opinion.
17     Q.   What's that opinion?
18     A.   Yes, that is unreasonably high.
19     Q.   Do you have an opinion whether or not a
20  reoperation rate of 19% is unreasonably high?
21     A.   Yes, I have an opinion.
22     Q.   What's that opinion?
23     A.   It is unreasonably high.
24     Q.   Do you have an opinion one way or the

Page 609

1  other whether or not the risks of the TVT-Secur
2  were outweighed -- outweighed the benefits of the
3  TVT-Secur?
4      A.   Yes, I have an opinion.
5      Q.   What's that opinion?
6      A.   The risks outweighed the benefits.
7      Q.   And what's the basis for that opinion?
8      A.   The internal documents that I reviewed
9  and the medical literature.
10     Q.   And is that consistent with these
11  researchers' decisions or decision to terminate the
12  study early?
13     A.   Correct.
14     Q.   What's the next publication in your
15  binder?
16     A.   Publication by Dr. Andrada Hamer from
17  the International Urogynecology Journal in 2013.
18     MR. SNELL:  Can I get a copy?
19  BY MR. THORNBURGH:
20     Q.   What's the exhibit number?
21     A.   It is P2362.
22     Q.   Can you identify P2362 to the ladies and
23  gentlemen of the jury?
24     A.   It is a one-year prospective randomized

65 (Pages 606 to 609)

Bruce Alan Rosenzweig, M.D.

Page 610

1    controlled trial comparing the TVT-Secur with the
2    TVT.
3        Q.   Did you review and rely on the Hamer
4    study?
5        A.   Yes.
6        Q.   And so I don't have to keep repeating
7    that, did you review and rely on all of the studies
8    that are in your binder?
9        A.   Yes.
10       Q.   Which we've marked -- have we marked the
11   binder yet?
12       MR. THORNBURGH:  Let's go ahead and mark the
13   binder as Exhibit 9.
14       MR. SNELL:  While we are doing this, move to
15   strike the risk/benefit opinion as to violating
16   705, PA.  Go ahead.
17              (WHEREUPON, a binder was marked as
18              BR-Secur Exhibit No. 9:  Binder
19              containing articles relied on by
20              deponent.)
21   BY MR. THORNBURGH:
22       Q.   What opinions does the Hamer study
23   support?
24       A.   The Hamer study supports my opinion that

Page 611

1    there are design characteristics of the TVT-Secur
2    that make it unreasonably unsafe.
3              The authors found significant
4    complications associated with the device so that
5    they do not recommend the use of the TVT-Secur
6    device because of the complications associated with
7    it, and they also found that it had a significantly
8    lower objective cure rate than the TVT.
9        MR. SNELL:  Object.  Move to strike.  Violates
10   Pennsylvania rule regarding learned treatise.
11   BY MR. THORNBURGH:
12       Q.   How does -- how does the Hamer study
13   support your opinions?
14       A.   It supports my opinions that the
15   TVT-Secur is unreasonably unsafe and unreasonably
16   ineffective in treating stress urinary
17   incontinence.
18       Q.   Are there any other opinions -- do you
19   have any other -- what other opinions, if any, does
20   the Hamer study support?
21       A.   The Hamer study showed that there was a
22   risk of urethral erosion of 1.4%.
23       Q.   And how does that finding support your
24   opinion?

Page 612

1        A.   That demonstrates that there are design
2    characteristics of the TVT-Secur device that make
3    it unreasonably unsafe, including the stiff, rigid
4    mesh, which is dangerous to the surrounding tissue
5    and leads to erosion.
6        Q.   And was the Hamer study also a
7    randomized controlled trial?
8        A.   Yes.
9        Q.   And, again, is this the type of study
10   that Ethicon had planned to do before they launched
11   the product?
12       MR. SNELL:  Object.  Sorry.  Object; leading.
13   BY THE WITNESS:
14       A.   Yes.
15   BY MR. THORNBURGH:
16       Q.   And can you remind the jury why Ethicon
17   chose not to conduct a randomized controlled trial?
18       MR. SNELL:  Object.
19   BY THE WITNESS:
20       A.   Budget constraints.
21   BY MR. THORNBURGH:
22       Q.   Is that a reasonable reason for a
23   company to choose not to do adequate studies for
24   products it intends to sell as permanent

Page 613

1    implantable devices?
2        MR. SNELL:  Object.
3    BY THE WITNESS:
4        A.   No.
5    BY MR. THORNBURGH:
6        Q.   Are there any other opinions that are
7    supported by the Hamer study?
8        A.   Not that I specifically recall.
9        Q.   I do want to -- if you turn with me to
10   page 226, and you'll see on the right side of the
11   page, the first full paragraph, the authors write,
12   "We do not believe that the difference in cure
13   rate - in particular, the proportion of uncured and
14   early recurrence patients in the TVT-Secur group -
15   can be explained by insufficient surgical skills,
16   as the basics of both procedures are similar.
17   Participating surgeons had broad experience in
18   sling surgery, having performed at least 100
19   procedures each.  Moreover, pre-study training was
20   supervised by one of the authors and aimed to
21   standardize the operative technique before
22   enrolling patients into the study."
23              Did I read that correctly?
24       MR. SNELL:  Object; leading, improper use of a

66 (Pages 610 to 613)

Bruce Alan Rosenzweig, M.D.

Page 614

1    learned treatise.
2    BY THE WITNESS:
3        A.   Yes.
4    BY MR. THORNBURGH:
5        Q.   And do you have -- what does that
6    statement by these authors indicate to you?
7        MR. SNELL:  Same objection.
8    BY THE WITNESS:
9        A.   That there are design characteristics of
10   the TVT-Secur that make it unreasonably unsafe or
11   unreasonably ineffective.
12   BY MR. THORNBURGH:
13       Q.   We looked at an exhibit early on in this
14   litigation or in this deposition dating back I
15   think to November of 2006 from David Robinson where
16   he identified three potential explanations for the
17   high failure rates that were being experienced by
18   surgeons worldwide.
19           Do you recall that exhibit?
20       MR. SNELL:  Objection; leading, misstates.
21   BY THE WITNESS:
22       A.   Yes.
23   BY MR. THORNBURGH:
24       Q.   And do you recall one of the potential

