EXHIBIT F



# TIFFANY ALLEY
## GLOBAL REPORTING AND VIDEO

Deposition of:

## Ralph Zipper, M.D.

May 16, 2015

In The Matter Of:

## In Re: CR Bard (300)

Tiffany Alley Global Reporting & Video

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696 | schedule@tiffanyalley.com | 800.808.4958



EXHIBIT 4
Deponent ZIPPER
Date 8/29/15  Rptr GR
WWW.DEPOBOOK.COM

Case 2:12-md-02327 Document 5124-5 Filed 12/08/16 Page 3 of 8 PageID #: 160427
Case 2:12-md-02327 Document 2190-5 Filed 05/10/16 Page 3 of 8 PageID #: 67834

In Re: CR Bard (300)     Ralph Zipper, M.D.     05/16/2015

Page 114

1    A. This looks like the one. Is this the one I
2 gave you? Let me make sure. It looks like it to me.
3 Yeah, I mean, it's lengthy so -- but yes, it looks like
4 the correct reliance list.
5    Q. Do you recall what you added to it to make it
6 updated from the one that you had attached to your
7 report?
8    A. No, I'd have to compare the two. I mean, it
9 was a work in progress. I've relied on a tremendous
10 number of documents, an exhausting number of documents
11 aside from my own clinic experience, my years of
12 treating patients, implanting, explanting, et cetera, so
13 no. But I can get -- if you'd like a cross-referenced
14 list, I can do that for you.
15    Q. In some instances people bold what's new.
16    A. I did not.
17    Q. Can you?
18    A. Yes, I can. I can have that for you on Monday,
19 but yes, I can certainly try to do that for you.
20    Q. You indicated that you relied on a lot of
21 documents in order to prepare your Exhibit 26 disclosure
22 which is marked as Exhibit 1. Where did you get the
23 documents that are contained on your reliance list?
24    A. The internal documents were provided by
25 counsel. Some of the studies were provided by counsel

Page 115

1 upon my request. Some of the documents were provided
2 from -- on my own research, going through -- usually
3 what will happen, sometimes someone will give me an
4 article to look at and say you might want to consider
5 this, and I open the article and there's ten more
6 articles I need because I'm not going to just trust that
7 article. I'm pulling every reference in that article.
8 It's the gift that keeps on giving. So there are
9 numerous places that my reliance list comes from.
10    Q. The research that you're just discussing with
11 me now that someone sends you an e-mail and there's an
12 article and then that might lead you to two or three
13 other articles, will all that research be provided with
14 the documents you're going to send to me?
15    A. Would you like a copy of every article in the
16 reliance list? Because, I don't know, it's going to
17 take me a while.
18    Q. Let me clarify that. Every article that you
19 did rely on is in the reliance list?
20    A. Yes.
21    Q. Okay. Even if you went to the two or three
22 others? You had suggested that you would read an
23 article --
24    A. Oh, no, that's how it got to this size, so
25 right, everything that I relied on is in here. I'm not

Page 116

1 bulletproof. I mean, could I have missed one, sure.
2 Could I miss two, sure. But with rare exception, if I
3 relied on it, it should be in here.
4    Q. Did you take any handwritten notes when you
5 were making your exhibit -- expert report?
6      MR. THORNBURGH: Objection, not discoverable.
7 Drafts aren't discoverable.
8      MS. GLEIM: I didn't ask him to produce. I
9 asked if he made any handwritten notes.
10    A. I'm sure I did. Probably not many. I'm not a
11 big guy for handwriting. He makes fun of me.
12    Q. How was it that you put together your expert
13 report?
14    A. With great meticulousness, exhaustion. I tend
15 to start at -- I pick an article and I start -- I start
16 working my way down it. I cross-reference as much as
17 possible. I create a timeline. When it's -- for
18 example, if it was an expert specific -- I mean a case
19 specific, I -- I mean, the system is go through every
20 single document. From that document, formulate an
21 opinion. If more information is needed to form that
22 opinion or if there are references, go pull those
23 references and continue until I feel that I've had
24 enough information in relation to any specific documents
25 to determine whether -- to determine how that document

