EXHIBIT I

```
 1            IN THE UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 2                  CHARLESTON DIVISION

 3            Master File No. 2:12-MD-02327

                     MDL No. 2327

 4

                  JOSEPH R. GOODWIN

 5                U.S. DISTRICT JUDGE

 6

 7

 8    IN RE:  ETHICON, INC., PELVIC

      REPAIR SYSTEM PRODUCTS LIABILITY

 9    LITIGATION

                                            _____

10

      THIS DOCUMENT RELATES TO ALL

11

      WAVE VI CASES:

12                                          _____

13

14

15

                        DEPOSITION OF

16

                     RALPH ZIPPER, M.D.

17

18

19            Friday, October 27, 2017

               12:17 p.m. - 2:57 p.m.

20

          Hilton Melbourne Rialto Place

21             200 Rialto Place

22         Melbourne, Florida 31901-3092

23

24        Stenographically Reported By:

25            Lisa G. Smith, RMR
```

Ralph Zipper,

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         AYLSTOCK, WITKIN,
           KREIS & OVERHOLTZ, PLLC

 5         17 East Main Street
           Suite 200

 6         Pensacola, Florida 32502
           (850) 202-1010

 7         By:  Daniel J. Thornburgh, Esquire
                DThornburgh@awkolaw.com

 8

 9

      ON BEHALF OF ETHICON, INC.:

10
           BUTLER SNOW, LLP

11         1020 Highland Colony Parkway
           Suite 1400

12         Ridgeland, Mississippi 39157
           (601) 948-5711

13         By:  Jordan N. Walker, Esquire
           jordan.walker@bultersnow.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Ralph Zipper, M.D.

```
1    BY MR. WALKER:

2         Q.   Other than medical literature and company

3    documents, what other materials did you review when you

4    were formulating your opinions on TVT-Secur?

5              MR. THORNBURGH:  Objection.  There's

6         things in addition to medical literature and

7         internal corporate documents.

8    BY MR. WALKER:

9         Q.   That's what I'm asking.  I'm asking what are

10   those other categories of documents?

11        A.   I'll do my best to answer your question.  My

12   opinion is based not only on the internal documents of

13   Ethicon, including but not limited to their

14   memorandums, their PowerPoint presentations, their

15   emails, their guidance documents, the medical

16   literature that pertains to products relevant to this

17   opinion, but also my years of knowledge, training and

18   experience as both a pelvic surgeon and as an inventor

19   of medical devices and as an executive working as a

20   consultant to medical device companies and as an

21   executive running medical device companies.  Those are

22   an example of things that were used to formulate my

23   opinion, but not necessarily the comprehensive list of

24   all things.

25        Q.   Doctor, I've marked as Exhibit No. 6 a copy
```

Ralph Zipper, M.D.

```
 1    there any others that you perform?

 2              MR. THORNBURGH:  Objection.

 3              THE WITNESS:  Lisa, can you please read

 4         back my answer?

 5    BY MR. WALKER:

 6         Q.   Your answer involved non-surgical treatment

 7    options for stress urinary incontinence.  I'm just

 8    trying to establish, Doctor, a list of strictly the

 9    surgical options that you provide your patients with.

10         A.   Well, if Lisa read back my answer, you

11    would --

12              MR. THORNBURGH:  That's a different

13         question than was originally asked.

14         A.   However, I offer my patients procedural

15    options that include transurethral bulking agent

16    implantation, that include the sling surgeries,

17    midurethral sling surgeries performed with synthetic

18    material, as well as natural materials such as

19    xenograft, allograft and autograft surgery.

20    BY MR. WALKER:

21         Q.   What synthetic materials do you use when you

22    surgically treat stress urinary incontinence?

23              MR. THORNBURGH:  Objection.

24         A.   I presently in a select group of patients, a

25    small select group of patients, will offer them a
```

