# EXHIBIT D



**Digital Commons @ Georgia Law**

Scholarly Works

Faculty Scholarship

1-1-2017

# Monopolies in Multidistrict Litigation

Elizabeth Chamblee Burch

*University of Georgia School of Law*, eburch@uga.edu

Repository Citation

Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation* , 70 Vand. L. Rev. 67 (2017),
Available at: http://digitalcommons.law.uga.edu/fac_artchop/1113

This Article is brought to you for free and open access by the Faculty Scholarship at Digital Commons @ Georgia Law. It has been accepted for
inclusion in Scholarly Works by an authorized administrator of Digital Commons @ Georgia Law. For more information, please contact
tstriepe@uga.edu.

# Monopolies in Multidistrict Litigation

*Elizabeth Chamblee Burch\**

*When transferee judges receive a multidistrict proceeding, they select a few lead plaintiffs' lawyers to efficiently manage litigation and settlement negotiations. That decision gives those attorneys total control over all consolidated plaintiffs' claims and rewards them richly in common-benefit fees. It's no surprise then that these are coveted positions, yet empirical evidence confirms that the same attorneys occupy them time and again.*

*Anytime repeat players exist and exercise both oligopolistic leadership control across multidistrict proceedings and monopolistic power within a single proceeding, there is concern that they will use their dominance to enshrine practices and norms that benefit themselves at consumers' (or here, clients') expense. Apprehensiveness should increase when defense lawyers are repeat players too, as they are in multidistrict litigation. And anxiety may peak when the circumstances exhibit these anti-competitive characteristics, but lack regulation as they do here. Without the safeguards built into class certification, judicial monitoring and appellate checks disappear. What remains is a system that may permit lead lawyers to act, at times, like a cartel.*

*Basic economic principles demonstrate that noncompetitive markets can result in higher prices and lower outputs, and agency costs chronicle ways in which unmonitored agents' self-interest can lead them astray. By analyzing lead lawyers' common-benefit fees, the non-class deals that they design, and the results they generate for their clients, this Article introduces new empirical evidence that multidistrict litigation is not immune to market or agency principles. It demonstrates that repeat players on both sides continually*

---

\*　　Charles H. Kirbo Chair of Law, University of Georgia Law School. My sincere thanks to Andrew Bradt, Nathan Chapman, Harlan Cohen, Brannon Denning, Howard Erichson, Alexandra Lahav, Valerie Nannery, Margaret Williams, Morris Ratner, Theodore Rave, Judith Resnik, Charlie Silver, Jay Tidmarsh, Margaret Torrey, Adam Zimmerman, anonymous transferee judges, anonymous multidistrict litigation attorneys, and participants at Duke Law School's Mass-Tort MDL Program for Judicial Conference Committees, Notre Dame Law School's faculty workshop, and UGA/Emory's faculty workshop for their comments on earlier drafts and insights on the topic. Thanks also to Payton Bradford, Lee Deneen, Hayes Dever, and Kyle Hollomon for their research and data collection assistance, to the editors at *Vanderbilt Law Review* for their valuable editorial assistance, and especially to Georgia Law School for generously funding this research. With one exception in 2009, I have never provided outside consulting or expert witness services. No outside funding or grants have been used to fund this work.

*achieve their goals in tandem—defendants end massive suits and lead plaintiffs' lawyers increase their common-benefit fees. But this exchange may result in lower payouts to plaintiffs, stricter evidentiary burdens in claims processing, or more coercive plaintiff-participation measures in master settlements.*

*These circumstances warrant regulation. Even though judges entrench and enable repeat players, they are integral to the solution. By tinkering with selection and compensation methods and instilling automatic remands after leaders negotiate master settlements, judges can capitalize on competitive forces already in play. Tapping into the vibrant rivalries within the plaintiffs' bar allows judges to use dynamic market solutions to remap the existing regulatory landscape by invigorating competition and playing to attorneys' adversarial strengths.*

INTRODUCTION .................................................................................. 70

I.    LEAD LAWYERS' MONOPOLISTIC POWER
      IN MULTIDISTRICT LITIGATION ............................................. 79
      A.    *Empirical Evidence of Oligopolies:*
            *Repeat Play and Market Share* ................................... 79
      B.    *Institutional Practices Foster Rule*
            *Entrenchment and Erect Entry Barriers* ................... 81
            1.    Leadership Selection Methods
                  Restrain Competition ...................................... 81
            2.    Compensation Methods Impose
                  Costs on Competitors ...................................... 84
            3.    Repeat Play Can Promote Efficiency
                  and Economies of Scale .................................. 85

II.   EMPIRICALLY AND ETHICALLY ASSESSING
      THE DEALS REPEAT PLAYERS DESIGN .................................. 86
      A.    *Defendants Bargain for Closure*
            *and Returned Funds* .................................................. 90
            1.    Recommendation, Withdrawal,
                  and Walkaway Provisions Impart Closure,
                  Restrain Competition ...................................... 94
            2.    Case-Census Provisions Yield
                  Judicially Reinforced Closure
                  and Define the Relevant Market .................. 102
            3.    Latecomer and Reverter Clauses
                  Promote Finality, Inhibit Advertising,
                  and Return Funds ......................................... 104
      B.    *Lead Lawyers Bargain*
            *for Common-Benefit Fees* ......................................... 107

         1.    Using Early Bird Discounts
              and Summary Fee Increases ........................ 112
         2.    Expanding Fees to State-Court Litigants.... 114
         3.    Negotiating Common-Benefit Fees
              with the Defendant ....................................... 119

   *C.*   *Cartel-like Sanctions Suppress
       Dissent and Competition* ........................................ 122
   *D.*   *What Then Do Plaintiffs Receive?* ........................... 124
         1.    Plaintiffs Are Unlikely to Receive
              the Peace Premium ...................................... 127
         2.    Plaintiffs Appear to Be
              Inadequately Represented ........................... 132

III.   REGULATING THE MONOPOLY .............................................. 135
   *A.*   *Competing to Become the Monopoly:
       Leadership Selection Criteria* .................................. 137
         1.    Competitive Selection Processes
              and Criteria ................................................ 138
         2.    Permitting Confidential Objections
              to Special Masters ....................................... 141
         3.    Presumptive Appointments and Removals
              Based on Structural Conflicts ...................... 143
   *B.*   *Regulating Fees to Encourage Competition
       and Fidelity to Claimants* ....................................... 145
         1.    Compensate Leadership on
              a Quantum Meruit Basis .............................. 146
         2.    Best Practices Can Empower State-Court
              Cases as Competitive Checks ....................... 150
   *C.*   *Automatically Requesting Remand
       for Non-settling Plaintiffs* ....................................... 152

CONCLUSION .................................................................................. 154

TABLE A1: AGGREGATE SETTLEMENTS OCCURRING WITHIN THE
   DATASET ............................................................................. 156

TABLE A2: REPEAT PLAINTIFFS' ATTORNEYS' PARTICIPATION IN
   NON-CLASS SETTLEMENTS .................................................... 158

A3: POCKET GUIDE FOR LEADERSHIP APPOINTMENT AND
   COMPENSATION ................................................................... 160

A4: SAMPLE LEADERSHIP APPLICATION FORM ............................... 162

A5: LEADERSHIP APPLICANT SCORING SHEET ................................ 164

A6: SAMPLE ORDERS SUGGESTING REMAND AND REPLACING
   LEADERS ............................................................................. 165

INTRODUCTION

Clients are people, not inventories. But their claims are often "sold" through referring attorneys and warehoused like commodities by the high-end plaintiffs' lawyers who control multidistrict litigations. As in class actions, judicially appointed lead lawyers dominate settlement discussions. By consolidating control in the hands of a few lawyers and giving those attorneys negotiating power over all the claims pending before the transferee court, leadership is able to both credibly threaten the defendant with significant exposure and promise some degree of holistic closure. If lead lawyers can conscript individual plaintiffs' attorneys into consenting to a deal that allows those attorneys to cash in on their fees only by settling their entire client list, then the defendant will receive something of value that only such a monopoly can offer.

Nevertheless, as in any monopoly, the downside may well be that leadership receives higher common-benefit fees for reduced outputs.[1] Common-benefit fees are akin to the price that a monopoly charges for goods or services. And it's clear that even less frequent repeat players in leadership roles fare quite well as evidenced by some of their lavish lifestyles—some have appeared in *The Real Housewives of Beverly Hills* and in magazine spreads alongside yachts and private planes.[2] Common-benefit fees alone—without the accompanying contingent fees—have ranged from $4 million to over $356 million.[3]

What is less clear, however, is how the plaintiffs fare—the consumers, so to speak. Not all plaintiffs' claims are created equal.[4] If leadership's influence is unchecked, it's possible that lead attorneys could secure generous common-benefit fees for themselves, while generating suboptimal outcomes for some or all claimants. It is here that a significant departure from the class-action baseline emerges,

---

1.   Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action*, 103 COLUM. L. REV. 149, 164 (2003).

2.   Amanda Bronstad, *With a Smooch, Tom Girardi Makes Debut on '*Real Housewives,*'* NAT'L L.J. (Dec. 16, 2015), http://www.nationallawjournal.com/id=1202745063522/With-a-Smooch-Tom-Girardi-Makes-Debut-on-Real-Housewives?slreturn=20160912185720 [https://perma.cc/SSR6-SFPE]; Richard Johnson, *Perry Weitz is Living the Lavish Life*, PAGE SIX (Jan. 30, 2015), http://pagesix.com/2015/01/30/perry-weitz-is-living-the-lavish-life/ [https://perma .cc/Q45G-HSLD]. Perry Weitz appeared only once in the dataset (*Fosamax*), though his law firm had attorneys in ten leadership positions; Tom Girardi was a leader in three multidistrict proceedings (*BPA*, *Yasmin/Yaz*, and *Nexium*).

3.   *Infra* tbl.3.

4.   The scholarly literature is rife with such examples. The interested reader, however, might begin with Nagareda, *supra* note 1, at 166 (pointing out sources of variance in the determination of damages, such as plaintiff friendly jurisdictions).

for without certification, multidistrict proceedings lack the judicial, competitive-market, and institutional checks that can help safeguard and legitimize class outcomes.

Self-dealing settlement terms and collusive behavior have been well documented in class actions even though classes require extensive regulation throughout the proceedings.[5] In Rule 23(b)(3) classes, because only class counsel stand to gain attorneys' fees, a host of competing attorneys who are otherwise boxed out of that fee award have incentives to solicit and assist class members in opting out. Appellate courts stand ready to reverse collusive deals and chastise self-dealing attorneys.[6] And even defendants occasionally serve as watchdogs for class members when their interests align: they invoke inadequate representation as a rationale against class certification and then, when settling, may consider its existence to prevent the class-wide settlement's preclusive effect from unraveling.[7]

But even these safeguards crumble in non-class, multidistrict proceedings. When transferee judges select lead lawyers, they rarely attend to adequate representation, focusing instead on financial means, expertise, and cooperation—factors that empower repeat players but may stifle competition. And unlike class settlements that require judges to ensure that they are fair, reasonable, and adequate, judges have little say in "private" global deals that leaders design. External competitive checks are likewise absent: the overwhelming message sent by transferee judges is that leadership appointments—and the lucrative fees accompanying them—are conditioned upon cooperation and team play. So, even though plaintiffs' attorneys are assertive and ambitious, their calculated response may be to silence their discord and achieve financial success by playing the long game. Defendants are no help either, for finality hinges not on adequate

---

5. FED. R. CIV. P. 23; *e.g.*, Eubank v. Pella Corp., 753 F.3d 718, 729 (7th Cir. 2014) (overturning a class settlement approved by the lower court because the settlement "flunked the 'fairness' standard by the one-sidedness of its terms and its fatal conflicts of interest . . ."); Howard M. Erichson, *Aggregation as Disempowerment: Red Flags in Class Action Settlements*, 92 NOTRE DAME L. REV. (forthcoming).

6. *E.g.*, Pearson v. NBTY, Inc., 772 F.3d 778, 787 (7th Cir. 2014); *Eubank*, 753 F.3d at 729.

7. *E.g.*, Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 393 (1996) (Ginsburg, J., concurring in part and dissenting in part) (pointing to an observation by the magistrate judge that the defendant's willingness to create a settlement fund, thereby reducing the amount received by the plaintiffs' counsel, resulted from a desire to avoid further litigation in related state law claims); Stephenson v. Dow Chem. Co., 346 F.3d 19 (2d Cir. 2003) (involving the potential preclusion of an earlier class-action settlement creating a compensation program for the plaintiffs that purported to resolve all claims based on the harm giving rise to the prior class action).

representation and preclusion, but on convincing claimants to accept the deal.[8]

Maybe these circumstances would be less troubling if they affected only a few cases, but multidistrict litigation is mushrooming in both impact and sheer numbers. These cases often attract sustained media attention (e.g., General Motors' ignition switch litigation), which influences public perception. And from 2002 to 2015, multidistrict proceedings leapt from sixteen to thirty-nine percent of the federal courts' entire civil caseload.[9] Removing prisoner and social security cases escalates that number to 45.6 percent.[10] Many factors surely contribute to that increase, but two pulling in divergent directions stand out: corporations operate nationally (and internationally), but recent congressional and judicial decisions have hobbled the use of nationwide class actions, particularly when state laws govern.[11]

In short, multidistrict litigation impacts the entire civil justice system. Even though the Judicial Panel on Multidistrict Litigation ("the Panel") centralizes factually related cases to promote efficient *pretrial* handling only,[12] the reality is that just 2.9 percent of cases return to their original districts.[13] As cases routinely conclude through

---

8.  *Infra* Part II.A.1.

9.  DUKE LAW CTR. FOR JUDICIAL STUDIES, MDL STANDARDS AND BEST PRACTICES, at x (2014), https://law.duke.edu/sites/default/files/centers/judicialstudies/MDL_Standards_and_Best _Practices_2014-REVISED.pdf [https://perma.cc/5SXR-TGG8]; JUDICIAL PANEL ON MULTIDISTRICT LITIG., 2015 YEAR-END REPORT 1 (2015).

10.  DUKE LAW CTR. FOR JUDICIAL STUDIES, *supra* note 9, at x–xi. This number will likely increase once the 2015 year-end statistics are publicly available.

11.  *E.g.*, Class Action Fairness Act of 2005 §§ 2(a)–(b), 4, Pub. L. No. 109-2, 119 Stat. 4–6 (codified in scattered sections of 28 U.S.C.) (creating federal jurisdiction over class actions, which increases choice-of-law problems); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 363–67 (2011) (strengthening commonality requirement for class certification under Rule 23(a)). For a detailed overview of these changes, see Elizabeth Chamblee Burch, *Constructing Issue Classes*, 101 VA. L. REV. 1855, 1860–66 (2015). The settlement class action in mass torts has, however, seen a recent revival. *E.g.*, *In re* Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 448 (3d Cir. 2016) (affirming approval of a class-action settlement for former NFL players); *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, 295 F.R.D. 112, 161 (E.D. La. 2013) (certifying a class of medical claims).

12.  28 U.S.C. § 1407 (2012); Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 40 (1998) (pointing to legislative history indicating that the statute applies only to pretrial stages).

13.  Since its creation in 1968, the Panel has centralized 462,501 civil actions for pretrial proceedings. By the end of 2013, a total of 13,432 actions had been remanded for trial, 398 had been reassigned within the transferee districts, 359,432 had been terminated in the transferee courts, and 89,123 were pending throughout the district courts. *Judicial Panel on Multidistrict Litigation—Judicial Business 2013*, U.S. COURTS (2013), http://www.uscourts.gov/statistics-reports/judicial-panel-multidistrict-litigation-judicial-business-2013 [https://perma.cc/MZJ2-CYB7].

these proceedings, the lack of checks and balances to thwart self-dealing temptations becomes all the more startling and suggests that regulation is warranted. Part I adds theoretical and empirical support to that argument. It highlights evidence that a small cadre of elite actors routinely occupies the most powerful positions, pinpoints the institutional policies that promote monopolization, and describes how players use their influence to create and entrench practices that serve their mutual interests.

Part I's point, however, is not that repeat players form an actionable oligopoly, cartel, or monopoly under antitrust law. Instead, antitrust and economic principles enter in two distinct, but intertwined ways. First, like oligopolies where a few sellers control most of the market's output, repeat players occupy plaintiffs' leadership positions across many multidistrict proceedings, as Part I illustrates empirically, and a handful of those repeat players are central to every proceeding.[14] By designing and replicating beneficial practices, as well as imposing social and financial sanctions on rivals, repeat players may use cartel-like understandings and enforcement mechanisms to disable other firms from competing and to make their own next leadership appointment more likely.[15] Second, once judges appoint leaders in a particular multidistrict proceeding, those attorneys control the litigation, usurping the traditional attorney's daily responsibilities. As such, lead lawyers monopolize decisions, negotiation strategies, and settlement discussions, often in ways that encompass even state-court cases. The deals they devise reduce competition by tethering all attorneys' financial interests together and sometimes further diminish the demand for legal services by

---

14.    *Infra* Part I.A.; *see also* Herbert Hovenkamp & Christopher R. Leslie, *The Firm as Cartel Manager*, 64 VAND. L. REV. 813, 817–18 (2011) (defining a cartel as "an organization of two or more separate firms that coordinates output or price, [but] may coordinate other aspects of its members' behavior as well"); Richard A. Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach*, 21 STAN. L. REV. 1562, 1562 (1969) (defining oligopolies).

15.    *See* TIM FRAZER, MONOPOLY, COMPETITION AND THE LAW 9 (1992) (noting that monopoly power can be achieved through unfair competitive techniques that prevent firms from competing); HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY § 1.2a (5th ed. 2016) (noting that economists would label repeat players as "dominant firms," not as "monopolists" due to the existence of a competitive "fringe" of smaller competitors); Myriam Gilles, *Tribal Rituals of the MDL*, 5 J. TORT L. 173, 178 (2012):

> On this [hub-and-spoke] model, a principal reason why some lawyers recurrently appear in MDLs is that they've managed to form, or join, fluid networks that are held together through mutually beneficial arrangements that are only possible among repeat players, where there is always a "next time"—a next MDL—in which a favor can be repaid, or a threat can be carried out;

Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 TEX. L. REV. 515, 584–90, 593–600 (2004) (explaining how cartels use social sanctions).

restricting attorney advertising. Without regulation, this consolidated control may tempt plaintiffs' leadership to collude with defense attorneys in ways that hurt plaintiffs.

Monopolistic power over individual proceedings carries an inherent potential for abuse.[16] It is here that classic principal-agent concerns over agents' self-dealing tendencies converge with market theory. Well-established economic principles demonstrate that non-competitive markets can result in higher prices and lower outputs that harm consumer welfare.[17] In principal-agent terms, the worry is that agents may bargain for higher common-benefit fees in return for selling out their principals—perhaps in the form of reduced payouts to plaintiffs, stricter evidentiary burdens in claims processing, or more coercive participation measures.

Accordingly, Part II builds on Part I's evidence of repeat play to shine fresh empirical light onto the settlements those players design. It shows that multidistrict litigation is not immune to agency or market principles. Analyzing the non-class settlements that occurred within an original dataset built from all product-liability and sales-practices multidistrict litigations pending as of May 2013, I identified provisions that one might argue principally benefit the attorneys and not the litigants, such as those that compensate lead lawyers or generate closure for defendants. One theme emerged from this exercise: the outcomes seem to favor repeat agents. They achieved their goals time and again in concert—defendants gained finality, and lead lawyers increased their fees. They accomplished both by marrying individual lawyers' attorneys' fees to all their clients' willingness to settle; if too few clients settled, then the deal would collapse. This allowed defendants to receive closure, plaintiffs' leadership to receive common-benefit fees, and individual attorneys to receive their cut of the contingency fee.

This win-win-win may not extend to plaintiffs even though the main goal of personal injury suits is to compensate them—not to resolve a big case. To take but one example, in the *Propulsid* litigation, 6,012 plaintiffs traded their lawsuit for the settlement process. Yet, only thirty-seven of them (0.6 percent) recovered any money through the rigorous physician-controlled settlement process,

---

16.    Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 273 (2d Cir. 1979) ("[Monopolistic power] like all power . . . is laden with the possibility of abuse; because it encourages sloth rather than the active quest for excellence; and because it tends to damage the very fabric of our economy and our society, monopoly power is 'inherently evil.'" (quoting United States v. United Shoe Mach. Corp., 110 F.Supp. 295, 345 (D. Mass. 1953))).

17.    *See* FREDERIC M. SCHERER, INDUSTRIAL MARKET STRUCTURE AND ECONOMIC PERFORMANCE 13–19 (1970) (showing how monopolies can lead to market inefficiencies).

and they received little more than $6.5 million in total.[18] Yet, the court awarded lead lawyers over $27 million in common-benefit fees based on an $87 million-dollar fund,[19] the bulk of which reverted back to the defendant.[20]

Whether lead lawyers trade finality for enhanced common-benefit fees and whether this uniformly comes at an unacceptable cost to plaintiffs is impossible to decipher given how few comparisons exist. It is also besides the point. The point is not to demonstrate a causal relationship, to reveal explicit collusion, or even to claim that repeat players are inherently bad. Rather, the point is that self-interest can take over if left unchecked, and no checks exist.

As such, Part III shifts from Part II's question of *why* we should regulate to *how*. Over the years, academics have proposed various monitoring solutions, each with its own merits and drawbacks. First, clients might monitor, much as they do in individual suits. But lawyers in large multidistrict litigations often represent hundreds of clients, making tailored client communication difficult. While judges, special officers, and even lawyers can empower clients to interact,[21] share information, form groups, and even govern themselves,[22] collective-action problems may persist without intervention. Moreover, doctrinal confusion among courts and the bar over ethical obligations in aggregate settlements undermines the enforcement threat of attorney malpractice suits.[23]

Second, courts might embrace class actions and let judges police misconduct.[24] Acting as a fiduciary for absent class members,

---

18.     *Infra* note 294 and accompanying text.

19.     *Infra* note 295 and accompanying text.

20.     *Infra* notes 115 and 120 and accompanying text.

21.     *See* Robert H. Klonoff et al., *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV. 727, 730 (2008) (advocating for the use of the internet in facilitating class interaction); Judith Resnik et al., *Individuals Within the Aggregate: Relationships, Representation, and Fees*, 71 N.Y.U. L. REV. 296, 394–95 (1996); Jack B. Weinstein, *The Democratization of Mass Actions in the Internet Age*, 45 COLUM. J.L. & SOC. PROBS. 451 (2012).

22.     I have expanded upon this idea elsewhere. Elizabeth Chamblee Burch, *Litigating Together: Social, Moral, and Legal Obligations*, 91 B.U. L. REV. 87 (2011). Judge Weinstein has written extensively in this area as well. JACK B. WEINSTEIN, INDIVIDUAL JUSTICE IN MASS TORT LITIGATIONS 57–61 (1995); Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 NW. U. L. REV. 469, 542–49 (1994).

23.     *See* Lynn A. Baker, *Aggregate Settlements and Attorney Liability: The Evolving Landscape*, 44 HOFSTRA L. REV. 291, 298–304 (2015) (illustrating doctrinal confusion).

24.     *E.g.*, Howard M. Erichson, *Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation*, 2003 U. CHI. LEGAL F. 519, 527–28 ("Another direction might be to consider judicial approval of class settlement and fees . . . ."); David Rosenberg, *Mandatory-Litigation Class Action: The Only Option for Mass Tort Cases*, 115 HARV. L. REV. 831, 834 (2002) (arguing that courts should take a more active role in class action

the judge substitutes judicial wisdom for individual autonomy. While retrofitting class actions to non-class aggregation via "quasi-class actions" is problematic,[25] courts could theoretically revive plenary class actions[26] or certify a defendant's uniform conduct toward plaintiffs as an issue class.[27] Though judges appear increasingly comfortable with issue classes, plaintiffs' lawyers rarely propose them; if they lose the issue-class trial, then issue preclusion prevents them from relitigating, and, even if they win (unless the win prompts the defendant to settle), there is still no common fund from which to collect attorneys' fees.[28]

Finally, looking outside the traditional litigation context, third-party financiers might monitor lead lawyers. If plaintiffs assigned a financier a stake in their lawsuit as the contingent fee does now and, in exchange, the financier funded the suit on a non-recourse basis, then the financier would become a super stakeholder akin to institutional lead plaintiffs in securities class actions.[29] As sizeable and sophisticated monitors, these funders might help manage principal-agent problems by unbundling attorneys' competing roles as investors and advisors. They might likewise become repeat players. Just as the NAACP, ACLU, and unions counteract the typical disadvantages one-shot plaintiffs face by aggregating interests and resources, a third-party financier could monitor and discipline lawyers by ending relationships with certain law firms, for example.[30] The more difficult question, however, is how to ensure that financiers do

---

litigation). For a perspective that plays to the strengths of judges and the needs of claimants, see Resnik et al., *supra* note 21.

25.    The *Principles* suggest that issue classes might "more closely approximate restitutionary principles" than the infamous "quasi-class action." PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.09 reporter's notes on cmt. c (AM. LAW INST. 2010).

26.    This would require the Supreme Court to reverse its trend toward stricter certification standards.

27.    For more on how this approach might work, see Burch, *supra* note 11, at 1871–90.

28.    *Id.* at 1905–16; Elizabeth Chamblee Burch, *Financing Issue Classes: Benefits and Barriers to Third-Party Funding*, 12 N.Y.U. J.L. & BUS. 889 (examining the possible role of third-party financing in incentivized issue class trials).

29.    For more on this proposal, see Elizabeth Chamblee Burch, *Financiers as Monitors in Aggregate Litigation*, 87 N.Y.U. L. REV. 1273, 1291–1300 (2012).

30.    *See generally* Marc Galanter, *Why the "Haves" Come Out Ahead: Speculations on the Limits of Legal Change, in* IN LITIGATION: DO THE "HAVES" STILL COME OUT AHEAD? 13, 37–38 (Herbert M. Kritzer & Susan S. Silbey eds., 2003) (suggesting that organizing one shotters into repeat players might prove advantageous). Financiers, like other organizations, will have their own agenda. *See e.g.*, Derrick A. Bell, Jr., *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation*, 85 YALE L.J. 470, 512–15 (1976) (arguing that some civil rights lawyers have failed to put the needs of their clients ahead of their own idealistic legal objectives).

not turn into toll collectors who extract additional rents from plaintiffs.[31]

While each of these potential monitors—clients, judges, and third-party financiers—promises to alleviate some agency concerns, they all share one principal deficit: information barriers. Judges might want to appoint leaders who collectively represent claimants' diverse composition, but without the adversarial airing of potential conflicts they lack the knowledge to do so. Claimants might push for self-governance, but they need sophisticated legal advice to understand why their best interests may not align. And financiers—who may have access to the requisite facts and law—may represent only a fraction of the claimants.

Enter competition. By drawing on the vibrant rivalries within the plaintiffs' bar, judges can use market solutions to remap the existing regulatory landscape without rule amendments or legislation. In a somewhat related vein, Professors Charles Silver and Geoffrey Miller have proposed an incentive-based approach where judges appoint a plaintiffs' management committee comprised of attorneys with the largest client inventory, and those attorneys then pick, compensate, and monitor the lawyers performing the common-benefit work.[32] Relying on plaintiffs' attorneys shifts power away from the judge, a move they explain by noting, "[J]udges have compromised their independence, created unnecessary conflicts of interest, intimidated attorneys, turned a blind eye to ethically dubious behavior, and weakened plaintiffs' lawyers' incentives to serve clients well."[33] To be sure, judges can be part of the problem. But they can become part of the solution as well. Although Silver and Miller's proposal overcomes information asymmetries, the concern is that it may reward lawyers who "purchase" referrals that include undifferentiated (and often weak) claims, further entrench repeat players, and allow inadequate representation to persist particularly for plaintiffs with idiosyncratic claims.

Accordingly, Part III offers a different approach. Educating judges and encouraging them to implement four key innovations can incentivize those with the greatest access to information—other plaintiffs' lawyers—to police the monopoly when it threatens to wield its power in self-serving ways. First, judges should reject consensus

---

31.    Samuel Issacharoff, *Litigation Funding and the Problem of Agency Cost in Representative Actions*, 63 DEPAUL L. REV. 561, 581 (2014) ("[O]ne of the few veritable truths of life is that every gatekeeper in life will at some point become a toll collector.").

32.    Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107, 111 (2010).

33.    *Id.*

slates for leadership positions and use a competitive selection process where attorneys openly jockey to hold the leadership's monopoly power. Competing *for* the market, that is, competing to *become* the monopoly, may produce some of the same benefits of open market competition,[34] particularly if attorneys can confidentially air objections about one another to a special master. Second, issuing an order that presumptively adds (or replaces) lead lawyers with challengers who successfully demonstrate the presence of unaddressed structural conflicts of interest incentivizes those selected to remedy inadequate-representation concerns quickly.[35] It likewise maximizes the payoff for outside challengers, making it more profitable to compete and discipline leaders than to play the long game in hopes of receiving common-benefit work or leadership roles.

While the first two proposals infuse competition into leadership selection, the latter two revamp compensation methods and external safeguards. Thus, the third proposal urges judges to compensate lead lawyers based on a percentage of the benefit they actually confer on claimants—not a set percentage of the fund. This promotes fidelity by realigning common-benefit fees with basic contingent-fee principles: the better claimants fare, the better leadership fares. Quantum meruit principles can also invigorate state-court competition over claims that are not exclusively federal by replacing flat fees with tailored pricing packages for state litigants who need access to some (but not all) common-benefit work, and rewarding state lawyers whose efforts benefit all claimants.

Finally, issuing a standing order that automatically recommends the Panel remand non-settling cases to their courts of origin after a global settlement can harness market forces to check the leadership's monopoly power.[36] Automatic remands pressure lead lawyers to design a deal that caters to multiple injury types by threatening to destabilize their consolidated power and weakening the settlement vortex, which currently gives plaintiffs only two choices: settle or risk dismissal. Remanding puts trials back on the table, returning one of plaintiffs' most valuable bargaining chips. When combined, these proposals tap into the robust rivalries within the plaintiffs' bar, inciting those who possess the most relevant

---

34. CHRISTOPHER DECKER, MODERN ECONOMIC REGULATION 37–40 (2015) (describing the competition for the market approach); Elizabeth E. Bailey, *Contestability and the Design of Regulatory and Antitrust Policy*, 71 AM. ECON. REV. 178, 178 (1981) ("In the case of contestable markets, potential entry or competition *for* the market disciplines behavior almost as effectively as would actual competition *within* the market.").

35. Structural conflicts of interest present a high bar. *See infra* Part III.A.3.

36. The Panel can likewise accomplish this unilaterally by amending its own rules.

information and have the most at stake to hold those with monopolistic power accountable.[37]

## I. LEAD LAWYERS' MONOPOLISTIC POWER IN MULTIDISTRICT LITIGATION

Academics have long expected that more extensive repeat players (as I use the term) who regularly encounter the legal system will have different goals than those who don't—"one shotters." Because repeat players encounter the system and its inhabitants routinely, they may act strategically to maximize gains over a series of cases, and play for "rules," the short-hand term for standard practices and norms that tip the scales in their favor in future cases.[38]

While major corporate defendants are repeat players in multidistrict proceedings, they are not the only ones. Many plaintiffs' and defense attorneys are likely to be repeat actors, too. This leaves only one segment as probable one-shotters: the plaintiffs themselves, and perhaps their individually retained non-lead attorney. Repetitive play might advantage plaintiffs through their representative's inside knowledge. Or, repeat agents' frequent interactions with one another may tempt them to be more loyal to each other, to those who supplied them with client referrals, or even to defendants who could pay them handsomely in return for delivering finality, than to their own clients.[39]

### A. Empirical Evidence of Oligopolies: Repeat Play and Market Share

The first question then is whether repeat players exist and, if so, whether they dominate influential positions across multidistrict

---

37. Although this Article focuses on multidistrict litigation, many of these proposals apply equally to all mass, non-class settlements. Such settlements can occur in federal courts without multidistrict litigation (toxic torts, for example) or in state courts.

