IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

IN RE:   ETHICON INC.
PELVIC REPAIR SYSTEMS
PRODUCT LIABILITY LITIGATION                 MDL No. 2327

THIS DOCUMENT RELATES TO:

Cases Identified in Exhibit A
attached hereto

ORDER ADOPTING
MEMORANDUM OPINION AND ORDER
(*Daubert* ruling re: Brian Parker, M.D.)

On October 20, 2017, plaintiffs filed a Notice of Adoption of Prior *Daubert* Motion of Brian Parker, M.D. for Wave 6. [ECF No. 4830]. The court **ORDERS** that the Memorandum Opinion and Order (*Daubert* Motion re: Brian Parker, M.D.) [ECF No. 6239] entered on July 19, 2018 as to the Ethicon Wave 4 cases is **ADOPTED** in the Wave 6[1] cases identified in Exhibit A. The Memorandum Opinion and Order (*Daubert* Motion re: Brian Parker, M.D.) is attached hereto as Exhibit B.

The court **DIRECTS** the Clerk to file a copy of this Order Adopting Memorandum Opinion and Order in 2:12-md-2327 and in the Ethicon Wave 6 cases identified in the Exhibit attached hereto.

ENTER:   July 27, 2018

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

[1] On Exhibit A, I have marked through cases that are closed on the inactive docket or assigned to another District Judge and any cases that could not be identified because of an error in the style or case number.

# EXHIBIT A

| | |
|---|---|
| ~~Terry, Patricia~~ | ~~2:12-cv-08140~~ |
| ~~Garcia, Caira~~ | ~~2:12-cv-08956~~ |
| ~~Hylton, Mary~~ | ~~2:12-cv-09098~~ |
| ~~Cayer, Diane~~ | ~~2:12-cv-09976~~ |
| ~~Jimenez, Ellen~~ | ~~2:13-CV-01108~~ |
| ~~Davis, Julie Ann~~ | ~~2:13-cv-01246~~ |
| Evans, Deborah | 2:13-cv-01521 |

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

IN RE: ETHICON INC.
PELVIC REPAIR SYSTEMS
PRODUCT LIABILITY LITIGATION          MDL No. 2327

THIS DOCUMENT RELATES TO:

Cases Identified in the Exhibit
Attached Hereto

MEMORANDUM OPINION AND ORDER
(*Daubert* Motion re: Brian Parker, M.D.)

Pending before the court is the Plaintiff's Motion to Exclude or Otherwise Limit the Opinions and Testimony of Defense Expert Brian Parker, M.D. [ECF No. 3672] filed by the plaintiffs on April 13, 2017. The Motion is now ripe for consideration because briefing is complete.

I. Background

This case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI"). In the seven MDLs, there are more than 16,000 cases currently pending, approximately 10,000 of which are in this MDL, which involves defendants Johnson & Johnson and Ethicon Inc. (collectively "Ethicon"), among others.

In this MDL, the court's tasks include "resolv[ing] pretrial issues in a timely and expeditious manner" and "resolv[ing] important evidentiary disputes." Barbara

J. Rothstein & Catherine R. Borden, Fed. Judicial Ctr., *Managing Multidistrict Litigation in Products Liability Cases* 3 (2011). To handle motions to exclude or to limit expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the court developed a specific procedure. In Pretrial Order ("PTO") No. 243, the court instructed the parties to file only one *Daubert* motion per challenged expert, to file each motion in the main MDL—as opposed to the individual member cases—and to identify which cases would be affected by the motion. PTO No. 243, at 4.[1]

## II. Preliminary Matters

Before plunging into the heart of the Motion, a few preliminary matters need to be addressed.

I am compelled to comment on the parties' misuse of my previous *Daubert* rulings on several of the experts offered in this case. *See generally Sanchez v. Bos. Sci. Corp.*, No. 2:12-cv-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501 (S.D. W. Va. 2014); *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658 (S.D. W. Va. 2014). The parties have, for the most part, structured their *Daubert* arguments as a response to these prior rulings, rather than an autonomous challenge to or defense of expert testimony based on its reliability and relevance. In other words, the parties have comparatively examined expert testimony

---

[1] The plaintiff identified in the Wave 4 case affected by this Motion and attached as Exhibit A [ECF No. 3672-1], has been attached to this Memorandum Opinion and Order. At the time of transfer or remand, the parties will be required to designate relevant pleadings from MDL 2327, including the motion, supporting memorandum, response, reply, and exhibits referenced herein.

and have largely overlooked *Daubert*'s core considerations for assessing expert testimony. Although I recognize the tendency of my prior evidentiary determinations to influence subsequent motions practice, counsels' expectations that I align with these previous rulings when faced with a different record are misplaced, especially when an expert has issued new reports and given additional deposition testimony.

