EXHIBIT E

C. Bryce Bowling, M.D.

```
 1        IN THE UNITED STATES DISTRICT CIRCUIT
       FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3
    IN RE: ETHICON INC., PELVIC      )  Master File
 4  REPAIR SYSTEM PRODUCTS LIABILITY )  No.
    LITIGATION                       )  2:12-MD-02327
 5  _____  )  MDL No. 2327
                                     )
 6  THIS DOCUMENT RELATES TO ALL     )  JOSEPH R. GOODWIN
    WAVE 8 AND SUBSEQUENT WAVE CASES )  U.S. DISTRICT JUDGE
 7  AND PLAINTIFFS                   )
                                     )
    _____  )
 8
 9  In Re:  General re
            Prolift/Prolift+M/Gynemesh &
10          TVT/TVT-Exact/TVT-O
11
12
                      ORAL DEPOSITION OF
13
                     C. Bryce Bowling, M.D.
14
                  Friday, September 28, 2018
15
                          9:00 A.M.
16
              University of Tennessee Medical Center
17
                       1930 Alcoa Highway
18
                      Knoxville, Tennessee
19
20
21
22
23
                     Georgette H. Mitchell
24              Registered Professional Reporter
```

C. Bryce Bowling, M.D.

| | |
|---|---|
| 1 | APPEARANCES OF COUNSEL: |
| 2 | ON BEHALF OF THE PLAINTIFF: |
| 3 | Ann Gayle, Esquire |
| | Aylstock, Witkin, Kreis & Overholtz, PLLC |
| 4 | 17 East Main Street |
| | Suite 200 |
| 5 | Pensacola, Florida 3202 |
| | 850.202.1010 |
| 6 | Agayle@awko.law.com |
| 7 | ON BEHALF OF THE DEFENDANTS: |
| 8 | Jordan N. Walker, Esq. |
| | Butler Snow LLP |
| 9 | 1020 Highland Colony Parkway |
| | Suite 1400 |
| 10 | Ridgeland, Mississippi 39157 |
| | 601.948.5711 |
| 11 | Jordan.walker@butlersnow.com |
| 12 | Also Present: |
| | (Telephonically) |
| 13 | |
| | James Lyle, Esq. |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

C. Bryce Bowling, M.D.

```
 1   cited in your report?
 2        A.     Same reason we cited the articles in the
 3   Prolift report.  If you look through there we tried our
 4   best to utilize randomized controlled trials and to use
 5   Cochrane reviews, give the highest level of scientific
 6   data that we could.
 7               We also tried to look for long term
 8   studies demonstrating ten plus years of follow-up with
 9   patients that have had midurethral slings.
10        Q.     Doctor, if you would look at Exhibit 7,
11   Page 5, Section 2, and I've highlighted there for your
12   ease of reference, Doctor, there is a sentence that
13   says plaintiffs' expert, I have reviewed the expert
14   statements of multiple plaintiffs' experts for both
15   case specific and general reports.
16               Do you see that, Doctor?
17        A.     Yes.
18        Q.     Doctor, what case specific reports did
19   you rely on in forming your opinions?
20        A.     Case specific reports.  They will be in
21   the reliance list.  I looked over expert opinions in
22   both general reports and case specific reports for
23   several of the cases that I was working on to see what
24   the plaintiffs' claims were regarding midurethral
```

C. Bryce Bowling, M.D.

```
 1    slings.
 2        Q.      And, Doctor, if you could turn to your
 3    reliance list for Exhibit 7, and indicate which cases
 4    you are working on that are the case specific reports
 5    that you relied on?
 6              MR. WALKER:  Object to form.
 7    BY MS. GAYLE:
 8        Q.      Doctor, you said your case specific
 9    reports that you relied on, that you did rely on them,
10    and that they should be in this list correct, Doctor?
11              MR. WALKER:  Object to form.
12              THE WITNESS:  Okay.  So when you say rely
13        on them, can you explain to me exactly what you
14        mean?
15    BY MS. GAYLE:
16        Q.      You said you have reviewed the expert
17    report statements of multiple plaintiffs' experts for
18    both case specific and general reports.
19              What I'm trying to get to, Doctor, is
20    which case specific reports you reviewed?
21        A.      Any that have been sent to me.  I've
22    reviewed everything that's been sent to me.
23        Q.      Do you recall what Waves, doctor?
24        A.      They would have all been Wave 8 or
```

C. Bryce Bowling, M.D.

```
 1      Q.      Okay.  Do you know Dr. Richard Ellkerman
 2   E-l-l-l-e-r-m-a-n?
 3      A.      I've heard the name.  I don't know who he
 4   is.  I don't know him personally.
 5      Q.      You cited an Ellkerman study in your
 6   report.
 7      A.      Which report?
 8      Q.      Good question, Doctor.  I'll withdraw the
 9   question, Doctor, because I don't know which report but
10   you don't know Dr. Ellkerman personally, correct?
11      A.      No.
12      Q.      And because you don't know him personally
13   you would not know whether or not he's a defense expert
14   for the defendants in this multi-district litigation,
15   would you?
16      A.      I don't know anything about him other
17   than his research.
18              (Exhibit 10 - Richard Ellkerman's reliance list.)
19   BY MS. GAYLE:
20      Q.      Doctor, I represent to you that he is an
21   expert that's been named in Wave 8 and he's tendered an
22   expert report, and I'm handing you what's been marked
23   as Exhibit 10 which is entitled Richard Ellkerman,
24   General Reliance List in Addition to Materials
```

C. Bryce Bowling, M.D.

```
 1   referenced in Report.
 2              Doctor, if you'd take your Exhibit 5 and
 3   your Exhibit 6 and compare them to Dr. Ellkerman's
 4   they're almost identical in formatting, font, exactly
 5   the same, including typographical errors.
 6              I believe counsel said earlier that they
 7   prepared the reliance list for you.  So since you
 8   didn't prepare it, would that be a possible explanation
 9   on why your report, your reliance list materials would
10   be identical to Dr. Ellkerman's?
11              MR. WALKER:  Objection to form.
12              THE WITNESS:  Again, I don't know about
13       Ellkerman's reliance list.  I didn't put the
14       reliance list together.  I did my own reports and
15       so I can't really speak to his reliance list.
16   BY MS. GAYLE:
17       Q.     So any type -- but you didn't copy his
18   reliance list, is that what you're saying?
19       A.     No, I didn't copy his reliance list.
20              MR. WALKER:  Object to form.
21   BY MS. GAYLE:
22       Q.     So you didn't type this reliance at
23   Exhibit 5 or 6 either, did you?
24              MR. WALKER:  Object to form.  He's
```

C. Bryce Bowling, M.D.

1      already testified.

2              THE WITNESS:  No, I think we made that

3      clear earlier.

4  BY MS. GAYLE:

5      Q.     Okay.  Great.  Butler Snow put that

6  together, right?

7              MR. WALKER:  Object to form.

8              THE WITNESS:  That's correct.

9      (Exhibit 11 - Dr. Ahmet Bedestani general

10      reliance list.)

11  BY MS. GAYLE:

12     Q.     Doctor, same thing with Dr. Bedestani,

13  B-e-d-e-s-t-a-n-i, Ahmet first name, A-h-m-e-t, General

14  Reliance List in Addition to Materials Referenced in

15  Report, I have marked that as exhibit number 11.

16             Again, Doctor, do you know that

17  particular doctor?

18     A.     No.

19     Q.     And you would not know whether or not

20  that doctor was an expert designated in this

21  litigation?

22     A.     No.

23     Q.     And again, any similarities between Dr.

24  Bedestani's reliance list, Exhibit 11, and yours at

C. Bryce Bowling, M.D.

```
 1   Exhibit 5 and 6 would also be something that you would
 2   not be familiar with?
 3              MR. WALKER:  Object to form.
 4              THE WITNESS:  You will have to speak with
 5       Butler Snow about that.  I don't get involved in
 6       other people's reliance list.
 7   BY MS. GAYLE:
 8       Q.     Okay.  And certainly you didn't cut and
 9   paste from this reliance list, correct?
10              MR. WALKER:  Object to form.  He's made
11       it crystal clear he did not put together the
12       reliance list.
13              MS. GAYLE:  Thank you, counsel.  I just
14       want to make sure that there's no -- you know, he
15       did say earlier that he put some, maybe some
16       materials.
17              So as long as you all put this together,
18       that's all I'm trying to get at.
19              MR. WALKER:  That's what has been
20       represented numerous times now on the record.
21              MS. GAYLE:  Thank you.
22       (Exhibit 21 - Supplemental reliance list.)
23   BY MS. GAYLE:
24       Q.     Doctor, while we're talking about the
```

C. Bryce Bowling, M.D.

```
 1   find --
 2              MS. GAYLE:  Go off the record.
 3              (Off record discussion.)
 4              THE WITNESS:  Actually I'm not going to
 5       speak on the apical because I don't have in my --
 6       in my most trusted data, which is the randomized
 7       controlled trials here and the Cochrane reviews, I
 8       don't have specific bullet points regarding
 9       apical.
10              I have them regarding anterior and
11       posterior which I've addressed no benefit to mesh
12       in the posterior compartment, but absolutely no
13       benefit to the mesh augmentation in the anterior
14       compartment.
15   BY MS. GAYLE:
16       Q.     Thank you, Doctor.  With regard to the
17   first bullet point, do you see that, Doctor?
18       A.     Yes.
19       Q.     Starting with mesh used in transvaginal
20   POP repair.  Do you agree with or disagree with that
21   statement?
22       A.     I disagree with that statement.
23       Q.     Can you briefly state why you disagree
24   with that?
```

C. Bryce Bowling, M.D.

```
 1   BY MS. GAYLE:
 2        Q.     So would you disagree with -- I'm sorry,
 3   Doctor.  So would you degree with this paragraph where
 4   they're talking about mesh contraction is a previously
 5   unidentified risk of transvaginal POP repair with mesh
 6   that has been reported in the published scientific
 7   literature under the adverse event reports to the FDA
 8   since the October 20th, 2008 FDA update public health
 9   notification?
10        A.     You know, I don't think mesh contraction
11   was a previously unidentified risk.  Mesh has been
12   around literally for decades and was FDA cleared to be
13   used in the human body back in the 1960s, and surgeons
14   have been aware of different types of complications
15   with any implantable material since that time.
16               So, no, I don't agree that it was a
17   previously unidentified risk.  I think that mesh
18   contraction has been known about for some time.  I
19   think that clinically relevant mesh contraction is not
20   really something that exists.
21               I think that you do have some contraction
22   of the mesh.  I think that that is a normal part of the
23   healing process that occurs in the immediate
24   postoperative period, but we have had several studies
```

C. Bryce Bowling, M.D.

1   A.      Well, you know, I don't really believe
2   that degradation occurs.  We have good scientific data
3   from last year that shows that what has been termed
4   degradation quote unquote in the past is not really
5   degradation of the mesh itself, but more of a cracked
6   layer of the formalin fixation process that occurs
7   after putting the mesh into formalin.  It's not an
8   actually degradation of the mesh.
9           We have data that looks at mesh weights
10  pre and post-insertion that shows that their weights
11  are the same.  You can't have degradation of a mesh
12  that doesn't lose weight.
13  Q.      And, Doctor, that study that you're
14  referring to is Thames, T-h-a-m-e-s; is that correct?
15  A.      That's correct.
16  Q.      And you have testified earlier this
17  morning that you haven't done any sort of, excuse me,
18  strike that.
19          You haven't published any sort of report
20  on degradation in a peer-reviewed journal, correct?
21  A.      I have not.
22  Q.      Doctor, does your experience with not
23  having any mesh complication patients or -- strike
24  that.

C. Bryce Bowling, M.D.

```
 1                 Does your experience as you've just
 2   testified with zero complications in your patients
 3   attributable to mesh shape some of the opinions that
 4   you might have using these products?
 5                 MR. WALKER:  Object to form.
 6                 THE WITNESS:  Well, first of all, I
 7        didn't say that I had zero complications.  I have
 8        an extremely low complication rate.
 9   BY MS. GAYLE:
10        Q.       Complications attributable to mesh,
11   Doctor.
12        A.       So again, if we're teasing this out and
13   saying how many complications do I have in my practice
14   that I would say the mesh caused that problem?  None.
15                 How many complications have I had in my
16   patients that I could attribute to something that I
17   messed up in the operating room or that the patient
18   messed up by not following restrictions or where a
19   piece of mesh was placed into an inappropriate patient
20   and referred to me for removal or revisions, those
21   patients exist.  My complication rate is very low.
22        Q.       And I'm just asking with regard to the
23   mesh complications, not a patient factor or improper --
24        A.       Well, they are mesh complications still.
```

```
 1   So I think we need to make sure that we're defining
 2   this appropriately.
 3           Whether or not I mess something up or
 4   another surgeon messes something up or the patient
 5   doesn't follow a restriction and they come back in with
 6   a complication from their mesh, you can still term that
 7   a mesh complication.  But do I look at the mesh and say
 8   this evil mesh caused this?  No, I don't.
 9       Q.   Okay.  Thank you, Doctor, for that
10   clarification.  And so you've seen zero where you would
11   say this evil mesh has caused this problem, correct?
12       A.   That's correct.
13           MR. WALKER:  Object to form.
14   BY MS. GAYLE:
15       Q.   Okay.  And does that experience help
16   shape your opinions, some of the opinions that you
17   might have using these types of products?
18           MR. WALKER:  Object to form.
19           THE WITNESS:  I think the products in my
20       hands are perfectly safe.
21   BY MS. GAYLE:
22       Q.   So that's a yes, that experience would
23   shape some of your opinions?
24       A.   If I -- well, look.  You know, it's a
```

C. Bryce Bowling, M.D.

```
 1    combination as we've stated several times today of my

 2    training, my background, my experiences, and what I

 3    have found in the medical literature that bring me back

 4    to the same statement every time that these products

 5    have been shown and effective for decades.

 6         Q.    And certainly, Doctor, if you were

 7    experiencing lots of or seeing lots of patients where

 8    you could say hey, this is evil, in your words, evil

 9    mesh could have caused those bucket of patients to have

10    problems, that might change your opinion on the

11    products?

12               MR. WALKER:  Object to form.

13               THE WITNESS:  No.  You know, if I was

14         having a multitude of patients come back into my

15         office with mesh complications, I would start to

16         re-evaluate myself and ask myself whether or not I

17         am skilled enough to be doing these procedures.

18    BY MS. GAYLE:

19         Q.    And you wouldn't attribute it at all to

20    anything about the mesh products?

21         A.    Based on my education, background,

22    experiences and review of the medical literature, no.

23         Q.    Doctor, you talked about the pore size in

24    your report and one of the questions I'd like to ask
```

C. Bryce Bowling, M.D.

```
 1    you is your knowledge about -- basically about the pore
 2    sizes that you talk about, and you've already said that
 3    you haven't published anything in a peer-reviewed
 4    journal regarding degradation.
 5               Have you published anything in a
 6    peer-reviewed journal regarding pore size?
 7        A.     I have not.
 8        Q.     You testified earlier that sometimes you
 9    look at it under a microscope, mesh, and sometimes you
10    have not looked at it under a microscope, correct?
11        A.     That's correct.
12        Q.     Before you were retained as an expert for
13    Ethicon did you ever talk about pore size to your
14    patients?
15        A.     Yes, actually I have.  I have told
16    several patients that the type of mesh that we use,
17    this is especially true of patients who come in after
18    they see one of these ridiculous commercials on TV.
19               Patients come in asking about mesh.  I
20    have told them that we have ample evidence pointing to
21    the long-term efficacy and safety of macroporous
22    polypropylene mesh and we have talked about the
23    differences between meshes that are macroporous and
24    meshes that are not.
```

1   Q.   What assurances are you talking about?

2   A.   Oh, well, again these TV commercials.
3   This is all plaintiff's counsel TV commercials that we
4   see that are making references to mesh migration and
5   references and innuendos that mesh can crawl around the
6   body and wreck havoc, and it's just a generalized term,
7   and I think if general -- if plaintiff's counsel and
8   plaintiff's expert want to come forward and say that
9   they don't believe that, well I'd be happy to hear it.

10   Q.   And, Doctor, again I'm just trying to get
11   to sort of the source of what you're referencing there
12   so --

13   A.   Well, I think my source is a combination
14   of seeing commercials on TV.  My source is being
15   deposed several times in the past by plaintiffs'
16   counsel who as you have done today tend to word
17   questions in such a way that makes the mesh seem to be
18   a dangerous product, when I as a surgeon, researcher,
19   and scholar know that that's not the case.

20   Q.   And, Doctor, I haven't tried to word my
21   questions where it makes mesh seems as a dangerous
22   product.  Again, as I've told you many times my job is
23   just to get to the basis of your opinions.

24        And in one report you do cite your