# EXHIBIT C

Dorothy Kammerer-Doak, M.D.

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2   CHARLESTON DIVISION
                               JOSEPH R. GOODWIN
 3   MDL NO. 2:12-MD-02327        U.S. DISTRICT JUDGE
     _____
 4
     DEPOSITION OF DOROTHY KAMMERER-DOAK, M.D.
 5                                    March 7, 2017

     _____
 6
     IN RE:  ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS
 7
     LIABILITY LITIGATION
 8
     TVT General
 9   _____
     APPEARANCES:
10
         WAGSTAFF & CARTMELL LLP
11             By Christopher L. Schnieders, Esq.
               4740 Grand Avenue
12             Suite 300
               Kansas City, Missouri  64112
13             816-701-1100
               Appearing telephonically on behalf of
14             Plaintiff.
15       BOWMAN AND BROOKE LLP
               By Barry J. Koopmann, Esq.
16             150 South Fifth Street
               Suite 3000
17             Minneapolis, Minnesota  55402
               612-339-8682
18             Appearing on behalf of Defendant.
19
20
21
22
23
24
25
```

Dorothy Kammerer-Doak, M.D.

Page 2

```
1       Pursuant to Notice and the Federal Rules of
2  Civil Procedure, the deposition of DOROTHY
3  KAMMERER-DOAK, M.D. called by Plaintiff, was taken on
4  Tuesday, March 7, 2017, commencing at 9:05 a.m., at
5  457 Mountain Village Boulevard, Telluride, Colorado,
6  before Dianna L. Buckstein, Professional Shorthand
7  Reporter and Notary Public within and for the State
8  of Colorado.
9
10              I N D E X
11
12  DEPOSITION OF DOROTHY KAMMERER-DOAK, M.D.
```

```
13  EXAMINATION BY:                    PAGE
14    Mr. Schnieders              4
15    Mr. Koopmann                --
16
17  EXHIBITS              INITIAL REFERENCE
18  Exhibit 1  Notice to Take Deposition     4
            of Dr. Dorothy Kammerer-Doak
19
    Exhibit 2  Curriculum vitae of          4
20            Dorothy Kammerer-Doak
21  Exhibit 3  General Reliance List in      4
            Addition to Materials
22            Referenced in Report,
            MDL Wave 4
23
    Exhibit 4  Expert Report of Dorothy      4
24            Kammerer-Doak, M.D.
25
```

Page 3

```
1  EXHIBITS              INITIAL REFERENCE
2  Exhibit 5  Envelope with two        16
            thumb drives in it
3
    Exhibit 6  Document entitled        19
4            Invoice for services
5  Exhibit 7  E-mail chain             20
6  Exhibit 8  Supplemental materials   24
7  Exhibit 9  Supplemental General     24
            Reliance List in Addition to
8            Materials Referenced in
            Report, MDL Wave 4
9
    Exhibit 10 Document entitled Vaginal    100
10            Erosion of Cadaveric Fascia
            Lata following Abdominal
11            Sacrocolpopexy and Suburethral
            Sling Urethropexy
12
    Exhibit 11 E-mail chain, Subject: IUGA  106
13            R&D Committee: Pelvic Floor
            Simulator
14
    INFORMATION REQUESTED TO BE SUPPLIED     PAGE
15
    List of depositions              8
16
    Most current curriculum vitae    37
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            P R O C E E D I N G S
2      (Exhibits 1 through 4 were marked.)
3          DOROTHY KAMMERER-DOAK, M.D.
4  being first duly sworn in the above cause, was
5  examined and testified as follows:
6            EXAMINATION
7  BY MR. SCHNIEDERS:
8      Q   Good morning, Doctor.  We are taking this
9  deposition by phone, so I'm going to -- I would like
10  you to bear with me.  If we ever get to a point where
11  you can't hear me or if I can't hear you, we might
12  have to adjust the seating situation; but as long as
13  you can hear me okay at this point, I think we're
14  working okay.
15      Can you hear me?
16      A   Yes.
17      Q   Okay.  Doctor, could you please state for
18  the jury your full name.
19      A   Dorothy Kammerer-Doak.
20      Q   If I refer to you as Dr. Kammerer-Doak, is
21  that okay?
22      A   Yes.
23      Q   Doctor, have you ever been deposed before?
24      A   Yes.
25      Q   On how many occasions have you been
```

Page 5

```
1  deposed?
2      A   Approximately six times.
3      Q   Okay.  We'll talk about that in a moment,
4  but for the purposes of the deposition going well, I
5  just wanted to briefly remind you of the ground rules
6  that you probably already knew from those.
7      One, especially when I'm on the phone, it's
8  important that you let me finish my question before
9  you start your answer; is that fair?
10      A   Yes.
11      Q   Two, you're being -- your testimony is
12  under oath today, and it's -- you've been sworn to
13  tell the truth the same way as you would in front of
14  the judge and jury.
15      You understand that, right?
16      A   Yes.
17      Q   Lastly, if I ask a question, especially
18  over the phone, if I can't hear you or if it's an
19  "uh-huh" or "huh-uh," I have a tough time
20  understanding what that means and so does the court
21  reporter; so I may ask you to repeat or to say, "Is
22  that a 'yes'; is that a 'no'?"  It's not intended to
23  be rude.  I just want to make sure we have a clear
24  record, okay?
25      A   Yes.
```

Dorothy Kammerer-Doak, M.D.

Page 6

1    Q   Doctor, you understand that for the
2  purposes of this deposition, you are here today to
3  talk about an expert report that you have rendered in
4  the Ethicon TVT litigation.
5       Do you understand that?
6    A   Yes.
7    Q   And it's your intention today to offer
8  opinions with regard to the TVT device; is that
9  right?
10   A   Please repeat that.
11   Q   It's your intention as we sit here today to
12 offer opinions with regard to the TVT device that's
13 manufactured by Ethicon, correct?
14      (Reporter requested clarification.)
15   Q   (By Mr. Schnieders)  -- manufactured by
16 Ethicon, correct?
17   A   Yes.
18   Q   Okay.  Now, as far as the other depositions
19 that you've offered, Doctor, you said that you've
20 been deposed on six occasions that you can recall; is
21 that right?
22   A   Approximately.  I didn't count them out.
23   Q   Okay.
24   A   It could be -- it's somewhere between 6 and
25 10.

Page 7

1    Q   Have any of those depositions occurred in
2  the last five years?
3    A   Yes.
4    Q   And do you keep a list of your testimony
5  that you've offered anywhere?
6    A   No.
7    Q   Did counsel before this deposition at any
8  point ask you for a list of your dep -- over the last
9  five years?
10      (Reporter requested clarification.)
11   A   Sorry.  Just someone just opened the door.
12 Can you please repeat that?
13   Q   (By Mr. Schnieders)  Are you having a tough
14 time hearing me, because I'm right in front of my
15 phone.
16   A   Yes.  Let me see if I can turn this phone
17 up any more.  Okay.
18   Q   Is that -- hopefully that's better.  I'm
19 not sure if it's going up or not.  We'll see.  I will
20 try to keep my voice up and see what we can do here,
21 okay?
22   A   Okay.
23   Q   Doctor, at any point prior to rendering
24 your expert report, did counsel for Ethicon ask you
25 to compile a list of all the depositions that you had

Page 8

1  given over the past five years?
2    A   No.
3    Q   Okay.  And you never made a list like that?
4    A   I have not.
5    Q   Okay.
6       MR. SCHNIEDERS:  Barry, I ask pursuant to
7  civil procedure rules that you provide a list as soon
8  as possible of those depositions, okay?
9       MR. KOOPMANN:  I think that she hasn't been
10 deposed as an expert witness in the last four years,
11 and she said that in her general report, if I'm not
12 mistaken.
13      MR. SCHNIEDERS:  Well, if that's the case,
14 we'll find out, I guess, here.
15   A   No.  I have not been deposed as an expert
16 witness in the past four years.
17   Q   (By Mr. Schnieders)  Have you ever offered
18 expert testimony?
19   A   I was deposed as an expert witness about 10
20 or 11 years ago.
21   Q   Okay.  And what was that with regard to?
22   A   It was with regard to an obstetrical anal
23 sphincter laceration.
24   Q   Were you offering testimony on behalf of a
25 party in that case?

Page 9

1    A   I was the plaintiff's expert.
2    Q   Okay.  And was that a medical malpractice
3  case?
4    A   Yes, it was.
5    Q   Did you ever give trial testimony in that
6  case?
7    A   I did not.
8    Q   Are you aware of what the resolution of
9  that case was?
10   A   I am not.
11   Q   Now, with regard to the depositions that
12 have occurred more recently, what has been the
13 subject matter of those depositions?
14   A   A fact witness.
15   Q   Okay.  Have they all been medical
16 malpractice cases where you were a treating
17 physician?
18   A   Some have been where I was a treating
19 physician, and the others have been -- and another
20 one was -- I'm trying to figure how to best describe
21 it.  I wasn't the treating physician.  I was
22 defending another physician kind of as a character
23 witness and to testify to her surgical skills as she
24 had assisted me.
25   Q   And what kind of physician was that

Dorothy Kammerer-Doak, M.D.

Page 10

1 physician?
2    A    A gynecological physician.
3    Q    And what was the subject surgery in that
4 case?
5    A    Say that again.
6    Q    What was the subject surgery in that case?
7    A    So she was assisting a GYN oncologist on a
8 radical cancer surgery case that was laparoscopic.
9 The surgeries that she's assisted me on were both
10 laparoscopic gynecological cases and vaginal
11 urogynecological cases.
12    Q    Okay.  With regards to any of these cases
13 where you testified as a fact witness, did they
14 involve transvaginal mesh?
15    A    In one case she did have a sling placed,
16 but that was not what the suit was about.
17    Q    Okay.  What was the suit about?
18    A    She had developed a pelvic hematoma
19 following a hysterectomy that was performed vaginally
20 in a prolapse repair.
21    Q    And if you can recall, where was that case
22 filed?
23    A    It was filed in New Mexico.
24    Q    Do you know if it was filed in state court
25 or in federal court?

Page 11

1    A    I don't have any idea.
2    Q    Okay.  And that's fair.  And, again, if we
3 get to anything where you just don't know the answer
4 or are not sure, that's what I want you to say.  I
5 don't want you to guess at anything.
6         You understand that the litigation we are
7 here today regarding is in federal court in West
8 Virginia.
9         Did you know that?
10    A    Yes.
11    Q    Okay.
12         THE DEPONENT:  We're having a really hard
13 time hearing you, Mr. Schnieders, and we're going to
14 go downstairs and see if they can give us a better
15 phone.
16         (Recess from 9:13 a.m. to 9:19 a.m.)
17    Q    (By Mr. Schnieders)  We're back on the
18 record, Doctor.  We were talking a bit about your
19 deposition that you had offered in the past, and I
20 think we established that all the depositions in the
21 last four to five years were related to fact witness
22 testimony in medical malpractice cases; is that
23 right?
24    A    Yes.
25    Q    And I think we also established that the

Page 12

1 only case that involved transvaginal mesh product was
2 actually about something else beyond that, and you
3 didn't offer any testimony with regards to the mesh;
4 is that right?
5    A    We did talk about the sling in the case,
6 but the case was not about the sling itself.
7    Q    Got it.  Okay.  Doctor, I understand that
8 we've brought -- you've brought some binders and
9 other materials with you here today; is that right?
10    A    Yes.
11    Q    Okay.  Can you tell us for the record what
12 you brought with you?
13    A    So I have a binder with my general TVT
14 report, and the literature that was used to compile
15 this.  I also have a supplemental general reliance
16 list in addition to the materials referenced in the
17 report.
18         I have another binder that contains some of
19 the key literature that was reviewed in the
20 preparation.  And I also have a binder that's labeled
21 Stress Urinary Incontinence Mesh Documents Binder 1
22 that contains some company memos as well as other
23 articles.
24    Q    Okay.  A couple things there, Doctor.  You
25 said something about a supplemental reliance list.

Page 13

1         Is there an additional reliance list to
2 what you issued with your general report?
3    A    I didn't finish my answer.  I'm sorry.
4    Q    Sorry about that.
5    A    No.  I also have two disks that contain all
6 of the information.  They're not disks, they're
7 sticks.  I have a copy of my invoice, as well as the
8 e-mails.  And I also have some articles that are in
9 addition to what's in my original list.
10    Q    Okay.  Are you finished now, Doctor?  I
11 don't want to cut you off.
12    A    I'm sorry.  No.  It's difficult when we're
13 not face-to-face.  Yes, I'm finished.  Thank you.
14    Q    No problem.  So -- and you might have
15 answered my question there with that last binder.  It
16 sounds like you've got a binder that has some
17 materials in it that were not part of your original
18 reliance list; is that fair?
19    A    Yes.
20    Q    Okay.  And were those materials what is
21 reflected in your supplemental reliance list?
22    A    Some of these are in addition to what's in
23 my supplemental reliance list.
24    Q    Okay.  Just for my benefit since I'm not
25 looking at this binder, how many pages are we

Dorothy Kammerer-Doak, M.D.

Page 14

1  estimating are in that binder, how many studies?
2      A   They're all -- they're loose.  So I have 1,
3  2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,
4  17 -- 18 documents.
5      Q   Okay.  And if I'm understanding right, not
6  all 18 of those documents appear even on the
7  supplemental reliance list; is that correct?
8          MR. KOOPMANN:  Do you know the answer to
9  that?
10     A   I don't know.
11     Q   (By Mr. Schnieders)  Okay.
12     A   Like for example, I know for sure some of
13  them are not.  One of the articles that I have is an
14  article that I pulled regarding urethral erosion
15  after synthetic and nonsynthetic pubo-vaginal slings,
16  differences in management and continence outcomes.
17  And I pulled that after reading Dr. Blaivas's
18  deposition, where he had said he had never seen a
19  urethral erosion after a pubo-vaginal sling.  And so
20  I pulled this where it showed that there are such a
21  thing -- where there is such a thing.
22     Q   When you say you read Dr. Blaivas's
23  deposition, are you talking about his recent
24  deposition he offered in the case specific context
25  with regard to Crespin?

Page 15

1      A   I'm not sure if it was that one or his
2  general deposition, his general TVT, because I read
3  both of those.
4      Q   Okay.  Well, his general deposition
5  occurred well before you issued your general report.
6          Is that something you would have read
7  before issuing your report?
8      A   No.  I read it recently.
9      Q   Okay.  And you recognize that that is on
10  your list of reliance materials related to your TVT
11  general report, right?
12     A   What is?
13     Q   Dr. Blaivas's deposition, his general
14  deposition.
15     A   Yes.
16     Q   Okay.  But it's your testimony today that
17  you didn't read that prior to issuing your general
18  report, right?
19     A   Yes.
20     Q   Okay.  All right.  I think I want to do it
21  this way:  So there's a thumb drive, as I understand,
22  and I think there's also another thumb drive that's
23  specific to Crespin.
24          MR. SCHNIEDERS:  Is that right, Barry?
25          MR. KOOPMANN:  Yes.  There's two thumb

Page 16

1  drives containing general materials and one with just
2  Crespin materials.
3      Q   (By Mr. Schnieders)  Okay.  Now, the thumb
4  drives that relate to general materials, would they
5  encompass everything including what's in the binders
6  there?
7      A   Yes.
8      Q   Okay.
9          MR. SCHNIEDERS:  I'm going to mark those
10  thumb drives as Exhibit 5, which is what I think
11  we're up to.  And I just ask that those be handled in
12  the same way as previous thumb drives have with
13  regard to making them exhibits, if you don't mind,
14  Madam Court Reporter.
15          THE REPORTER:  Okay.
16          (Exhibit 5 was marked.)
17     Q   (By Mr. Schnieders)  All right.  Now,
18  Doctor, you said that you pulled some additional
19  materials, that are part of what I'm going to call
20  the supplemental binder, yourself.
21          When did you pull those materials?
22          MR. KOOPMANN:  Object to form.  Go ahead.
23     A   They were pulled over the past, I would
24  say, two to three weeks.
25     Q   (By Mr. Schnieders)  Okay.  And all of the

Page 17

1  other binders that contain materials that you brought
2  here today, did you or your office actually put those
3  binders together?
4      A   The binders were put together by and given
5  to me by Dr. Koopmann -- Mr. Koopmann, I'm sorry.
6      Q   Okay.  And so the materials that are in
7  those binders were selected by Mr. Koopmann's office,
8  correct?
9      A   No.  That's not correct.  They were
10  articles -- some of them were given to me or supplied
11  by him, but a lot of them, in fact, most of them, are
12  articles with which I am familiar or I asked to be
13  pulled myself.
14          Most of the articles that are in the
15  binders are ones that I have read before.  Ones that
16  are new to me are ones that are from journals that I
17  don't typically access as a female pelvic medicine or
18  reconstructive surgery specialist; and that would be,
19  for example, the Journal of Urology, and then some of
20  the European journals.
21     Q   And I appreciate the clarification, but I
22  want to make sure that we're tracking because that
23  wasn't exactly my question.
24          It sounds like those binders don't have
25  every single document that was part of your reliance

Dorothy Kammerer-Doak, M.D.

Page 18

1  materials; is that right?
2  A   Yes.
3  Q   Okay.  So there were selections made from
4  your reliance materials to put into those binders
5  that you've brought here today, fair?
6  A   Yes.
7  Q   Who decided what those materials would be
8  in those binders?
9  A   It was based on my report that was
10  generated.
11  Q   And I'm not sure that I understand.  You
12  mean that they are the materials that were cited
13  within the report itself?
14  A   So in my general report, I have articles
15  that I cited, and that is what is in the binder that
16  contains my general report.
17      As far as the other two binders, those were
18  given by Mr. Koopmann.
19  Q   Okay.  And those are selections of what
20  ended up on the reliance list itself, fair?
21  A   Yes.
22  Q   And those selections were made by
23  Mr. Koopmann's office?
24      MR. KOOPMANN:  Object to form.
25  A   Yes.

Page 19

1  Q   (By Mr. Schnieders)  All right.  Doctor,
2  you stated that you had some invoices there that you
3  brought today; is that right?
4  A   Yes.
5  Q   I would like to mark those as Exhibit 6,
6  please.
7      (Exhibit 6 was marked.)
8      (Discussion off the record.)
9  Q   (By Mr. Schnieders)  Doctor, how many pages
10  am I looking at here in Exhibit 6?
11  A   Two.
12  Q   Can you tell me the dates of those
13  invoices?
14  A   So the first one says, Invoice for services
15  November 2016; and the second one is from December,
16  January, and February.
17  Q   And that would track over December of 2016
18  through January and February of 2017?
19  A   Correct.
20  Q   Okay.  And what's the total amount of those
21  invoices in Exhibit 6?
22  A   So from December through February, it's
23  $16,886.45; and for November 2016, it's $4,434.50.
24  Q   Okay.  So approximately $20,000 of invoices
25  that comprise Exhibit 6?

Page 20

1  A   Yes.
2  Q   Okay.  The first invoice you said was
3  November of 2016.  Is that the first invoice that you
4  have submitted in the Ethicon litigation?
5  A   Yes, it is.
6  Q   Okay.  And I believe -- and correct me if
7  I'm wrong -- that you also said there were some
8  e-mails representing contact from Ethicon to you to
9  begin the process of reviewing this case; is that
10  right?
11  A   That is correct.
12  Q   Okay.  I'd ask that those be marked as
13  Exhibit 7, please.
14      (Exhibit 7 was marked.)
15  A   And that's finished.
16  Q   (By Mr. Schnieders)  Thank you.
17      Doctor, when were you first contacted with
18  regard to this case?
19  A   It was probably sometime March or April of
20  2016.
21  Q   Okay.  And who contacted you initially?
22  A   Mr. Koopmann.
23  Q   And what -- what was the -- what was the
24  request from Mr. Koopmann's office for you to look
25  at?

Page 21

1  A   So when he contacted me, he simply asked me
2  if I would be amenable to being an expert witness for
3  Johnson & Johnson.
4  Q   Okay.  And was that with regard to the TVT
5  products; with regard to slings, generally; with
6  regard to POP kits; or was there any specification?
7  A   We discussed all of the above; and because
8  I really haven't done a lot of the pelvic mesh
9  kits -- in fact, none that were manufactured by
10  Johnson & Johnson -- I said I was comfortable being
11  an expert witness for the retropubic TVT sling.
12  Q   Okay.  Have you ever used Ethicon products
13  for -- and -- strike that.
14      Have you ever used Ethicon vaginal mesh
15  products?
16  A   No, I have not.
17  Q   Okay.  So as we sit here today, you've
18  never actually implanted a TVT?
19  A   Well, no.  You asked me about prolapse
20  cases.
21  Q   Well, and that's a fair distinction.  Let
22  me make it this way:  So is there mesh in a sling?
23  A   Yes.  So I've implanted many Ethicon TVT
24  retropubic slings.
25  Q   Okay.  And is the TVT retropubic sling the

Dorothy Kammerer-Doak, M.D.

Page 22

1 only Ethicon-manufactured mesh product that you used?
2    A    Yes.
3    Q    Okay.  All right.  So, Doctor, is there
4 unbilled time that you have related to your general
5 testimony that you're offering here today that has
6 not been submitted yet?
7    A    Starting from today -- starting from March
8 1st, yes, there's time.
9    Q    Okay.  And have you met with counsel for
10 Ethicon over the past week at times?
11    A    Yes, I have.
12    Q    How many times?
13    A    Once.
14    Q    And for how long was that meeting?
15    A    It was 7-1/2 hours.
16    Q    And when did that occur?
17    A    Yesterday.
18    Q    Was that a face-to-face meeting?
19    A    Yes.
20    Q    Any other time that you've spent preparing
21 for your deposition here today?
22    A    Yes.  We had a phone conversation.
23    Q    Okay.  What about time on your own?  Is
24 there any other time on your own that you've spent
25 preparing for today's deposition?

Page 23

1    A    In reviewing the documents that I will be
2 discussing, yes.
3    Q    Okay.  And, for instance, with regard to
4 the study that you've referenced in your supplemental
5 binder, when did you go and find that?
6    A    Within the past couple of weeks.
7    Q    Okay.  Any other materials that you have
8 gone and found yourself that make up that
9 supplemental binder?
10    A    No, but there are -- let me amend that.
11 There are things that I have asked for and have been
12 supplied to me.
13    Q    Okay.  I think to make it -- so let me ask
14 it this way:  With regard to the binders that you've
15 brought here today, did you make any notes or other
16 highlights, anything like that in them?
17    A    No, I did not.
18    Q    So the binders themselves are just the
19 printed-off pages of the materials on your reliance
20 list as we discussed so far, right?
21    A    Say that again, please.
22    Q    Sure.  It's a bad question.
23      The materials that are in the binders are
24 just the printed-off pages of some of the materials
25 on your reliance list, fair?

Page 24

1    A    Correct.
2    Q    Okay.  So given that, I don't know that I
3 need to mark the binders that are representative of
4 materials that were on your original reliance list,
5 but I do want to mark the binder that we are calling
6 the supplemental binder.
7      MR. SCHNIEDERS:  So if you wouldn't mind, I
8 think that's Exhibit 8, please.
9      MR. KOOPMANN:  Just so you know, Chris,
10 that's not an actual binder; it's just a stack of
11 paper.
12      MR. SCHNIEDERS:  Okay.  I think it's still
13 probably -- we're going to get down to a lot of
14 exhibits if we mark them all separately, so let's
15 just call Exhibit 8 the supplemental materials.
16      MR. KOOPMANN:  Okay.
17      (Exhibit 8 was marked.)
18      THE DEPONENT:  Okay.  That's done.
19    Q    (By Mr. Schnieders)  And lastly, just to
20 make sure we're talking about the same stuff, I'm
21 going to mark as Exhibit 9 the supplemental reliance
22 list that you brought here today, Doctor.
23      (Exhibit 9 was marked.)
24    A    That's finished.
25    Q    (By Mr. Schnieders)  Okay.  And for my

Page 25

1 benefit since I'm on the phone, are there any
2 materials that you have there that we haven't
3 discussed at this point?
4    A    No, there is not.
5    Q    Okay.  All right, Doctor.  I'm going to ask
6 you to turn to your CV if it's necessary, but we've
7 marked it as Exhibit 2.
8      I'd like to talk a little bit about your
9 background, okay?
10    A    Okay.
11    Q    All right.  And, Doctor, you're currently
12 in private practice; is that right?
13    A    That is correct.
14    Q    And where are you in private practice?
15    A    In Albuquerque, New Mexico.
16    Q    Okay.  And tell me what your current
17 practice is, meaning what do you do on a weekly
18 basis.
19    A    So the practice is focused on
20 urogynecology.  There are five health care providers
21 there.  I am a board-certified female pelvic medicine
22 and reconstructive surgeon.  And so what I see
23 probably is about 60 to 70 percent urogyn, and then
24 the remainder is general gynecology.  And we focus on
25 all types of issues in regards to the pelvic floor

Dorothy Kammerer-Doak, M.D.

Page 26

1 and problems in that area.
2    Q    And are all of your colleagues
3 urogynecologists as well?
4    A    I have one other colleague that is board
5 certified, and then the third person, who also
6 specializes in pelvic floor disorders, is not board
7 certified, but she has practiced a lot of it over the
8 past 10 years and trained under me when I was
9 training the residents at the University of New
10 Mexico residency program.
11    Q    Okay.  And I think you referenced a couple
12 of other colleagues.  So what is their specialty?
13    A    Gynecologists.
14    Q    Okay.  Sorry.  Maybe I missed that.
15        And then you say that 60 to 70 percent of
16 your practice is spent in urogynecological issues and
17 the other 30 to 40 percent is spent in general
18 gynecology; is that right?
19    A    Yes.
20    Q    So I want to take that percentage that's
21 dealing with urogynecologic issues.  Try to break
22 down for me what that encompasses in your practice.
23    A    So you mean what type of problems that it
24 encompasses?  Or what are you meaning by that?
25    Q    Let's start with what you're treating and

Page 27

1 what the percentages are of that.
2    A    Okay.  So typical problems involve urinary
3 and fecal incontinence, prolapse, other pelvic
4 disorders, urological disorders that involve the
5 pelvis such as interstitial cystitis or painful
6 bladder syndrome --
7        (Reporter requested clarification.)
8    A    -- bladder such as interstitial cystitis or
9 painful bladder syndrome, chronic pelvic pain, pelvic
10 floor muscle spasms, sexual dysfunction.  I'm trying
11 to think if there's any else.  Oh, recurrent urinary
12 tract infections.
13        So as long as it's in the pelvic area, I
14 will evaluate that; but, for example, kidney stones
15 or kidney issues, I don't deal with that.
16        I will work up persistent hematuria,
17 including cystoscopy, but if an abnormality is found
18 on cystoscopy such as a tumor, then I will refer
19 those to the urologist to treat.
20    Q    Okay.  So you've mentioned urinary and
21 fecal incontinence as part of that practice; is that
22 correct?
23    A    Yes.
24    Q    Okay.  And what percentage of your
25 urogynecologic practice would you say encompasses

Page 28

1 urinary and fecal incontinence?
2    A    So fecal incontinence is less common.  So,
3 you know, that would be in the range of somewhere
4 between 10 to 15 percent.  And then urinary
5 incontinence often goes hand in hand, meaning it
6 coexists with prolapse, so it would be more than
7 50 percent would involve urinary incontinence.
8    Q    Okay.  And is there any way for you to
9 break out based upon that answer the amount of your
10 practice that's urogynecologically spent regarding
11 prolapse?
12    A    I'm thinking.  So, again, it would be
13 somewhere in the range of 40 to 50 percent because,
14 again, these conditions often coexist.
15        Oh, the other thing I will evaluate and
16 manage is voiding dysfunction as well.  That's
17 another problem that we evaluate.
18    Q    So if I'm tracking right with you, Doctor,
19 it sounds like somewhere just north of 50 percent of
20 your urogynecological practice is spent on urinary
21 incontinence, which oftentimes overlaps with your
22 prolapse treatment, fair?
23    A    Yes, or coexists with the prolapse and vice
24 versa.
25    Q    Currently, when you treat prolapse, what

Page 29

1 are you typically going to do to help a woman?
2    A    So there are three main treatments of
3 prolapse.  The first is conservative, and that
4 involves trying to minimize the progression of the
5 prolapse; and it's performing Kegel exercises,
6 avoiding prolong standing, heavy lifting,
7 constipation; and, oftentimes, if a woman is post
8 menopausal, giving them vaginal estrogen, which
9 doesn't take the prolapse away, but it thickens the
10 vaginal tissues and makes the irritation from the
11 prolapse less.
12        Secondly, is the use of a pessary, which is
13 a device that's placed inside of the vagina; and it
14 can be managed by the patient herself, or it can be
15 managed by a health care provider.
16        And then, lastly, there's surgery.
17        And so when I see a patient, I discuss all
18 three of the options with them, and then we come up
19 with an individualized plan based on their
20 examination as well as the symptoms that they have.
21    Q    And what are the surgical options that you
22 would currently be offering patients under those
23 scenarios?
24    A    So mostly we do vaginal surgery for
25 primary, nonrecurrent pelvic organ prolapse, and that

Dorothy Kammerer-Doak, M.D.

Page 30

1 is a native tissue repair that is performed
2 vaginally. So if a woman has a uterus in situ, we do
3 a vaginal hysterectomy, and then we resuspend the top
4 of the vagina, the apex, to ligaments on either side
5 of the rectum up by the tailbone area.
6      If there is a cystocele that is central,
7 then that is repaired, again native tissue using
8 sutures with an anterior repair. And if they have a
9 rectocele that is distal or in the middle of the
10 vagina, we do a posterior repair with perineorrhaphy.
11      If somebody has recurrent prolapse, meaning
12 they've undergone a surgery previously and it's
13 failed, then we talk about a mesh augmentation of
14 that surgery, and that can be performed either
15 vaginally or abdominally.
16      At this stage, I really don't perform any
17 more vaginal mesh cases. They are all done either
18 laparoscopically or robotically with the abdominal
19 sacrocolpopexy.
20   Q   And in the scenario that you have decided
21 to use mesh augmentation, what mesh do you use?
22   A   So I am not performing the abdominal
23 sacrocolpopexies. I haven't performed any for the
24 past eight to nine years.
25   Q   Okay. So the last time that you did

Page 31

1 perform a mesh augmentation, what mesh did you use?
2   A   PROLENE.
3   Q   What is the reason that you are no longer
4 performing those procedures?
5   A   Because there's very few ladies that
6 require the abdominal sacrocolpopexy; and in private
7 practice, those surgeries take about five hours in my
8 hands. And so I have referred them out: initially,
9 to the University of New Mexico; and now to my
10 partner, who does do them.
11      When I went into private practice, which
12 was about 8-1/2, 9 years ago, I didn't have someone
13 to assist me that was familiar with that procedure;
14 and my specialty is the vaginal route; and there's
15 not a lot of people in New Mexico who do those types
16 of surgeries. So that is what I specialized in.
17   Q   Okay. And are you aware of -- strike that.
18      If I heard you right, you said that
19 currently in that type of a case you're referring
20 those types of patients to one of your colleagues in
21 your practice; is that correct?
22   A   Yes.
23   Q   And are you aware of what mesh is used by
24 your colleague?
25   A   I am not. I know she uses the Y-shaped

Page 32

1 mesh; but I have not assisted her on any of the
2 cases, so I'm not sure what mesh she is using.
3   Q   The PROLENE mesh that you discussed using
4 in the past, is that something that's available to be
5 used today?
6   A   I don't know. I haven't researched that.
7   Q   Are you offering any opinions here today
8 regarding the safety and efficacy of mesh when used
9 to augment a POP repair?
10   A   No. I'm specifically here to discuss the
11 TVT sling.
12   Q   Prior to referring on a patient to your
13 colleague for the potential mesh augmentation, do you
14 have any sort of a risk-benefit discussion with that
15 patient?
16   A   Yes.
17   Q   And tell me what that entails.
18   A   So when I'm talking about a prolapse
19 repair -- I just want to make that clear -- we're
20 talking about somebody who has recurrent prolapse?
21   Q   Yes.
22   A   Okay. So I discuss with them that their
23 choices for treatment are conservative pessary or
24 surgery; and that because they failed a previous
25 native tissue repair, to do another one more than

Page 33

1 likely would fail; and so a mesh-augmented repair is
2 something to be considered. We talk about going
3 through the abdomen, and going through the abdomen as
4 compared to going vaginally has a higher risk simply
5 because we are in the intra-abdominal cavity.
6      We also talk about because of being in the
7 intra-abdominal cavity, there's higher risks of
8 bleeding because of where the mesh is attached over
9 the sacral area.
10      We then talk about the risks of using mesh
11 over native tissue and that we have to balance out
12 the risks, increased risks of surgery, which do
13 include the mesh as well as the operative approach,
14 to the benefit of an increased chance of success.
15 With vaginal native tissue repair, the success is
16 approximately 80 percent; and with the mesh-augmented
17 repair, it's approximately 90 percent.
18      Using the mesh for abdominal
19 sacrocolpopexy, there's an approximate 10 percent
20 risk of a vaginal mesh exposure, the majority of
21 which can be treated vaginally; but rarely an
22 intra-abdominal approach to deal with the mesh issue
23 will be necessary. And this is, again, for the
24 abdominal approach for abdominal sacrocolpopexy.
25   Q   Okay. And if I heard you right initially,

Dorothy Kammerer-Doak, M.D.

Page 34

1  Doctor, you always suggest that the primary surgery
2  with regard to pelvic organ prolapse be a native
3  tissue repair, correct?
4     A   Currently, that's what I do, yes.
5     Q   Okay.  And how long has that been the case?
6     A   For about the past three to four years.
7     Q   Prior to that, did you suggest that mesh
8  augmentation would be primary?
9     A   Prior to that in selected cases as per
10  suggestions by organizations such as the
11  International Urogynecology Association and the
12  American Urogynecological Society, I would discuss
13  the use of mesh for primary repairs under special
14  circumstances, such as women with poor connective
15  tissue who had very severe prolapse or had very
16  significant weakness of their pelvic floor muscles.
17     Q   What has changed in the last three to four
18  years that has made you decide that native tissue
19  repair should be utilized as the primary augmentation
20  first?
21     A   The litigation issue.  I still strongly
22  believe that vaginal mesh augmentation is a very
23  viable option, but I don't want to expose myself to
24  possible litigation from using them.
25     Q   Do you believe that mesh is the better

Page 35

1  alternative under those circumstances?
2        MR. KOOPMANN:  Object to form.
3     A   I believe it is a viable alternative and
4  something that can be discussed with the patient, the
5  risk and the benefit profile, and it's up to the
6  patient and myself to decide what she would like
7  based on that risk-benefit profile.
8        Again, going back to what I had said
9  previously, when I counsel a patient who has
10  recurrent prolapse, we discuss that a vaginal native
11  tissue repair has a lower chance of success but has
12  less risks; and a mesh-augmented repair, whether it's
13  done vaginally or whether it's done abdominally, has
14  a higher chance of success, but has more
15  complications.
16        So they have to choose between higher
17  chance of success versus the complications, which
18  primarily would be the mesh complications with the
19  vaginal route, and abdominally would include the
20  abdominal approach.
21     Q   (By Mr. Schnieders)  Okay.  And so we're
22  all tracking, Doctor, if a device fails -- sorry.
23  Strike that.
24        In other words, we're tracking with regard
25  to success, you're saying that 80 percent of the time

Page 36

1  that native tissue repair will work, whereas your
2  experience or read of the literature is that
3  90 percent of the time mesh augmentation will work?
4     A   So when we classify -- I have to define
5  what you mean by "work."  So when we talk about
6  80 versus 90 percent for the vaginal repair, it
7  doesn't mean that the patient has no prolapse.  What
8  it means is that the prolapse if it does reoccur is
9  not symptomatic or bothersome and it is at or above
10  the hymen; and that for the abdominal approach using
11  mesh, that is at approximately 90 percent.
12     Q   Okay.
13     A   And if we talk about the vaginal approach
14  with mesh augmentation, it's best studied; and I only
15  used it -- or mainly use it in the anterior
16  compartment.  And that in randomized trials, again,
17  the anterior augmentation with mesh, synthetic mesh,
18  has a higher chance of success than a native tissue
19  repair.
20     Q   And if I understood your testimony
21  correctly, your only reasoning for not offering mesh
22  augmentation as the primary repair is due to concern
23  over litigation, correct?
24     A   Offering it primary repair for special
25  cases where the prolapse is severe, meaning grade --

Page 37

1  advanced Grade 3 -- I'm sorry -- Stage 3 to Stage 4
2  with weak pelvic floor muscles or connective tissue
3  disorder.
4     Q   I'll strike that based upon
5  nonresponsiveness.
6        Doctor, as I understand your testimony,
7  your only reason for not offering mesh augmentation
8  as a primary repair for pelvic organ prolapse is due
9  to concern over litigation, correct?
10        MR. KOOPMANN:  Object to the form.
11     A   So going back to my previous answer, in
12  those special circumstances, yes.
13     Q   (By Mr. Schnieders)  Now, what we've marked
14  as Exhibit 2 here, Doctor, your curriculum vitae
15  is -- it's listed at 2015.
16        Is this up to date?
17     A   I'm looking at it.  No.  I have a few other
18  publications.
19     Q   Okay.  Do you have a more current version
20  of this CV?
21     A   I do.
22     Q   I'd ask that you provide that to counsel,
23  and then --
24        MR. SCHNIEDERS:  Barry, if you could
25  provide that to me, I'd appreciate it.

Dorothy Kammerer-Doak, M.D.

Page 38

1    MR. KOOPMANN: Sure. We will.
2    Q   (By Mr. Schnieders) Doctor, I'll ask that
3  you just generally, then -- not based on this CV --
4  have you ever published any peer-reviewed literature
5  regarding the TVT?
6    A   I have not.
7    Q   Okay. Have you ever published any peer
8  review literature regarding suburethral slings?
9    A   No.
10   Q   Have you ever published any peer review
11 literature regarding pelvic organ prolapse?
12   A   So let me go back to that. I did recently
13 publish -- and this is something that's not on
14 there -- it was a survey of the practice patterns of
15 the International Urogynecology Association members
16 as to their practice patterns for the treatment of
17 prolapse and stress urinary incontinence, and in that
18 case -- I mean in that instant, I did report on the
19 use of the suburethral slings.
20   Q   Okay. A couple questions. Is that a peer
21 review -- peer-reviewed publication we are discussing
22 right now?
23   A   Yes, it is. It's the International
24 Urogynecology Journal.
25   Q   Would that be the IUGA that we're talking

Page 39

1  about?
2    A   No. It's IUGA (pronouncing).
3    Q   Okay.
4    A   I-U-G-A.
5    Q   IUGA (pronouncing) or I-U-G-A. And is that
6  a professional society that you belong to?
7    A   Yes, it is.
8    Q   And, in fact, Doctor, have you been a
9  member of the research and development team for IUGA?
10   A   Yes, I have.
11   Q   Okay. What other professional societies
12 are you currently a member of?
13   A   The American Urogynecology Society.
14   Q   Any others, Doctor? I don't want to jump
15 on your answer if you've not completed it.
16   A   No. I'm also a member of the American
17 College of Obstetrics and Gynecology and the Greater
18 Medical -- I'm sorry -- the Greater Albuquerque
19 Medical Association and the Society of Gynecological
20 Surgeons. I don't think I'm current on my dues yet
21 this year for that one.
22   Q   Okay. And as a general proposition, AUGS
23 is what we often refer to as the American
24 Urogynecologic Study, correct?
25   A   Yes.

Page 40

1    Q   And then ACOG, that's the American College
2  you referred to, correct?
3    A   Yes.
4    Q   Okay. And are those the four societies,
5  the current societies that you belong to?
6    A   Yes.
7    Q   Are you an officer in any of those
8  societies?
9    A   No.
10   Q   Would you say that you're more involved
11 with IUGA, or I-U-G-A, than the other societies?
12   A   Yes.
13   Q   Okay. Describe your involvement with IUGA
14 for us.
15   A   So for the past -- now I'm past-chairperson
16 of the research and development committee. So prior
17 to two thousand and -- well, my chairpersonship
18 lasted for five years, and I completed that in 2016.
19   Q   Okay. And what was the research and
20 development committee of IUGA?
21   A   Do you mean what were their functions?
22   Q   Yeah. What is the function of that
23 committee?
24   A   So one of the main functions was to review
25 research grant applications and then to award the

Page 41

1  grants based on the review by the entire committee.
2      We also did research projects, and then we
3  also did some literature reviews and wrote summary
4  articles about them.
5      Also developed a mentorship program to
6  mentor less experienced researchers within IUGA as
7  well as people in training such as fellows and
8  residents. Helped to develop what's now an
9  e-learning program.
10     Also, looked into the development of an
11 international database. We revised the sexual
12 function questionnaire, and I was -- I personally was
13 in charge of the international translation and
14 validation project, where that revised questionnaire
15 was translated into multiple different languages and
16 then validated.
17     That's a general overview.
18   Q   Thank you. And that sexual function
19 questionnaire, Doctor, was that something that was
20 funded by IUGA?
21   A   That revision project was, yes.
22   Q   Okay. The initial development of the
23 questionnaire, was that funded by IUGA?
24   A   No, it was not.
25   Q   Okay. What was that funded by?

Dorothy Kammerer-Doak, M.D.

Page 42

1    A   I don't think it received any funding.
2    Q   Okay.
3    A   I mean, it was funded by the University of
4  New Mexico when we -- you know, when we developed it.
5  We might have had it -- I'm sorry.  We might have had
6  a grant from the clinical research group at the
7  University of New Mexico, but I don't recall.
8    Q   And, Doctor, with regard to the grants
9  process that you mentioned where research and
10 development committee would be in charge of awarding
11 grants; is that right --
12   A   Yes.
13   Q   -- where did those grants come from?
14   A   They came from IUGA.
15   Q   Okay.  And where did IUGA receive the funds
16 for those grants?
17   A   I'm not sure.  I wasn't part of the
18 executive committee, so I do not know where the funds
19 came from.
20   Q   Okay.  All right.  Backtracking a little
21 bit on your publications, Doctor, because we've got
22 several pages here, and then it sounds like there's
23 some additional publications that you had since the
24 2015 version that we have as Exhibit 2.
25      I think we established that you have never

Page 43

1  published anything regarding transvaginal mesh; is
2  that correct?
3    A   Yes.
4    Q   Okay.  And that includes suburethral slings
5  and POP kits, correct?
6    A   Yes.
7    Q   Have you ever published on stress urinary
8  incontinence?
9    A   Not specifically stress urinary
10 incontinence, but I have published on sexual function
11 in women before and after surgery for prolapse and
12 incontinence, and I've published on sexual function
13 in women with and without incontinence and prolapse.
14   Q   Any other publications with regard to that
15 topic?
16   A   For stress incontinence, we also published
17 on the use of the Burch procedure in obese women,
18 whether or not there was increased complications.
19   Q   Any other publication?
20   A   About?
21   Q   About the topic we're talking about, stress
22 urinary incontinence.
23   A   Not in peer-reviewed journals.
24   Q   And then I believe that in the reliance
25 list you have one article that regards cadaveric

Page 44

1  fascia lata; is that correct?
2    A   Yes.  I was just going to bring that up.
3  So I have published on the use of cadaveric fascia
4  lata and the suburethral sling procedures, and the
5  association with the use of the cadaveric fascia lata
6  and erosion or exposure into the vagina with the
7  cadaveric fascia lata with both abdominal
8  sacrocolpopexy as well as the suburethral sling.
9    Q   Any other peer-reviewed publications that
10 you've authored or been a co-author of that have
11 bearing on your opinions here today?
12   A   I'm just going to take a quick look at
13 this.
14      So something that would also be part of my
15 experience is the randomized trial that compared the
16 anterior colporrhaphy Kelly-Kennedy plication to the
17 Burch retropubic urethropexy.  So that is something
18 that I utilized in forming my opinions.
19   Q   Okay.  And that's fair.  Anything else?
20   A   So I have also authored -- but this is not
21 a peer-reviewed journal -- the Surgical Treatment of
22 General Stress Urinary Incontinence in the Female
23 Patient.
24   Q   Anything else, Doctor?
25   A   So there's also another article here, which

Page 45

1  is Predictors of Urinary Tension after Pelvic
2  Reconstructive Surgery and Stress Urinary
3  Incontinence Surgery.
4    Q   Any others?
5    A   No.
6    Q   Do you have any pending articles or
7  research that you intend to publish in the next
8  couple years regarding these topics?
9    A   No, I do not.
10   Q   Doctor, have you ever conducted a
11 randomized controlled trial?
12   A   Yes.
13   Q   Okay.  What randomized controlled trials
14 have you conducted?
15   A   So the one that I mentioned that compared
16 the Burch retropubic urethropexy to the Kelly-Kennedy
17 plication for the surgical treatment of stress
18 urinary incontinence.
19      And then we also conducted a randomized
20 trial that compared the surgical treatment of
21 obstetrical anal sphincter laceration third and
22 fourth degree.
23      And then we also conducted a randomized
24 placebo-controlled trial that compared antibiotic to
25 no antibiotic for the prevention of post-operative

Dorothy Kammerer-Doak, M.D.

Page 46

1  urinary tract infection in women undergoing
2  suprapubic catheterization following prolapse and
3  urinary incontinence surgery.
4      Q   Have you ever formed --
5      A   Wait.
6      Q   -- a clinical trial --
7      A   One more.  I also performed --
8      Q   Are you not finished, Doctor?  I apologize.
9      A   No, that's okay.  I also -- we also
10  performed a randomized trial, again, placebo
11  controlled, evaluating postoperative pain relief
12  following laparoscopic tubal sterilization using the
13  Falope-Ring, and it was a comparison between the use
14  of ketorolac; bupivacaine, a local anesthetic; and
15  placebo.
16      Q   Okay.  Are you finished with your answer?
17  I don't want to jump in.
18      A   I am.  I'm sorry.  It's really hard because
19  we're not face-to-face.  I apologize.
20      Q   I get it.  So, Doctor, just to confirm,
21  you've never performed a study on transvaginal mesh,
22  fair?
23      A   I have not.
24      Q   You've never published anything related to
25  transvaginal mesh, correct?

Page 47

1      A   I have not.
2      Q   And, Doctor, going back to what we were
3  discussing briefly earlier with regard to mesh
4  augmentation for pelvic organ prolapse, is the mesh
5  used in that surgery the same type of mesh as that
6  used in the TVT?
7          MR. KOOPMANN:  Object to form.
8      A   It's a polypropylene mesh.  So in that
9  regards, the TVT sling is a polypropylene mesh as
10  well.
11      Q   (By Mr. Schnieders)  Sitting here today, do
12  you know if the mesh that's used in a TVT sling is
13  the same or different from the mesh that's used to
14  repair pelvic organ prolapse?
15      A   It's going to be different in that it's
16  larger and the way that it is put together.  For
17  example, the Perigee has the arms that have a
18  little -- for lack of a better word, I will say
19  "button" -- and I put that in parentheses -- that has
20  a suture attached to it.
21          So the mesh that I used for prolapse repair
22  vaginally is different than the mesh that's used for
23  the TVT sling.
24      Q   But the mesh itself with regard to pore
25  size and everything else that goes into that is the

Page 48

1  same mesh, isn't it, Doctor?
2          MR. KOOPMANN:  Object to form.
3      A   I would have to review the pore size of the
4  Perigee mesh to be able to answer that for sure.
5      Q   (By Mr. Schnieders)  Sitting here today,
6  you don't know the answer to that question?
7      A   The pore size of the Perigee mesh?  No, I
8  do not.
9      Q   Do you know if the mesh that's used in a
10  TVT is the same as mesh used by other manufacturers
11  in suburethral slings?
12      A   It can't be the same -- in my
13  understanding, it can't be the same otherwise because
14  it's protected by patent laws.  So there are going to
15  be some differences based on how they develop the
16  product.
17      Q   Sitting here today, do you have any
18  appreciation for the difference between the mesh used
19  in a TVT and the mesh used for Boston
20  Scientific's suburethral slings, for instance?
21      A   Yes.
22      Q   What are the differences?
23      A   So the pore size of the TVT sling is
24  approximately 1,379 microns, whereas the pore size
25  for the Boston Scientific is approximately 1,200.

Page 49

1  They're both about -- the weight is -- they are both
2  approximately 100 grams per meter squared.  So
3  they're very similar.  There is also some slight
4  differences as far as other characteristics of the
5  mesh, but they're going to be very similar.
6      Q   Okay.  And same thing with regard to TVT
7  mesh versus an American Medical Systems product.
8          Are they the same mesh or different?
9      A   Well, they are composed of polypropylene,
10  but there are going to be differences in their exact
11  weight and other characteristics.
12      Q   And --
13      A   They're not exactly the same.
14      Q   What are the differences between their
15  weight, for instance?
16      A   So with the other one that you described, I
17  would have to look it up to tell you for sure what
18  the different weights are.
19      Q   And do you know the different weights of
20  any of the Boston Scientific suburethral slings?
21      A   Didn't I just talk about the Boston
22  Scientific?
23      Q   I don't recall you saying anything about
24  the weight.
25      A   I said it was 100 grams per meter squared.

Dorothy Kammerer-Doak, M.D.

Page 50

1    Q   Okay.  Are you familiar with the Bard
2  midurethral slings?
3    A   The only slings that I have used are the
4  Johnson & Johnson and the Boston Scientific.
5    Q   Okay.
6    A   So I have not utilized the others.
7    Q   But sitting here today, you would
8  acknowledge that there are differences between the
9  mesh used in Boston Scientific slings and the TVT
10  slings, correct?
11    A   Very minimal differences, but there are
12  differences, yes.
13    Q   Okay.  And there are differences between
14  the TVT sling and the mesh used in American Medical
15  System slings, correct?
16    MR. KOOPMANN:  Object to form.
17    A   So, again, what I've said previously is
18  that there are going to be slight variations in how
19  the meshes are made, but they're all composed of
20  polypropylene, and they are all around the same
21  weight, and they have similar pore sizes.
22    Q   (By Mr. Schnieders)  So when you say
23  "similar pore sizes," for instance, in the Monarc --
24  which I believe you've used before, correct?
25    A   I've used several times; and I haven't used

Page 51

1  the Monarc in, I would say, eight or nine years.
2    Q   Okay.  So what's the pore size for the
3  Monarc?
4    A   Off the top of my head, I can't tell you
5  the pore size of the Monarc.  I know it is considered
6  macroporous according to the Amid classification, but
7  the exact pore size of Monarc, I can't tell you.
8    Q   Okay.  Well, I'm happy if you need to refer
9  to your materials, you can go ahead and do that.
10    (The deponent is reviewing documents.)
11    Q   (By Mr. Schnieders)  And I apologize if I'm
12  interrupting, but I assume you're looking through
13  your materials right now; is that right?
14    A   Yes.
15    (The deponent is reviewing documents.)
16    A   So what is your question for me?
17    Q   (By Mr. Schnieders)  What is the pore size
18  of the mesh used for the Monarc?
19    A   Can you tell me who makes the Monarc?
20    Q   Do you know who makes the Monarc, Doctor?
21    A   No, I do not.  When I use a device, I use
22  the device based on the characteristics of the
23  device, and not the company.
24    Q   Okay.  It's American Medical Systems.
25    A   Pore size is 1,000 microns.

Page 52

1    Q   And what are you looking at for that?
2    A   The Moalli article.
3    Q   Okay.  And is that something that you
4  considered in forming your opinions today?
5    A   The Moalli article?
6    Q   No.  The pore size of the Monarc mesh.
7    A   I'm not forming an opinion on the Monarc
8  mesh.  I'm forming an opinion on the TVT sling.
9    Q   Is it fair to say that the pore size of the
10  Monarc mesh did not factor into your opinion today,
11  correct?
12    A   Correct.
13    Q   Okay.  Same question with regard to Bard
14  and their slings; for instance, the ALIGN.  Are you
15  aware of the pore size of the mesh used for the
16  ALIGN?
17    A   So looking at this article, it's 1,160
18  microns.
19    Q   Okay.  And until you looked at that article
20  just now, that's not something you fully appreciated,
21  fair?
22    MR. KOOPMANN:  Object to form.
23    A   It's not something that I researched or
24  would have researched because I do not use that
25  product.

Page 53

1    Q   (By Mr. Schnieders)  Okay.  And so it's
2  fair to say that the pore size of the mesh used in
3  the ALIGN is not something that factored into your
4  opinions here today, correct?
5    A   Correct.
6    Q   And I could go through the list, but I
7  assume your answer is going to be the same.  The pore
8  size of any mesh used in a midurethral sling that was
9  not the TVT is not something that's factored into
10  your opinions, fair?
11    MR. KOOPMANN:  Object to form.
12    A   Can you repeat that, please.
13    Q   (By Mr. Schnieders)  Sure.  Well, I'll ask
14  it -- because there was an objection, I'll ask it
15  this way:  Doctor, when you formed your opinions with
16  regard to the TVT that you're here to offer today,
17  the only pore size that factored into those opinions
18  was the pore size of the TVT mesh and none of the
19  other suburethral slings, fair?
20    A   So in forming my opinion about the TVT
21  sling, I looked at the pore size and, again, based on
22  the admin article, and so the pore size of the TVT
23  sling is the optimal pore size.  I did not look at
24  the pore size of other slings in forming my opinion.
25    Q   Because the pore size of the other meshes

Dorothy Kammerer-Doak, M.D.

Page 54

1  and other slings is irrelevant to your opinion, fair?
2      A   Yes, because I'm not offering an opinion on
3  the other slings, just on the TVT.
4      Q   Okay.  Doctor, we've marked as Exhibit 4 --
5  and we'll go here on a break in just one second
6  because I think we've been going about an hour -- but
7  marked as Exhibit 4, your expert report that you're
8  offering regarding your general TVT opinions; is that
9  correct?
10     A   Yes, if you say so.  Let me look to see
11  which number it is.  Yes, it is No. 4.
12     Q   Okay.  And is it fair to say that report
13  that we've marked as Exhibit 4 encompasses all of
14  your opinions with regard to the TVT that you're here
15  today to offer?
16     A   Yes.
17     Q   All right.
18         MR. SCHNIEDERS:  Why don't we -- why don't
19  we take a quick break because I think we've been
20  going for a little bit over an hour at this point.
21         MR. KOOPMANN:  Okay.
22         (Recess from 10:22 a.m. to 10:32 a.m.)
23     Q   (By Mr. Schnieders)  All right, Doctor,
24  we're back on the record after a short break.
25         Did you review any documents during the

Page 55

1  break?
2      A   I did not.
3      Q   Okay.  Before the break, we were talking
4  about your reliance list and your report, and I think
5  we've already talked about your report and the fact
6  that it encompasses all of your opinions, correct?
7      A   Yes.
8      Q   And I realize that you have a supplemental
9  reliance list that we've marked as Exhibit 9.  And
10  then I believe there's also some additional materials
11  that may not be reflected in that, that we've marked
12  as Exhibit 8.
13         But between Exhibit 8 and Exhibit 9, have
14  we -- do we have all of the documents that you're
15  relying upon to make your opinions in this case?
16     A   All the documents, yes.
17     Q   Okay.  And I'm assuming that you're saying
18  it that way because you're also relying upon your
19  experience, correct?
20     A   Yes.
21     Q   Anything else?
22     Q   Anything else?
23     Q   That you're relying upon to make your
24  opinions as we sit here today?
25     A   Well, my experience and my training, I

Page 56

1  would say as well.  In addition to that, my
2  continuing medical education, which is not reflected
3  in all of the materials that are here today, which
4  includes mostly yearly attendance at AUGS, IUGA, and
5  SGS, and listening to presentations about this
6  subject matter.  And so those may not all be in my
7  supplemental list.
8      Q   And so just so we're clear, there have been
9  continuing medical education programs at AUGS, IUGA,
10  and ACOG that you would have also attended with
11  regard to transvaginal mesh?
12     A   Well, SGS, yes.  I didn't say ACOG.
13     Q   I apologize.
14     A   That's okay.  I don't typically go to those
15  meetings.
16     Q   Okay.  But there would have been continuing
17  medical education regarding transvaginal mesh that
18  you would have attended at IUGA, AUGS, and SGS,
19  correct?
20     A   Yes.
21     Q   All right.  Doctor, earlier we briefly
22  mentioned a sexual function questionnaire that I
23  believe you had a hand in creating; is that correct?
24     A   Yes.
25     Q   And can you tell me just briefly what that

Page 57

1  sexual function questionnaire is?
2      A   So it's called the Pelvic Organ Prolapse in
3  Urinary Incontinence Sexual Function Questionnaire,
4  or PISQ for short, P-I-S-Q, and the long form
5  contains 31 questions and it assesses sexual
6  function, specifically in women with these pelvic
7  floor disorders.  There's also a short form that
8  contains 12 questions.
9      Q   Okay.  And that's for use both in the
10  instance of pelvic organ prolapse and in the instance
11  of stress incontinence; is that correct?
12     A   Urinary incontinence.  So not just stress
13  incontinence, in all forms of incontinence.  It's
14  also been validated for use in the general population
15  as well.
16     Q   Gotcha.  Okay.  And I appreciate the
17  correction.
18         Is this a questionnaire that you use in
19  your clinical practice?
20     A   It's -- I use it -- we have used it mostly
21  for research.  So I do not use this specific
22  questionnaire in my clinical practice.
23     Q   Okay.  When you're evaluating a woman for a
24  sexual function or sexual disorder function, what do
25  you use in your clinical practice?

Dorothy Kammerer-Doak, M.D.

Page 58

1    A   So I have a questionnaire that I use that
2   encompasses prolapse urinary incontinence and sexual
3   function.  And that questionnaire contains questions
4   about -- that are taken from the PISQ.  So, for
5   example, it says:  Are you sexually active?  And the
6   answer is yes and no.  And if not, is it because
7   you're without a partner?  And then:  How often does
8   pain interfere with your sexual activity?  How often
9   does prolapse interfere with your sexual activity?
10   And how often does urinary incontinence interfere
11   with your sexual activity?
12       So what that questionnaire does is it opens
13   up the discussion for me with the patient as to what
14   is going on.  And there is some research to back this
15   up that -- and it's a questionnaire by Plouffe,
16   P-l-o-u-f-f-e, that says that three simple questions:
17   Are you sexually active?  Are you having any
18   problems? and, Are you having pain with intercourse?
19   are as effective in opening up the discussion and
20   dialog about sexual function as a full-length
21   interview.
22       So that is why I have chosen to address
23   sexual function problems in this way, and then
24   talking to a woman more about it when a problem is
25   identified.

Page 59

1    Q   Thank you.
2       Doctor, sitting here today, this deposition
3   is being conducted in Telluride, Colorado; is that
4   correct?
5    A   Yes.
6    Q   Okay.  And your private practice is in
7   Albuquerque, right?
8    A   Yes.
9    Q   And so it begs the question:  What brings
10   us to Telluride for this deposition?
11    A   So currently I'm living here and -- as of
12   December the 17th -- and traveling to Albuquerque to
13   work there.
14    Q   Okay.  So currently with your clinical
15   practice, you are commuting to Albuquerque weekly?
16    A   I go once a month for an entire week.
17    Q   Okay.  And then you'll see patients for an
18   entire week and then go back to Telluride; is that
19   right?
20    A   Yes.
21    Q   Okay.  So currently your current practice
22   is to see patients approximately one week every
23   month; and that's when you see them, right?
24    A   Yes.
25    Q   Okay.  And is that just representative of

Page 60

1   wanting to slow your practice down a bit?
2    A   It's a long story.  My husband was supposed
3   to be transferred for his work to Los Angeles, and so
4   we put our home on the market.  And our home sold
5   very quickly, much more quickly than we had thought.
6   And in between the time that our house sold and it
7   closed, he wasn't transferred to Los Angeles, but
8   there's still the potential that he may be
9   transferred to Los Angeles.  So we didn't know what
10   to do.
11       We had a home here in Telluride that is our
12   retirement home.  So we put everything into storage,
13   and I'm currently in Albuquerque -- I mean currently
14   in Telluride and commuting back to Albuquerque for
15   the time being until I know what happens in the
16   future.
17    Q   And I appreciate that, and I don't want to
18   get into your personal life; that's not my intention.
19   I just basically want to know:  Is it your intention
20   to continue working full-time; or are you planning on
21   some sort of a slowdown in your work, ultimately,
22   when this is all cleared?
23    A   So I am not sure what's happening at this
24   point in time, but more than likely a slowdown.
25    Q   Okay.  All right.  Doctor, I believe we've

Page 61

1   established previously that the suburethral sling
2   that you use in practice currently is the TVT,
3   correct?
4    A   I am doing a TVT sling.  I am not using the
5   Johnson & Johnson currently.
6    Q   Okay.  What is the current sling that you
7   use?
8    A   The Boston Scientific.
9    Q   And do you know which of the Boston
10   Scientific slings you're using?
11    A   Yes.  It's the Advantage Fit.
12    Q   Any particular reason you're using that
13   sling and not a Johnson & Johnson product?
14    A   It was a monetary decision by the hospital
15   because it was cheaper for them to get the Advantage
16   Fit than the TVT.
17    Q   When is the last time that you utilized an
18   Ethicon TVT yourself?
19    A   It would have to be several years ago.  I
20   can't give you the exact date.
21    Q   Do you have any estimate of the amount of
22   Ethicon TVTs you've implanted?
23    A   So I've implanted over 2,000 retropubic --
24   and I'm just going to use "TVT slings" to encompass
25   both types, both manufacturers.  And I would say

Dorothy Kammerer-Doak, M.D.

Page 62

1  about two-thirds of them, somewhere between one-half
2  and two-thirds, would be the Ethicon product.  And
3  yeah, one-half to two-thirds.
4      Q   And when did you first start regularly
5  using suburethral mesh slings?
6      A   So prior to the Hilton and Ward study, way
7  back when, I did use some Gore-Tex slings.  That
8  would have been many years ago when I was at the
9  University of New Mexico after I completed my
10  fellowship.
11         And I stopped using those slings when it
12  was discovered -- not discovered, but that the pore
13  size -- it was microporous and it was
14  multifilamentous, and there's the Weinberger and
15  Ostergard article that stated -- that demonstrated
16  there was a very high risk of complications.  So I
17  stopped using mesh for slings following that.  So
18  that would have been in probably mid-1990s.
19         I then started using -- we talk about
20  synthetic slings because I did use some cadaveric
21  fascia, and, you know, those -- I don't know if you
22  would consider them mesh or not, but synthetic mesh I
23  started using in 2004.
24      Q   And just so we're tracking, I would not
25  consider cadaveric to be mesh --

Page 63

1      A   Perfect.
2      Q   -- or synthetic to be mesh, okay?
3      A   Okay.
4      Q   So 2004.  And what was it about 2004 that
5  led you to begin using synthetic mesh?
6      A   So there was -- I was very aware of the TVT
7  sling and that, you know, the first publications were
8  in the late 1990s, but I didn't start using it until
9  the Hilton and Ward study came out that
10  demonstrated -- which is a randomized controlled
11  trial that compared the Burch retropubic urethropexy
12  to --
13         (Reporter requested clarification.)
14      A   -- randomized controlled trial that
15  compared the Burch retropubic urethropexy to the TVT
16  sling.
17         So the initial publication for that came
18  out a couple of years before, but I waited to use the
19  sling until the Hilton and Ward had the two-year
20  follow-up data and continued to show the same
21  results.
22      Q   (By Mr.Schnieders) Okay.  So,
23  specifically, it was the publication of that study
24  that led to you deciding to use synthetic mesh in
25  slings, correct?

Page 64

1      A   Yes.  Well, the TVT sling because I had
2  used the synthetic mesh for the Gore-Tex many years
3  before, but had abandoned that because of the high
4  risk of complications.
5      Q   That's fair, and just so we're tracking
6  again, when I'm talking about synthetic mesh, I'm
7  talking about what we're here to talk about today,
8  which is what is used in the TVT, the polypropylene,
9  okay?
10      A   Perfect.  Okay.
11      Q   And specific to polypropylene mesh, it
12  would be the Hilton study that led you to begin to
13  use polypropylene mesh in slings, correct?
14      A   Yes.
15      Q   Doctor, have you kept track of the number
16  of either Boston Scientific or Ethicon slings that
17  you've implanted?
18      A   I have not.
19      Q   Okay.  And it follows that you -- since you
20  have not kept track of them, you don't have any sense
21  of the complication rates of those, do you?
22         MR. KOOPMANN:  Object to form.
23      A   So I don't have a database with respect to
24  complications, but I'm in a fairly unique situation
25  in that there's only myself and the university or my

Page 65

1  practice and the university in the entire state of
2  New Mexico who are urogynecologists.
3         There are a few urologists out in the
4  community, but they do not do a lot of female
5  urology.  And so a patient would have to travel far
6  in order to see somebody else if they had a
7  complication.
8      Q   (By Mr. Schnieders)  But, again, fair to
9  say that you have not kept track of this in any
10  systematic way, right?
11      A   Correct.
12      Q   Doctor, do you know the difference between
13  mechanically cut mesh and laser cut mesh?
14      A   What do you mean by "do I know the
15  difference"?
16         Can you clarify what you mean by that.
17      Q   Well, first of all, for the jury's benefit,
18  what does it mean to be mechanically cut versus laser
19  cut for mesh?
20      A   So "mechanically cut" means it was cut
21  using a machine, but they do not do it kind of like
22  using a knife or a scissors.  And laser is using a
23  laser.
24      Q   And for the purposes of your opinion that
25  you're offering here today, is there any distinction

Dorothy Kammerer-Doak, M.D.

Page 66

1 to be made between whether mesh is cut by a laser or
2 cut mechanically?
3      MR. KOOPMANN:  Object to form.
4      A   So there is no difference clinically in the
5 mechanically cut versus the laser cut.
6      Q   (By Mr. Schnieders)  And is it your opinion
7 that there is no difference with regard to risk
8 vis-a-vis mechanically cut or machine cut -- or laser
9 cut?
10      MR. KOOPMANN:  Object to form.
11      A   There are no clinical studies that show any
12 difference in risk between laser cut versus
13 mechanical cut.
14      Q   (By Mr. Schnieders)  Are there any studies
15 that differentiate between laser cut and mechanically
16 cut?
17      A   So there is one randomized trial that
18 compares the TVT, which is mechanical cut, to the
19 TVT -- I believe it's ABBREVO -- that is laser cut.
20      Q   And when you say that there are no studies
21 that demonstrate a difference between laser cut and
22 mechanically cut, is that the study you're
23 specifically talking about?
24      A   There are also multiple randomized
25 controlled trials -- although we do not know if the

Page 67

1 TVT was laser cut or mechanical cut -- that have been
2 published since the introduction of the laser cut.
3 And there are no difference in those outcomes as
4 compared to prior to the onset of the use of
5 mechanical cut -- or I'm sorry, laser cut.
6      Q   So it's fair to say that your opinion that
7 laser cut has the same safety profile as mechanically
8 cut is based upon the fact that in your read of the
9 literature it's the same as it was before laser cut
10 came out?
11      A   Yes.
12      Q   Any other basis to state that laser cut and
13 mechanically cut are equivalent from a safety
14 perspective?
15      A   From a safety perspective, no.
16      Q   Doctor, is there a single, long-term,
17 randomized controlled trial for TVT with safety as a
18 primary end point?
19      A   Yes, there is.
20      Q   Can you please tell me what that is.
21      A   I believe it's by Angli -- Angliotti
22 (pronounced).
23      Q   Is that something that you reviewed in
24 your --
25      A   Yes.

Page 68

1      Q   -- preparation for drafting your expert
2 report here today?
3      A   Yes.
4      Q   And it's your testimony sitting here today
5 that that clinical trial has safety as the primary
6 end point?
7      A   The -- I just pulled it here.  Yeah, it's
8 Angiotti, Angiotti (pronounced).  And I'll read you
9 from the --
10      MR. KOOPMANN:  Angioli?
11      A   Angioli.  Sorry.  I have to put my glasses
12 on.
13      So it says:  Measurements.  This five-year
14 study represents the extension of our original
15 randomized trial, which was designed to assess the
16 incidence of long-term complications (primary end
17 point) and successes (secondary end point) for both
18 techniques.  And it's a randomized trial that
19 compares the tension-free vaginal tape versus the
20 transobturator suburethral tape.
21      Q   (By Mr. Schnieders)  Okay.  So, again,
22 you're stating that that study is a single,
23 long-term, randomized controlled trial that had four
24 TVTs that had safety as a primary end point?
25      A   It's five-year follow-up.

Page 69

1      Q   And what do you consider to be long-term?
2      A   Five years and greater.
3      Q   Okay.  The TVT is designed to be permanent,
4 correct?
5      A   Yes.
6      Q   And, typically, what's the age range of a
7 woman that's receiving a TVT?
8      A   So the median age is going to be in the
9 50s.
10      Q   So best estimate, we're dealing with women
11 that have at least 25 years left of life most likely,
12 correct?
13      A   Yes.
14      Q   But the long-term, randomized controlled
15 trial for TVT that has safety as a primary end point
16 that you're able to point to is a five-year study,
17 correct?
18      A   There are studies with up to 17 years of
19 follow-up; and while safety was not the primary end
20 point, safety and adverse events were recorded.
21      Q   The only single randomized controlled trial
22 for TVT that you're able to point to with safety as a
23 primary end point is the Angiotti (sic) study,
24 correct?
25      A   With safety as the primary end point, but

Dorothy Kammerer-Doak, M.D.

Page 70

1 all trials track adverse outcomes.
2    Q   What's the significance of an end point,
3 Doctor?
4    A   Primary versus secondary?
5    Q   Primary versus secondary, yes.
6    A   So it is all based on how the study is
7 designed and the power analysis.  So in order to
8 ensure that there is a difference or no difference
9 between two different types of interventions, a power
10 analysis is performed, and that tells you how many
11 subjects are needed in each group to ensure that you
12 don't have a Type II or a beta error which indicates
13 that finding no difference is due to lack of enough
14 patients in your study versus finding no difference
15 when you have enough patients in the study.
16      And so a primary end point simply tells you
17 that that study was based on that outcome to find
18 that there was a difference or no difference.
19      Secondary outcomes are also tracked, and it
20 doesn't mean they're no less important.  The study
21 just was not powered to find a difference in those
22 secondary end points.
23    Q   When you say "powered," for the jury's
24 benefit, you mean it didn't have enough people in the
25 study to track that, right?

Page 71

1    A   No.  It just means that the primary end
2 point is -- that the number of patients in that study
3 were recruited to answer that specific question.
4    Q   So using your words, Doctor, the only study
5 that was developed and recruited to answer the
6 question of safety with regard to TVT is the Angiotti
7 study that you're referring to, correct?
8      MR. KOOPMANN:  Object to form.
9    A   Looking at the TVT in comparison to other
10 types of surgeries, yes.
11    Q   (By Mr. Schnieders)  Now, you referenced a
12 moment ago a 17-year study.
13      Can you tell the jury which study you're
14 referencing?
15    A   That's the Ulmsten study.
16    Q   The Ulmsten study.  And do you know who
17 Dr. Ulmsten is?
18    A   Yes, I do.  And it's not Ulmsten, it's
19 actually Nilsson, because I believe Ulmsten had
20 passed away when that was written.
21    Q   And was Nilsson a colleague of Dr. Ulmsten?
22    A   Yes.
23    Q   Who is Dr. Ulmsten?
24    A   He is one of the inventors of the TVT
25 sling.

Page 72

1    Q   And with regard to that 17-year study that
2 you're referencing, have you performed a power
3 analysis on that?
4    A   It's not a randomized trial.  It is a
5 cohort study, so there is no power analysis that can
6 be performed.
7    Q   And what is the difference between a
8 randomized clinical trial and a cohort study, for the
9 jury's benefit?
10    A   So a randomized trial is where participants
11 are randomized by chance to undergo one treatment
12 versus another, and then those treatments are
13 compared head-to-head, so to speak.
14      A cohort study is where patients are simply
15 followed forward in time.
16    Q   And do you recall how many people -- or I'm
17 sorry, how many -- strike that.
18      Do you recall how many women were involved
19 in the study that you're referencing with the 17-year
20 data?
21    A   So the original cohort I believe had 50
22 women in it, and the 17-year follow-up I believe had
23 somewhere between 35 and 40.  I would have to pull it
24 for me to be able to tell you the specific numbers.
25    Q   Okay.  Now, are you aware of any other

Page 73

1 studies that are long-term that are random -- I'm
2 sorry, strike that.
3      Are you aware of any studies longer than
4 five years that are randomized clinical trials
5 assessing TVT?
6    A   So randomized controlled trials with more
7 than five years of follow-up.
8    Q   Correct.
9    A   I think at this point in time we just have
10 five follow-up year data.  With randomized controlled
11 trials there's --
12    Q   -- market?
13    A   Pardon me?
14    Q   How long has the TVT been on the market,
15 Doctor?
16    A   Since the mid 1990s.  Late 1990s.  I'm
17 sorry.
18    Q   Taking the randomized trials out of it, are
19 there any long-term studies with more than five-year
20 follow-up with TVT?
21    A   I'm sorry.  Can you repeat that?
22    Q   Yes.  Taking -- so I'm stepping back from
23 clinical trials or randomized clinical trials.
24    A   Uh-huh.
25    Q   Are there any long-term studies that have

Dorothy Kammerer-Doak, M.D.

Page 74

1 more than five years of follow-up with regard to the
2 Ethicon TVT?
3 A Yes. There's 10-year data, and there is
4 also, I believe, 13-year data, and there's also like
5 11.5-year data.
6 Q Okay. And can you tell me what studies
7 you're referencing when you mention those years?
8 A So I would have to turn to my little
9 section here to be able to tell you that.
10 Q That's fine.
11 A So Tommaselli. I'm pulling my notebook
12 here.
13 (The deponent is reviewing documents.)
14 A Tincello. And then there is another one
15 that I can't tell you off the top of my head, which
16 is from an Asian author that has 10-year follow-up.
17 Q (By Mr. Schnieders) Are we done, Doctor?
18 I don't want to step on your answer, but it sounds
19 like you might be finished.
20 A Yes. I know there's a couple others. I
21 just can't tell you off the top of my head.
22 Q I'm happy for you to look at your report
23 and reference them if you need to.
24 (The deponent is reviewing documents.)
25 Q (By Mr. Schnieders) And not to be rude.

Page 75

1 I'm just making sure you're looking through your
2 report right now, Doctor.
3 A Yes. And I think it's in my supplementary
4 thing, my supplementary list. So I know there's
5 several more. I just don't have them off the top of
6 my head. It's not listed in my report, so it's not
7 readily available to me.
8 Q Okay. And it's fair to say that if
9 something is in your supplemental reliance list, that
10 it was something that you did not review or consider
11 prior to issuing your report, fair?
12 MR. KOOPMANN: Object to form.
13 A No, that's not correct.
14 Q (By Mr. Schnieders) Okay. Well, your
15 supplemental reliance list was only made available to
16 me today, whereas your original report you provided a
17 reliance list with it. So anything that's been added
18 since the time of your report has not been reviewed
19 and been a part of your opinions that you're offering
20 in this case, correct?
21 MR. KOOPMANN: Object to form. It
22 misstates the record.
23 A So just because it's not listed in my
24 general report doesn't mean that I did not consider
25 it.

Page 76

1 Q (By Mr. Schnieders) Okay. Well, here's
2 what I need to know, then, Doctor, because this is my
3 one time to depose you on these issues. So I think
4 we established earlier that between the supplemental
5 documents in that list that I was provided today that
6 has been marked as Exhibit 9, additionally some other
7 materials that are marked as Exhibit 8, and the
8 materials that were provided with your reliance list
9 and your actual report, which was issued on January
10 31st of 2017, that we had encompassed all of the
11 documents that you were relying upon; is that not the
12 case?
13 A So just to go back, I have a long list of
14 TVT long-term studies that I can read to you. And I
15 apologize that it wasn't readily at my fingertips,
16 but I --
17 Q That's fair, Doctor, but I just ask that
18 you answer my question before we do that.
19 A Okay. Repeat that for me, please.
20 MR. SCHNIEDERS: Could you read that back,
21 please.
22 (Last question was read.)
23 Q (By Mr. Schnieders) Okay. All right. And
24 then, Doctor, could you tell me what you're reading
25 from to tell us what the long-term studies are that

Page 77

1 you are referencing?
2 A So I'm referencing the TVT Medical
3 Literature Binder 1.
4 Q Okay. And in that binder, what are you
5 reading from?
6 A I'm reading from TVT long-term studies. So
7 there's the Ward and Hilton with five-year follow-up,
8 which, you know, we've established you want something
9 longer than that. There's Liapis, which is five- and
10 seven-year follow-up. There's Olsson Long-term
11 Efficacy of the TVT Procedure. There is -- I don't
12 know how to pronounce it -- Heinonen, Heinonen
13 (pronouncing), and I believe that has 10-year
14 follow-up. There's Svenningsen, which is 10-year
15 follow-up, and he has -- he or she has two
16 publications. Serati, which is 10-year follow-up.
17 We've talked about the Angioli article,
18 which is five-year follow-up. Aigmueller, which is
19 10-year follow-up. Cresswell. Schiotz, 10-year
20 follow-up. Jelovsek, which I believe is five-year
21 follow-up, and that's a randomized trial comparing
22 the laparoscopic Burch to the TVT. Seven-year
23 outcome from Song. Prien-Larsen, which I believe is
24 7 to 10 years. It's not listed in the title here.
25 Holmgren. Li, seven-year follow-up. Song, 13 years

Dorothy Kammerer-Doak, M.D.

Page 78

1  follow-up.
2      I have to put my glasses on.  I'm sorry.
3    Q   That's okay.
4    A   Shao, which is 57 months.  It doesn't quite
5  meet our criteria.  Seven-year follow-up, Reich.
6  Groutz, 10-year follow-up.  Han.  And then
7  Costantini, which is 100-month follow-up.
8    Q   And I think you're done with your answer;
9  is that correct, Doctor?
10   A   That is correct.
11   Q   Okay.
12   A   Go ahead.
13   Q   No, Doctor, did you do an analysis of the
14 studies that actually tracked long-term pain?
15   A   So I'm looking at the study which -- whose
16 primary outcome was looking at adverse events.  So
17 that one -- I read that one about pain.  The other
18 ones, I'm not sure how many of them tracked pain.
19   Q   It's fair to say that you don't know how
20 many studies include long-term pain as a data point,
21 right?
22   A   Correct.  Looking at the meta-analysis, and
23 so the randomized trials that were included, some of
24 those randomized trials were included in the
25 meta-analysis and did track pain.

Page 79

1    Q   And you don't know how many of those
2  tracked pain as postoperative pain versus long-term
3  pain, meaning over six months, correct?
4    A   I think it's pain at any end point.  And
5  lots of studies do specifically address whether the
6  pain was more than six months or less than six months
7  or more than six weeks or greater than six weeks.
8    Q   Sitting here today, Doctor, are you able to
9  name the studies that tracked pain, meaning over six
10 months?
11   A   So if we look at the meta-analysis -- and I
12 would have to get out -- by Schimpf, that compiles
13 the studies that reviewed pain.
14   Q   And does it differentiate between the
15 studies that tracked long-term pain versus
16 postoperative pain?
17   A   I believe it does.
18   Q   Okay.  So your testimony here today is that
19 meta-analysis indicates which studies tracked
20 long-term pain versus postoperative pain, correct?
21   A   I'm going to look at it right now to be
22 able to tell you.
23       (The deponent is reviewing a document.)
24   A   So the Schimpf study just reports on
25 dyspareunia for the retropubic obturator mini-sling

Page 80

1  and pubovaginal.
2      And in reading those results there, I can't
3  tell you whether it was short-term or long-term, but
4  the typical way in which a study would be conducted
5  if they are reporting on dyspareunia, it's going to
6  be long-term.
7      It's not going to be in the immediate
8  postoperative period or in the short term.  It's
9  going to be as long as they followed those patients
10 up.  So the follow-up would be anywhere from one to
11 however many years the patients were followed up.
12 They're reporting on that last visit.
13   Q   (By Mr. Schnieders) Doctor, you would
14 agree with me that you're speculating as to whether
15 or not that study is tracking long-term or
16 postoperative dyspareunia, correct?
17       MR. KOOPMANN:  Object to form.
18   A   What I would say is that the -- in having
19 conducted many randomized controlled trials, that you
20 don't report on your findings that are short-term.
21 You report on the last visit with the patient.  So
22 it's not speculative.  It is what would be considered
23 scientific protocol in reporting.
24   Q   (By Mr. Schnieders) So I can be clear
25 here, Doctor, what are you pointing to, to say that

Page 81

1  that study is telling you that it's tracking the
2  long-term dyspareunia through the meta-analysis?
3    A   What I am pointing to is the way in which
4  scientific studies are conducted.
5    Q   Okay.  So you're saying that it would be
6  unscientific to even report on short-term
7  dyspareunia?
8    A   No.  I'm not saying that.  What I'm saying
9  is that when authors who conduct these studies report
10 on, for example, rates of dyspareunia, they're going
11 to report at the last follow-up visit.
12   Q   And are you able to tell me when the last
13 follow-up visit was for each of those studies for
14 each of the individuals that reported dyspareunia?
15   A   So I would have to pull each individual
16 study that is cited and -- to be able to tell you
17 that.
18   Q   Okay.  And absent pulling each of those
19 studies and reviewing that, you can't tell me,
20 correct?
21   A   The -- from each of the individual studies,
22 the follow-up range anywhere from 2 to -- I think one
23 of the randomized trials has 10-year follow-up.
24   Q   And I'm going to move to strike.  That is
25 nonresponsive.  I'm going to ask my question again.

Dorothy Kammerer-Doak, M.D.

Page 82

1    Absent pulling each of those individual
2  studies, you can't tell me what the final follow-up
3  was for those cases reporting dyspareunia, fair?
4    A   And I will say that these studies have, at
5  the minimum, two years follow-up, and at the maximum,
6  I believe, nine years follow-up.  So they are going
7  to range from 2 to 10 years follow-up.
8    Q   Okay.  And you're extrapolating the Schimpf
9  study only reports on long-term dyspareunia; is that
10 correct?
11   A   I am saying that the Schimpf study is
12 reporting on dyspareunia at the last follow-up visit.
13   Q   And you know for a fact that the
14 dyspareunia has been reported at the last follow-up
15 visit in each of those studies because you have
16 reviewed that in forming your opinions that you're
17 offering right now, Doctor, correct?
18   A   What I said was, I'm giving that opinion
19 based on how these studies are reported, that when
20 you report outcomes such as cure, you're going to
21 report it at the last visit.  You're not going to
22 report that the patients -- you're not going to
23 report that the patients were cured 90 percent at two
24 years and have that be in the meta-analysis when
25 there's a full five years of follow-up.  You're going

Page 83

1  to report your five-year follow-up data.  So at that
2  last visit is when those complications or those
3  outcomes are going to be reported.
4    Q   So, Doctor, just so I'm clear, you're
5  talking about a meta-analysis, correct?
6    A   Correct.
7    Q   And a meta-analysis is a grouping of many
8  different studies, correct?
9    A   Yes.
10   Q   All of which have different protocols,
11 correct?
12   A   All of them are designed differently or
13 they could be designed similarly, yes.
14   Q   But they have their own distinct protocols,
15 correct?
16   A   Yes.
17   Q   You're not aware of those protocols as you
18 sit here today, correct?
19     MR. KOOPMANN:  Object to form.
20   A   In the meta-analysis, you are not aware of
21 the protocols.
22   Q   (By Mr. Schnieders)  And a meta-analysis is
23 not actually reporting any first-hand information;
24 it's taking other information and grouping it, fair?
25   A   It's taking information from all the

Page 84

1  studies, and they analyze each of the studies.  They
2  give different weights to the studies based on the
3  design of the study, and then they group -- or I'm
4  sorry, they statistically analyze the results and
5  come up with data based on the information from all
6  of the different studies.
7    Q   But it's fair to say that the
8  information -- for instance, the reporting of
9  dyspareunia we're referencing, comes from the
10 actual studies themselves, correct?
11   A   So the information of dyspareunia does come
12 from multiple different studies, yes.
13   Q   And so the information is only as good as
14 what was reported within that study, correct?
15   A   Yes.
16   Q   Doctor, what's the best type of study?
17   A   Randomized controlled trial.
18   Q   And if we're talking about the hierarchy of
19 studies, what would come next?
20   A   So then you have cohort comparison studies,
21 where groups are compared but they're not randomized,
22 and that can be divided into those that are followed
23 forward in time versus those that are followed
24 backward in time.
25     And then, lastly, you have just plain ol'

Page 85

1  cohort studies that are not compared to anything or
2  anybody to a different group.  So it's a longitudinal
3  study.  And those can be retrospective cohort
4  studies, or they can be prospective cohort studies.
5    Q   And with regard to trials, the longer the
6  data that you can obtain, the better off you are,
7  correct?
8    A   I'm not sure I understand the question.  So
9  are you saying that the longer-term follow-up is
10 better than short-term follow-up?
11   Q   Correct.
12   A   So it depends on what you're looking at.
13 If you look at cure rate, the longer follow-up is,
14 the better.  Same thing for complication rates.  But
15 as far as certain complications like perioperative
16 complications, you are only going to assess those in
17 the short term because they are associated with the
18 surgery.
19     So it depends on, you know, what you're
20 wanting to look at and what you're wanting to
21 evaluate.
22   Q   Sure.  That's fair.  But if we are looking
23 at something like chronic pain following implantation
24 of a TVT sling, you want long-term follow-up,
25 correct?

Dorothy Kammerer-Doak, M.D.

Page 86

1    A   Yes.
2    Q   That data is going to be more important to
3  you as a clinician than short-term follow-up,
4  correct?
5    A   That's not necessarily the case.  And
6  that's because just because a patient develops pain,
7  it doesn't mean it's caused by, for example, a TVT
8  sling.  As a patient ages, there's multiple factors
9  that can contribute to the development of pain; most
10  specifically, degenerative joint disease.
11      A person who is 40 years old is unlikely to
12  have pain from degenerative joint disease, but when
13  they're in their 50s and 60s, women can develop pain
14  that's due to degenerative joint disease.  So the
15  development of pain long-term is not necessarily
16  caused by the sling procedure.
17      MR. SCHNIEDERS:  Okay.  And I'm going to
18  object and move to strike as nonresponsive.
19    Q   (By Mr. Schnieders)  I didn't say anything
20  about it being caused by TVT, Doctor.  I'm asking
21  about looking at the issue.
22      If you want to determine whether or not
23  there is an association or a causal relationship
24  between implantation of a device like the TVT sling
25  and chronic pain, the longer-term trials are going to

Page 87

1  give you more information, correct?
2    A   No.  Because, again, my answer -- I don't
3  mean to be nonresponsive, but my answer to that
4  stands because just because a patient develops pain,
5  there's no way to know whether or not it's caused by
6  the TVT sling unless you examine a person
7  individually who is complaining of that pain.  So
8  just simply assessing pain long-term in a patient who
9  has had a sling, there's no way to determine whether
10  or not that is due to the sling in and of itself.
11    Q   What's epidemiology, Doctor?
12    A   It is looking at -- oh, that's -- it's hard
13  to define.  So epidemiology is simply looking at what
14  happens within a certain population.
15    Q   And, Doctor, your opinion here today is
16  that the TVT device is not defective as designed,
17  correct?
18    A   Yes.
19    Q   Is it your opinion that the TVT device
20  cannot cause chronic pain?
21    A   The TVT sling, it's possible that it could
22  cause pain, but it's unlikely; and the association of
23  TVT sling to pain has not been established.  If you
24  look at pain in women who have undergone -- and,
25  again, looking at the Schimpf article, if you look at

Page 88

1  dyspareunia, if you look at pain, is that the rates
2  are either the same or lower in women who've had
3  retropubic slings and who have undergone other types
4  of anti-incontinence procedure, including the Burch
5  and the pubovaginal sling.
6      So while it's possible, I think it's very
7  unlikely.
8    Q   And you're -- strike that.
9      In order to form that opinion, you're
10  relying upon studies, correct?
11    A   I'm relying on my personal experience with
12  the use of a retropubic TVT sling in more than 1,000
13  cases and possibly up to 1,500 cases.  I'm also
14  relying on a biological plausibility of a sling that
15  is 1 centimeter -- 1.1 centimeter wide and very thin
16  and where it's located within the body.
17      Any surgery that's performed within the
18  human body has the potential to cause pain, and with
19  the TVT sling, because it's minimally invasive, and
20  because there's minimal tissue dissection, the
21  potential for causing pain, as evidenced by the
22  studies and by my personal experience, is minimal.
23    Q   And you've not tracked your complication
24  rates with your own implants, correct?
25    A   I see probably --

Page 89

1    Q   Doctor, we're going to be here a long time
2  if you don't just answer the questions.
3      You've not tracked the complication rates
4  of your own patients when you've implanted TVT or
5  sling devices, correct?
6      MR. KOOPMANN:  Object to form.
7    A   I see multiple patients on a daily basis.
8  I see approximately 20 patients a day, and I've been
9  doing this for more than 10 years.  So I've seen
10  thousands of women who've had slings.  And I have not
11  examined a single patient who has had pain
12  attributable to her retropubic sling.
13    Q   (By Mr. Schnieders)  You've never examined
14  a patient where you've attributed the pain to the
15  device, correct?
16    A   I have never examined a patient where there
17  has been pain that is caused by the sling, that
18  retropubic sling.
19    Q   I'm not trying to mince words here, Doctor,
20  but you're the one attributing where the pain is
21  from, correct?
22    A   I have never found a patient who's had pain
23  from the sling.
24    Q   Who did the examination in these instances
25  that we're talking about?

Dorothy Kammerer-Doak, M.D.

Page 90

1   A   Myself.
2   Q   Okay.  Was there anyone else in the room
3  that was deciding whether or not the pain was from
4  the sling?
5   A   No.
6   Q   Okay.  So you have not attributed the pain
7  in all of those instances to the sling, correct?
8   A   As a physician and expert in pelvic surgery
9  and someone who has examined multiple women,
10  thousands of women who have pain, on a daily basis
11  when I'm in practice evaluated women with pain, I
12  have not found a single case where a retropubic
13  pain -- a retropubic sling has caused pain.  And,
14  yes, that is my expert opinion by examining thousands
15  of women with pain.
16   Q   Thousands of women that have TVT devices
17  implanted?
18   A   With and without TVT slings.  So whenever I
19  see a patient, one of the things that gynecologists
20  and specifically urogynecologists see a lot of is
21  pelvic pain.  So I have examined lots and lots of
22  women who have pelvic pain, some of which have TVT
23  slings and some which do not.
24   Q   Well, clearly the women that don't have
25  slings can't have pain attributable to the sling,

Page 91

1  fair?
2   A   Absolutely.
3   Q   So how many women would you estimate you've
4  seen that have slings implanted that you have
5  examined for pain?
6   A   Excuse me.  Not very many.  Not pelvic
7  pain.  Not pain -- I mean, they have pain that's like
8  at the apex of the vagina, but pain over the TVT
9  sling site that are retropubic, none.
10   Q   Going back to what you said a moment ago,
11  Doctor, is it your testimony in this case that it is
12  biologically impossible for the TVT sling to cause
13  pelvic pain?
14   A   No, I didn't say that.  I said it's highly
15  unlikely.
16   Q   Well, you were the one that brought up the
17  term "biologically possible," Doctor, so what did you
18  mean by that?
19   A   What I mean is, is that because of where
20  the sling is located, that it's retropubic and that
21  it is very small, that its chances of causing pain
22  chronically is very low.  But I also said anytime
23  that you do surgery on a patient, regardless of
24  whether it's a TVT sling or it's a pubovaginal sling
25  or it's a Burch procedure or it's an anterior repair,

Page 92

1  any of those procedures can potentially cause pain;
2  but the chances with the sling, because it is
3  minimally invasive and because it's so small, that's
4  what I'm talking about as far as the biological
5  possibility.
6       When you make a large incision, when you do
7  a lot of tissue dissection, you know, those are
8  things that can be associated with the development of
9  pain when those incisions especially are within the
10  vagina.  And when we talk about pain here, I'm
11  talking more about dyspareunia as opposed to chronic
12  pelvic pain.
13   Q   Okay.  Doctor, with regard to the Burch
14  procedure, would you consider it to be a gold
15  standard in curing women's stress incontinence?
16   A   It is one of the gold standards for the
17  surgical treatment of stress incontinence.
18   Q   Would you also consider an autologous
19  fascial sling to be a gold standard for the treatment
20  of stress urinary incontinence?
21   A   I think the pubovaginal sling has more
22  risks than the Burch retropubic urethropexi, but it
23  has a higher cure rate.  So I would utilize the
24  pubovaginal sling for a subset of patients, and I
25  wouldn't use it as a first-line choice, whereas the

Page 93

1  Burch would be a first-line choice.
2   Q   Okay.  So with regard to the Burch, let's
3  take that.
4       What are the risks of a Burch procedure?
5   A   So the risks of the Burch procedure are
6  failure to cure the incontinence; development of de
7  novo urgency incontinence or overactive bladder;
8  injury to the bladder -- or the pelvic organs, so it
9  would be the bladder, the ureter, the urethra;
10  retention; not being able to urinate on a prolonged
11  or permanent basis; infection; bleeding
12  complications.
13       If permanent suture is used, that suture
14  could potentially erode into the bladder.  That risk
15  is very low.
16       There's risks if it's done through an
17  incision of incisional complications, hernia,
18  infection of the incision, wound seroma.  Those are
19  not common complications.
20       Uncommon complications would be nerve
21  injury, scarring in the retropubic space.
22       But if I were to consent a patient I
23  wouldn't list all of those, I would only list the
24  most common complications, which are the first ones
25  that I listed.

Dorothy Kammerer-Doak, M.D.

Page 94

1 Q Okay.
2 A I would also --
3 Q And with regard to a Burch, what failure
4 rate would you opine would occur?
5 A I just want to add to my last answer, I
6 would tell the patient while a serious complication
7 is rare, any one of those serious complications could
8 require surgery at a later date. The success rate
9 for the Burch in the short term, five years and less,
10 is approximately 80 to 90 percent, and with follow-up
11 of approximately up to 20 years, the cure rate falls
12 off to 50 to 60 percent.
13 Q Okay. All right. Now, going to a TVT-felt
14 sling, which I'm speaking specifically about
15 Ethicon's TVT, what are the risks of the TVT?
16 A The same as above, with the exceptions we
17 don't have the risk of the wound complications from
18 the abdominal incision. And there is a risk of
19 the -- instead of it being permanent suture, it would
20 be the mesh being exposed within the vagina, the
21 urethra, or the bladder.
22 Q And what is the failure rate on a TVT, in
23 your opinion?
24 A So based on my review of the literature, it
25 is 80 to 90 percent and --

Page 95

1 MR. KOOPMANN: He asked about failure rate.
2 A Oh, I'm sorry. I thought success. Failure
3 rate is 10 to 20 percent.
4 Q (By Mr. Schnieders) And is that based on
5 the five-year results?
6 A It's based on 5- and the 10-year and then
7 the 17-year. It's --
8 Q It's -- up to 17 years the success rate is
9 still 80 to 90 percent with TVT?
10 A No. The longer-term studies is they're
11 more in the 80 percent range.
12 Q You would agree that from an efficacy
13 standpoint, the Burch procedure is equivalent to TVT,
14 correct?
15 A In the short term, and by that I mean five
16 years and less.
17 Q So let's talk about a "mesh erosion."
18 What does that mean?
19 A So I prefer to use the term -- and that's
20 the term that's probably used more -- is "exposure."
21 So that means that when a vaginal exam is done, the
22 mesh is exposed within the vagina --
23 Q Okay.
24 A -- instead of being covered by the vaginal
25 mucosa.

Page 96

1 Q So whether it's called an "erosion" or an
2 "exposure," what does that mean?
3 A Pardon me?
4 Q Whether we call it an "erosion" or an
5 "exposure," what does it mean?
6 A What do you mean, "what does it mean"?
7 Q What is that? What is that complication?
8 If you see that when a woman comes into
9 your clinic, what does that mean?
10 A So just what I said, that I can see the
11 mesh in the vagina and it's not covered by the
12 vaginal skin.
13 Q Okay. Does that mean it's eroded through
14 something to get there?
15 A It means it's exposed. So whether --
16 that's why we don't use the term "eroded" anymore.
17 Q "Exposure" and "erosion" are two different
18 things, aren't they, Doctor?
19 A I don't believe so.
20 Q Doctor, is there a difference between a
21 suture and a mesh?
22 A Well, a suture is a suture and mesh is
23 mesh.
24 Q Okay. So is mesh much larger than a
25 suture?

Page 97

1 A So the mesh in the sling is 1.1 centimeters
2 wide, whereas a suture is going to be, obviously,
3 much smaller, in millimeter size.
4 Q And are you aware if they're made out of
5 the same exact materials or if there are differences?
6 A Well, it depends on what suture was
7 utilized. So, you know, for permanent sutures,
8 there's multiple different kinds that could be used
9 for pubovaginal slings or for Burch's.
10 Q And there's also dissolving or nonpermanent
11 sutures that can be used, too, correct?
12 A Yes, but we wouldn't be talking about those
13 sutures being exposed within the vagina or within the
14 bladder or within the urethra because they would
15 dissolve. They are dissolvable sutures.
16 Q That's right. Is there a risk of infection
17 from mesh?
18 A Yes. With any surgical procedure for
19 urinary incontinence, there's always a risk of
20 infection.
21 Q With the introduction of a foreign body
22 like mesh, is the risk for infection higher than it
23 would be with the Burch procedure?
24 A I don't believe there's any Level I
25 evidence that shows that the risk of infection is

Dorothy Kammerer-Doak, M.D.

Page 98

1 higher.
2    Q    And when you say "Level 1," are you talking
3 about a randomized controlled trial?
4    A    Yes.
5    Q    Are you aware of any evidence that shows
6 that the risk for infection is higher with regard to
7 mesh than it is with the Burch procedure?
8    A    No, because if you look at a Burch
9 procedure, you're going to have to take into account
10 incisional infection in addition to -- which are
11 going to be much greater than with a sling -- a TVT
12 sling procedure.
13    Q    You would agree that when we're talking
14 about mesh that's placed vaginally, that you don't
15 want it to be stiff, correct?
16    A    Well, I think that when you place a sling,
17 you want the mesh material to not be -- you know, you
18 want the Goldilocks principle.  You don't want it to
19 be too loose because then it's not going to do what
20 it's intended to do, which is to treat stress
21 incontinence.  So you want the correct balance.
22    Q    And you would agree that larger pore size
23 is better than smaller pore size, correct?
24        MR. KOOPMANN:  Object to form.
25    A    So you want a pore size that allows the

Page 99

1 macrophages to infiltrate to decrease the risk of
2 infection.  So the larger the pore size -- so no, I
3 don't agree with that statement.
4    Q    (By Mr. Schnieders)  You'd agree that mesh
5 causes scar plate formation within the vagina,
6 correct?
7    A    No, I do not.
8    Q    So there is no scar plate formed within the
9 vagina with mesh?
10    A    So as with any surgery, anytime you're
11 making an incision anywhere, you're going to have the
12 body's reaction to that, which is some type of a,
13 quote, scar, end quote.  But as far as a scar plate,
14 no.
15    Q    Does the body react to the mesh?
16    A    So the body will grow into the sling mesh
17 that is there, and it becomes incorporated into that
18 body's tissue.  There will be a reaction to it, but
19 it is not something that causes a, quote, scar plate
20 to form, end quote.
21    Q    So it's your testimony as we sit here
22 today, Doctor, that there is no scar plate formed
23 based upon the introduction of mesh, correct?
24    A    A scar plate, no.
25    Q    Doctor, what is the incidence of mesh

Page 100

1 exposure with the TVT?
2    A    It's approximately 2 to 3 percent.
3    Q    Would you agree that it has been associated
4 with erosion or exposure rates of 34 percent?
5    A    So if you look at small studies, there may
6 be some rates are that high, but if you look at the
7 overall incidence, it's about 2-1/2 percent.  So no,
8 I would not agree with that statement.
9    Q    All right.  Doctor, I would like to mark as
10 Exhibit 10 -- I think is what we're up to -- your
11 article entitled Vaginal Erosion of Cadaveric Fascia
12 Lata Following Abdominal Sacrocolpopexy and
13 Suburethral Sling Urethropexy.
14        MR. SCHNIEDERS:  Do you have that, Court
15 Reporter?
16        MR. KOOPMANN:  We'll grab it here in just
17 one second.
18        (Exhibit 10 was marked.)
19        THE DEPONENT:  Okay.  We have it.
20    Q    (By Mr. Schnieders)  Okay.  And, Doctor, if
21 you could first look at the front page.  This is the
22 article we referenced earlier.  This is actually on
23 your list of reliance materials that you've authored,
24 correct?
25    A    Yes.

Page 101

1    Q    And if you go to -- it's kind of a long
2 article -- but if you go to the third page, where
3 Discussion starts --
4    A    Uh-huh.
5    Q    -- and go down to the second paragraph, the
6 third full sentence starts:  Synthetic grafts are
7 associated with erosion rates of up to 12 percent for
8 abdominal sacrocolpopexy with erosion rate -- and
9 with -- and 34 percent for suburethral sling
10 urethropexy.
11        Do you see that?
12    A    Yes.
13    Q    Okay.  This is an article that you
14 authored, correct?
15    A    Correct.
16    Q    And you're identifying that suburethral
17 sling urethropexies have been associated with erosion
18 rates of up to 34 percent, correct?
19    A    This is in 19 -- this article was published
20 in, I believe, 1999, and the sling material that was
21 utilized whose rates have been reported up to
22 34 percent are not the TVT sling.  It is from the use
23 of Gore-Tex and Marlex.  It's not from the TVT sling.
24 This is before TVT slings were being utilized.
25    Q    So if you go to the study that you're

Dorothy Kammerer-Doak, M.D.

Page 102

1 citing there, the Iglesia study.
2       Do you see that?
3   A   Yes.
4   Q   And is that something that you reviewed and
5 included on your list of materials for your expert
6 report here?
7   A   The Iglesia article from 1997?
8   Q   Yes.
9   A   I don't recall if I have.  I don't think I
10 did.
11   Q   Okay.  So sitting here today, you're not
12 aware of mesh erosion rates of up to 34 percent with
13 regard to TVT polypropylene mesh, correct?
14       MR. KOOPMANN:  Object to form.
15   A   So there may be an individual study that
16 shows that, but that is the benefit of looking at a
17 meta-analysis where there's thousands of patients.
18       You may have a study population of 50
19 patients, and 17 of those have a mesh erosion, but
20 you don't know if the next 100 patients have no mesh
21 erosion.  So when you group patients together and you
22 have larger numbers, that's going to give you a
23 better idea of the incidence of mesh erosion than
24 looking at a single isolated study.
25   Q   (By Mr. Schnieders)  Sure.  And that goes

Page 103

1 to your issue of powering.
2   A   That's not powering.  That is the numbers
3 that have that complication.  Power is a completely
4 different issue.
5   Q   I disagree, Doctor, and you didn't let me
6 finish my question.
7   A   I apologize.
8   Q   I let you finish your question -- your
9 answer -- so let me get back to it.
10   A   Sure.  I'm sorry.
11   Q   -- a randomized --
12       (All speaking simultaneously, and reporter
13       requested clarification.)
14   Q   (By Mr. Schnieders)  Let me start over.
15       Doctor, getting back to the power issue, in
16 order to demonstrate something in a randomized
17 clinical trial, you need to have sufficient numbers
18 in order to be powered to detect that, correct?
19   A   Yes.
20   Q   And you would agree that there are no
21 randomized clinical trials that have been powered to
22 detect long-term pelvic pain, correct?
23   A   For the TVT sling?
24   Q   Yes, ma'am.
25   A   Yes.

Page 104

1   Q   Okay.  Doctor, you would agree that mesh
2 erosion -- or using your term, because you said
3 "erosion" in your study here -- but mesh erosion or
4 exposure causes pain for the patient, correct?
5   A   Can you ask that question again, please.
6   Q   I'm going to use the term "erosion" because
7 that's what you used --
8   A   Sure.
9   Q   -- in your study or in your article we just
10 looked at.
11       You would agree that mesh erosion causes
12 pain for the patient.
13   A   It can, but not always.  In fact, most
14 exposures are asymptomatic.
15   Q   You would agree that mesh erosion can cause
16 chronic pain.
17   A   It's possible.
18   Q   You would agree that mesh erosion can cause
19 a scar.
20   A   No.
21   Q   Just so I'm clear, if mesh erodes through,
22 for instance, the urethra, it cannot cause a scar?
23 It's not possible?
24   A   Where are you talking about a scar
25 formation?  I mean, the whole -- when you have an

Page 105

1 exposure or erosion, there is no vaginal tissue
2 there.  It's going to cause an inflammatory
3 reaction --
4   Q   Doctor, is a scar an inflammatory reaction?
5   A   I'm just thinking out loud.  So there could
6 be some scarring from an exposure, yes.
7   Q   Do you agree that mesh erosion can cause
8 pain during intercourse?
9   A   It can cause pain to the partner if they
10 feel the exposed part, yes.
11   Q   And is it your testimony that mesh erosion
12 cannot cause pain to a woman that actually
13 experiences it during intercourse?
14       MR. KOOPMANN:  Object to the form.
15   A   I don't understand the question.
16   Q   (By Mr. Schnieders)  So you answered on
17 behalf of the partner.  So I'm asking the opposite
18 question.
19       Can mesh exposure cause pain to a woman
20 during intercourse?
21   A   I guess it's possible.
22       MR. SCHNIEDERS:  Okay.  I am starting to
23 get down to -- I'm at about 35 minutes, so I'm going
24 to take a quick break, get my materials back
25 together, and then we'll get started again, if that's

Dorothy Kammerer-Doak, M.D.

Page 106

1 all right.
2     MR. KOOPMANN:  Okay.
3     (Recess from 11:47 a.m. to 11:56 a.m.)
4     (Exhibit 11 was marked.)
5     MR. SCHNIEDERS:  We're back on the record
6 after a quick break.
7     Q   (By Mr. Schnieders)  Doctor, did you review
8 any documents over the break?
9     A   I did not.
10    Q   Doctor, would you agree that polypropylene
11 mesh shrinks inside of a patient?
12    A   Not to any clinically significant degree.
13    Q   But it shrinks to what you would call
14 subclinically significant degree, correct?
15    A   The evidence that I've seen shows that it
16 hasn't shrunk significantly.
17    Q   Would you agree that polypropylene mesh can
18 degrade inside of the human body?
19    A   No, I do not.
20    Q   Okay.  Do you think it's possible that it
21 degrades inside the human body?
22    A   Not to any clinically significant degree.
23 If we look at, for example, cadaveric fascia lata in
24 explant, there's a significant degree of degradation,
25 and that is associated with a significantly lower

Page 107

1 cure of stress incontinence pretty quickly with time.
2     When we look at the TVT sling with
3 follow-up ranging from 10 to 17 years, while there is
4 a -- maybe a slight decrease, there's no significant
5 decrease.  So based on this, there's no clinically
6 significant degradation of TVT slings.
7     Q   Doctor, you would agree that you cannot
8 determine if there is degradation unless you actually
9 remove mesh from the body, correct?
10    A   You could have microscopic degradation
11 possibly that's not clinically significant.
12    Q   Doctor, you would agree that Ethicon did
13 not design the TVT mesh to rope, correct?
14    A   Yes.
15    Q   Doctor, you would agree that Ethicon did
16 not design the TVT mesh to curl, correct?
17    A   It's not been designed to do that, no.
18    Q   And you would agree that Ethicon did not
19 design the TVT mesh to fray, correct?
20    A   So I have seen pictures, and I've seen some
21 internal memos that when the TVT sling was pulled or
22 stretched beyond physiological parameters that there
23 was some fraying, but not under clinical scenarios
24 when implanted --
25    Q   And I appreciate that but --

Page 108

1     (All speaking simultaneously, and reporter
2     requested clarification.)
3     A   -- for a sling procedure.
4     Q   (By Mr. Schnieders)  Doctor, I appreciate
5 it, but I need you to answer my question.  I'm not
6 asking whether it does fray or it doesn't fray.  I'm
7 asking:  You agree that Ethicon did not design the
8 TVT mesh to fray, correct?
9     A   It's not designed to fray, yes.
10    Q   And you agree that Ethicon did not design
11 the TVT mesh to lose particles, correct?
12        MR. KOOPMANN:  Object to form.
13    A   It's designed to treat stress urinary
14 incontinence.
15    Q   (By Mr. Schnieders)  And part of that is
16 not -- it's not designed to have loose particles,
17 correct?
18    A   If a particle were to be lost, a small
19 piece, it would not change its primary design, which
20 is to treat stress urinary incontinence.
21    Q   Doctor, that's not my question.  I'm not
22 saying that you're telling me that there are clinical
23 consequences of any of these things.  I'm just asking
24 whether it was designed to lose particles or not.
25        Was it designed to lose particles?

Page 109

1     A   I believe it wouldn't be designed to lose
2 particles, no.
3     Q   Did Ethicon design the TVT mesh to shrink?
4     A   It was studied to make sure there was no
5 appreciable shrinkage before they brought it on the
6 market.  So no, it was not designed to shrink
7 clinically significantly.
8     Q   And you agree that Ethicon did not design
9 TVT mesh to easily deform, correct?
10        MR. KOOPMANN:  Object to form.
11    A   So I don't know what you mean by "easily
12 deform."  One of the properties of the TVT sling is
13 that it does have stretching capabilities, and that's
14 been hypothesized to be a good thing because it may
15 prevent a higher risk of erosion such as what was
16 seen with other materials that were not as, quote,
17 stretchy.
18        So, again, it goes back to that whole
19 Goldilocks principle is you want it to deform to some
20 degree, but not too much.
21    Q   (By Mr. Schnieders)  You would agree
22 Ethicon did not design the TVT mesh to be stiff,
23 correct?
24    A   Again, it goes back to the principle is
25 that it has to be somewhat stiff in order to provide

Dorothy Kammerer-Doak, M.D.

Page 110

1 a hammock of support underneath the urethra against
2 which the urethra can be compressed closed with
3 increases of abdominal pressure.
4     If it's, you know, too loose, then it's not
5 going to serve the purpose for which it was intended,
6 which is to treat stress incontinence.
7     Q    And, Doctor, you would agree that if the
8 TVT mesh were to rope or curl or fray or lose
9 particles or shrink, regardless of whether or not
10 there's a clinical impact, it was an unintended
11 consequence, correct?
12     A    I'm thinking about that.  Can you repeat
13 the question.
14     Q    Doctor, you would agree that if the TVT
15 mesh were to rope or curl or fray or lose particles
16 or shrink, that regardless of whether or not there
17 were clinical impacts, that it was an unintended
18 consequence.
19     A    Yes.
20     Q    Doctor, have you ever heard the term
21 "pelvic cripple"?
22     A    Yes.
23     Q    What does that mean?
24     A    So it is someone who has issues with being
25 unable to have vaginal intercourse, secondary to a

Page 111

1 tight, small vagina, usually related to scarring from
2 multiple previous pelvic surgeries.  It can also --
3     Q    Doctor, have you treated any women that you
4 considered to be pelvic cripples?
5     A    I'm also going to say, it also can involve
6 pain on some levels as well.
7     And yes, I have.
8     Q    Do you have an estimate as to how many
9 women you have treated that you consider to be pelvic
10 cripples?
11     A    So there's varying degrees of, quote,
12 pelvic cripples, end quote.  Either somebody who has
13 pain with intercourse and cannot have it comfortably,
14 if it falls into that category, versus somebody who
15 has, you know, a very -- like I described before,
16 which would be very severe.  So in that category of
17 "very severe," fortunately, it's not a lot of
18 patients.  Maybe -- I would say less than 50.
19     And as far as to lesser degrees of having a
20 tight, small vagina, still able to have intercourse
21 but with some pain, you know, probably in the 50 to
22 100 range.
23     Q    Of those women, are you aware of any of
24 them that had transvaginal mesh implanted?
25     A    They've had mesh for prolapse repairs, but

Page 112

1 again, going back to my earlier statement about not
2 having seen a woman like this who's had a retropubic
3 TVT sling, I would say that.
4     Q    So your testimony, just so I'm clear, is
5 that none of the women that you considered to be
6 pelvic cripples that you've treated had a
7 mid-urethral sling, correct?
8     A    In isolation.  So they may have had a TVT
9 sling, but they also had multiple prior pelvic
10 surgeries with and without mesh; for example,
11 multiple previous prolapse repairs that could have
12 been done with mesh or without mesh.  And those
13 patients could have also had a TVT sling, but not
14 just a simply TVT sling in isolation.
15     Q    Okay.  Doctor, the mesh -- the
16 polypropylene mesh that's used in the TVT, are you
17 aware if it is the same or different than the mesh
18 that's used in Ethicon's POP kit?
19     A    So I have not used the -- Ethicon's pelvic
20 organ prolapse repair kits, so I cannot answer that
21 question.
22     Q    And you haven't reviewed any literature
23 related to them, either?
24     A    To the Ethicon products?  No, I have not
25 for prolapse -- for prolapse kits.

Page 113

1     Q    Okay.  Doctor, would you agree that doctors
2 rely upon companies such as Ethicon to tell them
3 whether or not the products that they manufacture are
4 safe?
5     A    You're saying do they rely on Ethicon to
6 tell them if their product is safe or not?
7     Q    Yes.
8     A    So it's one of the things that a doctor can
9 rely upon, but I think it's the responsibility of the
10 physician who is performing the procedure to have all
11 the information.  And the company that makes that
12 device is not going to have all that information.
13     The literature is a place that I look.  I
14 rely on continuing medical education, going to the
15 courses with presentations on both randomized
16 controlled trials as well as cohort studies that look
17 at complications, that look at risks.  And I rely on
18 my colleagues as well as my own personal experience.
19     So the last place that I look is with the
20 manufacturer themselves.
21     Q    But you agree that doctors in general use
22 that as part of their analysis as to whether a
23 product is safe, correct?
24     A    As part of their analysis, yes.
25     Q    And you agree that patients should be

Dorothy Kammerer-Doak, M.D.

Page 114

1 warned of all significant risks that accompany a
2 procedure for implantation of a medical device,
3 correct?
4     MR. KOOPMANN:  Object to form.
5     A   So I agree that patients need to be
6 informed of the risks that are commonly associated
7 with that device.
8     Q   (By Mr. Schnieders)  That are clinically
9 significant, correct?
10     A   That are commonly associated with that
11 device and clinically significant, yes.
12     Q   Do you agree that a medical device company
13 has the responsibility to warn doctors about
14 significant or clinically significant risks
15 associated with the implantation of its devices?
16     MR. KOOPMANN:  Object to form.
17     A   So the doctor has the responsibility when
18 he or she is using that device to know the risks, and
19 part of the information gathering of the risks will
20 come from that company.
21     Q   (By Mr. Schnieders)  Doctor, are you aware
22 of the legal responsibilities that a company has in
23 making and designing its IFU?
24     A   I am aware of the -- some of the
25 regulations that are involved, yes.

Page 115

1     Q   And are those on your reliance list?
2     A   They are in the materials that I provided
3 today.
4     Q   So you just in the past couple of weeks
5 since your supplemental reliance list have gone and
6 looked at statutes and CFRs related to the IFU?
7     A   Yes.
8     Q   Fair to say you hadn't reviewed those at
9 the time you authored your report, correct?
10     A   Correct.
11     Q   Fair to say that as of the time of your
12 authorizing of this report, you were unaware of the
13 legal responsibilities of what is supposed to be in
14 an IFU, correct?
15     A   Yes.
16     Q   Doctor, you'd agree that if Ethicon knew
17 that a 30 percent shrinkage rate and an association
18 with pain was correlated with the TVT products, that
19 that's something it should pass along to physicians,
20 correct?
21     MR. KOOPMANN:  Object to form, foundation.
22     A   So there is no evidence that there is that
23 type of shrinkage when utilized clinically.
24     Q   (By Mr. Schnieders)  If there was, is that
25 something that Ethicon should pass along?

Page 116

1     A   If there was clinical evidence of that
2 amount of shrinkage, then that should be passed
3 along.  And by "clinical," I mean, if there was
4 evidence when used in treating women with stress
5 incontinence that that -- there was that amount of
6 shrinkage, then that should be passed on.
7         However, the clinical data does not support
8 that in that the chance of undergoing a sling
9 revision for urinary tension is quite low.  It
10 plateaus.  It does not increase with time.  And if
11 there was that amount of shrinkage, you should see an
12 increased -- a significant increase in sling revision
13 for retention, both at the incident as well as
14 increasing with time, and we just don't see that.
15     Q   Doctor, have you been provided any internal
16 Ethicon documents relating a 30 percent shrinkage
17 rate with a TVT?
18     A   I believe that's from abdominal wall hernia
19 repairs.  I've seen that.
20     Q   Abdominal wall hernia repairs with a TVT?
21     A   No.  With the use of PROLENE mesh and
22 abdominal wall hernias.  I have not seen any
23 documents that shows a 30 percent shrinkage rate of
24 the TVT sling.
25     Q   Okay.  And that's something that you would

Page 117

1 want to know as an expert that's opining in this
2 case, correct?
3         MR. KOOPMANN:  Object to form.
4     A   So, again, an internal document of what
5 possibly could happen in the lab is not where I would
6 place weight in making my opinion.  It's how the
7 sling behaves when implanted and when utilized for
8 the treatment of stress incontinence.
9         And in my review of the literature, as well
10 as my experience with my patients, we do not see that
11 type of shrinkage.  Again, if we would, we would be
12 doing a lot more sling revisions for retention, and
13 we don't see that.
14         In the Nilsson study which has that
15 long-term follow-up, all of the patients that did not
16 have comorbidities had a normal post-void residual.
17         We also have ultrasound studies that show
18 that there is no change in the position.  There's not
19 any shrinkage -- or any clinically significant
20 shrinkage.
21         We also have the study by Mimi Lukacz and
22 her colleagues from San Diego, which two years after
23 implantation, there was no change in the Q-tip angle,
24 or in the hypermobility of the ureterovesical
25 junction, which, again, shows that there's no

Dorothy Kammerer-Doak, M.D.

Page 118

1 clinically significant shrinkage.
2        So that 30 percent, if it happens in the
3 lab or happens in animal studies, doesn't translate
4 into what happens in real life.  And that's what I'm
5 basing my expert opinion upon.
6    Q   (By Mr. Schnieders) And, Doctor, this is
7 not a controversial issue.  You just want to know all
8 the information, don't you?  You want to be given the
9 information that is present so you can make your
10 opinion, correct?
11       MR. KOOPMANN:  Object to form.
12    A   So again, going back to what I just said --
13    Q   (By Mr. Schnieders) Doctor, I don't have
14 time for you to go on, on the same tangent.
15       I'm just asking:  You want to have all the
16 information available to be able to make your
17 opinions so you can consider it, correct?
18       MR. KOOPMANN:  Object to form.
19    A   I don't agree with that based on what I
20 just said.
21    Q   (By Mr. Schnieders) Okay.  You don't want
22 to have all the information before you make your
23 expert opinion, fair?
24    A   So I can review that information, but what
25 I place my weight upon is not the -- whether or not

Page 119

1 it happens in a laboratory situation.  It's what
2 happens in real life.
3    Q   But if you haven't been provided with that
4 information, you can't factor it in one way or the
5 other, correct?
6    A   I can totally factor it in because
7 regardless of whether that happened in a laboratory
8 situation, I'm still going to have that same opinion.
9    Q   Okay.  So you are sitting here today,
10 Doctor, saying that your expert opinion would not
11 change even if there was hypothetical information
12 that you don't even know what it says?
13       MR. KOOPMANN:  Object to form.
14    A   I have seen documents, again, that there is
15 shrinkage of polypropylene mesh by 30 to 40 percent;
16 and that is -- again, is in laboratory situations;
17 and I am basing my opinion on what happens in real
18 life.
19       And I would absolutely take that into
20 consideration, but if I had that information, it
21 would not change my opinion because I'm basing my
22 opinion on what happens in real life and not what
23 happens in a laboratory.
24    Q   (By Mr. Schnieders) When you formed your
25 expert opinion in this case, Doctor, and you read the

Page 120

1 studies that you have referenced in your reliance
2 materials, you factored out all of the suburethral
3 slings that were not Ethicon TVT, correct?
4    A   No, because a lot of the studies that --
5 the highest form of evidence is the meta-analysis.
6 And so a lot of the studies for the meta-analysis
7 that we looked at -- that I looked at contains slings
8 other than the TVT sling, the Ethicon TVT slings.
9 The majority are going to be the Ethicon TVT slings,
10 but it's not -- but they're not all.
11    Q   Okay.  Fair to say as we sit here today
12 that of the literature that you've considered, you
13 can't identify how often it's dealing with a TVT
14 product versus a different manufacturer's product,
15 correct?
16    A   No.  I can identify because the majority of
17 the studies that I've looked at that are individual
18 are going to be the TVT sling.  And then when you
19 look at the meta-analysis, you know, I did read how
20 many were TVT -- the retropubics were TVT versus the
21 other -- and, again, the majority are going to be TVT
22 versus the other manufacturers.
23    Q   Okay.  But despite the fact that the other
24 suburethral slings have different mesh, you didn't
25 factor those out in your considerations, correct?

Page 121

1        MR. KOOPMANN:  Object to form.
2    A   So say that again.
3    Q   (By Mr. Schnieders) Despite the fact that
4 there are other manufacturers' suburethral slings and
5 that those slings have different mesh than the TVT
6 product, you did not factor those out, correct?
7    A   No, because in my report it does say,
8 Retropubic slings like the TVT.  So when we look at
9 the meta-analysis, I did take that into
10 consideration.  And when you look at the long-term
11 studies, those are all going to be -- for the most
12 part, all going to be the TVT slings.
13    Q   Doctor, are you -- we established
14 previously that you're a member of IUGA, correct?
15    A   Yes.
16    Q   Did you know that IUGA has put out a mesh
17 complication classification system?
18    A   Yes.
19    Q   It's the Haylen article, but I did not see
20 that reflected in your reliance materials.
21       Is that something that you've read?
22    A   I have read parts of it, yes.
23    Q   Any particular reason why you didn't read
24 it for your expert reports in this transvaginal mesh
25 case?

Dorothy Kammerer-Doak, M.D.

Page 122

1   A   Because I was focusing on the TVT sling, so
2   I did not reference that in this case.
3   Q   Okay.  And that classification system deals
4   with complications of the TVT sling amongst other
5   meshes, correct?
6   A   Yes.
7   Q   Okay.  But you agree that that's not
8   something you considered in forming your opinions
9   here today?
10   A   That article?
11   Q   Correct.
12   A   I did consider it when I used the word
13   "exposure" versus "erosion."  That's what I'm basing
14   using that terminology.
15   Q   Sitting here today, Doctor, you haven't
16   even fully read that article yet, have you?
17   A   I probably read 90 percent of it, and --
18       (All speaking simultaneously, and reporter
19       requested clarification.)
20   A   And I would also say that one of the
21   reasons why it's not referenced is because there's
22   very -- it's not used in very much of the literature
23   currently -- in the TVT literature.
24   Q   (By Mr. Schnieders)  But it's a guideline
25   from IUGA, correct?

Page 123

1   A   Yes.
2   Q   And you reference other guidelines from
3   IUGA, correct?
4   A   In relationship to the use of the TVT
5   sling.
6   Q   Those are in your report, right?
7   A   The other guidelines from IUGA with respect
8   to the TVT sling, yes, as well as to training of
9   pelvic surgeons.
10   Q   And I actually looked at the training of
11   pelvic surgeons.
12       Would it surprise you that dyspareunia
13   doesn't appear in that document in any way, shape, or
14   form?
15   A   I think it talks about sexual dysfunction.
16   Q   Because you're using that as the basis to
17   say that all pelvic surgeons are aware of all of the
18   risks that are in the current IFU for TVT today,
19   correct?
20   A   Yes.
21   Q   Okay.  And they were going back into the
22   mid-2000s, correct?
23   A   Yes.
24   Q   Then why is it that the IFU has changed
25   over time?

Page 124

1   A   You'll have to ask Ethicon about that.  I
2   can hypothesize for you, but I can't tell you why the
3   company changed the IFU.
4   Q   Okay.  You would agree that you're not able
5   to opine as to what was in the IFU and why, correct?
6   A   No.  I can tell you that in the IFU what's
7   required according to the federal guidelines is for
8   adverse events and complications which are unique to
9   that device, are not well known, should be placed in
10   the IFU.
11   Q   And we established before that you had not
12   read those federal guidelines until after drafting
13   your report, correct?
14       MR. KOOPMANN:  Object to form.
15   A   Correct.
16   Q   (By Mr. Schnieders)  Doctor, are you
17   familiar with the Agnew article entitled Functional
18   Outcomes Following Surgical Management of Pain
19   Exposure or Extrusions Following a Suburethral Tape
20   Insertion for Urinary Stress Incontinence?
21       It doesn't appear on your reliance list.
22   That's why I ask.
23   A   I would have to -- that does sound
24   familiar.  I'm looking at the supplemental list here.
25   No, it's not on my list.

Page 125

1   Q   Which means you didn't consider it for your
2   report today, correct?
3   A   Correct.
4   Q   Same with if there are articles that are
5   not in either your reliance list, your report, your
6   supplemental reliance list, or Exhibit 8, you didn't
7   consider them in forming your opinions, correct?
8       MR. KOOPMANN:  Object to form.
9   A   I'm sorry.  When he says that, I lose my
10   train of thought.
11       Can you please read that back for me.
12   Q   (By Mr. Schnieders)  Sure.  And I can just
13   ask it again.
14       If the -- with regard to the articles, if
15   it's not -- or studies, if it's not in your expert
16   report, your reliance list, your supplemental expert
17   report, or your supplemental reliance list as
18   Exhibit 9, or your materials in Exhibit 8, it's not
19   something that you considered in forming your
20   opinions, correct?
21   A   Correct.
22   Q   Doctor, you're not an expert in the design
23   of the TVT, correct?
24       MR. KOOPMANN:  Object to form.
25   A   So I have utilized different devices in

Dorothy Kammerer-Doak, M.D.

Page 126

1  pelvic surgery for more than 20 years.  So I would
2  say I'm an expert in the -- their use.
3      Q    (By Mr. Schnieders)  Right.  But as far as
4  actually designing products, you've never designed
5  anything for a device company, correct?
6      A    I have not designed something for a device
7  company, but I certainly have utilized or evaluated
8  multiple devices.  And in that sense, I'm an expert
9  in what is used within the female pelvis as far as
10 devices.
11     Q    In your expert report, you say that a pore
12 size is enough that one can see through the mesh
13 easily, and it's sufficiently large to permit tissue
14 ingrowth and permit entry of microfascias to clear
15 material.
16          You would agree that that's a statement
17 that you are making -- strike that.
18          Sorry.  Strike that.  I'm running out of
19 time.
20          Doctor, what's the proper way to tension
21 the TVT device?
22     A    So that is something that is individual
23 based on the patient.  If you compare the TVT sling
24 as -- to the pubovaginal sling, the traditional
25 slings, those slings were placed under somewhat

Page 127

1  greater tension because they were tended to be used
2  for, quote, rescue when people had real severe
3  incontinence.
4          So the tension that's under the TVT sling
5  should be minimal to tension free.  And when the TVT
6  sling is placed according to the original protocol
7  developed by Ulmsten, he would fill the bladder to
8  300 milliliters and then have the patient cough and
9  adjust the tension until the tension -- until the
10 patient had only drops of urine.
11         And the way I train and the way I perform
12 the TVT sling is in patients who have more severe
13 incontinence, I follow the Ulmsten method, where I
14 have the patient cough, or I will simulate a cough by
15 pressing on her abdomen with 300 milliliters, and
16 tighten the sling down until there's no leakage.
17         In women who do not have severe
18 incontinence, then I will place it under minimal to
19 no tension.
20     Q    Do you believe that Ethicon is responsible
21 to tell physicians how to properly tension its
22 device?
23     A    No, I don't believe Ethicon is responsible
24 at all.  Again, that's when you are treating stress
25 incontinence surgically, whether it's with the Burch

Page 128

1  procedure, the pubovaginal sling, or with the TVT,
2  it's somewhat of an art in how to tension it.
3          And just like I said, back when you tied
4  down the Burch stitches, oftentimes you would tie
5  them down as tightly as possible.  But then we
6  started to learn if you tied it down really tight,
7  then they might have some degree of obstruction.  So
8  then we tied it down until we thought there was
9  adequate support.
10         With the TVT sling, again, you want -- you
11 have a way to kind of guide how tight to make the
12 tension by the intraoperative stress test or placing
13 under no tension at all with -- in patients who don't
14 have significant incontinence.
15         And that is not something that Ethicon can
16 teach.  It's something that's learned through
17 mentorship or through continuing medical education
18 courses.  And, you know, if it's a course that
19 Ethicon sponsors, that's fine; but, you know, the way
20 I learned was through mentorship and by reading the
21 original report that Ulmsten wrote.  And, again, any
22 reasonable physician who is performing that surgery
23 should know that.
24     Q    Okay.  And, Doctor, what does IFU stand
25 for?

Page 129

1      A    Oh, my brain.
2      Q    Is it Instructions for Use?
3      A    Thank you.  Instructions for Use.
4      Q    Okay.  So, literally, the IFU are the
5  instructions for use for the TVT, correct?
6      A    Correct.
7      Q    And they discuss how to tension the TVT
8  device, correct?
9      A    Yes, that's in there.
10     Q    Okay.  Do you agree that the strongest
11 unmet need with a TVT is the ability to adjust
12 tension both intraoperatively and postoperatively?
13     A    No, I don't agree with that.
14     Q    Do you believe that the ability to adjust
15 tension both intraoperatively and postoperatively is
16 maximal and there's no need to improve on that?
17     A    Well, you can't adjust it postoperatively,
18 but I'm not sure that it's an unmet need.  You can't
19 adjust tension on a Burch or an autologous
20 pubovaginal sling, either.
21         In the operating room, you can certainly
22 adjust the tension on the TVT sling just as I
23 described.
24     Q    Do you agree that there is not a consensus
25 on the right size of the mesh used for SUI?

Dorothy Kammerer-Doak, M.D.

Page 130

1     MR. KOOPMANN:  Object to form.
2     A   So the right size -- you mean pore size?
3     Q   (By Mr. Schnieders)  No.  The right -- the
4  amount of mesh used.
5     A   So the question is:  Is the amount of mesh
6  that -- "the size," you mean as far as whether it's
7  1 centimeter or 2 centimeters?
8     Q   The amount of mesh used in a sling, Doctor.
9     A   So I believe there is a consensus from many
10 societies -- IUGA, AUGS, SUFU, a whole lot of other
11 ones, that the TVT sling is considered to be, quote,
12 the gold standard.  And so that size of a mesh, I
13 would think, would be a consensus.
14       The midurethral slings, the ones that are
15 used now, are all in the range of 1 to 1.1
16 centimeters, so I believe --
17    Q   Is that the --
18    A   -- there is a consensus.
19    Q   -- product that --
20       (All speaking simultaneously, and reporter
21       requested clarification.)
22    Q   (By Mr. Schnieders)  Has Ethicon come up
23 with a product that uses less mesh in a sling?
24    A   So I know they've investigated the use of a
25 mesh that was partially absorbable, but they weren't

Page 131

1  able -- in animal studies, there were some
2  deficiencies in it, so they did not bring it onto the
3  market because it was -- it didn't work in the animal
4  models.
5     Q   Doctor, you would agree that in order to
6  limit mesh-related complications of exposure or
7  erosion, that it's optimal to use the least amount of
8  mesh necessary to achieve efficacy, correct?
9     A   So the sling that we have now has a very
10 low risk of mesh exposure, and it has a high rate of
11 efficacy.  So if there were any changes to that mesh,
12 it may not work as well.  And so I can't agree with
13 that statement.
14       MR. KOOPMANN:  Counsel, your three hours
15 are up.
16       MR. SCHNIEDERS:  Well, I'm going to make
17 her answer that question again.  She didn't answer
18 it.
19       So read it back.  And then that will be my
20 last question.
21       (Last question was read.)
22    A   And as I said, I don't agree with that
23 statement because you have to -- you have to balance
24 efficacy with risks of complications.  And, again, we
25 have a safety profile over a large number of years

Page 132

1  that shows very low risks of erosion with the mesh
2  that we have currently.
3        MR. SCHNIEDERS:  All right.  Barry, you
4  want to -- how long do you guys want to take in
5  between depos?
6        MR. KOOPMANN:  Well, I want to ask some
7  follow-up questions first, and then maybe we'll take
8  45 minutes between the two, if that's all right.
9        MR. SCHNIEDERS:  Sure.
10       MR. KOOPMANN:  Okay.
11             EXAMINATION
12 BY MR. KOOPMANN:
13    Q   Dr. Kammerer-Doak, I want to ask you some
14 follow-up questions based on plaintiff's counsel's
15 questioning.
16       You were asked earlier today about what
17 sort of publications you had.  And is it true that
18 you've published on pubovaginal cadaveric fascial
19 slings?
20       MR. SCHNIEDERS:  Object to the form.
21    A   Yes, I have.
22    Q   (By Mr. Koopmann)  Does your report that
23 has been marked today as Exhibit 4 contain your
24 opinions regarding the safety and efficacy of the TVT
25 and the labeling for that device?

Page 133

1     A   Yes.
2     Q   And do you hold those opinions to a
3  reasonable degree of medical certainty?
4     A   I do.
5     Q   And what are the bases for the opinions
6  that you've provided here today?
7     A   It's based on my review of the literature.
8  It's based on my training as a resident and as a
9  fellow.  It's based on more than 20 years of
10 experience as a specialist in pelvic floor surgery.
11 It's based on continuing medical education at
12 conferences that are specific for pelvic floor
13 disorders, including the AUGS, IUGA, and SGS.
14    Q   Would it also be based in part on your
15 medical education --
16       MR. SCHNIEDERS:  Object to the form.
17    Q   (By Mr. Koopmann)  -- medical school
18 education?
19    A   Yes.
20       MR. SCHNIEDERS:  Object to the form.
21    Q   (By Mr. Koopmann)  Are your opinions today
22 based in part on your -- the research that you've
23 done over the course of your career and the
24 publications you've issued?
25       MR. SCHNIEDERS:  Object to the form.

Dorothy Kammerer-Doak, M.D.

Page 134

1  A  It's based on my research as well as my
2  personal experience. And I hold kind of a unique
3  situation. Even though I don't practice at a
4  tertiary care center, because of the fact that the
5  state of New Mexico has paucity of specialists, I
6  have been referred patients from all over the state
7  of New Mexico, as well as Northern Texas, Arizona,
8  and Southern Colorado.
9      So I just don't see routine cases. I,
10  again, function closer to a tertiary care center.
11  Q  (By Mr. Koopmann) Do you practice
12  evidence-based medicine?
13  A  Yes, I do, to the --
14      MR. SCHNIEDERS: Form.
15  A  -- best of my ability.
16  Q  (By Mr. Koopmann) What does that mean?
17  A  That means I look at the literature, and I
18  base my practices as best I can on the evidence
19  that's out there. For example, I did not start using
20  the TVT sling --
21      MR. KOOPMANN: Sorry.
22  A  -- in my own personal practice until we had
23  the two-year data from the Ward and Hilton study. I
24  knew from previous studies that a randomized compared
25  trial that compared the Burch to the modified Pereyra

Page 135

1  procedure to the modified Kelly-Kennedy plication,
2  that at one to two years the cure rates were similar,
3  but when followed out for three years, that there was
4  a significant drop off of the other two procedures as
5  compared to the Burch. So I would not use the TVT
6  sling until we had that two-year data.
7  Q  (By Mr. Koopmann) Is some evidence thought
8  of as being more powerful than other evidence?
9  A  Yes.
10  Q  What are the highest levels of evidence?
11  A  So the randomized controlled trial is the
12  highest level of evidence. But above that is the
13  meta-analysis, and that is because it's taking
14  multiple randomized controlled trials and putting
15  them together so that you're having a higher number
16  of patients on which to base the conclusions.
17  Q  And what type of evidence did you focus on
18  in evaluating and forming your opinions in this case?
19      MR. SCHNIEDERS: Object to the form.
20  A  I focused on the meta-analysis, as well as
21  the randomized controlled trials, but primarily
22  looking at the meta-analysis.
23  Q  (By Mr. Koopmann) What is the lowest level
24  of evidence?
25      MR. SCHNIEDERS: Object to form.

Page 136

1  A  The lowest level of evidence, which is
2  considered Level III or Grade C, is the cohort study
3  where patients are followed. And there's the level,
4  like A. So it would be III-A, which would be
5  prospectively followed. And then a lower level than
6  that would be retrospectively.
7  Q  (By Mr. Koopmann) Where do animal studies
8  fall within the levels of evidence?
9      MR. SCHNIEDERS: Object to the form.
10  A  They do not fall into the evidence for the
11  practice of human medicine.
12  Q  (By Mr. Koopmann) Are levels of evidence
13  important in your opinion in assessing the safety and
14  efficacy of the TVT device?
15      MR. SCHNIEDERS: Object to form.
16  A  Yes.
17  Q  (By Mr. Koopmann) Why is that?
18  A  Because, again, that's evidence-based
19  medicine. The cohort studies could have those
20  findings by chance, but a randomized compared trial
21  lets you know when you compare to another procedure
22  what the true risks are.
23      And I'll give an example of that. When we
24  look at the use of hormones in women and we had the
25  retrospective studies, it appeared that there was a

Page 137

1  protective effect for heart disease; but when we
2  followed women prospectively in a randomized
3  controlled trial, we found that that wasn't true.
4      So looking at the highest level of evidence
5  can provide different information than cohort
6  studies.
7  Q  Are you aware of any device or procedure
8  used to treat stress urinary incontinence for which
9  there is more randomized controlled trial data than
10  the TVT device?
11      MR. SCHNIEDERS: Object to the form.
12  A  The TVT sling is the best-studied surgery
13  in urogynecology and perhaps of any surgery that's
14  out there, but for sure within urogynecology.
15  Q  (By Mr. Koopmann) And what does that mean
16  for patients? If you were to tell a patient that the
17  TVT is the best-studied device for the treatment of
18  stress incontinence, what does that mean to them?
19      MR. SCHNIEDERS: Object to the form.
20  A  That the information that we have about the
21  efficacy and the risks are the best type of
22  scientific data that we have, and that this data has
23  been gathered from a very large population of
24  individuals, not only in the United States, but from
25  around the world.

Dorothy Kammerer-Doak, M.D.

Page 138

1  Q   (By Mr. Koopmann)  You were asked some
2  questions earlier today about the mesh
3  characteristics for some other manufacturers' mesh
4  devices.
5        Do you remember that line of questioning?
6  A   Yes.
7  Q   The Perigee product, that's a product that
8  you've used in the past?
9  A   Yes.
10  Q   Is that a polypropylene product?
11  A   Yes.
12  Q   Okay.  But that polypropylene is --
13        (All speaking simultaneously, and reporter
14        requested clarification.)
15        MR. SCHNIEDERS:  Thank you.
16        Object to form.
17  Q   (By Mr. Koopmann)  -- is that polypropylene
18  different from the PROLENE polypropylene that Ethicon
19  uses in its devices --
20        MR. SCHNIEDERS:  Object to the form.
21  Q   (By Mr. Koopmann)  -- their proprietary
22  PROLENE?
23  A   It's going to be different.  Same way the
24  mesh for one type of retropubic or transobturator
25  sling is going to be different.

Page 139

1        It's also different in how it is prepared.
2  Like I talked about before, the Perigee product has
3  arms that are attached to the main body of the mesh
4  with little buttons, and the amount of mesh that's
5  placed is much, much greater than what's used with
6  the sling.
7        Additionally, the amount of mesh that's
8  within the vagina is markedly greater than with the
9  retropubic TVT sling.
10  Q   You were asked some questions earlier about
11  your tracking of the exact numbers of TVT slings or
12  other products that you've implanted in your patients
13  over your career.
14        Do you remember those questions?
15  A   Yes.
16  Q   And you said that you don't precisely track
17  the exact number of TVT slings or other products
18  you've used; is that fair to say?
19  A   Yes.
20        MR. SCHNIEDERS:  Object to form.
21  Q   (By Mr. Koopmann)  Even though you don't
22  track those number precisely, do you still feel
23  comfortable with the estimate of the numbers of
24  slings that you've implanted?
25        MR. SCHNIEDERS:  Object to the form.

Page 140

1  A   Very comfortable.
2  Q   (By Mr. Koopmann)  And is that something
3  that you discuss with your patients from time to
4  time?  If you are recommending that they have a
5  mid-urethral sling to treat their stress
6  incontinence, do you talk to the patient about how
7  many of those slings you've implanted?
8  A   I do.
9        MR. SCHNIEDERS:  Object to form.
10  Q   (By Mr. Koopmann)  And --
11        THE DEPONENT:  The court reporter is asking
12  us to slow down and turn a little bit so that she can
13  hear better.
14        MR. SCHNIEDERS:  Sure.  Thank you.
15  Q   (By Mr. Koopmann)  And do you have an
16  understanding of how some of your colleagues at your
17  current clinic or the clinics you've worked at in the
18  past, how they counseled their patients regarding
19  stress incontinence surgeries?
20        MR. SCHNIEDERS:  Object to the form.
21  A   So they would counsel them very similarly
22  to how I would counsel them regarding the
23  treatment -- surgical treatment of stress
24  incontinence.  And as I discussed previously, you
25  know, currently there's three treatments, surgical

Page 141

1  treatments for stress incontinence surgically, and
2  that would be the TVT sling, the pubovaginal sling,
3  and the Burch retropubic urethropexy.
4        And so, again, we tend to reserve the
5  pubovaginal sling for very complicated cases of
6  stress incontinence, and we would offer either the
7  Burch or the TVT sling; but, again, counseling them
8  that overall, the Burch and the TVT sling have very
9  similar success rates, but because the TVT sling has
10  less -- is less invasive, it has less risks overall.
11  Q   (By Mr. Koopmann)  Is it commonplace for
12  surgeons to counsel their patients regarding the
13  number of slings that that surgeon has implanted,
14  even though that surgeon doesn't precisely track the
15  exact number of slings the surgeon has placed?
16        MR. SCHNIEDERS:  Object to the form.
17  A   It should be something that a physician or
18  surgeon discloses to a patient, yes.
19  Q   (By Mr. Koopmann)  And as far as you
20  understand, is it commonplace for surgeons to do that
21  for patients, to say, "I've used this sling X number
22  of times," even though that surgeon doesn't have a
23  precise number that's verifiable of the exact number
24  of slings they've placed?
25        MR. SCHNIEDERS:  Object to the form.

Dorothy Kammerer-Doak, M.D.

Page 142

1    A    I don't think it's common for surgeons to
2  say that.
3    Q    (By Mr. Koopmann)  You don't think it's
4  common for surgeons to say, "I've put in a thousand
5  TVT slings before," if that's true?
6    A    Oh, if that's true --
7        MR. SCHNIEDERS:  Object to the form.
8    A    -- but I don't --
9        (All speaking simultaneously, and reporter
10       requested clarification.)
11   Q    (By Mr. Koopmann)  -- if that's true, that
12  they have placed a thousand TVT slings.
13   A    No, I think --
14       MR. SCHNIEDERS:  Object to the form.
15  Sorry.
16       MR. KOOPMANN:  He's going to object to
17  every question.
18       THE DEPONENT:  Okay.
19       MR. KOOPMANN:  So just wait two seconds and
20  then give your answer.
21       THE DEPONENT:  Okay.
22   A    So if they've done a lot of slings, I think
23  they will disclose that, and -- but if they've done
24  few slings, I don't think they will disclose that.  I
25  don't think they will tend to do that.

Page 143

1    Q    (By Mr. Koopmann)  When you are discussing
2  with your patients the risks of a midurethral sling
3  surgery like the TVT, do you quote for those patients
4  approximate complication rates that you've seen using
5  the sling in your own practice?
6        MR. SCHNIEDERS:  Object to the form.
7    A    Yes, I do.  And oftentimes what I quote to
8  them is the literature; and oftentimes patients will
9  ask me what is my own personal experience, and I will
10  tell them that as well.
11   Q    (By Mr. Koopmann)  And do you feel
12  comfortable telling them that?
13   A    I feel --
14       MR. SCHNIEDERS:  Object to the form.
15   A    I feel extremely comfortable in telling
16  them the complication rates because of the very large
17  body of literature that lists those complication
18  rates.
19   Q    (By Mr. Koopmann)  And do you feel
20  comfortable telling your patients what your own
21  approximate complication rates are, even though you
22  don't specifically track those complication rates in
23  a data base?
24       MR. SCHNIEDERS:  Object to form.
25   A    Yes, I do for the reasons mentioned, is

Page 144

1  that we're a very small medical community within New
2  Mexico, so it would be unlikely or it would be
3  difficult for a patient to go someplace else outside
4  of Albuquerque.
5    Q    (By Mr. Koopmann)  And you were asked some
6  questions earlier about factoring in the pore size of
7  other types of mesh in forming your opinions.
8        Do you remember that line of questioning?
9    A    Yes.
10   Q    Did you factor in the pore size of the
11  Gore-Tex suburethral slings in forming your opinions
12  regarding the TVT?
13   A    Yes.
14       MR. SCHNIEDERS:  Object to the form.
15   Q    (By Mr. Koopmann)  You mentioned -- may I
16  see Exhibit 8, please.  It's the whole stack.  So
17  let's separate 10 and 11 out there.
18   A    Here's 4.  Here it is.
19   Q    Okay.
20       (Pause.)
21   Q    (By Mr. Koopmann)  You were asked some
22  questions earlier today about your awareness of
23  studies that looked at laser-cut mesh versus
24  mechanically cut mesh.  And I think you mentioned a
25  study involving the TVT and TVT ABBREVO.

Page 145

1        Do you remember that testimony?
2    A    Yes.
3    Q    In one of your binders here marked TVT
4  Medical Literature Binder 1, there's a study by
5  Dr. de Barros (phonetic) and others.
6        Is that a study that you reviewed --
7    A    Yes.
8    Q    -- in the course of forming your opinions
9  in this case?
10   A    Yes.
11   Q    And what is the significance of that study?
12   A    So it's the TVT EXACT is laser cut.  And the
13  TVT could be mechanical cut or possibly laser cut.
14   Q    So that's a study that looks at TVT
15  laser-cut mesh and the TVT EXACT, and potentially TVT
16  mechanical-cut mesh in the other arm of the study?
17   A    Yes.
18   Q    Another study that's included in your
19  materials is Tommaselli, Abstract Regarding a
20  Comparison of the TVTO and TVT ABBREVO for the
21  Surgical Management of Female Stress Urinary
22  Incontinence; is that correct?
23   A    Yes.
24       MR. SCHNIEDERS:  Object to the form.
25   Q    (By Mr. Koopmann)  And the TVT -- well,

Dorothy Kammerer-Doak, M.D.

Page 146

1 what's the significance of this study?
2 　A　Well, the TVTO, again, could either be
3 mechanical or laser cut, and the TVT ABBREVO is laser
4 cut.
5 　Q　Okay. Okay. Thank you.
6 　　You were asked some questions earlier today
7 about studies that tracked long-term pain.
8 　　Do you remember that line of questioning?
9 　A　Yes.
10 　Q　And is the meta-analysis and systematic
11 review by Dr. Tommaselli and colleagues published in
12 the International Urogynecology Journal in 2015 one
13 of the studies that you've reviewed and relied on in
14 forming your opinions in this case?
15 　A　Yes, it is.
16 　Q　And in the abstract, it says that the
17 study -- the meta-analysis and systematic review --
18 looked at studies with a follow-up of 36 months for
19 transobturator midurethral slings and 60 months for
20 retropubic midurethral slings.
21 　　That's what was searched for, right?
22 　A　Yes.
23 　　MR. SCHNIEDERS: Form.
24 　Q　(By Mr. Koopmann) And they included data
25 from 49 studies?

Page 147

1 　　MR. SCHNIEDERS: Object to the form.
2 　A　49 studies were included.
3 　Q　(By Mr. Koopmann) If you'll turn to the
4 page containing Table 2.
5 　A　Okay. I'm there.
6 　Q　Sorry. The continuation of Table 2. It
7 says that they defined as persistent pain all pain
8 reported beyond the perioperative period, meaning
9 greater than seven days after the procedure, correct?
10 　A　Yes.
11 　　MR. SCHNIEDERS: Object to the form.
12 　Q　(By Mr. Koopmann) If you'll look at the
13 next page, they noted that persistent or
14 chronic pain, i.e., pain persisting beyond the
15 perioperative period or reported at the last
16 follow-up visit, was reported by 13 patients for
17 retropubic midurethral slings; is that right?
18 　　MR. SCHNIEDERS: Object to the form.
19 　A　Yes.
20 　Q　(By Mr. Koopmann) And how many retropubic
21 midurethral slings in total were studied in this
22 paper?
23 　A　3,801.
24 　Q　Well, that's the number of TVTs, correct?
25 　A　Yes.

Page 148

1 　Q　And how many total retropubic slings in the
2 study?
3 　A　3,974.
4 　Q　So 13 patients out of 3,974 had persistent
5 or chronic pain based on this systematic review and
6 meta-analysis?
7 　A　Yes.
8 　　MR. SCHNIEDERS: Object to the form.
9 　Q　(By Mr. Koopmann) Do you have the Schimpf
10 paper? It's at Tab 68.
11 　A　Yes.
12 　Q　Now, on the first page of the Schimpf paper
13 under Study Design, it indicates that the authors
14 conducted a systematic review, including English
15 language randomized controlled trials for 1990
16 through April 2013 with a minimum 12 months of
17 follow-up comparing a sling procedure for SUI to
18 another sling, a Burch urethropexy; is that right?
19 　A　Yes.
20 　　MR. SCHNIEDERS: Object to the form.
21 　Q　(By Mr. Koopmann) And if you'll turn to
22 Table 1, it lists the various studies, the randomized
23 controlled trials that were included in the
24 systematic review, correct?
25 　A　Yes.

Page 149

1 　Q　At the bottom of the first page of Table 1,
2 it lists a couple TVT randomized controlled trials
3 with 12-month follow-up.
4 　　MR. SCHNIEDERS: Object to the form.
5 　A　There's two with 12-month and one with 48
6 months. But that's not the TVT.
7 　Q　(By Mr. Koopmann) Okay. The TVTs, it says
8 12 months --
9 　A　12 months.
10 　Q　-- for those two?
11 　A　Correct.
12 　　MR. SCHNIEDERS: Object to the form.
13 　Q　(By Mr. Koopmann) And then on the next
14 page of Table 1, it lists many more TVT randomized
15 controlled trials with follow-up duration ranging
16 from 12 months to five years; is that fair to say?
17 　　MR. SCHNIEDERS: Object to the form.
18 　A　Yes.
19 　　MR. SCHNIEDERS: Are you going to ask any
20 nonleading questions, Barry?
21 　Q　(By Mr. Koopmann) And if you'll go to the
22 next page, you'll see more TVT randomized controlled
23 trials listed that have a follow-up of 12 months; is
24 that right?
25 　　MR. SCHNIEDERS: Object to the form.

Dorothy Kammerer-Doak, M.D.

Page 150

1    A    Yes.
2    Q    (By Mr. Koopmann)  And then if you'll turn
3  to Table 3, Table 3 lists the summary estimate of
4  incidents for various complications seen in
5  connection with Burch procedures, retropubic
6  midurethral sling procedures, mini-sling procedures,
7  obturator sling procedures, and pubovaginal sling
8  procedures; is that right?
9    A    Yes.
10        MR. SCHNIEDERS:  Object to the form.
11    Q    (By Mr. Koopmann)  And if you'll look at
12  the Exposure section of that table, what does it
13  indicate in terms of the relative risks of retropubic
14  midurethral sling exposure and pubovaginal sling
15  exposure?
16    A    So for the retropubic, it's 1.4 percent
17  with a confidence interval from 1.1 to 1.7 percent.
18    Q    What about for the pubovaginal sling?
19    A    For the pubovaginal slings, it is
20  5.4 percent with the confidence interval from 4
21  to 7 percent.
22    Q    Okay.  And if you'll go to the next page,
23  it lists, for instance, bowel injury and what the
24  relevance risk for those are with retropubic slings
25  and Burch procedures, correct?

Page 151

1        MR. SCHNIEDERS:  Object to the form.
2    A    Can I please mention, because this was
3  something that was brought up --
4    Q    (By Mr. Koopmann)  Sure.
5    A    -- in our last discussion.
6        Return to the operating room for erosion.
7  And that is for the pubovaginal sling, 1.6 percent;
8  and for the retropubic, it is 1.9 percent.
9        So, again, they are very similar, and it
10  goes back to what I said about all surgeries for
11  stress urinary incontinence have risks.
12    Q    And there's a risk of bowel injury with the
13  Burch procedure?
14    A    Yes.
15    Q    What is that risk according to this study?
16    A    3.3 percent.
17    Q    And what's the risk of a bowel injury with
18  the retropubic midurethral sling like the TVT,
19  according to this study?
20    A    0.34 percent.
21    Q    Is a bowel injury a -- potentially a very
22  significant complication?
23        MR. SCHNIEDERS:  Object to the form.
24    A    Yes, it is.
25    Q    (By Mr. Koopmann)  Does this table list the

Page 152

1  risk of overactive bladder or urgency?
2    A    Yes.
3    Q    What does it say the summary estimate of
4  incidence for a retropubic midurethral sling
5  procedure --
6        (Reporter requested clarification.)
7    Q    (By Mr. Koopmann)  What does it say the
8  summary estimate of incidence is for overactive
9  bladder or urgency in connection with a retropubic
10  midurethral sling procedure?
11    A    6 --
12        MR. SCHNIEDERS:  Object to the form.
13    A    6.9 percent.
14    Q    (By Mr. Koopmann)  And what does it say the
15  summary estimate of incidence is for overactive
16  bladder or urgency in connection with a pubovaginal
17  sling procedure?
18        MR. SCHNIEDERS:  Object to the form.
19    A    8.6 percent.
20    Q    (By Mr. Koopmann)  On the next page of
21  Table 3, does it list the summary estimate of
22  incidence for retention lasting longer than six weeks
23  postoperatively?
24    A    Yes.
25    Q    And how does the summary estimate of

Page 153

1  incidence of retention lasting more than six weeks
2  postoperatively compare for retropubic midurethral
3  slings like the TVT and the pubovaginal sling and the
4  Burch procedure.
5        MR. SCHNIEDERS:  Form.
6    A    It's more than twice.  Retropubic, 2.7
7  percent; and the pubovaginal sling and the Burch,
8  approximately 7.5 percent each.
9    Q    (By Mr. Koopmann)  And is this study by
10  Dr. Schimpf and colleagues one of the studies that
11  you reviewed and relied upon in forming your opinions
12  in this case?
13    A    Yes.
14        MR. SCHNIEDERS:  Object to the form.
15    Q    (By Mr. Koopmann)  This is a systematic
16  review and meta-analysis?
17        MR. SCHNIEDERS:  Object to the form.
18    A    Yes.
19    Q    (By Mr. Koopmann)  Like the Tommaselli
20  paper we just went over?
21    A    Yes.
22        MR. SCHNIEDERS:  Object to the form.
23    Q    (By Mr. Koopmann)  Do you have the Ford
24  paper in your binder there?
25    A    Yes, I do.

Dorothy Kammerer-Doak, M.D.

Page 154

1    Q    This study was a Cochrane review; is that
2  right?
3    A    It was a -- C-o-c-h -- okay.
4    Q    And it says what their selection criteria
5  were for this paper, correct?
6    A    Yeah, under Search Methods.
7    Q    And then below that it says --
8    A    It says --
9        (All speaking simultaneously, and reporter
10       requested clarification.)
11   A    Below that it says, Selection Criteria.
12   Q    (By Mr. Koopmann)  What does it say under
13  Selection Criteria?
14   A    Randomized or quasi-randomized controlled
15  trials amongst women with SUI, USI, or MUI in which
16  both trial arms involved an MUS operation.
17   Q    MUS operation means mid --
18   A    Midurethral sling.
19   Q    Sorry.  You've got to stop and let me
20  finish the question before you start to answer so she
21  can take it all down.  All right.
22       And then the main Result section on the top
23  of the next page, Page 2, does it list there how many
24  trials involving a certain number of women that they
25  included?

Page 155

1    A    Yes.
2    Q    What does it say?
3    A    81 trials that evaluated 12,113 women.
4    Q    And in the author's Conclusions section on
5  Page 2 -- do you see that section?
6    A    Yes.
7    Q    It says there:  Midurethral sling
8  operations have been the most extensively researched
9  surgical treatment for stress urinary incontinence in
10  women and have a good safety profile.  Irrespective
11  of the routes traversed, they are highly effective in
12  the short and medium term, and accruing evidence
13  demonstrates their effectiveness in the long term.
14       This review illustrates their positive
15  impact on improving the quality of life of women with
16  SUI.
17       Did I read that correctly?
18       MR. SCHNIEDERS:  Object to the form.
19   A    Yes.
20   Q    (By Mr. Koopmann)  And is this one of the
21  studies that you reviewed and relied upon in forming
22  your opinions in this case?
23   A    Yes.
24       MR. SCHNIEDERS:  Object to the form.
25   Q    (By Mr. Koopmann)  And is this the type of

Page 156

1  data, along with the Schimpf study we just looked at
2  and the Tommaselli study we just looked at, that you
3  consider to be the highest level of evidence on
4  suburethral slings or midurethral slings?
5        MR. SCHNIEDERS:  Object to the form.
6    A    Yes.
7    Q    (By Mr. Koopmann)  If you'll turn to
8  Page 10 of the Ford study, in the right-hand column
9  they talk about Type I mesh; is that right?
10   A    Yes.
11   Q    And what does it say there about Type I
12  mesh?
13   A    Are macroporous and monofilament, and they
14  have the highest biological -- I'm sorry -- highest
15  biocompatibility with the least propensity for
16  infections.
17   Q    And is the TVT mesh and the TVT sling a
18  Type I mesh?
19   A    Yes, it is.
20   Q    And it says further down in that paragraph:
21  Macroporous meshes pore size in excess of 75 microns
22  easily allow macrophages, leukocytes, fibroblasts,
23  blood vessels, and collagen to transverse the pores.
24  Thus, macroporous meshes promote tissue host ingrowth
25  with resultant biocompatibility and low risk of

Page 157

1  infection.  Amid 1997.
2        Monofilament tapes are widely available and
3  now predominate in current clinical practice.
4        Did I read that correctly?
5        MR. SCHNIEDERS:  Object to the form.
6    A    Yes.
7    Q    (By Mr. Koopmann)  And is this information
8  that you reviewed and relied upon in forming your
9  opinion?
10   A    Yes, it --
11       MR. KOOPMANN:  Object to the form.
12   A    Yes, it is.
13   Q    (By Mr. Koopmann)  Is the TVT mesh
14  monofilament mesh?
15   A    Yes, it is.
16   Q    You were asked some questions earlier about
17  the terminology of "erosion" versus "exposure."
18       Do you remember that line of questioning?
19   A    Yes.
20   Q    Has that terminology changed over time?
21   A    It has.
22   Q    Okay.  And has your use of that terminology
23  changed over time?
24   A    Yes.
25   Q    Can a suture erosion cause chronic pain?

Dorothy Kammerer-Doak, M.D.

Page 158

1 MR. SCHNIEDERS: Object to the form.
2 A In the same way that potentially a mesh
3 exposure could.
4 Q (By Mr. Koopmann) So the answer is yes?
5 A Yes.
6 Q You were asked some questions earlier by
7 plaintiff's counsel about the shrinkage of
8 polypropylene or contraction of polypropylene.
9 Does scar tissue shrink as it heals?
10 MR. SCHNIEDERS: Object to the form.
11 A From an in -- when you make an incision?
12 Q (By Mr. Koopmann) Yeah.
13 MR. SCHNIEDERS: Object to the form.
14 A So there will be some minor shrinkage, and
15 then there may be actually some stretching out with
16 time as the tissues get remodeled.
17 Q (By Mr. Koopmann) And so if there is any
18 shrinkage of a sling following the implantation of
19 the TVT, is it the mesh itself that shrinks, or is it
20 the tissue that's incorporated into the mesh that
21 shrinks?
22 MR. SCHNIEDERS: Object to the form.
23 A More than likely it's the tissue that's
24 growing into the mesh.
25 Q (By Mr. Koopmann) You were asked some

Page 159

1 questions earlier about whether the mesh -- the TVT
2 mesh was designed to do certain things like rope or
3 curl or fray or lose particles.
4 Do you remember those questions?
5 A Yes.
6 Q And I think your testimony was: It's
7 designed to correct SUI, correct?
8 MR. SCHNIEDERS: Object to the form.
9 A Yes.
10 Q (By Mr. Koopmann) For instance, a car
11 could be driven into a ditch, but it wasn't
12 necessarily designed to do that; is that fair to say?
13 MR. SCHNIEDERS: Object to the form.
14 A Yes.
15 Q (By Mr. Koopmann) Do you think surgeons
16 need to be informed by medical device manufacturers
17 about risks that are commonly known among pelvic
18 floor surgeons?
19 MR. SCHNIEDERS: Object to the form.
20 A No, I do not.
21 Q (By Mr. Koopmann) You were asked some
22 questions earlier about whether a 30 percent
23 shrinkage rate would need to be passed along.
24 What sort of data do you think would be
25 required in your opinion for a 30 percent shrinkage

Page 160

1 rate to be passed along?
2 Would it need to be -- you know, could it
3 be a single case report or would it need to be
4 randomized controlled trials or what sort of evidence
5 would you want to be seeing there?
6 MR. SCHNIEDERS: Object to the form.
7 A So as I mentioned previously, for there --
8 there would have to be evidence of shrinkage
9 clinically. And that could be done in multiple,
10 multiple studies; and that could be done with
11 ultrasound; it could be done with examination, for
12 example, with a Q-tip test where if there was that
13 amount of shrinkage, then we should see contraction
14 underneath the urethra.
15 So we mention the Q-tip test, that means
16 the Q-tip test would be negative, so it would be
17 deflected downward, indicating that the urethra was
18 being pulled up.
19 We would also see significant increase in
20 voiding dysfunction or otherwise known as urinary
21 tension with the shrinkage.
22 And as we just reviewed the Schimpf
23 article, the risk of retention with the retropubic
24 TVT sling is quite low, and surgical revision of the
25 TVT sling for retention is also very low and doesn't

Page 161

1 increase with time.
2 So this clinical data supports that the TVT
3 does not shrink with time. And so for that to be
4 refuted would require extensive studies.
5 Q (By Mr. Koopmann) Okay. If there's a
6 document in the binder that's labeled SUI Mesh
7 Documents Binder 1 that references a 30 percent rate
8 of shrinkage of the TVT sling, is that a document
9 that you would have reviewed before forming your
10 opinions in this case?
11 A Yes, it is.
12 MR. SCHNIEDERS: Object to the form.
13 Q (By Mr. Koopmann) Because you've reviewed
14 all the documents in SUI Mesh Documents Binder 1?
15 MR. SCHNIEDERS: Object to the form.
16 (Reporter requested clarification.)
17 Q (By Mr. Koopmann) Is that because you've
18 reviewed all of the documents in SUI Mesh Documents
19 Binder 1?
20 MR. SCHNIEDERS: Object to the form.
21 A Yes, I reviewed all of those documents.
22 Q (By Mr. Koopmann) You were asked some
23 questions earlier about some Code of Federal
24 Regulations -- regulations and FDA guidance documents
25 that you reviewed.

Dorothy Kammerer-Doak, M.D.

1    Do you remember those questions?

2    MR. SCHNIEDERS:  Object to the form.

3    A   Yes, I do.

4    Q   (By Mr. Koopmann)  Is it fair to say that

5 what you reviewed in those documents is consistent

6 with your opinions regarding the appropriateness of

7 the IFU that you set forth in your general TVT expert

8 report?

9    MR. SCHNIEDERS:  Object to the form.

10    A   Yes.  As I said in my report is that it's

11 really dependent on the surgeon to know what the

12 risks are for any given procedure, and that the IFU

13 should contain only those things that are not well

14 known to a surgeon or those things that are specific

15 to that device.  And that is consistent with what I

16 wrote in my general report.

17    Q   (By Mr. Koopmann)  You were asked some

18 questions about a paper by a Dr. Gerard Agnew and

19 others entitled Functional Outcomes Following

20 Surgical Management of Pain Exposure or Extrusion

21 Following a Suburethral Tape Insertion for Urinary

22 Stress Incontinence.

23    Do you remember those questions?

24    A   Yes.

25    Q   If that article was published in the

1 International Urogynecology Journal in 2014, do you

2 think it's more likely than not that you would have

3 reviewed that particular paper when it was published?

4    MR. SCHNIEDERS:  Object to the form.

5    A   Absolutely.

6    Q   (By Mr. Koopmann)  Because you read the

7 International Urogynecology Journal every month or

8 whenever it comes out?

9    A   Yes.

10    MR. SCHNIEDERS:  Object to the form.

11    A   Yes, I do, along with the journal from

12 AUGS.

13    Q   (By Mr. Koopmann)  Has all of the journal

14 reading that you've been doing on stress incontinence

15 and its surgical treatment over the course of your

16 career been factored into your opinions that you

17 formed in this case?

18    A   Yes --

19    MR. SCHNIEDERS:  Object to the form.

20    A   Yes, it has.

21    Q   (By Mr. Koopmann)  And based on your use of

22 the TVT device in more than a thousand surgical cases

23 and your review of the medical literature regarding

24 the TVT sling and alternative treatments, do you

25 consider yourself an expert on the design of the TVT

1 sling?

2    MR. SCHNIEDERS:  Object to the form.

3    A   Yes, I do.

4    Q   (By Mr. Koopmann)  There's no manufacturer

5 to teach surgeons how to tension the sutures used in

6 a Burch procedure, is there?

7    MR. SCHNIEDERS:  Object to the form.

8    A   No, there is not.  That's something that

9 you learn during your training and that you learn

10 while operating on patients.

11    Q   (By Mr. Koopmann)  There's no manufacturer

12 to teach surgeons how to properly tension an

13 autologous fascial sling, is there?

14    MR. SCHNIEDERS:  Object to the form.

15    A   No, there is not.

16    Q   (By Mr. Koopmann)  Does the amount of mesh

17 used in a sling procedure depend to some extent on

18 the patient's body habitus?

19    MR. SCHNIEDERS:  Object to the form.

20    A   So the more heavy a patient is, the more

21 subcutaneous tissue there is, the greater the mesh

22 that will be used, although, the amount that's within

23 the vaginal area will be pretty much the same because

24 it's the subcutaneous tissues that are abdominally

25 where the increased length of the sling will be.

1    (Pause.)

2    Q   (By Mr. Koopmann)  Does the reliable

3 scientific evidence that you have assessed on the TVT

4 device and the intended use of treating stress

5 urinary incontinence show that there's a significant

6 risk of mesh roping?

7    MR. SCHNIEDERS:  Object to the form.

8    A   No.

9    Q   (By Mr. Koopmann)  Does it show that

10 there's a significant risk of mesh curling?

11    A   No.

12    MR. SCHNIEDERS:  Object to the form.

13    Q   (By Mr. Koopmann)  Does it show that

14 there's a significant risk of mesh fraying?

15    MR. SCHNIEDERS:  Object to the form.

16    A   No.

17    Q   (By Mr. Koopmann)  Does it show that

18 there's a significant risk of mesh pore collapse?

19    MR. SCHNIEDERS:  Object to the form.

20    A   No.

21    Q   (By Mr. Koopmann)  Does it show that

22 there's a significant risk of degradation?

23    MR. SCHNIEDERS:  Object to the form.

24    A   No.

25    Q   (By Mr. Koopmann)  Does it show that

Dorothy Kammerer-Doak, M.D.

Page 166

1 there's a significant risk of fibrotic bridging?

2     MR. SCHNIEDERS: Object to the form.

3   A  No.

4   Q  (By Mr. Koopmann) Does it show that

5 there's a lack of biocompatibility for the TVT mesh?

6     MR. SCHNIEDERS: Object to the form.

7   A  No.

8   Q  (By Mr. Koopmann) Have all of the opinions

9 that you've offered here today been offered to a

10 reasonable degree of medical certainty?

11   A  Yes, they have.

12     MR. KOOPMANN: Those are all the questions

13 I have.

14     MR. SCHNIEDERS: All right. It's 1:15 your

15 guys' time, so why don't we plan on coming back in at

16 2:00 your time, all right?

17     MR. KOOPMANN: Okay. That sounds good.

18     (The deposition concluded at 1:15 p.m.,

19     March 7, 2017.)

20

21

22

23

24

25

Page 167

1   I, DOROTHY KAMMERER-DOAK, M.D. do hereby certify

2 that I have read the foregoing transcript and that

3 the same and accompanying amendment sheets, if any,

4 constitute a true and complete record of my

5 testimony.

6

7

8

        _____

9        Signature of Deponent

10        ( ) No amendments

        ( ) Amendments attached

11

12

13    Acknowledged before me this _____ day of

  _____, 20__.

14

15     Notary public:

   _____

16

    My commission expires:

17  _____

18    Seal:

19

20

21

  DLB

22

23

24

25

Page 168

1 STATE OF COLORADO)

2     ) ss. REPORTER'S CERTIFICATE

3 COUNTY OF DENVER )

4    I, Dianna L. Buckstein, do hereby certify

5 that I am a Professional Shorthand Reporter and

6 Notary Public within the State of Colorado; that

7 previous to the commencement of the examination, the

8 deponent was duly sworn to testify to the truth.

9    I further certify that this deposition was

10 taken in shorthand by me at the time and place herein

11 set forth, that it was thereafter reduced to

12 typewritten form, and that the foregoing constitutes

13 a true and correct transcript.

14    I further certify that I am not related to,

15 employed by, nor of counsel for any of the parties or

16 attorneys herein, nor otherwise interested in the

17 result of the within action.

18    In witness whereof, I have affixed my

19 signature this 20th day of March, 2017.

20     My commission expires November 25, 2017.

21

22

23     _____

    Dianna L. Buckstein

24     216 - 16th Street, Suite 600

    Denver, Colorado 80202

25