# EXHIBIT C

Ahmet Bedestani, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   CHARLESTON DIVISION

 4    In Re:  Ethicon, Inc.       Master File No.

      Pelvic Repair System        2:12-MD-02327

 5    Products Liability

      Litigation                  MDL No. 2327

 6

      This document relates to

 7    all Wave 8 and subsequent   Joseph Goodwin

      wave cases as plaintiffs    U.S. District Judge

 8

 9

10

11

12

13

14       Deposition of AHMET BEDESTANI, M.D., taken on

15    Friday, September 21, 2018, in the conference room

16    of Courtyard by Marriott, Two Galleria Boulevard,

17    Metairie, Louisiana 70001, commencing at

18    11:52 a.m.

19

20

21

22

23

      Reported by:

24    AURORA M. PERRIEN

      CERTIFIED COURT REPORTER

25    REGISTERED PROFESSIONAL REPORTER
```

Ahmet Bedestani, M.D.

```
 1                    I N D E X

 2                                         Page

 3      Caption  ........................  1

 4      Appearances  ....................  3

 5      Agreement of Counsel  ...........  4

 6      Reporter's Certificate  .........  119

 7

 8

 9              E X A M I N A T I O N

10      MR. JONES  ......................  5

11      MR. WALKER  .....................  109

12

13

14                E X H I B I T S

15      No. 1  Ahmet Bedestani, LLC,       16
               Invoice 10016

16      No. 2  (flash drive)              16

        No. 3  General Expert Report of   17
17             Ahmet Bedestani, M.D.
               (PowerPoints)

18      No. 4  (e-mail dated 4/18/01)     46

        No. 5  Notice to Take Deposition...  115

19      No. 6  Curriculum Vitae           116

20

21

22

23

24

        **Reporter's Note:  Exhibit Nos. 2 and 4 were

25      retained by plaintiff's counsel.
```

Ahmet Bedestani, M.D.

```
 1              A P P E A R A N C E S
 2   REPRESENTING PLAINTIFF:
 3        WAGSTAFF & CARTMELL, L.L.P.
          BY:  NATE JONES, ESQ.
 4        4740 Grand Avenue, Suite 300
          Kansas City, Missouri 64112
 5        816.701.1100
          Njones@wcllp.com
 6
 7
 8   REPRESENTING DEFENDANT:
 9        BUTLER SNOW, L.L.P.
          BY:  JORDAN N. WALKER, ESQ.
10        1020 Highland Colony Parkway, Suite 1400
          Ridgeland, Mississippi 39157
11        601.985.4643
          Jordan.walker@butlersnow.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ahmet Bedestani, M.D.

1              S T I P U L A T I O N

2      It is stipulated by and among Counsel that

3   the deposition of AHMET BEDESTANI, M.D., is being

4   taken under the Federal Rules of Civil Procedure

5   for all purposes permitted under the law.

6      The formalities of reading and signing are

7   waived.

8      The formalities of sealing, certification

9   and filing are hereby waived.  The party

10  responsible for services of the discovery material

11  shall retain the original.

12                  *   *   *   *   *

13          Aurora M. Perrien, Certified Court

14  Reporter, Registered Professional Reporter, in and

15  for the State of Louisiana, officiated in

16  administering the oath to the witness.

17

18

19

20

21

22

23

24

25

Ahmet Bedestani, M.D.

1           AHMET BEDESTANI, M.D.,

2    4228 Houma Boulevard, Suite 410A, Metairie,

3    Louisiana 70006, after having been first duly

4    sworn, testified on his oath as follows:

5           E X A M I N A T I O N

6    BY MR. JONES:

7       Q.  Hey, Doctor.  My name is Nate Jones.  I'm

8    from the law firm of Wagstaff & Cartmell.  I think

9    you already know this, but I represent the

10   plaintiffs in the transvaginal mesh MDL that is

11   headquartered in Charleston, West Virginia, and is

12   ongoing.

13          So are you prepared today to answer some

14   questions about the work that you performed in

15   this case?

16      A.  Yes, sir.

17      Q.  And just briefly break it down to me what

18   your understanding of your role is in this case.

19      A.  I don't know how to answer that, really.

20      Q.  You're sure?

21      A.  My role -- I believe I was retained by

22   defendant's law firms to answer questions

23   regarding the accusations against certain products

24   put into the marketplace by Ethicon, and to give

25   information based on science, education,

Ahmet Bedestani, M.D.

1   experience.

2      Q.   And is there one particular product that

3   attorneys for Ethicon have asked you to look at

4   specifically?

5      A.   Prosima.

6      Q.   Okay.  So we're here today to talk bout

7   Prosima and the work that you've done.

8           You've authored an -- what's called an

9   expert report on the Prosima product; correct?

10     A.   That is correct.

11     Q.   Okay.  And I'm assuming that you spent

12  some time authoring that report of yours?

13     A.   I did.

14     Q.   Okay.  And your counsel e-mailed me

15  earlier a invoice detailing certain work that you

16  performed.

17          Just to cut to the chase, is it fair for

18  me and other attorneys to look at that invoice and

19  rely on it for the amount of work that you

20  performed in this case?

21     A.   The -- there should be an invoice that was

22  a preliminary invoice that is 58 hours, then there

23  was another one for another 6 hours relating to

24  that general report; so in total, 64.4 hours

25  specifically devoted to the Prosima general

Ahmet Bedestani, M.D.

1    report.  But I must add that that is a fraction of

2    the time that I spent in that it -- I used this as

3    an exercise to satisfy intellectual curiosity and

4    to improve my understanding of certain concepts.

5         Q.  If we combine the preliminary invoice,

6    which totals to 58.1 hours, and the second

7    invoice, that would total it up to 64.4 hours.

8            That's what we need to look at to

9    determine the amount of time that you've invoiced

10   for in this case.  Fair?

11        A.  That is fair.

12        Q.  Okay.

13        A.  Invoice time, 64 hours.

14        Q.  Okay.  Now on this invoice, I got to ask

15   you a few questions about some of the language on

16   here.

17        A.  I don't have the invoice in --

18        Q.  Okay.

19        A.  -- front of me here.

20            MR. WALKER:

21                Here, we can -- we can look at it

22            here.  I have it on my screen; so just let

23            us know what you're looking at.

24   BY MR. JONES:

25        Q.  Yeah.  The very -- the very -- towards the

Ahmet Bedestani, M.D.

1   very end, on Page 3 of 3, underneath Consulting,

2   it says, "Preparation of Prosima" or Prosima,

3   however we're going to roll in this depo,

4   "Position and and supporting slides."

5           What's the Prosima position statement

6   paper that you were working on?

7       A.  Isn't that my report?

8       Q.  That's my question.

9       A.  That is my report.

10      Q.  Okay.  And then the supporting slides,

11  what are you referring to there?

12      A.  I believe -- I have it in -- in my hand.

13          MR. WALKER:

14              Let -- well, let me -- let me just

15          interject to this point.  They are

16          references in attachment to his report.

17          And a slide deck that -- that he used as

18          sort of a foundation for his report should

19          have been attached --

20          MR. JONES:

21              Okay.

22          MR. WALKER:

23              -- in the materials that y'all were

24          served.  I've got a copy for you here if

25          you'd like that.

Ahmet Bedestani, M.D.

```
1            MR. JONES:

2                Yeah.  Great.

3            MR. WALKER:

4                (Tenders document.)

5   BY MR. JONES:

6       Q.  So you -- you put together -- you put

7   together a report; correct?  Yes?

8       A.  I did -- I did put together a position

9   statement.  That position statement is in the form

10  of a report that reflects my thoughts on Prosima.

11      Q.  Okay.  And then you also put together a

12  PowerPoint slide presentation; correct?

13      A.  That PowerPoint presentation is a run- --

14  is reflective of notes, images, information that I

15  have gathered through the passage of time that has

16  formulated my --

17      Q.  I'm just asking --

18      A.  -- thought process.

19      Q.  -- whether you did it or not.

20          Did you --

21      A.  Of course I did it.

22      Q.  Did you put together the PowerPoint

23  presentation?

24      A.  That is 100 percent mine.

25      Q.  Thanks.  It's a lot of work.
```

Ahmet Bedestani, M.D.

1        A.   It is a lot of work.

2        Q.   Then a few of these other entries on the

3    invoice, it says, "Research of chain breakdown in

4    graft matrix."

5             Explain to me what you mean when you write

6    on your billing invoice "Research of chain

7    breakdown in graft matrix."

8        A.   As I was reflecting on some of the

9    accusations that were put forth or that I was made

10   aware of in terms of how certain people believe

11   mesh was reacting within the human body,

12   specifically referencing papers accusing of

13   oxidation, breakdown, etcetera.  So when I dug

14   deep into the actual papers, I had to re-educate

15   myself, going back to organic chemistry, learning

16   about isomers, learning about florescence testing,

17   learning about electron scanning microscopy.

18            I would have to reflect upon my notes that

19   I don't -- I don't think I have with me.  But

20   really trying to learn what florescence,

21   transgravitent -- transgravonometric -- I'd have

22   to pronounce it again.  I'm certainly not an

23   organic chemist, but I had to learn so I could

24   make understanding of the papers and their

25   rebuttal so that I can formulate my own

Ahmet Bedestani, M.D.

1  understanding, look at you and say I either

2  believe it or I don't believe it.

3      Q.  Sure.  So the -- so underneath "Research

4  of chain breakdown and graft matrix" and "Research

5  into defending against accusations of" oxidate --

6  oxidate -- "oxidation of implants," talking about

7  similar concepts there.  Fair?

8      A.  Polypropylene is a chain polymer.  And

9  then Prolene is a stereoisomer.  So I had to

10  really go back in that.  And isotonic are all the

11  carbon molecules and substituents on the same.  So

12  I would have to go back and go exactly into my

13  notes to better delineate what I am trying to

14  display to you.  So I was really trying to say

15  what was going on with the graft and was it really

16  oxidation.

17      Q.  So as far as your two entries in your

18  billing invoice that relate to the "Research of

19  chain breakdown and graft matrix" and "defending

20  against accusations of oxidation of implants,"

21  you're -- you're talking about two similar

22  concepts; correct?

23      A.  Yes.

24      Q.  Okay.  All right.  That's all the question

25  was.

Ahmet Bedestani, M.D.

1              And then I assume you've come to the

2    conclusion that polypropylene mesh does not

3    degrade or oxidize inside of the human body.

4    Fair?

5        A.  I believe that Prolene, polypropylene is

6    completely inert and does not do those things --

7        Q.  Okay.  And --

8        A.  -- within the human body.

9        Q.  Yeah.  And in your research on that issue,

10   you went out and looked at -- let me ask you.

11             Did you look at medical literature on the

12   subject?

13       A.  I did.

14       Q.  And did you -- did you look at internal

15   testing that Ethicon had done on the subject?

16       A.  I -- I visited the papers by Abbott, Cabot

17   [phonetic], if -- if -- I can't remember his name,

18   and Clave.

19       Q.  Clave?

20       A.  Clave.

21       Q.  Sure.

22       A.  And then the accusations by Ostergard in

23   his three in really trying to understand what was

24   going on, and then really going back to Boyd's --

25   really going back to Boyd's Organic Chemistry

Ahmet Bedestani, M.D.

```
 1   textbook, which was mine.
 2           So really just trying to once again
 3   understand what all of this terminology was.  I do
 4   -- I think I billed these -- the company 7 hours,
 5   but I could definitely tell you there was far more
 6   time spent just trying to understand these
 7   concepts and I didn't feel that it was appropriate
 8   to bill a company to --
 9       Q.  Yeah.  Yeah.  Yeah.
10       A.  -- educate myself.
11       Q.  Got it.  And I'm not trying to be rude and
12   cut you off, but I mean, if I ask you a question,
13   I just want the answer to the question.  I mean,
14   you'll get it.  You'll -- you'll get it.  And I
15   know it's like -- we're human beings.  We try to
16   have a conversation, and there will probably be
17   some topics where you and I both will start
18   getting into a conversation mode.  But for now,
19   this -- this -- these are like housecleaning
20   issues; so --
21       A.  Okay.
22       Q.  -- I'm just firing like simple
23   questions --
24       A.  Okay.
25       Q.  -- that I just want answers to.
```

Ahmet Bedestani, M.D.

1          So the question was -- you looked at what

2     you looked at in -- in researching the issue of

3     degradation or oxidation of polypropylene mesh

4     implants inside of a woman's body.  And I asked

5     you if you looked at medical literature, and you

6     said yes.  And then I asked you if you looked at

7     any Ethicon testing that the company had done on

8     the subject.  And so that's the question.

9          Did you look at any testing that Ethicon

10    specifically had done on the subject?

11          A.   I would have to reference my -- I think I

12    -- in that huge binder there's over a hundred some

13    odd papers, and there's ancillary material.  If

14    that -- if Ethicon material was there, I'm sure

15    that I looked at it.

16          Q.   Okay.  And as far as -- we're talking

17    about the reliance list of materials?

18          A.   Yes.

19          Q.   So let me -- let me shortcut this.

20          If an item is listed on your reliance

21    list, it means that you looked at it at one point

22    in time before preparing your report; correct?

23          A.   Completely.  Yes.

24          Q.   Thank you.

25          And that means we can -- if -- if one of

Ahmet Bedestani, M.D.

1    these cases goes to trial and you're called to

2    testify, we can, when you're up on the stand, look

3    at that reliance list and we can pull out the

4    document, show it to you, and say, Doctor,

5    according to your reliance list, you looked at

6    this prior to authoring your report -- I'm going

7    to give you an opportunity to look at it again

8    because it's probably been a second since you

9    looked at it.  But then you'll answer questions

10   about it.  Fair?

11        A.  That is correct.

12        Q.  Okay.

13        MR. WALKER:

14            Nate, are you done with this invoice?

15        MR. JONES:

16            Yeah.

17        MR. WALKER:

18            Okay.  And you -- you may or may not

19            ask about this, but let me just go ahead

20            and state.  I brought a flash drive that

21            has electronic copies of all of the

22            reliance material --

23        MR. JONES:

24            Yeah.

25        MR. WALKER:

Ahmet Bedestani, M.D.

1              -- that's contained.  So if you want

2        this --

3        MR. JONES:

4              Yeah.  I want it.

5        MR. WALKER:

6              -- we do have it for you.

7        MR. JONES:

8              Awesome.  Thank you.

9        MR. WALKER:

10             (Tenders document.)

11        MR. JONES:

12             We'll mark that invoice that we have

13        -- if we can get the other one, please, or

14        at some point in the future, would be --

15        MR. WALKER:

16             Yes.

17        MR. JONES:

18             -- be great.  And we'll mark those for

19        the record as Exhibit 1.

20        (Exhibit No. 1 was marked for

21        identification and attached hereto.)

22        MR. JONES:

23             We'll mark this flash drive as

24        Exhibit 2.

25        (Exhibit No. 2 was marked for

Ahmet Bedestani, M.D.

1              identification and attached hereto.)

2              MR. JONES:

3                  That's it for now.  Oh.  And we'll go

4              ahead and mark an electronic copy, which

5              I'll send you, of his report and

6              PowerPoint stuff as Exhibit 3.

7              (Exhibit No. 3 was marked for

8              identification and attached hereto.)

9    BY MR. JONES:

10       Q.  All right, Doctor.  Let's switch gears.

11   This is the section of the deposition where I ask

12   you a whole bunch of questions about work that

13   you've done for Ethicon before this case, before

14   expert work, before this case ever existed.  So

15   I'm going to ask you questions about work you ever

16   did for Ethicon, if you ever did work for any

17   other mesh companies, and ask you about your --

18   your background a little bit.

19              So prior to performing work as an expert

20   in this case revolving around the Prosima product,

21   had you ever acted as a paid physician consultant

22   for Ethicon?

23       A.  Yes.

24       Q.  Okay.  Let's -- give me the breakdown of

25   -- when did you first start acting as a paid

Ahmet Bedestani, M.D.

1   physician consultant for Ethicon?

2       A.   2010 would be a -- I think a good start

3   point.

4       Q.   Okay.   And what would -- what did your

5   consulting responsibilities entail in 2010?

6       A.   Speaking about -- speaking to my thought

7   process of the Prosima itself, graft augmentation,

8   specifically Prolene, polypropylene augmentation

9   of transvaginal reconstructive procedures to

10  address pelvic organ prolapse, symptomatic.

11      Q.   Fair to say in 2010 your consulting work

12  for Ethicon consisted of work revolving around the

13  Prosima product and other graft augmentation

14  procedures for pelvic organ prolapse?

15      A.   My main focus was specifically to provide

16  professional-level education on behalf of Prosima.

17  This involved preceptorship.   This involved

18  anatomical dissection, displaying that anatomical

19  dissection.

20      Q.   And in your work in 2010, your consulting

21  work, would have primarily revolved around the

22  Prosima product -- fair -- for Ethicon?

23      A.   For Ethicon, only Ethicon.   Prosima, only

24  Prosima.

25      Q.   Okay.   Did you do any other work as a paid

Ahmet Bedestani, M.D.

```
 1   physician consultant for any companies that market
 2   transvaginal mesh devices that aren't named
 3   Ethicon?
 4       A.   Absolutely no.  I was paid to man a
 5   cadaveric lab while a fellow, and that's because
 6   my bosses said, Show up, and I did --
 7       Q.   Right.
 8       A.   -- and I collected -- I believe it was
 9   either 500 or $800.  And that would be between
10   2007 and 2010.  I -- I don't -- you would -- you
11   could -- I -- I don't know exactly when.  It was
12   on behalf of Pinnacle.  So whenever Pinnacle hit
13   the market, it would be around that time.
14       Q.   Got it.
15            As far as your consulting work, you --
16   other than the one event that we just described
17   that you were required to attend, your consulting
18   work was solely with Ethicon as it relates to
19   transvaginal mesh; correct?
20       A.   Solely with Ethicon as it relates with
21   Prosima.
22       Q.   Okay.  Why is it that you only worked for
23   Ethicon?
24       A.   I believed in the -- the concept of mesh
25   augmentation.  But more importantly, I was
```

Ahmet Bedestani, M.D.

1   fascinated, not intrigued, fascinated by the

2   vaginal support device, which is a component only

3   of Prosima.

4       Q.   The -- the Prosima uses the vaginal

5   support device, or -- or VSD, which is unique to

6   all other transvaginal mesh POP kits ever on the

7   market; correct?

8       A.   Excuse me?  I -- you have to repeat that

9   for me.

10      Q.   The -- the Prosima uses the VSD, or

11  vaginal support device, mechanism; correct?

12      A.   That is correct.

13      Q.   And the design of the Prosima, which

14  includes the VSD device, is unique to any other

15  transvaginal mesh POP kit ever marketed in the

16  United States.  Fair?

17      A.   Absolutely no.

18           The vaginal support device was only

19  involved with Prosima.  There was no other

20  splinting-type device that I was aware of for any

21  other marketed transvaginal mesh kit:  Apogee,

22  Perigee, Elevate, Pinnacle, Uphold.  I can't keep

23  them straight.

24      Q.   Sure.  There's a bunch.

25           But as far as the splinting -- the splint

Ahmet Bedestani, M.D.

1    device, that was unique to the Prosima; correct?

2         A.   Yes.

3         Q.   Okay.  All right.  None of -- I'm not

4    aware of it either.

5              But there's -- there's no other

6    transvaginal mesh product that you're aware of

7    that uses the type of design that Prosima does;

8    correct?

9         A.   That is correct, sir.

10        Q.   And that's why you're fascinated, I'm --

11   I'm assuming -- let me ask.

12             Is that one of the reasons why you were

13   fascinated by the Prosima back in 2010?  It was

14   different --

15        A.   Way before.

16        Q.   -- right?  Oh.  Way before?

17        A.   Way before, I always felt that precision

18   of application of graft with vector molding,

19   intrinsic or extrinsic pressure, was the key.

20   Basically I felt that Ethicon, when they

21   introduced me to the vaginal support device, gave

22   me what I had been looking for.  I felt that that

23   would solve a lot of problems, and I once again

24   was fascinated by this concept.

25        Q.   And the concept was invented by a

Ahmet Bedestani, M.D.

1  Australian doctor; correct?

2      A.  I believe it was Marcus Carey, to be

3  specific.

4      Q.  Yeah.  He's Australian; right?

5      A.  Yes.

6      Q.  Okay.  And do you know when Prosima was

7  launched in the United States?

8      A.  I remember attending some type of event in

9  Colorado where they were getting ready to roll it

10  out.  And I say that because I would have to look

11  back at my travel logs.  It's either going to be

12  2009 or beginning of 2010.

13      Q.  That brings up a good point.

14          Was this rollout event that you attended

15  in 2009 or 2010 an event sponsored by Ethicon?

16      A.  I believe it was.

17      Q.  I'm assuming, dating back to 2009 or 2010,

18  that you've attended multiple events sponsored by

19  Ethicon in your role as a consulting physician?

20      A.  From 2009 to -- yeah.

21      Q.  To -- to current?  Okay.

22      A.  I -- I attended many such events.  Many

23  such events not only sponsored by Ethicon but all

24  of the companies at the time.

25      Q.  Good.

Ahmet Bedestani, M.D.

1          And have you -- have you -- has Ethicon

2    paid for you to travel to their headquarters?

3          A.   I did go to their headquarters, but that's

4    when I went to see my family.  I did.  Because we

5    are -- we live in Hamilton, New Jersey, which is

6    not that far from East Brunswick or Somerville.

7          Q.   Sure.

8          Do any other events or trips stand out to

9    you in the last 8 or 9 years that you attended

10   where Ethicon either sponsored the event or paid

11   for you to travel there?

12         A.   Many wonderful memories come back from

13   labs that were hosted or put forth by Ethicon:

14   Chicago, Florida.  I would have to look back at

15   the travel log.  Many.

16         But I do know this:  It was through all of

17   these labs that I was able to further dissect and

18   further advance my knowledge in pelvic anatomy.

19   Because I can tell you this:  Through that company

20   I was able to study over 26 cadavers.  So usually

21   it was four cadavers per an event.  Four into 26

22   -- let's round up.  Say I missed two.  So at least

23   seven events.

24         Q.   All right.  So 2010, you're a consultant

25   for Ethicon.

Ahmet Bedestani, M.D.

1          2011, are you a consultant for Ethicon?

2     A.  I think so.

3     Q.  2012, are you still consulting with

4  Ethicon?

5     A.  No.  I'm not.

6     Q.  Okay.  What -- why did you stop acting as

7  a physician consultant in 2012 for Ethicon?

8     A.  I think I -- I actually transitioned out

9  of one position and then took some time to decide

10  in what direction my career was going to go; so I

11  felt that was an important part.  And it -- that

12  was -- it was at that point that I passed my

13  general obstetrics and gynecology boards, two

14  thousand and -- I think it's right here.  Two --

15  November of 2011.  And then I started putting

16  together my practice at East Jefferson General

17  Hospital, and that took some time to really get

18  off the ground.  So I was really devoted to that.

19     Q.  Okay.  Did Ethicon between the years of

20  2012 to 2016 ever reach out to you to ask you if

21  you would act as a paid physician consultant for

22  them again?

23     A.  No.

24     Q.  Now November of 2011 is when you first

25  passed your general OB-Gyn boards; is that

Ahmet Bedestani, M.D.

```
1    correct?

2        A.  That is correct.

3        Q.  And you finished -- finished your

4    fellowship training in June of 2010; correct?

5        A.  That is correct.

6        Q.  And then you talked about starting your

7    practice at East Jefferson; correct?

8        A.  Yes.  I left my -- my previous -- where I

9    did my fellowship, I stayed on, and I felt that it

10   was time to move on.

11       Q.  Sure.

12       A.  And so I think that was a period of

13   transition.

14       Q.  So sometime in late 2010 you begin

15   practicing as a full-time physician; correct?

16       A.  I was a fellow from 2007 to 2010.  And

17   then I joined as an assistant professor, and so I

18   was -- at that point we transitioned from fellow

19   to attending.  That is correct.

20       Q.  Okay.  And then at some point in 2011 you

21   start your practice at East Jefferson; correct?

22       A.  We started I think in May of 2012.  It

23   took a while to get started.  It should be then.

24   Yeah.  May of 2012.

25       Q.  When's the last time that you used the
```

Ahmet Bedestani, M.D.

1    Prosima device in a patient?

2         A.   I -- I think probably in 2011.   Probably.

3         Q.   Okay.   When is the first time you used the

4    Prosima device on a patient?

5         A.   As soon as I could probably get my hands

6    on it; so probably somewhere in 2009 or 2010.

7         Q.   Fair to say the first time that you would

8    have used the Prosima device would have been

9    shortly after it was first marketed in the

10   United States?

11        A.   As soon as I could obtain the device.

12   Yes.   Whatever that time period is.

13        Q.   How many total Prosima devices did you

14   implant in patients?

15        A.   That would be a -- that would have to be a

16   range.

17        Q.   Give me a range.

18        A.   Probably more than 40, less than a

19   hundred.

20        Q.   Now in the course of your review in --

21   in -- in educating yourself about issues that were

22   relevant to the Prosima device, you're aware that

23   the launch of the Prosima device was delayed

24   several times by Ethicon; correct?

25        A.   I didn't know that at the time where --

Ahmet Bedestani, M.D.

1    when it first was presented to me.  On further

2    study, I do know that it was delayed for some

3    time, but I felt that that was a good thing in the

4    sense that they wanted to actually have good

5    Level 1 data.

6        Q.  You became -- any time I say something

7    that's off-base, correct me if I'm wrong.

8            When you -- when you were a practicing

9    physician in 2009 and 2010 and started using the

10   Prosima device, you had no knowledge at that time

11   that there was delays in the launching of the

12   device made by Ethicon; correct?

13       A.  That is correct.

14       Q.  At some point in your review of materials

15   and in authoring and in -- in authoring your

16   expert report in this case on the Prosima device,

17   you -- you became aware that there were several

18   delays of the launch of the Prosima device made by

19   Ethicon; correct?

20       A.  That is correct.

21       Q.  And you would have became educated in that

22   subject when you reviewed internal documents

23   supplied to you from attorneys who represent

24   Ethicon.  Fair?

25       A.  That is correct.

Ahmet Bedestani, M.D.

1      Q.   Okay.  And in fairness, the only way that

2  a physician could have known that there were

3  multiple delays in the launch of the Prosima

4  device would be to have access to Ethicon's

5  internal documents; correct?

6           MR. WALKER:

7              Object to form.

8  BY MR. JONES:

9      Q.   That's a bad question.  Let me ask in a

10  more targeted question.

11           One way a physician would become aware of

12  the multiple -- multiple delays in the launch of

13  the Prosima device made by Ethicon would be to

14  have access to their internal documents; correct?

15      A.   No.  Because if a company says that

16  Product X is coming September 2008 and you're

17  waiting for it and it doesn't show up, then that

18  keys you off there's a problem.  So I think

19  finding out the developmental timeline of a

20  product, I don't know if that's really germane to

21  the issue at the time.

22      Q.   You reviewed -- I mean, the -- the

23  internal documents are -- to me are interesting,

24  actually, in this -- with this device.  Sometimes

25  they're not that interesting.  But with Prosima,

Ahmet Bedestani, M.D.

1    they are definitely interesting.  There's some

2    that really stand out.

3              And -- and I'm sure you reviewed documents

4    where employees at Ethicon are disappointed with

5    some of the initial safety data that came back

6    prior to the launch of the Prosima device;

7    correct?

8              MR. WALKER:

9                   Object to form.

10             THE WITNESS:

11                  I don't remember any type of

12             information standing out regarding safety

13             data, none -- nothing regarding safety.

14   BY MR. JONES:

15        Q.   You reviewed documents where Ethicon --

16   employees at Ethicon were concerned about the

17   performance data of Prosima prior to its launch;

18   correct?

19        A.   Please define --

20        Q.   Meaning whether -- meaning whether it

21   worked or not.

22        A.   Of performance --

23        Q.   Sure.

24        A.   -- in terms of --

25        Q.   Efficacy.

Ahmet Bedestani, M.D.

1        A.   Okay.  That's a good word.

2             I do believe that the concept of success

3    still eludes pelvic floor surgeons.  I think we've

4    seen that in Barber's paper.  And I think

5    understanding what Prosima envisioned in terms of

6    a tension-free placement -- and I always liked

7    that word "tension-free."

8        Q.   It sounds nice.

9        A.   It sounds nice.

10       Q.   Endearing.  All right.  Here's the

11   question, because I don't think you answered it.

12   It's a simple -- whether you saw documents or not.

13   I'm guessing you did, but I got to ask.

14            Did you review documents where employees

15   at Ethicon were concerned about efficacy data

16   associated with the Prosima device prior to the

17   device being launched onto the market in the

18   United States?

19            MR. WALKER:

20                 Object to form.

21            THE WITNESS:

22                 I saw a lot of correspondence in the

23                 form of e-mail that was difficult to

24                 delineate because it was -- there was such

25                 a substantial volume.  And I do recall

Ahmet Bedestani, M.D.

```
 1          reading some people making mention that --
 2          in terms of how they were going to report
 3          the data, I think there was ongoing debate
 4          about that.  But at no time did I see
 5          anything regarding safety.
 6  BY MR. JONES:
 7     Q.  Let me ask it this way:  You know based on
 8  your review of the documents that there was a --
 9  there was a level of concern inside the company
10  with multiple employees at Ethicon, including
11  medical directors, about the performance or
12  efficacy of the Prosima device before it was ever
13  launched onto the market?  You know that -- right
14  -- based on your review of the documents in this
15  case?
16          MR. WALKER:
17              Object to form.
18          THE WITNESS:
19              In my review of probably gigabytes of
20          information, I recall people being
21          concerned about 83 percent versus
22          94 percent efficacy and how one study was
23          going to shoot for 90 percent and maybe
24          they did not achieve that so there was
25          ongoing debate about that.  But I don't
```

Ahmet Bedestani, M.D.

1       know who was providing the data, where was

2       the data coming from.

3   BY MR. JONES:

4       Q.  You don't know who was providing that

5   data?

6       A.  In terms of the actual surgeons --

7       Q.  Okay.

8       A.  -- who were -- who was producing it --

9       Q.  Well, one of the surgeons --

10      A.  -- what was the skill set --

11      Q.  One of the surgeons was Marcus Carey;

12  right?

13      A.  That is correct.

14      Q.  So if there is going to be any surgeon

15  that has a skill set on a particular device, it

16  probably will be the person that invented that

17  device and is a internationally respected surgeon;

18  correct?

19      A.  Until Prosima, I had never heard of

20  Marcus Carey.  But I was intrigued to meet him,

21  and I think I met him once.

22      Q.  Well, let me ask you this:  Have you ever

23  invented a transvaginal mesh device?

24      A.  No.

25      Q.  Have you ever invented a medical device?

Ahmet Bedestani, M.D.

1      A.  I wanted to put standard pessaries in

2  people after we floated mesh into people, and I

3  was denied that.

4      Q.  Yeah.

5      A.  I . . .

6      Q.  So you haven't successfully invented --

7      A.  I have -- I have --

8      Q.  -- a medical device?  Okay.

9      A.  -- failed to do that.

10     Q.  You failed.  Your words, not mine.

11         But you failed --

12     A.  I failed --

13     Q.  All right.

14     A.  I failed --

15     Q.  So you realize how difficult it is, and so

16  you respect Marcus Carey in that regard; correct?

17     A.  I think Marcus Carey is only one player in

18  a huge team effort to bring something from concept

19  to actually placing it in a human being in the

20  United States of America.  I think marketing is a

21  component of science, of --

22     Q.  What about --

23     A.  -- of --

24     Q.  -- Marcus [sic] Slack?

25     A.  I am sure -- the name sounds familiar.  I

Ahmet Bedestani, M.D.

1  would have to look at what Marcus Slack's

2  contribution is.  I can't remember something.

3      Q.  What about Dr. Helen [sic] Zyczynski?

4      A.  I know Dr. Helen Zyczynski all the way

5  from the fellowship application trial.  She didn't

6  hire me as a fellow at the University of

7  Pittsburgh.  She's a past president of AUGS.  I

8  know her by reputation.  And I know that she was

9  one of the lead investigators of the Prosima

10 trial.  And I really came to -- I forgave her for

11 not taking me as a fellow when she said these

12 words at one of these education events.  She goes:

13 Do not be led astray by this product.  It requires

14 great sophistication to perform.  And I -- at that

15 moment, my level of respect for Dr. Zyczynski went

16 through the roof.  So I know who that one is --

17     Q.  Well, you --

18     A.  -- because she had an effect on me.

19     Q.  You respect her?

20     A.  Right.

21     Q.  So earlier you were questioning these --

22 you were bringing into question the skill set of

23 some of these surgeons that were providing the

24 data.

25          You're not going to question

Ahmet Bedestani, M.D.

1    Dr. Zyczynski's skill set?

2       A.  She's at an academic institution with

3    medical students and fellows.  If she said that

4    she did a Prosima and that -- whatever her

5    operation rate, whatever she told me, I would

6    believe that.  So what I need to know:  who was

7    doing the actual operating at her facility.

8       Q.  And have you --

9       A.  Mind you, I don't agree with everything

10   that Dr. Zyczynski does blindfolded.  She does not

11   even do urodynamics.  She does not do interval

12   slings on her . . . So everything that I do --

13   when I say that I know someone or I respect their

14   work, everything is taken in a spectrum.  You've

15   taken the -- their whole production of work.

16      Q.  Sure.  Have you seen -- I'm assuming that

17   you've seen the Zyczynski study?

18      A.  Yes.

19      Q.  Okay.  Have you seen -- has -- have

20   attorneys for Ethicon provided you the underlying

21   data for that study?

22      A.  I probably have perused it as well as the

23   prof ed slides of which I think there were 50 or

24   60 beautiful slick PowerPoint presentations of

25   which I used that as the basis of talks.

Ahmet Bedestani, M.D.

1    Q.  Have you ever taken the data as it's

2  written and recorded in an article and compared it

3  to the underlying data that attorneys for Ethicon

4  have supplied to you?

5    A.  Did I sit down and refigure the

6  statistics?  I --

7    Q.  Or just compared them.  I don't need you

8  to refigure them.  I just want you to look at them

9  as they're reported in the article and as they're

10  reported coming in from the data centers to

11  Ethicon.

12    A.  I would have -- I would have to revisit

13  that issue --

14    Q.  Okay.

15    A.  -- and I'm happy to do so.

16    Q.  Perfect.

17         And you would -- since you haven't done it

18  yet, you will at least admit that if there are

19  significant differences between the way the data

20  is presented and recorded in the article as it

21  comes in from the data centers, that that could be

22  a potentially misleading issue; correct?

23         MR. WALKER:

24            Object to form.

25         THE WITNESS:

Ahmet Bedestani, M.D.

```
 1              I think it is important to review the
 2         data in a totality.  You -- it's not just
 3         one data point, but it's many data points.
 4         So if you ask me and you put all of the
 5         papers right in front of me, I will be
 6         more than happy to review it and then
 7         right there on the spot state my findings.
 8 BY MR. JONES:
 9    Q.  You don't want people changing the data
10 from the point of time when it comes in from the
11 surgeons' data center from the point to where it
12 gets published in an article; correct?  That's
13 generally a bad thing; right?
14    A.  Changing --
15         MR. WALKER:
16              Object to form.
17         THE WITNESS:
18              -- values in terms of what happened.
19         So if they say -- if the patient comes in
20         -- and I have to use an example.  I'm
21         sorry.  I'm not trying to make this
22         difficult.  If the patient comes in and AA
23         six weeks post-op is plus-one and someone
24         reports that as minus-one, that data point
25         right there, if you capture that lie, that
```

Ahmet Bedestani, M.D.

```
 1            is unethical.  That is unethical.

 2   BY MR. JONES:

 3       Q.  It's unethical to take data that comes

 4   into you as a company and change it to present it

 5   in a more positive light in a medical journal;

 6   correct?

 7       A.  Are you --

 8           MR. WALKER:

 9               Object to form.

10           THE WITNESS:

11               -- accusing people in a totality of

12           massaging data?

13   BY MR. JONES:

14       Q.  Well, I'm not accusing anyone of anything.

15   All I'm asking is questions.

16           When you look at the data as it's

17   published compared to as it came in from the data

18   centers, which you haven't done -- when you

19   compare those, they're different.  And I think

20   once you do do that, then it could raise some

21   questions for you from an ethical standpoint.

22       A.  So --

23           MR. WALKER:

24               Object to form.

25           THE WITNESS:
```

Ahmet Bedestani, M.D.

```
 1                   -- if I'm understanding properly, if
 2          individual site investigators truly report
 3          the correct data to the company and then
 4          the company changes the actual data
 5          points, that -- so that the AA which is
 6          reported as plus-one, if someone changed
 7          that at the company level, that would of
 8          course be improper.
 9   BY MR. JONES:
10          Q.   Prosima -- Prosima uses Prolene -- or
11   Prosima uses Ethicon Prolene mesh; correct?
12          A.   Ethicon use -- I mean -- excuse me.
13   Prosima uses Ethicon's Gynemesh PS, which is
14   Prolene -- Prolene -- polypropylene soft.  I think
15   that's what the "PS" stands for, Prolene soft.
16          Q.   Prosima uses Ethicon's Prolene soft mesh;
17   correct?
18          A.   That is correct.  Gynemesh PS.
19          Q.   Yeah.
20          The stiffness value of transvaginal mesh,
21   especially when used in pelvic organ prolapse
22   repair, is one important mesh characteristic in
23   assessing -- in assessing the performance and
24   safety of transvaginal mesh; correct?
25          A.   One of many factors.
```

Ahmet Bedestani, M.D.

1    Q.  Stiffness is one of many factors important

2    in assessing the safety of transvaginal mesh;

3    correct?

4    A.  One of many.  That is correct.

5    Q.  Stiffness matters when it comes to the

6    safety of transvaginal mesh; correct?  I mean,

7    there's medical journals out there that talk about

8    it; right?

9    A.  Of course you're --

10   Q.  All right.

11   A.  -- not going to place something as stiff

12   as a 2-by-4 in someone's anatomy.  Stiffness,

13   pliability, porosity.

14   Q.  Density?

15   A.  Correct.

16   Q.  So -- and there's -- and you know this --

17   A.  Burst strength and --

18   Q.  Burst strength --

19   A.  All of it.

20   Q.  -- tensile strength, those things probably

21   don't matter as much just because, you know those

22   are tests for carpenters.  But -- not really, in

23   my mind, pelvic floor surgeons.  But --

24   A.  I think people at the University of

25   Pittsburgh, Moalli specifically --

Ahmet Bedestani, M.D.

1      Q.  Sure.

2      A.  -- has made a career of really trying to

3   figure out a mechanism in which to delineate some

4   of these factors.  But I don't think that they

5   have succeeded in producing a proper human model.

6   I might be incorrect by saying that.  I don't

7   know.  I remember some monkeys got slaughtered,

8   and I didn't agree with the -- the way that that

9   study was done.  And I'm not trying to be funny.

10     Q.  No.  I know.

11     A.  I'm not trying to be funny.

12     Q.  No.

13     A.  I did not -- I did not like that study

14  when it was presented at the podium.  So --

15     Q.  Yeah.  It's interesting.

16     A.  -- I -- I think -- so we have a lot of

17  factors in the behavior of mesh, which you said.

18  And so you don't think that I'm trying to be

19  obstinate, you are correct.  Stiffness is very

20  important.  Porosity is very important, weight,

21  all of that.

22     Q.  This is going to be one of those times

23  where we both -- we just kind of have a

24  conversation back and forth.

25          You're familiar with the work done at the

Ahmet Bedestani, M.D.

1    University of Pittsburgh led by Dr. Pam Moalli,

2    where a group of surgeons and researchers --

3    researchers have focused in on the stiffness of

4    transvaginal mesh and how that relates to patient

5    safety; correct?

6        A.  Yes.  Her and her team, not Dr. Moalli

7    only.  She has --

8        Q.  Right.

9        A.  -- biomedical engineers.

10       Q.  There's a team of surgeons and researchers

11   working on stiffness of transvaginal mesh and the

12   safety of transvaginal mesh at University of

13   Pittsburgh; correct?

14       A.  And all other parameters, that is correct.

15       Q.  And they published several articles that

16   specifically deal with the stiffness of mesh;

17   correct?  One of -- correct?

18       A.  That is correct.

19       Q.  One of which you referenced earlier that

20   involved the sacrificing of monkeys; correct?

21       A.  That is correct.

22       Q.  And you're aware that -- yeah.  I'll leave

23   it at that.

24           So -- and you're aware of what they've

25   done in some of those studies, is they've taken

Ahmet Bedestani, M.D.

1   several different transvaginal mesh product

2   devices that have been marketed on -- in the

3   United States and compared the stiffness values of

4   them; correct?

5       A.  They didn't use the kits.  They used the

6   mesh in the kits.  That is correct.  All of the

7   different trade names, which I cannot keep

8   straight.

9       Q.  I can't either.

10      A.  I would have -- I would have to use a

11  graph --

12      Q.  Yeah.

13      A.  -- and I would have to look at the paper.

14  But you are correct.  All -- all of that data --

15  most of that data has been that source or that

16  academic center.

17      Q.  And to -- to -- I'm sure people love this,

18  when people in a conference room do this to their

19  years of research and work.

20          But to oversimplify their work, they --

21  they have general -- generally concluded that the

22  stiffer the mesh is, the more safety risk it poses

23  to women in the realm of pelvic organ prolapse;

24  correct?

25          MR. WALKER:

Ahmet Bedestani, M.D.

1          Object to form.

2       THE WITNESS:

3          I can't answer that with a yes or no.

4    I need to explain something.  I think

5    stiffness, which is only one of the

6    parameters, is a spectrum.  And I do not

7    know exactly what the correct spectrum is

8    to this day in 2018.  I don't know what

9    the perfect value is for all of these --

10   BY MR. JONES:

11      Q.  Yeah.  I'm not --

12      A.  -- parameters.

13      Q.  -- asking what you think.  I'm asking what

14   they think, based on your review of those

15   articles.  And so their over -- overgeneralized

16   conclusion as it relates to stiffness of

17   transvaginal mesh is the stiffer the transvaginal

18   mesh product is, the more safety risk it poses to

19   the patient; correct?

20      A.  I think we would --

21      Q.  That's generally what --

22      A.  I -- I think that --

23      Q.  -- they're saying?

24      A.  -- I -- we would have to go back to each

25   paper and look.  But they usually end the papers

Ahmet Bedestani, M.D.

1    by saying it has to be an area of ongoing

2    research.

3        Q.  That's what every paper says; right?

4        A.  I didn't -- I can't attest to every paper

5    in the world.

6        Q.  Right.  Right.

7        A.  But . . .

8        Q.  I'm asking you generally, though.

9            From a general standpoint, their viewpoint

10   is the stiffer the mesh, the less state -- the

11   less safe the mesh; correct?

12           MR. WALKER:

13               Object to form.

14           THE WITNESS:

15               I don't -- I don't know if I can say

16           that.  I think that it -- it represents a

17           different value that has to take -- be

18           taken into account.

19   BY MR. JONES:

20       Q.  All right.  I guess we'll just disagree on

21   what the University of Pittsburgh has concluded in

22   their articles.

23           You've reviewed internal documents from

24   Ethicon that -- that discuss the stiffness of the

25   mesh used in Prosima; correct?

Ahmet Bedestani, M.D.

1      A.   There is documentation on the review of

2   all this data regarding that weight -- that weight

3   or stiffness question.   That is correct.

4      Q.   Okay.   I'm going to show you one document.

5   I'm going to give you however much time to a

6   reasonable standard that you want to look at it,

7   and then I'm going to ask you maybe five questions

8   about it.

9           MR. JONES:

10              And I'll e-mail it to the court

11              reporter.   I'll mark it as Exhibit 3 -- 3

12              -- 4.

13          COURT REPORTER:

14              (Indicating.)

15          MR. JONES:

16              Thank you.   Exhibit 4.

17          (Exhibit No. 4 was marked for

18              identification and attached hereto.)

19   BY MR. JONES:

20      Q.   It is titled FWD:   Project Gynemesh Vypro

21   PD00, backslash, 3.   It's an e-mail dated

22   April 18th, 2001.   And it attaches to the e-mail a

23   PowerPoint presentation, which you're familiar

24   with, Doctor, about Vypro mesh.   And it discusses

25   some things about the mesh used in Prosima that I

Ahmet Bedestani, M.D.

```
 1   want to ask you about.  So -- so questions I'm
 2   going to ask you about, on the very last page, 28
 3   of 28.  So skip there.  But you can skip forward,
 4   skip back.  Have at it.
 5       A.  Option 1, Option 2, Option 3 . . .
 6   Project.
 7           MR. WALKER:
 8               Sorry.
 9           THE WITNESS:
10               That's okay.
11           MR. WALKER:
12               Go back down.
13           THE WITNESS:
14               So Gynemesh Vypro, which we know is --
15   BY MR. JONES:
16       Q.  I haven't asked you any questions yet.
17   Just take your time to --
18       A.  Oh.
19       Q.  -- look at it, and then I'll ask you
20   questions.  If you're just reading out loud, what
21   the documents says --
22       A.  Polypropylene --
23       Q.  -- that's my bad.  But . . .
24       A.  Yeah.
25           MR. WALKER:
```

Ahmet Bedestani, M.D.

```
 1              Yeah.  Just take a -- take a second to

 2         look at this and then wait for his

 3         question.

 4         THE WITNESS:

 5              What does "VOC" mean?

 6         MR. JONES:

 7              Voice of customer.  That -- that's

 8         you.

 9         MR. WALKER:

10              Hang on.  Let's go to the top.  2001

11         . . . Sorry.  Let's go.

12         THE WITNESS:

13              Huh?

14         MR. WALKER:

15              All right.  Are you ready?

16         THE WITNESS:

17              I'm ready.

18    BY MR. JONES:

19         Q.  You're ready?  All right.  You and your

20    attorney have had an opportunity to look at that

21    document; correct?

22         A.  My attorney?

23         Q.  You --

24         A.  I don't think -- I can't say that.  The --

25    the -- the representative of the company.  But
```

Ahmet Bedestani, M.D.

1    yeah, we both looked at it.  That is correct.

2        Q.  That's a good point.  I'll -- I'll -- I'll

3    rephrase the question if that's important to you,

4    because it seems like it is.

5            You've had an opportunity to look at that

6    document; correct, Doctor?

7        A.  I -- you just gave it to me to take a

8    look, and I look -- seen it.  Yes.

9        Q.  Okay.  Have you ever seen that document

10   before?

11       A.  No.

12       Q.  First time you've seen that document;

13   correct?

14       A.  This is the first time that I am seeing

15   something regarding Gynemesh Vypro.

16       Q.  And did I state correctly earlier when I

17   said it was an e-mail dated from 2001?

18       A.  I didn't have the smarts to scale up.  The

19   Ethicon attorney did.  So this is --

20       Q.  Yeah.

21       A.  -- from 2001.  That is correct.

22       Q.  See if the Ethicon attorney does?

23       A.  That's . . .

24       Q.  All right.  So the document's dated from

25   2001; correct?

Ahmet Bedestani, M.D.

1      A.  Uh-huh.

2      Q.  Okay.  And the e-mail that's dated 2001

3   attaches a PowerPoint, which you have now had an

4   opportunity to look at.  And on the last page of

5   the PowerPoint, it -- it makes some

6   recommendations and statements as it relates to

7   Vypro mesh and as it relates to Prolene soft mesh;

8   correct?

9      A.  That is correct.

10      Q.  Okay.  And in that chart it talks about

11   stiffness; correct?

12      A.  Disadvantages.  It says VOC.

13      Q.  VOC, voice of customer?

14      A.  Voice of customer --

15      Q.  Okay.

16      A.  -- which I asked and you were kind enough

17   to tell me.  It says, Too stiff for use in vaginal

18   tissues.

19      Q.  Too stiff for vaginal -- for use in

20   vaginal tissues is listed under the Prolene soft

21   mesh; correct?

22      A.  Yes.  It is.

23      Q.  Okay.  And then next it says, Team

24   recommendation:  Do not pursue; correct?

25      A.  Well, it says, risks, cost, timing.

Ahmet Bedestani, M.D.

```
 1    Because this is a three-by-one, -two, -three,
 2    -four, -five, -six --
 3         Q.  Okay.
 4         A.  -- -seven . . . So it's a substantial
 5    chart.  And at the end it says, Team
 6    recommendation:  Do not pursue.  But it says the
 7    same thing for Option 2.  And then Option 3 is --
 8    and I knew you didn't ask me that.  But this is a
 9    point.  It says, Pursue as a second generation.
10         Q.  Yeah.
11         A.  So this is 2001.
12         Q.  So we're talking in 2001, and we're
13    looking at a PowerPoint presentation inside the
14    company; correct?
15         A.  (Nods head.)
16         Q.  Do you know who -- let me ask you about
17    some of the -- the engineers, mesh employees, and
18    researchers at Ethicon that were involved in -- in
19    this PowerPoint.
20              Do you know who Dr. Holst is?
21         A.  No.  I do not.
22         Q.  Do you know who Dr. Brigitte Hellhammer
23    is?
24         A.  No.  But I would --
25         Q.  Do you know --
```

Ahmet Bedestani, M.D.

1       A.   -- remember that name.

2       Q.   It's a pretty memorable -- memorable name;

3    right?

4       A.   Yes.

5       Q.   So if you've seen it before, you'd

6    remember it; right?

7       A.   That is correct.

8       Q.   How about -- what about Laura Angelini?

9       A.   Laura Angeline?

10       Q.   Angelini.

11       A.   Angelini?  Oh.  It -- the name sounds

12    familiar, but I can't put a face to it.

13       Q.   What about Dr. David Robinson?

14       A.   Don't know him.

15       Q.   What about Dr. Aaron Kirkemo?

16       A.   I worked with Aaron Kirkemo, taking apart

17    four or five of those cadavers.  I learned a lot

18    from him.  I know him, and he reported to the big

19    boss, the big, big boss, Pete Anewel [phonetic].

20    That is correct.

21       Q.   Do you consider -- based on your

22    understanding, Pete Anewel is the big boss?

23       A.   I think he was like -- I thought it was

24    wonderful -- you know, talking to him was

25    interesting.  He was trained in Belgium.

Ahmet Bedestani, M.D.

1      Q.  Sure.

2      A.  He had an interesting thing.  And I think

3   he had a title at that time.  Remember, I'm just a

4   fellow.

5      Q.  I got it.  Yeah.

6          You're just a fellow --

7      A.  In --

8      Q.  -- in Louisiana?

9      A.  In Louisiana.

10     Q.  Right.

11     A.  This guy's like --

12     Q.  You're a little --

13     A.  -- a PhD and a doctor, I think.

14     Q.  Right.  And he's -- and he has a good --

15     A.  And --

16     Q.  -- a good presence?

17     A.  I don't care about that.  But he did

18   have --

19     Q.  You don't care about that?

20     A.  I think he had the title known as

21   worldwide director.

22     Q.  Worldwide medical director.  Yeah.  It

23   sounds big.  It sounds important.

24          Aaron Kirkemo, you respect him, though;

25   right?  Correct?

Ahmet Bedestani, M.D.

1       A.  I thought he was knowledgeable.  I

2  appreciated how he dissected a pelvis; so I -- I

3  know that he had skill.

4       Q.  Okay.

5       A.  Or -- cadavers are dead.  He has

6  knowledge.

7       Q.  Right.

8       A.  So he had knowledge, and I respect

9  knowledge.

10      Q.  Yeah.

11          What about Dr. Thomas Barpul [phonetic]?

12      A.  I don't know him.

13      Q.  What about -- did you ever look at -- and

14  this would stand out if you did.  Did you ever

15  look at a consulting -- I think it's from 2011.

16  Ethicon pays a big fancy company overseas to do

17  kind of a consulting project or auditing project.

18  They're called the PA Consulting Group.

19          Did you ever see -- it would have been a

20  -- in your review of documents that attorney for

21  Ethicon may have provided you or not, did -- did

22  you ever see documents from PA Consulting Group

23  that discussed degradation of Ethicon's mesh

24  products or oxidation of Ethicon's mesh products?

25      A.  I would have to look, because I didn't see

Ahmet Bedestani, M.D.

1    the substantial amount of information from the law

2    firm that represents --

3        Q.  Sure.

4        A.  -- Ethicon.  So I would have to look back

5    at everything.

6        Q.  Nothing stands out --

7        A.  But nothing stands out about a

8    PA Consulting because I would have -- I would --

9    if I had came -- because I'm curious.  I would

10   want to know what --

11       Q.  Right.

12       A.  -- PA Consulting is and who is it.

13       Q.  Right.  If -- if you saw a lengthy

14   PowerPoint presentation similar to the one that

15   you did for Prosima that someone puts together and

16   -- and -- and, you know, there's doctors involved,

17   they interview company employees, and it makes

18   some conclusions like mesh degrades, that would

19   stand out to you?  Because you would want to do

20   additional research into that; right?

21           MR. WALKER:

22               Object to form.

23           THE WITNESS:

24               When I came across Clave and papers --

25               I'm just using Clave and then the Cabot.

Ahmet Bedestani, M.D.

1            I definitely went above and beyond to

2            answer that question.  So if I came across

3            a document that said this, I would

4            definitely investigate it.  And I think

5            you believe me, that I would.

6    BY MR. JONES:

7        Q.  I -- I totally believe you.  And that

8    tells me that you probably more likely than not

9    didn't see that document.  Because --

10       A.  I --

11       Q.  -- we would have -- we -- I feel like we

12   would have had a conversation about it just now

13   and the work that you would have done.  We could

14   have had -- you know, like you said, you would

15   have been like:  Who the heck is this PA

16   Consulting Group?  You would have reviewed any

17   papers they looked at.  I -- I just have that

18   feeling we would have had a conversation about it.

19           So it tells me -- and correct me if I'm

20   wrong -- that more likely than not that's not one

21   of the documents that attorneys for Ethicon

22   provided you in reviewing materials; correct?

23       A.  I don't remember seeing anything from PA.

24       Q.  Do you remember -- we talked about the

25   unfortunate issue of sacrificing monkeys earlier.

Ahmet Bedestani, M.D.

1   But -- and -- and so it made me think of this

2   earlier, and I don't know -- think I asked you

3   about it.

4        But did you review materials from

5   attorneys from Ethicon that relate to internal

6   testing they did on dogs?  It's commonly referred

7   to as the 7-year, 5-year, and 10-year dog study.

8   But Ethicon got beagles.  They went out and found

9   beagles, nice beagles, and they implanted the dogs

10  with Prolene.  Did you review those documents?

11       A.  I did not see anything relating to dog

12  labs.

13       Q.  Okay.

14       A.  If you've ever read the Guyton physiology

15  definitive textbook for most medical students, the

16  whole book is representative of a dog

17  slaughterhouse.  Most of the studies were done on

18  dogs.  Prolene suture, because of the cardiac

19  indication -- I'm sure that many animals hopefully

20  have furthered human --

21       Q.  Yeah.

22       A.  -- well-being with their sacrifice.  I

23  don't know what to say to that.

24       Q.  Yeah.  Unfortunately the dogs didn't make

25  it in that study.  They didn't even make it to the

Ahmet Bedestani, M.D.

1   end of the study.  All right.

2          MR. WALKER:

3              And that -- that was not Ethicon's

4          fault, just for the record.

5          MR. JONES:

6              Okay.  All right.  Ethicon doesn't

7          kill dogs.  All right.

8   BY MR. JONES:

9      Q.  All right.  Let's go back to some of this

10  consulting work stuff.  Because I should have

11  asked you some questions on it that I didn't

12  earlier.  And you tried to lead me in the right

13  direction, and I just didn't follow up.

14          Now in 2016, did you do consultant work

15  for Boston Scientific?

16     A.  No.

17     Q.  Okay.

18     A.  In 2016 I did not do any type of

19  consulting work for Boston Scientific.

20     Q.  Okay.  Did -- did -- did you perform

21  consultant work for Boston Scientific at any point

22  in your career as a physician?

23     A.  As I alluded --

24     Q.  Other than the one --

25     A.  No.

Ahmet Bedestani, M.D.

```
 1        Q.  -- required -- no.
 2            Coloplast.  There's some entries of
 3   interactions --
 4        A.  No.
 5        Q.  -- between you and Coloplast in 2014 and
 6   2013.
 7        A.  When you say interaction -- I believe that
 8   I did go to find out more about their Y-mesh --
 9        Q.  Okay.
10        A.  -- Restorelle.
11        Q.  But you didn't --
12        A.  I think --
13        Q.  -- act as a consultant --
14        A.  I think --
15        Q.  -- for them?
16        A.  But I'm not a consultant.
17        Q.  Sure.
18        A.  Nope.  No --
19        Q.  All right.  So two --
20        A.  -- payment --
21        Q.  -- thousand -- 2013, 2014 you go to
22   Coloplast-sponsored events to check out some of
23   their products, specifically Y-mesh; correct?
24        A.  That is correct.
25        Q.  2015 and 2016, you have some interactions
```

Ahmet Bedestani, M.D.

1    with Boston Scientific, on mesh -- a company that

2    manufactures transvaginal mesh devices.

3             What were your --

4        A.   They also had a Y-mesh too that I wanted

5    to go learn more about.

6        Q.   Okay.  And Y-mesh is generally implanted

7    abdominally; correct?

8        A.   The Y-mesh is utilized for abdominal

9    sacrocolpopexy.  That is correct.

10       Q.   And because I have a hard time saying that

11   word, the ASC procedure, do you consider that the

12   gold standard for treatment of pelvic organ

13   prolapse?

14       A.   Despite doing a lot of it now, I do not.

15       Q.   Okay.  Is that your primary surgical

16   choice when you treat a patient who suffers from

17   pelvic organ prolapse?

18       A.   The indication for that surgery in the

19   United States is apical prolapse.  If a patient

20   has apical prolapse and they meet the criteria and

21   stratification, risk-benefit ratio, and it's the

22   appropriate surgery for that particular patient,

23   taking into consideration all aspects of that

24   patient and their desire for future life, if it is

25   all correct and it represents a true benefit, that

Ahmet Bedestani, M.D.

1   is what they will be offered.

2        Q.   For apical prolapse, the primary surgical

3   technique that you currently use is the ASC;

4   correct?

5        A.   It is but one tool in my armamentarium.

6        Q.   Is it the primary one or not?  That's

7   what --

8        A.   I don't --

9        Q.   -- I'm asking.

10       A.   -- think that it's -- I wouldn't say it's

11  my primary.

12       Q.   So you don't use the ASC more than any

13  other surgical choice for apical prolapse is what

14  you're telling me?

15       A.   On review of -- of my personal performance

16  over the last 3 years, I am sure I have done more

17  abdominal sacrocolpopexy than other apical

18  suspension native tissue repairs.

19       Q.   Right.  What's your go-to surgery or your

20  primary surgery for rectocele?

21       A.   I have to take -- I am a firm believer

22  that you have to look at the entire POP-Q to see

23  if there's any impingement upon the anterior,

24  posterior, or apical.  I have to see about -- I

25  don't really truly believe that the -- isolated

Ahmet Bedestani, M.D.

1  defects exist.  If this was truly an isolated

2  posterior defect, then that patient would get a

3  transvaginal native tissue site-specific repair

4  reconstitution of the rectovaginal septum without

5  any type of graft augmentation placed

6  transvaginally.

7       Q.  Is it fair to say that you currently don't

8  use any Ethicon prolapse mesh kits?

9       A.  I do not use any transvaginal mesh.

10      Q.  Whatsoever; correct?

11      A.  At all.  I also do not use any type of

12  graft -- xenograft, allograft -- nothing.

13      Q.  Nothing?

14      A.  Nothing.

15      Q.  All right.  You talked about position

16  statement earlier.

17          And is it safe for me to assume that

18  you're familiar with the fact that medical bodies

19  in your field put out position statements?  You're

20  aware of that; right?

21      A.  Correct.

22      Q.  Okay.  And let me pull up the one I like

23  to show.  You're familiar with AUGS; correct?

24      A.  The American Urogynecology Society.

25  Correct, sir.

Ahmet Bedestani, M.D.

1    Q.  Yeah.

2        Are you a member of AUGS?

3    A.  I am a member of the American

4    Urogynecology Society.

5    Q.  Nice.  And --

6    A.  I go to the annual meeting maybe every

7    3 or 4 years.

8    Q.  Okay.

9    A.  I did go this past year to the AUGS update

10   class.  And I am on my way next week, Saturday and

11   Sunday, to a AUGS masters class.

12   Q.  Nice.

13   A.  So I do utilize them.  I think they do a

14   good job in providing opportunities to people to

15   further their education.

16   Q.  And you're generally familiar that they

17   release position statements on transvaginal mesh

18   for the treatment of pelvic organ prolapse;

19   correct?

20   A.  They have released such data in

21   conjunction with other organizations.  That is

22   correct, sir.

23   Q.  Okay.  I'm going to read you a couple

24   statements from a AUGS, slash, ACOG 2017 position

25   statement on pelvic organ prolapse mesh.

Ahmet Bedestani, M.D.

1          Are you ready?

2     A.  I am ready.

3     Q.  Okay.  Underneath summary of

4  recommendations and conclusions -- first off, what

5  is ACOG?

6     A.  The American College of Obstetrics and

7  Gynecology, not to be confused by the American

8  Board of Obstetrics and Gynecology.

9     Q.  Okay.

10    A.  ACOG is just an organization.

11    Q.  So AUGS and ACOG in 2017, in their

12  position statement on pelvic organ prolapse mesh,

13  underneath summary of recommendations and

14  conclusions state, The use of synthetic mesh or

15  biologic grafts in transvaginal repair of

16  posterior vaginal wall prolapse does not improve

17  outcomes.

18          Do you --

19    A.  Posterior wall.

20    Q.  Do you agree with that statement?

21    A.  I do not agree with that statement.

22    Q.  You disagree with AUGS and ACOG's position

23  statement from 2017?

24    A.  The statement that you just read is but

25  one of many --

Ahmet Bedestani, M.D.

1      Q.   Yeah.

2      A.   -- points that I do not agree with the

3   American Urogynecology Society nor the American

4   College of Obstetrics and Gynecology.

5      Q.   Tell me if you agree or disagree with this

6   statement from the position statement:   The use of

7   synthetic mesh or biologic grafts in POP surgery

8   is associated with unique complications not seen

9   in POP repair with native tissue?

10      A.   When I read that for the first time I

11   think my jaw hit the ground in the sense that of

12   course there's a unique complication profile for

13   graft augmentation in relation to native tissue

14   repair.   In native tissue repair, you have no

15   graft matrix, whatever it may be.   There's no

16   foreign body there.   Even though you get suture

17   erosion if you use a permanent -- but I'm not even

18   going to go there.   And you'll probably say,

19   Strike that.   But whatever.   I don't know why they

20   would feel the need to release a statement like

21   that.

22      Q.   You -- I get the feeling you kind of think

23   it's a nothing statement.   It's an obvious

24   statement.   Why would they say that?   Is that --

25   am I feeling you there, or am I way off-base?

Ahmet Bedestani, M.D.

1      A.   I look for guidance in how to practice

2   from organizations that represent a larger body of

3   knowledge --

4      Q.   Right.

5      A.   -- and is within myself.  And I expect

6   them to do a -- better guidance.

7      Q.   And there's -- to you, there's nothing

8   profound in -- in that -- or guiding in someone

9   stating that there are complications unique to

10  using mesh in pelvic organ prolapse surgery;

11  correct?

12     A.   I think that there's nothing unique about

13  that statement, and that is common knowledge for

14  anyone that puts themselves out there as a pelvic

15  floor surgeon.

16     Q.   That there's complications unique to the

17  use of transvaginal mesh; correct?

18     A.   I think that there is an -- I think

19  there's inherent specific unique complications to

20  any type of surgery that one does.  One has to

21  understand what they're doing.  I don't need the

22  American Urogynecology Society or the American

23  College to point that out to me --

24     Q.   Right.

25     A.   -- at this phase of my career.

Ahmet Bedestani, M.D.

1      Q.  Right.  You don't need guidance on that

2  there is -- there are unique complications

3  associated with transvaginal mesh; right?

4      A.  If you would like for me to say that

5  transvaginal mesh in the form of certain

6  complications are unique to graft augmented

7  surgery, depending on which complication that you

8  allude to, I would have to either say yes or no,

9  depending on which parameter.  And I would leave

10  that to you to ask me.

11      Q.  Mesh erosion?

12      A.  If you don't have any mesh, you're not

13  going to get an erosion unless you're using a

14  permanent suture.  If you use any type of foreign

15  body, you can definitely have an erosion.

16      Q.  How about the inability to remove -- to

17  safely remove the entirety of the mesh?

18      A.  Out of all of the questions that you have

19  asked me today, that is the most -- I bet you I

20  could utilize up all the remaining hours of today

21  and continue talking until tomorrow about that

22  topic.

23          How would you like me to answer that

24  question, sir?

25          MR. WALKER:

Ahmet Bedestani, M.D.

 1               Don't take all day.
 2  BY MR. JONES:
 3      Q.  Yeah.  I mean, I kind of just want you to
 4  answer the question that I just asked you, which
 5  is whether that's unique, whether that
 6  complication is unique to the use of transvaginal
 7  mesh, the fact that if complications do arise,
 8  that you can't ever freaking get this thing out of
 9  a woman's body entirely and safely?
10          MR. WALKER:
11              Object to form.
12          THE WITNESS:
13              I -- I -- and I'm not trying to be
14          cute or . . . I don't know if we have
15          decided as a collective of experts should
16          the mesh in -- in block entirety be
17          removed.  I don't know that answer.
18  BY MR. JONES:
19      Q.  Okay.  And that's a different answer to
20  the question I'm asking.
21      A.  Give me one more shot.
22      Q.  I'll try.  All right.
23          We're focusing on whether this is a
24  complication unique to the use of transvaginal
25  mesh.  That's the context that we're talking

Ahmet Bedestani, M.D.

1  about.  And I'm asking you --

2      A.  A complication has been encountered that

3  is pushing a well-trained, educated, experienced

4  pelvic surgeon to decide to remove the mesh?

5      Q.  First off --

6      A.  And you're saying that that person has to

7  remove all of it?

8      Q.  First off, removal of mesh or revision of

9  mesh is a complication unique to using mesh;

10  correct?  You give me that?

11      A.  I revise native tissue repair.  I've had

12  to go back and redo it.

13      Q.  Removing mesh is unique to the use of

14  mesh?  Don't make this overcomplicated.

15      A.  I'm not trying to.

16      Q.  You seem like it.

17      A.  This has been fun.  I'm not trying to

18  annoy anyone.

19          I can definitely tell you this:  If there

20  is a permanent mesh and it -- and it has eroded

21  and it has to come out or part of it has to come

22  out or you have to revise it, yes, because it's

23  still present.  And if that is what is causing the

24  specific spectrum of symptoms, then yes, I grant

25  you.  You will take it out, but I do not know if

Ahmet Bedestani, M.D.

1   you need to take it all out.

2       Q.   And my question isn't a discussion of

3   whether you think it's appropriate to take it all

4   out or whether another physician thinks, Shoot, Do

5   we take out all we can because it's causing

6   problems, or do we leave a little chunk in there

7   to see what happens with the rest of it.  That's

8   not the question.

9           The question --

10      A.   Okay.

11      Q.   -- is:  If a doctor makes the decision,

12  This mesh needs to come out of this patient's body

13  because it's in the best interest of this woman,

14  in some patients, you will agree with me, that you

15  can never safely and entirely remove all of the

16  mesh from the patient's body?

17          MR. WALKER:

18              Object to form.

19          THE WITNESS:

20              I cannot say that.  You're saying all

21          patients.  I --

22  BY MR. JONES:

23      Q.   No.  I just said "in some patients."  If

24  you listened, I said --

25      A.   I'm sorry.

Ahmet Bedestani, M.D.

1      Q.  -- "in some patients."

2      A.  It depends on the practitioner.  I

3   definitely think that certain practitioners

4   because of more skill attained through innate

5   ability, knowledge, drive for perfection, maybe

6   they have the skill set.  I -- when I have had

7   mesh complication from other providers, if I did

8   not believe that I could handle the surgery, I

9   have passed it on.  That has happened a handful of

10  my time, that I didn't think that I could safely

11  do that.  Those patients would not have existed if

12  there was not a permanent graft in there.  So if

13  -- and -- so I'm just trying to make amends with

14  you maybe in saying yes, those were certain

15  permanent graft implants placed in people, and I

16  felt that to safely remove it all I did not have

17  the skill set and I passed that on.

18     Q.  Okay.  I believe that does help -- help

19  me; so I appreciate that answer.  All right.

20         I want to read -- read through a few more

21  of these statements in AUGS, which I bet you'll

22  probably disagree with.  But I -- I've got three

23  more that I want to read, and then we'll be done

24  with that.

25         MR. WALKER:

Ahmet Bedestani, M.D.

1          And Nate, when you're done with that,

2      can we take a break?

3      MR. JONES:

4          Yeah.  Yeah.  All right.  So we'll get

5      through these statements in AUGS.

6  BY MR. JONES:

7      Q.  The use of synthetic mesh or biologic

8  grafts in transvaginal repair of posterior vaginal

9  wall prolapse does not improve outcomes.  In

10  addition, there are increased complications; e.g.,

11  mesh exposure associated with placement of mesh

12  through a posterior vaginal wall incision.

13          Do you agree with that or disagree?

14      A.  They're saying that there's a unique set

15  of complications possible by placing the graft

16  permanent or xenograft.  And -- and yes, I could

17  say that I agree with that.  That is a distinct

18  possibility.

19      Q.  Okay.  The next statement:  Thus,

20  synthetic mesh or biologic grafts should not be

21  placed routinely through posterior vaginal wall

22  incisions to correct POP for primary repair of

23  posterior vaginal wall prolapse?

24      A.  They're saying do not use a graft

25  augmentation for the first time that you're going

Ahmet Bedestani, M.D.

1    to go to repair.  So what they're advocating is:

2    Go do a surgery that you know is going to probably

3    have a 30 to 40 percent chance of failure so the

4    patient comes back and makes your second revision

5    harder.  So I don't really understand that

6    concept, and I don't agree with it.

7         Q.  You don't agree --

8         A.  I think you have to -- you have to -- you

9    have to individual -- individualize care.

10        Q.  And now we're talking about interior

11   vaginal repair.  Polypropylene mesh augmentation

12   is associated with higher rates of complications

13   compared with native tissue vaginal prolapse

14   repair.

15            You agree or disagree?

16        A.  I disagree.

17            MR. JONES:

18                All right.  Let's take that break.

19            (Brief recess was taken.)

20   BY MR. JONES:

21        Q.  All right, Doctor.  We took a short break.

22            Are you now ready to proceed?

23        A.  Yes, sir.

24        Q.  Good deal.  All right.

25            Besides the Prosima, what other pelvic

Ahmet Bedestani, M.D.

1 organ prolapse mesh kits did you use?

2     A.  I can definitely say that I used them all.

3     Q.  Used them all?

4     A.  At least all -- at least one to several

5 times each.

6     Q.  Okay.  Based on your experience in using

7 every single transvaginal mesh product for

8 treatment of pelvic -- pelvic organ prolapse at

9 least once, are there any specific things that

10 stand out to you about the safety and performance

11 of any of those particular mesh devices?

12     A.  I came into my fellowship before the

13 advent of the vaginal mesh kits, transvaginal mesh

14 kits.  And in fact, it was referenced in a paper

15 that I did.  It was on my CV.  I'm very proud of

16 it.

17     Q.  Nice.

18     A.  Where we fashioned two pieces of Gynemesh

19 and delivered it utilizing the Capio device.  I'm

20 telling you that so that you don't -- I'm not

21 trying to be boastful.  I'm trying to tell you

22 that violation of the sacrospinous ligament

23 neurovascular complex is something that all of

24 these mesh kits have in common.  Prosima, and

25 Prosima only, is the one that did not violate that

Ahmet Bedestani, M.D.

1    structure.  So none of these kits satisfied my

2    curiosity, if you would like to say, or my

3    approach to operating safely in a very challenging

4    piece of anatomy, transvaginally that is.

5        Q.  What about the -- I understand the

6    surgical approach didn't fascinate you or meet

7    your standards.

8            But what about the character --

9    characteristics of any of those mesh products?

10   Does anything stand out to you as far as one mesh

11   device, the actual mesh portion being softer or

12   lighter or more pliable or one being stiff, heavy,

13   rigid?  Anything like that stand out to you,

14   Doctor?

15       A.  Out of all of them, I was -- I was

16   intrigued at the time what became Restorelle, was

17   Empathy.

18       Q.  Sure.

19       A.  I thought they had a winner back then.  It

20   was too expensive.  I couldn't get the hospitals

21   to buy it; so I did not have access to it, sir.

22       Q.  And Restorelle is a -- is a light, soft

23   mesh; correct?

24       A.  It is.  It's by Coloplast now, but it was

25   bought by -- by them.

Ahmet Bedestani, M.D.

1      Q.  Yeah.

2      A.  Okay.

3      Q.  Right on.  I think you said Empathy and

4   then Coloplast.

5          What did you do after you graduated

6   undergrad?

7          A.  I tried to get into medical school.  Then

8   I did -- went to a master's degree.  If you look

9   at the CV, it says certificate of anatomy.  That

10  was a program at the St. Louis University School

11  of Medicine.  I went to undergrad at St. Louis

12  University.

13         Q.  Yeah.

14         A.  So the program was to give heavily

15  motivated people the opportunity to maybe take the

16  anatomical classes of the first year of medical

17  students and see how they do.  But the problem

18  with that program was when you let 40 motivated

19  kids in, we all did well.  So they threw a MCAT

20  recommendation again.  And I -- and I've always

21  had a hard time with that test.  So then I went

22  off and worked a while, and then I went back and

23  got my master's in molecular biology, protein

24  conformation dynamics, tried to get into medical

25  school again.  Despite a 4.0, I couldn't do well

Ahmet Bedestani, M.D.

1    on the MCAT.  Worked at a high volume PCR lab

2    doing protein -- doing viral load analysis.

3            MR. WALKER:

4                Hey, Nate, I'm sorry to do this.  Can

5            -- can we go off the record for just a

6            minute?

7            (There is an off-the-record discussion.)

8            (Brief recess was taken.)

9    BY MR. JONES:

10       Q.  All right.  Here's what I want to ask you

11   about and focus on, is the work that you did after

12   undergrad.  Where'd you work?

13       A.  Consolidated Laboratory Services.

14       Q.  Okay.  What's this DuPont work stuff?  Did

15   you work there, or is that --

16       A.  No.  That's -- so at the time all the

17   antiretroviral medications were coming out.  And

18   PCR at the time --

19       Q.  Okay.

20       A.  You want me to really expand on that

21   or . . .

22       Q.  Yeah.  Give me like the 2- or 3-minute

23   version.  I told Jordan we'd be done by 2:00; so

24   expand but don't expand that much.  That's a good

25   lawyer answer for you, by the way.

Ahmet Bedestani, M.D.

1      A.   So Hoffmann-La Roche had a kit.  So you --

2  HIV replicates, and you have viral load:  hundred

3  thousand copies, 50,000 copies, zero copies.  The

4  more copies, the sicker you are.  I give you a

5  pill that is an antiretro, and then we can

6  modulate how fast and how low we can get it.  So

7  that's what we did, DuPont Merck DMP 266.  I can't

8  even remember what it --

9      Q.   Sure.

10      A.   -- turned out to be.  It's one of many.

11  So we did high volume PCR analysis, which at the

12  time was pretty cutting edge.

13      Q.   Cool.  All right.

14           And then you talked about -- you had some

15  difficulties getting into medical school; correct?

16      A.   That's correct.

17      Q.   And eventually --

18      A.   In the United States.

19      Q.   In the United States.

20           And eventually you attended medical school

21  outside of the United States; correct?

22      A.   That is correct.

23      Q.   And you attended medical school outside of

24  the United States because of your difficulties

25  getting accepted into a medical school inside the

Ahmet Bedestani, M.D.

1    United States; correct?

2        A.  That is correct.  There was 132 medical

3    schools at the time.  There's many more now.  But

4    yes, that is correct.

5        Q.  And you --

6        A.  I think I hold the distinction of being

7    rejected by each one not once but twice.  I have a

8    binder somewhere with it.

9        Q.  You got to get rid of that binder, man.

10       A.  Oh, no.  No.  No.

11       Q.  Just --

12       A.  It's that --

13       Q.  -- move on.

14       A.  -- other chip on my other shoulder.

15       Q.  I get it, but you got to move on.  You

16   know, you got to . . . All right.  So there will

17   just be about a few more questions on this

18   subject, and then I'll move on.

19            Is it fair to say that you were not

20   accepted into any medical school inside the

21   United States?

22       A.  Not once but twice.  Yes.  I -- there were

23   many applications.  I can't keep track.  I might

24   say that in jest.  But regardless, there was no

25   MCAT policy at Dominica Ross University School of

Ahmet Bedestani, M.D.

1    Medicine.  I had friends that went, and they were

2    succeeding in their dreams.  And my dream was

3    always to be a physician; so I said screw it and I

4    went down there.

5        Q.  You did it?

6        A.  We did it.

7        Q.  And the medical school you attended is

8    located -- or was located in the --

9        A.  On the island of Dominica until the island

10   of Dominica got wiped out last year.  I think

11   they're in the process of transferring over to

12   Barbados.

13       Q.  Okay.  And that medical school is not

14   accredited in the United States; correct?

15       A.  No.

16           But whatever the -- the certification

17   allows you to take out American student loans for

18   that in paperwork; so they have certain

19   credentials that allows them to do that.  And then

20   the resident -- the graduates are allowed to take

21   the full gambit [sic] United States medical

22   license examining 1, 2, all of it.  So it's the

23   same thing.  So you're allowed to go.

24       Q.  I'm going to just ask it again so I can

25   just get the -- the answer to it.

Ahmet Bedestani, M.D.

1           But the medical school you attended in --
2    on the island of Dominica was not accredited in
3    the United States; correct?
4        A.   No.  It was not a United States medical
5    school.
6        Q.   And it was -- its accreditation came from
7    the Government of Dominica; correct?
8        A.   That is correct.
9        Q.   Okay.  Are you familiar with the Journal
10   -- JAMA or JAMA, Journal of American Medical
11   Association?  Are you familiar with JAMA?
12       A.   I -- I get a e-mail from them at least a
13   day or -- every day.
14       Q.   Is it safe to say that the American
15   Medical Association's medical journal that they
16   put out, JAMA, is reliable among doctors?
17       A.   I think it is one of many journals that
18   people read.
19       Q.   It -- it's a peer-reviewed medical
20   journal; right?
21       A.   Uh-huh.
22       Q.   It goes through a peer-review medical
23   process, where doctors and the editing board
24   review the materials submitted to the journal;
25   correct?

Ahmet Bedestani, M.D.

```
 1        A.  That is correct.

 2        Q.  And while you may not agree with

 3   everything that JAMA produces, you do accept that

 4   it's a reliable peer-reviewed medical journal in

 5   -- amongst doctors that they refer to; correct?

 6        A.  I do believe people read it.  I don't know

 7   its impact score; so I don't know how prestigious

 8   it is.  So -- and that -- isn't that the . . .

 9        Q.  Yeah.  I'm not asking whether --

10        A.  Okay.

11        Q.  -- it's the best or the worst.  I'm saying

12   it's reliable?

13        A.  It's an article.

14        Q.  Okay.  It's an -- it's a peer-reviewed

15   medical journal that's reliable among doctors;

16   correct?

17        A.  Uh-huh.

18        Q.  Okay.

19        A.  That is correct.

20        Q.  Has any transvaginal mesh company before

21   working on this case ever asked you to work as an

22   expert?

23        A.  Any manufacturer of a transvaginal mesh

24   kit ask me to work on their behalf?

25        Q.  Uh-huh.
```

Ahmet Bedestani, M.D.

```
1        A.  In two thousand and -- going from my
2    fellowship to this point?
3        Q.  Right.
4        A.  I was asked.  Yes.  I was asked to -- to
5    work on behalf of pretty much all of them, and I
6    did not.
7        Q.  You were asked to act as a expert witness
8    for --
9        A.  Oh.  Expert witness.  I thought expert
10   utilizing their products.  They always said, If
11   you use our products, you can become a teacher,
12   and then you could do this and X, Y, Z.  No.
13   It's --
14            MR. WALKER:
15                Your -- your question is in the
16        context of litigation?
17            MR. JONES:
18                Yeah.  In the context --
19            THE WITNESS:
20                Well, then no.
21            MR. JONES:
22                -- of litigation.
23            THE WITNESS:
24                No.  No one has --
25   BY MR. JONES:
```

Ahmet Bedestani, M.D.

1      Q.   Prior to your work performed on -- in

2  authoring this Prosima report, a transvaginal

3  mesh -- transvaginal mesh company has never asked

4  you to work as an expert in -- in litigation

5  context?

6      A.   That is correct.

7      Q.   Has any medical device company ever asked

8  you before your work done in this case to exam --

9  to -- to help them draft the product label

10 associated with their medical device?

11     A.   No.

12     Q.   Has --

13     A.   No.

14     Q.   -- any medical device company ever asked

15 you prior to your work on this case to review the

16 adequacy of their product label associated with

17 their medical device?

18     A.   No, sir.

19     Q.   Has any medical device company prior to

20 this case ever asked you to -- to review the

21 appropriateness of the warnings and adverse events

22 statements associated with a medical device

23 product?

24     A.   No, sir.

25     Q.   Have you ever -- are you familiar with --

Ahmet Bedestani, M.D.

1    are you familiar with the industry standards that

2    govern what information as it relates to the

3    safety of medical device is required to be in --

4    in a product label?

5         A.   No.

6         Q.   Are you familiar with the FDA guidelines?

7         A.   In regards to what, if I may ask?

8         Q.   On what information should be included in

9    a product label as it relates to the safety

10   performance of that device.

11        A.   No.  I -- I've never reviewed the mandates

12   from the Food and Drug Administration and how that

13   governs --

14        Q.   Have you --

15        A.   -- labeling.

16        Q.   Have you reviewed internal documents from

17   Ethicon that provide guidance and standards for

18   what information must be included in a product

19   label as it relates to the safety and performance

20   of a medical device?

21        A.   I can't recall reading something like

22   that.

23        Q.   Are you familiar with failure modes and

24   effects analysis?

25        A.   Failure mode analysis?

Ahmet Bedestani, M.D.

```
1         Q.   Yeah.   FMEAs.

2         A.   I think I was more familiar with it from

3    my fascination with aviation, where certain

4    components of aircraft would be -- or even

5    automobile, to see if it -- to -- to see failure

6    levels on even piping in one's home.  So I think

7    that -- I knew that -- so I think I was -- I

8    didn't see a number in all of the documents that I

9    reviewed.  In like how many of these cases would

10   fail, I didn't see that.  And I was intrigued to

11   see if anyone knew or had a model of what reality

12   would turn out to be.

13        Q.   Yeah.

14        A.   We had -- you had projection, but I would

15   have liked -- I think that would have been a

16   fascinating number to see.

17        Q.   We talked earlier.   You're not a polymer

18   chemist; right?

19        A.   I had to take organic chemistry a couple

20   of times.   It was a hard class.

21        Q.   Yeah.

22             You're not a polymer chemist, though;

23   right?

24        A.   Absolutely not.

25        Q.   And you don't -- as far as the design of
```

Ahmet Bedestani, M.D.

1    the Prosima, which to me includes the VSD and the

2    mesh -- we talked about the VSD and the -- the

3    uniqueness and -- and novel approach and some of

4    the reasons why that was fascinating to you, but

5    others as well.

6            But as far as the mesh, the mesh used in

7    the Prosima device was not unique or novel;

8    correct?

9            MR. WALKER:

10               Object to --

11           THE WITNESS:

12               No.

13           MR. WALKER:

14               -- form.

15   BY MR. JONES:

16       Q.  Okay.  And --

17       A.  I do not think that it was unique to the

18   Prosima device.

19       Q.  And -- and that same mesh was used in the

20   Prolift kit; correct?

21       A.  I believe so.  I'm not nearly as familiar

22   with Prolift as I am with Prosima, sir.

23       Q.  And as far as the mesh, you don't have any

24   opportunity as a physician -- other than what we

25   talked about with Restorelle earlier, you didn't

Ahmet Bedestani, M.D.

1  have any opportunity to tell a company like, Hey,

2  Ethicon, hey, man, I really love this Prosima

3  device, especially because of the VSD, In a way,

4  that eliminates a lot of the -- the problematic

5  surgical approaches with transvaginal mesh

6  augmented prolapse repair, But I don't like the

7  mesh you're using in this, so give me a different

8  fucking mesh or -- or a different mesh.

9      A.  Okay.

10      Q.  You don't have that opportunity as a

11  physician; correct?

12          MR. WALKER:

13              Object to form.

14          THE WITNESS:

15              I don't think that it's possible for

16          me to ask a major corporation --

17          MR. JONES:

18              Right.

19          THE WITNESS:

20              -- in the United States:  Build

21          something for me.

22          MR. JONES:

23              Right.

24          THE WITNESS:

25              I wish I could.

Ahmet Bedestani, M.D.

1    BY MR. JONES:

2        Q.   Right.   And so you're left in a position

3    as a physician to use the medical devices that the

4    companies put out on the market; correct?   And you

5    -- correct?

6        A.   That is correct.

7        Q.   And you've never worked --

8        A.   But I -- I was doing something similar

9    before these kits came out; correct?   So we accept

10   that?   I was putting mesh into human beings,

11   Gynemesh.

12       Q.   Gynemesh?

13       A.   Into people.

14       Q.   Gynemesh?

15       A.   That's it, Gynemesh.

16       Q.   Gynemesh is denser, stiffer, and heavier

17   than Gynemesh -- Prolene soft; correct?

18       A.   That is correct.

19       Q.   Okay.   And are you familiar with Ultrapro

20   mesh?

21       A.   Ultrapro is Prolene polypropylene with I

22   think monocryl --

23       Q.   Partially absorbable mesh; correct?

24       A.   Yeah.

25       Q.   And the partially -- partially absorbable

Ahmet Bedestani, M.D.

1    mesh is lighter and softer than a mesh like

2    Prolene soft; correct?

3         A.   It is.

4         Q.   Is there -- did -- did you ever do slings?

5         A.   Mid-urethral slings?

6         Q.   Yeah.

7         A.   It's part of the armamentarium --

8         Q.   Is -- is --

9         A.   -- to deal with SUI.

10        Q.   Is there any reason why a mesh like

11   Prolene soft would not work with -- in a

12   mid-urethral sling?

13             MR. WALKER:

14                  Object to form.

15             THE WITNESS:

16                  I don't know if that's been studied.

17             I guess if you are able to attach the

18             trocar needles to a piece of Gyne, I think

19             it could be done.

20   BY MR. JONES:

21        Q.   Okay.  Back to my original line of

22   questioning.

23             So you're not -- you've never been

24   involved with a medical corporation in helping

25   them decide which particular mesh they're going to

Ahmet Bedestani, M.D.

1    use in one of their devices; correct?

2        A.   I've never reached that level of position

3    to be able to dictate something like that.

4        Q.   And we talked about this earlier.

5             But some of the important mesh

6    characteristics as it relates to safety of the

7    mesh included stiffness, porosity, density, and

8    weight, among others; correct?

9        A.   Among others, yeah.  Uh-huh.

10       Q.   Is it fair that you don't consider

11   yourself an expert in the mesh selection process

12   as it relates to stiffness, porosity, density, and

13   weight when a medical device company is selecting

14   which mesh to use in their medical device?

15       A.   I never had any input into any of those

16   parameters when the manufacturer of any of these

17   different types of grafts -- that is correct.

18       Q.   And along the same lines, is it safe for

19   me to assume that you don't consider yourself an

20   expert in the warnings information that are

21   included in the product label?

22       A.   I don't think that I was ever in a

23   position to dictate what should or should not be

24   in a warning label.  But I do believe that it's my

25   responsibility to make other people aware if there

Ahmet Bedestani, M.D.

 1    were problems with certain applications of certain

 2    technologies, ergo in a paper, and I think I did

 3    that in the complications of transvaginal mesh.

 4        Q.  But because -- well, let me ask it this

 5    way:  Based on your experience and -- and the

 6    things we talked about earlier, like industry

 7    standards and FDA guidelines and whether you

 8    yourself had ever been -- worked on a product

 9    label, you don't consider yourself an expert in

10    that field; correct?

11        A.  But why would I?  I am -- I am the -- I am

12    the tool.  I am the delivery --

13        Q.  Right.

14        A.  I am the delivery --

15        Q.  Right.

16        A.  -- device.

17        Q.  Right.  You are -- and I want to be fair.

18    So, I mean, you're the physician, and so you're

19    assessing the -- the patient and the risk and

20    potential benefits of the medical device that

21    you're offering your patient; correct?

22        A.  Yes.  I am the -- I am the implementer.

23        Q.  You're the implementer.

24            And there are some things that -- that

25    aren't your responsibility but are the medical

Ahmet Bedestani, M.D.

1    device company's responsibility.  Fair?

2        A.  At the end of the day, all of that

3    responsibility on what I'm doing with that patient

4    is my responsibility.

5        Q.  Right.

6        A.  I don't have to --

7        Q.  Right.

8        A.  -- put that graft in.  I don't even have

9    to do surgery on that person.  I would have to say

10   management of each and individual patient is my

11   responsibility.

12       Q.  You're not -- and -- and I get that.

13           Back to the warnings and labels, you're

14   not -- that's not what you do every day?  You

15   don't sit around and write product labels every

16   day?  The --

17       A.  I certainly --

18       Q.  -- companies do, though?

19       A.  I certainly am not Ethicon.  I was never

20   directly an employee.  You don't see a -- so I

21   don't understand that.  That is not my position in

22   life.

23       Q.  Right.

24       A.  My position in life is to execute and

25   deliver health care.

Ahmet Bedestani, M.D.

1    Q.  Right.  Right.  And because of that,

2  you're an expert in -- in delivering health care

3  to your patients; correct?  That's fair?

4    A.  That is fair.

5    Q.  You don't consider yourself an expert in

6  what warning statements need to be in a product

7  label for a medical device, though.  Is that fair?

8    A.  I've never been put in a capacity to do

9  that.

10    Q.  Okay.  We talked earlier about being sent

11  -- oh, man, I only got ten more minutes -- about

12  being sent patients -- having patients referred to

13  you who will have complications after having

14  transvaginal mesh placed inside their body;

15  correct?

16    Let me ask you:  Do you have patients

17  referred to you who have suffered from

18  complications who have had transvaginal mesh

19  previous placed in -- inside their bodies?

20    A.  Not only do I get such patients referred

21  by other physicians, other members of the

22  community, I have been solicited by members of the

23  legal community who had promised to send me

24  inordinate amounts of patients to remove mesh.

25    Q.  That's not good.

Ahmet Bedestani, M.D.

1        A.   That is not good.

2        Q.   And just so --

3        A.   I actually reported it to the --

4        Q.   Good.

5        A.   -- medical director of my hospital.

6        Q.   I'm glad you did.

7             And -- and just so we're clear, I never

8    did that, did I?

9        A.   No, sir.  You --

10       Q.   I never --

11       A.   -- did not.

12       Q.   Okay.  Jordan --

13       A.   You did not.

14       Q.   -- didn't do that either?  But -- no.

15   Okay.

16            So you do get patients referred to you by

17   other physicians in other --

18       A.   And other patients.

19       Q.   -- and other patients who suffer from mesh

20   complications.  Is that fair?

21       A.   That is correct.

22       Q.   And what part of your -- percentage of

23   your current clinical practice relates to treating

24   women who suffer from mesh complications?

25       A.   When you say "mesh complications," these

Ahmet Bedestani, M.D.

1    are people that perceive that their issues relate

2    to a previous implant done by an outside provider.

3    If I myself am the implanting physician, I always

4    tell my patients that they and I are bonded; so

5    please always let me know.  But otherwise, what

6    you're saying is -- yes.  I evaluate them

7    completely, and we try to come up with a plan to

8    help them address their issues.

9        Q.   And you've treated women who have had

10   Ethicon transvaginal mesh products implanted in

11   them and who now suffer from complications;

12   correct?

13            MR. WALKER:

14                Object to form.

15            THE WITNESS:

16                I have dealt with a full component of

17            all of the transvaginal kits, from Elevate

18            to Apogee, Perigee, Pinnacles, homegrown,

19            Prolift.  I --

20   BY MR. JONES:

21       Q.   Prolift is a -- is a transvaginal mesh

22   device that was formerly marketed by Ethicon;

23   correct?

24       A.   That is correct.

25                And I also manage sacrocolpopexy

Ahmet Bedestani, M.D.

1  complications.

2      Q.  How about Prosima?  Have you had any

3  Prosima patients?

4      A.  I have not personally come across any

5  Prosima complication in the last five -- what year

6  is this?  2018.  2011 . . . So in the last

7  7 years, no Prosima implant patient has been

8  referred to me, nor have I heard of any Prosima

9  patient of mine within the community going to

10  another provider for management of whatever issue

11  that they were having.

12      Q.  And Prosima was only available to surgeons

13  for a couple years; correct?

14      A.  I think it was the -- some type of

15  corporate decision was made to no longer make it,

16  and I think it dissipated.  Because I think that

17  the packaging only had a 4-year shelf life.  So I

18  think that when it was introduced maybe in 2009, I

19  think in -- then it was no longer manufactured.  I

20  think they stopped making it.  That's all they

21  did.  And they -- in two thousand and, I think

22  twelve.

23      Q.  Yeah.  So they launched the device in

24  December 2009, and then in 2012, they -- they

25  ceased selling the device or making the device?

Ahmet Bedestani, M.D.

```
 1      A.   I think they stopped manufacturing the

 2   device, and I think if there was still product

 3   somewhere you could get your hands on it.

 4      Q.   So there's -- so there is a little bit

 5   more than a 2-year time period for when Ethicon

 6   was actively marketing this device; correct?

 7      A.   Yes.

 8      Q.   Okay.

 9      A.   They were actively --

10      Q.   And --

11      A.   -- marketing it.

12      Q.   And based on your consultant work with

13   Ethicon, you know that this wasn't an entirely

14   successful product for Ethicon; correct?

15           MR. WALKER:

16              Object to form.

17           THE WITNESS:

18              I thought that it was an extremely

19           successful product.

20   BY MR. JONES:

21      Q.   Did you -- did you ever -- did you ever --

22   were you ever made aware of how many total Prosima

23   devices were actually ever used in the

24   United States?

25      A.   For some odd reason, a number between four
```

Ahmet Bedestani, M.D.

```
1   and 6,000.

2        Q.  Okay.  That's what you think?

3        A.  I think.

4        Q.  Okay.

5        A.  Am I allowed to ask what the number is, if

6   you know?

7        Q.  You can ask Jordan.

8            THE WITNESS:

9                Am I allowed to ask you how many that

10           is -- was?  What?  You won't tell me?

11           Okay.  I --

12           MR. JONES:

13                Yeah.

14           THE WITNESS:

15                -- don't know.

16           MR. JONES:

17                He probably won't tell you.

18   BY MR. JONES:

19        Q.  All right.  So we've got four to 6,000

20   women out there in the United States with a

21   Prosima device.  That's it; correct?

22        A.  Maybe more if I'm incorrect.

23        Q.  Okay.  But if we're assuming you're

24   correct, there's anywhere from four to 6,000 women

25   in total who have received the Prosima device
```

Ahmet Bedestani, M.D.

```
 1    inside the United States --

 2         A.  Uh-huh.

 3         Q.  -- correct -- if you're correct?

 4         A.  If I am.  I don't know if it's just the

 5    United States or worldwide.  I -- because it was

 6    available worldwide, not just in the

 7    United States.

 8         Q.  All right.  I think the way I'm going to

 9    finish up is I'm going to ask you about some

10    specific -- some specific internal documents that

11    are pretty noteworthy, where employees inside of

12    Ethicon are discussing Prosima and they're saying

13    things about the device that stand out for sure.

14    I'm pulling up work product from 4 years ago from

15    a Prosima trial.  And I'm watching my computer

16    load it right now.

17              MR. WALKER:

18                   That -- that wouldn't be the Cavness

19              trial?

20         MR. JONES:

21                   It would be.

22              MR. WALKER:

23                   How about that?

24         MR. JONES:

25                   It would be.
```

Ahmet Bedestani, M.D.

```
 1              MR. WALKER:

 2                  Were you at that trial site?

 3          MR. JONES:

 4                  I was.  I was -- I was a -- the person

 5              they just keep locked up in the closet the

 6              whole time and never let come out, just

 7              feed to keep you alive so you can continue

 8              to work.  That's about it.

 9          MR. WALKER:

10                  A war room rat --

11          MR. JONES:

12                  Yeah.

13          MR. WALKER:

14                  -- basically.

15          MR. JONES:

16                  Great experience, though.

17      BY MR. JONES:

18          Q.  Yeah.  So what I'm going to do here,

19      Doctor, I'm going to just pick out some of the

20      internal documents that discuss Prosima.  Most of

21      them are from medical directors, some of which we

22      talked about before, like Aaron Kirkemo.

23          MR. WALKER:

24                  Are you going to let him look at them

25              on -- on your screen?
```

Ahmet Bedestani, M.D.

```
 1              MR. JONES:

 2                   I mean, that means we're going to be

 3              here for a lot longer.  But I'll -- I'll

 4              probably -- if I can pull them up, I'll --

 5              I'll let you look at them as long as it

 6              doesn't take a super long time.  Some may

 7              just jump out.  Some may be like:  Oh,

 8              yeah, I remember that one.

 9  BY MR. JONES:

10      Q.  Are you aware that Ethicon began working

11  on a Prosima +M device, where they were going to

12  use Ultrapro in the Prosima?

13              MR. WALKER:

14                   Object to form.

15              THE WITNESS:

16                   That, I do not know.

17              MR. JONES:

18                   Loading up.

19  BY MR. JONES:

20      Q.  Okay.  Are you familiar with

21  Dr. Vincent Lucente?

22      A.  I am.

23      Q.  You are?  And are you aware -- how -- how

24  are you aware of Dr. Vincent Lucente?

25      A.  I think I have nothing but admiration and
```

Ahmet Bedestani, M.D.

```
1   respect for Dr. Lucente.  His 2005 AUGS

2   conference and -- I knew that I wanted to be a

3   urogynecologist more than anything.  And he was

4   Vince Lucente.

5       Q.  Yeah.

6       A.  Okay.  He actually mentored me, helped me.

7   He let me talk with the correct people.  He

8   introduced me around.  And to this day, I have

9   nothing but admiration and respect for him as a

10  human being.  I don't think he's ever forgiven me

11  for never using Prolift or some of his other

12  products, but that does not mean -- we're very

13  collegial.

14      Q.  Did you review the Ethicon internal

15  document where Dr. Lucente calls Prosima a

16  reckless product?

17          MR. WALKER:

18              Object to form.

19          THE WITNESS:

20              I definitely did not see that document

21          because it would have stuck out in it and

22          I would have most likely called him on my

23          cell and said, You're incorrect.

24  BY MR. JONES:

25      Q.  You didn't see that document, though;
```

Ahmet Bedestani, M.D.

1    correct?

2        A.   I did not see that document.

3        Q.   Did you go to the 2009 Gynecare summit in

4    Florida at the Gaylord Palms Resort & Convention

5    Hotel, by chance?

6        A.   Is that where they filmed Back to the

7    Future?  Is that the one?  I'm not trying to --

8        Q.   Got me there, man.

9        A.   I -- I think I was -- I've been to Florida

10   a couple of times on . . . You know, so I think

11   one was that place, which was a big conference.

12       Q.   Yeah.

13       A.   That was the big thing.  So I don't know

14   where the Gaylord Hotel . . .

15       Q.   Okay.

16       A.   Is that . . .

17       Q.   Yeah.  I -- I don't know where it is

18   either.  Maybe I can Google it real quick.

19            But anyways, you -- you -- you went to a

20   few Ethicon-sponsored summits in Florida; correct?

21       A.   Correct.

22       Q.   And do you recall there being

23   presentations on Prosima?

24       A.   Yeah.  I think I do.  I can't really

25   remember.

Ahmet Bedestani, M.D.

```
 1        Q.   And do you remember specifically going to

 2   this hotel?  The hotel is located in Orlando.  So

 3   perhaps that was Back to the Future, some of that

 4   stuff was involved.  But I -- I'm going to ask you

 5   about some reports from that summit where there

 6   was a Prosima presentation given and ask if you've

 7   looked at these documents.  And again, these are

 8   ones that you either saw them or you didn't

 9   because they say powerful things, you know.

10        The feedback was from the 2009 Gynecare

11   summit after they gave a presentation on Prosima.

12   The feedback includes:  Big mistake, Don't do it,

13   Did not make sense, Worried that the risk-benefit

14   ratio could produce a backlash.

15        A.   I think Aaron Kirkemo --

16        MR. WALKER:

17             Object to form.

18        THE WITNESS:

19             -- wrote that.

20        MR. WALKER:

21             Object to form.

22        THE WITNESS:

23             Did he not?

24   BY MR. JONES:

25        Q.   Did he?
```

Ahmet Bedestani, M.D.

```
 1        A.  If I can come over to your computer
 2   screen.  And if I --
 3        Q.  Yeah.  It's not --
 4        A.  If it is --
 5        Q.  -- going to help you.
 6        A.  If it is Kirkemo, then obviously I'm an
 7   ethical human being.  Because I could pull that
 8   document out of the gigabytes of stuff that I've
 9   looked though.
10        Q.  So you do --
11        A.  Because that's a powerful statement.
12        Q.  Powerful.
13            And you do recall reading statements from
14   Ethicon's medical director, Aaron -- Aaron
15   Kirkemo, telling the company:  Don't launch the
16   Prosima device?
17            MR. WALKER:
18                Object to form.
19            THE WITNESS:
20                I don't remember the exact words.  But
21            I remember this long e-mail, and he -- I
22            don't know why he dragged BPH into it and
23            uroflow studies.  You're smiling because
24            that's a pretty good damn memory that I
25            could do this; right?  Because that's how
```

Ahmet Bedestani, M.D.

```
1              much I disagree with him.

2    BY MR. JONES:

3         Q.  Okay.  But you -- you generally recall

4    seeing documents detailing the negative feedback

5    following the 2009 conference that speak to

6    potentially Aaron Kirkemo's comments; right?

7         A.  I definitely --

8              MR. WALKER:

9                   Object to form.

10             THE WITNESS:

11                  -- can say to this out of all of the

12             documents that I read:  I read many

13             positive as well as negative comments

14             regarding Prosima.

15   BY MR. JONES:

16        Q.  Did you review the sales brochures

17   associated with the Prosima device?

18        A.  Of course I have reviewed them, because I

19   think they were distributed to patients and I want

20   to make sure that it did its job of conveying

21   messages to patients.

22        Q.  Were there any -- in your review of the

23   brochures associated with the Prosima device that

24   Ethicon used, did you notice any statements that

25   appeared to you to be misleading?
```

Ahmet Bedestani, M.D.

1          MR. WALKER:

2               Object to form.

3          THE WITNESS:

4               I -- if I -- upon -- I would have to

5          review the information once again.  But I

6          don't think that I had a problem with it.

7          If I had -- if I utilized the -- it, I

8          don't think that it would have represented

9          any type of misinformation.  But I think

10         that such a pamphlet is just but one

11         component of truly educating a patient so

12         that they could make proper decisions of

13         their health care.

14    BY MR. JONES:

15         Q.  Do you know who Martin -- Dr. Martin

16    Weisberg is?

17         A.  I do not know who Dr. Martin Weisberg is.

18         Q.  Did you stop using Prosima before or after

19    Ethicon ceased marketing the device?

20         A.  I think that it -- cessation of -- of

21    Prosima utilization occurred in 2011; so I think

22    whenever they actively stopped marketing it.  I

23    don't think that has a bearing as -- you know, if

24    that lines up with what -- in 2011, then that was

25    it.

Ahmet Bedestani, M.D.

1      Q.   Okay.   I'm -- I'm just asking.

2           Did you stop using it because Ethicon

3   stopped selling it, or did you stop using it

4   before Ethicon stopped selling it?

5      A.   I stopped using it before Ethicon stopped

6   selling it.

7      Q.   Okay.   Why was that?

8      A.   Because I wasn't really practicing at the

9   time.

10     Q.   Okay.

11     A.   And by the time that I restarted my own

12  practice at East Jefferson Hospital, I don't think

13  the environment was conducive to utilizing

14  transvaginal mesh at that time.   Because that was

15  after the FDA notice.

16     Q.   Sure.

17          MR. JONES:

18               Those are all the questions I have.

19          Thanks for your time today, Doctor.

20          THE WITNESS:

21               Thank you, sir.

22          MR. WALKER:

23               I have just a couple of follow-up

24          questions.

25  BY MR. WALKER:

Ahmet Bedestani, M.D.

1    Q.   Doctor, do you remember being asked some

2  questions about the AUGS position statement?

3    A.   Yes.

4    Q.   And specifically you were asked questions

5  about the AUGS statement regarding the efficacy of

6  mesh in the posterior compartment.

7    Do you remember that?

8    A.   Yes.

9    Q.   Why do you disagree with AUGS' statement

10  regarding the efficacy of mesh augmentation in the

11  posterior compartment?

12    A.   In my -- I simply did not see such a

13  degradation and repair.  I did not -- and I truly

14  felt that a native tissue repair in posterior

15  compartment is basically a nonfunctional approach,

16  that graft augmentation in the posterior

17  compartment is vital to a successful repair if

18  done appropriately.

19    Q.   And you -- you say "if done

20  appropriately."

21    From your experience and your review of

22  the literature, if a skilled surgeon is placing a

23  posterior mesh, is that likely to result in a

24  greater benefit to the patient than a native

25  tissue repair?

Ahmet Bedestani, M.D.

1        A.   I believe graft augmentation delivered to

2    the appropriate surgical plane utilizing the

3    appropriate fixation points represents a true and

4    utter benefit to the patient.  Yes.

5        Q.   I made a note early in the deposition.

6    You were asked some questions about your

7    professional education involvement with Ethicon

8    and the numerous cadaver studies that you

9    participated in.

10            Why is the study of cadavers important to

11   your education and professional development?

12       A.   The cadavers were not donated to me as a

13   thank you or anything from Ethicon.  These

14   cadavers were provided so that surgeons -- after

15   didactics and education, mentoring by more

16   experienced surgeons, passes were done.  And then

17   passes were done in nondissected and dissected

18   portions of these cadavers so people could learn

19   how to do these procedures properly.  When

20   everything was said and done and everybody was

21   going to the dinner or going back home, I was able

22   to stay and really take inventory of deep

23   dissection of these structures.  So I found it to

24   be invaluable.  So . . . before these were then

25   properly dealt with.

Ahmet Bedestani, M.D.

1      Q.  You were asked a number of questions

2  regarding the stiffness of mesh, density, pore

3  size.

4          Do you recall those questions?

5      A.  I do.

6      Q.  And, Doctor, you would agree that you are

7  here today in part because you are holding

8  yourself out as an expert in the biocompatibility

9  of mesh, specifically the Prosima mesh product;

10  correct?

11     A.  That is correct.  I hold myself as a

12  expert when it comes to Prosima and the

13  application of its technology.

14     Q.  And that would include the -- the mesh in

15  Prosima and the construction of that mesh;

16  correct?

17     A.  I hold --

18         MR. JONES:

19             Objection.

20         THE WITNESS:

21             -- myself in knowing a substantial

22         amount of knowledge based on all my

23         education, self-study, experience with all

24         the different platforms, and these

25         cadaveric dissections.

Ahmet Bedestani, M.D.

```
 1   BY MR. WALKER:
 2      Q.  And, Doctor, you recall you were asked
 3   some questions about the warnings associated with
 4   product labeling.
 5          Do you recall --
 6      A.  Uh-huh.
 7      Q.  -- that?
 8          As a pelvic floor surgeon, do you agree
 9   that you are an expert in assessing the potential
10   risks and complications associated with pelvic
11   floor surgery?
12          MR. JONES:
13              Another objection.
14          THE WITNESS:
15              I completely hold myself in a position
16          to judge the application of technology
17          when it comes to the realm of pelvic
18          surgery.  That is correct.
19   BY MR. WALKER:
20      Q.  And that would include understanding and
21   being knowledgeable about the potential adverse
22   events that could happen following a prolapse
23   repair surgery, for example?
24          MR. JONES:
25              Objection.
```

Ahmet Bedestani, M.D.

```
 1           THE WITNESS:
 2               I think any ethical surgeon who takes
 3           a human being to the operating room with
 4           the hopes of making them better learns
 5           from each and every individual case.  Now
 6           I'm not trying to sound like a
 7           cheerleader.  So any type of positive
 8           should be noted, and more importantly, any
 9           type of negative should be noted.  And you
10           take and you learn from each.
11               Going back to the cadavers.  Learning
12           that anatomy in real life, I have to
13           stress once again the invaluable nature.
14           Because transvaginal surgery is not so
15           easy.  You're operating through very
16           confined spaces.  And I'm not trying to
17           say anything with regard to certain
18           skills.  But really being able to open up
19           that -- these very confined spaces was
20           extremely beneficial in learning how these
21           grafts would work, where they were going,
22           and also as a basis of further
23           understanding as a professional developing
24           in pelvic surgery.  I don't know what else
25           to say about that.
```

Ahmet Bedestani, M.D.

```
 1          MR. WALKER:
 2              That's all I have.  Thank you for your
 3          time.
 4          THE WITNESS:
 5              All right.  Thank you.
 6          MR. JONES:
 7              A few housecleaning issues.
 8              Do you have any objection to me
 9          e-mailing the notice of deposition to the
10          court reporter after the deposition?
11          Unless you have a copy.
12          MR. WALKER:
13              I have a copy.
14          MR. JONES:
15              Easy.  I would like to mark for the
16          record the deposition notice as Exhibit
17          No. 5.
18          (Exhibit No. 5 was marked for
19          identification and attached hereto.)
20          MR. WALKER:
21              And you -- you didn't mark it.  But if
22          you want, I also have his CV.  I don't
23          know . . .
24          MR. JONES:
25              Let's do it.  Exhibit 6 will be the
```

Ahmet Bedestani, M.D.

```
1            doctor's CV.

2            (Exhibit No. 6 was marked for

3            identification and attached hereto.)

4       MR. JONES:

5            And then . . .

6       MR. WALKER:

7            And if you want to mark his report, I

8       have that as well.

9       MR. JONES:

10           Yeah.  And then the next exhibit --

11      because I already lost count --

12      Exhibit 7ish --

13      MR. WALKER:

14           I think it's 7.

15      MR. JONES:

16           -- will be the report of the doctor in

17      this case.  Just -- and then --

18      MR. WALKER:

19           That's just three copies of the same

20      report.

21      MR. JONES:

22           Okay.  And -- and then do you have any

23      objection to me e-mailing for the record

24      to the court reporter the -- the

25      electronic copy of the report that
```

Ahmet Bedestani, M.D.

```
 1          includes all like the -- the reliance list

 2          and the PowerPoint stuff?

 3          MR. WALKER:

 4              I -- I don't.  I do have a hard copy

 5          of the slide deck that was attached to his

 6          report, if you want to go ahead and just

 7          mark the hard copy.

 8          THE WITNESS:

 9              I thought he gave -- you gave it to

10          him already?

11          MR. JONES:

12              Yeah.  You did.

13          MR. WALKER:

14              You already --

15          MR. JONES:

16              Did I mark it earlier?  Whatever.  If

17          I --

18          MR. WALKER:

19              Okay.

20          MR. JONES:

21              -- marked it earlier, I marked it.

22          MR. WALKER:

23              Here (tenders document).

24          MR. JONES:

25              If not, I would like to add that to --
```

Ahmet Bedestani, M.D.

```
 1          MR. WALKER:

 2              But no objection.

 3          MR. JONES:

 4              -- Exhibit 7.

 5          THE WITNESS:

 6              I think you have it.  Yeah.

 7          MR. JONES:

 8              I don't want to take it with me.

 9          So . . . All right.  That's it.  Thanks,

10          guys.

11          MR. WALKER:

12              All right.

13          THE WITNESS:

14              Thank you, sir.

15          MR. WALKER:

16              We're off the record.

17          (The proceedings concluded at 2:18 p.m.)

18

19

20

21

22

23

24

25
```

1                C E R T I F I C A T E

2        This certification is valid only for

3     a transcript accompanied by my original signature

4     and original seal on this page.

5        I, AURORA M. PERRIEN, Registered Professional

6     Reporter, Certified Court Reporter, in and for the

7     State of Louisiana, as the officer before whom

8     this testimony was taken, do hereby certify that

9     AHMET BEDESTANI, M.D., after having been duly

10    sworn by me upon the authority of R.S. 37:2554,

11    did testify as hereinbefore set forth in the

12    foregoing 118 pages; that this testimony was

13    reported by me in the stenotype reporting method,

14    was prepared and transcribed by me or under my

15    personal direction and supervision, and is a true

16    and correct transcript to the best of my ability

17    and understanding; that the transcript has been

18    prepared in compliance with transcript format

19    guidelines required by statute or by rules of the

20    board; and that I am informed about the complete

21    arrangement, financial or otherwise, with the

22    person or entity making arrangements for

23    deposition services; that I have acted in

24    compliance with the prohibition on contractual

25    relationships, as defined by Louisiana Code of

Ahmet Bedestani, M.D.

1    Civil Procedure Article 1434 and in rules and

2    advisory opinions of the board; that I have no

3    actual knowledge of any prohibited employment or

4    contractual relationship, direct or indirect,

5    between a court reporting firm and any party

6    litigant in this matter nor is there any such

7    relationship between myself and a party litigant

8    in this matter.  I am not related to counsel or to

9    the parties herein, nor am I otherwise interested

10   in the outcome of this matter.

11

12

13

14

15            AURORA M. PERRIEN, CCR, RPR

16

17

18

19

20

21

22

23

24

25