# EXHIBIT D

Catherine A. Matthews, M.D.

1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF WEST

3               AT CHARLESTON

4    IN RE: ETHICON, INC., PELVIC

5    REPAIR SYSTEM PRODUCTS         Master File No:

6    LIABILITY LITIGATION           2:12-MD-02327

7    _____    MDL 2327

8    PATTI ANN PHELPS and JAMES

9    PHELPS,                        Case No: 2:12-CV-1171

10                Plaintiffs,

11      vs.

12   ETHICON, INC., ET AL.,

13                Defendants.

14

15

16

     Videotaped Deposition of Catherine A. Matthews, M.D.

17                General Deposition

                    March 24, 2016

18                 At 10:30 a.m.

19

          Taken at:

20        Embassy Suites

          460 N. Cherry Street

21        Winston-Salem, North Carolina

22

23

24   Reported by LeShaunda Cass-Byrd, CSR, RPR

Catherine A. Matthews, M.D.

---

**Page 2**

1  APPEARANCES OF COUNSEL:

2

   On behalf of Plaintiff:
3     MATTHEW P. TEAGUE, ESQ.
      Beasley Allen Crow Methvin Portis & Miles,
4     P.C.
      218 Commerce Street
5     Montgomery, Alabama 36104
      334.269.2343

6

7  On behalf of Ethicon and Johnson & Johnson:
      PAUL S. ROSENBLATT, ESQ.
8     Butler Snow, LLP
      1020 Highland Colony Parkway
9     Suite 1400
      Ridgeland, MS 39157
10    601.948.5711
      paul.rosenblatt@butlersnow.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1     EXAMINATION OF CATHERINE MATTHEWS, M.D.

2  By Mr. Teague                        6

3  By Mr. Rosenblatt                  150

4         DEPOSITION EXHIBITS

5  EXHIBIT   DESCRIPTION              PAGE

6  Exhibit 1  Notice to take Deposition of

7         Catherine A. Matthews, M.D.        6

8  Exhibit 2  Expert Report of Catherine A.

9         Matthews, M.D.         11

10 Exhibit 3  Catherine Matthews reliance List in

11        Addition to Materials Reference in

12        Report Patti Ann Phelps        11

13 Exhibit 4  GyneCare Article       102

14 Exhibit 5  Issue Report TVT Retropubic 1999-

15        2000 Open Date Between Jan 1, 1999

16        And December 31, 2000        109

17 Exhibit 6  2002 U.S.  Marketing Plan for GyneCare

18        TVT Tension-free Support for

19        Incontinence        121

20 Exhibit 7  Issue Report TVT Retropubic 1999-

21        2000 Open Date Between Jan 1, 1999

22        And December 31, 2000AF        125

23 Exhibit 8  E-mail Exchange between Axel Arnaud

24        And Martin Weisberg        131

---

**Page 4**

1  Exhibit 9  Memo from Dan Lamont, Titles: TVT-Base

2         & TVT-O Compliant Review for Laser

3         Cut Mesh (LCM) Risk Analysis        138

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**Page 5**

1     THE VIDEOGRAPHER:  We are now on the

2  record.  My name is Len Harris, I am the

3  videographer for Golkow Technologies.

4  Today's date is March 24th, 2016.  The time

5  is approximately 10:41 a.m.  This video

6  deposition is being held in Winston-Salem,

7  North Carolina, in regards to Ethicon,

8  Incorporated, Pelvic Repair System Products

9  Liability Litigation, Master File No.

10 212-MD-02327-MDL-2327.  This case refers to

11 Patti Ann Phelps, Case No. 212-CV-01171, in

12 the United States District Court for the

13 Southern District of West Virginia,

14 Charleston Division.  The deponent is

15 Catherine A. Matthews, MD.

16    Counsel, would you please identify

17 yourselves.

18    MR. TEAGUE:  Matt Teague for the

19 plaintiff.

20    MR. ROSENBLATT:  Paul Rosenblatt for

21 Ethicon, Inc., and Johnson & Johnson.

22    THE VIDEOGRAPHER:  The court reporter

23 is LeShaunda Byrd and will now swear in the

24 witness.

---

Catherine A. Matthews, M.D.

Page 6

1    CATHERINE A. MATTHEWS, M.D.,
2  having been first duly sworn, was examined and
3  testified as follows:
4            EXAMINATION
5  BY MR. TEAGUE:
6    Q.    Good morning.  Doctor, would you please
7  state your name for the record?
8    A.    Catherine Ann Matthews.
9    Q.    Okay.  And, Dr. Matthews, are you -- you
10  are here today as a witness.  On whose half are you --
11  excuse me -- on whose behalf are you appearing?
12    A.    The defense, for Ethicon.
13    Q.    Okay.  And that would be Ethicon, Johnson &
14  Johnson, the defendants in a general set of litigation
15  that is ongoing; is that correct?
16    A.    Correct.
17    Q.    Okay.  And, Doctor, you are here today
18  pursuant to a notice of deposition issued by my
19  office?
20    A.    Correct.
21       (Plaintiffs' Exhibit 1 was marked for
22    identification.)
23  BY MR. TEAGUE:
24    Q.    Okay.  And I am going to show you what I've

Page 7

1  marked as Plaintiffs' Exhibit 1, which is the
2  deposition notice.
3       Have you seen that document before, Doctor?
4    A.    I have.
5    Q.    And, Doctor, if you would turn to I believe
6  it's Schedule A on Page 6.
7    A.    (Witness complied.)
8    Q.    You see that?
9    A.    Correct.
10    Q.    Yeah.  And, Doctor, have you had a chance
11  to review that before today?
12    A.    I briefly looked through this.  I can't
13  tell you all the things that were listed in the
14  schedule, but I have some familiarity with it.
15    Q.    Okay.  Did you bring anything pursuant to
16  Schedule A today?
17    A.    I did.  I brought all the copies of the
18  records that I've reviewed.  As we just mentioned, I
19  have a copy of -- all of my reliance list, and I've
20  got all the articles that I've referenced with my
21  report here in a binder.
22    Q.    And you are referring to a flash drive that
23  was discussed in a -- in a conversation between
24  counsel right before we came on the record?

Page 8

1    A.    Correct.
2    Q.    Okay.  And, Doctor, have you been deposed
3  before today?
4    A.    I have.
5    Q.    Okay.  So I know you understand the ground
6  rules for the most part.  I will just say, quickly --
7  and you are doing a great job of it -- for the court
8  reporter's sake and for our sake down the road, you
9  are probably going to be able to anticipate where I am
10  going on multiple questions, but if you would, just
11  let me get the question out so that it's clear for the
12  record, and then I will do the same for you as you
13  respond.  That way the less talking over each other,
14  the better.
15    A.    Sure.
16    Q.    Thank you.
17       And also, Doctor, if at any point I use a
18  term incorrectly, which is possible, or if I use a
19  term in a way that you don't understand it, if you
20  would just ask me for clarification; otherwise, I'll
21  assume that you understood the question if you answer.
22       Is that okay?
23    A.    Correct.  Fine.
24    Q.    Okay.  Doctor, prior to the deposition,

Page 9

1  have you had a chance to review the report that you
2  issued on behalf of Ethicon?
3    A.    Well, yes, after spending many hours
4  writing it, I am certainly very familiar with it, and
5  I reviewed it again before coming today.
6    Q.    Okay.  Are there any changes, corrections,
7  anything that you want to point out in it before I use
8  it as an exhibit or ask you questions based on it?
9    A.    No, sir.
10    Q.    Okay.  The same with your reliance list,
11  any -- anything that you -- after reviewing it,
12  anything that you looked at and felt like needed to be
13  changed, added to, you know, as we sit here today?
14    A.    There are a few papers in the reliance list
15  that I didn't include within the reference list within
16  my case specific report, but as long as I am allowed
17  to reference all articles on my reliance list, nothing
18  additionally needs to be added.
19    Q.    Okay.  So the only distinction would be
20  there might have been a broader set -- or you tell me
21  if I understood you correctly -- there might have been
22  a broader list in the materials that were either cited
23  or used in your general report that you may not have
24  specifically cited again in your case specific report;

Catherine A. Matthews, M.D.

Page 10

1 is that correct?

2    A.   That is correct.

3    Q.   Okay.  But in terms of the overall list,

4 anything that you felt like needs to be added as we

5 sit here today?

6    A.   It's all there.

7    Q.   Okay.  And the same with the other

8 submissions you've made as part of that report in

9 terms of your testimony list, anything that needs to

10 be changed there?

11    A.   No, sir.

12    Q.   Okay.  And your CV, have you reviewed that?

13 Is that still accurate and up to date?

14    A.   There are probably a few more publications

15 that was from December, but it's reasonably current.

16    Q.   Okay.  While we are on that subject, do you

17 recall any publications as we sit here today that may

18 have come out in 2016 as of, you know -- or say from

19 December 2015 to today's date?

20    A.   I can't recall off the top of my head, but

21 I suspect that there may be one or two publications

22 that actually have -- that were in publication that

23 have now been actually published.

24    Q.   Okay.  Thank you.

Page 11

1         Would any of them have dealt specifically

2 with polypropylene mesh or any other procedures used

3 to implant polypropylene mesh?

4    A.   It's possible that one related to mesh used

5 in sacrocolpopexy but not related to suburethral

6 slings or other vaginal mesh.

7    Q.   Okay.  So in terms of transvaginal

8 approach, you don't -- you are not aware of anything

9 that has been published from the date that your --

10 that your publication list or CV was produced to us?

11    A.   Correct.

12    Q.   Okay.  That is fine.  Thank you.

13         (Plaintiffs' Exhibit 2 was marked for

14         identification.)

15 BY MR. TEAGUE:

16    Q.   And while we are at it, I will show you

17 what I've marked as Exhibit 2, and this is expert

18 report of Catherine A. Matthews, MD.  Just take a look

19 through that real quick and make sure that we are

20 talking about the same document.

21    A.   Yes, this is correct.

22         (Plaintiffs' Exhibit 3 was marked for

23         identification.)

24 BY MR. TEAGUE:

Page 12

1    Q.   Okay.  And if you would just look at

2 Exhibit 3, is that the -- to the best of your

3 knowledge, that's the reliance list, reference list

4 that you produced to us as part of this litigation?

5    A.   Yes, that is correct.

6    Q.   Thank you.

7         And am I correct, Doctor, that you are not

8 here on behalf of any individual plaintiff?

9    A.   That is correct.

10    Q.   Okay.  And when I mean that, as in you are

11 not a witness that was asked to appear by any

12 plaintiff or plaintiff's attorney, correct?

13    A.   Well, I was obviously asked to review the

14 specific records of Ms. Phelps, but I wasn't asked by

15 her or by someone representing her to appear here.

16    Q.   Correct.  That would have been Ethicon's

17 request, correct?

18    A.   Correct.

19    Q.   Okay.  And also, while we are on the

20 subject, there are multiple entities within the

21 Johnson & Johnson family.

22         Are you familiar with the entities or terms

23 Ethicon, Gynecare, Johnson & Johnson?

24    A.   Yes.

Page 13

1    Q.   Okay.  From time to time, I may lapse in

2 between them.  If there is a specific document that is

3 labeled or branded under one of those particular

4 names, I will probably refer to it directly as that.

5         But otherwise, to the extent you feel an

6 answer is dependent on one or other of those entities,

7 would you please point that out to me?

8    A.   Sure.

9    Q.   And that way I don't have to -- I may still

10 do it anyway, but that way I don't have to repeat

11 three names every time I ask you a question.

12    A.   Sure.

13    Q.   Thank you.

14         Doctor, what is polypropylene?

15    A.   It's a synthetic material that is used for

16 suture material and used in the construction of mesh.

17    Q.   Okay.  Does it have any -- does

18 polypropylene have any uses outside of the medical

19 community?

20    A.   I don't know.  Probably.

21    Q.   Okay.  You are not aware of any other uses

22 other than the medical community?

23    A.   That is where my area of knowledge is, so

24 that is -- to the extent the material science is known

Catherine A. Matthews, M.D.

Page 14

1  to me, I know it as it applies to medicine.
2      Q.    Okay.  Doctor, how long have you used
3  polypropylene medical devices?
4      A.    Since I -- if I can recall, since maybe
5  early 2005, possibly late 2004, but somewhere in that
6  range.
7          I'm sorry, if I can just clarify.
8      Q.    Absolutely.
9      A.    That was, of course, for mesh, not for
10  suture material.  I have been using polypropylene
11  suture material since I started as a physician.
12      Q.    Thank you for the clarification.
13          Do you know of any material differences
14  between polypropylene mesh used in slings and sling
15  kits versus the polypropylene material used in
16  sutures?
17          And obviously, I am not -- well, I will
18  just leave the question as is.  You can answer that.
19      A.    Both --
20          MR. ROSENBLATT:  Object to the form.
21          THE WITNESS:  Both material -- it's
22      the same makeup of material.  One is just
23      as a single filament of suture.  The other
24      is knitted to create a weaved mesh

Page 15

1      material.
2  BY MR. TEAGUE:
3      Q.    When you -- I'm sorry.  Were you --
4      A.    One -- both -- the same type that is
5  protected in an oxidation sheath are used, so the same
6  material that is used in a suture is used for the
7  mesh.
8      Q.    Okay.  Is it the suture material that is
9  knitted to form the polypropylene mesh used for
10  transvaginal implants?
11      A.    I don't believe it's the exact same -- it's
12  made of the same composition.
13      Q.    Okay.  While we are on that, Doctor, I was
14  looking at your curriculum vitae.  And if you would,
15  in testimony form, I would like to walk through it.
16          When you graduated from medical school,
17  what did you do -- or strike that.
18          What did you do after you graduated medical
19  school?
20      A.    I did an OB/GYN residency at VCU Medical
21  Center.
22      Q.    Okay.  And what were your responsibilities
23  at VCU Medical Center?
24      A.    As a resident or --

Page 16

1      Q.    Yeah, sorry.  Let me rephrase that.
2          As a resident, what were your
3  responsibilities at VCU Medical Center in a general
4  sense?
5      A.    Become an outstanding obstetrician
6  gynecologist.
7      Q.    Okay.  Did you do clinical work?  Did you
8  see patients at that time?
9      A.    Sure.
10      Q.    Okay.  Did you have a mentor or someone who
11  was responsible for your progress as a physician?
12      A.    I had several, but my primary mentor was
13  Glenn Hurt, who was one of the founders of
14  urogynecology in America.  And so I was steered down
15  the urogynecology track relatively early in my
16  residency training.
17      Q.    Okay.  And then after your residency, did
18  you stay on at VCU?
19      A.    I did.  I had a -- I was employed as an
20  assistant professor, but there was an understanding
21  that I was going to do a quote/unquote modified
22  fellowship under his tutelage where we would operate
23  together and do clinic together.  So I was being paid
24  as a faculty member, but really was sort of like a

Page 17

1  fellow.
2      Q.    Okay.  And your clinical experience during
3  that periods of time with Dr. Hurt, is this what is
4  referenced on your CV as the August 2001 to June 2007
5  period?
6      A.    Well, he retired in 2004, and so it was the
7  during the three years that he was still on faculty
8  that we worked very closely together.  And because he
9  was well renown across the United States, he had a
10  very large referral patent of complex cases of pelvic
11  floor disorders, and so I was the direct beneficiary
12  of his expertise and his reputation.
13      Q.    Okay.  Just to get back to the actual
14  experience though.
15          So from August 2001 to June 2007, were you
16  at VCU, correct?
17      A.    I was there until 2010.
18      Q.    Okay.  Got you.
19          What changed between June 2007 and
20  July 2007?  I notice there are separate entities on
21  your CV.
22      A.    I think I changed from assistant to
23  associate professor.
24      Q.    Okay.  And, Doctor, going back, during this

Catherine A. Matthews, M.D.

Page 18

1  period of time that you were with -- you were an
2  assistant professor, this August 2001 to June 2007
3  period, how many -- give me a general idea of your
4  work in clinical -- in your clinical -- strike that --
5  give me an idea of your work, clinical work, versus
6  your academic work at that time.
7      A.    So all of our work was really considered
8  academic, and that even the clinical work involved the
9  teaching of medical students and residents and the
10  accumulation of data that we might have published
11  subsequently.  So it was really a blended purpose,
12  which was to do academic clinical work.  I had -- you
13  know, 85 percent of my time was directed towards
14  clinical activities that included patient care and
15  teaching, and then I had about 15 percent of my time
16  that was reserved for academic work, specifically
17  working on research projects and so on and so forth.
18      Q.    Okay.  During this period of time, and I'll
19  limit it to the August 2001 to June 2007 period when
20  you were an assistant professor at Virginia
21  Commonwealth University, did you use polypropylene
22  mesh for the treatment of stress urinary incontinence?
23      A.    I didn't initially.  I was not an earlier
24  doctor of the use of synthetic meshes.  My mentor,

Page 19

1  Dr. Hurt, was a traditionalist.  He believed in Burch
2  colposuspension and in pubovaginal slings.  And at
3  that time I was waiting, both of us were waiting for
4  some better prospective evidence on efficacy.  And so
5  from 2001 until 2004, as I mentioned, I conducted
6  numerous procedures with him for management of stress
7  incontinence, both primary and recurrent, but included
8  only Burch procedures and slings, pubovaginal slings.
9          And then in late 2004, early 2005, after
10  the publication of the longer term outcomes of the
11  landmark Ward Hilton trial, I felt that there was
12  sufficient evidence to adopt something that had equal
13  efficacy and lower complications in my practice.  And
14  so at that point, I got additional training from
15  someone outside of my immediate institution and then
16  started performing retropubic clings.
17      Q.    Okay.  Were you ever trained by the
18  manufacturers of the polypropylene mesh slings that
19  you used?
20      A.    Never.  I don't believe that that is the
21  best way to learn how to do something.  I traveled to
22  Europe and did surgery with two -- several surgeons in
23  London and watched their technique, learned the
24  nuances really of placement.  And then after feeling

Page 20

1  that, I had satisfactorily observed this, then came
2  back to my institution and did the first several
3  procedures with my other partner, Edward Gill, who was
4  already performing retropubic slings.
5      Q.    Okay.  In terms of -- if I understood you
6  correctly, you said that manufacturer-based training
7  is not -- is not the best way to learn it?
8          MR. ROSENBLATT:  Object to form.
9  BY MR. TEAGUE:
10      Q.    Well, and that is what I'm asking.  You
11  tell me.  Is it --
12      A.    For me personally --
13      Q.    I -- you know what, Doctor, I didn't mean
14  to interrupt you.  Let me ask that a better way.
15          What do you consider the downside of
16  manufacturer training of products that they -- that
17  they produce?
18          MR. ROSENBLATT:  Object to form.
19          THE WITNESS:  I believe that
20  physicians are best trained through
21  traditional means, which involves medical
22  school education, residency education,
23  fellowship education, and then peer
24  education from colleagues that are

Page 21

1  respected in their educational efforts.
2          Certainly it is acknowledged that
3  industry has to partner with physicians to
4  conduct training, and that may be perfectly
5  acceptable.  For me personally, I didn't
6  want to rely on -- in that relatively early
7  stage in the game and the identification of
8  someone who I didn't know and I didn't
9  necessarily understand what their
10  credentials were, and so I took it upon
11  myself to find somebody that I respected
12  and I felt had good knowledge of the
13  procedure to be able to teach me the
14  correct way.
15  BY MR. TEAGUE:
16      Q.    Okay.  So is -- the decision was personal,
17  not necessarily a categorical criticism of industry
18  training?
19      A.    That is correct.  I think, unfortunately, a
20  lot of physicians rely on what is made available to
21  them, but I am very much a firm believer that
22  traditional methods of education should be used
23  whenever possible.
24      Q.    Okay.  And if the manufacturer were to

Catherine A. Matthews, M.D.

Page 22

1 employ one or more proctors who were experienced in
2 the -- in the implant of the product to teach other
3 surgeons, is that something that you would condone or
4 approve of?
5    A.    I think it's approved as long as the person
6 is well vetted in their abilities and that it's not
7 biased in some way.
8    Q.    Okay.  What forms of bias would you
9 consider could exist in that scenario?
10    A.    I think if someone is willing to teach
11 something that they don't really know that much about
12 or haven't really been well trained in themselves,
13 purely for financial remuneration, that would be a
14 biased -- biased proctor.
15    Q.    Okay.  Have you reviewed Ethicon's internal
16 documents to see what they taught in their
17 manufacturer-sponsored clinics for specifically stress
18 urinary incontinence products?
19    A.    I don't -- I can't recall specifically
20 looking at those documents.
21    Q.    Okay.  What about for any other
22 manufacturer, have you had an opportunity to review
23 the training materials that any other manufacturer of
24 polypropylene stress urinary incon- -- sorry --

Page 23

1 polypropylene mesh intended for stress urinary
2 incontinence treatment has put out?
3    A.    I cannot recall specifically, but it's
4 possible I have.  But I just can't recall off the top
5 of my head.
6    Q.    Okay.  Do you know Dr. Karram?
7    A.    I do.
8    Q.    Okay.  In what sense -- how do you know
9 him?
10    A.    He is, obviously, an exceptionally well
11 respected figure in urogynecology.  He has published
12 numerous textbooks and probably over 150 peer review
13 articles.  So not only is he a respected surgeon, but
14 he has been a very academic surgeon who is very well
15 published in the field.
16    Q.    Okay.  Would you consider him someone who
17 would be a proctor that wouldn't be subjected to the
18 biases that you -- or a proctor or preceptor that
19 wouldn't be subjected to -- strike that.
20          Based on your personal knowledge of
21 Dr. Karram, do you think that he has now or at any
22 time in the past been subject to any form of bias or
23 shown any form of bias based on his relationship with
24 any industry manufacturer?

Page 24

1          MR. ROSENBLATT:  Object to form.
2          THE WITNESS:  I don't believe so.  I
3    think that if somebody is willing to
4    publish their results where they have
5    clearly evaluated the patient population
6    that they are serving, that they are an
7    outstanding source of information.  It's
8    somebody who is not trying to hide their
9    outcomes.
10          So I think that he is -- he is the
11    exact kind of person who you like to see as
12    a proctor because he's actually been
13    academic in his pursuit of defining the
14    outcomes of the procedure that he is
15    actually teaching.  And he has done this
16    for many different companies and for many
17    different procedures.
18 BY MR. TEAGUE:
19    Q.    Okay.  What other companies besides
20 Ethicon?
21    A.    Well, gosh, I can't recall off the top of
22 my head, but, you know, if you look at the vast number
23 of publications he has had, they have included other
24 devices and other products.  And so, you know, I think

Page 25

1 that he has got a long track record of publishing
2 outcomes of surgical interventions.
3    Q.    Okay.  Now, moving -- again, during this
4 August 2001 to June 2007 period, which products were
5 you using for the surgical treatment of stress urinary
6 incontinence?  And I will qualify that to
7 polypropylene products right now.
8    A.    So initially, I used the TVT retropubic
9 sling from Gynecare.  And my rationale for that was
10 that that was the device that had been published on in
11 the Ward and Hilton trial, therefore I felt that I was
12 using the exact same material and could reliably
13 expect to have similar outcomes in my patients.
14    Q.    You mentioned the Ward-Hilton trial
15 earlier.
16          Did I understand you correctly, that was
17 one of the publications that began to move you away
18 from the older procedures you described earlier and
19 towards introducing into your practice the use of
20 polypropylene mesh or retropubic slings?
21    A.    Yes, I think it's fair to say that I've had
22 a long history of trying to practice evidence-based
23 medicine.  And if one looks at this product and this
24 mesh, there is more Level I evidence supporting its

Catherine A. Matthews, M.D.

Page 26

1  use than any other incontinence procedure.  So once
2  the medical evidence started to accumulate that gave
3  me confidence in the scientific efficacy, I felt
4  comfortable altering my surgical practice.  But I
5  waited for that information to present itself before
6  changing my surgical paradigm.
7      Q.    Okay.  And you would have put that around
8  the 2004-2005 that the medical evidence began to
9  satisfy your willingness to engage in a new procedure?
10     A.    Correct, I wasn't initially satisfied by
11 the very promising but small case series from the
12 Ulmsten and his colleagues.  I felt that they could
13 potentially be biased.  Who knows if someone has come
14 up with a new idea.  I wanted to make 100 percent sure
15 that other people had vetted this before considering
16 it to be potentially an exciting safe new innovation
17 for stress incontinence treatment.
18     Q.    Okay.  Thank you.
19           Did Virginia Commonwealth University, did
20 they purchase and stock the mesh products themselves?
21     A.    They did.
22     Q.    Okay.  What else was available besides the
23 TVT Gynecare?
24     A.    I don't know to be completely honest.  I do

Page 27

1  know that American Medical Systems at some point
2  started having products on the shelf, and I cannot
3  tell you when that was exactly.  I do know that
4  initially the TVT was on the shelf exclusively.
5      Q.    Okay.  And now, moving to your time
6  July 2007 to June of 2010 as an associate professor,
7  did you continue using Gynecare TVT products for women
8  that you treated surgically?
9      A.    I think that at some point -- at some
10 point, there was a contractual change at VCU, and they
11 got a lower price for a different type of mesh.  And I
12 don't remember if it was a Boston Scientific mesh or
13 it was an AMS mesh, but they were bottom-up approaches
14 that in the technique of insertion of the product it
15 didn't seem dramatically different.
16           I was somewhat concerned that the mesh
17 properties of those slings were different than the
18 initial TVT, but I was told that by the purchasing
19 people that they were similar enough that the price
20 was sig- -- the price differential didn't warrant
21 potential small differences in the mesh properties,
22 and therefore, you know, we were -- they were going to
23 use the different type of product.
24     Q.    Okay.  Did you -- and let's see.  So which

Page 28

1  AMS products would those have been?
2      A.    Whatever their bottom-up sling was, sling
3  is.  I don't now recall the name.  And I could -- I
4  said it's possible it's Boston Scientific.  I don't
5  remember.  I just remember that there was a cheaper
6  competitor that was brought in --
7      Q.    Sure.
8      A.    -- to the institution.
9      Q.    And I have seen in some records mention of
10 AMS, SPARC and Monarc.
11           Does that refresh your recollection, any of
12 those --
13     A.    It definitely was not a SPARC because it
14 was not a top-down sling, and it was not a Monarc
15 because it was not a transobturator technique.  It was
16 definitely a full length retropubic sling that was
17 from a bottom-up approach.
18     Q.    Okay.
19     A.    So it may have been the Boston Scientific
20 sling for all I know.
21     Q.    Okay.  And during that period of time, that
22 those were available, those were the products you
23 used, to the best of your recollection, either an AMS
24 or a SPARC -- excuse me -- either an AMS or a Bard

Page 29

1  product?
2            MR. ROSENBLATT:  Object to form.
3            THE WITNESS:  It was either an AMS or
4      a Boston Scientific.
5  BY MR. TEAGUE:
6      Q.    I'm sorry, that is my fault.
7      A.    But now that you mentioned Bard, it could
8  have been a Bard retropubic sling.
9      Q.    Okay.
10     A.    I just know that it was a full length
11 retropubic sling, and I'm sorry that I can't recall
12 off the top of my head exactly which product it was.
13     Q.    Okay.  No, and that is fine.  And just let
14 me clarify that last question.
15           So at some point, your hospital -- or VCU
16 moved away from Gynecare products to either, and you
17 don't recall which, an AMS, maybe a Bard, maybe a
18 Boston Scientific.
19     A.    For a diff- -- price -- based on a price
20 contracted -- a contracted price that was less.
21     Q.    Okay.  That is fair.  Thank you.
22           And so would I also be correct that since
23 those were available, those were the ones you used?
24     A.    That is correct.

Catherine A. Matthews, M.D.

Page 30

1    Q.    Okay.  And looking next at your -- the next
2    period on your CV is July 2010 to June 2015, and that
3    would have been at the University of North Carolina,
4    correct?
5    A.    That is correct.
6    Q.    Okay.  And did you also -- did you keep
7    both clinical and academic hours at UNC?
8    A.    I did there because I was the division
9    chief of urogynecology.  I had 70 percent of my effort
10   towards clinical activities, again, that included the
11   teaching of medical students, residents and fellows,
12   and then 30 percent of my time was for administration
13   where I was building a division and running a
14   division.
15   Q.    Okay.  And what pelvic mesh products,
16   specifically SUI, did UNC stock?
17   A.    So interestingly, when I got to UNC, I
18   can't remember if TVT Exact was on the shelf or not,
19   but I requested that it be pro- -- that it be made
20   available to me because I had moved to exclusively
21   doing these procedures under local anesthesia and IV
22   sedation.  And based on the properties of the small
23   needle of the TVT Exact and the fact that, again, this
24   mesh had been the most widely studied in all of the --

Page 31

1    in all of the publications around the world, I felt
2    more confident that that was the right sling to use.
3    And so on the basis of that, they, you
4    know, allowed me to use the TVT Exact, much to the
5    chagrin I think of the other companies that had their
6    products on the shelf.
7    Q.    Okay.  Do you recall whose -- which
8    companies' products were on the shelf at that time?
9    A.    AMS and Boston Scientific.
10   Q.    Both for stress urinary incontinence?
11   A.    Correct.
12   Q.    Okay.  And did you use those when those
13   were available, the either AMS or Boston Scientific
14   product?  Or I'll say, or did you use those until the
15   TVT Exact became available?
16   A.    I think that they made the TVT Exact
17   available to me immediately, so I don't recall
18   placing -- I certainly -- I certainly used the Monarc
19   sling for intermittent transobturator slings that I
20   placed, so I wasn't averse to using the AMS product.
21   But for the retropubic sling I felt that the TVT Exact
22   was a better product to use.
23   Q.    Okay.  Are there any differences between
24   the TVT Exact and the TVT Gynecare?

Page 32

1    A.    Yes, two differences.  One that I'm aware
2    of, there possibly are others, the -- one of course is
3    the size of the introducer needle, so they went from
4    being a relatively large size needle to one that was
5    very small.  And again, because I do these under local
6    anesthesia, the amount of pain that a patient
7    experiences when passing the needle, it, you know, to
8    me felt significantly different.  I felt that the
9    bladder perforation might be somewhat lower using a
10   smaller needle.
11   And finally, of course, the TVT Exact I
12   believe was all laser cut edge, but, you know, I know
13   that that is one of the differences in the later
14   meshes, so I believe that that was how the side of the
15   mesh was.
16   Q.    Okay.  Since you mentioned it, to the best
17   of your knowledge, do you know when Gynecare or
18   Ethicon's meshes moved from the mechanical process to
19   the laser cut process?
20   MR. ROSENBLATT:  Object to form.
21   THE WITNESS:  Well, I know that
22   they've always -- they've always made the
23   mechanical cut still available because
24   there was a large cohort of surgeons,

Page 33

1    particularly in Europe, who preferred that
2    based on the premise that you needed to
3    have intercalation of the mesh into the
4    tissue, and having a rougher edge actually
5    facilitated that.
6    I believe that the laser cut edge was
7    made available sometime between 2005 and
8    2007, but I can't give you an exact date.
9    BY MR. TEAGUE:
10   Q.    Okay.  Have you reviewed any of Ethicon's
11   internal documents on anything regarding laser cut
12   versus mechanical cut mesh?
13   A.    I have.  I specifically asked them to
14   provide me with any internal documents so I could
15   ensure that anything that had previously just been
16   internal was known to the rest of us.  So, yes, I
17   have.
18   Q.    Do you recall specifically what you
19   reviewed in that regard, laser cut versus mechanical?
20   A.    I can't tell you who the authors were, but
21   specifically looking at some of the properties under
22   the microscope, once you pulled on the edges, what --
23   you know, if there were any fragments that were found
24   under the microscope.  So I don't know what scientists

Catherine A. Matthews, M.D.

Page 34

1 were working with Ethicon, but I have looked at those
2 documents.
3     Q.    Okay.  Have you seen any of the pictures in
4 Ethicon's file regarding particles that become
5 separated from the larger body of mesh prior to
6 implantation?
7     A.    Yes, I have seen those.
8     Q.    Okay.  What are your opinion of that?
9     A.    I don't believe there is any clinical
10 significance to this finding under a microscope.  You
11 know, to me it looks like a tiny piece of suture that
12 no one would make any kind of drama with leaving a
13 piece of one centimeter suture on a permanent material
14 left in a patient.  So to have a small particle of
15 polypropylene to me was like having a small piece of
16 suture material.  So to me, there is absolutely no
17 clinical significance, and there is no clinical
18 significance that has been outlined in any published
19 literature.
20    Q.    Okay.  Are sutures immune from any type of
21 reaction in the body?
22    A.    I would say that when surgeons use
23 monofilament suture, be it delayed absorbable or
24 permanent, it is certainly true that the suture

Page 35

1 material would elicit some foreign body reaction.  To
2 the extent that a foreign body reaction is a problem
3 for a patient is very limited.  We certainly have
4 experience in pelvic floor reconstructive surgery with
5 patients complaining of pain because of an eroded
6 permanent suture at the vaginal apex that needs to be
7 removed.  We have experienced patients describing
8 dyspareunia after native tissue vaginal reconstruction
9 where they have scar tissue that forms around
10 permanent suture.
11     But these -- to the extent that they are
12 completely immune for patients, no, they are not
13 completely immune.  But when you are trying to achieve
14 a surgical result, it's a necessary part of achieving
15 that surgical result.
16    Q.    Okay.  So you are not ruling out the fact
17 that a particle loss from a vaginally implanted mesh
18 has the potential of a foreign body reaction?
19    A.    I don't believe that there is any
20 difference in the foreign body reaction if there is
21 particle loss or no particle loss.  If the particle is
22 attached to the mesh or it's separated from the mesh,
23 to me, it would induce exactly the same reaction.  So
24 to me, it's a -- it's an argument that has no

Page 36

1 scientific basis whatsoever.
2     Q.    Okay.  Theoretically, is it possible?
3     A.    Not in any respect.  As I just mentioned to
4 you, if you've got a piece of suture material or a
5 piece of -- a particle of mesh, why would -- why would
6 that make any clinical difference to a patient?
7     Q.    I'm asking -- I apologize, but I have to
8 ask you the questions, Doctor.  That is what I'm
9 trying to find out.
10    A.    Yeah, I believe that there is no scientific
11 basis for that claim whatsoever.
12    Q.    Okay.  So mesh in and of itself,
13 polypropylene mesh, can it elicit a foreign body
14 response?
15    A.    Every single permanent implant elicits a
16 foreign body response.
17    Q.    Okay, but that wasn't my question.  Can
18 polypropylene mesh elicit a foreign body response?
19    A.    As far as polypropylene is a permanent
20 material, of course, it can -- of course, it can and
21 will elicit a foreign body response.
22    Q.    Okay.  So that would also be true of any
23 particles that were lost from polypropylene mesh, they
24 have the potential or can cause foreign body

Page 37

1 responses?
2         MR. ROSENBLATT:  Object to form.
3         THE WITNESS:  Sure.  As I said, if
4     the particle is attached to the mesh or
5     detached from the mesh, I would expect it
6     would have the same properties and elicit
7     the same reaction.
8 BY MR. TEAGUE:
9    Q.    Okay.  And I'm sorry, lastly, when you
10 moved to Wake Forest, again, give me just a general
11 description of your clinical time versus your academic
12 time?
13    A.    So I'm a professor that has a joint
14 appointment in urology and OB/GYN.  90 percent of my
15 time is attributed to clinical activities and
16 10 percent to administrative responsibilities.  I'm
17 the codirector of an integrative public health unit.
18 Again, I have the same responsibilities of teaching
19 medical students, residents.  And I am working on an
20 application, we have applied for a fellowship here in
21 female pelvic medicine.
22    Q.    Okay.  How often in your practice -- and
23 I'm limiting it to Wake Forest -- how often do you
24 implant polypropylene mesh for the treatment of stress

Catherine A. Matthews, M.D.

Page 38

1  urinary incontinence?
2      A.    Can you clarify, what do you mean by how
3  often?  On the basis of a week, a month?
4      Q.    Yeah, sure.  Any -- any -- per year, per
5  week, per month, whatever you are comfortable --
6  whatever would be the easiest for you to translate for
7  us.
8      A.    Well, at the moment, I'm still establishing
9  my practice here, so my surgical volume is not yet
10  what it will be, you know, probably six or 12 months
11  from now.
12      Q.    Okay.
13      A.    So I have probably implanted five synthetic
14  slings since I've worked here since December.  But at
15  UNC, if I used that as my comparator that was most
16  recent, I would implant at least two or three slings a
17  week.
18      Q.    And those would be polypropylene retropubic
19  slings?
20      A.    The vast majority.  On occasion, a
21  transobturator sling in a patient who I believe would
22  be at increased risk of a voiding dysfunction or have
23  intraabdominal adhesive disease.  But the vast
24  majority were full length retropubics.

Page 39

1      Q.    Okay.  Have you ever used mesh for the
2  treatment or repair of pelvic organ prolapse?
3      A.    I do, with robotic sacrocolpopexy and for
4  recurrent anterior and apical wall prolapse in a
5  patient who is not a good candidate for
6  sacrocolpopexy.
7      Q.    Okay.  How often do you use -- have you
8  ever used the transvaginal approach for pelvic organ
9  prolapse repairs?
10      A.    Yes, as I just mentioned for recurrent
11  anterior and apical prolapse with someone who is not a
12  candidate for sacrocolpopexy.
13      Q.    Okay.  Do you still use autologous slings
14  for any of your patients who need surgical
15  intervention for stress urinary incontinence?
16      A.    I do, but rarely.  It's rare that a patient
17  will elect that procedure.  We offer it to every
18  single woman who has stress incontinence.  We offer
19  vertical for suspension, autologous vaginal sling and
20  synthetic midurethral slings to every patient.  It's
21  very rare that an individual would choose that.  It is
22  my recommendation to perform a pubovaginal sling in
23  someone, for example, who I believe has got specific
24  risk factors for a mesh-related complication, patients

Page 40

1  who have had radiation therapy, people who have
2  suprapubic underlying pain disorder.  Patients such as
3  those, I might make a specific recommendation that
4  they have a pubovaginal sling.
5      Q.    Okay.  What are the benefits of -- and give
6  me, when you are describing to a patient, what do you
7  describe is the benefits of a pubovaginal sling?
8          And I'm sorry, let me back that up a
9  second.  Would you define for us just so we have it on
10  the record what do you consider a pubovaginal sling?
11      A.    The pubovaginal sling is characteristically
12  an autologous fascial sling that is placed at the
13  bladder neck that is designed to elevate the bladder
14  neck at rest and during stress.  It's a procedure that
15  requires harvesting fascia from either the lateral
16  thigh or the abdominal wall, as cadaveric fascia of
17  the materials is not found to be as good as autologous
18  fascial.
19      Q.    Okay.  Now, using that definition, that
20  procedure, what do you advise your patients are the
21  benefits of that procedure?
22      A.    So the only benefit of that procedure is
23  that there is no -- there is no risk of mesh exposure
24  or erosion.  That is really the only benefit.  And

Page 41

1  that is -- that is evidenced through numerous clinical
2  trials of the best medical evidence.  There is head to
3  head worse subjective and objective outcomes.  There
4  is a higher rate of surgical complications.  There is
5  a much longer recovery time.  There is a much higher
6  rate of voiding dysfunction.  There is a higher rate
7  of pain.
8          So all told, the only difference is that
9  you don't have to deal with a foreign body being
10  present that can have erosion or exposure.
11      Q.    Okay.  And, Doctor, while I certainly
12  appreciate the answer, if you would just for
13  foundation and for some other legal reasons, you kind
14  of jumped ahead to -- I assume some of those were also
15  the risks that were involved in -- or what you would
16  consider negatives involved with that surgery?
17          MR. ROSENBLATT:  Object to form.
18          THE WITNESS:  Correct, the risks.
19  BY MR. TEAGUE:
20      Q.    Okay.  Really, I had only asked for the
21  benefits at that time.  So if you would just kind of
22  slow down a little bit and just stay with me so I can
23  put this together.  Do you understand --
24      A.    Sure.

Catherine A. Matthews, M.D.

Page 42

1    Q.    -- foundationally?  So that the record is
2  clear.
3          Okay.  So I will give you, you know -- am I
4  misquoting here, did you also -- the last few things
5  that you described in terms of there was no mesh
6  erosion, and then you listed some things that I
7  interpreted as being either complications or risks
8  associated with -- with that particular surgery.  Did
9  I understand you correctly?
10   A.    Correct.
11   Q.    Okay.  What about in terms of what other
12 non-mesh procedures, surgical procedures, do you use
13 to treat stress urinary incontinence?
14   A.    So the two others would be the Burch
15 retropubic colposuspension and then paraurethral
16 bulking injections, which I use probably least
17 commonly but certainly there are circumstances when it
18 may be indicated.
19   Q.    Okay.  Now, I'm going to give you a chance
20 to answer both, so just stick with me here on this
21 one.
22          Now, when you are advising a patient on the
23 benefits of a Burch procedure, what do you tell them,
24 typically?

Page 43

1    A.    That, again, they are not at risk for a
2  mesh exposure or erosion.  They are at risk for
3  permanent suture erosion, but they are not at risk for
4  mesh exposure and erosion.
5    Q.    Okay.  What about in terms of efficacy?  I
6  mean, do Burches work?
7    A.    They do, but they don't work better than a
8  midurethral sling, so I can't --
9    Q.    Okay.
10   A.    -- advise the patient that she would have a
11 better outcome.  And certainly, I might -- I might say
12 to her that really according to the results of the
13 randomized trial of Burch versus pubovaginal sling
14 that she is likely to experience worse outcomes than a
15 midurethral sling with a decline in efficacy over
16 time.
17   Q.    Okay.  So that is what I was going to ask
18 you next.  What do you consider the adverse events or
19 complications associated with Burch?
20   A.    So the adverse events, I think that you can
21 cluster into those related to the perioperative period
22 and then of course the longer term outcome.  So in the
23 perioperative --
24   Q.    Okay, sure, let's break that up.  So, yeah,

Page 44

1  I'm sorry, it sounds like you are already doing that.
2          So give me the perioperative period first.
3    A.    So perioperatively, because they -- the
4  vast majority of women still have an abdominal
5  incision, and with the abdominal incision they are the
6  risks of wound-related complications.  Bowel injury at
7  the time of surgery is at highest 3 percent.
8          Bladder injury ureteral kinking, bleeding
9  from the retropubic space, urinary tract infection,
10 post-operative voiding dysfunction, length of stay in
11 the hospital, need for catheter use, are all
12 relatively significant for patients undergoing Burch
13 and higher than for a midurethral sling.
14          And then post-operatively in the delayed
15 prolonged post-operative period, a decline in efficacy
16 over time has been evident and very clearly evident in
17 several studies.
18          And then, of course, the development of
19 pelvic organ prolapse is a consequence of deviating
20 the anterior vaginal wall, which is a significant
21 post-surgical complication that in many women requires
22 a fairly complicated surgical intervention.
23   Q.    Okay.  When you are describing periurethral
24 bulking to a patient, what did you describe as the

Page 45

1  benefits?
2    A.    The primary benefit is it can be done in
3  the office under a local anesthetic.
4    Q.    Okay.
5    A.    The risks of voiding dysfunction are
6  relatively low, but unfortunately, the efficacy is low
7  and declines over time very predictably.
8    Q.    Okay.  Just for the record, for the jury,
9  for anyone else who may look at this down the road,
10 periurethral bulking is not a surgical procedure per
11 se, is it?
12   A.    Well, I believe that any time I'm doing
13 something invasive to a patient, it's considered a
14 surgical procedure.  If a woman -- you know, if your
15 wife is having a needle stuck around her urethra and
16 something injected, I would imagine that you would
17 consider it to be a surgery.
18   Q.    Okay.
19   A.    It doesn't involve suture material.  It
20 doesn't involve -- involves a foreign body.  But
21 it's -- doesn't involve mesh material.  But it is a
22 surgical intervention.
23   Q.    What foreign body does it involve?
24   A.    Well, it depends on what you are injecting,

Catherine A. Matthews, M.D.

Page 46

1  so --
2      Q.    Give me some examples.
3      A.    Calcium, the Macroplastique beads, I can't
4  remember exactly what is -- what the makeup is of
5  those, but it's certainly a foreign body.
6      Q.    Okay.  Do you ever use periurethral bulking
7  as a say first step in the treatment -- or give me an
8  idea, what would be your sort of least invasive to
9  most invasive list of things that you would offer a
10  stress urinary incontinence patient?
11      A.    Well, least invasive is pelvic floor
12  physical therapy, followed by an incontinence pessary,
13  and so those two options are offered to every single
14  patient.
15      Q.    Okay.  Can I just stop you right there?
16  Are there any -- are there any adverse events
17  associated with pelvic floor therapy?
18      A.    Your pocketbook, if you want to pay money
19  for something.
20      Q.    Okay.  Other than -- but you have to pay
21  money for all of these procedures, correct?
22      A.    That is correct.  But if you look at the
23  randomized trial that was published in the New England
24  Journal of Medicine that looked at women who were

Page 47

1  randomized to physical therapy versus having a sling,
2  the crossover rate from the PT group to the sling
3  group was very high, so basically, saying that in
4  people that have significant stress incontinence,
5  they're going to go on to need sling, and that's the
6  far preferred intervention.  So actually it ends up
7  being cheaper just to do a sling on the front end
8  because the vast majority of people who actually have
9  physical therapy go on to need the surgery anyway.
10      Q.    Did that -- did that study factor in the
11  cost of women who have slings and then need erosion --
12  or subsequent intervention to treat, pick your topic,
13  erosions, pelvic pain, anything else along those
14  lines?
15      A.    Well, the study wasn't designed as a cost
16  effective analysis.  I'm just pointing out that
17  rationally if a large percentage of patients have to
18  have duplicate procedures, it's very likely that the
19  costs incurred are going to be higher.  And certainly,
20  in that trial, they reported on all the complications
21  that were endured by patients who underwent the sling,
22  and it's certainly true that as I started out by
23  saying physical therapy is the least invasive and has
24  no complications associated with it.

Page 48

1      Q.    So just so I'm clear, a woman that has a
2  retropubic sling, for instance, and then later for
3  whatever reason has complications arising therefrom,
4  she will also endure the additional cost associated
5  with the treatment for that procedure as well?
6      A.    Sure.
7      Q.    Okay.  And in terms of your role as a
8  physician, would the -- I mean, how often do you
9  actually look at the economic consequences of the
10  procedure itself?  In other words, do you advise or
11  not advise a patient to do something based on price
12  alone?
13      A.    I absolutely don't advise based on price
14  alone, but I am sensitive to women who have
15  significant economic restrictions.  So, you know, for
16  example, a patient that is paying -- would pay for
17  everything out of pocket, I would never recommend a
18  pubovaginal sling or a Burch procedure because they
19  are going to need to be in the hospital, and that is
20  the thing that has the majority of expense.  So even
21  while the implant itself is more expensive, the
22  perioperative expenses may be significantly lower.
23          But I think that the biggest thing that
24  motivates me when talking to a patient is the degree

Page 49

1  of their symptom bother and the likelihood that my
2  intervention, whatever I recommend, is going to work
3  for them.
4      Q.    Okay.  At Wake Forest, how much does a
5  typical retropubic sling implant cost to a patient --
6  or well, without getting into, you know, insurance
7  versus not insurance, what is the typical price of
8  that surgical procedure?
9      A.    So the -- the sling itself does vary
10  according to its if contracted or not, but anywhere
11  between 700 and a thousand dollars.
12      Q.    Okay.  And then there would also be the
13  surgeon's time, correct?
14      A.    Correct, I would hope that I would get
15  paid --
16      Q.    Yeah.
17      A.    -- for what we're doing.
18      Q.    I mean, certainly, no one is working for
19  free at a hospital, correct, other than the candy
20  stripers I guess if that still exists?
21      A.    Right.
22      Q.    So do you have a -- do you know the figure
23  all in, hospital stay, even if it's, you know,
24  30-minute non-invasive, let's say for retropubic

Catherine A. Matthews, M.D.

Page 50

1 slings, between the hospital cost, the mesh cost, the
2 surgeon cost, nurses, anesthesia, anything else that
3 may be involved?  What I'm asking is do you know what
4 the total overall price of that all in would be?
5    A.    I don't know Wake Forest because I've only
6 been there since the end of November, but I can tell
7 at UNC that it was around $4500.
8    Q.    Okay.  Thank you.
9         Doctor, for Exhibit -- I'm sorry --
10 Exhibit 2, your expert report, did you write that
11 entire report yourself?
12    A.    I did.
13    Q.    Did you have anyone else help you with that
14 report?
15    A.    Butler Snow sent me a list of all of the
16 items that they wanted me to cover, so I had a
17 quote/unquote outline.  But the contents -- other than
18 the outline, nothing else -- nothing else was provided
19 to influence writing of the report.
20    Q.    Sure.
21    A.    And I obviously, communicated with them
22 to -- with a long list of potential references to send
23 me, a digital library and a hard copy library of the
24 articles.

Page 51

1    Q.    What was the purpose of having them submit
2 you the articles?
3    A.    Just because I have -- you know, I have
4 these articles from doing literature reviews
5 throughout my academic career, and it takes time to
6 collate them into one place.  And so instead of having
7 to pull all of these articles from my office from
8 multiple different folders, it was easier just to have
9 them send me one binder that had everything neatly
10 organized.
11    Q.    Okay.  Do you know -- have you submitted
12 total hours tabulation for the time it took you to
13 review, research, and write this report?
14    A.    I did.
15    Q.    And how much time have you invested so far?
16    A.    25 hours for the writing of the report, and
17 then there were I think maybe four additional hours
18 for this -- the specific report on Phelps.  And I'm
19 recalling that by memory.  I believe it's correct.
20 But certainly, we can send you copies of bills that I
21 submitted.
22    Q.    Okay.  Would that -- would the 25 and --
23 hours and the four hours you just referenced, would
24 that include any background research or case-specific

Page 52

1 medical file research that you did?
2    A.    What do you mean background research?
3    Q.    In other words -- well, let's say for the
4 four hours -- and I don't want to mix them up too much
5 here -- but for the case specific, did you actually
6 review her medical records?
7    A.    Yes, and so that was -- so the four hours
8 was spent just writing the report.  There were -- I
9 spent additional hours, I think maybe -- contrary, it
10 was six hours maybe reviewing all of these two big
11 binders of medical records and depositions.  So
12 absolutely I reviewed the notes from her care.
13    Q.    And that is the same question I have for
14 the 25 hours for the general work, does that
15 include -- is that just the writing of the report, or
16 would that be review of literature that you needed to
17 refresh your recollection on some things?  And I am
18 just giving you examples.  In other words, was that
19 just strictly the writing of the report or was that
20 all in 25 hours?
21    A.    All in 25 hours.  I mean, it took -- it
22 took -- a lot of that 25 was reviewing individual
23 papers to craft the arguments that I felt were
24 necessary to make.  And because there's so much robust

Page 53

1 evidence in favor of midurethral slings, there is a
2 lot of information to go through.
3    Q.    Okay.
4         MR. TEAGUE:  We've been going a
5 little over an hour.  Is everybody still
6 good?
7         (Off the record.)
8         MR. TEAGUE:  Okay.  Sure.  Are you
9 all -- yeah, we'll go off the record for a
10 minute.
11         THE VIDEOGRAPHER:  I've got
12 25 minutes left.  I could stop this now and
13 start a new one or just go ahead.  I can
14 just end this one.
15         MR. TEAGUE:  Okay.
16         THE VIDEOGRAPHER:  This is the end of
17 Videotape No. 1 in the deposition of
18 Catherine Matthews, MD.  The time is
19 11:35 a.m.  We are off the record.
20         (Recess taken.)
21         THE VIDEOGRAPHER:  We are back on the
22 record.  This is the beginning of Videotape
23 No. 2 in the videotape deposition of
24 Catherine Matthews, MD.  The time is

Catherine A. Matthews, M.D.

Page 54

1    11.40 a.m.
2    BY MR. TEAGUE:
3        Q.    Dr. Matthews, did you have anyone else --
4    and again, I'm referring to Exhibit 2, your expert
5    report -- did you have anyone -- any non-lawyers
6    assist you in either the research or drafting of your
7    report?
8        A.    No, it took one very long, painful weekend.
9        Q.    Okay.  And you were paid for your time,
10   correct?
11       A.    Of course.
12       Q.    And you were paid at the rates that you
13   disclosed in your -- in your report?
14       A.    That is correct.
15       Q.    Okay.  Remind me again, Doctor, you may
16   have discussed this I think prior before.  But did you
17   have a list of either topics or -- let's just use that
18   word -- did you have a list of topics that you
19   provided to Ethicon in terms of things that you wanted
20   internal documents for?
21       A.    Yes.  I asked them about materials that
22   they submitted to the FDA and about studies that they
23   had done internally.  My greatest fear was that there
24   was some internal -- you know, I said for me my -- the

Page 55

1    company's obligation is that they truthfully provide
2    information that is internal to physicians, and I
3    wanted to make sure that there was no hidden
4    information that was not available to us that would
5    surprise me.
6        Q.    Okay.  Were you provided any Ethicon
7    records from the medical -- from the R&D file, or
8    research and development file?
9        A.    I can't recall exactly what records from
10   what file were provided.  But my general request was
11   to provide me with their research information and what
12   had been submitted to the FDA, and that is what I
13   reviewed.
14       Q.    Okay.  Did you have, for lack of a better
15   word, unfettered access to review their files on your
16   own?
17       A.    I didn't have an interest in reviewing all
18   of their files.  I didn't have the time.  I asked Paul
19   to provide me with what I had asked, and he was
20   willing to give me whatever I asked him to provide me.
21       Q.    Sure.  And certainly, I am not implying
22   anything negative about counsel here.  But how do you
23   know as a physician, how do you know Ethicon didn't
24   cull or edit what they gave to either your counsel or

Page 56

1    to you to review?
2        A.    I have no idea if they did.  I made a
3    request, and I got a reply, and that is all I can tell
4    you here today.
5            MR. ROSENBLATT:  We'll give her all
6        25 million documents next time.
7            MR. TEAGUE:  Do I have all 25 million
8        yet?
9    BY MR. TEAGUE:
10       Q.    Let's see.  Did you receive in the doc- --
11   strike that.
12           In the documents that you received from
13   Ethicon, did you have any MAUDE or adverse event
14   databases provided?
15       A.    I didn't get that from them.  I've
16   obviously -- as a board member for AUGS, we were fully
17   aware of the MAUDE database and data from that in
18   drafting the AUGS position statement on midurethral
19   slings, and so that was information that was known to
20   me well beforehand.
21       Q.    Okay.  As a clinical physician, do you have
22   hotlines or numbers that you can call for -- and I
23   will use Ethicon for now -- that you can call Ethicon
24   and ask their medical affairs team questions?

Page 57

1        A.    I don't off the back of my -- of the -- you
2    know, I don't off the top of my head know of a number.
3    But with a smartphone I'm imagining I could get
4    hold --
5        Q.    Right.
6        A.    -- of someone pretty quickly if I needed
7    to.
8        Q.    Well, let me ask you this:  In your
9    clinical practice, have you ever contacted a -- and
10   I'm not limiting it to mesh -- but have you ever
11   contacted a medical device manufacturer to ask them
12   specific questions about use, complications,
13   indications, anything along those lines?
14       A.    I would never rely on a company to provide
15   that information to me.  I have actually written a
16   very scathing article about this very point of not
17   relying -- you know, there have been some catastrophic
18   outcomes where people have relied on purely on
19   industry to provide them information, because that is
20   not the avenue of training that is accepted and
21   appropriate.  We in the medical field have to rely on
22   unbiased information from our medical training and
23   then to get appropriate training from colleagues if
24   you didn't learn that stuff when you were a trainee.

Catherine A. Matthews, M.D.

Page 58

1       So, you know, I -- I cannot tell you an
2  example where I've relied on a company to provide me
3  information.  If I needed information about a specific
4  product, I would call a colleague who had used it who
5  I respected and ask them their opinion and have them
6  walk me through any specifics of something.
7       Q.    Okay.  Are you aware, Doctor, that
8  Gynecare, Ethicon and Johnson & Johnson make more than
9  just retropubic slings?
10      A.    Sure.
11      Q.    Okay.  They also make polypropylene mesh
12  products intended for use in pelvic organ prolapse,
13  correct?
14      A.    They do that, and I believe they also make
15  it for hernia use.
16      Q.    Okay.  And they also make transobturator
17  slings, correct?
18      A.    Correct.
19      Q.    Doctor, what is your understanding of the
20  510K process?
21      A.    So a predicate process by which devices can
22  be approved without premarket clinical studies on the
23  basis of similar -- similarity to an existing product
24  that is approved.

Page 59

1       Q.    Okay.  And was -- to the best of your
2  knowledge, was the Gynecare TVT introduced that way to
3  the U.S. market?
4       A.    It was.
5       Q.    Okay.  And you said without preclinical
6  studies?
7       A.    Correct.
8       Q.    Okay.  Tell us what you mean by that.
9       A.    So a preclinical study would be a --
10  usually a randomized trial or a significant
11  prospective case series of collecting information,
12  publishing it and then getting it submitted on the
13  basis of those reports.  So typically, yeah, it would
14  require evidence -- like a pharmaceutical trial of a
15  new drug, they require documented efficacy and side
16  effect evaluation before something is approved.
17      Q.    Okay.  So Ethicon or Johnson & Johnson did
18  not have to go through that process for the Gynecare
19  TVT sling?  In other words, they did not have to do
20  clinical trials prior to approval, correct?
21      A.    They didn't have to, yet trials were done.
22      Q.    By Ethicon?
23      A.    By people that both affiliated with Ethicon
24  and those that were not affiliated with Ethicon.  So

Page 60

1  it was, obviously, approved in Europe -- or
2  manufactured and used in Europe before it was approved
3  in the United States, and studies were conducted, both
4  studies that were supported by Ethicon and then others
5  that were not.
6       Q.    Which studies did Ethicon support, to the
7  best of your knowledge?
8       A.    Well, Ulmsten, of course, had a close
9  relationship with Ethicon.  You know, he was trying to
10  find support for something that he believed was an
11  innovative solution to a very common problem.  And
12  there was a partnership between him and Ethicon in
13  the -- both the design and the production of the
14  product.  You know, he originally developed the six
15  intravaginal sling plasty, and that was modified to
16  some degree by Ethicon to produce what we now know as
17  the TVT retropubic sling.
18      Q.    Was Ulmsten an Ethicon employee to the best
19  of your knowledge?
20      A.    I don't know if he was an employee.  He
21  certainly had contractual relationships with Ethicon
22  and was paid by them.  He was paid by them both for
23  royalties of the device and then for publication data.
24      Q.    Okay.  Do you consider -- have you -- or

Page 61

1  how in your mind would you rule in or rule out the
2  possibility of bias, what you discussed earlier, in
3  that relationship?
4       A.    Yes.  I think that it's very fair to say is
5  there bias, and I believe that any individual that has
6  significant financial remuneration can have
7  significant bias.  And that is why I want us to look
8  at independent observers who did not have those
9  financial relationships to see if their results were
10  the same, both in terms of efficacy and in terms of
11  complications.  And it's exactly why I didn't jump on
12  the bandwagon early on but waited until other people
13  could corroborate those initial very positive results.
14      Q.    Okay.  You would agree with me that Ulmsten
15  would directly benefit financially from the adoption
16  of his process and use in commercial sales in the
17  United States or Europe?
18      A.    For sure.
19      Q.    Okay.
20      A.    I think that to some degree someone who
21  came up with a brilliant new design, he deserved to
22  be -- to not have all the credit go to just a company.
23  I think that physicians have not been able to
24  necessarily partner in a beneficial way always.  You

Catherine A. Matthews, M.D.

Page 62

1 know, they may come up with some brilliant idea, and
2 then a company basically snatches it up. And he
3 seemed to manage to structure things so that he really
4 would benefit.
5    Q.   Okay. Have you reviewed the contract
6 between him and Ethicon?
7    A.   I have.
8    Q.   Okay. Do you know how much -- do you know
9 any financial figures, what he benefited financially
10 from Ethicon's sale of TVT devices?
11    A.   It was over a million dollars. I don't
12 know to what extent it was over a million, but it was
13 definitely over a million dollars.
14    Q.   Okay. Do you know how much money to date
15 in any form, whether it be, you know, including
16 manufacturing costs, excluding manufacturing costs, do
17 you know how much -- have you looked at or have you
18 determined how much money Ethicon has made from the
19 sale of their TVT devices alone?
20    A.   I don't know, but if there have been 3 --
21 more than 3 million slings implanted, and you multiply
22 that by a thousand dollars a sling, then, you know,
23 you come up with a large number.
24    Q.   Okay.

Page 63

1    A.   I certainly know that no sale, no profit
2 will be able to pay for the costs of litigation that
3 have been set aside as -- with the example of AMS.
4 It's very clearly apparent that the billions of
5 dollars that have gone towards litigation certainly
6 far outnumber any profits they would have made.
7    Q.   Doctor, with all due respect, I'm going to
8 move to strike that entire response from the record
9 because that is not what I asked you, was it? Did I
10 ask you what the financial incurrence --
11    A.   You asked me what money they could -- you
12 asked me what money they made --
13    Q.   I asked --
14    A.   -- and so in the --
15    Q.   No, Doctor, what I asked you was are you
16 aware --
17       MR. ROSENBLATT: She -- let --
18       MR. TEAGUE: No, I'm not because --
19       MR. ROSENBLATT: -- let her finish
20    answering the question.
21       MR. TEAGUE: No, she is not answering
22    the question. She is speaking without a
23    question on the table.
24 BY MR. TEAGUE:

Page 64

1    Q.   What I asked you, Doctor, was -- and I'm
2 just asking you -- do you know what Ethicon -- do you
3 have any idea what their -- what their sales have been
4 of the Gynecare product? I didn't ask you about AMS
5 at all.
6       MR. ROSENBLATT: Objection, asked and
7    answered.
8 BY MR. TEAGUE:
9    Q.   Okay. So -- well, let me ask it again.
10 And let me specifically say, Doctor, without bringing
11 in AMS that I didn't ask you about at all, I'm just
12 asking a simple question. Do you know how much
13 money -- and you may not know, I'm just asking you --
14 do you have any idea how profitable or how much money
15 Gynecare, Ethicon, TV- -- J&J make from the sales of
16 their TVT product?
17       MR. ROSENBLATT: Object to form,
18    asked and answered.
19       THE WITNESS: I can tell you on the
20    basis of more than 3 million slings
21    implanted, based on whatever percentage
22    Ethicon has, it's a large figure if you
23    multiply that by a thousand dollars a sling
24    implant.

Page 65

1 BY MR. TEAGUE:
2    Q.   Okay. That is fair.
3    A.   Can I ask that you not raise your voice to
4 me if you have an objection about something?
5    Q.   Yeah. If I did, I apologize. But can I
6 ask that you not dovetail answers that are
7 unresponsive into your responses to my very direct
8 questions?
9       MR. ROSENBLATT: Matt, she -- she is
10    going to answer the way she feels is
11    appropriate and accurate, and if you don't
12    like it, I'm sorry, but she is going to
13    answer --
14       MR. TEAGUE: That is fine.
15       MR. ROSENBLATT: -- how she feels is
16    best to respond.
17       MR. TEAGUE: That is fine. I will
18    continue just to strike it on the record.
19 BY MR. TEAGUE:
20    Q.   Doctor, has any Ethicon polypropylene mesh
21 product ever been removed from the market?
22    A.   Removed in what respect?
23    Q.   How do you understand that question?
24       MR. ROSENBLATT: Object to form. Are

Catherine A. Matthews, M.D.

Page 66

1 you talking about the FDA or are you
2 talking about --
3 MR. TEAGUE: No, I'm not answering
4 questions on the record. I will --
5 THE WITNESS: I'm asking you to
6 clarify because I don't know what you mean
7 by "removed."
8 BY MR. TEAGUE:
9 Q. That is fine. That is fair.
10 Doctor, are you aware of Ethicon taking any
11 of its own polypropylene mesh products off the market?
12 A. Yes, I'm aware of them re- -- well, no
13 longer manufacturing and no longer selling the Prolift
14 vaginal mesh insert. To what extent it was removed, I
15 don't know if it was removed. It was -- the
16 manufacturing ceased, and it's no longer available for
17 implantation.
18 Q. What is your understanding of why that took
19 place? Why was the Prolift taken off the market?
20 A. I don't have -- I don't -- I have never
21 placed one, and I am not here to provide evidence
22 about vaginal mesh. And so I'm not rendering an
23 opinion about that.
24 MR. ROSENBLATT: Yeah, I'm just going

Page 67

1 to object to form to outside the scope.
2 BY MR. TEAGUE:
3 Q. You are not here to give an opinion about
4 vaginal mesh?
5 A. I am not here to give an opinion about
6 vaginal mesh for use in prolapse repair.
7 Q. Okay. That is fine.
8 Doctor, are there any other products that
9 you can think of that Ethicon has taken off of the
10 market, or stopped manufacturing to use your words?
11 A. I am not aware of any. I am -- there may
12 well be. I'm not aware of any.
13 Q. Okay. Do you know if the Prolift was
14 introduced via the 510K process?
15 MR. ROSENBLATT: Object to form,
16 outside the scope.
17 THE WITNESS: I'm aware that all
18 vaginal meshes have been introduced through
19 the 510K process.
20 BY MR. TEAGUE:
21 Q. That would be true for every product,
22 Ethicon has manufactured for the use included for --
23 that includes polypropylene mesh?
24 A. That is correct.

Page 68

1 Q. So, Doctor, it's fair to say that sometimes
2 mesh products introduced through the 510K process are
3 later removed from the market for whatever reason?
4 A. Sure.
5 Q. Would safety, efficacy be involved in that
6 decision?
7 A. I cannot comment on what the decision
8 was -- that Ethicon made. That was not my decision to
9 make, and I have no idea what they considered in
10 making that decision.
11 Q. Is the TVT Secur still on the market?
12 A. I don't believe so. I never have placed
13 one of those either, so I am -- I am not aware if it's
14 still available. If you tell me it's not available, I
15 wouldn't be surprised.
16 Q. No, I'm just asking if you know one way or
17 the other.
18 A. I don't.
19 Q. Okay. Doctor, have you ever advised or
20 consulted a product or pharmaceutical manufacturing
21 company on the 510K process?
22 A. No.
23 Q. Okay. Do you have any involvement in the
24 510K process other than review of records?

Page 69

1 A. No.
2 Q. Doctor, have you ever advised or consulted
3 a company -- and don't let my terms limit you -- have
4 you ever had any involvement with any pharmaceutical
5 or product device manufacturer in obtaining clearance
6 through the FDA through a process other than the 510K?
7 A. I was involved with a company called
8 Pelvalon in the manufacture of an intravaginal device
9 for fecal incontinence that was introduced through the
10 FDA in a non-510K process.
11 Q. Is that -- has that product gone to the
12 market in the United States?
13 A. It's been FDA approved, and it's currently
14 in production to become commercially available.
15 Q. When was that FDA approved?
16 A. Last year.
17 Q. What was your role in the process?
18 A. I was one of the principal investigators
19 for the evaluation of the efficacy of the device, and
20 I now serve as a consultant on their advisory board.
21 Q. Speaking of which, so you just -- and what
22 was the name of that company, I apologize?
23 A. Pelvalon.
24 Q. Pelvalon. So excluding Pelvalon, what

Catherine A. Matthews, M.D.

Page 70

1 other -- well, let's start with this: What other mesh
2 manufacturers have you worked with?
3     A.    I worked with AMS in trying to develop a
4 better Y-mesh for abdominal sacrocolpopexy, and that
5 is the only company that I've worked with in terms of
6 any product development.
7     Q.    And just for the jury or anyone else that
8 watches this who may not have an understanding of
9 medical literature -- or sorry -- medical procedure,
10 what is the Y-mesh used for?
11     A.    It's used for abdominal sacrocolpopexy for
12 apical prolapse.
13     Q.    And in a nutshell, how does that differ
14 from say the implant of a transvaginal approach for
15 addressing the same problem?
16     A.    So it's introduced abdominally, not
17 vaginally.
18     Q.    Okay.
19     A.    It was not included in part of the warnings
20 from the FDA in either 2010 or 2011.
21     Q.    To the best of your knowledge, Doctor, when
22 was the Gynecare TVT product introduced to the U.S.
23 market, in terms of the year?
24     A.    I think it was 1998, but I could -- I could

Page 71

1 be wrong about that. But late 1990s.
2     Q.    Okay. And at that time, were you in med
3 school, or were you a resident already?
4     A.    I was a resident.
5     Q.    During your residency, did you write any
6 papers or evaluate the Gynecare TVT product or 510K
7 process?
8     A.    No.
9     Q.    Okay. Have you ever worked for the FDA in
10 any capacity?
11     A.    No.
12     Q.    Have you ever been on an FDA advisory
13 committee?
14     A.    No.
15     Q.    Have you ever assisted a pharmaceutical or
16 medical device company in the production of -- I'm
17 going to use the term loosely -- literature or
18 labeling for benefits, indications, contraindications
19 for their product?
20     A.    No.
21     Q.    Okay. And that would be the same for the
22 fecal incontinence device that you discussed earlier?
23     A.    Correct.
24     Q.    Okay. Who is responsible, to the best of

Page 72

1 your knowledge, in the fecal incontinence device, who
2 is responsible for producing that information?
3     A.    I believe that in terms of the FDA, there
4 are FDA requirements as to the company in terms of
5 constructions for use and generally accepted
6 complications from the device.
7     Q.    Okay. And that would be true -- or do you
8 have any reason to believe that requirement wouldn't
9 be true in the sense of the Gynecare TVT, that the
10 responsibility would be Ethicon's and Johnson &
11 Johnson's to at least form the basis -- or strike
12 that. Strike that. That was a bad question.
13         Do you have any reason to believe that the
14 same obligation doesn't run to Ethicon for the
15 Gynecare TVT in terms of the IFU?
16         MR. ROSENBLATT: Object to form.
17         THE WITNESS: Every company has the
18     same set of requirements that are produced
19     by the FDA.
20 BY MR. TEAGUE:
21     Q.    Okay. Do you, as a clinical physician, do
22 you -- is it your belief -- or strike that.
23         As a clinical physician, do you believe
24 there is anybody in a better position to know the

Page 73

1 indications, contraindications, risk and benefit of a
2 product than the manufacturer itself?
3     A.    100 percent I believe that there are people
4 that are better equipped to know those.
5     Q.    Okay. Give me some examples, if you would.
6     A.    Companies are not in the business of taking
7 care of patients. They don't see patients in
8 follow-up in every office across the country. They
9 don't -- they are not there as implanting surgeons.
10 They certainly have material scientists that work for
11 them, but they are not -- they are not available to --
12 to see the patients or do the surgery.
13         So I would say that surgeons are the ones
14 who are most equipped to evaluate and report on
15 outcomes of an intervention.
16     Q.    Okay. In terms of legal status, just to
17 use a term loosely, are you required -- does -- is
18 that the way the -- does the FDA place responsibility
19 upon the surgeons or the manufacturers to know
20 information about that product?
21         MR. ROSENBLATT: Object to form.
22         THE WITNESS: Certainly, the FDA puts
23     responsibility on the manufacturer in the
24     IFU to detail any -- the generalities of

Catherine A. Matthews, M.D.

Page 74

1  any specifics of their particular
2  procedure, and they require them to
3  disclose the reasonable accepted risks of
4  the procedure.
5  BY MR. TEAGUE:
6  Q.  Okay.  Doctor, have you ever, in a clinical
7  setting, treated a patient for a mesh complication?
8  And I will break that down more later, but just right
9  now for a global term.  Have you ever treated a
10  patient for something you believe was a mesh
11  complication?
12  A.  Sure.
13  Q.  Okay.  If you would, just kind of give me
14  some general examples.
15  A.  I have treated patients for mesh exposure.
16  I have treated patients for voiding dysfunction.  I
17  have treated patients for dyspareunia.  I've treated
18  patients for groin pain.  I have treated patients for
19  thigh pain.  I've treated patients for retropubic
20  pain.  I have treated three patients with bladder
21  erosion of mesh, and I have treated two with urethra
22  erosion of mesh.  Not from people that I implanted the
23  mesh on but who were referred into my practice.
24  Q.  Okay.

Page 75

1  A.  Those are, I think, some general -- general
2  things.
3  Q.  Okay.  Were those -- and I'm sorry -- were
4  those limited to -- is that all mesh, or is that
5  limited to SUI TV -- I'm sorry -- to SUI related mesh
6  products?
7  A.  All mesh.
8  Q.  All mesh.  Okay.
9  What problems have you personally treated
10  for stress urinary incontinence polypropylene
11  implants?
12  A.  Mesh exposure, mesh erosion, voiding
13  dysfunction, pain.  Those are the predominant things
14  that I can recall.
15  Q.  Were any of those patients where you had
16  done the actual implant?
17  A.  A few of them, yes.  I can probably quote a
18  .5 to 1 percent rate of mesh exposure in the vagina
19  for patients that I have implanted the sling, so in my
20  career I think I've removed two -- treated two of my
21  personal patients for mesh exposure in the vagina.  I
22  have not personally had to treat a patient of mine
23  whom I implanted the sling for bladder injury, urethra
24  injury or bowel injury.  I treated one patient who had

Page 76

1  groin pain following a transobturator sling.  And I've
2  treated one who had retropubic pain after a TVT.  And
3  both of those patients resolved their pain with
4  medical management and physical therapy without
5  explant of the sling.
6  Q.  Okay.  While we are on that subject, have
7  you ever performed a follow-up surgery to an SUI
8  polypropylene device?
9  A.  Yes.
10  Q.  Okay.  And if you would, give me just some
11  examples of -- or what types of surgeries have you
12  performed to correct a complication from a stress
13  urinary incontinence polypropylene implant?
14  A.  So I have done sling release for
15  postoperative voiding dysfunction, two of my personal
16  patients that I can recall over the years.  I have
17  removed mesh, suburethral mesh that was not exposed
18  but patients had pain with intercourse, and there was
19  a palpable band across the vaginal fornix that I
20  believed was responsible for their pain, and these
21  were people who had transobturator slings.  I have
22  taken -- I have taken -- done bladder mesh removal in
23  three or four patients.  And I have taken mesh out of
24  the urethra twice.

Page 77

1  Q.  Okay.  Without being insensitive, Doctor,
2  did you consider or was it your medical opinion that
3  you had placed the slings wrong in those instances?
4  A.  Even those cases that I had placed, as I
5  told you before, I'd only had two cases where I placed
6  where the mesh was --
7  Q.  And I'm sorry, you are right, and I asked
8  the question poorly.
9  In the cases that you were the implanting
10  physician and there was later a complication, did you
11  consider that -- did you make a determination as to
12  whether it was an implanter error, in other words your
13  fault, or whether it was something to do with the
14  mesh?
15  A.  In both cases of voiding dysfunction, I
16  absolutely believed it was my error that the sling was
17  placed with too much tension at the time of surgery,
18  and as soon as it was released, there were no further
19  problems.  In the patients with mesh exposure, I don't
20  think it was my implanting error because I do it the
21  same technique every time.  But both patients were
22  smokers, which is a known independent risk factor, so
23  I believe that the interaction between the material
24  and the host was what likely created the -- the

Catherine A. Matthews, M.D.

1 exposure.
2    Q.    Has Ethicon or Gynecare or Johnson &
3 Johnson ever contraindicated any of their mesh sling
4 products for smokers?
5    A.    They have not, and I think that it's fair
6 to say that I wouldn't want the exclusion in smokers
7 because, again, it's a decision that is made between
8 the patient and the implanting surgeon.  And a
9 discussion is held with them that they have an
10 increased risk, and if they are willing to proceed
11 with the procedure because they are very bothered by
12 their stress incontinence, they -- again, each patient
13 has the choice of choosing a pubovaginal sling, a
14 Burch or a midurethral sling, and if it's their choice
15 that they want to proceed knowing that they have a
16 higher risk, that is their decision to make.
17    Q.    Okay.  And would you allow them to make
18 that decision even knowing that they're a current
19 smoker -- I'm sorry.
20          Knowing that they are a current smoker, if
21 that is their decision after informed consent, you'll
22 still implant it?
23    A.    Absolutely, because even in smokers the
24 risks for mesh exposure have never been documented to

1 be astronomically high.  We are not talking about a
2 50 percent erosion rate.  We are not talking about
3 even a 20 percent erosion rate.  It's higher than the
4 published 2 to 3 percent rate of exposure.
5    Q.    Okay.  On the two surgeries where you were
6 the original implanting surgeon and there were later
7 complications that you also addressed yourself, did
8 you implant the sling in accordance with the
9 instructions for use that Ethicon produces?
10    A.    I did.  And, you know, as a teaching
11 physician, when I am training someone, I don't know if
12 when I am asking a trainee to, you know, pull up on
13 the sling with the plastic sheaths attached, if it was
14 slightly tighter than I might have placed it.  You
15 know, I don't know what the variables are.  But, yes,
16 you know, I've placed it according to the instructions
17 for use, both -- placed it according to the technique
18 in which I was taught how to do it and then of course
19 following the general guidelines provided.
20    Q.    Okay.  So yeah, in addition to the training
21 you received in Europe, you have consulted the IFU
22 prior to the first time you implanted a Gynecare,
23 Ethicon, Johnson & Johnson device?
24    A.    You know, I really and truly cannot tell

1 you if I -- you know, the thing comes in the box, and
2 looking through this, I don't know if I can recall
3 back in 2003, of whenever it was, 2004, looking at it.
4 I'm familiar with what it is.
5    Q.    Okay.
6    A.    I would never rely on a piece of paper in a
7 box provided by a company to teach me as the
8 implanting surgeon how to do this.  Maybe that is
9 arrogance, but I feel like it's my responsibility to
10 not rely on something that is provided by a company to
11 do a surgery.
12    Q.    Okay.  Do you not take into account the
13 fact that, you know, Dr. Ulmsten and others who have
14 been involved with Ethicon might have had -- may have
15 had a role where their knowledge might have been
16 transferred to Ethicon in the production of the IFU?
17    A.    They absolutely I hope would have done
18 that.  But I would hope that I would go to the medical
19 literature as the prime resource and understand from
20 that medical literature what this is.  In the paradigm
21 of traditional medical education one relies on
22 textbooks and people that are training you in your
23 training program and published medical articles that
24 are not implements by industry to tell you how to do

1 something.  Going to workshops and meetings, and these
2 are the places to learn surgery, not learning them
3 from a company document.  I am never going to rely on
4 a company to teach me how to do a procedure.
5    Q.    Okay.  Would you ever rely on a sales rep
6 to teach you the procedure?
7    A.    I would hope that my publication in 2009
8 would speak to that point.
9    Q.    Well --
10    A.    A thousand percent, no.  And I think that
11 it's absolutely not the role of a sales representative
12 to teach anyone how to do anything.
13          I will -- I will make the point that if a
14 company clearly knows that the specific steps of a
15 procedure are X, and they want to try to improve the
16 reproducibility of the results in any individual's
17 hands, I think it's very reasonable to have clearly
18 outlined steps in the IFU that should be followed.
19 And I think that when reading the IFU, Ethicon is very
20 clear about the necessary steps that need to be
21 followed to achieve the outcomes that the original
22 implant has achieved.
23    Q.    Okay.  Does your surgical approach to a
24 retropubic sling placement vary at all from Ethicon's

Catherine A. Matthews, M.D.

Page 82

1 IFU?

2 A. It really doesn't. And I think there are a
3 couple of very, very critical steps in there that --
4 absolutely no deviance is acceptable because otherwise
5 the results may not be what you would expect them to
6 be.

7 Q. I'm sorry. Your -- your statement -- just
8 repeat that for me because I didn't quite catch that.
9 No deviance from what now?

10 A. I said my de- -- I don't deviate in my
11 surgical approach, and I think that there are some
12 very specific steps in -- that are detailed in the IFU
13 that cannot be deviated from or else a different
14 result would be achieved.

15 Q. Okay. Would the tensioning of the sling be
16 one of those steps?

17 A. The tensioning is one of the critical,
18 critical steps. And when you remove the plastic
19 sheaths, and if you try to tension it after the
20 plastic sheaths are removed, very different results
21 can be achieved.

22 Q. Okay. Is that what happened on the two
23 where the tension was, as you've described, too tight
24 in your two patients that you later repaired?

Page 83

1 A. No, I think in those circumstances we did
2 the techniques like we always do, and for whatever
3 reason in those two patients, I don't -- I don't know
4 if I pulled the sling tighter than I thought I did or
5 if I -- I cannot tell you exactly why. We're working
6 with trainees. Again, I don't know if the person
7 working with me pulled it tighter than not. But I
8 have done them often enough and in the same way that
9 there shouldn't be a variance. But again, I can't
10 tell you exactly why in those two cases out of 500 of
11 mine that they were too tight for the patients to
12 individually void.

13 Q. Just so I'm clear on the record, or the
14 record is clear, are you blaming your -- the surgeon
15 you were training?

16 A. No, I'm saying that I don't know. I can't
17 tell you because every surgery that I do is with a
18 trainee. I can't tell you if there was something
19 different about those two cases. I just -- I cannot
20 tell you.

21 Q. That is fair. That is fair.

22 Have you ever perforated an organ during
23 the placement of a retropubic sling?

24 A. I have certainly perforated the bladder.

Page 84

1 Q. Okay. How many times has that happened to
2 the best of your recollection?

3 A. You know, I think that my personal rates
4 when I am personally passing the sling are very
5 similar to the published literature, which is, you
6 know, four -- anywhere between 3 and 6, 7 percent. I
7 think when trainees are involved, the rate can be
8 higher, and this has been, again, documented in the
9 medical evidence. But I would say overall, probably
10 about a 3 percent rate.

11 Q. Okay. You can't put a specific number to
12 it?

13 A. Look, I mean, because I haven't published
14 on a cohort of my patients, I can't tell you a
15 specific number. But from my recollection of patients
16 in the operating room, I would venture to bet it's, as
17 I said, originally around 3 to 8 percent.

18 Q. Okay.

19 A. I will say this, that it doesn't -- it
20 didn't appear to deviate from the published evidence
21 that has existed from many trials.

22 Q. So you would accept that is -- bladder
23 organ specific perforations, that is well known within
24 the literature?

Page 85

1 A. Absolutely well known, and not a
2 significant issue as long as it's recognized.

3 Q. Okay. Would it be a more significant issue
4 to the person whose organs were pierced?

5 A. Not in any respect. And if you talk to a
6 woman who you have punctured the bladder, it's really
7 like they've had a suprapubic catheter in place. So
8 the clinical -- the clinical significance of
9 intraoperative bladder perforation is a nonentity as
10 long as it's recognized.

11 Q. Okay. So my understanding, again, that you
12 were trained in Europe on this procedure -- and I'm
13 sorry -- the retropubic sling procedure?

14 A. In London, correct.

15 Q. Okay. Who was your trainee -- trainer in
16 London?

17 A. Abdul Sultan.

18 Q. Okay.

19 A. He wasn't employed by Ethicon, and he
20 wasn't doing -- I was working with him in another
21 capacity, and he did TVT retropubic slings, and so I
22 learned from him how to place them.

23 Q. Thank you, Doctor.

24 One thing I forgot to ask you earlier.

Catherine A. Matthews, M.D.

Page 86

1 When you were in -- I read from your CV you were in
2 Africa recently for a period of time on sabbatical?
3    A.   Correct.
4    Q.   Okay.  Did -- did your sabbatical, did that
5 involve any teaching of mesh procedure, retropubic
6 mesh, anything along those lines?
7    A.   No.  I did surgery there.  I can't -- I
8 think we may have placed a retropubic sling, but it
9 wasn't -- it was part of another prolapse repair.  So
10 I wasn't -- I wasn't sponsored to go to Africa by a
11 company to teach.  I have a joint appointment at the
12 University of Cape Town, so I went on my own accord.
13   Q.   Okay.  Has there ever been a situation
14 where you as a clinical doctor, whether it be your
15 placement of a mesh or someone else's -- again,
16 limiting this to SUI -- has there ever been a time
17 where you have felt like the mesh itself, even if
18 perfectly placed, caused -- had a complication arise?
19   A.   Can I clarify, specifically, because of the
20 property of the mesh; is that what you are asking me?
21   Q.   Really I'm -- I don't have a, I mean,
22 secret or a hidden agenda in terms of questions.  It's
23 just very general.  It's just the best way I knew how
24 to ask it, so --

Page 87

1    A.   I don't -- I don't under- -- I don't really
2 understand what you are asking me.
3    Q.   Okay.  You have pointed out specifically, a
4 couple of times where you thought the mesh might have
5 been overtensioned in patients that you operated on,
6 correct?
7    A.   Correct.
8    Q.   Okay.  And you have also referenced a
9 larger body of patients that, whether it was your
10 placement or not, you have treated for some type of
11 mesh complication?
12   A.   Correct.
13   Q.   Okay.  What I'm asking you is, have you
14 ever made a determination as the clinical doctor that
15 you look at a mesh or a patient, you determine that it
16 was properly placed, but there is still a
17 complication?  Has that situation ever occurred in
18 your clinical practice?
19   A.   Yes.
20   Q.   Okay.  Do you -- in that situation, do you
21 attribute the complication to the mesh itself, the
22 mesh properties?  That is what I'm asking you to
23 explain.
24   A.   Yes.  So the best analogy that I can make

Page 88

1 to you probably is if you are at a picnic and
2 everybody eats the potato salad, and 1 percent of a
3 hundred gets sick, is the issue with the potato salad,
4 or does that person have something else going on that
5 made them sick?  If you go to a picnic and everyone
6 eats potato salad, and a hundred -- 99 of a hundred
7 people get sick, you assume there is something wrong
8 with the potato salad.
9    Q.   Okay.
10   A.   So the analogy that I would make of the
11 patients that I have put in with mesh is that it seems
12 that they all get the potato salad, and one out of a
13 hundred or two out of a hundred may get sick.
14        So I cannot -- in having the same device
15 that has the same properties implanted in patients,
16 the variable seems to be the patient and their local
17 host response.  It doesn't seem that there is any
18 variability in the material or in the product.  There
19 is certainly a variability in the technique in which
20 was placed, and so that can be -- that can be an
21 interaction in this tri-fold relationship between the
22 mesh, the patient and the physician.
23   Q.   Okay.  There can be variability in the way
24 it was placed?

Page 89

1    A.   For sure.
2    Q.   Okay.  This isn't -- at this point in time
3 this isn't a standardized procedure?
4    A.   One would hope it would be, but this is,
5 unfortunately, a reality where people, even though
6 people are encouraged to standardize procedure and
7 learn to do it with specific steps, there is still
8 variability.  And in watching enumerable people
9 perform live surgeries, one sees variability in
10 technique.  And I think variability in technique and
11 where someone is on their learning curve very much can
12 have an influence on the outcome for any particular
13 patient.
14   Q.   Okay.  Does Ethicon have sales
15 representatives?
16   A.   Yes, for sure.
17   Q.   Okay.  And these -- in my review of
18 documents, it appears to me that sales representatives
19 have marketed these products, not just to
20 urogynecologists, but also urologists and OB/GYNs.
21        Is that consistent with your understanding
22 of the medical industry?
23   A.   Yes.  But I will tell you that in the -- in
24 the -- as an OB/GYN professor and as a urology

Catherine A. Matthews, M.D.

1 professor, it is a requirement for residents from both
2 subspecialties to be able to do midurethral slings
3 upon graduation of residency without subspecialty
4 training. So I think it's fair to say that both
5 specialities have endorsed generalists being able to
6 offer this procedure as opposed to specialists.
7    Q.   Okay. So where does all of the variability
8 come in if all surgeons are trying to do this, and to
9 your knowledge in the industry, you know, all of these
10 disciplines essentially are given the same
11 information, where does the -- I'm just curious why --
12 where you think the variability comes from?
13    A.   You know, I just -- if you take ten people
14 driving down the highway, they are supposed to follow
15 the rules, they are supposed to drive at the right
16 speed. Some people speed, some people don't follow
17 the rules, accidents happen. Is it that the car is
18 defective, or is it the drivers? I can't tell you why
19 individual physicians don't do things or decide to do
20 things their way or they don't follow the IFUs. I --
21 I don't know why. But they're -- despite the fact
22 that the procedure in the majority of people's hands
23 is consistent, there is still variability in surgical
24 practice.

1    Q.   Is it your opinion that the retropubic TVT
2 Gynecare sling is the most studied medical device?
3    A.   It's not only my opinion, it's evident in
4 all the published literature.
5    Q.   Okay. How long has that been true?
6    A.   I would say that it's been true since about
7 2003 or '4 I would say.
8    Q.   Okay. Did I read correctly in your report,
9 the statement that erosions are a known complication
10 of TVT surgeries?
11    A.   Absolutely.
12    Q.   Okay. Do you believe stress urinary
13 incontinence, specifically retropubic mesh
14 complications or adverse events are underreported?
15    A.   In what respect? Underreported to the
16 MAUDE database, underreported to who?
17    Q.   Okay, sure, let's start with MAUDE
18 database. Do you believe they are underreported?
19    A.   Sure, to the MAUDE database, I think so,
20 and I think the FDA believes so as well, which is
21 certainly why they changed their modifications for
22 vaginal mesh --
23    Q.   Okay.
24    A.   -- for prolapse repair.

1    To the extent that they are underreported
2 in clinical studies, no, I think that these are
3 circumstances where you have very rigorous protocols,
4 where you have patients that are under a microscope
5 that are seen at much more frequent intervals than
6 they would be seen otherwise. And I think in those
7 settings, the -- the findings are very accurately
8 reported.
9    Q.   Okay. I'm sorry. Do you believe in --
10 well, let me just ask you it this way. I have read in
11 several -- several medical literature sources that
12 continued follow-up with patients is difficult, and
13 for most randomized clinical trials there is a --
14 either a general or very significant loss of the
15 cohort of patients over time.
16    Do you agree with that?
17    A.   There can be, but I think interestingly in
18 the TVT literature, we've got several examples of
19 amazing follow-up, specifically in the Nilsson study
20 after 17 years, I mean, a very high follow-up rate of
21 the original cohort. In the TOMUS trial, I think
22 their follow-up was remarkably good.
23    So, you know, yes, while there's a general
24 statement that can be made, I think that there are

1 certain circumstances where follow-up was actually
2 remarkably good.
3    Q.   And Nilsson, 17-year study, that was -- if
4 I understand correctly, wasn't there only something
5 like 46 out of the original 90 patients that were
6 actually able to be visited to be viewed in the
7 office?
8    A.   That is correct. But if you look at the
9 number of patients that had died in the meantime --
10 you know, like it was a significant amount of time
11 that had gone by. So I don't even -- I don't recall
12 how many were even able to be contacted because they
13 were still alive. But the point was that they still
14 were able to report on a significant percentage of
15 people.
16    And in the Scandinavian countries where
17 their medical system facilitates the long-term
18 follow-up. There, in Austria, from the Austrian
19 registry you've got very, very good long-term
20 follow-up.
21    So I would say certainly in the United
22 States where people move around a lot, it's not as
23 easy to capture data, but from the Scandinavian
24 countries and Austria, we've got really good, robust

Catherine A. Matthews, M.D.

Page 94

1  long-term follow-up with not a high lost-to-follow-up
2  rate.
3      Q.    Okay.  So for the doctors to only be able
4  to physically see 51 percent of the original cohort,
5  that is, in your mind -- and I'm asking you -- is that
6  a sufficient follow-up?
7      A.    For 17 years, certainly, in patients we
8  know because they are able to capture in those
9  Scandinavian countries if a patient is seen elsewhere
10  for a problem.  They have it all available on national
11  databases.  Even if they were not able to specifically
12  contact them at 17 years, they were able to evaluate
13  if they had been seen for complications.  And so I
14  don't think it's some great conspiracy that these
15  complications are being hidden from people trying to
16  do research on this subject.
17      Q.    Sure.  And you know I did not call it a
18  conspiracy, right?  I didn't use that in my question,
19  did I?
20      A.    No, but I'm saying that I be-- you know,
21  it seems that some people believe that it's a
22  hidden -- you know, you posed the question initially,
23  don't I believe that there is a major issue with
24  follow-up, that this issue was underreported.

Page 95

1      Q.    Well, no, I said that I've read that in
2  several sources, and I asked you what your opinion was
3  of it.
4      A.    Well, I think I've provided my opinion.
5      Q.    Yeah, it wasn't an accusation.  It was a
6  question.  It was a fair question, Doctor.
7          Okay.  So in -- also in the Nilsson study,
8  I believe a hundred percent of the women that did
9  return for the 17-year cohort refused to submit to
10  urodynamics; is that your understanding?
11          MR. ROSENBLATT:  Do you want to put
12      the study in front of her?
13          MR. TEAGUE:  Well, I mean, she's --
14      she quoted it to me, so I'm just asking
15      what her recollection is.
16          THE WITNESS:  I certainly don't
17      recall on the top -- off the top of my head
18      what percent of them wanted to have
19      urodynamics, and urodynamics would not be
20      used in any respect as the standard for an
21      outcome.  If you look at all the pelvic
22      floor disorders network outcomes,
23      urodynamics is off the table completely for
24      both preoperative evaluation and

Page 96

1      post-operative evaluation.
2  BY MR. TEAGUE:
3      Q.    It's off the table in what regard?
4      A.    It's not considered to be a recommended
5  preoperative evaluation or a post-operative outcome
6  measures.  We're using patient-centered outcomes now
7  that relate to symptoms, and that is what matters to
8  patients, not what you find in the urodynamic study.
9      Q.    Okay.  So why would Nilsson even -- why
10  would those researchers involved in that study, why
11  would they even ask for it then?
12      A.    Well, I think that it's fair that these
13  patients originally, you know, the historical standard
14  was to use urodynamics.  If you look at the
15  Hilton-Ward study, for example, they subjected all
16  these women to urodynamic software that was used at
17  that point as a metric of success.  And I think
18  Nilsson is maybe just reporting the fact that they
19  would have been willing to offer this as an outcome
20  measure, but, you know, are potentially using more
21  patients than an outcome for that study now.
22      Q.    Do you know any of the researchers involved
23  in the Nilsson study?
24      A.    Not personally, no.

Page 97

1      Q.    Okay.  And you are aware that Nilsson, in
2  the 17-year study, disclosed a conflict of interest
3  for work he has done with Ethicon, correct?
4      A.    Sure.  And I think if he was the only paper
5  who was out there with any long-term outcomes, I would
6  question the efficacy.  But as his results are very
7  similar to other longer-term outcome studies, no one
8  else has 17-year outcomes, but certainly we have
9  eight- and 10-year outcomes that are very, very
10  similar.
11      Q.    Okay.
12      A.    So I don't -- on the basis of the numbers
13  being similar, I don't discredit or disqualify his
14  publication.
15      Q.    Do you -- was he -- I'm sorry, was -- there
16  are no other 17-year studies, correct?
17      A.    Correct.
18      Q.    Okay.  How many randomized control
19  trials -- or how many other -- how many others have
20  gone more than five years to -- that you are aware of?
21      A.    Gosh, probably five or six trial.
22      Q.    Can you recall any names as we sit here
23  today?
24      A.    You know, gosh, right off the top of my

Catherine A. Matthews, M.D.

Page 98

1  head, I can't tell you the authors, but I -- if I --
2  if you needed me to provide you the studies, I
3  certainly could.
4      Q.    Okay.
5          MR. TEAGUE:  I'm going to make that
6  request, Counsel, any --
7          MR. ROSENBLATT:  What is your
8  request?
9          MR. TEAGUE:  -- post five-year
10  studies --
11         THE WITNESS:  Paul Tomasino's
12  Austrian study is certainly one of them,
13  the --
14  BY MR. TEAGUE:
15     Q.    Let me maybe short-circuit this a little
16  bit, Doctor.  Would these be studies that would be
17  involved in your -- or be included in your reliance
18  list?
19     A.    All of them.
20     Q.    Okay.  Would you agree that the majority of
21  the studies on retropubic slings have follow-ups that
22  are less than five years?
23     A.    Yes.
24     Q.    Less than one year?

Page 99

1      A.    Not the majority.
2      Q.    Okay.  Would you agree that to one extent
3  or another all randomized control trials have some
4  attrition of the original cohort that was -- that was
5  part of the investigation?
6      A.    Sure.
7      Q.    Okay.  And whether there is death or not
8  able to find them or other reason, I mean, it does
9  make it -- say for instance the 17-year study, I mean,
10  even through it's perfectly legitimate, you can't
11  interview or, you know, inspect someone who has -- who
12  has passed away, but that still change the available
13  data for the researchers, does it not?
14         MR. ROSENBLATT:  Object to form.
15         THE WITNESS:  Sure, it does.  But I
16  think it's reasonable in medicine to make
17  the very best effort at scientific
18  investigation reporting, and the very best
19  effort has been made in this regard with
20  midurethral slings.
21  BY MR. TEAGUE:
22     Q.    Okay.  Can you do a randomized control
23  trial designed specifically to test for an adverse
24  events or a contraindication?

Page 100

1      A.    I think because adverse events are
2  typically rare events, it's usually not viable to do a
3  prospective randomized trial just to look for adverse
4  events, so that is not the typical study design that
5  is used for that.  This is where large
6  population-based studies, retrospective series, are a
7  much better study design to try to look for events
8  that are more rare.
9      Q.    And I meant -- and I should have been a
10  little more clear, Doctor.  Thank you for your
11  response though.
12         In terms of -- are you aware of any ethical
13  medicolegal reasons that a study can't be designed to
14  prove an adverse event?
15         MR. ROSENBLATT:  Object to form.
16         THE WITNESS:  I think that if you
17  have a hypothesis that something is highly
18  associated with an adverse event, that
19  there would be ethical concerns behind
20  designing specific to look for that.  But I
21  think that we are all aware that paying
22  attention to potential adverse events is
23  something that is routinely included in any
24  well designed trial.

Page 101

1  BY MR. TEAGUE:
2      Q.    Okay.  In terms of erosion or extrusion,
3  any of those things, is it possible for it to be
4  asymptomatic for a woman but still have a negative
5  consequence in terms of male dyspareunia or his
6  dyspareunia?
7      A.    Yes.
8      Q.    Okay.  Doctor, in a very general sense,
9  what is the purpose of a nerve in the human body?
10     A.    It's got two purposes:  To provide sensory
11  function and motor function.
12     Q.    Okay.  Where are they located?
13     A.    Throughout the body.
14     Q.    Okay.  Are they in the pelvic region?
15     A.    Sure.
16     Q.    Do organs such as bladders, do those -- are
17  there nerves located there?
18     A.    Sure.
19     Q.    Okay.  In the urethra?
20     A.    Sure.
21     Q.    In the sphincter?  Not necessarily --
22  well --
23     A.    The nerve has to supply the urethra
24  sphincter for it to work.

Catherine A. Matthews, M.D.

Page 102

1  Q.   Okay.  In the vagina?
2  A.   Yes.
3  Q.   Okay.  Is it a fair statement to say that
4  nerves relay messages of pain to -- throughout their
5  system, ultimately to the brain?
6  A.   Sensory nerves, that is the function of
7  sensory nerves, yes.
8  Q.   Sensory nerves.  What other type of nerves
9  would there be?
10  A.   Motor nerves.
11  Q.   And what are those -- what is their
12  purpose?
13  A.   To innervate the muscles to perform
14  functions.
15  Q.   Okay.  Do they have any type of pain
16  response involved?
17  A.   I -- I don't think a motor -- most nerves
18  have both components, so most nerves would be able to
19  perform both functions.
20  Q.   Sure.  In terms of -- Doctor, you -- well,
21  strike that.  I will get back to that later.
22       Does the -- would you consider the organs
23  within the female pelvic area to be close to one
24  another?

Page 103

1  A.   Sure.
2  Q.   Okay.  So the -- myself, the jury, anyone
3  else who looks at this would understand, typically
4  what type of area as someone who's performed pelvic
5  surgeries and is familiar with the area, give us an
6  idea within that -- within that physical location of
7  the body, bladder, urethra, vagina, what type of space
8  are you working in within there?
9       MR. ROSENBLATT:  Object to form.
10       THE WITNESS:  I -- yeah, I don't
11    exactly know what you are asking.  Are you
12    asking like what is the distance you have
13    for placement of a sling?  What -- are
14    you -- I mean --
15  BY MR. TEAGUE:
16  Q.   Let's start there.  What is the distance
17  you have for the placement of a sling?
18  A.   So you have about three -- a
19  three-centimeter window from the lateral boarder of
20  the bladder to the iliac vessels for safe placement of
21  the sling on either side.  So certainly we are talking
22  about a relatively narrow space, and it doesn't matter
23  if you are placing sutures there, autologous fascia or
24  mesh, one is working in relatively close quarters.

Page 104

1  Q.   Okay.  Does a woman's -- does the
2  relationship of those organs -- or strike that.
3       Does the architectural anatomy of a woman
4  in that area, does it change as she ages?
5  A.   It can.  Certainly with a woman developing
6  any type of prolapse, the anatomy, the relationships
7  can change significantly.  With post menopausal
8  estrogen changes, the vaginal -- vaginal architecture
9  can change as well.
10  Q.   Okay.  Have you ever been trained in any
11  way in the assessment or understanding of -- well,
12  strike that.  Let me ask it a better way.
13       Do you have any biomaterials training?
14  A.   Well, that was one of the things that was
15  limiting me initially from -- from starting to implant
16  mesh.  So because I didn't have any understanding of
17  material science in 2004, I took it upon myself to
18  learn something about the material science, enough
19  that I felt that I had a general understanding of mesh
20  properties, biomechanical properties, to reasonably
21  counsel my patients about the safety of the implant
22  before proceeding.
23  Q.   Okay.  And what sources did you use to --
24  to develop your understanding?

Page 105

1  A.   So initially, I relied on the data that had
2  been gathered regarding hernia mesh.  So despite the
3  fact that it was different in terms of mesh load and
4  it was different in terms of where it was placed in
5  the body, the properties of the polypropylene mesh and
6  how it had been evaluated gave me some understanding
7  of the properties that I would seek in a suburethral
8  mesh.
9  Q.   Okay.
10  A.   And I think that the other thing that I
11  would have relied on was the Ahmed paper, which I
12  think was published in about '98.  But I definitely
13  had an awareness -- or studied the different
14  classification of mesh types.  So I would say that,
15  yeah, mesh -- it was information gleaned from that
16  paper that I found very informational and then
17  information from the hernia literature.
18  Q.   Okay.  And as a doctor, you have never been
19  asked or called upon to perform any type of tensile or
20  material test for polypropylene mesh, have you?
21  A.   No.
22  Q.   Okay.  For any other type of synthetic
23  device -- or synthetic material I should say?
24  A.   Well, when you are evaluating the Y-mesh,

Catherine A. Matthews, M.D.

Page 106

1 as I mentioned before, for sacrocolpopexy, you know,
2 we certainly looked at the tensile properties.
3    Q.    And anatomically, what is that -- what
4 conditions is that used to treat?
5    A.    Vaginal vault prolapse and uterine
6 prolapse.
7    Q.    Okay.  Does that involve the same placement
8 as a retropubic sling?
9    A.    Not at all.
10    Q.    Okay.  And it doesn't involve the same
11 approach as a retropubic sling?
12    A.    Correct.
13        (Plaintiffs' Exhibit 4 was marked for
14    identification.)
15 BY MR. TEAGUE:
16    Q.    Okay.  Doctor, I'm going to show you a few
17 documents that we received from Ethicon during
18 discovery.  I'll show you what I've marked as
19 Exhibit 4.
20        Doctor, I note for the record, you are
21 reviewing that right now.  You tell me when you've had
22 sufficient time to review it.
23    A.    Can you tell me when this was -- when then
24 was published?

Page 107

1    Q.    All I can say on the back it says 2006
2 Ethicon, Inc., TVT 107 trademark.  It would be 169751
3 on the very back page.
4    A.    Okay.
5    Q.    Doctor, this is a -- my understanding is a
6 literature Gynecare -- well, let's start with the
7 front.
8        Do you see on the very front page, that
9 it's branded as Gynecare TVT Tension-Free Support For
10 Incontinence?
11    A.    Correct.
12    Q.    Okay.  And then if you turn on the inside,
13 the product on the left-hand side, which is Bates
14 number FMESH 169749, it says Gynecare TVT, correct?
15    A.    Correct.
16    Q.    Okay.  And that is one of the products that
17 Ethicon has asked you to opine upon for this
18 litigation, correct?
19    A.    Correct.
20    Q.    And do you see, Doctor, the seven years of
21 proven clinical efficacy data in the middle there?
22    A.    Correct.
23    Q.    Okay.  97 percent overall success rate, do
24 you see that?

Page 108

1    A.    Correct.
2    Q.    Is that consistent with your clinical
3 results?
4    A.    So again, it depends on what you define as
5 success.  So we know from numerous trials that success
6 is defined in many different ways.
7    Q.    Okay.
8    A.    So how would you define success?
9    Q.    Well, Doctor, I'm asking -- well, okay,
10 let's use these two.  81 percent cured, 16 percent
11 improved.
12    A.    Right.  So in -- for a woman who is
13 improved, she may consider her procedure to be
14 successful.  So it, again, depends on if a woman is
15 requesting that she be dry at all times, every time,
16 that she be dry most of the time, or she be improved.
17 So when you ask people subjectively, were you
18 satisfied or were you improved, it may certainly be
19 that, you know, 97 percent give an affirmative to that
20 answer and 3 percent say, no, I am not -- I'm not a
21 success, the operation did not help me.
22    Q.    Okay.  If I'm mistaken, I believe either
23 from your report or your testimony that you had
24 previously said your success rate you felt was in the

Page 109

1 80 to 85 percent range?
2    A.    So this is asking women if they are dry.
3    Q.    Okay.
4    A.    So being dry is different than someone's
5 perception of success.  So I quote dry rates,
6 subjective dry rates of 80 to 85 percent.  In terms of
7 women who are overall improved, I would say that 95 to
8 98 percent is probably pretty accurate.  There is
9 certainly a consistent failure rate, particularly
10 amongst patients who have severe incontinence to begin
11 with.  But again, each individual woman will give a
12 different answer as to if they deem it to be
13 successful.
14    Q.    Okay.  Do you believe -- are both objective
15 and subjective determinations acceptable to you?
16    A.    To me, all that matters is subjective
17 outcomes, because really, it's really what the woman
18 tells you.  What objective testing we do to them
19 really has very little relevance.  It's a way that's
20 been an accepted corroboration of a woman's testimony,
21 but I think more and more people accept that women
22 will tell the truth and they will let you know if they
23 are bothered, not bothered, if they are improved, not
24 improved.  So looking at patients' in an outcome, is

Catherine A. Matthews, M.D.

Page 110

1 the most susceptible outcome in my opinion.
2    Q.    Okay.  The next thing on that same page,
3 exceptional safety profile.  Do you see there is three
4 bullet points underneath that?
5    A.    Correct.
6    Q.    And the first one says:  Low incidence of
7 serious reported complications.  The next one says:
8 Low retention rate.  And the final one says:  No
9 reported urethra erosions.
10        Is -- in 2006, would it be your clinical
11 experience that there were no urethra erosions in
12 all -- reported in all of the mesh literature?
13    A.    I certainly know that the -- that the rate
14 of urethra erosion has consistently been reported less
15 than 1 percent, so it ranges between .3 to .8 percent.
16 So I don't know when those urethra erosions occurred
17 to collect that less than 1 percent.  I -- you know,
18 in the references that have been provided here, 1 to
19 11, if there were no urethra erosions, there were no
20 urethra erosions.  But certainly I don't doubt --
21 there are urethra erosions, and I think that a rate of
22 less than 1 percent is an accurate rate to report.
23    Q.    Okay.  But I don't -- I don't see anything
24 about less than 1 percent on this --

Page 111

1    A.    Well, they provide a reference to 1 to 11.
2 So I would imagine that in the papers that they
3 reference on the back, that they were not a
4 reported -- there weren't any reported urethra
5 erosions in those 11 papers.  Now, were they leaving
6 out information that was available?  I don't know.
7    Q.    Okay.
8    A.    I certainly can tell you in the Shimerf
9 [phonetic] review, from 2014, that urethra erosions in
10 all of the meta analyses that have been done come in
11 at about .3 percent.
12    Q.    Okay.  But again, I'm not asking about any
13 other studies or anything else.  I'm asking about no
14 reported urethra erosions -- and I'm asking you this
15 specifically:  In 2006, were you aware, did you
16 believe that a complication associated with mesh was
17 urethra erosion?
18    A.    Certainly, that is a possibility.  And had
19 I observed one at that point?  No.  Was I aware of it
20 being able to be seen?  Sure.  And I think anybody who
21 has done any pubovaginal incontinence work knows that
22 urethra injury is a known and accepted complication of
23 the procedure.
24    Q.    Okay.  When did that become known?

Page 112

1    A.    It's been known ever since people have been
2 doing incontinence surgery.  If you are dissecting
3 around the urethra, urethra injuries occur.  There is
4 a known and accepted rate of urethra injury with any
5 kind of pubovaginal sling and even with Burch.
6    Q.    Okay.  If you look at -- and I will give
7 you a second to check this for yourself, but as I
8 was -- I circled the footnotes 1 through 11, and the
9 dates of these studies were 1999, 1998, 1998, 1999,
10 '99, '99, '99, '95, '95, 2000 and 2003.
11        Were there any -- by 2006, do you believe
12 there were any additional clinical trials that could
13 have been -- or I would say not even limited to
14 clinical trials.  Were there other studies that were
15 available between the years 2003 and 2006 that Ethicon
16 would have had access to?
17    A.    For sure.
18    Q.    Okay.  And I'm guessing that you don't --
19 or do you have any idea why Ethicon would not have
20 quoted more up-to-date literature in the design of
21 this piece?
22    A.    Again, as --
23        MR. ROSENBLATT:  Object to form.
24        THE WITNESS:  -- someone who doesn't

Page 113

1    work for Ethicon, I have no idea what
2    decisions they made to produce this
3    document.
4 BY MR. TEAGUE:
5    Q.    Okay.  If -- would you consider it less
6 than honest or in any way problematic if Gynecare had
7 individual reports of urethra erosions that may not
8 have been -- that may not have come through the
9 medical literature, would they have a duty to report
10 this?  Would you consider that something that would be
11 their responsibility to tell the circumstance?
12        MR. ROSENBLATT:  Object to form.
13        THE WITNESS:  I mean, yeah, if you
14    are asking me if a company hid negative
15    information that they received, I do think
16    they have a duty to report that, for sure.
17        (Plaintiffs' Exhibit 5 was marked for
18    identification.)
19 BY MR. TEAGUE:
20    Q.    Let me show you what I've marked as
21 Exhibit 5.  This document, again, was produced by
22 Ethicon, and this says issue report TVT retropubic
23 1999 through 2000 Open Date 1 January 1999 and 31
24 December 2000.

Catherine A. Matthews, M.D.

Page 114

1      Doctor, while you are reviewing that, I'm
2  just going to ask you, do you recognize this?  Have
3  you seen it before?
4      A.   No, I have not.
5      Q.   Okay.  Do you see -- tell me when you are
6  ready to proceed.
7      A.   Sure, go ahead.
8      Q.   Okay.  Do you see the entered date, top
9  left-hand corner, says July 6th, 1999?
10     A.   Correct.
11     Q.   And the event date was June 3rd, 1999?
12     A.   Uh-huh (affirmative).
13     Q.   Okay.  And the Ethicon alert date was
14  June 28th, 1999?
15     A.   Yes.
16     Q.   And the event description says:  Received
17  call from sales rep and was reported that there was
18  possible TVT erosion.  The surgeon had to cut the
19  tape.  Unknown lot number.
20          Did I read that correctly?
21     A.   Correct.
22     Q.   Okay.  And then do you see if you go down,
23  it says:  Further follow-up completed by the medical
24  directory with the surgeon.  It was reported the

Page 115

1  procedure was uneventful on April 26th.  Patient was a
2  32-year-old obese female with a prior history of
3  hysterectomy.  The patient was diagnosed with
4  hypermobile urethra.
5          And then postop:  The patient had a Foley
6  catheter in place for one week.  June 3rd, five weeks
7  postop, the patient arrived at the ER with severe
8  dysuria.  A catheter could not be passed.  Cystoscopy
9  revealed that the TVT tape eroded to the posterior
10  urethra wall in the prominent -- or prom, I think it
11  should prominale region portion.  The patient
12  underwent surgery to excise the TVT and repair the
13  urethra wall.  Ten days postop via emergency surgery
14  patient reports the leakage to be worse than prior to
15  the original surgery.
16          So can we at least agree that the adverse
17  event or issue that was reported to Ethicon was in
18  fact a urethra erosion?
19     A.   Or -- certainly, it could have been a
20  urethra erosion.  It's -- or it could have been
21  placement of the tape in the urethra.  So this is a
22  very short postoperative time.  So in looking at this,
23  I would have attributed this to placement of the mesh
24  through the urethra at the time of surgery --

Page 116

1      Q.   That would just be your --
2      A.   -- more likely --
3          MR. ROSENBLATT:  Let her finish the
4  answer.
5          MR. TEAGUE:  I'm sorry.
6          THE WITNESS:  -- more likely than not
7  that, you know, this is in a very, very
8  short postoperative time that the patient
9  has this complaint.  So certainly it could
10  be a urethra erosion, but in looking at
11  this, I would really say that because it's
12  such a short time interval, that I would
13  have considered that the surgeon have
14  placed this through the urethra at the time
15  of the procedure.
16  BY MR. TEAGUE:
17     Q.   Without any evidence, you can just divine
18  that?
19     A.   I said to you that the post surgical
20  interval of five weeks is the information that would
21  make me postulate that it had been placed through the
22  urethra at the time of surgery.
23     Q.   So in your opinion, any urethra erosion
24  within what period of -- within a five- or six-week

Page 117

1  window would be surgeon error?
2          MR. ROSENBLATT:  Object to form.  You
3  asked her specifically about this event.
4  You are asking her about -- are you now
5  asking just generally?
6          MR. TEAGUE:  Was my question that
7  difficult?
8          MR. ROSENBLATT:  I'm just asking --
9          MR. TEAGUE:  No, no, if you don't
10  under -- if you don't understand, that's --
11  please let --
12  BY MR. TEAGUE:
13     Q.   If you need me to rephrase it,
14  Dr. Matthews, I'm happy to do that.
15     A.   So one of the requirements of the procedure
16  is that one has to do cystoscopy of both the bladder
17  and the urethra at the time of surgery because it's
18  well known that you can place this mesh through the
19  urethra.
20          So I would opine to you that if a patient
21  is diagnosed with a urethra -- with urethra mesh
22  within a relatively short time period, I'm not going
23  to limit myself to one week, six weeks, eight weeks,
24  but a relatively short period of time after surgery, I

Catherine A. Matthews, M.D.

Page 118

1 would be concerned that the surgeon had placed it
2 through the urethra at the time of the original
3 surgery.
4 Q. Okay.
5 A. So based on what -- just what you provided
6 here, I would not automatically assume that it was
7 product error. I would say I would need to look at
8 the cystoscopy reports, the urethra -- if ureteroscopy
9 was performed, exactly what were the details of the
10 procedure to make that determination.
11 Q. That's where I was going to go and then --
12 and I understand your response. Your first response
13 was, well, this was surgeon error, and I was just
14 curious as to how you got there.
15 A. No, I said this is -- this is within the
16 two things in the differential diagnosis. I didn't
17 immediately say it was surgeon error. I said the two
18 things that it could be is urethra erosion or surgeon
19 error.
20 Q. Fair enough.
21 A. So I listed urethra erosion first before I
22 said surgeon error.
23 Q. It could be -- could be either one --
24 A. Could be either one.

Page 119

1 Q. -- right? And I'm not asking you to review
2 this for the purpose of making a decision. I'm
3 showing this to you to show that there were reports of
4 urethra erosion to Gynecare or Ethicon. I'm also
5 showing you Exhibit 4 that says no reported urethra
6 erosions.
7 A. But --
8 Q. Well, no, let me -- I haven't asked my
9 question yet.
10 I have a concern when a company has
11 information like this but still feels comfortable
12 putting this out even if they do have some medical
13 literature to base that upon.
14 MR. ROSENBLATT: Object to narrative.
15 Do you have a question?
16 MR. TEAGUE: Yeah, I'm getting to my
17 question.
18 MR. ROSENBLATT: Okay.
19 MR. TEAGUE: But you interrupted it,
20 so I'll ask it again.
21 BY MR. TEAGUE:
22 Q. Doctor, I didn't mean to raise my voice.
23 That's at your counsel.
24 So I'm going to ask you simply: You -- we

Page 120

1 have here a report of urethra erosion that came to
2 them in January 28 of 1999. Okay? We also have a
3 2006 --
4 A. Can I just clarify that it says on the
5 thing possible erosion. It doesn't say -- it doesn't
6 say actual erosion, It says possible erosion. So I
7 just want you to make sure you phrase that to reflect
8 that correctly in the record, that you don't have a
9 case of urethra erosion, you've got possible erosion.
10 Q. Okay. I'm reading here again: Cystoscopy
11 revealed that the TV tape -- TVT tape eroded to the
12 posterior urethra wall in the prominent portion.
13 Now, that sounds like a finding to me,
14 Doctor. Does it not to you?
15 A. It doesn't explain -- it doesn't tell me
16 whether or not that was placed that way at the time of
17 the original surgery or if something changed over the
18 five weeks following implantation.
19 Q. But that is not what I asked you. I
20 asked -- you said there was no diagnosis. I'm reading
21 to you that a cystoscopy, which is what you told me
22 you do to check the bladder and urethra, revealed
23 that -- revealed that the TVT tape eroded to the
24 posterior urethra.

Page 121

1 A. On five weeks after surgery, not at the
2 time of the original procedure. So at the time of the
3 original procedure, that's when you would want to have
4 evaluation of the cystoscopy and the ureteroscopy to
5 ensure that the surgeon actually looked at the urethra
6 upon withdraw of the cystoscope.
7 Q. Okay. Fair enough. But since we don't
8 have that, but we do have a cystoscopy five weeks
9 later documenting urethra erosion, I point that out to
10 you not because, again --
11 A. It's not documenting urethra erosion, it's
12 documenting presence of mesh in the urethra, but that
13 does not mean there was a urethra erosion. It means
14 that there is mesh --
15 Q. Okay.
16 A. -- in the urethra.
17 Q. Okay.
18 A. It could have arisen from two different
19 sources.
20 Q. Okay. That is fine. So we -- what I'm
21 saying is -- okay, that is fine. All right. So
22 that's the way you parse it is that -- or that's --
23 excuse me, I don't want to be negative. That's --
24 MR. ROSENBLATT: Argumentative.

Catherine A. Matthews, M.D.

Page 122

1    MR. TEAGUE: Yeah, so I struck that.
2 BY MR. TEAGUE:
3    Q.  So your interpretation of that is it could
4 have been -- it could have been one of those two
5 scenarios, and you are not comfortable saying which
6 one it is at this time?
7    A.  That is correct.
8    Q.  Okay.
9    A.  And I don't think it's fair to conclude
10 that this was definitive evidence of urethra erosion
11 that the company hid from -- from anybody publicly. I
12 think what they are reporting and they are referencing
13 on this material are 11 or 10 -- 11 references where
14 they didn't have reported urethra erosions. And on
15 the basis of that, you know, certainly it seems that
16 if someone wants to check and see if there were any
17 urethra erosions in those 11 publications, there may
18 be, but if they claim that there are not, they
19 probably are indeed correct that there were not from
20 those 11 publications.
21    Q.  Okay.  Would you agree with me that the
22 reporter -- or whoever it is it that authored this
23 sentence said the TV tape eroded?  They used the term
24 eroded, not me.  Do you understand that?

Page 123

1    MR. ROSENBLATT:  Object to form.
2    THE WITNESS:  That is correct, and
3 this is the implanting surgeon.  And if I
4 were the implanting surgeon, I might have
5 used similar language --
6 BY MR. TEAGUE:
7    Q.  Okay.
8    A.  -- if I didn't want to be held responsible
9 for putting it there in the first place.
10    Q.  So is it your medical experience that
11 surgeons lie to cover themselves?
12    A.  You know something, I think that people
13 want to hope for the best when they are doing what
14 they're doing, and if they find -- it's much -- who --
15 I would like to look at the original cystoscopy report
16 to provide -- render an opinion.
17    Q.  I'm sorry, are you done with your answer?
18    A.  Yes.
19    MR. TEAGUE:  We got to go, change the
20 tape.
21    THE VIDEOGRAPHER:  This is the end of
22 videotape No. 2 in the deposition of
23 Catherine Matthews, MD.  The time is
24 1:01 p.m.  We are off the record.

Page 124

1    (Recess taken.)
2    THE VIDEOGRAPHER:  We are back on the
3 record.  The time is 1:52 p.m.  This is the
4 beginning of tape No. -- videotape No. 3 in
5 the deposition of Catherine Matthews, MD.
6 BY MR. TEAGUE:
7    Q.  Doctor, thank you, back on the record.
8    And just to follow up on Exhibit 5, the
9 issue report, do you recall that before the break that
10 we looked at?
11    A.  Yes.
12    Q.  Okay.  And just a few things I want to
13 clear up, and I think we can do this pretty quick.  At
14 this point neither one of us has seen the operative
15 report, so we can't make a determination based on this
16 alone whether it was either of the two scenarios, a
17 true erosion or doctor error, correct?
18    A.  Correct.
19    Q.  Okay.  And we don't have any -- I mean, is
20 it fair to say you are not actually testifying to any
21 reasonable degree of certainty that this doctor lied
22 to Ethicon, are you?
23    A.  No, but I don't -- I think that it's
24 difficult for him to have an opinion as to whether or

Page 125

1 not it was erosion versus placement at the time.  I
2 mean, he uses that term, but I think that it's in some
3 respects potentially semantics on his part too, that
4 if you see mesh in the urethra, to term it a erosion,
5 it doesn't provide causation as to how it got there.
6    Q.  Okay.  The term alone doesn't in your
7 opinion supply causation?
8    A.  That is correct.
9    Q.  Okay.  If you would, Doctor, just turn to
10 the next page, the backside of that first page, it's
11 466.  And the only other thing I would point out is
12 that do you see there is a series of four questions
13 there?
14    A.  Correct.
15    Q.  And the first one deals with death, so
16 obviously we know that one is -- the response is a no.
17    But looking at the second one:  Does the
18 reported information reasonably suggest that one of
19 the companies' medical devices may have caused or
20 contributed to a serious injury as defined as life
21 threatening injury, permanent impairment of a body
22 function or permanent damage to a body structure, and
23 their response was yes, correct?
24    A.  Correct.

Catherine A. Matthews, M.D.

Page 126

1    Q.    And the next question, No. 3, it says:  Has
2  a person qualified to make a medical judgment reached
3  a conclusion that the device did not cause or
4  contribute to death or serious injury or that the
5  malfunction were not likely to cause or contribute to
6  a death or serious injury if it were to recur, and
7  their answer was no, correct?
8    A.    Correct.
9    Q.    Okay.
10        (Plaintiffs' Exhibit 6 was marked for
11    identification.)
12  BY MR. TEAGUE:
13    Q.    Doctor, I will show you what I have marked
14  as -- as Exhibit 6, and Counsel.
15        Doctor, while you're reviewing that, did
16  you just -- the first page of the document is entitled
17  2002 U.S. Marketing Plan for Gynecare TVT Tension-Free
18  Support for Incontinence, correct?
19    A.    Correct.
20    Q.    Doctor, as you are looking at this, when
21  you feel comfortable, would you let me know if this is
22  a document you've seen before in your review of
23  Ethicon materials?
24    A.    I have not.

Page 127

1    Q.    Okay.  And when you are ready, I have some
2  questions on the third page, which is the Eth.mesh
3  9306901.
4        And under the heading Competition, second
5  paragraph, it says:  Already in 2001, talk among
6  urologists has shifted from why surgeons shouldn't use
7  TVT (for example, due to concerns about urethra
8  erosion) to how they can take TVT better.
9        And I bring this up just to raise the issue
10  again, this is a second time we have seen a reference
11  to urethra erosion in Gynecare Ethicon materials.
12        As a doctor sitting here today, does that
13  give you any reason to be concerned about the opinions
14  you've proffered or whether urethra erosions were
15  documented or known to the company at this time?
16    MR. ROSENBLATT:  Object to form.
17    THE WITNESS:  The specific document,
18    the way that I read this from my English,
19    is that they weren't talking about their
20    concerns but the urologists' concerns about
21    urethra erosion.  And certainly, as a
22    physician, at that time it was a rational
23    concern knowing that you are operating
24    around the urethra, that you've got a

Page 128

1  permanent synthetic implant, that there
2  would have been a rational concern.
3        So it doesn't change anything about
4  my opinions.  I think that it was the
5  premise for how the procedure was being
6  done.  I had a concern about the permanent
7  material in many different respects.  And
8  so I think that this is a reflection of
9  concern on the part of the surgeons, not
10  concern on the part of just the company.
11  BY MR. TEAGUE:
12    Q.    Okay.  And -- but as we discussed before to
13  be fair, you've said it oftentimes, surgeons are in
14  the better position to understand the risk and
15  benefits of a procedure, and by risk I would include
16  urethra erosion?
17    A.    That is correct.  And it seemed what they
18  were saying is they're moving away from an
19  understanding that this risk before, that there was a
20  perception that it might be high, actually in reality
21  was not high and actually had not been recognized in
22  that published trials to that point.
23        So I think that it's fair that it was a
24  clinical concern based on knowledge of the surgical

Page 129

1  anatomy and the procedure that was being done, and
2  that I think the surgeons just like myself moved away
3  from the theoretical concern to seeing evidence that
4  there wasn't a high rate of urethra erosion or even a
5  rate that was more than 1 percent.
6    Q.    Okay.  And just tell me if I'm wrong in my
7  summary here:  It's your interpretation of this
8  document is that urologists are concerned, but there
9  is no evidence to support that there are urethra
10  erosions happening with TVT Gynecare procedures?
11    A.    That is not a true statement, and that is
12  not what I said.
13    Q.    Okay.
14    A.    What is evident here, and this reflects my
15  personal situation, was that there was general concern
16  about the use of a synthetic material in the
17  suburethral space.  But after evaluation of the device
18  and some prospective trials, at that point the concern
19  began to mitigate.
20    Q.    Okay.
21    A.    And in all the subsequent collection of
22  data regarding TVT we have observed a very, very low
23  rate of urethra erosion.  So the concern that
24  initially was present was indeed an unrealized

Catherine A. Matthews, M.D.

Page 130

1 concern.

2    Q.    Just using your testimony, this date,
3 September 28th, 2001, this would have been before you
4 personally had reached that conclusion based on the
5 medical literature?

6    A.    That is correct.

7    Q.    Okay.

8         (Plaintiffs' Exhibit 7 was marked for
9         identification.)

10 BY MR. TEAGUE:

11    Q.    And I'll mark this as 7.  This is a very
12 similar report to the one I marked in 5.  I would just
13 mark -- note again while you are reviewing that that
14 the enter date was June 30, 2000, and the alert date
15 was the same, correct?

16    A.    Correct.

17    Q.    And I apologize, Doctor, do you need
18 another minute to review?

19         The only thing I would -- or again, I would
20 point out under the investigative comments, that while
21 a lot of this is redacted and I can't read it in full,
22 the second sentence says:  The doctor reports this
23 patient underwent TVT in the fall of 1999.  And then
24 after symptoms and waging recurring fraction, failed

Page 131

1 medical therapy, she is referred to urology, quote,
2 who performed cystoscopy and diagnosed a posterior
3 urethra erosion with urethrovaginal fistula.

4         Did I read that correctly?

5    A.    Correct.

6    Q.    Okay.  So again, in this example, there was
7 a second doctor, a urologist, who looked at this and
8 actually diagnosed a posterior urethra erosion.

9         Again, given that this was information
10 provided to Ethicon by at least June 30th of 2000,
11 does it concern you that later marketing pieces would
12 tout that there was no reported urethra erosions when
13 here we have not just one but a second doctor who
14 reviewed a patient and the second doctor who has no
15 conflicts, no reason to cover himself, has reported
16 that this is a urethra erosion?

17    A.    Certainly, it does appear that this was --
18 this was more likely to have been a ure- -- an
19 erosion, and certainly there was evidence -- not even
20 erosion but a fistula.  So certainly, it appears that
21 there was evidence and how much -- to what extent this
22 should have been shared with marketing, you know, I
23 can't comment on the internal documents.  But, yes, it
24 seems reasonable that they could disclose this.

Page 132

1    Q.    Okay.

2    A.    And this may have been reported to the
3 MAUDE database.  I don't know.  It probably was.

4    Q.    Okay.  And then under the -- you see the
5 comment that was entered July 12th, 2000, starting
6 halfway through that, it says:  While the erosion may
7 have arisen from user error -- so they acknowledge
8 that that is possible -- it may have been associated
9 with mesh rejection or like the most recent symptoms
10 have been a consequence of mesh infection.

11         And I'm -- again, I know you are -- well,
12 let me just ask it this way.  As a clinical physician,
13 how would you interpret those phrases, mesh rejection
14 and then mesh infection?  You can start first with
15 mesh rejection.

16    A.    I don't know what is meant by the term mesh
17 rejection.  In the implantation of the more than
18 3 million slings that we have in there, we don't have
19 a clinical composite of symptoms that is consistent
20 with quote/unquote rejection.  So I don't really know
21 what to make of that term.

22    Q.    Okay.  Fair enough.

23         What about mesh infection?

24    A.    Certainly, infection of a synthetic

Page 133

1 polypropylene material is a well known risk, and
2 infection can lead to complications of the tissue and
3 breakdown of the tissue surrounding the mesh.  So it
4 certainly seems that that is a plausible explanation
5 for what happened.

6    Q.    Okay.  And what are -- what -- you said
7 that there are -- you know, I apologize, the
8 doctor-ese I don't do as well as you do, but -- so
9 what are some of the -- what are some of the known --
10 I'll use the word attributes for now -- what are some
11 of the known attributes for mesh infection?  What do
12 you see, how do you determine that, how do you make
13 that clinical diagnosis?

14    A.    How do you make the diagnosis of mesh
15 infection, or how do you -- what are the clinical
16 attributes of a mesh that link -- that cause
17 infection?

18    Q.    Okay.  Well, let's start with the second
19 part.  What are the clinical attributes of mesh that
20 cause infection?

21    A.    So we know that the smaller the pore size
22 of a mesh -- the mesh, the greater chance of
23 infection.  There is a very significant linear
24 correlation between the two.  And that is because the

Catherine A. Matthews, M.D.

Page 134

1 meshes that have very small pore size, the bacteria
2 can get in, but the body's white blood cells to fight
3 the infection are too big to fit into the space.  And
4 so there's a very significant -- a significantly
5 higher rate of infection for small pore mesh.  This is
6 a higher rate of infection in mesh that is
7 multifilament and mesh that is heavier weight as
8 opposed to a lightweight material.
9     Q.    And I just note earlier, it was noted as a
10 TVT, but -- so are you saying that TVT has the small
11 mesh size?
12    A.    No, the small -- it has the largest pore
13 size of all the commercially available meshes.
14    Q.    Okay.  So let me just redirect your
15 question in terms of TVT, what would be -- how would
16 you -- how would you -- what -- what would you
17 associate with mesh infection in a TVT size mesh?
18    A.    So, you know, I think that, again, there
19 are host factors, there are surgeon factors, and there
20 are mesh factors.
21    Q.    If you would, break each of them down for
22 me.
23    A.    So the surgeon factors would be if the mesh
24 is placed in the wrong -- if the mesh is placed in the

Page 135

1 wrong tissue plane, so either too close to the urethra
2 bladder or in the urethra bladder or too close to the
3 vagina.  If the mesh -- so, yeah, I would say that
4 those would be the main factors.  If the surgeon
5 contaminated the mesh in placement, touched it to
6 something that was not sterile --
7    Q.    Okay.
8    A.    -- used a nonsterile insertion technique,
9 didn't give perioperative antibiotics.
10    The patient factors would be if there was a
11 preexisting infection in the vagina.  The patient was
12 a smoker, again, they probably have a higher risk of
13 infection.
14    Q.    Okay.
15    A.    And then the mesh properties, again,
16 because the same mesh is put in in each patient, I've
17 told you the general mesh properties that are
18 associated as the TVT mesh has a large pore size
19 relatively, is monofilament mesh.  It's the lowest
20 profile for infection, but still infection exists with
21 any foreign body.
22    Q.    Okay.  So again, since we don't know which
23 of the three it is, if you were to look at that and
24 rule out doctor error, knowing that it's a TVT, which

Page 136

1 as you describe it has a large pore mesh, what within
2 the properties of that mesh do you consider -- or that
3 was a bad question.  Strike that.
4     All right.  If you were to rule out the
5 doctor error or that it was contaminated prior to
6 implant and you are only left with the mesh itself,
7 what are the -- what would you look at to determine --
8 or how would you determine whether or not the
9 infection arose?  That is a bad question.
10    MR. ROSENBLATT:  Object to form.
11 BY MR. TEAGUE:
12    Q.    Do you understand that at all?  And maybe
13 you've already covered that.  It may -- let me just
14 ask:  Is there anything -- is there anything you need
15 to add to your previous answer, because I think I'm --
16 I really just asked a bad question, and I think you
17 probably already covered it.  So are you good with me
18 moving on at this point?
19    A.    Sure.
20    Q.    All right.  Fair enough.
21    Doctor, we have talked about, to some
22 extent -- you know, strike that.  I'll -- I'll let you
23 look at this first, and then we will talk about it.
24    (Plaintiffs' Exhibit 8 was marked for

Page 137

1 identification.)
2 BY MR. TEAGUE:
3    Q.    I'll hand you what I've marked as
4 Exhibit 8.  This is an internal e-mail we received
5 during discovery, and the two parties Axel Arnaud and
6 Martin Weisberg.
7    Do you happen to know either of those
8 persons?
9    A.    I do not.
10    Q.    Okay.  And my concern or what I wanted to
11 ask you about, as someone who is representing Ethicon
12 at this deposition, or at least testifying on their
13 behalf, it says -- and this is Bates number 3910175,
14 and the last full paragraph, the e-mail at the bottom,
15 Dear Marty, and this is an October 13th, 2002, e-mail.
16    This is Axel Arnaud writing:  Dear Marty, I
17 reviewed your draft report.  Apart from minor
18 corrections concerning typing errors, it is perfect
19 for me.  I just had a concern about your statement
20 concerning potential complications/fistula and
21 erosions.  This is a problem which arises rather
22 commonly in practice, even polypropylene, and it might
23 be wise to be, quote, more elusive on this.
24    And this is, obviously, in terms of some --

Catherine A. Matthews, M.D.

Page 138

1  it looks to me labeling or at least something that is
2  intended to address potential complications of fistula
3  and erosion as shown in No. 5 above.
4         Now, my direct question to you is does it
5  concern you that an Ethicon representative would
6  recommend to another Ethicon representative to be
7  quote/unquote elusive on something that appears to be
8  a warning or an indication for their product?
9         MR. ROSENBLATT: Object to form, lack
10 of foundation.
11        THE WITNESS: Well, first of all,
12 I -- you know, when you look at the broad
13 category of potential complications,
14 fistula and erosions is a very broad
15 category of things. So am I concerned if a
16 company -- I am concerned if a company
17 deliberately hides significant risks from
18 patients. So to what extent being elusive
19 is hiding this, I don't know to what extent
20 that means. The word elusive can mean many
21 different things.
22        So I don't think that I am qualified
23 to provide direct commentary on this. I
24 have no doubt that internal communications

Page 139

1  exist to try to maximize the marketing
2  ability of a product.
3  BY MR. TEAGUE:
4     Q.   Okay. Does it concern you then that a
5  manufacturer, a device manufacturer like Ethicon might
6  place profits over potential safety issues?
7     A.   I think --
8         MR. ROSENBLATT: Objection to form.
9         THE WITNESS: I think that really and
10 truly, this is another example of how
11 studies that are conducted independent of
12 industry are necessary to validate in a
13 non-biased fashion if there are
14 complications. So there is nothing
15 elusive, hidden or any way disguised in the
16 Level I evidence that is published.
17        So in my -- in my opinion, that is
18 information that physicians rely on, not
19 anything that comes up from marketing. So
20 we are responsible to look at the evidence
21 that is very transparent and very clearly
22 collected to determine the rates. And the
23 rest of it is all bias to some extent.
24 BY MR. TEAGUE:

Page 140

1     Q.   Okay. Well, then, do I take it from your
2  testimony that there is some level of elusiveness or
3  bias apparent in anything that is put out by a device
4  manufacturer?
5     A.   Advertising --
6         MR. ROSENBLATT: Objection --
7         THE WITNESS: -- and marketing is
8  elusive.
9         MR. ROSENBLATT: Object to the
10 characterization.
11 BY MR. TEAGUE:
12    Q.   Do you -- while we are on that subject, do
13 you think it's wise for companies to advertise or
14 market products? So that I mean --
15    A.   Are you talking about medical companies?
16    Q.   Well, yeah, sure.
17    A.   Like what companies are you talking about,
18 chocolate companies?
19    Q.   Yeah, I'm talking about medical companies.
20 I mean, the role of advertising, to reach, you know,
21 consumers and influence them --
22    A.   So -- so --
23    Q.   -- outside the --
24    A.   -- if you want --

Page 141

1     Q.   --.
2     A.   -- so the greatest revenue from television
3  at the moment comes from pharmaceutical companies
4  selling drugs to patients directly. Do I personally
5  like that practice? Absolutely not. I think it's --
6     Q.   Okay.
7     A.   -- it's not -- it's not a great portion of
8  medicine, but it's a reality in America. So if you
9  want to transform the entire way that medicine is
10 practiced here, go for it. But I mean, yeah, my
11 personal opinion is direct-to-consumer advertising is
12 not great.
13    Q.   Okay. And let me ask you just one last
14 question on No. 8. Is this one of the documents you
15 were shown in the package that you received from
16 Ethicon?
17    A.   No. As I said before, I asked them
18 specifically to show me the clinical trials and
19 studies that they had done internally to evaluate
20 their product.
21    Q.   Okay. And does it concern you when you
22 asked for documents that would give you a full and
23 fair picture that something describes the
24 elusiveness -- and I'm using their words, the

Catherine A. Matthews, M.D.

Page 142

1  elusiveness of a warning -- that doesn't bother you at
2  all as someone who is here testifying on their behalf?
3        MR. ROSENBLATT:  Object to form.  I'm
4  just going to point out, Counsel, what you
5  read is not about TVT, and I will leave it
6  at that.
7        MR. TEAGUE:  I -- Counsel, if your
8  representation is that they would only be
9  elusiveness about one product and not the
10  whole rest of their family, then, sure,
11  I'll take that.  You'll make that
12  representation?  That's all right, we
13  can --
14        MR. ROSENBLATT:  You can move on and
15  ask your next question.  I just want you to
16  ask your questions --
17        MR. TEAGUE:  That question hasn't
18  been answered.
19        MR. ROSENBLATT:  -- in the context of
20  the TVT.
21        MR. TEAGUE:  That question hasn't
22  been answered.  That is fine.
23        MR. ROSENBLATT:  Okay.
24        MR. TEAGUE:  That question hasn't

Page 143

1  been answered.
2        MR. ROSENBLATT:  What is your
3  question?
4        THE WITNESS:  Can you read back the
5  question to me, please?
6        THE REPORTER:  I'll try --
7        MR. TEAGUE:  I'll rephrase it.  I'll
8  rephrase it.
9  BY MR. TEAGUE:
10     Q.   Doctor, granted, given that this is an
11  e-mail between Ethicon representatives that uses the
12  word elusive in something that they are going to use
13  to describe rates or complications associated with
14  fistula erosion, does the term elusive bother you at
15  all?
16     A.   Reading the --
17        MR. ROSENBLATT:  Object to form, lack
18  of foundation.
19        THE WITNESS:  In the context of all
20  the millions of e-mails that I am sure that
21  you've sifted through to find the word
22  elusive, does that concern me?  No.  I
23  think that you are really searching for
24  straws here out of millions of things that

Page 144

1  you must have gone through to find the one
2  word elusive.
3  BY MR. TEAGUE:
4     Q.   Okay.  If that is your opinion, I'll more
5  than happily take that.  I'm fine with that testimony.
6        (Plaintiffs' Exhibit 9 was marked for
7  identification.)
8  BY MR. TEAGUE:
9     Q.   I'll show you what I've marked as 9.
10        MR. ROSENBLATT:  Do you have an extra
11  copy?
12        MR. TEAGUE:  I do, sorry.
13  BY MR. TEAGUE:
14     Q.   And this is a document that, again, is
15  branded Gynecare Worldwide, noted as a memo, and the
16  title is TVT phase and TVT-O Compliant Review for
17  Laser Cut Mesh Risk Analysis?
18        And, Doctor, primarily, I wanted to get
19  your opinion on the second page, the analysis page,
20  and you just tell me when you are ready to turn there.
21        Doctor, what I specifically want to ask you
22  about is, in that first paragraph, the last sentence
23  of analysis, it says:  For TVT base product number
24  810041B, approximately 65 percent of all complaints

Page 145

1  fall into the following groupings:  Mesh
2  fraying/roping, sheath damage, erosion, exposure and
3  pain.
4        Doctor, do you believe that mesh fraying is
5  a complaint that is associated with TVT Gynecare?
6     A.   Yes.
7     Q.   Okay.  Describe for me, help me
8  understand -- or in your clinical -- strike that.
9        What do you -- how do you determine mesh
10  fraying?
11     A.   So if one puts significant tension on the
12  ends of the mesh when you remove the overlying the
13  plastic sheaths, you can deform the mesh, and you can
14  pull it into a tight bend with fraying of the edges.
15     Q.   Okay.  Is that a design defect?
16        MR. ROSENBLATT:  Object to form,
17  calls for a legal conclusion.
18        THE WITNESS:  It's not a design
19  defect because that's not how it's supposed
20  to be used.  So if you adjust the mesh with
21  the plastic sheaths overlying it, you can't
22  deform it, and that is how the mesh is
23  supposed to be tensioned, with the plastic
24  sheaths in place.

Catherine A. Matthews, M.D.

Page 146

BY MR. TEAGUE:

1  BY MR. TEAGUE:
2  Q.  Okay.  Did -- to your knowledge, did
3  Ethicon or Gynecare ever change the sheaths in any of
4  their products, from the original TVT Gynecare
5  version?
6  A.  I'm trying to recall as the surgeon.  I --
7  I don't know specifically.  There's always been a
8  plastic sheath that's completely covered the mesh, and
9  you are not able to deform the mesh when you're using
10  the sheaths that are covered.  So whether or not it
11  changed, I don't know.  I know that since I've used it
12  in 2004, 2005 to now, I have noticed the same
13  properties of the sheath.
14  Q.  Okay.  How would you interpret sheath
15  damage from this e-mail, just in your experience?  Do
16  you have any idea?
17  A.  I don't know if they were defects in the
18  external sheath that was torn in some respect or
19  missing.  I don't know what that means.
20  Q.  Okay.  What about erosion, we -- I know
21  we've covered that a good bit today, but do you have
22  anything -- well, strike that, we've already covered
23  erosion, so we can move on.
24  What do you consider -- what is your

Page 147

1  understanding of the term exposure is the next bullet
2  point?
3  A.  Exposure specifically references mesh
4  that's visible in the vagina.
5  Q.  Okay.  And what about -- the word pain is
6  here, and obviously I'm not going to ask you to
7  necessarily divine what they meant by that.  But what
8  types of pain do you see with the retropubic TVT
9  Gynecare?
10  A.  So certainly, and what's been again
11  described in the literature, there have been few
12  reports of retropubic pain, and I have seen a case of
13  that, pain with intercourse.  And really the leg and
14  thigh pain seems to be specifically limited to the
15  transobturator sling.  So I think that to the extent
16  that it's specifically related to TVT, I would say
17  suprapubic pain and dyspareunia.
18  Q.  Okay.  Would you -- in another deposition I
19  was reading, I believe it was yours, but correct me if
20  I'm wrong, you had made a distinction between initial
21  thigh or inner groin pain was more associated with a
22  TOT sling, obturator sling, but that postoperative,
23  you had seen more cases of pain in the thigh after the
24  retropubic down the road.

Page 148

1  A.  No.  I -- if you look at the results of the
2  TOMUS trial, I think that it's very consistent that
3  transobturator slings are associated with thigh and
4  groin pain, whereas retropubics don't have a
5  significant association with thigh and groin pain.
6  Whether or not some patient has complained of that,
7  it's certainly possible.  But in the medical
8  literature, the peers that find groin pain is much
9  more affiliated with transobturator than retropubic.
10  Q.  Okay.  And that is in all phases from post
11  surgical to, you know, whatever infinite life you want
12  to roll down the -- or strike that.
13  That would -- you would include in your
14  definition, both the postoperative period and the
15  period following that?
16  A.  Yeah, every -- all patients have some
17  degree of pain in the immediate postoperative period,
18  so it's difficult to identify if that is normal pain
19  or pathologic pain.  I think that longer term
20  pathologic pain that is experienced more than six
21  weeks out from the procedure, again, if you are
22  talking specifically about thigh and groin pain, it's
23  much more commonly observed with the transobturator.
24  Q.  Okay.  Do you -- in some of the expert

Page 149

1  reports that have been produced in this litigation,
2  there is mention of -- that if a -- if a chronic type
3  of pain exists for long enough, that at points the
4  amino acids take over and continue to send that
5  signal, even without necessarily a -- I guess like a
6  reaction or without an initiator of some kind for lack
7  of a better word.
8  Do you have any thoughts on that as -- do
9  you deal with, you know -- or based on what I just
10  said, do you have any thoughts on that at this point?
11  A.  I've never heard the theory proposed that
12  amino acids act to --
13  Q.  Yeah, you know what, I should have just --
14  I'll -- you know, I'll read it, I will read it
15  directly because I thought I could wing it, but it's
16  probably better that I just put it in front of me and
17  read it, so I don't -- because I don't want to
18  misrepresent anything that was said.
19  A.  Okay.
20  MR. ROSENBLATT:  And which expert
21  report are you referring to?
22  MR. TEAGUE:  That is what I'm saying,
23  I need to just pull my notes and see.
24  MR. ROSENBLATT:  Okay.

Page 150

BY MR. TEAGUE:

1  Q.    Yeah, the comment that I saw -- and this
2  was from one of the depositions you took in AMS -- was
3  that thigh pain in retropubic slings was higher after
4  six months.  Is that an opinion you still hold?
5  A.    It's whatever the results are from the
6  TOMUS trial --
7  Q.    Yeah.
8  A.    -- so I'm very happy to pull that paper and
9  have us look at that together.  But it's whatever the
10  longer term outcomes are from the TOMUS trial that
11  gives us the best information comparatively of
12  retropubic to transobturator.
13  Q.    Yeah.  And I believe that you had mentioned
14  of the five that were reported, only one of the five
15  was transobturator, the other four were retropubic,
16  after the six-month period.
17      Does that sound familiar to you based on
18  your reading of the --
19  A.    I would want to review the TOMUS trial
20  again to look specifically at the numbers to
21  corroborate that.  It's possibly true, but I would
22  like to look at it.
23  Q.    Okay.  Doctor, you have had involvement

Page 151

1  in AUGS, correct?
2  A.    Very much so, yes.
3  Q.    The -- and if you would, define what AUGS
4  is for the record.
5  A.    American Urogynecology Society.
6  Q.    Okay.  And have you served as an officer or
7  elected representative in any capacity?
8  A.    I have.  I was the vice chair and then
9  chair of the foundation for AUGS and served on the
10  board in that capacity.
11  Q.    Okay.  AUGS allows corporate or
12  manufacturing or industry -- manufacturers themselves
13  to join AUGS; is that correct?
14  A.    I think anybody is -- anyone is able to
15  join AUGS, correct.
16  Q.    Okay.  And were you aware that Ethicon was
17  a member of AUGS?
18  A.    It doesn't -- it doesn't surprise me at
19  all.  I certainly know of attorneys being members.
20  So, yeah, that doesn't surprise me at all.
21  Q.    Is it open to gynecologists and urologists
22  as well?
23  A.    Yeah.  So, I mean, that's specifically who
24  it's designed to serve.

Page 152

1  Q.    Okay.  Do you know what percentage of
2  doctors practicing in pelvic medicine belong to AUGS?
3  Without assuming.  I'm just asking if you know.
4  A.    I think that when you say practicing
5  urogynecology, I don't know exactly what you mean by
6  that.  Do you mean doing the full complement of pelvic
7  floor disorder treatment, or do you mean just placing
8  slings?
9  Q.    I mean, I didn't really have a specific --
10  I meant, you know, say roughly taking OB/GYNs,
11  urologists, gynecologists as a whole, do you know what
12  percentage of those practicing doctors would belong to
13  AUGS?  Have you ever seen any --
14  A.    Well, I think that -- gosh, almost --
15  Q.    -- data?
16  A.    - almost a hundred percent of people who
17  are board certified urogynecologists are members of
18  AUGS.  I'm sure it's not 100 percent because nobody is
19  ever 100 percent, but it's a very high number.
20      Of generalists who do urogynecologic
21  procedures, I cannot give you a breakdown, but I'm
22  sure that AUGS could provide you that information if
23  necessary.
24  Q.    Okay.  In terms of other experts in this

Page 153

1  litigation, have you read -- I know you've read
2  reports, and you disclosed those in your report.
3      But have you actually read any medical
4  literature from any of the other -- from any of the
5  plaintiff-designated experts?
6  A.    I have read medical literature from
7  Dr. Blaivas, yes.
8  Q.    Okay.
9  A.    And I've lectured with him at a conf- -- at
10  several conferences.
11  Q.    Okay.  So you all know each other?
12  A.    For sure.
13  Q.    Okay.  Have you -- have you all ever worked
14  together in any capacity?
15  A.    I -- in terms of being speakers at the same
16  conference, yes, but not to do -- not otherwise.
17  Q.    Okay.  In terms of his qualifications do
18  you have any doubt that he is qualified to illicit his
19  opinions on mesh, mesh properties, injuries associated
20  with mesh?
21      MR. ROSENBLATT:  Object to form.
22      THE WITNESS:  I think that -- I think
23  that Dr. Blaivas is biased, I think, but I
24  don't -- I certainly respect his medical --

Catherine A. Matthews, M.D.

Page 154

1    respect his position in the field.
2  BY MR. TEAGUE:
3    Q.   Okay.  Biased how?
4    A.   I think that it's interesting that, you
5  know, Dr. Blaivas has served on some important boards
6  within the AUA that have looked at outcomes of
7  different incontinence procedures.  He seemingly
8  agreed with the results that they've published, and
9  then personally he has provided different information.
10  So to the extent that, you know, I -- to that extent
11  it's a little bit confusing as to where his positions
12  really come from.
13    Q.   Do you not worry that the same could be
14  said for you?
15    A.   I think that I am very, very, very
16  representative of the vast Level I medical evidence
17  that has been published on the subject.  So I don't
18  think that I am presenting opinions that fly in the
19  face of the best medical evidence that exists.
20    Q.   Okay.  In terms of -- obviously, you have
21  been critical of sales reps.  You have written a paper
22  that, you know, describes some issues you have with
23  industry.
24       So to put it into that category, are you

Page 155

1  not concerned that you'll lose some credibility on
2  the -- on that front to have published such a paper
3  and then to later represent industry at trial?
4    A.   I'm not here representing Ethicon, I'm here
5  representing TVT as the best procedure for the
6  management of stress incontinence in women.
7    Q.   Okay.  Do you separate Ethicon and Gynecare
8  TVT?  I mean, that is the manufacturer.
9    A.   The company -- the company produces the
10  product, but it's the product that I'm here defending
11  vehemently because I believe that if this product is
12  removed as an option for the management of stress
13  incontinence in women, the many, many, many thousands
14  of women that I treat in my practice are going to be
15  very much harmed by not having this as an available
16  option to them.
17    Q.   Would you agree with me that to the extent
18  it's proven it's failed in an individual woman and
19  that woman's compensated by a jury, that is not --
20  that doesn't clinically mean anything is going to be
21  taken off the market, does it?
22    A.   I think that what I'm here to do is to
23  provide the best -- the best medical evidence for the
24  safety and the efficacy of the product, the product

Page 156

1  design and the way people implant it.  So that is
2  what -- that is my motivation for being here.  It's
3  not to support Ethicon.
4    Q.   Okay.
5       MR. TEAGUE:  I'm going to reserve the
6  rest of my time.  Do you have any follow-up
7  questions at this point?  If not, I'll just
8  keep going, but -- what am I at right
9  now --
10       MR. ROSENBLATT:  Actually, I --
11       MR. TEAGUE:  -- by your clock?
12       MR. ROSENBLATT:  2:52.
13       MR. TEAGUE:  Okay.  Okay.  I'll tell
14  you what then --
15       MR. ROSENBLATT:  Let me ask just -- I
16  think I have one question maybe.
17       Okay.  I'm ready.  Oh, I'm sorry.
18  Are you ready, Matt?
19       MR. TEAGUE:  Yeah, I'm sorry, go
20  ahead.
21       EXAMINATION
22  BY MR. ROSENBLATT:
23    Q.   Doctor, is pain a potential complication
24  that is unique to TVT?

Page 157

1    A.   It's actually not unique to TVT.  It's a
2  well known complication of any surgical procedure for
3  stress urinary incontinence.
4       MR. ROSENBLATT:  No further
5  questions.
6       MR. TEAGUE:  Okay.  I think I'm
7  pretty much done.  Let me just -- if you
8  don't mind, let me review for a second.
9       We can go off the record.
10       (Recess taken.)
11       THE VIDEOGRAPHER:  This is the end of
12  Videotape No. 3 in the deposition of
13  Catherine Matthews, MD.  The time is
14  2:31 p.m.  We are off the record.
15       (Deposition Adjourned at 2:31 p.m.)
16
17
18
19
20
21
22
23
24

Catherine A. Matthews, M.D.

Page 158

1       REPORTER'S CERTIFICATE
2     I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,
3   Registered Professional Reporter, certify that the
4   foregoing proceedings were taken before me at the time
5   and place therein set forth, at which time the witness
6   was put under oath by me;
7       That the testimony of the witness, the questions
8   propounded, and all objections and statements made at
9   the time of the examination were recorded
10  stenographically by me and were thereafter
11  transcribed;
12      That the foregoing is a true and correct
13  transcript of my shorthand notes to taken.
14  I further certify that I am not a relative or employee
15  of any attorney or the parties, nor financially
16  interested in the action.
17      I declare under penalty of perjury under the laws
18  of North Carolina that the foregoing is true and
19  correct.
20      Dated this March 29, 2016.
21
22
23      LESHAUNDA CASS-BYRD, CCR-B-2291, RPR
24

Page 160

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I,_____, do
5   hereby certify that I have read the
6   foregoing pages, and that the same is
7   a correct transcription of the answers
8   given by me to the questions therein
9   propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  CATHERINE A. MATTHEWS, M.D.     DATE
16
17
18  Subscribed and sworn
    to before me this
19  _____ day of _____, 20_____.
20  My commission expires:_____
21
22  _____
    Notary Public
23
24

Page 159

1       - - - - - -
        E R R A T A
2       - - - - - -
3
4   PAGE  LINE  CHANGE
5   ____  ____  _____
6       REASON: _____
7   ____  ____  _____
8       REASON: _____
9   ____  ____  _____
10      REASON: _____
11  ____  ____  _____
12      REASON: _____
13  ____  ____  _____
14      REASON: _____
15  ____  ____  _____
16      REASON: _____
17  ____  ____  _____
18      REASON: _____
19  ____  ____  _____
20      REASON: _____
21  ____  ____  _____
22      REASON: _____
23  ____  ____  _____
24      REASON: _____