# Exhibit B

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

             SOUTHERN DISTRICT OF WEST VIRGINIA

 2                   (CHARLESTON DIVISION)

 3

     ----------------------------X

 4                                  :

     IN RE:  ETHICON, INC. PELVIC : MASTER FILE NO.

 5   REPAIR SYSTEM PRODUCTS        : 2:12-MD-02327

     LIABILITY LITIGATION          :

 6                                  : MDL NO. 2327

     THIS DOCUMENT RELATES TO      :

 7                                  : JOSEPH R. GOODWIN

     ALL WAVE 8 AND SUBSEQUENT     : U.S. DISTRICT JUDGE

 8   WAVE CASES AND PLAINTIFFS     :

                                    :

 9   ----------------------------X

10

11          Deposition of MARK ELLERKMANN, M.D.

12                  Towson, Maryland

13            Friday, October 12, 2018

14                   1:05 p.m.

15

16

17

18

19

20

21

22

23

24   Reported by:  Linda M. Bahur, RPR
```

1    Deposition of MARK ELLERKMANN, M.D., held at:

2          SHERATON BALTIMORE NORTH HOTEL

3          903 Dulaney Valley Road

4          Towson, MD   21204

5       Pursuant to agreement, before Linda M. Bahur,

6    a Notary in and for the State of Maryland.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    A P P E A R A N C E S
 2    ON BEHALF OF THE PLAINTIFF:
 3         Andrew N. Faes, Esquire
           Wagstaff & Cartmell, LLP
 4         4740 Grand Avenue
           Suite 300
 5         Kansas City, MO  64112
           (816) 701-1100
 6         afaes@wcllp.com
 7
      ON BEHALF OF DEFENDANT:
 8
 9         Nils B. (Burt) Snell, Esquire
10         Butler Snow, LLP
11         500 Office Center Drive
           Suite 400
12         Fort Washington, PA  19034
           (267) 705-4910
13         burt.snell@butlersnow.com
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2                    I N D E X
 3                E X A M I N A T I O N
 4   Witness Name                                    Page
 5   Mark Ellerkmann, M.D.
 6       Direct By Mr. Faes ...................... 5
 7       Cross By Mr. Snell ...................... 138
 8
                    PLAINTIFF EXHIBITS
 9
                (Attached to the transcript)
10
     Exhibit    Description                        Page
11
     No. 1      Notice of Deposition ............. 5
12
     No. 2      General Expert Report, 8/4/18 ..... 5
13
     No. 3      General Reliance List in Addition . 5
14              to Materials Referenced in Report
15   No. 4      Curriculum vitae ................. 5
16
                    DEFENSE EXHIBITS
17
                (Exhibit No. 1 retained by Mr. Snell)
18
     No. 1      Objections to deposition notice ... 179
19
     No. 2      Thumb drive ...................... 179
20
21
22
23
24
```

1

2                    P R O C E E D I N G S

3               (Plaintiff Exhibit Nos. 1-4 were marked

4    for identification.)

5    Whereupon --

6                    MARK ELLERKMANN, M.D.

7    being first duly sworn, as hereinafter certified,

8    testifies as follows:

9                    EXAMINATION BY MR. FAES:

10        Q    Good afternoon, Dr. Ellerkmann.  My

11   name is Andrew Faes and I represent various

12   plaintiffs in this litigation, and I'm here today

13   to take your deposition regarding the Prolift

14   case.  Do you understand that?

15        A    Yes, I do.

16        Q    And you understand that you're under

17   oath and you're sworn to tell the truth; right?

18        A    Yes.

19        Q    And if for any reason during the course

20   of the day I ask you a question that doesn't make

21   sense to you, just let me know and I'll try to

22   rephrase the question.  All right?

23        A    I will.

24        Q    First of all, I've premarked some

```
 1   occasions?

 2        A    No, I wouldn't say that's accurate.

 3   Not less than five occasions, but less than 5

 4   percent of the time.

 5        Q    Okay.  Have you ever tracked a

 6   complication rate for the Prolift based on your

 7   personal use in your office?

 8        A    So I keep a database of my surgery,

 9   every surgery I've done even as a fellow.  Not as

10   a resident but as a fellow.  I did my training

11   here.  And of that database, I kept a complication

12   rate and still do.

13        Q    And I don't see anywhere in your expert

14   report where you say that you intend to state an

15   opinion as to what your complication rate is with

16   the Prolift®.  Is that an opinion that you intend

17   to offer in this case?

18             MR. SNELL:  I'm going to object to the

19   characterization.  Go ahead.

20        A    I can offer an opinion regarding my

21   complication rate with respect to Prolift and that

22   was that it was extremely low.

23        Q    So extremely low.  Can you put a

24   numerator on that or a denominator or a
```

1    percentage?

2            A    I can put a general percentage on that.

3    It was probably less than 5 percent.

4            Q    And that's all complications, not just

5    erosion?

6            A    It depends on what complication if we

7    look at the no classification.  You know, if we're

8    talking about Class 1 complications, maybe higher.

9    Urinary tract infections, something like that.

10   But if we're talking about specifically mesh

11   exposure, mesh erosion, less than 5 percent.

12           Q    But as you sit here today, you can't

13   give me, say, a denominator of the total number of

14   cases of Prolift or the numerator of the total

15   number of cases of Prolift?

16               MR. SNELL:  Object to form.  Go ahead.

17           Q    Complications?

18               MR. SNELL:  Object.  Form.

19           A    No.  My overall complication rate with

20   respect to Prolift, less than 5 percent.

21           Q    And would you agree with me that that,

22   since you can't give me the numerator or the

23   denominator as you sit here today, that that 5

24   percent isn't based on any formal analysis that

1    think you called it a Class 1 complication, is

2    that just Prolift/Gynemesh and Prolift+M or is

3    that all of your pelvic organ prolapse meshes?

4         A    I would say that that 5 percent, less

5    than 5 percent erosion rate would apply to all

6    transvaginal mesh that I've used in the last 15

7    years.

8         Q    And have you ever broken it down

9    between the Prolift and the Gynemesh PS and other

10   vaginal --

11        A    Not specifically.

12             MR. SNELL:  Objection.  Assumes with

13   regard to Gynemesh PS being different than

14   Prolift.

15             MR. FAES:  Is it really your position,

16   Counsel, that the Gynemesh PS is not different

17   than the Prolift kit?

18             MR. SNELL:  Actually, yes, it is.  You

19   know it's the same thing.  It's the only thing

20   left in the body.  It's the only thing left in the

21   body, period.  They are the same.  Unless you're

22   going to take the position that it is not Gynemesh

23   PS in the Prolift kit.

24             MR. FAES:  Let's us not argue about it.

1    particular.  No.

2         Q    Okay.

3         A    I may have glanced at them.  Some of

4    these articles that are listed here are articles I

5    am familiar with because either my fellows wrote

6    them or co-workers or colleagues.  So that doesn't

7    mean I read them back to back.  I'm familiar.  I

8    spent my last 20, 25 years reading the literature,

9    so that's how I spend a lot of my evenings.

10        Q    So if I understood you correctly,

11   you're not sure if you reviewed Piet Hinoul or

12   Marty Wiseberg's deposition testimony?

13        A    Yes.  I'm not sure I've reviewed those

14   in particular now.

15        Q    Are there other materials that are

16   listed in your reliance list that you haven't

17   reviewed?

18        A    I would say that most of these I have

19   reviewed.  Either read in their entirety or

20   reviewed.

21        Q    Most but not all?

22        A    Right.  So some of the depositions you

23   said O'Toole.  What page is that on?

24        Q    It's the second-to-last.

```
1          Q    Okay.

2          A    But aside from that, no.

3          Q    And with any of these doctors, did you

4    have any kind of conversation about the amount or

5    the amount of income you could expect if you

6    became a consultant?

7          A    No.

8          Q    Would you agree with me that you've

9    never written a peer-reviewed journal article

10   specifically on the Prolift device?

11         A    I would agree.

12         Q    Are you doing any current research at

13   all right now?

14         A    I'm not doing any clinical trials right

15   now.  The last clinical trial I was involved with

16   was a 522 study with Astora, anterior Elevate.

17   You guys know how to spell it better than I do.  I

18   think it's S-T-O-R-A.

19         Q    It's A-S-T-O-R-A.

20         A    Yeah.  I stand corrected.  522.

21         Q    And that's the Embrace trial listed on

22   your CV under recent clinical research; right?

23         A    Correct.

24         Q    And that study was actually terminated
```

1    because the product was no longer available;

2    right?

3           A    Yes.

4           Q    And do you have any plans to publish or

5    write up any of the research from that particular

6    trial?

7           A    No.

8           Q    Okay.   Would you agree with me that

9    you're not a -- strike that.

10          Would you agree with me that you're not

11   an expert in chemical engineering?

12          MR. SNELL:   Object to form.

13          A    No, I would not agree with that.

14          Q    Okay.   What experience do you have in

15   chemical engineering?

16          A    Well, I have years of working with

17   polypropylene mesh in clinical settings.   I know

18   what material, how it reacts.   I know how I found

19   it to handle when I'm using it.   I've been

20   involved in various industry-sponsored meetings as

21   a thought leader in the field, sharing ideas with

22   colleagues about polypropylene mesh.

23          Q    But you'd agree with me that you don't

24   hold any kind of degrees or certifications in

1    chemical engineering; correct?

2         A    I do.  I would agree with you that I

3    don't.  Yes, I don't.  I don't have a Ph.D in

4    chemical engineering or any other specific degree,

5    but I do have a lot of experience with

6    polypropylene mesh.

7         Q    Have you ever had any formal training

8    in chemical engineering?

9         A    Other than my classes in biochemistry

10   as an undergraduate and medical student, I've not

11   had any other formalized training.  No.

12        Q    And the classes you took as an

13   undergrad, those weren't in chemical engineering

14   specifically, were they?

15            MR. SNELL:  Object.  Form.

16        A    They were in biochemistry.

17        Q    Okay.  And would you agree with me that

18   -- do you hold yourself out -- strike that.  Let

19   me start over.

20            Do you hold yourself out as an expert

21   in polymer chemistry?

22        A    I'm an expert in polymer chemistry

23   insofar as it relates to the use of polypropylene

24   mesh in reconstructive pelvic surgery.

```
 1          Q    But you'd agree with me that you don't
 2   have any degree or certification specifically in
 3   polymer chemistry; right?
 4          A    No, I do not have degrees.
 5          Q    And have you had any formal education
 6   or training specifically in polymer chemistry?
 7          A    Other than seminars that I've attended
 8   and industry-sponsored, lack of a better term,
 9   think tanks regarding the use of polypropylene
10   mesh in reconstructive pelvic surgery.
11          Q    What seminars have you taken where
12   polymer chemistry was discussed?
13          A    Not specifically polymer chemistry but
14   specifically looking at different types of
15   polypropylene mesh -- that's one Type 2 mesh,
16   Marlex mesh -- in their use of pelvic organ
17   prolapse.  As a pelvic surgeon, I have a lot of
18   experience in different synthetic and biological
19   grafts.
20              MR. FAES:  Can you read just the first
21   sentence of that answer back, because I'm not sure
22   if I heard it right.
23              (The last question was read into the
24   record.)
```

1          Q     Would you agree with me that you've

2     never done bench research on polypropylene?

3          A     What do you define as bench research?

4          Q     Well, let me back up and ask you a

5     different question.

6                Do you know what bench research is in

7     regards to medical device testing?

8          A     Well, I think bench research, what it

9     connotes to me is you're sitting in a lab and you

10    have different machines, that you're looking at

11    tensile strength and elasticity and porosity and

12    looking at chemical compositions for specific

13    meshes.  I mean, that's what it connotes to me.

14         Q     So using that definition of bench

15    research, have you ever done any bench research on

16    polypropylene?

17         A     Using the specific definition I just

18    gave you, sitting in a lab working with testing

19    machines and so forth, the answer would be no.

20         Q     Have you ever done any lab research on

21    polypropylene?

22         A     I have worked in cadaver labs.

23         Q     Have you ever done any type of

24    pathological analysis on explanted polypropylene

1    industry standards?

2              MR. SNELL:  Object to form.

3         A    I thought I just answered your

4    question.  And I think industry standards require

5    medical device manufacturers to list potential

6    complications or risks of their device without

7    mandating that every potential complication of the

8    device be noted, because many potential

9    complications are within the common knowledge of

10   the implanting surgeon.

11        Q    And where does that standard come from?

12   Where are you coming up with that standard?

13        A    Well, that's just standard as far as

14   I've been taught.

15        Q    And who taught you that standard?

16        A    I don't know.  Somewhere along the last

17   25 years that's what I understood that to be.

18        Q    But as you sit here today, you can't

19   point to any treatise or document that states that

20   that's the standard?

21        A    I can't specifically reference you one,

22   no.  There is, indeed.

23        Q    Okay.  Would you agree that a medical

24   device manufacturer should include a warning in

Mark Ehrlichmann, M.D.

```
 1    that statement.
 2         Q    Okay.  So you don't think that that's
 3    the standard to be followed?
 4              MR. SNELL:  Objection.  He's told you
 5    that three times.
 6         Q    Is that correct, you don't believe that
 7    is the appropriate standard to follow with a --
 8         A    That is correct.
 9              MR. SNELL:  Objection.  Asked and
10    answered.
11         Q    -- medical device?
12              Have you ever reviewed any of the FDA's
13    guidance for labeling in a medical device?
14         A    I may have at some point.
15         Q    Have you ever reviewed the FDA's Blue
16    Book memo?
17         A    I can't recall.
18         Q    Do you believe that a medical device
19    manufacturer like Ethicon should follow the FDA's
20    guidance when deciding what warnings to put in
21    their IFU?
22              MR. SNELL:  Objection.  Go ahead.
23         A    I would think they would follow the FDA
24    recommendations.  Yes.
```

Mark Ehlermann, M.D.

```
 1          Q    Do you know what departments of a

 2    medical device company are involved in creating

 3    the warnings for an IFU?

 4          A    What departments specifically?

 5          Q    Yes.

 6          A    No.

 7          Q    Have you ever read any testimony from

 8    any Ethicon employees regarding Ethicon's position

 9    on what needs to be in the IFU for the Prolift?

10          A    So internal communications?

11          Q    No.  I'm talking about sworn testimony

12    under oath.

13          A    No.

14          Q    Do you know what the FDA's requirements

15    are regarding warnings for medical devices?

16               MR. SNELL:  Object to form to the

17    extent it has been asked and answered.

18          A    Yes, I think I answered that already,

19    Counsel.  To the best of my knowledge, the FDA

20    requires that a medical device company note

21    potential serious risks of their device and

22    serious complications while also acknowledging

23    that the IFU is not a comprehensive document

24    listing every potential risk or complication.  I
```

1    think I've stated that a few times now.

2          Q     Sorry.  Are you done?  I didn't mean to

3    interrupt you.

4          A     No.

5          Q     Have you ever drafted the IFU for a

6    medical device?

7          A     No, I have not.

8          Q     Have you ever worked on warnings for a

9    medical device?

10         A     No, I have not.

11         Q     Have you ever worked on warnings for a

12   prescription drug?

13         A     No, I haven't, but may I go back to

14   your answer just previously?  Because something

15   came to my mind.

16         Q     Sure.

17         A     I am actually on a board of advisors

18   for a development that's currently R&D.  We've

19   just actually received an N.I.H. grant for a new

20   type of pessary -- pessary, P-A-S-S-A-R-Y [sic] --

21   working with colleagues at Dartmouth-Hitchcock in

22   Hanover, New Hampshire.

23              So to that end, I have counseled and

24   provided Counsel regarding warnings for pessary

Mark Ellerkmann, M.D.

 1    use.

 2         Q    Would you agree with me that you've

 3    never worked on the warnings for a polypropylene

 4    mesh device?

 5              MR. SNELL:   Object to form.

 6         A    Other than providing feedback at

 7    various summits and advisory meetings during my

 8    time as a preceptor with Gynecare or AMS for that

 9    matter.

10         Q    So you actually provided feedback at

11    seminars for Ethicon and Johnson & Johnson

12    regarding warnings that were in the IFU for their

13    polypropylene mesh devices?

14         A    I would state it more different.  I

15    would state is differently, Counsel.  I would say

16    at various workshops and industry-sponsored

17    summits, be they in Minnesota or in New Jersey,

18    round table discussions that we had, we shared

19    information with one another about our clinical

20    experience, and I suspect that that information

21    was tabulated and looked at and ultimately played

22    a role in formulation of IFUs.

23         Q    So during your time consulting for

24    Ethicon specifically, did anyone at Ethicon ever

1    ask you what warnings they thought should be in

2    the IFU for one of their polypropylene medical

3    devices, whether orally or written?

4              MR. SNELL:  Objection.  Can you read

5    that question back?

6              (The last question was read into the

7    record.)

8              MR. SNELL:  Are you asking did someone

9    at Ethicon ask him what warnings that Ethicon,

10   they thought?

11             MR. FAES:  So let me see --

12             MR. SNELL:  I don't know if you meant

13   that.

14             MR. FAES:  Let me see I can reask it.

15             MR. SNELL:  I think I know what you're

16   trying to ask but the question was really --

17   BY MR. FAES:

18        Q    During your time consulting for Ethicon

19   and Johnson & Johnson, did anyone at Ethicon ever

20   ask you your opinion regarding what warnings you

21   thought should be in a polypropylene mesh device?

22        A    Not that I'm aware of specifically.

23        Q    Would you agree with me that you never

24   worked on warnings for a Class 3 medical device?

Mark Ellerkmann, M.D.

1    A    I would agree.  I mean, I think we all

2  know that these devices were elevated to a Class 3

3  device at one point.  But at that point in time,

4  no, I never worked directly with that.

5    Q    Would you agree with me that physicians

6  should be made aware of all the significant safety

7  risks associated with the Prolift in the IFU?

8         MR. SNELL:  Objection.  Asked and

9  answered.

10   A    Yes.  I've answered that.  I would

11  disagree with that, Counsel.  I think that the IFU

12  is intended as a general guideline.  Pelvic

13  surgeons are made aware of risks of pelvic surgery

14  when they're resident doctors when they do their

15  first episiotomy.  They know that can result in

16  dyspareunia.

17         I mean, we all have a fund of knowledge

18  of knowing complications of surgery whether we're

19  using mesh or native tissue.

20   Q    So if a corporate witness for Ethicon

21  and Johnson & Johnson testified that that was the

22  standard that Ethicon and Johnson & Johnson should

23  follow, you would disagree with that?

24   A    Yes, I would.

1        Q    Have you ever been involved with the --

2   strike that.

3             Have you ever been involved with the

4   design of a Class 3 medical device?

5        A    Well, I mean insofar that transvaginal

6   mesh was upgraded to Class 3.  But prior to its

7   being upgraded, I was involved with, as I said

8   here, with development of transvaginal mesh.

9        Q    You've never designed personally a

10  polypropylene medical device; right?

11       A    So have I sat down and actually drew

12  sketches of it and submitted that to other

13  engineers to consider?  No.  Have I participated

14  in workshops in which experts in our field sat

15  around together and talked about ideal properties

16  of polypropylene mesh or mesh or biological

17  materials, or for that matter, xenografts for use

18  in pelvic floor reconstruction?  Yes, I have.

19       Q    You don't have any patents on any

20  medical devices; correct?

21       A    No, I do not.

22       Q    Do you know what the standard is that a

23  manufacturer must follow in designing mesh

24  products?

```
1            A    I don't know.

2            Q    Okay.  If the indications for the

3    Gynemesh PS currently indicate that it's for

4    abdominal use only, would you agree with me that

5    implanting it vaginally would be an off label use

6    transvaginally?

7                 MR. SNELL:  Objection.

8            A    I don't agree with that statement

9    because we have used Gynemesh PS transvaginally

10   with good clinical outcomes.  So it being off

11   label use, I don't know if it would be or not, to

12   tell you the truth.

13           Q    Have you -- in forming your opinions in

14   this case, did you ever review the design history

15   file for the Prolift?

16           A    I may have at some point.

17           Q    Is it on your reliance list?

18           A    I don't know if I have reviewed that at

19   some point.

20           Q    Do you recall any of what's in the

21   design history file, if you reviewed it?

22           A    I don't.

23           Q    Did the contents of the design history

24   file influence any of the decisions that you
```

1    formed in this case?

2          A    It may have.  Yes.

3          Q    In what way?

4          A    Well, I don't know because it's been a

5    while since I glanced at that.  I think if I read

6    it, it may have influenced some point if I

7    referenced it in my report.

8          Q    Do you know what employees from Ethicon

9    were involved in the design of the Prolift device?

10         A    Which, no.  I don't know specifically

11   which employee, so.

12         Q    So do you know who the chief engineer

13   of the Prolift project was?

14         A    I can't recall his name.

15         Q    But it's fair to say that you've never

16   reviewed any testimony that he's offered because

17   you haven't reviewed testimony from any Ethicon

18   employees; correct?

19         A    That's correct.

20         Q    Do you know what a failure modes and

21   effects analysis is?

22         A    Not specifically.  No.

23         Q    So it's fair to say, then, that you

24   don't know what the purpose of failure modes and

1    effects analysis is?

2         A    I can speculate but I don't know

3    specifically.   No.

4         Q    Did you review any of the failure modes

5    and effects analysis in this case?

6         A    No.

7         Q    Do you have any understanding of how

8    the failure modes and effects analysis fits into

9    the warnings for the device during the design

10   process?

11             MR. SNELL:  Objection.   Foundation.

12        A    Not specifically.   No.

13        Q    Do you know what a DDSA is?

14        A    No.

15        Q    Have you reviewed any of the DDSAs for

16   the Prolift or Gynemesh PS in this case?

17             MR. SNELL:  Object.

18        A    No.  Since I don't know what DDSA is in

19   reference to, I wouldn't know if I reviewed it or

20   not.

21        Q    Have you ever reviewed any of Ethicon's

22   standing operating procedures related to design?

23        A    I may have at some point.

24        Q    Did any of those affect any of the

1    opinions that you intend to offer in this case?

2         A    They may.

3         Q    How?

4         A    Well, if I need to refresh my memory.

5    But as we sit right here, they're not influencing

6    any of my opinions because I'm not familiar with

7    them.

8         Q    Would you agree that Ethicon didn't

9    design the mesh arms of the Prolift to rope and

10   curl?

11        A    That's a double negative.  So did they

12   design them to rope and curl?

13        Q    Yes.

14        A    They didn't design them to rope and

15   curl.  No.

16        Q    Do you believe that the mesh arms of

17   the Prolift can rope and curl?

18        A    I don't know if they can rope and curl.

19   I don't think so.

20        Q    So you've never seen any photos of

21   Prolift mesh arms roping and curling?

22        A    I've seen photographs of explanted mesh

23   and explanted Prolift, but not specifically with

24   roping and curling.

1    complications they want to list in their IFU.

2    That's not for me to decide.

3              What I'm saying for the record, once

4    again, is that I don't believe that contraction of

5    tissue and scarring of tissue is related to the

6    polypropylene mesh.

7         Q    So you believe that Ethicon can choose

8    to put whatever warnings they want in their IFU?

9         A    There are guidelines for what warnings

10   they need -- we've been through this before --

11   that they, they need to or they are mandated to

12   put in their IFU, and I am not knowledgeable of

13   those specific guidelines.

14        Q    Earlier you stated it was their

15   prerogative.  Would you agree that that's their

16   prerogative to put additional warnings that may

17   not necessarily be required in the IFU if they

18   choose to do so?

19             MR. SNELL:  Objection.  Misstates.

20        A    Ethicon works with the FDA and the FDA

21   will require companies to list things in the IFU.

22   The process by which that takes place, I can't

23   specifically sit here and tell you now.

24        Q    Would you agree with me that if they

```
 1    want to, a company can list more warnings in their

 2    IFU than is required by law if they choose?  Or do

 3    you know?

 4            MR. SNELL:  Objection.  Foundation,

 5    legal conclusion, and way overbroad.

 6        A    I don't know.

 7        Q    Okay.  Doctor, are you a member of

 8    ACOG?

 9        A    I am.

10        Q    Do you agree with that -- strike that.

11            Do you agree that polypropylene mesh

12    augmentation of anterior vaginal wall prolapse is

13    associated with a higher rate of complications

14    compared with native tissue repair?

15        A    No, I do not.

16        Q    So you disagree with that statement?

17        A    I disagree with that statement.

18        Q    And are you aware that that's a

19    statement that ACOG has made in their most recent

20    treatment guidelines issued in April of 2017?

21        A    No, I'm not aware of that.

22        Q    Have you reviewed ACOG's treatment

23    guidelines for the treatment of pelvic organ

24    prolapse?
```

1    treating pelvic organ prolapse?

2         A    Yes, it would have.

3         Q    Would that presentation have included

4    your analysis and knowledge as to the design and

5    the utility, if any, of such a device?

6              MR. FAES:  Objection.

7         A    Yes.

8         Q    You told Plaintiff's counsel you also

9    have experience analyzing the design of devices in

10   cadaver labs?

11        A    Yes.

12        Q    Number 25, for example, lists a cadaver

13   lab you did on Prolift and other devices.  Do you

14   see that?

15        A    I do.  It was here in Baltimore.

16        Q    Did you do other cadaver labs on

17   Ethicon devices where you analyzed the design of

18   the device and the safety in places other than

19   Baltimore?

20             MR. FAES:  Objection.

21        A    Yes, I did.

22        Q    You were asked about the materials list

23   that my firm put together and I believe you

24   testified you did not read the two company witness

1    depositions that we put on that.  Is that correct

2    or wrong?

3         A    That's correct.

4         Q    Okay.  Did you review, though, the

5    company documents that we sent to you?

6              MR. FAES:  Objection.

7         A    I reviewed as much as I could, yes, of

8    those documents.

9         Q    Had you been reviewing company

10   documents and materials pertinent to the Prolift

11   actually even before becoming an expert in this

12   litigation?

13             MR. FAES:  Objection.

14        A    I reviewed documents in the past from

15   Ethicon as a preceptor and at our summit meetings.

16   Yes.

17        Q    And did you bring today response to

18   plaintiff's deposition notice that was marked as

19   Exhibit No. 1 the materials that you've considered

20   and relied upon?

21        A    I did.  Yes.

22        Q    Can you describe that for the court

23   reporter, please, what you brought.

24        A    So I have brought copies, both hard

Mark Ellsworth, M.D.

1    copy and a flash drive containing all the

2    literature that I had been able to review in

3    preparation for my expert report and for this

4    deposition.

5         Q    Does that also include company

6    documents such as the IFU and professional

7    educations lines?

8         A    Yes, it does.

9         Q    Does that include documents from

10   Ethicon pertaining to the design of the Prolift?

11        A    Yes, it does.

12        Q    You were asked about if you did an

13   analysis.  Did you do an analysis of the medical

14   literature with regard to Prolift to formulate

15   your opinions?

16        A    Yes, I did.

17        Q    Can you tell us in general how you went

18   about doing that analysis?

19        A    So that analysis has been ongoing since

20   I was introduced to transvaginal repairs.  And so

21   in addition to the literature reviewed for today's

22   deposition and for the report, the foundation for

23   my opinion and expert report is based on my

24   experience, my clinical experience, my

Mark Ellerkmann, M.D.

```
 1   communications with other colleagues, and my
 2   review of the literature over the years as well as
 3   specific review of the literature for preparations
 4   for the report.
 5        Q    And there's been questions about
 6   Gynemesh PS and Prolift.  Does Prolift use
 7   Gynemesh PS?
 8        A    Yes.
 9        Q    Do you view outcomes and studies on
10   those two devices as being relevant and similar?
11        A    I do.  Yes.
12        Q    Is that the way you considered those
13   devices back when you were using and teaching them
14   before becoming an expert?
15        A    Correct.  So we know that Gynemesh PS
16   is the same mesh that's used in Prolift.  The
17   difference is in the design, in the cut of the
18   mesh.
19        Q    And would Gynemesh PS and your personal
20   use of it, did you need to cut that mesh and trim
21   it before using it as well?
22        A    I have on occasion, yes.  It came in
23   sheets, so we cut it all the time when we used it
24   for abdominal sacrocolpopexy.
```