# EXHIBIT C

Oz Harmanli, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | : Master File No.<br>: 212-MD-02327<br>:<br>: MDL No. 2327 |
| THIS DOCUMENT RELATES TO ALL WAVE 8 AND SUBSEQUENT WAVE CASES AND PLAINTIFFS | :<br>: JOSEPH R. GOODWIN<br>: U.S. DISTRICT JUDGE<br>: |

*****VOLUME I*****

DEPOSITION OF:     OZ HARMANLI, M.D.

DATE:             OCTOBER 3, 2018

HELD AT:          NEW HAVEN LEGAL
                  900 CHAPEL STREET
                  NEW HAVEN, CT

Reporter:  Samantha M. Howell, LSR #00462

Oz Harmanli, M.D.

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| | REPRESENTING THE PLAINTIFFS: |
| 3 | |
| 4 | Wagstaff & Cartmell, LLP |
| | 4740 Grand Avenue, Suite 300 |
| | Kansas City, MO 64112 |
| 5 | (816) 701-1100 |
| | By: Andrew N. Faes, Esquire |
| 6 | |
| | REPRESENTING THE DEFENDANT: |
| 7 | |
| 8 | Butler Snow, LLP |
| | 1020 Highland Colony Parkway, |
| | Suite 1400 |
| 9 | Ridgeland, MS 39157 |
| | (601) 985-4596 |
| 10 | By: Paul S. Rosenblatt, Esquire |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | S T I P U L A T I O N S |
| 2 | |
| 3 | |
| 4 | IT IS HEREBY STIPULATED AND AGREED by and between |
| 5 | counsel for the respective parties hereto that all |
| 6 | technicalities as to proof of the official character |
| 7 | before whom the deposition is to be taken are waived. |
| 8 | |
| 9 | |
| 10 | IT IS FURTHER STIPULATED AND AGREED by and |
| 11 | between counsel for the respective parties hereto that |
| 12 | the reading and signing of the deposition by the |
| 13 | deponent are required. |
| 14 | |
| 15 | |
| 16 | IT IS FURTHER STIPULATED AND AGREED by and |
| 17 | between counsel for the respective parties hereto that |
| 18 | all objections, except as to form, are reserved to the |
| 19 | time of trial. |
| 20 | |
| 21 | |
| 22 | * * * * * |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | INDEX |
| 2 | WITNESS: PAGE: |
| 3 | Oz Harmanli, M.D. |
| 4 | |
| | Direct Examination by Mr. Faes 5 |
| 5 | |
| 6 | |
| | PLAINTIFF'S EXHIBITS |
| 7 | (for identification) |
| 8 | |
| 9 | EXHIBIT: PAGE: |
| 10 | Exhibit 1 Notice of Deposition 5 |
| 11 | Exhibit 2 Report 5 |
| 12 | Exhibit 3 1st Reliance List 5 |
| 13 | Exhibit 4 2nd Reliance List 5 |
| 14 | Exhibit 5 CV 5 |
| 15 | Exhibit 6 Invoice 5 |
| 16 | Exhibit 7 Email 76 |
| 17 | Exhibit 8 Invoice 78 |
| 18 | Exhibit 9 2009 Email 80 |
| 19 | Exhibit 10 2013 Email String 82 |
| 20 | Exhibit 11 Email 87 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 5 |
|---|---|
| 1 | (Plaintiff's Exhibit 1, Notice of |
| 2 | Deposition, marked for identification.) |
| 3 | (Plaintiff's Exhibit 2, Report, marked for |
| 4 | identification.) |
| 5 | (Plaintiff's Exhibit 3, 1st Reliance List, |
| 6 | marked for identification.) |
| 7 | (Plaintiff's Exhibit 4, 2nd Reliance List, |
| 8 | marked for identification.) |
| 9 | (Plaintiff's Exhibit 5, CV, marked for |
| 10 | identification.) |
| 11 | (Plaintiff's Exhibit 6, Invoice, marked for |
| 12 | identification.) |
| 13 | (Deposition commenced: 2:04 p.m.) |
| 14 | Oz Harmanli, M.D., called as a |
| 15 | witness, having been first duly sworn by Samantha |
| 16 | Howell, a Notary Public in and for the State of |
| 17 | Connecticut, was examined and testified as follows: |
| 18 | DIRECT EXAMINATION BY |
| 19 | MR. FAES: |
| 20 | Q Good afternoon, Dr. Harmanli. Did I get it |
| 21 | right? |
| 22 | A Harmanli. |
| 23 | Q Harmanli? |
| 24 | A You got it, or you can say Harmanli like I used |
| 25 | to go through, yes. |

2 (Pages 2 to 5)

Oz Harmanli, M.D.

Page 6

1       Q   Okay.  My name is Andy Faes and I represent the
2   plaintiffs in the litigation and I'm here today to take
3   your deposition regarding the TVT and TVT-O case; you
4   understand that?
5       A   Yes.
6       Q   Have you ever been deposed before, Doctor?
7       A   Yes.
8       Q   Have you ever been deposed as an expert before?
9       A   Yes.
10      Q   Okay.  Have you ever been deposed as an expert in
11  mesh litigation before?
12      A   No.
13      Q   Okay.  So this will be your first time on being
14  deposed as an expert for Ethicon and Johnson & Johnson?
15      A   That is correct.
16      Q   So you never testified as an expert for them
17  before in any other litigation; is that true?
18      A   No, I have not.
19      Q   All right.  And you stated -- about how many
20  times have you been deposed before?
21      A   Approximately seven.
22      Q   And you testified that you -- strike that.
23          You said that you had testified as an expert
24  witness before.  How many times have you testified as an
25  expert witness?

Page 7

1       A   One time.
2       Q   And that was in a deposition?
3       A   That was in a deposition.
4       Q   And did you end up testifying at trial in that
5   case?
6       A   Not yet.
7       Q   Okay.  And what case was that where you testified
8   in a deposition?
9       A   It was a litigation in Florida.
10      Q   I'm sorry?
11      A   It's a case from Florida.  You need more details?
12      Q   Yes.  What kind of case, what was it?
13      A   It is a medical malpractice case in Florida.
14      Q   And are you -- did you testify on behalf of the
15  plaintiff or the defendant in that case?
16      A   It's a different kind of case that actually the
17  patient, the defendant is -- is another law firm which did
18  not act upon the appropriate rules and regulations in favor
19  of the person who was injured in a medical malpractice.
20  And then another -- and this person is now suing this
21  malpractice lawyer in that case.
22      Q   So it's a --
23      A   I am --
24      Q   Sorry, go on.
25      A   I am basically representing the patient against

Page 8

1   the medical liability attorneys.
2       Q   So it's a -- essentially a legal malpractice
3   case?
4       A   It's a legal malpractice case; perfect.
5       Q   And you're representing -- strike that.
6           You don't represent anybody, but you're
7   testifying on behalf of the firm that's being sued, or the
8   firm that's bringing the suit.
9       A   I'm representing the firm which is bringing the
10  suit.
11      Q   Okay.  And what's the name of the firm that
12  retained you in that case?
13      A   St. Denis.
14      Q   And you said that's a case down in Florida?
15      A   Yes.
16      Q   And you know whether that's a --
17      A   Sarasota, Florida.
18      Q   Okay.  And do you know if that's in state court
19  or in federal court?
20      A   It's in state court.
21      Q   And your testimony, was it given here in New
22  Haven for your deposition or did you go down there?
23      A   Correct, here.
24      Q   And you stated in your -- I think it's in your
25  export report, it says that you've prepared testimony

Page 9

1   before in mesh cases but haven't actually testified; is
2   that a correct statement or not?
3       A   So in mesh cases everything I prepared was really
4   for Ethicon case.
5       Q   So I've marked what's Exhibit Number 1 to your
6   deposition, which is the notice of deposition in front of
7   you.  And that notice asks that you bring certain things to
8   the deposition.  And I believe either you or your counsel
9   did bring a couple things.  I've got a invoice, which we've
10  marked as Exhibit Number 6, and a flash drive.
11      A   Correct.
12      Q   And is that all you brought here today in
13  response to the document request in this notice?
14      A   If this is the only invoice, I would -- Paul is
15  bringing, and I had two others.
16          MR. ROSENBLATT:  It's just for your
17  general...
18          THE WITNESS:  Oh, I see.  Okay, yeah.
19          MR. ROSENBLATT:  Yeah, just general.
20          THE WITNESS:  Okay, thank you.
21      Q   (By Mr. Faes)  Okay.  So this invoice that's
22  marked a Exhibit Number 6 represents all of the work that
23  you had done through May 14th of 2018 in producing your
24  general TVT and TVT-O report, which is marked as -- what
25  did I mark that as?

                                    3  (Pages 6 to 9)

Oz Harmanli, M.D.

Page 10

1    A    Six.

2    Q    No, no, no, the report I didn't mark as six.  So

3    let me just ask that again.  This invoice marked as Exhibit

4    Number 6 represents all of the work you've done prior to

5    May 14th in producing your TVT and TVT-O general expert

6    report, which is marked as Exhibit Number 2; correct?

7    A    That is correct.

8    Q    And this invoice is dated May 14th, and your

9    expert report is dated August 9th of 2018.  Was there

10   additional work that you've done between May 14th and

11   August 9th that is not reflected in this invoice in

12   preparing your general expert report?

13   A    Probably was not finalized.  I did not sign it

14   maybe until then, but I did not do additional work specific

15   to the general report.

16   Q    And Exhibit Number 3 is your reliance list in

17   this case.  And Exhibit Number 4 is a supplemental reliance

18   list that was updated within the last week; right?

19   A    Correct.

20   Q    So have you reviewed new materials in the last

21   week to -- in order to update your reliance materials?

22   A    No.

23   Q    So let me ask you something about your reliance

24   list marked as Exhibit Number 3 and Number 4.  Did you make

25   those lists or did someone make them for you?

Page 11

1    A    Paul's firm helped me create that list.

2    Q    And is that all the material that you reviewed

3    and relied upon for your opinions as expressed in your TVT

4    and TVT-O report marked as Exhibit Number 2?

5    A    Yes.

6    Q    Have you reviewed all of the materials in Exhibit

7    Number 4, which is your supplemental reliance list?

8    A    Yes, I did.

9    Q    So in your -- in your invoice marked as Exhibit

10   Number 6, you've got -- you've got various itemized things

11   here that break out the work you've done.  You've got 5

12   hours for review of deposition, 6 hours for review of

13   cases, 12 hours for review of the literature and 22 hours

14   for preparation of the general report; right?

15   A    Correct.

16   Q    There's also a number of internal documents and a

17   number of plaintiff's expert reports that are in your

18   supplemental reliance list; right?

19   A    Correct.

20   Q    How many hours -- first of all, how many hours

21   would you say you've spent reviewing all of the expert

22   reports that are on the last page of your supplemental

23   reliance list?

24   A    I would say six to eight hours, I'm assuming.

25   Q    And is that six to eight hours included in this

Page 12

1    invoice marked as Exhibit Number 6, and, if so, where?

2    A    It is likely anywhere between the review of the

3    literature part and partly it's under preparation of the

4    general report part.

5    Q    Now, when you reviewed these expert reports, and

6    it looks like there's well over 20 of them, did you review

7    just the report itself or did you also review all of the

8    materials that these experts relied on in coming to their

9    conclusions?

10   A    I tried to look at everything I could see.  I did

11   look at exhibits as well.

12   Q    And I also see that there's a number of reports

13   on here that you reviewed that aren't specific to the TVT

14   and the TVT-O.  For instance, you reviewed some Prolift

15   reports and Prosima general reports; is that correct?

16   A    Some of them as well.

17   Q    Is there any particular reason why you chose to

18   review those expert reports and not just the TVT and

19   TVT-O?

20   A    Because they are products of the same company

21   which makes TVT and TVT-O, it just makes sense to make sure

22   that I cover all the basis.

23   Q    And on -- I think it's the third to last page,

24   there's a page labeled company witness depositions, and it

25   looks like there's only two of them; one day of Dr. Pete

Page 13

1    Newell and one day of Dr. Marty Wiseberg; do you see

2    that?

3    A    Yes.

4    Q    Are those the only two depositions -- Ethicon

5    depositions of company witnesses that you reviewed in

6    coming to your conclusions in this case?

7    A    Right.

8    Q    And just those two days?

9    A    As far as I remember, yes.  And if they are

10   listed that way, then it is true.

11   Q    Okay.  So I can turn your attention briefly to

12   Exhibit Number 2, it's your TVT and TVT-O expert report;

13   right?

14   A    Correct.

15   Q    When were you first contacted to be a expert for

16   Ethicon and Johnson & Johnson on the TVT and TVT-O

17   products?

18   A    Last spring.

19   Q    So not this year, but spring of 2017 or spring of

20   2018?

21   A    Spring of 2018.

22   Q    Spring of this year.  So now in your report you

23   go through various facts and discuss various facts.  Did

24   you discuss the facts that you felt were most important to

25   you in drawing your conclusions in the report?

4 (Pages 10 to 13)

Oz Harmanli, M.D.

Page 14

1    A   Yes.
2    Q   And you also cite a lot of articles, a whole lot
3  more than I've seen with other experts, throughout your
4  report.  In terms of your decision-making, why did choose
5  that particular articles to cite in your expert report?
6    A   I value literature highly.  I believe whatever
7  conclusion you should make in practice must come from high
8  quality data.  And I am obsessed to follow literature
9  really well.  So I want to make sure that everybody
10  understands that whatever I'm saying is relying on the best
11  evidence.
12    Q   Now, before you were approached as a litigation
13  expert to become a -- strike that.
14        Before you were approached to become a litigation
15  expert for Ethicon and Johnson & Johnson regarding their
16  mesh products, you'd actually worked for Ethicon as a
17  consultant before that; right?
18    A   I have worked for Ethicon as a consultant a few
19  times in the past, yes.
20    Q   When were you first -- when did you -- strike
21  that.
22        When did you first become a consultant for
23  Ethicon?
24    A   I don't remember the year, but it has been at
25  least ten years, so -- and maybe once or twice I was

Page 15

1  invited to their advisory meetings where they consult
2  opinion leaders in our field, but it's been at least ten
3  years.
4    Q   So it's fair to say it's been at least since 2008
5  when you first became a consultant for Ethicon and
6  Johnson & Johnson; right?
7    A   I would suppose so.
8    Q   Okay.  And you've also worked as a consultant for
9  a number of other pharmaceutical and medical device
10  manufacturers; right?
11    A   I've been asked to give my opinion on the devices
12  and medical procedures they were innovating over the years,
13  yes.
14    Q   And one of the companies that you've done
15  consulting work for is Coloplast; right?
16    A   Coloplast, I've been in their various studies,
17  yes.
18    Q   And you've received money in the past on behalf
19  of -- well, first of all, let me follow up with that.
20  Coloplast is also a manufacturer of pelvic mesh devices,
21  such as the slings and pelvic organ prolapse; correct?
22    A   That is correct.
23    Q   And, in fact, you are or have been an
24  investigator on studies of two of their devices; right?
25    A   That is right.  I've been PI on two of their

Page 16

1  projects.
2    Q   And one of the products that you've been a
3  investigator for is the Altis sling; right?
4    A   In that study I was on the arm which was not
5  using Altis.
6    Q   Okay.  So you were on the control arm?
7    A   That's correct.
8    Q   And what was the control product for the Altis?
9    A   Control product was transobturator slings.
10    Q   And was the control arm a specific kind of
11  obturator sling, or was it kind of a potpourri of obturator
12  slings?
13    A   It's been almost two years since we did that.  I
14  believe it was any transobturator outside-in sling would be
15  fine.
16    Q   And you've also served as an investigator for
17  Coloplasts for the Restorelle product?
18    A   Correct.
19    Q   And is that trial still ongoing or have you
20  completed that work?
21    A   That is their 532 study postmarked analysis; I
22  think they're wrapping it up now.
23    Q   But you're done -- are you done enrolling
24  patients for that study?
25    A   We stopped enrolling.

Page 17

1    Q   When did you stop enrolling patients for that
2  study?
3    A   I was a PI at my previous institution, which was
4  Bay State Medical Center, and I moved to Yale University
5  and there was already a PI here.  My colleague, Dr. Bercik,
6  and I just joined him and became like a sub-investigator
7  for the site.  So we stopped enrolling this past month.
8    Q   Okay.  And why did you stop enrolling this past
9  month?
10    A   Study was finished.
11    Q   Okay.  And do you have any plans to publish any
12  results from that study?
13    A   I am positive they will do that work, but I'm not
14  sure if I'm going to be part of it.
15    Q   Okay.  And are you still using the Restorelle
16  product outside of the study?
17    A   Yes.
18    Q   Are there -- and that's for -- you're using that
19  for pelvic organ prolapse; right?
20    A   Correct.
21    Q   Are there any other meshes that you're currently
22  using for the repair of pelvic organ prolapse?
23        MR. ROSENBLATT:  Object to form.  You can
24  answer.
25        THE WITNESS:  Currently I am using

5 (Pages 14 to 17)

Oz Harmanli, M.D.

Page 18

1   synthetic implants for sacrocolpopexy, and occasionally
2   transvaginally for anterior and posterior repairs, and I
3   use Restorelle for that.
4       Q   (By Mr. Faes) So it's correct to say that
5   currently the only mesh that you're using for pelvic organ
6   repair is the Restorelle mesh; correct?
7           MR. ROSENBLATT: Object to form.
8   Misstates.
9           THE WITNESS: I am quite positive that is
10  true.
11      Q   (By Mr. Faes) Okay. And you're saying that
12  you -- not only do you use it for ASC or sacrocolpopexy,
13  you do occasionally implant it transvaginally?
14      A   That is correct.
15      Q   Are there any -- well, strike that. I'm not
16  going to get into that.
17          As you sit here today, have you asked to be an
18  expert on any of Ethicon's pelvic floor products, such as
19  Prolift or Prolift+M or Prosima?
20      A   Yes.
21      Q   You have been asked, but as you sit here today,
22  you don't have any opinions to offer on the Prolift,
23  Prosima devices; right?
24          MR. ROSENBLATT: Objection to form. He
25  does not have a pelvic organ prolapse general report. And

Page 19

1   he's here today on his TVT, TVT-O general report.
2           MR. FAES: I understand that.
3       Q   (By Mr. Faes) But as you sit here today, you
4   don't intend to offer any opinions today -- I understand
5   that might change -- on the Prosima, Prolift or Prolift+M
6   device; right?
7       A   Correct. And I got ready, prepared to speak on
8   TVT and TVT-O today.
9       Q   Okay. And so let me ask you this: What slings
10  do you currently use for the treatment of SUI, stress
11  urinary incontinence?
12      A   Currently I use approximately 50/50 retropubic
13  bottom-up TVT or outside-in transobturator sling from
14  Boston Scientific, named Obtryx II.
15      Q   And what's the retropubic bottom-up product that
16  you use; is that the Advantage?
17      A   Classic TVT.
18      Q   Okay. So you use actually the Ethicon TVT?
19      A   Ethicon Classic, the most original TVT.
20      Q   So currently in your practice you're doing -- if
21  I understand you correctly, you're doing about 50 percent
22  Ethicon TVT for retropubic approaches, and 50 percent
23  Boston Scientific Obtryx II for obturator approaches;
24  correct?
25      A   Correct.

Page 20

1       Q   So you would agree with me at least currently
2   you're not regularly using the Ethicon TVT-O in your
3   practice; right?
4           MR. ROSENBLATT: Object to form.
5           THE WITNESS: I want to make sure I use
6   both products because I'm a teacher, and I see them
7   equally effective for most patients because I'm
8   responsible in the teaching of the residents and fellows.
9   I want to make sure that those skills are developed
10  well.
11      Q   (By Mr. Faes) But right now in your current
12  practice, if you're going to implant a TVT -- strike that.
13          Right now currently in your practice, if you're
14  going to implant an obturator sling, would it be fair to
15  say that currently your sling of choice is the Obtryx II?
16      A   That is because Boston Scientific probably made
17  the right purchasing agreements with the hospital, and it
18  is the most suitable -- economically suitable device to be
19  used for that purpose.
20      Q   So the answer to my question is yes, with that
21  explanation; right?
22      A   Correct.
23      Q   Okay. And with regard to the Ethicon TVT
24  product, are you using the mechanically cut mesh, or the
25  laser cut mesh, or do you know?

Page 21

1       A   I don't even pay attention to it.
2       Q   So it's correct to say you couldn't tell me one
3   way or the other if you regularly implant the mechanically
4   cut mesh or the laser cut retropubic TVT when you
5   implant?
6       A   I think it's irrelevant.
7       Q   I understand you think it's irrelevant, but my
8   question is: Is it true that currently you can't tell me
9   whether or not what you're implanting is mechanically cut
10  or laser cut?
11      A   What I'm hearing is Ethicon sometimes does it
12  mechanically, sometimes laser when it comes down to cutting
13  the product. So, to me, it really doesn't make any
14  difference, so I never question that.
15      Q   Do you know -- if you pick a TVT retropubic off
16  the shelf, do you know how to even tell whether or not it's
17  a mechanically cut or a laser cut?
18      A   I do not.
19      Q   Okay. Have you ever used the TVT Exact
20  product?
21      A   I have tried most of the full sling products and
22  many of the single incision slings, but I have concluded
23  that I can depend on the original TVT with its design.
24  It's a marvelous innovative device that I just go back to
25  that, because it also is backed by the largest evidence

6 (Pages 18 to 21)

Oz Harmanli, M.D.

## Page 22

1  ever occurs for any medical device.
2  Q   So it's correct to say that you've tried the TVT
3  Exact before, but you simply prefer the original TVT
4  retropubic?
5  A   I believe it's a lot easier to teach the original
6  design of TVT. That's why I stuck with that.
7  Q   Okay. And have you ever used the TVT Abbrevo
8  product?
9  A   I don't think I used it in my practice. I
10  probably used in meetings, cadaver labs.
11  Q   So it's correct to say that you don't believe you
12  ever implanted the TVT Abbrevo in an actual live patient;
13  is that accurate?
14  A   That is accurate.
15  Q   And the TVT-S product, have you used that product
16  before? TVT Secure, sorry, it's abbreviated TVT-S
17  sometimes. I'm referring to the TVT Secure.
18  A   I did a few cases with that.
19  Q   And you ultimately decided not to continue using
20  that product?
21  A   My personal experience was not extremely
22  pleasing. And then some data came out, and I decided not
23  to consider it within my arm of interest.
24  Q   And are you aware of what kind of mesh is
25  utilized in the TVT Secure device?

## Page 23

1  A   Same type 1 mesh we use for TVT.
2  Q   And do you know whether or not it's laser cut or
3  mechanically cut in the TVT-S?
4  A   I do not know.
5  Q   With regard to the TVT Exact, do you know what
6  type of mesh is utilized in that place?
7  A   It's the same type 1 polypropylene macroporous
8  monofilament mesh.
9  Q   And do you know whether the mesh in the TVT Exact
10  is laser cut or mechanically cut?
11  A   I don't know.
12  Q   And Abbreva; do you know what type of mesh is
13  used in that device?
14  A   Same thing.
15  Q   And do you know whether that's mechanically cut
16  mesh or laser cut mesh?
17  A   I do not pay attention to that detail. It's
18  irrelevant.
19  Q   So the answer to my question is no, you don't
20  know?
21  A   No, I do not know.
22  Q   Okay. Did you actually publish a poster or an
23  article on the TVT Secure device at one point?
24  A   TVT Secure, no.
25  Q   So I want to go through your CV just a little

## Page 24

1  bit, which I think is marked as Exhibit Number 5. This is
2  your current curriculum vitae; correct?
3  A   It's as current as when I last communicated with
4  Paul's office.
5  Q   Okay. And when did you prepare this CV?
6  A   So, I mean, I try to update it as often as
7  possible, but sometimes I'm too busy. So it must be from
8  late 2016. The copy you have, there's a date at the top;
9  right?
10  Q   Is there? Yes, there is; October 18, 2016.
11  A   Right.
12  Q   So is this a document that you largely created in
13  2016, or is this more of a living document that you just
14  kind of updated over the years?
15  A   That's correct. I keep it in a Word format and
16  keep adding to it.
17  Q   Okay. And you've also published a number of
18  articles. When's the last time that you'd say that you've
19  specifically published on the TVT or TVT-O devices?
20  A   So most of what I do involves pelvic floor
21  surgery, so anything that I publish would have patients who
22  had TVT or sometimes TVT-O as well. So specific to
23  mid-urethral slings, it's been a while. If the objective
24  is specific to sling procedures, it's been a while.
25  Q   So fair to say it's probably been about ten years

## Page 25

1  or so since you specifically published on the TVT or TVT-O
2  device?
3  MR. ROSENBLATT: Object to form.
4  THE WITNESS: So everything I have includes
5  patients who had slings placed. And some of the outcomes
6  listed in some of those studies do include the involvement
7  of those procedures, so I can't say it is that way you
8  just expressed.
9  Q   (By Mr. Faes) But in terms of a study that's
10  specifically focusing on safety or efficacy outcomes
11  specifically of a TVT or TVT-O device, it's been over ten
12  years since you've published; correct?
13  A   That's not correct, no.
14  Q   When's the last thing that you published on
15  them?
16  A   So in 2014 -- so, for example, in 2015 there
17  is -- actually, I did publish online last month a study,
18  the Journal of Female Pelvic -- Female Medicine and Pelvic
19  Reconstructive Surgery; very much about slings. The
20  procedure which we did at that time, which was the
21  objective of that study, was plication of mid-urethral
22  slings when they fail at the first time. It just came out
23  last month.
24  Q   Okay.
25  A   It's not included in that list, the one you

Oz Harmanli, M.D.

Page 26

1   have.
2       Q   Got it.  So when you were -- going back in time
3   here, when were you first trained on a mid-urethral sling
4   for the treatment of stress urinary incontinence; it was in
5   1999?
6       A   1999.
7       Q   And at that time it was the TVT mechanically cut
8   mesh that you would have been trained on; right?
9       A   I did not question that, and I do not want to say
10  it.  Again, I do not pay attention to which it's mechanical
11  cut or laser cut.  Please do not ask me that again because
12  it's irrelevant to me.  1999, whatever you know about TVTs
13  at that time, you know that better because I never pay
14  attention to it; it's a non event for me.  So, yes, in 1999
15  I trained on whatever TVT offered.
16      Q   And when were you first trained on a mid-urethral
17  sling that's implanted through the obturator approach?
18      A   2003.
19      Q   And what device were you first trained on for
20  that?
21      A   I did Monarc from AMS.
22      Q   And when you was first trained -- or when did you
23  first implant the TVT-O device made by Ethicon and Johnson
24  & Johnson?
25      A   It has to be a few years after Monarc.

Page 27

1       Q   Okay.  And so those -- so probably around 2005?
2       A   I'm guessing.
3       Q   So was there a period of time between 2003 and
4   2005 where you were regularly implanting the Monarc device
5   for treatment for stress urinary incontinence?
6       A   Correct.
7       Q   And why did you -- was there ever a time where
8   the TVT-O device made by Ethicon and Johnson & Johnson was
9   the primary choice of treatment for stress urinary
10  incontinence when a urethral approach was called for?
11      A   At the time I was at Bay State Medical Center and
12  our institution made sure that we had one product of any
13  particular approach.  And they ask general opinion and
14  looked at the prices.  At that time they thought AMS gave
15  the best price.  So that's why I used Monarc for
16  transobturator approach most of the time in that
17  hospital.
18      Q   Understand.  But my question was:  Was there ever
19  a time where the TVT-O device was your sling of choice,
20  your primary option for a patient who needed a obturator
21  sling?
22      A   It could have been if it were available to me.
23      Q   But, as you sit here today, is it correct to say
24  you can't remember a time where that was the case, where
25  the TVT-O was your primary option for treatment of stress

Page 28

1   urinary incontinence where an obturator sling was called
2   for?
3           MR. ROSENBLATT:  Object to form.
4           THE WITNESS:  I liked my experience with
5   TVT-O.  It was pretty much no different from my experience
6   with Monarc.  But because hospital had one transobturator
7   sling product available to us, that's why I used Monarc.
8       Q   (By Mr. Faes)  So if I understand your answer
9   correctly, your answer is that you can't remember a time
10  specifically where the TVT-O made by Ethicon and Johnson &
11  Johnson was ever your sling of choice for treatment of a
12  patient who needed an obturator sling?
13          MR. ROSENBLATT:  Object to form.
14          THE WITNESS:  Can you rephrase it?
15      Q   (By Mr. Faes)  I think you already answered the
16  question, but you're giving the -- you're giving the
17  explanation without giving the answer.  So my question is:
18  I understand the reason that you've stated why is because
19  your hospital felt that the Monarc was a better option, but
20  I just need to get the answer.  Do you recall at any time
21  in your career whether the TVT-O made by Ethicon and
22  Johnson & Johnson was your primary option for treatment?
23      A   It could have been.
24      Q   But you can't remember?
25      A   I would be indifferent if they were both

Page 29

1   available on the shelf to me.  Would that answer your
2   question?
3       Q   Not completely.  My question is:  Can you ever --
4   sounds like you're saying you can't remember.  Do you
5   remember if there was ever a time where the TVT-O was your
6   primary --
7       A   I remember well that I like both devices.  But in
8   my hospital, TVT always not available; what can I do?  I
9   use Monarc.  How do you like that?
10      Q   Right.  So it sounds like the TVT-O was never
11  your primary option for your treatment of urinary
12  incontinence?
13      A   That is not true.  You are misstating what I'm
14  saying.  That is wrong.  What I'm saying is if they were
15  both available at the same time on the shelf for me, I
16  could have used either one.
17      Q   So you would have no preference between --
18      A   Correct.
19      Q   -- the TVT-O --
20      A   Lovely.
21      Q   -- and the Monarc?
22      A   That's good.
23      Q   So I kind of lost track here so I want to circle
24  back a bit.  We were talking about, you know, consulting
25  work that you've done for medical device and pharmaceutical

8  (Pages 26 to 29)

Oz Harmanli, M.D.

Page 30

1  manufacturers, and I think that we've established that
2  you've been a consultant and an investigator for Coloplast;
3  right?
4      A   We already discussed that.
5      Q   Right.  And you received payments from Caldera
6  Medical before; is that accurate?
7      A   I might have.  I'm not sure.  If anything, must
8  be very limited.
9          MR. ROSENBLATT:  I don't want you to guess.
10  If you have, you have.  If you haven't, you haven't, but
11  you don't need to make up any numbers.
12          THE WITNESS:  I don't remember.
13      Q   (By Mr. Faes)  Okay.  And -- but if I were to go
14  on -- you know, there's websites now that disclose how much
15  doctors have been paid by medical device companies;
16  right?
17      A   Right.
18      Q   If I were to go online and see that you've been
19  paid by Caldera in 2015, received a payment from them,
20  you'd have no reason to dispute that, would you, as you sit
21  here today?
22      A   If it happened, probably for a dinner meeting,
23  maybe.  That's all I can say.  I don't remember the details
24  of working for Caldera as a consultant.
25      Q   And you've worked for C.R. Bard as a consultant

Page 31

1  before; right?
2      A   I had advised them on their device process,
3  yes.
4      Q   And C.R. Bard is also a manufacturer of synthetic
5  mesh products for stress urinary incontinence and pelvic
6  organ prolapse; right?
7      A   That is correct.
8      Q   And, in fact, specifically you consulted with
9  them regarding some of their synthetic mesh devices for
10  those indications; right?
11      A   That's correct.
12      Q   Do you remember attending a cadaver lab with them
13  in 2009 for a product called WEB TO?
14      A   I remember attending a cadaver program when they
15  were developing some products, yes.
16      Q   Do you remember what type of product that was?
17      A   I don't remember the details about it.
18      Q   If I represented to you that that particular
19  product was a prototype product for the treatment of pelvic
20  organ prolapse which was lighter weight than their current
21  offering at that time, which was the Avaulta, would you
22  have any reason to dispute that?
23          MR. ROSENBLATT:  Object to form.
24          THE WITNESS:  I wouldn't remember the
25  details.

Page 32

1      Q   (By Mr. Faes)  And you've consulted for American
2  Medical Systems or AMS before; right?
3      A   Yes.
4      Q   And they're a manufacturer of mesh products for
5  stress urinary incontinence and pelvic organ prolapse?
6      A   Correct.
7      Q   And you've received payments from Intuitive
8  Surgical before?
9      A   Correct.
10      Q   And you've received payments from Astellas
11  Pharmaceuticals before?
12      A   Correct.
13      Q   You've received payments from Allergen before?
14      A   That I don't remember.
15          MR. ROSENBLATT:  Andy, all these questions
16  you're saying received payments, you're not talking about
17  litigation consulting, you're talking about just general
18  consulting; is that how you're framing the questions?
19          MR. FAES:  Well, the question is what it
20  is, so if the Doctor doesn't understand it --
21          THE WITNESS:  So I guess --
22          MR. FAES:  He'll let me know.
23          THE WITNESS:  Some of them you're now
24  talking about might be dinners.
25      Q   (By Mr. Faes)  Okay.

Page 33

1      A   A bunch of them are dinners.  I have a strong
2  feeling like Allergen or Astellas, very likely they were
3  dinner sessions when maybe they paid our meal.
4      Q   Okay.  And what about Cogentix Medical,
5  C-O-G-E-N-T-I-X?
6          MR. ROSENBLATT:  Object to form.
7          THE WITNESS:  I don't remember that
8  particular company.
9      Q   (By Mr. Faes)  Okay.  And just to be clear, you
10  know, going back, I think we covered on -- with regard to
11  Coloplast and C.R. Bard and Ethicon, it wasn't just for
12  dinners, it was actually consulting for them on their
13  products; right?
14      A   So that is wrong.  So Coloplast was 522 study, so
15  true research.  And Ethicon, it was advisory meetings.  And
16  then the third company you said, AMS?
17      Q   C.R. Bard.
18      A   C.R. Bard, also advisory on their product
19  development.
20      Q   And that would be consulting work; right?
21      A   That's consulting, yes.
22      Q   And what about AMS?
23      A   AMS again, the work with AMS in two different
24  ways; one was I had a innovative idea and they collaborated
25  with me.  We developed a product.

9 (Pages 30 to 33)

Oz Harmanli, M.D.

Page 34

1    MR. ROSENBLATT:  And I'll just caution you
2  to the extent anything is privileged or confidential
3  between you and those companies, I ask you to keep that to
4  yourself.  If it's not privileged or confidential, you can
5  discuss it.
6    THE WITNESS:  So it was to test that
7  product, I was their advisor and collaborator.  Also, few
8  times I preceptored for them and also advised them on
9  their product development as well.
10    Q   (By Mr. Faes)  And you would consider that
11  consulting work; correct?
12    A   That's correct.
13    Q   And what about Boston Scientific; I don't think
14  we covered that one before?
15    MR. ROSENBLATT:  Object to form.
16    THE WITNESS:  It was, again, advisory and
17  sometimes as a preceptor function.
18    Q   (By Mr. Faes)  So if you were a preceptor, that
19  would also be considered consulting work; right?
20    A   That would be within that realm; yes.
21    Q   So it's fair to say that including Ethicon and
22  Johnson & Johnson, you had either been a consultant or an
23  investigator for at least five different companies that
24  manufacture synthetic pelvic mesh; right?
25    MR. ROSENBLATT:  Object to form.

Page 35

1    THE WITNESS:  That sounds right.
2    Q   (By Mr. Faes)  Okay.  And all of those
3  relationships predate when you first became a litigation
4  consultant for Ethicon and Johnson & Johnson; right?
5    A   That is correct.
6    Q   Now, you also -- I'm not going to get into this
7  too much, but you've also been retained as Ethicon and
8  Johnson & Johnson to do and write up some case specific
9  expert reports; right?
10    A   That's correct.
11    Q   How many of those have you done so far?
12    A   Five.
13    Q   Has there ever been a case that Ethicon and
14  Johnson & Johnson has sent to you to look at where you went
15  back to them and told them I don't think I can support -- I
16  don't think I can offer an opinion in this case, that you
17  thought that the mesh device actually caused the patient's
18  injury?
19    A   There has not been any.
20    Q   And have you -- well, strike that.
21    So so far 100 percent of the time when you looked
22  at cases sent to you by Ethicon and Johnson & Johnson, your
23  conclusion has been that that patient's complaints were due
24  to something other than the mesh; right?
25    MR. ROSENBLATT:  Object to form.  If you

Page 36

1  want to get into each of those, then we can have a
2  deposition on each of them within the respective time
3  period, but he has not been reviewing those reports.  He's
4  here to discuss his TVT, TVT-O general report.
5    THE WITNESS:  I rather stay focused on this
6  topic, if you don't mind.
7    MR. FAES:  Well, I mean, it's relevant, you
8  know, as to his general deposition.  So let me see if I
9  can phrase it another way.
10    Q   (By Mr. Faes)  You agree with me that you've
11  never represented a plaintiff, a person who's -- strike
12  that.
13    You agree with me that you've never written an
14  expert report or offered testimony supporting a plaintiff
15  who was suing a mesh manufacturer for alleged injuries;
16  right?
17    A   I am not.
18    Q   Okay.  What percent of your practice would you
19  say is spent treating stress urinary incontinence?
20    A   So 90 percent of what I do is for urinary
21  incontinence and prolapse, and many of those patients have
22  both.  So stress urinary incontinence is one of the types
23  of incontinence types, and -- I mean, the question's not
24  really very good.  I'd say 50 percent of my patients, I
25  think, have urinary stress incontinence.

Page 37

1    Q   Is it fair to say that 100 percent of your
2  practice is treating women or not?
3    A   That is correct, I'm a gynecologist.
4    Q   So currently how many surgeries would you say you
5  do for the treatment of urinary stress incontinence --
6  surgeries for urinary stress incontinence do you do?
7    A   Six a week.
8    Q   For SUI?
9    A   (Witness nods.)
10    Q   And are those generally all slings?
11    A   I can't imagine any other treatment for urinary
12  stress incontinence.
13    Q   So the answer's yes?
14    A   Yes.
15    Q   And how many pelvic organ prolapse surgeries do
16  you have on average?
17    A   So about maybe half of these patients have pelvic
18  prolapse.
19    Q   So about three or so a week?
20    A   I think so.
21    Q   How often would you say you do a surgery to treat
22  mesh complications?
23    MR. ROSENBLATT:  Object to form.
24    THE WITNESS:  Rarely.
25    Q   (By Mr. Faes)  So if you had to put a number on

10  (Pages 34 to 37)

Oz Harmanli, M.D.

| Page 38 | Page 40 |
|---|---|

**Page 38**

1 it, about how many times a year would you say that you do a
2 surgery to treat mesh complications?
3     MR. ROSENBLATT: Object to form.
4     THE WITNESS: It would be about five to ten
5 a year.
6     Q. (By Mr. Faes) And has that been pretty
7 consistent over the course of your career?
8     A. So I've been at Yale for two years and my role
9 here is slightly different. I am running a larger division
10 here with more research, other activities. So my clinical
11 activities also have been affected by it, and job change
12 also changes your patient population. Previous to that I
13 definitely did, sometimes twice as many surgeries. And
14 then probably all of these numbers would be like
15 two-fold.
16     Q. Okay. Let me see if I can ask it another way.
17 Over the course of your career, how many surgeries do you
18 think you've done to treat mesh complications?
19     MR. ROSENBLATT: Object to form.
20     THE WITNESS: I can't remember.
21     Q. (By Mr. Faes) Well, if you've done five to ten
22 on an average year, would it be fair to say that you've
23 probably done more than 50 surgeries to treat mesh
24 complications over the course of your career?
25     MR. ROSENBLATT: Object to form. And,

**Page 39**

1 Andy, are you asking about urinary stress incontinence
2 mesh or any mesh? I just -- that's why I'm objecting.
3     MR. FAES: I mean, the question is what it
4 is.
5     Q. (By Mr. Faes) Over the course of your career,
6 would it be fair to say that you have performed at least 50
7 surgeries to treat pelvic mesh complications?
8     MR. ROSENBLATT: Object to form. Vague.
9     THE WITNESS: So I'm not sure what that
10 question aims to find out. First of all, question should
11 be made clear, just like Paul is saying. Specific to
12 urinary stress incontinence, you're asking?
13     Q. (By Mr. Faes) Well, we'll break it down. If you
14 need me to break it up --
15     A. Let's do that.
16     Q. So how many surgeries to treat complications from
17 stress urinary incontinence products would you say you've
18 done over the course of your career?
19     MR. ROSENBLATT: Object to form.
20     THE WITNESS: So what exactly are you
21 talking about complications; when you say complications?
22     Q. (By Mr. Faes) Well, you're a doctor; whatever
23 you deem to be a complication from the surgery?
24     A. So I don't understand that. Please tell me
25 specifically what you want me to tell you. Are you talking

**Page 40**

1 about mesh extrusion, are you talking about voiding
2 difficulties?
3     Q. I'm talking about any situation where you had to
4 go in and do an additional surgery due to some complication
5 from the sling?
6     A. What is the complication? Define complication
7 for me.
8     MR. ROSENBLATT: Andy, that's different.
9 Before you were asking about mesh complication; now you're
10 just saying complication, so --
11     THE WITNESS: Yeah, exactly.
12     MR. ROSENBLATT: I think if you clarify.
13     THE WITNESS: Say it.
14     MR. ROSENBLATT: Ask him what you're trying
15 to ask him.
16     Q. (By Mr. Faes) So my question is: How many
17 revisions of mid-urethral sling -- let's back up and start
18 a little more simply. First of all, how many mesh removals
19 have you done over the course of your career?
20     MR. ROSENBLATT: Object to form. Be more
21 specific.
22     THE WITNESS: Specific to mid-urethral
23 slings, are you asking?
24     Q. (By Mr. Faes) No, any pelvic mesh removal that
25 you've done over the course of your career.

**Page 41**

1     MR. ROSENBLATT: Object to form.
2     THE WITNESS: So are you talking about
3 patients of my own or those referred to me by other
4 people?
5     Q. (By Mr. Faes) I'm talking about mesh removals
6 that you've personally performed, whether you put the mesh
7 in or somebody else put the mesh in?
8     MR. ROSENBLATT: You're asking about any
9 procedures using mesh, or you're asking any stress urinary
10 incontinence?
11     Q. (By Mr. Faes) I'm asking any pelvic mesh that
12 you've removed -- how many mesh removals that you've done
13 over the course of your career, regardless of whether you
14 put it in or somebody else put it in?
15     MR. ROSENBLATT: Object to form.
16     THE WITNESS: Removal would not be the
17 right word as well. Actually, sometimes we don't remove
18 it; we go back and tweak it, we change it, how it sits.
19 So if you're asking me all the patients who came to me,
20 whether they had the surgery through me or through
21 somebody else and had problems with the mesh inserted for
22 the purpose of treating urinary incontinence, pelvic organ
23 prolapse, I -- in my both institutions I am the referral
24 guy for things like that. And I can remember things,
25 again, maybe ten the max a year I would do a procedure

Oz Harmanli, M.D.

Page 42

1  like that.
2      Q   (By Mr. Faes)  So over the course of your career,
3  how many do you think you've done?
4          MR. ROSENBLATT:  Object to form.
5          THE WITNESS:  I don't want to guess.  I'm
6  not keeping tabs.  And, also, you have to keep in mind
7  that I have done thousands of procedures, so that number
8  is not really easy to interpret, if I say a number.
9          MR. ROSENBLATT:  Andy, if you want to ask
10  him more specifically, I think he might be better able to
11  answer your questions.
12      Q   (By Mr. Faes)  So you estimate about ten a year
13  and you've been in practice since 2000; right?
14      A   I've been in practice.  I would include -- like,
15  I've been inserting mesh for incontinence and prolapse
16  since 1999, actually even earlier than that because I did
17  some Mersilene mesh, which was not a product of a company,
18  we would just cut a piece of it, really, in my fellowship.
19  I did that, too.
20          So, yes, you can go back to 1997, but when I
21  really got started -- got involved in the urogynecology
22  world and then as a fellow, so, yeah, how many years is
23  that?  1997 to 2018.
24      Q   19 years; right?
25      A   It's 19 years.

Page 43

1      Q   So it's fair to say even conservatively, if
2  you're doing about ten a year and you -- ten mesh removals
3  a year and you've practiced for about 19 years --
4      A   About 20 years.
5      Q   -- conservatively, you've done --
6      A   I said in my report as 20 years of mesh insertion
7  for one reason or another to treat incontinence or
8  prolapse.
9      Q   So conservatively it's fair to say that you've
10  probably done 150 mesh removals during the course of your
11  career; correct?
12          MR. ROSENBLATT:  Object to form.
13          THE WITNESS:  Say it again.
14      Q   (By Mr. Faes)  I said conservatively, it's
15  probably fair to say that you've done at least 150 mesh
16  removals during the course of your career; right?
17      A   I do not want to answer that.
18      Q   So you don't know?
19      A   I don't know.
20      Q   Okay.  But you do say in your expert report that
21  you've implanted over 2,000 mid-urethral slings for urinary
22  stress incontinence?
23      A   That makes sense.
24      Q   And how did you come to that number?
25      A   That is -- I, at that time, made a very

Page 44

1  deliberate attempt to get the right number approximately
2  and went back to any record I could find to be as exact as
3  possible.
4      Q   So you felt it was important to do that; right?
5      A   I guess since I'm an expert on TVT, TVT-O sling
6  today, I assume that you would ask me those questions.
7      Q   So you felt it was important to get an accurate
8  number for how many slings you've put in, but you can't
9  give me an accurate number for how many you've taken out;
10  is that correct?
11          MR. ROSENBLATT:  Object to form.  You have
12  not limited your questions to stress urinary incontinence.
13  I'm sure if you ask your question about stress urinary
14  incontinence --
15          MR. FAES:  Paul, I'm going to ask you to
16  stop the speaking objections.  If the doctor doesn't
17  understand the question, he can ask me the question, but
18  this is getting ridiculous.
19          MR. ROSENBLATT:  You're misstating --
20          MR. FAES:  I mean, these are questions that
21  every expert has been asked.  They've asked them without
22  rancor, and if you're going to keep this up, I'm going to
23  file a motion to strike, I'm going to ask for more time
24  and we're going to have to take it up in front of Judge
25  Ifford (phonetic); okay?

Page 45

1          These are not controversial questions.  If he
2  doesn't know the answer to the question, he can say he
3  doesn't know the answer to the question.  But these
4  speaking objections need to stop.  If he needs
5  clarification, he can ask; but this has to stop, Paul.
6          MR. ROSENBLATT:  I'm trying to make it stop
7  because I want to help you.
8          MR. FAES:  No, you're not.
9          MR. ROSENBLATT:  No, ask specifically
10  stress urinary incontinence and I will stop objecting.
11          MR. FAES:  I will decide the questions that
12  get asked, Paul, not you.  I don't have to frame them to
13  your liking or the doctor's.
14          MR. ROSENBLATT:  Your questions are drawing
15  the objections, so if you want to phrase it --
16          MR. FAES:  And these time limits are based
17  on the expectation from Judge Ifford that the witness is
18  going to be responsive to the question, and, as you know,
19  Judge Ifford has ruled many, many times that if a yes or
20  no question is asked, that you first answer the question
21  yes or no --
22          MR. ROSENBLATT:  You're burning your clock.
23  Just go ahead and ask your questions.  You're burning your
24  own clock right now.
25          MR. FAES:  Well, I'll burn my clock the way

12  (Pages 42 to 45)

Oz Harmanli, M.D.

Page 46

```
 1   I want to.  So I --
 2          MR. ROSENBLATT:  Okay.
 3          MR. FAES:  I just want you and the witness
 4   to be aware that the judge has ruled on this issue that if
 5   a yes or no question is asked, that you need to first
 6   answer the question yes or no, or if you can't answer it
 7   with a yes or no, then you state that, and then if you
 8   need to provide an explanation that's responsive to the
 9   question, after your answer you can do so.
10          MR. ROSENBLATT:  Doctor, you can answer
11   however you feel is appropriate --
12          MR. FAES:  No, Paul that is not --
13          MR. ROSENBLATT:  -- responsive.  And to the
14   extent you can answer with a yes or no, I encourage you to
15   do so, but if you need to provide an explanation, then
16   you're entitled to provide your explanation.  Andy, if --
17   I'm done.  You can continue to ask him.
18      Q   (By Mr. Faes)  All right.  Well, let's start
19   again, Doctor.  Now, your expert report you've stated that
20   you've implanted over 2,000 mid-urethral slings over the
21   course of your career; correct?
22      A   Correct.
23      Q   And you feel confident in that number; correct?
24      A   I'm quite confident.
25      Q   And you felt that it was important to put that
```

Page 47

```
 1   number in your expert report; right?
 2      A   Correct.
 3      Q   And you felt it was important to get an accurate
 4   number to put in your expert report; right?
 5      A   That's correct.
 6      Q   You'd agree with me that nowhere in your expert
 7   report is there any information regarding how many slings
 8   you have removed over the course of your career?
 9      A   I don't think it's spelled out.
10      Q   Are you able to give me that number, as you sit
11   here today?
12      A   I cannot be accurate, but a rough calculation
13   based on the numbers you just offered, I would say ten a
14   year times, maybe -- we said twenty.  What is that?  200,
15   but there probably was less at some point, so let's say at
16   least 100.
17      Q   So you'd agree with me that you've removed
18   mesh -- pelvic mesh from patients at least 100 times over
19   the course of your career; right?
20      A   It's not removal only.  Sometimes it's
21   repositioning, sometimes it is loosening.
22      Q   So you'd agree with me --
23      A   Sometimes it's releasing or cutting.
24      Q   So you'd agree with me that you removed or
25   revised surgically pelvic mesh in patients at least 100
```

Page 48

```
 1   times during the course of your career; right?
 2      A   Yes.
 3      Q   And what percentage of that would you say was
 4   slings; are those 100 cases all slings or are we talking
 5   about all meshes there?
 6      A   As you already specified earlier, for all pelvic
 7   floor problems, if the mesh is inserted, those are the
 8   numbers we just talked about, so just to make it clear.
 9   And then when it comes to slings, maybe half of them were
10   for slings.  Most were not for removal, I can tell you
11   that.
12      Q   Okay.  So it's fair to say that you probably
13   removed or surgically revised mid-urethral slings at least
14   50 times during the course of your career?
15      A   That is fair.
16      Q   Okay.  Doctor, you'd agree with that you're not
17   an expert in chemical engineering; right?
18          MR. ROSENBLATT:  Object to form.
19          THE WITNESS:  I do not agree with you on
20   that.
21      Q   (By Mr. Faes)  So you hold yourself out as an
22   expert in the area of chemical engineers?
23      A   I am an expert when it come to the devices I use,
24   whether it's from the aspect of chemical engineering, or
25   mechanical engineering, or anatomical design, or
```

Page 49

```
 1   physiological design, but the logical aspects of it, I am
 2   an expert.
 3      Q   So do you have any training or background in
 4   chemical engineering?
 5      A   I went to medical school, I did chemistry, I kept
 6   up with all that.  And when it come to devices I'm using, I
 7   read way more than anybody else has read on it so I am an
 8   expert.
 9      Q   Would you agree with me that you have no
10   background or training specifically on polymer chemistry?
11      A   I did not go to school for it; you're right.
12      Q   Okay.
13      A   Except I train myself, educated myself on it
14   because it's something I use on a regular basis so I am an
15   expert on the type of devices I use if they are made of
16   polymer material.
17      Q   So you believe you hold yourself out as an expert
18   on polymer chemistry?
19      A   Specifically to my topic, my area, yes, I am an
20   expert when it comes to the use of those materials.
21      Q   So what formal training or education have you had
22   in that area?
23      A   As I said, I studied chemistry in school.  And
24   then I kept up my chemistry knowledge.  And whenever it
25   came down to the knowledge of polymers for any specific
```

13 (Pages 46 to 49)

Oz Harmanli, M.D.

Page 50

1    device we used, I kept reading on it and discussing on it.
2    I know more than anyone in this room about it.
3        Q    Have you ever done any research specifically in
4    the area of polymer chemistry?
5        A    I have not studied polymer myself.
6        Q    And you never published in the area of polymer
7    chemistry; right?
8        A    I have not published.  When I say study, in the
9    research from I mentioned specifically.
10       Q    And you agree me that you've never done any bench
11   research on polypropylene?
12           MR. ROSENBLATT:  Objection to form.
13           THE WITNESS:  I've been involved in bench
14   research.  Maybe I was not one of the authors.
15       Q    (By Mr. Faes)  What bench research were you
16   involved in with polypropylene specifically?
17       A    So throughout my career, when device companies
18   were coming out with their products I've been approached
19   with my opinion on different materials.  And I've
20   consulted, worked, halt, advised on their outcomes, their
21   design choices.  In our meetings we keep talking about
22   these things.  This is a hot topic, yes, I am an expert on
23   that.
24       Q    On lab research on polypropylene?
25       A    I am an expert on any type of research when it

Page 51

1    comes to polypropylene or similar materials used for pelvic
2    floor implantation.
3        Q    Have you ever done any kind of pathological
4    analysis on explanted polypropylene mesh?
5        A    I study those all the time.  It's my work; I am a
6    pelvic floor doctor.
7        Q    And what kind of analysis do you do on those
8    examples?
9        A    I study them like no one else does and that makes
10   me an expert.
11       Q    But you don't hold yourself out as a pathologist;
12   right?
13       A    Why would I; that's a licensure?  I hope no one
14   does without going through the entire residency.
15       Q    So you wouldn't hold yourself out as an expert in
16   the area of pathology; right?
17           MR. ROSENBLATT:  Object to form.
18           THE WITNESS:  That is specific to my area.
19   I am an expert in pathology when it comes to the use of
20   applications of pathology in my field.
21       Q    (By Mr. Faes)  So you wouldn't hold yourself out
22   as a pathologist, but you consider yourself an expert in
23   pathology; do I have that correct?
24       A    Correct.
25       Q    Would you agree with me that you are not a

Page 52

1    biomaterial specialist?
2        A    I understand a lot more than most people on that,
3    therefore, I am an expert in biomaterials being used in my
4    area.
5        Q    What qualified you to be an expert in
6    biomaterials?
7        A    30 years of training, education and practice.
8    Day in, day out, this is what we do.  I'm not sure what
9    you're talking about.
10       Q    Would you agree with me that you've never
11   published any opinions that polypropylene does not degrade
12   in the human body?
13       A    Ask me the question one more time.
14       Q    Would you agree with me that you personally never
15   published any opinions about whether or not polypropylene
16   degrades in the human body?
17       A    I did not.
18       Q    Have you ever published any opinions concluding
19   that polypropylene does not create a foreign body
20   reaction?
21       A    I have not published on those.
22       Q    Do you consider yourself an expert on warnings
23   for a medical device?
24       A    Certainly.
25       Q    Can you tell me what risk information medical

Page 53

1    companies are required to put in their IFUs or instructions
2    for use?
3        A    So, you know, as you know, there are federal and
4    state rules, right, regulations.  So if I want to come up
5    with a new medical device, I go to FDA.  Whatever FDA says
6    I must fulfill.  So FDA tells them to put in information on
7    the IFU, they got to do that.  So that's what I pay
8    attention to.  So if they obey FDA rules in whatever
9    product they're marketing in any state and following those
10   state rules as well, then they fulfilled their
11   obligations.
12       Q    And can you tell me what the rules say about the
13   information that medical device companies are required to
14   put in their IFUs?
15       A    So it's written in the federal law that -- you
16   know, FDA regulations are clear on it.  And they just look
17   at it, whatever they have.  And there's a current practice,
18   every year it's getting tighter and tighter.  And the
19   interpretation makes a difference, clearly, but because of
20   the concerns they're getting even harder, just a few pages.
21   So an FDA is extremely obsessive about the terminology, and
22   I think that is -- they're doing a good job with that.
23       Q    Are you familiar with what industry standards
24   govern warnings on medical devices?
25       A    Ask me again.

14 (Pages 50 to 53)

Oz Harmanli, M.D.

Page 54

1    Q   Are you familiar with what industry standards
2  govern warnings on medical devices?
3    A   Ask me some other -- I don't understand that
4  question.
5    Q   Are you aware of any -- can you -- yeah, strike
6  that.
7        Can you tell me any industry standards that
8  govern what warnings should be in a medical device?
9    A   Define industry standards for me.
10   Q   Well, it's any industry standard.  Are you
11 familiar with any?  Do you know about any Ethicon internal
12 standard?
13   A   Okay.  Please spell out what you mean when you
14 say industry standard.
15   Q   I mean a standard that's followed within the
16 industry.
17   A   You're -- like conventions?
18   Q   No.
19   A   What is a standard from the industry standpoint?
20 I know the standard in medicine, standard of care.  Like,
21 define what you are saying.
22   Q   That's what I'm asking you.  Are you aware of
23 industry standards that govern what warnings should or
24 shouldn't be on the instructions for use for a medical
25 devices; can you name any?

Page 55

1    A   So all I know is standards is set by the federal
2  government and the states.  As long as they're followed,
3  medical device companies fulfill their jobs.
4    Q   So it's correct to say that you're not aware of
5  any industry standards beyond what is required by the
6  federal government and the state; correct?
7    A   You have not been able to tell me what exactly
8  you're asking.
9    Q   Right.  I'm asking are you aware of any industry
10 standards, other than standards imposed by the federal
11 government or the state?
12   A   I'm not sure what you mean by saying -- I've been
13 asking you what you're saying, industry standards.  What is
14 industry standard you're talking about?  Give me examples
15 maybe if you cannot really explain exactly in words real --
16 clearly define it so that it's clear and transparent.
17   Q   Are you aware of what Ethicon internal standards
18 govern what warnings need to be in a IFU for a medical
19 device?
20   A   I know one thing about Ethicon, that actually
21 they do a great job in following the law before they bring
22 any product to the market.
23   Q   So you're not aware -- I mean, you're stating
24 that Ethicon does a good job of following the law.  You're
25 not aware of any instance where Ethicon marketed a product

Page 56

1  in the United States where that product had not been
2  cleared by the Food and Drug Administration?
3    A   I didn't say that.  I didn't say that.  They're
4  very diligent and meticulous and they follow the law.
5  That's what I'm saying.
6    Q   Are you aware that there's been at least one
7  incidence with a pelvic mesh product where Ethicon and
8  Johnson & Johnson marketed that product for a period of
9  several years without having clearance from the Food and
10 Drug Administration; are you aware of that or not?
11       MR. ROSENBLATT:  Object to form.
12       THE WITNESS:  I don't know.
13   Q   (By Mr. Faes)  Do you know what departments of a
14 medical device company are involved in creating warnings
15 for a IFU or instructions for use?
16   A   Regulatory.
17   Q   Any others?
18   A   R & D, marketing, sales.
19   Q   And have you looked at what the departments at
20 Ethicon and Johnson & Johnson, those departments had to say
21 about the contents of the TVT and TVT-O IFU before reaching
22 your opinions in this case?
23   A   I looked at whatever was made available from the
24 standpoint of the company documents, and, yes, I don't know
25 if I have any problem.

Page 57

1    Q   Well, for example, did you look at the testimony
2  of Susan Lynn who was Ethicon and Johnson & Johnson's
3  representative -- corporate representative on the issues of
4  what needed to be in an IFU and what standards Ethicon and
5  Johnson & Johnson followed?
6    A   I don't remember specifically what that was.
7    Q   So, as you sit here today, and I'll represent to
8  you it's not on your reliance list, you don't remember ever
9  reviewing the testimony of Susan Lynn; right?
10   A   Is it on the reliance list?
11   Q   Not that I see.  I mean, you've only reviewed two
12 depositions, right, Dr. Wiseberg and Dr. --
13   A   I see; right.  Then that's it.
14   Q   You think it would be important to review the
15 testimony of Ethicon corporate representative on the
16 policies and procedures that Ethicon followed for
17 determining what needed to be in the IFU before reaching
18 your conclusions in this case?
19   A   I believe I had all the information I need to
20 come to a conclusion on whether Ethicon did the right thing
21 about IFU or not.
22   Q   Have you ever reviewed the FDA Blue Book Memo on
23 labeling in forming your opinions in this case?
24   A   I am familiar with that.  I did not specifically
25 review that for this case.

15 (Pages 54 to 57)

Oz Harmanli, M.D.

Page 58

1    Q   Would you agree with me that a company should
2  include an appropriate warning if there is reasonable
3  evidence of an association of a serious hazard with the use
4  of the device, regardless of whether or not a causal
5  relationship has been proven?
6      MR. ROSENBLATT:  Object to form.
7      THE WITNESS:  So I really disagree that you
8  cannot spell out everything which happens associated with
9  insertion of a device.  First of all, when you do surgery,
10 any kind of surgery, with or without implants, there's all
11 kinds of risks, and some are not associated with the
12 device itself.  So specific to device, I understand, but
13 those risks which come from inherently from the type of
14 surgery being done, I don't see any reason why that should
15 be included in an appropriate IFU because I, as a fourth year medical
16 student, learned already that I must be very cautious when
17 I'm doing surgery.  It's not a child's play.  I got to be
18 very careful at every step of it.  I must be like a hawk
19 watching for the signs and symptoms of complications.
20      So it does not have to be in the IFU.  I don't
21 think any physician looks at the IFU when it come to
22 understanding the risks of any procedure.  We don't look at
23 IFUs.
24     Q   (By Mr. Faes)  So you don't believe that that's
25 the standard that should be followed; is that correct?

Page 59

1    A   IFU is what FDA wants.  Once you get FDA's
2  approval in your IFU, you're good to go.  The rest is up to
3  me.  Once you give that product to me, the outcome of that
4  product depends on me.  If I'm a lousy physician, I will do
5  wrong things.  If I am a good doctor, I will use it for the
6  best purpose, and I will use it with the most caution, and
7  I will inform my patient about it.
8    Q   Well, do you know whether or not that's one of
9  the standards that the FDA has set forth in their labeling
10 guideline, that a manufacturer should include an
11 appropriate warning if there's a reasonable evidence of an
12 association of a serious hazard with the use of the
13 device?
14     MR. ROSENBLATT:  Object to form.
15     THE WITNESS:  What I believe is Ethicon
16 followed the regulation to the T for the time they were
17 asked to do their IFU, and every time they updated it for
18 the climate we have in this country in a reasonable way.
19     Q   (By Mr. Faes)  So going back to my question.  My
20 question, though, is:  Do you believe that that's the
21 appropriate standard to follow or not, that a manufacturer
22 should include an appropriate warning if there is
23 reasonable evidence of an association of a serious hazard
24 with the use of the device?
25     MR. ROSENBLATT:  Object to form.

Page 60

1      THE WITNESS:  No.
2    Q   (By Mr. Faes)  Okay.  And do you know whether or
3  not that's one of the rules that the FDA has set forward?
4      MR. ROSENBLATT:  Object to form.
5      THE WITNESS:  FDA wouldn't like it if it
6  didn't do it that way.  FDA allowed it to go through, so
7  it's up to FDA then whether to like it or not.
8    Q   (By Mr. Faes)  So it's your opinion that if the
9  FDA clears the device and the labeling included with that
10 device, that that's -- they met the requirements and that's
11 all they have to do?
12     A   That's good enough for me, because I, as a
13 surgeon, am responsible for the rest of it.  As a pelvic
14 surgeon, when we go to the OR we know we're not going to
15 county fair, so every step of that surgery I must make sure
16 I am following the teachings of my mentors and using the
17 best technique, knowing the anatomy.  I prepped the patient
18 for it and I followed the patient for it.  So I don't need
19 a drug company or medical device company to tell me watch
20 for these things, because it's in my books.  I teach it.
21     Q   Well, do you know whether or not a IFU or
22 instructions for use can make it out into the market, and
23 the FDA can later decide that that product is misbranded,
24 meaning the product is correct; do you know what FDA
25 misbranding is?

Page 61

1    A   Right.  So they could ask for changes and upon
2  maybe the events coming out, reported to them, then they
3  deal with that.  And I think Ethicon dealt with that each
4  time in a reasonable way.
5    Q   Have you ever drafted an IFU or instructions for
6  use on a medical device?
7    A   Actually, I did for my own device, which is not
8  on the market yet.
9    Q   Is that the pessary device that's mentioned on
10 your website?
11    A   Right.
12    Q   Are you working with a company working on that?
13    A   No, I have my own company.  I'm pursuing it
14 myself with my son.
15    Q   Okay.  And do you know if that's going to be
16 considered -- what is -- what class device that's going to
17 be considered; is that a class I, II or III?
18    A   Class II 510(k) process.
19    Q   Okay.  Is it fair to say that you never drafted a
20 IFU or instruction for use for a class III medical
21 device?
22    A   I have not.
23    Q   And it's accurate to say that you never drafted
24 an IFU for a medical device that's actually been cleared or
25 approved or gone on the market; right?

16  (Pages 58 to 61)

Oz Harmanli, M.D.

Page 62

1     A   I don't remember.
2     Q   Okay.  Other than your one experience working on
3   an IFU or instruction for use for the pessary device that
4   you're developing, have you ever worked on warnings for a
5   medical device?
6     A   I don't remember.
7     Q   Have you ever worked on warnings for a
8   prescription drug?
9     A   I don't remember.
10    Q   Would you agree with me that a physician should
11   be made aware of all the significant safety risks
12   associated with a product in the IFU or instructions for
13   use?
14    A   No.
15    Q   Would you agree with me that a manufacturer of a
16   medical device that will be implanted in a women's body is
17   required to disclose all significant risks to a doctor that
18   comes with the use of that device?
19        MR. ROSENBLATT:  Object to form.
20        THE WITNESS:  Definitely no.
21    Q   (By Mr. Faes)  Would you agree or disagree that
22   the warnings and adverse reactions section of an IFU or
23   instructions for use should include all significant risks
24   and complications related to the use of the TVT?
25    A   I said no.

Page 63

1     Q   Okay.
2        MR. FAES:  Now might be a good time for a
3   break.
4
5        (Off the record at 3:35 p.m.)
6        (On the record at 3:41 p.m.)
7
8     Q   (By Mr. Faes)  Doctor, we're back on the record
9   after a short break; are you ready to proceed?
10    A   Yes.
11    Q   Now, on page 14 of your report you state and cite
12   a section of the code of federal regulation.  You say, "The
13   IFU for the TVT and TVT-O are detailed and cover all the
14   requirements set forth by the code of federal regulations
15   21 CFR 801.109(c);" You see that?
16    A   Yes.
17    Q   How did you come up with that specific of the
18   code of federal regulations?
19    A   It might be through my discussions and readings
20   with the Ethicon material.
21    Q   Okay.  So prior to becoming an expert in
22   litigation for Ethicon and Johnson & Johnson, have you ever
23   read or reviewed this particular provision of the code of
24   regulations?
25    A   I had read it a few times.

Page 64

1     Q   Okay.  And when had you read it?
2     A   Many years ago when I thought I was coming up
3   with the device first, and then later for the pessary work,
4   and then maybe this time.
5     Q   Okay.
6     A   So at least a few times before I read that code
7   in detail.
8     Q   So you don't hold your -- but you don't hold
9   yourself out as an FDA or regulatory expert; right?
10        MR. ROSENBLATT:  Object to form.
11        THE WITNESS:  I am an expert in that
12   area.
13    Q   (By Mr. Faes)  So you hold yourself out as a --
14    A   Yeah.
15    Q   -- regulatory expert?
16    A   I am.  I am definitely.
17    Q   Do you hold any regulatory certifications or
18   belong to any regulatory societies?
19    A   I do not.
20    Q   Have you had any formal education or training in
21   that area?
22    A   I don't think anyone needs it.  Just read the
23   code, be a doctor; you'll understand it better than anybody
24   else.
25    Q   Do you have any experience interpreting the code

Page 65

1   of federal regulations or other statutes, other than in
2   this case?
3     A   Specific to medicine, I am very good with that.
4     Q   Have you ever served as an expert in that area,
5   interpretation of statutes or regulations?
6     A   I don't remember.
7     Q   Are there any other statutes or regulations that
8   you're relying on other than 21 CFR 801.109(c) cited in
9   your report for your opinions that the TVT and TVT-O IFUs
10   in this case are adequate?
11    A   So over the years I educated myself on the FDA
12   law as much as I could at any circumstance where my
13   expertise was needed.  Sometimes for the devices we thought
14   we would come up with, sometimes maybe -- during the
15   advisory process through the companies I was asked what to
16   include and, therefore, I had to study these things.
17        So I had to rely on specific code and specific
18   numbers of the code, and also related extra readings.  So
19   I've read 100s of pages of FDA material at many different
20   steps of my life that I feel myself an expert in this
21   area.
22    Q   So maybe I asked a bad question.  I'm just asking
23   in this case are you relying on anything specifically,
24   other than 21 CFR 801.109(c) as stated in your report for
25   your opinions that the TVT and TVT-O warnings are

17 (Pages 62 to 65)

Oz Harmanli, M.D.

Page 66

1   adequate?
2       A   Correct.
3       Q   Is there anything else?
4       A   Yes, the rest of the FDA code.  This is just to
5   make it crystal clear that this was cited that way.
6       Q   Are you relying on any FDA guidance or
7   regulations?
8       A   I am relying on the written law and things which
9   interpret it in many different ways.  And the advices you
10  would find through the FDA material for the companies, for
11  the inventors, anyone who want to bring any product to the
12  FDA's interest.
13      Q   Are you relying on the FDA's Blue Book Guidance
14  Memo for your opinions in this case?
15      A   I would -- yes, I would consider that being part
16  of the material I rely on.
17      Q   And do you believe that that guidance -- strike
18  that.
19          Do you believe that that Blue Book Guidance Menu
20  should be followed by device manufacturers?
21          MR. ROSENBLATT:  Object to form.
22          THE WITNESS:  It all comes down to what is
23  written in the law.  And the rest is, as judged by the
24  FDA, whatever the material is produced for the
25  application.  And then they look at it to see if they're

Page 67

1   meeting the criteria.
2       Q   (By Mr. Faes)  Would you agree with me that if
3   a -- if the FDA issues guidance regarding --
4       A   It's helpful.
5       Q   Let me get the whole question out.  You agree
6   with me that if the FDA issues guidance regarding what
7   warnings should be included in a medical device IFU, that a
8   manufacturer should try and follow that guidance;
9   correct?
10          MR. ROSENBLATT:  Object to form.
11          THE WITNESS:  That's not true.
12      Q   (By Mr. Faes)  So you don't think that a
13  manufacturer should try to follow guidance documents put
14  out by the FDA; is that accurate?
15      A   I did not say that either.
16      Q   You said both yes and no.
17      A   Not really.  You rephrased your statement and you
18  made me think that it's the same; it really wasn't.  So ask
19  me one more question about it and then I will answer you
20  one more time.
21      Q   My question is:  Do you think if the FDA puts out
22  a guidance document regarding what warnings should be put
23  in a medical device IFU, that a medical device company
24  should try to follow that guidance?
25      A   Whatever's written in the FDA law regulations

Page 68

1   must be followed.  And the guidance documents are helpful,
2   but everything should be looked at as a whole.  And,
3   finally, the decision comes from FDA.  Whatever they have
4   there, they will judge whether the company's meeting the
5   regulation.
6       Q   So is it your -- strike that.  I'm just going to
7   move on to something else.
8           Do you know what standard or standards a
9   manufacturer must follow when designing mesh products?
10      A   Ask me a specific question.
11      Q   Do you know -- well, my question is:  Do you know
12  any standards that a medical device manufacturer must
13  follow in designing; can you name any?
14      A   FDA for medical devices made it clear.  Just
15  follow that.
16      Q   So other than FDA regulations, are you aware of
17  any standards that a mesh manufacturer must follow in
18  designing mesh products?
19      A   I would go by whatever FDA says.
20      Q   Do you know what internal standards that Ethicon
21  must follow in designing mesh products?
22      A   I'm not aware of what internal standards are and
23  would mean, but as long as FDA regulations are met, I am
24  happy with the product.
25      Q   Do you know what responsibilities a manufacturer

Page 69

1   holds in designing mesh products?
2       A   Just like doctors, they got to be -- make sure
3   that they're doing a good thing for the health care.
4           MR. ROSENBLATT:  Object to form.
5       Q   (By Mr. Faes)  Do you know what types of experts
6   are involved when a medical device company goes about
7   designing a device?
8       A   Yes, I do.
9       Q   So what kind of experts are involved?
10      A   As I said, the people who materials in experts,
11  mechanical experts, engineers, these guys are typically
12  engineers.  Then you need the marketing people, you need
13  the regulatory people, you need the salespeople; all of
14  them have to be included in the product design, otherwise
15  it's going to flop.
16      Q   Do you know what a design history file is?
17      A   Yes.
18      Q   Did you review the -- well, first of all, what is
19  your understanding of what a design history file is?
20      A   Design history, like I had to do it for my own
21  devices, that from day one we must document what we do with
22  the development of the idea, even until it comes to the
23  market.  Every single step must be well-documented.
24      Q   And did you review the design history file of the
25  TVT or the TVT-O device before you issued your opinions in

18 (Pages 66 to 69)

Oz Harmanli, M.D.

Page 70

1  this case?
2      A   I did study the paper where -- how they came up
3  with the idea and all that.  I don't remember if it was
4  within my reliance design history thing.  Is it there?
5      Q   I'm asking you:  Do you know if you reviewed --
6      A   I don't think so.  I don't remember doing that.
7      Q   Do you know if you reviewed the initial design
8  history risk assessment of the TVT device before it was put
9  on the market in the United States?
10     A   There were few scientific presentations and
11  papers on it that I did read.  And I saw how diligent and
12  meticulous they were in finding the right type of material,
13  the amount of material.  They studied more than anything
14  else I can imagine for the years they did this.  I can't
15  imagine better work than that can be done.
16     Q   Do you know what Medscand is; are you familiar
17  with that company or that work?
18     A   Med scan?
19     Q   Yes, M-E-D-S-C-A-N-D?
20     A   I'm not familiar.
21     Q   Okay.  Do you know if you looked at the risk
22  analysis of the TVT or not?
23     A   I don't remember looking at that.
24     Q   Do you know what the failure modes and effects
25  analysis is?

Page 71

1      A   Failure modes effect analysis, no.
2      Q   Do you know what the purpose of a failure modes
3  and effects analysis is?
4      A   I am not familiar.
5      Q   Do you know what a design failure modes and
6  effects analysis is?
7      A   No.
8      Q   Do you know what an application failure modes and
9  effects analysis is?
10     A   I'm not sure if those refer to things I know, but
11  just using a different terminology.
12     Q   Do you recall if you ever reviewed any of the
13  design failure -- strike that.
14         Do you recall if you ever reviewed any of the
15  design failure modes and effects analysis for either the
16  TVT or TVT-O devices in this case?
17     A   No.
18     Q   Do you know whether or not identifying the risks
19  of the device is part of that risks of failure modes and
20  effects analysis?
21     A   No.
22     Q   Do you know what kind of risks are to be assessed
23  in the design failure modes and effects analysis?
24     A   You already asked me whether I know, so, I mean,
25  you're asking me the details about it.  I already told you

Page 72

1  that the way you are calling it, I don't remember the
2  specific work.  But the type of work to analyze if a device
3  is going to be effective or not, there are many different
4  tests done to see.  It could be physical testing, it could
5  be mechanical testing, it could cytotoxicity testing, it
6  could be bycopetalative (phonetic) testing.  If you're
7  covering those and using different terminology, then maybe
8  I know some of those.
9      Q   Have you ever reviewed any of Ethicon's internal
10  standard operating procedures related to design?
11     A   No.
12     Q   Do you know how long it takes -- typically takes
13  a product to get to market?
14     A   I do, certainly.
15     Q   And how long is that generally?
16     A   Five years.
17     Q   I noticed in your report that you've got the
18  clearance date of the TVT-O product, or TVT product,
19  rather, on page four you state that it was cleared by the
20  FDA in January of 1998?
21     A   Correct.
22     Q   You see that?  Are you aware of when the TVT-O
23  product was cleared by the FDA?
24     A   I don't remember off the top of my head right
25  now.

Page 73

1      Q   Do you recall what the development time was for
2  the TVT-O product?
3      A   A few years.
4      Q   Okay.  Doctor, you've got a little website, a
5  little web page on Yale's University website; are you aware
6  of that?
7      A   Right, right.
8      Q   And on that website there's about a one minute
9  video of you talking about urinary stress incontinence
10  surgery?
11     A   I am on that; okay.
12     Q   Do you know that or not?
13     A   I haven't looked at it for a while.  I remember
14  they taped me when I first started.
15     Q   Okay.  I'll represent to you it's about a one
16  minute video, you're wearing kind of a brown sport coat,
17  all in brown.  Do you remember shooting that video or when
18  that occurred?
19     A   It's been a while.
20     Q   Okay.  But was it within the last two years?
21     A   Yeah, at least a year ago.
22     Q   So that's about a one minute video, and one of
23  the things you state in that video is that surgery for
24  stress incontinence is so gratifying; do you remember
25  saying that in the video?

19 (Pages 70 to 73)

Oz Harmanli, M.D.

Page 74

1    A   Yes.
2    Q   And it also states in the video that about 90
3   percent of patients are cured?
4    A   I'm helping easily 90 percent of patients with
5   stress incontinence surgeries.
6    Q   Do you remember in that video whether or not
7   there's any -- or have you reviewed the video to know
8   whether or not there's any discussion of any risks to the
9   patients in that one minute video?
10    A   I'm not sure what that video is about, to be
11   honest with you.
12    Q   Okay.  One of the things you state in the video,
13   I'll represent to you, is you state every time a patient
14   comes back, gives me a hug with the great results because
15   they can get back to their routine; do you remember saying
16   that?
17    A   Yes, that's like my routine discussion with the
18   patients.  I really believe in sling procedure, it's a life
19   changing procedure.
20    Q   But is that really what happens every time?
21   You've never had a patient who's been dissatisfied with the
22   procedure?
23    A   That's not a good question.  Obviously, surgery
24   is a risky business, things happen, and I inform the
25   patient before going to the OR.  But I can tell you if I go

Page 75

1   back, remember my memories, bring the memories back all
2   these 20 years taking care of urinary stress incontinence,
3   I know one thing I do well, did well for my patients is I
4   treated their stress incontinence really well thanks to TVT
5   and similar mid-urethral sling procedures.
6    Q   But you've agree with me that not every patient
7   that has a TVT sling, whether it be from you or another
8   doctor, have a great result; right?
9    A   Obviously not.
10    Q   Okay.  So this website video, do you think it's
11   responsible to put that out there, a minute long video
12   without informing patients of any of the risks?
13    A   It is extremely responsible.  Do you know why it
14   is very responsible?
15        MR. ROSENBLATT:  Object to form.
16        THE WITNESS:  Because all patients we are
17   hearing are, unfortunately, the wrong things about mesh
18   procedures, which is dinnertime, prime time TV commercials
19   from law offices.  And somehow we need to tell them how
20   actually good these products are.
21    Q   (By Mr. Faes)  And that's what your video does,
22   right, it explains the benefits, but none of the risks;
23   right?
24    A   The benefits, because, again, they're so
25   well-informed, trust me, about the things, advertisements

Page 76

1   coming from it.  Someone has to tell these people that
2   these procedures serve 90 percent of women in the right
3   way.  That's what I'm saying.
4
5        (Plaintiff's Exhibit 7, 2009 Email, marked
6   for identification.)
7
8    Q   (By Mr. Faes)  Doctor, I'm going to hand you what
9   I'm going to mark as Exhibit Number 7 to your deposition.
10   And this is an email that you're on dated 2009 and I'll
11   give you a minute to read that.
12    A   All right.
13    Q   You done there?
14    A   Yes.
15    Q   So this is an email between you and Mr. Steel
16   from Ethicon and Johnson & Johnson, who I assume is a sales
17   rep or marketing person?
18    A   Correct, like a more managerial.
19    Q   And in this particular email he's offering to
20   sponsor a dinner at your institution if you're willing to
21   do a talk on the Prosima device; right?
22    A   I'm not sure Prosima.  Probably all the Ethicon
23   products, I'm guessing.
24    Q   Okay.  Was that routine -- I'm going back to
25   2009 -- that Ethicon would agree to sponsor a dinner at

Page 77

1   your hotel if you were willing to give a talk on their
2   products?
3    A   So you misstated it.  Say it again, please.
4   Please read it carefully, see what the email says and then
5   ask me the question one more time.
6    Q   So my question is:  Independent of the email, was
7   it routine -- strike that.
8        Was it unusual in 2009 for Ethicon and Johnson &
9   Johnson to agree to sponsor a dinner or event at your
10   institution if you were willing to give a talk on their
11   products?
12        MR. ROSENBLATT:  Object to form.
13        THE WITNESS:  It was really not routine.
14   I'm not sure if it ever happened.  I'm not sure a meeting
15   like that ever happened, but it probably has happened a
16   few times that the industry helped us organize maybe a
17   meeting, typically not a dinner, like an education session
18   with the potential patients to inform them about what we
19   could do for their urinary incontinence and prolapse.
20        I don't remember specifics of this 9/29 basic
21   urogyn meeting on hospital grounds; I really don't remember
22   that.  But I might have had few meetings where the industry
23   provided food maybe for the patients so that we could tell
24   them about their options for incontinence and prolapse.
25    Q   (By Mr. Faes)  Right.  And that was something

20 (Pages 74 to 77)

Oz Harmanli, M.D.

Page 78

1 that Ethicon and Johnson & Johnson was willing to sponsor
2 for you; right?
3     A   All the companies like to do that with the
4 physicians. I probably did it less than anybody else ever.
5 That's pretty much routine in the industry, that companies
6 like to sponsor those educational sessions. I don't think
7 it ever happened with us and Ethicon then.
8
9         (Plaintiff's Exhibit 8, Invoice, marked for
10 identification.)
11
12     Q   (By Mr. Faes) Okay. Let me hand you what's been
13 marked as Exhibit Number 8 to your deposition. And this is
14 an invoice for a 2011 trip you took to an Ethicon summit in
15 Sonoma, California; do you recall that?
16     A   I do recall that, yes.
17     Q   And this is an event that you appeared at as a
18 consultant for Ethicon and Johnson & Johnson, they paid you
19 for that; right?
20     A   Correct.
21     Q   And they paid you an honorarium, it looks like
22 $500; is that correct?
23     A   Correct.
24     Q   And did they pay for your travel and expenses to
25 Sonoma, as well?

Page 79

1     A   Correct.
2     Q   How many times would you say that you've taken
3 trips or speaking events for Ethicon and Johnson &
4 Johnson?
5     A   Probably was it.
6     Q   So you believe that that was the only time?
7     A   I don't remember any other, but you bring it if
8 there is any.
9     Q   Do you recall ever traveling outside of the
10 United States for Ethicon and Johnson & Johnson?
11     A   I never did it under their payment. I did not
12 take those trips to Europe. I did it myself.
13     Q   Oh, so you did -- did you take a trip at some
14 point to attend or speak on Ethicon and Johnson & Johnson
15 products?
16     A   No, no.
17     Q   So I'm not -- to what are you referring?
18     A   So I remember when some of these products were
19 being designed they were taking some American physicians to
20 really, I think, probably make their products better, get
21 their opinions on it, and maybe get their experience on the
22 cadaver labs, because most of these devices were invented
23 in Europe. I've not been on any of those trips.
24     Q   Got it. You never got the invite to go over to
25 Sweden and train with --

Page 80

1     A   That's not right, you said wrong. I declined
2 invites.
3     Q   So you were invited to go to Belgium and train
4 with Dr. Delaval at one point?
5     A   Right. I was invited a few times. Not through
6 Ethicon only; other companies as well, but I just did not
7 want to be involved in that at that time.
8
9         (Plaintiff's Exhibit 9, 2009 Email, marked
10 for identification.)
11
12     Q   (By Mr. Faes) Okay. I'm going to hand you
13 what's been marked as Exhibit Number 9. And this is an
14 email from you in 2009 and I'll just give you a minute to
15 review that.
16     A   Right.
17     Q   So this is an email from you in 2009, and it's
18 regarding getting the TVT back in the hospital that you
19 were practicing at at that time?
20     A   Right.
21     Q   And what hospital was that?
22     A   Bay State Medical Center.
23     Q   So why was the TVT removed from Bayside Medical
24 Center?
25     A   Bay State Medical Center.

Page 81

1     Q   Bay State.
2     A   So I was a division director, I was basically
3 kind of representing a group of physicians who were using
4 sling products. So I remember that TVT, again, was more
5 expensive. So because of that, and Bay State Medical
6 Center did a good job looking for pricing and negotiating
7 pricing. And they're asking our opinions as well.
8 Obviously they would not necessarily bring a device which
9 is not acceptable, but economic.
10         Anyway, so there was arguments going back and
11 forth whether TVT should be there or not. So at some point
12 TVT wasn't there, so we wanted to bring it back because
13 it's almost the standard mid-urethral sling procedure. So
14 we argued for that, that it should be there, offered. So
15 that must related to that.
16     Q   Do you recall for how long of a period of time
17 that the TVT was not available at that particular
18 hospital?
19     A   I don't remember.
20     Q   So during the time -- well, what period of time
21 were you at Bay State Medical Center?
22     A   I moved to Bay State 2004 and came here 2017.
23     Q   Okay. So you can't recall, as you sit here
24 today, the length of time that the TVT device was
25 unavailable in Bay State prior to being reintroduced in

21 (Pages 78 to 81)

Oz Harmanli, M.D.

Page 82

1  2009?
2      A   No, definitely not.
3      Q   Do you recall what you were using -- and I'm
4  assuming this is referring to the TVT -- TVT retropubic;
5  right?
6      A   TVT bottom-up retropubic, yes.
7      Q   And during the time that the TVT was unavailable
8  prior to it being reintroduced in 2009, what device were
9  you using for the retropubic approach in your patients?
10     A   Lynx, Advantage, SPARC, AMS products, I'm
11  assuming.
12     Q   So at that time those products were available in
13  your hospital, the TVT was not?
14     A   For a while TVT was not there because of price
15  negotiations.
16     Q   Okay.
17
18         (Plaintiff's Exhibit 10, 2013 Email String,
19  marked for identification.)
20
21     Q   (By Mr. Faes)  Doctor, I'm going to hand you
22  what's been marked as Exhibit Number 10 to your deposition.
23  And this is a 2013 email string between you and some folks
24  at Ethicon.  You had a chance to review that document,
25  Doctor?

Page 83

1      A   Yeah.
2      Q   So this is a document from Ethicon to you back
3  and forth.  And one of the things they're discussing is
4  trying to get you to use some ARTISYN Y mesh for some of
5  your cases; is that correct?
6      A   So, yeah.  I mean, like any company, the
7  salespeople are trying to get their products in.  So, yes,
8  they were developing the Y mesh, their ARTISYN Y mesh.  And
9  then also Ethicon acquired one of the new suture materials
10  which we use in pelvic organ surgery, too.  So it sounds as
11  though they want us to use those things.
12         And so we were also organizing a meeting,
13  educational meeting for the region.  And most meetings
14  commonly are sponsored by companies.  So -- and they're
15  disclosed, and I don't think any society can happen without
16  sponsorship of the companies.  So for this regional meeting
17  we relied on the companies, which provided us products, so
18  that was probably the discussion about it.
19         And what this indicates, that we would like them
20  to have a booth so that they can show their products to the
21  attendees, and that would be benefit to their own
22  companies, and that would help us to do that meeting
23  there.
24     Q   Right.  So they emailed you and asked you about
25  the possibility of trialing this new ARTISYN Y mesh for

Page 84

1  pelvic organ prolapse in your practice, and your response
2  was to ask them about potentially sponsoring a booth at
3  your regional conference; right?
4      A   So we don't get together with these guys very
5  often, it's just very busy people.  As soon as I see a
6  company asking to come in to show their product, my brain
7  works in a different way; I want to make sure that our
8  meeting is sponsored.  And as a director of the division,
9  it was my job to make sure that we had a meeting and where
10  the companies also have a chance to show their product.  So
11  that's basically about that.
12     Q   Right.  That was your response, right, you asked
13  them about potentially sponsoring a booth in one of your
14  conferences; right?
15     A   And we never used that product.  I never used
16  that product.
17     Q   Did they end up sponsoring a booth at your
18  conference?
19     A   They did, they always do.  They have a budget for
20  things like this.  That's the way the whole medical device
21  or direct company world function.  And then for us, we do
22  use their products.  I guess somehow they feel obligated to
23  support our hospital and an educational session like that,
24  too.  And we never trialed it.
25     Q   Right.  So you sent them a request to sponsor a

Page 85

1  booth and their request was to send you back an
2  investigator initiated study or IIS request; right?
3      A   So they thought this was -- this was I wanted
4  them to sponsor one of those things.  And I said it's not
5  that, it's just basically you just be there, get a booth so
6  that you introduce your product to the people.
7      Q   Right.  And then IIS request is just an
8  investor -- initiated study; right?
9      A   Correct, it's not -- doesn't meet that criteria,
10  it's not that, that's not what we're asking.
11     Q   Right.  And that's what your response back to
12  them was, is that it's not really an IIS request; right?
13     A   It is not.
14     Q   And you stated, "I will do whatever is necessary
15  to do it right, thanks for the support;" what did you mean
16  by that?
17     A   So the paperwork was I will do whatever's
18  necessary to make sure that you can get support.  Whatever
19  paperwork's needed, let's just get you in so that you can
20  show your products and this meeting also gets your
21  financial support so that we can educate people.  All for
22  education.  Nothing but education.  We did not even trial
23  it.  And they supported it.  It's just the system how --
24  without the support from the companies, no educational
25  meeting or conference can be completed.

22  (Pages 82 to 85)

Oz Harmanli, M.D.

Page 86

1    Q   Right.  So your response was because of your
2  long-standing relationship with Ethicon, that they were
3  going to do whatever you could to help them sponsor a booth
4  at that convention; right?
5    A   The intentions were whatever paperwork needs to
6  be done, I'm ready to do it.  So don't interpret it in any
7  different way, please.
8    Q   So in terms of IIS or investigator initiated
9  study request -- so in terms of investigator initiated
10  study request, you've actually offered to write those up
11  and submit them to Ethicon before; right?
12    A   I try for something else, maybe.  I'm not sure.
13    Q   Was it for the SECURESTRAP, perhaps, that you
14  offered to --
15    A   Correct.
16    Q   And I think they ultimately told you with regard
17  to the SECURESTRAP, that they were more targeting hernia
18  surgeons at that time; right?
19    A   Very good, exactly.  I wanted to -- I thought it
20  would fit with some of the surgeries that I did.  And they
21  were pulling out slowly from the pelvic floor market, and
22  then they said, sorry, we're not focused on that area any
23  more.
24    Q   Okay.  And as part of your relationship with
25  Ethicon, you've actually allowed engineers from Ethicon to

Page 87

1  come and observe you while doing a surgery for one of their
2  products; right?
3    MR. ROSENBLATT:  Object to form.
4    THE WITNESS:  It was using SECURESTRAP
5  basically for a surgery, yes.
6    Q   (By Mr. Faes)  And that's what I was going to
7  ask; you've anticipated my next question.  I'm going to
8  hand you what's been marked as Exhibit Number 11 there.
9
10    (Plaintiff's Exhibit 11, Email, marked for
11  identification.)
12
13    THE WITNESS:  Yes.
14    Q   (By Mr. Faes)  And that's essentially -- what
15  Exhibit Number 11 is reflecting is that you allowed, upon
16  Ethicon's request, a couple of engineers to come and
17  observe you doing a SECURESTRAP in a patient with the
18  patient's consent, of course?
19    A   Yes, correct.
20    Q   And that SECURESTRAP, you used that for a pelvic
21  organ prolapse operation?
22    A   I attached the mesh to the sacrum that way.
23    Q   Okay.  So let me ask you just a few things.
24  Going through your expert report, here on page six of your
25  report you state that "The annual economic burden of

Page 88

1  urinary incontinence is approximately $20 billion dollars,
2  and the cost of nursing home admission, adult diapers,
3  medical and surgical treatments and time loss from work are
4  all taken into consideration;" do you see that?
5    A   Correct.
6    Q   And it looks like you got a reference there to an
7  article?
8    A   Yes.
9    Q   Is that where you're taking that reference
10  from?
11    A   It's not the whole statement.  Part of it must be
12  coming from that if I put it in parenthesis right next to
13  that statement.
14    Q   Have you ever done an analysis of the economic
15  burden of mesh complications from mid-urethral slings like
16  the TVT and TVT-O from medical and surgical treatments,
17  lost time from work and any nursing home admissions that
18  are required?
19    A   I have not done a study like that.
20    Q   Okay.  So, as you sit here today, you don't have
21  any kind of estimate as to what the economic burden from
22  mesh complications for mid-urethral slings is; right?
23    A   I do not.
24    Q   Okay.  Further down on the page on page six you
25  state that, "To date, the synthetic mid-urethral sling like

Page 89

1  the TVT and TVT-O are the best treatment option available
2  for the index patient with SUI;" do you see that?
3    A   Correct.
4    Q   So it's your opinion -- is it your opinion in
5  this case that any synthetic mid-urethral sling is the best
6  treatment option, or do you have an opinion as to which is
7  the best treatment option specifically for the index
8  patient for SUI?
9    A   So I would say in general mid-urethral slings, if
10  they're made of type 1 mesh, they're all very good.  But if
11  I have to say that one product differentiates itself from
12  the others, that would be TVT, specifically TVT.  And TVT-O
13  is almost next to it, because they've been on the market
14  the longest, they've been tested more than all of them
15  combined.
16    And the quality of the studies, number of
17  studies, level of evidence supporting TVT, TVT-O surpasses
18  all of them combined.  So because of that, if I had to pick
19  one, I would say TVT and TVT-O.  But on the other hand, all
20  the slings with type 1 mesh, full length mesh, I believe
21  are helping women and not causing problems as much as
22  you -- as much as litigation suggests.
23    Q   So if I understand you correctly, you think that
24  the best option for the index patient with SUI is
25  specifically the Ethicon TVT and, secondly, the TVT-O?

23 (Pages 86 to 89)

Oz Harmanli, M.D.

Page 90

1    A   So I would say, in general, I would be fine with
2  the mid-urethral sling, which are still on the market. But
3  if you ask me the one which has the best evidence, I would
4  say those two.
5    Q   But, currently, as we discussed earlier, you're
6  not using the TVT-O for patients with an obturator?
7    A   Correct.
8    Q   Who need an obturator sling, you're using the
9  Obtryx II; right?
10    A   That's correct.
11    Q   Do you tell your patients when you recommend a
12  obturator sling to them that you don't think that the
13  Obtryx II is the best option, that it's what you're limited
14  to use because that's what the hospital has?
15    A   In my hands there's hardly any difference in
16  between.  An Obtryx has been tested and tried in
17  prospective manner in many studies.  And my personal
18  experience also supports that's a good product.  So I have
19  no problem presenting that to my patient.  I -- the
20  difference would be more technical in that situation.
21    Q   So you think the Obtryx is a good product for
22  obturator, but it's just not the best product?
23    A   I would say it's a very good product.  I can't
24  say it's not the best product.  I can say that TVT-O has
25  been studied more extensively.  From that standpoint, TVT

Page 91

1  might be a better supported product with evidence.
2    Q   You also stated earlier that they've -- the TVT
3  and the TVT-O have been on the market the longest; is that
4  true with the TVT-O?
5    A   No, TVT-O has not been the longest on the market.
6  Yes, Uptake proceeded it and Monarc was before also TVT-O,
7  but they got good track record.
8    Q   You -- I believe you state in your report that at
9  least at one time the Burch treatments was considered the
10  gold standard for the treatment of urinary stress
11  incontinence; is that correct?
12    A   That's correct.
13    Q   Would you agree with me that the Burch procedure
14  for urinary stress incontinence is still within the
15  standard of care today for treatment of urinary stress
16  incontinence?
17    A   No.
18    Q   You don't think it's not within the standard of
19  care?
20    A   It's not any more.
21    Q   So you think that any doctor that performs a
22  Burch procedure is violating the standard of care?
23    A   I wouldn't say so.  Standard of care, I think,
24  has been replaced by just overwhelming evidence in favor of
25  TVT and the other mid-urethral slings.  So fellowship

Page 92

1  programs are not teaching Burch any more.  Fellows come out
2  doing no Burch procedures.  So these are the future
3  urogynecologists who will treat your wife, my wife, my
4  children; they don't have to do Burch.
5    Q   So you're not -- sorry, I don't mean to
6  interrupt.
7    A   But they know both transobturator and TVT
8  approaches so well, and I am confident they're going to do
9  a good job when one of our relatives need help.
10    Q   So it's your belief, as you sit here today, that
11  there are not any fellowship programs in the United States
12  that still teach the Burch procedure?
13    A   That's wrong.  Why are you stating that way?  Ask
14  me the right question.
15    Q   So you disagree with that?
16    A   I disagree with what you say.
17    Q   So you agree that there are still fellowship
18  programs within the United States that teach the Burch
19  procedure; correct?
20    A   Correct.  We want to teach it, but, look,
21  patients will not like it.  When you have TVT and Burch and
22  present the risks, complications, recovery and all that, no
23  one is going to take Burch.
24    Q   Would you agree with me that if after being
25  presented with the risks and benefits of both, the

Page 93

1  mid-urethral sling and a Burch procedure, that the patient
2  opts to go with the Burch procedure, that would be a
3  reasonable option for that patient?
4    A   In my opinion, it would be a lesser option for
5  the patient, so I do not even present it.  When they
6  mention that they're worried about mesh insertion, I start
7  telling them about everything else about Burch and they
8  immediately -- and what I'm telling them is evidence.  I
9  don't tell my personal experience on these, only strong
10  evidence.  And they immediately are convinced that I'm
11  giving you the best option, which has replaced Burch as the
12  standard of care today.
13    Q   But if you had, hypothetically, a patient that
14  was presented with the risks of both procedures and they
15  still decided I'd rather go with a Burch procedure because
16  I don't want this synthetic mesh, would you agree that
17  would be a reasonable option for that patient?
18    A   I would try my best to convince her that she's
19  making the wrong choice because I strongly believe that
20  mid-urethral sling will do it in a less complicated way and
21  faster recovery and everything else.
22    Q   But you would ultimately respect that patient's
23  wishes if they've decided?
24    A   Correct.
25    Q   Would you agree with me that the autologous

24 (Pages 90 to 93)

Oz Harmanli, M.D.

Page 94

1   facial sling is still within the standard of care for
2   urinary stress incontinence?
3       A   So, again, standard of care is mid-urethral
4   slings.  Those two are not in the standard of care any
5   more.  Those are options when patients refuse to have a
6   sling.  So standard of care, the go-to procedure if someone
7   has urinary stress incontinence with or without urge
8   incontinence, 99 percent of physicians in the world will
9   offer the patient mid-urethral slings.  There will be 1
10  percent, those are outliers.
11      Q   And so what -- strike that.
12          Would you agree with me that similar to the Burch
13  sling, if after hearing the risks and benefits of both, the
14  mid-urethral sling with mesh, and the risks and benefits of
15  the autologous facial sling, the patient decided to go with
16  the autologous facial sling, that would be a reasonable
17  treatment option for that patient.
18      A   I would, again, do my best to convince her that
19  she's not making the right decision.  But, again, if she's
20  so convinced that she's definitely not going to accept any
21  mesh placement in the form of a strip, which is sling mesh,
22  then I have no other choice, that I will have to follow the
23  patient's request.
24      Q   If you had a patient who ultimately decided that
25  they wanted a Burch procedure, would you do that procedure

Page 95

1   yourself or would you refer that patient to another
2   physician?
3       A   I would definitely -- I am very capable of doing
4   Burch procedures today, but how many of those do I do now?
5   Like one, two, nine ratio -- no, one to nine -- I don't
6   know when I did that Burch this past year.  Not even
7   that.
8       Q   I'm not sure I got an answer to my question.  My
9   question was simply --
10      A   I can do it.  I will do it.
11      Q   So you would do the procedure yourself as opposed
12  to referring it to another physician?
13      A   I will do it, because I have the skills to do
14  it.
15      Q   Okay.  And do you recall -- you kind of
16  anticipated my next question.  The answer may be you don't
17  remember, but can you recall the last time you performed a
18  Burch procedure?
19      A   Maybe two years ago.
20      Q   Okay.  Same question with autologous facial
21  slings.  If after hearing the risks and benefits --
22      A   About a year ago.
23      Q   That's exactly not the question I was going to
24  ask so let me ask that question.  When was the last time
25  that you recall performing an autologous fascial sling?

Page 96

1       A   About a year ago.
2       Q   And the question I was going to ask was:  If you
3   had -- which I think I already know the answer to, but if
4   you had a patient that after hearing the risks and benefits
5   of both, the synthetic sling and autologous facial sling,
6   decided they wanted to go with the autologous facial sling
7   and you weren't able to talk them out of it, would you do
8   the procedure yourself or would you refer them to another
9   physician?
10      A   I would do it myself.  And I would do both
11  procedures really well and to the best possible way for
12  sure, because I have the skills.
13      Q   Right.  Of course you wouldn't do a procedure if
14  you didn't feel like you could do it competently; right?
15      A   Correct, so I maintain the skills to do both.
16      Q   So on page eight of your report you talk about
17  the laparoscopic Burch procedure.  And you agree with me
18  that the laparoscopic Burch procedure is minimally
19  invasive; right?
20      A   It is minimally invasive as is any laparoscopic
21  surgery.
22      Q   And you also state that "It requires skills which
23  may take a longer time to require;" do you see that?
24      A   That's correct.
25      Q   Do you think that should be a consideration of a

Page 97

1   patient when deciding the best option for surgery, about
2   whether or not it takes a longer time to acquire the skills
3   for that particular surgery?
4       A   Certainly, because most people probably will be
5   in their learning curves to do laparoscopic Burch
6   procedures; that translates to higher risks.
7       Q   But you're not still in the learning curve for
8   laparoscopic Burch procedures, are you?
9       A   I am not in the learning curve; but, again,
10  considering my skills to do mid-urethral slings and my
11  outcomes from it, I cannot convince myself to do a
12  laparoscopic Burch procedure today, because, again, the
13  dissection requires way more skills.  And TVT today is
14  second nature to us.
15      Q   So on page 11 of your report you state that "The
16  utility, desirability and benefits of TVT and TVT-O
17  significantly outweigh the risks;" you see that page 11?
18      A   Yes.
19      Q   Okay.  And that's an opinion that you intend to
20  offer in this case; right?
21      A   Correct.
22      Q   So in doing -- in coming to this, an opinion, I
23  assume that you believe that -- you intend to offer an
24  opinion in this case that the TVT is safe; right?
25      A   TVT is very safe.

25 (Pages 94 to 97)

Oz Harmanli, M.D.

Page 98

1      Q   And you intend to offer an opinion in this case
2   that the TVT is effective; right?
3      A   TVT is very effective.
4      Q   And what do you think that the overall efficacy
5   or effective rate is for the TVT?
6      A   It depends on the measure you take. So I want to
7   say 90 percent improvement, slash, satisfaction which
8   translates, to me, subjective cure.
9      Q   And so that's essentially what you've said on
10  your one minute video on your website, right, 90 percent, I
11  think you say cure, but --
12     A   Subjective cure. Technically speaking,
13  subjective cure is 90 percent.
14     Q   So how low would the effectiveness rate of the
15  TVT have to be before you decide -- strike that.
16         How low would the effectiveness rate of a medical
17  device need to be for stress urinary incontinence before
18  you would decide that it's not an effective treatment for
19  stress urinary incontinence?
20         MR. ROSENBLATT:  Object to form.
21         THE WITNESS:  So I'm not sure I have a
22  magic number. I think when we talk about a procedure we
23  take everything into consideration. So effectiveness,
24  safety, ease of use, desirability, utility, cost; all
25  these are factors. So then I start thinking about that

Page 99

1   procedure. If it is graded high on all of these things in
2   a composite way, maybe that's a good thing.
3         So zero risk, there's no such a thing, but 70
4   percent effectiveness is not a bad thing. Something which
5   will not hurt anything, but is 70 percent effective, I
6   would like that.
7      Q   (By Mr. Faes) So if I understand you correctly,
8   I think you're saying that, you know, the effectiveness
9   rate for a device depends on large part -- the acceptable
10  effectiveness rate depends on also the complication rate?
11     A   You have to look at the device from all
12  perspectives; correct.
13     Q   So let me ask you this question:  How -- first of
14  all, what do you think that the overall complication rate
15  is for the TVT, specifically the retropubic?
16     A   Very low, extremely low.
17     Q   I think in one point in your report you state
18  that the complication rate of the TVT is around two
19  percent. I assume you meant that the erosion rate is
20  around two percent, not the overall complication rate;
21  right?
22     A   Correct, because everything else is related to
23  doing any cutting on the patient. Like, if you cut someone
24  there's a complication from it regardless of what you do.
25  Make an incision, there's a complication; bleeding,

Page 100

1   infection, organ injury. And where do they come from?
2   From just you cutting. So it's not TVT fault; it's
3   procedure's fault. Any procedure has it. Guess what?
4   Burch procedure has way more. Same for autologous; you're
5   removing a piece of mesh from the -- tissue from a patient.
6   Can you imagine, you're cutting a piece, taking it, putting
7   somewhere else, additional risk from it.
8      Q   So how high would the erosion rate, for example,
9   need to be on the TVT or -- strike that.
10         How high would the erosion rate on a mesh device
11  for stress urinary incontinence need to be before you would
12  think that that device was not safe enough to use?
13         MR. ROSENBLATT:  Object to form.
14         THE WITNESS:  Don't ask me hypothetical
15  questions, please.
16     Q   (By Mr. Faes) I'm allowed to ask hypothetical
17  questions. Is your answer essentially that there's no
18  magic number?
19     A   I don't have a magic number for you.
20     Q   Okay. But you know that there are some synthetic
21  slings on the market that were shown to have an erosion
22  rate up to 30 percent and were removed; right?
23     A   I'm sorry. Tell me -- be specific, please.
24         MR. ROSENBLATT:  Object to form.
25     Q   (By Mr. Faes) Are you familiar with the ProtoGen

Page 101

1   device at all?
2      A   Yes.
3      Q   And you know that that device has been removed
4   from the market; right?
5      A   Correct.
6      Q   And would you agree that that was removed due
7   to -- primarily due to safety concerns from high erosion
8   rates; correct?
9      A   Correct.
10     Q   Are you familiar with what the erosion rates were
11  for that device?
12     A   It was very high.
13     Q   But do you know the percent, as you sit here?
14     A   I don't remember off the top of my head, but it
15  was unacceptably high.
16     Q   What if -- if the erosion rate was shown to be 30
17  percent, would you think that that's a high enough risk to
18  determine that that device was not safe?
19         MR. ROSENBLATT:  Object to form.
20         THE WITNESS:  It depends on the volume of
21  the studies, the level of the studies. There will be one
22  outlier study on one particular instrument or device which
23  will show you 30 percent. It's because they don't know
24  how to operate in that hospital, I guess. It has happened
25  in many studies for any kind of sling or mesh

26 (Pages 98 to 101)

Oz Harmanli, M.D.

Page 102

1    applications. Some places it was zero percent extrusion
2    rate, some places 100 percent. How do you explain that?
3    Am I going to go by that 100 percent or this zero percent?
4         So you look at the entirety of the literature and
5    you look at the level of the literature. So you go by the
6    grading score of the literature. So that 30 percent alone
7    doesn't tell me anything.
8         Q    (By Mr. Faes)  Right. So if assuming that you
9    look at the entire literature and it consistently shows an
10   erosion rate for a SUI device for 30 percent or more, would
11   you think that that device is not safe?
12        A    It's systematic analyses, meta analyses on top of
13   level one studies demonstrate that there's 30 percent risk
14   of mesh erosion, extrusion, then that device should be
15   looked at definitely.
16        Q    So you agree with me that a 30 percent consistent
17   erosion rate is certainly cause for concern and might force
18   you to look more into the question of whether or not that
19   device is --
20        A    If the 30 percent comes from multiple studies all
21   substantiating the same thing, then I would look at it as a
22   serious consideration.
23        Q    So how high would the erosion rate need to be for
24   a SUI device before you start looking into it as a serious
25   concern?

Page 103

1         A    I don't have a magic number. I want to look at
2    it again from the efficacy, safety and everything else,
3    ease of use, utility, desirability, cost; all of that would
4    have to play a role in any decision-making.
5         Q    But we can agree that it's got to be somewhere
6    between 2 and 30 percent, because the TVT, you think, has a
7    2 percent erosion rate and 30 percent makes you
8    uncomfortable, so somewhere in that range; right?
9         A    Correct, that makes sense.
10        Q    But as you sit here today, you can't put a number
11   on it; right?
12        A    I don't want to set a bar there.
13        Q    If you can't put a number on it, what objective
14   standard are you using to determine whether or not a
15   medical device like the TVT or TVT-O is safe?
16        A    So subjective, objective outcome measures in
17   terms of effectiveness, the adverse events cumulatively and
18   how seriously the adverse events, all of that play a role.
19   So cumulatively they would all be looked together and that
20   will help us decide whether any procedure is safe to
21   continue or just abandon.
22        Q    But, as you sit here today, you can't put a
23   qualitative number, other than somewhere between 2 and 30
24   percent; correct?
25        A    I don't like to guess.

Page 104

1         Q    Okay. Are you aware that at least in some
2    studies the erosion rate for the TVT has been shown to be
3    up to 19 percent?
4              MR. ROSENBLATT: Object to form. If you
5    want to show him a specific study, you can pull it out.
6              THE WITNESS: Show me the study.
7         Q    (By Mr. Faes)  I'm just asking are you aware.
8    Are you aware of any studies?
9         A    There might be a study somewhere in esoteric
10   journal.
11        Q    So you believe that if there was a study of TVT
12   showing a 19 percent erosion rate, that it was in an
13   esoteric journal?
14        A    What I'm saying is: I looked at the level of
15   evidence, follow up, duration, prospective design. I look
16   at the researchers who put it out, then I decide whether
17   it's valuable for my interpretation or not. I disregard
18   studies many times immediately as soon as I look at their
19   methods. That possibly is one of those studies. But if
20   you look at the literature from the quality standpoint, I
21   don't think there's any study, there's any procedure which
22   has been studied and substantiated as much as, like, in a
23   favorable way, as much as TVT has been.
24        Q    Yeah. We're --
25        A    Any discipline of medicine --

Page 105

1         Q    We'll get to that topic in a little bit, but I
2    want to follow up on that. Are you aware that at one point
3    Ethicon reported on its website the results of a study with
4    TVT where the erosion rate was 19 percent?
5              MR. ROSENBLATT: Object to form.
6              THE WITNESS: I don't remember anything as
7    such.
8         Q    (By Mr. Faes)  Assuming that they did that, do
9    you think that Ethicon would put the results from a
10   esoteric journal, as you put it, on their website?
11        A    I don't know. It's up to Ethicon.
12        Q    When you would counsel your patients, I would
13   assume that you -- before a TVT procedure, I assume that
14   you would inform them of the risk of erosion; right?
15        A    Right.
16        Q    And if they ask what the rate of erosion is, what
17   would you tell them?
18        A    I say two percent.
19        Q    Okay. So you never at any point told any of your
20   patients that you think it's 2 percent, but at least in
21   some studies, according the Ethicon's website, it's been as
22   high as 19, you've never told a patient that; right?
23        A    A scientist would not go by one study, you look
24   at the abundance of the literature. And they all indicate
25   one number; two percent, one to three percent. Go look at

27 (Pages 102 to 105)

Oz Harmanli, M.D.

Page 106

1   it across the board, all the major reliable studies show
2   that. So I'm not going to tell what one study did. I'm
3   looking at level one high quality studies with the longest
4   term outcomes, and systematic analyses and meta analyses.
5   When I look at that, the number is one, one to three
6   percent, and I say two percent; right in the middle.
7       Q   So I think you are doing what you were doing
8   before, which is giving me the explanation to the answer,
9   which is fine, but I don't think I ever got an answer to
10  the actual question, which was: It's true that you have
11  never, when you consented a patient, told the patient
12  that -- I understand that you tell them that the risk of
13  erosion is generally around 2 percent, but you've never
14  told a patient that in some studies, the risk of erosion
15  can be as high as 19 percent; is that correct?
16      A   It's not worth to even bring it up.
17      Q   So the answer is yes; that's correct?
18      A   I do not tell that to the patients.
19      Q   Okay. So you've never done that?
20      A   That would be misleading. I've not done that.
21      Q   And you've never told -- in fact, it sounds like
22  you were never aware that at one point Ethicon reported
23  that 19 percent erosion on their website; correct?
24      A   I am not aware.
25          MR. ROSENBLATT: Object to form.

Page 107

1       Q   (By Mr. Faes) So, obviously, if you weren't even
2   aware of it, that's not something you could have ever
3   reported to a patient; right?
4       A   I wasn't aware of that. And it's not a valuable
5   information for the clinician or the scientist, it's an
6   outlier.
7       Q   So you made that decision yourself and decided
8   that that wasn't information that needed to be passed on to
9   your patients; right?
10      A   Look, science -- science requires that you look
11  at all the data, you then remove the outliers, you
12  disregard them. You don't look at them any more, period.
13      Q   Would you agree with me that if you were looking
14  at having a medical device implanted, your decision-making
15  process would be very different if you were told that there
16  was a 2 percent chance of a serious adverse event versus a
17  19 percent chance; right?
18      A   Correct, but it would be unfair to the patient to
19  share that 19 percent information because it's an outlier.
20  You are -- you're misleading her. So she's not -- she's
21  not getting fair and honest counseling there. You're
22  misleading her that 19 percent comes from, I don't know
23  what, but probably that surgeon did only 10 TVTs. I don't
24  even know that study, but I know in the hands of, let's
25  say, beginner, yes, there are risks.

Page 108

1       Probably that surgeon published those results;
2   that's what I would say. It would be unfair to the
3   patient. If I tell 19 percent, I am making her not choose
4   the right procedure, and that would be so wrong, unfair to
5   the patient.
6       Q   Do you think it would be a reasonable option to
7   tell a patient that, as you said, you believe that there's
8   a 2 percent risk of erosion with the TVT, and disclose the
9   fact that there's been studies that showed it as high as 19
10  percent and explained to them that you think it's an
11  outlier and let the patient make that decision for
12  themselves?
13      A   No, no, a scientist wouldn't do that. Scientist
14  would see the problem with the methodology of the study and
15  will say that this study is not worth even bringing to the
16  discussion. That's what I do. If I went by every study I
17  read in the literature, there would not be any decision
18  being made anywhere because, again, literature is full of
19  all kind of studies. If you pull one and make your
20  decision based on that, everything I do is wrong. I don't
21  do that, that would be so wrong.
22      Q   So do you believe, as a physician, that you have
23  an obligation to inform a patient considering a potential
24  medical device or medical procedure like the TVT what the
25  worst-case scenario is?

Page 109

1       A   Okay. I mean, you don't start with the
2   worst-case scenario first, okay. So if you start with
3   worst-case scenario, no surgery would ever be done. So
4   that would also be misleading. If any cardiac surgery,
5   let's say you're discussing you'll die, start with that,
6   guess where -- like, see if that patient will stay in
7   your office and will have this amazingly life saving
8   procedure or not. So you're not going to say that.
9       So your physician -- your obligation as a
10  physician is to put it out there as truly it is. If you
11  don't do that, you're doing really a disservice to the
12  patient and that's so wrong. If I put that 19 percent,
13  which comes from one study when hundreds of studies here
14  says it's 1 to 3, 2, maybe 4 percent, something like that,
15  it would be so wrong; that patient will not choose the
16  surgery which will change her life in an amazing way.
17  She's going to exercise, lose weight. She can't now
18  because she is losing urine. Do you know how bad it is?
19      Q   So you feel it's your obligation as a doctor to
20  filter this information and tell the patient what you think
21  they need to know?
22      A   Whatever word you're using you're using wrong
23  words today. I can tell you that's not filtering. Look,
24  it's analyzing the data, putting in the right perspective.
25  It's my job as a scientist, as an academician to evaluate

28 (Pages 106 to 109)

Oz Harmanli, M.D.

Page 110

1  everything available to me and then put it in the right
2  context and present it to the patient.  If I see that 19
3  percent, she has no clue where 19 percent came from, but I
4  studied the methodology of that study and I will see that
5  there are big flaws in that study.  There's no way that
6  study could represent the entire perioperative outcomes
7  when 100 other studies performed by the top
8  urogynecologists and followed prospectively, diligently,
9  meticulously, they cannot have the same weight.  Are you
10  saying they have the same weight?  Can I ask you questions,
11  too?
12      Q   No.  Let me see if I can ask a follow up question
13  here.  So you're -- you don't think the best practice is to
14  give the patient the information and let them make the
15  decision themselves after explaining why you don't believe
16  it's applicable; right?
17      A   So we have pretty much 30 to 40 minutes to sit
18  down with a patient when we are talking about the risks,
19  benefits and all that.  So obviously I must definitely
20  absorb all the literature and put it in the right words to
21  convey what this procedure is about.  If I start talking
22  about every procedure, there's like 5 -- I'm sorry, every
23  study, there's probably 1,000 on TVT.  And some are here at
24  this end of the spectrum, some are at this end of the
25  spectrum.

Page 111

1      Maybe they're 100 percent effective procedures
2  and there are people, like, who presented maybe zero
3  complication rate; I'm not going to use either one of these
4  two.  Do you know what I'm going to use?  As I've been
5  saying, the bulk of the literature with the prospective
6  level one evidence, if they all indicate one thing, which
7  is 2 percent, that's what I'm going to share with my
8  patient.  If you do that, she's going to be confused, she
9  won't understand it.
10      Q   So you don't think that with -- example, with the
11  TVT, that a patient has the right to know that there's a
12  study out there that shows a 19 percent erosion rate;
13  correct?
14      A   If she wants to know every single study, if I
15  have time, I will tell that.  But I will also put it in the
16  right context telling that this study has problems, and the
17  majority of the studies done in the right hands found this.
18  This is what you should go by.  And that's my obligation to
19  the patient.  If I miss -- if I start with the 19 percent,
20  which is very likely because of study flaws, that would be
21  making the patient not choose the most appropriate option
22  among my treatment management plans.
23          (Deposition adjourned: 5:01 p.m.)
24                  *****
25

Page 112

1          - - - - - -
2          E R R A T A
3          - - - - - -
4  PAGE LINE  CHANGE
5  ____ ____  _____
6      REASON:  _____
7  ____ ____  _____
8      REASON:  _____
9  ____ ____  _____
10      REASON:  _____
11  ____ ____  _____
12      REASON:  _____
13  ____ ____  _____
14      REASON:  _____
15  ____ ____  _____
16      REASON:  _____
17  ____ ____  _____
18      REASON:  _____
19  ____ ____  _____
20      REASON:  _____
21  ____ ____  _____
22      REASON:  _____
23  ____ ____  _____
24      REASON:  _____
25

Page 113

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do hereby
4  certify that I have read the foregoing pages, and that
5  the same is a correct transcription of the answers
6  given by me to the questions therein propounded, except
7  for the corrections or changes in form or substance, if
8  any, noted in the attached Errata Sheet.
9
10
11  _____
12  [WITNESS NAME]              DATE
13
14
15  Subscribed and sworn to
16  before me on this _____day
17  of_____,20___, by _____
18  _____,
19  proved to me on the basis of satisfactory
     evidence to be the person(s) who appeared before me.
20
21      Signature _____
22
23
24
25

29 (Pages 110 to 113)

Oz Harmanli, M.D.

Page 114

```
 1              C E R T I F I C A T I O N
 2    STATE OF CONNECTICUT:
      COUNTY OF HARTFORD:
 3
 4        I, SAMANTHA M. HOWELL, a Notary Public duly
      commissioned and qualified in and for the State of
 5    Connecticut, do hereby certify that pursuant to Mr. Faes
      there came before me on the 3rd of October, 2018, the
 6    following named person, to wit: Dr. Oz Harmanli, who was
      previously duly sworn to testify to the truth and nothing
 7    but the truth; that he was thereupon examined upon his
      oath; that the examination was reduced to writing by
 8    computer under my supervision and that this transcript is a
      true record of the testimony given by said witness.
 9
10        I further certify that I am neither attorney nor
      counsel for, nor related to, nor employed by any of the
11    parties to the action in which this deposition was taken,
      and further, that I am not a relative or employee of any
12    attorney or counsel employed by the parties hereto, or
      financially interested in the outcome of this action.
13
          In witness whereof I have hereunto set my hand
14    this 8th day of October, 2018.
15
16
17        _____
                Samantha M. Howell
18              Notary Public
19
20    My Commission expires
        September 31, 2021
21
22
23
24
25
```