Confidential - Subject to Stipulation and Order of Confidentiality

1                            - - -

   IN RE:                          :SUPERIOR COURT OF
2  PELVIC MESH/GYNECARE            :NEW JERSEY
   LITIGATION                      :LAW DIVISION -
3                                  :ATLANTIC COUNTY
                                   :MASTER CASE 6341-10
4                                  :CASE NO. 291 CT
                                   :
5                                  :Civil Action
6      CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
7                    CONFIDENTIALITY
8      EXPERT WITNESS TESTIMONY OF MILES MURPHY, M.D.
9                            - - -
10                    November 30, 2012
11                            - - -
12                 Videotaped deposition of MILES MURPHY,
13  M.D., held at BUTLER SNOW, 500 Office Center Drive,
14  Suite 400, Blue Bell Conference Room, Fort Washington,
15  Pennsylvania, commencing at approximately 9:43 a.m.,
16  before Margaret M. Reihl, a Certified Realtime
17  Reporter, Certified Court Reporter and Notary Public
18  for the State of New Jersey and Commonwealth of
19  Pennsylvania.
20
21
22
                    GOLKOW TECHNOLOGIES, INC.
23             877.370.3377 ph|917.591.5672 fax
                       deps@golkow.com
24
25

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    A P P E A R A N C E S:
 2

      MAZIE SLATER KATZ & FREEMAN, LLC
 3    BY:  ADAM M. SLATER, ESQUIRE
      103 Eisenhower Parkway
 4    2nd Floor
      Roseland, New Jersey 07068
 5    (973) 228-9898
      aslater@mskf.net
 6    Representing the Plaintiffs
 7

      BUTLER, SNOW, OMARA, STEVENS & CANNADA, PLLC
 8    BY:  NILS B. (BURT) SNELL, ESQUIRE
      500 Office Center Drive, Suite 400
 9    Fort Washington, Pennsylvania  19034
      (267) 513-1884
10    burt.snell@butlersnow.com
      Representing Johnson & Johnson and Ethicon
11    (and the witness)
12                       — — —
13    Also Present:    SILLS CUMMIS & GROSS, P.C.
                       BY:  ROBERTA L. BARNES, BSN, RN, LNC
14                     The Legal Center, One Riverfront Plaza
                       Newark, New Jersey  07102
15                     (973) 643-7000
16                     David Lane, Videographer
                       Golkow Technologies
17                       — — —
18
19
20
21
22
23
24
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    patient and how you're going to actually, for example,

2    trim the mesh and implant the mesh, correct?

3                    MR. SNELL:  Object to the form.

4                    THE WITNESS:  Correct.

5                    MR. SLATER:  What is your objection?

6                    MR. SNELL:  Template, I'm not sure what

7    you mean by template.

8                    MR. SLATER:  You don't know what the

9    word template means, counsel; is that what you're

10   saying in good faith on this record?

11                   MR. SNELL:  Yes, as to the Prolift® as

12   a template.

13   BY MR. SLATER:

14        Q.    Okay.  You understood what I meant, right?

15        A.    I think I did.

16        Q.    Let's go back to your Exhibit Murphy-1.

17   Page 32 is a bibliography.  What does that

18   bibliography represent?  It goes from Page 32 to 38.

19   What does that represent?

20        A.    It represents the resources that I used in

21   drafting my report.

22        Q.    After the bibli -- well, rephrase.

23              When you say the resources you used in

24   drafting your report, what do you mean by that?

25        A.    Meaning that when I wrote the report, most

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    of the opinion, most of the body of the report is

 2    based on scientific data, published data and whenever

 3    I used, for instance, a paper that had been published,

 4    I referenced that in the report.

 5         Q.    So whatever clinical data you relied on in

 6    writing your report is found in the bibliography?

 7         A.    No.

 8         Q.    Well, besides what's referenced in the

 9    bibliography, what other clinical data did you rely on

10    in forming your opinions in this case?

11         A.    My own medical experience, my own clinical

12    experience and that of my colleagues.

13         Q.    To the extent that clinical or medical data

14    is published someplace and you relied on it to some

15    extent in forming your opinions, is it listed in the

16    bibliography?

17         A.    For this first report, yes.

18         Q.    At the time you wrote and signed your first

19    report, which is Murphy-1, the published or documented

20    clinical data that you were relying on was listed in

21    the bibliography from Page 32 to 38, correct?

22              MR. SNELL:  Objection, form.

23              THE WITNESS:  That was a pretty long

24    question, but I think the answer is yes.

25    BY MR. SLATER:
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    Q.   Okay.  Well, what I was saying is at the

2    time you formed your opinions that are set forth in

3    Murphy-1, the first report you authored, to the extent

4    that you relied on data that is actually published,

5    actually documented, are those sources of data listed

6    in the bibliography?

7    A.   The ones that I specifically referenced are

8    in the bibliography.  It doesn't mean that I may not

9    have read something else in my life, in my last eight

10   and a half years of practice and used that in forming

11   my opinions, but when I specifically, for instance,

12   quote a paper, I put it in my bibliography.

13   Q.   You understand one of the purposes of

14   writing your report is to give notice to myself and

15   other attorneys as to what your opinions are and what

16   you relied on in forming those opinions, correct?

17   A.   Right.

18   Q.   You understood that, right?

19   A.   I understand that generally you don't want

20   to be surprised at court if I, all of the sudden, want

21   to reference something and I haven't mentioned it

22   before.

23   Q.   Well, not just generally, but you understand

24   that the court rules actually say that if you're going

25   to rely on something, you're supposed to actually

Confidential - Subject to Stipulation and Order of Confidentiality

1    disclose what you relied on in forming your opinions;

2    did you understand that when you authored this report?

3         A.    I think so.  I'm not a lawyer but --

4         Q.    When you wrote this report and you attached

5    this bibliography to it --

6         A.    Yes.

7         Q.    -- did you intend to give notice to myself

8    and other people in this case as to what published or

9    documented clinical data you were relying on in

10   forming your opinions in the report?

11              MR. SNELL:  Objection, go ahead.

12              THE WITNESS:  When I wrote the report

13   and compiled the bibliography, I wanted to make sure

14   that if there was important literature that I wanted

15   to reference in my report that I included in the

16   bibliography.  That was my main purpose of doing the

17   bibliography.

18   BY MR. SLATER:

19        Q.    So at the time that you wrote the report,

20   any literature that was -- rephrase.

21              So at the time you wrote this report and

22   signed it, any published data, clinical data that you

23   felt was important to you in forming your opinions,

24   you listed in the bibliography?

25              MR. SNELL:  Objection, form.

Confidential - Subject to Stipulation and Order of Confidentiality

1           THE WITNESS:  Not necessarily.  I

2    simply --

3    BY MR. SLATER:

4         Q.   Well, tell me.

5         A.   Those were the ones that I used when I wrote

6    the report.

7         Q.   Well, is there something that you relied on

8    that is published data at the time you wrote this

9    report that's not listed in the bibliography that you

10   can point to right now?

11        A.   That I relied on in actually writing this

12   version of the report?

13        Q.   Yes.

14        A.   I can't point to anything like that right

15   now.

16        Q.   Okay.  After the bibliography there is a

17   section titled "Additional List of Materials - Miles

18   Murphy, M.D."

19             Do you see that?

20        A.   Yes.

21        Q.   What does that list represent?

22        A.   That represents additional material that I

23   thought we might want to be able to reference in my

24   testimony on this case.

25        Q.   Did you review all of the materials listed

Confidential - Subject to Stipulation and Order of Confidentiality

1    on this list of additional materials before you signed

2    that report?

3        A.   Briefly, yes.

4        Q.   When you say "briefly," what do you mean?

5        A.   I looked at them.

6        Q.   Well, when you say "looked at them," for

7    example, there could be a deposition transcript, and

8    I'll take an example from this additional list of

9    materials.  There's the deposition transcript of

10   exhibits of Piet Hinoul, P-i-e-t H-i-n-o-u-l, listed.

11            Did you read that entire transcript and

12   exhibits?

13       A.   No, I did not.  That's a very long --

14   there's a couple volumes of that, but I had certainly

15   reviewed it.

16       Q.   Well, when you say you reviewed it, what

17   does that mean?

18       A.   I read some of it.

19       Q.   How many pages of it did you read?

20       A.   I don't recall.

21       Q.   Did you read more than ten pages of that

22   deposition?

23       A.   Yes.

24       Q.   But you can't tell me beyond that what you

25   specifically read?

Confidential - Subject to Stipulation and Order of Confidentiality

1      A.   I can remember some of the things that I

2   read in it.

3      Q.   Well, was there -- well, we'll come back to

4   that.

5           Did you read -- it says -- rephrase it.

6           It says Jessica Shen, deposition transcript

7   with exhibits.

8           Did you read the entire deposition and

9   exhibits?

10     A.   No.

11     Q.   It says Judi Gauld, deposition transcript

12   with exhibits.

13          Did you read the entire deposition and

14   exhibits?

15     A.   I did not.

16     Q.   It says David Robinson, deposition

17   transcript with exhibits.

18          Did you read the entire deposition and read

19   all the exhibits?

20     A.   No.

21     Q.   And with regard to Jessica Shen, Piet

22   Hinoul, Judi Gauld and David Robinson's deposition

23   transcripts that are listed here, did you actually

24   watch the videos of their depositions?

25     A.   No.

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.   Didn't see any of those videos, correct?

2      A.   Correct.

3      Q.   Have you seen the video of anyone's

4  deposition that's ever been taken in this case?

5      A.   No.

6      Q.   Did you ever ask to see any of the videos of

7  the actual deposition testimony of any witness in this

8  case?

9      A.   No.

10      Q.   In writing the report, which we marked as

11  Murphy-1 -- well, rephrase.

12           This list of additional materials, are these

13  basically other materials that you wanted to list in

14  case you wanted to mention them during trial so you

15  could say, hey, you know that I listed them; is that

16  basically the purpose?

17               MR. SNELL:  Object to form.  Go ahead.

18               THE WITNESS:  I think that's a fair

19  assessment because from the time I drafted my report,

20  there were a lot of depositions and your -- you know,

21  the plaintiffs' expert had referenced things, and I

22  wanted to make sure that I could reference other

23  things as well.

24  BY MR. SLATER:

25      Q.   Okay.  Is it fair to say that at the time

Confidential - Subject to Stipulation and Order of Confidentiality

1    you wrote your first report, which is Murphy-1, you

2    had not read all of the materials listed on the

3    list -- additional list of materials?

4         A.   Yes.

5         Q.   Is it fair to say you did not rely on all

6    the materials listed in the additional list of

7    materials when you actually formed your opinions?

8         A.   I would say that I didn't rely on all of

9    them, but it's very likely that I would have read some

10   of the other additional materials, just not quoted

11   them in my bibliography.

12        Q.   When you wrote your report, you set forth

13   opinions, and I'm talking about your first report,

14   Murphy-1, you set forth certain opinions in the

15   report, correct?

16        A.   Correct.

17        Q.   Were those all of the opinions you had

18   formed with regard to this litigation at the time that

19   you authored that report?

20        A.   I don't know that I -- I mean, I have lots

21   of opinions about this case.  I don't know that every

22   single solitary one was listed in the report.

23        Q.   You understood that one of the purposes of

24   your report was to give notice to attorneys in the

25   litigation like myself of what your opinions were,

Confidential - Subject to Stipulation and Order of Confidentiality

1    correct?

2        A.    Correct.

3        Q.    Okay.  Did you endeavor, when you wrote this

4    report, to list each of the opinions that you had

5    formed at the time that you authored the report; was

6    that your goal?

7        A.    My goal was simply to write a report that

8    reflected my views of Prolift® in this case.

9        Q.    Okay.  And the opinions set forth in your

10   first report, Murphy-1, accomplished that, from your

11   perspective?

12       A.    I think so, but I think that in looking at

13   other people's depositions, there may have been things

14   that they covered that I didn't think were necessarily

15   essential to cover in my first report and, therefore,

16   wanted to have some supplemental material later on.

17       Q.    At the time that you authored your first

18   report --

19       A.    Yes.

20       Q.    -- the day that you put your signature, your

21   electronic signature on there, typed your name in, did

22   that represent the opinions you had formed as of that

23   point in time with regard to this litigation?

24            MR. SNELL:  Objection, form.

25            THE WITNESS:  Yes.

Confidential - Subject to Stipulation and Order of Confidentiality

1    BY MR. SLATER:

2        Q.   In the report you listed many facts from

3    various sources of information that you referred to in

4    the report, correct?

5        A.   Yes.

6        Q.   Did you, in writing the report, attempt to

7    list those facts that you felt were most important to

8    you in forming your opinions as set forth in the

9    report?

10       A.   I think that's a fair thing to say.

11       Q.   If you read something in one of the

12   depositions that you listed in your additional

13   materials -- rephrase.

14            Let me ask you this:  Had you read any parts

15   of the Jessica Shen, Piet Hinoul, Judi Gauld and David

16   Robinson deposition transcripts at the time you wrote

17   the report, or did you just list them at the time

18   because it was something that you thought you might

19   want to reference later?

20       A.   When I wrote Murphy-1?

21       Q.   Yes.

22       A.   I believe I had not seen those when I wrote

23   Murphy-1.

24       Q.   At the time you wrote Murphy-1 and signed

25   it, had you read all of the expert reports that are

Confidential - Subject to Stipulation and Order of Confidentiality

1    listed below the list of deposition transcripts, or

2    were those things you listed because you planned to

3    read them at a later date?

4        A.    I'm sorry.  Which are you referring to?  Are

5    you referring to something in the bibliography?

6        Q.    I'm looking the list of additional

7    materials.

8        A.    Oh, additional materials.  I'm sorry.  Can

9    you repeat the question then?

10       Q.    Sure.  Go to the page where you listed the

11   four deposition transcripts?

12       A.    Yes.

13       Q.    Because right below that are a list of

14   expert reports.

15       A.    Yes.

16       Q.    Might as well turn to it.

17       A.    Yeah.

18       Q.    Right before your CV.

19             Are you with me now?

20       A.    Yes.

21       Q.    On the last page of the list of additional

22   materials, there's a list of expert reports under

23   three headings, expert general reports, Plaintiff

24   Gross, Plaintiff Wicker.

25             Do you see that?

Confidential - Subject to Stipulation and Order of Confidentiality

1      A.   Yes.

2      Q.   At the time that you authored Murphy-1, your

3   first report, had you read those, or did you simply

4   list those in the list of additional materials because

5   they were things that you intended to read later?

6      A.   The Anne Weber expert report, I believe I

7   had that at the time I drafted Murphy-1.  I certainly

8   did not read every page of that report, but I had read

9   a significant amount of it.  I don't think that I had

10  read any of the other reports at the time I drafted

11  Murphy-1.

12     Q.   Okay.  With regard to the list of additional

13  materials, with the exception of the deposition

14  transcripts and expert reports, which you've already

15  spoken about, are you able to go through this list if

16  you needed to, and would you be able to tell me which

17  things you had looked at at the time you wrote the

18  report versus those things that you just listed

19  because you intended to look at them later, or would

20  that be something you would be unable to do?

21     A.   I think I'd be unable to do that.

22     Q.   Okay.  To the extent that you felt that

23  something was important enough to actually reference

24  it in the report itself as having been relied on,

25  those materials are listed in the bibliography,

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    BY MR. SLATER:

 2         Q.   You've never worked directly at a medical

 3    device company, correct?

 4         A.   Correct.

 5         Q.   Never worked at a pharmaceutical company,

 6    correct?

 7         A.   Correct.

 8         Q.   You've never been involved in a design

 9    control process prelaunch of a medical device,

10    correct?

11         A.   I've been involved in -- I think they called

12    it a validation study for TVT-Secur®.  They had me

13    come in and look at -- jeez, it's been many years, but

14    I think it was along the lines of wanting to

15    standardize technique so that it can be, you know,

16    printed in the IFU, things like that.  I think it was

17    along those lines, but I was not -- I was a consultant

18    at that point.  I was not employed.

19         Q.   You've never been involved in structuring or

20    implementing a design control process for a medical

21    device from the medical device company perspective,

22    correct?

23         A.   No.  I don't really even know what design

24    control process is.

25         Q.   Are you familiar with what the term DDSA is?
```

Confidential - Subject to Stipulation and Order of Confidentiality

1       A.    I'm not.

2       Q.    Are you familiar with the term FMEA, failure

3    modes and effects analysis?

4       A.    No.

5       Q.    And DDSA, just for the record, device design

6    safety assessment, is that a term you're familiar

7    with?

8       A.    No.

9       Q.    Did you look at the DDSA or FMEA analyses

10   for the Prolift® in this case?

11      A.    I did not.

12      Q.    And you're not going to offer any opinions

13   on that subject at all, correct?  If you didn't look

14   at them, you're not going to offer opinions, right?

15      A.    If you show it to me, I guess maybe I would,

16   but, otherwise, no, I'm not going to offer them in my

17   report.

18      Q.    It's not something you've ever done, as we

19   sit here now, right?

20      A.    No.

21      Q.    Have you ever been involved in authoring a

22   clinical expert report within a medical device company

23   with regard to a medical device that was going to be

24   on the market or was already on the market?

25      A.    A clinical device --

Confidential - Subject to Stipulation and Order of Confidentiality

1  saying you haven't read it and have no opinions now, I

2  will not be giving it to you.

3      A.   Okay.

4      Q.   Unless you want to really stay late tonight.

5           To your knowledge, were the exposure rates

6  in the French and US TVM study accurately counted or

7  undercounted?  Do you have any information one way or

8  the other on that?

9      A.   I do not.

10     Q.   That's not something you tend to offer

11 opinions on, correct?

12     A.   I tend to offer opinions on whether or not I

13 believe what I see is published or presented at

14 meetings.

15     Q.   Without looking at the underlying data and

16 studying that question, you're not in a position, as

17 you sit here now, to offer an opinion on whether or

18 not the exposures that occurred in the French and US

19 TVM studies were accurately reported in the published

20 manuscripts, correct?

21              MR. SNELL:  Objection, form.

22              THE WITNESS:  I guess I'd have trouble

23 agreeing to that.  I mean, most doctors that I know

24 that dedicate their time to taking care of people and

25 going through the trouble of producing research, and I

Confidential - Subject to Stipulation and Order of Confidentiality

1    tend to believe what they produce, but I wasn't there

2    standing next to them when they looked to see whether

3    or not there was an exposure and checked off on the

4    sheet.

5    BY MR. SLATER:

6        Q.    You don't have information one way or the

7    other specific to whether or not the exposure rates

8    that were actually reported with regard to the TVM

9    study were representative of what the underlying data

10   showed; is that a true statement?

11               MR. SNELL:  Objection, form.

12               THE WITNESS:  I guess.

13               MR. SNELL:  You're not here to guess.

14   If you don't understand his question, just ask him to

15   rephrase it.

16               THE WITNESS:  Are you saying do I think

17   that they -- that the doctors reported a certain

18   erosion rate and they changed it?

19   BY MR. SLATER:

20       Q.    No.  What I'm asking is this:  You read the

21   exposure rates that were reported in connection with

22   the TVM studies, correct?

23       A.    Correct.

24       Q.    But you haven't looked at the underlying

25   data to try to form an opinion about whether or not

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1   what was reported in the articles that you read is

 2   actually reflective of what was documented in the

 3   underlying data?

 4        A.   And when you say "the underlying data," what

 5   are you referring to?

 6        Q.   The case specific -- patient specific forms

 7   for each patient that show each exam that was done and

 8   what was recorded with regard to whether or not an

 9   exposure existed at a certain time.

10        A.   Right.  I have not -- to save us some time

11   maybe, I have not reviewed any case report forms that

12   the physicians or the patients filled out.  I have not

13   reviewed their database.  I have not reviewed their --

14   you know, their SAS database or anything like that.  I

15   did not have any access to the primary data, only what

16   was published.

17        Q.   Okay.  So you wouldn't be forming an opinion

18   about whether or not the published data reflects what

19   the actual raw data in the case specific forms shows,

20   correct?

21                 MR. SNELL:  Objection, form.

22                 THE WITNESS:  Only to what I just

23   responded before, that I tend to trust doctors that do

24   this work.

25   BY MR. SLATER:
```

Confidential - Subject to Stipulation and Order of Confidentiality

1        Q.    You tend to trust when something is

2    published or presented at a meeting, you tend to trust

3    that the data being given is accurate, right?

4        A.    Correct.

5        Q.    If it were to turn out later that the data

6    was inaccurate, that would raise questions about the

7    reliability of the conclusions about that reported

8    data, correct?

9        A.    In general, yes.

10       Q.    With regard to the recurrence rates, you did

11   not review the raw data, so you have no basis to offer

12   an opinion one way or another as to whether the

13   reported recurrence rates accurately reflect what's in

14   the underlying data, correct?

15              MR. SNELL:  Objection, form.

16              THE WITNESS:  Again, I did not review

17   any of the primary data on any outcome of the TVM

18   study.

19   BY MR. SLATER:

20       Q.    Let's change gears for a second and talk

21   about Gynemesh® PS -- rephrase.

22              Let me ask you one or two other questions

23   about TVM, because I want to try to put this aside.

24              Do you know how Ethicon utilized the TVM

25   study in connection with the Prolift®; meaning from

Confidential - Subject to Stipulation and Order of Confidentiality

1   Ethicon's perspective, what, if any, reliance was

2   placed on the TVM studies?

3       A.   I do not know.

4       Q.   Let me ask you about the Gynemesh® PS study.

5   Do you know what that is?

6       A.   I know that a study was reported in terms of

7   abstract form on the use of Gynemesh® if that's the

8   one you're referring to.

9       Q.   Do you know any specific information about,

10  for example, how the Gynemesh® was used in that study?

11      A.   I believe it was used both transabdominally

12  and transvaginally.

13      Q.   Have you looked at any of the underlying

14  data, patient report forms or any of that with regard

15  to Gynemesh® PS study?

16      A.   No.

17      Q.   So you're not in a position to form any

18  opinions about whether what is actually reported in

19  the abstract or the white paper or the actual

20  documents that were produced following the Gynemesh®

21  PS study about whether that accurately reflects what

22  the data shows?

23      A.   I will go back to my previous answer, only

24  in that I tend to trust that what I'm seeing published

25  is valid.

Confidential - Subject to Stipulation and Order of Confidentiality

1       Q.    Beyond that you have never looked at the

2    underlying data to compare it to what was reported by

3    the authors of the -- or the investigators of the

4    Gynemesh® PS study, so you're not in a position to

5    form any specific opinions on whether or not the

6    reported results reflect the underlying data, correct?

7              MR. SNELL:   Objection, form.

8              THE WITNESS:   I was going to answer one

9    of your questions, and I was going to say I have not,

10   and by the end of the question it changed to a

11   different question.

12   BY MR. SLATER:

13      Q.    Okay.

14      A.    I have not reviewed any of the original

15   patient reports.

16      Q.    You haven't reviewed any of the underlying

17   Gynemesh® PS data, correct?

18      A.    Not that I know of.

19      Q.    And you haven't ever compared the underlying

20   data to what was reported by the investigators in any

21   articles or abstracts, correct?

22      A.    Correct.

23      Q.    So you're not going to offer any opinions

24   about whether or not what was reported, either

25   abstracts or papers, reflects the underlying data

Confidential - Subject to Stipulation and Order of Confidentiality

1    because it's not something you've looked at, right?

2        A.   Yes, only to -- it's the same question you

3    asked before in terms of only to the extent that I --

4    it's my opinion that I tend to trust that.

5        Q.   Your assumption is that the reported results

6    would be accurate, but you've never actually looked at

7    it yourself to confirm that?

8        A.   Correct.

9        Q.   And you're not in a position to form a

10   specific opinion about whether it's correct.  All you

11   have is your assumption, which is a general assumption

12   that people will only accurately report data?

13                MR. SNELL:  Object to form.

14                THE WITNESS:  Correct.

15   BY MR. SLATER:

16       Q.   Do you know whether or to what extent

17   Ethicon relied on or utilized the Gynemesh® PS study

18   in connection with the Prolift®?

19       A.   I do not know what Ethicon relied upon.

20       Q.   Do you know what Ethicon relied on before it

21   marketed the Prolift® to make the decision the

22   Prolift® is safe and effective and should be released

23   for marketing to the public?

24       A.   As we stated earlier, I've never been an

25   employee of Ethicon.  I never worked in there.  I

Confidential - Subject to Stipulation and Order of Confidentiality

1    never went to their meetings about how they were

2    deciding whether -- how to release Prolift®.

3         Q.   And there's no specific deposition testimony

4    you recall seeing on that topic?

5         A.   Not that I recall.

6         Q.   And no specific documents that you saw on

7    that specific topic, as you sit here now, which would

8    indicate what specific information Ethicon relied on

9    to say, okay, this is a safe and effective product,

10   we're going to release the Prolift®?

11        A.   Yeah, I mean, I've -- some of these

12   depositions are very long, and I know Piet Hinoul, I

13   think there was some discussion of that in his

14   deposition, but I don't have any specific

15   recollection.  If you want to ask me something

16   specific, I'd be happy to answer.

17        Q.   You're certainly not offering any opinions,

18   as you sit here now, with regard to what Ethicon may

19   or may not have relied on when they decided, yes, the

20   Prolift® is safe and effective, and we're going to

21   mark it to the world?

22        A.   I could with a reasonable certainty surmise

23   that they relied upon Gynemesh® studies and TVM

24   studies, but, again, I wasn't there to know that for

25   sure.

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.    That's just an assumption you're forming?

2      A.    It's an educated assumption.

3      Q.    Do you know what data was available to

4  Ethicon at the time the decision was made that the

5  Prolift® is safe and effective to be marketed?

6      A.    I'm sorry.  Could you repeat the question.

7      Q.    Sure.  Do you know what specific data was

8  available to Ethicon as of February, March 2005 when

9  they were actually now launching the Prolift®, what

10  they actually were relying on at the time they made

11  the decision, yes, it's safe and effective, yes, we

12  can market it?

13      A.    I do not know what they were relying on.

14      Q.    Since you don't know specifically what

15  they're relying on, you're not going to offer any

16  specific opinions about whether that data was

17  sufficient or not; fair statement?

18              MR. SNELL:  Objection, form.

19              THE WITNESS:  I'm happy to offer

20  opinions on the data that was present.  I'm not going

21  to make an expert opinion as to what Ethicon was

22  relying on.  I have no idea what they thought was

23  important.

24  BY MR. SLATER:

25      Q.    My question is this:  Since you don't know

Confidential - Subject to Stipulation and Order of Confidentiality

1    what Ethicon specifically was relying on when they

2    made that decision to launch the Prolift®, you

3    wouldn't be offering me an opinion about whether

4    something you're not familiar with was reasonable or

5    not, correct?

6         A.   Not unless you give me some information

7    about what they knew and what they were relying upon,

8    and then I'd be happy to make an opinion on it.

9         Q.   Well, this is my chance to ask you what you

10   know and what your opinions are.

11             So as you sit here now, you have no opinion

12   on that, correct?

13        A.   Correct.

14        Q.   Do you know Axel Arnaud?  Did you ever meet

15   him?

16        A.   I think I met him in an airport once.

17        Q.   Attached to your supplemental report, which

18   we marked as Murphy-2, is a list of transcripts,

19   expert reports and literature and then an other

20   section, right?

21        A.   I see that.

22        Q.   Did you read all these materials before

23   signing this report on November 28, 2012?

24        A.   What I will say is I've been bombarded with

25   documents in the last two weeks.  I open the Fed Ex

Confidential - Subject to Stipulation and Order of Confidentiality

1    A.   I may have spoken to them personally.  I

2    don't know that we were speaking about that.  I know

3    there are people like at the Mayo Clinic and Cleveland

4    Clinic that get a lot of these referred in to them,

5    and I've certainly spoken to a lot of those

6    physicians.

7         I don't know that -- I know that a lot of

8    people have come to me at meetings and said, hey, you

9    know, we're seeing more problems with these types of

10   things than what you guys are reporting.  And I know

11   Matt Barber, his group did a presentation on, you

12   know, removing mesh and things like that and what we

13   call tips and tricks in terms of techniques for doing

14   that.

15   Q.   Let me come back to your report, your

16   supplemental report.  We were talking about the list

17   of materials.

18        Are there materials on this list that you

19   probably have not read at this point?

20   A.   Certainly in their entirety, yes.

21   Q.   Are there materials on this list that you

22   probably just scanned very quick and couldn't even

23   tell me what those materials said, as you sit here

24   now?

25   A.   As I sit here now, probably yes.

Confidential - Subject to Stipulation and Order of Confidentiality

1          Q.    Are you able to point out, other than

2     Dr. Margolis' transcript and Dr. Elliott's transcript,

3     which you said you believe you read completely, and

4     Dr. Lucente's you said you read --

5          A.    10%.

6          Q.    10% -- can you give me any quantification of

7     how much of these other materials you reviewed?

8          A.    It would be something pretty close to a

9     guess.  Let me say this, less than 20% of all of them.

10         Q.    In the list of materials there's literature,

11    and on the second page of that there's a series of

12    articles towards the middle, where the first author in

13    four straight is Klinge, K-l-i-n-g-e.

14               Do you see that?

15         A.    I do.

16         Q.    Do you know who that is?

17         A.    He's one of these names that I see in

18    regards to mesh, basic science regarding mesh.

19         Q.    Anything else?

20         A.    I don't know him personally.  I don't even

21    know if it's a man or a woman, to be honest with you.

22         Q.    Have you made a point of studying the basic

23    science with regard to polypropylene mesh and how it

24    interacts within the woman's pelvis?

25         A.    I certainly have tried to keep up on all the

Confidential - Subject to Stipulation and Order of Confidentiality

1   standpoint.

2       Q.   Is there -- well, let me ask you this:  The

3   standard you just gave me of what you think should be

4   in an IFU, is that just your own personal standard?

5       A.   That was my opinion of what makes sense to

6   be in an IFU.

7       Q.   That's your own personal opinion, not based

8   on any other information you've read or seen, correct?

9       A.   Correct.

10      Q.   It's just your own personal viewpoint, your

11  own personal standard, correct?

12      A.   Yes.

13      Q.   With regard to what would need to be

14  included in the patient brochure with regard to risks

15  and benefits, to the extent you've drawn any opinions

16  in your report on that, again, is that based on your

17  own personal standard, your own personal opinion?

18      A.   I do not -- I think the answer is yes

19  because I don't know any sort of legal guidelines by

20  which patient brochures are supposed to be produced.

21      Q.   And do you have any information you can

22  share with me now that you gleaned from any Ethicon

23  documents or testimony where you saw what Ethicon

24  thought the standards were to determine whether or not

25  a risk or a benefit would need to be described and how

Confidential - Subject to Stipulation and Order of Confidentiality

1    it should be described in a patient brochure?

2        A.   I don't recall seeing any standards that

3    they refer to.

4        Q.   Did you see any testimony in any deposition

5    that you're relying on, as you sit here now, with

6    regard to what needs to be included in an IFU?

7        A.   I do not recall seeing anything like that.

8        Q.   So, again, with regard to the IFU and the

9    contents of the IFU, whatever opinion you're drawing

10   is just based on your own personal opinion, not based

11   on what any other standards may be or what anyone else

12   might think, correct?

13       A.   Right.   It's my expert opinion, not based on

14   outside information.

15       Q.   And in your entire career, have you ever

16   been asked to determine what information needs to be

17   provided in an IFU?

18       A.   Not that I recall.

19       Q.   Have you ever in your career ever been asked

20   to give input on what should be in a patient brochure?

21       A.   Not that I recall.

22       Q.   So the first time you've ever offered such

23   opinions and done this type of analysis has been in

24   this case as an expert, correct?

25       A.   Correct.

Confidential - Subject to Stipulation and Order of Confidentiality

1       A.   Yes.

2       Q.   Do you know, as you sit here now, based on

3   whatever you've reviewed, what the potential risks of

4   the Prolift® were from the perspective of what medical

5   affairs in Ethicon knew?

6       A.   I do not know what medical -- what that

7   group knew.

8       Q.   Would you assume that Ethicon medical

9   affairs would have more information about the overall

10   potential risks of the Prolift® than you would have?

11           MR. SNELL:  Objection, form.

12           THE WITNESS:  I don't know how that --

13           MR. SNELL:  He's not here to assume.

14           MR. SLATER:  Well, he is, actually.

15   You can answer.

16           THE WITNESS:  I don't know if they'd

17   know more.  I think they would know probably most that

18   I would.

19   BY MR. SLATER:

20       Q.   As you sit here now, you don't know whether

21   Ethicon medical affairs -- well, rephrase.

22           As you sit here now, you don't know what

23   risks Ethicon medical affairs has testified to knowing

24   about at different points in time, correct?

25       A.   I can't recall any testimony that I saw

Confidential - Subject to Stipulation and Order of Confidentiality

1    regarding that.

2        Q.   You certainly didn't talk about that subject

3    in your reports, correct?

4        A.   Correct.

5        Q.   Did you in reading any of the materials that

6    you actually did read or review -- rephrase.

7             In any of the materials that you reviewed,

8    to the extent you reviewed any of the materials you've

9    listed, did you at any point see anybody from Ethicon

10   talk about knowing about risks where you said, well, I

11   didn't know that was a risk, I wasn't aware of that?

12   Did that ever happen?

13       A.   Did it ever happen that someone at Ethicon

14   knew a risk that I wasn't aware of as a potential

15   risk?

16       Q.   Right, where you read the depositions and

17   saw something to that effect?

18       A.   Not that I know of.

19       Q.   But, again, you've told me you didn't

20   read -- other than a couple depositions, you didn't

21   read any of them in their entirety, right?

22       A.   Correct.

23       Q.   For the most part, you just skimmed through

24   a few of them?

25       A.   Correct.

Confidential - Subject to Stipulation and Order of Confidentiality

1     Q.    Am I correct that you reviewed very little

2  by way of documents indicating what the people within

3  medical affairs at Ethicon thought at any particular

4  point in time?

5     A.    What I'm saying is I got stacks of documents

6  within the last two weeks that were about 2 feet high,

7  and I have only gotten through a small percentage of

8  that.

9     Q.    As you sit here now, you don't feel that you

10  have a good understanding of what the people in

11  medical affairs at Ethicon thought with regard to mesh

12  shrinkage, erosion or other topics?

13     A.    If you read my report, I don't think

14  anywhere do I mention what the people in medical

15  affairs at Gynecare knew or didn't know.

16     Q.    Let's turn to the page that at the top says

17  "Clinical impact of mesh shrinkage."

18     A.    How far?

19     Q.    It's about ten pages in or so.

20     A.    What's the topic -- the title again?

21     Q.    "Clinical impact of mesh shrinkage."

22     A.    Not how to assess?

23     Q.    It's right before that.

24     A.    Right before that.  I don't see anything

25  before that.  I see how to assess mesh shrinkage,