```
 1      IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2              CHARLESTON DIVISION
                    - - -
 3

     IN RE: ETHICON, INC. PELVIC   : Master File No.
 4   REPAIR SYSTEM PRODUCTS        : 2:12-MD-02327
     LIABILITY LITIGATION          : MDL No. 2327
 5

     THIS DOCUMENT RELATES TO ALL   : JOSEPH R.
 6   WAVE 8 AND SUBSEQUENT WAVE     : GOODWIN
     CASES AND PLAINTIFFS           : U.S. DISTRICT
 7                                  : JUDGE
 8          General TVT and TVT-O Matter
 9                    - - -
10              OCTOBER 9, 2018
11                    - - -
12              Oral deposition of MILES
13   MURPHY, M.D., taken pursuant to notice,
14   was held at the law offices of Butler
15   Snow LLP, 500 Office Center Drive, Suite
16   400, Fort Washington, Pennsylvania 19034,
17   commencing at 10:02 a.m., on the above
18   date, before Amanda Dee Maslynsky-Miller,
19   a Certified Realtime Reporter and Notary
20   Public in and for the Commonwealth of
21   Pennsylvania.
22                    - - -
             GOLKOW TECHNOLOGIES, INC.
23      877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com
24
```

Miles Murphy, M.D.

```
1    APPEARANCES:
2
3         AYLSTOCK, WITKIN, KREIS &
          OVERHOLTZ, PLLC
4         BY:  ANN GAYLE, ESQUIRE
          17 E. Main Street
5         Suite 200
          Pensacola, Florida 32563
6         (850) 202-1010
          Agayle@awkolaw.com
7         Representing the Plaintiff
8
9
10        BUTLER SNOW LLP
          BY:  NILS B. (BURT) SNELL, ESQUIRE
11        500 Office Center Drive
          Suite 400
12        Fort Washington, Pennsylvania 19034
          (267) 705-4910
13        Burt.snell@butlersnow.com
          Representing the Defendant
14
15
16
17
18
19
20                  - - -
21
22
23
24
```

```
 1   report as well, correct?
 2        A.    Correct.
 3        Q.    Doctor, for Exhibit-7, your
 4   report, how did you decide to combine
 5   your TVT and your TVT-O products into
 6   that report?
 7        A.    That was at the request of
 8   Mr. Snell.
 9        Q.    And does this report contain
10   each of the opinions that you've reached
11   regarding TVT and TVT-O?
12        A.    Yes.
13        Q.    Sometimes, Doctor, I might
14   refer to TVT and TVT-O as the SUI
15   products or the SUI report.  I'm talking
16   about Exhibit-7, if I happen to do that.
17              Can we agree that you
18   would -- do you have any objections to
19   that or any -- you would understand it if
20   I'm referring to that, correct?
21        A.    That's fine, yes.
22        Q.    Okay.  In Exhibit-7, did you
23   discuss the facts that you felt were most
24   important in drawing your opinions?
```

Miles Murphy, M.D.

```
1        Q.    So, Doctor, with regard to
2   those general expert reports that you
3   read, do you recall who you read?
4        A.    Not off the top of my head.
5   Sorry.
6        Q.    Did any one particular
7   expert's opinions stand out that you
8   disagreed with?
9        A.    Not in -- not in particular.
10       Q.    Of the experts that you
11  read, Doctor, do you know any of the
12  plaintiff experts personally?
13       A.    In the Wave 8?  No.
14       Q.    In the Wave 8 general
15  reports that you've reviewed.
16       A.    Not that I -- I do not
17  believe so.
18       Q.    Doctor, this report is dated
19  August 2018; is that correct?
20             Page 71, I believe, Doctor.
21       A.    Yes.  August 11, 2018.
22       Q.    And, Doctor, on that day
23  when you signed there, did that -- this
24  report represent all the opinions that
```

1  you had formed regarding the TVT and the
2  TVT-O up until that point?
3      A.  Yes, I think that's a fair
4  assessment of it.
5      Q.  And, Doctor, since the
6  signing of this report, have you formed
7  any other opinions that may not be
8  included in this report, since August of
9  2018?
10     A.  So since then I have
11 reviewed some additional articles,
12 specifically on ABBREVO® and EXACT®,
13 which I don't think we're talking about
14 today.  None of those changed my general
15 opinions, but I did review some of those
16 since signing this report on August 11th.
17     Q.  Doctor, are you aware of how
18 many documents have been produced, and
19 we're talking about the volume of
20 documents, in the litigation by Ethicon
21 and Johnson & Johnson to the plaintiffs?
22     A.  I have a general
23 understanding that it's quite extensive.
24     Q.  And, Doctor, do you have any

```
1        A.      The name rings a bell, but I
2   couldn't tell you specifically who she
3   is.
4        Q.      And in connection with my
5   question regarding whether or not you're
6   holding yourself out as an expert in
7   pathology in this litigation, have you
8   performed any sort of large histological
9   review of tissue samples taken out of
10  patients?
11       A.      I've reviewed --
12               MR. SNELL:  Object to form.
13               Go ahead.
14               THE WITNESS:  I've reviewed
15          many articles on the pathology and
16          the histology of samples reviewed.
17  BY MS. GAYLE:
18       Q.      I'm talking about the actual
19  slides, Doctor, that you might look at
20  under the microscope.
21       A.      Have I looked at the slides
22  under a microscope myself?
23       Q.      From a large selection of
24  those particular things you might have
```

```
 1   removed.
 2             In other words, what I'm
 3   trying to get at is, have you done a
 4   formal study regarding transvaginal mesh
 5   in your patients?
 6             MR. SNELL:  Object to form.
 7             Go ahead.
 8             THE WITNESS:  So all the
 9        studies that I've conducted are in
10        my CV.  I do not -- since medical
11        school, I've never looked at a
12        microscope of anything that I've
13        removed from a patient.
14   BY MS. GAYLE:
15        Q.   And, I'm sorry, Doctor, I
16   have to go through these.  It's just sort
17   of a formality.
18             Doctor, are you holding
19   yourself out as an expert in the Food and
20   Drug Administration's medical device
21   labeling regulations?
22        A.   Yes, I am.
23        Q.   And, Doctor, do you have any
24   formal FDA regulation training and
```

Miles Murphy, M.D.

1      A.    I would, basically, going
2  back to the same type of answer, for the
3  sake of time, that I gave for
4  biomechanics.
5      Q.    Biomechanics?
6      A.    Yes.
7      Q.    Thank you, Doctor.
8           And Doctor, do you hold a
9  degree in chemical engineering?
10     A.    I do not.
11     Q.    Doctor, do you hold a degree
12  in polymer chemistry?
13     A.    I do not.
14     Q.    Doctor, have you ever
15  performed any bench research on
16  polypropylene mesh?
17     A.    I personally have not
18  performed bench research on polypropylene
19  mesh, no.
20     Q.    And, Doctor, we talked about
21  a few of the articles that you had
22  published in peer-reviewed journals
23  earlier and you listed those out.
24          I understood that none of

1      Q.    And, Doctor, in the
2  mechanical cut, if small pieces were to
3  separate in the human body from the
4  mechanical cut, that potentially could
5  cause a patient complications?
6      A.    There's certainly no
7  evidence in the medical literature to
8  suggest that that's the case.
9      Q.    So you don't believe that --
10 summarizing your opinion, you don't
11 believe that if there was any sort of
12 particles or pieces of mesh that had
13 frayed off of a mechanical cut piece of
14 mesh, that that would cause any sort of
15 complication in a patient?  Did I
16 summarize that correctly?
17           MR. SNELL:  Asked and
18      answered.
19           Go ahead.
20           THE WITNESS:  I think
21      overall as a whole, yes, that's
22      correct.
23 BY MS. GAYLE:
24     Q.    Do you believe that those

1  pieces of mesh that would fray off a
2  mechanical cut piece would cause any
3  inflammatory response?
4            MR. SNELL:  Foundation.
5            THE WITNESS:  I don't think
6       it would be any greater than the
7       sling itself.
8  BY MS. GAYLE:
9       Q.   And what do you mean by "any
10 greater than the sling itself"?
11      A.   So there's always some
12 degree of inflammation regarding
13 placement of a foreign body in the human
14 body.  And there's going to be
15 inflammation from the sling itself.
16           If little particles of that
17 sling separate from the sling itself,
18 it's still the same amount of foreign
19 body that would have been in the patient.
20 And I don't think the inflammatory
21 response is substantially different if
22 it's separate from the sling versus
23 attached to the sling.
24      Q.   When you were reviewing your

Miles Murphy, M.D.

```
 1        A.    No.
 2        Q.    And with regard to the
 3   TVT-O, have you ever provided any input
 4   to Ethicon on what information should be
 5   included in the TVT-O IFU?
 6        A.    Not that I recall.
 7        Q.    Have you ever drafted an IFU
 8   for TVT?
 9        A.    No.
10        Q.    Have you ever drafted an IFU
11   for TVT-O?
12        A.    No.
13        Q.    Have you ever drafted an IFU
14   for any mesh manufacturer?
15        A.    I haven't drafted a whole
16   IFU.  I think some of the validation that
17   I did for Secur would have probably
18   worked into the IFU.  Similarly, some of
19   the work I did with the Prosima may have
20   had some bearing and went into the IFU.
21              But I have not specifically
22   authored IFUs for any mesh product.
23        Q.    You didn't draft the
24   language for either the Prosima or the
```

1   TVT-S?
2        A.   I did not draft it, no.
3        Q.   Is it your opinion, Doctor,
4   that the IFU for the TVT is adequate?
5        A.   Yes.
6        Q.   And, Doctor, what is the
7   basis of that opinion?
8        A.   My basis is that the
9   document is designed to provide,
10  obviously, the instructions for use.
11  It's supposed to inform the implanter
12  regarding risks associated with the
13  device.
14            And I think it has -- I
15  think all the iterations of it have done
16  that, done so.
17       Q.   What standards, other than
18  your own personal viewpoint, what source
19  of information are you relying on to
20  claim adequacy?
21       A.   I think my own personal
22  input is not just personal, but it's
23  professional.  And I think that as
24  someone who has dedicated their life to

```
 1   pelvic reconstructive surgery, I think
 2   I'm -- there's no better source of what's
 3   appropriate than myself.
 4          Q.   And that would apply to an
 5   IFU for both products?
 6          A.   Yes.
 7               MS. GAYLE:  I'll reserve the
 8          balance of my questions.
 9                     - - -
10                  EXAMINATION
11                     - - -
12   BY MR. SNELL:
13          Q.   Dr. Murphy, Burt Snell.
14   I'm just going to go back through a
15   couple of things I want to follow up on.
16               You were asked about the
17   structure of your report in the
18   beginning.  You were asked about certain
19   summaries of conclusions, for example, at
20   Page 62 where the text is in bold.
21               Do you see that?
22          A.   I do.
23          Q.   Is it fair to say that the
24   entirety of your report contains your
```

| | | |
|---|---|---|
| 1 | Q. | Have you reviewed literature |
| 2 | on mesh histology? | |
| 3 | A. | Yes, I have. |
| 4 | Q. | Is that something you |
| 5 | testified to plaintiffs' counsel? | |
| 6 | A. | Yes. |
| 7 | Q. | Based on your review of the |
| 8 | high-level, reliable, scientific | |
| 9 | evidence, as you testified to with your | |
| 10 | methodology, did you find any clinically | |
| 11 | significant complications with any | |
| 12 | fraying of the TVT slings, if that even | |
| 13 | occurs? | |
| 14 | A. | No, I did not. |
| 15 | Q. | Based on your review of the |
| 16 | high-level scientific studies, including | |
| 17 | the long-term studies on the TVT and | |
| 18 | TVT-O that you identified here today, do | |
| 19 | those support your opinion that there is | |
| 20 | not pathologic contraction with TVT and | |
| 21 | TVT-O? | |
| 22 | | MS. GAYLE: Object to form. |
| 23 | | THE WITNESS: Yes. |
| 24 | | Absolutely. |

Miles Murphy, M.D.

```
 1                MR. SNELL:  That's all I
 2      have.  Thank you.
 3                MS. GAYLE:  Doctor, I just
 4      have two more questions for you.
 5                     -  -  -
 6                   EXAMINATION
 7                     -  -  -
 8   BY MS. GAYLE:
 9        Q.    Do you have a degree in
10   materials engineering?
11        A.    I do not.
12        Q.    And, Doctor, earlier you
13   were asked by counsel about the mesh, and
14   you said that you knew that it was a
15   macroporous monofilament mesh before you
16   became an expert in this litigation.
17              How did you know that?  What
18   was your basis for that understanding?
19        A.    Reading the scientific
20   literature.
21        Q.    Any specific literature,
22   Doctor?
23        A.    Well, I mean, I already
24   mentioned the Amid paper.  That was the
```

```
 1   main paper that broke down the different
 2   types.
 3              But as we looked in my CV, I
 4   did -- I wrote a whole chapter on
 5   materials used in reconstructive pelvic
 6   surgery, and I authored that before
 7   becoming an expert in this litigation.
 8   And that references multiple other
 9   articles as well.
10         Q.   Doctor, that chapter in the
11   book that you talked about, was that
12   regarding polymers used?
13         A.   It included polymers.
14         Q.   And I think I might have
15   asked this before, Doctor, but you don't
16   have a degree in design engineering, do
17   you?
18              MR. SNELL:  Object to form.
19              Go ahead.
20              THE WITNESS:  I do not have
21         a degree in that, no.
22              MS. GAYLE:  No further
23         questions.
24                  - - -
```