# EXHIBIT C

Ahmet Bedestani, M.D.

```
 1            UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF WEST VIRGINIA
 3                  CHARLESTON DIVISION
 4    In Re:  Ethicon, Inc.      Master File No.
      Pelvic Repair System       2:12-MD-02327
 5    Products Liability
      Litigation                 MDL No. 2327
 6
      This document relates to
 7    all Wave 8 and subsequent  Joseph Goodwin
      wave cases as plaintiffs   U.S. District Judge
 8
 9
10
11
12
13
14      Deposition of AHMET BEDESTANI, M.D., taken on
15    Friday, September 21, 2018, in the conference room
16    of Courtyard by Marriott, Two Galleria Boulevard,
17    Metairie, Louisiana 70001, commencing at
18    11:52 a.m.
19
20
21
22
23
      Reported by:
24    AURORA M. PERRIEN
      CERTIFIED COURT REPORTER
25    REGISTERED PROFESSIONAL REPORTER
```

Page 2

1            I N D E X
2                              Page
3   Caption ........................ 1
4   Appearances .................... 3
5   Agreement of Counsel ........... 4
6   Reporter's Certificate ......... 119
7
8
9         E X A M I N A T I O N
10  MR. JONES ...................... 5
11  MR. WALKER ..................... 109
12
13
14          E X H I B I T S
15  No. 1  Ahmet Bedestani, LLC,       16
           Invoice 10016
16  No. 2  (flash drive)               16
    No. 3  General Expert Report of   17
17         Ahmet Bedestani, M.D.
           (PowerPoints)
18  No. 4  (e-mail dated 4/18/01)      46
    No. 5  Notice to Take Deposition... 115
19  No. 6  Curriculum Vitae             116
20
21
22
23
24
    **Reporter's Note: Exhibit Nos. 2 and 4 were
25  retained by plaintiff's counsel.

Page 3

1          A P P E A R A N C E S
2   REPRESENTING PLAINTIFF:
3      WAGSTAFF & CARTMELL, L.L.P.
       BY:  NATE JONES, ESQ.
4      4740 Grand Avenue, Suite 300
       Kansas City, Missouri 64112
5      816.701.1100
       Njones@wcllp.com
6
7
8   REPRESENTING DEFENDANT:
9      BUTLER SNOW, L.L.P.
       BY:  JORDAN N. WALKER, ESQ.
10     1020 Highland Colony Parkway, Suite 1400
       Ridgeland, Mississippi 39157
11     601.985.4643
       Jordan.walker@butlersnow.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           S T I P U L A T I O N
2     It is stipulated by and among Counsel that
3   the deposition of AHMET BEDESTANI, M.D., is being
4   taken under the Federal Rules of Civil Procedure
5   for all purposes permitted under the law.
6     The formalities of reading and signing are
7   waived.
8     The formalities of sealing, certification
9   and filing are hereby waived.  The party
10  responsible for services of the discovery material
11  shall retain the original.
12               * * * * *
13        Aurora M. Perrien, Certified Court
14  Reporter, Registered Professional Reporter, in and
15  for the State of Louisiana, officiated in
16  administering the oath to the witness.
17
18
19
20
21
22
23
24
25

Page 5

1         AHMET BEDESTANI, M.D.,
2   4228 Houma Boulevard, Suite 410A, Metairie,
3   Louisiana 70006, after having been first duly
4   sworn, testified on his oath as follows:
5          E X A M I N A T I O N
6   BY MR. JONES:
7     Q.  Hey, Doctor.  My name is Nate Jones.  I'm
8   from the law firm of Wagstaff & Cartmell.  I think
9   you already know this, but I represent the
10  plaintiffs in the transvaginal mesh MDL that is
11  headquartered in Charleston, West Virginia, and is
12  ongoing.
13        So are you prepared today to answer some
14  questions about the work that you performed in
15  this case?
16    A.  Yes, sir.
17    Q.  And just briefly break it down to me what
18  your understanding of your role is in this case.
19    A.  I don't know how to answer that, really.
20    Q.  You're sure?
21    A.  My role -- I believe I was retained by
22  defendant's law firms to answer questions
23  regarding the accusations against certain products
24  put into the marketplace by Ethicon, and to give
25  information based on science, education,

Page 6

1  experience.
2     Q.  And is there one particular product that
3  attorneys for Ethicon have asked you to look at
4  specifically?
5     A.  Prosima.
6     Q.  Okay.  So we're here today to talk bout
7  Prosima and the work that you've done.
8        You've authored an -- what's called an
9  expert report on the Prosima product; correct?
10    A.  That is correct.
11    Q.  Okay.  And I'm assuming that you spent
12 some time authoring that report of yours?
13    A.  I did.
14    Q.  Okay.  And your counsel e-mailed me
15 earlier a invoice detailing certain work that you
16 performed.
17       Just to cut to the chase, is it fair for
18 me and other attorneys to look at that invoice and
19 rely on it for the amount of work that you
20 performed in this case?
21    A.  The -- there should be an invoice that was
22 a preliminary invoice that is 58 hours, then there
23 was another one for another 6 hours relating to
24 that general report; so in total, 64.4 hours
25 specifically devoted to the Prosima general

Page 7

1  report.  But I must add that that is a fraction of
2  the time that I spent in that it -- I used this as
3  an exercise to satisfy intellectual curiosity and
4  to improve my understanding of certain concepts.
5     Q.  If we combine the preliminary invoice,
6  which totals to 58.1 hours, and the second
7  invoice, that would total it up to 64.4 hours.
8        That's what we need to look at to
9  determine the amount of time that you've invoiced
10 for in this case.  Fair?
11    A.  That is fair.
12    Q.  Okay.
13    A.  Invoice time, 64 hours.
14    Q.  Okay.  Now on this invoice, I got to ask
15 you a few questions about some of the language on
16 here.
17    A.  I don't have the invoice in --
18    Q.  Okay.
19    A.  -- front of me here.
20       MR. WALKER:
21          Here, we can -- we can look at it
22       here.  I have it on my screen; so just let
23       us know what you're looking at.
24 BY MR. JONES:
25    Q.  Yeah.  The very -- the very -- towards the

Page 8

1  very end, on Page 3 of 3, underneath Consulting,
2  it says, "Preparation of Prosima" or Prosima,
3  however we're going to roll in this depo,
4  "Position and and supporting slides."
5        What's the Prosima position statement
6  paper that you were working on?
7     A.  Isn't that my report?
8     Q.  That's my question.
9     A.  That is my report.
10    Q.  Okay.  And then the supporting slides,
11 what are you referring to there?
12    A.  I believe -- I have it in -- in my hand.
13       MR. WALKER:
14          Let -- well, let me -- let me just
15       interject to this point.  They are
16       references in attachment to his report.
17       And a slide deck that -- that he used as
18       sort of a foundation for his report should
19       have been attached --
20       MR. JONES:
21          Okay.
22       MR. WALKER:
23          -- in the materials that y'all were
24       served.  I've got a copy for you here if
25       you'd like that.

Page 9

1        MR. JONES:
2           Yeah.  Great.
3        MR. WALKER:
4           (Tenders document.)
5  BY MR. JONES:
6     Q.  So you -- you put together -- you put
7  together a report; correct?  Yes?
8     A.  I did -- I did put together a position
9  statement.  That position statement is in the form
10 of a report that reflects my thoughts on Prosima.
11    Q.  Okay.  And then you also put together a
12 PowerPoint slide presentation; correct?
13    A.  That PowerPoint presentation is a run- --
14 is reflective of notes, images, information that I
15 have gathered through the passage of time that has
16 formulated my --
17    Q.  I'm just asking --
18    A.  -- thought process.
19    Q.  -- whether you did it or not.
20       Did you --
21    A.  Of course I did it.
22    Q.  Did you put together the PowerPoint
23 presentation?
24    A.  That is 100 percent mine.
25    Q.  Thanks.  It's a lot of work.

Page 10

1  A. It is a lot of work.
2  Q. Then a few of these other entries on the
3  invoice, it says, "Research of chain breakdown in
4  graft matrix."
5      Explain to me what you mean when you write
6  on your billing invoice "Research of chain
7  breakdown in graft matrix."
8  A. As I was reflecting on some of the
9  accusations that were put forth or that I was made
10 aware of in terms of how certain people believe
11 mesh was reacting within the human body,
12 specifically referencing papers accusing of
13 oxidation, breakdown, etcetera.  So when I dug
14 deep into the actual papers, I had to re-educate
15 myself, going back to organic chemistry, learning
16 about isomers, learning about florescence testing,
17 learning about electron scanning microscopy.
18     I would have to reflect upon my notes that
19 I don't -- I don't think I have with me.  But
20 really trying to learn what florescence,
21 transgravitent -- transgravonometric -- I'd have
22 to pronounce it again.  I'm certainly not an
23 organic chemist, but I had to learn so I could
24 make understanding of the papers and their
25 rebuttal so that I can formulate my own

Page 11

1  understanding, look at you and say I either
2  believe it or I don't believe it.
3  Q. Sure.  So the -- so underneath "Research
4  of chain breakdown and graft matrix" and "Research
5  into defending against accusations of" oxidate --
6  oxidate -- "oxidation of implants," talking about
7  similar concepts there.  Fair?
8  A. Polypropylene is a chain polymer.  And
9  then Prolene is a stereoisomer.  So I had to
10 really go back in that.  And isotonic are all the
11 carbon molecules and substituents on the same.  So
12 I would have to go back and go exactly into my
13 notes to better delineate what I am trying to
14 display to you.  So I was really trying to say
15 what was going on with the graft and was it really
16 oxidation.
17 Q. So as far as your two entries in your
18 billing invoice that relate to the "Research of
19 chain breakdown and graft matrix" and "defending
20 against accusations of oxidation of implants,"
21 you're -- you're talking about two similar
22 concepts; correct?
23 A. Yes.
24 Q. Okay.  All right.  That's all the question
25 was.

Page 12

1     And then I assume you've come to the
2  conclusion that polypropylene mesh does not
3  degrade or oxidize inside of the human body.
4  Fair?
5  A. I believe that Prolene, polypropylene is
6  completely inert and does not do those things --
7  Q. Okay.  And --
8  A. -- within the human body.
9  Q. Yeah.  And in your research on that issue,
10 you went out and looked at -- let me ask you.
11    Did you look at medical literature on the
12 subject?
13 A. I did.
14 Q. And did you -- did you look at internal
15 testing that Ethicon had done on the subject?
16 A. I -- I visited the papers by Abbott, Cabot
17 [phonetic], if -- if -- I can't remember his name,
18 and Clave.
19 Q. Clave?
20 A. Clave.
21 Q. Sure.
22 A. And then the accusations by Ostergard in
23 his three in really trying to understand what was
24 going on, and then really going back to Boyd's --
25 really going back to Boyd's Organic Chemistry

Page 13

1  textbook, which was mine.
2     So really just trying to once again
3  understand what all of this terminology was.  I do
4  -- I think I billed these -- the company 7 hours,
5  but I could definitely tell you there was far more
6  time spent just trying to understand these
7  concepts and I didn't feel that it was appropriate
8  to bill a company to --
9  Q. Yeah.  Yeah.  Yeah.
10 A. -- educate myself.
11 Q. Got it.  And I'm not trying to be rude and
12 cut you off, but I mean, if I ask you a question,
13 I just want the answer to the question.  I mean,
14 you'll get it.  You'll -- you'll get it.  And I
15 know it's like -- we're human beings.  We try to
16 have a conversation, and there will probably be
17 some topics where you and I both will start
18 getting into a conversation mode.  But for now,
19 this -- this -- these are like housecleaning
20 issues; so --
21 A. Okay.
22 Q. -- I'm just firing like simple
23 questions --
24 A. Okay.
25 Q. -- that I just want answers to.

Page 18

1 physician consultant for Ethicon?
2   A. 2010 would be a -- I think a good start
3 point.
4   Q. Okay. And what would -- what did your
5 consulting responsibilities entail in 2010?
6   A. Speaking about -- speaking to my thought
7 process of the Prosima itself, graft augmentation,
8 specifically Prolene, polypropylene augmentation
9 of transvaginal reconstructive procedures to
10 address pelvic organ prolapse, symptomatic.
11   Q. Fair to say in 2010 your consulting work
12 for Ethicon consisted of work revolving around the
13 Prosima product and other graft augmentation
14 procedures for pelvic organ prolapse?
15   A. My main focus was specifically to provide
16 professional-level education on behalf of Prosima.
17 This involved preceptorship. This involved
18 anatomical dissection, displaying that anatomical
19 dissection.
20   Q. And in your work in 2010, your consulting
21 work, would have primarily revolved around the
22 Prosima product -- fair -- for Ethicon?
23   A. For Ethicon, only Ethicon. Prosima, only
24 Prosima.
25   Q. Okay. Did you do any other work as a paid

Page 19

1 physician consultant for any companies that market
2 transvaginal mesh devices that aren't named
3 Ethicon?
4   A. Absolutely no. I was paid to man a
5 cadaveric lab while a fellow, and that's because
6 my bosses said, Show up, and I did --
7   Q. Right.
8   A. -- and I collected -- I believe it was
9 either 500 or $800. And that would be between
10 2007 and 2010. I -- I don't -- you would -- you
11 could -- I -- I don't know exactly when. It was
12 on behalf of Pinnacle. So whenever Pinnacle hit
13 the market, it would be around that time.
14   Q. Got it.
15     As far as your consulting work, you --
16 other than the one event that we just described
17 that you were required to attend, your consulting
18 work was solely with Ethicon as it relates to
19 transvaginal mesh; correct?
20   A. Solely with Ethicon as it relates with
21 Prosima.
22   Q. Okay. Why is it that you only worked for
23 Ethicon?
24   A. I believed in the -- the concept of mesh
25 augmentation. But more importantly, I was

Page 20

1 fascinated, not intrigued, fascinated by the
2 vaginal support device, which is a component only
3 of Prosima.
4   Q. The -- the Prosima uses the vaginal
5 support device, or -- or VSD, which is unique to
6 all other transvaginal mesh POP kits ever on the
7 market; correct?
8   A. Excuse me? I -- you have to repeat that
9 for me.
10   Q. The -- the Prosima uses the VSD, or
11 vaginal support device, mechanism; correct?
12   A. That is correct.
13   Q. And the design of the Prosima, which
14 includes the VSD device, is unique to any other
15 transvaginal mesh POP kit ever marketed in the
16 United States. Fair?
17   A. Absolutely no.
18     The vaginal support device was only
19 involved with Prosima. There was no other
20 splinting-type device that I was aware of for any
21 other marketed transvaginal mesh kit: Apogee,
22 Perigee, Elevate, Pinnacle, Uphold. I can't keep
23 them straight.
24   Q. Sure. There's a bunch.
25     But as far as the splinting -- the splint

Page 21

1 device, that was unique to the Prosima; correct?
2   A. Yes.
3   Q. Okay. All right. None of -- I'm not
4 aware of it either.
5     But there's -- there's no other
6 transvaginal mesh product that you're aware of
7 that uses the type of design that Prosima does;
8 correct?
9   A. That is correct, sir.
10   Q. And that's why you're fascinated, I'm --
11 I'm assuming -- let me ask.
12     Is that one of the reasons why you were
13 fascinated by the Prosima back in 2010? It was
14 different --
15   A. Way before.
16   Q. -- right? Oh. Way before?
17   A. Way before, I always felt that precision
18 of application of graft with vector molding,
19 intrinsic or extrinsic pressure, was the key.
20 Basically I felt that Ethicon, when they
21 introduced me to the vaginal support device, gave
22 me what I had been looking for. I felt that that
23 would solve a lot of problems, and I once again
24 was fascinated by this concept.
25   Q. And the concept was invented by a

Page 22

1 Australian doctor; correct?
2  A. I believe it was Marcus Carey, to be
3 specific.
4  Q. Yeah. He's Australian; right?
5  A. Yes.
6  Q. Okay. And do you know when Prosima was
7 launched in the United States?
8  A. I remember attending some type of event in
9 Colorado where they were getting ready to roll it
10 out. And I say that because I would have to look
11 back at my travel logs. It's either going to be
12 2009 or beginning of 2010.
13  Q. That brings up a good point.
14    Was this rollout event that you attended
15 in 2009 or 2010 an event sponsored by Ethicon?
16  A. I believe it was.
17  Q. I'm assuming, dating back to 2009 or 2010,
18 that you've attended multiple events sponsored by
19 Ethicon in your role as a consulting physician?
20  A. From 2009 to -- yeah.
21  Q. To -- to current? Okay.
22  A. I -- I attended many such events. Many
23 such events not only sponsored by Ethicon but all
24 of the companies at the time.
25  Q. Good.

Page 23

1    And have you -- have you -- has Ethicon
2 paid for you to travel to their headquarters?
3  A. I did go to their headquarters, but that's
4 when I went to see my family. I did. Because we
5 are -- we live in Hamilton, New Jersey, which is
6 not that far from East Brunswick or Somerville.
7  Q. Sure.
8    Do any other events or trips stand out to
9 you in the last 8 or 9 years that you attended
10 where Ethicon either sponsored the event or paid
11 for you to travel there?
12  A. Many wonderful memories come back from
13 labs that were hosted or put forth by Ethicon:
14 Chicago, Florida. I would have to look back at
15 the travel log. Many.
16    But I do know this: It was through all of
17 these labs that I was able to further dissect and
18 further advance my knowledge in pelvic anatomy.
19 Because I can tell you this: Through that company
20 I was able to study over 26 cadavers. So usually
21 it was four cadavers per an event. Four into 26
22 -- let's round up. Say I missed two. So at least
23 seven events.
24  Q. All right. So 2010, you're a consultant
25 for Ethicon.

Page 24

1    2011, are you a consultant for Ethicon?
2  A. I think so.
3  Q. 2012, are you still consulting with
4 Ethicon?
5  A. No. I'm not.
6  Q. Okay. What -- why did you stop acting as
7 a physician consultant in 2012 for Ethicon?
8  A. I think I -- I actually transitioned out
9 of one position and then took some time to decide
10 in what direction my career was going to go; so I
11 felt that was an important part. And it -- that
12 was -- it was at that point that I passed my
13 general obstetrics and gynecology boards, two
14 thousand and -- I think it's right here. Two --
15 November of 2011. And then I started putting
16 together my practice at East Jefferson General
17 Hospital, and that took some time to really get
18 off the ground. So I was really devoted to that.
19  Q. Okay. Did Ethicon between the years of
20 2012 to 2016 ever reach out to you to ask you if
21 you would act as a paid physician consultant for
22 them again?
23  A. No.
24  Q. Now November of 2011 is when you first
25 passed your general OB-Gyn boards; is that

Page 25

1 correct?
2  A. That is correct.
3  Q. And you finished -- finished your
4 fellowship training in June of 2010; correct?
5  A. That is correct.
6  Q. And then you talked about starting your
7 practice at East Jefferson; correct?
8  A. Yes. I left my -- my previous -- where I
9 did my fellowship, I stayed on, and I felt that it
10 was time to move on.
11  Q. Sure.
12  A. And so I think that was a period of
13 transition.
14  Q. So sometime in late 2010 you begin
15 practicing as a full-time physician; correct?
16  A. I was a fellow from 2007 to 2010. And
17 then I joined as an assistant professor, and so I
18 was -- at that point we transitioned from fellow
19 to attending. That is correct.
20  Q. Okay. And then at some point in 2011 you
21 start your practice at East Jefferson; correct?
22  A. We started I think in May of 2012. It
23 took a while to get started. It should be then.
24 Yeah. May of 2012.
25  Q. When's the last time that you used the

Ahmet Bedestani, M.D.

Page 26

1  Prosima device in a patient?
2      A. I -- I think probably in 2011. Probably.
3      Q. Okay. When is the first time you used the
4  Prosima device on a patient?
5      A. As soon as I could probably get my hands
6  on it; so probably somewhere in 2009 or 2010.
7      Q. Fair to say the first time that you would
8  have used the Prosima device would have been
9  shortly after it was first marketed in the
10 United States?
11     A. As soon as I could obtain the device.
12 Yes. Whatever that time period is.
13     Q. How many total Prosima devices did you
14 implant in patients?
15     A. That would be a -- that would have to be a
16 range.
17     Q. Give me a range.
18     A. Probably more than 40, less than a
19 hundred.
20     Q. Now in the course of your review in --
21 in -- in educating yourself about issues that were
22 relevant to the Prosima device, you're aware that
23 the launch of the Prosima device was delayed
24 several times by Ethicon; correct?
25     A. I didn't know that at the time where --

Page 27

1  when it first was presented to me. On further
2  study, I do know that it was delayed for some
3  time, but I felt that that was a good thing in the
4  sense that they wanted to actually have good
5  Level 1 data.
6      Q. You became -- any time I say something
7  that's off-base, correct me if I'm wrong.
8         When you -- when you were a practicing
9  physician in 2009 and 2010 and started using the
10 Prosima device, you had no knowledge at that time
11 that there was delays in the launching of the
12 device made by Ethicon; correct?
13     A. That is correct.
14     Q. At some point in your review of materials
15 and in authoring and in -- in authoring your
16 expert report in this case on the Prosima device,
17 you -- you became aware that there were several
18 delays of the launch of the Prosima device made by
19 Ethicon; correct?
20     A. That is correct.
21     Q. And you would have became educated in that
22 subject when you reviewed internal documents
23 supplied to you from attorneys who represent
24 Ethicon. Fair?
25     A. That is correct.

Page 28

1      Q. Okay. And in fairness, the only way that
2  a physician could have known that there were
3  multiple delays in the launch of the Prosima
4  device would be to have access to Ethicon's
5  internal documents; correct?
6         MR. WALKER:
7             Object to form.
8  BY MR. JONES:
9      Q. That's a bad question. Let me ask in a
10 more targeted question.
11        One way a physician would become aware of
12 the multiple -- multiple delays in the launch of
13 the Prosima device made by Ethicon would be to
14 have access to their internal documents; correct?
15     A. No. Because if a company says that
16 Product X is coming September 2008 and you're
17 waiting for it and it doesn't show up, then that
18 keys you off there's a problem. So I think
19 finding out the developmental timeline of a
20 product, I don't know if that's really germane to
21 the issue at the time.
22     Q. You reviewed -- I mean, the -- the
23 internal documents are -- to me are interesting,
24 actually, in this -- with this device. Sometimes
25 they're not that interesting. But with Prosima,

Page 29

1  they are definitely interesting. There's some
2  that really stand out.
3         And -- and I'm sure you reviewed documents
4  where employees at Ethicon are disappointed with
5  some of the initial safety data that came back
6  prior to the launch of the Prosima device;
7  correct?
8         MR. WALKER:
9             Object to form.
10        THE WITNESS:
11            I don't remember any type of
12        information standing out regarding safety
13        data, none -- nothing regarding safety.
14 BY MR. JONES:
15     Q. You reviewed documents where Ethicon --
16 employees at Ethicon were concerned about the
17 performance data of Prosima prior to its launch;
18 correct?
19     A. Please define --
20     Q. Meaning whether -- meaning whether it
21 worked or not.
22     A. Of performance --
23     Q. Sure.
24     A. -- in terms of --
25     Q. Efficacy.

Page 58

1 end of the study. All right.
2    MR. WALKER:
3      And that -- that was not Ethicon's
4    fault, just for the record.
5    MR. JONES:
6      Okay. All right. Ethicon doesn't
7    kill dogs. All right.
8 BY MR. JONES:
9   Q. All right. Let's go back to some of this
10 consulting work stuff. Because I should have
11 asked you some questions on it that I didn't
12 earlier. And you tried to lead me in the right
13 direction, and I just didn't follow up.
14     Now in 2016, did you do consultant work
15 for Boston Scientific?
16   A. No.
17   Q. Okay.
18   A. In 2016 I did not do any type of
19 consulting work for Boston Scientific.
20   Q. Okay. Did -- did -- did you perform
21 consultant work for Boston Scientific at any point
22 in your career as a physician?
23   A. As I alluded --
24   Q. Other than the one --
25   A. No.

Page 59

1   Q. -- required -- no.
2     Coloplast. There's some entries of
3 interactions --
4   A. No.
5   Q. -- between you and Coloplast in 2014 and
6 2013.
7   A. When you say interaction -- I believe that
8 I did go to find out more about their Y-mesh --
9   Q. Okay.
10   A. -- Restorelle.
11   Q. But you didn't --
12   A. I think --
13   Q. -- act as a consultant --
14   A. I think --
15   Q. -- for them?
16   A. But I'm not a consultant.
17   Q. Sure.
18   A. Nope. No --
19   Q. All right. So two --
20   A. -- payment --
21   Q. -- thousand -- 2013, 2014 you go to
22 Coloplast-sponsored events to check out some of
23 their products, specifically Y-mesh; correct?
24   A. That is correct.
25   Q. 2015 and 2016, you have some interactions

Page 60

1 with Boston Scientific, on mesh -- a company that
2 manufactures transvaginal mesh devices.
3     What were your --
4   A. They also had a Y-mesh too that I wanted
5 to go learn more about.
6   Q. Okay. And Y-mesh is generally implanted
7 abdominally; correct?
8   A. The Y-mesh is utilized for abdominal
9 sacrocolpopexy. That is correct.
10   Q. And because I have a hard time saying that
11 word, the ASC procedure, do you consider that the
12 gold standard for treatment of pelvic organ
13 prolapse?
14   A. Despite doing a lot of it now, I do not.
15   Q. Okay. Is that your primary surgical
16 choice when you treat a patient who suffers from
17 pelvic organ prolapse?
18   A. The indication for that surgery in the
19 United States is apical prolapse. If a patient
20 has apical prolapse and they meet the criteria and
21 stratification, risk-benefit ratio, and it's the
22 appropriate surgery for that particular patient,
23 taking into consideration all aspects of that
24 patient and their desire for future life, if it is
25 all correct and it represents a true benefit, that

Page 61

1 is what they will be offered.
2   Q. For apical prolapse, the primary surgical
3 technique that you currently use is the ASC;
4 correct?
5   A. It is but one tool in my armamentarium.
6   Q. Is it the primary one or not? That's
7 what --
8   A. I don't --
9   Q. -- I'm asking.
10   A. -- think that it's -- I wouldn't say it's
11 my primary.
12   Q. So you don't use the ASC more than any
13 other surgical choice for apical prolapse is what
14 you're telling me?
15   A. On review of -- of my personal performance
16 over the last 3 years, I am sure I have done more
17 abdominal sacrocolpopexy than other apical
18 suspension native tissue repairs.
19   Q. Right. What's your go-to surgery or your
20 primary surgery for rectocele?
21   A. I have to take -- I am a firm believer
22 that you have to look at the entire POP-Q to see
23 if there's any impingement upon the anterior,
24 posterior, or apical. I have to see about -- I
25 don't really truly believe that the -- isolated

Page 70

1 you need to take it all out.
2    Q. And my question isn't a discussion of
3 whether you think it's appropriate to take it all
4 out or whether another physician thinks, Shoot, Do
5 we take out all we can because it's causing
6 problems, or do we leave a little chunk in there
7 to see what happens with the rest of it. That's
8 not the question.
9      The question --
10    A. Okay.
11    Q. -- is: If a doctor makes the decision,
12 This mesh needs to come out of this patient's body
13 because it's in the best interest of this woman,
14 in some patients, you will agree with me, that you
15 can never safely and entirely remove all of the
16 mesh from the patient's body?
17      MR. WALKER:
18         Object to form.
19      THE WITNESS:
20         I cannot say that. You're saying all
21      patients. I --
22 BY MR. JONES:
23    Q. No. I just said "in some patients." If
24 you listened, I said --
25    A. I'm sorry.

Page 71

1    Q. -- "in some patients."
2    A. It depends on the practitioner. I
3 definitely think that certain practitioners
4 because of more skill attained through innate
5 ability, knowledge, drive for perfection, maybe
6 they have the skill set. I -- when I have had
7 mesh complication from other providers, if I did
8 not believe that I could handle the surgery, I
9 have passed it on. That has happened a handful of
10 my time, that I didn't think that I could safely
11 do that. Those patients would not have existed if
12 there was not a permanent graft in there. So if
13 -- and -- so I'm just trying to make amends with
14 you maybe in saying yes, those were certain
15 permanent graft implants placed in people, and I
16 felt that to safely remove it all I did not have
17 the skill set and I passed that on.
18    Q. Okay. I believe that does help -- help
19 me; so I appreciate that answer. All right.
20      I want to read -- read through a few more
21 of these statements in AUGS, which I bet you'll
22 probably disagree with. But I -- I've got three
23 more that I want to read, and then we'll be done
24 with that.
25      MR. WALKER:

Page 72

1      And Nate, when you're done with that,
2      can we take a break?
3      MR. JONES:
4         Yeah. Yeah. All right. So we'll get
5      through these statements in AUGS.
6 BY MR. JONES:
7    Q. The use of synthetic mesh or biologic
8 grafts in transvaginal repair of posterior vaginal
9 wall prolapse does not improve outcomes. In
10 addition, there are increased complications; e.g.,
11 mesh exposure associated with placement of mesh
12 through a posterior vaginal wall incision.
13      Do you agree with that or disagree?
14    A. They're saying that there's a unique set
15 of complications possible by placing the graft
16 permanent or xenograft. And -- and yes, I could
17 say that I agree with that. That is a distinct
18 possibility.
19    Q. Okay. The next statement: Thus,
20 synthetic mesh or biologic grafts should not be
21 placed routinely through posterior vaginal wall
22 incisions to correct POP for primary repair of
23 posterior vaginal wall prolapse?
24    A. They're saying do not use a graft
25 augmentation for the first time that you're going

Page 73

1 to go to repair. So what they're advocating is:
2 Go do a surgery that you know is going to probably
3 have a 30 to 40 percent chance of failure so the
4 patient comes back and makes your second revision
5 harder. So I don't really understand that
6 concept, and I don't agree with it.
7    Q. You don't agree --
8    A. I think you have to -- you have to -- you
9 have to individual -- individualize care.
10    Q. And now we're talking about interior
11 vaginal repair. Polypropylene mesh augmentation
12 is associated with higher rates of complications
13 compared with native tissue vaginal prolapse
14 repair.
15      You agree or disagree?
16    A. I disagree.
17      MR. JONES:
18         All right. Let's take that break.
19      (Brief recess was taken.)
20 BY MR. JONES:
21    Q. All right, Doctor. We took a short break.
22      Are you now ready to proceed?
23    A. Yes, sir.
24    Q. Good deal. All right.
25      Besides the Prosima, what other pelvic

Page 74

1  organ prolapse mesh kits did you use?
2     A. I can definitely say that I used them all.
3     Q. Used them all?
4     A. At least all -- at least one to several
5  times each.
6     Q. Okay. Based on your experience in using
7  every single transvaginal mesh product for
8  treatment of pelvic -- pelvic organ prolapse at
9  least once, are there any specific things that
10 stand out to you about the safety and performance
11 of any of those particular mesh devices?
12    A. I came into my fellowship before the
13 advent of the vaginal mesh kits, transvaginal mesh
14 kits. And in fact, it was referenced in a paper
15 that I did. It was on my CV. I'm very proud of
16 it.
17    Q. Nice.
18    A. Where we fashioned two pieces of Gynemesh
19 and delivered it utilizing the Capio device. I'm
20 telling you that so that you don't -- I'm not
21 trying to be boastful. I'm trying to tell you
22 that violation of the sacrospinous ligament
23 neurovascular complex is something that all of
24 these mesh kits have in common. Prosima, and
25 Prosima only, is the one that did not violate that

Page 75

1  structure. So none of these kits satisfied my
2  curiosity, if you would like to say, or my
3  approach to operating safely in a very challenging
4  piece of anatomy, transvaginally that is.
5     Q. What about the -- I understand the
6  surgical approach didn't fascinate you or meet
7  your standards.
8        But what about the character --
9  characteristics of any of those mesh products?
10 Does anything stand out to you as far as one mesh
11 device, the actual mesh portion being softer or
12 lighter or more pliable or one being stiff, heavy,
13 rigid? Anything like that stand out to you,
14 Doctor?
15    A. Out of all of them, I was -- I was
16 intrigued at the time what became Restorelle, was
17 Empathy.
18    Q. Sure.
19    A. I thought they had a winner back then. It
20 was too expensive. I couldn't get the hospitals
21 to buy it; so I did not have access to it, sir.
22    Q. And Restorelle is a -- is a light, soft
23 mesh; correct?
24    A. It is. It's by Coloplast now, but it was
25 bought by -- by them.

Page 76

1     Q. Yeah.
2     A. Okay.
3     Q. Right on. I think you said Empathy and
4  then Coloplast.
5        What did you do after you graduated
6  undergrad?
7     A. I tried to get into medical school. Then
8  I did -- went to a master's degree. If you look
9  at the CV, it says certificate of anatomy. That
10 was a program at the St. Louis University School
11 of Medicine. I went to undergrad at St. Louis
12 University.
13    Q. Yeah.
14    A. So the program was to give heavily
15 motivated people the opportunity to maybe take the
16 anatomical classes of the first year of medical
17 students and see how they do. But the problem
18 with that program was when you let 40 motivated
19 kids in, we all did well. So they threw a MCAT
20 recommendation again. And I -- and I've always
21 had a hard time with that test. So then I went
22 off and worked a while, and then I went back and
23 got my master's in molecular biology, protein
24 conformation dynamics, tried to get into medical
25 school again. Despite a 4.0, I couldn't do well

Page 77

1  on the MCAT. Worked at a high volume PCR lab
2  doing protein -- doing viral load analysis.
3        MR. WALKER:
4           Hey, Nate, I'm sorry to do this. Can
5     -- can we go off the record for just a
6     minute?
7        (There is an off-the-record discussion.)
8        (Brief recess was taken.)
9  BY MR. JONES:
10    Q. All right. Here's what I want to ask you
11 about and focus on, is the work that you did after
12 undergrad. Where'd you work?
13    A. Consolidated Laboratory Services.
14    Q. Okay. What's this DuPont work stuff? Did
15 you work there, or is that --
16    A. No. That's -- so at the time all the
17 antiretroviral medications were coming out. And
18 PCR at the time --
19    Q. Okay.
20    A. You want me to really expand on that
21 or . . .
22    Q. Yeah. Give me like the 2- or 3-minute
23 version. I told Jordan we'd be done by 2:00; so
24 expand but don't expand that much. That's a good
25 lawyer answer for you, by the way.

Page 78
1    A. So Hoffmann-La Roche had a kit. So you --
2  HIV replicates, and you have viral load: hundred
3  thousand copies, 50,000 copies, zero copies. The
4  more copies, the sicker you are. I give you a
5  pill that is an antiretro, and then we can
6  modulate how fast and how low we can get it. So
7  that's what we did, DuPont Merck DMP 266. I can't
8  even remember what it --
9    Q. Sure.
10    A. -- turned out to be. It's one of many.
11  So we did high volume PCR analysis, which at the
12  time was pretty cutting edge.
13    Q. Cool. All right.
14      And then you talked about -- you had some
15  difficulties getting into medical school; correct?
16    A. That's correct.
17    Q. And eventually --
18    A. In the United States.
19    Q. In the United States.
20      And eventually you attended medical school
21  outside of the United States; correct?
22    A. That is correct.
23    Q. And you attended medical school outside of
24  the United States because of your difficulties
25  getting accepted into a medical school inside the

Page 79
1  United States; correct?
2    A. That is correct. There was 132 medical
3  schools at the time. There's many more now. But
4  yes, that is correct.
5    Q. And you --
6    A. I think I hold the distinction of being
7  rejected by each one not once but twice. I have a
8  binder somewhere with it.
9    Q. You got to get rid of that binder, man.
10    A. Oh, no. No. No.
11    Q. Just --
12    A. It's that --
13    Q. -- move on.
14    A. -- other chip on my other shoulder.
15    Q. I get it, but you got to move on. You
16  know, you got to . . . All right. So there will
17  just be about a few more questions on this
18  subject, and then I'll move on.
19      Is it fair to say that you were not
20  accepted into any medical school inside the
21  United States?
22    A. Not once but twice. Yes. I -- there were
23  many applications. I can't keep track. I might
24  say that in jest. But regardless, there was no
25  MCAT policy at Dominica Ross University School of

Page 80
1  Medicine. I had friends that went, and they were
2  succeeding in their dreams. And my dream was
3  always to be a physician; so I said screw it and I
4  went down there.
5    Q. You did it?
6    A. We did it.
7    Q. And the medical school you attended is
8  located -- or was located in the --
9    A. On the island of Dominica until the island
10  of Dominica got wiped out last year. I think
11  they're in the process of transferring over to
12  Barbados.
13    Q. Okay. And that medical school is not
14  accredited in the United States; correct?
15    A. No.
16      But whatever the -- the certification
17  allows you to take out American student loans for
18  that in paperwork; so they have certain
19  credentials that allows them to do that. And then
20  the resident -- the graduates are allowed to take
21  the full gambit [sic] United States medical
22  license examining 1, 2, all of it. So it's the
23  same thing. So you're allowed to go.
24    Q. I'm going to just ask it again so I can
25  just get the -- the answer to it.

Page 81
1      But the medical school you attended in --
2  on the island of Dominica was not accredited in
3  the United States; correct?
4    A. No. It was not a United States medical
5  school.
6    Q. And it was -- its accreditation came from
7  the Government of Dominica; correct?
8    A. That is correct.
9    Q. Okay. Are you familiar with the Journal
10  -- JAMA or JAMA, Journal of American Medical
11  Association? Are you familiar with JAMA?
12    A. I -- I get a e-mail from them at least a
13  day or -- every day.
14    Q. Is it safe to say that the American
15  Medical Association's medical journal that they
16  put out, JAMA, is reliable among doctors?
17    A. I think it is one of many journals that
18  people read.
19    Q. It -- it's a peer-reviewed medical
20  journal; right?
21    A. Uh-huh.
22    Q. It goes through a peer-review medical
23  process, where doctors and the editing board
24  review the materials submitted to the journal;
25  correct?

Page 82

1 A. That is correct.
2 Q. And while you may not agree with
3 everything that JAMA produces, you do accept that
4 it's a reliable peer-reviewed medical journal in
5 -- amongst doctors that they refer to; correct?
6 A. I do believe people read it. I don't know
7 its impact score; so I don't know how prestigious
8 it is. So -- and that -- isn't that the . . .
9 Q. Yeah. I'm not asking whether --
10 A. Okay.
11 Q. -- it's the best or the worst. I'm saying
12 it's reliable?
13 A. It's an article.
14 Q. Okay. It's an -- it's a peer-reviewed
15 medical journal that's reliable among doctors;
16 correct?
17 A. Uh-huh.
18 Q. Okay.
19 A. That is correct.
20 Q. Has any transvaginal mesh company before
21 working on this case ever asked you to work as an
22 expert?
23 A. Any manufacturer of a transvaginal mesh
24 kit ask me to work on their behalf?
25 Q. Uh-huh.

Page 83

1 A. In two thousand and -- going from my
2 fellowship to this point?
3 Q. Right.
4 A. I was asked. Yes. I was asked to -- to
5 work on behalf of pretty much all of them, and I
6 did not.
7 Q. You were asked to act as a expert witness
8 for --
9 A. Oh. Expert witness. I thought expert
10 utilizing their products. They always said, If
11 you use our products, you can become a teacher,
12 and then you could do this and X, Y, Z. No.
13 It's --
14     MR. WALKER:
15         Your -- your question is in the
16     context of litigation?
17     MR. JONES:
18         Yeah. In the context --
19     THE WITNESS:
20         Well, then no.
21     MR. JONES:
22         -- of litigation.
23     THE WITNESS:
24         No. No one has --
25 BY MR. JONES:

Page 84

1 Q. Prior to your work performed on -- in
2 authoring this Prosima report, a transvaginal
3 mesh -- transvaginal mesh company has never asked
4 you to work as an expert in -- in litigation
5 context?
6 A. That is correct.
7 Q. Has any medical device company ever asked
8 you before your work done in this case to exam --
9 to -- to help them draft the product label
10 associated with their medical device?
11 A. No.
12 Q. Has --
13 A. No.
14 Q. -- any medical device company ever asked
15 you prior to your work on this case to review the
16 adequacy of their product label associated with
17 their medical device?
18 A. No, sir.
19 Q. Has any medical device company prior to
20 this case ever asked you to -- to review the
21 appropriateness of the warnings and adverse events
22 statements associated with a medical device
23 product?
24 A. No, sir.
25 Q. Have you ever -- are you familiar with --

Page 85

1 are you familiar with the industry standards that
2 govern what information as it relates to the
3 safety of medical device is required to be in --
4 in a product label?
5 A. No.
6 Q. Are you familiar with the FDA guidelines?
7 A. In regards to what, if I may ask?
8 Q. On what information should be included in
9 a product label as it relates to the safety
10 performance of that device.
11 A. No. I -- I've never reviewed the mandates
12 from the Food and Drug Administration and how that
13 governs --
14 Q. Have you --
15 A. -- labeling.
16 Q. Have you reviewed internal documents from
17 Ethicon that provide guidance and standards for
18 what information must be included in a product
19 label as it relates to the safety and performance
20 of a medical device?
21 A. I can't recall reading something like
22 that.
23 Q. Are you familiar with failure modes and
24 effects analysis?
25 A. Failure mode analysis?

Page 94

1  Q. Right. Right. And because of that,
2  you're an expert in -- in delivering health care
3  to your patients; correct? That's fair?
4  A. That is fair.
5  Q. You don't consider yourself an expert in
6  what warning statements need to be in a product
7  label for a medical device, though. Is that fair?
8  A. I've never been put in a capacity to do
9  that.
10  Q. Okay. We talked earlier about being sent
11  -- oh, man, I only got ten more minutes -- about
12  being sent patients -- having patients referred to
13  you who will have complications after having
14  transvaginal mesh placed inside their body;
15  correct?
16     Let me ask you: Do you have patients
17  referred to you who have suffered from
18  complications who have had transvaginal mesh
19  previous placed in -- inside their bodies?
20  A. Not only do I get such patients referred
21  by other physicians, other members of the
22  community, I have been solicited by members of the
23  legal community who had promised to send me
24  inordinate amounts of patients to remove mesh.
25  Q. That's not good.

Page 95

1  A. That is not good.
2  Q. And just so --
3  A. I actually reported it to the --
4  Q. Good.
5  A. -- medical director of my hospital.
6  Q. I'm glad you did.
7     And -- and just so we're clear, I never
8  did that, did I?
9  A. No, sir. You --
10  Q. I never --
11  A. -- did not.
12  Q. Okay. Jordan --
13  A. You did not.
14  Q. -- didn't do that either? But -- no.
15  Okay.
16     So you do get patients referred to you by
17  other physicians in other --
18  A. And other patients.
19  Q. -- and other patients who suffer from mesh
20  complications. Is that fair?
21  A. That is correct.
22  Q. And what part of your -- percentage of
23  your current clinical practice relates to treating
24  women who suffer from mesh complications?
25  A. When you say "mesh complications," these

Page 96

1  are people that perceive that their issues relate
2  to a previous implant done by an outside provider.
3  If I myself am the implanting physician, I always
4  tell my patients that they and I are bonded; so
5  please always let me know. But otherwise, what
6  you're saying is -- yes. I evaluate them
7  completely, and we try to come up with a plan to
8  help them address their issues.
9  Q. And you've treated women who have had
10  Ethicon transvaginal mesh products implanted in
11  them and who now suffer from complications;
12  correct?
13     MR. WALKER:
14        Object to form.
15     THE WITNESS:
16        I have dealt with a full component of
17     all of the transvaginal kits, from Elevate
18     to Apogee, Perigee, Pinnacles, homegrown,
19     Prolift. I --
20  BY MR. JONES:
21  Q. Prolift is a -- is a transvaginal mesh
22  device that was formerly marketed by Ethicon;
23  correct?
24  A. That is correct.
25     And I also manage sacrocolpopexy

Page 97

1  complications.
2  Q. How about Prosima? Have you had any
3  Prosima patients?
4  A. I have not personally come across any
5  Prosima complication in the last five -- what year
6  is this? 2018. 2011 . . . So in the last
7  7 years, no Prosima implant patient has been
8  referred to me, nor have I heard of any Prosima
9  patient of mine within the community going to
10  another provider for management of whatever issue
11  that they were having.
12  Q. And Prosima was only available to surgeons
13  for a couple years; correct?
14  A. I think it was the -- some type of
15  corporate decision was made to no longer make it,
16  and I think it dissipated. Because I think that
17  the packaging only had a 4-year shelf life. So I
18  think that when it was introduced maybe in 2009, I
19  think in -- then it was no longer manufactured. I
20  think they stopped making it. That's all they
21  did. And they -- in two thousand and, I think
22  twelve.
23  Q. Yeah. So they launched the device in
24  December 2009, and then in 2012, they -- they
25  ceased selling the device or making the device?

Ahmet Bedestani, M.D.

Page 98

1    A. I think they stopped manufacturing the
2 device, and I think if there was still product
3 somewhere you could get your hands on it.
4    Q. So there's -- so there is a little bit
5 more than a 2-year time period for when Ethicon
6 was actively marketing this device; correct?
7    A. Yes.
8    Q. Okay.
9    A. They were actively --
10    Q. And --
11    A. -- marketing it.
12    Q. And based on your consultant work with
13 Ethicon, you know that this wasn't an entirely
14 successful product for Ethicon; correct?
15       MR. WALKER:
16          Object to form.
17       THE WITNESS:
18          I thought that it was an extremely
19       successful product.
20 BY MR. JONES:
21    Q. Did you -- did you ever -- did you ever --
22 were you ever made aware of how many total Prosima
23 devices were actually ever used in the
24 United States?
25    A. For some odd reason, a number between four

Page 99

1 and 6,000.
2    Q. Okay. That's what you think?
3    A. I think.
4    Q. Okay.
5    A. Am I allowed to ask what the number is, if
6 you know?
7    Q. You can ask Jordan.
8       THE WITNESS:
9          Am I allowed to ask you how many that
10       is -- was? What? You won't tell me?
11       Okay. I --
12       MR. JONES:
13          Yeah.
14       THE WITNESS:
15          -- don't know.
16       MR. JONES:
17          He probably won't tell you.
18 BY MR. JONES:
19    Q. All right. So we've got four to 6,000
20 women out there in the United States with a
21 Prosima device. That's it; correct?
22    A. Maybe more if I'm incorrect.
23    Q. Okay. But if we're assuming you're
24 correct, there's anywhere from four to 6,000 women
25 in total who have received the Prosima device

Page 100

1 inside the United States --
2    A. Uh-huh.
3    Q. -- correct -- if you're correct?
4    A. If I am. I don't know if it's just the
5 United States or worldwide. I -- because it was
6 available worldwide, not just in the
7 United States.
8    Q. All right. I think the way I'm going to
9 finish up is I'm going to ask you about some
10 specific -- some specific internal documents that
11 are pretty noteworthy, where employees inside of
12 Ethicon are discussing Prosima and they're saying
13 things about the device that stand out for sure.
14 I'm pulling up work product from 4 years ago from
15 a Prosima trial. And I'm watching my computer
16 load it right now.
17       MR. WALKER:
18          That -- that wouldn't be the Cavness
19       trial?
20       MR. JONES:
21          It would be.
22       MR. WALKER:
23          How about that?
24       MR. JONES:
25          It would be.

Page 101

1       MR. WALKER:
2          Were you at that trial site?
3       MR. JONES:
4          I was. I was -- I was a -- the person
5       they just keep locked up in the closet the
6       whole time and never let come out, just
7       feed to keep you alive so you can continue
8       to work. That's about it.
9       MR. WALKER:
10          A war room rat --
11       MR. JONES:
12          Yeah.
13       MR. WALKER:
14          -- basically.
15       MR. JONES:
16          Great experience, though.
17 BY MR. JONES:
18    Q. Yeah. So what I'm going to do here,
19 Doctor, I'm going to just pick out some of the
20 internal documents that discuss Prosima. Most of
21 them are from medical directors, some of which we
22 talked about before, like Aaron Kirkemo.
23       MR. WALKER:
24          Are you going to let him look at them
25       on -- on your screen?

Page 106

1  A. If I can come over to your computer
2  screen. And if I --
3  Q. Yeah. It's not --
4  A. If it is --
5  Q. -- going to help you.
6  A. If it is Kirkemo, then obviously I'm an
7  ethical human being. Because I could pull that
8  document out of the gigabytes of stuff that I've
9  looked though.
10  Q. So you do --
11  A. Because that's a powerful statement.
12  Q. Powerful.
13     And you do recall reading statements from
14  Ethicon's medical director, Aaron -- Aaron
15  Kirkemo, telling the company: Don't launch the
16  Prosima device?
17     MR. WALKER:
18        Object to form.
19     THE WITNESS:
20        I don't remember the exact words. But
21     I remember this long e-mail, and he -- I
22     don't know why he dragged BPH into it and
23     uroflow studies. You're smiling because
24     that's a pretty good damn memory that I
25     could do this; right? Because that's how

Page 107

1     much I disagree with him.
2  BY MR. JONES:
3  Q. Okay. But you -- you generally recall
4  seeing documents detailing the negative feedback
5  following the 2009 conference that speak to
6  potentially Aaron Kirkemo's comments; right?
7  A. I definitely --
8     MR. WALKER:
9        Object to form.
10     THE WITNESS:
11        -- can say to this out of all of the
12     documents that I read: I read many
13     positive as well as negative comments
14     regarding Prosima.
15  BY MR. JONES:
16  Q. Did you review the sales brochures
17  associated with the Prosima device?
18  A. Of course I have reviewed them, because I
19  think they were distributed to patients and I want
20  to make sure that it did its job of conveying
21  messages to patients.
22  Q. Were there any -- in your review of the
23  brochures associated with the Prosima device that
24  Ethicon used, did you notice any statements that
25  appeared to you to be misleading?

Page 108

1     MR. WALKER:
2        Object to form.
3     THE WITNESS:
4        I -- if I -- upon -- I would have to
5     review the information once again. But I
6     don't think that I had a problem with it.
7     If I had -- if I utilized the -- it, I
8     don't think that it would have represented
9     any type of misinformation. But I think
10     that such a pamphlet is just but one
11     component of truly educating a patient so
12     that they could make proper decisions of
13     their health care.
14  BY MR. JONES:
15  Q. Do you know who Martin -- Dr. Martin
16  Weisberg is?
17  A. I do not know who Dr. Martin Weisberg is.
18  Q. Did you stop using Prosima before or after
19  Ethicon ceased marketing the device?
20  A. I think that it -- cessation of -- of
21  Prosima utilization occurred in 2011; so I think
22  whenever they actively stopped marketing it. I
23  don't think that has a bearing as -- you know, if
24  that lines up with what -- in 2011, then that was
25  it.

Page 109

1  Q. Okay. I'm -- I'm just asking.
2     Did you stop using it because Ethicon
3  stopped selling it, or did you stop using it
4  before Ethicon stopped selling it?
5  A. I stopped using it before Ethicon stopped
6  selling it.
7  Q. Okay. Why was that?
8  A. Because I wasn't really practicing at the
9  time.
10  Q. Okay.
11  A. And by the time that I restarted my own
12  practice at East Jefferson Hospital, I don't think
13  the environment was conducive to utilizing
14  transvaginal mesh at that time. Because that was
15  after the FDA notice.
16  Q. Sure.
17     MR. JONES:
18        Those are all the questions I have.
19     Thanks for your time today, Doctor.
20     THE WITNESS:
21        Thank you, sir.
22     MR. WALKER:
23        I have just a couple of follow-up
24     questions.
25  BY MR. WALKER:

Page 110

1  Q. Doctor, do you remember being asked some
2 questions about the AUGS position statement?
3  A. Yes.
4  Q. And specifically you were asked questions
5 about the AUGS statement regarding the efficacy of
6 mesh in the posterior compartment.
7      Do you remember that?
8  A. Yes.
9  Q. Why do you disagree with AUGS' statement
10 regarding the efficacy of mesh augmentation in the
11 posterior compartment?
12  A. In my -- I simply did not see such a
13 degradation and repair. I did not -- and I truly
14 felt that a native tissue repair in posterior
15 compartment is basically a nonfunctional approach,
16 that graft augmentation in the posterior
17 compartment is vital to a successful repair if
18 done appropriately.
19  Q. And you -- you say "if done
20 appropriately."
21      From your experience and your review of
22 the literature, if a skilled surgeon is placing a
23 posterior mesh, is that likely to result in a
24 greater benefit to the patient than a native
25 tissue repair?

Page 111

1  A. I believe graft augmentation delivered to
2 the appropriate surgical plane utilizing the
3 appropriate fixation points represents a true and
4 utter benefit to the patient. Yes.
5  Q. I made a note early in the deposition.
6 You were asked some questions about your
7 professional education involvement with Ethicon
8 and the numerous cadaver studies that you
9 participated in.
10      Why is the study of cadavers important to
11 your education and professional development?
12  A. The cadavers were not donated to me as a
13 thank you or anything from Ethicon. These
14 cadavers were provided so that surgeons -- after
15 didactics and education, mentoring by more
16 experienced surgeons, passes were done. And then
17 passes were done in nondissected and dissected
18 portions of these cadavers so people could learn
19 how to do these procedures properly. When
20 everything was said and done and everybody was
21 going to the dinner or going back home, I was able
22 to stay and really take inventory of deep
23 dissection of these structures. So I found it to
24 be invaluable. So . . . before these were then
25 properly dealt with.

Page 112

1  Q. You were asked a number of questions
2 regarding the stiffness of mesh, density, pore
3 size.
4      Do you recall those questions?
5  A. I do.
6  Q. And, Doctor, you would agree that you are
7 here today in part because you are holding
8 yourself out as an expert in the biocompatibility
9 of mesh, specifically the Prosima mesh product;
10 correct?
11  A. That is correct. I hold myself as a
12 expert when it comes to Prosima and the
13 application of its technology.
14  Q. And that would include the -- the mesh in
15 Prosima and the construction of that mesh;
16 correct?
17  A. I hold --
18     MR. JONES:
19        Objection.
20     THE WITNESS:
21        -- myself in knowing a substantial
22     amount of knowledge based on all my
23     education, self-study, experience with all
24     the different platforms, and these
25     cadaveric dissections.

Page 113

1 BY MR. WALKER:
2  Q. And, Doctor, you recall you were asked
3 some questions about the warnings associated with
4 product labeling.
5      Do you recall --
6  A. Uh-huh.
7  Q. -- that?
8      As a pelvic floor surgeon, do you agree
9 that you are an expert in assessing the potential
10 risks and complications associated with pelvic
11 floor surgery?
12     MR. JONES:
13        Another objection.
14     THE WITNESS:
15        I completely hold myself in a position
16     to judge the application of technology
17     when it comes to the realm of pelvic
18     surgery. That is correct.
19 BY MR. WALKER:
20  Q. And that would include understanding and
21 being knowledgeable about the potential adverse
22 events that could happen following a prolapse
23 repair surgery, for example?
24     MR. JONES:
25        Objection.

Ahmet Bedestani, M.D.

| Page 114 | Page 116 |
|---|---|
| 1  THE WITNESS:<br>2     I think any ethical surgeon who takes<br>3  a human being to the operating room with<br>4  the hopes of making them better learns<br>5  from each and every individual case.  Now<br>6  I'm not trying to sound like a<br>7  cheerleader.  So any type of positive<br>8  should be noted, and more importantly, any<br>9  type of negative should be noted.  And you<br>10 take and you learn from each.<br>11    Going back to the cadavers.  Learning<br>12 that anatomy in real life, I have to<br>13 stress once again the invaluable nature.<br>14 Because transvaginal surgery is not so<br>15 easy.  You're operating through very<br>16 confined spaces.  And I'm not trying to<br>17 say anything with regard to certain<br>18 skills.  But really being able to open up<br>19 that -- these very confined spaces was<br>20 extremely beneficial in learning how these<br>21 grafts would work, where they were going,<br>22 and also as a basis of further<br>23 understanding as a professional developing<br>24 in pelvic surgery.  I don't know what else<br>25 to say about that. | 1  doctor's CV.<br>2     (Exhibit No. 6 was marked for<br>3  identification and attached hereto.)<br>4  MR. JONES:<br>5     And then . . .<br>6  MR. WALKER:<br>7     And if you want to mark his report, I<br>8  have that as well.<br>9  MR. JONES:<br>10    Yeah.  And then the next exhibit --<br>11 because I already lost count --<br>12 Exhibit 7ish --<br>13 MR. WALKER:<br>14    I think it's 7.<br>15 MR. JONES:<br>16    -- will be the report of the doctor in<br>17 this case.  Just -- and then --<br>18 MR. WALKER:<br>19    That's just three copies of the same<br>20 report.<br>21 MR. JONES:<br>22    Okay.  And -- and then do you have any<br>23 objection to me e-mailing for the record<br>24 to the court reporter the -- the<br>25 electronic copy of the report that |

| Page 115 | Page 117 |
|---|---|
| 1  MR. WALKER:<br>2     That's all I have.  Thank you for your<br>3  time.<br>4  THE WITNESS:<br>5     All right.  Thank you.<br>6  MR. JONES:<br>7     A few housecleaning issues.<br>8     Do you have any objection to me<br>9  e-mailing the notice of deposition to the<br>10 court reporter after the deposition?<br>11 Unless you have a copy.<br>12 MR. WALKER:<br>13    I have a copy.<br>14 MR. JONES:<br>15    Easy.  I would like to mark for the<br>16 record the deposition notice as Exhibit<br>17 No. 5.<br>18 (Exhibit No. 5 was marked for<br>19 identification and attached hereto.)<br>20 MR. WALKER:<br>21    And you -- you didn't mark it.  But if<br>22 you want, I also have his CV.  I don't<br>23 know . . .<br>24 MR. JONES:<br>25    Let's do it.  Exhibit 6 will be the | 1  includes all like the -- the reliance list<br>2  and the PowerPoint stuff?<br>3  MR. WALKER:<br>4     I -- I don't.  I do have a hard copy<br>5  of the slide deck that was attached to his<br>6  report, if you want to go ahead and just<br>7  mark the hard copy.<br>8  THE WITNESS:<br>9     I thought he gave -- you gave it to<br>10 him already?<br>11 MR. JONES:<br>12    Yeah.  You did.<br>13 MR. WALKER:<br>14    You already --<br>15 MR. JONES:<br>16    Did I mark it earlier?  Whatever.  If<br>17 I --<br>18 MR. WALKER:<br>19    Okay.<br>20 MR. JONES:<br>21    -- marked it earlier, I marked it.<br>22 MR. WALKER:<br>23    Here (tenders document).<br>24 MR. JONES:<br>25    If not, I would like to add that to -- |

|  | Page 118 |  | Page 120 |
|---|---|---|---|
| 1 | MR. WALKER: | 1 | Civil Procedure Article 1434 and in rules and |
| 2 | But no objection. | 2 | advisory opinions of the board; that I have no |
| 3 | MR. JONES: | 3 | actual knowledge of any prohibited employment or |
| 4 | -- Exhibit 7. | 4 | contractual relationship, direct or indirect, |
| 5 | THE WITNESS: | 5 | between a court reporting firm and any party |
| 6 | I think you have it.  Yeah. | 6 | litigant in this matter nor is there any such |
| 7 | MR. JONES: | 7 | relationship between myself and a party litigant |
| 8 | I don't want to take it with me. | 8 | in this matter.  I am not related to counsel or to |
| 9 | So . . . All right.  That's it.  Thanks, | 9 | the parties herein, nor am I otherwise interested |
| 10 | guys. | 10 | in the outcome of this matter. |
| 11 | MR. WALKER: | 11 | |
| 12 | All right. | 12 | |
| 13 | THE WITNESS: | 13 | |
| 14 | Thank you, sir. | 14 | |
| 15 | MR. WALKER: | 15 | AURORA M. PERRIEN, CCR, RPR |
| 16 | We're off the record. | 16 | |
| 17 | (The proceedings concluded at 2:18 p.m.) | 17 | |
| 18 | | 18 | |
| 19 | | 19 | |
| 20 | | 20 | |
| 21 | | 21 | |
| 22 | | 22 | |
| 23 | | 23 | |
| 24 | | 24 | |
| 25 | | 25 | |

|  | Page 119 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | This certification is valid only for |
| 3 | a transcript accompanied by my original signature |
| 4 | and original seal on this page. |
| 5 | I, AURORA M. PERRIEN, Registered Professional |
| 6 | Reporter, Certified Court Reporter, in and for the |
| 7 | State of Louisiana, as the officer before whom |
| 8 | this testimony was taken, do hereby certify that |
| 9 | AHMET BEDESTANI, M.D., after having been duly |
| 10 | sworn by me upon the authority of R.S. 37:2554, |
| 11 | did testify as hereinbefore set forth in the |
| 12 | foregoing 118 pages; that this testimony was |
| 13 | reported by me in the stenotype reporting method, |
| 14 | was prepared and transcribed by me or under my |
| 15 | personal direction and supervision, and is a true |
| 16 | and correct transcript to the best of my ability |
| 17 | and understanding; that the transcript has been |
| 18 | prepared in compliance with transcript format |
| 19 | guidelines required by statute or by rules of the |
| 20 | board; and that I am informed about the complete |
| 21 | arrangement, financial or otherwise, with the |
| 22 | person or entity making arrangements for |
| 23 | deposition services; that I have acted in |
| 24 | compliance with the prohibition on contractual |
| 25 | relationships, as defined by Louisiana Code of |