# EXHIBIT 1

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                        -  -  -

    IN RE:                          :SUPERIOR COURT OF
 2  PELVIC MESH/GYNECARE            :NEW JERSEY
    LITIGATION                      :LAW DIVISION -
 3                                  :ATLANTIC COUNTY
                                    :MASTER CASE 6341-10
 4                                  :CASE NO. 291 CT
                                    :
 5                                  :Civil Action
 6     CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 7                      CONFIDENTIALITY
 8      EXPERT WITNESS TESTIMONY OF MILES MURPHY, M.D.
 9                        -  -  -
10                  November 30, 2012
11                        -  -  -
12              Videotaped deposition of MILES MURPHY,
13  M.D., held at BUTLER SNOW, 500 Office Center Drive,
14  Suite 400, Blue Bell Conference Room, Fort Washington,
15  Pennsylvania, commencing at approximately 9:43 a.m.,
16  before Margaret M. Reihl, a Certified Realtime
17  Reporter, Certified Court Reporter and Notary Public
18  for the State of New Jersey and Commonwealth of
19  Pennsylvania.
20
21
22
              GOLKOW TECHNOLOGIES, INC.
23        877.370.3377 ph|917.591.5672 fax
                 deps@golkow.com
24
25
```

**Page 2**

```
 1  A P P E A R A N C E S :
 2
    MAZIE SLATER KATZ & FREEMAN, LLC
 3  BY:  ADAM M. SLATER, ESQUIRE
    103 Eisenhower Parkway
 4  2nd Floor
    Roseland, New Jersey 07068
 5  (973) 228-9898
    aslater@mskf.net
 6  Representing the Plaintiffs
 7
    BUTLER, SNOW, OMARA, STEVENS & CANNADA, PLLC
 8  BY:  NILS B. (BURT) SNELL, ESQUIRE
    500 Office Center Drive, Suite 400
 9  Fort Washington, Pennsylvania  19034
    (267) 513-1884
10  burt.snell@butlersnow.com
    Representing Johnson & Johnson and Ethicon
11  (and the witness)
12              – – –
13  Also Present:    SILLS CUMMIS & GROSS, P.C.
                BY:  ROBERTA L. BARNES, BSN, RN, LNC
14              The Legal Center, One Riverfront Plaza
                Newark, New Jersey  07102
15              (973) 643-7000
16              David Lane, Videographer
                Golkow Technologies
17              – – –
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1           I N D E X
 2  Witness                        PAGE
 3  MILES MURPHY, M.D.
        By Mr. Slater         9, 536
 4      By Mr. Snell          518
 5          – – –
 6  MURPHY DEPOSITION EXHIBITS            MARKED
 7  No. 1    General Report of Miles Murphy, MD    11
 8  No. 2    Supplemental Ethicon Expert Report of
             Miles Murphy, MD        79
 9
    No. 3    Prolift RCT Advisory Board 21/22 March
10           2006
             [ETH.MESH.05537956 through 05357973]   276
11
    No. 4    Article, Clinical Practice guidelines on
12           Vaginal Graft Use from the Society of
             Gynecologic Surgeons       307
13
    No. 5    Article, Vaginal Prolapse Repair
14           Suture Repair Versus mesh Augmentation:
             A Urogynecology Perspective     381
15
    No. 6    Article, Predicting Treatment Choice for
16           Patients With Pelvic Organ Prolapse   389
17  No. 7    Article, Transvaginal mesh repair of
             anterior and posterior vaginal wall
18           prolapse:  A clinical and
             ultrasonographic study        411
19
    No. 8    Deposition of Vincent R. Lucente, MD
20           taken November 2, 2012        546
21          – – –
22
23
24
25
```

**Page 4**

```
 1  PREVIOUSLY MARKED EXHIBITS
 2  No. 240  E-mail string, top one dated 12/15/08
             [ETH.MESH.00067354 through 67363]   286
 3
    No. 420  Gynecare Prolift, Total Pelvic Floor
 4           Repair System
             [ETH.MESH.02341522 through 02341527]   365
 5
    No. 451  US FDA Medical Devices, FDA Safety
 6           Communication:  UPDATE on Serious
             Complications Associated with
 7           Transvaginal Placement of Surgical
             Mesh for Pelvic Organ Prolapse     478
 8
    No. 665  Article, Perioperative Morbidity Using
 9           Transvaginal Mesh in Pelvic Organ
             Prolapse Repair
10           [ETH-02277 through 02282]      426
11  No. 760  Article, Complications from vaginal
             placed mesh in pelvic reconstructive
12           surgery               439
13  No. 895  Title Page, Short-Term Results of the
             Prolift Procedure in 349 Patients Used
14           in the Treatment of Pelvic Organ Prolapse
             [ETH-02683 through 02696]      176
15
    No. 899  E-mail string, top one dated 1/21/10
16           [ETH.MESH.00851319 through 00851321]   163
17  No. 935  Brochure, "Get the Facts, Be Informed,
             Make YOUR Best Decision"       449
18
    No. 1208  Slide deck, Outcome Incidence: A
19           Retrospective Series of Over 1000
             Patients Following Transvaginal Mesh
20           Surgery for Pelvic Organ Prolapse   499
21  No. 1215  Article, Time to rethink:  An evidence-based
             response from pelvic surgeons to the FDA
22           Safety Communication:  "UPDATE on Serious
             Complications Associated with Transvaginal
23           Placement of Surgical Mesh for Pelvic
             Organ Prolapse"             492
24
    No. 1216  Article, One-year anatomic and quality-of-life
25           outcomes after the Prolift procedure for
```

**Page 5**

```
 1
    No. 1217  Article, Vaginal Hysterectomy at the Time
 2           of Transvaginal Mesh Placement    174
 3  No. 1271  Slide deck, Mesh shrinkage:  How to
             assess, how to prevent, how to manage?  474
 4
    No. 2002  Notes from Meeting with Dr. V Lucente and
 5           Dr. M Murphy (Allentown, PA) to discuss
             Prolift RCT 02 February 2006
 6           [ETH.MESH.01782783 through 01782785]   243
 7  No. 3008  Article, Safety of Trans Vaginal Mesh
             procedure:  Retrospective study of
 8           684 patients               392
 9          – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1          DEPOSITION SUPPORT INDEX
 2                  - - -
 3     Directions to Witness Not to Answer
 4           Page    Line
 5
 6
 7                  _ _ _
 8     Request for Production of Documents
 9           Page    Line
10
11
12                  - - -
13          Stipulations
14           Page    Line
15
16
17                  - - -
18          Question Marked
19           Page    Line
20           235     17
             363     25
21
22                  - - -
23
24
25
```

Page 8

```
 1          CONFIDENTIAL DESIGNATION INDEX
 2                  - - -
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1          CONFIDENTIAL DESIGNATION INDEX
                    - - -
 2     PAGE 163 LINE 2  THROUGH PAGE 163 LINE 20
 3     PAGE 164 LINE 2  THROUGH PAGE 165 LINE 20
 4     PAGE 211 LINE 22 THROUGH PAGE 212 LINE 1
 5     PAGE 212 LINE 10 THROUGH PAGE 212 LINE 14
 6     PAGE 243 LINE 18 THROUGH PAGE 244 LINE 15
 7     PAGE 252 LINE 21 THROUGH PAGE 253 LINE 18
 8     PAGE 254 LINE 4  TRHOUGH PAGE 254 LINE 24
 9     PAGE 256 LINE 9  THROUGH PAGE 256 LINE 11
10     PAGE 272 LINE 10 THROUGH PAGE 272 LINE 19
11     PAGE 273 LINE 10 THROUGH PAGE 274 LINE 23
12     PAGE 275 LINE 19 THROUGH PAGE 276 LINE 13
13     PAGE 276 LINE 19 THROUGH PAGE 284 LINE 12
14     PAGE 284 LINE 19 THROUGH PAGE 286 LINE 14
15     PAGE 547 LINE 16 THROUGH PAGE 548 LINE 15
16
17
18
19
20
21
22
23
24
25
```

Page 9

```
 1          THE VIDEOGRAPHER:  We're now on the
 2     record.  My name is David Lane.  I'm the videographer
 3     for Golkow Technologies.  Today's date is
 4     November 30th, 2012.  The time on the monitor is
 5     9:43 a.m.  This video deposition is taking place in
 6     Fort Washington, Pennsylvania in regard to pelvic
 7     mesh.  The deponent today is Dr. Miles Murphy.
 8     Counsel will be noted on the stenographic record.
 9          The court reporter today is Peg Reihl
10     and will now swear in the witness.
11          ... MILES MURPHY, M.D., having been
12          duly sworn as a witness, was examined and
13          testified as follows ...
14          THE VIDEOGRAPHER:  Please begin.
15          MR. SLATER:  Did we place our
16     appearances on the record yet?
17          THE VIDEOGRAPHER:  Stenographic.
18          MR. SLATER:  Oh, you did it.  Okay,
19     great.
20     BY MR. SLATER:
21     Q.   Good morning, Dr. Murphy.
22     A.   Good morning.
23     Q.   Just to introduce myself to you, I'm Adam
24     Slater.  I'm here to take your deposition.
25          You understand that's why you're here,
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 10

1 right?

2    A. Yes.

3    Q. You understand you're under oath now and

4 have to tell the truth in response to every single

5 question I ask you today?

6    A. Yes.

7    Q. If there's a question I ask you that you

8 don't understand for any reason, please tell me that

9 and I'll reask the question, okay?

10    A. Okay.

11    Q. If there's something that's unclear, you

12 maybe have to explain to me what it is that I'm not

13 making clear to you, but, ultimately, you can explain

14 to me what's unclear, and we'll get to the bottom of

15 it and we'll get a responsive answer, okay?

16    A. Okay.

17    Q. Otherwise, if you just answer the question,

18 we're going to assume you understood it and you were

19 doing your best to answer as truthfully and accurately

20 as you possibly could, okay?

21    A. Sounds good.

22    Q. If counsel objects, he'll be objecting to

23 the form of the question. He won't be giving you any

24 signals of what to do. He won't be trying to signal

25 you whether or not to answer a question responsively.

Page 11

1 That would be improper under the court rules in the

2 State of New Jersey, which governs this deposition.

3 But he is allowed to object. Let him make his

4 objection and then I cannot really imagine a situation

5 where you wouldn't go ahead and answer the question,

6 okay.

7    A. Okay.

8    MR. SLATER: You have stickers there,

9 please. Thanks a lot.

10    (Document marked for identification

11    as Murphy Deposition Exhibit No. 1.)

12 BY MR. SLATER:

13    Q. I'm going to hand you an exhibit that we've

14 marked as Murphy-1.

15    Is that the first report you wrote in this

16 case?

17    A. Yes.

18    Q. Does it have attached to it your Curriculum

19 Vitae?

20    A. Yes.

21    Q. Now, it has attached to it -- well,

22 actually, let me start over.

23    The report itself is 30 pages long, correct?

24    A. I have to look at it.

25    Q. I'm going to rephrase the question.

Page 12

1    Here in Exhibit Murphy-1, the start of the

2 exhibit is your report, your first report in this

3 case, correct?

4    A. I don't -- I guess I don't know exactly what

5 you mean by my first.

6    Q. You've written two reports in this case that

7 I've seen.

8    Are you aware of having written more than

9 two reports?

10    A. I just thought you might mean like a draft,

11 like I didn't write it all at once, I didn't sit down

12 and write it all at once.

13    Q. No, and I'm actually not interested in your

14 drafts, just like the defense wouldn't be interested

15 in drafts written by plaintiff experts. Court rules

16 say we're not supposed to ask about that. So I'll

17 start over.

18    Here in Exhibit Murphy-1, the first 30 pages

19 is the first report that you authored in this

20 litigation as an expert witness for Ethicon and

21 Johnson & Johnson, correct?

22    A. Correct.

23    Q. And on Page 31 it says that your

24 compensation is $400 an hour.

25    That's what you're charging in this case?

Page 13

1    A. Yes.

2    Q. Then it says in the past four years you gave

3 expert testimony in only one case where the

4 plaintiff's name was Neff, N-e-f-f, and the defendant

5 was Collins, C-o-l-l-i-n-s, in Lycoming,

6 L-y-c-o-m-i-n-g, County, Pennsylvania in 2009.

7    A. That was to the best of my recollection,

8 yes.

9    Q. When you say that you gave expert testimony

10 in that case, you mean you actually testified in

11 court?

12    A. Correct.

13    Q. Have you acted as an expert in any other

14 matters besides the Neff case?

15    A. Yes.

16    Q. In your career?

17    A. Yes.

18    Q. Okay. How many times?

19    A. I believe three other times, and I testified

20 once in New Jersey early in my career. I testified

21 once in Allentown, Pennsylvania. Those are the only

22 times I recall testifying in court.

23    Q. What were the other -- well, let's start

24 with Neff.

25    What was the subject matter of the Neff

Confidential - Subject to Stipulation and Order of Confidentiality

Page 14

1 case?

2 A. If I recall, it was an injured ureter in a

3 hysterectomy case.

4 Q. Medical malpractice case?

5 A. Correct.

6 Q. Who were you the expert for?

7 A. The defendant.

8 Q. In the other cases you've been an expert in,

9 have they been medical malpractice cases?

10 A. Yes.

11 Q. Were you the expert for the defendant in

12 each of those cases?

13 A. Yes.

14 Q. Have you ever been the expert for a

15 plaintiff in any litigated matter?

16 A. No.

17 Q. Have you ever been asked to look at a matter

18 on behalf of a plaintiff, to review it, to see if you

19 could act as an expert?

20 A. Maybe once. I don't recall for sure.

21 Q. The one that you're saying maybe once, was

22 there a matter you looked at and said you couldn't act

23 as the expert for some reason?

24 A. Yeah, I certainly didn't say yes, I could

25 act as the expert because I think I would have then

Page 15

1 proceeded.

2 Q. Have any of the cases in which you've acted

3 as an expert witness in the past involved the

4 implantation of mesh for any sort of a pelvic

5 condition?

6 A. Not that I recall.

7 Q. They basically dealt with general

8 gynecologic treatment and surgery?

9 A. Yes. I recall two of them specifically, if

10 you'd like me to tell you.

11 Q. Sure. What were the two that you --

12 A. One was a laparoscopic reconstructive

13 surgery without mesh, and one was simply a

14 laparoscopic injury at the time of various needle

15 placement.

16 Q. Are you familiar with the concept of medical

17 judgement?

18 MR. SNELL: Objection.

19 THE WITNESS: Yes.

20 BY MR. SLATER:

21 Q. What's your understanding of what that

22 means?

23 A. I think if I understand medical judgement,

24 it's giving the -- giving my opinion to a reasonable

25 degree of medical certainty.

Page 16

1 Q. Do you have an understanding that when

2 physicians treat patients, they make decisions and

3 exercise their medical judgement in deciding what to

4 recommend to a patient, how to treat the patient,

5 those types of things?

6 A. Yes.

7 Q. Do you have an understanding that when a

8 surgeon performs an operation, for example, a Prolift®

9 procedure, that the surgeon during the procedure will

10 be exercising his or her medical or surgical judgement

11 in making decisions on how to perform the procedure

12 during the actual operation?

13 A. That sounds reasonable as a definition.

14 Q. It's certainly something that the physicians

15 that you're familiar with do, right?

16 A. Correct.

17 Q. Something you do when you perform

18 procedures, correct?

19 A. Correct.

20 Q. Something you did when you performed

21 Prolift® procedures, correct?

22 A. Correct.

23 Q. And, essentially, you have the Prolift®

24 procedure, which is a template, and then you have to

25 exercise your judgement in evaluating the particular

Page 17

1 patient and how you're going to actually, for example,

2 trim the mesh and implant the mesh, correct?

3 MR. SNELL: Object to the form.

4 THE WITNESS: Correct.

5 MR. SLATER: What is your objection?

6 MR. SNELL: Template, I'm not sure what

7 you mean by template.

8 MR. SLATER: You don't know what the

9 word template means, counsel; is that what you're

10 saying in good faith on this record?

11 MR. SNELL: Yes, as to the Prolift® as

12 a template.

13 BY MR. SLATER:

14 Q. Okay. You understood what I meant, right?

15 A. I think I did.

16 Q. Let's go back to your Exhibit Murphy-1.

17 Page 32 is a bibliography. What does that

18 bibliography represent? It goes from Page 32 to 38.

19 What does that represent?

20 A. It represents the resources that I used in

21 drafting my report.

22 Q. After the bibli -- well, rephrase.

23 When you say the resources you used in

24 drafting your report, what do you mean by that?

25 A. Meaning that when I wrote the report, most

Confidential - Subject to Stipulation and Order of Confidentiality

Page 18

1 of the opinion, most of the body of the report is
2 based on scientific data, published data and whenever
3 I used, for instance, a paper that had been published,
4 I referenced that in the report.
5     Q.  So whatever clinical data you relied on in
6 writing your report is found in the bibliography?
7     A.  No.
8     Q.  Well, besides what's referenced in the
9 bibliography, what other clinical data did you rely on
10 in forming your opinions in this case?
11    A.  My own medical experience, my own clinical
12 experience and that of my colleagues.
13    Q.  To the extent that clinical or medical data
14 is published someplace and you relied on it to some
15 extent in forming your opinions, is it listed in the
16 bibliography?
17    A.  For this first report, yes.
18    Q.  At the time you wrote and signed your first
19 report, which is Murphy-1, the published or documented
20 clinical data that you were relying on was listed in
21 the bibliography from Page 32 to 38, correct?
22        MR. SNELL:  Objection, form.
23        THE WITNESS:  That was a pretty long
24 question, but I think the answer is yes.
25 BY MR. SLATER:

Page 19

1     Q.  Okay.  Well, what I was saying is at the
2 time you formed your opinions that are set forth in
3 Murphy-1, the first report you authored, to the extent
4 that you relied on data that is actually published,
5 actually documented, are those sources of data listed
6 in the bibliography?
7     A.  The ones that I specifically referenced are
8 in the bibliography.  It doesn't mean that I may not
9 have read something else in my life, in my last eight
10 and a half years of practice and used that in forming
11 my opinions, but when I specifically, for instance,
12 quote a paper, I put it in my bibliography.
13    Q.  You understand one of the purposes of
14 writing your report is to give notice to myself and
15 other attorneys as to what your opinions are and what
16 you relied on in forming those opinions, correct?
17    A.  Right.
18    Q.  You understood that, right?
19    A.  I understand that generally you don't want
20 to be surprised at court if I, all of the sudden, want
21 to reference something and I haven't mentioned it
22 before.
23    Q.  Well, not just generally, but you understand
24 that the court rules actually say that if you're going
25 to rely on something, you're supposed to actually

Page 20

1 disclose what you relied on in forming your opinions;
2 did you understand that when you authored this report?
3     A.  I think so.  I'm not a lawyer but --
4     Q.  When you wrote this report and you attached
5 this bibliography to it --
6     A.  Yes.
7     Q.  -- did you intend to give notice to myself
8 and other people in this case as to what published or
9 documented clinical data you were relying on in
10 forming your opinions in the report?
11        MR. SNELL:  Objection, go ahead.
12        THE WITNESS:  When I wrote the report
13 and compiled the bibliography, I wanted to make sure
14 that if there was important literature that I wanted
15 to reference in my report that I included in the
16 bibliography.  That was my main purpose of doing the
17 bibliography.
18 BY MR. SLATER:
19    Q.  So at the time that you wrote the report,
20 any literature that was -- rephrase.
21        So at the time you wrote this report and
22 signed it, any published data, clinical data that you
23 felt was important to you in forming your opinions,
24 you listed in the bibliography?
25        MR. SNELL:  Objection, form.

Page 21

1        THE WITNESS:  Not necessarily.  I
2 simply --
3 BY MR. SLATER:
4     Q.  Well, tell me.
5     A.  Those were the ones that I used when I wrote
6 the report.
7     Q.  Well, is there something that you relied on
8 that is published data at the time you wrote this
9 report that's not listed in the bibliography that you
10 can point to right now?
11    A.  That I relied on in actually writing this
12 version of the report.
13    Q.  Yes.
14    A.  I can't point to anything like that right
15 now.
16    Q.  Okay.  After the bibliography there is a
17 section titled "Additional List of Materials - Miles
18 Murphy, M.D."
19        Do you see that?
20    A.  Yes.
21    Q.  What does that list represent?
22    A.  That represents additional material that I
23 thought we might want to be able to reference in my
24 testimony on this case.
25    Q.  Did you review all of the materials listed

Confidential - Subject to Stipulation and Order of Confidentiality

Page 22

1  on this list of additional materials before you signed
2  that report?
3      A.  Briefly, yes.
4      Q.  When you say "briefly," what do you mean?
5      A.  I looked at them.
6      Q.  Well, when you say "looked at them," for
7  example, there could be a deposition transcript, and
8  I'll take an example from this additional list of
9  materials.  There's the deposition transcript of
10  exhibits of Piet Hinoul, P-i-e-t H-i-n-o-u-l, listed.
11          Did you read that entire transcript and
12  exhibits?
13      A.  No, I did not.  That's a very long --
14  there's a couple volumes of that, but I had certainly
15  reviewed it.
16      Q.  Well, when you say you reviewed it, what
17  does that mean?
18      A.  I read some of it.
19      Q.  How many pages of it did you read?
20      A.  I don't recall.
21      Q.  Did you read more than ten pages of that
22  deposition?
23      A.  Yes.
24      Q.  But you can't tell me beyond that what you
25  specifically read?

Page 23

1      A.  I can remember some of the things that I
2  read in it.
3      Q.  Well, was there -- well, we'll come back to
4  that.
5          Did you read -- it says -- rephrase it.
6          It says Jessica Shen, deposition transcript
7  with exhibits.
8          Did you read the entire deposition and
9  exhibits?
10      A.  No.
11      Q.  It says Judi Gauld, deposition transcript
12  with exhibits.
13          Did you read the entire deposition and
14  exhibits?
15      A.  I did not.
16      Q.  It says David Robinson, deposition
17  transcript with exhibits.
18          Did you read the entire deposition and read
19  all the exhibits?
20      A.  No.
21      Q.  And with regard to Jessica Shen, Piet
22  Hinoul, Judi Gauld and David Robinson's deposition
23  transcripts that are listed here, did you actually
24  watch the videos of their depositions?
25      A.  No.

Page 24

1      Q.  Didn't see any of those videos, correct?
2      A.  Correct.
3      Q.  Have you seen the video of anyone's
4  deposition that's ever been taken in this case?
5      A.  No.
6      Q.  Did you ever ask to see any of the videos of
7  the actual deposition testimony of any witness in this
8  case?
9      A.  No.
10      Q.  In writing the report, which we marked as
11  Murphy-1 -- well, rephrase.
12          This list of additional materials, are these
13  basically other materials that you wanted to list in
14  case you wanted to mention them during trial so you
15  could say, hey, you know that I listed them; is that
16  basically the purpose?
17          MR. SNELL:  Object to form.  Go ahead.
18          THE WITNESS:  I think that's a fair
19  assessment because from the time I drafted my report,
20  there were a lot of depositions and your -- you know,
21  the plaintiffs' expert had referenced things, and I
22  wanted to make sure that I could reference other
23  things as well.
24  BY MR. SLATER:
25      Q.  Okay.  Is it fair to say that at the time

Page 25

1  you wrote your first report, which is Murphy-1, you
2  had not read all of the materials listed on the
3  list -- additional list of materials?
4      A.  Yes.
5      Q.  Is it fair to say you did not rely on all
6  the materials listed in the additional list of
7  materials when you actually formed your opinions?
8      A.  I would say that I didn't rely on all of
9  them, but it's very likely that I would have read some
10  of the other additional materials, just not quoted
11  them in my bibliography.
12      Q.  When you wrote your report, you set forth
13  opinions, and I'm talking about your first report,
14  Murphy-1, you set forth certain opinions in the
15  report, correct?
16      A.  Correct.
17      Q.  Were those all of the opinions you had
18  formed with regard to this litigation at the time that
19  you authored that report?
20      A.  I don't know that I -- I mean, I have lots
21  of opinions about this case.  I don't know that every
22  single solitary one was listed in the report.
23      Q.  You understood that one of the purposes of
24  your report was to give notice to attorneys in the
25  litigation like myself of what your opinions were,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 26

1  correct?

2      A.  Correct.

3      Q.  Okay.  Did you endeavor, when you wrote this

4  report, to list each of the opinions that you had

5  formed at the time that you authored the report; was

6  that your goal?

7      A.  My goal was simply to write a report that

8  reflected my views of Prolift® in this case.

9      Q.  Okay.  And the opinions set forth in your

10  first report, Murphy-1, accomplished that, from your

11  perspective?

12      A.  I think so, but I think that in looking at

13  other people's depositions, there may have been things

14  that they covered that I didn't think were necessarily

15  essential to cover in my first report and, therefore,

16  wanted to have some supplemental material later on.

17      Q.  At the time that you authored your first

18  report --

19      A.  Yes.

20      Q.  -- the day that you put your signature, your

21  electronic signature on there, typed your name in, did

22  that represent the opinions you had formed as of that

23  point in time with regard to this litigation?

24          MR. SNELL:  Objection, form.

25          THE WITNESS:  Yes.

Page 27

1  BY MR. SLATER:

2      Q.  In the report you listed many facts from

3  various sources of information that you referred to in

4  the report, correct?

5      A.  Yes.

6      Q.  Did you, in writing the report, attempt to

7  list those facts that you felt were most important to

8  you in forming your opinions as set forth in the

9  report?

10      A.  I think that's a fair thing to say.

11      Q.  If you read something in one of the

12  depositions that you listed in your additional

13  materials -- rephrase.

14          Let me ask you this:  Had you read any parts

15  of the Jessica Shen, Piet Hinoul, Judi Gauld and David

16  Robinson deposition transcripts at the time you wrote

17  the report, or did you just list them at the time

18  because it was something that you thought you might

19  want to reference later?

20      A.  When I wrote Murphy-1?

21      Q.  Yes.

22      A.  I believe I had not seen those when I wrote

23  Murphy-1.

24      Q.  At the time you wrote Murphy-1 and signed

25  it, had you read all of the expert reports that are

Page 28

1  listed below the list of deposition transcripts, or

2  were those things you listed because you planned to

3  read them at a later date?

4      A.  I'm sorry.  Which are you referring to?  Are

5  you referring to something in the bibliography?

6      Q.  I'm looking the list of additional

7  materials.

8      A.  Oh, additional materials.  I'm sorry.  Can

9  you repeat the question then?

10      Q.  Sure.  Go to the page where you listed the

11  four deposition transcripts?

12      A.  Yes.

13      Q.  Because right below that are a list of

14  expert reports.

15      A.  Yes.

16      Q.  Might as well turn to it.

17      A.  Yeah.

18      Q.  Right before your CV.

19          Are you with me now?

20      A.  Yes.

21      Q.  On the last page of the list of additional

22  materials, there's a list of expert reports under

23  three headings, expert general reports, Plaintiff

24  Gross, Plaintiff Wicker.

25          Do you see that?

Page 29

1      A.  Yes.

2      Q.  At the time that you authored Murphy-1, your

3  first report, had you read those, or did you simply

4  list those in the list of additional materials because

5  they were things that you intended to read later?

6      A.  The Anne Weber expert report, I believe I

7  had that at the time I drafted Murphy-1.  I certainly

8  did not read every page of that report, but I had read

9  a significant amount of it.  I don't think that I had

10  read any of the other reports at the time I drafted

11  Murphy-1.

12      Q.  Okay.  With regard to the list of additional

13  materials, with the exception of the deposition

14  transcripts and expert reports, which you've already

15  spoken about, are you able to go through this list if

16  you needed to, and would you be able to tell me which

17  things you had looked at at the time you wrote the

18  report versus those things that you just listed

19  because you intended to look at them later, or would

20  that be something you would be unable to do?

21      A.  I think I'd be unable to do that.

22      Q.  Okay.  To the extent that you felt that

23  something was important enough to actually reference

24  it in the report itself as having been relied on,

25  those materials are listed in the bibliography,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 30

1  correct?

2      A.  I'm sorry.  Could you repeat the question.

3      Q.  Sure.  To the extent that you found that a

4  study or a document was important enough to you that

5  you actually wanted to reference it in the report as

6  having been relied on in forming the opinions, those

7  things are listed in the bibliography, correct?

8      A.  Yeah, I think that's fair to say.  Those are

9  the things that I thought were important when I was

10  drafting the report, and I thought they were important

11  to reference.

12     Q.  Are you aware of how many documents have

13  been produced, the volume of documents that have been

14  produced in this litigation by Ethicon and Johnson &

15  Johnson to the plaintiffs?  Do you have any idea of

16  that volume?

17     A.  I do not.

18     Q.  And nobody has ever told you that?

19     A.  No.

20     Q.  Did you ever ask anybody how many documents

21  have you produced?

22     A.  No.

23     Q.  Have you ever tried to gain an understanding

24  of what types of documents have been produced?  Did

25  you ever want to say -- did you ever ask anyone, hey,

Page 31

1  I want to know what you've produced so I can tell you

2  what I need to see?

3      A.  I can tell you right now, I did not ask

4  anybody what about what's been produced.  I wouldn't even

5  know that term.

6      Q.  There are documents that came from Ethicon

7  that are listed in the list of additional materials,

8  correct?

9      A.  Mm-hmm.

10     Q.  Meaning their own internal documents,

11  correct?

12     A.  I think so, yes.

13     Q.  Those were documents that were given to you

14  to list in the list of additional materials.  None of

15  those are documents that you asked for; fair

16  statement?

17     A.  I think it's fair to say that some of these

18  were suggested that I might want to include in my

19  additional materials because they might be important

20  in the testimony that I'm going to give.

21     Q.  You didn't request any of the internal

22  Ethicon documents; they were provided to you, correct?

23     A.  Correct.

24     Q.  Did you expect -- well, rephrase.

25         As an expert witness, because you've done

Page 32

1  this several times now, one of the things that you

2  want to do if you're being -- well, let me rephrase.

3         Let me ask you, what do you think your role

4  is as an expert witness in this litigation?

5      A.  My role is to tell the truth about my

6  opinions.

7      Q.  One of the things that you're intending to

8  do is to offer opinions ultimately in a courtroom to a

9  jury that's going to decide certain issues in this

10  case, correct?

11     A.  Correct.

12     Q.  And one of the things that you want to do

13  when you give those opinions is to have all of the

14  necessary background information so that when you give

15  those opinions, you can feel confident that they're

16  supported by the actual facts, right?

17     A.  Sure.

18     Q.  And with regard to the actual conduct of

19  Ethicon in terms of what the company was actually

20  doing day-to-day, you didn't work at Ethicon, right?

21     A.  Correct.

22     Q.  So the only knowledge you would have from

23  that would be your personal interaction with people at

24  Ethicon over the years; that would be one source of

25  that information, correct?

Page 33

1      A.  Correct.

2      Q.  And the other source of that information

3  would be whatever documents Ethicon provided you to

4  look at, right?

5      A.  Correct.

6      Q.  Did you rely on Ethicon to provide you all

7  of the documents that were important for you to be

8  able to -- well, let me rephrase.

9         To the extent that internal Ethicon

10  documents would be important in establishing what the

11  actual facts were, you weren't in a position to ask

12  for those from Ethicon because you didn't know what

13  existed, right?

14     A.  Correct.

15     Q.  So did you rely on Ethicon to give those

16  documents to you so that when you would form your

17  opinions, you would do it based on the facts as they

18  actually existed?

19         MR. SNELL:  Objection, form.  Go ahead.

20         THE WITNESS:  Not completely because

21  some of them would have been things that I didn't even

22  realize that all these records were available, e-mails

23  and things like that, but they were brought up in

24  other people's deposition, the plaintiffs' expert

25  reports.  So some of that I read that and said, oh,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 34

1 boy, I didn't realize that would be part of a record.

2 That's something that I would want to know about.

3 BY MR. SLATER:

4     Q. Well, to the extent that document were --

5 rephrase.

6     The documents that Ethicon provided to you,

7 meaning the internal Ethicon documents, are listed in

8 this list of additional materials, correct?

9     A. Correct.

10     Q. The documents provided by Ethicon to you so

11 that you could form your opinions based on a full

12 factual record did not include any e-mails, correct?

13 I don't see any e-mails listed on this list of

14 additional materials, so am I correct?

15     MR. SNELL: Object to the form,

16 actually misrepresents.

17 BY MR. SLATER:

18     Q. Well, I'll ask you very simply.

19     A. I'm sorry. Go ahead.

20     Q. If you understand the question, you can

21 answer it.

22     A. I think what you're -- well, now I'm a

23 little bit confused --

24     Q. Let me ask --

25     A. -- but I think some e-mails were referred to

Page 35

1 in other depositions that I've read.

2     Q. This is what I want to ask you: In the list

3 of additional materials --

4     A. Sure.

5     Q. -- the actual Ethicon internal documents

6 that Ethicon provided you, not things that were

7 referenced in people's depositions but what Ethicon

8 actually gave you, the actual documents, they didn't

9 actually give you e-mails, I don't see any listed

10 here; is that true?

11     A. Not that I recall.

12     Q. Do you know Anne Weber personally?

13     A. I've met her.

14     Q. Do you have respect for her as a

15 urogynecologist?

16     A. Yes.

17     Q. Is she considered to be a key opinion leader

18 in the field of urogynecology?

19     MR. SNELL: Objection, form.

20     THE WITNESS: I don't think so anymore.

21 I think at one point she was.

22 BY MR. SLATER:

23     Q. Let me ask you this with regard to your

24 Curriculum Vitae.

25     A. Yes.

Page 36

1     Q. It's the last thing that's listed here in

2 your report on Murphy-1, correct?

3     A. Correct.

4     Q. It's the last attachment to your report,

5 correct?

6     A. Correct.

7     Q. Is that your up-to-date CV?

8     A. There may be some additions since then.

9 Something was just published this month.

10     Q. What was just published this month?

11     A. I don't think it would have much bearing

12 upon this case.

13     Q. Not relevant to this case?

14     A. Well, actually, it was a little bit

15 relevant. It had to do with risk factors for mesh

16 erosion in vaginal surgery and abdominal surgery, so I

17 guess it has some relevance.

18     Q. Where was that published?

19     A. It was published in the -- what we call the

20 gold journal, Female Pelvic Medicine and

21 Reconstructive Surgery.

22     Q. And in that article you attempted to do

23 what?

24     A. I was a co-author. It was what's called a

25 Fellow's Pelvic Research Network. I was a mentor for

Page 37

1 that, and it was a case control study of what risk

2 factors there are for mesh erosion when you place mesh

3 vaginally and when you place it abdominally.

4     Q. Are there different risk factors when it's

5 placed vaginally versus abdominally?

6     A. That was the question we were trying to

7 answer, and, unfortunately, statistically, the

8 statistician didn't think that we could compare one

9 versus the other. We could only come up with risk

10 factors for each.

11     Q. What were the risk factors you came up for

12 erosion when --

13     A. Hysterec -- I'm sorry.

14     MR. SNELL: Let him finish his

15 question.

16     THE WITNESS: I'm sorry. I apologize.

17     MR. SNELL: It's okay.

18 BY MR. SLATER:

19     Q. What were the risk factors listed in your

20 recently published article with regard to erosion when

21 the mesh is placed vaginally?

22     A. Concomitant hysterectomy, to the best of my

23 knowledge.

24     Q. Nothing else?

25     A. I don't think so. Initial statistical

Confidential - Subject to Stipulation and Order of Confidentiality

Page 38

1 evaluation seemed to suggest some other things, but I
2 think in the final manuscript, hysterectomy was the
3 only risk factor, and I believe it was listed for both
4 vaginal and abdominal.
5     Q. Were there any other risk factors for
6 vaginal erosion either place -- where the mesh is
7 either placed vaginally or abdominally, other than
8 hysterectomy?
9     A. I don't think that we came up with any other
10 ones.
11     Q. In your experience, are there any others
12 that you're familiar with?
13     A. Yes. Certainly a history of smoking seems
14 to predispose patients to that, and that has been
15 shown in other studies. Certainly, theoretical risk
16 factors, things like diabetes, things that would lead
17 to poor wound healing, prior radiation, steroid use.
18 That's what I'm recalling at this time.
19     Q. When you refer to theoretical risks --
20 rephrase. When you refer to theoretical -- rephrase.
21     When you refer to factors that could
22 theoretically increase the risk for an erosion, you
23 mean these haven't been studied to the point where
24 that's been established?
25     A. It's a combination of, yes, that's partly it

Page 39

1 and partly just I don't recall exactly. You know,
2 some studies were looking at abdominal mesh; some
3 studies were looking at vaginal, and I know at some
4 point smoking was definitely noted as a risk, but I'm
5 not sure whether that was an abdominal or a vaginal
6 mesh placement.
7     Q. As you sit here now, is there a study you're
8 familiar with that actually established that smoking
9 is a risk factor one way or the other with regard to
10 erosion?
11     A. I could not quote the study.
12     Q. In your consenting of patients with regard
13 to the Prolift® from the very beginning, did you tell
14 patients who were smokers that that was a risk factor
15 for them to have a higher risk for erosion?
16     A. I wouldn't say that I necessarily would
17 counsel every patient who was a smoker of that, but I
18 certainly could remember cases where I would say when
19 I talk about the risk of erosion with every patient, I
20 would say, oh, you know, in your case, since you're a
21 smoker, that risk is probably higher.
22     Q. So for some smokers you told them, for some
23 you didn't; it just depended basically if you thought
24 to say it during the conversation?
25     A. Correct. There's a lot we cover in

Page 40

1 consenting.
2     MR. SLATER: Move to strike from
3 there's a lot to cover.
4 BY MR. SLATER:
5     Q. Your Board certification, did you pass both
6 the oral and written portions on the first try?
7     A. I did.
8     Q. Abington Memorial Hospital, how many beds
9 are in that hospital?
10     A. I could give you a --
11     Q. Give me an estimate.
12     A. -- a very rough estimation, 4 to 600.
13     Q. Where is that hospital located? It says
14 Abington, Pennsylvania.
15     A. Yes.
16     Q. How many gynecologists are in the department
17 of obstetrics and gynecology currently?
18     A. Again, it would be an estimation, 30 to 50.
19     Q. How much of your time do you spend on
20 administrative work in connection with your role as
21 chief of the section of urogynecology?
22     A. Probably in the range of 10 to 15 hours a
23 month.
24     Q. How many urogynecologists are in the
25 department of obstetrics and gynecology?

Page 41

1     A. We just got our second.
2     Q. So when you say you just got your second,
3 when was that?
4     A. Within the year.
5     Q. So before that you were the only
6 urogynecologist in that department?
7     A. I was the only urogynecologist. There were
8 two what we call female urologists. There's an
9 overlap in this field between the field of urology and
10 gynecology.
11     Q. Was there a section of urology that those
12 female urologists would technically fall within?
13     A. I believe all the urologists fall under the
14 division -- or excuse me -- the department of surgery,
15 and so they would have fallen under the division of
16 urology in the department of surgery.
17     Q. So as chief of the section of urogynecology,
18 until very recently that section was made up of one
19 urogynecologist, yourself, correct?
20     A. Let me -- I just recalled something. My
21 partner Dr. Lucente was also on the -- in the division
22 as well.
23     Q. He was in the division. Did he also
24 typically use Abington Memorial Hospital for the
25 treatment of his patients?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 42

1    A. He did probably from 2004 -- excuse me --

2  from 2000 maybe '02 to 2004 or '05, around that time.

3  He phased out of operating much there and pretty much

4  operated up in Allentown.

5    Q. During the time you've been chief of the

6  section of urogynecology, that section has essentially

7  been you, right?

8    A. Since I've been the chief, correct.

9    Q. So you were chief of a section of

10  urogynecology where you were the one urogynecologist?

11    A. Correct.

12    Q. It says that you've been a journal peer

13  reviewer for four different journals.

14    Do you see that?

15    A. Yes. Well, I don't see it yet, but I can

16  find it.

17    Q. Page 5 of your CV.

18    A. Yes.

19    Q. In your role as a peer reviewer for the

20  American Journal of Obstetrics & Gynecology, what have

21  you actually done?

22    A. The journal has sent me papers, they've

23  asked me to review them and give my opinions regarding

24  the value and quality of the study.

25    Q. How many times?

Page 43

1    A. For the American Journal?

2    Q. Yeah.

3    A. I would guess somewhere in the range of 10

4  to 15.

5    Q. The International Urogynecology Journal,

6  same type of work?

7    A. Yes.

8    Q. How many times have they sent you articles

9  to look at?

10    A. Twenty to 30.

11    Q. European Journal of Obstetrics & Gynecology,

12  same thing?

13    A. No, I think that was only once.

14    Q. One article?

15    A. I think so.

16    Q. How about the Physicians' Information and

17  Education Resource for the American College of

18  Physicians?

19    First of all, what is that?

20    A. Again, that's I think just one time. That

21  was a web-based thing.

22    Q. Okay. That's certainly not any sort of a

23  high level medical journal, correct?

24    A. No.

25    Q. Is the European Journal of Obstetrics &

Page 44

1  Gynecology considered to be a high level medical

2  journal?

3    A. It might be in Europe. It's not in the

4  United States.

5    Q. If you were at a meeting with other

6  urogynecologists and you mentioned that you were a

7  peer reviewer for that journal, would they be

8  impressed by it or would they say, oh, okay, whatever?

9    MR. SNELL: Objection, form.

10    THE WITNESS: I don't think I'd ever

11  mention that, but, no, they wouldn't be particularly

12  impressed.

13  BY MR. SLATER:

14    Q. The International Urogynecology Journal, is

15  that considered to be a high quality journal?

16    A. Yes.

17    Q. How about the American Journal of Obstetrics

18  & Gynecology?

19    A. Yes.

20    Q. How long have you been a reviewer for

21  International Urogynecology Journal?

22    A. I would guess at least eight years.

23    Q. How about the American Journal of Obstetrics

24  & Gynecology, how long?

25    A. Same.

Page 45

1    Q. You started reviewing basically right out of

2  your fellowship?

3    A. Correct.

4    Q. Your fellowship was under Dr. Lucente at his

5  practice, correct?

6    A. No.

7    Q. Oh, I actually mixed you up with somebody

8  else.

9    A. It's okay.

10    Q. Where did you do your fellowship?

11    A. The University of Louisville.

12    Q. As a peer reviewer you're familiar with the

13  standards, and let's talk about American Journal of

14  Obstetrics & Gynecology and the International

15  Urogynecology Journal, journals of that stature, okay?

16    A. Yes.

17    Q. There are standards that apply to whether or

18  not something will get published by those types of

19  journal, right?

20    A. Correct.

21    Q. Those standards are very serious and they're

22  taken very seriously by the journals, correct?

23    A. Correct.

24    Q. Those standards are taken very seriously by

25  the peer reviewers, correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 46

1    A. Correct.

2    Q. Those standards are relied on by those who

3 are reading the articles in journals like that to give

4 them the comfort that they can believe what they're

5 reading and trust the information they're being

6 provided, correct?

7    A. Correct.

8       MR. SNELL: Objection, form. Go ahead.

9       THE WITNESS: Correct.

10 BY MR. SLATER:

11   Q. The reason that journals are considered high

12 level journals, those that have attained that status,

13 is a product of what is perceived in the medical

14 community to be the strict peer-review process,

15 correct?

16   A. It's part of it.

17   Q. If it were to turn out that somebody who

18 published an article in a medical journal falsified

19 data, would that be a very egregious situation?

20       MR. SNELL: Objection, form.

21       THE WITNESS: If they falsified data,

22 that would be -- I'm not so familiar with the term

23 egregious, but, yeah, that would be bad.

24 BY MR. SLATER:

25   Q. Well, let me ask you in your own words, if

Page 47

1 it were to turn out that there was somebody who wrote

2 an article that turned out to have falsified data with

3 regard to the results of whatever was being studied,

4 from your perspective, what would be the significance

5 of that?

6       MR. SNELL: Objection, form.

7       THE WITNESS: That would show that they

8 had reported data that was not true.

9 BY MR. SLATER:

10   Q. And from your perspective as a peer

11 reviewer, what would be your viewpoint on somebody who

12 would author a report and provide false data in such

13 an article?

14   A. I would feel that they had done something

15 very wrong.

16   Q. You would feel that person is not

17 trustworthy, correct?

18       MR. SNELL: Objection, form.

19       THE WITNESS: In that regard, yes.

20 BY MR. SLATER:

21   Q. You would feel, in essence, with regard to

22 anything that person published, you would have to

23 question any of their data once you knew that they

24 falsified data in one article, you would question,

25 well, have they done this other times, right?

Page 48

1       MR. SNELL: Objection, form.

2 BY MR. SLATER:

3    Q. It's a reasonable question, right?

4    A. Yes. I think that it certainly might make

5 you question other things, not necessarily everything,

6 but, yes.

7    Q. One of the things that the high level

8 journals require is disclosures of potential bias and

9 potential sources of conflict of interest, correct?

10   A. Correct.

11   Q. Why is that disclosed?

12   A. So that everybody knows where everybody is

13 coming from.

14   Q. Why is that important?

15   A. Because bias exists in everything we do in

16 life and certainly in medical research, and you want

17 to know someone's biases when you're reading their

18 work so that you have that knowledge.

19   Q. If it were to turn out that someone were to

20 write an article that was published in a high level

21 journal and the person misrepresented potential

22 conflict of interest or bias that had gone into the

23 study or the article being reported, would that be

24 significant?

25       MR. SNELL: Objection, form.

Page 49

1       THE WITNESS: It depends on the intent.

2 If they simply forgot to mention something that was --

3 other people might consider very significant, then I

4 don't think that that's that big a deal, but,

5 certainly, if someone falsified data, that would be a

6 very big deal.

7 BY MR. SLATER:

8    Q. When you say if somebody forgot, if somebody

9 makes a statement in a -- well, rephrase.

10      In high level journals, it's customary to

11 make disclosures, for example, of the author's

12 financial connection to -- if it's a medical device

13 being studied the manufacturer of that medical device,

14 correct?

15   A. Sure. I guess what I'm saying is the rules

16 as to what you need to report versus what you don't

17 need to report vary from journal to journal. How long

18 ago a potential conflict of interest, how big it was.

19 I mean, I know that people go out to dinners at

20 medical conferences that might be sponsored by a

21 device company. Do they have to report that? You

22 know, that can be -- and maybe they did, maybe they

23 didn't, maybe they forgot that they went out to that

24 dinner and that would be something that they had to

25 report.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 50

1  Q. If the author of a study were to
2  affirmatively state, for example, that the
3  manufacturer of the device being studied had no input
4  into the design of the study, but it turned out that
5  the manufacturer actually did have input into the
6  design of the study, that would be significant, right?
7      MR. SNELL: Objection, form.
8      THE WITNESS: Yes, I think if it was a
9  substantial input into the design of the study from
10 the company and there was no disclosure of that, that
11 would be significant.
12 BY MR. SLATER:
13     Q. If the author of a study published in a high
14 level journal were to affirmatively say that the
15 manufacturer of the device being studied had no input
16 into the study design, then people reading that
17 article would assume that that's a truthful statement
18 that there was no input; fair statement?
19     MR. SNELL: Objection, form.
20     THE WITNESS: Yes.
21 BY MR. SLATER:
22     Q. If the author of a article published in a
23 high level medical journal were to affirmatively
24 represent that the manufacturer of the device being
25 studied had no input or no involvement in the writing

Page 51

1  of the manuscript, people reading that would assume
2  there really was no input or involvement, correct?
3      MR. SNELL: Objection, form.
4      THE WITNESS: That's what people would
5  assume.
6  BY MR. SLATER:
7      Q. If it turned out that somebody made a
8  representation in an article published in a high level
9  medical journal that the manufacturer of the device
10 being studied had no involvement in the writing of the
11 manuscript and it turned out, well, yes, the
12 manufacturer actually did have involvement in the
13 writing of the manuscript, that would be very
14 significant, right?
15     MR. SNELL: Objection, form.
16     THE WITNESS: It would depend, I guess,
17 on how much involvement, but it's certainly something
18 that people would want to know about.
19 BY MR. SLATER:
20     Q. Well, it would be significant at level -- at
21 the first level of saying, well, the person
22 misrepresented; that's a significant thing, right?
23     MR. SNELL: Objection, form.
24     THE WITNESS: Again, yes, but, again,
25 there are levels of what is more significant versus

Page 52

1  less, less significant.
2  BY MR. SLATER:
3      Q. In a high level medical journal, any
4  affirmative misrepresentation about the involvement of
5  the manufacturer of a device that was being studied in
6  the article would be significant; any
7  misrepresentation would be significant, right?
8      MR. SNELL: Objection, form.
9      THE WITNESS: I think I just answered
10 that, and that it depends on how much involvement and
11 what degree of significance we're talking about.
12 BY MR. SLATER:
13     Q. So from your perspective as a peer reviewer,
14 is it your testimony that your standards are, well, if
15 somebody misrepresents a little thing, it's okay.
16 They'd have to misrepresent something big for it to
17 really matter; is that what you're telling this jury?
18     A. My testimony -- what I'm telling the jury is
19 that it all depends on what we're talking about.
20     Q. Okay. If the author of an article published
21 about a medical device in a high level journal
22 represented there was no involvement in the writing of
23 the manuscript by the manufacturer, and, in fact, the
24 manufacturer's employees, several of them, went
25 through multiple drafts of the manuscript and made

Page 53

1  substantive recommendations and asked for changes to
2  be made and they were made on substantive issues in
3  the article, that would be significant, correct?
4      MR. SNELL: Objection, form. Go ahead.
5      THE WITNESS: That's something I would
6  be interested to know as a reviewer and a reader.
7  BY MR. SLATER:
8      Q. In the medical community, the people that
9  rely on high level journals, that would be a very
10 significant thing, wouldn't it be?
11     MR. SNELL: Objection, form.
12     THE WITNESS: Again, it depends on the
13 degree. If someone took someone out to dinner and
14 they didn't report that --
15 BY MR. SLATER:
16     Q. No, no. Stick with my question, which I
17 just gave you.
18     If that were to have happened and that were
19 to come to light, physicians who actually rely on the
20 veracity, the truthfulness of what is disclosed and
21 what is stated would be very, very concerned if that
22 were to come to light, wouldn't they?
23     MR. SNELL: Objection, form. You're
24 asking him to speak on behalf of all physicians.
25     MR. SLATER: He's an expert witness. I

Confidential - Subject to Stipulation and Order of Confidentiality

Page 54

1 can ask him whatever I want.
2 BY MR. SLATER:
3    Q.  Answer the question.
4    A.  I would say concerned --
5        MR. SNELL:  I'm going to -- note my
6 objection to form.  Go ahead.
7 BY MR. SLATER:
8    Q.  You would agree with me that if an author
9 affirmatively misrepresented in an article that the
10 manufacturer of the medical device being studied had
11 no involvement in the writing of the manuscript, and,
12 in fact, the manufacturer's employees had substantive
13 material involvement in the content that actually was
14 published, and due to their input certain things were
15 changed in the article that were substantive, that
16 would be a very serious infraction by that author;
17 wouldn't it be?
18        MR. SNELL:  Objection, form.
19        THE WITNESS:  That would be something
20 that I would be -- want to be aware of.
21 BY MR. SLATER:
22    Q.  It would be a very serious infraction of the
23 rules; wouldn't it be?
24        MR. SNELL:  Same objection to form.
25        THE WITNESS:  It depends on what --

Page 55

1 when you say "substantive," I don't know what that
2 means.
3 BY MR. SLATER:
4    Q.  Whatever you would define as substantive, if
5 that were to have happened, that would be a serious
6 infraction?
7        MR. SNELL:  Objection to form.  Go
8 ahead.
9        THE WITNESS:  If it was something that
10 I thought was substantive, then I would be concerned
11 about that, absolutely.
12 BY MR. SLATER:
13    Q.  And you as a peer reviewer would want to
14 have very, very high standards in determining what
15 would be substantive, correct?
16        MR. SNELL:  Objection.
17 BY MR. SLATER:
18    Q.  You would want to be very conservative about
19 that, wouldn't you?
20        MR. SNELL:  Objection, form.
21        MR. SLATER:  I'll withdraw the
22 question.
23 BY MR. SLATER:
24    Q.  As a peer reviewer if you're going to make a
25 decision of what is substantive and what's not, you

Page 56

1 would want to err on the side of most things being
2 substantive because you don't want people
3 misrepresenting anything in an article, right?
4        MR. SNELL:  Objection, form.
5        THE WITNESS:  I would simply view what
6 I thought as substantive as substantive.  I don't know
7 whether I'd be conservative or liberal in regard to
8 that.
9 BY MR. SLATER:
10    Q.  If an author were to have made such a
11 misrepresentation, one that you felt was substantive,
12 that's an author who you would deem to not be
13 trustworthy in terms of reporting information in a
14 published article, right?
15        MR. SNELL:  Objection, form.
16        THE WITNESS:  Yes.
17 BY MR. SLATER:
18    Q.  And the article itself, if that were to come
19 out, that would be an article that you would say
20 should be disregarded at that point, correct?
21        MR. SNELL:  Objection, form.  Go ahead.
22        THE WITNESS:  If I felt it was
23 substantive enough that it misrepresented the reality
24 of the outcomes of the study, then, yes.
25 BY MR. SLATER:

Page 57

1    Q.  If the author allowed -- rephrase.
2        If the input was substantive and changed the
3 content of what was actually concluded and what was
4 described in the article and it came to -- and it came
5 out that this input had actually occurred and you felt
6 it was substantive, strictly following the peer-review
7 process and rules, that article should be retracted
8 and not relied on, correct?
9        MR. SNELL:  Objection, form.
10        THE WITNESS:  When you say conclusions,
11 that might mean that they -- the data was all correct
12 and that simply there was input on how that was
13 viewed, how the conclusions -- you know, the last part
14 of a scientific article is usually, well, let's
15 interpret these results.  Here's our opinions on what
16 this means.  That's something that as a reader you
17 want to know about any biases that can go into that,
18 okay, but, you know, people can have biases when they
19 write those conclusions that don't necessarily sway
20 me.  I mostly care about what the data showed, and I'm
21 allowed, you know, as a good doctor to interpret those
22 results with my own biases.
23 BY MR. SLATER:
24    Q.  What usually happens is the conclusions
25 drawn by the authors, that's usually what people are

Confidential - Subject to Stipulation and Order of Confidentiality

Page 58

1 focusing on, though, right?
2        MR. SNELL: Objection, form.
3 BY MR. SLATER:
4    Q.  Because people don't have time to read the
5 complete articles and all of the data and draw their
6 own conclusions, generally rely on the conclusions by
7 the authors, right?
8        MR. SNELL: Objection, form.
9        THE WITNESS: I would disagree with
10 that. Generally, when I look at an article, the first
11 thing I do is I read the abstract. The first thing I
12 do is sort of say what was the purpose, and then I go
13 to the results section, and I read the results. Then
14 I'm curious as to how that author then viewed those
15 results, but, really, what I care about is the
16 results.
17 BY MR. SLATER:
18    Q.  Do you know whether that's what most
19 gynecologists and urogynecologists do, or is that just
20 your practice?
21    A.  I don't know.
22    Q.  Have you ever misrepresented the --
23 rephrase.
24        Have you ever misrepresented the results of
25 any studies that you've performed in any peer-reviewed

Page 59

1 journal?
2    A.  Not that I know of.
3    Q.  How about in anything you've ever authored
4 or co-authored?
5    A.  Not that I know of.
6    Q.  Have you ever been accused, to your
7 knowledge, of falsifying data that you or your group
8 were reporting?
9    A.  No.
10    Q.  As you sit here right now, are you aware of
11 anybody within Ethicon ever stating that your data was
12 false as reported with regard to anything that you had
13 authored or co-authored?
14        MR. SNELL: Objection to form. Go
15 ahead.
16        THE WITNESS: I'm not aware of that.
17 BY MR. SLATER:
18    Q.  When did you first enter into any sort of a
19 consulting relationship with Ethicon?
20    A.  I don't recall exactly, but I think it would
21 be pretty soon after starting my practice after
22 fellowship.
23    Q.  What year are we talking?
24    A.  I started my practice in 2004, so somewhere
25 in the range of 2004 to 2006.

Page 60

1    Q.  How did it come about that you became
2 involved with Ethicon?
3    A.  I don't recall.
4    Q.  Who introduced you to the people at Ethicon?
5 Who was the person that was your conduit to developing
6 this relationship?
7    A.  Well, I certainly had known people at
8 Ethicon when I was a resident, when I was a fellow and
9 as an attending. When I was a resident at Lehigh
10 Valley Hospital, that's when TVT® first came out, and
11 Dr. Lucente, my partner, currently my partner, he was
12 a mentor of mine at the time from when I was a
13 resident, he was doing TVT® procedures and he was
14 doing training on TVT®. And so I -- you know, I had a
15 strong interest in urogynecology at that time, and so
16 in working with him, I met people at Ethicon at that
17 time, I believe.
18        Certainly, when I was a fellow, we at times
19 used mesh for sacrocolpopexy from Ethicon, and I went
20 down to Atlanta to look at doing laparoscopic
21 sacrocolpopexy with Gynemesh® and met people from
22 Ethicon at that time.
23        And, then again, when I started my practice,
24 certainly, Dr. Lucente had a pretty strong
25 relationship with Ethicon and met Ethicon people

Page 61

1 through him as well.
2    Q.  When you first entered into your own
3 personal consulting arrangement where you were going
4 to now start being paid money directly by Ethicon --
5    A.  Yes.
6    Q.  -- was that in 2004?
7    A.  I don't recall exactly.
8    Q.  What was it in regard to? What was your --
9 how did your relationship start? What were you being
10 paid for?
11    A.  My guess would be the first time that I was
12 ever paid by Ethicon would be when I did cadaver labs
13 on TVT® and TVT-O®.
14    Q.  So were you training other surgeons on
15 performing TVT® and TVT-O® on cadavers?
16    A.  Correct.
17    Q.  And, again, you think that was somewhere
18 around 2004?
19    A.  2004 or 2005.
20    Q.  Over the years beginning in 2004 or 2005 --
21 well, rephrase.
22        Have you continuously been a paid consultant
23 for Ethicon from that point when you first started in
24 2004, 2005 to the present?
25    A.  I guess it depends on how you define

Confidential - Subject to Stipulation and Order of Confidentiality

Page 62

1  continuously.  There were certainly large periods of
2  time where I never received a check from Ethicon.
3      Q.  When you say "large periods of time," was
4  there ever an entire year?
5      A.  I think so.
6      Q.  What year?
7      A.  I couldn't tell you, but I don't think
8  I've -- certainly within the last year I don't think
9  I've received any money from Ethicon from a
10 professional education standpoint, consulting.
11      Q.  Is that because of the reduction in the use
12 of Prolift® and then ultimately the Prolift® being
13 removed from the market?
14         MR. SNELL:  Objection, form.
15         THE WITNESS:  Probably something to do
16 with that and probably also with the fact that their
17 slings have been out a long time.  I think most people
18 either learn to do them in residency now or learned it
19 in the past.
20 BY MR. SLATER:
21      Q.  Over the years can you estimate for me the
22 amount of money Ethicon has paid you?
23      A.  In total?
24      Q.  Yeah.
25      A.  I would guess somewhere in the range of --

Page 63

1  let's see.  Eight years.  Probably in the range of 80
2  to $100,000.
3      Q.  In your career have you ever worked -- well,
4  rephrase.
5         Have you also consulted for companies other
6  than Ethicon?
7      A.  I have.
8      Q.  Which others?
9         MR. SNELL:  To the extent that they're
10 not subject to a nondisclosure, you can answer that.
11         MR. SLATER:  Well, I don't understand
12 what that means.  I mean, he has a CV where he
13 makes -- he talks about -- and there's disclosures in
14 his published articles, so how can you say --
15         MR. SNELL:  Obviously anything that's
16 public, he can tell you about, but if it's not public,
17 if it's subject to a Confidentiality Agreement, I
18 don't want him to answer that question, but if it's
19 not, obviously, he should tell you.
20 BY MR. SLATER:
21      Q.  Well, this is what I'd like to do:  Tell me
22 all the other medical device manufacturers or
23 pharmaceutical companies you've also consulted with,
24 and if there are ones that you don't want to tell me
25 about because you think that you're not allowed to,

Page 64

1  you'll say there's other that I can't tell you about,
2  and then we'll cross that bridge.
3      A.  Okay.
4      Q.  Are there any that you can't tell me about?
5      A.  Not that I know of.
6      Q.  So we just wasted a minute.
7         MR. SNELL:  I just wanted to be
8  cautious, you know, obviously not -- go ahead.  Answer
9  the question.
10 BY MR. SLATER:
11      Q.  So tell me all of the medical device
12 manufacturers, in addition to Ethicon, that you have
13 consulted for.
14      A.  AMS, which stands for American Medical
15 Systems.
16      Q.  Right.  What was that in connection with?
17      A.  That was in connection with doing an
18 investigational project regarding an attempt to create
19 a system to do the sacrocolpopexy procedure through a
20 transvaginal approach.
21         I've also done consulting with Boston
22 Scientific.
23      Q.  What was that in connection with?
24      A.  I -- many years ago, probably in 2005, 2006,
25 something like that, they wanted my input into one of

Page 65

1  their transvaginal mesh procedures for prolapse and
2  then more recently wanted, you know, to use my
3  opinions regarding some of their newer products.
4         And then I also believe that they came out
5  with a prepubic sling as opposed to a retropubic
6  sling, and I believe I did some consulting with them
7  in regards to that.
8      Q.  Which product is that?
9      A.  I forget the name of it.  It didn't really
10 go very far.
11      Q.  Any other manufacturers?
12      A.  Yes.  Coloplast.  Would you like to know
13 what I've done with them?
14      Q.  Sure.
15      A.  Worked with them regarding their
16 sacrocolpopexy mesh and a -- well, maybe that's
17 something I -- basically a stent, a vaginal stent to
18 help do the sacrocolpopexy.
19         And then I've also worked with Bard.  I was
20 a research site for Bard regarding the adjust sling.
21      Q.  That's an SUI sling?
22      A.  Correct.
23      Q.  So during your career you have consulted for
24 Ethicon, and you estimate you were paid 80 to $100,000
25 during this entire period of time?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 66

1    A.  Yeah, that may be an overestimation because,
2  again, I was sort of doing it what might I make in an
3  average year, but, again, there have been years where
4  I probably haven't done much, so it may be a low as
5  50, but I don't really know.
6    Q.  You realize all that documentation was
7  produced to us, right?
8    A.  I don't realize that.
9    Q.  Yeah, it --
10    A.  I would like to see it.
11    Q.  Because, okay, I think that you're
12  underestimating, but that's fine.
13    So in your career you've --
14        MR. SNELL:  Move to strike.  You're
15  asking him his best estimate.  Let's not be
16  ridiculous.
17        MR. SLATER:  Let's not be ridiculous?
18  I'm trying to refresh his recollection.
19        MR. SNELL:  Show it to him then.  Don't
20  sit there and try to insult him say, you know --
21        MR. SLATER:  I'm not trying to insult
22  him.
23        MR. SNELL:  -- you're underestimating.
24  He told you his best estimate.
25        MR. SLATER:  Can I keep going?

Page 67

1        MR. SNELL:  Yeah, go ahead.
2  BY MR. SLATER:
3    Q.  In your career you have consulted for
4  Ethicon, correct?
5    A.  Correct.
6    Q.  In your career you have consulted for
7  additional medical device manufacturers, including
8  AMS, Boston Scientific, Coloplast and Bard, correct?
9    A.  Correct.
10    Q.  And all of those companies also paid you for
11  your consulting work as well, correct?
12    A.  Yes.
13    Q.  And all of that consulting work addressed
14  one form or another of procedure in which a device
15  manufactured by one of these companies would be used
16  as part of a procedure to treat either pelvic organ
17  prolapse or stress urinary incontinence?
18    A.  Correct.
19    Q.  Would every one of these projects have
20  involved mesh in one way or another?
21    A.  I don't know that for sure, but I think all
22  the things that I've just mentioned -- certainly, the
23  substantial portion of them have regards to mesh.
24    Q.  You would agree with me that it would be
25  preferable for you in your practice to be able to

Page 68

1  achieve whatever level of efficacy you're hoping to
2  achieve without having to use synthetic mesh; you
3  prefer not to have to use it, right?
4        MR. SNELL:  Objection, form.
5        THE WITNESS:  I would prefer that I
6  could wave a magic wand over a woman's pelvis and make
7  it better.
8  BY MR. SLATER:
9    Q.  You would prefer that, all things being
10  equal, you not have to put synthetic mesh, which is a
11  foreign body, into a woman's pelvis if you didn't need
12  to, right?
13        MR. SNELL:  Same objection, form.
14        THE WITNESS:  I don't really know how
15  to answer that.  I mean, I prefer to never expose a
16  woman to any risk.
17  BY MR. SLATER:
18    Q.  You would agree with me that if there were
19  two procedures that have roughly the same level of
20  efficacy but one of the procedures has higher levels
21  of risk, you should choose the procedure that has the
22  lower level of risk, correct?
23        MR. SNELL:  Objection, form.
24        THE WITNESS:  I'm always -- I would
25  always want to give patients the procedure that had

Page 69

1  the best chance of working with the lowest chance of
2  risk, yes.
3  BY MR. SLATER:
4    Q.  If there were two procedures available to
5  you to treat prolapse and the level of efficacy
6  between the two, and I'm not talking about anatomic,
7  I'm talking about functional in terms of what the
8  patient's actual experience of life is, would be
9  essentially the same but one of the procedures would
10  introduce risks that the other doesn't have, you would
11  want to choose the former that doesn't have the
12  additional risk, correct?
13        MR. SNELL:  Objection, form.
14        THE WITNESS:  Well, that assumes that
15  each patient, each surgeon, each surgery goes exactly
16  the same.  So that's kind of a hard thing to say
17  correct to.
18  BY MR. SLATER:
19    Q.  Would you agree with that as a general
20  proposition?
21        MR. SNELL:  Same objection.
22        THE WITNESS:  As a general proposition,
23  like I said before, I always want to provide the
24  patient with the best outcome with the lowest level of
25  risk, always, of course.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 70

1 BY MR. SLATER:
2     Q.  You're familiar with the Altman study
3 published in 2011 in the New England Journal of
4 Medicine, correct?
5     A.  I am.
6     Q.  You're familiar with the fact that from a
7 functional outcome perspective, the outcomes between
8 the colporrhaphy and the Prolift® groups were
9 essentially the same, right?
10         MR. SNELL:  Objection to form.
11         THE WITNESS:  I would disagree with
12 that statement.
13 BY MR. SLATER:
14     Q.  Well, you would agree that the authors did
15 not feel there was any significant difference overall
16 in terms of the functional outcomes between the
17 colporrhaphy and the Prolift® groups; wouldn't you
18 agree with that?
19         MR. SNELL:  Objection to form.
20         THE WITNESS:  I would not agree with
21 that.  The primary endpoint was a subjective sense of
22 no longer feeling a bulge.  That was part of the
23 primary endpoint, and that was significantly different
24 between the two groups.
25 BY MR. SLATER:

Page 71

1     Q.  In terms of the two groups, the colporrhaphy
2 and the Prolift®, the quality of life measures were
3 essentially the same, according to what the authors
4 concluded, correct?
5     A.  So you are talking about specific quality of
6 life instruments like POP-DI, those types of things?
7     Q.  The ones that were used in the study.
8     A.  As far as I recall, yes.
9     Q.  The level of adverse events was higher for
10 the Prolift® arm than the colporrhaphy arm, correct?
11         MR. SNELL:  Objection, form.
12         THE WITNESS:  I don't recall, but I
13 wouldn't be surprised if that was the result.
14 BY MR. SLATER:
15     Q.  If, in fact, from a quality of life
16 perspective, colporrhaphy and Prolift® are essentially
17 providing the same outcomes for patients, if that's
18 the fact, but the Prolift® has a higher level of
19 adverse events, if that is -- if that general profile
20 would apply, you would agree with me that you would
21 want to use colporrhaphy rather than Prolift® as a
22 general proposition, correct?
23         MR. SNELL:  Objection, form.  Go ahead.
24         THE WITNESS:  No, because quality of
25 life instruments while I think are a very important

Page 72

1 part of how we assess outcomes, they're very
2 important, they're also pretty nonspecific in many
3 cases.  And if a recurrence -- if there is going to be
4 a higher rate of recurrence with one group versus the
5 other and that's subsequently a year after the study
6 is concluded going to require someone to have
7 another surgery because their prolapse procedure
8 failed, then that would definitely figure into which
9 one I'd want to choose.
10 BY MR. SLATER:
11     Q.  You would agree with me that the evaluation
12 of what is important about a recurrence has evolved
13 and changed over the years in your field, correct?
14     A.  Correct.
15     Q.  Back around 2000, 2001 the focus was
16 basically 100% or close to 100% on anatomic
17 recurrence, correct?
18     A.  I would say in the '90s it was more around
19 100%.  Right around that time is when people really
20 started wanting to incorporate quality of life
21 outcomes into their studies.
22     Q.  And there were articles that started to get
23 published in the early 2000s where respected authors
24 like people like Anne Weber started to say, hey, you
25 know, maybe we need to start looking not just at

Page 73

1 anatomic evaluation but we have to start looking at
2 function and quality of life because I think we're
3 neglecting to look at that.
4         You would agree with that statement,
5 correct?
6         MR. SNELL:  Objection to form.  Go
7 ahead.
8         THE WITNESS:  I don't recall that Anne
9 Weber per se was one of those people, but, certainly,
10 that was a movement at that time.
11 BY MR. SLATER:
12     Q.  And that movement continued, and at the
13 present the focus is far less on anatomic recurrence
14 and is really primarily on what's the functional and
15 quality of life outcome in terms of how the patient
16 functions and feels day-to-day, correct?
17     A.  I wouldn't agree with that 100%.  I mean, I
18 think people really still care about where the anatomy
19 is because I think it's an indicator of where things
20 may go in the future.  You know, we don't treat people
21 hoping that we're just going to make them good for a
22 year.  We treat them hoping that we're going to make
23 them good for the rest of their lives.  So it's
24 certainly much more valued now and much more studied.
25 We have better tools to measure it now than we did ten

Confidential - Subject to Stipulation and Order of Confidentiality

Page 74

1  years ago.
2      Q.  You would agree with me that when you look
3  at anatomic outcome alone, that doesn't give enough of
4  a picture to determine whether or not a recurrence is
5  really significant to the patient, correct?
6      A.  Yes, I'd agree with that.
7      Q.  And to give you an example, you could get
8  somebody to a stage zero and have everything right
9  where it belongs, if you were to put together a
10 perfect anatomic model, and for many women that would
11 actually be incredibly uncomfortable, correct?
12     A.  Correct.
13     Q.  Based on your experience, how would you
14 describe your partner, Vincent Lucente's role with
15 Ethicon in connection with the Prolift®?
16     A.  My understanding is that he was one of the
17 first US doctors to travel to France to learn the TVM
18 procedure, which is the precursor to Prolift®.  I
19 don't know how many other US doctors went and did
20 that.  I certainly know that he was one.  I can't
21 imagine they sent 100.  And he certainly trained many
22 doctors in the United States on doing the procedure.
23     Q.  Did Vincent Lucente speak on a regular basis
24 to other physicians at professional meetings and
25 events like that about the benefits of the Prolift®?

Page 75

1      A.  I think that's a fair assessment, yeah.
2      Q.  You attended meetings where he did so,
3  correct?
4      A.  Yes.
5      Q.  You attended professional meetings, for
6  example, where Vincent Lucente told physicians that,
7  from his perspective, they should use the Prolift®,
8  correct?
9      A.  I don't think that those are the words that
10 came out of his mouth.  I think the words that came
11 out of his mouth is here's a product, let me tell you
12 about it, maybe here are results, and I think they're
13 great.
14     Q.  You're familiar with the fact that Vincent
15 Lucente interacted on a regular basis with the
16 marketing people within Ethicon, correct?
17          MR. SNELL:  Objection, form.
18          THE WITNESS:  I don't know what you
19 mean by "regular basis."
20 BY MR. SLATER:
21     Q.  Did Vincent Lucente, to your knowledge,
22 interact with the marketing people within Ethicon?
23     A.  I guess.  I really -- to be 100% honest,
24 like I'm trying to be this whole time, I have trouble
25 knowing when someone comes from a company which

Page 76

1  division they're in.
2      Q.  Was an important part of Vincent Lucente's
3  professional time devoted to the consulting work and
4  the speaking work he did on behalf of Ethicon during
5  the time the Prolift® was on the market?
6          MR. SNELL:  Objection, form.
7          THE WITNESS:  Can you repeat.  You said
8  a word in terms of the degree of it.  I forget what it
9  was.
10 BY MR. SLATER:
11     Q.  Well, let me ask you this:  Was a
12 significant part of Vincent Lucente's professional
13 work, from your perspective being his partner --
14     A.  Yes.
15     Q.  -- devoted to the Prolift®?
16     A.  There was -- I'm not trying to give you a
17 hard time.  He did a fair amount of talking and things
18 like that.  I wouldn't say that that was most of his
19 work, but in his work, he did a lot of training, where
20 he would do the surgery and people would come and
21 learn about the surgery while he was doing it, so it
22 was a combination of those two things.
23     Q.  Did yourself and Dr. Lucente socialize with
24 people from Ethicon?
25     A.  Yes.

Page 77

1      Q.  Attend dinners with people from Ethicon?
2      A.  Yes.
3      Q.  Attend parties with people from Ethicon?
4      A.  Yes.
5      Q.  At times did Ethicon sponsor dinners and
6  parties that you and Vincent Lucente attended?
7      A.  Yes.
8      Q.  And that went on for years, correct?
9      A.  Yeah.  I mean, most, you know, big national
10 meetings, there would be a dinner that would be
11 sponsored by Ethicon that I would go to.
12     Q.  Who are the people at Ethicon that you
13 worked most closely with?
14     A.  Well, I did a research project on Prosima,
15 and so I made a couple trips to Europe, and Judi Gauld
16 was one of the people that I worked with quite a bit;
17 Dave Robinson initially, and then I think he phased
18 out, I believe, Piet Hinoul, and there was another
19 very nice guy from Scotland whose name I can't
20 remember.
21     Q.  Graeme Scott?
22     A.  That might be it.
23     Q.  Who else did you interact with at Ethicon on
24 a regular basis?
25     A.  Well, I certainly interact with sales reps

Confidential - Subject to Stipulation and Order of Confidentiality

Page 78

1  that, you know, bring the product to the hospitals
2  that I work in.
3      Q.  How about people in the marketing
4  department?
5      A.  Again, I don't know who is in the marketing
6  department and who is not.  They don't necessarily
7  wear badges that say what department they're in.
8      Q.  Did you, before the Prolift® became
9  available, utilize Gynemesh® PS to treat prolapse
10  where you would cut it and then implant it through the
11  vagina?
12      A.  Not -- well, yes, I did do some of that
13  before Prolift®.
14      Q.  Can you quantify for me to what extent you
15  were doing that?
16      A.  Maybe 30 to 50 cases, something like that.
17      Q.  Total?
18      A.  Rough estimate.
19          Yes.
20      Q.  Once the Prolift® came out, did you at any
21  point --
22          MR. SNELL:  I'm sorry.  Can you read
23  back the question.
24          MR. SLATER:  I asked him how many times
25  he used Gynemesh® before the Prolift® came out to

Page 79

1  treat prolapse through the vagina.
2          MR. SNELL:  Through the vagina, okay,
3  that was the question.  I didn't know if you were
4  including abdominal.  Was it transvaginally?  That's
5  fine, go ahead.
6  BY MR. SLATER:
7      Q.  Once the Prolift® came out, did you ever use
8  Gynemesh® PS, just that product, where you cut it and
9  put it in through the vagina to treat prolapse?
10      A.  No.  I actually I think stopped doing that
11  before Prolift® came out.
12      Q.  Why was that?
13      A.  With the exception of I also did Prosima
14  afterwards.
15      Q.  Why was it that you stopped using Gynemesh®
16  through the vagina?
17      A.  Because the way I had been using it was a
18  non-anchored way, and I just thought that running it
19  through the tissues provided better support.
20          (Document marked for identification
21          as Murphy Deposition Exhibit No. 2.)
22  BY MR. SLATER:
23      Q.  Hand you an exhibit marked as Murphy-2.
24  This is what was served on me about 36 hours ago,
25  which I am told is your supplemental report in this

Page 80

1  case.
2      A.  Yes.
3      Q.  Is Murphy-2 your supplemental report in this
4  litigation?
5      A.  Yes.
6      Q.  Is this the only supplemental report you
7  have authored?
8      A.  Yes.
9      Q.  You set forth three numbered opinions in
10  your supplemental report.  Do you see that?
11      A.  Yes.
12      Q.  Are those the three additional opinions that
13  you documented having formed since the writing of your
14  initial report?
15      A.  Yes.
16      Q.  Now, you indicate in the supplemental report
17  that you reviewed additional Ethicon funded studies.
18          When you say that, are you saying you
19  reviewed the actual -- well, rephrase.
20          When you say that you reviewed additional
21  Ethicon funded studies, what are you referring to?
22      A.  I'm referring to work that was back from the
23  time of TVM.
24      Q.  What specific documents were you looking at?
25      A.  I don't recall.

Page 81

1      Q.  You say you reviewed mesh studies to repair
2  pelvic organ prolapse.  Is that something different
3  from the additional Ethicon funded studies, or is that
4  just another description of the same thing?
5      A.  I think looking at other studies in terms of
6  histology, things of that nature.
7      Q.  What studies are you referring to there?
8      A.  Again, I don't recall.
9      Q.  You say you reviewed Axel Arnaud's
10  deposition.
11          Did you read the deposition?
12      A.  Again, very cursory.
13      Q.  When you say "cursory," how much time did
14  you spend?
15      A.  Probably 15 minutes.
16      Q.  Okay.  Was there anything of significance
17  you saw when you read Axel Arnaud's -- well, rephrase.
18          When you made your cursory review of Axel
19  Arnaud's deposition for about 15 minutes, was there
20  anything you saw that was of any significance to you
21  that you can relate to me right now?
22      A.  Not that I can recall.
23      Q.  How was it that a cursory 15-minute review
24  of Axel Arnaud's deposition led you to say that that
25  further supports your opinions in the initial report?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 82

1  A.  Well, it's not just Axel Arnaud's
2  deposition.
3  Q.  I just want to -- what I'm asking is that
4  component.  I'll reask the question.
5      You say that after the first sentence of --
6  rephrase.
7      After the first sentence of your
8  supplemental report where you say, I have reviewed the
9  additional Ethicon funded studies, mesh studies to
10  repair pelvic organ prolapse and Axel Arnaud's
11  deposition, the next sentence you say, these studies
12  and testimony further support my opinions in my
13  initial report, including but not limited to those
14  below.
15      You see that?
16  A.  Yes.
17  Q.  How was it that your cursory 15-minute
18  reading of Axel Arnaud's deposition, how did that
19  component further support your opinions?
20  A.  I don't have an answer for you.
21  Q.  How is it that the additional Ethicon funded
22  studies, whatever they were, specifically further
23  supported your opinions?
24  A.  The answer to that is that it was not that I
25  read something ground shaking in those extra reports.

Page 83

1  It was that these are opinions that I thought, given
2  the other testimonies from depositions and reports
3  that I read, that's something that I should at least
4  address, that I hadn't necessarily addressed in my
5  first report.
6  Q.  The additional Ethicon funded studies and
7  mesh studies to repair pelvic organ prolapse -- well,
8  let me ask you this, let me take a step back.
9  A.  Sure.
10  Q.  Have you reviewed the actual raw study
11  documents from the TVM study, the actual raw data, the
12  questionnaires, the underlying data?
13  A.  That the patients filled out, those types of
14  things?
15  Q.  Well, whatever.
16  A.  No.
17  Q.  None of it?
18  A.  No.
19  Q.  And it would have been filled out by the
20  nurses or the doctors and whatever data was collected
21  before it was placed in a published form, you didn't
22  look at any of that, right?
23  A.  I did not.
24  Q.  So you're not offering any opinions on that,
25  correct?

Page 84

1      MR. SNELL:  Object to form.
2      THE WITNESS:  Correct.
3  BY MR. SLATER:
4  Q.  You say in your opinion Number 1 -- well,
5  let me ask you this -- well, rephrase.
6      In Opinion Number 1 here in your
7  supplemental report you say, "Ethicon properly studied
8  and funded studies to support its use of the Gynemesh®
9  PS mesh used in Prolift®."
10      Do you see that?
11  A.  Yes.
12  Q.  What is the specific basis for what you're
13  referring to there to support that opinion?
14  A.  I believe that the -- some of the TVM work
15  was funded by Ethicon.
16  Q.  When you say that Ethicon properly studied
17  and funded studies to support its use of the Gynemesh®
18  PS mesh used in Prolift®, what specifically about the
19  TVM study, if that's what you're referring to, are you
20  relying on for that opinion?
21  A.  I'm sorry, I lost you.
22  Q.  That Opinion Number 1, you're saying that's
23  a reference to the TVM study?
24  A.  Yes.
25  Q.  What specifically about the TVM study are

Page 85

1  you relying on to say that Ethicon properly studied
2  the use of Gynemesh® PS for use in the Prolift®?
3  A.  I'm specifically referring to the fact that
4  the material that was left in the patients ultimately
5  within that study was Gynemesh® PS and that that's
6  what's used in Prolift®.  Does that answer your --
7  Q.  Well, what specifically about that study led
8  you to conclude that Ethicon properly studied the use
9  of Gynemesh® PS mesh used in the Prolift® before it
10  was launched?
11  A.  It was a large study that had good outcome
12  data, both anatomic and functional.
13  Q.  You believe that the outcome data from the
14  TVM study was good outcome data?
15  A.  Yes.
16  Q.  When you say "good outcome data," are you
17  saying valid, or are you saying the results were
18  positive results?
19  A.  I'm saying both.
20  Q.  Are you aware of the fact -- well, rephrase.
21      Did you ever review the actual mesh exposure
22  rates from the TVM studies?
23  A.  I have.
24  Q.  Do you know what they are?
25  A.  Well, I can't necessarily quote them, but

Confidential - Subject to Stipulation and Order of Confidentiality

Page 86

1 they're certainly higher than what we see with
2 Prolift® or at least in my practice at this time.  I
3 know there were, you know, multicenter studies, and
4 some studies had quite high erosion rates.  Other
5 centers had very low erosion rates.
6     Q.  The erosion rates documented in the TVM
7 study are high rates of erosion and exposure, correct?
8         MR. SNELL:  Objection, form.
9         THE WITNESS:  Compared to what I've
10 seen in my practice, yes.
11 BY MR. SLATER:
12     Q.  You certainly wouldn't take those rates of
13 exposure that were demonstrated in the TVM study and
14 tell a patient based on that, there's only a small
15 risk of exposure into the vagina; you'd agree with
16 that statement, right?
17         MR. SNELL:  Objection, form.
18         THE WITNESS:  Not necessarily.  Because
19 the risk might be small, meaning if it happens, it's
20 not that bad an outcome.  It's something that can
21 usually be pretty easily addressed, but I would not
22 consider 30% erosion rate to be a small risk.
23 BY MR. SLATER:
24     Q.  You would not consider a 20% erosion rate to
25 be a small risk?

Page 87

1     A.  I wouldn't say that that percent is a small
2 percent.
3     Q.  You wouldn't call 10% a small risk
4 percentage-wise, would you?
5         MR. SNELL:  Objection, form.
6         THE WITNESS:  I think that's getting
7 into the range of small or low.
8 BY MR. SLATER:
9     Q.  What about 12%?
10     A.  Again, that's higher than I would like to
11 see.
12     Q.  Not a small risk, right?
13         MR. SNELL:  Objection, form.
14         THE WITNESS:  It's smallish.
15         MR. SLATER:  You have to change the
16 tape.
17         THE VIDEOGRAPHER:  Going off the
18 record.  The time is 11:03 a.m.
19         (Brief recess.)
20         THE VIDEOGRAPHER:  Back on the record.
21 Here marks the beginning of Volume 1 in Tape Number 2,
22 the deposition of Dr. Miles Murphy.  The time is
23 11:13 a.m.
24 BY MR. SLATER:
25     Q.  Looking at your supplemental report, coming

Page 88

1 back to your Opinion Number 1, when you refer to
2 Ethicon properly studied and funded studies to
3 supports its use of the Gynemesh® PS mesh used in
4 Prolift®, you're talking about the TVM study, correct?
5     A.  That's one of the things I'm referring to as
6 well.
7     Q.  Well, is there something else you're
8 referring to?
9     A.  Not that I'm recalling right now.
10     Q.  And when you say they properly funded it,
11 what are you referring to?  Do you have some knowledge
12 about the funding for the TVM study?
13     A.  It's just my understanding.  I don't have
14 any documentation.
15     Q.  You have no support for that statement, do
16 you?
17     A.  No, because when an abstract is published,
18 they don't have to necessarily write funding, things
19 like that.
20     Q.  All I'm asking is you say that Ethicon
21 properly funded, here you're talking about the TVM
22 study --
23     A.  Right.
24     Q.  -- but you have no basis to say what funding
25 they put into play for that, right?  You have no idea

Page 89

1 on the funding?
2         MR. SNELL:  Objection, form.
3         THE WITNESS:  I don't exactly recall.
4 I think when the manuscripts came out later, it
5 mentioned that there was funding, but I don't recall
6 for sure.
7 BY MR. SLATER:
8     Q.  Do you have any information you can give me
9 now about the funding of the TVM study?
10     A.  No.
11     Q.  Can you give me the -- okay.
12         You did not look at the underlying data for
13 the TVM study, correct?
14     A.  I've only looked at things that were
15 published or as abstracts at meetings.
16     Q.  So you've seen the one year -- well,
17 rephrase.
18         With regard to the TVM study, what
19 specifically are you relying on to say that Ethicon
20 properly studied the use of Gynemesh® PS mesh used in
21 Prolift®, and you're talking about the TVM study, so
22 what are you talking about?
23     A.  Right.  I'm referring to the studies that
24 were released as abstracts or presented as abstracts
25 in 2004, 2005 meetings, international meetings.  There

Confidential - Subject to Stipulation and Order of Confidentiality

Page 90

1  were also studies on Gynemesh® PS, not in TVM as well.
2      Q.  Let's talk about.  I'm trying to limit this
3  to TVM to begin with.
4      A.  Okay.
5      Q.  So with regard to TVM, what specific
6  documentation are you relying on to say that Ethicon
7  properly studied the use of Gynemesh® PS in the
8  Prolift®?  You said abstracts that you think were
9  published somewhere around 2004, 2005.  Anything else
10  specifically document-wise that you're relying on for
11  that opinion?
12     A.  Let me look through the references.
13  (Witness reviews document.)
14         I believe the de Tayrac study here used
15  Gynemesh®, the 2002.
16     Q.  Was that part of the TVM study because
17  that's what we're asking about right now?  Is what are
18  you talking about with regard to the TVM study?
19     A.  You know, as an American, I wasn't
20  necessarily sure who exactly was in the, quote, TVM
21  group or not.  He may not have been.
22         And I think I had already referenced the
23  published TVM data in my initial report, for instance,
24  the Miller study from 2011,
25     Q.  You mean the Miller article from 2011,

Page 91

1  correct?
2      A.  Yes.  Sorry.
3      Q.  That's the five-year results of the TVM
4  study that was published in 2011?
5      A.  Correct.
6      Q.  Okay.  Anything else?
7      A.  I think the Debodinance article from 2004.
8  The Fatton study from -- published 2007.
9      Q.  When you refer to the Fatton study, you're
10  talking about the preliminary results, the case series
11  of 110 patients, correct?
12     A.  I'm referring to transvaginal repair of
13  genital prolapse:  Preliminary results of new
14  tension-free vaginal mesh Prolift® technique.  I could
15  be wrong on that.  That might be plus M.  I'm not
16  sure.
17         The Cosson study from 2003 on Page 35 of my
18  initial report.  I would have to see some of the
19  original, you know, the articles to know for sure
20  which were which, but those are some that I am
21  recalling now.
22     Q.  Do you consider yourself to have a good
23  understanding of the literature published by the
24  French TVM group with regard to the TVM procedure and
25  the Prolift®?

Page 92

1      A.  Yes.
2      Q.  Who are the members of the French TVM group;
3  do you know?
4      A.  I know some of them.
5      Q.  If you weren't going to look at the list of
6  their names on those articles, would you know?
7      A.  I would think Cosson, Jacquetin, I think
8  Debodinance, Collinet.  Those are the ones that come
9  to mind.  And I never took French, so if I'm
10  mispronouncing the names, I apologize to them.
11     Q.  Do you feel that the conclusions in the
12  articles published by the French TVM group with regard
13  to the TVM procedure which ultimately became the
14  Prolift® procedure are an important source of
15  information about the Prolift®?
16     A.  Yes.
17     Q.  Let's talk about the TVM study a little bit.
18         Do you know what the primary outcome measure
19  was, the primary endpoint was?
20     A.  If I recall correctly, it was less than or
21  equal to Stage 1 POP-Q.
22     Q.  Do you have an understanding of what the
23  percentage of recurrence was set down as in order to
24  meet or fail the primary endpoint?
25     A.  I believe they wanted to show that there was

Page 93

1  not greater than 20% failure.
2      Q.  Do you know whether the French study met
3  that endpoint, the French TVM study?
4      A.  I believe it did.  I believe it did.
5      Q.  You believe the French TVM study, when the
6  confidence interval was applied, demonstrated less
7  than 20% recurrence rate?
8      A.  I believe so.
9      Q.  With regard to the US arm of the TVM study,
10  did it meet the primary endpoint based on less than
11  20% recurrence rate with the confidence interval
12  applied; do you know?
13     A.  That I don't recall.  It's been a while
14  since I reviewed that.
15     Q.  Is it of significance to you in forming your
16  opinions whether or not the primary endpoint
17  recurrence rate under 20% was met or not?
18     A.  For the US study?
19     Q.  For either one or both.  Is that of
20  significance to you?
21     A.  Not particularly.  I think it's a somewhat
22  arbitrary point that they picked.
23     Q.  Why pick an endpoint for a study like the
24  TVM study?
25     A.  I think whenever you design a study,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 94

1  especially a prospective study, you want to have an
2  endpoint, doesn't mean it's necessarily a perfect
3  endpoint.
4      Q. Generally, when in a study like the TVM
5  study when an endpoint is chosen, if it doesn't -- if
6  the study does not meet the endpoint, should that be
7  any significance to the people running the study, or
8  can they say, well, no big deal, we just made up the
9  number anyway?
10         MR. SNELL: Objection, form.
11 BY MR. SLATER:
12     Q. How does that work?
13         MR. SNELL: Objection, form.
14         THE WITNESS: I think actually what you
15 said is pretty good. It should matter, but to a
16 certain extent, you have to take it in context that it
17 was a somewhat arbitrary endpoint.
18 BY MR. SLATER:
19     Q. What, if any, reaction did Ethicon have to
20 whether or not the endpoints were met in the French
21 and US TVM studies?
22     A. I don't know.
23     Q. Do you know what the actual recurrence rates
24 were that were found in the US and French TVM studies?
25     A. I think the recurrence rate in the -- at

Page 95

1  what year are we talking about?
2      Q. Let's talk about the one year.
3      A. In the French TVM I believe the recurrence
4  rate was somewhere in the range of 10 to 15%. I
5  believe -- I don't recall for the US. The most recent
6  US one I reviewed was the five-year, and I think it
7  was, you know, significantly higher than that.
8      Q. Do you know how recurrences were measured in
9  the French and US TVM study?
10     A. I believe with the POP-Q system.
11     Q. Therefore, it would be important that those
12 who were actually performing the POP-Q measurements
13 would know how to do that, correct?
14     A. Correct.
15     Q. And would accurately record what was found,
16 correct?
17     A. Correct.
18     Q. And would -- rephrase.
19        Do you know whether or not there were any
20 issues with the POP-Q measurements that were
21 documented in the TVM study?
22        MR. SNELL: Objection, form. Go ahead.
23        THE WITNESS: I know that when we were
24 doing the Prosima study, there were some issues with
25 POP-Q, making sure people were measuring it right

Page 96

1  because it is a somewhat complex system. I don't find
2  it that complex, but a lot of people do. And someone
3  may have mentioned that there was an issue during the
4  TVM study along the same lines, but I don't recall for
5  sure.
6  BY MR. SLATER:
7      Q. Have you ever reviewed any document with
8  regard to whether or to what extent there were errors
9  with the POP-Q measurements in the French or US TVM
10 studies?
11     A. Not that I recall.
12     Q. You would agree with me if there was a
13 systemic problem with errors with the POP-Q
14 measurements, that would cast doubt on the validity of
15 the data that was reported with regard to recurrences,
16 correct?
17     A. Sure.
18        MR. SNELL: Objection, form.
19 BY MR. SLATER:
20     Q. And to the extent that there were errors in
21 the POP-Q measurements with the TVM study, you're not
22 in a position to give me any information on that right
23 now, other than that you generally heard there might
24 have been some issues when you were doing your own
25 study years later?

Page 97

1      A. Correct.
2      Q. So, as you sit here now, you can't offer me
3  an opinion as to whether or not the recurrence rates
4  that were recorded in the French and US TVM studies
5  are valid or reliable; true statement?
6         MR. SNELL: Objection, form.
7         THE WITNESS: All I can comment on is
8  what was published.
9  BY MR. SLATER:
10     Q. You only know what was published, but you
11 have no information about whether there were errors
12 that were noted with regard to the recurrence rates
13 when the POP-Q measurements were done, correct?
14     A. I do not.
15     Q. Do you know what the exposure rates were in
16 the French and US TVM studies?
17     A. I think we covered that earlier, yes.
18 Again, it varied from site to site, but I think the
19 average was around 15%.
20     Q. Do you know if an effort was ever made to
21 try to determine why there was a variation in exposure
22 rates from site to site in the TVM study?
23     A. I believe in one of the papers that I read,
24 they mentioned that because there were -- and this may
25 not have been TVM, it may have been the Nordic group

Confidential - Subject to Stipulation and Order of Confidentiality

Page 98

1 with Prolift®. I'm sorry. Some of it runs together.
2        But that, you know, any time had you to do a
3 multicenter study and you find different results using
4 the same procedure, similar types of patients and you
5 see differences, you try and determine, you know,
6 maybe why one group had a higher rate than the other.
7    Q.  You would agree with me with regard to the
8 TVM study that to the extent there were differences in
9 exposure rates from hospital to hospital, it would
10 have been important for Ethicon to find out why that
11 existed in case that would have some impact on patient
12 selection, correct?
13           MR. SNELL: Objection.
14 BY MR. SLATER:
15    Q.  That would be one factor you'd want to look
16 at, right?
17           MR. SNELL: Objection, form. Go ahead.
18           THE WITNESS: Yes.
19 BY MR. SLATER:
20    Q.  Another thing you'd want to look at is there
21 any sort of factor that led to these differences that
22 you would want to warn physicians and patients about;
23 that'd be another reason to want to learn that,
24 correct?
25    A.  I'm sorry, factors, is that what you said?

Page 99

1    Q.  A factor.  You want me to reask the
2 question?
3    A.  Yes.
4    Q.  Sure.  Another reason why you would want to
5 try to -- rephrase.
6        Another reason why you want Ethicon to have
7 tried to determine the differences -- why these
8 differences existed was in case there were factors
9 that were leading to these different exposure rates
10 that Ethicon would then have needed to warn physicians
11 and patients about, right?
12           MR. SNELL: Objection, form. Go ahead.
13           THE WITNESS: That sounds reasonable.
14 BY MR. SLATER:
15    Q.  Do you know whether Ethicon made any effort
16 to determine the differences or why the differences
17 existed in exposure rates from hospital to hospital?
18    A.  I don't.
19    Q.  If Ethicon made no such effort, that would
20 be a bad thing, right?
21           MR. SNELL: Objection, form.
22           THE WITNESS: I don't think it's
23 necessarily a bad thing, but it's just it may have
24 been one of ways they could have improved their
25 launch.

Page 100

1 BY MR. SLATER:
2    Q.  You certainly would have wanted Ethicon to
3 try to determine why the differences in exposure rates
4 existed from center to center, right?
5           MR. SNELL: Objection, form.
6 BY MR. SLATER:
7    Q.  Sitting here as an expert witness, giving
8 opinions about Ethicon's conduct, overall, you would
9 say they should have done that, right?
10    A.  I think that --
11           MR. SNELL: Objection, form. Go ahead.
12           THE WITNESS: -- the physicians running
13 the study that would be something that they would have
14 wanted to look at.  It might be hard to study that,
15 though.
16 BY MR. SLATER:
17    Q.  Well, Ethicon funded the study, correct?
18    A.  Again, I'm not positive of that.  I think
19 they funded it to some degree.
20    Q.  Do you know who owned the data from the TVM
21 studies, whether the data was owned by Ethicon or by
22 the investigators?
23    A.  I do not, no.
24    Q.  Assuming that Ethicon owned the data, you
25 would expect that Ethicon would have taken steps to

Page 101

1 figure out why are we seeing these variances in
2 exposure rates from center to center before we are
3 going to now put this procedure out on the market for
4 widespread marketing?
5    A.  If they had reason --
6           MR. SNELL: Objection to form.  Go
7 ahead.
8           THE WITNESS: If they had reason to
9 suspect that it was something simple like all erosions
10 were in people who were smokers, then that might be
11 something they might have wanted to figure out.  If
12 it's simply that, you know, they went from site to
13 site and saw that one physician maybe didn't seem to
14 have as good surgical skills and it was just a result
15 of that, then I don't know what else they could have
16 done.
17 BY MR. SLATER:
18    Q.  You would have -- well, rephrase.
19        For Ethicon to be able to make those types
20 of decisions, they would need to study the question to
21 find out what are the variables in play?  If they
22 don't study the question, there's no way to have any
23 idea what's going on, right?
24    A.  That's correct.
25    Q.  And if, for example, it turned out that

Confidential - Subject to Stipulation and Order of Confidentiality

Page 102

1  there was a physician's technique at one particular
2  center that was leading to a much higher erosion rate,
3  it's something that Ethicon would very much want to
4  know so they could make sure that they give the right
5  instructions in their surgical technique and make sure
6  the professional education is geared to prevent that,
7  right?
8        MR. SNELL:  Objection, form.
9        THE WITNESS:  I can't say to what
10 Ethicon would have liked but I believe a paper to that
11 effect was published looking at risk factors during
12 TVM such as T incision and hysterectomy.  That was
13 published.
14 BY MR. SLATER:
15     Q.  My question is with regard to differences in
16 exposure erosion rates between the different centers.
17 If it turned out -- if they actually did study the
18 question and it turned out that there was a technique
19 issue, you would want to be able to study it,
20 establish that and then incorporate that information
21 into your instructions and professional education,
22 right?
23        MR. SNELL:  Objection, form.
24        THE WITNESS:  That would be a nice
25 thing to have.

Page 103

1  BY MR. SLATER:
2      Q.  You've never worked directly at a medical
3  device company, correct?
4      A.  Correct.
5      Q.  Never worked at a pharmaceutical company,
6  correct?
7      A.  Correct.
8      Q.  You've never been involved in a design
9  control process prelaunch of a medical device,
10 correct?
11     A.  I've been involved in -- I think they called
12 it a validation study for TVT-Secur®.  They had me
13 come in and look at -- jeez, it's been many years, but
14 I think it was along the lines of wanting to
15 standardize technique so that it can be, you know,
16 printed in the IFU, things like that.  I think it was
17 along those lines, but I was not -- I was a consultant
18 at that point.  I was not employed.
19     Q.  You've never been involved in structuring or
20 implementing a design control process for a medical
21 device from the medical device company perspective,
22 correct?
23     A.  No.  I don't really even know what design
24 control process is.
25     Q.  Are you familiar with the term DDSA is?

Page 104

1      A.  I'm not.
2      Q.  Are you familiar with the term FMEA, failure
3  modes and effects analysis?
4      A.  No.
5      Q.  And DDSA, just for the record, device design
6  safety assessment, is that a term you're familiar
7  with?
8      A.  No.
9      Q.  Did you look at the DDSA or FMEA analyses
10 for the Prolift® in this case?
11     A.  I did not.
12     Q.  And you're not going to offer any opinions
13 on that subject at all, correct?  If you didn't look
14 at them, you're not going to offer opinions, right?
15     A.  If you show it to me, I guess maybe I would,
16 but, otherwise, no, I'm not going to offer them in my
17 report.
18     Q.  It's not something you've ever done, as we
19 sit here now, right?
20     A.  No.
21     Q.  Have you ever been involved in authoring a
22 clinical expert report within a medical device company
23 with regard to a medical device that was going to be
24 on the market or was already on the market?
25     A.  A clinical device --

Page 105

1      Q.  Clinical expert report; do you know what
2  that is?
3      A.  No.
4      Q.  To your recollection, did you review the
5  clinical expert reports for the Prolift®?
6      A.  No.
7      Q.  You're not going to offer any opinions on
8  that subject, or you haven't yet, right?
9      A.  Correct.
10     Q.  You don't intend to, as you sit here now,
11 right?
12     A.  Unless you ask me about it and show me the
13 report.
14     Q.  There's no -- you have no familiarity, as
15 you sit here now, with the clinical expert report for
16 the Prolift®, and you have no opinions, as you sit
17 here now on it, correct?
18     A.  I've never read it.
19        MR. SNELL:  Objection, form.
20 BY MR. SLATER:
21     Q.  You've never read it, so you wouldn't expect
22 to be offering opinions, correct?
23     A.  Unless you gave it to me and asked me to
24 read it and then asked my opinion.
25     Q.  Well, I can guarantee you, based on you

Confidential - Subject to Stipulation and Order of Confidentiality

Page 106

1 saying you haven't read it and have no opinions now, I

2 will not be giving it to you.

3    A.  Okay.

4    Q.  Unless you want to really stay late tonight.

5       To your knowledge, were the exposure rates

6 in the French and US TVM study accurately counted or

7 undercounted?  Do you have any information one way or

8 the other on that?

9    A.  I do not.

10    Q.  That's not something you tend to offer

11 opinions on, correct?

12    A.  I tend to offer opinions on whether or not I

13 believe what I see is published or presented at

14 meetings.

15    Q.  Without looking at the underlying data and

16 studying that question, you're not in a position, as

17 you sit here now, to offer an opinion on whether or

18 not the exposures that occurred in the French and US

19 TVM studies were accurately reported in the published

20 manuscripts, correct?

21       MR. SNELL:  Objection, form.

22       THE WITNESS:  I guess I'd have trouble

23 agreeing to that.  I mean, most doctors that I know

24 that dedicate their time to taking care of people and

25 going through the trouble of producing research, and I

Page 107

1 tend to believe what they produce, but I wasn't there

2 standing next to them when they looked to see whether

3 or not there was an exposure and checked off on the

4 sheet.

5 BY MR. SLATER:

6    Q.  You don't have information one way or the

7 other specific to whether or not the exposure rates

8 that were actually reported with regard to the TVM

9 study were representative of what the underlying data

10 showed; is that a true statement?

11       MR. SNELL:  Objection, form.

12       THE WITNESS:  I guess.

13       MR. SNELL:  You're not here to guess.

14 If you don't understand his question, just ask him to

15 rephrase it.

16       THE WITNESS:  Are you saying do I think

17 that they -- that the doctors reported a certain

18 erosion rate and they changed it?

19 BY MR. SLATER:

20    Q.  No.  What I'm asking is this:  You read the

21 exposure rates that were reported in connection with

22 the TVM studies, correct?

23    A.  Correct.

24    Q.  But you haven't looked at the underlying

25 data to try to form an opinion about whether or not

Page 108

1 what was reported in the articles that you read is

2 actually reflective of what was documented in the

3 underlying data?

4    A.  And when you say "the underlying data," what

5 are you referring to?

6    Q.  The case specific -- patient specific forms

7 for each patient that show each exam that was done and

8 what was recorded with regard to whether or not an

9 exposure existed at a certain time.

10    A.  Right.  I have not -- to save us some time

11 maybe, I have not reviewed any case report forms that

12 the physicians or the patients filled out.  I have not

13 reviewed their database.  I have not reviewed their --

14 you know, their SAS database or anything like that.  I

15 did not have any access to the primary data, only what

16 was published.

17    Q.  Okay.  So you wouldn't be forming an opinion

18 about whether or not the published data reflects what

19 the actual raw data in the case specific forms shows,

20 correct?

21       MR. SNELL:  Objection, form.

22       THE WITNESS:  Only to what I just

23 responded before, that I tend to trust doctors that do

24 this work.

25 BY MR. SLATER:

Page 109

1    Q.  You tend to trust when something is

2 published or presented at a meeting, you tend to trust

3 that the data being given is accurate, right?

4    A.  Correct.

5    Q.  If it were to turn out later that the data

6 was inaccurate, that would raise questions about the

7 reliability of the conclusions about that reported

8 data, correct?

9    A.  In general, yes.

10    Q.  With regard to the recurrence rates, you did

11 not review the raw data, so you have no basis to offer

12 an opinion one way or another as to whether the

13 reported recurrence rates accurately reflect what's in

14 the underlying data, correct?

15       MR. SNELL:  Objection, form.

16       THE WITNESS:  Again, I did not review

17 any of the primary data on any outcome of the TVM

18 study.

19 BY MR. SLATER:

20    Q.  Let's change gears for a second and talk

21 about Gynemesh® PS -- rephrase.

22       Let me ask you one or two other questions

23 about TVM, because I want to try to put this aside.

24       Do you know how Ethicon utilized the TVM

25 study in connection with the Prolift®; meaning from

Confidential - Subject to Stipulation and Order of Confidentiality

Page 110

1  Ethicon's perspective, what, if any, reliance was
2  placed on the TVM studies?
3      A.  I do not know.
4      Q.  Let me ask you about the Gynemesh® PS study.
5  Do you know what that is?
6      A.  I know that a study was reported in terms of
7  abstract form on the use of Gynemesh® if that's the
8  one you're referring to.
9      Q.  Do you know any specific information about,
10  for example, how the Gynemesh® was used in that study?
11      A.  I believe it was used both transabdominally
12  and transvaginally.
13      Q.  Have you looked at any of the underlying
14  data, patient report forms or any of that with regard
15  to Gynemesh® PS study?
16      A.  No.
17      Q.  So you're not in a position to form any
18  opinions about whether what is actually reported in
19  the abstract or the white paper or the actual
20  documents that were produced following the Gynemesh®
21  PS study about whether that accurately reflects what
22  the data shows?
23      A.  I will go back to my previous answer, only
24  in that I tend to trust that what I'm seeing published
25  is valid.

Page 111

1      Q.  Beyond that you have never looked at the
2  underlying data to compare it to what was reported by
3  the authors of the -- or the investigators of the
4  Gynemesh® PS study, so you're not in a position to
5  form any specific opinions on whether or not the
6  reported results reflect the underlying data, correct?
7          MR. SNELL:  Objection, form.
8          THE WITNESS:  I was going to answer one
9  of your questions, and I was going to say I have not,
10  and by the end of the question it changed to a
11  different question.
12  BY MR. SLATER:
13      Q.  Okay.
14      A.  I have not reviewed any of the original
15  patient reports.
16      Q.  You haven't reviewed any of the underlying
17  Gynemesh® PS data, correct?
18      A.  Not that I know of.
19      Q.  And you haven't ever compared the underlying
20  data to what was reported by the investigators in any
21  articles or abstracts, correct?
22      A.  Correct.
23      Q.  So you're not going to offer any opinions
24  about whether or not what was reported, either
25  abstracts or papers, reflects the underlying data

Page 112

1  because it's not something you've looked at, right?
2      A.  Yes, only to -- it's the same question you
3  asked before in terms of only to the extent that I --
4  it's my opinion that I tend to trust that.
5      Q.  Your assumption is that the reported results
6  would be accurate, but you've never actually looked at
7  it yourself to confirm that?
8      A.  Correct.
9      Q.  And you're not in a position to form a
10  specific opinion about whether it's correct.  All you
11  have is your assumption, which is a general assumption
12  that people will only accurately report data?
13          MR. SNELL:  Object to form.
14          THE WITNESS:  Correct.
15  BY MR. SLATER:
16      Q.  Do you know whether or to what extent
17  Ethicon relied on or utilized the Gynemesh® PS study
18  in connection with the Prolift®?
19      A.  I do not know what Ethicon relied upon.
20      Q.  Do you know what Ethicon relied on before it
21  marketed the Prolift® to make the decision the
22  Prolift® is safe and effective and should be released
23  for marketing to the public?
24      A.  As we stated earlier, I've never been an
25  employee of Ethicon.  I never worked in there.  I

Page 113

1  never went to their meetings about how they were
2  deciding whether -- how to release Prolift®.
3      Q.  And there's no specific deposition testimony
4  you recall seeing on that topic?
5      A.  Not that I recall.
6      Q.  And no specific documents that you saw on
7  that specific topic, as you sit here now, which would
8  indicate what specific information Ethicon relied on
9  to say, okay, this is a safe and effective product,
10  we're going to release the Prolift®?
11      A.  Yeah, I mean, I've -- some of these
12  depositions are very long, and I know Piet Hinoul, I
13  think there was some discussion of that in his
14  deposition, but I don't have any specific
15  recollection.  If you want to ask me something
16  specific, I'd be happy to answer.
17      Q.  You're certainly not offering any opinions,
18  as you sit here now, with regard to what Ethicon may
19  or may not have relied on when they decided, yes, the
20  Prolift® is safe and effective, and we're going to
21  mark it to the world?
22      A.  I could with a reasonable certainty surmise
23  that they relied upon Gynemesh® studies and TVM
24  studies, but, again, I wasn't there to know that for
25  sure.

Page 114

1   Q.  That's just an assumption you're forming?

2   A.  It's an educated assumption.

3   Q.  Do you know what data was available to

4   Ethicon at the time the decision was made that the

5   Prolift® is safe and effective to be marketed?

6   A.  I'm sorry.  Could you repeat the question.

7   Q.  Sure.  Do you know what specific data was

8   available to Ethicon as of February, March 2005 when

9   they were actually now launching the Prolift®, what

10  they actually were relying on at the time they made

11  the decision, yes, it's safe and effective, yes, we

12  can market it?

13  A.  I do not know what they were relying on.

14  Q.  Since you don't know specifically what

15  they're relying on, you're not going to offer any

16  specific opinions about whether that data was

17  sufficient or not; fair statement?

18      MR. SNELL:  Objection, form.

19      THE WITNESS:  I'm happy to offer

20  opinions on the data that was present.  I'm not going

21  to make an expert opinion as to what Ethicon was

22  relying on.  I have no idea what they thought was

23  important.

24  BY MR. SLATER:

25  Q.  My question is this:  Since you don't know

Page 115

1   what Ethicon specifically was relying on when they

2   made that decision to launch the Prolift®, you

3   wouldn't be offering me an opinion about whether

4   something you're not familiar with was reasonable or

5   not, correct?

6   A.  Not unless you give me some information

7   about what they knew and what they were relying upon,

8   and then I'd be happy to make an opinion on it.

9   Q.  Well, this is my chance to ask you what you

10  know and what your opinions are.

11      So as you sit here now, you have no opinion

12  on that, correct?

13  A.  Correct.

14  Q.  Do you know Axel Arnaud?  Did you ever meet

15  him?

16  A.  I think I met him in an airport once.

17  Q.  Attached to your supplemental report, which

18  we marked as Murphy-2, is a list of transcripts,

19  expert reports and literature and then an other

20  section, right?

21  A.  I see that.

22  Q.  Did you read all these materials before

23  signing this report on November 28, 2012?

24  A.  What I will say is I've been bombarded with

25  documents in the last two weeks.  I open the Fed Ex

Page 116

1   package, I look at it as quickly as I can to determine

2   how important it is for me to read this through and

3   then try and use my time.  I'm a fully practicing

4   physician with two kids.  I have not read every word

5   of everything that was presented here.

6   Q.  Is there anything here in this list of

7   materials that you can tell me, yes, I know I read

8   that in its entirety?

9   A.  No.

10  Q.  Are there some of these materials that you

11  have not read at all?

12  A.  I'm sorry.  Can I take that back?

13  Q.  Sure.

14  A.  I think that I read all of Michael Margolis'

15  deposition, and I think that I read all of Daniel

16  Elliott's deposition.  I think that's the only thing

17  I've read in its entirety.

18  Q.  Did you read Vincent Lucente's deposition?

19  A.  No.  I only got about many 10% of the way

20  through it.

21  Q.  Did you talk to him about his deposition?

22  A.  I talked to him briefly about how it went.

23  Q.  What did he tell you?

24  A.  He told me that it went pretty well.

25  Q.  Do you and Vincent Lucente, in your

Page 117

1   experience, generally have the same viewpoints on the

2   Prolift®?

3      MR. SNELL:  Objection.  I'm going to

4   object to that.  Objection, form.

5   BY MR. SLATER:

6   Q.  Well, let me ask the question differently.

7      Are there any disagreements, significant

8   disagreements between you and Vincent Lucente with

9   regard to the Prolift® that you're aware of that you

10  can tell me about?

11  A.  Nothing comes to mind.

12  Q.  I mean, you interact with him on a daily

13  basis.  You've written articles with him.  You've

14  operated with him, treated patients with him, so --

15  A.  Correct.

16  Q.  -- based on that daily interaction, is there

17  anything where you can say, you know, we've had -- we

18  have a disagreement about this particular issue with

19  the Prolift®?

20  A.  I think what I would -- I might say in

21  regards to that is that I think at least in the years

22  when Prolift® was on the market, he used it on a more

23  regular basis than I did; meaning a higher percentage

24  of the reconstructive pelvic surgery cases that he did

25  were Prolift®, probably a smaller percentage of my

Confidential - Subject to Stipulation and Order of Confidentiality

Page 118

1  cases were.  I don't know that there were any specific
2  disagreements as to why that might be or might not be,
3  but I think that's a fair assessment of the
4  differences between he and I.
5      Q.  What is your -- well, rephrase.
6          During the time you've used the Prolift®,
7  did your patient selection criteria change over the
8  years?
9      A.  Not substantially, I don't think.
10     Q.  Did your understanding of which patient
11 groups may be at increased risk for complications or
12 poor outcomes evolve over the years?  Did you learn
13 more as time went on on that subject?
14         MR. SNELL:  Objection, form.  Go ahead.
15         THE WITNESS:  I will say that I
16 constantly learn about all the surgeries I do every
17 day.  What has also changed is the environment in
18 which I practice, to be 100% honest.  As, I don't
19 know, people may or may not know, there's a lot of ads
20 on TV about mesh.  I go in to see my patients before
21 surgery, and the TV is on and there's an ad saying,
22 you know, 1-800 bad mesh.  So to say that that hasn't
23 impacted the way I practice would be untrue.
24 BY MR. SLATER:
25     Q.  It's a good thing if the threat of

Page 119

1  litigation will make doctors more cautious on who
2  they'll put mesh into; isn't that a good thing?
3          MR. SNELL:  Objection, form.  Go ahead.
4          THE WITNESS:  I disagree with that
5  statement.
6  BY MR. SLATER:
7      Q.  Let me ask you this:  You know that there
8  are women who have suffered catastrophic injuries due
9  to complications from the Prolift®; you know that,
10 right?
11         MR. SNELL:  Objection, form.  Go ahead.
12         THE WITNESS:  I don't have any personal
13 patients who have suffered catastrophic.  I'm sure the
14 people that are plaintiffs in this case would consider
15 what has occurred to them as catastrophic.
16 BY MR. SLATER:
17     Q.  Let me ask you a question -- let me go
18 through this a little bit with you.
19     A.  Sure.
20     Q.  One of the complications that can occur as a
21 result of the Prolift® is a woman can end up with
22 urinary retention, correct?
23     A.  That is not something that I have ever seen,
24 to be honest with you.
25     Q.  Are you aware that -- well, rephrase.

Page 120

1      Are you aware as to whether or not -- let me
2  ask you a more general question.
3      A.  Sure.
4      Q.  Your knowledge of the Prolift® comes from
5  your clinical experience; that's one source of
6  information, correct?
7      A.  Correct.
8      Q.  Another source of information is what you've
9  read in the literature, correct?
10     A.  Correct.
11     Q.  Another source of information is what you've
12 been told by other physicians at meetings or informal
13 conversations?
14     A.  Correct.
15     Q.  Is there any other source of information
16 that I'm missing?
17     A.  Not that I can think of.
18     Q.  Your personal experience with the Prolift®
19 and the outcomes that you get in your group with
20 Dr. Lucente, how would you compare that -- those
21 outcomes with what you would expect to see in the
22 general community around the country?
23         MR. SNELL:  Objection, form.  Go ahead.
24         THE WITNESS:  We tend to report a lot
25 of our results.  We tend to report, amongst other

Page 121

1  things, our erosion rates.  It's not uncommon at
2  meetings for people to say those look like good rates,
3  you know, seems like we see higher rates.  What do you
4  attribute that to?
5  BY MR. SLATER:
6      Q.  So one thing that you have an understanding
7  of -- well, let me ask you this:  Do you believe that
8  the complication rates that are reported through your
9  group that you've published about are likely lower
10 than the rates you would expect to see out there in
11 the community among other surgeons using the Prolift®?
12     A.  Are you talking about --
13         MR. SNELL:  Objection, form.  Go ahead.
14         THE WITNESS:  -- specific communities
15 or the whole -- every community combined other than
16 ours?
17 BY MR. SLATER:
18     Q.  That's what I'm asking about, the second
19 part.
20         MR. SNELL:  Same objection.
21         THE WITNESS:  It's hard for me to offer
22 that because a lot of that data hasn't been published.
23 Again, I can report on what I -- or I can give my
24 opinion on what has been said to me at meetings, like
25 I just reported, that our erosion rates seems lower

Confidential - Subject to Stipulation and Order of Confidentiality

Page 122

1 than some people are finding.
2 BY MR. SLATER:
3     Q.  Do you feel that you have a solid
4 understanding of what the actual complications rates
5 and adverse events being seen out in the community
6 outside of your practice, do you feel a good
7 understanding of that?
8         MR. SNELL:  Objection, form.
9         THE WITNESS:  It's very hard because
10 it's very hard to get a denominator in terms of how
11 many are being done.  You know, when I drafted the
12 time to rethink article, which I'm sure we'll talk
13 about, you know, I had attended the FDA open forum in,
14 I don't know, September 2011 and had gotten some
15 information from industry in terms of what a
16 denominator might have been during the time that the
17 reports came to the MAUDE database, and it actually
18 seemed that the rates of complications were actually,
19 if you used that denominator in terms of how many had
20 been out there, sold to the public and how many have
21 been reported to the MAUDE database, they actually
22 seemed quite comparable.
23         Now, the problem with that is that not
24 everything gets reported to the MAUDE database.  So
25 that's the best educated answer I can give you.

Page 123

1 BY MR. SLATER:
2     Q.  With regard to the Prolift®, to your
3 knowledge, urinary retention is not a risk of the
4 Prolift®, correct?
5     A.  Yes.
6     Q.  Is pudendal neuralgia a potential
7 complication that can result from the Prolift® being
8 put in the woman's body?
9     A.  Can I go back to my last answer?
10     Q.  Sure.
11     A.  I believe it was either in David Robinson's
12 deposition or someone discussing David Robinson's
13 deposition, I think he had made some point about being
14 aware that urinary -- I think he had seen some urinary
15 retention, something along those lines.  I'm just
16 record reporting that I don't recall ever having a
17 patient that had urinary retention from the Prolift®.
18 I may have done a Prolift® and a sling and she had
19 urinary retention and, therefore, I had to address her
20 sling but not from the Prolift® per se.
21     Q.  In your experience and based on your
22 knowledge, urinary retention where a woman just has a
23 Prolift® performed is not a risk?
24     A.  I wouldn't say is not a risk.  Any
25 reconstructive surgery that involves operating on the

Page 124

1 pelvic floor, that is a potential risk because you can
2 affect the nerves that go to the bladder and you could
3 certainly either have a temporary or a more prolonged
4 problem with urinary retention, but anything
5 specifically related to the Prolift®, I don't know of
6 that.
7     Q.  When you read David Robinson's testimony
8 regarding patients with urinary retention following
9 Prolift® surgery, was that the first time you had been
10 made aware of patients developing urinary retention
11 after Prolift®?
12     A.  I think so because I don't think in any of
13 the other literature on Prolift® that I've seen that
14 that is a commonly reported adverse event.
15     Q.  Do you know whether or not Ethicon ever
16 considered warning in either the IFU or the patient
17 brochure that urinary retention was a potential
18 outcome adverse event of Prolift® surgery?
19     A.  I think in reviewing the patient brochures,
20 I think that that was added from
21 the initial Prolift® brochure to the second brochure.
22 This is to the best of my recollection.
23     Q.  Do you know whether Ethicon ever considered
24 adding language to the IFU to warn doctors that
25 urinary retention could result from the Prolift®

Page 125

1 procedure?  One way or another, do you know whether
2 that was considered?
3     A.  I don't, I don't recall knowing that.
4     Q.  If Ethicon had information indicating
5 that -- well, rephrase.
6         We went through a moment ago the sources of
7 information you have about the Prolift® and the
8 outcomes of Prolift® surgery.  We just talked about
9 that a few moments ago?
10     A.  Yes.
11     Q.  You would certainly expect that Ethicon,
12 since it would have information from a much broader
13 base of sources about the Prolift®, would have more
14 information than you would have about the outcomes of
15 Prolift® surgery, correct?
16     A.  Correct.
17     Q.  And you would expect that Ethicon would act
18 on that information in a responsible way, for example,
19 if there was a report coming in of -- reports coming
20 in of a specific complication occurring, you would
21 expect Ethicon to look into that and find out what's
22 happening, right?
23         MR. SNELL:  Objection, form.
24         THE WITNESS:  If it was something that
25 they didn't expect would be an expected outcome

Confidential - Subject to Stipulation and Order of Confidentiality

Page 126

1  anyway, but if it's something that they didn't include
2  on their first, you know, information but they assumed
3  that it was something that people could infer from the
4  other information written there, I don't know that
5  they'd have to go out of their way just because they
6  found something out that they already knew was a
7  potential risk.
8          Like I said, urinary retention is a
9  risk any time you do pelvic reconstructive surgery.
10 So if you say there's potential damage to the nerves
11 and the pelvis doing the Prolift®, well, then you can
12 sort of extrapolate that there is a risk of voiding
13 dysfunction afterwards.
14 BY MR. SLATER:
15     Q.  If Ethicon had reason to know that there
16 were aspects of the Prolift® procedure itself which
17 could create a risk for urinary retention, that's
18 something you would expect Ethicon to warn about,
19 meaning if there is something about the Prolift®
20 procedure itself which creates a particular risk for
21 urinary retention?
22     A.  Do you mean more so than any other
23 reconstructive pelvic surgery?
24     Q.  Yes.
25     A.  Yes, I think that would be a reasonable

Page 127

1  thing that they would want to report.
2      Q.  If there was something about the Prolift®
3  procedure that would -- in other words, would increase
4  the risk that you could get urinary retention, meaning
5  not just the general risk, but there's also something
6  about the Prolift® procedure itself that can increase
7  that risk, that's something that should be warned
8  about, correct?
9          MR. SNELL:  Objection to form.  Go
10 ahead.
11         THE WITNESS:  So you mean that, for
12 instance, that the risk is significantly higher when
13 you do a Prolift® than when you do a sacrocolpopexy,
14 something like that?
15 BY MR. SLATER:
16     Q.  Well, what I'm saying is if there's
17 something intrinsic to the Prolift® procedure that
18 Ethicon knew could create a risk for urinary retention
19 and that risk of that avenue of ending up with urinary
20 retention wouldn't exist with, for example, native
21 tissue repairs or ligament fixations, then you would
22 expect that to be warned about, correct?
23         MR. SNELL:  Objection, form.
24         THE WITNESS:  Yeah, I mean, I think
25 that's a hypothetical that I can't really see that

Page 128

1  ever being a hypothetical that's true, but if it were,
2  yes.
3  BY MR. SLATER:
4      Q.  Has anybody ever told you that during the
5  dissections of the sacrospinous ligament in connection
6  with the Prolift® procedure that the pelvic splanchnic
7  nerves could be disrupted and that could cause or
8  contribute to urinary retention?
9      A.  Again, I don't think there is anything
10 different about the dissection of the sacrospinous
11 ligament for Prolift® then, for instance, the
12 sacrospinous ligament suspension with suture.
13     Q.  Well, you don't dissect tissue away from
14 both sides of the sacrospinous ligament when you do a
15 sacrospinous ligament fixation, correct?
16     A.  Both ways, what do you mean?
17     Q.  Both sides.
18     A.  When you do a dissection for Prolift®, you
19 clear off the sacrospinous ligament.
20     Q.  On both sides of it, correct?
21     A.  I'm not aware of what you mean by "both
22 sides," but you clear off the ligament.
23     Q.  Okay.  When you do a sacrospinous ligament
24 fixation, the dissection of tissue from the sacral
25 spinous ligament is less extensive, correct?

Page 129

1      A.  I would disagree with that statement.
2      Q.  Do you know what the pelvic splanchnic
3  nerves are?
4      A.  I'm familiar with them.
5      Q.  Do you know whether or not disruption of
6  those nerves can lead to urinary retention?
7      A.  I would assume that they could.
8      Q.  And why would you assume that?
9      A.  Because they're pelvic floor nerves.
10     Q.  Do you know what their relationship is to
11 the bladder and bladder function?
12     A.  I can't say right now splanchnic nerves per
13 se what the role of that in bladder function is.
14     Q.  Can Prolift® mesh irritate the bladder just
15 by rubbing up against it?
16     A.  Not that I know of.
17     Q.  You've never heard of that occurring?
18     A.  No.
19     Q.  Can the inflammatory reaction caused by
20 Prolift® mesh cause irritation of the bladder?
21         MR. SNELL:  Objection, form.
22         THE WITNESS:  Can it cause irritation
23 of the bladder; is that what you said?
24 BY MR. SLATER:
25     Q.  Yes.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 130

1   A.  How are you defining "irritation of the
2   bladder"?
3   Q.  Something that irritates the lining of the
4   bladder.
5   A.  No.
6         MR. SNELL:  Objection, form.  Go ahead.
7         THE WITNESS:  No, because the Prolift®
8   mesh doesn't lie along the lining of the bladder.  It
9   lies underneath the bladder.
10  BY MR. SLATER:
11  Q.  Well, does the Prolift® mesh come into
12  contact with the bladder once it's placed?
13  A.  Yes, but not the bladder lining.
14  Q.  I was using lining and you're talking about
15  the inside of the bladder.  I'm talking about the
16  outside.
17  A.  Okay.
18  Q.  So I used the wrong term.
19  A.  It lies next to the bladder.  There's no
20  evidence that I'm aware of that it irritates or
21  inflames the bladder by lying there.
22  Q.  Have you removed a revised Prolift® mesh
23  from women with complications?
24  A.  Some.
25  Q.  How many?

Page 131

1   A.  I would say somewhere in the range of 5 to
2   20.
3   Q.  Were those your patients, meaning that you
4   performed the Prolift® on them and then they had the
5   complications?
6   A.  The majority would be my patients, yes.
7   Q.  And what were the reasons for those
8   revisions that you had to perform?
9   A.  That were my patients?
10  Q.  Yes, start with those.
11  A.  The most common one would be an exposure of
12  the mesh.
13  Q.  What else?
14  A.  The only other resections, I can recall one
15  where a patient had some irritation on the upper arm
16  of the anterior Prolift®.  It seemed like it was
17  tight, and I went in and released that.
18  Q.  Anything else?
19  A.  Not too long ago I had a patient that I had
20  done a total Prolift® on.  I sutured the posterior
21  mesh at the cervix at the 6:00 position with a braided
22  suture, and she had come back with granulation tissue,
23  and I removed the granulation tissue, the suture, and
24  I think in the process of doing that, I removed a few
25  fibers of the mesh.

Page 132

1   Q.  Anything else you can remember?
2   A.  That's all I can remember right now.
3   Q.  Let's talk about patients that you didn't
4   place the Prolift® in but came to you and you needed
5   to revise or remove mesh.
6         What were the reasons for those?
7   A.  It does become a little bit hard to remember
8   which ones were Prolift® versus which ones were some
9   other company's device, but I think all of them have
10  been mesh exposures.
11  Q.  The 5 to 20 patients for which you've done
12  mesh revisions and removals, was that just Prolift®,
13  or does that include all mesh?
14  A.  I think I was referring specifically to
15  Prolift® when I said that.
16  Q.  I thought you were too.  I just want to make
17  sure.
18  A.  Yeah, I think so, and would you like to know
19  how many beyond that?  Probably another 10 to 20 were
20  non-Prolift®.
21  Q.  Have you ever spoken to any physicians who
22  have removed or revised Prolift® mesh and the mesh of
23  the similar prolapse kits from more than 50 patients?
24  A.  Have I ever spoken to them personally?
25  Q.  Yeah.

Page 133

1   A.  I may have spoken to them personally.  I
2   don't know that we were speaking about that.  I know
3   there are people like at the Mayo Clinic and Cleveland
4   Clinic that get a lot of these referred in to them,
5   and I've certainly spoken to a lot of those
6   physicians.
7         I don't know that -- I know that a lot of
8   people have come to me at meetings and said, hey, you
9   know, we're seeing more problems with these types of
10  things than what you guys are reporting.  And I know
11  Matt Barber, his group did a presentation on, you
12  know, removing mesh and things like that and what we
13  call tips and tricks in terms of techniques for doing
14  that.
15  Q.  Let me come back to your report, your
16  supplemental report.  We were talking about the list
17  of materials.
18        Are there materials on this list that you
19  probably have not read at this point?
20  A.  Certainly in their entirety, yes.
21  Q.  Are there materials on this list that you
22  probably just scanned very quick and couldn't even
23  tell me what those materials said, as you sit here
24  now?
25  A.  As I sit here now, probably yes.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 134

1    Q.  Are you able to point out, other than

2  Dr. Margolis' transcript and Dr. Elliott's transcript,

3  which you said you believe you read completely, and

4  Dr. Lucente's you said you read --

5    A.  10%.

6    Q.  10% -- can you give me any quantification of

7  how much of these other materials you reviewed?

8    A.  It would be something pretty close to a

9  guess.  Let me say this, less than 20% of all of them.

10    Q.  In the list of materials there's literature,

11  and on the second page of that there's a series of

12  articles towards the middle, where the first author in

13  four straight is Klinge, K-l-i-n-g-e.

14      Do you see that?

15    A.  I do.

16    Q.  Do you know who that is?

17    A.  He's one of these names that I see in

18  regards to mesh, basic science regarding mesh.

19    Q.  Anything else?

20    A.  I don't know him personally.  I don't even

21  know if it's a man or a woman, to be honest with you.

22    Q.  Have you made a point of studying the basic

23  science with regard to polypropylene mesh and how it

24  interacts within the woman's pelvis?

25    A.  I certainly have tried to keep up on all the

Page 135

1  basic science, to the best of my ability, and I

2  certainly want to apply that to my clinical experience

3  with using mesh.  Would I consider myself a basic

4  science expert on histology of mesh?  No.

5    Q.  When you talk about histology, you're

6  talking about how it interacts with the tissue?

7    A.  I'm talking about I have not personally

8  conducted studies where I am explanting mesh from an

9  animal model and then performed histologic evaluation

10  of that.  I've read papers on that.  I have some basic

11  understanding of it.

12    Q.  The Prolift® mesh once it's placed in the

13  woman's pelvis, a foreign body reaction occurs,

14  correct?

15    A.  Correct.

16    Q.  An inflammatory reaction occurs, correct?

17    A.  Correct.

18    Q.  Fibrotic tissue forms, correct?

19    A.  Correct.

20    Q.  If too much fibrotic tissue forms and if it

21  starts to bridge across the pores, that can create a

22  higher risk for contraction, correct?

23      MR. SNELL:  Objection, form.

24      THE WITNESS:  If too much, what did you

25  say too much?

Page 136

1  BY MR. SLATER:

2    Q.  I'll withdraw the question.

3    A.  Okay.

4    Q.  When the fibrosis forms as a result of the

5  Prolift mesh in the woman's body, are there risks?

6    A.  Yes.

7    Q.  What are the risks?

8    A.  I would say just like any other time

9  fibrosis occurs, there's a risk for tenderness in the

10  area, and there is a risk of shortening of vaginal

11  length, and those can subsequently lead to functional

12  outcomes.

13    Q.  When you say "functional outcomes," are you

14  talking about, for example, dyspareunia?

15    A.  Correct.

16    Q.  Are you talking about chronic pelvic pain?

17    A.  Correct.

18    Q.  Are you familiar with the concept of

19  bridging fibrosis or scar plating?

20    A.  I've heard of it, and I have a cursory

21  familiarity with it.

22    Q.  Do you have an understanding from your

23  review of materials in this case of what Ethicon's

24  knowledge base has been with regard to bridging

25  fibrosis and scar plating?

Page 137

1      MR. SNELL:  Objection, form.  Go ahead.

2      THE WITNESS:  The only thing I would

3  say is that I've been involved with some professional

4  education material that suggests, you know, the larger

5  the pore size, less chance of bridging fibrosis and

6  scarring.

7  BY MR. SLATER:

8    Q.  Do you have an understanding of why that is,

9  why the larger pores will reduce the risk of bridging

10  fibrosis and scar plating?

11    A.  Just less likely chance of more aggressive

12  fibrosis.

13    Q.  Do you have an understanding of why that is?

14    A.  Again, from a very basic science standpoint,

15  no.

16    Q.  Do you have an understanding of what

17  Ethicon's understanding has been as to why that is?

18      MR. SNELL:  Objection, form.

19      THE WITNESS:  Again, only that there's

20  some relation to pore size with that.

21  BY MR. SLATER:

22    Q.  Did you in reviewing materials to write your

23  expert reports in this case make any effort to try to

24  learn what Ethicon's internal knowledge has been from

25  all of its various sources of information with regard

Page 138

1 to the subject of bridging fibrosis and scar plating
2 and why the larger pores reduce that risk?
3     MR. SNELL: Objection, form.
4     THE WITNESS: I don't recall from
5 reading these particular documents of seeing a lot of
6 information on that.
7 BY MR. SLATER:
8     Q. Was that a subject that you particularly
9 looked at in doing your work in this case? Did you
10 try to figure that out, did you look in the documents
11 to try to find that information specifically?
12     MR. SNELL: Objection, form.
13     THE WITNESS: I did not.
14 BY MR. SLATER:
15     Q. Do you have an understanding that if the
16 pores of the mesh are 1 millimeter or greater in
17 diameter once it's actually placed in the woman's body
18 in actual use, that that reduces the risk of bridging
19 fibrosis and scar plating?
20     MR. SNELL: Objection, form.
21     THE WITNESS: I'm sorry. I'm not
22 trying to be difficult. Just could you repeat the
23 question?
24 BY MR. SLATER:
25     Q. Sure. Are you familiar with any

Page 139

1 significance to a 1 millimeter diameter of pore size
2 once the mesh is actually placed with regard to
3 whether or not that has any impact on bridging
4 fibrosis or scar plating?
5     A. I am not.
6     MR. SNELL: Objection, form. Go ahead.
7 BY MR. SLATER:
8     Q. Are you familiar at all with the information
9 that Ethicon has in its own files with regard to
10 whether or to what extent the one millimeter diameter
11 of the pore sizes can have significance with regard to
12 bridging fibrosis or scar plating?
13     A. I recall, and I don't recall where, reading
14 something about some people being concerned about 1
15 millimeter, thinking that was an odd number, but not
16 specifically what impact that had on Gynecare's
17 decision-making process.
18     Q. Am I correct that you would not be forming
19 any opinions or offering opinions with regard to the
20 specific significance of the pore size with regard to
21 bridging fibrosis and scar plating? Is that something
22 you don't feel that you would be offering opinions on?
23     MR. SNELL: Objection, form.
24     THE WITNESS: Oh, absolutely. I mean,
25 I think the size of a pore can affect how fibrosis

Page 140

1 occurs.
2 BY MR. SLATER:
3     Q. The larger pore being better?
4     A. Generally, if you're looking at microporous
5 meshes, you are more concerned about fibrosis.
6     Q. Beyond that, do you have any other opinion
7 on that subject?
8     A. No, not at this time.
9     Q. In all your interactions with Ethicon, did
10 anybody from Ethicon, whether it was formal or
11 informal, like it could be a professional education
12 event, it could be a document they provided to you or
13 it could just be a conversation, did anybody from the
14 company outside of your work as an expert in this
15 case, ever communicate to you what they knew about the
16 significance of pore size?
17     A. Not that I recall.
18     Q. Do you have an understanding of the
19 mechanism that leads to what is termed contraction,
20 retraction and shrinkage?
21     MR. SNELL: Objection, form. Go ahead.
22     THE WITNESS: I think I have a basic
23 clinical understanding of it, yes.
24 BY MR. SLATER:
25     Q. What is your understanding of what is

Page 141

1 occurring and why?
2     A. My understanding is that fibroblasts
3 invaginate into the spaces within a mesh, they lay
4 down fibrotic tissue like collagen, and that can cause
5 scar type tissue that can contract.
6     Q. Have you seen that with any mesh that you've
7 actually explanted where you've actually looked for
8 that?
9     A. I have not seen a problem with mesh
10 contraction personally.
11     Q. Do you have an understanding of whether
12 there were any factors with the Prolift® that would
13 increase the risk of contraction, retraction,
14 shrinkage occurring?
15     A. Increase compared to what?
16     Q. Is there anything about -- compared to --
17 well, I'll ask the question again.
18     Do you have an opinion as to whether there's
19 anything that one might do in implanting a Prolift®,
20 placing it in the woman's body, that could increase
21 the risk that the woman could end up with contraction,
22 retraction or shrinkage of Prolift® mesh?
23     A. My opinion on this, and I'm not sure that
24 I'm totally answering your question but -- is that
25 what is often termed contraction is simply that a mesh

Confidential - Subject to Stipulation and Order of Confidentiality

Page 142

1  is put in with too much tension on it, and it then is
2  referred to as a contracted mesh, when I don't think
3  that's really what happened.
4       You know, I read a lot about this shrinkage,
5  contraction, both in, you know, the FDA's warning and
6  in scientific literature.  It's not something that I
7  have encountered in my vast experience using this
8  product and other products, specifically in relation
9  to how it compares to other reconstructive pelvic
10  surgeries.
11     Q.  What is your understanding -- well,
12  rephrase.
13       As you sit here now, are you saying that
14  contraction, retraction, shrinkage doesn't occur, or
15  are you saying that you just don't see it in your
16  practice but you're not disputing that it occurs?
17     A.  The latter, I'm disputing that I think that
18  mesh contraction is a major contributing factor to
19  adverse outcomes when using macroporous polypropylene
20  monofilament meshes.  You can certainly do an animal
21  study where you show that mesh contracts, you know, if
22  you lay it in the belly of a rat or a rabbit.  And I
23  certainly see that vaginal length often shortens after
24  a Prolift® procedure, but my point was that I often
25  see that in native tissue repairs as well.

Page 143

1       MR. SLATER:  Move to strike I often see
2  it in native tissue repairs.
3  BY MR. SLATER:
4     Q.  What is your opinion as to why tension --
5  well, rephrase.
6       When you refer to "tension," what are you
7  referring to?
8     A.  I'm referring to the mesh being pulled too
9  firmly in two directions.
10    Q.  And, in your opinion, why does tension, as
11  you've just described it, occur with Prolift®?
12       MR. SNELL:  Objection, form.
13       THE WITNESS:  If the supports are
14  pulled too tightly.
15  BY MR. SLATER:
16    Q.  When you say "pulled too tightly," what
17  mechanism are you referring to?
18    A.  The physician placing it.
19    Q.  You would agree with me that there's no such
20  thing really as a tension free placement of the
21  Prolift®, correct?
22    A.  It depends on what you refer -- what you
23  mean by the definition of tension free.  A lot of
24  people have different definitions of that, and I'm
25  happy to give you my definition of tension free.

Page 144

1     Q.  If I were to define tension as absolutely no
2  tension on the mesh, it is loose and there's no
3  tension on it, is that something that actually exists
4  with Prolift® placement?
5     A.  Okay.  Well, that's totally different --
6       MR. SNELL:  Objection to form.  Go
7  ahead.
8       THE WITNESS:  -- than the term tension
9  free.  Tension free refers to a technique.
10  BY MR. SLATER:
11    Q.  And that's how you define that term?
12    A.  Yes, that's how I would define that term.
13    Q.  So when you refer to tension free, you're
14  not talking about the outcome of the placement,
15  meaning that there is no tension on it, correct?
16    A.  Correct.  What I'm referring -- can I just
17  say what I think tension free is?
18    Q.  I'll ask the clean question.  When you say
19  "tension free," what do you mean by that?
20    A.  What I mean by tension free is a term that
21  was coined when midurethral, minimally invasive
22  synthetic slings were first developed.  Specifically,
23  I referred to the TVT® procedure, which stands for
24  tension free vaginal tape.
25       Prior to that slings were placed and they

Page 145

1  were anchored in a specific point.  So they were tied
2  over the rectus fascia.  They were -- a bone anchor
3  was placed in the back of the pubic bone, something
4  along those lines, where there was an actual fixation
5  point.
6       When the tension free vaginal tape procedure
7  came around, what was very unique about it was it
8  wasn't anchored in one place.  It was placed with a
9  plastic sheath covering it, which allowed you to move
10  it and then once you removed that sheath, there was an
11  initial friction force that holds it in place, and
12  then as time develops, connective tissue grows into
13  that to help support it in place.  That was a very
14  sort of revolutionary concept, okay.
15       In my opinion, something like the Prolift®
16  also uses tension free securement in that prior to
17  Prolift®, something like a sacrospinous ligament
18  suspension using mesh or abdominal sacrocolpopexy
19  using mesh, the mesh was anchored at a specific point
20  in the ligament, either the sacrospinous ligament or
21  the anterior longitudinal ligament of the sacrum.  But
22  with Prolift® it uses a similar mechanism to TVT®, in
23  that the mesh arm is simply brought through the
24  ligament but not anchored at one specific point.
25  That's what I refer to as tension free placement.

Confidential – Subject to Stipulation and Order of Confidentiality

Page 146

1   Q.  So when you refer to tension free placement
2   of the Prolift®, you're referring to the fact that
3   when you place it, you don't actually anchor it to
4   another structure within the pelvis, correct?
5   A.  It's not anchored at a specific point,
6   correct.
7   Q.  Are there risks to using a suture to secure
8   the Prolift® at any point?
9       MR. SNELL:  Objection, form.
10      MR. SLATER:  I'll ask the question
11  again.
12      MR. SNELL:  I don't know what the --
13  BY MR. SLATER:
14  Q.  Are there any risks to using a suture to
15  help place or support the Prolift® when it's placed in
16  the body?
17  A.  I just gave you a case of a patient that I
18  sutured the mesh to the cervix using a braided suture,
19  and the suture itself caused granulation tissue within
20  the patient's vagina.
21  Q.  Are there risks for creating Prolift®
22  complications if you suture the mesh in place?
23  A.  I guess I don't know what you mean by
24  Prolift® complications.
25  Q.  Meaning can that create tension on the mesh

Page 147

1   that could lead to discomfort or complications?
2       MR. SNELL:  Objection, form.
3       THE WITNESS:  I can't think of one.
4   BY MR. SLATER:
5   Q.  Do you know whether or not Ethicon felt that
6   the securing of the Prolift® with sutures could
7   increase the risk of discomfort or other
8   complications?
9   A.  Well, just so we're clear, I want to talk
10  about using suture to support the mesh versus using
11  suture to attach it to the vagina or the cervix,
12  because that's two -- that's two sort of different
13  concepts.
14  Q.  I'm talking about the second.
15  A.  When you suture it to either the vagina or
16  the cervix, okay.
17      And then what's the question?
18  Q.  Does that create a risk for poor outcome or
19  a complication?
20  A.  I don't know.
21  Q.  Okay.  Who contacted you and asked you to
22  act as an expert in this litigation?
23  A.  The first person I recall speaking to is an
24  attorney named Michael Brown.
25  Q.  When was that?

Page 148

1   A.  It was in 2011.  I don't recall exactly
2   when.
3   Q.  Did you start reviewing documents shortly
4   after that?
5   A.  I don't think shortly after.  I think it was
6   quite a few months after that.
7   Q.  When did you first start reviewing documents
8   for your report in this case?
9   A.  This would be my best estimation.  It would
10  be late 2011.
11  Q.  How much time have you spent working on this
12  case?
13  A.  I was just talking about this with my wife,
14  because I'm very poor at keeping track of some of
15  these things.
16  Q.  Let me withdraw the question and ask it
17  differently.
18      Have you been invoicing for your time in
19  this case and been getting paid?
20  A.  I have.
21  Q.  Because the defense normally would have
22  given me that disclosure, which they'll have to give
23  me now later today or tomorrow or whatever, but do you
24  know how much time you've invoiced for?
25  A.  I believe that I did an invoice for

Page 149

1   somewhere in the range of 7 to $8,000 this summer, and
2   I did an invoice for somewhere in the range of $11,000
3   in October.  I can do the math for you charging $400
4   an hour at that if you'd like, so I'm better at
5   remembering the money than the number of hours.
6   Q.  How much time did you spend reviewing the
7   materials listed in your supplemental report and
8   writing the report?
9   A.  So I would say I've done a lot more work in
10  the last month than I've done leading up to this, so
11  quite a few hours.
12  Q.  Can you tell me how many?
13  A.  I would say at least, you know, 20 to 40
14  hours, something like that.  I'd have to go back and
15  look at my documentation.  And I have not invoiced
16  that yet, that time.
17  Q.  There are various procedures that a
18  physician can recommend to a patient for pelvic floor
19  repair when there's prolapse, correct?
20  A.  Correct.
21  Q.  One of the procedures available is abdominal
22  sacrocolpopexy, correct?
23  A.  Correct.
24  Q.  And that can be done either open or
25  laparoscopically, correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 150

1   A.  Yes.

2   Q.  Another procedure that's available is either

3   anterior or posterior colporrhaphy, correct?

4   A.  Correct.

5   Q.  Another procedure that can be performed is

6   sacrospinous ligament fixation, correct?

7   A.  Correct.

8   Q.  Another procedure that can be performed is

9   uterosacral ligament fixation, correct?

10   A.  Correct.

11   Q.  There is another procedure that I've seen

12   generally described as transvaginal repair.  Are you

13   familiar with that term?

14   A.  No.  Let me -- can I readdress that.  I

15   mean, transvaginal repair is just an approach to

16   repairing a prolapse.  If you do it transvaginally,

17   it's transvaginal.  It encompasses lots of different

18   procedures, including anterior and posterior

19   colporrhaphy, sacrospinous ligament fixation.

20   Q.  The Prolift® is not one of the procedures

21   available to treat prolapse at this time, correct?

22   A.  No.  If you still have it on the shelf, you

23   could do it, but it's not being produced anymore, to

24   the best of my knowledge.

25   Q.  Are you still doing Prolift®?

Page 151

1   A.  I haven't done one in a while.

2   Q.  Did there come a point when you stopped

3   using the Prolift® and started using the Prolift+M®?

4   A.  There was never a time where I stopped using

5   Prolift® all together.

6   Q.  Was there ever a time where your -- well,

7   rephrase.

8   Once the Prolift+M® came out and was

9   available to you, how would you compare your use of

10   that with the Prolift®?

11   A.  Well, you know, I tried to look at whatever

12   data was available to me, and, you know, at some point

13   we did a cohort study where we looked at Prolift®

14   versus Prolift+M®, and it seemed like while there was

15   generally an improvement in sexual function in both

16   groups, there seemed to be more of an improvement in

17   the +M.  So at that point I started using it in

18   patients who were sexually active, but because it was

19   more expensive than Prolift® alone, I used Prolift®

20   alone in people who are not sexually active.

21   Q.  So if a woman was sexually active, you would

22   use the Prolift+M®, once the Prolift+M® became

23   available?

24   MR. SNELL:  Objection, form.

25   BY MR. SLATER:

Page 152

1   Q.  And once you then saw some data indicating

2   that it was a safer alternative for sexually active

3   women?

4   MR. SNELL:  Objection to form.

5   THE WITNESS:  I wouldn't say it was

6   safer.  I just say that we found better improvement in

7   sexual function afterwards.  I still feel that

8   Prolift® was safe.

9   BY MR. SLATER:

10   Q.  For sexually active women, you made a

11   decision that Prolift+M® was a better choice than the

12   Prolift®, correct?

13   A.  Correct.

14   Q.  Do you know when it was that Ethicon

15   first -- well, rephrase.

16   Do you have an understanding of the fact

17   that the Prolift+M® is the Prolift® but without the

18   Gynemesh® PS, instead Ultrapro® is used?

19   A.  Yes.

20   Q.  Do you know when it was that Ethicon first

21   started to discuss the subject of using Ultrapro®

22   rather than Gynemesh® PS in the Prolift® system?

23   A.  I do not know.

24   Q.  Am I correct that you have no opinions as to

25   whether or not Ethicon's -- I'll withdraw that.

Page 153

1   As a physician treating women with prolapse,

2   including sexually active women, would you have wanted

3   Ethicon to actively work to develop the Prolift+M®

4   concept as soon as they started to think that this

5   could be a promising alternative to the Prolift®?

6   MR. SNELL:  Objection, form.

7   BY MR. SLATER:

8   Q.  From your perspective as a clinician

9   treating patients?

10   A.  I think that if Ethicon had good data to

11   suggest that sexual function would be more improved

12   using a Prolift+M® mesh, that they'd want to pursue

13   that and produce it.

14   Q.  You as somebody treating patients would want

15   them to do so, correct?

16   A.  Well, in the respect that I wouldn't want

17   something else to suffer on the other hand.  If it's

18   better for sexual function but it doesn't work as well

19   and people get more prolapse, recurrent prolapse, then

20   I'd want them to use caution.

21   Q.  Well, ultimately, you made the decision with

22   your own sexually active patients that the efficacy

23   was at least comparable, right?

24   A.  Correct.

25   Q.  And that from a sexual function standpoint,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 154

1 you thought there were advantages to the Prolift+M®
2 versus the Prolift®, right?
3     A.  Correct.
4     Q.  You would certainly as an expert in this
5 litigation would agree with me that when people within
6 Ethicon whose job it was to help to develop products
7 like the Prolift® or alternatives, once they started
8 to realize help the use of Ultrapro® could be better
9 and could be better for sexually active women or
10 reduce complications, you would expect that Ethicon
11 would have moved as quickly as possible to look into
12 that so that if that turned out to be true, that could
13 be made available as soon as possible, right?
14        MR. SNELL:  Objection, form.
15        THE WITNESS:  I guess it depends on
16 what evidence they had.  If they just had a hunch,
17 then I wouldn't necessarily fault them for not doing
18 it.  It all depends on what evidence they had.
19 BY MR. SLATER:
20     Q.  You have no knowledge one way or the other
21 as to when anybody in the research and development arm
22 of Ethicon first started to advocate to utilize
23 Ultrapro® rather than Gynemesh® PS in the Prolift®
24 system?
25     A.  To advocate to whom?

Page 155

1     Q.  Other people within the company.
2     A.  No, no idea.  I never worked at Ethicon.
3     Q.  And you saw no documents in that regard?
4     A.  I don't recall seeing documents that talked
5 about that.
6     Q.  One of the complications that can occur as a
7 result of a Prolift® being placed in a woman's body is
8 pudendal neuralgia, correct?
9     A.  I don't necessarily say I'd say correct to
10 that.  I think that is certainly a potential outcome
11 of doing reconstructive pelvic surgery utilizing the
12 Prolift® system.  I don't know it's necessarily from
13 the Prolift® being placed in the patient.
14     Q.  Well, during the Prolift® procedure, the
15 pudendal nerve can be injured and that can result in
16 pudendal neuralgia, correct?
17     A.  Correct.
18     Q.  After the Prolift® mesh has been placed, the
19 mesh itself can either directly irritate the pudendal
20 nerve or the inflammatory reaction and the fibrosis
21 could cause irritation to the pudendal nerve, correct?
22        MR. SNELL:  Object to form.
23        THE WITNESS:  I don't think there's any
24 evidence to support that.
25

Page 156

1 BY MR. SLATER:
2     Q.  You have no knowledge one way or the other
3 on that?
4     A.  No.
5     Q.  One of the things that can occur once a
6 Prolift® is in a woman's body is that she can get
7 recurrent mesh erosions, correct?
8     A.  Correct.
9     Q.  One of the things that can occur when a
10 woman has recurrent mesh erosions -- well, rephrase.
11        One of the things that can occur once a
12 Prolift® is placed in a woman's body is the woman can
13 begin to feel pain, correct?
14     A.  Correct.
15     Q.  And one of the things that physicians do
16 when a woman is complaining of pain after a Prolift®
17 is placed is to do exploratory surgery to try to see
18 if the mesh is causing the pain; that's one of the
19 things surgeons do, correct?
20     A.  That would be a very aggressive first step
21 for sure.
22     Q.  You're aware that there are surgeons who
23 treat women who are complaining of pain with the
24 Prolift® who after trying to conservatively treat the
25 women for a period of time will do an exploratory

Page 157

1 surgery to try to determine if the mesh is the cause
2 of the pain, correct?
3     A.  I'm aware that they do exploratory surgery
4 for that.  I don't know if it's for that purpose, but,
5 yeah.
6        MR. SLATER:  You need to change the
7 tape?
8        THE VIDEOGRAPHER:  Couple more minutes.
9        MR. SLATER:  Okay.  We'll keep going.
10 BY MR. SLATER:
11     Q.  You're aware that there are times where a
12 woman has pain that develops after a Prolift® is
13 placed in her body and the surgeon tries to treat that
14 conservatively and then ultimately makes the decision
15 to re-operate and remove and revise the mesh to some
16 extent, right?
17     A.  Correct.
18     Q.  And you're aware that sometimes the woman
19 doesn't get sustained relief, and the surgeon may do
20 so more than one time; you know that happens, correct?
21     A.  Correct.
22     Q.  And as a result of the multiple surgeries to
23 try to treat the pain following a Prolift® insertion,
24 that can lead to other morbidity for the patient,
25 correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 158

1    MR. SNELL:  Objection, form.
2    THE WITNESS:  What I'd say is that all
3 those repeat surgeries, that might cause the patient
4 to continue to have pain, but that doesn't mean that
5 the Prolift® was causing the pain in the first place.
6 BY MR. SLATER:
7    Q.  Well, if a woman has a Prolift® in her body
8 and the surgeon -- rephrase.
9    Let's take a woman who has a Prolift®
10 placed.
11    A.  Yeah.
12    Q.  She is complaining of pain after the
13 Prolift®.  The surgeon surmises after he's treated her
14 for a period of time that the Prolift® is the cause
15 and decides to operate to try to determine whether the
16 Prolift® is the cause and remove some of the mesh,
17 take that scenario, okay?
18    A.  Yes.
19    Q.  That surgery took place as a result of the
20 Prolift® being put in the woman's body because but for
21 the Prolift®, the surgeon is not operating to try to
22 investigate whether the Prolift® is causing pain,
23 correct?
24    MR. SNELL:  Objection, form.
25    THE WITNESS:  No, I would disagree with

Page 159

1 that.  He's thinking that the surgery that he
2 performed caused the pain.
3 BY MR. SLATER:
4    Q.  Well, the surgery that a surgeon performs
5 when they place a Prolift® is the Prolift® procedure,
6 correct?  Is that a true statement?
7    A.  Well, it's one of the procedures that they
8 often do.  You can do concomitant surgery at the same
9 time.
10    Q.  Let's take a woman who has a Prolift®
11 procedure, and that's the procedure that's performed.
12    A.  No additional procedures.
13    Q.  No additional procedures.  A total Prolift®
14 is placed, no sling, no any other procedure, it's a
15 total Prolift®.
16    A.  Okay.
17    Q.  And after that the woman is complaining of
18 pain and the surgeon treats her for a period of time,
19 she continues to complain of the pain, and the surgeon
20 now does surgery to explore and then ultimately either
21 at that surgery or subsequent surgery removes some
22 mesh, okay?
23    A.  Yes.
24    Q.  You would agree with me in that case, the
25 surgeon -- the surgeries being performed are a result

Page 160

1 of the Prolift® being in her body because that's what
2 the surgeon is investigating, correct?
3    A.  That's where you and I --
4    MR. SNELL:  Objection to form.  Go
5 ahead.
6    THE WITNESS:  That's where you and I
7 have a disagreement.  You're saying because the
8 Prolift® was left in the patient.  I'm saying that the
9 surgery itself, okay, having nothing to do with the
10 mesh itself, the surgery just isn't you throw mesh at
11 the patient.  The surgery is you dissect, you ligate
12 things, you know, you stop bleeders, you dissect, and
13 the pain could be caused by that process, not just
14 from the mesh being left in the patient.
15    Does that make sense?
16 BY MR. SLATER:
17    Q.  The Prolift® procedure that was performed
18 from incision to closing can lead to the pain, as well
19 as the mesh itself can lead to the pain, correct?
20    MR. SNELL:  Objection.
21 BY MR. SLATER:
22    Q.  Is that what you're saying?
23    MR. SNELL:  Objection, form.
24    THE WITNESS:  No, I'm saying that the
25 surgery itself can lead to pain.

Page 161

1    MR. SLATER:  We'll come back to this.
2    THE VIDEOGRAPHER:  Going off the
3 record.  The time is 12:37 p.m.
4    (Brief recess.)
5    THE VIDEOGRAPHER:  Back on the record,
6 here marks the beginning of Volume 1 in Tape 3 of the
7 deposition of Dr. Miles Murphy.  The time is
8 12:53 p.m.
9 BY MR. SLATER:
10    Q.  In simple terms, what is the purpose of the
11 Prolift® procedure?
12    A.  To correct pelvic organ prolapse.
13    Q.  And what is the purpose of the implantation
14 of the mesh?
15    A.  To correct poor pelvic organ prolapse.
16    Q.  And how does that occur?  What is it about
17 the mesh being implanted that is intended to correct
18 pelvic organ prolapse?
19    A.  It recreates the attachments to the
20 surrounding pelvic tissue and also reinforces the
21 actual vaginal walls themselves.
22    Q.  How is the pelvic floor different post the
23 Prolift® actually being placed to what the pelvic
24 floor was before, in general terms?  Obviously, every
25 patient has a little bit of different issues, but what

Confidential - Subject to Stipulation and Order of Confidentiality

Page 162

1 is the difference?

2    A.  Generally, the major difference is that she

3 had prolapse of her pelvic organs before and

4 afterwards she doesn't.  In addition, she has

5 polypropylene mesh in the spaces between the vagina

6 and the bladder in the form of the anterior and

7 between the vagina and the rectum in the form of the

8 posterior.

9    Q.  For lack of a better word, once the Prolift®

10 is placed, is the actual engineering or architecture

11 of the pelvic floor different than what it was before

12 the Prolift® mesh was placed?

13         MR. SNELL:  Objection, form.

14         THE WITNESS:  Yeah, there is no longer

15 prolapse of the pelvic organs.

16 BY MR. SLATER:

17    Q.  And in terms of the pelvic floor itself, in

18 terms of what it's made up of, is that different now

19 that the Prolift® mesh has been placed?

20    A.  Yes.  Women are not born with polypropylene

21 meshes in their body.

22    Q.  So the condition of the pelvic floor before

23 the Prolift® is placed is different from what the

24 condition is once the Prolift® has been placed; is

25 that correct?

Page 163

1    A.  From before to after, it's different, yes.

2    Q.  I'm going to show you a document that was

3 marked at a prior deposition as Exhibit 899.  Here you

4 go.  It's a short e-mail chain, January of 2010, and

5 the last e-mail in the chain, which appears at the top

6 of the first page, was written by Piet Hinoul on

7 January 21, 2010 to Cliff Volpe and David Robinson.

8    A.  I'm sorry, which, on the second page?

9    Q.  Very first page, the top.

10    A.  The first page, yeah.

11    Q.  You see that?

12    A.  Piet to Volpe, yes.

13    Q.  A little bit down in the e-mail, the third

14 paragraph, Piet Hinoul is talking about erosion rates.

15         Do you see that?

16    A.  I see Prosima had such a high erosion rate,

17 8% when Prolift®, is that what you're referring to?

18    Q.  Yes, that paragraph.

19         A little further down -- well, rephrase.

20         In the third --

21         THE VIDEOGRAPHER:  We're going off the

22 record.  The time 12:57 p.m.

23         (Pause.)

24         THE VIDEOGRAPHER:  We're back on the

25 record.  The time is 12:57 p.m.

Page 164

1 BY MR. SLATER:

2    Q.  Looking at Exhibit 899 in the third

3 paragraph, Piet Hinoul is talking about erosion rates

4 in certain studies with regard to the Prolift®.

5         Do you see that?

6    A.  Yes.

7    Q.  And he points out that Elmer and Altman had

8 11% erosion in one of their trials.

9         You see that?

10    A.  Yes.

11    Q.  And they say that the Withagen, the Dutch

12 prospective trial had a 10% erosion rate?

13    A.  Correct.

14    Q.  And then he says, "Who believes

15 Mr. Lucente's group when Van Raalte publishes that

16 they have no erosions?  Nobody!"

17         You see that?

18    A.  I see that.

19    Q.  Is this the first time you're being made

20 aware that Piet Hinoul documented that, from his

21 perspective, nobody believes the data that your group

22 was reporting with regard to erosion rates?

23         MR. SNELL:  Objection, form.

24         THE WITNESS:  No.  I've recently seen

25 this, this e-mail.

Page 165

1 BY MR. SLATER:

2    Q.  Did you ever discuss it with Piet Hinoul?

3    A.  No.

4    Q.  Would you like to?

5    A.  I have no thoughts on the matter one way or

6 the other.

7    Q.  Well, as somebody who has spent a lot of

8 time and years and years consulting with Ethicon and

9 working closely with them, you know, what is your

10 reaction to seeing --

11    A.  Oh, you mean -- I'm sorry to interrupt.  You

12 mean that he states that no one would believe us?

13    Q.  Yes.

14    A.  Oh, no, we have the same feeling ourselves.

15 It's tough sometimes, but this is just -- that was

16 just one study.  You know, it just so happened in that

17 I forget how many patients exactly were in the study,

18 but it was, you know, somewhere I think between 100

19 and 200 people, and we just didn't happen to have any

20 erosions in that series.

21    Q.  Have other people said to you that they

22 don't believe your results that you reported?

23    A.  It's not that they say they don't believe

24 them, it's hard for people to believe because, you

25 know, most large series show at least one or two

Confidential - Subject to Stipulation and Order of Confidentiality

Page 166

1  erosions, and we've published studies or at least
2  presented our own research that shows that, yes, we
3  get erosions. It just so happened in this one we had
4  none.
5      Q. Are the results from your group
6  representative of the results that physicians across
7  the board would get, or would you agree that the data
8  that you have compiled with regard to your results of
9  your patients is better than what most people can
10  obtain?
11      MR. SNELL: Objection, form, go ahead.
12      THE WITNESS: Again, it's hard for me
13  to speak to what most people -- what results they get.
14  I can only look at what other people have published.
15  Certainly, when I talk to people at meetings, they
16  seem to say that, you know, their erosion rates for
17  whatever transvaginal mesh procedure they're doing
18  tends to be closer to 3 to 10%. But, again, when you
19  look at our larger series, you know, we quote 3%
20  erosion rate.
21  BY MR. SLATER:
22      Q. Do you believe that the skill level of you
23  and Dr. Lucente and the surgeons in your group is the
24  reason why your erosion rates are lower than the
25  erosion rates of other published and reported studies?

Page 167

1      A. You know, I've talked to people I
2  specifically know, thinking about people who practice
3  in New Jersey, who often do different type of mesh
4  repairs, and, you know, again, they're seeing more
5  like 3 to 10% as opposed to 1 to 4 or 5%, and I wonder
6  whether -- you know, as far as I know, they're very
7  skilled surgeons. They've done fellowship training,
8  and I wonder if maybe it has to do with our patient
9  population somewhat, but I don't know.
10      Q. Do you have any opinion as to why the
11  results that you say your group is able to achieve in
12  terms of complications, including erosion rates, are
13  better than what is reported pretty much by everybody
14  else who reports on those subjects?
15      MR. SNELL: Objection, form.
16      THE WITNESS: Yeah, I don't think that
17  that's -- that I ever agreed to the fact that our
18  results are that much better than everybody else's. I
19  simply said that sometimes people are surprised when
20  we present lower erosion rates.
21  BY MR. SLATER:
22      Q. Is there a difference in skill level between
23  your group and most other surgeons who have performed
24  Prolift® procedures?
25      A. I don't know.

Page 168

1      Q. Do you have any opinion one way or the other
2  on that?
3      A. No, I do not.
4      Q. Did you read Dr. Lucente's deposition
5  testimony on that subject?
6      A. I don't think I did.
7      Q. If Dr. Lucente said something to the effect
8  of your group has a much higher skill level and most
9  erosions are due to the skill level of the surgeons,
10  which explains why your group has such lower rates,
11  would you agree with that?
12      MR. SNELL: Objection, form.
13      THE WITNESS: I wouldn't be surprised
14  if he said that.
15  BY MR. SLATER:
16      Q. Would you agree with it?
17      A. No.
18      Q. What are the factors that lead to erosion of
19  Prolift® mesh?
20      A. And let me just -- is it okay if I qualify
21  that answer?
22      Q. Sure.
23      A. I think that technique used in doing the
24  surgery definitely affects the outcome, but whether I
25  can say ours are -- that we have greater skill than

Page 169

1  all the other surgeons out there, I just -- I don't
2  feel comfortable expressing that opinion.
3      Q. Well, do you have an explanation for why the
4  results reported by your group from a complication
5  perspective are better than across the board pretty
6  much every other reported study with regard to the
7  Prolift®?
8      MR. SNELL: Objection, form.
9      THE WITNESS: I think our erosion rates
10  are lower than most other published data out there. I
11  don't know that our complication rate is different.
12  BY MR. SLATER:
13      Q. Why do you believe your erosion rates are
14  lower?
15      A. I -- well, for instance, I think Altman
16  study is -- they quote something like 4% or 5%, I
17  think, if I'm recalling correctly?
18      Q. Are you talking 2011 Altman?
19      A. Yes.
20      Q. Actually, they reported the re-operated
21  patients and never disclosed their erosion rate, did
22  they?
23      A. I don't think they did.
24      Q. So you don't know what their erosion rate
25  was?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 170

1    A. I don't.

2    Q. Okay.

3    A. I just know who they had to re-operate on.

4  But, again, sitting here without all the papers in

5  front of me, I think there are other people that have

6  published erosion rates around 5%. So is the

7  difference between 5 and 3% significant, I don't know.

8  That's up to the person who is looking at that.

9        But it's possible that it's related to our

10  technique for hydro dissection. It's possible that

11  it's related to full thickness incisions. It's

12  possible that it's related to the fact that people in

13  Southeastern Pennsylvania, you know, have healthier

14  vaginal tissues. I don't know for sure. It's

15  different women.

16    Q. What are the factors that lead to erosion of

17  Prolift® mesh?

18    A. I don't know how to answer the question of

19  what are factors. Do you mean what are risk factors?

20  Looking into someone before they have surgery, what

21  their risk factor is going to be; is that what you

22  mean?

23    Q. This is my question: In your opinion, why

24  is it that Prolift® erosions occur? What are the

25  reasons why it occurs?

Page 171

1        MR. SNELL: Objection, form. Just so

2  we're all clear, you're talking erosions, not

3  exposures or --

4        MR. SLATER: I don't know. I mean,

5  he's used the terms interchangeably too during this

6  deposition so...

7        THE WITNESS: Yes, and that is a common

8  thing that people do.

9        So when you and I are talking, unless

10  you specifically are referring to an erosion into a

11  visceral organ, and you say that --

12  BY MR. SLATER:

13    Q. I'm not talking about that.

14    A. Then I will -- and when I say it, I'm going

15  to use erosion and exposure interchangeably to mean an

16  exposure of the mesh in the vagina. Because sometimes

17  I use the term erosion for that, even though lots of

18  people only think it should only be used going into

19  visceral organs.

20    Q. Let's start over.

21    A. Yes.

22    Q. In your opinion, why do erosions/exposures

23  of Prolift® mesh occur?

24    A. Okay. The best way I can answer that

25  question is that, for the most part, when I have seen

Page 172

1  an exposure of a Prolift® mesh, it is along the

2  midline, so meaning it is where the incision was, and

3  so it's probably related to the incision line not

4  healing properly over the mesh.

5        The second place where I sometimes see them

6  is in relation to where the mesh might be anchored in

7  place with a suture. So it could be related to the

8  inflammatory process at those locations.

9    Q. And that's based on your own experience?

10    A. That is based on my experience in talking to

11  other people, other colleagues.

12    Q. Are you aware of any other reasons why

13  erosion into the vagina can occur?

14    A. Well, I've certainly read the depositions of

15  the expert witnesses on the plaintiff's side that

16  suggest that all erosions are related to infection and

17  that, basically, you can't place a mesh to the vagina

18  without it being infected.

19    Q. Do you think there's any validity to the

20  viewpoint that infection of Prolift® mesh can cause

21  erosion through the vaginal wall?

22    A. I don't think there is much validity to

23  that, no. I think that it's probably that once an

24  erosion occurs, if you were to culture that, you would

25  see bacteria because it's exposed to the vagina, where

Page 173

1  there's ton of bacteria naturally.

2    Q. Did you read what Axel Arnaud said about

3  exposures of mesh into the vagina?

4    A. I don't recall reading Axel Arnaud's

5  explanation.

6    Q. So then I couldn't ask you if you agree with

7  it?

8    A. Correct.

9    Q. Do you agree that erosion can occur as a

10  result of mesh contraction, that when the mesh is

11  contracted by scar tissue that that can lead to

12  erosions?

13        MR. SNELL: Objection, form.

14        THE WITNESS: I think if a mesh

15  contraction were to have been documented and it's at

16  the site of an erosion, then that would be one reason

17  why you might suspect that it occurred.

18  BY MR. SLATER:

19    Q. And how would a contraction lead to an

20  erosion?

21    A. Well, if there's enough contraction,

22  theoretically, it could affect the blood flow to the

23  area. It could create a ridge that had enough of a

24  sharpness to it or edge to it that it could have a

25  more mechanical erosion through the vaginal wall.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 174

BY MR. SLATER:

1    Q.  Let me show you a document marked as Exhibit
2  1217 at a prior deposition.  It's an article that you
3  were the first listed author on.
4    A.  Yes.
5    Q.  And what I'd like to do is ask you to turn
6  to Page 276 of the article, which is titled "Vaginal
7  Hysterectomy at the time of Transvaginal Mesh
8  Placement," which published in 2010, correct?
9    A.  Correct.
10   Q.  At the bottom of the left-hand column under
11  the discussion section there's a sentence that reads
12  as follows:  "In fact, even 2 or 3 years of follow-up
13  without erosion does not guarantee a future free from
14  erosion; there is no safe time from erosion when
15  permanent materials are used."
16       Do you see that statement?
17   A.  I do.
18   Q.  And that's a statement you co-authored,
19  correct?
20   A.  Correct.
21   Q.  And you believe it to be true, correct?
22   A.  Correct.
23   Q.  And you believe it to be true with regard to
24  the Prolift®, correct?

Page 175

1    A.  Correct.
2    Q.  To your knowledge, was Ethicon aware of
3  that?
4    A.  To my knowledge, any person who has any
5  basic understanding of biology, life, if you put a
6  permanent material in someone, you never know what
7  could happen to that material for the rest of one's
8  life.  So I think it's quite likely that they would
9  realize that you never can say there's never ever
10  going to be an erosion again.
11   Q.  Did you ever discuss with anybody at Ethicon
12  the fact that with regard to the Prolift® the risk of
13  erosion of the material was a lifetime risk?
14   A.  I never thought to.  Again, I would assume
15  that everyone who has a brain would know that.
16       MR. SLATER:  Move to strike.
17  BY MR. SLATER:
18   Q.  Am I correct that you can't recall ever
19  discussing directly with anyone in Ethicon the fact
20  that erosion of Prolift® mesh is a lifetime risk?
21       MR. SNELL:  Objection to form.
22  BY MR. SLATER:
23   Q.  Am I correct, you just don't recall having
24  that discussion with anyone at Ethicon?
25       MR. SNELL:  Objection to form.

Page 176

1       THE WITNESS:  I do not recall.
2  BY MR. SLATER:
3    Q.  I'll give you an exhibit we've marked as
4  895, which is a manuscript titled "Short-Term Results
5  of the Prolift® Procedure in 349 Patients Used in the
6  Treatment of Pelvic Organ Prolapse."
7    A.  Sorry, I got two.
8       Yes, I see it.  I have it.
9    Q.  And you're one of the authors of that
10  article, correct?
11   A.  I am.
12   Q.  And as with the prior article, co-authors
13  include Heather van Raalte, Robin Haff, Vincent
14  Lucente, correct?
15   A.  Correct.
16   Q.  All members of at the time the same -- your
17  group in Pennsylvania?
18   A.  I don't see a date on this, but, certainly,
19  Heather was with us for three years, Dr. van Raalte.
20   Q.  And then she went to another practice,
21  correct?
22   A.  Correct.
23   Q.  Now, do you know when this was -- well,
24  rephrase.
25       Was this ever published?

Page 177

1    A.  This manuscript, to the best of my
2  knowledge, was never published.
3    Q.  Why not?
4    A.  Because it takes a lot of work to get a
5  manuscript published, and my guess is that Heather --
6  excuse me -- Dr. van Raalte started her practice, was
7  having babies and didn't have the time to go through
8  the process of publishing it.
9    Q.  Was this data reported in any form?
10   A.  I believe it was reported at a scientific
11  meeting.
12   Q.  When this study was being done, is it fair
13  to assume that Ethicon would have been aware of the
14  work you were doing in your practice, meaning you and
15  Dr. Lucente and the rest of the group?
16   A.  The work meaning --
17       MR. SNELL:  Objection to form.
18       THE WITNESS:  -- we were reconstructive
19  pelvic surgeries, doing surgery or that we were
20  specifically looking to do this study.
21  BY MR. SLATER:
22   Q.  The study that you were looking at the
23  results.
24   A.  No, I don't think that's reasonable.
25   Q.  Did you ever discuss with anyone at Ethicon

Confidential - Subject to Stipulation and Order of Confidentiality

Page 178

1 any ongoing studies when you were involved in doing a
2 study?
3     A.   Did I ever -- any study whatsoever, yes, I'm
4 sure I did.
5     Q.   There's nothing that comes to mind?
6     A.   No.
7     Q.   This indicates in the results section of the
8 abstract postoperative voiding dysfunction in 3.4% of
9 the patients.
10        Do you see that?
11    A.   I do.
12    Q.   And this was 349 patients total that had
13 Prolift, correct?
14    A.   Correct.
15    Q.   According to the paper, these were performed
16 between February 2005 and May 2006, that's on Page 5.
17    A.   Okay.
18    Q.   When you refer in this article to voiding
19 dysfunction, what are you referring to?
20    A.   Difficulty emptying of the bladder.
21    Q.   Does that include urinary retention?
22    A.   Partial urinary retention, I would think.  I
23 don't think anybody is completely -- complete
24 retention, and can I continue on that?  I mean, we
25 didn't just do Prolift® in these cases, just so you're

Page 179

1 aware.  These also included patients who had slings.
2     Q.   Is there a higher risk for voiding
3 dysfunction when a Prolift® is done along with a SUI
4 sling like a TVT®?
5         MR. SNELL:  Objection, form.
6         THE WITNESS:  Than if it's done without
7 a sling?
8 BY MR. SLATER:
9     Q.   Yes.
10    A.   I would guess if there's a higher risk when
11 it is done with a sling.
12    Q.   Why is that?
13    A.   Because a sling is a slightly obstructive
14 procedure.
15    Q.   You report that 22 of the patients, 6.3% had
16 dyspareunia, correct?
17    A.   That's what we report, yes.
18    Q.   And then on Page 7 you indicate that most of
19 those resolved by three or six-month visits, correct?
20    A.   I don't see it, but I'm sure if you say --
21        MR. SNELL:  Take your time and look at
22 it.
23 BY MR. SLATER:
24    Q.   It's on Page 7, the last full paragraph.
25    A.   Last full paragraph.  A majority of

Page 180

1 dyspareunia symptoms resolved by the three or
2 six-month follow-up visit, yes, I see that.
3     Q.   What do you attribute that to, the fact that
4 dyspareunia symptoms would resolve in some patients
5 but not in others after these procedures?
6     A.   I mean, it most likely is related to the
7 effects of inflammation and scar tissue post surgery
8 that often will, for lack of a better term, cool down
9 over time.
10    Q.   When you say it's due to the effects of
11 inflammation and scar tissue, what are you
12 specifically referring to?
13    A.   I'm not specifically referring to anything.
14    Q.   Well, I asked you why -- well, let me ask
15 you the question more generally.  Why would in some
16 patients who have Prolift® and report dyspareunia some
17 would resolve and in some it would be a persistent
18 condition?
19        MR. SNELL:  Objection, form.  Hold on.
20        THE WITNESS:  I don't know exactly.
21        MR. SNELL:  Go ahead.  Withdraw the
22 objection.
23        THE WITNESS:  I don't know exactly why
24 it would be.  You know, I know that around this time
25 we had done I'm not sure if it was this study or

Page 181

1 another study that suggests that when we looked at
2 people that had more chronic pain postoperatively, the
3 majority of those patients had had prior surgery or
4 had had permanent, prior permanent materials placed.
5 I don't hold to say that that's why these -- why some
6 of these patients would have resolution of their
7 dyspareunia and others wouldn't, but if that's what
8 you're getting at, that is something that we looked
9 at.
10 BY MR. SLATER:
11    Q.   Here's what I'm trying to understand is do
12 you have an opinion as to why patients who develop
13 dyspareunia after Prolift® surgery will in some cases
14 it will resolve and go away, and in some cases,
15 regardless of what treatment is provided, it will not
16 go away and the patient will have longstanding
17 dyspareunia?
18    A.   I don't have a good explanation for that.
19    Q.   Now, let's take native tissue repair.  Women
20 can report dyspareunia after native tissue repair?
21    A.   Yes.
22    Q.   What is the reason for that?  What causes
23 that, in your opinion?
24    A.   Sometimes it can be related to scar tissue.
25 Sometimes it could be related to just inflammation in

Confidential - Subject to Stipulation and Order of Confidentiality

Page 182

1  general.  Sometimes it can be related to shortening of
2  the vagina, deviation of the axis of the vagina.
3      Q.  When a woman has native tissue repair and
4  reports dyspareunia, in most cases it will resolve on
5  its own, correct?
6      A.  I would not agree with that.
7      Q.  Let me ask you this:  When a woman has
8  native tissue repair and develops dyspareunia, are
9  there treatments that are used to try to treat that?
10     A.  Of course there are.
11     Q.  What?
12     A.  Sometimes re-operation, sometimes physical
13 therapy, sometimes vaginal estrogen, sometimes vaginal
14 dilators.
15     Q.  Do you have an opinion as to an overall
16 percentage of women who have native tissue repair and
17 develop dyspareunia as to how many of them -- either
18 it goes away on its own or it's treated successfully,
19 as opposed to those that where it doesn't?
20     A.  I haven't seen any.  I can't recall seeing
21 any literature on that point.
22     Q.  So there's no percentages that you can offer
23 me, as you sit here now?
24     A.  In terms of how much will resolve
25 spontaneously?

Page 183

1      Q.  Or through treatment as opposed to if anyone
2  won't.
3      A.  No, I certainly can't quote you anything.
4  If you wanted me to give you my expert opinion on what
5  might, I certainly could.
6      Q.  Well, I want to know if you have an opinion.
7  I don't want you to just surmise or, you know, guess
8  at something.  If you have a reasonable -- an opinion
9  to a reasonable degree of medical probability, then
10 that's fine, but if it's not, you can tell me I would
11 just be guessing or speculating.
12     A.  Well, let me put it this way, because it
13 depends on when you define when the dyspareunia is
14 starting.  So if someone has dyspareunia the very
15 first time they have sex after surgery, what's the
16 chance of that resolving, that's pretty high.  I would
17 say, you know, it's very likely that more than half of
18 those people will have resolution of their symptoms.
19     If you're talking about someone who has
20 dyspareunia for the first six months after their
21 native tissue repair and then some percentage of those
22 will resolve after six months of having it, I would
23 say that there is a good likelihood that without
24 serious intervention, at least 50% would not have
25 resolution.

Page 184

1      Q.  And then as to the women that do have
2  intervention, you're saying those would be resolved?
3      A.  They would have a slightly higher chance of
4  having resolution.
5      Q.  Is there any data or studies you can point
6  to for these percentages?
7      A.  I can't, no.
8      Q.  Now, when a woman has a Prolift® placed in
9  her body and has dyspareunia following that, complains
10 of dyspareunia, what is it about the Prolift®
11 procedure, the mesh, the Prolift® instruments, what
12 about those things can lead to dyspareunia?
13         MR. SNELL:  Objection, form.
14         THE WITNESS:  I think the same things
15 that can lead to dyspareunia after a native tissue
16 repair are the same things that can lead to
17 dyspareunia after the Prolift®, with the exception of
18 you can't get dyspareunia related to a mesh erosion if
19 you don't put mesh in someone.
20 BY MR. SLATER:
21     Q.  Let me ask you this question:  With regard
22 to the Prolift® mesh, the instruments and the Prolift®
23 procedure to place the mesh, what about those things
24 that are particular to the Prolift® itself that can
25 cause or contribute to dyspareunia?

Page 185

1         MR. SNELL:  Objection, form.
2         THE WITNESS:  I think it's -- I guess
3  I'm having trouble answering that question.  Someone
4  can have dyspareunia for lots of reasons after
5  surgery.  I don't know that there's anything unique to
6  Prolift® that can cause it.
7  BY MR. SLATER:
8      Q.  Let me try to explain to you what I'm trying
9  to get at.
10     A.  Okay.
11     Q.  What about the Prolift® procedure,
12 everything that needs to be done to place the Prolift®
13 from start to finish, the Prolift® mesh itself, which
14 is being placed in the body and remains in the body,
15 and the instruments that are used during the procedure
16 to place the Prolift®, what about those specific
17 things can lead to dyspareunia?
18         MR. SNELL:  Objection, form, asked and
19 answered.
20         THE WITNESS:  Could I have a pen just
21 so -- because there's lots of parts to that question.
22 I want to answer correctly in the future.  Thank you.
23         So, certainly, making an incision,
24 which is part of the Prolift® procedure, and then
25 eventually closing that incision that can lead to

Confidential - Subject to Stipulation and Order of Confidentiality

Page 186

1 dyspareunia.

2        Laying, again, as I referred to

3 earlier, a mesh under that's too tightly placed, again

4 to differentiate from what tension free means, I think

5 that can lead to dyspareunia.

6        I think postoperative inflammation can

7 lead to dyspareunia.

8 BY MR. SLATER:

9    Q.  Anything else specific to the Prolift®, as I

10 defined it?

11    A.  I don't think you asked specific to

12 Prolift®.  You just said with Prolift®.

13    Q.  Well, I did.  The question is this:  What is

14 it about the Prolift® procedure, the Prolift® mesh,

15 the Prolift® instruments, what is it about -- which

16 I'm calling the Prolift® system, what is it about

17 that, putting that into the body and then it being in

18 the body that can lead to a woman suffering from

19 dyspareunia?

20        MR. SNELL:  Objection, form.

21        THE WITNESS:  But when you say specific

22 to that, that implies that making an incision is --

23 because that's part of the Prolift® procedure, okay.

24 BY MR. SLATER:

25    Q.  So that's part of my question then, because

Page 187

1 to put a Prolift® in, you have to perform the Prolift®

2 procedure so that's part of it.

3    A.  But that is not specific to the Prolift®

4 procedure, that's what I'm saying.  It's not unique to

5 it.

6    Q.  I'll ask the question differently.

7        What about the Prolift® procedure, the

8 Prolift® mesh and the Prolift® instruments used during

9 the procedure to place the mesh and then the fact that

10 the mesh is left inside the body where it's left in

11 there, what about those facets can lead to a woman

12 suffering from dyspareunia?

13        MR. SNELL:  Objection, form.

14        THE WITNESS:  I think I just gave you

15 my answer.  I can't answer it any better than I did.

16 BY MR. SLATER:

17    Q.  So you said --

18    A.  Because I'm not sure if you're trying to say

19 specific to that, meaning as opposed to another type

20 of repair.

21    Q.  I'm not trying to compare it to anything.

22 This is not a question of comparison.

23    A.  Well, that's -- well, then when you say

24 specific to it, to me that means as opposed to another

25 procedure.

Page 188

1    Q.  What I'm saying is what about -- my question

2 is this:  What about the Prolift® procedure, the

3 Prolift® mesh, the Prolift® instruments can cause a

4 woman to suffer from dyspareunia?

5    A.  Okay.  I think I answered that question.

6        MR. SNELL:  Objection, form.  Go ahead.

7 BY MR. SLATER:

8    Q.  And the answer was the incision that's made

9 the closure of the incision, laying the mesh and the

10 mesh then being too tight?

11    A.  Laying the mesh too tightly, yes.

12    Q.  And postoperative inflammation?

13    A.  Correct.

14    Q.  That postoperative inflammation can be due

15 to the mesh itself, correct?

16    A.  I guess so because there's inflammation when

17 you put a mesh in.  You also have inflammation when

18 you don't put in a mesh after surgery, but, yes, you

19 certainly have it in relation to the mesh.

20    Q.  If the mesh -- well, rephrase.

21        Can the fibrosis that forms as a result of

22 the mesh being in the body cause or contribute to

23 dyspareunia?

24    A.  Can the mesh, the fibrosis and the

25 inflammation that occurs, can that lead to

Page 189

1 dyspareunia?

2    Q.  Yes.

3    A.  I would think so, yes.

4    Q.  Can the Prolift® procedure lead to vaginal

5 anatomic distortion which would cause dyspareunia?

6    A.  I would say if you include vaginal

7 shortening in distortion, I would say yes.

8    Q.  Can exposure of the mesh into the vagina

9 lead to dyspareunia?

10    A.  Yes.

11    Q.  Can what is referred to as contraction of

12 the Prolift® mesh lead to dyspareunia?

13    A.  Again, I think when I say -- most of my

14 experience was when something is contracted is when it

15 was placed too tight, so that was my answer before.

16    Q.  Beyond just your experience base, though, in

17 your opinion, can contraction of the Prolift® mesh

18 lead to dyspareunia, or is it something you just don't

19 know one way or the other?

20    A.  Again, you know, I see patients and I look

21 at them clinically, okay.  When I see someone's vagina

22 and it's a centimeter shorter than it was before the

23 surgery, I can say that's because of mesh contraction,

24 if I want, but I don't know, I haven't explanted the

25 mesh to see, or it could be because I made an incision

Confidential - Subject to Stipulation and Order of Confidentiality

Page 190

1 and I sewed that shut or I trimmed tissue -- well, I
2 don't do that in a Prolift® procedure, but if I were
3 doing a native tissue repair and I did that and it
4 shortened it, then that -- I guess what I'm trying to
5 get at is is that I think whatever anybody is calling
6 contraction of the mesh would lead to shortening of
7 the vagina, and that's what would lead to the pain,
8 not that the area around the mesh was contracted.
9         MR. SLATER: Just I'll move to strike
10 as referred to other procedures.
11 BY MR. SLATER:
12    Q. Are you aware that there are people within
13 Ethicon who believe that contraction of Prolift® mesh
14 can cause dyspareunia?
15    A. I don't have any recollection of reading
16 that or anyone saying that to me.
17    Q. Do you believe that contraction of Prolift®
18 mesh can cause or contribute to dyspareunia?
19    A. I think that, again, the mesh doesn't
20 contract, the tissues around it contract, and that can
21 lead to shortening of the vagina, which could lead to
22 dyspareunia.
23    Q. Can the Prolift® procedure or the mesh
24 remaining within the body after the procedure which
25 has been placed, can that lead to irritation of nerves

Page 191

1 which can cause dyspareunia?
2         MR. SNELL: Objection, form.
3         THE WITNESS: I don't know the answer
4 to that question.
5 BY MR. SLATER:
6    Q. What are the treatments for a woman who has
7 dyspareunia after a Prolift®?
8    A. All the same that I listed for after native
9 tissue repair, with the exception that with the
10 Prolift®, you can also remove pieces of it.
11         MR. SLATER: Move to strike with regard
12 to native tissue repair.
13 BY MR. SLATER:
14    Q. Can a woman who has had a Prolift® placed,
15 as we were talking about here, in the context of
16 dyspareunia develop as a result of the Prolift®
17 procedure or subsequent treatments, for example, to
18 remove exposures develop pelvic floor myalgia?
19         MR. SNELL: Objection, form, compound.
20         THE WITNESS: Yes. Anybody who has
21 surgery can develop pelvic floor myalgia.
22 BY MR. SLATER:
23    Q. And where it happens under those
24 circumstances, that can lead to dyspareunia, correct?
25    A. Correct.

Page 192

1    Q. When a woman has multiple surgeries
2 following a Prolift® procedure in an effort to treat
3 complications that she's suffering from, can the
4 multiple procedures lead to the development of pelvic
5 floor myalgia?
6    A. Yes, although one would assume that if she's
7 having those procedures in the first place, she had
8 pelvic floor myalgia. Meaning you're saying she had
9 surgery because she had pelvic pain, and, you know,
10 it's a fine line when someone can't say, well, my
11 muscle hurts, but my vaginal lining doesn't hurt.
12    Q. Well, a surgeon can evaluate a woman on the
13 exam, find no signs of myalgia, operate to treat
14 whatever pain the patient is complaining of, and then
15 later the patient can begin to display clinical
16 symptoms and signs of myalgia, correct?
17         MR. SNELL: Objection, form.
18 BY MR. SLATER:
19    Q. You're not saying that every woman with a
20 complaint of pelvic pain it's due to myalgia?
21    A. I'm saying that --
22         MR. SNELL: Note my objection to both
23 questions.
24         THE WITNESS: I'm saying it's often
25 very hard to determine why someone has pelvic pain.

Page 193

1 There is no test that you can do in someone that has
2 pelvic pain that I'm aware of that says definitively
3 their pain is related to myalgia.
4 BY MR. SLATER:
5    Q. You've certainly diagnosed women who have
6 pelvic pain and said it was due to myalgia, right?
7 You've formed that diagnosis, correct?
8    A. I don't -- well, we're going to separate
9 that from fibromyalgia?
10    Q. Yes.
11    A. Okay. I certainly think that pain can be
12 related to the pelvic floor musculature. I'm sorry.
13 I've lost track of what your question was.
14    Q. I'm going to withdraw it. Let's look at
15 this article, the 349 patient study, and if you could,
16 turn to Page 10.
17         You note in the first paragraph, "nearly all
18 (5 of 6) patients with persistent postoperative
19 dyspareunia carried pre-existing diagnoses of
20 interstitial cystitis, chronic lower back pain and
21 sciatica, fibromyalgia or endometriosis."
22         Do you see that?
23    A. I do.
24    Q. Those are chronic pain conditions, correct,
25 generally stated?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 194

```
 1    A.  Yes.
 2    Q.  A little further down you state in this
 3  article along with your co-authors -- rephrase.
 4         On Page 10 of this article about halfway
 5  down, there is a sentence that states, "Based on our
 6  outcomes, patients with chronic pain conditions,
 7  pre-existing pelvic pain and a history of pelvic
 8  surgery should be carefully counseled about the
 9  potential risk of postoperative dyspareunia and
10  avoidance of mesh use should be considered."
11         Do you see where I'm reading?
12    A.  I do.
13    Q.  And you believed that to be a true statement
14  when this article was written?
15    A.  Well, let me answer that question this way:
16  I wasn't the only author on this paper.  I doubt I
17  wrote that sentence.  I certainly think that it is a
18  true statement in that it's suggesting that patients
19  who have these chronic pain syndromes before the
20  Prolift® surgery are more likely to have chronic pain
21  afterwards.  Whether or not you should, therefore,
22  avoid the use of mesh, I think, in general, you should
23  try and do everything you can not to operate on those
24  patients in the first place.  Do I think that actually
25  putting mesh in them is going to increase that risk?
```

Page 195

```
 1  Not necessarily.  Do I think it's going to expose you
 2  to more liability because they can say it's because of
 3  that particular product being in there?  Yes.
 4    Q.  In this statement in the article which you
 5  co-authored --
 6    A.  Yes.
 7    Q.  -- you and your co-authors stated that where
 8  a patient has a chronic pain condition, pre-existing
 9  pelvic pain or a history of pelvic surgery, those
10  patients should be carefully counseled about the
11  potential risk of postoperative dyspareunia and
12  avoidance of mesh use should be considered.
13         That's what it states, correct?
14    A.  Correct, and I would absolutely counsel
15  anybody with a chronic pelvic pain about the potential
16  risk of postoperative dyspareunia after Prolift® and
17  any other pelvic reconstructive surgery.
18    Q.  Well, here you and your co-authors
19  specifically said that with these patients avoidance
20  of mesh use should be considered.
21         That's what you said, right?
22    A.  It should be considered, and I am giving you
23  my answer as to why I would consider that, okay, and
24  it's because there is a -- if someone has
25  postoperative pain afterwards, after a surgery, they
```

Page 196

```
 1  are likely to be upset with you, okay, and you want to
 2  make sure that you've not done something that might
 3  expose you to medical-legal risk.
 4    Q.  That's the point -- that's the reason why
 5  you and your co-authors wrote that there?
 6    A.  I'm saying that's why I would agree with
 7  this statement.
 8    Q.  Do you agree with the proposition stated
 9  here that with these types of patients with chronic
10  pain, pre-existing pelvic pain or a history of pelvic
11  surgery, that because they have more risk of
12  postoperative dyspareunia, avoidance of using mesh
13  should be considered?
14         MR. SNELL:  Objection, form.
15         THE WITNESS:  I think that's what I'm
16  saying, yes.
17  BY MR. SLATER:
18    Q.  The way that this reads it's indicating that
19  with these patients, you should consider avoiding the
20  use of mesh.  It doesn't say you should try to find a
21  way not to operate on them at all.  That's a true
22  statement, correct?
23    A.  That's a true statement.
24         MR. SNELL:  Objection to form.
25         THE WITNESS:  Because this is a paper
```

Page 197

```
 1  about Prolift®.  It's not a paper about generally
 2  operating on patients with prolapse.
 3         MR. SLATER:  Move to strike from
 4  because forward.
 5         MR. SNELL:  Denied.
 6  BY MR. SLATER:
 7    Q.  On Page 10 in this large paragraph here, at
 8  the very bottom of that paragraph, the first
 9  paragraph -- rephrase.
10         Here on Page 10 at the end of the first
11  paragraph you state, "Similarly, younger, sexually
12  active patients should be counseled regarding the
13  potential for dyspareunia following mesh placement and
14  alternative treatment options should be discussed."
15         Do you see that?
16    A.  Yes.
17    Q.  That's a true statement, correct, with
18  regard to the Prolift®?
19    A.  It's true that that is what it says here.
20    Q.  Well, it was written here because you and
21  your co-authors thought it to be a true statement,
22  right?
23    A.  I'm trying to find the sentence again.  It's
24  in the bottom paragraph?
25    Q.  No, it's in the top paragraph, the bottom
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 198

1 sentence.
2    A.   Similarly, younger, sexually active patients
3 should be counseled regarding the potential for
4 dyspareunia following mesh placement and alternative
5 treatment should be discussed.  I would agree that in
6 my practice, I am somewhat leery of doing a Prolift®
7 procedure in a very young patient.
8    Q.   What do you define as a very young patient?
9    A.   I would say someone in their 30s, early 40s.
10    Q.   And you would be leery of that why?
11    A.   Again, to my point that -- well, here's the
12 difficulty with treating young, sexually active
13 patients who have prolapse, okay, it's a fine line
14 between durability and functionality.  Procedures, in
15 my opinion, that tend to -- you have to balance
16 between the function of the vagina and durability, and
17 that's why we use -- that's why there's a debate about
18 mesh in general, okay.  Most people use mesh use it
19 because they want to improve the durability of the
20 repairs, okay.  You have to balance that with the risk
21 of any change in functionality, like pain from an
22 erosion, okay.
23         And it's a conundrum of, well, for those
24 very same reasons you'd want to use mesh in a young
25 patient, whether it be vaginally or abdominally, you

Page 199

1 have to also think about the reasons why you might not
2 want to, because you can't get an erosion of mesh if
3 you don't use mesh.
4    Q.   You said a moment ago that you're leery
5 about recommending a Prolift® to a young, sexually
6 active woman?
7    A.   Correct.
8    Q.   Is that because the risk to a woman who fits
9 that criteria if she does get complications can be
10 very severe?
11    A.   No, the --
12        MR. SNELL:  Object to form.
13 BY MR. SLATER:
14    Q.   The impact on her life?
15        MR. SNELL:  Object to form.
16        THE WITNESS:  No.  It's more related to
17 the fact that it's a permanent material, and, like I
18 stated earlier, you never can say you can't have later
19 term sequelae when you're using a permanent material;
20 whereas, you can know that you're not going to have a
21 mesh erosion 20 years down the line in someone if you
22 didn't use mesh in the first place.
23 BY MR. SLATER:
24    Q.   So just by virtue of a woman being younger
25 and being sexually active, there's more risk to her of

Page 200

1 putting in the permanent Prolift® just because of her
2 life expectancy and the fact that she's sexually
3 active as compared to someone who may be older and not
4 sexually active; is that your understanding?
5        MR. SNELL:  Objection, form.
6        THE WITNESS:  No.  What I'm saying is
7 that if there's an alternative to not using mesh in
8 someone that you're concerned about long term
9 sequelae, you might want to try that first, not in all
10 cases, but certainly in some cases.
11 BY MR. SLATER:
12    Q.   Well, you stated in this article that you
13 should counsel, you're recommending to other
14 physicians, you should counsel younger, sexually
15 active patients regarding the potential for
16 dyspareunia following mesh placement and alternative
17 treatment options should be discussed, right?
18    A.   Correct.
19    Q.   And that's because of the particular risk
20 that a woman who is younger and sexually active would
21 face if complications were to occur with the Prolift®
22 as well as the long-term risk, correct?
23        MR. SNELL:  Objection, form.
24        THE WITNESS:  I think I am mostly
25 referring to the long-term risk.

Page 201

1 BY MR. SLATER:
2    Q.   The concern for the consequences that could
3 potentially occur for younger, sexually active woman
4 in terms of the overall community of surgeons using
5 mesh like the Prolift®, is that an awareness that has
6 developed over the years?
7    A.   I don't know.  I mean, I think that some
8 people certainly felt that way right from the start.
9    Q.   In terms of the overall community of
10 physicians, is that something that's became more in
11 focus as the years have gone on, as the Prolift® has
12 been used for a longer period of time?
13        MR. SNELL:  Objection, form.
14        THE WITNESS:  I'm sorry.  Can you
15 repeat the question?
16 BY MR. SLATER:
17    Q.   Sure.  Has the concern for the consequences
18 of Prolift® complications for younger, sexually active
19 women has that issue become more of an issue overall
20 for surgeons as the years have gone on as the Prolift®
21 has been used for a longer period of time?
22        MR. SNELL:  Objection, form.  Go ahead.
23        THE WITNESS:  I wouldn't necessarily
24 say that there is a concern about using it in young,
25 sexually active patients across the board.  I just

Confidential - Subject to Stipulation and Order of Confidentiality

Page 202

1 specifically referred to myself to answer the first
2 part of your question.
3 BY MR. SLATER:
4     Q.  So are you saying you are not able to tell
5 me to what extent surgeons -- well, rephrase.
6         Do you have any opinion as to whether or to
7 what extent surgeons in general who would consider
8 using the Prolift® have been aware of potential -- the
9 potential risks to younger, sexually active women from
10 Prolift® complications?
11     A.  Let me answer this way:  We don't live in a
12 bubble.  There's a chance for discomfort with
13 intercourse after any pelvic surgery that you do,
14 okay.  Over the past few years, specifically since
15 2008, when the first FDA notification came out, there
16 is certainly a growing amount of concern regarding
17 liability when you're using a permanent material in
18 someone, okay, a mesh placed transvaginally, because
19 that's what the FDA came out within 2008.
20         Because of that, who are more likely to have
21 pain with intercourse?  People that are younger,
22 generally.  I have some older patients that have sex
23 every day, but, you know, generally, younger patients
24 are more likely to be more frequently sexually active
25 and, therefore, that complication of dyspareunia,

Page 203

1 which, again, can occur with any procedure is going to
2 be higher in people that are more sexually active.
3         Therefore, when you're looking at your
4 liability, that was something that certainly came into
5 a lot of doctors' minds I would say from 2008 on.
6     Q.  In this article you and your group actually
7 observed that in five of the six patients who had
8 persistent dyspareunia, where it didn't resolve on its
9 own and whatever treatment you did didn't resolve it,
10 that five out of six of those had pre-existing chronic
11 pain conditions of one type or another, correct?
12     A.  Correct.
13     Q.  You certainly felt that there was an
14 association between having the chronic pain condition
15 and then suffering from dyspareunia after having a
16 Prolift® in your body; that's why you talk
17 about it in the article, correct?
18         MR. SNELL:  Objection, form.
19         THE WITNESS:  We're talking about after
20 having surgery, the only surgeries that we're studying
21 in this are Prolift.  We couldn't see compared to
22 other surgeries.
23 BY MR. SLATER:
24     Q.  I'm only talking about the Prolift®.
25     A.  Okay.  I'm just saying that, you know,

Page 204

1 because it's often a -- we look at relative risk many
2 times in medicine.
3     Q.  Well, coming back to my question, you noted
4 the fact that five out of the six patients with the
5 persistent dyspareunia had pre-existing chronic pain
6 of one sort or another because you saw an association
7 between the two; otherwise, you wouldn't have
8 commented on it, correct?
9         MR. SNELL:  Objection, form.
10         THE WITNESS:  Correct.
11 BY MR. SLATER:
12     Q.  When was it that you first started to become
13 aware of a potential association between chronic pain
14 and Prolift® complications?
15     A.  I would never say that I've had that
16 particular -- whatever term you used, feeling.  That's
17 generally something that I've felt any surgery is
18 going to be a risk for having that outcome.
19     Q.  When the Prolift® mesh is placed in the body
20 and creates irritation -- rephrase.
21         When the Prolift® mesh is placed in the body
22 and creates inflammation and if a person is up
23 regulated due to a pain condition that they previously
24 had so that they're more susceptible, that
25 inflammation can interact with the nerves and create

Page 205

1 more pain than if the patient didn't have that
2 condition going in, correct?
3         MR. SNELL:  Objection, form.
4         THE WITNESS:  Just like with any
5 surgery.
6 BY MR. SLATER:
7     Q.  Well, if the Prolift® is done and it's the
8 Prolift® mesh creating this widespread inflammation,
9 then it's the Prolift® that's creating that situation,
10 correct?
11     A.  Well, I disagree with you.
12         MR. SNELL:  Object to form.  Go ahead.
13         THE WITNESS:  I disagree with the
14 premise of your question, so it's hard for me to
15 answer it yes or no.
16 BY MR. SLATER:
17     Q.  What do you disagree with?
18     A.  That the mesh is the only thing that is
19 causing inflammation after surgery.
20     Q.  That's not what I'm asking you.  You want to
21 keep talking about other surgeries.  I understand
22 that's what you want to talk about.  But let's
23 understand something, when a woman gets a Prolift® put
24 in her body, she didn't have colporrhaphy.  If she
25 just had a total Prolift®, she got Prolift® surgery

Confidential - Subject to Stipulation and Order of Confidentiality

Page 206

1 performed on her; isn't that true?

2 A. Yes, and that involves incisions.

3 Q. Right. The incisions that are done in

4 accordance with the Prolift® procedure, correct?

5 A. Correct.

6 Q. And the incisions are not identical between

7 the Prolift® procedure and, for example, colporrhaphy

8 or ligament fixation, correct?

9 A. Depends on who is doing the surgery.

10 Q. Okay. And the dissections are not the same

11 as between the Prolift® procedure and native tissue

12 repair; the dissections are different, correct?

13 A. They are.

14 Q. And the introduction of the large mesh

15 implant when it's placed in the woman's body is

16 different than traditional suture repair because in

17 those procedures you're not putting the mesh implant

18 in the body, correct?

19     MR. SNELL:  Objection, form.

20     THE WITNESS:  Yes.

21 BY MR. SLATER:

22 Q. So there are significant differences in

23 terms of the actual procedure and what is actually

24 done inside the woman's body as between the Prolift®

25 procedure and traditional suture repair, correct?

Page 207

1 A. Yes, but you keep saying we're not talking

2 about different procedures, but now you're asking me

3 about differences between the two procedures, so it's

4 natural to assume that that's what we're looking at.

5     MR. SLATER:  Move to strike from but

6 forward.

7 BY MR. SLATER:

8 Q. In fact, when a woman suffers from

9 complications after a Prolift® procedure -- well,

10 let's be more specific. Withdraw the question. How

11 are we doing?

12     Let's take a woman who has a Prolift® put in

13 her body and afterwards she develops chronic pelvic

14 pain and dyspareunia --

15 A. Yes.

16 Q. -- and recurrent erosions and ends up with

17 multiple operations to try to treat these

18 complications, okay. Take that patient.

19 A. Okay.

20 Q. As my hypothetical.

21 A. Okay.

22 Q. Whatever long-term injury or damage she

23 suffers resulted from the Prolift® procedure that was

24 performed because that's the only thing that was

25 performed on her, correct?

Page 208

1     MR. SNELL:  Objection, form.

2 BY MR. SLATER:

3 Q. By definition.

4 A. I think by the definition of your

5 hypothetical situation, correct.

6 Q. Okay. And for that woman in this

7 hypothetical, you can't say, well, if she had had

8 colporrhaphy or she had suture fixation, she would

9 have ended up with the same complications, you can't

10 say that. That would be speculative, right?

11     MR. SNELL:  Objection, form.

12     THE WITNESS:  Right.

13 BY MR. SLATER:

14 Q. You can say there are risks with these other

15 procedures, which may have some of the same symptoms,

16 but you can't -- it would be pure speculation to say

17 those things would have actually occurred if a

18 different operation was performed, correct?

19 A. Of course.

20     MR. SLATER:  Why don't we take a break.

21     THE VIDEOGRAPHER:  We're going off the

22 record. The time is 1:51 p.m.

23     (Luncheon recess.)

24     THE VIDEOGRAPHER:  We're back on the

25 record. Here marks the beginning of Volume 1 in Tape

Page 209

1 Number 4 in the deposition of Dr. Miles Murphy. The

2 time is 2:39 p.m.

3 BY MR. SLATER:

4 Q. Okay. Doctor, I just gave you an exhibit

5 that was marked at a prior deposition as 1216. It's

6 an article titled "One-year anatomic and

7 quality-of-life outcomes after the Prolift® procedure

8 for treatment of posthysterectomy prolapse."

9     It's an article that you were one of the

10 authors of, correct?

11 A. Correct.

12 Q. Now, there's a listing of authors. In this

13 one you're listed as the last author. What's the

14 significance of who's listed first, second, third,

15 fourth, last?

16 A. Generally, the person who does the most work

17 on the study gets listed first, the person who is

18 doing the drafting of the document, for the most part,

19 and then, generally, it goes from level of importance

20 of import into it, but then often times you reserve

21 the last spot for a more senior person.

22 Q. What was your involvement with the study?

23 It was published, by the way, December 2008, correct?

24 A. Yes.

25 Q. What was your involvement?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 210

1    A.  My involvement was it involved outcomes of a
2  number of my patients.  I helped with the statistics.
3  I may have helped with the data collection, edited the
4  manuscript.
5    Q.  Now, if you turn to the second page, there's
6  a bit of information provided.  The materials and
7  methods says that this only included patients who had
8  a minimum of one-year follow-up, correct?
9    A.  Yes.
10    Q.  And then if you go to the results section,
11  it says 151 patients met the inclusion criteria and
12  their surgeries were performed between February 2005
13  and August 2006, correct?
14    A.  Correct.
15    Q.  And then you go through the results and talk
16  about different results throughout that section, and I
17  want to draw your attention to the last column, the
18  end of the first long paragraph right in the middle of
19  the page.
20      Do you see that?
21    A.  Mm-hmm.
22    Q.  There's a sentence that says, "no mesh
23  exposures or erosions were detected."
24      Do you see that?
25    A.  I do.

Page 211

1    Q.  Is that a statement that of the 151 patients
2  who were included in the study, not one of them had a
3  mesh exposure or an erosion at any point during that
4  year?
5    A.  I think it's basically saying of those that
6  we had follow-up for up to a year, none of them had an
7  erosion.
8    Q.  Well, was there follow-up on the 151
9  patients?  Let me rephrase the question.  Let me
10  withdraw it.
11      In the results section right at the
12  beginning it says that of the 151 eligible patients,
13  97 presented for one year or greater office
14  evaluation.
15    A.  Correct.
16    Q.  So for 97 patients operated on between
17  February 2005 and August 2006, with at least a year
18  follow-up, not one of them had a mesh exposure or a
19  mesh erosion detected on any exam; is that what you
20  reported?
21    A.  Yes.
22    Q.  Now, I showed you a few moments ago the
23  e-mail written by Piet Hinoul, Exhibit 899, who stated
24  who believes Mr. Lucente's group when Van Raalte
25  publishes that they have no erosions?  Nobody -- need

Page 212

1  to take a break.
2      THE VIDEOGRAPHER:  Going off the
3  record, the time is 2:43 p.m.
4      (Brief recess.)
5      THE VIDEOGRAPHER:  We're back on the
6  record.  Here marks the beginning of Volume 1 and Tape
7  Number 4 in the deposition of Dr. Miles Murphy.  The
8  time is 2:55 p.m.
9  BY MR. SLATER:
10    Q.  Doctor, I had shown you earlier in the
11  deposition Exhibit 899, the e-mail that Piet Hinoul
12  wrote where he stated, who believes Mr. Lucente's
13  group when Van Raalte publishes that they have no
14  erosions?  Nobody.
15      In this article you and your group, which is
16  Van Raalte and the group, as he states, correct?
17    A.  Correct.
18    Q.  Reported that 97 women with at least one
19  year of follow-up had zero erosions or exposures,
20  correct?
21    A.  Correct.
22    Q.  Do you stand by the report in this article
23  that there were no mesh exposures or erosions for any
24  of those 97 patients over the course of a year?
25    A.  I would just say, to the best of our

Page 213

1  knowledge, there were none.
2    Q.  Well, what does that mean to the best of
3  your knowledge?
4    A.  Well, what I would say is that what we're
5  saying is that anybody that came for one-year
6  follow-up and we did an examination on them, we did
7  not see a mesh erosion from the time we started --
8  from the time we did their surgery till their one-year
9  follow-up.
10    Q.  How was a mesh erosion defined for purposes
11  of this article?
12    A.  Any exposure of the mesh that can be seen
13  through the vagina.
14    Q.  So it would have to be visible on
15  examination?
16    A.  Generally, it would have to be visible on
17  examination, yes.
18    Q.  If on your exam you had palpated mesh just
19  under the surface of the vaginal tissue, you would not
20  have counted that as an exposure or an erosion?
21    A.  I think if you palpate it, then you look
22  harder to see if you can see anything, and if you
23  don't see anything, you don't call it an erosion or an
24  exposure.
25    Q.  So in your practice group, an exposure only

Confidential - Subject to Stipulation and Order of Confidentiality

Page 214

1  exists if it can actually be seen with the eye on an
2  exam?
3      A.  For the purposes of reporting erosion and
4  exposure rates, I would say that is correct.
5      Q.  If there's a development of granuloma
6  tissue, is that reported separately as a different
7  finding than an exposure in your group?
8      A.  It would be, yes.
9      Q.  Granuloma tissue is what in this context?
10     A.  Red beefy tissue that looks different than
11 the average vaginal lining.
12     Q.  And what is the association between
13 granuloma tissue and exposure?
14     A.  You can have granulation tissue overlying an
15 exposure that you can't see.
16     Q.  Was any granulation tissue reported in this
17 study?
18     A.  I don't recall.  I'd have to read through
19 the results.
20     Q.  If you can take a quick look, I'm curious if
21 you can point to anything like that.
22     A.  I don't see any tables that list that.  Let
23 me look in the results.  (Witness reviews document.)
24         I just scanned through the results section,
25 and I don't see anything regarding granulation tissue.

Page 215

1      Q.  Do you have any recollection of whether or
2  not, as part of this study, you and your partners
3  looked for granulation tissue?
4      A.  As part of the study, I don't recall
5  specifically.  I know that in the -- in some research
6  that we've done, we've reported on granulation tissue,
7  but I don't recall if we would have specifically
8  looked at that as an outcome in this procedure -- in
9  this study, excuse me.
10     Q.  Are you aware of any other published study
11 in existence in the peer-reviewed medical literature
12 where 97 or close to that number of patients had at
13 least one-year follow-up and not one patient had an
14 exposure?  Is there any other article that you can
15 point to anywhere in the published literature ever?
16     A.  I couldn't quote anything right now.  I
17 could do a literature search for you.
18     Q.  You're very familiar with the literature,
19 aren't you?
20     A.  I am, but being able to then report what
21 name and, you know, what article it was published in,
22 it would be hard to recall.
23     Q.  Without even naming it, are you aware of any
24 other published study in which 97 or around that
25 number of patients, so we know it's not just a small

Page 216

1  case series but actually is a significant number of
2  patients, had at least one year follow-up with no
3  erosions and no exposures?
4      A.  For Prolift®?
5      Q.  Start with Prolift®.
6      A.  No, I can't think of any.
7      Q.  How about with regard to any transvaginally
8  placed synthetic mesh for the treatment of prolapse?
9      A.  I know that in some of the -- I was involved
10 in a systematic review group as part of the Society
11 for Gynecologic Surgeons, and one of the offshoots of
12 one of our projects was looking at adverse outcomes
13 with transvaginal mesh for Prolift®, so I believe Sam
14 Abed was the lead author on that.  I know that we list
15 zero to, you know, something like 25, 30% erosion
16 rates across the studies.  I'm not sure what that
17 zero, if that was specifically referring to this one
18 or not.
19         I do know of studies like Withagen study
20 where they looked at different -- as a multi-center
21 study and they looked at certain centers, and certain
22 centers had zero percent erosion rates in a year.  I
23 don't know if there's any published study where the
24 total population was zero, though, other than what I
25 just referred to in that review.

Page 217

1      Q.  On Page e4, actually e5 of this article in
2  the left column, you refer to bunching of mesh.
3          What does that mean?
4      A.  It means that rather than lying flat, the
5  mesh is bunched.
6      Q.  Why does that happen with the Prolift®?
7      A.  It could happen -- most likely I would think
8  that too large of an area of mesh was placed in too
9  small of an area of the patient's spaces, anatomic
10 spaces.  That would be the main reason that I can
11 think of.
12     Q.  One of the areas of medical judgement that
13 is brought to bear on a Prolift® procedure is the
14 surgeon's decision as to whether or to what extent to
15 cut the mesh down and trim the mesh down, correct?
16     A.  Sure, correct.
17     Q.  Do you, as a matter of course, trim the mesh
18 in virtually every single Prolift® procedure to some
19 extent?
20     A.  Yes.
21     Q.  What is the considerations that go into your
22 exercise of judgement in deciding whether or to what
23 extent to trim mesh down as part of a Prolift®
24 insertion?
25     A.  The patient's anatomy.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 218

1    Q.  And what is it you are seeking to accomplish
2  with trimming the mesh?
3    A.  To have there not be excess mesh where there
4  isn't room for it.
5    Q.  When you refer to "excess mesh," it may seem
6  very obvious to you and seem basic, but I want to make
7  sure we're on the same page.  What does that mean?
8    A.  Well, for instance, the Prolift® it's easy
9  to cut away from it.  You can't really add to it.  So
10  they're going to make it long, so if someone has a
11  particularly long vagina, that Prolift® mesh will fit.
12  But if someone has a shorter vaginal length, you can
13  trim it to fit the patient, and so, in general, it
14  just makes sense to have more mesh on the initial
15  potential implant and cut away from that.
16    Q.  When you refer to not wanting to leave any
17  excess mesh, what does that mean in terms of to you as
18  a surgeon, if there's excess mesh, what is it that's
19  going on and what's the problem with that?
20    A.  Just like noses or, you know, ears, some
21  people have big ones, some people have small ones,
22  they're shaped different ways.  It's the same with
23  vaginas.  Vaginal lengths, widths, calibers are all
24  different.  So it just wouldn't make sense to put a
25  10-centimeter strip of mesh in someone with a

Page 219

1  9-centimeter vagina.
2    Q.  What is the risk to the patient if excess
3  mesh is there, if the mesh implant is too big for the
4  woman's anatomy?
5    A.  Well, like we said, you could get bunching
6  of the tissue or just it's almost not that it would be
7  a risk, it just wouldn't even necessarily fit in the
8  space, unless you rolled it up or bunched it up in
9  some way.
10    Q.  Are there risks associated with having
11  excess mesh, meaning that the implant that's placed is
12  too large for the anatomy of the woman?
13    A.  It's not going to maybe lay as flat and
14  wouldn't provide as natural a recreation of vaginal
15  wall as it otherwise would.
16    Q.  So one of the risks of having excess mesh is
17  that the Prolift® will not function as intended?
18    A.  Say that again.
19    Q.  Is one of the risks associated with having
20  excess mesh, having more mesh than you need for the
21  woman's anatomy that the Prolift® will not function as
22  intended?
23    A.  Yeah, I wouldn't necessarily say it's a
24  risk, but, yes, I mean, if you had a whole lot of
25  extra mesh where you didn't need it to be, that

Page 220

1  probably wouldn't work as well as if you didn't have
2  extra mesh.
3    Q.  If there's excess mesh, can that contribute
4  to failure?
5    A.  How do you define "failure"?
6    Q.  Recurrence of the prolapse.
7    A.  I wouldn't think so.  I can't really think
8  of a situation where that would be the case.
9    Q.  If there's excess mesh, could that
10  contribute to erosion?
11    A.  I think potentially it could, yeah.
12    Q.  If there's excess mesh and it leads to
13  bunching of the mesh, what can that lead to?  When you
14  have bunched mesh inside the woman's pelvis, what can
15  that cause?
16    A.  Well, again, like I said --
17        MR. SNELL:  Objection, form.  Go ahead.
18        THE WITNESS:  Again, it just wouldn't
19  let the vaginal wall lay as flat as it normally would.
20  BY MR. SLATER:
21    Q.  The intent of the Prolift® is for the mesh
22  to lay flat, correct?
23    A.  As in terms of where it is in the relation
24  to the vagina, yes.
25    Q.  And if the mesh does not lay flat, it's not

Page 221

1  functioning as intended because it's not in the
2  position that was intended, correct?
3        MR. SNELL:  Objection, form.
4        THE WITNESS:  I think that's pretty
5  fair to say.
6  BY MR. SLATER:
7    Q.  And are there risks to a woman whose --
8  where the mesh is not laying flat as intended, and can
9  that have negative consequences?
10    A.  I guess it could have some negative
11  consequence.  I can't see it having major negative
12  consequences.
13    Q.  Are you aware of whether Ethicon believed
14  that where the mesh does not lay flat, whether Ethicon
15  believed that could lead to more risk for the patient
16  or negative consequences?
17    A.  I'm not aware of what they knew.
18    Q.  Am I correct that it's important for a
19  surgeon placing a Prolift® to evaluate the woman's
20  anatomy and trim the mesh to the appropriate size to
21  fit the anatomy?
22    A.  Yes.  Now, one person's decision as to what
23  is the right fit or not may differ from one surgeon to
24  another, but, certainly, you'd want to keep that in
25  the back of your mind as you're placing the Prolift®.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 222

1    Q.  The evaluation of how much to trim the mesh
2    will depend on the surgeon's judgement in evaluating
3    the patient at the time of the surgery and deciding
4    how to trim the mesh right there in the operating
5    room, correct?
6    A.  Yes.
7    Q.  There are no objective standards one could
8    look to to say, well, you know, I need to trim this
9    Prolift® this much in order for it to work best with
10   this woman's anatomy, that's not something that's
11   taught; that's not something that is out there to be
12   objectively learned, right?
13   A.  It's certainly taught that you want to trim
14   it so it lays in a flat manner, but it's not like you
15   can have a POP-Q of something and say when these POP-Q
16   numbers are this way, you can plug it into a computer
17   and it tells you how to cut the mesh.
18   Q.  Would you agree with me an important part of
19   the Prolift® procedure is in the vast majority of
20   surgeries, unless the Prolift® that came out of the
21   box happens to be the perfect size for that woman, is
22   to appropriately trim the mesh so that you get the
23   right fit?
24   A.  Yes.  I think it's one of the important
25   steps in making it work properly.

Page 223

1    Q.  Are there risks if one were to trim the mesh
2    too much and make the implant too small for the
3    anatomy of the woman?
4    A.  I think the major risk would be that of a
5    higher chance of recurrence of prolapse.
6    Q.  Why is that?  Why would that risk exist?
7    A.  Because the whole point of employing a graft
8    is to substitute for deficient tissue within the
9    patient you're operating on.
10   Q.  Is there a risk that if the mesh is trimmed
11   too much to too small a size, that that could lead to
12   tension in the mesh and pain for the patient?
13   A.  I'm trying to think of a scenario like that.
14   I can't really think of one.
15   Q.  What about if the mesh is cut too small and
16   then the body starts to integrate and the inflammatory
17   reaction takes place and the fibrosis lays down, and
18   the mesh, due to tissue shrinkage, shrinks after it's
19   been set into place by the fibrotic tissue; could that
20   lead to pain for the patient?
21   MR. SNELL:  Objection, form.
22   THE WITNESS:  I wouldn't think so.  I
23   think the -- I wouldn't necessarily see that as true
24   or not.
25   BY MR. SLATER:

Page 224

1    Q.  Are you aware of anybody within Ethicon
2    that's ever held that viewpoint that that is a risk?
3    A.  I'm not aware of that.
4    Q.  Are you aware of any literature that
5    discusses that issue?
6    A.  Of trimming too much mesh, I am not.
7    Q.  Other than a surgeon's subjective judgement
8    at the time of the surgery, would the surgeon have
9    anything else to go on in determining how much and
10   what parts of the Prolift® to trim?
11   A.  Usually when most people first start using
12   Prolift®, they go to -- when people did start using
13   Prolift®, they went to professional education, cadaver
14   labs, lectures, things of that nature, precepting,
15   proctorship, and, generally, the leader, the teacher
16   in that situation would give their own sort of
17   opinions as to what might be a good amount to trim
18   here or there.
19   Q.  So those would be essentially general
20   recommendations on what to do if you're going to trim
21   the mesh?
22   A.  Yeah.
23   Q.  And those recommendations would vary most
24   likely from preceptor to preceptor or proctor to
25   proctor, right?

Page 225

1    A.  To a certain degree, yes, it would probably
2    vary.
3    Q.  To your knowledge, there certainly was never
4    any standardized instructions from Ethicon, meaning a
5    standardized, copy reviewed document or a video or
6    something where Ethicon provided this to all surgeons
7    and said, this is what we want you to know about
8    trimming the mesh in any detail?
9    Am I correct, to your knowledge?
10   MR. SNELL:  Objection, form.
11   BY MR. SLATER:
12   Q.  I'm going to ask a different question
13   because counsel objected, and I'll try to get a better
14   question.
15   To your knowledge, is there any copy
16   reviewed material from Ethicon where Ethicon
17   officially stated to surgeons using the Prolift®, this
18   is what you need to take into account and this is what
19   you need to do when trimming Prolift® mesh?
20   A.  I can't recall ever seeing anything like
21   that.
22   Q.  With regard to tension and establishing a
23   tension free placement of the Prolift®, are you aware
24   of any copy reviewed, official Ethicon documents
25   advising surgeons of what they should be doing and

Page 226

1 what they should be looking for in order to be able to
2 confirm yes, this is a tension free placement of the
3 Prolift®?
4      A.  What do you mean by "copy reviewed"?
5      Q.  Something that's an official Ethicon
6 document, something that Ethicon promulgates saying
7 this is what Ethicon is saying to doctors.
8           MR. SNELL:  Objection to form.
9           THE WITNESS:  Yeah, I can't
10 definitively recall.  I mean, I think in some of the
11 professional education slides, there may be talk
12 about, you know, making sure that you don't over
13 tension the mesh, but I couldn't refer you to a
14 specific file.
15 BY MR. SLATER:
16      Q.  Is there any objective standard you can
17 point to whereby Ethicon ever explained what a doctor
18 should be -- rephrase.
19           To your knowledge, is there any Ethicon
20 document or source of information where Ethicon
21 explained, this is how you can objectively verify that
22 you have a tension free placement that's proper for
23 this Prolift®?  Is there any way to objectively verify
24 it that Ethicon has told surgeons?
25           MR. SNELL:  Objection, form.  Go ahead.

Page 227

1           THE WITNESS:  I don't know that there
2 is a known perfect way to place it.
3 BY MR. SLATER:
4      Q.  So, from your perspective, that objective
5 standard doesn't exist; is that correct?
6      A.  I think the objective standard is to try
7 and, in the surgeon's own estimation, who is a surgeon
8 who is supposed to be trained in pelvic reconstructive
9 surgery, to not make it too tight, whatever that means
10 to that surgeon.
11      Q.  That could mean different things to
12 different surgeons, correct?
13      A.  Potentially, but for the most part, it's
14 kind of like whatever that senator said about
15 pornography, you know, I may not be able to define it,
16 but I know it when I see it.  Most surgeons will know
17 if something's tight what that means.
18      Q.  Well, you don't -- well, rephrase.
19           You would agree with me there are surgeons
20 of varying skill levels and experience levels who have
21 used the Prolift®, correct?
22      A.  Correct.
23      Q.  And some of them are more highly skilled
24 than others, right?
25      A.  I guess that's a matter of opinion.

Page 228

1      Q.  As an expert in this case, do you agree with
2 the proposition that surgeons utilizing the Prolift®
3 had varying skill levels?
4      A.  Yes.
5      Q.  Do you agree that the surgeons have varying
6 levels of training?
7      A.  Yes.
8      Q.  Do you agree that the quality of the
9 training that surgeons using the Prolift® -- rephrase.
10           Would you agree that for surgeons using the
11 Prolift®, the quality of their training, however you
12 would define high quality training and maybe not as
13 good quality, varies from surgeon to surgeon in many
14 cases?
15           MR. SNELL:  Objection, form.
16 BY MR. SLATER:
17      Q.  And I'm talking about their training to
18 become a surgeon and then the training they get after
19 that.
20           MR. SNELL:  I'm going to object to
21 form.  You're not talking about training on Prolift®,
22 you're just talking their general training?
23 BY MR. SLATER:
24      Q.  I'm not talking about Ethicon's professional
25 education right now.  I'm talking about general

Page 229

1 training for becoming a surgeon.
2      A.  Well, let me put it this way:  Someone from
3 Mayo probably thinks they're a better surgeon than
4 someone from the Cleveland Clinic.  So you're asking
5 my professional opinion do I think there are some
6 surgeons that are better than other surgeons?  Of
7 course.  But other people may have totally different
8 opinions, so -- and, basically, what Ethicon put forth
9 in their IFU was that you should be familiar in the
10 placement of permanent mesh and that you should be
11 familiar with treating pelvic organ prolapse in a
12 surgical manner.
13      Q.  And familiarity does not presuppose any
14 specific skill level, correct?
15      A.  I don't think Ethicon has any control over
16 that.  If someone is Board -- or somebody is licensed
17 to be a doctor, they can do what they want.
18      Q.  The skill of a surgeon -- well, rephrase.
19           In your opinion, does the skill of a surgeon
20 have an impact on the outcomes that surgeon gets with
21 Prolift® surgery?
22      A.  Like any surgery that they do, the skill
23 that I think -- my definition of skill is going to
24 affect their surgical outcomes, yes.
25      Q.  And would you agree with me that a high

Page 230

1 level of skill is needed in order to perform Prolift®
2 surgery?
3          MR. SNELL: Objection, form.
4          THE WITNESS: I don't know what you
5 mean by high. No, I think that there's probably
6 people that I would consider maybe not quite as good a
7 surgeon as someone else, and they would get good
8 results with Prolift® too.
9 BY MR. SLATER:
10     Q. Do you think that there is a correlation
11 between a surgeon's skill level and the outcomes they
12 will get with the Prolift®? Do you have an opinion to
13 a reasonable degree of medical probability one way or
14 the other on that question?
15     A. I have never seen a study that looked
16 specifically at Prolift®. I think there are studies
17 out there that show that, for instance, if you do a
18 lot of vaginal hysterectomies in a year, you're going
19 to have less complications than someone who does only
20 a handful. So, yes, that would probably apply to
21 Prolift® as well.
22     Q. So, in your opinion, a surgeon's skill level
23 will have a correlation to the surgeon's outcomes with
24 the Prolift®, correct?
25          MR. SNELL: Objection, form.

Page 231

1          THE WITNESS: I don't know. I mean,
2 that's not a crazy supposition, but I don't know that
3 for sure.
4 BY MR. SLATER:
5     Q. So you don't have an opinion one way or the
6 other on that specific question?
7     A. I would just simply say what I said before,
8 that, for the most part, the more type of surgery
9 someone does, generally, the better outcomes they're
10 going to get, and that would apply to Prolift® as
11 well.
12          In terms of skill, you know, one person
13 thinks they're very skilled at surgery, someone else
14 thinks they're not. I mean, it's a very subjective
15 thing, and it's hard to know unless you're actually in
16 the OR with them.
17     Q. In your opinion, is there a correlation
18 between a surgeon's experience with the Prolift® in
19 terms of how many procedures he or she has performed
20 and the outcomes that that surgeon will obtain, as a
21 general proposition?
22     A. Like all surgeries, I learn from every
23 surgery that I do. So the more surgery I do, the
24 better I get. I guess there's going to be a point in
25 time where my eye-hand coordination isn't as good and

Page 232

1 my vision isn't as good, and eventually my experience
2 will have me have worse outcomes, but, yes, the more
3 of any procedure, including Prolift®, that you do,
4 probably the better you're going to be at it.
5          MR. SLATER: Move to strike.
6 BY MR. SLATER:
7     Q. Is the answer to my question yes?
8     A. You'd have to repeat the question.
9          MR. SNELL: Object to form.
10 BY MR. SLATER:
11     Q. In your opinion, is there a correlation
12 between the number of Prolift® procedures a surgeon
13 has performed and the outcomes that that surgeon will
14 obtain?
15          MR. SNELL: Objection, form, asked and
16 answered.
17          THE WITNESS: Yes.
18 BY MR. SLATER:
19     Q. Do you have an opinion as to how many
20 procedures it takes for a surgeon to get through --
21 well, rephrase.
22          Are there different stages of the learning
23 curve with the Prolift®, in your opinion?
24     A. As with all surgeries, yes.
25     Q. I'm not asking about any other surgeries,

Page 233

1 with all due respect, so let's just stick to the
2 Prolift® now, okay?
3     A. Okay.
4     Q. I know you're not available tomorrow
5 apparently, even though I noticed the deposition to
6 continue tomorrow, so we're going to be here a long
7 time, so the more we stick to my questions, the
8 quicker we get done.
9     A. Okay. But I also have to answer them the
10 best way I think.
11     Q. That's fine, but if I ask only about the
12 Prolift® and you talk about other things, it's not
13 responding to my question.
14          MR. SNELL: I think it is.
15          MR. SLATER: You really do, Burt?
16          MR. SNELL: Yeah.
17          MR. SLATER: If I ask you is this wall
18 yellow and you say, well, you know, that other wall
19 looks blue, but this wall could look yellow too, it's
20 not responsive. I didn't ask about the other wall. I
21 asked about the yellow wall. So let's stick with the
22 yellow wall, okay.
23          Can you read back my last question that
24 actually was sane.
25          (The court reporter read back the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 234

1       record as requested.)
2   BY MR. SLATER:
3       Q.  In your opinion, are there different stages
4   of the learning curve with the Prolift® procedure?
5           MR. SNELL:  Objection, form.
6           THE WITNESS:  Yes.
7   BY MR. SLATER:
8       Q.  How would you break that down?
9       A.  I would say that the very first time someone
10  does a Prolift® procedure, they are probably more
11  likely to encounter difficulties than the
12  one-hundredth one that they've done.
13          In terms of actual stages, I know that
14  somewhere I've been an author on a paper where it said
15  somewhere along the lines of 20 -- I don't know if it
16  was a paper or not, but it was something I reviewed in
17  this process, where I said 20 to 30 is probably when
18  you're getting a high level of familiarity and comfort
19  with it, something along those lines.  I don't recall
20  exactly what I said.
21      Q.  The learning curve will vary beyond those
22  general numbers on a surgeon by surgeon basis,
23  correct?
24      A.  I think that's fair to say.
25      Q.  Was it important -- well, rephrase.

Page 235

1       Is the Prolift® complex pelvic
2   reconstructive surgery?
3       A.  I think it's relatively complex, and to get
4   back to that last question, I just thought of
5   something, if you don't mind.
6           You know, it also depends on what experience
7   that surgeon has coming in to doing a Prolift®.  So
8   someone who has done a lot of reconstructive pelvic
9   surgery with mesh, suturing it to the sacrospinous
10  ligaments, something along those lines, their learning
11  curve is going to be different from someone who has
12  never done pelvic reconstructive surgery.
13          MR. SLATER:  I have to just move to
14  strike just because it bottled up the other answer.
15  I'm just moving to strike the add-on.
16          THE WITNESS:  Okay.
17          MR. SNELL:  Mark that for me because I
18  want to make sure that that does get in there.
19          MR. SLATER:  I was going to ask him
20  about it right now, Burt.
21          MR. SNELL:  Okay, okay.
22          MR. SLATER:  Because I'm not playing
23  games with you.  I just want a clean answer.
24  BY MR. SLATER:
25      Q.  From your perspective with regard to the

Page 236

1   learning curve, that will also vary based upon the
2   experience and skill level of the surgeon coming into
3   the first time they try to do a Prolift, correct?
4       A.  Correct.
5       Q.  Let's look at the article that you have in
6   front of you, Exhibit 1216.  Again, we're on page e5.
7   Look at the third column, right-hand side down the
8   very bottom.  One of the things that you and your
9   co-authors state is "there is also a need for
10  long-term follow-up to evaluate the potential for
11  delayed complications, such as late-onset graft
12  infection, exposure or visceral erosion."
13          Do you see that?
14      A.  Yes.
15      Q.  And that was an opinion that you held at the
16  time that you co-authored this article, correct?
17      A.  Yes.
18      Q.  And that was in December 2008 when this was
19  published?
20      A.  Yes.
21      Q.  What is late-onset graft infection?
22      A.  Well, it's something I've never seen, but it
23  would imply that the mesh becomes infected sometime
24  after the early postoperative period.
25      Q.  You've indicated during the deposition

Page 237

1   several times that there were risks or complications
2   that I've raised with you that you hadn't seen in your
3   own practice.  Just because you're saying you haven't
4   seen these things, you're not denying that they exist
5   and they happen to patients with the Prolift®,
6   correct?
7       A.  I'm not, but in regard to that specific
8   question -- that specific complication that you've
9   just discussed, I've never seen a case report of a
10  late infection of a Prolift®.
11      Q.  Are you familiar with the fact that there
12  are surgeons who believe that due to the existence of
13  the biofilm on the Prolift® mesh, that the mesh can
14  have a chronic low grade infection within the woman's
15  body?  Are you familiar with that concept?
16          MR. SNELL:  Objection, form.
17          THE WITNESS:  I'm not familiar -- I'm
18  not particularly familiar with the term biofilm.  I
19  think I've heard it here or there.  I don't know
20  exactly what someone would mean when they say that
21  but --
22  BY MR. SLATER:
23      Q.  As you sit here now, what is your
24  understanding of what a biofilm is?
25      A.  I would assume it would be some type of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 238

1 life -- some type of organism that would be adhered or
2 near the mesh.
3    Q.  Did you see the term biofilm in any of the
4 deposition testimony?  Did you see that described by
5 any of the Ethicon witnesses in any of the
6 depositions?
7    A.  I don't recall seeing that.
8    Q.  Did you see the term biofilm discussed in
9 any of Ethicon's internal documents?
10    A.  I don't recall seeing that.
11    Q.  Do you know whether or not the medical
12 affairs people in Ethicon believe that a biofilm can
13 form on a Prolift® and lead potentially to
14 complications for a patient?
15    A.  I don't recall seeing that.
16    Q.  Is that a subject about which you have very
17 little familiarity, the concept of biofilm and what
18 that can lead to?
19       MR. SNELL:  Objection to form.
20       THE WITNESS:  I have familiarity with
21 the theory put forth by a number of the plaintiffs'
22 experts that once you put a mesh in through the
23 vagina, it's going to be contaminated, there's going
24 to be potential of having bacteria there and that you
25 could have a low grade infection or, you know,

Page 239

1 bacteria there that wouldn't have been there otherwise
2 indefinitely.
3 BY MR. SLATER:
4    Q.  With regard to what you just stated, do you
5 agree that can happen?
6    A.  I don't know.  What I would care about is
7 the consequences that that would have.
8    Q.  I mean, with regard to whether or not that
9 happens to certain women with the Prolift® or has
10 happened to women with the Prolift®, do you have an
11 opinion one way or the other on that?
12    A.  My opinion would be that if it was a
13 significant contamination of the mesh that it would
14 have sequelae that we would see.
15    Q.  If it was a low grade infection, not a
16 significant infection that led to a large abscess or
17 something, you might not see the clinical sequelae,
18 correct?
19       MR. SNELL:  Objection, form.
20       THE WITNESS:  It's almost by
21 definition, yes.
22 BY MR. SLATER:
23    Q.  You don't deny that that can happen with the
24 Prolift®, do you?
25    A.  I don't know.

Page 240

1    Q.  One way or the other, you don't know one way
2 or the other?
3       MR. SNELL:  Object to form.
4       THE WITNESS:  Again, all I know is that
5 I've put in hundreds of Prolifts®, and I would think
6 if there was a low grade infection, we'd see sequelae
7 of that.
8 BY MR. SLATER:
9    Q.  It could be that your technique is better
10 than other surgeons and you have less complications;
11 that's possible, right?
12    A.  Well, what I would say is, you know,
13 theoretically, the people that believe that type of
14 thing think that that's what leads to erosions and
15 that it would lead to late erosions.  So, again, what
16 I would care about is what the rate of late erosion
17 was.
18    Q.  You're not familiar -- rephrase, withdrawn.
19       At the time that the Prolift® was first
20 launched, you would agree with me that there was no
21 long-term data with regard to the Prolift®, correct?
22       MR. SNELL:  Objection, form.
23       THE WITNESS:  It would depend what you
24 mean by Prolift®, and it would depend what you mean by
25 long-term.

Page 241

1 BY MR. SLATER:
2    Q.  Well, how would you define long-term data
3 with regard to studies of the Prolift®?
4    A.  I would tend to say that some people,
5 including myself, at times would consider one year
6 long-term data.  I think that as we have more and more
7 one-year data on prolapse procedures, we now think
8 that, you know, long term refers more to three or
9 five-year.  It's a relative term.
10    Q.  Well, are you basically saying, look, at the
11 point when you first doing your first study, one year
12 would be long term because you can -- it's longer than
13 a month or two months?
14    A.  Yes.
15    Q.  But you're saying as years go on, one year
16 now is a short period of time compared to the amount
17 of years it's been available to be studied?
18    A.  Yes, and I'm also saying that female pelvic
19 reconstruction surgery is a relatively new field, so
20 our initial studies 20, 30 years ago were pretty bad.
21 And so when people came out with one-year data, it was
22 often considered long term.  Nowadays, we do much more
23 research in this field, and so a one-year doesn't seem
24 so much long term.
25    Q.  With regard to the Prolift®, which is a

Confidential - Subject to Stipulation and Order of Confidentiality

Page 242

1 permanent implant --

2    A.  Yes.

3    Q.  -- and that presents risks of complications

4 years in the future, one year is not long term,

5 correct?

6         MR. SNELL:  Objection, form.

7         THE WITNESS:  I think that that's

8 somewhat reasonable, yes.

9 BY MR. SLATER:

10    Q.  When the Prolift® was launched, there was no

11 long-term data with regard to the Prolift® system as

12 it was marketed in the box with the Prolift® procedure

13 and instruments, correct?

14         MR. SNELL:  Objection to form.  Go

15 ahead.

16         THE WITNESS:  In the sake of time,

17 again, I will give to you that at the time the

18 Prolift® was launched, to my knowledge, it was the

19 first time Prolift® was being used, when you

20 specifically refer to a kit that you can look at and

21 it says Prolift® on it.

22 BY MR. SLATER:

23    Q.  In fact, before the Prolift® was launched,

24 there was no clinical study done with the Prolift®

25 shaped mesh with the actual Prolift® instruments that

Page 243

1 were eventually marketed as part of the kit, correct?

2    A.  Are you saying the specific instruments that

3 came in the kit?

4    Q.  Yes.

5    A.  Yes, I don't think those -- to my knowledge,

6 those instruments, for instance, the cannulae had any

7 significant data.

8    Q.  Well, is there any clinical data you can

9 point to of the Prolift® mesh being put in with the

10 actual Prolift® instruments that were packaged; is

11 there any study you're aware of where that was

12 actually studied?

13    A.  Not that I'm aware of.

14    Q.  You would agree with me -- well, withdrawn.

15 Come back to it.

16         I'm done with that document, so you can put

17 it aside.

18         I'll show you a document that was marked at

19 a prior deposition, Exhibit 2002.  It's titled notes

20 from meeting from Dr. Vince Lucente and Dr. Miles

21 Murphy, Allentown, Pennsylvania to discuss Prolift®

22 RCT, 2nd February 2006, and there is a G. Scott name

23 right under the title of that.

24         Do you see that?

25    A.  I do.

Page 244

1    Q.  That's the person we talked about earlier,

2 Graeme Scott that you couldn't remember his name from

3 Scotland, or you don't know?

4    A.  I don't know.  Very possible, I guess.

5    Q.  These are the minutes of a meeting that you

6 attended on February 2, 2006, correct?  That's what it

7 says.

8    A.  Yes.  I mean, that's what it says right

9 here.  I'm not sure that's when this was drafted or

10 that's when the meeting was, probably pretty close.

11    Q.  You were discussing the possibility of a

12 Prolift® RCT being structured and performed, correct?

13    A.  Correct.

14    Q.  Was that ever done?

15    A.  No, not by Ethicon.

16    Q.  Was there ever a registry developed with

17 regard to the Prolift®?

18    A.  Sponsored by Ethicon?

19    Q.  Let's start with sponsored by Ethicon.

20    A.  Not that I'm aware of.

21    Q.  Was there a Prolift® registry in existence

22 anywhere?

23    A.  I guess depends by how you define

24 "registry."

25    Q.  Did your group have a registry?

Page 245

1    A.  We did not have a registry.  We made an

2 early on decision that we would like to look -- to

3 look at our patients at least a year, whoever we were

4 putting Prolift® in.

5    Q.  You understand what a registry is, correct,

6 or maybe you don't?

7    A.  I understand that a registry generally

8 refers to a -- collecting data on a group of patients

9 that have had a procedure.

10    Q.  Do you think it would have been helpful if

11 Ethicon had formed a Prolift® registry at the time the

12 Prolift® was launched in order to collect data from

13 various different surgeons of varying skill levels

14 around the country or around the world?

15         MR. SNELL:  Objection, form.  Go ahead.

16         THE WITNESS:  I think the more data you

17 have on anything, the better off you're going to be.

18 BY MR. SLATER:

19    Q.  Do you know whether Ethicon considered

20 forming a registry and conducting a registry for the

21 Prolift®?

22    A.  I do not know that.

23    Q.  And, therefore, you don't know if Ethicon

24 actually considered the question, you wouldn't know

25 why they decided not to do it, correct?

Page 246

1    A. Yeah, I -- I mean, vaguely, I may have --
2 you know, this was six years ago, seven years ago. I
3 may have heard some discussion about potentially
4 having a registry, but I certainly don't know why they
5 decided not to, if they had been thinking about doing
6 it.
7    Q. In some ways a registry gives very useful
8 data because you're getting results from surgeons of
9 varying backgrounds and skill levels as opposed to
10 just those surgeons who actually will routinely
11 conduct clinical trials and maybe the higher skilled
12 surgeons, correct?
13        MR. SNELL: Objection, form.
14 BY MR. SLATER:
15    Q. You understand what I'm getting at?
16    A. Because we've made this distinction between
17 TVM and Prolift®, I want to be answering your
18 questions about Prolift® as the actual kit Prolift®.
19    Q. That's what I'm asking about.
20    A. Okay. But I want to put on the record as my
21 opinion that what is being left in that patient
22 polypropylene mesh that's of large porosity and
23 monofilament in the shape that Prolift® is was done in
24 the TVM study in that over 700 patients that they
25 followed or over 600 patients that they followed in

Page 247

1 TVM.
2        MR. SLATER: Move to strike.
3 BY MR. SLATER:
4    Q. With regard to my question about the
5 usefulness of a Prolift® registry, do you agree that
6 that would be useful for the reason I stated?
7    A. As I stated --
8        MR. SNELL: Objection, form. Go ahead.
9        THE WITNESS: As I stated before, the
10 more data you have on anything, including Prolift®,
11 the better off you're going to be.
12 BY MR. SLATER:
13    Q. The last thing you would have wanted to see
14 Ethicon do was decide not to conduct a registry
15 because of a concern that if there was more accurate
16 data because there was more -- let me start over.
17        The last thing you would want to have seen
18 Ethicon do was decide not to have a registry because
19 they were concerned that if they had more data than
20 their competitors about the complications, it could
21 make the Prolift® look worse than the competitor
22 products?
23        MR. SNELL: Objection.
24 BY MR. SLATER:
25    Q. You wouldn't want to see Ethicon make that

Page 248

1 decision, would you?
2        MR. SNELL: Objection, form.
3        THE WITNESS: I'm a doctor, I like to
4 have my decisions being made on medicine as much as I
5 can.
6 BY MR. SLATER:
7    Q. As an expert who has put himself out to give
8 opinions about the propriety of what a medical device
9 manufacturer did, would you agree with me that that
10 would be improper if that was the decision why Ethicon
11 chose not to conduct a registry?
12        MR. SNELL: Objection, form.
13        THE WITNESS: Because they didn't want
14 it known that there were more complications than with
15 a different device?
16 BY MR. SLATER:
17    Q. Because they didn't want it to be perceived
18 that because they were collecting more information
19 about the Prolift® than their competitors were about
20 the competitive products that it might be perceived
21 that there was a higher level of complications; that
22 would be wrong?
23        MR. SNELL: Same objection.
24        THE WITNESS: That would disappoint me.
25 I don't know that it's wrong.

Page 249

1 BY MR. SLATER:
2    Q. It would disappoint you, though?
3    A. Yeah, it would disappoint me.
4    Q. In doing your overall evaluation of whether
5 or not Ethicon acted as a responsible medical device
6 manufacturer, that would weigh on the side of no, they
7 didn't, right?
8        MR. SNELL: Objection, form.
9        THE WITNESS: I don't think it shows
10 that they're not being responsible. I just think
11 that's a business decision. I mean, they're a
12 business.
13 BY MR. SLATER:
14    Q. Well, do you think that it's acceptable for
15 Ethicon's medical affairs people, for example, to
16 advocate for decisions based on commercial
17 considerations, where those decisions would cut
18 against patient safety?
19        MR. SNELL: Objection, form. Go ahead.
20        THE WITNESS: You know, as I said
21 before, the more data you have about something the
22 better. If you could do, you know, a detailed
23 examination and questionnaire preoperative at two
24 weeks, at six weeks, at eight weeks, at six months, at
25 one year, at five years, I think that would be good.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 250

1  I'm a doctor.  I want as much data as I can, but
2  studies cost money, and if you're going to do a study
3  that you think because it isn't necessarily going to
4  demonstrate to the public eye something poor, then you
5  might not want to do it.  That doesn't mean that I
6  think that that would be an irresponsible thing -- an
7  irresponsible decision for the company.
8         MR. SLATER:  Move to strike.
9  BY MR. SLATER:
10     Q.  As an expert forming an opinion as to
11  whether or not Ethicon acted appropriately in studying
12  the potential risks and complications with the
13  Prolift®, if they decided not to have a registry
14  because someone in medical affairs said, well, that's
15  going to make our complication rates look higher and
16  worse than competitors, so let's not do it because
17  that will hurt us from a marketing standpoint, what
18  would you have to say about that?
19         MR. SNELL:  Objection, form.
20         THE WITNESS:  I would say that I want
21  the most data I can get.
22  BY MR. SLATER:
23     Q.  And you would say to Ethicon, you should
24  have done the registry, so what if the other people
25  aren't doing the registry, give the information to the

Page 251

1  other doctors and stand behind your product, right?
2  Isn't that what you would say?
3         MR. SNELL:  Object to form.  Go ahead.
4         THE WITNESS:  Not necessarily.  I mean,
5  I'm a doctor.  I don't rely on Ethicon to do
6  everything for me.  I am perfectly capable of reading
7  literature and following my own patients.
8  BY MR. SLATER:
9     Q.  When the Prolift® went on the market, there
10  was no Prolift® specific literature, right?
11         MR. SNELL:  Objection, form.
12         THE WITNESS:  Correct.
13  BY MR. SLATER:
14     Q.  One of the things you would want to see
15  Ethicon do when they launched this Prolift® for the
16  first time is to try to do whatever they can to start
17  to make it as easy as possible for data to be
18  generated as quickly as possible so that could be
19  provided to surgeons, right?
20     A.  I forget the first part of that question.
21     Q.  You would want to see Ethicon have taken
22  whatever steps were available to it to start to
23  collect data so that that information could get to
24  doctors as quickly as possible, and so also down the
25  line, there would be a lot of data to be able to look

Page 252

1  back on and say we have a good idea of what's been
2  going on, correct?
3         MR. SNELL:  Objection, form.
4         THE WITNESS:  I think they were doing
5  that in following TVM patients.  Even though you seem
6  to think there's a huge difference between the
7  Prolift® kit and TVM, as a doctor, as an expert, I
8  don't see a big difference there.
9  BY MR. SLATER:
10     Q.  Was there a difference in the instruments
11  between TVM and Prolift®?
12     A.  A small difference, yes.
13     Q.  That's your understanding, it was a small
14  difference?
15     A.  It's not my understanding.  It's what I
16  know.
17     Q.  Do you think the tools, the instruments used
18  in the TVM study were good instruments, good tools?
19     A.  I think they were good.  I think the
20  Prolift® instruments were better for the procedure.
21     Q.  Let's look at Exhibit 2002, the notes from
22  the February 2, 2006 meeting.  If you could turn to
23  the second page, there's a statement attributed to
24  Vincent Lucente that says "dyspareunia is more likely
25  from posterior incisions."

Page 253

1         Is that something you agree with with the
2  Prolift®?
3         MR. SNELL:  What page are you on?  I'm
4  sorry.
5  BY MR. SLATER:
6     Q.  Second page, top, fourth line.
7     A.  Is that something that I agree with,
8  currently as we sit here today?
9     Q.  Yes.
10     A.  No.
11     Q.  Is it something that you agreed with in
12  early 2006?
13     A.  Let me put it this way, I think that there
14  was literature prior to 2006 that suggested that
15  posterior repairs were more likely to cause discomfort
16  than anterior repairs.  That had not been my
17  experience.  So in that sense, I wouldn't agree with
18  that, but I could see why he might think that.
19     Q.  In forming your opinions in this case, are
20  your opinions primarily based on your own experience
21  with the Prolift®?
22     A.  I wouldn't say primarily.  I would say it's
23  part of it.
24     Q.  Well, is there literature that shows that
25  dyspareunia is more likely from posterior incisions?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 254

1    A.  With Prolift® or just --

2    Q.  With Prolift®.

3    A.  Not that I'm aware of.

4    Q.  Down further there's a heading, "Recent

5  Problem with Prolift®" and it says according to

6  Dr. Lucente "recently removed the center of an

7  anterior Prolift® from a Tennessee woman.  The device

8  appeared to have been placed too tightly.  Patient was

9  in constant pain and had been since two weeks

10  post-surgery," and then Dr. Lucente apparently said,

11  "returning for surgery to deal with a bad Prolift®

12  will be a disaster.  It must be fitted with slack."

13        Do you see that?

14    A.  I do.

15    Q.  And do you agree where you have to return

16  for surgery to deal with what he terms a bad Prolift®

17  which is here described as one that was placed too

18  tightly, that that is a disaster?

19    A.  I don't know in what context he's talking

20  about it will be a disaster.  I don't know if it's in

21  regard to if there's a study or just in general it's a

22  disaster, without having read the whole document, but

23  I agree that's what he said.  There's no question

24  that's what he said.

25    Q.  When a patient has to be re-operated on for

Page 255

1  a Prolift® that's causing constant pain in a patient,

2  the surgery to try to remove parts of the Prolift® can

3  be very difficult surgery, correct?

4        MR. SNELL:  Object to form.  Go ahead.

5        THE WITNESS:  I would say it can be

6  difficult.  I don't know how -- it's not usually

7  necessarily very difficult.

8  BY MR. SLATER:

9    Q.  Well, how many times have you actually tried

10  to remove Prolift® mesh from a woman due to complaints

11  of constant pain?

12    A.  Luckily, I have not had to do that very

13  much.

14    Q.  Well, how many times?

15    A.  I think I told you at the beginning of this

16  deposition that I had one patient that the deep arm

17  was too tight, and I certainly didn't have to remove

18  the whole thing, but I cut it and I may have removed a

19  small portion.  I don't remember to be exact.

20    Q.  So that was the one patient?

21    A.  The other people that I've operated found

22  erosions.

23    Q.  They were not constant pain patients,

24  correct?

25    A.  I think some of them had some pain.  I don't

Page 256

1  know if I would say constant pain for two weeks since

2  the surgery, no.  Can I -- I'll answer that question

3  more specifically.  I have never operated on someone

4  who has been in constant pain two weeks after a

5  surgery for a Prolift®.

6    Q.  Let me ask the question clean, just because

7  we kind of went around a little bit.

8    A.  Okay.

9    Q.  This document refers to a patient being in

10  constant pain beginning two weeks after the Prolift®

11  surgery.

12        Have you ever had to operate on a patient to

13  remove part of a Prolift® implant where a patient had

14  constant pain following the procedure up till the

15  surgery?

16    A.  Up until my revision surgery, no, I do not

17  recall ever having to do that.

18    Q.  The one patient where you had to release the

19  deep arm, was that a patient that was in constant

20  pain?

21    A.  I wouldn't say constant, no.

22    Q.  So you have no experience personally with

23  the removal of mesh from a patient suffering from

24  constant pain from a point after the Prolift®

25  procedure forward to the time of the surgery; that's

Page 257

1  not something you've done, correct?

2        MR. SNELL:  Objection, form.

3        THE WITNESS:  I don't recall ever

4  having a patient that I operated on that was in

5  constant pain.

6  BY MR. SLATER:

7    Q.  Have you read the literature written by

8  surgeons who have written about the morbidity and the

9  problems faced by women who suffer from constant pain

10  and they need to go through multiple operations to

11  remove Prolift® mesh?

12        MR. SNELL:  Objection, form.  Go ahead.

13        THE WITNESS:  I have read articles

14  about having to take patients back to the operating

15  room more than once.

16  BY MR. SLATER:

17    Q.  You would not disagree with the proposition

18  that where a patient develops chronic pain after a

19  Prolift® procedure and then has to go through multiple

20  procedures and the pain still doesn't go away and the

21  patient is left with the pain remaining, the tissue

22  damage, the scarring from the multiple procedures, the

23  dyspareunia, you wouldn't deny that that is life

24  altering?

25        MR. SNELL:  Objection, form.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 258

1    THE WITNESS: So in this case I have
2 reviewed the testimony of some of the experts about
3 one of the patients who had multiple surgeries, so I
4 know that they exist. I know that there are patients
5 like that.
6 BY MR. SLATER:
7    Q. When that happens to patients like that,
8 that is --
9    A. That's a horrible outcome.
10    Q. The patient you're talking about, is that
11 Linda Gross?
12    A. Yes.
13    Q. You would agree Linda Gross has had a
14 horrible outcome, correct?
15    A. I would agree that --
16    MR. SNELL: I'm going to object to --
17 go ahead.
18    THE WITNESS: I would say that what she
19 has gone through, best as I can tell from reading
20 these reports, is something that no patient would want
21 to have to go through.
22    MR. SLATER: Okay. And just I only
23 followed up on it because he mentioned it. I'm not
24 going any further into it.
25    MR. SNELL: He hasn't served a report

Page 259

1 in the Gross case.
2    MR. SLATER: Burt, that's why I just
3 said what I said to you.
4    THE WITNESS: You guys obviously know
5 what you're thinking.
6    MR. SLATER: I don't know, if me and
7 Burt know what we're thinking, we're both in trouble.
8 BY MR. SLATER:
9    Q. Let me ask you this: When a patient is
10 suffering from chronic pain following Prolift® surgery
11 and the surgeon then goes through the different levels
12 of treatment starting with conservative and then to
13 re-operating and trying to remove mesh and all the
14 things that doctors do step by step and the patient
15 isn't getting better, the patient is basically in a
16 very difficult situation at that point, because
17 there's one choice is just keep living in this
18 constant pain state with this decreased quality of
19 life, and the other is to potentially go for risky
20 surgery that could cause even more damage.
21    Would you agree with that?
22    MR. SNELL: Objection to form.
23 BY MR. SLATER:
24    Q. For those patients?
25    MR. SNELL: Note my objection.

Page 260

1    THE WITNESS: You said a lot of things
2 there. I generally agree with the general sentiment
3 that you're saying.
4 BY MR. SLATER:
5    Q. And you would agree with me that as a
6 patient faces that type of a situation, it's
7 essentially a catch 22 because you're kind of damned
8 if you do and damned if you don't. If you don't do
9 the surgery, you may just live with this pain forever,
10 and if you do do the surgery and try to treat further,
11 it might help you, but it also might make you worse?
12 Would you agree with that, that that's a catch 22 the
13 patient is faced with?
14    MR. SNELL: Object to form. Go ahead.
15    THE WITNESS: It's a difficult
16 situation for a patient.
17 BY MR. SLATER:
18    Q. Are you aware of whether Ethicon was aware
19 at the time that the Prolift® was first launched that
20 there were patients who were going to end up in that
21 type of a situation?
22    A. I don't know what Ethicon knew.
23    Q. Certainly, if Ethicon was aware that that
24 would be happening to some number of patients, you
25 would want Ethicon to make sure they clearly

Page 261

1 communicated that to surgeons and patients, correct?
2    MR. SNELL: Objection, form.
3    THE WITNESS: Sure.
4 BY MR. SLATER:
5    Q. When a patient goes to a surgeon -- and if I
6 ask you a question that you say, look, I haven't done
7 that and I don't have an opinion on it because it's
8 not something I've dealt with, you can just say I
9 don't and we can move on I'm not trying to force you
10 to answer. I'm going through things that I have made
11 notes on, so I just want you to understand that.
12    A. Okay.
13    Q. When a patient comes to a surgeon and the
14 patient has been through multiple modes of treatment
15 from conservative right up to now invasive operations
16 and is trying to deal with chronic pain and
17 dyspareunia and debilitating problems that are
18 affecting the quality of life, you would agree there
19 are -- at that point the surgeons are exercising their
20 judgement about how to treat the patient, whether or
21 not to recommend surgery or other treatments in that
22 type of a situation?
23    A. Yes.
24    Q. And different doctors will have different
25 ideas and different recommendations based on their own

Confidential - Subject to Stipulation and Order of Confidentiality

Page 262

1 individual judgement in a situation like that,
2 correct?
3    A. Correct.
4    Q. Some surgeons would be more willing than
5 others to do more radical or more invasive surgery
6 based on whatever is entering into their own
7 judgement, correct?
8    A. I would guess so. I can't speak for other
9 surgeons, but I would think that would be reasonable.
10    Q. Did Ethicon ever promulgate any instructions
11 or warnings to surgeons on how to safely or most
12 safely remove Prolift® mesh or parts of the mesh, if
13 necessary, to treat complications?
14    A. The first part was did they ever communicate
15 it to --
16    Q. Promulgate, put out, communicate to doctors.
17    A. Outside of -- well, I think part of the
18 professional education in terms of people coming to
19 lectures and doing cadaver labs, part of that would
20 have been talking about correcting mesh erosions,
21 taking out mesh.
22    Q. Well, that would be just if the individual
23 doctor running the session talked about it?
24    A. I don't know.
25    Q. Right? You don't know whether that was

Page 263

1 discussed from session to session, right?
2    A. I don't know if Ethicon specifically decided
3 to, you know, include that in a slide deck.
4    Q. To your knowledge, you're not able to point
5 to any specific professional education information
6 that Ethicon put out for doctors to give them
7 instructions or warnings on how to safely remove
8 Prolift® mesh, if necessary, correct?
9    A. I'm not aware of any documents that they
10 produced.
11    Q. Now, one of the things -- well, rephrase.
12    The Prolift® ultimately is a system
13 comprised of mesh, instruments, instructions for how
14 to perform the procedure that that's -- rephrase.
15    The Prolift® is a procedure, and it's sold
16 as a system essentially to doctors along with the mesh
17 and the instruments to execute that procedure to treat
18 the pelvic floor, correct?
19    A. Correct.
20    Q. And when Ethicon markets that Prolift®
21 system, Ethicon is saying to surgeons, here, use this
22 with your patients. We're telling you what we know to
23 be the risks and the benefits, and here's what we
24 know. I mean, that's a fair statement, correct?
25    MR. SNELL: Objection, form.

Page 264

1    THE WITNESS: I'm sorry. Repeat that.
2 I drifted there for a second.
3 BY MR. SLATER:
4    Q. When Ethicon markets that Prolift® to
5 physicians, Ethicon is saying to physicians, here,
6 this is a system that we're telling you is safe and
7 effective to use with your patients, correct?
8    A. I assume that's what -- I mean, they don't
9 say that when they -- but, yes, it's implied.
10    Q. It's implied?
11    A. Yes.
12    Q. And Ethicon sends the IFU along with the
13 Prolift® to tell doctors here are the
14 contraindications, the warnings, the adverse events,
15 the risks that we know of with regard to the Prolift®,
16 and here is the list so that you can take this into
17 account, correct?
18    A. They do provide an IFU, and in that is
19 potential complications with the procedure.
20    Q. And one of the things that Ethicon knew from
21 the day that it marketed the Prolift® was that some
22 women were going to have complications that would lead
23 to surgeons operating on those women to try to remove
24 some or all of the mesh; they knew that would happen
25 to some number of women, correct?

Page 265

1    A. I think it's certainly --
2    MR. SNELL: Object to form. Go ahead.
3    THE WITNESS: I think it's certainly
4 safe to say that they knew that some women would have
5 erosions of mesh and that you could live with that,
6 but that in many cases you'd want to remove that.
7 BY MR. SLATER:
8    Q. It's also safe to say that Ethicon knew that
9 women would have complications beyond just erosions of
10 mesh or exposure of mesh that would require surgery to
11 remove some of the mesh?
12    A. I don't know if they knew that or not.
13    Q. You didn't see that in anything that you
14 reviewed, any indication, any deposition or document
15 indicating they knew that?
16    A. I knew that from TVM data that some women
17 had dyspareunia after having a TVM. I don't know that
18 it was determined at that time or 2005 that those
19 people would have to have mesh removed.
20    Q. In drawing your opinions in this case --
21    A. Yes.
22    Q. -- are you assuming one way or the other
23 that Ethicon knew from the day of the launch of the
24 Prolift® that some women would need to have surgery to
25 remove parts of the Prolift® mesh or all of the

Page 266

1 Prolift® mesh, not only due to exposures but also due
2 to other complications?  Do you have an assumption one
3 way or the other?
4      A.  I have an assumption that they probably
5 think that would be a possibility.
6      Q.  It was certainly foreseeable, right?
7           MR. SNELL:  Objection, form.  Go ahead.
8           THE WITNESS:  I think to a certain
9 extent it's foreseeable that if you're putting a
10 permanent material in someone that at some point that
11 might have to come out.
12 BY MR. SLATER:
13      Q.  And if you -- and if -- rephrase.
14           And since that was foreseeable to Ethicon,
15 you would agree with me that Ethicon should have taken
16 into account, well, what can we tell surgeons about
17 how to deal with that situation if they do need to try
18 to remove some or all of the mesh; wouldn't that be a
19 reasonable thing for Ethicon to think about?
20      A.  There's where I sort of disagree with you
21 because I think that any pelvic reconstructive surgeon
22 realizes that if they do surgery on someone,
23 particularly if they're using permanent materials like
24 permanent sutures, that they may have to go back in
25 and take them out.

Page 267

1      Q.  Well, my question is did Ethicon have an
2 obligation, in your opinion, to try to accumulate
3 information through study, through all of the
4 resources available to Ethicon so that Ethicon could
5 give some guidance to surgeons and say, look, we're
6 selling you this Prolift® to put in patients' bodies.
7 When there's a problem and you need to remove some or
8 all of the mesh, here's what we're telling you is the
9 way that you're going to want to try to do it.
10           Didn't Ethicon have some obligation to try
11 to be able to do that for surgeons?
12           MR. SNELL:  Objection, form.
13           THE WITNESS:  It guess it all depends
14 on "some obligation."  Is that a great piece of
15 information to be able to impart on surgeons who are
16 going to do this?  Certainly.  Is it absolute
17 requirement for them?  I wouldn't say so, and I don't
18 know that they would know exactly the best way to do
19 that.
20 BY MR. SLATER:
21      Q.  Well, Ethicon had the ability to talk to
22 surgeons all over the world, people who had the most
23 experience with the TVM procedure before the Prolift®
24 went on the market, right?
25      A.  As far as I know.

Page 268

1      Q.  And from everything you've seen, did Ethicon
2 make any effort at all to try to study the subject of
3 what is the best way, if there is one, or what is the
4 safe way, if there is one, to remove some or all of
5 the Prolift® mesh when that is called for due to
6 complications?
7           MR. SNELL:  Objection, form.  Go ahead.
8           THE WITNESS:  I'm not an employee of
9 Ethicon.  I do not know what they knew.  I have not
10 come across any documents so far that I have reviewed
11 that suggest one way or the other.
12 BY MR. SLATER:
13      Q.  Do you have an opinion one way or the other
14 as to whether or not Ethicon should have at least
15 studied the question and tried to come -- rephrase.
16           Do you have any opinion as to whether or not
17 Ethicon should have studied that question and tried to
18 do the best they could to give some information to
19 surgeons on that issue?
20      A.  Prior to launching it?
21      Q.  Yes.
22      A.  No.
23           MR. SLATER:  Take a break for a couple
24 minutes.
25           THE VIDEOGRAPHER:  Going off the

Page 269

1 record, the time is 3:59 p.m.
2           (Brief recess.)
3           THE VIDEOGRAPHER:  We're back on the
4 record.  Here marks the beginning of Volume 1 of Tape
5 Number 5 of the deposition of Dr. Miles Murphy.  The
6 time is 4:18 p.m.
7 BY MR. SLATER:
8      Q.  As you sit here now, Doctor, are you able to
9 tell me a safe and effective way for surgeons to in a
10 reproducible manner remove all or part of Prolift®
11 mesh, when necessary, due to complications?
12           MR. SNELL:  Object to the form.
13           THE WITNESS:  Would you like me to
14 answer the all or the part?
15 BY MR. SLATER:
16      Q.  Well, let's start with all.
17      A.  It would be very difficult to know that
18 you've removed every single piece of mesh out of
19 someone once they've had a Prolift®.
20      Q.  Now, with regard to removal of parts, when
21 necessary, due to complications, is there a
22 reproducible, standardized method that you can tell me
23 to do so in a safe and effective way when necessary to
24 treat complications?
25      A.  If you want to give me a specific example of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 270

1 a complication I could.

2    Q.  Well, let's talk about a woman who has

3 chronic pain and the mesh is fully integrated, the

4 fibrosis has formed, so the mesh is fully integrated

5 into the woman's pelvis.

6        Do you need more information than that?

7    A.  And what do you want me to remove?

8    Q.  Well, I don't know.  That's what I'm asking

9 you, maybe part --

10    A.  I'm sorry.

11    Q.  Part of the question is I suppose being able

12 to identify what you need to remove, right?

13    A.  Well, your question implies that her pain is

14 being caused by the mesh being there, which I disagree

15 with that premise.

16    Q.  It was my hypothetical.

17    A.  Okay.  I didn't realize we were talking

18 hypothetical.

19    Q.  I'm giving you a hypothetical situation

20 where a woman has a total Prolift® implant, and she is

21 suffering as a result of the implant from dyspareunia.

22 The mesh has become very stiff all around the vagina

23 and is causing her pain.

24    A.  Okay, well, I began --

25        MR. SNELL:  Objection, form.  You

Page 271

1 can...

2        THE WITNESS:  I began my answer -- I

3 mean this cycle of questions by saying that I think to

4 suggest that one can be certain that you've removed

5 every single piece of mesh from someone who has had a

6 total Prolift® is not something that you could assure

7 yourself that you've done.  Therefore, if you remove

8 some and the person still says they have pain and they

9 can still then attribute that pain to the mesh, that

10 doesn't mean it's true, and that could potentially

11 mean that she'd have surgery after surgery where

12 people took out small amounts of mesh expecting that

13 that's going to make her pain better, when that had

14 nothing to do with her pain whatsoever in the first

15 place.

16 BY MR. SLATER:

17    Q.  One of the problems when there is a Prolift®

18 in a woman's body and she is suffering from chronic

19 pelvic pain following the surgery that she didn't have

20 before the surgery is pinpointing exactly what it is

21 that's generating the pain in many cases, correct?

22    A.  Correct.

23    Q.  The presence of the mesh within the woman's

24 pelvis complicates things to some extent because to

25 the extent that you surmise that it's the mesh, it's

Page 272

1 very difficult in many cases to remove portions of the

2 mesh, correct?

3        MR. SNELL:  Objection, form.

4        THE WITNESS:  That would assume that

5 one was surmising that the mesh was the cause, which

6 in your case, if that's what you're saying, then, yes,

7 that would be a difficult thing to know what to do

8 with.

9 BY MR. SLATER:

10    Q.  Go to the next page of Exhibit 2002.  New

11 question, in Exhibit 2002, let's look at the third

12 page talking about this potential RCT.  It talks at

13 the top about other opinions, and this is a carryover,

14 I guess, from the prior pages where it says Trial

15 Design Advice.  Vincent Lucente says "speak to David

16 Grimes, California," then other under Other Opinions

17 he names some other physicians.

18        Do you see that?

19    A.  Yes.

20    Q.  What is the purpose of listing these other

21 opinions as dissenting voices.  What does that mean?

22    A.  Where is it -- oh, dissenting voices.  I

23 think it's speaking to -- well, if you're going to

24 design a trial, you'd like it to be unbiased.  All the

25 science we try and do, we try and minimize our bias.

Page 273

1 It's impossible to get rid of bias all together.  So

2 if you're going to design it and you happen to be a

3 company that makes one device that's going to be one

4 arm of the trial, it might be wise if you're going to

5 go ahead with that trial to talk to people who might

6 have different biases.  They may bring to the table

7 that they think mesh is a horrible idea, and maybe

8 they could inform you on how to do your randomized

9 trial.

10    Q.  So am I reading this correctly that as part

11 of the discussion on February 2, 2006 about a

12 potential Prolift® RCT, the group of people that were

13 there, including yourself, discussed bringing in

14 surgeons other than yourselves who were pro Prolift®

15 to say -- to bring others in who might not be so pro

16 the Prolift® to give input into the study design?

17    A.  I don't recall this conversation.  It was

18 six years ago, but by VL, Vince Lucente, saying be a

19 better dissenting descenting voice, that implies that

20 at least somewhere here you'd want someone with a

21 dissenting voice.

22    Q.  And the people that were discussed in that

23 context, the first one Linda Cardozo, do you know who

24 she is?

25    A.  I do.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 274

1  Q. She's a surgeon, correct?

2  A. Correct.

3  Q. Is she in United Kingdom?

4  A. Yes.

5  Q. Very well respected?

6  A. Yes.

7  Q. Then it says avoid Linda Brubacher. Do you

8  know why that is stated?

9  A. I don't know why.

10  Q. And then according to this, Vince Lucente

11  said, "Anne Weber would be a better dissenting voice."

12  Do you see that?

13  A. I do.

14  Q. Do you know why he said that?

15  A. Maybe because I know that she had done a

16  randomized, controlled trial before in reconstructive

17  pelvic surgery.

18  Q. So during this meeting regarding a potential

19  Prolift® RCT, this meeting taking place in February of

20  2006, it was suggested that Anne Weber would be

21  potentially a good person to bring in to have input

22  into the study design?

23  A. One can surmise that from this, yes.

24  Q. Let me ask you to back up for a second.

25  Unrelated question but related to Linda Cardozo.

Page 275

1  Did you see any documentation with regard to

2  Linda Cardozo's viewpoint on the Prolift® in your

3  review of materials in this case?

4  A. I don't recall seeing that.

5  Q. Is she someone you know personally, or you

6  just know of her?

7  A. I believe that I met her at the meeting in

8  France where we talked about a randomized, controlled

9  trial.

10  Q. Is she somebody who you respect in terms of

11  her stature in the urogynecologic community?

12  A. Yes. When I was -- when I went to the

13  international Euro gyno meeting in Athens, I think it

14  was -- I don't know what year it was, somewhere around

15  2007 or 2008, I met a number of her fellows, people

16  that trained under her, and they seemed to speak

17  highly of her. She is certainly a well-respected

18  person in the field.

19  Q. Then it says "Pre-Trial

20  Training/Experience," and it attributes to both

21  yourself and Vince Lucente 20 to 30 cases needed

22  before randomizing first patient, 20 anyway to master

23  the technique.

24  Was that essentially your viewpoint at that

25  point on how many procedures were needed to become

Page 276

1  proficient with the Prolift®?

2  A. I think that what that was referring to was

3  if you're doing a randomized trial, abdominal

4  sacrocolpopexy versus this, chances are most of the

5  people that you're going to be getting to be surgeons

6  will have done a lot more abdominal sacrocolpopexy,

7  when it would present bias into the study if you had

8  someone who had done 300 abdominal sacrocolpopexies

9  and had only done one Prolift®.

10  Q. Meaning that you wanted to have a solid base

11  of experience with the Prolift® too so that learning

12  curve wouldn't become a factor influencing outcomes?

13  A. Correct.

14  MR. SLATER: I'm going to mark a

15  document now as Murphy-3.

16  (Document marked for identification

17  as Murphy Deposition Exhibit No. 3.)

18  BY MR. SLATER:

19  Q. This was an advisory board that took place

20  March 21 and 22, 2006, and it states that you were one

21  of the members of that advisory board that was

22  present.

23  Do you see that?

24  A. Correct.

25  Q. If you could, turn to -- there's Bates

Page 277

1  numbers at the bottom. The last three digits are 962.

2  In the middle of the page it says

3  "Discussion Point 4: Is Gynemesh® PS the mesh of

4  choice?"

5  Do you see where I'm reading?

6  A. I do.

7  Q. It states, "If a lighter, softer mesh were

8  available for the trial at the time it is due to start

9  then this might be the preferred option."

10  Do you see that?

11  A. Yes.

12  Q. Now, this advisory board, let's just take a

13  step back, that you attended, what was the purpose of

14  this?

15  A. I believe, if I'm looking at this right, the

16  purpose of it was to look at whether or not an RCT

17  should be done with Prolift®, and if so, how it should

18  be conducted.

19  Q. In that context on the page where the Bates

20  stamp, the last three digits is 962, the question was

21  asked or the suggestion was made that if a lighter,

22  softer mesh were available for the trial at the time

23  it is due to start then this might be the preferred

24  option as compared to Gynemesh® PS. Do you see that?

25  MR. SNELL: Objection, form. You

Confidential - Subject to Stipulation and Order of Confidentiality

Page 278

1  misstate.
2         MR. SLATER:  You think I misstate?
3  What's your objection?
4         THE WITNESS:  I don't see it.
5         MR. SNELL:  You said it was a
6  suggestion.  It's actually a discussion point.
7  BY MR. SLATER:
8     Q.  Let me ask you, do you remember this
9  meeting?
10    A.  I remember it vaguely.
11    Q.  These discussion points are summaries of
12 different points in the discussion that took place at
13 that advisory board, correct?
14    A.  Sounds reasonable.
15    Q.  And Discussion Point 4 the topic listed as
16 one of the things that was discussed is the subject of
17 "is Gynemesh® PS the mesh of choice," correct?
18    A.  That's the title of it, yes.
19    Q.  And then the text right under that starts
20 out by saying, "If a lighter, softer mesh were
21 available for the trial at the time it is due to start
22 then this might be the preferred option."
23        That's the first part of what it states,
24 correct?
25    A.  That's what it states, yes.

Page 279

1     Q.  Do you recall a discussion at this meeting
2  with regard to the question of whether Gynemesh® PS
3  should be used or whether if a lighter, softer mesh
4  were available, it would be preferred to use that?
5     A.  I recall going to the meeting, and this is
6  my first time seeing this document, that this is the
7  first time I'm reading through this.  I don't really
8  recall that specifically, but I'm happy to comment on
9  whatever it says we said.
10    Q.  Do you recall that at that point in time in
11 March of 2006, there was discussion around the subject
12 of trying to identify a lighter, softer mesh to use in
13 the Prolift® system?
14    A.  I believe that there was, and now I'm seeing
15 this, so it sort of -- it affects my memory, so it was
16 probably said.  I don't remember the discussion.
17    Q.  Now, a little further down, I'm going to
18 skip over the post meeting note and then we'll come
19 back to that.
20    A.  Okay.
21    Q.  There is a statement attributed to
22 Dr. Lucente, "What to do is better mesh arrives on the
23 scene?  Consider switching mesh type mid-study."
24        Do you see that?
25    A.  Yes.

Page 280

1     Q.  So according to this document, that was a
2  suggestion that Dr. Lucente made, which was if we
3  start out with Gynemesh PS but a better mesh comes
4  along, can we switch in the middle?
5     A.  He says to consider that, yes.
6     Q.  Okay.  And then just below that, according
7  to MC, who is -- I don't know.  Do you know who MC is?
8     A.  Could be Marcus Carey, that's a name that I
9  know, but I don't know if he was there or not.  I
10 think he's a UK urogynecologist.
11    Q.  According to whoever MC is, it says,
12 "Recruitment must be complete in no more than 1 year
13 because of potential redundancy of study by the time
14 of publication due to anticipated superior products."
15        So somebody during this meeting also pointed
16 out that there was an expectation that something
17 superior was going to be coming out, so if you were
18 going to start, we need to get started basically,
19 right?
20        MR. SNELL:  Objection, form.
21        THE WITNESS:  I mean, I'm reading what
22 I'm -- I mean --
23 BY MR. SLATER:
24    Q.  You don't recall one way or the other?
25    A.  Yeah, I don't recall one way or the other.

Page 281

1     Q.  Let's go to the next statement.  According
2  to DR, which is David Robinson, "We must, therefore,
3  address the training issue (minimum number of cases
4  before randomizing a patient).  Later in the day we
5  agreed that 10 would be required of which at least 5
6  must have been anterior Prolifts®."
7         Do you see that?
8     A.  Yes.
9     Q.  So what is that telling us in terms of ten
10 procedures?
11    A.  That I think it would achieve the goal of
12 getting this trial started earlier while at the same
13 time minimizing the bias that the people doing the
14 surgery were more experienced in the other arm of the
15 study.
16    Q.  So it was agreed within this advisory board,
17 according to these minutes, that as long as each of
18 the surgeons had performed at least ten Prolifts® with
19 at least five of them being anteriors, that would be
20 suitable in order to be able to proceed?
21    A.  I don't know that that was agreed upon.  I
22 just think David Robinson says that we agreed it.
23    Q.  Well, do you recall one way or the other
24 whether --
25    A.  No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 282

1    Q. -- you agreed with that decision?

2    A. No.

3    Q. According to this document, that was what

4    was agreed on behalf of the advisory board, correct?

5    A. According to this statement right here, he's

6    saying that, yes. I haven't had a chance to read

7    through the rest of it.

8    Q. According to this document, it was agreed at

9    this Prolift® advisory board that was discussing the

10   structuring of an RCT to test the Prolift® against an

11   alternative procedure that as long as each of the

12   surgeons had performed at least ten Prolifts® with at

13   least five of them being anterior Prolifts®, that

14   would be sufficient, correct?

15        That's what it states in the document,

16   right?

17             MR. SNELL: Objection, form.

18             THE WITNESS: Exactly. It's what it

19   states right there.

20   BY MR. SLATER:

21   Q. Do you recall one way or the other whether

22   you agreed or disagreed with that?

23   A. I can anticipate that I would have -- let me

24   rephrase that. I think that that's a pretty low

25   number to all -- to then be saying that someone who

Page 283

1    has done years and years of doing an abdominal

2    sacrocolpopexy, that then comparing it to someone who

3    has only done ten Prolifts®, I would think that that

4    would introduce significant bias into the results of

5    the study.

6    Q. Look at the page that has a 72 at the

7    bottom. Don't lose this page, but flip to the page

8    that has a 72 at the bottom. Point of discussion 19

9    regarding prior training.

10        It states here, it was agreed that it will

11   be considered sufficient to have carried out 10

12   Prolifts® prior to randomizing a patient if the

13   surgeon is experienced with obturator anatomy and

14   vaginal work. This must be include greater than or

15   equal to anterior cases.

16        Do you see that?

17   A. I see that.

18   Q. So at some point during the discussion,

19   there was refinement made to the experience level that

20   would be required as a minimum with the Prolift®,

21   correct?

22   A. To be -- to efficiently carry out this

23   randomized trial, yes.

24   Q. Are you saying this was something that was

25   being done as a matter of expediency, or are you

Page 284

1    saying -- I mean, are you saying the advisory board

2    wasn't trying to have as good a study as possible?

3    A. Well, I'm saying that -- you had just asked

4    me previously about MC's comments that you want to be

5    complete in one year because of potential redundancy.

6    So what happens is -- and Anne Weber complains about

7    this all the time, that you study something, and by

8    the time you study it, people have changed how they do

9    it, and now the study doesn't mean as much. So for

10   reasons like you were saying earlier, you know, you

11   want to have data whenever possible, so you sometime

12   have to make compromises.

13   Q. Okay. Ten procedures at minimum was the

14   requirement in the Iglesias study, correct?

15   A. If you say so. I don't recall exactly.

16   Q. You're not sure one way or the other?

17   A. I know it was somewhere -- I know it -- I

18   thought it was a pretty low number.

19   Q. Let's go to the Discussion Point 4. Let's

20   come back to the post-meeting note now.

21   A. Okay.

22   Q. The post-meeting note states, after

23   consultation within Johnson & Johnson, a decision has

24   been reached to proceed with the current mesh.

25   Gynemesh --

Page 285

1    A. I'm sorry. I'm missing where you are.

2    Q. On the page with the 62 at the bottom.

3    A. I'm on it, that page. I just don't see

4    where you are.

5    Q. Under Discussion Point 4.

6    A. Yes.

7    Q. Go to the next paragraph, post-meeting note.

8    A. Yeah, got it.

9    Q. After consultation with Johnson & Johnson, a

10   decision has been reached.

11             MR. SNELL: Within, go ahead. You said

12   with. You make it sound like these people are

13   talking. I'm just trying to correct you before you

14   got too far down the road.

15             MR. SLATER: Okay.

16   BY MR. SLATER:

17   Q. In this advisory board document under

18   Discussion Point 4 which was titled "Is Gynemesh® PS

19   the mesh of choice," there's a post-meeting note.

20        Do you see that?

21   A. Yes.

22   Q. Which was apparently placed there after the

23   meeting to reflect on the issue of whether or not a

24   different mesh would be used.

25        You see that?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 286

1    A. I do.

2    Q. And it states, after consultation within

3 Johnson & Johnson, a decision has been reached to

4 proceed with the current mesh. Gynemesh® PS is the

5 mesh within the approved Prolift® System.

6        You see that?

7    A. I do.

8    Q. So according to this, Johnson & Johnson had

9 made the decision let's study Gynemesh® PS. We're not

10 going to do this, even if there is a lighter, softer

11 mesh available that might be the preferred option,

12 we're going to use Gynemesh® PS, correct?

13       MR. SNELL: Object to form. Go ahead.

14       THE WITNESS: Correct.

15 BY MR. SLATER:

16   Q. I'm going to hand you a document we've

17 marked as Exhibit 240. This is an e-mail dated

18 December 15, 2008 which attaches to it the transcript

19 of a webinar involving Dr. Lucente. And it's with

20 regard to the Prolift+M®, and if you could, turn to

21 the first page of the actual webinar. There is a 56

22 at the bottom.

23       There's a long paragraph from Dr. Lucente

24 responding to a question, the question being "did the

25 change in graft properties of Prolift+M® require you

Page 287

1 to adjust your Prolift® technique in any way, if so

2 where or how?"

3        Do you see where I am?

4    A. Yes.

5    Q. I'm not going to read the whole entire long

6 paragraph, but towards the bottom, about two-thirds of

7 the way down, there's a sentence that starts,

8 "Actually, I think, some of us out there have known

9 that I was actually holding patients off for nearly a

10 year waiting for the new mesh and these were our

11 younger sexually active patients; the 30 years old, 40

12 year olds and so on. So I think the biggest

13 consideration, I think, is in patient selection and

14 making sure that the patients that are sexually active

15 can understand what we're trying to achieve with this

16 new mesh and have them be reassured."

17       Do you see that?

18   A. Yes.

19   Q. Do you recall that there was a period of

20 time for about a year when your group was not doing

21 Prolifts® on young, sexually active women waiting for

22 the Prolift+M® to become available?

23   A. Not our group, but specifically Dr. Lucente.

24   Q. Were you holding patients back during that

25 period of time waiting?

Page 288

1    A. No.

2    Q. Did you know at that point in time that the

3 expectation was that the Prolift+M® would be a better

4 alternative for younger, sexually active women?

5    A. Did I know it?

6    Q. Did you know that that was the expectation,

7 or was that the expectation?

8        MR. SNELL: Objection, form.

9        THE WITNESS: At this time in 200 --

10 BY MR. SLATER:

11   Q. No, before the Prolift+M® came out when

12 Dr. Lucente was -- new question.

13       During the time period when Dr. Lucente was

14 holding patients back who were young and sexually

15 active waiting for the Prolift+M®, did you have an

16 understanding of what the expectations were for the

17 Prolift+M® in terms of why he would do that?

18       MR. SNELL: Objection, form.

19       THE WITNESS: I can read from this that

20 his expectation was it would provide better sexual

21 function. I don't know what J&J's or Gynecare's

22 expectations were.

23 BY MR. SLATER:

24   Q. Do you recall what your expectations were at

25 that time?

Page 289

1    A. I didn't have expectations.

2    Q. Go to the next page. Towards the bottom

3 there's a question, with less scar tissue formation,

4 are you seeing less tissue --

5    A. I'm sorry. Where are you?

6    Q. Two-thirds of the way down. It says voice.

7    A. Okay.

8    Q. And there is a question from someone named

9 Allen Kenny from Toronto.

10   A. Okay.

11   Q. With less scar tissue formation, are you

12 seeing less tissue retraction postoperatively? And

13 Dr. Lucente's response starts out, "Yes, we are. We

14 are seeing again less, whether you call it traction

15 banding or scarring. We all know it, hard to, you

16 know, sort of describe it, but we know it when we

17 tactilely palpate the vagina and feel a contraction

18 band or, you know, some fibrosis contraction. So we

19 are seeing much less of that when we examine these

20 patients."

21       Do you see that?

22   A. I do.

23   Q. First of all, do you recall, in your own

24 experience, that when the Prolift+M® came out that you

25 were seeing less scar tissue formation, less what he

Confidential - Subject to Stipulation and Order of Confidentiality

Page 290

1 talks about as traction banding or scarring?

2 　　　　MR. SNELL: Objection, form.

3 　　　　THE WITNESS: Can we take them one at a

4 time?

5 BY MR. SLATER:

6 　　Q. Sure.

7 　　A. So the first thing you had said was less

8 scar formation, I did not notice less scar formation.

9 　　　　The next one was traction banding, is that

10 what you're asking?

11 　　Q. Yes.

12 　　A. I don't recall noting less traction banding.

13 　　Q. Did you know that Dr. Lucente was telling

14 people that not only him but we are seeing less scar

15 tissue formation and less tissue retraction with the

16 Prolift+M®?

17 　　A. It doesn't surprise me that he said that.

18 　　Q. When you say it doesn't surprise you, why

19 not?

20 　　A. Because I think reading what he said here

21 seems to be an accurate representation of the opinion

22 he had at that time.

23 　　Q. Did you have the same opinion?

24 　　A. I wouldn't say one way or the other. Again,

25 we have to see what time this was. I tend to be, for

Page 291

1 lack of a better term, a little bit more hard core

2 data driven than Dr. Lucente.

3 　　Q. He describes tactilely palpating the vagina

4 and feeling a contraction band or fibrosis

5 contraction.

6 　　　　Do you see that?

7 　　A. I do.

8 　　Q. Is that something that you felt with your

9 own fingers as well?

10 　　A. Felt it when?

11 　　Q. At any point in time with Prolift® mesh,

12 contraction bands or fibrosis contraction, as he

13 describes it?

14 　　A. Well, like I said, that one case where I had

15 the patient who had -- where it seemed like it was too

16 tight at the top in the arm, I think that's what

17 people are sort of referring to as a -- for lack of a

18 better term, fibrosis, contraction, contraction band.

19 　　Q. He says, we are seeing much less of that

20 when we examine these patients. Do you see that?

21 　　A. I see that.

22 　　Q. So, in his experience, he was seeing that

23 much less with the Prolift+M® than the Prolift®,

24 according to what he states here, correct?

25 　　　　MR. SNELL: Objection, form.

Page 292

1 　　　　THE WITNESS: According to what he

2 states here, I think that's a fair representation.

3 BY MR. SLATER:

4 　　Q. Do you recall being his partner at the time?

5 　　A. I do.

6 　　Q. Do you recall that that's what he was

7 relating to you, that he was feeling that less?

8 　　A. I don't recall him specifically talking

9 about traction bands or scar plate formation. I

10 remember him getting the sense that when he examined

11 those patients, it felt even softer in the vagina.

12 　　Q. Were you having the same experience when you

13 started using the Prolift+M®, that you felt that the

14 mesh felt softer through the vagina?

15 　　A. I can't say that I necessarily did feel

16 that.

17 　　Q. Go to the next page. Dr. Lucente is talking

18 about in responding to a question where he was asked

19 are there any patients in whom you would not use

20 Prolift+M®, and he says, in our literature -- a little

21 further down from the top he says, in our literature,

22 in our series points to the three areas that increase

23 the likelihood of pain, and that is a patient of a

24 younger age, and I'm going to paraphrase a little,

25 second, a patient who has had a prior pelvic surgery

Page 293

1 with a permanent material being utilized, whether

2 suture or graft, and, third, chronic pain disorder of

3 any type.

4 　　　　Do you see that?

5 　　A. I do.

6 　　Q. And that is -- those are three categories of

7 patients that have been described in literature by

8 your group as being at a higher risk of developing

9 pain after Prolift® surgery, correct?

10 　　A. He's stating that. I don't know if that's

11 an accurate representation of our literature.

12 　　Q. So when he did this webinar, you think he

13 was not accurately describing your literature?

14 　　A. I'd have to look back at what reference he's

15 referring to. I certainly think the last two we've

16 already seen that he referred to that in our

17 referred to that in one of our papers. The first one,

18 the younger age, I don't know that we ever determined

19 that.

20 　　Q. Well, isn't it true that -- well, rephrase.

21 I'll withdraw it.

22 　　　　He then a little further down says, "we all

23 know that once those C-fibers get activated they tend

24 to stay activated and hypersensitive and, of course,

25 I'm more concerned about chronic pelvic pain

Confidential - Subject to Stipulation and Order of Confidentiality

Page 294

1 disorders, but we've actually seen with any chronic
2 pain," and he says he calls them relative
3 contraindications.
4      Do you see that?
5   A. Yes.
6   Q. And in his practice he's representing that
7 he considered people with any sort of a chronic pain
8 history to have a relative -- start over.
9      In this webinar Dr. Lucente is stating here
10 on the page that has the 58 at the bottom that in his
11 practice, patients with chronic pain, to his
12 perspective, had a relative contraindication to the
13 Prolift® due to activation of the C-fibers.
14      Do you see that?
15      MR. SNELL: Objection, form.
16      THE WITNESS: I see that.
17 BY MR. SLATER:
18   Q. Do you recall from working with him that
19 that was his practice?
20   A. I recall there came a time where he sort of
21 felt that way, yes.
22   Q. Did you feel that way?
23   A. I felt like -- I think we already went over
24 this, that in patients with chronic pain syndromes, I
25 really only felt chronic pelvic pain -- well, yeah,

Page 295

1 let's just go back to chronic pain syndromes, that in
2 general, operating on those people is going to
3 increase their risk of more postoperative pain than
4 the average person, in that it might be wise to think
5 twice about putting permanent materials in those
6 patients.
7   Q. Do you know when it was that Ethicon first
8 became aware of that viewpoint, that there were
9 surgeons in your group with Dr. Lucente thought this
10 way or that any other surgeons out there thought that
11 there's at least a relative contraindication to
12 patients with chronic pain to putting the permanent
13 material into the body?
14      MR. SNELL: Objection, form.
15 BY MR. SLATER:
16   Q. You can answer. I'm asking do you have
17 knowledge about when or if Ethicon ever understood --
18   A. What I would have --
19   Q. -- that that thinking was out there?
20   A. I'm sorry to step on you.
21      What knowledge I think they would have is
22 when we presented that study that we just reviewed
23 earlier today and we state that five out of six people
24 with chronic pain syndrome had more postoperative
25 pain.

Page 296

1   Q. Do you have any knowledge as to when Vincent
2 Lucente recalls having communicated that concern to
3 Ethicon, in discussing it with people in medical
4 affairs at Ethicon?
5   A. I do not.
6   Q. You would certainly agree with me that once
7 Ethicon was aware of that concern, it's certainly
8 something they should have taken into account in what
9 warnings they were giving to surgeons and what
10 information they were giving to patients, correct?
11      MR. SNELL: Objection, form.
12      THE WITNESS: Not necessarily.
13 BY MR. SLATER:
14   Q. Well, it's certainly something they should
15 have taken into account, right?
16      MR. SNELL: Objection, form.
17      THE WITNESS: Taken into account in
18 what regard?
19 BY MR. SLATER:
20   Q. Ethicon has an obligation to warn of the
21 potential risks in connection with the use of the
22 Prolift®, which include -- would include someone who
23 has a relative contraindication that could increase
24 their risk, right?
25      MR. SNELL: Objection, form. You're

Page 297

1 misstating now.
2      MR. SLATER: I am?
3      MR. SNELL: Yes.
4      MR. SLATER: I'll ask a new question.
5      MR. SNELL: He is talking liability.
6 You're talking medical contraindications.
7      MR. SLATER: I don't know what you're
8 talking about.
9 BY MR. SLATER:
10   Q. Did Ethicon have an obligation to warn
11 physicians and patients if they knew there was a
12 condition that a patient could have that could
13 increase the risk of suffering a complication like
14 pain after Prolift® surgery?
15      MR. SNELL: Objection, form. Go ahead.
16      THE WITNESS: I think we've already
17 gone through this, and what I told you is that that's
18 a risk with any surgery. These people are at high
19 risk, and what at least my opinion is is that because
20 of the medical-legal environment you're going to be at
21 higher risk for having a problem with those patients
22 if you've put a permanent foreign body in there.
23      MR. SLATER: Move to strike.
24 BY MR. SLATER:
25   Q. Understand I'm asking you a general

Confidential - Subject to Stipulation and Order of Confidentiality

Page 298

1  question. I'm not asking it with particular to pain
2  conditions right now, okay. Here's my question, clean
3  question: If Ethicon became aware of a certain
4  patient criteria, something about the patient's
5  background that could increase the patient's risk to
6  have a poor outcome, for example, to cause the patient
7  to develop more pain after the Prolift® than other
8  patients, if Ethicon was aware of that, did they have
9  an obligation, first of all, to look into it and study
10 it to determine whether it needed to be communicated
11 to patients and physicians?
12         MR. SNELL: Objection, form. Go ahead.
13         THE WITNESS: No.
14 BY MR. SLATER:
15    Q. So it would be okay for Ethicon to receive
16 such information and to do nothing about it, not think
17 about it, not study the question and to just move on?
18    A. I didn't say that.
19    Q. That was what my question was, and you said
20 no, so I just want you to know that's what you said.
21         MR. SNELL: Now you're misstating his
22 answer.
23         THE WITNESS: If we could read back
24 those two things --
25         MR. SNELL: Read both questions.

Page 299

1         THE WITNESS: -- I'm quite sure they
2  would say different things.
3         MR. SLATER: We don't need to read both
4  questions, okay, Burt, with all due respect. I'm not
5  going to waste ten minutes.
6  BY MR. SLATER:
7     Q. When Ethicon became aware that there were
8  surgeons who felt that the use of the Prolift® mesh in
9  their body, if they had a chronic pain condition could
10 put them at increased risk to get more pain
11 afterwards, if Ethicon got that information, did
12 Ethicon have an obligation to follow through and look
13 at that to see if that was something that needed to be
14 warned about?
15         MR. SNELL: Objection, form, asked and
16 answered.
17         THE WITNESS: We are talking purely
18 hypothetically at this point.
19 BY MR. SLATER:
20    Q. Well, we're talking a hypothetical, yes.
21    A. Okay. Because before we were talking about
22 Dr. Vincent Lucente. Now you're talking about
23 surgeons reporting this to them. He is one surgeon.
24    Q. If any surgeon or surgeons reported that to
25 them, somebody who they respected, did they have an

Page 300

1  obligation to do something to follow up on that?
2         MR. SNELL: Objection, form.
3         THE WITNESS: To do something to follow
4  up. I think maybe it's reasonable to do something to
5  look at it in some way.
6  BY MR. SLATER:
7     Q. And if people in Ethicon concluded that
8  there was a higher potential risk for pain for
9  patients if they already had a chronic pain condition
10 and were to have a Prolift® put in their body, if
11 Ethicon had enough information to believe this is not
12 some remote possibility but we have information that
13 we think is reliable, did they have an obligation to
14 warn about that?
15         MR. SNELL: Objection, form.
16         THE WITNESS: I'm not trying to be
17 argumentative, but you're always talking about just
18 Prolift®, and it assumes that that's sort of the only
19 way one can treat prolapse. And if you think that
20 people with prolapse should be able to have the choice
21 to be treated, then you have to look at the options
22 for treatment.
23 BY MR. SLATER:
24    Q. Do you understand that a medical device
25 manufacturer like Ethicon has an obligation to warn

Page 301

1  about the contraindications, the warnings, the risks,
2  the adverse events associated with that product
3  because they're selling that system? Do you
4  understand that that's an obligation?
5     A. Do I understand it's an obligation from a
6  regulatory standpoint?
7     Q. Let's start with regulatory standpoint. Do
8  you understand that that's an obligation?
9     A. I really don't know the specifics about what
10 a medical device company has to report.
11    Q. As an expert in this case, do you have an
12 understanding as to whether or not Ethicon had an
13 obligation to warn physicians in the IFU and patients
14 in the patient brochure as to the risks, the
15 contraindications, the adverse events that were known
16 to Ethicon when giving information about the Prolift®
17 which Ethicon was selling?
18         MR. SNELL: Objection, form. Go ahead.
19         THE WITNESS: If it's a
20 well-established association, then, yes, I think
21 they -- that would be something that they might want
22 to make people aware of.
23 BY MR. SLATER:
24    Q. Did Vincent Lucente think there was a
25 well-established association between a person having

Page 302

1 chronic pain and then having a Prolift® put in and
2 having an increased risk of developing pain due to the
3 Prolift® procedure?
4          MR. SNELL: What time are you talking
5 about?
6          MR. SLATER: At any point in time.
7          THE WITNESS: Was it a relative
8 contraindication in his mind?
9 BY MR. SLATER:
10     Q. Yes.
11     A. I think he just stated that, yes.
12     Q. Okay. If Vincent Lucente told Ethicon in
13 late 2005 or early 2006 that he felt that chronic pain
14 was a relative contraindication to the use of the
15 Prolift® in patients, if he provided that information
16 to Ethicon at that time, did Ethicon have an
17 obligation to get that information out to physicians
18 so that they would have that information when
19 considering whether or not to recommend a Prolift® to
20 patients?
21          MR. SNELL: Objection, form. Go ahead.
22          THE WITNESS: I respect Dr. Lucente's
23 opinions very much. Do I think that Ethicon was
24 obligated to do anything just because he had an
25 opinion? No.

Page 303

1 BY MR. SLATER:
2     Q. What did Ethicon need to do as soon as
3 Vincent Lucente provided that information to them?
4 Let's assume it happened in late 2005, early 2006.
5 What was Ethicon's obligation at that point?
6     A. I think to continue to monitor the ongoing
7 studies of TVM and Prolift® to see if that actually
8 seemed to be the case.
9     Q. And for how long would they -- would
10 Ethicon reason -- rephrase.
11          And how long would it be reasonable for
12 Ethicon to continue to monitor that issue while
13 Prolifts® continued to be put in women's bodies every
14 day, including women with chronic pain conditions?
15     A. I think it's -- I think once that there was
16 data from at least more than one study that showed
17 that the risk of chronic pain postoperatively was
18 higher in people with pre-existing chronic pain
19 conditions than in those who did not have pre-existing
20 chronic pain conditions.
21     Q. Was that data ever available?
22     A. I have never seen a study that shows that
23 comparison that I'm aware of.
24     Q. What about the manuscript we read earlier
25 today by you and your group that showed that five of

Page 304

1 the six patients with persistent dyspareunia had
2 pre-existing chronic pain?
3     A. There were no statistics done on that
4 finding, as far as I know.
5     Q. What would be -- rephrase.
6          What would the downside have been if
7 assuming that Vincent Lucente told Ethicon that he
8 believed there was an increased risk to develop pain
9 if a patient were to get a Prolift® where the patient
10 had chronic pain to begin with, what would be the
11 downside to Ethicon disseminating that information out
12 to physicians so they could at least be aware of the
13 potential issue?
14          MR. SNELL: Objection, form.
15          THE WITNESS: I don't see that there
16 could be much downside to it. In fact, I think --
17 well, you're probably going to strike it if I say
18 anything else.
19          MR. SNELL: Give your full answer. He
20 can strike whatever. I'll ask it later.
21          THE WITNESS: I think in one of what we
22 call throw-away journals, a journal that is not a
23 peer-reviewed journal, he states that pretty clearly,
24 and I think that was somewhere around 2007/2008.
25          MR. SLATER: I'm going to move to

Page 305

1 strike that last part. It's too late in the day for
2 me to try to think anything through.
3 BY MR. SLATER:
4     Q. Can you turn to the page with the 61 at the
5 bottom.
6     A. The same document?
7     Q. Same document.
8          There is a discussion at the top between
9 Dr. Lucente and Douglas Greer.
10          You know Douglas Greer?
11     A. I do not.
12     Q. Do you know who he is?
13     A. Not to my recollection.
14     Q. He is talking about, coming back from the
15 prior page, some issues about potential infection --
16 rephrase. I'm going to withdraw that.
17          At the top of the page with the 61, Douglas
18 Greer makes a point where in a discussion with Vincent
19 Lucente here under the context of vaginal
20 rehabilitation, do you see that's what Dr. Lucente was
21 discussing?
22     A. No.
23     Q. Second line of the page.
24     A. Oh, yeah. Yes, I see it, yes.
25     Q. He's talking about the fact that surgeons in

Confidential - Subject to Stipulation and Order of Confidentiality

Page 306

1 other parts of the body in other fields have less
2 concern about splitting the incisions open when they
3 get the patients up and moving around and starting to
4 rehabilitate after surgery.
5 　　　Do you see that?
6 　　A.　I do see that.
7 　　Q.　And then Doug Greer says their incisions
8 don't live in a sea of bacteria.
9 　　　Do you see that?
10 　　A.　I see that.
11 　　Q.　He's referring to the environment of the
12 vagina, correct?
13 　　A.　Dr. Greer or Douglas Greer, yes, I would
14 think.
15 　　Q.　And then Dr. Lucente responds, absolutely,
16 agreeing with that as being an issue, correct?
17 　　　　　MR. SNELL:　Objection, form.
18 　　　　　THE WITNESS:　He states absolutely.
19 BY MR. SLATER:
20 　　Q.　It may not be the terminology you would
21 choose, but you would agree that the environment of
22 the vagina is a sea of bacteria, correct?
23 　　　　　MR. SNELL:　Objection, form.
24 　　　　　THE WITNESS:　There is a great deal of
25 bacteria in the vagina.　There's a great deal of

Page 307

1 bacteria on the skin, but more so in the vagina than
2 on the skin.
3 BY MR. SLATER:
4 　　Q.　Can the bacteria in the vagina traverse
5 through the incision after Prolift® surgery,
6 contaminate the mesh and lead to an infection?
7 　　A.　Theoretically, I'm sure it could.
8 　　Q.　Have you ever studied the question of
9 whether or not that occurs in some patients?
10 　　A.　Have I personally studied that?　No, with
11 the exception that I do a lot of study on people who
12 have had incisions and Prolift® had put in them.
13 　　　　　(Document marked for identification
14 　　　　　as Murphy Deposition Exhibit No. 4.)
15 BY MR. SLATER:
16 　　Q.　Exhibit 4.　I've marked as Exhibit Murphy-4
17 an article titled "Clinical Practice Guidelines on
18 Vaginal Graft Use From the Society of Gynecologic
19 Surgeons."
20 　　　You have that in front of you, correct?
21 　　A.　I do.
22 　　Q.　This is an article that you authored,
23 correct?
24 　　A.　Correct.
25 　　Q.　What is the Society of Gynecologic Surgeons?

Page 308

1 　　A.　It's a society of -- a medical society of
2 Gynecologic Surgeons that have particular interest in
3 doing surgery on gynecologic patients.
4 　　Q.　This article was published in the journal
5 titled Obstetrics & Gynecology, correct?
6 　　A.　Correct.
7 　　Q.　And the publication date is November 2008,
8 correct?
9 　　A.　Correct.
10 　　Q.　And it says, the objective of this article
11 is to set forth what you found or what you
12 determined -- rephrase.
13 　　　The objective of this study is defined in
14 the abstract portion as "to develop guidelines
15 regarding whether graft or native tissue repair should
16 be done in transvaginal repair of anterior, posterior
17 or apical pelvic organ prolapse," correct?
18 　　A.　Correct.
19 　　Q.　And this was a study that you did along with
20 some other physicians to try to meet that objective,
21 correct?
22 　　A.　It was a systematic review, and from the
23 systematic review, we developed guidelines.　True
24 sense of the word, it wasn't a study, like an
25 experimental study.

Page 309

1 　　Q.　Let's go through some of the findings that
2 are in this article.　Let's look at the Materials and
3 Methods section actually first.　Right under that it
4 says, the Society of Gynecologic Surgeons is a select
5 member group of more than 250 physicians representing
6 both private practice and academic faculty - all
7 involved in the teaching and practice of advanced
8 gynecologic surgery.
9 　　　That's what that organization is, correct?
10 　　A.　That's a much more eloquent way than I just
11 defined it, yes.
12 　　Q.　And it states that in 2007 the research
13 committee of SGS formed a Systematic Review Group to
14 develop these and future guidelines, and you were part
15 of that group, correct?
16 　　A.　Correct.
17 　　Q.　You essentially for this article established
18 a grading system so that you could provide
19 recommendations based on the literature that was
20 available, correct?
21 　　A.　We did not establish it.　It was a
22 pre-established system.
23 　　Q.　Where did that system come from?
24 　　A.　It came from a group of physicians who do a
25 lot of systematic reviews.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 310

1  Q.  Let's start with the Results section on page
2  1125.  About three-quarters of the way down in the
3  right-hand column it states, start of the last
4  paragraph, "from a historical perspective, native
5  tissue repair can be considered the default or
6  standard of care."
7      Do you see that?
8  A.  I do.
9  Q.  And when you refer to the default or
10  standard of care, what are you saying?
11  A.  It means that from a historical perspective,
12  meaning in the past, all that was available were
13  native tissue repairs.
14  Q.  Go to the next page regarding "Synthetic
15  Graft Use in the Anterior Compartment."
16      Do you see that?
17  A.  I do.
18  Q.  And you indicate here the first randomized
19  trial of use of this graft, and that was an absorbable
20  synthetic graft, with anterior colporrhaphy was
21  published in 2001 by Weber, et. al.
22      That's a study that was published and is
23  widely cited, correct?
24  A.  Yes.
25  Q.  And that was a study that focused on a

Page 311

1  comparison of this absorbable graft material versus
2  anterior colporrhaphy in terms of anatomic outcomes,
3  correct?
4  A.  Yes, I believe there was a third arm as
5  well, the ultra lateral anterior colporrhaphy.
6  Q.  And that study focused specifically on the
7  anatomic outcomes and the anatomic recurrences,
8  correct?
9  A.  Correct.
10  Q.  If you go down further, the next heading,
11  "It is suggested that native tissue repair remains
12  appropriate in anterior vaginal wall repair when
13  compared with absorbable synthetic graft."
14      What are you discussing there?
15  A.  We are providing a clinical practice
16  guideline.
17  Q.  When you refer to "a clinical practice
18  guideline," what does that mean?
19  A.  What it means is that doctors receive all
20  sorts of information about how to practice medicine.
21  They receive it in their training.  They receive it
22  talking to their colleagues.  They receive it from
23  reading the medical literature.  It can be sometimes
24  hard to synthesize all that data and come up with how
25  you should best treat your patients.  So the goal of a

Page 312

1  systematic review followed by clinical practice
2  guidelines is to synthesize all -- a lot of data and
3  then suggest how people can proceed in their practice.
4  Q.  In this study and these recommendations --
5  rephrase.
6      And in this article there is a comparison of
7  nonabsorbable synthetic mesh or an analysis of
8  nonabsorbable synthetic mesh; that's what is stated on
9  Page 1126, correct?
10  A.  Correct.
11  Q.  Towards the bottom of the page in the
12  right-hand column, "There is a paragraph that starts,
13  these studies found a number of complications
14  associated with the use of synthetic graft in the
15  anterior compartment."
16      Do you see that paragraph?
17  A.  I do.
18  Q.  You then continued, "when considering these
19  studies in conjunction with the case series of
20  anterior compartment mesh use, the following adverse
21  outcomes have been reported," and then you list
22  "infection, hemorrhage, mesh erosion, dyspareunia,
23  incontinence, bladder injury, voiding dysfunction and
24  ureteric obstruction," correct?
25  A.  Correct.

Page 313

1  Q.  You then indicate, "Overall, the rate of
2  mesh erosion/exposure ranges from 0-24.5%," correct?
3  A.  Correct.
4  Q.  Then you say, "In summary, there are
5  trade-offs between using nonabsorbable synthetic mesh
6  or native tissue in anterior compartment repair,"
7  correct?
8  A.  Correct.
9  Q.  And the trade-offs you're talking about are
10  as described above in the article, from your
11  perspective, you can get better anatomic outcomes with
12  the mesh, but the trade-off is the complications that
13  you can get with the mesh as well, correct?
14      MR. SNELL:  Objection, form.  Go ahead.
15      THE WITNESS:  Not specifically.  The
16  trade-offs when you look at the comparative data that
17  we looked at that time were specifically a higher rate
18  of de novo stress incontinence and a risk of mesh
19  erosion that does not exist when you don't use mesh.
20      The other complications we were listing
21  are simply listing complications that can occur with
22  mesh.  They can occur without mesh as well, but we're
23  just listing them.
24  BY MR. SLATER:
25  Q.  The proposition analyzed at the end of the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 314

1  section about the use of synthetic mesh for anterior
2  repairs says, "It is suggested that nonabsorbable
3  synthetic mesh may improve anatomic outcomes of
4  anterior vaginal wall repair, but there are
5  significant trade-offs in regard to the risk of
6  adverse events."
7      Do you see that?
8      A.  Yes.
9      Q.  That was certainly a statement that you
10  believed was accurate as of the time you published
11  this article in November 2008, correct?
12     A.  I believe it was accurate, but it is
13  important to realize that I published this on behalf
14  of the whole group.  It simply wasn't a reflection of
15  my pure opinion, but, yes, I agreed with that.
16     Q.  And you put your name on the article as the
17  author, right?
18     A.  Absolutely.
19     Q.  You then say at the end "Weak," and that's
20  grading, what, the strength of the recommendation with
21  regard to the use of graft material for anterior
22  repairs?
23     A.  That's stating that the recommendation is a
24  weak recommendation based on the fact that it's not
25  based on a whole lot of great data.

Page 315

1      Q.  So there is a lack of data that you felt was
2  reliable to -- in this context at that point on that
3  question?
4      A.  Yes, as there is in most pelvic
5  reconstructive surgery.
6      Q.  Go to the next page.  On Page 1127,
7  right-hand side, there is a paragraph with regard to
8  use of nonabsorbable synthetic mesh in posterior
9  vaginal wall repairs.
10     Do you see that?
11     A.  Are we talking about nonabsorbable now?
12     Q.  Yes.
13     A.  Yes, I see the recommendation.
14     Q.  And you state, "The quality of the evidence
15  for the use of nonabsorbable synthetic graft in the
16  posterior wall is graded as very low."
17     What did you mean by that?
18     A.  It means that there are not a lot of
19  randomized trials looking at permanent synthetic mesh
20  in the posterior compartment compared to native tissue
21  repairs.
22     Q.  You then talk about, a little further down,
23  "there are uncertain trade-offs with its use."
24     Is that again referring to the same fact
25  that because of the lack of data, it's uncertain as to

Page 316

1  what trade-offs you're going to be making?
2      A.  I think that's what we were stating, yes.
3      Q.  You then state, "The risk of mesh
4  erosion/exposure in the posterior compartment is
5  nonexistent in native tissue repair."
6      Why did you state that?
7      A.  Because while it's something that's obvious,
8  we're still trying to point out to people that we're
9  just stating the facts.
10     Q.  You then state, "There are no comparative
11  studies to guide any recommendation on the use of
12  nonabsorbable synthetic mesh in posterior vaginal wall
13  repair when compared with native tissue repair."
14     That was the conclusion, correct?
15     A.  That was our statement.
16     Q.  Then there's a section on multiple
17  compartment use, and you point out that there are no
18  randomized studies, correct?
19     A.  Correct.
20     Q.  Further down you point out in that same page
21  on 1128 of this article, "The quality of the evidence
22  for the use of nonabsorbable synthetic grafts in
23  multiple compartments is graded as very low," correct?
24     A.  Correct.
25     Q.  And that was your viewpoint at the time,

Page 317

1  correct?
2      A.  Again, that's talking about the fact that
3  the quality of evidence is low because there's
4  essentially no evidence.
5      Q.  You then state, "The decision for grading
6  was based on the fact that there are no comparative
7  studies in the literature about the use of
8  nonabsorbable synthetic grafts for the repair of
9  combined anterior, posterior and/or apical compartment
10  prolapse."
11     Saying the same thing, there's no
12  comparative studies in that subject, correct?
13     A.  Correct.
14     Q.  And as a result you say, "there are
15  uncertain trade-offs with its use," right?
16     A.  Correct.
17     Q.  You then point out, the risk of graft
18  erosion or exposure in the vagina is nonexistent in
19  native tissue repair, correct?
20     A.  Yes.
21     Q.  At the top right there's a discussion of the
22  1999 National Institutes of Health workshop examining
23  the state of basic epidemiologic and clinical research
24  addressing female pelvic floor disorders, and there is
25  a citation number 28 to a paper that was written about

Confidential - Subject to Stipulation and Order of Confidentiality

Page 318

1 that.
2    Do you see that?
3    A.  I do.
4    Q.  And that's a paper authored by Anne Weber
5 and some other doctors titled the standardization of
6 terminology for researchers in female pelvic floor
7 disorders.
8    Do you see that?
9    A.  I do.
10   Q.  And why did you cite to that meeting and to
11 that article?
12   A.  I'd have to read through this paragraph to
13 tell you why.  Would you like me to do that?
14   Q.  Sure.  It's short.
15   A.  (Witness reviews documents.)  Okay.  I've
16 read that paragraph.  Would you mind repeating the
17 question back.
18   Q.  Sure.  Why did you cite to that meeting and
19 that article?
20   A.  The point of this section of the discussion
21 was to guide people in how to conduct future research
22 on this topic and that since there was so little data
23 out there when we published this, we thought well who
24 wants to read a paper that basically says, we didn't
25 find anything, and so part of our goal in this paper

Page 319

1 was to suggest how to best go about conducting future
2 research, and there were certain domains that we
3 thought should be covered, and the citation that I
4 cite goes along with some of the previous
5 recommendations that were listed in that citation.
6    Q.  So, in part, you're telling people who read
7 this article that the reference number 28, the article
8 by Dr. Weber and others is titled the standardization
9 of terminology for researchers in female pelvic floor
10 disorders, that that's a resource that should be
11 utilized in future research in this area?
12       MR. SNELL:  Object to form.  Go ahead.
13       THE WITNESS:  I don't think that's what
14 we said.  I just said that our recommendations seemed
15 to go along with that recommendation.
16 BY MR. SLATER:
17   Q.  So you felt those recommendations that were
18 made by Dr. Weber and her co-authors in that article
19 were valid, correct?
20   A.  For the most part, yes, sir, certainly in
21 regards to the points that I then lay out following.
22   Q.  Go to the next page, please.  Let's look at
23 the heading "Recommendations for Preoperative
24 Counseling and Vaginal Graft Use" on Page 1129 of this
25 article.  Got that?

Page 320

1    A.  I'm on that page.  I don't see the
2 recommendations.  That's the start of --
3    Q.  It's the heading on the left-hand side.
4    A.  Oh, the heading, yes, I see it.
5    Q.  You started out by saying, "Balancing the
6 potential risks and benefits of reconstructive surgery
7 always poses a challenge for pelvic surgeons.  This is
8 particularly true for new procedures," right?
9    A.  That's what I state.
10   Q.  And that was your viewpoint at the time,
11 correct?
12   A.  That was my viewpoint.
13   Q.  The new procedures would be, for example,
14 the Prolift®, correct?
15   A.  That would be an example of a new procedure
16 at that time.
17   Q.  You continue, "Vaginal repairs with native
18 tissue have been performed for decades, and although
19 there are questions about the durability of these
20 repairs, the risks are well-known.  In particular,
21 potential long-term sequelae are easier to predict
22 given the long track record of these procedures," and
23 that was a true statement, correct?
24   A.  That is a true statement.  I would like to
25 add something qualifying that.

Page 321

1    Q.  Well, when you made that statement, that's
2 what you published and felt to be a true statement,
3 correct?
4    A.  Yes.
5    Q.  You then continue, "Some studies show a
6 decrease in recurrence of prolapse associated with use
7 of graft in reconstructive pelvic surgery, but others
8 show no benefit in this regard.  There is undoubtedly
9 a paucity of randomized, comparative data to guide
10 recommendations regarding efficacy."
11       You see where I just read?
12   A.  Yes.
13   Q.  I want to ask you about your comment that
14 there was a paucity of randomized comparative data to
15 guide recommendations regarding efficacy, okay?
16   A.  Sure.
17   Q.  From your perspective in authoring this
18 article in November of 2008, you felt that without
19 randomized, comparative data you didn't have the type
20 of evidence that you would really ultimately want to
21 be able to rely on when making recommendations to
22 patients for treatment, correct?
23       MR. SNELL:  Objection, form.  Go ahead.
24       THE WITNESS:  No, this is not talking
25 about talking to patients.  This is talking to other

Confidential - Subject to Stipulation and Order of Confidentiality

Page 322

1 doctors.
2 BY MR. SLATER:
3 Q. Well, ultimately, you talked to doctors in
4 this context with the understanding that that will
5 help guide their decisions on what treatment to
6 recommend to patients, correct?
7 A. Well, to a certain extent, but doctors have
8 to then filter that with their own clinical
9 experience.
10 Q. Well, that's what happens with every doctor
11 reading every article like this. They read it and
12 they filter it based on their own background and
13 experience, right?
14 A. Yes. My point is that this article that
15 we're talking about, and you're quoting all these
16 things from, was geared to be read by physicians, not
17 by patients.
18 Q. I never suggested it was.
19 A. I thought that's what that last question
20 was, because you said about I'm recommending it to
21 patients, when I'm really recommending to doctors.
22 Q. What you're saying -- all right. I'll
23 rephrase.
24     What you're saying here with regard to the
25 paucity of randomized, comparative data to guide

Page 323

1 recommendations regarding efficacy, you're talking
2 about recommendations to other surgeons, or are you
3 talking about for surgeons to be able to rely on data
4 so that when they make recommendations to patients,
5 they have reliable data to rely on?
6     MR. SNELL: Objection, form. Go ahead.
7     THE WITNESS: I got a little confused
8 by that question, but I don't see the difference
9 between those two things you were saying.
10 BY MR. SLATER:
11 Q. Fine. Basically, what you're saying is you
12 need randomized, comparative data so that when,
13 ultimately, a surgeon makes a recommendation to a
14 patient, that's at the end of the line what ultimately
15 is going to happen, the doctor can rely on valid data?
16 A. Yes, and that goes both ways. You want to
17 not recommend an inferior procedure to someone, such
18 as one that has a high recurrence rate.
19 Q. Let me ask you a question. Do you perform
20 native tissue repair?
21 A. I do.
22 Q. So for some patients you think that is an
23 appropriate treatment, correct?
24 A. Correct.
25 Q. You take into account the risk of

Page 324

1 recurrence, you take into account the potential
2 benefits, and for some patients you choose native
3 tissue repair over the use of the Prolift®, right?
4 A. Well, that's an excellent question. Do I
5 choose it, or does the patient choose it? In my
6 practice, I tend to try to provide all the information
7 that I can to a patient and work with her to come to a
8 decision, and I say that because that's not always the
9 way it was. I think 10, certainly 20 years ago, the
10 patient came in, the doctor said, you need this
11 surgery, patient doesn't even know what was done to
12 their body.
13 Q. As things stand now --
14 A. Yes.
15 Q. -- and as things have stood throughout the
16 time you have utilized the Prolift®, you make
17 recommendations to patients, you offer options, and
18 then the patient makes the ultimate decision, correct?
19 A. I would say it's a combination of the two.
20 I have some patients that it's totally their option.
21 Some patients they can't make the decision. They say,
22 Doctor, I'm not a doctor, you need to make that
23 decision for me.
24 Q. But even with those patients, you still
25 offer them options, and then you just give the best

Page 325

1 advice you can, but with a patient like that, they're
2 likely to take your advice?
3 A. Correct.
4 Q. There are patients throughout the time that
5 the Prolift® was on the market where you balanced the
6 risks and benefits of alternative procedures and the
7 recommendation to some of those patients was native
8 tissue repair, not the Prolift®, correct?
9 A. Correct.
10 Q. Which patients would that, in general, be
11 the recommendation, or is it too general a question;
12 you have to go patient by patient?
13 A. I would have to say you have to go patient
14 by patient.
15 Q. So throughout the time the Prolift® was
16 something available to you to utilize, you didn't
17 reject native tissue repair as something to do on
18 patients; it was something you continued to recommend
19 to some patients and perform on some patients,
20 correct?
21 A. Correct.
22 Q. And you still performed ligament fixations,
23 correct?
24 A. Yes.
25 Q. Did you have a preference for sacrospinous

Confidential - Subject to Stipulation and Order of Confidentiality

Page 326

1 or uterosacral, or did you do both?

2    A. I have a preference for uterosacral.

3    Q. And you also performed abdominal

4 sacrocolpopexy on patients, correct?

5    A. Correct.

6    Q. Both open and robotic?

7    A. Correct.

8    Q. And when I say "robotic," that would be

9 laparoscopic, correct?

10    A. Yes. And I've also have and continue to do

11 some straight stick laparoscopic, which means --

12    Q. Without a robot?

13    A. -- without robotic. Yes.

14    Q. You use the Davinci when you do robotic

15 surgery?

16    A. I do.

17    Q. Is abdominal sacrocolpopexy still considered

18 the gold standard for apical support?

19    A. I think most people would consider it the

20 gold standard. It's very hard to -- who gets to come

21 on high and say something is the gold standard, but

22 that's certainly reported in lots of papers. It's

23 considered the gold standard.

24    Q. If someone were to say that, you wouldn't

25 disagree with it?

Page 327

1    A. I would not.

2    Q. Would you agree that for a young, sexually

3 active woman with apical prolapse, that taking

4 everything into account that you know now with regard

5 to the potential risks and benefits of the Prolift®,

6 native tissue repair, abdominal sacrocolpopexy, that

7 the gold standard treatment for a patient like that

8 would be abdominal sacrocolpopexy?

9        MR. SNELL: Objection to form. You

10 mean as we sit here in this room today?

11        MR. SLATER: Yeah.

12 BY MR. SLATER:

13    Q. As when the Prolift® was available?

14        MR. SNELL: Object to form.

15        THE WITNESS: Okay, I'm sorry. Let's

16 repeat the question.

17 BY MR. SLATER:

18    Q. I'm going to withdraw it.

19      Once he exhaled that it was a bad question,

20 I don't want to embarrass myself and ask it again. I

21 care a lot, and I want Burt not to be upset with me.

22        MR. SNELL: Stop it.

23 BY MR. SLATER:

24    Q. Let's look on Page 1129 a little bit further

25 down. You state, "However, there is a known, unique

Page 328

1 risk associated with the use of grafts about which

2 potential surgical candidates need to be counseled.

3 The risk of erosion of grafts varies between studies,

4 but it is a risk that does not exist with native

5 tissue repairs."

6      You see what I just read?

7    A. I do.

8    Q. You stand behind that, right?

9    A. I do.

10    Q. You state further into this recommendation

11 section, "The group also recommends that patients be

12 made aware of the relative lack of long-term data on

13 the durability of and adverse events associated with

14 vaginal graft use."

15      You stand behind that statement?

16    A. Can I give you a non-yes or no answer.

17    Q. Well, first of all, what I'd like to know is

18 when you wrote it and published it in November of

19 2008, did you believe it to be true?

20        MR. SNELL: Well, object to the form.

21 You're changing questions now?

22        MR. SLATER: We're going back and

23 forth. I don't know what you're objecting to, Burt.

24 Don't be so technical.

25        MR. SNELL: There's multiple questions

Page 329

1 on the table. You can answer the question how you

2 feel is accurate.

3        MR. SLATER: Burt, you're getting

4 confused. He asked me a question, I'm refining it,

5 but I'll start over now.

6        MR. SNELL: Well, he asked you can he

7 answer it without a yes or no.

8        MR. SLATER: I have no idea where we

9 were, so we're going to start over.

10        MR. SNELL: Just answer it accurately.

11        MR. SLATER: You splashed it. We're

12 going to start over again. You splashed the pot. We

13 got to redeal, okay.

14        THE WITNESS: All right.

15 BY MR. SLATER:

16    Q. Now, you state under the recommendation

17 section, "The group also recommends that patients be

18 made aware of the relative lack of long-term data on

19 the durability of and adverse events associated with

20 vaginal graft use." That sentence that you published

21 in November of 2008, did you stand behind that

22 statement at the time and believe it to be valid?

23    A. When I published this, as I stated earlier,

24 I was not the sole author. I was a representative of

25 a group. As I state in my time to rethink article,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 330

1  that risk, that lack of long-term data that we mention
2  about grafted repairs, I also believe to be 100% true
3  regarding native tissue repairs as well. When you're
4  going through the editorial process in a peer-reviewed
5  journal, you get comments regarding things.
6      Q.  Well, let's look a little bit above where we
7  just were reading.
8      A.  Yes.
9      Q.  In fact, you stated, "Vaginal repairs with
10  native tissue have been performed for decades, and
11  although there are questions about the durability of
12  these repairs, the risks are well-known. In
13  particular, potential long-term sequelae are easier to
14  predict given the long track record of these
15  procedures."
16      Do you see that?
17      A.  Yes, I do, and that's why I wanted to
18  qualify my answer, in that they are well known
19  clinically because we've been doing them for years.
20  There are issues that confirm that, and this is a
21  paper looking at studies.
22      Q.  But would you agree with me that as of the
23  time the Prolift® was launched, there was a relative
24  lack of long-term data on the durability of and
25  adverse events associated with vaginal graft use?

Page 331

1      A.  I feel that way about vaginal graft use and
2  about native tissue repairs.
3      MR. SLATER:  Move to strike.
4  BY MR. SLATER:
5      Q.  Is the answer to my question, yes, that that
6  was true as of the time the Prolift® was launched?
7      MR. SNELL:  Objection, form.
8      THE WITNESS:  I can't give you a yes or
9  no answer to that question.
10  BY MR. SLATER:
11      Q.  Let me explain to you, he can ask you
12  questions at the end, but I get to ask my questions on
13  the specific subject. If you keep throwing in
14  something else I'm not asking you about, I have to
15  keep asking the question.
16      A.  Repeat it, please.
17      Q.  I have to keep doing it.
18      As of November 2008 you felt there was a
19  relative lack of long-term data on the durability of
20  and adverse events associated with vaginal graft use,
21  correct?
22      A.  That is what I wrote.
23      MR. SNELL:  Objection to form. Go
24  ahead.
25  BY MR. SLATER:

Page 332

1      Q.  And you recommended at that time that
2  patients be made aware of that lack of long-term data,
3  correct?
4      A.  I state that the group recommends that.
5      Q.  The group on behalf of which you authored
6  this article, correct?
7      A.  Yes.
8      Q.  If that was true in November of 2008, that
9  would have been true when the Prolift® was launched in
10  March of 2005, correct?
11      A.  Correct.
12      Q.  In fact, that continued to be true going
13  forward several years, correct, even up till the
14  present, right?
15      A.  We don't have ten-year data on vaginal graft
16  use placed vaginally.
17      Q.  You certainly would agree that as of the
18  time the Prolift® was launched, the important thing
19  for patients to be made aware of was that there's a
20  lack of long-term data on the durability of these
21  repairs with the Prolift®, and there's a lack of
22  long-term data regarding the adverse events associated
23  with the Prolift®, correct?
24      A.  Not really.
25      MR. SNELL:  Object to form. Go ahead.

Page 333

1      THE WITNESS:  Not really.
2  BY MR. SLATER:
3      Q.  That's fine. Let me ask you this:  It
4  certainly would have been improper for Ethicon to
5  suggest in any way to a patient through a patient
6  brochure and other information patients would see,
7  that there was long-term data; would you agree with
8  that?
9      MR. SNELL:  Objection, form.
10  BY MR. SLATER:
11      Q.  That would have been wrongful if that was
12  suggested in any way, correct?
13      MR. SNELL:  Objection, form.
14      THE WITNESS:  All I can say is when
15  Prolift® was released, there was no long-term data on
16  Prolift®, meaning 10, 15-year data on it, and if they
17  suggested that there were 10 or 15-year data on it, I
18  think that would be wrong.
19  BY MR. SLATER:
20      Q.  If Ethicon -- well, rephrase.
21      One of the things Ethicon would have wanted
22  to do -- rephrase.
23      One of the things Ethicon should have done
24  in its patient brochure is make sure that patients
25  understood that the Prolift®, which they were reading

Confidential - Subject to Stipulation and Order of Confidentiality

Page 334

1  about in glowing terms in that brochure, that just
2  understand whatever information we have on this is
3  based on a similar but not identical procedure in all
4  respects, and we don't have long-term data on this,
5  just so the patient would understand where things
6  stood. That should have been communicated in some
7  way, correct?
8        MR. SNELL: Objection, form.
9        THE WITNESS: I think it was.
10 BY MR. SLATER:
11    Q.  Well, you think it should have been
12 communicated, correct?
13    A.  Yes. I think it should have been and I
14 think it was.
15    Q.  And you think it was communicated in the
16 patient brochure?
17    A.  Yes.
18    Q.  If it wasn't communicated in the patient
19 brochure, then you would have a criticism of the
20 patient brochure, correct?
21    A.  Not necessarily.
22    Q.  You can't have it both ways, with all due
23 respect.
24        MR. SNELL: He can have an opinion, and
25 it doesn't matter whether you like it or not.

Page 335

1        MR. SLATER: Boy, you're not as
2  friendly as you were a couple minutes ago. I'm going
3  to ask you a different question.
4  BY MR. SLATER:
5     Q.  It was necessary, from your perspective, for
6  Ethicon to provide that information -- I'm going to
7  ask it clean.
8        From your perspective, the patient brochure
9  for the Prolift® needed to tell patients that there
10 was not long-term data on which Ethicon could rely to
11 give patients an idea of how well is this going to
12 work long-term and what risks or complications the
13 patient might face long-term; that was important for
14 Ethicon to let patients know in the patient brochure,
15 correct?
16    A.  No.
17        MR. SNELL: Objection, form. Go ahead,
18 answer.
19        MR. SLATER: He said no.
20 BY MR. SLATER:
21    Q.  It was important that Ethicon not suggest in
22 any way, directly or indirectly, that there was any
23 long-term data with regard to the durability of the
24 repair or the risks and complications that could be
25 faced long term, correct?

Page 336

1        MR. SNELL: Objection, form. Go ahead.
2        THE WITNESS: I guess that depends on
3  how you define indirectly.
4  BY MR. SLATER:
5     Q.  Did you read the patient brochure?
6     A.  Yes, I did.
7     Q.  All right. Let me ask you this question:
8  If anything in the patient brochure was misleading to
9  a patient, that would be problematic, correct?
10        MR. SNELL: Objection, form.
11        THE WITNESS: I think a purpose of a
12 brochure is to give information, not to mislead.
13 BY MR. SLATER:
14    Q.  You have no idea what -- whether or to what
15 extent surgeons around the country were using the
16 patient brochure in discussions directly with patients
17 about the Prolift®, right?
18    A.  Are you asking me to testify what thousands
19 of surgeons around the --
20    Q.  I'm asking if you have knowledge about that.
21    A.  I mean, other than common sense, that it was
22 given to people who were doing the procedure that they
23 might do it, but, no, I wasn't in their offices, no
24 idea.
25    Q.  You certainly wouldn't have any information

Page 337

1  to know what specific things physicians told patients
2  in connection with the patient brochure if they did
3  discuss it with a patient, right? It's not something
4  you have information about, correct?
5     A.  I do not have information about what
6  individual surgeons talk to their patients about with
7  regard to Prolift®.
8     Q.  Did you see any information whatsoever in
9  any of the documents that were provided to you by
10 Ethicon indicating that Ethicon ever made any effort
11 to determine how doctors were using the patient
12 brochures and what they were telling patients when
13 discussing them with the patients, if that occurred?
14        MR. SNELL: Objection, form. Go ahead.
15        THE WITNESS: As I told you, most of
16 the documents that I've gotten from Ethicon, I have
17 only been able to look at cursory, so, no, I do not
18 have any recollection of reading that.
19 BY MR. SLATER:
20    Q.  As we sit here now, to the extent Ethicon
21 provided you their own internal documents, there's
22 none that you could point to now and say, you know, I
23 reviewed that carefully and I'm relying on that
24 document for one of my opinions?
25    A.  No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 338

1   Q. Meaning I'm correct?

2   A. You are correct.

3   Q. Would you agree that it would be wrongful if

4   any of the statements made in the patient brochure

5   were inconsistent with what Ethicon's own

6   understanding was with regard to a specific subject

7   addressed?

8        MR. SNELL: Objection, form.

9        MR. SLATER: What's your objection?

10   You have objected to like 90% of my questions, so I'm

11   going to call you out on this one.

12        What's the objection to that one?

13        MR. SNELL: It would be wrongful.

14        MR. SLATER: You don't know what

15   wrongful means?

16        MR. SNELL: Inconsistent?

17        MR. SLATER: You don't know what

18   inconsistent means?

19        MR. SNELL: No, I mean, I don't

20   understand what you mean, is it wrongful if it's

21   inconsistent?

22        MR. SLATER: With what Ethi --

23        MR. SNELL: In what manner? I mean,

24   wrongful as to who? Wrongful as to what's the outcome

25   of it? Is it wrongful? I don't know, maybe -- I

Page 339

1   don't understand.

2        MR. SLATER: Do you understand the

3   purpose of this litigation is partially to prove

4   whether or not the patient brochure was accurate or

5   not in describing the risks and benefits of the

6   Prolift®? Are you aware of that, counsel? I know you

7   are. So now we're going to continue.

8   BY MR. SLATER:

9   Q. Now let's wake up a little.

10        Do you understand the purpose of the patient

11   brochure?

12   A. From whose standpoint?

13   Q. From Ethicon's standpoint.

14   A. No.

15   Q. Do you know how Ethicon intended for the

16   patient brochure to be utilized?

17   A. No.

18   Q. Do you have an understanding of whether or

19   not Ethicon expected patients to believe everything

20   they read in the patient brochure when the patients

21   read the brochure?

22   A. I'm sorry. Repeat that.

23   Q. Do you know whether Ethicon expected

24   patients to believe everything they read in the

25   patient brochure for the Prolift®?

Page 340

1   A. I don't know whether they expected it. I

2   assume they would.

3   Q. Would you as an expert witness in this case

4   expect that patients would believe what they read in

5   the patient brochure for the Prolift®?

6   A. Yes.

7        MR. SLATER: Take a break.

8        THE VIDEOGRAPHER: Going off the

9   record, the time is 5:38 p.m.

10        (Brief recess.)

11        THE VIDEOGRAPHER: We're back on the

12   record. Here marks the beginning of Volume 1, Tape

13   Number 6 in the deposition of Dr. Miles Murphy. The

14   time is 5:56 p.m.

15   BY MR. SLATER:

16   Q. Let's look at your clinical practice

17   guidelines article, a little bit further, still on

18   Page 1129.

19        After you state that the group recommends

20   that patients be made aware of the relative lack of

21   long-term data on the durability of and adverse events

22   associated with vaginal graft use, there has been a

23   list of some risks with graft use.

24        Do you see that?

25   A. I do.

Page 341

1   Q. And in the article you list "Potential risks

2   include chronic pain, dyspareunia, fistula, infection

3   and delayed graft erosion/exposure," correct?

4   A. I see that, yes.

5   Q. That was not meant to be an exhaustive list;

6   it was meant to be some examples, correct?

7   A. Correct.

8   Q. And those were all risks that were known as

9   of November 2000 date in connection with the Prolift®,

10   correct?

11   A. It states them as potential. I don't know

12   that they're absolutely known to be risks of the graft

13   placement.

14   Q. These are certainly risks that were --

15   rephrase.

16        Certainly, these risks were the types of

17   risks that should be warned about in the basic

18   labeling for the product like the IFU, correct?

19        MR. SNELL: Objection.

20        THE WITNESS: These are potential or

21   theoretical risks. Whether they should be warned

22   about in an IFU or the other thing you said.

23   BY MR. SLATER:

24   Q. The IFU.

25   A. The IFU, I don't know that that necessarily

Confidential - Subject to Stipulation and Order of Confidentiality

Page 342

1 means that that would have to be something that was in
2 the Prolift® IFU.
3     Q.  Are you saying you just don't know one way
4 or the other.  It's just not something you're opining
5 on?
6     A.  It's something that I'm saying that these
7 are quoted here as potential risks and, therefore, I
8 don't know that it has to be in a Prolift® IFU.
9     Q.  Well, let me ask you this:  With regard to
10 the Prolift IFU, do you have an opinion one way or
11 the other as to whether or not this list of potential
12 risks, chronic pain, dyspareunia, fistula, infection
13 and delayed graft erosion and exposure, are those
14 risks that should be in the Prolift® IFU?
15     A.  An IFU, as I understand it, is an
16 instructions for use.  The goal, I would think, if I
17 had a definition for instructions for use is to help
18 instruct physicians, surgeons on how to do the
19 Prolift® procedure.  I think part of an IFU is to list
20 potential complications.  I think that's one of the
21 headings.  I think that, again, you can't exhaustively
22 write every potential risk on there.  They should list
23 things, I think, that are very specific to Prolift®
24 that one might not otherwise assume would be a risk of
25 pelvic reconstructive surgery.

Page 343

1     Q.  Well, with regard to these risks that you
2 listed in this article in November of 2008, it would
3 have been reasonable for Ethicon to list those risks
4 in the IFU, correct?
5     MR. SNELL:  Objection, form.
6     THE WITNESS:  I think it's reasonable
7 to say it was reasonable.  I don't think it's
8 absolutely something that should have been there.
9 BY MR. SLATER:
10     Q.  Do you consider yourself to be -- well,
11 withdrawn.
12     Do you have an understanding as to what
13 Ethicon's obligations were with regard to what risks
14 needed to be included in the IFU?
15     A.  From whose perspective?
16     Q.  From anyone's perspective.
17     A.  No, I mean, just because that's so vague.
18     Q.  Do you have an understanding as to any
19 standard, whether a written standard or anything else,
20 that would apply to determining whether or not risks
21 needed to be included in the IFU for the Prolift®?
22     A.  I don't really know what standards exist for
23 instructions for use.  I know that that is -- I'm
24 pretty sure that that's a heading in an instructions
25 for use.

Page 344

1     Q.  Do you know what standards Ethicon was
2 required to follow in deciding whether or not risks
3 needed to be listed in the IFU?
4     A.  I do not know those standards.
5     Q.  Do you know what internally within Ethicon
6 what Ethicon's understanding as to, from a standard
7 level or from a general level, what risks would need
8 to be included in an IFU for the Prolift®?
9     MR. SNELL:  Objection, form.
10 BY MR. SLATER:
11     Q.  Meaning how they would be able to make that
12 decision as to a particular risk to say, yes, this has
13 to be included, no, this doesn't; do you have any
14 idea?
15     MR. SNELL:  Objection, form.  Go ahead.
16     THE WITNESS:  There is a difference
17 between whether I have any idea or whether I know.  I
18 was never an employee of Ethicon.  I don't know what
19 has to be in an instructions for use.  I think part of
20 what should be in an instructions for use, because
21 I've seen it in other instructions for use, is
22 potential risks and complications.
23 BY MR. SLATER:
24     Q.  You would agree that the IFU for the
25 Prolift® was intended to list the potential risks and

Page 345

1 complications with the use of the Prolift®, correct?
2     A.  I don't think it was supposed to list every
3 one.  I think it was supposed to list some and things
4 that again were somewhat specific to this new
5 procedure that they have just put out.
6     Q.  That list would include meaning risks that
7 were specific to the Prolift®, that things that can
8 happen with the Prolift® would include chronic pain,
9 right?
10     A.  I don't think those are specific to
11 Prolift®.
12     Q.  Well, did you note that -- you read the IFU,
13 right?
14     A.  I've gone through it.  It's been a little
15 while.
16     Q.  The Prolift® IFU lists bleeding as a
17 potential risk of the Prolift® procedure, right?
18     A.  It does.
19     Q.  So you're not saying to me, well, you only
20 need to list those things that people would have no
21 idea of because you list bleeding, right?
22     A.  I'm saying I think it's sort of silly that
23 they have to put anything in an IFU, honestly.  As a
24 physician, I didn't read that before I did a Prolift®.
25     Q.  Well, you have a certain level of knowledge

Confidential - Subject to Stipulation and Order of Confidentiality

Page 346

1  and experience, but that may not be the level of
2  knowledge and experience of every person reading the
3  IFU; you'd accept that, right?
4       MR. SNELL:  Object to form.  Go ahead.
5       THE WITNESS:  Well, if they're doing a
6  Prolift®, then they should be, according to the IFU,
7  familiar with pelvic reconstructive surgery and
8  familiar with placing permanent grafts.  So that's
9  kind of like me.
10 BY MR. SLATER:
11      Q.  Well, somebody who is familiar with pelvic
12 reconstructive surgery could be somebody who learned
13 about it during the residency, never did a fellowship,
14 did a handful of colporrhaphys and did four SUI
15 slings.  That would make them familiar with pelvic
16 reconstructive surgery and the use of mesh, correct?
17      A.  If that's how you want to categorize
18 familiar, you can, but that's not how I would
19 categorize it.
20      Q.  What I'm saying is if you just read the
21 words on the page, what I just described to you would
22 be somebody who has some level of familiarity, right?
23      MR. SNELL:  Objection, form.
24      THE WITNESS:  I'd like to read the
25 words on the page, rather than deal in hypotheticals.

Page 347

1  BY MR. SLATER:
2       Q.  Well, it says familiar with, right?
3       A.  I don't know exactly what it says.
4       Q.  The IFU says users should be familiar with
5  surgical procedures and techniques involving pelvic
6  floor repair and nonabsorbable meshes before employing
7  the Gynecare Prolift® pelvic floor repair systems?
8       A.  Yes.  I don't think that having done some in
9  residency and having a passing interest in anterior
10 colporrhaphy means you're familiar with those things.
11      Q.  It doesn't say that here, though, that
12 there's any specific level of familiarity anyone
13 should have.  It just says familiar with, right?
14      A.  Correct.  And my opinion of that term
15 familiarity is not just someone who has a passing
16 interest in something.
17      Q.  Someone else could read it and define it
18 differently, right?
19      A.  Of course.
20      Q.  Coming back to the need to -- well,
21 rephrase.
22      Coming back to the adverse events that need
23 to be listed in IFU for the Prolift®, do you have an
24 understanding as to -- let me ask it differently.  Let
25 me withdraw that question.

Page 348

1       Was it Ethicon's intention to list the
2  potential risks of using the Prolift® in the adverse
3  event and warning section of the Prolift® IFU?  Do you
4  know if that was the intention?
5       A.  I don't know what their intent was.  I
6  wasn't employed by them.
7       Q.  Did you look at any internal Ethicon
8  documents or deposition testimony that you can tell me
9  about now that addressed that question?
10      A.  I don't recall exactly.  I know I read some
11 of Piet Hinoul's deposition.  It may have been
12 addressed there, but I can't recall specifics.
13      Q.  In offering -- well, rephrase.
14      As you sit here now, can you tell me any
15 standard or any test that would apply to the question
16 of whether or not a risk needed to be included in the
17 IFU?  I mean, is there any specific standard or test
18 you can point to and say this is the test that
19 applies, and this is how I can tell you whether or not
20 a risk needed to be listed or not?
21      A.  My opinion to that would be that it would --
22 the IFU should list things that a reasonable surgeon
23 who is familiar with pelvic reconstructive surgery
24 wouldn't automatically think would otherwise be a risk
25 of Prolift®.

Page 349

1       Q.  Taking that definition --
2       A.  Yes.
3       Q.  -- what are the risks of the Prolift® that
4  should be listed in the IFU?  Give me that list.
5       A.  Mesh erosion, potentially mesh contraction,
6  puncture of organs, meaning damage to surrounding
7  structures with the introducing devices.
8       Q.  Anything else?
9       A.  No.
10      Q.  Do you think it's necessary, in your
11 opinion, to describe the potential consequences of
12 these risks occurring?
13      A.  No.
14      Q.  Do you think it's necessary to describe the
15 treatment that may need to occur if a patient were
16 to -- if these risks were to occur?
17      A.  No.
18      Q.  Do you think it's necessary to describe the
19 potential morbidity that could occur to a patient if
20 one of these risks occurs and if treatment has to
21 happen so that a doctor would understand this is the
22 other things that could end up happening as a result
23 of putting this in a woman's body?
24      A.  When you say supposed to, I really -- I do
25 not know what standards an IFU is held to from a legal

Confidential - Subject to Stipulation and Order of Confidentiality

Page 350

1 standpoint.

2 Q. Is there -- well, let me ask you this: The

3 standard you just gave me of what you think should be

4 in an IFU, is that just your own personal standard?

5 A. That was my opinion of what makes sense to

6 be in an IFU.

7 Q. That's your own personal opinion, not based

8 on any other information you've read or seen, correct?

9 A. Correct.

10 Q. It's just your own personal viewpoint, your

11 own personal standard, correct?

12 A. Yes.

13 Q. With regard to what would need to be

14 included in the patient brochure with regard to risks

15 and benefits, to the extent you've drawn any opinions

16 in your report on that, again, is that based on your

17 own personal standard, your own personal opinion?

18 A. I do not -- I think the answer is yes

19 because I don't know any sort of legal guidelines by

20 which patient brochures are supposed to be produced.

21 Q. And do you have any information you can

22 share with me now that you gleaned from any Ethicon

23 documents or testimony where you saw what Ethicon

24 thought the standards were to determine whether or not

25 a risk or a benefit would need to be described and how

Page 351

1 it should be described in a patient brochure?

2 A. I don't recall seeing any standards that

3 they refer to.

4 Q. Did you see any testimony in any deposition

5 that you're relying on, as you sit here now, with

6 regard to what needs to be included in an IFU?

7 A. I do not recall seeing anything like that.

8 Q. So, again, with regard to the IFU and the

9 contents of the IFU, whatever opinion you're drawing

10 is just based on your own personal opinion, not based

11 on what any other standards may be or what anyone else

12 might think, correct?

13 A. Right. It's my expert opinion, not based on

14 outside information.

15 Q. And in your entire career, have you ever

16 been asked to determine what information needs to be

17 provided in an IFU?

18 A. Not that I recall.

19 Q. Have you ever in your career ever been asked

20 to give input on what should be in a patient brochure?

21 A. Not that I recall.

22 Q. So the first time you've ever offered such

23 opinions and done this type of analysis has been in

24 this case as an expert, correct?

25 A. Correct.

Page 352

1 Q. If there was a patient population that the

2 people in Ethicon thought needed to be -- rephrase.

3 If there was a patient population that

4 Ethicon thought physicians should show caution with

5 before placing a Prolift®, did that need to be

6 communicated in the IFU?

7 A. If Ethicon knew of a particular patient

8 condition that they thought was particularly at risk

9 of a Prolift®, that that should be communicated in the

10 IFU; is that the question?

11 Q. Let's start with that.

12 A. Yes, I think that's reasonable.

13 Q. And Ethicon didn't have to know it 100%,

14 they just had to have enough information for it to be

15 reasonable to communicate that, correct?

16 MR. SNELL: Objection, form.

17 BY MR. SLATER:

18 Q. Or do you not know?

19 A. It all depends on what reasonable means.

20 Q. Okay. If Ethicon knew of a type of patient

21 that Ethicon thought physicians should show caution

22 for because of their characteristics, like young,

23 sexually active women, before recommending the

24 Prolift® to them, did Ethicon need to communicate that

25 in the IFU to surgeons?

Page 353

1 A. No.

2 Q. They could just assume that surgeons would

3 know that or figure that out on their own?

4 A. For that specific example that you gave me,

5 yes.

6 Q. And, again, you base that just on your own

7 personal experience, your personal opinion, correct?

8 A. Based on the fact that that's generally a

9 risk of pelvic reconstructive surgery.

10 Q. Are you -- well, rephrase.

11 Bleeding is a risk of pelvic reconstructive

12 surgery, correct?

13 A. It is.

14 Q. Do you know why the risk of bleeding is

15 included in the Prolift® IFU?

16 A. I do not.

17 Q. Do you know whether it was ever proposed by

18 anybody to put a warning in the Prolift® IFU with

19 regard to young, sexually active women?

20 A. I do not know whether or not that happened.

21 Q. With regard to the list of potential risks

22 with the Prolift®, you have your own understanding of

23 what that list is, correct? I'm not going to ask you

24 to list it now, but you have your own understanding,

25 correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 354

1    A.  Yes.
2    Q.  Do you know, as you sit here now, based on
3  whatever you've reviewed, what the potential risks of
4  the Prolift® were from the perspective of what medical
5  affairs in Ethicon knew?
6    A.  I do not know what medical -- what that
7  group knew.
8    Q.  Would you assume that Ethicon medical
9  affairs would have more information about the overall
10  potential risks of the Prolift® than you would have?
11       MR. SNELL:  Objection, form.
12       THE WITNESS:  I don't know how that --
13       MR. SNELL:  He's not here to assume.
14       MR. SLATER:  Well, he is, actually.
15  You can answer.
16       THE WITNESS:  I don't know if they'd
17  know more.  I think they would know probably most that
18  I would.
19  BY MR. SLATER:
20    Q.  As you sit here now, you don't know whether
21  Ethicon medical affairs -- well, rephrase.
22       As you sit here now, you don't know what
23  risks Ethicon medical affairs has testified to knowing
24  about at different points in time, correct?
25    A.  I can't recall any testimony that I saw

Page 355

1  regarding that.
2    Q.  You certainly didn't talk about that subject
3  in your reports, correct?
4    A.  Correct.
5    Q.  Did you in reading any of the materials that
6  you actually did read or review -- rephrase.
7       In any of the materials that you reviewed,
8  to the extent you reviewed any of the materials you've
9  listed, did you at any point see anybody from Ethicon
10  talk about knowing about risks where you said, well, I
11  didn't know that was a risk, I wasn't aware of that?
12  Did that ever happen?
13    A.  Did it ever happen that someone at Ethicon
14  knew a risk that I wasn't aware of as a potential
15  risk?
16    Q.  Right, where you read the depositions and
17  saw something to that effect?
18    A.  Not that I know of.
19    Q.  But, again, you've told me you didn't
20  read -- other than a couple depositions, you didn't
21  read any of them in their entirety, right?
22    A.  Correct.
23    Q.  For the most part, you just skimmed through
24  a few of them?
25    A.  Correct.

Page 356

1    Q.  One of the things that you would agree with
2  is that when Ethicon made affirmative statements in
3  the IFU, those affirmative statements about the
4  Prolift® needed to be truthful and accurate, correct?
5       MR. SNELL:  Objection, form.  Go ahead.
6       THE WITNESS:  What do you mean by
7  "affirmative statements"?
8  BY MR. SLATER:
9    Q.  When Ethicon made statements in the IFU, did
10  those statements need to be truthful?
11    A.  I think anything that Ethicon produces
12  should be truthful.
13    Q.  When Ethicon made statements making claims
14  about the Prolift®, did they need to have support for
15  those claims, in your opinion?
16    A.  I guess it would depend on what the claims
17  were.
18    Q.  Well, if Ethicon made a claim about the
19  attributes of the mesh material in terms of how it
20  would behave inside the body and what its
21  characteristics were, did those claims need to be
22  backed up by data that Ethicon could rely on, so if
23  someone said, hey, what's your basis for saying this,
24  Ethicon can say, well, here's my basis, here's the
25  data?

Page 357

1       Do you think that's something that was
2  required?
3       MR. SNELL:  Objection, form.
4       THE WITNESS:  I would think that they'd
5  want to support anything that they say in IFU.
6  BY MR. SLATER:
7    Q.  Would you agree with me that it would
8  constitute -- well, rephrase.  I'll withdraw.
9       Did you see an indication in any materials
10  you reviewed of any instance where Ethicon admitted
11  that a statement made in the IFU could not be
12  supported by any data that they could produce at the
13  time they were asked do you have supporting data for
14  this statement?  Did you see any examples of that?
15    A.  I think I saw something along those lines
16  regarding bidirectionality of the mesh.
17    Q.  Were you surprised to see that Ethicon said
18  they could not support any data to support that
19  sentence?
20       MR. SNELL:  Objection, misstates.  You
21  know it does.
22       MR. SLATER:  No, actually, I don't know
23  it does.
24       MR. SNELL:  You said any data or in
25  vivo data?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 358

1      MR. SLATER:  Listen, you're wrong.
2  Let's continue.
3  BY MR. SLATER:
4      Q.  Did you see what Ethicon's -- new question.
5      Did you see what Ethicon told the FDA with
6  regard to the statement, the bidirectional elastic
7  property allows adaptation to various stresses
8  encountered in the body?
9      A.  I don't recall.
10     Q.  If Ethicon did not have data that it could
11  produce to the FDA to document that this elastic
12  property would, quote, allow adaptation to various
13  stresses encountered in the body, closed quote, that
14  statement should not have been made in the IFU,
15  correct?
16     MR. SNELL:  Objection, form.
17     THE WITNESS:  I can hold a piece of
18  Gynemesh® mesh in my hand and stretch it both ways.
19  If that's not evidence enough for the FDA, then I
20  guess they have a difference of opinion of what
21  constitutes good evidence.
22  BY MR. SLATER:
23     Q.  Well, let's listen to the sentence.
24     A.  Okay.
25     Q.  The sentence says, the bidirectional elastic

Page 359

1  property, okay, that's the first half.
2      A.  Yes.
3      Q.  That means it can stretch in two directions?
4      A.  Correct, I think so.  That's my
5  understanding of it.
6      Q.  Allows adaptation to various stresses
7  encountered in the body.
8      As to that second half of the sentence, if
9  Ethicon had no data that it was able to produce when
10  asked by the FDA to support that second half of the
11  sentence, Ethicon should not have included that in the
12  IFU, correct?
13     MR. SNELL:  Objection, form.  Go ahead.
14     THE WITNESS:  If they thought they had
15  evidence that it did that, I don't know that it was
16  the wrong thing to do, if then they couldn't produce
17  evidence that was good enough for the FDA.
18  BY MR. SLATER:
19     Q.  What if they told the FDA -- well, rephrase.
20     What if when asked for the data to support
21  that second half of the sentence, what if Ethicon
22  could not come up with any data to support that
23  statement, that it didn't have any in its files and
24  couldn't produce any, so rather than produce data,
25  they said, okay, we'll take it out of the IFU.

Page 360

1  If that's what occurred, the statement never
2  should have been in the IFU to begin with, right?
3      MR. SNELL:  Objection, form.
4      THE WITNESS:  It's a pretty general
5  statement that it can react to different forces.  If
6  it has stretching in both directions and that implies
7  that if you push from one way, it can stretch one way.
8  If you push from another, it can stretch from another.
9  I mean, it's hardly -- I don't think it's some huge
10  falsehood that they were trying to perpetrate on
11  doctors and patients.
12  BY MR. SLATER:
13     Q.  Do you have any idea where that statement
14  came from?
15     A.  I do not.
16     Q.  Would it surprise you to learn that all they
17  did was copy out of the IFU that statement from
18  another product and that it had actually been used in
19  yet another product before that, and they just
20  basically copied it and assumed there must be support
21  for it if it was used somewhere else, and we'll just
22  copy it; is this the first time you're hearing that?
23     MR. SNELL:  Objection, form.
24     THE WITNESS:  Wait.  First you asked
25  would it surprise me.  Now you're asking me is it the

Page 361

1  first time I've heard it.
2  BY MR. SLATER:
3      Q.  Well, would it surprise you, since you,
4  obviously, have never heard that before?
5      A.  It wouldn't surprise me because based on
6  your question, I assume that's what happened.
7      Q.  Well, you never heard that until right now?
8      A.  No.
9      Q.  Do you think that it's appropriate for a
10  medical device company to copy a statement making a
11  claim about a new device, the Prolift® system, copying
12  a statement out of another IFU for another product
13  without actually confirming with data that that
14  statement actually applies to the Prolift®?  Do you
15  think that's appropriate?
16     MR. SNELL:  Objection, form.
17     THE WITNESS:  I guess it depends on
18  what the other product was.
19  BY MR. SLATER:
20     Q.  Well, what level of -- well, rephrase.
21     What standard do you hold Ethicon to in
22  terms of what they say in an IFU to surgeons and
23  doctors?  Is it okay if they just say things and hope
24  that they're true, or should they confirm everything
25  as true before they say it in the IFU?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 362

1    A.  What I hope is when they produce an IFU that
2    it's not misleading me.
3    Q.  When you read the Prolift® IFU in your own
4    practice, you assumed that whatever was being stated
5    in that IFU was information that Ethicon could back up
6    with data, right?
7    A.  I don't recall ever reading the Prolift®
8    IFU.
9    Q.  In your practice, you don't think you ever
10   read it?
11   A.  Not that I recall.
12   Q.  Do you have any opinion as to whether or not
13   surgeons in general read the Prolift® IFU before they
14   use the Prolift®?
15   A.  I think that some surgeons may review it the
16   night before they do their very first one.  That's
17   about the best I can testify.  I really -- it's hard
18   for me to speak for all the surgeons out there in the
19   world.
20   Q.  Are you basically just guessing as you say
21   that, I mean, or do you have any basis to know?
22   A.  I'm basing it on what it's like to do a
23   procedure for the first time.
24   Q.  For you to do a procedure for the first
25   time?

Page 363

1    A.  And in talking to my colleagues.
2    Q.  Have you ever discussed with anybody whether
3    or not they read IFUs for medical devices?
4    A.  Not that I recall.
5    Q.  So you know your own personal experience,
6    but you don't know what anyone else has done?
7    A.  I'm not saying that I haven't had that
8    discussion.  I just don't recall having that
9    discussion.
10   Q.  You're certainly not relying on what anyone
11   else has told you about what they did with an IFU,
12   right, because you don't remember what anyone told
13   you, if they told you anything?
14   A.  Yeah, but I think it's a general sort of
15   opinion around docs that these big packages that come
16   with these kits are not really something that they
17   rely on.  They may want to -- which step did we do
18   first, we're supposed to do one step versus the other,
19   maybe that's something the night before they'll look
20   at, but they don't depend on whether or not there's
21   bidirectional elasticity as to whether or not they're
22   going to do the procedure.  I can guarantee that.
23       MR. SLATER:  Move to strike from but
24   forward.
25       MR. SNELL:  Mark that for me.

Page 364

1    BY MR. SLATER:
2    Q.  Have you ever studied the question of
3    whether or not physicians read IFUs before they use
4    medical devices?
5    A.  From a scientific standpoint?
6    Q.  On any level have you ever studied the
7    question?
8    A.  No.
9    Q.  You've never -- there's not even a
10   conversation you can point to now that you can recall
11   where you ever spoke to anyone on that subject, right?
12   A.  I just said that.
13   Q.  When Ethicon promulgate -- well, rephrase.
14       When Ethicon puts the IFU in the box with
15   Prolift®, is it appropriate for Ethicon to assume,
16   well, you know what, some doctors aren't going to
17   bother reading this, so we don't have to be careful
18   about being able to back up everything we say; is that
19   okay?
20       MR. SNELL:  Objection, form.
21       THE WITNESS:  Is it okay for Ethicon to
22   not care about what's in IFU?  No, it's not.  I think
23   that was the basic gist of that question.
24   BY MR. SLATER:
25   Q.  The mesh in the Prolift® causes a chronic

Page 365

1    inflammatory reaction, correct?
2    A.  I guess it depends on how you define
3    chronic.  Certainly, there is an inflammatory reaction
4    after Prolift® is placed.
5    Q.  Is the inflammatory reaction that results
6    from the Prolift® at some point chronic?
7    A.  I don't know.
8    Q.  The inflammatory reaction elicited by the
9    Prolift®, can it be in some patients severe?
10   A.  At what time period are we speaking of?
11   Q.  Short term and/or long term.  Can the
12   Prolift® elicit a severe inflammatory reaction in some
13   patients?
14   A.  Not that I'm aware of.
15   Q.  Have you ever read anything indicating that
16   it could?
17   A.  A severe inflammatory reaction, I don't
18   recall ever reading anything along those lines.
19   Q.  In the IFU there's a reference to potential
20   adverse reactions are those typically associated with
21   surgically implantable materials.
22       You know that statement?
23   A.  I don't.  I'd have to look at the IFU.
24   Q.  This is Exhibit 420, last page, section
25   Adverse Reactions, halfway through the page.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 366

1    Do you see that?
2    A. I see Adverse Reactions.
3    Q. "Potential adverse reactions are those
4 typically associated with surgically implantable
5 materials." Do you see that?
6    A. Yes.
7    Q. When this IFU refers to surgically
8 implantable materials, do you know what is being
9 referred to?
10    A. I think it's referring to mesh.
11    Q. And why do you assume that?
12    A. Because this is an IFU about a mesh product.
13    Q. Mesh is not the only surgically implantable
14 material, correct?
15    A. It is not.
16    Q. There are many others that are different
17 from mesh, correct?
18    A. Correct.
19    Q. Do they all have the same potential adverse
20 reactions, mesh versus other surgically implantable
21 materials?
22    A. I would say infection potentiation, yes.
23 Inflammation, I would say yes. Adhesion formation, I
24 would say no. Fistula formation, I would say no.
25 Erosion, I would say no. Extrusion, I would say no.

Page 367

1 Scarring that results in implant contraction, I would
2 say yes.
3    Q. Scarring that results in implant contraction
4 referred to in the IFU, do you see that?
5    A. Yes.
6    Q. Does that provide any information to the
7 surgeon with regard to the potential consequences when
8 the Prolift® implant is contracted as a result of
9 scarring?
10    A. The beginning does it say to the surgeon
11 what?
12    MR. SLATER: Could you read that back,
13 please.
14    (The court reporter read back the
15    record as requested.)
16    THE WITNESS: Yes.
17 BY MR. SLATER:
18    Q. What does this IFU tell the surgeon as to
19 what the results of implant contraction due to
20 scarring would be? Where does it say that in the IFU?
21    A. Where does it say the results of that
22 scarring?
23    Q. Yes. Where is the doctor provided a warning
24 as to what the consequences of implant contraction
25 are?

Page 368

1    A. I'll have to read through it. (Witness
2 reviews document.) Well, it certainly refers to
3 contraindications, which I think, you know, implant
4 contraction could refer to those, since it states that
5 the product will not stretch significantly as the
6 patient grows, for instance, someone who is going to
7 be pregnant or is a child.
8    Q. That's it?
9    A. That's it.
10    Q. The sentence that you just referred to in
11 the contraindications makes no -- that sentence makes
12 no reference to contraction of the implant, correct?
13    A. Right, it does not.
14    Q. In the Adverse Reactions section where it
15 states "scarring that results in implant contraction,"
16 there is absolutely no description of the potential
17 consequences of that implant contraction, correct?
18    A. Correct.
19    Q. One of the risks of the Prolift® is vaginal
20 anatomic distortion, correct?
21    A. Are you saying that that's stated here?
22    Q. I'm asking you, first of all, one of the
23 risks of the Prolift® is that when a Prolift® is
24 placed in a woman's body, she can develop vaginal
25 anatomic distortion, correct?

Page 369

1    A. I mean, distortion compared to how she was
2 beforehand, absolutely. I mean, it was out, now it's
3 in. That's a distortion, that's a change.
4    Q. Well, a woman can end up with a shortened
5 vagina as a result of the Prolift®, correct?
6    A. There is data that suggests that there can
7 be shortening of the vagina after a Prolift® is
8 placed.
9    Q. Do you know whether Ethicon was aware of
10 that at the time the Prolift® was launched, that that
11 was a risk?
12    A. I don't know.
13    Q. Do you assume that Ethicon knew that?
14    A. I don't assume that.
15    Q. If Ethicon knew that, it should have been
16 listed in the IFU, correct?
17    A. Not necessarily.
18    Q. You're saying maybe yes, maybe not; what do
19 you mean by "not necessarily"?
20    A. I'll state it real clear. You know, they
21 have to make a decision on how many risks they want to
22 list. There's at least 100 risks that can occur after
23 Prolift®. I could probably think of more, it would
24 take me a very long time. You can't list every
25 potential risk.

Confidential – Subject to Stipulation and Order of Confidentiality

Page 370

1    Q.  Coming back to a question we asked before,
2  you can't point to any standard that you would apply,
3  other than just your own feeling, as to whether or not
4  particular risks would need to be listed, correct?
5    A.  From a law standpoint?
6    Q.  From the standpoint of what a medical device
7  manufacturer should do when promulgating an IFU.
8    A.  Again, I'm not well versed in what are the
9  guidelines for developing IFU.
10   Q.  The Warnings and Precautions, the second to
11  last bullet point says, "Transient leg pain may occur
12  and can usually be managed with mild analgesics."
13       Do you see that?
14   A.  I do.
15   Q.  Do you have any idea why that's listed
16  there?
17   A.  I think because it's a sort of unique risk
18  of Prolift® that in standard reconstructive surgery
19  wasn't there.  So, for instance, you're doing passes
20  through the obturator canal, through the abductor
21  muscles of the thigh.  When you do an anterior
22  colporrhaphy, you're not going through the obturator
23  canal.  So it's sort of a unique thing that Prolift®
24  brings to the table.
25   Q.  In those transobturator passes, are there

Page 371

1  other risks besides transient leg pain?
2    A.  Yes.
3    Q.  What?
4    A.  Injury to surrounding organs.
5    Q.  Which organs?
6    A.  Bladder specifically.
7    Q.  Are there any risks to any particular nerves
8  as a result of those particular passes?
9    A.  There's, you know, the obturator nerve goes
10  through the obturator space, where you are directed to
11  go to the obturator fossa in the -- I believe in the
12  IFU, I'd have to look through it again, tells you to
13  not go in that area, but, certainly, that's a risk.
14   Q.  Do you know what the understanding was of
15  physicians around the country with regard to the
16  Prolift® when the Prolift® first came on to the market
17  as to whether or not the risk of erosion or exposure
18  was a risk that was pretty much limited to the
19  short-term as opposed to the long-term?
20   A.  When I came out what do I think the views of
21  most physicians around the United States were?
22   Q.  Do you have a basis to know that?
23   A.  Are you talking about urogynecologists, you
24  know, people who do this or just physicians in
25  general?

Page 372

1    Q.  Physicians who would be potential users of
2  the Prolift®.
3    A.  I think there was a fair amount of data on
4  vaginal erosions of mesh when it was placed vaginally.
5    Q.  Well, my question is was there -- well,
6  rephrase.
7       Do you have an opinion as to what the
8  understanding was among surgeons who might be Prolift®
9  users as to whether or not the risk of exposure of the
10  mesh was something that would generally manifest in
11  the short term if it was going to happen?
12   A.  It's hard for me to recall what I thought
13  other physicians thought in 2005.  I can certainly say
14  my opinion on that now, but I would have trouble
15  testifying as to what my thoughts were at that time.
16   Q.  Would you agree with me that the risks with
17  regard to the Prolift® are better understood now than
18  they were in March of 2005 when the Prolift® first
19  went on the market?
20   A.  Yes.
21   Q.  Tell me how.
22   A.  As we've stated multiple times in this
23  deposition, the Prolift®, as we're defining it, had
24  not been done prior to 2005.  So it would stand to
25  reason that we've learned something since then.

Page 373

1    Q.  Tell me what risks from your perspec --
2  rephrase.
3       Tell me what risks with regard to the
4  Prolift® are better understood now than they were when
5  the Prolift® was launched in March of 2005?
6    A.  I don't think that there are any new risks
7  per se.  I just think that we better understand the
8  existing risks.
9    Q.  When you say "better understand the existing
10  risks," what do you mean?
11   A.  So we knew when Prolift® came out that
12  erosion would be a risk, okay, but we didn't have tons
13  of data on the Prolift®, because it had just come out,
14  what that risk would be, when it would occur, things
15  of that nature.
16   Q.  What have you learned between March of 2005
17  and now with regard to the specifics of the risk of
18  erosion with the Prolift®?
19   A.  Again, it's not a difference.  It's simply
20  that how could I know anything about the Prolift® as
21  it was packaged in 2005 when it had never been done
22  prior to that?
23   Q.  What I want to understand is how has your
24  understanding of the risk of erosion evolved?  What is
25  it that you know now that you didn't understand in

Confidential - Subject to Stipulation and Order of Confidentiality

Page 374

1  March of 2005?  You've told me you understood there
2  was a risk of erosion, but if I'm understanding, the
3  nuances of that risk, the details of that risk are
4  better understood now?
5      A.  Correct.
6          MR. SNELL:  Objection to form.
7  BY MR. SLATER:
8      Q.  Tell me how.
9      A.  Well, I generally thought at that point
10  that, for the most part, when erosions were going to
11  occur, it was going to occur within the first year,
12  that you could have late erosions, but they were
13  usually going to be pretty rare, but I couldn't say
14  that with any certainty about the exact Prolift®
15  system then because it had just come out.
16          Now, I now have data that essentially tell
17  me the same things, but I didn't know it back then for
18  sure.
19      Q.  Anything else that you have learned about
20  erosion?
21      A.  Of Prolift®?
22      Q.  Yes.
23      A.  Learned ways in which to manage it.
24      Q.  What do you mean by that?
25      A.  Again, I hate to harp on this, but if you're

Page 375

1  going to make a big differential between TVM and
2  Prolift®, I'm just going to have to say that we
3  didn't -- as I've testified many times today, when
4  Prolift® first came out, as you're describing it, it
5  had just come out, there wasn't any data on it.
6          MR. SNELL:  Adam, are you just wanting
7  him to focus solely on Prolift, or you want him -- can
8  he talk about TVM when you're talking general?
9          MR. SLATER:  No, I'm asking Prolift®.
10          MR. SNELL:  Okay.  All right.
11  BY MR. SLATER:
12      Q.  When the Prolift® came out, you had a
13  certain understanding of what the risk of erosion was
14  and how it could manifest, correct?
15      A.  Correct.
16      Q.  And over the course of years --
17      A.  Yes.
18      Q.  -- that understanding has evolved, correct?
19      A.  It hasn't particularly changed.  It's the
20  same.  I just now have data that support it.
21      Q.  With regard to any risks -- well, rephrase.
22          Are there any other risks that you
23  understand better now with regard to the Prolift than
24  you understood when the Prolift® first went on the
25  market?

Page 376

1      A.  Only to the extent that I just talked about,
2  and we've talked about multiple times, that Prolift®
3  did not exist prior to its launch.
4      Q.  Well, whatever understanding you had about
5  the potential risks with the Prolift® when it was
6  launched would have been, to some extent, guided by
7  your knowledge of TVM, correct?
8      A.  Yes, absolutely.
9      Q.  Okay.  And as comparing what you understood
10  about, for example, the risk of erosion as of March
11  of 2005 and as compared to now, have you learned
12  anything further of any significance with regard to
13  that risk with regard to the Prolift®?
14      A.  I wouldn't say of any significance, no.
15      Q.  How about with regard to any risk, anything
16  of significance you've learned since the launch of the
17  Prolift® in March of 2005?
18      A.  In terms of risk of recurrence, I think I've
19  learned some things about that.
20      Q.  What?
21      A.  You know, there's a question as to whether
22  or not to do a hysterectomy at the time of Prolift®
23  was something that was being discussed in academic
24  circles around that time, and some of the TVM data
25  suggested that if you do a hysterectomy at the time of

Page 377

1  the TVM, that was going to increase your risk of
2  erosion.
3          So, therefore, we -- when Prolift® came out,
4  we tried to avoid hysterectomy when we thought it was
5  okay to avoid it, and what I found was that in certain
6  cases, it was my opinion that if you didn't do a
7  hysterectomy at the time of Prolift®, that that
8  patient may stand a chance of recurrence of the cervix
9  prolapsing.
10      Q.  Are there any risks besides erosion and the
11  risk of recurrence as to which you've learned anything
12  since the launch of the Prolift®?
13      A.  Well, we did a study that looked at Prolift®
14  versus Prolift+M®, and we seemed to see that the
15  improvements in sexual function in this retrospective
16  cohort study showed that there was more improvement in
17  Prolift+M® versus Prolift+M® in regards to sexual
18  function.
19      Q.  From your perspective, comparing the
20  Prolift+M® to the Prolift®, based on your study and
21  what you've learned in your experience, the Prolift+M®
22  has -- gives women better sexual function than the
23  Prolift®?
24      A.  In that study there was improvement in both
25  groups.  There was greater improvement in the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 378

1 Prolift+M® group.

2 Q. Since March of 2005 has your knowledge with

3 regard to the inflammatory process, the foreign body

4 reaction, the formation of fibrosis evolved at all?

5 MR. SNELL: Can you repeat that

6 question.

7 (The court reporter read back the

8 record as requested.)

9 MR. SNELL: Objection, form.

10 THE WITNESS: Not substantially.

11 BY MR. SLATER:

12 Q. At all?

13 A. I can't point to specific instances I could

14 tell you about.

15 Q. If you could, take a look at your SGS

16 article from November of 2008, the clinical practice

17 guidelines.

18 A. Yes.

19 Q. Page 1129. You state at the top of the

20 right-hand column in the third line, "In order for

21 women to give true informed consent."

22 A. I'm sorry, top of the right-hand column.

23 The right-hand column, is that what you said?

24 Q. Yes. Third line?

25 A. Yes, I see it.

Page 379

1 Q. "In order for women to give true informed

2 consent, we as surgeons must convey the unique risks

3 related to grafts and the lack of long-term data

4 comparing native tissue repair to vaginal graft use to

5 our patients."

6 You believe that to be a valid and truthful

7 statement at the time you made it in this article?

8 A. Yes.

9 Q. Would you agree that in the patient

10 brochure, Ethicon needed to convey the unique risks

11 related to grafts and to do so accurately? Start with

12 that.

13 A. Yes.

14 Q. Do you agree that in the patient brochure,

15 Ethicon needed to convey the lack of long-term data

16 comparing native tissue repair to vaginal graft use?

17 A. No.

18 Q. Did you ever personally compare the Prolift®

19 IFU that was originally used with the one that went

20 into effect in 2009?

21 A. I know that there were some changes in it.

22 Q. Do you know why those changes were made?

23 A. I think it may have had something to do with

24 the fact that when -- and I could be wrong about this,

25 but I think it was -- it had to do with when

Page 380

1 Prolift+M® came on the market and Gynecare applied for

2 a 510(k) approval and it became -- the FDA became

3 aware that Prolift® itself had not gotten 510(k)

4 approval, and they went back and granted 510(k)

5 approval to Prolift® and, therefore, some changes were

6 made. I think it was in relation to that.

7 Q. Do you know why the changes were made to the

8 Prolift® IFU; meaning, do you know why Ethicon decided

9 to make those changes? Was it on their own, or did

10 the FDA have input; do you have any idea?

11 A. I don't know for sure. I think that it

12 something to do with the FDA, but I could be wrong

13 about that.

14 Q. Did you ever sit down and compare the 2009

15 IFU to the IFU that was in effect before that to see

16 what was different?

17 A. I think in the preparation of coming to this

18 deposition, I did look at both of them.

19 Q. Did you see any -- rephrase.

20 Any of the things that were changed and

21 added or modified, if those changes made the

22 information more accurate, you would agree that that

23 is what it should have said from day one, right?

24 A. Not really.

25 MR. SNELL: Objection, form. Go ahead.

Page 381

1 THE WITNESS: Not really. I mean, I

2 don't put that much importance on IFU. You're asking

3 me my expert opinion. That's my opinion.

4 BY MR. SLATER:

5 Q. From your perspective, the IFU is not that

6 important a document?

7 A. I'm not saying that. I'm saying from my

8 standpoint as a surgeon who operates on patients, who

9 knows a lot about pelvic reconstructive surgery,

10 what's in the IFU doesn't mean that much to me.

11 Q. Do you know if -- well, rephrase.

12 Have you ever studied or made an effort to

13 learn what other surgeons believe on that topic?

14 A. I've never studied that.

15 (Document marked for identification

16 as Murphy Deposition Exhibit No. 5.)

17 BY MR. SLATER:

18 Q. I've marked Murphy-5, an article that you

19 co-authored in 2012 titled "Vaginal Prolapse Repair,

20 Suture Repair Versus Mesh Augmentation: A

21 Urogynecology Perspective."

22 A. Yes.

23 Q. What's the name of the journal this was

24 published in?

25 A. Urology Clinics North America, something

Confidential - Subject to Stipulation and Order of Confidentiality

Page 382

1 along those lines.
2     Q.  Is that considered to be a high powered
3 journal?
4     A.  I would say no.
5     Q.  Go to the second page please, Page 326, left
6 column under the heading in the middle of the page.
7 Go down good five lines, just after reference 11.
8         You state, "Obviously, the female pelvis is
9 substantially different in many aspects when compared
10 with the abdominal wall."
11        That's a true statement, correct?
12    A.  Yes.
13    Q.  And if you go over to the -- just directly
14 across the page, the other column, you state, "As
15 mentioned, the vagina does have unique differences
16 when compared with the abdominal wall."
17        Do you see that?
18    A.  Yes.
19    Q.  True statement, correct?
20    A.  Correct.
21    Q.  And when you -- a little further down, you
22 state that "unique considerations to the vagina in the
23 use of mesh-augmented repair," and then you list some
24 of those in bullet points, correct?
25    A.  Correct.

Page 383

1     Q.  One of them is that the surgical site cannot
2 be sterilized, correct?
3     A.  Correct.
4     Q.  And that's due to the fact that the vagina
5 is a contaminated environment, correct?
6     A.  Correct.
7     Q.  Thus that increases the risk of infection,
8 correct?
9     A.  Compared to an abdominal wall, yes.
10    Q.  If you could turn to Page 330, the very last
11 word in the left-hand column is the word "however."
12        Do you see that?
13    A.  I do.
14    Q.  I want to read that sentence.
15        "However, for sexually active patients that
16 develop new-onset dyspareunia, the low rate is
17 irrelevant and the impact on their individual quality
18 of life is significant."
19        You see that?
20    A.  I do.
21    Q.  And that's based on you had earlier in the
22 article described the rates of new-onset dyspareunia
23 with the use of mesh, and you had classified those
24 rates as low rates, correct?
25    A.  I'd have to read through the whole article,

Page 384

1 to be honest with you.  I'm not -- haven't read this
2 in a while.
3     Q.  Well, let me ask you a clean question.
4     A.  Okay.
5     Q.  Regardless of what the rate is for new-onset
6 dyspareunia with women getting Prolifts®, let's talk
7 about Prolifts®, whatever that rate is would be
8 irrelevant to a woman who is sexually active and
9 actually develops it because of the impact on her
10 individual quality of life; fair statement?
11    A.  Yes.
12    Q.  And the reason being that even if there's
13 benefit to some number of women, if you get a very
14 serious complication like dyspareunia and it doesn't
15 go away, that can be very devastating on the women
16 that do get it, correct?
17    A.  Correct.  Plane travel is very safe, but for
18 someone who dies in a plane crash, it's very
19 significant for them.
20    Q.  And if someone develops a plane that they
21 think is going to get better gas mileage, but then it
22 turns out that even if it is getting somewhat better
23 gas mileage, there's also more crashes occurring
24 because the part that you had to change on it to get
25 the gas mileage causes a new risk for it to crash, you

Page 385

1 probably want to take that plane off the market,
2 right?
3         MR. SNELL:  Objection, form.
4         THE WITNESS:  I am not going to hold
5 myself out as an expert on airplanes.
6 BY MR. SLATER:
7     Q.  Well, it was your analogy, so following with
8 your analogy, you would agree with me, right?
9     A.  No.  It's just a simple analogy that when
10 something bad happens to a person, it doesn't matter
11 to them that there's a low risk of it.
12    Q.  Well, one of the things Ethicon needed to
13 look at was even if we're going to benefit some number
14 of women with the Prolift® because we think they're
15 going to have lower recurrence rates, they needed to
16 weigh that against what were the complications women
17 were going to suffer as a result of the Prolift®, and
18 even if it was a low number, if the complications were
19 severe enough, Ethicon had to consider whether it was
20 worth it to keep the product on the market, correct?
21    A.  Again, I'm going to have to state that
22 you're implying that this is a risk that can only
23 occur when you fix pelvic organ prolapse with Prolift®
24 or that the risk is higher with Prolift® than with
25 alternative surgical options.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 386

1    Q.  I'm not.  What I'm actually asking you is
2    this:  When Ethicon markets the Prolift® that's what
3    they're offering for sale and asking for money back
4    for, so Ethicon's obligations are limited to the
5    Prolift®.  Ethicon doesn't have to worry about
6    alternative procedures and whether or not people are
7    going to get those.  Ethicon has to worry about are we
8    being responsible in marketing this Prolift®, correct?
9            MR. SNELL:  Objection, form.
10   BY MR. SLATER:
11   Q.  Do you understand that?
12   A.  I'm understanding that what, again, you seem
13   to be implying is that if there's a risk with a
14   product that someone should not market it.
15   Q.  No, that's not what I'm saying.
16   A.  Okay.  Well, it sounded like that to me.
17   Q.  What I'm saying is this:  Do you have any
18   understanding -- if you don't know or it's something
19   you don't feel comfortable talking about, you can say
20   I'm not going to get into that area.
21           Do you have an understanding about whether a
22   medical device manufacturer like Ethicon needs to
23   weigh, in some instances, the risk of very
24   catastrophic complications to some minority of women
25   that are going to get it against a potential benefit

Page 387

1    to other women, and in some cases, needs to say, you
2    know what, there's enough getting these very
3    catastrophic complications that we have to say even
4    though there may be many women getting benefited, it's
5    not worth selling and we need to not market it?
6            MR. SNELL:  Objection, form.  Go ahead.
7            THE WITNESS:  I think that any person,
8    corporation, group that holds itself out to be an
9    ethical group, that they should always balance risks
10   and benefits when they would then market a product.
11   BY MR. SLATER:
12   Q.  Do you know specifically within Ethicon what
13   they've considered on an ongoing basis once the
14   Prolift® was launched to evaluate the risks and
15   benefits on an ongoing basis?  Do you know what, if
16   anything, in particular Ethicon internally was looking
17   at?
18   A.  So, again, all I know about Ethicon, because
19   I'm not an employee, is what I've reviewed so far in
20   this case.  I think in reviewing those documents, it's
21   pretty clear that they have looked at data that's been
22   published on Prolift® since its launch.  So my
23   guess is that -- not my guess.  I would say to a
24   reasonable degree of certainty that they at least
25   looked at the data being published on Prolift® after

Page 388

1    it was launched.
2    Q.  Are you aware of anything else that Ethicon
3    had available to it by way of information about the
4    risks and benefits of the Prolift® once it was
5    launched in an ongoing basis?
6    A.  I know the MAUDE database exists.  I don't
7    know if things get reported to Ethicon if something
8    goes to there that's specifically Prolift®, I don't
9    know that for sure, but maybe that's something.  Other
10   than that, no, I don't.
11   Q.  You don't have an understanding of the
12   mechanisms by which complaints can be made to Ethicon
13   and whether or to what extent those would be looked
14   at?
15   A.  So do I know that if someone sent a
16   complaint to Ethicon about their product, whether or
17   not they'd review it?
18   Q.  Do you know what would happen with that
19   complaint; do you have any information?
20   A.  Not specifics.  I assume it would go to
21   someone in the company and they would review it.
22   Q.  Beyond that, you don't know anything
23   specific?
24   A.  I do not know, no.
25           (Document marked for identification

Page 389

1    as Murphy Deposition Exhibit No. 6.)
2    BY MR. SLATER:
3    Q.  Let me give you Exhibit 6.  This is an
4    article you published in June of 2003.  This would
5    have been just about the point where you were
6    finishing your fellowship up in Louisville?
7    A.  Correct.
8    Q.  And this article is titled predicting
9    treatment choice for patients with pelvic organ
10   prolapse, correct?
11   A.  Correct.
12   Q.  One of the people who authored this is Susan
13   Shott, Ph.D.  Who is she?
14   A.  I would -- again, I don't like to use the
15   word guess.  I'm not supposed to use the word guess,
16   but I would think that it's probably a statistician.
17   Q.  Other than that, you're not familiar with
18   her?
19   A.  In reviewing some of this stuff, I did know
20   a statistician at the University of Louisville.  I met
21   her a couple times.  That may have been Susan Shott.
22   I'm not sure.  I'm not good friends with her, wouldn't
23   necessarily recognize her if I walked down the street
24   and passed her.
25   Q.  Turn to Page 1282 of this article, please.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 390

1    A.  Okay.
2    Q.  On Page 1282 at the top right-hand corner,
3  four lines down, there's a sentence that says, "We
4  recently published data showing that pelvic organ
5  prolapse was not a cause of pelvic or lower back
6  pain."
7        Do you see that?
8    A.  I do.
9    Q.  True statement?
10   A.  The article, let me look at it, I know it
11  was a Heit publication, is pelvic organ prolapse a
12  cause of pelvic or low back pain.  My understanding of
13  that study was that a lot of people who present with
14  pelvic organ prolapse also have lower back pain, and
15  to the extent that we could statistically look at it
16  and see the correlation between prolapse and lower
17  back pain, we could not see a definite correlation.
18        Certainly, in my own practice, I have lots
19  of patients that complain of low back pain that they
20  think is related to their prolapse.  I certainly have
21  lots of patients in whom I fix their prolapse and
22  their low back pain gets better, but in terms of a
23  sort of quintessential symptom of pelvic organ
24  prolapse, that one study that is quoted here, Number
25  5, showed that they're not highly correlated.

Page 391

1    Q.  The Reference Number 5 --
2    A.  Yes.
3    Q.  -- with regard to the statement, "we
4  recently published data showing that pelvic organ
5  prolapse was not a cause of pelvic or lower back
6  pain," that's a study that was published and could not
7  substantiate a correlation between prolapse and pelvic
8  or lower back pain?
9    A.  Correct.
10   Q.  Is there anything in particular about
11  prolapse that would cause pain for a patient?
12   A.  Yes.
13   Q.  What specifically about prolapse would cause
14  pain?
15   A.  If you have prolapse, it's not uncommon to
16  get ulceration of the vaginal wall.  That can cause
17  pain.
18        Again, pain is such a subjective thing.
19  Well, is discomfort pain?  For some people, yes; for
20  some people, no.  It's very much semantics.
21        People certainly feel very uncomfortable
22  with pelvic organ prolapse.  We tend to not think of
23  it as acute pain, kind of like when you break an arm.
24  It's not like that kind of pain.  It's more of a dull
25  ache, pressure, heavy sensation.

Page 392

1  cases of prolapse, correct?
2    A.  No.  The ulceration is only going to happen
3  if you have prolapse beyond the introitus, but in
4  terms of the sensation of pressure and heaviness and
5  discomfort, that can be in nonsevere prolapse as well.
6    Q.  Generally, you would expect that only in
7  someone who is Stage 3 or 4, correct?
8    A.  I would not say that.
9    Q.  Not as a general proposition?
10   A.  No.
11        MR. SLATER:  Can we go off the record
12  for about five minutes.  I'm going to organize my
13  notes a little, try to move through this a little
14  quicker.
15        THE VIDEOGRAPHER:  Going off the
16  record.  The time is 7:01 p.m.
17        (Brief recess.)
18        THE VIDEOGRAPHER:  We're back on the
19  record.  Here marks the beginning of Volume 1, Tape
20  Number 7, the deposition of Dr. Miles Murphy.  The
21  time is 7:16 p.m.
22  BY MR. SLATER:
23   Q.  I've handed you Exhibit 3008, which is a
24  article titled Safety of Transvaginal Mesh procedure:

Page 393

1  Retrospective study of 684 patients written by mostly
2  the French TVM group, correct?
3    A.  Correct.
4    Q.  You are familiar with this article?
5    A.  I have some familiarity with it.
6    Q.  Do you know whether at any point the data
7  that's referred to in this article was available in
8  any form to the people within Ethicon before the
9  article was published; do you have any knowledge one
10  way or the other?
11   A.  I do not.  I do not know.
12   Q.  Do you have any knowledge as to whether or
13  to what extent any of the data from this article was
14  relied on for any purpose by anyone in Ethicon medical
15  affairs?
16   A.  I know that Ethicon was involved in the TVM
17  study, so I assume they had some knowledge, but I
18  don't know what they knew.
19   Q.  You have no information as to whether or to
20  what extent this study was relied on in any way within
21  Ethicon medical affairs for any -- this study
22  particularly, do you?
23   A.  I don't know.
24   Q.  Okay.  This study involved the TVM technique
25  with Gynemesh® PS, correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 394

1    A.  Yes.
2    Q.  It involved surgeries performed on 684
3   patients between October 2002 and December 2004 at
4   various hospitals in France, correct?
5    A.  Correct.
6    Q.  It says in the results section of the
7   abstract, the mean follow-up period was 3.6 months.
8   You see that?
9    A.  Yes.
10    Q.  In the results section of the abstract,
11  there's a list of what are referred to as late
12  postsurgical complications.
13      Do you see that?
14    A.  No.  How far down?
15    Q.  About halfway through there's a reference to
16  early postsurgical complications.
17    A.  Yes.
18    Q.  Which are defined as the first month after
19  surgery.
20      Do you see that?
21    A.  Yes.
22    Q.  And then what they call late postsurgical
23  complications, and then they give some percentages of
24  those.
25      Do you see that?

Page 395

1    A.  I see that.
2    Q.  And we know the mean follow-up period was
3   3.6 months overall, correct?
4    A.  Correct.
5    Q.  And with regard to postsurgical
6   complications that manifested more than one month
7   after the surgery, it shows that 11.3% of the women
8   had mesh exposures, correct?
9    A.  I believe it says granulomas or prosthetic
10  expositions, but I think that means exposures, but it
11  does say granulomas as well.
12    Q.  11.7% of the women had retractions, correct?
13    A.  It says that, yes.
14    Q.  And it says that 6.9% of the women had
15  recurrences, correct?
16    A.  Yes.
17    Q.  Now, if you flip to the second page, there's
18  a diagram of the implant that they say was used.
19      In fact, that's a diagram of the actual
20  Prolift®, correct?
21    A.  I don't know.  It looks familiar as
22  Prolift®.
23    Q.  You can't tell whether that's the Prolift®
24  or whether it's something different?
25    A.  I can't.  No, I can't say for sure.

Page 396

1    Q.  Do you know what the exact shape was of the
2   implant as used by these TVM physicians in this study?
3    A.  I've seen other descriptions of TVM mesh
4   from TVM studies that looks slightly different than
5   this.
6    Q.  If you look at Page 452, I have a few
7   questions on that page.
8      There's a section on Page 452 of this
9   article titled Late Postsurgical Complications.
10    A.  Yes.
11    Q.  And it indicates that 157 late postsurgical
12  complications were noted, correct?
13    A.  157 late -- yes.
14    Q.  And then it says, the most frequent was
15  vaginal exposition of prosthesis, which they put at
16  11.3%, correct?
17    A.  Correct.
18    Q.  That would be exposure, correct?
19    A.  I think that's what they're referring to,
20  yes.
21    Q.  And they say 46 of those women required
22  treatment, right?
23    A.  Correct.
24    Q.  So if you go up to the top of the next
25  column, the second full paragraph with regard to the

Page 397

1   exposures, 42% were able to be treated medically and
2   57.8% needed surgery, correct?
3    A.  Correct.
4    Q.  So about 58% of the mesh exposures that were
5   found in this study required surgical treatment,
6   according to this article, correct?
7    A.  That's what they say, surgery.
8    Q.  And if I understand correctly, you believe
9   that the studies performed by the French TVM group are
10  important in providing information about the potential
11  risks with the -- what became the Prolift®, correct?
12    A.  Correct.
13    Q.  So this information indicating that 58% of
14  the exposures needed to be treated surgically, that's
15  something that Ethicon would have needed to take into
16  account when trying to project what is going to be the
17  necessary treatment for exposures with the Prolift®,
18  correct?
19    A.  Yes.  I mean, the study is published in
20  2008, so that was well past then, but if you have
21  information regarding what Ethicon knew, I don't.
22    Q.  If Ethicon had information about the data
23  that was collected in this study at the time of the
24  launch of the Prolift®, Ethicon needed to take that
25  data into account in making the decision of whether to

Confidential - Subject to Stipulation and Order of Confidentiality

Page 398

1 market the Prolift®, correct?

2    A.  Certainly, yes.

3    Q.  And if Ethicon had information about the

4 data reflected in this article, Ethicon needed to take

5 that information into account in writing the warnings

6 and information in both the IFU and the patient

7 brochure, correct?

8    A.  It had to take it into account, yes.

9    Q.  And with regard to any of the data that had

10 been compiled by the French TVM group, whether it was

11 published or whether it was just available to Ethicon

12 before launch, the same would hold true, correct?

13    A.  I'm sorry.  Say that again.

14    Q.  With regard to any data that the French TVM

15 group had that Ethicon was privy to, whether it was

16 published or not, Ethicon had to similarly take that

17 into account, correct?

18    A.  Yes.

19        MR. SNELL:  Objection to form.

20 BY MR. SLATER:

21    Q.  And they would have had to take that

22 information and that data into account in deciding

23 whether to market the Prolift®, correct?

24    A.  They'd have to take it into account, yes.

25    Q.  And they would have to take it into account

Page 399

1 in providing the warnings and information in the IFU

2 and the patient brochure, correct?

3        MR. SNELL:  Objection, form.

4        THE WITNESS:  Yes.

5 BY MR. SLATER:

6    Q.  If we go a little further down in the second

7 column of Page 452, looking at about the -- well,

8 rephrase.

9        In the third paragraph in the right-hand

10 column on Page 452, the authors state, the other

11 frequent late complication is retraction of the

12 prosthesis, symptomatic or not, 80 were shown in the

13 study, which was 11.7%.

14        You see that?

15    A.  I do.

16    Q.  And then it says, 19 of the retractions

17 required surgery, which was a total of 2.8% of the

18 study participants, correct?

19    A.  Correct.

20    Q.  And then it says, 52.6% of these retractions

21 were associated with prosthetic exposition, meaning

22 exposure, correct?

23    A.  Correct.

24    Q.  So, certainly, statistically, there seems to

25 be an association, based on this study, between

Page 400

1 retraction and exposure, correct?

2        MR. SNELL:  Objection.  You said

3 statistically?

4        MR. SLATER:  Yes.

5        MR. SNELL:  All right.  Objection.

6        THE WITNESS:  I've already stated my

7 opinion about retraction.  This situation that they're

8 talking about, someone who has a retraction and they

9 needed surgery to go in to correct that, that's along

10 the lines of that complication that I talked about

11 with the patient of mine, where it felt like there was

12 too much tension on one of the arms and wanted to go

13 in and release it.

14        I don't necessarily, again, believe

15 that that truly represents a contraction, and I don't

16 know if that's a French to English difference in terms

17 of how they view that or not, but that's a phenomenon

18 that if you're just saying it's truly a contraction, I

19 don't really think exists, but that's what they're

20 calling it.

21 BY MR. SLATER:

22    Q.  I'm only presenting to you what's written in

23 this article by the French TVM doctors.

24    A.  Right, I understand, but there's -- they're

25 calling it a contraction.  I don't know that it's my

Page 401

1 opinion that that's really what it is.

2    Q.  In this article they point out that over

3 50%, 52.6% to be precise, of the retractions were

4 associated with exposures, correct?

5    A.  Correct.

6    Q.  So in 52.6% of the cases where there was a

7 retraction, there was also a exposure; is that what

8 this is saying?

9    A.  Yes.

10    Q.  That certainly suggests an association

11 between the two, correct, between retraction and

12 exposure, correct?

13    A.  An association, yes.

14    Q.  If you go to the next page on the right-hand

15 column just above the word multi-varied analysis,

16 about fourth line from the bottom it says, retractions

17 and relapse of prolapse were also significantly

18 linked.

19        Do you see that?

20    A.  No.

21    Q.  Second paragraph.

22    A.  Second paragraph under multi-varied analysis

23 or second paragraph from the top?

24    Q.  Right, from the top.

25    A.  The last, the percentage of vaginal

Confidential - Subject to Stipulation and Order of Confidentiality

Page 402

1 exposure; is that where you are?

2 Q. Yeah, next paragraph.

3 A. Complications of prosthetic, okay.

4 Read the part that you want me interested

5 in.

6 Q. On the right-hand column of Page 453, the

7 authors state, retractions and relapse of prolapse

8 were also significantly linked.

9 Do you see that?

10 A. Retractions and relapse of prolapse were

11 also significantly linked. Yes, I saw that.

12 Q. So the authors saw a connection between

13 retraction and recurrence, correct?

14 A. That's what they're stating.

15 Q. And, actually, in the left-hand column, the

16 very first sentence in the left-hand column at the

17 top, for 15 patients, 2.2%, vaginal expositions, which

18 is an exposure, correct?

19 A. Correct.

20 Q. Were combined with prosthetic retractions.

21 This suggests a statistical link between the two.

22 So they saw a statistical correlation

23 between retraction and exposure, correct?

24 A. I don't know if they saw it or not. They

25 said it suggested.

Page 403

1 Q. Go to the next page, 454. On Page 454 look

2 at the third to the bottom paragraph, starts out at a

3 short review.

4 A. Okay.

5 Q. A short review confirms that the incidence

6 of prosthetic expositions, which is exposures,

7 correct?

8 A. Correct.

9 Q. Is high in our study, with a mean value of

10 11.3%.

11 Do you see that?

12 A. Yes.

13 Q. So the authors of this study, who include

14 the TVM group physicians, felt that an 11.3% exposure

15 rate was a high rate of exposure, correct?

16 A. Correct.

17 Q. Do agree with the TVM group that 11.3% is a

18 high exposure rate?

19 A. It's on the high side. Again, when I have

20 done -- been involved in systematic review of mesh

21 placed transvaginally, the average rate came out at

22 about 10%.

23 Q. Go to the next page, please. The left-hand

24 column of Page 455 and the second to last paragraph or

25 third to last paragraph just at the bottom, maybe ten

Page 404

1 lines up from the bottom of the page, there's a

2 sentence that starts, prosthetic retractions.

3 Do you see that?

4 A. I do.

5 Q. It says, prosthetic retractions were not

6 systematically looked for in any of the centers when

7 the study began so results may have been biased in our

8 study for our different observers.

9 That's basically saying that they were not

10 as a point of the study looking for retraction of the

11 mesh so they may have missed some because the surgeons

12 were basically -- some were looking for it, some

13 weren't. That's basically what that says, correct?

14 A. It just means that it was not systematically

15 looked at. It doesn't necessarily mean that surgeons

16 weren't looking for it, but it may have been that they

17 weren't -- if they were, they weren't noting it. It

18 seemed like there was not a prospective decision to go

19 ahead and make that be an important measurement that

20 was going to be documented.

21 Q. Do you think that in any study of the TVM

22 procedure or the Prolift® where safety is being looked

23 at or even recurrence is being looked at, that one of

24 the things that should be a part of the protocol is to

25 identify contraction/retraction of the mesh?

Page 405

1 A. Well, you can't do that in a retrospective

2 study, and that's what this is.

3 Q. How about in a prospective study?

4 A. I think that's an important data point to

5 look at.

6 Q. At the very bottom of that column, the left

7 column on Page 455, they indicate that no complication

8 was significantly linked to age, menopause, I want to

9 just stop there.

10 What does that mean, just with regard to age

11 and menopause, what does that mean?

12 A. I still don't see the --

13 Q. Very bottom of the page, the last sentence.

14 A. To conclude, in univaried or multi-varied

15 analysis, no complication was significantly linked to

16 age, menopause. What they mean by that is that when

17 they looked at complications and they looked to see if

18 it varied in some systematic way in relation to the

19 patient's age or to her menopausal status, they did

20 not see a correlation or an association.

21 Q. Is that consistent with your own experience?

22 A. In regards to Prolift®?

23 Q. Yes.

24 A. I can't say that I can think of any study

25 that I've written where I linked a certain

Confidential - Subject to Stipulation and Order of Confidentiality

Page 406

1  complication to age or menopausal status.
2      Q.  Let's look at the conclusion to this article
3  by Caquant, et. al.
4          They indicate in the first paragraph, cure
5  of genital prolapse by interposing synthetic
6  prosthesis in vaginal root is reliable and easily
7  reproduced.
8          See that?
9      A.  Reproduced, yes.
10     Q.  Then they say, however, the present study
11 shows a relatively high incidence of late postsurgical
12 complications.
13         Do you see that?
14     A.  Yes.
15     Q.  So they're saying that with regard to
16 complications, at least in this study of 684 patients,
17 they term the complication rate, postsurgical
18 complication rate as relatively high, correct?
19     A.  They term it that way, yes.
20     Q.  Further down, the authors indicate, the very
21 bottom of the next paragraph, symptomatic prostatic
22 retractions may be of handicap with pelvic pain,
23 dyspareunia, dyschezia.
24         You see that?
25     A.  Yes.

Page 407

1      Q.  So they're saying that when there's a
2  retraction of the mesh as a result of the scar
3  formation around it, that can cause pelvic pain,
4  dyspareunia and dyschezia, correct?  That's what
5  they're saying?
6      A.  I think that's a fair assessment of what
7  they're saying.
8      Q.  That's consistent with your understanding?
9      A.  My understanding of what they're saying or
10 my understanding of what my opinions are about that?
11     Q.  Your understandings of your opinions.
12     A.  No.
13     Q.  So you disagree with that finding by the
14 French TVM group?
15     A.  Correct, for the reasons I already stated,
16 about my feelings on contraction versus tensioning on
17 the mesh.
18     Q.  Is it your contention that retraction of
19 mesh doesn't really occur?  And what I'm saying is are
20 you saying that scar tissue formation doesn't cause
21 the mesh to be contracted down in size; are you saying
22 that doesn't really happen?
23     A.  What I'm saying is that in all the studies
24 that I've looked at and the studies that I've done,
25 there is consistently some shortening of the vagina

Page 408

1  after mesh placement.  Also, consistently what I find
2  and when I look at the literature of comparative data,
3  that when other reconstructive procedures such as
4  native tissue repairs are done, there's a similar
5  shortening of the vagina.
6          So if it was just because of mesh
7  contraction, if that was the only reasoning there was
8  shortening, why would you see it in procedures where
9  mesh was not placed?
10     Q.  Well, you could have mesh retraction or mesh
11 contraction -- rephrase.
12         Mesh contraction can occur and cause
13 symptoms for the patient but not cause vaginal
14 shortening, correct?
15     A.  I don't know.
16     Q.  Have you ever read any studies to that
17 effect?  I just showed you one, right?
18     A.  Again, so when they called it a contraction,
19 how do they know it's a contraction?  I don't know how
20 they define that.  I don't know how they measured it.
21 They just called -- they just said these people had a
22 contraction.
23     Q.  Have you ever seen any articles where
24 contraction has been measured, where doctors have
25 actually tried to objectively verify that contraction

Page 409

1  was occurring?
2      A.  I've looked at studies that try and look at
3  that question, yes.
4      Q.  Have you seen any studies where that was
5  actually established that contraction actually occurs?
6      A.  In human beings?
7      Q.  Yes.
8      A.  The study that I can recall did not show
9  that.
10     Q.  Which study are you thinking of?
11     A.  Was an ultrasound study looking at vaginal
12 mesh after it had been placed.
13     Q.  Is that the Dietz?
14     A.  Yes.
15     Q.  Dietz, you actually cited that study in your
16 list of materials, right?
17     A.  I know that I cited it in the -- my time to
18 rethink article, and I probably cited it in my
19 article -- in my report, excuse me.
20     Q.  Have you read any other articles by Dietz
21 with regard to whether or not ultrasound shows
22 contraction or retraction of mesh?
23     A.  That's the one I'm familiar with.
24     Q.  Are you familiar with any other articles
25 he's written on that subject?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 410

1    A.  No.

2    Q.  Would it surprise you to know that he had

3    written other articles where he actually confirmed

4    that ultrasounds do show the retraction of the mesh?

5    A.  No, it would not surprise me.

6    Q.  Would it surprise you to know that he found

7    that ultrasound shows retraction of mesh earlier, and

8    then when he started apparently working with AMS,

9    then, all of a sudden, his article said, no, I don't

10   see a retraction; would that be surprising to you?

11       MR. SNELL:  Objection, form.

12       THE WITNESS:  That's a lot of

13   suppositions.

14   BY MR. SLATER:

15   Q.  It's a pretty straightforward supposition.

16   Would that surprise you if a relationship with

17   industry caused him to suddenly come out with an

18   article that contradicted what he had said in a prior

19   article?

20   A.  It would surprise me if that was the reason

21   that he falsified his findings.

22   Q.  Are you familiar with other literature with

23   regard to whether ultrasound shows retraction of mesh,

24   other than the Dietz article?

25   A.  I'm not.

Page 411

1    Q.  Did you make any effort to read any other

2    articles besides that one?

3    A.  In regards to ultrasound?

4    Q.  Yeah.

5    A.  I've looked at other articles on ultrasound,

6    I just can't quote them to you.

7    Q.  Why didn't you cite those other articles?

8    A.  Because they didn't have outcomes that I

9    thought were worth citing that I recall.

10   Q.  Okay.  I'm going to show you an article I've

11   marked as Exhibit Murphy-7.

12       (Document marked for identification

13       as Murphy Deposition Exhibit No. 7.)

14   BY MR. SLATER:

15   Q.  Article that I've marked as Murphy-7 is

16   titled "Transvaginal mesh repair of anterior and

17   poster vaginal wall prolapse: a clinical and

18   ultrasonographic study."  It's published in the

19   Ultrasound Obstetric Gynecology Journal in 2010.

20       You see this?

21   A.  I do.

22   Q.  You see who the authors are?

23   A.  I do.

24   Q.  Are you familiar with any of those names?

25   A.  Fatton and Jacquetin.

Page 412

1    Q.  Who are they?

2    A.  I believe those are -- I know Jacquetin and

3    I believe Fatton are members of the TVM group.

4    Q.  Jacquetin is actually the person who was the

5    leader of the French TVM group, correct?

6    A.  That's my understanding.

7    Q.  Have you ever seen this article before?

8    A.  Not that I recall.

9    Q.  Let's go to the second page, Page 475, and

10   the first full paragraph in the left column starts

11   "between," you see that?

12   A.  Yes.

13   Q.  The article starts off with that paragraph

14   says, "Between 2000 and 2005 our team participated in

15   the development of the tension-free vaginal mesh

16   technique," and that's the technique that became the

17   Prolift®, correct?

18   A.  Yes.

19   Q.  And the work of that team, the French TVM

20   group, you believe is very important in understanding

21   the potential risks and benefits of the Prolift®,

22   correct?

23   A.  Correct.

24   Q.  In the next sentence they say, "Over time it

25   appeared that mesh retraction was probably a

Page 413

1    contributing factor to recurrence, postoperative pain

2    and dyspareunia."

3        You see that sentence?

4    A.  I do.

5    Q.  So the French TVM group felt that mesh

6    retraction was a real phenomenon and that it was

7    probably a contributing factor to recurrences of

8    prolapse, as well as postoperative pain and

9    dyspareunia, according to this article, correct?

10   A.  Correct.

11       MR. SNELL:  Objection to form.

12   BY MR. SLATER:

13   Q.  Were you aware of the fact that the French

14   TVM group had that viewpoint before I just showed you

15   this article?

16       MR. SNELL:  Objection, form.

17       THE WITNESS:  I don't know that this

18   article represents all the thinking of the French TVM

19   group.

20   BY MR. SLATER:

21   Q.  Well, did you know that any of the members

22   of the French TVM group, including Professor Jacquetin

23   as one of the authors of this article, believed that

24   mesh retraction was probably a contributing factor to

25   recurrence, postoperative pain and dyspareunia in

Confidential - Subject to Stipulation and Order of Confidentiality

Page 414

1   women who had the TVM technique performed on them?

2       A.  I know that lots of people think it's a real

3   phenomena, and I am not disputing that they feel that

4   way.

5       Q.  My question is whether you knew that

6   Jacquetin and potentially other members of the French

7   TVM group had that viewpoint?  Did you know that

8   before I just showed this to you?

9       A.  No.

10      Q.  I think you said earlier you have a great

11  deal of respect for the French TVM group's knowledge

12  of the procedure that became the Prolift®.

13          Did I understand you correctly?

14      A.  I don't recall saying that, but --

15      Q.  Do you feel that way?

16      A.  I do feel what?

17      Q.  That you have a great deal of respect for

18  Professor Jacquetin and the other members of the TVM

19  group with regard to their understanding of the TVM

20  procedure that became the Prolift® procedure?

21      A.  I have a great deal of respect for them in

22  regard to that specific thing.  I know that they have

23  done a lot of studying on it, so -- and I think that

24  they are surgeons that should be respected and

25  research that should be respected.

Page 415

1       Q.  Well, now that I'm showing you this

2   sentence, does that impact on your opinions to see

3   that Professor Jacquetin is one of the authors in the

4   article that states that mesh retraction is probably a

5   contributing factor to recurrence, postoperative pain

6   and dyspareunia?

7       A.  It certainly doesn't, because they've stated

8   about retraction in all their articles.

9       Q.  So it doesn't change anything about your

10  opinions, seeing this right now?

11      A.  Does it change anything about my opinions?

12      Q.  Right.

13      A.  No.

14      Q.  Do you dispute that mesh retraction is

15  probably a contributing factor to recurrence,

16  postoperative pain and dyspareunia or --

17      A.  Yes.

18      Q.  -- do you agree that that's true?

19      A.  I do not agree that that's true.

20      Q.  So you dispute what Professor Jacquetin and

21  his co-authors say in this article that was published

22  in 2010?

23      A.  Yes.

24      Q.  Do you know what the viewpoint of Ethicon's

25  medical affairs people, any of them is with regard to

Page 416

1   whether or not they believe that Professor Jacquetin

2   is correct when he -- and his co-authors make this

3   statement; do you know what their viewpoint is on this

4   question?

5       A.  To the extent that I reviewed depositions of

6   members of Ethicon, I think I recalled seeing people

7   mention that contraction can occur, but, no, I really

8   don't have a great deal of knowledge about what they

9   thought.

10      Q.  If there are physicians within Ethicon

11  medical affairs who believe that mesh retraction of

12  Prolift® mesh is a contributing or causative factor to

13  recurrence, postoperative pain and dyspareunia, if

14  someone within medical affairs has that perspective,

15  you disagree with that?

16          Is that what you're telling this jury?

17      A.  Yes.

18      Q.  Let's look at the results section of the

19  article.

20          Well, let me ask you this first:  Have you

21  in your practice ever attempted to utilize ultrasound

22  imaging with regard to the post-operative assessment

23  of Prolifts®?

24      A.  No.

25      Q.  Have you ever considered using ultrasound?

Page 417

1       A.  No.

2       Q.  Has anybody ever discussed the topic with

3   you, suggested that you should?

4       A.  No.

5       Q.  Have you ever thought about using ultrasound

6   to assess Prolift® mesh?

7       A.  I've thought about lots of different

8   techniques.

9       Q.  Have you thought about using ultrasound to

10  image Prolift® mesh within a woman's body?

11      A.  No.

12      Q.  You would certainly agree with me that if an

13  ultrasound can image Prolift® mesh within a woman's

14  body, that that would be very helpful in assessing and

15  treating complications?

16      A.  I do not agree with that.  I think what's

17  important is what my patients complain of and what I

18  see when I examine them.  I think if I can't explain

19  something, based on my examination and my knowledge of

20  medicine, then some additional diagnostic modalities

21  might be helpful, but just to do it for the heck of

22  it, no.

23      Q.  Well, let's talk about women who have

24  complaints of severe pain or severe complications

25  within their pelvis and the surgeon wants to assess

Confidential - Subject to Stipulation and Order of Confidentiality

Page 418

1  whether the mesh is a possible cause before the
2  surgeon is going to operate and do potentially morbid
3  surgery on the woman.  Let's talk about that
4  situation.
5      A.  Okay.
6      Q.  In that context would ultrasound be helpful?
7      A.  It might be.
8      Q.  You haven't thought about that question one
9  way or the other?
10     A.  I think about -- I don't know that I've
11  thought specifically about that question.
12     Q.  In Results section on next column down at
13  the bottom, this article defines that "between
14  March 2005 and August 2006, 125 consecutive patients
15  were operated on in our unit for symptomatic POP-Q
16  Stage 2-4 anterior and/or posterior vaginal wall
17  prolapse with the Prolift® procedure."
18         You see that?
19     A.  I do.
20     Q.  So that's telling us how many patients and
21  some general information about who they were and that
22  they all got Prolifts®, correct?
23     A.  Correct.
24     Q.  Let's go to the next page.  In the
25  right-hand column, we get some information about the

Page 419

1  outcomes at three months, which started in the left
2  column but goes over to the top and says that 9, which
3  was 9.9% of the patients had vaginal mesh exposure at
4  three months, correct?
5      A.  It says that.
6      Q.  And then it says at the one year or greater
7  follow-up where the mean was 17.9 months 13% of the
8  patients had recurrence of vaginal wall prolapse,
9  correct?
10     A.  That's what it says.
11     Q.  They then give some grading of the
12  retractions in the anterior and posterior mesh, and
13  then they go on on the next page to a discussion with
14  regard to their findings, correct?
15     A.  I haven't read this recently or if ever, and
16  so I'll trust you that that's what those two
17  paragraphs say.
18         MR. SNELL:  You can take your time and
19  read it, if you want to.
20         MR. SLATER:  I was actually going to
21  Page 478 at this point.
22         THE WITNESS:  Okay.
23  BY MR. SLATER:
24     Q.  Part of the discussion, there's a table and
25  then a series of images from ultrasounds.

Page 420

1      Q.  Do you see that?
2      A.  Yes.
3      Q.  At the bottom of the page, Page 478, it
4  says, "Mesh retraction, also known as mesh shrinkage
5  or mesh contraction, can be defined by a reduction of
6  the surface area of the original implanted mesh."
7         Is that a statement you agree with or
8  disagree with?
9      A.  I think that is a statement that makes
10  sense.
11     Q.  They then say, "It has been shown that, in
12  the abdominal wall, mesh retraction is related to the
13  degree of tissue inflammation around the mesh after
14  implantation."
15         Do you see that?
16     A.  I do.
17     Q.  And do you have an understanding of why in
18  an article about the use of mesh for prolapse an
19  article with regard to mesh retraction in the
20  abdominal wall would be cited?
21     A.  Yes, because it's a similar type of
22  procedure.
23     Q.  And they cite it says reference 14, and that
24  is an article that was authored by Klinge,
25  K-l-i-n-g-e, Klosterhalfen and several other people

Page 421

1  named "Foreign body reaction to meshes used for the
2  repair of abdominal wall hernias," correct?
3      A.  Correct.
4      Q.  So they're citing to Klinge, Klosterhalfen,
5  et. al. for that proposition, correct?
6      A.  Correct.
7      Q.  With regard to the use of the Prolift® in
8  the woman's pelvis, do you agree or believe that mesh
9  retraction is related to the degree of tissue
10  inflammation around the mesh after implantation?
11     A.  I have no reason to dispute the findings
12  from Reference 14.
13     Q.  With regard to the tissue inflammation
14  around the mesh, they state, "This host reaction
15  depends on both biocompatibility of the foreign
16  material and the patient's immune system."
17         Is that a statement you agree with?
18     A.  Yes.
19     Q.  If you go to the page that we've turned to,
20  the authors talk about an article by Tunn, T-u-n-n,
21  et. al. with regard to the possibility of considerable
22  mesh retraction after TVM repair.
23         Do you see that?
24     A.  I do.
25     Q.  Are you familiar with Tunn's article in this

Confidential - Subject to Stipulation and Order of Confidentiality

Page 422

1 field?
2    A. Let me look at the reference. I'm not
3 recalling that I'm familiar with this article.
4    Q. The authors of this article in talking about
5 Tunn talk about the fact that in that study, the
6 authors compared the initial length of implanted mesh
7 and the sonographically measured mesh length six weeks
8 postoperatively observing a decrease in the mesh
9 length of 60% for anterior meshes and 65% for
10 posterior meshes.
11    You see that?
12    A. I do.
13    Q. Is that -- is this an article that you're
14 familiar with? Are those statistics you're familiar
15 with?
16    A. No.
17    Q. This article that I'm showing you now with a
18 reference to Tunn, is this providing information to
19 you that is essentially new to you with regard to the
20 use of ultrasound where studies have actually,
21 according to the studies, documented mesh retraction?
22    A. You know, I did a debate with Don Ostergard
23 at a course, I think it was last summer, and, you
24 know, I have seen other studies, I just couldn't
25 recall any particular exact study. So it's not that

Page 423

1 I'm not aware that there are people out there that
2 have shown different findings than what I quoted in
3 regard to the article I reference in the time to
4 rethink article.
5    Q. Well, in the time -- when you authored the
6 time to rethink article, you only referred to the
7 Dietz article with regard to ultrasound, correct?
8    A. Yes. It was not a systematic review, that's
9 correct.
10    Q. I'm showing you some literature from
11 Jacquetin and his group and other articles they cited.
12    Do you feel, in retrospect, that you
13 probably didn't give a balanced view of the literature
14 with regard to ultrasound and the ability to image
15 retraction?
16    MR. SNELL: Objection, form.
17    THE WITNESS: I'd have to review the
18 literature before I could make that statement in a
19 systematic way.
20 BY MR. SLATER:
21    Q. You would agree with me that in any article
22 describing anything in the literature, and we're
23 talking about, you know, pelvic mesh in the Prolift®
24 here, but in any context, you want to be fair and
25 balanced in providing information in the journal,

Page 424

1 correct?
2    A. You want to represent the reality of life,
3 as you see it, yes, absolutely.
4    Q. And you don't want to give a biased,
5 one-sided perspective; you want to give both sides to
6 be fair and balanced, correct?
7    MR. SNELL: Well, I'm going to object
8 to form of that.
9 BY MR. SLATER:
10    Q. When you author articles, don't you want to
11 be fair and balanced to make sure you take into
12 account both sides?
13    A. The point of the time to rethink article was
14 to specifically present a counterpoint to, in my
15 opinion, a biased viewpoint. It was not a scientific
16 article.
17    Q. The rethink article was meant to give a
18 counterpoint; meaning you thought the FDA had been
19 one-sided, so you were trying to give the other side
20 of the story?
21    A. Correct.
22    Q. So you weren't intending to be scholarly in
23 that sense; you were trying to just give the other
24 side of the story?
25    A. I was trying to base all my arguments based

Page 425

1 on evidence that I found in the literature that's in
2 the thing, but in no way did I purport that I had
3 performed a systematic review on this and these were
4 my opinions.
5    Q. And you weren't intending to be fair and
6 balanced in providing your viewpoint; you were trying
7 to find -- you were trying to provide your side of the
8 story?
9    A. I was trying to provide balance to the
10 story.
11    Q. So you felt the FDA had gone one way, so you
12 were trying to balance that by giving the other
13 viewpoint?
14    A. Well, I wanted to present data that I
15 believed in, and, yes, I mean, the whole point of the
16 article was to say, we think that there's some bias in
17 the way all this is going down, so to speak, and we
18 would like people to see another side of things,
19 absolutely.
20    Q. The -- I think you said a moment ago, the
21 time to rethink article was not meant to be a
22 scholarly article, correct?
23    MR. SNELL: Objection, misstates.
24    THE WITNESS: I think you said that. I
25 didn't say that.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 426

1  BY MR. SLATER:
2      Q.  When you wrote the time to rethink article,
3  you didn't write it in a -- well, rephrase.
4          The time to rethink article, was it peer
5  reviewed?
6      A.  Yes.
7      Q.  By who?
8      A.  By the editors of the International
9  Urogynecology Journal.
10     Q.  Did you have to make any changes to it?
11     A.  Yes.
12     Q.  What?
13     A.  If you provide me the article, I might be
14  able to recall some changes.  I know one of the things
15  I had to say was that the -- I think the very article
16  that we're referring to, it had not been -- it would
17  be much easier for me to give the answer to that
18  question if I could look at the article.
19     Q.  That's fine.  We'll come back to it.
20         MR. SNELL:  Okay.
21  BY MR. SLATER:
22     Q.  Show you an article marked as Exhibit 665
23  titled "Perioperative Morbidity Using Transvaginal
24  Mesh in Pelvic Organ Prolapse Repair" authored by
25  Daniel Altman, Christian Falconer in February 2007.

Page 427

1          Are you familiar with this article?
2      A.  Yes.
3      Q.  Is Dr. Altman somebody whose viewpoints you
4  respect?
5      A.  Yes.
6      Q.  If you could turn to Page 307 of this
7  article.  Actually, before you do that, let's just set
8  a couple of parameters.  This article studied short
9  term what they called perioperative complications,
10  meaning complications that were documented during the
11  procedure or during the hospital stay following the
12  procedure, correct?  It's on Page 304, top right
13  corner.
14     A.  Correct.
15     Q.  And this involved the use of the Prolift®
16  and just below it says 248 women, correct?
17     A.  Correct.
18     Q.  Now, let's turn to the Results, that's Page
19  306, first of all, the Discussion section.  The very
20  bottom of that first paragraph Discussion it says,
21  "The present study focuses on immediate morbidity
22  caused by the surgical technique rather than mid-to
23  long-term complications such as rejection, erosion and
24  infections typically ascribed to the biomaterials
25  themselves."

Page 428

1          So this article was focused only on, as they
2  said before, what they're calling mid -- what they're
3  calling immediate morbidity is what happened either at
4  the time of the procedure or what manifested in the
5  hospital, correct?
6      A.  Correct.
7      Q.  And if you go to the next page, they found
8  that what they termed minor complications -- rephrase.
9          On Page 307 Dr. Altman says, "Close to 15%
10  of our patients experienced what we characterized as
11  minor complications.  Although not life threatening,
12  such complications may have considerable impact on
13  quality of life and daily function.  Prospective
14  studies extending beyond the operative hospital stay
15  are therefore needed to clarify how minor
16  complications attributed to the surgical procedure,
17  such as groin pain, buttock pain, defecation
18  difficulties, urinary urgencies and bladder emptying
19  difficulties, progress over time."
20         First of all, do you agree that the types of
21  complications described, even if you term them minor
22  because they're not life-threatening, can have
23  considerable impact on the quality of life and daily
24  function for a woman?
25     A.  Yes.

Page 429

1      Q.  And do you agree that as of the time of this
2  article, February 2007, there was a need for
3  prospective studies and, in fact, even though it's not
4  stated here, prospective long-term studies to gather
5  information about how the types of complications
6  listed here could progress over time and impact on a
7  patient?
8      A.  There's always need for more study of any
9  procedure.
10     Q.  In the next column, top, fifth line down,
11  they say, "Finally, a surgical procedure may be
12  universally accepted when the magnitude of its
13  benefits outweighs the risks.  To decide whether
14  transvaginal mesh procedures are beneficial in
15  comparison with traditional suture techniques,
16  prospective comparative studies are necessary."
17         You agree with that statement, correct?
18         MR. SNELL:  Objection.  Which one?  I
19  thought you read a couple statements there.
20  BY MR. SLATER:
21     Q.  The second sentence, do you agree with that
22  statement?
23     A.  "To decide whether transvaginal mesh
24  procedures are beneficial in comparison with
25  traditional suture techniques, prospective comparative

Confidential - Subject to Stipulation and Order of Confidentiality

Page 430

1 studies are necessary."

2   Q. Do you agree that that was a true statement

3 when this article was written, February 2007?

4   A. Again, I will state that the more data you

5 have, the better it is.

6   Q. At the bottom of Page 307, you can read it

7 to yourself, it says "much of the current knowledge."

8     Do you see that?

9   A. I do.

10   Q. That paragraph basically talks about TVT®

11 and SUI slings.

12     Do you see that?

13   A. I do.

14   Q. And then it talks about the fact that "it

15 is, however, important to consider the different

16 anatomical conditions associated with pelvic organ

17 prolapse surgery."

18     Do you agree with that, that if you're going

19 to try to compare TVT® with --

20   A. Yes, they're not the same procedure.

21   Q. Okay. And they say, "Compared with

22 suburethral tapes, biomaterials used at pelvic organ

23 prolapse repair increase the biomaterial load

24 considerably because of the increased size of the

25 mesh."

Page 431

1     Would you agree with that statement?

2   A. Again, I'm not overly familiar with the term

3 biomaterial load, but if there is a biomaterial load

4 on a TVT® sling, I would definitely agree that the

5 biomaterial load on a Prolift® is going to be larger.

6   Q. The authors say, "This may increase the risk

7 for adverse tissue reactions and

8 biomaterial-associated complications."

9     Do you agree with that?

10   A. Certainly, if you have more biomaterial and

11 with one versus the other, the risk for

12 biomaterial-associated complications would reasonably

13 be expected to be higher.

14   Q. They go on to state, "Although the

15 polypropylene compound used for TVT® and transvaginal

16 mesh is identical, other characteristics, such as

17 elasticity and pore size, differ."

18     You agree with that statement, correct?

19   A. Yes.

20   Q. They then state, "One should, therefore, not

21 assume that the biomaterial properties are the same

22 for the two procedures, and results from incontinence

23 surgery may not be directly applicable to pelvic organ

24 prolapse surgery."

25     Do you agree with that?

Page 432

1   A. I agree with the fact that they said results

2 may not be directly applicable. It doesn't mean you

3 can't draw any conclusions from it.

4   Q. The authors conclude at the end of this

5 article, "Caution is advised until large-scale

6 long-term prospective safety studies describing

7 biocompatibility are available."

8     Do you think that they are correct that as

9 of February 2007 when they published this article, one

10 needed to exercise caution?

11   A. One always needs to exercise caution in

12 operating on patients.

13   Q. Well, especially here where there were no

14 large-scale long-term prospective safety studies as of

15 that time, was that an additional reason to be

16 cautious?

17   A. I wouldn't say it's additional. I mean,

18 there weren't lots of long-term studies on anterior

19 colporrhaphy when people were doing that with a lot of

20 regularity, but you still did it because you had to

21 treat patients the best way you thought possible.

22   Q. Anterior colporrhaphy was not developed by a

23 company, was it?

24   A. No, it was not.

25   Q. It was developed by surgeons who were

Page 433

1 working to develop methods to treat pelvic floor --

2   A. Correct.

3   Q. -- issues, correct?

4   A. Correct, sorry, yes.

5   Q. And that's just part of the advance of

6 surgical technique and surgical knowledge, and part of

7 that was the development of anterior and posterior

8 colporrhaphy, correct?

9   A. I guess so.

10   Q. That's very different than where you have a

11 company like Ethicon that is involved in developing a

12 system that is going to be packaged in a box and sold

13 for thousands of dollars for the profit of the

14 company; that's a different context than when surgeons

15 on their own develop a procedure and there's no

16 company standing behind it to make money every single

17 time the procedure is done, correct?

18   A. It's not different in my patient-doctor

19 relationship.

20   Q. Well, it's different in the fact that there

21 are -- it's a completely different context in terms of

22 how the procedure that may be performed on the patient

23 came about, right?

24     MR. SNELL: Objection, form.

25     THE WITNESS: I think that's -- there's

Confidential - Subject to Stipulation and Order of Confidentiality

Page 434

1 definitely some truth to that.

2 BY MR. SLATER:

3     Q. When a company like Ethicon is involved in

4 developing a procedure like the Prolift® and intends

5 to sell it for money --

6     A. Yes.

7     Q. -- the company has an independent obligation

8 to make sure that the company is cautious and is

9 careful and makes sure that there are enough studies

10 so the company can provide reliable information to

11 physicians and patients about that?

12     A. I'm agreeing with everything you said except

13 the "enough studies." I think that the duty of a

14 company that's going to produce a medical device,

15 their duty is to try to provide more benefit than harm

16 to the patients in whom this device is going to be

17 used.

18     Q. Does -- did Ethicon have an obligation to

19 make sure that it had adequate data to be able to

20 reliably provide warnings and information to

21 physicians and patients about the risks and benefits

22 of the Prolift® before they put it on the market?

23     MR. SNELL: Objection, form.

24     THE WITNESS: You'd have to repeat that

25 question.

Page 435

1     MR. SLATER: Could you read that back,

2 please.

3     (The court reporter read back the

4     record as requested.)

5     MR. SNELL: Same objection.

6     THE WITNESS: That's a lot of a

7 statement to agree to or disagree to.

8     I think that just what I said before,

9 that if you're producing a product, you want to be

10 reasonably sure that it is going to provide more

11 benefit than harm to the patients in which it is used.

12 BY MR. SLATER:

13     Q. When Ethicon was getting ready to market the

14 Prolift®, did it have to be reasonably sure that it

15 had enough data to be able to reliably provide

16 information about the benefits and risks of the

17 Prolift® to the surgeons and patients?

18     MR. SNELL: Objection, form. He just

19 told you three times.

20     MR. SLATER: It's a different question.

21     MR. SNELL: I think it's exactly the

22 same.

23     THE WITNESS: What's different about

24 it?

25     MR. SLATER: The answer was different

Page 436

1 and I clarified it. You could read it back again.

2     (The court reporter read back the

3     record as requested.)

4     MR. SNELL: Objection, form.

5     THE WITNESS: No.

6 BY MR. SLATER:

7     Q. Does a company like Ethicon that is

8 intending to market a medical device have an

9 obligation to study that medical device before

10 marketing it?

11     A. From whose viewpoint?

12     Q. From your viewpoint as an expert on behalf

13 of Ethicon.

14     A. Does it have to study the product? It has

15 to -- so here's the thing, medical devices are often

16 changed as time goes by, okay. What constitutes a big

17 enough change that you have to do a whole lot more

18 study, that's a very subjective question.

19     So, for instance, monofilament, large pore

20 polypropylene mesh have been used in human beings for

21 decades, okay, so that plays into the answer, okay,

22 where you're leaving polypropylene mesh in patients.

23 That's something that's been done for many, many

24 years.

25     Q. The Prolift® system involved leaving

Page 437

1 polypropylene mesh inside a woman's body but in a

2 shape that hadn't been used, with instruments that

3 hadn't been used and with a procedure that was a new

4 procedure, correct?

5     A. The shape --

6     MR. SNELL: Object to form. Go ahead.

7     THE WITNESS: The shape was extremely

8 similar to that in the TVM studies. The way it was

9 placed was very similar to how it had been done in the

10 TVM studies, and I forget the other point.

11 BY MR. SLATER:

12     Q. The instruments.

13     A. The instruments were very similar.

14     Q. Did you ever compare the instruments from

15 the TVM study to the Prolift®?

16     A. Yes.

17     Q. Do you know what instruments were used by

18 the French doctors in the TVM study?

19     A. I was not in France, no.

20     Q. Did you see the instruments that were used

21 by Dr. Lucente?

22     A. Yes.

23     Q. Did you see the instruments used by

24 Dr. Miller or Robinson?

25     A. No.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 438

1     Q.  Do you know whether there were any
2 differences between the instruments used at the
3 various centers?
4     A.  I do not.
5     Q.  Do you know if there were variations to any
6 extent between the procedures that were being
7 performed at the various centers in the TVM study?
8     A.  Do you mean concomitant procedures?
9     Q.  No, the procedure, the TVM procedure that
10 was being used, were there any variations between
11 let's start with the French procedure in the US, were
12 there any differences?
13     A.  Not to my knowledge.
14     Q.  Did you ever look at that issue to see if
15 there were any even minor differences between what the
16 surgeons were doing either between the French and US
17 groups or even from center to center?
18     A.  I don't know how I could have looked at
19 that, apart from what I read in the articles on TVM.
20     Q.  Have there been any patients, to your
21 knowledge, who you place Prolifts® in who then left
22 your care to go to other doctors to treat their
23 complications?
24     A.  I can very specifically think of a couple of
25 cases of sling patients that did that.  If there are

Page 439

1 patients who had Prolift® who did that, I would not be
2 surprised at all if there were, but I can't recall any
3 right now.
4     Q.  Let me give you an article marked as Exhibit
5 760 titled "Complications from vaginally placed mesh
6 in pelvic reconstructive surgery" published in 2009 by
7 several physicians from the Mayo Clinic.
8     Did you ever see this article before?
9     A.  I probably saw it in passing.  It's a
10 journal that I look at every month it comes out.
11     Q.  Do you have any recollection of ever reading
12 this article?
13     A.  I don't recall reading it from front to
14 back.  I wouldn't be surprised if I read the abstract.
15     Q.  Turn, if you could, to Page 529.
16     A.  I think I'm -- oh, sorry.  Yes, I'm there.
17     Q.  Do you see the bottom right corner, there
18 are two diagrams of a woman's vagina and some mesh
19 being removed and then the actual mesh on the gauze?
20     A.  I think they're photographs, not diagrams,
21 but yes.
22     Q.  I meant to say photographs.  Thank you.
23     A.  Yes, I see it.
24     Q.  Tell me if I'm correct, you've never been
25 involved in performing a procedure similar to this

Page 440

1 where mesh in this type of a quantity had to be
2 removed in this fashion from a Prolift® patient?
3     A.  I've never done a surgery where I removed
4 that much material, correct.
5     Q.  Have you ever treated a patient who had that
6 or a similar amount of mesh removed?
7     A.  I don't know.  I don't recall.
8     Q.  Just above that, those two pictures, there's
9 a sentence that starts just three lines up, "it is
10 important."  Do you see that?
11     A.  Yes.
12     Q.  "It is important to remember that a
13 percentage of patients who undergo pelvic
14 reconstructive surgery with vaginally placed mesh will
15 have life-changing complications.  Moreover, whereas
16 minor complications such as small vaginal mesh
17 erosions are simple and easy to manage, incapacitating
18 pelvic pain, dyspareunia and large-scale erosions can
19 be exceedingly complex and not easily resolved."
20     Is that a true statement with regard to the
21 Prolift®?
22     MR. SNELL:  Objection, form, which one
23 of the couple sentences.
24 BY MR. SLATER:
25     Q.  That entire paragraph, does that paragraph

Page 441

1 apply to the Prolift®?
2     MR. SNELL:  Objection, form.
3     THE WITNESS:  I'm just rereading it.
4 Again, it's not my experience that that is something
5 that happens to people with Prolift®.
6 BY MR. SLATER:
7     Q.  Are you denying that it happens with the
8 Prolift®?
9     A.  I'm not denying that it happens with
10 Prolift®.  I'm not disputing what these physicians are
11 saying, just saying that that's not something that I'm
12 familiar with.
13     Q.  You don't have experience with patients with
14 that level of complications with the Prolift®,
15 correct?
16     A.  That's --
17     Q.  You have not treated patients who have had
18 this level of complications as is described here,
19 correct, Prolift® patients?
20     A.  Well, I've had patients who have had other
21 transvaginal mesh procedures that had
22 complications.  I mean, I don't know what a
23 life-changing complication is.  Life changing can mean
24 a lot of different things.  And it can be a complex
25 thing to treat, and it is not always easily resolved.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 442

1  So I agree with that in regards to transvaginal mesh
2  procedures, and I do have experience in treating
3  patients like that.
4      Q.  Just to be very clear and clean, with regard
5  to this portion of the article on Page 529 to 530 that
6  starts out, "It is important to remember that a
7  percentage of patients who undergo pelvic
8  reconstructive surgery with vaginally placed mesh will
9  have life-changing complications.  Moreover, whereas
10  minor complications such as small vaginal mesh
11  erosions are simple and easy to manage, incapacitating
12  pelvic pain, dyspareunia and large-scale erosions can
13  be exceedingly complex and not easily resolved."
14      To be very clear, with regard to the
15  Prolift®, is what I just read applicable?
16          MR. SNELL:  Objection, form.
17          THE WITNESS:  Okay.  Can we go sentence
18  by sentence because you're asking me to agree or not
19  agree to multiple sentences; is that fair enough?
20  BY MR. SLATER:
21      Q.  Sure.
22      A.  So "it is important to remember that a
23  percentage of patients who undergo pelvic
24  reconstructive surgery with vaginally placed mesh will
25  have life-changing complications."

Page 443

1      Q.  Is that a true statement with regard to the
2  Prolift®?
3      A.  I agree that that is a true statement with
4  Prolift®.
5      Q.  Next sentence.  You wanted to go sentence by
6  sentence.
7      A.  I know.
8      Q.  You can read the next sentence.
9      A.  Moreover, whereas minor complications such
10  as a small vaginal mesh erosion are simple and easy to
11  manage, incapacitating pelvic pain, dyspareunia and
12  large-scale erosions can be exceedingly complex and
13  not easily resolved.
14      Q.  Is that true of some women who have the
15  Prolift®?
16      A.  There are multiple parts to that.  I think
17  that certainly there are people that have a Prolift®
18  procedure and they may have pelvic pain.  May it be
19  incapacitating, I don't know.  I have not seen that.
20  They're reporting it on people with transvaginal mesh.
21  I don't know if they're specifically referring to
22  Prolift®.
23      Q.  I'm asking you, though, is that statement
24  true for the Prolift®?
25      A.  It may be, it may not be.

Page 444

1      Q.  You don't know?
2      A.  I have not seen that.
3      Q.  Well, I'm not asking whether you've seen it
4  or not.  You certainly have information available
5  besides what you've seen, so do you have an opinion
6  one way or the other as to whether that's true for the
7  Prolift®?
8      A.  Here's the problem, you can have
9  incapacitating pain from a surgery, so if you have a
10  prolapse, if you have a Prolift® procedure done and
11  you have incapacitating pelvic pain after that, is it
12  specifically because of the Prolift® or is it because
13  you had surgery on your pelvis?  That's where it's
14  hard to differentiate the two.
15      Q.  Well, if a woman only had a Prolift®
16  procedure and didn't have anything else, then the
17  surgery in her pelvis was the Prolift® procedure,
18  correct?
19      A.  Correct.
20      Q.  Do you have an opinion as to whether that
21  sentence is true for some women who have Prolift®
22  complications?
23      A.  It could be.  It can be for any surgery,
24  yes.
25      Q.  Well is it true for the Prolift®?

Page 445

1      A.  It's theoretically possible, yes.
2      Q.  Do you know whether the people in medical
3  affairs believe that this section of this article that
4  I just read to you is true for women, some women who
5  have Prolifts®?
6      A.  The medical affairs department of Ethicon?
7      Q.  Ethicon.
8      A.  I don't know.
9      Q.  Do you know whether the people at Ethicon
10  knew at the day the Prolift® was launched that there
11  were some women who were going to end up having
12  complications like what is described here from the
13  Prolift®?
14      A.  I do not know.
15      Q.  If Ethicon knew that at the day of launch,
16  they needed to warn physicians and patients about
17  that, correct?
18          MR. SNELL:  Objection, form.
19  BY MR. SLATER:
20      Q.  If they knew complications this severe were
21  going to occur?
22      A.  I'm not trying to be difficult, but I've
23  answered this question about five different times, and
24  it has to do with the fact that you can have surgery
25  and it involves the Prolift® procedure, okay, but to

Page 446

1  say that the Prolift® was uniquely responsible for
2  that complication is hard to say.
3          MR. SLATER: Move to strike.
4  BY MR. SLATER:
5      Q.  Here's my question: If medical affairs knew
6  that some women who would get the Prolift® put in
7  their body would have complications as severe as what
8  is described in what we just read from Page 529 to
9  Page 530 of this article, you would agree with me that
10  Ethicon, if they knew that on the day of launch, that
11  this is the kind of information that they needed to
12  warn about in the IFU and warn patients about in the
13  patient brochure, correct?
14     A.  I think that they did.
15         MR. SNELL: Objection, form. Go ahead.
16         THE WITNESS: I think that they did
17  warn people of that in the IFU.
18  BY MR. SLATER:
19     Q.  You think that what I just read there that
20  that is warned of in the IFU?
21     A.  I think that they warn of the things that
22  can lead to that complication.
23     Q.  Do you think that IFU for the Prolift®, and
24  we're talking about the first IFU, obviously, you
25  understood that, right?

Page 447

1      A.  Yes.
2      Q.  Warns physicians that patients who get the
3  Prolift® put in their body can end up with
4  incapacitating pelvic pain?
5      A.  I think it states that it can lead to -- I'd
6  have to read it again, but I think it says scarring,
7  damage to surrounding organs, all of those things can
8  lead to pelvic pain.
9      Q.  They don't necessarily lead to
10  incapacitating pelvic pain, do they?
11     A.  They do not necessarily lead to it.
12     Q.  Does the IFU specifically warn of the risk
13  of dyspareunia?
14     A.  Does it use the term dyspareunia? I do not
15  believe that it does.
16     Q.  Does the IFU warn that large-scale erosions
17  from the Prolift® can be exceedingly complex and not
18  easily resolved?
19     A.  Those words are not in the IFU.
20     Q.  There is no description whatsoever in the
21  IFU of the complexity of some of the erosions that can
22  occur and the fact that even with intensive treatment,
23  they may not be able to be resolved, that is not
24  warned about with regard to the Prolift® in the IFU,
25  correct?

Page 448

1      A.  I am happy to look at the IFU and state
2  exactly what it says. I think it mentions erosions.
3      Q.  It mentions erosion. Does it point out to
4  surgeons in the IFU that large-scale erosions from the
5  Prolift® can be exceedingly complex and not easily
6  resolved with treatment?
7      A.  It certainly does not say those words, as
8  you and I know.
9      Q.  The information found on Page 529 and 530
10  here with regard to these very serious complications,
11  does the patient brochure for the Prolift® provide
12  that type of information to patients?
13     A.  I'd have to review it.
14     Q.  I almost gave you someone else's notes that
15  I don't know what they say.
16         THE WITNESS: You might want to try
17  opening that door again.
18         MR. SNELL: Yeah, that's a good idea.
19         MR. SLATER: I got a pair of shorts in
20  my car, if you want.
21         THE WITNESS: I do too.
22  BY MR. SLATER:
23     Q.  Have you looked at the patient brochure to
24  try to answer that question?
25     A.  I'm sorry. I didn't realize that's what you

Page 449

1  were asking me to do. I thought you were checking
2  your e-mail. Okay.
3          So the question is?
4      Q.  Does the patient brochure warn patients, and
5  the patient brochure I gave you is marked Exhibit 935,
6  correct?
7      A.  Correct.
8      Q.  And that's the first patient brochure that
9  was used beginning in 2005 for the Prolift®. Does it
10  warn patients with regard to the very serious
11  complications described as we've been reading from the
12  bottom of Page 529 over to the top of Page 530 of the
13  article by Blandon, B-l-a-n-d-o-n, et. al.?
14     A.  I can state exactly what it states.
15     Q.  Rather than you reading it to me, I'm asking
16  you are the very severe types of complications
17  described in this article warned about in this patient
18  brochure?
19     A.  I mean, did they use the exact same words
20  that they did in the article? I mean, it would be
21  quite a coincidence if they did, so let me -- can I
22  answer your question?
23     Q.  I'm obviously not asking if they used the
24  exact words, but do they warn of those types of
25  complications?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 450

1  A.  Yes.

2  Q.  Show me where.

3  A.  Okay.  They say, although rare,

4  complications include injury to blood vessels of the

5  pelvis.  If you injure a blood vessel of the pelvis,

6  that could lead to you bleeding out and dying.  That

7  is a life-changing complication.  If you injure a

8  nerve, I think that could lead to pelvic pain.

9      If you have difficulty urinating, if you

10  have bladder or bowel injury, I think that could be a

11  life-changing or life-altering -- no, life changing is

12  the term that they use -- complication.  So that's why

13  I said yes to your question.

14  Q.  So you're basically saying that based on

15  that language, you would assume that patients would

16  figure out that when they read that language, that is

17  communicating to them that the complications they can

18  suffer from the Prolift® can be life changing and that

19  those complications can result in incapacitating

20  pelvic pain, dyspareunia and large-scale erosions that

21  can be exceedingly complex and not easily resolved?

22  A.  I don't think that a patient brochure is --

23  the point of it is to explain every potential possible

24  thing that can happen to a patient.  I think what the

25  point of a patient brochure is is to facilitate a

Page 451

1  discussion between the patient and her surgeon

2  regarding the surgery that that surgeon is about to

3  perform upon the patient, and, yes, I think that is

4  adequate.

5  Q.  When you say that that is adequate, that, as

6  I think we described earlier or discussed earlier,

7  that is your personal viewpoint, not based on any

8  standards that Ethicon was utilizing or any other

9  standards you can point to for what needs to be

10  communicated in a patient brochure, correct?

11  A.  I'm not holding myself out as a expert on

12  regulatory issues within Gynecare, correct.

13  Q.  Are you holding yourself out as an expert

14  with regard to what needs to be communicated in the

15  patient brochure?

16  A.  Yes.

17  Q.  What standards, other than your own personal

18  viewpoint, what source of information are you relying

19  on besides that?

20  A.  My standards as a caring, compassionate

21  physician.

22  Q.  But it's your own personal standard,

23  correct?

24  A.  And I think that's shared by the vast

25  majority of doctors out there.

Page 452

1  Q.  But you've never studied that question, and

2  you can't point to anything to confirm that, correct?

3  A.  I have no publications on that.

4  Q.  Let's take a step back.  Here in the patient

5  brochure, Page 13, there's a heading that says "What

6  are the risks?"  And it says that the complications

7  from the Prolift® procedure are rare.

8      Do you see that?

9  A.  No, I don't see that it says that.  It says,

10  "although rare, complications associated with the

11  procedure include" those things, so it's saying that

12  not every complication is going to be common to the

13  procedure.

14  Q.  Let's go to the prior page, if you could,

15  and we're going to read a few things together.

16      At the top of Page 10 of the patient

17  brochure, it says, What is Gynecare Prolift®, and it

18  describes that and says, "A new and revolutionary

19  minimally invasive surgical procedure using Gynecare

20  Prolift®," and it goes on, right?

21  A.  Correct.

22  Q.  Then if we go to the next page, when it

23  says, "What are the risks?"  It says, "All surgical

24  procedures present some risks.  Although rare,

25  complications associated with the procedure," and

Page 453

1  that's referring back, that's the Prolift® procedure

2  we're talking about, correct?

3  A.  Yes.

4  Q.  So Ethicon represented that complications

5  associated with the Prolift® procedure are rare,

6  correct?  That's what it says here, correct?

7      MR. SNELL:  Objection, form.

8      THE WITNESS:  I think it's stating that

9  the particular complications that they then list are

10  rare.  It's not saying that all risks -- that all

11  risk, all potential complications in summary are rare.

12  BY MR. SLATER:

13  Q.  You would agree with me that the

14  complications that are associated with the Prolift®

15  are not rare?  You'd agree with that statement,

16  correct, the overall --

17  A.  You would have to --

18  Q.  The overall rate of complications with the

19  Prolift® are not rare, correct?

20  A.  It all depends on how you define "rare."

21  Q.  Well, let me ask you this question:  Do you

22  know how Ethicon expected patients to define rare when

23  they read this patient brochure?

24  A.  No.

25  Q.  Do you have any idea what the definition of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 454

1 rare is in this patient brochure?

2    A. No.

3    Q. Would you agree with me that it's likely

4 that different patients would define rare differently

5 as they would read this brochure?

6    A. Sure.

7    Q. And would you agree with me that some

8 patients would probably read this brochure and believe

9 that it's telling them that the complications

10 associated with the Prolift® procedure are rare in

11 general?

12    A. Again, to answer the same way, the same

13 question I think, I think it's referring to, well, the

14 risk of injury to blood vessels of the pelvis, that's

15 rare. The risk of nerve damage, that's rare.

16 Difficulty urinating, that's rare. It's not saying

17 that in totality any risk from surgery is rare. It's

18 saying -- it's referring specifically to those

19 complications that it then lists.

20    Q. Would it be a reasonable reading of this for

21 a patient who is not a urogynecologist with your

22 experience to read it and say, okay, what are the

23 risks? All surgical procedures present some risks.

24 So, okay, the patient has been told every procedure

25 has some risks; patient could understand that, right?

Page 455

1    A. Correct.

2    Q. And then a patient could read this and say,

3 okay, although rare, complications associated with the

4 procedure include, and at that point couldn't some

5 patients reasonably read this and say, this is telling

6 me that although these only occur rarely, the

7 complications associated with the procedure include,

8 and then I'm going to get a list of what they are;

9 that's a reasonable reading, right?

10    A. I think that's reasonable.

11    Q. And then there's a list here of these

12 complications that are defined as rare that include

13 injury to blood vessels of the pelvis, nerve damage,

14 difficulty urinating, bladder and bowel injury, right?

15    A. I think that would scare a lot of people if

16 they read all that.

17    Q. I didn't ask you that, so I move to strike.

18    A. Okay.

19    Q. It would be a reasonable reading for a

20 patient to read this section under what are the risks

21 and believe that she's being told the complications

22 with the Prolift® procedure only occur rarely, except

23 in the next sentence, there is a small risk of the

24 mesh material becoming exposed into the vaginal canal?

25      MR. SNELL: Objection, form.

Page 456

1 BY MR. SLATER:

2    Q. So other than exposure of mesh, which is a

3 small risk, the rest of the complications occur

4 rarely; patients could read this that way, correct?

5      MR. SNELL: Objection.

6      THE WITNESS: Yes, I think they could.

7 BY MR. SLATER:

8    Q. You would agree with me that the overall

9 complications with the Prolift® procedure are not

10 rare?

11    A. Again, I have to get back into comparison to

12 other surgeries, so if you're saying it's rare, you

13 have to have some standard for what's rare, okay. So

14 we're saying all surgical procedures have risk. So if

15 you're saying, okay, we're talking about a surgical

16 procedure, so if you want to differentiate it from

17 other surgical procedures, you're saying that it's so

18 different than anterior colporrhaphy, so then you

19 would want to compare it, and as far as I know, the

20 studies, comparative studies, transvaginal mesh

21 procedures and native tissue repairs show that

22 complication rates are comparable.

23      MR. SLATER: Move to strike.

24 BY MR. SLATER:

25    Q. Is there any way for you and I to be able to

Page 457

1 agree or disagree as to whether or not the

2 complications of the Prolift® procedure are rare as

3 that term is used here in the brochure, understanding

4 the fact that it's not a defined term? I mean,

5 basically, what I'm saying is --

6      MR. SNELL: Objection.

7 BY MR. SLATER:

8    Q. -- because it's not a defined term, it's

9 something that we -- you can't know whether or not

10 it's true or not because you don't know what rare

11 means?

12      MR. SNELL: Objection.

13 BY MR. SLATER:

14    Q. Let me rephrase.

15      Because we don't know what rare means as

16 used here, we can both agree to that, right? We don't

17 have a definition of rare, right?

18    A. Correct.

19    Q. It would probably be impossible for us to be

20 able to definitively say whether or not the

21 complications are rare or not because we don't know

22 what rare means?

23    A. Unless they --

24      MR. SNELL: Objection, form. Go ahead.

25      THE WITNESS: Unless they listed the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 458

1 exact percentage in all the Prolifts® that have been
2 done in the world in totality, yes, it would be
3 impossible to say exactly what rare meant in relation
4 to each of those complications.
5 BY MR. SLATER:
6     Q.  If a patient were to read this and say,
7 complications are rare and were to read rare to mean
8 it's something that basically almost never happens,
9 it's such a small amount of time that I don't even
10 have to worry about it, if a patient read it that way
11 because a patient defines rare to mean something that
12 you might see once in your life, that's what rare
13 means to this patient, that wouldn't surprise you if
14 some patients think that, right?
15     A.  I would hope that that person, that patient
16 would also have a discussion about the risks of the
17 surgery with their physician, but, yes, absolutely, if
18 they read this, they might think that rare means rare.
19     Q.  In the second sentence here under what are
20 the risks where it says, "There is a small risk of the
21 mesh material becoming exposed into the vaginal
22 canal," if there were people within Ethicon that
23 thought that exposure was common and that was the word
24 they actually used internally, then they shouldn't
25 have called it a small risk, correct?

Page 459

1     A.  I think that when regarding risks, the term
2 small and common would be different.
3     Q.  So you would agree with me if people within
4 Ethicon thought exposure was common, they shouldn't
5 have used the word small here, right?
6         MR. SNELL:  Objection, form.  Would you
7 read that back.  I missed small.
8         (The court reporter read back the
9         record as requested.)
10         THE WITNESS:  That would assume that
11 everybody within Ethicon had that same opinion.
12 BY MR. SLATER:
13     Q.  If people within medical affairs believed
14 that the risk of exposure into the vagina was common,
15 then they should have made sure it didn't say a small
16 risk here, right?
17         MR. SNELL:  Object to form.  Go ahead.
18         THE WITNESS:  If the consensus of the
19 people who put this brochure together was that it was
20 a common occurrence, I think that small is not the
21 best term to use.  I think common would be the best
22 term to use, if that's the term that they agreed on.
23 BY MR. SLATER:
24     Q.  Are you able to tell me what the people
25 within medical affairs believed the reference to rare

Page 460

1 complications and small risk to actually be referring
2 to or what they actually thought it meant?
3     A.  I do not have any insight into what they
4 knew.
5         MR. SLATER:  Change the tape.
6         THE VIDEOGRAPHER:  Going off the
7 record.  The time is 8:38 p.m.
8         (Brief recess.)
9         THE VIDEOGRAPHER:  We're back on the
10 record.  Here marks the beginning of Volume 1 in Tape
11 8, the deposition of Dr. Miles Murphy.  The time is
12 8:53 p.m.
13 BY MR. SLATER:
14     Q.  Let's look at the patient brochure, Page 10,
15 under where it says "What is Gynecare Prolift®?"
16         It describes the Prolift® as a new and
17 revolutionary minimally invasive surgical procedure.
18         You see that?
19     A.  I do.
20     Q.  Do you agree that the Prolift® procedure is
21 minimally invasive?
22     A.  I do.
23     Q.  The vaginal incisions again with the total
24 Prolift®, the six trocar incisions placed through the
25 skin into the pelvis and then all of the dissections

Page 461

1 inside of the body, you consider that to be minimally
2 invasive?
3     A.  I have a definition of minimally invasive
4 that I'd be happy to give to you, if you like.
5     Q.  Sure.
6     A.  I consider minimally invasive surgery
7 something that is -- in my field as something that is
8 done through a transvaginal route or something that is
9 done through a laparoscopic or robotic route.
10         Open laparotomy is a non-minimally invasive
11 way to operate.
12     Q.  There's a reference to the Prolift®
13 employing a specially designed supportive soft mesh.
14         Do you see that?
15     A.  I do.
16     Q.  Do you know what the basis was for Ethicon
17 to make that claim in the patient brochure?
18     A.  Again, I'm not an employee of Ethicon.
19 My --
20     Q.  Do you know what their basis was within
21 Ethicon, why they thought that was a legitimate
22 statement to make?
23     A.  I can't testify as to what they thought.  I
24 have not read any documents.
25     Q.  Are you aware of the fact that the mesh used

Confidential - Subject to Stipulation and Order of Confidentiality

Page 462

1  in the Prolift®, if you trace it back, was actually
2  Prolene® Soft mesh that was developed for use to treat
3  hernias originally?
4     A.  I'm aware that it was Gynemesh® PS, which
5  had an FDA approval for use in the pelvic floor.  I've
6  heard something about that it had previous uses, but I
7  don't know for sure.
8     Q.  You don't know, as you sit here now, what
9  the -- where the Gynemesh® PS mesh came from in terms
10  of what its use was before that, that mesh material?
11     A.  I'm pretty sure that it was an existing
12  hernia mesh, but I don't know for sure.
13     Q.  Is it based on basically what I just told
14  you?
15     A.  No.  I think that's something I've heard
16  before.  I can elaborate a little bit more.
17        When I was a fellow, towards the end of my
18  fellowship, we switched using meshes, and I think what
19  we switched to was ultimately what makes the mesh in
20  Prolift®.
21     Q.  Is there anywhere in this patient brochure
22  where a patient is advised that one of the potential
23  risks of the Prolift® procedure is that the woman
24  could end up with dyspareunia?  Is that spelled out,
25  and whether it's called dyspareunia or painful sexual

Page 463

1  relations or sexual intercourse?
2     A.  So I'll go back to the risks and the terms.
3  Sexual intercourse and dyspareunia are not words that
4  I see here.
5        Let me look on the back under warnings and
6  precautions.  I do not see those words.
7     Q.  If you look at Page 10, there is a section
8  that says "How is Gynecare Prolift® different from
9  other surgical alternatives?"
10        Do you see that section?
11     A.  I do.
12     Q.  The middle paragraph under that says, "It
13  allows for the restoration of sexual function by
14  restoring normal vaginal anatomy."
15        Do you see that?
16     A.  I do.
17     Q.  Therefore, what Ethicon is telling patients
18  is the Prolift® will restore your sexual function by
19  restoring your normal vaginal anatomy, if there are
20  any issues with that, that's a positive piece of
21  information to the patient, correct?
22     A.  Yes.
23     Q.  Nowhere in the brochure is there any -- is
24  the flip side explained, that one of the outcomes of
25  the Prolift® could be not restoration of sexual

Page 464

1  function or improvement but actually could be sexual
2  function could get worse and the patient could end up
3  with painful sexual intercourse; that's not
4  communicated, correct?
5     A.  I think I just answered that question, yes,
6  that's correct.
7     Q.  From your perspective, is dyspareunia an
8  important risk with regard to the Prolift®?
9     A.  Yes.
10     Q.  Ultimately, where would you place it in the
11  hierarchy of your personal concern for patients with
12  Prolifts® in terms of the risks that you would fear
13  the most or would least want to see with a patient?
14     A.  I haven't considered a hierarchy of all the
15  potential risks, so I know it's a significant risk
16  that I would be concerned about.
17     Q.  In some women who have Prolift® placed in
18  their body and then develop dyspareunia as a result,
19  the dyspareunia cannot be successfully treated, and it
20  turns out to be a permanent condition that happens to
21  some women, correct?
22        MR. SNELL:  Objection, form.
23        THE WITNESS:  As with all surgical
24  procedures in the vagina, that is a risk with
25  Prolift®.

Page 465

1        MR. SLATER:  Move to strike.
2  BY MR. SLATER:
3     Q.  Let's look on Page 10 under the heading "How
4  does Gynecare Prolift® work?"  Just read that to
5  yourself and tell me if anywhere in there the patient
6  is told that part of what is going to happen is that
7  there's going to be an inflammatory response, there's
8  going to be a development of scar tissue and that is
9  part of the process of incorporating the Prolift® into
10  the woman's body?
11     A.  It states that the body tissues quickly grow
12  into the pores of the mesh.  Apart from that, it
13  doesn't say the things that you said.
14     Q.  The last sentence under "How does Gynecare
15  Prolift® work" on Page 10 of the patient brochure
16  says, "Despite which of the defects you are
17  experiencing, repair with Gynecare Prolift® will
18  correct these defects and restore normal support."
19        Do you see that?
20     A.  I do.
21     Q.  That sentence oversells to a patient
22  unrealistic expectations, correct?
23        MR. SNELL:  Objection, form.
24        THE WITNESS:  I think what it's
25  implying is that whether you have an anterior defect,

Confidential - Subject to Stipulation and Order of Confidentiality

Page 466

1 a posterior defect or an apical defect, it can repair

2 those different compartments.

3 BY MR. SLATER:

4     Q.  The word you used is can, meaning it might

5 happen, but it doesn't always happen, right?

6     A.  Well, meaning that that particular part of

7 their prolapse can be addressed with this system.

8     Q.  Well, this sentence tells a patient --

9 rephrase.

10     The last sentence under "How does Gynecare

11 Prolift® work" tells a patient, "Despite which of the

12 defects you are experiencing, repair with Gynecare

13 Prolift® will correct these defects and restore normal

14 support."

15     That's what it says, right?

16     A.  That's what it says.

17     Q.  It's telling the patient if you have a

18 Prolift® used, your defects will be corrected and your

19 normal support will be restored.  It's saying that

20 definitively that that is what will happen, correct?

21     That's what the words say on the page,

22 right?

23     A.  And it's part of a sentence, and the first

24 part of the sentence is despite which of the defects

25 you are experiencing.

Page 467

1     Q.  Right.

2     A.  Right.  So, again, it's referring to -- it's

3 not -- it's a system that is not just limited to

4 fixing anterior compartment defects.  It's not a

5 system that's just limited, so, guess what, doc, I

6 came in, I have a cystocele, this product, it only fix

7 rectocele.  So if that was the situation, Gynecare

8 Prolift® couldn't fix it.  It's telling the patient it

9 doesn't matter whether you have an anterior defect, a

10 posterior defect or an apical defect, this system can

11 treat that.

12     Q.  Well, what you're saying is that you think

13 this means regardless of whether you have a posterior,

14 anterior or apex defect, this system can be used to

15 treat you?

16     A.  That's how I'm reading it because of that

17 statement, despite which of the defects you are

18 experiencing, which is part of the sentence.

19     Q.  Well, let's look at the second half of the

20 sentence.

21     A.  Okay.

22     Q.  It says that the Gynecare Prolift® will

23 correct these defects and restore normal support.  The

24 use of the word will, if a patient reads that and

25 believes it, that's an unrealistic expectation, isn't

Page 468

1 it, because you can't say that to a patient, this will

2 correct your defects and restore your normal support?

3 You can just say that's the intention to expect to

4 happen, it might, it could, it can, but you can't be

5 sure, right?

6     A.  I think that's what this is implying, but,

7 again, I'm going to say the same thing over and over

8 again, because it's a reference to despite which type

9 of defect you have.

10     Q.  Let's take a step back because -- let's take

11 a step back.

12     The last sentence under "How does Gynecare

13 Prolift® work" starts out to tell a patient, despite

14 which of the defects you are experiencing, that's the

15 first part, right?

16     A.  Yes.

17     Q.  That's communicating to the patient this can

18 be used with poster, anterior or apex defects,

19 correct?

20     A.  Correct.

21     Q.  We can agree that's what that part of

22 the sentence means, right?

23     A.  Yes.

24     Q.  Now, let's go to the next part of the

25 sentence.  The next part of the sentence tells you,

Page 469

1 repair with Gynecare Prolift® will correct these

2 defects and restore normal support.

3     I want to ask you about the use of the word

4 will, okay?

5     A.  Okay.

6     Q.  You would not tell a patient that the

7 Prolift® will correct their defects and restore their

8 normal support, right?

9     A.  I would --

10     MR. SNELL:  Objection, form.  Go ahead.

11     THE WITNESS:  I would say that.  I

12 wouldn't say that there's zero chance that she could

13 have a recurrence after it restores that anatomy.

14 BY MR. SLATER:

15     Q.  If a patient were to read that, a patient

16 could realistically read this to mean, they're telling

17 me this is going to work, right?

18     A.  I think that's reasonable that they might

19 suspect that.

20     Q.  Ethicon certainly knew that the Prolift®

21 would not correct the defects and restore normal

22 support for all women.  For some women it would fail

23 to do so, correct?

24     A.  I disagree with that statement.

25     Q.  Are you telling me the Prolift® works in

Page 470

1 100% of the women in correcting their defects and
2 restoring normal support?
3     A.  I'm saying when it's placed, it does.  Is
4 there a chance for recurrence later on?  Absolutely.
5     Q.  So in order to make this sentence
6 perfectly -- rephrase.
7     So to make this sentence accurate, you would
8 need to add something to the effect of, however, the
9 defects can recur in the future, the support could
10 fail in the future, you could end up with a
11 recurrence?
12     A.  If that was your intent in writing that
13 sentence.
14     Q.  Well, to make it truthful and accurate in
15 providing information to a patient who is not a
16 doctor, you would need to say that to make this
17 accurate, correct?
18     A.  Again --
19         MR. SNELL:  Object to form.  Go ahead.
20         THE WITNESS:  I'm going to give you the
21 same answer I've given you three times before.
22     If the intent of this sentence as you
23 were writing it as a member of Ethicon was to let
24 women know that your defects can be treated whether
25 anterior, posterior and apical, Prolift® can do that.

Page 471

1 I mean, I'll say that till I'm blue in the face.
2 BY MR. SLATER:
3     Q.  And you said can do it, right?
4     A.  Yes.
5     Q.  You didn't say will do it?
6     A.  I said that is the intent, in my opinion, of
7 this sentence.
8     Q.  So your testimony to this jury is it would
9 be reasonable to expect a patient to read the word
10 will and to in their own mind say, well, they just
11 mean can; is that what you're telling this jury?
12     A.  I'm not saying that.  You said that.
13     Q.  Well, I'm asking you, is that what you're
14 saying?
15     A.  No.
16     Q.  It's misleading to say that the Prolift®
17 will correct the defects and restore normal support
18 because we both know, and you would agree as an expert
19 in this case, for some women, the defects are going to
20 recur and the support is going to fail, correct?
21         MR. SNELL:  Object to form.  Go ahead.
22         THE WITNESS:  That is correct, but I
23 don't agree with your initial premise in that
24 sentence.
25 BY MR. SLATER:

Page 472

1     Q.  One of the things Ethicon had to be very
2 sure of in this patient brochure was they didn't say
3 anything misleading to patients, right?
4     A.  I think that a point of a patient brochure
5 is to give the patient information, not to mislead
6 them.
7     Q.  Look at Page 13 the section that says "Is
8 Gynecare Prolift® right for me?"
9     Do you see that?
10     A.  Yes.
11     Q.  It states, in part, that the Prolift® is
12 appropriate for almost all patients, including
13 overweight patients, elderly patients and even those
14 who have undergone previous operations for pelvic
15 organ prolapse or stress incontinence.
16     Do you see that?
17     A.  I do.
18     Q.  Do you agree with that statement?
19     A.  Yes.
20     Q.  There are certain patient groups that are
21 contraindicated per what's stated below, shouldn't be
22 performed on pregnant women, infants or children or
23 women who plan a future pregnancy, right?
24     A.  They don't use the term contraindication,
25 but it does state that.

Page 473

1     Q.  Are there any other types of women that
2 should not have the Prolift® other than the little
3 list right there?
4     A.  That should not have it?
5     Q.  Yes.
6     A.  No.  Well, someone who doesn't have prolapse
7 shouldn't have it.
8     Q.  Should women -- should a woman who has a
9 chronic pain condition have it, have a Prolift® put in
10 her body?
11     A.  If she wants to have the surgery to correct
12 her prolapse, that's certainly an option.
13     Q.  Should a woman with a chronic pain condition
14 be told that if she has the Prolift® put in her body
15 that she has an increased risk of suffering from pain
16 afterwards?
17     A.  Increased compared to what?
18     Q.  Increased compared to women that doesn't
19 have a chronic pain condition.
20     A.  I think that that's a reasonable thing that
21 someone should know, knowing what we've said up till
22 this point.
23     Q.  You think that would be reasonable to say,
24 correct?
25     A.  Okay.  I think that that would be a

Confidential - Subject to Stipulation and Order of Confidentiality

Page 474

1 reasonable thing to say. This was produced, I
2 believe, if we're talking about this, I think this was
3 produced before that conclusion that we've discussed
4 earlier today was brought about.
5     Q. Once that information was available to
6 Ethicon, that's information that would be reasonable
7 to provide to patients, correct?
8     A. I don't think it would be necessary to put
9 on a patient brochure.
10     Q. It would be necessary for Ethicon to put it
11 someplace once Ethicon had that information so that
12 Ethicon could get that information out to doctors who
13 might not know about it and might not know to tell the
14 patient, right?
15         MR. SNELL: Objection to form. Go
16 ahead.
17         THE WITNESS: We've already had this
18 discussion. I already answered these questions. It
19 was the opinion of one doctor that I'm aware of that
20 came to Ethicon and said that. Does that mean that
21 Ethicon has to make that widely known to everybody? I
22 don't think so.
23 BY MR. SLATER:
24     Q. I'll show you a document marked as Exhibit
25 1271 previously. I'm not going to go through the

Page 475

1 whole thing, but I want to just go over a couple
2 things with you for a few moments. This is a
3 presentation titled "Mess Shrinkage: How to assess,
4 how to prevent, how to manage" authored by Velemir,
5 Fatton and Jacquetin.
6     Do you see that?
7     A. I do.
8     Q. Have you ever seen this before?
9     A. Yes.
10     Q. When did you see it?
11     A. In reviewing materials for this deposition.
12     Q. Were you aware of this presentation when it
13 was given?
14     A. I was not in Como, Italy. I wish I was, but
15 I wasn't.
16     Q. With regard to mesh shrinkage, does
17 Ethicon -- well, rephrase.
18     With regard to mesh shrinkage, contraction,
19 retraction, did Ethicon ever at any point within
20 medical affairs feel that it had an understanding of a
21 way to limit mesh shrinkage; do you know?
22     A. I've reviewed very little records from what
23 people in medical affairs at Gynecare knew or didn't
24 know, so the answer is I couldn't point to anything
25 specifically.

Page 476

1     Q. Am I correct that you reviewed very little
2 by way of documents indicating what the people within
3 medical affairs at Ethicon thought at any particular
4 point in time?
5     A. What I'm saying is I got stacks of documents
6 within the last two weeks that were about 2 feet high,
7 and I have only gotten through a small percentage of
8 that.
9     Q. As you sit here now, you don't feel that you
10 have a good understanding of what the people in
11 medical affairs at Ethicon thought with regard to mesh
12 shrinkage, erosion or other topics?
13     A. If you read my report, I don't think
14 anywhere do I mention what the people in medical
15 affairs at Gynecare knew or didn't know.
16     Q. Let's turn to the page that at the top says
17 "Clinical impact of mesh shrinkage."
18     A. How far?
19     Q. It's about ten pages in or so.
20     A. What's the topic -- the title again?
21     Q. "Clinical impact of mesh shrinkage."
22     A. Not how to assess?
23     Q. It's right before that.
24     A. Right before that. I don't see anything
25 before that. I see how to assess mesh shrinkage,

Page 477

1 clinical assessment.
2     Are you referring to something different?
3     Q. I'm definitely talking about something
4 different, because I'm on a page that says this:
5 "Clinical impact of mesh shrinkage."
6     A. Okay. Here I am. Got there.
7         MR. SNELL: What's before? I wasn't
8 seeing it either.
9         THE WITNESS: It's more than ten pages,
10 probably 15 or 20, I guess.
11 BY MR. SLATER:
12     Q. Within this Exhibit 1271, this PowerPoint
13 that was presented at the IUGA meeting apparently in
14 June of 2009, there is a page that says "Clinical
15 impact of mesh shrinkage."
16     Are you on that page?
17     A. I am.
18     Q. And, again, this presentation was made by
19 Velemir, Fatton and Jacquetin, and Jacquetin is part
20 of the French TVM group, correct?
21     A. Correct.
22     Q. The second bullet point indicates
23 tenderness/pain at vaginal examination associated with
24 mesh shrinkage present in 21 of the patients in this
25 study, which was 19.6%, with a mean VAS of 5 out of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 478

1  10.
2      Do you see that?
3      A.  I do.
4      Q.  Before you saw this document in preparing
5  for this deposition, were you aware of the fact that
6  Professor Jacquetin and others in his group had
7  reported a 19.6% symptomatic mesh shrinkage rate in a
8  study done with the Prolift®?
9      A.  I can't recall.
10     Q.  That's certainly a finding that is
11  concerning with regard to the complication and risk
12  profile with regard to the Prolift®, correct, that
13  almost 20% of the patients in this study had
14  symptomatic mesh shrinkage?
15         MR. SNELL:  Objection, form.
16         THE WITNESS:  No.  I think 20% of
17  patients who have surgery who have tenderness and
18  pain, that's something -- whatever term you used --
19  significant or -- yes.
20  BY MR. SLATER:
21     Q.  Now we can finally talk about the things you
22  prepped for.
23      I've just handed you Exhibit 451.
24      You're familiar with that document, right?
25     A.  I am.

Page 479

1      Q.  This is the July 13, 2011 notification by
2  the FDA with regard to mesh for pelvic organ prolapse,
3  correct?
4      A.  Transvaginal placement of mesh pelvic organ
5  prolapse, yes.
6      Q.  And the FDA in this notification provided
7  information to the public, which would include
8  patients and physicians, about the use of
9  transvaginally placed surgical mesh for the treatment
10  of prolapse, correct?
11     A.  Correct.
12     Q.  Do you agree that it was a good thing that
13  the FDA put this notification out in order to raise
14  awareness about the things that can happen with these
15  types of products?
16     A.  As I stated in my time to rethink article, I
17  think any time someone is looking out for the welfare
18  of patients, it's a good thing.
19         MR. SLATER:  Move to strike.
20  BY MR. SLATER:
21     Q.  Just so you understand why I'm striking, I
22  didn't ask about the article.  We'll talk about it.
23  I'm just asking direct questions about this.  If you
24  talk about the article, then it becomes problematic if
25  I need to use it later.

Page 480

1      A.  Okay.
2      Q.  Just so you know I'm not trying to give you
3  a hard time.
4      A.  Okay.
5         MR. SLATER:  Could you read the
6  question back, please.
7         (The court reporter read back the
8  record as requested.)
9         THE WITNESS:  I think in some ways it
10  was good; in some ways it was bad.
11  BY MR. SLATER:
12     Q.  Let's look at some of the things that are
13  described in this notification.  Under "Summary of
14  Problem and Scope," the third paragraph which starts
15  with "in order to better understand."
16      Do you see where I am?
17     A.  I do.
18     Q.  Right in the middle of that paragraph
19  there's a sentence that reads, the review showed that
20  transvaginal pelvic organ prolapse repair with mesh
21  does not improve symptomatic results or quality of
22  life over traditional nonmesh repair.
23      Is that a conclusion that you agree with?
24     A.  No.
25     Q.  Let's go a little further down.  The FDA

Page 481

1  states, "In particular, the literature review revealed
2  that," and I'm going to start with the first bullet
3  point.  Mesh used in transvaginal pelvic organ
4  prolapse repair introduces risks not present in
5  traditional nonmesh surgery for pelvic organ prolapse
6  repair.
7      That's a true statement, correct?
8      A.  That is.
9      Q.  The second bullet point says, mesh placed
10  abdominally for pelvic organ prolapse repair appears
11  to result in lower rates of mesh complications
12  compared to transvaginal pelvic organ prolapse surgery
13  with mesh.
14      Do you agree with that statement?
15     A.  I believe that, in general -- I believe
16  that, in general, when referring to mesh erosions, if
17  you look at the totalities of studies that have been
18  performed, that is a correct statement when looking at
19  the risk of mesh erosion.
20     Q.  Let's go to the third bullet point.  There
21  is no evidence that transvaginal repair to support the
22  top of the vagina (apical repair) or the back wall of
23  the vagina (posterior repair) with mesh provides any
24  added benefit compared to traditional surgery without
25  mesh.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 482

1    Do you agree with that?
2    A. No.
3    Q. Let's start with apical repair.
4    Do you disagree with this sentence with
5    regard to apical repair?
6    A. No.
7    Q. You don't disagree?
8    A. I do not disagree.
9    Q. So you agree that there is no evidence that
10   transvaginal repair to support the top of the vagina,
11   termed apical repair, with mesh provides any added
12   benefit compared to traditional surgery without mesh?
13   A. There is no evidence, and I think what they
14   mean by this is evidence published in peer-reviewed
15   journals, and I would agree with that.
16   Q. You believe there is evidence that
17   transvaginal repair to support the back wall of the
18   vagina, termed posterior repair, with mesh provides
19   added benefit compared to traditional surgery without
20   mesh?
21   A. I do.
22   Q. You believe there's studies that document
23   that?
24   A. I believe there's one study of recurrent
25   prolapse that documents that.

Page 483

1    Q. Which study?
2    A. The Withagen, however you pronounce the
3    name.
4    Q. The RCT from 2010 or 2011, is that the study
5    you're talking about?
6    A. I think so. It's the study of -- it's RCT
7    of recurrent prolapse.
8    Q. Let's look below the bullet points under
9    what the literature review revealed, according to this
10   notification.
11   The FDA states, the FDA's literature review
12   found that erosion of mesh through the vagina is the
13   most common and consistently reported mesh-related
14   complication from transvaginal pelvic organ prolapse
15   surgeries using mesh.
16   Do you agree with that?
17   A. Yes.
18   Q. And, obviously, I'm not asking you do you
19   agree that their review found that, but do you agree
20   that that's what the literature shows?
21   A. Yes.
22   Q. The second sentence here -- rephrase.
23   The FDA states, mesh erosion can require
24   multiple surgeries to repair and can be debilitating
25   for some women. In some cases, even multiple

Page 484

1    surgeries will not resolve the complications.
2    Do you agree with that statement?
3    MR. SNELL: Objection, form. Which one
4    of them?
5    BY MR. SLATER:
6    Q. The two sentences that I just read.
7    A. Wait. Let me take them one at a time. Mesh
8    erosion can require multiple surgeries to repair and
9    can be debilitating for some women. Yes, I agree.
10   Q. How about the next sentence?
11   A. In some cases, even multiple surgeries will
12   not resolve the complication. I think people have
13   probably reported that. That's not my experience.
14   Q. Do you have an opinion one way or the other,
15   based on whatever information is available to you
16   beyond your own experience, as to whether that's a
17   true statement?
18   A. No.
19   Q. The sentence that says, mesh erosion can
20   require multiple surgeries to repair and can be
21   debilitating for some women, that statement is true of
22   the Prolift®, correct?
23   A. I think the debilitating is a very
24   subjective term, but it certainly Prolift® can cause
25   mesh erosion, and there can be multiple surgeries

Page 485

1    required to repair it.
2    Q. Based on information that's available to
3    you, not limited to your own experience, do you have
4    an opinion one way or the other as to whether when a
5    woman has multiple surgeries to repair mesh erosion,
6    whether that can be debilitating for some of those
7    women with regard to the Prolift®?
8    A. I mean, I think we just reviewed an article
9    in which other authors stated that, so it exists out
10   there.
11   Q. The second to last paragraph on this page
12   says, mesh contraction (shrinkage) is a previously
13   unidentified risk of transvaginal pelvic organ
14   prolapse repair with mesh that has been reported in
15   the published scientific literature and in adverse
16   event reports to the FDA since the October 20, 2008
17   FDA Public Health Notification.
18   That's just the FDA providing information
19   that they didn't have that reported to them before,
20   correct?
21   A. I guess so.
22   Q. The FDA then states, "Reports in the
23   literature associate mesh contraction with vaginal
24   shortening, vaginal tightening and vaginal pain."
25   Do you agree with that?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 486

1    A.   There are certainly reports in the
2 literature that associate that.
3    Q.   Do you agree that with regard to the
4 Prolift®, that Prolift® mesh contraction is associated
5 with vaginal shortening, vaginal tightening and
6 vaginal pain in some women?
7         MR. SNELL:  Objection, form.
8         THE WITNESS:  Can you repeat the
9 beginning part of the question.
10        MR. SLATER:  Probably not.  You can
11 read it.
12        (The court reporter read back the
13        record as requested.)
14        THE WITNESS:  No.  Specifically vaginal
15 tightening.
16 BY MR. SLATER:
17   Q.   That's the part that you disagree with?
18   A.   That's the part that I disagree with.
19   Q.   You would agree that with regard to Prolift®
20 mesh contraction, that is associated in some women
21 with vaginal shortening and vaginal pain, correct?
22   A.   As I've testified many times today, I think
23 that what people refer to in the literature is
24 contraction can cause pain.
25   Q.   And can cause vaginal shortening?

Page 487

1    A.   No, that's different.
2    Q.   In the last sentence on this page, the first
3 page of the July 2011 notification says, "both mesh
4 erosion and mesh contraction may lead to severe pelvic
5 pain."  Let's stop there.
6         Do you agree with that?
7    A.   I don't believe that mesh erosion -- yes, it
8 may, it may.
9    Q.   And that's true with the Prolift®, correct?
10   A.   It may.
11   Q.   I'm going to take this sentence now and just
12 read each part using the first part and going along,
13 so the FDA also indicates both mesh erosion and mesh
14 contraction may lead to painful sexual intercourse.
15        Do you agree with that?
16   A.   I do.
17   Q.   And that's true of the Prolift®, correct?
18   A.   Correct.
19   Q.   The FDA indicates both mesh erosion and mesh
20 contraction may lead to an inability to engage in
21 sexual intercourse.
22        Do you agree with that statement?
23   A.   No.
24   Q.   You don't agree that in some women, and
25 we'll talk about the Prolift®, both mesh erosion and

Page 488

1 mesh contraction may lead to an inability to engage in
2 sexual intercourse?
3    A.   No.
4    Q.   There's a -- excuse me.
5         The last sentence on this page indicates
6 that "men may experience irritation and pain to the
7 penis during sexual intercourse when the mesh is
8 exposed in mesh erosion."
9         That's a true statement, correct?
10   A.   Yes.
11   Q.   That's true of the Prolift®, correct?
12   A.   Correct.
13   Q.   The various risks that we just went through
14 that you do agree apply to the Prolift®, do you think
15 that it is appropriate for those risks to be
16 communicated to a patient?  Obviously, I'm talking
17 about when the Prolift® was available, that those
18 risks should be communicated to a patient before they
19 would be asked to consent to a Prolift® procedure?
20        MR. SNELL:  Objection, form.
21        THE WITNESS:  I'm confused by your
22 question.  Are you talking about since this has come
23 out or when the Prolift® first came on the market?
24 BY MR. SLATER:
25   Q.   Well, let's talk about from the time this

Page 489

1 came out.
2    A.   Okay.
3    Q.   With regard to those risks that you agreed
4 apply to the Prolift®, those risks need to be
5 communicated to a patient, correct?
6    A.   Correct.
7    Q.   And if medical affairs at Ethicon knew about
8 those risks on the day the Prolift® was launched,
9 medical affairs needed to warn of those risks,
10 correct?
11   A.   Not necessarily.
12   Q.   Any of those risks?
13   A.   Well, we can go through them one by one, if
14 you'd like.
15   Q.   Well, I don't need to do anything, but
16 here's what I want to ask you:  Are any of the risks
17 listed here -- rephrase.
18        With regard to all the risks listed here in
19 this notice from the FDA, July 2011, the ones that you
20 think actually exist for the Prolift®, are there any
21 listed here that if Ethicon medical affairs knew about
22 those risks on the day of the Prolift® launch that
23 they should have warned about?
24        MR. SNELL:  Objection, form.
25        THE WITNESS:  Warned about in what

Confidential - Subject to Stipulation and Order of Confidentiality

Page 490

1  form?
2  BY MR. SLATER:
3    Q.  The IFU and/or the patient brochure.
4        MR. SNELL:  Objection, form.
5        THE WITNESS:  I think we've gone
6  through that multiple times already.
7  BY MR. SLATER:
8    Q.  I've never asked you about this.
9    A.  Well, you're asking about the same
10 complications that we've already discussed.  Is there
11 something you're talking about that we haven't
12 discussed?  Please point it out, if we have.
13       MR. SNELL:  No, it's the same stuff.
14       THE WITNESS:  Just asking.
15 BY MR. SLATER:
16   Q.  I don't really know.  I'm asking you a
17 question.
18   A.  I answered it.
19   Q.  Well, you didn't, actually.  You said
20 basically I've answered it before, but let me ask you
21 this:  Are there any risks on this FDA notification
22 that if Ethicon knew about those risks on the day the
23 Prolift® was launched that they needed to have those
24 risks included in the IFU?
25   A.  No.

Page 491

1    Q.  Are there any risks listed on this FDA
2  notification from July 2011 that if Ethicon medical
3  affairs knew about them, that Ethicon should have
4  warned about in the patient brochure?
5    A.  I mean, we had this discussion at length.
6    Q.  It's a yes or no question.
7    A.  Right, and if you're going to make me say
8  yes or no, I'm going to say no.
9    Q.  I'm not making you say anything.  I'm just
10 asking you to answer the question.
11   A.  Well, you're not allowing me to explain
12 myself or to say that I've already explained myself at
13 length on this topic.
14   Q.  With all due respect, I haven't questioned
15 you about the FDA notification, which is a discrete
16 document, okay.
17       MR. SNELL:  But you're asking about all
18 these things, contraction, erosion, pain, what needs
19 to be in there or not.
20       MR. SLATER:  Do you think these
21 questions are improper?  I mean, what are we doing
22 here?  We're wasting more time debating it.
23       MR. SNELL:  No, you're asking the same
24 question 100 times.  That's what he's trying to say
25 and that's what I agree, I mean, so...

Page 492

1        MR. SLATER:  You know what, that may
2  be, but I'm taking this deposition on behalf of a lot
3  of people.
4        MR. SNELL:  I know.  He's already
5  testified what he thinks --
6        MR. SLATER:  I didn't get an answer.
7        MR. SNELL:  -- should be in there or
8  not.
9        MR. SLATER:  I just didn't get an
10 answer to the question.
11       MR. SNELL:  You did get the answer you
12 didn't want.
13       MR. SLATER:  No, I want an answer.
14       MR. SNELL:  Object to the form.
15       THE WITNESS:  If we read it back, I
16 think I said no.
17 BY MR. SLATER:
18   Q.  Well, is your answer to the question no?
19   A.  Yes.
20   Q.  Okay.
21   A.  I think I already said it.
22       (Discussion off the record.)
23 BY MR. SLATER:
24   Q.  I'm going to hand you a document that was
25 marked at a previous deposition as 1215.

Page 493

1        This is an article that you authored,
2  correct?
3    A.  Correct.
4    Q.  It refers to the Pelvic Surgeons Network,
5  right?
6    A.  It does.
7    Q.  The Pelvic Surgeons Network is what?
8    A.  A Network is a group of people that share a
9  common interest in pelvic reconstructive surgery.
10   Q.  Who came up with the name Pelvic Surgeons
11 Network?
12   A.  I don't recall.
13   Q.  Is there a formal organization known as the
14 Pelvic Surgeons Network?
15   A.  It is not formal in the sense that we do not
16 have meetings.  If you want to define formal, I'll be
17 happy to -- no, I don't think it's a formal
18 organization.
19   Q.  You and some other people basically came up
20 with that name and then sent out the manuscript for
21 this article to a bunch of doctors and asked them to
22 sign something saying they agreed with the article,
23 right?
24   A.  We didn't ask them to sign it.  We said
25 we're presenting this, do you endorse it or not, and

Confidential - Subject to Stipulation and Order of Confidentiality

Page 494

1  if you do, we consider you a member of the Pelvic
2  Surgeons Network.
3      Q.  The Pelvic Surgeons Network, is that an
4  organization where people pay dues, for example, to be
5  a member?
6      A.  No.
7      Q.  Do they have to apply to be a member?
8      A.  No.
9      Q.  Is there a membership list of the Pelvic
10 Surgeons Network?
11     A.  I'm not aware of one.
12     Q.  Let's look at some of the things you said.
13 Look at the second page of this article.
14         You point out in the first column, "we
15 realize that many complications of TVM go unreported
16 to the MAUDE database."
17         You see that?
18     A.  I don't see it, but -- yes, I see it, yes.
19     Q.  There's no way, based on what's reported to
20 the MAUDE database or any other data that you have --
21 well, rephrase.
22         Do you have any opinion as to the extent to
23 which there's underreporting of complications to the
24 MAUDE database?  Do you have any opinion on
25 quantifying that?

Page 495

1          MR. SNELL:  In this?  Are you talking
2  about in general?  You just mean in general?
3          MR. SLATER:  I don't even know what
4  that means.
5          MR. SNELL:  Like in general, you mean
6  in the mesh or in just in general, anything and
7  everything?
8  BY MR. SLATER:
9      Q.  Okay.  With regard to the reporting of
10 complications to the MAUDE database with regard to
11 mesh for the use of treatment of prolapse, do you have
12 any opinion as to the extent of underreporting, any
13 way to quantify that?
14     A.  I couldn't quantify it for you, no.
15     Q.  Let's go pretty much right across the page,
16 the next column, just the right column now.  You have
17 a sentence that says, "Nonetheless, most surgeons
18 would agree that the risk of vaginal mesh exposure, in
19 general, is higher when placed through the vaginal
20 approach," and you are comparing it to abdominal
21 sacrocolpopexy, correct?
22     A.  Correct.
23     Q.  And that's a position that you agree with,
24 correct?
25     A.  Yes.

Page 496

1          MR. SNELL:  I'm sorry.  Can you read
2  that question back.
3          (The court reporter read back the
4          record as requested.)
5  BY MR. SLATER:
6      Q.  Let's go to the next page, the left column,
7  just below the midway point of the page, you have a
8  statement that says, we agree that there is a relative
9  paucity of comparative data regarding apical or apical
10 -- I'm going to start over.
11         On Page 7 on the left column you state, "We
12 agree that there is a relative paucity of comparative
13 data regarding apical and posterior support with TVM,
14 but we also feel that this issue is more complex than
15 this statement implies."
16         You see that statement?
17     A.  I do.
18     Q.  When you say there is a relative paucity of
19 comparative data regarding apical and posterior
20 support with TVM, what do you mean?
21     A.  I am comparing it to when you look at data
22 of the anterior compartment.
23     Q.  And you say that just below that a little
24 further down, "In regards to the posterior wall,
25 again, we acknowledge that there are less data

Page 497

1  available compared to the anterior wall."
2      A.  Correct.
3      Q.  Let's go to the next page.
4      A.  Page 8.
5      Q.  Looking for the page numbers, to be honest
6  with you.  Yes, Page 8, in the top left portion, you
7  cite to Reference 21, and that's the Dietz article,
8  correct?
9      A.  Correct.
10     Q.  And you cite the Dietz article for the
11 proposition, "While contraction may occur in some
12 cases, analysis of translabial four-dimensional
13 ultrasounds of 40 patients who underwent anterior mesh
14 procedures showed no evidence of mesh contraction
15 between their first and last postoperative visits."
16         At that point in time, is it your testimony
17 you were not aware that Dietz in another article had
18 said he was able to show contraction on ultrasound?
19     A.  I was not aware of that when I wrote this
20 article.
21     Q.  Did you attempt to find other articles that
22 went the other way, so that you could tell both sides
23 of the story here?
24     A.  I guess the easiest way to answer that
25 question is I didn't do a lit search of ultrasound and

Confidential - Subject to Stipulation and Order of Confidentiality

Page 498

1 mesh contraction. I certainly did not perform a
2 systematic review of that question.
3    Q. In the conclusion you say in part, "No one
4 is suggesting that mesh is recommended for all
5 patients."
6       What patients would you say should not get a
7 Prolift®? Is there any particular categories of
8 patients?
9          MR. SNELL: Objection, form.
10         THE WITNESS: People who don't have
11 pelvic organ prolapse.
12 BY MR. SLATER:
13    Q. Was this article seen in any form before it
14 was published by anybody within Ethicon or any other
15 medical device manufacturer?
16    A. Certainly not that I'm aware of.
17    Q. Was it discussed, was the content discussed
18 by you or any of the co-authors, to your knowledge,
19 with anybody at Ethicon or another medical device
20 manufacturer?
21    A. Not that I recall.
22    Q. With regard to the Prolift®, once the
23 surgeon provides the information to the patient as to
24 what's being recommended, what the options are, what
25 the potential risks and benefits are, ultimately, the

Page 499

1 decision about what treatment to have is the
2 patient's, correct?
3    A. Yes.
4    Q. Did you learn at any point in your medical
5 practice or from anything that you were provided by
6 Ethicon in connection with this case of any instances
7 where a patient had complications so severe that the
8 surgeon trying to treat the patient termed the woman
9 to have a permanently destroyed vagina; have you ever
10 seen anything like that or heard anything like that?
11    A. No.
12    Q. Show you a document marked as Exhibit 1208.
13 What is this PowerPoint?
14    A. This is a PowerPoint of the presentation
15 that I gave at the annual scientific meeting of the
16 American Urogyn Society in Chicago this year.
17    Q. This was given in October of 2012?
18    A. Correct. Yes, I believe it was October.
19    Q. This was with regard to -- what was it that
20 -- rephrase.
21       What were you reporting on? In general
22 terms, what were you reporting on?
23    A. A retrospective study of patients who had
24 undergone the Prolift® procedure in our practice.
25    Q. Looking at the second -- third to last page,

Page 500

1 "Specific Outcomes Noted by FDA."
2       You indicated that one of the outcomes that
3 you looked at was vaginal mesh contraction, correct?
4    A. Right.
5    Q. And you indicated decrease in total vaginal
6 length greater than 3 centimeters occurred in 2.2% of
7 the patients?
8    A. That we had those numbers that we had pre
9 and postoperative data on, yes.
10    Q. For some patients you didn't have the data,
11 correct?
12    A. Correct.
13    Q. And you have the indication that 17 out of
14 764 patients, so you had the data for 764 of the
15 patients?
16    A. Correct.
17    Q. Do you consider a mesh contraction rate
18 causing a decrease in total vaginal length of greater
19 than 3 centimeters of 2.2% of the patients, do you
20 consider that to be high, low? Where would you put
21 that on a continuum?
22    A. Well, first of all, I'd like to state that I
23 am defining what I would consider a mesh contraction.
24 I don't know if other people would define it that way,
25 so I want to be clear about that.

Page 501

1    Q. As you define mesh contraction there, that
2 occurring to 2.2% of the women for which you had data,
3 what do you say about that percentage?
4    A. It doesn't surprise me.
5    Q. Is it of concern to you?
6    A. Of course.
7    Q. The next bullet point you say, de novo
8 dyspareunia, which you rated as a 1 unit negative
9 change in Item 5 of the PISQ-12.
10    A. No, it's a greater than 1 unit negative
11 change.
12    Q. I just said one unit?
13    A. Yes. Well, it could be construed that that
14 is a bullet point as opposed to a less than, but...
15    Q. No, no, I'm just -- it's almost 10:00.
16 Okay.
17       The second bullet point you say, de novo
18 dyspareunia greater than 1 unit negative change in
19 Item 5 of the PISQ-12, and the question being, do you
20 feel pain during sex? 11.9% of the women for whom you
21 had that information reported yes?
22    A. They did.
23    Q. Is that of concern to you, 11.9% reporting
24 de novo dyspareunia?
25    A. Any patient with de novo dyspareunia is of

Confidential - Subject to Stipulation and Order of Confidentiality

Page 502

1 concern to me.

2 Q. Is a rate of 11.9%, from your perspective,

3 high?

4 A. I would say, from my perspective, given the

5 previous data that's been published on dyspareunia,

6 that's somewhere in the range of what people see.

7 Q. When you say that an outcome percentage like

8 this 11.9% is within the range of what people see,

9 just because that's in the range of what occurs

10 doesn't necessarily make it something that should be

11 accepted, right?

12 A. When I'm saying that, I'm referring to

13 articles like the Lohman paper that looks at different

14 studies that looked at various ways of repairing

15 pelvic organ prolapse and what the outcomes are. So,

16 again, I don't mean to be argumentative, but when we

17 fix prolapse, there are not just one way to do it, and

18 if you're fixing it, what you really want to be

19 concerned about is if one procedure has a particular

20 higher rate of a negative outcome than another.

21 So, again, I'm concerned if any patient has

22 pelvic -- or dyspareunia, but it's a known risk of

23 repairing prolapse.

24 Q. Your complication rates and success rates

25 within your practice, do you believe that those rates,

Page 503

1 as you're reporting, for example, in this PowerPoint,

2 are representative of what physicians in the general

3 community should expect to be able to achieve with the

4 Prolift®?

5 A. Should they expect to achieve it? Why not?

6 Yes.

7 Q. The point I'm making is do you believe that

8 because of the experience and the skill level of

9 yourself and the others in your practice group, should

10 it be expected that your complication rates will be

11 lower than what others will see generally in the

12 community, for example?

13 A. I think, and I've talked about this before,

14 that I think the more experience you have with any

15 procedure, the better you're going to get at it. So

16 do I think that having rates like this after having

17 done 1,000 in a practice are someone can expect those

18 types of rates that just started doing something,

19 maybe not.

20 Q. Were there surgeons who did Prolift®

21 procedures who because of a lack of skill level really

22 shouldn't have been doing the Prolift®?

23 A. I don't know.

24 Q. You have no opinions one way or the other on

25 that?

Page 504

1 A. Repeat the question.

2 Q. Do you have any opinion one way or the other

3 about whether there were patient -- rephrase.

4 Do you have an opinion one way or the other

5 about whether there were surgeons who were performing

6 Prolifts® who because of a lack of skill or experience

7 really should not have been doing the Prolift®?

8 A. Probably, yes.

9 Q. Have you reviewed the professional education

10 material that was utilized to train physicians with

11 regard to the Prolift®, and I'm talking about the copy

12 reviewed PowerPoints and other information promulgated

13 by Ethicon?

14 A. I certainly have some familiarity with them.

15 Q. What was the purpose of that material?

16 A. To provide professional education to

17 physicians.

18 Q. That was not meant to give a surgeon a

19 particular skill level, correct? What I mean by that

20 is the surgeon has their skill level as a surgeon.

21 The professional education was to give them specific

22 training with regard to the Prolift®, correct?

23 A. Correct.

24 Q. Did you do Prolift® training? Did you train

25 surgeons on the Prolift® procedure?

Page 505

1 A. I did do some, yes.

2 Q. What type of training was that?

3 A. I did a number of cadaver labs both on

4 Prolift® and Prolift+M®. I don't know how many. I

5 would probably say somewhere in the range of 5 to 15,

6 and then I also did some proctoring and some -- maybe

7 a little bit of precepting as well.

8 Q. When you conducted professional education

9 with regard to the Prolift®, did you tell surgeons at

10 any point that they needed to be cautious about

11 recommending the use of the Prolift® in young and/or

12 sexually active women?

13 A. I don't recall.

14 Q. Do you know why the Prolift® was removed

15 from the market?

16 MR. SNELL: Objection, form. It wasn't

17 removed.

18 MR. SLATER: Rephrase. Well, it really

19 was, but you can say whatever you want, because

20 everyone knows it, but I will continue.

21 BY MR. SLATER:

22 Q. Do you have any knowledge as to why Ethicon

23 ceased marketing the Prolift®?

24 A. I've heard theories.

25 Q. Tell me what you've heard.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 506

1     A.  I've heard that they were losing market
2  share to other transvaginal mesh devices and that
3  given the medical-legal environment, they felt that it
4  was better to just stop producing it.
5     Q.  Any other reasons that you heard?
6     A.  No, not that I can recall.
7     Q.  Did you ever speak with anybody affiliated
8  with Ethicon about that subject?
9     A.  I spoke to my local sales representative.
10    Q.  Who was that?
11    A.  Christine President.
12    Q.  Is she the person who told you what you just
13 related to me?
14    A.  No.
15    Q.  What did she tell you about why the Prolift®
16 was not being marketed any longer?
17    A.  She didn't know.
18    Q.  Did you speculate?
19    A.  No, not that I recall.
20    Q.  Are you aware that the indications for
21 Gynemesh® PS have been changed by Ethicon?
22    A.  I'm not aware of that.
23    Q.  There are blind passages as part of the
24 Prolift® procedure, correct?
25    A.  Yes.

Page 507

1     Q.  Do you know what PVDF is?
2     A.  Off the top of my head, I can't recall what
3  that stands for.
4     Q.  Do you know what Pronova is?
5     A.  Pronova?
6     Q.  P-r-o-n-o-v-a?
7     A.  No, I don't recall that.
8         MR. SLATER:  Why don't we take five
9  minutes.  I may be done.
10        THE VIDEOGRAPHER:  We're going off the
11 record.  The time is 9:53 p.m.
12        (Brief recess.)
13        THE VIDEOGRAPHER:  We're back on the
14 record.  Here marks the beginning of Volume 1, Tape
15 Number 9 in the deposition of Dr. Miles Murphy.  The
16 time is 10:05 p.m.
17 BY MR. SLATER:
18    Q.  I'm looking now at the additional list of
19 materials, and go to the point where it says other
20 documents after the list of articles.  Turn forward a
21 couple pages.
22    A.  Forward, meaning keep going?
23    Q.  Yes.  Go to the page where at the top the
24 first document listed is Ethicon memo to R. Rousseau
25 from Thomas Barbolt.

Page 508

1     A.  I see it.
2     Q.  Have you reviewed that document?
3     A.  I don't recall reviewing it.
4     Q.  Go to the next document Ethicon Report, PSE
5  Accession No., et cetera, is that a document you
6  reviewed?
7     A.  I don't recall.
8     Q.  Go to the third document, Ethicon March 5,
9  2001 memo, et cetera, is that a document you reviewed?
10    A.  I don't remember reviewing that.
11    Q.  The fourth document listed here, Ethicon
12 December 2, 2001 memo to Maggie D'Aversa, et cetera,
13 is that a document you reviewed?
14    A.  I don't remember reviewing it.
15    Q.  The next document listed, Ethicon Final
16 Report PSE Accession No., et cetera, a 28-day tissue
17 reaction study, is that a document you reviewed?
18    A.  I don't remember.  I don't recall reviewing
19 that.
20    Q.  The next document, Ethicon Final Report, PSE
21 Accession No., et cetera, 14-day adhesion prevention
22 study, did you review that document?
23    A.  I don't recall reviewing that document.
24    Q.  Go to the next document listed, which is
25 Ethicon Report PSE Accession No. 02-0579, Project No.

Page 509

1  48010, et cetera, did you review that document?
2     A.  I may have.
3     Q.  Is there anything you can tell me about it
4  now that's of any significance?
5     A.  No.
6     Q.  Go to the next document, Ethicon report
7  dated 1/19/05 Biocompatibility Risk Assessment, is
8  that a document you reviewed?
9     A.  Again, I may have.  It looks familiar, but I
10 don't -- I couldn't tell you anything substantive
11 about what it said.
12    Q.  Next document, Ethicon Completion Report:
13 BE-2004-1606, design verification, et cetera, is that
14 a document you reviewed?
15    A.  I don't recall reviewing that.
16    Q.  The next document, clinical study report
17 evaluation of the TVM technique for treatment of
18 genital prolapse dated June 27, 2006, is that a
19 document you reviewed?
20    A.  That looks familiar.
21    Q.  Is there anything you can tell me about it
22 in terms of whether there's anything of significance
23 in it, as you sit here now?
24    A.  Significance in relation to what?
25    Q.  Your opinions?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 510

1    A.  I can't recall anything.

2    Q.  Go to the next document, clinical study

3  report evaluation of TVM technique for treatment of

4  genital prolapse dated June 28, 2006, did you review

5  that document?

6    A.  I may have, but, again, I would give you the

7  same answer as the previous document.

8    Q.  Let's go to the next page.  Ethicon Final

9  Report PSE Accession No. 00-0035, an exploratory

10  91-day tissue reaction, et cetera, is that a document

11  you reviewed?

12    A.  I may have.  Again, I remember reviewing

13  some documents regarding animal models.

14    Q.  Is there anything about this document that

15  you can tell me now?

16    A.  No.

17    Q.  Anything of any significance?

18    A.  No, not at this moment.

19    Q.  The next document, Final Report PSE Study,

20  No. 08-0311; Project No. 67624, some sort of a rabbit

21  study, is that something that you read?

22    A.  Same answer as last question.

23    Q.  The next document, chart comparing Ethicon,

24  AMS and Bard's products by characteristic, area

25  weight, largest pore size, et cetera, is that a

Page 511

1  document you reviewed?

2    A.  I don't recall.

3    Q.  The next document, Ethicon Performance

4  Evaluation Technical Report, Assessment of Competitor

5  Pelvic Floor Repair Meshes, Version 1 study number, et

6  cetera, did you review that document?

7    A.  I don't recall.

8    Q.  The next document, International

9  Urogynecological Association:  The Usage of Grafts in

10  Pelvic Reconstructive Surgery Symposium 2005, did you

11  review that document?

12    A.  Yes.

13    Q.  What's the significance of that document?

14    A.  It was a -- if I'm recalling correctly, it

15  was a symposium of people in the International Urogyn

16  Association looking at the usage of grafts in pelvic

17  reconstructive surgery, and I think it was focusing on

18  transvaginal use of grafts.

19    Q.  Is there anything that you can tell me about

20  that now that's of any significance to you in forming

21  your opinions?

22    A.  I can't recall.

23    Q.  The next document, Anatomic Overview of

24  Prolift Anterior and Posterior Procedure, is that

25  something you reviewed?

Page 512

1    A.  I think so.

2    Q.  Do you know what it is?  What is that

3  document?

4    A.  I think it's a computer-generated model for

5  the procedures and it's narrated.

6    Q.  Is it something that you ever utilized or

7  saw in the course of your practice or professional

8  education?

9    A.  I believe so.

10    Q.  What use was made of that document; do you

11  know?

12    A.  It's helpful in getting a three-dimensional

13  appreciation of pelvic floor anatomy.

14    Q.  Does that animation, from your prospective,

15  provide a fair representation of, in broad

16  illustrative terms, the Prolift® procedure?

17    A.  If I'm recalling the proper thing, yes, it

18  does.

19    Q.  The next document listed, Gynecare Prolift®

20  Pelvic Floor Repair Systems Procedure DVD, do you know

21  specifically which procedure DVD that is?

22    A.  I couldn't say for sure.

23    Q.  Did you review it?

24    A.  I've reviewed a procedure DVD of one of the

25  French surgeons doing the Prolift®.

Page 513

1    Q.  Do you know if that's what this is?

2    A.  I couldn't say for sure, don't recall.

3    Q.  Did you rely on it in any way in forming

4  your opinions, whatever DVD you saw?

5    A.  Yes.

6    Q.  How?

7    A.  It was an example of how a Prolift® is

8  performed.

9    Q.  Would that DVD, from your perspective, be a

10  fair representation of how the Prolift® procedure is

11  performed?

12    A.  I don't recall.

13        MR. SLATER:  And, counsel, I'm going to

14  make a request just to get the Bates numbers on those

15  two documents, okay, just so I know which ones they

16  are.

17        MR. SNELL:  Okay.

18  BY MR. SLATER:

19    Q.  At the very bottom of this page, it says

20  letter to EWHU Field Sales Force from Price St.

21  Hilaire dated October 23, '06 regarding criteria for

22  surgeons being trained for Gynecare Prolift®.

23        Did you review that document?

24    A.  I don't recall.

25    Q.  Next page at the top, letter to Gregory

Confidential - Subject to Stipulation and Order of Confidentiality

Page 514

1 Jones from Celia M. Witten with FDA dated 1/8/02

2 regarding Gynemesh® Prolene® synthetic surgical mesh,

3 et cetera.

4 Is that a document you reviewed?

5 A. I don't recall reviewing it.

6 Q. The next document, memo to materials -- to

7 hospital materials managers and/or directors from

8 Gynecare Worldwide Ethicon dated October 10, 2002

9 regarding Gynemesh® PS, is that a document you

10 reviewed?

11 A. I don't recall reviewing it.

12 Q. The next document, memo to customer from

13 Sean M. O'Bryan dated February 8, 2005 regarding

14 Gynecare Prolift®, did you review that document?

15 A. I don't recall reviewing that document.

16 Q. If you could just turn back three pages to

17 the beginning where it says "Other Documents." This

18 is, again, in your additional materials section of

19 your original report where it says Other Documents.

20 At the very bottom of the page it says Clinical Expert

21 Report Gynecare Prolift® Pelvic Floor Repair System

22 dated July 2, 2010, did you review that document?

23 A. I may have. I don't recall.

24 Q. Go to the next page. At the top, clinical

25 study report evaluation of the TVM technique for

Page 515

1 treatment of genital prolapse, is that something you

2 reviewed?

3 A. I may have, but I don't recall. I couldn't

4 tell you anything substantive about it.

5 Q. The next document, would the answer be the

6 same?

7 A. Yes.

8 Q. Now, the third document on this page, would

9 the answer be the same?

10 A. Yes.

11 Q. The fourth document, which says Exhibit 15,

12 letter to Bryan Lisa from Mark Melkerson, is that a

13 document you reviewed?

14 A. I don't recall.

15 Q. The next document, memo to Jennifer Paine

16 from Renee Selman dated 1/16/08, did you review that

17 document?

18 A. I don't recall reviewing that document.

19 Q. Next document, one year objective and

20 functional outcomes -- well, I know you saw that.

21 That's no problem.

22 Next document -- the seventh document on

23 this page, Summary of Safety and Effectiveness

24 submitted by Bryan Lisa for Gynecare Prolift® and

25 Prolift+M® stamped May 15, 2008, two pages, did you

Page 516

1 review that document?

2 A. I don't recall.

3 Q. If you skip down a few lines it says, 2007

4 and 2008 Gynecare Prolift® Pelvic Floor Repair Systems

5 - slides (46 pages). What is that?

6 A. I believe that is a PowerPoint presentation

7 regarding professional education.

8 Q. Did you review it in connection with this

9 case?

10 A. Yes, I did.

11 Q. Is it of any significance to you on any

12 particular issue?

13 A. If you wanted to name an issue, I could say

14 whether it's significant or not. I think -- yes, I

15 mean, yeah, it certainly goes to what professional

16 education Gynecare provided to physicians.

17 Q. Next it says 2005 to 2006, Gynecare Prolift®

18 Pelvic Floor Repair Systems - slides (16 pages). Do

19 you know what that is?

20 A. I think that's a similar slide set for

21 professional education that I believe I reviewed.

22 Q. The next item, Gynecare Gynemesh® PS

23 nonabsorbable Prolene® Soft mesh IFU, did you review

24 that?

25 A. I think I probably did.

Page 517

1 Q. Do you have any recollection of reading it?

2 A. I can't recall right now.

3 Q. Is there anything that you can point to now

4 that's of significance to you with regard to that

5 document?

6 A. I can't recall right now.

7 MR. SLATER: Thank you. I don't have

8 any other questions for you tonight.

9 THE WITNESS: Thank you.

10 MR. SLATER: I am going to reserve my

11 rights only with regard to some e-mails I had

12 exchanged with defense counsel the last couple days,

13 not with counsel who is present. We had asked for

14 documents to be searched to see if there was anything

15 in the files of Ethicon with regard to Dr. Murphy,

16 other than what we have been previously produced in

17 the DFSes, and counsel never apparently did the search

18 or produced any documents. So in case something were

19 to come out that we thought was really pressing, we'll

20 reserve our rights; otherwise, thank you very much.

21 THE WITNESS: Thank you.

22 MR. SNELL: How much time do you have?

23 Did you put a new tape in?

24 THE VIDEOGRAPHER: Yes.

25 MR. SLATER: Doesn't it feel good to

Confidential - Subject to Stipulation and Order of Confidentiality

Page 518

1  finally have a real lawyer sitting next to you.
2         THE WITNESS: Not particularly.
3         MR. SLATER: If I was defending this
4  deposition, it would have taken 45 minutes.
5         THE WITNESS: I doubt that.
6  BY MR. SNELL:
7     Q.  You got your report there, there's a couple
8  things.
9         Dr. Murphy, my name is Burt Snell. I
10  represent Ethicon and Johnson & Johnson. We know each
11  other. I just want to ask you a few follow-up
12  questions in response to plaintiffs' counsel's
13  questions.
14        The first is concerning the TVM study. The
15  plaintiffs' counsel asked you some questions about
16  that study, correct?
17    A.  Correct.
18    Q.  And I believe he asked you whether you
19  recalled if the TVM study was funded by Ethicon?
20    A.  Yes.
21    Q.  Do you know whether the US study -- strike
22  that.
23        Do you know whether the US TVM study was
24  funded in part by Ethicon?
25    A.  Yes, it was.

Page 519

1     Q.  Your report Pages 17 to 19, do you discuss
2  the TVM studies in your report?
3     A.  I do.
4     Q.  And I believe you were asked questions about
5  whether the upper confidence interval bound in the
6  French study was more than 20% and thus not meeting
7  the primary endpoint.
8         Do you recall that question or questions
9  concerning whether the French study met the primary
10  endpoint?
11        MR. SLATER: Objection to the form.
12  You can answer.
13        THE WITNESS: I do recall.
14  BY MR. SNELL:
15    Q.  Do you have a specific recollection of
16  whether the French TVM study met the upper confidence
17  interval 20% cut point?
18    A.  I think I had been testifying regarding my
19  recollection of the US TVM study when I was answering
20  his questions regarding the French study.
21    Q.  You were asked questions about the Fatton
22  2007 study and whether that was -- whether that --
23  strike that.
24        You were asked questions about the Fatton
25  2007 study and whether it involved the TVM or the

Page 520

1  Prolift®.
2         Can you turn to page 21 of your report.
3         Did the Fatton 2007 study concern the
4  Prolift® system or the TVM?
5     A.  The Prolift® system.
6     Q.  Turn, if you would, to Page 20 of your
7  report.
8     A.  Page 20?
9     Q.  Yes. You were asked questions about whether
10  the pore size of a mesh needed to be 1 millimeter.
11        Do you recall those questions, in general?
12        MR. SLATER: Objection. You can
13  answer.
14        THE WITNESS: I do.
15        MR. SLATER: What page are you on?
16        MR. SNELL: Twenty.
17  BY MR. SNELL:
18    Q.  Page 20, do you set forth at the bottom of
19  your report the definition of macroporous?
20        MR. SLATER: Objection. You can
21  answer.
22        THE WITNESS: Yes.
23  BY MR. SNELL:
24    Q.  And what is that?
25    A.  Greater than 75 microns.

Page 521

1     Q.  Plaintiffs' counsel moved to strike quite a
2  few of your answers. I want to give you an
3  opportunity to give what you believe are accurate and
4  complete answers.
5         MR. SLATER: Objection.
6  BY MR. SNELL:
7     Q.  Setting aside the potential for mesh
8  contraction and mesh erosion, do other pelvic organ
9  prolapse surgeries have the same type of risk as the
10  Prolift®?
11        MR. SLATER: Objection. You can
12  answer.
13        THE WITNESS: Yes.
14  BY MR. SNELL:
15    Q.  Can native tissue repairs have vaginal
16  shortening?
17    A.  Absolutely.
18    Q.  Plaintiffs' counsel asked you a question
19  about Prolift® mesh being placed and causing pudendal
20  neuralgia.
21        Have you seen any evidence of that in the
22  literature or in your clinical practice?
23    A.  I have not.
24    Q.  Plaintiffs' counsel asked you questions
25  about the potential risk of chronic pain.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 522

1        Do you recall those questions?

2    A.  I recall some of them, yes.

3    Q.  Can chronic pain patients have a potential

4  increased risk with any pelvic organ prolapse surgery?

5    A.  Yes.

6    Q.  Is the relationship between chronic pain

7  patients and surgery specific to the Prolift®?

8        MR. SLATER:  Objection.  You can

9  answer.

10        THE WITNESS:  No, not that I'm aware

11  of.

12  BY MR. SNELL:

13    Q.  If you have the exhibits, let's turn back

14  to -- going to go in pretty much reverse order, turn

15  back to Plaintiffs' Exhibit 895, which were the

16  Short-Term Results of the Prolift® Procedure in 349

17  Patients.

18    A.  Get there in just one minute.  Got it, I

19  think.  Is this 895, is that what you're referring to?

20    Q.  Yes.

21    A.  Yes.

22    Q.  Turn, if you would, to the Results section,

23  Bates Number 2689.

24    A.  Results section where, 2689, yes, I'm there.

25    Q.  And third paragraph that begins

Page 523

1  "post-operative findings included," are you there?

2    A.  Yes.

3    Q.  Plaintiffs' counsel asked you a question

4  about the sentence that says the majority (73%) of

5  dyspareunia symptoms resolved by 3 or 6 month

6  follow-up visit, and then he asked you about this 1.7%

7  of patients who experienced persistent discomfort.

8        Do you recall those questions?

9    A.  Yes.

10    Q.  Now, that was persistent discomfort at six

11  months, correct?

12    A.  Correct.

13    Q.  And patients can get better from six months,

14  if you look at them again a year or more than that

15  down the road?

16        MR. SLATER:  Objection.

17        THE WITNESS:  Yes, they can.

18  BY MR. SNELL:

19    Q.  Let's go to Exhibit 1217, which is "Vaginal

20  Hysterectomy at the Time of Transvaginal Mesh

21  Placement."

22    A.  Yes, I have it.

23    Q.  Plaintiffs' counsel asked you questions

24  about mesh exposure in this study.

25        Do you recall those questions?

Page 524

1        MR. SLATER:  Objection.  You can

2  answer.

3        THE WITNESS:  Yes.

4  BY MR. SNELL:

5    Q.  And I believe your testimony was that anyone

6  with a brain would know mesh exposure is a potential

7  risk when using mesh?

8        MR. SLATER:  Objection.

9        THE WITNESS:  Yes, I think that was my

10  testimony.

11  BY MR. SNELL:

12    Q.  By 2005 had mesh been used to treat prolapse

13  for decades?

14    A.  Yes.

15        MR. SLATER:  Objection.  You can

16  answer.

17        THE WITNESS:  Yes, it had.

18  BY MR. SNELL:

19    Q.  Was mesh exposure reported in the literature

20  before 2005?

21        MR. SLATER:  Objection.  You can

22  answer.

23        THE WITNESS:  Yes, it was.

24  BY MR. SNELL:

25    Q.  Turn, if you would, to Exhibit 1216, the

Page 525

1  "One-year anatomic and quality of life outcomes after

2  the Prolift® procedure" published in 2008.

3    A.  I have it here.

4    Q.  Plaintiffs' counsel asked you about the

5  change in vaginal length in this study.  Turn, if you

6  would, to the third page, e3.  In the middle column it

7  reports that the average change of vaginal length was

8  negative 0.6 centimeters, plus or minus 1.1.

9        Do you see that?

10    A.  On e3?

11    Q.  Yeah, right in the middle column.

12    A.  Oh, I'm sorry.  I was looking at the table.

13  Yes.

14    Q.  Was that believed to be clinically

15  significant?

16    A.  It was not.

17    Q.  And on e5 in the top left-hand corner, do

18  you talk about the different techniques that were used

19  that you believe led to a low mesh exposure rate?

20        MR. SLATER:  Objection, you can answer.

21  BY MR. SNELL:

22    Q.  Strike that.

23        Do you talk about the techniques used to

24  prevent measure erosion after transvaginal placement?

25        MR. SLATER:  Objection.  You can

Confidential - Subject to Stipulation and Order of Confidentiality

Page 526

1 answer.
2         THE WITNESS:  We're looking at the
3 third column?
4 BY MR. SNELL:
5     Q.  I'm sorry if I said the third column.  On
6 Page e5 on the first column, do you discuss techniques
7 used to prevent mesh erosion after transvaginal
8 placement?
9     A.  I do.
10     Q.  Plaintiff's Exhibit 240, the transcript from
11 Dr. Lucente's webinar.
12     A.  I have it.
13     Q.  Do you see the date on this is
14 December 14th, 2008?
15     A.  At the top I see December 15th, 2008.  I
16 think the time is 14:59, yeah, if I'm looking at the
17 same place you're looking.
18     Q.  With regard to chronic pain patients in
19 Dr. Lucente's opinions regarding them, have you seen
20 those opinions set forth in a journal available to
21 pelvic floor surgeons?
22     A.  Yes, I have.
23     Q.  Turn, if you would, to the clinical -- turn,
24 if you would, Doctor, to the clinical practice
25 guidelines on vaginal graft use from 2008.

Page 527

1     A.  I have it.
2     Q.  Did these clinical practice guidelines focus
3 on whether there were randomized, controlled trials
4 available for different prolapse procedures?
5         MR. SLATER:  Objection.
6         THE WITNESS:  Yes.
7 BY MR. SNELL:
8     Q.  And was one of the findings that other
9 prolapse procedures did not have many randomized,
10 controlled trials?
11     A.  Yes.
12     Q.  Was that a specific finding to transvaginal
13 mesh or to all prolapse procedures observed and
14 analyzed in this document?
15     A.  Unfortunately, specifically at the time when
16 this was analyzed, there were very few randomized
17 clinical trials regarding prolapse repair of any type.
18     Q.  Does this document say that surgeons should
19 not use transvaginal mesh?
20     A.  It does not.
21     Q.  Plaintiffs' counsel pointed you towards Page
22 1126, synthetic graft use in the anterior compartment
23 and the first randomized trial in 2001 by Weber.
24         Do you see that?
25     A.  I do.

Page 528

1     Q.  Do you remember plaintiffs' counsel asking
2 you about that?
3     A.  I do.
4     Q.  A little further down with regard to that
5 trial, it states that they also failed to meet their
6 desired sample size based on prospective power
7 calculation?
8     A.  Yes.
9     Q.  And that was for the Weber study?
10     A.  Correct.
11     Q.  On the last page with regard to the
12 recommendations, plaintiffs' counsel asked you
13 questions about those recommendations, correct?
14     A.  Yes.
15     Q.  And was the risk of erosion identified as
16 the known unique risk associated with the use of
17 grafts?
18     A.  Yes.
19     Q.  The potential risks include chronic pain and
20 dyspareunia.  Are those potential risks with all
21 prolapse surgeries?
22         MR. SLATER:  Objection.  You can
23 answer.
24         THE WITNESS:  Yes.
25 BY MR. SNELL:

Page 529

1     Q.  Plaintiffs' counsel asked you about topics
2 such as trimming the mesh and dealing with
3 complications.
4         Do you recall those questions, in general?
5     A.  Yes.
6     Q.  Did the Prolift® professional education
7 address trimming the mesh?
8     A.  Yes, it did.
9     Q.  Did the Prolift® professional education
10 address treating complications, such as mesh exposure?
11         MR. SNELL:  Objection.  You can answer.
12         THE WITNESS:  Yes, it did.
13 BY MR. SNELL:
14     Q.  Did it address different ways or steps to
15 address dyspareunia or pain?
16     A.  Yes.
17         MR. SLATER:  Objection.  You can
18 answer.
19         THE WITNESS:  Yes, it did.
20 BY MR. SNELL:
21     Q.  Did the professional education also address
22 how to set the mesh in a tension-free manner?
23         MR. SLATER:  Objection.  You can
24 answer.
25         THE WITNESS:  Yes, it did.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 530

```
 1  BY MR. SNELL:
 2     Q.  And when you actually led cadaver labs, is
 3  that something you taught to physicians?
 4     A.  Yes.
 5         MR. SLATER:  Objection.  You can
 6  answer.  I realize it's after but went too quick for
 7  me.
 8  BY MR. SNELL:
 9     Q.  If surgeons encountered a complication and
10  wanted to seek input from someone such as yourself, a
11  precept or a proctor, were they available to do such?
12     A.  Absolutely.
13     Q.  Plaintiffs' counsel asked you some questions
14  about the IFU and the specific -- in certain specific
15  sections of the IFU.
16         Do you recall that?
17     A.  Yes.
18     Q.  Look at the very front of the IFU.  It
19  states, training on the use of Gynecare Prolift®
20  Pelvic Floor Repair Systems is recommended and
21  available.
22         Do you see that?
23     A.  How far down are we?
24     Q.  On the very first page, the third line.
25     A.  Yes.
```

Page 531

```
 1     Q.  And it also referenced the recommended
 2  surgical technique guide right below that?
 3     A.  Yes.
 4     Q.  Is the IFU intended for surgeons like
 5  yourself?
 6     A.  I think so, yes.
 7     Q.  Turn to Exhibit Number 5, "Vaginal Prolapse
 8  Repair, Suture Repair Versus Mesh Augmentation:  A
 9  Urogynecology Perspective."
10     A.  I have it here.
11     Q.  It's the article from 2012.
12         Turn to Page 330 and 331.  You talk about
13  the small percentage of patients who develop
14  dyspareunia will require a surgical intervention?
15         MR. SLATER:  Objection.
16         THE WITNESS:  Yes.
17  BY MR. SNELL:
18     Q.  Do you also discuss how patients can
19  significantly improve with different therapies?
20         MR. SLATER:  Objection.
21         THE WITNESS:  Yes.
22  BY MR. SNELL:
23     Q.  And are those treatment modalities also
24  potentially effective for other prolapse nonmesh
25  surgeries?
```

Page 532

```
 1         MR. SLATER:  Objection --
 2  BY MR. SNELL:
 3     Q.  -- in dealing with dyspareunia that may
 4  arise after those types of prolapse surgeries?
 5         MR. SLATER:  Objection.
 6         THE WITNESS:  Yes, they are.
 7  BY MR. SNELL:
 8     Q.  In the different studies and exhibits, have
 9  you seen other groups who had a zero percent exposure
10  rate?
11     A.  Yes, I quoted that Abed study that looked
12  at -- systematically looked at risk of erosion, and
13  the range was from zero and up.
14     Q.  Turn to Exhibit Number 7, the transvaginal
15  mesh ultrasound study by Velemir.  You know what,
16  forget that.
17         Plaintiffs' counsel asked you some questions
18  about how surgical procedures for prolapse developed
19  over time with regard to native tissue repairs.
20         Do you recall answering all those questions?
21     A.  Yes.
22     Q.  Was the transvaginal mesh procedure also
23  developed by surgeons?
24     A.  Yes.
25     Q.  Plaintiffs' counsel asked you some questions
```

Page 533

```
 1  about the patient brochure, the initial patient
 2  brochure for Prolift®.  I want to ask you a couple
 3  other questions.
 4         Under what are the risks, where it
 5  identifies injury to the blood vessels of the pelvis,
 6  nerve damage, difficulty urinating, bladder and bowel
 7  injury and a risk of the mesh material becoming
 8  exposed into the vaginal canal, was it your testimony
 9  that reading that could scare a patient?
10         MR. SLATER:  Objection.  You can
11  answer.
12         THE WITNESS:  Yes.
13  BY MR. SNELL:
14     Q.  And that's the testimony plaintiffs' counsel
15  sought to strike earlier, correct?
16         MR. SLATER:  Objection.
17         THE WITNESS:  I believe so, yes.
18  BY MR. SNELL:
19     Q.  He asked you to read the top part of "Is
20  Gynecare Prolift® right for me?"
21         Do you recall that about the different
22  patients?
23     A.  Yes.
24     Q.  What does the last sentence of that
25  paragraph say?
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 534

1    A.  Only a complete physical examination and
2   consultation with your physician can determine which
3   procedure is right for you.
4       Q.  And the last page of the patient brochure,
5   does it also include adverse reactions including
6   infection potentiation, inflammation, adhesion,
7   fistula, erosion, extrusion, scarring, implant
8   contraction?
9           MR. SLATER:  Objection.  You can
10  answer.
11          THE WITNESS:  Yes, it does.
12  BY MR. SNELL:
13      Q.  Turn to Exhibit 760, the "Complications from
14  vaginally placed mesh in pelvic reconstructive
15  surgery."
16      A.  What exhibit number?
17      Q.  760, the 2009 article.
18      A.  I have it.
19      Q.  Turn back to Page 530.  You were asked about
20  the complications and whether with Prolift® there
21  could be life-changing complications.
22      Do you recall that?
23      A.  Yes.
24      Q.  Can there be life-changing complications
25  with any pelvic organ prolapse surgery?

Page 535

1    A.  Yes.
2       Q.  And that would include pelvic pain or
3   dyspareunia?
4       A.  It would.
5       Q.  Turn, if you would, to the FDA 2011 alert,
6   Exhibit 451.
7       A.  I have it.
8       Q.  Down in the bottom third of the first page,
9   plaintiffs' counsel began reading "In particular, the
10  literature review revealed that," and it lists four
11  bullet points.
12      Do you see that?
13      A.  Yes.
14      Q.  The third bullet point, there's no evidence
15  that transvaginal repair to support the top of the
16  vagina (apical repair) provides added benefit compared
17  to traditional surgery without mesh.
18      Do you see that?
19      A.  I do.
20      Q.  Turn if you would to Page 22 of your report.
21      Is there evidence that Prolift® repair to
22  support the top of the vagina, being apical repair,
23  provides a benefit compared to traditional surgery?
24          MR. SLATER:  Objection.  You can
25  answer.

Page 536

1           THE WITNESS:  Yes, there is.
2   BY MR. SNELL:
3       Q.  Is there a particular study that you
4   reference?
5       A.  The Halaska study from 2012.
6           MR. SNELL:  Thank you.
7           MR. SLATER:  I'm going to come back
8   around the table and continue questioning you now.
9   Give me one second.  Off the video for a second.
10          THE VIDEOGRAPHER:  Going off the
11  record.  The time is 10:57 p.m.
12          (Brief recess.)
13          THE VIDEOGRAPHER:  We're back on the
14  record.  The time is 10:59 p.m.
15  BY MR. SLATER:
16      Q.  Okay.  Doctor, you were asked a question a
17  few moments ago about the article published by Fatton
18  and a group of doctors from the TVM group in 2007,
19  which was actually published online in 2006.
20      Do you remember that question?
21      A.  Yes.
22      Q.  Are you familiar with that study?
23      A.  I'd have to review it again to give you
24  details on it, but I report on it in my report.
25      Q.  Do you know anything about that study, other

Page 537

1   than the fact that it was some TVM doctors reporting
2   on the results of patients with the Prolift®?  Is
3   there anything you can tell me about it, as you sit
4   here right now?
5       A.  That it was a study of Prolift®.
6       Q.  Anything beyond that?
7       A.  That it had results regarding Prolift®.
8       Q.  Anything else you can tell me right now
9   about that article?
10      A.  I believe it reported both outcomes and
11  adverse events.
12      Q.  Do you remember what the shrinkage rate was
13  that was reported in that article?
14      A.  I do not.
15      Q.  Do you remember that it was a 17% shrinkage
16  rate that was documented by the TVM group in that
17  article that was published online in late 2006?
18      A.  I don't recall that.
19      Q.  17% shrinkage rate, that's a very high rate,
20  isn't it?
21          MR. SNELL:  Objection, form.
22          THE WITNESS:  Depends how you're
23  defining shrinkage.
24  BY MR. SLATER:
25      Q.  When Ethicon saw that data, whenever it was

Confidential - Subject to Stipulation and Order of Confidentiality

Page 538

1 first available to Ethicon, Ethicon needed to be
2 concerned that the TVM group, some of the preeminent
3 physicians with regard to the TVM procedure/the
4 Prolift® procedure were getting 17% shrinkage, right?
5         MR. SNELL:  Objection, form.
6         THE WITNESS:  I missed the beginning
7 part of that question after the rest of it.
8 BY MR. SLATER:
9     Q.  When Ethicon saw the data that's reported
10 that Fatton article --
11     A.  Yes.
12     Q.  -- you would agree that Ethicon needed to be
13 concerned that the TVM group doctors, among the most
14 proficient in the world at doing the Prolift®, were
15 getting 17% shrinkage?
16     A.  No.
17     Q.  Meaning 17% of the patients were being
18 reported with shrinkage.
19         MR. SNELL:  Objection, form.  Go ahead.
20         THE WITNESS:  No.
21 BY MR. SLATER:
22     Q.  You as an expert for Ethicon, do you think
23 there's anything of concern about the fact that in
24 that study it was documented that 17% of those
25 patients with Prolifts® were found to have shrinkage

Page 539

1 of the mesh?
2     A.  Any adverse outcome is concerning.
3     Q.  What should Ethicon have done in response to
4 that data, anything?
5     A.  I don't know.
6     Q.  Do you know what the conclusion was of the
7 Fatton article authors in that article that was
8 published online at the end of 2006?
9     A.  Are you asking me to recall a specific
10 conclusion from that paper.
11     Q.  Do you remember?  Do you know?
12     A.  I do not recall.
13     Q.  Is it referenced in your report?
14     A.  Yes.
15     Q.  The conclusion by the authors?
16     A.  The report, the article is referenced in my
17 report.
18     Q.  Well, as you sit here now, do you know what
19 the conclusion was by the authors?
20     A.  I listed many, many studies.  They all have
21 many conclusions.  How could you expect me to remember
22 all the conclusions?
23     Q.  Well, I remember them so...
24     A.  You're asking the questions, it's easy that
25 way.

Page 540

1     Q.  Well, let me ask you this:  With regard to
2 that study, did you list it for any particular reason,
3 or was it just part of a laundry list of studies that
4 you referred to just so that you could be sure that
5 you had referred to these articles in case you wanted
6 to talk about them at trial?
7     A.  No, it certainly involved me forming my
8 opinion.
9     Q.  What about that article was significant to
10 you in forming your opinion, the Fatton 2006 article
11 about the 110 patients?
12     A.  That it was a published study on Prolift®.
13     Q.  What about the study was significant to you
14 in forming your opinions?
15     A.  That it reported on Prolift®, the outcomes.
16     Q.  The fact that outcomes were reported in that
17 article, that was the significant fact with regard to
18 that study that you relied on?
19     A.  That's one of them.
20     Q.  What else?
21     A.  That's the main thing that I report on.
22 Outcomes is the whole topic that we're talking about.
23     Q.  Was there anything about -- rephrase.
24         Are you saying that because there was an
25 article that reported on outcomes, regardless of what

Page 541

1 those were, that's significant to you?
2     A.  Ask the question again.
3     Q.  Are you saying that the fact that the Fatton
4 article reports outcomes of the Prolift® procedure in
5 and of itself, the fact that there was a report of
6 outcomes, that that was what was significant to you?
7     A.  Yes.
8     Q.  Was there anything about the particular
9 outcomes that were reported that were of significance
10 to you?
11     A.  If you'd like to get out the article, I can
12 look it through, and I can't recall right now.
13     Q.  Is there anything that you referred in your
14 report to saying in that article, these outcomes were
15 referenced and this is significant to me?
16     A.  I believe that it was one of the first
17 articles that actually reported on the actual Prolift®
18 procedure, so that's significant.
19     Q.  Here's my question:  Was there anything
20 about what was reported in that article that you
21 referenced in your report as having been of
22 significance to you, any specific finding in that
23 article, anything that was reported in that article?
24 Did you talk about anything like that in your report?
25     A.  (Witness reviews document.)  I'm having

Confidential - Subject to Stipulation and Order of Confidentiality

Page 542

1 difficulty finding in my report where I reference it.
2 If you'd like to help me, we might be able to move
3 along.
4     Q.  I don't know.
5         MR. SNELL:  Page 21.  I only pointed
6 him to it because he couldn't remember whether it was
7 TVM or Prolift®.
8         MR. SLATER:  It's okay.
9 BY MR. SLATER:
10    Q.  It's on Page 21, end of -- at the top of the
11 first full paragraph, a third of the way down the
12 page.
13    A.  Yes, I specifically reference it because
14 it's the first study of the Prolift® system to be
15 published in peer-reviewed journals.
16    Q.  So other than the fact that this was the
17 first study published with regard to the Prolift®, was
18 there anything else that was of significance to you
19 within the content of the article, any of the data
20 that was reported?
21    A.  I would have to get out the article and look
22 at it to know.
23    Q.  You did not in your report discuss any of
24 the data reported in the Fatton article, correct?
25    A.  I do not reference it specifically to that

Page 544

1     Q.  Because it's a true statement, right?
2     A.  Because it's always great to have lots of
3 data.
4     Q.  Well, when Ethicon decides to sell the
5 Prolift®, they need to take seriously if there is a
6 need for long-term data before doctors can say, yes,
7 this is a safe and effective procedure.  They need to
8 wait until they have that data before they tell the
9 world it's a safe and effective procedure; that's the
10 obligation of the manufacturer who's selling the
11 procedure for money, right?
12        MR. SNELL:  Objection, form.
13        THE WITNESS:  There were a lot of
14 things you just said there.  You want me to agree to
15 each one?
16 BY MR. SLATER:
17    Q.  No, I'll ask a new question.  You're
18 entirely right.  It was a rambling, long question.
19        Ethicon needed to make sure that it had the
20 clinical evidence to prove that the Prolift® was safe
21 and effective before it would sell the Prolift® on the
22 open market, right?
23    A.  Yes and --
24        MR. SNELL:  Objection to form.
25        THE WITNESS:  I think they did.

Page 543

1 report, correct.
2     Q.  In fact, nowhere in your report do you point
3 out that the Fatton article reports a 17% shrinkage
4 rate with the Prolift®, that's not mentioned in your
5 report anywhere, right?
6     A.  That's correct.
7     Q.  And what you don't mention also is the
8 conclusion by the authors, which is that long-term
9 studies are needed in order to confirm the safety and
10 efficacy of the Prolift® procedure; that's not
11 mentioned in your report either, is it?
12        MR. SNELL:  Objection, form.
13        THE WITNESS:  That's correct.
14 BY MR. SLATER:
15    Q.  And, in fact, you have that article, which
16 is written by the TVM group doctors, right?
17    A.  Some of them.
18    Q.  Where they're saying almost two years after
19 the Prolift® was almost -- was already on the market,
20 they're saying long-term studies are needed to confirm
21 it's a safe and effective procedure, right?
22    A.  If you look at almost any article in the
23 scientific literature referring to new procedures,
24 almost every one will say you need more long-term
25 data.

Page 545

1         MR. SLATER:  Move to strike from and.
2 BY MR. SLATER:
3     Q.  And if Ethicon needed to have long-term data
4 to prove the safety and effectiveness of the Prolift®,
5 according to the people who created the procedure, and
6 they're saying that at the end of 2006, it was
7 probably premature to put the Prolift® on the market
8 in March of 2005; isn't that so?
9         MR. SNELL:  Objection, form.
10        THE WITNESS:  I disagree.
11 BY MR. SLATER:
12    Q.  I want to ask you about Exhibit 895, the
13 short-term results with the 349 patients, okay.  I
14 don't know that you're going to really have to look at
15 it.  If you do, you can look at it, but I'm going to
16 try to just ask you one direct question about it.
17        The 1.7% of patients who had persistent
18 dyspareunia at six months, ask you about that group,
19 okay?
20    A.  Okay.
21    Q.  That's --
22    A.  Are we referring to six people?
23    Q.  Whatever number it is that was 1.7%?
24    A.  Well, then I should look at the article and
25 if you -- I should look at it.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 546

1    Q.  It's Exhibit 895.

2    A.  I have it here.

3    Q.  And that article, which you're one of the

4  co-authors on, 1.7% of the patients in that study had

5  persistent dyspareunia at six months, correct?

6    A.  I don't see it here, but I agree that

7  that's, I think, one of the conclusions.

8    Q.  Which means that those patients, whatever

9  treatment they got, the dyspareunia was refractory to

10  that treatment and the patients continued to have that

11  complaint, correct?

12    A.  At that time point.

13    Q.  Right.

14    A.  Yes.

15    Q.  At the six months?

16    A.  Yes.

17    Q.  Okay.  What ended up happening with those

18  patients?

19    A.  I don't know.

20      (Document marked for identification

21      as Murphy Deposition Exhibit No. 8.)

22  BY MR. SLATER:

23    Q.  I'm going to mark as Exhibit Murphy-8 the

24  November 2, 2012 deposition transcript of Dr. Lucente

25  and ask you to turn to Page 104.

Page 547

1    A.  Okay.

2    Q.  On Page 104 Dr. Lucente is asked a question

3  on Line 6 --

4      MR. SNELL:  Let me get there.

5  BY MR. SLATER:

6    Q.  And you knew at least by 2005 to early 2006

7  that those individuals who had migraines and

8  interstitial cystitis and other similar chronic --

9  systemic -- I'm sorry -- systemic chronic pain

10  syndromes would be at a heightened risk for developing

11  chronic pain after the insertion of the Prolift®,

12  correct?

13      Answer that Dr. Lucente gave was what, he

14  says correct, right?

15    A.  He does.

16    Q.  The next question, and you had by that point

17  in time had a number of discussions with those

18  individuals, higher-ups at Ethicon concerning that,

19  correct?

20      And Dr. Lucente answers, correct, right?

21    A.  Correct.

22    Q.  And then he's asked the question, and they

23  knew that Dave Robinson, Charlotte Owens, Piet Hinoul

24  through your conversation with them, they expressed

25  that they were aware of that fact and that risk,

Page 548

1  correct?

2      And the witness, Dr. Lucente says, yes,

3  right?

4    A.  Correct.

5    Q.  So Dr. Lucente testified under oath that by

6  2005 to early 2006, he had had discussions with people

7  in medical affairs at Ethicon with regard to the fact,

8  from his perspective, chronic pain syndromes, if

9  someone had a systemic chronic pain syndrome, they

10  would be at a heightened risk for developing chronic

11  pain after the insertion of the Prolift®; that's what

12  he testified to, correct?

13      MR. SNELL:  Object to the form.  He

14  testified on that subject to different dates, multiple

15  different dates.

16      MR. SLATER:  Do you want to testify?

17  You want to switch seats because it's too late for

18  this now.

19  BY MR. SLATER:

20    Q.  Am I correct?

21      MR. SLATER:  So move to strike the

22  comment by counsel.

23      THE WITNESS:  You read the testimony --

24      MR. SNELL:  Objection, form.  Go ahead.

25      MR. SLATER:  I'll ask a new question.

Page 549

1  BY MR. SLATER:

2    Q.  Did you -- do you dispute what Dr. Lucente

3  testified to here on Page 104?

4    A.  Yes.

5    Q.  Do you dispute that he provided that

6  information to Ethicon in 2005 to early 2006?

7    A.  Yes.

8    Q.  Do you dispute that Ethicon was aware of

9  that information at that time?

10    A.  At that time period, yes.

11    Q.  Do you dispute that Dr. Lucente had drawn

12  that conclusion by 2005 to early 2006?

13    A.  Yes.

14    Q.  If this jury finds that Ethicon was aware by

15  2005 to early 2006 that patients with systemic chronic

16  pain syndromes would be at a heightened risk for

17  developing chronic pain after the insertion of the

18  Prolift®, if that's what the jury finds, you as an

19  expert would agree that's information that Ethicon

20  needed to get to physicians so that they could know

21  that as available information when deciding what to

22  recommend to their patients, correct?

23      MR. SNELL:  Objection, form.

24      THE WITNESS:  I don't recall the

25  beginning of that statement.  I wouldn't even know

Confidential - Subject to Stipulation and Order of Confidentiality

Page 550

1 what to say, yes or no.
2        MR. SLATER:  Could you read it back to
3 him, please.
4        (The court reporter read back the
5        record as requested.)
6        MR. SNELL:  Note my objection again.
7        THE WITNESS:  I think I already
8 testified to this.  I think that that's opinion of one
9 doctor.  I think the time frame, I think he's probably
10 not recalling that correctly, but apart from that,
11 that's the opinion of one doctor to some people in
12 Ethicon.
13 BY MR. SLATER:
14    Q.  My question is this -- I'll ask a new
15 question.
16        MR. SLATER:  Do you have a problem?
17 Are you rolling your eyes at me now?
18        MR. SNELL:  No, I just -- I think we've
19 covered this before a couple times.
20        MR. SLATER:  You opened the door and
21 started talking about this when you asked him about
22 the webinar, so I'm going to cover the issue now.
23        MR. SNELL:  No.  You marked the webinar
24 as an exhibit.  I just asked him a question about a
25 sentence right next to the sentence you asked him

Page 551

1 about that you want -- that you moved to strike.
2        MR. SLATER:  You talked about it, I'm
3 going to go through it.  I told you if you question
4 him, I'm going to question him thoroughly.
5        MR. SNELL:  All I did was --
6        MR. SLATER:  What are we doing?
7        MR. SNELL:  -- ask him about what you
8 moved to strike.
9        MR. SLATER:  You can ask him whatever
10 you want, but don't roll your eyes at me for following
11 up.
12        MR. SNELL:  I'm not rolling my eyes at
13 you.
14        MR. SLATER:  You are.  You are.  I
15 think you hurt my feelings.
16        MR. SNELL:  You're going way over --
17        MR. SLATER:  I'm very sensitive.
18        MR. SNELL:  You're going way over.  I
19 just asked about stuff you tried to strike.  That's
20 it.
21 BY MR. SLATER:
22    Q.  What do you say to a patient who had a
23 Prolift® put in her body after Ethicon became aware
24 that patients with systemic chronic pain conditions
25 were at a heightened risk to suffer from pain

Page 552

1 following Prolift® insertion?
2    A.  I disagree with the premise of your
3 statement.
4    Q.  You don't even know what I'm going to ask
5 you.
6    A.  I know, because I'm not stating an answer to
7 your question.  I'm disagreeing with that premise.
8    Q.  Okay.  What do you say to a patient who had
9 a systemic chronic pain condition, had a Prolift® put
10 in her body and developed severe pain afterwards and
11 the doctor didn't know that that woman was at a
12 heightened risk, according to what I just read to you
13 from Dr. Lucente's deposition, and the doctor himself
14 says, if I knew that, I wouldn't have used the
15 Prolift® with her?  If I knew that that was a concern,
16 I wouldn't have used the Prolift® with this woman.
17 What do you say to that woman about Ethicon's failure
18 to get that information out to her?
19        MR. SNELL:  Objection.
20 BY MR. SLATER:
21    Q.  To her doctor?
22        MR. SNELL:  Objection, form.
23        THE WITNESS:  I would say that it's my
24 opinion no matter what surgery she had, she was at a
25 heightened risk for that outcome.

Page 553

1 BY MR. SLATER:
2    Q.  And if she said, well, you know, I would
3 have liked to know that I could have had something
4 other than the Prolift® because -- rephrase.
5        And if she said to you, you know what, I
6 would have liked to have known that I had a higher
7 risk with the Prolift® and I could have decided not to
8 use it if I wanted to, would that information --
9    A.  Again, you're using the term higher, that
10 implies a comparison.  There is no comparative data in
11 regard to this point.
12    Q.  Okay.  So you disagree with Dr. Lucente's
13 viewpoint on this issue, the issue of women with
14 systemic chronic pain syndromes, like migraines or
15 interstitial cystitis, having a higher risk to develop
16 pain after Prolift® insertion?  You just disagree with
17 him on that; am I correct?
18        MR. SNELL:  Object to the form.
19        THE WITNESS:  You mentioned many things
20 that I either have to agree or disagree with, so,
21 number one, I disagree with his recalling the time
22 period when he discovered that.
23 BY MR. SLATER:
24    Q.  My question didn't ask about the time period
25 just now.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 554

1    A.  Your question asked about all sorts of
2  things.
3    Q.  I'm asking you a clean question because I
4  didn't ask you about the time period.
5    A.  Okay.
6    Q.  It's late, I understand it can be confusing,
7  so here is a very simple question:  Do you disagree
8  with Dr. Lucente to the extent that he offers the
9  opinion that a patient with a systemic chronic pain
10  syndrome has a higher risk to develop chronic pain
11  after Prolift® surgery?
12        MR. SNELL:  Objection, form.
13        THE WITNESS:  You're saying that he
14  says that's a higher risk.  I don't know what that
15  means, a higher risk than someone who doesn't have
16  chronic pain?
17  BY MR. SLATER:
18    Q.  Right.
19    A.  I don't disagree with that.
20    Q.  You agree with him on that?
21    A.  I don't disagree that a patient who has a
22  Prolift® who has a pre-existing condition of chronic
23  pain is not at a higher risk of having that outcome
24  after the Prolift® than someone who does not have a
25  pre-existing pain syndrome, okay, because I think

Page 555

1  that's the case in any surgery that someone has, and
2  I've said this about 15 times tonight.
3    Q.  You were asked by counsel a moment ago about
4  professional education, and you agreed with him when
5  he asked you if professional education from Ethicon
6  addressed trimming mesh, you remember that?
7    A.  Yes.
8    Q.  Addressed treatment of complications, you
9  remember that?
10    A.  Yes.
11    Q.  And how to address dyspareunia and pain; do
12  you remember that?
13    A.  Yes.
14    Q.  Tell me what specific professional education
15  documents addressed those three issues?
16    A.  The slide deck on professional education.
17    Q.  And when are those slide decks dated, the
18  ones that cover those three issues?  Start with
19  trimming mesh, when is that slide deck dated?
20    A.  I can't recall exactly.  I would say they're
21  somewhere in the range of 2005 to 2007.
22    Q.  You don't know, though?
23    A.  I can't recall exactly.  No, I do not.
24    Q.  Would about treatment of complications, same
25  answer?

Page 556

1    A.  Correct.
2    Q.  What about how to address dyspareunia and
3  pain, same answer?
4    A.  Correct.
5    Q.  Do you know whether those slide decks were
6  seen by all surgeons using the Prolift®?
7    A.  I do not.
8    Q.  Do you know which preceptors or physicians
9  who conducted professional education used those slide
10  decks as opposed to any other materials?
11    A.  I think anyone who had those slide decks
12  used them, any of the preceptors that acted on behalf
13  of Gynecare.
14    Q.  Why do you believe that they were used?
15    A.  Because when people give professional
16  education talks on behalf of a company, they usually
17  use slide decks from that company.
18    Q.  Did you ever use the professional education
19  slide decks in a professional education event you were
20  involved in?
21    A.  I think so.
22    Q.  What do you mean you think so; either you
23  did or you didn't?
24    A.  I can't recall exactly.
25    Q.  Do you know which one -- well, let me ask

Page 557

1  you this:  You can't recall whether you used a slide
2  deck, so you wouldn't be able to tell me which you
3  might have used at any point in time; is that true?
4        MR. SNELL:  Objection, form.
5        THE WITNESS:  Generally, my role at a
6  lot of these continuing -- or excuse me --
7  professional education meetings was as a preceptor on
8  cadavers.  It was very rare that I was the one giving
9  a talk.  I know that once or twice I did.  I can't
10  recall whether that was in regard to TVT®, Prosima®,
11  Prolift®.  I can't recall.
12  BY MR. SLATER:
13    Q.  As you sit here now, you can't recall
14  whether you actually conducted a professional
15  education event with regard to the Prolift®, other
16  than maybe when you precepted or proctored; is that
17  true?
18    A.  I can't recall which product I might have
19  given a lecture for.
20    Q.  Okay.  Do you know when -- well, rephrase.
21        The IFU for the Prolift® is intended to be
22  read and understood by physicians, correct?
23    A.  Yes.
24    Q.  It's not written for patients, correct?
25    A.  That is my understanding, yes.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 558

1    Q.  So to the extent that the information in the
2    IFU about adverse events, contraindications or
3    warnings, that type of information, to the extent
4    that's found in the IFU, you wouldn't expect a patient
5    to read that, understand it, utilize it, because it's
6    not intended for patients, correct?
7           MR. SNELL:  Objection, form.  Go ahead.
8           THE WITNESS:  Correct.
9    BY MR. SLATER:
10   Q.  The TVM study -- rephrase.
11       The TVM procedure was developed by some
12   French surgeons, correct?
13   A.  That's what I believe, yes.
14   Q.  With the involvement of Axel Arnaud of
15   Gynecare France from the very beginning, correct?
16   A.  I do not know.
17   Q.  Do you know whether Gynecare ran the
18   logistics for that TVM procedure to be developed?
19   A.  I think it ran the study.  I don't know if
20   it ran the logistics for the initiation of it as a
21   concept.
22   Q.  You don't know what involvement somebody
23   from Gynecare or Ethicon had with the TVM doctors in
24   developing the TVM procedure, correct?
25   A.  Correct.

Page 559

1           MR. SLATER:  No other questions.
2           MR. SNELL:  That's all I have.  I don't
3    have anything.
4           MR. SLATER:  Did you strike anything?
5           THE VIDEOGRAPHER:  Here marks the end
6    of Volume 1 and Tape Number 9 in the deposition of
7    Dr. Miles Murphy.  We're going off the record.  The
8    time is 11:24 p.m.
9                 ---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 560

1           C E R T I F I C A T I O N
2           I, MARGARET M. REIHL, a Registered
3    Professional Reporter, Certified Realtime Reporter,
4    Certified Shorthand Reporter, Certified LiveNote
5    Reporter and Notary Public, do hereby certify that the
6    foregoing is a true and accurate transcript of the
7    testimony as taken stenographically by and before me
8    at the time, place, and on the date hereinbefore set
9    forth.
10          I DO FURTHER CERTIFY that I am neither
11   a relative nor employee nor attorney nor counsel of
12   any of the parties to this action, and that I am
13   neither a relative nor employee of such attorney or
14   counsel, and that I am not financially interested in
15   the action.
16
17
18       --------------------------------
         Margaret M. Reihl, RPR, CRR, CLR
19       CSR #XI01497  Notary Public
20
21
22
23
24
25

Page 561

1           INSTRUCTIONS TO WITNESS
2
3           Please read your deposition over carefully
4    and make any necessary corrections.  You should
5    state the reason in the appropriate space on the
6    errata sheet for any corrections that are made.
7           After doing so, please sign the errata
8    sheet and date it.
9           You are signing same subject to the
10   changes you have noted on the errata sheet, which
11   will be attached to your deposition.
12          It is imperative that you return the
13   original errata sheet to the deposing attorney
14   within thirty (30) days of receipt of the deposition
15   transcript by you.  If you fail to do so, the
16   deposition transcript may be deemed to be accurate
17   and may be used in court.
18
19
20
21
22
23
24
25

Confidential - Subject to Stipulation and Order of Confidentiality

Page 562

```
 1        E R R A T A  S H E E T
 2            - - - - - -
 3
 4  PAGE  LINE   CHANGE
 5  ____ ____  _____
 6     REASON:  _____
 7  ____ ____  _____
 8     REASON:  _____
 9  ____ ____  _____
10     REASON:  _____
11  ____ ____  _____
12     REASON:  _____
13  ____ ____  _____
14     REASON:  _____
15  ____ ____  _____
16     REASON:  _____
17  ____ ____  _____
18     REASON:  _____
19  ____ ____  _____
20     REASON:  _____
21  ____ ____  _____
22     REASON:  _____
23  ____ ____  _____
24     REASON:  _____
25
```

Page 564

```
 1        LAWYER'S NOTES
 2  PAGE LINE
 3  ____ ____ _____
 4  ____ ____ _____
 5  ____ ____ _____
 6  ____ ____ _____
 7  ____ ____ _____
 8  ____ ____ _____
 9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25  ____ ____ _____
```

Page 563

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4        I, MILES MURPHY, M.D., do
 5  hereby certify that I have read the foregoing pages,
 6  1-564, and that the same is a correct transcription
 7  of the answers given by me to the questions therein
 8  propounded, except for the corrections or changes in
 9  form or substance, if any, noted in the attached
10  Errata Sheet.
11
12
    _____
13
    MILES MURPHY, M.D.          DATE
14
15
16
17
    Subscribed and sworn
18  to before me this
    ____ day of _____, 2012.
19
    My commission expires:_____
20
21  _____
    Notary Public
22
23
24
25
```