# EXHIBIT 2

Miles Murphy, M.D.

```
 1      IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2              CHARLESTON DIVISION
                    -  -  -
 3

     IN RE: ETHICON, INC. PELVIC   : Master File No.
 4   REPAIR SYSTEM PRODUCTS         : 2:12-MD-02327
     LIABILITY LITIGATION          : MDL No. 2327
 5

     THIS DOCUMENT RELATES TO ALL  : JOSEPH R.
 6   WAVE 8 AND SUBSEQUENT WAVE     : GOODWIN
     CASES AND PLAINTIFFS          : U.S. DISTRICT
 7                                  : JUDGE
 8          General TVT and TVT-O Matter
 9                  -  -  -
10              OCTOBER 9, 2018
11                  -  -  -
12          Oral deposition of MILES
13   MURPHY, M.D., taken pursuant to notice,
14   was held at the law offices of Butler
15   Snow LLP, 500 Office Center Drive, Suite
16   400, Fort Washington, Pennsylvania 19034,
17   commencing at 10:02 a.m., on the above
18   date, before Amanda Dee Maslynsky-Miller,
19   a Certified Realtime Reporter and Notary
20   Public in and for the Commonwealth of
21   Pennsylvania.
22                  -  -  -
            GOLKOW TECHNOLOGIES, INC.
23     877.370.3377 ph| 917.591.5672 fax
                deps@golkow.com
24
```

Miles Murphy, M.D.

Page 2

1  APPEARANCES:
2
3      AYLSTOCK, WITKIN, KREIS &
       OVERHOLTZ, PLLC
4      BY:  ANN GAYLE, ESQUIRE
       17 E. Main Street
5      Suite 200
       Pensacola, Florida 32563
6      (850) 202-1010
       Agayle@awkolaw.com
7      Representing the Plaintiff
8
9
10     BUTLER SNOW LLP
       BY:  NILS B. (BURT) SNELL, ESQUIRE
11     500 Office Center Drive
       Suite 400
12     Fort Washington, Pennsylvania 19034
       (267) 705-4910
13     Burt.snell@butlersnow.com
       Representing the Defendant
14
15
16
17
18
19
20               - - -
21
22
23
24

Page 3

1               - - -
2         I N D E X
3               - - -
4
5  Testimony of:  MILES MURPHY, M.D.
6  By Ms. Gayle              7, 253
   By Mr. Snell            205, 255
7
8               - - -
9         E X H I B I T S
10              - - -
11
   NO.        DESCRIPTION            PAGE
12
   Murphy-1    Notice to Take Deposition
13            of Miles Murphy, MD        13
14  Murphy-1A    Thumb drive with Materials  19
15  Murphy-2    Defendants' Objections and
              Responses to Plaintiffs'
16            Notice to Take Deposition
              of Miles Murphy, MD        19
17
   Murphy-3    Invoices            20
18
   Murphy-3A   Held Open for Additional
19            Invoices            31
20  Murphy-4    Intentionally Blank
21  Murphy-5    Intentionally Blank
22  Murphy-6    Miles Murphy, General
              Reliance List in
23            Addition to Materials
              Referenced in Report    33
24

Page 4

1               - - -
2         E X H I B I T S
3               - - -
4
5  NO.        DESCRIPTION            PAGE
6  Murphy-7    General Report of Miles
              Murphy, MD, MSPH, FACOG   34
7  Murphy-8    Intentionally Blank
8  Murphy-9    Curriculum Vitae, Miles
              Murphy, MD, MSPH, FACOG   88
9
   Murphy-10   Richard Ellerkmann,
10            General Reliance List in
              to Addition to Materials
11            Referenced in Report    94
12  Murphy-11   Ahmet Bedestani General
              Reliance List in Addition
13            to Materials Referenced
              In Report            113
14
   Murphy-12   Curriculum Vitae, Miles
15            Murphy, MD, MSPH, FACOG   195
16  Murphy-13   Elongation Of Textile
              Pelvic Floor Implants Under
17            Load is Related To
              Complete Loss of Effective
18            Porosity, Thereby Favoring
              Incorporation in Scar
19            Plates, Otto         195
20  Murphy-14   AUGS, Update on Vaginal
              Mesh for Prolapse and
21            Incontinence         197
22  Murphy-15   Table of Contents, General
              Report of Miles Murphy,
23            MD, MSPH, FACOG       201
24

Page 5

1               - - -
2         E X H I B I T S
3               - - -
4
5  NO.        DESCRIPTION            PAGE
6  Murphy-16   Clinical Expert Report,
              Laser Cut Mesh        229
7  Murphy-17   3/6/06 Letter from Gene
              Kammerer to Dr. Marty
8            Weisberg            229
9  Murphy-18   Intentionally Blank
10  Murphy-19   Intentionally Blank
11  Murphy-20   Intentionally Blank
12  Murphy-21   Miles Murphy, Supplemental
              General Materials List in
13            Addition to Materials
              Referenced in Report    44
14
   Murphy-21A  Updated Materials List   44
15
   Murphy-22   Intentionally Blank
16
   Murphy-23   Clinical Study Agreement -
17            Ethicon Initiated     67
18
19
20
21
22
23
24

Miles Murphy, M.D.

Page 6

```
 1              - - -
 2       DEPOSITION SUPPORT INDEX
 3              - - -
 4
 5  Direction to Witness Not to Answer
 6  Page Line   Page Line   Page Line
 7  None
 8
 9
10  Request for Production of Documents
11  Page  Line  Page Line   Page Line
12  29    20
13
14
15  Stipulations
16  Page Line   Page Line   Page Line
17  7    1
18
19
20  Question Marked
21  Page Line   Page Line   Page Line
22  None
23
24
```

Page 8

```
 1  the one report I've issued, but --
 2       MS. GAYLE:  Well, let's go
 3  off the record for one second.
 4       MR. SNELL:  We can stay on
 5  the record just for clarification.
 6       So he did issue one report,
 7  but it's about the TVT and TVT-O
 8  products.
 9       MS. GAYLE:  So he's not
10  opining today about the PROLIFT®?
11       MR. SNELL:  Correct.  He's
12  already given a full-day
13  deposition on that, more than a
14  full day, it was like 12, 14
15  hours.
16       So today he's being put up
17  on his TVT and TVT-O opinions
18  served in his general report.
19       MS. GAYLE:  Can we go off
20  the record for a moment?  Because
21  I was told something else, but
22  that's okay.  So let's go off the
23  record.
24              - - -
```

Page 7

```
 1              - - -
 2       (It is hereby stipulated and
 3  agreed by and between counsel that
 4  sealing, filing and certification
 5  are waived; and that all
 6  objections, except as to the form
 7  of the question, will be reserved
 8  until the time of trial.)
 9              - - -
10       MILES MURPHY, M.D., after
11  having been duly sworn, was
12  examined and testified as follows:
13              - - -
14          EXAMINATION
15              - - -
16  BY MS. GAYLE:
17       Q.   Good morning, Dr. Murphy.
18  My name is Ann Gayle.  I'm with the law
19  firm of Aylstock, Witkin, Kreis and
20  Overholtz.  I'm here to take your
21  deposition today regarding the two
22  general reports that you've issued.
23       Do you understand that?
24       A.   I thought it was just about
```

Page 9

```
 1       (Whereupon, a brief recess
 2  was taken.)
 3              - - -
 4       MS. GAYLE:  Thank you, Burt,
 5  for the courtesy of going off the
 6  record.
 7       MR. SNELL:  Of course.
 8       MS. GAYLE:  Burt and I
 9  cleared it up off the record.  And
10  the doctor is, in fact, here today
11  for only the TVT and TVT-O report.
12  BY MS. GAYLE:
13       Q.   So, Doctor, I understand
14  that you've been deposed before; is that
15  correct?
16       A.   Yes.
17       Q.   And so you're familiar with
18  this process, correct?
19       A.   Yes.
20       Q.   And have you been deposed
21  before as an expert?
22       A.   Yes, I have.
23       Q.   Yes.
24       And so you understand that
```

Miles Murphy, M.D.

1 I'm here today to depose you as an expert
2 witness for your TVT and TVT-O product,
3 correct?
4      A.   Correct.
5      Q.   Doctor, there may be times
6 today where counsel and I may go back and
7 forth and make objections, or even say
8 the words "move to strike."
9           When that happens, sir,
10 there is nothing meant disrespectful to
11 you, it's just that we are doing our jobs
12 to preserve what we call the record.
13          Do you understand that?
14     A.   I understand.
15     Q.   And the court reporter is
16 here today taking the record down.  And
17 it would help her if we don't talk over
18 each other and we let each other finish
19 our questions.
20          Do you understand that?
21     A.   I do.
22     Q.   Also, do you understand that
23 she would require a verbal answer.  So
24 instead of shaking your head or

1 indicating, if you would, the best you
2 could, verbalize your answer, okay?
3      A.   Yes.
4      Q.   And unless your counsel
5 specifically instructs you, then if you
6 understand my question, then please try
7 to answer that.
8           If you don't understand the
9 question, we can either have it read back
10 to you by the court reporter, or we can
11 work through it to where we get to a
12 question that you understand and feel
13 like you can answer, okay?
14     A.   Yes.
15          MR. SNELL:  Just one
16     clarification, I'm not Dr.
17     Murphy's counsel.  I am counsel to
18     Ethicon and Johnson & Johnson.
19          MS. GAYLE:  Thank you.
20 BY MS. GAYLE:
21     Q.   Doctor, would you please
22 state your name for the record?
23     A.   Miles Murphy.
24     Q.   And how many times would you

1 estimate that you have been deposed as an
2 expert for Ethicon?
3      A.   I believe twice.
4      Q.   And what products were
5 those, sir?
6      A.   One was for the PROLIFT® and
7 the PROLIFT® +M and one was regarding my
8 role as a research consultant for the
9 company.
10     Q.   And for the PROLIFT® and
11 PROLIFT® +M, do you remember what year
12 that was that you were deposed?
13     A.   Not exactly.  But I believe
14 it was some time around 2013.
15     Q.   And for the research
16 consultant, what year was that?
17     A.   Around maybe a year later.
18     Q.   Sir, are you a fellowship
19 trained, board certified urogynecologist?
20     A.   I am.
21     Q.   And how long have you been
22 that?
23     A.   I've been board certified in
24 urogynecology since, I believe, 2013, the

1 first time it was available.
2      Q.   You understand today that
3 you're under oath and that you have to
4 tell the truth in response to every
5 question I ask today, correct?
6      A.   Yes.
7      Q.   Doctor, I'm handing you
8 what's been marked as -- what will be
9 marked as Exhibit Number 1, and I believe
10 that you have that in front of you?
11          - - -
12          (Whereupon, Exhibit
13     Murphy-1, Notice to Take
14     Deposition of Miles Murphy, MD,
15     was marked for identification.)
16          - - -
17 BY MS. GAYLE:
18     Q.   This is the notice to take
19 the deposition of Miles Murphy.
20     A.   Yes.
21     Q.   And on Page -- on Page 6,
22 Doctor, there is an attachment, a
23 schedule.
24     A.   Yes.

Miles Murphy, M.D.

1    Q.   And we have asked you to
2  bring certain items listed in that
3  schedule.
4    A.   Yes.
5    Q.   And, Doctor, I didn't
6  mention it earlier.  But I note that your
7  phone just buzzed.  If there's something
8  that you need to do today and need to
9  take a call or something, please
10 certainly just let us know, and we'll
11 take a break at whatever point you need
12 to do that, okay?
13   A.   Thank you.  I turned it off.
14   Q.   So, Doctor, according to
15 Schedule A, did you bring any of the
16 items listed there?
17        Counsel for Ethicon had
18 handed me an updated CV prior to the
19 start of the deposition.
20        Other than that, what did
21 you bring?
22   A.   I have some invoices for my
23 expert work.  I do have a copy of my CV.
24 I have some communications and study

1  agreements with Ethicon.  And it's just
2  some -- and a copy of my report as well.
3    Q.   Okay.  And can I just see
4  those things, if you don't mind, just for
5  a quick look?
6    A.   Sure.
7        MS. GAYLE:  Burt, if you
8    have no objection, when we take a
9    break, we'll get some copies of
10   these so we can put them in the
11   record, okay?
12       MR. SNELL:  Those are
13   copies, I think.
14       MS. GAYLE:  For us to go
15   ahead and --
16       MR. SNELL:  Yeah, we should
17   mark those.
18       Is that okay?
19       THE WITNESS:  That's fine.
20       MS. GAYLE:  Okay.  I'll just
21   put them right here for now,
22   Doctor.  And when we get to them,
23   we'll talk about them in just a
24   minute.

1  BY MS. GAYLE:
2    Q.   So that's the extent of the
3  materials that you brought today?
4    A.   Yes.
5        Oh, I'm sorry.  I have a
6  thumb drive.
7    Q.   That's what I was going to
8  ask you.
9    A.   Yes.  This has numerous
10 documents that have been provided to me,
11 plus a folder with all my own personal
12 documents that I used in preparation of
13 the report.
14   Q.   And, Doctor, when you say it
15 has numerous documents that were provided
16 to you, who provided those documents to
17 you?
18   A.   Mr. Snell and his
19 colleagues.
20   Q.   And the folder that has
21 articles that you said were personal
22 articles, did you personally compile that
23 particular folder?
24   A.   Yes.

1    Q.   And with regard to that
2  folder, Doctor, when was the last time
3  that you placed articles in that folder?
4    A.   It very well may have been
5  within the last two months or so; two or
6  three months.
7    Q.   And were those articles
8  specifically only related to your TVT and
9  TVT-O opinions?
10   A.   For the vast majority of
11 them.  There may be one or two that are
12 related to just general mesh.
13       MS. GAYLE:  We'll mark that
14   as Exhibit 1A.
15       I assume there's a password
16   on that?  Or not?
17       MR. SNELL:  I don't think
18   that there is.
19       Is there?
20       THE WITNESS:  No, there's no
21   password.
22       MS. GAYLE:  And we'll talk
23   about this later about how to take
24   custody and so forth.

Miles Murphy, M.D.

Page 18

1    MR. SNELL:  Why don't we go
2  ahead and do this.  So generally,
3  you will take possession and
4  Golkow will copy it as is, meaning
5  electronically to electronically.
6    We definitely do not want
7  everything on that thumb drive
8  printed out.  It is voluminous.
9    And, typically, your side
10  also asks for just an electronic
11  copy that has all the electronic
12  files.
13    MS. GAYLE:  Sure.
14    MR. SNELL:  And then if it
15  can be returned, either to my
16  attention or Dr. Murphy's --
17  return it to my attention because
18  you have my address, and then I'll
19  make sure it gets back to Dr.
20  Murphy.
21    If that's acceptable to you?
22    MS. GAYLE:  That's fine.
23  Last week we did it a little bit
24  different, Butler Snow wanted it

Page 19

1  done different so we did it
2  differently.  So that works for
3  me.
4    Is that okay with you,
5  Madame Court Reporter?
6    - - -
7    (Whereupon, Exhibit
8  Murphy-1A, Thumb drive with
9  Materials, was marked for
10  identification.)
11    - - -
12    MS. GAYLE:  Exhibit-2.
13    - - -
14    (Whereupon, Exhibit
15  Murphy-2, Defendants' Objections
16  and Responses to Plaintiffs'
17  Notice to Take Deposition of Miles
18  Murphy, MD, was marked for
19  identification.)
20    - - -
21    MS. GAYLE:  Just for the
22  completeness of the record,
23  Doctor, and for you, Burt, I'm
24  handing the doctor the objections

Page 20

1  the defendants filed to the notice
2  of deposition.
3  BY MS. GAYLE:
4    Q.   Doctor, have you seen this
5  document before today?
6    A.   Not that I recall.
7    MR. SNELL:  So what are we
8  marking --
9    MS. GAYLE:  That's
10  Exhibit-2.  That's the objections,
11  yes.
12  BY MS. GAYLE:
13    Q.   You said you brought some
14  invoices with you today.  We see that we
15  have several invoices.
16    And we are going to mark all
17  of them as Exhibit-3 collectively.
18    - - -
19    (Whereupon, Exhibit
20  Murphy-3, Invoices, was marked for
21  identification.)
22    - - -
23  BY MS. GAYLE:
24    Q.   Doctor, we have, like I

Page 21

1  said, several invoices here, the first
2  dated April 19th of 2014.
3    And the caption is, Invoice
4  for Butler Snow, Ethicon expert witness
5  consultation on pelvic mesh litigation.
6  Then it has your name.  Time spent from
7  March 21st, '13 to April 8, '14, working
8  as a consultant in the above-mentioned
9  matter was 43.75 hours at a rate of $400.
10    Is that when you first
11  started your work on the Ethicon expert
12  witness work for this particular report?
13    A.   I'd have to look to make
14  sure there aren't ones before then.  But
15  that's about the right time.
16    Yes, these appear to be in
17  the order of time.  So yes.
18    Q.   And was that solely for the
19  TVT and TVT-O work, or was that for
20  multiple products for Ethicon?
21    A.   So these invoices are for
22  the work that I do for the TVT/TVT-O
23  work.
24    Q.   So any other work that you

Miles Murphy, M.D.

Page 22

1 would do with Ethicon for other products
2 is not found here in these invoices,
3 correct?
4     A.   Yes.  Some of the time
5 period I may have been working on two
6 things at once.  But the ones that are
7 here are -- if not completely, the vast
8 majority of the time spent on this
9 particular report.
10     Q.   And, Doctor, as I understand
11 your prior testimony, you have worked
12 with Ethicon in various roles off and on
13 since about 2004; is that correct?
14     A.   2004, 2005.  Probably closer
15 to 2005.
16     Q.   And you also have previously
17 testified, back in the 2012 time frame,
18 that at that point you estimated that you
19 had earned approximately between $80,000
20 to $100,000 in various roles with
21 Ethicon.
22         Since that time frame, do
23 you estimate what you've earned to be
24 more than $100,000?

Page 23

1     A.   From Ethicon specifically --
2     Q.   For your work --
3     A.   -- consultancy?
4     Q.   -- related to Ethicon,
5 right.
6     A.   Just so I can clarify, is
7 that work similar to what I testified to
8 earlier, or are you talking about legal
9 consultation?
10     Q.   Let's just break it down.
11         So work that you've
12 testified to earlier, so how much have
13 you made since 2012?
14     A.   So, essentially, I don't
15 think I've made any money from doing
16 actual consultation on medical services
17 with Gynecare since then.
18     Q.   And what about expert work,
19 consultations?
20     A.   Expert work, consultation, I
21 believe -- was the question was, was it
22 more than $100,000?
23     Q.   Yes.
24     A.   I believe it has been, yes.

Page 24

1     Q.   More than $500,000?
2     A.   No.
3     Q.   And is that for all products
4 combined, or individual products?
5     A.   I was giving you everything
6 combined.
7     Q.   Everything combined, okay.
8         And so, Doctor, so these
9 invoices here today for the TVT and
10 TVT-O, we have a total, in April of 2014,
11 of 17,5; we have in December of 2014, it
12 looks like $10,200; June of 2015, it
13 looks like $6,750.  And then in December
14 30th, 2017, $5,125; and then it looks
15 like an invoice dated June 28th, $18,000.
16         Is that correct?
17     A.   Correct.
18     Q.   Doctor, who prepared these
19 invoices?
20     A.   I did.
21     Q.   You prepared them
22 individually, Doctor?
23     A.   Yes.
24     Q.   So any exact similarities

Page 25

1 between any other expert's invoices would
2 be coincidence?
3         MR. SNELL:  Objection to
4     form.
5         THE WITNESS:  I guess so.  I
6     have no idea what you're implying.
7 BY MS. GAYLE:
8     Q.   Did you consult with any
9 other expert that might be working on
10 behalf of Ethicon in the format of your
11 invoices?
12     A.   No.
13     Q.   And, Doctor, there seems to
14 be some date gaps in here.  For instance,
15 the December 30th invoice is from
16 November 18th, 2017 through December
17 30th, 2017.  And then the next invoice
18 picks up March 26th of 2018, that would
19 be about a three-month gap there.
20         Is that just a period that
21 you were not doing any work for the TVT
22 and the TVT-O projects?
23     A.   Correct.
24     Q.   How did you keep track of

Miles Murphy, M.D.

Page 26

1  your hours when you were working on this,
2  Doctor?
3       A.   I wrote notes to myself.
4       Q.   So handwritten notes?
5       A.   Either that or e-mails to
6  myself.
7       Q.   And it looks like also,
8  Doctor, that through the time that you're
9  billing these invoices your rate changed;
10  is that correct?
11       A.   That's correct.
12       Q.   Approximately when did your
13  rate change?
14       A.   I believe it has changed
15  twice.  Initially it was $400 an hour.
16  Probably a couple of years ago, it went
17  to, I believe, $500 an hour.  And just
18  this summer I increased it to $650 an
19  hour.
20       Q.   When in the summer did you
21  increase it?
22       A.   July 1.
23       Q.   July 1, okay.
24            Doctor, starting on July 1

Page 27

1  to the present date, October the 9th,
2  today, did you do any work on the TVT and
3  TVT-O report?
4       A.   Yes.
5       Q.   How much time, Doctor, do
6  you estimate that you have worked on
7  that?
8       A.   Since that time, since July
9  1?
10       Q.   Yes.
11       A.   I would have to look at my
12  notes to give you an exact answer.  But
13  probably somewhere around five to ten
14  hours.
15       Q.   And you have not billed for
16  that --
17       A.   Excuse me.  Can I clarify
18  that answer?
19       Q.   Sure.
20       A.   I have also done work, just
21  in the last couple of days, preparing for
22  this deposition that I have not billed
23  for.
24       Q.   And how much time would you

Page 28

1  think in the last couple of days that
2  you've not billed for?
3       A.   Probably around eight to ten
4  hours.
5       Q.   So since July 1, adding both
6  of those up, approximately you think
7  you've spent about 20 hours for work that
8  you haven't billed for?
9            MR. SNELL:  Objection.
10  Misstates the testimony.
11            THE WITNESS:  No.  Some of
12       it is -- I have billed for, up
13       until, I believe, August.  But in
14       September and early October, I've
15       done additional work that I have
16       not billed for.
17  BY MS. GAYLE:
18       Q.   Okay.  So we do not have any
19  work that you billed for between June
20  28th and August.  We don't have an
21  invoice here.
22            So what I'm getting at,
23  Doctor, is, do you have that invoice with
24  you today, or can you provide that

Page 29

1  invoice to us?
2            MR. SNELL:  I will say, I
3       believe I have it.  There might be
4       a problem insofar as Dr. Murphy
5       did case-specific reports on
6       different Wave 8 cases.  So I
7       don't know if that invoice breaks
8       it out for his general TVT/TVT-O
9       as opposed to the different cases.
10            MS. GAYLE:  If it doesn't, I
11       would ask that he break it out and
12       then you guys provide us the work
13       that was billed for this
14       particular report from July 1 to
15       the present.
16            So if that's a couple of
17       invoices or not, I would ask that
18       you guys supply that.
19            And we'll have a placeholder
20       at Exhibit-3A for those invoices
21       that we are requesting.
22            MR. SNELL:  We'll see if we
23       can do it on a break.
24            But there are not multiple

Miles Murphy, M.D.

Page 30

1    invoices.  The doctor testified
2    that there is one invoice.  My
3    concern is that it's going to
4    include case-specific expert work.
5        But he is certainly free to
6    give you his best estimate, which
7    I think he has already done.
8  BY MS. GAYLE:
9        Q.    Doctor, is there one invoice
10  since July 1, or is there two invoices?
11       A.    I'm pretty sure there's just
12  one.
13       Q.    Just one?
14       A.    I will be creating another
15  one for this deposition and the prep for
16  that, but I have not generated that.
17       Q.    When you do generate that
18  one, Doctor, if you could also provide
19  that one to us as well, both of those we
20  will mark at Exhibit-3A.]
21       A.    Sure.
22       Q.    We'll have a placeholder in
23  the meantime for both of those.  All
24  right?

Page 31

1        A.    Yes.
2             - - -
3        (Whereupon, Exhibit
4    Murphy-3A, Held Open for
5    Additional Invoices, was marked
6    for identification.)
7             - - -
8  BY MS. GAYLE:
9        Q.    And that work, Doctor, just
10  so the record is clear, from July 1 to
11  the present, you've been billing at $650
12  an hour; is that correct?
13       A.    Correct.
14       Q.    And you've not been paid for
15  that work since July 1st; is that
16  correct?
17       A.    To the best of my knowledge,
18  I have not.
19       Q.    Doctor, did you write your
20  TVT/TVT-O report yourself?
21       A.    Yes.
22       Q.    Can you explain to me the
23  process whereby you did that?  Did you
24  put pen to paper?  Did you sit down at

Page 32

1    the typewriter?  How did that process
2    work for you?
3        A.    Sure.  I'd be happy to tell
4    you that.
5        So it started about four
6    years ago, Mr. Snell asked me to prepare
7    the report.  And at that time, I had a
8    large amount of scientific data,
9    articles -- you know, journal articles at
10  my -- at my convenience.  And I,
11  essentially, started writing a report on
12  a computer.
13       I was also given
14  supplemental materials from Mr. Snell and
15  his associates.  And I continued to
16  update it over the years.
17       Q.    Did you dictate it to
18  yourself, or did you just sit down and
19  just write it when you had free time?
20       A.    The latter.
21       MS. GAYLE:  Now, Ms. Court
22  Reporter, as we discussed,
23  Exhibits 4 and 5 will be blank,
24  and we'll start with Exhibit-6.

Page 33

1             - - -
2        (Whereupon, Exhibit
3    Murphy-6, Miles Murphy, General
4    Reliance List in Addition to
5    Materials Referenced in Report,
6    was marked for identification.)
7             - - -
8  BY MS. GAYLE:
9        Q.    Doctor, I was given, with
10  your report, what is listed as your
11  general reliance list in addition to
12  materials referenced in your report.
13       Did you bring a copy of that
14  with you today, Doctor?
15       A.    Yes, I did.
16       Q.    Feel free to refer to it if
17  that would make you feel better.
18       And, Doctor, is this the
19  general reliance list that was served in
20  conjunction with your TVT-O report?
21       A.    Yes.
22       MS. GAYLE:  We're going to
23  mark your report as Exhibit Number
24  7.

Miles Murphy, M.D.

Page 34

1          - - -
2          (Whereupon, Exhibit
3     Murphy-7, General Report of Miles
4     Murphy, MD, MSPH, FACOG, was
5     marked for identification.)
6          - - -
7     BY MS. GAYLE:
8     Q.   That's your report, Doctor.
9          I'd like to ask you a couple
10    of questions about your sources and the
11    materials that you relied on, Doctor.
12    That's what we'll be focusing on here.
13         MR. SNELL:  Can we just give
14    him a second to look at Exhibit-7
15    and make sure it's --
16         MS. GAYLE:  Sure.  Go ahead.
17         THE WITNESS:  Okay.
18    BY MS. GAYLE:
19    Q.   Okay, Doctor, so we have
20    Exhibit-7, which is your TVT/TVT-O
21    report; is that correct?
22    A.   Yes.
23    Q.   And at Exhibit-6 we have the
24    reliance list that accompanied that

Page 35

1     report as well, correct?
2     A.   Correct.
3     Q.   Doctor, for Exhibit-7, your
4     report, how did you decide to combine
5     your TVT and your TVT-O products into
6     that report?
7     A.   That was at the request of
8     Mr. Snell.
9     Q.   And does this report contain
10    each of the opinions that you've reached
11    regarding TVT and TVT-O?
12    A.   Yes.
13    Q.   Sometimes, Doctor, I might
14    refer to TVT and TVT-O as the SUI
15    products or the SUI report.  I'm talking
16    about Exhibit-7, if I happen to do that.
17         Can we agree that you
18    would -- do you have any objections to
19    that or any -- you would understand it if
20    I'm referring to that, correct?
21    A.   That's fine, yes.
22    Q.   Okay.  In Exhibit-7, did you
23    discuss the facts that you felt were most
24    important in drawing your opinions?

Page 36

1     A.   Yes.
2     Q.   Doctor, on Page --
3     throughout your report, you summarize
4     different opinions and conclusions.  For
5     instance, at Page 49, you have your
6     summary or your conclusions for that
7     particular section in bold.
8          Is that how you formulated
9     this report, by making your conclusory
10    summary statements at the end of each
11    section?
12         MR. SNELL:  Objection to
13    form.
14         Go ahead.
15         THE WITNESS:  I believe most
16    of the major sections ended with a
17    summary of my conclusions, yes.
18    BY MS. GAYLE:
19    Q.   And is that why that
20    material would be in bold there?
21    A.   Yes.
22    Q.   And, again, Doctor, if you
23    would look to Page 62.  And that, again,
24    looks like a summary of your conclusions

Page 37

1     for the TVT-O data.
2          Again, that would be
3     summarizing that particular section,
4     correct?
5          MR. SNELL:  Objection to
6     form.
7          Go ahead.
8          THE WITNESS:  Right.  Right.
9     This is a summary of my
10    conclusions regarding the
11    comparative data on TVT-O.
12    BY MS. GAYLE:
13    Q.   Doctor, if you look at your
14    Exhibit Number 7, beginning at Page 72,
15    you'll find the word "bibliography" on
16    Page 72.
17    A.   I see it.
18    Q.   Doctor, it looks like that
19    that bibliography runs through Page 87;
20    is that correct?
21    A.   Yes, that looks right.  Let
22    me just verify.
23         Yes.
24    Q.   And, Doctor, can you tell me

Miles Murphy, M.D.

Page 38

1  what this bibliography represents?
2      A.   Sure.  It represents all of
3  the articles, the scientific articles,
4  that I referenced in my report directly.
5      Q.   And, Doctor, how does this
6  bibliography differ or is the same as the
7  articles and materials found at
8  Exhibit-6?
9      A.   There may be overlap in
10 them.  But mostly the difference is that
11 the articles within my bibliography were
12 specifically referred to in my report,
13 whereas the additional materials involves
14 other things such as company documents
15 and potentially other studies that I did
16 not specifically refer to in my report.
17     Q.   Doctor, if you referred to
18 any clinical data, would that be found in
19 your bibliography?
20         MR. SNELL:  Objection.
21 BY MS. GAYLE:
22     Q.   Did you refer to any
23 clinical data in your TVT or TVT-O
24 report?

Page 39

1      A.   I did.
2      Q.   And would that be in your
3  bibliography?
4      A.   Yes.
5         MR. SNELL:  Sorry, counsel,
6  I didn't understand the question.
7  I must have totally missed it.
8  BY MS. GAYLE:
9      Q.   To the extent that clinical
10 or medical data is published someplace
11 and you relied on it to some extent in
12 forming your opinions, it would also be
13 listed in your bibliography; would it?
14     A.   I'm sorry, are you saying if
15 there are articles that may support what
16 I said in my -- in my report -- I'm
17 sorry, could you repeat the question?
18     Q.   Sure.
19         So you said that you have --
20 your bibliography contains any clinical
21 data that you may have relied on in
22 forming your opinions, correct?
23     A.   Yes, yes.
24     Q.   Apparently, you've

Page 40

1  supplemented your report a couple of
2  times.
3         And so what I'm trying to
4  get at is, if any additional clinical
5  data that you had relied on since your
6  initial drafting of this report, would
7  you have updated your bibliography to
8  reflect that information as well?
9      A.   If I specifically referred
10 to it, I would have.  There certainly
11 could be articles out there that formed
12 my opinions that I didn't specifically
13 refer to that are not in my bibliography.
14         But anything that I
15 specifically referenced in my report is
16 in my bibliography.
17     Q.   And, Doctor, did you prepare
18 this bibliography yourself?
19     A.   I did.
20     Q.   And did you prepare it more
21 recently or was it like your report, a
22 product that you prepared over time?
23     A.   I added to it as I added to
24 my report.  That's why it's not

Page 41

1  specifically in exact order.
2      Q.   Doctor, did you prepare the
3  information found at Exhibit-6?
4      A.   No.
5      Q.   Who prepared this
6  information, Doctor?
7      A.   Butler Snow.
8      Q.   And for the information
9  found at Exhibit-6 that was prepared by
10 Butler Snow, is this a list of the
11 materials that they provided you?
12     A.   Yes.
13     Q.   And, Doctor, have you
14 reviewed everything listed in Exhibit-6?
15     A.   Yes.
16     Q.   And how long did that take
17 you, Doctor, as far as hours?
18     A.   It's been a process over
19 four years, so I couldn't put an hour
20 unit on it.
21     Q.   We talked about that just a
22 little bit ago, about when you first
23 started work with Butler Snow.
24         And just to clarify the

Miles Murphy, M.D.

Page 42

¹ record, when did you first start working
² on the TVT and TVT-O report?
³        MR. SNELL:  Objection.
⁴     Asked and answered.
⁵        THE WITNESS:  I believe
⁶     about four years ago.
⁷ BY MS. GAYLE:
⁸     Q.   Four years ago.
⁹        Doctor, if you would look
¹⁰ towards the end of Exhibit-6, there is a
¹¹ page entitled, Company Witness
¹² Depositions.  It's about five or six
¹³ pages from the end.
¹⁴     A.   I see it.
¹⁵     Q.   It appears to be a list of
¹⁶ the company witness depositions that you
¹⁷ have reviewed, correct?
¹⁸     A.   Yes.
¹⁹     Q.   And is that a list that you
²⁰ reviewed over the years, Doctor?
²¹     A.   Yes.
²²     Q.   Did you view any of the
²³ videos that accompanied these
²⁴ depositions?

Page 43

¹     A.   If I did, it would have only
² been as part of the trial.
³     Q.   And which trial are you
⁴ referring to, Doctor?
⁵     A.   The one in Atlantic City in
⁶ 2013, 2014.  I'm sorry, I'm not great on
⁷ these exact dates.
⁸     Q.   That's okay.
⁹        Doctor, did anything -- in
¹⁰ these list of depositions, did anything
¹¹ particularly stand out to you when you
¹² were forming your opinions about the TVT
¹³ that sticks in your mind?
¹⁴     A.   No.
¹⁵     Q.   And did anything about these
¹⁶ particular depositions stand out to you
¹⁷ when you were forming your opinions about
¹⁸ the TVT-O?
¹⁹     A.   No.
²⁰     Q.   Doctor, we were served with
²¹ a supplemental general materials list and
²² an updated materials list, which we're
²³ going to mark -- I'm going to skip a
²⁴ couple of numbers.  So we're going to

Page 44

¹ mark it as Exhibit Number 21.  We'll come
² back to the other exhibit numbers.
³        - - -
⁴        (Whereupon, Exhibit
⁵     Murphy-21, Miles Murphy,
⁶     Supplemental General Materials
⁷     List in Addition to Materials
⁸     Referenced in Report, was marked
⁹     for identification.)
¹⁰        - - -
¹¹        MS. GAYLE:  This will be the
¹²     updated materials list, we can
¹³     mark it as 21A, if you wish.
¹⁴        - - -
¹⁵        (Whereupon, Exhibit
¹⁶     Murphy-21A, Updated Materials
¹⁷     List, was marked for
¹⁸     identification.)
¹⁹        - - -
²⁰ BY MS. GAYLE:
²¹     Q.   Doctor, we recently received
²² Exhibit-21 and Exhibit-21A.  And I
²³ apologize, I only have one copy there.
²⁴        Between the exhibit we were

Page 45

¹ just looking at, Exhibit-6, and
² Exhibit-21, do you know what changes were
³ made?
⁴     A.   I'm sorry, could you repeat
⁵ that question one more time?
⁶     Q.   Sure.
⁷        Between Exhibit-6, which is
⁸ your original reliance list, and this
⁹ supplemental reliance list that we were
¹⁰ served this week, what changes were made?
¹¹     A.   There were just some
¹² additional general materials added.
¹³     Q.   And, again, you said that
¹⁴ Butler Snow had originally prepared
¹⁵ Exhibit Number 6.
¹⁶        Did Butler Snow prepare
¹⁷ Exhibit-21?
¹⁸     A.   Yes.
¹⁹     Q.   And were those additions
²⁰ made by Butler Snow?
²¹     A.   Yes.
²²     Q.   And, Doctor, Exhibit Number
²³ 21A, that looks slightly different, and
²⁴ that looks like an updated list of

Miles Murphy, M.D.

Page 46

1  materials also.
2          Did you prepare Exhibit-21A?
3      A.   I did not.
4      Q.   Do you know who prepared
5  Exhibit-21A, Doctor?
6      A.   Butler Snow.
7      Q.   And, Doctor, if you look at
8  Exhibit-21A, the top of the first page
9  with substantive material on it, it lists
10 several transcripts.
11         Do you see that, Doctor?
12     A.   I do.
13     Q.   Doctor, there are not any
14 dates on those transcripts.
15         If those individuals had
16 multiple depositions, just with the
17 single notation right now of Axle Arnaud,
18 for instance, deposition, transcript with
19 exhibits, that doesn't indicate which
20 deposition of Mr. Arnaud you read; is
21 that correct?
22     A.   That's correct.
23     Q.   And is it fair to say,
24 Doctor, that you don't have that

Page 47

1  information memorized, correct?
2      A.   I do not.
3      Q.   And, Doctor, so we looked at
4  a bibliography attached to your general
5  report --
6          MR. SNELL:  Counsel, can I
7      make a statement on the record on
8      this?
9          Exhibit-21A appears to be
10     the updated materials list served
11     by Butler Snow pertaining to Dr.
12     Murphy with regard to the Gross
13     New Jersey trial.  It was my
14     understanding that this was
15     actually served with his original
16     report in Wave 8.
17         But perhaps they included it
18     just to make double sure.
19         MS. GAYLE:  Okay.
20         MR. SNELL:  Just so that
21     statement is in the record.
22     Because I don't want Dr. Murphy
23     being confused with that.
24 BY MS. GAYLE:

Page 48

1      Q.   What we're looking at, Dr.
2  Murphy, is I want to sort of get the
3  universe of the materials that you relied
4  on to form your TVT and TVT-O opinions.
5  That's what I'm doing here today, that's
6  my job.
7      A.   Sure.
8      Q.   So we have several buckets,
9  if you will, of materials that you have
10 relied on.
11         And so we have your
12 bibliography, which is attached to your
13 report, correct?
14     A.   Yes.
15     Q.   And then we have your
16 general reliance list with materials that
17 Butler Snow prepared, Exhibit-6, correct?
18     A.   Correct.
19     Q.   And then we see that we have
20 another list that Butler Snow prepared,
21 the supplemental list at Exhibit-21,
22 correct?
23     A.   Correct.
24     Q.   And then we have the other

Page 49

1  materials, again, Butler Snow prepared
2  it, Exhibit-21A, correct?
3      A.   Correct.
4      Q.   Doctor, are there any other
5  materials that you relied upon in forming
6  your opinions for the TVT and TVT-O that
7  we have not gone over?
8          MR. SNELL:  I'm going to --
9      object to the form as to asked and
10     answered.
11         Go ahead.
12         THE WITNESS:  Other than
13     just my own clinical experience,
14     my reading of the literature that
15     I may not have specifically
16     referenced, but just my general
17     knowledge base as a pelvic surgeon
18     doing this for 14 years.
19         MR. SNELL:  And let the
20     record reflect that the doctor did
21     earlier identify the thumb drive
22     with the folder that he brought of
23     materials responsive to your
24     request.

Miles Murphy, M.D.

Page 50

1    MS. GAYLE:  Thank you for
2  that.
3    MR. SNELL:  That was my
4  objection.
5    MS. GAYLE:  Thank you for
6  that, Burt.
7  BY MS. GAYLE:
8    Q.   So also, Doctor, we have
9  some materials found on that thumb drive,
10 right?
11   A.   Correct.
12   Q.   And, Doctor, it would be
13 your understanding that those materials
14 that Butler Snow provided you on that
15 thumb drive would be the materials listed
16 in Exhibit-6, Exhibit-21 and Exhibit-21A;
17 is that correct?
18   A.   There may be some things on
19 that thumb drive that are not in here;
20 but, yes, there's probably an overlap.
21   Q.   Doctor, when you wrote your
22 report, as you've stated, you cited
23 certain articles, and those articles were
24 found in your bibliography.

Page 51

1    What decisions went into
2  your opinions when you decided to cite a
3  certain article?
4    MR. SNELL:  Objection.
5  Vague.  Overbroad.
6  BY MS. GAYLE:
7    Q.   Do you understand me,
8  Doctor?
9    A.   I think so.
10   Q.   Sure.
11   A.   I can try to answer as best
12 as I can.
13   Q.   Sure.
14   A.   So I tried to rely on the
15 highest forms of evidence, which in this
16 field would be randomized clinical
17 trials, long-term studies of the device,
18 comparative studies that may not be
19 randomized, and just large trials in
20 general or large series in general.
21 Those tend to be the highest level of
22 evidence.
23   So there's so much data on
24 TVT and TVT-O that it would be -- for me

Page 52

1  to use every single article and have a
2  life and take care of patients and take
3  care of my family would be virtually
4  impossible.  So I tried to cull it to the
5  most highest-level data that I could.
6    Q.   Doctor, that level of data,
7  would you refer to that in your field as
8  Level 1 data?
9    A.   Primarily.
10   Q.   And, Doctor, some of the
11 larger trials, would that be something
12 along the lines of the Cochrane review?
13   A.   So the Cochrane review is a
14 systematic review that includes
15 evaluation, meta-analysis of a lot of
16 randomized clinical trials.  So the thing
17 that makes up the systematic review is
18 the individual Level 1 evidence.
19   Q.   Doctor, in Exhibit-21A, we
20 have a listing of expert reports that you
21 reviewed.
22   Do you see that, Doctor?
23   A.   I do.
24   Q.   And, Doctor, do you know if

Page 53

1  those were general reports or
2  case-specific reports?
3    A.   I couldn't tell you which
4  were which, just looking at this list
5  today.
6    Q.   And, Doctor, looking at that
7  list, can you tell me which of those
8  experts you read in relation to Wave 8
9  general experts?
10   A.   So I believe, as Mr. Snell
11 pointed out, that some of this may be
12 from older work, since it's -- there's a
13 number of references that include
14 prolapse repair.  And, for instance,
15 there's an expert report from Ann Weber,
16 and I know she was involved in the
17 prolapse mesh use.
18   So some of this may be
19 pertinent to my TVT and TVT-O report,
20 some of it may not.
21   Q.   Doctor, have you relied on
22 any expert reports that plaintiffs'
23 experts may have issued in forming your
24 opinions for the TVT-O?

Miles Murphy, M.D.

Page 54

1    A.   So when I'm forming my
2 opinions, many sources come into what
3 form my opinions.  There may have been
4 something in some of these reports that
5 may have possibly, you know, made a small
6 impact.
7         But I don't think there's
8 probably anything in any of these reports
9 that I specifically relied upon in
10 drawing my conclusions.
11    Q.   And would that be the same
12 answer for your TVT opinions as well?
13         I asked TVT-O initially.  So
14 would that be the same answer for TVT?
15    A.   Yes.
16    Q.   And, Doctor, in connection
17 with your general work for Wave 8, do you
18 have a listing of any of the reports that
19 you've read specifically?
20         We talked about how that
21 looks like an older list that is in
22 connection with other litigation.  I just
23 was trying to get to if that's listed
24 anywhere else in these materials.

Page 55

1    A.   So in my work for Butler
2 Snow, I have been a case-specific expert
3 for a number of Wave 8 cases.  I believe
4 none of them were -- well, let me
5 rephrase that.
6         I reviewed some expert
7 reports specifically from the plaintiffs'
8 side, and they may not be included in
9 this list.  None of them did I rely upon,
10 in any important way, to form my opinions
11 regarding this report.
12    Q.   And, Doctor, just so you're
13 clear and the record is clear, today
14 we're only getting to your general TVT
15 and TVT-O opinions.
16         So I'm not asking in regards
17 to any case-specific work or any
18 case-specific expert reports that you
19 have made in connection with Wave 8,
20 okay?
21    A.   Sure.
22         MR. SNELL:  I think his
23 answer was responsive, though, to
24 your question.

Page 56

1         MS. GAYLE:  I think it was,
2 too.  But going forward, I wanted
3 him to be clear so that that way
4 we can just sort of -- I only have
5 four hours here, so I didn't want
6 to be bogged down by any
7 case-specific questions or
8 analysis that you might think.
9         THE WITNESS:  Just so I can
10 clarify, some of the expert
11 reports that I did review in the
12 specific cases were general
13 reports.
14         MS. GAYLE:  And that's fine,
15 Doctor.  So I'm just going to be
16 asking you about those general
17 expert reports that you reviewed
18 in connection with this wave.  So
19 not the individual case specifics.
20 So we're not getting into any
21 details about any one particular
22 patient or plaintiff today, okay?
23         THE WITNESS:  Okay.
24 BY MS. GAYLE:

Page 57

1    Q.   So, Doctor, with regard to
2 those general expert reports that you
3 read, do you recall who you read?
4    A.   Not off the top of my head.
5 Sorry.
6    Q.   Did any one particular
7 expert's opinions stand out that you
8 disagreed with?
9    A.   Not in -- not in particular.
10    Q.   Of the experts that you
11 read, Doctor, do you know any of the
12 plaintiff experts personally?
13    A.   In the Wave 8?  No.
14    Q.   In the Wave 8 general
15 reports that you've reviewed.
16    A.   Not that I -- I do not
17 believe so.
18    Q.   Doctor, this report is dated
19 August 2018; is that correct?
20         Page 71, I believe, Doctor.
21    A.   Yes.  August 11, 2018.
22    Q.   And, Doctor, on that day
23 when you signed there, did that -- this
24 report represent all the opinions that

Miles Murphy, M.D.

Page 58

1  you had formed regarding the TVT and the
2  TVT-O up until that point?
3      A.   Yes, I think that's a fair
4  assessment of it.
5      Q.   And, Doctor, since the
6  signing of this report, have you formed
7  any other opinions that may not be
8  included in this report, since August of
9  2018?
10     A.   So since then I have
11 reviewed some additional articles,
12 specifically on ABBREVO® and EXACT®,
13 which I don't think we're talking about
14 today.  None of those changed my general
15 opinions, but I did review some of those
16 since signing this report on August 11th.
17     Q.   Doctor, are you aware of how
18 many documents have been produced, and
19 we're talking about the volume of
20 documents, in the litigation by Ethicon
21 and Johnson & Johnson to the plaintiffs?
22     A.   I have a general
23 understanding that it's quite extensive.
24     Q.   And, Doctor, do you have any

Page 59

1  idea about what percentage of documents
2  the materials listed in Exhibit-6 and
3  Exhibit-21 represent, that volume?
4      A.   I do not.
5      Q.   Have you ever asked anybody
6  how many documents were produced to the
7  plaintiffs?
8      A.   For the whole mesh
9  litigation, for everything?
10     Q.   For the Ethicon litigation.
11     A.   I have not asked.
12     Q.   Have you tried to gain an
13 understanding of what types of documents
14 have been produced in the Ethicon
15 litigation by Ethicon to plaintiffs?
16     A.   Well, I think from the
17 references that have been supplied to me
18 by Mr. Snell and his firm, I have a
19 general idea that those probably
20 represent the type of documents that have
21 been supported -- excuse me, supplied.
22         But I don't, as I said, have
23 a complete understanding of exactly what
24 has been submitted.

Page 60

1      Q.   So you've never asked
2  someone, hey, I want to know what you
3  produced to the plaintiffs so I can see
4  that list and decide if I need anything
5  from that list; is that fair?
6      A.   Again, since I said it was
7  quite extensive, my educated guess is
8  there's no way I could weed through all
9  of that material, if I did ask for that,
10 and still work and take care of patients.
11     Q.   Doctor, one of the things
12 that you're intending to do is to offer
13 opinions ultimately in a courtroom to a
14 jury that's going to decide issues in
15 this case; is that fair?
16     A.   Yes.
17     Q.   One of the things that you
18 will want to do when you give those
19 opinions is to have all of the necessary
20 background information so that when you
21 give those opinions, you can feel
22 confident that they are supported by the
23 actual facts; would that be fair?
24         MR. SNELL:  Objection to

Page 61

1      form.
2          THE WITNESS:  Sure.
3  BY MS. GAYLE:
4      Q.   Doctor, did you work at
5  Ethicon?
6      A.   I was never an employee of
7  Ethicon.
8      Q.   So in terms of Ethicon's
9  actual conduct on a day-to-day basis, you
10 weren't there to witness that firsthand;
11 is that correct?
12     A.   I was not there to witness
13 it.  But I have reviewed internal company
14 documents.
15     Q.   Do you know if you reviewed
16 internal e-mails from Ethicon?
17         I noticed that you didn't
18 have very many e-mails at all listed in
19 your materials.
20         MR. SNELL:  I'll object to
21 the characterization.
22         Go ahead.
23         THE WITNESS:  I have seen
24 e-mails from Ethicon.

Miles Murphy, M.D.

Page 62

1  BY MS. GAYLE:
2      Q.   Do you know whose e-mails
3  you've seen?
4      A.   Just to clarify, again, are
5  we talking specifically regarding
6  TVT/TVT-O or about any mesh litigation?
7      Q.   TVT/TVT-O and their conduct
8  in relation to those two products.
9      A.   Okay.  Since I now know what
10  we're talking about, can you please
11  repeat the question?
12      Q.   Sure.
13          Have you seen any e-mails
14  with regard to TVT/TVT-O from Ethicon,
15  internal e-mails?
16      A.   I believe that I've seen
17  some.  I can't, sitting here, tell you
18  who sent them or what date.  But I
19  believe I have reviewed some, yes.
20      Q.   Would it be fair that you
21  also can't say what volume of those
22  e-mails you've seen?
23      A.   I would guess that it's a
24  small percentage of all the e-mails ever

Page 63

1  sent by Ethicon employees.
2      Q.   And would it also be fair
3  that you don't know what percentage it
4  might be of the e-mails related to TVT or
5  TVT-O?
6      A.   I would be happy to review
7  any -- you know, go over any e-mails that
8  you specifically are interested in.  But,
9  no, it would be hard to know what
10  percentage.
11      Q.   Okay.  Doctor, I'm just
12  trying to get, again, to the universe of
13  documents that you relied on in forming
14  your opinions for the TVT and TVT-O.
15          And we said you didn't work
16  for Ethicon, Doctor.
17          But you were a consultant;
18  is that correct?
19      A.   That's correct.
20      Q.   And, Doctor, when did you
21  become a consultant with Ethicon?
22      A.   I believe somewhere between
23  2005 and 2006.
24      Q.   And what project did you

Page 64

1  initially start consulting with Ethicon
2  on in 2005?
3      A.   I believe around that time
4  is when I started being faculty for some
5  of the continuing medical education or
6  professional education labs that they put
7  on.
8      Q.   And was that for a variety
9  of products, Doctor?
10      A.   Over time, yes.  Probably
11  initially it was with TVT-O and TVT.  And
12  then later with PROLIFT® and PROLIFT® +M.
13      Q.   Who recruited you to be a
14  consultant in 2005?
15      A.   So the person at Ethicon who
16  was in charge of professional education
17  at that time, I believe, was Paul Parisi.
18      Q.   Do you know how to spell
19  that last name, for the court reporter?
20      A.   I believe it's P-A-R-I-S-I.
21      Q.   Was he your initial contact
22  at Ethicon with regard to that work?
23      A.   It's very hard for me to
24  recall with sort of any certainty who may

Page 65

1  have first sent me an e-mail or talked to
2  me at a meeting.
3          But I do certainly recall
4  working with Mr. Parisi early on.
5      Q.   And, Doctor, when you first
6  started working with Mr. Parisi, do you
7  recall sort of under what circumstances
8  he had approached you to start working
9  for Ethicon?
10      A.   I don't.
11      Q.   Do you recall anyone else
12  over the years that you've worked with
13  although at Ethicon regarding your
14  consulting agreements?
15      A.   Again, are we specifically
16  talking about TVT and TVT-O or all pelvic
17  mesh products?
18      Q.   All pelvic mesh products,
19  Doctor.
20      A.   I have worked doing research
21  with Ethicon on the Prosima system, and
22  Judy Gauld.  I'm sorry, I could not spell
23  her last name for you.  I did some work
24  for them in product validation with

Miles Murphy, M.D.

Page 66

1 the -- I believe with the TVT-Secur.  And
2 there may have been a gentleman named Dan
3 Smith, maybe, who was involved with that
4 project.
5        That's what -- those are the
6 few names that come to mind sitting here
7 today many years later.
8     Q.   And you did some work with
9 PROLIFT®, is that correct, Doctor, with
10 Ethicon?
11    A.   I did work as faculty for
12 professional education with PROLIFT® as
13 well, yes.
14    Q.   And, Doctor, explain what
15 you mean by "professional education."
16    A.   Certainly.  This would
17 predominantly involve courses that would
18 take place, usually on a weekend, and
19 involved didactic lecturing to other
20 physicians in the field.  And then
21 helping with cadaver labs in which we
22 helped the doctors learn how to implant
23 these devices.
24    Q.   Doctor, are you familiar

Page 67

1 with the phrase "key opinion leader"?
2    A.   I am.
3    Q.   And would you consider
4 yourself a key opinion leader for Ethicon
5 on these mesh products?
6    A.   I consider that that is a
7 term that should be applied to someone,
8 not that someone should apply it to
9 themselves.  I think it's a -- something
10 that generally would be the feeling of
11 the doctors that work in a field as to
12 whether or not someone is a key opinion
13 leader.
14        Ethicon may designate
15 someone that way, but I don't think they
16 are the best ones to choose that.
17    Q.   Doctor, do you know whether
18 or not Ethicon designated you as a key
19 opinion leader?
20    A.   I do not.
21    Q.   And, Doctor, we're going to
22 mark what we have as Exhibit-23.
23            - - -
24        (Whereupon, Exhibit

Page 68

1        Murphy-23, Clinical Study
2        Agreement - Ethicon Initiated, was
3        marked for identification.)
4            - - -
5 BY MS. GAYLE:
6    Q.   You brought some clinical
7 study agreements -- you brought clinical
8 study agreements with you today, correct?
9    A.   I did.
10    Q.   And, Doctor, is this all one
11 agreement, or is this multiple
12 agreements?
13    A.   It is an agreement; I
14 believe it's just one.  I could be wrong
15 there.  And it's also some e-mails
16 regarding that project.
17    Q.   Doctor, I'm going to hand
18 you what's been marked as Murphy-23 and
19 have you look at it for a minute.
20        Then ask you to explain what
21 all this document comprises, okay?
22    A.   Sure.
23        The first section is
24 entitled, Clinical Study Agreement,

Page 69

1 Ethicon initiated.  And it's an agreement
2 between Ethicon and Saint Luke's Hospital
3 of Bethlehem, Pennsylvania, which was a
4 hospital I did, and currently, work at.
5 And it's regarding the conduct of a study
6 on Prosima, I believe.
7        Let me verify that.
8        Yes.
9    Q.   Do you know what year that
10 was, Doctor?
11    A.   2007.
12        The second document is a
13 research subject information and consent
14 form.  It's the consent form that we
15 would have gone through with any patients
16 who were candidates to be in the study.
17        And if they decided to
18 partake in the study, they would
19 understand what was involved in the study
20 and would give their consent to be
21 involved in this prospective study.
22        The next document is an
23 itemized budget of the study.
24        The next document is an

Miles Murphy, M.D.

Page 70

1 e-mail from Colin Urquhart,
2 U-R-Q-U-H-A-R-T, who was the clinical
3 project manager for this study.
4        The next is another e-mail
5 from Mr. Urquhart regarding POP-Q
6 standardization for the study.  POP-Q is
7 the way we measure pelvic support on
8 physical examination, pelvic examination.
9        The next is another e-mail,
10 from Mr. Urquhart again, I think along
11 the lines of the same topic.
12        The next is another e-mail
13 from Judy Gauld, who I referred to
14 earlier.  And I can now tell you how to
15 spell her name, G-A-U-L-D.  She was the
16 clinical research manager at the time,
17 and she was involved with the drafting of
18 the abstract regarding the Prosima study.
19        And then there's another
20 e-mail from Mr. Urquhart.
21        And, finally, an e-mail from
22 Melissa Day, who was the project manager
23 of worldwide customer quality for
24 Ethicon, Inc.

Page 71

1     Q.   And, Doctor, how did you go
2 about selecting those materials to bring
3 today?
4     A.   I had an old folder in my
5 e-mail account for the Prosima study.
6 Those were the documents in that.
7     Q.   Did you have any other
8 documents, Doctor, with regard to TVT or
9 TVT-O?
10     A.   I did not.
11     Q.   So this Exhibit-23 would
12 represent all the documents that you had
13 with regard to Ethicon on your computer;
14 is that fair?
15     A.   In 2018, correct.
16     Q.   In 2018.
17        And you clarified by stating
18 the year.
19        Since you're been working
20 for Ethicon over the years, I would
21 assume that you've collected materials
22 over the years, is that fair, for your
23 work with Ethicon?
24     A.   I haven't really collected

Page 72

1 them, no.  I have had them, but I haven't
2 collected them.
3     Q.   You only had these materials
4 for 2018.  So any other materials that
5 you've gotten over the years, did you
6 delete them?  How did you store them?
7 Did you give them back?
8        I'm wondering what happened
9 to any materials from Ethicon that you've
10 previously had.
11     A.   Right.  So, yes, either
12 I've deleted them from my e-mail -- I get
13 a lot of e-mails, as I'm sure most people
14 do -- or if they were paper documents or
15 discs of -- things of that nature, I
16 simply don't have them anymore.
17     Q.   Doctor, when you do your
18 work for Ethicon, your consulting work,
19 do you keep hardcopy files of that in
20 your office?
21     A.   Can we clarify whether we're
22 talking about expert witness work or
23 clinical work?
24     Q.   Both, Doctor.

Page 73

1     A.   Okay.  So the clinical work
2 ceased over five years ago, so I simply
3 don't have those documents anymore.
4        For the work I do as an
5 expert witness, yes, I have collected
6 those things, and those are the things
7 that I've produced today.
8     Q.   And do you store those in a
9 hardcopy format or just electronically?
10     A.   Mostly electronically.  I
11 certainly have printed out articles.
12 Sometimes when I'm writing my report,
13 it's easier to have a paper copy of the
14 article I'm looking at as I'm typing at
15 my computer.
16        But I don't necessarily have
17 a good filing system for that.  I wish I
18 did.
19     Q.   And, Doctor, you have an
20 office at your practice locale; would
21 that be fair?
22     A.   That would be fair.  But
23 that's not where I do this work.
24     Q.   Thank you for anticipating

Miles Murphy, M.D.

Page 74

1 that question, Doctor.
2         Where do you do this type of
3 work?
4     A.   Mostly out of my private
5 home.
6     Q.   And so you would have
7 materials at your private home and they
8 may be electronically stored there; is
9 that correct?
10    A.   Again, the type of stuff
11 that I produced today, absolutely.
12        MR. SNELL:  We've been going
13    for about an hour, do you want to
14    take a break, restroom break?
15        MS. GAYLE:  Sure.  Just a
16    quick break, that would be fine.
17        Going off the record.
18        - - -
19    (Whereupon, a brief recess
20    was taken.)
21        - - -
22 BY MS. GAYLE:
23    Q.   Doctor, we've been over your
24 work for Ethicon.

Page 75

1         As I understand your former
2 testimony, you've also been -- or worked
3 with AMS; is that fair?
4     A.   That's correct.
5     Q.   And what was your role with
6 AMS?
7     A.   For AMS, I was involved in a
8 project in which we were looking to
9 create a medical device system to do a
10 sacrocolpopexy with a transvaginal
11 approach.
12    Q.   Do you need to take that,
13 Doctor?
14    A.   No.  Sorry.
15        In addition to that, I
16 believe, if I'm not mistaken, I was going
17 to be a site for 522 Studies, which the
18 government had ordered for any prolapse,
19 transvaginal mesh prolapse systems that
20 wanted to remain on the market in the
21 United States.  But then the company
22 dissolved.
23        Those are the main things
24 that I remember doing for AMS.

Page 76

1     Q.   Doctor, you've also worked
2 for Boston Scientific; is that fair?
3     A.   I've been a consultant for
4 Boston Scientific as well, yes.
5     Q.   Since approximately 2005 or
6 2006, or earlier?
7     A.   I believe way back in around
8 2005, 2006 I briefly did some consulting
9 work for them regarding a prepubic sling.
10        But then I did not work for
11 them -- work as a consultant for them for
12 many years after that.  It was only in
13 the last few years.  Again, I've been a
14 site, a clinical research site for their
15 522 Studies.
16        And I am also on an advisory
17 board for Boston Scientific currently.
18    Q.   Are those 522 Studies
19 regarding transvaginal mesh products?
20    A.   Yes.
21    Q.   And you said you're on their
22 board.
23        Is that also in regards to
24 transvaginal mesh products?

Page 77

1     A.   Excuse me, I don't think I
2 said a board.
3     Q.   I'm sorry.
4     A.   Senior advisory board, not
5 on the board of the company.
6     Q.   Yes, yes.
7     A.   It's simply a group of
8 physicians that they have asked to advise
9 them on all sorts of products, not just
10 transvaginal mesh products.
11    Q.   Thank you, Doctor.
12        Have you also worked for
13 Coloplast?
14    A.   I was a research site for
15 Coloplast in the non-Coloplast arm of one
16 of their 522 Studies as well.
17    Q.   And, again, is that related
18 to transvaginal mesh products?
19    A.   That was specifically in
20 regards to sling procedures, yes.
21    Q.   Thank you, Doctor.
22        And lastly, Doctor, have you
23 worked for Bard?
24    A.   I don't believe that I ever

Miles Murphy, M.D.

Page 78

1  worked for Bard.
2      Q.   If you previously testified
3  that you worked -- that you were a
4  research site for Bard regarding the
5  AJUSTTM sling, does that refresh your
6  recollection?
7      A.   It may, in that my -- my
8  company -- my practice may have been.
9  But I don't believe that I personally was
10  a consultant or involved in that study.
11     Q.   Okay, thank you.
12         Doctor, are there any other
13  medical device companies that I haven't
14  named that you've worked for?
15     A.   Not that I can recall.
16     Q.   And, Doctor, are there any
17  other pharmaceutical companies that I
18  haven't named that you may have worked
19  for?
20     A.   Yes.
21     Q.   Can you name those, please?
22     A.   Yes.
23         I believe the company itself
24  is known as AMAG.  And I apologize, I

Page 79

1  don't know what that stands for.  They
2  make a product called INTRAROSA®, which
3  is a steroid vaginal insert for the
4  treatment of dyspareunia in
5  postmenopausal women.
6         And I have also -- so I've
7  given lectures on their product.  I'm on
8  the speaking board.
9         I have been on the speaking
10  board of another company, but that was
11  many years ago.  I can't recall the name
12  of the company nor the exact product, but
13  it was an overactive bladder medication.
14     Q.   And for all the companies
15  that we've listed, have you been paid for
16  your work in association with those
17  companies?
18     A.   Yes.
19     Q.   And you were paid by those
20  respective companies, correct?
21     A.   Correct.
22         And just to clarify, that's
23  not always specifically a payment to me.
24  For instance, these research studies are

Page 80

1  payments that go to either the practice
2  or the hospital that I work for.
3         And so, generally, that's
4  covering things like the research
5  coordinator's time and things of that
6  nature.
7      Q.   Doctor, do you also act as a
8  peer reviewer for any medical journal?
9      A.   I do.
10     Q.   How long have you been doing
11  that?
12     A.   Around 14 years.
13     Q.   And what journals do you
14  currently review for?
15     A.   The American Journal of
16  Obstetrics and Gynecology; the
17  International Urogyn -- the International
18  Journal of Urogynecology; a journal which
19  is titled, Female Pelvic Medicine and
20  Reconstructive Surgery.  I also serve on
21  the editorial board of that journal.
22         And then there are numerous
23  other smaller journals that I've done
24  peer-review work for in the last couple

Page 81

1  of years.  They are listed on my CV.
2      Q.   And, Doctor, in connection
3  with your peer-review journal activities,
4  is it important for you that the authors
5  of materials that are submitted to you
6  for possible publication be forthright
7  and honest in their research?
8      A.   Yes.
9      Q.   And, Doctor, just generally
10  speaking, if you had found that an author
11  had not been forthright or honest, and
12  if, in your opinion, that was
13  significant, would that be a cause for
14  your concern?
15         MR. SNELL:  Objection to
16     form.  Improper hypothetical.
17         Go ahead.
18         THE WITNESS:  It certainly
19     could.  And I would be happy to
20     look at any specific examples that
21     you have in mind.
22  BY MS. GAYLE:
23     Q.   We're just speaking
24  generally, Doctor.

Miles Murphy, M.D.

Page 82

1    That would be a cause for
2 your concern -- as you said, it certainly
3 could be a cause for your concern.
4    Doctor, why could that be a
5 cause for your concern?  Would you
6 explain for the benefit of the jury, if
7 you -- you know, if we happen to read
8 this testimony later to them?
9    MR. SNELL:  Object to form.
10 Speculation.
11    Go ahead.
12    THE WITNESS:  Certainly, if
13 the court reporter could read back
14 the words that you said, because
15 they were varied.  But I believe
16 it was along the lines of being
17 dishonest.  So that would be
18 something -- if I could hear the
19 exact words -- it would be of
20 concern.
21 BY MS. GAYLE:
22    Q.   Sure.  And, Doctor, I'll
23 just rephrase the question for your
24 convenience.

Page 83

1    You said it could be a cause
2 for concern if you had read something
3 where an author was not forthright or
4 honest in a particular piece of research.
5    And I just want you to
6 explain why that might be a concern to a
7 person that's a peer reviewer like
8 yourself.
9    MR. SNELL:  Same objection.
10    Go ahead.
11    THE WITNESS:  Sure.  So I
12 believe that if someone is
13 falsifying information that
14 they're reporting, that would be
15 important for me to know, as a
16 peer-review journal reviewer.
17    I certainly think that in
18 this day and age, part of
19 submitting an article to a
20 peer-reviewed journal is also
21 presenting any disclosures that
22 one has, because there's always
23 sources of potential bias.  And
24 it's important, when reading

Page 84

1 articles, to be aware of those
2 disclosures.
3 BY MS. GAYLE:
4    Q.   Generally, Doctor, would you
5 agree that the function of a peer
6 reviewer for a journal is to act as a
7 type of gatekeeper for the information
8 that is published in that particular
9 journal?
10    A.   I think gatekeeper is kind
11 of a -- it's not, maybe, the key role.
12    I think the key role is to
13 identify the strengths and weaknesses of
14 the paper and the scientific validity of
15 it and the relevance of it, the
16 importance of it.
17    You can have a fantastic
18 study, but if it's not of interest to the
19 readership of the journal, even though
20 you may not have any critiques of the
21 actual study itself, you may not find
22 that it's an appropriate article to be
23 published in this particular journal.
24    Q.   Doctor, have you published

Page 85

1 in any peer-reviewed journals within the
2 last three years?
3    A.   Yes.
4    Q.   When was your most recent
5 publication, Doctor?
6    A.   If we could look through my
7 CV, I could be very specific for you.
8    Q.   Sure.
9    Would that be your updated
10 CV, Doctor, that they have provided
11 today?
12    A.   Yes.
13    Q.   We'll mark that in a little
14 bit as an exhibit.
15    A.   I believe that this CV was
16 updated in August of 2018.
17    And if you would like, I can
18 read through --
19    Q.   That's okay, Doctor.  I'm
20 just wondering, generally, when was your
21 last publication in a peer-reviewed
22 journal?
23    A.   This year.
24    Q.   And was that also on the

Miles Murphy, M.D.

Page 86

1  topic that we're talking about today, TVT
2  or TVT-O?
3      A.   No, it was not.
4      Q.   Doctor, have you published
5  on TVT or TVT-O?
6      A.   I have.
7      Q.   And when was that, Doctor?
8      A.   The most recent one was in
9  2010.  I was not the lead author, but I
10 was an author on an article entitled,
11 Risk Factors Leading to Midurethral Sling
12 Revision, a Multicenter Case Controlled
13 Study.
14         In addition to that, I was
15 the lead author on a paper in 2008
16 entitled, Incontinence Related Quality of
17 Life and Sexual Function Following
18 Tension-Free Vaginal Tape Versus the
19 "Inside Out" Tension-Free Vaginal Tape
20 Obturator.
21         I was a lead author on a
22 paper published in the Journal of
23 Obstetrics and Gynecology, in 2005,
24 entitled, Is the Cough Stress Test

Page 87

1  Necessary When Placing the Tension-Free
2  Vaginal Tape?
3          I was also the lead author
4  on a review article in the American
5  Journal of Medicine Sports, in 2003,
6  entitled, Evaluation Treatment of Female
7  Urinary Incontinence.
8          That was not specifically a
9  study just of TVT, but it included
10 discussion of that treatment within it.
11         I also was the lead author
12 on a paper entitled, Effect of Anesthesia
13 on Voiding Function Following
14 Tension-Free Vaginal Tape in Obstetrics
15 and Gynecology, in 2003.
16         I believe that is the extent
17 of my peer-reviewed articles specifically
18 regarding sling surgery and TVT.
19     Q.   Thank you, Doctor.
20         MR. SNELL:  Just so I'm
21     clear, was that last question
22     specific to just peer-reviewed
23     articles?
24         MS. GAYLE:  That was

Page 88

1  published in any peer-reviewed
2  journals, yes.
3          MR. SNELL:  Okay.
4          MS. GAYLE:  Thank you.
5  BY MS. GAYLE:
6      Q.   So, Doctor, we were provided
7  with a couple of CVs.  And as we sort of
8  talked about in the beginning, one of
9  them was attached to your POP report,
10 which we're not here today to talk about,
11 PROLIFT®.  And then the other CV was
12 attached to your TVT report.
13         And just for clarification,
14 I'm going to give you the CV that was
15 attached to your TVT report.  And that's
16 going to be marked as Exhibit Number 9.
17         - - -
18         (Whereupon, Exhibit
19     Murphy-9, Curriculum Vitae, Miles
20     Murphy, MD, MSPH, FACOG, was
21     marked for identification.)
22         - - -
23         THE WITNESS:  Did you want
24     to mark that first?

Page 89

1          MS. GAYLE:  We're going to
2      mark that in just a minute.
3  BY MS. GAYLE:
4      Q.   So, Doctor, you said, with
5  regard to the exhibit that you just --
6  the updated CV, we'll refer to it that
7  way, that it was updated in August; is
8  that correct?
9      A.   Yes.
10     Q.   And, Doctor, my question is,
11 just because there's so many CVs floating
12 around, I just wanted to make sure that
13 there were no other changes, other than
14 the update in August that you referred
15 to?
16     A.   In regard to peer-reviewed
17 publications?
18     Q.   In regard to whatever
19 changes you may have made on your resume.
20         So were they all the same
21 except with regard to the update that was
22 provided today?
23         MR. SNELL:  Objection to
24     form.

Miles Murphy, M.D.

Page 90

1    THE WITNESS:  I'm sorry, I'm
2  not following your question.
3  BY MS. GAYLE:
4    Q.   Sure.
5    You had a CV attached to
6  your POP report.  You had a CV attached
7  to your TVT report.
8    A.   Yes.
9    Q.   First question, are those
10 identical?
11   A.   I doubt it.
12   Q.   And, secondly, the CV today
13 that you have been given, is that just
14 reflecting an update to your -- the CV
15 that you keep for all your
16 qualifications?
17   A.   Absolutely.  So a CV is sort
18 of a living document, you update it on a
19 monthly basis.
20   Q.   Of course.
21   A.   So I sort of start with the
22 base one, the one that I would have
23 provided back for the POP expert report,
24 and I've simply continued to add to it.

Page 91

1    Q.   And I'm just trying to make
2  sure, Doctor, that we're on your most
3  current CV as we talk about your
4  qualifications today.
5    And that would be the
6  updated version; is that correct?
7    A.   The one that you have, as I
8  said, I believe was updated in August of
9  2018.  I have given some lectures since
10 then that I've added to that.  I don't
11 think there's any new peer-reviewed
12 literature that I've published, certainly
13 nothing specifically on TVT since then.
14   Q.   And the lectures that you've
15 given that are not appearing on your
16 updated CV, would those be relevant to
17 anything that we're discussing here
18 today?
19   A.   No.
20    Let me rephrase that.  The
21 most recent lecture I gave was not
22 relevant.  But I did also act as a
23 faculty member for a cadaver lab
24 sponsored by the American Urogynecologic

Page 92

1  Society.  And at that meeting, I was
2  the -- it was a cadaver lab in which we
3  had multiple cadavers and multiple
4  physicians teaching different procedures
5  to them; things like prolapse repair,
6  things like fistula repair.
7    The specific cadaver that I
8  was at was specifically for midurethral
9  sling placement.  So it was related to
10 the topic today, but it was not a
11 lecture.
12   Q.   Do you know the approximate
13 date of that, Doctor?
14   A.   It was about three weeks
15 ago.
16   Q.   And, Doctor, just a couple
17 of sort of cleanup questions before we
18 move on to the next section of what we're
19 going to talk about.
20    Do you know a Dr. Richard
21 Ellerkmann?
22   A.   That does not ring any
23 bells.
24   Q.   So, Doctor, I'm going to

Page 93

1  hand you what has been marked as Exhibit
2  Number 10.
3    And as you said, you don't
4  know Dr. Richard Ellerkmann.  However, in
5  preparing Dr. Ellerkmann's general
6  reliance list for your general reliance
7  list, found at Exhibit-6, there are quite
8  a number of similarities, including
9  typographical mistakes.
10    As you testified before,
11 Doctor, you didn't prepare your reliance
12 list at Exhibit-6, correct?
13   A.   That's correct.
14   Q.   So you would not know why or
15 be able to explain why there's
16 similarities in -- with regard to the two
17 reliance lists, including any
18 typographical mistakes, correct?
19    MR. SNELL:  Objection to
20 form.
21    THE WITNESS:  That's
22 correct.
23    And just so you know, I do
24 know, I believe, a Mark

Miles Murphy, M.D.

Page 94

1    Ellerkmann.  I don't know if
2    that's a middle name or anything
3    of that nature, but.
4         MS. GAYLE:  You can hand me
5    that back, Doctor.  I'll mark it
6    as Exhibit-10.
7              - - -
8         (Whereupon, Exhibit
9    Murphy-10, Richard Ellerkmann,
10   General Reliance List in to
11   Addition to Materials Referenced
12   in Report, was marked for
13   identification.)
14             - - -
15   BY MS. GAYLE:
16        Q.   Doctor, I have a similar
17   question with regard to what will be
18   marked as Exhibit Number 11.
19             - - -
20        (Whereupon, Exhibit
21   Murphy-11, Ahmet Bedestani General
22   Reliance List in Addition to
23   Materials Referenced in Report,
24   was marked for identification.)

Page 95

1              - - -
2    BY MS. GAYLE:
3         Q.   Do you know a Dr. Ahmet
4    Bedestani?
5         A.   I do not.
6         Q.   And, Doctor, again, any
7    similarities between Dr. Bedestani's
8    general reliance list and the general
9    reliance list that is found at Exhibit-6,
10   you would not be able to explain that
11   because you did not prepare Exhibit-6,
12   correct?
13        A.   That's correct.
14        Q.   Doctor, turning to your role
15   in this litigation, you don't have an
16   engineering degree, do you?
17        A.   I do not.
18        Q.   Are you holding yourself out
19   in this litigation as an expert in the
20   field of engineering?
21        A.   Engineering of -- that's a
22   very broad term.
23        Q.   In the broadest sense,
24   Doctor.  And then we'll sort of get down

Page 96

1    to more specifics.
2         Are you holding yourself out
3    as an expert in the field of engineering?
4         MR. SNELL:  I'm going to
5    object to the form.  Lacks
6    specification.
7         THE WITNESS:  As it regards
8    to engineering the functional
9    properties of devices, I do feel
10   like I am an expert in that
11   regard.
12   BY MS. GAYLE:
13        Q.   Have you ever been involved
14   in structuring or implementing a
15   design-controlled process for a medical
16   device from the medical company
17   perspective?
18        A.   Yes.
19        MR. SNELL:  Object to form.
20        Go ahead.
21   BY MS. GAYLE:
22        Q.   And what device was that?
23        A.   The TVT-Secur.
24        Q.   TVT-Secur with Dan Smith; is

Page 97

1    that right?
2         A.   That's my recollection.
3         Q.   Doctor, do you know if the
4    TVT-Secur is still on the market?
5         A.   It is not.
6         Q.   Do you know why it has been
7    taken off the market?
8         A.   I do not.  I have some
9    ideas, but I was not involved in that
10   decision.
11        Q.   Are you familiar with the
12   term "FMEA," failure modes and effect
13   analysis?
14        A.   Not particularly.
15        Q.   Are you familiar with the
16   term "DDSA," device design safety
17   assessment?
18        A.   Yes, vaguely, in that I
19   could understand what that would mean.
20        Q.   You would understand what
21   device design safety and assessment,
22   those words put together, would mean,
23   correct?
24        A.   Correct.

Miles Murphy, M.D.

Page 98

1    Q.    But you wouldn't -- strike
2  that.
3         Do you know what regulations
4  would consist of, or requirements would
5  consist, in the device design safety
6  assessment protocol?
7         MR. SNELL:  I'm going to
8      object to foundation.  You said
9      regulations that require DDSA, so
10     foundation.
11        MS. GAYLE:  Strike my
12     question.  And let me give him a
13     better question.
14  BY MS. GAYLE:
15    Q.    So you said you understood
16  what that phrase meant.
17        Have you ever worked in any
18  area that that phrase might encompass?
19    A.    I think so.
20    Q.    And in what regard would you
21  think so?
22    A.    Could you just repeat the
23  term one more time, not the -- not the
24  initials, the actual --

Page 99

1    Q.    Device design safety
2  assessment.
3    A.    Yes.  So in product
4  validation, you're looking to make sure
5  that the system that has been employed,
6  the IFU, things of that nature, are going
7  to be applicable to use in the general
8  use by surgeons.
9         So you would want to make
10  sure that the device and its usage are
11  safe.
12    Q.    And did you do any device
13  design safety assessments for any product
14  for Ethicon?
15    A.    So, again, this may be a
16  very specific term that I'm not familiar
17  with it.  But I think something like the
18  Prosima study that I was involved with
19  would have involved steps in that basic
20  process.
21    Q.    Have you ever been involved
22  in authoring a clinical expert report,
23  within a medical device company, with
24  regard to a device that was going to be

Page 100

1  on the market or was already on the
2  market?
3         MR. SNELL:  Object to form.
4         Go ahead.
5         THE WITNESS:  Not that I
6      recall.
7  BY MS. GAYLE:
8    Q.    Do you know what a clinical
9  expert report is?
10    A.    I've seen in the review of
11  the materials that I have for this
12  litigation documents that sound like that
13  would be.
14        For instance, a physician
15  resource monograph, I believe it was
16  called, for the TVT; one of the authors
17  of which was my medical partner, Dr.
18  Lucente.
19    Q.    And, Doctor, would it be
20  fair to say that Dr. Lucente would be
21  better versed to opine on the materials
22  in that document?
23        MR. SNELL:  Object to form.
24        THE WITNESS:  I don't know

Page 101

1      if he would be better to opine on
2      it.  He could certainly opine on
3      what he meant when he wrote
4      something.
5         But I certainly think I'm
6      just as good an expert in regards
7      to the topic that is contained
8      therein.
9  BY MS. GAYLE:
10    Q.    Whereas he wrote it, Doctor,
11  and you reviewed it; is that correct?
12    A.    I've read it, yes.
13    Q.    Okay.  Did you also read the
14  one -- you said you read the one for TVT;
15  is that correct?
16    A.    Correct.
17    Q.    Did you read the clinical
18  expert report for TVT-O?
19    A.    I very likely did.  Again,
20  if you look at the list of my materials,
21  they're extensive.  So remembering
22  exactly which one I reviewed versus which
23  one I haven't is difficult sitting here
24  today.  But if it's in my list of

Miles Murphy, M.D.

Page 102

1  materials, then I reviewed it.
2      Q.   And, Doctor, would it be
3  fair to say, then, that you, sitting here
4  today, don't recall who the clinical
5  expert report author for the TVT-O might
6  be?
7      A.   I wouldn't be surprised if
8  the creator of the system was involved.
9          But, no, I can't say I would
10 know who the author was, no.
11     Q.   And when you say "the
12 creator of the system," who would you be
13 referring to?
14     A.   I'm sorry, are we talking
15 about the TVT-O or the TVT ABBREVO® ?
16     Q.   The TVT-O, that's what
17 you're opining about today, correct?
18     A.   Yes, yes.
19          Actually, I can't recall
20 right now.
21     Q.   Do you have any patents on
22 medical devices, Doctor?
23     A.   I do not.
24     Q.   Are you holding yourself out

Page 103

1  as an expert in biomechanics?
2      A.   Yes.
3      Q.   What experience do you have
4  in biomechanics?
5      A.   I have both the experience
6  that I've learned through my formal
7  education in medical school, as well as
8  the work that I've continued to work on
9  as an expert in the field of
10 urogynecology, both from working with
11 device companies and their review of the
12 literature of these products.
13     Q.   You said the "formal
14 education in medical school."
15          Did you take biomechanics
16 classes?
17     A.   Not particular -- not
18 entitled biomechanics.
19     Q.   What particularly in your
20 formal education lends you to think that
21 you're an expert in biomechanics?
22     A.   Because I'm an expert in the
23 biology of the human body and the way
24 that the body works and how devices

Page 104

1  interact with the body.
2      Q.   Doctor, are you a
3  pathologist?
4      A.   I have certainly reviewed
5  lots of pathological slides and reports,
6  and I did histology for two years in the
7  urology research lab at the University of
8  Pennsylvania and the Veterans
9  Administration in Philadelphia.
10     Q.   Was that -- I'm just going
11 to stop you right there.
12          That histology, was that in
13 relation to any transvaginal mesh
14 products?
15     A.   It was in relation to
16 urology research.  So it would have, you
17 know -- for instance, we had a model on
18 obstruction of the urethra for rabbits.
19 Now, that was really more for a model for
20 benign prostatic hypertrophy.  But it
21 certainly could be applied to retention
22 that would be involved with a sling.
23          But I do not -- I have not
24 done a residency in pathology.

Page 105

1      Q.   And, Doctor, you, as a
2  urogynecologist, treat patients with
3  complications from TVT and TVT-O; is that
4  fair?
5      A.   Yes.
6      Q.   And, Doctor, have you -- in
7  treating those patients, have you
8  performed what might be termed a revision
9  surgery, where you go in and you might
10 operate on part of that mesh by either
11 trimming it or removing it?
12     A.   Yes.
13     Q.   And, Doctor, when you did
14 that, did you track what -- from a
15 pathological standpoint to perform any
16 sort of histology analysis, did you track
17 those samples that you might have removed
18 from a patient?
19     A.   In some cases, yes; in some
20 cases, no.
21     Q.   So can you explain that,
22 Doctor?
23     A.   So, in general, when you are
24 performing a procedure for voiding

Miles Murphy, M.D.

Page 106

1 dysfunction or urinary retention after a
2 sling, generally in that situation,
3 cutting the sling perpendicular to its
4 axis is usually adequate to relieve that
5 obstruction. You don't actually need to
6 remove a portion of the sling.
7        I have certainly, in other
8 cases, removed portions of sling for
9 things like exposure in the vagina.
10 Sometimes, specifically at the request of
11 the attorneys that some of the patients
12 have retained, they've asked that it
13 specifically be sent for pathologic
14 evaluation. So I certainly would have
15 reviewed any of those evaluations.
16        At other times, especially
17 if an attorney is not involved, I feel
18 that it's not a great use of medical
19 dollars to send a piece of mesh there to
20 the pathology to say explanted mesh. So
21 I don't always send that to the pathology
22 department.
23    Q.   Do you know who Shelby
24 Thames is?

Page 107

1    A.   The name rings a bell, but I
2 couldn't tell you specifically who she
3 is.
4    Q.   And in connection with my
5 question regarding whether or not you're
6 holding yourself out as an expert in
7 pathology in this litigation, have you
8 performed any sort of large histological
9 review of tissue samples taken out of
10 patients?
11    A.   I've reviewed --
12        MR. SNELL: Object to form.
13        Go ahead.
14        THE WITNESS: I've reviewed
15    many articles on the pathology and
16    the histology of samples reviewed.
17 BY MS. GAYLE:
18    Q.   I'm talking about the actual
19 slides, Doctor, that you might look at
20 under the microscope.
21    A.   Have I looked at the slides
22 under a microscope myself?
23    Q.   From a large selection of
24 those particular things you might have

Page 108

1 removed.
2        In other words, what I'm
3 trying to get at is, have you done a
4 formal study regarding transvaginal mesh
5 in your patients?
6        MR. SNELL: Object to form.
7        Go ahead.
8        THE WITNESS: So all the
9    studies that I've conducted are in
10    my CV. I do not -- since medical
11    school, I've never looked at a
12    microscope of anything that I've
13    removed from a patient.
14 BY MS. GAYLE:
15    Q.   And, I'm sorry, Doctor, I
16 have to go through these. It's just sort
17 of a formality.
18        Doctor, are you holding
19 yourself out as an expert in the Food and
20 Drug Administration's medical device
21 labeling regulations?
22    A.   Yes, I am.
23    Q.   And, Doctor, do you have any
24 formal FDA regulation training and

Page 109

1 knowledge, outside of what you've gotten
2 through the medical device company?
3    A.   Yes.
4    Q.   And what was that training,
5 Doctor?
6    A.   That was -- it wasn't --
7 excuse me. Just so I clarify.
8        There was sort of two parts
9 of that question. One was with whether
10 it was formal, and one was whether I
11 received any outside of a medical
12 company.
13        I've never had any formal
14 training, in that I can't point to a
15 class entitled, FDA regulation. But I
16 certainly have knowledge of it and
17 training in the sense that I've read lots
18 of articles and information on it, and
19 none of it -- well, maybe some of it has
20 been included in the references that they
21 provided to me. But other ones have
22 certainly been on my own time.
23    Q.   Doctor, are you a biomedical
24 engineer?

Miles Murphy, M.D.

Page 110

1    A.   I would, basically, going
2  back to the same type of answer, for the
3  sake of time, that I gave for
4  biomechanics.
5    Q.   Biomechanics?
6    A.   Yes.
7    Q.   Thank you, Doctor.
8         And Doctor, do you hold a
9  degree in chemical engineering?
10   A.   I do not.
11   Q.   Doctor, do you hold a degree
12 in polymer chemistry?
13   A.   I do not.
14   Q.   Doctor, have you ever
15 performed any bench research on
16 polypropylene mesh?
17   A.   I personally have not
18 performed bench research on polypropylene
19 mesh, no.
20   Q.   And, Doctor, we talked about
21 a few of the articles that you had
22 published in peer-reviewed journals
23 earlier and you listed those out.
24        I understood that none of

Page 111

1  those articles related to polypropylene
2  mesh and degradation in the human body;
3  is that correct?
4         MR. SNELL:  Did you say
5    based on his prior testimony?
6         MS. GAYLE:  The articles
7    that he listed out that were TVT
8    and TVT-O -- I'll restate my
9    question, Doctor.
10 BY MS. GAYLE:
11   Q.   Do you have any articles
12 that you've published with regard to TVT
13 or TVT-O that specifically discuss
14 degradation of polypropylene mesh in
15 those two products?
16        In other words, that article
17 would solely talk about that, not other
18 issues, but just the issue of
19 degradation.
20        MR. SNELL:  And you're only
21   asking about peer-reviewed
22   articles?  Or what about book
23   chapters?  What exactly are you
24   asking?

Page 112

1         MS. GAYLE:  We'll break it
2    down.  I said peer-reviewed
3    articles first.
4         MR. SNELL:  Peer-reviewed
5    articles.
6         MS. GAYLE:  And then we'll
7    break it down into any other
8    publications.
9         THE WITNESS:  So, certainly,
10   the publications that I have
11   published in peer-reviewed
12   journals on polypropylene mesh
13   slings look at outcomes beyond the
14   day that they were placed.
15        So in that regard, if there
16   was degradation of those
17   materials, those outcomes would be
18   reflected in the findings that we
19   found.
20 BY MS. GAYLE:
21   Q.   And I'm speaking solely from
22 a -- as you said, a microscopic pathology
23 sort of histology viewpoint.
24        So a more general view of

Page 113

1  that type of degradation where you've
2  looked at it under a microscope and
3  actually wrote up your analysis on what
4  you saw under a microscope?
5    A.   Sure.
6         So your question implies
7  that the mesh degrades, which I take
8  issue with.
9         But, secondarily, no, I do
10 not -- I have not been an author on a
11 paper that specifically has within the
12 topic of it the degradation of mesh.
13        MS. GAYLE:  And the court
14   reporter, can you mark this as
15   Exhibit Number 12?
16        - - -
17        (Whereupon, Exhibit
18   Murphy-12, Curriculum Vitae,
19   Miles Murphy, MD, MSPH, FACOG, was
20   marked for identification.)
21        - - -
22        MS. GAYLE:  We talked about
23   this earlier, this is the updated
24   curriculum vitae of Dr. Murphy.

Miles Murphy, M.D.

Page 114

1  BY MS. GAYLE:
2      Q.   Doctor, you just said now in
3  your answer that you take issue with
4  degradation in polypropylene mesh.
5          Can you explain why that is,
6  why you take issue with that?
7      A.   I take issue with the
8  implication that it's a -- the question
9  suggested that it was a topic which is
10  considered known or noncontroversial,
11  that mesh degrades.
12         And I take issue with that
13  because there's lots of studies that show
14  that it does not, that are specifically
15  histologically based, pathologically
16  based, electron microscopy based.
17         I also have extensive
18  personal experience with mesh long-term.
19  I've been in practice in the same exact
20  town for the last 14 years, so I sort of
21  have firsthand knowledge of that.
22         And then more
23  scientifically, I'm very well versed in
24  the literature regarding long-term

Page 115

1  studies of polypropylene mesh in the
2  human body, which do not suggest any
3  significant degradation of that material.
4      Q.   And off the top of your
5  head, Doctor, with regard to the
6  long-term studies, which one are you
7  referring to?
8      A.   If we look at my report --
9  and just so you know, I've added this, if
10  you want to add this.
11     Q.   Okay.
12     A.   This is just a table of
13  contents.  I was not smart enough to put
14  a table of contents in my original
15  report, so I thought it would be helpful,
16  to speed things along today, to have
17  that.
18         So if you look at Page 50 of
19  my report, there is a long discussion --
20  let's see, six pages -- looking at the
21  long-term studies of TVT.  So all the
22  references within those pages, 55 to --
23  excuse me, 50 to 55, I'm referring to
24  those studies.

Page 116

1          And then Page 63 of my
2  report looks -- is entitled, TVT-O
3  Long-Term Data.  And that extends from
4  Page 63 to 66.  And the references that I
5  include in that portion of my report are
6  the long-term studies that I'm referring
7  to.
8      Q.   And, Doctor, in those pages,
9  which studies particularly are you
10  referring to with regard to degradation?
11     A.   All of them.
12     Q.   All of them.
13         And, Doctor, do you think
14  that the issue of whether or not mesh
15  degrades long-term is a settled issue?
16     A.   I think if it were, I
17  wouldn't be sitting in this room.  I
18  think that the vast majority of people
19  that practice in this field, actually
20  take care of patients in this field, the
21  vast, vast majority of them, I think it's
22  a settled issue.
23         But if that were -- if it
24  were 100 percent across the board, I

Page 117

1  don't think I would be giving this
2  deposition.
3      Q.   Doctor, since you started
4  work as an expert witness in this
5  litigation, when you're talking to your
6  patients through an informed consent
7  process, have you begun to include a
8  conversation about potential degradation?
9      A.   So I certainly talk to my
10  patients about long-term data; and in
11  regards to certain topics, how sometimes
12  there's more long-term data and other
13  times there is not.
14         In regards to degradation,
15  it's a common question that my patients
16  ask about.  And I give them the most
17  balanced answer that I can, as I do with
18  everything that I discuss with my
19  patients.
20     Q.   Doctor, I think you said
21  earlier today that you had practiced
22  approximately 14 years; is that correct?
23     A.   That's correct.  That's
24  following fellowship.

Miles Murphy, M.D.

Page 118

1    Q.   Thank you.
2         And, Doctor, in that 14-year
3    period, would it be fair to say that the
4    process of -- your process of informed
5    consent in speaking with your patients
6    has changed over time?
7    A.   I don't think the process
8    has changed.  I think the --
9    Q.   The substance, I'm sorry.
10   Doctor, thank you.
11        The substance of what you
12   talk about to your patients has changed
13   over time?
14        MR. SNELL:  Object.
15   Overbroad.
16        THE WITNESS:  The contents
17        have changed since I started, yes.
18   BY MS. GAYLE:
19   Q.   Generally speaking, Doctor,
20   would it be fair to say that medical
21   science changes and evolves?
22   A.   Absolutely.
23   Q.   And as that medical science
24   changes and evolves, Doctor, would it be

Page 119

1    fair to say that you keep up, generally
2    speaking, with those changes and
3    evolutions in your field?
4    A.   I certainly try.
5    Q.   And, Doctor, when you're
6    talking to your patients, you would want
7    to try to convey a balanced approach to
8    those changes and evolutions; is that
9    fair also?
10   A.   Yes.
11   Q.   So, Doctor, as you've
12   learned over time about an issue in this
13   litigation that may not be settled, using
14   your words, would it be fair to say that
15   if a patient brought those up or wanted
16   to discuss some of these unsettled
17   issues, you would discuss those with your
18   patient?
19        MR. SNELL:  Object to form.
20   Misstates.
21        Go ahead.
22        THE WITNESS:  Yes.
23   BY MS. GAYLE:
24   Q.   And, Doctor, you mentioned

Page 120

1    an IFU earlier.
2         I take it you know what the
3    letters "IFU" mean?
4    A.   I do.
5    Q.   And would that be
6    instructions for use, Doctor?
7    A.   Yes.
8    Q.   And over time, would it be
9    fair to say that the instructions for use
10   for the TVT have changed through the
11   years?
12   A.   I think that there have been
13   a number of iterations of the IFU.
14   Q.   Thank you, Doctor.
15        And would it also be fair to
16   say that there have been a number of
17   iterations of the TVT-O IFU over the
18   years?
19   A.   I believe so.
20   Q.   And, Doctor, you implant the
21   TVT; is that correct?
22   A.   Are you talking about
23   currently?
24   Q.   Not currently, Doctor.

Page 121

1         Over the years, in the last
2    14 years, you have implanted the TVT; is
3    that correct?
4    A.   Yes.
5    Q.   And, Doctor, over the years,
6    you have implanted the TVT-O; is that
7    also correct?
8    A.   Yes.
9    Q.   And, Doctor, as those
10   iterations for those particular products
11   in the IFU changed over time, is it fair
12   to say that as you were implanting those
13   products, you would change your
14   discussions with your patients as those
15   IFUs gave you more information?
16        MR. SNELL:  Object to form.
17   Misstates.
18        THE WITNESS:  No, I don't
19        think so.
20   BY MS. GAYLE:
21   Q.   So, Doctor, if the IFU was
22   updated to include more adverse events,
23   for instance, let's say dyspareunia,
24   would you then include that in your

Miles Murphy, M.D.

Page 122

1  discussions with your patients?
2        MR. SNELL:  Same objection.
3        Go ahead.
4  BY MS. GAYLE:
5        Q.   Do you understand my
6  question, Doctor?
7        A.   I do.
8        So I do not rely on the IFU.
9  It's certainly a nice addition to all my
10  knowledge base.  But I rely much more on
11  my training, the review of the medical
12  literature and my personal experience in
13  regard to my counseling of my patients.
14        And, for instance,
15  dyspareunia has been something that's
16  been known as a potential complication of
17  any pelvic reconstructive surgery for the
18  past 50 years.
19        Q.   And you said you don't rely
20  on the IFU; is that correct?
21        A.   No, I said I don't rely
22  solely on it.  It's part of the
23  information that is included in my whole
24  knowledge base.

Page 123

1        But it is not something that
2  I expect to go to, to know of every
3  single potential risk of a product or
4  procedure.
5        Q.   And I'm not inferring that
6  you would, Doctor.
7        But on the part of the IFU
8  that you do rely on, in that little small
9  part of your knowledge base, as you just
10  inferred, Doctor, would you expect the
11  IFU to be accurate at all times that
12  you're looking at it and relying on it?
13        MR. SNELL:  Object to form.
14        Go ahead.
15        THE WITNESS:  I think to the
16        form that the company that
17        produces the IFU, they want to be
18        as accurate as they can.  I
19        absolutely think that's important.
20  BY MS. GAYLE:
21        Q.   Just again, and for the
22  benefit of others that may not understand
23  what we all do here today, can you
24  explain why that would be important for

Page 124

1  the company to do that?
2        A.   So part of a company's
3  responsibility is to convey information
4  to the doctors that use their products.
5  And it is important for that information,
6  obviously, to be as accurate as possible.
7        Q.   And, Doctor, in that process
8  of them conveying information to the
9  doctors, then the doctors can, in turn,
10  convey the information to the patients;
11  is that fair?
12        MR. SNELL:  Hold on.  I
13        object.  It calls for speculation
14        now.
15        MS. GAYLE:  Sure.  Strike
16        that question.
17  BY MS. GAYLE:
18        Q.   Doctor, can you explain what
19  the informed consent process is that
20  doctors undergo with their patients?
21        MR. SNELL:  Same objection.
22        Go ahead.
23        THE WITNESS:  Sure.
24        So the informed consent

Page 125

1        process is a process that occurs
2        from the first time you meet a
3        patient until the time that they
4        go to sleep for their surgery.
5        Generally, the biggest part
6        of that informed consent process
7        is the preoperative counseling
8        visit where the patient actually
9        signs a written form.
10        But the most important part
11        of that process is the discussion
12        of the condition that the patient
13        is suffering from; the options in
14        regards to moving forward, both
15        treatment and nontreatment; the
16        pros and cons of treatment and
17        nontreatment; and then the pros
18        and cons of the treatment options
19        that are available.
20        And then after doing that
21        and coming to a decision with the
22        patient as to what procedure to
23        perform, specifically discussing
24        what to expect leading up to the

Miles Murphy, M.D.

Page 126

1    surgery, during the surgery, after
2    the surgery.  And that includes
3    the risks and benefits of the
4    surgery.
5    BY MS. GAYLE:
6        Q.   And when you say "pros and
7    cons," does that also include the risks
8    and benefits of the surgery or the
9    particular treatment that you're talking
10   about?
11       A.   Yes.
12       Q.   And is it fair to say,
13   Doctor, that those types of discussions,
14   as medical science evolved over the
15   years, may have changed in your practice
16   over the years?
17           MR. SNELL:  Object to form.
18       Asked and answered.
19           THE WITNESS:  I don't
20       think -- well, certainly.  I mean,
21       in incremental, small amounts,
22       yes.
23   BY MS. GAYLE:
24       Q.   Doctor, we talked about some

Page 127

1    of the iterations in the TVT IFU and the
2    TVT-O IFU.
3            As those iterations changed
4    over the years, did you incorporate those
5    changes with regard to the adverse events
6    and to your discussions with your
7    patients?
8            MR. SNELL:  Objection.
9        Asked and answered.
10           THE WITNESS:  I've never
11       seen anything in the IFU -- in any
12       of the iterations of the IFU that
13       changed the way I discussed the
14       pros and cons of the procedure --
15       of those two procedures with my
16       patients.
17   BY MS. GAYLE:
18       Q.   And that would include the
19   last IFU that you reviewed for those
20   particular products; is that fair?
21       A.   Yes.
22       Q.   And, Doctor, do you know
23   approximately what year the last IFU that
24   you reviewed was?

Page 128

1        A.   Not off the top of my head.
2        Q.   And you said -- earlier you
3    qualified my question about whether or
4    not you implant TVT to this day.
5            That infers that you've
6    stopped implanting TVT at some point; is
7    that correct?
8        A.   It is.  In that I have
9    switched from the TVT traditional,
10   original, to the TVT EXACT®.
11       Q.   And, Doctor, when did you
12   switch from the TVT original to the TVT
13   EXACT®?
14       A.   I couldn't give you an exact
15   date.  But it would probably be some time
16   within the first 18 months after that
17   product launched.  And I don't know
18   exactly when that was.  My guess was it
19   was about five to eight years ago,
20   something along those lines.
21       Q.   I was going to say, Doctor,
22   can you clarify, you said 18 months after
23   that product launch.
24           Can you clarify what product

Page 129

1    you're referring to?
2        A.   TVT EXACT®.
3        Q.   And, Doctor, why did you
4    switch over to the TVT EXACT®?
5        A.   I think it was just a little
6    bit more user friendly than the TVT
7    EXACT® -- excuse me, than the original
8    TVT.
9        Q.   And in what way, Doctor?
10       A.   So with the traditional TVT,
11   when you place the first trocar, you look
12   inside the bladder to make sure there's
13   not a perforation.  Assuming there is
14   not, you pull that trocar through.  You
15   pass the second side, assuming there's
16   not a perforation.  Then you -- so you
17   have to do two cystoscopies.
18           For the TVT EXACT®, the
19   trocar has a plastic covering.  And that
20   plastic covering is much more flexible
21   than the metal trocar that you would have
22   had to have left in for the original TVT.
23   So it allows you to pass both sides
24   before doing cystoscopy.  So it makes the

Miles Murphy, M.D.

Page 130

1 procedure more efficient.
2 The needle is also smaller
3 in diameter than the original, and that
4 makes the passage a little bit easier.
5 I think that both products
6 are excellent products. And if I had to
7 go back to the original one, I think I
8 could do fine with it. But it just made
9 it a little bit more, as I said,
10 convenient and user friendly to use the
11 EXACT® over the traditional.
12 Q. And, Doctor, in your report,
13 you talked a little bit about pore size.
14 Do you know if pore size on
15 the TVT original and the TVT EXACT® are
16 the same?
17 A. To the best of my knowledge,
18 they are the same, yes.
19 Q. Do you know if the weight of
20 the product is the same?
21 A. As far as I know, yes.
22 Well, let me rephrase. So
23 the original TVT now comes in both a
24 laser cut and a mechanical cut. The TVT

Page 131

1 EXACT® only comes in the laser cut.
2 Is the weight different with
3 a laser cut from the EXACT® than the
4 mechanical cut from the original TVT?
5 Maybe a couple milligrams, but not --
6 nothing substantial and certainly nothing
7 that's clinically relevant.
8 Q. Doctor, do you know why they
9 switched from the laser cut to -- from
10 the mechanical cut to the laser cut?
11 MR. SNELL: Object.
12 Misstates.
13 Go ahead.
14 THE WITNESS: Yes, so they
15 are both still available, so they
16 didn't switch wholeheartedly --
17 completely.
18 I think there were certainly
19 some physicians that, you know,
20 the company spoke to that felt
21 that they preferred the laser cut.
22 So, ultimately, after -- after
23 doing evaluation of the two
24 techniques, and I've reviewed

Page 132

1 internal documents regarding this,
2 they felt that there would not be
3 a substantial change in the
4 clinical efficacy of the device if
5 they performed a laser cut. And
6 so they decided to make that
7 available as well.
8 BY MS. GAYLE:
9 Q. Doctor, you said that some
10 physicians preferred the laser cut over
11 the mechanical cut.
12 Why was that preference
13 there?
14 MR. SNELL: Object to form.
15 Go ahead.
16 THE WITNESS: The documents
17 that I reviewed where they
18 specifically talked about reasons
19 why some physicians preferred that
20 mostly talked to the issue of
21 small pieces of the mesh
22 separating from the sling itself
23 with the mechanical cut.
24 BY MS. GAYLE:

Page 133

1 Q. And, Doctor, in the
2 mechanical cut, if small pieces were to
3 separate in the human body from the
4 mechanical cut, that potentially could
5 cause a patient complications?
6 A. There's certainly no
7 evidence in the medical literature to
8 suggest that that's the case.
9 Q. So you don't believe that --
10 summarizing your opinion, you don't
11 believe that if there was any sort of
12 particles or pieces of mesh that had
13 frayed off of a mechanical cut piece of
14 mesh, that that would cause any sort of
15 complication in a patient? Did I
16 summarize that correctly?
17 MR. SNELL: Asked and
18 answered.
19 Go ahead.
20 THE WITNESS: I think
21 overall as a whole, yes, that's
22 correct.
23 BY MS. GAYLE:
24 Q. Do you believe that those

Miles Murphy, M.D.

Page 134

1 pieces of mesh that would fray off a
2 mechanical cut piece would cause any
3 inflammatory response?
4          MR. SNELL:  Foundation.
5          THE WITNESS:  I don't think
6      it would be any greater than the
7      sling itself.
8 BY MS. GAYLE:
9      Q.   And what do you mean by "any
10 greater than the sling itself"?
11      A.   So there's always some
12 degree of inflammation regarding
13 placement of a foreign body in the human
14 body.  And there's going to be
15 inflammation from the sling itself.
16          If little particles of that
17 sling separate from the sling itself,
18 it's still the same amount of foreign
19 body that would have been in the patient.
20 And I don't think the inflammatory
21 response is substantially different if
22 it's separate from the sling versus
23 attached to the sling.
24      Q.   When you were reviewing your

Page 135

1 materials for Ethicon, and you say you
2 were reviewing the doctors talking about
3 some of their reasons they were
4 switching, did you review any materials
5 where the doctors were talking about
6 patients where a fraying piece of
7 material had caused one of their patients
8 a complication?
9          MR. SNELL:  Object.
10      Foundation.
11          Go ahead.
12          Foundation.  Misstates
13      evidence.
14          Go ahead.
15          THE WITNESS:  I don't recall
16      specifically a doctor saying it
17      caused a complication in one of
18      their patients.
19 BY MS. GAYLE:
20      Q.   Doctor, do you know which
21 products were mechanically cut?
22      A.   Yes.
23      Q.   Which ones were those?
24      A.   The original TVT and the

Page 136

1 original TVT-O.
2      Q.   Do you know which product is
3 the laser-cut product?
4      A.   I believe that the original
5 TVT-O and the original TVT are now
6 available as laser cut.  It's my
7 understanding that all the EXACTs® and
8 all the ABBREVOs® are laser cut.
9      Q.   And I believe you earlier,
10 Doctor, correct me if I'm wrong, that you
11 weren't part of that decision at Ethicon
12 when they were discussing moving from a
13 mechanical cut to a laser cut on some
14 products or all products, correct?
15      A.   I was not part of that
16 discussion in any formalized way.
17 Someone may have asked me in the hall, at
18 a meeting, what did I think about it, but
19 nothing that was official.
20      Q.   Doctor, have you ever
21 operated on a patient where you've had to
22 remove these particles of the mesh that
23 may have come off from mechanical pieces
24 of mesh?

Page 137

1      A.   No.
2      Q.   When you're operating on a
3 patient, can you tell with your naked eye
4 which pieces, or which -- when you're
5 looking into the human body, can you tell
6 which pieces may have been mechanically
7 cut versus which have been laser cut?
8      A.   So just so I understand your
9 question.
10          If you're saying I have a
11 patient that has had a sling placed and I
12 go back in and open up the tissues, if I
13 look at the mesh -- the sling, can I tell
14 whether it was laser cut or mechanically
15 cut?  I never would have had any reason
16 to sort of have that be part of my
17 thought process while I was doing that
18 procedure.
19          If someone presented me two
20 cadavers or something and said, open up
21 these tissues and see which is which, I
22 might be able to tell the difference.
23 But I've never done that in a human, in a
24 live human.

Miles Murphy, M.D.

Page 138

1    Q.   If you learned of
2  medically -- medical evidence in the
3  course of this litigation that there
4  would be a difference and that would
5  cause a substantial inflammatory response
6  in a patient, then would that be
7  something that you would start to look
8  out for as you operate on patients?
9         MR. SNELL:  Objection.
10    Improper hypothetical.  Misstates.
11        Go ahead.
12  BY MS. GAYLE:
13    Q.   In other words, if you
14  learned that information, Doctor, would
15  that -- would you incorporate that
16  information so that you could use that in
17  your practice as you're operating on your
18  patients?
19        MR. SNELL:  Same objection.
20    Improper hypothetical.  As well as
21    speculation now.
22        THE WITNESS:  So I think
23    that's a hypothetical.  I don't
24    think there's any evidence to

Page 139

1    suggest that that is the case,
2    despite lots and lots of studies.
3  BY MS. GAYLE:
4    Q.   And I can ask you a
5  hypothetical, Doctor.  So just
6  hypothetically speaking --
7    A.   That's fine.
8        MR. SNELL:  A witness is
9    allowed to reject a hypothetical
10    if they say there is no basis for
11    it, which is what he testified to.
12        MS. GAYLE:  I would dispute
13    that.
14  BY MS. GAYLE:
15    Q.   Doctor, again, if there was
16  evidence that came up in the course of
17  this litigation, and I'm asking if you
18  would incorporate that, if it were -- if
19  it would impact how you would practice,
20  in other words, it would be something
21  that would cause you concern, would you
22  adapt to that and would you incorporate
23  that when you're operating on your
24  patients?

Page 140

1         MR. SNELL:  Same objection.
2    It's an improper hypothetical.
3    Speculation.
4         THE WITNESS:  So if what
5    happened was a case was decided
6    and the jury felt that the reason
7    the patient suffered a
8    complication was because of a
9    mechanically cut --
10  BY MS. GAYLE:
11    Q.   We're not talking about
12  litigation.  So let me try to ask the
13  question again.
14        We're talking about if you
15  saw some sort of medical evidence in your
16  review of the materials that you've been
17  reviewing for your expert opinion, and
18  you thought that that medical evidence
19  was sound and that it was influential to
20  you and your opinions, and it did say
21  that there was an inflammatory response
22  due to these fraying particles, would you
23  then change the nature of how you would
24  operate on those patients looking for the

Page 141

1  particles, whereas now you do not look
2  for the particles?
3         MR. SNELL:  Same objections.
4    Also compound.  And misstates now.
5        Go ahead.
6         THE WITNESS:  So if the
7    evidence that came out was
8    clinically relevant, you mean
9    actually impacted patient
10    outcomes, and there was no
11    question about the validity of it,
12    then, yes, I would incorporate
13    that into how I take care of my
14    patients.
15  BY MS. GAYLE:
16    Q.   And, Doctor, that would be
17  true for any type of complication that we
18  might discuss today; if it were
19  clinically relevant and it would impact
20  the patient outcome and you've learned of
21  new medical evidence, then that would
22  change the way that you would treat your
23  patients; is that fair?
24        MR. SNELL:  Same objection.

Miles Murphy, M.D.

Page 142

1  Hypothetical.  And speculation.
2       THE WITNESS:  I am
3  continually evaluating all the
4  information out there, that would
5  include anything that came up in
6  legal proceedings, to best take
7  care of my patients.
8  BY MS. GAYLE:
9       Q.   And, in fact, that would be
10 our goal, is to provide the best care
11 for your patients that you possibly can?
12      A.   Absolutely.
13      Q.   Doctor, do you know whether
14 the laser-cut mesh is stiffer than the
15 mechanically cut mesh?
16      A.   So I've reviewed all the
17 documents regarding the stiffness of
18 mesh, both mechanically cut and laser
19 cut.  And I know there is a difference at
20 different degrees of stress on the mesh.
21      Q.   Have you seen any of the
22 Ethicon studies regarding whether or not
23 the laser-cut mesh is three times stiffer
24 than the mechanically cut mesh?

Page 143

1       A.   I don't recall specifically
2  seeing three times.  But I would be happy
3  to look at any document you want to
4  produce.
5       Q.   But you don't recall that
6  particular study?
7       A.   Not particularly that it was
8  three times more.
9       Q.   Doctor, we've talked about
10 how you treat your patients with
11 complications following a sling implant
12 procedure.
13      When you see these patients,
14 do you generally attribute their problems
15 to any one particular thing?
16      A.   No.
17      MR. SNELL:  Object.
18 Overbroad.
19      Go ahead.
20 BY MS. GAYLE:
21      Q.   So, Doctor, when you treat
22 your patients -- let's talk about your
23 numbers first.
24      So how many patients, this

Page 144

1  year, do you think you've treated that
2  have TVT that have had complications?
3  Not from yourself, but may have been
4  referred to you, your total patient
5  population, Doctor?
6       A.   Just for clarity sake, are
7  we talking about the original TVT?
8       Q.   Yes, the original TVT.
9       A.   I don't think any.
10      Q.   And how many patients do you
11 think that you've treated, in total, with
12 regard to any complications from TVT-O?
13      A.   In total in my whole
14 practice?
15      Q.   This year.  This year.
16      A.   This year.
17      Maybe one or two.  But
18 it's -- it could be zero.
19      Q.   And, Doctor, with regard to
20 any of the other products, with TVT
21 EXACT®, TVT ABBREVO® , TVT-Secur, could
22 you break down how many patients you
23 think you may have treated this year with
24 regard to those three products and

Page 145

1  complications?
2       MR. SNELL:  Complications
3  only, not implanting?
4       MS. GAYLE:  Not implanting.
5  BY MS. GAYLE:
6       Q.   Whether they were referred
7  to you or your own patient population.
8       A.   Maybe one or two.
9       Q.   And would that be -- when we
10 talk about complications, would that be a
11 variety of complications or a
12 complication that you would attribute to
13 any one particular factor?
14      A.   So if we're talking about
15 any that are particularly this year, I'd
16 have to look back at the chart.
17      But I can certainly give you
18 my answer for over the last five years,
19 if that makes things easier.
20      Q.   Yes.  Let's do that.
21      A.   Okay.  So the primary
22 complaints or complications that I see
23 patients presenting with, in regards to
24 all the TVT family of products, they

Miles Murphy, M.D.

Page 146

1  are -- the two most common ones are
2  voiding dysfunction in some form,
3  essentially too much tensioning on the
4  sling or proper tensioning and the
5  patient just has poor detrusor function;
6  and then exposure of the mesh in the
7  vagina; and then, lastly, pain associated
8  with the surgery that they had.
9  Generally, that is in the form -- well,
10 that can be in the form of just pain
11 unrelated to intercourse or pain related
12 to intercourse.
13     Q.   And, Doctor, with regard to
14 the too much tensioning on the sling, is
15 that an issue that you would attribute to
16 the implanting physician?
17     A.   So, you know, with all these
18 complications, there's an interaction
19 between the surgeon performing the
20 surgery, the patient who is receiving the
21 surgery, and the device that is implanted
22 in the patient.
23         And all of them can
24 contribute, to different degrees, to the

Page 147

1  complication.
2      Q.   So you would not blame an
3  implanting physician solely for any sort
4  of complication?
5      A.   Well, "blame" is a kind of
6  interesting term.  So --
7      Q.   You would not attribute,
8  let's say --
9      A.   Yes.
10     Q.   -- any complication to
11 solely the implanting physician?
12         MR. SNELL:  Object to the
13 form.
14 BY MS. GAYLE:
15     Q.   You said there's an
16 interaction.
17     A.   Yes.  I think that for
18 the -- I think there may be instances
19 where it could be pretty much solely
20 related to the surgeon.  I don't know
21 that I've ever seen that exact situation.
22 Hypothetically, it could be.
23         But usually it's an
24 interaction.

Page 148

1      Q.   And, Doctor, what -- in that
2  interaction, what part would the patient
3  play in that?
4      A.   So various ways.  So some
5  people have different body habituses than
6  others; so their bone structure, their
7  pelvis is anomalous, or they are
8  particularly thin or they are
9  particularly heavy, or there are other
10 conditions of their body in regards to
11 atrophy or prior radiation that can
12 contribute to the issue.
13         There are activities that
14 the patient takes -- partakes in, both
15 before and after the surgery.  So if they
16 are a smoker, if they resume certain
17 activities, like intercourse, prior to
18 proper healing, that -- those are the
19 patient factors, amongst others, that can
20 contribute to the complication.
21     Q.   And we talked about your
22 informed consent process earlier and your
23 conversations generally with your
24 patients over time.

Page 149

1          Do you talk to your
2  patients, when you're implanting TVT or
3  TVT-O, about the risk of smoking?
4      A.   I do.
5      Q.   And do you talk to them --
6  do you tell them -- strike that.
7          Do you tell them whether or
8  not the risk of smoking is a
9  complication -- would be causing a
10 complication following their device
11 implant?
12     A.   I would never tell them it
13 was the cause.  What I would counsel
14 them, preoperatively, I think that's what
15 you asked, is that smoking compromises
16 wound healing of all types, and that
17 includes the incision healing over a
18 sling that is placed.
19         So, in general, both from an
20 anesthesia standpoint and a wound healing
21 standpoint, the cessation of smoking is
22 something that can very much help the
23 patient.  And it's often a good excuse to
24 get them to stop smoking anyway.  Most

Miles Murphy, M.D.

Page 150

1  people are looking for a reason to stop
2  smoking so it's a good --
3      Q.   Do you know if smoking is a
4  contraindication in the TVT or TVT-O IFU?
5      A.   It is not, as far as I know.
6      Q.   You said there are other
7  factors from a patient standpoint.
8          And I think that you maybe
9  inferred that a person's size, for
10 instance, their weight, might be a
11 factor; is that fair?
12     A.   Yes.
13     Q.   And do you know if obesity
14 is a contraindication in the IFU for TVT
15 or TVT-O?
16     A.   To my knowledge, it is not.
17     Q.   Would diabetes, in your
18 opinion, be a factor that could play into
19 how a patient is -- complications a
20 patient might receive?
21     A.   So diabetes is much like
22 smoking.  It tends to impair wound
23 healing.  So, yes, uncontrolled diabetes
24 is a factor that one would like to avoid

Page 151

1  if doing any type of surgery.
2      Q.   And I'm going to ask you the
3  same question, I'm sorry, Doctor.
4          But would that -- do you
5  know whether or not uncontrolled
6  diabetes, or diabetes, is a
7  contraindication in the TVT or TVT-O IFU?
8      A.   It is not.
9      Q.   And, Doctor, I don't think
10 you maybe specified, we talked about the
11 last five years generally, the patients
12 that you've treated.
13         Can you put a number on
14 that, if you had to, for the TVT/TVT-O
15 product?
16     A.   The number of complications
17 specifically from the traditional TVT and
18 TVT-O?
19     Q.   Yes, sir.
20     A.   I would probably say
21 somewhere in the range of one to five in
22 the last five years.
23     Q.   And, Doctor, from that one
24 to five, if you recall, were those

Page 152

1  patients that were your patients, meaning
2  you had operated on those particular
3  patients and implanted the device, or
4  were those patients that were referred to
5  you, or were they a mix?
6      A.   For the sake of the ease of
7  this deposition, since I don't recall the
8  exact cases, I would say that I see
9  complications both from my own patients
10 and ones that are referred to me in which
11 I did not do the original surgery.
12     Q.   And, Doctor, on the patients
13 that are referred to you in your
14 practice, are they referred from any one
15 particular source?
16     A.   No.
17     Q.   And they're referred from
18 across this region, would that be fair,
19 Doctor?
20     A.   Yes.
21     Q.   And your practice, Doctor,
22 is connected -- let me strike that.
23         Is your practice connected
24 with a hospital facility, Doctor?

Page 153

1      A.   So we are a private
2  practice.  We are affiliated with two
3  health systems, Saint Luke's Health
4  Network, and what is now known as
5  Abington-Jefferson Health.  For most of
6  those 14 years, it was Abington Memorial
7  Hospital.  But within the last two years
8  or so we have merged with Jefferson
9  Health System.
10         I work more out of the
11 latter than the former.
12     Q.   And are you the only
13 urogynecologist in that particular
14 practice?
15     A.   I am not.
16     Q.   How many do you have?
17     A.   We have three, including
18 myself.
19     Q.   Are they all fellowship
20 trained, board certified?
21     A.   Yes.
22     Q.   And how long have they been
23 working with you?
24     A.   Dr. Lucente has been working

Miles Murphy, M.D.

Page 154

1 with me ever since I started.  And Dr.
2 Ephraim did her fellowship with us and is
3 now an attending in our practice, and
4 that has been the case for approximately
5 two years and change, I believe.
6      Q.   And it's the three of you,
7 then, correct?
8      A.   We also have a nurse
9 practitioner who is a provider in our
10 office.  She does not operate.
11           MR. SNELL:  Counsel, we've
12      been going about another hour and
13      25 minutes.  We need to take a
14      break.  I need to order some lunch
15      and stuff.
16           - - -
17      (Whereupon, a brief recess
18      was taken.)
19           - - -
20 BY MS. GAYLE:
21      Q.   Okay, Doctor, we're back on
22 the record.
23           Switching gears just a
24 little bit, do you remember when the TVT

Page 155

1 came on the market?
2      A.   Yes.
3      Q.   And what year was that?
4      A.   It was the late 1990s.
5           - - -
6      (Whereupon, a discussion off
7      the record occurred.)
8           - - -
9 BY MS. GAYLE:
10      Q.   Doctor, do you know who was
11 the inventor of the TVT?
12      A.   I think the person that
13 would be most considered the inventor was
14 Ulf Ulmsten.
15      Q.   Do you know a Dr. Nilsson?
16      A.   Not personally.
17      Q.   Have you heard Dr. Nilsson's
18 name in connection with TVT?
19      A.   Yes.
20      Q.   And what's your
21 understanding of who he is?
22      A.   My understanding is that
23 he's another Scandinavian surgeon who was
24 involved with some of the early studies

Page 156

1 and certainly some of the longer-term
2 studies of the TVT.
3      Q.   Do you know whether he was a
4 paid expert on behalf of Ethicon, Johnson
5 & Johnson or Gynecare?
6      A.   I don't know for sure.
7      Q.   And you said Ulmsten.
8 Ulmsten, I'm sorry, I'm probably
9 mispronouncing it.
10           Do you know whether he was a
11 paid consultant?
12      A.   Well, I know that he
13 received royalties for the device.  And
14 I'm sure that in the process of going
15 from a sort of investigational device in
16 his own hands to making it a system that
17 was marketed by Gynecare that he was paid
18 for that, I'm sure, yes.
19      Q.   Do you know whether or not,
20 in the royalties that he received, there
21 was any stipulation connected with
22 complications reported?
23           MR. SNELL:  Object to form.
24           THE WITNESS:  I don't recall

Page 157

1      seeing any documents to that
2      effect.
3 BY MS. GAYLE:
4      Q.   If there were such a
5 connection, limiting his royalties if
6 complications had been reported, would
7 that be something you would want to know?
8           MR. SNELL:  I'm going to
9      object to the foundation, you've
10      changed your question now, to
11      foundation of your question.
12 BY MS. GAYLE:
13      Q.   If there were, Doctor -- if
14 you understand the question, go ahead and
15 answer it.
16           If there were some sort of
17 limitation on his royalties due to
18 reported complications, would that be
19 some information that you would want to
20 know?
21           MR. SNELL:  Same objection.
22           THE WITNESS:  My
23      understanding regarding Dr.
24      Ulmsten is that he worked all his

Miles Murphy, M.D.

Page 158

1   life in the treatment of urology.
2   And the majority of his time was
3   spent in the treatment of urinary
4   incontinence in women.
5        And he worked years, from a
6   scientific standpoint, long before
7   he was ever paid any money from
8   Gynecare, on the best treatments,
9   the best materials to use in the
10  treatment of stress incontinence.
11       I did not know him
12  personally.  But it would surprise
13  me if he would substantially alter
14  his reported results purely for
15  financial reasons.
16  BY MS. GAYLE:
17       Q.   And, Doctor, I appreciate
18  that answer.
19       But my question is, do you
20  know, yes or no, whether or not there is
21  any sort of limitation, again, on the
22  royalties that he might receive due to
23  reported complications?
24       MR. SNELL:  Object to form.

Page 159

1   BY MS. GAYLE:
2        Q.   It's a yes-or-no question?
3        MR. SNELL:  Hold on.  I'm
4   going to object, because this is a
5   different question than what you
6   posed earlier, which was, was
7   there a stipulation.
8        That's my objection,
9   counsel.  You're changing it, but
10  you're then tying the follow-up
11  question as if it's the same
12  thing.
13       THE WITNESS:  My
14  understanding of your question was
15  a hypothetical.
16  BY MS. GAYLE:
17       Q.   Hypothetically, Doctor, yes
18  or no, would you want to know that type
19  of information?
20       MR. SNELL:  Same objection.
21       THE WITNESS:  Again, I'm
22  sorry, I thought you said,
23  hypothetically, would it --
24  let's --

Page 160

1   BY MS. GAYLE:
2        Q.   I'm trying to get to bias.
3   You talked about bias earlier, so let's
4   go at it that way.
5        A.   Sure.
6        Q.   And you said, I think,
7   something to the effect of in this day
8   and age, or nowadays, you think it's
9   important that authors of articles
10  disclose bias.  And that's where I'm
11  going with this question, Doctor.
12       If Dr. Ulmsten had some sort
13  of bias, would that bias be information
14  that you would want to know?
15       A.   I think that all people have
16  biases, whether that is financial bias or
17  otherwise.
18       I think that my answer to
19  that other question was in regards to
20  what is expected.  And I think what's
21  expected in 2018 isn't necessarily what
22  was expected in 1998.  And so I think,
23  again, the more information you have
24  about a person who is submitting data for

Page 161

1   a peer-reviewed journal, the better you
2   can judge the validity of it.
3        I don't think -- and I think
4   I already answered this question, I don't
5   think that, based on what I know of Dr.
6   Ulmsten, that that would change my view
7   of his results if I knew that.
8        Q.   If you knew that
9   complications were somehow tied to the
10  amount of royalties that he were getting?
11       A.   That's right.
12       Q.   But would it be information
13  that you would want to take into
14  consideration?
15       A.   I think that the more
16  information you have about any topic, the
17  better off you're going to be.
18       Q.   And, Doctor, we talked about
19  a product that had been taken off the
20  market, the TVT-Secur.
21       Is the TVT-O still on the
22  market, Doctor?
23       A.   Yes.
24       Q.   And do you still use the

Miles Murphy, M.D.

Page 162

1  TVT-O?
2      A.   Not the traditional TVT-O.
3      Q.   And you -- do you use the
4  TVT ABBREVO® ®?
5      A.   I do.
6      Q.   Do you know when you stopped
7  using the TVT-O?
8      A.   I would say, again, it's
9  similar to when I switched to the
10  EXACT®®.  Within, probably, 18 months of
11  the launch of the TVT ABBREVO® ®, I
12  stitched to it.  And that's a ballpark
13  answer.
14      Q.   Sure.  And in connection
15  with those two questions, Doctor, you had
16  mentioned earlier some of your lectures
17  or teaching activities that you do for
18  other doctors.
19          You continue those type of
20  teaching or didactic lectures to this
21  day, correct?
22      A.   Correct.
23      Q.   And, Doctor, do you know,
24  have you talked on TVT in the past 14

Page 163

1  years?
2      A.   Yes.
3      Q.   Do you know when the last
4  time you talked on TVT was?
5      A.   I'd like to clarify my
6  answer.
7          So, you know, I have
8  specifically talked, as part of
9  professional education, specifically on
10  the product.  The rest of the lectures
11  that I've given specifically, say, in the
12  last year or two, they are not branded.
13  I'm not specifically talking about the
14  Gynecare version of one sling versus the
15  other.  I'm talking about, in general,
16  transobturator slings or retropubic
17  slings and whether it's a single incision
18  or multi-incision sling.
19          But I don't specifically
20  lecture regarding just this particular
21  company's product.
22      Q.   And thank you for that,
23  Doctor.
24          And because I only have

Page 164

1  limited time today, we're not talking
2  about the retropubic or the
3  transobturator products generally.  I'm
4  asking specifically about these
5  particular products, TVT or TVT-O.
6          And you said that you had
7  talked in the past about TVT, correct?
8      A.   Yes.
9      Q.   Do you happen to remember
10  approximately when the last time you
11  talked about TVT was?
12      A.   I'm not trying to be
13  argumentative, but I just talked within
14  the last year about midurethral slings,
15  and that includes TVT.  So I don't want
16  to come off --
17      Q.   I think you said talked
18  about the product itself, okay.
19      A.   So are you talking as a
20  consultant --
21      Q.   As a representative --
22      A.   -- for the company?
23      Q.   Yes.  Thank you.
24      A.   Thank you.

Page 165

1          So with that understanding,
2  the last -- you're asking when the last
3  time I spoke as a representative of the
4  company or a consultant of the company
5  about TVT?
6      Q.   Correct.
7      A.   It probably would have been
8  some time around 2007.
9      Q.   And the same question,
10  Doctor, but for TVT-O.
11      A.   Probably 2008 or '09.
12      Q.   Was that approximately the
13  same time that you stopped using those
14  products and started using the other
15  products, or was it some time after, to
16  the best of your recollection?
17      A.   I think it was before I
18  switched.
19      Q.   And now that you've
20  switched, in your words, do you talk, as
21  a representative of the company, on the
22  products that you now use, being the TVT
23  ABBREVO® ®  and the TVT EXACT®®?
24          MR. SNELL:  I'm going to

Miles Murphy, M.D.

Page 166

1    object to the term
2    "representative" of the company.
3         THE WITNESS:  I think I
4    testified earlier that I don't
5    think I served any sort of
6    clinical consultancy to
7    Ethicon/Gynecare since 2010, 2011.
8    BY MS. GAYLE:
9         Q.    And that would include any
10   sort of physician training activities?
11        A.    Correct.
12        Q.    When you were performing
13   your physician training activities,
14   teaching about the different products,
15   the TVT and the TVT-O, would you get some
16   materials for your presentation from the
17   manufacturer of the device?
18        A.    Yes.
19        Q.    Did you expect that those
20   materials, whatever that was that you
21   received from the company, would be
22   accurate and truthful?
23        A.    Yes.
24        Q.    And you were imparting that

Page 167

1    information, in part, to the persons that
2    you were training, correct?
3         A.    Correct.  If they gave me a
4    slide and I spoke on the slide, I was
5    imparting it to the people I was speaking
6    to.  I may have used my own information
7    as well.
8         Q.    Right.  And I'm not
9    suggesting that you just used that one
10   particular piece of information, if it
11   were a slide, but you may have used a
12   package insert, correct, to refer to, for
13   instance?
14        You may have used many
15   things that maybe some came from the
16   company, some medical journals; is that
17   fair?
18        A.    That's fair.
19        Q.    A mix.
20        But whatever you did receive
21   from the company, you would expect it to
22   be truthful and accurate, fair?
23        MR. SNELL:  Objection.
24   Asked and answered.

Page 168

1         THE WITNESS:  Correct.
2    BY MS. GAYLE:
3         Q.    Do you know if TVT is still
4    available on the market?
5         A.    I believe it is, yes.
6         Q.    And TVT-O is also still on
7    the market, correct?
8         A.    Yes.
9         Q.    Between the TVT and the
10   TVT-O, do you believe that one of those
11   products represents more risk for a
12   patient than the other?
13        A.    No.
14        Q.    And why?
15        A.    I think that risks vary.
16   And I think that there are some aspects
17   of the original TVT that carry additional
18   risk over the TVT-O.  And then I think
19   the opposite is true, I think there are
20   some risks with the TVT-O that are
21   greater with it than with the TVT.
22        Q.    So let's break those down,
23   Doctor.
24        So with regard to the TVT,

Page 169

1    what do you think are the greater risks
2    there?
3         A.    I think there's a greater
4    risk of bladder perforation with the
5    retropubic TVT than with the TVT-O.  I
6    think there's a greater risk of
7    retropubic hematoma with the TVT over the
8    TVT-O.  I think there's a greater risk of
9    intestinal injury with the TVT over the
10   TVT-O.  I think there's maybe a very
11   slight increased risk of voiding
12   dysfunction with the retropubic.
13        Those are the ones that come
14   to mind quickly.
15        Q.    Do you know if any of those
16   three things that you've just listed were
17   incorporated into the IFU for the TVT?
18        A.    I don't see why they would
19   be.
20        Q.    And why is that, Doctor?
21        A.    Because you just asked me
22   about comparing one product to the other,
23   not about the specific product.
24        Q.    Right.  But if the TVT has

Miles Murphy, M.D.

Page 170

1  these risks, say, for instance, bladder
2  perforation, would that be something that
3  you would think would be in the IFU?
4      A.   I think what's included in
5  the IFU includes that, even if it doesn't
6  use those exact words.
7      Q.   And what are the risks for
8  the TVT-O over the TVT?
9      A.   I think there is a greater
10 risk of groin pain with the TVT-O.  I
11 think there's probably, in my clinical
12 opinion, a higher risk of vaginal
13 exposure, although I don't think from a
14 statistical standpoint that exists.  But
15 I think it may be a reasonable clinical
16 difference.
17      That's it.
18      Q.   Doctor, on the groin pain,
19 why do you believe that the TVT-O would
20 have groin pain over the TVT?
21      A.   Because the path of the
22 sling goes through the groin with the
23 TVT-O and it doesn't with the TVT
24 retropubic.

Page 171

1      Q.   And your report, Doctor,
2  talks a lot about the inside-out versus
3  outside-in sort of product and
4  terminology that they use.
5      What, can you clarify, is
6  the TVT-O?
7      A.   It's an inside-out sling.
8      Q.   And do you believe that the
9  inside-out approach is more beneficial
10 than the outside-in approach?
11      A.   I think that there are
12 reasons that I prefer it.  I think what's
13 the most important thing is what's
14 comfortable in any given surgeon's hands.
15      I think that the vast
16 majority of the literature out there
17 suggests that there's no real substantial
18 difference in the outside-in versus the
19 inside-out.
20      Q.   And you said that in your
21 clinical opinion vaginal exposure would
22 be one of the risks.
23      Why is that?
24      A.   Because the path of the

Page 172

1  TVT-O goes towards the sulci of the
2  vagina, whereas the path of the
3  retropubic goes more directly to the
4  underside of the pubic bone.
5      So the area of the mesh that
6  is contiguous or tangential to the
7  vaginal lumen is greater with the
8  obturator than with the retropubic.
9      Q.   And when you switched and
10 stopped using the obturator and now you
11 use the TVT --
12      A.   ABBREVO® ® .
13      Q.   -- ABBREVO® ® , do you still
14 see that phenomenon with use of the
15 ABBREVO® ®?
16      MR. SNELL:  Object to form.
17      THE WITNESS:  So I wasn't
18      quoting on my personal experience.
19      I was talking about the scientific
20      literature in general.
21 BY MS. GAYLE:
22      Q.   So from a scientific
23 standpoint, do you see that risk in the
24 TVT ABBREVO® ®  also?

Page 173

1      A.   I do.
2      Q.   Do you also see groin pain
3  in the TVT ABBREVO® ®?
4      A.   I think you can have groin
5  pain after a TVT ABBREVO® ®, and I think
6  the risk of it is probably a little
7  higher than it would be in a retropubic
8  TVT.  I think significant groin pain is
9  very rare after the TVT ABBREVO® ®.
10      Q.   Doctor, do you believe that
11 the TVT or TVT-O products pose any risk
12 to a patient over and beyond those that
13 traditional surgeries might pose?
14      A.   So the one thing that I
15 think is indisputable is that it is
16 impossible to have a mesh erosion or
17 exposure if mesh is not implanted in a
18 patient.
19      I think that if you
20 consider, which I do, a mesh exposure to
21 be a wound complication, then I don't
22 think the rates are any higher with a TVT
23 or TVT-O than with a traditional, what I
24 call suture-based, repair.

Page 174

1    But, again, you certainly
2 can't have a mesh exposure or mesh
3 erosion if you don't implant mesh.
4    Q.    And, Doctor, you said that
5 you consider exposure a wound
6 complication.
7       Did I understand you
8 correctly?
9    A.    A vaginal mesh exposure,
10 yes.
11    Q.    Vaginal mesh exposure.
12       Doctor, do different
13 physicians, such as yourself, if you can
14 answer, do they define that differently?
15 You said you consider it a wound
16 complication.
17       Do other physicians consider
18 it something else, to your knowledge?
19       MR. SNELL:  Objection.
20       THE WITNESS:  They might.
21 BY MS. GAYLE:
22    Q.    I was just wondering,
23 Doctor, why you limited, you said you
24 considered it wound complication.

Page 175

1    A.    I just -- because there are
2 different words.
3    Q.    And, Doctor, what is your
4 understanding of a mesh erosion?
5    A.    So oftentimes the terms
6 extrusion, exposure and erosion are used
7 interchangeably.  And, in fact, I do -- I
8 find myself doing that as well.
9       I think that for the
10 purposes of being more specific about
11 what we're referring to, most people say
12 if you were going to state differences
13 between an erosion and an exposure, an
14 erosion refers to a visceral erosion, so
15 the mesh going into either the urethra,
16 the bladder or some other structure other
17 than the vagina.
18    Q.    Doctor, we talked briefly
19 earlier about the pore size.
20       Do you know what the pore
21 size is in TVT mesh?
22    A.    It depends what you're
23 referring to as the pores.  If you're
24 talking about the largest pores, I

Page 176

1 believe they are approximately one
2 and-a-half millimeters.  But I'd have to
3 look at my notes to see for sure.
4    Q.    And your report talked a
5 little bit about the pore size; is that
6 correct?
7    A.    Yes.
8    Q.    And when you were talking
9 about that, you were referring to the
10 Amid article; is that correct?
11    A.    Well, that's one of the
12 sources that I cite, yes.
13    Q.    What else -- what other
14 sources are you citing for your
15 discussion on pore sizes?
16    A.    Lots of articles about
17 different mesh materials that are used.
18 Amid doesn't specifically refer to TVT,
19 as far as I know.
20       So there's lots of articles
21 that look at the composition of TVT mesh.
22    Q.    Do you know if there's an
23 understanding about what the ideal
24 microns might be for TVT mesh?

Page 177

1    A.    I think most people who work
2 in this field consider that you want to
3 have pores that are at least 75 microns
4 in size, which is much, much smaller than
5 the pore size for the TVT.
6       And the main reason for that
7 is to allow white blood cells, such as
8 macrophages, to get within the spaces
9 within the knit of the mesh.
10    Q.    And we talked earlier about
11 the pore sizes between the two products,
12 and I think that you said that they are
13 the same, is that correct, between the
14 TVT and TVT-O?
15    A.    Yes, that's my
16 understanding.
17    Q.    When you worked with the
18 TVT-S, your work in connection with
19 Ethicon on that product, do you recall
20 what the pore sizes were on that product?
21    A.    I believe it was the same,
22 but I couldn't say for sure.
23    Q.    Do you perform, in your
24 practice, sacrocolpopexy?

Miles Murphy, M.D.

1    A.   I do.

2    Q.   Do you perform it to this

3 day?

4    A.   I do.

5    Q.   And when you perform it,

6 what product do you use when you perform

7 that for mesh?

8    A.   I've used three different

9 products in the last five years.  I've

10 used Gynemesh PS.  I've used Restorelle®

11 Y mesh, which is produced by Coloplast, I

12 believe.  And I've used the Upsylon mesh,

13 which is the -- a Boston Scientific Y

14 mesh.

15    Q.   Do you still use all three

16 of those products to this day?

17    A.   I have not used the

18 Restorelle® Y mesh in the last year, I

19 would say.

20    Q.   Do you know what the pore

21 size is of the Gynemesh that you use for

22 the sacrocolpopexy?

23    A.   I believe it's 2.5

24 millimeters.

1    Q.   Do you believe that pore

2 size plays a part in any way to

3 complications?

4         MR. SNELL:  Object.

5         MS. GAYLE:  Strike that.

6 BY MS. GAYLE:

7    Q.   Do you believe that the pore

8 size of the TVT or the TVT-O would play a

9 part in the role of complications in a

10 patient?

11         MR. SNELL:  Object to form.

12         Go ahead.

13         THE WITNESS:  I believe that

14     the pore size of the TVT and the

15     TVT-O is a good pore size.  I

16     believe that pore size, in

17     general, for any mesh, can

18     contribute to complication risk.

19 BY MS. GAYLE:

20    Q.   Why do you think it's a good

21 pore size?

22    A.   Because I think the risk of

23 mesh exposure and erosion with TVT is

24 low.

1    Q.   And how do you define "low,"

2 Doctor?

3    A.   Well, I can tell you what I

4 consider the mesh exposure rate to be for

5 TVT and TVT-O.  And I would consider it

6 the range of 0.5 percent to 2 percent.

7 And I consider that to be low.

8    Q.   And is that based on what,

9 Doctor?

10    A.   Based on my clinical

11 experience and my reading of the

12 literature, the scientific literature.

13    Q.   Doctor, do you believe that

14 contraction occurs with transvaginal mesh

15 products of the TVT or TVT-O?

16    A.   I don't believe that the

17 mesh itself contracts.  I think that the

18 tissues that grow within the spaces

19 within the mesh can cause some

20 contraction of the overall implant and

21 response to the implant.

22         I think that for the most

23 part, specifically with TVT and TVT-O,

24 that it is not a -- what I would consider

1 a pathologic contraction.

2    Q.   And what is the basis for

3 that, Doctor?

4    A.   My basis for that is that we

5 have a plethora of very high-quality

6 scientific data that suggests excellent

7 outcomes with the TVT and the TVT-O that

8 would not exist if there was pathologic

9 contraction.

10    Q.   You said "excellent

11 outcomes," Doctor.

12         Are you referring to

13 functional outcomes or anatomic outcomes?

14    A.   I don't really think of

15 anatomic outcomes with regards to sling

16 procedures.  That's more of an outcome

17 that one would apply to a prolapse

18 repair.

19         But I am referring to both

20 objective and subjective outcomes.

21    Q.   What do you consider a

22 subjective outcome?

23    A.   A standing stress test,

24 urodynamic studies, pad weight test.

Miles Murphy, M.D.

Page 182

1    Q.   And subjective outcome?
2    A.   There are various validated
3  instruments that can be used.
4    Q.   What do you use?
5    A.   They include the urinary
6  distress inventory, the incontinence
7  impact questionnaire, the Sandvik
8  severity index score, amongst others.
9    Q.   Do you use any of those
10  things that you just listed?
11    A.   I do.  I also use the
12  prolapse and -- well, it's called the
13  PISQ.  I believe it stands for prolapse
14  and incontinence sexual function
15  questionnaire.
16    Q.   Do you use that with every
17  patient?
18    A.   I try.  If they fill it out.
19    Q.   And do you know if the --
20  you talk about the outcomes.
21        These outcomes as they are
22  reported in the study, do they similarly
23  use the same things that you do?
24    A.   I'm sorry, did you say the

Page 183

1  study?
2    Q.   So you talked about, you
3  focus on outcomes.  So outcomes in
4  whether it's the medical literature that
5  you review or the clinical experience
6  that you have.
7        So you said that you use
8  specific objective or subjective
9  materials with your patients, you try to,
10  correct?
11    A.   Correct.
12    Q.   When you are looking at
13  studies that have outcomes that you're
14  interested in, do you know what
15  subjective materials they might use?
16    A.   Certainly, many of the
17  articles that look at subjective outcomes
18  have used those same instruments.  They
19  sometimes use other ones as well.
20    Q.   Do you look at issues such
21  as quality of life for your outcomes?
22    A.   Yes.
23    Q.   And sexual function, do you
24  look at that also?

Page 184

1    A.   Yes.
2    Q.   Have you heard of the term
3  banding?
4    A.   I have.
5    Q.   And does that term apply to
6  the midurethral slings?
7        MR. SNELL:  Objection.
8  BY MS. GAYLE:
9    Q.   Have you heard of that in
10  connection with midurethral slings?
11    A.   I think I've heard it more
12  in regards to prolapse meshes, but
13  there's certainly some people who may use
14  that term in regard to slings.
15    Q.   And in regards to slings,
16  have you heard of the sling material
17  folding or moving in place?
18    A.   I've heard it in that I've
19  read some plaintiff expert witnesses
20  talking about those types of outcomes.  I
21  have not heard it in the scientific
22  literature that I've quoted in my report.
23    Q.   And have you had occasion,
24  when you operated on the patients that

Page 185

1  you mentioned earlier, revision
2  surgeries, have you seen that in a
3  patient?
4    A.   I have not seen folding.
5        What was the other term?
6    Q.   Banding.
7    A.   Well, it would be helpful to
8  establish what people mean by banding.
9        My general understanding of
10  what the general understanding of what
11  banding is, is that the mesh becomes more
12  narrow than it is in its natural state
13  before it's implanted in a patient.  And
14  I think that there may have been a time
15  or two where I've done a revision on a
16  patient where I felt that maybe the
17  tensioning on the sling were such that it
18  made the mesh more banded than I would
19  have liked to have seen.
20    Q.   And, Doctor, when you're
21  looking at the different products that
22  you switched from, the TVT and the TVT-O,
23  is there anything that you see with your
24  use of the TVT ABBREVO ® ® or the TVT

Miles Murphy, M.D.

Page 186

1  EXACT®® that has essentially disappeared?
2       In other words, you have
3  these complications with the TVT or the
4  TVT-O, or these negative drawbacks, let's
5  say, however you want to phrase that, and
6  then you switched over to the other
7  products.
8       Did you see any benefit to
9  doing that switch?
10      MR. SNELL:  Objection.
11      Go ahead.
12      THE WITNESS:  I haven't done
13  any formal study of it.  I think
14  that there is, in general, less
15  risk of groin pain with the TVT
16  ABBREVO® ®  than with the TVT-O.
17      I can't say that I've seen
18  that clinically in my practice
19  with a sort of real relevant
20  finding that jumps out at me, in
21  absence of a study.
22  BY MS. GAYLE:
23      Q.   What about dyspareunia, have
24  you looked at dyspareunia between

Page 187

1  products?
2       A.   I've looked at dyspareunia
3  between the original TVT and the TVT-O.
4  I have not done any study of dyspareunia
5  with EXACT®® or ABBREVO® ®.
6       Q.   Have you seen the patient --
7  have you seen patients in your practice
8  with dyspareunia following a sling
9  implant?
10      MR. SNELL:  Object to form.
11  BY MS. GAYLE:
12      Q.   In other words, have you
13  treated patients with dyspareunia?
14      A.   Yes.
15      Q.   Are you familiar with the
16  term "roping" or "curling"?
17      A.   I'm mostly familiar with
18  those terms in regards to the litigation
19  that happened in Atlantic City that I was
20  an expert witness for in the prolapse
21  mesh.
22      Q.   Have you studied the TVT or
23  the TVT under load for -- to look at the
24  properties of those two products?

Page 188

1       A.   I have not personally
2  studied that.  I've read the studies
3  looking at that, though.
4       Q.   Do you know whether or not,
5  when the TVT or TVT-O are under load,
6  whether or not the product would lose the
7  effect of porosity?
8       MR. SNELL:  Object to form.
9       Go ahead.
10      THE WITNESS:  I think under
11  physiologic loads, when it has
12  been studied, it has not lost
13  that.
14  BY MS. GAYLE:
15      Q.   Do you know when the last
16  time, approximately, you looked at that
17  issue in the medical literature?
18      A.   Last night.
19      Q.   Do you remember what author,
20  or the name of the article that you
21  reviewed?
22      A.   No.
23      Q.   When I say "effective
24  porosity," do you understand -- what is

Page 189

1  your understanding of that term?
2       A.   My understanding of that
3  term is that you can have a porosity that
4  exists prior to being implanted in a
5  patient or prior to putting any load on
6  that implant that then changes once a
7  force is applied to it.
8       Q.   Do you know whether that
9  was -- effective porosity was an idea
10  that was developed by Muhl, M-U-H-L?
11      A.   That doesn't ring any bells.
12      Q.   And on your reliance list,
13  Exhibit-7, do you have any articles for
14  Dr. Klinge, K-L-I-N-G-E?
15      A.   Yes.
16      Q.   And how many do you have for
17  him?
18      A.   For the sake of time, if you
19  want to refer to an area where that might
20  be, that would help.  Otherwise, I can
21  just look through it.
22      Q.   So Exhibit-6 would be the
23  one that Butler Snow had provided to you
24  with the general reliance list.  And it's

Miles Murphy, M.D.

Page 190

1  alphabetical, the literature is.  And
2  there's no page numbers, I'm sorry.
3      A.   That's okay.
4          Six articles.
5      Q.   Do you have an idea of how
6  many articles Dr. Klinge may have written
7  on the issue of porosity?
8      A.   There is one in this list.
9  And I would not be surprised if he has
10  more, or she.  I assume it's a he.  I
11  don't like to judge.
12      Q.   And, Doctor, how did you go
13  about, when you were drafting your
14  report, on selecting medical journal
15  articles that might be adverse to your
16  opinions?
17      A.   I tried to use the data --
18  or, excuse me, the articles that were of
19  the highest level of evidence.
20          I certainly am more familiar
21  with the literature in clinical outcomes
22  than I am with bench research, based on
23  the fact that I am a clinical physician,
24  and I only have so many hours in a day to

Page 191

1  read journals.
2          But most of the really
3  important work in material science that
4  directly affects our field will be
5  published in a journal like the
6  International Urogynecology Journal,
7  which I read regularly.
8      Q.   And, Doctor, when you're
9  opining as an expert in these cases, is
10  it fair to say that you would want to
11  take all information in and consider all
12  information whether it is favorable to
13  your opinions or adverse to your
14  opinions?
15          MR. SNELL:  Objection.
16  Overbroad.  Vague as well.
17          Go ahead.
18          THE WITNESS:  Yes.  Yes, I
19  do believe that.  And that's where
20  it is helpful to read the reports
21  of the experts for the plaintiffs,
22  because they often include
23  articles that I wasn't necessarily
24  familiar with, because they're

Page 192

1  published in journals that I don't
2  read on a regular basis.  So I
3  would always take whatever
4  articles they quoted into effect
5  when forming my opinions.
6  BY MS. GAYLE:
7      Q.   And, Doctor, has any one
8  particular article stood out, in your
9  opinion, that you may have stopped to go
10  look at?
11      A.   I've done it on multiple
12  ones.  No one individual pops out.
13      Q.   No one particular article.
14          What about, you said you've
15  done it on multiple ones, multiple
16  experts, is that what you mean?
17      A.   Yes -- I'm sorry, no.
18  Multiple articles.
19      Q.   Multiple articles, okay.
20          And I asked you about, did
21  any one particular article pop out at
22  you.
23          Now I'm going to ask you the
24  following question:  Did any one

Page 193

1  particular expert report stand out where
2  you had to do that, look at articles that
3  they might have listed?
4      A.   Well, there have been a
5  number of articles -- excuse me, expert
6  reports in cases for pelvic mesh in
7  general, for a different legal action
8  that I've been involved in, not
9  specifically for the sling report.
10          And the authors of those
11  articles, I can't recall their names
12  exactly.  One of them is a doctor with a
13  Russian name, so even if it was in front
14  of me, I might have trouble pronouncing
15  it.  And the other was a basic
16  researching non-clinician.
17      Q.   Doctor, early on you
18  mentioned an article that you had written
19  in your CVC -- CV, sorry, about risk
20  factors in 2010.  If you want to refer to
21  your CV.
22      A.   Yes, I'm there now.
23      Q.   And the title of that,
24  again, Doctor, that paper in 2010?

Page 194

1    A.    Risk Factors Leading to
2  Midurethral Sling Revision, a Multicenter
3  Case Controlled Study.
4    Q.    And are those the risk
5  factors, Doctor, that we talked about
6  earlier, smoking, diabetes, obesity?
7    A.    I'd have to review the paper
8  to answer that accurately.
9    Q.    You don't recall?
10    A.    Those probably would have
11  been involved, but I think there may have
12  been other factors as well, specifically
13  in regards to sling type, surgeon, that
14  might have added to those.
15    Q.    Okay.  I may just have a few
16  more questions, Doctor, and I'll be
17  finished.
18        So just going backwards just
19  a moment, we were talking about examining
20  products under load.
21        MS. GAYLE:  We'll mark this
22        13.
23            - - -
24        (Whereupon, Exhibit

Page 195

1    Murphy-13, Elongation Of Textile
2    Pelvic Floor Implants Under Load
3    is Related To Complete Loss of
4    Effective Porosity, Thereby
5    Favoring Incorporation in Scar
6    Plates, Otto, was marked for
7    identification.)
8            - - -
9  BY MS. GAYLE:
10    Q.    Doctor, are you familiar
11  with this particular article?
12    A.    I, again, recognize the
13  senior author's name.  So there's a very
14  good chance that in the course of the
15  last four years I've looked at this
16  article.  But I can't say when it would
17  have been.
18    Q.    And I think you said last
19  night that you had read something on the
20  effect of porosity; is that correct?
21    A.    I was looking at reports of
22  the properties of sling mesh under
23  tension, not specifically -- if I said I
24  was specifically looking at complete loss

Page 196

1  of effect of porosity last night, I
2  misstated that.  I was looking at the
3  effect of load on slings.
4    Q.    And do you remember what it
5  was that you were looking at, what
6  document it was?
7    A.    I looked at a couple of
8  them.  And they would be in my list, but
9  I can't recall exactly.
10    Q.    Were they internal documents
11  or --
12    A.    I believe it was a
13  combination of internal documents and
14  some science -- you know, some
15  peer-reviewed work.
16    Q.    And, Doctor, are you a
17  member of AUGS?
18    A.    Yes.  I'm going there
19  tomorrow.
20        MS. GAYLE:  Exhibit-14.
21            - - -
22        (Whereupon, Exhibit
23        Murphy-14, AUGS, Update on Vaginal
24        Mesh for Prolapse and

Page 197

1        Incontinence, was marked for
2        identification.)
3            - - -
4        MS. GAYLE:  Can you take a
5        look, I only have one extra copy,
6        before I go ahead and give it to
7        him?
8  BY MS. GAYLE:
9    Q.    Doctor, my question is --
10  you said you're a member of AUGS.
11        You said you're going
12  tomorrow, correct?
13    A.    Correct.
14    Q.    And from time to time do you
15  receive news updates from AUGS?
16    A.    I do.
17    Q.    And this one is dated
18  February 13th, 2018 a.m.  And it says,
19  Tweet.
20        Do you recall receiving this
21  information from AUGS?
22    A.    I think so.
23    Q.    And, Doctor, on the second
24  page of this exhibit, they list several

Miles Murphy, M.D.

Page 198

1 dates and also governments.
2        They start out at the top of
3 the page talking about the Scottish
4 government releasing an independent
5 review of the use, safety and efficacy of
6 transvaginal mesh implants and the
7 treatment of stress urinary incontinence
8 and pelvic organ prolapse.
9        Do you see that, Doctor?
10   A.   I do.
11   Q.   And going down from the
12 Scottish government, they talk about the
13 UK's National Institute for Health and
14 the results that they've published in a
15 guidance document.
16        Do you see that?
17   A.   Yes.
18   Q.   Then they talk about the
19 Australian Therapeutic Goods
20 Administration and talking about their
21 study there with regard to pelvic organ
22 prolapse and midurethral slings.
23        And then the New Zealand
24 Ministry of Health.

Page 199

1        My question is, Doctor, for
2 any of those governments there that are
3 listed in this newsletter, did you
4 incorporate any of that information into
5 your TVT or TVT-O report?
6        MR. SNELL:  Objection to
7        form.  Foundation.
8        Go ahead.
9        THE WITNESS:  So I think
10        most of the information that these
11        reports were based on was
12        information that's available in
13        the peer-reviewed literature.  So
14        in that sense, yes.
15 BY MS. GAYLE:
16   Q.   And have you read these
17 reports independently?
18   A.   Some of them I may have
19 seen.  I certainly have not read every
20 word of every one of them.
21   Q.   And, Doctor, you said you're
22 going to AUGS tomorrow.
23        If you can so state, why are
24 you going to AUGS tomorrow?

Page 200

1   A.   So AUGS, for the benefit of
2 the jury, is the American Urogyn Society.
3 It is the largest American U.S.
4 association of people in this country,
5 doctors in this country, that study and
6 treat stress urinary incontinence and
7 pelvic organ prolapse.
8        It is where the latest
9 research is being presented in abstract
10 form.  So it's important for me to go to
11 meetings like this to keep up on the
12 latest research.
13        It's also important because
14 you get face-to-face interaction with the
15 other people in this field that you can
16 talk to that otherwise would be difficult
17 to talk to because some of them are in
18 California and you're in Pennsylvania.
19        And it's an important way to
20 stay abreast of all the latest
21 developments in our field.
22        MS. GAYLE:  We can break
23        now, so you all can eat.  I know
24        you're starving.  And then we'll

Page 201

1        come back.  I may not have much
2        after we come back.
3             - - -
4        (Whereupon, a luncheon
5        recess was taken.)
6             - - -
7 BY MS. GAYLE:
8   Q.   Doctor, didn't you say you
9 prepared earlier a table of contents for
10 your report?
11   A.   I did.
12        MS. GAYLE:  And we're going
13        to mark that as Exhibit-15.
14             - - -
15        (Whereupon, Exhibit
16        Murphy-15, Table of Contents,
17        General Report of Miles Murphy,
18        MD, MSPH, FACOG, was marked for
19        identification.)
20             - - -
21        MS. GAYLE:  Just so we have
22        it in the record.
23        MR. SNELL:  Did we mark
24        this?

Miles Murphy, M.D.

Page 202

1    MS. GAYLE:  We marked a copy
2    of his report.
3         MR. SNELL:  Where is your
4    report?
5         MS. GAYLE:  It was
6    Exhibit --
7         MR. SNELL:  Make sure that
8    gets clipped on the front.  It
9    goes along with it.
10   BY MS. GAYLE:
11       Q.   Shortly before the break, we
12   were talking about porosity.
13            Have you ever provided input
14   to a mesh manufacturer on the optimal
15   porosity of a mesh device?
16       A.   Not that I recall.
17       Q.   Have you ever provided input
18   to a mesh manufacturer on the optimal
19   weight of the mesh device?
20       A.   Not that I recall.
21       Q.   With regard to the TVT, have
22   you provided any input to Ethicon on what
23   info, information, needs to be included
24   in an IFU?

Page 203

1        A.   No.
2        Q.   And with regard to the
3    TVT-O, have you ever provided any input
4    to Ethicon on what information should be
5    included in the TVT-O IFU?
6        A.   Not that I recall.
7        Q.   Have you ever drafted an IFU
8    for TVT?
9        A.   No.
10       Q.   Have you ever drafted an IFU
11   for TVT-O?
12       A.   No.
13       Q.   Have you ever drafted an IFU
14   for any mesh manufacturer?
15       A.   I haven't drafted a whole
16   IFU.  I think some of the validation that
17   I did for Secur would have probably
18   worked into the IFU.  Similarly, some of
19   the work I did with the Prosima may have
20   had some bearing and went into the IFU.
21            But I have not specifically
22   authored IFUs for any mesh product.
23       Q.   You didn't draft the
24   language for either the Prosima or the

Page 204

1    TVT-S?
2        A.   I did not draft it, no.
3        Q.   Is it your opinion, Doctor,
4    that the IFU for the TVT is adequate?
5        A.   Yes.
6        Q.   And, Doctor, what is the
7    basis of that opinion?
8        A.   My basis is that the
9    document is designed to provide,
10   obviously, the instructions for use.
11   It's supposed to inform the implanter
12   regarding risks associated with the
13   device.
14            And I think it has -- I
15   think all the iterations of it have done
16   that, done so.
17       Q.   What standards, other than
18   your own personal viewpoint, what source
19   of information are you relying on to
20   claim adequacy?
21       A.   I think my own personal
22   input is not just personal, but it's
23   professional.  And I think that as
24   someone who has dedicated their life to

Page 205

1    pelvic reconstructive surgery, I think
2    I'm -- there's no better source of what's
3    appropriate than myself.
4        Q.   And that would apply to an
5    IFU for both products?
6        A.   Yes.
7            MS. GAYLE:  I'll reserve the
8    balance of my questions.
9                 - - -
10           EXAMINATION
11                - - -
12   BY MR. SNELL:
13       Q.   Dr. Murphy, Burt Snell.
14   I'm just going to go back through a
15   couple of things I want to follow up on.
16            You were asked about the
17   structure of your report in the
18   beginning.  You were asked about certain
19   summaries of conclusions, for example, at
20   Page 62 where the text is in bold.
21            Do you see that?
22       A.   I do.
23       Q.   Is it fair to say that the
24   entirety of your report contains your

Miles Murphy, M.D.

Page 206

1  opinions and not just the section you
2  bolded?
3      A.   Absolutely.
4      Q.   You were asked questions
5  about the bibliography you composed that
6  follows your report, beginning at Page
7  72.
8          Do you recollect that topic?
9      A.   Yes.
10     Q.   And you were asked questions
11 about the original -- or general
12 materials list, and then the supplemental
13 general materials list in addition to
14 materials referenced in your report.
15         Do you recall discussing
16 those documents?
17     A.   I do.
18     Q.   Did you review and rely upon
19 those materials identified in the
20 original general materials list and
21 supplemental general materials list in
22 formulating your opinions?
23     A.   Yes.  They were a part of
24 what I relied upon.

Page 207

1      Q.   Is it fair to say that
2  there's quite a bit of medical literature
3  identified both in your bibliography as
4  well as in your general materials list?
5      A.   Yes.
6      Q.   And were you familiar with
7  any of that literature before becoming an
8  expert?
9      A.   Yes.
10     Q.   Did you assess and consider
11 the medical literature on the TVT and
12 TVT-O devices before becoming an expert
13 witness in this matter?
14     A.   I certainly --
15         MS. GAYLE:  Object to form.
16         THE WITNESS:  I certainly
17     had opinions regarding it, yes.
18 BY MR. SNELL:
19     Q.   Did you assess the design
20 and the different attributes of those
21 devices before becoming an expert in this
22 litigation?
23         MS. GAYLE:  Object to form.
24         THE WITNESS:  Yes, I did.

Page 208

1  BY MR. SNELL:
2      Q.   Did you assess the design
3  and the attributes and the potential
4  utility of the TVT and TVT-O devices
5  before you began using those in your
6  clinical practice?
7      A.   Certainly.  You know, you
8  want to, obviously, understand the
9  devices, the procedures that you're going
10 to be doing in a patient before you do
11 them.
12     Q.   You were asked various
13 questions about your expertise -- let me
14 take you, if you will -- do you have your
15 curriculum vitae handy?
16     A.   I do.  It's Exhibit-9.
17     Q.   And so plaintiffs' counsel
18 asked you about peer-reviewed literature
19 that you had published concerning the TVT
20 and TVT-O devices.
21         Do you recollect that?
22     A.   Yes.
23     Q.   Have you also prevented --
24 strike that.

Page 209

1          Have you also presented, via
2  lecture or other means, on the TVT and
3  TVT-O devices?
4      A.   Yes, I have.
5      Q.   Have you -- let's go to
6  under book chapters.  Let's me know when
7  you get to that subject on your CV.
8      A.   I'm there.
9      Q.   Do you believe you have
10 expertise in biomaterials?
11     A.   I do.
12     Q.   You have a -- you are listed
13 as an author of a book chapter titled,
14 Use of Mesh and Materials in Pelvic Floor
15 Surgery.
16         Do you see that?
17     A.   I do.
18     Q.   Published 2009, guest
19 editor, Joseph I. Schaeffer.
20         Do you see that?
21     A.   I do.
22     Q.   Did you assess biomaterials,
23 including the TVT and TVT-O devices, and
24 their use in stress incontinence surgery

Miles Murphy, M.D.

Page 210

1  in connection with your evaluation and
2  writing of that book chapter on mesh and
3  materials in pelvic floor surgery?
4      A.  Yes.  That chapter included
5  a review of materials, their use in
6  pelvic surgery, including suture,
7  biologic grafts, xenografts, cadaveric
8  grafts and synthetic grafts, particularly
9  the synthetic grafts used in TVT and
10  TVT-O.
11      Q.  And at that time, were you
12  already familiar with the macroporous
13  nature of the TVT slings?
14      A.  Yes.
15      Q.  Is that something you had
16  studied in connection with your earlier
17  education, training and clinical
18  practice?
19          MS. GAYLE:  Object to form.
20          THE WITNESS:  Yes.
21  BY MR. SNELL:
22      Q.  You told us that you had
23  performed professional education on the
24  TVT and TVT-O devices.

Page 211

1          Do you recollect that
2  subject?
3      A.  Yes, I did.  Yes, I do.
4      Q.  In teaching professional
5  education and the different types of
6  courses, did you teach and discuss with
7  the participants the different aspects of
8  the devices?
9      A.  Yes.
10      Q.  Including the mesh, the
11  trocars or guides, things of that nature?
12      A.  Yes.
13      Q.  Did you discuss the overall
14  design of the device and how it should
15  and could be employed and the benefits
16  that could flow from that device design?
17          MS. GAYLE:  Object to form.
18          THE WITNESS:  Yes.  Those
19      are the types of things that you
20      go over in these lectures.
21  BY MR. SNELL:
22      Q.  Did you discuss the
23  invasiveness, or lack thereof, for the
24  TVT and TVT-O devices during your

Page 212

1  professional education?
2      A.  Yeah.  One of the benefits
3  over traditional repairs like the Burch
4  procedure is the less invasive nature of
5  the TVT.  And that's certainly something
6  that we would have -- or I would have
7  lectured on during this time.
8      Q.  And did you also lecture on
9  the devices' IFUs and the procedural
10  steps?
11          MS. GAYLE:  Object to form.
12          THE WITNESS:  Yes,
13      absolutely.  And that was also
14      part of what happened in the
15      cadaver labs as well, is going
16      through the particular steps
17      involved with the procedure.
18  BY MR. SNELL:
19      Q.  Did you lecture and discuss,
20  during your role as teaching professional
21  education, about potential complications
22  and their management?
23      A.  Yes.  Certainly that was
24  part of it.

Page 213

1      Q.  Before becoming an expert in
2  this litigation and knowing that you
3  taught professional education on TVT and
4  TVT-O, were you familiar with and had you
5  used slide decks on the TVT and TVT-O
6  device?
7          MS. GAYLE:  Object to form.
8          THE WITNESS:  Yes, I did.
9  BY MR. SNELL:
10      Q.  And when I say "slide
11  decks," I mean the Ethicon master slide
12  decks on those devices.
13      A.  Yes.  So I would have had
14  lectures where the slides were sort of
15  prepared and approved by Ethicon.  But
16  then I've also lectured, even prior to
17  becoming an attending physician,
18  regarding slings such as the TVT.
19      Q.  And is that, based in part,
20  due to the fact that if one is looking at
21  the retropubic slings, the midurethral
22  slings, the TVT Ethicon device composes
23  the vast bulk of the medical literature?
24          MS. GAYLE:  Object to form.

Miles Murphy, M.D.

Page 214

1    THE WITNESS: Yes.
2  BY MR. SNELL:
3    Q.  Can the same be said for the
4  TVT-O?
5    A.  Yes.  Of all the obturator
6  slings that have been studied, I think
7  it's safe to say that TVT-O is the most
8  studied procedure.
9    Q.  You talked about your work
10  in the product and design validation with
11  TVT-Secur.
12    Do you recall that?
13    A.  Yes.
14    Q.  Is that evidence of your
15  design experience and expertise that you
16  have?
17    MS. GAYLE:  Object to form.
18    THE WITNESS:  I believe that
19  that's part of it.
20  BY MR. SNELL:
21    Q.  Have you looked at, for
22  example, design validation on these
23  materials -- strike that.
24    Have you looked at design

Page 215

1  validation, for example, for the TVT-O
2  device?
3    A.  Yes.  And the TVT-Secur.
4    Q.  You brought and produced a
5  clinical study agreement regarding the
6  Prosima device.
7    Do you recall that?
8    A.  Yes.
9    Q.  Did you evaluate the design
10  of that device before employing it?
11    A.  Absolutely.
12    Q.  Did you discuss with Ethicon
13  internal personnel, be it medical
14  directors, clinical engineers or
15  otherwise, the different attributes of
16  that medical device?
17    A.  Yes.  And that included
18  things like the stent that is placed in
19  the vagina after placing the graft, the
20  balloon that's used, the instruments that
21  are used to insert the implant into the
22  body, in addition to the actual implant
23  itself.
24    Q.  And did you all formally

Page 216

1  study the device -- the design of the
2  device and the outcomes that it produced?
3    MS. GAYLE:  Object to form.
4    THE WITNESS:  We did.
5  BY MR. SNELL:
6    Q.  Before becoming an expert in
7  this litigation, were you also familiar
8  with the IFUs and monographs pertinent to
9  the TVT-O device, for example?
10    A.  Yes.
11    Q.  And have you taught other
12  residents, fellows or other professionals
13  on those IFUs?
14    A.  Yes.
15    Q.  Did you also testify you had
16  design experience with regard to your
17  work with AMS when you were asked to
18  assist or evaluate the creation of a new
19  medical device?
20    MS. GAYLE:  Object to form.
21    THE WITNESS:  Yes.
22  BY MR. SNELL:
23    Q.  And, in general, can you
24  tell us, did that focus on the design of

Page 217

1  this new device?
2    A.  Very specifically, both
3  tools that could be used to assist in
4  completing the procedure, as well as the
5  materials that would be implanted as
6  well.
7    Q.  Did you utilize your
8  knowledge with regard to the state of the
9  art with regard to female pelvic medicine
10  when you provided that consulting?
11    A.  Absolutely.  So I trained,
12  both in my residency and fellowship, on
13  both transvaginal surgery with and
14  without materials and transabdominal
15  surgery with and without materials.
16    And one of the unique things
17  about this new potential design is that
18  it would be a combination of techniques
19  that had been used from abdominal and a
20  vaginal approach.
21    So my expertise in both was
22  critical in being able to provide good
23  consultation for that company.
24    Q.  And did you utilize your

Miles Murphy, M.D.

Page 218

1  understanding of female pelvic medicine
2  and relate it to the design of that
3  device for the potential utility, risk or
4  benefits that that device could
5  potentially produce?
6      A.   Yes.
7      Q.   Did you consult with that
8  company with regard to the potential risk
9  of such an approach or a device?
10     A.   Absolutely.  And, in fact,
11 we had cadaver models that looked
12 specifically at potential risks that
13 could occur with that system.
14     Q.   And that was your -- and you
15 analyzed that in connection with your
16 work as a consultant?
17     A.   Yes.
18     Q.   Your role on the -- strike
19 that.
20          Your role, I believe you
21 testified to, with regard to Boston
22 Scientific and being on the senior
23 advisory board to advise on different
24 types of products, do you recall that

Page 219

1  subject?
2      A.   Yes.
3      Q.   Did that pertain to the
4  products' utility in the marketplace?
5      A.   Sure, yes.
6      Q.   Would that have concerned
7  potential risk or safety issues with
8  products?
9      A.   Yes.  Both mesh products,
10 non-mesh products, abdominal products,
11 vaginal products.
12     Q.   Would that work and your
13 consulting with Boston Scientific pertain
14 to, for any medical devices, their design
15 or the outcomes that could flow from a
16 design of a device?
17     A.   Certainly, yes.
18     Q.   And is this work that you
19 did that is independent and separate from
20 this expert work in the litigation?
21     A.   Yes.  I have not done any
22 expert work from litigation with Boston
23 Scientific.
24     Q.   Turning back to your expert

Page 220

1  report and your CV in particular, I see,
2  for example, on lectures and roles, there
3  are several presentations with regard to
4  the use of transvaginally placed mesh in
5  reconstructive surgery.
6          Do you see those
7  different --
8      A.   Yes.
9      Q.   Update on the surgical
10 treatment of stress urinary incontinence,
11 grand rounds here in Philadelphia at
12 Albert Einstein.
13          Do you see that?
14     A.   Yes.
15     Q.   Would it be fair to say that
16 you -- let me back up one more.
17          If we keep taking it back to
18 2006 and 2005, where you presented on
19 surgery for incontinence, as well as
20 advances in pelvic surgery -- do you see
21 that?
22     A.   Yes.
23     Q.   Back in 2002, 2003, you
24 presented on surgical management of

Page 221

1  stress urinary incontinence, what the
2  primary care provider should know.
3      A.   Yes, I did.
4      Q.   In general, did those
5  presentations concern data and/or the TVT
6  or TVT-O devices?
7      A.   Yes.
8      Q.   Is it fair to say that long
9  before becoming an expert in this
10 litigation, you were evaluating and
11 presenting and teaching and publishing on
12 these devices, namely TVT and TVT-O?
13         MS. GAYLE:  Object to form.
14         THE WITNESS:  Yes.
15 BY MR. SNELL:
16     Q.   The book chapter from 2007,
17 Surgery for Incontinence and Pelvic
18 Dysfunction, you are one of the authors
19 to that chapter; is that correct?
20     Q.   With regard to the
21     Q.   With regard to the
22 peer-reviewed articles, you identified
23 some of them, are there others on your
24 materials list that -- strike that.

Miles Murphy, M.D.

Page 222

1  Are there other
2 peer-reviewed articles in your CV that
3 also have relevance or pertain to the TVT
4 or TVT-O device?
5  A.  Yes, I would say so.
6  Q.  I guess when you were asked
7 the question, you focused on the ones
8 where the specific focus of the study was
9 on that device.
10  My question to you is, for
11 example, a paper you did in 2003
12 regarding bacterial colony counts during
13 surgery, vaginal surgery, did that
14 concern, in part, the TVT device?
15  A.  Sure.  The large proportion
16 of the cases that were included in that
17 study involved surgeries where TVT slings
18 were implanted.
19  Q.  And did you report on the
20 risk of infection in that study?
21  A.  We did.
22  Q.  And was there any infection
23 seen with the TVT devices in your study
24 back in 2003?

Page 223

1  A.  There were none.
2  Q.  Now, you have numerous
3 abstracts also listed in your CV; is that
4 fair?
5  A.  Yes.
6  Q.  And do any of those pertain
7 to TVT, TVT-O and, in particular,
8 retropubic and midurethral -- retropubic
9 and transobturator midurethral slings?
10  A.  Certainly many of them are
11 related.  And some of them are very
12 specifically about those types of slings.
13  Q.  And you were earlier
14 discussing your work on product
15 validation, for example, with regard to
16 the TVT-Secur.
17  And I believe you testified
18 that in that work, and in other work, you
19 had looked at a device, as well as the
20 IFU, to determine whether they are
21 adequate and safe?
22  A.  That's right.
23  Q.  And is that work and
24 knowledge and experience you have

Page 224

1 separate from your work here as an
2 expert?
3  A.  Yes.  That was done before I
4 became an expert.
5  Q.  In connection with your work
6 as an expert, did you review or re-review
7 the medical literature and any company
8 documents to further bolster your
9 knowledge about device design?
10  MS. GAYLE:  Object to form.
11  THE WITNESS:  Yes.  I
12  specifically looked at documents
13  both on the TVT and the TVT-O.
14 BY MR. SNELL:
15  Q.  Is it fair to say that you
16 have participated and evaluated and
17 studied transvaginal application of mesh
18 in both the stress incontinence and
19 prolapse applications in numerous
20 different studies?
21  A.  Yes, I have.
22  Q.  And have you presented and
23 published on those topics?
24  A.  Yes.  I presented at

Page 225

1 national and international meetings, and
2 published in peer-reviewed journals on
3 both those topics.
4  Q.  You were asked about bench
5 research.
6  Did you review bench
7 research pertaining to the TVT and TVT-O?
8  A.  I did.
9  Q.  In your CV -- strike that.
10  In your materials list, the
11 original, there is a paper in the
12 International Urogynecology Journal,
13 2008, by Moalli titled, Tensile
14 Properties of Five Commonly Used
15 Midurethral Slings Relative to the TVT.
16  Do you see that?
17  A.  I do.
18  Q.  Is that an article or a
19 study you had reviewed and considered?
20  A.  Yes.
21  Q.  The International
22 Urogynecology Journal, is that an
23 important journal in your field?
24  A.  Yes, it is.

Miles Murphy, M.D.

Page 226

1  Q.  When you made a statement
2  that, with regard to the attributes of
3  the mesh, pore size, things like that, if
4  it was an important paper in your field,
5  you would expect it to be published in
6  one of the higher-level journals; is that
7  a fair summary of your testimony?
8        MS. GAYLE:  Object to form.
9        THE WITNESS:  I would
10       certainly think that any type of
11       research that was going to impact
12       the clinical care of patients
13       would be published in such a
14       journal.
15 BY MR. SNELL:
16   Q.  And given that this paper
17 was from 2008, would you have reviewed
18 this paper in the International Urogyn
19 Journal back when it was
20 contemporaneously published in that year?
21   A.  Yes.
22   Q.  Were you regularly reading
23 the IUJ back in 2008?
24   A.  I've been regularly reading

Page 227

1  it since essentially 2002 to this day.
2    Q.  And in connection with your
3  use of the TVT and TVT-O devices, did you
4  analyze the pore size to determine
5  whether it was state of the art?
6        MS. GAYLE:  Object to form.
7        THE WITNESS:  Yes.  I think
8        it is.
9  BY MR. SNELL:
10   Q.  Did you assess whether it
11 was macroporous or microporous before you
12 utilized the device?
13   A.  So, yes.  Prior to ever
14 utilizing it, I knew it was a macroporous
15 monofilament polypropylene mesh.  It's
16 commonly referred to as a Type I mesh.
17   Q.  You mentioned that you had
18 looked at various company documents on
19 bench research and properties of the
20 mesh.
21       Do you recall that?
22   A.  Yes.
23   Q.  And you discussed looking at
24 different documents pertaining to the

Page 228

1  mechanical and laser cutting of mesh; is
2  that fair?
3    A.  Yes, I did.
4        MR. SNELL:  I'll just give
5        you --
6  BY MR. SNELL:
7    Q.  You also testified that you
8  had reviewed, in formulating your
9  opinions, different clinical expert
10 reports by people at Ethicon; is that
11 fair?
12   A.  Yes, I did.
13   Q.  So I've handed you the
14 clinical expert report on the laser-cut
15 mesh utilized, as you testified, in the
16 TVT and TVT-O devices.
17       Is this a document you would
18 have reviewed and considered when you
19 were formulating your opinions that you
20 referenced to plaintiffs' counsel in your
21 answers?
22       MS. GAYLE:  Object to form.
23       THE WITNESS:  Yes, it is.
24 BY MR. SNELL:

Page 229

1    Q.  This memo from 2006 --
2        MR. SNELL:  Let's go ahead
3        and -- so we will mark the CER as
4        Exhibit-16.
5        - - -
6        (Whereupon, Exhibit
7        Murphy-16, Clinical Expert Report,
8        Laser Cut Mesh, was marked for
9        identification.)
10       - - -
11       MR. SNELL:  I'm going to
12       hand you Exhibit-17.  This is a
13       memo.
14       - - -
15       (Whereupon, Exhibit
16       Murphy-17, 3/6/06 Letter from Gene
17       Kammerer to Dr. Marty Weisberg,
18       was marked for identification.)
19       - - -
20 BY MR. SNELL:
21   Q.  Can you tell us, is this one
22 of the company documents you had talked
23 about that you had reviewed and
24 considered on the subject of the TVT mesh

Miles Murphy, M.D.

Page 230

1 and bench research and the laser versus
2 mechanical cutting?
3     A.   Yes, it is.
4     Q.   Did you see, in your
5 analysis and review of all the reliable
6 information and data, any clinical
7 significant difference between laser
8 cutting and mechanical cutting the edges
9 of the TVT slings?
10        MS. GAYLE:  Object to form.
11        THE WITNESS:  So I reviewed
12     both, you know, internal
13     documents, which basically
14     included that, and I agreed with
15     those conclusions.
16        In addition, I looked at
17     lots and lots of other
18     peer-reviewed medical studies that
19     do not demonstrate any clinical
20     significance.
21 BY MR. SNELL:
22     Q.   You were asked about
23 degradation.
24        Have you found any reliable,

Page 231

1 high-level scientific evidence that
2 degradation of the TVT slings occurs?
3     A.   No, I have not.
4     Q.   You were asked, if I recall,
5 some hypotheticals about if there was
6 reliable data that was sound that you
7 found important, and all these other
8 caveats, would that be important to you.
9        Do you recall, in general,
10 getting those types of hypothetical
11 questions?
12        MS. GAYLE:  Object to form.
13        THE WITNESS:  Yes, I do.
14 BY MR. SNELL:
15     Q.   Do you recall my objections
16 to those questions?
17     A.   I do.
18        MS. GAYLE:  Object to form.
19 BY MR. SNELL:
20     Q.   My question to you is this:
21 Have you -- do you believe that you've
22 done a thorough evaluation of what is the
23 reliable sound scientific evidence with
24 regard to the TVT and TVT-O devices?

Page 232

1     A.   Yes.  So much so that I find
2 it very hard that there would be a
3 hypothetical situation that would come
4 out in the process of this litigation
5 that would change that.
6     Q.   You mentioned several pages
7 of your expert report that concerns
8 long-term study and long-term analysis of
9 the TVT and TVT-O devices.
10        Do you remember covering
11 that subject?
12     A.   I do.
13     Q.   At Page 68, there is a
14 Tommaselli systematic review.
15        I don't remember you
16 referencing Page 68 of your expert
17 report.  Just to save us some time -- or
18 if you're able to get to it.
19     A.   I'm on Page 68.
20     Q.   Okay.  At the bottom, you
21 talk about Thomaselli and their
22 publishing of medium- and long-term
23 outcomes.
24        Do you see that?

Page 233

1     A.   I do.
2     Q.   Did that dataset concern the
3 TVT and TVT-O devices?
4     A.   So this was a systematic
5 review of medium- and long-term outcomes
6 of midurethral slings for SUI.  So it
7 included a lot of different companies'
8 products.  But by far, the vast majority
9 of the studies were conducted using TVT
10 or TVT-O.
11     Q.   And do you recall, in
12 general, that in that systematic review,
13 that there were more than 40 medium- and
14 long-term studies on the TVT and TVT-O
15 device?
16     A.   That sounds about right.
17     Q.   And is the systematic
18 review, the meta-analysis, where does
19 that fit on the evidence hierarchy that
20 you discussed with plaintiffs' counsel
21 that you employ during your methodology?
22 Is it at the top or the bottom?
23     A.   It's extremely high.  You
24 can do a systematic review of any type of

Miles Murphy, M.D.

Page 234

1 study.  The majority of times when we do
2 a systematic review, especially if we're
3 doing meta-analysis, you're including
4 studies that are just randomized clinical
5 trials.
6         So not only is it that
7 you're studying a high level of evidence
8 and that you're looking at randomized
9 clinical trials, but you're then
10 scientifically and systematically
11 combining the outcomes of clinical -- of
12 multiple randomized clinical trials.
13         So it's very high on the
14 pyramid of levels of evidence.
15         Q.   Is that something you relied
16 upon in formulating your opinions about
17 the long-term safety, efficacy,
18 durability of the TVT and TVT-O devices?
19         A.   Yes, it is.
20         Q.   Is that one of the
21 high-level reliable data sources that you
22 rely upon with your methodology when you
23 testified that, in your review of the
24 long-term data, the outcomes seen with

Page 235

1 TVT and TVT-O are inconsistent with
2 degradation?
3         A.   Yes.
4         Q.   You were asked about various
5 other attributes of the mesh,
6 particularly let's call it the weight of
7 the mesh and the pore size with TVT.
8         My question to you is this:
9 Is there any high-level reliable evidence
10 that shows that the mesh used in TVT and
11 TVT-O is anything other than safe and
12 superior --
13         MS. GAYLE:  Object to form.
14 BY MR. SNELL:
15         Q.   -- to other forms of mesh?
16         MS. GAYLE:  Object to form.
17         THE WITNESS:  There is not.
18 BY MR. SNELL:
19         Q.   You reference in your expert
20 report the Ogah Cochrane review and the
21 finding that the bottom-up retropubic
22 slings, particularly TVT, had better
23 efficacy, lower exposure than the
24 top-to-bottom retropubic slings.

Page 236

1         Do you recollect that
2 subject?
3         A.   Yes.
4         Q.   And is that consistent with
5 your view that the TVT and TVT-O
6 midurethral slings are safe?
7         MS. GAYLE:  Object to form.
8         THE WITNESS:  Absolutely.
9 BY MR. SNELL:
10         Q.   You were asked questions --
11 even though this wasn't really supposed
12 to be a TVT EXACT®® or ABBREVO® ®
13 deposition, do you recall being asked
14 several questions about those devices?
15         A.   Yes.
16         Q.   And your report pertaining
17 to those devices?
18         A.   Yes.
19         Q.   Do you believe that the TVT
20 ABBREVO® ® is safer than the TVT-O?
21         A.   I do not.
22         Q.   Do you believe that the TVT
23 EXACT®® is safer than the TVT?
24         A.   No, I do not.

Page 237

1         Q.   In your report at Page 71,
2 you state that, Overall the TVT ABBREVO® ®
3 system demonstrates comparable outcomes
4 to the original TVT-O, with TVT ABBREVO® ®
5 system having less immediate short-term
6 pain in some studies.
7         Did I read that correctly?
8         A.   You did.
9         Q.   Is that your overall
10 assessment and opinion with regard to the
11 comparison between the TVT-O device and
12 the TVT ABBREVO® ®?
13         A.   Yes, it is.
14         Q.   And in your analysis and
15 synthesis of the TVT-O versus the TVT
16 ABBREVO® ® data, have you seen any
17 reliable high-level evidence that there
18 is a statistically significant difference
19 for mesh exposure between those two
20 devices?
21         A.   No, there is not.
22         Q.   And is that consistent with
23 your opinion that there is no clinical
24 significant difference in mechanical

Miles Murphy, M.D.

Page 238

1  versus laser cut?
2      A.   That's part of it for sure,
3  yes.
4      Q.   Same thing, in your
5  assessment of the TVT EXACT® device,
6  have you seen that it has statistically
7  significant lower mesh exposure rates
8  than the original TVT?
9      A.   No, there's no evidence to
10 suggest that.
11     Q.   Is that supportive or not of
12 your opinion that there is no clinical
13 difference between mechanical- and
14 laser-cut TVT mesh?
15     A.   Yes, that's supportive of
16 that.
17     Q.   Do you recall being asked,
18 in general, questions about Professor
19 Ulmsten and his role as the inventor of
20 the TVT?
21     A.   Yes.
22     Q.   And I believe you testified
23 to plaintiffs' counsel you were aware of
24 him receiving royalties on the TVT; is

Page 239

1  that correct, or not?
2      A.   That's correct.
3      Q.   And is that something you
4  would have known of before being an
5  expert in this litigation, or not?
6      A.   Sure.  Most people don't do
7  work for -- most physicians don't do work
8  for companies, medical device companies,
9  for free.
10     Q.   You were asked about
11 Professor Ulmsten and this issue of bias
12 and studies and peer review.
13         Do you recall, in general,
14 that subject?
15     A.   I do.
16     Q.   I believe you testified that
17 it's good to have more information on
18 bias.
19         Do you recall that?
20     A.   Yes.
21     Q.   Did you also testify that
22 what is expected in 2018 is not the same
23 as 1998?
24     A.   Yes.  I think that's safe to

Page 240

1  say.
2      Q.   During the early 2000s and
3  the late 1990s, when TVT was introduced,
4  were you following the literature and/or
5  attending conferences in the field of
6  stress urinary incontinence surgery?
7      A.   I was.
8      Q.   And was Dr. Ulmsten and the
9  TVT-O a topic of conversation at that
10 time, at that level, the professional
11 pelvic surgeon level?
12         MS. GAYLE:  Object to the
13         form.
14         THE WITNESS:  Yes, it was.
15 BY MR. SNELL:
16     Q.   For example, in these
17 sessions that you would go to, like you
18 said you're going to the AUGS studies
19 scientific session very soon; is that
20 correct?
21     A.   Yes.
22     Q.   Were those types of sessions
23 held concerning TVT at the international
24 level, like the International

Page 241

1  Urogynecological Association and the
2  International Continental Society level?
3         MS. GAYLE:  Object to the
4         form.
5         THE WITNESS:  Yes.
6  BY MR. SNELL:
7      Q.   Was it any secret -- strike
8  that.
9         You're aware that Ulf
10 Ulmsten passed away a while ago?
11     A.   A few years ago, yes.
12     Q.   And are you aware of whether
13 or not there is an Ulmsten award
14 pertinent to his work in the development
15 and design of the TVT device?
16     A.   Yes.  There's an Ulmsten
17 award that's awarded at the International
18 Urogyn Association meeting.
19     Q.   Was it any secret, as far as
20 you're aware, that Ulmsten was the
21 inventor of TVT back in the 2000s?
22     A.   No, it was not a secret.  It
23 was well known.
24     Q.   So would you need to have --

Miles Murphy, M.D.

Page 242

1 focusing on that, would you need to have
2 more information on Dr. Ulmsten and his
3 role in order to make an assessment as to
4 the validity of his data?
5     MS. GAYLE: Object to form.
6     THE WITNESS: No. I think
7     anybody that was in the field and
8     was studying, reading about new
9     developments in the field, knew
10    that Ulf Ulmsten was the creator
11    of the TVT and knew that he had
12    worked specifically with Gynecare
13    in bringing that from a sort of
14    prototype to a marketed device.
15        And that he -- anybody would
16    have reasonably assumed that he
17    was being compensated for that
18    work.
19 BY MR. SNELL:
20    Q.   And has Dr. Ulmsten and his
21 data been -- have the results been
22 essentially replicated, based on your
23 analysis of the overall literature?
24    A.   Hundreds of times.

Page 243

1    Q.   You were asked, I believe,
2 about the TVT and TVT-O and TVT ABBREVO® ®
3 devices and, in particular, mesh
4 exposure.
5        Let me ask you this, just so
6 we're clear: Do you believe, based on
7 the reliable data and evidence,
8 high-level evidence, that there is a
9 significant difference between the mesh
10 exposure rates with TVT and TVT-O,
11 Ethicon's devices?
12    A.   Yeah. When you look
13 systematically at all the randomized
14 trials, comparator trials in totality,
15 there's no evidence that the risk of mesh
16 exposure is higher with one or the other.
17    Q.   And I focused on the Ethicon
18 devices because in your report, do you
19 note at Page 69, for example, that with
20 regard to the outside-in
21 transobturator -- first of all, you're
22 familiar with those devices that are
23 outside-in transobturators?
24    A.   I am.

Page 244

1    Q.   And those are the
2 non-Ethicon transobturator sling; is that
3 correct?
4    A.   That's correct. Ethicon
5 does not market an outside-in obturator
6 sling.
7    Q.   Based on your analysis and
8 the highest level of evidence and the
9 most reliable evidence, where does the
10 risk of mesh exposure and vaginal injury
11 with TVT and TVT-O compare to the
12 outside-in transobturator slings?
13    A.   So the risk of exposure
14 appears to be higher in the outside-in
15 rather than the inside-out technique,
16 based on meta-analysis.
17    Q.   You were asked a question
18 about Exhibit-19, the paper by Otto,
19 O-T-T-O, The Effect of Porosity?
20    A.   Yes, I have it here. It
21 says 13.
22    Q.   I'm sorry, 13. Thank you
23 for that clarification.
24        Was that a study about the

Page 245

1 TVT and the TVT-O devices?
2    A.   No. This was a study of
3 prolapse mesh.
4    Q.   And this effect of porosity,
5 is that a hypothesis or theory, or is
6 this something proven based on
7 high-level, reliable, scientific
8 evidence?
9        MS. GAYLE: Object to form.
10        THE WITNESS: I think it's
11    much more theoretical.
12        MR. SNELL: Give me a
13    second.
14 BY MR. SNELL:
15    Q.   Over the past 15 years, have
16 you kept current with the state of the
17 art in the field of stress urinary
18 incontinence surgery?
19    A.   Absolutely.
20    Q.   Do you believe you have
21 expertise in that subject?
22    A.   I sure do.
23    Q.   Is that part of your
24 education, training, your subspecialty

Miles Murphy, M.D.

Page 246

1  board certification and your daily
2  practice?
3      A.   Yes.
4      Q.   Is that a basis for your
5  work and role with the various
6  professional societies you've talked
7  about with us here today?
8      A.   Yes.
9      Q.   In connection with your
10  knowledge of the state of the art, are
11  you also -- do you also have expertise on
12  the standard of care with regard to
13  stress urinary incontinence surgery?
14      A.   Yes, I do.
15      Q.   Do you have knowledge and
16  expertise with regard to the common
17  knowledge that is expected of a pelvic
18  surgeon in the last 15 years?
19      A.   Yes.
20      Q.   Do you have knowledge and
21  expertise as to the potential
22  complications and risks that are inherent
23  across all stress incontinence surgeries,
24  whether mesh is used or not?

Page 247

1      A.   I do.
2      Q.   And did you utilize that
3  knowledge and experience in formulating
4  your opinions that the IFU for the TVT
5  and TVT-O devices were adequate?
6      A.   Yes.
7      Q.   When you were teaching
8  professional education on TVT and TVT-O
9  that included, as you said, the IFUs, the
10  procedural steps, the complications and
11  management, did you assess whether those
12  IFUs were adequate at that time?
13      A.   Sure.
14      Q.   Did you discuss the adequacy
15  of those IFUs with your audience over
16  time?
17      A.   I think the -- I wouldn't
18  specifically hold up the document and
19  say, this is adequate.
20      Q.   Right.
21      A.   But I would certainly go
22  over the types of things that were listed
23  in the IFU and discuss that with the
24  audience.

Page 248

1      Q.   Okay.  And that's what I
2  meant.  I'm sorry for a bad question.
3          In connection with the
4  Prosima study, did you have interactions
5  with Ethicon personnel with regard to the
6  types of instructions that should be
7  given to clinical investigators and the
8  potential risks and complications with
9  that device?
10          MS. GAYLE:  Object to form.
11          THE WITNESS:  Yes.
12  BY MR. SNELL:
13      Q.   Did you analyze and consider
14  the adequacy of the instructions given to
15  the clinical investigators for the
16  Prosima device in your work as a
17  consultant?
18      A.   Yes.
19      Q.   Did you analyze and consider
20  the adequacy of the instructions that you
21  received, as a pelvic floor surgeon and
22  clinical investigator, with regard to
23  your ability to adequately consent
24  patients into that clinical study?

Page 249

1      A.   Yes.
2      Q.   And did you determine that
3  the IFU was adequate?
4      A.   Yes.
5      Q.   Did you determine that the
6  clinical instructions given to you, as an
7  investigator, and to the other
8  investigators, was adequate in your role
9  as a consultant and study participant?
10      A.   Yes.  I mean, obviously,
11  there was some discussion about best ways
12  to communicate things.
13          But ultimately it was
14  adequate, yes.
15      Q.   And is that work you have
16  done -- had done before becoming an
17  expert in this litigation?
18      A.   Yes.
19      Q.   And I believe you testified
20  that you began your work or involvement
21  in the Prosima study, I don't want to
22  misstate you, but I thought you said
23  around 2007?
24      A.   Yes, 2007.

Miles Murphy, M.D.

Page 250

1    Q.   Have you reviewed literature
2  on mesh histology?
3    A.   Yes, I have.
4    Q.   Is that something you
5  testified to plaintiffs' counsel?
6    A.   Yes.
7    Q.   Based on your review of the
8  high-level, reliable, scientific
9  evidence, as you testified to with your
10  methodology, did you find any clinically
11  significant complications with any
12  fraying of the TVT slings, if that even
13  occurs?
14    A.   No, I did not.
15    Q.   Based on your review of the
16  high-level scientific studies, including
17  the long-term studies on the TVT and
18  TVT-O that you identified here today, do
19  those support your opinion that there is
20  not pathologic contraction with TVT and
21  TVT-O?
22        MS. GAYLE:  Object to form.
23        THE WITNESS:  Yes.
24    Absolutely.

Page 251

1  BY MR. SNELL:
2    Q.   I'm not sure if I asked
3  this.  You were asked about how you went
4  about selecting and considering articles
5  and your methodology.
6        Do you recall that subject?
7    A.   Yes.
8    Q.   For the high-level and the
9  reliable medical literature and articles
10  that you considered, had you reviewed any
11  or many of them before your work as an
12  expert in this case?
13        MS. GAYLE:  Object to form.
14        THE WITNESS:  Absolutely.
15    You know, for instance, the Ward
16    Hilton study, I was present when
17    that data was presented for the
18    very first time in a U.S.
19    scientific meeting.  And I would
20    have read the article when it
21    first was published.
22  BY MR. SNELL:
23    Q.   In your review of the
24  plaintiffs' experts' reports -- and I

Page 252

1  believe in your materials list towards
2  the back there's a list of various
3  plaintiffs' experts for the wave cases.
4        Do you see that?
5    A.   Yes.
6    Q.   Do you believe that those
7  experts presented any high-level,
8  reliable, sound, scientific evidence, as
9  you were asked in your hypotheticals,
10  that showed that the TVT and the TVT mesh
11  and TVT-O were defective?
12    A.   I did not see any high-level
13  evidence, in any of those reports, that
14  suggested to me that these materials in
15  the TVT and TVT-O were defective.
16    Q.   Your overall review and
17  analysis of the data and the studies, is
18  that consistent or inconsistent with your
19  clinical experience on these devices?
20    A.   The vast majority of the
21  cases, my clinical experience jives with
22  the material that I presented.
23    Q.   Let me just look at one
24  thing.

Page 253

1        MR. SNELL:  That's all I
2    have.  Thank you.
3        MS. GAYLE:  Doctor, I just
4    have two more questions for you.
5        -   -   -
6        EXAMINATION
7        -   -   -
8  BY MS. GAYLE:
9    Q.   Do you have a degree in
10  materials engineering?
11    A.   I do not.
12    Q.   And, Doctor, earlier you
13  were asked by counsel about the mesh, and
14  you said that you knew that it was a
15  macroporous monofilament mesh before you
16  became an expert in this litigation.
17        How did you know that?  What
18  was your basis for that understanding?
19    A.   Reading the scientific
20  literature.
21    Q.   Any specific literature,
22  Doctor?
23    A.   Well, I mean, I already
24  mentioned the Amid paper.  That was the

Miles Murphy, M.D.

Page 254

1 main paper that broke down the different
2 types.
3        But as we looked in my CV, I
4 did -- I wrote a whole chapter on
5 materials used in reconstructive pelvic
6 surgery, and I authored that before
7 becoming an expert in this litigation.
8 And that references multiple other
9 articles as well.
10     Q.   Doctor, that chapter in the
11 book that you talked about, was that
12 regarding polymers used?
13     A.   It included polymers.
14     Q.   And I think I might have
15 asked this before, Doctor, but you don't
16 have a degree in design engineering, do
17 you?
18        MR. SNELL:  Object to form.
19     Go ahead.
20        THE WITNESS:  I do not have
21     a degree in that, no.
22        MS. GAYLE:  No further
23     questions.
24             - - -

Page 255

1        EXAMINATION
2             - - -
3 BY MR. SNELL:
4     Q.   Just a couple follow ups.
5        Doctor, with regard to the
6 questions about the degree, do you
7 believe you have expertise in
8 biomaterials?
9     A.   Yes, I do.
10     Q.   Have you studied and
11 evaluated and published on them and their
12 use in pelvic floor, specifically stress
13 urinary incontinence, surgery?
14     A.   Yes, I have.
15     Q.   Do you have expertise on
16 device design?
17     A.   Absolutely.
18     Q.   And have you talked about
19 the various bases and ways in the
20 consulting and investigations and
21 evaluations you've done over the past
22 decade and-a-half in that regard?
23     A.   Yes.
24     Q.   The Moalli paper about the

Page 256

1 tensile properties of mesh, including
2 TVT, you testified this is something you
3 would have read at or about the time it
4 was published?
5     A.   Yes.
6     Q.   And looking at that paper,
7 is the TVT mesh macroporous like you
8 identified?
9     A.   Yes.
10     Q.   And did Dr. Moale cite to
11 and reference other studies and data,
12 including biomechanical literature from
13 Deetz, for example, mechanical properties
14 of urogynecologic implants?
15     A.   Yes.  That was cited in this
16 paper.
17     Q.   And had you seen the
18 Deetz -- for example, the Deetz paper and
19 the graphs from it published in
20 connection with the assessment in your
21 evaluation of the laser versus mechanical
22 cut?
23     A.   I have seen that, yes.
24     Q.   And would you have been

Page 257

1 familiar also with the Deetz paper and
2 the properties of the TVT and other
3 stress incontinence materials as
4 published back in the 2003 to 2004 time
5 period?
6     A.   Yes.
7     Q.   There's a paper by Koram and
8 others.
9        Do you know who that Koram
10 is?
11     A.   I do.
12     Q.   Can you just tell us who
13 that is?
14     A.   His name is Mickey Koram.
15 He was editor-in-chief of this journal
16 for a while.  He was president of the
17 American Urogyn Society at one time.  And
18 I've met him personally.
19        I also, actually,
20 interviewed at his fellowship when I was
21 interviewing for fellowships.
22     Q.   And it looks like in 2003 he
23 published on complications with regard to
24 the TVT device in the Obstetrics and

Miles Murphy, M.D.

Page 258

1 Gynecology Journal.
2        Do you see that?
3     A.   Yes.  That's what's known as
4 the Green Journal.
5     Q.   Is that a journal you've
6 regularly read over the course of your
7 career as well?
8     A.   Certainly.
9     Q.   Is that a paper, a type of
10 paper you would have been reading and
11 considering and evaluating back in 2003,
12 when it contemporaneously came out in the
13 journal you followed?
14    A.   Yes.
15    Q.   Do those Moalli and Deetz
16 papers support your opinions on the
17 sufficiency, adequacy and the macroporous
18 nature of the TVT mesh?
19    A.   They do.
20    Q.   Your professional education,
21 the teaching, slide decks and the
22 monographs, for example, were those a
23 source of information that you had with
24 regard to your determination that the TVT

Page 260

1 contemporaneous with your usage years,
2 before your role as an expert here?
3        MS. GAYLE:  Object to form.
4        THE WITNESS:  Yes.
5        MR. SNELL:  That's all I
6 have.  Thank you.
7        MS. GAYLE:  No more
8 questions, Doctor.  Thank you for
9 your time today.
10       - - -
11       (Whereupon, the deposition
12 concluded at 3:39 p.m.)
13       - - -
14
15
16
17
18
19
20
21
22
23
24

Page 259

1 mesh was macroporous?
2     A.   I'm sorry, could you repeat
3 that question?
4     Q.   Sure.
5        The TVT professional
6 education, the slide decks, would those
7 have also been a source of information
8 you would have considered in coming to
9 the conclusion, before being an expert
10 here, that the TVT mesh was macroporous?
11    A.   Yes.
12    Q.   Before and during your use
13 of the TVT device, did you hold it up and
14 analyze it and look at it, specifically
15 the mesh?
16       MS. GAYLE:  Object to form.
17       THE WITNESS:  Yes.
18 BY MR. SNELL:
19    Q.   Were you able to look
20 through the mesh?
21    A.   I was.
22    Q.   Were you able to assess
23 whether it was macroporous by your own
24 visual evaluation of that product,

Page 261

1        CERTIFICATE
2
3
4        I HEREBY CERTIFY that the
5 witness was duly sworn by me and that the
6 deposition is a true record of the
7 testimony given by the witness.
8
9
10
        Amanda Maslynsky-Miller
11      Certified Realtime Reporter
        Dated:  October 12, 2018
12
13
14
15
16
17       (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 262

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14         It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 264

ACKNOWLEDGMENT OF DEPONENT

1
2
3          I,_____, do
   hereby certify that I have read the
   foregoing pages,  1 - 257, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   MILES MURPHY, M.D.          DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20____.
12
   My commission expires:_____
13
14 _____
   Notary Public
15
16
17
18
19
20
21
22
23
24

Page 263

1          - - - - - -
            E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____

Page 265

LAWYER'S NOTES

1
2  PAGE  LINE
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____