# EXHIBIT 2

C. Bryce Bowling, M.D.

```
 1          IN THE UNITED STATES DISTRICT CIRCUIT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
 3
    IN RE: ETHICON INC., PELVIC      )  Master File
 4  REPAIR SYSTEM PRODUCTS LIABILITY )  No.
    LITIGATION                       )  2:12-MD-02327
 5  _____  )  MDL No. 2327
                                     )
 6  THIS DOCUMENT RELATES TO ALL     )  JOSEPH R. GOODWIN
    WAVE 8 AND SUBSEQUENT WAVE CASES )  U.S. DISTRICT JUDGE
 7  AND PLAINTIFFS                   )
    _____  )
 8
 9  In Re:  General re
    Prolift/Prolift+M/Gynemesh &
10  TVT/TVT-Exact/TVT-O
11
12
                 ORAL DEPOSITION OF
13
              C. Bryce Bowling, M.D.
14
           Friday, September 28, 2018
15
                   9:00 A.M.
16
         University of Tennessee Medical Center
17
                1930 Alcoa Highway
18
              Knoxville, Tennessee
19
20
21
22
23
               Georgette H. Mitchell
24         Registered Professional Reporter
```

C. Bryce Bowling, M.D.

Page 2

1  APPEARANCES OF COUNSEL:
2  ON BEHALF OF THE PLAINTIFF:
3  Ann Gayle, Esquire
   Aylstock, Witkin, Kreis & Overholtz, PLLC
4  17 East Main Street
   Suite 200
5  Pensacola, Florida 3202
   850.202.1010
6  Agayle@awko.law.com
7  ON BEHALF OF THE DEFENDANTS:
8  Jordan N. Walker, Esq.
   Butler Snow LLP
9  1020 Highland Colony Parkway
   Suite 1400
10 Ridgeland, Mississippi 39157
   601.948.5711
11 Jordan.walker@butlersnow.com
12 Also Present:
   (Telephonically)
13
   James Lyle, Esq.
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  I N D E X (Continued)
2  Exhibit 12-A - Resume supplied on September
   28/2018.                                      90
3  Exhibit 20 - Medical License.            127
4  Exhibit 13 - FDA Article entitled Update on
   serious complications associated with
5  transvaginal placement of surgical mesh for
   pelvic organ prolapse, FDA safety
6  communication.                           128
7  Exhibit 14 - Article entitled Safety of
   Vaginal Mesh Surgery Versus Laparoscopic Mesh
8  Sacropexy for Cystocele Repair: Results of
   the Prosthetic Pelvic Floor Repair Randomized
9  Controlled Trial.                        146
10 Exhibit 15 - Urogynecologic Surgical Mesh:
   Update on the safety and effectiveness of
11 transvaginal placement for pelvic organ
   prolapse dated July 2011 from the FDA.    150
12 Exhibit 23 - POP report with markings.    155
13 Exhibit 24 - Transvaginal report with
   markings.                                155
14 Exhibit 16 - Cochrane Library Surgery for
   women with posterior compartment prolapse
15 review.                                  156
   Exhibit 17 - Document entitled Long-term
16 outcome of vaginal mesh or native tissue in
   recurrent prolapse: A randomized controlled
17 trial.                                   187
   Exhibit 22 - AUGS document entitled Update on
18 Vaginal Mesh for Prolapse and Incontinence
   dated March 2017.                        195
19 Exhibit 19 - Document entitled Elongation of
   textile pelvic floor implants under load is
20 related to complete loss of effective
   porosity, thereby favoring incorporation in
21 scar plates.                             216
   Exhibit 18 - Document entitled Vaginal Mesh
22 Contraction.                             219
23
24

Page 3

1            I N D E X
2  C. BRYCE BOWLING, M.D.                    6
3  EXAMINATION BY MS. GAYLE                  6
4  EXAMINATION BY MR. WALKER               225
5  EXAMINATION BY MS. GAYLE                232
6          E X H I B I T S
7  Exhibit 1 - Notice of deposition.       13
8  Exhibit 3 - Invoices.                   15
9  Exhibit 3-A - Billing from August 12, 2018 to
   September 28, 2018 to be furnished.      20
10 Exhibit 1-A - Jump Drive, retained by Ms.
   Gayle.                                   21
11 Exhibit 2 - Defendants' objections and
   responses to plaintiffs' notice to take C.
12 Bryce Bowling, M.D.'s deposition.        22
13 Exhibit 4 - Expert Report of C. Bryce Bowling
   M.D., regarding Prolift/Prolift+M/Gynemesh.  25
14 Exhibit 5 - Reliance list relating to Exhibit  37
   4.
15 Exhibit 6 - General Reliance List relating to  39
   TVT, TVT-Exact and TVT-O report.
16 Exhibit 7 - Report regarding TVT/TVT     42
   Exact/TVT-O.
17 Exhibit 10 - Richard Ellkerman's reliance  72
   list.
18 Exhibit 11 - Dr. Ahmet Bedestani general  74
   reliance list.
19 Exhibit 21 - Supplemental reliance list.  75
                                            76
20 Exhibit 21 - Bryce Bowling Supplemental
   General Materials List in Addition to
21 Materials Referenced in Report.
22 Exhibit 8 - Curriculum Vitae.            89
23 Exhibit 9 - Curriculum Vitae.            89
24 Exhibit 12 - Resume in 2012.             89

Page 5

1           S T I P U L A T I O N
2        The deposition of C. BRYCE BOWLING, M.D.,
3  called as a witness at the instance of the Plaintiffs,
4  pursuant to all applicable rules, taken by agreement on
5  the 30th day of September, 2018, beginning at
6  approximately 9:19 a.m., at the University of Tennessee
7  Medical Center, 1930 Alcoa Highway, Knoxville,
8  Tennessee, before Georgette H. Mitchell, Registered
9  Professional Reporter and Notary Public, pursuant to
10 the stipulation of Counsel.
11       It being agreed that
12 Georgette H. Mitchell, Registered Professional Reporter
13 and Notary Public, may report the deposition in machine
14 shorthand, afterwards reducing the same to typewriting.
15       All objections, except as to the form of
16 the question, are reserved to on or before the hearing.
17       It being further agreed that all
18 formalities as to notice, caption, certificate,
19 transmission, etc., including the reading of the
20 completed deposition by the witness and the signature
21 of the witness, are waived.
22
23
24

C. Bryce Bowling, M.D.

**Page 6**

1    (The deposition began at 9:19 a.m.)

2         C. BRYCE BOWLING, M.D.,

3    having first been duly sworn, was examined and deposed

4    as follows:

5    EXAMINATION BY MS. GAYLE:

6    Q.    Good morning, Doctor.  Thank you for your

7    time today.

8    A.    Absolutely.

9    Q.    My name is Ann Gayle.  We met just

10   briefly just before the deposition.  I'm here to take

11   your deposition today regarding the two reports that

12   you have issued in and what we refer to as Wave 8.

13            You've issued a

14   Prolift/Prolift+M/Gynemesh/TVT/TVT-O/TVT Exact report.

15   Do you understand that I'm here to take that deposition

16   in connection with those two reports?

17   A.    Yes.

18   Q.    Okay.  Do you understand that you're

19   sworn to tell the truth today?

20   A.    Yes.

21   Q.    I see from your testimony history that

22   was attached and provided to the materials that we were

23   given that you have been deposed approximately ten

24   times; is that correct?

**Page 7**

1    A.    I don't know how many times I've been

2    deposed.

3    Q.    You've been deposed as early as 2015 in

4    the Nolan versus Ethicon case, Vandergriff versus

5    Ethicon in 2016, Mays versus Ethicon, Gaylor versus

6    Ethicon, Slade versus Ethicon, Allmon versus Ethicon,

7    White versus Ethicon, Cosgray versus Ethicon, Wimberly

8    versus Ethicon and Mays versus Ethicon.  Does that

9    sound about right?

10   A.    I think that's a sample of the

11   depositions I've given.  Not all of the depositions

12   I've given have involved the products.

13   Q.    Okay.  But certainly you've been deposed?

14   A.    Several times.

15   Q.    Several times.  So you're familiar with

16   the process?

17   A.    I am.

18   Q.    There are times today as you probably

19   have seen in the past where counsel and I will --

20   counsel maybe will have an objection.  I would ask that

21   you answer the question over the objection unless

22   counsel instructs you not to answer.

23            Of course, sometimes in my questioning I

24   may be just looking for a yes or a no answer.  I would

**Page 8**

1    ask that you try to stick to that if I'm asking for a

2    yes or no answer.

3            Sometimes I might say after you maybe

4    elaborate after yes or no, I might say move to strike.

5    There is nothing against you for that.  There's nothing

6    personal.  I'm just doing by job sort of as an

7    attorney.  Counsel may also do the same thing when he's

8    questioning you.

9            Again, we're just trying to keep a clean

10   record here.  So I just wanted to tell you no offense,

11   okay?

12   A.    Sure.

13   Q.    All right.  Would you please state your

14   name, for the record.

15   A.    Chadwick Bryce Bowling.

16   Q.    Have you also been known by Bryce C.

17   Bowling?

18   A.    No.  C. Bryce Bowling.

19   Q.    C. Bryce Bowling?

20   A.    Yes.

21   Q.    Doctor, I've seen in these cases that I

22   read you that Ethicon noticed your deposition in some

23   of those cases and they actually noticed it with Bryce

24   C. Bowling.

**Page 9**

1            So that would have been in error; is that

2    correct?

3    A.    Yes.

4    Q.    And you've not published under any other

5    aliases other than Chadwick Bryce Bowling?

6    A.    I think all of my publications are under

7    C. Bryce Bowling.

8    Q.    C. Bryce Bowling.  Thank you, Doctor.

9    And you have no other aliases?

10   A.    No.

11   Q.    You're a fellowship trained board

12   certified urogynecologist, correct?

13   A.    Correct.

14   Q.    Does Roberta Baldridge still work in your

15   office as office supervisor?

16   A.    No.

17   Q.    Who took her place?

18   A.    Lane Schaeffer is currently office

19   supervisor.

20   Q.    And during the course of today as we

21   discuss names and so forth, it might be easier for the

22   court reporter if we just begin to just take the

23   practice of spelling last names for her ease of

24   reference.

C. Bryce Bowling, M.D.

Page 10

1 Could you spell Miss Schaeffer's last
2 name.
3 A.    I believe it's S-c-h-a-e-f-f-e-r.
4 Q.    And did she handle the scheduling of the
5 deposition today?
6 A.    I don't know who handled the scheduling.
7 Q.    Mr. Walker is here with -- representing
8 Ethicon today.  Have you met him before?
9 A.    Yes.
10 Q.    How many times?
11 A.    Twice, I believe.
12 Q.    Okay.  Was it in connection with, and
13 without getting into the substance of your testimony or
14 your communications with him, was it in connection with
15 this particular deposition?
16 A.    No.
17 Q.    Okay.  In connection with another
18 deposition?
19 A.    Yes.
20 Q.    Against Ethicon?
21 A.    I believe so, yes.
22 Q.    Were you acting as a defense expert in
23 that litigation?
24 A.    I don't know if I was a defense expert.

Page 11

1 I think I was a treating physician.
2 Q.    A treating physician?
3 A.    Yes.
4        MR. WALKER:  Let me clarify one thing.
5 There may have been a miscommunication.  I deposed
6 Dr. Bowling at one point in the past where he was
7 a treating doctor.  That's what I think he's
8 referencing right there.
9        Separate and apart from that, we've met
10 twice in connection with his expert work.
11        MS. GAYLE:  Okay.  Thank you for that,
12 counsel.  Do you recall just for the record what
13 case that was when you deposed him?
14        MR. WALKER:  No.
15 BY MS. GAYLE:
16 Q.    And, Doctor, when you met twice with Mr.
17 Walker, approximately how long did you meet in
18 connection with your work for this particular general
19 expert work?
20 A.    Well, in connection for this general
21 report we've only met once and that was yesterday, four
22 to five hours probably.
23 Q.    Doctor, in April of 2016 in the
24 Vandergriff case you had testified that the name of

Page 12

1 your practice at that time was UT Urogynecology.  Is
2 that still the name of your practice?
3 A.    It is.
4 Q.    You also had testified back then that UT
5 Urogynecology had been started in July of 2010; is that
6 correct?
7 A.    That's correct.
8 Q.    Also, Doctor, as of 2016 April, you were
9 the only practicing urogynecologist at your practice.
10 Is that still the case?
11 A.    No.
12 Q.    Who else is now with you?
13 A.    I have Robert Elder and Michael Polin.
14 P-o-l-i-n.
15 Q.    When did Dr. Elder join your practice?
16 A.    It would have been, I believe, in late
17 2016.  I don't know the exact date and then Dr. Polin
18 joins probably about five to six months thereafter.
19 Q.    And doctor -- is Dr. Elder like yourself
20 a fellowship trained board certified urogynecologist?
21 A.    He is a board certified urogynecologist.
22 He came through the ranks prior to there being
23 fellowships.
24        Dr. Polin is both board certified and

Page 13

1 fellowship trained.
2 Q.    Doctor, thank you for anticipating my
3 question there.  Counsel may tell you not to later, but
4 it sure does speed up some things.
5        Is Jessica Dobbs still your nurse
6 practitioner?
7 A.    Yes.
8 Q.    Do you have any other nurse practitioners
9 at this time?
10 A.    No.
11 Q.    How long has Jessica been with you?
12 A.    Oh, I think Jess has been there three to
13 four years.  I'm going to err on the side of four
14 years.
15        MS. GAYLE:  Counsel, I'm going to start
16 handing him some exhibits and I know there's a lot
17 of paper here and you probably have your own
18 copies, so maybe to sort of eliminate some of that
19 just let me know if you don't have a copy of the
20 exhibit that I might be handing the doctor.
21        I've brought you extra copies, but I
22 don't want to inniadate you.
23        MR. WALKER:  Perfect.  Thank you.
24 (Exhibit 1 - Notice of deposition.)

C. Bryce Bowling, M.D.

Page 14

BY MS. GAYLE:

Q.    Doctor, I am handing you what's been marked, pre-marked as Exhibit 1, the notice of deposition today.

Doctor, have you reviewed this document prior to today?

A.    Yes.

Q.    And, Doctor, at the end of this document basically what's marked as page seven there's a schedule.

A.    Yes.

Q.    It asks you to bring some things here, and so we'll just take it one at that time.  You have several different things you brought here.

A complete copy of your curriculum vitae.  Did you bring that today?

A.    Yes.

Q.    And, Doctor, has this changed any from your previous curriculums that you've had, in other words?

A.    It gets up-dated a couple times a year.

Q.    Okay.  Defendants recently or Ethicon, sorry, I might refer to them as defendants in this matter so you understand I'm referring to Ethicon.

Page 15

Ethicon provided a copy of your resume with your recent reports in early August.  Have you up-dated this resume since August?

A.    Well, I'm not sure if the resume that they had that they sent to you in August was my most recent or not but, no, I've not up-dated my CV since August.  I'll look.

I would say that this is current through the summer of this year.  There may be one or two didactic sessions with the residents and faculty here at UT that are not on here, otherwise it should be fairly complete.

Q.    Okay.  Doctor, number two is any and all documents specifically consulting agreements, invoices, and so forth.

I understand that you have brought some invoices today?

A.    Yes.

MS. GAYLE:  Okay.  And Madam Court Reporter, if we could just mark all of these together as Exhibit 3.  I'm sorry, I'm going to jump around.

(Exhibit 3 - Invoices.)

MR. WALKER:  Are you going to mark the CV

Page 16

as number two?

MS. GAYLE:  I'm going to come back to that.

BY MS. GAYLE:

Q.    Okay.  Doctor, so what's been marked as Exhibit 3, it looks like we have several different invoices.  Now, the right hand corner has the date; is that correct?

A.    I'll need a copy to confirm.

Q.    Sure.

A.    Yes.

Q.    Okay.  And then it's your invoice number, correct?

A.    That must be something that's assigned by Johnson & Johnson.  That's an invoice number that I'm familiar with and I don't know what the number underneath that is either.

Q.    So the invoices that you're looking at were generated by Johnson & Johnson?

A.    No.  The invoice, this portion of the invoice was generated by me through an email and sent in to the attorneys.

Q.    Okay.  So the substance of the invoice was generated by you?

Page 17

A.    Correct.

Q.    The letterhead and whatever marking is there in the right hand corner would be from Johnson & Johnson?

A.    Correct or from the attorney group.

Q.    The attorney group.  And you understand that Johnson & Johnson is also Ethicon, correct?

A.    Yes.

Q.    And the attorney group would be Mr. Walker's firm, Butler Snow?

A.    Correct.

Q.    And that would be the case for all of the invoices?

A.    I assume.

Q.    Okay.  So it looks like you met in March 15, 2018.  Do you remember who Andrew is?  It says one hour meeting with Andrew.

MR. WALKER:  That would be an attorney from our firm.

MS. GAYLE:  Do you know the last name?

MR. WALKER:  Tharp.

MS. GAYLE:  Pardon?

MR. WALKER:  Tharp.

BY MS. GAYLE:

C. Bryce Bowling, M.D.

Page 18

1    Q.    Then you have some invoices dated
2  July 16th for work that you did for the month of July,
3  correct?
4    A.    Yes.
5    Q.    So I apologies.  In March it looks like
6  you had $2,700 incurred.  In July 23,400, and that was
7  part of July, it looks like through the 16th.
8         And the next invoice appears to be from
9  the 17th through the 31st.  Does that sound accurate,
10  Doctor?
11    A.    Let me look at it.  Yes.  July 17th
12  through July 31st.
13    Q.    For a total of 13,500?
14    A.    Yes.
15    Q.    And, Doctor, is that all that you have
16  billed -- oh, wait, there's one more.  August 15, 2018
17  and that's from August the 2nd to August the 12th, and
18  I'll let you have that just to double check.  Does that
19  sound accurate?
20    A.    Yes.
21    Q.    And that's for $27,000, correct?
22    A.    Correct.
23    Q.    And, Doctor, so would it be correct to
24  assume that any time that you have incurred from

Page 19

1  August 12th through the present date has not yet been
2  billed to Butler Snow?
3    A.    From August the 12th?  No, there have
4  been bills sent to Butler Snow but not for general
5  reports.
6    Q.    Okay.  So for your work and for this
7  deposition today, how have you billed for that work
8  through the present?
9    A.    I'm sorry?
10    Q.    So for your work, so from 8/12,
11  August 12th, not for the work that you've done as an
12  expert for Butler Snow, but for this particular project
13  for Butler Snow?
14    A.    For the expert reports?
15    Q.    Yes, for the expert reports.
16    A.    Everything has been billed except for the
17  meeting time yesterday.
18         MR. WALKER:  We're talking about the
19  general reports?
20         MS. GAYLE:  For the general reports.  Not
21  any case specific work, but these general reports.
22         THE WITNESS:  Correct.
23  BY MS. GAYLE:
24    Q.    So just to clarify the record, Doctor,

Page 20

1  you are doing other projects with Butler Snow in the
2  Ethicon litigation?
3    A.    I'm looking at case specific reports.
4    Q.    Okay.  For Wave 8 or for a future wave?
5    A.    For Wave 8 and for the Election Wave.
6         MS. GAYLE:  Okay.  Counsel, I would
7  request that we have any future billing we're
8  going to have a placeholder that I'm going to mark
9  as Exhibit 3-A.  So any billing from August the
10  12th up to the present date, if you will please
11  supply that whenever it becomes available.
12         I'll also give the court reporter a copy,
13  unless you have any objections that you'd like to
14  register.
15         MR. WALKER:  That's fine.
16         MS. GAYLE:  Okay.  Great.  Thank you.  So
17  Madam Court Reporter, we will mark 3-A as a
18  placeholder.
19  (Exhibit 3-A - Billing from August 12, 2018 to
20  September 28, 2018 to be furnished.)
21  BY MS. GAYLE:
22    Q.    And, Doctor, it looks like you've also
23  brought some binders here today, and we will mark
24  those.  I think there is a CD that also talks -- that

Page 21

1  also has the identical materials; is that correct?
2    A.    Jump drive.
3         MR. WALKER:  Can I make a suggestion, and
4  we can just put this on the record.  We have
5  brought a thumb drive that has all of the general
6  reliance materials that we supplied and that are
7  on his reliance list.
8         Everything in the binders is on this jump
9  drive.  I understand he's made some notes on his
10  report.  I don't think there are any notes on the
11  supporting documents.
12         So what I would suggest is that we only
13  mark the reports, not the entire binders, given
14  that all the material is on the jump drive which I
15  assume you want to mark.
16         MS. GAYLE:  Okay.  Yes, we will
17  definitely mark the jump drive as Exhibit 1-A, and
18  I assume that we can talk about if there is any
19  sort of password protection or anything like that
20  on the break.  I wouldn't assume there would be.
21         MR. WALKER:  There is a password on that
22  and I can supply that to you.
23         MS. GAYLE:  Okay.  Thank you.
24  (Exhibit 1-A - Jump Drive, retained by Ms.

Page 22

1    Gayle.)
2         MS. GAYLE:  And what we'll do, counsel,
3    on the break, I'll look at these binders and make
4    sure that the reports are the only things that
5    have the marking, and we'll hold open a copy of
6    Exhibit 1-B for a copy of the reports with any
7    markings on there.
8         If I find that other things have been
9    marked, we can address it at that time, okay?
10        MR. WALKER:  Fair enough.
11   BY MS. GAYLE:
12        Q.    And, Doctor, that would be the extent of
13   the materials that you've brought today in connection
14   with Exhibit 1?
15        A.    Correct.
16   (Exhibit 2 - Defendants' objections and responses
17   to plaintiffs' notice to take C. Bryce Bowling,
18   M.D.'s deposition.)
19   BY MS. GAYLE:
20        Q.    Doctor, I'm handing you what's been
21   marked as Exhibit 2.  It's defendants' objections and
22   responses to the requests that we have taken.  Have you
23   seen this document before?
24        A.    No.

Page 23

1         MS. GAYLE:  And counsel, just for the
2    sake of completeness of the record, I'm entering
3    this as well into record.  All right, Doctor, you
4    can put that aside.
5         MR. WALKER:  Okay.
6    BY MS. GAYLE:
7         Q.    Doctor, do you know when you completed
8    your general reports in this case?
9         A.    No.
10        Q.    And as we discussed a moment ago the
11   total that you would have billed would be a combination
12   of the invoices that we looked at plus any invoices
13   that you are yet to submit?
14        A.    Correct.
15        Q.    Have you had been paid for the amount of
16   time you've already been billed?
17        A.    I've been paid part of it.  I don't
18   really kept track of it.
19        Q.    And again, that check would not be coming
20   from Johnson & Johnson or Ethicon, it would come from
21   Butler Snow?
22        A.    I have no clue.  It gets electronically
23   deposited so I don't get an actual check in hand.
24        Q.    But you bill Butler Snow?

Page 24

1         A.    Correct.
2         Q.    Is there any one person that you direct
3    that bill to?
4         A.    There are three people that get copied on
5    that, Jordan being one of them.
6         Q.    Okay.  Who else?
7         A.    Nicky.
8         MR. WALKER:  Paralegals.
9         THE WITNESS:  Paralegals, and I can't
10   remember the other one.
11   BY MS. GAYLE:
12        Q.    And, Doctor, according to your reports,
13   you charge $600 per hour for the drafting and reviewing
14   of materials.  Does that sound accurate?
15        A.    That's correct.
16        Q.    You also charge $4,000 for up to four
17   hours and then $6,000 exceeding four hours plus travel
18   expenses; is that correct?
19        A.    That's correct.
20        Q.    And you also bill at the rate of 7,500
21   daily for any trial testimony in addition to any travel
22   expenses; is that also correct?
23        A.    That's also correct.
24        Q.    And that holds true for both reports,

Page 25

1    correct?
2         A.    Correct.
3    (Exhibit 4 - Expert Report of C. Bryce Bowling
4    M.D., regarding Prolift/Prolift+M/Gynemesh.)
5    BY MS. GAYLE:
6         Q.    Doctor, I'm handing you what I have
7    marked as Exhibit 4.  Yes, counsel, it does have some
8    highlighting.  That's for the doctors ease of
9    reference, questions that we're going to be talking
10   about shortly.
11        MR. WALKER:  Is that his report?
12        MS. GAYLE:  Yes, it is.
13        MR. WALKER:  Which one is that?
14        MS. GAYLE:  That is the Prolift report.
15   We can go off the record for a moment.
16        (Off record discussion.)
17   BY MS. GAYLE:
18        Q.    Doctor, I'm handing you what I've marked
19   as Exhibit 4.  Can you tell me what that is?
20        A.    This appears to be a copy of my general
21   Prolift report.
22        Q.    Okay.  And doctor, does this report
23   contain each of the opinions that you've reached
24   regarding the Prolift, Prolift+M and Gynemesh?

C. Bryce Bowling, M.D.

Page 26

1    A.    It does.
2    Q.    And, Doctor, there was a little confusion
3  between, I guess, what the attorneys said and what the
4  title of your report was and sort of -- so I just want
5  to clarify.
6         In Wave 8, the products that you're
7  opining on are what products specifically?
8    A.    I think Prolift, Prolift+M, Gynemesh,
9  TVT, TVT-O, TVT-Exact.
10        MS. GAYLE:  And, counsel, he's been
11  designated for all six of those products; is that
12  correct?
13        MR. WALKER:  Correct.
14        MS. GAYLE:  I just noticed your binders
15  are marked Prolift and then TVT.  Just one of
16  those things.
17        MR. WALKER:  Those are just informal
18  cover pages.
19        MS. GAYLE:  Thank you.
20  BY MS. GAYLE:
21    Q.    Okay, Doctor.  And you said this report,
22  Exhibit 4, contains all of the opinions that you've
23  reached regarding the Prolift, Prolift+M and Gynemesh?
24    A.    That's correct.

Page 27

1    Q.    Doctor, throughout this deposition to
2  make things a little easier I might refer to them as
3  POP products or your POP report.  Can we agree to
4  shorthand that?
5    A.    That's fine.
6    Q.    Okay.  And likewise, Doctor, the TVT
7  report, we might refer to that as the TVT report or the
8  sling report, okay?
9    A.    Okay.
10    Q.    Doctor, is there any reason, particular
11  reason why you chose to combine your opinions on these
12  three products for Exhibit 4 into a single report as
13  opposed to separating them out?
14    A.    Their similarities.  There would have
15  been a lot of redundancy otherwise.
16    Q.    Okay.  Before it went off the market,
17  would it be correct to estimate that you've implanted
18  Prolift in patients several hundred times?
19    A.    Yes.
20    Q.    Possibly even 800 to a thousand times?
21    A.    I don't know if it's that high.
22        MR. WALKER:  And when you say Prolift,
23  are you referring to Prolift and Prolift+M
24  collectively or just Prolift?  Can you clarify

Page 28

1  that?
2        MS. GAYLE:  I was going to ask him that,
3  yes.
4  BY MS. GAYLE:
5    Q.    Doctor, in the past you have said that
6  possibly you had implanted Prolift as much as 800 to a
7  thousand times.  If you had to -- I know you were
8  estimating at that time during your testimony.
9         If you had to estimate today, how many
10  times would you think that you have implanted the
11  Prolift product?
12    A.    Prolift alone?  Ethicon product alone?
13  Maybe 500 would probably be a good ball park.
14    Q.    Prolift+M, how many times have you
15  implanted that?
16    A.    I'd say less than a hundred.
17    Q.    Gynemesh?
18    A.    I don't know.  We use Gynemesh not only
19  in vaginal surgeries but we use it in abdominal
20  sacrocolpopexies as well, so I don't have a clear
21  accurate answer for you there.
22    Q.    Okay.  And, Doctor, just so we can just
23  go ahead and hit on it now, the TVT, how many times
24  have you implanted the TVT?

Page 29

1    A.    In excess of 2,000 times.
2    Q.    The TVT-Exact?
3    A.    I'd say probably 500.
4    Q.    And the TVT-O?
5    A.    Between 250 and 500.  Those are estimates
6  without actually counting.
7    Q.    Okay.  And so, Doctor, obviously it's
8  safe to assume you have used the Prolift in your
9  practice.  You previously testified that you began
10  using the Prolift as early as your residency; is that
11  correct?
12    A.    No, I don't think I began using Prolift
13  in my residency.  We may have done some senior year of
14  residency.  I can't recall.  Certainly slings in
15  residency.
16    Q.    Okay.  So when is the first time that you
17  recall using the Prolift device?
18    A.    That I recall using it?  It probably
19  would have been 2007.
20    Q.    At what facility was that?
21    A.    UAB.
22    Q.    And UAB, Doctor, is University of Alabama
23  at Birmingham; is that correct?
24    A.    That's correct.

Page 30

1    Q.    And you were in Birmingham from what I
2  can tell from your background, approximately a year; is
3  that correct?
4    A.    No, I was there for three years.
5    Q.    Three years.
6    A.    During those three years I was involved
7  in a fellowship that was both accredited by ABOG and
8  ABU.
9    Q.    And one of those is the American Board of
10  Obstetricians and Gynecology; is that correct?
11    A.    That's correct.
12    Q.    And the other is American Association of
13  Urology?
14    A.    American Board of Urology.
15    Q.    American Board of Urology.  Thank you,
16  Doctor.
17        Doctor, would you agree that the Prolift
18  has a different safety and efficacy profile than the
19  Gynemesh flat mesh?
20    A.    A different safety and efficacy profile?
21  Are you talking about in terms of long term efficacy of
22  the product and as it results in recurrence or what do
23  you mean?  I'm not sure.
24    Q.    Just in general, Doctor, however you want

Page 31

1  to interpret that.
2    A.    I think the safety and efficacy profile
3  of those two products are very similar.
4    Q.    How so, Doctor?
5    A.    How so?  Well, Gynemesh is the mesh that
6  was used in Prolift, so I think its safety is well
7  established, and efficacy studies looking at Gynemesh
8  versus Prolift are a little bit difficult.
9        So you can't really compare taking a
10  sheet of Gynemesh and placing it in a transvaginal
11  manner directly to Prolift because Prolift is a more
12  standardized way of correcting anal prolapse, whereas
13  before we had Prolift we had thousands of doctors doing
14  thousands of different methods trying to figure out a
15  way to properly affix Gynemesh to decrease recurrences
16  and to keep exposures and the other complications low.
17        So I think it's a little bit hard to
18  compare efficacy of those two products without a head
19  to head study where the Gynemesh portion of it is
20  standardized.
21    Q.    Doctor, would you agree, for example,
22  that the Prolift kit has the trocars and the Gynemesh
23  flat mesh did not have the trocars, correct?
24    A.    Well, Gynemesh flat mesh just comes in a

Page 32

1  box.  It has to still be inserted utilizing tools, and
2  in early adaptations of the transvaginal mesh group
3  they actually did utilize trocars that were very
4  similar to what's in the Prolift kit to place that
5  Gynemesh that was also cut in an extraordinarily
6  similar fashion to the Prolift.
7    Q.    But you would again agree that they don't
8  come with trocars, maybe an earlier iteration did, but
9  the Gynemesh is not in a kit, correct?
10    A.    The Gynemesh is in a box as a flat piece
11  of mesh.  It's up to the surgeon if they're going to
12  use a portion of Gynemesh to figure out a way to
13  deliver that mesh into its fixation, either by use of
14  trocar or use of more invasive surgeries to get to
15  ligaments that generally cause a little bit more
16  bleeding and potential nerve damage compared to trocar
17  passages.
18    Q.    Wheres the Prolift does product come in a
19  mesh kit and includes a trocar or trocars to implant
20  that?
21    A.    The Prolift product came in a box that
22  had not only mesh but also trocars to assist in the
23  delivery of the mesh.
24    Q.    Okay.  And you would agree that the

Page 33

1  Gynemesh as you said came in a box and not a kit,
2  including the trocars; correct?
3    A.    That's correct.
4    Q.    And, Doctor, can we agree that when you
5  implant -- was implanting the Prolift versus the
6  Gynemesh that there might be a different risk for
7  implanting those two products?
8    A.    No --
9        MR. WALKER:  Object to form.
10        THE WITNESS:  -- I wouldn't agree with
11    that.
12  BY MS. GAYLE:
13    Q.    And, Doctor, you said that you've
14  implanted the Gynemesh in an abdominal sacrocolpopexy?
15    A.    Abdominal sacrocolpopexy.  I've also
16  delivered that in laparoscopic sacrocolpopexies as well
17  as robotics.
18    Q.    And would you agree when using the
19  Gynemesh in that fashion that the risks are less than
20  if you would have placed that Gynemesh in a more
21  traditional route that was used previously?
22        MR. WALKER:  Object to form.
23        THE WITNESS:  Risk of what?
24  BY MS. GAYLE:

C. Bryce Bowling, M.D.

Page 34

1    Q.    Risk of complications?
2    A.    Which complications, because it varies.
3    Q.    Are there more complications with the
4  Gynemesh whenever you place it with the trocars when a
5  surgeon places it vaginally versus through the --
6    A.    Well, again --
7        MR. WALKER:  Object to form.
8        THE WITNESS: -- it depends on what risks
9  we're talking about.  If we look at studies
10 comparing abdominal sacrocolpopexies with
11 transvaginal mesh placement, we find that the
12 largest and only randomized control that I'm aware
13 of showed similar erosion rates.
14       So if you're talking specifically about
15 erosions, we have a randomized controlled trial to
16 see if the erosions are same.  If you're talking
17 about major vessel injury or bowel injury you're
18 more likely to have a bowel injury or a vessel
19 injury on an abdominal sacrocolpopexy than you are
20 a transvaginal mesh kit.
21 BY MS. GAYLE:
22   Q.    And Doctor, on the erosions that you've
23 mentioned with the randomized controlled trial, that is
24 the highest level of evidence for physicians, would you

Page 35

1  agree to that?
2    A.    Randomized controlled trial or Cochrane
3  review and systematic reviews.
4    Q.    And, Doctor, what randomized controlled
5  trial are you referencing with regard to the erosion?
6    A.    Let's see if I can find it.
7        MS. GAYLE:  If we can go off the record,
8  please.
9        (Off record discussion.)
10       THE WITNESS:  It is a 2011 report
11 entitled Laparoscopic Sacrocolpopexy versus Total
12 Vaginal Mesh for Vaginal Vault Prolapse on
13 Randomized Trial.  That was published in the
14 American Journal of Obstetrics and Gynecology.
15 BY MS. GAYLE:
16   Q.    Who was the lead author on that?
17   A.    Maher.  M-A-H-E-R.
18   Q.    Doctor, in Exhibit 4 did you discuss the
19 facts you felt were the most important in drawing
20 your opinions in this report?
21   A.    I'm sorry.  See, I was concentrating on
22 which exhibit you were talking about.  My Prolift
23 report?
24   Q.    Yes, sir, that's right.

Page 36

1    A.    Say the question again.
2    Q.    So did you discuss the facts within that
3  report that you felt were the most important in drawing
4  your opinions?
5    A.    I discussed the facts that I thought were
6  important and for people that are involved in these
7  litigations to understand from both sides.
8    Q.    What I'm getting at, Doctor, is this
9  report contains all of your opinions that you're
10 prepared to offer in this litigation; is that correct?
11   A.    Well, as I said, in both reports I've
12 reserved the right to alter those.  At the current time
13 they're reflective of what my opinions are, but if
14 there is more evidence that is put forth before trial,
15 then I would go back and add an addendum to the report.
16   Q.    And certainly, Doctor, to date you have
17 not added an addendum, correct?
18   A.    I have not.
19   Q.    Doctor, in terms of your decision-making
20 when you were writing Exhibit 4, the POP report, why
21 did you choose to cite the articles you cited?
22   A.    Well, if you pay attention to the
23 articles that are cited in here I've actually gone to
24 the effort of trying to make it very easy to look

Page 37

1  through these and divide them in to sections.
2        So you'll find that the first section is
3  Cochrane reviews, Cochrane database reviews, systematic
4  reviews and then randomized controlled trial.  So the
5  studies that I chose to place in here were ones that
6  were that of the highest scientific validity.
7        I tried to stay away from small case
8  reports and small case series and chose to -- try to
9  stick to the most highly trusted scientific evidence
10 that we have.
11   (Exhibit 5 - Reliance list relating to Exhibit
12    4.)
13 BY MS. GAYLE:
14   Q.    Thank you, Doctor.  Doctor, I'm marking
15 now or handing you now what's been marked as Exhibit 5
16 and this is your reliance list to Exhibit 4 and it's
17 entitled Bryce Bowling, General Reliance List In
18 Addition to Materials Referenced in Report.
19       If you look at that.  And, Doctor,
20 is that the reliance list that was initially issued
21 with your report?
22   A.    Yes, this is the reliance list.
23       MR. LYLE:  Hello.
24       THE COURT REPORTER:  Hello.

C. Bryce Bowling, M.D.

Page 38

1    MR. LYLE:  This is James Lyle.
2    MS. GAYLE:  Hi, James.  This is Ann
3  Gayle.  Thanks for joining us.
4    MR. WALKER:  Can with you please restate
5  that?  This is Jordan Walker with Ethicon.  I
6  don't think the court reporter and myself could
7  understand what you had said.  It sounded broken.
8    MR. LYLE:  Okay.  Well, that's the reason
9  I said something just to make sure you can hear
10  me.  Is that better?
11    MR. WALKER:  That is better.  What's your
12  name again?  I'm sorry.
13    MR. LYLE:  It's James Lyle, L-y-l-e.
14    MR. WALKER:  What firm are you with, by
15  the way?
16    MR. LYLE:  I'm with my own firm.  I don't
17  plan on participating.  I just plan on listening
18  in.
19    MS. GAYLE:  Thank you, Mr. Lyle.
20    MR. LYLE:  Thank you.
21  BY MS. GAYLE:
22    Q.    Doctor, we're going to get back to what
23  we were just discussing which is your reliance list and
24  you have identified that as Exhibit 5.

Page 39

1    I assume that you have your own copy of
2  that reliance list, is that correct, Doctor?
3    A.    I do.
4  (Exhibit 6 - General Reliance List relating to
5  TVT, TVT-Exact and TVT-O report.)
6  BY MS. GAYLE:
7    Q.    Doctor, now I'm handing you what what's
8  been marked as Exhibit 6 and it's also entitled Bryce
9  Bowling General Reliance List In Addition to Materials
10  Referenced in Report, and this was the reliance list
11  that was given to us along with a copy of your
12  TVT/TVT-Exact and TVT-O report.
13    Do you recognize that as that exhibit,
14  Doctor?
15    A.    I won't take the time to compare every
16  page of this to the reliance list that is in my folder
17  but if you're telling me that this is the one that was
18  associated with the TVT report then I'll believe you.
19    Q.    Thank you, Doctor.  And, Doctor, I've
20  compared both Exhibit 5 and Exhibit 6 together and they
21  appear to be exact duplicates.  Is that your
22  understanding as well?
23    A.    I don't know.  I've not compared the two.
24    Q.    Doctor, did you prepare Exhibit 5 and 6

Page 40

1  or did Butler Snow prepare that for you?
2    A.    They prepared that based off the
3  information that I used in my report and additional
4  information that I asked for during the writing of
5  those reports.
6    Q.    So this material and these lists would be
7  the information that you specifically asked them for
8  and then they put it in this format for you?
9    A.    No, that's not what I said.  It's a
10  portion of what was in there is material that I asked
11  for.  A portion of what's in there is material that
12  they provided, and a portion of what is in there is
13  material that I searched for and found on my own.
14    Q.    Okay.  So it's a mix of things.  Again,
15  just to make sure I've got it right, things that you've
16  asked for, it's a mix of things that they have provided
17  you, and things that might be cited in your report?
18    A.    Correct.
19    Q.    In forming your opinions on the POP
20  products in Exhibit 4, did you rely on midurethral
21  slings and the TVT, TVT-O, TVT-Exact to form any of
22  your opinions regarding the safety and efficacy of the
23  Prolift?
24    A.    I don't think I relied on TVT data to

Page 41

1  look at safety and efficacy of a Prolift product.  I
2  think we may have looked at some of the differences in
3  mesh, but I don't think I used TVT data in the Prolift
4  report.
5    I think probably that reliance list is a
6  culmination of both Prolift and TVT materials that have
7  been used throughout writing both reports.
8    Q.    And, Doctor, I would ask the same
9  question with regard to the Prolift+ M.  So in forming
10  your opinions on the Prolift + M.
11    Did you use any -- did you rely on any
12  midurethral sling data for the TVT, TVT-O or TVT-Exact
13  to form any of your opinions regarding the safety and
14  efficacy of the Prolift+M?
15    A.    I don't believe I have, no.
16    Q.    And, Doctor, the same question for
17  Gynemesh.  Did you rely on any of the sling data to
18  form your opinions regarding the safety and efficacy of
19  the Gynemesh product?
20    A.    Not that I'm aware of.
21    Q.    Doctor, did you in rendering your
22  opinions on the pelvic organ prolapse products in
23  Exhibit 4, did you rely at all on internal company
24  documents?

C. Bryce Bowling, M.D.

Page 42

1    A.    I don't know if they actually -- if I
2  actually used those in writing specific paragraphs of
3  this report.  I have reviewed several company
4  documents.
5         I did review over the resource monographs
6  and instruction for use.  So some of that information
7  may be in there.
8    Q.    Doctor, if you had to estimate, how many
9  company documents would you think that you've reviewed?
10   A.    Oh, I don't know.  I think there's a
11 pretty healthy list on the reliance list, and I would
12 have either scanned or reviewed every one of those or
13 at least looked at the bulk of the material in the vast
14 majority of them.  I can't estimate a number for you
15 though.
16 (Exhibit 7 - Report regarding
17    TVT/TVT-Exact/TVT-O.)
18 BY MS. GAYLE:
19   Q.    And, Doctor, in rendering your opinions
20 on the TVT products, which you've got a copy of your
21 report there, and we're going to mark as Exhibit 7
22 which I'm handing you, Doctor, does that appear to be
23 your TVT, TVT-Exact and TVT-O report?
24   A.    It does.

Page 43

1    Q.    Okay.  And, Doctor, in rendering your
2  opinions found in Exhibit 7, did you also rely on
3  internal company documents?
4    A.    I may, like I said with the Prolift, I
5  may have looked over and utilized some.  I'm not sure
6  exactly that there's a sentence or paragraph that
7  relates directly to company documents, but I have
8  reviewed several of them.
9    Q.    And if you did rely on any internal
10 company documents, you would expect to find those
11 internal company documents on your reliance list; is
12 that correct, Doctor?
13   A.    That's correct.
14   Q.    Okay.  Put that aside for now, Doctor.
15        If you did review the -- as you say you
16 reviewed the Ethicon internal documents, are there any
17 specifically that stuck out in your head with regard to
18 Exhibit 4, your POP opinions?
19   A.    No.
20   Q.    Are there any internal company documents
21 that specifically stick out in your head with regard to
22 Exhibit 7, your TVT products?
23   A.    No.
24   Q.    And, Doctor, in Exhibit 7, does Exhibit 7

Page 44

1  contain each of the opinions that you've reached
2  regarding the TVT, TVT-Exact and TVT-O?
3    A.    Yes.
4    Q.    As we've asked in the -- with regard to
5  Exhibit 4, Doctor, is there any particular reason why
6  you choose to confine your opinions on the TVT,
7  TVT-Exact and TVT-O in a single report as opposed to
8  separating them out?
9    A.    Because of their similarities.
10   Q.    And can you elaborate on that, Doctor?
11   A.    Can I elaborate on the similarities?
12   Q.    The similarities between the three
13 products.
14   A.    Well, sure.  I mean they're all
15 midurethral slings.  They're all a large pore
16 polypropylene mesh product intended to treat stress
17 urinary incontinence.
18        A couple of them differ only in the route
19 of the distal ends of the sling and where those come
20 through the skin, but they all are the same in their
21 placement underneath the midurethra and their purpose.
22   Q.    Thank you, Doctor.  In terms of your
23 decision-making in writing the report found at
24 Exhibit 7, why did you choose to cite the articles

Page 45

1  cited in your report?
2    A.    Same reason we cited the articles in the
3  Prolift report.  If you look through there we tried our
4  best to utilize randomized controlled trials and to use
5  Cochrane reviews, give the highest level of scientific
6  data that we could.
7         We also tried to look for long term
8  studies demonstrating ten plus years of follow-up with
9  patients that have had midurethral slings.
10   Q.    Doctor, if you would look at Exhibit 7,
11 Page 5, Section 2, and I've highlighted there for your
12 ease of reference, Doctor, there is a sentence that
13 says plaintiffs' expert, I have reviewed the expert
14 statements of multiple plaintiffs' experts for both
15 case specific and general reports.
16        Do you see that, Doctor?
17   A.    Yes.
18   Q.    Doctor, what case specific reports did
19 you rely on in forming your opinions?
20   A.    Case specific reports.  They will be in
21 the reliance list.  I looked over expert opinions in
22 both general reports and case specific reports for
23 several of the cases that I was working on to see what
24 the plaintiffs' claims were regarding midurethral

Page 46

1  slings.
2      Q.    And, Doctor, if you could turn to your
3  reliance list for Exhibit 7, and indicate which cases
4  you are working on that are the case specific reports
5  that you relied on?
6          MR. WALKER:  Object to form.
7  BY MS. GAYLE:
8      Q.    Doctor, you said your case specific
9  reports that you relied on, that you did rely on them,
10 and that they should be in this list correct, Doctor?
11         MR. WALKER:  Object to form.
12         THE WITNESS:  Okay.  So when you say rely
13    on them, can you explain to me exactly what you
14    mean?
15 BY MS. GAYLE:
16     Q.    You said you have reviewed the expert
17 report statements of multiple plaintiffs' experts for
18 both case specific and general reports.
19    What I'm trying to get to, Doctor, is
20 which case specific reports you reviewed?
21     A.    Any that have been sent to me.  I've
22 reviewed everything that's been sent to me.
23     Q.    Do you recall what Waves, doctor?
24     A.    They would have all been Wave 8 or

Page 47

1  Election Wave cases.  Case specific reports that I am
2  involved in.
3      Q.    And with the Election Wave, what do you
4  mean by that, Doctor?
5      A.    Well, I mean maybe you can explain that.
6          MR. WALKER:  We can talk about that off
7     the record.
8          MS. GAYLE:  Counsel, I'm just trying to
9     get at which case specific reports.
10         MR. WALKER:  He has not been disclosed
11    yet as an expert in any Election Wave documents
12    because the deadline frankly is today.
13         So after today we had can discuss any
14    Election Wave cases in which he's been disclosed
15    as an expert, and he can certainly answer
16    questions about Wave 8.
17 BY MS. GAYLE:
18     Q.    Doctor, with regard to previous Waves,
19 there are --
20     A.    I don't think I've reviewed any case
21 specific reports from previous Waves.
22         MR. WALKER:  Other than Wave 8.
23         THE WITNESS:  Correct.
24 BY MR. GAYLE:

Page 48

1      Q.    So, Doctor, on your list you have several
2  reports for your reliance list that are Wave 4.
3      A.    Are those general?
4      Q.    Some of them are, Doctor, and some of
5  them are issued in specific cases such as the -- you
6  have the Carlino case, the Huskey case, Lewis, Mullins,
7  Ramirez, but you did review those in previous Waves,
8  right?
9      A.    If they were general --
10         MR. WALKER:  Object to form.
11         THE WITNESS: -- reports in previous waves
12    I may have looked at those.  I don't think that
13    I've looked at specific case reports from Waves
14    that I have not been involved in.  I may have.  I
15    don't know.
16 BY MR. GAYLE:
17     Q.    And, Doctor, as he said your deadline was
18 today for designating you in any Wave 8 cases.
19         MR. WALKER:  Not Wave 8.  Election Wave.
20 BY MR. GAYLE:
21     Q.    Election Wave, Election Wave cases, and
22 so if you've looked at case specific reports that
23 plaintiff issued in that Wave, that would not be
24 included on your list?

Page 49

1      A.    I don't know.
2      Q.    It's not on your list?
3      A.    You're asking questions --
4      Q.    And so counsel?
5      A.    -- after I've gone over thousands and
6  thousands and thousands of documents, and I don't have
7  it.  That's what the reliance list is for.
8          I don't have it in my head exactly what
9  pages I've read on what reports that I have read.  So
10 I trust the counsel to help prepare the reliance list
11 of anything that has been emailed to me, sent to me,
12 requested or researched by me to add to that list, but
13 I cannot go on there and tell you which case specific
14 report from which Wave that I reviewed for these
15 reports.
16     Q.    I appreciate that, Doctor, but you
17 realize my role today is to try to get to the basis of
18 your opinions, and so I don't see any case specific
19 reports for Wave 8 or Election Wave on your list or
20 your supplemental reliance list.
21     A.    Okay.
22     Q.    And so if you reviewed those in
23 connection with your opinions, we are entitled to find
24 out that information to determine the scope or the

C. Bryce Bowling, M.D.

Page 50

1  basket of information that you reviewed.
2      A.    Well, a lot of them are the same.  A lot
3  of them are the same.
4          If you look at some of those on there we
5  have general and case specific reports from a number of
6  different people who essentially copy and paste their
7  opinions from one case to another.
8          So that may be the reason why I'm having
9  a hard time telling you which Waves these are from and
10  what I've reviewed because they are so similar, many of
11  these general and case specific reports.
12     Q.    And who are you referring to when you
13  refer to many that have copied and paste?
14     A.    I don't have specific names.  They're on
15  the reliance list there.  You can see the ones that
16  have been reviewed.
17     Q.    And, Doctor, with regard to the general
18  reports, that would be on the reliance list or on the
19  supplemental reliance list, the ones that you've
20  reviewed?
21     A.    They should be on there, yes.
22     Q.    What in the general reports was important
23  in forming your opinions?
24         MR. WALKER:  Object to form.

Page 51

1  BY MS. GAYLE:
2      Q.    What stood out?
3      A.    Let's see.  Some of the things that stood
4  out were the lack of data, lack of long term randomized
5  controlled trial and Cochrane review data that were
6  left off of those reports showing the long term safety
7  and efficacy of the products.
8      Q.    Doctor, if you could turn to your
9  Exhibit 4, which is your POP report and page five on
10  that particular exhibit and this paragraph is similar
11  except for two lines with regard to your sling or your
12  Exhibit 7 report.
13         It does not have the sentence that quote,
14  I have reviewed the expert statements of multiple
15  plaintiff experts for both case specific and general
16  reports.
17         Was that an oversight, doctor?
18         MR. WALKER:  Object to form.
19         THE WITNESS:  I don't know.
20  BY MS. GAYLE:
21     Q.    Did you review any case specific reports
22  for Exhibit 4?
23     A.    I don't recall.
24     Q.    Did you review any general reports for

Page 52

1  Exhibit 4?
2      A.    I don't recall.  I'm sure that I have.
3      Q.    So --
4      A.    Again, these are -- these are thousands
5  upon thousands of documents that I have reviewed in
6  formulating my opinions.
7          If I reviewed a general report, then
8  okay.  I may not have put it in the materials reviewed.
9  It may be an oversight.  I can't tell you for sure.
10     Q.    Okay.  Doctor, again like I said, I'm
11  basis trying to get to the basis of your opinions.
12     A.    I understand.
13     Q.    And so I thought it was odd that one says
14  that you did review case specific and general and the
15  other report says that you didn't.
16     A.    I wouldn't read too much into that.
17     Q.    Okay.  So that might be just an error
18  that you did rely on case specific for your Prolift?
19         MR. WALKER:  Object to form.
20         THE WITNESS:  Again, I don't remember.
21  BY MS. GAYLE:
22     Q.    Okay.  And again, you may have relied on
23  general reports for your Prolift, but you don't know?
24         MR. WALKER:  Object to form.

Page 53

1      A.    Possibly so.
2  BY MS. GAYLE:
3      Q.    Do you know whether you relied on general
4  reports for your Prolift?
5          MR. WALKER:  Object to form.
6          THE WITNESS:  You're asking the same
7      questions over and over again.  I'll give you the
8      same response.  I don't know.
9          I have reviewed so many records that I
10     cannot give you an accurate statement of what I
11     reviewed for each of the reports.
12  BY MS. GAYLE:
13     Q.    So you don't know, again, I'm sorry,
14  we're saying relied and reviewed.  So let me just ask
15  one more time to cure his objection, okay, Doctor?
16     A.    Okay.
17     Q.    Like I said, sometimes us attorneys might
18  be going back and forth.  Your counsel has objected, so
19  I'm going to reform my question.
20     A.    Wear yourself out.
21     Q.    Okay, Doctor.  So you don't know if you
22  reviewed general reports for your Prolift report,
23  Exhibit 4?
24     A.    Correct, I do not recall.

C. Bryce Bowling, M.D.

Page 54

1    Q.    Okay.  And you do not recall whether or
2  not you reviewed the case specific reports for your
3  Prolift POP opinions in Exhibit 4?
4    A.    Correct.
5    Q.    Okay.  Thank you, Doctor.  Sometimes we
6  may do that and again no offense as we talked about at
7  the beginning of the deposition, Doctor.
8    A.    None taken.
9    Q.    Doctor, also in that paragraph on page
10 five if you would look at Exhibit 7, and like I told
11 you we're going to be comparing certain sections side
12 by side to sort of eliminate some of the time and
13 duplicity that we have today, Doctor.
14         Exhibit 7, the second line down, first
15 paragraph in section two starts with -- see the words
16 ACOG that I have highlighted for your reference,
17 Doctor?
18    A.    Yes.
19    Q.    ACOG Committee Opinions, Position
20 Statements from the major gynecological surgical
21 societies.
22         That phrase, Doctor, is in Exhibit 7 but
23 again that phrase does not appear in Exhibit 4, and so
24 since this section talks about the materials that you

Page 55

1  have reviewed, I just want to be clear, you reviewed
2  those ACOG materials, committee opinions and position
3  statements in connection with your opinions in the
4  sling report in Exhibit 7, correct?
5    A.    Correct.
6    Q.    Did you also review those materials in
7  connection with your POP opinions in Exhibit 4?
8    A.    I have.
9    Q.    And you would have relied on both of that
10 material for both of the reports, correct?
11         MR. WALKER:  Object to form.
12         THE WITNESS:  Correct.
13 BY MS. GAYLE:
14    Q.    You would rely on those materials for
15 forming your opinions in Exhibit 7, correct?
16    A.    Yes.
17    Q.    And you would rely on those materials for
18 forming your opinions in Exhibit 4, correct?
19    A.    Yes.  Well, let me go back and clarify
20 because I think we're -- I think you're sticking on
21 some terminology here that I think is important to
22 tease out.
23         When you say rely upon, what I would like
24 to clarify is that a lot of the ACOG committee

Page 56

1  opinions, position statements from these different
2  surgical societies, this is information that as a
3  urogynecologist is common knowledge for me.  These are
4  things that have been reviewed multiple times per year.
5         So pulling out an ACOG committee opinion
6  and reading it at the time of the report may not be
7  exactly how my information from those societies got
8  into the report.
9         This is material that I have read several
10 times, that I have a working knowledge of, that may
11 have been incorporated into my report where I didn't
12 actually have the surgical society or the committee
13 opinion open and looking at the time.
14    Q.    And, Doctor, again these are the
15 materials contained in this paragraph for both reports.
16 Basically what I'm getting at is they form the basis of
17 your opinions in each of those reports?
18         MR. WALKER:  Object to form.
19         THE WITNESS:  It is a combination of the
20    materials that I reviewed as well as my
21    background, training and experience in dealing
22    with pelvic floor disorders throughout many years.
23         So I would not say that it is all based
24    on committee opinions, statements or documents.  A

Page 57

1    large portion of what I base my opinions on are
2    training and previous education.
3  BY MS. GAYLE:
4    Q.    Thank you, Doctor.  And again we're just
5  trying to get to the materials that you relied on for
6  each specific report.  As you said in your reliance
7  list combined all the materials, and so we're trying to
8  get to what differences there might be as far as that
9  collection of materials.
10         And I believe you may have anticipated my
11 next question, Doctor, which is if you would look at
12 Exhibit 4, you see that I've highlighted for your
13 convenience the phrase other company documents.
14         That phrase appears in your materials
15 reviewed for Exhibit 4 whereas that phrase does not
16 appear in your terms reviewed for Exhibit 7; is that
17 correct?
18    A.    Correct.
19    Q.    And, Doctor, would that be an oversight
20 there?
21         MR. WALKER:  Object to form.
22         THE WITNESS:  I think you're asking
23    questions as if the differences between these two
24    paragraphs is intentional.  That's why I said

C. Bryce Bowling, M.D.

Page 58

1  earlier I think you're reading too much into this.
2       Because one says company documents and
3  the other does not, does not mean that I didn't
4  have a working knowledge of company documents.
5  I've seen company documents long before I agreed
6  to sign on to do these reports.
7       I have seem ACOG committee opinions,
8  position statements from different gynecological
9  surgical societies. I've read the literature long
10 before I agreed to do these reports.
11      So, again I think we're getting into a
12 lot of questions here that I think are reading too
13 much into what my thought process is. There's
14 nothing nefarious in section two of either of my
15 reports.
16 BY MS. GAYLE:
17     Q.   And, Doctor I don't mean for my question
18 to sound nefarious to you.
19     A.   I understand.
20     Q.   As I said before, my job is to get to the
21 basis of your opinions.
22     A.   I understand.
23     Q.   And so my question is simply, did you
24 review company documents for your opinions contained in

Page 59

1  Exhibit 7?
2       MR. WALKER: Object to form.
3       THE WITNESS: I have reviewed company
4       documents to formulate opinions for both of my
5       reports.
6  BY MS. GAYLE:
7       Q.   Thank you, Doctor. So the fact that the
8  phrase company documents in one report and omitted in
9  the other is simply inconsequential to you?
10      MR. WALKER: Object to form.
11      THE WITNESS: Let's see. You know, I
12      don't know if I specifically went back and looked
13      at a company document while I was writing the TVT
14      report.
15 BY MS. GAYLE:
16      Q.   Okay. Thank you, Doctor.
17      A.   Okay. What I will say again, before I
18 did either of these reports, a basic working knowledge
19 of company documents is something that was already in
20 my head along with research, along with committee
21 opinions.
22      So again, that was all information that
23 had been reviewed by me at some point in time, whether
24 it was during my residency or fellowship or during my

Page 60

1  course of serving as a treating physician in other
2  cases. Those things have been reviewed in the past. I
3  can't say for certain if I had any of those open on a
4  separate screen as I was writing a report.
5       Q.   Thank you, Doctor. Now, let's just break
6  that down a little bit.
7       The ones that were in your head, you said
8  that may have been from work that you did previously as
9  a treating physician, correct?
10      A.   All right.
11      Q.   We're talking about internal company
12 documents. Would those documents have been familiar to
13 you through any of the expert work that you previously
14 did for Butler Snow?
15      MR. WALKER: Object to form.
16      THE WITNESS: I don't recall. I don't
17      recall when I looked at company documents. Maybe
18      if you define company documents for me and tell me
19      what you're talking about that may help.
20      Do you consider a surgeon's resource
21      monograph as a company document?
22 BY MS. GAYLE:
23      Q.   Doctor, I'm letting you use the company
24 documents as you would refer to them because it's your

Page 61

1  phrase in this --
2       A.   I've seen multiple company documents
3  ranging from surgeon's resource monographs to internal
4  company documents.
5       Q.   Okay. And, Doctor, if we would -- if you
6  would turn back to the first page of both of your
7  reports.
8       As I indicated earlier, there's just a
9  little bit of duplicity there and we can agree that
10 section one of your credentials and qualifications in
11 both Exhibit 4 and Exhibit 7 is the same. Would you
12 say that, Doctor?
13      A.   They should be the same, yes.
14      Q.   With the exception of on page four of
15 those -- your report, Doctor, towards the end you
16 would see that I have highlighted the words Prolift,
17 Prolift+M and Gynemesh in Exhibit 4 whereas you have
18 the other products TVT, TVT-Exact and TVT-O in
19 Exhibit 7, correct, Doctor?
20      A.   Correct.
21      Q.   And, Doctor, turning to exhibit or,
22 excuse me, section number three in your report, your
23 fees. Those two sections would be identical; is that
24 correct?

C. Bryce Bowling, M.D.

Page 62

1    A.    They should be.

2    Q.    And, Doctor, we've already discussed your

3  fee rate which is exactly what is stated here.  That's

4  not changed, correct?

5    A.    Correct.

6    Q.    Turning to page six, Doctor, of your

7  report, Exhibit 7, and then turn to page six of

8  Exhibit 4, Doctor.

9          With respect to the section number four,

10 your expert opinion on your TVT report, the section

11 appears the same up to letter A except for the phrase

12 in Exhibit 7 as it pertains to stress urinary

13 incontinence.

14         Do you see those words on page six?

15   A.    I do.

16   Q.    And that differs to your Exhibit 4 which

17 says as it pertains to prolapse treatment; is that

18 right?

19   A.    That's right.

20   Q.    Doctor, if you would turn to page 10 and

21 11 of your Exhibit Number 7, and then place Exhibit 4

22 in front of you and turn to pages nine and ten.

23   A.    Uh-huh.

24   Q.    Again, Doctor, for your convenience I

Page 63

1  have highlighted the language that begins with the

2  words a study by Sarma.  Do you see that, Doctor?

3          MR. WALKER:  What page are you on?

4          MS. GAYLE:  On page ten of Exhibit 7.

5          THE WITNESS:  Yes.

6  BY MS. GAYLE:

7    Q.    And going down all the way through the

8  next page, Doctor, through the end of this section just

9  above Section C, the last paragraph is while pessaries.

10 Do you see that, Doctor?

11   A.    Pessary, yes.

12   Q.    And you see that I've highlighted and

13 circled in red the words incontinence and prolapse?

14   A.    Correct.

15   Q.    And if you would look at your Exhibit

16 Number 4 page number nine, again it's Exhibit 4, page

17 nine.  You would see that the words a study by Sarma is

18 also found there?

19   A.    Correct.

20   Q.    And it goes all the way through again to

21 the last paragraph of that section B?

22   A.    Yes.

23   Q.    Starting with while pessaries, and I've

24 circled the words prolapse there in that last

Page 64

1  paragraph.  That would be the only difference, can we

2  agree to that, Doctor?

3    A.    Correct.

4    Q.    And, Doctor, you just spoke a moment ago

5  sort of about your drafting process and you said, you

6  know, you may have had different screens open when you

7  sort of sat down pen to paper or, you know, fingers to

8  keyboard, if you will, drafting these.

9          Did you sort of cut and paste like your

10 bio section from one report to another?  Did you use

11 that as template?  Can you sort of explain to me what

12 your process was for drafting your reports?

13   A.    If there was something that was similar

14 that was not specific to TVT or Prolift such as my

15 rates and qualifications, then that may have been

16 copied and pasted based on to a secondary report.

17 Otherwise expert opinion sections mostly would have

18 been dictated rather than typed through a program on my

19 computer at home, and gone back in and reviewed and

20 revised as needed.

21   Q.    And, Doctor, what program would that have

22 been that you used at home?

23   A.    Oh, it's just a voice to text program

24 that's part of Microsoft Word.

Page 65

1    Q.    And, Doctor, they have changed the rules

2  in Rule 26 recently, which I'm just letting counsel

3  know that we can't get to your drafts but we can ask

4  you, Doctor, when you were drafting those, did you from

5  time to time send those to Butler Snow, ask them to

6  look over it and maybe make any suggestions, and I

7  don't want to get into the substance of any suggestions

8  they would have made, but just did you send it to them

9  for, you know, in the drafting process?

10   A.    They would have gotten a draft after I

11 finished a complete report to review prior to

12 signature.

13   Q.    And that would have been for both reports

14 at Exhibit 4 and Exhibit 7, correct?

15   A.    That's correct.

16         MS. GAYLE:  How long have we been going?

17         THE COURT REPORTER:  One hour and nine

18 minutes.

19         MS. GAYLE:  Okay.  Let's take a quick

20 break.

21         (Recess taken.)

22 BY MS. GAYLE:

23   Q.    So, Doctor, turning towards your reliance

24 list which were, as we discussed previously, your

C. Bryce Bowling, M.D.

Page 66

1  Exhibit 5 and your Exhibit 6, as you said that those
2  were a mix of materials that had been given to you as
3  well as things that you've cited, things that you
4  researched, correct?
5      A.    Correct.
6      Q.    And, Doctor, in your binders, are those
7  the materials that you simply cited in your report or
8  are those a mix of materials as well?
9      A.    They will be a mix of materials, I think.
10     Q.    Okay.  Meaning partly from the defense,
11 partly that you asked them to put together?
12     A.    You know, I can take the time to go
13 through these and compare and make sure.
14         MR. WALKER:  I can clear this up.
15         THE WITNESS:  Maybe he can help.
16         MR. WALKER:  We put this together for him
17     to assist in the deposition today.  So he had his
18     materials handy to reference as you ask questions,
19     and everything behind his report in these binders
20     should only be medical literature or other
21     documents that he specifically cites in the body
22     of his report.
23         MS. GAYLE:  Okay.  Thank you.
24 BY MS. GAYLE:

Page 67

1      Q.    In putting together your materials that
2  you reviewed, Doctor, did you do an independent
3  systematic review and decide on which of the articles
4  you wanted to list in rendering your opinions?
5      A.    Yes, I did.
6      Q.    And can you explain that systematic
7  review process, Doctor?
8      A.    Well, I'm looking through Pub Med.  I'm
9  looking at trying to filter through and pick out
10 Cochrane database reviews and looking at trying to find
11 long term randomized controlled trials.
12     Q.    Do you know the last time you performed
13 that independent systematic review?
14     A.    It would have been within the last few
15 months as I was writing the reports.
16     Q.    So in other words, Doctor, if something
17 was perhaps published in February of 2017 that you
18 found that was important, you would have picked that up
19 in your review; is that correct?
20         MR. WALKER:  Object to form.
21         THE WITNESS:  Well, I don't know that I
22     have everything that's been published in the last
23     20 years on midurethral slings.
24 BY MS. GAYLE:

Page 68

1      Q.    And I'm not inferring that you do,
2  Doctor.  You said you that had performed a systematic
3  review in the last couple of months.
4         And my question was, in performing that
5  systematic review if you would have found something
6  relevant to your opinions that you thought was relevant
7  in the last say year or so, you would have likely
8  picked that up, correct?
9      A.    Unless we thought that was redundant from
10 another study.
11     Q.    And can you think of anything right now
12 that you think would have been redundant that you
13 excluded?
14     A.    There's a lot of redundancy.  There's a
15 lost of randomized controlled trials out there and a
16 lot of newer trials that have come out just in the last
17 six months that show redundancy, that show long term
18 safety and efficacy of the products.
19     Q.    Do you know off the top of your head
20 which trials you're referencing?
21     A.    Are we talking specifically about the
22 slings right now or are we talking about Prolifts?
23     Q.    I'm just trying to get to -- you just
24 said there's a lot of redundancy.

Page 69

1      A.    Yes.  So, well, for instance, in the
2  slings there have been two publications this year
3  looking at 17 year data on midurethral slings.
4         So when I say redundancy, I don't
5  necessarily mean that the rates of efficacy or rates of
6  complications are identical.  What I mean to say is
7  that 17 year data from a couple of studies from this
8  year show very high long term efficacy rates just like
9  some of the 13 and 17 year studies that were referenced
10 from previous years.
11     Q.    Doctor, in receiving the medical articles
12 that defense counsel provided you, your reliance list
13 also lists expert reports that we've spoken about
14 earlier and I forgot to ask you, did you receive those
15 expert reports from Butler Snow?
16     A.    Yes.
17     Q.    Did you include anything that you might
18 have had, you know, lying around in your own personal
19 collection as far as expert reports?
20     A.    No.
21     Q.    Did you -- strike that.  Doctor, in your
22 reliance list materials you list one report by a
23 defense expert, doctor, and I might pronounce his name
24 incorrectly, Toglia, T-O-G-L-I-A?

C. Bryce Bowling, M.D.

Page 70

1    A.    Marc Toglia.
2    Q.    Okay.  Do you know him, Doctor?
3    A.    Yes.
4    Q.    Personally?
5    A.    Yes.
6    Q.    How long have you known him?
7    A.    Since -- I guess since I became a member
8  of the Society of Gynecologic Surgeons.
9    Q.    What was that date, Doctor?
10    A.    Give me one second.
11    A.    Approximately is fine.
12    A.    No, I want to give you --
13    Q.    Will it be on your CV?
14    A.    It will be on my CV.
15    Q.    Okay.  Thank you, Doctor.  And other than
16  Toglia's report --
17    A.    That would have been 2012.
18    Q.    Okay.  Thank you, Doctor.  Other than Dr.
19  Toglia's report, do you recall any other reports that
20  would have been defense experts that you would have
21  reviewed?
22    A.    No.  No, I don't recall reviewing any
23  other defense expert report.
24    Q.    So, Doctor, we've talked about the total

Page 71

1  basket of all the materials that you've reviewed into
2  putting -- into forming your opinions in both reports,
3  would that be fair?
4    A.    I mean we have not specifically discussed
5  each one of the trials but, yes, in terms of what I
6  utilized to form my opinions it was a combination of my
7  background, training, experience as a gynecologic
8  surgeon, company documents, multiple randomized
9  controlled clinical trials, Cochrane databases,
10  studies, committee opinions, professional organization
11  opinions.  Its all been used.
12    Q.    Thank you, Doctor.  And one last question
13  on that subject.  I did ask you if defendants or Butler
14  Snow had given you any sort of expert reports.
15          Did any of your, say, doctors or friends
16  that you know in the medical community, did they send
17  you any sort of expert reports through your drafting
18  process?
19    A.    No.
20    Q.    So in other words, Dr. Toglia, for
21  instance would not have emailed you and said hey,
22  here's, you know, my expert report that I issued in a
23  certain Wave, look at that, right?
24    A.    No.

Page 72

1    Q.    Okay.  Do you know Dr. Richard Ellkerman
2  E-l-l-l-e-r-m-a-n?
3    A.    I've heard the name.  I don't know who he
4  is.  I don't know him personally.
5    Q.    You cited an Ellkerman study in your
6  report.
7    A.    Which report?
8    Q.    Good question, Doctor.  I'll withdraw the
9  question, Doctor, because I don't know which report but
10  you don't know Dr. Ellkerman personally, correct?
11    A.    No.
12    Q.    And because you don't know him personally
13  you would not know whether or not he's a defense expert
14  for the defendants in this multi-district litigation,
15  would you?
16    A.    I don't know anything about him other
17  than his research.
18          (Exhibit 10 - Richard Ellkerman's reliance list.)
19  BY MS. GAYLE:
20    Q.    Doctor, I represent to you that he is an
21  expert that's been named in Wave 8 and he's tendered an
22  expert report, and I'm handing you what's been marked
23  as Exhibit 10 which is entitled Richard Ellkerman,
24  General Reliance List in Addition to Materials

Page 73

1  referenced in Report.
2          Doctor, if you'd take your Exhibit 5 and
3  your Exhibit 6 and compare them to Dr. Ellkerman's
4  they're almost identical in formatting, font, exactly
5  the same, including typographical errors.
6          I believe counsel said earlier that they
7  prepared the reliance list for you.  So since you
8  didn't prepare it, would that be a possible explanation
9  on why your report, your reliance list materials would
10  be identical to Dr. Ellkerman's?
11          MR. WALKER:  Objection to form.
12          THE WITNESS:  Again, I don't know about
13      Ellkerman's reliance list.  I didn't put the
14      reliance list together.  I did my own reports and
15      so I can't really speak to his reliance list.
16  BY MS. GAYLE:
17    Q.    So any type -- but you didn't copy his
18  reliance list, is that what you're saying?
19    A.    No, I didn't copy his reliance list.
20          MR. WALKER:  Object to form.
21  BY MS. GAYLE:
22    Q.    So you didn't type this reliance at
23  Exhibit 5 or 6 either, did you?
24          MR. WALKER:  Object to form.  He's

C. Bryce Bowling, M.D.

Page 74

1 already testified.
2 THE WITNESS: No, I think we made that
3 clear earlier.
4 BY MS. GAYLE:
5 Q. Okay. Great. Butler Snow put that
6 together, right?
7 MR. WALKER: Object to form.
8 THE WITNESS: That's correct.
9 (Exhibit 11 - Dr. Ahmet Bedestani general
10 reliance list.)
11 BY MS. GAYLE:
12 Q. Doctor, same thing with Dr. Bedestani,
13 B-e-d-e-s-t-a-n-i, Ahmet first name, A-h-m-e-t, General
14 Reliance List in Addition to Materials Referenced in
15 Report, I have marked that as exhibit number 11.
16 Again, Doctor, do you know that
17 particular doctor?
18 A. No.
19 Q. And you would not know whether or not
20 that doctor was an expert designated in this
21 litigation?
22 A. No.
23 Q. And again, any similarities between Dr.
24 Bedestani's reliance list, Exhibit 11, and yours at

Page 75

1 Exhibit 5 and 6 would also be something that you would
2 not be familiar with?
3 MR. WALKER: Object to form.
4 THE WITNESS: You will have to speak with
5 Butler Snow about that. I don't get involved in
6 other people's reliance list.
7 BY MS. GAYLE:
8 Q. Okay. And certainly you didn't cut and
9 paste from this reliance list, correct?
10 MR. WALKER: Object to form. He's made
11 it crystal clear he did not put together the
12 reliance list.
13 MS. GAYLE: Thank you, counsel. I just
14 want to make sure that there's no -- you know, he
15 did say earlier that he put some, maybe some
16 materials.
17 So as long as you all put this together,
18 that's all I'm trying to get at.
19 MR. WALKER: That's what has been
20 represented numerous times now on the record.
21 MS. GAYLE: Thank you.
22 (Exhibit 21 - Supplemental reliance list.)
23 BY MS. GAYLE:
24 Q. Doctor, while we're talking about the

Page 76

1 reliance list Butler Snow this week had provided
2 another reliance list for you that was a supplemental
3 reliance list.
4 MS. GAYLE: My apologies, Madam Court
5 Reporter. I've marked it as Exhibit 21. So
6 towards the end.
7 (Exhibit 21 - Bryce Bowling Supplemental General
8 Materials List in Addition to Materials
9 Referenced in Report.)
10 BY MS. GAYLE:
11 Q. Doctor, I'm handing you that reliance
12 list and that's a supplemental. Do you know what the
13 changes were in that reliance list as compared to
14 Exhibit 5 and 6?
15 A. I do not.
16 Q. Did you ask Butler Snow to include any
17 material in your supplemental reliance list in forming
18 this?
19 A. You know, let me just go back and clarify
20 one more time. The reliance list has been put together
21 by Butler Snow. It is a culmination of materials that
22 they provided to me that I requested and that I
23 researched on my own and cited in my report.
24 I did not type the reliance list. I'm

Page 77

1 not aware of any supplements to the reliance list. The
2 only interaction that I've had with that reliance list
3 is seen it at the end of my report.
4 Q. Thank you, Doctor. Doctor, in your
5 reliance list you list the depositions of two company
6 witnesses and that would be for Exhibit 5, Exhibit 6
7 and Exhibit 21.
8 You list Piet Hinoul and Martin Weisberg.
9 Do you know Piet Hinoul?
10 A. I don't know him personally. I know who
11 is he.
12 Q. Okay. Can you tell me just for the
13 record, Doctor, who he is?
14 A. Well I don't know his exact title. I
15 think he's in the medical affairs, maybe medical
16 director at Ethicon. He's a urogynecologist.
17 Q. Okay. And you also listed the deposition
18 of Martin Weisberg.
19 A. Uh-huh.
20 Q. Do you know who Martin Weisberg is?
21 A. (Witness nods head.)
22 Q. Who is he, Doctor?
23 A. He also works at Ethicon. He's also a
24 medical doctor and works, I think, in the medical

C. Bryce Bowling, M.D.

Page 78

1  affairs portion of Ethicon.
2      Q.    Okay.  And you listed one depo for each
3  of those particular individuals?
4      A.    Uh-huh.
5      Q.    Was there anything specific in either
6  depo that stood out to you, Doctor?
7      A.    No.
8      Q.    Doctor, turning to your role in this
9  litigation, you do not have an engineering degree, do
10  you?
11      A.    I have a medical degree.
12      Q.    Okay.  You're not holding yourself out as
13  an expert in the field of engineering, are you, doctor?
14      A.    Well, define expert in engineering.
15      Q.    So, Doctor, just as you're an expert in
16  medical, you have a degree.  An engineer would be an
17  expert in engineering, would hold an engineering degree
18  and be offering opinions in the field of engineering.
19  I didn't see that on your CV.
20      A.    Again, I think if you want to be specific
21  about what the word expert means.  If you mean do I
22  have a degree in engineering, no, I do not.
23          Do I have knowledge as a surgeon and as a
24  medical doctor about design issues, about how mesh

Page 79

1  incorporates into human tissue and about
2  complications that can go along with certain types of
3  designs, then, yes, I would consider myself an expert.
4      Q.    So you would consider yourself an expert
5  on the design of transvaginal mesh products?
6      A.    I think, yes, as a surgeon who has
7  implanted thousands of pieces of mesh.  I also sat on
8  committees where we have looked at mesh design and mesh
9  innovation, looking at complications, looking at the
10  design and shape of meshes, composition of meshes.
11  I've spent several years doing that on committees.
12      Q.    Can you give me an example of those
13  committees that you would have sat on, Doctor?
14      A.    Sure.  I sat on a AMS, American Medical
15  Systems committee for three years.
16      Q.    Do you know when that was, Doctor?
17      A.    It's in my CV.
18      Q.    Okay.
19      A.    I'll find the dates for you.
20      Q.    What device was that that you were
21  designing?
22      A.    That would have been 2013, '14 and '15
23  and those were multiple devices that we were looking at
24  for possibilities in treating pelvic organ prolapse in

Page 80

1  women.
2      Q.    Do you remember what they were?
3      A.    Some of them actually didn't even have
4  names.  We were -- and some of them weren't finished
5  products.  A lot of this was ideas and design.
6      Q.    Were you paid for your work to sit on
7  that committee, Doctor?
8      A.    I was.
9      Q.    Was that the only work that you did for
10  AMS?
11      A.    Yes, just design.
12      Q.    And, Doctor, we talked about AMS and we
13  talked about some of your work with Butler Snow in
14  regard to this litigation.
15          Have you worked for any other defendant
16  in the transvaginal mesh litigation?
17      A.    No.
18      Q.    For instance, you've not worked for
19  Boston Scientific?
20      A.    No.
21      Q.    Coloplast?
22      A.    Well, okay.
23          MR. WALKER:  Can I clarify one thing?
24  Are you asking in a litigation capacity?

Page 81

1          MS. GAYLE:  In a litigation capacity,
2  yes.
3          THE WITNESS:  Okay.  So in a litigation
4  capacity, no, I have not worked for any of the --
5  well, you ask your questions.  Boston Scientific,
6  no, I've not worked for Boston Scientific.
7  BY MS. GAYLE:
8      Q.    In a non-litigation capacity, Doctor,
9  have you worked -- what other pharmaceutical medical
10  device companies have you worked for or with?
11      A.    I worked from 2011 to 2013 with a company
12  known as Warner Chilcott who at the time was in charge
13  of certain medications used for overactive bladder.
14          Outside of that and American Medical
15  Systems and the current litigation ongoing, I've not
16  worked for any medical device corporations.
17      Q.    Doctor, you've never designed a medical
18  device by yourself, would that be correct?
19      A.    I have not patented a medical device, but
20  yes, I have designed medical devices.
21      Q.    So you have no patents on any medical
22  device that you may have designed?
23      A.    Unfortunately, no.
24      Q.    And when you say that you did design a

Page 82

1  medical device, without getting into the specifics, as
2  you said you don't have a patent, would that be a
3  transvaginal mesh device?
4      A.    No.
5      Q.    Would it be a mesh or a device used for
6  any of the conditions that we're discussing?
7      A.    It is a device used in the assessment and
8  treatment of women with urinary incontinence.
9      Q.    Is there any reason that you haven't
10 sought a patent on that, Doctor?
11     A.    Time constraints.
12     Q.    Doctor, you don't have a degree in
13 biomechanics, do you?
14     A.    I do not have a degree in biomechanics.
15 I have a degree in biology.
16     Q.    And I'm sorry, I just sort of have to
17 tick through this list for clarification.
18     A.    Sure.
19     Q.    And, Doctor, you don't have a degree in
20 pathology, correct?
21     A.    I do not have a degree in pathology, but
22 I have reviewed thousands upon thousands of pathology
23 reports and I have explanted several hundred pieces of
24 mesh and seen the reactions and surrounding tissues,

Page 83

1  but I do not have a degree in pathology.
2      Q.    And, Doctor, do you know if you're
3  designated as pathologist in Wave 8?
4      A.    I am not, to the best of my knowledge.
5      Q.    And you're not designated as a
6  biomechanics expert either in Wave 8?
7      A.    I don't believe that I am.
8      Q.    Doctor, are you holding yourself out as
9  an expert in the Food and Drug Administration, medical
10 device labeling and requirements?
11     A.    Well, I think from the physician, from
12 the medical side of things, knowing how drugs and being
13 on the side of studying drugs and devices in the past,
14 knowing how those procedures are studied, how they're
15 cleared and how they work in the current medical-legal
16 environment, I'd say I'm very well versed in that.
17        I do not sit on an FDA board.  I don't
18 make rules for how the FDA clears medical devices, but
19 I have ample experience in how devices make their way
20 through the system.
21     Q.    And you've not been designated as an
22 expert in Food and Drug Administration in this Wave or
23 in the Election Wave, correct?
24     MR. WALKER:  Object to the form.

Page 84

1        THE WITNESS:  Not that I'm aware.
2  BY MS. GAYLE:
3      Q.    You don't hold a biomedical engineer
4  degree, do you?
5      A.    I do not have a degree in biomedical
6  engineering.  I have a medical degree and I have a
7  biology degree.
8      Q.    Sorry, Doctor.  Like I said, I just have
9  to tick through my list.
10     A.    That's fine.
11     Q.    You don't have a chemical engineering,
12 degree, correct?
13     A.    I do not have a degree in chemical
14 engineering.
15     Q.    You do not have polymer chemistry degree,
16 correct?
17     A.    I don't have a polymer chemistry degree,
18 but in terms of implanting and knowing how these
19 materials interact in the human body in terms of their
20 biologic component, in terms of the way that the
21 synthetic meshes interact with the human body, I would
22 consider myself an expert.
23     Q.    Doctor, have you ever done any bench
24 research on polypropylene mesh?

Page 85

1      A.    Bench.  Define bench research for me.
2  Have I taken a piece of mesh into the lab and stretched
3  it to see how long it takes to break?
4        Personally, I have not done that.  I do
5  have several publications in -- with mesh related
6  products though.
7      Q.    Are those relating to bench research?
8      A.    Define bench research.
9      Q.    As you understand it, Doctor.
10     A.    Well, I'm not --
11     Q.    You just said you've not taken it into
12 the lab so --
13     A.    Yeah, I've not taken -- again, I'll
14 clarify.  I have not taken a piece of mesh into the lab
15 and stretched it to find out when it breaks.  If that's
16 the definition of bench research then, no, I have not
17 done that.
18     Q.    And similarly, Doctor, have you done any
19 lab research on polypropylene?
20     A.    What kind of lab research?
21     Q.    Well, anything regarding work in the
22 laboratory on polypropylene in a laboratory setting?
23     A.    You know, we have done several cadaver
24 dissection labs where we've utilized mesh.  I've taught

C. Bryce Bowling, M.D.

Page 86

1  not only medical students and residents but other
2  faculty members both at the University of Alabama
3  Birmingham and here at the University of Tennessee
4  Medical Center, cadaver labs where mesh and its
5  interaction with the tissue was heavily discussed.
6      Q.    Any other types of labs, Doctor?
7      A.    Outside of the cadaver labs we have done
8  cystoscopic evaluations in laboratory settings of
9  complications from mesh as well as suture
10  complications.
11          Outside of those, probably the only
12  laboratory settings that we've done related to mesh.
13      Q.    Thank you, Doctor.  Have you done any
14  type of pathological analysis on the explant of
15  polypropylene?
16      A.    Define for me analysis.
17      Q.    Where you look at it under the microscope
18  and publish your opinions?
19      A.    Look at it under the microscope?  Yes,
20  absolutely.  Publish opinions, I have not published an
21  opinion based on the microscopic analysis of mesh but I
22  have reviewed pathology reports.  I have sat with
23  pathologists and looked at explant materials.
24      Q.    Do you do that with every explant that

Page 87

1  you explant?
2      A.    No.
3      Q.    Doctor, you don't have a biomaterials
4  degree either, correct?
5      A.    Again, I don't have a degree in
6  biomaterials, but I do consider myself an bit of an
7  expert when it comes to the way that materials interact
8  with human tissues.
9      Q.    And the reason you consider yourself an
10  expert again, Doctor, is based on your work?
11      A.    Based on 15 years of performing pelvic
12  organ prolapse procedures with and without mesh,
13  dealing with the complications that go along with not
14  only mesh implants but also permanent suture implants,
15  and seeing how those implants both mesh and non-mesh
16  interact with the human body.
17      Q.    Doctor, you haven't published anything on
18  polypropylene mesh and degradation in the human body,
19  have you?
20      A.    I have not published anything regarding
21  degradation.
22      Q.    And you have not published anything
23  regarding polypropylene and a foreign body reaction,
24  have you?

Page 88

1      A.    No.  My publications in mesh are listed
2  here on my CV, including removals of mesh and repair of
3  complications related to implants.
4      Q.    Doctor, I think we talked about this a
5  little bit earlier.  On your invoices with Exhibit 3,
6  the earliest invoice that you had was in March.
7          Was that the first time that you were
8  contacted about being a general expert in this
9  particular Wave, that you recall?
10      A.    I think when I was first contacted I
11  wasn't contacted to be a general expert.  I think
12  initially I was contacted to be a case specific expert.
13      Q.    Would the March 2018 date be consistent
14  with when you first started your work as a general
15  expert?
16      A.    If you'll give me one second.
17      Q.    Certainly.
18      A.    I will give you a date.  It looks like I
19  was initially contacted around mid-February.
20      Q.    Okay.  Thank you, Doctor.  And we've
21  talked about the invoices and so forth that you had.
22          Off the top of your head, Doctor, can you
23  break down how much time you spent preparing each of
24  the two separate reports?

Page 89

1      A.    Probably 30 to 40 hours on each report.
2      Q.    Would that include your drafting process?
3      A.    Correct.
4  (Exhibit 8 - Curriculum Vitae.)
5  (Exhibit 9 - Curriculum Vitae.)
6  BY MS. GAYLE:
7      Q.    Doctor, I'm handing what's been marked as
8  your Exhibit 8 and your Exhibit 9.  Those are your CVs
9  that were respectively supplied with your Exhibit 4,
10  your POP report and your Exhibit 7, your TVT report.
11          It appears that Exhibit 8 and 9 were
12  identical in all respects.  Is that the case to the
13  best of your knowledge, doctor?
14      A.    I can take the time to look through them
15  and see if they're identical.  If you are representing
16  they are identical, I won't disagree with that.
17      Q.    We can take a moment for you to look,
18  Doctor.
19          MS. GAYLE:  Go off the record.
20          (Off record discussion.)
21          THE WITNESS:  They appear to be the same.
22  (Exhibit 12 - Resume in 2012.)
23  BY MS. GAYLE:
24      Q.    Thank you, Doctor.  And I'm going to hand

C. Bryce Bowling, M.D.

Page 90

1  you what has also been marked as Exhibit 12.  Thank
2  you, Doctor.
3          And this appears to be an earlier
4  iteration of your resume online, which I presume would
5  have been superceded by your resume that you provided
6  this month.  I believe this one was online in 2012.
7      A.    Okay.
8      Q.    And we might look at those in just a
9  little while, Doctor.  I have just a few questions with
10 regard to those.
11         And then, of course, as you had prepared
12 earlier and given to us a resume that we are going to
13 mark as Exhibit 12-A, and that would be the one that
14 you brought with you today.
15     (Exhibit 12-A - Resume supplied on September
16     28/2018.)
17 BY MS. GAYLE:
18     Q.    Doctor, in your previous testimony you
19 have testified that you haven't authored anything
20 looking at long term treatments for pelvic organ
21 prolapse kits.  I didn't see anything on your current
22 resume.  Is that still the case?
23     A.    I've not authored anything.  I have been
24 involved in many of the trials looking at the long term

Page 91

1  safety and efficacy of prolapse kits.
2      Q.    Were you a co-author on any of those?
3      A.    My name is not listed.  I was the
4  implanting surgeon in many of those.  Those would have
5  been during my fellowship years.
6      Q.    Does any particular one stick out in your
7  mind, Doctor?
8      A.    No.  Anything that would have been
9  published out of the University of Alabama Birmingham,
10 the Pelvic Floor Disorders Network or the Urinary
11 Incontinence Treatment Network between the dates of
12 2007 to 2010 I would have been involved in.
13     Q.    And, Doctor, I'm going to be asking you a
14 series of questions with regard to the six products
15 that you opinioned on.  After I ask the first question
16 you may anticipate for the following products if you
17 wish.
18         Do any of the publications listed in your
19 current CV specifically address the Prolift product?
20     A.    Let's see.  I think there are three.  I
21 have three mesh.  Let's see if we have any others here.
22         I think we have three publications dating
23 from 2015 through 2017.  Those do not have a name
24 assigned to them in terms of what product, but they all

Page 92

1  -- two of the three appear to be sling related.
2          One is just a removal of mesh, but it
3  does not say what the product was, so I don't know if
4  that was a prolapse mesh or if that was a sling mesh.
5      Q.    Okay.  Thank you, Doctor.  Of the two of
6  the three that are slings, do you know what slings
7  those were?
8      A.    I do not.  We did not list corporation
9  information in the studies.
10     Q.    Was there a particular reason why you
11 didn't list the corporation information?
12     A.    Because the corporations don't really
13 matter.  The use of polypropylene mesh and the
14 complications that go along with them can stretch from
15 every product manufacturer out there.  So the
16 corporation was not important in the study.
17     Q.    And, Doctor, I couldn't find anything
18 that you've written on the Burch procedure.  Have you
19 written on the Burch procedure?
20     A.    I have lectured on the Burch procedure.
21 I have not written.  I'm not an author on any Burch
22 papers.
23     Q.    And, Doctor, just to make things a little
24 bit quicker that's all I'm trying to get at is whether

Page 93

1  you've authored a peer-reviewed publication on these
2  topics, okay?
3      A.    All right.
4      Q.    And have you written anything on
5  biological tissue slings in a peer-reviewed journal?
6      A.    I have not authored anything in a
7  peer-reviewed journal on biologic slings.
8      Q.    Doctor, earlier when we were talking
9  about Prolift products, you had referenced some other
10 techniques that were previously used.
11         Would you agree that the Prolift was an
12 alternative surgical procedure for the treatment of
13 prolapse as compared to other techniques that are
14 available to physicians?
15     A.    The Prolift was an alternative surgical
16 procedure to address pelvic organ prolapse in women.
17     Q.    With regard to your current practice,
18 your residency training was an obstetrics -- I think
19 I'm going to need some water -- in gynecology, correct,
20 OB/GYN?
21     A.    Unfortunately, yes.
22     Q.    You also completed a urogynecology
23 fellowship program.  As you said earlier, it was three
24 years, correct?

C. Bryce Bowling, M.D.

Page 94

1    A.    Correct.
2    Q.    After your fellowship you limited your
3  practice to female pelvic medicine and reconstructive
4  surgery, correct?
5    A.    That's correct.
6    Q.    As we talked about before, you're board
7  certified in OB/GYN as well as female pelvic medicine
8  and reconstructive surgery, correct?
9    A.    Yes.
10    Q.    Would you agree that urogynecology is the
11  same thing as pelvic medicine and reconstructive
12  surgery?
13    A.    Yes.
14    Q.    As of April 2016 you testified you did
15  not handle general obstetrics and gynecology in your
16  practice, correct?
17    A.    That's correct.
18    Q.    Is that still the same, Doctor?
19    A.    Absolutely.
20    Q.    You don't handle any OB/GYN cases?
21    A.    Thankfully, no.
22    Q.    Not delivering babies today?
23    A.    No.
24    Q.    Let's see.  We talked about when you

Page 95

1  first used your mesh, and in your fellowship training
2  program you used mesh as part of the way that you
3  surgically addressed pelvic organ prolapse or stress
4  incontinence, correct?
5    A.    In some patients, yes.
6        MR. WALKER:  And just to clarify, I
7    recall you asking him when you first used Prolift.
8    I don't recall the same question about the slings.
9        MS. GAYLE:  Thank you.
10  BY MS. GAYLE:
11    Q.    Doctor, for clarification, when did you
12  first use slings?
13    A.    It would have been during my residency
14  training between 2003 and 2007.
15        MR. WALKER:  We're talking about
16    synthetic slings?
17        THE WITNESS:  Yes.
18        MS. GAYLE:  Yes.
19  BY MS. GAYLE:
20    Q.    And where were you at that time, Doctor?
21    A.    I was at the University of Tennessee
22  Medical Center in Memphis.  I guess they called that
23  the Regional Medical Center.  I don't know.  I think
24  they've renamed it again.  I don't know what it is.

Page 96

1    Q.    Is that maybe the West Memphis
2  Crittenton?
3    A.    No, that was different.
4    Q.    That's a different hospital?
5    A.    This was different.  My training was at
6  the Regional --- what was known formerly as the
7  Regional Medical Center or The Med in Memphis.
8    Q.    Doctor, while we're talking about west
9  Memphis, I noticed on one of your resumes that you had
10  the facility there in West Memphis --
11    A.    Crittenton.
12    Q.    Crit tendon.  It was on your 2012 resume
13  but it wasn't -- I didn't see it on other resumes.
14    A.    Really?
15    Q.    That I noticed.
16    A.    It's on this most recent one.
17    Q.    Okay.  It is on the most recent one?
18    A.    Yes.  2006 through 2007.
19    Q.    That's the facility that burned down.
20    A.    Did it?
21    Q.    Okay.  You didn't know that it burned
22  down?
23    A.    No.  Completely unaware.  Wow.  Burned
24  down.

Page 97

1    Q.    Okay.  So let see, Doctor.  As of
2  April 2016 you had testified that you used every pelvic
3  mesh product except the Mini-Slings.  Is that still the
4  case?
5    A.    Probably so.  I think we've used
6  throughout our -- my fellowship training and residency
7  we probably used every type of pelvic mesh that was
8  available on the market at that time.
9    Q.    Including the Mini-Slings?
10    A.    No, I've never touched a Mini-Sling.
11    Q.    And, Doctor, when you were just talking
12  about the use of the synthetic slings as early as 2003,
13  do you remember what product you initially used?
14    A.    I think throughout the residency training
15  program they were the standard retropubic TVT sling.
16    Q.    Do you remember when you started using
17  the TVT-Exact?
18    A.    It was after I came here.  So it would
19  have been somewhere in the range of 2010 to 2014-ish.
20    Q.    And the TVT-O, Doctor, do you know when
21  you started using that?
22    A.    The TVT-O was utilized primarily during
23  fellowship.
24    Q.    And, Doctor, you've testified elsewhere

C. Bryce Bowling, M.D.

Page 98

1 that you really did not use the TVT-O in your practice
2 as much particularly with regard to your other fellows.
3 Is that still the case today?
4     A.    I'm sorry.  We don't have fellows here.
5     Q.    I'm sorry.  With persons that you're
6 training throughout your teaching and training
7 activities here at the university you said that you
8 don't use the TVT-O?
9     A.    We do occasionally use TVT-Os here.  We
10 are majority retropubic, but we do use transobturator
11 slings from time to time.  They're not my sling of
12 choice in the majority of patients, however.
13    Q.    Thank you.  I think that was the phrase
14 that you had said and testified to previously.
15        TVT-O was not your sling of choice in
16 these training pursuits, primarily because you had
17 testified that there were complications that I believe
18 you said an aggressive or overstimulated, other person
19 that you were training could have punctured something
20 or caused -- overaggressive student perhaps?
21        MR. WALKER:  Object to form.
22        THE WITNESS:  Well, so what I would say,
23    and I don't recall exactly what was said during
24    the deposition from years ago is that we have used

Page 99

1    both retropubic and transobturator slings, and
2    that the retropubic midurethral slings aren't
3    really passing as close to some of the pelvic
4    vasculature as the transobturator slings do.
5        It doesn't change my opinion that the
6    transobturator sling is safe and effective.  I
7    think that's been demonstrated, but there are
8    anatomic landmarks that in the correct hands these
9    slings can be placed easily in the hands of a
10    pelvic surgeon, but when you're talking about a
11    first year resident that is fresh out of medical
12    school, that they be a little bit shaky and a
13    little bit jumpy in the operating room, you just
14    want to keep a little bit of a more close eye on
15    them.
16 BY MS. GAYLE:
17    Q.    So you would be a little bit observing
18 that particular student in your hypothetical a little
19 bit more closely if they were implanting a TVT-O versus
20 a retropubic, fair?
21        MR. WALKER:  Object to form.
22        THE WITNESS:  No, no.  I watch -- any
23    time I put a knife in the hand of an intern I
24    watch them like a hawk, and it doesn't -- I don't

Page 100

1    care if we're just suturing up an incision or if
2    we're putting a transobturator sling in.  We watch
3    them regardless of what they're doing.
4        What I was saying is that there is the
5    potential to injure vasculature from a
6    transobturator sling that may not be the same
7    vasculature that you would injure in a retropubic
8    sling.
9        There are retropubic sling placements
10    that can injure vasculature that you would not
11    injure on a transobturator sling.  So we watch
12    both of them very carefully.
13 BY MS. GAYLE:
14    Q.    Thank you for that clarification, Doctor.
15        You don't -- at this point, Doctor, do
16 you use a lot of transvaginal mesh or have you gotten
17 away from that?
18        MR. WALKER:  Object to form.
19        THE WITNESS:  Well, I wouldn't say I have
20    gotten away from it.  If I still had Prolift on
21    the shelves, I would be using them.
22        There have been numerous patients over
23    the course of the last few years that I thought
24    were outstanding Prolift candidates and

Page 101

1    unfortunately I did not have Prolift to use in
2    those patients, otherwise I would be still using
3    it today.
4        MR. WALKER:  And just again to clarify,
5    the question was -- was that both regard to slings
6    and pelvic organ prolapse products?
7        MS. GAYLE:  Yes.
8        THE WITNESS:  So in terms of slings, yes,
9    I still use slings to this day several times per
10    week.
11 BY MS. GAYLE:
12    Q.    Okay.  Can you estimate how many times
13 per week that you still use slings if you had to guess?
14    A.    Three to five times weekly.
15    Q.    Okay.  And, Doctor, you just said that
16 you really liked the Prolift product, paraphrasing your
17 words, but can you tell me what you liked about the
18 Prolift product specifically?
19    A.    Well, the Prolift products offered a way
20 to improve clinical outcomes, improve long term success
21 rates and decrease recurrence rates, decrease
22 symptomatic prolapse without increasing the risk of
23 postoperative complications, postoperative side effects
24 from vaginal surgeries.

C. Bryce Bowling, M.D.

## Page 102

1       We are always looking for a way to
2   increase long-term efficacy of any type of repair that
3   we do in the female pelvic floor and we want to do that
4   in such a way that minimize complications.
5       Q.   Have you used any other manufacturer's
6   kit to treat pelvic organ prolapse?
7       A.   Like I was saying earlier, during my
8   fellowship training we used several different types of
9   pelvic organ prolapse kits.  I still to this day use
10  Gynemesh for sacrocolpopexy procedures pretty much on a
11  weekly basis.
12      Q.   Do you remember whose kit you had used
13  previously?
14      A.   You know --
15      Q.   Other than Johnson & Johnson?
16      A.   -- during fellowship we used kits from
17  Bard.  We used kits from Boston Scientific.  We used
18  kits from AMS.
19      Q.   Thank you for that clarification, Doctor.
20           When you consented a patient for a mesh
21  kit such as the Prolift, did you talk to them about the
22  specific manufacturers or compare the kits with them
23  when you were consenting them?
24      A.   Compare which kits?

## Page 103

1       Q.   Any of the products?
2       A.   You mean did I sit down with a patient
3   and compare Johnson & Johnson kits to Bard's kits?
4       Q.   Yes.
5       A.   No.
6       Q.   And just to break that down, you know
7   what the consent process is, correct, Doctor, informed
8   consent?
9       A.   I do.
10      Q.   And so that when you're in the informed
11  consent with the patient talking about surgical
12  correction using a synthetic mesh product, would you
13  have compared one product as opposed to the other
14  product with the patient?
15      A.   Not with every patient.
16      Q.   And would you have compared specific
17  manufacturers of the product with the patient?
18      A.   Unless there was something specific that
19  came up in our discussions of -- and if we did have
20  those discussions it would have been with patients that
21  were moving more toward a mesh augmented repair, but I
22  don't recall having a formal discussion as part of our
23  routine informed consent process with patients where we
24  discussed the differences between the manufacturers.

## Page 104

1       Q.   I believe you mentioned earlier that
2   corporations really didn't matter whose sling or whose
3   polypropylene product it was?
4       A.   Well, I think that's a very broad
5   generalized term that I think we probably need to tease
6   out a bit.
7            I think that there are design differences
8   between several mesh manufacturers which is why later
9   in my fellowship and after my fellowship I deviated to
10  using one type and that was the Prolift procedure, and
11  I made that change based on what I considered to be
12  some design issues with the other manufacturers' meshes
13  that we did not have with Prolift.
14      Q.   Okay.  Is it fair to say that Prolift was
15  your device of choice for the more severe prolapse
16  patient like Grade III or IV?
17      A.   No.  We used native tissue repairs for
18  Stage II, III and IV.  We used sacrocolpopexies for
19  pelvic organ prolapse.  We used transvaginal mesh kits.
20           The decision to move between transvaginal
21  mesh abdominally placed sacrocolpopexy mesh and native
22  tissue was not based solely on the prolapse of the
23  patient, but many times was based on several factors
24  such as if the patient had ever had a prolapse repair

## Page 105

1   in the past, what was the age of the patient, what was
2   the smoking status of the patient, were they obese,
3   were they on chronic steroids, were they
4   immunocompromised, what is their activity level going
5   to be afterwards.
6            There are a number of different factors.
7   Each one of the patients that ended up getting a native
8   tissue, mesh repair or sacrocolpopexy, there was an
9   independent review of that patient's medical history
10  and a discussion with that patient going over the
11  risks, the benefits, the alternatives and indications
12  of all of the available procedures, and then letting
13  the patient help us decide what was best for them.
14      Q.   Okay.  Doctor, turning to the
15  instructions for use which you had mentioned earlier,
16  would you agree that the instructions for use are
17  required by law to be in as part of -- accompany the
18  medical devices that you opinioned on today?
19           MR. WALKER:  Objection to form.
20           THE WITNESS:  Sorry.  Say that one more
21  time.
22  BY MS. GAYLE:
23      Q.   So I will break it down, Doctor.  Would
24  you agree that the instructions for use are required by

C. Bryce Bowling, M.D.

Page 106

1 law to be in -- were required to law to be in the
2 Prolift kit products?
3        MR. WALKER: Object to form.
4        THE WITNESS: I don't know. Are you
5    talking about a state law, a federal law?
6 BY MS. GAYLE:
7    Q.    A federal law, Doctor.
8    A.    I don't know what the federal law is.
9    Q.    FDA federal law.
10    A.    I don't know what the FDA law is and what
11 has to be in packaging.
12    Q.    Okay. And that would apply to all the
13 products that you've opined on today, you wouldn't know
14 what law relate to what has to be in the
15 packaging, correct?
16    A.    No, I'm not a legal expert.
17    Q.    Okay. And, Doctor, do you know if the
18 instructions for use for the Prolift talk about use for
19 that product in any particular grade of prolapse?
20    A.    I don't know if it specified that it had
21 to be used in a certain grade of prolapse.
22    Q.    Doctor, you guys use different phrases in
23 your profession. Do you know what a revision surgery
24 is, Doctor?

Page 107

1    A.    Yes.
2    Q.    Okay. And just for clarification on the
3 record, can you briefly describe what a revision
4 surgery in your mind is?
5    A.    Well, a revision surgery is anything that
6 requires that we go back to the operating room and make
7 a change. That can be related to over tensioning of a
8 device. It can be related to the over tensioning of a
9 suture.
10        It can be any type of permanent implant,
11 whether it is mesh or suture used in a native tissue
12 repair that requires that we go back to the operating
13 room and make some sort of change, and those revision
14 surgeries generally are done if there is a symptom
15 related to a surgical procedure, a vaginal surgical
16 procedure that is causing some type of symptomatic
17 change in the patient that they would like altered.
18    Q.    Doctor, breaking it down by product, just
19 a number, can you tell me approximately how many
20 revision surgeries you would have done on the specific
21 products that you opined about today?
22    A.    No, I don't know. I mean I do multiple
23 revision surgeries per month. Some of those are mesh
24 and some are not.

Page 108

1    Q.    Okay. Thank you, Doctor.
2    A.    I can't tell you how many of them were
3 mesh and I can't tell you how many of them were
4 specific products. Sometimes I don't even know what
5 the product is.
6        We see a little piece of mesh or we see a
7 suture poking through or something. We go back to make
8 a revision and sometimes the operative notes that we
9 review from the prior procedure don't always tell us
10 who the manufacturer was.
11    Q.    Thank you. Doctor, do you know what a
12 FDA 522 order is?
13    A.    I'm familiar with the FDA 522 process.
14    Q.    And, Doctor, do you know whether a 522
15 order was ever issued on Prolift?
16    A.    Again, I'm not sure exactly how the 522
17 process worked with Prolift. I believe there was, but
18 again I'm not sure exactly how that works.
19        MS. GAYLE: Go off the record.
20        (Off record discussion.)
21 BY MS. GAYLE:
22    Q.    Doctor, again, sorry. Do you know
23 whether a 522 order was issued on any of the other
24 products that you're opining about today?

Page 109

1    A.    I believe they were.
2    Q.    Can you remember anything specific about
3 that process with regard to any particular product?
4    A.    No. I mean, I'm happy to try to answer
5 some questions but I don't remember anything specific.
6 I don't know what you're looking for.
7    Q.    Has anyone ever told you, Doctor, why the
8 Prolift was removed from the market?
9        MR. WALKER: Object to form.
10        THE WITNESS: Why the Prolift was removed
11    from the market? I mean I'm sure I've heard from
12    several different individuals why Prolift was off
13    the market.
14        I don't know who would have told me. I
15    don't know if it would have been other physicians
16    or representatives. I'm not sure.
17 BY MS. GAYLE:
18    Q.    For the record, Doctor, as you sit here
19 today, can you briefly explain what your understanding
20 is of why the Prolift was removed from the market?
21    A.    Well, you know, I don't work for Ethicon
22 and I don't know what their reasoning was for removing
23 the product from the market.
24        I know that there were -- I know that

C. Bryce Bowling, M.D.

Page 110

1 there were a lot of FDA warnings that were pretty
2 abhorrent and had a lot of incorrect information that
3 started kind of an anti-mesh frenzy throughout the
4 country, but I don't know.  Since I'm not privy to
5 Ethicon's information about why they took it off, I
6 can't tell you exactly why it was removed.
7    Q.    Doctor, talking about the FDA warnings
8 and your words that were abhorrent that caused the
9 anti-mesh frenzy, can you explain a little bit more
10 what you're talking about there?
11    A.    Sure.  I think that they utilized some
12 words and some phrases and didn't actually use good
13 clinical data to drive their statements.
14        Now, they did go back in 2013 and correct
15 some of that, specifically with the sling, the
16 midurethral sling products, they did go back and admit
17 that these were -- these had been shown to be safe and
18 effective in the long-term, and they came to that
19 conclusion only after the FDA went back and did their
20 own systematic review of the medical literature.
21        Prior to their initial statements, we
22 have no indication that they did a systematic review of
23 the medical literature before making their statements.
24    Q.    Doctor, just to clarify and clean the

Page 111

1 record up.  You're using the word "they".  Who are you
2 referring to when you say "they"?
3    A.    The authors of the FDA reports.
4    Q.    FDA personnel?
5    A.    Whoever the authors of the report were.
6    Q.    Okay.  Which report are you speaking of?
7    A.    Well, there's several FDA reports.  I
8 cited them in my literature.  There's a 2011 report and
9 there's a supplement, and then there's a 2013 report.
10    Q.    Doctor, after the Prolift was taken off
11 the market, do you recall ever using the Prolift after
12 that time?
13    A.    Let's see.  I don't know what the dates
14 were.  I do -- I can tell you that we got to a point
15 where we were not able to order any more Prolifts in to
16 the hospital and at that time there was an effort on my
17 part to find as many Prolift kits as I possibly could.
18        I think I even asked them to branch out
19 and try to find Prolift kits at other hospitals so that
20 we could continue using those for as long as possible.
21 I think my final Prolift insertion was on a
22 dermatologist from middle Tennessee.
23    Q.    Okay.  Thank you, Doctor.  Do you know
24 what the shelf life of a Prolift kit is?

Page 112

1    A.    No, I do not.
2    Q.    Is it your usual practice to check the
3 expiration date of a product, synthetic product, before
4 you implant the product in the person?
5    A.    Yes, that occurs as part of our timeout
6 in the operating room.
7    Q.    To your knowledge, have you ever
8 implanted a product that was past the expiration date,
9 synthetic mesh product?
10    A.    Not in the United States.
11    Q.    Have you taken that outside the United
12 States?
13    A.    I have.
14    Q.    In Africa; is that correct?
15    A.    Yes.
16    Q.    And, for the record, Doctor, can you
17 state what facility you were working at in Africa?
18    A.    Ganta, G-a-n-t-a United Methodist
19 Hospital.
20    Q.    Doctor, are you aware of whether that
21 facility has burned down also?
22    A.    Well, gee.  I don't know.
23    Q.    I'm just asking if you know.
24    A.    Has it?

Page 113

1    Q.    Yes, it has.
2    A.    It wouldn't surprise me.  When we were
3 there before there were mortar holes and bullet holes
4 in the side of the building large enough to crawl
5 through.  So it wouldn't surprise me.  They have been
6 in a civil war in Liberia off and on for many years.
7    Q.    And, Doctor, how long were you in Africa
8 at that facility?
9    A.    We were there for a little more than
10 three weeks.
11    Q.    And that was in connection with what time
12 during your --
13    A.    Am I being investigated for arson?
14    Q.    No, Doctor.
15    A.    This is the second --
16        MR. WALKER:  I'm struggling with whether
17    or not to object here.
18 BY MS. GAYLE:
19    Q.    No, Doctor, I'm just trying to get at
20 when you were in Africa.  You have many different
21 places, Doctor, that you were --
22    A.    I'm sorry.  In two of the places that
23 I've previously worked at you've indicated have burned
24 to the ground after I left.

C. Bryce Bowling, M.D.

Page 114

1    Q.    They have, Doctor, so it kind of made it
2  hard to --
3    A.    I'm a little bit.
4    Q.    -- to follow where you were at in your
5  resume.
6    A.    That was in January of 2009.
7    Q.    And which university were you affiliated
8  with?
9    A.    I was a fellow at the University of
10 Alabama Birmingham at the time.
11   Q.    Thank you, Doctor.
12        MR. WALKER:  Which has not burned down to
13 the ground.
14        MS. GAYLE:  Which has not burned down to
15 the ground.  Thank you, counsel.
16 BY MS. GAYLE:
17   Q.    Doctor, do you have a -- I think we
18 talked about earlier when you put your products
19 together you said that they had a lot of general
20 similarities in each of the different reports.
21   A.    Yes.
22   Q.    And you said earlier also that you used
23 Gynemesh and you still use it today in your
24 laparoscopic sacrocolpopexies, correct?

Page 115

1    A.    In the robotic sacrocolpopexies, yes.
2    Q.    In the robotic.  And this Gynemesh is
3  typically a flat piece of mesh that you would trim in
4  the proper shape; is that correct.
5    A.    That's correct.
6    Q.    Could you estimate how many times you
7  have placed that either robotically, the Gynemesh
8  robotically?
9    A.    We probably do three or four per month.
10 So I would estimate that we're doing somewhere between,
11 taking out vacation time, maybe 40 to 50 per year, and
12 started doing those robotically when I came here in
13 2010.  So I would say more than 200, less than 500.
14   Q.    Thank you, Doctor.  And you also as
15 you've indicated earlier that you do the Gynemesh, flat
16 mesh transvaginally as well, correct?
17   A.    No.
18   Q.    You don't?
19   A.    No.
20   Q.    Abdominally?
21   A.    Correct, and we have utilized -- I have
22 not utilized a flat piece of Gynemesh since I was in
23 fellowship.
24        MR. WALKER:  Vaginally?

Page 116

1        THE WITNESS:  Vaginally, correct.  Thank
2  you.
3  BY MS. GAYLE:
4    Q.    And abdominally, what would you estimate
5  your usage of that has been?
6    A.    That's what I was talking about the 200
7  to 500.  That is a flat sheet of Gynemesh PS that is
8  trimmed specific to each patient's prolapse.
9    Q.    Okay.  Thank you, Doctor.  What product
10 do you use today for pelvic organ prolapse?
11   A.    Well, it depends on the patient.
12   Q.    Okay.
13   A.    But we do a combination of native tissue
14 repairs, and mesh augmented repairs that we do are all
15 sacrocolpopexies at this point due to our inability to
16 utilize good transvaginal mesh kits.
17   Q.    Do you know what the clearance date was
18 for the Gynemesh, flat mesh?
19   A.    I'm sorry?
20   Q.    The clearance date, the FDA clearance
21 date for the Gynemesh?
22   A.    Gynemesh, I believe, was 2002.  Somewhere
23 around 2002.
24   Q.    Do you know off the top of your head what

Page 117

1  the first launch date for Gynemesh was?
2    A.    I'm going to say around the same time.
3  I'm sorry, I don't know the exact date.
4    Q.    I'm talking about launch in the United
5  States?
6    A.    I would assume around the same time.
7    Q.    Doctor, with regard to the IFUs for the
8  products that we talked about, those would be contained
9  as we talked about ad nauseam earlier in your reliance
10 list or within your report, correct?
11   A.    They should be in some form or another,
12 yes.
13   Q.    Doctor, with regard to the FDA, do you
14 agree with the FDA's viewpoint there's a need for more
15 rigorous study regarding safety and efficacy of mesh
16 kits?
17        MR. WALKER:  Objection to form.
18        THE WITNESS:  No.  No, I think there is
19 always a need for studies that are done in a
20 rigorous fashion to look at long-term efficacy and
21 safety, but do I think that we need studies that
22 are more rigorous than have been in the past?  No.
23        I think ongoing studies of adequate rigor
24 are needed in all facets of medicine, not just

C. Bryce Bowling, M.D.

## Page 118

1 transvaginal repairs but prolapse repairs in
2 general, anti-incontinence repairs in general.
3 Robust randomized control trials are a necessary
4 part of evidence-based learning.
5 BY MS. GAYLE:
6 Q. But not specifically any more for and
7 with regard to rigorous studies regarding safety and
8 efficacy of the mesh kits, correct?
9 A. Specifically Prolift?
10 Q. Just the mesh kits, mesh exits, synthetic
11 mesh kits?
12 A. Well, I think if mesh kits are going to
13 be marketed then we need studies of that material.
14 Either studies that have been previously done on the
15 exact mesh material or studies that are looking at a
16 specific product that is being rolled out.
17 Q. Do you think that there need to be any
18 more rigorous studies or studies regarding the safety
19 and efficacy for the Prolift kit?
20 A. No, I don't think we need any more
21 rigorous studies. I think that the randomized
22 controlled trials and that the Cochrane reviews looking
23 at those randomized controlled trials showed long-term
24 efficacy and safety compared to native tissue repairs.

## Page 119

1 Q. Do you know what Ethicon did in response
2 to their 522 order on the Gynemesh?
3 A. On Gynemesh?
4 Q. Gynemesh, the flat mesh.
5 A. I'm not sure what you're asking. What
6 did they do?
7 Q. In response to the 522 order?
8 MR. WALKER: Object to form.
9 BY MS. GAYLE:
10 Q. Did they take any action in response to
11 the FDA's 522 order?
12 A. You know, I recall something. I'm not
13 sure exactly what was done. You know, I think that
14 they -- certainly they kept their Gynemesh product, but
15 I'm not sure exactly what their response was. I'm not
16 sure that I've seen an actual response on it.
17 Q. Do you believe it was a reasonable
18 decision for a doctor to stop using the Prolift device
19 following the July 2011 FDA public health notification?
20 MR. WALKER: Object to form.
21 THE WITNESS: Do I think it was
22 reasonable for a surgeon to stop using Prolift
23 after the FDA's --
24 BY MS. GAYLE:

## Page 120

1 Q. 2011 notification?
2 A. I can't speak to other physicians and to
3 other surgeons. I can tell you that it had no bearing
4 on the way that I practiced.
5 Q. In fact, you disagreed with that
6 July 2011 FDA public health notification?
7 A. I disagreed with certain parts of the
8 FDA's notification, but not all of it.
9 Q. We'll get to that in just a minute,
10 Doctor. How do you understand the word rare just so
11 that we can sort of go forward on that?
12 MR. WALKER: Object to form.
13 BY MS. GAYLE:
14 Q. How do you understand the word rare when
15 it comes to complications?
16 A. Well, you know, I think that rare is a
17 relative term and everything has their own definitions
18 of what they consider rare. So I can't really speak to
19 -- since the FDA did not actually utilize a number, I
20 can't really speak to what they meant by rare.
21 I can, however, speak to what the
22 response was to the FDA's safety communication update
23 was on what the medical literature actually indicates
24 are complications from mesh.

## Page 121

1 MS. GAYLE: How long have we been going?
2 THE COURT REPORTER: Two hours
3 16 minutes.
4 THE WITNESS: What I will follow-up with
5 that is looking at a response to the FDA's safety
6 communication where they indicated that -- where
7 the FDA had indicated at least 100,000 prolapse
8 repairs were used and about 75,000 of those were
9 transvaginal in nature, and the statement
10 suggested that 225,000 transvaginal mesh
11 procedures were done in a three-year period, and
12 in that three-year period there were 1,500
13 approximate complications noted from transvaginal
14 mesh and that number calculated out as less than
15 one percent.
16 BY MS. GAYLE:
17 Q. And, Doctor, what -- do you have a paper
18 there in front of you?
19 A. This is one of the response papers
20 authored by Miles Murphy and it's a response to the FDA
21 safety communication update using the actual numbers,
22 which the FDA did not provide.
23 Q. Published in what journal, doctor?
24 A. This was published in the International

C. Bryce Bowling, M.D.

Page 122

1  Urogynecology Journal.
2      Q.    And for the record, Doctor, can you just
3  state the title of the paper?
4      A.    Time to Rethink.  An Evidence-based
5  Response from Pelvic Surgeons to the FDA Safety
6  Communication Update on Serious Complications
7  Associated with Transvaginal Placement of Surgical Mesh
8  for Pelvic Organ Prolapse.
9          It's authored by Miles Murphy and
10  co-authored by Holzberg, Kohli, Gandel and Lucente.
11      Q.    Doctor, if the Prolift were available
12  today, would you believe that it would be within the
13  standard of care to continue to implant the Prolift?
14      A.    Absolutely.
15      Q.    And even if it weren't available and you
16  found some on the shelf that had not expired, would you
17  still believe that it were the standard of care to
18  implant the Prolift?
19      A.    Yes.  If there was one on the shelf now
20  we wouldn't be able to utilize it now because of it
21  being out of date.
22      Q.    Well, let's just assume that it would be
23  in date.
24      A.    So if you're giving a hypothetical --

Page 123

1      Q.    Hypothetical, Doctor.
2      A.    -- question, if there were Prolifts still
3  available today that were still in date, yes, I think
4  that it would still be acceptable to implant a
5  transvaginal mesh just like an abdominally
6  placed mesh into a patient that has been appropriately
7  counseled, that has gone through an informed consent
8  process, understands the data and understands the
9  long-term efficacy and safety of the products.
10      Q.    Would that be the same for like the
11  Prolift+M product as well, the same answer?
12      A.    The Prolift+M products, I've used that
13  far less than the Prolift product, but we don't have as
14  much unfortunately.  We don't have as much data on the
15  Prolift+M as we do the Prolift.
16          What data that we do have showed the
17  Prolift+M to be safe and effective, to have similar
18  outcomes as the Prolift.  So, yes, I think it was also
19  a safe and effective means of augmenting certain pelvic
20  organ prolapse repair procedures.
21          MS. GAYLE:  Can we go off the record for
22      just one moment.
23          (Recess taken.)
24          MS. GAYLE:  All right.  Go ahead.

Page 124

1          THE WITNESS:  Now, that we're back on the
2  record before we get started again I do want to --
3  I want to clear two things up that I think were
4  some exaggerated claims previously.
5          The hospital in West Memphis Arkansas,
6  Crittenton, did not burn to the ground.  They had
7  a fire that broke out in the intensive care unit
8  where they had to evacuate 14 patients.
9          The hospital was already seeking
10  donations to stay afloat before the fire closed
11  their doors a month later.  So the hospital didn't
12  actually burn down.
13          I did text the medical director of Ganta
14  United Methodist in Liberia and that hospital also
15  did not burn down.  There was a fire that they
16  believe started from a generator in one of the
17  doctor's residence buildings that burned a
18  resident's house, a resident building down, but
19  did not burn the hospital down.
20  BY MS. GAYLE:
21      Q.    Thank you for that, Doctor, and I wasn't
22  inferring that you had started the fire or that you
23  were under investigation for arson.
24      A.    I'm putting it on the record.

Page 125

1      Q.    My investigator told me that there were
2  fires and that they had burned down in both facilities,
3  and so just -- and I was just in that context trying to
4  place you as you were at UAB, and then you were in
5  Africa and I was trying to get to the connection to the
6  two of those.
7          MR. WALKER:  Let the record reflect the
8      doctor's diligence in running facts to the ground.
9  BY MS. GAYLE:
10      Q.    I know.  There you are.  Again, my
11  apologies if you think I was.
12      A.    No problem.
13      Q.    Okay.  Doctor, so just to kind of wrap up
14  a couple of things with regard to your resume.  I told
15  you that we would get back to that a little bit later.
16          So as we discussed, you have a resume at
17  Exhibit 8 which is your 2012, your Exhibit 9 resume,
18  which was tendered with your reports, as well as your
19  exhibit, excuse me, an Exhibit 12 -- Exhibit 8, 9 and
20  12 and 12-A.  Okay.
21          On all of these resumes, Doctor, your
22  medical license, you have three medical licenses that
23  are issued.  You have the state of Arkansas, state of
24  Alabama and the state of Tennessee, correct?

Page 126

1    A.    Correct.
2    Q.    Under the state of Arkansas license you
3 have the word retired listed.
4    A.    Correct.
5    Q.    When contacting the licensing board in
6 Arkansas, they stated they didn't have a retired status
7 but an inactive status.
8    A.    Okay.
9    Q.    Does that word mean the same thing to
10 you, inactive versus retired?
11   A.    As I understand it, you can default on
12 your medical -- on your, sorry, on your medical license
13 by not sending in payment or you can request that your
14 medical license be retired.  That was the terminology
15 that was used when I spoke to the medical boards at
16 both Arkansas and Alabama.
17        So when you're in fellowship not really
18 knowing where you're going to end up in practice, you
19 don't let your medical license lapse.  But rather than
20 making payments to keep medical licenses active each
21 year, we decided to put them into retirement so that
22 they could be reactivated without having to go back
23 through the process of applying for a medical license
24 again.

Page 127

1    Q.    Okay.  Thank you, Doctor.  And that would
2 apply to both Arkansas and Alabama?
3    A.    That's correct.
4    Q.    Thank you for that clarification.  And
5 then with regard to your license at the state of
6 Tennessee, you have license number 39871 on your CV, on
7 all of your CVs as far back as I can find.
8    A.    Okay.
9    (Exhibit 20 - Medical License.)
10   Q.    And, Doctor, I pulled from the Tennessee
11 Department of Health your license verification and this
12 is what's been marked as Exhibit 20.
13   A.    Okay.
14   Q.    And, Doctor, that's not your name.  It's
15 Dr. Sandra Nichole Feeney is found under that license
16 number.  And we checked and the state of Tennessee does
17 not reissue license or recirculate the numbers.
18   A.    Okay.  So that is obviously a typo on my
19 part that has been carried forward for several years
20 without my knowledge.
21   Q.    Could you --
22   A.    I will take that care of that for one
23 second if you want to go off the record.
24        MS. GAYLE:  If we can go off the record.

Page 128

1 Thank you, Doctor.
2        (Off record discussion.)
3 BY MS. GAYLE:
4    Q.    Doctor, you just made a phone call to
5 your office; is that correct?
6    A.    Yes.
7    Q.    And you were attempting to clarify, it
8 looks like a typographical error on your resume.  Could
9 you please state what you found out?
10   A.    I have accidently transposed the numbers
11 three or, sorry, the numbers nine and eight.  My
12 license number is actually 38971.
13   Q.    Okay, Doctor.  And under license number
14 38971, that would be your active license for state of
15 Tennessee, correct?
16   A.    That's correct.
17   Q.    Thank you for that clarification, Doctor.
18   (Exhibit 13 - FDA Article entitled Update on
19        serious complications associated with
20        transvaginal placement of surgical mesh for
21        pelvic organ prolapse, FDA safety communication.)
22 BY MS. GAYLE:
23   Q.    Now, turning back to our discussion about
24 the FDA, Doctor, I am handing you what has been marked

Page 129

1 as Exhibit 13 and we spoke briefly about the July 2011
2 publication.
3        And do you recognize that document,
4 Doctor, as the July 13, 2011 FDA public health
5 notification?
6    A.    Yes, I do.
7    Q.    Doctor, if you would turn to the second
8 page of that notification.
9    A.    Okay.
10   Q.    I tried to highlight for you on that one
11 too also for your convenience.  Doctor, do you see the
12 paragraph I highlighted starting with the FDA is
13 issuing?
14   A.    Yes.
15   Q.    "The FDA is issuing this update to inform
16 you that serious complications associated with surgical
17 mesh for transvaginal repair or POP are not rare."
18   A.    Yes, I see that.
19   Q.    Okay.  Do you disagree with the FDA in
20 that regard?
21   A.    I guess I would disagree on what their
22 definition of what not rare is.  I think we covered
23 that a little bit before the break today.
24        I think that the terms rare and not rare

C. Bryce Bowling, M.D.

## Page 130

1 are very subjective terms, and what we notice is that
2 we don't really find a percentage that the FDA gives us
3 of complications versus actual implants, and when you
4 look at those numbers of actual implants versus the
5 reported complications it's less than one percent.
6 Now, we don't -- certainly are not here
7 trying to propose that every complication is reported.
8 We understand that there are complications that don't
9 get reported, but I think across the medical
10 literature, in randomized controlled trials, in
11 Cochrane databases we find very low rates of
12 complications that require any type of additional
13 surgical treatment.
14 Q. Doctor, after you -- after the issuance
15 of this July 13, 2011 FDA notice, did you consult your
16 patients about this notice?
17 A. We talked about FDA notices, yes, we did.
18 Q. What did you tell them about this notice?
19 A. Well, we told them that the notice was
20 there. I think we discussed some of the terminology in
21 the notice and we also discussed that the products for
22 pelvic organ prolapse and stress urinary incontinence
23 while not actually noted in the FDA's reports had been
24 studied in numerous trials and shown to be safe and

## Page 131

1 effective, and that we would not expect the patients to
2 have serious complications if we were doing our jobs
3 correctly and if the patients were doing their jobs
4 correctly.
5 Q. Did you discuss the fact that they had
6 said that they were not rare and qualify it with --
7 A. Well, I don't recall specific
8 conversations where we attempted to define what is rare
9 and not rare.
10 Q. And I'm just speaking generally, Doctor.
11 A. Yes, I mean we may have discussed that at
12 some point. Again, I don't recall a specific instance
13 where we tried to place a number on rare or not rare.
14 We do in our counseling sessions or we
15 did in our counseling sessions with individuals that
16 were undergoing transvaginal mesh procedures for
17 prolapse, talk about several of the risks and the
18 percentages that had been listed in our most trusted
19 studies.
20 Q. Can you list any of those most trusted
21 studies off the top of your head?
22 A. I'm happy to go through several of them
23 with you.
24 Q. Just the names, Doctor, and the authors

## Page 132

1 would be great, which ones you're referring to.
2 A. Sure. That's my TVT report.
3 Q. The name and date.
4 A. Sure. First would be Maher, M-a-h-e-r
5 from 2013 as well a 2016 Cochrane review by the same
6 author. We also have a 2016 systematic review by Megan
7 Schimpf spelled S-c-h-i-m-p-f.
8 We have randomized control trials from
9 Altman, and I'll have to go back, and I believe that
10 was 2011. We have a Withagn, W-i-t-h-a-g-n. That
11 trial I would have to go back and look for. I believe
12 it was also 2011. Yes, 2011.
13 We also have a reference in my report, a
14 2012 randomized control trial from Halaska. We have a
15 2014 multi-center randomized control trial from da
16 Silveira, and all of these are -- we also have
17 long-term randomized control trial data from 2016 from
18 Dr. Heinonen's group.
19 We have a 2011 study from Miller. We
20 have studies from Cosson, from Bhatia. We have -- I've
21 included some of the studies referenced by plaintiffs'
22 expert witness and including Benbouzid's study, Kozal's
23 study.
24 Q. Would you spell that, Doctor.

## Page 133

1 A. Benbouzid is B-e-n-b-o-u-z-i-d. Kozal is
2 K-o-z-a-l. I believe those were both referenced by
3 plaintiffs' expert witness in some of their reports.
4 Q. Do you remember which expert doctor?
5 A. I do not. I do not. I just had it under
6 the heading of going back and addressing some of the
7 expert witnesses statements and their -- we also have a
8 Meyer, M-e-y-e-r study that we've addressed. That's
9 different from the Maher study.
10 And then we have a large list that I
11 won't bore you with but it's on pages 34 and 35 of my
12 Prolift general statement that lists 15 or 20 different
13 studies looking at the generalizable known risks of all
14 pelvic organ prolapse surgeries, mesh or otherwise.
15 Q. And, Doctor, just to clarify. You said
16 on your generalized statement. You mean your report,
17 pages 34 and 35?
18 A. Of the Prolift general report.
19 Q. That would be Exhibit 4, correct, Doctor?
20 A. That's correct.
21 Q. Thank you, Doctor. So, Doctor, do you
22 agree or disagree that there is no evidence that
23 transvaginal mesh repair provides any added benefit
24 compared to a traditional surgery without mesh?

Page 134

1    A.    I disagree with that statement.  We have
2  randomized controlled trials and Cochrane databases
3  that refute that, specifically in the anterior
4  compartment where it has been shown numerous times that
5  mesh augmented anterior repairs have a decreased rate
6  of recurrence compared to native tissue repairs.
7         We have the data looking at recurrence
8  rates following apical procedures that showed similar
9  efficacies to abdominal sacrocolpopexy, which is
10 another mesh augmented procedure.
11        We have references comparing mesh
12 augmented sacrocolpopexy procedures to native tissue
13 repairs that show increased durability and decreased
14 failure rates.
15   Q.    Thank you, Doctor.  Turning back to our
16 Exhibit Number 13, again on the third page the third
17 bullet point down, Doctor, do you see where it says
18 "there is no evidence that transvaginal repair to
19 support the top of the vagina (apical repair) or the
20 back wall of the vagina (posterior repair) with mesh
21 provides any added benefit compared to traditional
22 surgery without mesh"?
23   A.    Yes.  So I agree with part of that
24 statement, that we don't have evidence -- well, I won't

Page 135

1  say we don't have evidence.
2         I would say the preponderance of the
3  evidence shows that there is no benefit to placing mesh
4  in the posterior compartment compared to a native
5  tissue repair.
6         What that has not been stratified in to
7  is do we know that that is the data on people who have
8  already had a native tissue repair, had a failure of
9  that repair and ended up going back to the operating
10 room.
11        Again, we have some data that I'm happy
12 to share with you looking at apical support utilizing
13 mesh.  It's not necessarily a transvaginal mesh because
14 we don't tend to place mesh at the apex and we tend to
15 place mesh in the anterior/posterior compartments while
16 the abdominal sacrocolpopexies, many people will
17 actually attach the mesh directly to the apex, and
18 that's not something that I have done in patients that
19 are getting transvaginal mesh.
20   Q.    Thank you, Doctor.  I'm just speaking as
21 regarding this particular bullet point, and you said
22 again you agree in part and you would disagree in part,
23 correct?
24   A.    Well, again, give me one second to

Page 136

1  find --
2         MS. GAYLE:  Go off the record.
3         (Off record discussion.)
4         THE WITNESS:  Actually I'm not going to
5  speak on the apical because I don't have in my --
6  in my most trusted data, which is the randomized
7  controlled trials here and the Cochrane reviews, I
8  don't have specific bullet points regarding
9  apical.
10        I have them regarding anterior and
11 posterior which I've addressed no benefit to mesh
12 in the posterior compartment, but absolutely no
13 benefit to the mesh augmentation in the anterior
14 compartment.
15 BY MS. GAYLE:
16   Q.    Thank you, Doctor.  With regard to the
17 first bullet point, do you see that, Doctor?
18   A.    Yes.
19   Q.    Starting with mesh used in transvaginal
20 POP repair.  Do you agree with or disagree with that
21 statement?
22   A.    I disagree with that statement.
23   Q.    Can you briefly state why you disagree
24 with that?

Page 137

1    A.    Sure.  This says that mesh used in
2  transvaginal prolapse repair introduces risk not
3  present in traditional non-mesh surgery for pelvic
4  organ prolapse, and what I would do is point you to the
5  2013 release from the FDA, almost a response to their
6  own review, and I'll pull that up for you here.
7         Let me go from memory so we don't have to
8  waste time.  In a 2013 FDA release they came back and
9  stated that -- they're specifically talking about the
10 mesh used in midurethral slings at this point -- that
11 the known complications of vaginal scarring,
12 dyspareunia, pain, bleeding, that all of the previously
13 known and associated complications that they had quoted
14 to be related to transvaginal mesh were also known
15 complications of native tissue repairs with the sole
16 exception of mesh exposure.
17        That's from -- that's straight from the
18 FDA.  I agree with that statement with the exception of
19 the exposure.
20        Now, while you cannot have a mesh
21 exposure without the implantation of mesh, you can have
22 an exposure of implantable material used in native
23 tissue repairs, and I have personally removed implanted
24 permanent material used in native tissue repairs from

C. Bryce Bowling, M.D.

| Page 138 | Page 140 |
|---|---|

**Page 138**

1  the bladder, from the urethra, from the vagina, from
2  the rectum, both erosions and exposures.
3      Q.    In your clinic, in your practice, in your
4  years being a doctor?
5      A.    That's correct, and we have addressed the
6  same complications that the FDA changed course in 2013.
7  This is straight from their report with the exception
8  of mesh erosion the above complications, pain, mesh
9  erosion through the vagina also called exposure,
10  extrusion or protrusion, infection, urinary problems,
11  recurrent incontinence, pain during intercourse or
12  dyspareunia, bleeding, organ perforation, neuromuscular
13  problems, vaginal scarring, can occur following a
14  non-mesh surgical procedure.
15      That is -- what I'm saying is that each
16  one of these problems with the exception of a mesh
17  exposure, we have dealt with in native tissue repairs.
18      In that same vein, however, I have dealt
19  with exposures of implantable materials used in native
20  tissue repairs frequently, removed them from the
21  vagina, from the bladder, from the rectum.
22      So I don't agree with the 2011 FDA
23  statement that says that mesh introduces risk not
24  present in non-mesh surgeries.

**Page 139**

1      Q.    Doctor, when you say that you've dealt
2  with these implanted materials when you were doing the
3  native tissue repairs, what kind of implanted materials
4  are you referring to?
5      A.    Permanent sutures.
6      Q.    Again, I'm sorry?
7      A.    Permanent sutures.
8      Q.    Any specific type of sutures?
9      A.    We have also had complications from
10  cadaver grafts, fascia lata type graphs we've had to
11  address, so both synthetic and biologic issues.
12      Q.    Thank you, Doctor.  Switching gears just
13  a little bit, Doctor, at the end of that exhibit on
14  page three, if we can look at Exhibit 13.  You'll see a
15  paragraph I highlighted for you talking about mesh
16  contraction.
17      A.    Sure.
18      Q.    At least would you agree when this was
19  published on July 13th, 2011 that the FDA recognized
20  that mesh contraction existed?
21      MR. WALKER:  Objection to form.
22      THE WITNESS:  Okay.  So I can't speak to
23  what the FDA -- where they got their information
24  regarding mesh contraction.

**Page 140**

1  BY MS. GAYLE:
2      Q.    So would you disagree with -- I'm sorry,
3  Doctor.  So would you degree with this paragraph where
4  they're talking about mesh contraction is a previously
5  unidentified risk of transvaginal POP repair with mesh
6  that has been reported in the published scientific
7  literature under the adverse event reports to the FDA
8  since the October 20th, 2008 FDA update public health
9  notification?
10      A.    You know, I don't think mesh contraction
11  was a previously unidentified risk.  Mesh has been
12  around literally for decades and was FDA cleared to be
13  used in the human body back in the 1960s, and surgeons
14  have been aware of different types of complications
15  with any implantable material since that time.
16      So, no, I don't agree that it was a
17  previously unidentified risk.  I think that mesh
18  contraction has been known about for some time.  I
19  think that clinically relevant mesh contraction is not
20  really something that exists.
21      I think that you do have some contraction
22  of the mesh.  I think that that is a normal part of the
23  healing process that occurs in the immediate
24  postoperative period, but we have had several studies

**Page 141**

1  looking at so-called shrinkage of mesh that have shown
2  that that is not really the issue that it has been made
3  out to be.
4      We have studies looking not only at
5  so-called mesh shrinkage with TVT and midurethral
6  slings, but we also have studies that have looked at
7  the potential for mesh contraction in pelvic organ
8  prolapse kits that have not shown any clinically
9  significant shrinkage.
10      They have measured total vaginal length
11  in women undergoing pelvic organ prolapse repairs
12  utilizing mesh kits that showed no difference in
13  preoperative and postoperative total vaginal lengths.
14      If you had a significant clinically
15  relevant shrinkage of the mesh, you would expect that
16  the total vaginal length of these women would change
17  preoperatively and postoperatively.
18      Q.    And, Doctor, I'm going to stop you just
19  right there --
20      A.    Sure.
21      Q.    -- so I understand your testimony.
22  You've used the phrase significant and clinically
23  relevant.
24      A.    Correct.

C. Bryce Bowling, M.D.

Page 142

1    Q.    Can you explain to me what you mean by
2    that phrase?
3    A.    Well, I think that we plan as surgeons
4    for a certain amount of mesh contraction to occur
5    during the healing process, which is why as we teach
6    residents and other physicians to do mesh augmented
7    procedures, whether they are prolapse or incontinence
8    in nature, and while companies such as Johnson &
9    Johnson and Ethicon teach physicians about mesh
10   products, that the knowledge is given to these surgeons
11   that there is a certain amount of mesh contraction that
12   must be accounted for at the time of the surgery, which
13   is why we find midurethral slings being placed in a
14   tension-free fashion and why we find pelvic organ
15   prolapse kits using mesh be placed without tension so
16   that we can allow for that certain known contraction to
17   occur.
18   Q.    And, Doctor, do you know what that
19   certain amount is?
20   A.    It depends on the product.  I have seen
21   data from 15 percent to 30 percent with contraction for
22   pelvic organ prolapse kits, but again I've not seen any
23   valid scientific evidence that shows that a clinically
24   relevant shrinkage of material that changes the access,

Page 143

1    changes the caliber or changes the length of the vagina
2    in a female exists.
3    Q.    Okay, Doctor.  And when you said that
4    Ethicon has trained doctors to where they account for
5    the mesh, have they told you any sort of number or any
6    sort of degree to where you had to account for that?
7    A.    Well, Ethicon didn't train me to put mesh
8    in, so I don't know what they have told people.
9    Q.    Well, you said Ethicon trains doctors.
10   I'm just trying to get to your testimony.
11   A.    No, I didn't say Ethicon trained doctors.
12   Q.    Okay.
13   A.    Ethicon does not train doctors to do mesh
14   procedures.  Ethicon gives information about their mesh
15   products to physicians.
16        It's up to the physician at that point to
17   determine.  The onus is on the physician at that point
18   to determine whether or not they should be doing any
19   type of pelvic organ prolapse procedure or any type of
20   anti-incontinence procedure.  It's not Ethicon's place
21   to train a physician to do a procedure.
22   Q.    We'll get to the training part in just a
23   minute, Doctor, but I'm just trying to get to you said
24   that the -- they must be accounted for when they're

Page 144

1    implanting the products --
2    A.    Correct.
3    Q.    -- as far as the degree of contracture or
4    contraction, shrinkage, that a doctor should expect.
5        Have you ever seen any materials from the
6    corporation that would include what degree to expect?
7    A.    I may have seen those at some point.  I
8    can't quote them for you.
9    Q.    Doctor, on the next page of Exhibit 13 at
10   paragraph number or page four, we've talked about
11   abdominally placing mesh.
12   A.    I'll sorry, which page are we on?
13   Q.    Page four, Exhibit 13.  And I've
14   highlighted that paragraph for you towards the bottom
15   there, Doctor.
16   A.    Okay.
17   Q.    Do you agree or disagree with that
18   statement from the FDA?
19   A.    You know, I think that if you get a
20   general gestalt from pelvic surgeons they will tell you
21   that there is a lower likelihood of having mesh come
22   through the vaginal wall on a sacrocolpopexy,
23   specifically because you're not making an incision in
24   the vaginal wall at the time of the sacrocolpopexy.

Page 145

1        However, the only randomized controlled
2    trial I'm aware of looking at abdominal sacrocolpopexy
3    versus transvaginal mesh actually showed no difference
4    in exposure rates.
5    Q.    Do you remember what the name of that
6    trial was?
7    A.    Sure, I can find that for you.
8        MS. GAYLE:  Go off the record.
9        (Off record discussion.)
10       THE WITNESS:  Actually, I think that's
11   the same one that we talked about earlier.  That
12   is the Maher, 2011.  Laparoscopic Sacrocolpopexy
13   Versus Total Vaginal Mesh for Vaginal Vault
14   Prolapse, a Randomized Control Trial.
15   BY MR. GAYLE:
16   Q.    So you would disagree with that
17   statement; is that correct, Doctor?
18   A.    What I'm telling you is that that
19   randomized controlled trial, which is the not what the
20   FDA used to make their statement, the randomized
21   control trial, the authors "failed to find a
22   statistically significant difference in the rate of
23   mesh erosion.  They also failed to show a difference in
24   quality of life measures."

C. Bryce Bowling, M.D.

Page 146

1    Q.    And what year was that?
2    A.    That's 2011.
3    Q.    Okay.  Thank you, Doctor.
4    A.    I don't know what month it was available,
5  but my assumption would be it would have been available
6  at the time the FDA was releasing their updates.
7       (Exhibit 14 - Article entitled Safety of Vaginal
8       Mesh Surgery Versus Laparoscopic Mesh Sacropexy
9       for Cystocele Repair:  Results of the Prosthetic
10      Pelvic Floor Repair Randomized Controlled Trial.)
11 BY MS. GAYLE:
12   Q.    Thank you.  Doctor, I'm going to hand you
13 what's been marked as Exhibit Number 14.  Doctor, for
14 the record, can you read the title of this paper?
15   A.    Safety of Vaginal Mesh Surgery Versus
16 Laparoscopic Mesh Sacropexy for cystocele repair:
17 Results of the Prosthetic Pelvic Floor Repair
18 Randomized Controlled Trial.
19   Q.    And, Doctor, if we can look at the
20 authors for a moment.  Do you know any of these authors
21 personally, and I'll give you a moment to look over
22 that list?
23   A.    No, I don't know them personally.
24   Q.    Do you know or do you recognize any of

Page 147

1  their names?
2    A.    I recognize a few of the names, but it's
3  not -- it's not anyone that I've had discussions with
4  or know on a personal level.
5    Q.    Okay.  Thank you, Doctor.  And, Doctor, I
6  could not find this article anywhere in your report or
7  your reliance materials.
8       Have you seen this article before?  It is
9  a newer article.
10   A.    Yes, I don't know if I've seen it or not.
11 It's a 2018 article.
12   Q.    All right.  You can flip that over if you
13 haven't seen it.
14   A.    Well, again I'll lay it to the side.  I'm
15 not sure if I've seen it or not.  I review a lot of
16 articles.
17   Q.    Okay.  This is in the European
18 Association of Urology.
19   A.    Uh-huh.
20   Q.    Do you read that journal, Doctor?
21   A.    I have read some articles from that
22 journal.  I don't have a subscription to that journal
23 or have that journal sent to my office.
24       Is there a specific question from this

Page 148

1  article you'd like to ask?
2    Q.    Certainly, Doctor.  My question relates
3  to their findings that the rate of complications is
4  lower after the laparoscopic mesh sacrocolpopexy than
5  TVM, and you can look down at the first page at the
6  results and the limitations.
7       And of course it goes on to say that the
8  rate of complications of Grade III or higher were
9  nonetheless significantly lower after LS.
10   A.    Okay.
11   Q.    It seems from your testimony, and correct
12 me if I'm wrong, that you disagree that those rates
13 would be lower based on, for instance, the papers that
14 you've previously cited?
15   A.    No, I think you're misquoting what I
16 said.  I said that among most pelvic surgeons it's
17 understood that there could be a increased risk of a
18 mesh exposure in a transvaginal case versus abdominal
19 sacrocolpopexy.
20       We have data that says both, okay?  We
21 also have different surgeons in different locations,
22 some that are skilled in transvaginal mesh, some that
23 are very skilled in laparoscopic assisted
24 sacrocolpopexy.

Page 149

1       It would not surprise me to have
2  different rates of exposure between facilities, even if
3  you're using the same products because of differences
4  in surgical skill level, because of differences in the
5  numbers of procedures that those individuals do.
6    Q.    And what is your interpretation of that
7  data?
8    A.    Of which data?
9    Q.    You said you have different data and
10 different skill sets.
11   A.    Well, the data that I quoted previously
12 stated in their randomized control trial they did not
13 see a significant difference.
14   Q.    Okay.  Thank you, Doctor.
15   A.    Now, one other thing that I think we need
16 to point out here.  If we're going to compare mesh
17 complications or mesh exposures or erosions from mesh
18 between transvaginal mesh procedures and abdominal
19 sacrocolpopexies or laparoscopic sacrocolpopexies, that
20 we should also give some fairness to the discussion of
21 other potential complications that occur with both of
22 those procedures, and if we're going to state that we
23 need to go back to the operating room to perform a
24 15-minute procedure where we address a small mesh

C. Bryce Bowling, M.D.

Page 150

1 complication, I would say that anybody would prefer
2 that type of reoperation to a reoperation where we have
3 to go back and open someone's abdomen up again because
4 they have a small bowel obstruction from their
5 abdominal surgery or because they have a large vessel
6 injury around the iliac or because they have some other
7 type of abdominal injury that they're not going to have
8 with a transvaginal mesh procedure.
9         So I think if we're talking about
10 post-operative complications we need to be fair in
11 talking about the severity of the complications that
12 can occur after each one of those surgeries.
13     Q.    And, Doctor, is that your experience or
14 do you have a certain source that you're citing that?
15     A.    Well, you know, fortunately I have not
16 really had a lot of complications with either of these,
17 but I will tell you that the risks of me injuring
18 someone's aorta on a sacrocolpopexy is a very real
19 possibility.  The risk of me damaging someone's aorta
20 on a Prolift is basically zero.
21 (Exhibit 15 - Urogynecologic Surgical Mesh:
22     Update on the safety and effectiveness of
23     transvaginal placement for pelvic organ prolapse
24     dated July 2011 from the FDA.)

Page 151

1 BY MS. GAYLE:
2     Q.    All right.  Thank you, Doctor.  You can
3 put that aside.
4         Doctor, I'm handing you what has been
5 marked as Exhibit Number 15, and this is the full
6 report of the FDA.  It's July 2011 findings.  If you
7 would turn to page eight.
8     A.    Okay.
9     Q.    And if you'd look at the bullet points.
10 Do you see those, Doctor?
11     A.    I do.
12     Q.    The second bullet from the end starting
13 with transvaginal surgery.  Do you see that bullet
14 point?
15     A.    I do.
16     Q.    If you could read that statement, you may
17 have already discussed this earlier, Doctor.  Do you
18 agree or disagree with that statement?
19     A.    I think that statement needs to be teased
20 apart a bit because that's not a agree or disagree
21 statement.
22     Q.    Okay.
23     A.    Are the rates of reoperation from a
24 transvaginal mesh higher than a native tissue

Page 152

1 reoperation?
2         If you are looking at reoperation rates
3 from recurrent prolapse alone, no.  The rate of
4 reoperations for native tissue repairs, for an
5 indication of recurrent prolapse would be higher in the
6 native tissue arm than it would be in the mesh arm.
7         The problem with this statement is that
8 they are looking at overall reoperation rates, which
9 not only incur the reoperations for recurrent prolapse
10 but also reoperations for the development of stress
11 incontinence or reoperations to go back in and trim a
12 piece of mesh that became exposed.
13         So, yes, the overall reoperation rate in
14 a transvaginal mesh procedure is higher than it would
15 be in a native tissue repair if you're comparing
16 recurrent prolapse, mesh exposures, development of
17 stress urinary incontinence, but again I will go back
18 and state that a reoperation to perform a 15 minute
19 excision of mesh is preferred to a reoperation to
20 address prolapse.  So it would not surprise me --
21     Q.    I'm just -- I'm sorry to interrupt you.
22 I'm just trying to get to --
23     A.    Well, let me finish my statement.
24     Q.    -- who think it's preferred?

Page 153

1     A.    Let me finish my statement and then you
2 can continue.
3         If I have a woman that has a transvaginal
4 mesh procedure that has a small mesh exposure
5 afterwards and I say to her, I didn't get this closed.
6 I got my dissection a little bit wrong.  You've got a
7 small little mesh exposure.  I apologize profusely.
8         Let me take you back to the operating
9 room or let me trim this here in the clinic and let me
10 get this taken care of as opposed to I did a native
11 tissue repair on a diabetic obese patient and she
12 failed.
13         Some of these randomized control trials
14 looking at transvaginal mesh, specifically Prolift
15 transvaginal mesh versus native tissue repair showed a
16 less than ten percent recurrence rate in the
17 transvaginal mesh arm, and between 45 and 50 percent
18 recurrence rate in the native tissue repair.
19         So I would expect the reoperation rate in
20 a transvaginal rate to be higher because what women is
21 going to say yes, I just went through two months where
22 I wasn't allowed to lift, push or pull anything heavier
23 than five pounds.
24         My surgery failed in less than a year and

Page 154

1  now you want to take me back to the operating room
2  again and do another prolapse repair where you're going
3  to put me on lifting restrictions again two months.  I
4  can't lift my grandbaby for another two months.  No, I
5  don't want to go back to the operating room and have
6  another three hour prolapse repair where I have to stay
7  in the hospital overnight.
8      So, yes, I would expect reoperation rates
9  for small mesh complications to be higher than somebody
10  that says, take me back and let's do it all over again.
11      Q.  Okay.  And, Doctor, for that statement in
12  the sources they list, Caquant, C-a-q-u-a-n-t.  I
13  didn't see that in your writings or in your binders or
14  materials, your reliance list or your report.
15      Is there any specific reason that you
16  would have excluded an article by that particular
17  author?
18      A.  I think we must be looking at a different
19  reference list.
20      Q.  I'm sorry.
21      A.  I don't see that author.
22      Q.  Hold on just one second.  Sorry, Doctor.
23  I'm just going to strike that question.
24      A.  Okay.

Page 155

1      Q.  And, Doctor, you were talking about --
2  earlier you made a remark about the lifting of five
3  pounds.  On our break I was able to go through your
4  reports and your markings, which we're going to mark
5  for the record as Exhibit 23 and Exhibit 24.
6      MS. GAYLE:  The POP report we'll mark as
7      Exhibit 23 that he's marked on and the
8      transvaginal report we'll mark as Exhibit 24 that
9      he's marked on.
10      (Exhibit 23 - POP report with markings.)
11      (Exhibit 24 - Transvaginal report with markings.)
12      THE WITNESS:  Will you need copies of
13      these?
14      MS. GAYLE:  Yes, doctor, we will.
15      THE WITNESS:  We will make copies of
16      those and get them to you.
17  BY MS. GAYLE:
18      Q.  And just to sort of tie up those loose
19  ends, you've got some orange highlighting on your
20  report as well as some ink marks.
21      A.  Yes.
22      Q.  Did you make those orange highlighting
23  marks on your POP report?
24      A.  Yes, I did.

Page 156

1      Q.  Did you make those orange highlighting
2  marks on your TVT report?
3      A.  Yes, I did.
4      Q.  And, Doctor, with regard to the ink
5  handwriting on those reports, is that your handwriting
6  in regard to the things written there in ink on your
7  POP report?
8      A.  Every word.
9      Q.  And is that your handwriting with regard
10  to your TVT report?
11      A.  Every word.
12      Q.  Okay.  So, Doctor, in other words,
13  counsel has not written on or made any markings on
14  those reports for you in advance of the deposition
15  today?
16      A.  No, they have not.
17      (Exhibit 16 - Cochrane Library Surgery for women
18      with posterior compartment prolapse review.)
19  BY MS. GAYLE:
20      Q.  Thank you, Doctor.
21      I'm handing you what's been marked as
22  Exhibit Number 16.  Doctor, if would you turn to page
23  two on that exhibit.
24      A.  Uh-huh.

Page 157

1      Q.  I believe, I'm not sure if I highlighted
2  it for you.  At the bottom is the page numbers, Doctor.
3  Are you there?  It says plain language summary.
4      A.  Hold on.  Yes.
5      Q.  And if you look down, I'm not sure if I
6  highlighted it, under other comparisons, the last
7  sentence.  "The mesh rate in the synthetic group
8  compared with the native tissue group was seven
9  percent."  Do you see that?
10      A.  I do.
11      Q.  Do you agree with that statement?
12      MR. WALKER:  Object to form.
13      THE WITNESS:  Okay.  Explain to me.  What
14      do you mean do I agree with that statement?  Do I
15      agree that in their Cochrane review and comparing
16      their randomized controlled trials that they found
17      a mesh exposure rate of seven percent?
18      Yes, I agree that that's what they found
19      in their trial.
20      Do I agree that that is a mesh exposure
21      rate that I have experienced with my patients?
22      No, I do not.
23  BY MS. GAYLE:
24      Q.  You have, as I understand your testimony,

C. Bryce Bowling, M.D.

Page 158

1 your experiences is that it's lower that seven percent?
2    A.    My experience is that.
3    Q.    And as we've talked about today, partly
4 some of your opinions today are based on your
5 experience as a urogynecologist, correct?
6    A.    Of course.
7    Q.    Doctor, if you would take a moment to
8 look at the author's conclusions.
9    A.    Okay.
10    Q.    And just let me know whether or not you
11 agree or disagree with their conclusions, particularly
12 the conclusion beginning with the words "evidence does
13 not support the utilization of any mesh."
14    A.    Well, to be more thorough it says
15 "evidence does not support the utilization of any mesh
16 or graft material at the time of posterior vaginal
17 repair", and I think we alluded to that earlier that we
18 have randomized controlled trials that do not show a
19 difference in mesh augmented and native tissue repairs
20 specifically in the posterior compartment.  That does
21 not hold true to anterior compartment.
22    Q.    Doctor, if one aim of the POP kit is to
23 restore sexual function, would you agree that a POP kit
24 should not make it worse?

Page 159

1        MR. WALKER:  Object to form.
2        THE WITNESS:  I'm sorry.  Say that again.
3 BY MS. GAYLE:
4    Q.    If one aim of the POP kit is to restore
5 sexual function in a patient, would you agree that a
6 POP kit should not make sexual function worse?
7        MR. WALKER:  Same objection.
8        THE WITNESS:  Well, so here that's not
9 really a yes or no answer either, so I'll give you
10 a quantitative answer.
11        Any surgery that is performed inside the
12 vagina can lead to dyspareunia.  What we have seen
13 in multiple randomized control trials and Cochrane
14 reviews is an actual increased rate of
15 postoperative dyspareunia, painful intercourse in
16 patients who were in the native tissue arms of
17 studies compared to transvaginal mesh arms of the
18 studies.
19        We also have an abundance of medical
20 literature that's specific to the posterior
21 compartments since you offered the Cochrane review
22 on posterior surgery, that actually show a
23 decrease in dyspareunia following implantation of
24 mesh for a indication of rectocele.

Page 160

1 BY MS. GAYLE:
2    Q.    And, Doctor, I looked through your
3 reports, both of them again and your reliance list and
4 your supplemental reliance list and I didn't see this
5 Cochrane review.  I know that you cited the 2016
6 Cochrane review.
7        Was there any particular reason that you
8 didn't cite the 2018 Cochrane review?
9    A.    This 2018 review?
10    Q.    Yes.
11    A.    Well, because the finding of this
12 Cochrane review is identical to the finding of the
13 other Cochrane review that I listed, that there was no
14 difference in mesh augmented or native tissue repair in
15 the posterior compartment.
16    Q.    And that's the sole reason that you
17 didn't use the 2018?
18    A.    It's repetitive if I put that in there.
19    Q.    And I believe that we've talked about
20 some of the repetitive information that you felt that
21 you excluded and this would be an example of that
22 repetitive information?
23    A.    Well, so the issue here is that we have a
24 Cochrane review that is a culmination of multiple,

Page 161

1 multiple randomized controlled trials that show that
2 there is no benefit of using mesh in the posterior
3 compartment.
4        What I will also put on the record,
5 possibly, you know, against your objection, is that
6 many of these studies and Cochrane reviews that we have
7 now were not available at the time that surgeons were
8 utilizing mesh in the posterior compartment.
9        So I don't fault physicians for using
10 mesh in a patient who had a prior native repair in the
11 posterior compartment that failed, because there were a
12 number of studies where people that failed the native
13 tissue arm of the study ended up going back to the
14 operating room to ultimately have their repair
15 finalized using a mesh product.
16    Q.    Doctor, you're limiting your answer only
17 to mesh in the posterior compartment?
18    A.    I thought that you were speaking
19 specifically about mesh in the posterior compartment.
20 If you want to talk about mesh in the anterior
21 compartment, we can switch gears and talk about that.
22    Q.    Do you believe that the rate of exposure
23 is different in the anterior compartment with the
24 native tissue arm?

C. Bryce Bowling, M.D.

Page 162

1    A.    I think that the overall exposure rates
2  vary greatly amongst studies and that if one study
3  tells me that they have a two percent mesh erosion rate
4  and another study tells me that they have a 40 percent
5  mesh erosion rate, it doesn't matter to me at that
6  point if it's in the anterior or the posterior
7  compartment.
8          What those numbers tell me and what
9  numbers -- we have one randomized controlled trial that
10  actually shows a range of mesh, it's a multi-center
11  randomized controlled trial, that shows a range of mesh
12  exposures from 0 percent to 100 percent.  They're
13  utilizing the exact same products.
14    Q.    Do you remember what the name --
15    A.    What that tells me --
16    Q.    -- of that study?  I'm sorry.
17    A.    I can find that for you.  What that tells
18  me is that this is an implantation issue, that this is
19  not a design flaw or a problem with the actual mesh.
20          This is a difference in the way that
21  surgeons at one location are implanting mesh,
22  performing their dissections, performing their closures
23  compared to surgeons at another location that may have
24  a mesh complication with every single case they do

Page 163

1  because they're not doing the case appropriately.
2    Q.    Okay.  Do you need to get that?
3    A.    I don't that.
4          MS. GAYLE:  Go off the record.
5          (Off record discussion.)
6  BY MS. GAYLE:
7    Q.    Doctor, in the Vandergriff case in
8  April of 2016 you had testified that "Ethicon and every
9  other company that has been involved in the mesh field
10  has trained way too many physicians that probably
11  should not have been trained."
12          It sounded like earlier you alluded to
13  that fact.  Is it still your opinion that only doctors
14  that have done specialized training in urogynecology
15  should be implanting these products?
16          MR. WALKER:  Object to form.
17          THE WITNESS:  It is my opinion, as I've
18  stated in both of my reports, that the onus falls
19  to the physician to make the determination on
20  whether or not they should be doing a repair.
21          So when I say that mesh corporations have
22  trained too many physicians, it's not necessarily
23  stating that Ethicon or Bard or Boston Scientific
24  or any of these companies are guilty of going out

Page 164

1  and training the wrong people, rather that there
2  are surgeons rolling in to various training
3  facilities, whether it be mesh or any other
4  product and doing cases that may not be in their
5  best interest to do.
6          I was trained to do bowel resections as
7  part of my fellowship.  I can do a bowel resection
8  if I need to.
9          I don't do bowel resections here because
10  we have board certified fellowship trained
11  colorectal surgeons that do bowel resections and
12  reanastomosis and complications related to those
13  on a daily basis.  So I leave those to the
14  colorectal surgeons to do.
15          That is me stepping out of my ego and
16  saying that I don't need to be a cowboy and do a
17  procedure that I may not be well trained to do.
18  So I think that to clarify that statement that it
19  is more of a problem with physicians seeking to be
20  trained, possibly when they don't have the
21  experience or the surgical acumen to perform a
22  procedure, but again that has to fall back to the
23  physician to make their determination of whether
24  or not they should be doing a procedure.

Page 165

1  BY MS. GAYLE:
2    Q.    Doctor, in your testimony in Vandergriff
3  you described a situation where sometimes doctors would
4  go to these training seminars and, in fact, you had
5  said that you yourself had gone to some and you hadn't
6  even laid your hand on the product, but you would still
7  get a certificate showing that you had actually
8  received training and if you were unethical, which you
9  had said in your testimony that you weren't and you
10  hadn't done this, so I'm not implying that you have,
11  that some doctors would perhaps take that certificate
12  to their hospital and would be able through that means
13  to implant a particular product.
14    A.    Yes, that actually occurred in --
15          MR. WALKER:  Object to form.
16          THE WITNESS:  That actually occurred in
17  one training facility that I went to with one
18  company that I went to, and I never went back to
19  another one of those companies again to implant a
20  product or to one of their seminars and refuse to
21  this day to utilize products from that very
22  corporation, and that was Boston Scientific.
23  BY MS. GAYLE:
24    Q.    Okay.  I was going to ask you, Doctor,

C. Bryce Bowling, M.D.

Page 166

1  what company that was.
2      A.    Yes.
3      Q.    And that has not happened to you?
4      A.    That has happened that I have seen with
5  Johnson & Johnson, Ethicon seminars that I have been to
6  in the past.  The only place that I ever saw that
7  happen was a Boston Scientific lab.
8      Q.    And certainly, Doctor, again just to
9  clarify the record, we're not talking about that you
10 have done this, nor am I making that allegation, I'm
11 saying that you have witnessed physicians that have
12 done this; is that correct?
13     A.    In the Boston Scientific lab I left with
14 a certificate stating that I was -- that I had
15 completed training on a product that I did not complete
16 training on.
17     Q.    And, Doctor, you certainly didn't tell
18 the hospital that you were equipped to implant that
19 product at that point in time since you never laid your
20 hands on the product?
21     A.    No, and I had no intention of ever
22 touching that product again.
23     Q.    Thank you, Doctor.  Is it opinion that
24 general OB/GYNs should be doing transvaginal mesh kits

Page 167

1  for pelvic organ prolapse?
2      A.    Again, it depends on the OB/GYN.  I think
3  it depends on their background and their training.
4          I think that the majority of prolapse
5  procedures and incontinence procedures in today's
6  landscape are handled by board certified
7  urogynecologists, but I do also feel that there are
8  several obstetrician/gynecologists out there that have
9  never done a fellowship that are perfectly qualified to
10 perform vaginal surgery, to correct prolapse, to
11 correct incontinence with and without the use of mesh.
12         So I think that's a very broad
13 generalizable statement that hopefully I've not made on
14 the record in the past.  If I have, then I want to
15 clarify that I do not think that prolapse and
16 incontinence procedures should only be handled by
17 urogynecologists.
18         I think there are a vast number of
19 obstetrician/gynecologists that have the certain
20 surgical skill, the education and the training to
21 perform these procedures.
22     Q.    Even if they're not fellowship trained
23 and board certified?
24     A.    Even if they are not fellowship trained

Page 168

1  and board certified.  If they have been adequately
2  trained.
3          We have a -- we have several members here
4  at the University of Tennessee that are not board
5  certified and are not fellowship trained, and they do
6  mesh slings on a regular basis and they do them well,
7  and I will take credit for training many of them.
8      Q.    I was going to ask you, who trained them?
9      A.    Me.
10     Q.    And, Doctor, when you trained those
11 physicians, did you incorporate, for instance, any
12 corporate materials, instructions for use from the
13 corporation?
14     A.    You know, from -- I don't get the best
15 follow-up reviews from medical students and I think a
16 large portion of that is because I don't turn a medical
17 student loose on a patient, and a lot of what I talk
18 about in clinic and in the operating room speaks to
19 complications that occur with surgeries.
20         We discuss warnings.  We discuss
21 complications.  We discuss what happens in the pelvic
22 floor when you make incisions in the vagina, when you
23 make incisions in the musculature.
24         We describe these things ad nauseam

Page 169

1  throughout the urogynecology rotation, throughout the
2  urogynecology conferences, throughout the general
3  gynecology conferences, both M & M conferences and
4  preoperative conferences as well as Grand Rounds.
5          So I hammer into the minds of my student,
6  my residents and hopefully one day my fellows that
7  these are surgical complications that can occur with
8  any type of vaginal procedure.
9          So we try as best we had can to make sure
10 that every person that leaves the rotation or every
11 person that leaves here as a resident or medical
12 student leaves with the understanding that it doesn't
13 just take a piece of mesh to cause a complication, that
14 you can cause the same complication with a suture.  You
15 can cause the same complication from an overaggressive
16 repair of a laceration at the time of the vaginal
17 delivery.
18         We've been asked to go back and take
19 people for reoperations due to overly aggressive
20 perineoplasties done at the time of vaginal deliveries
21 where there have been laceration.  So we try to hammer
22 this home that any type of vaginal procedure can lead
23 to these complications.
24     Q.    Doctor, is it your opinion that mesh adds

C. Bryce Bowling, M.D.

Page 170

1 an additional potential problem to surgeries for stress
2 urinary incontinence such as a potential for a foreign
3 body response?
4 　　　MR. WALKER:  Object to form.
5 　　　THE WITNESS:  No.
6 BY MS. GAYLE:
7 　　Q.　Why not?
8 　　A.　Well, let's compare it to what else we
9 have to treat stress incontinence.  If we want to
10 compare it to a Stamey, needle urethropexy or compare
11 it to a Burch or an MMK where we're utilizing permanent
12 sutures, sometimes multifilament permanent sutures that
13 we see, and unfortunately I'll point out that we see in
14 some of the repairs that are done.
15 　　　We have seen extraordinary tissue damage,
16 scarring, the need to take patients back to have
17 permanent sutures removed from their bladder, from
18 their urethra, from their rectums, permanent sutures
19 removed from underneath the vaginal wall and several
20 reconstructive procedures to deal with scar tissue that
21 was leading to dyspareunia so bad that the patients had
22 undergone a divorce, and you go back and you look
23 through their medical record there's no mention of mesh
24 anywhere.  This was native tissue repair with permanent

Page 171

1 sutures.
2 　　　So, no, I don't agree that these buzz
3 words of chronic inflammatory response, cytotoxicity, I
4 don't think that you can point directly toward a piece
5 of mesh and say this is the implantable material that
6 causes all of this and back it up with actual
7 scientific literature.
8 　　Q.　And, Doctor, and that's the same question
9 I have for you and you mentioned buzz words.  So
10 exposure.
11 　　　You don't believe that mesh presents an
12 additional potential problem to surgeries for stress
13 urinary incontinence with regard to exposure?
14 　　A.　So as I stated earlier today with regards
15 to specific mesh exposure, yes.  You can't have an
16 exposure of mesh without implanting mesh.
17 　　　With regards to an overall exposure of
18 implanted material, no.  We have case upon case upon
19 case of implanted permanent sutures used both in
20 prolapse and incontinence repairs that lead to
21 exposures and erosions and extrusions.
22 　　Q.　Okay.  That was going to be my next
23 question, Doctor.  I was going to include extrusions in
24 that but you went ahead and did that.

Page 172

1 　　　We talked about the contraction and the
2 shrinkage earlier today.  And, Doctor, do you feel like
3 there's -- mesh adds an additional potential problem to
4 surgeries for stress urinary incontinence such as
5 dyspareunia?  I believe you've already discussed that,
6 correct?
7 　　　MR. WALKER:  Object to the form.
8 　　　THE WITNESS:  No, we have ample evidence
9 　　that dyspareunia, sexual satisfaction, all improve
10 　　after the placement of mesh midurethral slings for
11 　　stress urinary incontinence.  That has been shown
12 　　time and time again in the literature.
13 BY MS. GAYLE:
14 　　Q.　And off top of your head, Doctor, do you
15 know who you're referring to for that?
16 　　A.　Which study we're referring to for that?
17 　　Q.　Yes, Doctor.  Thank you.
18 　　A.　I'll give you a list.  This is why I have
19 highlights in these.  I'm trying to make it easier for
20 me to find one paragraph in a 50 page report, which
21 isn't always easy.
22 　　　The long-term prevalence of dyspareunia
23 in patients receiving midurethral slings for stress
24 urinary incontinence is extraordinary small.  In fact,

Page 173

1 multiple studies show improvements in sexual function
2 for sexually active patients treated with mesh
3 midurethral slings for stress urinary incontinence.
4 　　　The authors that I've cited for that
5 statement are Halina Zyczynski in 2012 in a report
6 titled Sexual Activity and Function in Women More than
7 Two Years After Midurethral Sling Placement.
8 　　　Additional citations there were for a
9 report titled Sexual Function Following Retropubic TVT
10 and Transobturator Monarc Sling in Women with Intrinsic
11 Sphincter Deficiency, a Multi-center Perspective Study.
12 That was published in 2012 in the International
13 Urogynecology Journal as well as Mengerink's 2016 study
14 titled The Impact of Midurethral Sling Surgery on
15 Sexual Activity and Function in Women with Stress
16 Urinary Incontinence.
17 　　Q.　Thank you, Doctor.  With regard to
18 dyspareunia, you previously testified that there's a
19 number of different reasons why dyspareunia would
20 occur.
21 　　A.　Correct.
22 　　Q.　Improper placement of the mesh, correct?
23 　　A.　Improper placement of mesh or any implant
24 procedure.

C. Bryce Bowling, M.D.

Page 174

1    Q.    That would include whether or not the
2  mesh was -- if the dissection plane that the mesh was
3  placed in was the wrong dissection plane, correct?
4    A.    Yes.  So let me help you clarify.  Do I
5  that think the insertion, the proper insertion of a
6  mesh midurethral sling causes dyspareunia?  No, I
7  don't.
8        Do I think that the improper insertion of
9  a mesh midurethral sling can cause dyspareunia?  Yes, I
10  think that the improper insertion of a mesh midurethral
11  sling can lead to scarring just like the improper
12  insertion of a permanent suture for stress urinary
13  incontinence can cause vaginal scarring as well as
14  dyspareunia.
15        So do I think the mesh itself causes the
16  dyspareunia?  Absolutely not.
17    Q.    So the improper placement in that
18  dissection, is that of a doctor that's a bad doctor?
19        MR. WALKER:  Object to form.
20        THE WITNESS:  Well, look, I'm not --
21  BY MS. GAYLE:
22    Q.    Or a poorly trained doctor?
23    A.    I'm not going to throw him under the bus
24  in either of those scenarios, okay?  I'm just not going

Page 175

1  to do that.  What I will tell you is that I think there
2  are different skill sets among physicians and that some
3  physicians are better trained than others.
4        That being said, I could have a
5  complication next week from a midurethral sling that I
6  placed and I consider myself to be exceptionally well
7  trained.  I'm still human.  I could make a mistake.  I
8  could get my dissection plane incorrect.  I could get
9  my closure incorrect.
10        I could have a patient that doesn't
11  follow the post-operative restrictions, goes home and
12  lifts a 50-pound bale of hay three days after her
13  procedure and pops her incision open and exposes her
14  mesh.  Any of that could happen to me or to a
15  non-fellowship trained surgeon.
16    Q.    Doctor, do you believe that the
17  corporations that make these products have any
18  responsibility in training physicians?
19        MR. WALKER:  Object to form.
20        THE WITNESS:  Well as I said earlier,
21  corporations aren't really there to train me how
22  to do a procedure.
23        It is my responsibility as a surgeon, as
24  a pelvic surgeon who is taking women to the

Page 176

1  operating room, and the fact that we're having a
2  conversation about this I find mind boggling.
3        Any surgeon that is willing to take a
4  woman to the operating room and put her to sleep
5  and cut on her body has an obligation to make sure
6  that they are trained to do a procedure before
7  they go.
8        If you need a valve replacement in your
9  heart, please don't come to my office and ask me
10  if I'm trained to do that, okay?  I'm not.  I'm
11  not going to make a decision to take somebody to
12  the operating room and do something that I'm not
13  well trained to do.
14        So as I've stated in my reports and here
15  today several times, the onus falls to the
16  physician to make the determination of whether or
17  not they should be doing a procedure.
18  BY MS. GAYLE:
19    Q.    And I appreciate that, Doctor, but again
20  do you think that the company has a role in training
21  physicians?
22        MR. WALKER:  Object to form.
23        THE WITNESS:  I will not say that they
24  have a role in training physicians.  I do think

Page 177

1  that a corporation has a role in educating
2  physicians.
3  BY MS. GAYLE:
4    Q.    And how would you expect a company to
5  educate physicians?
6    A.    Well, for instance, Ethicon's Surgeons'
7  Resource Monographs.  Their availability of training
8  opportunities for surgeons to learn.  Their
9  instructions for use.  Their multiple documents that
10  they make available for physicians who choose to seek
11  out those products, and who choose to do those type of
12  procedures.  They are there for the taking.
13        The problem is that we have several
14  physicians and dare I say a generation of physicians
15  that don't take the time to seek out data and don't
16  take the time to seek out additional training.  They
17  don't take the time to seek out or to spend the actual
18  time learning how to properly do a procedure.
19        A physician that wants to learn how to do
20  a midurethral sling in my residency program, I don't
21  send them to Ethicon and allow Ethicon to teach my
22  resident how to do a midurethral sling.  I take my
23  resident to the operating room and teach them how to do
24  a midurethral sling.

C. Bryce Bowling, M.D.

Page 178

1    I don't rely on Ethicon to provide
2 anything to my residents. That resident when they
3 leave this program after four years should be skilled
4 at inserting transobturator slings and retropubic
5 midurethral slings, and I would venture a guess that
6 out of the 16 residents that we have in this program
7 every single one of them will leave this program
8 without seeing an Ethicon representative in this
9 hospital.
10    Q.    And, Doctor, would they have seen during
11 the course of your training any of Ethicon's materials
12 like the surgeons' monograph?
13    A.    They may have. They may have seen that.
14 They may have seen an IFU.
15    Q.    Is that something that you would show
16 them depending on --
17    A.    Depending on what the conversation was at
18 that time, yes, but IFUs are readily available in the
19 operating room. It is the role of each physician
20 learner, each resident that walks into the operating
21 room to decide how much they want to learn before they
22 leave that day.
23    If they just want to come in and do
24 enough of the surgery that they can go to their

Page 179

1 computer and check off their ACGME requirement that
2 they worked on a midurethral sling that day and they
3 have no desire to learn how to do a midurethral sling
4 because when they leave here they're going to do a MFM
5 fellowship. They're going to do amniocentesis every
6 day. That's fine. That's their role.
7    However, if I have a resident that comes
8 in here that is planning on doing a urogynecology
9 fellowship or they're planning on doing pelvic
10 reconstructive procedures when they finish their
11 residency program, you better believe that I expect
12 that resident to do everything that they can do in the
13 operating room, outside the operating room to learn not
14 only about the patient, the implantation of the
15 material, but the complications and the risks that go
16 along with vaginal surgeries. That is what they are
17 here to learn. That's their obligation.
18    Q.    Doctor, in your practice, how many
19 clients or patients, excuse me, would you estimate that
20 have had complications from the transvaginal mesh
21 itself?
22    MR. WALKER: Object to form.
23 BY MR. GAYLE:
24    Q.    Not a placement issue, none of the issues

Page 180

1 that you talked about, actually from the mesh itself?
2    A.    Are you asking about my personal patients
3 or are you asking about patients that are referred to
4 me, because I am a referral center for mesh
5 complications.
6    Q.    Break it down both if you wish, Doctor.
7    A.    Well, mesh complications that I attribute
8 to the mesh?
9    Q.    Yes.
10    A.    Zero.
11    Q.    Okay. And that would be that are
12 referred or that you have also operated or both?
13    A.    Well, so I'm going back again and I'm
14 going to restate what I said from earlier.
15    Do think that a piece of mesh used in
16 prolapse repair or used in an anterior incontinence
17 repair has the ability to cause a complication on its
18 own if it's been placed in an appropriate patient by a
19 skilled physician, in an appropriate manner, in a
20 patient that follows their postoperative restrictions?
21    No, I do not think that there will be any
22 type of mesh complication in a patient like that.
23    Q.    And that would go for complications such
24 as degradation?

Page 181

1    A.    Well, you know, I don't really believe
2 that degradation occurs. We have good scientific data
3 from last year that shows that what has been termed
4 degradation quote unquote in the past is not really
5 degradation of the mesh itself, but more of a cracked
6 layer of the formalin fixation process that occurs
7 after putting the mesh into formalin. It's not an
8 actually degradation of the mesh.
9    We have data that looks at mesh weights
10 pre and post-insertion that shows that their weights
11 are the same. You can't have degradation of a mesh
12 that doesn't lose weight.
13    Q.    And, Doctor, that study that you're
14 referring to is Thames, T-h-a-m-e-s; is that correct?
15    A.    That's correct.
16    Q.    And you have testified earlier this
17 morning that you haven't done any sort of, excuse me,
18 strike that.
19    You haven't published any sort of report
20 on degradation in a peer-reviewed journal, correct?
21    A.    I have not.
22    Q.    Doctor, does your experience with not
23 having any mesh complication patients or -- strike
24 that.

C. Bryce Bowling, M.D.

Page 182

1    Does your experience as you've just
2  testified with zero complications in your patients
3  attributable to mesh shape some of the opinions that
4  you might have using these products?
5         MR. WALKER:  Object to form.
6         THE WITNESS:  Well, first of all, I
7    didn't say that I had zero complications.  I have
8    an extremely low complication rate.
9  BY MS. GAYLE:
10   Q.   Complications attributable to mesh,
11 Doctor.
12   A.   So again, if we're teasing this out and
13 saying how many complications do I have in my practice
14 that I would say the mesh caused that problem?  None.
15       How many complications have I had in my
16 patients that I could attribute to something that I
17 messed up in the operating room or that the patient
18 messed up by not following restrictions or where a
19 piece of mesh was placed into an inappropriate patient
20 and referred to me for removal or revisions, those
21 patients exist.  My complication rate is very low.
22   Q.   And I'm just asking with regard to the
23 mesh complications, not a patient factor or improper --
24   A.   Well, they are mesh complications still.

Page 183

1  So I think we need to make sure that we're defining
2  this appropriately.
3         Whether or not I mess something up or
4  another surgeon messes something up or the patient
5  doesn't follow a restriction and they come back in with
6  a complication from their mesh, you can still term that
7  a mesh complication.  But do I look at the mesh and say
8  this evil mesh caused this?  No, I don't.
9    Q.   Okay.  Thank you, Doctor, for that
10 clarification.  And so you've seen zero where you would
11 say this evil mesh has caused this problem, correct?
12   A.   That's correct.
13        MR. WALKER:  Object to form.
14 BY MS. GAYLE:
15   Q.   Okay.  And does that experience help
16 shape your opinions, some of the opinions that you
17 might have using these types of products?
18        MR. WALKER:  Object to form.
19        THE WITNESS:  I think the products in my
20   hands are perfectly safe.
21 BY MS. GAYLE:
22   Q.   So that's a yes, that experience would
23 shape some of your opinions?
24   A.   If I -- well, look.  You know, it's a

Page 184

1  combination as we've stated several times today of my
2  training, my background, my experiences, and what I
3  have found in the medical literature that bring me back
4  to the same statement every time that these products
5  have been shown and effective for decades.
6    Q.   And certainly, Doctor, if you were
7  experiencing lots of or seeing lots of patients where
8  you could say hey, this is evil, in your words, evil
9  mesh could have caused those bucket of patients to have
10 problems, that might change your opinion on the
11 products?
12        MR. WALKER:  Object to form.
13        THE WITNESS:  No.  You know, if I was
14   having a multitude of patients come back into my
15   office with mesh complications, I would start to
16   re-evaluate myself and ask myself whether or not I
17   am skilled enough to be doing these procedures.
18 BY MS. GAYLE:
19   Q.   And you wouldn't attribute it at all to
20 anything about the mesh products?
21   A.   Based on my education, background,
22 experiences and review of the medical literature, no.
23   Q.   Doctor, you talked about the pore size in
24 your report and one of the questions I'd like to ask

Page 185

1  you is your knowledge about -- basically about the pore
2  sizes that you talk about, and you've already said that
3  you haven't published anything in a peer-reviewed
4  journal regarding degradation.
5         Have you published anything in a
6  peer-reviewed journal regarding pore size?
7    A.   I have not.
8    Q.   You testified earlier that sometimes you
9  look at it under a microscope, mesh, and sometimes you
10 have not looked at it under a microscope, correct?
11   A.   That's correct.
12   Q.   Before you were retained as an expert for
13 Ethicon did you ever talk about pore size to your
14 patients?
15   A.   Yes, actually I have.  I have told
16 several patients that the type of mesh that we use,
17 this is especially true of patients who come in after
18 they see one of these ridiculous commercials on TV.
19       Patients come in asking about mesh.  I
20 have told them that we have ample evidence pointing to
21 the long-term efficacy and safety of macroporous
22 polypropylene mesh and we have talked about the
23 differences between meshes that are macroporous and
24 meshes that are not.

C. Bryce Bowling, M.D.

Page 186

1    Q.    And, Doctor, which awful commercials are
2  you talking about?
3    A.    Oh, come on now.
4    Q.    Now, Doctor I --
5    A.    I think if you've watched TV anytime in
6  the last five years, I bet if I put you under oath you
7  wouldn't tell me that you've never seen a commercial
8  about mesh complications.  So I think we can all stop
9  playing games and admit that we know what mesh
10  complications are --
11    Q.    Doctor, I don't have TV.  I have Netflix
12  actually, so I would ask you --
13    A.    So you've been watching the Bleeding
14  Edge, then.
15    Q.    Yes.  Doctor, so again --
16    A.    I'm talking about --
17          MR. WALKER:  Let her ask the question.
18  BY MS. GAYLE:
19    Q.    Again, what type of -- what type of
20  commercials, just to clarify the record, Doctor?
21    A.    So the type of commercials that I am
22  talking about are generalized bull, plaintiff attorney
23  generated commercials on TV that state if you have had
24  one of these mesh products please call the following

Page 187

1  number, you may be entitled to compensation.
2    Q.    Okay.  Thank you, Doctor.
3    A.    Sure.
4    Q.    Doctor, you do you believe that there is
5  a certain pore size that mesh should be to properly
6  integrate into tissue?
7    A.    I think that a macroporous polypropylene
8  mesh such that the pore size is above 75 microns has
9  been shown safe and effective as an implant in the
10  human body since the 1960s.
11          MS. GAYLE:  Counsel, do you need to take
12  a real quick break?
13          MR. WALKER:  No, just stretching.
14  (Exhibit 17 - Document entitled Long-term outcome
15    of vaginal mesh or native tissue in recurrent
16    prolapse:  A randomized controlled trial.)
17  BY MS. GAYLE:
18    Q.    Doctor, I'm going to hand you what's been
19  marked as Exhibit 17.  And, Doctor, could you read the
20  title of that, for the record?
21    A.    Long-term outcome of vaginal mesh or
22  native tissue in recurrent prolapse:  a randomized
23  controlled trial.
24    Q.    And, Doctor, we have talked about this

Page 188

1  over the course of the day regarding native tissue
2  repairs.
3          Again, I didn't see in your report or
4  your reliance materials this particular article.  Are
5  you familiar with this article?
6    A.    I may have seen it at one point.
7    Q.    If it was excluded from your report or
8  your materials, is there any particular reason that you
9  would have excluded it that you can think of?
10    A.    No, I'll be happy to include it in my
11  report.  It actually shows here that the pain with mesh
12  was 39 percent while the pain with native tissue was 50
13  percent.  So I wouldn't have a problem including that
14  in my report at all.
15          Mesh exposure rate was 42 percent in this
16  trial and as we've talked about several times there are
17  a number of different factors that go into a mesh
18  complication.
19          One of the things that I'll point out to
20  you is that is a this long-term outcome of vaginal mesh
21  or native tissue in recurrent prolapse.  So this is a
22  woman that has already had a recurrence of her
23  prolapse.
24          That means that she has had a previous

Page 189

1  repair, which means that she has previous scarring and
2  that she is at risk for recurrent prolapse, and the
3  people that we find that are at risk for recurrent
4  prolapse are obese, smokers, diabetics, the same people
5  that have an increased risk of having a complication
6  from any implantable material because of their medical
7  comorbidities.
8    Q.    Doctor, on this particular article on
9  page 850 or you can look at it as page four under the
10  discussion.  Oh, I'm sorry, Doctor, this page.
11    A.    I have 854.  I don't have a page four.
12  You said 850?
13    Q.    850.
14    A.    Sorry.
15    Q.    Under discussion.
16    A.    Yes.
17    Q.    At the bottom of the second column a
18  sentence.  Let's see one, two, three, four, five, six
19  lines up.  It starts with the word one.  One should
20  consider.  Do you see that, Doctor?
21    A.    Yes.
22    Q.    That sentence.  One should consider,
23  however, that total vaginal mesh implants are
24  associated with a significantly higher risk of mesh

Page 190

1 exposure.

2     A.    Compared to what?

3     Q.    That's what they're talking about.

4     A.    So like you pointed out before you

5 started asking questions, I'm not familiar with this

6 study. So I'm asking you if you're pointing to this as

7 a question, if they are saying that they have a

8 significantly higher risk of mesh exposure, I'm asking

9 you what are they comparing that to?

10     Q.    I'm just sort of getting to whether or

11 not you have reviewed this or it looks familiar,

12 Doctor. You said you would be willing to incorporate

13 it into your report, but it's not currently, presently,

14 right?

15     A.    Before I would incorporate it into a

16 report, I would go back and I would read through this.

17 I would find out if it is a viable piece of scientific

18 literature.

19     If the scientific process was followed

20 appropriately and if this was something that we could

21 consider to be a viable study and if so, then we could

22 happily incorporate these findings into a report,

23 because it doesn't change anything.

24     You demonstrating one study with a

Page 191

1 40 percent mesh erosion rate for every one that you do

2 that, I can turn around and show you a similar study

3 that has a zero to five percent erosion rate.

4     Q.    And, Doctor, I noticed in your materials

5 and your reliance list, your supplemental reliance list

6 and your reports, for instance, that you might have one

7 article for a particular author but you maybe didn't

8 have additional articles for a particular author.

9     Was there any reason that you might have

10 excluded some of the author's writings even if it was

11 on these subjects?

12     A.    Well, so I'll take Meyer, for instance.

13 I'm sure that Dr. Meyer has written numerous scientific

14 articles, and as I pointed out at the beginning of this

15 deposition, the articles that I incorporated into this

16 I tried to -- whether they were showing low

17 complications, high complications, ineffective,

18 effective, we try to incorporate randomized controlled

19 trials of the highest quality with the longest

20 available follow-up.

21     We tried to incorporate Cochrane reviews

22 that showed a comprehensive picture of mesh procedures

23 and non-mesh procedure comparing those in prolapse and

24 incontinence patients.

Page 192

1     So no author was specifically targeted

2 and excluded, and no report was specifically targeted

3 or excluded based on the finding of their scientific

4 writings.

5     Q.    Including the authors with adverse

6 literature to your opinions?

7     A.    I have several, several in here that I

8 can point to that showed mesh erosion rates in the

9 20 percent range.

10     Q.    And, Doctor, we're going to talk about

11 that because you list several opinions where you state

12 that plaintiffs' expert or plaintiffs' counsel contend

13 one thing or the other.

14     A.    Sure.

15     Q.    But you list no citations for that, and

16 so I'd like to get to who you're talking about.

17     A.    Sure, let's go through that.

18     Q.    We'll get to that in a moment. I also

19 noticed that you didn't include any consensus

20 statements from the European Urology Association and

21 the European Urogynecological Association.

22     Was there a particular reason why you

23 didn't include those in your reports?

24     A.    Well, we're not in Europe. You know, I

Page 193

1 think the majority of the scientific bodies that we

2 have included in here were ones that I am familiar with

3 here in the United States or that have a large presence

4 here in the United States.

5     International Continence Society,

6 International Urogynecologic Association, American

7 Urogynecologic Association, AAGL, Society of

8 Gynecologic Surgeons, these are all governing bodies

9 that have a large presence here in the United States

10 that are looked to to provide sound scientific

11 reasonable conclusions.

12     Q.    Doctor, you're a member of AUGS, correct?

13     A.    I am.

14     Q.    And, in fact, AUGS, I believe was one of

15 the societies that you've been a member of for quite

16 some time, correct?

17     A.    Yes.

18     Q.    Do you remember when again?

19     A.    I don't. It's in my CV.

20     Q.    Okay. Doctor, this is an update dated

21 February 13, 2018 on vaginal mesh with prolapse and

22 incontinence and they talk about on the second page

23 that the Scottish government had released an

24 independent review of the safety and efficacy of mesh

C. Bryce Bowling, M.D.

Page 194

1  in their findings, and that the current evidence does
2  not indicate any additional benefit.  I did not see
3  that information in there.
4        Was there a particular reason that you
5  didn't include that information or is it the same
6  answer as you just gave?
7     A.    Well, this is a similar statement to what
8  we have from our governing body here in the United
9  States, the FDA.  So, you know, I can go back and if
10 you want to give me information, I can turn into this
11 150 page report, but for the sake of trying to keep
12 things concise and for the sake of trying to use the
13 largest governing bodies that people here that would be
14 involved in trials and depositions in the United States
15 would be familiar with, I tried to keep it concise.
16    Q.    So you have no opinion as you sit here
17 today whether you agree or disagree with those bodies?
18    A.    I would have to take the Scottish review
19 and sit down and go through that, and I'm happy to do
20 that if you'd like.
21    Q.    The same thing with the UK review?
22    A.    Sure.
23    Q.    Same thing with the Australian review?
24    A.    Yes.

Page 195

1     Q.    Same thing with the New Zealand review?
2     A.    Correct.
3     Q.    And you haven't done that, have you,
4  Doctor?
5     A.    I think I may have alluded to one in my
6  report.  I'm not sure.  It might have been the New
7  Zealand.  I'm not sure.  I'd have to go back and look
8  through there.  I can do that.
9     Q.    Yes.
10       MS. GAYLE:  If you want to go off the
11    record.  But Madam Court Reporter, before we do
12    that we are going to mark that as 22 if I didn't
13    already say that.  Thank you.
14    (Exhibit 22 - AUGS document entitled Update on
15    Vaginal Mesh for Prolapse and Incontinence dated
16    March 2017.)
17 BY MS. GAYLE:
18    Q.    Doctor, did you find that references?
19    A.    I did, yes.  This is on page 36 of my TVT
20 report.  This is talking about the FDA's -- this is
21 talking about the FDA's statements as well as the
22 responses from the American Urogynecologic Society and
23 in conjunction with the Society of Urodynamics Female
24 Pelvic Medicine and Urogenital Reconstruction otherwise

Page 196

1  know as SUFU.
2        That joint statement said that this
3  procedure, the mesh midurethral sling for stress UI is
4  probably the most important advancement in the
5  treatment of stress urinary incontinence in the last
6  50 years and has the full support of our organizations
7  which are dedicated to improving the lives of women
8  with urinary incontinence, and there was a supporting
9  list of organizations that signed on to that, including
10 AAGL, ACOG, the National Association for Continence,
11 International Urogynecologic Association as well as the
12 Society of Gynecologic Surgeons.
13       I also reference in here that the Royal
14 Australian and New Zealand College of Obstetrics and
15 Gynecologists had stated in their 2018 position
16 statement that in the case of stress urinary
17 incontinence and the use of midurethral sling, this
18 surgery has been extensively reviewed with numerous
19 high quality studies.  Overall the safety profile has
20 found to be very good with high success rates.  In most
21 cases women's quality of life and sexual function
22 improved significantly after this surgical
23 intervention.
24    Q.    So you did review the Australian

Page 197

1  findings?
2     A.    I reviewed their position statement from
3  2018.
4     Q.    Okay.  Thank you, Doctor.  Doctor, if we
5  can look back to your reports at Exhibit 7 and
6  Exhibit 4 and place them in front of you.
7        Exhibit 4 being page 13, and Exhibit 7
8  being page 14, and we kind of talked about this
9  earlier, Doctor, where we had some repetitive language
10 in the report and I think you talked about how some of
11 that might have been cut and pasted or copied over like
12 your qualifications and so forth.
13    A.    Uh-huh.
14    Q.    Looking at Section D on that page, the
15 language for both reports seems again to mirror each
16 other except for the words that I've circled for you
17 with regard to pelvic organ prolapse on Exhibit 4 and
18 stress urinary incontinence on Exhibit 7, and the last
19 of then the phrase where it ends with high failure
20 rates, and the last of that sentence on Exhibit 7 and
21 high complication rates patients were experiencing with
22 previously available repairs.
23    A.    So I see two sentences here that are
24 almost identical.

## Page 198

1  Q. Okay.

2  A. And the reasoning behind that is that

3  these are mesh augmented surgical repair procedures,

4  and that there is a certain amount of overlap when you

5  talk about mesh augmented repairs and those statements

6  are based on years of good scientific data that show

7  what the procedure's efficacy is, and trying to outline

8  for people that may be lay persons what the overall

9  goals of correction of prolapse and urinary

10 incontinence are, and those are to restore anatomic

11 function and anatomic support and to hopefully provide

12 good scientific evidence that in order to help restore

13 anatomic function that some -- that some patients

14 benefit from the use of mesh.

15 Q. Thank you for that clarification, Doctor.

16 And then on page 14 of Exhibit 4 and page 16 of

17 Exhibit 7 you have another paragraph beginning with the

18 words polypropylene in Exhibit 4.

19      Polypropylene despite assurances from

20 plaintiff's counsel has been shown safe and effective

21 for decades, and then again if you look at Exhibit 7 it

22 says polypropylene with a clause that I've circled for

23 you, material make-up of the TVT despite assurances

24 from plaintiff's counsel has been shown safe and

## Page 199

1  effective for decades.

2      That sentence along with much of the rest

3  of the paragraph is repetitive in both reports. Is

4  this also because that information crosses over?

5  A. Yes. They are both the material make-up

6  of the TVT and the material make-up of the Prolift are

7  polypropylene. So, yes, there's a certain amount of

8  overlap as I stated earlier in mesh materials used for

9  pelvic organ prolapse and stress incontinence.

10     This is a very generalized paragraph that

11 is there specifically to point out that these materials

12 are polypropylene and that polypropylene had been

13 deemed safe and effective by the FDA originally back in

14 1969.

15 Q. And, Doctor, if you would turn to

16 Exhibit 7 on page 28. You have nearly the exact

17 language again that we have just read.

18 A. Yes. Yes. It's a very long report.

19 Q. Is there any reason that you copied that

20 paragraph twice?

21 A. Yes. It's a very long report, and I feel

22 that -- I felt that it was necessary to try to break a

23 50 page report down into appropriate sections, and some

24 of that information on polypropylene I put into the

## Page 200

1  safety section of Exhibit 7 and I don't think we

2  actually have a safety section on Exhibit 4.

3      If we do, it may not be labeled exactly

4  the same because these two reports were prepared at

5  separate times. So I think that I reiterated that just

6  as a means of showing the FDA had deemed that product

7  safe and effective.

8  Q. And, Doctor, what I couldn't figure out

9  though is when you copied it from page 16 and

10 reiterated it on page 28 on Exhibit 7, the one

11 difference you left out is at the end of the second to

12 last sentence where on page 16 the clause is but

13 surgeries throughout the body, but on page 28 --

14 A. I'm sorry. Which page is that one?

15 Q. Page 16, and you'll see the phrase three

16 lines from the bottom, but surgeries throughout the

17 body.

18 A. Okay.

19 Q. And then in the next -- in the copy

20 material on page 28 --

21 A. Yes.

22 Q. -- you leave that off.

23 A. Right.

24 Q. Is there a specific reason for that?

## Page 201

1  A. No, nothing nefarious there just -- and I

2  think that goes to the point that I made earlier, not

3  all of this is an episode where I've copied and pasted

4  a paragraph.

5      Some of this, as I've stated earlier, is

6  me dictating my thoughts into a report. So there may

7  be sentences that look very similar in nature that may

8  have one or two words that are differing, but I assure

9  you there's no nefarious design there in those

10 admissions.

11 Q. And again if they transfer, the language

12 transferred from one report to the other, you would

13 simply put that language in your other report, correct?

14 A. Depending on what the language was, yes.

15 Q. But if the language transferred?

16 A. If the language transferred, I would use

17 some of the language from one report in to another as

18 long as it wasn't anything that was specific to a

19 certain product that did not cross over.

20 Q. And, Doctor, in both reports you make a

21 statement when you're talking about the polypropylene

22 in that particular paragraph. You say "despite

23 assurances from plaintiff's counsel".

24 A. Sure.

C. Bryce Bowling, M.D.

Page 202

1    Q.    What assurances are you talking about?
2    A.    Oh, well, again these TV commercials.
3 This is all plaintiff's counsel TV commercials that we
4 see that are making references to mesh migration and
5 references and innuendos that mesh can crawl around the
6 body and wreck havoc, and it's just a generalized term,
7 and I think if general -- if plaintiff's counsel and
8 plaintiff's expert want to come forward and say that
9 they don't believe that, well I'd be happy to hear it.
10   Q.    And, Doctor, again I'm just trying to get
11 to sort of the source of what you're referencing there
12 so --
13   A.    Well, I think my source is a combination
14 of seeing commercials on TV. My source is being
15 deposed several times in the past by plaintiffs'
16 counsel who as you have done today tend to word
17 questions in such a way that makes the mesh seem to be
18 a dangerous product, when I as a surgeon, researcher,
19 and scholar know that that's not the case.
20   Q.    And, Doctor, I haven't tried to word my
21 questions where it makes mesh seems as a dangerous
22 product. Again, as I've told you many times my job is
23 just to get to the basis of your opinions.
24        And in one report you do cite your

Page 203

1 sources periodically and the other report it's devoid
2 of citations and so --
3    A.    Can you point to the area where I'm
4 devoid of citations?
5    Q.    Particularly in the section on Exhibit 7,
6 for instance, when you're talking about plaintiffs'
7 counsel and/or plaintiffs' experts.
8        So I'm just trying to figure out, for
9 instance, page 29, you're talking about mesh
10 degradation.
11   A.    Sure.
12   Q.    And you say any suggestions by
13 plaintiffs' counsel regarding mesh degradation are not
14 supported by reasonable medical literature.
15   A.    Correct.
16   Q.    Again, I'm trying to figure out which
17 plaintiffs' counsel, who you're talking about?
18   A.    I didn't make any names. I didn't place
19 names in here and --
20   Q.    Can you tell us who you're talking about?
21   A.    I tell you what we'll do. I have, with
22 discussions with counsel, I have made a decision not to
23 call out any of the plaintiffs' experts.
24        If you go through plaintiffs' experts'

Page 204

1 reports, I think it will be abundantly clear what I'm
2 saying here, but I do know some of these people on a
3 personal level, and I'm not going to take a colleague
4 and throw them under the bus and try to make them look
5 foolish which would be played out in courtroom dramas
6 over and over and over again.
7        What I will say is that in the reports,
8 the general reports as well as the case specific
9 reports that I have reviewed, that I have seen multiple
10 experts make claims, unsubstantiated claims of
11 cytotoxicity, chronic inflammation, degradation and
12 everything else that I have listed here.
13       So while I have not named them, rest
14 assured that if I have made a claim that plaintiffs'
15 experts have made claims in their statements it has
16 been something that I have seen.
17   Q.    And, Doctor, it's not my job to go
18 through those reports and to find the language that
19 you're referencing.
20   A.    And if my counsel --
21       MR. WALKER: Let her finish.
22 BY MS. GAYLE:
23   Q.    And so what you're telling me is is that
24 your counsel has instructed you not to say what the

Page 205

1 basis --
2    A.    No, you're putting words in my mouth. I
3 didn't say that.
4    Q.    You said under your counsel you have --
5    A.    I have made the decision after
6 discussions with counsel. I have made that decision.
7    Q.    Now, is this your counsel that's
8 representing you on a personal level or your counsel
9 representing you in your expert capacity?
10       MR. WALKER: Hang on. This is getting
11 out of hand. First of all, you're not going to go
12 into anything that you and I have discussed.
13       Second of all, I think he's being very
14 clear he's talking about decisions he's making out
15 of professional courtesy to his colleagues and I
16 think that's the scope of what is going on.
17       THE WITNESS: Correct.
18       MS. GAYLE: Well, we can't be here trying
19 to discover the basis of his opinion when he's
20 going to call out his colleagues and then not cite
21 who --
22       THE WITNESS: The basis --
23       MS. GAYLE: -- and not cite who he is
24 referencing. We have the right to figure out what

C. Bryce Bowling, M.D.

Page 206

1 he's referring to in this material.

2     MR. WALKER: And that information is

3 found in great detail on his reliance list for the

4 specific expert reports that he has been sent and

5 reviewed are itemized.

6     MS. GAYLE: We can't be expected to find

7 out what language he is quoting. We don't know

8 where this comes from and then he's also saying

9 plaintiffs' counsel. Which plaintiffs' counsel?

10     THE WITNESS: You've not read plaintiffs'

11 experts reports?

12     MS. GAYLE: Excuse me.

13     MR. WALKER: Hang on.

14     MS. GAYLE: Which plaintiffs' counsel?

15 We have again, we have to the right to figure out

16 what sources and what his basis of his opinions

17 are, and so if he claims that plaintiffs' counsel

18 has made that we have the right to say that.

19     He uses that phrase repetitively

20 throughout his report, and so if his response is

21 hey, I'm not going to name them, then he can't

22 tell me who his sources are and so that we can

23 pull up that particular expert's report and then

24 look at what he's talking about and trying to

Page 207

1 rebut?

2     THE WITNESS: The sources are in the

3 reliance list.

4 BY MS. GAYLE:

5     Q.   So --

6     A.   Have a perusal through the reliance list,

7 review the plaintiffs' experts' reports and you will

8 find that information.

9     Q.   So you can't say which plaintiffs' expert

10 talked about mesh degradation?

11     A.   I already stated several times that

12 several of the experts' reports that I read had similar

13 information in them, almost as if they had been copied

14 and pasted between plaintiffs' experts, similar

15 information.

16     Q.   Doctor, if you're rebutting something

17 from one of our experts, if these cases were to go to

18 trial, we would need to know whose opinion you're

19 specifically rebutting?

20     A.   And if you want to give me a plaintiffs'

21 experts' report during a trial to review, I would be

22 happy to rebut their claims?

23     Q.   We're talking about the ones that you've

24 quoted, Doctor.

Page 208

1     A.   Sure.

2     Q.   And you can't tell me who you quoted?

3     A.   Several of them.

4     Q.   Which is?

5     A.   In the reliance list.

6     Q.   And plaintiffs' counsel, your references

7 to those, would you like to list the counsel that you

8 attribute to as the source?

9     MR. WALKER: Object to form.

10     THE WITNESS: As I said earlier, I have

11 been deposed several times by plaintiffs' counsel

12 pleural, that have made claims in their statements

13 and in their questioning of mesh products.

14 I did not name them. I have not named

15 you. I'm not talking about you, but there have

16 been instances where I have had discussions with

17 plaintiffs' counsel where they have made these

18 assurances.

19 There have also been instances, since

20 we're getting into my discussions with plaintiffs'

21 counsels, there have also been instances where we

22 have gone off the record and plaintiffs' counsel

23 had admitted to me that if their wife needed a

24 mesh midurethral sling, they would have no problem

Page 209

1 with them having a mesh midurethral sling, that

2 they understood mesh that wasn't a problem.

3 So if you want to get into conversations

4 about what I've spoken with plaintiffs' counsel, I

5 will be happy to do that, but I'm not going to

6 name people by name.

7 BY MS. GAYLE:

8     Q.   And that is the basis of your opinions

9 that you're setting out today?

10     MR. WALKER: Objection to form.

11     THE WITNESS: Correct. That's -- that is

12 a partial basis of my opinions.

13 BY MS. GAYLE:

14     Q.   Thank you, Doctor. If you would turn to

15 page 30 on Exhibit 7.

16     A.   Okay.

17     Q.   Doctor, the second paragraph again it

18 starts with plaintiffs' counsel.

19     A.   Uh-huh.

20     Q.   Talking about intraoperative and

21 postoperative complications and just again, just to run

22 through it in the report just for clarity of the

23 record, you're not going to discuss who that was,

24 correct?

Page 210

1    A.    I will have further discussions with
2  defendant counsel about that and if they feel that's
3  appropriate then we'll do that, but at this time, and I
4  am not going to name names from the plaintiffs' expert
5  or counsel.
6         MS. GAYLE:  So pending the outcome of
7    those discussions, counsel, I would reserve my
8    right to depose the doctor again to get to those
9    sources, but you can of course advise me of what
10   your advice is to him about this.
11        MR. WALKER:  I've already made my
12   position clear.  I think you've asked this a
13   number of different times and every single report
14   that he's reviewed is on the reliance list, and --
15        THE WITNESS:  And every single
16   deposition.
17        MR. WALKER:  Hang on.  And every specific
18   design defect allegation that he is addressing is
19   reflected in the report, and I think it's very
20   clear that almost all of the plaintiffs' experts'
21   reports contain the same basic design defect
22   allegations and that's what he's tackling in the
23   report.
24  BY MS. GAYLE:

Page 211

1    Q.    Doctor, turn to page 38 if you would,
2  please, on Exhibit 7.
3    A.    Okay.
4    Q.    You again say that the basis of your
5  opinion is plaintiffs' experts' and counsel build the
6  entirety of their case based on language and statements
7  which are designed to shock but are not backed up by
8  scientific evidence.
9         And again, this is where you've already
10  testified that these are persons that you're not going
11  to name that have made --
12   A.    Well, read a little bit more there.  That
13  next person, that next one is a very specific statement
14  that you guys should be able to locate if you really
15  need a name.
16        One expert's witness summation is as
17  follows.  Ethicon's old construction mesh prolene used
18  in the TVT is not suitable for its intended application
19  as permanent prosthetic implant for stress urinary
20  incontinence because of the following reasons.  He
21  lists out all those reasons.
22        In my rebuttal I take every one of his
23  reasons and actually provide scientific literature to
24  help back up some of those claims or to help refute

Page 212

1  some of his claims.  So, yes, again, I'm not going to
2  name names, but every expert report, general or case
3  specific that I have reviewed is in my reliance list
4  and available for you to review.
5    Q.    And, Doctor, in fact from what you're
6  saying, you can't tell me whether or not that
7  particular language that you just quoted is a him or a
8  her, correct?
9    A.    You know what, I don't recall.
10   Q.    Doctor, if you'd turn to page 40 and just
11  to sort of speed things up here for you, we're going to
12  be looking at page 40 and 42 and again, Doctor, your
13  bullet points with your numbering.
14        Your number two, your number three, your
15  number four, five and six all begin with the same
16  phrases, plaintiffs' expert/counsels' and then proceed
17  with the statement that you would attribute to them.
18        Again, you're not going to name --
19   A.    It's not a statement that I'm attributing
20  to them.  It's statements that they have made in their
21  reports.
22   Q.    Okay.  Counsels' report?
23   A.    No, plaintiffs' experts' report.
24   Q.    Okay.  So what do you mean by, and let's

Page 213

1  take number two, for instance.  Plaintiff's
2  expert/counsel's statement's suggests mesh degrades
3  over time.  This too is patently false.
4    A.    Correct.
5    Q.    Any suggestion by plaintiffs' counsel
6  regarding mesh degradation are not supported by medical
7  literature.
8    A.    Correct.
9    Q.    Who are you referring to in those
10  sentences?
11   A.    So here's what I would say --
12   Q.    Again, I'm trying to get to are not going
13  to name plaintiffs' counsel there either?
14   A.    No.  So here's what I'm going to say.  If
15  we wind up in a courtroom drama here, my assertion is
16  going to be that any suggestion that plaintiffs'
17  counsel, plural, Bob, Cindy, Sue, I don't care who it
18  is, any assertion made by the plaintiffs' counsel
19  regarding mesh degradation is not supported by
20  scientific literature.  That is fact.  That is fact.
21  So --
22        MR. WALKER:  Can I just ask a couple of
23   questions that I think will clarify this?
24        MS. GAYLE:  Let's go off the record.

## Page 214

1      (Off record discussion.)
2  BY MS. GAYLE:
3      Q.    All right, Doctor.  Again, after
4  discussion with counsel, as you stated anything that
5  you quoted in these reports, either Exhibit 4 or
6  Exhibit 7 you contend is in your reliance list,
7  correct?
8      A.    In one form or another it will be in the
9  reliance list or it may be covered in the list of
10 depositions that I have given in the past that you
11 have, which again is not a complete list of
12 depositions, but it will either be personal experience
13 from those depositions, either Ethicon or beyond or it
14 will be in my reliance list.
15     Q.    You're talking about the complete list of
16 your depositions, right, Doctor?
17     A.    Well, I just said that that's not a
18 complete list of my depositions.
19     Q.    That's what I just want to make sure
20 you're referring to.  It's your listing of depositions,
21 because I think we've said that you have done more than
22 ten, right?
23     A.    Yes.
24     Q.    Doctor, just a few more questions.

## Page 215

1      MS. GAYLE:  How much time do I have left?
2      THE COURT REPORTER:  You have 47 minutes.
3      MS. GAYLE:  Thank you.
4  BY MS. GAYLE:
5      Q.    Do you believe, Doctor, that there's any
6  difference between laser cut and mechanical cut mesh?
7      A.    If we --
8      MR. WALKER:  Object to form.
9      THE WITNESS:  If we trust the scientific
10 literature, there is no difference in objective or
11 subjective cure rates.
12     We have a study from 2017 looking at
13 mechanical cut and laser cut TVT-O midurethral
14 slings that showed that there was no difference
15 noted between the two groups with respect to
16 bladder neck mobility, showing that the direction
17 and length of vector of the movement of the
18 bladder neck between rest and maximum Valsalva
19 between the mechanical cut and laser group were
20 the same, and we have long-term subjective and
21 objective surgery outcome measures, including cure
22 rates, reoperation and mesh exposures at two years
23 after the surgery and they were comparable.
24     So the long-term as quoted from Wasabe's

## Page 216

1  2017 study "the long-term follow-up outcome and
2  ultrasound data presented in this study suggests
3  that the importance of the tape resistance to
4  elongation under load is of only significance in
5  the first two weeks after implantation."  That
6  again is a comparison between laser kit and
7  mechanical cut slings.
8  BY MS. GAYLE:
9      Q.    Doctor, do you remember which of the TVT
10 products that you had opinioned on used laser cut mesh?
11     A.    I've utilized both laser and mechanical
12 mesh.
13     Q.    Well, with regard to the TVT, TVT-Exact
14 and the TVT-O do you know which one used the laser cut
15 mesh?
16     A.    I cannot tell you which meshes that I
17 implanted at which time that were laser cut and
18 mechanical cut.  I did not do a lot of research into
19 that to determine if there was one that I should be
20 using because there really are no differences shown in
21 the medical literature between the two.
22     (Exhibit 19 - Document entitled Elongation of
23      textile pelvic floor implants under load is
24      related to complete loss of effective porosity,

## Page 217

1  thereby favoring incorporation in scar plates.)
2  BY MS. GAYLE:
3      Q.    Doctor, I think you just mentioned your
4  -- the elongation and I'm going to hand you what's been
5  marked as Exhibit 19.  It's an article by Otto.
6      Are you familiar with that article,
7  Doctor?
8      A.    I think I've seen this, yes.
9      Q.    I did not again find it in your report or
10 your materials.  If it is excluded, would there have
11 been a particular reason why you would have excluded
12 it?
13     A.    No.
14     Q.    And, Doctor, when we talked about the
15 pore sizes of materials, what was the microns that you
16 said that you felt would be suitable in your opinion
17 for a mesh product?
18     A.    Well, what's listed in the scientific
19 literature is that 75 microns or above is considered a
20 macroporous polypropylene mesh.
21     Q.    So it would be your opinion that
22 something like 79 microns would be an adequate pore
23 size?
24     MR. WALKER:  Object to form.

C. Bryce Bowling, M.D.

Page 218

1    THE WITNESS:  Well, an adequate pore size
2    for what.
3  BY MS. GAYLE:
4    Q.    Meaning to allow for tissue ingrowth for
5  a good response?
6    A.    Well, 79 microns is not the pore size of
7  any of the materials that we're speaking about today.
8    Q.    I'm just trying to get to what you think
9  would be a good pore size for a good response in your
10 opinion?
11    MR. WALKER:  Object to form.
12    THE WITNESS:  Well, I'll answer with the
13   same response.  79 microns is not the pore size of
14   any of the materials that we've talked about
15   today.
16    I'm here today to talk about Prolift,
17   Prolift+M, Gynemesh, TVT, TVT-Exact and TVT-O and
18   those all use polypropylene mesh which is defined
19   as having a pore size of greater than 75 microns,
20   but those materials have larger pore sizes than
21   75 microns.
22 BY MS. GAYLE:
23    Q.    Do you know what the pore size of TVT is?
24    A.    I think it's about 1.3.

Page 219

1    Q.    Translating into microns?
2    A.    Sorry 1.3 millimeters.
3    Q.    Can you translate that to microns?
4    A.    I can do a --
5    Q.    Would it be roughly say --
6    A.    I'm going back to my --
7    Q.    -- fourteen the times of 75 microns.
8  Does 1300 microns sound right?
9    MR. WALKER:  Come on, Doctor, move the
10   decimal.
11    THE WITNESS:  Yes.
12 BY MS. GAYLE:
13    Q.    Okay.  And, Doctor, is the basis for your
14 opinion regarding the good pore size, 75 microns, is
15 that the Ahmet article that you cited in your
16 materials?
17    A.    Uh-huh.
18    (Exhibit 18 - Document entitled Vaginal Mesh
19   Contraction.)
20 BY MS. GAYLE:
21    Q.    Doctor, handing you what's been marked as
22 Exhibit 18, my last exhibit.
23    A.    All right.
24    Q.    Doctor, this article is entitled Vaginal

Page 220

1  Mesh Contraction and it's by Benjamin Feiner.  Do you
2  know Dr. Feiner?
3    A.    No.
4    Q.    Do you know Christopher Maher?
5    A.    I don't know them personally.  I have
6  heard their names.  I don't know them personally.
7    Q.    And again, Doctor, we've talked about in
8  your materials that you may have left off an article
9  from one author or another.
10    In regard to Dr. Feiner you did that.
11 You included some articles but not this article.  Was
12 there a specific reason why you wouldn't have included
13 this article?
14    A.    This article represents less than two
15 years of scientific data whereas the report that I have
16 listed in -- or the study that I have listed in my
17 report is a 17 year follow-up looking at shrinkage.
18    So I tend to, as I've stated several
19 times today, trust long-term randomized controlled
20 Cochrane database type procedures that give us a very
21 long-term outlook on things.
22    So I tend to trust what's going on with a
23 study looking at a 17 year follow-up more than I do
24 something that is less than two years.

Page 221

1    And specifically I'm referring to
2  Nielson's study, Lowe's study and others here that
3  concluded that shrinkage and comprise of the TVT sling
4  does not occur.
5    Q.    Do you know whether Nielsen, the one that
6  you just referred to is a paid expert for the defendant
7  in this litigation?
8    A.    I don't know if Nielsen or Lowe is.
9    MR. WALKER:  Object to form.
10    THE WITNESS:  I don't know if Dietz is,
11   but Lowe and Dietz came to the same conclusion so
12   I don't know who are experts on either side.
13 BY MS. GAYLE:
14    Q.    Would it be important for you to know
15 whether or not they were an expert for the defendant
16 when evaluating their literature?
17    MR. WALKER:  Object to form.
18    THE WITNESS:  No, I don't care if they're
19   an expert for the plaintiffs or the defendant when
20   I evaluate a piece of literature.
21 BY MS. GAYLE:
22    Q.    Do you believe that being paid by either
23 one side or the other could have a bias on a particular
24 author of a medical paper?

C. Bryce Bowling, M.D.

Page 222

1    MR. WALKER:  Object to form.
2    THE WITNESS:  Well, you know, long-term
3  randomized controlled trials, Cochrane database
4  are there expressly to eliminate bias.
5    So again, that's why I tend to trust the
6  articles that I have in my report versus the
7  articles that you're presenting to me today, to
8  eliminate bias.
9  BY MS. GAYLE:
10    Q.    And do you know Dr. Nielsen personally?
11    A.    No, I do not.
12    Q.    Doctor, earlier we talked about some of
13  your literature that you had -- excuse me -- articles
14  that you had written in your CV that you had pointed
15  out that were relevant today.  Just a clean up question
16  with regard to that.
17    Were any of those studies funded by a
18  pharmaceutical or medical device corporation?
19    A.    I believe that I have in my CV the only
20  actual funding that I have obtained from a medical
21  device corporation.  Just to be clear and transparent,
22  I will find that for you so that we can put that on the
23  record.
24    This was a grant that I received in 2009.

Page 223

1  The total amount was $10,000.  That was from Astellas
2  Corporation, and that was in my design of a cystoscopy
3  teaching models for residents and fellows.
4    Outside of that, I've received no funding
5  from medical device corporations for any of my
6  publications.
7    Q.    Thank you, Doctor.  And my last couple of
8  questions here, just clean up questions.  Have you ever
9  heard the term banding?
10    A.    Yes.
11    Q.    And, Doctor, do you think that the
12  phenomenon of banding takes place because the surgeon
13  who is putting in the transvaginal mesh product pulled
14  too tightly on the mesh itself?
15    A.    I think that is one of the reasons that
16  banding can occur.  I think that specific to
17  midurethral slings, that what I teach my residents in
18  the operating room every time we do a dissection for
19  mesh is that the tunnels leading from the area of the
20  midurethra back to the descending pubic rami, which is
21  where the transobturator sling as well as the
22  retropubic sling pass, that tunnel must be dissected to
23  the same width as the midurethral sling.
24    If we place a one centimeter wide

Page 224

1  midurethral sling into a tunnel that is .5 centimeters,
2  that mesh is going to roll and it's going to band
3  because you are forcing a one centimeter wide piece of
4  mesh into a half centimeter wide tunnel.
5    It is basic scientific understanding.  So
6  what I teach my residents to do is make sure that the
7  tunnels leading back, the tunnels leading between the
8  area of the midurethra and the area of the descending
9  pubic rami be the same width as the midurethral sling
10  so that banding and rolling can't occur.
11    And, yes, I think the rest of it is
12  banding and rolling can occur either from over
13  tensioning at the time of surgical implant or it can
14  occur as a result of a surgical implant not being
15  appropriately sutured and tacked into its surrounding
16  tissues to prevent rolling of the edges.
17    Q.    But you do not think that it would be due
18  to a product defect?
19    A.    No, I do not.
20    Q.    And, Doctor, with regard to fraying, you
21  do not think that fraying would occur due to a product
22  defect, correct?
23    A.    In all of the pieces of mesh that I have
24  removed in my career, the only fraying of a mesh that I

Page 225

1  have observed was at my own hands where I was trying to
2  cut and remove a piece of mesh.
3    Outside of that, in all of the mesh that
4  I have seen inside too, whether it was being removed or
5  not, I've never seen any evidence of fraying of the
6  mesh.
7    MS. GAYLE:  I'll reserve the balance of
8  my time.  If we could take a short break before
9  you start with your questions if you don't mind.
10    (Recess taken.)
11  EXAMINATION BY MR. WALKER:
12    Q.    Good afternoon, Doctor.
13    A.    Good afternoon.
14    Q.    I don't think I ever introduced myself on
15  the record initially, but I'm Jordan Walker
16  representing Ethicon and Johnson & Johnson.  I have
17  just a few followup questions for you.
18    A.    Sure.
19    Q.    This won't take long.  Let's go back to
20  the very beginning of the deposition.
21    Do you remember one of the earlier
22  questions that you were asked had to do with whether or
23  not you relied on any information pertaining to slings
24  in the formulation of your Prolift report.

C. Bryce Bowling, M.D.

Page 226

1      Do you remember that question?
2   A.   I do.
3   Q.   And then the inverse of that question was
4   asked as well.  Do you remember that?
5   A.   I do, yes.
6   Q.   And is it fair to say that your answer
7   reflected the fact that a randomized controlled trial
8   for TVT doesn't really inform you as it pertains to
9   Prolift, is that fair?
10      MS. GAYLE:  Objection to leading.
11      THE WITNESS:  That's correct.
12   BY MR. WALKER:
13   Q.   Doctor, both sling and the prolapse
14   products are made or prolene material, correct?
15   A.   That's correct.
16   Q.   And, Doctor, I'm going to show you a
17   position statement issued by AUGS/SUFU in 2018.  You
18   have seen this before and have relied on it, correct?
19   A.   I have.
20   Q.   This doesn't pertain to prolapse meshes
21   per se, it's addressing full length midurethral slings,
22   correct?
23   A.   Correct.
24   Q.   Doctor, do you see the first paragraph,

Page 227

1   just the bold heading right there where it says
2   polypropylene material is safe and effective as a
3   surgical implant?
4   A.   Correct.
5   Q.   Have I read that correctly?
6   A.   Yes.
7   Q.   Doctor, is that the sort of information
8   pertaining to the prolene, polypropylene material in
9   general that is applicable and the basis for your
10   opinions for both slings and the Prolift products?
11      MS. GAYLE:  Objection.
12      THE WITNESS:  Yes, specific crossover
13      between my reports on sling and prolapse are
14      related to generalizable findings of the actual
15      material itself and not specific to the product.
16   BY MR. WALKER:
17   Q.   So if there's medical literature or
18   position statements or any other kinds of documents
19   that you've reviewed that is addressing the issue of
20   the biocompatibility of polypropylene and/or prolene,
21   is that the type of information that would form the
22   basis of your opinions both in the realm of slings and
23   in the realm of prolapse repair kits?
24   A.   Yes, that's correct.

Page 228

1      MS. GAYLE:  Objection to form.
2   BY MR. WALKER:
3   Q.   Are you currently licensed to practice
4   medicine in the state of Tennessee?
5   A.   Yes, I am.
6   Q.   I just wanted to make that clear.
7   A.   All right.
8   Q.   A number of questions were asked about
9   your reliance list and your reference to -- strike
10   that.
11      A number of questions were asked
12   initially in the deposition about whether you reviewed
13   expert reports that had been issued by plaintiffs'
14   counsel in the pelvic mesh litigation.
15   A.   Yes.
16   Q.   Do you recall that?
17   A.   Yes.
18   Q.   And you have, in fact, reviewed a number
19   of different expert reports issued by plaintiffs'
20   counsel in this litigation?
21      MS. GAYLE:  Objection, leading.
22      THE WITNESS:  Yes.
23   BY MR. WALKER:
24   Q.   And are those reports reflected on your

Page 229

1   reliance list?
2   A.   Yes, they are.
3   Q.   And you correct me if I'm wrong here, but
4   is it fair to say that in terms of the design defect
5   allegations against slings if it's a sling report or
6   against Prolift if it's a Prolift report, those design
7   defect allegations from the plaintiffs' experts are
8   essentially the same from report to report; is that
9   fair?
10   A.   Yes, they're very similar.
11   Q.   So, for example, when Dr. Daniel Elliott
12   issued a Prolift general report that you have
13   referenced on your reliance list, that's something you
14   would have read?
15   A.   Yes.
16   Q.   And when Uwe Klinge issued a POP general
17   report, that's something you would have read?
18   A.   Yes.
19   Q.   In all of these -- Jerry Blaivas issued a
20   Prolift general report.  That's something that you
21   read?
22   A.   Yes, sir.
23   Q.   So all of those reports, do they
24   essentially contain the same design defect allegations?

C. Bryce Bowling, M.D.

Page 230

1    A.    Yes, they do.
2    Q.    And are those design defect allegations
3  specifically identified in your report?
4    A.    Yes, they are.
5    Q.    And do you provide specific rebuttals in
6  your report to those allegations?
7    A.    Yes, I do.
8        MS. GAYLE:  Objection to leading.
9  BY MR. WALKER:
10   Q.    In your reports as noticed by plaintiffs'
11 counsel.
12   A.    Hold on one second.  Hand me back what I
13 just gave you.  I need half of that back.  Sorry.
14   Q.    So in today's deposition, plaintiffs'
15 counsel asked a number of questions about the verbiage
16 in your report that refers to plaintiffs'
17 experts/counsel or references to plaintiffs' counsel.
18        When you were referring to plaintiffs'
19 counsel, were you referring to any one particular
20 individual?
21        MS. GAYLE:  Objection, leading.
22        THE WITNESS:  No, I'm more referring to a
23 culmination of different plaintiffs' counsels that
24 I have dealt with in numerous depositions that

Page 231

1  I've given in the past on mesh products.
2  BY MR. WALKER:
3    Q.    And when you say plaintiffs'
4  expert/counsel, is that your way of communicating the
5  overall position of the plaintiffs in this litigation
6  is fill in the blank?
7        MS. GAYLE:  Objection, leading and form.
8        THE WITNESS:  Yes, it is.  It is again a
9  culmination of different experts as I stated
10 earlier in her questioning.  This is a culmination
11 of expert witnesses that have provided both
12 general and case specific testimony and I have
13 used their claims in my report.
14       MR. WALKER:  And, counsel, there were a
15 couple of times where you used the word duplicity
16 in your questions, but can we stipulate you were
17 not implying deceitfulness?
18       MS. GAYLE:  That's correct.  Thank you
19 for that.  We were talking about off the record
20 earlier repetitive language and I think that we
21 covered that in his report where he testified that
22 sometimes repetitive language would cross over
23 between the two reports, and it would be
24 identical.  Thank you.

Page 232

1        MR. WALKER:  Got you.  Thank you.
2  BY MR. WALKER:
3    Q.    Doctor, have all of the opinions that
4  you've expressed in these two expert reports and those
5  opinions that you articulated in this deposition, have
6  those opinions been to a reasonable degree of medical
7  certainty?
8    A.    Absolutely.
9        MR. WALKER:  Nothing further.
10 EXAMINATION BY MS. GAYLE:
11   Q.    Doctor, just one or two short questions.
12 You were just asked a moment ago about Dr. Elliott's
13 report.  Do you know when you may have read Dr.
14 Elliott's report?
15   A.    Sometime within the last four to
16 five months during the creation of these reports.
17   Q.    Doctor, I think you were asked about Dr.
18 Blaivas' report.  Would that be the same answer for his
19 report?
20   A.    It would be the same.
21   Q.    And I think you were asking about Dr.
22 Klinge's report.  Would that be the same answer for
23 him?
24   A.    Correct.

Page 233

1    Q.    And, Doctor, I think we looked at your
2  invoices earlier from August the 12th until present.
3  So we're in September 28th today.
4        In the last two weeks, have you read any
5  reports, expert plaintiff expert reports?
6    A.    Yes.
7    Q.    Which ones have you read in the last two
8  weeks?
9    A.    Oh --
10       MR. WALKER:  Hang on.  Let me just
11 interrupt.  To the extent you're talking about any
12 Election Wave materials, I would ask you not to
13 disclose any case names, but if you recall the
14 name of the plaintiff expert.
15       MS. GAYLE:  I'm talking about with regard
16 to this Wave 8 general designation today.  I'm not
17 talking about a designation that you hope to make
18 or haven't made as of today.
19       MR. WALKER:  Okay.
20       THE WITNESS:  Do you mind reask ing with
21 that clarification?
22 BY MS. GAYLE:
23   Q.    Certainly, Doctor.  With regard to
24 reports issued today in Wave 8, your general reports,

C. Bryce Bowling, M.D.

Page 234

1  Exhibit 4 and 7 that we've talked about, in the last
2  two weeks have you read any general reports with regard
3  to that work?
4      A.    I have, but I cannot tell you specific
5  names.  Some of them have been read repetitively.  Some
6  of them have only been read once.
7          I have gone back during the course of
8  preparing for this deposition and looked at general
9  reports as well as read through my reports, but I
10 cannot specify to you a specific name that I have read
11 in the last two weeks.
12     Q.    And, Doctor, you haven't certainly or I
13 haven't received a supplemental report.  So you have
14 not supplemented your opinions in either the Prolift
15 report found at Exhibit 4 or the TVT report found at
16 Exhibit 7?
17     A.    I have not at this point submitted
18 supplements to either of my reports.
19         MS. GAYLE:  Thank you, doctor.  No
20 further questions.
21         MR. WALKER:  Thank you.  Nothing further
22 We're done.
23         FURTHER THIS DEPONENT SAITH NOT
24         (The deposition concluded at 2:44 p.m.)

Page 235

1          C E R T I F I C A T E
2  STATE OF TENNESSEE
3  COUNTY OF KNOX
4      I, Georgette H. Mitchell, Registered
5  Professional Reporter, Licensed Court Reporter #55 and
6  Notary Public, do hereby certify that I reported in
7  machine shorthand the deposition of C. BRYCE BOWLING,
8  M.D., called as a witness at the instance of the
9  Plaintiffs, that the said witness was duly sworn by me;
10 that the reading and subscribing of the deposition by
11 the witness was waived; that the foregoing pages were
12 transcribed under my personal supervision and
13 constitute a true and accurate record of the deposition
14 of said witness.
15     I further certify that I am not an attorney or
16 counsel of any of the parties, nor an employee or
17 relative of any attorney or counsel connected with the
18 action, nor financially interested in the action.
19     Witness my hand and seal this the 4th day of
20 October, 2018.
21     _____
        Georgette H. Mitchell
22      Registered Professional
        Reporter, Licensed Court
23      Reporter 55, LCR expires
        6-30-20 and Notary Public
24      My Commission Expires: