# EXHIBIT C

Mark Ellerkmann, M.D.

```
 1           IN THE UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  (CHARLESTON DIVISION)
 3
        ------------------------------X
 4                                    :
     IN RE:  ETHICON, INC. PELVIC     : MASTER FILE NO.
 5   REPAIR SYSTEM PRODUCTS           : 2:12-MD-02327
     LIABILITY LITIGATION             :
 6                                    : MDL NO. 2327
     THIS DOCUMENT RELATES TO         :
 7                                    : JOSEPH R. GOODWIN
     ALL WAVE 8 AND SUBSEQUENT        : U.S. DISTRICT JUDGE
 8   WAVE CASES AND PLAINTIFFS        :
                                      :
 9   ------------------------------X
10
11            Deposition of MARK ELLERKMANN, M.D.
12                    Towson, Maryland
13              Friday, October 12, 2018
14                       1:05 p.m.
15
16
17
18
19
20
21
22
23
24   Reported by:  Linda M. Bahur, RPR
```

Page 2

1  Deposition of MARK ELLERKMANN, M.D., held at:
2       SHERATON BALTIMORE NORTH HOTEL
3       903 Dulaney Valley Road
4       Towson, MD  21204
5    Pursuant to agreement, before Linda M. Bahur,
6  a Notary in and for the State of Maryland.

Page 3

            A P P E A R A N C E S
ON BEHALF OF THE PLAINTIFF:
    Andrew N. Faes, Esquire
    Wagstaff & Cartmell, LLP
    4740 Grand Avenue
    Suite 300
    Kansas City, MO  64112
    (816) 701-1100
    afaes@wcllp.com

ON BEHALF OF DEFENDANT:

    Nils B. (Burt) Snell, Esquire
    Butler Snow, LLP
    500 Office Center Drive
    Suite 400
    Fort Washington, PA  19034
    (267) 705-4910
    burt.snell@butlersnow.com

Page 4

                  I N D E X
              E X A M I N A T I O N
Witness Name                              Page
Mark Ellerkmann, M.D.
  Direct By Mr. Faes ........................ 5
  Cross By Mr. Snell ....................... 138

              PLAINTIFF EXHIBITS

          (Attached to the transcript)

Exhibit    Description                      Page

No. 1      Notice of Deposition .............. 5

No. 2      General Expert Report, 8/4/18 ..... 5

No. 3      General Reliance List in Addition . 5
             to Materials Referenced in Report
No. 4      Curriculum vitae .................. 5

               DEFENSE EXHIBITS

     (Exhibit No. 1 retained by Mr. Snell)

No. 1      Objections to deposition notice ... 179

No. 2      Thumb drive ....................... 179

Page 5

              P R O C E E D I N G S
        (Plaintiff Exhibit Nos. 1-4 were marked
 for identification.)
 Whereupon --
        MARK ELLERKMANN, M.D.
 being first duly sworn, as hereinafter certified,
 testifies as follows:
        EXAMINATION BY MR. FAES:
    Q   Good afternoon, Dr. Ellerkmann.  My
 name is Andrew Faes and I represent various
 plaintiffs in this litigation, and I'm here today
 to take your deposition regarding the Prolift
 case.  Do you understand that?
    A   Yes, I do.
    Q   And you understand that you're under
 oath and you're sworn to tell the truth; right?
    A   Yes.
    Q   And if for any reason during the course
 of the day I ask you a question that doesn't make
 sense to you, just let me know and I'll try to
 rephrase the question.  All right?
    A   I will.
    Q   First of all, I've premarked some

|  | Page 14 |
|---|---|
| 1 | probably around 2010.  Somewhere in that range. |
| 2 |     Q   And when was the last time that you |
| 3 | implanted a Prolift device? |
| 4 |     A   Sometime around the same period of |
| 5 | time. |
| 6 |     Q   And the Prolift+M? |
| 7 |     A   I can't give you an exact date. |
| 8 |     Q   You kind of lumped the Gynemesh PS |
| 9 | Prolift and Prolift+M all together and state that |
| 10 | you've utilized them in hundreds of patients.  Do |
| 11 | you have any kind of breakdown of how many |
| 12 | Gynemesh PS devices you've implanted in a patient |
| 13 | or patients? |
| 14 |     A   I would say Gynecare -- that Gynemesh |
| 15 | PS, I would say I was using that prior, obviously, |
| 16 | to launch a Prolift for prolapse repair.  I would |
| 17 | say the breakdown would be probably around 30 |
| 18 | percent Gynecare Gynemesh PS and 70 percent -- |
| 19 | just under 70 percent for Prolift. |
| 20 |     Q   And for Prolift+M, it's less than 5 |
| 21 | percent or less than 2 percent? |
| 22 |     A   That is correct.  Right. |
| 23 |     Q   Is it accurate to say that you probably |
| 24 | implanted the ProliftM on less than five |

|  | Page 15 |
|---|---|
| 1 | occasions? |
| 2 |     A   No, I wouldn't say that's accurate. |
| 3 | Not less than five occasions, but less than 5 |
| 4 | percent of the time. |
| 5 |     Q   Okay.  Have you ever tracked a |
| 6 | complication rate for the Prolift based on your |
| 7 | personal use in your office? |
| 8 |     A   So I keep a database of my surgery, |
| 9 | every surgery I've done even as a fellow.  Not as |
| 10 | a resident but as a fellow.  I did my training |
| 11 | here.  And of that database, I kept a complication |
| 12 | rate and still do. |
| 13 |     Q   And I don't see anywhere in your expert |
| 14 | report where you say that you intend to state an |
| 15 | opinion as to what your complication rate is with |
| 16 | the Prolift®.  Is that an opinion that you intend |
| 17 | to offer in this case? |
| 18 |         MR. SNELL:  I'm going to object to the |
| 19 | characterization.  Go ahead. |
| 20 |     A   I can offer an opinion regarding my |
| 21 | complication rate with respect to Prolift and that |
| 22 | was that it was extremely low. |
| 23 |     Q   So extremely low.  Can you put a |
| 24 | numerator on that or a denominator or a |

|  | Page 16 |
|---|---|
| 1 | percentage? |
| 2 |     A   I can put a general percentage on that. |
| 3 | It was probably less than 5 percent. |
| 4 |     Q   And that's all complications, not just |
| 5 | erosion? |
| 6 |     A   It depends on what complication if we |
| 7 | look at the no classification.  You know, if we're |
| 8 | talking about Class 1 complications, maybe higher. |
| 9 | Urinary tract infections, something like that. |
| 10 | But if we're talking about specifically mesh |
| 11 | exposure, mesh erosion, less than 5 percent. |
| 12 |     Q   But as you sit here today, you can't |
| 13 | give me, say, a denominator of the total number of |
| 14 | cases of Prolift or the numerator of the total |
| 15 | number of cases of Prolift? |
| 16 |         MR. SNELL:  Object to form.  Go ahead. |
| 17 |     Q   Complications? |
| 18 |         MR. SNELL:  Object.  Form. |
| 19 |     A   No.  My overall complication rate with |
| 20 | respect to Prolift, less than 5 percent. |
| 21 |     Q   And would you agree with me that that, |
| 22 | since you can't give me the numerator or the |
| 23 | denominator as you sit here today, that that 5 |
| 24 | percent isn't based on any formal analysis that |

|  | Page 17 |
|---|---|
| 1 | you've done of your complication rate? |
| 2 |         MR. SNELL:  Object.  You're misstating. |
| 3 |     A   No, I would not agree with that, |
| 4 | actually, because I did look at my complication |
| 5 | rate and it is generally less than 5 percent. |
| 6 |         MR. FAES:  Okay.  Well, Counsel, if |
| 7 | that's an opinion he's going to express at trial, |
| 8 | we're going to request production of the data from |
| 9 | this database that substantiates his opinion that |
| 10 | his complication rate is 5 percent. |
| 11 |         MR. SNELL:  We'll take that up.  That's |
| 12 | for me.  We'll take that up. |
| 13 |     Q   Same question with regard to the |
| 14 | Gynemesh PS.  Have you done any kind of tracking |
| 15 | of a complication rate of your use of Gynemesh PS? |
| 16 |         MR. SNELL:  Hold on.  Hold on.  I'm |
| 17 | going to object to the form and foundation of the |
| 18 | question to the extent it assumes Gynemesh PS to |
| 19 | be different than Prolift.  You can go ahead and |
| 20 | answer. |
| 21 |     A   So Counsel, I've told you that I kept a |
| 22 | record of every surgery that I've done since I was |
| 23 | a fellow.  That included the use of Gynemesh PS |
| 24 | Prolift. |

Page 38

1 the materials listed in Exhibit 3?
2    A   Better part of four weeks.
3    Q   So how many hours would you say you
4 spent on that?
5    A   Close to 120 hours.  That includes
6 looking at these articles, refreshing my memory,
7 and composing the manuscript, the expert report.
8    Q   So the 120 hours includes both the
9 review of the materials and the writing of the
10 report; right?
11    A   That's correct.  Yes.
12    Q   How many hours would you say you spent
13 actually drafting your report as opposed to
14 reviewing materials?
15    A   Well, I took notes as I reviewed the
16 materials and I composed my report.  I had two
17 computers going at the time, two screens.  So a
18 lot was done simultaneously, so it's hard to break
19 it down.
20    Q   Okay.  In your reliance list, you've
21 got --
22        MR. FAES:  Counsel, is this his current
23 reliance list or is there a supplemental one that
24 I might be missing out on?

Page 39

1        MR. SNELL:  No, I think this is his
2 list.  I don't think that he has a pending
3 supplemental one.
4        MR. FAES:  Everybody else supplemented
5 theirs, so I wasn't sure.  I got brought in late
6 on this so I just wanted to make sure that there
7 wasn't a supplemental one that I wasn't aware
8 of.
9        MR. SNELL:  Not that I know of.
10        THE WITNESS:  This looks current to me.
11        MR. SNELL:  Okay.
12 BY MR. FAES:
13    Q   Who created Exhibit No. 3?
14    A   Mr. Snell's firm.
15    Q   Okay.  So did Mr. Snell's firm provide
16 you with all of the documents and materials listed
17 in Exhibit No. 3?
18    A   Did they provide me with them all?
19    Q   Yes.
20    A   They comprised this report.  Yes.  And
21 there's other things are included in this that I
22 shared with them that I was using in my report.
23    Q   Okay.  So it's accurate to say that
24 they provided a large majority and then you

Page 40

1 supplemented it with some materials that you had
2 reviewed and relied on on your own; is that
3 correct?
4    A   That is correct.
5    Q   Did you feel like that you had
6 everything you needed in order to form your
7 opinions in this case?
8    A   Well, my opinions are formulated in
9 part due to literature and also my own clinical
10 experience.  So in terms of written literature
11 that I reviewed, this served as the bulk of that.
12 Yes.
13    Q   Did you do any of your own independent
14 literature searching for peer-reviewed literature
15 on Prolift®?
16    A   I did, and that's what I'm saying.
17 It's the articles that weren't included in this
18 are referenced and submitted ultimately in what we
19 have before us here.
20    Q   And I see that on your reliance list
21 that you did review the testimony of a couple
22 Ethicon employees?  A Piet Hinoul and a Marty
23 Wiseberg?
24    A   I'm not sure I reviewed those in

Page 41

1 particular.  No.
2    Q   Okay.
3    A   I may have glanced at them.  Some of
4 these articles that are listed here are articles I
5 am familiar with because either my fellows wrote
6 them or co-workers or colleagues.  So that doesn't
7 mean I read them back to back.  I'm familiar.  I
8 spent my last 20, 25 years reading the literature,
9 so that's how I spend a lot of my evenings.
10    Q   So if I understood you correctly,
11 you're not sure if you reviewed Piet Hinoul or
12 Marty Wiseberg's deposition testimony?
13    A   Yes.  I'm not sure I've reviewed those
14 in particular now.
15    Q   Are there other materials that are
16 listed in your reliance list that you haven't
17 reviewed?
18    A   I would say that most of these I have
19 reviewed.  Either read in their entirety or
20 reviewed.
21    Q   Most but not all?
22    A   Right.  So some of the depositions you
23 said O'Toole.  What page is that on?
24    Q   It's the second-to-last.

Page 42

1 Unfortunately, you guys never put page numbers on
2 this, which I think they do on purpose.
3      A    Yes.  So Counsel, some of the
4 depositions and some of the email communications I
5 would have probably not reviewed.  I was looking
6 more at Level 1, Level 2 literature as I did my
7 report.
8      Q    So as we sit here today, is there any
9 kind of list out there that reflects what you
10 actually did review and rely on in coming to your
11 opinions in this case?
12     A    I would say the list before us is
13 fairly comprehensive on what I reviewed.
14     Q    But as you stated earlier, there are
15 some items in here that you haven't actually
16 reviewed?
17         MR. SNELL:  Objection as to scope of
18 that.  Go ahead.
19     A    I would say yes to that.
20     Q    Okay.  So is it fair to say that in
21 forming your own opinions in this case, that you
22 haven't reviewed the deposition testimony of any
23 Ethicon witnesses?
24     A    Any Ethicon witnesses?

Page 43

1      Q    Any Ethicon witnesses that worked for
2 the company.
3      A    Well, at least those two that you've
4 listed here.  No, I have not reviewed those.  I
5 think that's fair to say.
6      Q    Okay.  Doctor, have you ever been a
7 party to a lawsuit?
8      A    Yes.
9      Q    How many times?
10     A    Twice I'm aware of.
11     Q    And what was your role in those cases?
12     A    I was a defendant.
13     Q    In both cases?
14     A    Both cases, yes.
15     Q    And were they both medical malpractice
16 cases?
17     A    Yes.
18     Q    And when did those two cases occur?
19     A    Yeah.  One case was sometime in -- the
20 first case, I was a fellow, and that would have
21 been 2000, 2001.  And then again about five years
22 later -- I don't know when they were finally
23 resolved, the exact years, but one case I was
24 dismissed without prejudice and the other was

Page 44

1 settled for a nominal amount of money to cover
2 court costs or something like that it was.
3      Q    Were you deposed in either of those
4 cases?
5      A    I was deposed, I know, in the first
6 one.  Probably both of them, actually.
7      Q    And where were you employed at the time
8 that those occurred?
9      A    Greater Baltimore Medical Center.
10     Q    And do you recall the name of any of
11 the law firms involved in those cases?
12     A    No.
13     Q    Do you recall the name of any of the
14 plaintiffs in those cases?
15     A    One plaintiff was Loftus.
16     Q    And can you spell that for the
17 reporter, to the best of your memory.
18     A    Yes, L-O-F-T-U-S.  And the other
19 plaintiff I can't remember offhand.
20     Q    And you're currently licensed in the
21 state of Maryland; right?
22     A    Yes.
23     Q    And is that the only state where you're
24 currently licensed?

Page 45

1      A    Yes.
2      Q    And in the past, you've been licensed
3 in the state of Maine?
4      A    Correct.
5      Q    But that license is no longer active?
6      A    That's correct.
7      Q    When did you let that license lapse?
8      A    When I moved to Maryland in 1998.
9      Q    Okay.  Have you ever had any -- are
10 those the only two states where you've ever been
11 licensed?
12     A    Yes.
13     Q    Have you ever had any action whatsoever
14 taken against your medical license?
15     A    No.
16     Q    Never had any disciplinary action
17 taken?
18     A    No.
19     Q    Never had any orders of compliance
20 issued?
21         MR. SNELL:  Objection.  Asked and
22 answered already.
23     A    No.
24     Q    Okay.  Now, I notice that you've

Page 66

 1  think I've stated that a few times now.
 2    Q  Sorry. Are you done? I didn't mean to
 3  interrupt you.
 4    A  No.
 5    Q  Have you ever drafted the IFU for a
 6  medical device?
 7    A  No, I have not.
 8    Q  Have you ever worked on warnings for a
 9  medical device?
10    A  No, I have not.
11    Q  Have you ever worked on warnings for a
12  prescription drug?
13    A  No, I haven't, but may I go back to
14  your answer just previously? Because something
15  came to my mind.
16    Q  Sure.
17    A  I am actually on a board of advisors
18  for a development that's currently R&D. We've
19  just actually received an N.I.H. grant for a new
20  type of pessary -- pessary, P-A-S-S-A-R-Y [sic] --
21  working with colleagues at Dartmouth-Hitchcock in
22  Hanover, New Hampshire.
23       So to that end, I have counseled and
24  provided Counsel regarding warnings for pessary

Page 67

 1  use.
 2    Q  Would you agree with me that you've
 3  never worked on the warnings for a polypropylene
 4  mesh device?
 5       MR. SNELL: Object to form.
 6    A  Other than providing feedback at
 7  various summits and advisory meetings during my
 8  time as a preceptor with Gynecare or AMS for that
 9  matter.
10    Q  So you actually provided feedback at
11  seminars for Ethicon and Johnson & Johnson
12  regarding warnings that were in the IFU for their
13  polypropylene mesh devices?
14    A  I would state it more different. I
15  would state is differently, Counsel. I would say
16  at various workshops and industry-sponsored
17  summits, be they in Minnesota or in New Jersey,
18  round table discussions that we had, we shared
19  information with one another about our clinical
20  experience, and I suspect that that information
21  was tabulated and looked at and ultimately played
22  a role in formulation of IFUs.
23    Q  So during your time consulting for
24  Ethicon specifically, did anyone at Ethicon ever

Page 68

 1  ask you what warnings they thought should be in
 2  the IFU for one of their polypropylene medical
 3  devices, whether orally or written?
 4       MR. SNELL: Objection. Can you read
 5  that question back?
 6       (The last question was read into the
 7  record.)
 8       MR. SNELL: Are you asking did someone
 9  at Ethicon ask him what warnings that Ethicon,
10  they thought?
11       MR. FAES: So let me see --
12       MR. SNELL: I don't know if you meant
13  that.
14       MR. FAES: Let me see I can reask it.
15       MR. SNELL: I think I know what you're
16  trying to ask but the question was really --
17  BY MR. FAES:
18    Q  During your time consulting for Ethicon
19  and Johnson & Johnson, did anyone at Ethicon ever
20  ask you your opinion regarding what warnings you
21  thought should be in a polypropylene mesh device?
22    A  Not that I'm aware of specifically.
23    Q  Would you agree with me that you never
24  worked on warnings for a Class 3 medical device?

Page 69

 1    A  I would agree. I mean, I think we all
 2  know that these devices were elevated to a Class 3
 3  device at one point. But at that point in time,
 4  no, I never worked directly with that.
 5    Q  Would you agree with me that physicians
 6  should be made aware of all the significant safety
 7  risks associated with the Prolift in the IFU?
 8       MR. SNELL: Objection. Asked and
 9  answered.
10    A  Yes. I've answered that. I would
11  disagree with that, Counsel. I think that the IFU
12  is intended as a general guideline. Pelvic
13  surgeons are made aware of risks of pelvic surgery
14  when they're resident doctors when they do their
15  first episiotomy. They know that can result in
16  dyspareunia.
17       I mean, we all have a fund of knowledge
18  of knowing complications of surgery whether we're
19  using mesh or native tissue.
20    Q  So if a corporate witness for Ethicon
21  and Johnson & Johnson testified that that was the
22  standard that Ethicon and Johnson & Johnson should
23  follow, you would disagree with that?
24    A  Yes, I would.

Page 74

1  A   Yeah. I don't know what you mean by
2  that. Physician's experience and clinical
3  experience and knowledge base varies. So is mine
4  different than my mentor's, Dr. Bent or my
5  colleague, Dr. Harry Johnson? It may very well
6  be. It most certainly is. My clinical experience
7  is my clinical experience. It's unique to me.
8  Q   Would you agree with me that you might
9  know about a potential complication from your own
10 experience that another doctor might not know
11 about?
12       MR. SNELL: Objection.
13 A   I would agree that there are
14 complications I've had that other doctors may not
15 have had and vice-versa. That's certainly true in
16 clinical practice. We all have unique
17 complications, and I think if you practice long
18 enough, you'll probably have every complication in
19 the book at some point in your career.
20 Q   So you'd agree with me, then, that
21 another doctor has an experience that he might not
22 know about; correct?
23       MR. SNELL: Objection. Misstates.
24 A   I'm not quite sure where you're going

Page 75

1  with this except to say that we've all experienced
2  unique complications that another doctor may not
3  have experienced, and that's why we have M&M
4  conferences and that's why we call colleagues when
5  we have a unique complication and pick each
6  other's brains. I mean, that's what a collegial
7  relationship is about.
8  Q   Right. I think you're maybe
9  misunderstanding my question. I'm not asking you
10 about whether another doctor might have
11 experienced a different complication than you
12 haven't experienced. I'm asking about
13 complications that another doctor might not know
14 about. So I'm going to reask the question again
15 and ask you to focus on that.
16       MR. SNELL: Hold on. I'm going to
17 object because your questions were about
18 experiencing complications. It wasn't about
19 knowledge.
20       MR. FAES: No. It's about
21 complication.
22       MR. SNELL: Complications experience.
23 You asked him two or three times and he testified
24 to that. Now you're changing. I just don't want

Page 76

1  you to break --
2        MR. FAES: I don't think I am.
3  BY MR. FAES:
4  Q   Let me ask the question and ask you to
5  focus on the question if you can.
6        Would you agree with me that you might
7  know about a complication from your own experience
8  that another doctor might not know about?
9        MR. SNELL: Objection. I think that
10 was asked and answered.
11 A   Okay. So I might have a complication
12 that another doctor might not know about. I mean,
13 that's obvious. To me, I might have a
14 complication with a surgical procedure that I'm
15 doing that another doctor would not have
16 experienced and would not know about.
17 Q   Have you ever studied the question of
18 what information needs to be in an IFU,
19 instructions for use?
20 A   Have I ever studied that? I think I've
21 answered this before. I'll answer it again.
22       My understanding of an IFU is that it
23 provides a general background and guidance noting
24 potential risks and complications of a medical

Page 77

1  device, if that's what we're talking about,
2  without needing or being required to list every
3  potential complication or risk related to it.
4  Q   Are you relying on any objective
5  standard from any source for that opinion?
6  A   Any objective standard? Have I read
7  that as a specific guideline? No. That is my own
8  general understanding of IFUs that I've understood
9  during my career.
10 Q   Would you agree with me that you're not
11 a biomedical engineer?
12       MR. SNELL: Objection.
13 A   I would disagree with that, Counsel. I
14 think I don't have a degree as a bioengineer, I
15 don't have a Ph.D or a doctorate, but I have a lot
16 of experience in reference to the use of
17 polypropylene mesh and pelvic reconstructive
18 surgery, and, as such, I have been privy to how
19 polypropylene mesh reacts in the human body. I've
20 been a participant at various summits and industry
21 meetings where we've looked at and evaluated
22 properties of polypropylene mesh.
23 Q   So you hold yourself out to the public
24 as a biomedical engineer; is that accurate?

Page 90

1  Q  Would you agree with me that Ethicon
2 did not design the mesh arms of the Prolift to
3 deform?
4  A  Deform in what way?  Mesh arms are able
5 to conform and to be pliable.  So can they deform
6 as pliability and deformable?  I'm not sure.  When
7 you place the Prolift and you place the arms
8 through the cannula, once the cannulas are
9 removed, the mesh arms remain in place.
10     So do they deform once they're in
11 place?  Are they incorporated into the tissue?
12  Q  My question is do you agree that
13 Ethicon didn't design the mesh to deform?
14     MR. SNELL:  Objection.  Asked and
15 answered.
16  A  I think the mesh was designed to be
17 very pliable, and in being pliable, pliability
18 allows the mesh to deform but in a positive way.
19  Q  So you believe that Ethicon did design
20 the mesh to deform but only in a positive way?
21     MR. SNELL:  Object.  Misstates.
22  A  I believe that Ethicon designed a
23 polypropylene microporous mesh to be compatible,
24 biocompatible and to provide for native tissue

Page 91

1 in-growth to provide for anatomical repair of the
2 prolapse.  And I would need to see what the
3 definition of deformity is before I answer that
4 question definitively.
5  Q  So as you sit here today, do you know
6 whether or not one of the intentions of the
7 Ethicon designers, when designing the Prolift
8 arms, was that the mesh would deform?
9  A  I don't know specifically if that was
10 the word they used in designing the mesh not
11 deforming.
12  Q  Would you agree with me that Ethicon
13 did not design the Prolift mesh to shrink?
14  A  They did not design the mesh to shrink.
15 That's correct.
16  Q  Would you agree with me that excessive
17 contraction or shrinkage of the tissue surrounding
18 the mesh is a potential adverse reaction from the
19 Prolift mesh?
20     MR. SNELL:  Objection.  Form.
21  A  No, I would not agree with that,
22 Counsel.
23  Q  So if that's a potential adverse
24 reaction of the Prolift mesh listed in the IFU,

Page 92

1 you would disagree with that?
2     MR. SNELL:  Objection.  Foundation.
3 Misstates the evidence.
4  A  I think that any surgery can lead to
5 contraction; okay?  So that's a known risk of any
6 surgery we do, is contraction.
7  Q  Would you agree with me that excessive
8 contraction or shrinkage of the tissue surrounding
9 the mesh is a potential adverse event of the
10 Prolift procedure?
11     MR. SNELL:  Objection.  Form.
12  A  I don't think it's specific to the
13 Prolift procedure.  I don't think it's specific to
14 the polypropylene mesh.  I think it's specific to
15 surgery in general that one can have contraction
16 and shrinkage of tissue.  I have seen this with
17 native tissue repair.  Seen that with posterior,
18 anterior colporrhaphy without the use of mesh or
19 permanent suture.
20  Q  Right.  But I'm asking specifically
21 about mesh and excessive shrinkage --
22  A  Right.
23  Q  -- and contraction.  Strike that.
24 Excessive contraction or shrinkage of tissue

Page 93

1 surrounding the mesh.  Is that a potential adverse
2 reaction of the Prolift mesh?
3     MR. SNELL:  Objection.  Asked and
4 answered.
5  A  And I've answered that question.  My
6 answer to that is no, I do not believe it's
7 related specifically to the mesh.
8  Q  And so you believe that that's
9 incorrect information?
10  A  I'm saying that that information is
11 relevant to the surgery in general and not
12 specific to the implant.
13  Q  Do you think that that is an
14 appropriate warning for Ethicon to put in their --
15 in the adverse reaction section of the IFU for
16 their Prolift mesh device?
17     MR. SNELL:  Objection.  Vague as to
18 "that."
19  Q  Is it vague as to that?  Do you know
20 what I'm talking about?  Do I need to restate the
21 question?
22     MR. SNELL:  Objection.
23  A  You can restate the question, Counsel.
24  Q  Do you think that putting the warning

|  | Page 94 |
|---|---|
| 1 | in the adverse reactions section of the -- let me |
| 2 | reask this because now I'm all befuddled here with |
| 3 | Burt's objections. |
| 4 | You think a warning in the Prolift IFU |
| 5 | that excessive contraction or shrinkage of tissue |
| 6 | surrounding the mesh is an appropriate warning to |
| 7 | put in the adverse reaction section of the IFU? |
| 8 | MR. SNELL: Objection. Misstates. |
| 9 | A   So I think the IFU can list potential |
| 10 | complications of the device and of the procedure |
| 11 | and contraction. Scarring is a known risk. It's |
| 12 | known to anyone doing pelvic surgery that that is |
| 13 | a known potential risk of surgery, whether the |
| 14 | mesh is there or not. |
| 15 | Q   But my question is is it an appropriate |
| 16 | warning to put in the IFU that excessive |
| 17 | contraction or shrinkage of the tissue surrounding |
| 18 | the mesh may occur? |
| 19 | A   If they put -- |
| 20 | MR. SNELL: Objection. Go ahead. |
| 21 | A   If that's in the IFU warning, then |
| 22 | Ethicon deemed that an appropriate thing to |
| 23 | mention. Yes. |
| 24 | Q   So would that warning be an appropriate |

Page 95
1 warning to put in the instructions for use for the
2 Prolift device since the device was first
3 marketed, that Ethicon knew that was a risk?
4     MR. SNELL: Objection.
5  A   So when they -- are we --
6  Q   Let me restate the question.
7  A   Restate it.
8  Q   If Ethicon knew at the time that the
9 Prolift was launched that excessive contraction or
10 shrinkage of the tissue surrounding the mesh was a
11 potential adverse reaction, would it have been
12 appropriate to include that in the adverse
13 reaction section of the IFU at launch?
14     MR. SNELL: Objection.
15  A   No, I don't think so, because as we've
16 already mentioned, IFU, it does not need to be all
17 inclusive of every potential risk or complication
18 of the proposed surgery and the medical device
19 being employed. And so I think Ethicon has the
20 discretion and knowledge to know which risks are
21 to be listed.
22  Q   Is it an appropriate warning now as we
23 sit here in 2018?
24  A   The contraction --

Page 96
1     MR. SNELL: Objection. Form, vague,
2 overbroad.
3  A   They chose to list that as a potential
4 complication. I'm not here to tell you whether
5 that's right or wrong, but I am telling you that I
6 don't believe that contraction of tissue is a
7 result of mesh implantation.
8  Q   So if I understand you correctly, you
9 believe it was inappropriate at the time of launch
10 but now you can't tell me if it was right or
11 wrong?
12     MR. SNELL: Objection. Misstating his
13 testimony completely. Argumentative too.
14  A   That's not what I said. I said that I
15 don't believe -- you asked me if I think that
16 should be in the IFU and my answer to you is I
17 don't know if it should be in the IFU or not but
18 that I don't believe it's related to the mesh.
19  Q   Actually, my question wasn't should it
20 be in the IFU now? I asked -- well, maybe I did
21 or I didn't.
22     MR. SNELL: Yes.
23  Q   So I'll let the record speak for
24 themselves.

Page 97
1     My question now is do you believe,
2 today, that it's appropriate to put a warning in
3 the Prolift mesh IFU that excessive contraction or
4 shrinkage of the tissue surrounding the mesh is a
5 potential adverse reaction?
6     MR. SNELL: Objection. Asked and
7 answered, I believe.
8  A   I will again state for the record that
9 I cannot tell you whether that is an appropriate
10 warning to have in the IFU, then or now, because I
11 don't believe -- it is my opinion, based on my
12 clinical experience, that I don't believe that's a
13 result of the medical device itself but, rather,
14 surgery. So that's my statement.
15  Q   So if Ethicon were to list that as a
16 potential adverse reaction of the medical device
17 itself, you believe that would be incorrect
18 information?
19     MR. SNELL: Objection.
20  Q   Is that accurate?
21     MR. SNELL: Objection. Foundation.
22 Improper hypothetical.
23  A   I would say that that is Ethicon's
24 prerogative to list whatever potential

Page 102

1 statement?
2  A  Well, I think that that is left
3 intentionally vague and to the discretion of the
4 pelvic surgeon. So if you're asking me what I
5 consider high risk surgical patients, I can answer
6 that question.
7  Q  Okay. What do you consider high risk
8 surgical patients?
9  A  Okay. So if we're talking about
10 anterior vaginal wall prolapse, cystocele, loss of
11 apical support, I would consider a high risk
12 surgical patient, an individual who I might not
13 want to operate on abdominally.
14      I take a lot of factors into
15 consideration when I choose a surgical approach.
16 I have patient's age, her medical history, her
17 past surgical history.
18      THE REPORTER: Patient's age what?
19  A  Stage, medical history, surgical
20 history, the stage and location of pelvic organ
21 prolapse, whether she's had previous surgeries.
22 And all of this plays into my ultimate decision as
23 to whether she represents a high risk surgical
24 patient.

Page 103

1  Q  So using your definition of high risk
2 individuals, do you believe that pelvic organ
3 prolapse vaginal mesh repair should be limited to
4 high risk individuals?
5      MR. SNELL: Objection to form.
6  A  I think it should be limited to those
7 patients that you deem appropriate candidates and
8 I would need to know more specifically regarding
9 what is considered a high risk surgical candidate.
10 A high risk surgical candidate is not someone I
11 want to operate on.
12  Q  Do you agree that current evidence on
13 the safety of transvaginal mesh repair of anterior
14 and posterior vaginal wall prolapse shows that
15 there are serious but well-recognized safety
16 concerns?
17      MR. SNELL: Objection.
18  A  I believe that we're all aware of
19 potential risks of utilizing transvaginal mesh.
20  Q  So you'd agree with that statement?
21  A  There are risks of traditional surgical
22 repairs as well.
23  Q  You would agree that transvaginal mesh
24 repair of anterior or posterior vaginal wall

Page 104

1 prolapse should only be used in the context of
2 research?
3  A  I think that ideally it is used in
4 research settings, but I would also take point as
5 an expert that not all surgeries utilizing
6 transvaginal mesh need to be part of a research
7 trial or cohort.
8  Q  So you would disagree with that
9 statement?
10  A  I would disagree with that statement.
11  Q  Have you read the NIHCE, the National
12 Institute for Health and Care Excellence
13 guidelines that were issued in December of 2017?
14  A  I have read them.
15  Q  And did you rely on them for issuing
16 your opinions in this case?
17  A  I may have. Yes.
18  Q  Would you agree that if a procedure is
19 only used in the context of research, it's
20 essentially experimental; right?
21      MR. SNELL: Objection.
22  A  No, I do not agree with that.
23  Q  So you don't think that if a procedure
24 is only being used in research studies, it's

Page 105

1 experimental?
2      MR. SNELL: Objection. Asked and
3 answered.
4  A  No, I don't. I don't agree with that.
5  Q  Do you agree that synthetic mesh for
6 pelvic organ prolapse should only be used in
7 complex cases with recurrent prolapse in the same
8 compartment?
9      MR. SNELL: Objection. Form and
10 foundation.
11  A  I know that statement and I don't agree
12 with that statement.
13  Q  So you disagree -- so you know that it
14 comes from the European Association of Urology's
15 treatment guidelines; right?
16  A  I believe that's where it's coming
17 from. I know what our European colleagues have
18 said. Yes.
19  Q  So you disagree with the European
20 Association of Urology in that regard?
21      MR. SNELL: Objection. Asked and
22 answered.
23  A  Yes.
24  Q  Would you agree that the currently

Page 106

1  available literature does not support the routine
2  use of transvaginal mesh for prolapse repair?
3          MR. SNELL: Object.
4      Q   Let me actually ask a different
5  question. Would you agree with me that currently
6  available literature does not support the routine
7  use of transvaginal mesh for prolapse repair but
8  that that does not apply to the use of
9  transabdominal mesh used during a minimally
10 invasive or open sacrocolpopexy?
11         MR. SNELL: Objection. Form and
12 foundation.
13     A   So you need to -- please just state
14 that question again.
15     Q   Well, let me back up. Have you read
16 the Canadian Urological Association's treatment
17 guidelines for pelvic organ prolapse repair issued
18 in 2017?
19     A   '17. Yes, I did read that.
20     Q   Are you aware that that guidance states
21 that the currently available literature does not
22 support routine use of transvaginal mesh for
23 prolapse repair. This recommendation does not
24 apply to the use of transabdominal mesh used

Page 107

1  during a minimally invasive or open
2  sacrocolpopexy?
3      A   I'm familiar with that statement.
4      Q   Do you disagree with that statement?
5          MR. SNELL: Object.
6      A   I disagree with that statement. Yes.
7      Q   Do you agree that a reasonable argument
8  can be made that as a result of very serious
9  complications that can occur from the Prolift, the
10 risks outweigh the benefit and there's -- well,
11 strike that.
12         Would you agree with me that when you
13 take into account the most serious complications
14 Ethicon knows have happened to women with the
15 prolapse, when you look back, a reasonable
16 argument can be made that as a result of those
17 very serious complications, the risks outweigh the
18 benefit and it shouldn't have been sold?
19         MR. SNELL: Objection.
20     A   No, I don't agree with that statement,
21 Counsel.
22     Q   So if the chief medical officer of
23 Ethicon and Johnson & Johnson agreed with that
24 statement, you would disagree with them; is that

Page 108

1  accurate?
2          MR. SNELL: Misstates, foundation. Go
3  ahead.
4      A   Are you telling me that the chief
5  medical officer stated that Prolift should never
6  have been sold?
7      Q   I'm telling you that the chief medical
8  officer agreed that when you take into account the
9  most serious complications that Ethicon knows have
10 happened with the Prolift, when you look back, a
11 reasonable argument can be made that as a result
12 of those very serious complications, the risks
13 outweighed the benefit and it shouldn't have been
14 sold?
15         MR. SNELL: Objection. Foundation.
16 Misstates the evidence. Asked and answered as
17 well. He's already told you his view on that.
18     A   Yeah. My view on that is that my
19 clinical experience and my review of the
20 literature support the use of Prolift.
21     Q   And you've never seen the testimony of
22 the chief medical officer of Ethicon and Johnson &
23 Johnson, Jim Hart?
24     A   No, I have not.

Page 109

1      Q   And that's not something that you
2  considered in reaching your opinions in this case?
3      A   No. I considered my opinions based on
4  review of the literature specifically with
5  attention to Level 1 and Level 2, not to expert
6  testimony and less quality evidence. So I did
7  focus my expert report on review of the
8  literature, Level 1, Level 2 evidence and
9  statements and email communication from industry.
10     Q   So you don't think that the testimony
11 of Ethicon's chief medical officer can offer any
12 relevant opinion regarding the safety and efficacy
13 of the Prolift device?
14     A   I can't comment on that because I
15 didn't read his statement.
16     Q   Is that something that you would have
17 liked to have reviewed prior to issuing your
18 opinions in this case?
19     A   I'm not sure it would have had any
20 bearing on my opinion, on my report.
21     Q   But would you have liked to have seen
22 it?
23         MR. SNELL: Objection. Asked and
24 answered.

|  |  |
|---|---|
| Page 134 | Page 136 |

Page 134

1  A   Okay. So we're talking about erosion.
2  There's lots of things that lead to erosion,
3  Counsel, and contraction and scarring is due, in
4  my opinion, to surgery.
5       You don't have contraction and scarring
6  if you don't use a scalpel. If you use a scalpel,
7  you're going to have some contraction and
8  scarring. Tissue never regains its initial
9  strength. And I don't believe that contraction
10 and scarring is a result of the mesh.
11  Q   Never? It's never? So you believe
12 that it's never a result of the mesh?
13      MR. SNELL: Objection. Asked and
14 answered about seven times. He's already
15 testified to that numerous times, Counsel.
16  A   Again, I don't believe it's related to
17 the mesh. That is my statement, my testimony.
18  Q   So then you believe that a mesh which
19 causes excessive shrinkage and contraction can't
20 be a defect in the device because it doesn't
21 occur; right?
22      MR. FAES: Object.
23  A   Right. I don't think -- again,
24 answering that question again, I do not believe

Page 135

1  that excessive contraction and shrinking, whatever
2  you just said, if you want to restate it. But I
3  think I've tried to make my point. I do not
4  believe that histological changes are a result of
5  a defect in the mesh.
6   Q   On page 12 of your report, you state
7  that "Assuming that pain or dyspareunia are due to
8  the Prolift or the Gynemesh PS is speculative and
9  non-evidence based."
10      Do you see that, page 12, last sentence
11 of the continuing paragraph.
12      MR. SNELL: Okay. Sorry.
13  Q   Do you see that, Doctor?
14  A   Yes, I do.
15  Q   So is it your opinion that pain and
16 dyspareunia can never be due to the Prolift or
17 Gynemesh PS?
18  A   My opinion is that there are many
19 causes for pain and dyspareunia and sexual
20 dysfunction, and that if we look at studies that
21 look at those complaints in the general population
22 presented to either primary care physician offices
23 or presenting in our study, that we looked at
24 evidence at the prevalence of dyspareunia and

Page 136

1  pelvic pain in patients presenting to our clinic
2  at Hopkins with pelvic organ prolapse, we see that
3  there's a very high incidence of those conditions
4  at baseline. And so I do not believe that mesh
5  implantation, whether it's Prolift or Elevate,
6  contributes necessarily to dyspareunia.
7   Q   So let me see if I can answer it, ask
8  it as a yes-or-no question, because I'm running
9  out of time. I'll try to keep it very simple.
10      Doctor, do you believe that pain can
11 potentially result from a Prolift mesh?
12      MR. SNELL: Objection. Asked and
13 answered.
14  A   I believe that pain, just like erosion,
15 can be multifactorial and that there can be -- by
16 that, I mean there can be many things that lead to
17 pain and painful intercourse, dyspareunia that are
18 not necessarily related to the use of transvaginal
19 mesh.
20  Q   That's not what I'm asking. I'm asking
21 the question very specific and I'm using your
22 language from your report.
23      Do you believe -- and I'm asking you a
24 yes-or-no question. Do you believe, yes or no,

Page 137

1  that pain can be due to a Prolift mesh? I'm not
2  asking about multifactorial or anything else. I'm
3  asking if pain can be due to a Prolift mesh?
4       MR. SNELL: Objection. Asked and
5  answered.
6   A   So my statement here is that it's
7  speculative and nonevidence-based. And so as far
8  as you can say a yes-or-no answer to that, I don't
9  think you can. I think that you need to take
10 cases on a case-by-case basis and understand that
11 there are lots of things that can contribute to
12 pelvic pain and dyspareunia and that we can't just
13 say oh, well, you had a mesh placed and,
14 therefore, your pain is related to the mesh.
15  Q   So I just want this to be clear.
16 You're stating that you can't answer yes or no to
17 the question of whether or not pain can be due to
18 Prolift?
19      MR. SNELL: Objection. Form.
20 Misstates.
21  A   Right. I can't answer that
22 definitively. No.
23  Q   Would you agree with me that you can't
24 state yes or no that dyspareunia can be due to

Page 138

1 Prolift?
2   A   For the same reasons I've just
3 enumerated, I can't say that dyspareunia would be
4 directly related to Prolift.
5   Q   Doctor, on page 3 of your report, you
6 discuss the erosion rates for the TVT and TVT-O
7 product.
8   A   Yes.
9   Q   Would you agree with me that there's
10 nowhere in your report where you discuss what the
11 overall rates of mesh exposure are for the Prolift
12 or Gynemesh PS product?
13   A   That could be.
14       MR. FAES:  How are we doing on time?
15       THE REPORTER:  You are right at the
16 end.
17       MR. FAES:  I'll reserve my one minute
18 for what I'm sure will be Burt Snell's
19 hour-and-half direct.  And can we take a quick
20 break?
21       MR. SNELL:  If you want to.
22       (Break taken, 4:16 - 4:21 p.m.)
23       EXAMINATION BY MR. SNELL:
24   Q   All right.  Burt Snell, attorney for

Page 139

1 Ethicon and Johnson & Johnson.
2       Dr. Ellerkmann, I just have some
3 followup questions on some of the topics that
4 you've been discussing with Plaintiff's counsel
5 today, the first of which -- well, I'll come back
6 to that.
7       Let's kind of start in the beginning
8 with some of the topics.  You recall being asked
9 about your opinions as to the adequacy of the
10 Prolift IFU?
11   A   Yes.
12   Q   And I believe you testified to
13 Plaintiff's counsel you believe that it was
14 adequate?
15   A   Yes.
16   Q   Do you have expertise as to the
17 expected knowledge of the pelvic surgeon who might
18 perform the Prolift?
19   A   Yes, I do, because I am one.
20   Q   Do you have expertise and knowledge
21 with regard to the expected knowledge of pelvic
22 surgeons coming out of residency?
23   A   Yes, I do.
24   Q   How is that?

Page 140

1   A   Well, I have been an associate
2 residency director at Johns Hopkins, as my CV
3 attests to.  I've taught residents for all of my
4 career post-residency myself.  I've been involved
5 with fellowship training.  And so I am very aware
6 of what they require by the RFC, Residency Review
7 Committee, in terms of what their fund of
8 knowledge needs to be, what their surgical
9 experience needs to be at the time of graduation
10 from residency.
11   Q   And did you apply that as a standard
12 for your IFU opinions?
13   A   Yes, I did.
14   Q   Have you talked Prolift to any
15 surgeons?
16   A   Yes, I have.
17   Q   Can you tell us the types of surgeons?
18   A   I've taught Prolift surgeries to
19 residents more than I can count, fellows of which
20 I've had over 20 in my career, many of which you
21 know.  I've taught Prolift to some generalists in
22 the community here as well as to other
23 urogynecologists.
24   Q   Did you utilize that as a standard and

Page 141

1 basis for your IFU opinions with regard to the
2 adequacy of the Prolift IFU?
3       MR. FAES:  Objection.
4   A   Yes, I did.
5   Q   Are you familiar with the board
6 certification process -- strike that.
7       Are you familiar with the knowledge
8 base tested and evaluated with the OB-GYN board
9 certification process?
10       MR. FAES:  Objection.
11   A   Yes, I am.
12   Q   Same question with regard to female
13 public medicine and that subspecialty board.  Are
14 you familiar with the knowledge base, the expected
15 knowledge base of surgeons sitting for that board?
16       MR. FAES:  Objection.
17   A   Yes, I am.
18   Q   For those board certifications, is
19 there an expected required knowledge with regard
20 to complications that can come from pelvic organ
21 prolapse surgery?
22       MR. FAES:  Objection.
23   A   Yes, there are.
24   Q   With and without mesh?

|  Page 150 | Page 152 |
|---|---|
| 1  or presented at. One, let's take number 4, Pelvic<br>2  Organ Prolapse and Biomaterial Augmentation.<br>3     A   Correct.<br>4     Q   Is that a course?<br>5     A   Where was that?<br>6     Q   Sure. Number 4, Pelvic Organ Prolapse<br>7  and Biomaterial Augmentation.<br>8        My question to you -- are you there?<br>9     A   Oh, yes. Yes, I remember that very<br>10 well. I went and spoke to the European<br>11 Association of Gynaecologists. That was in Bern,<br>12 Switzerland, and we spoke. That was at that time<br>13 with Cook and we were speaking primarily about<br>14 Surgisis. That was a xenograft that Cook was<br>15 developing for pelvic floor reconstruction.<br>16    Q   In 2000, were you analyzing<br>17 biomaterials and specifically how they performed<br>18 in the pelvic organ prolapse application?<br>19       MR. FAES: Objection.<br>20    A   Yes, I was. In fact, Counsel, as a<br>21 fellow, I was very involved in developing and<br>22 working with my co-fellows and subsequently as a<br>23 junior attending. We did several pilot studies<br>24 looking at some of the earliest biological grafts, | 1  treating pelvic organ prolapse?<br>2     A   Yes, it would have.<br>3     Q   Would that presentation have included<br>4  your analysis and knowledge as to the design and<br>5  the utility, if any, of such a device?<br>6        MR. FAES: Objection.<br>7     A   Yes.<br>8     Q   You told Plaintiff's counsel you also<br>9  have experience analyzing the design of devices in<br>10 cadaver labs?<br>11    A   Yes.<br>12    Q   Number 25, for example, lists a cadaver<br>13 lab you did on Prolift and other devices. Do you<br>14 see that?<br>15    A   I do. It was here in Baltimore.<br>16    Q   Did you do other cadaver labs on<br>17 Ethicon devices where you analyzed the design of<br>18 the device and the safety in places other than<br>19 Baltimore?<br>20       MR. FAES: Objection.<br>21    A   Yes, I did.<br>22    Q   You were asked about the materials list<br>23 that my firm put together and I believe you<br>24 testified you did not read the two company witness |
| Page 151 | Page 153 |
| 1  xenografts, including Tutoplast and Surgisis, and<br>2  seeing whether there were improved outcomes in<br>3  anatomical repair and subjective outcomes with<br>4  their use for transvaginal augmentation.<br>5     Q   Another one, if you just go to number<br>6  22, Biomaterials in Gynecologic Surgery: A Review<br>7  of the Literature and Current Applications. You<br>8  were the invited speaker at the American<br>9  Urogynecology Association Annual Scientific<br>10 Meeting in 2005. Do you see that reference in<br>11 number 22?<br>12    A   Yes, I do.<br>13    Q   And in connection with that, would you<br>14 have analyzed biomaterials?<br>15    A   Yes.<br>16    Q   Would you have presented to pelvic<br>17 surgeons on biomaterials and their use in these<br>18 applications?<br>19    A   I did. That was a presentation.<br>20    Q   Would that presentation have included<br>21 the pelvic organ prolapse application?<br>22    A   Absolutely. Yes.<br>23    Q   Would that presentation have included<br>24 the use of a macroporous polypropylene mesh for | 1  depositions that we put on that. Is that correct<br>2  or wrong?<br>3     A   That's correct.<br>4     Q   Okay. Did you review, though, the<br>5  company documents that we sent to you?<br>6        MR. FAES: Objection.<br>7     A   I reviewed as much as I could, yes, of<br>8  those documents.<br>9     Q   Had you been reviewing company<br>10 documents and materials pertinent to the Prolift<br>11 actually even before becoming an expert in this<br>12 litigation?<br>13       MR. FAES: Objection.<br>14    A   I reviewed documents in the past from<br>15 Ethicon as a preceptor and at our summit meetings.<br>16 Yes.<br>17    Q   And did you bring today response to<br>18 plaintiff's deposition notice that was marked as<br>19 Exhibit No. 1 the materials that you've considered<br>20 and relied upon?<br>21    A   I did. Yes.<br>22    Q   Can you describe that for the court<br>23 reporter, please, what you brought.<br>24    A   So I have brought copies, both hard |

Page 154

1  copy and a flash drive containing all the
2  literature that I had been able to review in
3  preparation for my expert report and for this
4  deposition.
5      Q   Does that also include company
6  documents such as the IFU and professional
7  educations lines?
8      A   Yes, it does.
9      Q   Does that include documents from
10 Ethicon pertaining to the design of the Prolift?
11     A   Yes, it does.
12     Q   You were asked about if you did an
13 analysis. Did you do an analysis of the medical
14 literature with regard to Prolift to formulate
15 your opinions?
16     A   Yes, I did.
17     Q   Can you tell us in general how you went
18 about doing that analysis?
19     A   So that analysis has been ongoing since
20 I was introduced to transvaginal repairs. And so
21 in addition to the literature reviewed for today's
22 deposition and for the report, the foundation for
23 my opinion and expert report is based on my
24 experience, my clinical experience, my

Page 155

1  communications with other colleagues, and my
2  review of the literature over the years as well as
3  specific review of the literature for preparations
4  for the report.
5      Q   And there's been questions about
6  Gynemesh PS and Prolift. Does Prolift use
7  Gynemesh PS?
8      A   Yes.
9      Q   Do you view outcomes and studies on
10 those two devices as being relevant and similar?
11     A   I do. Yes.
12     Q   Is that the way you considered those
13 devices back when you were using and teaching them
14 before becoming an expert?
15     A   Correct. So we know that Gynemesh PS
16 is the same mesh that's used in Prolift. The
17 difference is in the design, in the cut of the
18 mesh.
19     Q   And would Gynemesh PS and your personal
20 use of it, did you need to cut that mesh and trim
21 it before using it as well?
22     A   I have on occasion, yes. It came in
23 sheets, so we cut it all the time when we used it
24 for abdominal sacrocolpopexy.

Page 156

1      Q   You were asked about whether you
2  separated Prolift studies into different buckets
3  or categories. Do you recall in general those
4  types of questions?
5      A   I do.
6      Q   Did you review the overall data an
7  Prolift to evaluate and help form your opinions?
8          MR. FAES: Objection.
9      A   Yes, I did.
10     Q   Even as you sit here, do you recall any
11 specific studies that actually stated that Prolift
12 was defective?
13         MR. FAES: Objection.
14     A   I didn't see any study that
15 specifically stated that Prolift was defective.
16     Q   In formulating your opinions that
17 Prolift was not defective, have you described your
18 methodology earlier?
19         MR. FAES: Objection.
20     A   I believe I did describe my
21 methodology.
22     Q   You were asked about pathology. Have
23 you seen any medical literature that concerns
24 pathology of explanted mesh?

Page 157

1      A   Yes, I have seen literature that looks
2  at histology of explanted mesh.
3      Q   Is that something you would have seen
4  not just in connection with your role here, but is
5  that something that will be part of your regular
6  reading of the literature?
7          MR. FAES: Objection.
8      A   Absolutely. I mean, as I noted to
9  Counsel earlier, even years ago with my fellow,
10 we've looked personally at explanted mesh
11 microscopically in trying to obtain a better idea
12 of what was going on histologically with that
13 material.
14     Q   And when you were doing these
15 presentations to other pelvic surgeons, whether at
16 the annual AUGS scientific meetings or otherwise,
17 as part of that and devising your opinions at that
18 time with regard to the biocompatibility of mesh
19 for the prolapse application, did you consider
20 clinical studies published on the mesh?
21         MR. FAES: Objection.
22     A   We considered -- I considered clinical
23 studies and I also looked at the review of the
24 biological grafts as well as synthetic grafts that

```
                                          Page 186                                              Page 188
 1     Q   And is that part of your professional    1  reporter.)
 2  experience that you rely upon for your opinions? 2          INSTRUCTIONS TO WITNESS
 3     A   It is.  I personally view every          3
 4  pathology report on my patient.                  4      Please read your deposition over
 5        MR. FAES:  We're going to have to take    5  carefully and make any necessary corrections.  You
 6  another break if you keep going much longer.     6  should state the reason in the appropriate space
 7     Q   I'm just checking.                        7  on the errata sheet for any corrections that are
 8        And in your expert report, did you         8  made.
 9  discuss your opinions on the design of the Prolift  9      After doing so, please sign the errata
10  device?                                         10  sheet and date it.
11     A   Yes, I did.                              11      You are signing same subject to the
12     Q   Did you discuss the potential benefits   12  changes you have noted on the errata sheet, which
13  -- strike that.                                 13  will be attached to your deposition.
14        Did you discuss the benefits as you saw   14      It is imperative that you return the
15  them with regard to the components and parts to 15  original errata sheet to the deposing attorney
16  the Prolift device including Gynemesh PS?       16  within thirty (30) days of receipt of the
17     A   Yes, I did, previously elaborated on     17  deposition transcript by you.  If you fail to do
18  that briefly here today.                        18  so, the deposition transcript may be deemed to be
19        MR. SNELL:  I think that's all.  Thank    19  accurate and may be used in court.
20  you.                                            20
21        MR. FAES:  Thank you, Doctor.             21
22        (Deposition concluded at 5:28 p.m.)       22
23                                                  23
24                                                  24

                                          Page 187                                              Page 189
 1                                                   1
 2  STATE OF MARYLAND )                              2          - - - - - -
 3  COUNTY OF HARFORD )                              3            E R R A T A
 4                                                   4          - - - - - -
 5      I, Linda Bahur, a Notary Public of the       5
 6  State of Maryland, do hereby certify that the    6  PAGE  LINE  CHANGE
 7  above-captioned proceeding took place before me at 7  ____ ____ _____
 8  the time and place herein set out.                8  REASON: _____
 9      I further certify that the proceeding was    9  ____ ____ _____
10  recorded stenographically by me and this        10  REASON: _____
11  transcript is a true record of the proceedings. 11  ____ ____ _____
12      I further certify that I am not of          12  REASON: _____
13  counsel to any of the parties, nor an employee of 13  ____ ____ _____
14  counsel, nor related to any of the parties, nor in 14  REASON: _____
15  any way interested in the outcome of this action. 15  ____ ____ _____
16                                                  16  REASON: _____
17                                                  17  ____ ____ _____
18       _____            18  REASON: _____
              Linda M. Bahur                        19  ____ ____ _____
19       My commission expires 8/27/2019            20  REASON: _____
20                                                  21  ____ ____ _____
21      (The foregoing certification of this        22  REASON: _____
22  transcript does not apply to any reproduction of 23  ____ ____ _____
23  the same by any means, unless under the direct  24  REASON: _____
24  control and/or supervision of the certifying
```