# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

------------------------------------------------x
: CIVIL ACTION
: NO. 08-1633
:
In Re: Vioxx Products Liability Litigation :
: SECTION L, MAG. 3
:
: HONORABLE ELDON E. FALLON
:
:
: In Relation To: MDL No. 1657
:
:
:
------------------------------------------------x

## MOTLEY RICE'S OBJECTION TO THE VIOXX FEE ALLOCATION COMMITTEE'S COMMON BENEFIT FEE RECOMMENDATION

Motley Rice hereby submits its Objection to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation. Motley Rice ("this Firm") believes the Fee Allocation Committee's ("FAC") Recommendations to be self-enriching and lacking evenhandedness for those applicants not on the Committee. Therefore, the FAC's recommendations should be stricken in their entirety with a *de novo* evaluation to be undertaken by Special Master Juneau.

### I.   INTRODUCTION

This Court designated the FAC to carefully review and judiciously allocate the limited resources available to common benefit fee applicants. This process of valuing over forty individual firms' contributions to the ultimate success of the Vioxx settlement was no doubt painstakingly performed. However, your Honor entrusted the FAC with a duty to be transparent and absent of bias, particularly due to the natural conflicts created by fee applications by both Committee members and non-Committee firms for the same funds. The Committee was charged to put friendships and politics aside and use "objective measures and the committee's subjective

understanding of the relevant contributions of counsel toward generating the Settlement Fund in accordance with established fee jurisprudence." Pre-Trial Order 6(D), at 2.

Just as the Court ascribed the FAC with the enormous responsibility of justly allocating monies where they belonged, the Court similarly tasked the Committee with the unspoken duty of treating themselves as justly. In this, the Committee failed. The disparate treatment can be no more clearly recognized than in the hourly fees awarded to FAC members, some in excess of $2,000 per hour. Meanwhile, the time and value of work contributed by Motley Rice was severely discounted, and the award recommended - $194,153.00 for 3289.50 hours – is woefully deficient. In fact, few of the Committee's recommendations other than for their own members resemble the order of the Court or established case law regarding time valuation. As such, the recommendations must be stricken and the process begun *de novo*.

## II. ARGUMENT

### A. THE POINTS ALLOCATION SYSTEM IS UNFAIR

The points allocation system, designed by the FAC, is fundamentally flawed. It presents an unavoidable and unfair prospect of self-dealing and "double-dipping" by its very creators from the limited fund whom, by their actions, inevitably disregard and disrespect the enormous contribution of others in this litigation. By way of example, FAC members can, and based on recommended awards clearly did, award themselves three times over for exact same functions. Awards under the points allocation scheme include the following:

Settlement Negotiations – 100 points
Post-Settlement with Brown Greer – 100 points
Key Leadership – 125 points
                                     Total: 325 points

Each of these duties is the same task wearing a different hat. By this methodology, only those who played a role in the settlement – the same individuals who created this points system – are

those who can be awarded richly under this allocation scheme. Certainly this Court did not intend that triple-dipping for the same common benefit service be the manner by which this fee is awarded.

Nor is the FAC's award scheme supportable by law. The Court referred both the FAC and common benefit fee applicants to the *Johnson* factors, addressed more fully herein, as a traditional method of calculating reasonably hourly rates. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Rather than allocated points evenly among tasks that bear like results, the FAC's point scheme inappropriately weighted points heavily in favor of leadership positions that they, themselves, held to the exclusion of other common benefit petitioners. For instance, the highest level of participation in "Discovery, Science and Expert" work – the product that unquestionably drove the settlement – was awarded thirty points less than the lowest level of contribution to "Settlement Implementation and Post-Settlement Issues." Here again, the FAC-derived point system ignored the fiduciary responsibility to all petitioners to the benefit of Committee members who took part in these unnamed "post-settlement issues."

The FAC similarly rewarded trial counsel, largely members of the FAC, unjustifiably richly. Participation in a *single trial* in an undefined role, regardless of the result, garnered 40 points. Meanwhile, "substantial time and resources expended doing discovery and advancing the docket" – essentially performing the work that created the trial opportunity – earned only 35 points. Therefore, a lawyer who sat in the courtroom for one trial received a greater share of the common benefit fees than one who, over the course of many months, worked to identify and uncover key documents for themes used in *each* of the eleven trials. Rather than reward firms that completed much of the substantive work in these cases, the points system allows an

opportunity to ignore the enormous benefit for the overall success of this litigation contributed by various firms.

### B. MOTLEY RICE WORK WAS NOT VALUED APPROPRIATELY

In its appointment of the FAC, this Honorable Court obligated the Committee to engage equity in providing economic recognition for "a common benefit attorney who expended considerable time, resources, and took significant economic risks to produce the fee . . .." *See* October 19, 2010 Order, J. Fallon, at 22. That Motley Rice's substantial and valuable work was awarded at only $58 per hour can only be interpreted as punitive. Based on the award recommended and hours submitted, some firms were awarded $2,000.00 per hour for *every hour* submitted. Surely, these firms' *staff member's* contributions cannot be *thirty-five times* more valuable than that of a senior partner at this firm who conducted highly strategic corporate depositions, or an associate at this firm that wrote legal briefs that generated positive results to advanced this litigation. A cursory review of the discrepancies in amounts awarded to various firms reveals an indefensible lodestar.

Motley Rice was judicious in the common benefit hours submitted for compensation, and each hour submitted constituted real work lead by high level lawyers and staff that achieved tangible results. Our petition contained no padding, and suspicion of such was not broached by the FAC when it had the full opportunity during the FAC oral presentation process. Based on the recommended award, clearly a great portion of this firm's work was severely discounted or completely ignored. It is these overlooked hours that this firm seeks to discern through the discovery process, and thereafter prove their worth to this Honorable Court.

Motley Rice's contributions ranged widely from technical document analysis and review, to taking depositions of key executives in Merck's Vioxx network, to writing briefs that

uncovered documents and testimony falsely protected as attorney-client privileged. Each project required considerable time and expenditure, and each made a marked contribution to the litigation. Critical to the analysis of whether fairness played a role in the recommendations is that *each hour spent by Motley Rice was either authorized or requested by the Vioxx Plaintiff's Steering Committee or Liaison Counsel.* Work on these projects was not mandatory, but voluntary, with the expectation that Motley Rice work would benefit the entire litigation. The benefit was passed along, but the reward did not follow.

### A. Marketing

During the course of this litigation, it became clear that Vioxx marketing was a critical area deserving of concentrated analysis. Motley Rice was lead counsel in the taking of the 30(b)(6) deposition of Merck's Office of Medical-Legal. Ellen Westrick, Director of this Office, led efforts to develop fraudulent marketing schemes presenting Vioxx as a safe drug to the FDA, the medical community and the public at large, including promoting Vioxx as cardioprotective. Her deposition resulted in critical testimony later used by trial counsel to illustrate the pattern of Merck's marketing fraud.

Motley Rice, at the direction of Liaison Counsel, developed third-party discovery against DDB and Ogilvy, the marketing agencies engaged by Merck to create sales and marketing pieces for Vioxx, many of which misrepresented the drug's safety and efficacy. This firm litigated the right to receive documents and records related to Vioxx ads created.[1] The FAC promoted the value of this third-party work in its Affidavit to the Court "intended to provide the Court with an

---

[1] Our contributions in this effort were seconded by Chris Placitella in his hearing before this Committee: "I also was involved for New Jersey in subpoenaing the Ogilvy records. We litigated the right to get those records. That review was done in connection with the Motley Rice firm." Confidential Vioxx Fee Committee Presentation, Cohen, Placitella & Roth, at 12:7-12.

appreciation of the general objectives we pursued in the management of this litigation and our approach to carrying out these objectives." *See* Affidavit of Russ M. Herman in Support of the Plaintiffs' Liason Cousel's Memorandum in Support of Motion for Award of Plaintiffs' Common Benefit Counsel Fees and Reimbursement of Expenses, p. 2, and p. 24, para. 35 (referencing the Sales and Marketing Committee's work on Ogilvy-DDB).

### A. Uncloaking the "Cardioprotective Theory"

It is clear that the Allocation Committee underappreciated our work to convince the Court to grant Plaintiffs the deposition of Merck's Senior In-House Legal Counsel. Motley Rice reviewed defendant-produced documents that uncovered a trend in which defendants redacted for privilege what would became known as one of the most damning marketing strategies – promoting Vioxx as cardioprotective. Although these documents originated out of the marketing department, a large percentage of these e-mails, memos and strategy plans arbitrarily copied Joanne Lahner, Merck in-house counsel. Merck took great liberties in designating each of these documents as privileged. When Plaintiffs moved the Court to review these documents *in camera* to examine their propriety as privileged, Merck sought a protective order.

Motley Rice researched and wrote the brief that persuaded Judge Higbee in the New Jersey consolidation that Ms. Lahner played a major role in crafting false messages about Vioxx that were communicated to the FDA, physicians, and the public at large. Soon after Judge Higbee stripped the attorney-client privilege cloak from Ms. Lahner and the documents we requested, Merck announced its settlement. The timing of Merck's decision to pay $4.8 billion in a settlement just before Plaintiffs were to analyze the de-privileged documents and Ms. Lahner's role is no coincidence.

## B. Participation in New Jersey Trial Cases

Motley Rice worked up six bellwether cases for trial in New Jersey. These cases, carefully selected in conjunction with Liaison Counsel and New Jersey trial counsel, some of whom sit on the FAC, required an estimated 500 hours in prepping fact witnesses for deposition, taking sales representative depositions, meeting with physicians, and preparing cases scheduled for trial in the months following the settlement announcement. Although work on these cases certainly qualified as projects that would benefit the entire litigation, Motley Rice did not include these hours in its common benefit submission as *explicitly instructed* by the FAC.[2] Motley Rice spent its own resources dutifully preparing these cases for trial only to have them pushed aside for lesser cases selected by individuals who positioned themselves for a vast overpayment of common fund. Knowing, as we do now, the purpose behind these actions, Motley Rice should be allowed submission of these 500 hours for compensation.

Beyond the individual case work-up, Motley Rice lawyers worked on motions *in limine* and jury charges for New Jersey trial cases. At the request of New Jersey liaison counsel, we sought out and worked up experts for use by the entire litigation to advance cases, including Dr. Michael Hoffman. This firm's cultivation of general liability themes and experts, volunteered and performed in the spirit of coordination and common end goals, assisted the trial teams and allowed them time to devote efforts to other case-specific aspects of their cases. The benefit of this firm's work is found only in the common benefit fee award recommendations of those trial teams, who took credit for all New Jersey trial work even though a great portion of that was prepared by our firm and others.

---

[2] This firm had no motivation to leave these hours out of its submission other than this instruction, which was not widely shared as evidenced by a review of the FAC interview transcripts. *See* Transcript from Anapol Schwartz interview, attached at Exhibit A.

### III. APPLICATION OF THE *JOHNSON* FACTORS TO MOTLEY RICE WORK

The Court recommended the Allocation Committee look to the *Johnson* factors as "general fee jurisprudence to identify the factors that should be applied in making appropriate allocations.[3] Pre-Trial Order No. 6(D). Indeed, guidance from the Firth Circuit provides that "[the Court] must determine whether 'the record clearly indicates that the district court has utilized the *Johnson* framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation.'" *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir.2008) citing *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir.1996). Reviewing Motley Rice's work within the framework of these guidelines only strengthens our argument of unjust allocation.

#### A. The Time and Labor Required; The Preclusion of Other Employment Due to Acceptance of the Case; Partner Participation

The time spent by Motley Rice lawyers and paralegals on the Vioxx projects assigned by the PSC or liaison counsel necessarily required a sacrifice of work on other projects. The Motley Rice attorney hours submitted amount to over one-half of one attorney's annual hourly expectations; the paralegal hours constitute more than an entire year's work for one employee. Motley Rice dedicated strong assets to these tasks – three senior partners and two associates – each of whom performed valuable work. The firm supported these lawyers and paralegals throughout the protracted litigation during which these hours were recorded with the expectation that this dedication would be rewarded rather than disregarded. This commitment did not diminish when defense verdicts stacked up; in fact, it was at that time that Motley Rice presented nineteen cases for consideration as bellwether trials, six of which were selected.

---

[3] Referencing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

## B. The Quality of the Work; Contribution to the Litigation Outcome

The value of Motley Rice's work can best be judged by the results it accomplished. Our work to uncover the role Merck's in-house counsel played in the crafting of marketing messages corresponded in time directly with the settlement announcement. In fact, the documents sought were never seen outside the Court's *in camera* review. The Westrick deposition we took pushed the issues forward related to the intersection of medicine and marketing within Merck. Our detailed examination of the privilege log uncovered critical documents. Strong records created in depositions of detail representatives in our six bellwether cases helped strengthen sales training themes. Each of Motley Rice's efforts substantively contributed to the overall litigation outcome.

## C. The Novelty and Difficulty of the Questions; The "Undesirability" of the Case

Each project undertaken by Motley Rice involved questions not previously presented in pharmaceutical litigation. No outline was available for a witness whose responsibilities spanned both medical and legal departments; no precedent existed for deposing in-house counsel on marketing strategies; no manual presented itself for the handling of complex evidentiary issues involving fraud of this magnitude. All work performed by Motley Rice required critical analysis and innovative legal strategy to successfully overcome the legal hurdles presented. To a project, our firm prevailed for the benefit of the entire litigation.

## D. The Skill Requisite to Perform the Legal Services Properly; The Experience, Reputation, and Ability of the Attorneys

Motley Rice's experience in mass tort litigation not only guided its lawyers and paralegals that performed the tasks requested of them, but created a reliance on our firm to

handle complex legal issues without oversight. The PSC and Liaison Counsel reached out to Motley Rice because of our proven ability to add value to mass tort cases. The speed and skill with which our firm performed work assisted trial teams and the litigation as a whole in moving the litigation forward to resolution.

### E. Customary Fee; Whether the Fee is Fixed or Contingent; Amount Involved and Results Obtained

The time documented by Motley Rice is absent any fluff. They are real hours backed by hard work that achieved concrete results. Based on the attorney hourly rate designated by the Court ($443.29 per hour), Motley Rice submitted time amounts to $1,458,202.45. The additional as yet unsubmitted 500 hours spent on bellwether case work adds $221,645.00, for a grand total of $1,679,847.40. Based on this number alone, it is abundantly clear that the Fee Allocation Committee's recommended award of $194,153.00 is woefully short – less than one-eighth – of the work performed and reimbursement deserved. This inadequacy is particularly clear considering this same committee reimbursed Motley Rice over $300,000.00 in expenses related to these same tasks.

Even if each firm received full reimbursement for the 568,142 hours submitted at the court-approved rate of $443.29, which they did not, the common benefit well still would not run dry. Based on the value of this firm's contributions, Motley Rice believes that a multiplier of 3 should be applied to this firm's hourly total, for a grand total of $5,039,542.20. This figure amounts to approximately one-half of one percent of the available funds and is more than reasonable.

### CONCLUSION

Motley Rice played a significant role in the outcome of this litigation and should be compensated accordingly. Based on the Order of the Court, the directive to the Allocation Committee, and precedent related to disbursement of common benefit fees, Motley Rice believes the recommended award is unjust and urges this Court to explore the methodology of the FAC and reevaluate its recommendation as to this firm.

Respectfully submitted,

Joseph F. Rice, Esq.
Fred Thompson, Esq.
Carmen S. Scott, Esq.
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
(843) 216-9000 office
(843) 216-9440 fax
cscott@motleyrice.com



**MotleyRice** LLC
ATTORNEYS AT LAW

RECEIVED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
2011 FEB -7 AM 11: 08
LORETTA G. WHYTE
CLERK

February 4, 2011

Loretta G. Whyte
US District Court
Eastern District of Louisiana
500 Poydras Street
Room C151
New Orleans, LA 70130

**Re:  MDL 1657 Vioxx**

Dear Clerk:

Please find enclosed for filing Motley Rice's Objection to the Vioxx Fee Allocation Committee's Common Benefit Fee Recommendation.

Thank you.

Sincerely,

Staci Palmer Barra, Paralegal
to Carmen Sessions Scott, Esq.

Enclosure

---

\* 1100 Glendon Ave., 14th Floor
Los Angeles, CA 90024-3503
o. 310.500.3540
f. 310.824.2870

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
o. 843.216.9000
f. 843.216.9450

321 South Main St.
Providence, RI 02903
o. 401.457.7700
f. 401.457.7708

One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
o. 860.882.1681
f. 860.882.1682

275 Seventh Ave., 2nd Floor
New York, NY 10001
o. 212.577.0040
f. 212.577.0054

320 Chestnut St.
Morgantown, WV 26505
o. 304.413.0456
f. 304.413.0458

1000 Potomac St., Ste. 150
Washington, DC 20007
o. 202.232.5504
f. 202.232.5513

\* Motley Rice LLP operates the California office.

www.motleyrice.com