**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2325 |
| IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2326 |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2327 |
| IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2387 |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2440 |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL No. 2511 |

**THIS DOCUMENT RELATES TO ALL CASES**

_____

**COMMON BENEFIT FEE AND COST COMMITTEE'S
PETITION FOR AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES AND
EXPENSES, AND MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………………………………i

TABLE OF AUTHORITIES …………………………………………………….....ii

I.   INTRODUCTION ……………………………………………………………1

II.  COURT ORDERS RELATED TO COMMON BENEFIT FUND …………………………15

III. ARGUMENT AND AUTHORITIES ……………………………………………18

   A.   The District Court has Broad Discretion in Awarding Common Benefit Fee …………18

   B.   The Five-Percent (5) Holdback is an Appropriate Amount to be Awarded to Plaintiffs' Participating Counsel for Fees and Reimbursement of Expenses …………..19

   C.   The Value and Scope of the Benefit Provided to MDL Claimants Supports a Five-Percent (5%) Fee and Expense Award ……………………………………………22

   D.   The Requested Five-Percent (5%) Award for Fees and Expenses Falls Well Within The Benchmark Percentage for Similar Cases …………………………………………23

   E.   Consideration of the *Barber* Factors Further Supports the Five-Percent (5%) Award …26

      1.   Time and Labor Required (Factor 1); Attorneys' Opportunity Costs in Pressing Litigation (Factor 4); Attorneys' Expectations at the Outset of the Litigation (Factor 6); Time Limitations Imposed by the Client or the Circumstances (Factor 7) ………………………………………………………………...27

      2.   The Novelty and Difficulty of the Questions (Factor 2); the "Undesirability" of the Case (Factor 10) ……………………………………………………28

      3.   The Skill Required to Perform the Legal Service (Factor 3); The Experience, Reputation, and Ability of the Attorneys (Factor 9) …………………………...31

      4.   Nature and Length of Professional Relationship Between Attorney and Client (Factor 11) ……………………………………………………………33

      5.   Customary Fee for Similar Work (Factor 5) ……………………………………33

   F.   The Five-Percent (5%) Fee is Supported by the "Lodestar" Cross-Check ………………33

   G.   CONCLUSION………………………………………………………………37

# <u>TABLE OF AUTHORITIES</u>

***<u>Cases</u>***

*Arenson v. Board of Trade,*
   372 F. Supp. 1349 (N.D. Ill. 1974) ........................................................................ 32

*Barber v. Kimbrell's, Inc.,*
   577 F.2d 216 (4th Cir. 1978) ............................................................................... 26

*Campbell v. Boston Scientific Corporation,*
   882 F.3d 70 (4th Cir. 2018) .................................................................................. 14

*Cisson v. C.R. Bard, Inc.,*
   810 F.3d 913 (4th Cir. 2016) ............................................................................... 14

*Deem v. Ames True Temper, Inc.,*
   2013 WL 2285972 (S.D.W. Va. 2013) ................................................................. 20

*Deloach v. Philip Morris Cos.,*
   2003 WL 23094907 (M.D.N.C. 2003) ................................................................. 35

*Edmonds v. U.S.,*
   658 F. Supp. 1126 (D.S.C. 1987) ................................................................... 22, 31

*Eghnayem v. Boston Scientific Corporation,*
   873 F.3d 1304 (11th Cir. 2017) ........................................................................... 14

*Good v. West Virginia-American Water Co.,*
   2017 WL 2884535 (S.D.W. Va. 2017) ........................................................... 24, 32

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ............................................................................................ 22

*Huskey v. Ethicon, Inc.,*
   848 F.3d 151 (4th Cir. 2017) ............................................................................... 14

*In re Actos (Pioglitazone) Prods. Liab. Litig.,*
   2017 WL 3033134 (W.D. La. 2017) ........................................... 21, 24, 34, 36, 37

*In re Air Crash Disaster at Florida Everglades,*
   549 F.2d 1006 (5th Cir. 1977) ............................................................................. 18

*In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.,*
844 F. Supp. 2d 1359 (J.P.M.L. 2012) ................................................................. 1, 2

*In re AOL Time Warner, Inc. Sec. Litig.,*
2006 WL 3057232 (S.D.N.Y. 2006) ......................................................................... 35

*In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.,*
2012 WL 6923367 (E.D. Pa. 2012) ........................................................ 21, 23, 25, 36

*In re Avaulta Pelvic Support Sys. Prods. Liab. Litig.,*
746 F. Supp. 2d 1362 (J.P.M.L. 2010) ......................................................................... 1

*In re Cardinal Health Inc. Sec. Litig.,*
528 F. Supp. 2d 752 (S.D. Ohio 2007) ...................................................................... 35

*In re Coloplast Corp. Pelvic Repair Support Sys. Prods. Liab. Litig.,*
883 F. Supp. 2d 1348, MDL 2387 (J.P.M.L. 2012) ..................................................... 2

*In re Cook Medical, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,*
949 F. Supp. 2d 1373, MDL 2440 (J.P.M.L. 2013) ..................................................... 2

*In re Diet Drugs Prods. Liab. Litig.,*
553 F. Supp. 2d 442 (E.D. Pa. 2008), *aff'd*, 582 F.3rd 524 (3rd Cir. 2009) ................ 22, 25, 27

*In re Diet Drugs,*
582 F.3d 524 (3d Cir. 2009) ............................................................................... 19, 36

*In re Enron Corp. Securities, Derivative & ERISA Litig.,*
586 F. Supp. 2d 732 (S.D. Tex. 2008) ....................................................................... 35

*In re Equity Funding Corp. Sec. Litig.,*
438 F. Supp. 1303 (C.D. Cal. 1977) .......................................................................... 32

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.,*
2013 WL 1867117 (E.D. La. 2013) ............................................................................ 21

*In re Genetically Modified Rice Litig.,*
835 F.3d 822 (8th Cir. 2016) .................................................................................... 19

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
2008 WL 682174 (D. Minn. 2008) ........................................................................ 21

*In re King Resources Co. Sec. Litig.*,
420 F. Supp. 610 (D. Colo. 1976) ......................................................................... 32

*In re Linerboard Antitrust Litig.*,
292 F. Supp. 2d 644 (E.D. Pa. 2003) .................................................................... 18

*In re MRRM, P.A.*,
404 F.3d 863 (4th Cir. 2005) ................................................................................ 26

*In re NASDAQ Market-Makers Antitrust Litig.*
187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................... 35

*In re Nat'l Football League Players' Concussion Injury Litig.*,
2018 WL 1635648 (E.D. Pa. 2018) ...................................................................... 36

*In re Neomedic Pelvic Repair Sys. Prods. Liab. Litig.*,
999 F. Supp. 2d (J.P.M.L. 2014) ........................................................................... 2

*In re Nuvaring Prods. Liab. Litig.*,
2014 WL 7271959 (E.D. Mo. 2014) ................................................... 21, 25, 33, 34

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 2010*,
2016 WL 6215974 (E.D. La. 2016) ................................................................ passim

*In re Oil Spill by the Oil Rig "Deepwater Horizon"*,
2016 WL 614690 (E.D. La. 2016) ......................................................................... 18

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) ........................ 23

*In re Royal Ahold N.V. Securities & Erisa Litig.*,
461 F. Supp. 2d 383 (D. Md. 2006) ................................................................. 21, 35

*In re Serzone Prods. Liab. Litig.*,
2007 WL 7701901 (S.D.W. Va. 2007) ........................................................... passim

*In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*,
268 F. Supp. 2d 907 (N.D. Ohio 2003) ................................................................. 35

*In re Syngenta AG MIR 162 Corn Litig.*,
    2015 WL 2165341 (D. Kan. 2015) ........................................ 25

*In re Tyco Int'l, Ltd.*,
    535 F. Supp. 2d 249 (D.N.H. 2007) ...................................... 35

*In re Vioxx Prods. Liab. Litig.*,
    760 F. Supp. 2d 640 (E.D. La. 2010) ............................... passim

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................... 35

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................... 35

*Jenson v. First Trust Corp.*,
    2008 WL 11338161 (C.D. Cal. 2008) ................................ 31, 32

*Johnson v. Ga. Hwy. Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ..................................... 25, 26, 33

*Jones v. Dominion Resources Services, Inc.*,
    601 F. Supp. 2d 756 (S.D.W. Va. 2009) ....................... 20, 26, 33

*Kay Co. v. Equitable Production Co.*,
    749 F. Supp. 2d 455 (S.D.W. Va. 2010) ............................ 20, 35

*Lewis v. Johnson & Johnson*,
    601 Fed. App'x 205 (4th Cir. 2015) ...................................... 14

*Muhammad v. Nat'l City Mortgage, Inc.*,
    2008 WL 5377783 (S.D.W. Va. 2008) ................................... 20

*Smith v. Krispy Kreme Doughnut Corp.*,
    2007 WL 119157 (M.D.N.C. 2007) ...................................... 22

*Weiss v. Mercedes-Benz of N.Am., Inc.*,
    899 F.Supp. 1297 (D.N.J. 1995) ......................................... 23

### *Statutes*

28 U.S.C. § 1407.................................................................................................. 1

### *Pre-Trial Orders*

AMS MDL 2325 PTO 4……………………………………………………………...5

AMS MDL 2325 PTO 77 (amended by PTO 174)…………………………………19

Bard MDL 2187 PTO 33……………………………………………………………5

Bard MDL 2187 PTO 84 (amended by PTO 134)…………………………………19

BSC MDL 2326 PTO 4………………………………………………………………5

BSC MDL 2326 PTO 52 (amended by PTO 110)…………………………………...19

Coloplast MDL 2387 PTO 2…………………………………………………………5

Coloplast MDL 2387 PTO 32 (amended by PTO 59)………………………………19

Cook MDL 2440 PTO 4……………………………………………………………...5

Cook MDL 2440 PTO 12 (amended by PTO 45)…………………………………19

Ethicon MDL 2327 PTO 4…………………………………………………………...5

Ethicon MDL 2327 PTO 62 (amended by PTO 134)………………………………19

Neomedic MDL 2511 PTO 7………………………………………………………5

Neomedic MDL 2511 PTO 23………………………………………………………19

**MEMORANDUM IN SUPPORT OF**
**THE COMMON BENEFIT FEE AND COST COMMITTEE'S**
**PETITION FOR AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES**

## I.   INTRODUCTION AND FACTS.

The pelvic mesh multi-district litigations ("MDLs") pending before this Court are unprecedented. What began with the Judicial Panel on Multidistrict Litigation's order consolidating 36 individual cases involving the Avaulta line of pelvic organ prolapse repair devices—sold by C.R. Bard, Inc. ("Bard")—in 2010, ultimately led to the consolidation of seven related multidistrict litigations ("MDLs") in the Southern District of West Virginia.[1]

As pelvic mesh cases began to be filed against various pelvic mesh defendants in different federal courts, the firms involved in leadership came together to discuss potential MDL strategy. In light of the presence of numerous cases where a single plaintiff was implanted with multiple products, and the similar defects and complications associated with the various products, the firms involved in the leadership of the litigation decided to request the JPML to send all of the pelvic mesh cases to this Court for coordination pursuant to 28 U.S.C. § 1407. The JPML agreed, holding that the presence of several common fact issues shared by all MDLs, and the fact that many individual cases involved the implantation of multiple products from different manufacturers, supported centralization of all of these products before the same Court. *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F. Supp. 2d 1359, 1360-61 (J.P.M.L. 2012) ("The actions in each MDL share factual issues arising from allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific, and Ethicon, respectively. Centralization therefore will eliminate duplicative discovery; prevent inconsistent pretrial rulings;

---

[1] *In re Avaulta Pelvic Support Sys. Prods. Liab. Litig.* (later expanded to include a range of other pelvic repair mesh devices sold by Bard, and renamed the *C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*), 746 F.Supp.2d 1362, MDL No. 2187 (J.P.M.L. 2010).

and conserve the resources of the parties, their counsel and the judiciary."; "Chief Judge Joseph R. Goodwin of that district is currently presiding over MDL No. 2187, which involves claims of defects in similar pelvic surgical mesh products, and is uniquely situated to preside over the similar claims in these three MDLs. The pelvic surgical mesh products at issue in MDL Nos. 2325, 2326, and 2327 are used to treat similar conditions as those at issue in MDL No. 2187, and they have allegedly resulted in similar injuries…. Finally, a number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. Centralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions.").

At the request of the Plaintiffs, the MDL Panel sent four additional MDLs to this Court in 2012, another in 2013, and a seventh MDL in 2014.[2] These seven (7) related pelvic mesh MDLs involved different medical device manufacturers along with other related defendants, and included dozens of related pelvic mesh devices.[3] Never before in the history of MDL practice has the JPML sent multiple, large-scale product liability MDLs involving different products and manufacturers to a single MDL court for inter-MDL coordinated proceedings. The pelvic mesh litigation coordinated before this Court ultimately grew to include 104,836 filed cases, comprising one of the largest mass tort litigations in history.[4]

---

[2] *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F. Supp. 2d 1359, MDLs Nos. 2325, 2326, 2327 (J.P.M.L. 2012) (3 separate MDLs); *In re Coloplast Corp. Pelvic Repair Support Sys. Prods. Liab. Litig.*, 883 F. Supp. 2d 1348, MDL 2387 (J.P.M.L. 2012); *In re Cook Medical, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 949 F. Supp. 2d 1373, MDL 2440 (J.P.M.L. 2013); *In re Neomedic Pelvic Repair Sys. Prods. Liab. Litig.*, 999 F. Supp.2d, MDL 2511 (J.P.M.L. 2014).

[3] For example, the Bard MDL 2187 involved claims against two international medical device companies (C.R. Bard, Inc. and subsidiaries of Covidien, PLC (now Medtronic)), both of which represented by different counsel.

[4] Illustrating the impact of this litigation, the filing fees ($450 per case) for this number of cases totals $47,176,200.

As explained in the Plaintiffs' Proposed Counsel Organizational Structure (a copy of which is attached hereto as **Exhibit 1**), which was submitted to the Court on March 17, 2012, the common medical, scientific and legal claims and theories, common defenses, and common experts, as well as the presence of numerous plaintiffs implanted with different defendants' products, called for a singular "cross-MDL" Plaintiffs' leadership structure. The Proposed Counsel Organizational Structure was vetted and agreed upon by every attorney who was included in the proposal. As stated in the Proposed Counsel Organizational Structure, "[t]his [singular leadership] structure is the product of numerous meetings and many more conversations by attorneys from across the country who have devoted a substantial amount of time, effort and resources into the investigation and development of these cases, and who are committed to working together for the mutual interests of their respective clients. . . . The serious health risks generally associated with these women's pelvic repair products also warrant legal inquiry that is not confined to a single product or manufacturer. . . . [T]he problems associated with transvaginal mesh products are inherent in the use of mesh in the female pelvic region, and thus are not limited to any one product. Instead, these are issues that need to be explored and addressed globally. Many experts for both Plaintiffs and Defendants will traverse company and product lines. The efficient conduct of these cases will require coordination by Plaintiffs' counsel across MDL lines, while still maintaining the [multiple] MDL's. Additionally, discovery relating to corporate liability issues will involve common themes, and coordination between the four MDL's will be beneficial." **Exhibit 1**. The Proposed Counsel Organizational Structure further stated as follows:

> The interrelationship between these products is but one significant issue that lends itself to coordinated investigation across MDL lines. . . .
>
> In light of the interrelationship between the products, the serious health problems generally associated with these devices, and the commonality of the defenses anticipated in every case, a coordinated and unified leadership that spans the four

related pelvic repair product MDL's before this Court is essential to the effective and efficient prosecution in these cases. . . .

Perhaps most importantly, because of the interrelationship between these MDL's in terms of common product defect allegations, similar injuries, and the prevalence of cases involving multiple products by the various defendants, the leadership structure in these MDL's should be composed of attorneys who have the ability and the expressed desire to work with one another in a concerted effort to seek a timely and just resolution of these cases. . . .

As set forth in more detail below, the undersigned propose a Coordinating Co-Lead Counsel, an Executive Committee made up of Co-Leads for each MDL, and a singular PSC all to coordinate across MDL lines. If such proposal is accepted by the Court, then the Coordinating Co-Lead Counsel in conjunction with the Executive Committee will be able to work across MDL lines in conjunction with one PSC to determine which lawyers are best suited to handle a given Task. . . . Many of these tasks will not be MDL-specific, but rather will be common issues that will need a coordinated effort. It is also the intent that the Coordinating Co-Lead Counsel will be in a position to determine when separate groups from the PSC should be designated to work on MDL-specific issues that do not cross MDL lines. However, it is vital to this proposal that there be a cohesive and coordinated structure that spans these four related MDL's so as to best achieve the efficiency and effectiveness of representation that will move this litigation forward.

[T]his proposal calls for a singular PSC to coordinate across MDL lines in four separate MDL's, each of which involves a different manufacturer (and related defendants in some cases) and several different products. . . .

The undersigned submit that a PSC composed of a significant number of attorneys is necessary to accommodate the large amount of work that will be necessary to prepare these cases effectively, and with many coordinated litigation activities occurring simultaneously across MDL lines.

At the Initial Case Management Conference in the first of the additional related pelvic mesh MDLs transferred to this Court, the Court made clear its intent to coordinate and consolidate across MDL lines to the fullest possible extent, stating "[i]n its most simplistic form, we have similar pelvic mesh products manufactured by different defendants that allegedly caused a variety of injuries to women. We suspect and we hope that there are commonalities among the four MDLs, and [Magistrate] Judge Stanley and I believe that the most efficient way to handle the four MDLs, particularly for discovery purposes, is to coordinate them as much as possible. . . . I believe that

the most efficient way to handle the four MDLs is to consolidate as much as possible." (April 13, 2012 Hearing T., 33:1-15). The Court similarly observed that "[a] coordinated and unified Plaintiffs' leadership team that spans the four related pelvic repair mesh MDLs before this Court is essential to the efficient, effective prosecution . . . of this case." (*Id.*, 22:19-22).

The Plaintiffs' lawyers involved in the litigation from the outset foresaw the onerous task that lay ahead and assembled a Plaintiffs' Steering Committee ("PSC") of 61 attorneys from law firms across the country, who were ultimately appointed and assigned by the Court the responsibility of marshaling resources and leading this sprawling litigation under a unified leadership structure. The Court entered Orders in each of the MDLs stating that "[i]t shall be the responsibility of Coordinating Co-Lead Counsel to work across MDL lines in conjunction with the Executive Committee named below to determine which attorneys are best suited to handle a given task. . . ." and appointing "[a] singular PSC to coordinate across MDL lines in the [] separate pelvic mesh MDLs before this court. . . .".[5]

As envisioned and directed by the Court, the Court-appointed PSC coordinated and collaborated across MDL lines to plan the litigation strategy, develop theories and confront legal issues, identify experts, and ultimately bear the cost and expended the labor necessary to develop the general liability cases against numerous products made and sold by a variety of corporate defendants. This singular PSC and leadership structure enabled such coordinated development of litigation strategy and theories and allowed the work product from one MDL to be utilized across product and manufacturer lines. Important legal decisions by the Court and by counsel impacted all MDLs due to the commonality of the products and issues involved. This single, unified leadership structure was also necessary to avoid potential conflicts and cross-purpose work.

---

[5] Bard MDL 2187 PTO 33, AMS MDL 2325 PTO 4, BSC MDL 2326 PTO 4, Ethicon MDL 2327 PTO 4, Cook MDL 2440 PTO 4, Coloplast MDL 2387 PTO 2, Neomedic MDL 2511 PTO 7.

As anticipated, the time, effort and expense of simultaneously pursuing and developing multiple legal theories against a range of products manufactured and sold by a disparate group of defendants, has been enormous.

The defendants in these MDLs are several of the largest medical device manufacturers in the world, and this litigation has been vigorously defended by this country's largest and most experienced medical device defense law firms. Prosecuting multiple MDLs simultaneously before one court presented unique logistical and procedural difficulties and taxed the resources of the firms leading this litigation. To address the economic disparity between the parties, the PSC firms were required to expend tens of millions of dollars to prosecute this massive litigation. The PSC firms contributed a total of $17,825,000 in common benefit assessments, which were used to fund the litigation generally. "Held costs" in the amount of $28,986,811.38 were recognized by the FCC as common benefit, which have not yet been reimbursed out of the MDL fund. An additional $12,037,448.66 has been paid from the common benefit fund as costs associated with general expert fees, special master fees, data warehousing and management fees, and to the Court-appointed accountant overseeing the MDL fund. These costs continue to be incurred and some of these costs continue to be paid from the common benefit fund while additional costs remain as held costs.

At the outset, Plaintiffs' leadership undertook to define the parameters of the litigation through Master Pleadings, Plaintiff Profile Forms and Plaintiff Fact Sheets, and pushed the litigation forward through a series of procedural and scheduling orders. After establishing these baseline documents and schedules, Plaintiffs' leadership undertook the onerous process of discovery.

Discovery in these cases was among the first areas to be tackled by leadership. Electronically-Stored Information protocols and search parameters, plaintiff and defendant fact sheets/profile forms, joint records collection, protective orders, and procedures for the collection and preservation of pathology were the subject of intense negotiation, and in several instances, disputes with defendants. Because certain of the Defendants had been involved in prior litigation relating to the same products, Plaintiffs' leadership undertook the motions practice necessary to obtain documents produced by those Defendants in those prior cases over their objection. The number of different products, defendants, and related third parties (materials processors, component or materials manufacturers), necessitated multiple rounds of written discovery and ESI term search requests to defendants related to a variety of subjects and from a number of non-party sources. Plaintiffs' leadership established and funded the shared electronic document depository (Crivella West) where all defense-produced documents and other important materials were made accessible to all MDL plaintiffs' counsel in searchable format. Plaintiffs' leadership identified the important issues in these cases and created "issue codes" for purposes of document review, and documents were reviewed and "coded" according their relevance. Plaintiffs' leadership and other Participating Counsel[6] reviewed and analyzed Defendants' discovery responses and objections and handled disputes regarding confidentiality, privilege and work product claims by the defense, typically by way of informal meet and confer, but occasionally necessitating motions practice before the Magistrate Judge or the Court. Other discovery disputes necessitated numerous meet and confers with defense counsel, discovery conferences with the Court's Magistrate Judge, and motions to compel or responses to motions for protective order or motions to quash. The

---

[6] As used in this Petition, "Participating Counsel" has the same definition as that set forth in the Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues, to wit: "'Participating Counsel' are counsel who subsequently desire to be considered for common benefit compensation. . . ."

production of documents in these cases was voluminous. To date, more than 21,504,590 documents totaling over 199,740,958 pages have been produced across the pelvic mesh MDLs, and production is on-going in some of the MDLs. Plaintiffs' leadership was responsible for the oversight and coordination of this massive review effort and bore responsibility for culling the thousands of documents used in expert preparation and the preparation of these cases for trial, and at trial, and identification of important documents for use by other attorneys with cases in these MDLs.

Depositions were taken in these MDLs by Plaintiffs' leadership and other Participating Counsel of a variety of former and current employees of the defendants, including representatives from sales and marketing, regulatory, post-market surveillance, manufacturing, research and development/product design, risk management, as well as managerial and executive employees. More than two-hundred (200) individual and 30(b)(6) corporate depositions were eventually taken of the Defendants in these MDLs. Plaintiffs fought multiple "apex" motions relative to depositions sought of Defendants' executive employees. The cases also involved significant third-party depositions, including depositions of "key opinion leader physicians," representatives of medical organizations who issued "position statements" in support of the products at issue, and various individuals and entities that participated in the design or testing of the devices or that manufactured or processed components or materials used in the pelvic mesh products.

The scope and complexity of these MDLs also complicated expert discovery. Plaintiffs' leadership was required to identify and cultivate general experts from an array of scientific and medical fields, from biomaterials, pathology, physicians (including pathologists, pelvic pain specialists, urologists, gynecologists and Female Pelvic Reconstructive Surgeons) to regulatory.

The theories and concepts relating to the defective design of the TVM devices in these MDLs – what made these devices problematic in the female pelvis – required knowledge of the applicable anatomy, medicine, and the scientific principles and literature applicable to synthetic and biologic surgical mesh devices. Proving to a jury the complex scientific and medical reasons that these products caused the Plaintiffs' injuries required education. Plaintiffs' leadership developed and presented expert reports addressing the important scientific product defect principles, such as the *in vivo* degradation of polypropylene, chronic and excessive foreign body reaction to the mesh, inadequate pore size (scar-induced mesh contracture), mechanical instability, anatomical mismatch, mesh arm "sawing," and asymmetrical mesh contracture utilized across all MDLs.

Due to the number of products and defendants involved, as well as the number of cases that were ultimately worked up towards potential trial, the plaintiffs' leadership were required to develop numerous qualified experts from a relatively limited pool. Because much of the innovation related to these products occurred in Europe, several of the foremost plaintiffs' experts were in Europe, which entailed additional expense and effort as a result of travel, translation and compliance with foreign applicable law regarding discovery. Several of these experts conducted extensive laboratory testing of the materials and products involved utilizing a variety of laboratory and scientific equipment, and plaintiffs' leadership oversaw the issuance of extensive reports outlining, in detail, these experts' medical and scientific findings and opinions. For example, biomaterials experts conducted testing to demonstrate scientifically the phenomenon of mesh degradation, showing through microscopic photographs actual images of degraded mesh that had been removed from the bodies of plaintiffs. The potential for mesh degradation, and the clinical effects, was vigorously disputed by the defense. Establishing this important theory through

scientific testing (which was admitted despite repeated *Daubert* challenges) was key to conveying these matters to a jury. Pathology experts examined numerous explanted mesh samples and pathology slides from plaintiffs under electron microscopy to explain the chronic negative effects of body's reaction to the mesh and the results of scarification of tissue due to the mesh design. Plaintiffs' experts conducted testing and developed demonstrative exhibits, including 3D models, to show how the design of these products caused asymmetrical contracture, which pulled the mesh and caused chronic pain and sexual dysfunction. These tests and exhibits demonstrated the experts' theories and opinions in a tangible way.

Ultimately, Plaintiffs' leadership identified and served 84 Rule 26 Reports for 52 general plaintiffs' experts. As anticipated from the outset, many of Plaintiffs' experts designated by leadership to provide general testimony crossed MDL lines. Nineteen of Plaintiffs' 52 experts (36.5%) provided general expert testimony in more than one MDL, while nine (17.3%) provided testimony in more than three or more MDLs.

Defendants likewise had their own respective teams of experts, and Plaintiffs' leadership was responsible for preparing for and taking their depositions. One hundred nine (109) general experts were identified by the defense in these cases, and nearly all of them were deposed by Plaintiffs' leadership, some of them multiple times. Many of the defense experts issued voluminous reports, citing to reams of scientific testing and clinical and animal study results, all of which had to be meticulously reviewed and analyzed by Plaintiffs' leadership, and ultimately addressed by way of cross-examination, *Daubert* motions and testimony from Plaintiffs' experts.

While some of the MDL defendants undertook early efforts to attempt to compromise, most made clear that they had no interest in settlement, at least not without first trying multiple cases. This necessitated the preparation of numerous cases for trial across the MDLs, which process was

handled and overseen by Plaintiffs' leadership. Some of the trial selection cases were resolved prior to trial, but only after all of the extensive pre-trial work had been done and the cases were ready for trial.[7] Preparing a case for trial in these MDLs was an expensive and difficult undertaking in light of the complexity of the issues involved, and the number of fact and expert witnesses whose testimony is necessary to meet the burden of proof and to address the litany of defenses asserted. Every MDL trial case entailed additional rounds of motions and briefing on procedural and substantive legal issues, arguments over deposition designations and other evidence to be offered at trial and a variety of other pre-trial issues.

Following initial "bellwether" trials, the Court ordered several successive "waves" of cases to be prepared for trial in several of the MDLs. Each of these waves consisted of dozens, if not hundreds, of individual plaintiffs. These trial waves required an extensive amount of orchestration and effort in a condensed time frame by Plaintiffs' leadership. These hundreds of wave cases necessitated the identification and depositions of numerous general experts for both plaintiff and defense, and an intensive general motions practice that involved briefing of dozens of additional dispositive, *Daubert* and *in limine* motions. The same legal issues had to be addressed by Plaintiffs' leadership under numerous different states' substantive law. Responses to these motions prepared by leadership were then provided to other MDL counsel, and served as the template for responses in future trial selection or remanded cases.

Plaintiffs' leadership oversaw the preparation of case-specific discovery to be served by individual plaintiffs on the defendants in the wave process and led efforts to ensure consistent responses from the Defendants to this discovery. To assist the several firms outside of leadership who had cases included in the bellwether process and later in the trial waves, Plaintiffs' leadership

---

[7] The FCC also recognized as common benefit time expended preparing for and trying cases in certain state court venues, provided that the cases were the first involving the product at issue to be tried.

conducted, and continue to conduct, in-person educational sessions in various locations throughout the country to help educate these attorneys about the liability case generally, as well as how to handle the individual case-specific issues in their cases, such as preparing for and taking plaintiff and treating physician depositions and responding to the motions anticipated from the defense. Educational materials, including legal and factual outlines, template response briefing, sample expert reports, collections of important documents, corporate deposition transcripts and exhibits, sample plaintiff and doctor depositions, deposition outlines, trial exhibits and trial transcripts, were prepared by leadership and provided to or made available to counsel for the MDL plaintiffs. Expert reports and expert depositions for both Plaintiffs' and Defendants' general experts, as well as all corporate and third-party depositions, were also made available to MDL Plaintiffs' counsel by way of the Crivella West shared document depository.

During the course of the pelvic mesh MDLs pending in this Court, volumes of pre-trial, trial and post-trial motions have been argued and decided and orders have been issued by the Court pursuant to the laws of many different states, including: *Daubert* motions against nearly every expert (and other witnesses); summary judgment motions on issues relating to design defect, punitive damages, warnings sufficiency, the learned intermediary doctrine, preemption, statute of limitations, general causation and specific causation; and numerous motions *in limine* seeking to limit or exclude Plaintiffs' evidence. Because certain of the defendants were affiliated corporate entities, Plaintiffs' leadership undertook the discovery and motions practice necessary to establish liability on the part of each the named defendants, which resulted in important stipulations regarding the liability of parent corporations for conduct of their subsidiaries. Plaintiffs' leadership briefed important procedural issues related to joinder, remand, choice-of-law, jurisdiction, venue and *Lexecon*, and the Court's ability to try MDL cases upon remand to other federal jurisdictions.

Plaintiffs' leadership handled the *Daubert* and dispositive responsive briefing, as well as Plaintiffs' "offensive" summary judgment motions and reply briefing, and Plaintiffs' motions *in limine*. Important legal issues regarding consolidation of multiple MDL plaintiffs for purposes of trial pursuant to Rule 42 were briefed and argued by leadership. Plaintiffs' leadership also handled the briefing regarding the exclusion of evidence regarding the FDA 510(k) clearance process. The Court's ruling on this motion proved a seminal ruling that impacted all of the MDLs. This critical evidentiary ruling spurred a litany of related motions for reconsideration, motions for new trial and evidentiary proffers across the MDLs, as well as grounds for appeal in multiple cases. Leadership also prepared the briefing regarding the admissibility of important product-related evidence used by all Plaintiffs. Hundreds of instructive opinions from the Court in these pelvic mesh MDLs are available through online legal research sites, such as Westlaw, most of which were directly the result of the work of Plaintiffs' leadership.[8]

Several of the bellwether cases were resolved shortly before trial, but the pre-trial preparation for these cases was no different than the cases that ultimately went to verdict. When MDL bellwether cases were tried, the verdicts were subject to various post-trial motions and eventually appealed. The appeals often involved amicus briefing by multiple interested third parties due to the significance of the issues involved in this litigation. The extensive pre-trial briefing (pre-trial orders, jury charges, evidentiary motions), trial briefing (motion for directed verdict, evidentiary motions), and post-verdict briefing (motion for judgment as a matter of law, motion for new trial) in the bellwether cases were handled primarily by Plaintiffs' leadership.

---

[8] For example, a recent Westlaw search of the terms "pelvic OR transvaginal WITHIN THE SAME SENTENCE AS mesh AND goodwin" within the West Virginia Federal Courts database yields 1,970 results.

Plaintiffs' leadership also handled the appellate briefing in these cases, and these rulings helped shape the course of this litigation.

- *Lewis v. Johnson & Johnson*, 601 Fed. App'x 205 (4th Cir.2015) (affirming grant of motion for judgment as a matter of law for Defendants)
- *Cisson v. C.R. Bard, Inc.*, 810 F.3d 913 (4th Cir. 2016) (affirming $2 million verdict for plaintiffs)
- *Huskey v. Ethicon, Inc.*, 848 F.3d 151 (4th Cir.2017) (affirming $3.2 million verdict for plaintiffs)
- *Eghnayem v. Boston Scientific Corporation*, 873 F.3d 1304 (11th Cir. 2017) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $26.7 million)
- *Campbell v. Boston Scientific Corporation*, 882 F.3d 70 (4th Cir. 2018) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $18.5 million)

The results of these post-trial motions and appellate rulings have likewise provided instructive guidance for the participants in this MDL, as well as for future product liability MDLs. Disparate legal and factual issues such as the propriety of consolidated, multi-plaintiff trials, the admissibility of evidence related to FDA, statutes of limitations, gross negligence and punitive damages, and the sufficiency of the evidence to sustain multi-million dollar verdicts on design defect and failure to warn have been addressed and resolved in plaintiffs' favor by the Fourth and Eleventh Circuits, providing substantial benefit to all MDL claimants and further certainty across MDL lines.

Plaintiffs' leadership also coordinated efforts with attorneys who were handling related litigation against the same defendants in various State courts across the country.

Eventually, and due in large part to the continuing efforts of the plaintiffs' leadership and the Court's innovative approaches to move cases forward, the defendants, who had generally resisted settlement discussions, began to consider resolution. However, resolution in these MDLs has proven nearly as challenging as the litigation itself. The range of products involved, the varying nature of the injuries or damages claimed by Plaintiffs, the "multi-product" issue, and the differing

financial status and interest in resolution among the different Defendants presented difficulties in resolutions that required perseverance and creativity by Plaintiffs' leadership. Plaintiffs' leadership coordinated efforts to conduct "censuses" of thousands of MDL cases in order to inform the Court and the parties of the range of products and injuries involved.  At the request of the Court, Plaintiffs' leadership has been involved in attempting to facilitate the settlement process for other MDL firms. The Court has conducted multiple mandatory settlement conferences with various Defendants in which Plaintiffs' leadership has played an important role.

Through December 21, 2016, ninety-four law firms submitted more than 900,000 hours of time for common benefit consideration, and the Court-appointed FCC has recognized a total of 679,191.20 of those hours as being for common benefit.

To date, tens of thousands of cases in these MDLs have resolved, which has resulted in $366,102,875.06 in payments into the common benefit fund by Defendants to date.[9]  Based on the number of cases that have been resolved pursuant to a Master Settlement Agreement but not yet processed or that remain in the MDLs, it is anticipated that the common benefit fund will ultimately equal or exceed $550,000,000.00.

## II.    COURT ORDERS RELATED TO COMMON BENEFIT FUND

The Court entered the same orders in each of the coordinated pelvic mesh MDLs relating to the common benefit fund and common benefit work. As with the singular PSC appointed to coordinate work in this litigation across MDL lines, the common benefit fund to compensate such work was likewise established, coordinated and overseen on a cross-MDL basis.

On October 4, 2012, the Court entered the "Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues," which set forth the

---

[9] Common benefit fund balance as of November 9, 2018.

procedures, guidelines, and limitations for submission of applications for reimbursement for common benefit fees and expenses. This Order appointed a CPA to receive and review all time and expense records for all MDLs. Per the Order, the CPA was to be paid from common benefit funds and to work with the Executive Committee and Co-Liaison Counsel to insure the accuracy of submissions. The CPA was also required to "work with the Coordinating Co-Leads to manage the litigation fund and administer the payment of the expenses (not fees) from the litigation fund." The Order provided that the cross-MDL Executive Committee was to make such assessments and to receive and hold those funds as necessary to prosecute the interests of the pelvic mesh litigation. Pursuant to the Court's Order, common benefit assessments received from the members of the singular PSC were to be deposited into a common benefit account. Likewise, reimbursement of expenses requested from all MDLs were paid from the common benefit account at the direction of the Coordinating Co-Lead Counsel. The Court directed attorneys to submit time and expense records to the Court-appointed accountant on a periodic basis of every six weeks. The Order provides that common benefit work includes "assignments made by Coordinating Co-Lead Counsel and/or the Co-Lead of each MDL, who will work in consultation with each other to facilitate the litigation." As part of this Order, which was approved by all members of the PSC and signed and submitted by all members of the Plaintiffs' Executive Committee, counsel who desire to be considered for common benefit compensation acknowledged – as a condition for such consideration – that the Court will have "**final, non-appealable authority** regarding the award of fees, the allocation of those fees and awards for cost reimbursements in this matter" and they "have (or will have) agreed to and therefore **will be bound by the court's determination** on common benefit attorney fee awards, attorney fee allocations, and expense awards, and…**knowingly and expressly waive any right to appeal those decisions or the ability to assert the lack of**

**enforceability of this Agreed Order or to otherwise challenge its adequacy**." (Emphasis added).

On August 26, 2013, the "Agreed Order Establishing MDL [] Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit" was entered, which provided for the sharing of the costs of services and expenses by Participating Counsel. This Order established a 5% assessment of all claims across all MDLs for payment of attorneys' fees and approved common benefit expenses. The Order requires this 5% assessment was to be withheld by Defendants from amounts paid on any Covered Claim (covering all Defendants' products) and paid directly into the MDL Fund as a credit against the Settlement or Judgment. This Order incorporated and made binding the procedures and guidelines set forth in the prior-filed "Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues."

The January 15, 2016 "Order Establishing Criteria for Applications to MDL Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee" appointed a Common Benefit Fee and Cost Committee (hereinafter, "FCC") and set forth the criteria by which common benefit fee applications were to be analyzed. This Order incorporated by reference all prior common benefit orders.

The June 23, 2017 "Order re: Fee Committee Protocol" established the procedure and further guidance for the FCC's review of time and expenses submitted by counsel seeking common benefit reimbursement.

## III.    ARGUMENT AND AUTHORITIES.

### A.    The District Court Has Broad Discretion in Awarding Common Benefit Fee.

As experienced MDL Judge Eldon Fallon recognized in *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647-48 (E.D.La.2010), an award of common benefit fees to counsel who provided work beneficial to all Plaintiffs is supported by the common fund doctrine, equity, quantum meruit, as well as the inherent managerial authority afforded an MDL Court.  The Court's inherent managerial authority necessarily includes the power to provide compensation for those attorneys who provided common benefit work separate and apart from their fee agreements with their respective clients. *See*, *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1016 (5th Cir. 1977) ("[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation…. The interests to be served are too important to be left to volunteers (or draftees) who are unpaid in the sense that they get nothing additional."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 653 (E.D. Pa. 2003) ("A necessary corollary to court appointment of lead and liaison counsel is the power to assure that these attorneys receive reasonable compensation for their work….It is well established that courts can impose liability for court-appointed counsel's fees on all plaintiffs benefitting from their services.") (internal cites. omitted); *See also*, *In re Genetically Modified Rice Litig.*, 835 F.3d 822, 828 (8th Cir. 2016) ("No party challenges the propriety of the Common Benefit Order or the 'well established' authority of a district court to compensate leadership lawyers by ordering funds to be set aside from recoveries obtained by other plaintiffs in multidistrict litigation.").  The managerial discretion is critical for any MDL judge, particularly one charged with overseeing more than 100,000 cases. *In re Oil Spill by the Oil Rig "Deepwater Horizon"*, 2016 WL 614690, *7 (E.D. La. 2016) ("As multidistrict litigation is a 'special breed of complex litigation' wherein case management serves as the 'engine that drives disposition on the

merits,'... greater deference is afforded to the MDL Court in connection with administrating the proceedings.") (internal cits. omitted).

In *In re Serzone Prods. Liab. Litig.*, 2007 WL 7701901, *2 (S.D.W. Va. 2007) (J. Goodwin), this Court observed that MDL trial courts are accorded wide discretion in weighing the different criteria touching upon the value of common benefit services provided by counsel.

### B. The Five-Percent (5%) Holdback is an Appropriate Amount to be Awarded to Plaintiffs' Participating Counsel for Fees and Reimbursement of Expenses.

As set forth above, the "Agreed Order Establishing MDL . . . Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit" ("Holdback Order") established a five-percent (5%) assessment for payment of attorneys' fees and approved common benefit expenses.[10] Defendants were ordered to pay the assessment directly into the MDL Fund.

The Holdback Order, which expressly incorporated prior common benefit orders, was approved and agreed to by the Coordinating Co-Leads, Executive Committee, Co-Leads and the Plaintiffs' Steering Committee, and was signed and submitted to the Court by the Coordinating Co-Leads, Co-Leads and Co-Liaison Counsel.

In *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009), the Third Circuit observed that "[w]hen calculating attorneys fees in [cases involving a common fund], the percentage of recovery method is generally favored." Although the Fourth Circuit has not specifically addressed the question of how to determine the appropriate attorney's fee in a multi-plaintiff, common fund setting, district courts within the Circuit, including this Court, have applied the percentage of

---

[10] Bard MDL 2187 PTO 84 (amended by PTO 134), AMS MDL 2325 PTO 77 (amended by PTO 174), BSC MDL 2326 PTO 52 (amended by PTO 110), Ethicon MDL 2327 PTO 62 (amended by PTO 134), Cook MDL 2440 PTO 12 (amended by PTO 45), Coloplast MDL 2387 PTO 32 (amended by PTO 59), Neomedic MDL 2511 PTO 23.

recovery method, sometimes using a "rough" lodestar as a cross-check. *Kay Co. v. Equitable Production Co.*, 749 F. Supp. 2d 455, 462 (S.D.W. Va. 2010) (J. Goodwin) ("Courts have increasingly favored the percentage method for calculating attorneys' fees in common fund cases."). Under the percentage method, the court awards fees as a reasonable percentage of the common fund to compensate attorneys who recovered an identifiable sum by awarding them a reasonable fraction of that sum. *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 650 (E.D. La. 2010). The lodestar involves consideration of the number of hours reasonably expended on the litigation multiplied by an hourly rate. *Kay Co.*, *supra* at 462.

In a decision involving a class action fee award, this Court observed that "[t]he percentage method has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases," but noted the use of lodestar as a cross-check for the reasonableness of the percentage fee. *Jones v. Dominion Resources Services, Inc.*, 601 F.Supp.2d 756, 758 (S.D.W. Va. 2009). *See also*, *Kay Co., supra* at 462 (J. Goodwin) ("Courts have increasingly favored the percentage method for calculating attorneys' fees in common fund cases," and applying a lodestar cross-check); *In re Serzone*, 2007 WL 7701901 at *1 (S.D.W. Va. 2007) (J. Goodwin) ("Courts inside and outside this district also frequently use a 'percentage of the fund' method with a 'lodestar cross check.'"); *Deem v. Ames True Temper, Inc.*, 2013 WL 2285972, *5 (S.D.W. Va. 2013) (J. Goodwin) ("there is a clear consensus among the federal and state courts, consistent with Supreme Court precedent, that the award of attorneys' fees in common fund cases should be based on a percentage of the recovery."); *Muhammad v. Nat'l City Mortgage, Inc.,* 2008 WL 5377783 (S.D.W. Va. 2008) (J. Copenhaver) ("percentage of fund approach is the better-reasoned and more equitable method of determining attorneys' fees in [common fund] cases."); *In re Royal Ahold N.V. Securities & Erisa Litig.*, 461 F. Supp. 2d 383, 385 (D. Md. 2006) ("While the Fourth Circuit

has not yet definitively addressed the issue, other district judges in this circuit have suggested a flexible analysis that uses the percentage of recovery method but applies the lodestar method as a cross-check, recognizing that 'both are useful tools for trial courts to use to inform and calibrate a judgement as to a fair and reasonable [class action] fee award.'"). This same methodology – percentage with a rough lodestar analysis as a cross-check – is consistently employed in MDL mass tort product liability actions. *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2017 WL 3033134, *26 (W.D. La. 2017) ("Virtually all of the recent common fund fee awards in district courts in the Fifth Circuit – whether MDL or class action – have used the percentage method, with an overlay analysis of reasonableness…."); *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D. Mo. 2014) (noting "well-established" use of percentage method to determine attorney's fees in common fund case, and that "courts may then choose to use the lodestar method to cross-check the fairness of a percentage of the fund award."); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2013 WL 1867117, *3 (E.D. La. 2013) ("The [blended] approach entails the use of a percentage, the reasonableness of which is analyzed in light of the Johnson factors, as well as comparison with published data regarding such awards, and 'cross-checked' against a rough lodestar analysis."); *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2012 WL 6923367, *2 (E.D. Pa. 2012) ("In common fund cases, attorneys' fees typically are awarded as a percentage of the fund, and an abbreviated lodestar cross-check is used to assess the reasonableness of the proposed fee."); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, *6 (D. Minn. 2008) (MDL court applied percentage method with lodestar as cross-check).

In assessing the reasonableness of a percentage fee award, courts typically follow a four-step analysis: (1) assess the value of the benefits of the settlement; (2) examine awards for common

benefit work in comparable cases; (3) analyze the reasonableness of the percentage utilizing the appropriate criteria, in this case the "*Barber*" factors addressed below, in light of the facts and circumstances of the case; and (4) perform an abbreviated lode-star cross-check. *See, e.g.*, *Vioxx*, *supra* at 652; *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 2010*, 2016 WL 6215974, *15 (E.D. La. 2016). *See also*, *In re Serzone*, 2007 WL 7701901 at *2-*5; *Smith v. Krispy Kreme Doughnut Corp.*, 2007 WL 119157, *1 (M.D.N.C. 2007) (applying *Barber* factors to a percentage attorney's fee award); *Edmonds v. U.S.*, 658 F. Supp. 1126, 1143 n.37 (D.S.C. 1987) ("The [*Barber*] factors … can be used in analyzing a fee either based on the percentage method, or the lodestar method.").

### C.  The Value and Scope of the Benefit Provided to MDL Claimants Supports an Award of the Previously-Ordered Five-Percent (5%) Holdback for Compensation for Common Benefit Fees and Expenses.

As recognized in *Deepwater Horizon*, 2016 WL 6215974 at *18, "the most critical factor in determining the reasonableness of a fee award is the degree of the success obtained," and "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." (*citing*, *inter alia*, *Vioxx*, 760 F. Supp. 2d at 657-68; *In re Diet Drugs Prods. Liab. Litig.*, 553 F.Supp.2d 442, 472-73 (E.D.Pa.2008), *aff'd*, 582 F.3d 524 (3rd Cir.2009)). *Accord Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). The value of a settlement fund includes all monetary amounts actually paid (or irrevocably deposited into a fund for payment) to or for the benefit of plaintiffs in the litigation. *Vioxx*, 760 F. Supp.2d at 652. Here, the current total value of all settlements and

judgments subject to the common benefit assessment is approximately $7,250,000,000, which includes the resolution of tens of thousands of individual claims.[11]

Where, as here, the settlement involves payments over a period beyond the point the common benefit fee is determined, the settlement fund also includes a "reasonable estimate" of the amount of future payments that are expected to be made to the plaintiffs. *Deepwater Horizon*, *supra* at *15 ("Where the settlement provides benefits on a 'pay-as-you-go' basis over a period beyond the point that a common benefit fee is to be awarded, the settlement fund also includes a reasonable estimate of the amount of future payments that will be made to claiming class members."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 334 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999) (the percentage method requires court to make a "reasonable estimate" of settlement value to be received in future). *Accord Weiss v. Mercedes-Benz of N.Am., Inc.*, 899 F. Supp. 1297, 1304 (D.N.J. 1995) (addressing future and contingent payments in analyzing amount of settlement recovered in analyzing attorney's fees request). Based upon the number of cases that have been resolved pursuant to a master settlement agreement and cases remaining in the litigation, and in light of the value of prior settlements, it is the FCC's reasonable expectation that the final total value of all settlements and judgments will be approximately $11,000,000,000.

The value of the benefit provided to the clients in this litigation is substantial and supports an award of the previously-ordered holdback amount of 5% as compensation for fees and expenses.

### D.      The Previously-Ordered Five-Percent (5%) Holdback for Fees and Expenses Falls Well Within the Benchmark Percentage for Similar Cases.

---

[11] As noted in *In re Avandia*, 2012 WL 6923367 at *5, the total amount of the aggregate settlements facilitated by counsel's collective common benefit efforts is the practical equivalent of a distinct common benefit fund in the class action context. The court in *Avandia* noted that individual MDL plaintiffs had received considerable payments in settlement of their claims that would not have come about but for the common benefit work performed.

The next step in the process is to assess whether the requested percentage fee is in line with other fee awards in similar litigations. As noted in *In re Vioxx*, *supra* at 654-55, "a reasonable common benefit assessment or award can vary from MDL to MDL…There is no mathematical formula for deriving a 'correct' amount," and agreeing with plaintiffs' leadership there that "a reasonable benchmark percentage is a flexible concept." Because the total anticipated recoveries – for all plaintiffs in all seven pelvic mesh MDLs – exceed $1 billion, the aggregate settlements in this litigation make this what has been referred to as a "super-mega-fund" case. *In re Actos*, *supra* at *27 (describing "mega-fund" cases as recoveries exceeding $100 million, and "super-mega-fund" cases as recoveries exceeding $1 billion). Although the court in *In re Actos* noted that the number of super-mega-fund cases is relatively limited, the court's research showed that the average fee awards in those cases is 9.9%. *Id.*

In light of the *Barber* factors, discussed below, the 5% holdback previously ordered by the Court is reasonable and is well within the benchmark percentage for comparable cases. In fact, this holdback amount is decidedly on the low end of the range of percentage awards in similar litigations. *See*, *In re Serzone*, *surpa* at *3 (J. Goodwin) (examining size of percentage fee awards in several mass tort drug and device litigations in relation to amount of benefit procured and amount of time invested by counsel ranging from 4.2% to 16% (average of 10.94%) and awarding 14.5% fee); *Good v. West Virginia-American Water Co.*, 2017 WL 2884535, *25 (S.D.W. Va. 2017) (noting fee percentages in common fund cases exceeding $100 million ranged from 4.1% to 17.92%); *In re Actos*, *supra* at *28 (concluding that 8.6% holdback previously entered by the Court was reasonable, and in line with common benefit awards in other super-mega-fund cases); *Deepwater Horizon*, *supra* at *16 (approving plaintiffs' requested 4.3% fee award from estimated $13 billion settlement, and noting request was "modest" in light of court's analysis of 21 class

action super-mega-fund settlements demonstrated average fee award of 9.92% and median fee of 7.4%); *In re Syngenta AG MIR 162 Corn Litig.*, 2015 WL 2165341, *5 (D. Kan. 2015) ("The 8 percent [attorney fee] figure falls easily within the range of awards in cases with large recoveries."); *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *3 (E.D. Mo. 2014) (11% attorney fee holdback out of $100 million settlement was "very reasonable" in light of the work performed and result obtained, and "well within the percentages that courts have routinely awarded in similar cases."); *In re Avandia*, *supra* at *7 ("the fee award in this case of 6.25% of the estimated collective value of the settlements (or an award of up to $143,750,000), is squarely in line with awards that have been approved in the context of other super-mega-fund settlements. In fact, the requested percentage is lower than the percent awarded in multiple cases." (listing the percentage awards from multiple super-mega-fund cases, ranging from a low of 4.8% to a high of 15%, with an average of 9.15%)); *In re Vioxx*, *supra* at 655 (examining range of percentage awards in similar cases, and concluding that 6% assessment was reasonable benchmark);[12] *In re Diet Drugs*, 553 F. Supp. 2d at 485 (6.75% appropriate percentage in light of range of super-mega-fund benchmarks from 4.8% to 15%).

### E. Consideration of the *Barber* Factors Further Supports an Award of the Five-Percent (5%) Holdback for Attorney's Fees and Expenses.

After a percentage fee is determined to be comparable to benchmark percentage awards in similar litigations, the percentage is examined in light of the twelve "*Barber*" reasonableness factors, which were outlined in Paragraph B.10 of the Court's January 15, 2016 "Order Establishing Criteria for Applications to MDL Fund to Compensate and Reimburse Attorneys for

---

[12] This 6% benchmark in *Vioxx* was adjusted upwards to 6.5% based on application of the twelve reasonableness factors set forth in *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *Vioxx*, *supra* at 658.

Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee." (noting twelve factors set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978)).[13] In *In re MRRM, P.A.*, 404 F.3d 863, 867-68 (4th Cir. 2005), the Fourth Circuit approved the use of the "*Barber*" factors in assessing the reasonableness of a proposed percentage fee award in a common fund case (28.75% of $70 million settlement). In *Jones v. Dominion Resources Services, Inc.*, *supra* at 760, this Court observed as follows: "with regard to both the percentage of fund factors and the lodestar cross-check, 'there is no specific formula for analyzing these factors. Each case is different, and in certain cases, one factor may outweigh the rest.'" Similarly, in *In re Serzone*, 2007 WL 7701901 at *2, this Court noted that "[n]ot all [*Barber*] considerations apply to every case, and case law and the Manual for Complex Litigation accord trial courts wide discretion in how they weigh different criteria touching upon the value of the service provided by Class Counsel."

    1.  **Time and Labor Required (Factor 1); Attorneys' Opportunity Costs In Pressing Litigation (Factor 4); Attorneys' Expectations at the Outset of the Litigation (Factor 6); Time Limitations Imposed by the Client or the Circumstances (Factor 7)**

The common fact questions that made these cases appropriate for MDL coordination before a single Court allowed leadership to develop and implement an overall approach, with certain consistent themes and legal theories, cross-MDL scientific and medical experts and coordination of effort in the development of evidence and legal issues. However, the nuances between

---

[13] The *Barber* factors, derived from the Fifth Circuit's *Johnson v. Ga. Hwy. Express, Inc.* opinion, are: (1) time and labor expended; (2) novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services; (4) attorney's opportunity costs in pressing the litigation; (5) customary fee for like work; (6) attorney's expectations at the outset of litigation; (7) time limitations imposed by the client or circumstances; (8) amount in controversy and results obtained; (9) experience, reputation, and ability of the attorney; (10) undesirability of the case within the legal community in which the suit arose; (11) nature and length of the professional relationship between the attorney and client; (12) fee awards in similar cases. Factors (8) and (12) are addressed *supra*.

defendants and individual products necessitated intense and sustained effort over several years by a large number of attorneys working across MDL lines. The fact that this coordinated litigation ultimately involved seven MDLs involving multiple products and multiple defendants required simultaneous efforts from teams of attorneys, working collaboratively on parallel tracks. The collective work and lessons learned from one product or one MDL aided the process overall, while each product required specific focus in terms of liability discovery and pre-trial preparation, expert development, and trial work-up. The time and labor required to move seven multi-product MDLs forward in the same Court is reflected in the number of Common Benefit hours that have been recognized by the Fee and Cost Committee. Due to the complexity and scope of these seven related MDLs, the number of FCC-recognized hours necessary to move this massive litigation forward (679,191.20) exceeds many of the largest MDLs in this country's history. *See, e.g.*, *Vioxx*, 760 F. Supp. 2d at 659 (562,943.55 hours); *Deepwater Horizon*, 2016 WL 6215974 at *19 (approximately 527,000 hours); *In re Diet Drugs*, 553 F. Supp. 2d at 479 (553,020.53 hours).

The opportunity costs and time limitations imposed by the circumstances of these related MDLs were likewise onerous. This litigation is not only one of the largest – if not *the* largest – product liability mass torts in this nation's history, but it is the only mass tort product liability litigation in this country that has involved multiple related MDLs, each involving multiple products, coordinated before the same Court simultaneously. For a number of years, the amount of time and effort necessary to coordinate this litigation significantly limited involvement in other matters for the lawyers responsible for spearheading this litigation. The burdens of funding this behemoth litigation through PSC contributions and tens of millions of dollars in held costs strained the resources of leadership. Indeed, for several of the firms involved in leadership, the work

required to pursue this historic litigation seriously limited, if not precluded their involvement in other litigation, as the number of recognized common benefit hours expended amply demonstrates.

**2.  The Novelty and Difficulty of the Questions (Factor 2); The "Undesirability" of the Case (Factor 10)**

Individually, the cases in these MDLs involve complex prescription medical devices, implanted by surgeons through an invasive surgical procedure. Thus, the Plaintiffs' leadership was not only required to address the difficult legal questions that arise in product liability cases generally, but also had to navigate the unique regulatory, scientific and medical issues presented in these cases. There were also significant issues related to the plaintiffs' treating physicians, which necessitated understanding and addressing questions such as surgical skill and experience, doctor training, and patient selection, and in some cases, defenses of medical negligence. Adding to the complexity, the defendants helped to organize a campaign within the medical community during the course of this litigation that resulted in doctor organizations issuing various "position statements" regarding this litigation and the products involved, which spawned additional motions practice, legal issues, and discovery.

The disputed issues involved in these cases included a wide range of complicated scientific, medical and legal questions. Merely understanding from a scientific and medical perspective what was "wrong" with these products and with the defendants' product warnings, and how these defects caused the plaintiffs' injuries, required extensive study and research. All of these issues were, of course, bitterly disputed by the defendants. Fitting these scientific and medical concepts into the product liability legal construct, and then translating these complex concepts into a form that a jury could understand, was exceptionally difficult. As described above, plaintiffs' leadership was responsible for development of experts from several different scientific and medical fields, including pelvic repair surgeons, pain specialists, biomaterials experts, polymer scientists,

- 28 -

biostatisticians, pathologists, and regulatory experts. Several of the plaintiffs' experts conducted extensive laboratory testing of the materials and products involved utilizing a variety of scientific equipment, and issued extensive reports outlining and explaining in detail their medical and scientific findings and opinions. Many of the defense's multitude of experts likewise issued voluminous reports, citing to reams of scientific testing and clinical and animal study results, all of which had to be meticulously reviewed and analyzed by plaintiffs' leadership. To be prepared to handle their duties, plaintiffs' leadership was required to become knowledgeable and proficient in several diverse scientific and medical areas, and to recognize and address issues when (if not before) they arose. There was nothing routine or easy about these cases.

The complexity inherent in any individual pelvic mesh case was increased exponentially based on the number of products and defendants involved. The fact that this litigation encompassed seven MDLs, with different defendants, multiple products and different counsel and litigation and settlement strategies, and each with issues impacting the development of the liability theories, made this novel undertaking exceedingly difficult and required a cohesive effort among the Plaintiffs' leadership. Plaintiffs' leadership also had to confront the delay and other practical and logistical difficulties inherent in multiple MDLs with hundreds or thousands of cases simultaneously in a single court. Moving multiple large-scale product liability MDLs forward in the same court necessitated innovation, perseverance and intense work by many lawyers and firms over several years working together across MDL lines.

This litigation has also been hard-fought by the several defense firms involved. The defense has utilized every tactic within their legal arsenal to try and defeat these cases, including a panoply of dispositive motions on every claim in nearly every case, *Daubert* challenges against nearly every one of plaintiffs' experts (and often multiple motions per expert), several attempts to limit

Plaintiffs' counsel's ability to meet with treating doctors, efforts to curtail the Plaintiffs' ability to put on evidence through *in limine* motions and other means, and seemingly indefatigable attempts to inject regulatory and preemption-related defenses into these cases. Important legal and evidentiary issues (such as applicability of punitive damages, admissibility of FDA regulatory evidence and the admissibility of the Material Safety Data Sheet product warnings) were often subject to multiple rounds of briefing, across the various MDLs, with each round of briefing raising new arguments or citing additional facts alleged to warrant different results. Plaintiffs' leadership was required to deal with ancillary issues such as the propriety and scope of "independent" medical examinations of plaintiffs, and the alleged involvement of third-party litigation funding and surgical funding groups. In addition to drafting and responding to the "general" motions filed in the main MDL docket applicable to all cases, the Plaintiffs' leadership also oversaw the preparation of case-specific motions and responses to defense motions filed in individual cases, providing templates and exemplar motions to MDL Plaintiffs' counsel. The motions practice involved in these MDLs is too voluminous to recount here but suffice to show that nearly every procedural and substantive factual and legal issue that could possibly be disputed was litigated, typically many times over (generally with new arguments and issues presented as Defendants "refined" their positions).

Finally, with respect to the desirability of this litigation, the prospects of litigating a complex product liability MDL against a multi-national corporate defendant, defended by top U.S. defense law firms, were daunting from the outset. Before 2011, only a small number of firms in the country were willing to institute litigation involving these products. Prior to that time, there were substantial risks and costs that made the litigation undesirable. Even with the increase in interest in the pelvic mesh litigation, however, these cases were far from a "sure thing," as the past

several years of hotly-contested litigation have proven. The risks and costs associated with leading this litigation have remained onerous from the beginning. Leading this litigation required fortitude and persistence, as well as substantial financial sacrifice. The well-represented corporate defendants litigated these MDLs fiercely, recognizing that trying these cases would be difficult and expensive given the number of fact and expert witnesses necessary to establish liability, causation and damages. With costs approaching half-a-million dollars or more per trial for some of the bellwether trial cases, the impediments to pursuing these cases were enormous.

### 3. The Skill Required to Perform the Legal Service (Factor 3); The Experience, Reputation, and Ability of the Attorneys (Factor 9)

As noted in *Jenson v. First Trust Corp.*, 2008 WL 11338161, *13 (C.D.Cal.2008), "[t]he 'prosecution and management of a complex national class action requires unique legal skills and abilities.' *Edmonds v. U.S.*, 658 F. Supp. 1126, 1137 (D.S.C. 1987)." These "unique skills and abilities" were indispensable to management of these coordinated MDLs, which together involved tens of thousands of individual personal injury actions against different manufacturers including several different products. The quality of the work performed in the prosecution of these seven coordinated MDLs is reflected in the outcomes of the several trials that have included multiple significant plaintiffs' verdicts, as well as the numerous large-scale settlements across the MDLs. *Jenson*, *supra* at *13.

Managing several related complex medical device product liability MDLs simultaneously necessitated the involvement of the preeminent attorneys in this area of the law. The lawyers appointed by the Court to lead the litigation on plaintiffs' behalf in these MDLs include attorneys from many of the foremost plaintiffs' mass tort law firms from across the United States. These attorneys and law firms involved in Plaintiffs' leadership specialize in representing individuals who have suffered injury from prescription drugs and medical devices. The collection of attorneys

necessarily included a broad array of experience and skills, from the conduct of electronic discovery and analysis of voluminous document production, to motions and briefing, to deposing experts and corporate representatives and taking these complex cases to trial. Other attorneys within Plaintiffs' leadership brought their knowledge and experience in mass tort settlement negotiation to bear in bringing tens of thousands of cases to resolution and assisting others in their own settlements. This litigation required dedicated research and study to comprehend and address the difficult and novel legal, scientific and medical issues presented in these cases. *Good v. West Virginia-American Water Co.*, 2017 WL 2884535 at *24 (noting diligent research and education required to understand scientific and legal issues involved, which bore on *Barber* analysis in awarding attorney's fees). This collective experience and skill was vital to the success of the litigation, as these cases were defended by teams of attorneys from several of the nation's largest, most experienced and capable defense firms. As several courts considering attorney fee awards have noted, "[t]he quality of opposing counsel is also important in evaluating the quality of the work done by Plaintiffs' Counsel." *Jenson*, 2008 WL 11338161 at *14 (citing *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977); *In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); and *Arenson v. Board of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974)). The fact that the plaintiffs have been able to withstand the legal firepower brought to bear by these highly-skilled and experienced defense firms is largely a testament to the experience and ability of the collection of attorneys making up plaintiffs' leadership, and their coordination and cooperation across the scope of this litigation.

### 4. <u>Nature and Length of Professional Relationship Between Attorney and Client (Factor 11)</u>

This *Barber* factor was designed to consider those instances where "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client

with his office." *See*, *Johnson*, 488 F.2d at 719. There are few, if any, pre-existing relationships between the plaintiffs in these MDLs and plaintiffs' leadership. Although some attorney-client relationships continue beyond the settlement phase to include litigation-related matters such as health insurance or governmental lien resolution or bankruptcy negotiation, this factor is not entitled to significant weight in the analysis.

### 5. <u>Customary Fee for Similar Work (Factor 5)</u>

As noted in *Deepwater Horizon*, *supra* at *19, the "Customary Fee for Similar Work" analysis is largely redundant of the benchmark percentage factor, which is discussed above. Again, the 5% fee is well within the benchmark percentages for similar cases.

### F. An Award of the Five-Percent (5%) Holdback is Supported by the "Lodestar" Cross-Check.

While use of the lodestar is often referenced as a "cross-check" on the reasonableness of a percentage fee award, courts have observed that "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting," and that "a court performing a lodestar cross check need not scrutinize each time entry; reliance on representation by class counsel as to total hours may be sufficient." *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D. Mo.2014) (citing several MDL and class action decisions). In *Jones v. Dominion Resources Services, Inc.*, *supra* at 765-66, this Court similarly observed as follows:

> Because I am using the lodestar method as a cross-check, I need not apply the "exhaustive scrutiny" normally required by that method. *Goldberger*, 209 F.3d at 50 ("[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case."); *see also In re Rite Aid Corp.,* 396 F.3d 294, 306–07 (2005). Instead, I may use Class Counsels' estimate of the hours they have spent working on this case.

Some courts do not even attempt to assign a specific "hourly rate" in calculating the lodestar. In *Nuvaring*, for example, the Order simply noted that the common benefit hours

- 33 -

expended was 34,440 and when multiplied by "each attorney's typical hourly rate," the lodestar "would substantially exceed the holdback of $11,000,000" without ever mentioning the hourly rate that the court considered to be "typical." 2014 WL 7271959 at *4. Likewise, in *Actos*, the court discussed generally how a reasonable hourly fee in an MDL should be calculated, but never expressly stated what a reasonable hourly rate would be. 2017 WL 3033134, *24-*26. The court in *Actos* explained that neither the hours expended, nor an hourly rate could reflect the value or quality of the work or any of the "intangible" factors courts must consider. *Id.*, *29. The court in *Actos* noted that application of "a possible reasonable lodestar" (which was never expressly stated) to the number of approved hours expended also supported the percentage award.

Using a total expected common benefit fund of $550,000,000, less current held costs and recognized PSC and State Court assessments through December 21, 2016 ($46,811,811.38) and less expenses paid to date from the fund ($12,037,448.66), the total amount of anticipated common benefit fees is $491,150,739.96. This number is artificially high because held costs incurred after December 21, 2016 are not included, but it will be used for purposes of demonstrating the reasonableness of the previously-awarded 5% holdback amount for fees and expenses.

The Court need not assign an hourly rate in order to determine that the rough lodestar cross-check amply supports the reasonableness of the fee and expense award here. Irrespective of what hourly rate were to be selected for the cross-check, the number of hours already expended in this litigation would yield a multiplier that would fall well within the range of reasonableness for similar litigations. Merely for purposes of illustration, an hourly rate of $300 would yield a "multiplier" of 2.41 (dividing the anticipated common benefit fees ($491,150,739.96) by the lodestar cross-check amount ($203,757,360.00 (679,191.20 x $300/hour)). An hourly rate of $500 per hour would yield a "multiplier" of 1.45 (dividing the anticipated common benefit fees

($491,150,739.96) by the lodestar cross-check amount ($339,595,600.00 (679,191.20 x

$500/hour)). Obviously, application of different hourly rates would yield a different lodestar

multiplier, but the multiplier would still fall squarely within the range that courts have deemed

reasonable irrespective of the hourly rate that one chose to utilize.[14]

In *Kay Co.*, *supra* at 470, this Court recognized that "Courts have generally held that

lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee." This is

consistent with the range of similar multipliers that courts have found reasonable, as demonstrated

in the chart below:

| Case | Lodestar Multiplier |
|---|---|
| *Deloach v. Philip Morris Cos.*, 2003 WL 23094907 (M.D.N.C. 2003) | 4.45 |
| *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) | 4 |
| *In re NASDAQ Market-Makers Antitrust Litig.* 187 F.R.D. 465 (S.D.N.Y. 1998) | 3.97 |
| *In re AOL Time Warner, Inc. Sec. Litig.*, MDL 1500, 2006 WL 3057232 (S.D.N.Y. 2006) | 3.69 |
| *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) | 3.5 |
| *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | 2.697 |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006) | 2.57 |
| *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003) | 2.4 |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007) | 5.9 |
| *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) | 5.2 |

In *In re Diet Drugs*, 582 F.3d 523, 545 (1st Cir. 2009), the First Circuit concluded that a

multiplier of 3.4 "or somewhere in that neighborhood" is "not problematically high," but is instead

---

[14] While the FCC does not anticipate reaching a total common benefit fund of $700,000,000.00, even assuming such a hypothetical level the "multiplier" for a rate of $300 per hour would be 3.15 and the "multiplier" for a rate of $500 per hour would be 1.89. These values would still fall well within the acceptable range based on other MDL litigation.

"either below or near the average multiplier in the 'super-mega-fund' cases…." *See also*, *Deepwater Horizon*, *supra* at *20 (lodestar multiplier of 2.34 was reasonable in light of research showing average multiplier of 3.14 in cases with settlements totaling more than $1 billion); *In re Avandia*, 2012 WL 6923367 at *10 (lodestar multiplier of 2.6 was consistent with applicable jurisprudence and lower than multipliers approved in other cases); *In re Nat'l Football League Players' Concussion Injury Litig.*, 2018 WL 1635648, *9 (E.D. Pa. 2018) (noting a lodestar multiplier of 2.96 was "well within the norm for this Circuit, which has noted that multipliers ranging from one to four are frequently awarded."). Moreover, as noted in the *NFL Players Concussion MDL*, the lodestar cross-check multiplier calculated here is artificially high, and the actual lodestar will continue to increase as common benefit work has continued beyond the FCC's cutoff of December 21, 2016 and is on-going. *Id.* at *9 n. 9. Again, whatever hourly rate is employed to perform the lodestar cross-check, the multiplier calculated here demonstrates that the fee is reasonable.

It is important to note here that irrespective of whether an hourly lodestar rate is calculated or applied to the total number of hours for the sole purpose of cross-checking the reasonableness of the overall fee, or what "blended" hourly rate may be used, this lodestar rate has no application to the Court's subsequent consideration of any individual attorney or law firm's allocation from the total fee. The two analyses – total award and individual allocation – are distinct. As noted in *Actos*, "the jurisprudence suggests that the average rate is not necessarily reflective of the rate ultimately used to calculate any firm's award, rather it is used as an additional evaluation of the reasonableness of a total common benefit fee award," and "[t]herefore, an hourly rate should only be considered one factor among several when determining the reasonableness of a fee award, rather

than determinative of the hourly rate awarded to any individual attorney." *In re Actos*, 2017 WL 3033134 at *29.

The five-percent (5%) award sought here results in a rough lodestar cross-check that is directly in line with awards in other "super mega fund" cases and demonstrates the reasonableness of the Court's holdback years ago.

## IV.    CONCLUSION.

In light of the foregoing analysis, the *Barber* factors support affirmance of the Court's initial holdback of five percent (5%) as an award for common benefit expenses and attorney's fees. The undersigned members of the FCC respectfully request that the Court enter an Order granting an award of attorney's fees and expenses in the amount of five percent (5%) of the settlements and judgments subject to the common benefit assessment.

Dated: November 12, 2018

                              Respectfully submitted,

                              THE COMMON BENEFIT FEE AND COST
                              COMMITTEE

                        By:   */s/ Henry G. Garrard, III*
                              Henry G. Garrard, III
                              hgarrard@bbga.com
                              Chairman of the Fee &
                              Compensation Committee

BLASINGAME, BURCH, GARRARD & ASHLEY
P.O. Box 832
Athens, GA  30603
706-354-4000

                              */s/ Renee Baggett*
                              Renee Baggett
                              RBaggett@awkolaw.com

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
17 East Main Street, Suite 200
Pensacola, FL 32502
850-202-1010

**/s/ Riley L. Burnett, Jr.**
Riley L. Burnett, Jr**.**
rburnett@rburnettlaw.com

BURNETT LAW FIRM
55 Waugh Drive, Suite 803
Houston, TX 77007
832-413-4410

**/s/ Thomas P. Cartmell**
Thomas P. Cartmell
tcartmell@wcllp.com

WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1100

**/s/ Clayton A. Clark**
Clayton A. Clark
CClark@triallawfirm.com

CLARK, LOVE & HUTSON, G.P.
440 Louisiana Street, Suite 1600
Houston, TX 77002
713-757-1400

**/s/ Yvonne M. Flaherty**
Yvonne M. Flaherty
ymflaherty@locklaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis MN  55401
612-339-6900

**/s/ Carl N. Frankovitch**
Carl N. Frankovitch
carl@facslaw.com

FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, WV 26062
304-723-4400

**/s/ Joseph F. Rice**
Joseph F. Rice
jrice@motleyrice.com

MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843-216-9000

***/s/ William H. McKee, Jr***
William H. McKee, Jr
bmckee@suddenlink.net

1804 Louden Heights Road
Charleston, WV 25314
304-546-2347

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 12, 2018, I electronically filed the ***Common Benefit Fee and Cost Committee's Petition for an Award of Common Benefit Attorneys' Fees and Expenses and Memorandum in Support*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

By:   ***/s/ Henry G. Garrard, III***
Henry G. Garrard, III
hgarrard@bbga.com
Chairman of the Fee &
Compensation Committee

BLASINGAME, BURCH, GARRARD & ASHLEY
P.O. Box 832
Athens, GA 30603
706-354-4000