**DENIED and SO ORDERED.**

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br>------------------------------------------------------ | MDL NO. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br>------------------------------------------------------ | MDL NO. 2325 |
| IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br>------------------------------------------------------ | MDL NO. 2326 |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br>------------------------------------------------------ | MDL NO. 2327 |
| IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION<br>------------------------------------------------------ | MDL NO. 2387 |
| THIS DOCUMENT RELATES TO ALL CASES | |

## MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ADDITIONAL DISCOVERY DIRECTED AT THE FEE AND COST COMMITTEE IN CONNECTION WITH THE REQUEST FOR ALLOCATION OF AGGREGATE COMMON BENEFIT AND COST AWARD

Pursuant to the Federal Rules of Civil Procedure, Kline & Specter, P.C. ("Kline & Specter"); Mazie Slater Katz & Freeman ("Mazie Slater"); and Anderson Law Offices ("ALO") (hereinafter "Moving Firms") respectfully move this Court for an Order compelling compliance with the Combined Third Requests for Production of Documents, Things, and Answers to

1

Interrogatories served on the Transvaginal Mesh MDL Common Benefit Fee and Cost Committee ("FCC") in connection with the Request for Allocation of Aggregate Common Benefit and Costs Award, and in support thereof states as follows:

## PRELIMINARY STATEMENT

The eight law firms on the FCC have ignored the Court's directive "for the fair and equitable sharing among plaintiffs' counsel of the Common Benefit Fund," and have brazenly issued a preliminary recommendation awarding themselves $249 million of the $374 million to be distributed, or a staggering **2/3 of the fund**.[1] This is an average award of $31 million per FCC firm, including expenses.     On their face, these numbers taken together with the scant information currently available, indicate that the most heavily weighted achievement in the FCC's calculus was not the trial victories, key depositions, or the other critical work that was supposed to drive the allocation, but rather appointment to the FCC.

The FCC has insulated its actions to date by rejecting all requests for production of important documents necessary for the Moving Firms, and others, to fairly address the FCC's decisions, including its preliminary recommendations. This documentation would give the underlying basis for the FCC's allocation, and disclose potentially problematic factors such as financial relationships between FCC members, if any. The lack of transparency and deprivation of due process to date has enabled the FCC to issue preliminary recommendations that defy any definition of objective reasonableness.

---

[1] This motion is not a substitute for substantive objection to the FCC's recommendations, as the process is ongoing and it is hoped that this motion will help to fix the process before final recommendations are issued.  However, it is clear at this stage that the purpose of the common benefit process, to compensate the law firms commensurate with the benefit they conferred for the most important constituents, the injured women and their families, has not been respected.

## I.   FACTUAL BACKGROUND

1. In accordance with the Pretrial Orders of this Court, the Fee Committee Protocol, and the parameters further established by the FCC, the Moving Firms submitted their Common Benefit Fee hours and expenses.

2. As required by the Fee Committee Protocol, the Moving Firms provided the FCC with the firms' total revised time and an accompanying affidavit stating that the firms had audited the time and expenses and that the revised time and expenses submitted were for the common benefit.

3. The Moving Firms thereafter received a letter from the FCC which stated that after an initial review, the FCC disallowed hours submitted by the firms.  In doing so, the FCC provided blanket and unspecified reasons for the disallowances.

4. The FCC and the Fee Committee protocol further stated that any comments to be included provided by the Moving Firms in response to these disallowed entries, final expense submissions, and an accompanying affidavit were to be completed and submitted within thirty (30) days of receipt of the FCC's February 16, 2018 letter.

5. On February 27, 2018, Kline & Specter sent a letter to Henry Garrard, Esquire, Chairperson of the FCC.  *See* February 27, 2018 Letter to Henry Garrard, attached hereto as Exhibit "A." In the letter, Kline & Specter asked if the FCC would voluntarily produce the documents and information related to Requests at issue in this Motion.   Kline & Specter asked that the FCC respond within five days as to if they would comply with the Requests. Mr. Garrard declined to respond.

3

6.  On March 6, 2018, Kline & Specter (through its attorneys Bowles Rice LLP) filed a
    Motion with this Court requesting information related to the FCC's allowance and
    disallowance of Kline & Specter's submitted hours as being for the common benefit. *See*
    Kline & Specter Motion for Discovery, attached as Exhibit "B." This Motion was denied
    by Order of the Court dated March 7, 2018.

7.  On May 25, 2018, following the submission of its Affidavit, Kline & Specter served
    Combined Requests for Production of Documents, Things, and Interrogatories on the
    Transvaginal Mesh MDL Common Benefit Fee and Cost Committee ("FCC") in
    connection with the Request for Allocation of Aggregate Common Benefit and Costs
    Award. *See* Discovery Requests, attached as Exhibit "C." These requests were objected
    to by the FCC and no documents or information were produced.

8.  Thereafter, the Moving Firms presented arguments in front of the FCC in support of their
    Affidavits requesting recognition of the disallowed hours and expenses as for the
    common benefit, and other relevant factors.

9.  On July 12, 2018, Kline & Specter filed a Motion to Compel Production of Documents
    and Additional Discovery Directed at the Fee and Cost Committee in Connection with
    the Request for Allocation of Aggregate Common Benefit and Cost Award related to the
    May 25, 2018 Discovery Requests. This Court denied the Motion, specifically stating
    that the matter was not yet ripe. *See* this Court's July 13, 2018 Order, attached hereto as
    Exhibit "D."

10. Thereafter, the Moving Firms received the FCC's "Transvaginal Mesh MDL Common
    Benefit Fee and Cost Committee Preliminary Written Recommendation." *See*

September 13, 2018 Recommendation Letter, attached hereto as Exhibit "E." This letter wrongly proposes to disallow thousands of hours and substantial expenses for the Moving Firms, and undervalues a significant portion of the hours that were allowed.

11. On September 24, 2018, following the receipt of the FCC's recommendation letter, the Moving Firms served their Combined Third Requests for Production of Documents, Things, and Interrogatories on the Transvaginal Mesh MDL Common Benefit Fee and Cost Committee ("FCC") In Connection with the Request for Allocation of Aggregate Common Benefit and Costs Award. *See* Discovery Requests, attached as Exhibit "F."

12. These Combined Third Requests and Interrogatories seek information in the possession, custody, or control of the FCC and its members relating to the proposed allocation and distribution of funds among the participating firms in the Pelvic Mesh MDLs as reflected in documents following the FCC's September 13, 2018 Recommendation Letter.

13. On October 24, 2018, the FCC responded to the Combined Third Requests, objecting to each and every request.  The FCC asserted that the requested discovery is conclusively barred and precluded by res judicata, collateral estoppel, stare decisis and the law of the case doctrine.  The FCC further asserted that there is no legal authority that would purport to allow counsel for certain plaintiffs in this MDL proceeding to seek discovery from other plaintiffs' counsel by way of interrogatory or request for production of documents. *See* FCC Response to Moving Firms' Combined Third Requests, attached hereto as Exhibit "G."

14. The Moving Firms filed their objections to the preliminary recommendations; however, these were limited to a mere 10 pages, and were written without access to the key

documents and information relied on by the FCC.  Despite these limitations, which need to be remedied, the Moving Firms relied on the available information and objected to the preliminary recommendations, as well as the complete lack of transparency in the allocation process to date, and the disproportionate proposed allocation by the FCC.

15. On September 27, 2018, counsel for ALO sent an informal discovery request to the FCC seeking an opportunity to review the records and data supporting the fee allocations. This request was rejected in its entirety the next day by the FCC's External Review Specialist.  *See* ALO Discovery Request to FCC, attached hereto as Exhibit "H."

16. To date, the requested documents and materials have not been produced.  Moving Firms now file this instant Motion to Compel Discovery.

## II.    LEGAL ARGUMENT

The information Requested in Moving Firms' Combined Third Requests for Production of Documents, Things, and Interrogatories (Exhibit "F") served on the FCC is not duplicative of prior discovery requests as it relates to the hours and fees recommended following the FCC's September 13, 2018 Recommendation Letter and therefore, could not be barred by res judicata, collateral estoppel, stare decisis, and/or the law of case doctrine, if those doctrines could potentially apply to ongoing interlocutory discovery requests, which they do not. Furthermore, as discussed throughout this Motion, keeping the requested information confidential is inappropriate.  Doing so does not lend itself to a fair and open process essential to a transparent distribution of funds which in turn avoids future litigation.

In the Vioxx litigation, discussed below, FCC member Joseph Rice, Esq. of Motley Rice **objected** to the fee committee's proposed allocation, condemning what he described as: "**self-**

6

dealing and double dipping" and "self-enriching and lacking evenhandedness for those applicants not on the Committee," and unacceptable "disparate treatment" as between the FCC and non-FCC firms." *See* Motley Rice Brief in Opposition to Proposed Allocation in Vioxx, attached hereto as Exhibit "I.", at 1-2. With Mr. Rice now in power, the FCC is inexplicably repeating the sins Mr. Rice so vehemently criticized in the Vioxx litigation.  The Moving Firms seek to compel necessary discovery and initiate a process to achieve the transparency and fair allocation this Court mandated in the series of Orders and communications creating this process.

Moving Firms are entitled to the requested information regarding the proposed distribution of funds among the participating firms in the Pelvic Mesh MDLs. The outright refusal by the FCC to provide this information perpetuates the indefensible information gap that limited the ability of the Moving Firms to submit fully informed responses to the disallowance of time and expenses, and fully informed objections to the preliminary recommendations, and this unfairness will only be compounded as this process advances to final recommendations to the Court.

Throughout the process of assessing common benefit time, the FCC purported to allow the Moving Firms to challenge the reduction of hours made by the FCC and to explain why these hours should be considered as for the common benefit.  However, the FCC made this task virtually impossible. The FCC provided blanket, non-specific disallowances of the Moving Firms' time, making a specific response to each fee entry a futile guessing game. Then the FCC criticized the Moving Firms' responses as failing to adequately address the ambiguous disallowances.  This is fundamentally unfair.  A basic tenet of justice is that a party receive

notice of the nature of a claim or defense. The lack of specificity of the reason for proposed disallowance prevented the Moving Firms from meaningfully responding and challenging the substantial reductions to their shares of the common benefit fund that has been proposed. Moreover, the refusal to disclose all firms' submissions and the allowances and disallowances of each precludes a fair analysis – for example, were FCC firms credited for work that was disallowed to the Moving Firms?

It is clear that the Moving Firms must be given an opportunity to obtain the materials requested. The process of determination of appropriate common benefit compensation is a most sensitive issue and fraught with potential for abuse, especially because the FCC members and their close associates will be recipients of FCC awards – as Mr. Rice himself recognized in Vioxx. The lack of transparency heightens these risks. In 2017, Elizabeth Chamblee Burch, articulated this tendency for a flawed, conflicted process in her article *Monopolies in Multidistrict Litigation*:

> [P]laintiffs' leadership across multidistrict proceedings can act like oligopolies and cartels. Cartels punish defectors by imposing costs on them and denying them access. When attorneys become lead lawyers, they have the power to control access and inflict costs, too: they distribute common-benefit work to allies, use settlements to restrict attorney advertising and reduce attorney demand, suggest common-benefit fee allocations, and report uncooperative behavior to the judge—carrots and sticks, in other words, that impair rivals' financial and leadership opportunities.
>
> *****
>
> Attorneys work together frequently. As such, they form a close-knit group (though not necessarily one predicated on friendship) that may develop and enforce norms to maximize members' collective welfare in current, concurrent, and future litigation.

*****

> Because information flows easily through the network, it increases the opportunities for both tacit and explicit collusion and enables leaders to credibly punish and reward others for following or disregarding norms.

*See* Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation,* 70 Vand. L. Rev. 67 (2017), pp. 122-123, attached as Exhibit "J." Only through discovery will the parties have equal access to the foundational documents at the core of the process and learn the actual reasoning behind the proposed distribution of funds, which appears to heavily favor the FCC members and their allied law firms.

The Moving Firms also propose making the information sought available to every firm that has submitted fee applications. Burch stated as follows, "[g]iven the information barriers that prevent judges and clients from monitoring leadership, however, regulation should incentivize and leverage other plaintiffs' attorneys to function as checks and balances." *Id.* p. 135. The FCC, if it were fairly discharging its responsibilities, would embrace transparency. Making this information available to every firm involved in this process is in everyone's best interest – every attorney and every client. Fee disputes, like other litigation (especially with millions of dollars at stake), ought to be litigated openly and transparently. Attorneys inclined to question these unexplained fee awards should be well positioned to comment—publicly and openly—on each other's relative contribution to the litigation.

The FCC appears to have chosen to award only a fraction of the Moving Firms' hours and lodestar, and no multiplier enhancement. At the same time, it suggests that its own members be grossly over-compensated. 93 firms submitted fee applications. Based on the available information, the FCC recommended that its eight member-firms receive awards with an

estimated average fee award of **$28,739,750** and an estimated average hourly rate of **$739.75** – well over the average hourly rate applied to the Moving Firms' hours.  In comparison, Moving Firms were awarded an average hourly rate on approved hours of $347. Of their total submitted hours, Kline & Specter received an hourly rate of $116; Mazie Slater received an hourly rate of $202; and ALO received an hourly rate of $217. *See* Exhibit B from FCC Preliminary Recommendations, attached hereto as Exhibit "K."  Furthermore, the total fees proposed to be awarded to the eight FCC member firms is $229,915,000.  This is almost exactly 2/3 of the $344,000,000 total fee award available at this time across the entire litigation.  Thus, the eight FCC member firms would receive over 2/3 of total fees while the FCC divide the remaining 1/3 of the allocated fees to the remaining 85 non- member firms.  Given the massive imbalance, and the fact that all of the largest awards are remarkably round numbers, including all of the FCC member firms' allotments, there are strong reasons to suspect that the FCC has arbitrarily determined the shares.

In its September 13, 2018 letter, the FCC states that there were over 900,000 hours submitted to the FCC for review.  *See* Exhibit "E." Adding up the total amounts of allocated fees in Exhibit B to the September 13th letter, the total number of hours recommended as allowed for all fee requesting firms is 679,149.  Moving Firms Kline & Specter, Mazie Slater, and ALO submitted over 88,000 hours as for the common benefit and yet only 51,093 hours were approved.  Thus, the FCC allowed over 75% of all time submitted across all firms but approved less than 58% of the Moving Firms' time: Kline & Specter was approved for 29% of its submitted time; Mazie Slater was approved for 65% of its submitted time; and ALO was approved for 66% of its submitted time.  There is no way of confirming to what extent the FCC

10

member firms' hours were reduced – or, for that matter, the extent of hour reduction for firms other than the Moving Firms.

The limited information available to the Moving Firms, including the FCC's internal "TVM Historical Analysis," (Exhibit "L", attached hereto) demonstrates the need for full production of the requested documents – for example the key source documents including the submissions by each firm, and the transcripts of each firm's meeting with the FCC.  This internal FCC document is replete with inaccurate and biased statements, and a comparison of the data within this document to the FCC's preliminary recommendations evidences uneven and manipulated treatment of the FCC firms to the detriment of the rest, including the Moving Firms. For example, FCC Chairman Henry Garrard's law firm, the Blasingame firm, was credited for 63,719 hours and $9,545,824 in expenses, plus $350,000 in assessments.  According to the TVM Historical Analysis, the Blasingame firm had 64,613 hours with $9,623,801 in expenses as of August 24, 2016.  Thus, the FCC Chairman's law firm was awarded nearly 100% of both, and the gross figures, excessive and in need of explanation on their face, raise serious questions that can only be answered by reviewing the firm's time and expense submissions. And this is the tip of the iceberg.   For example, the Blasingame firm somehow recorded 7,525 hours and $2,687,171 in expenses on the Ethicon litigation although it was noticeably absent from that litigation, which was led in New Jersey beginning long before the MDL was formed.  It is widely believed that the Blasingame firm and others re-reviewed massive numbers of Ethicon documents that had already been reviewed, finding nothing of import that was not already known, and created expert reports in reliance on the templates already available, then fully credited and enhanced this time with multipliers.

11

The favorable treatment of FCC member Riley Burnett's law firm provides another troubling example illustrating the need for full transparency. The TVM Historical Analysis shows a mere 1,662.80 hours and $10,941.33 in expenses, most of which were in the Coloplast MDL where no true discovery took place. Yet, the final calculation increased the hours to 10,490.35 hours, with the same meager expense amount. Where did another 8827.55 hours come from? Moreover, to our knowledge Mr. Burnett took no significant depositions, tried no cases, led no litigations, took almost no financial risk, and contributed nothing of common benefit. Yet, he was awarded fees of $5,075,000, almost as much as Mazie Slater, the law firm that started and has played a lead role in the Ethicon litigation from day one in 2008, with an hourly rate of $483.78 based on the disclosed number of hours – 1.6 times the hourly rate for Mazie Slater on the hours allowed. At 1662.8 hours, the hourly rate jumps to $3052.08. The purpose of these examples is not to litigate the preliminary recommendations, but rather to demonstrate the need for the requested discovery. Only full transparency will enable a fair opportunity to object, and to engage in meaningful steps towards applying verifiable criteria and fixing this process at this stage.

Up to this point, the Moving Firms have been denied discovery requests seeking the requested information. The information sought by the Moving Firms directly relates to the blatant discrepancy between the fees and expenses preliminarily awarded to the FCC Member Firms, the Moving Firms, and all other firms involved in this litigation, as this information gap is severely prejudicing the Moving Firms and others from objecting and engaging with the FCC on a level playing field. In this context, it is important to recognize that even to the extent the

deliberative process was intended to be confidential, the source documents relied on should not be confidential, and the unbalanced preliminary recommendations require full disclosure.

The following is the crux of the crucial information (and subsequent related documents) requested. These requests are narrowly focused and relate directly to the FCC's preliminary recommendation of the common benefit fee and expense distribution as requested by Moving Firms:

- the full and complete reason for each entry considered compensable as for the common benefit and explain in detail the methodology employed for each allowance, the factual basis for each allowance, and the person(s) participating in determining each allowance. It is the Moving Firms' understanding that color coded spreadsheets were created during this process, specifying this information, as well as the cases in which the time was submitted yet those spreadsheets have been withheld despite numerous requests.
- the complete submissions and responses to and from all firms and the FCC in the course of this process.
- the transcripts of each firm's presentation to the FCC.
- the methodology employed for each denial, the factual basis for each denial, and the person(s) participating in determining each denial.
- information and documents regarding any financial arrangements between and among the FCC member firms, or affiliated firms - in the mesh MDL and other litigation.
- the specific hourly and lodestar rates awarded to each fee requesting firm and the specific reasons for the discrepancies in firm hourly and lodestar rates including the methodology used to determine each firm's hourly and lodestar rate, and multipliers.

13

- the specific methodology used to calculate each fee requesting firm's common benefit allocation, hourly rates, and lodestar, and the criteria and methodology used to calculate the fee allocation.
- the criteria and methodology used to calculate the compensable state court time, identify which of the state court trials were compensated for common benefit time, identify the participating firms in each trial, and identify how many hours were considered for the common benefit for each trial.
- the criteria and methodology used to calculate the compensable MDL court trial time, identify which of the MDL trials were compensated for common benefit time, identify the participating firms in each trial, and identify how many hours were considered for the common benefit for each MDL trial.

*See* Exhibit "F."

These Requests focus on the foundational documentation, the methodology of compensation, criteria for compensation, distribution of fees, and the reasons for discrepancy between the FCC Member Firms and the other firms involved in this litigation. The FCC has provided no information regarding these inquiries. This information is essential for a fair and transparent process and to avoid future litigation regarding these matters.

Lessons learned from a similar fee dispute in the *Vioxx* litigation illustrate the need for a fair and transparent process to avoid the complexities of inevitable litigation should this information be withheld. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657. The *Vioxx* personal injury litigation resulted in a $4.85 billion settlement, of which over $315 million was allocated to pay attorneys for their common benefit work. Similar to the current issues in the Pelvic Mesh Litigation, significant problems plagued the management and distribution of this

common benefit fund. Those problems arose because that fee committee proposed fee allocations through a seemingly arbitrary approach that favored those insiders and sought to purchase peace through covert negotiation. *See* Charles L. Becker, Shanin Specter, & Thomas R. Kline, *How Not to Manage a Common Benefit Fund: Allocating Attorney's Fees in Vioxx Litigation*, 9 Drex. L. Rev. 1 (Fall 2016), p. 2, attached as Exhibit "M."

In October 2010, New Orleans Federal District Court Judge Eldon Fallon set aside 6.5 percent of the fund — $315.3 million — for attorney fees. He also appointed nine firms to allocate the fees among the 109 plaintiffs law firms involved in the New Orleans multidistrict *Vioxx* litigation. On Jan. 20, the committee filed its fee allocation recommendations. The proposal granted the fee committee's own members a huge proportion of the fees in the common benefit fund: $230 million, or about 70 percent of the total pool. The two biggest winners (fee committee member firms) each received $40.9 million and $32.5 million under the proposed allocation. Multiple firms who had performed important common benefit work filed objections. The objections accused the fee committee of ignoring lodestar calculations and granting its own members fees based on outsized hourly rates, while leaving much less for other lawyers who committed thousands of hours to the *Vioxx* litigation. Much as here, they likewise recommended that other firms that performed significant common benefit work receive relatively little compared to their effort and contributions. *Id.* at p. 15

Member Firms objected. One of the objections was by Motley Rice, signed by Joseph Rice, Esq., as set forth above. These objections were eventually resolved when many firms agreed to accept larger sums of common benefit money and the fee committee firms agreed to accept less. In the end, the fee committee declined to permit its allocations to receive judicial

15

scrutiny by settling all the objections. The critical observations that followed the objections and allocations include how the fee allocation system was undisciplined and jurisprudentially unmoored, how it operated to favor the interests of those who designed it, and how it promoted objection and litigation, the very opposite of what a fee-allocation system should do. *Id.* at p. 19. The Pelvic Mesh FCC appears to be utilizing an even more deeply flawed process, paying lip service but tethered to no objective criteria.

In the end, the system used to calculate the allocation of funds in *Vioxx* was a substantive, procedural, and practical failure and also an embarrassment to the bench and the bar. This Court should ensure that the same failures are avoided in the Pelvic Mesh Litigation. The *Vioxx* approach produced a justifiable storm of objections that required considerable time and effort to resolve. Little credit could be given to the fee committee's purported objectivity after it recommended that its members receive 73 percent of all fees for 42.6 percent of the hourly work. As Judge Thomas L. Ambro observed in *In re Diet Drugs Products Liability Litigation*, "[t]hey make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the chickens?" *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 172 (3d Cir. 2005) (Ambro, J., concurring).

The failed process in *Vioxx* is analogous to the current failures of the fee allocation process in the Pelvic Mesh Litigation. In *Vioxx,* as in this present case, there was a lack of transparency in the process and an egregiously inequitable recommended allocation of funds favoring the Committee Member firms in charge of determining those apportionments. Discovery is necessary.

The allowance of discovery in these types of fee disputes is obviously not without precedence. Judge Eldon Fallon of the Eastern District of Louisiana oversaw the coordinated discovery and pretrial matters in the *Vioxx* litigation and allowed for discovery following participating firms' objections subsequent to his decision to award a common benefit fee of 8% of the $4.85 billion settlement.

Judge Fallon also allowed for discovery in *Turner v. Murphy Oil USA, Inc.* 582 F.Supp.2d 797 (E.D. La. 2008). In *Turner*, homeowners and business owners sued an oil refinery operator for damages from an oil spill that resulted when an above-ground tank ruptured during the flooding following Hurricane Katrina. The case was certified as a class action and settled for approximately $330.1 million. Judge Fallon approved an award for attorneys' fees and costs of approximately $33.7 million and appointed a special master to recommend allocation of the award to the various plaintiffs' attorneys. Similar to the situation here, firms submitted affidavits setting forth their common benefit work. *Id.* at 803. After the service of the affidavits, all counsel had five days to serve written discovery. *Id.*

## III.    CONCLUSION

Wherefore, Moving Firms respectfully request that this Court enter an order compelling the production of documents and information requested in the Moving Firms' Combined Third Requests for Production of Documents, Things, and Interrogatories on the Transvaginal Mesh MDL Common Benefit Fee and Cost Committee ("FCC") in connection with the Request for Allocation of Aggregate Common Benefit and Costs Award.

Respectfully submitted,

**BOWLES RICE, LLP**

By:   /s/ Floyd E. Boone Jr.
Charles M. Love, III (WVSB 2254)
Floyd E. Boone Jr. (WVSB 8784)
600 Quarrier Street
Charleston, WV 25301
(304) 347-1100 (Tel.)
(304) 347-1746 (Fax)
fboone@bowlesrice.com
*Counsel for Kline & Specter, P.C.*

**KLINE & SPECTER, PC**

Shanin Specter, Esquire
Lee B. Balefsky, Esquire
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
*Counsel for Plaintiffs*

18

**MAZIE SLATER KATZ
& FREEMAN, LLC**

  /s/ Adam S. Slater, Esquire
Adam M. Slater, Esquire
103 Eisenhower Parkway
Roseland, NJ 07068
973-228-9898
*Counsel for Plaintiffs*


**PAUL W. FLOWERS CO., LPA**

  /s/ Paul W. Flowers, Esquire
Paul W. Flowers, Esquire
Louis E. Grube, Esquire
50 Public Square, Terminal Tower, Suite 1910
Cleveland, OH 44113
216-344-9393
*Counsel for Anderson Law Offices, LLC*

**LEWIS GLASSER LLC**

  /s/ Webster J. Arceneaux, III
Webster J. Arceneaux, III (State Bar No. 155)
Richard L. Gottlieb (State Bar No. 1447)
Post Office Box 1746
Charleston, WV 25326
Phone: 304-345-2000
*Counsel for Anderson Law Offices, LLC*


**ANDERSON LAW OFFICES, LLC**

  /s/ Benjamin H. Anderson, Esquire
Benjamin H. Anderson, Esquire
17138 Lorain Avenue, Suite 211
Cleveland, OH 44111
Phone: 216-589-0256
*Counsel for Plaintiffs*

October 31, 2018