IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| ---------------------------------------------------------- | |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2325 |
| ---------------------------------------------------------- | |
| IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2326 |
| ---------------------------------------------------------- | |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2327 |
| ---------------------------------------------------------- | |
| IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2387 |
| ---------------------------------------------------------- | |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR LIABILITY LITIGATION | MDL NO. 2440 |
| ---------------------------------------------------------- | |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL NO. 2511 |

THIS DOCUMENT RELATES TO ALL CASES

**RESPONSE IN OPPOSITION TO COMMON BENEFIT FEE AND COST COMMITTEE'S PETITION FOR AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES AND EXPENSES AND MEMORANDUM IN SUPPORT**

Pursuant to the Federal Rules of Civil Procedure, Kline & Specter, P.C. respectfully

requests that the Court deny the Common Benefit Fee and Cost Committee's Petition for An

Award of Common Benefit Attorneys' Fees and Expenses, and in support, thereof states as follows:

## I.    INTRODUCTION

Kline & Specter opposes the Common Benefit Fee and Cost Committee's ("FCC") petition for the award of five percent (5%) of the transvaginal mesh litigation settlements as compensation for attorneys' fees and expenses. A 5% fee award to Plaintiffs' Participating Counsel is excessive and unreasonable given the outcome of this litigation and the proposed allocation of attorneys' fees set forth in the September 13, 2018 Transvaginal Mesh MDL Common Benefit Fee and Cost Committee Preliminary Written Recommendation ("September 13, 2018 FCC Preliminary Recommendation") and the November 20, 2018 Transvaginal Mesh MDL Common Benefit Fee and Cost Committee Final Written Recommendation ("November 20, 2018 FCC Final Recommendation"), attached hereto as Exhibits "A" and "B."

First, the Plaintiffs' Steering Committee ("PSC") failed to achieve a Global Settlement of the litigation and should not be generously rewarded for its failure.  Thousands of cases remain unresolved, and litigation remains for thousands of plaintiffs who have completed discovery through the MDL "Waves."  Most settlements were wholly inadequate, considering the seriousness and permanence of their injuries and the courtroom track record of verdicts for these cases. The per case settlement average is approximately $40,000 while the average trial award has been approximately $9,800,000.  Despite puny case settlement values, the Common Benefit Fund currently has $366 million to be distributed among 94 firms simply because of the large number of cases filed.

The current assessment and proposed common benefit fee is too high at 5%.  Part of the evidence for that conclusion is that a few firms seek to grab 2/3 of a fund that now exceeds $350

million and is expected to grow to $550 million. Given the paltry recoveries for the injured women in this successful-in-the courtroom, surrender-at-the-settlement-table mass tort, it is more equitable for the common benefit fee to be half of the requested amount and to remit their proportionate share of these saved funds to the injured women. Thus, the proposed allocation is directly relevant to the proposed assessment — and both are wrong.

Second, the FCC's petition for a 5% fee assessment should be denied as the FCC's allocation would result in critical work for the common benefit going uncompensated while the FCC's member firms are overcompensated. On September 13, 2018, the FCC made its initial recommendation for common benefit fee allocation, and Kline & Specter objected as most of its hours submitted for the state litigation were not considered and the FCC-member firms were significantly overcompensated. *See* Objection of Kline & Specter, P.C. to the Transvaginal Mesh MDL Common Benefit Fee and Cost Committee Preliminary Written Recommendation, attached hereto as Exhibit "C." at pp. 2-3. Despite assurances to the contrary by this Court and the FCC, the FCC has refused to recognize thousands of hours of state court litigation common benefit time. The state court trials have been essential to the overall success of the transvaginal mesh litigation as they resulted in substantial plaintiffs' verdicts and created comprehensive trial packages for benefit of all pelvic mesh plaintiffs. The state court awards will also be assessed the 5% fee, resulting in firms who did this critical work being overcharged at the 5% rate without proper recognition of the thousands of hours that were spent performing this work for the common benefit. The Court should deny the fee petition where the proposed fee allocation amongst the Plaintiffs' Participating Counsel is so heavily skewed in the favor of the FCC-member firms.

Third, the FCC's petition should also be denied as its proposed fee allocation is based on no apparent methodology and fails to provide for reasonable compensation for the majority of the

Plaintiffs' Participating Counsel. The September 13, 2018 FCC Preliminary Recommendation and the November 18, 2018 FCC Final Recommendation do not take into consideration the participating firms' lodestars. The lodestar calculation method seeks to prevent attorneys' fees windfalls in mass tort and class action litigation where there is the potential for enormous common benefit fees (due to many plaintiffs) despite limited work performed by the attorneys. Further, the *Johnson* factors articulated by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978) support Kline & Specter's position that the FCC's recommended allocation is biased and inappropriate. As the FCC's preliminary recommendation does not provide a valid lodestar calculation or crosscheck, the petition for the 5% fee must be denied.

The Common Benefit Fee percentage should be reduced and the excess money returned to the plaintiffs and their law firms.

## II.   ARGUMENT

An award of attorney fees is committed to the sound discretion of the district court. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999). However, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 730 (3d Cir. 2001) (quoting *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999)). The "appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, --- F.3d ---, No. 07-30384, 2008 WL 287347, at *4 (5th Cir. Feb. 4, 2008).

### A.   As Plaintiffs' Participating Counsel, Kline & Specter Has Not Waived Its Right to Object to the Common Benefit Fee Petition

Firms cannot be held to a waiver of appeal of the Common Benefit Fee petition and individual firm award where these petitions are based on a lack of transparency, failure to comply with the underlying agreement for recognition of common benefit work, self-dealing, and disparate treatment between FCC member and non-member firms.  On October 4, 2012, the Court entered the "Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues," which set forth the procedures, guidelines, and limitations for submission of applications for reimbursement for common benefit fees and expenses. *See e.g.* PTO No. 18 MDL 2237.   Part of this Order stated  that the Court will have "final, non-appealable authority regarding the award of fees, the allocation of those fees and awards for cost reimbursements in this matter" and they "have (or will have) agreed to and therefore will be bound by the court's determination on common benefit attorney fee awards, attorney fee allocations, and expense awards, and…knowingly and expressly waive any right to appeal those decisions or the ability to assert the lack of enforceability of this Agreed Order or to otherwise challenge its adequacy." *See* PTO No. 18 at p. 6.

Kline & Specter entered this MDL when it was believed that this would be a fair and transparent process and the work performed would be justly compensated – especially the work performed in state court.  However, the eight law firms on the FCC have ignored the Court's directive "for the fair and equitable sharing among plaintiffs' counsel of the Common Benefit Fund," and have brazenly issued a preliminary recommendation awarding themselves $249 million of the $374 million to be distributed, or a staggering 2/3 of the fund.  This is an average award of $28,739,750 per FCC firm.   On their face, these numbers taken together with the scant information available from the FCC, indicate that the most heavily weighted achievement in the FCC's calculus

was not the trial victories, key depositions, or the other critical work for the success of the overall litigation, but, rather, appointment to the FCC.

The FCC has insulated its actions to date by rejecting all requests for production of important documents necessary for Kline & Specter, and others, to fairly address the FCC's decisions, including its preliminary recommendations. This documentation would give the underlying basis for the FCC's allocation, and disclose potentially problematic factors such as financial relationships between FCC members, if any. Based on the limited documentation available, the FCC appears to have chosen to award only a fraction of the non-FCC member firms' hours and lodestar, with no multiplier enhancement. At the same time, it suggests that its own members be grossly over-compensated. 94 firms submitted fee applications.  It also appears that the FCC recommended that its eight member-firms receive awards with an estimated average fee award of **$28,739,750** and an estimated average hourly rate of **$739.75** – well over the average hourly rate applied to non-member firms' hours.  In comparison, Kline & Specter received an hourly rate of $116.  These numbers are glaringly suspect on the surface.

### B. The PSC's Work Did Not Result in a Global Settlement, and the Settlements that Have Occurred Have Inadequately Compensated Plaintiffs

A five percent fee assessment is unwarranted when there was no global settlement and the work performed by the PSC did not actually contribute to the common benefit of all transvaginal mesh MDL plaintiffs in the resolution of their cases.  Throughout its Petition, the FCC refers to "the" settlement insinuating that there was one singular settlement to benefit all claimants.  *See, e.g.,* FCC Petition at p. 23.  This is fundamentally untrue.  The cases that have resolved by settlement are the result of hard-fought individual negotiations by the plaintiffs' firms, and thousands of cases are currently pending with extensive discovery and case work-up still to be completed.

The FCC states that part of the analysis in accessing the requested percentage fee is whether the "requested percentage fee is in line with other fee awards in similar litigations." *See* FCC Petition at p. 24.   However, the majority of the "similar litigations" cited by the FCC in its Petition resulted in either global settlements or court ordered damages applicable to an entire class, neither of which have occurred in the transvaginal mesh litigation. For example, the FCC cited the following litigations:

- *In re Vioxx Prods. Liab. Litig.*, **760 F. Supp. 2d 640 (E.D. La. 2010)** "The next task is to determine an initial benchmark percentage. The Court's goal in setting a benchmark percentage is not to rubber-stamp the PLC's proposed figure. Rather, the Court will endeavor to arrive at an independent and justified reasonable percentage appropriate to the facts particular to this **global settlement**." *Id.* at p. 652.

- *In re Actos (Pioglitazone) Prods. Liab. Litig.*, **2017 WL 3033134 (W.D. La. 2017)** "It is of note that the initial status conference the Court conducted with counsel was on March 22, 2012; the **Master Settlement Agreement** ("MSA") that ultimately resulted in the **global settlement** of approximately 11,000 claims for $2.4 billion was signed and submitted to the Court by the parties on April 28, 2015" *Id* at p. 503.

- *Barber v. Kimbrell's, Inc., 577 F.2d 216* **(4th Cir. 1978)** The district court certified a class consisting of plaintiff and persons who entered into add-on credit transactions at Kimbrell's downtown Charlotte furniture store. It ruled that Kimbrell's and its corporate parent were liable under the Act to plaintiff and the members of the class and, proceeding non-jury, it assessed **statutory damages in the amount of $100,000** plus costs and attorneys' fees. Barber v. Kimbrell's, Inc., 424 F.Supp. 42 (W.D.N.C.1976)." *Id.* at p. 218.

- *Good v. West Virginia-American Water Co.*, **2017 WL 2884535 (S.D.W. Va. 2017)** "In late October 2016, on the eve of the Phase I fault trial in this court, the parties participated in extended settlement negotiations. **These negotiations resulted in settlements** with Eastman and WV American Water that were memorialized." *Id.* at p. 2.

- *In re Syngenta AG MIR 162 Corn Litig.*, **2015 WL 2165341 (D. Kan. 2015)** In a nationwide class action, Syngenta paid a **$1.51 billion settlement** to U.S. corn farmers, grain handling facilities and ethanol plants. The settlement covers corn priced after September 15, 2013.

All farmers are eligible for the settlement, including those who might have opted out of previous Syngenta lawsuits.

▪ ***NuvaRing In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959 (E.D. Mo. 2014)** "Thereafter, the Special Master was to make recommendations, with input from Co–Lead Counsel, focusing on the quality of the work performed as well as the value of the work performed that achieved the global settlement, and that simply multiplying the hours logged by a rate (although to be considered) would not be controlling of the fee recommendation.in Term Sheets lodged with the court on October 25 and October 31, 2016, respectively (ECF Nos. 1096, 1108)." *Id.* at p.1.

The absence of a global settlement is evidence of the fact that much of the work performed by the PSC was not truly work for the "common benefit." Some settlements were largely driven by the financial status of the manufacturer defendant, the manufacturer defendant's wish to avoid discovery, and the discovery schedules set by the Court's "waves." For example, American Medical Systems ("AMS") cases were settled at an early stage because of the perceived financial condition of the company, and Coloplast and Covidien entered into an early settlement program whereby no discovery was ever conducted in the MDL. Where no global settlement occurred, and the MDL cases were resolved through individual firms' private negotiations, a common benefit fee assessment of five percent of the overall settlement value is excessive.

Some good was done for the common benefit. Some good discovery was taken, and trial success was impressive. But this was over shadowed by the poor per client results. Verdicts prove that this is the most successful mass tort products litigation in history – this was not born by the settlements, which were puny by comparison. There have been $304,284,443 in total verdicts for an average of $9,815,627 award per case, including the seven defense verdicts. *See* TVM Trial Awards Spreadsheet, attached as Exhibit "E." Yet, the per case settlement average is approximately $40,000. The settlements were wholly inadequate for many of plaintiffs, considering the seriousness and permanence of their injuries and the courtroom track record of verdicts for these cases. These settlement results should not be rewarded.

8

In fact, the leaders of this litigation did the worst possible thing to the detriment of all plaintiff mesh victims and their attorneys: they settled their inventories way too cheaply, making it difficult for other attorneys to settle their cases reasonably. They did this despite the huge verdicts in the vast majority of mesh trials. These discounted settlements were driven by the sheer enormity of the number of claims and the inability of lawyers to discover and try hundreds of thousands of cases in their inventory.

Leadership, including the FCC members, took too many individual cases and could not or would not discover them all, try the cases or send them to lawyers who would. They should not be rewarded for their small settlements of large numbers of cases, providing large fees for them and small and inadequate compensation to their clients, the women who have suffered at the hands of the mesh manufacturers. Leadership's conduct also poorly served the other plaintiff's mesh lawyers who are now doubly punished by the proposed allocation of the bulk of the common benefit fee to these same underperforming leaders.

While Kline & Specter has requested specific information regarding the total amount of all settlements, this information has not been provided. The FCC's Petition fails to state the total number of cases settled, the total number of cases settled per manufacturer, each manufacturer per case settlement average, the results of the verdicts, the claimed and allowed lodestars per firm, and/or claimed and allowed blended hourly rates per firm. It also fails to state each firms' settlements with each defendant. In sum, it fails to provide the most basic facts necessary to assess the quality of results of the leadership of this litigation. The omissions are the telling Rosetta Stone of the unsuccessfulness of this litigation. Discovery on these issues is needed. Such discovery has been propounded. *See* Exhibit "D."

It's been an open secret in this litigation that "leadership" took too many cases to effectively litigate themselves. By doing so and by not associating other lawyers to help discover and try their cases, they were forced to settle. This wasn't bad for "leadership" because a large number of small fees on small settlements is still a large number. But it mistreated the women they represent. And it mistreated the other plaintiff's counsel who were stuck behind this low bar set by leadership. And it treated way too well the manufacturers of these defective medical devices, who got off way too easy because, ironically, they hurt so many women that their victims' lawyers chose mass settlement over individual justice.

This result was doubly painful and, again, ironic given the phenomenal success these cases enjoyed in the courtroom. Thus leadership snatched defeat from the jaws of victory. They should not be rewarded once more by a substantial percentage common benefit fee on a very large number of cases where their strategy and tactics did not commonly benefit the other plaintiff attorneys and nearly all the injured women.

C.     **The FCC's Recommended Allocation of the 5% Common Benefit Fee Would Result in Critical Work Going Uncompensated**

1.     **The FCC has Essentially Ignored the State Court Litigation and Its Importance to the Entire Transvaginal Mesh Litigation**

Thousands of hours of work done in the state court litigations that went unrecognized by the FCC despite firms being assured that this work would be compensated. In a February 11, 2016 email from Kline & Specter partner and PSC member, Lee B. Balefsky to FCC Chairperson, Henry G. Garrard, III, Mr. Balefsky confirmed the following:

> Henry, thank you for hosting the meeting yesterday in Atlanta. One of our major concerns is the compensation for state court litigation common benefit work. This will confirm that you agreed that such work will be compensated and included in the process. We look forward to working with the committee.

*See,* February 11, 2016 email, attached hereto as Exhibit "F."

No reply disputing this arrangement was sent or received. The recent statement by the FCC that only the first product trials would be recognized is an improper, after-the-fact attempt to change the agreement.

Not only did the FCC ensure that state court work would be compensated but so did this Court. In PTO No. 18, Judge Goodwin stated:

> Common benefit work performed in state court litigation — whether the proceedings are consolidated or not — should be considered to the extent it contributed to the outcome of the litigation and benefitted the MDL. The Court recognizes, particularly to the extent there are agreements between state court attorneys and MDL leadership, that state court attorneys may make an application for common benefit fees and expenses to be fully considered by the FCC. In order for an attorney's work in state court litigation to be considered for payment from the Common Benefit Fund, settlements from the requesting attorneys must include the five percent assessment.

Additionally, PTO No. 262 (the <u>Fee Committee Protocol</u>) recognized that state court work would be considered. *See* PTO 262, at p. 5.

Despite these assurances, the success of the state court litigation has been ignored in the FCC's recommended allocation. Attorneys from Kline & Specter, in some cases with partnering firms, have successfully obtained five (5) verdicts totaling over $110 million:

a. *Hammons v. Ethicon*, No. 130503913, Pa. Comm. Pls., Philadelphia Co. (2015): **$12,500,000 verdict.** ($5.5 million in compensatory damages, $7 million in punitive damages.) Prolift.

b. *Carlino v. Ethicon,* Case No. 130603470. Pa. Comm. Pls., Philadelphia Co. (2016). **$13.5 million verdict**. ($3.25 million in compensatory damages for Mrs. Carlino, $250,000 to Mr. Carlino for loss of consortium, and $10 million in punitive damages.) TVT.

c. *Engelmann v. Ethicon*, Case No. No. 140305384. Pa. Comm. Pls., Philadelphia (2017). **$20 million verdict**. ($2.5 million in compensatory damages and $17.5 million in punitive damages.) TVT Secur.

d.  *Beltz v. Ethicon,* Case No. 130603835, Pa. Comm. Pls., Philadelphia Co. (2017).
   **$2.16 million verdict**. ($2.16 million in compensatory damages) Prolift.

e.  *Ebaugh v. Ethicon*, Case No. 130700866. Pa. Comm. Pls., Philadelphia Co. (2017)
   **$57.1 million verdict**.  ($7.1 million in compensatory damages and $50 million in
   punitive damages.) TVT and TVT Secur.

Beyond the sheer enormity of these verdicts, Kline & Specter's success in the Philadelphia
Court of Common Pleas has been essential to the litigation by driving Ethicon to settle cases,
bolstering trial packages, bringing about key rulings, and simply weakening Ethicon's ability to
fight the cases across the country.

Kline & Specter and its clients have contributed over $5,000,000 to the Common Benefit
Fund as a result of its settlements and the state court litigation so far, yet the majority of these
hours spent achieving these results have not been recognized by the FCC, despite Kline &
Specter's reliance on the assurance of the FCC and this Court. Ironically, the FCC seeks fees for
coordinating with state courts but does not want to pay the firms that did the work and
accomplished the success through the state litigation. If Kline & Specter is to collect all of its
clients' verdicts, the common benefit fund will receive an additional approximately $5 million plus
the 5% fees on all of the firm's unsettled cases. At the current rate this will likely equal an
additional $8 to $12 million in assessment fees paid. Thus, even if all Kline & Specter's time is
recognized, the fund will still benefit financially from the work of Kline & Specter attorneys. The
FCC's failure to consider this critical work supports reducing the Common Benefit Fee percentage
to a more reasonable number given the limited work the FCC has considered as work for the
common benefit.

> **2.**   **The Recommended Allocation is Skewed in Favor of the FCC's Members by Unequally Compensating Only Certain Work Done in the Litigation**
>
> >  **i.**   **Compensation for the Covidien and Coloplast Litigation is Improper as No Common Benefit Work was Generated**

The FCC's recommended allocation provides for compensation in the Covidien and Coloplast litigations where **no discovery was conducted in the MDL** and, thus, no common benefit work could have been completed.  Defendants Coloplast and Covidien entered into an early firm by firm settlement program. However, a 5% fee was assessed for these settlements.  This is improper.  The TVM Historical Analysis that was prepared by FCC Member Firm Motley Rice contains several break-downs of the time entries that had been submitted through August 24, 2016.  *See* TVM Historical Analysis, attached hereto as Exhibit "G.".  The TVM Historical Analysis shows Riley Burnett's law firm submitting a mere 1,662.80 hours and $10,941.33 in expenses, most of which were in the Coloplast MDL where no true discovery took place. Yet, in the initial FCC recommendation, the Burnett Law Firm was compensated for a total of 10,490.35 hours. This is fundamentally wrong and any proposed distribution of funds regarding Covidien and Coloplast should be returned in full to the clients and the firms who negotiated the settlements.   Furthermore, the favorable treatment of FCC member Riley Burnett's law firm provides another troubling example illustrating the need for full transparency in the fee allocation process.  There should be no Common Benefit Fee for Coloplast and Covidien.

> >  **ii.**   **The Recommended Allocation Fails to Consider Critical Expert Development by Other Firms**

In their Petition, the FCC emphasizes their own contributions to MDL discovery in this litigation with close to zero regard for the important work performed by other firms.  Specifically, the FCC focuses throughout their Petition on their "expert development":

> The scope and complexity of these MDLs also complicated expert discovery. Plaintiffs' leadership was required to identify and cultivate general experts from an array of scientific and medical fields, from biomaterials, pathology, physicians (including pathologists, pelvic pain specialists, urologists, gynecologists and Female Pelvic Reconstructive Surgeons) to regulatory.

*See* FCC Petition at p. 8. However, the FCC member-firms did not perform this work alone. Kline & Specter attorneys helped develop the experts who proved valuable throughout the pelvic mesh litigation and were utilized by other participating attorneys and firms. Utilizing their medical, scientific and bioethics training, Kline & Specter attorneys, including physician-attorneys, committed extensive time working with experts to develop expert reports, prepare for depositions and trial testimony, and hone and improve their impact upon this litigation.

Additionally, Kline & Specter attorneys developed as many as 40 experts in wave processes. Kline & Specter has offered to share the work done regarding these experts. This appreciable work was not recognized for compensation. It is inherently unfair that this comparable work was not recognized and compensated in a similar manner.

### iii. The Arbitrary Cutoff Date for Common Benefit Work Results in Significant Contributions to the Litigation going Uncompensated

The FCC set deadlines as the cut-off for common benefit work to be compensated. These deadlines were arbitrary and selected for when the "Plaintiffs' Leadership" had completed its work without regard for continuing work by others. Thousands of cases remained unsettled as of the cut-off dates and thousands remain unsettled now.

As discussed *supra*, Kline & Specter's *Engleman, Beltz,* and *Ebaugh* cases resulted in significant verdicts after January 1, 2017 – the Ethicon cut-off date. These large verdicts only drove further settlements, contributed to refining the trial packages, obtained positive verdicts useful to all Plaintiffs, and overall continued the established success of Kline & Specter's work in

14

the PCCP. *Engleman v. Ethicon* was the first TVT-Secur case to be tried to a jury verdict and it resulted in a $20 million verdict ($2.5 million in compensatory damages and $17.5 million in punitive damages). This was the third straight loss for Ethicon in the Philadelphia litigation. *Engleman* served as an important reminder to Ethicon that the PCCP cases would continue to be a major threat to the defendant in the pelvic mesh litigation. In May 2017, Kline & Specter attorneys tried the second Prolift trial in the PCCP, *Beltz v. Ethicon*. The jury awarded Mrs. Beltz $2.16 million in compensatory damages. In September 2017, Kline & Specter represented Plaintiff, Ella Ebaugh, through a five-week long trial in *Ebaugh v. Ethicon, Inc.*, a case involving both the TVT and TVT-Secur devices. Through the *Ebaugh* trial, Kline & Specter attorneys obtained the largest verdict against Ethicon to date: $57.1 million ($7.1 million in compensatory damages and $50 million in punitive damages).

While the FCC will continue to collect the five percent assessment fees for this significant work regarding these trials, there has been no indication of payouts or whether any of these hours will ever be recognized by the FCC. Furthermore, Kline & Specter is currently in the middle of the most considerable Wave discovery of this litigation. However, while undetermined, these hours may not be recognized by the FCC while they record their own similar work. Thus, the FCC member-firms are charging for Wave discovery but non-FCC member firms may not be compensated due to arbitrary cut-off dates despite performing the same work as the FCC member-firms in Wave discovery.

### D. The FCC's Apparent Methodology is Improper and Should Utilize a Lodestar Calculation

In calculating the recommended fees to be awarded to all firms, the FCC utilized an unreliable methodology, refused to disclose how work and hours were assessed, and failed to perform a lodestar crosscheck to ensure the reasonableness of the requested fee. For the reasons

stated herein and in its previously filed objections, Kline & Specter opposes the use of the illegitimate methodology employed by the FCC in its recommended allocation.

In *Barber v. Kimbrell's, Inc., 577 F.2d 216* (4th Cir. 1978), the Fourth Circuit considered attorneys' fees in a consumer class-action action lawsuit and recognized that a number of circuits follow the lead of the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974), requiring that the district courts are to consider and make detailed findings with regard to twelve factors relevant to the determination of reasonable attorneys' fees. The *Barber* court held that any award must be accompanied by detailed findings of fact with regard to the factors considered. *Id.* at 226. *Barber* further recognized that a number of reported district court decisions from the Fourth Circuit have already utilized the *Johnson* guidelines in making an attorneys' fee award. *See, e. g., Sherill v. J. P. Stevens*, 441 F.Supp. 846 (W.D.N.C.1977); *Phillips v. Moore*, 441 F.Supp. 833 (W.D.N.C.1977); *Younger v. Glamorgan Pipe and Foundry Co.*, 418 F.Supp. 743 (W.D.Va.1976), vacated on other grounds, 561 F.2d 563 (4 Cir. 1977). *See Barber* at p. 226, Fn. 29.

> The *Johnson* factors recognized by the *Barber* court are the following:
>
>> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber* at p. 226, Fn. 28.

The *Johnson* factors illuminate the unreasonableness of the FCC's recommended allocation. As explained above, Kline & Specter expected at the outset of the litigation that state

court work would be recognized as part of the common benefit. This, apparently, was not the case, and the Kline & Specter ultimately expended thousands of hours pursuing state court trial verdicts that would be ignored by the FCC. The amount in controversy and the results obtained also indicate that a five percent assessment is too high. Tens of billions of dollars were generated by this litigation, but the results for individual plaintiffs were extremely poor. One need only consider the disparity between the average settlement amount ($40,000) and the average trial verdict ($9,800,000) to see that the results obtained were disappointing.

Courts have used several techniques for calculating the award of attorneys' fees – none of which have been used by the FCC here. The two primary methods for determining a common fund fee award are the percentage-of-fund method and the lodestar method. *In re Cendant Corp.*, 243 F.3d at 732 (3rd Cir. 2001). Whichever method is used, "any given attorney should receive neither too little nor too much of an award as compensation for the common benefit he conferred upon the class as a whole*." In re Sulzer Hip Prosthesis* and *Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003).

This is also the law within the Fourth Circuit, where courts calculate fee awards based either on the percentage-of-fund method and lodestar methods. *In re Royel Ahold N.V. Securities & ERISA Litigation*, 461 F.Supp.2d 383, 385 (D.Md.2006); *Teague v. Bakker*, 213 F.Supp.2d 571 (W.D.N.C.2002); *In re Microstrategy Inc.*, 172 F.Supp.2d 778(E.D.Va.2001). Furthermore, Courts within the Fourth Circuit have combined the two methods and implemented the use of a "percentage of the fund" method with a "lodestar crosscheck." *In re Royal Ahold N.V. Securities & ERISA Litigation*, 461 F.Supp.2d 383, 385 (D.Md.2006). This method has the ultimate goal of the determination of a "reasonable" fee, and this Court should consider both the percentage of the fund method and a lodestar crosscheck.

This Court in *Jones v. Dominion Resources Services, Inc.* stated that the lodestar method can counteract the anchoring effect of a percentage fee request. Because courts tend to deviate only slightly from the requested percentage amount, plaintiffs' counsel can effectively manipulate the fee award they are likely to receive by simply requesting a higher percentage. The lodestar method, and the use of it as a crosscheck, provides courts with an objective fee amount with which to compare the requested fee. The lodestar method can also guard against attorney windfalls. *Jones v. Dominion Resources Services, Inc.*, 601 F. Supp. 2d 756, 759 (S.D.W. Va. 2009)(internal citations omitted).

The FCC's fee recommended allocation is unreasonable, and it is clear that its methodology was severely flawed. On November 20, 2018, the FCC filed its Final Written Recommendation, and in it the FCC admits that not all submitted hours for the common benefit had equal value. *See* November 20, 2018 Final Written Recommendation of the Common Benefit Fee and Cost Committee Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs, at pp. 32-33. This admission suggests that there was some undisclosed multiplier applied, of which there is no explanation – a so called "silent multiplier."

After review of the scant information provided, it is apparent that several attorneys /firm's average hourly rates are unreasonably high, including the rates for the eight FCC member-firms. There is no reasonableness to the differing hourly rates that were applied to participating firms. Additionally, in its November 20, 2018 Final Recommendation, the FCC modified several firms' awards from the initial awards presented in the FCC's September 13, 2018 FCC Preliminary Recommendation with no explanation. *See* FCC Awards Final Excel, attached hereto as Exhibit "H." The differing fee allocations resulted in an increase of $6,346,409.65 of common benefit

fees awarded in the Final recommendation. No explanation was given as where this money came from or the reasoning behind its seemingly arbitrary distribution.

The FCC's recommended allocation demonstrates an improper fee assessment that is similar to common benefit fee allocations that have been heavily scrutinized by the courts in other mass tort litigations. In *High Sulfur,* the Fifth Circuit forecast the issues presented here – especially those issues concerning the lack of transparency regarding the FCC's methodology in determining attorney's fees. *In re High Sulfur Content Gasoline Products Litig.,* 517 F.3d 220 (5th Cir. 2008). There, a plaintiffs' steering committee made a recommendation regarding allocation of common benefit funds to a district court in an *ex parte* proceeding. The district court adopted the recommendation with basically no analysis, and then sealed all records describing the recommendation and its bases. The Fifth Circuit vacated and remanded. *See id.* at 224-26. The Court explained that while a district court may appoint a committee to recommend allocation of an aggregate fee award, "the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *Id.* at 227. Such close scrutiny "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class" and "deflect[ing] the potential public misunderstanding that they may cultivate in regard to the interests of class counsel." *Id.* (citations and internal quotation marks omitted).

The Fifth Circuit court criticized the district court for sealing record entries that made it impossible for attorneys to understand the basis upon which fee recommendations had been made. Here, this Court has sealed no documents but has thus far not permitted discovery on these issues. As of this writing, the FCC has refused to disclose the methodology used to assess the fee

requests from different law firms.  It has further refused to provide requested information on how it developed its methodology or determined how specific hourly rates were determined.  These refusals by the FCC highlight the Fifth Circuit's observation that "[t]he lack of transparency about the individual fee awards supports a perception that many of these attorneys were more interested in accommodating themselves than the people they represent." *Id.* at 229. As the Court also concluded, without full transparency about a fee committee's process, attorneys cannot "compare their awards to those of other attorneys .... One cannot compare apples to oranges without knowing what the oranges are." *Id.* at 232.

The established methodology for determining attorney's fees, including the lodestar crosscheck and the *Johnson* factors, has been set in place by the courts to ensure fairness and reasonableness.  The FCC has not employed the established methodologies and its recommended attorney's fees reflect that.  There is nothing "reasonable" the FCC awards itself 2/3 of the total aggregate fund for an average payout of over $28,739,750.   There is nothing reasonable about the 8 FCC member-firms receiving an average of $739/hr while the remainder of the participating firms were awarded a mere average of $251/hr.

In addition to the fact that the FCC's recommendations rely on a methodology with no precedent in any relevant case law, the FCC also has provided no justification or supporting documents supporting its conclusions, which remain secret to everyone except the FCC's members. The awards cannot meaningfully be compared to one another.   The FCC's recommendations not only violate substantive law, but basic principles of transparency and fairness.

Rather than working within the established jurisprudence, the FCC replaced it with an unvetted, unvalidated and untested system.  *High Sulfur* says that lodestar is the touchstone of

fee allocation. So did the Court in *In re Royal Ahold N.V. Securities & ERISA Litigation*, 461 F.Supp.2d 383, 385 (D.Md.2006). So has every other court to consider this issue. The FCC's system violates all fee jurisprudence on this subject.

Lessons learned from a similar fee dispute in the *Vioxx* litigation illustrate the need for a fair and transparent process to avoid the complexities of inevitable litigation should this information be withheld. *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657. The *Vioxx* personal injury litigation resulted in a $4.85 billion settlement, of which over $315 million was allocated to pay attorneys for their common benefit work. Similar to the current issues in the Pelvic Mesh Litigation, significant problems plagued the management and distribution of the common benefit fund. Those problems arose because that fee committee proposed fee allocations through a seemingly arbitrary approach that favored insiders and sought to purchase peace through covert negotiation. *See* Charles L. Becker, Shanin Specter, & Thomas R. Kline, How Not to Manage a Common Benefit Fund: Allocating Attorney's Fees in Vioxx Litigation, 9 Drex. L. Rev. 1 (Fall 2016), p. 2. Such negotiations have apparently occurred here too. Originally, there were twenty-four objecting firms. This number has been reduced to thirteen. *See* November 19, 2018 Declaration of Henry Garrard at p. 32, attached hereto as Exhibit "I." Who was paid how much and by whom? This should all be disclosed.

The FCC refuses to produce the requested documents and information that would allow firms to review the methodology used by the FCC in determining fees. Although Kline & Specter has not viewed the intermediate steps taken by the FCC, it can see the final result. The FCC's fee recommendations are the ultimate test of whether its system produces proportionate results. Manifestly, it does not. It has produced wildly disproportionate results that award

2/3rds of all fees to the FCC's eight firms. And it has done so in a radically nontransparent way.

The FCC admits its shortcomings as much in their Petition, noting throughout that the use of lodestar should be used as a cross-check for the reasonableness of the percentage. *See* FCC Petition at pp. 20-21. However, they have not adequately done so. Instead, the FCC appears to have chosen to award only a fraction of the non-FCC member firms' hours and lodestar, with no multiplier enhancement. Given the lack of transparency in the FCC dealings, the massive imbalance of awards, and the fact that all of the largest awards are remarkably round numbers, including all of the FCC member firms' allotments, there are strong reasons to suspect that the FCC has arbitrarily determined the shares.

## III.   CONCLUSION

For all the reasons described above, Kline & Specter respectfully requests that the five percent common benefit fee be halved, this half returned to the plaintiff's and their firms and the fee allocations readjusted as demonstrated herein to properly reflect the level of work performed by Kline & Specter and others. In addition, there should be no Common Benefit Fee for Coloplast and Covidien.

Respectfully Submitted,

**BOWLES RICE, LLP**

By:   /s/ Floyd E. Boone Jr.
Charles M. Love, III (WVSB 2254)
Floyd E. Boone Jr. (WVSB 8784)
600 Quarrier Street
Charleston, WV 25301
(304) 347-1100 (Tel.)
(304) 347-1746 (Fax)
fboone@bowlesrice.com
*Counsel for Kline & Specter, P.C.*

**KLINE & SPECTER, PC**

By:

Shanin Specter, Esquire
Lee B. Balefsky, Esquire
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
*Counsel for Plaintiffs*