**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| **IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2187** |
| **IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2325** |
| **IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2326** |
| **IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2327** |
| **IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2387** |
| **IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** | **MDL No. 2440** |
| **IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION** | **MDL No. 2511** |

**THIS DOCUMENT RELATES TO ALL CASES**

**COMMON BENEFIT FEE AND COST COMMITTEE'S REPLY IN SUPPORT OF ITS
PETITION FOR AN AWARD OF COMMON BENEFIT
ATTORNEYS' FEES AND EXPENSES**

**I.      INTRODUCTION.**

This historic litigation, which began in this Court more than eight years ago, ultimately

grew to include over 100,000 plaintiffs and spanned defendant and product lines.  The tens of

thousands of plaintiffs in this litigation were, in turn, represented by an array of hundreds of

lawyers and law firms from throughout the country.  As noted in the FCC's Final Written

Recommendation for Allocation, which Kline & Specter, P.C. ("KS" or "Kline & Specter") chose to file with its Response (Ex. B to KS Response), 94 law firms from across the United States – including KS – ultimately submitted time and/or expenses for consideration by the FCC for common benefit reimbursement.  Out of the hundreds of attorneys and law firms in this litigation, and the firms who performed common benefit work recognized by the FCC, only one firm has filed an opposition to the Court's award of the 5% fee and expense set-aside: Kline & Specter. The reason that Kline & Specter is alone in its objection is that its arguments are entirely self-interested and self-serving based solely upon its desire for an increased allocation, in addition to lacking in factual or legal support.

## II.     ARGUMENT AND AUTHORITY.

### A.     Nearly the entirety of Kline & Specter's Response is improperly devoted to challenging the separate and distinct proposed allocation of fees, which is not yet before the Court, rather than the issue that is before the Court regarding the aggregate 5% award for fees and expenses.

While casting aspersions as to the common benefit work before this Court, the true motivation of this Response is self-evident: KS believes it should receive more money from the common benefit fund while others (the FCC and MDL leadership) should get less.[1]  Indeed, the entirety of Sections A, C and D and much of the Introduction of KS's Response are devoted solely to complaining about the methodology and results of the FCC's proposed allocation of fees – *not the aggregate fee and expense award at issue here*.  KS improperly seeks to conflate these two separate and distinct issues.  The FCC will not attempt to address the myriad arguments addressing

---

[1] This Response is merely the latest in a series of collateral attacks on the common benefit process that serves no purpose other than to vent its displeasure with its proposed allocation, in blatant disregard of well-established principle of law that a "request for attorney's fees should not result in a second major litigation." *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

the proposed allocation process or methodology because those arguments are irrelevant to the Court's analysis here.[2]

According to KS's Response, the FCC's recommended allocation of the common benefit fund – which is now before the External Review Specialist and is not yet before this Court – would somehow support a finding that a 5% common benefit fee and expense award is too high.[3]  The fundamental logical flaw inherent in KS's position is plain: the reasonableness of an aggregate award for common benefit fees and expenses has nothing at all to do with how that award may ultimately be allocated amongst counsel.  KS has had ample opportunity to object to the FCC's initial proposed allocation (and has done so), and it will have additional opportunities to object before the External Review Specialist and also to this Court. However, the issue of how a fee award may be allocated between common benefit counsel is separate and distinct from the analysis

---

[2] While not relevant to the Court's analysis of the 5% fee and expense award, the FCC feels compelled to point out certain misstatements in KS's Response.  For example, KS falsely states that its "hourly rate" is $116.  While the FCC did not employ rates or multipliers in its recommended allocation, KS was credited with 9,402.19 common benefit hours and its recommended allocation is $3,745,000.00 (plus reimbursement of the firm's $350,000.00 in assessments and $667,584.48 in expenses).  Using KS's reverse calculation, this equates to a rate of $398.31/hour. KS also inaccurately states the hours submitted by the Burnett Law Firm in an attempt to discredit the FCC's analysis of time submitted.  As identified in the FCC's Final Written Recommendation, 9,004.1 hours submitted by Burnett Law Firm were originally submitted jointly by the Potts Law Firm and the Burnett Law Firm for the time period of June 2012 through December 2013. The joint time submitted was originally credited solely to Potts Law Firm. During the self-auditing time period, Potts Law Firm and Burnett Law Firm agreed to transfer 9,004.1 hours of the jointly-submitted time from Potts Law Firm to Burnett Law Firm with a corresponding reduction of time by Potts Law Firm.

[3] KS Response, pp. 2-3 ("Part of the evidence for that conclusion [that a 5% award is too high] is that a few firms seek to grab 2/3 of that fund…."; "[T]he FCC's petition for a 5% fee assessment should be denied as the FCC's allocation would result in [KS's] critical work for the common benefit going uncompensated while the FCC's member firms are overcompensated."); KS Response, Section A (arguing non-waiver of ability to contest FCC's recommended allocation of common benefit fees); KS Response, Section C ("The FCC's Recommended Allocation of the 5% Common Benefit Fee Would Result in [KS's] Critical Work Going Uncompensated"); KS Response, Section D (criticizing FCC's methodology used in its recommended allocation of the aggregate award, not the methodology used in the Petition now before the Court).

of the reasonableness of the fee award itself.  As recognized by the MDL court in *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563, *9 (S.D.N.Y. 2011):

> In determining reasonableness of attorneys' fees, different methodologies are used to determine a fair aggregate award versus a fair allocation of that aggregate award. Determination of a reasonable and fair aggregate award requires a measured analysis of the appropriate fees that the Court believes class counsel may charge the class…for its work in the litigation. By contrast, determination of a reasonable and fair allocation of the aggregate award requires a focus on the relative contributions of each firm. Simply put, the calculation shifts from measuring the *overall* sum of the aggregate fee award to measuring the *relative* sums of the fee allocations. (Emphasis in original). [4]

The issue of allocation of any fee and expense award is not currently before the Court. Therefore, KS's arguments that the potential allocation of the requested fee award should impact the Court's separate legal analysis of whether the aggregate fee and expense award is reasonable is meritless.  The FCC and the External Review Specialist are proceeding through the Court's Protocol regarding common benefit to deliver a recommendation to the Court.  Ultimately the decision regarding the allocation of funds is a matter solely for the Court's determination.  KS's argument that it should be allocated more money from the fund, and that others deserve less, is a separate issue for another day.

**B.    Kline Specter's claim that the 5% set-aside should not be awarded for common benefit fees and expenses incurred in this pelvic mesh litigation because there was no "global" settlement, or because the MDL settlements are "inadequate," is a hypocritical and unfounded attack.**

---

[4] *See also*, *In re Vioxx Prods. Liab. Litig.*, 760 F.Supp.2d 640, 662 (E.D.La.2010) (in order granting fee award based on applicable legal principles, the Hon. Eldon Fallon noted that allocation of fee is handled separately); *In re Vioxx Prods. Liab. Litig.*, 2014 WL 31645, *6-*7 (E.D.La.2014) (noting distinct legal analyses between aggregate fee award and allocation of fee between counsel); *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 2016 WL 6215974, *21 (E.D.La.2016) (order granting aggregate fee award based on relevant legal factors, and noting "[t]he allocation of the common benefit fee among the common benefit attorneys shall be determined at a later date….").

In Section B. of its Response, KS claims that the 5% set-aside should not be awarded for the common benefit because there was no global settlement and because it claims the settlement values were too low in comparison with certain trial verdicts. Before addressing the global settlement and inadequate settlement argument, the blatant hypocrisy of KS's argument cannot be ignored. Aside from the fact that KS itself has been a member of the cross-MDL PSC from its inception, KS's denigration of the common benefit work in this Court over the past eight years is particularly incongruous given that KS has undoubtedly been one of the primary beneficiaries of the MDL's stellar work product.[5]

In its brief, KS touts "its" success in a handful of Ethicon trials in the Philadelphia Court of Common Pleas, where verdicts were achieved.[6] Initially, the individual trial values obtained for a few state court plaintiffs is irrelevant to the Court's determination of an aggregate fee award. *In re Diet Drugs*, 582 F.3d 524, 544 (3d Cir.2009) ("What individual counsel received in a particular state case, however, is irrelevant to the fee award here, which compensates Class Counsel for services that benefitted all class members, as well as the litigants in coordinated state actions."). Moreover, KS conspicuously fails to acknowledge that its trials were founded largely upon the common benefit work in the MDL. KS's first trial was not conducted until December of 2015, which was after years of exhaustive discovery and expert development by multiple MDL firms and several trials in the MDL (and other state court venues). By the time KS tried its first

---

[5] The logical disconnect between KS's claim that the MDL settlements were "puny" and "too cheap[]," while simultaneously arguing that its trial success was a driving factor behind those settlements is obvious. (*See, e.g.*, KS Response, p. 12 ("Beyond the sheer enormity of these verdicts, Kline & Specter's success in the Philadelphia Court of Common Please has been essential to the litigation by driving Ethicon to settle cases…."), *Id.*, p. 14 ("These large verdicts only drove further settlements….")). Moreover, KS was itself part of the MDL PSC, which approved the consolidated proposal for a 5% assessment applicable to all cases, and thus, any criticism by KS aimed at "MDL leadership" is in essence an attack *on itself*.

[6] While KS does not discuss same in its Response, every case tried by KS outside of the Philadelphia state court to date has resulted in a defense verdict.

case in Philadelphia state court in December 2015, it had a detailed trial package prepared largely through tens of thousands of hours of work by dozens of lawyers in the MDL. KS had the extensive document discovery and corporate depositions that were taken by MDL leadership and others. Indeed, KS had the relevant corporate deposition designations and "cuts," along with the applicable documentary exhibits, prior to trying its first case. KS also had access to and took full advantage of the biomaterials, pathology and medical experts identified and developed by MDL leadership and others.[7]  In addition, KS had the benefit of several prior pelvic mesh trials, as well as several years' worth of illustrative motions and responses and MDL and appellate rulings related to the critical legal and evidentiary issues and expert challenges relevant to these cases. Further, while not credited in its spreadsheet summary of trial results or in its brief, KS actually involved lawyers active in the MDL leadership to help prepare its cases for trial and to actually assist in trying some of those cases. In sum, KS's trial success was founded in large measure on the MDL common benefit work product that it now seeks to disparage. KS was predominantly a consumer rather than a contributor to the common benefit.  Thus, rather than undermining the MDL's common benefit efforts, KS's trial success actually serves to underscore the tremendous value of the common work contributed by so many firms over many years in the MDL.

KS also accuses the MDL leadership of taking on more cases than they could discover and try, which it claims resulted in decreased settlement values. (KS Response, pp. 9-10).[8]  KS suggests

---

[7] Contrary to its claim in its Response that it had "developed as many as 40 experts," KS did not identify or develop any of the general experts utilized in the pelvic mesh MDL litigation (or even those used *in its own state court trials*).  In its appearance before the FCC, KS was asked directly whether it had developed any general expert and KS acknowledged that it had not but suggested that it would have if it had been asked to by MDL leadership.  Instead, KS relied on the MDL leadership and others to identify and cultivate the experts that KS used in its trials.  Having directly and materially benefited from the MDL's stellar work, it is particularly disingenuous for KS to criticize the value of that work after-the-fact.

[8] KS has previously stated in an Affidavit to the FCC that it represented over 3,000 pelvic mesh clients. While KS chastises the FCC for not disclosing all of the MDL firms' settlement values for all cases across

that because MDL leadership did not enlist the services of other firms (presumably KS) to assist in discovery and trial of their cases, "they were forced to settle." (*Id.*). This type of disparagement for the apparent sake of generating controversy is as unfortunate as it is nonsensical. Aside from the fact that KS's trial success has been largely built upon the hard work of dozens of lawyers in the MDL over many years, it is likewise a fact that KS has only tried a few of its more than 3,000 cases to date.[9] This after-the-fact claim that any firm's settlement values were negatively affected by the number of clients represented by that firm is factually groundless and patently unreasonable.

K&S's contention that only cases resolved by way of a "global" settlement can be assessed for common benefit reimbursement borders on specious. The "Agreed Order Establishing MDL…Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit," which established the 5% assessment, was entered on August 16, 2013 (hereinafter, the "Holdback Order"). Paragraph 1 of the Holdback Order provides that all "Participating Counsel" – which includes "all members of the PSC" such as KS here – "agree to pay the [5%] assessment amount … **on all filed and unfiled cases or claims in state or federal court in which they share a fee interest**."[10] The Holdback Order was

---

the entire litigation (which, other than their own, are unknown to the FCC and would be confidential in any event), it is telling that KS does not make any representation about how many of its clients' cases have been settled or its own settlement values. KS has no idea whether its clients' settlement values were any higher – or lower – than any other firm in this litigation. This is yet another unjustified attack unsupported by any facts.

[9] With over 3,000 clients and at its rate of one or two trials a year, the math is straightforward. KS's mockery of the "MDL leadership" for taking more cases than they could reasonably discover and take to trial is, like all of its other arguments, disingenuous.

[10] The Attorney Participation Agreement agreed to by KS states that "[t]his Agreement applies to each and every claim, case or action arising from the use of Mesh Products in which the Participating Counsel has a financial interest, whether the claim, case or action is currently filed in state or federal court, or is unfiled, or is on a tolling agreement (hereinafter collectively the 'Covered Claims')." (Holdback Order, Ex. A). KS acknowledges that it is bound by the Participation Agreement. *See*, 2:12-md-02387, Doc. 1006, p. 4 ("Entered by this Court on August 26, 2013, Kline & Specter, along with all other participating

approved and submitted by the Plaintiffs' Coordinating Co-Leads, Plaintiffs' Executive Committee and Liaison Counsel after consulting and obtaining approval from the Plaintiffs' Steering Committee – of which KS is a member.  As intended, this Holdback Order provided the basis for attorneys to commit significant resources and to forego other opportunities for several years to take on the intensive common benefit work on behalf of all pelvic mesh plaintiffs. *See, e.g.*, (Oct. 4, 2012 "Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues" (incorporated by reference in the Holdback Order), ¶ 3 ("For PSC counsel appointed by the court or acting under the direction of the leadership of the PSC, the recovery of common benefit time and cost reimbursements will be allowed and is essential."); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 2009 WL 6042809, *1 (W.D.Wa. 2009) ("Certain lawyers representing plaintiffs in this litigation were authorized to undertake work for the benefit of all MDL 1407 plaintiffs…. Counsel undertaking this work did so with the understanding that at the conclusion of MDL 1407, they would be reimbursed out of an account funded with a percentage of verdicts and settlements in cases associated with MDL 1407.").

KS's present contention that the Holdback Order entered more than five years ago should not apply to *any* of the tens of thousands of cases settled to date in this litigation is, in a word, frivolous.  If its approval of the very agreed order that expressly subject *all* claims to the 5% common benefit assessment were not dispositive of its belated objection, KS's failure to object to the order in the five years it has been in effect certainly does. *See In re General Motors LLC Ignition Switch Litig.*, Civil Action No. 14-md-2543, 2016 WL 1441804, at *6 (S.D.N.Y. 2016) ("Orderly litigation depends on lawyers raising issues and problems in a timely fashion; a failure to do so not only prevents a court from nipping problems in the bud, but also casts doubt on whether

---

firms, joined the Coloplast MDL Attorney Participation Agreement (the 'APA') automatically as members of the PSC.").

the alleged problems were in fact so problematic."); *In re Factor VIII or IX Concen. Blood Prod. Litig.*, 159 F.3d 1016, 1020 (7th Cir. 1998) (finding attorneys had waived their right to seek additional fees where, "[h]aving participated in the settlement proceeding and having failed to make timely objection to it, they are barred by the principles of waiver and equitable estoppel from challenging the settlement after it has become final and the defendants have paid and the class members have received hundreds of millions of dollars") (citation omitted).

In *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 870-71 (8th Cir. 2014) is instructive here. In *Genetically Modified Rice*, the Eighth Circuit affirmed the MDL court's finding that an objecting firm waived its right to challenge the application of the MDL common benefit set-aside to its clients' settlements. Although the firm had previously objected to the court's establishment of the common benefit fund and the requirement that the firm contribute to the fund, the firm chose to submit claims pursuant to the settlement agreement which provided that all payments were subject to the common benefit set-aside. By submitting claims under the settlement agreement which provided that a percentage of all payments to clients would be allocated to the common benefit fund, the Eighth Circuit held that the firm had waived its challenge to the fund and to the order that the firm and its clients must contribute to the fund. This reasoning applies even more strongly to KS in the present circumstances.

Here, unlike the firm in *Genetically Modified Rice*, KS never objected to the creation of the common benefit fund, the terms of the Holdback Order, or the application of the common benefit set-aside to cases settled outside of a "global" settlement.[11] Not only did KS fail to object to the Holdback Order for more than five years during which numerous of its own clients'

---

[11] KS did file a motion in the Coloplast MDL to exempt one of its state court settlement cases from the 5% holdback, but that motion had nothing to do with the issue of no global settlement. MDL 2387, Doc. 1029 (Feb. 3, 2017 Order on Motion on Settlement of *Senodja Jones v. Coloplast*).

payments (and payments to tens of thousands of other firms' clients) were subject to the MDL common benefit assessment, KS itself approved the Holdback Order prior to its submission to the Court – in 2013.[12]   Having supported the very order it now seeks to challenge five years after-the-fact, KS's present argument that the 5% assessment does not apply in the absence of a "global" settlement is clearly barred by waiver and estoppel.

Aside from the fact that KS has waived and should be estopped from raising any after-the-fact objection to applicability of the Holdback Order that it approved, its belated challenge is legally invalid.  In *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113 (2nd Cir.2010), the Second Circuit considered an objection by an attorney for an individual settling plaintiff to the application of the MDL set-aside to his client's case (there was no global settlement in *Zyprexa*).  In rejecting the attorney's argument regarding applicability of the set-aside to his case, the Second Circuit in *Zyprexa*, *supra* at 129-130, addressed the applicability of common benefit assessments in the context of an MDL where cases settle individually, observing instructively as follows:

> The situation is somewhat different with respect to MDLs consisting of individual cases prosecuted by individual plaintiffs, sometimes numbering in the thousands, and other litigation involving large numbers of separately represented claimants. Unlike most class actions, recoveries by individual plaintiffs or groups of plaintiffs in such matters may occur at different times, and individual plaintiffs or groups of plaintiffs, unlike most individual class members, usually are represented by individual counsel. Nevertheless, there are substantial similarities to class actions as well. As an initial matter, the efficient handling of such cases demands a similar approach to case management. District courts typically appoint a lead counsel or plaintiffs' steering committee to coordinate and conduct pretrial proceedings on behalf of all plaintiffs in order to avoid what otherwise might well become chaotic. Moreover, while individual plaintiffs are separately represented,

---

[12] Without disclosing the terms or conditions of any firm's confidential Master Settlement Agreement entered with any defendant, it is instructive to consider here that the MSAs invariably included a provision that 5% would be withheld from every payment made under the agreement and paid into the MDL common benefit fund (typically referencing the Holdback Order directly).  Thus, KS not only approved the Holdback Order, it also agreed with the defendants that 5% would be withheld from every settlement payment in accordance with the Holdback Order.

they typically benefit also—often predominantly—from the work of the lead counsel or committee.

The same equitable considerations that warrant payment of class counsel out of common funds generated by their efforts apply in these circumstances as well. The desirability—indeed, the compelling need—to have pretrial proceedings managed or at least coordinated by lead counsel or a steering or executive committee demands the existence of a source of compensation for their efforts on behalf of all. The logical, and a most equitable, source of that compensation is recoveries of individual plaintiffs who benefit from that work. Indeed, foreclosing those recoveries as a source of funding for the common benefit work would enrich the non-contributing individual plaintiffs unjustly at the expense of either or both of the lead counsel and any contributing individual plaintiffs. The district court thus acted within the scope of its discretion when it established an account to compensate counsel for common benefit work funded by a set aside of future *Zyprexa* MDL recoveries.

In *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2012 WL 6923367, *5 (E.D. Pa. 2012), the MDL court similarly observed that the total amount of the aggregate settlements facilitated by counsel's collective common benefit efforts is the practical equivalent of a distinct common benefit fund in the class action context. The court in *Avandia* noted that individual MDL plaintiffs had received considerable payments in settlement of their claims that would not have come about but for the common benefit work performed.  Several other MDL courts have awarded common benefit fees and expenses in litigation where no "global" settlement was reached. *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 2006 WL 471782 (N.D.Cal.2006) (no global settlement – order establishing fee based on percentage proportion of gross amount recovered by every client represented by "participating counsel"); *In re Trasylol Prods. Liab. Litig.*, 1:08-md-01928 (S.D.Fla. Nov. 2, 2012) (no global settlement – order granting aggregate fee requested by MDL leadership); *In re Kugel Mesh Hernia Patch Prods. Liab. Litig.*, 1:07-md-01842, Doc. 4563 (D.R.I. May 9, 2014) (no global settlement – order granting common benefit fee of 8%); *In re Yasmin and Yaz Prods. Liab. Litig.*, 3:09-md-02100, Doc. 3856 (no global settlement – Minute Order adopting Special Master's recommended

aggregate fee award and allocation in its entirety) (S.D. Ill. Nov. 20, 2015).  KS's "no global settlement" objection is baseless.

Likewise, KS's contention that the "per case average" settlement values in the pelvic mesh litigation are insufficient to support a 5% common benefit fee is meritless.  The value of any individual case depends upon a multitude of factors, including but certainly not limited to the plaintiff's personal and medical history, the specific product at issue, the nature of the injuries, the identity and financial status of the defendant, potential affirmative defenses and the treating doctor's critical testimony.  MDL and participating counsel have tried many pelvic mesh cases. As KS points out, some of the trials resulted in sizable verdicts for claimants.  However, as KS's Response fails to discuss, several cases were also lost outright, resulting in verdicts or directed verdicts for the defendants.  Moreover, a significant number of cases prepared for trial in this litigation have been dismissed by way of dispositive motion for a variety of reasons, including the learned intermediary doctrine, statute of limitations or the application of differing state law standards relating to the plaintiff's burden of proof on product liability claims.  Other cases have been voluntarily dismissed after being prepared for trial due to factual issues and circumstances specific to a particular claimant.  This is simply the reality of litigation of complex personal injury claims.

Further, handling attorneys in certain venues are able to dictate that the best cases are set for trial, such as in KS's preferred Pennsylvania state court venue.  After the bellwether process did not make reasonable progress toward resolution, the Court employed a different approach, grouping hundreds of cases together to be worked up in "waves" simultaneously, irrespective of the "quality" or representativeness of the case. Even with the ability of certain firms such as KS to dictate that only the "best" cases are tried where they want to try them, that is still no guarantee

that a jury will render a verdict in favor of the plaintiff.  Indeed, as KS knows full well, a good case can be lost even in a favorable venue, and every lawyer knows that past success does not predict future success.  KS's "average verdict exceeds settlement value" argument is an intentional and gross oversimplification plainly intended to undermine the painstaking efforts of so many in this Court for several years.  Attempting to cloak itself beneath a façade of altruism does not obviate this fact.

This Court is well aware of the nature and quality of the work that was required by many lawyers and law firms to achieve these settlements in this historic and hard-fought litigation.  This Court has handled this litigation from its inception, addressed volumes of motions and discovery disputes, presided over multiple trials, received appellate affirmance on a variety of important legal and evidentiary issues, and supervised Court-ordered mediations and settlement negotiations.  The Court thus has intimate familiarity with the myriad complicated factual and legal issues involved in these complex cases that comprise this unprecedented litigation.  The Court is aware of the settlement values of the various types of cases that made up this litigation, and the reasonableness of those settlements.  To attempt to discredit the years of work of the MDL leadership which fostered the fair and reasonable resolution of tens of thousands of cases before this Court by arguing the settlement values were too low has no basis in fact.

*In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp.2d 907, 932-35 (N.D.Ohio 2003), a group of attorneys who chose to litigate their cases in state court, separate from the MDL, challenged the size of the award of common benefit funds to the MDL leadership, arguing that the MDL lawyers had negotiated an initial settlement that was inadequate.  Much like KS urges here, the state court lawyers in Sulzer argued that the MDL leadership had not done enough to justify their requested fee. *Id.* at 930.  These state court attorneys argued that the final

settlement, which significantly increased the value of the initial settlement, was due largely to their efforts litigating their cases in state court. *Id.* at 930-35.

In disposing of the state court lawyers' arguments that the alleged inadequacy of the initial settlement values should limit the common benefit award, the MDL court in *Sulzer*, *supra* at 934, observed as follows:

> It is simply wrong to characterize generally the efforts of class counsel of the other Fee Award applicants as 'substandard,' or as having caused harm to the class, based on the fact that the terms of the initial settlement agreement did not benefit the class as much as the final settlement agreement. To the contrary, the terms of the initial settlement agreement satisfied this Court's threshold examination as to overall fairness and adequacy, and the significant improvement of those terms to the plaintiff class thereafter is attributable to the valuable efforts of those Fee Award applicants who produced a common benefit.

The MDL court in *Sulzer*, *supra* at 934-35, also rejected the state court attorneys' contention that their efforts led to the improved final MDL settlement agreement, stating:

> This assertion is simply a mis-statement of what occurred, except that many state court attorneys *did* work to "dismantle" the proposed [initial MDL] settlement. These dismantling efforts, however, were clearly *not* for the purpose of improving the settlement to the entire class; rather, many state court attorneys worked urgently to obtain verdicts for their *own* individual clients, and had absolutely no concern that doing so might scuttle the settlement, send Sulzer Orthopedics into bankruptcy, and prevent every other class member from receiving any meaningful benefits at all…. To suggest that it was the efforts of those attorneys pursuing their own cases in state court who improved the final settlement terms, and not class counsel and the other plaintiffs' counsel working with them, is to proffer a fiction.

Here, KS's argument is even more unreasonable. Kline & Specter was itself the beneficiary of the MDL's common benefit work. The results achieved in trial by Kline & Specter for its own individual clients was due to the extensive efforts to discover and develop these cases by several other firms. As in *Sulzer*, Kline & Specter's efforts in Philadelphia state court were undoubtedly for its own individual clients and did not inure to the benefit of anyone in the MDL. Kline & Specter received the benefit of the MDL's work, not vice versa. To seek to disparage the

work of the MDL that allowed it to achieve the very success in the courtroom that it touts throughout its Response is the height of disingenuity.

**C.**     **KS's after-the-fact attempt to distinguish the common benefit work as relative to specific defendants in this litigation fails in light of the cross-MDL nature of the common benefit work, which has inured to the common benefit of all pelvic mesh claimants, as well as in light of the facts.**

KS also urges this Court to conclude that there should be no common benefit assessment in cases involving Coloplast or "Covidien" because they allege "no discovery was ever conducted in the MDL."  This argument disregards that the benefit of common work must be examined in relation to the pelvic mesh plaintiffs generally. In *In re Genetically Modified Rice Litig.*, 2010 WL 716190, *5-*6 (E.D.Mo.2010), where a group of attorneys objected to an MDL common benefit award on the basis that their clients had not received substantial benefit from the MDL's leadership's work, the MDL court observed:

> This argument is simply incorrect. **Substantial benefit should be determined with respect to the plaintiffs as a whole, not with respect to individual plaintiffs.** *See In re Diet Drugs,* 582 F.3d at 544-545; *see also In re Clearsky Shipping Corp.,* No. Civ. A 96-4099, 2003 WL 1563820, at *1-4 (E.D.La. Feb. 26, 2003). All of the producer plaintiffs (including those whose cases are in state court) and all of the non-producer plaintiffs have benefitted substantially, and will continue to do so, from the work performed by plaintiffs' leadership counsel. (Emphasis added).

Here, likewise, any contention that any individual plaintiff or sub-group of plaintiffs did not receive the benefit of the cross-MDL common benefit work done on behalf of all plaintiffs in this interrelated litigation "is simply incorrect."  While the work product may differ depending on the product or defendant at issue, the fact remains that the benefit of the work "should be determined with respect to the plaintiffs as a whole, not with respect to individual plaintiffs" as KS would urge here.

Attempting to draw arbitrary lines between defendants or products, several years after this litigation was centralized before this Court specifically due to the factual interrelationship between these products,[13] is flatly contrary to the manner in which this litigation has been coordinated both by the Court and by Plaintiffs' leadership.  At the outset of the litigation, Kline & Specter was involved in the proposed cross-MDL counsel leadership structure submitted to the Court to coordinate the litigation efforts in these interconnected MDLs.  In his Application for membership on the cross-MDL PSC, KS partner Lee Balefsky represented to the Court that "I have reviewed the *Plaintiffs' Proposed Counsel Organizational Structure* plan filed with the Court for MDL 2325, 2326 and 2327 on March 19, 2012, and join in the recommendation to the Court that the plan be accepted." (Ethicon MDL, 2:12-md-02327, Doc. 58 (Application for Lee B. Balefsky for Membership on Plaintiffs' Steering Committee)).

The "Plaintiffs' Proposed Counsel Organizational Structure," which Mr. Balefsky reviewed and recommended to the Court on March 17, 2012 – and which included him as a member of the cross-MDL PSC – stated "[t]he serious health risks generally associated with these women's pelvic repair products also warrant legal inquiry that is not confined to a single product or manufacturer. . . . [T]he problems associated with transvaginal mesh products are inherent in the use of mesh in the female pelvic region, and thus are not limited to any one product. Instead,

---

[13] *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F.Supp.2d 1359, 1360-61 (J.P.M.L. 2012) ("The actions in each MDL share factual issues arising from allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific, and Ethicon, respectively. Centralization therefore will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."; "Chief Judge Joseph R. Goodwin of that district is currently presiding over MDL No. 2187, which involves claims of defects in similar pelvic surgical mesh products, and is uniquely situated to preside over the similar claims in these three MDLs. The pelvic surgical mesh products at issue in MDL Nos. 2325, 2326, and 2327 are used to treat similar conditions as those at issue in MDL No. 2187, and they have allegedly resulted in similar injuries…. Finally, a number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. Centralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions.").

these are issues that need to be explored and addressed globally. Many experts for both Plaintiffs and Defendants will traverse company and product lines. The efficient conduct of these cases will require coordination by Plaintiffs' counsel across MDL lines, while still maintaining the [multiple] MDL's. Additionally, discovery relating to corporate liability issues will involve common themes, and coordination between the four MDL's will be beneficial." Exhibit 1 to FCC Petition (emphasis added). The Proposed Counsel Organizational Structure further stated:

> The interrelationship between these products is but one significant issue that lends itself to coordinated investigation across MDL lines. . . .

> In light of the interrelationship between the products, the serious health problems generally associated with these devices, and the commonality of the defenses anticipated in every case, a coordinated and unified leadership that spans the four related pelvic repair product MDL's before this Court is essential to the effective and efficient prosecution in these cases. . . .

> Perhaps most importantly, because of the interrelationship between these MDL's in terms of common product defect allegations, similar injuries, and the prevalence of cases involving multiple products by the various defendants, the leadership structure in these MDL's should be composed of attorneys who have the ability and the expressed desire to work with one another in a concerted effort to seek a timely and just resolution of these cases. . . .

> Many of these tasks will not be MDL-specific, but rather will be common issues that will need a coordinated effort…. [I]t is vital to this proposal that there be a cohesive and coordinated structure that spans these four related MDL's so as to best achieve the efficiency and effectiveness of representation that will move this litigation forward.

> [T]his proposal calls for a singular PSC to coordinate across MDL lines in four separate MDL's, each of which involves a different manufacturer (and related defendants in some cases) and several different products. . . .

> The undersigned submit that a PSC composed of a significant number of attorneys is necessary to accommodate the large amount of work that will be necessary to prepare these cases effectively, and with many coordinated litigation activities occurring simultaneously across MDL lines.

Again, these MDLs would not have been centralized before the same Judge with a singular

PSC – to which KS was appointed and on which it has served for more than six years – but for the

overarching factual commonalities between products and defendants.  The cross-MDL work in the pelvic mesh litigation generally, which resulted in decisions by the Court that have shaped and guided the litigation overall, inured to the benefit of all pelvic mesh plaintiffs in general.  This litigation has been handled and coordinated across MDL lines, with common legal, medical, scientific and damages theories and strategies developed that apply to all pelvic mesh products across all MDLs.  This litigation was overseen and administered by a singular leadership structure.  The litigation was funded by the singular leadership, with PSC members contributing their assessments irrespective of product or defendant.  Although it chose to focus its efforts primarily in its preferred state court venue, KS was a member of the cross-MDL leadership structure.  Thus, like all participating counsel, KS enjoyed the benefit of all common work performed by the cross-MDL leadership in the development of the scientific and medical expertise and knowledge base over several years that spanned manufacturer and product lines.[14]   All MDL plaintiffs had access to this same common MDL work product – developed by a team of dedicated attorneys working collaboratively together for years in this interrelated, coordinated litigation – which undeniably benefited all plaintiffs.[15]   The mere fact as KS acknowledges that different defendants in this litigation chose different settlement and litigation strategies based on a variety of factors, including financial, does not change or diminish the fact that the common benefit efforts in this litigation

---

[14] Plaintiffs' leadership identified and served 84 Rule 26 Reports for 52 general plaintiffs' experts. As anticipated from the outset, many of Plaintiffs' experts designated by leadership to provide general testimony crossed MDL lines. Nineteen of Plaintiffs' 52 experts (36.5%) provided general expert testimony in more than one MDL, while nine (17.3%) provided testimony in more than three or more MDLs.  As merely one example, a urologist expert identified by KS in its Coloplast state court settlement case KS sought to exempt from the MDL assessment (*Senodja Jones v. Coloplast*), Dr. Daniel Elliott, was developed in the MDL and has served as a plaintiffs' expert in numerous pelvic mesh MDL cases against several different manufacturers.

[15] It must be pointed out here that KS has submitted its own request for common benefit fee and expense compensation in which it has repeatedly represented that all of its work inured to the common benefit of all pelvic mesh plaintiffs generally.

were undertaken on behalf of and for the benefit of all plaintiffs collectively, not one group or another.  Indeed, it is fair to say that the defendants' litigation strategies and settlement choices were strongly influenced by the effective and coordinated Plaintiffs' leadership capable of standing toe-to-toe with these well-funded corporate defendants. To argue otherwise in a transparent attempt to extract an additional fee allocation, is regrettable.

While the common benefit work in the pelvic mesh litigation was coordinated across MDL lines for the benefit of all pelvic mesh plaintiffs, it is nonetheless instructive to consider the factual inaccuracy underlying the premise of KS's "no MDL discovery" argument.  With respect to Coloplast, Coloplast's lead counsel announced to the Court and to Plaintiffs' leadership Coloplast's intention to settle cases against it on September 21, 2012.  Based thereon, the Court entered a stay of discovery.  A full year later, on August 26, 2013, the Holdback Order was entered in the Coloplast MDL, which expressly stated that it was submitted after consultation and approval among all PSC counsel, which again included Kline Specter.  Thus, with full knowledge that Coloplast intended to settle claims without the necessity of formal discovery, KS approved the Order subjecting all Coloplast cases to the same 5% MDL common benefit assessment applicable to all other pelvic mesh defendants.  Other than the one settlement that it moved to exempt from the assessment,[16] KS never objected to the 5% assessment in *Coloplast* in the more than five years after it agreed to the Holdback Order.  In addition to being unsupported by law, any argument that Coloplast plaintiffs should not bear the same common benefit expense as all other plaintiffs in this coordinated litigation merely because Coloplast chose an early settlement course should be barred by waiver and estoppel.

---

[16] MDL 2387, Doc. 1029 (Feb. 3, 2017 Order on Motion on Settlement of *Senodja Jones v. Coloplast*).

In addition, although Coloplast had indicated its intent to settle cases in lieu of proceeding with discovery, there were periods of time where general discovery was not stayed in Coloplast. During those active periods of general discovery, MDL leadership was proactive.  On July 6, 2016, MDL leadership served the Plaintiffs' First Request for Production, which 156 separate requests covered areas including pre-market studies, post-market surveillance, 522 reporting, regulatory, experts, consultants, marketing and sales, suppliers, distributors, and various other areas of inquiry. On this same date, MDL leadership served Plaintiffs' First Interrogatories, which addressed predicate devices, 510(k) applications, device descriptions, intended uses, electronic databases, lifecycle, pre-clinical studies and post-marketing studies, among other relevant issues.  On July 22, 2016, Coloplast served its 77-page written response to Plaintiffs' First Requests for Production, which required several meet and confers in efforts to address inadequacies in the responses. Coloplast also served 1,444,349 pages of documents in response to the Plaintiffs' Request for Production.  The documents were uploaded to a system called Beyond Recognition and the MDL document review began its review and analysis of this production.[17]  Thus, any assertion that there was "no MDL discovery" in the Coloplast MDL is erroneous.

With respect to "Covidien," KS's allegation that there was no MDL discovery is likewise inaccurate.  For clarity purposes, "Covidien" is not a party in this litigation.  The "Covidien" defendants were dismissed from the Bard MDL after discovery, research and motions practice

---

[17] While not bearing on the common benefit analysis, MDL leadership has served eight Notices of Deposition, and met and conferred on producing witnesses for these depositions, in addition to serving 28 additional Interrogatories, 10 Requests for Admissions and 318 additional Requests for Production.  Since December 21, 2016, MDL counsel have also engaged in several in-person meet and confers, numerous telephonic meetings with Coloplast's counsel and the discovery motion practice in order to obtain the additional discovery.  Also, MDL counsel has reviewed and analyzed 724 pages of privilege logs, continued its review of the 1,444,349 pages of initial document production, and has received three additional document productions totaling more than 963,000 additional pages (productions from Mentor on January 31, 2018, Coloplast on June 1, 2018 and Coloplast on July 3, 2018).

relating to alter ego/piercing the corporate veil by MDL leadership resulted in a beneficial stipulation under which Covidien agreed to stand behind any judgments or settlements of its wholly-owned subsidiaries, Sofradim Production, S.A.S. ("Sofradim") and Tissue Science Laboratories ("TSL"), which remained as named defendants. (2:10-md-02187, Doc. 179 (Mar. 5, 2012) (Stipulation)).[18]

Aside from the negotiation of the volume of stipulations, protocols and orders that would serve to guide discovery in this litigation generally, there were several rounds of extensive and thorough written and ESI custodial search-term discovery served on Sofradim and TSL relating to each of their multiple products at issue in the litigation.[19] This discovery resulted in numerous meet and confers with defense counsel (including several in-person meetings at various locations), multiple motions to compel, hearings before the Court, numerous rounds of document and ESI production, ESI responsiveness "sampling," privilege log challenges, and extensive document and privilege log review efforts. (*See, e.g.*, 2:10-md-02187, Doc. 90 (Sept. 27, 2011 Motion to Compel); Doc. 128 (Order on Motion to Compel); Doc. 268 (July 11, 2012 Second Motion to Compel); Doc. 572 (April 23, 2013 Sofradim objection to sharing of documents across MDL lines); Doc. 679 and 682 (Oct. 30, 2013 Sofradim motion objecting to Plaintiffs' request for consolidated trials)).

Plaintiffs' leadership handled all disputes, meet and confers, and negotiations with TSL/Sofradim's counsel regarding Plaintiffs' general document and ESI discovery and drafted the

---

[18] This stipulation was later used as a guide for a nearly identical stipulation with Endo Pharmaceuticals to stand behind judgments or settlements involving its subsidiary American Medical Systems.

[19] The pleadings, discovery requests and protocols and case management orders involving Bard, TSL and Sofradim were the first to be filed, negotiated or argued and thus served to guide the pelvic mesh MDLs generally. Likewise, the ESI protocols and term searches, as well as the Plaintiffs' written discovery requests and strategies, were used as guides in the other related MDLs sent to this Court for coordination.

Plaintiffs' motions to compel and every other correspondence and pleading related to Plaintiffs' general discovery. Plaintiffs' leadership also drafted and served third-party discovery on International Management Associates (IMA), which held a licensing agreement with TSL, and drafted Plaintiffs' opposition to TSL's Motion to Quash the IMA subpoena. (2:10-md-02187, Doc. 270 (Order on TSL motion to quash subpoena)). As a result of Plaintiffs' efforts, Sofradim ultimately produced 3,264,981 pages of discovery, TSL produced 2,076,771 pages of discovery, and IMA produced 121,809 pages of discovery. These documents were reviewed and coded for importance and theme by a multi-member document review team over several months. Plaintiffs' leadership took depositions of Sofradim corporate representatives in two multi-day trips to Sofradim headquarters in Lyon, France. Plaintiffs' leadership also took depositions of multiple Bard representatives wherein the products manufactured by Sofradim or TSL and sold by Bard were addressed.

Furthermore, Sofradim was a defendant in one of the initial bellwether cases selected for trial work-up in the Bard MDL (*Nancy Smith v. C.R. Bard, Inc., Covidien, Inc., et al.*, 2:10-cv-01355)). Ms. Smith was implanted with an Avaulta device manufactured by Sofradim. Both parties identified multiple experts and presented expert reports in Ms. Smith's case relative to both Sofradim and Bard.[20] Ms. Smith, her treating physicians, and her general and case-specific experts were deposed by both Sofradim and Bard. Ms. Smith's case was settled prior to trial.

---

[20] Plaintiffs produced reports from two different biomaterials experts (Ahmed El-Ghannam and Anthony Brennan), both of whom performed extensive scientific testing and materials analyses, a biomedical engineer (Julia Babensee), a regulatory expert (David Kessler, former head of the FDA), the world's foremost mesh pathologist expert (Bernd Klosterhalfen), a pelvic pain expert (Denniz Zolnoun), and multiple urogynecologist experts (Bob Shull and Lennox Hoyte). Sofradim also identified and produced reports for a number of medical, scientific and regulatory experts, which had to be reviewed, analyzed and addressed by MDL leadership and their team of experts.

Although KS was apparently unaware of this common benefit work by the MDL, perhaps due to its lack of meaningful involvement in the MDL, its ignorance does not diminish the work's import.  In *In re Diet Drugs,* 582 F.3d 524, 547-48 (3d Cir.2009), the Third Circuit rejected arguments by multiple law firms on appeal who claimed that their "opt out" clients who did not participate in the MDL settlement did not receive any substantial benefit from the MDL work that led to the settlement.  One of the objecting attorneys insisted that he had not used any of the MDL work product, and had to discover and develop his state court cases on his own. *Id.* The Third Circuit in *Diet Drugs* affirmed the MDL court's conclusion that even if the objecting attorneys had not used the MDL's common discovery, "the mere availability of the discovery…substantially influenced [the defendant's] evaluation of *every* plaintiff's case." *Id.* at 548 (Emphasis in original). The Third Circuit further found that the MDL leadership had benefited every claimant in the litigation by helping to administer the MDL by tracking individual cases, distributing court orders, and serving as a repository of information concerning the litigation and settlement, and also that leadership "obtained a number of favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and it enforced a uniform procedure for the production of documents, deposition testimony, and expert disclosures that governed every MDL case against [the defendant]." *Id.*  The Third Circuit stated "[w]e think it beyond reasonable denial that the [objectors'] claimants benefitted from [the defendant's] loss of bargaining power due to the [MDL's] efforts," observing that the defendant had to defend itself knowing that the objectors had access to the MDL's discovery and the objecting firms knew the defendant was heavily invested in settlement. *Id.*  Thus, the Third Circuit concluded, "those plaintiffs stood a better chance of recovery from [the defendant] than they would have absent the [MDL's] efforts." *Id.*

- 23 -

Even if the Court were to consider Coloplast and Covidien separately, although that is not how this litigation was coordinated or conducted from Plaintiffs' leadership's perspective, the coordinated common benefit efforts in the MDL leveled the playing field and reduced the bargaining power otherwise enjoyed by these well-funded corporate defendants. Plaintiffs' MDL leadership has, for the benefit of all plaintiffs, helped to administer the MDL by establishing uniform procedures and protocols intended to promote efficiency and economy, and has been a repository for information to assist all plaintiffs' counsel in the handling of their own cases. Further, Plaintiffs' leadership has secured numerous important discovery, evidentiary and substantive rulings that apply on a litigation-wide basis, both in the MDL and on appeal. In the absence of MDL leadership's extraordinary efforts over several years to continue developing large numbers of cases for trial, to defeat dispositive motions, and to secure important pretrial and trial victories for plaintiffs – and importantly, to prepare other plaintiffs' counsel to do so in their own cases – the willingness of any of these defendants to pursue a settlement strategy would have been negatively impacted. The overall coordination and collaboration by Plaintiffs' leadership in the MDL, which provided all plaintiffs access to the same medical, scientific and legal expertise, spurred these defendants' choice to be – and stay – "heavily invested in settlement." With the bargaining leverage in favor of every plaintiff in the litigation due to the on-going efforts of MDL leadership, the plaintiffs "stood a better chance of recovery" than they would have absent the MDL's collaborative efforts.

## III.    CONCLUSION.

Kline & Specter's Response in Opposition to the FCC's Petition for an Award of Common Benefit Attorney's Fees and Expenses is revealed as little more than a premature challenge to the allocation of common benefit fees, which is not before the Court at this time. KS's arguments

regarding the propriety of a fee award in the absence of a "global" settlement, and its criticism of

the settlement values in cases before this Court, are self-serving and unfounded.  KS's allegation

regarding an alleged lack of discovery with respect to particular defendants disregards the manner

in which these interrelated cases have been prosecuted and coordinated before this Court from the

outset of this litigation, and moreover is factually inaccurate.

Dated: December 3, 2018

Respectfully submitted,

THE COMMON BENEFIT FEE AND COST
COMMITTEE

By:      */s/ Henry G. Garrard, III*
          Henry G. Garrard, III
          hgarrard@bbga.com
          Chairman of the Fee &
          Compensation Committee

BLASINGAME, BURCH, GARRARD & ASHLEY
P.O. Box 832
Athens, GA  30603
706-354-4000

*/s/ Renee Baggett*
Renee Baggett
RBaggett@awkolaw.com

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
17 East Main Street, Suite 200
Pensacola, FL 32502
850-202-1010

*/s/ Riley L. Burnett, Jr.*
Riley L. Burnett, Jr**.**
rburnett@rburnettlaw.com

BURNETT LAW FIRM
3737 Buffalo Speedway, Suite 1850
Houston, TX 77098

*/s/ Thomas P. Cartmell*
Thomas P. Cartmell
tcartmell@wcllp.com

WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1100

*/s/ Clayton A. Clark*
Clayton A. Clark
CClark@triallawfirm.com

CLARK, LOVE & HUTSON, G.P.
440 Louisiana Street, Suite 1600
Houston, TX 77002
713-757-1400

*/s/ Yvonne M. Flaherty*
Yvonne M. Flaherty
ymflaherty@locklaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis MN  55401
612-339-6900

*/s/ Carl N. Frankovitch*
Carl N. Frankovitch
carl@facslaw.com

FRANKOVITCH, ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, WV 26062
304-723-4400

*/s/ Joseph F. Rice*
Joseph F. Rice
jrice@motleyrice.com

MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843-216-9000

*/s/ William H. McKee, Jr*
William H. McKee, Jr
bmckee@suddenlink.net

1804 Louden Heights Road
Charleston, WV 25314
304-546-2347

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 3, 2018, I electronically filed the ***COMMON BENEFIT FEE AND COST COMMITTEE'S REPLY IN SUPPORT OF ITS PETITION FOR AN AWARD OF COMMON BENEFIT ATTORNEYS' FEES AND EXPENSES*** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

By:    ***/s/ Henry G. Garrard, III***
Henry G. Garrard, III
hgarrard@bbga.com
Chairman of the Fee &
Compensation Committee

BLASINGAME, BURCH, GARRARD & ASHLEY
P.O. Box 832
Athens, GA  30603
706-354-4000