**Louisiana Law Review**

Volume 74 | Number 2
*Eastern District of Louisiana: The Nation's MDL*
*Laboratory - A Symposium*
*Winter 2014*

# Common Benefit Fees in Multidistrict Litigation

Eldon E. Fallon

Repository Citation

Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. (2014)
Available at: https://digitalcommons.law.lsu.edu/lalrev/vol74/iss2/5

This Article is brought to you for free and open access by the Law Reviews and Journals at LSU Law Digital Commons. It has been accepted for inclusion in Louisiana Law Review by an authorized editor of LSU Law Digital Commons. For more information, please contact kayla.reed@law.lsu.edu.

**Common Benefit Fees in Multidistrict Litigation**

*Eldon E. Fallon*[*]

INTRODUCTION

In 1968, Congress enacted The Multidistrict Litigation Act.[1] This Act bestowed upon a panel of seven federal judges (the Panel), appointed by the Chief Justice of the United States, broad powers to transfer groups of cases filed in multiple federal district courts to a single federal district court for the purpose of coordinating and conducting pretrial proceedings.[2] This transfer is made without consideration of personal jurisdiction over the parties or the venue requirements of 28 U.S.C. § 1404.[3] In making such a transfer from the court in which the case was filed (the transferor court) to the court designated to receive the cases (the transferee court), the Panel considers whether there are sufficient common questions of fact among these civil actions to justify centralizing them in a single district to further the convenience of the parties and witnesses and to promote the just and efficient conduct of the actions.[4] The Panel may carry out this function either upon its own initiative or in response to a motion filed with the Panel by a party in any action in which transfer might be appropriate.[5]

---

Copyright 2014, by ELDON E. FALLON.

[*] Judge, United States District Court for the Eastern District of Louisiana. B.A. 1960 Tulane University; J.D. 1962 Tulane Law School; LL.M. 1963 Yale Law School. The author thanks Lexy Butler for her editorial suggestions and Ashley Barriere for helping with the format of the footnotes.

1. 28 U.S.C. § 1407 (2006).

2. *See* Gregory Hansel, *Extreme Litigation: An Interview with Judge Wm. Terrell Hodges, Chairman of the Judicial Panel on Multidistrict Litigation*, 19 ME. B. J. 16, 18 (2004). *See generally* John G. Heyburn II, *A View from the Panel: Part of the Solution*, 82 TUL. L. REV. 2225 (2008); John F. Nangle, *From the Horse's Mouth: The Workings of the Judicial Panel on Multidistrict Litigation*, 66 DEF. COUNS. J. 341 (1999).

3. *See In re* FMC Corp. Patent Litig., 422 F. Supp. 1163, 1165 (J.P.M.L. 1976) ("Transfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue.").

4. *See* 28 U.S.C. § 1407(a) which provides, *inter alia*:
When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such action.
*Id.*

5. *Id.* § 1407(c).

When the Panel finds that centralization of related actions is appropriate, a multidistrict litigation (MDL) case is formally created by the issuance of a transfer order.[6] The Panel's transfer order designates the transferee court, assigns a title and number to the MDL, and identifies the related actions currently pending in federal districts outside of the selected transferee forum that will be transferred pursuant to 28 U.S.C. § 1407. These cases, together with any related actions originally filed in the transferee forum, constitute the MDL. If the Panel subsequently learns of additional related cases, it will issue conditional transfer orders identifying tag-along actions that will be sent to join the MDL.[7] The finality of the transfer order is delayed for seven days to permit the opportunity to object to the transfer.[8] Transferor courts retain jurisdiction over cases subject to conditional transfer orders until such orders become final. Occasionally, the Panel will vacate a conditional transfer order before it becomes final, typically based either on a well-founded objection or in light of the dismissal or remand of an action by the transferor court.

In the early decades of multidistrict litigation, business was slow. The 1970s and 1980s saw some modest increase, but since the 1990s, the workload of the Panel has substantially increased.[9] This increase is generally attributed to the change in the nature of civil litigation, which has placed greater emphasis on class actions, mass torts, and complex litigation. Presently, with the passage of the Class Action Fairness Act (CAFA) and the general disfavor of nationwide class actions expressed by several U.S. circuit courts, multidistrict litigation is playing an increasingly significant quantitative role in

---

6.  *Id.*

7.  A tag-along action is "a civil action pending in a district court which involves common questions of fact with either (1) actions on a pending motion to transfer to create an MDL or (2) actions previously transferred to an existing MDL, and which the Panel would consider transferring under Section 1407." Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Rule 1.1(h), 277 F.R.D. 480 (2011) [hereinafter Panel Rules].

8.  *See id.* Rule 7.1(b).

9.  *See* Heyburn, *supra* note 2, at 2231; ANNUAL REPORT OF THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION 1 (1980), *available at* http://www.jpml.us courts.gov/sites/jpml/files/Legacy_Statistical_Reports-1980-1991-Compressed.pdf (reporting that pursuant to 28 U.S.C. § 1407, between July 1, 1979, to June 30, 1980, the Panel acted upon 1,386 civil actions); ANNUAL STATISTICS OF THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION (2011), *available at* http://www.jpml.uscourts.gov/sites/jpml/files/JPML_Annual_Statistics_CY_2011-Revised.pdf (during the 12-month period ending September 30, 2011, the Panel acted upon 43,769 civil actions).

all civil litigation in the United States.[10] Some estimates suggest that MDL cases account for more than 15% of all civil litigation in this country.[11] Many MDLs include thousands of individual cases and multiple class actions. Hundreds of lawyers from various parts of the country might be involved in a single MDL case. It is necessary for an MDL transferee judge to impose some organizational structure on the attorney representation so that the case can proceed in an effective and efficient manner.[12] To accomplish this task, the court usually appoints a Plaintiffs' Steering Committee (PSC) to speak for all of the plaintiffs and their lawyers and a Defendant(s) Steering Committee (DSC) to speak for the defendant(s).[13] But in practice, the DSC is generally selected by the defendant itself with the approval of the court.[14]

The committees occupy leadership roles in the litigation—conducting documentary discovery, establishing document depositories, taking depositions, arguing motions, conducting bellwether trials, and in general, carrying out the duties and responsibilities set forth in the court's pretrial orders, including appearing before the court at periodic conferences or hearings.[15] The MDL transferee court theoretically oversees the discovery aspect of the case and remands various cases back to the transferor courts for further proceedings.[16] In practice, however, it is not unusual for the

---

10.   *See* Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4; *see also* Castano v. Am. Tobacco Co., 84 F.3d 734, 746–47 (5th Cir. 1996); *In re* Rhone-Poulenc Rorer Inc., 51 F.3d 1293, 1299–1304 (7th Cir. 1995).

11.   John G. Heyburn II & Francis E. McGovern, *Evaluating and Improving the MDL Process*, LITIGATION, Spring 2012, at 26.

12.   *See* MANUAL FOR COMPLEX LITIGATION § 22.6 (4th ed. 2004) [hereinafter MANUAL].

13.   *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, at 1–2 (E.D. La. July 27, 2009) (pretrial order appointing Defendants' Steering Committee), *available at* http://www.laed.uscourts.gov/Drywall/Orders /Orders.htm (follow "Pretrial Order 7" hyperlink); *In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047 (E.D. La. July 27, 2009) (pretrial order appointing Plaintiffs' Steering Committee), *available at* http://www.laed .uscourts.gov/Drywall/Orders/Orders.htm (follow "Pretrial Order 8" hyperlink); *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *1 (E.D. La. Apr. 8, 2005) (pretrial order appointing Plaintiffs' Steering Committee); *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850962, at *1 (E.D. La. Apr. 8, 2005) (pretrial order appointing Defendants' Steering Committee).

14.   *See* MANUAL, *supra* note 12, §§ 22.61, 22.62.

15.   *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, at 2–4 (E.D. La. July 27, 2009) (pretrial order appointing Defendants' Steering Committee), *available at* http://www.laed.uscourts.gov/Drywall/Orders /Orders.htm (follow "Pretrial Order 7" hyperlink); *In re Vioxx*, 2005 WL 850963, at *1–9; *In re Vioxx*, 2005 WL 850962, at *1–2.

16.   Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998).

transferee court to conduct bellwether trials and encourage a global resolution of the matter before recommending to the Panel that the case be remanded.[17] All of this work consumes time and raises costs. While the members of the DSC are typically compensated by their client on a regular basis, the members of the PSC are not. Because the work that the PSC performs inures to the common benefit of all plaintiffs and their primary counsel (the counsel that they employed), MDL transferee courts usually establish a procedure for creating a common benefit fee to compensate the members of the PSC and the members of any subcommittees who have done common benefit work.[18]

This Article discusses the history of the common benefit fee concept, how the amount of the common benefit fee is computed, the eligibility requirements for claiming common benefit fees, and the method for determining how these fees should be distributed among those who have done common benefit work.

## I. HISTORY OF THE COMMON BENEFIT FEE DOCTRINE

Under the general rule prevalent in American courts, known as the "American Rule," the attorney for the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser.[19] Instead, the attorney for the prevailing litigant must look to his or her own client for payment of attorney's fees. Since the 19th century, however, the Supreme Court has recognized an equitable exception to the American Rule.[20] This exception, which has become known as the "common fund doctrine" or the "common benefit doctrine," permits the creation of a common fund for the

---

17. The authority to remand an action to the transferor court rests with the Panel and not the transferee court. *See In re* Roberts, 178 F.3d 181, 183–84 (3d Cir. 1999) (holding that 28 U.S.C. § 1407(a) and the Supreme Court decision in *Lexecon*, 523 U.S. at 26, signify that the power to remand a transferred case to the transferor court lies with the Panel and not with the transferee district judge, a conclusion further supported by Panel Rules, *supra* note 7, at Rule 14). However, in practice, the Panel usually acts favorably on the transferee court's recommendation. For a more in depth discussion of the use of bellwether trials in multidistrict litigation, see Eldon E. Fallon, Jeremy T. Grabill & Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323 (2008).

18. *See* Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (explaining the Court's historical recognition that "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); MANUAL, *supra* note 12, §§ 14.11, 14.12.

19. *See* Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 561 (1986).

20. *See, e.g.*, Internal Imp. Fund Trs. v. Greenough, 105 U.S. 527, 537–38 (1881); Cent. R.R. & Banking Co. of Ga. v. Pettus, 113 U.S. 116, 127–28 (1885).

purpose of paying reasonable attorneys' fees. The fund is created by taxing persons other than a particular client for legal services beneficial to such persons thus spreading the cost of the litigation to all beneficiaries of these services.[21] Under the common fund concept, the funds are actually accumulated from those aligned with the successful litigant and not extracted from the defeated adversary; thus, one might argue that it is not technically an exception to the American Rule.[22] But regardless of its taxonomy, the common fund doctrine constitutes a departure from the traditional rule that each litigant bears his or her own costs.

The common fund doctrine was originally, and perhaps still is, most commonly applied to awards of attorneys' fees in class actions.[23] But this doctrine is not limited solely to class actions: It has been used in complex litigation to compensate attorneys whose work benefits others similarly situated.[24] As class actions were combined with individual actions to form MDLs, as is the modern trend, the common benefit concept migrated into the latter area.[25] It

---

21. *See In re* Zyprexa Prods. Liab. Litig., 594 F.3d 113, 128 (2d Cir. 2010); *see also In re* Vioxx Prods. Liab. Litig., MDL No. 1657, at 1 (E.D. La. Aug. 4, 2005) (Pretrial Order No. 19); *In re* Propulsid Prods. Liab. Litig., MDL No. 1355, at 1 (E.D. La. Dec. 26, 2011) (pretrial order establishing Plaintiffs' Litigation Expense Fund), *available at* http://propulsid.laed.uscourts.gov/orders.htm (follow "Pretrial Order No. 16" hyperlink).

22. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 30 reporter's note a (Tentative Draft No. 3, 2004) (commenting on "[t]he persistent and confusing identification of common-fund recovery as an 'exception' to the American rule on attorneys' fees," and noting that in a common fund situation the funds are actually distributed "among those aligned with the plaintiff rather than extract[ed] . . . from the defeated adversary" (quoting Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 DUKE L.J. 651, 662 (1982))).

23. *See, e.g.,* 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 13:76 (4th. ed. 2002) (discussing common fund doctrine in context of class actions); FED. R. CIV. P. 23(h).

24. *See generally* Sprague v. Ticonic Nat'l Bank, 307 U.S. 161 (1939) (employing common benefit doctrine to award fees and costs to litigant whose success benefitted unrelated parties by establishing their legal rights). *See also* ALAN HIRSCH & DIANE SHEEHEY, FED. JUDICIAL CTR., AWARDING ATTORNEYS' FEES AND MANAGING FEE LITIGATION 60 (2d ed. 2005) ("Although many common fund cases are class actions . . . the common fund doctrine is not limited to class actions."); MANUAL, *supra* note 12, § 14:121.

25. *See* Sullivan v. DB Invs., Inc., 667 F.3d 273 (3d Cir. 2011); *In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010, MDL No. 2179 (E.D. La. June 15, 2012) (order setting caps on individual attorney's fees), *available at* http://www.laed.uscourts.gov/OilSpill/Orders/Orders.htm (follow "June 15 2012 Order" hyperlink); *In re* Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740 (E.D. La. 2011); *In re* Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MDL No. 05-1708, 2008 WL 682174, at *5 (D. Minn. 2008); *In re* Zyprexa, Prods. Liab. Litig., 433 F. Supp. 2d 268, 272–73 (E.D.N.Y. 2006).

has been used to compensate attorneys who render legal services beneficial to all MDL plaintiffs. Courts have justified this approach by postulating that MDLs are quasi-class actions because, like class actions, they involve large numbers of cases grouped together and handled by one judge for efficiency, consistency, and coordination.[26] The theoretical bases for the application of the common fund concept to MDLs are the same as for class actions—namely, equity and her blood brother, quantum meruit. However, there is a difference: In class actions the beneficiary of the common benefit work is the claimant; in MDLs the beneficiary is the primary attorney (the attorney who has the representation agreement with the claimant). For this reason, in MDLs, the common benefit fee is extracted from the fee of the primary attorney and not the claimant, as is the case with class actions. Thus in MDLs, the claimant does not pay the common benefit fee; the primary attorney who is the beneficiary of the common benefit work pays it.[27]

---

26.    *See In re* Zyprexa Prods. Liab. Litig., 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (holding the "large number of plaintiffs subject to the settlement matrix approved by court; the utilization of special masters appointed by the court to control discovery and to assist in reaching and administering a settlement; the court's order for a huge escrow fund; and other interventions by the court" in the MDL litigation are the same characteristics of a class action and thus the MDL should be considered a "quasi-class action"); *In re Guidant*, 2008 WL 682174, at *5 (asserting that "when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation") (quoting *Sprague*, 307 U.S. at 167); *In re* Vioxx Prods. Liab. Litig. 650 F. Supp. 2d 549, 554 (E.D. La. 2009); *see also* Edward F. Sherman, *Judicial Supervision of Attorney Fees in Aggregate Litigation: The American Vioxx Experience as Example for Other Countries* 11 (Tul. Pub. Law Research Paper No. 09-07), *available at* http://ssrn.com /abstract=1407559 (finding 28 U.S.C. § 1407(a) offers some support to the argument that MDLs are quasi-class actions). *But see* Charles Silver & Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal*, 63 VAND. L. REV. 107, 113 (2010) (maintaining MDLs do not constitute quasi-class actions, as MDLs merely aggregate individual lawsuits under 28 U.S.C. § 1407 to promote judicial efficiency and those suits are not "not certified under the [Federal] Rule [of Civil Procedure] 23 standards of commonality, typicality, numerosity, adequacy of representation, predominance, and superiority; there is no representative plaintiff; and there is no attorney appointed by the court as counsel for the entire class"); Aimee Lewis, *Limiting Justice: The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 REV. LITIG. 209, 215 (2012) (asserting a key difference between class actions and MDL cases is that MDL litigants have already brought their claims to court and likely sought representation prior to those filings, while class actions include all class members whether or not they brought suit).

27.    *See, e.g., In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 658 (E.D. La. 2010) (ordering the common benefit fee of 6.5% to be extracted from the 32%

In addition to turning to class actions for authority to utilize the common benefit concept in MDLs, courts also find support in their inherent managerial authority, particularly in light of the complex nature of an MDL. The Fifth Circuit has long recognized that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and to compensate them for their work.[28] In *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, the Panel transferred all federal cases arising out of a passenger plane crash near Miami to the Southern District of Florida.[29] The transferee court appointed a plaintiffs' committee to coordinate discovery and pretrial matters and then to conduct bellwether trials.[30] The court compensated the committee through an assessment on the contingent fees of attorneys who represented MDL plaintiffs but were not on the plaintiffs' committee.[31] The non-committee attorneys appealed, and the Fifth Circuit upheld the district court's authority to impose that assessment.[32] The Fifth Circuit explained that a district court has inherent authority "to bring management power to bear upon massive and complex litigation to prevent [the litigation] from monopolizing the services of the court to the exclusion of other litigants."[33] Therefore, an MDL court "may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide."[34] Naturally, this authority would be "illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."[35] Assessment of those fees against other retained lawyers who benefitted from the work done was permissible and appropriate.[36]

---

fee of the primary counsel); *see also* Smiley v. Sincoff, 958 F.2d 498, 500 (2d Cir. 1992) (affirming order providing that "any committee fee was to be paid by all attorneys on behalf of their clients. Plaintiffs were not to pay fees to the committee out of their own recoveries."); *In re* Zyprexa Prods. Liab. Litig., 467 F. Supp. 2d 256, 266–67 (E.D.N.Y. 2006).

28.  *See, e.g.*, *In re* Air Crash Disaster at Fla. Everglades on Dec. 29, 1972, 549 F.2d 1006, 1008 (5th Cir. 1977).

29.  *Id.*

30.  *Id.* at 1009.

31.  *Id.*

32.  *Id.* at 1012.

33.  *Id.*

34.  *Id.* at 1014.

35.  *Id.* at 1016.

36.  *See id.* at 1019–20; *see also In re* Diet Drugs Prod. Liab. Litig., 582 F.3d 524, 546–47 (3d Cir. 2009); *In re* Genetically Modified Rice Litig., No. 4:06 MD 1811 CDP, 2010 WL 716190, at *4 (E.D. Mo. 2010) ("An MDL court's authority

Finally, in addition to justifying the use of the common benefit doctrine on principles of equity or quantum meruit or class action procedures or their inherent authority, MDL transferee courts often derive express authority to set common benefit fees from the terms of the settlement agreement of the parties, to which their primary attorneys consented. Some MDL cases utilize the settlement class vehicle created by Rule 23(e) of the Federal Rules of Civil Procedure to amicably resolve the case. As with other class actions, claimants with adequate notice must opt out of the settlement to avoid being bound by its terms. When this procedure is utilized, the court has statutory authority to set common benefit fees pursuant to Rule 23(h), which allows the court to award reasonable attorneys' fees and nontaxable costs. But an increasing number of MDLs utilize a private settlement agreement to resolve claims. The agreement contains the terms of the settlement, which provide the total dollar amount of the settlement and the mechanism for allocating the funds among eligible claimants. In addition, the agreement usually contains a provision establishing a fund for common benefit work. For example, in the *Vioxx Products Liability Litigation*,[37] section 9.2 of the settlement agreement governed common benefit fees, expressly authorized the transferee court to determine the amount of the common benefit attorneys' fees, and provided that the fees were to be deducted from the fee of the primary plaintiffs' attorneys.[38] The agreement is usually an opt-in

---

to establish a trust and to order contributions to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."); *id.* at *4 n.2 (relying on common fund doctrine as an alternate basis to inherent managerial authority and concluding that "[b]oth sources of authority provide the same result"); *In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 648–49 (E.D. La. 2009); *In re* Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *4–5 (D. Minn. Aug. 21, 2008); *In re* Zyprexa Prods. Liab. Litig., 467 F. Supp. 2d 256, 265–66 (E.D.N.Y. 2006); *In re* Propulsid Prods. Liab. Litig., MDL No. 1355, 2005 WL 3541041, at *1–2 (E.D. La. Nov. 28, 2005) (pretrial order distributing attorneys' fee funds); *In re* Linerboard Antitrust Litig., 292 F. Supp. 2d 644, 653–56 (E.D. Pa. 2003); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT, *supra* note 22, § 30 ("In contrast to the standard view of class-action fees, which explains them as restitutionary, the leading accounts of fees to court-appointed counsel in consolidated litigation properly emphasize factors independent of restitution to justify the imposition of a liability by court order." (citing *In re Air Crash*, 549 F.2d at 1017–19)); MANUAL, *supra* note 12, § 22.62.

37.  802 F. Supp. 2d 740, 771 (E.D. La. 2011).

38.  *See In re* Vioxx Prods. Liab. Litig., 650 F. Supp. 2d 549, 554 (E.D. La. 2009).

agreement; when a claimant opts into the agreement, the claimant and the claimant's primary counsel agree to be bound by the terms of the agreement, including the payment of common benefit fees.

Regardless of the legal basis given to explain its use, the common benefit doctrine has been consistently used and is well established as the justification for the payment of common benefit fees in MDLs. But how is it calculated, who is eligible to receive it, and how much should each applicant receive? These inquiries are discussed in turn in the following Sections. Before proceeding to these topics, it is necessary to focus on the fees of primary counsel.

## II. FEES OF PRIMARY COUNSEL

The purpose of this Article is to explore the history, computation, and distribution of common benefit fees. But there is a symbiotic relationship between the fee for common benefit work and the fee of the primary attorney. As mentioned above, the common benefit fee comes out of the fee of the primary attorney—a slice out of that pie, so to speak. Thus, before the size of that slice can be determined, some courts have found it appropriate to first consider the size of the pie (the primary attorneys' fees). At the outset, it is important to recognize that judicial review of the fee arrangements of the attorneys appearing before the court is not only controversial but unpleasant. Some courts have concluded that this comes with the territory and have occasionally found it necessary to wade into this Serbonian Bog. By and large, the legal bases relied on by courts that have reviewed and altered contingent fee contracts in MDL cases for reasonableness are similar to the justifications for creating a common benefit fee fund, namely: (1) a court's equitable authority to oversee the administration of a global settlement, (2) a court's inherent authority to exercise ethical supervision over the parties, and (3) the court's express authority pursuant to the terms of the MDL settlement agreement. It is useful to explore each of these bases in more detail.

The argument that courts use to support their equitable authority to review attorneys' fees emanates from Rule 23 of the Federal Rules of Civil Procedure. Rule 23 expressly provides that a district court presiding over a class action must scrutinize the attorneys' fees of class counsel to assure that they are reasonable. The transferee judge in MDLs should have the same responsibility because MDLs are quasi-class actions as their purpose and function—namely, efficiency and coordination before a single court—are the same as the traditional class action. Furthermore, many MDLs contain multiple class actions along with individual claims, and it is not unusual to utilize the settlement class vehicle provided by Rule

23(e) to resolve the entire matter. Thus, Rule 23 is often an integral part of the MDL process.

With regard to a court's inherent authority to exercise ethical supervision over the parties in MDL matters, courts have relied on the broad equitable powers of a federal court over an attorney's contingent fee contract. Pursuant to the court's supervisory authority, the court may address the reasonableness of a contingent fee contract even if the parties have not raised the issue.[39] District courts argue that they necessarily retain the authority to examine attorneys' fees sua sponte because the attorneys' interests in this regard are in conflict with those of their clients.[40] Further, the potential harm to the public's perception of the judicial process is especially acute in MDLs because of the large number of claimants involved. Disproportionate results and inconsistent standards threaten to damage the public's faith in the judicial resolution of mass tort litigation by creating an impression of inherent unfairness. A significant justification for the MDL process is that it brings coordination, efficiency, and uniformity to an inherently, or at least potentially, chaotic situation caused by the vast number of cases that make up many MDLs. Thus, instead of pursuing individual discovery, filing individual motions, preparing individual trial plans, and incurring expenses time and time again, attorneys who participate in the MDL usually benefit, both in time and expense, from a uniform and efficient resolution procedure. The economies of scale should cut both ways. Like their attorneys, the claimants should also benefit from the uniformity and efficiency of the MDL process in the form of reduced fees.

Finally, with regard to the court's express authority to review fees, the settlement usually contains a specific agreement addressing the court's authority regarding attorneys' fees. Those opting into the settlement agree to be bound by the terms of the agreement. For example, the opt-in agreement in the *Vioxx* MDL provided that the transferee court had express authority to modify any provision of the agreement in certain limited circumstances if the court determined that the provision was "prohibited or unenforceable to any extent or in any particular context but in some modified form would be enforceable."[41] To the extent that the settlement agreement would be unenforceable if it resulted in excessive or unreasonable attorneys' fees that threaten the public interest and reflect poorly on the courts or system of justice, the court concluded it had express authority to

39. Rosquist v. Soo Line R.R., 692 F.2d 1107, 1111 (7th Cir. 1982).
40. *In re Guidant*, 2008 WL 682174; *In re* Zyprexa Prods. Liab. Litig., 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006).
41. *See In re Vioxx*, 650 F. Supp. 2d at 554.

examine the reasonableness of contingent fee contracts in order to protect the claimants and enforce the settlement agreement.[42] In *Vioxx*, the MDL court set the primary attorneys' fees at a maximum of 32%, out of which the common benefit fee was to be paid. This created uniformity for both the litigants and primary counsel. After the primary counsel fees are established or at least considered, it is timely to turn to the common benefit fees.

## III. METHODOLOGY FOR CALCULATING COMMON BENEFIT FEES

The transferee court must formulate some methodology for establishing the total amount of the common benefit fund and some procedure for disbursing the fund. The total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data.

Over the years, courts have employed various methods for determining the reasonableness of an award of attorneys' fees. These methods include: (1) the lodestar method, which entails multiplying the reasonable hours expended on the litigation by an adjusted reasonable hourly rate;[43] (2) the percentage method, in which the court compensates attorneys who recovered some identifiable sum by awarding them a fraction of that sum;[44] or (3) the blended method, a combination of both methods, in which a percentage is selected and cross checked for reasonableness by utilizing the lodestar method.[45] It is helpful to consider each of these methods in turn.

---

42.   *In re* Vioxx Prods. Liab. Litig., 574 F. Supp. 2d 606, 614 (E.D. La. 2008).

43.   *See* Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 583 n.15 (5th Cir. 1980); s*ee also* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. EMPIRICAL LEGAL STUD. 27, 31 (2004) (summarizing the lodestar method as a means to calculate attorneys' fees). *See generally* Gisbrecht v. Barnhart, 535 U.S. 789 (2002) (providing analysis and discussion of the lodestar method); Blum v. Stenson, 465 U.S. 886 (1984); Hensley v. Eckerhart, 461 U.S. 424 (1983).

44.   *See* Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1271 (D.C. Cir. 1993) (establishing the percentage method as the sole means to calculate attorneys' fees in common fund cases in the D.C. Circuit); Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991) (holding the percentage method to be the best calculation approach for common fund cases in the Eleventh Circuit); Eisenberg & Miller, *supra* note 43, at 32 (summarizing the percentage method as a means to calculate attorneys' fees).

45.   *See In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640, 652 (E.D. La. 2010) (finding the blended method to be in line with Fifth Circuit precedent and the best means to calculate common benefit attorneys' fees in the instant case); Turner v. Murphy Oil USA, 472 F. Supp. 2d 830, 861 (E.D. La. 2007) (using the blended percentage approach to calculate attorneys' fees pursuant to Fifth Circuit

Using the lodestar method to calculate attorneys' fees begins with a determination of the reasonable number of hours expended on the litigation by those seeking common benefit fees and then multiplying the total number of hours by an appropriate hourly rate.[46] To facilitate this process, it is helpful for the transferee court to fix guidelines at the outset of the litigation to establish the type of activities performed and expenses incurred by counsel that may entitle them to seek payment or reimbursement from the common benefit fund.[47] These guidelines should include such mundane things, among others, as per diem allowances for food, type or class of air travel, and daily rates for hotel accommodations. The court should also provide a definition of "shared costs" (i.e., costs for which the attorney is entitled to immediate reimbursement by the PSC) and "held costs" (i.e., costs that the attorney should hold for potential reimbursement from the common benefit fund if or when the case is successfully resolved from the plaintiffs' standpoint).[48] To create a record of the type of work performed as well as the costs expended by the attorneys performing common benefit work, it is also helpful for the transferee court, at an early stage in the litigation, to appoint a CPA to receive and vet records periodically submitted by counsel. Those attorneys who are seeking or plan to seek common benefit fees are expected to contemporaneously report their hours, the nature of the work performed, and the expenses incurred for common benefit work to the court-appointed CPA.[49]

---

precedent); Eisenberg & Miller, *supra* note 43, at 32 (summarizing the blended method as a means to calculate attorneys' fees).

46. *See Copper Liquor, Inc.*, 624 F.2d at 583.

47. *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, at 1–2 (E.D. La. July 28, 2009), *available at* http://www.laed.uscourts .gov/Drywall/Orders/Orders.htm (follow "Pretrial Order 9" hyperlink) (outlining that "[a]ll time and expenses submitted must be incurred only for work authorized in advance by the Plaintiffs' Steering Committee" and that "no time spent on developing or processing any case for an individual client (claimant) will be considered or should be submitted"); *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *2–6 (E.D. La. Apr. 8, 2005) (pretrial order appointing Plaintiffs' Steering Committee) (detailing costs eligible for reimbursement include counsel's recorded billable hours, court costs, travel expenses, clerical expenses, and communication costs; establishing concrete limitations on those expenses).

48. *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, at 3–5 (E.D. La. July 28, 2009), *available at* http://www.laed.uscourts .gov/Drywall/Orders/Orders.htm (follow "Pretrial Order 9" hyperlink) (Pretrial Order No. 9 relating to plaintiffs' counsel's time and expense submissions); *In re Vioxx*, 2005 WL 850963, at *4–6.

49. *See In re* Chinese-Manufactured Drywall Prods. Liab. Litig., MDL No. 2047, at 1–2 (E.D. La. July 28, 2009), *available at* http://www.laed.uscourts .gov/Drywall/Orders/Orders.htm (follow "Pretrial Order 9" hyperlink) (Pretrial

These reports are reviewed by the CPA and the court on a regular basis during the course of the litigation for compliance with the court's guidelines for recoverable costs and fees and the reasonableness of the hours reported. The CPA files a monthly or bi-monthly report with the court, which is entered into the record under seal for release at the appropriate time. Such records are an important factor in determining the total reasonable hours spent on the case and who actually performed the work that produced the result.

Once the total reasonable hours are determined, the appropriate hourly rate must be established. This calculation starts with ascertaining the rate charged for comparable work by experienced attorneys in the region. When the attorneys come from all parts of the country, as is often the case, it is appropriate to use some average of the various rates. This figure is then adjusted upward or downward based on an analysis of 12 factors known as the "*Johnson* factors"—first formulated in *Johnson v. Georgia Highway Express, Inc.*[50] These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[51] This enhanced or discounted figure, as the case may be, is then multiplied by the total reasonable hours logged in the case by those seeking common benefit fees. The result is the product of the lodestar method.

---

Order No. 9 relating to plaintiffs' counsel's time and expense submissions); *In re* Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740, 762–63 (E.D. La. 2011); *In re* Guidant Corp. Implantable Defibrillators Prods. Liab. Litig., MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *13 (D. Minn. Aug. 21, 2008); *In re* Propulsid Prods. Liab. Litig., MDL No. 1355, 2005 WL 3541041, at *1–2 (E.D. La. Nov. 28, 2005) (pretrial order distributing attorneys' fee funds); MANUAL, *supra* note 12, § 14.214; HIRSCH & SHEEHEY, *supra* note 24. *See generally In re* Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on Apr. 20, 2010, MDL No. 2179 (E.D. La. Oct. 8, 2010), *available at* http://www.laed.uscourts.gov/OilSpill/Orders/Orders.htm (follow "Pretrial Order #9" hyperlink) (Pretrial Order No. 9 detailing "Plaintiffs' Counsel's Time and Expense Submissions").

    50.    488 F.2d 714, 717–19 (5th Cir. 1974).

    51.    *Id. See also* Von Clark v. Butler, 916 F.2d 255, 258 (5th Cir. 1990).

The lodestar method is not without flaws, especially in common fund cases.[52] As an influential report by the Third Circuit Task Force concluded, the drawbacks of the lodestar method include: (1) increased workload on an already overtaxed judicial system; (2) inconsistent application of the approach and widely varied fee awards; (3) illusory mathematical precision unwarranted by the realities of the practice of law; (4) potential for manipulation; (5) reward of wasteful and excessive attorney effort; (6) disincentive for early settlement; (7) insufficient flexibility for judicial control of litigation; (8) discouragement of public interest litigation; and (9) confusion and lack of predictability in setting fee awards.[53]

In reaction to the difficulties with the lodestar method, courts have turned to the percentage method, which bases the common benefit award on a percentage of the amount recovered. The percentage method gained momentum following the publication of the aforementioned Third Circuit Task Force report in 1985. Recognizing the "contingent risk of nonpayment" in such cases, courts have found that class or lead counsel ought to be compensated "both for services rendered and for risk of loss or nonpayment assumed by carrying through with the case."[54] Moreover, courts find that the percentage method provides more predictability to attorneys and class members, encourages settlement, and avoids protracted litigation for the sake of racking up hours, thereby reducing the time consumed by the court and the attorneys.[55]

The United States Supreme Court has acknowledged the use of the percentage method in common fund cases.[56] The percentage

---

52.  *See* Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 TEX. L. REV. 865, 867–68 (1992) (finding the lodestar method to be "widely condemned" and relaying the "widespread belief" that the method generates more costs than benefits).

53.  *See* Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About "Reasonable Percentage" Fees in Common Fund Cases*, 18 GEO. J. LEGAL ETHICS 1453, 1456 (2005) (summarizing *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237 (1985)).

54.  *In re* Combustion, Inc., 968 F. Supp. 1116, 1132 (W.D. La. 1997) (summarizing the various methods used to calculate attorneys' fees). *See In re* Cabletron, 239 F.R.D. 30, 37 (D.N.H. 2006) (stating that the percentage method allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure) (quotation omitted); *see also* Samuel R. Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?*, 126 U. PA. L. REV. 281 (1977).

55.  *See* Walker & Horwich, *supra* note 53, at 1456–57 (citing *In re* Activision Sec. Litig., 723 F. Supp. 1373, 1378 (N.D. Cal. 1989)); *accord In re* Diet Drugs, 582 F.3d 524, 540 (3d Cir. 2009).

56.  *See* Camden I Condo. Ass'n v. Dunkle, 946 F.2d 768, 773–74 (11th Cir. 1991) (reading *Blum v. Stenson*, 466 U.S. 886, 900 n.16 (1984), as the Supreme

method, however, should not be completely arbitrary, devoid of all
reality or inconsistent with usual fees for the type of case involved.
There is not one percentage that should apply to all cases. The
percentage depends on the facts and circumstances of the particular
case at issue. A number of courts have reviewed data compiled in
empirical studies of attorneys' fees in class actions to determine
what has been awarded in similar cases to assist them in computing
the appropriate percentage fee in the case before them.[57] The studies
reveal that the higher the settlement, the lower the percentage of the
fee.[58] For example, in settlements between $190 million and $900
million, fees between 10% and 12% have been allowed.[59] Whereas
for settlements between $1 million and $2 million, fees between
32% and 37% have been awarded.[60] Of course, the percentages
allowed in past cases are only guideposts, and each case should be
analyzed on its own basis with the objective of determining a
reasonable fee in the case before the court.

   To further ensure that the percentage selected is reasonable,
many courts have utilized the blended method. Under this method,
the fee arrived at by the percentage method is cross-checked by the
lodestar method utilizing the *Johnson* factors. If the fee arrived at by
the percentage method is within "the ball park" of the fee that would
result from the lodestar method, its reasonableness is more
sustainable. This blended approach has been used by a plethora of
district courts.[61] All circuit courts, including most recently the Fifth

---

Court's "acknowledgment" of the percentage method in common fund cases); *In re* Prudential-Bache Energy Income P'ships Sec. Litig., 1994 WL 150742 (E.D. La. Apr. 13, 1994) (tracing the history of the various methods).

   57.   Eisenberg & Miller, *supra* note 43, at 31; Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010).

   58.   *See* Eisenberg & Miller, *supra* note 57, at 250.

   59.   *See id.* at 265.

   60.   *See id.*

   61.   *In re* Vioxx Prods. Liab. Litig., 760 F. Supp. 2d 640 (E.D. La. 2010); *In re* OCA Inc. Sec. & Derivative Litig., No. 05-2165, 2009 WL 512081, at *19 (E.D. La. Mar. 2, 2009); *In re* Enron Corp. Sec., Derivative & ERISA Litig., 586 F. Supp. 2d 732, 766, 778 (S.D. Tex. 2008); Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 859–61 (E.D. La. 2007); *In re* Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig., 447 F. Supp. 2d 612, 628–29 (E.D. La. 2006); Batchelder v. Kerr-McGee Corp., 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003); *In re Combustion*, 968 F. Supp. at 1135–36; Shaw v. Toshiba Am. Info. Sys. Inc., 91 F. Supp. 2d 942 (E.D. Tex. 2000); *In re* Catfish Antitrust Litig., 939 F. Supp. 493, 499–501 (N.D. Miss. 1996).

Circuit, have approved the use of the blended method.[62] Once the total amount of the common benefit fee is established, it is then necessary to determine who is eligible to receive it.

## IV. ELIGIBILITY FOR PARTICIPATION IN COMMON BENEFIT FEES

From the very beginning of an MDL, the transferee court can take steps to create a fair and open environment in which all interested attorneys have the opportunity to perform work for the common benefit of the plaintiff litigants. The court can also establish a transparent factual record for an eventual application for common benefit fees. Of course, the appointment of a supervising PSC is necessary to create centralized leadership and control of the litigation, particularly in the mega MDLs.[63] But the court, the bar associations, the litigants, and the justice system in general have an interest in broadening the range of attorney participation in MDL cases so that the work is not confined to an elite bar of MDL attorneys, which would result in exclusivity, unfairness, or discrimination and inure to the disadvantage of litigants and their attorneys. To accomplish this while still preserving a centralized structure, the transferee court can encourage the PSC to create subcommittees comprised of interested plaintiff attorneys *not* on the PSC and assign these attorneys tasks consistent with the duties of the PSC.[64] The court should announce this policy in its minute entries, in open-court meetings, and on its MDL website and invite all plaintiffs' attorneys in the litigation who are interested in doing common benefit work to contact the PSC and coordinate their efforts through the PSC. In the mega MDLs, it is not unusual for hundreds of plaintiffs' attorneys to perform common benefit work in

---

62.   *See* Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 644 (5th Cir. 2012). In the *Union Asset Management Holding* case, the Fifth Circuit announced:

> To be clear, we endorse the district courts' continued use of the percentage method cross-checked with the *Johnson* factors. We join the majority of circuits in allowing our district courts the flexibility to choose between the percentage and lodestar method in common fund cases, with their analyses under either approach informed by the *Johnson* considerations.

*Id. See also* Goldberger v. Integrated Res., Inc., 209 F.3d 43, 50 (2d Cir. 2000) (averring that the Third Circuit should not "junk" the lodestar method and district courts can use it at their discretion and as a check on the percentage method).

63.   *See generally* MANUAL, *supra* note 12, § 10.221.

64.   *See, e.g.*, *In re* Vioxx Prods. Liab. Litig., MDL No. 1657, 2005 WL 850963, at *4 (E.D. La. Apr. 8, 2005) (Pretrial Order No. 6) (encouraging the PSC to organize "sub-committees comprised of plaintiffs' attorneys not on the PSC and assign[] them tasks consistent with the duties of the PSC").

a coordinated way and become eligible for common benefit fees.[65] The court-appointed CPA records in periodic reports the number of hours expended, the type and significance of the work performed, and who performed it. Such records are an important factor in determining the appropriate total amount of common benefit fee, as well as the proper distribution of the common benefit fee among those who actually performed the work that produced the result achieved.

## V. DISTRIBUTION OF COMMON BENEFIT FEES

After the total common benefit fund is established, a mechanism or procedure must be devised to determine the proper distribution of the fund among those attorneys who did the common benefit work. It is helpful for the transferee court to get input from the plaintiffs' attorneys who occupied leadership roles, those who actually did the work both in the MDL and the state courts, and a third party, someone outside of this group, who can bring an objective perspective to the issue. But in the end, it is the transferee court's responsibility to set the common benefit fee and determine how it is to be distributed.[66]

In the *Vioxx* litigation, the transferee court appointed an allocation committee consisting of several members of the PSC as well as several attorneys who were not on the PSC but who did significant work in either the MDL or the various state court cases that coordinated with the MDL.[67] In addition to the allocation committee, the court appointed a Special Master to provide another perspective.

More than 100 attorneys applied for common benefit fees and submitted supporting documents. The attorneys sent applications and supporting material to the allocation committee, which

---

65.   *See In re* Vioxx Prods. Liab. Litig., 802 F. Supp. 2d 740, 762 (E.D. La. 2011) ("All interested attorneys, including those in the state court litigations, were encouraged to coordinate with the PSC and to do work for the common benefit. Over one hundred firms or attorneys availed themselves of the opportunity to perform common benefit work.").

66.   In the *Turner v. Murphy Oil USA* case, the court initially left allocation of common benefit funds to the PSC, finding that the small number of attorneys involved in the litigation and good working relationships among the group fostered a unique situation where unanimity might be possible. 472 F. Supp. 2d 830 (E.D. La. 2007). The attorneys were unable to reach a consensus on a fee allocation though, so the court appointed a Special Master to generate a proposed fee allocation. *Id.*

67.   *In re* Vioxx Prods. Liab. Litig., MDL No. 1657 (E.D. La. Nov. 20, 2007) (Pretrial Order No. 32), *available at* http://vioxx.laed.uscourts.gov/Orders/Orders .htm (follow "Pretrial Order No. 32" hyperlink).

proceeded to review them and set up interviews with the applicants. Each applicant was given an opportunity to explain his or her position and offer any other material or testimony supporting the request, all of which was recorded and compiled into transcripts.[68] After this was completed in an orderly but expedited fashion, the allocation committee made tentative recommendations to the court.[69] The committee then met privately with each involved attorney, advised that attorney of the committee's proposed fee allocation for the attorney's work, and invited a response. These meetings, in a few instances, resulted in minor adjustments.[70]

Thereafter, the allocation committee made a final recommendation to the court. This recommendation, which contained the allocation committee's recommended common benefit fee for each applicant, was made public on the court's website.[71] The court gave the applicants a deadline to object to the allocation committee's recommendations, and it subsequently received 19 objections.[72] The court met with the objectors and advised them to select a lead and liaison counsel from among their number.

The process then continued before the Special Master.[73] The transcripts and the documentation compiled by the allocation committee were sent to the Special Master for his review. The Special Master then met with lead and liaison counsel for the objectors and lead and liaison counsel for the allocation committee and set a discovery and briefing schedule and a hearing date. Several depositions were taken, the issues were briefed, and the matter proceeded to a formal hearing before the Special Master where testimony and documents were admitted. Promptly thereafter, the Special Master issued a report setting forth his recommendations, sent the report to all interested parties, and posted it on the court's website. The court then set a deadline for objections and received only four.[74]

At this point the court had before it the report of the allocation committee; the transcript and documents compiled by the allocation committee; the depositions, briefs, and transcript compiled by the Special Master, as well as his report; and the data showing the hours logged, costs expended, and the nature of the work performed. The court prepared a summary chart listing the name of each fee applicant, a cross column for each category of work performed by

---

68.  *In re Vioxx*, 802 F. Supp. 2d at 765.
69.  *Id.* at 766–67.
70.  *Id.* at 767.
71.  *Id.*
72.  *Id.*
73.  *Id.*
74.  *Id.* at 768.

the applicant, and the total time logged in performing that task. The categories included such things as: preparing pleadings; taking or assisting in depositions; participating in written discovery; writing briefs; arguing motions; preparing for trial; participating in trials, appeals, or settlement negotiations; and administration and committee leadership. Each category was assigned a number with categories such as participating in trials, participating in settlement negotiation, taking depositions, writing briefs, and committee leadership having a larger number. A total of these numbers generally revealed the individuals who performed the most significant work in resolving the litigation.

The court reviewed all of this material and issued its opinion setting out the allocation of the common benefit fee among the attorneys who performed common benefit work. For each attorney who sought common benefit fees, the court discussed the type of the work performed, the hours logged, the resources expended, and such other factors that inured to the common benefit of the plaintiff litigants.[75] Two of the objectors filed notices of appeal, but these notices were eventually withdrawn. When the opinion became final, the appropriate allocations were made.[76]

CONCLUSION

Each MDL is usually complex and always unique; this is in the DNA of this type of litigation. There is no one way of dealing with the multitudinous issues that erupt during the course of the litigation. This is certainly true when it comes to determining the amount and appropriate distribution of the common benefit fee. Every MDL will have its own peculiarities that will call for some distinct approach. But whatever approach is used, it is helpful if it is developed as early as possible, is transparent, includes input from all interested participants, and contains a multilayered process for deciding the amount of each distribution.

---

75.   *Id.* at 774–825. *See also* Turner v. Murphy Oil USA, Inc., 582 F. Supp. 2d 797 (E.D. La. 2008); *In re* Propulsid Prods. Liab. Litig, MDL No. 1355, 2005 WL 3541041 at *1–2 (E.D. La. Nov. 28, 2005); *In re* Zyprexa Prods. Liab. Litig., 424 F. Supp. 2d 488, 490 (E.D.N.Y. 2006).
76.   *See In re Vioxx*, 802 F. Supp. 2d at 774.