# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC. PELVIC REPAIR SYSTEM PRODCUTS LIABILITY LITGATION | MDL NO. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION | MDL NO. 2325 |
| IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2326 |
| IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2327 |
| IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2387 |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR LIABILITY LITIGATION | MDL NO. 2440 |
| IN RE: NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL NO. 2511 |

THIS DOCUMENT RELATES TO ALL CASES

**LEVIN SIMES ABRAMS LLP REPLY TO THE PETITION FOR AN AWARD OF COMMON BENEFIT ATTORNEY'S FEES AND EXPENSES AND TO THE OPPOSITION**

I. INTRODUCTION

Levin Simes Abrams LLP is one of the two co-leads in the AMS MDL (MDL 2325). We are also a member of leadership for all seven transvaginal mesh MDLs, serving on the Executive Committee and the Plaintiffs' Steering Committee.

We are not members of the FCC. In fact, we objected to the FCC's recommendations for our firm's fee allocation. Pursuant to PTO #244, we followed this Court's protocols and directives for addressing our objections. Those efforts did not succeed until we were able to mediate the disputed fee issues with Judge Daniel Stack. Nonetheless, the protocol set out by the Court in its orders addressing the Common Benefit process provided an opportunity to reach a compromise with the FCC regarding our firm's allocation. We objected to the FCC's Preliminary Written Recommendation, our objections were heard and considered, and the FCC met with us and provided us with feedback and its position. While we did not agree with the FCC on all of its points, the process set forth in the Court's orders provided us and the FCC the opportunity to work in good faith to reach a compromise.

We have reviewed the FCC's Petition and the Opposition filed by Kline and Specter. While we do not agree with all of the positions taken by either the FCC or Kline and Specter, we believe we have a responsibility to address certain important issues raised in both pleadings that impact everyone.

We have not and are not taking any position with respect to the recommended fee allocation as to any firm other than our own, because individual fee allocation issues are not ripe at this juncture.

I. **THE FIVE PERCENT ALLOCATION IS FAIR AND REASONABLE**

On August 26, 2013, this Court entered PTO # 77 which adopted a "voluntary, private and cooperative" agreement for performing work and sharing the work product performed for the Common Benefit of all plaintiffs. Similar orders were entered by this Court in all seven MDLs. We were signatories to the Participation Agreement which was signed by all members of leadership including every member of the Executive Committee and the entire Plaintiffs' Steering Committee.

In sum and substance these Orders, and the Participation Agreement, provide for the joint prosecution of the litigation in all seven MDLs. The signatory firms agreed to perform legal services for the benefit of <u>all</u> claimants and to share the work product with all participating firms with the expectation that they would later be compensated out of the Common Benefit Fund established by the Court.

Pursuant to that Participation Agreement, and in the reliance upon this Court's Orders, the participating firms, including Levin Simes Abrams LLP, performed legal services for the Common Benefit of <u>all</u> claimants. From the outset of this litigation, the leadership of the MDLs worked to achieve the effective and efficient prosecution of <u>all</u> transvaginal mesh claimant's cases. The significant efforts which were required to do so—in terms of financial resources, time and effort of hundreds of lawyers across the country in expending hundreds of thousands of hours of work for the common benefit of all plaintiffs in the litigation—more than justifies an award of 5%. Indeed, the lawyers that initially funded and performed the Common Benefit work would likely not have undertaken such a task without an understanding that their remarkable efforts would be compensated in the event of a successful outcome.

The Court's initial assessment of 5% was established in order to hold back sufficient funds to compensate the participating firms for such work. 95% of the aggregate settlement amounts are completely unaffected by the Court's assessment. No one objected to the Court's initial 5% assessment, which was ordered in 2013. Subsequent to the Court's decision to levy the 5% assessment, <u>all</u> participating firms have operated within this framework over a period of years and have performed hundreds of thousands of hours of collective Common Benefit legal work with the reasonable expectation of having those services compensated out of the Common Benefit Fund. While we recognize that this reasonable reliance may not be dispositive, we do think it is very significant that <u>all</u> participating firms have continued to perform these Common Benefit services without <u>any</u> firm ever raising any objection as to the amount of the 5% assessment.

Kline and Specter now asserts that the amount is excessive. We disagree for the following reasons:

The firms representing individual clients in the underlying cases were spared the important and time-consuming work of conducting the corporate and expert discovery necessary to prove the liability case against each of the defendants. This included but was not limited to developing the medical and scientific experts, taking and defending the expert depositions, reviewing the millions of pages of corporate documents, taking the depositions of the corporate witnesses, substantial motion practice and legal briefing, management of the litigation and trial preparation in the bellwether trial set cases.  By contrast, since the vast majority of discovery in the individual cases was stayed, (save for completion of a Plaintiff Profile Form), a lawyer representing individual claimants had limited responsibilities with respect to proving their underlying cases. Individual case responsibilities were essentially limited to filing a Complaint, completing a Plaintiff Profile Form, obtaining and reviewing limited client medical records, and identifying the device.  Beyond these tasks, the lawyers in the underlying cases were able to rely heavily on the Common Benefit work product in order to prove liability and medical causation. Essentially, the liability case was proven by the firms participating in the Common Benefit effort. Yet 95% of the recovery remains untouched by this Court's assessment so that the lawyers in the underlying cases can still earn most of their fee even though most of the important work was done by others.

## II.     THE OPPOSITION TO 5% ASSESSMENT IS UNSOUND

Our firm has been a participant in leadership in multiple MDLs over the years. We have also reviewed the Common Benefit jurisprudence in every MDL that has produced a published opinion. It is clear that 5% is well within the established due process norms for determining fair compensation for Common Benefit work of this nature and magnitude. Notwithstanding these precedents, the Opposition to the Petition raises certain issues we feel compelled to address.

First, there is a suggestion that because the many billions of dollars in overall recoveries were not the product of a "global settlement," that this fact somehow leads to the conclusion that a Common Benefit was not conferred, or that the value of the work should be somehow diminished.  We have participated in Common Benefit work in many MDLs and have monitored others. Suffice it to say that we are not aware of a single instance where compensation for work

that benefitted all claimants and their counsel was not compensated because the cases were resolved outside of a single global settlement. Moreover, until now, not a single one of the Participating Firms asserted the requirement for a global settlement as a predicate for payment for the work that led to these settlements. The benefit of the work that everyone performed on behalf of all claimants has already been conferred and shared irrespective of the method of resolution.

The opposition also advances an argument that a per case average of "only" $40,000 somehow supports its position that a 5% award is excessive. This is unduly simplistic depiction of the settlement value obtained for claimants obscures the real issues.

In this MDL, as in others, it is often the case that there a large number of claimants who present with lesser injuries, and many who present with no injuries. In this litigation, as in most litigations, many of the claims may have problems which negatively impact their value because of difficulties proving case specific causation and damages. For example, there are questions with respect to the extent of the injuries, there are product identification issues and there are often significant defenses with respect to the presence of other serious medical problems being partly responsible for the claimant's symptoms. On the other hand, there are a smaller number of higher value cases where the claimant is otherwise healthy and where there are no other significant health issues which could explain the symptoms. So, "averages" are not instructive as to the overall results obtained or benefit conferred. The whole phenomenon of "averages" is influenced by a myriad of factors including the fact that defendants often insist upon the inclusion of a large volume of low value cases in settlements in order to be able to publicize a lower case "average". Finally, it is worth noting that these settlements were the result of private negotiations between the underlying counsel of record, or their settlement counsel, and particular defendants. There wasn't any matrix or "average" governing any firm's negotiations, leaving individual firms, consistent with the ethical rules, to apportion settlement monies among their clients depending on their evaluation of the strengths and weaknesses of their cases and after obtaining their clients' consent

Consequently, it makes absolutely no sense to look at across the board "averages" as some sort of short hand yardstick to evaluate the overall benefit conferred. We see no reason to doubt the fact that each law firm was motivated to reach good settlements which accurately reflected the nature and strength of the underlying individual claims. Not surprisingly, the individual settlements reached have varied within a range depending on a host of variables which have <u>nothing</u> to do with the value conferred by the Common Benefit work. There is simply no basis for this Court to devalue the overall impact of the Common Benefit work based on some retrospective opinion that the overall case "averages" achieved should have been higher. The firms that performed the work that helped all of the claimants and the lawyers representing them are in no position to determine or affect whether or not individual law firms obtained the best value they could in their individual lawsuits. That is <u>not</u> the function of leadership or the function of this Court. All the Participating Firms could do was provide everyone with the foundation to prove the liability case in support of the underlying cases.

We also think that there is ample evidence that 5% is actually on the <u>low</u> side of a fair assessment for the overall benefit conferred by the firms doing the work. Our reasoning is as follows:

The lion's share of the work which was necessary to prove all of the cases was performed by the participating Common Benefit firms. The attorneys representing individual claimants in the underlying cases did not have a lot of work to do since discovery in the underlying cases was stayed with the exception of a small subset of cases which were selected as a member of a bellwether pool or placed on a Wave Order. Yet, the recoveries that were obtained relied heavily on the Common Benefit work product which the law firms in the underlying cases have already benefitted from and for which they previously agreed to compensate. The Common Benefit fund is substantial but that is only because the overall recoveries from which the contributions were made were 20 times more substantial. It makes no sense to look at the current fund of $366 million without also looking at the much larger amount of settlement funds which remain to adequately compensate the lawyers in the underlying cases. The hundreds of thousands of hours of Common Benefit work is largely responsible for achieving an aggregate settlement value of

between $7 billion and $11 billion across all the MDLs and yet 95% of those amounts are retained by each claimant and their counsel despite the fact that the entire liability and medical case was built by the firms who did the Common Benefit work. It would be patently unfair for the firm's representing individual clients to retain their entire fee when they have received an enormous amount of assistance in proving their cases and where they already agreed to pay for that help in the form of a fraction of their fee and recovery.

Finally, we do not believe that verdicts provide a useful reference point for overall fairness. Only a tiny portion of the cases were tried (less than one thousandth of a percent) and everyone realized that most cases would never be tried. In any mass tort MDL, the plaintiff's verdicts are usually substantial, but those results merely inform the negotiating parties as to how to value each individual case. The Opposition papers ask this Court to somehow assume that in light of the verdicts, the firms that negotiated their individual client's cases should have achieved better settlements. Putting aside the fact that the Court lacks any practical way of testing this hypothesis, it makes no logical sense since the incentive for each firm is to maximize their client's recovery and is based upon the unique facts of each case. And, every firm had the tools provided by the Common Benefit work product to negotiate the best settlements possible. It is not the job of this Court, or the participating firms, or Kline and Specter to engage in some sort of retrospective second guessing of individual settlement values. We can only observe that if one or more firms did a poor job of representing their clients it was not because they lacked the requisite proof of liability or medical causation. That proof was provided as a result of years of hard work by the firms who devoted their time to lifting all of the boats.

Dated: December 3, 2018

Respectfully submitted,

/s/Rachel Abrams
Rachel Abrams
Levin Simes Abrams LLP
1700 Montgomery, Suite 250
San Francisco, CA 94111
Phone: (415) 426-3000
Fax: (415) 426-3001
rabrams@levinsimes.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

/s/Rachel Abrams
Levin Simes Abrams LLP