# EXHIBIT B

Edward Stanford, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF WEST VIRGINIA

 3                   AT CHARLESTON

 4

 5   IN RE:  ETHICON, INC., PELVIC     )

     REPAIR SYSTEM PRODUCTS LIABILITY ) Master File No.

 6   LITIGATION                        ) 2:12-MD-02327

                                       ) MDL 2327

 7                                     )

     MARABETH CLARK,                   )

 8                                     )

                 Plaintiff,            ) JOSEPH R. GOODWIN

 9                                     ) U.S. DISTRICT JUDGE

     v.                                )

10                                     )

     ETHICON, INC., et al.,            ) Case No.

11                                     ) 2:12-CV-09251

                 Defendants.           )

12                                     )

13

14

15       VIDEO DEPOSITION OF EDWARD STANFORD, M.D.

16           August 10, 2017, at 11:11 a.m.

17

18       Reported by:  ANNETTE M. DERUYTER, CSR

                   Calif. CSR #9816

19

20

21

22

23

24

25
```

Edward Stanford, M.D.

## Page 2

1    DEPOSITION OF EDWARD STANFORD, produced, sworn,
2  and examined on August 10, 2017, at Doctors Medical
3  Center, 1441 Florida Avenue, in the city of Modesto,
4  state of California, before Annette M. DeRuyter, a
5  Certified Shorthand Reporter.
6
7
8         APPEARANCES OF COUNSEL
9
10  Appearing telephonically on Behalf of Plaintiff:
         Wagstaff & Cartmell, LLP
11       4740 Grand Avenue, Suite 300
         Kansas City, MO  64112
12       (816) 701-7473
         By:  Robert G. Groves, Esquire
13          rgroves@wcllp.com
14  On Behalf of Defendants:
         Friday, Eldredge & Clark
15       400 West Capitol Avenue, Suite 2000
         Little Rock, AR  72201
16       (501) 370-1429
         By:  Kimberly D. Young, Esquire
17          kyoung@fridayfirm.com
18
     ALSO PRESENT:
19     NICHOLAS BOULE, Videographer
20
21
22
23
24
25

## Page 3

1         INDEX OF EXAMINATION
2  EXAMINATION BY:                    PAGE
3    Ms. Young                 6, 113
4    Mr. Groves                  63
5
6         ---oOo---
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1         INDEX OF EXHIBITS
2  DEFENDANT'S         DESCRIPTION         PAGE
3  Exhibit 1   Stress Urinary Incontinence
              Journals           23
4
   Exhibit 2   Surgeon's Resource Monograph      30
5
   Exhibit 3   AUGS Practice Bulletin        32
6
   Exhibit 4   AUGS Position Statement on
7             Mesh Midurethral Slings for
              Stress Urinary Incontinence      33
8
   Exhibit 5   Potential Risks of Non-Mesh
9             SUI Surgery          39
10 Exhibit 6   Potential Risks of Non-Mesh
              and Mesh SUI Surgeries      40
11
   Exhibit 7   Clinic records         48
12
   Exhibit 8   TVT Tension-free Vaginal Tape   97
13
   Exhibit 9   St. Mary's Good Samaritan
14             Inpatient Registration Form     114
15 Exhibit 10  Curriculum Vitae Edward J.
              Stanford, MD, MHA, MS, FACOG,
16             FACS           123
17
18         ---oOo---
19
20
21
22
23
24
25

## Page 5

1         Thursday, August 10, 2017
2
3         ---oOo---
4
5     VIDEOGRAPHER:  We are now on the record.
6     My name is Nicholas Boule.  I am a
7  videographer for Golkow Technologies.  Today is
8  8/10/17, and the time is 11:11 a.m.
9     This video deposition is being held in
10  Modesto, California, in the matter of Clark versus
11  Ethicon, et al., for the Southern District of
12  West Virginia.
13     The deponent is Dr. Edwards Stanford.
14     Would Counsel please identify yourselves.
15     MS. YOUNG:  Kimberly Young on behalf of
16  Ethicon and Johnson & Johnson.
17     MR. GROVES:  Robert Groves on behalf of
18  plaintiff Marabeth Clark.
19     VIDEOGRAPHER:  The court reporter is Annette
20  DeRuyter, and will now swear in the witness.
21
22     EDWARD STANFORD, M.D.,
23  a witness herein, having been duly and regularly sworn
24  by the Certified Shorthand Reporter, was deposed and
25  testified as follows:

Edward Stanford, M.D.

Page 6

1
2
3    EXAMINATION
4
5 BY MS. YOUNG:
6    Q. Good morning, Doctor. Will you please state
7 your full name for the record?
8    A. Edward Stanford.
9    Q. And we met just a few minutes ago before we
10 started, but, again, my name is Kim Young, and I am
11 here today on behalf of Johnson & Johnson and
12 Ethicon.
13    A. Okay.
14    Q. And we're taking your deposition today
15 because you were a treating physician of Ms. Marabeth
16 Clark, who has filed a lawsuit that we're here in
17 regard to today.
18        You and I have never met before today; is
19 that right?
20    A. Correct.
21    Q. And you treated Ms. Clark back in the early
22 2000's, and I'm sure you see many patients. Do you
23 have any independent memory of her?
24    A. No, I do not.
25    Q. Have you spoken with any attorney

Page 7

1 representing Ms. Clark before your deposition today?
2    A. I have not.
3    Q. Did you happen to bring an exhibit with -- a
4 CV with you today?
5    A. No.
6    Q. Okay.
7    A. Was I supposed to?
8    Q. Well, it's fine if you didn't. We're going
9 to ask you some questions about your training and
10 education and experience. But I'm sure that you'll be
11 able to tell us that off the top of your head.
12        If you would, Doctor, please tell the ladies
13 and gentlemen of the jury where you went to college
14 and medical school and the years you graduated.
15    A. I went to Pepperdine University and graduated
16 in 1979. Then I went to UCLA for graduate school, and
17 I completed that in 1983 during medical school. And I
18 graduated from med school from the Medical College of
19 Pennsylvania in 1985, which is now Drexel University.
20 I guess there's been purchases, so I'm an alumni of a
21 school I didn't graduate from.
22    Q. And what was your graduate degree in at
23 UCLA?
24    A. Kinesiology or physiology of exercise.
25    Q. After completing medical school did you go on

Page 8

1 to a residency?
2    A. I did. I did a one-year internship in
3 general surgery at Cedars-Sinai. That was 1985
4 through '86.
5        Then I went on to do family medicine at the
6 Northridge Medical Center, which is the UCLA Hospital,
7 and finished that in 1989 and received my board
8 certification to family medicine.
9        And then practiced for just about a year in
10 Wisconsin. And then went back for training in
11 obstetrics and gynecology at Illinois Masonic from
12 1990 to 1993. And completed my boards in OB/GYN in
13 1996.
14    Q. And does this mean you are board certified in
15 family medicine and also obstetrics and gynecology?
16    A. I let the family medicine boards lapse, and
17 I've maintained my boards in OB/GYN.
18    Q. Are you a member of any professional
19 societies?
20    A. The Society of Gynecologic Surgeons, I'm a
21 member. I've been a member of many, many societies.
22 But right now the society of Gynecologic Surgeons
23 and -- oh, and the International Continence Society.
24    Q. What is the International Continence
25 Society?

Page 9

1    A. It's an international society of -- dedicated
2 to the science of pelvic floor dysfunction and
3 incontinence. It's urologists and urogynecologists, as
4 well as physiotherapists and nurses.
5    Q. Do you know how long you've been a member of
6 that society? Approximately.
7    A. A long time. I don't remember. I've been a
8 member of either American Urogyn Society, and sat on
9 their board of directors. I'm sorry, their executive
10 committee.
11        American Association of Gynecologic
12 Laparoscopists. Sat on their board of directors.
13        International Urogyn Association, sat on
14 several committees.
15        ICS, International Continence Society. Was
16 chairman of a couple of committees, including the
17 ethics committee.
18        American College of OB/GYN, and taught coding
19 courses for them for a couple decades.
20        SGS, Society of Gynecologic Surgeons. I
21 was -- it's by invitation only, and I became a member
22 in 2004.
23        So a lot of societies. Usually in a
24 leadership role.
25        MS. YOUNG: Rob, would you mind just muting

Edward Stanford, M.D.

Page 10

1  on your end whenever you're not speaking?  I can hear
2  the clicking of the keys.
3      MR. GROVES:  Sorry about that.
4      MS. YOUNG:  That's fine.  I just don't want
5  it to interfere with the video.  Thank you.
6      Q.  So, Doctor, it sounds as though you've had a
7  particular interest in female urological problems for
8  sometime in your practice; is that fair?
9      A.  That's fair.  That's true.
10     Q.  And when would you say that that particular
11 interest in your practice began?
12     A.  In my chief year, my last year of OB/GYN
13 training, I was given the opportunity by my division
14 chief to branch out.  Since I'd already finished a
15 surgical internship, another residency, during my last
16 year I was allowed to sort of focus on pelvic
17 reconstructive and laparoscopic surgery.
18     And back then urogynecology was sort of a new
19 field, so there weren't hard- -- there were maybe
20 two fellowships available at that point.  So I
21 went this route instead of trying to find a fellowship
22 since there was very few at that point.  And since, of
23 course, the field has blossomed and several more
24 fellowships have come into existence.
25     Q.  Would that have been in 1996, that final

Page 11

1  year?
2      A.  Yeah.  Yes, it would.
3      Q.  Did you publish any articles on treatment of
4  female urologic problems?
5      A.  Yes.  Probably 30.
6      Q.  Have you done any presentations on female
7  urologic problems?
8      A.  Yes.
9      Q.  Can you estimate how many?
10     A.  All over the world.  500.
11     Q.  How long have you --
12     MR. GROVES:  Was that 500?
13     THE WITNESS:  Yes.
14     MR. GROVES:  Thank you.
15     MS. YOUNG:  Q.  And what types of
16 circumstances have you given presentations under?
17     A.  Grand rounds, society meetings, abstract
18 presentations, paper presentations, staff CME
19 presentations.
20     At one point when I was helping some
21 companies with research, I would give lectures,
22 several dozen a year for -- you know, to educate
23 physicians.
24     So, you know, it could be 300.  I don't know.
25 I don't know how many I've done.

Page 12

1      I would say grand rounds or the similar type
2  of thing, well over 100.
3      Q.  And for the benefit of the jury, what are
4  grand rounds?
5      A.  A hospital educational program, residency
6  academic center might ask for a specialist to come in
7  and talk about a subject matter.  And then they
8  present to a department, as well as maybe nursing and
9  residency staff, and usually that's considered a Grand
10 Rounds.  It's getting everybody together for -- to
11 listen to a scholarly presentation.
12     Q.  How long have you treated patients for stress
13 urinary incontinence?
14     A.  Since probably my -- you mean surgical
15 treatment or just treatment?
16     Q.  Just treatment in general.
17     A.  Oh.  My entire medical career.
18     As a family physician I would treat
19 overactive bladder and retentive patients.  And then
20 as an OB/GYN I learned about surgical treatment.  And,
21 you know, the combination probably since 1987.
22     Q.  And when did you begin surgical treatments of
23 your patients for stress urinary incontinence?
24     A.  As a resident I would assist on those types
25 of surgeries.  And then as a private physician it

Page 13

1  became a focus of my practice for a couple of
2  decades.
3          (Whereupon a conversation
4           was held off the record.)
5      MS. YOUNG:  Q.  Doctor, what is your current
6  job?
7      A.  I am the market chief medical officer for the
8  central California hospital, Tenant hospitals.
9      So Tenant is an AD hospital system.  And they
10 have I think 22 or 24 CMOs.  And I'm the CMO of the
11 three tenant facilities in Central California.
12     I also don't have the official title of chief
13 operating officer but I have operational oversight
14 over nine clinical departments of this hospital,
15 Doctors Medical Center.
16     Q.  With all of those responsibilities, are you
17 still able to see patients at this point in your
18 career?
19     A.  I don't operate anymore.  I only see patients
20 in the family medicine residence clinic.  So I do a
21 gynecologic clinic two or three Fridays a month and an
22 OB clinic two or three Wednesdays a month, and I teach
23 residents.  But I don't deliver babies or do surgery
24 for the last two years now.  I've gone to the
25 administrative side.

Edward Stanford, M.D.

Page 14

1    Q.  I understand.
2         So is two years ago the last time that you
3    would have performed any surgeries to treat stress
4    urinary incontinence?
5    A.  It would have been June of 2015.  That's a
6    little over two years.
7    Q.  And at that time what percentage of your
8    practice would involve treatment of stress urinary
9    incontinence?
10   A.  At that point I had curtailed that activity
11   because I was the chief of OB/GYN and chief medical
12   officer of another hospital.  And so it would have
13   been about 50 percent of my practice.  And the rest
14   would have been obstetrics since I was overseeing the
15   obstetric division.
16   Q.  And how many years would you say that the
17   treatment of patients for SUI represented about 50
18   percent of your practice?
19   A.  Oh, just those two or three years.  The rest
20   of it, it was probably 75 to 80 percent.  I always did
21   a little obstetrics on the side, always.
22   Q.  But it had been 75 to 80 percent from the
23   time that you completed your residency in '96 in that
24   field?
25   A.  Yes.  But there was about a -- probably a

Page 15

1    seven- or eight-year period where I didn't do
2    obstetrics at all and I only did gynecology.
3    Q.  And does gynecology include treatment of
4    stress urinary incontinency?
5    A.  Yes.
6    Q.  Okay.
7         When you were training, were you trained on
8    any non-mesh surgical options to treat stress urinary
9    incontinence?
10   A.  Yes.
11   Q.  And if you would, tell me what those were.
12   A.  The -- back when I was training, the sort of
13   state of the art at that point was to do a Burch
14   procedure.  I've done hundreds of open Burch as well
15   as laparoscopic Burch procedures.
16        Less common would be pubovaginal sling
17   procedures.  But I've done those in the United States
18   as well as in Africa.
19        And needle suspensions.  I was never a big
20   fan of needle suspensions, but I did perform those,
21   since they were minimally invasive, on hundreds of
22   other patients.  And that would have been in the '90s
23   up to the early 2000s.
24        And then, of course, the minimally invasive
25   mesh slings became more prevalent, and so that shifted

Page 16

1    the practice away from non-mesh procedures.  But not
2    entirely.  There was still a role for mesh
3    procedures -- I mean non-mesh procedures.
4    Q.  When you say you were not a big fan of the
5    needle suspension procedures, what were your concerns
6    with that procedure?
7    A.  Historically they had about a 50 percent
8    failure rate over time.
9         So if the counseling was such that the
10   patient would probably be a suitable candidate or had
11   health risks that a larger surgery may not be the best
12   choice, then a minimally invasive procedure such as a
13   staming needle procedure might be done.  And it would
14   be the patient's choice.
15   Q.  And when you refer to a needle suspension
16   procedure as less invasive, are you saying that it was
17   less invasive than a Burch procedure?
18   A.  Yes.
19   Q.  Describe if you would for the jury what a
20   Burch procedure entails?
21   A.  A traditional Burch procedure would be an
22   incision in the suprapubic region.  You would dissect
23   between the pubic bone and the bladder.  And then you
24   would place sutures adjacent to the lower bladder and
25   upper urethra and suspend it to a ligament.

Page 17

1         Now, that could also be done
2    laparoscopically.  But, again, you have to get into
3    the retropubic space.  And usually two sutures were
4    replaced on each side and suspended with a one hand in
5    the vagina lifting and one hand suturing adjacent to
6    the lower bladder, upper urethra, and then securing it
7    to a ligament and tying it to the point where the
8    ureterovesical junction is elevated to stop the urine
9    flow.  Or urine leakage.  Not urine flow, but urine
10   leakage.
11   Q.  And what is it about the mesh slings when
12   they came onto the market that made them a preferable
13   option in certain cases over the Burch procedure?
14        MR. GROVES:  Object to form.
15        THE WITNESS:  Answer anyway?
16        MS. YOUNG:  Q.  You can, yes.
17   A.  Okay.  Great.
18   Q.  From time to time either one of us might make
19   objections.
20   A.  Sure.
21   Q.  But they're strictly for the record.  But you
22   can go ahead and answer.
23   A.  I guess I didn't quite understand the
24   question.
25   Q.  Sure.  And thank you for telling me that.  If

Edward Stanford, M.D.

Page 18

1  that ever happens, let me know --
2      A.  Okay.
3      Q.  -- and I'll rephrase it.
4      I thought that you mentioned that at a
5  certain time the -- there were mesh slings that came
6  on the market.
7      A.  Yes.
8      Q.  And that there was a shift in the procedures
9  that you did from more invasive procedures to mesh
10  sling procedures.  Did I understand that correctly?
11      A.  Yes.
12      MR. GROVES:  Object to form.
13      MS. YOUNG:  Q.  Okay.
14      A.  There was a natural history, yeah.  After
15  Olmsted's research back in I think '94 maybe, I forget
16  the date, there was an interest in mesh sling
17  procedures, in particular the TVT procedure.  And over
18  time as the research developed, it was considered a
19  less invasive and highly effective procedure.  So more
20  of those slings started to be done by folks like
21  myself who were treating incontinence.
22      Q.  When did you first use a mesh product to
23  surgically treat stress urinary incontinence?
24      A.  I don't recall.
25      Q.  Approximately.

Page 19

1      A.  I actually went and trained with Olmsted in
2  Sweden, but I don't recall the first one I did.
3      Q.  And that is Dr. Olmsted?
4      A.  Olmsted.  He's the one that invented the TVT.
5  I believe I have his name correct.
6      Q.  No, yes, you're correct.
7      A.  Yes.  It's been a long time.
8      Q.  It has been by this point.
9      Do you remember approximately how long you
10  trained with him?
11      A.  Yes.  It was about a five-day trip to Sweden.
12  And I performed a few cases there and observed several
13  cases.
14      And then I didn't adopt it right away when I
15  came back.  So I would say probably '95.  Around '95 I
16  started incorporating them into my practice.
17      Q.  And what, if anything, explained the delay in
18  when you first came back and when you incorporated it
19  into your practice?
20      A.  I've always been a little bit of a stickler
21  for numbers, so I wanted to see more research
22  developed.
23      Q.  And did you see that research?
24      A.  Yes.  It started to come out.  Yeah.
25      Q.  And when the additional research came out,

Page 20

1  did you reach a point where you were comfortable using
2  the TVT?
3      A.  I was actually always comfortable with the
4  procedure, but I needed to be able to counsel my
5  patient.  So I became comfortable that I could give
6  the patients some data so they could make a choice.
7      Q.  I understand.
8      Can you estimate the number of patients that
9  you surgically treated for SUI before Ms. Clark's
10  procedure in 2003, including in that number both mesh
11  and non-mesh procedures?
12      A.  No.
13      Q.  Just adding up the numbers that you were
14  assigning to different types of procedures, was it
15  fair to say it was in the hundreds?
16      A.  Yes.
17      Q.  Could it have been in the thousands?
18      A.  Oh, over the course of my career, yes.
19  Between '94 and '95 and 2003 is it?
20      Q.  Yes.
21      A.  It's in the hundreds.
22      Q.  Okay.
23      And before your procedure with Ms. Clark in
24  June of 2003, can you estimate how many TVT procedures
25  you would have done by then?

Page 21

1      A.  I'm not even sure how to arrive at the
2  number.  Several hundred.
3      Q.  And we may have covered this a little bit
4  earlier, but why did you start using the TVT
5  midurethral sling to treat patients with SUI as
6  opposed to other surgical options that you had?
7      A.  Well, again, I was comfortable with the
8  procedure.  I was comfortable with the preliminary
9  research.  And then as I became more familiar with the
10  procedure, I saw -- personally saw very good success.
11  It was less invasive than a Burch, either laparoscopic
12  or open Burch.  Less time in the hospital.  And the
13  complication rates were relatively low.
14      Q.  Did you continue to use the TVT product after
15  Ms. Clark's procedure in June of 2003?
16      A.  Yeah, I have used TVT my entire career.  Now,
17  you know that, probably after 2005 or '06 when the
18  transobturator approach became more popular, the TVT
19  use dropped off.  And I certainly did convert to the
20  transobturator approach, o-b-t-u-r-a-t-o-r.
21      So, yes, it was a natural progression of
22  newer techniques that I adopted.
23      Q.  And were you using the TVT with the obturator
24  approach at the time that you stopped performing these
25  types of surgeries?

Edward Stanford, M.D.

Page 22

1    A. Oh, you mean when I sort of went into my
2  administrative retirement?
3    Q. Exactly.
4    A. Yes, I was doing TVTs and TOTs.
5    Q. Doctor, in an effort to provide quality
6  medical care to your patients, is it fair to say that
7  you've familiarized yourself with safety information
8  before using a new surgical product for the first
9  time?
10   A. Yes.
11   Q. And is that what you touched on earlier when
12 you were talking about training and obtaining data to
13 be able to inform your patients?
14   A. Yes.
15   Q. Is reading medical journals one of the ways
16 you educate yourself about surgeries and medical
17 devices?
18   A. Yes.
19   Q. You also attend medical conferences?
20   A. Less now.  But, yes.
21     I usually attended a couple international or
22 U.S. conferences every year.  And, of course, there
23 research is presented at all of them.  A lot of the
24 research I kind of knew beforehand because I review
25 for journals.  At one point I was reviewing for I

Page 23

1  think 13 different journals and was on the editorial
2  board of two.  And -- or three.
3     And so I would have the opportunity to review
4  a lot of research ahead of time.  So I was pretty
5  familiar with data.
6    Q. I am going to hand you what's been marked as
7  Exhibit 1 to your deposition.
8        (Whereupon Defendant's
9         Exhibit 1 was marked for
10        identification.)
11     MS. YOUNG:  Q.  And it's titled, "Stress
12 Urinary Incontinence Journals."
13     If you would take a look at this list and
14 tell me whether you're familiar with these journals.
15   A. I didn't realize the Cochrane Library
16 (Cochrane Reviews) was a journal, but I'm familiar
17 with all of these.
18   Q. Okay.
19     You mentioned being on the editorial board of
20 two or three journals.  Which journals were those?
21   A. The International Urogyn Journal.  I was on
22 their editorial board.
23     Female Pelvic Medicine Reconstructive
24 Surgery, I was on their editorial board.
25     The Journal of Minimally Invasive Gynecology,

Page 24

1  I was on theirs as well.
2    Q. Do you recall the years that you were on
3  those boards approximately?
4    A. Different times.  I don't recall.
5    Q. That's fine.
6     And you also mentioned being a reviewer for
7  journals.  Are any of the journals that you served in
8  that role listed here on this list?
9    A. I've actually reviewed for every one of them
10 except the Cochrane Library.
11   Q. Okay.  Thank you, Doctor.
12   A. Oh, no, I take that back.  I don't think I
13 reviewed for New England Journal.  I don't recall
14 doing that.
15   Q. Okay.
16   A. But all the rest, yes.
17   Q. Thank you.
18     As part of educating yourself about different
19 procedures and the efficacy and safety of procedures,
20 do you sometimes confer with medical colleagues on
21 those issues?
22   A. Or they conferred with me, yes.
23   Q. And do you also I'm sure take into account
24 your own clinical experience?
25   A. Yes.

Page 25

1    Q. In your opinion is there any surgery that is
2  totally risk free?
3    A. No.
4    Q. In your opinion are there known basic risks
5  to all pelvic floor surgeries?
6    A. Yes.
7    Q. Do you ever guarantee an outcome to a
8  patient?
9    A. No.
10   Q. Anytime that you do a surgery on a woman in
11 her pelvic area, do you discuss with the patients
12 risks associated with that procedure?
13   A. Yes.
14   Q. And would some of those risks associated with
15 the pelvic procedure include pain with intercourse
16 after the procedure?
17   A. Yes.
18   Q. Would they -- the risk also include --
19     MR. GROVES:  Object to form.
20     MS. YOUNG:  Q.  Would the risk also include
21 vaginal scaring?
22     MR. GROVES:  Object to form.
23     THE WITNESS:  Yes.
24     MS. YOUNG:  Q.  Would the risk also include
25 urinary problems such as retention or trouble emptying

Edward Stanford, M.D.

Page 26

1  the bladder?
2      A.  Yes.
3          MR. GROVES:  Object to form.
4          MS. YOUNG:  Q.  Were those risks that you
5  knew were associated with any pelvic surgery when you
6  operated on Ms. Clark?
7          MR. GROVES:  Object to form.
8          THE WITNESS:  That would have been a usual
9  conversation.  What I said to her specifically, I
10  don't recall.
11          MS. YOUNG:  Q.  Were those risks that you
12  yourself would have been aware of at the time of
13  Ms. Clark's procedure in 2003?
14      A.  Yes.
15      Q.  If a patient develops a particular side
16  effect or complication, does that mean that you have
17  made an incorrect choice in recommending the
18  surgery?
19          MR. GROVES:  Object to form.
20          THE WITNESS:  Not usually, no.
21          MS. YOUNG:  Q.  If a patient develops a side
22  effect or complication, does that mean that you made
23  the wrong choice in recommending a product to be used
24  in surgery?
25          MR. GROVES:  Object to form.

Page 27

1          THE WITNESS:  I don't believe so.
2          MS. YOUNG:  Q.  If a patient develops a side
3  effect or complication, in your opinion does that mean
4  that something was wrong with the product you used?
5      A.  I would -- well --
6          MR. GROVES:  Object to form.
7          THE WITNESS:  Yeah, I'm not sure exactly how
8  to answer that.
9          But, no, I would -- I would answer that if I
10  felt it was safe and effective and the patient
11  understood the risks, then I would feel comfortable
12  proceeding with the procedure.  I'm not sure I could
13  blame the product, per se, for a known complication.
14          Did that answer your question?
15          MS. YOUNG:  Q.  It did.  Thank you, Doctor.
16      A.  Okay.
17      Q.  When you're deciding whether or not to offer
18  a surgery to a patient, do you have to weigh the
19  potential risks and side effects with the potential
20  benefits?
21      A.  Every time.
22      Q.  Do you remember any of the Ethicon sales
23  representatives from the 2001 to 2003 period?
24      A.  I do not.  I usually did not interact much
25  with the representatives.

Page 28

1      Q.  Okay.
2          Did you have sales reps from many different
3  pharmaceuticals companies and medical device companies
4  that would call on you or your clinic for their
5  products?
6      A.  They would call, but I wasn't a fan of
7  entertaining sales reps.
8      Q.  That's fair enough.
9          Do you recall whether Ethicon sales
10  representatives ever left, from time to time, any
11  written documents at various times?
12      A.  Oh, they always drop by and left written
13  documents.  I couldn't tell you what they were.  They
14  didn't get read very often.
15      Q.  Okay.
16          Do you know whether or not in the time frame
17  of June 2003 there would have been a place in your
18  office with brochures available for patients that
19  discussed various gynecological issues?
20          MR. GROVES:  Object to form.
21          THE WITNESS:  Yeah, it was a bit of an
22  expense for the office, but I would purchase ACOG
23  bulletins, and I put them up in a rack in the -- in
24  one of my offices, I think, it was in the waiting room,
25  and the other one it was in a patient access

Page 29

1  hallway.
2          MS. YOUNG:  Q.  Can you tell the jury please
3  what ACOG stands for?
4      A.  American College of Obstetrics and
5  Gynecology.
6      Q.  Do you recall whether you ever used a
7  brochure relating to the TVT sling?
8      A.  I don't recall.
9      Q.  Do you recall whether you would have given
10  Ms. Clark any Ethicon brochure related to the TVT
11  sling?
12      A.  I don't recall.
13          Now, that said, usually there was a -- there
14  would have been some sort of description of what the
15  procedure looks like.  And I don't recall back then
16  what educational materials I might have used.  But I'm
17  not a great artist, so I probably had a photograph or
18  a picture or a pelvic model, and I would show them.
19          I do know that I had the trocars in the
20  office at one point to demonstrate what the procedure
21  meant.  And when I would use the word trocar, most
22  patients wouldn't know what that meant, so I would
23  show them.
24      Q.  And can you explain for the jury what a
25  trocar is?

Edward Stanford, M.D.

Page 30

1   A. Yeah.
2      The mesh product is delivered under the pubic
3  bone with the help of a metal stick that's shaped in a
4  way that would introduce a track for the device to be
5  implanted. And then -- so that was a trocar. A
6  metal -- a curved metal implant stick, for lack of a
7  better word.
8      Q. And when you say you would use a model, is
9  that a model of the anatomy that would be involved in
10 the procedure?
11     A. Yes. I had some pelvic models in the office
12 that I would use to demonstrate different types of
13 surgeries to different patients.
14     Q. Do you know the source of any of the
15 photographs or illustrations you may have used to
16 describe a procedure to your patient?
17     A. I really don't recall what I used then.
18 Sorry. I don't recall.
19     Q. That's all right.
20     I'm going to hand you what's been marked as
21 Exhibit 2 to your deposition. It's titled, "Surgeon's
22 Resource Monograph."
23            (Whereupon Defendant's
24            Exhibit 2 was marked for
25            identification.)

Page 31

1      MS. YOUNG: Q.  Is this something that you
2  recall ever receiving a copy of during your training
3  on the TVT midurethral sling?
4      MR. GROVES: May I ask, is Exhibit 2 dated?
5      THE WITNESS: Yes.
6      MS. YOUNG: It is. It says on the front page
7  a report of June 2000 Summit Meeting.
8      MR. GROVES: June 2000 Summit Meeting?
9      MS. YOUNG: Yes.
10     MR. GROVES: Thank you.
11     MS. YOUNG: You're welcome.
12     THE WITNESS: I don't recall this monograph.
13 But I recall the -- these black and white pictures on
14 page five, I believe it is --
15     MS. YOUNG: Q.  Okay.
16     A. -- I do recall these pictures.
17     And I'm pretty sure I had something similar
18 to this in the office to demonstrate what the
19 procedure was.
20     I don't recall this monograph though.
21     Q. Is it possible you received the monograph but
22 don't remember as you sit here today whether you
23 remember it?
24     A. Sure, it's possible, yes.
25     Q. Do you from time to time review practice

Page 32

1  bulletins issued by the American College of Obstetrics
2  and Gynecologists?
3      A. Yes.
4            (Whereupon a conversation
5            was held off the record).
6      MS. YOUNG: I'm going to hand you what's been
7  marked as Exhibit 13. I'm sorry, as Exhibit 3.
8            (Whereupon Defendant's
9            Exhibit 3 was marked for
10           identification.)
11     MS. YOUNG: Q.  If you would, would you read
12 the title of that practice bulletin?
13     A. Urinary Incontinence in Women.
14     Q. And do you recall whether or not you received
15 that practice bulletin?
16     A. From November 2015, I don't recall.
17     Well, first of all, I would not have received
18 it. I would have to go and look for it myself.
19     Q. Okay.
20     A. And I'm not -- I don't recall having read it
21 either.
22     MR. GROVES: Is that an ACOG bulletin?
23     MS. YOUNG: Yes, it was.
24     Q. Okay. Now I'm going to hand you what has
25 been marked as Exhibit 4 to your deposition.

Page 33

1            (Whereupon Defendant's
2            Exhibit 4 was marked for
3            identification.)
4      MS. YOUNG: Q.  A physician's statement
5  issued by AUGS. It's an acronym, A-U-G-S.
6      Here you go, Doctor.
7      A. Give me just one second. I'm looking at
8  this.
9      Q. Sure.
10     MR. GROVES: What's the date of this, the
11 AUGS statement?
12     MS. YOUNG: Yes, I was just about to get to
13 that. January 2014.
14     Q. Doctor, could you read the title of that
15 position statement, please?
16     A. Position statement on Mesh Midurethral
17 Slings for Stress Urinary Incontinence.
18     Q. And what is the organization that issued the
19 physician's statement?
20     A. The American Urogynecologic Society, in
21 conjunction with the Society of Urodynamics, Female
22 Pelvic Medicine and Urogenital Reconstruction. SUFU,
23 S-U-F-U.
24     Q. Thank you.
25     Doctor, I'm going to read you some statements

Edward Stanford, M.D.

Page 34

1 from this and then ask you whether or not you agree
2 with them. All right?
3     A. Yes.
4     Q. "The polypropylene mesh midurethral sling is
5 the recognized worldwide standard of care for the
6 surgical treatment of stress urinary incontinence."
7         MR. GROVES: Object to form. Also object to
8 this use of this exhibit. Lacking in foundation.
9         MS. YOUNG: Q. "The polypropylene mesh
10 midurethral sling is the recognized worldwide standard
11 of care for the surgical treatment of stress urinary
12 incontinence. The procedure is safe, effective, and
13 has improved the quality of life for millions of
14 women."
15        MR. GROVES: Object to form. Object to this
16 use of this exhibit. Lacking in foundation.
17        MS. YOUNG: Q. Doctor, do you have the
18 January 2014 physician's statement in front of you?
19     A. I do.
20     Q. And if you will look at the very first page,
21 there's an introductory paragraph that's italicized,
22 which is the source of the statement I just read.
23        Do you agree with that statement today?
24        MR. GROVES: Again, object to form. Lack of
25 foundation.

Page 35

1        THE WITNESS: Well, it's a rather broad
2 statement, but I think it's accurate.
3        MS. YOUNG: Q. And the next statement I'm
4 going to read is "Polypropylene material is safe and
5 effective as a surgical implant."
6        Do you agree with that statement today?
7     A. I do.
8        MR. GROVES: Object to form. Lack of
9 foundation.
10        MS. YOUNG: Q. Did you agree with the two
11 statements I just read at the time of Ms. Clark's
12 implant in June of 2003?
13     A. Yes.
14        MR. GROVES: Object to form. Lack of
15 foundation.
16        THE WITNESS: Still yes.
17        MS. YOUNG: Counsel, would you like a
18 continuing objection to any questions from this
19 position statement?
20        MR. GROVES: I'll just keep objecting to form
21 and lacks foundation on this particular exhibit. I'm
22 not quite sure if I'm entitled to a continuing
23 objection under the rules.
24        I apologize, Counsel. And to you, Doctor.
25 I'm sorry if I'm talking over you as well.

Page 36

1        MS. YOUNG: That's all right. If you feel
2 more comfortable with that, we'll do it this way.
3        THE WITNESS: Yeah, I don't take it
4 personally, okay.
5        MR. GROVES: I'm sorry. I'm just this guy
6 joining by phone. You guys are traveling and taking
7 time out of your day, so I just want to be as polite
8 as I can. Sorry about that.
9        MS. YOUNG: That's quite all right.
10     Q. The next statement is, "The monofilament
11 polypropylene mesh midurethral sling is the most
12 extensively studied anti-incontinence procedure in
13 history."
14        Do you agree with that statement today?
15        MR. GROVES: Object to form. Lack of
16 foundation.
17        THE WITNESS: That's probably true.
18        MS. YOUNG: Q. Did you agree with that
19 statement at the time of Ms. Clark's implant in June
20 of 2003?
21        MR. GROVES: Object to form. Calls for
22 speculation. Lack of foundation.
23        THE WITNESS: I'm not sure.
24        MS. YOUNG: Q. That's okay.
25        Is that because of the time that's lapsed

Page 37

1 between now and then?
2     A. Yes.
3     Q. Poly -- the next statement is, "Polypropylene
4 mesh midurethral slings are the standard of care for
5 the surgical treatment of SUI and represent a great
6 advance in the treatment of this condition for our
7 patients."
8        Do you agree this statement today?
9        MR. GROVES: Object to form. Lack of
10 foundation.
11        THE WITNESS: Yes.
12        MS. YOUNG: Q. Did you agree with that
13 statement at the time of Ms. Clark's implant in June
14 of 2003, if you remember?
15        MR. GROVES: Object to form. Calls for
16 speculation. Lacks foundation.
17        THE WITNESS: I would say yes.
18        MS. YOUNG: Q. In your opinion, Doctor, is
19 the TVT an important treatment option that should be
20 available to women and surgeons?
21     A. Yes.
22     Q. Would you agree that the TVT is the best
23 studied procedure for the treatment of SUI?
24        MR. GROVES: Object to form. Lack of
25 foundation.

Edward Stanford, M.D.

Page 38

1    THE WITNESS: Well, I think best is not the
2  best word.
3    MS. YOUNG: Q.  Okay.
4    A.  It is extensively studied, and so are a lot
5  of other midurethral mesh, polypropylene mesh slings,
6  yes.
7    Q.  And I understand your hesitation in comparing
8  it to other products and respect that, so let me just
9  rephrase it a little bit.
10    Are you comfortable with the level of study
11  and testing done with the TVT product?
12    A.  Yes.
13    MR. GROVES:  Object to form.
14    MS. YOUNG: Q.  And you've already testified
15  that the TVT is a less invasive surgical procedure
16  than the Burch; is that correct?
17    A.  Yes.
18    Q.  And, Doctor, in your hands have your patients
19  had a good clinical experience with the TVT?
20    A.  Yes.
21    Q.  And have you found in your experience that
22  the benefits of TVT have outweighed the potential
23  risks of using it?
24    A.  Yes.
25    Q.  In your experience have you found the TVT

Page 39

1  sling to be a safe and effective treatment option?
2    A.  Yes.
3    Q.  Okay.
4    I think we're on Exhibit No. 5.
5    (Whereupon Defendant's
6    Exhibit 5 was marked for
7    identification.)
8    MS. YOUNG: Q.  Doctor, I'm going to hand
9  you what's been marked as Exhibit 5 to your
10  deposition.
11    It's titled, "Potential Risks of Non-Mesh
12  Surgical" -- I'm sorry, "Non-Mesh Stress Urinary
13  Incontinence Surgery."
14    If you would take a look at those and read
15  over the list.
16    Are you familiar with what's listed on this
17  exhibit as being potential risks of surgery to treat
18  SUI even when a synthetic mesh is not used?
19    A.  Yes.  This is a very comprehensive list.
20    Q.  And were you aware of each of these potential
21  risks in non-mesh SUI surgeries at the time that you
22  did Ms. Clark's surgery?
23    A.  Yes, I was.
24    Q.  I'm going to hand you next what's been marked
25  as Exhibit 6 to your deposition.

Page 40

1    (Whereupon Defendant's
2    Exhibit 6 was marked for
3    identification.)
4    MR. GROVES:  Object to form.  Sorry.  I was
5  on mute there.
6    Counsel, what's the date of that document,
7  Exhibit 5?
8    MS. YOUNG:  There is no date.
9    MR. GROVES:  Okay.  And that was the non-mesh
10  one?
11    MS. YOUNG:  Yes.  Correct.
12    Are you okay, Doctor.  Do you need to take a
13  break?
14    THE WITNESS:  One second.
15    (Whereupon a conversation
16    was held off the record.)
17    MS. YOUNG: Q.  If you would take a look at
18  what's been marked as Exhibit 6 to your deposition.
19  And you will see that it has on the left side the same
20  list of risks that was listed on number 5 --
21    A.  Okay.  All right.
22    Q.  -- as risks associated with non-mesh
23  surgeries to treat stress urinary incontinence.
24    And then on the right there are a list of
25  risks associated with mesh surgeries to treat SUI.

Page 41

1    And my question is are you familiar with each
2  of the lists listed on the right as being a risk
3  associated with the mesh SUI surgery?
4    A.  Yes, they are identical lists, and it makes
5  perfect sense that they would be.
6    Q.  Okay.
7    And were you aware of these as risks
8  associated with a mesh SUI surgery at the time of
9  Ms. Clark's procedure in 2003?
10    A.  Yes.
11    Q.  At the time of Ms. Clark's procedure were you
12  aware that acute or chronic pain with intercourse was
13  a risk of a mesh SUI surgery?
14    And I apologize it seems tedious, but I'm
15  going to need to ask about each one.
16    A.  Well, then it's yes to each one.
17    Q.  Okay.  This will go quickly then.
18    Were you aware at the time of Ms. Clark's
19  surgery that acute or chronic pain was a risk of mesh
20  SUI surgery?
21    A.  Yes.
22    Q.  Were you also aware that vaginal scarring was
23  a risk of the mesh SUI surgery?
24    A.  Yes.
25    You really have to go through each one of

Edward Stanford, M.D.

Page 42

1 these?
2    Q. I apologize. I'm told to. Yes.
3    A. I can read the list, and it's yes to all of
4 these. I was aware.
5    Q. Let me just read them all and have you
6 respond.
7        Were you aware at the time that infection was
8 a risk of a mesh SUI surgery?
9    A. Yes.
10    Q. Were you aware at the time of urinary
11 problems, including frequency, urgency, dysuria,
12 retention, or obstruction, and incontinence as a risk
13 of a mesh SUI surgery?
14    A. Yes.
15    Q. Were you aware of organ or nerve damage as a
16 risk to a mesh SUI surgery?
17    A. Yes.
18    Q. Were you aware of bleeding as a risk to a
19 mesh SUI surgery?
20    A. Yes.
21    Q. Were you aware of wound complications as
22 well?
23    A. Yes.
24    Q. And inflammation?
25    A. Yes.

Page 43

1    Q. And fistula formation?
2    A. Yes.
3    Q. And neuromuscular problems?
4    A. Yes.
5    Q. Were you aware of one or more surgeries to
6 treat an adverse event as a potential risk of a SUI
7 surgery?
8    A. Yes.
9    Q. And were you also aware of recurrence or
10 failure?
11    A. Yes.
12    Q. Were you aware of foreign body response as a
13 risk to a mesh SUI surgery?
14    A. Yes. It's not worded properly. But yes.
15    Q. Okay.
16        And how would you word it differently?
17    A. Well, you're asking a -- you're asking about
18 mesh in general. And so, yes, with some mesh that is
19 definitely true. But with a monofilament
20 polypropylene it was -- a foreign body reaction would
21 be pretty obscure.
22    Q. Okay. Thank you for that clarification,
23 Doctor.
24        Were you aware of erosion, exposure or
25 extrusion of mesh as risks of a mesh SUI surgery?

Page 44

1    A. Yes.
2    Q. And lastly, were you aware of contraction or
3 shrinkage of tissues as a risk related to a mesh SUI
4 surgery?
5    A. Yes.
6    Q. Doctor, when you performed the procedure on
7 Ms. Clark, would the TVT have come in packaging?
8    A. Yes. Of course.
9    Q. And does it include instructions for use in
10 that packaging? An IFU or a document listing
11 instructions for its use, if you know?
12    A. I don't recall.
13    Q. Okay.
14        Do you recall --
15    A. I would open the package, but I don't recall
16 if there was an instruction pamphlet or sheet. I
17 don't know.
18    Q. Would you rely on a set of instructions that
19 came within the product to teach you how to do the
20 procedure?
21    A. No.
22    Q. Would you rely on a set of instructions that
23 came with the product to inform you of potential risks
24 or side effects?
25    A. No.

Page 45

1    Q. Do you know for sure whether or not you ever
2 read the instructions for use that accompany a TVT
3 package?
4    A. I was very well aware of how to perform the
5 procedure. That's like asking would I open the book
6 before every surgery to read about it. But, yes, I
7 had read the instructions. I had memorized the
8 instructions. I had performed many of these
9 procedures. So I would not have read that prior to
10 each individual surgery.
11    Q. Doctor, one of the allegations in this
12 lawsuit is that if all of the risks listed in
13 Exhibit 6 had been included word for word in the
14 instructions for use inside the TVT package that that
15 would have changed your decision to prescribe the TVT
16 for Ms. Clark.
17        If each of those had been included in the TVT
18 for the particular package that you would have opened
19 and used with Ms. Clark, would that have had any
20 impact on your decision to prescribe that product for
21 her?
22        MR. GROVES: Object to the narrative. Object
23 to the form of the question.
24        THE WITNESS: I don't really understand your
25 question to be honest with you.

Edward Stanford, M.D.

Page 46

1    MS. YOUNG:  Q.  Okay.
2    Is it fair to say that since you did not rely
3 on the IFU in making your medical decision to
4 prescribe the TVT, that changes to the wording within
5 the IFU would have had no effect on your medical
6 decision to prescribe the TVT?
7    MR. GROVES:  Object to the form of the
8 question.  Object to the question as lacking in
9 foundation.  I also think the question might have
10 misstated the Doctor's testimony.
11    Subject to that, Doctor, you can answer if
12 you can.
13    THE WITNESS:  I don't know how to answer
14 that.  That would be like saying did I open the PDR
15 from five years ago or today and look up a drug and it
16 had a new list of complications, and did I memorize
17 that list, and the answer would be no.
18    I know how to use the product or the drug.
19 I'm familiar with it.  And if I use it repetitively, I
20 would assume I'm still very familiar with it.
21    MS. YOUNG:  And regardless of what was
22 printed in the IFU, you were already aware of all the
23 risks listed on Exhibit 6, correct?
24    A.  Yes.
25    Q.  Yes.

Page 47

1    That's what we went through in tedious
2 detail; is that right?
3    A.  Okay.  Yes.
4    Q.  Yes.  All right.
5    A.  And I've actually published a paper on the
6 complications of incontinence procedures, and this
7 is -- many of these are listed in that paper.  So I'm
8 very well aware.
9    Q.  In the paper that you have published related
10 to the complications of this type of procedure, was
11 the risk of dyspareunia or painful sex included?
12    A.  Yes.
13    Q.  Was the list of retention of urine or
14 problems emptying the bladder included?
15    A.  Yes.
16    Q.  Was the risk of vaginal scarring included?
17    A.  Not directly.
18    Q.  And why is that?
19    A.  It was a review of literature regarding the
20 complications, and the specific word "scarring," I
21 don't recall it being used specifically as a
22 complication.
23    Q.  Does the surgery to implant a TVT result in
24 any scarring?
25    A.  All surgery results in some scarring.

Page 48

1    Q.  And what was the basis of your decision to
2 not -- to not have scarring be a focus of the list of
3 complications that you included in your article?
4    MR. GROVES:  Object to form.
5    THE WITNESS:  I don't know how to answer
6 that.
7    MS. YOUNG:  Q.  Did you consider -- well,
8 let me ask you this.
9    If a patient is complaining of pain with deep
10 thrusts or insertion of the penis within the vagina,
11 would you relate that to scarring from a TVT implant
12 procedure?
13    MR. GROVES:  Object to form.  Lack of
14 foundation.
15    MS. YOUNG:  Q.  You can answer.
16    A.  That would be very patient specific.  In some
17 cases maybe.  In some cases, no.
18    Q.  Doctor, I'm going to hand you now what's been
19 marked as Exhibit 7 to the deposition.
20    (Whereupon Defendant's
21    Exhibit 7 was marked for
22    identification.)
23    MS. YOUNG:  Q.  And, Counsel, these are the
24 clinic records that we were discussing.  It may have
25 been before we went on the record.  But the Bates

Page 49

1 numbers began with CLARKM_ABC_MDR00028.
2    Doctor, if you would, can you tell me the
3 date it appears you first saw Ms. Clark.
4    A.  I'd have to look through here.  I don't know.
5 This is not my writing.
6    This is my writing.
7    I have a form here, initial exam, and it's
8 dated 11/27/2001.
9    Q.  Okay.
10    And what were Ms. Clark's chief complaints at
11 the time?
12    A.  I wrote, "Chief complaint.  Bladder problems,
13 frequency, occasional leaking, two periods this month,
14 medium flow, was irregular."
15    And then I wrote, "Menstrual irregularity,
16 controlled with a medication for two years.  This
17 month two heavy cycles."
18    So menstrual irregularity and incontinence
19 looks like the initial -- at the initial visit.
20    Q.  Okay.
21    And on the next page is there a diagnosis
22 there?
23    A.  Yes.  Menorrhagia.  And stress urinary
24 incontinence.
25    Q.  And if you would, does it look like she came

Edward Stanford, M.D.

Page 50

1 back about a year later, November 12th, 2002?
2    A. Looks that way.  But she had missed -- well,
3 never mind.  There's something written here about
4 canceled office appointments.
5        11/12/2012 an establish patient visit, it
6 likes that's the next visit, yes.
7    Q. Okay.
8        And what were her complaints at that time?
9    A. The same.  Incontinence and irregular
10 periods.
11    Q. And on the next page is there a diagnosis?
12    A. Dysfunctional uterine bleeding, which again
13 is menstrual irregularity, and stress urinary
14 incontinence.  And I put in question mark, "a mixed
15 incontinence."
16    Q. For the ladies and gentlemen of the jury,
17 what does mixed incontinence mean?
18    A. So to divide incontinence into three or maybe
19 four different subtypes, if a patient predominantly
20 strains, like with a cough or a laugh or a lifting
21 something, and they leak urine, that would usually
22 be -- get a diagnosis of stress urine incontinence.
23        If a patient has trouble holding urine in the
24 bladder because the bladder spasms, then that may
25 indicate a detrusor overactivity or a -- which is not

Page 51

1 a stress incontinence.
2        In some cases the two actually may coexist,
3 and that would be a mixed type of incontinence.
4    Q. Thank you.
5    A. I'm sure you've heard this before.
6    Q. Well, the jury hasn't.
7    A. Okay.
8    Q. So it's very helpful.  I assure you.
9        What was your plan at that time?
10    A. Well, nothing definitive, but I wrote for the
11 dysfunctional uterine bleeding an ultrasound and
12 possibly an endometrial biopsy.
13        For the incontinence, further workup, which
14 would include urodynamic testing and a cystoscopy to
15 look in the bladder.  And, of course, prior to that a
16 urinalysis to make sure there is no infection.
17        And then to I guess to keep focus on the
18 problem, since it had been existing for well over a
19 year, possibility of a laparoscopic-assisted vaginal
20 hysterectomy, which I wrote LAVH.  And then I rarely
21 did this.  I don't know why I wrote, but
22 radiofrequency bladder neck suspension was discussed.
23    Q. Okay.
24        And on the next page is there a patient
25 questionnaire that Ms. Clark filled out?

Page 52

1    A. Yes.
2    Q. And what did she indicate in this
3 questionnaire?
4    A. She indicated that she was leaking urine
5 often, that she usually needed to know where a
6 bathroom was located because she would have sudden
7 urges to urinate.  And sometimes she didn't make it to
8 the bathroom.
9        She wasn't wearing protective clothing at
10 that time.  I don't know the date of this.  And that
11 she was getting up more, either two times a night or
12 more.  But that wasn't a constant thing.  It was she
13 wrote sometimes.
14    Q. Okay.
15        If you go to a few more pages, there's a
16 document titled, "Urogynecology History
17 Questionnaire."  That's dated May 16th of 2003.
18    A. Mine doesn't have a date.
19    Q. Yeah, there's one without a date and one past
20 it that does have a date.
21    A. Okay.
22    Q. Do you see the one with the date?  The number
23 at the bottom is 107.
24    A. Yes.
25    Q. Okay.

Page 53

1        At that time there's a question number 15
2 that asks if she loses urine by spurts during severe
3 coughing, sneezing, vomiting or laughing.
4    A. She wrote sometimes with laughing.
5    Q. Okay.
6        And then on the next page is there a question
7 29, if you would read that question for me, please.
8    A. "Is your urinary problem bad enough that you
9 would request surgery to fix it?"
10        And she wrote, "Yes."
11    Q. Okay.
12        And that is May of 2003.
13        If you will go two more pages to document --
14 it has 87 at the bottom.  Might be three more pages.
15    A. Yes.
16    Q. What do you see there?
17    A. Okay.  So this was a urinary -- excuse me, a
18 urodynamic report.  And so she voided normally with a
19 normal flow rate.
20        The system metrogram portion showed that she
21 had a normally compliant bladder, and it held an
22 adequate amount of urine.  And when she strained, she
23 demonstrated stress urinary incontinence.
24        There was no evidence of detrusor spasms, and
25 so the interpretation was stress urinary incontinence.

Edward Stanford, M.D.

Page 54

1  Q. And as a result of the stress urinary
2  incontinence and her other gynecological issues that
3  she was having, did you recommend surgery at that
4  time?
5  A. I did.
6  Q. Okay.
7  If you would --
8  A. I don't recall the conversation, but I wrote,
9  "Laparoscopic-assisted vaginal hysterectomy/sling."
10  So I'm pretty sure given the way I practiced
11  that, given this information and her questionnaire
12  answers, that I counseled her that removing her uterus
13  and supporting her bladder would probably correct
14  these issues.
15  Q. Thank you, Doctor.
16  If you will turn to Bates label page 40 at
17  the bottom.
18  A. I have to tell you this. I'm looking back.
19  This is nice and thorough. This is good.
20  Here we go.
21  Q. It should be -- okay. And what is this
22  document?
23  A. This looks like her preoperative history and
24  physical.
25  Q. And under the history section, at the last

Page 55

1  sentence, does it indicate that the risk and benefits
2  of surgery were thoroughly discussed with Ms. Clark?
3  A. Yes.
4  Q. And I understand that you don't have an
5  independent memory of this particular patient after
6  all this time; is that right?
7  A. I do not.
8  Q. What would your informed consent discussion
9  for the TVT procedure specifically have involved with
10  a typical patient in 2003?
11  A. I would have definitely discussed some of the
12  complications listed on your potential risks Exhibit
13  No. 6.
14  Q. Okay. Thank you.
15  A. It's a rather focused discussion about the
16  way the procedure is done, the path of the trocars,
17  and the potential for injury, potential for bleeding,
18  the potential for failure, which is not really listed
19  here. These procedures don't always work.
20  Well, I guess it is here. Recurrence of
21  failure. Excuse me.
22  Pain after the procedure, mesh extrusion,
23  nerve pain, the possibility of having to remove the
24  mesh if there were complications. Certainly pain,
25  which could be from the combination of these

Page 56

1  procedures, and also the way she heals.
2  Again, all surgeries are fraught with
3  potential complications, and residual pain is
4  certainly something that -- you know, pain, a wound
5  complication, infection, I mean these can happen with
6  any surgery.
7  So there would be a pretty generic
8  discussion, pretty rehearsed actually, about all of
9  these possible complications.
10  And a lot of patients would ask, well, how
11  often. And the answer would have been not very often.
12  And then they may ask, and in my hands how
13  many have I done. And I would tell them hundreds.
14  And how often do I see complications, and I would
15  probably tell them one or two out of a hundred would
16  come back with some sort of complication.
17  I would be honest with them and tell them,
18  yes, I've had to remove a sling or I've had to -- at
19  that point I was also removing slings that other
20  doctors were putting in because of my specialty
21  practice. So I would tell them that I've seen some
22  pretty nasty things and -- but that I would also be
23  checking during the procedure to make sure that the
24  sling was in the proper location, that it hadn't -- to
25  the best of my knowledge it hadn't snagged some other

Page 57

1  tissue, like there's been reports of bowel being
2  pulled into the procedure.
3  I mean, obviously I would let them know that
4  there are some pretty horrendous potential
5  complications. But I would also reassure them that
6  that had never happened to me and I didn't anticipate
7  it would.
8  And then, of course, that conversation would
9  have occurred probably at more than one occasion
10  because at the urodynamics, once we have a diagnosis,
11  we would talk about the options.
12  And then, of course, prior to surgery the
13  patient needs to sign their consent, and there would
14  be an opportunity to discuss again what we're doing
15  and why we're doing it.
16  And as I guess as you can see from my
17  charting here, you know, I was trying to put all the
18  pieces in place. And so I would -- I -- I'm actually
19  a surgeon who is very -- I'm quite a stickler for
20  patient's being well informed.
21  Now --
22  Q. Thank you, Doctor.
23  A. -- discussed thoroughly is all I put, but
24  there was a lot more to that discussion.
25  Q. I understand.

Edward Stanford, M.D.

Page 58

1    If you'll turn to page 45 at the end.  I'm
2  going to need to move just a little more quickly.
3    A.  Sure.
4    Q.  Because I only have an hour and a half with
5  you, and I'm going to reserve some of my time for the
6  end.
7    But is this your report of operation?
8    A.  It is.
9    Q.  And is that June 30th of 2003?
10   A.  It is.
11   Q.  And if you could explain in laymen's terms
12 what you did in this surgery for Ms. Clark.
13   A.  I removed her uterus using a laparoscopic
14 approach as well as a vaginal approach.  I removed
15 some implants.  And I placed the sling and checked its
16 location with a cystoscope.
17   Q.  What kind of implants did you remove?
18   A.  Well, I wrote endometriotic implants.  I'd
19 have to look through here to see.  Which turned out to
20 be scar tissue.
21   Q.  And what is endometriosis?
22   A.  Well, this wasn't endometriosis.
23   Q.  Oh, okay.
24   What are endometriotic implants?
25   A.  This was probably -- and, again, I don't have

Page 59

1  an independent recollection.  But I wrote here,
2  "Careful inspection revealed multiple areas of
3  fibrosis and endometriotic implants."
4    So they were probably red or black or
5  implants that were causing some sort of tissue
6  distortion or scarring.
7    And so I removed them and sent them to
8  pathology.
9    Q.  And are you able to tell where the scarring
10 was from your report?
11   A.  Multiple areas.  So I didn't -- I don't think
12 I specifically stated where.
13   There was quite a bit of scarring in the
14 right ovarian fossa.  So in the right side above the
15 ureter where the ovary would sit.  I wrote here a
16 large area of fibrosis with a possible implant of
17 endometriosis was incised with electrocautery
18 scissors.
19   Because to take the uterus out and then leave
20 her ovaries but leave active endometriosis would
21 probably lead to further therapy, further surgery, so
22 I removed the scar tissue at that point.
23   Q.  Okay.
24   And, Doctor, if you could turn to page 93.
25 Did you continue to follow Ms. Clark after her

Page 60

1  procedure?
2    A.  It looks that way.
3    Q.  And did she see you on August 20th of 2003?
4    A.  She did.
5    Q.  And what is it that your records say about
6  that visit?
7    A.  She came in with some frequency of urination.
8  And it looks like she was having some mild retention.
9    And I talked to her about self-catheterizing
10 to see if this would resolve or to do what's called a
11 ureterolysis.
12   Q.  Okay.
13   And when it says, "There's a small band of
14 tightness on the right aspect of the urethra and I
15 think that needs to be released," what does that
16 mean?
17   A.  Specifically to her -- I'm sure I'm
18 summarizing from the exam that it just didn't feel as
19 supple as you might expect, and it may have -- it felt
20 tighter.  And I didn't write here that it was tender,
21 but I would assume it's a tender area as well.
22   Q.  Okay.  If you can turn to page 62.
23   Is that the history and physical?
24   A.  It is.
25   Q.  On August 28, 2003?

Page 61

1    A.  It is.
2    Q.  And what does it say there in the history
3  section?
4    A.  That she had developed retention, and that
5  the sling may be too snug.  And that she had been
6  self-catheterizing, but the problem persisted.
7    So due to the persistent retention she
8  requested that I go ahead and release the sling, which
9  is called ureterolysis.
10   Q.  Thank you.
11   Is the risk that the placement may be too
12 snug, was that a known risk of the procedure at the
13 time?
14   A.  Yeah.  For the TVT it actually was because of
15 the angle of insertion under the urethra.  And so
16 compared to other types of slings, it actually was.
17   Turns out that it was a little more common
18 with a TVT.
19   It's also a little more common in somebody
20 who underwent -- common in somebody who is asleep
21 during the procedure.  And -- but, yes, this is a
22 known complication of a TVT.
23   Q.  When you say common to the procedure, do you
24 mean the fact she also had a hysterectomy at the same
25 procedure?

Edward Stanford, M.D.

Page 62

1  A.  Yes.  And she was asleep for that.
2  Q.  Okay.
3     And then did you perform a revision on
4  August 28, 2003, page 60?
5  A.  Well, not a revision.
6  Q.  Okay.
7  A.  I released -- I released the sling slightly.
8  It looks like I did it under local.
9     So I basically opened up the area under the
10 sling and made a small snip in it to just give it a
11 little release, which is usually very effective, and
12 then I closed the vaginal tissue.
13 Q.  Okay.
14    And, Doctor, I'm going to need to reserve the
15 rest of my time.  So let's take a quick break at this
16 point.
17    VIDEOGRAPHER:  All right.  We are going off
18 the record at 12:31 p.m.
19        (Recess taken.)
20    VIDEOGRAPHER:  All right.  We are back on the
21 record at 12:42 p.m.
22
23
24
25

Page 63

1        EXAMINATION
2
3  BY MR. GROVES:
4  Q.  Good afternoon, Doctor, Counsel.  I
5  understand it's a little bit after the lunch hour
6  there.  Thank you for your time dealing with us today,
7  Doctor.
8     My name is Rob Groves, and I, of course, as I
9  previously mentioned, am the attorney for the
10 plaintiff, Ms. Marabeth Clark, in this case.  This is
11 a lawsuit filed by Ms. Clark against Ethicon, the
12 maker of a TVT sling that is the subject matter of
13 this lawsuit.
14    Is that understood, Doctor?
15 A.  It is understood.
16 Q.  Okay.
17    And you are -- I don't believe we made any
18 sort of an exhibit of it.
19    You at some point today, you or your office
20 received what we as attorneys like to call Notice of
21 Deposition; is that correct?
22 A.  Probably, yes.
23 Q.  Okay.  That sounds good enough for me.
24    Doctor, is it your understanding that that
25 Notice of Deposition was issued by counsel for

Page 64

1  defendants Ethicon Corporation; is that correct?
2  A.  Yes, I'll agree with you.
3  Q.  Okay.
4     Kind of at the outset what I like to do at
5  some of these depositions, Doctor, is make clear that
6  in no way, shape or form has my client made any sort
7  of complaint or legal allegations against you in this
8  case.  Okay?  Is that understood?
9  A.  Well, that's nice to hear.
10 Q.  Okay.
11    So her lawsuit, in effect, it's not about
12 you.  It's about a product.  Is that understood?
13 A.  Yes, that's understand.
14 Q.  Okay.
15        (Whereupon a conversation
16        was held off the record.)
17    MR. GROVES:  Q.  Thanks again to every in
18 the room for putting up with me by joining by phone.
19 I appreciate it.
20    I also have a one and three-year-old at home
21 that probably appreciate it as well, I hope.
22    Doctor, defense counsel asked you some
23 questions kind of about your background.  And I was
24 kind of wanting to get a better understanding.  And
25 she probably did a good job going over this.  But I

Page 65

1  want to get a slight better understanding about some
2  of your relevant work history back in around the 1996,
3  1997 time frame.
4     I understand that you said that you said that
5  you had some training experience with a Dr. Olmsted;
6  is that correct?
7  A.  Yeah.  A brief visit to him to learn about
8  this procedure, yes.
9  Q.  Okay.
10    And did I understand your testimony correctly
11 that you don't recall what year that was?
12 A.  I don't.
13 Q.  But it was sometime say after 1996?
14 A.  I don't recall.
15 Q.  Okay.
16    And it was about a week-long course in
17 Sweden?
18 A.  Yeah, a couple -- yeah, with travel it was
19 about a five-day trip.
20 Q.  Okay.
21    And was it a cadaver type course?
22 A.  There was a portion of it was cadaver and
23 portion was live.
24 Q.  Okay.
25    And do you have any idea, was the trip

Edward Stanford, M.D.

Page 66

1  sponsored by a manufacturer of mesh product?
2      A.  That's a good question.
3          I don't recall, but it's possible.  Yeah.
4      Q.  And, Doctor, I'll just say kind of I think as
5  counsel probably already alluded to.  If you don't
6  specifically recollect or something like that, I
7  understand that we are talking about something that
8  happened sometime ago.
9      A.  Yeah.  And I took a lot of trips to Europe
10 because of -- for different reasons, professional and
11 personal so...
12     Q.  Okay.
13         Well, and that was kind of one of my next
14 questions.
15         I was wondering if you had ever traveled to
16 any other places other than Sweden for training on
17 things like a transvaginal mesh product?
18     A.  Not that I recall.
19     Q.  So is the trip to Sweden with Dr. Olmsted the
20 only training that you've had on transvaginal mesh
21 products for the treatment of stress urinary
22 incontinence?
23     A.  Well, no, I had training in my residency.
24     Q.  I'm sorry, Doctor.  I meant in regards to
25 traveling to a destination to take a course of study

Page 67

1  for TV mesh products for the treatment of stress
2  urinary incontinence, is Sweden the only trip?
3      A.  Well, for my personal edification, probably.
4  But I've also taught dozens of these types of courses
5  for different procedures, and a lot of that required
6  travel as well.
7      Q.  Okay.
8          So as a student, if you will, Sweden was the
9  only trip?
10     A.  Yeah, I'm not -- yeah, I don't know.  I don't
11 know that it was the only trip.  It was the only trip
12 to Sweden.  I can recall that.
13     Q.  And do you have any recollection about how
14 that trip was funded?  Did you pay for it out of your
15 own personal finances?
16     A.  I don't recall.  I don't recall if I was
17 already over there.  I don't recall if it was
18 partially sponsored.  I don't recall.
19     Q.  Okay.
20     A.  I mean, I'll give you an example.
21         I've done research for a couple of companies,
22 and they would say something like, "Could you please
23 go over to Munich and work on this, and we'll give you
24 a ticket."
25         Or I was doing work with the WHO, and

Page 68

1  somebody realized I was there, and they said could you
2  swing by and meet with so and so.
3          And so I've actually had quite a bit of
4  experience doing collegial work, and I don't recall --
5  to be honest, I don't recall how this trip was put
6  together.
7      Q.  Okay.
8          And I don't necessarily need the particular
9  details.  All I'm trying to do is figure out if you
10 were ever -- either attended a training as a trainee
11 or a trainer that was essentially sponsored by a
12 product manufacturer, a transvaginal mesh product
13 manufacturer.  That's all.
14     A.  I know I've been a trainee or trainer.
15 Not -- a trainer.
16     Q.  Yes.
17     A.  Yes.  Yes.
18     Q.  Okay.
19     A.  And with Olmsted it was a new procedure, so,
20 yes, I was a trainee under those circumstances.
21     Q.  Okay.
22         And you've also -- you said you've given
23 literally hundreds of seminar type speeches and
24 presentations; is that correct?
25     A.  That is true.

Page 69

1      Q.  Okay.
2          And does -- I'm assuming that those
3  presentations could vary on a number of OB/GYN
4  subjects; is that correct?
5      A.  Yes.  It wasn't the same lecture over and
6  over.  There would be some variety.
7      Q.  Okay.
8          To the best of your ability do you recall,
9  would any of those presentations specify techniques,
10 trends, things of that nature, hazardous issues,
11 anything like that with regards to TVT products?
12     MS. YOUNG:  Object to form.
13     THE WITNESS:  Yes.
14         Maybe not specifically or only TVT, but I'm
15 sure -- yes, TVT, would have been part of the subject
16 matter.
17     MR. GROVES:  Q.  Okay.
18         And you also mentioned doing grand rounds.
19     A.  Yes.
20     Q.  Now, in your -- as a presenter -- and I'm
21 completely foreign to this.
22         As a presenter of the sort of information
23 that you're doing, if you're doing a Grand Round, is
24 that sort of a -- is that a bigger event deal to you
25 than a regular presentation, or is there really no

Edward Stanford, M.D.

Page 70

1 distinction?
2     A.  Oh, I think in the academic world it's
3 considered kind of a feather in the cap.  But I've
4 given lectures to 3,000 people at a conference which
5 was not a grand rounds, which, you know, is quite a
6 big -- that's quite a big audience.
7     Q.  Was any of these Grand Round type lectures,
8 were they also concerned, at least a portion of them,
9 TVT products?
10     A.  Some of them may have, yes.
11     Q.  And, Doctor, I wasn't quite clear.
12         Do you know roughly when you did do your
13 first, as the implanting physician, your first implant
14 of any sort of mesh product for treatment of stress
15 urinary incontinence in a female, roughly speaking
16 what year that might have been?
17     A.  Maybe 1994 or so.
18     Q.  Okay.
19         And I believe you said that you had done
20 several hundred TVT procedures prior to Ms. Clark, and
21 that would have been several hundred procedures
22 starting back in roughly 1994 to about the time of
23 Ms. Clark's operation in 2003?
24     A.  Yes.  I think, yes.
25     Q.  Okay.

Page 71

1         Do you currently use TVT slings to this
2 day?
3     A.  No.  I've stopped doing surgery.
4     Q.  I'm sorry.  You said you stopped.
5         When you stopped -- at the time you stopped
6 doing surgery and kind of gone over to more of the
7 kind of administrative hospital role, were you using
8 TVT products then?
9     A.  Yes.
10     Q.  Do you recall to the best of your ability who
11 the product was, product or products were manufactured
12 by?
13     A.  You mean -- you asked for products.  What do
14 you -- what specifically do you mean?
15     Q.  Well, okay.  This lawsuit is a Gynecare TVT
16 sling product.  And I guess my question is were you --
17 do you know who the manufacturer of your mesh products
18 were about the time you stopped doing surgery?
19     A.  Well, there was Johnson & Johnson.  I believe
20 they still own Gynecare.  There's Coloplast.  There's
21 AMS.  There's Boston Scientific, but I rarely used
22 those.  Caldera.  And there's a number of corporations
23 that produce different slings that I have used.
24     Q.  Okay.  And I guess I was trying to understand
25 who you were using about the time that you decided to

Page 72

1 go to more of the hospital administrative role as
2 opposed to the implant or surgeon role.  All those
3 companies?
4     A.  Yeah, I would say all of those.  If -- yeah.
5 Depends if the hospital stocked them on the -- in the
6 hospital.  Not every product was carried by every
7 hospital.
8     Q.  Okay.
9         Doctor, I want to go through some of the
10 things that you would use to kind of inform yourself
11 about mesh products when you would be giving a
12 presentation or anything like that.
13         Would you rely upon medical journals?
14     A.  Yes, I would.
15     Q.  Would you rely upon discussions you had with
16 colleagues?
17     A.  You mean passing on just stories or anecdotal
18 stuff, usually not, no.
19     Q.  Okay.
20         I'm assuming you would use your own clinical
21 experience?
22     A.  Yes, I would.
23     Q.  Would you use your body of knowledge based
24 upon other presentations that you either attended or
25 presented at?

Page 73

1     A.  Yes.  I would have, yes.
2     Q.  In back around the time of 2003 when the
3 implant procedure was performed on my client, were you
4 also giving presentations and so forth at that point
5 in time as well?
6     A.  Yes.
7     Q.  And would I be correct to presume that some
8 of those presentations would, of course, have to deal
9 with mesh sling implants and revision and so forth?
10     A.  Some of them, yes.
11     Q.  Back around that same time frame 2003, would
12 you rely upon materials for mesh manufacturers when
13 giving presentations about TVT products?
14     A.  Well, you used the word rely on.  No.  I
15 might borrow some photographs or I might use tables of
16 numbers that sort of summarize the literature.  But,
17 of course, it's my -- it would be my talk.  I would
18 rely on the information sort of in combination and I
19 would use the information that was presented to me in
20 different ways, yeah.
21     Q.  Certainly.  And I don't want to get hung up
22 on one word, but let me kind of rephrase.
23         Would you consider information that was put
24 forth by TVT manufacturers, say like Ethicon, in
25 coming to whatever conclusions you needed to about

Edward Stanford, M.D.

Page 74

1 making a presentation or PowerPoint slides and so
2 forth?
3 　　　MS. YOUNG:  Object to form.
4 　　　THE WITNESS:  Like I said, I might borrow
5 some information or borrow a photograph, sure.
6 　　　MR. GROVES:  Q.  Okay.
7 　　　Would you discuss adverse events and warnings
8 and things like that back in 2003 at these
9 presentations?
10 　　A.  That usually wasn't the reason for the
11 presentation, so I don't recall.
12 　　Q.  Doctor, would you -- back in around 2003
13 would you ever have occasion to read any sort of Dear
14 Doctor letters or anything like that issued by mesh
15 manufacturers?
16 　　A.  I guess I would have the occasion, but I
17 can't -- I don't recall ever reading them, no.
18 　　Q.  Well, if a mesh manufacturer issued a Dear
19 Healthcare Provider letter or Dear Doctor letter to
20 the implanting physicians out there in the public, is
21 that something that if it were out there, would you at
22 least read it?
23 　　　MS. YOUNG:  Object to form.
24 　　　THE WITNESS:  I guess I have no idea.  I
25 mean, I'm not sure what you're talking about.  But I

Page 75

1 guess yes, if there was some informational letter, I
2 would probably glance at it or read it, yes.
3 　　　MR. GROVES:  Q.  And, Doctor, kind of the
4 same question.  In regards to IFU's, instructions for
5 use, I believe defense counsel might have asked you a
6 question or two about it.
7 　　　If I understood correctly, you testified that
8 you would read an instruction for use for a TVT
9 product, but you would not necessarily read it prior
10 to every single surgery you did.  Is that a fair
11 characterization of your testimony?
12 　　　MS. YOUNG:  Object to form.
13 　　　THE WITNESS:  Yes, I would not reread
14 material over and over prior to every procedure.  So,
15 no, I wouldn't.
16 　　　MR. GROVES:  Q.  Okay.
17 　　　So, for example, in this particular case we
18 had an implant surgery that was done in June of 2003.
19 And I may be -- I think I'm right on this.  But the
20 relevant instructions for use that were in effect in
21 June of 2003 were issued sometime in 2000.  At least
22 they're dated in 2000.
23 　　　Is it fair to say that sometime between 2000
24 and June of 2003 that you would have read the
25 instructions for use prior to your implant of

Page 76

1 Ms. Clark
2 　　A.  I have no way of knowing whether I read it
3 during that time period or not.
4 　　　I mean, I guess you're asking, so if a new
5 textbook on gynecologic surgery was published, would I
6 have read the new edition.  I would have to say
7 probably not, or maybe.  But I wouldn't reread an
8 instructional manual on something that hasn't changed.
9 　　Q.  No.  And that's my point.  That was kind of
10 the basis of my question.  I think I maybe did a poor
11 job of asking.
12 　　A.  Okay.
13 　　　I think I have a pretty good memory.  That's
14 what I'm trying to tell you.
15 　　Q.  I guess there's essentially a two-and-a-half
16 or three-year period where Ethicon, the manufacturer
17 of Mrs. Clark's TVT sling, had made what we call an
18 instructions for use, which are titled, "Instructions
19 of Use."
20 　　　And my question to you would be if at any,
21 not certainly prior to every surgery, but anytime
22 prior to Mrs. Clark's surgery in 2000 and 2003 you had
23 read Instructions for Use.
24 　　　MS. YOUNG:  Object to form.
25 　　　THE WITNESS:  What does that even matter.

Page 77

1 I'm sorry.  I don't mean to be argumentative, but I
2 don't know what that matters.
3 　　　As a surgeon I -- yes, I probably would have
4 read -- I've written instructions for use for
5 different procedures.  So I get it.
6 　　　And, yes, I probably did familiarize myself
7 with the procedure probably with something like one of
8 these monograms or an instructions for use.  But I
9 have no recollection of when I would have read
10 something like that or to what extent.
11 　　　MR. GROVES:  Q.  Okay.  Thanks, Doctor.
12 　　　And I don't mean to irk you or anything like
13 that, and I don't want to get to hyperspecific with my
14 questions.
15 　　　And I guess let me ask you kind of a
16 follow-up question to that.
17 　　　Have you ever done consulting work for a
18 product manufacturer, a mesh product manufacturer in
19 terms of consulting work for drafting instructions for
20 use or anything of that nature?
21 　　A.  Yes, I have.
22 　　Q.  Do you know what manufacturer or
23 manufacturers you have done consulting work for?
24 　　A.  For products?
25 　　Q.  Yes.  Yes, sir, for mesh products.

Page 78

1    A. Oh, for mesh products.
2        Yes. I was the lead principle investigator
3  of the international study on anterior elevate for
4  AMS. And we've published two papers on that.
5        I -- in fact, for that procedure I wrote the
6  instructions of how to implant them.
7        I believe I've done the same for Coloplast
8  for one of their mesh sling devices.
9        At the moment that's all I recall.
10   Q. Okay.
11       And sorry, Doctor, if I jump in there if
12  there's kind of a dead space. I don't want to
13  interrupt you. Just please tell me that you are not
14  done answering my question.
15       To the best of your knowledge did you ever do
16  any consulting work for Ethicon in regards to any mesh
17  products or anything like that?
18   A. No, I didn't.
19       The only consulting I did for Ethicon was to
20  prepare a paper for some of their internal
21  administrative positions, kind of a synopses on the
22  state of the art of reconstructive pelvic surgery and
23  stress incontinence, which I gave to them. I don't
24  remember exactly when. Maybe two-thousand-and- -- I
25  don't remember when it was. In the mid 2000s.

Page 79

1        That's -- and that was the only time I've
2  ever done any consulting work for Ethicon.
3    Q. Okay. Thank you, Doctor.
4        Doctor, would you agree with me a mesh
5  manufacturer is responsible for the safety of its
6  product?
7    A. No, I don't agree with that. I think that to
8  a point once they are -- when they are manufactured,
9  they need to be manufactured properly and safely, and
10  they need to be sterile products. But once they are
11  on the hospital's shelves, personally I don't think
12  it's their responsibility anymore.
13   Q. Doctor, do you agree in order to determine
14  whether a medical device is safe and effective, the
15  device must be adequately studied?
16   A. I think that's a fair statement.
17   Q. Do you agree that the best way to determine
18  whether a medical device is safe and effective is for
19  a manufacturer to conduct randomized controlled trials
20  of the device?
21   A. No. Randomized controlled trials of surgery
22  are very, very difficult. And so cohorts studies,
23  retrospective studies are -- I think are equally
24  effective. It does not have to be a randomized
25  controlled study.

Page 80

1    Q. Well, do you believe that the device -- the
2  medical product manufacturer, the mesh manufacturer is
3  in the best position to study its own device?
4    A. No, not always. I think outside research is
5  just as effective.
6    Q. Do you believe at the time you recommended
7  the TVT product to Mrs. Clark that the manufacturer
8  Ethicon had adequately studied the product to
9  determine that the product was both safe and
10  effective?
11   A. I do. Or available research showed that it
12  was safe and effective in my opinion.
13   Q. Did you believe that at the time you
14  recommended the product to Mrs. Clark that the
15  manufacturer had conducted proper trials to determine
16  that its product was safe and effective?
17   A. You're asking me whether industry sponsored
18  research was sufficient for me to rely only on that as
19  enough information. And I would say I don't really
20  know how to answer that.
21       I don't recall if the research -- the
22  research that I would quote was industry sponsored or
23  not.
24       So I don't know whether it was -- whether the
25  manufacturer had done the research adequately. I

Page 81

1  don't know how to -- I don't know if that's the case
2  or not. I would assume that they did or that they had
3  collected enough information from other researchers to
4  present that the data was compelling and convincing.
5    Q. Well, let me ask kind of another way.
6        If you had known at the time that the
7  manufacturer had not -- at the time of your
8  recommendation or your time of implant to Mrs. Clark
9  that the manufacturer had not adequately studied its
10  product to determine it was safe and effective, would
11  you still have recommended the product to plaintiff?
12       MS. YOUNG: Object to form. Lack of
13  foundation.
14       THE WITNESS: Yeah, that's kind of a
15  misleading question.
16       No, I -- I really don't know how to answer
17  that to be perfectly honest with you.
18       MR. GROVES: Q. Well, I'll just ask the
19  court reporter to repeat my question.
20   A. Okay.
21   Q. Or I'll just go ahead and repeat it.
22       If you had known at the time of implant or
23  the time Mrs. Clark was needing an implant, I should
24  say, that the manufacturer had not adequately studied
25  its product to determine that it was safe and

Page 82

1 effective, would you have gone ahead and recommended
2 it to Mrs. Clark?
3     MS. YOUNG: Same objection.
4     THE WITNESS: I told you I didn't rely on the
5 manufacturer's research, so, yes. The answer would be
6 yes. I would have still implanted it.
7     But I have no idea what you mean by the
8 manufacturer and adequate research. I'm just still
9 stumped on that.
10     MR. GROVES: Q. Would you consider research
11 data provided by the manufacturer?
12     A. No, I would -- I told you earlier I relied on
13 my reading of the literature and my interpretation of
14 the literature. I didn't spend much time with Ethicon
15 or their representatives. And I certainly wouldn't
16 rely on them to convince me that something is
17 adequately studied or reliable. That was my job as
18 the surgeon.
19     Q. Well, Doctor, one of the things that device
20 manufacturers such as Ethicon warn about these mesh
21 products is that if you are somebody who is pregnant
22 or becoming pregnant or thinking about becoming
23 pregnant, then you should either refrain or have a
24 discussion with your physician first about implanting
25 this product; is that correct?

Page 83

1     A. Yeah. That's commonsensical, yes.
2     Q. And that's information that's put out by the
3 manufacturer, correct?
4     A. Yeah, I would imagine they would publish that
5 somewhere, yes.
6     Q. And that's a conversation that I'm assuming
7 that you have with your mesh candidates, your patients
8 who are contemplating having a mesh implant prior to
9 implant, correct?
10     A. Probably not. The average age is 53, which
11 is well beyond child-rearing age.
12     Now, if they were 20, yes. But I probably
13 wouldn't put a mesh in a 20 year old.
14     Q. Doctor, in front of you you have a AUGS
15 Physician Statement. I believe it's dated January
16 2014. That's Exhibit 4.
17     A. Okay.
18     I have it in front of me.
19     MS. YOUNG: Can you hold on just a second,
20 Rob, so I can grab it.
21     MR. GROVES: Sure.
22     MS. YOUNG: Exhibit 4.
23     Okay. I've got it. Thank you.
24     MR. GROVES: Q. Doctor, anywhere in that
25 physician's statement does it mention the specific

Page 84

1 product that you had implanted in Mrs. Clark?
2     A. Specifically I don't believe so.
3     Q. Is there any information or did Counsel give
4 you any information to show you that mesh
5 manufacturers are actually members of AUGS and pay
6 money to that organization?
7     MS. YOUNG: Object to form. Lack of
8 foundation.
9     THE WITNESS: What was that question again?
10         (Record read.)
11     THE WITNESS: No. They -- Counsel, gave me
12 no information to that effect.
13     But I sat on the executive committee of AUGS
14 as well as other organizations, and that's a common
15 practice to partner with manufacturers to offset the
16 costs of running annual meetings and whatnot. So
17 that's actually a very common practice.
18     MR. GROVES: Q. Doctor, isn't it correct,
19 isn't it true that the statement that Counsel read
20 you, the names of authors of those statements are not
21 set forth anywhere in the AUGS documents that Counsel
22 gave you?
23     A. It was drafted by three, five different
24 individuals on page three. All of whom I know.
25     Q. I'm sorry. Did I interrupt you, Doctor?

Page 85

1     A. No. No. Go ahead.
2     Q. Doctor, are you aware that some of the
3 authors of these physician statements have been
4 deposed in product liability lawsuits?
5     MS. YOUNG: Object to form. Lack of
6 foundation.
7     THE WITNESS: I would have no way of knowing
8 that.
9     MR. GROVES: Q. Were you aware that under
10 oath at least one AUGS author had stated that one of
11 the reasons for these physician statements was to be
12 used in litigation?
13     MS. YOUNG: Object to form. Lack of
14 foundation.
15     THE WITNESS: I would have no way of knowing
16 that.
17     MR. GROVES: Q. Doctor, isn't it true that
18 in medicine there have been things called the gold
19 standard and later were proven not only to be a,
20 quote, unquote, "gold standard," but they were
21 actually abandoned procedures altogether?
22     A. I would say that's true of almost any surgery
23 that hasn't stood the test of time. At one point the
24 Burch was the gold standard, but it got supplanted by
25 these mesh sling procedures.

Edward Stanford, M.D.

Page 86

1  Q. And last, defense counsel didn't walk you
2  through any of the references in these physician
3  statements to actually show you what the references
4  actually say, right?
5  A. No, she did not.
6  Q. Doctor, I want to take a look at Exhibit 5
7  and Exhibit 6. I believe that you might remember
8  that. It was kind of mesh, non-mesh chart that
9  defense counsel provided you.
10  A. Yeah. But I think I'm going to have to amend
11  one of my answers about specifically mentioning this
12  product because reference number 11 by Ward and Hilton
13  specifically mentions a randomized trial of
14  tension-free vaginal tape. So I guess it is mentioned
15  in this physician paper, or whatever this is called.
16  Q. Doctor, if you're looking at Exhibit 5 and
17  Exhibit 6, I just want to ask you a few kind of
18  follow-up questions.
19      Doctor, would you agree with me that each
20  pelvic surgery carries with it its own risk product
21  profile.
22  A. Yes. I think I could say yes to that.
23  Q. What -- would you kind of agree with me --
24  kind of a similar question -- that each patient
25  undergoing some sort of pelvic surgery carries with

Page 87

1  them their own risk profile as well?
2  A. Yeah, that's probably a more accurate
3  statement.
4  Q. So the answer is yes?
5  A. Yes.
6  Q. Would you agree with me that as a result of
7  these things that the informed consent discussions for
8  pelvic surgeries is going to differ patient by
9  patient?
10  A. It should, yes. I mean, there's going to be
11  some generic overlap with and common discussions with
12  each patient. But there may be some tailored
13  discussions based on different patient factors, of
14  course.
15  Q. Okay.
16      And, Doctor, you'd agree with me the chart
17  does not include any information about frequency,
18  severity or chronicity of the risks or complications
19  noted, does it?
20  A. You mean Exhibit 7, the chart we looked at?
21  Q. I believe we were talking about Exhibits 5
22  and/or 6.
23  A. Oh, I'm sorry. I thought you said the chart.
24  This chart. Okay.
25      I mistake the medical record as the chart.

Page 88

1  Q. I'm sorry. Doctor, if you need to go back
2  and amend any of your answers, please let me know.
3  A. No. No.
4  Q. I was talking about Exhibits 5 and 6.
5  A. No. I got you.
6  Q. Okay.
7  A. So these lists, they do not mention specific
8  numbers, no.
9  Q. Well, I believe I asked about frequency,
10  severity and chronicity, but you said numbers. Do we
11  agree that they do not --
12  A. Yeah.
13  Q. -- contain any of that information?
14  A. They do not, no.
15  Q. Do we agree that the chart does not include
16  any information about mesh fraying, roping, curling,
17  migrating?
18  A. No, it doesn't.
19  Q. It doesn't contain that information?
20  A. No, it does not.
21  Q. Okay. I'm sorry. I was just trying -- I
22  didn't want to have a double negative on the record
23  there. Sorry, Doctor.
24  A. Yeah, I actually -- I'm kind of surprised by
25  the question. I hadn't even -- I don't know. Those

Page 89

1  are things that I've heard of in theory but never in
2  practice. So I would -- I was kind of surprised by
3  the question.
4      That was a knee jerk. I was thinking on my
5  feet.
6  Q. I'm sorry, Doctor. Do you need a break or
7  anything?
8  A. No. No.
9  Q. Okay.
10      Now, I apologize. I was working off a
11  different chart than what Counsel has, so I don't have
12  the specific Bates number for you. But what I've got
13  is the informed consent document that you had at
14  St. Mary's Good Samaritan. And it's signed and dated
15  6/03/03. It's signed by my client Marabeth Clark, and
16  what looks to be a fellow physician or coworker Kathy
17  Dun- -- I can't read the last name. Kathy Dunbar or
18  something like that. I assume you don't recall who
19  that would be.
20      Regardless, it is the informed consent
21  document entitled, "Special Consent to Operation or
22  Other Procedure." This is at Saint Mary's Good
23  Samaritan in June of 2003. Is that understood?
24  A. I understand what you're saying, yes.
25  Q. Okay.

Edward Stanford, M.D.

---

Page 90

1 And I'm assuming it's somewhere in the
2 medical record that you've been given in Exhibit 7;
3 however, I just don't have the specific page number.
4 I'm sorry about that.
5 MS. YOUNG: Counsel, I may -- Exhibit 7 was
6 just the clinic records, and so I think on Bates label
7 number 31 there is an operative consent. But it -- I
8 don't think it's the facility consent form that you're
9 referring to.
10 I can probably find that so he has it in
11 front of him, if you want.
12 MR. GROVES: Is it within Exhibit 7?
13 MS. YOUNG: I don't think so. I just see --
14 I see maybe a clinic consent in Exhibit 7. But --
15 THE WITNESS: Okay. So this -- if the
16 operative consent from is it 6/16/03?
17 MR. GROVES: Q. This is actually dated 6/3
18 of '03.
19 And I'd be happy to read to you, you know,
20 the specific portion of it that I want. I should have
21 sent it to our court reporter to have for you so you
22 could look at it. But...
23 MS. YOUNG: Actually, I found it, Counsel, if
24 you'd like me to hand it to him.
25 MR. GROVES: I appreciate that. Thank you.

Page 91

1 Can you tell me what the Bates number is for
2 the record?
3 MS. YOUNG: It looks like
4 CLARKM_SMGSA_MDR00143.
5 MR. GROVES: Oh, okay. So we did have the
6 same record. I'm not quite --
7 MS. YOUNG: Well, I had separated them
8 between clinic records and facility records. And in
9 the last few minutes that I have I'm also going to
10 introduce those as an exhibit, but I didn't have a
11 specific question about them yet.
12 MR. GROVES: Okay. Thank you, Counsel.
13 MS. YOUNG: Sure.
14 MR. GROVES: Q. Doctor, if you want to
15 familiarize yourself with that, that record, please
16 feel free.
17 A. No. Please go ahead.
18 Q. Okay.
19 I wanted to ask you about paragraph two. For
20 starters here, I'm assuming is any of that on there
21 your handwriting? I'm assuming it's not.
22 A. None of it.
23 Q. Okay.
24 Paragraph two says, "The procedures listed in
25 paragraph one have been explained to me by

Page 92

1 Dr. Stanford."
2 And I believe you testified that that would
3 be pretty common, you would discuss the procedure with
4 a patient beforehand; is that right?
5 A. Yes.
6 Q. And then it says, "I completely understand
7 the nature of my condition, the nature of the
8 operation or procedure to be performed, and the degree
9 of risks and benefits associated with such."
10 So I'll stop right there. So is the degree
11 of the risks associated with a particular procedure
12 something that you would discuss with your patient
13 prior to implant?
14 A. Yes.
15 Q. And then it says, "Including any possible
16 serious complications of the procedure."
17 A. Correct.
18 Q. Says, "I also have been informed of any
19 alternative treatment and the risks of benefits of
20 such by my physician."
21 Doctor, my question to you is, A, did I read
22 that properly?
23 A. Yes.
24 Q. And, B, what would be some of the alternative
25 treatment that you would give to Ms. Clark in this

Page 93

1 particular situation?
2 Excuse me. That was a poorly worded
3 question.
4 What would be some of the alternative
5 treatment ideas and procedures that you would discuss
6 with Ms. Clark prior to her implant procedure?
7 A. Well, I assume you're not asking me to
8 specifically recall what I discussed with her.
9 Q. Well, no. I'm sorry.
10 A. Okay.
11 Q. In 2003 what would be some of the
12 alternatives to mesh implant that you would discuss
13 with a patient like Ms. Clark who's got complaints of
14 stress urinary incontinence?
15 A. There would have been discussions about doing
16 nothing. There were some less effective procedures
17 like a needle suspension or a radiofrequency bladder
18 neck suspension or a Burch procedure.
19 Since I was doing a laparoscopic procedure, a
20 laparoscopic Burch would have been a possibility. I
21 may or may not have mentioned them to her. And then,
22 of course, the mesh sling procedure would have been
23 discussed.
24 Q. Doctor, these alternative procedures, am I
25 correct, that you wrote a -- you were an author on an

Edward Stanford, M.D.

Page 94

1 article in the International Urogynecological Journal
2 that I believe was published in 2004 regarding Burch
3 urethropexy? Did I say that properly?
4     A. With Willy Davila, yes.
5     Q. I guess I don't see that name listed here. I
6 see a Laura R. Lynn, a Gordon C. Dunn, D-u-n-n?
7     A. Oh. Okay. Yeah, I'd forgotten about that
8 paper.
9     Q. And a T. Flemming Mattox?
10    A. Okay.
11    Q. Does that at all sound familiar to you at
12 all?
13    A. Yes. I'm one of the authors, I believe,
14 yes.
15    Q. And, again, this is in the International or
16 maybe it's Internal Urogynecological Journal. It's
17 published on-line date is January 9, 2004.
18       In it the conclusion is made, "We conclude
19 that the standard Burch procedure and paravaginal
20 repair can be accomplished safely and with excellent
21 short-term efficacy through a 1.50 to 2.5 inch
22 incision."
23       Does that sound familiar to you at all?
24    A. Yes.
25    MS. YOUNG: Counsel, can I interrupt just

Page 95

1 with a question?
2     MR. GROVES: Sure.
3     MS. YOUNG: Is this a document that was part
4 of the defense's document production, or is this
5 something else?
6     MR. GROVES: I couldn't tell you whether it
7 was or whether it wasn't. It's a published journal.
8     MS. YOUNG: Okay.
9       To the extent it was part of the defense
10 document production, I just need to object for the
11 record for failure to provide notice as required by
12 the PTOs.
13       Go ahead.
14    MR. GROVES: Well, I guess I'll just state
15 for the record that I didn't know that the PTOs
16 eviscerates documents which are in the public sphere
17 just because you did or did not produce them. And, of
18 course, we don't know if you did produce this.
19    MS. YOUNG: Well, there are millions of
20 documents I believe that were produced.
21    MR. GROVES: You're right.
22    MS. YOUNG: But because you are using it, I
23 would say it would be your responsibility to know
24 whether or not it was covered by the PTO. But I don't
25 want to get into an argument about it. I think we

Page 96

1 both put our positions on the record.
2     MR. GROVES: I don't think that's what the
3 PTO requires. The PTO talks about documents produced.
4 And it doesn't say anything about having to disclosure
5 to you all documents that are public. It's a public
6 document.
7     MS. YOUNG: I think we both --
8     MR. GROVES: Is your objection I can't ask
9 the doctor about public documents?
10    MS. YOUNG: I think we both stated our
11 objections, and I'm not instructing -- I have no
12 authority to instruct the witness not to answer since
13 we both stated our positions. I think we should move
14 on now.
15    MR. GROVES: I was just trying to get a
16 clarification of your position.
17    MS. YOUNG: And I feel it's clear. Please go
18 ahead.
19    MR. GROVES: Okay. Thank you, Counsel.
20    Q. So, Doctor, sorry about the interruption
21 there.
22       The authors say, we quote, "We conclude that
23 the standard Burch procedure and paravaginal repair
24 can be accomplished safely and with excellent
25 short-term efficacy through a 1.5 to 2.5 inch

Page 97

1 incision."
2       Does that sound familiar to you at all?
3     A. Yes.
4     Q. Okay.
5       And I'll read the entire title of the paper.
6       "Is mini-incisional Burch urethropexy a less
7 invasive method to accomplish a time tested procedure
8 for treatment of genuine stress incontinence."
9       And, Doctor, so we're clear. Would the Burch
10 procedure have been something that in 2003 would have
11 been available as an alternative procedure to
12 Mrs. Clark?
13    A. Yes. I think I stated that earlier.
14    Q. Okay.
15       And I'm sorry if I -- I'm sorry if I'm making
16 you retread a little bit, Doctor.
17    A. It's okay.
18    Q. I guess what I would like to do real quick is
19 mark Exhibit 8. The court reporter should have it.
20       (Whereupon Defendant's
21        Exhibit 8 was marked for
22        identification.)
23    MR. GROVES: Q. Doctor, have you ever seen
24 this document before?
25    A. Probably, but I can't specifically recall

Edward Stanford, M.D.

Page 98

1  where or when.
2      Q.  That's okay.
3      And I'll just note for the record there, I
4  believe it's dated 2000.
5      A.  Okay.
6      Q.  If you'll skip down to kind of the bottom
7  portion of it there.  It says -- there's a section on
8  adverse reactions.  Or adverse events.  Excuse me.
9  Adverse reactions.
10     A.  Where?
11     Q.  I believe it's on page ETH.MESH and then a
12  long number ending in 383.
13     A.  This would be on page 28?
14     Q.  Yeah.  I'm sorry, yes.  We'll ignore -- I
15  think that it's Russian over there on the right-hand
16  side.  Page 28.
17     A.  All right.
18     Q.  And bullet number three it says, in the
19  adverse reaction section, it says that mesh may
20  potentiate an existing infection.
21     Is that information you would pass along to
22  your client, to your own patients?
23     A.  I'm sorry.  I don't see what he's talking
24  about.
25     Q.  Oh, I'm sorry.  Bullet number three.  It

Page 99

1  starts with, "As with all foreign bodies."
2      A.  Oh, okay.
3      Well, yeah, but -- yeah.  I would -- no, I
4  would not discuss this specifically with a patient.
5  But that's how -- that's how it elicits a reaction to
6  hold the mesh in place.  So that's -- that's the
7  normal physiologic reaction of implanting the wide
8  pore monofilament polypropylene mesh.
9      Q.  Okay.
10     A.  I would not have discussed this with a
11  patient unless they specifically asked.
12     Q.  Would you agree with me that an existing
13  infection is an infection that is already present in
14  the patient before the TVT is implanted?
15     A.  Yes.  I mean, it doesn't say preexisting.
16  But, yes.
17     So I assume existing here means something
18  that is currently present at the time.
19     Q.  Okay.  Thank you, Doctor.
20     Doctor, in this IFU adverse reactions section
21  would you agree we me that the labeling in this TVT
22  IFU does not indicate that the mesh may potentiate a
23  new infection in the patient?
24     MS. YOUNG:  Object to form.
25     THE WITNESS:  I'm reading so I can give you a

Page 100

1  correct answer.
2      Okay.  So no, I don't read that it states
3  that it could potentiate a new infection.  I don't
4  read that.
5      MR. GROVES:  Q.  Okay.
6      Doctor, bullet one discusses punctures or
7  lacerations which may require repair.  Would you agree
8  with me that that bullet is referenced an adverse
9  reaction regarding surgical technique or surgical
10 placement of the sling, not a complication of the
11 sling itself?
12     A.  I don't know how to separate those two.
13     Q.  Well, it references, "During needle passage
14 and may require surgical repair."
15     My question to you is, is needle passage, is
16 that a complication or an adverse reaction to the
17 sling itself, or do you read that as a reference to
18 surgical technique?
19     MS. YOUNG:  Object to form.  Asked and
20 answered.
21     THE WITNESS:  Yeah, again, I really don't
22 know how to separate the two.
23     MR. GROVES:  Q.  Doctor, looking at these
24 IFUs, would you agree that these -- that this IFU
25 does not warn that the mesh may cause chronic

Page 101

1  inflammation?
2      A.  No, it does.  Page 28, second bullet point.
3  It could result in extrusion, erosion, fistula
4  formation and inflammation.
5      Q.  My question to you was do you agree that this
6  IFU does not warrant that the mesh could cause, quote,
7  "chronic inflammation"?
8      MS. YOUNG:  Object to form.
9      THE WITNESS:  I don't know.  Again, I don't
10 want to be argumentative, but the question is
11 nonsensical.  I don't see the word chronic
12 inflammation.
13     MR. GROVES:  Q.  Okay.
14     Would you agree that that IFU does not warn
15 that the mesh may cause chronic vaginal pain?
16     A.  I'll agree with you it does not say the word
17 chronic.
18     Q.  Would you agree that that IFU does not warn
19 the mesh may cause permanent painful intercourse?
20     A.  Yes, I'll agree that it does not say that.
21     Q.  Would you agree that it does not warn that
22 this product could cause painful intercourse?
23     A.  I don't -- I do not see that written here,
24 no.
25     Q.  Would you agree that this IFU does not warn

Edward Stanford, M.D.

Page 102

1 that this mesh product may cause chronic urinary tract
2 infection?
3      A.  I agree it does not say that.
4      Q.  Would you agree that -- that doesn't answer
5 my question.
6          Would you agree the IFU does not warn that
7 the product may cause chronic urinary tract infection?
8      MS. YOUNG:  Object to the form of the
9 question.
10     THE WITNESS:  And I've agreed with you.  Yes.
11     MR. GROVES:  Q.  Are these the type of
12 things that you would want the mesh manufacturer to
13 make the prescribing implanting physician aware of
14 prior to implant procedure?
15     A.  No, not necessarily.
16     MS. YOUNG:  Object to form.
17     MR. GROVES:  Q.  I don't understand your
18 answer.
19         Not necessarily.  Does that mean sometimes
20 yes, sometimes no, or --
21     A.  No.  I think I've answered this to you
22 before.  I -- first of all, I would not rely on this
23 for any purpose at all.  This is something that's
24 required by the government.  So whether it
25 specifically states something or not, I would not rely

Page 103

1 on this.
2         And I don't know how the manufacturer could
3 put in all of the nuanced words that would be
4 required.  So I -- I guess I'm a little, still a
5 little stumped by the direction of the questions
6 because I'm agreeing that, yes, it doesn't say some of
7 the things you've asked.  But, again, I would never
8 rely to this piece of paper for anything.
9      Q.  Well, I'm going to strike your answer and
10 have the court reporter reread my question.
11     A.  Okay.
12     MS. YOUNG:  You can move to strike.  But go
13 ahead.
14     MR. GROVES:  Sorry.  I'll move to strike.
15         And I ask the court reporter to please read
16 my question again.
17         Thank you.
18             (Record read.)
19     MR. GROVES:  Q.  I'll go ahead and reread
20 it.
21         If Counsel objects asked and answered, then
22 I'm going to have the court reporter reread it.  And
23 I'll just put that out there.
24         So the question was, Doctor, we talked about
25 chronic inflammation, chronic vaginal pain, permanent

Page 104

1 painful intercourse, chronic urinary tract infection.
2 And I asked you are these the type of things you'd
3 want to be made aware of as an implanting physician by
4 the manufacturer?
5      A.  I think I'll use the same answer I used
6 before.
7          I wouldn't necessarily rely on the
8 manufacturer to tell me that information.  I probably
9 would rely on other scholarly activities that point
10 out the complications of these procedures.  And --
11     Q.  Okay.  Fair enough.
12         I'll ask a similar version of the same
13 question.
14         Are these the types of things that you would
15 want to be made aware of as the implanting physician
16 prior to your implant?
17     A.  Yes.
18     Q.  Thank you.
19     A.  But I think I said yes a few times.  Sorry.
20 But I thought I did.
21     Q.  Doctor, you'd agree with me that these IFUs
22 do not warn that mesh may defray, do they?
23     A.  I don't see that written on this, no.
24     Q.  If the manufacturer knows in 2003, prior to
25 the time of your implant of Ms. Clark, that its product

Page 105

1 may degrade in the human body, is that information
2 that you would want to be made aware of prior to
3 implant?
4      MS. YOUNG:  Object to form.
5      THE WITNESS:  Yes.
6      MR. GROVES:  Q.  Doctor, you'd agree that
7 these IFUs do not warn that the mesh may fray, rope
8 or curl when implanted in the human body, correct?
9      A.  I do not see it written here, so correct.
10     Q.  Doctor, prior to your implant of Ms. Clark in
11 2003 if the manufacturer knew that its product may
12 fray, rope or curl, is that information that you would
13 like to be made aware of?
14     MS. YOUNG:  Object to form.
15             (Court reporter asks for
16              clarification.)
17     MS. YOUNG:  Counsel, did you say fray, rope
18 or curl?
19     MR. GROVES:  Yes, I did.  Thank you.
20     COURT REPORTER:  Rope, r-o-p-e?
21     THE WITNESS:  Roll.
22     COURT REPORTER:  Roll, r-o-l-l?
23     THE WITNESS:  Rope or roll?
24     MR. GROVES:  Rope.
25     A.  Rope.

Edward Stanford, M.D.

Page 106

1    Yes, I guess I would like to know that.  Yes.
2    Q.  Doctor, these things that we've been
3  discussing, the chronicity, the permanency, things of
4  that nature, are those the types of things that you
5  would want to pass on to your patients prior to
6  implant?
7    A.  Maybe not that specifically.  But, yes, there
8  would be -- there would be probably a more generic
9  discussion about the complications.  But probably not
10  as specific as you're asking, no.
11    Q.  So going back to your informed consent where
12  it says you discussed the degree of these sorts of
13  things --
14    A.  Um-hum.
15    Q.  -- that's the type of information you want to
16  know and pass along to your patients prior to implant,
17  correct?
18    A.  Well, that's not my consent.  That's the
19  hospital's consent about the degree.
20    Q.  So you're saying you would not discuss the
21  degree of these things with your patient prior to
22  implant?
23    MS. YOUNG:  Object to form.
24    THE WITNESS:  What do you mean by degree?
25  You mean prevalence, or the chance of them happening?

Page 107

1  Is that what you mean?
2    MR. GROVES:  I mean degree of risks.
3    MS. YOUNG:  Object to form.
4    THE WITNESS:  Okay.  No, I would discuss to
5  some extent the degree of certain risks.  Yes, I
6  would.
7    MR. GROVES:  Q.  Doctor, you'd agree with me
8  this IFU describes procedures for implanting the
9  device, correct?
10    A.  Oh, I don't know.  Does it?
11    No, I don't think it does.
12    Oh, wait.  I'm sorry.  Instructions for use.
13  Page 26?
14    Q.  I'm sorry.  I'm talking about the document,
15  the exhibit in general, the instructions for use.
16  Yeah, do they describe procedure for implanting this
17  product?
18    A.  Yeah, it says instructions for use.  So, yes,
19  I guess it does.  Um-hum.
20    Q.  Okay.
21    And, Doctor, please feel free to look over it
22  if you want.
23    Does it also describe indications for use of
24  this product?
25    A.  Yes.

Page 108

1    Q.  Doctor, would you agree with me that the IFU
2  contains no procedure describing the proper procedure
3  for removal of the mesh product?
4    A.  I don't see that here, no.
5    Q.  Would you agree with me that the IFU contains
6  no indication for removal of the mesh product?
7    A.  I agree with you.
8    Q.  Would you agree with me this IFU contains no
9  adverse reactions associated with removal of the mesh
10  product?
11    A.  No, it doesn't state that, no.
12    Q.  As a physician who is performing implanting
13  and removal of these products, wouldn't you want to
14  know Ethicon's method of procedure for removal of its
15  mesh product?
16    A.  No.
17    Q.  As a physician who is implanting and doing
18  removal procedures, if Ethicon knew of adverse events
19  associated with removal of its product, wouldn't you
20  want to know what those events are, if any?
21    MS. YOUNG:  Object to form.  Lack of
22  foundation.
23    THE WITNESS:  Could you please repeat that?
24    MR. GROVES:  Q.  As an implanting physician
25  who may also do removal, if Ethicon knew of adverse

Page 109

1  events associated with removal of its product,
2  wouldn't you want to know those events, what they are,
3  if any?
4    MS. YOUNG:  Same objection.
5    THE WITNESS:  No.  I think, again, I wouldn't
6  rely on Ethicon for that information.
7    I would get that probably from scholarly
8  journals or other educational materials.  And in this
9  case, of course, it wasn't removed.  It was lysed.
10    MR. GROVES:  Q.  Doctor, in March or April
11  of 2008 -- and maybe tell me if this is one of the
12  journals that you've done more work on.  The Journal
13  of Minimally Invasive Gynecology has a published
14  article where you are I believe the lead author
15  entitled, "Comprehensive Review of Suburethral Sling
16  procedure complication."  Does that sound familiar to
17  you at all?
18    A.  Yes.
19    Q.  Okay.
20    You and an author named Marie Padilla R.
21  Paraiso.
22    A.  Paraiso.  From Cleveland Clinic, yes.
23    Q.  In it you did some, I guess, statistical
24  analysis.  Is that fair to call it?
25    A.  No.  I -- well, I guess you could call it

Edward Stanford, M.D.

Page 110

1    that, yes.
2        Q.  In my understanding in just kind of looking
3    through the beginning section here where you are
4    discussing, I guess, some of your research procedures,
5    you talked about doing PubMed research and also using
6    the Manufacturer and User Facility Device Experience
7    database.  Does that sound familiar to you at all?
8        A.  That was the methods we used to get the
9    information, yes.  The MAUDE database and PubMed.
10       Q.  I'm sorry.  I didn't hear that.  The what
11   database?
12       A.  MAUDE.
13       Q.  Can you tell me a little bit about the MAUDE
14   database, Doctor?
15       A.  Yes.
16           Anytime there is an adverse event that occurs
17   the hospital and/or manufacturer is supposed to report
18   to the MAUDE database so that the -- I believe it's the
19   FDA branch of the government can collect and collate
20   information about adverse events.  Of any device
21   that's FDA approved.
22       Q.  So MAUDE is an FDA database?
23       A.  I don't know that for a fact.
24       Q.  And, Doctor, and if this is too long ago,
25   just tell me if you don't recall.

Page 111

1        In compiling your research and ultimately
2    coming to your conclusions for this particular
3    article, isn't it true that you predominantly relied
4    upon your own research and PubMed as opposed to MAUDE?
5        A.  Yes, I do think that the MAUDE database did not
6    provide as much information as published research.
7        Q.  And, Doctor, if I said that you -- you noted
8    as the lead author in this you consider that MAUDE
9    proved to be of limited use, you wouldn't disagree
10   with me; isn't that correct?
11       A.  Yeah, I think that's probably true.
12           I need to text my office real quick.
13       MR. GROVES:  If we need to go off the record,
14   please.
15       THE WITNESS:  I just need to postpone a
16   meeting.
17       MR. GROVES:  I'm sorry, Doctor.  I only have
18   about ten minutes left, and I will try to wrap up here
19   sooner than that.
20       MS. YOUNG:  We'll go off for just a second.
21       VIDEOGRAPHER:  We are going off the record at
22   2:02 p.m.
23           (Recess taken.)
24       VIDEOGRAPHER:  All right.  We are back on the
25   record at 2:05 p.m.

Page 112

1        MR. GROVES:  Q.  Doctor, in your conclusions
2    of this article we've been discussing in 2008 authored
3    by -- authored by you in the Minimally Invasive
4    Gynecology Journal, the conclusion states that
5    sling-related complications are vastly unreported and
6    studies with long term follow-up are lacking.
7        Does that sound correct?
8        A.  Is that what I wrote?
9        Q.  Yes, sir.
10       A.  Well, at that point in time it was probably
11   correct.
12       Q.  You state, "Mesh-related complications are
13   less when macroporous, loosely knitted polypropylene
14   mesh is used."
15       Does that sound correct, Doctor?
16       A.  That is correct.
17       Q.  Doctor, do you have an understanding of the
18   TVT Gynecare mesh that was implanted in Ms. Clark?
19       A.  I do.
20       Q.  Is it a loosely knitted polypropylene mesh?
21       A.  It is.
22       Q.  Okay.
23       A.  Monofilament.  Yes.
24       Q.  Doctor, if a mesh manufacturer were to
25   undertake a long-term follow-up study, is that

Page 113

1    information that you would consider as a physician?
2        A.  Sure.  Yes.
3        Q.  Thank you, Doctor.
4            Let me look over my notes.  I'll reserve the
5    rest of my time.
6
7            REEXAMINATION
8
9    BY MS. YOUNG:
10       Q.  Okay, Doctor.  I'm going to ask you, if you
11   would, to look at Exhibit 7 again.
12           Do these appear to be the clinic records for
13   Ms. Marabeth Clark?
14       A.  Yes.
15       Q.  And would these have been kept in the normal
16   course of the business of this medical practice and
17   clinic?
18       A.  Yes.
19       Q.  Would they have been created near or at the
20   time that the treatment was given?
21       A.  Yes.
22       Q.  Also I want to hand you what I'll marked as
23   Exhibit -- are we on 9?  Okay.  Exhibit 9.
24   /////
25

Page 114

1 (Whereupon Defendant's
2 Exhibit 9 was marked for
3 identification.)
4 MS. YOUNG: Q. And, Counsel, I'm handing
5 him the records we have off Marker from St. Mary's
6 Good Samaritan. They start with SMGSA_MDR00083.
7 Doctor, do these appear to be the facility
8 records for Ms. Marabeth Clark?
9 A. Yes.
10 Q. Beginning with June 30th, '03, the date of
11 her implant procedure?
12 A. Yes.
13 Q. And would these have been kept in the regular
14 course of business?
15 A. Yes.
16 Q. Would they have been made at or near the time
17 of Ms. Clark's treatment?
18 A. Yes.
19 Q. And you were kind enough to say that even
20 though you hadn't brought a CV, that you would be
21 willing to e-mail a copy of that to our court reporter
22 today; is that right?
23 A. Yes.
24 Q. Okay.
25 I'd like to make that Exhibit 10 to be mailed

Page 115

1 to us once our court reporter has received that.
2 Doctor, would you please look at Exhibit 6,
3 the list of the chart that has potential risks of
4 non-mesh and mesh SUI surgeries on it?
5 Q. I believe you testified earlier that all of
6 the risks listed under the mesh column on the right
7 were risks that you would have been aware of as being
8 associated with mesh SUI surgeries at the time of
9 Ms. Clark's procedure; is that correct?
10 A. Yes.
11 Q. And at that time would you have been aware
12 that any of these risks could have been temporary or
13 chronic?
14 A. Yes.
15 Q. And at that time would you have been aware
16 that any of these risks could have been mild,
17 moderate, or severe?
18 A. Yes.
19 Q. And specifically do these lists include pain
20 with intercourse, vaginal scarring, urinary retention,
21 and one or more surgeries to treat an adverse event?
22 A. Yes.
23 Q. Doctor, can stress urinary incontinence have
24 an impact on a woman's life?

Page 116

1 A. Oh, yes.
2 Q. In your clinical experience that you've
3 outlined for us today, what kind of impact have you
4 observed it to have?
5 A. Well, as you can see in the questionnaire,
6 the patient gets to judge how impactful on their
7 quality of life it is. And in some cases some women
8 it's -- it doesn't bother them much at all.
9 In others, it impacts them to the point where
10 they become reclusive, stop exercising. It can damage
11 relationships. It can create work place problems. It
12 can create depression. And it can really alter the
13 patient's quality of life. And, you know, everybody's
14 different in how it impacts them.
15 Q. And in the questionnaire from your clinic
16 that we reviewed that Ms. Clark had filled out, did
17 she indicate that it was bothering her enough that she
18 wanted a surgical treatment for it?
19 A. Yes.
20 Q. And when she decided to have that surgical
21 treatment, that wasn't the first time she had come to
22 you with problems with incontinence was it?
23 A. No. In fact, we followed her for over a year
24 until she got to the point where she wanted something
25 more definitive done, so we did more testing,

Page 117

1 confirmed the diagnosis and moved on with the
2 procedure.
3 Q. I want to ask you some questions about the
4 device itself and some allegations in the lawsuit.
5 Doctor, there's a claim made in this case
6 that TVT mesh is cytotoxic. Can we agree that
7 cytotoxic means cell death?
8 A. Yeah. Yes.
9 Q. After implanting Ms. Clark with the TVT, did
10 you find any evidence that she had been harmed by the
11 mesh allegedly being cytotoxic?
12 MR. GROVES: Object to form.
13 THE WITNESS: First of all, I don't know how
14 I would know that it's cytotoxic. But, no, I don't
15 believe the mesh itself is cytotoxic.
16 MS. YOUNG: Q. Is that something that
17 you've seen in any of your patients where you have
18 either implanted a TVT or done a subsequent procedure
19 involving a TVT?
20 A. Not --
21 MR. GROVES: Object to form. Lacks
22 foundation.
23 THE WITNESS: Okay. I'm not sure what lack
24 of foundation means.
25 But, no, I've never, with a monofilament

Edward Stanford, M.D.

Page 118

1  macroporous mesh like this, no, I've never seen that.
2      MS. YOUNG:  Q.  There's also a claim in the
3  lawsuit that the TVT device degrades and falls apart
4  or leaches chemicals into the body.
5      In the time that you treated Ms. Clark after
6  the implant, did you see any evidence of the TVT
7  device degrading, falling apart or leaching chemicals
8  into her body?
9      A.  Not at all.
10     Q.  Have you seen in any of your patients
11 evidence of a TVT device degrading, falling apart or
12 leaching chemicals into the body?
13     A.  Not at all.
14     Q.  There's also a claim in this case that the
15 TVT mesh frays and sheds particles both before and
16 after it's implanted.  Have you ever seen such
17 evidence in any of your patients that a TVT device has
18 frayed or shed particles?
19     MR. GROVES:  Object to form.  Calls for
20 general cause expert testimony.  I don't believe
21 Counsel has retained the witness to call such
22 testimony.
23     THE WITNESS:  No, I've never seen anything
24 that makes me think that that occurs.
25     MS. YOUNG:  Q.  Before you implanted the TVT

Page 119

1  in Ms. Clark, did you notice any particle loss or bits
2  of mesh breaking off of the TVT?
3      A.  No.
4      Q.  If you had seen that, what would you have
5  done?
6      A.  I'm not sure.
7      Q.  Have you ever encountered that?
8      A.  No.
9      Q.  After implanting mesh or after implanting the
10 mesh in Ms. Clark, did you find any evidence that the
11 mesh had roped or curled in her?
12     A.  No.
13     Q.  Did you find any evidence with Ms. Clark that
14 the mesh had shrunk or contracted?
15     A.  No.  But it is supposed to shrink a small
16 percentage.  It's just part of the natural healing
17 process that causes the mesh to shrink.  So I can't
18 specifically say I saw it, but it is something I would
19 expect.
20     Q.  And explain, if you would for the jury, why
21 that's an expected and necessary part of the healing
22 process?
23     A.  So when the mesh is placed into the tissue
24 and then, of course, it's now encompassed in the
25 tissue, the expectation is that specific cells such as

Page 120

1  macrophages would infiltrate the mesh.
2      They would lay down a collagen material which
3  is, of course, a part of a scar.  And in doing so it
4  would tend to contract locally, and so the mesh would
5  be encompassed locally into a scar.
6      And this occurs over about a -- it begins
7  occurring over about a two-week period and finalizes
8  over about a year.
9      So that's the normal mechanism.  So, yes, you
10 would expect for the body to incorporate the mesh in
11 totality.
12     Q.  Does the TVT sling treat urge incontinence to
13 your understanding?
14     A.  Actually, there is some research showing that
15 it could.  It wouldn't be the primary indication.  But
16 it could.  It could in some women correct urge
17 symptoms.
18     MR. GROVES:  I think we're going beyond the
19 scope of your direct or any questions I asked,
20 Counsel.
21     MS. YOUNG:  I reserved additional time to
22 complete my questioning.  It's not redirect.
23     Q.  Doctor, why did you recommend the TVT to
24 Ms. Clark as opposed to the Burch procedure?
25     A.  I don't recall.  At this stage I don't

Page 121

1  recall.
2      Q.  In general what sort of things do you
3  consider when deciding whether to recommend a TVT
4  sling as opposed to another surgical option?
5      MR. GROVES:  Object to form.
6      THE WITNESS:  I think as we discussed
7  earlier, there was a shift away from more invasive
8  procedures like the Burch.  And so the options would
9  have been discussed.  During the informed consent the
10 decision to combine TVT with the LAVH would have been
11 sort of what we resolved from the discussion.
12     I do know that at that point I was still
13 doing Burches, so I'm pretty sure it was part of the
14 discussion.
15     MS. YOUNG:  Q.  And without remembering her
16 specifically, can you tell from the medical records
17 whether you decided her best option would be a TVT?
18     MR. GROVES:  Objection.  Asked and
19 answered.
20     THE WITNESS:  Well, no, it actually wasn't
21 answered because we didn't -- there was one section in
22 the medical record where there's a diagram that
23 reflects what's called the POP-Q.  And If you look at
24 the numbers, she did not have anterior compartment
25 prolapse.

Page 122

1    In a patient with anterior compartment
2  prolapse, I would probably be more inclined to do a
3  procedure to correct the prolapse, which a Burch could
4  have done that along with a paravaginal repair.  Since
5  she didn't have that, doing the LAVH and supporting
6  the top of the vagina along with a sling would have
7  actually been a very rational decision.
8    Q.  Putting yourself back in the time frame of
9  Ms. Clark's procedure with the knowledge that you have
10  gained since about the TVT, in your opinion is the TVT
11  still a safe and effective treatment for stress
12  urinary incontinence in women?
13    A.  Yes.
14    Q.  Putting yourself back in the time of
15  Ms. Clark's procedure in 2003 but with the knowledge
16  and information that you've gained even through today,
17  in your opinion do the potential benefits of using the
18  TVT to treat SUI outweigh the potential risks?
19    A.  Yes.
20    Q.  You mentioned the procedure that Ms. Clark
21  had at the same time as her TVT implant.  Was that a
22  hysterectomy?
23    A.  Yes.
24    Q.  And can a hysterectomy result in painful
25  intercourse?

Page 123

1    A.  Yes.
2    Q.  Can a hysterectomy result in vaginal
3  scarring?
4    A.  Yes.
5    Q.  Those are all the questions that I have,
6  Doctor.  Thank you for your time.
7    MR. GROVES:  Thank you for your time, Doctor.
8  I'm sorry if we kept you past the meeting.
9    THE WITNESS:  We're done?
10    MS. YOUNG:  Yes.
11    VIDEOGRAPHER:  All right.  We are going off
12  the record at 2:21 p.m.
13    (Whereupon the deposition
14    of EDWARD STANFORD, M.D.
15    concluded at 2:21 p.m.)
16    (Whereupon Defendant's
17    Exhibit 10 was marked for
18    identification.)
19
20    --o0o--
21
22
23
24
25

Page 124

1    - - - - - -
  E R R A T A
2    - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6    REASON:  _____
7  ____  ____  _____
8    REASON:  _____
9  ____  ____  _____
10    REASON:  _____
11  ____  ____  _____
12    REASON:  _____
13  ____  ____  _____
14    REASON:  _____
15  ____  ____  _____
16    REASON:  _____
17  ____  ____  _____
18    REASON:  _____
19  ____  ____  _____
20    REASON:  _____
21  ____  ____  _____
22    REASON:  _____
23  ____  ____  _____
24    REASON:  _____
25

Page 125

1
2    ACKNOWLEDGMENT OF DEPONENT
3
4    I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10  changes in form or substance, if any,
11  noted in the attached Errata Sheet.
12
13
14  _____
15  EDWARD STANFORD, M.D.          DATE
16
17
18  Subscribed and sworn
  to before me this
19  _____ day of _____, 20____.
20  My commission expires:_____
21
22  _____
  Notary Public
23
24
25

Edward Stanford, M.D.

Page 126

1   STATE OF CALIFORNIA )
              : ss
2   COUNTY OF STANISLAUS )
3         I, ANNETTE M. DERUYTER, do hereby certify
4   that I am a licensed Certified Shorthand Reporter,
5   duly qualified and certified as such by the State of
6   California;
7         That prior to being examined, the witness
8   named in the foregoing deposition was by me duly sworn
9   to testify to the truth, the whole truth, and nothing
10  but the truth;
11        That the said deposition was by me recorded
12  stenographically at the time and place herein
13  mentioned; and the foregoing pages constitute a full,
14  true, complete and correct record of the testimony
15  given by the said witness;
16        That I am a disinterested person, not being
17  in any way interested in the outcome of said action,
18  or connected with, nor related to any of the parties
19  in said action, or to their respective counsel, in any
20  manner whatsoever.
21     DATED: _____
22
23     _____
           Annette M. DeRuyter
24         Calif. CSR #9816
25