EXHIBIT A

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                          -   -   -

    IN RE:                        :SUPERIOR COURT OF
 2  PELVIC MESH/GYNECARE          :NEW JERSEY
    LITIGATION                    :LAW DIVISION -
 3                                :ATLANTIC COUNTY
                                  :MASTER CASE 6341-10
 4                                :CASE NO. 291 CT
                                  :
 5                                :Civil Action
 6      CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
 7                      CONFIDENTIALITY
 8      EXPERT WITNESS TESTIMONY OF MILES MURPHY, M.D.
 9                          -   -   -
10                     November 30, 2012
11                          -   -   -
12              Videotaped deposition of MILES MURPHY,
13  M.D., held at BUTLER SNOW, 500 Office Center Drive,
14  Suite 400, Blue Bell Conference Room, Fort Washington,
15  Pennsylvania, commencing at approximately 9:43 a.m.,
16  before Margaret M. Reihl, a Certified Realtime
17  Reporter, Certified Court Reporter and Notary Public
18  for the State of New Jersey and Commonwealth of
19  Pennsylvania.
20
21
22
                    GOLKOW TECHNOLOGIES, INC.
23           877.370.3377 ph|917.591.5672 fax
                      deps@golkow.com
24
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    A P P E A R A N C E S:
 2

      MAZIE SLATER KATZ & FREEMAN, LLC
 3    BY:  ADAM M. SLATER, ESQUIRE
      103 Eisenhower Parkway
 4    2nd Floor
      Roseland, New Jersey 07068
 5    (973) 228-9898
      aslater@mskf.net
 6    Representing the Plaintiffs
 7

      BUTLER, SNOW, OMARA, STEVENS & CANNADA, PLLC
 8    BY:  NILS B. (BURT) SNELL, ESQUIRE
      500 Office Center Drive, Suite 400
 9    Fort Washington, Pennsylvania  19034
      (267) 513-1884
10    burt.snell@butlersnow.com
      Representing Johnson & Johnson and Ethicon
11    (and the witness)
12                      _ _ _
13    Also Present:    SILLS CUMMIS & GROSS, P.C.
                       BY:  ROBERTA L. BARNES, BSN, RN, LNC
14                     The Legal Center, One Riverfront Plaza
                       Newark, New Jersey  07102
15                     (973) 643-7000
16                     David Lane, Videographer
                       Golkow Technologies
17                      _ _ _
18
19
20
21
22
23
24
25
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    patient and how you're going to actually, for example,

2    trim the mesh and implant the mesh, correct?

3                    MR. SNELL:  Object to the form.

4                    THE WITNESS:  Correct.

5                    MR. SLATER:  What is your objection?

6                    MR. SNELL:  Template, I'm not sure what

7    you mean by template.

8                    MR. SLATER:  You don't know what the

9    word template means, counsel; is that what you're

10   saying in good faith on this record?

11                   MR. SNELL:  Yes, as to the Prolift® as

12   a template.

13   BY MR. SLATER:

14       Q.    Okay.  You understood what I meant, right?

15       A.    I think I did.

16       Q.    Let's go back to your Exhibit Murphy-1.

17   Page 32 is a bibliography.  What does that

18   bibliography represent?  It goes from Page 32 to 38.

19   What does that represent?

20       A.    It represents the resources that I used in

21   drafting my report.

22       Q.    After the bibli -- well, rephrase.

23             When you say the resources you used in

24   drafting your report, what do you mean by that?

25       A.    Meaning that when I wrote the report, most

Confidential - Subject to Stipulation and Order of Confidentiality

1   of the opinion, most of the body of the report is

2   based on scientific data, published data and whenever

3   I used, for instance, a paper that had been published,

4   I referenced that in the report.

5       Q.   So whatever clinical data you relied on in

6   writing your report is found in the bibliography?

7       A.   No.

8       Q.   Well, besides what's referenced in the

9   bibliography, what other clinical data did you rely on

10  in forming your opinions in this case?

11      A.   My own medical experience, my own clinical

12  experience and that of my colleagues.

13      Q.   To the extent that clinical or medical data

14  is published someplace and you relied on it to some

15  extent in forming your opinions, is it listed in the

16  bibliography?

17      A.   For this first report, yes.

18      Q.   At the time you wrote and signed your first

19  report, which is Murphy-1, the published or documented

20  clinical data that you were relying on was listed in

21  the bibliography from Page 32 to 38, correct?

22              MR. SNELL:  Objection, form.

23              THE WITNESS:  That was a pretty long

24  question, but I think the answer is yes.

25  BY MR. SLATER:

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.    Okay.  Well, what I was saying is at the

2   time you formed your opinions that are set forth in

3   Murphy-1, the first report you authored, to the extent

4   that you relied on data that is actually published,

5   actually documented, are those sources of data listed

6   in the bibliography?

7      A.    The ones that I specifically referenced are

8   in the bibliography.  It doesn't mean that I may not

9   have read something else in my life, in my last eight

10  and a half years of practice and used that in forming

11  my opinions, but when I specifically, for instance,

12  quote a paper, I put it in my bibliography.

13     Q.    You understand one of the purposes of

14  writing your report is to give notice to myself and

15  other attorneys as to what your opinions are and what

16  you relied on in forming those opinions, correct?

17     A.    Right.

18     Q.    You understood that, right?

19     A.    I understand that generally you don't want

20  to be surprised at court if I, all of the sudden, want

21  to reference something and I haven't mentioned it

22  before.

23     Q.    Well, not just generally, but you understand

24  that the court rules actually say that if you're going

25  to rely on something, you're supposed to actually

Confidential - Subject to Stipulation and Order of Confidentiality

1    disclose what you relied on in forming your opinions;

2    did you understand that when you authored this report?

3         A.    I think so.  I'm not a lawyer but --

4         Q.    When you wrote this report and you attached

5    this bibliography to it --

6         A.    Yes.

7         Q.    -- did you intend to give notice to myself

8    and other people in this case as to what published or

9    documented clinical data you were relying on in

10   forming your opinions in the report?

11                   MR. SNELL:  Objection, go ahead.

12                   THE WITNESS:  When I wrote the report

13   and compiled the bibliography, I wanted to make sure

14   that if there was important literature that I wanted

15   to reference in my report that I included in the

16   bibliography.  That was my main purpose of doing the

17   bibliography.

18   BY MR. SLATER:

19        Q.    So at the time that you wrote the report,

20   any literature that was -- rephrase.

21                   So at the time you wrote this report and

22   signed it, any published data, clinical data that you

23   felt was important to you in forming your opinions,

24   you listed in the bibliography?

25                   MR. SNELL:  Objection, form.

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1                    THE WITNESS:  Not necessarily.  I

 2    simply --

 3    BY MR. SLATER:

 4         Q.   Well, tell me.

 5         A.   Those were the ones that I used when I wrote

 6    the report.

 7         Q.   Well, is there something that you relied on

 8    that is published data at the time you wrote this

 9    report that's not listed in the bibliography that you

10    can point to right now?

11         A.   That I relied on in actually writing this

12    version of the report?

13         Q.   Yes.

14         A.   I can't point to anything like that right

15    now.

16         Q.   Okay.  After the bibliography there is a

17    section titled "Additional List of Materials - Miles

18    Murphy, M.D."

19              Do you see that?

20         A.   Yes.

21         Q.   What does that list represent?

22         A.   That represents additional material that I

23    thought we might want to be able to reference in my

24    testimony on this case.

25         Q.   Did you review all of the materials listed
```

Confidential - Subject to Stipulation and Order of Confidentiality

1    on this list of additional materials before you signed

2    that report?

3        A.    Briefly, yes.

4        Q.    When you say "briefly," what do you mean?

5        A.    I looked at them.

6        Q.    Well, when you say "looked at them," for

7    example, there could be a deposition transcript, and

8    I'll take an example from this additional list of

9    materials.  There's the deposition transcript of

10   exhibits of Piet Hinoul, P-i-e-t H-i-n-o-u-l, listed.

11           Did you read that entire transcript and

12   exhibits?

13       A.    No, I did not.  That's a very long --

14   there's a couple volumes of that, but I had certainly

15   reviewed it.

16       Q.    Well, when you say you reviewed it, what

17   does that mean?

18       A.    I read some of it.

19       Q.    How many pages of it did you read?

20       A.    I don't recall.

21       Q.    Did you read more than ten pages of that

22   deposition?

23       A.    Yes.

24       Q.    But you can't tell me beyond that what you

25   specifically read?

Confidential - Subject to Stipulation and Order of Confidentiality

1        A.   I can remember some of the things that I

2   read in it.

3        Q.   Well, was there -- well, we'll come back to

4   that.

5             Did you read -- it says -- rephrase it.

6             It says Jessica Shen, deposition transcript

7   with exhibits.

8             Did you read the entire deposition and

9   exhibits?

10       A.   No.

11       Q.   It says Judi Gauld, deposition transcript

12  with exhibits.

13            Did you read the entire deposition and

14  exhibits?

15       A.   I did not.

16       Q.   It says David Robinson, deposition

17  transcript with exhibits.

18            Did you read the entire deposition and read

19  all the exhibits?

20       A.   No.

21       Q.   And with regard to Jessica Shen, Piet

22  Hinoul, Judi Gauld and David Robinson's deposition

23  transcripts that are listed here, did you actually

24  watch the videos of their depositions?

25       A.   No.

Confidential - Subject to Stipulation and Order of Confidentiality

1    Q.    Didn't see any of those videos, correct?

2    A.    Correct.

3    Q.    Have you seen the video of anyone's

4    deposition that's ever been taken in this case?

5    A.    No.

6    Q.    Did you ever ask to see any of the videos of

7    the actual deposition testimony of any witness in this

8    case?

9    A.    No.

10    Q.    In writing the report, which we marked as

11    Murphy-1 -- well, rephrase.

12        This list of additional materials, are these

13    basically other materials that you wanted to list in

14    case you wanted to mention them during trial so you

15    could say, hey, you know that I listed them; is that

16    basically the purpose?

17        MR. SNELL:  Object to form.  Go ahead.

18        THE WITNESS:  I think that's a fair

19    assessment because from the time I drafted my report,

20    there were a lot of depositions and your -- you know,

21    the plaintiffs' expert had referenced things, and I

22    wanted to make sure that I could reference other

23    things as well.

24    BY MR. SLATER:

25    Q.    Okay.  Is it fair to say that at the time

Confidential - Subject to Stipulation and Order of Confidentiality

1    you wrote your first report, which is Murphy-1, you

2    had not read all of the materials listed on the

3    list -- additional list of materials?

4        A.    Yes.

5        Q.    Is it fair to say you did not rely on all

6    the materials listed in the additional list of

7    materials when you actually formed your opinions?

8        A.    I would say that I didn't rely on all of

9    them, but it's very likely that I would have read some

10   of the other additional materials, just not quoted

11   them in my bibliography.

12       Q.    When you wrote your report, you set forth

13   opinions, and I'm talking about your first report,

14   Murphy-1, you set forth certain opinions in the

15   report, correct?

16       A.    Correct.

17       Q.    Were those all of the opinions you had

18   formed with regard to this litigation at the time that

19   you authored that report?

20       A.    I don't know that I -- I mean, I have lots

21   of opinions about this case.  I don't know that every

22   single solitary one was listed in the report.

23       Q.    You understood that one of the purposes of

24   your report was to give notice to attorneys in the

25   litigation like myself of what your opinions were,

Confidential - Subject to Stipulation and Order of Confidentiality

1    correct?

2        A.    Correct.

3        Q.    Okay.  Did you endeavor, when you wrote this

4    report, to list each of the opinions that you had

5    formed at the time that you authored the report; was

6    that your goal?

7        A.    My goal was simply to write a report that

8    reflected my views of Prolift® in this case.

9        Q.    Okay.  And the opinions set forth in your

10   first report, Murphy-1, accomplished that, from your

11   perspective?

12       A.    I think so, but I think that in looking at

13   other people's depositions, there may have been things

14   that they covered that I didn't think were necessarily

15   essential to cover in my first report and, therefore,

16   wanted to have some supplemental material later on.

17       Q.    At the time that you authored your first

18   report --

19       A.    Yes.

20       Q.    -- the day that you put your signature, your

21   electronic signature on there, typed your name in, did

22   that represent the opinions you had formed as of that

23   point in time with regard to this litigation?

24              MR. SNELL:  Objection, form.

25              THE WITNESS:  Yes.

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    BY MR. SLATER:
 2         Q.   In the report you listed many facts from
 3    various sources of information that you referred to in
 4    the report, correct?
 5         A.   Yes.
 6         Q.   Did you, in writing the report, attempt to
 7    list those facts that you felt were most important to
 8    you in forming your opinions as set forth in the
 9    report?
10         A.   I think that's a fair thing to say.
11         Q.   If you read something in one of the
12    depositions that you listed in your additional
13    materials -- rephrase.
14              Let me ask you this:  Had you read any parts
15    of the Jessica Shen, Piet Hinoul, Judi Gauld and David
16    Robinson deposition transcripts at the time you wrote
17    the report, or did you just list them at the time
18    because it was something that you thought you might
19    want to reference later?
20         A.   When I wrote Murphy-1?
21         Q.   Yes.
22         A.   I believe I had not seen those when I wrote
23    Murphy-1.
24         Q.   At the time you wrote Murphy-1 and signed
25    it, had you read all of the expert reports that are
```

Confidential - Subject to Stipulation and Order of Confidentiality

1   listed below the list of deposition transcripts, or

2   were those things you listed because you planned to

3   read them at a later date?

4       A.   I'm sorry.  Which are you referring to?  Are

5   you referring to something in the bibliography?

6       Q.   I'm looking the list of additional

7   materials.

8       A.   Oh, additional materials.  I'm sorry.  Can

9   you repeat the question then?

10      Q.   Sure.  Go to the page where you listed the

11  four deposition transcripts?

12      A.   Yes.

13      Q.   Because right below that are a list of

14  expert reports.

15      A.   Yes.

16      Q.   Might as well turn to it.

17      A.   Yeah.

18      Q.   Right before your CV.

19           Are you with me now?

20      A.   Yes.

21      Q.   On the last page of the list of additional

22  materials, there's a list of expert reports under

23  three headings, expert general reports, Plaintiff

24  Gross, Plaintiff Wicker.

25           Do you see that?

Confidential - Subject to Stipulation and Order of Confidentiality

1      A.   Yes.

2      Q.   At the time that you authored Murphy-1, your

3   first report, had you read those, or did you simply

4   list those in the list of additional materials because

5   they were things that you intended to read later?

6      A.   The Anne Weber expert report, I believe I

7   had that at the time I drafted Murphy-1.  I certainly

8   did not read every page of that report, but I had read

9   a significant amount of it.  I don't think that I had

10   read any of the other reports at the time I drafted

11   Murphy-1.

12      Q.   Okay.  With regard to the list of additional

13   materials, with the exception of the deposition

14   transcripts and expert reports, which you've already

15   spoken about, are you able to go through this list if

16   you needed to, and would you be able to tell me which

17   things you had looked at at the time you wrote the

18   report versus those things that you just listed

19   because you intended to look at them later, or would

20   that be something you would be unable to do?

21      A.   I think I'd be unable to do that.

22      Q.   Okay.  To the extent that you felt that

23   something was important enough to actually reference

24   it in the report itself as having been relied on,

25   those materials are listed in the bibliography,

Confidential - Subject to Stipulation and Order of Confidentiality

1        Q.    That's just an assumption you're forming?

2        A.    It's an educated assumption.

3        Q.    Do you know what data was available to

4    Ethicon at the time the decision was made that the

5    Prolift® is safe and effective to be marketed?

6        A.    I'm sorry.  Could you repeat the question.

7        Q.    Sure.  Do you know what specific data was

8    available to Ethicon as of February, March 2005 when

9    they were actually now launching the Prolift®, what

10   they actually were relying on at the time they made

11   the decision, yes, it's safe and effective, yes, we

12   can market it?

13       A.    I do not know what they were relying on.

14       Q.    Since you don't know specifically what

15   they're relying on, you're not going to offer any

16   specific opinions about whether that data was

17   sufficient or not; fair statement?

18                 MR. SNELL:  Objection, form.

19                 THE WITNESS:  I'm happy to offer

20   opinions on the data that was present.  I'm not going

21   to make an expert opinion as to what Ethicon was

22   relying on.  I have no idea what they thought was

23   important.

24   BY MR. SLATER:

25       Q.    My question is this:  Since you don't know

Confidential - Subject to Stipulation and Order of Confidentiality

1   what Ethicon specifically was relying on when they

2   made that decision to launch the Prolift®, you

3   wouldn't be offering me an opinion about whether

4   something you're not familiar with was reasonable or

5   not, correct?

6       A.   Not unless you give me some information

7   about what they knew and what they were relying upon,

8   and then I'd be happy to make an opinion on it.

9       Q.   Well, this is my chance to ask you what you

10  know and what your opinions are.

11          So as you sit here now, you have no opinion

12  on that, correct?

13      A.   Correct.

14      Q.   Do you know Axel Arnaud?  Did you ever meet

15  him?

16      A.   I think I met him in an airport once.

17      Q.   Attached to your supplemental report, which

18  we marked as Murphy-2, is a list of transcripts,

19  expert reports and literature and then an other

20  section, right?

21      A.   I see that.

22      Q.   Did you read all these materials before

23  signing this report on November 28, 2012?

24      A.   What I will say is I've been bombarded with

25  documents in the last two weeks.  I open the Fed Ex

Confidential - Subject to Stipulation and Order of Confidentiality

```
1          A.    I may have spoken to them personally.  I
2     don't know that we were speaking about that.  I know
3     there are people like at the Mayo Clinic and Cleveland
4     Clinic that get a lot of these referred in to them,
5     and I've certainly spoken to a lot of those
6     physicians.
7               I don't know that -- I know that a lot of
8     people have come to me at meetings and said, hey, you
9     know, we're seeing more problems with these types of
10    things than what you guys are reporting.  And I know
11    Matt Barber, his group did a presentation on, you
12    know, removing mesh and things like that and what we
13    call tips and tricks in terms of techniques for doing
14    that.
15         Q.    Let me come back to your report, your
16    supplemental report.  We were talking about the list
17    of materials.
18              Are there materials on this list that you
19    probably have not read at this point?
20         A.    Certainly in their entirety, yes.
21         Q.    Are there materials on this list that you
22    probably just scanned very quick and couldn't even
23    tell me what those materials said, as you sit here
24    now?
25         A.    As I sit here now, probably yes.
```

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.    Are you able to point out, other than

2    Dr. Margolis' transcript and Dr. Elliott's transcript,

3    which you said you believe you read completely, and

4    Dr. Lucente's you said you read --

5      A.    10%.

6      Q.    10% -- can you give me any quantification of

7    how much of these other materials you reviewed?

8      A.    It would be something pretty close to a

9    guess.  Let me say this, less than 20% of all of them.

10     Q.    In the list of materials there's literature,

11   and on the second page of that there's a series of

12   articles towards the middle, where the first author in

13   four straight is Klinge, K-l-i-n-g-e.

14           Do you see that?

15     A.    I do.

16     Q.    Do you know who that is?

17     A.    He's one of these names that I see in

18   regards to mesh, basic science regarding mesh.

19     Q.    Anything else?

20     A.    I don't know him personally.  I don't even

21   know if it's a man or a woman, to be honest with you.

22     Q.    Have you made a point of studying the basic

23   science with regard to polypropylene mesh and how it

24   interacts within the woman's pelvis?

25     A.    I certainly have tried to keep up on all the

Confidential - Subject to Stipulation and Order of Confidentiality

1    standpoint.

2         Q.    Is there -- well, let me ask you this:  The

3    standard you just gave me of what you think should be

4    in an IFU, is that just your own personal standard?

5         A.    That was my opinion of what makes sense to

6    be in an IFU.

7         Q.    That's your own personal opinion, not based

8    on any other information you've read or seen, correct?

9         A.    Correct.

10        Q.    It's just your own personal viewpoint, your

11   own personal standard, correct?

12        A.    Yes.

13        Q.    With regard to what would need to be

14   included in the patient brochure with regard to risks

15   and benefits, to the extent you've drawn any opinions

16   in your report on that, again, is that based on your

17   own personal standard, your own personal opinion?

18        A.    I do not -- I think the answer is yes

19   because I don't know any sort of legal guidelines by

20   which patient brochures are supposed to be produced.

21        Q.    And do you have any information you can

22   share with me now that you gleaned from any Ethicon

23   documents or testimony where you saw what Ethicon

24   thought the standards were to determine whether or not

25   a risk or a benefit would need to be described and how

Confidential - Subject to Stipulation and Order of Confidentiality

1    it should be described in a patient brochure?

2        A.   I don't recall seeing any standards that

3    they refer to.

4        Q.   Did you see any testimony in any deposition

5    that you're relying on, as you sit here now, with

6    regard to what needs to be included in an IFU?

7        A.   I do not recall seeing anything like that.

8        Q.   So, again, with regard to the IFU and the

9    contents of the IFU, whatever opinion you're drawing

10    is just based on your own personal opinion, not based

11    on what any other standards may be or what anyone else

12    might think, correct?

13        A.   Right.  It's my expert opinion, not based on

14    outside information.

15        Q.   And in your entire career, have you ever

16    been asked to determine what information needs to be

17    provided in an IFU?

18        A.   Not that I recall.

19        Q.   Have you ever in your career ever been asked

20    to give input on what should be in a patient brochure?

21        A.   Not that I recall.

22        Q.   So the first time you've ever offered such

23    opinions and done this type of analysis has been in

24    this case as an expert, correct?

25        A.   Correct.

Confidential - Subject to Stipulation and Order of Confidentiality

1       A.    Yes.

2       Q.    Show me where.

3       A.    Okay.  They say, although rare,

4    complications include injury to blood vessels of the

5    pelvis.  If you injure a blood vessel of the pelvis,

6    that could lead to you bleeding out and dying.  That

7    is a life-changing complication.  If you injure a

8    nerve, I think that could lead to pelvic pain.

9            If you have difficulty urinating, if you

10   have bladder or bowel injury, I think that could be a

11   life-changing or life-altering -- no, life changing is

12   the term that they use -- complication.  So that's why

13   I said yes to your question.

14      Q.    So you're basically saying that based on

15   that language, you would assume that patients would

16   figure out that when they read that language, that is

17   communicating to them that the complications they can

18   suffer from the Prolift® can be life changing and that

19   those complications can result in incapacitating

20   pelvic pain, dyspareunia and large-scale erosions that

21   can be exceedingly complex and not easily resolved?

22      A.    I don't think that a patient brochure is --

23   the point of it is to explain every potential possible

24   thing that can happen to a patient.  I think what the

25   point of a patient brochure is is to facilitate a

Confidential - Subject to Stipulation and Order of Confidentiality

1    discussion between the patient and her surgeon

2    regarding the surgery that that surgeon is about to

3    perform upon the patient, and, yes, I think that is

4    adequate.

5         Q.   When you say that that is adequate, that, as

6    I think we described earlier or discussed earlier,

7    that is your personal viewpoint, not based on any

8    standards that Ethicon was utilizing or any other

9    standards you can point to for what needs to be

10   communicated in a patient brochure, correct?

11        A.   I'm not holding myself out as a expert on

12   regulatory issues within Gynecare, correct.

13        Q.   Are you holding yourself out as an expert

14   with regard to what needs to be communicated in the

15   patient brochure?

16        A.   Yes.

17        Q.   What standards, other than your own personal

18   viewpoint, what source of information are you relying

19   on besides that?

20        A.   My standards as a caring, compassionate

21   physician.

22        Q.   But it's your own personal standard,

23   correct?

24        A.   And I think that's shared by the vast

25   majority of doctors out there.

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.    But you've never studied that question, and

2    you can't point to anything to confirm that, correct?

3      A.    I have no publications on that.

4      Q.    Let's take a step back.  Here in the patient

5    brochure, Page 13, there's a heading that says "What

6    are the risks?"  And it says that the complications

7    from the Prolift® procedure are rare.

8           Do you see that?

9      A.    No, I don't see that it says that.  It says,

10   "although rare, complications associated with the

11   procedure include" those things, so it's saying that

12   not every complication is going to be common to the

13   procedure.

14     Q.    Let's go to the prior page, if you could,

15   and we're going to read a few things together.

16          At the top of Page 10 of the patient

17   brochure, it says, What is Gynecare Prolift®, and it

18   describes that and says, "A new and revolutionary

19   minimally invasive surgical procedure using Gynecare

20   Prolift®," and it goes on, right?

21     A.    Correct.

22     Q.    Then if we go to the next page, when it

23   says, "What are the risks?"  It says, "All surgical

24   procedures present some risks.  Although rare,

25   complications associated with the procedure," and

Confidential - Subject to Stipulation and Order of Confidentiality

1     Q.    Am I correct that you reviewed very little

2   by way of documents indicating what the people within

3   medical affairs at Ethicon thought at any particular

4   point in time?

5     A.    What I'm saying is I got stacks of documents

6   within the last two weeks that were about 2 feet high,

7   and I have only gotten through a small percentage of

8   that.

9     Q.    As you sit here now, you don't feel that you

10  have a good understanding of what the people in

11  medical affairs at Ethicon thought with regard to mesh

12  shrinkage, erosion or other topics?

13    A.    If you read my report, I don't think

14  anywhere do I mention what the people in medical

15  affairs at Gynecare knew or didn't know.

16    Q.    Let's turn to the page that at the top says

17  "Clinical impact of mesh shrinkage."

18    A.    How far?

19    Q.    It's about ten pages in or so.

20    A.    What's the topic -- the title again?

21    Q.    "Clinical impact of mesh shrinkage."

22    A.    Not how to assess?

23    Q.    It's right before that.

24    A.    Right before that.  I don't see anything

25  before that.  I see how to assess mesh shrinkage,

Confidential - Subject to Stipulation and Order of Confidentiality

1        Q.    Do you know what PVDF is?

2        A.    Off the top of my head, I can't recall what

3    that stands for.

4        Q.    Do you know what Pronova is?

5        A.    Pronova?

6        Q.    P-r-o-n-o-v-a?

7        A.    No, I don't recall that.

8                     MR. SLATER:  Why don't we take five

9    minutes.  I may be done.

10                     THE VIDEOGRAPHER:  We're going off the

11    record.  The time is 9:53 p.m.

12                     (Brief recess.)

13                     THE VIDEOGRAPHER:  We're back on the

14    record.  Here marks the beginning of Volume 1, Tape

15    Number 9 in the deposition of Dr. Miles Murphy.  The

16    time is 10:05 p.m.

17    BY MR. SLATER:

18        Q.    I'm looking now at the additional list of

19    materials, and go to the point where it says other

20    documents after the list of articles.  Turn forward a

21    couple pages.

22        A.    Forward, meaning keep going?

23        Q.    Yes.  Go to the page where at the top the

24    first document listed is Ethicon memo to R. Roussesau

25    from Thomas Barbolt.

Confidential - Subject to Stipulation and Order of Confidentiality

1        A.    I see it.

2        Q.    Have you reviewed that document?

3        A.    I don't recall reviewing it.

4        Q.    Go to the next document Ethicon Report, PSE

5    Accession No., et cetera, is that a document you

6    reviewed?

7        A.    I don't recall.

8        Q.    Go to the third document, Ethicon March 5,

9    2001 memo, et cetera, is that a document you reviewed?

10       A.    I don't remember reviewing that.

11       Q.    The fourth document listed here, Ethicon

12   December 2, 2001 memo to Maggie D'Aversa, et cetera,

13   is that a document you reviewed?

14       A.    I don't remember reviewing it.

15       Q.    The next document listed, Ethicon Final

16   Report PSE Accession No., et cetera, a 28-day tissue

17   reaction study, is that a document you reviewed?

18       A.    I don't remember.  I don't recall reviewing

19   that.

20       Q.    The next document, Ethicon Final Report, PSE

21   Accession No., et cetera, 14-day adhesion prevention

22   study, did you review that document?

23       A.    I don't recall reviewing that document.

24       Q.    Go to the next document listed, which is

25   Ethicon Report PSE Accession No. 02-0579, Project No.

Confidential - Subject to Stipulation and Order of Confidentiality

1    48010, et cetera, did you review that document?

2         A.   I may have.

3         Q.   Is there anything you can tell me about it

4    now that's of any significance?

5         A.   No.

6         Q.   Go to the next document, Ethicon report

7    dated 1/19/05 Biocompatibility Risk Assessment, is

8    that a document you reviewed?

9         A.   Again, I may have.  It looks familiar, but I

10   don't -- I couldn't tell you anything substantive

11   about what it said.

12        Q.   Next document, Ethicon Completion Report:

13   BE-2004-1606, design verification, et cetera, is that

14   a document you reviewed?

15        A.   I don't recall reviewing that.

16        Q.   The next document, clinical study report

17   evaluation of the TVM technique for treatment of

18   genital prolapse dated June 27, 2006, is that a

19   document you reviewed?

20        A.   That looks familiar.

21        Q.   Is there anything you can tell me about it

22   in terms of whether there's anything of significance

23   in it, as you sit here now?

24        A.   Significance in relation to what?

25        Q.   Your opinions?

Confidential - Subject to Stipulation and Order of Confidentiality

1        A.    I can't recall anything.

2        Q.    Go to the next document, clinical study

3   report evaluation of TVM technique for treatment of

4   genital prolapse dated June 28, 2006, did you review

5   that document?

6        A.    I may have, but, again, I would give you the

7   same answer as the previous document.

8        Q.    Let's go to the next page.   Ethicon Final

9   Report PSE Accession No. 00-0035, an exploratory

10  91-day tissue reaction, et cetera, is that a document

11  you reviewed?

12       A.    I may have.   Again, I remember reviewing

13  some documents regarding animal models.

14       Q.    Is there anything about this document that

15  you can tell me now?

16       A.    No.

17       Q.    Anything of any significance?

18       A.    No, not at this moment.

19       Q.    The next document, Final Report PSE Study,

20  No. 08-0311; Project No. 67624, some sort of a rabbit

21  study, is that something that you read?

22       A.    Same answer as last question.

23       Q.    The next document, chart comparing Ethicon,

24  AMS and Bard's products by characteristic, area

25  weight, largest pore size, et cetera, is that a

Confidential - Subject to Stipulation and Order of Confidentiality

```
 1    document you reviewed?

 2         A.    I don't recall.

 3         Q.    The next document, Ethicon Performance

 4    Evaluation Technical Report, Assessment of Competitor

 5    Pelvic Floor Repair Meshes, Version 1 study number, et

 6    cetera, did you review that document?

 7         A.    I don't recall.

 8         Q.    The next document, International

 9    Urogynecological Association:  The Usage of Grafts in

10    Pelvic Reconstructive Surgery Symposium 2005, did you

11    review that document?

12         A.    Yes.

13         Q.    What's the significance of that document?

14         A.    It was a -- if I'm recalling correctly, it

15    was a symposium of people in the International Urogyn

16    Association looking at the usage of grafts in pelvic

17    reconstructive surgery, and I think it was focusing on

18    transvaginal use of grafts.

19         Q.    Is there anything that you can tell me about

20    that now that's of any significance to you in forming

21    your opinions?

22         A.    I can't recall.

23         Q.    The next document, Anatomic Overview of

24    Prolift Anterior and Posterior Procedure, is that

25    something you reviewed?
```

Confidential - Subject to Stipulation and Order of Confidentiality

1      A.   I think so.

2      Q.   Do you know what it is?  What is that

3   document?

4      A.   I think it's a computer-generated model for

5   the procedures and it's narrated.

6      Q.   Is it something that you ever utilized or

7   saw in the course of your practice or professional

8   education?

9      A.   I believe so.

10      Q.   What use was made of that document; do you

11   know?

12      A.   It's helpful in getting a three-dimensional

13   appreciation of pelvic floor anatomy.

14      Q.   Does that animation, from your prospective,

15   provide a fair representation of, in broad

16   illustrative terms, the Prolift® procedure?

17      A.   If I'm recalling the proper thing, yes, it

18   does.

19      Q.   The next document listed, Gynecare Prolift®

20   Pelvic Floor Repair Systems Procedure DVD, do you know

21   specifically which procedure DVD that is?

22      A.   I couldn't say for sure.

23      Q.   Did you review it?

24      A.   I've reviewed a procedure DVD of one of the

25   French surgeons doing the Prolift®.

Confidential - Subject to Stipulation and Order of Confidentiality

1       Q.   Do you know if that's what this is?

2       A.   I couldn't say for sure, don't recall.

3       Q.   Did you rely on it in any way in forming

4   your opinions, whatever DVD you saw?

5       A.   Yes.

6       Q.   How?

7       A.   It was an example of how a Prolift® is

8   performed.

9       Q.   Would that DVD, from your perspective, be a

10  fair representation of how the Prolift® procedure is

11  performed?

12      A.   I don't recall.

13           MR. SLATER:  And, counsel, I'm going to

14  make a request just to get the Bates numbers on those

15  two documents, okay, just so I know which ones they

16  are.

17           MR. SNELL:  Okay.

18  BY MR. SLATER:

19      Q.   At the very bottom of this page, it says

20  letter to EWHU Field Sales Force from Price St.

21  Hilaire dated October 23, '06 regarding criteria for

22  surgeons being trained for Gynecare Prolift®.

23           Did you review that document?

24      A.   I don't recall.

25      Q.   Next page at the top, letter to Gregory

Confidential - Subject to Stipulation and Order of Confidentiality

1    Jones from Celia M. Witten with FDA dated 1/8/02

2    regarding Gynemesh® Prolene® synthetic surgical mesh,

3    et cetera.

4              Is that a document you reviewed?

5         A.   I don't recall reviewing it.

6         Q.   The next document, memo to materials -- to

7    hospital materials managers and/or directors from

8    Gynecare Worldwide Ethicon dated October 10, 2002

9    regarding Gynemesh® PS, is that a document you

10   reviewed?

11        A.   I don't recall reviewing it.

12        Q.   The next document, memo to customer from

13   Sean M. O'Bryan dated February 8, 2005 regarding

14   Gynecare Prolift®, did you review that document?

15        A.   I don't recall reviewing that document.

16        Q.   If you could just turn back three pages to

17   the beginning where it says "Other Documents."  This

18   is, again, in your additional materials section of

19   your original report where it says Other Documents.

20   At the very bottom of the page it says Clinical Expert

21   Report Gynecare Prolift® Pelvic Floor Repair System

22   dated July 2, 2010, did you review that document?

23        A.   I may have.  I don't recall.

24        Q.   Go to the next page.  At the top, clinical

25   study report evaluation of the TVM technique for

Confidential - Subject to Stipulation and Order of Confidentiality

1    treatment of genital prolapse, is that something you

2    reviewed?

3         A.   I may have, but I don't recall.  I couldn't

4    tell you anything substantive about it.

5         Q.   The next document, would the answer be the

6    same?

7         A.   Yes.

8         Q.   Now, the third document on this page, would

9    the answer be the same?

10        A.   Yes.

11        Q.   The fourth document, which says Exhibit 15,

12   letter to Bryan Lisa from Mark Melkerson, is that a

13   document you reviewed?

14        A.   I don't recall.

15        Q.   The next document, memo to Jennifer Paine

16   from Renee Selman dated 1/16/08, did you review that

17   document?

18        A.   I don't recall reviewing that document.

19        Q.   Next document, one year objective and

20   functional outcomes -- well, I know you saw that.

21   That's no problem.

22             Next document -- the seventh document on

23   this page, Summary of Safety and Effectiveness

24   submitted by Bryan Lisa for Gynecare Prolift® and

25   Prolift+M® stamped May 15, 2008, two pages, did you

Confidential - Subject to Stipulation and Order of Confidentiality

1    review that document?

2         A.   I don't recall.

3         Q.   If you skip down a few lines it says, 2007

4    and 2008 Gynecare Prolift® Pelvic Floor Repair Systems

5    - slides (46 pages).  What is that?

6         A.   I believe that is a PowerPoint presentation

7    regarding professional education.

8         Q.   Did you review it in connection with this

9    case?

10        A.   Yes, I did.

11        Q.   Is it of any significance to you on any

12   particular issue?

13        A.   If you wanted to name an issue, I could say

14   whether it's significant or not.  I think -- yes, I

15   mean, yeah, it certainly goes to what professional

16   education Gynecare provided to physicians.

17        Q.   Next it says 2005 to 2006, Gynecare Prolift®

18   Pelvic Floor Repair Systems - slides (16 pages).  Do

19   you know what that is?

20        A.   I think that's a similar slide set for

21   professional education that I believe I reviewed.

22        Q.   The next item, Gynecare Gynemesh® PS

23   nonabsorbable Prolene® Soft mesh IFU, did you review

24   that?

25        A.   I think I probably did.

Confidential - Subject to Stipulation and Order of Confidentiality

1      Q.   Do you have any recollection of reading it?

2      A.   I can't recall right now.

3      Q.   Is there anything that you can point to now

4    that's of significance to you with regard to that

5    document?

6      A.   I can't recall right now.

7           MR. SLATER:  Thank you.  I don't have

8    any other questions for you tonight.

9           THE WITNESS:  Thank you.

10          MR. SLATER:  I am going to reserve my

11   rights only with regard to some e-mails I had

12   exchanged with defense counsel the last couple days,

13   not with counsel who is present.  We had asked for

14   documents to be searched to see if there was anything

15   in the files of Ethicon with regard to Dr. Murphy,

16   other than what we have been previously produced in

17   the DFSes, and counsel never apparently did the search

18   or produced any documents.  So in case something were

19   to come out that we thought was really pressing, we'll

20   reserve our rights; otherwise, thank you very much.

21          THE WITNESS:  Thank you.

22          MR. SNELL:  How much time do you have?

23   Did you put a new tape in?

24          THE VIDEOGRAPHER:  Yes.

25          MR. SLATER:  Doesn't it feel good to