**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABIILITY LITIGATION | MDL No. 2325 |
| IN RE: BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2326 |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2327 |
| IN RE: COLOPLAST CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2387 |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2440 |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL No. 2511 |

*This Document Relates To All Cases*

**Recommended Allocation of Common Benefit Fees and the Reimbursement of Shared
Expenses and Held Costs by the Court Appointed External Review Specialist**

COMES NOW, The Honorable Daniel J. Stack, Retired, as External Review Specialist[1] (as identified in the Order Granting Motion to Appoint the Hon. Daniel J. Stack Ret., as External Review Specialist (the "Appointment Order") and in accordance with the Fee Committee Protocol[2] (the "Protocol") issue my Recommended Allocation in accordance with Section F of the Protocol as follows:

The Court having entered its Memorandum Opinion and Order (Re: Petition for an Award of Common Benefit Attorneys' Fees and Expenses) (S.D. W. Va. Jan. 30, 2019), which was entered in each of the seven MDLs, (hereinafter referred to as "Fee Petition Order") establishing the common benefit fund, this Recommended Allocation sets forth the basis for my recommendation that the Court award payment from the common benefit fund for payment of fees in the percentages shown in **Exhibit 1** to this Recommended Allocation and award payment of costs from the common benefit fund in the amounts shown in **Exhibit 2** to this Recommended Allocation.

In making this Recommended Allocation, I rely upon the time and expense submissions made by firms seeking common benefit funds and/or expenses (hereinafter may be referred to as "applicant firms"), the Common Benefit Orders of this Court, the Final Written Recommendation of the Common Benefit Fee and Cost Committee, including the Declaration of Henry Garrard and the other material supplied therewith,[3] my observation of and participation in the review and

---

[1] Appointed by Court Order entered October 13, 2017: Bard MDL 2187 [ECF No. 4663], AMS MDL 2325 [ECF No. 5112], BSC MDL 2326 [ECF No. 4422], Ethicon MDL 2327 [ECF No. 4783], Cook MDL 2440 [ECF No. 592], Coloplast MDL 2387 [ECF No. 1572], Neomedic MDL 2511 [ECF No. 177].

[2] Bard MDL 2187 PTO 257 [ECF No. 4020], AMS MDL 2325 PTO 244 [ECF No. 4346], BSC MDL 2326 PTO 166 [ECF No. 3968], Ethicon MDL 2327 PTO 262 [ECF No. 4044], Cook MDL 2440 PTO 81 [ECF No. 503], Coloplast MDL 2387 PTO 133 [ECF No. 1437], Neomedic MDL 2511 PTO 38 [ECF No. 172].

[3] Available to me for my evaluation of applicant firms were: (1) attorney biographies provided by applicant firms, (2) the original time submission made by each applicant firm to the Court appointed CPA, (3) the

deliberation undertaken by the Common Benefit Fee and Cost Committee (the "FCC"), my conversations, written correspondence and meetings with applicant firms, and applicable law.[4] In delivering this Recommended Allocation to the Court, I request that the FCC provide to the Court for its consideration, *in camera*, all of the same materials that were made available to me.

## I.    BACKGROUND

In relating the history of the transvaginal mesh litigation, I reviewed and incorporate by reference the lengthy historical narrative of the litigation by the FCC and the factual and procedural history of the FCC's activities set forth in the Declaration of Henry Garrard which is included with the attached FCC's Final Written Recommendation (**Exhibit 3**). The pelvic mesh multi-district litigations ("MDLs") pending before this Court began with the Judicial Panel on Multidistrict Litigation's order consolidating cases involving the Avaulta line of pelvic organ prolapse repair devices sold by C.R. Bard, Inc. ("Bard") in 2010 and ultimately led to the consolidation of seven multidistrict litigations ("MDLs") in the Southern District of West Virginia.[5] The MDL Panel sent

---

self-audited time submission made by each applicant firm to the Court appointed CPA, (4) the affidavit provided by each applicant firm accompanying its self-audited time, (5) the letter to each applicant firm reflecting the FCC's initial review of time submissions including Exhibits identifying time found not compensable by the FCC at that time, (6) the materials provided by applicant firms in response to the FCC's initial review including affidavits provided by applicant firms, (7) the expense submissions provided by each applicant firm, where applicable, (8) the letter to each applicant firm reflecting FCC's revised time and expense review after the FCC's consideration of the materials received from applicant firms including the Exhibits detailing individual line items of time and expense not accepted by the FCC at that time, (9) the transcripts of the in-person meetings conducted among the FCC, myself and those firms seeking an in-person opportunity to be heard by the FCC, (10) the FCC's Preliminary Written Recommendation delivered to each firm and the two Exhibits attached thereto, and (11) the FCC's Final Written Recommendation including all Exhibits.

[4] A copy of the Final Written Recommendation of the Common Benefit Fee and Cost Committee Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs delivered by the FCC which includes the Declaration of Henry Garrard is attached hereto as **Exhibit 3** and is incorporated by reference.

four additional MDLs to this Court in 2012, another in 2013, and a seventh MDL in 2014.[6] The pelvic mesh litigation coordinated before this Court ultimately grew to include more than 104,836 filed cases, comprising one of the largest mass tort litigations in history.

As explained in the Plaintiffs' Proposed Counsel Organizational Structure, which was submitted to the Court on March 17, 2012, the common medical, scientific and legal claims and theories, common defenses, and common experts, as well as the presence of numerous plaintiffs implanted with different defendants' products, called for a singular "cross-MDL" Plaintiffs' leadership structure. The Plaintiffs' lawyers involved in the litigation foresaw the challenge that lay ahead and assembled a Plaintiffs' Steering Committee ("PSC") of 61 attorneys from law firms across the country, who were ultimately appointed and assigned by the Court the responsibility of marshaling resources and leading this sprawling litigation under a unified leadership structure.

As envisioned and directed by the Court, the Court-appointed PSC, Coordinating Co-Lead Counsel, Executive Committee, and Co-Lead Counsel coordinated and collaborated across MDL lines to plan the litigation strategy, develop theories and confront legal issues, identify experts, and ultimately bear the cost and expend the labor necessary to develop the general liability cases against numerous products made and sold by a variety of corporate defendants. This singular PSC and leadership structure enabled such coordinated development of litigation strategy and theories and allowed the work product from one MDL to be utilized across product and manufacturer lines.

---

[5] *In re Avaulta Pelvic Support Sys. Prods. Liab. Litig.* (later expanded to include a range of other pelvic repair mesh devices sold by Bard, and renamed the *C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*), 746 F.Supp.2d 1362, MDL No. 2187 (J.P.M.L. 2010).

[6] *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F.Supp.2d 1359, MDLs Nos. 2325, 2326, 2327 (J.P.M.L. 2012) (3 separate MDLs); *In re Coloplast Corp. Pelvic Repair Support Sys. Prods. Liab. Litig.*, 883 F.Supp.2d 1348, MDL 2387 (J.P.M.L. 2012); *In re Cook Medical, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 949 F.Supp.2d 1373, MDL 2440 (J.P.M.L. 2013); *In re Neomedic Pelvic Repair Sys. Prods. Liab. Litig.*, 999 F.Supp.2d, MDL 2511 (J.P.M.L. 2014).

As the Court found in its Fee Petition Order entered in each of the seven MDLs, "[t]his singular PSC worked and collaborated across MDL lines to develop the litigation strategy and theories of liability, depose experts, and absorb the massive litigation costs." *Id.* at 5. Important legal decisions by the Court and by counsel impacted all MDLs due to the commonality of the products and issues involved. This single, unified leadership structure was also necessary to avoid potential conflicts and cross-purpose work. Further, the Court found that absent the cross-MDL leadership structure, "all of the progress and efficiencies in these MDLs would have been impossible." Fee Petition Order at 6. As anticipated, the time, effort and expense of simultaneously pursuing and developing multiple legal theories against a range of products manufactured and sold by a disparate group of defendants, was enormous.

Prosecuting multiple MDLs simultaneously before one court presented unique logistical and procedural difficulties and taxed the resources of the firms leading this litigation. To address the economic disparity between the parties, the PSC firms were required to expend tens of millions of dollars to prosecute this massive litigation. The PSC firms contributed a total of $17,825,000 in common benefit assessments, which were used to fund the litigation generally. "Held costs" in the amount of $28,986,811.38 were recognized by the FCC as incurred for the common benefit, which have not yet been reimbursed out of the MDL fund. An additional amount of approximately $12,000,000 has been paid from the common benefit fund as costs associated with general expert fees, special master fees, data warehousing and management fees, and to the Court-appointed accountant overseeing the MDL fund. These costs continue to be incurred and to be paid from the common benefit fund.

In addition to the costs incurred, through December 21, 2016, ninety-four law firms submitted more than 900,000 hours of time for common benefit consideration, and the Court-appointed FCC has recognized a total of 679,191.20 of those hours as being for common benefit.

In order to provide a mechanism to compensate attorneys who performed work for the common benefit of all plaintiffs in this complex litigation and to reimburse those attorneys for common benefit expenses, this Court entered orders establishing a five percent (5%) assessment upon the gross monetary recovery in every case.[7] In addition, this Court set forth the procedures to be employed for reporting common benefit time and expenses.[8]

This Court Ordered that all time and expenses must be (a) for the common benefit, (b) appropriately authorized, (c) timely submitted, and (d) approved by this court.[9] All applicant firms were ordered to maintain contemporaneous time and expense records and submit the records every six (6) weeks.  Standardized forms were provided for recordkeeping, and all time and expense submissions were delivered to the Court appointed CPA.

On January 15, 2016, this Court entered its Pretrial Order Establishing Criteria for Applications to the MDL Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee in each of the related MDL's (the "FCC Order").[10] The

---

[7] Bard MDL 2187 PTO 84 [ECF No. 634], AMS MDL 2325 PTO 77 [ECF No. 833], BSC MDL 2326 PTO 52 [ECF No. 508], Ethicon MDL 2327 PTO 62 [ECF No. 747], Cook MDL 2440 PTO 12 [ECF No. 44], Coloplast MDL 2387 PTO 32 [ECF No. 124], Neomedic MDL 2511 PTO 21 [ECF No. 79].

[8] Bard MDL 2187 PTO 54 [ECF No. 365], AMS MDL 2325 PTO 20 [ECF No. 303], BSC MDL 2326 PTO 17 [ECF No. 212], Ethicon MDL 2327 PTO 18 [ECF No. 282], Cook MDL 2440 PTO 11 [ECF No. 43], Coloplast MDL 2387 PTO 6 [ECF No. 15], Neomedic MDL 2511 PTO 20 [ECF No. 78].

[9] *Id.*

[10] Bard MDL 2187 PTO 207 [ECF No. 1744], AMS MDL 2325 PTO 204 [ECF No. 204], BSC MDL 2326 PTO 136 [ECF No. 1289], Ethicon MDL 2327 PTO 211 [ECF No. 1845], Coloplast MDL 2387 PTO 85

FCC Order appointed nine individuals to serve as members of the Common Benefit Fee and Cost Committee for purposes of recommending an allocation of a singular common benefit fund. Under the FCC Order and the Protocol, the FCC was to review the submissions of applicant firms and to provide a recommendation regarding the allocation of common benefit funds. The Protocol further provided the framework under which I, as External Review Specialist, was to assist the FCC in performing its duties, review the FCC's recommendation, hear objections, and provide this Recommended Allocation. The primary focus of the FCC's and my review was always the quality and value of the work performed. Specifically, this Court's FCC Order provided "the over-arching guideline that the FCC must consider is the contribution of each common benefit attorney to the outcome of the litigation."

I was directed by the Appointment Order to "assist[] the FCC in its duties of evaluating the time and expenses submitted for consideration in this MDL, and to aid the FCC in any way appropriate in performing the work of the FCC and in furtherance of the directives and mandates" of the Protocol. I was further directed by the Appointment Order to "exercise the duties set forth in [the Protocol], including meeting with firms submitting requests for fees or expenses to the FCC, attempting to resolve objections [to the FCC's recommendation], if any, and submitting to this Court a written recommendation as to a fair allocation of the Common Benefit Fund." That work has now been completed.

---

[ECF No. 441], Cook MDL 2440 PTO 71 [ECF No. 414], and Neomedic MDL 2511 PTO 23 [ECF No. 85].

## II.   EXPERIENCE AND METHODOLOGY OF THIS REPORT

### A.  Methodology of Review of the Work Performed

I am impressed by the robust due process safeguards utilized by the FCC in its execution of its duties under the Protocol.  Applicant firms were presented with several opportunities to interact with the FCC in the review and evaluation of time and expense submissions.  Applicant firms were first presented the opportunity to perform a "self-audit" of their time and expense submissions.  The self-audited time and expense submissions provided applicant firms the opportunity to clarify and correct entries prior to consideration by the FCC.  After the opportunity for self-audit, the FCC then evaluated the time for each applicant firm along with review of each applicant firm's initial affidavit and attorney biographies.   This review resulted in a communication sent to each applicant firm reflecting the initial review of time submissions.  The applicant firms received a spreadsheet indicating those individual time entries where the FCC found that the work was not for the common benefit and a separate spreadsheet indicating those individual time entries where the FCC had questions regarding the common benefit of the work performed.  The FCC requested that applicant firms respond to those individual time entries identified by the FCC and provide information that would substantiate the common benefit of the time entry, thus presenting a second opportunity for applicant firms to provide additional information for consideration by the FCC.  The FCC received those responses along with additional affidavits from the applicant firms. Each applicant firm was required by the Protocol to include in their affidavit a sworn discussion of how the firm "made a substantial common benefit contribution to the outcome of the litigation" as follows:

> a.   The consistency quantum, duration, and intensity of the firm's commitment to the litigation;

b.  The level of experience, reputation, and status of each attorney and firm, including partner participation by the firm;

c.  The firm's membership and/or leadership on the [PSC] and/or Executive Committee;

d.  The firm's participation and leadership in discovery (motions, depositions);

e.  The firm's participation and leadership in law and briefing matters;

f.  The firm's participation and leadership in science and expert matters;

g.  The firm's participation and leadership in document review;

h.  The firm's activities in preparation for, support of or conduct of bellwether trials or other trials which impacted proceedings on a common benefit level . . . [including] an explanation. . . of why the Firm believes such work should be considered as common benefit. For example, whether and how such work benefitted the MDL plaintiffs generally; the status of settlements in the particular MDL in which the work was performed at the time such work was performed, and whether the case-specific work assisted in bringing about settlements with the defendant in that MDL. Each Firm requesting common benefit reimbursement for work done in any State Court case shall provide an explanation in their affidavit of why the Firm believes such work should be considered as common benefit;

i.  The firm's participation and leadership in settlement negotiations, drafting of settlement documentation and closing papers, and administration of settlement agreements (excluding individual representations);

j.  Where common benefit work occurred;

k.  The . . . members of the firm [that] held leadership positions in groups that engaged in common benefit work (describe position and group);

l.  The firm's participation in ongoing activities, such as the Fee and Cost Committee, Settlement Claims Administration, or Court-Appointed Committees and Leadership, which are intended to provide common benefit;

m. [Explanation of] whether counsel in the firm were or were not involved in the litigation prior to the formation of the MDL, and the time and expenses incurred during such time period;

n.  The firm made the following, significant contributions to the funding of the litigation (include all assessments made to the MDL) and the amount of any sums reimbursed and date(s) of reimbursement;

      o.   The members of the firm who were PSC members, group members, or Executive Committee members whose commitment to the litigation did not ebb; and

      p.   The other relevant factors which the Fee Applicant requests be considered by the Court.

*See* Protocol at 6; *see also* Ex. 4 to Protocol, Fee Affidavit in Connection With Request for Allocation of Aggregate Common Benefit and Costs Award.

The FCC then communicated to each applicant firm the FCC's decision based upon its review of the responsive information received from the applicant firm.  The FCC invited each applicant firm to appear for an in-person meeting with the FCC thereby, which is the third opportunity applicant firms were presented to provide additional information for consideration by the FCC.  Of the ninety-four applicant firms, twenty-seven appeared before the FCC for an in-person meeting. After conducting these in-person meetings, the FCC prepared and delivered its Preliminary Written Recommendation.  Applicant firms were given an opportunity to object in writing to the Preliminary Written Recommendation – their fourth opportunity to provide information and share concerns with the FCC – and twenty-four chose to do so.  The FCC received and evaluated those written objections in preparing its Final Written Recommendation.  Under the Protocol, parties had the opportunity to object to the Final Written Recommendation, which was the fifth opportunity that applicant firms had to present facts and argument to the FCC and to receive feedback from the FCC.  Eight firms objected to the FCC's Final Written Recommendation.

In preparing this Recommended Allocation, I familiarized myself with the history of this litigation and the contributions of the applicant firms through review of the materials submitted by those firms and through observation of and assistance in the FCC's evaluation of the materials submitted by those firms.  I attended an in-person meeting with co-lead counsel for each of the

related pelvic mesh MDLs to discuss the quality and value of the applicant firms' contribution to the common benefit. I also reviewed the materials submitted by each of the applicant firms, including their affidavits and biographical information for attorneys seeking common benefit reimbursement for their work. In addition, I received and considered the applicant firms' responses to the FCC's initial review, as well as the applicant firms' objections to the FCC's Preliminary Written Recommendation.

For those twenty-seven applicant firms who sought to meet with the FCC in-person to further discuss their contribution to the litigation following the FCC's Initial Review of the time and expense submissions, I attended each of their presentations to the FCC, and I considered the information provided during these presentations in making my recommendation. As noted above, 70 of the 94 firms accepted the FCC's Preliminary Written Recommendation without objection. I considered the contentions and information contained in the objections made by twenty-four applicant firms to the FCC's Preliminary Written Recommendation. While I did not participate in the FCC's allocation decision, the opportunity to review the applicant firms' objections and to observe the FCC's deliberations was most informative and helpful. I joined in the delivery of the FCC's Preliminary Written Recommendation for purposes of attesting to the FCC's adherence to the requirements of the Protocol and the Fee Order consistent with my charge under the Protocol. I also reviewed and considered the Final Written Recommendation of the FCC, including the factual background of the common benefit process provided in the provided in the Declaration of Henry Garrard and the firm-specific paragraphs addressing the contribution of each firm that the FCC proposed to receive common benefit funds. I found that the methodology utilized by the FCC was fair and in accordance with the law and directions of this Court. In summary, prior to issuing its Final Written Recommendation, the FCC provided ample opportunities for the firms to

advocate for their contribution to the common benefit of the litigation, including through providing for a period of self-audit prior to submission for review, written responses to the initial review performed by the FCC, an opportunity to provide a detailed affidavit addressing the nature and value of the applicant firm's contribution to the common benefit, an opportunity to be heard by the FCC, and a written objection to the Preliminary Written Recommendation.

In accordance with the Court's directive in the Order appointing me as External Review Specialist, I provided assistance to the FCC in evaluating the time and expenses submitted for consideration as common benefit. I observed the FCC's painstaking process of reviewing the time and expense submissions from 94 different firms, which is explained in detail in the Final Written Recommendation, and which consumed several months. The total individual time entries across the 94 firms exceeded over 900,000 hours in entries. I observed the several FCC meetings where the time and expense submission of each applicant firm, as well as each firm's contributions to and participation in the litigation, was discussed and analyzed.[11] I was struck by the significant differences in the quality of record-keeping among the various applicant firms. From my involvement in the process of review of the applicant firms' submissions, I observed significant problems with the timekeeping records submitted by certain of the applicant firms including some of the firms that remain as objectors. Some firms submitted obviously excessive time submissions, inadequate descriptions of the task performed, duplicative submissions, work that conferred little or no common benefit, individual case work, and various inaccuracies and instances of non-

---

[11] Importantly, it is clear to me based on my personal observations of and participation in the FCC's deliberations that all applicant firms were subject to, and reviewed under, the same rules and analysis regarding the common benefit time, including the FCC firms. For example, issues such as whether to compensate law clerk time arose, and the decision to disallow common benefit time for law clerks impacted each and every law firm, including without exception the FCC member firms. The same set of rules and guidelines for the evaluation of common benefit time and expenses were applied with equal force to all applicant firms, regardless of whether they were represented on the FCC or not.

compliance with the Protocol.  The FCC addressed these submissions through its review process that resulted in the elimination of more than 200,000 hours from consideration.  Many of the firms clearly did not comply with the Court's directive to self-audit their time, which complicated the FCC's review process.

Based on my observation of and assistance in the FCC's review of the time and expense submissions, as well as my attendance at each of the applicant firms' presentations and review of the affidavits and materials submitted by the applicant firms, I was able to evaluate the nature and quantity of the work performed by each applicant firm in considering each applicant firm's contribution to the outcome of the litigation.

Of the twenty-four objections to the FCC's Preliminary Written Recommendation, sixteen of those objections were ultimately resolved.  Eight firms objected to the FCC's Final Written Recommendation. I find it particularly instructive that of the 94 firms who submitted common benefit time for consideration, and of twenty-four firms that objected to the FCC's Preliminary Written Recommendation, and the eight firms that objected to the Final Written Recommendation, only four firms remain as objectors.  The multiple opportunities to give and receive feedback and the FCC's demonstrated willingness to hear and give due consideration to the positions of those applicant firms who made objections and to adjust its recommended allocation where appropriate is evidence of the allocation process working as the Court intended.  *See*, *In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 774 (E.D.La.2011) (J. Fallon) ("The Court interprets this ongoing development of the FAC's and the Special Master's recommended allocations as an indication that the allocation process was working properly. The effectiveness of this [allocation] process in this case is supported by the fact that only 4 out of the 108 common benefit fee applicants continue to maintain their objections."). As shown in **Exhibit 1** to this Recommended Allocation, the proposed

allocation of common benefit funds to applicant firms changed from the FCC's Preliminary Written Recommendation to its Final Written Recommendation in response to information received by the FCC through its review and objection process. Based on the information I received through the objections to the Final Written Recommendation, I made further changes in allocation to certain applicant firms.

I have personally spoken or met with each of the eight firms that objected to the FCC's Final Written Recommendation, and I have considered their arguments and submissions in making this Recommended Allocation. The opportunity to meet with each of the firms objecting to the Final Written Recommendation was very helpful and informative, and it afforded me an additional opportunity to ask questions and to evaluate any additional materials and arguments advanced beyond what had been presented previously, and it provided another opportunity for the objecting firms to ask questions of me and to receive feedback from me.

Certain of the eight firms that objected to the FCC's Final Written Recommendation did work primarily, if not exclusively, in the State Courts of New Jersey and have based their objection, in part, on an agreement entered between MDL leadership and certain New Jersey counsel. These objectors argue that because of this agreement, all of their time submitted should be considered as common benefit. These objectors also assert that the FCC's recommendations regarding allocation of funds do not accurately reflect the value of their common benefit contribution. I reviewed the agreement entered between MDL leadership and the New Jersey counsel and have considered that agreement in light of the Court's Protocol and Fee Order. My recommendation regarding allocation of common benefit fees and expenses takes into consideration the contribution of those who participated in the New Jersey litigation as well as those who participated in related litigation in other state court venues. I further note that state court

trials were subject to the same analysis by the FCC, regardless of the identity of trial counsel and irrespective of whether the time was expended by Plaintiffs' leadership, Participating Counsel, or member firms of the FCC. Arguments that there were different "rules" for the FCC members and other applicant firms are simply without merit and factually incorrect.

Certain of the firms objecting to the FCC's Final Written Recommendation complain that they are unable to adequately respond to or assess the FCC's recommended allocation without first receiving discovery from the FCC regarding its deliberations. Contrary to the suggestion of these objectors, I have observed the FCC's process to be open and transparent. The FCC provided ample information and explanation regarding its process and its analysis both in writing and in person to each of the objecting firms. The FCC's process provided applicant firms with meaningful opportunities to object and to be heard. These objectors have also had the opportunity to be heard by me, and again I have taken their objections into consideration in making my recommendation. I find it noteworthy that sixteen of the twenty-four firms that objected to the FCC's Final Written Recommendation were able to resolve their objections without discovery from the FCC. As the FCC has pointed out in response to one objecting firm's requests for discovery from the FCC, each of which were denied by the Court, discovery in connection with fee motions is rarely permitted and should never result in a second major litigation. *See, e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014). Moreover, as the FCC pointed out in its response to one of the several motions to compel discovery filed by the same firm, the FCC has already provided much of the information that the firm sought to discover and certain of the requested information was not in the FCC's possession. Finally, it is not the FCC's or my obligation to demonstrate why any particular time submission was *not* considered for the common benefit. To the contrary, it is the burden of the applicant firm who claims entitlement to common benefit to prove its compliance

with the Court's Common Benefit Orders as well as to prove how and the extent to which its work benefited the litigation. *See*, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 2019 WL 274036, \*5-\*9 (9th Cir. Jan. 22, 2019).

One common theme of the eight firms' objections to the Final Written Recommendation is that their work was improperly undervalued by the FCC while other firms would receive too much money for their work under the FCC's recommendation.  It is inevitable that law firms that have devoted significant time and effort to this litigation will view the value of their own work, and that of others, differently.  It would be unrealistic to expect that every lawyer (or judge) would reach the same conclusion regarding the value of every applicant firm's work.  In *Diet Drugs*, 2003 WL 21641958 \*10-\*11, the court made an observation that I find particularly instructive here, stating "[w]ith so much money at stake and so much time invested by skilled attorneys on valuable common benefit work, it is not surprising that disputes exist concerning the proper method and dollar amount of the individual allocations. We emphasize, however, that the allocation of fees is not an exact science."  The court in *In re Motor Fuel Temperature Sales Practices Litig.*, 2016 WL 4445438, \*13 (D.Kan.2016), made a similar observation, stating that "[i]n determining reasonable attorneys' fees, the essential goal 'is to do rough justice, not to achieve auditing perfection.'"

Because many of the relevant factors in the allocation decision process are inherently subjective, Judge Fallon noted in *Vioxx* that "some subjectivity is unavoidable in allotting common benefit fees." 802 F. Supp. 2d at 774.  None of the applicant firms could dispute the truism that not all hours are entitled to equal reimbursement.  As Judge Fallon explained, "there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more 'common benefit.' Such work deserves greater compensation." *Id.* at 772. Judge Fallon explained further that "in the real and imperfect world of litigation it is an accepted fact that not all work hours are

entitled to the same compensation rate. The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation. How these factors are weighed injects an unavoidable amount of subjectivity in the analysis. **The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from those affected**." *Id.* at 774 (emphasis added).

The common benefit allocation process is intended to provide meaningful input and feedback, the ultimate goal of which is not to achieve perfection but rather a result that is fair and reasonable. *Diet Drugs*, 2003 WL 21641958 at *6 (noting that applicants had the opportunity to object to their proposed fee allocation, meet with the fee committee and discuss their objections, suggest revisions before a final recommended allocation was determined, and, if still dissatisfied, seek relief from the court). As outlined above, the common benefit allocation process here provided multiple opportunities to object and to be heard. Where appropriate, adjustments have been made in light of the feedback and information provided for certain of the applicant firms.

Based upon my review of the objections and my meetings and discussions with the objecting firms, it is apparent that some of the objecting firms are seeking credit for much of the same work. For example, three of the objecting firms claim that they deserve more credit than others for the development or the success of the Ethicon litigation. Some of these objecting firms worked on the same trials together and some claim to have developed some of the same experts and the same litigation theories and strategy. Certain of these objecting firms claim that their work that resulted in an early New Jersey State Court trial verdict provided substantial benefit to the litigation. However, another objecting firm argues that the New Jersey verdict was only of limited value compared to subsequent trial(s) in which their firm was involved because the New Jersey

verdict addressed only failure to warn and not design defect.  The point of this observation is not to decide which of these firms is right or wrong about who deserves the most credit for the development or success of this litigation.  I have no doubt about the sincerity of these firm's beliefs that their contributions were more significant than those of one another or those of other firms. However, these competing objections only emphasize the point made by several courts in the common benefit context: the allocation process necessarily involves a certain level of subjectivity, and different people could analyze the same work and come to different conclusions regarding the value of that work in terms of its benefit to the litigation overall as to who deserves the most credit for that work.

Contrary to the urging of certain of the objecting firms, I am not required to and I did not attempt to employ any "lodestar" calculation in making my recommended allocation. *Glaberson v. Comcast Corp.*, 2016 WL 6276233 (E.D.Pa. 2016) ("a mathematical application of a ratio of the firms' lodestars is not mandated" in the allocation of common benefit attorneys' fees).  It is telling that the firms advocating for a lodestar approach were among the most abusive of the Court-ordered time reporting requirements, submitting excessive time, inadequate descriptions of work performed, time that provided minimal to no common benefit and duplicate billings for the same task, among other violations.  Citing to Judge Fallon's *Vioxx* opinion, the Special Master in *Deepwater Horizon* observed that **"[m]echanically calculating hours and allocating fees solely on that basis would incentivize padded hours and diminish the work that truly moved the litigation towards its conclusion**." (*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 2:10-md-2179, Doc. 23574-1 (Special Master's Recommendation Concerning the Allocation of Common Benefit Fees) (Oct. 24, 2017), p. 8 (emphasis added)).  I similarly find that multiplying the number of hours submitted by an hourly

rate would only serve to reward firms that abused the process and would not adequately account for the wide variations in the value of the benefit of the work performed by the applicant firms.

While the hours submitted by the various firms was considered as a part of my analysis, I reviewed the submitted time and applicant presentations and materials not to calculate a "lodestar" but rather in light of the Court's overarching instruction to "evaluat[e] what work and expenses furthered the common benefit of the litigation." (Fee Committee Protocol, p. 10). *See also*, *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir.1995) ("While the time logged is still relevant to the court's inquiry – even under the [percentage of fund] method, time records tend to illuminate the attorney's role in the creation of the fund, and, thus, inform the court's inquiry into the reasonableness of a particular percentage…."); *In re Copley Pharmaceutical, Inc., Albuterol Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1149-50 (D.Wyo.1999) ("[t]he value of time expended with appropriate adjustments may provide a rough starting point for assessing the respective roles of counsel, but it should not be used rigidly as a precise measure to the exclusion of other intangible factors.").

In addition to the number of hours submitted, my review of the work performed considered additional factors in order to determine its quality and the value it generated towards the overall litigation and ultimate settlement.  For example, those attorneys who spent their time passively involved in meetings, reviewing emails, telephone conferences, or attending hearings or depositions to merely observe were viewed as not having contributed to the common benefit on the same level as those attorneys and firms who undertook critical aspects of the litigation, such as (1) preparing for and taking generic liability depositions, (2) meeting and working with experts, (3) preparing experts for and defending their depositions, (4) presenting motions and briefs and oral arguments before the Court or on appeal, (5) preparing for and participating in trials and (6)

leading settlement negotiations. In fact, a number of firms submitted time that conferred no common benefit whatsoever.   I also took into account the length of the applicant firm's involvement in the litigation, its overall time and resource commitment to the case, whether attorneys in the firm assumed a leadership role, and the reputation and experience of the attorneys performing work.

Certain of the objecting firms point out their participation in the trial of cases, some of which resulted in verdicts, that they believe were beneficial to the litigation.   I would first point out that not all work spent related to a given "trial" are of equal value. Some firms performed the work related to preparing for and trying the case from the time the case was identified for trial and their work continued through the post-trial appeal process. Others may have provided valuable support at some point before or during trial, and still others may have participated in the trial itself, but in different roles. Moreover, as Judge Fallon observed in the *Vioxx* litigation, not all trials are equal in terms of common benefit and the evaluation of trial-related work must take into consideration whether and the extent to which that work was beneficial to others.   *Vioxx*, 802 F. Supp. 2d at 773 ("In allocating common benefit fees to trial counsel it is important to determine when the trial occurred, whether the work was shared with other counsel, whether the work was helpful in other cases or just in that one case. In this latter event, it does not mean that such counsel would not be entitled to some common benefit fee because there is a salutary rippling effect which a win or 'hard fought case' has on other cases. But it also does not mean that such counsel may be entitled to the same common benefit fee as a colleague whose work was shared with other counsel and had a meaningful effect on subsequent trials.").   I am aware that certain of the trials in which the objecting firms were involved were built upon work product from others and occurred after the liability case had been established for the product at issue by others.   I am also aware that

certain of the objecting firms outwardly resisted sharing information and work product with others, and the value of the trials inured largely to the clients in those individual cases.   All of these factors must be taken into account.

Finally, some objectors argue that the outcome reflected in the FCC's Final Written Recommendation was predetermined. This allegation is without merit. I have personal knowledge from my observation of and participation in the review of common benefit time and my observation of the FCC's analysis of the value of those contributions that the FCC did not discuss specific allocations until *after* all of the submitted time and expense was evaluated. Certainly, that review and analysis informed the FCC's determination about the value of the common benefit contributions of each applicant firm, but there was never a discussion of specific values for allocations until the arduous work of analyzing the time and expense submitted was complete. To the extent that any objector—especially given that they were not present for these deliberations— alleges otherwise, they are quite simply misinformed.

I also evaluated each attorney who was appointed to a leadership position to determine if they performed common benefit work. In some instances, certain members of Plaintiffs' Leadership did limited work, and in some instances, no substantive work contributing to the common benefit of the litigation at all even though this Court made clear that leadership appointments were individual in nature. There were members of the MDL PSC that utilized work product developed in the MDL for benefit outside of the MDL without making substantive contribution to the common benefit of the MDL litigation. Having assisted the FCC in its evaluation of the efforts and effectiveness of leadership, I find that the FCC properly evaluated the contributions of Plaintiffs' Leadership. I did consider that PSC firms contributed substantial capital to fund the litigation. Where appropriate, I considered information that was harmful to the

- 21 -

advancement of the litigation. Actions by certain attorneys caused the Plaintiffs' Leadership and the FCC to incur significant additional costs and were disruptive to the advancement of this litigation. These negative consequences to the litigation as a whole are referred to as "common detriment," and I was directed to consider common detriment pursuant to the Protocol and the FCC Orders.

My methodology in assigning a percentage to each applicant firm of the aggregate award based on the firm's relative contribution to the outcome of the litigation is consistent with the methodology in similar multi-plaintiff product liability MDLs, including those in which I have served in a similar role. In *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D.Mo.2014), the MDL court affirmed my recommended allocation of common benefit fees that was based on the quality and value of the work performed rather than on a "lodestar" analysis of rates multiplied by hours. *Id.* at *6. Likewise, in the *In re Yasmin and Yaz Prods. Liab. Litig.* MDL, I recommended an allocation based on the quality and value of the work to the litigation and resolution and I expressly declined the "lodestar" approach as both arbitrary and inappropriate because it would not properly consider the value and quality of the work involved. *In re Yasmin and Yaz Prods. Liab. Litig.*, 3:09-md-02100, Doc. 3843 (Special Master's Report and Recommendation Regarding the Allocation and Distribution of Common Benefit Fees and Expenses) (S.D.Ill. Nov. 6, 2015), pp. 7-8. The *Yaz* MDL Judge, the Hon. David R. Herndon, adopted my allocation recommendation in its entirety. *Id.*, Doc. 3856 (Minute Order adopting Special Master's recommended allocation in its entirety) (S.D. Ill. Nov. 20, 2015).

The First Circuit in *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307-08 (1st Cir.1995), expressly held that "in a common fund case the district court, in the exercise of discretion, may calculate counsel fees either on a percentage of the

fund basis or by fashioning a lodestar…. [W]e rule the court below did not err in purposing to allocate fees based on the [percentage of fund] method, emphasizing the attorneys' 'relative contribution' to the creation of the Fund."  Similarly, the MDL court in *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2013 WL 1867117, *4-*15 (E.D.La.2013) approved the common benefit fee allocation proposed by the steering committee and the court-appointed special master, which awarded a stated percentage of available common benefit fees to each of the firms applying for common benefit.  Similarly, in *In re Prempro Prods. Liab. Litig.*, 2014 WL 3809101, *1-*2 (E.D. Ark. 2014), the MDL court adopted a percentage-based common benefit allocation as recommended by fee committee and proposed by the special master.  More recently, in *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, MDL 2428 ("*Granuflo*"), the court-appointed fee committee recommended an allocation to each applicant firm of a percentage of the total fee award based on the committee's experience and the facts submitted and after receiving input from the interested firms. *Granuflo*, 1:13-md-2428, Doc. 1983 (Memorandum in Support of Plaintiff Leadership's Petition for Award and Allocation of Common Benefit Fees) (D.Mass. Dec. 12, 2017). The fee committee in *Granuflo* emphasized in its petition that it did not undertake to apply "an unyielding mathematical formula," which it noted could not properly account for the subjective differences that must be considered in making such an award, such as the differing skills and contributions of the attorneys and varying nature and complexity of the tasks involved. *Id.*, p. 22.  The MDL court approved the committee's recommendation. *Granuflo*, 2018 WL 2163627 (D.Mass.2018).

At the time of this Recommendation, half of the objectors to the FCC's Final Written Recommendation have agreed to withdraw their objection. This is a direct result of the more than adequate Due Process safeguards put into place by the Court in the Fee Protocol and its

implementation by the FCC. It is further a testament to the reasonableness of certain objectors and the FCC, as well as a willingness to reach compromise despite good faith disagreements concerning the ultimate common benefit value provided by a particular firm. Only four objectors remain, and I discuss each in turn below. I am satisfied that the methods employed by the FCC, as well as my methodology in making allocations, is consistent with applicable precedent, as well as the directives given to me by this Court. For each of the four firms that continue to object to the FCC's Final Written Recommendation after my meetings and conversations with them, I make the following findings and recommendations regarding allocation of common benefit funds:

1. **Anderson Law Offices:** I received the materials submitted by this objector, met with this objector and considered the contribution of the firm to the common benefit of the litigation.  I participated in observing the review of the hours submitted by this objector, and I remain concerned regarding the hours submitted by this firm. In balancing the information gained from representatives of this objector with the information gleaned from the evidence developed throughout the common benefit review process under the Protocol, I recommend an increase of 0.1142858% which when considered in light of the anticipated $350,000,000 initial fund for distribution for common benefit fees results in an effective increase of $400,000.00. This increase in the recommended award results in a total percentage of 2.1742858%% as reflected in **Exhibit 1** hereto.

2. **Bernstein Liebhard:** I received the materials submitted by this objector, met with this objector and considered the contribution of the firm to the common benefit of the litigation.  In balancing the information gained from representatives of this objector with the information gleaned from the evidence developed throughout the common benefit review process under the Protocol, I recommend an increase of 0.1285715%

which when considered in light of the anticipated $350,000,000 initial fund for distribution for common benefit fees results in an effective increase of $450,000.00. This increase in the recommended award results in a total percentage of 0.3978090% as reflected in **Exhibit 1** hereto.

3. **Kline & Specter:** I received the materials submitted by this objector, met with this objector and considered the contribution of the firm to the common benefit of the litigation. In making my recommendation, I reviewed and considered the time and effort expended by this objector and recognize that a great deal of their work was done in individual cases filed in the Court of Common Pleas in Philadelphia, Pennsylvania. Most of the information and argument during our meeting was related to the number of State Court cases they had tried with successful verdicts, their continuing trials of cases, the number of cases accepted by other plaintiffs' counsel, and the settlement value of cases obtained by other firms.  In balancing the information gained from representatives of this objector with the information gleaned from the evidence developed throughout the common benefit review process under the Protocol, I recommend no change in the amount allocated for common benefit fees as reflected in **Exhibit 1** hereto.

4. **Mazie Slater Katz & Freeman:** I received the materials submitted by this objector, met with this objector and considered the contribution of the firm to the common benefit of the litigation. In making my recommendation, I reviewed and considered the time and effort expended by this objector and recognize that a great deal of their work was done in individual cases filed in the state courts of New Jersey and that multiple firms sought compensation for the same work as was sought by this objector. I first met

with Mssrs. Slater and Mazie as representatives of this objector after the firm's
objection to the FCC's Preliminary Written Recommendation in their offices in
Morristown, NJ together with Mssrs. Thomas Cartmell and Jeff Kuntz. The meeting
was unproductive. I later met with the objector again in St. Louis during my process of
attempting to resolve objections to the Final Written Recommendation. While the
meeting was very cordial, and arguments were made, it still appeared to me that the
objector's central argument was that early cases tried in New Jersey as well as the one
expert developed by Mr. Slater were almost solely responsible for the success of all of
the MDLs. I was unable to arrive at any amount of common benefit compensation that
would be reasonable in amount and satisfactory to the objector. In balancing the
information gained from representatives of this objector with the information gleaned
from the evidence developed throughout the common benefit review process under the
Protocol, I recommend no change in the amount allocated for common benefit fees as
reflected in **Exhibit 1** hereto.


III.   **REIMBURSEMENT OF SHARED EXPENSES AND HELD COSTS**

The common fund doctrine also authorizes reimbursement of the reasonable amounts paid
out-of-pocket to achieve a common benefit recovery or to advance the common goals of all
plaintiffs in MDL litigation. As discussed above, this Court previously ordered that 5% of all
proceeds of cases be held back for "payment of attorneys' fees and approved common benefit and
MDL expenses." The common benefit attorneys have incurred a substantial amount in common
benefit "held" expenses and the PSC funded substantial "shared" expenses to advance the
litigation. These expenses include, but are not limited to: housing all of the discovery produced by

the parties to this litigation and making it searchable and accessible to all common benefit attorneys; travel costs for attending depositions around the country and in Europe; expert fees and expenses; deposition transcript and video costs; hearing transcript costs; PSC group administration matters, such as meetings and conference calls; and other litigation expenses, including the significant costs of preparing for and trying the MDL bellwether and consolidated trials to verdict and handling of the defendants' appeals of those verdicts. All the submitted expenses were audited and inappropriate or excessive expenses were disallowed or reduced.

Through my participation in the FCC's review of expenses submitted by each common benefit attorney, I observed that the same due process protections provided to applicant firms with regard to common benefit time submissions were also applied to the review of expense submissions. The FCC ensured that each request complied with this Court's direction as set forth in the Protocol and the FCC Order. All the expenses that the FCC has recommended for reimbursement were incurred in the ordinary course of litigation for the common benefit of all plaintiffs and are reasonable. I also note that additional common benefit expenses will be incurred for the further administration of the litigation, and therefore, funds should he maintained in the common benefit fund until the litigation is concluded.

## IV.   ALLOCATION OF COMMON BENEFIT FEES, SHARED EXPENSES AND HELD COSTS

Based upon all of this work, I made my determination for each firm independently of the FCC. The FCC's process for evaluation of firms was the most thorough that I have ever encountered.  While I am convinced that the FCC process was thorough and fair, I did reach different conclusions as to a number of firms - including adjusting allocations for firms on the FCC. For those firms which did not accept the FCC recommendation and objected to the Final

Written Recommendation of the FCC, I engaged in discussions with those firms in an attempt to reach a global consensus.

The allocations of fees and expenses are attached as **Exhibits 2 and 3**, and for the detailed reasons set-forth herein, I make the recommendation that this Court approve these allocations. Further, it is anticipated that additional monies will be added to the common benefit fee fund as additional cases are resolved, although the precise amount is incapable of determination at this time. I recommend that the Court (1) allocate thirty percent (30%) of future funds received in the MDL common benefit fund as being subject to future orders of the Court regarding payment; and (2) allocate seventy percent (70%) of future funds received in the MDL common benefit fund amongst applicant firms utilizing the same percentages as set forth in this Recommended Allocation. Any future distributions of the thirty percent (30%) should be at an appropriate time and method as directed by this Court, and it is my recommendation such distributions must be made upon Order of the Court.

## V.      CONCLUSION

For the reasons set forth above, in my capacity as External Review Specialist, I respectfully request that this Court adopt my Recommended Allocation, including the following:

1.   To approve the allocation of common benefit fees as set forth in Exhibit 1, and order that those funds be distributed from the common benefit fund account to those firms promptly;

2.   To approve the reimbursement of common benefit expenses as set forth in Exhibit 2, and order that those amounts be distributed from the common benefit fund account promptly;

3.   To allocate thirty percent (30%) of future funds received in the MDL common

benefit fund as being subject to future orders of the Court regarding payment; and

4.  To allocate seventy percent (70%) of future funds received in the MDL common

    benefit fund amongst applicant firms utilizing the same percentages as set forth in

    this Recommended Allocation in Exhibit 1.


Respectfully submitted this 11th day of March, 2019.

Daniel J. Stack, Court Appointed External Review Specialist
1529 Anton Drive
Columbia, IL 62236
618-792-8604

EXHIBIT 1
External Review Specialist's
Recommended Allocation of Fees

| Firm | FCC's Preliminary Written Recommendation Allocation | FCC's Final Written Recommendation Allocation | External Review Specialist's Recommended Allocation |
|---|---|---|---|
| Anapol Weiss | 0.0000000% | 0.0000000% | 0.0000000% |
| Anderson Law Offices, LLC | 2.0600000% | 2.0600000% | 2.1742858% |
| Andrus Wagstaff | 2.4900000% | 2.4900000% | 3.7142858% |
| Ashcraft & Gerel, LLP | 0.0499050% | 0.0499050% | 0.0499050% |
| Aylstock, Witkin, Kreis & Overholtz, PLLC | 7.7500000% | 7.7500000% | 7.5175000% |
| Babbitt Johnson Osborne & LeClainche, PA | 0.3800000% | 0.3871430% | 0.3871430% |
| Baron & Budd, P.C. | 0.0000000% | 0.0000000% | 0.0000000% |
| Baron and Blue | 0.0392500% | 0.0392500% | 0.0392500% |
| Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. | 1.5000000% | 1.5000000% | 1.5000000% |
| Bell Law Firm | 0.2326170% | 0.2326170% | 0.2326170% |
| Bernstein Liebhard, LLP | 0.2692375% | 0.2692375% | 0.3978090% |
| Bertram & Graf, LLC | 0.0238800% | 0.0238800% | 0.0238800% |
| Blasingame, Burch, Garrard & Ashley, PC | 16.2000000% | 16.1812550% | 15.4288224% |
| Blizzard & Nabers, LLP | 0.4100000% | 0.4100000% | 0.4100000% |
| Burke, Harvey & Frankowski, LLC | 0.0276900% | 0.0276900% | 0.0276900% |
| Burnett Law Firm | 1.4500000% | 1.4500000% | 1.4065000% |
| Carey Danis & Lowe | 0.2000000% | 0.2000000% | 0.3714290% |
| Chaffin Luhana, LLP | 0.0166200% | 0.0166200% | 0.0166200% |
| Clark, Love & Hutson, G.P. | 13.0000000% | 13.0000000% | 12.3248225% |
| Cohen, Placitella & Roth, PC | 0.0980300% | 0.0980300% | 0.0980300% |
| Davis & Crump, LLP | 0.6700000% | 0.7700000% | 1.2271429% |
| Davis, Bethune & Jones, L.L.C. | 0.1005271% | 0.1576700% | 0.1576700% |
| Doyle Lowther, LLP | 0.0600075% | 0.0600075% | 0.0600075% |
| Edwards Kirby, LLP | 0.0449600% | 0.0449600% | 0.0449600% |
| Evers & Preston Law Firm | 0.1350000% | 0.1350000% | 0.1350000% |
| Fibich, Leebron, Copeland & Briggs | 0.9500000% | 1.1428580% | 1.1428580% |
| Fleming Nolen Jez, L.L.P. | 0.4100000% | 0.4100000% | 0.4100000% |
| Frankovitch, Anetakis Simon, Decapio & Pearl, LLP | 0.4600000% | 0.4600000% | 0.3171428% |
| Frees & Goss, PLLC | 3.4199996% | 4.0279510% | 4.0279510% |
| Girard Gibbs, LLP | 0.0045450% | 0.0045450% | 0.0045450% |
| Goza & Honnold, LLC | 0.1173300% | 0.1173300% | 0.1173300% |
| Greene Ketchum Farrell Bailey & Tweel, LLP | 0.6900000% | 0.6900000% | 0.6900000% |
| Gustafson Gluek, PLLC | 0.0454000% | 0.0454000% | 0.0454000% |
| Heninger Garrison Davis, LLC | 0.0506550% | 0.0506550% | 0.0506550% |
| Herman Gerel, LLP | 0.0496200% | 0.0496200% | 0.0496200% |
| Herman, Herman & Katz, LLC | 0.0340500% | 0.0340500% | 0.0340500% |
| Hersh and Hersh | 0.0689300% | 0.0760730% | 0.0760730% |
| Hissey Kientz, LLP | 0.0877080% | 0.0877080% | 0.0877080% |
| Hunt & Lees, LC | 0.0235500% | 0.0235500% | 0.0235500% |
| Irpino Avin Hawkins Law Firm | 0.2243070% | 0.2243070% | 0.2243070% |
| Johnson Becker, PLLC | 0.1723120% | 0.2043150% | 0.2043150% |
| Junell & Associates, PLLC | 0.0474200% | 0.0474200% | 0.0474200% |
| Keith, Miller, Butler, Scneider & Pawlik, PLLC | 0.2584680% | 0.2584680% | 0.2584680% |
| Kell Lampin, LLC | 0.0934575% | 0.0934575% | 0.0934575% |
| Kline & Specter, P.C. | 1.0700000% | 1.0700000% | 1.0700000% |
| Laminack, Pirtle & Martines, LLP | 0.1540100% | 0.1825820% | 0.1825820% |
| Lanier Law Firm | 0.1869225% | 0.1869225% | 0.1869225% |
| Levin Simes, LLP | 1.4600000% | 1.5742860% | 2.2171430% |
| Levin, Papantonio, Thomas, Mitchell, Rafferty, Proctor, P.A. | 0.1096125% | 0.1096125% | 0.1096125% |
| Lockridge Grindal Nauen, PLLP | 1.8300000% | 1.8300000% | 1.6871428% |
| Lopez McHugh, LLP | 0.0124575% | 0.0124575% | 0.0124575% |
| Lyon Firm | 0.0124575% | 0.0124575% | 0.0124575% |
| Matthews & Associates | 1.0000004% | 1.1777640% | 1.1777640% |
| Mazie Slater Katz & Freeman, LLC | 1.7200000% | 1.7200000% | 1.7200000% |

EXHIBIT 1
External Review Specialist's
Recommended Allocation of Fees

| Firm | FCC's Preliminary Written Recommendation Allocation | FCC's Final Written Recommendation Allocation | External Review Specialist's Recommended Allocation |
|---|---|---|---|
| Meyers & Flowers, LLC | 0.1299225% | 0.1299225% | 0.1299225% |
| Miller Firm, LLC | 0.0000000% | 0.0000000% | 0.0000000% |
| Monsour Law Firm | 1.2900000% | 1.4185720% | 1.4185720% |
| Moody Law Firm, Inc. | 0.2412320% | 0.2412320% | 0.2412320% |
| Morgan & Morgan, PA | 0.0290775% | 0.0290775% | 0.0290775% |
| Mostyn Law Firm, P.C. | 0.0609900% | 0.0609900% | 0.0609900% |
| Motley Rice, LLC | 14.0000000% | 14.0000000% | 13.2948225% |
| Mueller Law Firm | 1.3600000% | 1.3600000% | 1.3600000% |
| NastLaw, LLC | 0.1142325% | 0.1142325% | 0.1142325% |
| Nations Law Firm | 0.0044250% | 0.0044250% | 0.0044250% |
| Neblett, Beard & Arsenault | 0.0392400% | 0.0392400% | 0.0392400% |
| Oliver Law Group, P.C. | 0.1246200% | 0.1246200% | 0.1246200% |
| Osborne & Associates | 0.0666700% | 0.1523850% | 0.1523850% |
| Paul Sadler Law Firm, PC | 0.0373440% | 0.0373440% | 0.0373440% |
| Perdue & Kidd | 0.5100000% | 0.5100000% | 0.5100000% |
| Piscitelli Law Firm | 0.0036675% | 0.0036675% | 0.0036675% |
| Potts Law Firm | 1.8500000% | 1.9928580% | 2.1642860% |
| Pritzker Hageman, P.A. (Pritzker Olsen) | 0.0072675% | 0.0072675% | 0.0072675% |
| Reilly Pozner, LLP | 0.7200000% | 0.8342860% | 0.8342860% |
| Restaino Law, LLC | 0.0755775% | 0.0755775% | 0.0755775% |
| Robins Cloud, LLP (Heard Robins) | 0.0415400% | 0.0415400% | 0.0415400% |
| Robinson Calcagnie, Inc. | 0.0021600% | 0.0021600% | 0.0021600% |
| Salim Beasley, LLC | 0.6200000% | 0.6200000% | 0.6200000% |
| Sanders Law Firm (Sanders Venier Grossman, L.L.P.) | 0.0290780% | 0.0290780% | 0.0290780% |
| Saunders & Walker, PA | 0.0084750% | 0.0084750% | 0.0084750% |
| Schroeder Law Office | 0.0013800% | 0.0013800% | 0.0013800% |
| Seeger Weiss, LLP | 0.0290775% | 0.0290775% | 0.0290775% |
| Simmons Browder Gianaris Angelides & Barnerd, LLC | 0.1124280% | 0.1124280% | 0.1124280% |
| Simons Hanly Conroy, LLC | 0.0286000% | 0.0286000% | 0.0286000% |
| Sommers Schwartz, P.C. | 0.0103800% | 0.0103800% | 0.0103800% |
| Taylor Martino, P.C. | 0.0011475% | 0.0011475% | 0.0011475% |
| | | | |
| Turning Point Litigation - Mullins Duncan | | | |
| Harrell & Russell PLLC (Allison Van Laningham) | 0.0861560% | 0.1147270% | 0.1718710% |
| Verhine & Verhine, PLLC | 0.0072675% | 0.0072675% | 0.0072675% |
| Wagstaff & Cartmell, LLP | 11.0000000% | 11.0000000% | 10.5559290% |
| Waters & Kraus, LLP | 0.0318400% | 0.0318400% | 0.0318400% |
| Watts Guerra, LLP | 0.1384650% | 0.1384650% | 0.1384650% |
| Wexler Wallace, LLP | 3.3800000% | 3.3800000% | 3.5514290% |
| Wilson Law, PA | 0.0235400% | 0.0306830% | 0.0306830% |

EXHIBIT 2
External Review Specialist's
Recommended Allocation of Expenses

| Firm | Total Expense Reimbursement | MDL Assessment Paid | Total Expense and MDL Assessment |
|---|---|---|---|
| Anapol Weiss | $ - | $ 100,000.00 | $ 100,000.00 |
| Anderson Law Offices, LLC | 666,993.81 | 350,000.00 | 1,016,993.81 |
| Andrus Wagstaff | 505,275.50 | 350,000.00 | 855,275.50 |
| Ashcraft & Gerel, LLP | 7,200.40 | 350,000.00 | 357,200.40 |
| Aylstock, Witkin, Kreis & Overholtz, PLLC | 1,108,942.51 | 350,000.00 | 1,458,942.51 |
| Babbitt Johnson Osborne & LeClainche, PA | 200,816.91 | 350,000.00 | 550,816.91 |
| Baron & Budd, P.C. | - | 350,000.00 | 350,000.00 |
| Baron and Blue | 33,687.74 | 350,000.00 | 383,687.74 |
| Beasley, Allen, Crow, Methvin, Portis & Miles, | 308,978.75 | 350,000.00 | 658,978.75 |
| Bell Law Firm | 6,253.68 | 350,000.00 | 356,253.68 |
| Bernstein Liebhard, LLP | 102,445.59 | 350,000.00 | 452,445.59 |
| Bertram & Graf, LLC | 12,404.24 | - | 12,404.24 |
| Blasingame, Burch, Garrard & Ashley, PC | 9,545,824.63 | 350,000.00 | 9,895,824.63 |
| Blizzard & Nabers, LLP | 241,576.56 | 350,000.00 | 591,576.56 |
| Burke, Harvey & Frankowski, LLC | 14,197.66 | 300,000.00 | 314,197.66 |
| Burnett Law Firm | 10,941.33 | 350,000.00 | 360,941.33 |
| Carey Danis & Lowe | | - | - |
| Chaffin Luhana, LLP | 1,578.10 | 50,000.00 | 51,578.10 |
| Clark, Love & Hutson, G.P. | 4,230,319.61 | 350,000.00 | 4,580,319.61 |
| Cohen, Placitella & Roth, PC | 71,444.10 | 350,000.00 | 421,444.10 |
| Davis & Crump, LLP | 120,902.90 | 350,000.00 | 470,902.90 |
| Davis, Bethune & Jones, L.L.C. | 346,652.48 | - | 346,652.48 |
| Doyle Lowther, LLP | 2,751.93 | - | 2,751.93 |
| Edwards Kirby, LLP | - | - | |
| Evers & Preston Law Firm | - | - | - |
| Fibich, Leebron, Copeland & Briggs | 155,301.31 | 350,000.00 | 505,301.31 |
| Fleming Nolen Jez, L.L.P. | 15,862.79 | 350,000.00 | 365,862.79 |
| Frankovitch, Anetakis Simon, Decapio & Pearl, | 28,892.78 | 350,000.00 | 378,892.78 |
| Frees & Goss, PLLC | 910,588.03 | 350,000.00 | 1,260,588.03 |
| Girard Gibbs, LLP | 4,337.32 | - | 4,337.32 |
| Goza & Honnold, LLC | 17,629.76 | - | 17,629.76 |
| Greene Ketchum Farrell Bailey & Tweel, LLP | 26,653.16 | 350,000.00 | 376,653.16 |
| Gustafson Gluek, PLLC | 1,707.61 | - | 1,707.61 |
| Heninger Garrison Davis, LLC | 3,639.07 | - | 3,639.07 |
| Herman Gerel, LLP | 25,861.53 | - | 25,861.53 |
| Herman, Herman & Katz, LLC | 15,810.91 | - | 15,810.91 |
| Hersh and Hersh | 5,114.80 | - | 5,114.80 |
| Hissey Kientz, LLP | 2,619.91 | 350,000.00 | 352,619.91 |
| Hunt & Lees, LC | 14,895.21 | - | 14,895.21 |
| Irpino Avin Hawkins Law Firm | 6,999.14 | - | 6,999.14 |
| Johnson Becker, PLLC | 34,897.65 | 350,000.00 | 384,897.65 |
| Junell & Associates, PLLC | - | - | - |
| Keith, Miller, Butler, Sneider & Pawlik, PLLC | 17,151.53 | - | 17,151.53 |
| Kell Lampin, LLC | 43,541.16 | - | 43,541.16 |
| Kline & Specter, P.C. | 667,584.48 | 350,000.00 | 1,017,584.48 |

EXHIBIT 2
External Review Specialist's
Recommended Allocation of Expenses

| Firm | Total Expense Reimbursement | MDL Assessment Paid | Total Expense and MDL Assessment |
|------|---------------------------|---------------------|----------------------------------|
| Laminack, Pirtle & Martines, LLP | 37,286.70 | - | 37,286.70 |
| Lanier Law Firm | 15,671.35 | 350,000.00 | 365,671.35 |
| Levin Simes, LLP | 680,168.41 | 400,000.00 | 1,080,168.41 |
| Levin, Papantonio, Thomas, Mitchell, Rafferty, Proctor, P.A. | 41,058.32 | 350,000.00 | 391,058.32 |
| Lockridge Grindal Nauen, PLLP | 79,703.00 | 350,000.00 | 429,703.00 |
| Lopez McHugh, LLP | 3,293.31 | - | 3,293.31 |
| Lyon Firm | - | - | - |
| Matthews & Associates | 376,254.76 | 350,000.00 | 726,254.76 |
| Mazie Slater Katz & Freeman, LLC | 1,815,034.41 | - | 1,815,034.41 |
| Meyers & Flowers, LLC | 32,328.06 | 100,000.00 | 132,328.06 |
| Miller Firm, LLC | - | 350,000.00 | 350,000.00 |
| Monsour Law Firm | 232,499.22 | 350,000.00 | 582,499.22 |
| Moody Law Firm, Inc. | 10,555.33 | 250,000.00 | 260,555.33 |
| Morgan & Morgan, PA | 961.36 | 350,000.00 | 350,961.36 |
| Mostyn Law Firm, P.C. | 4,531.84 | 350,000.00 | 354,531.84 |
| Motley Rice, LLC | 2,927,113.91 | 350,000.00 | 3,277,113.91 |
| Mueller Law Firm | 263,115.43 | 350,000.00 | 613,115.43 |
| NastLaw, LLC | 20,515.89 | 350,000.00 | 370,515.89 |
| Nations Law Firm | 30,231.86 | - | 30,231.86 |
| Neblett, Beard & Arsenault | 8,523.52 | 350,000.00 | 358,523.52 |
| Oliver Law Group, P.C. | 17,040.78 | 175,000.00 | 192,040.78 |
| Osborne & Associates | - | - | - |
| Paul Sadler Law Firm, PC | 2,332.07 | - | 2,332.07 |
| Perdue & Kidd | 68,707.62 | - | 68,707.62 |
| Piscitelli Law Firm | - | - | - |
| Potts Law Firm | 210,083.09 | 350,000.00 | 560,083.09 |
| Pritzker Hageman, P.A. (Pritzker Olsen) | 6,455.24 | - | 6,455.24 |
| Reilly Pozner, LLP | 225,913.39 | 350,000.00 | 575,913.39 |
| Restaino Law, LLC | - | - | - |
| Robins Cloud, LLP (Heard Robins) | 33,552.71 | 350,000.00 | 383,552.71 |
| Robinson Calcagnie, Inc. | 13,518.39 | 350,000.00 | 363,518.39 |
| Salim Beasley, LLC | 107,219.58 | 350,000.00 | 457,219.58 |
| Sanders Law Firm (Sanders Venier Grossman, | 102,554.64 | 350,000.00 | 452,554.64 |
| Saunders & Walker, PA | 134.64 | 100,000.00 | 100,134.64 |
| Schroeder Law Office | - | - | - |
| Seeger Weiss, LLP | 98,011.34 | - | 98,011.34 |
| Simmons Browder Gianaris Angelides & | 23,049.47 | 250,000.00 | 273,049.47 |
| Simons Hanly Conroy, LLC | 18,754.07 | 350,000.00 | 368,754.07 |
| Sommers Schwartz, P.C. | 5,042.70 | - | 5,042.70 |
| Taylor Martino, P.C. | 49,903.58 | - | 49,903.58 |
| Turning Point Litigation - Mullins Duncan | 10,799.05 | - | 10,799.05 |
| Verhine & Verhine, PLLC | - | - | - |

EXHIBIT 2

External Review Specialist's

Recommended Allocation of Expenses

| Firm | Total Expense Reimbursement | MDL Assessment Paid | Total Expense and MDL Assessment |
|---|---|---|---|
| Wagstaff & Cartmell, LLP | 1,634,637.93 | 350,000.00 | 1,984,637.93 |
| Waters & Kraus, LLP | - | - | - |
| Watts Guerra, LLP | 16,457.55 | - | 16,457.55 |
| Wexler Wallace, LLP | 420,171.37 | 350,000.00 | 770,171.37 |
| Wilson Law, PA | 1,421.43 | 350,000.00 | 351,421.43 |
| **Total:** | **$ 29,079,741.96** | **$ 17,825,000.00** | **$ 47,007,883.90** |

# Exhibit 3