## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABIILITY LITIGATION | MDL No. 2325 |
| IN RE: BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2326 |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2327 |
| IN RE: COLOPLAST CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2387 |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2440 |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL No. 2511 |

*This Document Relates To All Cases*

**Declaration of Henry G. Garrard, III in Support of
Final Written Recommendation of the Common Benefit Fee and Cost Committee
Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared
Expenses and Held Costs**

On this day came the undersigned, Henry G. Garrard, III, who, pursuant to 18 U.S.C. § 1746, makes this declaration under penalty of perjury:

1.     Never before in the history of MDL practice has the JPML sent multiple, large-scale product liability MDLs involving different products and manufacturers to a single MDL court for inter-MDL coordinated proceedings.

2.     As pelvic mesh cases began to be filed against various pelvic mesh defendants in different federal courts in 2010, the firms involved in leadership came together to discuss potential MDL strategy.

3.     In light of the presence of numerous cases where a single plaintiff was implanted with multiple products, and the similar defects and complications associated with the various products, the firms involved in the leadership of the litigation decided to request the JPML to send all of the pelvic mesh cases to this Court for coordination pursuant to 28 U.S.C. § 1407.

4.     The JPML agreed in orders entered between 2012 and 2014, holding that the presence of several common fact issues shared by all MDLs, and the fact that many individual cases involved the implantation of multiple products from different manufacturers, supported centralization of all of these products before the same Court.

5.     Plaintiffs' counsel requested that the MDL Panel send four additional MDLs to the U.S. District Court for the Southern District of West Virginia in 2012, a sixth in 2013, and a seventh MDL in 2014.

6.     These seven (7) related pelvic mesh MDLs involved different medical device manufacturers along with other related defendants and included dozens of related pelvic mesh devices.

7.     The pelvic mesh litigation coordinated before this Court ultimately grew to include 104,836 filed cases, comprising one of the largest mass tort litigations in history.

8.     As explained in the Plaintiffs' Proposed Counsel Organizational Structure, which was submitted to the Court on March 17, 2012, the common medical, scientific and legal claims and theories, common defenses, and common experts, as well as the presence of numerous plaintiffs implanted with different defendants' products, called for a singular "cross-MDL" Plaintiffs' leadership structure. A true and correct copy of Plaintiffs' Proposed Counsel Organizational Structure is attached hereto as **Exhibit 1.** Exhibit 1 is offered as an example.  Substantially identical documents were delivered for each subsequent MDL.

9.     The Proposed Counsel Organizational Structure was vetted and agreed upon by every attorney who was included in the proposal.

10.    The Plaintiffs' lawyers involved in the litigation from the outset foresaw the onerous task that lay ahead and assembled a Plaintiffs' Steering Committee ("PSC") of 61 attorneys from law firms across the country, who were ultimately appointed and assigned by the Court the responsibility of marshaling resources and leading this sprawling litigation under a unified leadership structure.

11.    The Court-appointed PSC coordinated and collaborated across MDL lines to plan the litigation strategy, develop theories and confront legal issues, identify experts, and ultimately bear the cost and expended the labor necessary to develop the

general liability cases against numerous products made and sold by a variety of corporate defendants.

12. This singular PSC and leadership structure enabled such coordinated development of litigation strategy and theories and allowed the work product from one MDL to be utilized across product and manufacturer lines.

13. Important legal decisions by the Court and by counsel impacted all MDLs due to the commonality of the products and issues involved.

14. The single, unified leadership structure was also necessary to avoid potential conflicts and cross-purpose work.

15. The time, effort and expense of simultaneously pursuing and developing multiple legal theories against a range of products manufactured and sold by a disparate group of defendants, has been enormous.

16. The defendants in these MDLs are several of the largest medical device manufacturers in the world, and this litigation has been vigorously defended by this country's largest and most experienced medical device defense law firms.

17. Prosecuting multiple MDLs simultaneously before one court presented unique logistical and procedural difficulties and taxed the resources of the firms leading this litigation.

18. To address the economic disparity between the parties, the PSC firms were required to expend tens of millions of dollars to prosecute this massive litigation.

19. The PSC firms contributed a total of $17,825,000 in common benefit assessments, which were used to fund the litigation generally.

4

20.     "Held costs" in the amount of $28,986,811.38 were recognized by the FCC as common benefit, which have not yet been reimbursed out of the MDL fund.

21.     An additional $12,037,448.66 has been paid from the common benefit fund as costs associated with general expert fees, special master fees, data warehousing and management fees, and to the Court-appointed accountant overseeing the MDL fund.

22.     These costs continue to be incurred and to be paid from the common benefit fund upon application to the Court and the grant of an Order.

23.     At the outset, Plaintiffs' leadership undertook to define the parameters of the litigation through Master Pleadings, Plaintiff Profile Forms and Plaintiff Fact Sheets, and pushed the litigation forward through a series of procedural and scheduling orders.

24.     After establishing these baseline documents and schedules, Plaintiffs' leadership undertook the onerous process of discovery.

25.     Discovery in these cases was among the first areas to be tackled by leadership.

26.     Electronically-Stored Information protocols and search parameters, plaintiff and defendant fact sheets/profile forms, joint records collection, protective orders, and procedures for the collection and preservation of pathology were the subject of intense negotiation, and in several instances, disputes with defendants.

27.     Because certain of the Defendants had been involved in prior litigation relating to the same products, Plaintiffs' leadership undertook the motions practice necessary to obtain documents produced by those Defendants in those prior cases over the Defendants' objection.

28.     The number of different products, defendants, and related third parties (materials processors, component or materials manufacturers), necessitated multiple rounds of written discovery and ESI term search requests to defendants related to a variety of subjects and from a number of non-party sources.

29.     Plaintiffs' leadership established and funded the shared electronic document depository (Crivella West) where all defense-produced documents and other important materials were made accessible to all MDL plaintiffs' counsel in searchable format.

30.     Plaintiffs' leadership identified the important issues in these cases and created "issue codes" for purposes of document review, and documents were reviewed and "coded" according to their relevance.

31.     Plaintiffs' leadership and other Participating Counsel[1] reviewed and analyzed Defendants' discovery responses and objections and handled disputes regarding confidentiality, privilege and work product claims by the defense, typically by way of informal meet and confer, but occasionally necessitating motions practice before the Magistrate Judge or the Court.

32.     Other discovery disputes necessitated numerous meet and confers with defense counsel, discovery conferences with the Court's Magistrate Judge, and motions to compel or responses to motions for protective order or motions to quash.

33.     The production of documents in these cases was voluminous.

---

[1] "Participating Counsel" has the same definition as that set forth in the Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues, to wit: "'Participating Counsel' are counsel who subsequently desire to be considered for common benefit compensation...."

34.     To date, more than 21,504,590 documents totaling over 199,740,958 pages have been produced across the pelvic mesh MDLs, and production is on-going in some of the MDLs.

35.     Plaintiffs' leadership was responsible for the oversight and coordination of this massive review effort and bore responsibility for culling the thousands of documents used in expert preparation and the preparation of these cases for trial, and at trial, and identification of important documents for use by other attorneys with cases in these MDLs.

36.     Depositions were taken in these MDLs by Plaintiffs' leadership and other Participating Counsel of a variety of former and current employees of the defendants, including representatives from sales and marketing, regulatory, post-market surveillance, manufacturing, research and development/product design, risk management, as well as managerial and executive employees.

37.     More than two-hundred (200) individual and 30(b)(6) corporate depositions were eventually taken of the Defendants in these MDLs.

38.     Plaintiffs fought multiple "apex" motions relative to depositions sought of Defendants' executive employees.

39.     The cases also involved significant third-party depositions, including depositions of "key opinion leader physicians," representatives of medical organizations who issued "position statements" in support of the products at issue, and various individuals and entities that participated in the design or testing of the devices or that manufactured or processed components or materials used in the pelvic mesh products.

40.     The scope and complexity of the MDLs complicated expert discovery.

41.     Plaintiffs' leadership was required to identify and cultivate general experts from an array of scientific and medical fields, from biomaterials, pathology, physicians (including pathologists, pelvic pain specialists, urologists, gynecologists and Female Pelvic Reconstructive Surgeons) to regulatory.

42.     The theories and concepts relating to the defective design of the TVM devices in these MDLs – what made these devices problematic in the female pelvis – required knowledge of the applicable anatomy, medicine, and the scientific principles and literature applicable to synthetic and biologic surgical mesh devices.

43.     Proving to a jury the complex scientific and medical reasons that these products caused the Plaintiffs' injuries required education.

44.     Plaintiffs' leadership developed and presented expert reports addressing the important scientific product defect principles, such as the *in vivo* degradation of polypropylene, chronic and excessive foreign body reaction to the mesh, inadequate pore size (scar-induced mesh contracture), mechanical instability, anatomical mismatch, mesh arm "sawing," and asymmetrical mesh contracture utilized across all MDLs.

45.     Due to the number of products and defendants involved, as well as the number of cases that were ultimately worked up towards potential trial, the plaintiffs' leadership were required to develop numerous qualified experts from a relatively limited pool.

46.     Because much of the innovation related to these products occurred in Europe, several of the foremost plaintiffs' experts were in Europe, which entailed additional

expense and effort as a result of travel, translation and compliance with foreign applicable law regarding discovery.

47.     Several of these experts conducted extensive laboratory testing of the materials and products involved utilizing a variety of laboratory and scientific equipment, and plaintiffs' leadership oversaw the issuance of extensive reports outlining, in detail, these experts' medical and scientific findings and opinions.

48.     Biomaterials experts conducted testing to demonstrate scientifically the phenomenon of mesh degradation, showing through microscopic photographs actual images of degraded mesh that had been removed from the bodies of plaintiffs.

49.     The potential for mesh degradation, and the clinical effects, was vigorously disputed by the defense.

50.     Establishing this important theory through scientific testing (which was admitted despite repeated *Daubert* challenges) was key to conveying these matters to a jury.

51.     Pathology experts examined numerous explanted mesh samples and pathology slides from plaintiffs under electron microscopy to explain the chronic negative effects of body's reaction to the mesh and the results of scarification of tissue due to the mesh design.

52.     Plaintiffs' experts conducted testing and developed demonstrative exhibits, including 3D models, to show how the design of these products caused asymmetrical contracture, which pulled the mesh and caused chronic pain and sexual dysfunction.

53.     These tests and exhibits demonstrated the experts' theories and opinions in a tangible way.

54.     Plaintiffs' leadership identified and served 84 Rule 26 Reports for 52 general plaintiffs' experts.

55.     Many of Plaintiffs' experts designated by leadership to provide general testimony crossed MDL lines.  Nineteen of Plaintiffs' 52 experts (36.5%) provided general expert testimony in more than one MDL, while nine (17.3%) provided testimony in more than three or more MDLs.

56.     Plaintiffs' leadership was responsible for preparing for and taking their depositions. One hundred nine (109) general experts were identified by the defense in these cases, and nearly all of them were deposed by Plaintiffs' leadership, some of them multiple times.

57.     The defense experts issued voluminous reports, citing to reams of scientific testing and clinical and animal study results, all of which had to be meticulously reviewed and analyzed by Plaintiffs' leadership, and ultimately addressed by way of cross-examination, *Daubert* motions and testimony from Plaintiffs' experts.

58.     While some of the MDL defendants undertook early efforts to attempt to compromise, most made clear that they had no interest in settlement, at least not without first trying multiple cases.

59.     The defendants' conduct necessitated the preparation of numerous cases for trial across the MDLs, which process was handled and overseen by Plaintiffs' leadership.

60.  Some of the trial selection cases were resolved prior to trial, but only after all of the extensive pre-trial work had been done and the cases were ready for trial.

61.  Preparing a case for trial in these MDLs was an expensive and difficult undertaking in light of the complexity of the issues involved, and the number of fact and expert witnesses whose testimony is necessary to meet the burden of proof and to address the litany of defenses asserted.  For example, I participated in the trial of *Cisson v. C. R. Bard, Inc.* where trial costs exceeded $600,000.00.

62.  Every MDL trial case entailed additional rounds of motions and briefing on procedural and substantive legal issues, arguments over deposition designations and other evidence to be offered at trial and a variety of other pre-trial issues.

63.  Plaintiffs' leadership coordinated the preparation of cases set by the Court in trial "waves".

64.  These trial waves required an extensive amount of orchestration and effort in a condensed time frame by Plaintiffs' leadership.

65.  These hundreds of wave cases necessitated the identification and depositions of numerous general experts for both plaintiff and defense, and an intensive general motions practice that involved briefing of dozens of additional dispositive, *Daubert* and *in limine* motions.

66.  The wave cases required that the same legal issues be addressed by Plaintiffs' leadership under numerous different states' substantive law.

67.  Responses to wave case motions prepared by leadership were then provided to other MDL counsel, and served as the template for responses in future trial selection or remanded cases.

68.   Plaintiffs' leadership oversaw the preparation of case-specific discovery to be served by individual plaintiffs on the defendants in the wave process and led efforts to ensure consistent responses from the Defendants to this discovery.

69.   To assist the several firms outside of leadership who had cases included in the bellwether process and later in the trial waves, Plaintiffs' leadership conducted, and continue to conduct, in-person educational sessions in various locations throughout the country to help educate these attorneys about the liability case generally, as well as how to handle the individual case-specific issues in their cases, such as preparing for and taking plaintiff and treating physician depositions and responding to the motions anticipated from the defense.

70.   Educational materials, including legal and factual outlines, template response briefing, sample expert reports, collections of important documents, corporate deposition transcripts and exhibits, sample plaintiff and doctor depositions, deposition outlines, trial exhibits and trial transcripts, were prepared by leadership and provided to or made available to counsel for the MDL plaintiffs.

71.   Expert reports and expert depositions for both Plaintiffs' and Defendants' general experts, as well as all corporate and third-party depositions, were also made available to MDL Plaintiffs' counsel by way of the Crivella West shared document depository.

72.   During the course of the pelvic mesh MDLs pending in this Court, Plaintiffs' leadership researched and argued: *Daubert* motions against nearly every expert (and other witnesses); summary judgment motions on issues relating to design defect, punitive damages, warnings sufficiency, the learned intermediary doctrine,

preemption, statute of limitations, general causation and specific causation; and numerous motions *in limine* seeking to limit or exclude Plaintiffs' evidence.

73.    Because certain of the defendants were affiliated corporate entities, Plaintiffs' leadership undertook the discovery and motions practice necessary to establish liability on the part of each the named defendants, which resulted in important stipulations regarding the liability of parent corporations for conduct of their subsidiaries.

74.    Plaintiffs' leadership briefed important procedural issues related to joinder, remand, choice-of-law, jurisdiction, venue and *Lexecon*, and the Court's ability to try MDL cases upon remand to other federal jurisdictions.

75.    Plaintiffs' leadership handled the *Daubert* and dispositive responsive briefing, as well as Plaintiffs' "offensive" summary judgment motions and reply briefing, and Plaintiffs' motions *in limine*.

76.    Important legal issues regarding consolidation of multiple MDL plaintiffs for purposes of trial pursuant to Rule 42 were briefed and argued by leadership.

77.    Plaintiffs' leadership also handled the briefing regarding the exclusion of evidence regarding the FDA 510(k) clearance process.  The Court's ruling on this motion proved a seminal ruling that impacted all of the MDLs.

78.    This critical evidentiary ruling spurred a litany of related motions for reconsideration, motions for new trial and evidentiary proffers across the MDLs, as well as grounds for appeal in multiple cases.

79.    Plaintiffs' Leadership also prepared the briefing regarding the admissibility of important product-related evidence used by all Plaintiffs.

80.     Several of the bellwether cases were resolved shortly before trial, but the pre-trial preparation for these cases was no different than the cases that ultimately went to verdict.

81.     When MDL bellwether cases were tried, the verdicts were subject to various post-trial motions and eventually appealed.

82.     The appeals often involved amicus briefing by multiple interested third parties due to the significance of the issues involved in this litigation.

83.     The extensive pre-trial briefing (pre-trial orders, jury charges, evidentiary motions), trial briefing (motion for directed verdict, evidentiary motions), and post-verdict briefing (motion for judgment as a matter of law, motion for new trial) in the bellwether cases were handled primarily by Plaintiffs' leadership.

84.     Plaintiffs' leadership also handled the appellate briefing in these cases, and these rulings helped shape the course of this litigation.

- *Lewis v. Johnson & Johnson*, 601 Fed. App'x 205 (4th Cir.2015) (affirming grant of motion for judgment as a matter of law for Defendants)
- *Cisson v. C.R. Bard, Inc.*, 810 F.3d 913 (4th Cir. 2016) (affirming $2 million verdict for plaintiffs)
- *Huskey v. Ethicon, Inc.*, 848 F.3d 151 (4th Cir.2017) (affirming $3.2 million verdict for plaintiffs)
- *Eghnayem v. Boston Scientific Corporation*, 873 F.3d 1304 (11th Cir. 2017) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $26.7 million)
- *Campbell v. Boston Scientific Corporation*, 882 F.3d 70 (4th Cir. 2018) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $18.5 million)

85.     The results of these post-trial motions and appellate rulings have likewise provided instructive guidance for the participants in this MDL, as well as for future product liability MDLs.

86.     Disparate legal and factual issues such as the propriety of consolidated, multi-plaintiff trials, the admissibility of evidence related to FDA, statutes of limitations, gross negligence and punitive damages, and the sufficiency of the evidence to sustain multi-million dollar verdicts on design defect and failure to warn have been addressed and resolved in plaintiffs' favor by the Fourth and Eleventh Circuits, providing substantial benefit to all MDL claimants and further certainty across MDL lines.

87.     Plaintiffs' leadership also coordinated efforts with attorneys who were handling related litigation against the same defendants in various State courts across the country.

88.     Eventually, and due in large part to the continuing efforts of the plaintiffs' leadership and the Court's innovative approaches to move cases forward, the defendants, who had generally resisted settlement discussions, began to consider resolution.

89.     Resolution in these MDLs has proven nearly as challenging as the litigation itself.

90.     The range of products involved, the varying nature of the injuries or damages claimed by Plaintiffs, the "multi-product" issue, and the differing financial status and interest in resolution among the different Defendants presented difficulties in resolutions that required perseverance and creativity by Plaintiffs' leadership.

91.     Plaintiffs' leadership coordinated efforts to conduct "censuses" of thousands of MDL cases in order to inform the Court and the parties of the range of products and injuries involved.

92.    At the request of the Court, certain Plaintiffs' leadership has been involved in attempting to facilitate the settlement process for other MDL firms without receiving any portion of the fee in the case.

93.    The Court has conducted multiple mandatory settlement conferences with various Defendants in which Plaintiffs' leadership has played an important role.

94.    Through December 21, 2016, ninety-four law firms submitted more than 900,000 hours of time for common benefit consideration, and the Court-appointed FCC has recognized a total of 679,191.20 of those hours as being for common benefit.

95.    To date, over 90% of the cases in these MDLs have reached resolution or have otherwise been dismissed.

96.    Defendants have made approximately $366,500,000 in payments into the common benefit fund.

97.    Based on the number of cases that have been resolved pursuant to a Master Settlement Agreement but not yet processed or that remain in the MDLs, it is anticipated that the common benefit fund will ultimately equal or exceed $550,000,000.

98.    On October 4, 2012, the Court entered its Pretrial Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues.

99.    In its Order, the Court set preliminary procedures for attorneys establishing standards for maintaining and submitting time and expenses for possible future consideration as common benefit and established the account to receive and disburse funds for the common benefit of the litigation.

100. The Court directed attorneys to submit time and expense records to the Court-appointed accountant on a periodic basis of every six weeks beginning November 1, 2012.

101. The Court's October 4, 2012, Order was approved by all members of the PSC and signed and submitted by all members of the Plaintiffs' Executive Committee.

102. All Participating Counsel are expressly bound by the terms of the Court's October 4, 2012, Order.

103. Upon the entry of the Pretrial Order Establishing Criteria for Applications to the MDL Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee (the "FCC Order") on January 15, 2016, the FCC began to meet for the purpose of performing the tasks required under the FCC Order so as to evaluate the common benefit work performed by applicant firms.

104. The FCC met in Atlanta, Georgia on February 8, 9 and 10, 2016, along with members of the PSC for a portion of the time to discuss the entry of the FCC Order and to discuss the upcoming work of the FCC.

105. The FCC invited the PSC to provide input and feedback into the process during this meeting and after.

106. Several members of the PSC and Executive Committee met with the FCC and expressed thoughts and opinions about the process, including some concerns, that were considered by the FCC in establishing its review process.

107.   The FCC met with the Court-appointed accountants on February 16 and 22, 2016 to discuss the time and expense submissions by firms and funds received into the MDL common benefit fund.

108.   After meeting with the Court-appointed accountants, the FCC met to begin the process of proposing a set of policies and procedures for the review of time and expense submissions for common benefit funds.

109.   During the period from March through October of 2016, the FCC consulted the Co-Lead Counsel for the MDLs regarding the appropriate policies and procedures for evaluating the common benefit contributions of applicant firms.

110.   These meetings included a meeting with the PSC on April 4 and 5, 2016, in Charleston, West Virginia.

111.   On November 3 and 4, 2016, the FCC met in Charleston, South Carolina to draft a proposed set of policies and procedures for the review of time and expense submissions for common benefit funds.

112.   On December 1, 2016, FCC Chairperson Henry Garrard appeared before the Court for the purpose of addressing the entry of an order establishing policies and procedures for common benefit fund application review.

113.   After the December 1, 2016, appearance, the FCC met via conference calls, virtual meetings, and in-person meetings to refine the proposed policies and procedures.

114.   The FCC met in Atlanta, Georgia on May 17, 2017, regarding the contents of the proposed policies and procedures for the evaluation of common benefit contributions of firms to the litigation.

115.   On June 23, 2017, the Pretrial Orders establishing the Fee Committee Protocol (the "Protocol") were entered by the Court, which established the baseline policies and procedures to be utilized by the FCC in determining the value of the common benefit work performed by each applicant firm.

116.   Shortly after the Court's entry of the Protocol, the FCC began preparations for the review of common benefit work and recommending an allocation to the Court in accordance with the Protocol.

117.   On June 26 and 27, 2017, the FCC met in Washington, DC, for the purpose of planning the process of review of time and expense submissions by firms seeking payment for common benefit work performed.

118.   The FCC focused its efforts and attention on how the time and expense submissions of firms would be evaluated for the purpose of determining the overall contribution of each applicant firm to the common benefit of the litigation.

119.   At the conclusion of the meeting, FCC members continued to discuss the timeframe and procedures that would be necessary within the requirements of the Protocol.

120.   Pursuant to the Protocol, the CPA returned to each applicant firm the time and expense documentation received by the CPA through December 21, 2016.

121.   Thereafter, each firm had sixty days in which to audit its time and confirm that the time and expense submitted was true, accurate, clear, and for the common benefit of the litigation.

122.   Once complete, each firm was to resubmit its time and expense along with an affidavit from a senior member of the firm attesting that the time and expenses submitted were for common benefit.

123.    The required affidavit was also to designate whether the party billing time was a full-time or contract employee, and to provide an individual biography not exceeding two (2) pages for each attorney billing time.

124.    The FCC received the audited time and expense from firms and accompanying affidavits in September of 2017.

125.    The FCC met on September 8, 19 and 20, 2017 in Atlanta, Georgia, and October 2 and 3, 2017 in Athens, Georgia, to plan the process of reviewing the time submissions received from applicant firms.

126.    The FCC Chairperson then met with The Honorable Daniel J. Stack, Retired, regarding his willingness and availability to serve as the External Review Specialist under the Protocol.  The FCC Chairperson also interviewed another potential candidate for the External Review Specialist.

127.    Upon appointment by the Court on October 13, 2017, Judge Stack began serving as the External Review Specialist and attended almost all meetings of the FCC.

128.    The FCC met on October 16 and 17, 2017, to establish the procedure for review of all applicant firms.

129.    The process of the Initial Review under the Protocol began in October of 2017.

130.    The FCC's methodology in evaluating the submissions of applicant firms follows the Protocol and the Court's prior common benefit orders.

131.    The FCC's review of the time and expense submissions and accompanying affidavits was conducted in accordance with the fifteen items enumerated in Section B of the Protocol, the ten factors identified in Section C of the Protocol (which are

the same as the items in Section B of the FCC Order), as well as the factors enumerated in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978).

132. The FCC assigned each firm seeking payment of common benefit funds to two members of the FCC for initial review.

133. Those two FCC members worked together to review every time and expense entry received from the applicant firm.

134. In reviewing the time and expense submissions and affidavits, the reviewers were guided by the Protocol and the FCC Order in determining the firm's contribution to the common benefit of the overall litigation.

135. The FCC continued to meet during the process of review to discuss and ensure the consistent application of the review for each applicant firm's submission.

136. The FCC was assisted in its review process by certain other attorneys who were requested to assist the FCC pursuant to Section A of the FCC Order.

137. Those attorneys were Amy Collins (Burnett Law Firm), Thomas Hollingsworth (Blasingame, Burch, Garrard & Ashley), Jeff Kuntz (Wagstaff & Cartmell), Don Migliori (Motley Rice), and Mike Moreland (Clark, Love & Hutson). These attorneys assisted the FCC in the preparation of materials for FCC meetings.

138. Upon commencement of the Initial Review of the time submission by applicant firms, the FCC recognized that some firms diligently self-audited their time entries and submitted time for review that was substantially compliant with the instructions from the Court regarding hours that would be considered as contributing to the common benefit of the litigation.

139.   Other firms made little or no changes to their time submission during the Court-ordered self-audit process, which resulted in submissions for time that did not satisfy the Court's instructions.

140.   The elimination of time that clearly did not satisfy the Court's criteria for common benefit consideration, which should have been identified in the self-audit process, resulted in the FCC's recognition of a relatively lower percentage of submitted hours as common benefit for firms that failed to adequately self-audit. Conversely, firms that made a good-faith effort to review their time submission during the self-audit period had a higher percentage of submitted time recognized as contributing to the common benefit.

141.   The FCC met on November 16 and 17, 2017 in Atlanta, Georgia to discuss ongoing reviews and ensure that all firms were receiving consistent evaluations pursuant to the Protocol.

142.   The FCC met again on December 4 and 5, 2017, in Houston, Texas, for the purpose of discussing firms whose review had been completed by the two FCC members primarily assigned the task of reviewing time submissions.

143.   The FCC met again on December 12, 13 and 14, 2017, and continued to discuss those firms whose review had been completed by the two FCC members primarily assigned the task of reviewing time submissions.

144.   Finally, the FCC met on January 5 (by telephone), 10, 23 and 24, and February 1, 2018 in Atlanta, Georgia, to complete the process of discussing those firms whose review had been completed by the two FCC members primarily assigned the task

of reviewing time submissions. During these meetings, each firm was thoroughly discussed by the entire FCC.

145.    While the number of FCC meetings was significant, far greater time was invested by FCC members between meetings.

146.    FCC members routinely worked on matters in preparation for the next FCC meeting.

147.    During its meetings from November 16, 2017 through February 1, 2018, the FCC received detailed presentations about each firm seeking common benefit compensation.

148.    Except for the telephonic meeting on January 5, 2018, the FCC's initial review meetings were conducted in-person.

149.    With the exception of a single instance where an FCC member was participating in a jury trial, all members of the FCC were in attendance at the FCC meetings during the initial review process.

150.    The FCC also consulted with the Co-Leads of the MDLs, including an in-person meeting with the MDL Co-Leads in Houston, Texas on December 5, 2017, and discussed the quality and value of the contribution of applicant firms to the common benefit of the litigation.

151.    The work of the FCC during this period was not simply to determine the number of hours that might be considered compensable, but also (and more significantly to the FCC) the quality of those hours and the overall value a firm contributed to the common benefit of the litigation.

152.    As each firm was discussed, the FCC decided which time entries would (at that stage) be considered as common benefit, which time entries were deemed of no compensable value, and which entries required additional information in order for the FCC to properly evaluate the submission.

153.    During discussions of firms, the FCC evaluated the nature of the legal work reflected in the time submissions.

154.    The FCC considered for each firm whether the work for which time was submitted was performed by attorneys or non-attorney staff, and the experience and seniority of the attorney performing work, as well as whether multiple lawyers or firm members were performing the same or similar tasks that could appropriately be handled by a single attorney

155.    The FCC discussed the nature of the work and the role of the applicant firm as reflected in the time submissions, including for example whether the firm was engaged in document review, expert identification and preparation, written discovery, depositions, trials, briefing or appellate work, or settlement negotiation.

156.    With regard to the venue of cases, and in accordance with the Court's instruction in the FCC Protocol, the FCC considered whether trial work was performed within the MDLs or in various state courts, and the extent to which it contributed to the outcome of the litigation and benefited the MDL.

157.    In addressing trials, the FCC considered whether a trial was the first successful trial of a particular mesh product, whether the trial attorneys created common benefit materials and shared such materials with other plaintiffs' firms within the litigation without compensation (and at what point in time that material was shared), and

whether the trial attorneys consulted with MDL leadership in case selection, trial preparation and trial strategy.

158.   The FCC considered whether a firm participated in a lead role, a back-up role, or was simply an observer of the activity in the litigation.

159.   As directed in the Protocol, emphasis was placed on work product and materials that were provided to Plaintiffs' counsel to prepare for trial.

160.   In some instances, the low quality of information delivered to the FCC by the applicant firm made it impossible for the FCC to identify any common benefit derived from the submitted time.

161.   The foregoing examples are not meant to be exhaustive but are meant to be illustrative of the attention given to each firm during the Initial Review. Throughout the Initial Review, the FCC was mindful of the Court's instruction that "the over-arching guideline that the FCC must consider is the contribution of each common benefit attorney to the outcome of the litigation."

162.   The FCC received time entries totaling more than nine hundred thousand (900,000) hours.

163.   The FCC reviewed every time entry from every firm in conducting its Initial Review.

164.   Where the FCC had questions requiring further evaluation of applicant firms, the FCC members continued their review and returned at subsequent meetings to respond.

165.   No applicant firm's time was approved for distribution to the firm until the FCC unanimously approved the time.

166.  On February 16, 2018, the FCC provided its Initial Review to the applicant firms.

167.  Each firm received a letter detailing the process utilized by the FCC along with four exhibits. Exhibit A identified those time entries where the FCC found that there was no compensable basis for the time. Exhibit B identified those time entries requiring more information from the applicant firm. Exhibit C identified the dates beyond which the FCC determined that time did not contribute to the common benefit of the litigation. Exhibit D set forth categories of expenses which applicant firms were to remove from their submission. A true and correct example of the letter sent to each firm is attached hereto as **Exhibit 2**.

168.  The letter to each firm instructed the applicant firm how and when to respond and also provided the reasons why time was placed on Exhibits A and B for that firm.

169.  Each letter was unique and tailored to the specific firm providing only those reasons that were applicable to the particular firm's time.

170.  Firms were required to provide an affidavit in the format provided in the Protocol signed by a senior firm member setting forth the reasons, grounds and explanation for the Firm's entitlement to common benefit fees under the factors outlined in the FCC Order and in the FCC Protocol.

171.  Firms were also given the opportunity to provide a response for each time entry that the firm believed was placed on Exhibit A or B in error, and to provide revised expenses in accordance with the instructions given.

172.  For any firm that did not provide a complete response, the FCC sent letters on April 18, 2018, requesting that the applicant firm complete its response.

173.   After receipt of the affidavits and responsive materials from the firms, the FCC once again reviewed each time entry for which the applicant firm sought reimbursement, as well as their affidavits, in order to further evaluate the contribution made by each firm to the common benefit of the litigation.

174.   The FCC met on March 29 and 30, 2018 in Atlanta Georgia. During the meeting the FCC received presentations from its members regarding the responses received from applicant firms.

175.   The FCC discussed and decided on whether time submissions placed on Exhibits A and B delivered to the firms should be considered as compensable.

176.   Revised expenses were reviewed by FCC members in the same manner as had previously been used for the evaluation of time entries.

177.   The FCC also heard reports and discussed the amount of expenses for consideration for each applicant firm.

178.   The meetings of the FCC continued and were conducted on April 23, 24 and 25, 2018 and May 7, 2018 in Atlanta, Georgia.

179.   In addition, there was an FCC conference call conducted on May 2, 2019, to address firms' time and expense and affidavit review.

180.   As discussed above, the FCC's focus during its review of responses of applicant firms was not directed toward a mechanical calculation of the numbers reflected in time and expense entries. Rather, the FCC endeavored to analyze the benefit and value of the work reflected in these submissions in light of each firm's role in the litigation and in accordance with the Court's directives set forth in the common

benefit orders, based on the FCC's experience in the litigation and the materials and information submitted by each Firm.

181.   Specifically, the FCC considered the final time and expense submissions and affidavits of each firm in light of the items enumerated in Section B of the Protocol, the factors enumerated in Section C of the Protocol, and the factors set forth in *Barber v. Kimbrell's, Inc.*

182.   On May 18, 2018, the FCC delivered to each applicant firm the results of the FCC's evaluation of the firm's affidavit and materials in response to the Initial Review. A true and correct example of the letter sent to each firm is attached hereto as **Exhibit 3**.

183.   At that time, the FCC notified each firm of the hours and expenses that the FCC found to be eligible for consideration as common benefit.

184.   In accordance with Section D of the Protocol, each firm was given notice of the opportunity to be heard by the FCC.

185.   The letter provided to each firm was accompanied by a revised version of Exhibits A and B reflecting the FCC's decision to allow or disallow each entry based upon the information provided by the applicant firm in its final submission of time, expense and its affidavit.

186.   The letter provided instructions on how to request an opportunity to be heard by the FCC.

187.   Of the ninety-four firms whose time was reviewed, twenty-seven elected to be heard by the FCC.

188.  The FCC conducted in-person meetings with representatives of each firm who made a request.

189.  The FCC conducted in-person meetings in Charleston, West Virginia on June 12, 13, 14 and 15, 2018, and in Atlanta, Georgia on July 17, 18 and 19, 2018.

190.  In accordance with Section C. of the FCC Order, each firm was permitted to "present the reasons, grounds, and explanation for their entitlement to common benefit," and was generally allowed to be heard by and to discuss with the FCC any matter of its choosing during these in-person meetings.

191.  The FCC received and considered all of the oral presentations of all applicant firms who availed themselves of this opportunity.

192.  Based on the presentations of firms, the FCC reviewed, and where appropriate, revised the hours or expenses considered for common benefit.

193.  Additionally, the FCC met and discussed the presentation of firms in light of the value that each firm contributed to the litigation.

194.  At the conclusion of the in-person meetings, the FCC finalized the number of hours and amount of expenses for its preliminary recommendation.

195.  The FCC met on August 1 and 2, 2018 in Atlanta, Georgia for the purpose of finalizing its allocation of funds available for compensation of common benefit.

196.  In so doing, the FCC relied upon its detailed knowledge and understanding of the work performed accumulated throughout the process of thoroughly reviewing each firm's time and expense submissions, affidavits, written materials accompanying affidavits, and in-person meetings.

197. The FCC also relied upon the collective personal knowledge and experience of its members in this litigation and the input received from other leadership within the litigation.

198. The process of allocating the potential fund was not a new process for the FCC, rather it was the continuation of the process that began with the entry of the FCC Order.

199. Members of the FCC continued to meet on August 15, 2018 in Washington, DC and discussed the allocation of the potential fund for common benefit.

200. The FCC met again on August 21, 2018, in Atlanta, Georgia to continue its discussion of the allocation of potential funds for common benefit awards.

201. At the request of the FCC, the Chairperson proposed a series of awards utilizing a percentage of the funds for each of the applicant firms.

202. The FCC then addressed each of the firms individually and discussed whether the proposed percentage award was appropriate.

203. The percentage value assigned to each firm was then adjusted to reflect the decision of the FCC for each firm.

204. Some adjustments were upwards, some downwards and some remained unchanged.

205. In discussing an appropriate percentage for the applicant firms, the FCC was again guided by their experience and familiarity with the litigation, the nature and value of the work performed, the FCC Order and the FCC Protocol with focus being given to the items enumerated in Section C of the Protocol and the *Barber* factors.

206. Only FCC members participated in the discussion and decision regarding the allocation of common benefit funds. Attorneys who assisted the FCC in its review

process did not participate in the decision by the FCC regarding allocation of funds to applicant firms.

207. The FCC did not request any information regarding billing rates utilized by applicant firms.

208. The FCC did not apply a formulaic or grid approach whereby an applicant's recommended common benefit award was the sum of points or the product of an "hours x rate x multiplier" equation.

209. The FCC observed that the hours submitted by firms varied widely in quality, with some applicants submitting significant numbers of hours of limited value, while others submitted fewer hours that provided substantial benefit to the litigation.

210. The FCC identified its directive under the Protocol to focus on (and reward) firms based on their substantive contributions rather than the bulk submission of hours.

211. Upon the completion of the allocation process, the FCC was unanimous in its agreement that the process used throughout the review of time and expense was performed in accordance with the Court's Orders and the applicable legal authority, and the FCC was unanimous in its agreement to the amounts allocated to each firm in the Preliminary Written Recommendation.

212. The FCC met and collectively prepared the materials for distribution of the FCC's Preliminary Written Recommendation on September 11, 2018.

213. The FCC reviewed the information being delivered to each applicant firm and discussed the Protocol with regard to the Preliminary Written Recommendation, the opportunity for objections thereto and the Final Written Recommendation.

214.   The FCC's Preliminary Written Recommendation was delivered to all applicant firms on September 13, 2018. A true and correct example of the letter sent to each firm is attached hereto as **Exhibit 4**.

215.   Applicant firms were permitted to make any objection to the Preliminary Written Recommendation on or before September 28, 2018.

216.   Of the ninety-four firms receiving the Preliminary Written Recommendation, the FCC received objections from 24 firms.

217.   The FCC considered the written objections of firms and met on October 22 and 23, 2018, in Athens, Georgia to deliberate and discuss the objections.

218.   The FCC then continued to confer regarding objections, and on November 16, 2018, the FCC met to approve the form and content of the FCC's Final Written Recommendation.

219.   The FCC's Final Written Recommendation includes the FCC's consideration of the objections made to the Preliminary Written Recommendation.  In response to those objections, the FCC decided to modify some of the awards to firms seeking common benefit funds.

220.   After consideration of the objections, the FCC unanimously agreed to its proposed allocation of funds for compensation of common benefit to each applicant firm as set forth in the Final Written Recommendation.

221.   The FCC received certain objections from counsel to its Preliminary Written Recommendation.

222.   Based upon the objections received, the FCC revisited its preliminary recommendations with an eye toward ensuring compliance with the Courts

directives in the applicable pretrial orders, with careful attention paid to recommending awards on a firm-by-firm basis that reflected as accurately as possible the value provided by that firm to MDL claimants.

223.    The FCC did not use an hourly rate method in arriving at its percent allocation for each applicant firm. However, in an effort to ensure that the method employed by the FCC delivered a fair result, the FCC performed a review of the effective hourly rates resulting from its percentage award set forth in its Preliminary Written Recommendation.

224.    The FCC reviewed and considered each of the effective hourly rates for the applicant firms and determined that the result was consistent with the FCC's determination of the appropriate percentage award, which was determined in accordance with the factors and instructions set forth in the FCC Protocol and the Court's prior common benefit orders.

225.    Having conducted this additional crosscheck of its recommended allocations, the FCC unanimously agreed to its proposed allocation of funds for compensation of common benefit to each applicant firm as set forth in its Final Written Recommendation.

226.    The FCC was well-informed of the substantive contributions made by each applicant firm and endeavored to appropriately recognize those contributions.

227.    The FCC exhaustively reviewed all of the facts and information provided by common benefit applicant firms, applied the principles and complied with the directives established in the Court's protocol, and relied upon its experience and familiarity with the litigation and with the facts, providing multiple opportunities

to provide and receive input by common benefit applicant firms in writing and in person.

228.   The FCC, through carrying out the process in the Protocol, allowed firms seeking payment for common benefit work to participate in the process of evaluation and provide additional information to the FCC including: (1) allowing firms to self-audit their time prior to consideration by the FCC; (2) allowing firms to respond to the comments delivered as a result of the FCC's initial review; (3) allowing firms to appear for an in-person opportunity to be heard; (4) allowing firms to provide a written objection from the FCC's preliminary written recommendation; and (5) allowing firms to provide a written objection to the FCC's final written recommendation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2018.

_____

Henry G. Garrard, III
Blasingame, Burch, Garrard & Ashley, P.C.
440 College Avenue
P.O. Box 832
Athens, Georgia 30603
706-354-4000
706-549-3545 fax
hgarrard@bbga.com

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

In re American Medical Systems, Inc. Pelvic Repair System          MDL No. 2325
Products Liability Litigation

THIS DOCUMENT RELATES TO ALL CASES

_____

**PLAINTIFFS' PROPOSED COUNSEL ORGANIZATIONAL STRUCTURE**

COME NOW, the Plaintiffs represented by the undersigned counsel, with the unanimous support of the counsel listed hereinbelow, and filed their proposed their Proposed Counsel Organizational Structure in accordance with Paragraph 3 of the Initial Conference and Case Management Order (Pretrial Order No. 1).

**Proposed Organizational Structure**

As discussed in Section 14.211 of the Manual for Complex Litigation (Fourth), "private ordering" is the recommendation of attorneys with related actions for a particular organizational structure to manage and conduct the litigation, and if adequate to represent the interests of the litigants involved in the proceeding, is one of the methods that Courts have generally used to appoint common benefit counsel in mass tort litigations. In the related context of class action counsel selection, the Third Circuit Task Force on the Selection of Class Counsel observed in its Final Report that "[m]uch of the time [class action plaintiffs' counsel] work out among themselves a voluntary plan to allocate responsibility, often referred to as 'private ordering.'" *Selection of Class Counsel*, Final Report, Section I.D., p. 6.[1] As the Task Force recognized,

_____

[1] This Report is available on-line at:
http://www.ca3.uscourts.gov/classcounsel/final%20report%20of%20third%20circuit%20task%20force.pdf (last viewed 3/8/12).

"[c]ase law and experience indicates that the dominant scenario for appointing class counsel is deference to private ordering," further noting that there is generally no reason to consider alternatives to this structure "when the court is presented with qualified counsel who have been chosen through private ordering." Id., Section XII, p. 95.

Private ordering of a proposed organizational structure for the Plaintiffs in these related MDL's is necessary to allow the Plaintiffs to compete on a more level playing field with the Defendants, some of the largest medical device manufacturers in the world.  Unlike the Defendants and their counsel, counsel for the Plaintiffs in this litigation must merge quickly to create strategic alliances amongst themselves in order to litigate against several of the world's largest law firms.  Without private ordering of counsel structure, the Court is faced with the challenge of selecting from plaintiffs' law firms who are often competing with each other for "market share," and for leadership positions.  While it is the Court's obligation to appoint the leadership in these MDL's, the undersigned submit this suggested organizational structure that is being proffered by coordinating and cooperating counsel for Plaintiffs as a proposal to aid the Court.  The proposal comes as a result of meetings and much discussion among various counsel representing plaintiffs in these related women's pelvic repair product liability MDLs (MDL 2187; 2325; 2326; and 2327).  In circumstances like these related MDL's where a large number of Plaintiffs' counsel have made extensive efforts to organize themselves, the Court's role in the appointment-of-counsel process is hopefully assisted, and perhaps guided by that cooperative effort.  The structure proposed herein will avoid the potentially disorganized and inefficient leadership that can result from an organizational structure composed of competing applications.

The undersigned have met and conferred extensively with many of the attorneys who represent or who will represent Plaintiffs in this MDL in an effort to reach a consensus as to a

proposed counsel structure for purposes of this MDL, and for the related MDL's involving

similar products (MDL No. 2326 (In re: Boston Scientific Corp. Pelvic Repair Systems Products

Liability Litigation) and MDL No. 2327 (In re: Ethicon Pelvic Repair System Products Liability

Litigation)).[2]  Much thought and work has gone into the organizational structure proposed

herein.  This structure is the product of numerous meetings and many more conversations by

attorneys from across the country who have devoted a substantial amount of time, effort and

resources into the investigation and development of these cases, and who are committed to

working together for the mutual interests of their respective clients.  Counsel who have led these

discussions have been actively involved in the leadership of MDL 2187, and also have had

extensive experience with mesh litigation pending elsewhere.  In crafting these proposals, the

experience in managing existing MDL's involving mesh products both in this Court and other

courts has been a guide.

Several months ago, a group of attorneys who have been actively involved in the

litigation relating to these products began discussing how to address the many problems inherent

in having a case involving a single plaintiff implanted with multiple pelvic repair products

manufactured by different companies (including the counsel signing this petition, Henry G.

Garrard, III, Fred Thompson and Bryan Aylstock).  Because of this one-plaintiff/multi-defendant

factor, and the multiple factual and legal commonalities in these cases that transcend company

lines, it was recognized that having these cases before a singular tribunal made practical sense.[3]

Counsel for several women implanted with pelvic repair products sold by AMS, Boston

Scientific, and Ethicon/Johnson & Johnson, including the counsel making this proposal,

---

[2] This proposal also will suggest changes to the leadership structure in the existing MDL 2187 to
have all four (4) MDLs operate under a cohesive and consistent structure.

[3] Many of the common factual and legal issues that span these four related MDL's are outlined in
the Plaintiffs' Preliminary Position Statement, which is being filed contemporaneously herewith.

ultimately filed separate motions for MDL treatment of those cases seeking transfer to this Court for coordination with the related Bard cases already pending here. In its Transfer Order, the MDL Panel agreed that "[t]he actions in each MDL share factual issues that arise from the allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific and Ethicon/Johnson & Johnson, respectively," and that this Court "is currently presiding over MDL No. 2187, which involves claims of defects in similar pelvic surgical mesh products." (MDL Transfer Order, p. 2). The Panel further noted that "a number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. Centralization of these three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions." Id. For the same reasons that MDL centralization for these three MDL's before this Court was deemed appropriate, these MDL's should have an organizational structure that is cohesive and coordinated across MDL lines.

Each of these MDL's will involve common questions of fact and law that will need to be addressed. For example, all of the devices share a common regulatory lineage, and many of the products at issue in these MDL's are fruit of the same cross-pollinated "family tree" of products. As explained in Plaintiffs' motion filed with the Panel, each of these four manufacturers sought FDA clearance for their respective pelvic repair devices through the FDA's § 510(k) application process, wherein a device is allowed to be marketed if it is deemed "substantially equivalent" to a previously cleared "predicate device" – even if the prior device was marketed by a manufacturer other than the applicant.[4] Several of the AMS, Bard, Boston Scientific, and

---

[4] A device is "substantially equivalent" to a predicate device if it: "(i) has the same technological characteristics as the predicate device, or (ii) (I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device

Ethicon/Johnson & Johnson pelvic repair products were represented to the FDA to be "substantially equivalent" to products sold by one or more of these other defendants. The interrelationship between these products is but one significant issue that lends itself to coordinated investigation across MDL lines.

The serious health risks generally associated with these women's pelvic repair products also warrant legal inquiry that is not confined to a single product or manufacturer. As discussed in Plaintiffs' MDL motions, the FDA issued public health warnings in 2011 wherein it observed that the serious complications generally associated with these products are not unique to any particular device or company, stating that "[t]he complications associated with the use of surgical mesh for POP repair have not been linked to a single brand of mesh." (See, e.g., Case 2:10-md-02187, Dkt. No. 73-1, p. 1). Plaintiffs submit that the problems associated with transvaginal mesh products are inherent in the use of mesh in the female pelvic region, and thus are not limited to any one product. Instead, these are issues that need to be explored and addressed globally. Many experts for both Plaintiffs and Defendants will traverse company and product lines. The efficient conduct of these cases will require coordination by Plaintiffs' counsel across MDL lines, while still maintaining the four MDL's. Additionally, discovery relating to corporate liability issues will involve common themes, and coordination between the four MDL's will be beneficial.

Finally, the defenses will largely be the same in each MDL, regardless of the product or manufacturer, specifically the "blame the doctor/blame the plaintiff" defense. In September

---

contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary…, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device." 21 U.S.C. § 360c(i)(1)(A).

2011, the FDA convened a hearing to discuss safety concerns relating to pelvic repair products. [5] At that hearing, the manufacturers of transvaginal mesh products (including each of the defendants in the respective MDL's now before this Court) were represented by AdvaMed, the world's largest medical technology association representing medical device manufacturers. (See, Excerpt of Transcript of FDA hearing attached hereto as "**Exhibit 1**," p. 132).  At the hearing, these manufacturers did not try and differentiate between their respective products – or the reasons that women were experiencing problems.  Instead, they asserted the same explanation that the Court can expect to hear in every case in this litigation: "it is the doctor's and/or patient's fault."  AdvaMed took the position at the hearing that complications generally associated with all pelvic repair products are the result of patient-related factors and/or factors relating to the doctors who implanted the devices – rather than the products themselves.  Dr. Piet Hinoul, Ethicon/Johnson & Johnson's Medical Director for Women's Health and Urology, addressed the Panel on behalf of AdvaMed, Id. at 133 and 140-149, and stated:

> One of the most important questions we need to ask ourselves is also why these adverse events [associated with pelvic repair mesh devices generally] are occurring.  And the risk factors for mesh exposures are becoming more and more apparent.  Several studies published this year show that hysterectomy, patient age, smoking, diabetes, and surgeon experience predispose patients to mesh exposure.

> In light of the interrelationship between the products, the serious health problems

generally associated with these devices, and the commonality of the defenses anticipated in every case, a coordinated and unified leadership that spans the four related pelvic repair product MDL's before this Court is essential to the effective and efficient prosecution in these cases.

---

[5] The legal implications of the FDA Committee's findings and proposals, and the FDA's actions with respect thereto – including the potential reclassification of POP mesh devices, the institution of studies to assess the risks and benefits of vaginal mesh products, as well as expanded post-market monitoring of the performance of these devices – are common issues that will be presented in every case, irrespective of manufacturer.

Several issues relating to damages, causation, and defectiveness of design and manufacturing will be similar as to each MDL defendant for the pelvic organ prolapse products, and likewise with respect to the stress urinary incontinence devices, irrespective of manufacturer. Consequently, cross-MDL coordination will again lead to efficiency.

While it cannot be represented that the proposal herein has the unanimous support of every attorney representing every plaintiff in this MDL or that may become a part of this MDL, the undersigned can represent to the Court that this proposal enjoys a broad consensus among many law firms throughout the country that have participated in the efforts to organize this litigation for several months.  The undersigned, as well as the individual counsel listed hereinbelow, unanimously support this proposal.[6]  The expeditious, economical and just resolution of these MDL's can best be achieved by a leadership structure composed of counsel who collectively have the willingness and availability to commit to this time-consuming and expensive litigation, and who have the requisite professional experience in handling complex medical device mass tort litigation.  Perhaps most importantly, because of the interrelationship between these MDL's in terms of common product defect allegations, similar injuries, and the prevalence of cases involving multiple products by the various defendants, the leadership structure in these MDL's should be composed of attorneys who have the ability and the expressed desire to work with one another in a concerted effort to seek a timely and just resolution of these cases.

As set forth in more detail below, the undersigned propose a Coordinating Co-Lead Counsel, an Executive Committee made up of Co-Leads for each MDL, and a singular PSC all to

---

[6] The individual attorneys listed in the proposed organizational structure hereinbelow will be filing separate applications in accordance with Paragraphs 18 and 19 of the Initial Conference and Case Management Order (Pretrial Order No. 1).

coordinate across MDL lines. If such proposal is accepted by the Court, then the Coordinating

Co-Lead Counsel in conjunction with the Executive Committee will be able to work across MDL

lines in conjunction with one PSC to determine which lawyers are best suited to handle a given

task, be it common corporate discovery, expert identification, deposition preparation, motions

practice and brief drafting, trial teams, and other similar matters that will develop as this

litigation progresses. Many of these tasks will not be MDL-specific, but rather will be common

issues that will need a coordinated effort. It is also the intent that the Coordinating Co-Lead

Counsel will be in a position to determine when separate groups from the PSC should be

designated to work on MDL-specific issues that do not cross MDL lines. However, it is vital to

this proposal that there be a cohesive and coordinated structure that spans these four related

MDL's so as to best achieve the efficiency and effectiveness of representation that will move this

litigation forward.

While the size of the proposed Plaintiffs' Steering Committee is large for a typical single

MDL, this proposal calls for a singular PSC to coordinate across MDL lines in four separate

MDL's, each of which involves a different manufacturer (and related defendants in some cases)

and several different products.[7] In light of the number of defendants[8] and products involved in

these four MDL's, the size of this PSC is both appropriate and necessary. The undersigned

submit that a PSC composed of a significant number of attorneys is necessary to accommodate

---

[7] Recent product liability MDL's have had large PSC's, such as DePuy ASR (MDL 2197) with 34 attorneys, and DePuy Pinnacle (MDL 2244) with 42 attorneys. These two DePuy hip replacement MDL's both involved a single product and a single manufacturer whereas the four MDL's at issue herein involve multiple different manufacturers (and related defendants), and dozens of related pelvic repair devices. It is anticipated that the number of cases to be filed in the four MDL's will be significantly greater than in both of the hip replacement MDL's combined.

[8] All of these Defendants are represented by large national defense law firms with hundreds, if not thousands of attorneys, all of whom will be coordinating their defense efforts in this litigation.

the large amount of work that will be necessary to prepare these cases effectively, and with many coordinated litigation activities occurring simultaneously across MDL lines.  The manpower and womanpower will be essential.  The Coordinating Co-Lead Counsel in conjunction with the Executive Committee will be responsible for coordinating the efforts of the members of the PSC.

Based on the foregoing, the undersigned respectfully submit the following proposed counsel structure for the Plaintiffs in this litigation: [9]

## COORDINATING CO-LEAD COUNSEL

Bryan F. Aylstock; Henry G. Garrard, III; Fred Thompson, III.

## EXECUTIVE COMMITTEE

Bryan F. Aylstock; Tom Cartmell; Clayton Clark; Amy Eskin; Henry G. Garrard, III; Derek Potts; Fred Thompson, III; Aimee Wagstaff.

## CO-LEAD COUNSEL, *IN RE: C.R. BARD, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2187)

Henry G. Garrard, III; Derek Potts.

## CO-LEAD COUNSEL, *IN RE: AMERICAL MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2325)

Amy Eskin; Fidelma Fitzpatrick.

## CO-LEAD COUNSEL, *IN RE: BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2326)

Clayton Clark; Aimee Wagstaff.

## CO-LEAD COUNSEL, *IN RE: ETHICON, INC., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION*  (MDL 2327)

Renee Baggett; Tom Cartmell.

## CO-LIAISON COUNSEL

Harry Bell; Paul Farrell; Carl Frankovitch.

---

[9] The following counsel are listed in alphabetical order.

**SINGULAR PLAINTIFFS' STEERING COMMITTEE**

David Allen; Tom Anapol; Ben Anderson; Richard Arsenault; Bryan Aylstock; Renee Baggett
Lee Balefsky; Harry Bell; Ed Blizzard; Lisa Blue; Riley Burnett; Tom Cartmell; Clayton Clark;
Jayne Conroy; Erin Copeland; Martin Crump; A. J. De Bartolomeo; Amy Eskin; Paul Farrell, Jr.;
Fidelma Fitzpatrick; Yvonne Flaherty; Wendy Fleishman; Pete Flowers; Carl Frankovitch;
Henry G. Garrard, III; Michael Goetz; Tim Goss; Jeff Grand; Todd Harvey; Stacy Hauer; Scott
Love; Victoria Maniatis; Dave Matthews; Rick Meadow; Karen Menzies; Mike Miller; Doug
Monsour; Mark Mueller; Dianne Nast; Leigh O'Dell; Joe Osborne; Michelle Parfitt; Jerry Parker;
Chris Placitella; Derek Potts; Robert Price; John Restaino; Bill Robins; J.R. Rogers; Robert
Salim; Joe Saunders; Laurel Simes; Hunter Shkolnik; Fred Thompson, III; Josh B. Wages;
Aimee Wagstaff; Ed Wallace; Kim Wilson; Laura Yaeger; Joe Zonies.

This 19th day of March, 2012.

By: /s/ Henry G. Garrard, III
   Henry G. Garrard, III
   hgg@bbgbalaw.com
   Georgia Bar No. 286300

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
 (706) 354-4000
(706) 549-3545 (fax)

By: /s/ Fred Thompson, III
   Fred Thompson, III
   fthompson@motleyrice.com
   South Carolina Bar No. 5548

Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9118

By: /s/ Bryan F. Aylstock
   Bryan F. Aylstock
   BAylstock@awkolaw.com
   Florida Bar No.: 078263

Aylstock, Witkin, Kreis & Overholtz
17 E. Main Street, Suite 200

Pensacola, Florida 32502
(877)810-4808
(850)916-7449 (fax)

# Exhibit 2

# BBGA BLASINGAME · BURCH · GARRARD & ASHLEY, P.C.
### Attorneys at Law

W. SEABORN ASHLEY
1947–2001

J. RALPH BEAIRD
1925–2014

E. DAVISON BURCH
of counsel

LEANNA B. PITTARD
of counsel

GARY B. BLASINGAME

HENRY G. GARRARD III

ANDREW J. HILL III

THOMAS H. ROGERS JR.

MICHAEL A. MORRIS

JAMES B. MATTHEWS III

RICHARD W. SCHMIDT

EVAN W. JONES

GEORGE W. BROWN III

DAVID A. DISMUKE

MOLLY K. TALLEY

JOSH B. WAGES

THOMAS F. HOLLINGSWORTH III

ALVIN L. BRIDGES

LEE S. ATKINSON

MICHAEL RUPPERSBURG

PATRICK H. GARRARD

SARA E. SCHRAMM

THOMAS J. JEFFORDS

HALEY C. ROBISON

P.O. Box 832
Athens, Georgia 30603
440 College Avenue, Suite 320
Athens, GA 30601
Phone 706.354.4000
Fax 706.353.0673

1021 Parkside Commons
Suite 104
Greensboro, GA 30642
Phone 706.453.7139
Fax 706.453.7842

PLEASE REPLY TO
ATHENS ADDRESS

Henry G. Garrard, III
hgarrard@bbga.com

***Sent Via E-Mail***
RECIPIENT FIRM CONTACT
RECIPIENT FIRM
E-MAIL ADDRESS


RE:     Transvaginal Mesh MDL Common Benefit Fee and Cost Committee
        Initial Review of Fee Submission

Dear RECIPIENT:

I am writing to you on behalf of the Common Benefit Fee and Cost Committee appointed by the Honorable Joseph R. Goodwin with regard to MDL Nos. 2187, 2325, 2326, 2327, 2387, 2440, and 2511 (the "FCC"). The FCC is in the process of applying to the Court for an order awarding five percent of the gross value of all resolved cases for the purpose of payment of common benefit fees and expenses. If approved, the five percent award would then be available for distribution to firms seeking common benefit compensation through the FCC process. Likewise, the FCC is in the process of reviewing submissions from firms seeking reimbursement of professional time and expense associated with work that was to the common benefit of the MDL litigation in accordance with the Fee Committee Protocol established by the Court. At this time, the FCC has completed its Initial Review of your fee submissions. Once the final compensable time is established through the process outlined in the Fee Committee Protocol, the FCC will finish evaluation of expense submissions.

The challenge of reviewing the time and expense submissions is substantial. There were approximately 900,000 hours submitted to the FCC for review. The FCC has carefully reviewed each time submission and has met with the co-leads of the MDL to discuss the contributions made by each firm to the MDL common benefit. All time entries have been evaluated by the FCC under the criteria as set forth in the Fee Committee Protocol and the Orders of the Court. The time and expenses submitted by the firms who have a member on the FCC have been evaluated under the same protocol, rules and criteria. **Under the rules of the FCC, individual members of the committee cannot discuss your submission with you.** You will have the opportunity, if you desire, to discuss any issues you have in accordance with the Fee Committee Protocol. You must submit a response to the FCC by affidavit, in accordance with the terms of the Court's Fee Protocol Order.

Consistent with the Court's orders regarding common benefit – as well as applicable case law – the number of hours expended by a firm is simply one of numerous factors guiding the FCC's impending recommendations. As you are all aware, the court has outlined many criteria to apply in analyzing the overall contributions of firms and lawyers. Hours claimed are a factor but overall contribution in accordance with the court protocol are very important and significant.

As an initial matter, you submitted XXXX hours to be considered as common benefit time. After careful review the FCC has determined that certain hours that you submitted were not for the common benefit. The FCC's Initial Review has determined that XXXX hours of that total were not for the joint and common benefit of plaintiffs and claimants whose claims have been treated by the MDL Court as part of the MDL proceedings. *See,* Exhibit A attached hereto. The reasons for the FCC's reduction of these hours include:

1.  INDIVIDUALIZED EXPLANATIONS WERE PROVIDED FOR PLACEMENT OF TIME ENTRIES ON EXHIBIT A

If you have an issue with these reductions by the FCC, then include in your final Affidavit reasons explaining why you should receive reimbursement from the common benefit fund for those items described above. In providing your explanation, you should address why the time "deemed by the FCC not to be 'for the joint and common benefit of plaintiffs and claimants whose claims have been treated by this Court as part of these proceedings'" should nevertheless be compensated. *See*, Fee Protocol Order § B, p. 3.

Additionally, the FCC also identified XXXX hours of your submitted time that the FCC believes should not be recognized as common benefit or should be reduced. *See,* Exhibit B attached hereto. The FCC identified the following issues upon its completion of its initial review of your time:

1.  INDIVIDUALIZED EXPLANATIONS WERE PROVIDED FOR PLACEMENT OF TIME ENTIRES ON EXHIBIT B

Your Affidavit "shall set forth the reasons, grounds and explanation for the Firm's entitlement to common benefit fees," for those categories of time as identified in 1 through 5 immediately above.

The FCC, as a policy, believes that time submissions of fifteen hours or more in a day are *per se* excessive. Additionally, the FCC looked at many tasks where the submitted time is believed to be excessive in relation to the task. The time that the FCC included on Exhibit A indicates that in the judgment of the FCC and under the Court's Orders that time was not expended for the common benefit of the claimants in the pelvic mesh MDLs. The FCC, as a further policy, believes that all time submitted for law clerks was not of value to the common benefit of the claimants in the pelvic mesh MDLs. There are also date ranges in which the FCC anticipates compensable time will occur. Within the exhibits to this letter is a sheet identifying the creation date for each MDL and the end date for common benefit work for each MDL. *See* Exhibit C attached hereto.  Time submission outside of these date ranges will be evaluated with close scrutiny regarding whether common benefit was derived from those entries.  As a general proposition, the Committee does not believe such time is compensable.

The FCC, in accordance with the Court's Orders, has established criteria for the evaluation of expense submissions. The FCC determined that certain categories of expense were not expended for the common benefit of the claimants in the pelvic mesh MDL's. Within the exhibits to this letter is a sheet identifying those categories of expense that are NOT of common benefit. *See* Exhibit D attached hereto. The FCC requests that you review your expenses and remove any request for reimbursement of expenses identified in the exhibit as not being for the common benefit. **Your final time submission should not include requests for reimbursement of expenses identified in the attached exhibit. Additionally, when time has not been allowed as set forth in Exhibit A, expenses related to that time should be removed.**

The FCC membership is familiar with the challenges associated with trial preparation and is aware of the operation of a modern law practice. In an effort to address instances of significant duplication of time entries by multiple persons on the same date, the FCC has allowed two persons from a law firm to bill while not accepting any duplicative entries by greater than two persons per firm. This was done as an accommodation to firms. There are many instances where multiple people billed for the same task such as "receipt and review" of a document. This is not allowable under the Court's Protocol. On the other hand, where there is an actual trial that is deemed to have benefitted the MDL process, the FCC has been more liberal.

In accordance with the Court's Orders, your firm has thirty (30) days from the date of this letter in which to review the information accompanying this letter and submit your firm's final affidavit for review. The process for completing your response is as follows:

1. In the spreadsheets delivered as Exhibits A and B with this letter, a column has been added under the heading "Comments From Requesting Firm". Please add any information or explanation you deem significant for the FCC to review in making its final evaluation of the time submission. The information provided within this column cannot exceed 75 characters within any particular cell. This response will be considered your final time submission by the FCC.

2. Revise your request for expenses to be reimbursed in accordance with Exhibit D. Additionally, where expenses have been submitted for time that is not allowed as reflected on Exhibit A, the corresponding expenses should be deleted. Deliver your revised expense request spreadsheet reflecting only those expenses eligible for reimbursement as being for the common benefit of all plaintiffs and claimants.

3. Prepare the affidavit set forth under the Fee Committee Protocol in conformity with Exhibit 4 set forth in the Protocol Order including your response to the issues identified herein.

4. Deliver any comments to Exhibits A and B, your final expense submission in compliance with Exhibit D, and the affidavit to me as Chairman and to the accountant, John Jenkins, within thirty (30) days of receipt of this letter. No other submissions will be accepted by the FCC for review. Only the timely delivery of these materials will be considered by the FCC.

As a reminder for firms claiming less than 20,000 hours, you are limited to an affidavit of twenty (20) pages, and if you are claiming over 20,000 hours, the limit is twenty-five (25) pages. The

process identified above gives you the opportunity to provide comment on any time identified by the FCC as being not for the common benefit. Completion of the process constitutes the delivery of your final time and expense in accordance with the Fee Committee Protocol.

Upon timely submission of the required materials, you may request an in-person meeting between a representative of your firm and the FCC in which there will be an opportunity to be heard on all matters concerning the final submission of time and expenses by your firm. Should you choose to do so, you will be expected to present on issues identified by the FCC regarding the compensability of the time submitted by your firm. Please be aware that as a result of any meeting with the FCC, the amount of time found to be for the common benefit could be increased or reduced for your firm. The meeting will take place in Charleston, West Virginia at the Robert C. Byrd United States Federal Courthouse. Additional information on dates and times will be circulated after consultation with the Honorable Joseph R. Goodwin regarding availability. If you agree with the FCC's review of your time, you will not need to schedule an in-person meeting. The Court appointed Judge Dan Stack to assist the FCC. Judge Stack will participate in all of the meetings that occur.

After completion of those meetings, the FCC will deliberate and provide its preliminary written recommendation to you. In accordance with the Fee Committee Protocol the FCC, in considering any fee award, will give appropriate consideration to the experience, talent, and contribution made by any eligible attorney or law firm submitting an application for reimbursement of costs and apportionment of attorneys' fees from the MDL Fund for work performed for common benefit. The FCC will also give appropriate consideration to the time and effort expended and the type, necessity, and value of the particular legal services rendered. In making its recommendations to the Court, the over-arching guideline that the FCC will consider is the contribution of each common benefit attorney to the outcome of the litigation. **The FCC's task is not to simply apply an hourly rate to approved hours.** In making its preliminary recommendation for payments to firms seeking compensation, the time and expense submitted will be a component, but there are other factors that will be considered in accordance with the Court's Orders regarding reimbursement for common benefit work, as well as applicable case law.

Thank you for your prompt attention to the matters addressed herein.

Very truly yours,

Henry G. Garrard, III
Chairperson

The Honorable Daniel J. Stack, Ret.
External Review Specialist

Renee Baggett

Yvonne M. Flaherty

Riley L. Burnett, Jr.

Carl N. Frankovitch

Thomas P. Cartmell

William H. McKee, Jr.

Clayton A. Clark

Joseph F. Rice

Exhibit C

| START DATES - COMMON BENEFIT WORK | | |
|---|---|---|
| **MDL** | **Creation Date** | **FCC Cut-Off Date** |
| C.R. Bard - MDL No. 2187 | October 12, 2010 | September 1, 2015 |
| AMS - MDL No. 2325 | February 7, 2012 | October 2, 2014 |
| Boston Scientific - MDL No. 2326 | February 7, 2012 | January 1, 2016 |
| Ethicon - MDL No. 2327 | February 7, 2012 | January 1, 2017 |
| Coloplast - MDL No. 2387 | August 6, 2012 | June 16, 2014 |
| Cook - MDL No. 2440 | June 11, 2013 | June 22, 2016 |
| Neomedic - MDL No. 2511 | February 18, 2014 | November 30, 2015 |

Exhibit D

## **Categories of Expense**

### **Not for the Joint and Common Benefit of Plaintiffs and Claimants**

1. Plaintiff and spouse travel expenses for deposition

2. Plaintiff and spouse deposition costs - Transcript/Court reporter

3. Medical records costs

4. Court filing fees

5. Treating physician expenses – Unless during trial

6. Other individual specific case expenses

    a. Damages only witness expenses

    b. Plaintiffs' family members travel expenses

    c. Plaintiff specific support witness expenses

    d. Independent Medical Examination client expenses

    e. Medical summary service expenses

    f. Storage of pathology expenses

7. Expenses of observing filings – PACER / FileServe / LEXIS

    a. Unless you were in leadership – Leads/Co-Leads

8. Legal research costs – Westlaw / Lexis / Research Costs

    a. Unless you were in leadership – Leads / Co-Leads / Specifically assigned a research project by a Lead or Co-Lead

9. Case specific experts unless deemed by leadership to have been for the Common Benefit

10. Observation of Trial – Except for Leads / Co-Leads

11. Non-Federal MDL Assessments

# Exhibit 3

# BBGA BLASINGAME · BURCH · GARRARD & ASHLEY, P.C.
### Attorneys at Law

W. SEABORN ASHLEY
1947–2001

J. RALPH BEAIRD
1925–2014

E. DAVISON BURCH
of counsel

LEANNA B. PITTARD
of counsel

GARY B. BLASINGAME

HENRY G. GARRARD III

ANDREW J. HILL III

THOMAS H. ROGERS JR.

MICHAEL A. MORRIS

JAMES B. MATTHEWS III

RICHARD W. SCHMIDT

EVAN W. JONES

GEORGE W. BROWN III

DAVID A. DISMUKE

MOLLY K. TALLEY

JOSH B. WAGES

THOMAS F.
HOLLINGSWORTH III

ALVIN L. BRIDGES

LEE S. ATKINSON

MICHAEL RUPPERSBURG

PATRICK H. GARRARD

SARA E. SCHRAMM

THOMAS J. JEFFORDS

HALEY C. ROBISON

P.O. Box 832
Athens, Georgia 30603
440 College Avenue, Suite 320
Athens, GA 30601
Phone 706.354.4000
Fax 706.353.0873

1021 Parkside Commons
Suite 104
Greensboro, GA 30642
Phone 706.453.7139
Fax 706.453.7842

PLEASE REPLY TO
ATHENS ADDRESS

Henry G. Garrard, III
hgarrard@bbga.com

***Sent Via E-Mail***
RECIPIENT FIRM CONTACT
RECIPIENT FIRM
E-MAIL ADDRESS

RE:     Transvaginal Mesh MDL Common Benefit Fee and Cost Committee

Dear RECIPIENT:

I am writing to you on behalf of the Common Benefit Fee and Cost Committee appointed by the Honorable Joseph R. Goodwin with regard to MDL Nos. 2187, 2325, 2326, 2327, 2387, 2440, and 2511 (the "FCC"). At this time, the FCC has completed its Initial Review of your fee submissions. Further, the FCC received your final time and expense submission as accompanied by your affidavit in accordance with the Protocol established by the Court.

At the time the FCC delivered its initial review, your firm submitted XXXX hours of time for consideration as common benefit. The FCC's initial review identified XXXX hours on Exhibit A as not being common benefit, and XXXX hours on Exhibit B as having questions regarding common benefit at that time.

After review and consideration of your Affidavit and revisions or comments in Exhibits A and B delivered by your firm, the FCC has determined that XXXX hours identified on Exhibit A and XXXX hours on Exhibit B will be eligible for consideration as common benefit, thereby increasing your hours for consideration by the FCC as common benefit by a total of XXXX hours. **The FCC, after its review, now identifies a total of XXXX hours for consideration as common benefit time.** Your Exhibit A and B reflecting those hours eligible for consideration after the FCC considered your input are included herewith. Please understand that the number of hours under consideration as common benefit is only one part of the evaluation process in regard to an award ultimately recommended to the Court. In the Fee Committee Protocol there are multiple other factors the FCC is obligated to consider. Your Affidavit is helpful to the FCC in that regard.

**Additionally, the FCC has reviewed your expense submission. Your firm submitted $XXXX in expenses.  The FCC identifies a total of $XXXX in expenses for potential reimbursement as compensable Common Benefit expenses.  The amount identified for expenses does not include any Federal MDL Assessment payments made by your firm. The paid MDL Assessments will be reimbursed at the same time as expenses.** Generally, the FCC is not recognizing as Common Benefit, expenses incurred in individual cases nor expenses identified on Exhibit D to the letter of February 16, 2018 sent to you. For bellwether cases and cases in which a particular TVM product was tried for the first time, certain individual case expenses may be considered. Individual case expenses, including Wave cases, in normal practice are charged to the individual case at settlement. The approach to what will be recognized as common benefit expense is being applied to all firms.

**If you do not wish to further challenge the FCC's findings with regard to your hours and expenses set forth in the preceding paragraphs as recognized by the FCC as common benefit you need take no further action.  In accordance with the Fee Committee Protocol, if you wish to be heard by the FCC on the number of hours and the amount of expense to be considered by the FCC you must notify the FCC on or before Thursday May 24, 2018, via email to the FCC Chairperson Henry Garrard at hgarrard@bbga.com.** Upon timely notice to the FCC, you will be contacted regarding the timing of your meeting with the FCC.  The FCC anticipates that your meeting with the FCC will take place at the United States District Courthouse in Charleston, West Virginia.

Thank you for your prompt attention to the matters addressed herein.

Very truly yours,

Henry G. Garrard, III
Chairperson

The Honorable Daniel J. Stack, Ret.
External Review Specialist

Renee Baggett

Yvonne M. Flaherty

Riley L. Burnett, Jr.

Carl N. Frankovitch

Thomas P. Cartmell

William H. McKee, Jr.

Clayton A. Clark

Joseph F. Rice

# Exhibit 4

# BBGA BLASINGAME · BURCH · GARRARD & ASHLEY, P.C.
### Attorneys at Law

W. SEABORN ASHLEY
1947–2001

J. RALPH BEAIRD
1925–2014

E. DAVISON BURCH
of counsel

LEANNA B. PITTARD
of counsel

GARY B. BLASINGAME

HENRY G. GARRARD III

ANDREW J. HILL III

THOMAS H. ROGERS JR.

MICHAEL A. MORRIS

JAMES B. MATTHEWS III

RICHARD W. SCHMIDT

EVAN W. JONES

GEORGE W. BROWN III

DAVID A. DISMUKE

MOLLY K. TALLEY

JOSH B. WAGES

THOMAS F. HOLLINGSWORTH III

ALVIN L. BRIDGES

LEE S. ATKINSON

MICHAEL RUPPERSBURG

PATRICK H. GARRARD

SARA E. SCHRAMM

THOMAS J. JEFFORDS

HALEY C. ROBISON

P.O. Box 832
Athens, Georgia 30603
440 College Avenue, Suite 320
Athens, GA 30601
Phone 706.354.4000
Fax 706.353.0673

1021 Parkside Commons
Suite 104
Greensboro, GA 30642
Phone 706.453.7139
Fax 706.453.7842

PLEASE REPLY TO
ATHENS ADDRESS

Henry G. Garrard, III
hgarrard@bbga.com

September 13, 2018

***Sent Via E-Mail***
RECIPIENT FIRM CONTACT
RECIPIENT FIRM
E-MAIL ADDRESS

RE:     Transvaginal Mesh MDL Common Benefit Fee and Cost Committee
        Preliminary Written Recommendation


Dear RECIPIENT:

We are writing to you on behalf of the Common Benefit Fee and Cost Committee appointed by the Honorable Joseph R. Goodwin with regard to MDL Nos. 2187, 2325, 2326, 2327, 2387, 2440, and 2511 (the "FCC"). At this time, the FCC has completed its Initial Review of your fee submissions and your final time and expense submission as accompanied by your affidavit in accordance with the Fee Committee Protocol established by the Court. For those firms who sought an opportunity to be heard regarding common benefit fees and expenses, those meetings have been completed. There were approximately 900,000 hours submitted to the FCC for review. The FCC has carefully reviewed each submission and has met with the co-leads of the MDL to discuss the contributions made by each firm to the MDL common benefit. For those firms that did not object to the hours and expense as delivered to you, the FCC deems that you have no objection regarding your hours or expenses for consideration.

The FCC now issues its Preliminary Written Recommendation with regard to the allocation of fees and expenses. The FCC currently recommends that your firm receive consideration for XXXX hours of time and receive $XXXX for common benefit. Additionally, the FCC currently recommends that your firm receive $XXXX in reimbursement for held expenses that were for the common benefit of MDL claimants, plus the reimbursement of $XXXX which was paid by your firm as an assessment in the MDL. The dollar amounts identified herein for the compensation for your contribution to the common benefit are based on the assumption by the FCC that there will be approximately $344,000,000.00 available for payment of common benefit contributions at the time of the first distribution. The FCC also anticipates an additional amount of approximately $49,000,000.00 will be paid for the reimbursement of held costs and MDL assessments in the first distribution.

The amounts discussed herein are the FCC's preliminary recommendation and are subject to change prior to the submission of the FCC's final written recommendation to the external review specialist, The Honorable Dan Stack.  Please note that all amounts are proposed and are subject to the consideration and final decision of the MDL Court. The FCC anticipates that there will be subsequent distributions in the future. The FCC anticipates requesting that 70% of any additional funds received be distributed by the Court pro rata in accordance with the allocations made to applicant firms. In addition, the FCC anticipates that it will request that 30% of any additional funds be held pending further Order of the Court.

Each firm is receiving the basis for its allocation in accordance with the Fee Committee Protocol. Further, in accordance with the Fee Committee Protocol, attached to this letter are (1) the explanation of the basis of the allocation for your firm, and (2) an explanation of the time and expenses allowed by the FCC for every firm seeking compensation for common benefit.  In making its Preliminary Written Recommendation, the FCC considered, over a period of two years, the factors set forth in the Orders regarding common benefit, including Section B (Criteria for Common Benefit Applications) of the Court's Order establishing common benefit compensation criteria for each of the firms seeking compensation.  The FCC previously delivered to you those hours and expenses that the FCC identified as being disallowed for purposes of consideration for compensation through its delivery of Exhibits A, B and expenses at the conclusion of its Initial Review. The number of hours under consideration as common benefit was only one part of the evaluation process in regard to the FCC's Preliminary Written Recommendation. Based on the requirements of the Fee Committee Protocol, the FCC evaluated each firm using the same criteria and exercised its discretion in evaluating the degree to which the work and expense incurred by each firm furthered the common benefit of the litigation. To the extent a firm requested an opportunity to be heard by the FCC, the FCC has considered the information presented by firms and has incorporated its deliberations and decisions into its Preliminary Written Recommendation. Throughout its evaluation, the FCC was primarily focused on evaluating the contribution of each common benefit attorney to the outcome of the litigation.

**You did not request an opportunity to be heard previously. If you accept the FCC's Preliminary Written Recommendation, you need take no further action.  In accordance with the Fee Committee Protocol, if you wish to object to the preliminary written recommendation, you must notify the FCC on or before Friday, September 28, 2018, via email to the FCC Chairperson Henry Garrard at hgarrard@bbga.com.** Any objection is limited to ten (10) pages. Upon timely notice to the FCC, your objection will be considered by the FCC prior to the issuance of the final written recommendation by the FCC.

Thank you for your prompt attention to the matters addressed herein.

Very truly yours,

Henry G. Garrard, III
Chairperson

The Honorable Daniel J. Stack, Ret.
External Review Specialist

Renee Baggett

Yvonne M. Flaherty

Riley L. Burnett, Jr.

Carl N. Frankovitch

Thomas P. Cartmell

William H. McKee, Jr.

Clayton A. Clark

Joseph F. Rice