IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| ------------------------------------------------------- | |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2325 |
| ------------------------------------------------------- | |
| IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2326 |
| ------------------------------------------------------- | |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2327 |
| ------------------------------------------------------- | |
| IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2387 |
| ------------------------------------------------------- | |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2440 |
| ------------------------------------------------------- | |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL NO. 2511 |
| ------------------------------------------------------- | |

THIS DOCUMENT RELATES TO ALL CASES

## OBJECTION OF KLINE & SPECTER, P.C. TO THE RECOMMENDED ALLOCATION OF COMMON BENEFIT FEES AND THE REIMBURSEMENT OF SHARED EXPENSES AND HELD COSTS BY FORMER JUDGE STACK

I. **INTRODUCTION**

   Kline & Specter, P.C. ("Kline & Specter") objects to the Recommended Allocation of

Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs by former

1

judge Stack[1] which proposes to allocate $3,745,000 of the common benefit fee (1.07% of the total) to Kline & Specter.  *See* Recommended Allocations, attached as Exhibit "A." This allocation is the same amount set forth in the Fee and Cost Committee's ("FCC") September 13, 2018 Preliminary Written Recommendation and the FCC's November 20, 2018 Final Recommendations, to which Kline & Specter objected.  *See* September 24, 2018 Objection to the FCC's Preliminary Written Recommendation, attached as Exhibit "B"; *see also*, December 4, 2018 Objection to the FCC's Final Recommendation, attached as Exhibit "C."  For all the reasons set forth below, and in the September 24, 2018 and December 4, 2018 Objections, Mr. Stack's recommendation should not be followed.

Perhaps the most obvious indication that Mr. Stack is wrong is that he says he's wrong. During a January 3, 2019 teleconference between Mr. Stack and Kline & Specter partners, Shanin Specter and Lee B. Balefsky, Mr. Stack stated that Kline & Specter's common benefit fee should be more than the $3.7 million awarded by the FCC. *See* Declaration of Shanin Specter, Esq and Affidavit of Lee B. Balefsky, Esq., attached as Exhibit "D."

Instead, Mr. Stack simply rubberstamped his and the FCC's recommendations. He did no independent evaluation.  Mr. Stack claims to have used an independent methodology very different from the FCC's.  This is obviously false as he simply adopted the same numbers as the FCC for 78 of the 94 common benefit firms, including Kline & Specter. Moreover, the methodology he alleges to have employed is improper.  Mr. Stack's fee recommendation is replete with examples of questionable allocations, especially his recommendation that the 8 FCC member firms, out of 94 common benefit firms, receive awards totaling $219,829,192, an average of $27,478,649, which is approximately 60% of the total fund.

---

[1] For brevity, former judge Stack will be referred to as Mr. Stack.

Mr. Stack also says he rewarded firms for their work in settlement negotiations. *See* Exhibit "A" at p. 9. Work on individual settlements obviously aren't for the common benefit – they are for individual clients or groups of clients.

Kline & Specter played a critical role in the transvaginal mesh litigation. *See* Common Benefit Fee Affidavit of Lee B. Balefsky, attached as Exhibit "E." Twenty-four (24) of Kline & Specter's attorneys[2] participated in this litigation, performing over 32,000 hours of common benefit work, including obtaining six verdicts for plaintiffs totaling over $146 million. These verdicts undoubtedly encouraged settlements for the common benefit of all claimants. No firm tried more cases than Kline & Specter or won more verdicts. Kline & Specter partner Lee B. Balefsky served on the Plaintiffs' Steering Committee ("PSC") in the MDL, the New Jersey State Court Discovery Committee for mesh, and acted as liaison counsel in the Philadelphia Court of Common Pleas Pelvic Mesh Mass Tort Program. These contributions were no less significant than the contributions provided by the other top firms in the litigation, notably the FCC members own firms. The FCC and Mr. Stack undervalued the common benefit work of Kline & Specter, including the firm's enormous success in the courtroom, and seemingly valued other, less essential work by others. Utilization of an objective methodology, such as application of the *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) factors, required by the Fourth Circuit and not used by the FCC or Mr. Stack, supports increasing the fee allocation for Kline & Specter.

---

[2] Participating attorneys included: Thomas R. Kline, Founding Partner; Shanin Specter, Founding Partner; Lee B. Balefsky, Partner; Charles Becker, Partner; Christopher Gomez, Partner; James J. Waldenberger, Partner; Michael Trunk, Partner; Lisa Dagostino, M.D., Partner; Barry Magen, M.D., Partner; Kila Baldwin, Partner; Regan Safier, Partner; Robert Leoni, Partner; Kristen Sipala, Associate; Christine Clarke, Associate; Priscilla Jimenez, Associate; Colin Burke, Associate; Patrick Fitzgerald, Associate; Andra Laidacker, Associate; Tracie Palmer, Associate; Elia Robertson, Associate; Roger Cameron, Attorney; Catherine Foley, Attorney; Jonathan Goodall, Attorney; Ebiho Ahonkai, Attorney.

In addition, Mr. Stack has an inherent conflict in presiding over the common benefit fee allocations, including disputes between Kline & Specter (and any other objecting firms) and the FCC, because he admittedly participated in the creation of the FCC's allocation recommendations and signed them. He is not neutral.

**A.   Mr. Stack Undervalued the Significance of Kline & Specter's Contributions to the Common Benefit.**

Kline & Specter attorneys have had a critically important role in all aspects of the pelvic mesh litigation, particularly the Ethicon litigation. As noted, attorneys from Kline & Specter, including founding partners Thomas R. Kline and Shanin Specter, have successfully obtained six (6) verdicts totaling over **$146 million**:

    a.   *Hammons v. Ethicon*, No. 130503913, Pa. Comm. Pls., Philadelphia Co. (2015): **$12.5 million verdict.** Tried with Adam Slater. ($5.5 million in compensatory damages, $7 million in punitive damages.) Affirmed by the Superior Court of Pennsylvania. Prolift.

    b.   *Carlino v. Ethicon,* Case No. 130603470. Pa. Comm. Pls., Philadelphia Co. (2016). **$13.5 million verdict**. Tried with Richard Frees. ($3.25 million in compensatory damages, $250,000 for loss of consortium, and $10 million in punitive damages.) TVT.

    c.   *Engelmann v. Ethicon*, Case No. No. 140305384. Pa. Comm. Pls., Philadelphia (2017). **$20 million verdict**. Tried with Benjamin Anderson. ($2.5 million in compensatory damages and $17.5 million in punitive damages.) TVT Secur.

    d.   *Beltz v. Ethicon,* Case No. 130603835, Pa. Comm. Pls., Philadelphia Co. (2017). **$2.16 million verdict**. ($2.16 million in compensatory damages) Prolift.

    e.   *Ebaugh v. Ethicon*, Case No. 130700866. Pa. Comm. Pls., Philadelphia Co. (2017) **$57.1 million verdict**. ($7.1 million in compensatory damages and $50 million in punitive damages.) TVT and TVT Secur.

    f.   *Emmet v. Ethicon*, Case No. 130701495 Pa. Comm. Pls., Philadelphia Co. (2019) **$41 million verdict.** ($15 million compensatory, $1 million for loss of consortium and $25 million punitive). Prolift and TVT-O.[3]

Kline & Specter continues to defend these verdicts on appeal.

    **1.   Verdicts Obtained by Kline & Specter in the Philadelphia Court of Common Pleas Were Critical to the Common Benefit.**

---

[3] While the *Engleman*, *Beltz*, *Ebaugh,* and *Emmet* cases were after 2016, all hours submitted by Kline & Specter are for work performed before the cut-off date for submission of common benefit time.

### i.   *Hammons v. Ethicon*

In December 2015, Kline & Specter tried the first case against Ethicon in the PCCP - *Hammons v. Ethicon Inc.*, No. 130503913.  The *Hammons* case was the second Prolift trial in the country, and the Kline & Specter attorneys who worked on this case were responsible for developing a trial package for Prolift that covered the essential parts of the liability theories, including design defect, failure to warn, alternative design, and foreseeable misuse.

After a two-and-a-half-week trial, the jury in *Hammons* found that the Prolift was defectively designed, that Ethicon failed to properly warn of the risks of the device, and that Ethicon was liable for punitive damages.  The *Hammons* case was the first time that a jury found for the plaintiff on a defective design claim in a Prolift trial –which established the viability of design defect claims in all Prolift cases going forward.   The jury awarded Mrs. Hammons $5.5 million in compensatory damages and $7 million in punitive damages.

Subsequently, attorneys around the country requested and used portions of the *Hammons* trial package, including deposition outlines for their Ethicon MDL Wave cases.

Mr. Stack states that he is "aware that certain of the trials . . . occurred after the liability case had been established for the product at issue by others."  *See* Recommended Allocations, Exhibit "A" at p. 20.  If this is meant to apply to Kline & Specter, it is false.  Over 4,000 of Kline & Specter hours submitted for the work done in the *Hammons v. Ethicon* case were disallowed by the FCC.  *Hammons* was the first Prolift case where the jury found for the Plaintiff on a defective design claim. The design defect claim is at the heart of these cases.  While the failure to warn claim is case specific – it generally depends on the testimony of the implanting doctor – to the contrary, the design defect claim concerns the product itself and is at issue in every case.

### ii.   *Carlino v. Ethicon*

In January 2016, Kline & Specter tried the first TVT retropubic sling case in the PCCP - *Carlino v. Ethicon Inc.*, No. 130603470. *Carlino* was the first TVT case to go to a jury and resulted in what was the largest verdict for an Ethicon stress urinary incontinence product to date. The jury awarded Mrs. Carlino $3.25 million in compensatory damages, $250,000 to Mr. Carlino for loss of consortium, and $10 million in punitive damages.

The *Carlino* trial team achieved favorable rulings from the trial court on dispositive motions and motions *in limine* which would prove to benefit pelvic mesh litigants in other mesh cases throughout the various jurisdictions. For example, Ethicon's Motion for Partial Summary Judgment on Plaintiffs' failure to warn claim was denied, allowing, for the first time, a jury to consider the adequacy of the warnings that accompanied the TVT device. The jury ultimately concluded that the TVT was defectively designed and that Ethicon had failed to warn physicians of the TVT's medical risks.

Again, the trial package prepared by Kline & Specter attorneys for *Carlino* was highly sought after for other TVT cases across the country. The deposition designations created by the Kline & Specter attorneys for *Carlino* were utilized by other attorneys in preparing for New Jersey and MDL trials, and the rulings Kline & Specter attorneys obtained on Ethicon's pre-trial motions, including motions *in limine*, were relied upon for cases in the MDL and other district courts.

Mr. Stack stated that he was "aware that certain of the trials in which the objecting firms were involved were built upon work product from others." *See* Recommended Allocations, Exhibit "A" at p. 20. He doesn't identify who he's writing about, but that can't be said of Kline & Specter. As explained in detail above, Kline & Specter did not just "use" materials from the MDL but, rather, accessed the raw materials available to them and every other participating firm and honed them into viable, successful trial packages. Depositions and exhibits were culled down. Themes

6

were developed. Expert testimony was refined, and crucial rulings that continue to benefit the entire litigation were won.  This work was praised and, more importantly, utilized by other participating firms.  In Kline & Specter's most recent trial, *Emmet v. Ethicon*, only 30% of the documents used were from MDL work product.

Mr. Stack explicitly states that he "not all work spent on a given 'trial' are of equal value," perhaps implying that the work on trials as less important than other common benefit work.  *See* Recommended Allocation, Exhibit "A" at p. 20.  This assessment is erroneous, subjective and contrary to established precedent.  *See, In re Actos (Pioglitazone) Products Liability Litigation,* 274 F.Supp.3d 485, 531-532 (2017).  Trial is paramount in the work of trial lawyers.

**2.      Kline & Specter was Assured that its Work in State Court Would be Recognized as for the Common Benefit.**

From the onset of this litigation, Kline & Specter relied on assurances from both the FCC and the Court that its work in state court would be recognized and compensated. PTO No. 18 and PTO No. 262 both recognize that state court common benefit work would be considered.

In a February 11, 2016 email from Kline & Specter partner and PSC member, Lee B. Balefsky to FCC Chairperson, Henry G. Garrard, III, Mr. Balefsky confirmed the following:

> Henry, thank you for hosting the meeting yesterday in Atlanta.  One of our major concerns is the compensation for state court litigation common benefit work. This will confirm that you agreed that such work will be compensated and included in the process. We look forward to working with the committee.

*See* February 11, 2016 email, attached hereto as Exhibit "F." No reply disputing this arrangement was sent or received.

Not only did the FCC state that state court work would be compensated but so did the Court.  In PTO No. 262 (Fee Committee Protocol), the Court stated:

> Common benefit work performed in state court litigation — whether the proceedings are consolidated or not — should be considered to the extent it contributed to the outcome of the litigation and benefitted the MDL. The Court

> recognizes, particularly to the extent there are agreements between state court attorneys and MDL leadership, that state court attorneys may make an application for common benefit fees and expenses to be fully considered by the FCC. In order for an attorney's work in state court litigation to be considered for payment from the Common Benefit Fund, settlements from the requesting attorneys must include the five percent assessment.

See PTO 262, at pp. 6-7.

Additionally, PTO 18 recognized that state court work would be considered. *See* PTO 18, at pp. 11-12.

Mr. Stack and the FCC clearly valued the work in bellwether cases and those tried in the MDL more so than those tried in state court, though state court cases were at least as beneficial to the plaintiffs' common benefit. The state court litigation demonstrated to the defendants that they were vulnerable to attack on several fronts where the plaintiffs could get quicker trial listings and large verdicts. Kline & Specter's work on state court trials was just as valuable as the work on the MDL trials.

The disparity of recognition between the MDL trials and state court trials showcases the preferential treatment that the FCC member firms and certain PSC member firms were given. Kline & Specter was ready, willing, and able to try an MDL case but was never given the opportunity to do so. But even without that chance, Kline & Specter has obtained six substantial verdicts in the state courts. At this writing, the firm is simultaneously trying two more mesh cases.

### 3. Kline & Specter's Work in the Ethicon Pelvic Mesh Litigation Benefitted All Plaintiffs.

The significant majority of Kline & Specter's common benefit work occurred in the Ethicon pelvic mesh litigation. Beginning in 2012, attorneys at Kline & Specter devoted thousands of hours to the review of millions of pages of documents produced by defendants. Many of the key documents found by Kline & Specter attorneys were used in multiple depositions and trials and have proved crucial in developing case strategy from the onset of this litigation.

8

The following is just a sample of the coordinated efforts between Kline & Specter attorneys and lead members of the PSC which formulated the key strategy to developing the work for the benefit of all plaintiffs in this litigation:

- At the request of Thomas Cartmell, Kline & Specter attorneys provided key documents to MDL attorneys regarding the acquisition of Medscand's TVT system in a September 6, 2013 email: "This document is a treasure trove of substantive information about the acquisition of Medscand's TVT System and this shift of its manufacturing from Sweden to Neuchatel. It is also a road map for the further avenues of discovery and prod of the multiple failures of JnJ to respond to our discovery request and to manipulate the process to our prejudice. . . " Thomas Cartmell responds with: "Roger, this and your earlier email are great. I am thinking we will likely need to draft either a letter or RFP for the documents that haven't been produced. **Will you please handle?** Actually, the more I think about it, let's just do an RFP so we can at least get formal answers. . ." (*See* September 6, 2013 email, attached as Exhibit "G.")
- Additionally, it was Mr. Cameron who discovered the key "Destroy after reading" email on spoliation from Ethicon employee Dan Smith. (*See* January 15, 2014 email from Roger Cameron to Bryan Aylstock, et al., attached as Exhibit "H.")

The deposition work performed by Kline & Specter attorneys was routinely recognized by members of the PSC as being crucial to case theory and development. Kline & Specter was continually recognized for its excellent work in this area. By way of example:

- On February 17, 2013, Thomas Cartmell asked PSC members to participate in MDL depositions. Lee Balefsky writes "Tom we will certainly participate. Bryan has already assigned us a deposition that Roger will cover." Mr. Cartmell responds, "That is fine. We aren't worried about you guys!" (*See* February 17, 2013 email, attached as Exhibit "I.")
- In August 2013, Lee Balefsky deposed Ethicon's Gregory Jones, in charge of Product Development. Roger Cameron provided all firms with a substantive update of the deposition. "Great work gentlemen! Sounds like an interesting read!" Jeff Kuntz: "Awesome. Thanks guys. Will get Blume and Pence reports. Send any documents you came across or used that may be good." Bryan Aylstock: "Great work. Definitely want to read. Can you get a cut done together with any key admissions for the expert?" (*See* August 21, 2013 email, attached to Exhibit "J.")
- Regarding the deposition of Peter Cecchini, Ethicon Regulatory Affairs, Richard A. Frees of Freese & Goss writes, ""Thanks Roger. You did awesome. Getting the hernia 510 out was brilliant." (*See* October 24, 2013 email, attached as Exhibit "K.")

4.      **Proving the Ethicon/Secant Connection was Key to the Success of the Ethicon Pelvic Mesh Litigation.**

Ethicon had a long-standing relationship with Secant Medical, Inc. ("Secant"), a Pennsylvania company, regarding the design, manufacture, knitting and supply of the mesh used in its pelvic mesh devices. In May 2013, Kline & Specter began filing cases involving transvaginal mesh devices in the Philadelphia Court of Common Pleas ("PCCP"). Named as defendants were both Ethicon and Secant. Up until 2013, the vast majority pelvic mesh litigation against Ethicon was confined to the cases filed in the MDL and New Jersey. It was important for the common benefit to open a third venue of litigation. The key to filing these cases in Philadelphia was Secant, a Pennsylvania company that played a vital role in the manufacture of Ethicon's pelvic mesh devices.

Ethicon vigorously fought the propriety of over 100 lawsuits in Philadelphia County. Ethicon removed the cases to Federal Court claiming fraudulent joinder regarding the naming of Secant as a Defendant. Kline & Specter filed extensive briefing, defeating Ethicon's fraudulent joinder argument, and was able to effectively remand these cases back to the PCCP, thus concretely establishing the Pelvic Mesh Mass Tort program in Philadelphia. The importance of the ruling was not lost on Ethicon, who asked this Court to certify an Interlocutory Appeal, which was denied.

Lee Balefsky emailed members of the PSC: "Huge win! Goodwin remanded Secant cases back to Philly!" This work by Kline & Specter and the importance of the establishment of the PCCP pelvic mesh mass tort program was recognized by key members of the PSC as a "game changer!!!" (Bryan Aylstock) and "Fantastic!!" (Justin Witkin) and "Wow! Great!" (Fidelma Fitzpatrick). Other members replied "Boom!!" (Doug Kreis). And Thomas Cartmell wrote, "Ha. Love it! Best news I've had in a long time. . . wow this is crazy good!" (*See* December 19, 2013 email from Lee Balefsky to PSC members, attached as Exhibit "L.")

Ethicon then filed a Motion to Dismiss 118 single-plaintiff cases in the mass tort proceedings in the PCCP asserting lack of personal jurisdiction. That motion was denied. Thus, Kline & Specter proved that Secant's manufacture of the mesh in Pennsylvania established a significant contact with Ethicon and the Commonwealth of Pennsylvania. Kline & Specter successfully managed to keep the 118 cases in the PCCP – maintaining another avenue for litigating these cases against Ethicon and establishing further pressure on this defendant to the benefit of all pelvic mesh litigants.

Once again, PSC members were enthusiastic with the result, praising Kline & Specter for its hard-fought win. *See* March 31, 2015 emails, attached as Exhibit "M."

In 2017, the Supreme Court of the United States ruled in favor of defendants on two cases regarding personal jurisdiction: *Bristol-Myers Squibb Co. v. Superior Court of California* and *BNSF Railway Co. v. Tyrrell*. Ethicon once again challenged the jurisdiction of the Pennsylvania Courts.

Over Ethicon's objections, Lee B. Balefsky of Kline & Specter took the deposition of James O. Williams, Ethicon's former Strategic Sourcing Manager. Mr. Balefsky was able to successfully obtain the key testimony from Mr. Williams that indeed, all the mesh used by Ethicon in its pelvic mesh products (with the exception of Prolift + M) was manufactured by Secant, in the Commonwealth of Pennsylvania. This testimony would prove essential in defeating Ethicon's motion to remove the pelvic mesh cases from Philadelphia.

The "Secant Story" and resulting litigation against Ethicon in Philadelphia were critical to the Common Benefit of all plaintiffs. More cases have been tried against Ethicon in the PCCP than both the MDL and NJ combined. These cases have been hugely successful. This stalwart effort by Kline & Specter forced Ethicon to divert resources from litigations in other venues and

ultimately has likely been critical in the settlements of thousands of cases.  All of Kline & Specter's work regarding Secant should be recognized as for the common benefit and was and is very important for the common benefit.

### 5.      Development of Experts

Utilizing their medical, scientific and bioethics training, Kline & Specter attorneys, including physician-attorneys, committed extensive time to this litigation working with experts to develop expert reports, prepare for depositions and trial testimony, and hone and improve their impact upon this litigation.

Kline & Specter attorneys helped develop the experts who proved valuable throughout the pelvic mesh litigation and were utilized by other attorneys and firms involved in this litigation. Specifically, the experts developed by Kline & Specter attorneys in whole or in part are as follows:

- Ralph Zipper, M.D., FACOG, FPMRS – Urogynecology. (Testified in *Hammons v. Ethicon*.)
- Bruce Rosenzweig, M.D. - Urogynecology. (Testified in numerous bellwether and state court trials, including in the MDL and the Philadelphia Court of Common Pleas.)
- Michael Thomas Margolis, M.D. – Urogynecology. (Testified in numerous bellwether and state court trials, including in the MDL and the Philadelphia Court of Common Pleas.)
- Peggy Jo Clark Pence, Ph.D – FDA/Regulatory. (Testified in numerous bellwether and state court trials, including in the MDL.)
- Richard S. Bercik, M.D. – Urogynecology. (Testified in Delaware state court.)

### 6.      The Work of Kline & Specter Should be Recognized in Accordance With Other Firms who Provided a Similar Value to this Litigation.

Kline & Specter has clearly worked diligently in the best interest of its individual clients and for the common benefit of all clients in the pelvic mesh litigation. In an effort to encourage timely resolution of cases that had been pending for several years, Kline & Specter filed a petition with the Fourth Circuit to get the District Court to either transfer Petitioners' cases or issue a

pretrial order for completion of pretrial discovery and motion practice. This action was unfairly criticized by the FCC and unfairly castigated in a veiled attack by Mr. Stack:

> Actions by certain attorneys caused the Plaintiffs' Leadership and the FCC to incur significant additional costs and were disruptive to the advancement of this litigation. These negative consequences to the litigation as a whole are referred to as "common detriment," and I was directed to consider common detriment pursuant to the Protocol and the FCC Orders.

*See* Recommended Allocations, Exhibit "A" at p. 21

This petition was not "disruptive" but was an attempt to improve the pace of case resolution for the common benefit of all claimants. It should be rewarded, not punished.

Surely, the work described above, its value and impact in the pelvic mesh litigation, is worth more than the 1.07% award that Mr. Stack and the FCC have deemed worthy. The work of Kline & Specter is on par with or in excess of the other highest beneficiaries of the FCC's buddy system, who have been rewarded in the 13-15% range.

**B.   Mr. Stack Failed to Provide an Independent Evaluation and Instead Relied on the Opinions and Work Product of the FCC.**

Mr. Stack was not an independent neutral fact-finder. Throughout his recommendations, Mr. Stack admits that he relied on the opinions and work product of the FCC. His reliance on the FCC and failure to perform an independent evaluation is abundantly clear, especially given the fact that the vast majority of Mr. Stack's allocation amounts are the <u>exact</u> same amounts recommended by the FCC. For the few firms (16) that did receive increases or decreases, Mr. Stack provided no explanation.

Mr. Stack was involved with the FCC's recommendations from the beginning. He signed the FCC's preliminary recommendations. He contradictorily states in his report that he "joined in" on the delivery of the FCC's Preliminary Written Recommendation "for purposes of attesting to the FCC's adherence to the requirements of the Protocol and the Fee Order consistent with my

charge under the Protocol." *See* Recommended Allocations, Exhibit "A" at p. 11. This is also contrary to Mr. Stack's statement during the January 3, 2019 meeting with Kline & Specter attorneys that he "probably should not have" signed the Preliminary Recommendations and "didn't feel comfortable" doing so. *See* Declaration and Affidavit, attached as Exhibit "D." He's right.

Mr. Stack's report is replete with instances of praise for the FCC and admissions of either assistance to the FCC in making its recommendations, or reliance upon those recommendations in making his own. Mr. Stack aided the FCC in evaluating time and expenses submitted for consideration as common benefit and observed "the FCC's painstaking [sic] process of reviewing the time and expense submissions from 94 different firms." *Id*. at p. 12. Mr. Stack also "observed the several FCC meetings where the time and expense submission of each applicant firm, as well as each firm's contributions to and participation in the litigation, was discussed and analyzed." *Id.*

Mr. Stack says it was based on his observation of and assistance in the FCC's review of the time and expense submissions, as well as his attendance at each of the applicant firms' presentations and review of the affidavits and materials submitted by the applicant firms, that he was able to evaluate each firms' submission and make his recommendation. *Id.* at 13. By participating in the FCC recommendation deliberations, Mr. Stack, ex parte, gained personal knowledge of facts and opinions of FCC members regarding non-FCC member firms common benefit contributions and work product without the ability of firms like Kline & Specter to be present and to make contrary arguments.

It is also obvious that Mr. Stack did not do his homework – during the January 3, 2019 teleconference with Kline & Specter, he was not even aware that Kline & Specter had any cases in the MDL, let alone well over 1000. *See* Declaration and Affidavit, attached as Exhibit "D."

**C.      Mr. Stack's Recommended Allocations Are Not Based on Objective Methodology.**

In calculating his recommended fees, Mr. Stack utilized an arbitrary, unreliable, subjective methodology, failed to disclose how he assessed work and hours, and failed to perform a lodestar crosscheck to ensure the reasonableness of the requested fee. He flatly did not bother to explain his "methodology" at all. In his recommendation, Mr. Stack admits the that he did not perform a lodestar cross-check: "I am not required to and I did not attempt to employ any "lodestar" calculation in making my recommended allocation." *See* Recommended Allocation, Exhibit "A" at p. 16.

Courts have used several techniques for calculating the award of attorneys' fees – none of which were used by Mr. Stack here. The two primary methods for determining a common fund fee award are the percentage-of-fund method and the lodestar method. *In re Cendant Corp.*, 243 F.3d at 732 (3rd Cir. 2001). Whichever method is used, "any given attorney should receive neither too little nor too much of an award as compensation for the common benefit he conferred upon the class as a whole*." In re Sulzer Hip Prosthesis* and *Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003).

Courts within the Fourth Circuit calculate fee awards based either on the percentage-of-fund method or lodestar method. *In re Royal Ahold N.V. Securities & ERISA Litigation*, 461 F.Supp.2d 383, 385 (D.Md.2006). Furthermore, Courts within the Fourth Circuit have combined the two methods and implemented the use of a "percentage of the fund" method with a "lodestar crosscheck." *In re Royal Ahold N.V. Securities & ERISA Litigation*, 461 F.Supp.2d 383, 385 (D.Md.2006). This Court should consider both the percentage of the fund method and a lodestar cross-check.

This Court in *Jones v. Dominion Resources Services, Inc.* stated that the lodestar method can counteract the anchoring effect of a percentage fee request. Because courts tend to deviate only

slightly from the requested percentage amount, plaintiffs' counsel can effectively manipulate the fee award they are likely to receive by simply requesting a higher percentage. The lodestar method, and the use of it as a cross-check, provides courts with an objective fee amount with which to compare the requested fee. The lodestar method can also guard against attorney windfalls. *Jones v. Dominion Resources Services, Inc.*, 601 F. Supp. 2d 756, 759 (S.D.W. Va. 2009)(internal citations omitted).

Mr. Stack's methodology, if one exists, was severely flawed. He states that he assigned "a percentage to each applicant firm of the aggregate award based on the firm's relative contribution to the outcome of the litigation" but no further details are provided. *See* Recommended Allocations, Exhibit "A" at p. 22. His failure to utilize any established methodology or lodestar cross-check resulted in a shocking and unsustainable disparity in hourly rates, from $104/hour to $913/hour, with no explanation. *See* Awards Chart, attached as Exhibit "N."

Mr. Stack concedes that not all submitted hours for the common benefit had equal value. *See* Recommended Allocation, Exhibit "A" at p. 16. This admission suggests that there was some undisclosed multiplier applied, of which there is no explanation – a "silent multiplier." This arbitrary methodology resulted in several attorneys'/firms' average hourly rates being unreasonably high, including the rates for the eight FCC member-firms. There is nothing reasonable about the 8 FCC member-firms receiving an average of $730/hour while Kline & Specter was awarded a $115/hour as derived from its initial submitted hours. The FCC member-firm's hourly rate is nearly 6.5 times the multiplier applied to Kline & Specter's $115 hourly rate and nearly twice the $400 hourly rate applied to Kline & Specter hours after the FCC's significant reduction of those hours. Kline & Specter performed 32,270.19 hours of common benefit work in the Pelvic Mesh litigation for a total lodestar of approximately $16,400,000. The proposed award

of $3.745 million is a small fraction of Kline & Specter's lodestar. Kline & Specter should receive a multiple of its lodestar like other "leaders," not a fraction.

**D.     Mr. Stack Declined to Consider the *Johnson* Factors as Required by the Fourth Circuit.**

The Fourth Circuit has expressly adopted the criteria established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) for determining the reasonableness of attorneys' hours and rates.  Yet, Mr. Stack did not even consider the "*Johnson* factors," as required by the Fourth Circuit.  Application of these factors demonstrates that Kline & Specter is entitled to a significantly greater portion of the common benefit fee fund.

In *Barber v. Kimbrell's, Inc., 577 F.2d 216* (4th Cir. 1978), the Fourth Circuit considered attorneys' fees in a consumer class-action action lawsuit and followed the lead of the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974), requiring that the district courts are to consider and make detailed findings with regard to twelve factors relevant to the determination of reasonable attorneys' fees. The *Barber* court held that any award must be accompanied by detailed findings of fact with regard to:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber* at p. 226, Fn. 28.

The *Johnson* factors illuminate the unreasonableness of Mr. Stack's recommended allocation. As explained above, Kline & Specter was promised at the outset of the litigation that state court work would be considered.  *See* factors 4, 6. This was not the case, and Kline & Specter

17

ultimately expended thousands of hours pursuing state court trial verdicts that are ignored by the FCC and Mr. Stack.  The amount in controversy and the results obtained also indicate that Kline & Specter's work was not properly recognized.  $7.25 billion was generated by this litigation so far, but the results for individual plaintiffs were extremely poor.  One need only consider the disparity between the approximate average settlement amount ($40,000) and the average trial verdict ($10,700,000) to see that the results obtained were disappointing.  This ratio is 1:245, not even pennies on the dollar.  So, the result of leadership's work was poor, undermining their proposed opposite disparity in compensation. *See* factors 1, 2, 3, 8 and 9.

Additionally, there is no question that the *Johnson* factors favor recognizing the time and labor expended by Kline & Specter (over 32,000 hours), the skills required to properly perform the legal services rendered, and the experience, reputation and ability of the Kline & Specter attorneys requires re-allocation.  Consideration of these factors leads to the inevitable conclusion that Kline & Specter's work was grossly undervalued by Mr. Stack and the FCC.

**E.**     **Fee Allocations for Settlement Negotiations Should Have No Common Benefit Value as There Was No Global Settlement, Only Individual Firms Settling Their Own Cases.**

Mr. Stack recommended awarding common benefit fees for settlement negotiations in individual cases.  *See* Recommended Allocation, Exhibit "A" at p. 9.  However, time spent negotiating individual settlement for individual firm clients are not for the common benefit.

The Plaintiffs' Steering Committee ("PSC") failed to achieve a Global Settlement of the litigation and should not be generously rewarded for its failure. Litigation remains for thousands of plaintiffs who have completed discovery through the MDL "Waves." Most settlements were wholly inadequate, considering the seriousness and permanence of their injuries and the courtroom track record of verdicts for these cases. The per case settlement average is approximately $40,000

while the average trial award has been approximately $10.7 million. Despite puny case settlement values, the Common Benefit Fund currently has $366 million to be distributed among 94 firms simply because of the large number of cases filed.

The average settlement in mesh is roughly the same as the average settlement in the Xarelto litigation, also against Johnson & Johnson. *See* Max Mitchell, "*$775M Global Settlement Reached in Litigation Over Blood Thinner Xarelto*", The Legal Intelligencer, March 26, 2019.  In Xarelto, there were no recoveries in the six cases that went to trial, so the average settlement of $30,000 per case is understandable.  But in mesh the average verdict has been over $10 million in over 30 verdicts.  The puny mesh settlements are simply unjustifiable.

The absence of a global settlement is evidence of the fact that much of the work performed by the PSC was not truly work for the "common benefit." Some settlements were largely driven by the financial status of the manufacturer defendant, the manufacturer defendant's wish to avoid discovery, and the discovery schedules set by the Court's "waves." For example, American Medical Systems ("AMS") cases were settled at an early stage because of the perceived financial condition of the company, and Coloplast and Covidien entered into an early settlement program whereby no discovery was ever conducted in the MDL.  Where no global settlement occurred, and the MDL cases were resolved through individual firms' private negotiations, a common benefit fee allocation is inappropriate.

In fact, the leaders of this litigation did the worst possible thing to the detriment of all plaintiff mesh victims and their attorneys: they settled their inventories way too cheaply, making it difficult for other attorneys to settle their cases reasonably. They did this despite the huge verdicts in the vast majority of mesh trials. These discounted settlements were driven by the sheer enormity of the number of claims and the inability of lawyers to discover and try

hundreds of thousands of cases in their inventory.

Leadership took too many individual cases, could not (or would not) discover them all, and could not (or would not) try the cases or send them to lawyers who would. They should not be rewarded for their small settlements of large numbers of cases, providing large fees for them and small and inadequate compensation to their clients, the women who have suffered at the hands of the mesh manufacturers. Leadership's conduct also poorly served the other plaintiffs' mesh lawyers who are now doubly punished by the proposed allocation of the bulk of the common benefit fee to these same underperforming leaders. Tellingly, "leadership" has never denied these basic facts in any of their filings.

**F.      A Fair and Transparent Process is Necessary.**

Throughout this process, Kline & Specter has pushed for a fair, transparent, and accurate fee allocation to ensure that all eligible firms receive proper compensation for their contributions. In his recommendations, Mr. Stack states:

> Certain of the firms objecting to the FCC's Final Written Recommendation complain that they are unable to adequately respond to or assess the FCC's recommended allocation without first receiving discovery from the FCC regarding its deliberations. Contrary to the suggestion of these objectors, I have observed the FCC's process to be open and transparent.

*See* Recommendation Allocations, Exhibit "A" at p. 15.  The FCC's process has been anything but open and transparent, and Mr. Stack's validation of the FCC's process further demonstrates the lack of an independent, neutral fact-finder in this process.

Kline & Specter has propounded discovery requests on the FCC for information related to the fee allocation process.  These requests include the following: reasons for disallowances of hours; individual firm requests; fee sharing agreements; communication amongst FCC members and firms; and information related to settlements and the common benefit fee assessments.  *See*

Combined Discovery Requests, attached as Exhibit "O." These requests were either objected to by the FCC or went completely unanswered.  Kline & Specter followed each request with a Motion to Compel, individually denied in turn by this Court.  *See* Combined Motions to Compel, attached as Exhibit "P."

The FCC has insulated its actions to date by rejecting all requests for production of important documents necessary for all firms to fairly address the recommendations of Mr. Stack and the FCC.  This documentation would provide the underlying basis for the fee allocation and potentially disclose problematic factors such as financial relationships between FCC members, if any. The lack of transparency and deprivation of due process to date has enabled Mr. Stack and the FCC to issue recommendations that defy any definition of objective reasonableness.

The outright refusal by the FCC to provide this information perpetuates the indefensible information gap that limits Kline & Specter, and others, in its objections to Mr. Stack's recommendations. This unfairness may be compounded as this process advances to this Court as the Court has requested much of the same information for an ex parte, *in camera* review.  This request of documents and materials by the Court only confirms the need for discovery for all parties.

Throughout the process of assessing common benefit time, the FCC purported to allow objectors to challenge the reduction of hours made by the FCC and to explain why these hours should be considered as for the common benefit.  However, without the requested discovery, the FCC made this task impossible. The FCC provided blanket, non-specific disallowances of Kline & Specter's time, making a specific response to each fee entry a futile guessing game. Mr. Stack simply rubberstamped the FCC's recommendations and stated that neither he nor the FCC were required to provide an explanation.  This is fundamentally unfair.  A basic tenet of justice is that a

party receive notice of the nature of a claim or defense. The lack of specificity of the reason for proposed disallowance prevents objectors from meaningfully responding and challenging the substantial reductions to their shares of the common benefit fund that has been proposed.

Up to this point, Kline & Specter, and other firms, have been denied discovery requests seeking the requested information. The information sought by Kline & Specter directly relates to the blatant discrepancy between the fees and expenses awarded to the FCC member firms and all other firms involved in this litigation. This Court should also be concerned about public confidence, both as to how the injured women have been treated and as to how attorneys have been treating each other. *See* Mathew Goldstein, "*As Pelvic Mesh Settlements Near $8 Billion, Women Question Lawyers' Fees*", New York Times, Feb. 1, 2019. The importance of preserving and enhancing public confidence in judicial proceedings further militates in favor of allowing the requested discovery on this matter. *See, also,* See Charles L. Becker, Shanin Specter, & Thomas R. Kline, *How Not to Manage a Common Benefit Fund: Allocating Attorney's Fees in Vioxx Litigation*, 9 Drex. L. Rev. 1 (Fall 2016).

### G.    Mr. Stack's Recommendation for the Allocation of the Future Fund is Fundamentally Unfair.

The pelvic mesh litigation is one of the largest MDLs in history, with settlements and judgments totaling $7.25 billion now and expected to grow to $11 billion. The question of how to deal with future common benefit funds has remained unresolved. To this regard, Mr. Stack stated the following:

> Further, it is anticipated that additional monies will be added to the common benefit fee fund as additional cases are resolved, although the precise amount is incapable of determination at this time. I recommend that the Court (1) allocate thirty percent (30%) of future funds received in the MDL common benefit fund as being subject to future orders of the Court regarding payment; and (2) allocate seventy percent (70%) of future funds received in the MDL common benefit fund amongst applicant firms **utilizing the same percentages as set forth in this**

> **Recommended Allocation**. Any future distributions of the thirty percent (30%) should be at an appropriate time and method as directed by this Court, and it is my recommendation such distributions must be made upon Order of the Court.

*See* Recommended Allocation, Exhibit "A" at p. 28.

Kline & Specter objects to the recommendation that any future funds be subject to the same percentages as set forth in Mr. Stack's Recommended Allocation as it unfair, illogical, goes against the basic tenants of due process, and is fundamentally confounding.

Future holdback funds should not be distributed at same percentage rate as in this allocation. While perhaps "easy," it goes against common sense. If this Court were to do so, certain firms would be rewarded for work not performed and other firms would go completely undercompensated. For example, since the arbitrary cut-of date, Kline & Specter has continued to try cases, obtain verdicts equaling $120 million and develop key evidence against Ethicon, Boston Scientific, Coloplast and the other mesh manufacturers, contributing to the common benefit of all plaintiffs. All work performed after the cut of date for this fee allocation should be reevaluated at the appropriate time.

## III.    CONCLUSION

At bottom, Mr. Stack's report is worthless. He could not navigate the simultaneous roles of participant, advocate, mediator and arbitrator. No one can. At the end, he simply capitulated to the FCC, going back on his word to recommend higher awards, adding a little to a few and shaving a bit off the FCC's aggrandizement of the vast majority of the common benefit fees for themselves.

There's been no fair process here. Instead, there is an attempted mass taking by the FCC lawyers, in violation of the substantive and procedural due process and equal protection rights of Kline & Specter.

23

To prevent this from happening, the court appointed an intermediate officer, variously termed a "special master" or "external review specialist." *See* March 25, 2019, Letter to Lana Keeton, attached as Exhibit "Q." But the special master failed to be special or master but rather was ordinary and servant. He was neither external nor reviewer but instead was participant and supplicant.

A lot of law firms worked very hard, Kline & Specter among them. And it's just not the objecting firms whose interests are at stake.

At stake as well is whether going forward good lawyers will be properly incented to do the hard work of mass tort litigation against big companies. If this court permits this proposed injustice in this very high-profile litigation, good firms will be deterred and won't participate in common benefit work. Victims will be undercompensated. And wrongdoers will be underdetterred.

For the reasons stated above, Kline & Specter respectfully requests that Mr. Stack's recommendations be rejected and that new allocations be issued, accurately reflecting appropriate compensation for the common benefit work performed by Kline & Specter.


Dated: March 26, 2019                           Respectfully submitted,


                                                **KLINE & SPECTER, PC**


                                                Shanin Specter, Esquire
                                                Lee B. Balefsky, Esquire
                                                1525 Locust Street
                                                Philadelphia, PA 19102
                                                (215) 772-1000
                                                *Counsel for Plaintiffs*

**BOWLES RICE, LLP**

By:   /s/ Floyd E. Boone Jr.
Charles M. Love, III (WVSB 2254)
Floyd E. Boone Jr. (WVSB 8784)
600 Quarrier Street
Charleston, WV 25301
(304) 347-1100 (Tel.)
(304) 347-1746 (Fax)
fboone@bowlesrice.com
*Counsel for Kline & Specter, P.C.*