# EXHIBIT B

## OBJECTION OF KLINE & SPECTER, P.C. TO THE
## TRANSVAGINAL MESH MDL COMMON BENEFIT FEE AND
## COST COMMITTEE PRELIMINARY WRITTEN RECOMMENDATION

Pursuant to this Court's Pre-Trial Order No. 262, Kline & Specter, P.C. ("Kline & Specter") hereby objects to the recommendation of the Fee and Cost Committee ("FCC") that Kline & Specter receive a common benefit fee award of $3,745,000.

Kline & Specter performed 32,270.19 hours of common benefit work in the Pelvic Mesh litigation for a total lodestar of approximately $16,400,000. This work included many critical tasks which contributed to the success of the pelvic mesh litigation for the common benefit to all claimants that helped create common benefit to share with and make available to MDL claimants. Additionally, the work by Kline & Specter attorneys, including over **$110,000,000** in state court verdicts, which helped pave the way for future trials, encouraged settlements, and contributed to the common benefit of all claimants. These contributions were no less significant than the contributions provided by the other top firms in the litigation, notably the FCC's own members. However, the FCC disallowed over 70% of Kline & Specter hours and recommended that Kline & Specter receive 23% of its lodestar, resulting in an effective hourly rate of $115.00. At the same time, the FCC recommends that its eight (8) members receive awards totaling $229,915,000, an average of $28,739,750, resulting in an estimated average hourly rate of $739. This represents 2/3 of the total fee allowed. In addition, the multiplier is nearly *6.5 times* the multiple applied to Kline & Specter. This treatment is unsupportable under the applicable facts and law.

## I.    BACKGROUND

Kline & Specter attorneys engaged in all aspects of pre- trial litigation, including document discovery, identification and preparation of experts, development of legal and factual theories, the taking of depositions, motion practice, the coordination of state and federal proceedings, and contributions to the trial packages. Kline & Specter attorneys were actively involved in all of these critical tasks. In support thereof, Kline & Specter incorporates by reference its previously submitted Affidavit in Connection with The Request For Allocation Of Aggregate Common Benefit And Costs Award dated April 9, 2018. *See* Affidavit of Kline & Specter, attached hereto as Exhibit "A." In addition, Kline & Specter incorporates

1

the arguments made at the presentation before the fee committee on June 12, 2018. *See* Transcript of Kline & Specter's Pelvic Mesh Fee Presentation, dated June 12, 2018, attached hereto as Exhibit "B."

From an early stage of the litigation, the Court indicated that any plaintiffs' attorney wishing to perform common benefit work would have that opportunity. Such attorneys were required, however, to work under the PSC's direction and to report their time and expenses to the FCC. Over 93 firms reported that they performed common benefit work and filed fee applications.

In January 2016, the Court appointed a Fee Allocation Committee ("FCC") to receive applications for common benefit fees. *See* Pre-Trial Order 211, dated January 15, 2016, attached hereto as Exhibit "C." The Court established guidelines for assessing each applicant's contribution.[1]
*Id.*

On September 13, 2018, the FCC provided applicants with a letter detailing the FCC's "Preliminary Written Recommendation." *See* FCC September 13, 2018 Recommendation Letter, attached hereto as Exhibit "D." The letter stated that the FCC had completed its initial review and that the FCC's recommended award for Kline & Specter was $3,745,000. *Id.* It instructed Kline & Specter to indicate acceptance or objection of this amount by September 28, 2018. *Id.* Kline & Specter now objects.

The FCC has provided only a vague, arbitrary explanation for the reduction of Kline & Specter's hours. The FCC has not explained the basis for its calculations, whether it utilizes a point system, the reasons for the vastly differing hourly rates awarded to different firms, or the details of each firm's fee allocation total. The FCC has not disclosed the basis for those determinations. Kline & Specter has outstanding discovery on these issues.

Although the FCC would award Kline & Specter only a fraction of its hours and lodestar, and no multiplier enhancement, it suggests that its own members be handsomely rewarded. 93 firms submitted fee applications. The FCC recommended that its 8 member firms receive awards with an estimated average fee award of $28,739,75 and an estimated average hourly rate of $739.75 - nearly 6.5 times the multiplier

---

[1] In particular, the Court directed that:
The FCC will be guided by governing fee jurisprudence in determining the reasonableness of the allocation, including the factors enumerated in Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978). The Barber factors include (1) the time and labor required; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services; (4) the attorney's opportunity costs in pressing the litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorney and client; and (12) the size of the fee awards in similar cases.

applied to Kline & Specter's $115 hourly rate as derived from its initial submitted hours and nearly twice the $400 hourly rate applied to Kline & Specter hours after the FCC's significant reduction of those hours. *See* Exhibit B from FCC Preliminary Recommendations, and Kline & Specter Excel Spreadsheet, attached hereto as Exhibits "E" and "F." Furthermore, the total fees awarded to the 8 FCC member firms is $229,915,000. This is approximately 2/3 of the $344,000,000 total fee award available at this time across the entire litigation. Thus, the 8 FCC member firms received over 2/3 of total fees while the FCC divvied up the remaining 1/3 of the allocated fees to the remaining 85 non- member firms.

In its September 13, 2018 letter, the FCC states that there were over 900,000 hours submitted to the FCC for review. *See* Exhibit "D." Adding up the total amounts of allocated fees in Exhibit B to the September 13th letter, the total number of hours allowed for all fee requesting firms is 679,149. Kline & Specter submitted over 32,000 hours and yet only 9,402.19 were approved for common benefit. Thus, the FCC allowed over 75% of all time submitted across all firms but approved less than 30% of Kline & Specter's time. There is no way of knowing to what extent the FCC member firms' hours were reduced – or, for that matter, the extent of hour reduction for any other firms. Up to this point, Kline & Specter has been denied discovery requests seeking this information. *See* Exhibit "A." The FCC made this recommendation despite the fact that Kline & Specter's contributions were no less valuable than the average contribution of other FCC members and that Kline & Specter was in the top echelon in number of hours expended in the litigation and worked on many difficult and crucial tasks.

Exhibit "A" to the FCC's September 13th letter was what was purported to be an explanation of the basis of the allocation for each firm and an explanation of the time and expenses allowed by the FCC for every firm seeking compensation for common benefit. *See* Exhibit A to FCC September 13, 2018 letter, attached as Exhibit "G." These "explanations" were anything but explanatory and included many inaccurate and misleading statements. Those with which Kline & Specter takes particular issue are set forth below:

1. **Kline & Specter "declined to participate meaningfully in the fee allocation process, declining to provide additional information to specific entries whose appropriateness was questioned."**

This is false. Kline & Specter has cooperated with the FCC protocol as outlined by the Court. Throughout the process of assessing common benefit time, the FCC attempted to strongarm firms such as Kline & Specter to challenge the reduction of hours by requiring the firms to do the FCC's job. Kline & Specter submitted over 5000 entries for consideration of common benefit hours. The FCC provided no

3

specific reason or explanation why these hours were denied for common benefit. Yet the FCC required firms to provide explanations for their denial of each individual entry. This was an impossible task. There only exists blanket, non-specific lists of vague reasons for why time may have been disallowed, making a specific response to each fee entry a futile guessing game. The lack of specificity of the reason for proposed disallowance prevents firms from meaningfully responding. Kline & Specter has meaningfully and vigorously participated in each and ever step of the fee allocation process, and to suggest otherwise is preposterous.

2.   **"Kline & Specter's efforts often conflicted with the cooperative efforts of the MDL and the firm mandamused the Court on multiple occasions."**

This is false. Kline & Specter has always worked diligently in the best interest of its individual clients and for the common benefit of all clients in the Pelvic Mesh litigation. In an effort to encourage timely resolution of cases that had been pending for several years, Kline & Specter filed a petition with the Fourth Circuit to get the District Court to either transfer Petitioners' cases or issue a pretrial order for completion of pretrial discovery and motion practice. *See* Mandamus attached as Exhibit "H." This petition was not at odds with the "cooperative efforts of the MDL" but was an attempt to improve the rate of case resolution for the common benefit of all claimants. It should be rewarded, not punished. Furthermore, the FCC has not provided any specific examples of how Kline & Specter "often" was at conflict with the MDL, thus Kline & Specter cannot meaningfully reply.

3.   **"In the Philadelphia Mass Tort Program in Pennsylvania State Court, the firm assisted in obtaining several successful verdicts against Ethicon, although most of those verdicts came on products where Plaintiffs' verdicts were already obtained either in the MDL or in prior state courts."**

The FCC acknowledges that Kline & Specter was successful in its work in the Philadelphia Court of Common Pleas ("PCCP") and "ultimately performed good work in representing their individual clients in state court in Pennsylvania." *See* Exhibit "G." Kline & Specter tried more cases to successful verdict than any other firm involved in this litigation. However, Kline & Specter's work in the PCCP cases is an example of a substantial hours reduction by the FCC for work that significantly contributed to the common benefit of all pelvic mesh claimants. Over 4,000 of Kline & Specter hours submitted for the *Hammons v. Ethicon* case tried in the PCCP were disallowed. All of Kline & Specter's work in the six PCCP trial cases benefited all Plaintiffs, but the *Hammons* case is the most blatant disallowance of hours. *Hammons* was tried in December 2015, *before* Ethicon settled the majority of cases. While the *Hammons*

4

case was the second trial involving the Prolift, it was the first and <u>ONLY</u> case where the jury found for the Plaintiff on a defective design claim. The *Gross v. Ethicon* verdict (*Gross* being the first Prolift case to be tried) was successful on the failure to warn claim only. The design defect claim is at the heart of these cases. While the failure to warn claim is case specific – it generally depends on the testimony of the implanting doctor - the design defect claim concerns the product itself and is at issue in every case.

Furthermore, the overall work of the attorneys involved in the pelvic mesh mass tort litigation did not result in a Global Settlement. Instead, individual firms negotiated piecemeal settlements. While Kline & Specter has requested the total amount of all settlements, this information has not been provided by the FCC. Kline & Specter has reason to believe that the per case settlement average is approximately $40,000. Many of the settlements were wholly inadequate for a substantial number of plaintiffs, considering the seriousness and permanence of their injuries and the courtroom track record of verdicts for these cases.

### 4. "The firm tried no cases in the MDL and was not an active participant in the overall strategy and decision-making of the PSC."

The fact that Kline & Specter did not try an MDL case is completely irrelevant to the number of hours Kline & Specter submitted towards common benefit time. The FCC's inclusion of this "explanation" also showcases the bias of the FCC and privilege that the FCC member firms and certain PSC member firms were given. The trial attorneys at Kline & Specter are recognized as some of the best in the country, as recognized by the FCC and PSC with our significant Pelvic Mesh verdicts in the PCCP. Kline & Specter was ready, willing, and able to try an MDL case but was never given the opportunity to do so.

With regard to the assertion that Kline & Specter was "not an active participant in the overall strategy and decision-making of the PSC," it is difficult for Kline & Specter to meaningfully respond given the vague nature of the accusation. Kline & Specter partner, Lee B. Balefsky, personally served on the PSC in the MDL and participated in every MDL Status Conference. In addition to serving on the PSC in the MDL's, Mr. Balefsky served on the New Jersey State Court Discovery Committee for mesh and as liaison counsel in the Philadelphia Court of Common Pleas Pelvic Mesh Mass Tort Program. Kline & Specter also executed one of the most significant litigation strategies by keeping Secant, Inc. as a defendant in the PCCP cases, thus securing a foothold in a crucial jurisdiction. This strategy was one

of the most significant and beneficial strategic decisions that ultimately benefited the entirety of the Ethicon litigation. *See* Exhibit "A" pp. 11-15.

Given the fixed nature of the common benefit fund, one person's loss is another person's gain. As discussed *supra*, the FCC recommended that its 8 member firms receive $230,000,000 in common benefit fees. *See* Excel Spreadsheet Prepared by Kline & Specter, attached as Exhibit "F". This inequality provides the backdrop against which Kline & Specter objects to the FCC's recommended allocation.

## II. ARGUMENT

### A. According to established legal principles, the FCC's recommended award for Kline & Specter is improperly low.

In the setting of common benefit fee allocations, district courts oversee the fee allocation to ensure the fair and equitable allocation of attorneys' fees, and at the heart of the Court's duty is transparency in the allocation process. The law governing allocation of common benefit fees to individual law firms is well developed. A seminal case, especially on procedural matters, is the Fifth Circuit's decision in *In re High Sulfur Content Gasoline Products Litig.*, 517 F.3d 220 (5th Cir. 2008). In this case, a plaintiffs' steering committee made a recommendation regarding allocation of common benefit funds to a district court in an *ex parte* proceeding. *Id.* The district court adopted the recommendation with basically no analysis and then sealed all records describing the recommendation and its bases. *Id.* The Fifth Circuit vacated and remanded. *See id.* at 224-26. The Court explained that while a district court may appoint a committee to recommend allocation of an aggregate fee award, "the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *Id.* at 227. Such close scrutiny "guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class" and "deflect[ing] the potential public misunderstanding that they may cultivate in regard to the interests of class counsel." *Id.* (citations and internal quotation marks omitted).

The Fifth Circuit explained further that for a district court to fulfill its duty, it "must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties." *Id.* Rather, exacting review is "necessary to discharge the court's obligation to award fees that are reasonable and consistent with the governing law." *Id.* (citation and internal quotation marks omitted). The Fifth Circuit added that district courts are required to use the "lodestar" method to assess common benefit fees. *Id.*

Under this framework, the District Court must first determine the reasonable number of hours expended on the litigation, and the reasonable hourly rate for the participating attorney. *Id.* The lodestar is computed by multiplying the number of hours reasonably expended by the reasonable hourly rate. The District Court may adjust the lodestar upward or downward after a review of the twelve factors set forth in *Johnson v. Georgia Highway*, Inc., 488 F.2d 714 (5th Cir. 1974):

> (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and resulted obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* at n.6, citing *Johnson*, 488 F.2d at 717-19.

In *High Sulfur*, the Fifth Circuit forecast the exact transparency issue presented here. It criticized the District Court for sealing record entries that made it impossible for attorneys to understand the basis upon which fee recommendations had been made. Here, this Court has sealed no documents but has not allowed for discovery requested by Kline & Specter that would allow for transparency of the process the FCC used to determine fee allocations. As of this writing, the FCC has refused to disclose the number of hours submitted by each firm, the process in which it assessed the reductions for each fee submitting firm, and the methodology for doing so. This refusals highlight the Fifth Circuit's observation that "[t]he lack of transparency about the individual fee awards supports a perception that many of these attorneys were more interested in accommodating themselves than the people they represent." *Id.* at 229. As the Court also concluded, without full transparency about a fee committee's process, attorneys cannot "compare their awards to those of other attorneys .... One cannot compare apples to oranges without knowing what the oranges are." *Id.* at 232.

Another circuit court case with implications here is *In re Agent Orange Product Liability Litig.*, 818 F.2d 216 (2d Cir. 1987). In this case, the Second Circuit invalidated a plaintiffs' steering committee's decision to divide a common benefit fee based on a private fee allocation. The Court explained that while some authority supported the committee's authority to divide money pursuant to private agreement, the committee could not divide the award in any manner it deemed satisfactory. "Such a division overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases." *Id.* at 223 (emphasis added). Under *Agent*

*Orange*, a court's duty to assure reasonableness extends to the allocation of common benefit money and does not end with creation of the aggregate fund. *Id*. Reasonableness is the touchstone for allocation of a common benefit fund. *Id*.

Another instructive circuit court case is *In re FPI Agretech Securities Litig.*, 105 F.3d 469 (9th Cir. 1997), in which the Ninth Circuit affirmed a district court's decision not to allocate attorneys' fees to a lawyer who was uninvolved in the litigation in which the fees were recovered. The rejected lawyer had argued for enforcement of a prior fee agreement. *Id*. The Ninth Circuit found that that district court properly could reject that agreement if it rewarded an attorney "in disproportion to the benefits that attorney conferred upon the class - even if the allocation in fees has no impact on the class." *Id*. at 473. The Ninth Circuit added that district courts should "reject a fee allocation that does not accurately reflect the amount of work performed by the various attorneys." *Id*. Indeed, "we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal." *Id*. at 474. *FPI* and *Agent Orange* reach basically the same conclusion: courts must assure "reasonableness" and avoid "disproportion" when allocating common benefit fees, and transparency in the allocation process is critical.

### B.    The amount recommended for Kline & Specter is manifestly too small given the quantity and significance of its common benefit work.

The above cases frame the legal analysis and require a dramatic rise in Kline & Specter's common benefit fee; the recommended $3.4 million is grossly insufficient. Initially, as described above, Kline & Specter performed a massive amount of common benefit work during Pelvic Mesh litigation. Its lawyers served on the PSC, on subcommittees, tried several cases to verdict, and expended substantial time and resources in fulfilling the responsibilities of these appointments. They provided significant briefing support on key legal issues. They also helped fund the Pelvic Mesh MDL through over $350,000 in contributions. Most of this work occurred in the heat of litigation, without any certainty of recovery, and before any settlements. *See* Exhibit "A."

Despite the significance of Kline & Specter's common benefit work, the FCC recommended that Kline & Specter's fee equal a .23 multiplier on its estimated lodestar and estimated hourly rate of $115. As stated above, the total submitted hours by all firms were reduced by only 25% yet Kline & Specter hours were reduced by 70%.

Throughout this process, Kline & Specter has reiterated its request for transparency. The process for determination of appropriate common benefit compensation is a most sensitive issue and fraught with potential for abuse, especially because the FCC members are recipients of FCC awards. At this juncture in the litigation, it is apparent that discovery is more critical than ever. Only further discovery will reveal the truth behind the proposed fee allocations. This fee allocation process is highly sensitive and fraught with potential for abuse, especially because the FCC members and their close associates will be recipients of FCC awards. In 2017, Elizabeth Chamblee Burch, articulated this tendency for a flawed, conflicted process in her article Monopolies in Multidistrict Litigation:

> [P]laintiffs' leadership across multidistrict proceedings can act like oligopolies and cartels. Cartels punish defectors by imposing costs on them and denying them access. When attorneys become lead lawyers, they have the power to control access and inflict costs, too: they distribute common-benefit work to allies, use settlements to restrict attorney advertising and reduce attorney demand, suggest common-benefit fee allocations, and report uncooperative behavior to the judge—carrots and sticks, in other words, that impair rivals' financial and leadership opportunities.
>
> *****
>
> Attorneys work together frequently. As such, they form a close-knit group (though not necessarily one predicated on friendship) that may develop and enforce norms to maximize members' collective welfare in current, concurrent, and future litigation.
>
> *****
>
> Because information flows easily through the network, it increases the opportunities for both tacit and explicit collusion and enables leaders to credibly punish and reward others for following or disregarding norms.

*See* Elizabeth Chamblee Burch*, Monopolies in Multidistrict Litigation,* 70 Vand. L. Rev. 67 (2017), pp. 122-123, attached as Exhibit "I." The only way to ensure that insidious conduct like that described in Burch's article will not happen here with this common benefit fee allocation is to permit discovery.

Making all information regarding the submissions of firm hours available to every Plaintiffs' lawyer involved in this process is in everyone's best interest – every attorney and every client. Fee disputes, like other litigation with millions at stake, ought to be litigated openly and transparently. Attorneys are inclined to argue over these generous fee awards and should be well positioned to comment—publicly and openly—on each other's relative contribution to the litigation.

Burch stated the need for judicial administration of the fund succinctly when she wrote, "[j]udges have the power to appoint leaders and the power of the purse. Common-benefit funds are judicially created and should likewise be judicially administered—not circumvented through settlement's backdoor or shielded by sealed fee petitions." *Id.*; see also, Charles L. Becker, Shanin Specter, & Thomas R. Kline, *How Not to Manage a Common Benefit Fund: Allocating Attorney's Fees in Vioxx Litigation*, 9 Drex. L. Rev. 1 (Fall 2016), attached as Exhibit "J."

The conflict of interest involving the members of the FCC and their ability to determine the fee awards for all fee requesting firms, including their own firms, becomes even more patently obviously when it is recognized that the External Special Master, The Honorable Daniel J. Stack, Ret., assigned to oversee the fairness of the process was himself a member of the FCC.  The conflict is astounding.

## III.   CONCLUSION

In conclusion, Kline & Specter reiterates its objection to the fee recommendations in the September 13, 2018 Transvaginal Mesh MDL Common Benefit Fee and Cost Committee Preliminary Written Recommendation and seeks a reevaluation at this time.  Recommendation.

Respectfully Submitted,

**KLINE & SPECTER, P.C.**

By: _____

Shanin Specter, Esquire/40928
Thomas R. Kline, Esquire/28895
Lee B. Balefsky, Esquire/25321
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
(215) 772-1000
*Attorneys for Plaintiff*

Dated: September 28, 2018

10