# EXHIBIT C

**OBJECTION OF KLINE & SPECTER, P.C. TO THE
TRANSVAGINAL MESH MDL COMMON BENEFIT FEE
AND COSTS COMMITTEE'S FINAL WRITTEN RECOMMENDATION**

## I.     INTRODUCTION

Kline & Specter, P.C. ("Kline & Specter") objects to the Final Written Recommendation of the Fee and Cost Committee ("FCC") which allocates $3,745,000 of the common benefit fee (1.07% of the total) to Kline & Specter.  This allocation is the same amount set forth in the FCC's September 13, 2018 Preliminary Written Recommendation, to which Kline & Specter objected and explained, in great detail, the unreasonableness of the FCC's allocation given the extensive common benefit worked performed by the Kline & Specter attorneys.  *See* September 24, 2018 Objection to the FCC's Preliminary Written Recommendation ("September 24, 2018 Objection") attached hereto as Exhibit "A."  For all the reasons set forth below and in the September 24, 2018 Objection, the FCC's Recommendation should be denied.

Throughout the fee allocation process, Kline & Specter has fully cooperated with the FCC and has pushed for a fair, transparent, and accurate fee allocation to ensure that all eligible firms receive proper compensation for their contributions.   On April 9, 2018, Kline & Specter submitted its Affidavit in Connection with the Request for Allocation of Aggregate Common Benefit Fee and Costs Award which provided a thorough explanation of Kline & Specter's involvement in and contribution to the transvaginal mesh litigation.  *See* April 9, 2018 Affidavit attached hereto as Exhibit "B."  On June 12, 2018, Shanin Specter, Esq., Lee B. Balefsky, Esq., and Thomas R. Kline, Esq. appeared before the FCC to outline the firm's extensive common benefit work.  Despite these submissions, on September 13, 2018, the FCC provided its Preliminary Written Recommendation which excluded over 70% of Kline & Specter's hours and allocated only $3,745,000 to the firm. *See* FCC September 13, 2018 Recommendation Letter, attached hereto as Exhibit "C."  Kline & Specter then submitted its September 24, 2018 Objection.  *See* Exhibit "A."  In addition, Kline & Specter has served 4 different sets of discovery on the FCC regarding its fee allocation procedure which have gone unanswered to date.  On November 20, 2018, the FCC submitted its Final Written Recommendation, which had increased the awards for several objecting firms.  *See* FCC November 20, 2018 Recommendation Letter, attached hereto as Exhibit "D." However, Kline & Specter's objections were ignored, and its recommended fee allocation - $3,745,000 – remained the same.

1

The FCC's proposed common benefit fee allocation should be denied as the FCC has substantially reduced, discounted, and excluded important common benefit work performed by Kline & Specter.  Kline & Specter played a critical role in the transvaginal mesh litigation and performed over 32,000 hours of common benefit work, including work that resulted in over **$110,000,000** in verdicts and encouraged settlements for the common benefit of all claimants.[1] These contributions were no less significant than the contributions provided by the other top firms in the litigation, notably the FCC's own members.  Yet, in its Final Written Recommendation, the FCC downplays the common benefit work of Kline & Specter, including the firm's enormous success in the courtroom, and seemingly values other, less essential work, over the contributions of Kline & Specter.

The FCC has also failed to employ an objective methodology in its allocation process. Throughout its Final Recommendation, the FCC makes vague statements regarding utilizing the "collective personal knowledge and experience of its members in this litigation" to "reflect on" the subjective value of the work submitted for consideration.  The FCC's fee recommendation is replete with examples of questionable allocations, especially its recommendation that its 8 members receive awards totaling $229,849,392.50, an average of $28,731,174, which is approximately 2/3 of the total fee allowed. Utilization of an objective methodology, such as application of the *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) factors, supports increasing the fee allocation for Kline & Specter.

In addition, the External Review Specialist has an inherent conflict in presiding over the common benefit fee allocation dispute between Kline & Specter (and any other objecting firms) and the FCC because he is a member of the FCC and has participated in the creation of the FCC's allocation recommendations.  Therefore, the FCC's Final Written Recommendation should be referred to a neutral third party for a new allocation based on an objective methodology, such as a lodestar calculation, to ensure fair and adequate compensation to the eligible firms.

II.     **ARGUMENT**

A.      **Kline & Specter's Work Was Vital to the Advancement of the Transvaginal Mesh MDL Plaintiffs' Common Benefit, But the FCC Ignored the Significance of Kline & Specter's Contributions**

---

[1] Some settlements by some firms were too low given the verdict track record, but that's a separate issue.

Over the past six-years, Kline & Specter attorneys have devoted over 32,000 hours to the transvaginal mesh litigation common benefit in order to serve the hundreds of thousands of women who have been injured by the defective pelvic mesh devices.  Kline & Specter attorneys engaged in all aspects of pre- trial litigation, including document discovery, identification and preparation of experts, development of legal and factual theories, the taking of depositions, motion practice, the coordination of state and federal proceedings, and contributions to the trial packages.  *See* April 9, 2018 Affidavit at Exhibit "B."  Furthermore, attorneys from Kline & Specter successfully obtained five (5) verdicts totaling over \$110 million[2] and have tried more cases – nine with one more on trial as of this writing - than any other firm in this litigation. Yet Kline & Specter's work was not recognized for the common benefit where such recognition was warranted.

The FCC contends that Kline & Specter was able to "dictate that the best cases" were set for trial in the Philadelphia Court of Common Pleas.  *See* Common Benefit Fee and Cost Committee's Reply in Support of Its Petition for an Award of Common Benefit Attorneys' Fees and Expenses at p. 12.  This is untrue.  The cases tried in the PCCP were done in a "FIFO order" – the cases were listed for trial in the order that they were filed on the docket.  To suggest that this selection process somehow gave Kline & Specter an advantage over other plaintiffs' lawyers in other jurisdictions is wrong.

In their Final Recommendation, the FCC unfairly criticizes Kline & Specter in wrongly asserting that "much of the work product used in their state court trials was obtained from the MDL, and MDL attorneys – including leadership in the Ethicon MDL, BSC MDL and others – also participated in the work-up and trial of those cases." *See* FCC Final Recommendation at p. 58.  This is untrue.  Kline & Specter did not just "use" materials from the MDL but, rather, accessed the raw materials available to them and every other participating firm and honed them into viable, successful trial packages.  Depositions and exhibits were culled down. Themes were developed.

---

a.   *Hammons v. Ethicon*, No. 130503913, Pa. Comm. Pls., Philadelphia Co. (2015): \$12,500,000 verdict. (\$5.5 million in compensatory damages, \$7 million in punitive damages.) Prolift.

b.   *Carlino v. Ethicon*, Case No. 130603470. Pa. Comm. Pls., Philadelphia Co. (2016).  \$13.5 million verdict. (\$3.25 million in compensatory damages for Mrs. Carlino, \$250,000 to Mr. Carlino for loss of consortium, and \$10 million in punitive damages.) TVT.

c.   *Engelmann v. Ethicon*, Case No. No. 140305384. Pa. Comm. Pls., Philadelphia (2017). \$20 million verdict. (\$2.5 million in compensatory damages and \$17.5 million in punitive damages.) TVT Secur.

d.   *Beltz v. Ethicon*, Case No. 130603835, Pa. Comm. Pls., Philadelphia Co. (2017). \$2.16 million verdict. (\$2.16 million in compensatory damages) Prolift.

e.   *Ebaugh v. Ethicon*, Case No. 130700866. Pa. Comm. Pls., Philadelphia Co. (2017) \$57.1 million verdict. (\$7.1 million in compensatory damages and \$50 million in punitive damages.) TVT and TVT Secur.

Expert testimony was refined, and crucial rulings that continue to benefit the entire litigation were won. This work was praised and, more importantly, utilized by other participating firms. *See* Exhibit "B" at pp. 15-20.

Additionally, Kline & Specter's work on the initial trial packages extended far beyond the mere observer status the FCC wishes to relegate the firm to. Kline & Specter developed experts and its involvement in the initial taking of depositions extended beyond the asking of questions. Kline & Specter attorneys participated in culling important documents, drafting and preparing questions, and analyzing these depositions. *See* Exhibit "B." This critical work seems to have been ignored by the FCC.

The FCC acknowledges that Kline & Specter was successful in its work in the PCCP and performed excellent work in representing their individual clients in state court in Pennsylvania and that "[t]he Mass Tort Program in Philadelphia was an additional pressure point in the Ethicon litigation." *See* FCC Final Recommendation at p. 58. However, Kline & Specter's work in the PCCP cases is an example of a substantial hours reduction by the FCC for work that significantly contributed to the common benefit of all pelvic mesh claimants. Over 4,000 of Kline & Specter hours submitted for the *Hammons v. Ethicon* case tried in the PCCP were disallowed. All of Kline & Specter's work in the six PCCP trial cases benefited all Plaintiffs, but the *Hammons* case is the most blatant disallowance of hours. *Hammons* was tried in December 2015, *before* Ethicon settled the majority of cases. While the *Hammons* case was the second trial involving the Prolift, it was the first and only case where the jury found for the Plaintiff on a defective design claim. The *Gross v. Ethicon* verdict (*Gross* being the first Prolift case to be tried) was successful on the failure to warn claim only. The design defect claim is at the heart of these cases. While the failure to warn claim is case specific – it generally depends on the testimony of the implanting doctor - the design defect claim concerns the product itself and is at issue in every case.

From the onset of this litigation, Kline & Specter relied on assurances from both the FCC and the Court that its work in state court would be recognized and compensated. PTO No. 18 and PTO No. 262 both recognize that state court common benefit work should be considered. In a February 11, 2016 email from Kline & Specter partner and PSC member, Lee B. Balefsky to FCC Chairperson, Henry G. Garrard, III, Mr. Balefsky confirmed the following:

> Henry, thank you for hosting the meeting yesterday in Atlanta. One of our major concerns is the compensation for state court litigation common benefit work. This will confirm that you agreed that such work will be

> compensated and included in the process. We look forward to working with
> the committee.

*See* February 11, 2016 email, attached hereto as Exhibit "E." No reply disputing this arrangement was sent or received. The recent statement by the FCC that only the first product trials would be recognized is an improper, after-the-fact attempt to change the agreement. *See* Final Recommendation at p. 24.

Not only did the FCC ensure that state court work would be compensated but so did this Court.  In PTO No. 18, Judge Goodwin stated:

> Common benefit work performed in state court litigation — whether the proceedings are consolidated or not — should be considered to the extent it contributed to the outcome of the litigation and benefitted the MDL. The Court recognizes, particularly to the extent there are agreements between state court attorneys and MDL leadership, that state court attorneys may make an application for common benefit fees and expenses to be fully considered by the FCC. In order for an attorney's work in state court litigation to be considered for payment from the Common Benefit Fund, settlements from the requesting attorneys must include the five percent assessment.

Additionally, PTO No. 262 (the <u>Fee Committee Protocol</u>) recognized that state court work would be considered.  *See* PTO 262, at p. 5.

Throughout its Final Recommendation, the FCC generally acknowledges the value of trials and substantial verdicts to this litigation, including the state court verdicts which encouraged settlements:

> Preparing a case for trial in these MDLs was an expensive and difficult undertaking in light of the complexity of the issues involved, and the number of fact and expert witnesses whose testimony is necessary to meet the burden of proof and to address the litany of defenses asserted. Every MDL trial case entailed additional rounds of motions and briefing on procedural and substantive legal issues, arguments over deposition designations and other evidence to be offered at trial and a variety of other pre-trial issues.

*See* Final Recommendation at p. 13.  The FCC clearly valued the work in bellwether cases and those tried in the MDL more so than those tried in state court though state court cases were at least as beneficial to the plaintiffs' common benefit.  The state court litigation demonstrated to the defendants that they were vulnerable to attack on several fronts where the plaintiffs could get quicker trial listings and enormous verdicts. Kline & Specter's work on state court trials were just as valuable as those spent on the MDL trials.

The FCC's inclusion of this "explanation" also showcases the bias of the FCC and privilege that the FCC member firms and certain PSC member firms were given (presumably this is the so-called "Plaintiffs' leadership" referred to throughout the FCC's Final Recommendation). The trial attorneys at Kline & Specter are recognized as some of the best in the country as has praised by the FCC and PSC members. *See, e.g.,* Affidavit at p. 13   Kline & Specter was ready, willing, and able to try an MDL case but was never given the opportunity to do so.

Despite the FCC's reiterations of the importance of trying cases, a significant number of firms were awarded high allocations where they did not try one case. Ironically, the FCC repeatedly states that the trial work was of the utmost importance.

Kline & Specter has worked diligently in the best interest of its individual clients and for the common benefit of all clients in the Pelvic Mesh litigation. In an effort to encourage timely resolution of cases that had been pending for several years, Kline & Specter filed a petition with the Fourth Circuit to get the District Court to either transfer Petitioners' cases or issue a pretrial order for completion of pretrial discovery and motion practice. This action was unfairly criticized by the FCC. *See* Final Recommendation at p. 58. This petition was not at odds with the "cooperative efforts of the MDL" but was an attempt to improve the rate of case resolution for the common benefit of all claimants. It should be rewarded, not punished. The criticism is a reflection of the timidity of the approach of leadership, also reflected in their puny and ill-serving mass settlements.

**B.     The FCC's Final Written Recommendation is Based On No Objective Methodology**

In calculating the recommended fees to be awarded to all firms, the FCC utilized an arbitrary, unreliable, subjective methodology, refused to disclose how work and hours were assessed, and failed to perform a lodestar crosscheck to ensure the reasonableness of the requested fee. This abstract methodology was without support from any established case law. The FCC does not even attempt to demonstrate otherwise. In its Final Recommendation, the FCC admits the following:

- As discussed above, the FCC's focus during its review of responses of applicant firms **was not directed toward a mechanical calculation** of the numbers reflected in time and expense entries. Rather, the FCC endeavored to analyze the benefit and value of the work reflected in these submissions in light of each firm's role in the litigation and in accordance with the Court's directives set forth in the common benefit orders, based on the

FCC's experience in the litigation and the materials and information submitted by each Firm. *See* Final Recommendation at p. 26.

- The FCC also relied upon the collective **personal knowledge** and experience of its members in this litigation and the **input received from other leadership** within the litigation. *See*, *id.* at p. 27.

- The FCC **did not apply a formulaic or grid approach** whereby an applicant's recommended common benefit award was the sum of points or the product of an "hours x rate x multiplier" equation. The FCC observed that the hours submitted by firms varied widely in quality. . . *Id.*

- The FCC, as discussed in detail in this Final Written Recommendation, **did not use an hourly rate method** in arriving at its percent allocation for each applicant firm. *See*, *id.* at p. 31.

The FCC's fee recommended allocation is unreasonable, and it is clear that its methodology was severely flawed. The FCC concedes that not all submitted hours for the common benefit had equal value. It did not use hourly rates. There was no request for billing rates. *See* Final Recommendation at pp. 31-33. This admission suggests that there was some undisclosed multiplier applied, of which there is no explanation – "silent multiplier." This arbitrary methodology resulted in several attorneys'/firms' average hourly rates being unreasonably high, including the rates for the eight FCC member-firms. There is nothing reasonable about the 8 FCC member-firms receiving an average of $739/hr while the remainder of the participating firms were awarded a mere average of $251/hr. The FCC member's hourly rate is nearly 6.5 times the multiplier applied to Kline & Specter's $115 hourly rate as derived from its initial submitted hours and nearly twice the $400 hourly rate applied to Kline & Specter hours after the FCC's significant reduction of those hours. Kline & Specter performed 32,270.19 hours of common benefit work in the Pelvic Mesh litigation for a total lodestar of approximately $16,400,000.

The FCC claims that its analysis did not focus "solely on whether or not the firm had a member who was appointed to a leadership position, or whether any of the firm's members contributed value to the litigation, but instead necessarily focused on the value contributed to the litigation *by the firm as a whole*." *See* Final Recommendation at p. 32. This makes zero sense with regards an objective methodology. Furthermore, if it is true that the FCC looked at the efforts of a firm "as a whole", it seemed to overlook the firmwide efforts of Kline & Specter. Twenty-

four (24) of Kline & Specter's attorneys[3] participated in this litigation - not to mention countless paralegals, staff, and all other available resources. Kline & Specter's work for the Common Benefit of this litigation utilized the firm as a whole, and this effort went uncompensated.

### C. The *Johnson* Factors Support An Increased Fee Allocation for the Work Performed by Kline & Specter

The FCC claims that it considered what it referred to as "*Barber* factors" in its allocation process. *See*, Final Recommendation at p. 28. However, it is clear that the FCC did not consider these factors, as application of the factors demonstrate that Kline & Specter is entitled to a significantly greater portion of the common benefit fee fund.

In *Barber v. Kimbrell's, Inc., 577 F.2d 216* (4th Cir. 1978), the Fourth Circuit considered attorneys' fees in a consumer class-action action lawsuit and follows the lead of the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714 (1974), requiring that the district courts are to consider and make detailed findings with regard to twelve factors relevant to the determination of reasonable attorneys' fees. The *Barber* court held that any award must be accompanied by detailed findings of fact with regard to:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber* at p. 226, Fn. 28.

The *Johnson* factors illuminate the unreasonableness of the FCC's recommended allocation. As explained above, Kline & Specter expected at the outset of the litigation that state court work would be recognized as part of the common benefit. *See* factors 4, 6. This, apparently,

---

[3] Participating attorneys included: Thomas R. Kline, Founding Partner; Shanin Specter, Founding Partner; Lee B. Balefsky, Partner; Charles Becker, Partner; Christopher Gomez, Partner; James J. Waldenberger, Partner; Michael Trunk, Partner; Lisa Dagostino, M.D., Partner; Barry Magen, M.D., Partner; Kila Baldwin, Partner; Regan Safier, Partner; Robert Leoni, Partner; Kristen Sipala, Associate; Christine Clarke, Associate; Priscilla Jimenez, Associate; Colin Burke, Associate; Patrick Fitzgerald, Associate; Andra Laidacker, Associate; Tracie Palmer, Associate; Elia Robertson, Associate; Roger Cameron, Attorney; Catherine Foley, Attorney; Jonathan Goodall, Attorney; Ebiho Ahonkai, Attorney.

was not the case, and the Kline & Specter ultimately expended thousands of hours pursuing state court trial verdicts that would be ignored by the FCC. The amount in controversy and the results obtained also indicate that Kline & Specter's work was not properly recognized. $7.25 billion was generated by this litigation so far, but the results for individual plaintiffs were extremely poor. One need only consider the disparity between the approximate average settlement amount ($40,000) and the average trial verdict ($9,800,000) to see that the results obtained were disappointing. This ratio is 1:245, not even pennies on the dollar. So, the result of leadership's work was poor, undermining their proposed opposite disparity in compensation. *See* factors 1, 2, 3, 8 and 9.

Additionally, there is no question the *Johnson* factors favor recognizing the time and labor expended by Kline & Specter (over 32,000 hours), the skills required to properly perform the legal services rendered, and the experience, reputation and ability of the Kline & Specter attorneys.

### D.    The External Review Specialist Has an Inherent Conflict in this Matter

At this writing, the assigned External Review Specialist is playing a role in this litigation that creates an inherent conflict of interest. Former Judge Daniel J. Stack has been involved in the FCC's initial fee determinations, has approved them in writing, and will be reviewing those fee determinations at a subsequent step in the final process. With respect to Judge Stack's dual role, this is a deprivation of due process. Judge Stack is serving in a judicial or quasi-judicial capacity. It is fundamental that no one should judge their own conduct.

## III.    CONCLUSION

For the reasons stated above and in the September 24, 2018 Objection, Kline & Specter objects to the fee allocations set forth in the FCC's Final Written Recommendation and seeks a reevaluation at this time. Furthermore, Kline & Specter requests that the Final Written Recommendation should be referred to a neutral third party for a new allocation based on an objective methodology, such as a lodestar calculation, to ensure fair and adequate compensation to the eligible firms.

Respectfully Submitted,

**KLINE & SPECTER, P.C.**

By: _____

Shanin Specter, Esquire/40928
Thomas R. Kline, Esquire/28895
Lee B. Balefsky, Esquire/25321
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
(215) 772-1000
*Attorneys for Plaintiff*

Dated: December 4, 2018