**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE:  C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| IN RE:  AMERICAN MEDICAL SYSTEMS, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION | MDL NO. 2325 |
| IN RE:  BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2326 |
| IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LIGITATION | MDL NO. 2327 |
| IN RE:  COLOPLAST CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2387 |
| IN RE:  COOK MEDICAL, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2440 |
| IN RE:  NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL NO. 2511 |

*This Document Relates To All Cases*

**MAZIE SLATER'S OBJECTION TO RECOMMENDED ALLOCATION**
**OF COMMON BENEFIT FEES AND THE REIMBURSEMENT**
**OF SHARED EXPENSES AND HELD COSTS**

The Fee and Cost Committee's ("FCC") Final Written Recommendation ("FWR") and the Report of the Hon. Daniel Stack ("Stack Report") do not fairly recognize the significant work performed by Mazie Slater for the common benefit. Mazie Slater was a catalyst of the overall litigation, filing the first case in the country against Ethicon/Johnson & Johnson in the New Jersey Superior Court in March 2008, long before the first FDA Public Health Notification that drew most of the other law firms to the litigation. Mazie Slater also tried the first case in the country against Ethicon, and more than a decade later, we continue to be at the forefront of this litigation. Rather than credit these and other contributions, such as (1) being sole trial counsel or co-lead trial counsel in multiple bellwether trials around the country, (2) questioning 93 witnesses at the four bellwether trials where Mr. Slater was lead or co-lead trial counsel, including the *Bellew* case in this Court (*See* Declaration of Adam Slater ("Slater Dec.")), (3) questioning additional witnesses on video at trials that Mr. Slater did not attend in person, and (4) taking over 235 important depositions, the FCC inexplicably took pains to minimize Mazie Slater's role.[1] Mazie Slater was one of the driving forces and largest risk-takers in the litigation, having accumulated $2.7 million in held costs, and even after unjustified reductions by the FCC was awarded $1.8 million for costs, **the fourth largest amount of any firm**. As this Court recently recognized, "Before 2011, there were only a handful of firms involved in this mesh litigation. The risks and costs associated with leading this litigation have remained onerous from the beginning." (PTO #201, p.17). That certainly applies to Mazie Slater, yet Mazie Slater's inadequate fee award is commensurate with those law firms who only advanced modest sums and took little or no risk, because they tried no cases, developed no experts, and took few if any important depositions. This result is objectively

---

[1]     In addition to this Objection and the Declarations submitted herewith, Mazie Slater relies on and incorporates by reference the entire record that is now before the Court, *in camera*, including Mazie Slater's prior submissions, and the transcript of the meeting with the FCC.

unsustainable, and Mazie Slater requests a fee award commensurate with its status as one of the few fundamental leaders of this litigation.

As this Court previously recognized, fee awards should apply the "*Barber* factors". (*See* PTO No. 327); *Barber v. Kimbrel's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978) (adopting the *Johnson* factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714-718, 719 (5th Cir. 1974)); *In re Serzone Prods. Liab. Litig.*, 2007 WL 7701901, at *2 (S.D.W. Va. May 16, 2007). *See also In re Vioxx*, 802 F. Supp. 2d 740 (E.D. La. 2011). Fair evaluation of Mazie Slater's contributions overwhelmingly supports a significantly greater award.

One of the fundamental facts invalidating the FWR is the FCC's failure to adhere to this Court's Orders and direction as to the involvement of Mazie Slater. The Court directed the FCC to include Adam Slater in the deliberative process so that the process would be transparent, and the work performed -- including in New Jersey where the litigation was born and flourished for nearly two years before the MDL became active -- would be fairly considered and valued:

> Regarding the involvement of Adam Slater in the FCC, Judge Goodwin expects that Adam will be the unofficial New Jersey liaison and, in that role, **he will be invited frequently to participate where appropriate**. **This is consistent with the overall goal of transparency in the process of making fee recommendations for ultimate consideration and decision by Judge Goodwin**. (*See* Ex. B to Mazie Slater's Objections to the FCC's Preliminary Written Recommendation ("Mazie Slater PWR Objection")) (emph. added).

Despite this directive, the FCC lost sight of its narrow mandate and fiduciary obligations, and brazenly disregarded the Court's clear instruction: Adam Slater was never allowed to participate, and the FCC steadfastly refused to disclose details or documentation of the its opaque evaluation of the common benefit submissions. The exclusion of Mr. Slater -- preventing rather than promoting transparency -- undercuts the entire process, which as stated above, was intended to aid this Court in its "ultimate consideration and decision."

Another significant defect in the FWR is the FCC's failure to fairly value state court work, despite the Court's clear mandate that state court work be valued on an equal basis (e.g., "[state court work and trials] will be compensable time…so long as it has been approved and agreed to by the co-lead of the applicable MDL.") (*See* PTO #54, 18, 207, and 211; Slater Cert., Ex. "E" to Mazie Slater's Objection to the FWR ("Mazie Slater FWR Objection")).[2]  However, after years of litigation, the FCC issued a self-serving rule stating that: "**Once a favorable result was reached with regard to a particular TVM product, no further state court time was considered by the FCC as being for the common benefit**." (*See* Mazie Slater PWR Objection, Ex. "C"). This "rule" was used by the FCC to eliminate substantial important work, in direct contravention of the Court's Orders. See *In re Vioxx*, 802 F. Supp. 2d at 764, 769, 771, 774 (emphasizing (1) the importance of the New Jersey state court discovery and trials in that analogous litigation, (2) the value of repeated trials on a single product, and (3) the value of close consultation with state court judges on common benefit allocation). In fact, this Court recognized that, "the quality of the work is reflected in the significant **verdicts** achieved…." (PTO #201, p.17).

This unsanctioned "rule" selectively harmed Mazie Slater, as we tried multiple Prolift cases in state courts around the country; refining and strengthening the claims with new discovery, depositions, scientific literature, and strategies at every trial; and then sharing our evolving trial presentation and strategies with other plaintiff firms. This blueprint was relied on and emulated in the TVT cases, which were built on the same themes and overlapping testimony, maintaining continuous trial pressure on Ethicon. Even more egregious, this "rule" was not evenly applied. For example, FCC Chairman Henry Garrard's sole trial, *Cisson*, was the **second** Avaulta Plus trial that

---

[2]     All of this work was deemed approved per the 2/16/16 letter sent by Henry Garrard to Mr. Slater, where Mr. Garrard clearly stated, "As to the prior authorization for work, it is agreed that will not be an issue." (Ex. F to the Mazie Slater FWR Objection).

took place; Mr. Garrard's only trial followed the successful California state court trial on that product in the *Scott v. C.R. Bard* case. Thus, if the FCC's "no value for a second trial" rule were to apply uniformly, Mr. Garrard deserved no credit for the *Cisson* trial. Of course, this manipulative "rule" should never have been created by the FCC as all of the trials were important, and each trial refined the attack, putting sustained pressure on the defense. The FCC's unsanctioned exclusion of trials directly violated the Court's Orders prioritizing trial work, and further undermines the validity of the conclusions in the FWR and the Stack Report.

Another fundamental problem, to quote FCC member Joseph Rice's objection to the fee recommendation in the *Vioxx* litigation, is the FCC's unabashed "self-dealing," which demonstrates "disregard and disrespect [for] the enormous contribution of others in this litigation" and a "lack [ of] evenhandedness for those applicants not on the Committee." (*See* Motley Rice's Obj. to *Vioxx* Fee Allocation Committee's Common Benefit Fee Recommendation; Ex. "A" to Mazie Slater's PWR Objection).  Ironically, here Mr. Rice has committed the very wrong he decried in *Vioxx*:  the FCC treated the massive fund at issue as its own, awarding the 8 FCC firms a staggering 62.5% of the fund, that is, an average award of $27.36 million per FCC firm.

In fact, from the outset certain FCC members and their partners repeatedly told Adam Slater and others that the process was not fair in substance, and it was clear that the heads of the FCC -- Mr. Garrard, Mr. Rice, and Mr. Clark -- who collectively took $143,669,635, or 41% of the total -- had predetermined to pay themselves the lion's share of the fund at the expense of other deserving firms. These FCC members (the Alystock and Cartmell law firms) were so concerned about the self-dealing that they provided Mazie Slater, and other non-FCC firms, with a biased internal analysis that was being utilized by the FCC. This faction of the FCC asked for help from Mazie Slater and others outside the FCC to provide countering facts to try to combat the false narratives that were being utilized within the FCC's evaluations of common benefit submissions.

(*See* TVM Historical Analysis; Mazie Slater PWR Objection, Ex. "E").  Unfortunately, those dissenters ultimately abdicated their fiduciary duties and fell in line when they were paid to do so, *i.e.*, in return for awards of $37 million (Cartmell) and $26 million (Aylstock).  Those five firms alone took $207 million, or 59% of the total - **$41.4 million per firm**.

Perhaps the most glaring example of self-dealing, and certainly the most disturbing -- disclosed by Judge Stack no less -- was Bryan Aylstock's refusal to allow his partner (FCC member Renee Baggett) to sign the FCC's PWR unless his firm was awarded substantially larger fees, resulting in an increase of approximately $10 million in his firm's award. Judge Stack stated that he "was sickened" and "angered" by this conduct, which he described as Mr. Aylstock pressuring the FCC Chairman when he was particularly vulnerable. Judge Stack explained that he could not recommend the far lower amount he believed Aylstock deserved since he was, as he termed it, "**put in a box" since the agreement with the Aylstock firm included assurance that Judge Stack would not reduce the agreed-upon award.** (*See* Slater Dec.; Declaration of David Mazie ("Mazie Dec."), filed herewith). This self-dealing, compounded by Judge Stack's inability or unwillingness to remedy the situation, is yet another invalidating factor.

Similarly, Judge Stack stated that he believed that Motley Rice (like some others in the litigation) had inflated its contributions and had "padded" its time with thousands of phantom hours, including hours attributable to re-reviewing documents that had already been reviewed, which Judge Stack advised that Motley Rice did "in every litigation." Id.  This too was ignored in the Stack Report. Ultimately, Judge Stack admitted that he was acting on behalf of the FCC, and he explained that he would not recommend any award that had not been pre-approved by the FCC. To that point, he confirmed that the additional amounts he recommended for the Anderson Law Firm and Bernstein Liebhard were only included because they were first approved by the FCC,

and that he could not recommend any additional monies to Mazie Slater because the FCC did not approve any such increase.  (Slater Dec.; Mazie Dec.).

## THE FCC FAILED TO FAIRLY VALUE WORK PERFORMED IN NEW JERSEY

The state court work that the FCC, and thus the Stack Report, did not fairly value was significant and foundational to the overall litigation. On March 27, 2008, Mazie Slater filed and began to heavily litigate **the first pelvic mesh case against Ethicon in the United States**, *Lombardi v. Ethicon*, in the New Jersey Superior Court. This foundational work is described in great detail in the Affidavit of Adam Slater filed in support of Mazie Slater's Request for Allocation ("Slater Fee Aff."), including Exhibits 1 and 2 thereto in particular. The New Jersey Multi-County Litigation ("MCL") was formed on September 13, 2010, and Adam Slater was appointed Liaison Counsel for the Ethicon Litigation at the outset. **Mazie Slater has continuously litigated these cases for 11 years, longer than any other firm in the country**.

The FCC's FWR is revisionist history because it ignores that years earlier the Leadership of the MDL had admitted the significant value of the New Jersey work, much of which was provided to the MDL based upon discovery obtained by Mazie Slater in *Lombardi*. That work product was provided to the MDL by virtue of an August 28, 2012 written Agreement signed by the Ethicon co-leads Tom Cartmell and Renee Baggett with the express authorization of the three coordinating co-leads of the MDL ("NJ Agreement") attached as Ex. 6 to the Slater Fee Aff.).  The NJ Agreement between Mazie Slater and the FCC states in relevant part that:

> Due to the **advanced stage of the NJ Litigation**, as compared to the MDL Ethicon litigation, and the value of the work and work product generated in and in connection with the NJ Litigation, the MDL Leadership sees a need to and thus desires to share in the benefits of the aforesaid work and resulting work product. (*Id*. at ¶ 7). (emphasis added)

6

Through the NJ Agreement, the MDL was given access to the New Jersey common benefit work product. The Agreement provides a detailed overview of this critical work (with emphasis on work performed by Mazie Slater), recognizing that it benefitted the Ethicon litigation and the "overall transvaginal mesh litigation":

> **It is hereby recognized that attorneys in the NJ Litigation have expended and will continue to expend a significant amount of time, effort, and money for the purpose of developing the claims in the NJ Litigation, which are also common to the MDL, and advancing the overall transvaginal mesh litigation**. For example, not by way of limitation, attorneys prosecuting the NJ Litigation have: initiated the NJ Litigation in early 2008, prior to the first FDA Notification on October 20, 2008, including but not limited to the matter of *Lombardi v. Ethicon, et. al*. **in which in excess of 100,000 pages of significant documents were obtained and analyzed** and numerous key depositions were noticed; developed and negotiated **master pleadings and master document requests, that have been utilized as templates in the MDL; taken extensive discovery, including the review and analysis of millions of pages of documents**, extensive data bases, instructional videos, and related materials, and the **depositions of dozens of relevant witnesses**, including the identification of and depositions of key corporate designees and witnesses; **litigated and argued numerous significant motions and informal applications**….reviewed and challenged the propriety of redaction logs and privilege logs; **developed trial theories and themes; retained and developed common experts**….as well as the related negotiation and establishment of protocols for, and the conduct of, review of pathology samples, and material science testing; **researched and analyzed common legal issues; analyzed and summarized dozens of depositions; conducted discovery in connection with and preparation of and for bellwether trials**.... (*Id*. at ¶ 4) (emph. added).

The FCC inexplicably ignored or unfairly minimized all of this foundational work, and the ongoing work in New Jersey, when much of the key discovery was completed before the MDL obtained it, such as: custodial productions for most of the key corporate witnesses, virtually all important databases, and critical indexes of the approval and in-use dates for fundamental documents such as IFUs, patient brochures, and professional education materials.

The importance of the New Jersey work product was also **confirmed by lead Ethicon defense counsel Christy Jones, Esq. in her May 21, 2012 letter to this Court,** submitted with

Ethicon's request that the still forming MDL rely on the New Jersey work. The letter details the extensive discovery already provided and ongoing in New Jersey (more than four years after *Lombardi* was filed), as compared to the other MDLs: "**Ethicon and J&J have made these productions [3.8 million pages of discovery] in New Jersey pursuant to agreements with the plaintiffs under the auspices of governing protective orders and ESI orders**…." The letter goes on to detail the extensive work that was shared with the MDL. (emphasis added) (Slater Fee Aff., Ex. 7).

Mr. Slater's pivotal role was also recognized by the Hon. Brian R. Martinotti (now a District Court Judge), in a March 22, 2016 Order when he appointed Mr. Slater as Common Benefit Liaison Counsel. (Slater Fee Aff., Ex. 5). The Order states in part: "The Court hereby appoints Adam M. Slater as common benefit liaison counsel, **recognizing that Mr. Slater has <u>guided this litigation from its inception</u>, and has the most detailed knowledge of the work performed, expenses paid, interaction with related litigation around the country, including the MDL venued in the Southern District of West Virginia, and the value of that work in advancing the litigation on behalf of all plaintiffs**." The MDL leadership intervened and weighed in on the motion, but notably did not object to or contradict this language in the Order – yet they ignored this in the FWR. Adam Slater's involvement in fact meets all criteria to be valued as a "senior leader providing maximum senior leadership effort…" (PTO #207, B(11)(G), ¶9). This is a distinction only a small handful of attorneys in the entire litigation can claim.

The FCC also completely ignored Mr. Slater's role as lead counsel, responsible for the administrative management and oversight of the New Jersey Ethicon and Bard consolidated litigations. These responsibilities have been extensive: leading more than eight years of case management conferences, arguing all important motions, leading all strategy decisions, organizing and directing all discovery, leading the bellwether case selection process, and much more. New

Jersey was the first battleground and continues to be a critical battleground, involving approximately 15,000 cases at its height. It is important to recognize that Adam Slater was asked by some of the ultimate leaders of the Ethicon MDL if he wanted to serve as a lead of the *In re Ethicon* MDL at the time of formation, since he was the unquestioned leader of the litigation at that time. Mr. Slater chose not to lead the MDL as a strategic decision for the common benefit; by staying in New Jersey Mr. Slater was able to continue to push the Ethicon discovery at a breakneck pace. This ultimately was a tremendous benefit to all the plaintiffs as discovery continued unabated in New Jersey while the MDL was being organized and developed. Mr. Slater then partnered with the nascent federal litigation as a co-lead of the coordinated (state and federal) national Ethicon litigation.  New Jersey remains a critical pressure point to this day.

The FCC also failed to abide by the binding agreement by Henry Garrard on behalf of the MDL leadership in his letter to Adam Slater dated February 16, 2016. (Ex. "F" to Mazie Slater FWR Objection).   Mr. Garrard represented that: (1) "your leadership in the New Jersey consolidated matters is certainly a factor that will be considered in any recommendation concerning payment of fees and expenses to you," and (2) the monies that "you have paid in for the New Jersey litigation will be reimbursed in the same manner as the amounts that have been paid in by PSC members in the MDL." Mazie Slater reasonably relied on the FCC Chairman's representations. Instead, Mr. Slater's leadership role in New Jersey was marginalized, and without explanation, Mazie Slater was arbitrarily awarded only $125,000 of the $170,000 it paid to fund the New Jersey litigation, the FCC cut all costs expended prior to the formation of the MDL, cut $143,00 in costs expended in the *Wicker* bellwether case, and cut all costs expended post-verdict in the *Gross* case. (7/5/18 FCC letter regarding expenses). These disallowances violated the agreements, representations, and the Court's Orders.

### MAZIE SLATER TRIALS/LITIGATION PRESSURE ACROSS THE LITIGATION

The FWR and the Stack Report failed to properly credit Mazie Slater for its extensive trial work. **Mazie Slater was sole trial counsel**, or co-lead **trial counsel**, in <u>**9 bellwether cases**</u> **around the country that went to trial or settled during or just before trial**, **prior to the FCC's arbitrary cut-off**.[3] No firm or attorney has tried more cases with more success than Mazie Slater, nor can they match or exceed the number of witnesses questioned live and on video at trials by Mr. Slater. But the FCC took pains to disallow or marginalize a great deal of this work. These cases include: *Gross* ($11 million verdict, first Ethicon case to go to trial in the country, discussed below); *Schubert v. Ethicon* (Missouri, first mixed product trial, Prolift/Prolift +M, settled two days into pretrial hearings, along with the two other cases in the inventory of the law firm who asked Mr. Slater to serve as lead trial counsel for these cases – all $127,000 in held expenses disallowed); *Budke v. Ethicon* (Missouri, first and only wrongful death trial, and only trial involving implanter as a defendant, settled 3 weeks into trial, just before closings. Mr. Slater was asked to serve as lead trial counsel by the Simon Law Firm in St. Louis, and Mr. Slater opened and questioned every single one of the 32 witnesses who testified at the trial – all $313,000 in expenses disallowed); *Bellew v. Ethicon* (first MDL Prolift trial, settled on day five of trial. Mr. Slater was asked to serve as co-lead trial counsel by the Aylstock firm <u>and questioned 11 of 13 witnesses at trial</u>); *Wicker v. Ethicon* (was to be the second New Jersey bellwether trial, settled after full pre-trial hearings for $5 million)[4]; *Hammons v. Ethicon* (first bellwether trial of any pelvic mesh case in Philadelphia Court of Common Pleas mass tort program, $12.5 million verdict. Mr. Slater was asked to serve as co-lead trial counsel by Kline & Specter and questioned 21 of 27

---

[3]    There is insufficient space to fully address the arbitrary cutoff dates here.

[4]    This amount has been publicized as it was learned and disseminated by Bloomberg News.

trial witnesses including all corporate witnesses and general experts, and the implanting and explanting surgeons, and shared the full trial package – this trial set the stage for the series of successful trials in that venue); *Corbett v. Ethicon* (this was a Seeger Weiss case, Adam Slater was asked to serve as lead trial counsel for the first TVT-R bellwether trial in New Jersey – Seeger Weiss settled their inventory with this case, weeks before openings); Korzeb v. Ethicon (this was a Beasley Allen case, Adam Slater was asked to serve as lead trial counsel for the first TVT-O bellwether trial in New Jersey – Beasley Allen settled their inventory with this case, prior to openings); and Smith v. Ethicon (this was a Fleming Nolen & Jez case, Adam Slater was asked to serve as lead trial counsel for the first TVT-O bellwether trial in New Jersey after Korzeb settled – Fleming Nolen & Jez settled their inventory with this case, prior to openings).

PTO No. 207 provides: "emphasis should be placed on work product and materials that are provided to counsel to prepare for trial…hours spent developing litigation strategies or preparing for and participating in trials generally provide greater common benefit than hours spent reviewing and coding documents." (Again, the FCC's "one trial" rule runs afoul of this Order). Over the past decade, Adam Slater and Mazie Slater attorneys have performed some of the most critical trial-related work in the entire litigation, including the development of trial themes and trial-ready evidence that was either directly utilized or has been emulated across the litigation, not just against Ethicon. This trial work has been a critical source of pressure throughout.  This string of trials began with the *Gross* and *Wicker* bellwether cases, which were worked up simultaneously until the *Gross* case was chosen to go to trial just a few months before opening statements (the FWR and Stack Report ignore *Wicker*).

**_Gross_ was the <u>first</u> pelvic mesh case tried in the country against Ethicon, and the first in New Jersey or the MDL against any pelvic mesh manufacturer**.  In order to learn how a pelvic mesh case could be tried, many MDL firms attended portions of the *Gross* trial in person or

11

paid to watch the trial on Courtroom View Network. *Id*. The transcripts, expert reports, depositions, briefing, and other work product from *Gross* were provided to the MDL and helped form the foundation of the work performed in the MDL going forward. This included, but is not limited to, the 512-page report of Anne Weber, M.D. This treatise of a report was an important resource for all attorneys preparing expert reports in the overall litigation, along with her multiple supplemental reports. In addition, Mazie Slater contributed Dr. Weber's trial testimony, and the reports and depositions of numerous other experts such as Tom Margolis, M.D. who has gone on to testify in a number of trials. Further, Mazie Slater undertook the direct and cross-examinations of key corporate witnesses, as well as Ethicon's presumed lead national expert on general liability and causation, Miles Murphy, M.D. (who never testified again after being cross-examined by Mr. Slater in *Gross*). Mr. Slater also developed the blueprint for questioning a hostile implanter/learned intermediary (the implanter in *Gross* was an Ethicon consultant who taught the Prolift procedure to other doctors). The $11.1 million verdict in *Gross* included punitive damages against both Ethicon and J&J – introducing it as a reality in the litigation; significantly J&J and its substantial assets were on the verdict sheet during the punitive phase of the trial. This was the result of Mazie Slater winning its motion to compel J&J apex witnesses to testify at trial. In exchange for agreeing not to compel J&J's apex witnesses to testify, J&J agreed to be on the verdict sheet, and its assets considered during the punitive phase, without further proof required. <u>That agreement has been used as a **template** in subsequent Ethicon trials around the country.</u>

It is also undisputed that Mazie Slater's work product is a material part of the Prolift trial package, including the videotaped testimony taken by Mr. Slater of general liability/causation expert Dr. Daniel Elliott, and the videotaped testimony taken by Mr. Slater of all key corporate witnesses. The testimony Mazie Slater elicited has been used in MDL, Philadelphia, Missouri and New Jersey trials. The Prolift trial package, which is the most complete and successful trial

package developed in this litigation, has been used multiple times in Philadelphia, in a 2018 MDL remand trial in the Southern District of Indiana to obtain a $35 million verdict, *Kaiser v. Johnson & Johnson*, and has driven the overall value of every Ethicon inventory settlement. On the other hand, while work on the mid-urethral slings had value, including work performed by Mr. Slater, the amounts paid in settlement sharply differ, and many of the MUS cases were paid nothing and dismissed.

The statement by the FCC in awarding $14.1 million to Freese & Goss, who did most of their work in state court (most of the time teamed up with Wagstaff Cartmell), clearly applies to Mazie Slater. "The trial efforts of the firm assisted the overall progress of the MDL through **continued pressure upon the defendants**…."[5] (FWR at 54).   However, Mazie Slater was awarded only a fraction of their award despite trying many cases, taking far more depositions, and leading the litigation.  Mazie Slater has applied relentless pressure on both Ethicon and Bard and Ethicon is the only litigation in which continuous trial pressure has existed from the earliest days to the present – with Mazie Slater playing a central role from start to the present, as compared to the other litigations where no more than short bursts of activity have been the norm (until Mr. Slater began to target Bard too).

Mr. Slater also provided substantial assistance to many other firms for trials around the country. For example, for the MDL trial of *Lewis v. Ethicon* (MDL – first TVT-R trial), Mr. Slater flew to Dallas and attended several days of meetings at the Freese & Goss office, offering extensive input into all aspects of the trial (also providing advice for their upcoming Texas state court trial, *Batiste*), and then conducted the *de bene esse* deposition of Ethicon corporate representative James

---

[5]     This finding further undercuts the FCC's unevenly applied *ad hoc* rule devaluing successive trials on a particular product.  It is the relentless pressure that brought the defendants to the table, not a single trial.

Mittenthal for the *Lewis* trial on behalf of the MDL. Mr. Slater and his associates have assisted many other law firms on issues large and small throughout the course of the litigation; and this assistance was not limited to Ethicon cases. Mr. Slater has also spoken on the regular MDL conference calls for all plaintiffs' counsel, and at national seminars regarding pelvic mesh litigation.

### MAZIE SLATER'S DEPOSITIONS, DISCOVERY, AND EXPERT WORKUP

Adam Slater conducted a staggering number of important depositions, **including more depositions that were used at trial or relied on at trial than any other attorney in the entire MDL**. This included deposing virtually every Ethicon corporate representative and medical affairs witness. (*See* Charts of Mazie Slater depos. and trial witnesses; Ex. "H" to the Mazie Slater FWR Objection; Slater Dec., Ex. "1").  Mazie Slater led all discovery efforts prior to formation of the MDL, including initiating and maintaining the initial document database for years before it was consolidated into the MDL, and Mazie Slater attorney Cheryll Calderon oversaw that system and supervised and directed all document review and deposition support assignments for the first several years of the litigation. Thereafter, Mazie Slater continued to lead all discovery efforts in New Jersey, and coordinated with the MDL leadership on nearly all significant discovery and related strategy decisions in the national Ethicon litigation. Significantly, Mazie Slater conducted **at least 235 important depositions**: **73 depositions of 38 Ethicon corporate witnesses,** this includes the highest level Apex witnesses such as J&J Chairman Alex Gorsky, Vice Chairwoman Sheri McCoy, Ethicon President Renee Selman, and nearly all corporate representatives; nine days of depositions of medical affairs corporate representative Piet Hinoul, and 2 Bard corporate witnesses for a total of **40 corporate witness depositions (according to Mr. Garrard's FWR Declaration this was nearly 20% of all corporate depositions taken in the entire litigation**); **72 depositions of 45 experts**, including many experts designated in the MDL (Adam Slater's

depositions and cross-examinations of defense experts have been used across the litigation, directly and as a tool by attorneys learning how to depose other experts); and **90 depositions of case specific witnesses** (including implanting and explanting physicians in other law firms' bellwether cases – including in Prolift and TVT cases that were utilized as templates by many other firms).

The FCC's comments which mischaracterize Mr. Slater as only developing the Prolift case are simply untrue. Mr. Slater conducted numerous important depositions regarding the TVT devices, including the three-day deposition **taken by Mr. Slater for the MDL** in Blue Ash, Ohio of Ethicon's Medical Affairs Corporate Representative on the TVT devices, Dr. Piet Hinoul. He also took the depositions of Peter Cecchini (who drafted the initial TVT IFU), Axel Arnaud (who oversaw the development of the TVT-R and TVT-O), document preservation corporate representative Jim Mittenthal, and others.

Mazie Slater's depositions of third-party witnesses were also significant. This includes multiple depositions of key Ethicon consultants Vincent Lucente, M.D. and Dr. Miles Murphy in Pennsylvania through which Mazie Slater was able to prove that the Ethicon IIS database study of these Key Opinion Leaders' Prolift and TVT-Secur patients had significantly higher complication rates than reported. Mr. Slater also successfully subpoenaed and deposed the Editors of the New England Journal of Medicine, defeating a motion to quash the subpoena in Boston, Massachusetts. These depositions yielded powerful evidence invalidating the article published in the New England Journal of Medicine by Ethicon consultant Daniel Altman, M.D. regarding his Randomized Controlled Trial comparing the Prolift to native tissue repairs. As a result, Ethicon agreed from that point forward not to rely on or reference that study at multiple trials. This was significant since Ethicon viewed this as the most important article in the literature for the defense of the Prolift.

Finally, as addressed throughout this and the other submissions in the record, Mazie Slater developed numerous experts, including Dr. Weber who is the only urogynecologist who analyzed

patient level data from Ethicon's internal prototype studies, and wrote devastating reports establishing problems with the studies, and that there were far higher complication rates than Ethicon and the investigators had reported. Other experts who Mazie Slater developed or assisted with include Dr. Tom Margolis, Dr. Susan Shott, the full slate of experts in the *Gross* case, and experts primarily developed by others, but who sought and obtained Adam Slater's input – such as Dr. Peggy Pence, Dr. Daniel Elliott, and others. This was a product of the collaborative spirit that existed among the firms who were actually litigating against Ethicon.

### MAZIE SLATER'S APPELLATE WORK

The FWR and Stack Report also ignore Mazie Slater's appellate contributions, including (1) affirmance of the *Gross* decision which established important law affirming the failure to warn claim, availability of punitive damages in a pelvic mesh case, and the relevance of a plaintiff's testimony on causation in a learned intermediary case, among other things (*Gross v. Gynecare*, 2016 WL 1192556 (N.J. App. Div. Mar. 29, 2016), *certif. denied*, 228 N.J. 430 (2016)), (2) the appeal of the New Jersey MCL Judge's decision regarding the defense's attempt to use plaintiffs' treating physicians as defense experts without critical safeguards, *In re Pelvic Mesh/Gynecare Litig.*, 426 N.J. Super. 167 (App. Div. 2012), (3) affirmance of the decision by the Massachusetts Superior Court allowing Mr. Slater to depose the editors of the New England Journal of Medicine, *In re Pelvic Mesh/Gynecare Litig.*, 32 Mass. L. Rptr. 304 (Sup. Ct. 2014), and (4) participation in the briefing that led to the affirmance of the verdict in *Hammons v. Ethicon*, 190 A.3d 1248 (Pa. App. 2018). Mazie Slater is currently defending on appeal two other verdicts it won: a $15 million verdict against Ethicon in 2017, and a $68 million verdict against Bard in 2018.

### MAZIE SLATER'S ASSISTANCE WITH SETTLEMENT

Adam Slater also aided settlement for other firms by providing pressure as lead trial counsel in other firms' bellwether cases (on behalf of the Seeger, Beasley and Fleming law firms,

discussed *supra*). This was for the common benefit, and without payment to Mazie Slater for the settlement of the inventories. Mr. Slater has also advised many firms on who to approach to seek resolution, and the strategies to reach settlement. In contrast, the FWR and Stack Report granted significant credit to many firms for facilitating inventory settlements (*e.g.*, Burnett, Blasingame, Aylstock, Motley), despite the failure to achieve a global settlement, inadequate values driven by the unmanageably large numbers of cases taken by these and other firms, and despite the fact that most, if not all, of those firms charged fees of 10-15% from every case in these inventory settlements – thus they have already been paid for this work which only benefitted the settling firms. Certainly this information should be disclosed and factored in. Most important, it was the trial and litigation pressure brought by Mazie Slater and others that made these settlements possible.

## MAZIE SLATER'S WORK ON THE BARD LITIGATION

The FCC set an arbitrarily early cut-off of September 2015 for Bard common benefit work for this first round of common benefit. Mr. Slater was appointed co-liaison counsel for the New Jersey Bard MCL by Judge Martinotti on September 16, 2015, when thousands of cases remained active and unsettled.  (Slater Fee Aff. at Ex. "18").  Mr. Slater convinced the Court to re-open discovery over Bard's objection, and from that point forward has applied relentless pressure on Bard. Mr. Slater's work created significant pressure that aided in the settlement of thousands of Bard cases. In fact, in order to create leverage in his negotiations with Bard, in June 2017 Tom Cartmell asked Mr. Slater to make it appear as though his firm had teamed up with Mazie Slater in New Jersey. Thereafter, Wagstaff Cartmell's Bard inventory settled. In 2018, Mazie Slater obtained a $68 million verdict against Bard in the *McGinnis* bellwether case presided over by the Hon. James DeLuca, which was the first and only case to go to trial against Bard in New Jersey. This was also the first trial anywhere in the country addressing the Avaulta Solo and Align TO

devices. Mazie Slater developed the case, including development of key experts, as no trial package existed for the Bard litigation. Thereafter, Mazie Slater made the expert *de bene esse* video of general expert Dr. Richard Bercik, and all other trial materials, available to all plaintiff counsel in the MDL. The FCC cut all expenses for Bard work, including the *McGinnis* case, based on the artificial cutoff: "All expenses cut post Bard cutoff (9/2015)." (*See* 7/5/18 FCC letter). This work should be fairly valued, either in this phase or in the allocation of the next influx of funds.

## DISPROPORTIONATE AWARDS TO THE FCC

Yet another fundamental flaw is the FCC's failure to abide by this Court's instruction to fully and fairly evaluate all law firm billing records, which were submitted and maintained at great expense throughout the litigation. In fact, though recorded time and expense was paid lip service, the recommended awards were not based on or cross-checked against hours, multipliers, or any objective methodology. (Stack Report at 18; FWR at 28; 36-37). Despite the massive amount of time the FCC claimed to have spent reviewing the submitted hours, it conspicuously refused to share the documentation of this review, and its decision was based solely on a self-serving and unverifiable analysis: "**how an attorney's time contributed to the outcome of the litigation**..." (FWR at 37). This amorphous approach is unmoored from the criteria in the Court's Orders. The amount awarded to Mazie Slater, as compared to the FCC firms and others, cannot be justified as there was absolutely no methodology, consistency or transparency in what the FCC valued, awarded or disregarded as to Mazie Slater.

**The inescapable conclusion is that the most important qualification for common benefit fees was a seat on the FCC**, or a close affiliation with an FCC member. This is evident from the astronomic common benefit awards to FCC member firms as compared to Mazie Slater's award of $6.02 million in fees:  Blasingame's fee award was almost **nine times greater** than Mazie Slater's; Motley Rice's fee award was **7.73 times greater**; Clark Love's fee award was **7.17 times**

**greater**; Wagstaff & Cartmell's fee award was **6.14 times greater**; and Aylstock's fee award was **4.37 times greater** than Mazie Slater. **Those five firms averaged $41 million in fees.** When one compares relative "contribution to the outcome of the litigation," these disparities are indefensible. To the extent the FCC may point to the awards to others, or the small number of remaining objections, those arguments are hollow as none of those other law firms have a resume as extensive as Mazie Slater's, and none were awarded such a drastically disproportionate amount.

The disparity in the hourly rates for the awards is another significant piece of objective evidence which establishes the invalidity of the award to Mazie Slater. Again, Mr. Rice's objection in *Vioxx* speaks volumes: "**The disparate treatment can be no more clearly recognized than in the hourly fees awarded to FAC members**…" (Ex. A to Mazie Slater PWR Objection).  Mazie Slater was awarded an average **hourly rate of $202** for the 29,752.27 hours submitted, and **$309/hr**. for the 19,482.75 hours accepted by the FCC (after they unreasonably cut 10,000 hours). In contrast, the average weighted hourly rate awarded to the FCC firms was **$730/hr**. This included an average hourly rate of **$728/hr**. to Frankovich Anetakis, an FCC firm who took no depositions and tried no cases; **$598.90/hr**. to Aylstock Witkin; **$652.51/hr**. to Wagstaff Cartmell; **$772.27/hr**. to Motley Rice; **$847/hr**. to Blasingame who tried one case; and **$913/hr**. to Clark Love, who tried one case. Nobody can reasonably argue that the fair hourly rate and/or multiplier applicable to Mazie Slater, based on the importance, complexity, and quality of the work performed, is worth a fraction of that awarded to FCC firms.

Examination of FCC member Riley Burnett's allocation raises more serious questions about how the FCC achieved unanimity on its recommendations. Mr. Burnett was awarded fees of $4,921,000, almost as much as Mazie Slater, with an hourly rate of $469.10 based on the disclosed number of hours – more than 1.5 times the hourly rate to Mazie Slater for its accepted hours. The FCC's TVM Historical Analysis shows Mr. Burnett's firm with a mere 1,662.80 hours and only

**$10,941 in expenses**, most of which were in Coloplast – a product which was never litigated, as of August 2016. The final calculation increased the Burnett firm's hours by approximately 9000 hours -- to 10,490.35 hours -- which Judge Stack and Mr. Cartmell advised was a result of the Potts Firm somehow "transferring" approximately 9,000 <u>contract lawyer hours</u> for document review to the Burnett law firm, despite the Court's Order requiring contemporaneous submissions of time and expenses. The award of almost the same amount to the Burnett firm as was awarded to Mazie Slater, at a significantly higher hourly rate, is incomprehensible as the Burnett firm billed almost exclusively for contract lawyer document review, **took no significant depositions**, **tried no cases**, **and bore almost no financial risk**.

The FCC's artificial inflation of awards occurred with the rest of the FCC firms as well: Lockridge Grindal Nauen was awarded fees of $5,905,000 (almost equal to Mazie Slater's award) and an hourly rate of $372.05 (more than Mazie Slater's hourly rate) for work primarily related to the AMS litigation (which never reached an advanced litigation stage). The FWR made its award based on the firm's "document review," assistance to leadership, and management of the Minnesota AMS litigation, which was never an active or important pressure point. In addition, the firm had a mere **$79,703** in held expenses (Mazie Slater had $2.7 million). Another example is the award of **$728/hr. for Frankovitch Anetakis**, a firm that was compensated for being "a member of the West Virginia bar, a trusted liaison…and [which] reviewed documents in the Cook litigation," and which expended a mere $29,000 in held costs. No reasonable argument can justify the comparative fees or hourly rates awarded as between these FCC firms and Mazie Slater, and the obvious explanation is beyond troubling.

There is also a pattern of disproportionate awards to certain non-FCC law firms. According to the FWR, Fibich Leebron provided "deposition support and assisting with discovery" and was awarded $4 million. *See also*: Beasley Allen ($5,250,000 awarded), the Monsour firm ($4,965,000

awarded), and Wexler Wallace ($12,430,000 awarded). None of these firms started or led a litigation, led multiple trials, conducted significant numbers of important depositions, developed multiple key experts or trial themes. Yet Beasley, Monsour, and Fibich received very close to Mazie Slater's award, and Wexler Wallace received more than double.

### INACCURACIES IN THE FWR, AND THUS IN THE STACK REPORT

The FWR's one-paragraph explanation of the award to Mazie Slater is filled with inaccuracies that are belied by the objective facts set forth above and demonstrates that the FCC did not fairly consider Mazie Slater's submissions or presentation to the FCC in Atlanta. The Stack Report mirrors the FWR with even less detail. For example:

**(1)** Mazie Slater did not focus "almost entirely" on litigation in New Jersey state court, as established herein. In addition to the very important work performed in New Jersey, Mazie Slater litigated and tried cases in Missouri and Philadelphia for other firms and was a key member of the trial team in the *Bellew* case presided over by this Court. Mr. Slater conducted many critical depositions, including on behalf of the MDL (*i.e.*, deposed Piet Hinoul as medical affairs corporate rep on the TVT devices for three days in a hotel in Ohio; deposed corporate representative James Mittenthal in New York as part of the *Lewis* trial; deposed Peter Cecchini who authored the first TVT IFU, etc.); briefed wave motions – successfully barring defense experts from giving warning opinions; defeated the Daubert motion against Dr. Anne Weber in Wave 1; and conducted numerous important defense expert depositions, the transcripts of which were used as templates by other lawyers to learn how to most effectively depose defense experts (as was also the case with Mr. Slater's depositions of implanting and explanting surgeons). In fact, Mr. Slater deposed the implanting physicians in both the *Bellew* and *Hammons* cases, both outside New Jersey, and in other cases, including for the Aylstock firm, further demonstrating the acknowledged quality of his ability to effectively question key witnesses for these trials.

**(2)**   The FWR incorrectly states that Mazie Slater withheld experts unless a personal financial arrangement was reached. The criticism by Clayton Clark at the meeting with the FCC was that Dr. Weber was not permitted to work with Mr. Clark's firm in a Texas state court case. However, it was established that Mazie Slater protected the value of this key expert.  (FCC Tr. 118:1-125:13; Ex. "I" to the Mazie Slater FWR Objection).  This occurred in consultation with other members of the Ethicon leadership, who agreed with the decision. And Mr. Slater did offer assistance to Mr. Clark's team, including guidance in deposing the implanter. Also, on April 9, 2013, Mr. Slater offered whatever help Mr. Garrard might need preparing for *Cisson*, including with experts.  (*See* April 9, 2013 email exchange, attached as Ex "J" to the Mazie Slater FWR Objection).

**(3)**   The complaint that Mazie Slater's submission was difficult to examine is specious and was not mentioned by Judge Stack. In fact, the FCC, in the February 16, 2016 letter from Mr. Garrard (Ex. "F" to the Mazie Slater FWR Objection), accepted the format of Mazie Slater's submissions. Mr. Garrard later confirmed that the format of the submission "is as good as what we have used." (3/15/16 email; Ex. "K" to the Mazie Slater FWR Objection).   Despite this representation, the FCC criticized the format of Mazie Slater's submission and then refused to give Mazie Slater the exact basis for its rejection of time and expense entries. In fact, it deleted key identifying information such as the case at issue from the spreadsheets provided to Mazie Slater, leaving Mazie Slater to guess at and generalize its responses. (FCC Tr. 145:13-149:21). Thus, the FCC created the issues it complained of, and internally acknowledged in emails that these were valid criticisms. In comparison, the FCC allowed 9,000 hours to be added to Mr. Burnett's total, as set forth above, and apparently credited the Mueller firm for years of work where little or no time records were kept and awarded that firm $4.76 million (despite trying no cases and performing work FCC members criticized).  (*See* Slater Dec).

**(4)**  The FCC improperly rejected thousands of hours of valuable work and approximately $900,000 in expenses, even after Mazie Slater provided glaring examples as to why the FCC was incorrect – including rejecting hours spent leading case management conferences and other obviously valid entries. The approved hours prior to the meeting with the FCC were 18,277.90 of the 29,752.27 originally submitted, and the FCC ultimately only added 1,204.85 hours, for a total of 19,482.75 hours (a 35% cut). On the expenses, $2,719,999.86 was submitted, that was cut to $1,687,534.41, and only $127,500 was added after the meeting, for a total of $1,815,034.41 (a 33% cut). Mazie Slater was never told what was added back in, or why work was still excluded, and this is a basis for our request for discovery (see below).

### THE UNSUPPORTED RECOMMENDATION FOR ONGOING LITIGATION

The FWR also included an unsupported recommendation that 70% of the future common benefit funds should follow this allocation, and the other 30% shall be addressed anew. The Stack Report adopts this recommendation with no analysis. The FCC's proposed formula would not fairly compensate Mazie Slater for its ongoing intensive efforts on behalf of the entire Ethicon and Bard litigations, for example pursuing ongoing discovery; obtaining multiple eight-figure, punitive damages verdicts; successfully trying and creating a trial package for the Bard Avaulta Solo and Align TO devices; and continuing to serve as the lead counsel for the New Jersey Ethicon and Bard litigations. This is compared to others who have disappeared since settling their cases. The landscape has changed as a result of these other firms leaving the litigation.  For example, the PSC stopped paying for the Crivella document database, so firms including Mazie Slater have been paying Crivella directly pursuant to private agreements to maintain access. The allocation of future funds should be determined anew, and Mazie Slater respectfully requests appointment to a reconstituted fee committee to address future fee and expense allocations.

## REQUEST FOR DISCOVERY

Mazie Slater served discovery requests on the FCC, and joined in a motion to compel discovery, so that an educated objection could be submitted at each stage of this process. That discovery has been refused despite a legitimate need. In *In re Vioxx Prod. Liab. Litig.*, 802 F.2d 740, 767-768 (E.D. La. 2011), the MDL court allowed the objecting attorneys to have "extensive discovery," including access to counsels' time records as well as a deposition of a representative of the fee committee, followed by a week-long evidentiary hearing. In allowing this discovery, the Court relied on the Fifth Circuit's decision in *In re High Sulfur Content Gas. Prods. Liab. Litig.*, 517 F.3d 220, 234 (5th Cir. 2008), which held that in allocating a fund of attorneys' fees, a court must conform to "traditional judicial standards of transparency, impartiality, procedural fairness and ultimate judicial oversight."

The Court has now ordered submission of all materials used or considered by the FCC for *in camera* review (PTO 332). Mazie Slater requests access to the materials submitted to the Court *in camera*, and the opportunity to take depositions of FCC members as needed, in the interest of transparency, fairness, and due process. Mazie Slater still does not know which of its work was disallowed or the specific basis why, nor the details of how the work of other firms was allowed, disallowed or valued. This is vital since this is a fixed fund, such that an award to one firm directly impacts the awards to all others.

In addition, certain FCC firms and their allies apparently re-reviewed voluminous Ethicon documents, and in connection with the waves, worked to develop experts where key experts were already in place and the template was already well-established. Their work was not original, creative or difficult. The Court warned counsel against this exact practice at the commencement of the Ethicon waves. (*See* PTO No. 205, A.3.a).

The scant information available at present demonstrates the need for transparency. For example, the internal TVM Historical Analysis that was provided to Mazie Slater includes the MDL accountant's spreadsheet of the time and expenses submitted as of August 2016, showing that the Blasingame firm had been credited with more than 7,500 hours of work and almost $3 million in held expenses in the Ethicon litigation as of August 2016 – these numbers defy the facts as they are known to those who led the Ethicon litigation, since that firm played no role in the development of the Ethicon litigation. Another example: the PWR states that "multiple firms submitted substantial time related to the trial of the *Gross* case."  However, Mazie Slater attorneys conducted virtually every aspect of the trial in the courtroom, including the directs, crosses, opening, closings, and the legal arguments. The only exceptions were Ben Anderson's direct exam of two witnesses, and Jeff Grand arguing certain deposition designation and legal issues. **No other lawyers made an argument**, **or spoke to a witness**, **the Judge**, **or jury.** The other firms (including FCC firms Wagstaff & Cartmell and Aylstock, Witkin) never appeared in court except to observe for a portion of the trial, and largely performed a basic support role when asked by the trial team.  It is important to see what was claimed, and what was credited.

## **CONCLUSION**

For the foregoing reasons, it is respectfully requested that the Court award fees and expenses to Mazie Slater in a fair amount, commensurate with Mazie Slater's foundational and continuing role at the forefront of this litigation.

Respectfully,

ADAM M. SLATER

Dated:  March 26, 2019

25