**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA CHARLESTON DIVISION**

**IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2187**

**IN RE: AMERICAN MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2325**

**IN RE: BOSTON SCIENTIFIC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2326**

**IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2327**

**IN RE: COLOPLAST PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2387**

**IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION** — **MDL No. 2440**

**IN RE: NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION** — **MDL No. 2511**

***THIS DOCUMENT RELATES TO ALL CASES***

**COMMON BENEFIT FEE AND COST COMMITTEE'S OMNIBUS RESPONSE TO THE OBJECTIONS TO THE RECOMMENDED ALLOCATIONS OF THE EXTERNAL REVIEW SPECIALIST**

Four law firms who chose to submit time and expense for consideration as potential common benefit compensation in these related MDL proceedings, each of whom have been recommended to receive substantial common benefit awards, object to the External Review Specialist's recommendation.

"Allocating a limited pot of common benefit fees among numerous counsel, all of whom are talented and capable attorneys and many of whom have made a significant contribution to the ultimate success of this case, is an unenviable task that is sure to lead to hurt feelings and bruised egos. Nevertheless, it has to be done." *Turner v. Murphy Oil U.S.A., Inc.,* 582 F.Supp.2d 797, 812 (E.D.La.2008) (J. Fallon) (internal citation omitted). The four law firms that have submitted objections obviously have a different opinion from that of the Common Benefit Fee and Cost Committee ("FCC") and External Review Specialist regarding the value of their respective contributions to the MDL and those of others, and they have had multiple opportunities to express their opinions – including their present objections to the Court. However, the sort of caustic rhetoric from the remaining objectors directed at the committee, its members and the Court-appointed External Review Specialist, among others, is unfortunate. It serves no legitimate purpose for these objectors to air personal grievances or what they apparently believe to be "dirty laundry" regarding alleged conversations with FCC members or with the External Review Specialist save perhaps to embarrass or insult. In a recent opinion regarding an MDL common benefit allocation, the Hon. Eldon Fallon made the following observation that is applicable here:

> At this point it is worth noting that many, if not all, of the common benefit applicants are also contract counsel in at least some of the cases and will receive significant compensation from those cases in addition to any amounts they may receive in common benefit fees. For this reason, it is disconcerting and disappointing to receive such vexatious, vitriolic, and acerbic briefs from some of the attorneys who seek common benefit fees. It is unfortunate that this has become the new norm in this type of litigation. If such unseemly conduct persists, it will

likely spawn "corrective legislation" to attempt to bring back some civility and professionalism to this aspect of complex litigation.

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*, Case 2:09-md-2047, Doc. 22089, p. 5 (E.D.La. Feb. 4, 2019) (J. Fallon) (Order and Reasons Allocating Common Benefit Fees).

One non-lawyer has also filed an objection. Although the issues presented by this non-lawyer objection are unique and separate from the law firm objectors (*i.e.*, a non-lawyer has no standing or ability to seek or receive an award of *attorney's fees*), the FCC addresses this objection here in the interests of economy and efficiency. Where this response refers to "objectors" collectively, it is referring only to the law firm objectors who, unlike the non-lawyer objector, are not legally and ethically prohibited from claiming a portion of the attorney's fee fund.

## **Argument and Citation of Authority**

### **I. The fact that there remain only four law firm objectors out of 94 applicant firms attests to the fairness of the FCC's and External Review Specialist's process and recommendations and undermines these objectors' contentions otherwise.**

An appropriate starting point for consideration of the four remaining objections is the simple fact that there are only four remaining objectors. 94 firms submitted time and/or expense and sought to receive some amount of common benefit compensation. 27 of the applicant firms chose to appear in-person before the FCC following the FCC's review of their time and expenses. 24 firms objected to the FCC's Preliminary Written Recommendation. As a result of the FCC's consideration of objections, changes in allocated percentages were made with respect to 17 firms. The changes in award percentage by the FCC resolved 16 objections. Eight firms objected to the FCC's Final Written Recommendation. The External Review Specialist considered the arguments and submissions of those eight objectors. The External Review Specialist further reviewed the allocation recommendations made in the FCC's Final Written Recommendation. The External Review Specialist increased the recommended award percentage for nine firms and reduced the

recommended award for eight as reflected in the attachments to the External Review Specialist's Recommended Allocation, which resulted in reallocation of $10,985,005 among the affected firms.[1] The changes in award percentages recommended by the External Review Specialist resolved an additional four objections. There remain just four objectors.

While unanimity was certainly the desire of the FCC and the External Review Specialist, the fact that four objectors remain who have a differing view from the FCC of the value of their contribution (and that of other firms) is by no means reflective of a flawed process. As the MDL court observed in *In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *10-*11 (E.D. Pa. 2003), "[w]ith so much money at stake and so much time invested by skilled attorneys on valuable common benefit work, it is not surprising that disputes exist concerning the proper method and dollar amount of the individual allocations." (emphasis added). The fact that 90 of 94 firms have no objection to the recommended allocation stands as testament to the fairness and transparency of the allocation process and refutes these remaining objectors' protests to the contrary. In *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 555 F.Supp.2d 661, 668 (E.D.La.2007), the MDL court rejected an objecting firm's contention that the court-appointed fee committee had acted improperly with respect to its recommended allocation, noting "[o]n the contrary, that the vast majority of counsel seeking either a common benefit or individual claimant award have accepted the committee's determination is telling of the fairness of the committee's approach." The External Review Specialist here similarly observed in his Recommendation that "[t]he multiple opportunities to give and receive feedback and the FCC's demonstrated willingness to hear and give due consideration to the positions of those applicant

---

[1] Dollar value of $10,985,005 is based upon the application of the recommended percentage awards to a total fund of $350,000,000.00.

firms who made objections and to adjust its recommended allocation where appropriate is evidence of the allocation process working as the Court intended." *See*, *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 774 (E.D. La. 2011) ('The Court interprets this ongoing development of the FAC's and the Special Master's recommended allocations as an indication that the allocation process was working properly. The effectiveness of this [allocation] process in this case is supported by the fact that only 4 out of the 108 common benefit fee applicants continue to maintain their objections.").

Given that more than 95% of Participating Counsel, or 90 of 94 firms, have no objection to the External Review Specialist's Recommendation after a years-long process in which all applicants had the same abundant opportunities to object and to provide and receive feedback regarding their contributions, the contention by these remaining four objectors that this process was unfair, predetermined, not transparent, or violative of applicant firms' rights rings hollow. Very simply, the objectors believe they should receive more money than the FCC and External Review Specialist have recommended. As discussed below, it is their burden to prove that to the Court, and the FCC respectfully submits they cannot meet that burden because their recommended allocations were fair and reasonable in light of their contributions.

## II. The objectors bear the burden of proving that they performed work and/or incurred expenses for the common benefit and the value of their contribution.

Three of the four remaining objectors allege that the FCC did not provide adequate information regarding why their disallowed time or expense was not recognized as common benefit. (Bernstein Liebhard Objection, pp. 9-11; Kline & Specter (hereinafter "KS") Objection, pp. 21-22; Mazie Slater Objection, pp. 22-23).[2] The laborious and painstaking process to review

[2] Instructively, the Anderson firm submitted a report from attorney Nicholas Casey, which acknowledges that the firm was provided information regarding the FCC's reasons for the rejection

all time and expense submissions from all 94 applicant firms, and the multiple opportunities each of those firms had to provide and receive feedback from the FCC regarding those submissions, has been detailed in prior pleadings and need not be recounted here. (Declaration of Henry G. Garrard, III filed with Final Written Recommendation, ¶¶ 118-194 (explaining FCC time and expense review process, including written explanation to each firm of time considered not for common benefit and time questioned as common benefit and multiple opportunities for firms to provide and receive information regarding FCC's analysis of time and expense submissions, both in person and in writing)). The FCC provided information sufficient for *every* applicant firm to meaningfully assess its time submissions that were questioned or identified by the FCC as not-for-common benefit. The same rules and the same analysis were applied to every one of the 94 firms. The fact that the other 90 firms have no objection to the recommended allocation when they participated in the same process and had access to the same information about their submissions from the FCC is telling.

The FCC and the External Review Specialist have made their recommendations and have explained the process and bases for those recommendations. It is now the burden of each of the objecting firms to prove its compliance with the Court's Common Benefit Orders and to prove to the Court how and the extent to which its work benefited the litigation and the value of its contribution. *See*, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 2019 WL 274036, *5-*9 (9th Cir. Jan. 22, 2019).

---

of certain of the hours submitted by the firm. (Anderson Objection, Ex. 1). While Anderson disagrees with the FCC's reasoning for disallowing this time, any contention by the other objectors that the FCC did not provide adequate information about its decision regarding their time and expense submissions is meritless.

The objectors focus much of their objections on attacking the FCC and its members and the External Review Specialist and complaining of information they were allegedly not provided about *other firms'* submissions. However, the objectors do little to explain how and why the work they claim to have performed that the FCC questioned or did not recognize should be considered for the common benefit of the MDL plaintiffs, or why the FCC's valuation of their contributions to the MDL is allegedly wrong. In *In re Educational Testing Service Praxis Principles of Learning and Teaching: Grades 7-12 Litig.*, 555 F.Supp.2d 661, 666 (E.D.La.2007), the MDL judge rejected a firm's objection to a proposed common benefit allocation, observing "[s]ignificantly,…[the firm] does not explain *how* or *why* this work was for the common benefit." (Emphasis in original). The court there stated "[w]ith respect to the character of the work that [the firm] alleges it performed for the common benefit, [the firm] does not explain why the Court should consider this work as being for the common benefit. It makes no effort to distinguish between work performed on behalf of its individual clients and work completed for the common benefit. Nor does it explain why the [fee committee's] evaluation that it performed only 19.5 hours of common benefit work is incorrect." *Id.*, p. 668. The court then explained that

> [i]n reviewing [the objecting firm's] arguments and its submitted records, the Court is aware of the complexity of coordinating the work of multiple counsel in multidistrict litigation and that counsel may disagree on what work is for the common benefit. **But asserting that work is for the common benefit does not make it so**. [The objecting firm] has not provided any explanation of why its work that appears by the firm's description to be on behalf of their individual client was for the common benefit.

*Id.* at 670 (Emphasis added).

Much of the Objectors' work was done in various state court venues and was done primarily (if not entirely) for the benefit of the individual plaintiffs in those cases, or perhaps for the benefit of the objectors' other clients or claimants in another venue. Because the objectors

claim here that this state court case work provided a common benefit to the MDL plaintiffs, it is their obligation to prove how and why. In *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 617 Fed.App'x 136 (3rd Cir.2015), the Third Circuit affirmed the MDL court's rejection of a law firm's attempt to avoid the MDL assessment on its state court cases. This law firm also claimed that the district court should have awarded it common benefit fees for its state court case work. Instructively, the Third Circuit observed that "[a]lthough [the law firm] says it spent fourteen million dollars litigating its [state court] cases, it did not offer evidence that its efforts were for the common benefit as opposed to solely on behalf of its clients," and therefore "[w]e cannot say the District Court abused its discretion in failing to consider or grant a credit for the common benefit [the firm] provided when no evidence exists in the record that [it] actually provided a common benefit." *Id.* at 144. The Third Circuit also noted that in addition to its own work product, the firm used MDL work product and expert reports to oppose summary judgment motions in state court and it indicated its intent to use a number of MDL materials in a state court trial planned before its cases settled. *Id.* at 139.

Similarly, in *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 869 (8th Cir.2014), the court-appointed Special Master rejected a firm's allocation request, finding that the firm "worked independently, developed [its] own strategy and prepared [its] cases for trial separate and apart from common benefit attorneys" and further concluding that the firm's "work ha[d] been performed in the client's interest and not for the common good," in part because "[t]here was never any attempt to co-ordinate [the firm's] activities with those of Lead Counsel [in the MDL]." The district court, in reviewing the Special Master's findings, likewise concluded that "the work done by the [objecting firm] for its own clients did not benefit the rest of the plaintiffs, while the work performed by the common benefit attorneys definitely benefitted the [objecting firm] and its

clients." *Id.* at 869-870. The Eighth Circuit affirmed those findings, including the district court's conclusion that there was "no basis in law or fact" for the objecting firm's claim that its state court lawsuits pressured the defendant to settle with the MDL plaintiffs. *Id.* at 873. Likewise, in *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306 (9th Cir.1994), the Ninth Circuit affirmed the district court's denial of a request for common benefit recovery by a group of law firms who handled a related state court case. While conceding the "incidental" nature of the benefits from the parallel state court action to the MDL plaintiffs, the Ninth Circuit affirmed the district court's finding that the work was not entitled to common benefit reimbursement because there was no proof of any direct benefit enjoyed by the MDL plaintiffs. The Ninth Circuit affirmed. *See also*, *In re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig.*, 268 F.Supp.2d 907, 924 (N.D.Ohio 2003) ("Fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not quality for reimbursement, as they did not provide a true 'Common Benefit.'").

Unlike in the cases described above, where allocation requests by lawyers in state court litigation were denied outright due to insufficient proof of MDL common benefit, each of the objectors here have been recommended to receive substantial common benefit fees. The FCC reviewed the objectors' time and expense submissions and recognized that certain of the work performed by these objecting firms inured to the benefit of the MDL plaintiffs. The FCC's recommended allocation reflects the fact that certain of the work for which common benefit compensation is sought was done for the objectors' individual state court plaintiffs or groups of plaintiffs with respect to products that had already been tried to verdict in other cases, with limited to no common benefit provided to the MDL plaintiffs. Again, however, it is not the FCC's burden to *disprove* the benefit or value of the objectors' work. It is instead the objectors' burden to prove

that their work was for the common benefit and the value of that purported benefit. As recognized in *Educational Testing Service*, merely claiming that the work was for the common benefit does not make it so.

## III. Contrary to the objectors' claims of self-dealing, every firm was evaluated by the same process according to the same criteria and the allegedly "disparate" recommended awards to certain FCC firms or others decried by the objectors is reflective of the extent and value of these firms' contributions to the litigation.

Rather than providing this Court with a factual basis upon which to grant an award of common benefit for work that they performed, the objecting firms instead devote much of their attention to questioning the FCC's and External Review Specialist's motives and the amounts of the recommended awards to the firms comprising the FCC and others. (Anderson Objection, § II.D., III; KS Objection, pp. 2, 16; Mazie Slater, pp. 4, 18-21). Mazie Slater's allegation that the outcome of the allocation was somehow "predetermined" by certain of the FCC members is false, as the External Review Specialist specifically addressed in his Recommendation. (External Review Specialist Recommended Allocation, p. 21).[3] The objectors suggest that the FCC's and External Review Specialist's recommendations should be disregarded because of the FCC's alleged "self-dealing," which in their view is evidenced by a comparison of their recommended awards to those of the FCC members and others.

The eight firms comprising the FCC have participated in the leadership of this unprecedented litigation from its inception in this Court. This Court has managed this litigation from the outset, heard and decided myriad motions and disputes, presided over numerous trials and the trial work-up of thousands of bellwether and "wave" cases, received appellate affirmance

[3] The FCC notes that the Court appointed William H. McKee, Jr. as a non-attorney participant with no financial interest in the common benefit fund. (FCC Order, p. 4). If there had been any attempt to subvert the process set forth by the Court in its prior Orders by anyone on the FCC, this Court would have been made aware. There was not.

on a variety of important legal and evidentiary issues, met and conferred numerous times with the Plaintiffs' leadership and the various defendants and their counsel, and supervised Court-ordered mediations and settlement negotiations involving thousands of cases. This Court is thus intimately familiar with the nature and quality of the work in this Court by the lawyers and law firms comprising the MDL leadership, including the FCC member firms, to pursue this hard-fought litigation for years. The Court has before it the Court-mandated affidavits addressing each of the *Barber* factors for the common benefit work claimed by every applicant firm, each firm's time and expense submission, as well as the transcripts of those firms who appeared before the FCC. The FCC will simply state that the attacks on the FCC firms and their work are unfounded.

Having managed and overseen this litigation and having observed much of the work claimed by the applicant firms as common benefit, the firms comprising the FCC have first-hand experience and knowledge of the contributions of the applicant firms. Especially after the exhaustive review of the time and expense submissions and consideration of the voluminous correspondence, objections and affidavits and in-person appearances of many of the applicant firms, the FCC is well-positioned to recommend a percentage of the award to firms based on the nature and extent of their respective contributions. As recognized in *In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *6 (E.D. Pa. 2003), a committee allocating attorneys' fees is "well suited" for that task where it is "comprised of respected attorneys with in-depth knowledge of the work performed throughout the course of . . . the litigation."; *Vioxx*, 802 F. Supp. 2d at 764 (J. Fallon) (observing that fee committee appointees were "heavily involved" in the litigation and thus "had firsthand knowledge of the nature and extent of the common benefit work which was done and who did it"). The court in *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563,

*10 (S.D.N.Y. 2011), rejected an argument that the committee's recommendation should be disregarded because the members recommended themselves to receive sizable fees, observing:

> Furthermore, [the objecting firm's] claim—that fee allocations proposed by appointed committees are not entitled to substantial deference due to conflicts of interest—makes no sense. Taking [the firm's] misguided rationale to its logical conclusion, all class counsel appointed to submit fee allocation proposals would have conflicts and thus no deference would ever be afforded to a committee's proposal. [The firm's] argument obviates the entire purpose of court-appointed lead counsel (who have been repeatedly recognized as best suited to gauge the value of one another's contribution to the class) to allocate fees from an aggregate award. Moreover, the inherent threat of conflicts of interest by involving class counsel in proposing fee allocations is precisely why district courts must ensure the fee allocations awarded are reasonable.

As Judge Fallon lamented in his recent common benefit fee allocation decision in the *Chinese Drywall* litigation cited above, the sort of "self-dealing" allegations lodged by these objectors have unfortunately become commonplace where firms are dissatisfied with their recommended allocation, attacking those who made the recommendation in an effort to increase their own allocation. Not dissimilar from these objections here, a group of objecting firms in *In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *10-*11 (E.D. Pa. 2003), argued that the fee committee's recommended allocation vastly understated the objectors' relative contribution to the outcome of the MDL, accused the committee of self-dealing and misrepresentation, and urged that the committee improperly "free rode" and took credit for work actually performed by the objectors. These *Diet Drug* objectors argued that they were primarily responsible for developing the liability and causation case against the defendant and for negotiating the overall settlement. *Id.* In rejecting the objectors' request for a re-allocation (the group was recommended an allocation of 18% of the total, but sought 60% in their objection), the court noted that "[w]ith so much money at stake and so much time invested by skilled attorneys on valuable common benefit work, it is not surprising that disputes exist concerning the proper method and dollar amount of the individual

allocations." *Id.* Specifically addressing the objection that the fee committee had awarded themselves a disproportionate share of the fee (one committee member firm was recommended to receive over 40% of the fee), the MDL court in *In re Diet Drugs*, *supra* at *8, instructively observed as follows:

> We note at the outset that the members of the Committee must necessarily be persons who participated in the litigation and who therefore are entitled to share in the award of fees. To allocate the award fairly and reasonably among all counsel, the Committee must include those who have played a significant role in the litigation such that they understand not only its complexities but also the different contributions of the various counsel.[4]

The objectors complain that the recommended allocations for the eight firms comprising the FCC comprise more than half of the common benefit award, which they claim is disproportionate in comparison with their own awards. (Anderson Objection, pp. 2, 9-18; KS Objection, p. 2; Mazie Slater Objection, pp. 4, 18-21). However, they disregard the fact that these same eight firms were collectively responsible for 299,639.34 recognized common benefit hours. Likewise, the FCC's member firms had an interest in and/or are responsible for securing the resolution of greater than 75% of cases filed in the MDL. The work of the FCC's member firms resulted in the deposit of the substantial majority of the funds in the common benefit fund, as identified in the Protocol stating the FCC should consider "[w]hether counsel made significant contributions to the funding of the litigation and creation of the Common Benefit Fund." (See, Fee Committee Protocol p. 8). The objectors likewise ignore that these firms, along with others in leadership positions before this Court, managed all facets of this litigation from moving and

[4] Notably, the MDL court in *Diet Drugs* endorsed the committee's allocation methodology, which was based on a percentage of available funds. In light of the committee members' significant contributions to the litigation, the court rejected the objections that the committee members' recommended allocation was disproportionate.

arguing for coordination of each of the related MDLs before the JPML to the present, including but certainly not limited to:

- the day-to-day administration and logistical management of over 100,000 cases involving dozens of different products and multiple defendants;
- coordinating the overall strategic planning since the inception of the litigation, including the organization and management of the vast teams of lawyers and firms assigned to handle various tasks across all MDLs;
- handling hearings and conferences before the Court;
- handling negotiations, disputes and communications with defense counsel on behalf of all MDL plaintiffs;
- communications with and coordination of MDL plaintiffs' counsel across product and defendant lines;
- conducting and managing the voluminous litigation-wide pleadings, discovery, document review, motions and briefing practice;
- handling of MDL bellwether cases, including consolidated trials involving multiple plaintiffs, from case selection through appeal;
- assisting the Court with settlement process and Court-ordered mediations; and
- orchestrating the massive "wave" process across the MDLs that involved the trial preparation of thousands of cases with numerous different products against different manufacturers over multiple years, which included identification and development of more than 50 general experts and educating and advising numerous MDL firms in handling and preparing their own cases for trial.

The objectors fail to acknowledge that the FCC firms' significant contributions to the funding of common benefit fund both in terms of the numbers and values of their own cases resolved as well as those of other MDL firms that they assisted in resolving. The objectors ignore that the FCC firms bore the largest financial risk and advanced the most funds to the common benefit as reflected, at least in part, in the recommended reimbursed held costs shown in the

External Review Specialist's Recommended Allocation.[5] The fact that the FCC members and other MDL leadership firms, who bore primary responsibility for the work before this Court for years, who contributed the most to the common benefit fund and who bore the most financial risk, who willingly shared their work product and assisted others in preparing for trial and in achieving resolution, and the quality of whose work is beyond serious dispute, would be recommended a larger allocation than firms whose work was done primarily with respect to one or a few products (primarily outside of this Court) for their individual cases is not anomalous or unfair. *See also*, *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563, *7-*9 (S.D.N.Y. 2011) (fee allocation recommendation for executive committee members was reasonable in light of time and labor required of members, magnitude and complexity of litigation overseen exclusively by leadership, leadership made most significant contributions, including strategic decisions and oversight of litigation, committee members bore most financial risk, and quality of committee members' work). The FCC notes that the same rules and the same analysis applied to all firms, and 90 of 94 firms have no objection.

What is characterized by objectors as disproportionate is no different than what has been reflected in numerous other common benefit allocations: the firms who take on the most responsibility, who lead and oversee the litigation generally, who devote the most resources and bear the most financial risk, and whose contributions were most valuable to the benefit of all MDL plaintiffs, receive the largest common benefit allocations. The following table amply demonstrates this truism:

---

[5] The FCC member firms, and others in the MDL leadership, have continued to make significant contributions to the common benefit fund and have continued to incur substantial costs for the common benefit beyond the applicable December 2016 cut-off date.

| Case | Findings |
|---|---|
| *In re Copley Pharmaceutical, Inc., "Albuterol" Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1154 (D.Wyo.1999) | Common benefit allocation of 37.57% of fund to lead counsel – which submitted 12.78% of total hours – reasonable in light of quality of firm's work |
| *In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 774 (E.D.La.2011) (J. Fallon) | over 100 common benefit fee applicant firms; 65.25% of common benefit award to nine firms who were members of FCC |
| *In re Prempro Prods. Liab. Litig.*, 2014 WL 3809101, *1-*2 (E.D. Ark. 2014) | 35% of common benefit award to lead counsel (one firm) |
| *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, Case 1:13-md-02419, Doc. 3129 ("Plaintiffs' Steering Committee's Notice of Filing Revised Proposed Allocation in Support of Motion for Distribution of Common Benefit Fees and Expenses") (D.Mass. Oct. 12, 2016) | seven firms on PSC, which recommended allocation, to receive 64% of total fund |
| *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, Case 1:13-md-2428, Doc. 1983 and 1983-1 (Memorandum in Support of Plaintiff Leadership's Petition for Award and Allocation of Common Benefit Fees) (D.Mass. Dec. 12, 2017) | 28% of common benefit fund awarded to two lead firms |
| *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, Case 2:09-md-2047, Doc. 22089 (E.D.La. Feb. 4, 2019) (J. Fallon) *(Order and Reasons Allocating Common Benefit Fees)* | 41.8% of common benefit fund allocated to two firms in leadership and co-chairs of FCC, both of whom were awarded equal allocations |
| *In re: Yasmin and Yas (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, Case 3:09-md-02100, Doc. 3854 (Special Master's Recommended Allocation); Doc. 3856 (S.D.Ill. Nov. 20, 2015) (Minute Order Adopting Special Master's Recommendation) | of 90 applicants, 69.22% of common benefit fund allocated to four firms |
| *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2017 WL 3033134, *68 (W.D. La. 2017) | two firms out of 31 applicants allocated 43.65% of common benefit award |
| *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, Case 2:10-md-2179, Doc. 23574 and 23574-1 (E.D. La. Oct. 24, 2017) (Order Adopting Special Master's Recommendation Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared Expenses and Held Costs) | 122 common benefit applicants, seven FCC member firms awarded 42.18% of common benefit award, with two co-lead firms receiving an equal award equating to 11.42% of the total each; in light of the objectors' focus on the reverse-calculated "hourly rate" for certain FCC firms, which they contend is excessive, it is instructive to consider that the effective hourly rate in |

| | |
|---|---|
| | *Deepwater Horizon* for the seven FCC firms was an *average* of $1,623.53/hour |

In light of the fact that the member firms of the FCC provided significant common benefit to all claimants, the objectors' claims of self-dealing are without merit.

**IV. The objectors' contention that a lodestar analysis, whereby hours are multiplied by some rate, should have been employed by the FCC and External Review Specialist is unfounded and is contrary to the Court's instruction that substantive contributions to the litigation – and not simply the number of hours – are the paramount consideration.**

The objectors also focus much of their attention on what they refer to as the "effective hourly rate" calculated by dividing their (or others') recommended allocation by the total number of hours, and the alleged disparity between hourly rates. (*See, e.g.*, Anderson Objection, pp. 9-11; Bernstein Liebhard Objection, pp. 7-9; KS Objection, Section C; Mazie Slater Objection, pp. 18-21). While the objectors criticize the FCC for not employing a "lodestar," they ignore that the Court expressly instructed that "the over-arching guideline that the FCC must consider is the contribution of each common benefit attorney to the outcome of the litigation." (FCC Order, ¶ B). The Court further directed that while the hours submitted should be taken into consideration, "the Court is primarily concerned with substantive contributions and not simply the total number of hours." (FCC Order, ¶ B.3.). In addition, the Court instructed that "[a]ttention shall be paid to the quality of the work performed separate and apart from the length of time required to perform it," and instructed that inefficiency should not be incentivized. (FCC Order, ¶ B.2.). Applying an "hours x rate" analysis as the objectors urge should have been employed here would have contravened the Court's explicit instruction.

Pursuant to the Court's instruction, and consistent with precedent, the FCC considered the hours submitted that were deemed to be for the common benefit as part of its Court-mandated effort to assess the nature and value of each firm's substantive contribution. *In re Thirteen Appeals*

*Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir.1995) ("While the time logged is still relevant to the court's inquiry – even under the [percentage of fund] method, time records tend to illuminate the attorney's role in the creation of the fund, and, thus, inform the court's inquiry into the reasonableness of a particular percentage…."); *In re Copley Pharmaceutical, Inc., "Albuterol" Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1154 (D.Wyo.1999) ("[C]ontrary to [the objector's] wishes, this Court will not solely employ hard, 'objective' criteria to make the fee allocation. As previously discussed, it is this Court's duty to weigh both the quantity and quality of work done. Addressing the quality of a given attorney's effort necessarily requires an element of subjectivity."). Because subjective factors, such as the nature of the work performed, the skill and experience of the counsel doing it, and the results achieved are relevant considerations, "some subjectivity is unavoidable in allotting common benefit fees." *Vioxx*, 802 F. Supp. 2d at 774. Indeed, in its appearance before the FCC, objector Mazie Slater candidly acknowledged that allocation by simply comparing the number of hours submitted is not feasible, and subjectivity is inevitable in the allocation process. (Mazie Slater FCC Transcript, 96:6-10 ("And in terms of the subjective analysis -- which I think is where you guys are going to ultimately have to end up -- because it's real hard to say based on just hours how you are going to split up all of this money."). As Judge Fallon explained in *Vioxx*, "in the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate. The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation. How these factors are weighed injects an unavoidable amount of subjectivity in the analysis. **The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from**

**those affected**." *Vioxx*, 802 F. Supp. 2d at 774 (Emphasis added). The FCC applied such an analysis here.

One of the objectors urges that an allocation cannot be made based on a percentage of the aggregate award reflecting the value of the firm's contribution. (*See*, Anderson Objection, § III).[6] Such contention is unfounded. The percentage of fund methodology has been applied in several other MDL common benefit allocations, including one of the largest fee allocations in product liability MDL history in the *Diet Drug* litigation. *In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *10-*11 (E.D. Pa. 2003). The MDL court in *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2013 WL 1867117, *4-*15 (E.D.La.2013) approved the common benefit fee allocation proposed by the steering committee and the court-appointed special master, which awarded a stated percentage of available common benefit fees to each of the firms applying for common benefit. Similarly, in *In re Prempro Prods. Liab. Litig.*, 2014 WL 3809101, *1-*2 (E.D. Ark. 2014), the MDL court adopted a percentage-based common benefit allocation as recommended by fee committee and proposed by the special master (*See*, Case 4:03-cv-1507, Doc. 3288-1 (July 14, 2014 recommended allocation based on percentage of aggregate fund)). More recently, in *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, MDL 2428 ("*Granuflo*"), the court-appointed fee committee recommended an allocation to each applicant firm of a percentage of the total fee award based on the committee's experience and the facts submitted and after receiving input from the interested firms. *Granuflo*, 1:13-md-2428, Doc. 1983 (Memorandum in Support of Plaintiff Leadership's Petition for Award and Allocation of Common Benefit Fees) (D.Mass. Dec. 12, 2017). Like the FCC here, the fee committee in *Granuflo*

---

[6] Although it complains about the allegedly disparate hourly rates generated by application of such methodology, KS acknowledges that fee awards may properly be based on the percentage of fund method. (KS Objection, pp. 14-16).

emphasized in its allocation petition that it did not undertake to apply "an unyielding mathematical formula," which it noted could not properly account for the subjective differences that must be considered in making such an award, such as the differing skills and contributions of the attorneys and varying nature and complexity of the tasks involved. *Id.*, p. 22. The MDL court approved the committee's recommendation. *Granuflo*, 2018 WL 2163627 (D.Mass.2018). *See also*, *In re Trasylol Prods. Liab. Litig.*, Case 1:08-md-01928, Doc. 13390 (S.D. Fla. Oct. 11, 2012) ("Motion for Payment of Common Benefit Attorneys' Fees From the Trasylol Common Benefit Fund….") (allocation based on percentage of fund); *Id.*, Doc. 13419 (S.D.Fla. Nov. 11, 2012) (Order granting Allocation Motion); *In re Copley Pharmaceutical*, 50 F.Supp.2d 1141, 1151-57 (assessing allocations to leadership and objectors in terms of percentage of aggregate award).

## V. The time and expense submissions of certain of the objectors were in direct violation of the Court's express instructions, and thus cannot support any increase in their allocations.

The objecting firms' time submissions are riddled with excessive entries, duplicate billing, vague or inadequate descriptions of work claimed, block billing, and various other violations of the Court's timekeeping rules set forth in its common benefit orders. (See, e.g., FCC Order, ¶ B (establishing criteria for analysis of fee and expense submissions); Fee Committee Protocol, ¶ B (setting forth criteria for review of time submissions)). Such timekeeping discrepancies were addressed in *In re Zyprexa Prods. Liab. Litig.*, 2008 WL 1844000, *6-*7 (E.D.N.Y.2008), where the court noted insufficient or vague explanation of time entries and multiple attorneys billing for the same task (including conferring on the same issues) in a common benefit submission, concluding that "a reasonable paying client would find such duplicative billing practices excessive." Due to the "overstaffing concerns and excessive vague time entries," the court reduced the firm's overall common benefit reimbursement by 30%. *Id.* at *8. As the MDL court noted in

*Sulzer*, *supra* at 926, "[f]ees [a]re not reimbursable if the attorney did not document them properly." *See also*, *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563, *4 (S.D.N.Y. 2011) ("Questionable hours submitted by applicant firms were either reduced or entirely eliminated" in allocation of common benefit fee). The FCC expended significant effort to review the submissions and to give credit to these objectors. Having chosen to object to the External Review Specialist's Recommendation, these objectors bear the burden of proving their compliance with the Court's orders and that their time and expense was for the common benefit. As discussed more fully below, certain of these objectors cannot meet their burden in light of the record-keeping discrepancies prevalent throughout their submissions.

## VI. The Court-appointed External Review Specialist followed his Court-Ordered mandate

The objectors criticize the External Review Specialist and his role in the common benefit allocation process. Therefore, it is necessary to point out that the External Review Specialist was expressly directed by the Court in the Order which appointed him to "assist[] the FCC in its duties of evaluating the time and expenses submitted for consideration in this MDL, and to aid the FCC in any way appropriate in performing the work of the FCC and in furtherance of the directives and mandates" of the FCC Protocol. The External Review Specialist was further directed by the Appointment Order to "exercise the duties set forth in [the Protocol], including meeting with firms submitting requests for fees or expenses to the FCC, attempting to resolve objections, if any, and submitting to this Court a written recommendation as to a fair allocation of the Common Benefit Fund." The External Review Specialist performed the job he was assigned to do, which is to assist the FCC under the Court's Protocol and to meet with applicant firms and to attempt to resolve objections to the FCC's recommendation and to make his recommendation. While glossed over in their objections, the External Review Specialist met or conferred with every objector and

considered the objectors' positions. Four objections were successfully resolved, and the External Review Specialist recommended additional allocations for two of the remaining four objectors, while decreasing members of the FCC.

The objectors contend that the External Review Specialist failed to properly consider their positions in making his recommended allocation. In *In re Genetically Modified Rice Litig.*, 2012 WL 6085141, *3-*4 (E.D.Mo.2012), where the MDL court adopted the report and recommendation of the Court-appointed Special Master regarding allocation of common benefit fees and expenses, the court rejected an objector's argument that the Special Master failed to consider and discuss each of its arguments, noting that the objector had ample opportunities to present all of its arguments in its objections to co-lead counsel's motions and in its own motions, and that the objector had participated in meetings with the Special Master in which it was able to explain its arguments. After conducting its own review, the MDL court found no merit to any of the objector's arguments and adopted the recommended allocation. *Id.* Here, each of these objectors likewise have had multiple opportunities to make their positions known, including receipt of written analysis of their time and expense submissions, recorded appearances before the FCC, objections in writing to the FCC's preliminary and final recommendations, meetings or conferences with the External Review Specialist, and now their written objections to the External Review Specialist's recommendation. The Court will make its determination regarding the merits of the objectors' respective positions.

## VII. Contrary to the objectors' contention, the process for the FCC's and External Review Specialist's recommended allocations has been transparent, with every applicant firm receiving information about the submissions and recommended allocations for all firms and with every applicant firm having ample opportunities to be heard and to object, including the opportunity to object to the Court which will make the final allocation decision.

Another common refrain among the remaining four objectors is that their inability to review the time and expense submissions of every one of the other applicant firms renders the FCC's allocation process not sufficiently transparent, generally citing to *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220 (5th Cir.2008). (*See, e.g.*, Anderson Objection, pp. 4-7; KS Objection, pp. 20-22; Mazie Slater Objection, pp. 24-25; Bernstein Liebhard Objection, pp. 10-11). However, neither *High Sulfur* nor any other case cited by any of the objectors – nor any other case – holds or even suggests that a firm objecting to a common benefit attorney's fee allocation in an MDL or class action context should have access to every other applicant firm's billing or expense records. *High Sulfur*, which involved a completely closed process where no one outside of the committee and the judge had *any* information about the allocation beyond what they were suggested to receive, stands for the proposition that a fee applicant should have sufficient information to be able to compare its award to that proposed for all other applicants. There can be no reasonable contention here that any objector lacks information about the other applicant firms' recommended allocations so as to be able to compare itself.

Here, unlike in *High Sulfur* where the non-committee member applicants had no information about what any other applicant submitted or what they were recommended to receive, every one of the 94 applicant firms was provided abundant information about every other applicant's submission and their recommended allocation. Every applicant – including these objectors – was provided the total number of hours and amount of expenses submitted overall and by each applicant firm, an explanation of the laborious process undertaken by the FCC for reviewing every firm's submission, and the results of this months-long process, including the total number of hours and expenses recognized by the FCC as for the common benefit by firm and each firm's recommended allocation. Every applicant firm was provided information about their own

time and why their submitted time or expense was questioned or was not considered for the common benefit. Every applicant has also had multiple opportunities to object and to be heard and to provide feedback and to receive feedback from the FCC – both in-person and in writing. Three of the four remaining objectors appeared before the FCC and had the opportunity to address any issue they deemed appropriate. Every objector who requested same has received the transcript of their appearance before the FCC. The four objectors have also met or spoken with the External Review Specialist after their objections to the FCC's Final Written Recommendation were served. The Final Written Recommendation, the Declaration of the FCC's Chairman, and the External Review Specialist's Recommendation are all filed of record. The objectors know which firms' recommended allocations increased and which have been decreased from the Preliminary Written Recommendation to the External Review Specialist's Recommendation. Moreover, the objectors have been advised – multiple times, both in writing and in-person – how the FCC's review of time submissions bore on its recommended allocation. The objectors now have chosen to exercise their right to object to the Court and have presented additional information for the Court's consideration. The Court will render its own decision regarding the allocation, which will be published. In light of these facts, any complaint of an alleged lack of transparency is baseless.

Much like the objectors here, a firm objecting to a common benefit allocation in *In re Genetically Modified Rice Litig.*, 2012 WL 6085141, *3 (E.D.Mo. 2012), moved to compel discovery of the individual billing records of all common benefit applicant firms. The MDL court found that "an in-depth examination of individual time sheets is not necessary given the sworn declarations of plaintiffs' co-lead counsel regarding the procedures used in analyzing those time sheets." *Id.* at *3. The MDL court there further noted that the objector provided no reason that the court may not rely on co-lead counsel's representations regarding the time sheets, and therefore

denied the objector's motion to compel. The Eighth Circuit affirmed the MDL Court's ruling denying discovery in *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir.2014), observing as follows:

> Although the court did not appoint an external auditor or permit discovery, *cf. In re Diet Drugs,* 582 F.3d at 533–34, discovery in connection with fee motions is rarely permitted, *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 338 (3d Cir.1998), and a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

*See also*, *Martinez v. Schock Transfer and Warehouse Co., Inc.*, 789 F.2d 848, 849-50 (10th Cir.1986) (trial court properly exercised discretion to preclude discovery in dispute regarding attorney's fees); *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish*, 2012 WL 12987026 (E.D.La.2012) (denying motion to compel discovery related to time keeping records in attorney's fee dispute based on legal precedent that attorney's fees should not generate a separate litigation). In denying discovery in connection with an attorney's fee request, the court in *Hamprecht v. Hamprecht*, 2012 WL 12905607, *1 (M.D.Fla.2012), instructively observed as follows:

> As the Supreme Court has explained, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). When deciding a motion for attorney's fees, courts rarely reopen discovery, and evidentiary hearings are often unnecessary. See Fed.R.Civ.P. 54(d)(2) advisory committee's note; 2 Mary Francis Derfner & Arthur D. Wolf, *Court Awarded Attorney Fees* § 25.01 (2007) ("[P]ost-judgment discovery into fee issues is rare."). A determination of a fee award by a district court "solely on the affidavits in the record" is "perfectly proper." *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1303 (11th Cir.1988).

Here, the Court provided detailed guidance and established rules and criteria in its common benefit orders that have governed the FCC's common benefit allocation process from the outset. The facts and information considered by the FCC have been provided and explained in detail to every firm that applied for common benefit, including the objectors here. Every applicant firm

(including each of these objectors) has been provided substantial information about how their work (and that of every applicant firm) was evaluated, including written explanations regarding the applicant firm's submitted time considered – or not considered – as common benefit, and an opportunity to respond in writing and in-person. Each firm also has received information about each of the other applicant firms' submitted time considered for common benefit (number of hours and amount of expenses submitted and number of hours and expenses recognized by the FCC as common benefit for every applicant firm). Importantly, the same process and criteria were applied to every firm that applied for common benefit consideration. The objectors' contention that they have not received adequate information regarding how their submitted time (or that of any other applicant firm) was reviewed and evaluated by the FCC, or why certain of their time was disallowed or questioned, is contrary to fact.

**VIII. The FCC's and External Review Specialist's recommendation that future allocations be made on a 70/30 basis (70% allocated in accordance with the recommended percentages set forth in the recommendations and 30% to be held back for consideration of post-cut-off work) is fair and reasonable.**

In his recommended allocation, consistent with the FCC's recommendation, the External Review Specialist recommends that the Court allocate thirty percent (30%) of future funds received in the MDL common benefit fund as being subject to future orders of the Court regarding payment and allocate seventy percent (70%) of future funds among the applicant firms utilizing the same percentage set forth in the Recommended Allocation.

The Anderson firm objects to the FCC's proposal for the retention of 30 percent of all future common benefit contributions pending future orders of the Court, stating "[t]here is no reason to believe that any firm will be entitled to payment for common benefit beyond that already submitted, and thus all further collections should be distributed in the same percentages as will be approved by the District Court for the initial allocation." (Anderson Objection, p. 18). However,

Mazie Slater says that the 30 percent for future common benefit contributions is too low in light of its "ongoing intensive efforts on behalf of the entire Ethicon and Bard litigations." (Mazie Slater, p. 23). KS claims similarly that it has continued to do substantial work that would be "completely undercompensated" unless all future funds are allocated *de novo*. (KS Objection, pp. 22-23). These competing objections demonstrate the necessity for a portion of the future common benefit funds to be allocated according to future orders of the Court.

While there has been on-going work in the litigation after the December 21, 2016 cut-off, the FCC is aware that most of the significant common benefit work was done prior to the cut-off. Cases that have resolved and assessments into the fund benefited from the work that was largely done prior to the cut-off. In recognition that several of the applicant firms have submitted time for work performed after the cut-off, and because that work has not been evaluated in terms of whether and the extent to which it provided any common benefit, the FCC and External Review Specialist believe that it would be prudent and reasonable to ensure that a portion of the future common benefit assessments be available to compensate such work. This post-cut-off work will be separately evaluated at a later date, and any further award of these funds would be reserved for a future order of this Court.[7]

## IX. The objectors' submissions directly conflict in several respects, thus effectively serving to cancel one another out which emphasizes the difficulty inherent in the FCC's and External Review Specialist's assigned tasks of deciphering such conflicting accounts and assigning credit in the face of divergent competing claims.

No response to these remaining four objectors could ignore the fact that all four are obviously claiming credit for much of the same work. Along with many other firms who are also

[7] While an exhaustive review has not been performed relative to time and expenses submitted post December 21, 2016, a cursory review indicates that much of the time and expense appears to work for individual cases and not for common benefit.

recommended for common benefit compensation, including firms on the FCC and several others in this Court, all four of these objectors worked almost exclusively on the Ethicon litigation, and much of these objectors' work focused on the Prolift device specifically.

For example, much of Bernstein Liebhard's objection addresses work by its former partner, Jeff Grand, in connection with state court trials involving the Ethicon Prolift device in New Jersey, and specifically the *Gross v. Ethicon* trial. Bernstein Liebhard claims that Grand was "an essential part" of the *Gross* trial team and that he played a "significant role" in the *Gross* trial. (Bernstein Liebhard Objection, pp. 2-3). Likewise, Anderson claims that he played a substantial role in the *Gross* trial, and he claims to have developed the scientific and liability theories that were successfully utilized in that case. (Anderson Objection, pp. 3, 24). Not to be outdone, KS claims that its attorneys "provided assistance in all aspects of litigation support" during the *Gross* trial and alleges that KS was the only firm besides Mazie Slater to "step up" and their firm was later recognized for their "significant work in the *Gross* trial." (KS Objection, Ex. E (Affidavit), ¶¶ 48-49). Mazie Slater, however, states that it did almost all of the work relative to the *Gross* trial, while Anderson merely "call[ed] two witnesses" and Grand "argu[ed] certain deposition designation and legal issues." (Mazie Slater Objection, p. 25). Mazie Slater does not mention KS with respect to *Gross*, at all. Instructively, in his appearance before the FCC, Anderson was asked about the *Gross* case and the number of different firms claiming significant hours related to *Gross*, and Anderson acknowledged that no fewer than six different law firms from across the country were substantively involved in *Gross*, and ultimately described the trial as "a free-for-all." (Anderson FCC transcript, 23:17-28:7). Somewhat contrary to the tenor of its Objection, Adam Slater of Mazie Slater likewise acknowledged in his testimony before the FCC that multiple law firms contributed significantly to the *Gross* case and to the Ethicon litigation generally. (Mazie Slater

FCC transcript, 107:18-111:3; 139:9-13; 144:24-145:4 (acknowledging that Mazie Slater was unable to run and fund New Jersey litigation by itself so it joined with other firms to run and fund the New Jersey litigation, stating "we all did it together.")).

In his Fee Affidavit filed pursuant to the Fee Committee Protocol, Anderson claims that his work in helping to uncover internal Ethicon documents relating to knowledge of the risks of polypropylene "was the linchpin for justifying punitive damages awards, which undoubtedly convinced the manufacturer to negotiate at least inventory settlements." (Anderson Fee Affidavit, § i., p. 6). Conversely, however, Mazie Slater claims in its prior objection to the FCC's Final Written Recommendation that it took an "apex" deposition that led to an agreement that Johnson & Johnson would be on the verdict sheet for future cases, and that "it is J&J's net worth that has driving the punitive damages awards, and in turn the settlements." (Mazie Slater objection to FCC's Final Written Recommendation, p. 4).

KS seeks common benefit reimbursement for its work in a "post-*Gross*" Prolift trial in Philadelphia state court, *Hammons v. Ethicon*. In an effort to prove how this subsequent trial could be deemed for the common benefit after the plaintiffs' verdict on the same product in *Gross*, KS points to the fact that *Hammons* is the first Prolift verdict on design defect whereas *Gross* only resulted in a verdict on failure to warn (Gross lost on her design defect claim). (KS Objection, p. 5; *See also*, KS Objection to FCC Final Written Recommendation, p. 4 (urging that failure to warn claim is case-specific while design defect claim is "at the heart of these cases.")). In other words, KS urges that the value of the *Gross* trial should be diminished in light of the fact that the design defect claim was not successful there. Moreover, Mazie Slater and Anderson both take credit for developing the trial themes and evidence, including the medical and scientific experts that were utilized by KS during the *Hammons* trial. (*See, e.g.*, Anderson Fee Affidavit, pp. 20-21 (claiming

that plaintiffs' liability case in *Hammons* rested on evidence developed by Anderson)). Indeed, Mazie Slater claims credit for actually *trying* the *Hammons* case, and further claims that it handled the case-specific depositions as well as the appeal briefing in *Hammons*. (Mazie Slater Objection, pp. 10-11, 16 and 21).

Anderson claims that he was lead trial counsel for the *Bellew* MDL Prolift bellwether trial. (Anderson Objection, Ex. 1 (Casey Report), p. 9). However, Mazie Slater says that its partner Adam Slater tried the *Bellew* case and Slater takes credit for questioning 11 of 13 witnesses at trial. (Mazie Slater Objection, pp. 10, 21; *Id.*, Ex. 1 (Slater Decl.), ¶ 2 and attached chart)). In another competing version, Bernstein Liebhard claims that its former attorney, Jeff Grand, "was a member of the [*Bellew*] trial team and contributed to the trial in several ways." (Bernstein Liebhard Objection, p. 4).

Mazie Slater contends that it was its work in certain Ethicon state court Prolift trials that resulted in plaintiffs' verdicts exerted litigation pressure on those Defendants and that its trial work "has driven the overall value of every Ethicon inventory settlement." (Mazie Slater Objection, p. 13 n. 5 ("It is the relentless pressure [allegedly provided by Mazie Slater] that brought the defendants to the table, not a single trial."); p. 16 ("Adam Slater also aided settlement for other firms by providing pressure as lead trial counsel in other firms' bellwether cases."); p. 17 ("it was the trial and litigation pressure brought by Mazie Slater and others that made these settlements possible.")). However, Anderson claims in its Fee Affidavit that it was not until the verdict in the 2017 *Engleman* case in which he was lead plaintiff's counsel "that Ethicon returned to the negotiation table in an earnest effort to resolve inventories at reasonable amounts." (Anderson Fee Affidavit, § i., p. 6). In another disparate version of the facts, KS claims that it was instead its trial success against Ethicon in Philadelphia state court in cases involving Prolift that pressured these

Defendants to settle and drove up the values of plaintiffs' settlements. (KS Response to FCC Petition for Award of Common Benefit Attorney's Fees and Expenses, p. 12 ("Beyond the sheer enormity of these verdicts, KS's success in the Philadelphia Court of Common Pleas has been essential to the litigation by driving Ethicon to settle cases…and simply weakening Ethicon's ability to fight the cases across the country."), p. 14 ("[T]hese large verdicts only drove further settlements…."). Paradoxically, however, both KS and Mazie Slater argue vociferously that the MDL settlement values – that they seek credit for "driving" – were grossly inadequate. (*See, e.g.*, Mazie Slater Objection, p. 17 (criticizing "failure to achieve a global settlement, [and] inadequate settlement values driven by the unmanageably large numbers of cases taken by these and other firms…."); KS Objection, p. 18 ("the results for individual plaintiffs were extremely poor [comparing alleged average settlement to purported average trial verdict]…. So, the result of leadership's work was poor, undermining their proposed opposite disparity in compensation"; "Most settlements were wholly inadequate...."); *Id.*, p. 19 ("The puny mesh settlements are simply unjustifiable.")).[8] Thus, the objectors not only contradict each other, they contradict themselves.

In a similar vein, Mazie Slater has criticized MDL Executive Committee, Ethicon MDL Co-Lead Counsel and FCC member firm Wagstaff & Cartmell with respect to its handling of the first TVT-R bellwether trial case in the MDL (*Lewis*), calling the trial "a disaster due to poor preparation." (Mazie Slater Objection to FCC Final Written Recommendation, p. 6). Anderson claims credit for being "co-lead trial counsel" in the *Lewis* case. (Anderson Objection, Ex. 1 (Casey Report), pp. 8-9). However, Mazie Slater simultaneously seeks common benefit compensation for

---

[8] It is difficult to discern how a firm can claim that their non-MDL work "drove" MDL settlements and increased the MDL plaintiffs' settlement values, while simultaneously lambasting the MDL plaintiffs' counsel for settling cases and criticizing the values of those settlements as "puny" or "unjustifiable." This sort of faulty logic pervades these objections.

its assistance in the preparation of the *Lewis* trial, claiming that it "provided substantial assistance," attending days of meetings and actually conducting depositions during the trial. (Mazie Slater Objection, pp. 13-14). Seeking common benefit consideration for allegedly assisting in preparation for a trial that was tried by others – while simultaneously disparaging the trial as a "disaster" because of "poor preparation" – is just another example of the intellectual duplicity that pervades these objections.

KS also claims to have "developed" certain experts, including urogynecologist Bruce Rosenzweig and urogynecologist Richard Bercik. (KS Objection, p. 12). However, Anderson claims that he was responsible for recruiting and first retaining Dr. Rosensweig and he acknowledges that Dr. Rosensweig was then developed primarily by Wagstaff & Cartmell. (Anderson Fee Affidavit, p. 12). Also, Mazie Slater claims to have been responsible for the development of Dr. Bercik as an expert in connection with the Bard litigation. (Mazie Slater Objection, pp. 17-18). The truth is that neither of these self-defeating objectors can claim to have developed Dr. Bercik.[9]

In another competing versions of events, Mazie Slater seeks credit for developing certain evidence in connection with the depositions of Ethicon physician expert, Vincent Lucente, and his partner Miles Murphy, regarding a Prolift study in which they participated – which depositions Mazie Slater claims to have taken. (Mazie Slater Objection, p. 15). Specifically, Mazie Slater

---

[9] Notably, Dr. Bercik was initially retained and developed in the *Sanchez* bellwether trial case as a case-specific expert in the Boston Scientific MDL by Clark, Love & Hutson. Dr. Bercik testified in *Sanchez* that he has not been retained or asked to serve as an expert in any other pelvic mesh case. Therefore, this objector's seeking credit for development of Dr. Bercik – who was already retained and developed as an expert by MDL leadership – is merely another area of discrepancy. Moreover, per Paragraph 3.D.e. of the October 4, 2012 Management Order, retention of an expert without approval of a Coordinating Co-Lead or Co-Lead of the MDL who is not needed or used in the MDL is not eligible for common benefit. Mazie Slater has no such approval with respect to Dr. Bercik, and Dr. Bercik has never been identified or utilized as a general expert in any MDL.

claims to have uncovered data related to Prolift complications that were not previously reported by Ethicon. However, Bernstein Liebhard also claims that its former attorney Grand prepared for and took the depositions of experts Lucente and Murphy, and it was Grand who was responsible for uncovering the previously withheld information. (Bernstein Liebhard Objection, p. 10).

These are merely a few of examples of these objectors' conflicting views of which firm or attorney was responsible for what claimed work, or whether certain work is entitled to common benefit compensation and the relative value of such work, which only prove why none of these objections are valid. These objectors' conflicting yet unwavering representations that "we did this – you did not" or "our work is more valuable than yours" – or the inane "your work was poor, but we deserve credit for it" – effectively serve to cancel one another out.[10] Plainly, different lawyers cannot be given equal credit or value for the very same work in the same litigation. The FCC was required to consider and analyze these sorts of irreconcilable versions of events in their effort to make what they contend is a fair and reasonable recommendation reflective of the value of these firms' work – and the work of all firms – to the MDL plaintiffs.

**X. The individual firm objections, each addressed in turn below, cannot withstand scrutiny and may well warrant a reduction in the objectors' allocations recommended by the FCC and the External Review Specialist.**

---

[10] In addition to presenting the FCC and the Court with conflicting factual narratives, many of the factual assertions themselves are inaccurate. As just one example, Slater argues that FCC member firm Clark, Love & Hutson "tried one case." (Mazie Slater Objection at p. 19). As the Court is aware, that firm achieved verdicts for eight women, and tried the first bellwether case through presentation of evidence, settling the afternoon before closing arguments. The firm's verdicts were affirmed by the Fourth and Eleventh Circuits, based in part on the appellate work of another FCC member firm, Blasingame, Burch, Garrard & Ashley. Anderson also inaccurately claims that the Blasingame firm "focused exclusively on the Bard Avaulta Plus product line…." (Anderson Objection, p. 13). This firm discovered and developed the liability case against every product in the Bard MDL and developed and provided general experts with respect to several other products across multiple other MDLs. The objectors are either unaware of the significant contributions made by MDL Participating Counsel or else they are intentionally misrepresenting the significance of others' work for their own benefit. Neither should be rewarded by the Court.

**A. Anderson Law Offices**

As noted above, this Court will make the decision regarding allocation of common benefit fees and expenses and to the extent he seeks to refute the FCC's or External Review Specialist's recommendation, it is Anderson's burden to prove to the Court what common benefit he provided and the value of that benefit. However, Anderson devotes comparatively little of his Objection to explaining what he did in the litigation, how that work benefited the MDL plaintiffs or how that work should be valued, or why the FCC's or External Review Specialist's recommendation did not properly value that work. Instead, nearly the entirety of Anderson's Objection is aimed at criticizing the FCC, the External Review Specialist, or the allocation process generally. The FCC submits that Anderson's work was properly valued in light of Anderson's contributions.

Anderson was appointed Co-Lead Counsel of the Cook MDL, but his firm submitted very little time and expense in connection with the Cook MDL and his objection devotes little attention to the Cook MDL. Others in MDL leadership bore substantially more responsibility than Anderson for the resolution of the Cook MDL.

To the extent it addresses his work in the litigation, Anderson's objection is devoted almost exclusively to his work in the Ethicon litigation. However, Anderson was not a Co-Lead in the Ethicon MDL and he held no Court-appointed leadership role with respect to Ethicon. As noted above, many of the 94 applicant firms – including members of the FCC (which includes both Co-Lead Counsel for the Ethicon MDL) and all four of the remaining objectors – also performed common benefit work with respect to the Ethicon litigation. In his appearance before the FCC, Anderson acknowledged that the majority of his work was in Ethicon and further stated that "I'm here to talk about myself today, but I'm not here to say that I'm the only one that did anything, because everybody in this room – there were a lot of people outside of this room that did a lot,

especially with regard to the Ethicon litigation." (Anderson FCC hearing transcript, 13:11-18). This admission speaks volumes: Anderson did common benefit work relative to Ethicon, but so did many others, including the firms who served in Court-appointed leadership positions and who committed substantially greater resources and personnel and performed far more work than his firm.

Anderson served in a support role for MDL and State Court leadership in the Ethicon litigation, developing general scientific and medical experts and preparing for and defending their general depositions: specifically, mesh science experts Dr. Klinge, Dr. Muehl and Dr. Jordi and urogynecologist Dr. Elliott.[11] Anderson handled 6 of the more than 80 corporate representatives who were deposed in the Ethicon litigation: Barbolt;[12] Burkley; Holste; Pruden; Vailhe; and Zaddem. Anderson also took the deposition of one of the more than 60 defense experts who were identified and deposed in the Ethicon litigation: Williams.

Anderson's Objection points out that Ethicon MDL Plaintiffs' general experts Dr. Iakovlev and Dr. Rosenzweig have provided hundreds of expert reports and have been deposed hundreds of times. (Anderson Objection, pp. 24-25). Emphasizing these facts actually undermines Anderson's Objection. The hundreds of reports and the hundreds of depositions that Dr. Rosenzweig gave in the Ethicon litigation (and in other of the MDLs) were handled by others, not by Anderson.

[11] In all, there were more than 27 plaintiffs' general experts who gave reports and were deposed in the Ethicon MDL. Anderson also seeks credit for working with pathologist Vladimir Iakovlev in the Ethicon litigation, but Dr. Iakovlev was identified, developed and defended by other MDL counsel in other MDLs before he was utilized in Ethicon.

[12] Barbolt, an important defense witness in the Ethicon litigation, was deposed on six separate occasions. Anderson asked questions of Barbolt on one of those dates and he attended another date but did not ask any questions. Anderson did not attend four of the six dates on which Barbolt was deposed. While Anderson claims credit for Barbolt, multiple other attorneys claim credit for Barbolt.

Despite the suggestion of his Objection, Anderson did not participate in the preparation of "hundreds" of case-specific expert reports or "hundreds" of case-specific depositions of Dr. Iakovlev – that would be impossible for any single lawyer. Anderson had no involvement in any of Dr. Iakovlev's reports or depositions in any of the other MDLs (other than Ethicon). Anderson did work with Dr. Iakovlev during the Ethicon wave process, defending some case-specific depositions and generally coordinating scheduling of Dr. Iakovlev's case-specific depositions and receipt of pathology from individual firms for preparation of case-specific reports. However, Dr. Iakovlev and his analysis of mesh pathology had already been developed by Motley Rice and other firms in other MDLs and had already been defended against *Daubert* challenges. Thus, Anderson's use of this expert and his adoption of the methodology developed by Dr. Iakovlev in conjunction with other firms – and defended in court by other firms – speaks more to the value of these other firms' contributions, rather than Anderson's. This is not to suggest that Anderson was given no credit relative to either of these experts, but Anderson's emphasis of his work relative to these experts only demonstrates the difficulty of assigning credit and value where multiple law firms simultaneously claim responsibility for the same activity or expert.

Anderson participated in the *Gross* New Jersey state court Prolift trial (again, according to Mazie Slater, lead trial counsel in *Gross*, Anderson questioned two witnesses at that trial). Anderson was also co-lead counsel for the *Bellew* MDL Prolift trial, which case also involved multiple other firms and was resolved prior to verdict (again, Slater says he served as lead trial counsel for *Bellew* and takes credit in his Objection for questioning 11 of 13 witnesses at trial, and

Bernstein Liebhard claims that its partner, Jeff Grand, also deserves significant credit for the *Bellew* trial).[13]

In short, Anderson was a member of a vast team that prosecuted the Ethicon litigation, and his firm did contribute to the common benefit with respect to Ethicon. To the extent his time reflects real work on common benefit tasks in Ethicon (and to a far lesser extent in Cook), his firm's work was valued appropriately. The FCC could not and did not, however, reward inefficient work or clearly excessive time entries reflected in Anderson's submissions.

Anderson expresses outrage that he was not recommended to receive common benefit compensation commensurate with the small number of firms who are recommended to receive a larger award, including certain of the FCC firms. Anderson is comparing apples to oranges. Anderson is **a one-lawyer firm with two paralegals**.[14] One of the specific criterion established by the Court in the FCC protocol is that the "[t]he level of experience, reputation and status of each attorney and firm, including partner participation by each firm," and that "[t]he extent and nature of participation by partner-level attorneys" and by "experienced attorneys" provides some evidence of the firm's commitment. (FCC Protocol, ¶ B.4.). Incredibly, Anderson criticizes certain of the FCC firms who were recommended a larger allocation on the ground that their supposedly unreasonable "hourly rate" includes time for paralegals and what he calls other "lower-level employees," which is particularly disingenuous for his firm which had nearly half of its time for

---

[13] Anderson discusses his role in a subsequent trial involving the Ethicon TVT-Secur product, but that trial occurred in 2017, after the cut-off for consideration for common benefit established by the Court for this initial allocation.

[14] Much of his paralegal time was deemed by the FCC to be duplicative, with both paralegals submitting the same or similar time for the same activity. The FCC treated Anderson the same as any other firm with respect to such duplicative time: it was not recognized.

paralegals and for which the vast majority of its disputed time is for duplicative paralegal time. (Anderson Objection, pp. 2, 9 and 14).

The few firms who are recommended to receive a larger allocation with whom Anderson seeks to compare his allocation in his objection devoted entire teams of lawyers over a number of years, including the day-to-day management and oversight of the MDLs and the monumental undertaking of coordinating the multiple "waves" consisting of thousands of trial work-up cases involving multiple products against several defendants ordered by the Court. These waves required these leadership firms to assign dozens of attorneys to coordinate the trial work-up of these thousands of cases across the country, coordinating and attending dozens of plaintiffs' and defense general expert depositions and having teams of attorneys to draft and file motions and to respond to volumes of defense dispositive and *Daubert* motions, among many others, under various States' laws, as well as working up – or directing others in the work-up – of several hundreds of individual cases across product and defendant lines. As demonstrated in the following table, Anderson's commitment to the litigation does not compare to the commitment of those firms he attacks, and whose recommended awards Anderson claims his should mirror:

| Firm | Attorneys | Paralegals | Total |
|---|---|---|---|
| Anderson Law Office | 1 | 2 | 3 |
| Aylstock, Witkin, Kreis & Overholtz | 21 | 21 | 42 |
| Blasingame, Burch, Garrard & Ashley | 15 | 19 | 34 |
| Clark, Love & Hutson | 19 | 17 | 36 |
| Motley Rice | 47 | 42 | 89 |
| Wagstaff Cartmell | 22 | 13 | 35 |

Anderson did some common benefit work with respect to Ethicon, but it is unreasonable for Anderson to suggest that the work of a single lawyer with two paralegals should be compensated anywhere near the level of firms that devoted several times over the number of lawyer (and paralegals) for the same duration. Anderson's recommended allocation is the eleventh

highest out of the 94 firms, and his recommendation was fair and reasonable in light of the firm's contributions.

Anderson also complains about his reverse-calculated "hourly rate" (recommended allocation amount divided by number of hours) compared with those of firms who were recommended a larger allocation. Anderson argues that his firm's time should be compensated at a higher rate. The fundamental problem with such argument is that by any reasonable standard, Anderson's time submitted for common benefit consideration is unreasonable. The Court expressly directed that "[a]ttention shall be paid to the quality of the work performed separate and apart from the length of time required to perform it. An attorney or law firm providing common benefit should not be penalized for efficiency, nor should inefficiency be incentivized." (FCC Protocol, ¶ B.2.). Anderson's submissions are either reflective of an egregiously ineffective and inefficient use of time, or else they are exaggerated – pure and simple. In total, the Anderson firm submitted time for 992 days of between 10 and 15 hours per day, 301 days between 15 and 20 hours a day, and 36 days of more than 20 hours in a day. For example, Anderson himself in 2012 submitted 3,606.80 hours of claimed common benefit time. That is the equivalent of **9.88 hours every day for 365 days, including weekends**. In 2013, Anderson submitted 3,471.15 hours, which equates to **9.51 hours per day for every single day of the year, including weekends**. In light of the fact that Anderson was not a Co-Lead in the Ethicon MDL or Coordinating Co-Lead and given the supporting nature of his role in the Ethicon litigation, this sort of time is excessive. *See, e.g.*, Fee Committee Protocol, ¶ B.9. (stating that time or expense will not be considered "that is excessive on its face when considered as a whole in light of the role(s) that the timekeeper(s) had in this litigation, which did not substantially benefit the claimants in [the MDLs].").

This pattern of excessive billing was not limited to Anderson. One of the two Anderson paralegals in 2012 billed the equivalent of 7.43 hours – every day for the entire year, including weekends – and an amount equal to 6.01 hours per day for every day for the entire year in 2013. The other Anderson paralegal submitted the equivalent of 6.61 hours every day in 2012 and the equivalent of 5.79 hours every day in 2013. Often, one or both of Anderson's paralegals billed for the same activities on the same day, if not for the same activities as Anderson on the same day, reflecting duplicate billing. Instructively, in his Fee Affidavit, Anderson does not dispute the fact that he and his two paralegals often submitted similar or duplicative time for the same activity on the same date, but instead attempted to defend it by claiming that he and his paralegals often worked "in concert" on the same task. (Anderson Fee Affidavit, p. 22). The MDL court in *In re Enron Corp. Securities, Derivative and ERISA Litig.*, 586 F.Supp.2d 732, 756 (S.D.Tex.2008) noted that "if more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do may be obviously discounted." This rule certainly applies where more than one paralegal submits similar or identical time for the same task, often including the same task as claimed by Anderson himself.

While it is acknowledged that Anderson traveled to Germany for purposes of meeting with and developing the two scientific experts in the Ethicon litigation discussed above (Dr. Klinge and Dr. Muehl), his time submitted for that purpose is clearly either excessive or inefficient.[15] Anderson traveled to Germany on eight separate occasions between October 2011 and October 2015, once for 23 straight days and another time for 18 consecutive days. The average duration

[15] One of these experts, Dr. Muehl, testified once – in the *Gross* trial in New Jersey – but has never testified in any MDL trial or anywhere else.

for Anderson for these eight trips was 11.38 days; none of these trips was for less than six days. On six of these occasions, Anderson was accompanied by one (or both) of his paralegals. These paralegals' average Germany trip duration was 10.57 days. The average number of hours submitted per day by Anderson alone for every one of these days is 12.58 hours per day (a total of 1,169.5 hours). Working with these two experts undoubtedly required time and effort. However, to suggest that it was necessary to spend over 12 hours a day over 3 months (93 days) on two experts – on 8 separate trips, generally accompanied by one or two paralegals who were typically billing for the same activity on the same dates – strains credibility.

The excessive or inefficient billing reflected in the Anderson time submissions is precisely why Anderson's (and the other objectors') focus on the amount of its allocation relative to the number of hours submitted is misguided. Courts have consistently reduced or disallowed such obviously excessive or inefficient time. For example, in *In re Sulzer*, 268 F.Supp.2d at 925, the MDL court disallowed fees to the extent the amount of time listed was "grossly excessive on its face" in light of timekeeper's role, and also to the extent the amount of time spent on a given task "was more than was reasonable or necessary." *See also*, *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563 (S.D.N.Y. 2011) ("Questionable hours submitted by applicant firms were either reduced or entirely eliminated" in allocation of common benefit fee); *In re Copley Pharmaceutical, Inc., "Albuterol" Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1156-57 (D.Wyo.1999) (in light of billing reflecting unreasonable hours, objector's allocation was not only fair and reasonable, but "generous"). Use of a "lodestar" methodology, such as suggested by Anderson, would only reward such obvious inefficient or excessive billing. *In re Vioxx*, 802 F.Supp.2d at 773-774 (J. Fallon) ("Mechanically calculating hours and allocating fees solely on that basis would incentivize padded hours and diminish the work that truly moved the litigation towards its

conclusion.")). Anderson's focus on its relative "hourly rate" only underscores the impropriety of using a lodestar method, which the FCC has made clear it did not do. Moreover, as noted above, the Court expressly instructed the FCC not to incentivize such inefficiency by focusing on the number of hours claimed, but instead to consider the quality of the work and its contribution to the outcome of the litigation, emphasizing that "the Court is primarily concerned with substantive contributions and not simply the total number of hours." (FCC Protocol, ¶¶ B.2-B.3.).

Tellingly, even though Anderson was appointed as Co-Lead of the Cook MDL, his firm had only 1,630.55 recognized common benefit hours in the Cook MDL out of a total of 22,209.68 (7.34% of the firm's total recognized time). Indeed, in his appearance before the FCC, Anderson did not mention the Cook litigation or any work related to Cook. 89% of the Anderson firm's time was spent in the Ethicon MDL. Again, numerous other attorneys and firms – both from the MDL leadership and across multiple state court venues – also submitted significant common benefit time and expense in the Ethicon litigation. As each of the remaining four objections attest, any recommendation of an award of common benefit fees requires the weighing of competing and widely differing accounts regarding who deserves most credit for a given expert, a particular trial, or any other task, development or achievement in the Ethicon litigation.

Anderson's suggestion that he "supplied key leadership strategies for science and expert issues involving **all mesh manufacturers and their products**" is not supported by any facts. (Anderson Objection, p. 22).[16] Anderson, along with numerous other firms and lawyers in the

[16] Anderson touts the fact that he was appointed National Co-Lead of the Science and Expert Committee across all TVM MDLs. However, he describes no work allegedly done by, for or on behalf of this committee. Any suggestion that Anderson somehow "established" or "developed" any of the scientific themes or theories utilized in this litigation is inaccurate. The scientific principles underlying the plaintiffs' liability theories in these cases were established by physicians and by scientists – not by lawyers – long before this litigation began. Moreover, law firms in leadership of these MDLs were handling surgical mesh cases and had identified developed

MDL and in various state courts, worked in the Ethicon litigation and to a far lesser extent, the Cook MDL. Again, 89% of Anderson's recognized common benefit time is in Ethicon and just 7.34% is in Cook. Unlike the few firms with whom he seeks to compare himself, whose teams of lawyers worked across product and manufacturer lines, Anderson had no substantive role regarding any other manufacturer in the litigation (besides Ethicon and Cook) and his firm provided no meaningful assistance in litigation against any other manufacturer, and his firm's hours reflect the same. Other than his self-serving statements, Anderson has made and can make no showing that he made any significant contribution with respect to any other litigation involving any other manufacturer beyond Cook and Ethicon.

Another aspect of Anderson's submission that the FCC would be remiss for not addressing directly is his attempt to claim credit related to the *Huskey* TVT-O bellwether case, which was tried to a successful plaintiffs' verdict by Motley Rice, Wagstaff Cartmell and Wexler Wallace. In support of his Objection, Anderson relies upon a report from attorney G. Nicholas Casey, Jr. In describing Anderson's role in the Ethicon MDL bellwether cases, and specifically with respect to general experts Klinge, Jordi and Rosenzweig, Mr. Casey makes the following factual assertion: "In the bellwether trial, *Huskey*, Dr. Rosenzweig testified and the work of Dr. Klinge and Dr. Jordi played important roles." (Casey Report (attached to Anderson Objection), p. 9). The insinuation, of course, is that Anderson played a role in and deserves credit for *Huskey*. This is false and misleading. Contrary to the insinuation of Mr. Casey's Report, Anderson had no involvement in *Huskey*. While Dr. Rosenzweig did testify in *Huskey*, he was prepared, developed and presented

---

scientific and physician experts who offered opinions regarding these same themes and theories years before the first of these pelvic mesh cases was filed – and years before Anderson became involved.

at trial by Wagstaff Cartmell.[17] Moreover, neither Dr. Klinge nor Dr. Jordi – for whom Anderson takes sole responsibility – played any role in *Huskey*. To the contrary, Anderson would not make Dr. Klinge or Dr. Jordi available in *Huskey*, forcing the lawyers involved to identify other experts under a tight deadline. Having refused to make "his" experts available for an MDL bellwether trial, and then filing a false report (that he presumably drafted) stating that these experts "played important roles" in that case, is telling. In sum, a one-lawyer firm with two paralegals working almost exclusively on one manufacturer simply cannot and did not provide the common benefit anywhere resembling the leadership firms with whom Anderson seeks to compare himself. The inefficiency and excessive billing evident on the face of the Anderson firm's submissions was critical in the FCC's consideration, and any attempt to claim a higher reimbursement based on the number of hours submitted only exposes the invalidity of the firm's position. Anderson was given credit for the common benefit work that he performed, which included the development and preparation of three scientific experts (Klinge, Muehl and Jordi) and one medical expert (Elliott) in the Ethicon litigation, certain corporate and expert depositions in the Ethicon litigation, providing assistance at certain Ethicon trials, co-lead counsel in an Ethicon MDL case that resolved before verdict, and far less time in the Cook MDL where he was appointed Co-Lead Counsel. Anderson's contributions were appropriately valued.

**B. Bernstein Liebhard**

Bernstein Liebhard's objection is without merit. Bernstein Liebhard points to an agreement entered in August 2012, which it cites for the proposition that the MDL agreed to make its "best efforts" to ensure that certain time related to the New Jersey state court litigation prior to August

[17] As noted above, Anderson had very little involvement with Rosenzweig after he was initially retained.

2012 would be "fairly compensated." (Bernstein Liebhard Objection, pp. 5-6). However, 89.66% of Bernstein Liebhard's submitted time was recognized by the FCC (total recognized time: 3,945.50 hours). Thus, Bernstein Liebhard's complaint is not truly that its time was not recognized. Instead, Bernstein Liebhard simply believes that its work was undervalued. The FCC submits that the firm's limited work was, in fact, fairly valued in the External Review Specialist's recommendation.

As noted above, Bernstein Liebhard's time was limited to Ethicon, and was largely submitted with respect to the New Jersey state court litigation, where former Bernstein Liebhard partner Jeff Grand served as co-liaison counsel. Grand participated in the deposition of seven Ethicon corporate representatives (in four of these depositions, Grand was one of two questioning attorneys). Bernstein Liebhard also relies heavily on Grand's contributions in connection with the *Gross* New Jersey Prolift trial. However, as noted above, all four remaining objectors have claimed and seek credit for the *Gross* trial. Mazie Slater, lead counsel for the *Gross* trial, downplays Grand's contributions to *Gross*, stating that Grand argued deposition designations and legal issues. Bernstein Liebhard also points out that Grand provided support in connection with the *Huskey* and *Lewis* trials (assisting in preparation of deposition cuts and exhibits lists) and the *Bellew* trial (assistance with deposition cuts, pretrial motions and jury instructions) in the MDL.[18] Those cases also were also actually tried by other firms.

Bernstein Liebhard next points to Grand's participation in the drafting of certain administrative and procedural orders and pleadings and legal briefing, and a court mediation

---

18 Bernstein Liebhard also points to Grand's work in the *Budke* Missouri state court trial that was resolved during trial, but that case belonged to another firm and was tried by yet another firm (Mazie Slater). Moreover, the *Budke* case also involved the Prolift product, which was also involved in *Gross* which had already been tried to verdict, and thus *Budke* settlement provided no common benefit to Plaintiffs.

process in the New Jersey Ethicon state court litigation. (Bernstein Liebhard Objection, p. 3). However, it offers no explanation or argument of how this State Court work could be deemed to have inured to the benefit of the MDL plaintiffs generally, or the extent of any such benefit. These same procedural and administrative orders, legal issues, trial selection process, and mediation/resolution were performed or addressed in the MDL – by others. The fact that Grand did or participated in similar work in the New Jersey Ethicon cases cannot be found to have provided significant, if any, benefit generally to the MDL Plaintiffs.

In sum, Bernstein Liebhard's former partner Jeff Grand played a limited supporting role in four Ethicon cases that were tried by other firms. He participated in or performed administrative work related to Ethicon in the state court in New Jersey that was also performed by others in the MDL. He participated in at least some capacity in seven Ethicon corporate depositions. Nearly all of the firm's submitted time was credited by the FCC. The FCC properly valued Bernstein Liebhard's contribution to the MDL plaintiffs generally.

**C. Kline & Specter**

KS submitted (and continues to submit) large amounts of time in the Ethicon litigation with respect to work in connection with certain Ethicon state court trials in Philadelphia state court. However, only two of the cases to which it cites (*Hammons* and *Carlino*) were tried before the Court's December 21, 2016 cut-off for this analysis. Moreover, KS has done very little work that could be considered for the common benefit. Instead, KS has been a consumer – rather than a producer – of the common benefit work product generated by others who led the Ethicon litigation. Trying cases built on the work product of others is further evidence of the significant value of the common benefit work done by many lawyers and firms over many years in the MDL and elsewhere.

Rather than identifying work that could be deemed to have benefited the plaintiffs in the MDL, KS instead points to work that was intended *to keep plaintiffs out of the MDL*. In Section A.4. of its Objection, KS explains its extensive efforts to keep cases in the Philadelphia Court of Common Pleas, where the firm tried Ethicon Physiomesh cases, over the defense's strenuous objection. KS disregards that state court work is only considered for compensation "to the extent it contributed to the outcome of the litigation and benefited the MDL." (Order Establishing Criteria for Applications to MDL…Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee, ¶ B.5). While being able to try cases in its "home court" may have provided a benefit to KS and to its clients, it provided little benefit to the MDL plaintiffs. When working to keep cases *out of the MDL* is the primary example of actual "common benefit" work product that KS can claim as its own, the amount recommended for KS is more than fair and reasonable.

Perhaps recognizing that its work cannot stand on its own, KS embarked on a campaign of denigration and harassment against the FCC and the External Review Specialist. Not only did KS file multiple invalid discovery requests and corresponding motions to compel, each of which were properly denied by the Court, it also opposed the FCC's Petition for a 5% common benefit award largely on its contention that its "slice of the pie" recommended by the FCC is not big enough. Inexplicably, after arguing that the pie is too big (which issue it has now appealed to the Fourth Circuit despite its acknowledgment that the agreed Management Order entered in 2012 plainly states that any award of common benefit fees by this Court would be final and non-appealable), KS nonetheless asks this Court to give it a bigger slice of pie. KS also continues to disparage the MDL leadership (and all MDL plaintiffs' counsel) for allegedly taking too many cases, for settling

cases and for settlement values far below the verdict value, even though KS itself has previously stated in its pleadings that it settled over 1,500 cases for 0.76% (or 76/10,000) of what it claims as the average verdict amount. (KS Objection, pp. 19-20). KS also furnished information and quotes to various media outlets which, in turn, published articles that largely recount KS's unfounded claims against the FCC asserted in its pleadings – and cites those articles in its Brief. (*Id.*, p. 19). KS is also coordinating directly with the non-attorney objector, Lana C. Keeton, no doubt encouraging her false and defamatory statements against the FCC, its members and others. There is no other explanation for why the firm would have a copy of the letter the External Review Specialist sent only to the non-attorney objector the day after it was sent, a copy of which was gratuitously appended to the firm's objection as if to trumpet its allegiance with the non-attorney objector.[19] KS moved to disqualify the Court-appointed External Review Specialist alleging that he is not impartial. KS objected to the Court's receipt of the applicant firms' submissions *in camera*, insisting that this documentation must be filed of record even though its incessant discovery requests for this information have each been properly denied. This unprofessional campaign to try and harass the members of the FCC as well as the External Review Specialist – and its denigration of MDL plaintiffs' counsel generally – in an effort to increase its own allocation should not be rewarded.

By causing unnecessary delay and expense and by seeking to diminish the amount of the common benefit award available to all applicant counsel simply because it feels slighted, KS has been a common detriment. This sort of behavior would warrant a reduction in its allocation rather

[19] The non-attorney objector's objection also makes clear that she is receiving non-public information from and through KS. (*See*, e-mails and correspondence attached to Lana C. Keeton Objection, referencing communications between KS and the FCC or the External Review Specialist, which were not public, but which were obviously provided by KS to this non-attorney objector).

than any increase. *See*, In re *Sulzer Hip*, *supra* at 927 ("The Court has been forced to take notice that several attorneys who submitted applications for Common Benefit Attorney Fee Awards have, in fact, taken action subsequent to finalization of the Settlement Agreement that is detrimental to the common benefit of the class."); *Id.* at 929 ("Accordingly, the Court concludes that it must, at this juncture, withhold any award of common benefit fees to attorneys who are engaged in activity that is inconsistent with the long-term benefit of the class."). As stated in *In re Oral Sodium Phosphate Solution-Based Prods. Liab. Action*, 2010 WL 5058454, *4 (N.D.Ohio 2010):

> [J]ust as a plaintiff's attorney can provide beneficent effort toward forging a settlement that inures to the common *benefit* of all settling plaintiffs, so can an attorney undertake maleficent efforts that work to the common *detriment* of all settling plaintiffs. For example, a plaintiff's attorney can repeatedly complicate and interfere with negotiations between the main parties, delaying settlement without rendering any consequent benefit; or can "contribute to the common detriment by causing the [Plaintiff's Executive Committee] to incur significant additional costs;" or can "contribute[ ] to a delay in the disbursement of settlement proceeds for all claimants;" or can even cause a *reduction* in the amount of total settlement proceeds available. Like making extensive misrepresentations in a fee application, this type of activity can also provide the Court with grounds to reduce a common benefit fee award to zero, and even to impose sanctions.

When discussing the concept of common detriment, the External Review Specialist's Recommended Allocation states, "[a]ctions by certain attorneys caused the Plaintiffs' Leadership and the FCC to incur significant additional costs and were disruptive to the advancement of this litigation. These negative consequences to the litigation as a whole are referred to as 'common detriment,' and I was directed to consider common detriment pursuant to the Protocol and the FCC Orders." (External Review Specialist's Recommended Allocation, p. 22). While this statement by the External Review Specialist did not identify any particular firm, KS acknowledges its role as a "common detriment" by condemning the External Review Specialist's identification that common detriment was considered in his recommendation. (KS Objection, p. 13) KS's detrimental tactics have proven unsuccessful. The FCC and External Review Specialist have made their

recommendations. The issue of allocation is now before the Court. KS's work in Ethicon state court trials in Philadelphia did not provide substantial benefit to the MDL plaintiffs generally. KS's recommended allocation from the FCC was fair and reasonable, if not magnanimous in light of the firm's detrimental conduct. KS cannot demonstrate otherwise.

While it is not the FCC's burden to prove a lack of common benefit, it is important to recognize that KS points to no common benefit work product relative to Ethicon that it provided to the litigation – other than its two Philadelphia state court verdicts. For example, KS was not involved in the development of the strategy that shaped and guided the Ethicon litigation. KS did not perform any managerial or administrative oversight in the MDL. KS did not lead any MDL bellwether or wave process, nor did it help others prepare their own cases for trial in the MDL. KS deposed no general experts in the Ethicon MDL. KS did not contribute to any of the pleading, motions or briefing work in the Ethicon MDL. Whatever "work product" it may claim to have developed on its own relative to Ethicon, even assuming *arguendo* there is any, KS certainly has never made it available to the MDL plaintiffs. That is not common benefit.

KS submitted a list of several depositions that were mostly *attended* by a former contract lawyer (Roger Cameron) or one of its firm lawyers. (KS Objection, Ex. E (Affidavit), pp. 6-9). However, the Paragraph 3.D. of the Court's Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues ("Management Order"), instructs that attendance of depositions without asking questions is presumed to be for individual cases, not for common benefit. That is the case here.

In its Objection, KS continues to inaccurately claim that it developed general plaintiffs' experts. (KS Objection, p. 12). The experts listed in its Objection were all identified and developed by MDL leadership – well before KS retained them to testify in their Philadelphia trials. This is

just another example of KS benefiting from the MDL's work, not *vice versa*. During its appearance before the FCC, the FCC Chairman specifically asked KS whether the firm had developed *any* general experts for the litigation, and KS admitted that it had not, but instead said that it worked with experts developed by MDL leadership. KS's response is particularly enlightening: "I don't believe so beyond what Lee had said to you. **We certainly did not do everything that was litigation…and we didn't do most things**. **Other people did most things** but we did largely in this litigation what we were asked to do by leadership, and if we had been asked to develop experts, we would have done that. (KS 6/12/18 FCC hearing transcript, 24:13-25:14). In other words, KS admitted that it had not actually developed any experts, but it would have if it had been asked. KS also admitted the most single important fact bearing on the value of its contribution – *it did not do most things; other people did most things*. Again, rather than contributing to the common benefit, KS was the recipient and beneficiary of the common work done by many dedicated attorneys in the MDL over years that allowed it to be in a position to take its cases to trial in its chosen venue.

KS also admitted that much of its deposition work, briefing and legal writing, as well as its document review work, for which it submitted time for consideration was handled by contract attorneys. (KS FCC transcript, 31:9-32:9). Of the KS time recognized by the FCC as common benefit, 52.48% was work done by contract lawyers. Much of that work (41.1% of KS's total recognized common benefit hours) was done by Roger Cameron, a former KS contract lawyer whose time largely consisted of preparation for and attendance of Ethicon corporate depositions that were actually taken by MDL leadership or others. Again, the Court expressly instructed the FCC to take into consideration the extent and nature of "partner participation" by each firm, and that mere attendance at depositions is presumptively not for the common benefit. (FCC Protocol, ¶ B.4.; Management Order, ¶ 3.D.).

While rife with rhetoric and hyperbole about its trial success, and its denigration of the work of others, KS simply cannot point to any significant work of its own that could be found to have benefited the MDL plaintiffs generally – beyond the fact it successfully tried two Ethicon cases in Philadelphia state court built nearly entirely on the work product of others, and at least one of which other firms claim credit for. In light of this dearth of evidence, its recommended common benefit allocation is generous. *In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.*, 386 Fed.App'x 584, 585 (9th Cir.2010) (affirming MDL court's reduction of objecting firm's common benefit fee request "in light of [firm's] **failure to identify any common-benefit work product that the firm produced over the course of this litigation**.").

As the foundation for its common benefit claim here, KS touts "its" success in a handful of Ethicon trials in the Philadelphia Court of Common Pleas where verdicts were achieved. Again, only two of those cases went to trial prior to the December 21, 2016 cut-off established by the Court.[20] KS fails to acknowledge that its trials were founded largely upon the common benefit work of others in the MDL. KS did not try its first state court case (*Hammons*) until December of 2015, and *Hammons* involved an Ethicon Prolift product which had already been the subject of a prior state court trial verdict (*Gross* in New Jersey), as well as multiple other state court trial cases that resolved short of trial. KS's first trial was tried after years of exhaustive discovery and expert development by multiple MDL firms and several trials in the MDL (and various state court venues). By the time KS tried its first case, it had a detailed trial package prepared largely through tens of thousands of hours of work by dozens of lawyers in the MDL and elsewhere. KS had the extensive document discovery and corporate depositions that were taken by MDL leadership and

[20] While KS does not discuss same in its Objection, every case tried by KS outside of the Philadelphia state court to date has resulted in a defense verdict.

others. Indeed, KS had the relevant corporate deposition designations and "cuts," along with the applicable documentary exhibits, prior to trying its first case. KS also had access to and took full advantage of the biomaterials, pathology and medical experts identified and developed by MDL leadership and others.[21] In addition, KS had the benefit of several prior pelvic mesh trials, as well as several years' worth of illustrative motions and responses and MDL and appellate rulings related to the critical legal and evidentiary issues and expert challenges relevant to these cases. Further, while not credited in its Objection or supporting materials, KS actually involved lawyers active in the MDL leadership to help prepare its cases for trial and to actually assist in trying some of those cases (as noted above, several other law firms claim credit related to the *Hammons* trial, and in fact, Mazie Slater claims that it actually tried the case – not KS). In sum, KS's trial success was founded in large measure on the MDL common benefit work product of others that it now seeks to disparage. Moreover, Ethicon was already in significant, advanced settlement negotiations with numerous MDL firms at the time of KS's first verdict. Again, KS was predominantly a consumer rather than a contributor to the common benefit. Thus, rather than undermining the MDL's common benefit efforts, KS's trial success actually serves to underscore the tremendous value of the common work contributed by so many firms over many years in the MDL.

In *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 869 (8th Cir.2014), an objector argued much like KS does here that its parallel state court work forced defendant to fight a two-front battle that its state court trial success provided leverage to the MDL's settlement negotiations and therefore requested over $13 million in common benefit fees. The MDL court adopted the

---

[21] As noted above, KS relied on the MDL leadership and others to identify and cultivate the experts that the firm used in its trials. KS admitted before the FCC it identified and developed no new experts.

Special Master's findings that the objector had worked independently of the MDL and that the firm's state court work was in its own clients' interests. *Id.* at 869, 873. The Eighth Circuit affirmed the MDL district court's conclusion that there was no factual or legal basis for the objecting firm's claim that its state court cases had pressured defendants to settle with MDL plaintiffs, and in fact, that the objector's conduct may have had a negative impact on the MDL plaintiffs. *Id.* at 873. Unlike KS here, which is recommended to receive millions of dollars, the objector's allocation request in *In re Genetically Modified Rice Litig.*, was denied outright, and was affirmed on appeal.

Irrespective of whether KS chooses to acknowledge its significant reliance on the MDL's work product, the fact remains: KS bears the burden to prove whether and the extent to which its work was for the common benefit as opposed to merely for KS's own state court clients. The FCC has no obligation to prove that its work was not for common benefit. In light of its inability to point to *any* common benefit work, and particularly in light of its detrimental conduct, KS's award recommended by the FCC is generous. The FCC and the External Review Specialist have made their recommendation and the FCC submits that their recommended allocation to KS is nothing other than fair and reasonable.

**D. Mazie Slater**

Initially, the FCC will briefly address the allegations by Mazie Slater regarding its purported communications with the External Review Specialist. Without dignifying this objector's version of events or attempting to engage in a "he said/she said," the FCC must state that any suggestion that FCC member and Ethicon MDL Co-Lead firm Aylstock, Witkin, Kreis & Overholz improperly pressured the FCC Chairman with respect to the firm's allocation is false. The FCC's Chairman, Henry Garrard, has never felt taken advantage of by this firm. As noted above, if any FCC member had attempted to undermine the process set forth in this Court's Orders,

it would have been brought to the Court's attention. The FCC evaluated the Aylstock firm's submission by the same criteria as every other firm, which included the opportunity to provide and receive feedback and to be heard. The Aylstock firm's recommended allocation reflects the firm's overall commitment and contribution to the litigation, which were substantial.

Much like Bernstein Liebhard, KS and Anderson, Mazie Slater's work prior to December 2016 (the only time considered by the FCC pursuant to Court order) was almost exclusively limited to the Ethicon litigation.[22] More specifically, Mazie Slater's work was limited largely to the Prolift product. In the firm's appearance before the FCC, partner Adam Slater acknowledged that the Ethicon litigation was a team effort and that many firms from across the country contributed significantly to the Ethicon litigation. (Mazie Slater FCC Transcript, 104:15-25 ("The contributions from law firms all over the country have been incredible. I'm very proud of the Ethicon litigation that everybody worked so well together. It was a large group…. I mean, a lot of the law firms that have been very prominent in this litigation were involved.")). Mazie Slater did significant work in New Jersey state court related mainly to the Ethicon Prolift, which is one of a dozen products in the Ethicon MDL alone and one of dozens of products from multiple manufacturers and related defendants across the MDLs. The firm did very little or nothing related to any other product or manufacturer that could be considered common benefit.

[22] Mazie Slater also claims that certain of its work in the New Jersey state court Bard consolidation should be considered as common benefit, but Mazie Slater did no common benefit work in Bard prior to the Court-established cut-off date of December 21, 2016, if at all. To the extent Mazie Slater contends that it performed work with respect to Bard after December 21, 2016 (which is after Bard had already resolved with several firms and was negotiating settlements with many others), such work was performed in its own individual cases based largely on the MDL's work product and without approval of MDL leadership. It was not common benefit.

Similar to KS, Mazie Slater relies heavily on its contention that it "tried" multiple cases in state court venues, boasting that "[n]o firm or attorney has tried more cases with more success than Mazie Slater…." (Mazie Slater Objection, pp. 10-11). While the firm did prepare some state court cases for trial, the cases Mazie Slater discussed in the context of its "trial" success argument are not quite what its Objection would suggest. Only one of the nine "trials" mentioned in the firm's Objection that was led by Mazie Slater (*Gross*) was tried to verdict, and again multiple other firms also claim credit relative to *Gross*. Of the nine cases cited in support of the firm's "most trials" argument, other firms represented the plaintiffs and claim to have been lead trial counsel in two of those cases (*Bellew* and *Hammons*), both of which involved Prolift.[23] *Budke* was another firm's Missouri state court post-*Gross* Prolift case which settled during trial but prior to verdict. Each of the other cases cited in the firm's Objection (*Schubert*, *Wicker*, *Corbett*, *Korzeb* and *Smith*) were cases that settled **prior to trial**. Indeed, as discussed below, Mazie Slater's limited work in *Corbett*, *Korzeb* and *Smith* was entirely case-specific and each of those cases settled long before those cases ever went to trial. This sort of alleged "trial" work (or more accurately pre-trial case work-up) pales in comparison to the massive trial work-up of hundreds of cases involving dozens of different products and several different defendants by Plaintiffs' leadership in the MDL – and the management and coordination of hundreds of other firms in the trial work-up of many hundreds of their own cases – through the bellwether and "wave" processes across the MDLs in this Court.

---

[23] Contrary to the suggestion in its Objection that it tried nine cases, Slater's Declaration states that "Mazie Slater tried **four** pelvic mesh cases prior to the Ethicon cut off at the end of 2016," citing *Gross*, *Budke*, *Bellew* and *Hammons*. (Slater Decl., ¶ 2) (emphasis added). Again, however, the *Bellew* and *Hammons* cases were other firm's cases, and those other firms claim that they actually tried those cases.

In support of its claim that the FCC did not fairly value work performed in New Jersey state court, Mazie Slater points to an Order entered by former New Jersey State Court Judge Brian Martinotti, who previously presided over the New Jersey state court pelvic mesh litigation, establishing a common benefit assessment for Ethicon state court cases in New Jersey. (Mazie Slater Objection, p. 8). A copy of the New Jersey Common Benefit Order is attached hereto as **Exhibit 1**. Rather than supporting its Objection, however, this New Jersey Common Benefit Order actually underscores the invalidity of its claim that the firm should receive more money here. The March 22, 2016 New Jersey Common Benefit Order, which Mazie Slater sought and obtained (and presumably drafted), appointed Slater as common benefit liaison counsel, established a 5% assessment against all New Jersey state court cases (excepting cases which were already subject to the MDL assessment), established a fund for payment and administration of common benefit assessments, and ordered the Ethicon Defendants to pay the assessments into this fund. This New Jersey Order was entered three years *after* the Order establishing the MDL common benefit fund. The fact that Mazie Slater deemed it necessary and advisable – in 2016 – to obtain a common benefit order to assess the New Jersey cases for its work in New Jersey in itself belies its assertion here that all of Mazie Slater's New Jersey work would be considered common benefit vis-à-vis the MDL (or that the MDL would have ever so agreed). Mazie Slater plainly recognized that certain of its New Jersey work could not be considered to have benefited the MDL plaintiffs.

As made clear in its objection, Mazie Slater made what it considers a strategic *choice* to perform its work in the New Jersey state court rather than the MDL. (Mazie Slater Objection, pp. 8-9). According to Mazie Slater's objection, the firm was offered but declined the opportunity to participate in the leadership of the Ethicon MDL. Thus, Mazie Slater's complaint that its "role as lead counsel, responsible for the administrative management and oversight of the New Jersey

Ethicon and Bard litigations" – such as attending case management conferences, arguing motions, making strategy decisions and leading bellwether case selection – was disregarded by the FCC falls flat. Work done by Mazie Slater in the New Jersey state court that was deemed to have benefited the MDL plaintiffs generally was recognized by the FCC based on the same criteria and same review process applied to every other applicant firm. Much of what is described as the "administrative management and oversight" in New Jersey was for the benefit *of the New Jersey state court plaintiffs* – **<u>not</u> the MDL**. Again, Mazie Slater sought and obtained a separate common benefit assessment order in New Jersey state court establishing a separate common benefit fund to compensate common benefit work in New Jersey state court. Per this Court's Order, state court work is only considered for compensation "to the extent it contributed to the outcome of the litigation and benefited the MDL." (Order Establishing Criteria for Applications to MDL…Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee, ¶ B.5).

Not only did Mazie Slater seek and obtain the New Jersey Common Benefit Order in 2016 to compensate New Jersey common benefit fees and expenses, but Mazie Slater earlier formed a group of law firms referred to as the "Gynecare Work Group" to run and to fund the New Jersey Ethicon Litigation. (Mazie Slater FCC transcript, 144:10-145:12). In his appearance before the FCC, Slater explained that "[t]hat [Group] was the private PSC that we ran and funded that made the litigation possible against Ethicon in the early years in New Jersey. Without it[,] it couldn't have been done. My firm wasn't going to be able to carry that itself, and we all did it together." (*Id.*). Several law firms, including firms in the MDL leadership (and some of the FCC member firms), paid $100,000 or more into this Gynecare Work Group. After naming some of the more

than fifteen firms that paid into this fund, Slater explained "[t]here is a whole series of firms made these contributions, without which we could not have done what we did to develop the early litigation." (*Id.*, 116:17-117:9). That money was used by Mazie Slater exclusively to fund the New Jersey litigation. However, Mazie Slater has never reimbursed any of those firms' contributions and made clear it has no intention of doing so – instead, it expects the MDL to reimburse those contributions.[24] The formation of this Group and the creation of this New Jersey fund emphasizes the collaborative nature of the Ethicon litigation generally and undermines any contention that Mazie Slater was solely responsible for the litigation or its funding. In short, Mazie Slater got what it wanted, which is to have its own litigation where it was in charge, and which was funded in part by several other law firms. Taking shots at the MDL in which it made the "strategic choice" not to participate serves no purpose.

Mazie Slater focuses much of its objection on what it describes as its "foundational" work in the New Jersey state court before the creation of the Ethicon MDL in 2012 and repeatedly alleges that the FCC and External Review Specialist "ignored" this pre-2012 work. (Mazie Slater Objection, pp. 6-9).[25] Mazie Slater's objection would appear to suggest that the FCC rejected any

[24] Even though Mazie Slater made the expenditures from this Group fund solely for the New Jersey litigation, Mazie Slater made clear in its appearance before the FCC that it did not intend to repay the funds to the contributing firms and expected the MDL to reimburse those contributions. (Mazie Slater FCC transcript, 113:16-115:3). The FCC has recommended to reimburse the firms who paid into this Group 75% of their Group assessment.

[25] Mazie Slater claims that it was the "catalyst" for the pelvic mesh litigation, that it has litigated pelvic mesh cases for "longer than any other firm in the country," and it makes much of the "advanced stage" of the New Jersey state court litigation when the Ethicon MDL was formed. Without lending undue credence to such self-serving representations, the FCC would merely point out that several other firms were handling and trying hernia mesh cases and other pelvic mesh cases – including in MDLs involving Bard and other Johnson & Johnson subsidiaries – years before Mazie Slater became involved in this litigation. While Mazie Slater did some good work relative to Prolift in New Jersey, it was certainly not the "founder" or "creator" of this litigation that its objection would appear to suggest.

time submitted by the firm prior to the creation of the Ethicon MDL. That is not true. 100% of Mazie Slater's time in 2008 and 76.35% of Mazie Slater's time from 2009 through 2012 was recognized for consideration as common benefit. Again, Mazie Slater's time was reviewed by the same process according to the same criteria as every one of the other 93 applicant firms. Indeed, Mazie Slater was given the benefit of having its pre-MDL time considered by the FCC as potential common benefit even though the FCC as a general rule did not consider pre-MDL time submitted by nearly every other applicant firm. If there was any exception made, it was in Mazie Slater's favor.

Mazie Slater's work with respect to the *Gross* case, the initial Prolift state court trial to go to verdict, was recognized by the FCC for consideration as common benefit.[26] While the work relative to Prolift was important, the bulk of the Ethicon MDL litigation involved products other than Prolift, including cases involving multiple SUI sling products (TVT-Retropubic (laser-cut and mechanical-cut), TVT-Obturator (laser-cut and mechanical-cut), TVT-Secur, TVT-Abbrevo, TVT-Exact).[27] Ethicon's counsel acknowledged the likelihood that the POP kit cases could

---

[26] Mazie Slater complains that the FCC "ignored" its work relative to *Wicker*, the firm's other New Jersey Prolift bellwether case which settled before trial following the *Gross* verdict. (Mazie Slater Objection, p. 11). However, the firm acknowledges that *Gross* and *Wicker* were worked up simultaneously. (*Id.*). Therefore, the FCC's recognition of general work relative to *Gross* necessarily encompasses *Wicker*, as well. Again, the firm's Objection is long on allegations but short on facts.

[27] While Mazie Slater suggests that the Prolift liability case served as the "blueprint" for the TVT case, much of the liability case for the seven separate TVT devices had to be developed independently, including re-deposing the same witnesses who had previously testified with respect to Prolift with respect to each additional product, and identification of additional teams of scientific and medical experts. While the Prolift device was removed from the market following significant complications, the TVT and its SUI sling progeny were defended by Ethicon as the "gold standard," with prominent medical organizations standing behind the safety and efficacy of these devices, all of which (besides the TVT-Secur) remain on the market. The Prolift product was initially marketed without first obtaining FDA 510(k) clearance, which was a hallmark feature of

ultimately be resolved but repeatedly held up the SUI sling cases, which it claimed comprised the vast majority of MDL cases (typically represented as 70% to 80% of the filed cases), as the impediment to settlement. Thus, the development of the liability case and general experts with respect to the SUI sling devices was instrumental to the achievement of resolutions in the Ethicon litigation. That work was performed largely by the MDL leadership. There were also several other Ethicon products (Prolift+M, Gynemesh PS, Prosima and Prolene) that had to be worked up by the MDL leadership, none of which Mazie Slater contributed to in any significant way. In a litigation that involved dozens of different devices against multiple manufacturers, Mazie Slater's recommended allocation is entirely appropriate for its work in a state court venue almost exclusively limited to a single product from one manufacturer, particularly when that work was at least partially funded by other law firms and when several others claim credit for much of the same work.

Because the FCC has pointed out that the Prolift-centric nature of Mazie Slater's work was one of the many factors considered in the FCC's analysis of the firm's contribution, the firm insinuates here that it also performed general work with respect to the TVT devices, pointing to four specific Ethicon depositions (Hinoul, Arnaud, Cecchini, Mittenthal) as support. (Mazie Slater Objection, p. 15). Mazie Slater did not perform substantial work related to the TVT devices. The Piet Hinoul deposition mentioned in the firm's objection did last three days, but Mazie Slater only handled the first day – related to Prolift – and other attorneys from the MDL handled the other two days related to the TVT devices. The Cecchini deposition was never used in any MDL case.

---

the *Gross* trial and subsequent Prolift trials. Those facts led to Ethicon's counsel's acknowledgment that the primary battleground and obstacle to resolutions in the Ethicon litigation was the sling devices, not the Prolift. Slater had no meaningful role in this protracted battle.

Mittenthal was designated by Ethicon as its 30(b)(6) representative for certain ESI and litigation hold issues generally – he did not give substantive testimony related to TVT. The value and benefit of these four depositions for which Slater seeks credit must be considered in light of the more than 55 other corporate representatives who were deposed by other firms over a total of 140 days with respect to the TVT products.

Mazie Slater also mentions three New Jersey Ethicon state court TVT bellwether cases in which it was hired by the individual plaintiff's counsel to serve as trial counsel, each of which settled well prior to trial. (Mazie Slater Objection, p. 11 (referencing *Corbett*, *Korzeb* and *Smith*)). Instructively, Mazie Slater fails to discuss any of these cases in any detail or to describe any of the work that it allegedly performed in those cases that could be found to have contributed to the common benefit. Simply naming a case and claiming to have done common benefit work in that case is meaningless. *In re Educational Testing Service*, 555 F.Supp.2d at 670 ("[A]sserting that work is for the common benefit does not make it so. [The objecting firm] has not provided any explanation of why its work that appears by the firm's description to be on behalf of their individual client was for the common benefit."). This conspicuous lack of information is likely because the work claimed by Mazie Slater relative to those cases, as described briefly in the firm's May 23, 2018 Fee Affidavit, was case-specific and not for the common benefit of the MDL. (Mazie Slater Fee Affidavit, p. 18 (firm's work in these three cases consisted of deposing the implanting doctor and designating prior deposition testimony in *Corbett* and unspecified "briefing" in all three cases)). This sort of case-specific work is not common benefit. *In re Sulzer Hip*, 268 F.Supp.2d at 924 ("Fees that were charged for counsel's efforts taken primarily for the benefit of a given individual plaintiff, or even a smaller group of plaintiffs, and not the entire class of plaintiffs as a whole, did not quality for reimbursement, as they did not provide a true 'Common Benefit.'").

These New Jersey cases were identified as bellwethers after the TVT liability case was developed, and after cases had been tried involving TVT-R (*Lewis*) and TVT-O (*Batiste* and *Huskey*). As noted above, the development of the general liability case against the TVT products was handled primarily by MDL leadership. MDL leadership identified and prepared the general experts for the TVT cases, **including these New Jersey cases**. In fact, MDL leadership even prepared the case-specific expert reports for these three cases. There is just nothing that Mazie Slater did relative to these cases that could be considered common benefit, and the firm certainly does nothing in its objection to meet its burden of proving otherwise. Pointing to these cases where the firm's work was entirely case-specific and where the general liability case and general experts (and even the case-specific experts) were developed by MDL leadership – after cases had been tried involving these products – only further undermines Mazie Slater's objection here.

While its objection would suggest otherwise, Mazie Slater developed just one of the more than 27 general experts who have been identified by the Ethicon MDL plaintiffs – urogynecologist Ann Weber – for purposes of the Prolift case.[28] (Mazie Slater FCC Transcript, 119:22-120:22 (explaining firm tried to protect Dr. Weber from over-exposure by not allowing her to testify against products other than Prolift, which product the firm felt was "most important")). Dr. Weber has never testified in any MDL trial (or in any other trial in which Mazie Slater did not have a fee

[28] Dr. Susan Shott, referenced in Mazie Slater's Objection, was never identified or used in any MDL case – and, upon information and belief, she was never used in any state court case. Mazie Slater's suggestion that it developed Dr. Tom Margolis is inaccurate. Mazie Slater may have used Dr. Margolis in its individual state court trials, but Dr. Margolis was initially identified and retained by MDL leadership firms and he has given general expert reports and depositions across the MDLs and he has testified at trial in multiple MDL and other state court cases – where Mazie Slater had no involvement. Indeed, KS also claims in its Objection that it is responsible for Margolis. (KS Objection, p. 12). Once again, the FCC expended a significant amount of its time parsing through this sort of conflicting account of who was responsible for what activity, expert, deposition or trial.

interest). In addition, as its Objection acknowledges, Mazie Slater initially refused to allow other firms to utilize Dr. Weber in order to "protect[] the value of this key expert." (Mazie Slater Objection, p. 22). In its appearance before the FCC, Adam Slater explained that he did not make Dr. Weber available until recently in the MDL because he was unsure how this Court may handle *Daubert* issues and he did not want her to get "dinged up on an early [*Daubert*] decision." (Mazie Slater FCC Transcript, 119:13-17). Whatever its rationale or justification, the fact remains that Dr. Weber was not made available to the MDL Plaintiffs until recently. As Judge Herndon recognized in *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Prods. Liab. Litig.*, 2017 WL 1314249, *1 (S.D.Ill. 2017), one of the purposes of providing common benefit reimbursement is "to encourage sharing of work product valuable to the litigation as a whole and avoid duplicative work," and to be recognized as common benefit, work product "should be available for all." Mazie Slater was credited for its work with Dr. Weber, and the FCC has recommended reimbursement to Mazie Slater of more than $600,000 in expenses related to Dr. Weber alone. However, the common benefit value of a single medical expert for a single product, who is made available only late in the litigation, is limited at best.[29]

Mazie Slater developed none of the general regulatory or scientific experts (materials scientists, pathologists, etc.) utilized in the MDL. In fact, Mazie Slater is not responsible for any of the general medical experts used in the MDL outside of Dr. Weber (for Prolift). On the other hand, Mazie Slater has relied heavily on MDL leadership to identify, develop and prepare the general experts that he has used in the state court trials (or cases that settled before or during trial) for which he seeks common benefit credit. As Mazie Slater acknowledged in its Objection, "[t]his

---

[29] By way of comparison, more than a dozen other general physician Plaintiffs' experts have been identified by the MDL Plaintiffs' leadership, several of whom were available and utilized in the MDL from the outset.

[expert development] was a product of the collaborative spirit that existed among the firms who were actually litigating against Ethicon." (Mazie Slater Objection, p. 17).

Of the more than 45 defense general experts deposed in the Ethicon MDL, Mazie Slater handled three (Factor, Fleischmann and Kavaler). Far from the dominating presence that its Objection would imply, Mazie Slater was one part of a large team assembled to handle the Ethicon litigation, and Mazie Slater chose to devote most of its focus to the Prolift product, which comprises but a small fraction of the cases within the Ethicon MDL.

Mazie Slater's timekeeping records were also largely indecipherable, making the FCC's task exceedingly difficult. The firm's Court-mandated Fee Affidavit, signed by Slater in the Ethicon MDL, states "I have complied with Pretrial Order No. 54, 84, 207 and 211 in all material aspects and the law firm identified herein has submitted true and correct time and expense submissions pursuant to the Court's Pretrial Orders." (Fee Affidavit of Mazie Slater in Connection with Request for Allocation of Aggregate Common Benefit and Costs Award). Contrary to this representation, Mazie Slater did not comply with the Court's billing rules set forth in its common benefit orders. In contravention of the Court's express instruction, numerous of the firm's time entries were so vague as to be meaningless, including such unhelpful descriptions as "case research and review," "prepare discovery," "research," "investigation," "letters," "depositions," "reviewed medical records," "review medical literature," "research and brief legal issues," "review documents," "prepare for depos," "correspond with defense counsel," "correspond with experts," "review depo transcripts," and "correspond with plaintiff's attorneys" – without reference to any case, expert, attorney, deposition, issue or documents allegedly involved. Also, contrary to the Court's instruction, Mazie Slater submissions consisted largely of "block bills," that is a single time entry that includes multiple different tasks, without delineation of what amount of time was

allegedly spent on a particular task. These submissions were in direct violation of the Court's Orders.[30] These were not isolated incidents. As reflected in the firm's time and expense submissions that are now before the Court for its review, these sorts of billing problems are extensive for this firm.

In its appearance before the FCC, Mazie Slater did not deny or attempt to explain any of its voluminous vague and ambiguous entries or block billing and it did not deny that these sorts of submissions made the FCC's work in analyzing the firm's time much more difficult. Instead, the firm essentially asked the FCC to "take our word for it": if Mazie Slater submitted the time, then the FCC should just assume that it was for the common benefit. (Mazie Slater FCC transcript, 145:13-151:2). The FCC explained that making such an exception for Mazie Slater would be contrary to the Court's Orders, would treat Mazie Slater preferentially, and would essentially penalize those who followed the Court's rules and did it the right way. (*Id.*).

The FCC could have simply refused to recognize any of this time in making its recommendation (and the Court certainly has the discretion to discredit any of the firm's time). The Court's orders clearly state that "[t]he failure…to provide a sufficient description of the activity will be grounds for denying the recovery of attorneys' fees or expenses in whole or in part" and that "[t]ime entries that are not sufficiently detailed may not be considered for common

[30] Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues ("Management Order"), ¶ 3 ("Plaintiffs' counsel who seek to recover court-awarded common benefit attorneys' fees and expenses in connection with this litigation shall keep a daily contemporaneous record of their time and expenses, noting with specificity the amount of time and particular activity…."); ¶ 3(E) ("Participating Counsel shall keep a daily record of their time spent in connection with common benefit work on this litigation, indicating with specificity the hours, location and particular activity (such as 'conducted deposition of John Doe')."); Fee Committee Protocol, ¶ B.6. (explaining that any item of time or expense that is not described in sufficient detail should be removed from any submission and providing examples of improper descriptions much like those identified in Mazie Slater's submissions here).

benefit payments."[31] As noted in *In re Enron Corp. Securities, Derivative and ERISA Litig.*, 586 F.Supp.2d 732, 756 (S.D.Tex.2008), "[l]itigants take their chances when submitting fee applications without adequate information for the court to determine the reasonableness of the hours expended or with vaguely described tasks such as 'review pleadings,' 'correspondence, or documents." *See also*, *In re Zyprexa Prods. Liab. Litig.*, 2008 WL 1844000, *6-*8 (E.D.N.Y.2008) (court significantly reduced common benefit award in light of excessive vague time entries); *Sulzer*, *supra* at 926 ("[f]ees [a]re not reimbursable if the attorney did not document them properly," including description "in sufficient detail [of] the nature and purpose of the legal services provided"); *In re Initial Public Offering Securities Litig.*, 2011 WL 2732563 (S.D.N.Y. 2011) ("Questionable hours submitted by applicant firms were either reduced or entirely eliminated" in allocation of common benefit fee); *Kindle v. Dejana*, 308 F.Supp.3d 698, 705-706 (E.D.N.Y. 2018) (excessive billing, vague billing descriptions and block billing prevent meaningful assessment of work performed and warrant across-the-board reduction).

The FCC recognized that Mazie Slater may not have maintained its records in accordance with prior MDL Common Benefit Orders, but the FCC had significant communications with Mazie Slater about attempting to address issues relative to timekeeping and billing records. The FCC made significant concessions with respect to Mazie Slater in light of the status of its timekeeping and billing records. Rather than refusing to credit any of the firm's improperly documented time, which would have been justified here, the FCC instead went to lengths to recognize the time submitted by Mazie Slater. Because of the dismal state of its record-keeping, the FCC had to go out of its way to credit Mazie Slater for many of its submissions. The Court may not give Mazie Slater the same benefit of the doubt. For Mazie Slater to attack the FCC's allocation after the FCC

[31] Management Order, ¶ 3 and ¶ 3(E); Fee Committee Protocol, ¶ B.

bent over backwards to analyze and recognize the firm's time that provided value to the litigation generally in spite of its often incomprehensible submissions – when it could have just rejected much of this time outright – is unfortunate.

Mazie Slater's representations to the FCC also call into question the "held costs" allegedly borne by the firm. As just one example, Mazie Slater continues to complain in its Objection that the FCC did not recommend reimbursement of $313,000 in expenses in the *Budke* case, which was another firm's Post-*Gross* Prolift case that settled during trial in Missouri state court and for which the firm was paid a portion of the attorney's fee. (Mazie Slater Objection, p. 10; *See also*, *Id.*, p. 22 (complaining of expenses not being reimbursed)). However, in his appearance before the FCC, Slater stated that the firm that hired him to try *Budke* had actually paid the expenses in that case – *including Mazie Slater's expenses*. (Mazie Slater FCC transcript, 128:20-129:24).[32] Perhaps realizing the ramifications of his admission, Slater told the FCC that he submitted the expenses for the *Budke* case to the FCC even though his firm's expenses had been already paid by the other firm "so you will know the amount that we expended on this litigation so you will know the risk that we took and the commitment that we had to put this…." (*Id.*). In other words, Slater suggested that he was not actually seeking reimbursement of such expenses (because his firm's expenses were paid by another firm), but he just wanted to let the FCC know how much the firm spent –

[32] Although Slater did not specifically discuss in his FCC appearance the firm's expenses in the other cases mentioned in the Objection in which Mazie Slater was hired by other firms to serve as trial counsel, the firms responsible for those cases would certainly have paid the expenses when the cases settled – including Mazie Slater's expenses – just like in *Budke*. Incredibly, however, the firm is still seeking reimbursement for expenses in similar cases. (Mazie Slater Objection, p. 10 (discussing $127,000 in expenses in *Schubert*, another firm's Missouri state court case that settled)).

which is dubious, at best.[33] Unbelievably, however, the firm still complains here of those individual case expenses not being reimbursed by the FCC – even though it admits **those expenses were paid by another firm**. Filing an Objection and asking this Court to recognize expenses that it has *admitted* to the FCC were either not incurred or else were reimbursed by another firm is troubling. These sorts of issues and questions pervade Mazie Slater's submissions, both for time and expense, and significantly complicated the FCC's analysis of the firm.

It is not the FCC's burden to prove that any time or expense submission by Mazie Slater failed to provide a common benefit. Instead, Mazie Slater bears the burden of proving that the work that it performed or expense it allegedly incurred was for the common benefit and the value of that benefit (and that it actually incurred the expenses, as opposed to the New Jersey Gynecare Group fund, and that the expenses were not incurred or reimbursed by another firm). With the records that Mazie Slater submitted to the FCC and which the Court now has for its review, it cannot meet its burden. Indeed, the records submitted by Mazie Slater may well warrant a reduction of much of the firm's time and expenses rather than any increase sought here.

Finally, Mazie Slater urges that it occupies a special position with regard to the common benefit process based on an agreement entered between certain New Jersey State Court leadership counsel and Ethicon MDL leadership counsel. Mazie Slater drastically overstates the import of this agreement to the FCC's – and certainly the Court's – analysis of its (or any other firm's) common benefit submission. The agreement at issue was entered in August of 2012. As reflected in the agreement, Plaintiffs' Ethicon MDL Leadership agreed that time spent by the New Jersey State Court plaintiffs' attorneys prior to the 2012 agreement could be submitted by New Jersey

[33] It would seem to go without saying that no firm should submit expenses to a common benefit fee and cost committee that it does not expect to be reimbursed.

State Court plaintiffs' attorneys for consideration as common benefit in the MDL – but only if the New Jersey State Court plaintiffs' attorneys chose to apply for common benefit compensation in the MDL.[34]

By choosing to make an application for common benefit fees and expenses in the MDL, Mazie Slater was undeniably required to comply with this Court's Orders relating to applications for common benefit compensation. Again, Mazie Slater's Fee Affidavit affirmatively represents that the firm complied with all common benefit orders. In performing its review of the common benefit application of Mazie Slater, the FCC was likewise required to comply with the Orders of this Court which provide specific instruction regarding the analysis of all submitted time, including State Court time. Mazie Slater's submissions were treated according to the same process and protocol that governed the review of every one of the other 94 firms.

Mazie Slater's reliance on the language from Paragraph 8(b) of the New Jersey/MDL Agreement that MDL leadership agreed to use their "best efforts" to ensure that this Court "fairly compensates" common benefit work performed in connection with the New Jersey Litigation is misplaced. Based on this language, Mazie Slater appears to suggest that the Ethicon MDL leadership agreed in 2012 that *any time* submitted in the MDL by Mazie Slater (or any other New Jersey state court plaintiffs' attorney) would be deemed for the common benefit simply because the time was expended in the New Jersey state court. To the extent that is its suggestion, it is fallacious. Not only is it specious to suggest that anyone would have ever made such an unreasonable agreement, but any such agreement would be meaningless in light of the fact that the Court will make the decision regarding what work is for the common benefit and the value thereof.

[34] As stated above, the FCC went to great lengths and gave credit for much of the time submitted by Mazie Slater for work done prior to August, 2012.

Contrary to Mazie Slater's apparent suggestion here, the August 2012 New Jersey/MDL Agreement did not somehow provide an exemption from the criteria established by this Court for analyzing whether work was for the common benefit or somehow except New Jersey time from the same rules and analysis applicable to every other applicant firm. *See* FCC Protocol Order at 5-6 (stating that non-compliance with certain provisions of the Common Benefit Orders alone will not result in disallowance of the time if "such work is deemed to be for the benefit of the MDL plaintiffs generally"). The New Jersey Order, however, does not obviate Mazie Slater's obligation to prove its time was for the common benefit of all MDL claimants, nor does it excuse Mazie Slater's billing practices in contravention of this Court's Orders. To the contrary, the New Jersey/MDL agreement provided that if the New Jersey state court lawyers chose to seek common benefit reimbursement in the MDL, the Orders of this Court would control, stating:

> The parties recognize that the Honorable Joseph Goodwin may enter an Order which will govern the receipt of funds necessary to fund the discovery work of the combined federal MDLs and which will further provide for the procedure for submission for common fund time and for reimbursement of common fund expenses, in the event of a settlement of the MDL litigation. Such Order will control the form of all common benefit submissions, but NJ Counsel will not be subject to such Order or be required to submit common benefit time or expense records unless and until such NJ counsel chooses to make an application for common benefit fees and expenses pursuant to such Order.[35]

Time and expense submissions related to work in the New Jersey State Court litigation was considered by the FCC (from Mazie Slater and others). In light of the agreement and the Court's common benefit orders, the FCC evaluated the time submission of Mazie Slater and identified certain of Mazie Slater for consideration as common benefit. Based upon its review of Mazie Slater's time pursuant to this Court's common benefit orders and the process applicable to all 94

[35] New Jersey/MDL Agreement Paragraph 5.

applicant firms, the FCC made its Final Written Recommendation. The External Review Specialist considered the arguments made here by Mazie Slater both through written objection and in-person meetings. In making his Recommended Allocation, the External Review Specialist states, "I reviewed the agreement entered between MDL leadership and the New Jersey counsel and have considered that agreement in light of the Court's Protocol and Fee Order. My recommendation regarding allocation of common benefit fees and expenses takes into consideration the contribution of those who participated in the New Jersey litigation as well as those who participated in related litigation in other state court venues."[36] In short, the New Jersey/MDL agreement has no bearing on any issue before the Court except that the New Jersey state court time and expenses were allowed to be submitted for consideration under the same criteria as every other firm that applied for common benefit compensation in this Court.

**E. <u>Lana C. Keeton</u>**

As mentioned in the introduction, an objection has been filed to the recommendation of the External Review Specialist by a non-lawyer, Lana C. Keeton. At the risk of giving undue attention to a patently meritless filing, the FCC is obliged to respond. This non-attorney objector has a documented history of making vile, false and defamatory statements about members of the MDL leadership and this Court, including on her personal website and blog and through mass e-mails. The FCC will not indulge this objector in attempting to respond to the disjointed ramblings alleging impropriety on the part of the FCC or the MDL leadership except to say that these scurrilous allegations are baseless. The FCC simply shows that the common benefit fund was established to compensate the work of attorneys deemed for the benefit of the MDL plaintiffs generally. (*See*,

[36] External Review Specialist's Recommended Allocation p. 14.

Memorandum Opinion and Order (Re: Petition for an Award of Common Benefit Attorneys' Fees and Expenses)). Indeed, the August 26, 2013 Order of the Court establishing the 5% holdback in all cases was entitled "Agreed Order Establishing MDL…Fund **to Compensate and Reimburse Attorneys** for Services Performed and Expenses Incurred for MDL Administration and Common Benefit," and stated in its first sentence that "[t]his Agreed Order is entered to provide for the fair and equitable sharing among plaintiffs of the cost of special services performed and expenses incurred **by 'participating counsel'** acting for MDL administration and common benefit of all plaintiffs in this complex litigation." (Emphasis added).[37]

While this objector repeatedly refers to her alleged performance of "legal work," she is not an attorney. She does not pretend otherwise. Awarding a non-lawyer a portion of a common benefit attorney's fees fund would not only be problematic and unprecedented, it would be unethical and violative of public policy, which is to say *illegal*. *See, e.g.*, *Rich v. Simoni*, 235 W.Va. 142 (2015) (W.Va. Supreme Court answering certified question from Northern District of West Virginia and holding that fee-sharing agreement with non-lawyer is void *ab initio* as violative of ethical prohibition of sharing attorney fee with non-lawyer, which is expression of public policy (citing cases from several states that similarly hold)).

This objector claims that she "consulted" on "scientific matters, research, discovery, strategic issues and extensive other matters" relative to certain of the pelvic mesh MDLs. (Keeton

[37] Every Common Benefit Order entered by this Court has likewise made it abundantly clear that any common benefit award is for payment to law firms of common benefit attorney's fees or expenses, and the protocols and procedures established in the Court's orders expressly relate to participating law firms. *See, e.g.*, Management Order, p. 1 ("The parties have submitted this Agreed Order to the court in anticipation of the possibility that, at some time in the future, there may be applications to this court **by attorneys** for payment of common benefit fees or expenses."); Id., p. 5 (defining "Participating Counsel" as "**counsel** who subsequently desire to be considered for common benefit compensation….") (Emphasis added).

Objection, p. 8). Assuming the veracity of this claim, solely for the sake of argument, this objector would occupy no different status than the hundreds of experts, consultants, jury selection and mock trial advisors, accountants, process servers, settlement administrators, e-discovery providers, and various other vendors and providers whose services have been utilized by one or more Participating Counsel throughout the course of this litigation. This non-lawyer objector is legally and ethically precluded from recovery of a portion of attorney's fees from an attorney's fee fund.

**XI. Conclusion**

The FCC's Final Written Recommendation and the External Review Specialist's Recommended Allocation have been delivered to the Court in accordance with the Protocol and both have been filed of record. The Court has now received the objections to the External Review Specialist's Recommended Allocation. Having responded to the objections, and on the grounds and for the reasons set forth herein, the FCC respectfully requests that the Court favorably consider the Final Written Recommendation and the External Review Specialist's Recommended Allocation in its Order allocating common benefit fees and expenses.

Dated: April 9, 2019

Respectfully submitted,

THE COMMON BENEFIT FEE AND COST COMMITTEE

By: ***/s/ Henry G. Garrard, III***
Henry G. Garrard, III
hgarrard@bbga.com
Chairman of the Fee & Cost Committee

BLASINGAME, BURCH, GARRARD & ASHLEY
P.O. Box 832
Athens, GA 30603
706-354-4000

***/s/ Renee Baggett***
Renee Baggett
RBaggett@awkolaw.com

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ
17 East Main Street, Suite 200
Pensacola, FL 32502
850-202-1010

***/s/ Riley L. Burnett, Jr.***
Riley L. Burnett, Jr.
rburnett@rburnettlaw.com

BURNETT LAW FIRM
3737 Buffalo Speedway, Suite 1850
Houston, TX 77098
832-413-4410

***/s/ Thomas P. Cartmell***
Thomas P. Cartmell
tcartmell@wcllp.com

WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
816-701-1100

***/s/ Clayton A. Clark***
Clayton A. Clark
CClark@triallawfirm.com

CLARK, LOVE & HUTSON, G.P.
440 Louisiana Street, Suite 1600
Houston, TX 77002
713-757-1400

***/s/ Yvonne M. Flaherty***
Yvonne M. Flaherty
ymflaherty@locklaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis MN 55401
612-339-6900

***/s/ Carl N. Frankovitch***
Carl N. Frankovitch
carl@facslaw.com

FRANKOVITCH, ANETAKIS, SIMON,
DECAPIO & PEARL, LLP
337 Penco Road
Weirton, WV 26062
304-723-4400

***/s/ Joseph F. Rice***
Joseph F. Rice
jrice@motleyrice.com

MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
843-216-9000

***/s/ William H. McKee, Jr***
William H. McKee, Jr
billmckee17@gmail.com

3041 Knotty Pine Dr.
Pensacola, FL 32505
304-546-2347

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2019, a true and correct copy of the foregoing ***Common Benefit Fee and Cost Committee's Omnibus Response to the Objections to the Recommended Allocations of the External Review Specialist*** was served via electronic filing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF counsel of record.

*/s/ Henry G. Garrard, III*
Henry G. Garrard, III
Chairman
The Common Benefit Fee and Cost Committee