# IN THE UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF WEST VIRGINIA
# CHARLESTON DIVISION

| | |
|---|---|
| IN RE:  C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| IN RE:  AMERICAN MEDICAL SYSTEMS, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION | MDL NO. 2325 |
| IN RE:  BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2326 |
| IN RE:  ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LIGITATION | MDL NO. 2327 |
| IN RE:  COLOPLAST CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2387 |
| IN RE:  COOK MEDICAL, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2440 |
| IN RE:  NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL NO. 2511 |

*This Document Relates To All Cases*

**MAZIE SLATER'S REPLY BRIEF IN OPPOSITION TO RECOMMENDED ALLOCATION OF COMMON BENEFIT FEES AND THE REIMBURSEMENT <u>OF SHARED EXPENSES AND HELD COSTS</u>**

The FCC ignores the numbers of trial witnesses questioned, important depositions conducted, and trial heavy contributions, as well as litigation-wide leadership by Mazie Slater.  The FCC's role was to perform an objective analysis of the time, expenses and work performed by the common benefit firms, in order to make a fair recommendation to the Court.  Instead, the FCC protected its own interests, and now weakly dismisses the identification of its patently inappropriate conduct as airing "dirty laundry."  The FCC also brazenly misrepresents fact after fact, for example claiming that the New Jersey common benefit Order was a recognition that New Jersey work would not be considered for common benefit and that Mazie Slater is being fairly compensated through New Jersey; in fact, the Order recognized that the common benefit allocation would be performed **in the MDL**, since any firm subject to the MDL common benefit order would only be assessed in the MDL. Thus, **not one penny has been paid into or out of a New Jersey common benefit fund**. The FCC also ignores Judge Martinotti's recitation of Mr. Slater's important role in the Order.

Perhaps most disturbing, the FCC again threatens that the filing of objections should result in the **reduction** of fee awards -- confirming that its members seek to deny the objectors' right to due process and a fair hearing. The <u>Chinese</u> Drywall language cited by the FCC applies to the FCC's cynical threats, rather than Mazie Slater's fact based objection.

The FCC fails to acknowledge that it has the burden to prove that all of its common benefit recommendations are fair, but they solely rely upon the simple one or two paragraph explanations in the Final Written Recommendation ("FWR")

1

adopted by the Stack Report, **without any independent scrutiny**. In contrast, the FCC spent 75 pages attacking Mazie Slater and the three other objectors. The FCC's misrepresentation that it, "provided abundant information about every other applicant's submission and their recommended allocation," is belied by the fact that **we have not been provided any other firm's submissions or the documented review of any of those submissions**. This is an allocation of a fixed fund so the award to one firm directly impacts the awards to all others. Every firm, including the FCC members, should be held to the same standard, with complete transparency, which was directed by the Court but refused by the FCC.

The FCC urges the Court to effectively "rubberstamp" its recommendation, asking the Court to disregard its responsibility to ensure that the allocation process conforms to "traditional judicial standards of transparency, impartiality, procedural fairness, and ultimate judicial oversight," which the FCC failed to meet. In re Vioxx Products Liability Litig. 802 F.Supp. 2d 740, 772 (E.D. La. 2011) citing In re High Sulfur Content Gasoline Prods. Liab. Litig. 517 F.3d 220, 234 (5th Cir. 2008). The Court's supervisory role requires that it "closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." In re Vioxx, 802 F. Supp. 2d at 773-74 citing High Sulfur, 517 F. 3d at 227. In fact, in In re Vioxx, the Court applied these standards and amended various recommendations made by both the fee committee and the court appointed special master, just as the Court should do here. Id. at 774-825.

Moreover, all of the cases relied upon by the FCC to support their factually unsupported contention that Mazie Slater's award was fair are completely inapposite.

See e.g., In Re Volkswagen ("Clean Diesel"), Marketing, Sales Practices and Prods. Liab. Litig. 2019 WL 274036 *5-*9 (9th Cir. January 22, 2019) (court denied objectors' request to share in attorneys fee because they violated the court's orders by, inter alia, not obtaining the approval of lead counsel before performing the work for which they were seeking reimbursement; also much of the work performed by the objectors only benefitted the objectors and their individual clients.); In Re Genetically Modified Rice Litig. 764 F. 3d. 864, 870 (8th Cir. 2014) (objecting attorney was denied any common benefit award because he interfered with the progress of the case and the settlement.); Avandia Marketing, Sales Practices and Prods. Liab. Litig. 617 Fed. App'x. 136 (3d Cir. 2015) (objectors denied an award because their work only benefitted their individual clients and not the class); Class Plaintiffs v. Jaffe & Schlesinger, P.A., 19 F. 3d. 1306 (9th Cir. 1994) (same); In Re Sulzer Hip Prosthesis and Knee Prosthesis Liab. Litig., 268 F. Supp. 2d. 907, 924 (M.D. Ohio 2003) (same).

That the FCC has held itself to a different standard is clear from their undisputed self-dealing. This includes Judge Stack's undisputed disclosure that the Aylstock firm (who along with the Cartmell firm complained that the process was corrupt from day one, until they were given their awards) told the FCC Chairman that it would not sign the Preliminary Written Recommendation ("PWR") if its own award was not increased by approximately $10 million; the award was then increased, and the Aylstock firm signed the PWR. The FCC's incredible statement that this was nothing more than "the opportunity to provide and receive feedback and to be heard," is a devastating admission. Mr. Garrard's protestation that "he was

not taken advantage of", contradicts Judge Stack's account, and is not a denial that the improper inside dealing occurred. Respectfully, this must be addressed.

The FCC also does not deny that Judge Stack concluded that "Motley Rice padded its hours" but did nothing about it. If the process were fair and open, there would have been significant repercussions, and no notion of justice can allow this to now be ignored. In addition, the FCC ignores and <u>never denies</u> that Judge Stack admitted that his report would not contain any recommendation that the FCC did not agree to, further undermining the validity of the process.

Another glaring omission from the FCC's brief is the indefensible result of a cross-check on the hourly rates awarded to the FCC firms as compared to the hourly rate applied to Mazie Slater. Mazie Slater was awarded an average hourly rate of $202 for the 29,752.27 hours submitted, and $309/hr. for the 19,482.75 hours accepted by the FCC. In contrast, the average weighted hourly rate awarded to the FCC firms for their inflated hours was $730/hr.; this disparity cannot be justified, especially since the FCC does not dispute that the quality of Mazie Slater's work was at least equal to the highest quality work performed in the litigation. The discrepancies in the hourly rates is objective evidence that the FCC's recommended award to Mazie Slater should be increased substantially.

In addition to ignoring the damaging facts which expose the unfairness of the process, the FCC's response is largely comprised of blatant misstatements and mischaracterizations designed to obscure the record. The FCC attacks and belittles Mazie Slater's work and contributions, completely ignoring objective facts such as Mazie Slater's **questioning of 93 trial witnesses** during the course of **four trials**,

4

and taking 40 corporate depositions -- which is **nearly 20% of all corporate depositions taken in the entire litigation** according to Mr. Garrard's prior declaration in support of the FWR (at p.7). None of this critical work has ever been mentioned or acknowledged by the FCC. The FCC's statements that additional depositions were conducted by others merely states the obvious, although **most of the depositions conducted by others were never used or relied on at trial**.

The litany of misrepresentations in the FCC's brief is disturbing.  For example, the FCC claims that Mazie Slater's time records were essentially invalid, but Henry Garrard previously confirmed in writing that the records were more than adequate. (3/16/16 letter from Mr. Garrard, Ex. "F" to the Mazie Slater FWR Objection). Mr. Garrard actually confirmed that the format of the submission "is as good as what we have used." (3/15/16 email; Ex. "K" to the Mazie Slater FWR Objection). This attack is even more empty as the FCC has made clear that the award was not based on the hours submitted but rather on its subjective analysis of each firm's contribution.

The effort to minimize Mazie Slater's work in the Gross trial because other firms provided support is nonsensical as every trial the FCC members and their firms took part in was conducted by multiple law firms, all of whom were presumably given varied levels of credit.  The fact remains that Mazie Slater handled the Gross case, from inception through trial and appeal (no other firm was involved in the appeal), examined all but two witnesses during this 2-month trial, and a handful of other firms provided support.

The FCC also unfairly downplays the significance of the New Jersey litigation, despite the fact that most of the PSC firms had cases filed in New Jersey and all

5

benefitted from that work. The FCC's disingenuous minimization of the New Jersey litigation is belied by the binding language in the Agreement:

> Due to the **advanced stage of the NJ Litigation**, as compared to the MDL Ethicon litigation, and the value of the work and work product generated in and in connection with the NJ Litigation, **the MDL Leadership sees a need to and thus desires to share in the benefits of the aforesaid work and resulting work product**. (attached as Ex. 6 to the Slater Fee Aff. at ¶ 7). (emphasis added)

The FCC also misrepresents that the August 2012 Agreement between NJ and the MDL only applies to work performed prior to that time, where the Agreement refers in Paragraph 7 to "**valuable common-benefit work that has been and will continue to be developed in and in connection with the NJ Litigation,**" and also recognizes the value of this work to the "**overall transvaginal mesh litigation**" in Paragraph 4.

The discussion of the Gynecare Work Group, a private PSC created and led by Mr. Slater for the common benefit of all litigants, is particularly troubling. The funds assessed for that private PSC were spent for the common benefit of the litigation, paying for the cost of the document management platform, deposition transcripts, and case management conference transcripts – all of which was provided to the MDL when it was formed. The suggestion that this fund, which is no different from the fund of assessments maintained by the PSC in the MDL, was somehow used only by Mazie Slater is absolutely false. In fact, Motley Rice, Wagstaff Cartmell, and Aylstock Witkin were members and know the truth, and Mr. Slater provided the FCC with the ledger showing all funds collected from the member firms and spent from that fund. It was always understood that each firm would seek reimbursement of those funds through the common benefit process, which is why Mr. Garrard

6

confirmed in writing that contributions to this fund would be reimbursed as if contributions had been made to the MDL PSC – a commitment that was breached by the FCC. (Ex. "F" to Mazie Slater FWR Objection) (the monies that "you have paid in for the New Jersey litigation will be reimbursed in the same manner as the amounts that have been paid in by PSC members in the MDL.")

      The FCC made even more misrepresentations in its opposition. For example: (1) that Mazie Slater claimed that Adam Slater was sole trial counsel in the <u>Bellew</u> and <u>Hammons</u> cases; instead we stated our role as co-lead trial counsel and simply set forth the hard facts of what was done in those trials (i.e., Mr. Slater examined 11 of the 13 witnesses in <u>Bellew</u> and 21 of 27 witnesses in <u>Hammons</u>); (2) that Mazie Slater is claiming to be "**the** catalyst" of the litigation (P.59, fn.25), when we accurately stated that we were "**a** catalyst." (Mazie Slater Objection at pg. 1); (3) that Dr. Susan Shott never testified (p.63, fn 28), but in fact her videotaped testimony was played in the <u>Gross</u> trial; (4) that the critical 3-day deposition of medical affairs TVT corporate representative Piet Hinoul in Ohio was conducted by Mr. Slater only on day one and only on the Prolift.; the transcripts establish that Mr. Slater was the only plaintiff lawyer to question Dr. Hinoul during those 3 days, and focused only on the TVT products – other firms had associates listen by telephone, and probably were credited for that time; (See Slater Reply Dec.); (5) that Mazie. Slater only questioned three Ethicon defense experts, Dr. Fleischmann, Dr. Kavaler, and Dr. Factor (all of whom we deposed multiple times) (p.65). In truth, Mazie Slater also deposed many others including for example, Dr. Denise Elser (Budke, 11/6/2014, Bellew, 9/16/2015); Dr. Nicolette Horbach (Schubert, 8/12/2013, Wicker, 11/22/2013);

Dr. Christina Pramudji (Schubert, 8/27/2013, 4/15/2014, Bellew, 9/17/2014); Dr. Theodore Ulatowski (Gross, 11/29/2012, 11/30/2012, Schubert, 8/12/2013); Dr. Joye Lowman (Hammons, 12/13/2015); Dr. Miles Murphy (Gross, 11/30/2012, General, 6/20/2014), Dr. Debra Fromer (Becker, 7/14/2017); Dr. Thomas Wright (Hrymoc, 9/8/2017, Burns, 8/21/2018) – the many early depositions listed served as templates used by firms across the entire litigation; (6) that Dr. Weber was held back from testifying in the MDL; however, Dr. Weber wrote a report as part of the wave 1 expert disclosures and Mr. Slater successfully defended her opinions against Daubert challenges; (7) that Mazie Slater focused almost solely on the Prolift, (**which would be an empty criticism if true as the case against that product drove the value of every Ethicon settlement, as compared to the TVT cases, most of which were dismissed with no recovery or settled for modest amounts**). Mazie Slater developed experts on other devices and laid the groundwork for all of the cases. For example, Schubert was a Prolift +M and Prolift case. Gynemesh PS and that clinical study were analyzed as part of the Prolift case. **Mazie Slater took important TVT depositions, including Piet Hinoul as set forth above, agreed to try TVT bellwether cases for other firms as set forth below, and deposed TVT implanters for other firms on New Jersey bellwether pool cases, including for the Aylstock (an FCC firm asking Mr. Slater to take the key deposition in its TVT case), Simmons Hanley, and Seeger firms**, and those transcripts were models for many others; (8) that Mazie Slater's work in Corbett, Korzeb, and Smith for other firms, was merely case specific – these were the first bellwether trials for the TVT-R and TVT-O in New Jersey and Mr. Slater was to be lead trial counsel on all issues; (9) that Clayton Clark developed Dr. Richard Bercik as an expert, where Mr.

8

Slater had already consulted with Dr. Bercik and then deposed him as an implanting surgeon years prior in Wicker on March 22, 2012 – before there was a functioning MDL; (10) that Mazie Slater's work in the Bard litigation was not approved, ignoring that Mr. Slater is lead counsel for the New Jersey Bard litigation and thus, the person who approves the work (which is ongoing), and Mr. Garrard's agreement in this regard: "As to the prior authorization for work, it is agreed that will not be an issue." (Ex. F to the Mazie Slater FWR Objection).

Another curious FCC attack relates to the Lewis case, which resulted in a directed verdict for Ethicon. To be clear, Mazie Slater assisted with the preparation of the case, and is asking to be credited to the extent credit is being given for work on the case. There is no contradiction here since it is assumed that the FCC credited the firms who worked on that case despite the negative outcome. Similarly, the FCC hollowly criticizes the work up of Gross and Wicker simultaneously – this was a herculean effort developing critical work product before any cases were worked up in the MDL, deserving of significant credit – while the FCC hypocritically touts its work up of multiple cases at the same time, including in the waves where the Court's Order cautioned about the value of this work, and the need to avoid duplication.

The FCC also falsely impugns Mazie Slater with regard to the more than $300,000 in expenses advanced in connection with the Budke trial, which was tried in Missouri in January 2015, against Ethicon's lead defense counsel Christy Jones, Esq. Mazie Slater has consistently asked the FCC to take note of this substantial expenditure in another firm's case – which is far in excess of the total held costs for several of the FCC member firms – as evidence of Mazie Slater's financial

9

commitment and risk-taking, while acknowledging that this amount was reimbursed from the settlement.

The FCC boasts that its eight lawyer members were the leaders of the litigation, yet multiple members never deposed any important witness or tried a case, including Mr. Rice. Mazie Slater was one of the leaders of the litigation from day one and simply asks that this be recognized. On page 15 of its brief, the FCC argues that it is entitled to the lion's share of the fund because it "bore the most financial risk" (Mazie Slater had the 4th largest reimbursed expenditures), "willingly shared their work product and assisted others in preparing for trial and in achieving resolution" (Mazie Slater tried, or agreed to try, at least 8 cases for other law firms, and shared all of its work product -- this started with the NJ Agreement with the MDL and continues through today), "the quality of [the FCC firm's] work is beyond dispute" (the quality of Mazie Slater's is equal to or greater than that of any other firm in this litigation, and our results are proof of this).

Mazie Slater respectfully submits that the fair outcome is a significant increase in its award, so that it is proportionate to the final awards made to the five FCC firms who collectively seek 60% of the entire fund.

Respectfully,

ADAM M. SLATER

Dated: April 15, 2019