# EXHIBIT B

*VAGINAL MESH HEARINGS*

*SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT*

*06/12/2018*

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5  IN RE:  C.R. BARD, INC. PELVIC REPAIR
            SYSTEM                  MDL NO. 2187
 6   PRODUCTS LIABILITY LITIGATION
 7
             IN THE UNITED STATES DISTRICT COURT
 8          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     CHARLESTON DIVISION
 9
10  IN RE:  AMERICAN MEDICAL SYSTEMS, INC.
            PELVIC REPAIR SYSTEM        MDL No. 2325
11   PRODUCTS LIABILITY LITIGATION
12
             IN THE UNITED STATES DISTRICT COURT
13          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     CHARLESTON DIVISION
14
15  IN RE:  BOSTON SCIENTIFIC CORP. PELVIC REPAIR
            SYSTEM PRODUCTS            MDL No. 2326
16   LIABILITY LITIGATION
17
18           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
19                   CHARLESTON DIVISION
20  IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM    MDL NO. 2327
            PRODUCTS LIABILITY LITIGATION
21
22
23
24
```

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                   CHARLESTON DIVISION
 3  IN RE: COLOPLAST CORP. PELVIC SUPPORT SYSTEMS   MDL No. 2387
            PRODUCTS LIABILITY LITIGATION
 4
 5           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                     CHARLESTON DIVISION
 6
     IN RE:  COOK MEDICAL, INC., PELVIC REPAIR SYSTEM  MDL No. 2440
 7    PRODUCTS LIABILITY LITIGATION
 8           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 9                   CHARLESTON DIVISION
10  IN RE: NEOMEDIC PELVIC REPAIR SYSTEM PRODUCTS   MDL No. 2511
            LIABILITY LITIGATION
11
12
13       Statement before the Finance Committee by Shanin Specter,
      Tom Kline and Lee Balefski with Specter & Kline before Teresa
14   Reedy, a Registered Professional Reporter, at West Virginia
      Federal Courthouse, Charleston, West Virginia, on the 12th day
15   of June, 2018.
16
17
18
              REALTIME REPORTERS, LLC
19                  713 Lee Street
                 Charleston, WV  25301
20                  (304) 344-8463
                 realtimereporters.net
21
22
23
24
```

Page 3

```
 1                  APPEARANCES:
 2  COMMITTEE MEMBERS:
 3
     Clayton Clark, Clark, Love & Hutson
 4  Joe Rice, Motley, Rice, LLC
     Riley Burnett, Burnett Law Firm
 5  Tom Cartmell, Wagstaff & Cartmell, LLP
     Renee Baggett, Aylstock, Witkin, Kreis & Overholtz
 6  Henry Garrard, Blasingame, Burch, Garrard & Ashley
     Daniel Stack, Court-Appointed Special Advisor to FCC
 7  Carl N. Frankovitch, Frankovitch & Anetakis
     William H. McKee, Jr., WHM Resources, LLC
 8  Yvonne M. Flaherty, Lockridge, Grindal, Nauen, PLLP
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1       MR. GARRARD:  For the court reporter, please
 2  give your names and your current --
 3       MR. SPECTER:  Good afternoon.  Shanin Specter,
 4  S-H-A-N-I-N, Specter, S-P-E-C-T-E-R from Kline & Specter in
 5  Philadelphia.  To my right is Tom Kline, and to my left is Lee
 6  Balefski, B-A-L-E-F-S-K-I.
 7       MR. GARRARD:  Thank you.  We appreciate you
 8  being here, and hope that you give us information that we
 9  should consider that would help us as we deal with evaluating
10  time, expenses and contributions on this litigation.  So we
11  would open the floor to you.
12       MR. SPECTER:  Good afternoon.  We're here to
13  reiterate our firm's significant contributions for the Common
14  Benefit of the transvaginal mesh litigation.  We're also here
15  to express our concerns about the process, the disallowance by
16  the FCC of 70 percent of our time, the lack of transparency,
17  and answer any questions the FCC may have about our firm's
18  contribution.
19           Please note that we object to our counsel,
20  Bowles Rice, not being allowed at this meeting.
21       MR. GARRARD:  Say that again.
22       MR. SPECTER:  I said please note that we
23  object to our counsel, Bowles Rice, not being allowed at this
24  meeting.
```

Page 5

1         MR. GARRARD:  Not to get into a dispute
2 with you, but nobody here said they couldn't be here.
3         MR. SPECTER:  Okay.  Well, we have
4 written information from you-all that indicated that to
5 us.
6         MR. GARRARD:  That was not the intent
7 of any written information to you.
8         MR. SPECTER:  In the course of Kline &
9 Specter's six-year involvement in this litigation, our
10 firm has, number one, done everything we've been asked
11 to do by leadership.  Number two, always volunteered
12 and offered to help with any project.  Number three, we
13 have never been questioned about our work product, work
14 ethic or the propriety of hours we have submitted for
15 any of the 37 reporting periods.  And, number four, we
16 have received numerous accolades for the work we did.
17         Since the establishment of the pelvic
18 mesh MDLs, lawyers and paralegals employed by Kline &
19 Specter have taken innumerable actions that have
20 provided common benefits and materially advanced the
21 interests of every plaintiff and claimant in the pelvic
22 mesh MDLs.
23         Kline & Specter has tried six pelvic
24 mesh cases to jury verdicts.  In five of those cases,

Page 6

1 the plaintiffs prevailed.  Collectively, juries have
2 awarded Kline & Specter's clients $110 million in
3 damages.
4         Kline & Specter submitted 32,270.19
5 hours of time for consideration of common benefit.
6 After the first review, the FCC approved only 5,202.95
7 of Kline & Specter's hours as for the common benefit of
8 all plaintiffs.  Following the submission of our
9 affidavit on February 9, 2018, requesting
10 reconsideration of our submitted time, the FCC approved
11 an additional 4,199.24 hours.  At this time, the fee
12 committee had identified a total of 9,42.19 of Kline &
13 Specter's hours for consideration as common benefit
14 time.  That means that there is a total of 22,868 hours
15 that the FCC proposes to disallow from our submission.
16 Over 70 percent of Kline & Specter's submitted hours.
17         Furthermore, initial exclusion of the
18 additionally allowed 4,199.24 hours was not merited as
19 evidenced by its later inclusion.  While we appreciated
20 having more hours included, we note that the doubling
21 of the hours that had been accepted demonstrates the
22 underlying flaws in the process.
23         Throughout the process of assessing
24 common benefit time, the FCC allowed firms such as

Page 7

1 Kline & Specter to challenge the reduction of hours
2 made by the FCC to explain why these hours should be
3 considered for common benefit.  However, the FCC has
4 made that task overly burdensome, impractical, and
5 frankly impossible.  The FCC has provided blanket,
6 non-specific disallowances of this firm's time, making
7 a specific response to each fee entry a futile guessing
8 game.  This is fundamentally unfair.  It is a basic
9 tenet of justice that a party receive notice of the
10 nature of a claim or defense.  The lack of specificity
11 of the reason for the proposed disallowance prevents us
12 from meaningfully responding.
13         Kline & Specter has submitted discovery
14 requests -- requests which we reassert at this time and
15 requests which are fundamental to this process.  We,
16 again, request that the FCC produce the specific reason
17 for each of the proposed disallowed entries so that
18 Kline & Specter can respond in an informed, appropriate
19 and meaningful manner.
20         We further request first production of
21 each fee and expense request of each firm and the FCC's
22 response to each request.  Second, disclosure of the
23 amount of money received pursuant to the five-percent
24 assessment, along with a per-firm itemization of these

Page 8

1 payments.  Third, all documents and emails relating to
2 any fee-sharing agreements between or among the members
3 of the FCC.  Fourth, all communications among FCC
4 members and all documents relating to FCC consideration
5 of the fee and expense reports.
6         This information is necessary to ensure
7 that the FCC functions in accordance with the most
8 basic judicial standards of transparency and fairness
9 and is crucial to ensure that fee allocations are
10 appropriate.
11         Kline & Specter also proposes making
12 the information sought available to every firm that has
13 submitted fee applications.  Making this information
14 available to every plaintiff's lawyer involved in this
15 process is in everyone's best interest, every attorney
16 and every client.  Fee disputes and other litigation
17 with millions of dollars at stake ought to be litigated
18 openly and transparently.  Attorneys are inclined to
19 argue over these generous fee awards and should be well
20 positioned to comment publicly and openly on each
21 other's relative contribution to the litigation.
22         We currently have a second set of
23 discovery requests pending that have not been answered
24 or objected to.  The continued lack of receipt of this

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

Page 9

1  information hampers our ability to meaningfully
2  participate in this proceeding.  Let me turn now to the
3  work performed.
4         Our affidavit speaks for itself as to
5  the important work Kline & Specter has done for the
6  Common Benefit.  We wish to highlight a few items.
7  First, as a firm, we've made huge commitment to this
8  litigation.
9         Second, Kline & Specter had 24
10  attorneys taking part in this litigation for which we
11  sought common benefit fees, including four of our
12  doctor-lawyers.  As we are here today, at this very
13  moment, we have 55 lawyers in our firm working in this
14  litigation including four in Suffolk, Massachusetts,
15  completing a trial against Boston Scientific.
16         Third, Kline & Specter Partner, Lee
17  Balefski, has served as a member of the MDL Plaintiff
18  Steering Committee, New Jersey Discovery Committee, and
19  as the liaison counsel in the Philadelphia Court of
20  Common Pleas Pelvic Mesh Litigation.
21         Fourth, Kline & Specter has performed a
22  total of over 32,000 hours of common benefit time.
23         Fifth, we've advanced millions of
24  dollars for both the common benefit and their

Page 10

1  individual clients.
2         Sixth, most importantly, our work has
3  resulted in phenomenal success.  We obtained five jury
4  verdicts against Ethicon totaling over $110 million
5  including punitive damages.  In the course of these
6  trials, we obtained many significant rulings and
7  provided substantial contribution to the improvement of
8  the Ethicon trial package including, but not limited
9  to, providing new and updated depositions, deposition
10  cuts, pleadings, motions, and expert reports.
11         Seventh, our discovery team uncovered
12  critical documents and helped significantly in
13  depositions of the Ethicon corporate witnesses --
14  particularly at the onset of this litigation.
15  Attorneys at Kline & Specter were crucial in the
16  preparing and taking of almost all of these key
17  depositions that were used in trials across the
18  country.  Rightly so, hundreds of these hours have been
19  approved by the FCC as work being for the common
20  benefit and our effort and work in this regard was
21  lauded by other attorneys in this litigation.
22         Eighth, our work contributed to the
23  success and development of the trial package in the
24  earliest trials, including Gross versus Ethicon and

Page 11

1  Lewis versus Ethicon.
2         Ninth, our battle to successfully
3  maintain jurisdiction over Ethicon in Pennsylvania was
4  critical to the common benefit by opening up a new
5  venue, forcing Ethicon to divert resources from other
6  venues and was likely critical in the settlement of
7  thousands of cases.
8         Tenth, despite these contributions,
9  over 70 percent of our hours have been disallowed by
10  the FCC.  It is difficult for us to determine why many
11  of these hours have been excluded.  We can only
12  conclude that many disallowances appear arbitrary.
13  There are times when certain work is approved for
14  common benefit and then we find an entry where similar
15  work is disallowed.  For example, a June 12, 2014 entry
16  for work performed by Attorney Catherine Foley was
17  described as, quote, review of Ethicon slash Secant
18  documents for West/Nadaeu, N-A-D-E-A-U, depositions,
19  unquote.  This entry was allowed.  A June 13, 2014
20  entry, the very next day for the continuation of the
21  same work, was then disallowed.
22         Similarly, an October 24, 2012 entry by
23  Attorney Roger Cameron for work spent preparing for
24  Ethicon corporate employee Axel Arnaud's deposition was

Page 12

1  allowed, and an October 25, 2012 entry by Mr. Cameron,
2  for additional work regarding his deposition the very
3  next day, was disallowed.
4         You've left it up to us and other firms
5  involved in this litigation to speculate.  We are left
6  scratching our collective heads, looking at the
7  thousands of disallowed entries, trying to fill in the
8  blank.  Obviously, the FCC made a determination at some
9  point in time.  There does exist a reason.  Why the
10  reasons are being withheld from the firms is
11  bewildering at this juncture.  We reiterate our request
12  for discovery and transparency in this process.
13         Let me turn, if I may, to a couple of
14  the cases.  Hammons versus Ethicon.  In reviewing the
15  disallowance of the entries, we have ascertained that
16  over 4,000 of Kline & Specter's hours submitted for the
17  Hammons versus Ethicon case, tried in the Philadelphia
18  court of common pleas, were disallowed.  We disagree
19  with this determination and assert that our work in the
20  Hammons case benefited all plaintiffs in this
21  litigation.
22         Hammons was in December 2015, before
23  Ethicon settled the majority of cases.  While the
24  Hammons case was the second trial involving the

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

Page 13

1 Prolift, it was the first and only case where the jury
2 found for the plaintiff on a defective design claim.
3 The Gross verdicts -- Gross being the first Prolift
4 case to be tried -- was successful on the
5 failure-to-warn claim only.
6        The design defect claim is at the heart
7 of these cases.  While the failure-to-warn claim is
8 case specific, it depends on the testimony of the
9 implanting doctor, who is the learned intermediary,
10 that the defect claim concerns the product itself and
11 is at issue in every case.  The bottom line is that the
12 verdict in Hammons was at least as, if not more,
13 significant for the common benefit as was the Gross
14 verdict and served to put Ethicon on notice that it
15 would probably be wise to seriously consider
16 settlement.
17        In addition to the significance of
18 findings on design defect, the plaintiff was awarded
19 $5.5 million in compensatory and $7 million in punitive
20 damages.  This was the largest Ethicon jury verdict to
21 date and the third largest verdict against any
22 defendant in the entire pelvic mesh litigation.
23        The significance of the Hammons verdict
24 was not just the verdict.  The trial package Kline &

Page 14

1 Specter developed was requested and used by attorneys
2 around the country for their Ethicon MDL wave cases.
3 For example, on March 28, 2016, Kline & Specter
4 partner, Kila Baldwin, sent her deposition of
5 Ms. Hammons' treating physician, Dr. Julie Drolet, to
6 multiple attorneys with cases pending in the Ethicon
7 MDL.  She also sent the outline to Attorney Daniel
8 Thornburgh, who had requested it, writing, quote,
9 Thanks, Kila.  If you have your outline that you used
10 for this deposition, I think it would help others who
11 are preparing for Urogyn depositions in the Ethicon
12 Wave 1 expert depo phase we are in right now in
13 MDL, unquote.
14        Additionally, the deposition cuts from
15 the de bene esse depositions of expert witnesses, such
16 as Dr. Daniel Elliot and Professor Uwe Klinge, which
17 were created by the Hammons trial team and played
18 during the Hammons trial were deemed admissible to be
19 used in Prolift Wave cases by magistrate Judge Cheryl
20 A. Eifert of the United States District Court for the
21 Southern District of West Virginia.
22        Let me speak now briefly about Carlino
23 versus Ethicon.  In contrast, the FCC approved our work
24 in Carlino versus Ethicon.  This was the second trial

Page 15

1 involving Ethicon's TVT retropubic device and the first
2 verdict in favor of the plaintiff.  It was also Kline &
3 Specter's second pelvic mesh trial in the Philadelphia
4 Court of Common Pleas and, ultimately, our second
5 landmark verdict.  The jury awarded Mrs. Carlino 3.25
6 million in compensatory damages, $250,000 for
7 Mr. Carlino for loss of consortium and $10 million in
8 punitive damages.  Kline & Specter's work in Carlino
9 benefited all plaintiffs in this litigation and our
10 work in Hammons has proven to be equally as beneficial.
11        Let me comment briefly on three other
12 cases that we've tried.  Beltz, Engleman, and Ebaugh.
13 In addition to Hammons, work on three of our other
14 important trial verdicts -- Beltz, Engleman and Ebaugh,
15 was also disallowed.  While these trials occurred in
16 2017, after the stated cut-off date of January 1, 2017,
17 much of the work did not occur after that date.  It
18 occurred prior to this date.
19        We have been unable to determine if our
20 work on this case was disallowed because the trials and
21 verdicts occurred after the January 1, 2017 date or
22 because it was not considered common benefit work or
23 both or something else.  If it was because of the
24 timing of the verdicts, that causes us to wonder, will

Page 16

1 these hours be considered at a later time and, if so,
2 when.  If these cases have been permanently excluded
3 because the work was not considered common benefit, we
4 would like to know why.
5        At the end of 2016, there were a
6 significant number of active Ethicon cases, many of
7 which were being worked up for trial in the MDL Wave
8 process.  These three significant verdicts surely had
9 an impact in Ethicon's increased interest in settling
10 cases through 2017.  This work should be recognized.
11        It is important to note that it's not
12 just a single verdict that drives settlement.  It's
13 multiple verdicts that take their toll on defendants
14 and their resources.  To say that no verdicts after a
15 product's first verdict against it should be considered
16 for the common benefit is arbitrary and without basis.
17        Let me comment, if I may briefly, on
18 Ethicon's existence as the defendant in the
19 Philadelphia Court of Common Pleas.  Kline & Specter's
20 success in Philadelphia Court of Common Pleas has been
21 instrumental in helping drive Ethicon to settle cases,
22 bolstering trial packages, bringing about key rulings
23 and simply weakening Ethicon's ability to fight the
24 cases across the country.

VAGINAL MESH HEARINGS                      SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
                                           06/12/2018

Page 17

1          Let me focus on Remands for a moment.
2  From the beginning, Ethicon vigorously fought the
3  establishment of a pelvic mesh mass tort program in
4  Philadelphia.  At the outset of filing our cases in the
5  PCCP, Ethicon removed the cases to federal court,
6  claiming fraudulent joinder regarding the naming of
7  Secant as a defendant.  Kline & Specter filed extensive
8  briefing defeating Ethicon's fraudulent joinder
9  argument and was able to effectively remand these cases
10 back to the Philadelphia Court of Common Pleas.
11 Hundreds of hours regarding these removals and remands
12 have been arbitrarily disallowed by the FCC, despite
13 the FCC correctly recognizing other work regarding
14 Secant and the establishment of the PCCP that did
15 benefit all litigants.  Again, we do not know why these
16 hours were disallowed.  The reasons were not provided.
17         Let me now focus for a moment on
18 jurisdiction.  Similarly after the fraudulent joinder
19 argument failed, Ethicon fought us on personal
20 jurisdiction multiple times, any and every way that
21 they could, and it appears that these hours have also
22 been disallowed.  We disagree with that determination.
23 Kline & Specter conducted hundreds of hours of
24 substantial legal work in order to establish that

Page 18

1  Secant's manufacturers of the mesh in Pennsylvania
2  created a significant contact between Ethicon and
3  Pennsylvania.  Kline & Specter successfully managed to
4  keep 118 cases in the Philadelphia Court of Common
5  Pleas, maintaining another avenue for litigating these
6  cases against Ethicon and establishing further pressure
7  on this defendant to the benefit of all pelvic mesh
8  litigants.
9          Again, while some work regarding that
10 has been allowed, hundreds of hours have been left on
11 the table and disallowed; and given the information
12 provided by the FCC, we cannot determine why.
13         Let me turn, if I may, to discuss the
14 Coloplast litigation.  Kline & Specter has been the
15 only firm to have performed significant work in the
16 Coloplast litigation, including the review of tens of
17 thousands of pages of documents.  More importantly, we
18 spent hundreds of hours working up the case of Jones
19 versus Coloplast, which was litigated in Philadelphia
20 County, and we received an eight-figure settlement in
21 that case, five percent of which went into the common
22 benefit assessment pool.
23         None of the hours submitted by Kline &
24 Specter were allowed by the FCC.  Kline & Specter

Page 19

1  cannot determine if any other firms were approved for
2  work in the Coloplast litigation, but we certainly were
3  not.  It seems fundamentally unfair that our work in
4  Coloplast, including the Jones case, was determined to
5  be global enough to assess our settlement by five
6  percent, but not global enough to be considered for the
7  common benefit of all plaintiffs in the litigation.  Of
8  course, we fought that five percent assessment, finding
9  it itself to be unfair.  At the very least, our work
10 provided a significant financial contribution to these
11 funds.
12         In conclusion, Kline & Specter is proud
13 of the work we have done and the success that we have
14 achieved.  Work and success that has benefited
15 thousands of injured women across the country.  And
16 work that we continue to do.
17         Throughout this process, we have
18 reiterated one request, transparency, and we imagine
19 that everyone involved in this litigation is or should
20 be on board with that.  At the April 2016 meeting with
21 the FCC held here in Charleston, West Virginia, it was
22 clearly stated that transparency will be the goal.
23 Each firm will be given an opportunity to comment on
24 other's submissions.  We now ask that this promise be

Page 20

1  upheld.  We ask for fairness in the process, for
2  transparency, and to be recognized for the time and
3  effort Kline & Specter has put forth for the benefit of
4  all plaintiffs in this litigation.  We would be pleased
5  to respond to any comment or questions.
6          MR. RICE:  I got a curiosity question.
7  I just don't know.  What is the status of the five
8  cases, as far as appeals or --
9          MR. SPECTER:  Those cases are all on
10 appeal pending resolution.
11         MR. RICE:  On a consolidated basis or
12 separate --
13         MR. SPECTER:  They're all separate
14 appeals.
15         MR. RICE:  Are they in the same
16 appellant court?
17         MR. SPECTER:  Yes.
18         MR. GARRARD:  I have a question.  In
19 the history of the transvaginal mesh and the MDL, what
20 assistance did your firm receive from members of the
21 MDL, from the PSC in terms of helping you prepare, for
22 example, for Ethicon trials and helping you prepare for
23 Boston Scientific trials?
24         MR. SPECTER:  It's varied.  The Ethicon

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

Page 21

1  work, a lot of it was very good.
2          MR. GARRARD:  When you say good, you're
3  referring to the work that was shared with you?
4          MR. SPECTER:  Yes.  There were fact
5  witness testimony taken on videotape from Ethicon
6  employees, some of which we used, although we recut
7  them.  There were expert reports which formed the basis
8  for experts that we decided to call.  Some of that was
9  reworked by us.  There was document review that was
10  done, and we used some of those documents at trial.
11  Some of those documents were developed by work that we
12  did.  So it came through the MDL process in part
13  through our work.
14          But I would say that the work done with
15  respect to the Prolift was very good.  The work on the
16  TVT was good.  Not as extensive, but good, as far as it
17  went.  On Boston Scientific, it was not as well
18  developed and we had to develop a lot of that.
19          MR. GARRARD:  Enlighten just a little
20  bit, when you say you had to develop Boston Scientific,
21  give us some specifics, if you don't mind, as to what
22  your firm did in developing that.
23          MR. SPECTER:  I think for that, Henry,
24  I'd like to respond to you in writing if I could.  I'd

Page 22

1  like to consult with Kila Baldwin in our firm to give
2  you a thorough answer to that.  She has been primarily
3  responsible for that work, along with Chris Gomez.  I'd
4  like to give you a more complete response.  I can
5  comment with greater specificity, as can Mr. Kline on
6  Ethicon because we've tried those cases ourselves.
7          MR. GARRARD:  I was specifically
8  interested in Boston, but if you want to give me
9  something, that's fine.  I will leave --
10          MR. SPECTER:  Good.  Thank you.
11          MR. GARRARD:  It is my belief that the
12  FCC recognized work your firm did in Engleman, Carlino
13  and Harris.  I may have misunderstood you, but I
14  thought, as to one of those cases, you said we did not.
15  Did I misunderstand you?
16          MR. SPECTER:  Yes.
17          MR. KLINE:  The Engleman case, Henry,
18  was tried in 2017.  I did not -- in my review of the
19  entries, did not see any work recognized for the
20  Engleman case.
21          MR. GARRARD:  For the trial in 2017 or
22  the work up to?
23          MR. KLINE:  For either.
24          MR. GARRARD:  I want to check on that

Page 23

1  because I thought at least some of that work had been
2  recognized and I could be in error but --
3          MR. CLARK:  Was that the TVTS case,
4  where both Mr. Cartmell's firm and my firm worked with
5  you on that?
6          MR. BALEFSKI:  That was the TVT case.
7  That we -- no, that was --
8          MR. CLARK:  -- do you recall?
9          MR. BALEFSKI:  It was the TVT.
10          MR. GARRARD:  What was the TVTS case?
11          MR. BALEFSKI:  The TVTS case that Ben
12  Anderson tried.
13          MR. SPECTER:  With us.
14          MR. CLARK:  But the workup prior to
15  that is what I'm asking you about, prior to the cut-off
16  time.  Because you didn't do all the workup just before
17  you tried the case.  I think some of the work was done
18  before and I'm just curious if you recognized whether
19  or not that work was, in fact, recognized as common
20  benefit.
21          MR. BALEFSKI:  I don't believe it was.
22  I will defer to --
23          MR. GARRARD:  I will be sure that we
24  check on that.

Page 24

1          MR. SPECTER:  On Engleman, the bulk of
2  our work was done late in the process, to answer your
3  question, Clayton.
4          MR. CLARK:  I believe that it was late
5  2015 that you began working on the case, as far as we
6  do, and we started getting requests for information and
7  Will Longquist from our office also worked on that case
8  as well, with delivering work we had done on it --
9          MS. BAGGETT:  And us.
10          MR. CLARK:  -- correct case.  But I
11  believe that was a secure case; is that right?
12          MS. BAGGETT:  Yeah.
13          MR. GARRARD:  Lee, or any of you, in
14  the course of the work you did, did you provide expert
15  reports that were new experts, new generated experts to
16  any of the firms involved in the MDL for uralitization?
17          MR. KLINE:  We did provide a new expert
18  report from a Dr. Ralph Zipper, which we worked on with
19  a couple of the other firms involved.  We also worked
20  extensively with Drs. Rosenzweig and Margolis to update
21  and refine their reports and, more importantly, their
22  testimony.
23          MR. GARRARD:  What I was interested
24  in -- no trick question -- is as to whether there were

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

Page 25

1  new experts you developed.  I mean, I'm familiar with
2  Zipper.  I'm familiar with the others.  I probably knew
3  Zipper before any of you guys did and I'm interested in
4  whether you had new experts you developed that got
5  expert reports and shared those with the MDL?
6          MR. SPECTER: I don't believe so beyond
7  what Lee had said to you.  We certainly did not do
8  everything that was litigation.
9          MR. GARRARD:  I'm not suggesting --
10         MR. SPECTER: -- and we didn't do most
11 things.  Other people did most things but we did
12 largely in this litigation what we were asked to do by
13 leadership, and if we had been asked to develop
14 experts, we would have done that.
15         MR. GARRARD:  On Coloplast, tell me a
16 little bit about the extent of the work you did in
17 Coloplast.  The Court here basically stayed discovery
18 and I believe there was a request, at some point, for
19 you providing to some of the Coloplast leadership some
20 information you had worked on.  Educate us just a
21 little bit about that, if you would please.
22         MR. BALEFSKI:  We filed
23 interrogatories and requests for production in
24 Philadelphia County in the Jones case, and were

Page 26

1  provided with millions of pages of documents for
2  review.  We broke those up into different people in the
3  firm, reviewed those documents and pulled the key
4  liability documents for Coloplast.  In addition, we
5  took four depositions in Minneapolis of Coloplast
6  corporate employees so those -- and whatever we were
7  asked to provide, I think we did to whoever wanted it.
8  I mean, there was a protective order in place, where
9  there was some issues as to whether we could do it, but
10 to the extent we could do it, we did.  So the Coloplast
11 work is now available for anybody who wants it.
12         MR. GARRARD:  I recall there being an
13 issue, at some point, Lee, as to whether you could or
14 would provide, for example, documents that you had
15 secured in your case over to the MDL and, if you would,
16 educate us as to the history of that, whether there was
17 resistance to provide, whether you felt you couldn't
18 provide it because of the protective order and what,
19 if, anything ultimately was provided.
20         MR. BALEFSKI:  There was -- we had no
21 problem providing anything we could.  There were
22 protective orders in place in Philadelphia County that
23 we had to get Coloplast's permission to get around in
24 order to provide the documents.  Eventually, we did

Page 27

1  and, eventually, we provided whatever documents were
2  requested to anyone.
3          MR. GARRARD:  Do you know what exactly
4  it is of what you provided?  Was it the gross documents
5  you received?  Was it some segregation of documents?
6          MR. BALEFSKI:  We provided a -- what we
7  felt were the key liability documents to whoever in the
8  MDL wanted them.  We also provided copies of the
9  deposition transcripts that we took.  We also provided
10 summaries, I believe if I'm not wrong, of what we -- of
11 those documents and what we garnered from those
12 documents.  I think, subject to the constraints we were
13 under, which we eventually got out from under, we
14 provided everything that we were asked to.  I know
15 that.
16         MR. GARRARD:  Do you recall which of
17 the leadership you provided that to?
18         MR. BALEFSKI:  It would have probably
19 been Skeeter.  I'm not sure who else.
20         MR. GARRARD:  Anything else you want to
21 tell us?
22         MR. CARTMELL: On Coloplast, real quick,
23 did you get to expert reports in that case, in other
24 words, generate any expert reports?

Page 28

1          MR. BALEFSKI  We did not -- we
2  generated -- yes, we generated case-specific expert
3  reports.  We did not generate a generic expert report.
4  We're actually working on that right now.
5          MR. SPECTER:  Yeah, just a couple other
6  problems on Coloplast.  One is that it's a matter
7  that's available to you, in terms of the records that
8  you -- that the common benefit fund received a million
9  dollars on the Jones case, which represents five
10 percent of --
11         MR. GARRARD:  I'm aware of that.
12         MR. SPECTER: -- the settlement.  So
13 that there has been a benefit to counsel, with regard
14 to our work on that case.  That's very significant.
15         MR. GARRARD:  I'm aware of the history.
16         MR. SPECTER:  The other thing I want to
17 comment on is that that litigation is ongoing.  We have
18 quite a few cases against Coloplast currently and we
19 are engaged now in discovery with them and we're
20 prepared to share everything we obtained to the degree
21 we possibly can with anybody else who wants it.
22         MR. GARRARD:  Currently, discovery is
23 basically stayed in Coloplast in the MDL, so I'm aware
24 of the factors in relation to the payment of the five

VAGINAL MESH HEARINGS                          SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
                                                                                            06/12/2018

Page 29

1  percent and first, I think, you guys said we don't
2  really think we ought to and we said pay it and you
3  paid it.
4              MR. SPECTER:  Unless we can hold
5  something additional, which is you said he was going to
6  make a determination at a later point as to whether
7  it's an appropriate allocation to come.
8              MR. GARRARD:  I think that's maybe his
9  policy, that if somebody objects, you got to pay it and
10  then if you want to object later, you get to object
11  later.
12              Anything else you guys would like us to
13  know?
14              MR. BALEFSKI:  May I ask a question?
15              MR. GARRARD:  Yes.
16              MR. SLACK:  I just wanted to ask this
17  question because Mr. Specter made a pretty good point,
18  which I think is commonly true, about the fact that the
19  state court trials still put pressure on defendants to
20  settle, but in my experience, I think there are -- all
21  state court trials that are -- that, while they
22  continue to put pressure on the defendant, don't
23  qualify as common benefit.  So I was just curious about
24  your perception of that and if you've had other DLs

Page 30

1  where you felt that was given common benefit
2  qualification.
3              MR. SPECTER:  Well, I would start with
4  the proposition that our understanding was that work
5  that was done on the state court trials would be
6  considered as common benefit in this litigation, so
7  let's just begin with that.
8              With respect to what happens in other
9  places, in other jurisdictions, we haven't been
10  involved in a lot of MDLs, Judge Stack.  So I can't
11  give you a comprehensive answer about that.
12              MR. SLACK:  Okay.  That's fair.
13              MR. CLARK:  Can you tell me which
14  Boston product is being tried right now?
15              MR. BALEFSKI:  Pinnacle.
16              MR. CLARK:  You're aware there was a
17  verdict in Florida regarding Pinnacle cases of four
18  consolidated plaintiffs?  Did you get that transcript
19  from the MDL?
20              MR. SPECTER:  I'm sure we did, yes, and
21  those materials -- that's part of what I would like to
22  have Ms. Baldwin provide to Mr. Garrard is information
23  such as that, where there had been assistance from the
24  work that has been done by those who have been involved

Page 31

1  in that litigation.
2              MR. CLARK:  I just want to make sure
3  that you received it because it was tried, verdict and
4  appealed; and the appeal was also on the 13th.
5              MR. SPECTER:  Yes, I know it was an
6  outstanding recovery.
7              MR. GARRARD:  Anything else you'd like
8  to share?
9              MR. RICE:  In the submission, you
10  designate partner, you designate associate, and you
11  designate counsel.
12              MR. SPECTER: Right.
13              MR. RICE:  What's the difference?  I
14  got the partner part.  What's the difference between
15  the associate and counsel?
16              MR. BALEFSKI:  Associate is somebody
17  who is employed by Kline & Specter.  Counsel is someone
18  who is employed by Kline & Specter on a temporary or
19  contract basis.
20              MR. RICE:  A lot of times -- and do the
21  counsel -- is that basically document review?  Is that
22  generally contract lawyers doing document review?
23              MR. BALEFSKI:  Majority, yes.  In
24  addition to that, they're involved in legal writing,

Page 32

1  briefing, helping with depositions.  In a couple
2  instances, actually taking depositions, which I think
3  we submitted for Mr. Cameron early on in the Ethicon
4  litigation.  He not only was involved in preparing for
5  depositions, but he actually was -- took one or two
6  depositions.
7              MR. RICE:  Okay.
8              MR. BALEFSKI:  It's not just document
9  review.  That answer your question?
10              MR. RICE:  Yeah, I just -- there was
11  some -- I just hadn't seen the distinction.  I was
12  trying to figure out what it was.
13              MR. GARRARD:  Thank you-all for coming.
14  Appreciate your candor.
15              (Concluded.)
16
17
18
19
20
21
22
23
24

Page 33

1  STATE OF WEST VIRGINIA,
2  COUNTY OF WOOD, to wit;
3
4        I, Teresa Reedy, a Notary Public within and for the
   County and State aforesaid, duly commissioned and qualified,
5  do hereby certify that the foregoing proceeding was duly taken
   by me and before me at the time and place and for the purpose
6  specified in the caption hereof.
7        I further certify that the attached transcript meets
   the requirements set forth within Article 27, Chapter 47 of
8  the West Virginia Code to the best of my ability.
9        I do further certify that the said proceeding was
   correctly taken by me in shorthand notes, and that the same
10 were accurately written out in full and reduced to
   typewriting.
11
         I further certify that I am neither attorney or
12 counsel for, nor related to or employed by, any of the parties
   to the action in which this deposition is taken, and further
13 that I am not a relative or employee of any attorney or
   counsel employed by the parties or financially interested in
14 the action and that the attached transcript meets the
   requirements set forth within article twenty-seven, chapter
15 forty-seven of the West Virginia Code.
16       My commission expires March 13, 2023.  Given under
   my hand this 12th day of August, 2018.
17
18 _____
   Teresa L. Reedy, RPR
19
20
21
22
23
24

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018 Index: $10..client

**$**

$10 15:7
$110 6:2 10:4
$250,000 15:6
$5.5 13:19
$7 13:19

**1**

1 14:12 15:16,21
118 18:4
12 11:15
13 11:19
13th 31:4

**2**

2012 11:22 12:1
2014 11:15,19
2015 12:22 24:5
2016 14:3 16:5 19:20
2017 15:16,21 16:10 22:18,21
2018 6:9
22,868 6:14
24 9:9 11:22
25 12:1
28 14:3

**3**

3.25 15:5
32,000 9:22
32,270.19 6:4
37 5:15

**4**

4,000 12:16
4,199.24 6:11,18

**5**

5,202.95 6:6
55 9:13

**7**

70 4:16 6:16 11:9

**9**

9 6:9
9,42.19 6:12

**A**

ability 9:1 16:23
accepted 6:21
accolades 5:16
accordance 8:7
achieved 19:14
actions 5:19
active 16:6
addition 13:17 15:13 26:4 31:24
additional 6:11 12:2 29:5
additionally 6:18 14:14
admissible 14:18
advanced 5:20 9:23
affidavit 6:9 9:4
afternoon 4:3,12
agreements 8:2
allocation 29:7
allocations 8:9
allowed 4:20,23 6:18, 24 11:19 12:1 18:10, 24
amount 7:23
Anderson 23:12
appeal 20:10 31:4

appealed 31:4
appeals 20:8,14
appears 17:21
appellant 20:16
applications 8:13
appreciated 6:19
approved 6:6,10 10:19 11:13 14:23 19:1
April 19:20
arbitrarily 17:12
arbitrary 11:12 16:16
argue 8:19
argument 17:9,19
Arnaud's 11:24
ascertained 12:15
assert 12:19
assess 19:5
assessing 6:23
assessment 7:24 18:22 19:8
assistance 20:20 30:23
associate 31:10,15, 16
attorney 8:15 11:16, 23 14:7
attorneys 8:18 9:10 10:15,21 14:1,6
avenue 18:5
awarded 6:2 13:18 15:5
awards 8:19
aware 28:11,15,23 30:16
Axel 11:24

**B**

B-A-L-E-F-S-K-I 4:6
back 17:10
BAGGETT 24:9,12

Baldwin 14:4 22:1 30:22
Balefski 4:6 9:17 23:6,9,11,21 25:22 26:20 27:6,18 28:1 29:14 30:15 31:16,23 32:8
basic 7:8 8:8
basically 25:17 28:23 31:21
basis 16:16 20:11 21:7 31:19
battle 11:2
began 24:5
begin 30:7
beginning 17:2
belief 22:11
Beltz 15:12,14
Ben 23:11
bene 14:15
beneficial 15:10
benefit 4:14 6:5,7,13, 24 7:3 9:6,11,22,24 10:20 11:4,14 13:13 15:22 16:3,16 17:15 18:7,22 19:7 20:3 23:20 28:8,13 29:23 30:1,6
benefited 12:20 15:9 19:14
benefits 5:20
bewildering 12:11
bit 21:20 25:16,21
blank 12:8
blanket 7:5
board 19:20
bolstering 16:22
Boston 9:15 20:23 21:17,20 22:8 30:14
bottom 13:11
Bowles 4:20,23
briefing 17:8 32:1
briefly 14:22 15:11

16:17
bringing 16:22
broke 26:2
bulk 24:1
burdensome 7:4

**C**

call 21:8
Cameron 11:23 12:1 32:3
candor 32:14
Carlino 14:22,24 15:5,7,8 22:12
CARTMELL 27:22
Cartmell's 23:4
case 12:17,20,24 13:1,4,8,11 15:20 18:18,21 19:4 22:17, 20 23:3,6,10,11,17 24:5,7,10,11 25:24 26:15 27:23 28:9,14
case-specific 28:2
cases 5:24 11:7 12:14,23 13:7 14:2,6, 19 15:12 16:2,6,10, 21,24 17:4,5,9 18:4,6 20:8,9 22:6,14 28:18 30:17
Catherine 11:16
challenge 7:1
Charleston 19:21
check 22:24 23:24
Cheryl 14:19
Chris 22:3
claim 7:10 13:2,5,6,7, 10
claimant 5:21
claiming 17:6
CLARK 23:3,8,14 24:4,10 30:13,16 31:2
Clayton 24:3
client 8:16