Page 615

1    explanations that David Robinson had identified was
2    surgeon technique?
3        MR. SNELL:  Object and leading.
4    BY THE WITNESS:
5        A.   Correct.
6    BY MR. THORNBURGH:
7        Q.   And what, if anything, does the Hamer
8    study indicate with respect to surgeon technique as
9    being the cause of the early failure rates that
10   were being reported worldwide?
11       MR. SNELL:  Object; improper learned treatise.
12   BY THE WITNESS:
13       A.   The Hamer study does not find that it is
14   the surgeon responsible for the poor outcomes
15   associated with the TVT-Secur; that it shows that
16   there are design characteristics that make it
17   unreasonably unsafe or unreasonably ineffective in
18   treating stress urinary incontinence.
19   BY MR. THORNBURGH:
20       Q.   If you turn to page 227 and you see the
21   "Conclusion" section?
22       A.   Yes.
23       Q.   Okay.  And in the "Conclusion"
24   section -- let me -- before I get there, let me

Page 616

1    just ask you without looking at this document.
2            What were the conclusions of these
3    authors?
4        MR. SNELL:  Objection; improper learned
5    treatise.
6    BY MR. THORNBURGH:
7        Q.   If you recall.  Let me -- let's just do
8    this.
9            If you look at the "Conclusion"
10   section -- I know we are all trying to get out of
11   here -- you see where it says, "The main arguments
12   for choosing TVT-Secur over TVT (less complications
13   and need for uro" -- uri -- how do you --
14       A.   Urethrocystoscopy.
15       Q.   -- "urethrocystoscopy) are not supported
16   by our data."
17           Did I read that correctly?
18       A.   Yes.
19       MR. SNELL:  Objection; leading, learned
20   treatise, improper.
21   BY MR. THORNBURGH:
22       Q.   Doctor, did -- do you have an opinion
23   whether or not based on your review of the internal
24   documents of Ethicon and the peer-reviewed

Page 617

1    publications whether or not Ethicon's claim for
2    choosing a TVT-Secur over a TVT, that there would
3    be less complications and no need for cystoscopy
4    were supported by the data?
5        MR. SNELL:  Object and violates 705, lacks
6    specificity.  Go ahead.
7    BY THE WITNESS:
8        A.   Not supported by this data.
9    BY MR. THORNBURGH:
10       Q.   Was it -- based on your review of the
11   overall -- your overall review of the data, both
12   internal data of Ethicon and the publications that
13   you've reviewed, was that claim by Ethicon
14   supported?
15       MR. SNELL:  Same objections.
16   BY MR. THORNBURGH:
17       Q.   The claim that there would be less
18   complications?
19       A.   No.
20       MR. SNELL:  Same objections.  Go ahead.
21   BY THE WITNESS:
22       A.   That was not supported.
23   BY MR. THORNBURGH:
24       Q.   Is there any other information from the

67 (Pages 614 to 617)

Bruce Alan Rosenzweig, M.D.

Page 618

1  Hamer study that you'd like to discuss?
2      A.  No.
3      Q.  Before we move on to the next study, did
4  the Hamer researchers encourage or discourage
5  further use of the TVT-Secur product?
6      MR. SNELL:  Object; improper learned treatise.
7  BY THE WITNESS:
8      A.  They discouraged the use of the
9  TVT-Secur.
10  BY MR. THORNBURGH:
11     Q.  And when was the Hamer study published?
12     A.  2013.
13     Q.  And when was it first -- it looks like
14  it was first sent to publication on what date?
15     A.  It was received from publication
16  February of 2012.
17     Q.  How long after the Hamer researchers and
18  scientists wrote this publication discouraging the
19  further use of TVT-Secur did Ethicon end up
20  discontinuing the sales of the TVT-Secur product?
21     MR. SNELL:  Objection; leading, improper
22  learned treatise.
23  BY THE WITNESS:
24     A.  Approximately four months later.

Page 619

1  BY MR. THORNBURGH:
2      Q.  What is the next publication that you'd
3  like to discuss?
4      A.  It's a paper by Abdel-Fattah from
5  European Urology 2011.
6      Q.  And what is the date of the Abdel-Fattah
7  publication?
8      A.  2011.
9      MR. SNELL:  Hold on.  You gave me your copy.
10     MR. THORNBURGH:  Sorry.
11     MR. SNELL:  I just want a clean one.
12     MR. THORNBURGH:  I think they're all
13  highlighted.
14     MR. SNELL:  I don't want your highlights.
15        Go ahead.  Thank you.
16  BY MR. THORNBURGH:
17     Q.  What is the Abdel-Fattah publication?
18     A.  This is a meta-analysis on
19  single-incision slings.
20     Q.  What opinion does the Abdel-Fattah
21  meta-analysis support?
22     A.  That there are design characteristics of
23  the TVT-Secur that make it unreasonably ineffective
24  in treating stress urinary incontinence even

Page 620

1  compared with other single-incision slings.
2      Q.  And how does the Abdel-Fattah
3  meta-analysis support that opinion?
4      A.  By describing the data -- a
5  meta-analysis, as I've described before, is a
6  publication that pools the data from all of the
7  research that's done in a -- on a given topic and
8  they find the best studies that they use to draw
9  conclusions.
10        And what they -- what the conclusions
11  that they drew is that compared to the other
12  midurethral slings, the TVT-Secur performed the
13  worst compared to the other midurethral slings.
14     MR. SNELL:  Object.
15  BY THE WITNESS:
16     A.  Single-incision slings.
17     MR. SNELL:  Object.  Move to strike.  Improper
18  use of learned treatise, hearsay of the authors.
19  Go ahead.
20  BY MR. THORNBURGH:
21     Q.  Let me ask that question real quick one
22  more time.
23        How did the Abdel-Fattah publication
24  support your opinions?

Page 621

1      A.  It supported my opinions that the
2  TVT-Secur has design characteristics that make it
3  unreasonably ineffective.
4        The study showed that it -- the
5  TVT-Secur did not even perform as well as other
6  single-incision slings.
7      Q.  Is there any other information from the
8  Abdel-Fattah publication that you'd like to
9  discuss?
10     A.  No.
11     Q.  What is the next publication in your
12  binder, which is Exhibit No. 9, right?  I think so.
13     A.  Yes.  This is a study by Dr. Neuman from
14  2011.
15     Q.  And what's the exhibit number?
16     A.  It is P2309.
17     Q.  And --
18     MR. SNELL:  Give me one second just to catch
19  up with you guys.
20        Okay.  Thank you.
21     MR. THORNBURGH:  No problem.
22  BY MR. THORNBURGH:
23     Q.  And can you identify the Abdel -- sorry.
24        Can you identify Exhibit 2309 for the

68 (Pages 618 to 621)

Bruce Alan Rosenzweig, M.D.

Page 622

1  jury, please?
2      A.   Yes, it is a paper by Dr. Neuman that
3  was published in the Journal of Minimally Invasive
4  Gynecology in 2011.
5      Q.   What type of study was this study by
6  Dr. Neuman?
7      A.   It is a prospective non-randomized
8  clinical trial.
9      Q.   And what opinions does the Neuman
10  publication support?
11     A.   The Neuman publication supports my
12  opinion that the design characteristic of the
13  TVT-Secur being the short, stiff, rigid, laser-cut
14  mesh leads to the harm of pain with intercourse.
15     Q.   How does the Neuman study and those --
16  how does the Neuman study support your opinion?
17     A.   The Neuman study found an eightfold
18  increase in pain with intercourse associated with
19  the short, stiff, rigid, laser-cut TVT-Secur mesh
20  compared to a TVT-Obturator.
21     Q.   And did the Neuman study identify a
22  reason or reasons for a higher dyspareunia rate in
23  the TVT-Secur arm compared to the TVT-Obturator
24  arm?

Page 623

1      MR. SNELL:  Objection; improper learned
2  treatise, hearsay of the authors.
3      BY THE WITNESS:
4      A.   It was concluded that the laser cutting
5  of the short mesh in the TVT-Secur was the cause of
6  the high rate of pain with intercourse.
7      MR. SNELL:  Move to strike the answer.
8      BY MR. THORNBURGH:
9      Q.   And does -- was there any reference by
10  Dr. Neuman or discussion by Dr. Neuman -- strike
11  that.
12         Were there any findings by Dr. Neuman
13  concerning how those patients who developed
14  dyspareunia were treated?
15     MR. SNELL:  Object; leading.
16  BY THE WITNESS:
17     A.   Patients that had dyspareunia from the
18  short, stiff mesh underwent a removal of the mesh.
19  BY MR. THORNBURGH:
20     Q.   And what does that mean, Doctor?
21     A.   That they required an additional surgery
22  to treat the complication from the defective design
23  of the TVT-Secur.
24     Q.   Did Ethicon disclose in their

Page 624

1  information for use the need for the complete
2  removal or for a -- strike that.
3         Did Ethicon disclose or inform or warn
4  in their IFU of the potential need for subsequent
5  surgeries to treat complications such as
6  dyspareunia?
7      MR. SNELL:  Object.
8  BY THE WITNESS:
9      A.   No.
10  BY MR. THORNBURGH:
11     Q.   Could they have warned about that?
12     MR. SNELL:  Same.
13  BY THE WITNESS:
14     A.   Yes.
15  BY MR. THORNBURGH:
16     Q.   Should they have warned about that?
17     A.   Yes.
18     Q.   If you look at page 1 of Exhibit 2309,
19  there is a statement by Dr. Neuman in the
20  "Conclusion" section of the abstract that "Sexually
21  active patients might be better referred for the
22  TVT-O procedure because it was not followed by
23  dyspareunia in our series."
24         Did I read that correctly?

Page 625

1      MR. SNELL:  Object; learned treatise, hearsay.
2  BY THE WITNESS:
3      A.   Yes.
4      MR. SNELL:  Leading.
5  BY MR. THORNBURGH:
6      Q.   Did Ethicon ever warn in their IFU or
7  otherwise that sexually active patients may
8  consider -- may want to consider the TVT-O
9  procedure rather than the TVT-Secur procedure?
10     A.   No.
11     Q.   Was it common knowledge that the
12  TVT-Secur device was associated with a greater risk
13  of dyspareunia than the other sling products that
14  were on the market?
15     MR. SNELL:  Object.
16  BY THE WITNESS:
17     A.   No.
18  BY MR. THORNBURGH:
19     Q.   Is there anything else from the Neuman
20  study that you'd like to discuss?
21     A.   No.
22     Q.   What's the next publication?
23     A.   It is an abstract by Dr. Tommaselli from
24  2012 which summarizes the results of a

69 (Pages 622 to 625)

Bruce Alan Rosenzweig, M.D.

Page 626

1    meta-analysis that was performed specifically on
2    the TVT-Secur.
3        Q.    And what's the exhibit number?
4        A.    P2356.
5        Q.    And what opinions does the Tommaselli
6    publication support?
7        A.    It supports my opinions that the
8    TVT-Secur has design characteristics that make it
9    unreasonably unsafe and unreasonably ineffective.
10   They found a 15% erosion rate and a 25% failure
11   rate.
12       Q.    How did those findings support your
13   opinions, Doctor?
14       A.    The -- those findings support my opinion
15   that there are design characteristics that are
16   unreasonably unsafe, including the stiff, rigid
17   mesh, the -- that increases the risk of erosion
18   into the vagina, the arrow tip introducer that
19   disrupts the vaginal tissue, which increases the
20   risk of erosion into the vagina, and the fleece
21   tips that do not hold the mesh into place, which
22   increases the risk of failure and erosion both into
23   the vagina and into other structures.
24       MR. SNELL:  Move to strike.  Non-responsive.

Page 627

1    BY MR. THORNBURGH:
2        Q.    And, Doctor, what type of study was the
3    Tommaselli 2012 publication?
4        A.    It was a meta-analysis.
5        Q.    And we've talked a little bit about
6    meta-analysis and you've testified in previous
7    de bene esse depositions about what those are, but
8    could you briefly describe what a meta-analysis is.
9        A.    Meta-analysis is similar to a systematic
10   review where the authors pool data from other
11   studies, categorize the studies based on the
12   quality of evidence and draw conclusions about a
13   topic based on that review of previously published
14   studies.
15       Q.    And have you reviewed several
16   meta-analysis that dealt with either the TVT-Secur
17   or with mini-slings?
18       A.    Yes.
19       Q.    And based on your review of the -- these
20   several meta-analyses, did you find any to be more
21   authoritative or -- strike that.
22       More -- strike that.
23       Based on your review of these several
24   meta-analyses, are there any that are more reliable

Page 628

1    in terms of the performance of the TVT-Secur than
2    others?
3        MR. SNELL:  Objection.
4    BY THE WITNESS:
5        A.    Well, this meta-analysis and also one by
6    the Cochrane meta-analysis specifically looked at
7    the TVT-Secur by itself.  We saw from the
8    Abdel-Fattah analysis that the TVT-Secur was
9    included in.  There's another meta-analysis that
10   was done by the group by Schimpf that looked at all
11   single-incision slings together.
12       The Tommaselli was the -- specifically
13   the only one that looked specifically at the
14   TVT-Secur, though the Cochrane analysis did analyze
15   the TVT-Secur group by themselves but also looked
16   at other midurethral slings.
17       Q.    Why can -- why would it be less reliable
18   to look at data concerning all of the mini-slings,
19   the pooled data, than it would be to look at the
20   metadata or meta-analysis related specifically to
21   the TVT-Secur?
22       MR. SNELL:  Objection and leading.
23   BY THE WITNESS:
24       A.    The -- there are two meta-analysis, both

Page 629

1    the Mostafa meta-analysis and the Abdel-Fattah
2    meta-analysis, that showed that the TVT-Secur does
3    not perform both to treat incontinence and for
4    complications as well as the other single-incision
5    slings.
6        So, if one were to put -- to pool the
7    data from all single-incision slings, it might
8    decrease the -- it might dilute out the negative
9    findings from the TVT-Secur.
10   BY MR. THORNBURGH:
11       Q.    And with respect to Tommaselli, do you
12   recall how many publications those authors looked
13   at in their meta-analysis?
14       A.    They looked at 54 studies, including
15   both peer-reviewed literature and abstracts, but
16   divided up their data based on peer-reviewed
17   literature and had a category that just looked at
18   data from abstracts.
19       Q.    And what were the findings from the
20   Tommaselli research concerning the erosion rate in
21   the published data versus the erosion rate in the
22   abstracts?
23       MR. SNELL:  Objection.  Also --
24   BY THE WITNESS:

70 (Pages 626 to 629)

Bruce Alan Rosenzweig, M.D.

Page 630

1          A.   They were similar.
2          MR. SNELL:  Objection, Doctor.  Also improper
3    learned treatise in PA.  Strike.
4    BY MR. THORNBURGH:
5          Q.   And what was the ultimate determination
6    by Tommaselli as to the rate of erosion?
7          MR. SNELL:  Same.
8    BY THE WITNESS:
9          A.   It was found to be 15%.  It was about
10   16% in peer-reviewed literature and about 14% in
11   abstracts.
12   BY MR. THORNBURGH:
13         Q.   Is there any other data from the
14   Tommaselli -- Tommaselli meta-analysis that you'd
15   like to discuss?
16         A.   No.
17         Q.   What's the next study in your binder?
18         A.   It is a meta-analysis by Dr. Mostafa
19   published in European Urology in 2014.
20         Q.   And what's the Exhibit number for the
21   record?
22         A.   P2281.
23         Q.   And what opinions does the Mostafa
24   publication support?

Page 631

1          A.   It supports my opinions that there are
2    design characteristics of the TVT-Secur that make
3    it unreasonably ineffective in treating stress
4    urinary incontinence.
5               The study by Mostafa showed that the
6    TVT-Secur does not perform as well both to treat
7    incontinence and with complications as other
8    single-incision slings.
9          Q.   How does the Mostafa meta-analysis
10   support your opinion?
11         A.   It supports my opinion that there are
12   design characteristics of the TVT-Secur that make
13   it unreasonably unsafe and unreasonably
14   ineffective.
15         MR. SNELL:  Objection.  Move to strike.
16   Non-responsive.
17   BY MR. THORNBURGH:
18         Q.   And did the Mostafa publications discuss
19   specifically any of the design characteristics of
20   the TVT-Secur product?
21         MR. SNELL:  Object; leading, improper use of a
22   learned treatise --
23   BY THE WITNESS:
24         A.   Yes.

Page 632

1          MR. SNELL:  -- in Pennsylvania.
2    BY MR. THORNBURGH:
3          Q.   And what was that discussion in regard
4    to?
5          MR. SNELL:  Same objections.
6    BY THE WITNESS:
7          A.   The Mostafa publication described that
8    the design characteristics that increase the risk
9    of the TVT-Secur being ineffective in treating
10   stress urinary incontinence was that the fleece
11   tips did not hold and, therefore, the urethra was
12   not supported and the risk of incontinence was
13   higher associated with the TVT-Secur than with
14   other single-incision slings.
15         MR. SNELL:  Move to strike.  Hearsay
16   statement.
17   BY MR. THORNBURGH:
18         Q.   And is that -- is that finding from
19   Mostafa consistent with the opinions you've
20   expressed throughout the last two days?
21         MR. SNELL:  Object.
22   BY THE WITNESS:
23         A.   Yes.
24   BY MR. THORNBURGH:

Page 633

1          Q.   And I want to point your attention
2    really quickly to page 403 of Exhibit 2281.  Are
3    you there?
4          A.   Yes.
5          Q.   Okay.  And if you -- just read -- I'm
6    going to just discuss with you the first full
7    paragraph on the left side under the "Introduction"
8    section.
9               It says, "In an early systematic review
10   and meta-analysis in 2011, we showed that SIMS did
11   not, at least at that stage, live up to their
12   potential and we recommended that only" -- "they
13   only be used within the context of research."
14              Did I read that correctly?
15         MR. SNELL:  Object; leading, improper learned
16   treatise.
17   BY THE WITNESS:
18         A.   Yes.
19   BY MR. THORNBURGH:
20         Q.   And what is an SIMS or a SIMS?
21         A.   A single-incision midurethral sling.
22         Q.   And is that the same as a mini-sling?
23         A.   Yes.
24         Q.   So, is that the same as a TVT-Secur?

71 (Pages 630 to 633)

Bruce Alan Rosenzweig, M.D.

Page 634

1    A.  Yes.
2    Q.  Okay.  And the publication goes on,
3  "Over the last two years, about 20 randomized
4  controlled trials (RCTs) comparing SIMS with SMUS,"
5  which would be the synthetic midurethral slings, is
6  that correct?
7    A.  Yes.
8    Q.  And is that the full-length slings?
9    A.  Yes.
10    Q.  "Were further reported and,
11  additionally, a number of RCTs published their
12  long-term follow-up."
13    Did I read that correctly?
14    MR. SNELL:  Object; leading, hearsay, learned
15  treatise.
16  BY THE WITNESS:
17    A.  Yes.
18  BY MR. THORNBURGH:
19    Q.  The authors go on to write that
20  "A significant event occurred when an extensively
21  researched SIMS (TVT-Secur) was withdrawn from
22  clinical practice by the manufacturer, having been
23  shown to have poor clinical outcomes at the midterm
24  follow-up.  This situation emphasizes the

Page 635

1  importance of mid- to long-term follow-up of new
2  technologies before they are adopted into clinical
3  practice."
4    Did I read that correctly?
5    MR. SNELL:  Object; leading, hearsay, improper
6  learned treatise.
7  BY THE WITNESS:
8    A.  Yes.
9  BY MR. THORNBURGH:
10    Q.  And do you agree with the discussion
11  being had here by the authors in the Mostafa
12  meta-analysis?
13    MR. SNELL:  Same objection.
14  BY THE WITNESS:
15    A.  Yes.
16  BY MR. THORNBURGH:
17    Q.  Do you agree with the statement --
18  strike that.
19    Do you agree that it is important for
20  companies to perform mid- to long-term follow-up of
21  new technologies before they sell those
22  technologies to patients or to patients'
23  physicians?
24    MR. SNELL:  Object.  Same objections.

Page 636

1  BY THE WITNESS:
2    A.  Yes.
3  BY MR. THORNBURGH:
4    Q.  What's that opinion?
5    MR. SNELL:  Same.
6  BY THE WITNESS:
7    A.  That mid- to long-term studies should be
8  performed before a product is launched on to the
9  market.
10  BY MR. THORNBURGH:
11    Q.  Is there any other information from the
12  Mostafa meta-analysis that you wish to discuss?
13    A.  No.
14    Q.  What is the next publication in your
15  binder?
16    A.  This is a study, a Cochrane review,
17  which is a systematic review by Dr. Cody published
18  in 2014.
19    Q.  And what's the exhibit number for the
20  record?
21    A.  P2310.
22    Q.  And can you identify for the ladies and
23  gentlemen of the jury what this publication is?
24    A.  This is a systematic review of

Page 637

1  midurethral slings, and it specifically looked at
2  the TVT-Secur as a midurethral sling.
3    Q.  And what was the date of this
4  publication?
5    A.  2014.
6    Q.  Now, by 2012 TVT-Secur had been
7  withdrawn -- had been taken off -- strike that.
8    By 2004, Ethicon was no longer selling
9  the TVT-Secur product, is that right?
10    MR. SNELL:  Objection; misstates the evidence.
11    MR. THORNBURGH:  I think I misspoke.
12  BY MR. THORNBURGH:
13    Q.  By 2014 Ethicon was no longer selling
14  the TVT-Secur product.  Is that fair?
15    A.  Correct.
16    Q.  And, obviously, this was published two
17  years after Ethicon was no longer selling the
18  TVT-Secur product, right?
19    A.  Correct.
20    Q.  Now, what opinions of -- are supported
21  by this Cochrane publication?
22    A.  The opinions that the Cochrane
23  publication supports is that the -- there are
24  design characteristics of the TVT-Secur that led to

72 (Pages 634 to 637)

Bruce Alan Rosenzweig, M.D.

Page 638

1    the risk of it being not effective for treating
2    stress urinary incontinence.
3         One of those design characteristics was
4    the fleece tip mechanism didn't hold the midurethra
5    in place, so that the harm was recurrence or poor
6    treatment of the stress urinary incontinence.
7         Q.   And what type of study was this again?
8         A.   It was a systematic review.
9         Q.   Okay.  And in this systematic review,
10   did the authors or researchers compare the
11   TVT-Secur to standard midurethral slings?
12        MR. SNELL:  Object; leading.
13   BY THE WITNESS:
14        A.   Correct.
15   BY MR. THORNBURGH:
16        Q.   And what were the findings by the -- by
17   the Cochrane authors concerning the comparison
18   between the TVT-Secur and the standard midurethral
19   full-length slings?
20        MR. SNELL:  Object; hearsay, improper learned
21   treatise, leading.
22   BY THE WITNESS:
23        A.   The TVT-Secur performed inferiorly to
24   the full-length midurethral slings in the treatment

Page 639

1    of stress urinary incontinence.
2    BY MR. THORNBURGH:
3         Q.   Are there any other -- how does the
4    Cochrane publication support any of your other
5    opinions?
6         A.   Again, it supports my opinions that
7    there are design characteristics that make the
8    TVT-Secur unreasonably unsafe and unreasonably
9    ineffective in treating stress urinary
10   incontinence.
11        MR. SNELL:  Object.  Move to strike.
12   Non-responsive.
13   BY MR. THORNBURGH:
14        Q.   And did the Cochrane analysis also look
15   at the risk of complications of the TVT-Secur and
16   compare those to other products?
17        MR. SNELL:  Object; leading.
18   BY THE WITNESS:
19        A.   Yes.
20   BY MR. THORNBURGH:
21        Q.   And how did those findings from the
22   Cochrane review support your opinion?
23        MR. SNELL:  Object; leading, improper use.
24   BY THE WITNESS:

Page 640

1         A.   It supported my opinions that there are
2    design characteristics of the TVT-Secur that make
3    it unreasonably unsafe.  This showed that there is
4    a higher rate of complications associated with the
5    TVT-Secur.
6    BY MR. THORNBURGH:
7         Q.   Is there any other data or information
8    from the Cochrane review that you'd like to
9    discuss?
10        A.   No.
11        Q.   Let me just look at -- look at page 2 of
12   the Cochrane review with you.
13        MR. SNELL:  Roman numeral or numbered?
14   BY MR. THORNBURGH:
15        Q.   Number 2 under the "Data Collection" --
16   under the "Main Results" section of the -- I think
17   the introduction -- of the abstract.
18        Are you there?
19        A.   Yes.
20        Q.   Okay.  And you see it talks about a
21   review of the single-incision slings?
22        MR. SNELL:  Object; leading.
23   BY THE WITNESS:
24        A.   Correct.

Page 641

1    BY MR. THORNBURGH:
2         Q.   Okay.  And it says that the types of
3    single-incision slings included in this review were
4    the TVT-Secur, the MiniArc, the Ajust, the
5    Needleless, the Tissue Fixation System and the
6    CureMesh.
7         Did I read that correctly?
8         MR. SNELL:  Object; learned treatise, hearsay,
9    leading.  You left out Ophira.
10   BY MR. THORNBURGH:
11        Q.   Sorry.  And Ophira.  Does that identify
12   all of the mini-slings that were analyzed?
13        A.   Correct.
14        Q.   And if you look at the next paragraph
15   the authors write that "Women are more likely to
16   remain incontinent after surgery with
17   single-incision slings than with retropubic slings
18   such as tension-free vaginal tape."
19        Did I read that correctly?
20        MR. SNELL:  Object; leading, improper use of
21   learned treatise.
22   BY THE WITNESS:
23        A.   Yes.
24   BY MR. THORNBURGH:

73 (Pages 638 to 641)

Bruce Alan Rosenzweig, M.D.

Page 642

1      Q.   And how, if at all, does that statement
2  support your opinions in this case?
3      MR. SNELL:  Same objections.
4  BY THE WITNESS:
5      A.   That there are design defects in the
6  TVT-Secur that increased the risk of harm and
7  increase the risk of inadequate treatment of stress
8  urinary incontinence.
9  BY MR. THORNBURGH:
10     Q.   The authors go on to write --
11     MR. SNELL:  Objection.  Move to strike.
12 Non-responsive.
13 BY MR. THORNBURGH:
14     Q.   The authors go on to write that "The
15 duration of the operation was slightly shorter for
16 single-incision slings but with higher risk of de
17 novo urgency."
18        Did I read that correctly?
19     A.   Yes.
20     MR. SNELL:  Object.
21 BY MR. THORNBURGH:
22     Q.   How does one --
23     MR. SNELL:  Hold on.
24     MR. THORNBURGH:  Go ahead.  I will give you a

Page 643

1  standing objection.
2      MR. SNELL:  Hearsay, learned treatise,
3  improper use, leading.  Go ahead.
4  BY MR. THORNBURGH:
5      Q.   How does that finding support your
6  opinions?
7      A.   It shows that there are design
8  characteristics of the TVT-Secur that make it
9  unreasonably unsafe.
10     MR. SNELL:  And I think you missed my
11 objection.  I said "Same."  I'm trying to be quiet
12 and not interrupt.  I'm trying to be quick too.
13 So, go ahead.
14 BY MR. THORNBURGH:
15     Q.   The authors go on and write that "Four
16 out of five studies in the comparison included
17 TVT-Secur as the single-incision sling."
18        Did I read that correctly?
19     MR. SNELL:  Same objections.
20 BY THE WITNESS:
21     A.   Yes.
22 BY MR. THORNBURGH:
23     Q.   What does that mean?
24     MR. SNELL:  Same.

Page 644

1  BY THE WITNESS:
2      A.   That the majority of studies included
3  the TVT-Secur that they looked at.
4  BY MR. THORNBURGH:
5      Q.   The authors go on and write that
6  "Single-incision slings resulted in higher
7  incontinence rates compared with inside-out
8  transobturator slings (30% versus 11%)."
9        Did I read that correctly?
10     MR. SNELL:  Same objections.
11 BY THE WITNESS:
12     A.   Yes.
13 BY MR. THORNBURGH:
14     Q.   Was that a statistically significant
15 finding?
16     A.   Yes.
17     MR. SNELL:  Same.
18 BY MR. THORNBURGH:
19     Q.   And the authors again go on and write
20 that "The adverse event profile was significantly
21 worse, significantly" -- "specifically consisting
22 of higher risks of vaginal mesh exposure."
23        Did I read that correctly?
24     MR. SNELL:  Same objections.

Page 645

1  BY THE WITNESS:
2      A.   Yes.
3  BY MR. THORNBURGH:
4      Q.   Did Ethicon ever disclose in their IFU
5  or elsewhere that the TVT-Secur was associated with
6  a higher risk of erosions than the other meshes or
7  mesh slings that were on the market?
8      MR. SNELL:  Object; misstates the evidence.
9  BY THE WITNESS:
10     A.   No.
11 BY MR. THORNBURGH:
12     Q.   And the authors note that "Most of these
13 findings were derived from the trials involving
14 TVT-Secur."
15        Did I read that correctly?
16     A.   Yes.
17     MR. SNELL:  Same objections.
18 BY MR. THORNBURGH:
19     Q.   The authors go on to write in the next
20 paragraph that "The duration of operation was
21 marginally shorter for single-incision slings
22 compared to transobturator slings, but only by
23 approximately two minutes and with significantly
24 heterogeneity in the comparison."

74 (Pages 642 to 645)

Bruce Alan Rosenzweig, M.D.

Page 646

 1           Did I read that correctly?
 2       MR. SNELL:  Same objection.
 3   BY THE WITNESS:
 4       A.  Yes.
 5   BY MR. THORNBURGH:
 6       Q.  How, if at all, does that statement
 7   support your opinions?
 8       MR. SNELL:  Same.
 9   BY THE WITNESS:
10       A.  It supports my opinions that the
11   TVT-Secur, while touted as being a minimally
12   invasive procedure that will decrease operative
13   time, when looked at, would only decrease operating
14   time by two minutes.
15   BY MR. THORNBURGH:
16       Q.  And is that -- does that two-minute
17   operative time in your opinion support or did it
18   support the use of the TVT-Secur device?
19       A.  No.
20       Q.  And the authors go on to write that
21   "The overall results showed that the TVT-Secur is
22   considerably inferior to retropubic and inside-out
23   transobturator slings."
24           Did I read that correctly?

Page 647

 1       MR. SNELL:  Objection.  Same objections.  Go
 2   ahead.
 3   BY THE WITNESS:
 4       A.  Yes.
 5   BY MR. THORNBURGH:
 6       Q.  How does that statement, if at all,
 7   support your opinions?
 8       MR. SNELL:  Same.
 9   BY THE WITNESS:
10       A.  It supports my opinions that there are
11   design characteristics of the TVT-Secur device that
12   make it unreasonably ineffective for treating
13   stress urinary incontinence.
14       Q.  And what were the authors' conclusions?
15       MR. SNELL:  Same objections, hearsay.
16   BY THE WITNESS:
17       A.  "TVT-Secur is inferior to standard
18   midurethral slings for the treatment of women with
19   stress urinary incontinence and has already been
20   withdrawn from clinical use."
21   BY MR. THORNBURGH:
22       Q.  Do you agree with that statement?
23       MR. SNELL:  Same.
24   BY THE WITNESS:

Page 648

 1       A.  Yes.
 2   BY MR. THORNBURGH:
 3       Q.  Are there -- is there any other
 4   information from the Cochrane review that you'd
 5   like to discuss?
 6       A.  No.
 7       Q.  What is the next publication that you'd
 8   like to discuss, Doctor?
 9       A.  It's a study by Dr. Haab published in
10   the European Journal of Urology in 2012 titled
11   "TVT-Secur Single-Incision Sling After Five Years
12   of Follow-Up:  The Promises Made and Promises
13   Broken."
14       Q.  Now, Doctor, first of all, what's the
15   exhibit number?
16       A.  P2321.
17       Q.  And what -- can you identify again -- I
18   didn't hear you.  I was distracted a little bit.
19           Can you identify again for the ladies
20   and gentlemen of the jury what this study is?
21       MR. SNELL:  Objection.
22   BY THE WITNESS:
23       A.  It is a follow-up of four and a half
24   years of a surgeon's experience with the TVT-Secur.

Page 649

 1   BY MR. THORNBURGH:
 2       Q.  And what was the name of this study?
 3       MR. SNELL:  Object.
 4   BY THE WITNESS:
 5       A.  "The TVT-Secur Single-Incision Sling
 6   After Five Years of Follow-Up:  The Promises Made
 7   and the Promises Broken."
 8   BY MR. THORNBURGH:
 9       Q.  Doctor, what opinions does the article
10   by Dr. Haab entitled "The Promises Made, the
11   Promises Broken," support?
12       MR. SNELL:  Object.
13   BY THE WITNESS:
14       A.  Supports my opinion that there are
15   design characteristics of the TVT-Secur device that
16   make it unreasonably ineffective in treating stress
17   urinary incontinence.
18   BY MR. THORNBURGH:
19       Q.  How does it support those opinions,
20   Doctor?
21       A.  That after four and a half years of
22   follow-up, only 30% of women were cured of their
23   stress incontinence.
24       Q.  Doctor, is this the longest -- was this

75 (Pages 646 to 649)

Bruce Alan Rosenzweig, M.D.

Page 650

1  the longest follow-up study at the time, to your
2  knowledge?
3       MR. SNELL:  Objection.
4  BY THE WITNESS:
5       A.   At the time, yes.
6  BY MR. THORNBURGH:
7       Q.   And we looked at -- strike that.
8            You've reviewed a number of publications
9  concerning the TVT-Secur.  Is that fair?
10      A.   Yes.
11      Q.   And were those studies short-term,
12  mid-term or long-term studies for the most part?
13      A.   For the most part they were short-term
14  studies.
15      Q.   For example, we looked at the Hota
16  study, right?
17      A.   Correct.
18      Q.   And how long, again, was that study?
19      A.   One year.
20      Q.   And that's the study that you testified
21  was shut down prematurely after the efficacy or the
22  benefits of the product were outweighed by the
23  risks?
24      MR. SNELL:  Objection; leading.

Page 651

1  BY MR. THORNBURGH:
2       Q.   Do you recall that?
3       MR. SNELL:  Sorry.  Objection; leading,
4  misstates prior testimony.
5  BY THE WITNESS:
6       A.   Correct.
7  BY MR. THORNBURGH:
8       Q.   In your -- to your knowledge based on
9  your review of the medical publications, over time,
10  do patients experience more complications --
11      MR. SNELL:  Object; leading.
12  BY MR. THORNBURGH:
13      Q.   -- from the TVT-Secur?
14      MR. SNELL:  Leading.
15  BY THE WITNESS:
16      A.   Yes.
17  BY MR. THORNBURGH:
18      Q.   And over time, based on your review both
19  of the internal Ethicon company documents and the
20  peer-reviewed publications, does the TVT-Secur
21  become less effective?
22      MR. SNELL:  Object; leading, also violates
23  705.
24  BY THE WITNESS:

Page 652

1       A.   Yes.
2  BY MR. THORNBURGH:
3       Q.   So, what does that mean for patients?
4       MR. SNELL:  Same.
5  BY MR. THORNBURGH:
6       Q.   Who are looking to short-term studies or
7  doctors -- strike that.
8            What does it mean to doctors who are
9  looking at short-term studies to determine whether
10 or not the product would be effective or safe for
11 patients?
12      MR. SNELL:  Same objection.
13 BY THE WITNESS:
14      A.   This is a product that is going to be
15 placed permanently in the female pelvis, on average
16 30 to 40 years in a woman that it's being placed.
17 Short-term studies will not give you the long-term
18 risks of a product that is placed inside a female
19 pelvis for the rest of their life.
20 BY MR. THORNBURGH:
21      Q.   So, is a five-week study going to
22 provide you with sufficient information to know
23 what the risk is to a patient at one year?
24      A.   No.

Page 653

1       Q.   Is a one-year study going to provide you
2  with sufficient data to inform you what the risk is
3  to a patient at two years?
4       MR. SNELL:  Objection.
5  BY THE WITNESS:
6       A.   No.
7  BY MR. THORNBURGH:
8       Q.   Is a two-year study sufficient to
9  provide you with information as to the risk to
10 patients at ten years?
11      MR. SNELL:  Same.
12 BY THE WITNESS:
13      A.   No.
14 BY MR. THORNBURGH:
15      Q.   And what about the or how does the Haab
16 study, "The Promises Made and Promises Broken,"
17 support your opinions in this case?
18      MR. SNELL:  Object.  Move to strike the title.
19 Improper opinion by experts, hearsay.  Go ahead.
20 BY THE WITNESS:
21      A.   It supports my opinion that there are
22 design characteristics of the TVT-Secur that make
23 it unreasonably ineffective in treating stress
24 urinary incontinence.

76 (Pages 650 to 653)

Bruce Alan Rosenzweig, M.D.

Page 654

1    BY MR. THORNBURGH:
2        Q.   And when was the Haab study published?
3        A.   2012.
4        Q.   And what were the findings from Dr. Haab
5    in his long-term study?
6        MR. SNELL:  Object; improper learned treatise.
7    Sorry, doctor.  Go ahead.
8    BY THE WITNESS:
9        A.   At four and a half years, only 30%,
10   slightly over 30% of women were cured of their
11   stress incontinence.
12   BY MR. THORNBURGH:
13       Q.   And what was the failure rate, then, for
14   the TVT-Secur at 4.5 years?
15       MR. SNELL:  Same.
16   BY THE WITNESS:
17       A.   Almost 70%.
18   BY MR. THORNBURGH:
19       Q.   Is that a good result for patients,
20   Doctor?
21       MR. SNELL:  Object.
22   BY THE WITNESS:
23       A.   No.
24   BY MR. THORNBURGH:

Page 655

1        Q.   Based on your review of Ethicon's
2    internal documents and the peer-reviewed
3    publications, what were the promises made that were
4    broken by Ethicon?
5        MR. SNELL:  Object; leading, 705 violation.
6    Same objections.
7    BY THE WITNESS:
8        A.   That the safety and efficacy of the
9    TVT-Secur would be similar or equivalent to the
10   full-length slings.
11   BY MR. THORNBURGH:
12       Q.   And was that -- did that claim by
13   Ethicon, which we saw early on in their internal
14   documents, did that claim bear out to be true or
15   false?
16       MR. SNELL:  Object and leading.
17   BY THE WITNESS:
18       A.   The literature showed that that was not
19   the case.
20   BY MR. THORNBURGH:
21       Q.   Are there any other -- is there any
22   other information in the Exhibit P2321 that you
23   wish to discuss?
24       A.   No.

Page 656

1        Q.   What's the next publication, Doctor?
2        A.   It is a publication by Dr. Nilsson from
3    the International Urogynecology Journal in 2005.
4        Q.   And what is the Exhibit number?
5        A.   P2282.
6        Q.   And what opinions does the Exhibit P2282
7    support?
8        A.   That the TVT-Secur was inadequately
9    studied prior to launch of the device.
10       Q.   And who was the author of this
11   publication?
12       A.   Dr. Nilsson.
13       Q.   And do you recall what Dr. Nilsson
14   reported in this publication, P2282?
15       MR. SNELL:  Object; improper learned treatise.
16   BY THE WITNESS:
17       A.   Yes, that new devices to treat stress
18   urinary incontinence should be studied and the
19   information analyzed prior to a new device being
20   put on the market.
21       MR. SNELL:  Move to strike.  Summary/reading.
22   BY MR. THORNBURGH:
23       Q.   I just want to turn your attention
24   really quick to page 468.

Page 657

1        You'll see the last sentence in the last
2    paragraph states, "It is a waste of both public and
3    private resources to launch poorly documented new
4    treatment concepts and it is especially wrong for
5    the women suffering from stress urinary
6    incontinence to become the subjects of experimental
7    efforts without ethical approval and written
8    informed consent."
9        Did I read that correctly?
10       MR. SNELL:  Objection; improper learned
11   treatise as well.
12   BY THE WITNESS:
13       A.   Yes.
14   BY MR. THORNBURGH:
15       Q.   Do you agree with that statement by
16   Dr. Nilsson?
17       MR. SNELL:  Same.
18   BY THE WITNESS:
19       A.   Yes.
20   BY MR. THORNBURGH:
21       Q.   Do you agree that it is a waste of both
22   public and private resources to launch studies --
23   to launch products that have not been properly
24   tested?

77 (Pages 654 to 657)

Bruce Alan Rosenzweig, M.D.

Page 658

1       MR. SNELL:  Same.
2    BY THE WITNESS:
3       A.   Yes.
4    BY MR. THORNBURGH:
5       Q.   Do you agree that it is wrong for women
6    suffering from stress urinary incontinence to
7    become the subjects of experimental, untested
8    products?
9       MR. SNELL:  Object and same as before.
10   BY THE WITNESS:
11      A.   Yes.
12   BY MR. THORNBURGH:
13      Q.   Is there anything else from the 2015
14   Nilsson publication that you'd like to discuss?
15      A.   No.
16      MR. THORNBURGH:  Take a break.
17      MR. SNELL:  Sure.
18      THE VIDEOGRAPHER:  Okay.  The time is 4:53
19   p.m. and we're going off the video record.
20          (WHEREUPON, a recess was had
21           from 4:53 to 5:06 p.m.)
22      THE VIDEOGRAPHER:  The time is 5:06 p.m.  This
23   is the end of Tape 4.  It's also the end of
24   Volume 2 of the deposition of Dr. Bruce Rosenzweig

Page 659

1    and we're going off the video record.
2          (WHEREUPON, at 5:06 p.m. the
3           videotaped de bene esse deposition
4           of BRUCE ALAN ROSENZWEIG, M.D. was
5           adjourned, to be reconvened at 9:00
6           a.m., on Sunday, July 16, 2017.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 660

1       I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2    Registered Professional Reporter and Certified
     Shorthand Reporter, do hereby certify:
3       That previous to the commencement of the
     examination of the witness, the witness was duly
4    sworn to testify the whole truth concerning the
     matters herein;
5       That the foregoing deposition transcript
     was reported stenographically by me, was thereafter
6    reduced to typewriting under my personal direction
     and constitutes a true record of the testimony
7    given and the proceedings had;
        That the said deposition was taken
8    before me at the time and place specified;
        That the reading and signing by the
9    witness of the deposition transcript was agreed
     upon as stated herein;
10      That I am not a relative or employee or
     attorney or counsel, nor a relative or employee of
11   such attorney or counsel for any of the parties
     hereto, nor interested directly or indirectly in
12   the outcome of this action.
        It was requested before completion of
13   the deposition that the witness, BRUCE ALAN
     ROSENZWEIG, M.D., have the opportunity to read and
14   sign the deposition transcript.
15

16      CORINNE T. MARUT, Certified Reporter
17
18   (The foregoing certification of this
     transcript does not apply to any
18   reproduction of the same by any means, unless under
     the direct control and/or supervision of the
19   certifying reporter.)
20
21
22
23
24

Page 661

1          INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4    carefully and make any necessary corrections.  You
5    should state the reason in the appropriate space on
6    the errata sheet for any corrections that are made.
7       After doing so, please sign the errata
8    sheet and date it.
9       You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12      It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the
15   deposition transcript by you.  If you fail to do
16   so, the deposition transcript may be deemed to be
17   accurate and may be used in court.
18
19
20
21
22
23
24

78 (Pages 658 to 661)