Page 117

1 is relevant to the opinion and to then assimilate that
2 portion of my discovery into my final opinion. That's
3 just a building process, like building a house, one
4 brick at a time.
5    Q. How long -- how many hours do you think you
6 spent preparing the expert report that's Exhibit 1?
7    A. Somewhere between a lot and a real, real, real
8 lot. Gosh, maybe -- it's almost like editing. I don't
9 know if you know anybody who does any film editing. You
10 call it a time machine. You know, you sit down to edit
11 the film and somebody reminds you that you forgot to eat
12 for the last two days. You know this because you
13 probably do it when you sit down to prepare for a case.
14      So over a hundred hours. Could it be three
15 hundred? It could be. Could it be four -- I mean,
16 that's how this happens. I mean, you get so absorbed
17 and immersed in it. I probably have decubitus ulcers on
18 my butt from sitting in a chair going through this
19 stuff, but you'll have an exact number because I need to
20 get you those invoices. My staff was supposed to have
21 them here today when I walked in, and they were not. So
22 no one is getting fired but someone is getting whipped
23 with a wet noodle and you'll get it.
24    Q. Okay. So you're going to be providing me the
25 invoices with regard to your preparation of your expert

Case 2:12-md-02327 Document 5124-5 Filed 12/08/16 Page 4 of 8 PageID #: 160428
Case 2:12-md-02327 Document 2190-5 Filed 05/10/16 Page 4 of 8 PageID #: 67855

In Re: CR Bard (300)　　　　　　Ralph Zipper, M.D.　　　　　　05/16/2015

Page 122

1 retained as an expert. My question is, has anyone
2 approached you to be an expert and you've declined?
3　　A. In the medical space?
4　　Q. Yes.
5　　A. No.
6　　Q. Do you hold yourself out as an expert in
7 anything but medical space?
8　　A. Yes.
9　　Q. What else?
10　　A. I'm an expert kite surfer. Some might consider
11 me an expert film producer. I don't, but some might. I
12 think there are many people that would consider me an
13 expert in device development and commercialization. I
14 believe that there are some young entrepreneurial
15 doctors who would consider me an expert in regulatory
16 pains as they pertain to device commercialization, and
17 the same goes true for materials. I try not to hold
18 myself out -- but other people make that opinion, come
19 to that opinion, am I an expert or not.
20　　Q. You're not a biomedical engineer, are you?
21　　　MR. THORNBURGH: Objection.
22　　A. I am not a biomedical engineer.
23　　Q. Are you a material scientist?
24　　　MR. THORNBURGH: Objection.
25　　A. Can you tell me what a material scientist is?

Page 123

1　　Q. Someone who has an expertise in materials, I
2 assume, with some sort of chemistry background.
3　　　MR. THORNBURGH: Objection.
4　　A. When it comes to the evaluation of materials,
5 it can be approached in many different ways. As a
6 physician who not only implants materials and uses
7 surgical products but also tries to -- has endeavors and
8 spent much of his career commercializing and developing
9 products, I have an expertise in material science, but I
10 am not a material scientist.
11　　Q. What materials do you believe you have an
12 expertise in?
13　　A. I have a increased fund of knowledge that
14 someone would consider a level of expertise in materials
15 that I have used and/or tried to commercialize within my
16 field of endeavor.
17　　Q. And what types of products have you tried to
18 commercialize?
19　　A. Devices for the treatment of urinary
20 incontinence, the devices for the treatment of pelvic
21 organ prolapse, devices for the treatment of overactive
22 bladder disease, devices for the treatment of pelvic
23 pain, devices for the treatment of female sexual
24 dysfunction and/or function. Well, let's leave it at
25 that for now.

Page 124

1　　Q. Would all of the expertise that you're relating
2 to be included on Table 1 to your CV where you've
3 attempted to get patent filings?
4　　A. Not necessarily.
5　　Q. Would it be a majority of them?
6　　A. I think that's hard to say. I mean, I can give
7 you examples of how I developed expertise in these
8 various areas, but when I'm working with a company,
9 another company or my own company and we're trying to
10 develop a product and I begin looking at the materials,
11 I will visit the manufacturer. I will look at the
12 manufacturing process.
13　　　In certain instances I'm looking at an MSDS. I
14 am looking at what they've done for biocompatibility
15 testing. I am looking at the physical properties of a
16 material. I'm looking at the elasticity. I'm looking
17 at the burst strength of the material. And this is --
18 these are not things that a doctor would typically look
19 at as an end-user.
20　　　But if you're trying to develop a company and
21 you're trying to honor your fiduciary duty to partners
22 in your company and also be ethical and moral in the
23 development of a product, as the president or the lead
24 person you are going to go the extra mile, at least I
25 am, and so I'm looking at those documents and I'm

Page 125

1 visiting the manufacturing facilities.
2　　　And so can I sit up at a chalkboard and go
3 stroke for stroke about the molecular composition and
4 the hydroxyl groups and the carbon groups with a
5 bioengineer? No, I can't. But I can also attack it
6 from an angle that he can't, taking some of those
7 principles and talking about how we're going to safely
8 get them into the market and also provide them in a safe
9 fashion to our patients.
10　　Q. So I understand that, in your development of
11 products in the medical space that you would perhaps
12 meet with manufacturers and the like, as a partner of a
13 group that's trying to commercialize products --
14　　A. Yes.
15　　Q. -- do you meet with manufacturers when you are
16 an end-user of a product? Like do most physicians have
17 the knowledge that you're claiming to have?
18　　A. They do not.
19　　Q. How did you gain the additional knowledge that
20 you have with regard to the development of certain
21 products?
22　　A. Sacrificing sleep in the pursuit of knowledge.
23　　Q. Did you have specific training?
24　　A. Yeah, the training is an extensive review of
25 documents that either were made available to me or that

Page 130

1 pathology and has the ability to look at gyn microscopy
2 with a better fund of knowledge and a better frame of
3 reference than most gynecologists.
4   Q. Well, I understand that you're saying that you
5 may understand pathology better than most gynecologists.
6 You, sitting here today, would not call yourself a
7 pathology expert?
8   A. I would not.
9   Q. Do you consider yourself an expert in the
10 biomechanical testing of pelvic mesh?
11   A. I consider myself an expert in evaluating the
12 expert evaluation of mesh.
13   Q. Would you explain that further?
14   A. Sure. There are scientists who are engineers
15 who have a background in testing the physical properties
16 and/or chemical properties of materials, and to most of
17 the planet their work is Chinese. I have an atypical
18 experience in reviewing their work product so I am
19 unusually familiar with and comfortable with reviewing
20 the expert's review.
21   Q. So you're not an expert in the biomechanical
22 testing, you allow experts to do that, but you can
23 review their findings?
24   A. Well, one of the problems is that they can't
25 review their own findings. And I don't mean to be

Page 131

1 disrespectful to them, because they're needed experts,
2 but their testing ends in the laboratory. And what
3 happens in practices and necessarily what happens in the
4 game -- hopefully the Rangers don't find that out this
5 week, playoffs, hockey playoffs, excuse me -- but your
6 practice and reality are different things.
7     And so the first thing you -- with anything, is
8 you want to do some testing and see how something works
9 out in the lab. But then you want to look at those same
10 biomechanical properties, those material properties in
11 real use, and it -- they do not have the correlation.
12 They don't get to go to the operating theater and
13 explant hundreds of pieces of mesh and see your
14 suppositions or your conclusions that you made in the
15 laboratory when doing testing correct, and sometimes the
16 answer may be yes and sometimes it will be no.
17     But when you explant mesh and it's brittle and
18 it cracks and it's lost all the elasticity and it's
19 deformed, it is changed. And in the initial testing
20 they may not have been able to predict that, and perhaps
21 because the initial testing wasn't even done to try to
22 predict that. Some of these things take a lot of time
23 to occur and you can't duplicate that in a laboratory in
24 one week or even a month.
25   Q. Is it your position, then, that in order to

Page 132

1 have a product in a market you have to wait two to five
2 years, or whatever the arbitrary number is, before you
3 would be able to do that?
4   A. I don't think it's arbitrary. I think the
5 international organization for standardization has made
6 it nonarbitrary. They've determined how long things
7 should be tested. And even if they're tested that long,
8 it doesn't really mean it's safe. It means it's safe to
9 test it further. Now you've tested it in the lab or a
10 rat or a hamster or a sheep and it is not -- and those
11 standards call for more than one or two weeks' worth of
12 testing.
13   Q. Which standards are you referring to?
14   A. I am referring to the ISO 10993, which doesn't
15 mean that it's going to be safe when ultimately
16 implanted. But if you've done that testing, for
17 example, some components of it have to do with
18 sensitization, some of it would have to do with
19 irritation, some of it would have to do with actual
20 implant on local tissue effects and if it was a systemic
21 effect. You're just showing that you're safe in that
22 particular environment, but it doesn't mean that in the
23 real world it's going to be safe. And that's where the
24 biomaterial scientist is at an unfair disadvantage.
25 They cannot evaluate the biomaterial properties post

Page 133

1 implantation.
2   Q. Have you tested the biomaterial products post
3 implantation?
4   A. Yes.
5   Q. What testing have you done on the explants of
6 your patients?
7   A. When I remove the explants I compare them to
8 the naive implants before implantation, side by side.
9   Q. Wait, let me stop to you there so I can follow
10 along. Naive implants before, I need you to explain
11 that to me.
12   A. This is a piece of paper before I put it under
13 the water, and then there will be a piece of paper after
14 it's been in the sink for three days. So I have --
15   Q. I'm trying to understand how you would have a
16 duplicate of the mesh implant --
17   A. The companies all give me their products to
18 look at. They leave samples in the office so I have
19 products that haven't been implanted.
20   Q. Right, but I thought you tailor them to the
21 anatomy of the patient?
22   A. I do. But even though I tailor it to the
23 anatomy of the patient, when you implant it -- for
24 example, let's just take an Avaulta Solo. Right? You
25 know you have a 1.6 by 1.4 centimeter pore size. When

Case 2:12-md-02327 Document 5124-6 Filed 12/08/16 Page 6 of 8 PageID #: 160430
Case 2:12-md-02327 Document 2190-5 Filed 05/10/16 Page 6 of 8 PageID #: 67859

In Re: CR Bard (300)　　　　　　　　Ralph Zipper, M.D.　　　　　　　　05/16/2015

Page 134

1 that pore size is gone, it's obliterated. It doesn't
2 matter what size it was to begin with. And also, I know
3 minimal patient diameters. I don't know any patient who
4 has a vagina this small. Which means when I put it in,
5 it wasn't this small. Right? So when I put it in, at a
6 minimum, excuse me, it was not the right shape but it
7 was probably this size.
8     So it doesn't take a micrometer to know that
9 there's been a substantial difference in the size. And
10 when the pores are gone, it doesn't take a micrometer so
11 you compare the naive implant to the implant you took
12 out. When it's all wrinkled and you can't straighten it
13 out, that doesn't have anything to do with what your
14 size was beforehand. When it's not stretchable, it has
15 nothing to do with what your size was beforehand. When
16 it breaks when you pull on it, these are very discrete
17 changes compared to the naive implant.
18   Q. Do all patients know what naive implant was
19 implanted in them when you do the explant?
20     MR. THORNBURGH: Objection, calls for
21   speculation.
22   A. I would say that many patients do not know, but
23 as the explanting surgeon I often know.
24   Q. And how do you make that determination?
25   A. Operative reports and implant records.

Page 135

1   Q. Can you -- can you determine from the explant
2 itself what mesh was used in the implant?
3     MR. THORNBURGH: Objection.
4   Q. If you didn't have an op record or if you
5 didn't have an implant record that actually showed you
6 the label of what it was, what I'm trying to decide or
7 understand is whether or not you can take it from an
8 explant?
9   A. Ms. Gleim, without having the implant record or
10 an operative note, when this mesh comes out it is so
11 altered, it is so shrunken, it is so brittle, it is so
12 contracted that it's almost unrecognizable. If you read
13 pathology reports, even pathologists sometimes, when
14 you're reading what he's looking at microscopically, the
15 pathologist is confused. So no, without the implant
16 record it is -- it would certainly -- or the operative
17 report, it would be very difficult.
18   Q. Okay. So you were explaining to me the testing
19 that you do on the explants once you've performed an
20 explant, and one of the things you indicated -- and I'm
21 sorry to have interrupted but I want to understand
22 fuller -- was that you compare the explant to the naive
23 implant?
24   A. Just call it the one that hasn't been
25 implanted.

Page 136

1   Q. Okay. All right. And what other testing have
2 you performed other than comparing those two products,
3 the explant versus the implant that wasn't implanted?
4   A. Can you restate the question? I know it was a
5 pretty simple question, but I'd just like you to restate
6 it.
7   Q. Of course. What biomechanical testing of the
8 explanted pelvic mesh have you done?
9   A. Other than what I just told you about?
10   Q. Correct.
11   A. That's it.
12   Q. What you just told me about, I want to confirm.
13 Was that just visual or did you also have pathology run
14 and/or look under a microscope? Was it to the naked eye
15 or did you take further tests?
16   A. It was to the naked eye and to my
17 experimentation in the operating room where I would take
18 a scalpel, I would cut through it, I would look at it, I
19 would try to clean it of fibrous tissue so I can look at
20 the actual material, and I would pull on it. But no,
21 did I put it under burst strength testing in the
22 operating room? No, I did not. So that's the extent of
23 my evaluation of the material post explant. It is
24 taking it out, watching it fall apart, break, snap,
25 crumble, and then examining it on the operating table

Page 137

1 thereafter which often would involve dissecting it.
2   Q. Do you have any pictures before and after
3 bisection of these pieces of explants that you tested?
4   A. I do not, but I can certainly start taking
5 them. I just took one the other day and I thought to
6 myself, maybe for you guys I should start taking
7 pictures. So I can definitely get that for you guys in
8 the future.
9   Q. How do you record your testing analysis of
10 explant material after you've done a explant operation
11 and put it on the operating table to dissect it? How do
12 you then take your notes on what you've seen?
13     MR. THORNBURGH: Objection.
14   A. I do not typically take notes on that other
15 than growing my own personal knowledge of the material.
16 I believe just recently, hoping that one way I will be
17 able to go back and provide or write something, write a
18 nice article about this, I've started to include some of
19 it in my -- in the slip that goes to the pathology
20 department and occasionally in my dictation.
21   Q. Okay. So to make sure I understood that, after
22 you have explanted material and you look at it with a
23 naked eye and use your scalpel to dissect it, you then
24 either dictate your findings or you include your
25 findings on the --

Case 2:12-md-02327 Document 5124-5 Filed 12/08/16 Page 7 of 8 PageID #: 160431
Case 2:12-md-02327 Document 2190-5 Filed 05/10/16 Page 7 of 8 PageID #: 67858

In Re: CR Bard (300)     Ralph Zipper, M.D.     05/16/2015

Page 146

1 here if I wasn't an expert user with an expert opinion.
2 And so if you're going to ask me about my own personal
3 experience with slings, then we're going to spend some
4 time today talking about the medical literature and the
5 scientific literature on slings and polypropylene mesh
6 as it relates to slings.
7     And so we've -- I feel like I need to be very
8 careful about providing a one sound bite without a frame
9 of reference, and I know that's not going to happen
10 today when we talk about polypropylene mesh because
11 that's what we're here for. And so that's why I'm
12 saying why don't we just both agree not to start
13 swinging about slings and talk about polypropylene mesh.
14     Q. I will agree that you've been put forth as an
15 expert on Avaulta and we will try to limit it to that
16 unless you need to clarify your answer. I don't want
17 anyone to say that I have kept you from clarifying your
18 answer, and as long as we're clear on that, we can move
19 forward.
20     Okay. So I understand that you were
21 considering partnering with BMS Rhode Island to create
22 mesh products that were -- consisted of polypropylene
23 mesh; is that correct?
24     A. Yes.
25     Q. And the mesh products were going to be

Page 147

1 implanted transvaginally?
2     A. Yes.
3     Q. What was the method of implementation?
4     A. Yes.
5     You mentioned we can keep on doing that.
6     The method of implantation was to be for (the
7 incontinence) for the incontinence would be needle
8 based, and then for the prolapse mesh would have been
9 direct visualization. It would have been self-tailored.
10 And we were also considering alternative fixation
11 techniques. We were working on things that we called
12 STAs, soft tissue anchors, and we just started
13 prototyping some STAs and designing different STAs.
14     Q. Why is it that you didn't move forward with
15 that partnership?
16     A. As I was going forward and developing that --
17 once again this is -- it's a bit fuzzy. It's been a
18 long time. But I believe that's when I got -- I began
19 doing my work with Mpathy, which required easily 40
20 hours a week for well over a year, maybe a year and a
21 half, two years, and so I just had to choose what I felt
22 was better for my career at that time.
23     And when I partnered with Mpathy, my
24 infrastructure grew immediately, and they had some
25 infrastructure. It wasn't just me by myself anymore and

Page 148

1 my engineer.
2     MR. THORNBURGH: I've got to use the
3 restroom.
4     MS. GLEIM: Let's take a short break.
5     THE VIDEOGRAPHER: Going off the video record
6 at 2 o'clock p.m.
7     (Recess taken.)
8     THE VIDEOGRAPHER: We are back on the video
9 record at 3:22 p.m. This is the Disc 3.
10     Q. Good afternoon, Dr. Zipper.
11     A. Good afternoon.
12     Q. Before we left we were discussing the fact that
13 you had been to Bard's facilities and possibly saw
14 laboratory testing at the facility?
15     A. Actually, we're going to have to go back and
16 read today's transcription. I do not believe that's
17 what I said.
18     Q. I'm sorry if I misstated it. Did you say that
19 you thought that you had perhaps seen laboratory
20 testing?
21     A. I said that it is possible, and I might have
22 said probable or possible, but I was recollecting that I
23 had been to a cadaver lab conducted by Bard where I
24 believe they were demonstrating properties of their
25 product line.

Page 149

1     Q. Thank you for the clarification. Have you
2 personally ever conducted any laboratory testing on any
3 of the Avaulta products?
4     MR. THORNBURGH: Objection.
5     A. I have not.
6     THE WITNESS: Sorry, Dan.
7     Q. Have you ever performed a study on the
8 degradation characteristics of mesh?
9     MR. THORNBURGH: Objection.
10     A. No. I have reviewed the medical and scientific
11 literature and degradation and carved that in with my
12 clinical findings in the operating theater.
13     Q. But you never put pen to paper and performed a
14 study or done an article on that?
15     MR. THORNBURGH: Objection.
16     A. I have not.
17     Q. Have you ever performed a study on the
18 contraction or shrinkage rate of mesh?
19     MR. THORNBURGH: Objection.
20     A. No, but I have studied the contraction and
21 shrinkage of mesh.
22     Q. And you studied that through articles?
23     A. I have studied that through a review of the
24 scientific literature, medical literature, and I have
25 done my own investigation by evaluating the changes

In Re: CR Bard (300)     Ralph Zipper, M.D.     05/16/2015

Page 150

1 taking place in the products that I implant versus the
2 products that I explant.
3    Q. The changes that you've noticed yourself in
4 your clinical practice, do you have any notes or any
5 information that you can provide to us besides the fact
6 that you've taken mental notes?
7    A. Well, my expert opinion is based on that so my
8 -- those thoughts and opinions are reduced to writing in
9 my expert report, which we have in front of me as
10 Exhibit 1, and those findings are consistent with what I
11 have found throughout the medical and scientific
12 literature. I am seeing what has been described.
13    Q. Have you ever performed a study on the tensile
14 strength of mesh?
15    MR. THORNBURGH: Objection.
16    A. I have studied the tensile strength of mesh,
17 but I have not performed a study on the tensile strength
18 of mesh.
19    Q. Have you ever performed a study on the
20 flexibility of mesh either before or after it's
21 implanted?
22    MR. THORNBURGH: Objection.
23    A. And when you asked me if I performed a study,
24 if you're asking me if I've statistically analyzed data
25 and published it, no. But I have studied those

Page 151

1 properties both through a review of the literature and
2 through an examination of the material before implanted
3 and after implanted, and I've also studied those
4 properties in mesh that I was considering
5 commercializing.
6    Q. Other than the review of the literature and
7 your clinical experience, you've not taken any steps
8 actually to perform a study yourself? I just want to
9 confirm that.
10    MR. THORNBURGH: Objection.
11    A. When you say perform a study -- and correct me
12 if I'm wrong, please. I know you will. I don't have to
13 say that. I -- my interpretation of that is you're
14 wanting to know if I performed a statistical analysis or
15 hired somebody to perform statistical analysis on data
16 that I collected with regard to that specific quality
17 and then published it, and I did not. However, I have
18 studied those qualities.
19    Q. I understand that. I just want to make sure
20 that we aren't missing each other on this, that there's
21 not something in between you studying it and a published
22 article, if there's anything else where you've done a
23 brochure or you have your website, anywhere that you
24 have discussed or provided your feedback or your
25 analysis.

Page 152

1    A. Yes, I mean --
2    MR. THORNBURGH: Objection. Go ahead.
3    A. We'd have to go through, try to dig deep into
4 Mpathy and Gyne Ideas' records, but what my engineer and
5 I were doing as we were developing products both for
6 Gyne Ideas and Mpathy to bring to the U.S. market, and
7 hopefully one day get an exit, which happened, and also
8 to develop our own products is we would compare those
9 type of characteristics -- we would compare those
10 characteristics of existing products with samples of
11 mesh that we were looking at and so we would look at
12 elasticity, tensile strength, and burst.
13    Q. And you did those studies in conjunction with
14 your development of mesh with --
15    A. Yes, with the development of mesh products for
16 commercialization.
17    Q. Right. I guess what I was trying to -- to try
18 to confine it to the time period in which you were doing
19 it for the Scottish companies.
20    A. Well, we've already --
21    MR. THORNBURGH: Objection.
22    A. -- talked about that throughout today and that
23 we can probably figure it out by looking through all the
24 documents when it started and when it ended, but the
25 ballpark figures I've given throughout the day remain

Page 153

1 the same. I can't really give you a one-year period.
2    Q. No, and maybe I misspoke so I will try that
3 again. You were just talking about how when you were
4 preparing to manufacture or to promote product --
5    A. Between 2007 and 2011 would be a good frame.
6    Q. Was it just for that one entity Mpathy, or were
7 you doing it for other manufacturers as well?
8    A. I was doing it for myself and products I was
9 considering commercializing on my own.
10    Q. Besides the Mpathy?
11    A. Yes.
12    Q. You're not an epidemiologist, are you?
13    MR. THORNBURGH: Objection.
14    A. I am not an epidemiologist.
15    Q. And are you a microbiologist?
16    MR. THORNBURGH: Objection.
17    A. I am not a microbiologist.
18    Q. Are you a bacteriologist? That's a mouthful.
19    A. You know I'm a bacteriologist.
20    No, I am not a bacteriologist.
21    Q. I'm sorry. It will just be quicker if I go
22 through the series of questions and then we can
23 continue. You're not a --
24    A. Is that actually a specialty, a bacteriologist?
25    Q. I think anyone can be a specialist now.