Ralph Zipper, M.D.

```
 1    polypropylene mesh full-length midurethral sling.

 2    BY MR. WALKER:

 3        Q.   And what product?

 4        A.   Whatever midurethral sling the surgical

 5    center or hospital has.

 6        Q.   Would that include the TVT retropubic

 7    full-length sling?

 8        A.   No.

 9        Q.   Are you able to recall any specific

10    manufacturer that your facility provides?

11        A.   Supplies have changed recently, but there was

12    a time before I learned through the suffering injury of

13    my patients and the chagrin of my peers of the

14    complications that are associated with slings and

15    therefore, as I did, I informed my patients.  Less and

16    less patients wanted slings.

17            So at one point in my career, I was doing

18    well over a hundred slings a year.  Maybe at this point

19    I'm doing five or 10.  Over the last year or two, those

20    slings may have been manufactured by companies such as

21    American Medical Systems and Boston Scientific.

22        Q.   Doctor, would you agree that if you are

23    providing as a treatment option a retropubic

24    full-length synthetic sling, that it is within the

25    standard of care to treat a patient for stress urinary
```

Ralph Zipper, M.D.

1   at their polypropylene mesh and the end results of the

2   process you're describing.  So though I could not

3   describe to you the antioxidant material used to

4   inhibit degradation in the TVT-S sling, I have had the

5   opportunity to look at the end result.

6   BY MR. WALKER:

7        Q.   Would you agree with me that the mesh

8   material of TVT-Secur is the same mesh material that's

9   used in TVT retropubic and the TVT-O with the exception

10  perhaps of how it's cut?

11            MR. THORNBURGH:  Objection.  I think

12       it's a significant exception.

13            THE WITNESS:  Could you please read back

14       the question?

15            (The question on page 32, line 7, was

16       read back.)

17       A.   With the exception of how it's cut, with the

18  exception of how it is shaped, and with the exception

19  of the pieces that are added to it, it is my

20  understanding that the base material, polypropylene is

21  the same.

22  BY MR. WALKER:

23       Q.   My question is a little more specific.  The

24  mesh itself, the weave of the mesh, the mesh material,

25  would you agree that it's the same in all three

Ralph Zipper, M.D.

1    products?

2              MR. THORNBURGH:   Objection, asked and

3        answered.

4        A.   When you originally asked the question, you

5    attached it to an exception and so my answer provided

6    that there are additional exceptions, and so you

7    excepted the fact that it was cut differently and I

8    want everyone who might read this transcript to

9    understand that there are other exceptions that need to

10   be considered as well.

11             But once again, if you're asking about the

12   substrate and the resin and the polypropylene fiber

13   that is extruded, it is my understanding that they're

14   the same.

15   BY MR. WALKER:

16       Q.   Let me try it this way:  Would you agree that

17   the pore size of the TVT-Secur mesh is the same as the

18   pore size of the TVT retropubic and TVT-O?

19       A.   I would -- it is my understanding that even

20   scientists within Ethicon could not confidently agree

21   with that because uniformity of fabrication was

22   compromised and pore size varied even in one sheet of

23   material.

24             But it is my understanding that the

25   fabrication process was the same and the resin was the

Ralph Zipper, M.D.

1    short.   The initial TVT-X sling was 12 centimeters

2    compared to a 48-centimeter TVT.

3            Well, we know that scaring takes place around

4    the sling.   That's how you get durable fixation and we

5    know that the amount of fixation is proportional to the

6    amount of material of which the scar occurs around.   So

7    when you place an eight centimeter sling in, you need

8    an even better fixation device, a better fixation

9    mechanism, instead of no fixation mechanism.

10           So there's -- the length was most likely --

11   more likely than not defective.   The fixation means was

12   defective.   The inserter was defective.   The inserter

13   was so defective that key opinion leader Dr. Jaime

14   Sepulveda dedicated 16 of his 29 slide lecture just to

15   talking about how to take out the darn inserter.

16           The laser cutting of the product was

17   defective, and this is just not my opinion this is the

18   opinion of some of the Ethicon's key opinion leaders

19   including Dr. Newman.   Dr. Newman opined that the stiff

20   laser cut edges were responsible for vaginal pain and

21   the high erosion rates.

22           There is additional discussion of design and

23   method defects that is described in my written opinion.

24   There are.

25           Q.   Doctor, what if any experience do you have in

Ralph Zipper, M.D.

```
 1    device labeling?

 2         A.    Early on -- in the middle of my career in or

 3    about 2006, 2007, I as a consultant began writing

 4    labeling for pelvic organ prolapse and mesh products

 5    and sling products, but more recently, have been

 6    intimately involved in the creation of the labels for

 7    both of my companies which are in the process of coming

 8    to market with two devices in the women's health space

 9    that already have 510(k) clearances, but we are

10    submitting a sub Q application for both an IDE and

11    randomized control trials for new indications for use

12    and those applications are associated with new labels

13    and I'm in the process of writing those labels.

14         Q.    Doctor, what if any methodology did you use

15    in rendering your warning and labeling opinions?

16         A.    So my method, which improves as all things do

17    over time, my method relies on the FDA guidance, which

18    includes the Code of Federal Regulations, Part 801, the

19    adjoining guidance G91-1, includes the ISO guidance,

20    including 14 630.

21              So my method begins by I open up all those

22    pages.  I open up the FDA guidance, I opened up the ISO

23    guidance.  I apply that to the development of my label.

24    That's where my minimum requirements begin.

25              But ultimately, when you're going to be
```

Ralph Zipper, M

```
1    selling a device for the treatment of human beings, in
2    this case women, you can't do the minimal.  You want to
3    try to do the maximum.
4             And so after I make sure that I meet the
5    minimum requirements and if we look at G91-1 guidance
6    to the original code of CFR 801, once I ensure that
7    I've met those minimum requirements and I create an
8    adequate label and I'm not ambiguous, and I make sure
9    that I use terms for a patient label that patients can
10   understand, and I make sure that I inform what is known
11   and what is not known and what clinical trials are
12   missing and what clinical trials we have and what
13   different opinions we have, I test that label first
14   among my coworkers and then once they're done, it'll be
15   tested among the end users.
16            And let me tell you, the end users are not
17   key opinion leaders.  That's not our intended user.
18   It's the world of generalists.  So although we may ask
19   key opinion leaders to be part of design validation,
20   design validation of these labels will include enough
21   true users of the device.  That's the only way that you
22   can adequately test a label.
23            So my method starts off the minimum
24   requirements, which are defined in the code of federal
25   regulations and in the guidance documents and in the
```

Ralph Zipper, M.D.

1    ISO documentation and then improve on that, get input

2    from the real end users and make sure the labels are

3    adequate to accomplish what a label needs to accomplish

4    to inform users and patients and make sure the device

5    can be used safely and effectively for its intended

6    use.

7         Q.    That methodology that you just described, do

8    you use that methodology in your practice as a CEO

9    executive board member of device manufacturing

10   companies?

11        A.    Absolutely.

12        Q.    Doctor, do you have an opinion one way or the

13   other whether or not a sutured device for treatment of

14   stress urinary incontinence is a safer, more -- a safe

15   alternative design?

16        A.    Yeah, absolutely.  I believe that there was a

17   systematic review of the literature in 2009 and/or 2011

18   by the Cochrane Group that compared the efficacy of

19   sutured-device type repairs such as the Burch

20   procedure, conventional slings and midurethral slings

21   and those systematic reviews found that all three

22   procedures, the suture-device-type repair, the Burch

23   repair, the traditional sling, and the synthetic

24   midurethral sling all had similar efficacy, so they

25   were all equally effective.

Ralph Zipper, M.D.

1           There was some -- what they call variable and

2    low level evidence to suggest that the synthetic repair

3    had less short-term urinary tract symptoms, but there

4    was no evidence of any long-term benefit from any one

5    of those procedures over the other.  So in the long

6    term, the suture-device repair and the classical

7    natural tissue sling repairs were equally effective and

8    more likely than not safer.

9           Q.    Doctor, do you have an opinion whether or not

10   a full-length midurethral sling mechanically cut using

11   Ultrapro would have been a safer alternative design

12   than the TVT-Secur device?

13          A.    It would have been safer.

14          Q.    As a CEO or an executive and board member of

15   medical device manufacturing companies, do you have an

16   opinion one way or the other whether or not Ethicon and

17   Johnson & Johnson acted as a prudent manufacturer could

18   have acted in manufacturing, designing, selling and

19   labeling the TVT-Secur device?

20          A.    Yes, I do.

21          Q.    What's that opinion?

22          A.    My opinion is that Ethicon slash Johnson &

23   Johnson took unacceptable shortcuts and thereby failing

24   to provide safety and efficacy for the devices subject

25   to today's deposition, the TVT-Secur device.