38. Galanter, *supra* note 30, at 15.

39. *Id.* at 24 ("For the lawyer who services [one shotters], with his transient clientele, his permanent 'client' is the forum, the opposite party, or the intermediary who supplies clients."). As plaintiff's attorney Francis Scarpulla noted in supporting the "consensus" group in the leadership appointment hearing, "this group works collegially and cooperatively with every single person sitting at that defense table. I've known some of them for 45 years, as long as I've been practicing. And I've probably been lead counsel in more cases than anybody in this courtroom . . . ." Transcript of Proceedings at 40, *In re* Lithium Ion Batteries Antitrust Litig., 4:13-md-02420-YGR (N.D. Cal. Apr. 16, 2013). When the judge then asked the defendants' counsel about objections to the proposed plaintiffs' structure, Jim McGinnis responded, "I been [sic] practicing here for almost 34 years, have known all of the people on that side of the courtroom for most of those years, and I can tell you with the utmost confidence that I've never had a problem with any one of them." *Id.* at 44–45.

litigations. Influential positions vary but typically include lead counsel, who heads the litigation; steering and executive committees, which make key decisions concerning litigation strategy and settlement; liaison counsel, who disseminates information to other attorneys, calls meetings, and coordinates with counsel in related state (and sometimes bankruptcy) actions; and occasionally separate committee chairs, such as discovery and trial committees.[40]

Previous research has suggested that plaintiffs' leadership is rife with repeat players,[41] but included little evidence on the defense side.[42] In a recent article,[43] my co-author Margaret Williams and I collected data on all judicially appointed attorneys in all product-liability and sales-practice proceedings pending on the multidistrict litigation docket as of May 14, 2013—seventy-three total proceedings.[44] The Panel centralized those proceedings over a twenty-two-year span, and collectively they include over 312,500 actions.

We confirmed that repeat players are prevalent leaders on both sides, with repeat players holding 62.8 percent of the available plaintiffs' leadership positions; and seventy-three of 414 judicially appointed defense leadership positions, or 17.6 percent. Of course, defense lawyers are rarely judicially selected (the defendant chooses a firm), so evidence of repeat play by law firm was more telling: of the 414 available leadership roles, attorneys from repeat-player defense firms occupied 341, or 82.3 percent.[45]

We then conducted a social network analysis to reveal those actors' connections to one another and found that no matter what measure of centrality we used, a key group of attorneys maintained their elite position within the network.[46] In fact, a small group of the same five high-level repeat players (Richard Arsenault, Daniel Becnel, Jr., Dianne Nast, Jerrold Parker, and Christopher Seeger) consistently occupied the most powerful positions, and seemed to have

---

40. MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.221 (2004).

41. *See* Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. REV. 71, 95–97 (2015); Margaret S. Williams, Emery G. Lee III & Catherine R. Borden, *Repeat Players in Federal Multidistrict Litigation*, 5 J. TORT L. 141, 149–60 (2012).

42. For a historical overview of repeat players' development on both sides, see Samuel Issacharoff & John Fabian Witt, *The Inevitability of Aggregate Settlement: An Institutional Account of American Tort Law*, 57 VAND. L. REV. 1571, 1581–84, 1590–99 (2004).

43. Elizabeth Chamblee Burch & Margaret S. Williams, *Repeat Players in Multidistrict Litigation: The Social Network*, 102 CORNELL L. REV. (forthcoming 2017), http://ssrn.com /abstract=2724637 [https://perma.cc/KNY3-GBR6].

44. For a table of included cases as well as information about how the cases were identified, see *id.* (manuscript at 20–22, 70–72).

45. A list of these firms appears in Burch & Williams. *Id.* (manuscript at 35).

46. *Id.* (manuscript at 24–33).

far more impact on settlement design than did the total number of involved repeat players.[47]

Consequently, while there is a vast market for legal services in litigating tort claims generally, the market for representing claimants in mass torts like products liability and sales practice cases can be highly concentrated on both the plaintiff and defense side.[48] Institutional coordination through multidistrict practices, referrals, specialization, long-standing social networks, high litigation start-up costs, and economies of scale winnow the pool of available lawyers.[49] For those in this pool, leadership selection practices create further entry barriers to leadership, allowing repeat actors to occupy those roles across multiple multidistrict proceedings—much like an oligopoly.

## B. Institutional Practices Foster Rule Entrenchment and Erect Entry Barriers

Judges' leadership selection methods and institutional norms combine to concentrate market share in the hands of a small number of repeat players.[50] And, once in power, repeat players may use their advantage to influence, create, perpetuate, and enforce practices—"rules," for short. Playing the long game allows them to reap the advantages those rules provide, standardize rules across proceedings, and erect entry barriers for rivals.

### 1. Leadership Selection Methods Restrain Competition

Judges' current methods for choosing leaders favor repeat actors by encouraging private ordering and consensus.[51] Consensus

---

47. *Id.* (manuscript at 41–42).

48. *See* Issacharoff & Witt, *supra* note 42, at 1621–25 (explaining the highly concentrated market for asbestos representation).

49. *See id.*; *see also* Howard M. Erichson, *Informal Aggregation: Procedural and Ethical Implications of Coordination Among Counsel in Related Lawsuits*, 50 DUKE L.J. 381, 387–90 (2000).

50. While multidistrict litigation has changed these conditions, they existed in class actions too. Issacharoff & Witt, *supra* note 42, at 1618–20.

51. It is often impossible to tell which selection method a judge uses: attorney applications are rarely on the judicial dockets, judges tend not to state their methodology on the record, and attorneys' behind-the-scenes efforts to coordinate may ultimately dictate the slate regardless. *E.g.*, Carolyn A. Dubay, Trends and Problems in the Appointment and Compensation of Common Benefit Counsel in Complex Multi-District Litigation: An Empirical Study of Ten Mega MDLs 32–33 tbl.3 (Oct. 2010) (unpublished manuscript) (on file with authors) (identifying the procedures for appointing plaintiffs' leadership that varied substantially in levels of generality and observing "while the court may initially dictate a competition, consensus, or hybrid

selection relies on informal attorney networks to identify necessary leadership roles and pick their own leaders.[52] Although private ordering might be preferable for positions that demand communication and camaraderie, such as liaison counsel, judges may use this method to appoint the entire leadership slate.[53] Somewhat similarly, the hybrid process allows interim lead counsel to apply, nominate executive committee members, and appoint subcommittees while simultaneously permitting those who were not handpicked to apply.[54] Still, interim lead counsel influences most appointments, which leaves only a few positions truly open to applicants.[55] Alternatively, judges might invite submissions and choose among them for all positions—a competitive process.

While it is simpler for judges to defer to private ordering, doing so makes it difficult for new entrants to break into the leadership market—despite their expertise.[56] Private ordering favors attorneys with long-standing business relationships, encourages attorneys to curry favor with one another to secure lucrative positions in future leadership hierarchies, and condones attorneys' behind-the-scenes political wrangling.[57] Long before attorneys even lobby the Panel to

---

approach, ultimately the actions of the attorneys themselves will dictate the level of cooperation in the development of a leadership slate").

52.    *E.g.*, *In re* Genetically Modified Rice Litig., No. 4:06-md-01811-CDP (E.D. Mo. Apr. 18, 2007) (order appointing leadership counsel); *In re* Neurontin Mktg., Sales Practices, & Prods. Liab. Litig., No. 1:04-cv-10981-PBS (D. Mass. Dec. 17, 2004) (order granting motion to appoint counsel) (appointing plaintiffs' counsel's proposed slate). The first Manual for Complex Litigation recommended this approach, though it changed course by the second edition and advised judges to oversee the appointment process. *Compare* MANUAL FOR COMPLEX LITIGATION (FIRST) §§ 1.92, 4.53 (1982) (recommending attorney networks), *with* MANUAL FOR COMPLEX LITIGATION (SECOND) § 20.224 (1985) (recommending judicial oversight).

53.    *See, e.g.*, *In re* Biomet M2a Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Dec. 5, 2012) (order concerning plaintiffs' counsel organizational structure at 1–2); Plaintiffs' Proposed Counsel Organizational Structure at 2, 4–5, *In re* Biomet M2a Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Nov. 16, 2012).

54.    Letter from Aaron S. Podhurst and Harley S. Tropin to Judge Jesse M. Furman 2, *In re* Gen. Motors LLC Ignition Switch Litig., No. 1:14-md-02543-JMF (S.D.N.Y. July 8, 2014).

55.    *E.g.*, Letter from Steve W. Berman, Elizabeth J. Cabraser, and Mark P. Robinson, Jr., to Judge Jesse M. Furman 4, *In re* Gen. Motors LLC Ignition Switch Litig., No. 1:14-md-02543-JMF (S.D.N.Y. July 7, 2014).

56.    *See* FRAZER, *supra* note 15, at 10–11 (observing how dominant firms might use business relationships and governmental agents to block entry).

57.    Supplemental Objection of Daniel E. Becnel, Jr. to Plaintiffs' Common Benefit Fee Award, Ex. A (Application of the Becnel Law Firm, LLC as Per Pre-Trial Order No. 6(D)) at 2, *In re* Vioxx Prods. Liab. Litig., No. 2:05-MD-01657-EEF-DEK (E.D. La. Jan. 26, 2011) ("I personally called a meeting at Antoine's Restaurant in New Orleans, at my expense, and invited every lawyer who had a filed case or was interested in the litigation to meet and confirm leadership."); *see* FRAZER, *supra* note 15, at 11 (chronicling entry barriers).

transfer cases to a specific location, players may make backroom deals as to how many positions to create and who will serve in which roles. In the *Power Morcellator* cases, for example, one of the lead lawyers noted, "The leadership team was created before we even applied for an MDL."[58] So, although that judge seemed to use an open application process and had several applicants, one competing attorney withdrew and another joined the consensus slate, prompting co-lead counsel to remark, "Part of our effort over the last year was to get the team together . . . [so] that we wouldn't have to worry about competition. It worked."[59]

Even when judges select leaders, they stress applicants' experience, cooperative tendencies, and ability to finance the litigation.[60] At least one judge has identified "team players" as "the primary factor" in choosing leaders.[61] To assess cooperation, judges often request short applications and call other judges to ask about uncooperative and disruptive attorneys.[62] This too advantages lawyers with pre-existing relationships who have a track record of working well together.[63]

---

58. Amanda Bronstad, *In a First, Women Compose Majority of MDL Committee*, Nat'l Law Journal (Nov. 19, 2015), http://www.nationallawjournal.com/id=1202742961283/In-a-First-Women-Compose-Majority-of-MDL-Committee?slreturn=20160826171813 [https://perma.cc/CZY5-C9GU].

59. *Id.*

60. Dubay, *supra* note 51, at 39–40 tbl.6; *e.g.*, *In re* Bos. Sci. Corp. Pelvic Repair Sys. Prods. Liab. Litig., No. 2:12-md-02326 (S.D. W. Va. Feb. 29, 2012) ("The main criteria for PSC membership will be: (a) willingness and availability to commit to a time-consuming project; (b) ability to work cooperatively with others; and (c) professional experience in this type of litigation."); *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, No. 2:10-md-02179-CJB-SS (E.D. La. Aug. 10, 2010) (pretrial order no. 1) (setting initial conference).

61. Stanwood R. Duval, Jr., *Considerations in Choosing Counsel for Multidistrict Litigation Cases and Mass Tort Cases*, 74 La. L. Rev. 391, 392 (2014).

62. *E.g.*, *In re* Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig., No. 3:15-md-02672-CRB, (N.D. Cal. Dec. 22, 2015) (pretrial order no. 2) (requesting leadership applicants to include the names and contact information of multidistrict judges with whom the applicant worked); *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, No. 2:10-md-02179-CJB-SS (E.D. La. Aug. 10, 2010) (pretrial order no. 1) (setting initial conference); Transcript of Proceedings on November 16, 2012 at 16–17, *In re* Biomet M2a Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Nov. 21, 2012) ("I know most of the judges who have your MDLs, and so I emailed them this week, gave the list of names that had been submitted, and said, 'Tell me anybody who I should not appoint.'"). Even attorneys' submissions sometimes suggest a litany of judges who can vouch for the applicant's reputation and "proven ability to work well with others." Plaintiffs' Proposed Counsel Organizational Structure at 12, 25–26, *In re* Biomet M2a Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Nov. 16, 2012) (leadership applications of Mark Lanier and Douglass Kreis).

63. *See* Frazer, *supra* note 15, at 11 (noting that long-standing business relationships and barriers arising through legal practices can create barriers to entry for competitors).

Stressing cooperation deters dissent by implicitly labeling it as something that should not be rewarded. In lieu of dissent, judges typically receive a chorus of support for informal consensus nominees—not information about potential conflicts.[64] Yet, because § 1407 requires only that cases share a common factual question, plaintiffs' best interests may not align.[65] Without attorneys who are willing to speak up on their behalf, adequate representation is at risk.

Of course, lawyers who work together frequently have superior information about both conflicts among cases and one another's skills and temperament. So, allowing attorneys to object to proposed leaders could help vet candidates. But the circumstances make this unlikely. Repeat players will reveal that kind of information only if solicited privately; speaking publicly diminishes their chances of receiving common-benefit work or being appointed to a steering committee if the objectionable candidate is empowered.[66]

### 2. Compensation Methods Impose Costs on Competitors

Ample opportunities also exist for lead lawyers to influence both their own and others' compensation since there is no firm doctrinal ground to guide judges in awarding common-benefit fees.[67] For instance, some judges institute fee-allocation committees comprised of the principal lead lawyers.[68] This means that at any given time, leaders can set what amounts to pricing policies and pressure rivals through their influence over fees in both that proceeding and concurrent litigations.[69]

Judges tend to defer to leaders on common-benefit fee practices, often implementing their proposed orders verbatim and increasing fees midway through the litigation at lead counsel's request.[70] Some transferee judges also insist that all attorneys with a

---

64. *E.g.*, Transcript of Proceedings at 59, *In re* Lithium Ion Batteries Antitrust Litig., No. 4:13-md-02420-YGR (N.D. Cal. Apr. 16, 2013) ("And we are also supporting the Cotchett, Lieff motion, but we are glad to work with all three firms.").

65. For more information on these conflicts and a discussion of adequate representation concerns, see *infra* Part II.D.2.

66. For more information on this aspect of sanctioning, see *infra* Part III.B.1.

67. Burch, *supra* note 41, at 102–09.

68. *E.g.*, *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. Mar. 18, 2015) (case management order no. 71) (creating a fee committee with five of eight members appointed by co-lead and liaison counsel).

69. *See infra* notes 268–273 and accompanying text; *see also* FRAZER, *supra* note 15, at 12 (noting that monopolies can affect pricing policies and use those policies to prevent market entry).

70. Dubay, *supra* note 51, at 22–23, 54–55; *see infra* notes 194–199 and accompanying text.

case in the federal proceeding sign fee-transfer agreements, which tax an attorney's entire client list to compensate lead lawyers—regardless of where that client's related case is pending.[71] Attorneys participating in the multidistrict proceeding have little choice in the matter; they cannot conduct discovery on their own and must rely on leaders' common-work product unless (one might think) they litigate solely in state courts.[72]

     But state litigants are not immune to federal common-benefit practices either. Fee-transfer agreements and private settlements often allow lead attorneys to expand their power structure beyond the federal court's jurisdiction to tax state-court litigants who benefit from their efforts.[73] In economic terms, this raises costs for competitors. As some federal judges recognize their limited authority to impinge on state suits, lead lawyers design settlements to collect common-benefit fees from state-court plaintiffs who want to accept the deal—either by including fees directly within the settlement or inserting provisions that require settling plaintiffs to consent to the transferee judge's fee orders.[74]

### 3. Repeat Play Can Promote Efficiency and Economies of Scale

     Although repeat players' control across and within multidistrict proceedings can produce costs, they can likewise generate positive developments that further pretrial efficiency. When asked, top-tier repeat players cite experience as their principal virtue.[75] Even basic antitrust doctrine recognizes that oligopolies may sometimes include those "who merely by superior skill and intelligence . . . got the whole business because nobody could do it as well."[76]

---

71.     *See In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EEF-DEK (E.D. La. Aug. 4, 2005) (pretrial order no. 19 at 3); William B. Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, CLASS ACTION ATT'Y FEE DIG., Mar. 2009, at 87, 90 (examining twenty-one reported cases using common-benefit fees).

72.     For more on fee-transfer agreements, see Burch, *supra* note 41, at 106–08.

73.     *See infra* Part II.B.2.

74.     *See infra* notes 223–229 and accompanying text.

75.     Amanda Bronstad, *'Good Ol' Boys Club' in MDL: Same Plaintiffs Firms Repeatedly Lead Suits*, NAT'L L.J. (Sept. 28, 2015), http://www.nationallawjournal.com/id=1202738239700/Good-Ol-Boys-Club-In-MDL [https://perma.cc/9QJB-GPYK] (quoting Richard Arsenault as saying, "A lot of deference should be given to experienced plaintiffs counsel who have been in these wars and understand what kinds of teams they need to put together").

76.     United States v. United Shoe Mach. Corp., 110 F. Supp. 295, 341 (D. Mass. 1953) (quoting the legislative history of the Sherman Antitrust Act, 21 CONG. REC. 3146–52 (1890)); *see also* Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004)

Repeat actors capitalize on economies of scale and their acquired knowledge is imperative; it takes expertise to comprehend the science behind injuries, understand the risks of various litigation strategies, build the infrastructure that accompanies a multidistrict litigation, and manage cases effectively. Certain firms are known to intensively vet cases before suing, and their reputation may encourage others to recruit clients and prompt claims to settle more quickly than they otherwise might. Those settlement values may likewise reflect repeat players' knowledge about previous settlement amounts, which helps prevent defendants from using informational asymmetries against their clients.[77]

But there are many experienced lawyers and law firms. In *Vioxx* alone, ninety-two law firms received common-benefit fees.[78] Yet, in product-liability and sales-practices multidistrict litigations, a mere sixteen percent of the involved plaintiffs' law firms occupied nearly fifty-four percent of all leadership roles.[79] And a small cadre of five high-level repeat players consistently occupy the most powerful positions.[80] As such, two points emerge: (1) high-level repeat players are not the only ones with experience—others can offer those same advantages; and (2) transactions may have become too efficient, without sufficient safeguards to ensure that the efficiencies further principals'—not agents'—collective interests.

## II. EMPIRICALLY AND ETHICALLY ASSESSING THE DEALS REPEAT PLAYERS DESIGN

Multidistrict litigations riddled with repetitive play present special challenges for transferee judges who must often manage them without Rule 23's class-action tools. The absence of clear adequate representation guideposts and the class action's policing power has left judges looking to repeat players for guidance and advice about what happens elsewhere. Without much external scrutiny, past practices quickly become best practices, and experienced agents are able to cite and replicate beneficial procedures in areas that affect their financial remuneration. This leaves a lot of leeway for both ingenuity and mischief, for without class certification, the resulting

---

(noting that monopolists cannot be condemned for developing the infrastructures necessary to operate in the market).

77.    Issacharoff & Witt, *supra* note 42, at 1599–1600.

78.    *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Sept. 27, 2011) (awarding ninety-two of 108 law firms common-benefit fees).

79.    Burch, *supra* note 41, at 96–97.

80.    Burch & Williams, *supra* note 43 (manuscript at 41–42).

settlements are private; they do not undergo Rule 23(e)'s judicial vetting to ensure that they are "fair, reasonable, and adequate."[81]

This begs the question of who reaps the advantage of repeat play—the regulars (attorneys and the defendant) or one-shotters (the plaintiffs). Repeat plaintiffs' attorneys' monopolistic bargaining authority adds to the conventional principal-agent concern that, unless properly monitored, the agent may face routine temptations to better herself at her principal's expense. Since monopoly power also creates a potential for higher prices and lower output,[82] this could mean higher common-benefit fees for attorneys and lower representation quality (and perhaps less compensation) for plaintiffs.

Evidence as to higher fees and lower outputs is hard to obtain in this context, for it is often shrouded by private, closed-door settlement negotiations. Accordingly, to unearth some indicators that might shed light on this question, I analyzed all publicly available non-class settlements[83] (thirteen settlements resulting from ten multidistrict litigations[84]) that occurred within a dataset of all seventy-three products-liability and sales-practices multidistrict litigations pending as of May 14, 2013, as well as related media stories, common-benefit fee awards, and docket entries from those proceedings.[85] Although thirteen settlements seems like a small number, the proceedings in which those settlements occurred collectively included 64,107 total actions—a number that does not include the thousands of related state-court cases resolved through the same settlements.[86] In general, products liability and sales practices should provide a representative sampling of multidistrict proceedings, for they constitute well over one-third of all multidistrict

---

81. FED. R. CIV. P. 23(e)(2).

82. FRAZER, *supra* note 15, at 9.

83. Because the focus is on the practices and norms that develop when judges lack Rule 23's supervisory powers, I excluded (at least for this Article) the class settlements that occurred within the data.

84. Three of those nine litigations—*Propulsid*, *DePuy ASR Hip Implant*, and *Yasmin/Yaz*—each generated two settlements.

85. For a further description of the data, see Burch & Williams, *supra* note 43 (manuscript at 20–21).

86. Using the most recent data available on the proceedings, the Pending MDLs by District as of July 15, 2016 (or the earlier 2013 information where the proceedings were no longer pending), the proceedings contained the following number of actions: Propulsid 474, Vioxx 10,320, Fosamax 1,141, Yasmin/Yaz 11,858, DePuy ASR 9,877, Biomet 2,607, NuvaRing 1,895, Actos 5,111, American Medical Systems 20,231, and Zimmer Durom 593. *MDL Statistics Report—Distribution of Pending MDL Dockets by District*, U.S. JUDICIAL PANEL ON MULTIDISTRICT LITIG. (July 15, 2016), http://www.jpml.uscourts.gov/sites/jpml/files/Pending _MDL_Dockets_By_District-July-15-2016.pdf [https://perma.cc/HLA8-FE9T].

litigations (the largest segment by far),[87] and up to ninety-two percent of the actual cases pending within all proceedings on the multidistrict docket.[88] Consequently, the data, while limited, nevertheless provides an interesting look into the deals that elite lawyers design.

Table A1 in the Appendix uses boldface type to designate the reviewed settlements. It also lists the multidistrict proceedings within the data that concluded with a holistic aggregate or inventory settlement (thirty-one out of seventy-three), class-action settlement (twenty out of seventy-three), and whether the non-class settlement was publicly available (ten of the thirty-one non-class settlements were public).[89] Three of the ten publically available non-class settlements had two settlements each, for a total of thirteen.[90] One of the publicly available non-class settlements (the American Medical Systems litigation) is a partial settlement; it covers only the claimants represented by two law firms, not all the pending claims. Because the other agreements in that case were confidential, it is unclear whether that settlement is representative of the others.

Using this same dataset, in *Repeat Players in Multidistrict Litigation: The Social Network*, my co-author and I confirmed that the repeat players are the lead plaintiffs' attorneys who negotiated, designed, and implemented the relevant settlements, as Appendix tables A1 and A2 reflect.[91] Table A2 shows which of the fifty-five highest-level repeat plaintiffs' lawyers (based on the total number of multidistrict proceedings in which they held leadership positions) led those ten proceedings. More importantly, one of the top five repeat players participated directly in each settled proceeding's leadership. Considering this evidence alongside the social network of repeat actors, it became evident that a relatively small group of high-level

---

87. CALENDAR YEAR STATISTICS OF THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION 12 (2012), http://www.jpml.uscourts.gov/sites/jpml/files/JPML_Calendar_Year _Statistics-2012.pdf [https://perma.cc/S6ZT-FCDE] (showing thirty-four sales practices multidistrict litigations and seventy-two products liability litigations out of 291 total multidistrict litigations).

88. Samuel Issacharoff, N.Y. Univ. Sch. of Law, Presentation at the Duke University School of Law Mass-Tort MDL Program: Snapshot of MDL Caseload Statistics 3 (Oct. 8, 2015).

89. Ten proceedings are still actively ongoing, one case settled through individual settlements, and one case settled through bankruptcy. Defendants successfully used *Daubert* motions, summary judgment motions, and arbitration to resolve ten proceedings. Burch & Williams, *supra* note 43 (manuscript at 15).

90. *Propulsid*, *DePuy ASR Hip Implant*, and *Yasmin/Yaz* each generated two settlement agreements. And the *American Medical Systems* litigation settlement was a partial settlement; it covered only the claimants represented by two law firms, not all the pending claims. Because the other settlements in that proceeding were confidential, it is unclear whether it was representative of the others.

91. Burch & Williams, *supra* note 43 (manuscript at 30).

repeat players who occupied the most powerful positions had more impact on settlement design than did the total number of involved repeat players.

Because the previous article launched our factual and empirical findings and linked the settlements to the network of repeat players, this Part builds upon that work by considering the ethical implications of the settlement provisions and adding new empirical data on common-benefit fees and—to the extent available—client outcomes. It focuses on settlement practices that might principally benefit the attorneys, but not necessarily the litigants:[92] (1) those that induce claimants to settle and thereby create closure for defendants, (2) those that reduce payouts to late-coming claimants who do not have counsel as of the settlement date, (3) those that allow unclaimed funds to revert to the defendant, and (4) those that compensate lead lawyers.

Part A begins by considering how the first three categories collectively benefit defendants by producing closure and returning money initially earmarked for settlement. Part B then contemplates judicial and settlement practices that allow lead lawyers to maximize their profits through common-benefit fees. Collectively, both parts suggest that repeat players—lead lawyers, defense attorneys, and defendants—may benefit handsomely from the multidistrict process, perhaps to the detriment of non-lead plaintiffs' attorneys and plaintiffs. By identifying potential cartel-like behavior among repeat plaintiffs' lawyers, Part C helps explain why non-lead attorneys (particularly those playing the long game) do not object. To stifle objections and dissent, leaders can credibly threaten social and financial sanctions—some of which even have judicial support. Finally, to the extent available, Part D introduces new empirical evidence as to whether current practices lead to lower outputs for plaintiffs. Much of the desired information on settlement payouts and recovery rates remains private, but the available information suggests that repeat players benefit from the settlements they design. If the information that repeat players make publicly available so readily appears to enrich them, the concern is that the gains unlocked in exchange for delivering finality may well be leaders' common-benefit fees—not more money for plaintiffs.[93]

---

92.    As others have explored, aggregation can create value, so one might argue that closure provisions benefit plaintiffs. *E.g.*, D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1192–1201 (2013). I address this argument *infra* at Part II.D.

93.    Commentators have often reasoned that the peace premium goes to plaintiffs. *E.g.*, Rave, *supra* note 92, at 1185 ("Defendants want peace, and they are often willing to pay for it.

## *A. Defendants Bargain for Closure and Returned Funds*

Concluding the litigation (and reassuring shareholders) becomes the end goal for most any defendant who cannot avoid liability. Achieving that goal, however, is more difficult without the ability to bind absent class members through class certification.[94] Nevertheless, the circumstances surrounding multidistrict proceedings produce favorable conditions for closure: transferee judges are reluctant to remand cases, which keeps the litigation centralized; coordinating suits and vesting power in the hands of a few attorneys makes unified negotiation easier; and judges pressure the parties to settle.[95]

Capitalizing on these circumstances, defense attorneys have been able to reach mutually beneficial arrangements with plaintiffs' leadership through a fundamental shift in settlement construction: unlike traditional settlements between plaintiffs and defendants, all thirteen deals in the dataset were agreements between lead lawyers and defendants. These deals position lead plaintiffs' lawyers as settlement gatekeepers, for defendants will not make better offers to others without the threat of trial; doing so would work against their closure goal. These new deals then serve as a mandatory gateway for anyone wanting to settle, and typically require non-lead attorneys to become signatories alongside their clients. Accordingly, master settlement agreements now aim some provisions at plaintiffs' attorneys and some at their clients.

Provisions targeting participating plaintiffs' attorneys push ethical boundaries that require them to act in each client's best interest.[96] In common parlance, these provisions are referred to as follows: (1) attorney-recommendation provisions, which require participating attorneys to recommend the deal to all of their clients; (2) attorney-withdrawal provisions, which instruct attorneys to withdraw from representing non-settling clients; (3) walkaway, withdrawal, or "blow" provisions, which release the defendant from its contractual obligations if too few plaintiffs settle; (4) case-census

---

Plaintiffs therefore may stand to gain if they can package all of their claims together and sell them to the defendant . . . .").

94.    Issacharoff & Witt, *supra* note 42, at 1581–84, 1588; *supra* notes 45–49.

95.    Elizabeth Chamblee Burch, *Remanding Multidistrict Litigation*, 75 LA. L. REV. 399, 415–18 (2014).

96.    MODEL RULES OF PROF'L CONDUCT r. 1.7(a), 2.1 (AM. BAR ASS'N 2013) (requiring attorneys to "exercise independent professional judgment and render candid advice," and prohibiting representation without informed consent if there's a significant risk that the lawyer's duty to someone else will materially affect the attorney's advice).

provisions, which require attorneys to register all their filed and unfiled claims with the court such that the defendant can use that number as the denominator for the walkaway percentage; (5) latecomer reductions that reduce payouts to claimants without counsel on the settlement date; and (6) reverter clauses, which allow the defendant to retain unclaimed settlement funds.

In *Repeat Players in Multidistrict Litigation: The Social Network*, we found that all settlements allowed the defendant to renege if too few claimants abandoned their right to sue in favor of the proposed claims-processing procedure.[97] These walkaway provisions ranged in their overall plaintiff participation requirements, with eighty-five percent at the low end (*Vioxx*), and one-hundred percent at the high end (*Fosamax*). All of the more recent settlements, *Yasmin/Yaz*, *DePuy*, *NuvaRing*, *Actos*, and *Zimmer Durom Hip Cup*, reinforced walkaway provisions with case-census provisions. Eighty-four percent (all but *Biomet* and *Zimmer Durom Hip Cup*, where the *judge* required all plaintiffs to participate in the Zimmer settlement) likewise included some form of attorney-recommendation provision. On the more coercive end, *Propulsid*, *Vioxx*, *Fosamax*, and *American Medical Systems* enhanced the likelihood of satisfying claimant-participation rates by including both mandatory attorney-recommendation provisions and mandatory attorney-withdrawal provisions. Others, including *Yasmin/Yaz*, *DePuy*, *NuvaRing*, and *Actos* insisted that participating attorneys use their "best efforts" to meet the participation benchmarks. Three of the thirteen settlements immediately reduced available settlement funds for plaintiffs that did not have an attorney or who had not filed suit as of the settlement date ("latecomers"), and four settlements permitted remaining funds to revert back to the defendant.

---

97. For a comparative overview of these provisions, see Burch & Williams, *supra* note 43 (manuscript at 34).

TABLE 1: PROVISIONS BENEFITING DEFENDANTS OCCURRING
WITHIN THE ANALYZED SETTLEMENTS

| Settlement Provision | Included in the Following Settlements | Deviations and Notes | Percentage of Settlements Including the Provision (of 13) |
|---|---|---|---|
| Walkaway Provision | All | Range in participation requirement from 85–100% | 100% |
| Case-census provision | *Yasmin/Yaz I & II, DePuy ASR I & II, Vioxx, NuvaRing, Actos, Zimmer Durom Hip Cup* | Case-census provisions provide a denominator for the walkaway provision | 61% |
| Mandatory attorney withdrawal | By plaintiffs' attorney: *Propulsid I & II, Vioxx, Fosamax, American Medical Systems* By defendant: *DePuy ASR I & II* | *DePuy ASR* allowed the defendant to expel non-compliant law firms | 53% |
| Attorney recommendation provision | Mandatory: *Propulsid I & II, Vioxx, Fosamax, American Medical Systems* "Best efforts": *Yasmin/Yaz I & II, DePuy ASR I & II, NuvaRing, Actos* | Best efforts required participating lawyers to use their best efforts to convince claimants to settle | 84% |
| Latecomer reductions | *DePuy ASR I & II, Zimmer Durom Hip Cup* | | 23% |
| Reverter clauses | *Propulsid I & II, DePuy ASR I & II* | | 30% |

Making deals with plaintiffs' *attorneys* masterfully furthers defendants' end game in two ways. First, the agreements impose uniform endorsement requirements on participating attorneys to discourage them from "cherry picking," a practice in which lawyers settle most cases, but continue litigating those with the strongest claims or most sympathetic facts. By requiring a high percentage of plaintiffs to accept the settlement offer for it to take effect and insisting that individual attorneys recommend that all their clients settle (including clients who had not yet sued or who were pursuing

relief elsewhere), defense attorneys essentially conditioned plaintiffs' attorneys' fees on achieving their closure aims. A plaintiffs' attorney is either "all in" and would collect significant contingent fees from all her settling clients, or "all out" and would have to spend significant resources litigating individual cases—at least if she has too few clients to trigger the walkaway provision. As such, recommendation provisions alter the typical contingent fee model where an attorney's recovery increases alongside her clients' recovery and instead ties plaintiffs' attorneys' financial self-interest to each other and to the entire claimant base. This shift also allows defendants to reach some plaintiffs who are outside of the federal court's jurisdiction, and others who haven't yet sued.

Second, these provisions reduce demand for legal representation, for the settlement effectively becomes the only "game" in town. Some deals demanded that plaintiffs' lawyers withdraw from representing non-settling clients and agree not to advertise for new ones.[98] Like oligopolists, leaders thwart competition and reduce demand by using attorney withdrawal and recommendation provisions to restrict the legal services market (at least for similar allegations against the same defendant).[99] When defendants threaten to abandon the deal if too few plaintiffs participate, and participating attorneys must recommend the deal to all of their clients and withdraw from representing those who refuse, leaders can regulate the legal service being offered and control a sufficiently large share of that market.[100] These deals likewise inhibit existing rivals from competing, for they are bound by ethical rules to convey settlement offers to their clients.

In this sense, master settlements can recreate bottleneck problems where dominant firms raise competitors' costs by obtaining exclusionary rights;[101] once defendants negotiate master settlements with plaintiffs' leadership, that agreement typically becomes the only settlement option. Non-settling attorneys can avoid the bottleneck only by taking state cases to trial. As such, the following sections explain how these clauses evolved, how they operate in practice, how

---

98.  *See infra* notes 143–183; text accompanying notes 166–168.

99.  *See* HOVENKAMP, *supra* note 15, § 4.1 (explaining that "[a] cartel is an agreement among otherwise competing firms to reduce their output to agreed upon levels, or sell at an agreed upon price," and that "cartel members must produce a sufficiently large share of the product or service [such] that their decisions are not undermined by existing rivals who are not cartel members").

100.  *See id.* (explaining the conditions for cartels).

101.  *See* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 234–36 (1986) (explaining bottlenecks).

they restrict legal services, and how they flaunt—and sometimes cross—ethical boundaries.

### 1. Recommendation, Withdrawal, and Walkaway Provisions Impart Closure, Restrain Competition

*Propulsid* was the earliest available non-class settlement within the data and is, to my knowledge, the first of its kind to propose and implement non-class closure mechanisms.[102] Propulsid's Steering Committee characterized its accomplishment as follows:

> Never before in the history of multidistrict litigation, have counsel achieved a global resolution of this proportion in the unique manner by which this Settlement Program resolves the litigation without resort to complex joinder devices or Class Certification. This remarkable approach to resolution of "mass tort" litigation promises to become the template for similar resolution of future litigations of this kind.[103]

This statement proved prophetic, for, as Figure 1 below shows, settlement designers replicated some aspect of *Propulsid* in every subsequent deal within the data.

---

102. Similar closure mechanisms in the later Vioxx settlement have been the subject of much ethical scrutiny. *E.g.*, Howard M. Erichson & Benjamin C. Zipursky, *Consent Versus Closure*, 96 CORNELL L. REV. 265, 267–68 (2011).

103. Memorandum in Support of Plaintiffs' Steering Committee's Motion for Award of Attorney's Fees and Reimbursement of Costs at 4, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. May 3, 2005).

**FIGURE 1: SETTLEMENTS IMPLEMENTING CLOSURE
PROVISIONS FROM *PROPULSID***



*Propulsid*'s dealmakers engineered three closure provisions—walkaway provisions, settlement bonuses, and a hybrid recommendation-withdrawal provision. First, eighty-five percent of death claims and seventy-five percent of injury claims had to enroll for the settlement to take effect.[104] Second, if one-hundred percent of non-death plaintiffs enrolled, Johnson & Johnson would add a $4 million "bonus" to the available settlement funds.[105] Third, an "opt-out" form accompanied the agreement even though all claimants had to affirmatively "opt in."[106] Designed for non-settling claimants, this form

---

104.  MDL-1355 Term Sheet § 1.B, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Apr. 30, 2004) [hereinafter Propulsid I Settlement]. The plaintiffs' steering committee represented about four thousand people, three hundred of whom allegedly died from using Propulsid. *Johnson & Johnson Unit in Legal Settlement Over Propulsid Suit*, PHARMAWATCH: CNS, Mar. 2004, at 15–16.

105.  Propulsid I Settlement, *supra* note 104, § 3.B.

106.  Opt Out Form for Propulsid MDL Settlement, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. 2004), http://www.laed.uscourts.gov/sites/default/files/propulsid/Forms/Opt%20Out%20Form%20Generic%20MDL.pdf [https://perma.cc/YV3R-KWXK].

authorized counsel to withdraw from representing the client (meaning that claimants effectively opted out of representation),[107] and later became the template for more sophisticated attorney recommendation and withdrawal provisions.

Negotiated in secret over twelve months by "The End Game Committee" and then approved by a unanimous Plaintiffs' Steering Committee, the settlement ("Propulsid I") divvied claims into three tiers—deaths, non-fatal heart attacks, and ventricular tachycardia (fast heart rate) cases—each with required proofs for establishing causation.[108] Medical records went to a panel of two doctors, one picked by the Plaintiffs' Steering Committee, one picked by defendants, plus a third for ties, who reviewed the records and permitted or denied claims without explanation. If a claimant qualified, the special master determined the confidential, non-appealable payment amount.[109]

Four years after the agreement, the physician panel had deemed only eleven claimants eligible for compensation and rejected 1,356 claims.[110] The settlement didn't cover state cases or plaintiffs who sued after February 1, 2004, which left around two thousand claimants with pending suits and around five thousand who had not yet sued.[111] Yet, the court awarded lead lawyers $22.5 million in attorneys' fees, which was the precise amount they negotiated for themselves with the defendant.[112] No attorneys objected.[113] Leaders based their request on a percentage of the fund or a lodestar analysis,

---

107. *Id.* For an in-depth analysis of the unethical nature of these mandatory recommendation and withdrawal provisions, see Erichson & Zipursky, *supra* note 102, at 281–92.

108. Memorandum in Support of Plaintiffs' Steering Committee's Motion for Award of Attorney's Fees and Reimbursement of Costs at 11–12, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. May 3, 2005).

109. *Id.* at 12.

110. Joint Report No. 62 of Plaintiffs' and Defendants' Liaison Counsel at 2, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Feb. 26, 2008); Janet McConnaughey, *Two Propulsid Settlements; A Handful of Checks*, ASSOCIATED PRESS, Feb. 29, 2008.

111. *Parties Announce New Propulsid Settlement to Resolve Remaining State, Federal Claims*, 7 Class Action Litig. Rep. (BNA) No. 2, at 63 (Jan. 27, 2006). Earlier reports estimated that 12,000 people had not yet sued at the time of the first settlement. *Johnson & Johnson Unit in Legal Settlement Over Propulsid Suit*, *supra* note 104.

112. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. June 2, 2005) (order); Propulsid I Settlement, *supra* note 104, § 19.

113. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. June 2, 2005) (order) ("No objections were made to the Motion."); Burch, *supra* note 41, at 108–09.

using the total fund "deposited" by defendants, $87.3 million—not the actual money paid to claimants.[114]

Eventually, only thirty-two of 4,245 claims submitted under Propulsid I were eligible for relief—the confidential amounts of which were filed under seal.[115] Because relatively little money went to claimants, the court and parties then transferred $8.3 million to Canada's Prepulsid Resolution Program and the same amount to "charitable organizations."[116] After a joint motion by the parties, $40 million reverted to Johnson & Johnson, the defendant, which left $12 million remaining in the fund.[117] So, as of July 31, 2012, claimants likely received little more than $3.66 million combined.[118]

Although Propulsid I had not yet concluded, given the continued need for finality with regard to the late-filed and state cases, lead lawyers negotiated "Propulsid II," a $15 million settlement that mostly mirrored the first, but required ninety percent of death claimants and ninety-five percent of personal-injury claimants to participate.[119] The physician panel found only five out of 1,767 claims compensable this time, and Johnson & Johnson paid only $2.85 million from the settlement fund.[120] Nevertheless, the leadership requested and received an additional $4.1 million in fees with no objections filed.[121] The court also granted a joint motion to revert $5

---

114. *See* Memorandum in Support of Plaintiffs' Steering Committee's Motion for Award of Attorney's Fees and Reimbursement of Costs at 2, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. May 3, 2005).

115. Joint Report No. 89 of Plaintiffs' and Defendants' Liaison Counsel at 1–2, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Feb. 22, 2011).

116. Order Granting Joint Motion for an Order Authorizing Distribution of MDL 1 Settlement Fund, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Nov. 30, 2009). The money went to Louisiana Health Public Initiative, even though claimants were geographically dispersed throughout the country. Joint Report No. 95 of Plaintiffs' and Defendants' Liaison Counsel at 2, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Mar. 6, 2012).

117. Joint Motion and Order for Partial Disbursement of Settlement Funds to Defendant Johnson & Johnson, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Dec. 14, 2011).

118. *See* Joint Report No. 97 of Plaintiffs' and Defendants' Liaison Counsel, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. July 31, 2012). The totals added in the text are not, of course, in the Joint Report, but derived from numbers provided in that and previous reports.

119. *Parties Announce New Propulsid Settlement to Resolve Remaining State, Federal Claims*, *supra* note 111; McConnaughey, *supra* note 110.

120. This number does not include the 2,059 claimants who enrolled in the program, had their claims extinguished, but did not submit claim forms. Memorandum in Support of Motion for Distribution of Attorney's Fees (Re: MDL Settlement Program II) at 2, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 1, 2012).

121. Memorandum in Support of Motion for Distribution of Attorney's Fees (Re: MDL Settlement Program II) at 5, Ex. B, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-

million of the second settlement fund as well the remaining balance of all funds to the defendant.[122] As the litigation concluded, lead lawyers requested and received an additional six-percent common-benefit fund, which taxed settlements that occurred before the master settlements and equaled $397,860.00.[123]

Two months after Propulsid II, the Panel centralized *Vioxx* before the same judge.[124] Its resulting non-class settlement has easily been the most cited, discussed, and criticized deal within the data.[125] Adapting closure and fee-related lessons from *Propulsid*, the settlement offer combined two provisions—a mandatory attorney-recommendation provision and a mandatory attorney-withdrawal provision—to link individual attorneys' interests to defendant Merck's closure goal. These provisions required each participating plaintiffs' attorney to recommend the deal uniformly or not at all. If she recommended it and the client refused, then she had to withdraw from representing that client.[126] If fewer than eighty-five percent of the claimants consented, Merck could abandon the deal.[127]

---

KWR (E.D. La. Aug. 1, 2012); *see also In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 22, 2012) (order) (granting motion for distribution of attorney's fees (Re: MDL Settlement Program II)). The only fee objections were those by firms objecting to their own cut. *E.g.*, Zimmerman Reed P.L.L.P.'s Response in Partial Objection to the Plaintiffs' Steering Committee's Motion for Distribution of Additional Attorneys' Fees and Reimbursement Costs (Re: MDL Settlement Program I), *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-1355-EEF-KWR (E.D. La. Apr. 17, 2012); Objection to the PSC's Motion for Distribution of Specific Attorney's Fees Awards and for Expenses and Reimbursements (Re: MDL Settlement Program I), *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Apr. 14, 2009) (filed by Lockridge Grindal Nauen P.L.L.P.).

122. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Oct. 3, 2012) (order terminating the claims of all enrollees in the second MDL resolution program and authorizing return to the defendants the balance of the settlement fund and administrative fund after all payments due thereunder have been made); *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Dec. 19, 2011) (order).

123. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-1355-EEF-KWR (E.D. La. Feb. 3, 2014) (order); Plaintiffs' Liaison Counsel's Memorandum in Support of Motion for Final Distribution of Remaining Funds at 3, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Jan. 31, 2014); *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Oct. 3, 2012) (order terminating the claims of all enrollees in the second MDL resolution program and authorizing return to the defendants the balance of the settlement fund and administrative fund after all payments due thereunder have been made).

124. *In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EEF-DEK (E.D. La. Feb. 17, 2005) (transfer order).

125. *E.g.*, Erichson & Zipursky, *supra* note 102, at 267–68.

126. Master Settlement Agreement §§ 1.2.8.1–3, *In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EEF-DEK (E.D. La. Nov. 9, 2007) [hereinafter Vioxx Settlement]. After some plaintiffs' attorneys contended the settlement conflicted with ethical rules, it was reinterpreted to mean that the attorneys should recommend the deal only if it was in the client's best interest. *In re* Vioxx Prods. Liab. Litig., 388 F. App'x 391, 395–97 (5th Cir. 2010); Alex Berenson, *Some Lawyers*

These similarities are unsurprising given that both *Vioxx* and *Propulsid* included many of the same lead plaintiff lawyers—Richard Arsenault, Dawn Barrios, Russ Herman, Arnold Levin, and Chris Seeger.[128] Like *Propulsid* and *Vioxx*, *Vioxx* and *Fosamax* shared many key players, too. Merck manufactured and distributed both drugs, thus Bruce Kuhlik, Merck's general counsel, and Ted Mayer of Hughes, Hubbard & Reed represented Merck in each suit. On the plaintiffs' side, James Dugan II, and Shelly Sanford were lead lawyers in both *Vioxx* and *Fosamax*, and Ashcraft and Gerel, LLP had attorneys on both leadership rosters. Moreover, two law firms— Murray Law Firm and Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A—had attorneys who served as leaders in *Propulsid*, *Vioxx*, and *Fosamax*.

Consequently, it follows that the *Fosamax* agreement replicated many *Propulsid* and *Vioxx*-like provisions: all attorneys with participating clients had to become parties to the agreement and recommend that their clients accept the deal.[129] But the walkaway provision in *Fosamax* differed from those in *Propulsid* and *Vioxx*. Merck had two options if a single claimant or her counsel failed to agree: (1) Merck could declare the agreement null and void, or (2) it could reduce the settlement amount by however much the allocation committee determined would have been paid to non-participating claimants and their counsel.[130] Merck did not activate its first option, but the judge allowed numerous attorneys to withdraw from representing non-settling claimants.[131] These measures led to a ninety-five percent participation rate four months after the

---

*Seek Changes in Vioxx Settlement*, N.Y. TIMES (Dec. 21, 2007), http://www.nytimes.com/2007/12/20/business/20cnd-vioxx.html?_r=0 [https://perma.cc/K8AN-WKWE].

127. Vioxx Settlement, *supra* note 126, § 11.1.

128. *See In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. June 2, 2005) (order) (Dawn Barrios and Richard Arsenault as State Liaison counsel; Russ Herman on Plaintiff's Steering Committee); *In re* Propulsid Prods. Liab. Litig., No. 2:00-MD-01355-EEF-KWR (E.D. La. Oct. 23, 2000) (pretrial order no. 3) (Russ Herman, Arnold Levin, and Chris Seeger on Plaintiff Steering Committee); *cf. In re* Vioxx Prods. Liab. Litig., No. 05-md-01657-EEF-DEK (E.D. La. May 22, 2009) (pretrial order no. 41) (Dawn Barrios on Private Third Party Payor Bellwether Trial Committee); *In re* Vioxx Prods. Liab. Litig., No. 05-md-01657-EEF-DEK (E.D. La. Apr. 8, 2005) (pretrial order no. 6) (Richard Arsenault, Arnold Levin, and Chris Seeger on Plaintiff's Steering Committee).

129. Master Settlement Agreement ¶¶ 1–2, 5, Exhibit C at C-15 (Certification and Joinder of Counsel, Claimant's Counsel), *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Mar. 24, 2014) [hereinafter Fosamax Settlement].

130. Fosamax Settlement, *supra* note 129, ¶ 11.

131. *E.g.*, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Sept. 22, 2014) (order) (allowing Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A. to withdraw as counsel).

settlement, which was likely later enhanced by granting Merck's unopposed *Lone Pine* orders—orders that impose evidentiary production requirements on non-settling plaintiffs, sometimes with little advanced notice.[132] As colorfully described by the leadership, *Lone Pine* orders are "a post-settlement mop-up procedure."[133]

Closure mechanisms in the American Medical Systems Pelvic Repair Systems agreement were strikingly similar to those in *Fosamax*, *Vioxx* and *Propulsid*: once again plaintiffs' attorneys had to recommend the deal uniformly, secure releases from at least ninety-five percent of plaintiffs, and "employ their best efforts to obtain an executed Release from 100%."[134] If a client still refused, counsel had to withdraw from representing her.[135] Although the deal explicitly purported not to restrict attorneys' right to practice law, which would violate Model Rule of Professional Responsibility 5.6(b),[136] participating counsel agreed not to "actively solicit prospective Pelvic Mesh clients via television, radio or website advertisement" and represented that the submitted claimant list included all known claims.[137] Moreover, the special master overseeing the claims process

---

132. *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. July 30, 2014) (order). Plaintiffs may be relying on common evidence produced by the lead lawyers, but, when a plaintiff refuses to settle, a *Lone Pine* order might require a plaintiff to retain an individual expert and produce her opinion within a couple of weeks. Lore v. Lone Pine Corp., No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Law Div. Nov. 18, 1986).

133. *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. July 30, 2014) (order) (quoting Plaintiffs' Steering Committee's Memorandum of Points and Authorities in Opposition to Defendant Merck's Motion for Entry of Lone Pine Order at 7, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Oct. 29, 2012)). *Lone Pine* orders typically require non-settling plaintiffs to provide some evidentiary support for their claims to avoid dismissal. *Lone Pine*, 1986 WL 637507 at *4; *see In re* Vioxx Prods. Liab. Litig., 509 F. App'x 383, 384–85 (5th Cir. 2013) ("[A] *Lone Pine* order[ ] imposed certain discovery requirements on such plaintiffs, including production of pharmacy and medical records, expert reports, and answers to Merck's interrogatories.").

134. Master Settlement Agreement § II.H, *In re* Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig., MDL No. 2325 (S.D. W. Va. June 14, 2013) [hereinafter Pelvic Repair Settlement].

135. *Id.* §§ II.H, I.

136. MODEL RULES OF PROF'L CONDUCT r. 5.6(b) (AM. BAR ASS'N 2013) ("A lawyer shall not participate in offering or making . . . an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 13(2) (2000) ("In settling a client claim, a lawyer may not offer or enter into an agreement that restricts the right of the lawyer to practice law, including the right to represent or take particular action on behalf of other clients."); MODEL CODE OF PROF'L RESPONSIBILITY DR 2-108(B) (AM. BAR ASS'N 1980) ("In connection with the settlement of a controversy or suit, a lawyer shall not enter into an agreement that restricts his right to practice law.").

137. Pelvic Repair Settlement, *supra* note 134, § II.S.

was the presiding judge in the New Jersey state-court *Propulsid* litigation.[138]

Like all the other settlements examined thus far, the two Yasmin/Yaz agreements (one for gallbladder injuries and one for arterial thromboembolism "ATE" injuries) shared many features with their predecessors.[139] The closure mechanism in the Gallbladder Settlement, however, was both novel and unorthodox. Even though it was not a class action, it included an automatic-enrollment provision that required non-participating plaintiffs to affirmatively opt-out.[140] A case management order—citing dubious judicial authority and precedent according to *Vioxx* and *Propulsid*—reinforced the automatic enrollment, notified claimants, and required them to either affirmatively "opt-out" before the deadline or complete a claims compensation package.[141] Failing to do either resulted in dismissal with prejudice.[142] Two additional provisions fortified this closure mechanism: a promise by the lead lawyers to "use their best efforts to achieve sufficient participation," and the defendant's ability to abandon the deal if less than ninety percent of all eligible claimants (with cases pending anywhere) accepted.[143] The Yasmin/Yaz ATE Settlement lacked the mandatory inclusion provision, but replaced it with higher participation thresholds and the same promise by leadership to meet those benchmarks.[144]

---

138. *See In re* Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig., No. 12-MD-2325 (S.D. W. Va., May 28, 2014) (pretrial order no. 175) (appointing Judge Marina Corodemus (Ret.) as special master for private settlement agreements between AMS and certain plaintiffs' counsel); *cf.* Jean Hellwege, *State Court Rejects Propulsid Class; Plaintiff Lawyers Unbowed*, TRIAL, July 1, 2002, at 90, 90.

139. ATE Master Settlement Agreement, *In re* Yasmin & Yaz (Dropirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill., Aug. 3, 2015) [hereinafter Yaz ATE Settlement]; Settlement Agreement, *In re* Yasmin & Yaz (Dropirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill., Mar. 15, 2013) [hereinafter Yaz Gallbladder Settlement].

140. Yaz Gallbladder Settlement, *supra* note 139, §1.01(A).

141. *In re* Yasmin & Yaz (Dropirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill., Mar. 15, 2013) (case management order #60 at 2).

142. *Id.*

143. Yaz Gallbladder Settlement, *supra* note 139, §§ 9.01, 9.02.

144. Yaz ATE Settlement, *supra* note 139, §§ 3.01, 3.02 (requiring 97.5 percent overall participation, ninety-five percent of death and severe injury claims, and all eligible claimants calendared for a trial or jury selection in state or federal court).

### 2. Case-Census Provisions Yield Judicially Reinforced Closure and Define the Relevant Market

To reach the entire spectrum of claimants (state, federal, filed, and unfiled), more recent walkaway provisions include a new twist—judicial reinforcement via census provisions. Settlement designers in the Vioxx settlement,[145] the DePuy ASR settlements,[146] the second Yasmin/Yaz ATE settlement agreement,[147] the Actos settlement,[148] the NuvaRing settlement,[149] and the Zimmer Durom Hip Cup settlement[150] employed "registration" or "case-census" provisions,[151] which involved jointly petitioning both the transferee judge and the coordinating state-court judges for an order notifying claimants of the deal and requiring them to register their claims—or face potential dismissal—by a certain date.[152]

---

145. Vioxx Settlement, *supra* note 126, § 1.1.

146. Settlement Agreement, Art. 3, §§ 3.1–3.3, *In re* DePuy Orthopaedics, Inc. Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Mar. 2, 2015) [hereinafter 2015 DePuy ASR Settlement]; Settlement Agreement at art. 3, §§ 3.1–3.3, *In re* DePuy Orthopaedics, Inc. Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Nov. 9, 2013) [hereinafter 2013 DePuy ASR Settlement. The 2013 DePuy Hip Implant ASR settlement was the first in the dataset to use a registration provision. Less than two years after the original settlement, settlement designers implemented the 2015 ASR Settlement Agreement, which extended the original program deadline to cover around 1,400 revision surgeries occurring after the original deadline as well as claimants who rejected Johnson & Johnson's initial offer. Joint Status Report Regarding U.S. Settlement Program, *In re* DePuy Orthopaedics, Inc. Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Feb. 20, 2015); Jef Feeley, *J&J to Pay as Much as $420 Million More to Resolve Additional ASR Hip Implant Suits*, 16 Class Action Litig. Rep. (BNA) No. 4, at 210 (Feb. 27, 2015).

147. Yaz ATE Settlement, *supra* note 139, § 1.02.

148. Master Settlement Agreement § 1.02, *In re* Actos (Pioglitazone) Prods. Liab. Litig., No. 6:11-md-02299-RFD-PJH (W.D. La. Apr. 28, 2015) [hereinafter Actos Settlement].

149. Master Settlement Agreement § 1.05, *In re* NuvaRing Prods. Liab., No. 4:08-md-01964-RWS (E.D. Mo. Feb. 7, 2014) [hereinafter NuvaRing Settlement]. The agreement also appointed the judge presiding over the NuvaRing litigation as the Special Master. *Id.* § 5.01. Parties appealing the claims administrator's decision (BrownGreer) to the Special Master had to pay the Special Master's cost, which was fixed at $300/per dispute. *Id.* § 5.05.

150. U.S. Durom Cup Settlement Program Agreement § V.A., V.B., *In re* Zimmer Durom Hip Cup Prods. Liab. Litig., No. 2:09-cv-04414-SDW-SCM (D.N.J. Feb. 11, 2016) [hereinafter Zimmer Durom Settlement].

151. The Pradaxa settlement was not publicly available, but the judge in that case likewise issued a census order. *In re* Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig., No. 3:12-md-02385-DRH-SCW (S.D. Ill. May 29, 2014) (case management order no. 76) (initial claimant identification certification order).

152. *E.g., In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Jan. 29, 2014) (case management order) (supplemental census of claims); *In re* Actos (Pioglitazone) Prods. Liab. Litig., No. 6:11-md-02299-RFD-PJH (W.D. La. Apr. 28, 2015) (order regarding settlement agreement and deadlines); *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill., Aug. 3, 2015) (case management order no. 77) (census of claims).

All attorneys representing a single plaintiff in the issuing courts had to register all related claims in which they had an interest (broadly defined to include "any financial interest of any kind whatsoever") regardless of whether the claims were unfiled or pending elsewhere.[153] Noncompliance would prompt a show-cause hearing.[154] Dealmakers then used the census to determine the total number of claimants, which became the denominator for satisfying the defendant's walkaway right.[155] As such, census orders define the universe of claims and the relevant market for attorneys' legal services, as well as fortify plaintiffs' leadership's position at the helm.[156] But the census provision in the Zimmer Durom Hip Cup settlement carried added weight: the judge not only ordered all plaintiffs' attorneys to register all of their clients (regardless of where those claims were pending), but also ordered all plaintiffs to participate in the settlement and stayed the proceedings pending the conclusion of the settlement's mediation process.[157]

Both DePuy settlements further reinforced case-census provisions and leaders' control with uniform recommendation requirements, which prevented participating attorneys from "defecting." First, signatory attorneys had to use their "best efforts" to enroll their clients[158] and "endorse enrollment" subject to their independent professional judgment.[159] Second, the agreement included a "meet and confer" provision with the special master and the steering committee, which lead lawyers billed as an opportunity to have participation questions answered.[160] But the subsequent clause was more revealing. The special master could use that opening to decide that a law firm or interested counsel "did not act in good faith in connection with the informed consent process and participation," which allowed DePuy, "at its sole option," to expel that firm or

---

153. Coordination Proceeding Special Title [Rule 3.550] Actos Prod. Liab. Cases, JCCP No. 4696 (Cal. Sup. Ct., May 7, 2015) (stipulation and order re census of claims and continuance of status conference).

154. *E.g.*, *id.*

155. *E.g.*, Yaz ATE Settlement, *supra* note 139, § 3.02.

156. *See* HOVENKAMP, *supra* note 15, § 3.2 (defining market power and describing mechanisms for maintaining market power, such as exclusion).

157. *In re* Zimmer Durom Hip Cup Prods. Liab. Litig., No. 2:09-cv-04414-SDW-SCM (D.N.J. May 13, 2016) (case management order regarding settlement agreement).

158. 2015 DePuy ASR Settlement, *supra* note 146, § 17.2.8; 2013 DePuy ASR Settlement, *supra* note 146, § 17.2.8.

159. 2015 DePuy ASR Settlement, *supra* note 146, § 17.2.8; 2013 DePuy ASR Settlement, *supra* note 146, § 17.2.8.

160. 2015 DePuy ASR Settlement, *supra* note 146, § 17.2.11; 2013 DePuy ASR Settlement, *supra* note 146, § 17.2.11.

attorney's other clients from the deal.[161] So, rather than requiring the attorney to withdraw, DePuy could expel them. But the result was the same as in *Propulsid*: attorneys had to consider their clients as a group—not individuals. So, the settlement's obligatory disclaimer that client recommendations were "subject to their independent professional judgment" accomplished little.

Defendants are, of course, free to structure settlement offers any way they like. They can even include provisions that force plaintiffs' lawyers to treat their clients as a group. There are, however, some ethical principles that restrict this unbridled freedom. Model Rule of Professional Conduct 8.4(a) states: "It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."[162] Unfortunately, this Rule has proven too flimsy to be of much use. Courts and commentators have differed substantially on how it applies to aggregate settlements, which dampens the threat of potential disciplinary repercussions.[163]

### 3. Latecomer and Reverter Clauses Promote Finality, Inhibit Advertising, and Return Funds

Two further provisions add to the possibility that repetitive play and plaintiffs' leadership's monopolistic control may principally benefit repeat actors: latecomer reductions and reversion clauses, which allow unclaimed funds to revert to the defendant. Beginning with the former, settlement designers in *Zimmer Durom Hip Cup* and *DePuy ASR* experimented with a unique provision that reduced payouts to claimants who were not represented by counsel as of the settlement date.[164] The idea was to inhibit the Field-of-Dreams problem: creating a claims process can encourage attorneys and claimants to emerge, file suit, and partake of the settlement. To discourage this, these anticompetitive provisions immediately reduced unrepresented claimants' awards by twenty-nine percent and covered two groups of people: (1) those litigating pro se and (2) those who retained attorneys and filed suit after the identified date. As to the pro se litigants, *DePuy ASR*'s designers explained that the reduction simply discounted their payout to the same amount they would have

---

161.  2015 DePuy ASR Settlement, *supra* note 146, § 17.2.12; 2013 DePuy ASR Settlement, *supra* note 146, § 17.2.12.

162.  MODEL RULES OF PROF'L CONDUCT r. 8.4(a) (AM. BAR ASS'N 2013).

163.  Baker, *supra* note 23, at 298.

164.  2015 DePuy ASR Settlement, *supra* note 146, § 4.4; 2013 DePuy ASR Settlement, *supra* note 146, § 4.4; Zimmer Durom Settlement, *supra* note 150, § III.A.2.e.

received if they had to pay individual attorneys' fees, but noted, "[T]here will be an additional Court approved deduction for common benefit fees and expenses."[165] The second group was even worse off, for if those DePuy ASR plaintiffs wanted an attorney to help with their claim, then they had to pay attorneys' fees and common-benefit fees out of their reduced award.

Latecomer reductions prompt two concerns. First, by decreasing awards, they discourage attorneys from representing new clients and run into ethical rules that prohibit counsel from restricting their right to practice through settlements.[166] To be sure, Model Rule of Professional Conduct 5.6(b) is controversial,[167] but even setting aside the restriction on practice, latecomer reductions unfairly penalize pro se litigants for representing themselves and assume they would have received more had they retained counsel. To the extent that settlement designers intended to discourage other attorneys from advertising, collecting a last-minute client roster, and freeriding on lead lawyers' hard work, they taxed the wrong people. Requiring dilatory attorneys to pay a scaled-up common-benefit fee makes sense under a restitution theory, but the brunt of latecomer reductions fell on clients—not attorneys. Moreover, restricting advertising and reducing settlement awards (and thus attorneys' fees) penalized and thereby discouraged last-minute competition, which helps insulate lead lawyers' monopolistic power from challenge.[168]

Second, DePuy ASR's leadership's attempt to disclaim fiduciary obligations to pro se plaintiffs by expressly stating that they "remain Unrepresented Claimants" even if they "obtain assistance" from the lead lawyers is dubious.[169] While leaders lack an individual attorney-client relationship with pro se litigants, their fiduciary obligations run to all plaintiffs within the proceeding equally.[170] Leaders apply for the right to control others' lawsuits. Allowing them to exert control without incurring a corollary duty to represent plaintiffs loyally would

---

165. 2015 ASR Settlement Agreement Benefits Overview at 4, *In re* DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Mar. 20, 2015), https://www.usasrhipsettlement.com/Un-Secure/WebNews.aspx [https://perma.cc/Y7UP-WLMU].

166. MODEL RULES OF PROF'L CONDUCT r. 5.6(b) (AM. BAR ASS'N 2013).

167. *E.g.*, Stephen Gillers & Richard W. Painter, *Free the Lawyers: A Proposal to Permit No-Sue Promises in Settlement Agreements*, 18 GEO. J. LEGAL ETHICS 291, 294 (2005).

168. *See* Ian Ayres, *How Cartels Punish: A Structural Theory of Self-Enforcing Collusion*, 87 COLUM. L. REV. 295, 306–07 (1987) (discussing advertising punishments for cartels).

169. 2015 DePuy ASR Settlement, *supra* note 146, § 4.4; 2013 DePuy ASR Settlement, *supra* note 146, § 4.4.

170. PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §§ 1.04 reporter's notes cmt. a, 1.05 illus. 2, 4 (AM. LAW INST. 2010); Charles Silver, *The Responsibilities of Lead Lawyers and Judges in Multidistrict Litigations*, 79 FORDHAM L. REV. 1985, 1987–89 (2011).

permit attorneys to exploit plaintiffs to their own advantage. Appointing them procedurally would likewise divest plaintiffs of substantive, contractual rights they would have had if their own attorneys retained control,[171] and would thereby violate the Rules Enabling Act.[172]

Ordinarily, leadership's fees come out of a plaintiff's attorney's fee such that the plaintiff is no worse off for litigating a case through multidistrict litigation. And freeriding pro se litigants who profit from leaders' work should likewise have to pay common-benefit fees.[173] But diminishing pro se litigants' award at the outset on top of requiring them to pay common-benefit fees to the lead lawyers who disserved them is different.[174] Leaders can't have it both ways: either they faithfully fulfilled their fiduciary obligations by protecting those claimants' financial interests and should be compensated for any benefit they conferred, or they did not and should receive nothing. Had the court certified the litigation as a class action, latecomer provisions would violate *Amchem*'s basic precept: by negotiating side deals that paid their current clients more than class members, class counsel would have inadequately represented the latter.[175]

In addition to the latecomer reductions, the DePuy settlements contained reversion clauses: the twenty-nine percent taken off the top reverted to DePuy, the defendant.[176] In class actions, reverter clauses often indicate collusion, can create perverse incentives to implement restrictive claims criteria, and can undermine the judgment's deterrent effect.[177] Yet, settlement designers in both *DePuy ASR* and

---

171. MODEL RULES OF PROF'L CONDUCT r. 1.7 (AM. BAR ASS'N 2013) (stating that clients are entitled to representation free from any conflicts and must give their informed consent if conflicts exist); *see also* Lynn A. Baker & Charles Silver, *Fiduciaries and Fees: Preliminary Thoughts*, 79 FORDHAM L. REV. 1833, 1836, 1838 (2011) (noting that by entering into a retainer agreement, an agent owes a duty of loyalty to clients with respect to actions within the representation's scope and could be sued if she breaches her fiduciary duty).

172. 28 U.S.C. § 2072(b) (2012) (prohibiting procedural rules from abridging, enlarging, or modifying any substantive right).

173. Burch, *supra* note 41, at 132.

174. For further arguments as to lead lawyers' fiduciary obligations, see Silver, *supra* note 170, at 1987–91.

175. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 600, 606, 626–28 (1997).

176. 2015 DePuy ASR Settlement, *supra* note 146, §§ 7.1.3.1, 7.1.7; 2013 DePuy ASR Settlement, *supra* note 146, §§ 7.1.3.1, 7.1.7.

177. Jones v. GN Netcom, Inc. (*In re* Bluetooth Headset Prods. Liab. Litig.), 654 F.3d 935, 947–48 (9th Cir. 2011); Sylvester v. CIGNA Corp., 369 F. Supp. 2d 34, 47 (D. Me. 2005) (noting "the reverter clause and clear sailing clause raise a presumption of unfairness"); BARBARA J. ROTHSTEIN & THOMAS E. WILLGING, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 13, 20 (2005); Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 631 (2010).

*Propulsid* used them.[178] When reversion clauses are paired with stringent claims-filing procedures and attorneys' fees are calculated using the fund's initial size—not claimants' benefit—self-dealing concerns increase.[179] As Justice O'Connor recognized in the class-action context, allowing judges to base attorneys' fees on a fund's sticker price would "decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery."[180] This can, she explained, "undermine the underlying purposes of class actions by providing defendants with a powerful means to entic[e] class counsel to settle lawsuits in a manner detrimental to the class."[181] Without Rule 23's regulatory safeguards, the practice is even more troubling.[182]

In sum, *Propulsid*'s designers were right. Their deal did become a template for future cases, and it was remarkable. But the remarkable things about the agreement were the ways in which it perfected the shift toward considering clients as inventories and entities instead of individuals, flaunted ethical rules (ceasing to represent non-settling clients seems to violate Model Rule of Professional Conduct 1.16, and attorney advertising restrictions risk violating Rule 5.6(b)), and reduced competition.[183]

## B. Lead Lawyers Bargain for Common-Benefit Fees

*Propusid*'s design likewise kick started a trend of expertly wedding plaintiffs' attorneys' interest in collecting fees to the

---

178. *Supra* notes 112–123, 176 and accompanying text. By contrast, no amount of the $56.9 million in the Yaz ATE settlement could revert to the defendant. Yaz ATE Settlement, *supra* note 139, § 4.01(F).

179. *In re Bluetooth Headset*, 654 F.3d at 947 ("Moreover the settlement also contained a 'kicker': all fees not awarded would revert to defendants rather than be added to the *cy pres* fund or otherwise benefit the class."); Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004) (noting the questionable nature of allowing unclaimed funds to revert to the putative wrongdoer); NEWBERG ON CLASS ACTIONS § 12:29 (5th ed. 2013) ("[B]ecause class counsel's fees may be pegged to the size of the fund made available (prior to reversion), a reversionary fund may be a warning that counsel has undersold the class's claims.").

180. Int'l Precious Metals Corp. v. Walters, 530 U.S. 1223, 1223 (2000) (O'Connor, J., statement respecting denial of certiorari).

181. *Id.*

182. *See supra* notes 112–123 and accompanying text.

183. MODEL RULES OF PROF'L CONDUCT r. 1.16, 5.6(b) (AM. BAR ASS'N 2013) (terminating the lawyer-client relationship and restricting the right to practice respectively); ABA Comm. on Prof'l Ethics & Grievances, Formal Op. 93-371 (1993); Erichson & Zipursky, *supra* note 102, at 284–92. *See generally* David L. Shapiro, *Class Actions: The Class as Party and Client*, 73 NOTRE DAME L. REV. 913, 923–34 (1998) (likening absent class members to entities).

defendant's closure goal: without convincing one's entire client roster to settle, the defendant's required claimant-participation rate would fail, the deal would collapse, and fees would disappear. Requiring attorneys to become signatories and to treat their clients as an entity means that attorneys' financial interests are intertwined with the deal's success. For lead lawyers, the stakes are even higher. In addition to their clients' contingency fees, they stand to gain common-benefit fees from the entire group.

To fund massive lawsuits, lead lawyers must front substantial resources to cover things like expert and administrative costs and the costs of taking depositions and creating document repositories. To do this, they pool their money into a fund. As such, some common-benefit payments are better viewed as reimbursing leaders for these costs. As in any contingent fee case, when litigation proves less successful than they'd hoped, recoveries may not cover those expenses.[184] But in successful litigation, when leaders settle their own cases, they (like others) will have to pay a percentage of their clients' gross settlement proceeds into the fund. For leaders, that money will eventually transfer from one pocket to the other at the same rate (unless the judge awards them less of a common-benefit fee), but collecting attorneys' fees from other cases can generate significant income.

Because fees are judicially imposed, information about them is more readily available. Table 2 includes information from the thirty (of the seventy-three) products-liability and sales-practice multidistrict litigations that concluded in non-class settlements (either as inventory settlements or holistic aggregate settlements),[185] even where the settlements were not publicly available. The totals in the final row indicate the prevalence of each fee practice. All proceedings taxed some state-court litigants. Plaintiffs' leadership in 88.8 percent of the proceedings with publicly available settlements negotiated some aspect of their common-benefit fee with the defendant. While 36.6 percent of the proceedings included at least one objection, that number is somewhat misleading for the most objectors were either lead lawyers complaining about their cut of the common-benefit fund allocations or attorneys concerned about taxing state cases.

---

184. Not all proceedings are profitable and leaders' out-of-pocket costs may exceed their return. *E.g.*, Consent Order Authorizing Final Disbursement from Common Benefit Fund Account, *In re* ConAgra Peanut Butter Prods. Liab. Litig., No. 1:07-md-01845-TWT (N.D. Ga. Aug. 15, 2014) (noting that the executive committee expended far more in out-of-pocket costs than was deposited into the common-benefit fund).

185. Information from the Asbestos litigation was not included since the early docket entries are not electronically available.

This convergence of fee-pricing practices is significant in thinking through potential implications of cartel-like collusion across multidistrict proceedings.[186] Although the law punishes only explicit collusion, game theory recognizes that when cartel members have shared beliefs of how others will react to their behavior, it can have real-world social and financial costs.[187] When used alongside credible punishment mechanisms, members' shared understanding can sustain a self-enforcing, collusive equilibrium.[188] Put simply, this understanding becomes the new profit-maximizing norm, despite its self-dealing nature. Accordingly, the following sections explain how certain practices deviate from a well-accepted restitutionary theory of fees, and how leaders' self-interest in maximizing common-benefit fees can breach their fiduciary obligations to plaintiffs and endanger adequate representation.

## TABLE 2: COMMON-BENEFIT FEE PRACTICES OCCURRING IN PROCEEDINGS CONCLUDING WITH NON-CLASS AGGREGATE SETTLEMENTS IN THE DATASET

| MDL No. | MDL Name | Common-Fund Holdback Increased Mid-stream | Escalating Percentages Based on Timing of Consent | Fee Aspects Negotiated with Defendant | State-Court Attorneys Taxed for Common Benefit | Plaintiff Objections to fees on MDL Docket |
|---------|----------|---|---|---|---|---|
| 1355 | Propulsid | No | No | Yes, directly | Yes, if state-court judge orders or counsel agrees, and via settlement agmt | No |
| 1431 | Baycol | No | No | Confidential settlement | Yes, via court order | No |
| 1507 | Prempro | No | No | Confidential settlement | Yes, via participation agmt | Yes |
| 1657 | Vioxx | Yes | Yes | Yes | Yes, via participation agmt and settlement agmt | Yes |
| 1742 | Ortho Evra | Yes | Yes | Confidential settlement | Yes, via participation agmt | Yes |

---

186. *See* ROBERT AXELROD, THE EVOLUTION OF COOPERATION 33–36 (1984) (observing that in repeated games, the players are more likely to reach the cooperative, joint-maximizing solution).

187. HOVENKAMP, *supra* note 15, §§ 4.3, 4.4 (noting that adhering to "a common law concept of 'agreement' . . . makes little sense in the context of strategic behavior among competing firms"); Ayres, *supra* note 168, at 296–97.

188. Ayres, *supra* note 168, at 296–97.

| MDL No. | MDL Name | Common-Fund Holdback Increased Mid-stream | Escalating Percentages Based on Timing of Consent | Fee Aspects Negotiated with Defendant | State-Court Attorneys Taxed for Common Benefit | Plaintiff Objections to fees on MDL Docket |
|---|---|---|---|---|---|---|
| 1763 | Human Tissue | No | No | Confidential settlement | Yes, via participation agmt (could exclude state cases with a promise not to use common-work product in them) | No |
| 2243 | Fosamax | No | Yes | Yes | Yes, via participation agmt and settlement agmt | No |
| 1836 | Mirapex | Un-known | Un-known | Confidential settlement | No order available | No |
| 1842 | Kugel Mesh Hernia Patch | No | No | Confidential settlement | Yes, via participation agmt and jurisdiction over defendant | Yes |
| 1845 | ConAgra Peanut Butter | No | No | Confidential settlement | Yes, if counsel consents or if plaintiff received a tangible benefit | Yes |
| 1871 | Avandia | No | No | Confidential settlement | Yes, via participation agmt | Yes |
| 1909 | Gadolinium Contrast Dyes | No | Yes* | Confidential settlement | Yes, via participation agmt | No |
| 1928 | Trasylol | No | No | Confidential settlement | Yes, via participation agmt | Yes |
| 1943 | Levaquin | Yes | No | Confidential settlement | Yes, via court order | No |
| 1953 | Heparin | No | Yes | Confidential settlement | Yes, via participation agmt | No |
| 1964 | NuvaRing | Yes | No | No | Yes, via order claiming jurisdiction over attorneys | Yes, one |
| 2004 | Mentor Corp ObTape | No | No | Confidential settlement | Yes, via participation agmt | No |
| 2092 | Chantix (Varenicline) | Yes | Yes | Confidential settlement | Yes, via participation agmt , or by benefitting from MDL work product | No |
| 2100 | Yasmin & Yaz (Drospirenone) | Yes | Yes | Yes | Yes, via participation agmt and settlement agmt | No |
| 2158 | Zimmer Durom Hip Cup | No | No | Yes | Yes, via settlement agmt and court order requiring all plaintiffs to participate in settlement | Yes |
| 2187 | C R Bard, Inc Pelvic Repair Sys | No | Yes* | Confidential settlements | Yes, via participation agmt , by seeking compensation, or benefiting from PSC's work | Unknown [189] |
| 2197 | DePuy ASR Hip Implant | Yes | Yes | Yes | Yes, via settlement agmt subjecting them to the court's fee order | Yes, one initially |

189   Judge Goodwin presides over five technically separate pelvic-mesh proceedings; some objections are filed in one proceeding, but pertain to all. None appear on this proceeding's docket.

| MDL No. | MDL Name | *Common-Fund Holdback Increased Mid-stream* | *Escalating Percentages Based on Timing of Consent* | *Fee Aspects Negotiated with Defendant* | *State-Court Attorneys Taxed for Common Benefit* | *Plaintiff Objections to fees on MDL Docket* |
|---------|----------|---------------------------------------------|------------------------------------------------------|------------------------------------------|---------------------------------------------------|---------------------------------------------|
| 2299 | Actos (Pioglitazone) | No | No | Yes | Yes, court order covered payments made by defendants to any plaintiff participating in settlement | No |
| 2325 | American Medical Systems | No | Yes* | Partially confidential settlements | Yes, via participation agmt , by seeking compensation, or benefiting from PSC's work | Unknown[190] |
| 2326 | Boston Scientific Corp Pelvic Repair Sys | No | Yes* | Confidential settlements | Yes, via participation agmt , by seeking compensation, or benefiting from PSC's work | Unknown[191] |
| 2327 | Ethicon, Inc Pelvic Repair | No | Yes* | Confidential settlements | Yes, via participation agmt , by seeking compensation, or benefiting from PSC's work | Unknown[192] |
| 2373 | Watson Fentanyl Patch | No order | No order | Confidential settlement | No common benefit order–cases brought by one law firm | No |
| 2391 | Biomet Magnum Hip Implant | No | No | Yes, directly | Yes, by signing motion or seeking compensation, and by settlement agmt | No |
| 2385 | Pradaxa | No | Yes | Kept confidential | Yes, by seeking compensation | Yes |
| 2387 | Coloplast Corp Pelvic Support Sys | No | Yes* | Kept confidential | Yes, via participation agmt | Unknown[193] |
| Total: 30 MDLs | | 23% Yes | 46 6% Yes | Of the proceedings with publicly available settlements, 88 8% negotiated fees with defendant (8 of 9) | 100% taxed state-court attorneys in some form; 88 8% of proceedings with publicly available settlements (8 of 9) did so by negotiating with defendants | 36 6% had known objections |

*Escalating percentages were not specified in the order, but the judge noted that attorneys who did not sign participation agreements may be subject to increased assessments.

1. Using Early Bird Discounts and Summary Fee Increases

When lead lawyers ask the judge to create a common-benefit fund, the percentages are often modest. As Table 2 shows, however, at least twenty-three percent of lead attorneys have found ways—through court orders or settlement—to increase that assessment and maximize profits as the litigation progresses. In *Chantix*,[194] *Yasmin/Yaz*,[195] *DePuy ASR*,[196] and *Levaquin*,[197] leadership requested and received court-ordered fee increases without opposition.[198] When leaders made the same request in *NuvaRing*, one attorney did object, but only as to his allocation as a steering committee member.[199]

Lead lawyers in *Vioxx* went one step further: they used settlement to contract around the court's three-percent common-benefit fund and raise it to eight percent.[200] Yet, unlike most examined

---

194. *In re* Chantix (Varenicline) Prods. Liab. Litig., No. 2:09-cv-02039-IPJ (N.D. Ala. Dec. 18, 2012) (order).

195. *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill., June 23, 2014) (case management order 63 supplement to case management order no. 14,); *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. May 16, 2014) (order granting 3315 Motion for Relief); *In re* Chantix (Varenicline) Prods. Liab. Litig., No. 2:09-cv-02039-IPJ (N.D. Ala. Dec. 18, 2012) (order).

196. *In re* DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Mar. 3, 2014) (amending Case Management Order No. 13); *In re* DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Nov. 28, 2011) (case management order no. 1 at 5).

197. *In re* Levaquin Prods. Liab. Litig., No. 0:08-md-01943-JRT (D. Minn. Apr. 23, 2013) (second amended pretrial order no. 3) (setting fees at 9.5 percent); *In re* Levaquin Prods. Liab. Litig., No. 0:08-md-01943-JRT (D. Minn. Jan. 22, 2009) (pretrial order no. 3) (declining to set a fee percentage).

198. In *Baycol*, the last available order on fees indicated a six percent holdback. *In re* Baycol Prods. Liab. Litig., No. 0:01-md-01431-MJD-SER (D. Minn. Mar. 1, 2011) (pretrial order 166, closure of MDL 1431 Fee and Cost Account (Common Benefit Fund)). One attorney has, however, indicated that "Baycol began at 4%, and was recently increased to 8%–12%." Motion of Plaintiffs' Executive Committee for Third Amendment to Case Management Order No. 9 at 4, *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio Dec. 22, 2008).

199. Ferrer, Poirot & Wansbrough's Objections to Special Master's Recommendation for Common Benefit Attorneys' Fees, *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Sept. 2, 2014); *In re* NuvaRing Prods. Liab. Litig., No. 08-MD-1964 (E.D. Mo. Dec. 9, 2011) (amended case management order no. 3). In *Pradaxa*, the judge addressed the entry and subsequent withdrawal of objections by four firms on December 11, 2014 to distribution of common-benefit funds. These objections are no longer available on the docket. However, in Judge Herndon's order, he states that all of the plaintiffs' firms are currently in agreement over the distribution of funds as of January 20, 2015. *In re* Pradaxa (Dabigatran Etexilate) Products Liability Litigation, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Jan. 21, 2015) (order concerning distribution of common-benefit fees and expenses).

200. Vioxx Settlement, *supra* note 126, § 9.2.1; *In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EFF-DEK (E.D. La. Aug. 4, 2005) (pretrial order no. 19).

cases, the carte blanche revision incited numerous objections.[201] Accordingly, the judge appointed a Liaison Counsel, which eventually persuaded leaders to decrease their request to 7.5 percent.[202] Nevertheless, the judge reduced the award to 6.5 percent—still a notable raise from the initial three percent.[203]

Finally, 46.6 percent of the proceedings in the data escalated common-benefit fees based on how quickly individual counsel agreed to them.[204] For example, *Ortho Evra* initially levied fees and costs at three percent and raised them to five for those who waited, but the court later eliminated the discount.[205] The court increased the tax from three to six percent, applied it to all pending cases (early birds too), and ruled that if newly filed or transferred cases failed to sign up on time, then the fee would jump to eight percent.[206] Plainly, the point was to incentivize prompt buy-in.

The practice of escalating common-benefit fees is troubling in two respects. First, judges typically issue these orders early in the

---

201. *In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 646–47 (E.D. La. 2010); Silver, *supra* note 170, at 2001–02 .

202. *Vioxx*, 760 F. Supp. 2d at 646–47.

203. *Id.* at 655. On total fees and costs, see *In re* Vioxx Prods. Liab. Litig., MDL No. 2:05-md-01657-EFF-DEK (E.D. La. Sept. 11, 2013) (pretrial order no. 51(A)) (awarding $40,000 in costs plus $214,944.60 to liaison counsel); *In re* Vioxx Prods. Liab. Litig., 2:05-md-01657-EFF-DEK (E.D. La. Aug. 9, 2011) (order and reasons) (awarding $315,250,000.00 in attorneys' fees); *In re* Vioxx Prods. Liab. Litig., 2:05-md-01657-EFF-DEK (E.D. La. Sept. 23, 2009) (pretrial order no. 51 on disbursement of costs) (awarding $40,049,748.16 in costs plus $500,000 to liaison counsel).

204. *In re* Pradaxa (Dabigatran Etexilate) Products Liability Litigation, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Nov. 13, 2012) (case management order no. 16 (establishing common-benefit fee and expense fund)); *In re* Yasmin & Yaz (Drospirenone) Mktg. Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. Mar. 25, 2010) (case management order no. 14 (establishing Common Benefit Fee and Expense Fund) at 3–4); *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Jan. 5, 2010) (case management order no. 17 at 3–4); Plaintiffs' Steering Committee's Memorandum of Authorities in Support of Motion for Creation of a Common Benefit Fund at 11, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Oct. 21, 2009) (requesting a ten percent total assessment for those who waited until settlement); *In re* Heparin Prods. Liab. Litig., No. 1:08-hc-60000-JGC (N.D. Ohio Aug. 12, 2008) (pretrial order no. 6 common benefit order); Participation Agreement, *In re* Gadolinium-Based Contrast Agents Prods. Liab. Litig., No. 1:08-gd-50000-DAP (N.D. Ohio Feb. 20, 2009) (noting that those who do not sign the participation agreement "may be subject to an increased assessment on all GBCA cases in which they have a fee interest"). Later amendments to the pretrial order removed the escalating fees based on the timing of consent. *See In re* Heparin Prods. Liab. Litig., No. 08-hc-60000 (N.D. Ohio Nov. 6, 2008) (first amended pretrial order no. 6 common benefit order).

205. *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio July 23, 2009) (third amended case management order no. 9).

206. *Id.*

litigation.[207] This may induce quick consent by participating attorneys, but it does nothing to incentivize faithful agency by the steering committee. In fact, it does precisely the opposite, particularly when the order is designed to enlist competing state-court lawyers. Professor Richard Nagareda's observation on this point in the class context holds true here as well: "What high-value damage claimants need is not so much a 'day in court' as the prospect of a different bargaining agent whose self-interest is not tied up with the sale of [plaintiffs'] rights en masse so as to achieve maximum [closure]."[208] Demanding early assent to the monopoly power by escalating fees or summarily increasing fees during the litigation does no such thing. Rather, it reduces the number of bargaining agents who might push their clients' cases toward trial in state court or postpone their consent until they can decide whether the negotiated settlement benefits their clients. Put simply, this practice reduces the prospect of a market-based check on lead lawyers' fees and results.

Second, increasing common-benefit fees for latecomers is at odds with the purpose of a common-benefit fund, which is predicated on unjust enrichment. Without a fund, non-lead attorneys might prefer to free ride on leaders' efforts, cash in on any resulting settlement, and pocket the windfall. Unjust enrichment thwarts this scenario when leaders confer a benefit, meaning that judges should tailor fees to the benefit conferred.[209] An escalating rate based on the timing of the attorney's consent may in no way approximate that benefit; those who sign-up early may actually benefit more from leaders' efforts since they can access discovery materials and independently assess acceptable settlement terms.

### 2. Expanding Fees to State-Court Litigants

Lead lawyers have not limited their fees to the confines of federal jurisdiction. They have uniformly expanded their tax base and raised the costs of competing by enveloping state-court claimants through either "voluntary" participation agreements like those in fifty-three percent of the cases (e.g., *Prempro*,[210] *Human Tissue*,[211]

---

207. For example, the Panel consolidated Fosamax on August 18, 2006. *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Aug. 18, 2006) (MDL transfer order). Judge Keenan granted lead lawyers' common-benefit fund request on January 5, 2010, and the master settlement agreement is dated March 24, 2014.

208. Nagareda, *supra* note 1, at 168.

209. Burch, *supra* note 41, at 102–09.

210. Including state court litigants led to the following tally of fees and costs. *In re* Prempro Prods. Liab. Litig., No. 4:03-cv-01507-BRW (E.D. Ark. Sept. 28, 2015) (order) (awarding

*Ethicon*,[212] and *American Medical Systems*[213]) or settlement provisions.[214] Some judges, like the one in *ConAgra Peanut Butter*, have been more cautious and assessed (without a participation agreement) only those state litigators who consent or plaintiffs who "received a tangible benefit" from leaders efforts,[215] while others (as in *Kugel Mesh*) have worried that using substantial benefit as a metric may over-extend their jurisdiction to include unfiled claims.[216] Still others, like the judge in *Levaquin*, have changed their orders over the course of litigation—moving from expressly taxing state plaintiffs whose lawyer also has pending cases in the multidistrict proceeding, to stating generally that the assessment obligation "attaches to cases, claims, or attorneys within the full scope and extent" of the court's jurisdiction.[217]

$852,746.63); *In re* Prempro Prods. Liab. Litig., No. 4:03-cv-01507-BRW (E.D. Ark. Sept. 9, 2015) (order) (awarding $1,035,000); *In re* Prempro Prods. Liab. Litig., No. 4:03-cv-01507-CRW (E.D. Ark. Aug. 1, 2014) (order) (awarding $64,581,093); *In re* Prempro Prods. Liab. Litig., No. 4:03-cv-01507-BRW (E.D. Ark. June 11, 2014) (order) (granting a total of $9,693,687.06 in costs and fees).

211. *In re* Human Tissue Prods. Liab. Litig., No. 2:06-cv-00135-WJM-MF (D.N.J. Nov. 15, 2006) (pretrial order no. 4) (providing a "limited waiver option" that allowed litigants to pay six percent, but promise not to use the work product in related state-court cases).

212. *In re* Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig., No. 2:12-md-02327 (S.D. W. Va. Jan. 15, 2016) (pretrial order # 211 (order establishing criteria for applications to MDL 2327 fund to compensate and reimburse attorneys for services performed and expenses incurred for MDL administration and common benefit and appointment of common benefit fee and cost committee)).

213. *E.g.*, *In re* Am. Med. Sys., Inc., Pelvic Repair Systems Prods. Liab. Litig., No. 2:12-md-02325 (S.D. W. Va. Jan. 15, 2016) (pretrial order no. 204 (order establishing criteria for applications to MDL 2325 fund to compensate and reimburse attorneys for services performed and expenses incurred for MDL administration and common benefit and appointment of common benefit fee and cost committee) at 6–7); *In re* Am. Med. Sys., Inc. Pelvic Repair Sys. Prods. Liab. Litig., No. 2:12-md-02325 (S.D. W. Va. Aug. 26, 2013) (pretrial order. no. 77 (agreed order establishing MDL 2325 fund to compensate and reimburse attorneys for services performed and expenses incurred for MDL administration and common benefit)).

214. *See* Krattenmaker & Salop, *supra* note 101, at 231 ("[V]irtually all antitrust issues not involving collaboration (or merger) among competitors are best analyzed by asking whether they unjustifiably confer on one party the power to raise price by raising its rivals' costs.").

215. *In re* ConAgra Peanut Butter Prods. Liab. Litig., No. 1:07-md-01845-TWT (N.D. Ga. Apr. 7, 2009) (order granting in part and denying in part plaintiffs' motion for the establishment of a common-benefit fund).

216. *In re* Kugel Mesh Hernia Patch Prods. Liab. Litig., No. 1:07-md-01842-ML-LDA (D.R.I. Nov. 19, 2009) (memorandum and order).

217. *Compare In re* Levaquin Prods. Liab. Litig., No. 0:08-md-01943-JRT (D. Minn. Jan. 22, 2009) (pretrial order #3 on plaintiffs' common-benefit fund, common cost fund, contingent fee appointments, fee and cost sharing, time and expense reporting) (expressly taxing state plaintiffs whose lawyers also have pending MDL cases), *with In re* Levaquin Prods. Liab. Litig., No. 0:08-md-01943-JRT (D. Minn. Apr. 23, 2013) (second amended pretrial order #3 on plaintiffs' common expense fund for reimbursement of common-benefit costs only) (stating that the assessment obligation attaches to cases, claims, and attorneys).

Although taxing state litigants has proven thorny for judges and far more objectionable to the litigating lawyers,[218] the practice has not waned. It continues to curb state courts' potential use as a competitive check on the federal proceeding, for rational attorneys are unlikely to heavily invest in developing state cases or in novel theories of liability only to have their recoveries taxed by federal leaders.

In 2011, the court in *NuvaRing* cited its jurisdiction over the attorneys practicing before it as a means to levy the common-benefit tax on settling state-court plaintiffs who used the same lawyers.[219] The order explicitly included attorneys practicing in "New Jersey State Court or any other state" with at least one case in the transferee court.[220] That hook then ensnared "all cases, including un-filed cases."[221] The order also extended to attorneys who received any of the steering committee's work product.[222] Consequently, when lead lawyers negotiated the master settlement, there was no need to use it to bait state-court plaintiffs into paying common-benefit fees—the court's order did it for them.

A similar proposed order in *DePuy ASR* aimed to "assess all cases . . . regardless of whether any substantive benefit was conferred by the PSC."[223] But some state lawyers balked: they had already created a document repository with 12.5 million pages of discovery, retained experts, and were prepared to litigate their clients' claims without any help from federal leaders.[224] Citing precedent from the *Genetically Modified Rice* litigation, where the judge declined to order state-court litigants to contribute to a common-benefit fund, the attorneys argued the transferee court lacked jurisdiction over them.[225] Nevertheless, the court applied its order to all plaintiffs' attorneys and their law firms who represented a client in the multidistrict

---

218. *E.g.*, *In re* Kugel Mesh Hernia Patch Prods. Liab. Litig., No. 1:07-md-01842-ML-LDA (D.R.I. Sept. 2, 2009) (sur-reply memorandum of Johnson Law Firm plaintiffs in further support of partial objection to motion for entry of an assessment order in MDL 1842) (objecting to the assessment of state court plaintiffs).

219. *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Dec. 9, 2011) (amended case management order no. 3 at 2–3) (establishing Common Benefit Order).

220. *Id.* at 3–4.

221. *Id.* at 4.

222. *Id.*

223. Plaintiff's Opposition to Plaintiffs' Executive and Steering Committees' Motion for Entry of a Common Benefit Order at 4, *In re* DePuy Orthopaedics, Inc., ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Nov. 22, 2011).

224. *Id.*

225. *In re* Genetically Modified Rice Litig., No. 4:06 MD 1811 CDP, 2010 WL 716190, at *9– 11 (E.D. Mo. Feb. 24, 2010) (memorandum and order) (creating a common-benefit fund).

proceeding.[226] When the leaders in *DePuy ASR* later requested common-benefit fees, they did so under seal,[227] presumably to avoid further objections and public scrutiny.

Although the *DePuy ASR* court never received additional objections, its implied rationale (and the explicit rationale given in *NuvaRing*) has gradually eroded. Lead lawyers in the *Genetically Modified Rice* litigation contracted around the judge's decision not to include state-court litigants through settlement. When challenged, they argued the *NuvaRing* theory: that the federal court needed jurisdiction over only the plaintiffs' attorneys and the defendant—not the plaintiffs themselves.[228] But the Eighth Circuit disagreed: "Even if the same plaintiffs' *attorneys* participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs* and [the defendant]."[229]

More recently, in litigation over *Avandia*'s common-benefit fees, the Third Circuit agreed with this core rationale—that district courts cannot require attorneys who litigate solely in state court to pay federal leadership fees.[230] But courts can enforce participation agreements that they require attorneys to sign if the attorney hopes to access any of the federal work product.[231] At best, this is jurisdictional bootstrapping. The *Avandia* order assessed fees for all Avandia claims in which an attorney who signed a participation agreement had a fee interest, "regardless of whether those claims are subject to the jurisdiction of MDL 1871."[232] So, a law firm that represented a few clients in the multidistrict proceeding but filed most suits in state courts (twenty-five and four thousand, respectively in the objector's

---

226. *In re* DePuy Orthopaedics, Inc., ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Nov. 28, 2011) (case management order no. 13).

227. Plaintiff's Motion for Leave to File Under Seal, *In re* DePuy Orthopaedics, Inc., ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Nov. 24, 2015).

228. *In re* Genetically Modified Rice Litig. Settlement, MDL No. 1811, §§ 8.1.1, 8.1.2 (MDL settlement agreement).

229. Phipps Grp. v. Downing (*In re* Genetically Modified Rice Litig.), 764 F.3d 864, 874 (8th Cir. 2014). The judge has now certified a class composed of those lead lawyers, other law firms, and clients who paid for common benefit services and expenses that is suing objectors for unjust enrichment. *See* Downing v. Goldman Phipps PLLC, No. 4:13CV206 CDP, 2015 WL 4255342, at *7–8 (E.D. Mo. July 14, 2015).

230. *In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., 617 F. App'x 136, 141 (3d Cir. 2015). For the total fees and costs awarded, see *In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., No. 07-md-01871, 2012 WL 6923367, at *1 (E.D. Pa. Oct. 19, 2002) (awarding $143,750,000 as 6.25 percent of the estimated value of the settlements and $10,050,000 for future administrative fees and expenses).

231. *In re Avandia*, 617 F. App'x at 141; *see also In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., No. 15-2990, 2016 WL 4010439, *2–5 (3d Cir. July 27, 2016).

232. *In re Avandia*, 617 F. App'x at 139.

case) had to pay common-benefit fees for *all* clients, which deters firms from investing in and developing competing state-court suits.[233]

In *Avandia*, the defendant used an ad hoc settlement strategy without a master settlement,[234] but global deals allow lead lawyers to circumvent these jurisdictional problems. By inserting fee provisions into a master settlement, plaintiffs (and their counsel) who want to settle must also "consent" to leadership's common-benefit fee. This allows lead attorneys—with the defendant's blessing—to reach settling state-court plaintiffs who would otherwise fall outside of the federal court's jurisdiction. Accordingly, eighty percent of proceedings (eight of ten—*Propulsid I & II*,[235] *Vioxx*,[236] *Fosamax*,[237] *Biomet*,[238] *Yasmin/Yaz*,[239] *Actos*,[240] *DePuy ASR I & II*,[241] and *Zimmer Durom Hip Cup*[242]) with publicly available non-class settlements used those agreements to subject all settling plaintiffs to the transferee judge's fee assessment. The two that did not insert fees into settlements included *NuvaRing* and *American Medical Systems*, both of which had broad court orders that already covered state plaintiffs.[243]

Of those that used settlements to reach state-court plaintiffs, two stand out. First, in *Fosamax*, if a lawyer waited until settlement to agree to the common-benefit tax (as many state-court attorneys would), then the court's order increased the tax from six to nine percent.[244] Second, in *Zimmer Durom Hip Cup*, the judge expressly

---

233. Although the objecting firm, Girardi Keese, petitioned for Supreme Court review, the request was denied. Petition for Writ of Certiorari, Girardi Keese Law Firm v. Plaintiffs' Advisory Comm., No. 15-704, 2015 WL 7713601 (U.S. Nov. 24, 2015); Amanda Bronstad, *Girardi Keese Loses SCOTUS Bid in Avandia Fee Fight*, NAT'L L.J. (Feb. 29, 2016), http://www.nationallawjournal.com/id=1202750967854/Girardi-Keese-Loses-SCOTUS-Bid-in-Avandia-Fee-Fight?slreturn=20160913080025 [https://perma.cc/JLT3-UA2Q].

234. *Avandia Lawsuit*, DRUGWATCH (May 16, 2016), http://www.drugwatch.com/Avandia/lawsuit.php [https://perma.cc/4N8P-PB67].

235. Propulsid I Settlement, *supra* note 104, § 9(A); Second MDL Program Term Sheet § 9(A), *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Dec. 15, 2005).

236. Vioxx Settlement, *supra* note 126, § 9.2.1.

237. Fosamax Settlement, *supra* note 129, ¶ 14.

238. Settlement Agreement § 10(b), *In re* Biomet M2a Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Jan. 31, 2014) [hereinafter Biomet Settlement].

239. Yaz ATE Settlement, *supra* note 139, § 4.01(B), (C); Yaz Gallbladder Settlement, *supra* note 139, § 1.03 (subjecting accepting state-court participants to the MDL court's jurisdiction and presumably its fee awards).

240. Actos Settlement, *supra* note 148, § 10.04.

241. 2015 DePuy ASR Settlement, *supra* note 146, § 4.1.8; 2013 DePuy ASR Settlement, *supra* note 146, § 4.1.8.

242. Zimmer Durom Settlement, *supra* note 150, § V.C.

243. *Supra* notes 213, 219–223.

244. *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Jan. 5, 2010) (case management order no. 17 establishing plaintiffs' common defense fund at 3–4). For the

struck proposed language in the common-benefit order that taxed state-court litigants.[245] But leaders then contracted around this restriction via settlement and included a provision that unilaterally taxed all settling plaintiffs four percent.[246] The court then ratified the workaround in two ways: (1) by ordering *all* multidistrict plaintiffs to participate in the settlement's mediation process, comply with its deadlines, or face dismissal;[247] and (2) by requiring all participating lawyers to register all their cases (filed or unfiled, in state or federal court).[248] The result was that lead lawyers effectively used their bargaining authority with the defendant to expand both the federal court's jurisdiction and leaders' fee base to include settling state-court cases and unfiled claims.

### 3. Negotiating Common-Benefit Fees with the Defendant

Anytime lead lawyers negotiate aspects of their fees with the defendant, they raise concerns about self-dealing.[249] Contingent fees are designed to increase proportionally alongside a plaintiff's recovery—to tie the fates of lawyer and client. When leaders take things one step further and bargain for the defendant to pay their common-benefit fees directly, they sever that tie. As a result, the attorneys' financial self-interest may no longer be linked to their clients' outcome, but to the defendant's wishes.[250]

Despite these self-dealing concerns, this is precisely what lead lawyers did in both *Biomet* and *Propulsid*. In *Propulsid*, lead lawyers asked the court to ratify the fees they negotiated directly with the

---

total calculation of fees and costs, see *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Nov. 16, 2015) (case management order no. 21 concerning release of common-benefit funds); Plaintiffs' Steering Committee's Memorandum in Support of its Consent Motion for Distribution of Common Benefit Funds, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Nov. 13, 2015) (noting that contributions, costs, and held costs would constitute most of the fund, $2,426,126 of $2,459,475). For awards to plaintiffs see Declaration of Timothy M. O'Brien ¶ 6, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. Nov. 13, 2015).

245.   *In re* Zimmer Durom Hip Cup Prods. Liab. Litig., No. 2:09-cv-04414-SDW-MCA (D.N.J. Jan. 21, 2011) (case management order 3: order establishing common-benefit fund).

246.   Zimmer Durom Settlement, *supra* note 150, § V.C.

247.   *In re* Zimmer Durom Hip Cup Prods. Liab. Litig., No. 09-cv-04414-SDW-SCM (D.N.J. May 13, 2016) (case management order regarding settlement agreement).

248.   Zimmer Durom Settlement, *supra* note 150, § I.B.

249.   Silver & Miller, *supra* note 32, at 134.

250.   This concern has long been recognized as one of structural collusion in the class context. John C. Coffee, Jr., *Rethinking the Class Action: A Policy Primer on Reform*, 62 IND. L.J. 625, 647–48 (1987). Courts have agreed. *E.g.*, Zucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1327 (9th Cir. 1999). For an excellent analysis of the problem in multidistrict litigation, see Silver & Miller, *supra* note 32, at 133–34.

defendant by citing common benefit as a supporting rationale.[251] Unjust enrichment lies at the heart of common-benefit awards.[252] As such, fees must come out of that benefit (the fund), not directly from the defendant. And the work must benefit the claimants. In *Propulsid*, only thirty-seven of 6,012 (0.6 percent) claimants received no more than $6.5 million collectively; the strict claims process extinguished the rest.[253] Yet, lead lawyers collected over $27 million in "common-benefit" fees,[254] vividly illustrating the worry that a defendant might negotiate higher fees in exchange for less relief to claimants.[255]

By contrast, the *Biomet* outcome initially appears less troubling. Lead lawyers negotiated a $6 million fee directly with the defendant via a separate agreement contingent on fulfilling the plaintiff-participation percentages, as well as a five-percent fee assessment (plus one percent for costs).[256] But the court's order required them to accept the lesser of the two—not both.[257] In their fee request, lead lawyers noted that $6 million was the lesser award given that the gross settlement award was $144.3 million, five percent of

---

251. Memorandum in Support of Plaintiffs' Steering Committee's Motion for Award of Attorney's Fees and Reimbursement of Costs at 12, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. May 3, 2005).

252. Burch, *supra* note 41, at 102–04; Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656, 663–66 (1991).

253. This number does not include the 2,059 claimants who enrolled in the program and had their claims extinguished but did not submit claim forms. Memorandum in Support of Motion for Distribution of Attorney's Fees at 5 and Ex. B, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 1, 2012); *see* Joint Report No. 97 of Plaintiffs' and Defendants' Liaison Counsel, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. July 31, 2012). The totals added in the text are not, of course, in the Joint Report, but derived from numbers provided in that and previous reports.

254. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Feb. 3, 2014) (order); *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. June 2, 2005) (order); Plaintiffs' Liaison Counsel's Memorandum in Support of Motion for Final Distribution of Remaining Funds (MDL Settlement Program), *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Jan. 31, 2014); Memorandum in Support of Motion for Distribution of Attorney's Fees at 5, Ex. B (Re: MDL Settlement Program II), *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 1, 2012); Propulsid I Settlement, *supra* note 104, § 19.

255. Silver & Miller, *supra* note 32, at 133.

256. Motion for Payment of Common Benefit Attorneys' Fees and Expenses from the Biomet Common Benefit MDL Assessment Fund ¶ 7, *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (S.D. Ind. Aug. 7, 2015) ("Pursuant to a separately negotiated settlement agreement dated January 31, 2014, the Biomet Common Benefit Settlement Agreement (CBSA), Biomet will deposit an additional $6 million into the Biomet Common Benefit Attorney's Fee Fund for the sole purpose of resolving the Common Benefit Attorney Fees associated with this litigation.").

257. *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Feb. 3, 2014) (case management order establishing common-benefit fee and expense funds § 2(c)).

which made the common-benefit set aside $7.2 million.[258] Moreover, they argued that $6 million was but 3.99 percent of the total settlement value—a figure "many objective parties" would cite as "being underpaid."[259] Leadership, however, "agree[d] that this amount is reasonable" because negotiating their fee with Biomet allowed "for 100% return of the provisional 5% assessment to counsel and claimants alike."[260]

*Biomet* leaders appear generous. But lead lawyers apparently represented most settling claimants, for they had no cases left after the settlement, and the judge had to appoint a new steering committee.[261] As such, the $6 million fee seems like a bonus at best (paid by the defendant presumably in exchange for something), or double dipping at worst. If leaders represented most claimants, a traditional set aside would simply take money from their contingent fee and pay it back to them in common-benefit fees. But accepting $6 million directly from the defendant avoided that pocket-shifting charade and may have compensated lead lawyers again for work they had already agreed to perform under their clients' initial retainer.[262] Common-benefit fees are supposed to compensate attorneys for the benefit they confer on others—not for work on their own cases.[263] Moreover, accepting payment from the defendant violates basic agency law, for side payments negotiated without client consent should be given directly to clients.[264]

---

258.  Motion for Payment of Common Benefit Attorneys' Fees and Expenses from the Biomet Common Benefit MDL Assessment Fund ¶ 10, *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Aug. 7, 2015).

259.  *Id.* ¶ 18.

260.  *Id.*

261.  *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Apr. 28, 2015) (order).

262.  Burch, *supra* note 41, at 132–33.

263.  *Id.*

264.  RESTATEMENT (THIRD) OF AGENCY §§ 8.02, 8.03 (AM. LAW INST. 2006).

*C. Cartel-like Sanctions Suppress Dissent and Competition*

If lead lawyers are overreaching in settlement design, flouting ethical obligations, reducing non-leaders' fees, and failing to consider conflicts, then why do non-lead attorneys rarely object?[265] Most plaintiffs' attorneys play the long game. Objecting in the face of judicially sanctioned cooperative norms and powerful repeat players can render them ineligible for future leadership roles and diminish their chances of receiving common-benefit work.

In this way, plaintiffs' leadership across multidistrict proceedings can act like oligopolies and cartels.[266] Cartels punish defectors by imposing costs on them and denying them access.[267] When attorneys become lead lawyers, they have the power to control access and inflict costs, too: they distribute common-benefit work to allies, use settlements to restrict attorney advertising and reduce attorney demand, suggest common-benefit fee allocations, and report uncooperative behavior to the judge—carrots and sticks, in other words, that impair rivals' financial and leadership opportunities.[268] For example, when the judge in the *DePuy ASR Hip Implant* litigation appointed a fee committee comprised in part of several high-level repeat players—Chris Seeger, Pete Flowers, and Steve Skikos—they had the power and means to sanction, reward, and incentivize others, particularly those in the five other pending hip-implant proceedings.[269]

Given the degree of specialization and capital contributions required to litigate multidistrict proceedings, the plaintiffs' bar is relatively small. Attorneys work together frequently. As such, they

---

265. *Supra* tbl.2.

266. Leslie, *supra* note 15, at 587–90.

267. HOVENKAMP, *supra* note 15, §§ 4.1, 4.1a3 (noting some similarities between cartels and oligopolies); Ayres, *supra* note 168, at 306–10.

268. *See* Ayres, *supra* note 168, at 306–08 (discussing how cartels can punish through advertising); Herbert Hovenkamp, *Exclusion and the Sherman Act*, 72 U. CHI. L. REV. 147, 148 (2005) (defining anticompetitive exclusionary conduct). Judges often appoint lead lawyers to fee allocation committees and solicit input on how to distribute attorneys' fees. *E.g.*, *In re* Vioxx Prods. Liab. Litig., MDL No. 2:05-md-01657-EEF-DEK (E.D. La. June 13, 2012) (order) (appointing lead lawyers to fee allocation committee). Power needn't be equal among members; they must simply have enough authority to credibly threaten to punish defectors. *See* ROBERT C. ELLICKSON, ORDER WITHOUT LAW: HOW NEIGHBORS SETTLE DISPUTES 179 n.42 (1991).

269. *In re* DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig., MDL No. 10-MD-2197-DAK (N.D. Ohio Oct. 14, 2015) (case management order no. 25). Contemporaneously pending hip implant cases included Biomet (MDL No. 2391), DePuy ASR (MDL No. 2197), Zimmer Durom (MDL No. 2158), Wright Medical Technology (MDL No. 2329), DePuy Pinnacle (MDL No. 2391), and Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation (MDL No. 13-2441) (consolidated on June 12, 2013).

form a close-knit group (though not necessarily one predicated on friendship)[270] that may develop and enforce norms to maximize members' collective welfare in current, concurrent, and future litigation.[271] As repeat actors interact with one another regularly, they form dyadic relationships to others in the social network,[272] which allows gossip and information about attorneys' reputations and common practices to flow freely among them. This may give lawyers inside information about past payoffs and sanctions. Because information flows easily through the network, it increases the opportunities for both tacit and explicit collusion and enables leaders to credibly punish and reward others for following or disregarding norms.[273]

Although off-the-record conversations with involved attorneys suggest social and financial sanctions are prevalent, they are nevertheless difficult to assess quantitatively. The best evidence is silence. These are, after all, the same attorneys who generate the robust literature on collateral attacks in class actions and partake in reverse auctions where defendants play them off of one another to achieve the lowest settlement price. News reports of infighting among plaintiffs' lawyers, secret financial deals, payoffs, as well as occasional judicial opinions about fee disputes, just scratch the surface of their complex and often acrimonious relationships.[274] Despite ample anecdotal conversations off-the-record, objectors rarely speak up

---

270. "A group is close-knit when informal power is broadly distributed among group members and the information pertinent to informal control circulates easily among them." ELLICKSON, *supra* note 268, at 177–78. Moreover, these close-knit groups have social networks that allow for credible and reciprocal applications of power. *Id.* at 181.

271. *E.g.*, *id.* at 167–78.

272. Burch & Williams, *supra* note 43 (manuscript at 16–23).

273. *See* NICHOLAS A. CHRISTAKIS & JAMES H. FOWLER, CONNECTED 160–61 (2009) (noting how networks among boards of directors allow for collusion and market manipulation); HOVENKAMP, *supra* note 15, § 4.4a (distinguishing between tacit and express collusion with regard to oligopolies); Leslie, *supra* note 15, at 589–91, 598–99 (explaining trust-based networks and sanctions in cartels).

274. *E.g.*, Glassman, Edwards, Wade & Wyatt, P.C. v. Wolf Haldenstein Adler Freeman & Herz, LLP, 601 F. Supp. 2d 991, 995–96 (W.D. Tenn. 2009) (describing lawsuit between two plaintiffs' firms over the alleged breach of a joint venture agreement in antitrust lawsuits); Emily Field, *Atty Who Exposed GM Switch Defect Blasts Drivers' Attys*, LAW360 (Jan. 25, 2016), http://www.law360.com/articles/750639/atty-who-exposed-gm-switch-defect-blasts-drivers-attys [https://perma.cc/KE66-ZRUJ] (chronicling allegations by one lead lawyer against co-lead counsel that they had made decisions based on their own financial interests and froze out other executive committee members in decisionmaking); Alison Frankel, *Exposing Class Action Objectors: Lieff Cabraser, Ted Frank in 'Lurid' Dispute*, REUTERS (June 22, 2015), http://blogs.reuters.com/alison-frankel/2015/06/22/exposing-class-action-objectors-lieff-cabraser-ted-frank-in-lurid-dispute/ [https://perma.cc/A9LM-FNAX] (chronicling the business relationship between nonprofit objector Ted Frank and for-profit plaintiffs' lawyer, Christopher Bandas).

during leadership selection, even though being chosen generates significant fees. Nor do most attorneys object when lead lawyers ask the judge to increase their common-benefit fees midway through the litigation, even though it reduces individual attorneys' profits.[275] This silence speaks volumes.

Policing group norms doesn't just affect leadership appointments and compensation. Evidence from social science suggests that the conditions likely present in these leadership groups may infect substantive decisions, too. When reputation is important, group members tend to adjust their positions to tilt toward whatever the dominant member believes and are more likely to withhold opposition.[276] Moreover, even when privy to unique information that others lack, lower-status members tend not to voice that information for fear of disapproval.[277] Discussing shared information is safer; it leads others to view the member as more competent, credible, and knowledgeable.[278] But attorneys have different expertise and diverse clients. When that information is not shared, representation is poorer because of its absence.

## D. What Then Do Plaintiffs Receive?

Based on the limited non-class settlements available, there is reason to be concerned that when repeat players influence the practices and norms that govern multidistrict proceedings the results they obtain may principally benefit them at the plaintiffs' expense,

---

275. Several attorneys objected to the court creating a common-benefit fund in the ConAgra Peanut Butter litigation. The lead lawyers then mooted those objections by exempting the objectors from the assessment. *In re* ConAgra Peanut Butter Prods. Liab. Litig., No. 1:07-md-01845-TWT (N.D. Ga. Apr. 7, 2009) (order granting in part and denying in part plaintiffs' motion for the establishment of a common-benefit fund); Transcript of Proceedings at 26, *In re* ConAgra Peanut Butter Prods. Liab. Litig., No. 1:07-md-01845-TWT (N.D. Ga. Jan. 21, 2009).

276. CASS R. SUNSTEIN, GOING TO EXTREMES: HOW LIKE MINDS UNITE AND DIVIDE 26–27 (2009).

277. *Id.* at 28–29; *see also* Armin Faulk, Ernst Fehr & Urs Fischbacher, *Driving Forces Behind Informal Sanctions*, 73 ECONOMETRICA 2017 (2005) (finding that cooperating group members impose the most severe sanctions on defectors and that retaliation is a driving factor behind fairness-driven informal sanctions); Ernst Fehr & Urs Fischbacher, *Why Social Preferences Matter—the Impact of Non-Selfish Motives on Competition, Cooperation and Incentives*, 112 ECON. J. C1, C2–C3 (2002); Michael Schrage, *Daniel Kahneman: The Thought Leader Interview*, 33 STRATEGY+BUSINESS 121, 124 (Winter 2003). Reciprocity and reputational concerns, along with trustworthiness, are most robust when people cooperate with one another over time in repeated interactions. Frans van Dijk et al., *Social Ties in a Public Good Experiment*, 85 J. PUB. ECON. 275, 291–92 (2002).

278. SUNSTEIN, *supra* note 276, at 29.

particularly those plaintiffs with idiosyncratic claims.[279] Leaders face systematic temptations at multiple points to serve themselves and act disloyally toward plaintiffs. As such, when repeat players collaborate, collectively maintain market power, and appear not to improve plaintiffs' results, there is cause for concern.[280]

Neither clients nor their attorneys freely consent to multidistrict litigation or the subsequent selection of lead counsel. In fact, many actively resist transfer; lawyers often push for the transferee court to remand their cases to their original court.[281] This non-voluntary aspect makes selecting lead lawyers akin to appointing class counsel.[282] But judges pay little attention to adequate representation on the front end—often appointing leaders before conflicts are known. And though plaintiffs have individually retained counsel (unlike all but the named plaintiff in class actions), that attorney has little to no control once the judge empowers the leaders. She cannot fire lead attorneys even when she feels they are not acting in her clients' best interest, and she regains control of her clients' suits only in the unlikely event of remand. Often, the most she can do is complain that the leaders have violated their fiduciary obligations to the whole group—a move that risks alienating her from receiving common-benefit work and future lead roles.[283]

The checks and balances for ensuring adequate representation are likewise absent on the back end. Even though class settlements included coercive provisions as well,[284] without a class, judges lack the explicit authority to ensure private non-class settlements are "fair,

---

279. The practices I have described likewise have a significant impact on autonomy considerations that rest on an assumed right to decline a settlement. *See* Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 114 (2015) (raising due process concerns with multidistrict litigation even when individual litigants can "opt out" of a settlement).

280. *See* Herbert Hovenkamp, *Exclusion and the Sherman Act*, 72 U. CHI. L. REV. 147, 163–64 (2005) ("[A]ntitrust policy tolerates collaboration among competitors who collectively have market power only to the extent that it tends to reduce costs or improve products, and the firms pass at least some of these economic improvements on to consumers.").

281. *E.g.*, Plaintiffs' Motion to Transfer, *In re* Bos. Sci. Corp. Pelvic Repair Sys. Prods. Liab. Litig., No. 2:12-md-02326 (S.D. W. Va. Feb. 19, 2016).

282. *See* Redish & Karaba, *supra* note 279, at 110–11 (unfavorably contrasting due process protections under Rule 23 with those in multidistrict litigation).

283. *See In re* San Juan Dupont Plaza Hotel Fire Litig., 111 F.3d 220, 234 (1st Cir. 1997) ("Whether or not there is a direct or formal attorney-client relationship between plaintiffs and the PSC, the PSC and its IRPA members necessarily owed a fiduciary obligation to the plaintiffs."); MANUAL FOR COMPLEX LITIGATION (FOURTH) § 10.22 (2004) (discussing the selection of lead counsel and fiduciary duties); Silver & Miller, *supra* note 32, at 119–20 (noting the difficulties in challenging the selection of lead counsel).

284. *E.g.*, *In re* Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 330, 354 (N.D. Ohio 2001). For an in-depth overview of such provisions, see Nagareda, *supra* note 1, at 204–16.

reasonable, and adequate."[285] And lead lawyers have no incentive to raise conflicts. They profit from their own clients' contingent fees and common-benefit fees—from representing as many people as possible— not from recognizing divergent interests. Their common-benefit fees are typically measured by the time they spend litigating, not by plaintiffs' recoveries or the benefits obtained. Put simply, leaders' compensation destroys the contingent fee's simple beauty: when functioning properly, contingent fees align the financial interests of attorneys and clients, preventing the need for expensive monitoring. But multidistrict litigation instills monopolistic control in leaders' hands, severs the contingent-fee link for their common-fund compensation, and then inhibits monitoring by allowing lead attorneys to operate in secret away from the watchful eye of non-lead lawyers.[286]

Collateral attacks, attorney malpractice actions, and appeals are not much help either. Even though class actions can be problematic too, at least non-class counsel stood to gain from soliciting a sub-segment of a previously certified class, filing a new case, and contending that preclusion didn't apply because of inadequate representation. But master settlements are predicated on client consent, which can blanket the host of wrongs that preceded it: to enroll in a settlement, both clients and their individual attorneys must expressly waive all of their objections to both the settlement documents and the release of their claims.[287] Conversely, those who do not settle have no standing to challenge the settlement's terms and have few options other than trying to convince enough plaintiffs to hold out so as to trigger the walkaway clause. Even though attorney malpractice suits are still possible, they are unlikely since courts and commentators have interpreted the governing ethics rules inconsistently.[288] Finally, as private deals, settlements are not appealable. And, on the off chance an appeal could occur, some judges have gone so far as to expressly waive parties' ability to appeal through their common-benefit fund participation agreement.[289]

---

285. FED. R. CIV. P. 23(e).

286. *E.g., In re* DePuy ASR Hip Implant Prods. Liab. Litig., No. 1:10-md-02197-DAK (N.D. Ohio Mar. 7, 2016) (sealed order no. 18) (granting sealed motion for common-benefit fees).

287. *E.g.,* 2015 DePuy ASR Settlement, *supra* note 146, at 22–23 (certification of counsel).

288. *Compare* Tilzer v. Davis, Bethune & Jones, L.L.C., 204 P.3d 617, 628–30 (Kan. 2009) (finding evidence of an ethics violation in executing an aggregate settlement), *with* G.H. v. Eli Lilly & Co., 412 S.W.3d 326, 327–28, 327 n.1 (Mo. Ct. App. 2013) (finding no violation under similar circumstances).

289. *E.g., In re* C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig., MDL No. 2187 (S.D. W. Va. Oct. 4, 2012) (pretrial order no. 54 at 5–6):

Thus, few regulatory mechanisms exist to police the line between acceptable settlements that rational claimants should accept because the offer is simply too good to pass up, and those that they can't refuse in the non-consensual "*Godfather* sense," as Professor Richard Nagareda has described them.[290] That is, some coercive settlement terms can be akin to a metaphorical gun to the head. Consequently, this Section considers the probable costs the absence of monitoring creates.

### 1. Plaintiffs Are Unlikely to Receive the Peace Premium

Because defendants need to end lawsuits to ease shareholders' minds about future business prospects, delivering finality can unlock a "peace premium," gains for plaintiffs that might not exist otherwise.[291] But with no accountability, repeat players may be tempted to design mutually beneficial deals that allow them to reap the peace premium—not the plaintiffs.

Table 3 below gathers the available information about leaders' common-benefit fees and costs and displays it alongside claimants' recoveries for the non-class settlements occurring within the dataset.[292] Some claimants fare better than others, and there are variables that are inherently unknown to outside researchers, such as how many weak claims might have flooded the litigation. But points of concern linger.[293] Take *Propulsid*, for example: only 0.6 percent of

---

Participating Counsel have (or will have) agreed to and therefore will be bound by the court's determination on common benefit attorney fee awards, attorney fee allocations, and expense awards, and the Participating Counsel knowingly and expressly waive any right to appeal those decisions or the ability to assert the lack of enforceability of this Agreed Order or to otherwise challenge its adequacy.

290. Richard Nagareda has written about class-action provisions extensively in these terms. *See* Richard A. Nagareda, *Closure in Damage Class Settlements:* The Godfather *Guide to Opt-Out Rights*, 2003 U. CHI. LEGAL F. 141, 141.

291. Samuel Issacharoff & D. Theodore Rave, *The BP Oil Spill Settlement and the Paradox of Public Litigation*, 74 LA. L. REV. 397, 413–17 (2014); Nagareda, *supra* note 1, at 164; Rave, *supra* note 92, at 1192–98.

292. Costs include reimbursement for money attorneys spent to litigate the suit. For information on the dataset, see *supra* Part I.A.

293. Anecdotal evidence is rife with mistrust of the deals these lawyers create. *See, e.g.*, Barry Meier, *Frustration from a Deal on Flawed Hip Implants*, N.Y. TIMES (Nov. 25, 2013), http://www.nytimes.com/2013/11/26/business/frustration-from-a-deal-on-flawed-hip-implants.html?_r=0 [https://perma.cc/TE8L-ZVYK]:

But some patients contend that the deal's real winners are Johnson & Johnson and the plaintiffs' lawyers. Those lawyers are set to receive about one-third of the settlement, or about $800 million. The single biggest chunk of those fees will go to the firms most involved with developing cases against Johnson & Johnson and negotiating the settlement; they will get a bonus of about $160 million.

claimants recovered money, totaling little more than $6.5 million.[294] Yet, leaders collected over $27 million in fees.[295] If those claims lacked merit, as some believe,[296] then judicially dismissing them earlier seems preferable to paying the leadership a premium to disserve their clients. The latter undermines contingent-fee principles, perpetuates public fears about attorneys getting rich while doing little for those they represent, and diminishes litigants' faith in the judicial system.

To be sure, *Propulsid* is an outlier in some respects, but its steering committee's statement that it would serve as a template for future proceedings rang true. As Part II.A.1 illustrated, some aspect of the three closure provisions *Propulsid* introduced—attorney recommendation, attorney withdrawal, and walkaway clauses—were later replicated, in whole or in part, in all future settlements in the data.[297] The full effects of that replication, however, are impossible to trace for some aspect of twenty-seven of the twenty-nine deals that followed it (ninety-three percent) remain confidential. From the data that is available, the low payout rates in *Ortho Evra*[298] and

---

294. This number does not include the 2,059 claimants who enrolled in the program and had their claims extinguished but did not submit claim forms. *See* Memorandum in Support of Motion for Distribution of Attorney's Fees (Re: MDL Settlement Program II) at 5, Ex. B, *In re* Propulsid Prods. Liab. Litig., No. 00-MD-1355 (E.D. La. Aug. 1, 2012); *see also* Joint Report No. 97 of Plaintiffs' and Defendants' Liaison Counsel, *In re* Propulsid Prods. Liab. Litig., No. 00-MD-1355 (E.D. La. July 31, 2012). The totals added in the text are not in the Joint Report but are derived from numbers provided in that and previous reports.

295. *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Feb. 3, 2014) (order); *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. June 2, 2005) (order); Plaintiffs' Liaison Counsel's Memorandum in Support of Motion for Final Distribution of Remaining Funds, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Jan. 31, 2014); Memorandum in Support of Motion for Distribution of Attorney's Fees (Re: MDL Settlement Program II) at 5, Ex. B, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 1, 2012); Propulsid I Settlement, *supra* note 104, § 19.

296. *But see* Melody Petersen, *Jury Levies $100 Million Award Against Heartburn Drug Maker*, N.Y. TIMES (Sept. 30, 2001), http://www.nytimes.com/2001/09/30/us/jury-levies-100-million-award-against-heartburn-drug-maker.html?_r=0 [https://perma.cc/BY67-GZV2] ("A Mississippi jury awarded $100 million in damages late Friday night to 10 people who said they had been injured by Propulsid, a heartburn drug that was taken from pharmacy shelves last year after it was linked to dozens of deaths.").

297. Burch & Williams, *supra* note 43 (manuscript at 42–43).

298. On fees and costs awarded, see *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio Mar. 22, 2012) (order) (awarding $950,000 for post-label cases); *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio July 20, 2010) (order) (awarding $253,645.20 in expenses); *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio May 22, 2009) (order) (awarding $2,338,280.10 in expenses); *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio May 7, 2008) (order) (awarding $522,959.56 in expenses); and Memorandum in Support of PSC's Motion for Reimbursement of Common Benefit Expenses at 2–3, *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio June 28, 2010) (noting sealed amount awarded as $43,238.20 and requesting an additional $253,645.20). For payouts, see Transcript of Status Conference, *In re* Ortho Evra Prods. Liab.

*NuvaRing*[299] are alarming when compared with common-benefit fees. Recovery rates appear higher in *Vioxx*,[300] *Biomet*,[301] *Pradaxa*,[302] and perhaps *Yaz/Yasmin*,[303] which is still pending, but it's precisely the dearth of information for the remaining ninety-three percent that should trouble us most given how little regulation exists. Put simply, if the information that lead lawyers are willing to make visible so readily appears to enrich them and the defendants with whom they broker the deal, one is left to wonder what the private aspects must look like. Plainly, the concern is that the gains unlocked in exchange

---

Litig., No. 1:06-cv-40000-DAK (N.D. Ohio Jan. 15, 2009). As of March 31, 2008, the court assessed a three percent award of $2,061,535.29 based on settlements to date, which means plaintiffs recovered $68,717,843.00. Memorandum in Support of PSC's Motion for Reimbursement of Certain Advanced Costs at 4, *In re* Ortho Evra Prods. Liab. Litig., No. 1:06-cv-40000-DAK (N.D. Ohio Apr. 17, 2008). No updates are available after 2008.

299. For information on fees and costs, see *In re* NuvaRing Prods. Liab. Litig., 4:08-md-01964-RWS (E.D. Mo. Dec. 18, 2014) (order approving the special master's report and recommendation regarding the allocation and distribution of common-benefit fees and expenses); Proposed Order Granting Special Master's Supplemental Report and Recommendation, *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Sept. 15, 2015); Special Master's Supplemental Report and Recommendation at 7, Ex. A, *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Sept. 2, 2015) (awarding $893,387.73 in common-benefit fees); and Special Master's Report and Recommendation Regarding the Allocation and Distribution of Common Benefit Fees and Expenses at 16, Ex. 1, *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS (E.D. Mo. Dec. 16, 2014) (recommending $10,123,395 in fees and $2,923,034.88 in expenses). For claims rates, see Transcript of Status Hearing at 7, *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS, (E.D. Mo. Sept. 9, 2015) (noting that 424 out of 3,704 had been denied, and 473 (based on numbers given) were still in the claims review process).

300. *In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EEF-DEK (E.D. La. Jan. 3, 2014) (order and reasons at 8).

301. *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Aug. 26, 2015) (order) (paying $6 million in common-benefit fees to the first steering committee and $849,250.00 to the Garretson Resolution Group); Motion for Payment of Common Benefit Attorneys' Fees and Expenses from the Biomet Common Benefit MDL Assessment Fund ¶¶ 10–12, *In re* Biomet M2A Mangum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Aug. 7, 2015).

302. For fees and costs, see Special Master's Report and Recommendation on the Distribution of Common Benefit Fees and Expenses, *In re* Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig., No. 3:12-md-02385-DRH-SCW (S.D. Ill. Dec. 4, 2014). For claimant recovery, see Case Management Order No. 88 at 7, *In re* Pradaxa (Dabigatran Eexilate) Prods. Liab. Litig., No. 3:12-md-02385-DRH-SCW (S.D. Ill. Dec. 29, 2014).

303. *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. Nov. 20, 2015) (minute order approving special master's report and recommendation) (awarding $77,644,000.00 in fees, and $5,803,010.77 in costs); Special Master's Report and Recommendation Regarding the Allocation and Distribution of Common Benefit Fees and Expenses, *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. Nov. 6, 2015); Transcript of Proceedings Status Conference at 2–3, 7, *In re* Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09-md-02100-DRH-PMF (S.D. Ill. Sept. 29, 2014) (providing information on claimants' recovery rates).

for delivering peace may be common-benefit fees—not enhancements for claimants.

Indeed, one theme emerges from dissecting the settlements: repeat players on both sides persistently benefit from the current system. Defendants gain closure, and lead lawyers broker deals that reward them handsomely and sometimes pay litigants very little. These outcomes are tied to the settlements, which fuse individual lawyers' financial interests to the defendant's closure goal. Without tendering one's entire client list over to the settlement, the defendant's required claimant-participation rate would fail, the deal would collapse, and attorneys' fees would disappear. Still, the point is not that lead plaintiffs' attorneys explicitly collude with the defendant by trading closure for fees.[304] Nor is there a viable means to demonstrate that leaders' monopolistic power leads to lower outputs, for even if they exist, few alternative settlement values are publicly available for comparison. Instead, the point is this: setting aside bad faith and overt collusion still leaves one key fact—the same players appear in the vast majority of these proceedings and design remarkably similar settlements that benefit themselves. And that suggests that oversight is warranted.

---

304. *See* HOVENKAMP, *supra* note 15, §§ 4.4b, 4.6a (explaining tacit collusion in oligopolies and noting that "[f]actors such as high concentration on the seller's side and diffusion on the buyer's side, significant economies of scale, a standardized product and publicly announced prices and terms, suggest that a market is conductive to express or tacit collusion"); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 GEO. WASH. L. REV. 951, 963 (2014) (noting that defining collusion as a "secret agreement for a wrongful purpose" is a "red herring").

## TABLE 3: COMMON-BENEFIT AWARDS AND NON-CLASS CLAIMANT RECOVERY WITHIN THE DATA

| MDL Information | | | Common-Benefit Fees | | | Recovery to Claimants | |
|---|---|---|---|---|---|---|---|
| *MDL Number* | *MDL Name* | *Non-class Settlement Publicly Available* | *Initial Percentage of Fees and Costs* | *Final Percentages of Fees and Costs* | *Common-Benefit Fee and Cost Awards* | *Percent of Claimants Who Recovered* | *Aggregate Amount of Recovery* |
| 1355 | Propulsid | Yes, I & II | 6% | 6% | $27,026,449 | 0 6% (37 of 6,012) | $6,521,482 74 |
| 1431 | Baycol | No | 6% | 6% (4/2) | Kept confidential | Kept confidential | Kept confidential |
| 1507 | Prempro | No | 5% fed; 3% state | 5% fed; 3% state | $77,768,733 | Kept confidential | Kept confidential |
| 1657 | Vioxx | Yes | 3% (2/1) | 6 5% | $356,054,692 | 65 9% (32,886 of 49,893) | $4,353,152,064 |
| 1742 | Ortho Evra | No | 3% | 6 to 8% | $41,081,123 | 15% (state); 5% (federal) | $68,717,843 (partial) |
| 1763 | Human Tissue | No | 6% fed; 4% state | 6% fed; 4% state | Only partial information available | Kept confidential | Kept confidential |
| 1789 | Fosamax | Yes | 9% | 9% | $2,459,475 | Kept confidential | Kept confidential $27,327,500 1,100 "resolved" |
| 1836 | Mirapex | No | Unknown | Un-known | Unknown | No information available | No information available |
| 1842 | Kugel Mesh Hernia Patch | No | 12% (8/4) | 12% (8/4) | $11,004,673 | Kept confidential | Kept confidential |
| 1845 | ConAgra Peanut Butter | No | 4% | 4% | $266,052 21 | Kept confidential | Kept confidential |
| 1871 | Avandia | No | 7% | 7% (4/3) | $153,800,000 | Kept confidential | Kept confidential |
| 1909 | Gadolinium Contrast Dyes | No | 6% (5/1) | 6% (5/1) | Sealed | Kept confidential | Kept confidential |
| 1928 | Trasylol | No | 6% | 6% | $1,323,202 | Kept confidential | Kept confidential |
| 1943 | Levaquin | No | Unknown | 9 5% | Sealed | Kept confidential | Kept confidential |
| 1953 | Heparin | No | 6% (3/3) | 6% (3/3) | Sealed | Kept confidential | Kept confidential |
| 1964 | NuvaRing | Yes | 8% (5/3) | 15 5% (11/4 5) | $13,939,817 | 42% (1,556 of 3,704 as of Sept 9, 2015) | Unknown Fund amount: $100,000,000 |
| 2004 | Mentor Corp ObTape | No | 5% | 5% (3/2) | Not yet awarded | Kept confidential | Kept confidential |
| 2092 | Chantix (Varenicline) | No | 6% | 7% (4/3) | Sealed | Kept confidential | Kept confidential |
| 2100 | Yasmin & Yaz (Drospirenone) | Yes, I & II | 6% (4/2) | 11% (9/2) for ATE; 6% (4/2) for gall | $83,447,010 (partial amount, will increase as VTE cases settle) | Partial info: Gallbladder 1,386 approved out of 1,410; total pending - 7,205 as of 9/29/14 | Partial info: VTE cases - $1,800,000,000 for 9,185 claimants; Gallbladder cases–59% paid as of 4/20/15 |
| 2158 | Zimmer Durom Hip Cup | Yes | 4% (2/2) Federal plaintiffs only | 4% (2/2) State and federal plaintiffs | Not yet awarded | Kept confidential | Kept confidential |
| 2187 | C R Bard, Inc Pelvic Repair Sys | No | 5% | 5% | Not yet awarded | Kept confidential | Kept confidential |

| MDL Information | | | Common-Benefit Fees | | | Recovery to Claimants | |
|---|---|---|---|---|---|---|---|
| *MDL Number* | *MDL Name* | *Non-class Settlement Publicly Available* | *Initial Percentage of Fees and Costs* | *Final Percentage of Fees and Costs* | *Common-Benefit Fee and Cost Awards* | *Percent of Claimants Who Recovered* | *Aggregate Amount of Recovery* |
| 2197 | DePuy ASR Hip Implant | Yes, I & II | 4% (3/1) | 6% (5/1) | Sealed | Sealed | Sealed |
| 2299 | Actos (Pioglitazone) | Yes | None set | 8 6% | $25,000,000 withheld[305] | Kept confidential | Kept confidential |
| 2325 | American Medical Systems | Semi | 5% | 5% | Not yet awarded | Kept confidential | Kept confidential |
| 2326 | Boston Scientific Cor Pelvic Repair | No | 5% | 5% | Not yet awarded | Kept confidential | Kept confidential |
| 2327 | Ethicon, Inc Pelvic Repair | No | 5% | 5% | Not yet awarded | Kept confidential | Kept confidential |
| 2373 | Watson Fentanyl Patch | No | No order | No order | No order (most claims brought by one firm) | Kept confidential | Kept confidential |
| 2391 | Biomet Magnum Hip Implant | Yes | 6% (5/1) | 3 99% | $6,849,250 | Kept confidential | $144,365,980 for 1,837 claimants |
| 2385 | Pradaxa | No | 6% | 6% (4/2) | $26,000,000 | 96 8% (4,444 of 4,590; 9 categories of payouts) | $650,000,000 for 4,444 claimants |
| 2387 | Coloplast Corp Pelvic Support Sys | No | 5% | 5% | Not yet awarded | Kept confidential | Kept confidential |
| 30 total 10 of 17 proceedings with publicly available settlements (3 with 2 each) for 13 total publicly available settlements | | | Avg 5 65% (for 26) | Avg 6 55 % (for 28) | Avg (for 10 known) $73,568,786 84 | Avg 61% recovered (for 5 proceedings) (8,061 8 recovered; 13,121 8 did not) | Unknown |

## 2. Plaintiffs Appear to Be Inadequately Represented

The overarching danger for plaintiffs is inadequate representation. Profiting at claimants' expense can disserve all settling plaintiffs equally, but since multidistrict proceedings require only a common question of fact, litigants can also be uniquely disadvantaged vis-à-vis one another. In class actions, due process requires separate representation when structural conflicts of interest exist.[306] Structural conflicts "present a significant risk that the lawyers for claimants might skew systematically the conduct of the litigation so as to favor some claimants over others on grounds aside

---

305   *In re* Actos (Pioglitazone) Prods. Liab. Litig., No. 6:11-md-02299-RFD-PJH (W.D. La. Sept. 1, 2015) (case management order: holdback order at 5).

306.   Hansberry v. Lee, 311 U.S. 32, 45 (1940); *see* Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625–26 (1997) (noting the class must share the same interest and injuries).

from reasoned evaluation of their respective claims or to disfavor claimants generally vis-à-vis the lawyers themselves."[307] Multidistrict litigation should demand no less.

Plainly, settlement provisions that chiefly benefit lead lawyers risk violating this principle, but conflicts among claimants can prove disabling, too. Differences may manifest while trying to establish liability, such as variations among claims[308] and injuries,[309] state-of-the-art issues,[310] claims arising pre- and post-label changes, statutes of limitation,[311] state law discrepancies,[312] or insurance-coverage questions,[313] while others may arise only when contemplating remedies. In direct representation, informed consent can paper over many conflicts, and only some will amount to structural conflicts.[314] But most conflicts will not be apparent at the outset of the case when leaders are appointed and clients do not freely consent to that representation. Likewise, forcing their attorneys to sign common-benefit participation agreements to gain access to leaders' work product in no way alleviates this concern.

---

307. PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.07(a) (AM. LAW INST. 2010).

308. *See, e.g.*, *In re* Genetically Modified Rice Litig., No. 4:06-md-01811-CDP (E.D. Mo. Apr. 18, 2007) (order appointing leadership counsel) (appointing separate representatives for Mississippi farmers and farmers who would prefer to litigate individually in state court).

309. For instance, hip-implant plaintiffs who had surgery revising the injury claimed will be differently situated than those without, and some claimed cobalt and chromium poisoning as well as device loosening. *E.g.*, Transcript of Proceedings at 27–29, *In re* Biomet M2a-Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. Nov. 21, 2012) (discussing differences between plaintiffs subject to revision surgery and those who have the device still implanted).

310. For example, in the hip implant litigation cases differed over the information available to surgeons in different years. *Id.* at 27 (discussing which cases to select for bellwether trials because there are "some serious state-of-the-art issues which plague two sides as to whether an orthopedic surgeon in 2011, who's implanting a device after substantial information, is a totally different case").

311. *E.g.*, *id.* at 30 ("There may be some rogue cases that are older that there's some statute of limitations.").

312. When transferee courts do remand actions, they often cite case-specific differences in state laws as a reason for remanding. *E.g.*, *In re* Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig., 840 F. Supp. 2d 1193, 1200 (D. Minn. 2012); *In re* Light Cigarettes Mktg. Sales Practices Litig., 832 F. Supp. 2d 74, 77 (D. Me. 2011); *In re* NuvaRing Prods. Liab. Litig., No. 4:08-md-01964-RWS, 2009 WL 4825170, at *2–3 (E.D. Mo. Dec. 11, 2009).

313. *E.g.*, Kasten v. Saint-Gobain Performance Plastics Corp., 556 F. Supp. 2d 941, 958–59 (W.D. Wis. 2008) (subclassing a class action because of different statutes of limitation); Maloney v. Califano, 88 F.R.D. 293, 294–95 (D.N.M. 1980) (subclassing based on the time taken by the government to make disability determinations).

314. Erichson & Zipursky, *supra* note 102, at 282 ("[A]lthough concurrent client-client conflicts of interest exist in any mass plaintiff representation, such conflicts ordinarily should not prevent mass representation as long as the clients are aware of the conflicts and give their informed consent.").

Divisions can also arise between lead lawyers who negotiate the settlement and non-lead attorneys. Dealmakers are privy to the settlement matrix and the confidential guidance document given to the claims administrator, which explains qualifying criteria for recovery.[315] This knowledge allows leadership to tailor their own clients' claim submissions to maximize their payout (and the leader's contingent fees). Consider two examples:

First, in *Biomet*, settlement designers had an understanding that if a claimant thought she was entitled to more than the presumptive award, she could seek an enhancement through mediation; after opening the file, however, Biomet could likewise seek a reduction.[316] Had the claimant accepted the presumptive award, the file would remain "closed," and Biomet would pay the presumed award.[317] But none of this was spelled out in the settlement itself. Granted, nothing in the settlement contradicted the practice, so when non-lead lawyers complained and requested interrogatories from lead counsel, the judge took lead counsel's word that the steering committee tried to inform them and denied the discovery request.[318]

Second, in the *Fosamax* litigation, the judge permitted evidence about claimants' Fosamax use to come from either pharmacy records or physician and dental records.[319] But the settlement designers limited proof to pharmacy records. In at least one client's case, this meant the difference between a $500 "category 1" claim and an $80,000 "category 4" case.[320] While trying to clarify the claimant's classification, Merck subjected the case to no less than three *Lone Pine* orders as a prelude to requesting dismissal.[321]

To be sure, divisions routinely arise between claimants competing for the same settlement money. But the concern lies in ensuring that the settlement administration process is a fair one ex ante. As such, claimants with structurally conflicting interests need their own representative at the table when dealmakers negotiate and formulate settlements.

---

315. *E.g.*, *In re* Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MDL No. 05-1708 (DWF/AJB), 2009 WL 5195841, at *2 (D. Minn. Dec. 15, 2009) ("[T]he Special Masters would be guided by an allocation plan proposed by the PLCC [Plaintiff's Lead Counsel Committee] and approved by the Special Masters.").

316. *In re* Biomet M2a-Magnum Hip Implant Prods. Liab. Litig., No. 3:12-md-02391-RLM-CAN (N.D. Ind. May 27, 2015) (case management order no. 3 at 2–3).

317. *Id.* at 3–4.

318. *Id.* at 4–5.

319. Osborn Law, P.C.'s Response to Merck's Third Motion for a *Lone Pine* Order at 3, *In re* Fosamax Prods. Liab. Litig., No. 1:06-md-01789-JFK-JCF (S.D.N.Y. June 18, 2014).

320. *Id.*

321. *Id.* at 1.

### III. REGULATING THE MONOPOLY

One overarching theme emerges from analyzing the settlements that repeat players design: the lead lawyers comprising the monopolistic power have few reasons to discipline themselves, and current circumstances render external checks ineffective. As repeat players wield their cohesive interests to their own benefit, allowing them to self-regulate can generate perverse results. As repeat actors in powerful positions standardize and replicate practices that benefit them and allow them to control others' compensation, they further insulate themselves from competitive market forces that might otherwise disrupt self-dealing.

In many economic markets, monopolistic authority can lead to higher prices and lower outputs. Here, the danger exists that defendants will accede to provisions that enhance lead lawyers' compensation in exchange for closure, less compensation for plaintiffs, and reversionary clauses. Lower output could thus mean inadequate representation through discounted payouts to claimants, stricter evidentiary requirements, or more coercive participation measures. Whether actual collusion exists or not, prophylactic regulation is necessary to address the abundant opportunities for self-dealing.

Given the information barriers that prevent judges and clients from monitoring leadership, however, regulation should incentivize and leverage other plaintiffs' attorneys to function as checks and balances. Plaintiffs' lawyers know all too well what happens behind the scenes and how it affects them and their clients, but their payoff for cooperating, staying silent, and playing the long game is currently more profitable than competing.[322] That profit calculation has to change. Faithfully representing plaintiffs' interests must be more lucrative than falling in line and climbing the leadership ranks.

Judges have the power to appoint leaders and the power of the purse.[323] Common-benefit funds are judicially created, and should likewise be judicially administered—not circumvented through settlement's backdoor or shielded by sealed fee petitions.[324] And

---

322. *See generally* HOVENKAMP, *supra* note 15, § 4.4(a) (noting that oligopolistic market structures can themselves produce a "'consensus' about how each firm can maximize its own profits by tacitly participating in a strategy to maximize the joint profits of the group").

323. Judith Resnik, *Money Matters: Judicial Market Interventions Creating Subsidies and Awarding Fees and Costs in Individual and Aggregate Litigation*, 148 U. PENN. L. REV. 2119, 2163–65 (2000).

324. *See* Silver & Miller, *supra* note 32, at 134 (discussing how settlement negotiations resulting in higher common-benefit fees harm non-lead attorneys and claimants). Settlements that do anything more than simply subject the settling parties to the transferee judge's fee orders smack of self-dealing.

though some scholars prefer to limit judicial involvement since judges continually empower the same attorneys, heavily favor settlement, ratify questionable settlement practices, and are repeat players too,[325] most judges do care about achieving justice, but lack unbiased guidance. Moreover, judges have welcomed training on how to overcome their own biases in other contexts, demonstrating receptiveness to critics and new methods.[326] As such, educating judges can be part of the solution. By implementing several changes, well-informed judges can hold leaders accountable and instill competition without legislative or rulemaking intervention, which allows for further innovation and adaptation.

The first step is for judges to reject consensus slates for appointing lead lawyers in favor of a competitive selection process that permits attorneys to air objections confidentially to a special master. Issuing an order that presumptively adds (or replaces) lead lawyers with the attorney who successfully demonstrates an unaddressed structural conflict of interest enhances the payoff for defecting, prompts lead lawyers to be vigilant about whether conflicts exist, and promotes fundamental due process through adequate representation.

The second step is for judges to compensate lead lawyers based on a percentage of the benefit leaders actually confer on plaintiffs (as opposed to a settlement fund's inflated sticker price or a set percentage of the fund). Tying fees to benefits instead of directly to defendant's closure goals realigns common-benefit fees with basic contingent-fee principles: the better claimants fare, the better leadership fares. Faithful representation should follow suit.

The third step is to invigorate competition through state courts and calculated decentralization. By creating pricing packages for state-court attorneys who want to access some (but not all) common-benefit work, transferee judges can motivate state-court attorneys to compete, develop claims under different states' laws, and thus more accurately price payouts under the settlement grid. Compensating state lawyers whose work benefits all claimants using quantum meruit principles encourages them to invest in developing their

---

325. *E.g.*, *id.* at 169–74 (noting that judges lack incentives to ensure that common-benefit work is done well and that existing practices compromise judicial independence by creating close relationships with lead lawyers).

326. Terry A. Maroney, *Why Choose? A Response to Rachlinski, Wistrich, & Guthrie's "Heart Versus Head: Do Judges Follow the Law or Follow their Feelings?,"* 93 TEX. L. REV. SEE ALSO 317, 318–19 (2015) (noting that judges routinely invite academics who reveal their cognitive biases to them to conferences and concluding that "there is something deeply comforting in recognizing judges' humanity" and that "many judges enjoy—at least when among themselves— being seen as they see themselves: ordinary people seeking to perform a difficult job consistently and fairly, with variable levels of success").

cases—not to skimp in hopes of reducing a common-benefit tax's impact.

Remands also play a vital role. By issuing a standing order indicating that they will suggest that the Panel remand non-settling cases to their courts of origin after a global settlement, transferee courts can employ market forces to discipline the leadership's monopoly power.[327] Potential remands pressure lead lawyers to craft settlements that cater to multiple injury types by dismembering their consolidated power structure and thereby reducing non-consenting plaintiffs' accompanying common-benefit fees. Remands likewise return plaintiffs' most valuable bargaining chip: trial. When combined, these proposals tap into the competitive rivalries within the plaintiffs' bar, inciting those who possess the most relevant information and have the most at stake to police the monopoly.

## A. Competing to Become the Monopoly: Leadership Selection Criteria

Consumers (legal clients included) tend to fare better in competitive markets. When firms compete, they can distinguish themselves based on price, expertise, and specialization.[328] Competition serves as an antidote to cartelization and corruption, incentivizes innovation, reduces prices, and encourages diversity.[329] The economic and regulated industries literature provides some apt analogies for incentivizing market checks on lead lawyers' monopolistic power in a particular proceeding. Competing *for* the market, that is, competing to *become* the monopoly, may produce some of the same benefits of open-market competition.[330]

If practice proved as straightforward as theory, then there would be no need for further regulation: competing to become a lead lawyer would do all the work. Judges could simply trust the process. But some of the economic criticisms of this theory are applicable here too.[331] One of the most salient is the idea that initial ex ante competition for monopoly power may not adequately regulate ex post,

---

327. The Panel could likewise institute this change unilaterally by amending its own Rule 10.1. *See infra* note 419 and accompanying text.

328. *See* HERBERT HOVENKAMP, THE ANTITRUST ENTERPRISE: PRINCIPLE AND EXECUTION 2 (2005) (defining a competitive market as one of "low prices, high output, and maximum room for innovation").

329. SCOTT E. PAGE, DIVERSITY AND COMPLEXITY 214–17 (2011).

330. Bailey, *supra* note 34, at 178.

331. DECKER, *supra* note 34, at 38–39.

opportunistic behavior.[332] Thus, there's a need for judicial action as well.

### 1. Competitive Selection Processes and Criteria

Although it's more time intensive, judges need to employ truly competitive processes in appointing lead lawyers—not rely on consensus slates. Lawyers have little incentive to consider adequate representation when brokering a consensus since representing more people (even with conflicting interests) leads to higher fees and a greater willingness to invest in the suit.[333] Relying on self-selection methods can encourage undisclosed fee-sharing arrangements that may adversely affect settlement incentives,[334] tit-for-tat reciprocity among repeat players, and unrepresentative committees. In short, consensus numbs the competitive forces that could erode repeat actors' cartel-like power across multidistrict proceedings by allowing rivals to enter the leadership ranks.[335]

As judges or special masters assume a more active role in selecting leaders, what should they look for and how might they assess those traits? While the sample leadership application and evaluation forms in the Appendix provide a concrete starting point with specific criteria, the goal—in contrast to the usual mantra of cooperation—is to appoint a small, cognitively diverse group somewhat akin to a "team of rivals."[336] Put simply, well-functioning decisionmaking groups tend to have five to six members who are not like-minded.[337]

---

332. *Id.* at 39. Similar problems arise in private prison systems, for instance. *E.g.*, James Theodore Gentry, Note, *The Panopticon Revisited: The Problem of Monitoring Private Prisons*, 96 YALE L.J. 353, 354–60 (1986).

333. Burch, *supra* note 22, at 121.

334. *E.g.*, *In re* "Agent Orange" Prod. Liab. Litig., 611 F. Supp. 1452 (E.D.N.Y. 1985), *rev'd*, 818 F.2d 216 (2d Cir. 1987) (approving a plaintiffs' management committee's internal fee-splitting agreement that would give financing attorneys three times the amount they advanced to finance the litigation).

335. *See* FRAZER, *supra* note 15, at 10 (observing that dynamic competition can correct inefficient markets by eliminating monopoly power).

336. As Cass Sunstein explains using a political example,

> In the presidency of George W. Bush, many failures occurred because of an unfortunate culture that encouraged, rather than combated, group polarization. . . . By contrast, Lincoln's presidency has been described as a healthy Team of Rivals, in which Lincoln self-consciously chose diverse people who could challenge his inclinations and test one another's arguments in the interest of producing the most sensible judgments.

SUNSTEIN, *supra* note 276, at 29–30.

337. While financing the suit may require leaders and steering committees to get buy in from additional attorneys, empirical research suggests that "[g]roups containing 3 to 8 members [are] significantly more productive and more developmentally advanced than groups with 9

Just as teams of doctors need skeptics to make accurate diagnoses and successful corporate boards require diverse, assertive members that don't kowtow to the CEO,[338] leadership groups in multidistrict litigation need members with mixed perspectives who are not afraid to openly disagree. As Professor Cass Sunstein has argued, "In business and in government, successful leaders seek divergent views and fresh opinions"; "Presidents Abraham Lincoln and Franklin Delano Roosevelt are the foremost examples; they made special efforts to ensure they did not live in echo chambers."[339]

What is it that people with diverse perspectives contribute to a group—and more importantly—to representation that a well-oiled network of repeat players may not? Answering this crucial question requires a very brief excursion into theory. There are certain patterns that emerge and hold true across many contexts—ecosystems, political elections, and economies, for instance. Here are two: (1) diversity typically helps these systems function and contributes to innovation and productivity; and (2) these systems need competition to flourish, and diversity drives competition.[340] So, it is unsurprising that studies from a variety of scholarly disciplines indicate that cognitively heterogeneous teams can outperform homogenous ones on disjunctive tasks like identifying and cultivating successful legal arguments.[341]

People with varied perspectives and heuristics frame and solve problems in different ways. When homogenous thinkers approach a problem, they are likely to get stuck at the same point.[342] But groups with cognitively diverse members can employ different tricks or reframe the problem in a way that allows the whole group to move forward. They have different peaks, in other words. Over time,

---

members or more," and productivity further increases in groups with five to six members. Susan A. Wheelan, *Group Size, Group Development, and Group Productivity*, 40 SMALL GROUP RES. 247, 257–58 (2009).

338. SUNSTEIN, *supra* note 276, at 147–48; Jeffrey A. Sonnenfeld, *What Makes Boards Great*, HARV. BUS. REV. (Sept. 2002), https://hbr.org/2002/09/what-makes-great-boards-great [https://perma.cc/4X9J-YMH5].

339. SUNSTEIN, *supra* note 276, at 83.

340. PAGE, *supra* note 329, at 8–9, 215–17.

341. SCOTT E. PAGE, THE DIFFERENCE: HOW THE POWER OF DIVERSITY CREATES BETTER GROUPS, FIRMS, SCHOOLS, AND SOCIETIES xiv–xv, 325–27 (paperback ed. 2007). As Scott Page points out, "[m]ost real world tasks are neither purely disjunctive nor purely conjunctive[,]" which is likewise true for the work of a plaintiffs' steering committee. *Id.* at xv; Stefan Schulz-Hardt et al., *Dissent as a Facilitator: Individual- and Group-Level Effects on Creativity and Performance*, *in* THE PSYCHOLOGY OF CONFLICT AND CONFLICT MANAGEMENT IN ORGANIZATIONS 149, 150–54, 162–63 (Carsten K.W. De Dreu & Michele J. Gelfand eds., 2008); Gayle W. Hill, *Group Versus Individual Performance: Are N + 1 Heads Better than One?*, 91 PSYCHOL. BULL. 517, 533 (1982).

342. PAGE, *supra* note 341, at 157.

however, cognitively diverse agents that interact frequently can lose those differences; members' thinking may converge, assimilate, and become cohesive as the similarities among settlement practices illustrate.[343]

Still, not all diversity is created equal. Unlike "identity" diversity, which includes visible differences such as race, ethnicity, age, gender, physical disabilities, and demographic dissimilarities, "cognitive" diversity focuses on diverse knowledge and expertise stemming from training, experiences, expertise and, yes, identity.[344] While identity can play a role by creating experiential differences that prompt contrasting analytic tools to develop, physical characteristics alone may tell us little.[345] For example, a Mexican American woman raised in an upper class family who attends Harvard Law School may have similar analytical tools and training as white males attending the same school.[346] As such, cognitive diversity can't readily be identified from someone's appearance; training and life experiences are traits that require understanding someone's background.[347]

Judges should seek cognitively diverse members with varied expertise and perspectives who will disclose privately held information and dissent over matters that are relevant to the leadership's substantive tasks—not contrarians.[348] Not all conflict is productive. Appointing a group of malcontents who dislike one another is unlikely to benefit anyone; relationship conflicts are detrimental to a group's longevity and performance, regardless of the type of task.[349] These interpersonal conflicts tend to distract group members from the job at hand, prompting them to focus instead on threats, increasing their own power, or cultivating their supporters.[350] Process-oriented conflict doesn't fare much better. The more leaders' opinions differ over the

343. *Id.* at 343.

344. *Id.* at 7–8, 302–12, 324–27; Karen A. Jehn et al., *Why Differences Make a Difference: A Field Study of Diversity, Conflict, and Performance in Workgroups*, 44 ADMIN. SCI. Q. 741 (1999); Eden B. King et al., *Conflict and Cooperation in Diverse Workgroups*, 65 J. SOC. ISSUES 261, 267–68 (2009); Elizabeth Mannix & Margaret A. Neale, *What Differences Make a Difference?: The Promise and Reality of Diverse Teams in Organizations*, 6 PSYCHOL. SCI. PUB. INT. 31, 41–42 (2005); Abby L. Mello & Lisa A. Delise, *Cognitive Diversity to Team Outcomes: The Roles of Cohesion and Conflict Management*, 46 SMALL GROUP RES. 204, 205–07 (2015).

345. Mello & Delise, *supra* note 344, at 204–05.

346. PAGE, *supra* note 341, at 359.

347. *Id.* at 302–10.

348. *See* CASS R. SUNSTEIN, WHY SOCIETIES NEED DISSENT 84–85 (2003).

349. *See* Karen A. Jehn, *A Multimethod Examination of the Benefits and Detriments of Intragroup Conflict*, 40 ADMIN. SCI. Q. 256, 275–76 (1995).

350. Karen A. Jehn, *A Qualitative Analysis of Conflict Types and Dimensions in Organizational Groups*, 42 ADMIN. SCI. Q. 530, 531 (1997).

means for achieving their ends, the worse their performance.[351] And there is no need for conflict in conducting standardized, routine tasks like reviewing discovery materials and producing documents.[352]

But conflict that centers on a non-routine task's substance—such as which legal theories are best suited for class certification, how to argue against motions to dismiss and motions for summary judgment, or how to structure a settlement—is beneficial, particularly when coupled with norms that favor discussing substantive conflicts and suppressing relationship conflicts.[353] So, members with diverse perspectives and expertise who make complex, non-routine decisions can benefit from dissenting perspectives—those perspectives can generate superior alternatives and yield new information.[354] This suggests that judges need to change the kind of information they request, and focus on compiling a qualified group with mixed experiences that complement one another. To aid in this endeavor, the sample leadership form and applicant scoring sheet in the Appendix provide straightforward information-gathering and assessment tools, while the pocket guide for leadership appointments and compensation explains best practices and cites to further reading for judges interested in the theory.[355]

### 2. Permitting Confidential Objections to Special Masters

Current practices and norms reward silence, not dissent. When judges require attorneys to openly object to proposed leaders,[356] they are unlikely to receive candid comments. Why? The conditions are ripe for conformity and informational cascades: the relevant plaintiffs' bar is small and lead lawyers can influence and sometimes directly control others' attorneys' fees.[357] Passing a microphone in open court to solicit

---

351. *See id.* at 551.

352. *See* Jehn, *supra* note 349, at 260, 275–76 (explaining that task-related conflict can be beneficial when the group's assignment is complex and demands creativity and innovation, but detrimental when assignments are routine).

353. *See* Jehn, *supra* note 350, at 551–52.

354. Jehn, *supra* note 349, at 260.

355. *Infra* apps. A3: Pocket Guide for Leadership Appointment and Compensation; A4: Sample Leadership Application Form; A5: Leadership Applicant Scoring Sheet.

356. *E.g., In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, No. 2:10-md-02179-CJB-SS (E.D. La. Aug. 10, 2010) (pretrial order no. 1) (setting initial conference).

357. *See* ELLICKSON, *supra* note 268, at 170–74 (discussing the role of sanctions for objectors/defectors in close-knit groups who aim to maximize their own welfare); SUNSTEIN, *supra* note 348, at 28–29, 68 (discussing the role of group identification and conformity). *But see* Transcript of Proceedings at 49, *In re* Lithium Ion Batteries Antitrust Litig., No. 4:13-md-02420-

information from attorneys about one another is likely to lead to an information cascade where group members withhold privately held information, fall in line behind those asked first, and simply echo that sentiment.[358]

Most objections occur nowhere within judicial earshot. Instead, attorneys hash them out behind closed doors, oftentimes before a power broker even convenes a leadership meeting.[359] Presently, one of several scenarios might unfold. First, if the challenger is powerful enough, the presumptive leaders might offer the objector a position in a concurrent or future multidistrict litigation. Second, if no deal is struck and the challenger has allies backing her, then that alternative group might present a competing slate or seek appointment alongside the principal group.[360] Finally, if the competitor is not well positioned, then she must choose between capitulating or publicly opposing attorneys who may be empowered.

Soliciting objections need not be so treacherous. The solution is somewhat straightforward: appoint a special master to oversee leadership selection. Lawyers can air their preferences and grievances confidentially to the special master and perhaps the judge's law clerks.[361] The clerks and the special master can speak privately with the attorneys, assimilate and score the application forms, and then recommend a slate to the judge.[362] The judge can then treat the final

---

YGR (N.D. Cal. Apr. 16, 2013) (claiming that if selected, the consensus group would not exclude objectors from receiving work).

358. *See* SUNSTEIN, *supra* note 348, at 23–24, 68–69; SUNSTEIN, *supra* note 276, at 90–93.

359. When plaintiffs' attorneys could not reach a consensus as to who would represent the indirect purchasers in the LCD antitrust litigation, Dan Becnel noted, "I tried to—when we came down here to—to have three, make a deal, and—and Mr. Berman decided not to. So the bulk of us think Mr. Cotchett and the Cabraser firm are excellent." Transcript of Proceedings at 51, *In re* Lithium Ion Batteries Antitrust Litig., No. 4:13-md-02420-YGR (N.D. Cal. Apr. 16, 2013); *see also* Supplemental Objection of Daniel E. Becnel, Jr. to Plaintiffs' Common Benefit Fee Award, Ex. B (Affidavit of the Becnel Law Firm, LLC as Per Order No. 6(D)) at 1, *In re* Vioxx Prods. Liab. Litig., No. 2:05-md-01657-EEF-DEK (E.D. La. Jan. 26, 2011):

> Numerous meetings were held in California, Texas, New York, Washington, D.C., Miami and New Orleans in an effort to organize this case for over a year prior to the MDL. My office initiated many of these meetings and I undertook to have a consensus built for electing leadership and for the sharing of information . . . .

360. Some judges have even requested that leadership applicants include lists of supporting attorneys with their application. *See In re* Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig., No. 3:15-md-02672-CRB (N.D. Cal. Dec. 22, 2015) (pretrial order no. 2: applications for appointment of plaintiffs' lead counsel and steering committee members at 2).

361. Judge David Proctor has used this procedure. *See* Special Master's Rule 23 Report Recommending Interim Plaintiff Leadership Counsel, *In re* Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 10, 2013).

362. For detailed information on this interview and screening process as well as information about application forms, see Burch, *supra* note 41, at 125–28.

appointment as a confirmation hearing.[363] Although this system may enable attorneys to jockey for position by needlessly complaining about one another, their reputations serve as one potential check. And the additional costs are surely offset by adequate representation gains.

### 3. Presumptive Appointments and Removals Based on Structural Conflicts

Competing to become the monopoly through open selection and allowing private objections improves the status quo, but does little to ensure faithful representation or police opportunistic behavior thereafter. As noted, even in diverse leadership groups, members' cognitive differences may dissipate as they begin to identify with one another.[364] Group identity leads to trust, and trust enables members to work together for their mutual gain.[365] Just think about cartels: it's easier to collude with fewer players who have long-standing relationships, communicate regularly, and use social norms to prevent competitors from defecting.[366] These traits should sound familiar by now, for repeat players share them too. But whereas antitrust laws disrupt cartels by creating distrust,[367] no parallel currently exists in multidistrict litigation.

Accordingly, the economic calculus must change such that the payoff for raising inadequate-representation concerns is greater than remaining complicit. If a leadership challenger successfully demonstrates that a neglected structural conflict of interest exists and that her appointment can alleviate it, then, depending on the conflict, the challenger has created a presumption that she should either serve alongside or replace current leadership.[368] Of course, since judges often appoint lead lawyers early in the proceeding, information about conflicts among claimants may not yet be available. As such, this incentivizes leaders to address and remedy conflicts as they surface.

Structural conflicts present a high bar: they can arise either between the claimants and the leadership or among the claimants

---

363. *See, e.g.,* Transcript of Evidentiary Hearing, *In re* Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP (N.D. Ala. Apr. 25, 2013).

364. SUNSTEIN, *supra* note 348, at 28–29.

365. Carol M. Rose, *Giving, Trading, Thieving, and Trusting: How and Why Gifts Become Exchanges, and (More Importantly) Vice Versa,* 44 FLA. L. REV. 295, 311–12 (1992); Wheelan, *supra* note 337, at 249–50.

366. Leslie, *supra* note 15, at 564–68, 579–81, 584–88, 590–91.

367. *Id.* at 622–36.

368. *See* Richard A. Nagareda, *Administering Adequacy in Class Representation,* 82 TEX. L. REV. 287, 347–63 (2003) (proposing a similar solution in the class context).

themselves, but must "present a significant risk" that leaders might "skew systematically the conduct of the litigation so as to favor some claimants over others on grounds aside from reasoned evaluation of their respective claims or to disfavor claimants generally vis-à-vis the lawyers themselves."[369] Pretrial efficiency may require placing monopolistic control in the hands of a few attorneys, but with that power comes the responsibility to act as fiduciaries for all claimants—not just one's individual clients.[370] That is the very crux of structural collusion—there need not be a backroom deal or conscious collusion. The mere act of pursuing one's own (and one's clients' own) self-interest can lead to conflicted representation for non-clients.[371]

Allowing structural conflicts to persist without separate representation violates basic due process rights in the class context,[372] and, by extension, the multidistrict context.[373] Multidistrict leadership and steering committees have morphed from voluntary, ad hoc groups into mandatory, judicially created ones.[374] And multidistrict proceedings share key traits with class actions: principal-agent concerns, mandatory consolidation, judicially imposed organization, judicially awarded common-benefit compensation, and a small cadre of attorneys who owe fiduciary duties to all claimants while monopolizing control and decisionmaking. Moreover, some global settlements have adopted class-like characteristics such as walkaway provisions and, in one case (the Yaz/Yasmin Gallbladder Settlement), included an automatic-enrollment provision that required non-participating plaintiffs to affirmatively opt out, as they would in a Rule 23(b)(3) class.[375] As such, multidistrict litigation should afford plaintiffs the same adequate representation protections.

Issuing a standing order that presumptively removes lead lawyers who created or ignored structural conflicts of interest and presumptively replaces leaders with the competing lawyers who successfully demonstrated the conflict—so long as the challenger has the requisite experience and available funding—can harness market

---

369. PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.07(a) (AM. LAW INST. 2010).

370. *Id.* § 1.04 (AM. LAW INST. 2010); MANUAL FOR COMPLEX LITIGATION (FOURTH) §10.22 (2004); Silver, *supra* note 170, at 1987–91.

371. *See, e.g.,* Ortiz v. Fibreboard Corp., 527 U.S. 815, 855 (1999).

372. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 600, 606, 626–28 (1997).

373. Redish & Karaba, *supra* note 279, at 132–33.

374. For a historical overview of how these concerns have evolved as group organization becomes increasingly formal and mandatory, see Burch, *supra* note 41, at 87–91.

375. Yaz Gallbladder Settlement, *supra* note 139, § 1.01(A).

forces to discipline the leadership's monopoly power.[376] If the entire leadership has disserved claimants to advantage itself, then the judge should clean house.[377] Similarly, if some leaders structured the settlement, negotiated side deals for their own clients, or litigated in a way that systematically biases non-client claimants for reasons that have no bearing on their claim's strength,[378] then the judge should replace those attorneys—presumptively with the challenger demonstrating the conflict.[379] Alternatively, certain conflicts among claimants suggest that the challenger should serve alongside current leaders, not unseat them. If some clients have materially different claims or circumstances such that unified representation would pose a direct ex ante conflict (such as the conflict between those with present and future claims in *Amchem*[380]), then judges should presumptively add the challenger to the leadership roster to separately represent those plaintiffs' interests.[381]

## B. Regulating Fees to Encourage Competition and Fidelity to Claimants

Transforming leadership selection is only half of the puzzle. Leadership's fidelity to claimants must likewise be linked to their

---

376. *See* Nagareda, *supra* note 368, at 347–63. Sample language for this order is included *infra* at app. A6: Sample Orders Suggesting Remand and Replacing Leaders.

377. The circumstances in *Propulsid* seem to provide one such example. *See supra* notes 104–123 and accompanying text.

378. The latecomer provisions in the *DePuy ASR* settlements provide one such example. *See supra* notes 164–176 and accompanying text.

379. *See* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 COLUM. L. REV. 370, 388 (2008) ("After *Ortiz*, such 'side settlements' now seem to represent a per se 'impermissible conflict of interest.' "); Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 SUP. CT. REV. 337, 385 (noting that courts should ensure against "structural allegiances of class counsel that would create incentives to favor one part of the class over another, or be biased against seeking the best possible return to a defined subset of claims"); Richard G. Stuhan & Sean P. Costello, *Robbing Peter to Pay Paul: The Conflict of Interest Problem in Sibling Class Actions*, 21 GEO. J. LEGAL ETHICS 1195, 1213–14 (2008) (noting that side deals give class counsel "great incentive" to reach any settlement that may survive judicial scrutiny). Depending on the circumstances, when competitors replace a current leader, the incumbent might still apply for common-benefit fees based on the quantum meruit principles outlined below. Fees are more acceptable when the lead lawyer recognizes the conflict in negotiating a side deal for her own clients and resigns from the leadership.

380. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626–28 (1997).

381. On the difference between ex ante and ex post conflicts created by the settlement itself, see Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. PENN. L. REV. 1649, 1685–91 (2008).

common-benefit fees.[382] Awarding leaders a flat percentage of either the claimants' gross recovery or the fund's sticker price does little to promote faithful service. And reflexively imposing common-benefit taxes on state-court litigants without some showing that those claimants actually benefited from federal efforts stifles state-court lawyers' incentives to compete. Their rational response isn't to expend resources on case development, but to invest as little as possible to profit when taxed through a global settlement. By contrast, using quantum meruit principles to customize fee percentages based on the benefit leadership actually bestowed better aligns lead lawyers' and claimants' financial interests, empowers state courts as competitive checks on overbearing deals, and irons out doctrinal wrinkles.

### 1. Compensate Leadership on a Quantum Meruit Basis

Judges and lead lawyers routinely invoke the common-fund doctrine to justify awarding leadership's fees. But common funds rest on restitution principles and assume that class members, as passive beneficiaries, implicitly consent to fee awards.[383] That's simply not the case in multidistrict litigation; plaintiffs have their own attorneys and have no choice but to accept and pay for lead lawyers' judicially appointed services.[384]

Lead lawyers also contend that courts should base their fees on the total amount of the fund—claimed or not—and routinely cite the Supreme Court's decision in *Boeing Co. v. Van Gemert* as support.[385] This overlooks a crucial distinction between the *Boeing* class and multidistrict litigation: in *Boeing*, all class members had to do to obtain their settlement money was prove they were class members, which made them the "equitable owners" of their award;[386]

---

382. Fees drive strategy. *See, e.g.,* Field, *supra* note 274 (accusing lead lawyers of foregoing a stronger case for bellwether trial when the family's attorney refused to pay lead lawyers half of any attorneys' fees if the plaintiff won).

383. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 29 cmt. c (AM. LAW INST. 2011) ("The contingent nature of the class action fee—the fact that a fee is payable only in the event of success, and then only by deduction from the recovery—obviates most of the potential threat of forced exchange.").

384. As the *Restatement (Third) of Restitution and Unjust Enrichment* makes plain: "By comparison with class actions, court-imposed fees to appointed counsel in consolidated litigation cannot be explained entirely by restitution principles, since litigants may have no choice but to accept and pay for certain legal services as directed by the court." *Id.*

385. 444 U.S. 472 (1980); *e.g.,* Memorandum in Support of Motion for Distribution of Attorney's Fees (Re: MDL Settlement Program II) at 2–3, Ex. B, *In re* Propulsid Prods. Liab. Litig., No. 2:00-md-01355-EEF-KWR (E.D. La. Aug. 1, 2012).

386. *Boeing*, 444 U.S. at 480–82.

multidistrict litigation claimants are not automatically entitled to their share—they must overcome evidentiary hurdles first.[387]

The unjust enrichment theory likewise shifts: *Boeing* class members would receive a windfall if they failed to compensate class counsel for helping them,[388] but multidistrict litigation plaintiffs must often surrender their right to sue in court in favor of the claims-administration process before knowing whether they will recover. While negotiating a no-hassle claims-resolution process that compensates plaintiffs based on easily identified medical criteria is a start, restitution principles still require a link between plaintiffs' ultimate recovery and attorneys' fees.[389] Without that link, results like those in *Propulsid* (where leadership's fees—$27 million—grossly outpaced claimants' collective recovery—$6.5 million) are possible.[390] The fear is the same one that animated changes to coupon settlements: class counsel could exchange class members' rights for valueless coupons in return for hefty attorneys' fees.[391] After the Class Action Fairness Act, federal courts must now calculate attorneys' fees based on the value of redeemed coupons.[392]

Common-benefit fees necessitate a similar shift. Without tying fees to benefits, the danger exists that leadership might negotiate high settlement amounts, use that inflated price to justify their fees, but then capitulate to a defendant's demands for stringent claims-resolution criteria, reversionary clauses, or both.[393] Using quantum meruit principles, however, deflates this premise.[394] Quantum meruit awards depend on a variety of factors, such as lead lawyers' opportunity costs, financial risks, billing practices (whether hourly billing or contingent fees), work, time spent,[395] the case's status, the

---

387. *E.g.,* Propulsid I Settlement, *supra* note 104, § 2.

388. *Boeing*, 444 U.S. at 478.

389. *See* Burch, *supra* note 41, at 102–04; Silver, *supra* note 252, at 663–66.

390. *See supra* notes 294–295 and accompanying text.

391. *See* S. REP. NO. 109-14, at 29–30 (2005).

392. 28 U.S.C. § 1712 (2012).

393. *See* PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13 cmt. a (AM. LAW INST. 2010) (discussing issues with fees that are not tied to the actual value of class members' claims).

394. Burch, *supra* note 41, at 128–35.

395. *See* Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717 (5th Cir. 1974) (assessing time spent on a case); Ackermann v. Levine, 610 F. Supp. 633 (S.D.N.Y. 1985), *aff'd in part, rev'd in part*, 788 F.2d 830 (2d Cir. 1986) (examining specific services rendered); Richardson v. Parish of Jefferson, 727 So. 2d 705, 708 (La. Ct. App. 1999) (considering attorney billing rate and hours involved); Hiscott & Robinson v. King, 626 A.2d 1235, 1238 (Pa. Super. Ct. 1993) (considering an attorney's hourly billing rate); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 39 cmt. c (AM. LAW. INST. 2000); Joseph M. Perillo, *The Law of Lawyers' Contracts is Different*, 67 FORDHAM L. REV. 443, 448 (1998) (discussing "whether [a] lawyer is entitled to compensation despite a violation of the lawyer's duties to the client").

amount of work the individual plaintiffs' chosen attorneys contributed to the outcome,[396] and—most importantly—the plaintiffs' ultimate success.

By their nature, quantum meruit awards typically entail evaluating the results obtained and the objective benefit to the client.[397] As such, while judges might issue an initial order holding back a portion of the settlement funds and award interim payments to finance the litigation, before they award final common-benefit fees, they should require parties to submit an accounting statement.[398] This final accounting should describe the benefits leaders conferred on plaintiffs, how the settlement funds were allocated, the number of plaintiffs who submitted claims, how many plaintiffs recovered in each category or tier, and the average recovery amount in each category or tier. Common-benefit fee awards should then be a percentage of plaintiffs' actual recovery, not the fund itself.[399]

Leadership has the burden of demonstrating that their efforts benefitted claimants, making them more profitable than they would have been without them. As such, where available, leaders should likewise include information about settlement values and verdicts obtained outside the multidistrict process as a comparative baseline. The accounting should then be available to the plaintiffs and their individual attorneys such that they can respond and object. This information allows judges to fine tune fee awards according to plaintiffs' actual benefits and discourages attorneys from padding their billable hours. For instance, because document review can

---

396. *See generally* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 39 cmt. c (AM. LAW. INST. 2000) ("The standard rate or hourly fee might be modified by other factors bearing on fairness, including success in the representation and whether the lawyer assumed part of the risk of the client's loss, as in a contingent-fee contract."); Lester Brickman, *Setting the Fee when the Client Discharges a Contingent Fee Attorney*, 41 EMORY L.J. 367, 392–93 (1992) (discussing how the size of recovery is a factor used to determine attorneys' fees).

397. *See, e.g.*, 520 E. 72nd Commercial Corp. v. 520 E. 72nd Owners Corp., 691 F. Supp. 728, 739 (S.D.N.Y. 1988), *aff'd without op.*, 872 F.2d 1021 (2d Cir. 1989) ("In determining the value of an attorney's services in quantum meruit, the following factors must be considered: 1. The difficulty involved in the matters in which services were rendered; 2. The nature of the services; 3. The amount involved; 4. The professional standing of counsel; 5. The results obtained."); *In re* Hall, 415 B.R. 911, 923 (Bankr. M.D. Ga. 2009) (citing Lewis v. Smith, 618 S.E.2d 32, 35–36 (Ga. Ct. App. 2005)):

> Under quantum meruit, attorney fees are valued in light of the amount of the work done and by the results obtained. The court must determine whether the client received any benefit from the services and the value of the services rendered. Value is determined in terms of value to the client.

398. *See* PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13(e) (AM. LAW INST. 2010) (proposing a similar accounting for class counsel's attorneys' fees).

399. *See* Jay Tidmarsh, *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L. REV. 767, 787–88 (2014) (proposing a similar adaptation for cy pres recoveries).

generate billable time, law firms may be less likely to outsource review to a cheaper legal process vendor that could perform the service at less expense to plaintiffs.[400] But subtracting and reimbursing costs and then awarding lead lawyers a percentage of plaintiffs' actual recovery may encourage leaders to use vendors that require only attorney supervision.[401]

Some circumstances should prompt judges to consider raising or lowering the percentage awarded for common-benefit fees. For example, meritorious objections from a particular tier of claimants might prompt judges to lower the common-benefit percentage awarded from that tier to better reflect the benefits conferred,[402] and higher settlements outside the multidistrict process might prompt judges to lower the common-benefit percentage across the board.[403] Similarly, evaluating benefits on a tier-by-tier basis encourages attorneys to maximize deterrence aims and value for "lower tier" claimants with less severe injuries—whether through added compensation or equitable or injunctive measures. This change incentivizes leaders to: (1) streamline and simplify the claims process, (2) expedite payouts, and (3) maximize the amounts (or equitable relief) paid to plaintiffs. Put simply, leadership has to actually benefit plaintiffs to be paid.

Quantum meruit likewise allows judges to implement a relatively novel theory of common detriment,[404] where they subtract money from a firm's common-benefit fee if its attorneys disrupt and delay the process without benefitting claimants.[405] Judges have, for

---

400. *See* Morris A. Ratner & William B. Rubenstein, *Profit for Costs*, 63 DEPAUL L. REV. 587, 603–04 (2014) (discussing functions that nonlawyers can perform under attorney supervision, such as work coding and searching discovery documents, but noting that paying attorneys more for their time incentivizes them not to outsource work in a cost-effective manner).

401. *Id.*

402. Though contingent fees from their own clients will still incentivize leaders to maximize payouts in particular tiers, ensuring adequate representation by appointing lawyers who represent claimants across the spectrum should help mitigate those disadvantages.

403. Of course, there are many variables here. For example, some cases will inevitably have stronger causation evidence and may not be representative of others, or state lawyers may have relied on the multidistrict litigation's common-work product to produce the results. The point, however, is that higher settlements outside the consolidated litigation should trigger closer judicial scrutiny.

404. *E.g.*, *In re* DePuy Orthopaedics, Inc. ASR Hip Implant Prods. Liab. Litig., MDL No. 1:10-md-02197-DAK (N.D. Ohio Oct. 14, 2015) (case management order no. 25 at 4); Special Master's Report and Recommendation on the Distribution of Common Benefit Fees and Expenses at 5–7, *In re* Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig., No. 3:12-md-02385-DRH-SCW (S.D. Ill. Dec. 4, 2014); *In re* Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MDL No. 05-1708 (DWF/AJB), 2009 WL 5195841, at *1 (D. Minn. Dec. 15, 2009).

405. *E.g.*, Special Master's Report and Recommendation Regarding the Allocation and Distribution of Common Benefit Fees and Expenses at 12, *In re* NuvaRing Prods. Liab. Litig.,

example, used this theory to sanction attorneys who fail to disclose claims-allocation plans to clients,[406] hamper settlement payouts, reduce settlement proceeds, or unjustifiably interfere with and delay settlement negotiations.[407] As such, the danger is obvious: courts must take great care to distinguish between task-substantive conflict (even if it fails to produce a tangible benefit) and relationship or process-oriented conflict that might prove detrimental to the group.[408] Failing to appreciate those differences can dampen all conflict, leading once again to an echo chamber.

Differentiating between dissenting behavior that improves representation versus behavior that disserves the group and assessing fees on a more granular level may necessitate appointing special masters. Special masters can alleviate fears over financial sanctioning and conflicting interests that arise when judges designate lawyer-led fee allocation committees.[409] And when they work with certified public accountants, they can audit billing reports (on a monthly basis, for instance) and spot billing outliers early on—not at the end when fee fights may erupt.

## 2. Best Practices Can Empower State-Court Cases as Competitive Checks

Quantum meruit can likewise recognize and compensate competitive and complementary state-court efforts. As Part II.B.2 explained, lead lawyers have gone to great lengths to ensure that state-court plaintiffs pay common-benefit fees if they have attorneys with cases in the transferee court or want to participate in a master settlement. On one hand, leaders' concern is understandable: state litigants may be freeriders who simply sit back and wait for leaders to negotiate a deal. Avoiding common-benefit fees would unjustly enrich

---

No. 4:08-md-01964-RWS (E.D. Mo. Dec. 16, 2014); *In re* Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig., 268 F. Supp. 2d 907, 927 (N.D. Ohio 2003).

406. *In re Guidant*, 2009 WL 5195841, at *7–8.

407. *In re* Oral Sodium Phosphate Solution-Based Prods. Liab. Action, No. MDL 2066, 2010 WL 5058454, at *4 (N.D. Ohio Dec. 6, 2010) (memorandum and order).

408. *Supra* notes 348–354 and accompanying text (discussing differences among conflict types).

409. *E.g.*, *In re* Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP (N.D. Ala. May 31, 2013) (order regarding protocols for plaintiffs' counsel time and expense submissions) (using a special master to compile and submit billing expenses on a monthly basis); *see also In re* Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP (N.D. Ala. June 10, 2014) (order regarding non-waiver of work product doctrine protection and attorney-client privilege as a result of the submission of plaintiffs' common benefit time and expense records to the special master and the court).

idle lawyers and their clients at the leadership's expense.[410] On the other hand, significant verdicts routinely affect factually related cases across the country, but those spillovers do not create compensable benefits.

The main problem is that awarding a common-benefit assessment of "X" percent is too blunt a tool. It doesn't distinguish between an attorney with all of her cases in the multidistrict proceeding and one with twenty-five federal cases and four thousand state-court suits. Nor does it adjust for the lawyer who has litigated exclusively in state court without any help from the federal court's document repository and is ready for trial, but has clients who opt for the global settlement. And it doesn't increase fees for counsel who wait for leaders to announce a settlement before dumping a bevy of cases into the proceeding to cash in on others' efforts. A flat tax thus discourages attorneys from competing in state court where they might form multiple centers of power that reveal additional information about claims valuation. Nuance is necessary both to serve fairness principles and to encourage state-court markets to function as rival regimes.

If federal common-benefit fees discourage lawyers from pushing state-court claims to trial, the status quo not only dampens state courts' use as a competitive check by raising rivals' costs, it also forestalls information from developing about claims' diverse values. States can differ over parties' rights, and respecting those differences is central to federalism.[411] But settlements are expertly designed to reduce outcome variance, and may thus provide less compensation to claimants in states that permit idiosyncratic claims such as loss of consortium, emotional distress, fear of disease, or medical monitoring.[412] States' citizens will likewise have heterogeneous preferences that can affect jury verdicts. Global settlements that follow bellwether trials in the multidistrict proceeding simply cannot recapture this variety with jurors from the transferee forum.

---

410. *In re* Nineteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig., 982 F.2d 603, 606 (1st Cir. 1992):

> [W]hen a court consolidates a large number of cases, stony adherence to the American rule invites a serious free-rider problem . . . . [E]ach attorney, rather than toiling for the common good and bearing the cost alone, will have an incentive to rely on others to do the needed work, letting those others bear all the costs of attaining the parties' congruent goals.

411. Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. REV. 547, 579 (1996).

412. *See* Amchem Products, Inc. v. Windsor, 521 U.S. 591, 604, 628–29 (1997) (striking down a settlement class action for failing to compensate claimants' unique claims, among other reasons).

Consequently, settlements may substantially misprice certain claims.[413]

Hewing common-benefit fees to quantum meruit principles and, as the next Section details, automatically remanding non-settling plaintiffs can eliminate barriers to competition and information gathering. On the front end, if state-court litigants want to access federal work product, then transferee judges should customize participation agreements. While contract principles are ill suited for attorneys litigating in the transferee court who have no choice but to accept,[414] tiered pricing packages (like digital photography bundles, for example) would allow state-court attorneys to contract with the federal leadership based on their document needs. Plaintiffs' attorneys often use sophisticated document repositories with unique login information that enables leadership to track which documents have been accessed and by whom.

On the back end, as some courts have done in the past,[415] judges should award common-benefit fees to state-court counsel who add value to the federal suit by objecting to practices that threaten adequate representation or trying state-court cases, for example. This encourages counsel to invest in state suits and can mobilize the plaintiffs' bar's entrepreneurial power to develop state-specific information that informs settlement awards.

## C. Automatically Requesting Remand for Non-settling Plaintiffs

Jockeying to become the monopoly through competitive selection processes, adding to and replacing plaintiffs' leadership based on structural conflicts, and customizing common-benefit fees using quantum meruit principles collectively improve multidistrict litigation by galvanizing competition. But these changes still lack one key pressure point: the threat of trial in the face of an unsatisfactory settlement offer. Often touted as the plaintiff's most valuable bargaining chip,[416] multidistrict litigation eliminates that threat for

---

413. Elizabeth Chamblee Burch, *Disaggregating*, 90 WASH. U. L. REV. 667, 672 (2013).

414. Burch, *supra* note 41, at 104–08.

415. *In re* Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740, 774 (E.D. La. 2011) (allocating common-benefit fees).

416. *See Amchem*, 521 U.S. at 621 (citing John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1379–80 (1995)) (noting that if a fairness inquiry controlled class certification, counsel "would be disarmed" and, "confined to settlement negotiations[,] could not use the threat of litigation to press for a better offer"); Erichson, *supra* note 304, at 953, 958 ("[T]he litigation class action works as a tool of plaintiff empowerment.").

all but a few bellwether cases.[417] In exchange, the process consolidates the masses behind an autocratic leadership that may use settlement to condition individual attorneys' fees on surrendering the lawyer's entire clientele to the claims process, thereby tying plaintiffs' financial fates. That tie is particularly costly when claimants' interests are non-uniform. Remand provides a vital alternative, particularly when non-settled cases may languish in consolidated proceedings that no longer benefit from consolidation. Accordingly, transferee judges should issue a standing order indicating that they will automatically request that the Panel remand non-settling plaintiffs to their court of origin after leaders negotiate a master settlement.[418] To achieve uniformity, the Panel could institute this check unilaterally by simply amending its own Rule 10.1(b).[419]

In addition to animating competition, automatic-remand requests post-master settlement yield four crucial benefits. First, they impart procedural justice to plaintiffs with unique claims that are most likely to be disserved by a leadership that caters to the majority. Remand allows those plaintiffs to pursue their suits in their chosen fora if faced with an unsatisfactory settlement offer.[420] It likewise pressures lead lawyers to negotiate a favorable deal for claimants across the spectrum, for leaders should not profit from people they do not benefit.[421] Second, if discovery has not neared completion before settlement, then this should raise red flags about whether the settlement value accurately reflects the claims' merits, and suggest that plaintiffs may be better served by conducting their own discovery upon remand—not waiting for lead lawyers who have settled their

---

417. Silver & Miller, *supra* note 32, at 123 (observing that the lack of trials "declaws plaintiffs in transferred cases by depriving them of the weapon that pressures a defendant to pay a reasonable amount in settlement: the threat of forcing an exchange at a price set by a jury").

418. Although parties can request that the Panel remand cases, it never appears to have done so without such a suggestion from the transferee court. Burch, *supra* note 95, at 418. Sample language for issuing these orders is included *infra* Appendix A6: Sample Orders Suggesting Remand and Replacing Leaders.

419. Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Rule 10.1(b), 277 F.R.D. 480 (2011).

420. This may affect counsel and plaintiffs' decision of where to sue, for many of them currently file directly in the transferee court after consolidation, which would weaken the threat of remand. Andrew D. Bradt, *The Shortest Distance: Direct Filing and Choice of Law in Multidistrict Litigation*, 88 NOTRE DAME L. REV. 759, 763 (2012). As Professor Bradt suggests, one solution would be to require a plaintiff who files directly in the multidistrict proceeding to declare an appropriate home court for remand purposes. *Id.* at 816.

421. *Supra* Part III.B.1 (discussing quantum meruit compensation principles); *see also* Resnik et al., *supra* note 21, at 389–91 ("Regulation should not only provide a generic admonition; it should also authorize judges to police those procedures by warning lawyers that failure to meet these obligations could be grounds for disaggregation and could be relevant to the payment of both costs and fees.").

cases to unselfishly fulfill their fiduciary obligations. Although some efficiency may be lost, the gains in individual autonomy may be a worthwhile trade at this stage.

Third, remanding cases to their transferor courts destabilizes leadership's power structure. Remand dislodges the omnipotence lead lawyers exercise and vests control in individual counsel's hands. It also undermines the settlement vortex, which currently limits plaintiffs to two choices: settle or risk dismissal. Remanding gives them a third option—trial. By increasing available institutional resources (judges and courts), remand destabilizes the monopoly and can advantage plaintiffs with claims that may be undervalued by a global settlement.[422] As such, remand is a mixed bag for defendants: Without a unified negotiating group that can deliver a wholesale deal, they would have to bargain with individual attorneys and customize settlements to reflect differences in state law and claim strength. But, because weaker claims can no longer lurk within the masses, the total number of plaintiffs may decline.

Finally, remanding cases to federal transferor courts and allowing state-court cases to flourish at times can produce what Professor Heather Gerken labels "second-order diversity."[423] Second-order diversity is generated when many different kinds of groups exist, but their members lack internal diversity. Ideologies and goals differ across, but not within, the groups. While most of this Article has espoused the need for first-order cognitive diversity and dissent within lead lawyers' decisionmaking groups, multidistrict litigation can also benefit from allowing state-court judges and transferor judges to innovate and experiment.[424]

## CONCLUSION

While courts and legislatures may seek tipping points to trigger change,[425] the reality is that repeat attorneys in this elite bar

---

422. Galanter, *supra* note 30, at 36 (observing that increasing institutional facilities can reduce advantages for repeat players, and would allow claimants to "litigate more and settle less").

423. Heather K. Gerken, *Second-Order Diversity*, 118 HARV. L. REV. 1099, 1172–73 (2005).

424. This is the basic thrust behind one line of the federalism literature arguing that state courts should serve as laboratories. *E.g.,* DAVID L. SHAPIRO, FEDERALISM: A DIALOGUE 85, 103 (1995); Burch, *supra* note 413, at 685–86; Michael W. McConnell, *Federalism: Evaluating the Founders' Design*, 54 CHI. L. REV. 1484, 1498–99 (1987).

425. *E.g.,* Class Action Fairness Act of 2005 § 2(a)–(b), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.); *Agenda Book*, ADVISORY COMM. ON CIVIL RULES 39–41 (Apr. 9–10, 2015), http://www.uscourts.gov/rules-policies/archives/agenda-books/advisory-committee-rules-civil-procedure-april-2015 [https://perma.cc/P23C-7V4A]; Jeffrey D. Koelemay,

are adaptive, resilient, and likely to withstand these adjustments. Thus, enhancing functionality within multidistrict litigation hinges not on top-down rulemaking or external legislative reforms, but in harnessing the power that already lies within the system itself: competition. The plaintiffs' bar is competitive and aggressive, but judicial selection methods and deference to repeat players have dampened open rivalry by rewarding cooperation. Dissenters are more likely to be shunned and ostracized than rewarded, particularly if their objections could derail a lucrative settlement. Consequently, the question becomes how to implement adaptive adjustments that could capitalize on competitive forces already in play, not how to coerce an unlikely paradigm shift.

Accordingly, this Article draws from basic economic principles to reinvigorate competition throughout the multidistrict proceeding. At the outset, lawyers jockey to become the monopoly through competitive selection processes. Allowing challengers to presumptively join or replace leaders who fail to recognize and address structural conflicts of interest incentivizes those boxed out of leadership roles to police conflicts midstream. So, too, does enabling external state-court competition. Carefully hewing to quantum meruit principles can distinguish between compensable common benefits and non-compensable spillovers to justly tax state lawyers without deterring them from developing and pursuing their own cases. After settlement and beyond, tethering leadership's common-benefit fees to the results they actually obtain for particular claimants may require longer waits or interim fee distributions, but it ultimately promotes fidelity in the agency relationship. And if claimants are dissatisfied with the settlement, giving them the freedom to return to their court of origin for trial gives them bargaining leverage both inside the multidistrict proceeding and with the defendant.

In sum, the point is not that repeat players are inherently bad, but rather that their self interest can takeover if left unchecked—and there is no check. When repeat players oligopolize most leadership roles across multidistrict proceedings and then exercise monopolistic control over plaintiffs' claims in a single proceeding, that dominance needs balance. Without counterweights and accountability, the line between deals that claimants can't refuse because they are simply too good to pass up and those they can't refuse in *The Godfather* sense gets pushed further into Corleone territory.

---

*Bill to Curb Class Suits Clears Committee; Civil Rights Plaintiffs Thrown a Bone*, Class Action Litig. Rep. (BNA) No. 16, at 718 (June 24, 2015).

## TABLE A1: AGGREGATE SETTLEMENTS OCCURRING
## WITHIN THE DATASET

The following table includes the aggregate settlements that occurred as of July 15, 2016, for the seventy-three products-liability and sales practice cases that were pending on the Multidistrict Litigation Docket as of May of 2013.[426] The settlements reviewed for this Article are indicated in bold.

| MDL Number | MDL Name | Consolidation Date | First Settlement Date | Class-Action Settlement | Publicly Available |
|---|---|---|---|---|---|
| 875 | Asbestos | 7/29/91 | 1980s | No | No |
| 986 | Factor VII or IX Concentrate Blood Prods. | 12/7/1993 | 5/8/1997 | Yes | Yes |
| 1203 | Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) | 1/6/1998 | 1/3/2002 | Yes | Yes |
| **1355** | **Propulsid** | **8/7/2000** | **4/30/2004** | **No** | **Yes** |
| 1431 | Baycol | 12/18/01 | 6/30/2005 | No | No |
| **1657** | **Vioxx** | **2/16/2005** | **11/9/2007** | **No** | **Yes** |
| 1742 | Ortho Evra | 3/1/2006 | 10/13/2008 | No | No |
| 1836 | Mirapex | 6/22/2007 | 2/29/2009 | No | No |
| 1909 | Gadolinium Contrast Dyes | 2/29/2008 | 4/15/2009 | No | No |
| 1845 | ConAgra Peanut Butter | 6/17/2007 | 5/29/2009 | No | No |
| 1763 | Human Tissue | 6/13/2007 | 1/30/2010 | No | No |
| 1871 | Avandia | 6/11/07 | 6/1/2010 | No | No |
| 2004 | Mentor Corp. ObTape | 12/3/08 | 6/8/2010 | No | No |
| 1928 | Trasylol | 4/7/2008 | 7/6/2010 | No | No |
| 1967 | Bisphenol-A Polycarbonate Plastic | 8/13/2008 | 1/3/2011 | Yes | Yes |
| 1873 | FEMA Trailer Formaldehyde | 10/24/2007 | 3/14/2011 | Yes | Yes |
| 1842 | Kugel Mesh Hernia Patch | 6/22/2007 | 7/1/2011 | No | No |
| 1953 | Heparin | 6/6/2008 | 12/1/2011 | No | No |
| 2188 | Apple iPhone 4 Marketing & Sales Practices | 10/8/2010 | 1/1/2012 | Yes | Yes |
| 2179 | Deepwater Horizon | 8/10/2010 | 4/18/2012 | Yes | Yes |
| 2308 | Sketchers Toning Shoe | 12/19/2011 | 5/02/2012 | Yes | Yes |
| 2023 | Bayer Corp. Combination Aspirin | 4/14/2009 | 5/16/2012 | Yes | Yes |
| 1507 | Prempro | 3/4/2003 | 6/8/2012 | No | No |
| 2047 | Chinese Drywall | 1/13/2010 | 6/14/2012 | Yes | Yes |
| 1958 | Zurn Pex Plumbing | 8/21/2008 | 10/15/2012 | Yes | Yes |
| 2284 | Imprelis Herbicide | 10/20/2011 | 10/19/2012 | Yes | Yes |
| 1943 | Levaquin | 6/13/2008 | 10/30/2012 | No | No |
| 2223 | Navistar Diesel Engine | 4/13/2011 | 11/1/2012 | Yes | Yes |

---

426. A full list of cases included in the database appears in Burch & Williams, *supra* note 43 (manuscript at Appendix).

| MDL Number | MDL Name | Consolidation Date | First Settlement Date | Class-Action Settlement | Publicly Available |
|---|---|---|---|---|---|
| 2151 | Toyota Motor Corp. Unintended Acceleration | 4/9/2010 | 12/26/2012 | Yes | Yes |
| 2092 | Chantix (Varenicline) | 10/1/2009 | 1/15/2013 | No | No |
| **2100** | **Yasmin & Yaz (Drospirenone)** | **10/1/2009** | **3/15/2013** | **No** | **Yes** |
| 2372 | Watson Fentanyl Patch | 8/7/2012 | 6/4/2013 | No | No |
| 2233 | Porsche Plastic Coolant Tubes | 5/23/2011 | 7/26/2013 | Yes | Yes |
| **2197** | **DePuy ASR Hip Implant** | **12/3/2010** | **11/11/2013** | **No** | **Yes** |
| **1789** | **Fosamax** | **11/21/2011** | **12/9/2013** | **No** | **Yes** |
| **2325** | **American Medical Systems** | **2/7/2012** | **4/30/2013** | **No** | **Semi[427]** |
| 2008 | Land Rover LR3 Tire Wear | 2/23/2009 | 5/30/2013 | Yes | Yes |
| **2391** | **Biomet Magnum Hip Implant** | **10/2/2012** | **1/31/2014** | **No** | **Yes** |
| **1964** | **NuvaRing** | **8/22/2008** | **2/7/2014** | **No** | **Yes** |
| 1629 | Neurontin | 10/26/2004 | 5/30/2014 | Yes | Yes |
| 2385 | Pradaxa | 8/8/2012 | 8/13/2014 | No | No |
| 2387 | Coloplast Corp. Pelvic Support Sys. | 8/6/2012 | 9/22/2014 | No | No |
| 2333 | MI Windows & Doors | 4/23/2012 | 12/24/2014 | Yes | Yes |
| 2419 | New England Compounding Pharmacy | 2/12/2013 | 2/13/2015 | Bankr.[428] | Yes |
| 2283 | Building Materials Corp. of Am. | 10/11/2011 | 4/22/2015 | Yes | Yes |
| 2327 | Ethicon, Inc. Pelvic Repair | 2/7/2012 | 3/10/2015 | No | No |
| **2299** | **Actos (Pioglitazone)** | **12/29/2011** | **4/29/2015** | **No** | **Yes** |
| 2187 | C.R. Bard, Inc. Pelvic Repair Sys. | 10/12/2010 | 6/23/2015 | No | No |
| 2326 | Boston Scientific Corp. Pelvic Repair Sys. | 2/7/2012 | 12/7/2015 | No | No |
| 2316 | Ford Motor Co. Spark Plug & 3-Valve Engine | 2/8/2012 | 1/26/2016 | Yes | Yes |
| 2327 | Ethicon, Inc. Pelvic Repair Sys. | 2/7/2012 | 1/27/2016 | No | No |
| **2158** | **Zimmer Durom Hip Cup** | **9/9/2010** | **2/11/2016** | **No** | **Yes** |
| 2100 | Whirlpool Corp. Front Loading Washer | 12/20/2008 | 5/11/2016 | Yes | Yes |

427   This settlement was included as an exhibit to a Securities and Exchange Commission filing; some confidential parts of it were redacted. Endo Health Sols., Inc., Master Settlement Agreement (Form 8-K EX-10.144) (Aug. 6, 2013). The agreement is between American Medical Systems and Freese & Goss, PLLC and Matthews & Associates. *Id.*

428   New England Compounding Pharmacy is in the midst of bankruptcy proceedings, so the settlement is a bankruptcy trust. *In re* New Eng. Compounding Pharmacy, Inc., 544 B.R. 724, 733 (Bankr. D. Mass. 2016).

## TABLE A2: REPEAT PLAINTIFFS' ATTORNEYS' PARTICIPATION IN NON-CLASS SETTLEMENTS

The following table includes a list of the highest level repeat player plaintiffs' attorneys (based on their number of appearances within the dataset) and whether they participated in any of the nine multidistrict proceedings that resulted in a publicly available non-class settlement.

| Attorney | Total No. Leadership Appearances | Total No. MDL Appearances | Propulsid | Vioxx | Yasmin/Yaz | DePuy ASR | Fosamax (1789) | Biomet | NuvaRing | Actos | American Medical Systems | Zimmer Durom Hip Cup |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arsenault, Richard | 21 | 18 | Yes | Yes | No | Yes | No | Yes | Yes | Yes | Yes | No |
| Seeger, Christopher | 21 | 16 | Yes | Yes | Yes | Yes | Yes | No | No | Yes | No | Yes |
| Nast, Dianne | 19 | 14 | No | Yes | Yes | No | No | No | No | Yes | Yes | No |
| Becnel, Jr., Daniel | 14 | 14 | Yes | No | Yes | No | No | No | No | No | No | No |
| Parker, Jerrold | 11 | 11 | No | No | No | Yes | No | No | No | Yes | Yes | No |
| Robinson, Jr., Mark | 14 | 10 | No | Yes | Yes | Yes | No | No | No | Yes | No | No |
| Conroy, Jayne | 12 | 10 | No | No | No | Yes | No | No | No | Yes | Yes | No |
| Parfitt, Michelle | 11 | 10 | No | No | No | No | Yes | No | No | No | Yes | No |
| Levin, Arnold | 15 | 9 | Yes | Yes | Yes | No | No | No | No | No | No | No |
| London, Michael | 14 | 9 | No | No | Yes | Yes | No | No | No | No | No | No |
| Thompson III, Fred | 12 | 8 | No | No | No | No | No | No | No | No | Yes | No |
| Lanier, W. Mark | 11 | 8 | No | No | No | Yes | No | Yes | No | Yes | No | No |
| Shkolnik, Hunter | 9 | 8 | No | No | No | No | No | No | Yes | No | Yes | No |
| Crump, Martin | 8 | 8 | No | No | No | No | No | No | No | No | Yes | No |
| Restaino, John | 10 | 7 | No | No | No | No | No | No | No | No | Yes | No |
| Cartmell, Thomas | 8 | 7 | No | No | No | No | No | No | No | No | Yes | No |
| Flowers, Peter | 8 | 7 | No | No | No | No | No | Yes | No | No | Yes | No |
| DeBartolomeo, A.J. | 7 | 7 | No | No | Yes | No | No | No | No | Yes | Yes | No |
| Flaherty, Yvonne | 7 | 7 | No | No | No | No | No | No | Yes | No | Yes | No |
| Osborne, Joseph | 7 | 7 | No | No | No | No | No | Yes | No | No | Yes | No |
| Dugan, II, James | 7 | 7 | No | Yes | No | No | Yes | No | No | No | No | No |
| Matthews, David | 7 | 7 | No | No | No | No | No | No | No | No | Yes | No |
| Meadow, Richard | 7 | 7 | No | No | Yes | No | No | No | No | No | Yes | No |

| Attorney | Total No. Leadership Appearances | Total No. MDL Appearances | Propulsid | Vioxx | Yasmin/Yaz | DePuy ASR | Fosamax (1789) | Biomet | NuvaRing | Actos | American Medical Systems | Zimmer Durom Hip Cup |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cabraser, Elizabeth | 10 | 6 | No | Yes | No | No | No | No | No | No | No | No |
| Aylstock, Bryan | 9 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Zonies, Joseph | 7 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Anapol, Thomas | 7 | 6 | No | No | No | Yes | No | Yes | No | No | Yes | No |
| Salim, Robert | 7 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Abrams, Rachel | 6 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Blizzard, Edward | 6 | 6 | No | No | No | Yes | No | No | No | No | Yes | No |
| Oliver, Alyson | 6 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Monsour, Doug | 6 | 6 | No | No | No | No | No | No | No | No | Yes | No |
| Climaco, John | 6 | 6 | No | No | No | No | No | Yes | No | No | No | No |
| Placitella, Christopher | 6 | 6 | No | No | No | Yes | No | No | No | No | Yes | No |
| Garrard, III, Henry | 11 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Denton, Roger | 9 | 5 | No | Yes | No | No | No | No | Yes | No | No | No |
| Chaffin, Eric | 7 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Love, Scott | 7 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Potts, Derek | 7 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Burnett, Jr., Riley | 6 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Mueller, Mark | 6 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Alonso, Andres | 6 | 5 | No | No | Yes | Yes | No | No | No | No | No | No |
| Clarke, Clayton | 6 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Grand, Jeff | 6 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Papantonio, J. Michael | 6 | 5 | Yes | No | Yes | No | No | No | No | No | No | No |
| Barrios, Dawn | 6 | 5 | Yes | Yes | No | No | No | No | No | Yes | No | No |
| Copeland, Erin | 5 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Goetz, Michael | 5 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Hauer, Stacy | 5 | 5 | No | No | No | No | No | Yes | No | No | Yes | No |
| Maniatis, Victoria | 5 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Miller, Michael | 5 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Robins, III, Bill | 5 | 5 | No | No | No | No | No | No | No | No | Yes | No |
| Saunders, Joseph | 5 | 5 | No | No | No | No | No | Yes | No | No | Yes | No |
| Skikos, Steven | 6 | 4 | No | No | Yes | Yes | No | No | No | No | No | No |
| Bell, Harry | 5 | 4 | No | No | No | No | No | No | No | No | Yes | No |

**A3: Pocket Guide for Leadership Appointment
and Compensation**

*Timing of Appointments (Interim and Semi-permanent Leaders):*
- Appoint interim leaders to serve until conflicts of interest can be identified.[429]

*Required Disclosures:*
- All financing arrangements (between attorneys, banks, financiers, etc.) should be disclosed in camera to the judge or special master.[430]

*Selection Process:*
- Open, written application process with no presumption toward reappointing interim counsel. Appendix A4 includes a sample leadership application form,[431] and A5 contains a scoring sheet.
- Allow applicants to air objections confidentially to a special master and judicial clerks through their applications and evidentiary hearings.[432]

*Selection Criteria and Goals:*
- Aim to appoint no more than five to six leaders to serve on the steering committee (this number includes lead counsel).[433]
- Seek qualified attorneys with diverse training and expertise who will be willing to dissent over non-routine, substantive tasks.[434]
- Consider applicants' willingness to seek competitive bids from complex settlement administrators who facilitate data management, lien resolution, and claims administration as well as their willingness to make those payments and costs transparent to other plaintiffs' attorneys.
- Ensure that claimants with structural conflicts have separate representation on the leadership committee[435] and that, collectively, leaders can finance the litigation.[436]

---

429. Burch, *supra* note 41, at 125–26.

430. *E.g.*, *In re* Blue Cross Blue Shield Antitrust Litig., No. 2:13-cv-20000-RDP (N.D. Ala. Feb. 28, 2013) (order appointing plaintiffs' liaison counsel and inviting applications for plaintiffs' leadership committee positions). For additional information, see Burch, *supra* note 29, at 1331–32; Burch, *supra* note 41, at 123–25.

431. See *supra* Part III.A.1 for a discussion of competitive selection processes and criteria.

432. Burch, *supra* note 41, at 126; *supra* Part III.A.2.

433. *Supra* note 337 and accompanying text.

434. *Supra* Part III.A.1.

435. Burch, *supra* note 41, at 122–23; *supra* Part II.D.2 (discussing concerns of adequate representation); *supra* Part III.A.3 (appointing and removing leaders based on structural conflicts).

436. Burch, *supra* note 41, at 123–25.

*Adding or Replacing Leaders:*
- If a leadership challenger successfully demonstrates that a neglected structural conflict exists and that her appointment can alleviate it, then, depending on the conflict, the challenger has created a presumption that she should either serve alongside or replace current leadership.[437] Sample language for such an order is included in Appendix A6.

*Common Benefit Assessment:*
- Common-benefit orders should designate presumptive holdback amounts and make clear that all final common-benefit fee awards shall be judicially allocated on a quantum meruit basis that ties fees to the amounts actually awarded to claimants.[438] Percentages awarded should be calculated on the gross amounts awarded to plaintiffs after subtracting costs. Judges (or special masters) might place claimants or lawyers into various presumptive fee categories to aid in this task.
- Consider pricing packages for state litigants who want to access some, but not all, federal work product.[439]
- Pay common-benefit awards to attorneys litigating in state court who confer benefits on multidistrict plaintiffs (through significant trial victories, for example).[440]
- If lead lawyers abuse their fiduciary duties toward certain claimants, those claimants should not pay common-benefit fees.[441]
- Common-benefit orders should not escalate fee and cost assessments based on the timing of plaintiffs' attorneys consent to the assessment.[442]
- Because common-benefit funds are judicially created, they should be judicially awarded. Attempts to contract around orders via a master settlement agreement should be viewed with careful attention to the incentives that animated the agreements and to attorneys' ethical obligations.
- Fee-transfer agreements are inappropriate for attorneys with cases pending in the multidistrict proceeding, but may be used

---

437. *Supra* Part III.A.3.

438. Burch, *supra* note 41, at 128–35; *supra* Part III.B.1.

439. *Supra* Part III.B.2.

440. *Supra* Part III.B.2.

441. Burrow v. Arce, 997 S.W.2d 229, 240 (Tex. 1999) (holding that "a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client"); *supra* notes 164–182 and accompanying text (discussing latecomer provisions).

442. *Supra* Part II.B.1.

to tailor pricing packages for state-court attorneys who want to access some but not all of the leadership's work product.[443]

*Automatic Suggestion of Remand:*

- Issue a standing order as part of the initial case management order indicating the court will suggest that the Panel remand non-settling cases to their courts of origin after a master settlement.[444] Sample language is included in Appendix A6.

## A4: SAMPLE LEADERSHIP APPLICATION FORM[445]

Applications for leadership positions should respond to each of the following questions by [date]. The information provided will be submitted in camera for confidential review by the judge or appointed special master.

1. Using the template below, please provide a summary list of all multidistrict litigations in which you or your law firm have had involved clients in the past five years (an example follows). Include:

    a. the multidistrict litigation's subject matter (products liability, antitrust, etc.);

    b. whether you held a leadership role (plaintiffs' steering committee, discovery committee, etc.), and, if so, your position;

    c. whether others in your firm held a leadership role;

    d. which of those multidistrict litigations are currently ongoing (please include these at the top of the list);

    e. for the litigations that have been resolved through a non-class master settlement agreement, indicate the average award paid to claimants (in each category, if applicable) if known, what percentage of your firm's clients agreed to the settlement, and what percentage of those clients recovered money through the claims process;

    f. and, if you or your firm served in a leadership role, the final percentage of the common-benefit fund lead lawyers requested for fees and costs, what percentage the court awarded, and the amounts awarded to your firm for fees and costs.

---

443. Burch, *supra* note 41, at 106–09; *supra* Part III.B.2.

444. *Supra* Part III.C.

445. Details explaining the rationales behind this form can be found in Burch, *supra* note 41, at 120–28.

| MDL Number and Status | Subject Matter | Leadership Role | Non-class Master Settlement Outcomes | Final Common-Benefit fee |
|---|---|---|---|---|
| 16-md-00001 (ongoing) | Products liability | • Personal (discovery committee)<br>• Firm (PSC appointment) | • Yes, resolved through master settlement. $4000/category A claimants; $6000/category B claimants<br>• 80% of firm clients settled<br>• 98% of those settling clients recovered money | • 6% fee and 2% costs requested<br>• 4% fee and 2% costs awarded<br>• Total amount of fees and costs received by your firm |

2. To the extent that you have subject matter expertise or experience handling mass actions that is not reflected in your response to number 1, please describe it briefly in no more than one page. Your response should highlight organization, writing, communication, leadership, and deposition skills.

3. Please identify any structural conflicts[446] that currently exist between plaintiffs or are likely to arise during the course of the litigation.

4. Please list the injuries and claims alleged by all your current clients (whether in state or federal court) and their states of domicile.

5. Please explain how you plan to finance the suit and disclose (in camera) any and all financial arrangements that you have made or anticipate making to fund your firm's financial contribution to this suit, whether between plaintiffs' attorneys, banks, vendors, or third-party financiers.

6. Please disclose any and all relationships with third-party vendors and any pricing structures or proposals that those vendors can provide for managing pleadings, discovery, documents, and claims processes in a cost-effective way.

7. Is there anyone with involved clients with whom you would prefer not to work if selected for a leadership role? If so, please explain.

---

446. That is, a conflict of interest either between the "claimants and the lawyers who would represent claimants on an aggregate basis" or "among the claimants themselves that would present a significant risk that the lawyers for claimants might skew systematically the conduct of the litigation so as to favor some claimants over others on grounds aside from reasoned evaluation of their respective claims or to disfavor claimants generally vis-à-vis the lawyers themselves." PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.07(a) (AM. LAW INST. 2010).

8. Is there anyone whom you feel would be particularly good in a given role? If so, please explain.

Note that numbers 7 and 8 can be answered orally in confidential meetings with the special master.

## A5: LEADERSHIP APPLICANT SCORING SHEET

Substantial research suggests that certain selection methods can decorrelate error and overcome decisionmaking biases, such as the halo effect, by compiling information from multiple, independent evidentiary sources.[447] As such, this form is designed for special masters, judicial clerks, and judicial assistants to use in evaluating leadership application forms (the diversity of perspectives enhances accuracy).

Instructions:

To avoid influencing one another and spreading biases, scorers should independently review the applications, collectively meet with the applicants, and allow them opportunities to confidentially object to one another, and then, before discussing them, independently rate the applicant's following traits on a scale of 1 (very weak) to 5 (very strong). Scorers should rate each trait sequentially. After all traits are scored for all candidates, scores should be tabulated.[448] Candidates with the highest scores should comprise the presumptive slate, though subsequent discussion may affect the selection of those with ties or scores at the margin. Judges can then make any necessary adjustments or substitutions to address conflicts of interest.[449]

Applicant's Name: _____

____ (a) Organization skills

____ (b) Leadership or negotiation skills

____ (c) Writing and deposition skills (or willingness to delegate to skilled others)

---

447. DANIEL KAHNEMAN, THINKING, FAST AND SLOW 84–85 (2011).

448. Time and again, research suggests "to maximize predictive accuracy, final decisions should be left to formulas, especially in low-validity environments"—not experts. *Id.* at 225–26. Simple formulas that assign equal weights to all relevant predictors using common sense "are often very good predictors of significant outcomes." *Id.* at 226.

449. For an overview of Daniel Kahneman's research in this area, see Gus Lubin, *Nobel Laureate Says There's a Better Way to Make Hiring Decisions*, BUSINESS INSIDER (Jan. 9, 2013, 12:23 PM), http://www.businessinsider.com/daniel-kahneman-on-hiring-decisions-2013-1 [https://perma.cc/67E8-XFJE].

_____ (d) Likelihood of dissenting or objecting as to how other leaders perform substantive tasks (e.g., crafting legal arguments, structuring settlements)

_____ (e) Dedication to client outcomes

_____ (f) Financing ability

_____ (g) Cognitive diversity (unique but relevant experiences, skills, analytical tools)

_____ (h) Close your eyes. Try to imagine the applicant in a leadership position, and assign a score on a scale of 1 (weak) to 5 (strong).

_____ Sum

## A6: SAMPLE ORDERS SUGGESTING REMAND AND REPLACING LEADERS

As part of the initial case management order, judges might include the following additional language:

**ADDITIONS TO OR REPLACEMENT OF PLANTIFFS' LEADERSHIP**—The Court intends to appoint a Plaintiffs' Steering Committee(s) and Lead Counsel to conduct and coordinate pretrial litigation. As part of the leadership application process, the Court has requested applicants to identify known structural conflicts of interest. Plaintiffs' leadership owes a fiduciary duty to all plaintiffs in this proceeding. Thus, if after the appointment an attorney successfully demonstrates that a neglected structural conflict[450] exists and that her appointment can alleviate it, then, depending on the conflict, the challenger has created a presumption that she should either serve alongside or replace current leadership. Should challengers replace a current leader, the incumbent might still apply for common-benefit fees based on quantum meruit principles.

**SUGGESTION OF REMAND**—Should the parties reach a master settlement, the Court will automatically suggest that the Judicial Panel on Multidistrict Litigation remand non-settling civil actions transferred to this Court for consolidated pretrial purposes that have provided basic evidentiary information about their claim. If a master settlement occurs, the Court will, without motion from the parties,

---

450. That is, a conflict of interest either between the "claimants and the lawyers who would represent claimants on an aggregate basis" or "among the claimants themselves that would present a significant risk that the lawyers for claimants might skew systematically the conduct of the litigation so as to favor some claimants over others on grounds aside from reasoned evaluation of their respective claims or to disfavor claimants generally vis-à-vis the lawyers themselves." PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.07(a) (AM. LAW INST. 2010).

issue a suggestion of remand that includes an appendix of cases to be remanded to the indicated transferor courts. At that time, if counsel believes that an error has been made in the Appendix, they should notify the Court in writing within fourteen (14) days of that Suggestion of Remand so that this Court, if persuaded by the asserted error, can notify the Panel.