Mindful of my role as gatekeeper for the admission of expert testimony, as well as my duty to "respect[ ] the individuality" of each MDL case, *see In re Phenylpropanolamine Prods. Liab. Litig.*, 460 F.3d 1217, 1231 (9th Cir. 2006), I refuse to credit *Daubert* arguments that simply react to the court's rulings in *Sanchez* and its progeny. Indeed, I feel bound by these earlier cases only to the extent that the expert testimony and *Daubert* objections presented to the court then are identical to those presented now. Otherwise, I assess the parties' *Daubert* arguments anew. That is, in light of the particular expert testimony and objections currently before me, I assess "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. Any departure from *Sanchez*, *Eghnayem*, or *Tyree* does not constitute a "reversal" of these decisions and is instead the expected result of the parties' submission of updated expert reports and new objections to the expert testimony contained therein.

Finally, I have attempted to resolve all possible disputes before transfer or remand, including those related to the admissibility of expert testimony pursuant to *Daubert*. Nevertheless, in some instances I face *Daubert* challenges where my

interest in accuracy counsels reserving ruling until the reliability of the expert testimony may be evaluated at trial. At trial, the expert testimony will be tested by precise questions asked and answered. The alternative of live *Daubert* hearings is impossible before transfer or remand because of the numerosity of such motions in these seven related MDLs. As these MDLs have grown and the expert testimony has multiplied, I have become convinced that the critical gatekeeping function permitting or denying expert testimony on decisive issues in these cases is best made with a live expert on the witness stand subject to vigorous examination.

In the course of examining a multitude of these very similar cases involving the same fields of expertise, I have faced irreconcilably divergent expert testimony offered by witnesses with impeccable credentials, suggesting, to me, an unreasonable risk of unreliability. The danger—and to my jaded eye, the near certainty—of the admission of "junk science" looms large in this mass litigation.

The parties regularly present out-of-context statements, after-the-fact rationalizations of expert testimony, and incomplete deposition transcripts. This, combined with the above-described practice of recycling expert testimony, objections, and the court's prior rulings, creates the perfect storm of obfuscation. Where further clarity is necessary, I believe it can only be achieved through live witness testimony— not briefing—I will therefore reserve ruling until expert testimony can be evaluated firsthand.

### III. Legal Standard

By now, the parties should be intimately familiar with Rule 702 of the Federal

Rules of Evidence and *Daubert*, so the court will not linger for long on these standards.

Expert testimony is admissible if the expert is qualified and if his or her expert testimony is reliable and relevant. Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597. An expert may be qualified to offer expert testimony based on his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Reliability may turn on the consideration of several factors:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592–94). But these factors are neither necessary to nor determinative of reliability in all cases; the inquiry is flexible and puts "principles and methodology" above conclusions and outcomes. *Daubert*, 509 U.S. at 595; *see also Kumho Tire Co. v. Carmichael*, 525 U.S. 137, 141, 150 (1999). Finally, and simply, relevance turns on whether the expert testimony relates to any issues in the case. *See, e.g., Daubert*, 509 U.S. at 591–92 (discussing relevance and helpfulness).

At bottom, the court has broad discretion to determine whether expert testimony should be admitted or excluded. *Cooper*, 259 F.3d at 200.

IV. Discussion

a. Warnings

5

Plaintiff claims Dr. Parker is not qualified to offer expert testimony about product warnings, which includes expert testimony about the adequacy of the relevant Instructions for Use ("IFU"). According to the plaintiff, Dr. Parker is not an expert in the development of warning labels and thus is not qualified to offer expert testimony about warnings. While an expert who is a urogynecologist—like Dr. Parker— may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant IFU, the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU. *Wise v. C. R. Bard, Inc.*, No. 2:12-cv-1378, 2015 WL 521202, at *14 (S.D. W. Va. Feb. 7, 2015). Dr. Parker does not possess the additional expertise to offer expert testimony about what an IFU should or should not include. Accordingly, Dr. Parker's expert testimony about these matters is **EXCLUDED** and plaintiff's Motion is **GRANTED** on this limited point.

In relation to the expert testimony about the adequacy of the IFU, Ethicon claims Dr. Parker is qualified to testify about whether certain risks were commonly known in the medical community. In my view, this is not the subject of the plaintiff's motion. The plaintiff's motion focuses on whether Dr. Parker is qualified to offer expert testimony about what should be included in or what may be excluded from an IFU. So I offer no opinion on whether Dr. Parker may testify about whether certain risks were common knowledge. However, an expert cannot testify about whether any risks should have been included in an IFU unless he or she possess additional expertise—expertise Dr. Parker does not possess.

6

### b. Design

The plaintiff claims Dr. Parker is not qualified to offer what they characterize as design opinions. But she does not explain or identify design opinions with sufficient specificity. This most recent wave of *Daubert* motions in this MDL is plagued with some confusion about what constitutes a design opinion. So some clarification is necessary before proceeding.

At first glance, it seems the plaintiff wants to prevent Dr. Parker from providing any opinions that even mention the word "design." But the mere utterance of a single word is not an incantation that transforms an opinion about one thing into something else.

A close, contextual reading of the transvaginal mesh cases where this issue has been raised before reveals the heart of the plaintiffs' objections. In this motion—and several others—the plaintiff argues that the expert at issue lacks the particularized skill, knowledge, experience, education, or training that is necessary to provide opinions about the process of designing a product. Opinions of this sort include, for example, opinions about pre-marketing product testing and product development. But upon review, I find Dr. Parker has not expressed any opinions about the process of designing a product. So the plaintiff's Motion is **DENIED as moot** on this very limited issue.

### c. Properties of the Mesh

Plaintiff seeks to exclude Dr. Parker's testimony as it relates to mesh properties, including degradation, cytotoxicity, pore-size and weight, and laser-cut

7

mesh versus mechanically cut mesh. Plaintiff argues that Dr. Parker lacks the qualifications to offer these opinions and that he fails to provide a reliable basis for his opinions.

As to qualifications, the plaintiff argues that Dr. Parker is not an expert designing mesh devices and, therefore, may not opine on the material properties of the TVT-O and TVT-S devices. But this does not render him unqualified to opine on mechanical properties. Dr. Parker is a board-certified urologist specializing in pelvic floor medicine and reconstructive surgery and has performed nearly 500 surgeries a year to treat POP and SUI. This extensive clinical experience qualifies Dr. Parker to opine on mesh's reaction to and effect on the human body. The plaintiff's Motion on this matter is **DENIED**.

### 1. Degradation

As to degradation, the plaintiff objects to Dr. Parker's statement that prolene sutures do not degrade, presumably attacking any comparison Dr. Parker may be making between prolene sutures and the TVT-O and TVT-S devices. He concludes, "if there was substantial degradation, we would have already seen a clinical problem arise in not only one but likely all of these surgical disciplines." Parker Report Ex. B, at 18 [ECF No. 3672-2]. The plaintiff arguse that these opinions are not reliable or scientifically sound.

On the one hand, Dr. Parker has based his opinion on his extensive clinical experience and a review of the medical and scientific literature, which, in the abstract, are reasonable bases on which to form an expert opinion. *See Kumho*, 526

U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

On the other hand, the court does not have enough information to judge the reliability or helpfulness of these particular clinical observations. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."). Although, Dr. Parker reviewed an extensive list of literature in forming his opinions generally, the court is not directed to specific support for the statements at issue or detail about Dr. Parker's methodology.

I am without sufficient information at this time to draw the fine line between reliable and unreliable expert testimony on mesh degradation based primarily on a doctor's clinical experiences *not* observing something. Accordingly, I **RESERVE** ruling until further testimony may be offered and evaluated firsthand at trial.

### 2. Cytoxicity

Ethicon does not address the alleged flaws in Dr. Parker's methodology regarding cytotoxicity and whether or not the polypropylene is inert. Plfs.' Mem. 8 [ECF No. 3674]. As the court will not raise counterarguments for Ethicon, Dr. Parker's testimony on cytoxicity is **EXCLUDED** and the plaintiff's Motion on this matter is **GRANTED**.

### 3. Contracture

9

The plaintiff seeks to exclude Dr. Parker's opinions regarding contracture of the mesh as unreliable. Ethicon acknowledges that Dr. Parker will opine that the mesh does not contract "in the way the plaintiffs' experts suggest," which Ethicon claims is based on his clinical experience and his review of studies that discuss in vivo changes to mesh. Defs.' Resp. 10 [ECF No. 3747]. Again, these are reliable bases on which to form an expert opinion in the abstract, the court is unable to judge the reliability of Dr. Parker's observations without more information about his methodology. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Accordingly, I **RESERVE** ruling until further testimony may be offered and evaluated firsthand at trial.

### 4. Pore Size and Weight Opinions

The plaintiff also challenges the reliability of Dr. Parker's opinions on pore-size and weight, specifically that macroporous mesh is ideal for proper tissue integration and that the mesh is not heavyweight. Plfs.' Mem. 9. Again, Ethicon responds that Dr. Parker will testify based on his clinical experience, his review of a document regarding pore size referred to in his report, his review of the medical literature relating to pore size and classification of mesh weight, studies of both characteristics, and other Ethicon documents. Resp. 12. Although personal experience and a review of the medical literature are reliable bases on which to form an expert opinion in the abstract, the court is unable to judge the reliability of Dr. Parker's observations without more information about his methodology. *See* Fed. R.

10

Evid. 702 advisory committee's note to 2000 amendment. Accordingly, I **RESERVE** ruling until further testimony may be offered and evaluated firsthand at trial.

### 5. Laser-Cut versus Mechanical-CUT TVT

Lastly, plaintiff seeks to exclude Dr. Parker's opinion that there is no clinically meaningful difference between laser-cut and mechanically cut mesh. Parker Report 21. Specifically, Ethicon argues that this opinion is consistent with his clinical experience and the medical literature. Again, although personal experience and a review of the medical literature are reliable bases on which to form an expert opinion in the abstract, the court is unable to judge the reliability of Dr. Parker's observations without more information about his methodology. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Accordingly, I **RESERVE** ruling until further testimony may be offered and evaluated firsthand at trial.

### V. Recurring Issues

Many of the *Daubert* motions filed in this MDL raise the same or similar objections.

One particular issue has been a staple in this litigation, so I find it best to discuss it in connection with every expert. A number of the *Daubert* motions seek to exclude FDA testimony and other regulatory or industry standards testimony. To the extent this Motion raises these issues it is **GRANTED in part** and **RESERVED in part** as described below.

I have repeatedly excluded evidence regarding the FDA's section 510(k) clearance process in these MDLs, and will continue to do so in these cases, a position

11

that has been affirmed by the Fourth Circuit. *In re C. R. Bard, Inc.*, 81 F.3d 913, 921–23 (4th Cir. 2016) (upholding the determination that the probative value of evidence related to section 510(k) was substantially outweighed by its possible prejudicial impact under Rule 403). Because the section 510(k) clearance process does not speak directly to safety and efficacy, it is of negligible probative value. *See In re C. R. Bard,* 81 F.3d at 920 ("[T]he clear weight of persuasive and controlling authority favors a finding that the 510(k) procedure is of little or no evidentiary value."). Delving into complex and lengthy testimony about regulatory compliance could inflate the perceived importance of compliance and lead jurors "to erroneously conclude that regulatory compliance proved safety." *Id.* at 922. Accordingly, expert testimony related to the section 510(k) process, including subsequent enforcement actions and discussion of the information Ethicon did or did not submit in its section 510(k) application, is **EXCLUDED**. For the same reasons, opinions about Ethicon's compliance with or violation of the FDA's labeling and adverse event reporting regulations are **EXCLUDED**. In addition to representing inappropriate legal conclusions, such testimony is not helpful to the jury in determining the facts at issue in these cases and runs the risk of misleading the jury and confusing the issues. Insofar as this Motion challenges the FDA-related testimony discussed here, the Motion is **GRANTED**.

A number of experts also seek to opine on Ethicon's compliance with design control and risk management standards. Some of this testimony involves the FDA's quality systems regulations, and some—likely in an attempt to sidestep my

anticipated prohibition on FDA testimony—involve foreign regulations and international standards. I find all of this proposed testimony of dubious relevance. Although these standards relate to how a manufacturer should structure and document risk assessment, the standards do not appear to mandate any particular design feature or prescribe the actual balance that must be struck in weighing a product's risk and utility. Nor is it clear that the European and other international standards discussed had any bearing on the U.S. medical device industry when the device in question was being designed.

Nevertheless, because the nuances of products liability law vary by state, I will refrain from issuing a blanket exclusion on design process and control standards testimony, whether rooted in the FDA or otherwise. Each standard must be assessed for its applicability to the safety questions at issue in this litigation, consistent with state law. I am without sufficient information to make these findings at this time. Accordingly, I **RESERVE** ruling on such matters until a hearing, where the trial judge will have additional context to carefully evaluate the relevance and potential prejudicial impact of specific testimony.

Similarly, I doubt the relevance of testimony on the adequacy of Ethicon's clinical testing and research, physician outreach, or particular product development procedures and assessments otherwise not encompassed by the above discussion. Again, such matters seem to say very little about the state of the product itself (i.e., whether or not it was defective) when it went on the market. But because the scope of relevant testimony may vary according to differences in state products liability law,

I **RESERVE** ruling on such matters until they may be evaluated in proper context at a hearing before the trial court before or at trial.

Additional—and more broad—matters also warrant mention. While some of these concerns may not apply to this particular expert, these concerns are raised so frequently that they are worth discussing here.

*First*, many of the motions seek to exclude state-of-mind and legal-conclusion expert testimony. Throughout these MDLs, the court has prohibited the parties from using experts to usurp the jury's fact-finding function by allowing testimony of this type, and I do the same here. *E.g.*, *In re C. R. Bard, Inc.*, 948 F. Supp. 2d 589, 611 (S.D. W. Va. 2013); *see also, e.g.*, *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("Inferences about the intent and motive of parties or others lie outside the bounds of expert testimony."). Additionally, an expert may not offer expert testimony using "legal terms of art," such as "defective," "unreasonably dangerous," or "proximate cause." *See Perez v. Townsend Eng'g Co.*, 562 F. Supp. 2d 647, 652 (M.D. Pa. 2008).

*Second*, and on a related note, many of the motions seek to prohibit an expert from parroting facts found in corporate documents and the like. I caution the parties against introducing corporate evidence through expert witnesses. Although an expert may testify about his review of internal corporate documents solely for the purpose of explaining the basis for his or her expert opinions—assuming the expert opinions

are otherwise admissible—he or she may not offer testimony that is solely a conduit for corporate information.

*Third*, many of the motions also ask the court to require an expert to offer testimony consistent with that expert's deposition or report or the like. The court will not force an expert to testify one way or another. To the extent an expert offers inconsistent testimony, the matter is more appropriately handled via cross-examination or impeachment as appropriate and as provided by the Federal Rules of Evidence.

*Fourth*, in these *Daubert* motions, the parties have addressed tertiary evidentiary matters like whether certain statements should be excluded as hearsay. The court will not exclude an expert simply because a statement he or she discussed may constitute hearsay. *Cf. Daubert*, 509 U.S. at 595. Hearsay objections are more appropriately raised at trial.

*Finally*, in some of the *Daubert* motions, without identifying the specific expert testimony to be exclude, the parties ask the court to prevent experts from offering other expert testimony that the moving party claims the expert is not qualified to offer. I will not make speculative or advisory rulings. I decline to exclude testimony where the party seeking exclusion does not provide specific content or context.

## VI. Conclusion

The court **DENIES in part**, **GRANTS in part**, and **RESERVES in part** the Plaintiff's Motion to Exclude or Otherwise Limit the Opinions and Testimony of Defense Expert Brian Parker, M.D. [ECF No. 3672].

The court **DIRECTS** the Clerk to file a copy of this Memorandum Opinion and Order in 2:12-md-2327 and in the Ethicon Wave 4 cases identified in the Exhibit attached hereto.

ENTER: July 19, 2018

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE