# EXHIBIT D

Peter Jeppson, MD, FACOG, FACS

```
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                  CHARLESTON DIVISION
           MASTER FILE NO:  2:12-MD-02327
 3

                                  MDL 2327
 4   IN RE:                     JOSEPH R. GOODWIN

                                U.S. DISTRICT JUDGE
 5   ETHICON, INC., PELVIC REPAIR SYSTEM
     PRODUCTS LIABILITY LITIGATION
 6

        DEPOSITION OF PETER JEPPSON, MD, FACOG, FACS
 7

                     May 16, 2019
 8                    9:30 a.m.
           500 Fourth Street NW, Suite 1000
 9             Albuquerque, New Mexico 87102
10      This deposition was taken by:
11              BRAD BRADFORD, ESQ.
                ATTORNEY FOR PLAINTIFFS
12

13
     REPORTED BY:  DANA N. SREBRENICK, CRR, CLR
14              NM CCR #513
                GOLKOW LITIGATION SERVICES
15              877.370.DEPS
16
17
18
19
20
21
22
23
24
25
```

Peter Jeppson, MD, FACOG, FACS

Page 2

A P P E A R A N C E S

For the Plaintiffs:
   BRAD BRADFORD, ESQ.
   RENÉE BAGGETT, ESQ.
   AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
   17 East Main Street, Suite 200
   Pensacola, Florida 32502
   850.202.1010
   BBradford@awkolaw.com
   RBaggett@awkolaw.com

For the Defendants:
   BARRY J. KOOPMANN, ESQ.
   BOWMAN AND BROOKE LLP
   150 South Fifth Street, Suite 3000
   Minneapolis, Minnesota 55402
   612.339.8682
   barry.koopmann@bowmanandbrooke.com

Page 4

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION        PAGE

Exhibit T-8    Letter from Bowman and
               Brooke signed by Mr.
               Koopmann to Dr.
               Jeppson, dated April
               19, 2018, ............... 19

Exhibit T-9    Correspondence
               surrounding billing...... 21

Exhibit T-10   Dr. Jeppson's
               Curriculum Vitae.........171

Exhibit T-11   Thumb drive..............171

Page 3

- - -

I N D E X

- - -

Testimony of:
   PETER JEPPSON, MD, FACOG, FACS

BY MR. BRADFORD......................... 5
BY MR. KOOPMANN......................... 227

- - -

E X H I B I T S

- - -

NO.        DESCRIPTION        PAGE

Exhibit T-1  Notice of Deposition....... 6
Exhibit T-2  Reliance list.............. 9
Exhibit T-3  Binder containing
             sacrocolpopexy report...... 10
Exhibit T-4  Binder containing general
             report for slings.......... 11
Exhibit T-5  SUI Mesh Documents Binder
             1......................... 11
Exhibit T-6  SUI Mesh Documents Binder
             2......................... 11
Exhibit T-7  Invoice.................... 17

Page 5

PETER JEPPSON, MD, FACOG, FACS
after having been first duly sworn under oath,
was questioned and testified as follows:

EXAMINATION BY MR. BRADFORD:

Q.   Good morning, Dr. Jeppson.

A.   Hello.  Good morning.

Q.   I'm going to be asking you some questions
today about an expert report that you filed in the
Ethicon transvaginal mesh litigation, okay?

A.   Okay.

Q.   And also about the materials that you
reviewed and your background and experience and
kind of what led you to being here today and what
led you to the experience to issue the reports you
rendered, okay?

A.   Okay.

Q.   I know you've been deposed at least once
before in this litigation -- and by "this
litigation," I mean the transvaginal mesh
litigation -- is that correct?

A.   Yes, sir.

Q.   All right.  And I don't want to -- I'm
sure your counsel has gone over this with you.  I
don't want to waste a lot of time on the ground
rules, but the basic ones are, if you don't

Peter Jeppson, MD, FACOG, FACS

Page 6

1 understand my question, let me know, and I'll ask
2 it better or differently, okay?
3    A.   Okay.
4    Q.   Is that fair?
5    A.   Yes.
6    Q.   And if you answer my question, is it fair
7 that you understood it?
8    A.   Yes.
9    Q.   I want to start -- we got a lot of
10 materials here today, and I'll start by marking
11 the Notice of Deposition in this case as the next
12 exhibit.
13       (Exhibit T-1, Notice of Deposition,
14 marked for identification.)
15    BY MR. BRADFORD:
16    Q.   All right.  Doctor, we marked as Exhibit
17 T-1 to your deposition the Notice of Deposition
18 that we filed in this case.
19       Have you seen this document before?
20    A.   Yes.
21    Q.   All right.  You've got some boxes and
22 some, it looks like, printed materials and a thumb
23 drive in front of you.  I'm assuming those are
24 responsive to the portion of the notice that is
25 the Schedule A; is that correct?

Page 7

1    A.   Yes, sir.
2    Q.   All right.  I don't know if between you
3 or between you and counsel -- I really don't
4 care -- whatever the easiest way is, tell me what
5 you got here today.
6    A.   So essentially I brought correspondence
7 between me and counsel, and then I have an invoice
8 for the time spent on the general reports for both
9 of them.  And then I have the reports that I wrote
10 along with the supporting documents for those, and
11 then I have materials that were referenced,
12 general materials, relating to mesh use.
13    Q.   Okay.  So what's on the thumb drive?
14    A.   So the thumb drive is essentially
15 information that's on the -- in the binders.
16    MR. KOOPMANN:  Well, let me clarify.  The
17 thumb drive contains all the general materials
18 he's been sent throughout his involvement in the
19 litigation.
20       The binders contain his -- his
21 sacrocolpopexy report and his midurethral sling
22 report and the materials that he sited in those
23 reports.  So the thumb drive contains more than
24 the binders technically.
25

Page 8

1    BY MR. BRADFORD:
2    Q.   All right.  So the binders and their --
3 or, several of these are floating around.  How
4 many binders did you bring -- how many original
5 blinders, not including copies, do you have?
6    A.   Four.  They are all about the same size,
7 and they're --
8    Q.   I don't need them up here, I don't think.
9 So just so I understand correctly, the thumb drive
10 contains everything provided to you by Ethicon to
11 review -- Ethicon's counsel or Ethicon to review
12 in forming your opinions; is that correct?
13    A.   No, that's not correct.  This includes
14 the information that I was sent by them as well as
15 the information that I reviewed.  It does not
16 include all the information that I've reviewed
17 relating to mesh or mesh use.
18       That would be in the last, you know, 15
19 years' worth of information that I've read and
20 studied and learned from, you know, medical
21 school, residency, fellowship, national meetings,
22 articles that I've written and then literature
23 that I've kept up with both for maintenance of
24 certification as well as just general knowledge to
25 practice as a urogynecologist.

Page 9

1    Q.   I'm going to mark as T-2 your reliance
2 list that was provided to us in this case.
3       (Exhibit T-2, Reliance list, marked for
4 identification.)
5    MR. KOOPMANN:  And, counsel, for
6 clarification, I don't know if I made this clear,
7 but this binder contains a sacrocolpopexy report
8 and the materials cited in that.  This contains
9 his midurethral sling report.  And then the other
10 two binders are just miscellaneous documents,
11 internal documents, deposition transcripts, things
12 like that.
13    MR. BRADFORD:  Okay.  Thank you.
14    BY MR. BRADFORD:
15    Q.   All right, Dr. Jeppson, you've got marked
16 the reliance list that was provided to us by
17 Ethicon as Exhibit T-2.  What I'm trying to do --
18 I'm not trying to trick you.  I'm not -- you know,
19 I'm just trying to figure out what you have here
20 today versus the materials that are on your
21 reliance list, okay?
22       And I know separate and different from
23 that is your experience in medical school and
24 residency and reading literature and whatever
25 else -- whatever other experience you have, okay?

1  So I appreciate that's separate and distinct, but
2  for right now, I want to focus on the reliance
3  list, your reports and what you have in front of
4  you, okay?
5      A.   Okay.
6      Q.   All right.  So, for example, the binder
7  I'm looking at now contains your sacrocolpopexy
8  report, correct?
9      A.   That is correct.
10     Q.   Okay.  And does it also contain the
11 references you've cited in the footnotes or in the
12 text of your report?
13     A.   That is correct.  That is what is in that
14 binder is the report that I wrote and the
15 supporting documents to go along with this.
16         MR. BRADFORD:  I'm going to go ahead and
17 mark this binder as T-3.
18         (Exhibit T-3, Binder containing
19 sacrolpopexy report, marked for identification.)
20 BY MR. BRADFORD:
21     Q.   All right.  There's another binder that's
22 in front of you that contains your general report
23 for the slings you're here to testify on in this
24 case, meaning the TVT, the TVT-O and the TVT
25 Abbrevo, correct?

1      A.   That is correct.
2      Q.   And also are -- the attachments are the
3  other tabbed exhibits to this binder.  Is that the
4  materials referenced and cited within your report,
5  either footnotes or in the report itself?
6      A.   That is correct.
7      Q.   Okay.  I'm going to mark this as T-4,
8  please.
9          (Exhibit T-4, Binder containing general
10 report for slings, marked for identification.)
11 BY MR. BRADFORD:
12     Q.   Okay.  And there are two more binders you
13 brought, correct?
14     A.   Yes.
15     Q.   Maybe you can slide these out of the way
16 for now.  And I will mark these T-5 and T-6.  And
17 they're titled SUI Mesh Documents Binder 1.  I'll
18 mark that as T-5.
19         (Exhibit T-5, SUI Mesh Documents Binder
20 1, marked for identification.)
21 BY MR. BRADFORD:
22     Q.   And then SUI Mesh Documents Binder 2,
23 I'll mark as T-6.
24         (Exhibit T-6, SUI Mesh Documents Binder
25 2, marked for identification.)

1  BY MR. BRADFORD:
2      Q.   All right, Dr. Jeppson, if you look at
3  what we've marked now as Exhibit T-2, which is
4  your reliance list -- it's over here.
5      A.   Uh-huh.
6      Q.   -- it's a -- I'm not going to guess how
7  many pages, but it's a many page document that
8  includes lots of medical literature, correct?
9      A.   That is correct.
10     Q.   And then it also -- after the medical
11 literature is -- strike that.
12         There's an alphabetized list of medical
13 literature, correct?
14     A.   Yes.
15     Q.   All right.  And then after that there is
16 a section called Production Materials which
17 includes some general things including what looks
18 to be Ethicon internal documents?
19     A.   Yes, that is correct.
20     Q.   All right.  And then after that is
21 included a section called Company Witness
22 Depositions, correct?
23     A.   Yes.
24     Q.   And then there's a section titled Other
25 Materials, correct?

1      A.   Yes, that is correct.
2      Q.   Okay.  Everything included in T-2, which
3  is your reliance list, can't be included in these
4  two binders, right?
5      A.   Cannot be?
6      Q.   It's not.  I mean, it's -- these binders
7  don't constitute everything that was included in
8  your reliance list?
9      A.   That is correct.  These are what support
10 the documents here, but is not everything in the
11 reliance list.
12     Q.   If they did, there would be binders to
13 the ceiling many times over, I suspect?
14     A.   Yes.  They would be very big binders,
15 yes.
16     Q.   Tell me, what is significant about what
17 is in T-5 and 6 versus the other materials listed
18 on the reliance list?  Why are these here as
19 opposed to all this stuff?
20     A.   From my perspective, when I write a
21 report, it's very similar to when I would write
22 and submit a manuscript for publication, so I am
23 not just purporting my opinions.  I am purporting
24 that the evidence that is available and the
25 evidence to support the statements that I'm

Peter Jeppson, MD, FACOG, FACS

Page 14

1  making. And so the reason or the rationale to
2  have binders with references is so that, as you
3  read the report, you can see what was referenced
4  in making -- in making -- in drafting the report
5  and what supports those statements.
6      Q.   The actual citations themselves and
7  the studies or materials that are actually cited
8  within your report are included in the binders
9  with the report, correct?
10     A.   That you have in front of you, yes.
11         MR. KOOPMANN: Those are just my copies
12 of those.
13         MR. BRADFORD: Maybe I'm confused.
14 BY MR. BRADFORD:
15     Q.   So if you look at your report, you have
16 citations and footnotes within your report; is
17 that right?
18     A.   That is correct.
19     Q.   And that is what is included in the
20 binder with your report, fair?
21     A.   That is what you have in front of you,
22 yes. This is the report. This is the binder with
23 the -- well, I'm sorry. These are different. I
24 moved it down. I apologize. I thought you still
25 had the SUI and the colpopexy reports in front of

Page 15

1  you.
2      Q.   Okay. Let me start over because I've
3  exchanged those binders, and they're now out of
4  the way. And these are two additional binders,
5  correct?
6      A.   These are general materials, yes.
7      Q.   And as I asked you before, these two
8  binders do not contain everything that is in the
9  reliance list that was provided to us by Ethicon,
10 correct?
11     A.   Yes.
12     Q.   What is significant about these documents
13 that caused you to bring them separately today as
14 opposed to all the other stuff in the reliance
15 list?
16     A.   So these are materials that I reviewed as
17 I became an expert witness for -- for Ethicon.
18 These are the documents that I went through that
19 were -- are perhaps slightly more important, or
20 they needed to be reviewed to ensure that I went
21 through all of them.
22         Again, as you mentioned, there is so much
23 data available. It's not possible to incorporate
24 it all. And so your question as to why these are
25 more important, you know, again, these are

Page 16

1  documents that I think are necessary to be known
2  as an expert witness, but are not necessarily the
3  most important in forming medical opinions, if
4  that makes sense.
5         Internal documents from Johnson & Johnson
6  and whatnot are not readily available in the
7  medical literature and that sort of thing, so
8  these were provided to me for review.
9      Q.   Looking back to T-1, which is the Notice
10 of Deposition, I want to look over to Schedule A,
11 and I'm not going to ask about each of these
12 things. I've got a lot of -- a lot of these have
13 been produced, but I do have questions about a few
14 of them.
15         You have in front of you, it looks like,
16 some billing records and then some correspondence,
17 including the work surrounding the billing; is
18 that correct?
19     A.   Yes.
20     Q.   Can I see those, please?
21     A.   Yes.
22     Q.   These weren't in any particular order;
23 were they?
24     A.   No.
25         MR. KOOPMANN: I don't think so.

Page 17

1  BY MR. BRADFORD:
2      Q.   I didn't want to reorder them and do
3  anything that you wouldn't like. I'm going to
4  mark as T-7 an invoice that you brought with you
5  today, and hopefully we can look at this together.
6         (Exhibit T-7, Invoice, marked for
7  identification.)
8  BY MR. BRADFORD:
9      Q.   All right, Dr. Jeppson, looking at what
10 we marked as T-7, that is your -- it looks like a
11 billing invoice; is that correct?
12     A.   Yes, sir.
13     Q.   All right. And looking at -- there's no
14 date itemization on this; is that correct?
15     A.   That is correct.
16     Q.   It's just a -- there's a gross -- a
17 number of hours and then your rate for what is
18 described as the MUS general report and the
19 colpopexy general report, correct?
20     A.   That is correct.
21     Q.   All right. And from what date range does
22 this billing encompass? And let me -- before I do
23 that, the date of the invoice is May 15th of '19?
24     A.   Yes.
25     Q.   That is yesterday, correct?

Peter Jeppson, MD, FACOG, FACS

Page 18

1    A.   That is correct.
2    Q.   Okay.  From what time frame generally?
3  I'm not going to marry -- if you miss it by a
4  month, I don't care.  I'm just looking for when
5  did you start for this billing invoice, and when
6  did you stop?
7    A.   I honestly don't remember when I started.
8  It's probably been five or six months is my guess.
9  There was a request to generate a report, and as
10  I've worked on that, I've just kept the time as a
11  lump sum.  I haven't itemized the time, as you
12  mentioned.
13       I did not keep track of the time in an
14  itemized form, but as I was reviewing materials
15  specific to the report and as I was drafting the
16  report and as I was preparing for this deposition,
17  all of that time is lumped into, you know -- into
18  that time, but, you know, a ballpark, you know,
19  six months.
20    Q.   All right.  And how current is this
21  report, meaning through when is this -- the
22  invoice marked as T-7 accurate?
23    A.   I updated it last night which is why it's
24  dated the 15th.  I will update it again at the
25  conclusion of today's proceedings and then submit

Page 19

1  it to Johnson & Johnson.
2    Q.   Is your rate different for a deposition
3  than record review or for preparation?
4    A.   It is not.  I have a standard rate.
5    Q.   I will next mark as Exhibit T-8 a letter
6  that -- in the group of documents you provided.
7  It's a letter from Bowman and Brooke.  It looks to
8  be signed by Mr. Koopmann, correct?
9    A.   Yes.
10    Q.   And that's the gentleman sitting next to
11  you today from Ethicon who is your counsel?
12    A.   Yes, sir.
13       MR. KOOPMANN:  Objection.  I'm -- I'm
14  J&J's and Ethicon's counsel, not his counsel,
15  but...
16       THE WITNESS:  Yeah.
17       MR. BRADFORD:  Fair enough.
18        We're going to mark that.
19       (Exhibit T-8, Letter from Bowman and
20  Brooke signed by Mr. Koopmann to Dr. Jeppson,
21  dated April 19, 2018, marked for identification.)
22  BY MR. BRADFORD:
23    Q.   All right, Dr. Jeppson, I've marked as
24  Exhibit 8 a letter to you from Mr. Koopmann from
25  Bowman and Brooke dated April 19, 2018.

Page 20

1       Are you familiar with this document?
2    A.   Yes.
3    Q.   All right.  In my quick review of these
4  documents that you provided regarding your
5  billing, that's the earliest dated one being back
6  in April of 2018.
7       Do you recall when you were first
8  approached by Mr. Koopmann or Ethicon or anyone
9  else to work as an expert in this transvaginal
10  mesh litigation?
11    A.   It would have been close to that time,
12  but I don't remember for sure.
13    Q.   And I'm not -- again, I don't care about
14  a week or even a month's difference, but close to
15  that time, what's the best you can give me as to
16  when you would have been first contacted?
17    A.   It would have been probably within a
18  month or two of the signed document.
19    Q.   And how were you first contracted to work
20  as a potential expert for Ethicon in this
21  litigation?
22    A.   Mr. Koopmann contacted me through my
23  institution, and I replied that I would be
24  interested in being an expert witness for Ethicon.
25    Q.   You referenced through your institution.

Page 21

1  What do you mean?
2    A.   I work for the University of New Mexico.
3  The administrative assistant that worked for me at
4  the time received a message that she forwarded to
5  me, and I replied to them.
6    Q.   I'm going to mark the rest of these
7  documents, the correspondences surrounding the
8  billing that you provided as just a composite, as
9  T-9.
10       (Exhibit T-9, Correspondence surrounding
11  billing, marked for identification.)
12  BY MR. BRADFORD:
13    Q.   I'm going to clip these together with
14  paperclips, so they stay together the best they
15  can.  I don't think I'm going to ask any general
16  questions about these, right now anyways.
17       Do you have any other documents that
18  would reflect or reference any of your billing for
19  your work for Ethicon in this matter?
20    A.   No, I don't.
21    Q.   Have you ever worked as a consultant for
22  Ethicon outside of serving as a testifying expert
23  in the transvaginal mesh litigation?
24    A.   I have not.
25    Q.   Are you familiar with the term "key

Peter Jeppson, MD, FACOG, FACS

Page 22

1 opinion leader"?
2    A.  Yes.  I've heard that term as it relates
3 to federal funding, stakeholders and key opinion
4 holders, yes.
5    Q.   Do you have any contracts with Ethicon to
6 work -- to do any consulting for them outside of
7 this litigation?
8    A.   I do not have any contracts with any --
9 with any businesses or, you know, medical --
10 anything outside of this.
11    Q.   Okay.  I was going to lead into those
12 questions.  So have you ever worked as a key
13 opinion leader for Ethicon?
14    A.   No, I have not.
15    Q.   Have you ever taught courses for Ethicon
16 products on Ethicon's behalf?
17    A.   I have taught courses, but never for
18 Ethicon.  I've done them through national or
19 international organizations, but never for
20 Ethicon.
21    Q.   Have you ever been paid by Ethicon to
22 speak on its behalf?
23    A.   I have not.
24    Q.   Have you ever been paid by Ethicon to
25 present to doctors regarding its products?

Page 23

1    A.   I have not.
2    Q.   Have you ever been paid by Ethicon for
3 anything other than your work in this litigation?
4    A.   I have not.
5    Q.   I want to ask you the same questions for
6 other manufacturers or industry entities, if you
7 understand what I mean.
8    A.   Yes.  I have never received payment from
9 industry in any other regard.  As an institution,
10 as part of our group, we do research studies, some
11 of which are funded by industry, but the funding
12 would come to the institution to provide support
13 for the -- the research assistance on those types
14 of things, not directly to any of us.  And I am
15 not the primary on any of those grants, if you
16 will.
17    Q.   And are those grants -- I've been through
18 your CV that you provided for us.  Are those
19 grants and that information included within your
20 CV?
21    A.   Anything that I've been involved in are
22 included in my CV, and there is a section of
23 grants.
24    Q.   Okay.  Thank you, Doctor.  We'll get
25 there in a minute.

Page 24

1        You're saving some time this morning.
2    A.   I am?
3    Q.   You are.
4        I want to direct you to what was marked
5 as Exhibit T-2.  That's the reliance list again.
6 I think I'm actually going to be finished with
7 this one.  I'll put this in the pile over here,
8 okay?
9    A.   Okay.
10    Q.   Okay.  I want to go through the reliance
11 list, not item by item, but -- Lord knows we don't
12 have the time, but I want to go through there and
13 just talk about what you've reviewed, what you've
14 reviewed thoroughly, what you might have skimmed,
15 what you would not have looked at, if any, okay?
16 And I don't want to do this item by item
17 certainly, but, I mean, we can if we need to.
18        As far as the studies listed, the medical
19 literature as described by Ethicon, did you
20 prepare this list?
21    A.   I did not prepare the list.
22    Q.   Was this list provided to you by Ethicon?
23    A.   Someone within Ethicon compiled the list
24 that, provided that this list was given to me, so
25 if that's what you mean by provided.  They did not

Page 25

1 generate the list and say, This is what we want
2 you to go through.  They provided some information
3 particularly towards the back as you kind of went
4 through earlier, you know, and some of the
5 production materials, some of the company witness
6 depositions.  Those types of things I would not
7 have had access to, but the medical literature, I
8 mean, it's all available through Medline.
9        And so much of this information and
10 really essentially everything in my report -- in
11 my reports, pleural, you know, is information that
12 I'm aware of or that I've read or that I've seen
13 elsewhere.  I did go through the -- I went through
14 this material again, some in more depth than
15 others, but as a practicing urogynecologist, this
16 information is very pertinent to my day-to-day
17 patient interaction treatment algorithms.
18        So the medical literature is, in general,
19 generality, is information that I was aware of or
20 that I found as I was searching, but much of it is
21 information that I'm aware of, if that makes
22 sense.
23    Q.   Sure.  And we'll go through -- I'm going
24 to go through your background and experience in
25 more detail in a little bit, but is it fair to say

Peter Jeppson, MD, FACOG, FACS

Page 26

1 that you work at a teaching hospital?
2 A. Yes, sir.
3 Q. And as part of working at a teaching
4 hospital, you teach residents; is that correct?
5 A. I'm hired through the School of Medicine.
6 I have an appointment with the School of Medicine
7 for medical students. I often teach students in
8 clinical settings and in classroom settings. I
9 also teach the residents as they rotate through
10 our service, both formally as well as informally
11 and in rounds in the OR and that type of thing.
12 We also have a fellowship. I am very
13 engaged with the fellowship teaching as I am with
14 the others. We just had meetings this morning.
15 We had didactics from 7:00 to 8:00, and then
16 another didactics meeting from 8:00 to 9:00, and
17 that's our -- my typical Thursday morning are
18 division meetings with didactics for the learners.
19 Q. I'd expect you have interest outside of
20 medicine also?
21 A. Certainly.
22 Q. All right. I want to just ask you
23 generally, tell me about whether you can describe
24 for me, whether it's by the week or the month or
25 whatever is easiest, Dr. Jeppson, but tell me

Page 27

1 generally about your -- the time you spend working
2 and what you do. I can ask smaller bites if you
3 would like.
4 A. No, that's fine.
5 As a general rule, I am -- I very much
6 like my job. I enjoy what I do. I like seeing
7 patients and treating my patients. As a
8 practicing physician, I have a busy clinical
9 schedule. I'm in the OR every Monday. I'm in
10 clinics on Tuesdays and Wednesdays. I have some
11 med student teaching obligations on Tuesday
12 afternoons. Wednesday is all day clinic.
13 Thursday, I have some clinical responsibilities on
14 Thursdays. We have the didactic sessions I
15 already discussed on Thursdays.
16 Fridays are grand rounds, and Friday for
17 me tends to be more administrative time. I am the
18 chief of the division of urogynecology. I get a
19 couple hundred e-mails a day that I keep up with.
20 I, you know, get all the medical results, all that
21 stuff, for patient care as well that I keep up
22 with.
23 On a given day, I would typically wake up
24 around 5:00 -- between 5:00 and 6:00 a.m. I tend
25 to go through e-mail in the morning. Sometimes

Page 28

1 I'll take my dog for a walk. Go to work through
2 the day. Come home at night. I'm usually home by
3 6:00-ish. I have dinner with my family. My boys
4 are involved in baseball and other activities like
5 that that I go to.
6 Once we get the kids in bed around 8:30
7 or 9:00 and we've done homework and all of that, I
8 talk to my wife for a bit, and then I get back to
9 the e-mail and the research projects that I'm
10 involved in, and that tends to be until 10:00
11 o'clock or so.
12 Weekends I, again, tend to get up early.
13 I wake up without an alarm around 5:00 or 6:00.
14 Work on things until 7:00 or 8:00 when my boys get
15 up, and then I try not to do much on Saturdays or
16 Sundays aside from, you know, non -- I don't want
17 to take away from family time. That sometimes is
18 necessary. I do have an occasional call that, you
19 know, I cover at the hospital, but that is more or
20 less my general schedule.
21 Q. Thank you, Doctor, and congratulations on
22 your balance. That's important. So I've seen
23 that you've written a lot on that, and that's
24 important, so as your career goes along, keep that
25 up. Be sure to keep up your balance, okay?

Page 29

1 A. Thank you.
2 Q. How many hours a week do you spend in
3 clinic, and how many patients per hours in a week
4 do you see?
5 A. I -- my FTE, which is the full-time
6 equivalent clinic, I think is .55. I usually work
7 around .6 or .65 clinical. That includes OR and
8 clinic. I exceed the institution's expectations
9 of me as far as clinical goes, but I prefer to be
10 above than under on anything.
11 As far as patients per half day, it
12 varies. Depends on, you know, who comes to
13 clinic, no show rates and that sort of thing,
14 which patients come to clinic and which don't.
15 You know, I have clinics where maybe, you know,
16 three or four people show up, which is unusual.
17 Typical would be probably somewhere around eight
18 per half day, six to eight. And then the other
19 would be clinics where things get overbooked, and
20 I'm seeing, you know, 14 to 17 per half day. It
21 just depends on the day.
22 Q. Sure. And Monday's your operating day?
23 A. I'm in the OR on Mondays, occasionally on
24 Tuesdays.
25 Q. Okay. How many cases on average do you

Peter Jeppson, MD, FACOG, FACS

Page 30

1  do weekly or monthly, whatever is the easiest way
2  for you to describe it?
3      A.   It depends on if they're majors or
4  minors.  Typically I would do somewhere between
5  probably three to five surgeries on a given OR
6  day, again, depending on the length and the
7  complexity of the case.
8          You know, very complicated cases, there
9  might only be two.  I don't -- I mean, I have all
10  that information available, but I don't remember
11  it off the top of my head.
12          We do go through our metrics as a
13  division monthly.  Our monthly metrics meeting
14  will be next Thursday, and so I do look at all
15  that.  And as division director, you know, I think
16  it's my job to know how the division is doing, but
17  I don't keep all those numbers in my head.
18  There's too much to remember and so...
19      Q.   Thank you, Doctor.  And general is fine.
20  You know, I'm not -- again, if it's a higher or
21  lower number within a margin, that's not of
22  significance to me.  I mean, you're welcome to
23  look at that and supplement this answer when the
24  time comes if you would like, but I'm pleased --
25  you know, I'm okay with the general nature of what

Page 31

1  you're telling me.
2          I want to talk to you about your
3  teaching, and for this question, it's not in the
4  clinic necessarily.  I'm talking about classroom
5  teaching, okay?
6          How much time do you spend per week on
7  average doing that?
8      A.   I don't know.  As I mentioned, we have
9  didactic sessions every Thursday.  That's going to
10  be at least an hour, if not two.  I teach -- I
11  used to be the residency, the assistant program
12  director, and as that, one of my job was to
13  coordinate and essentially arrange all of the
14  resident teaching.
15          So I did that for two years, and so, you
16  know, that would be three hours every Friday
17  morning.  That wasn't always me directly, but it
18  was me coordinating, you know, and following
19  the -- the ABOG, learning objectives for the
20  residents to make sure they were getting the full
21  gamut or the full representation of what was
22  needed for their license exams.
23          For the residents, it's similar.  I am
24  not the program director of the fellowship, but as
25  division chief, I am very involved in the

Page 32

1  fellowship, and I do review that with the
2  fellowship and the assistant fellowship directors
3  in making sure that we're covering the information
4  pertinent to trainees in female pelvic medicine
5  and reconstructive surgery, female pelvic medicine
6  and reconstructive surgery, which is what
7  urogynecology is.
8          The name through the American Board of
9  Obstetrician and Gynecology, which is ABOG, is
10  FPMRS, the female pelvic medicine reconstructive
11  surgery, but urogyn is what it's called, you know,
12  by most people.  So, you know, it's hard for me to
13  break down and say how much in classroom.
14  Classroom on a given week is probably going to be
15  at least -- at least two hours, you know, quote,
16  unquote, classroom time and in meetings, grand
17  rounds, all that kind of stuff, yeah.
18      Q.   And how much time on average weekly do
19  you spend with -- in the fellowship with the
20  fellows or the residents in clinic or the OR or
21  whatever more, not didactic, but hands-on?
22      A.   I think he asked me how much time I spend
23  with the residents and fellows in clinical and
24  operating settings.
25      Q.   I used the word "didactic."

Page 33

1      A.   Didactic, yeah.
2          So it's unusual for me not to have
3  learners with me in those settings.  In the
4  operating room, I typically would have a medical
5  student, a resident and a fellow, so it's going to
6  be every Monday.  Tuesday, my Tuesday clinic I
7  have a resident with me.  The Wednesday clinic I
8  usually have a student with me in the morning and
9  a fellow with me in the afternoon is more or less
10  the breakdown.
11      Q.   How much time per week or per month do
12  you spend reviewing medical literature?
13      A.   A lot, but I mean, I -- I'm constantly
14  reading.  I mean, I -- part of getting up early in
15  the morning is keeping up with literature.  I get
16  e-mails from JAMA and from other, you know, large
17  journals.
18          I'm a member of AUGS.  AUGS sends out a
19  weekly e-mail with articles of interest.  As part
20  of our fellowship didactics, primarily we tend to
21  have journal club at least every other week, if
22  not more often, which will consist of one or two
23  journal articles.
24          For patient care, I will look things up
25  specific to patients as well as needed, and then I

Peter Jeppson, MD, FACOG, FACS

Page 34

1 have been very involved in research projects and
2 many of which are systematic reviews. And so, I
3 mean, systematic reviews, you're taking a topic
4 and reading essentially everything on that topic
5 to coalesce or condensate the information into a
6 report.
7       And as you'll see from my CV, I have
8 several systematic review publications. I have
9 several that are ongoing. I mean, a lot, I read a
10 lot.
11    Q.   You had mentioned AUGS, and which --
12 strike that.
13       Which medical journals do you routinely
14 review?
15    A.   Oh, I get The Green Journal, which is
16 Obstetrician & Gynecology. I get The Gray
17 Journal, which is the American Journal of
18 Obstetrics & Gynecology. Those both come to me in
19 print. I also get The Yellow Journal, which is
20 the Female Pelvic Medicine & Reconstructive
21 Surgery journal. That's the one from AUGS. The
22 Green is from ACOG.
23       You know, I look at stuff, and I'm also a
24 member of the American College of Surgeons. I get
25 their journals online. I skim through the topics

Page 35

1 to see if there would be things of interest to me
2 as a surgeon, a Journal of Urology in urology as
3 well as the New England Journal, JAMA. I mean,
4 these are things that come to me in e-mail form or
5 in other kinds of consolidated form to help
6 identify what would be of interest. I mean, I get
7 a lot.
8    Q.   Looking back to the reliance list, I want
9 to go through and be sure I understand what you've
10 looked at and what you haven't.
11       So just so I'm clear, you did not type
12 this list up, correct?
13    A.   That is correct, I did not type this list
14 up. I did not compile it.
15    Q.   And this list regarding the medical
16 literature on Exhibit T-2 was compiled by someone
17 with Ethicon, correct?
18    A.   Yeah. I'm assuming a paralegal or
19 someone like that. I don't know who.
20    Q.   And they provided you this list, correct?
21    A.   They compiled the list and provided it to
22 me, yes.
23    Q.   Did they provide all of the articles
24 contained within the alphabetical list of medical
25 literature to you?

Page 36

1    A.   So if you're asking if they gave me this
2 list and told me to include it, the answer is no.
3 If you're asking if they compiled this list and
4 printed and collated and put everything in the
5 binders, then, yes.
6       Do you understand the distinction?
7    Q.   I do understand it. I'm asking not to
8 what they told you to put in your report. I'm not
9 going there at all. I'm not inferring that.
10       I'm asking specifically for these
11 questions what they did and what you received from
12 them.
13    A.   Correct. They compiled the list and
14 compiled the printed documents to go along with
15 the list for the report.
16    Q.   And when you point to those, you're
17 pointing to the binders marked Exhibits T --
18       MS. BAGGETT:  5 and 6.
19    BY MR. BRADFORD:
20    Q.   -- 3 through 6?
21    A.   Yes.
22    Q.   Did they provide you a copy of all of the
23 medical literature in this reliance list, whether
24 it be binders like that, whether it be via
25 Dropbox, e-mail, hard drive, thumb drive,

Page 37

1       Were you provided all of the medical
2 literature in -- listed on the reliance list by
3 Ethicon?
4    A.   I'm not sure if I understand the
5 question. Are you asking me if I was given
6 everything by them to review?
7    Q.   I'm asking if every piece of medical
8 literature in this reliance list was provided to
9 you by Ethicon, whether hard copy, digital copy,
10 on a drive, however.
11    A.   So it may be semantics. Some of this
12 information I provided to them to include, which
13 then they gave back to me, but the information
14 that's in the reliance list is information that I
15 have received. And I think all of it is on the
16 thumb drive or in some other form.
17    Q.   The question is simpler. I'm not trying
18 to get in the weeds with you or infer anything.
19 What I'm trying to just see is, did Ethicon
20 provide you either a hard digital or copy in some
21 other form of everything on the reliance list
22 listed under Medical Literature?
23    A.   I believe everything on the reliance list
24 is on the thumb drive.
25    Q.   Okay. And that was prepared to give to

Page 38

1 me today, correct?
2    A.   This is a copy to submit, yes.
3    Q.   How did they give it to you?
4    A.   So I have the information in the binders
5 that was reviewed.  Some came via e-mail.  I think
6 those are in the e-mail list that was seen.  You
7 know, much of that, I don't remember if it was all
8 sent secure.  I know anything patient is sent
9 secure, that I have to login and download, but I
10 think many of those were as well.
11      And then the thumb drive is here.  It was
12 brought today specific for this.  I have a copy of
13 the thumb drive as well.  And then there's the
14 list here.  So perhaps I'm not understanding the
15 question because I feel like I'm answering it, but
16 then you re-ask, so maybe I'm missing something.
17    Q.   Is every study or article listed under
18 Medical Literature on the reliance list on this
19 thumb drive?
20    A.   Yes.
21    Q.   And before today or whenever this was
22 copied to give to me, Ethicon had provided all of
23 that to you?
24    A.   Yes, with the caveats that we've gone
25 through, yes.  It was information that I received

Page 39

1 from Ethicon, and again, I might -- I might not be
2 understanding, so please forgive me if I'm not,
3 but, you know, again, I -- you know, it's not like
4 Ethicon just gave me this stuff and said, Here,
5 you know, look at all this stuff.
6      It's -- you know, some of that is true,
7 but much of this, particularly the medical
8 literature, is stuff that I've already known or
9 seen or coauthored, all right, and so I did not
10 receive that from Ethicon.  Like, I already knew
11 about that.
12      Does that make sense?
13    Q.   Yes.  Is all of the medical literature
14 significant to your opinions in this case
15 contained within those four binders?
16    A.   I would say no, not pertaining to mesh.
17 It's impossible to put everything that would be
18 important in a given binder.  I mean, it's -- I
19 mean, textbooks and I mean -- I mean, the amount
20 of medical literature out there is immense, you
21 know.
22      This is information pertinent to the
23 reports and pertinent to the discussion, but I
24 don't think that it contains everything.  I don't
25 think it's possible to contain everything in a

Page 40

1 printed form.
2      And then certainly, you know, experience
3 from treating patients and that sort of stuff
4 doesn't -- I mean, that stuff doesn't get printed
5 and go in here, but I have a lot of experience
6 with patients, and it does determine how you
7 treat.
8      So -- but, again, please feel free to
9 re-ask if I'm not understanding.
10    Q.   Yeah, sure.  Specifically, as to the
11 medical literature -- and here's the deal, right?
12 This is my chance to talk to you.
13    A.   Yeah.
14    Q.   This is my chance to learn the basis and
15 foundation for your opinions and what those
16 opinions are, right?
17      What I want to do is I want to be sure I
18 have the opportunity to look at, as opposed to
19 hundreds and hundreds and hundreds of studies or
20 pieces of journal literature, some of which are
21 meaningless to you in your opinions, I want to
22 look at what is meaningful, so when the time
23 comes, either me or some other lawyer around this
24 country can look at the relevant materials to ask
25 you questions about it, okay?

Page 41

1      That's the purpose of my question now.
2    A.   Okay.
3    Q.   And that's why I'm asking.  And I would
4 really not -- I just as soon not go through each
5 of these.  I mean, I can, and I don't want to.
6    A.   I don't want to either --
7    Q.   Okay.
8    A.   -- but I feel like I'm answering the
9 question, so that's where I'm struggling.
10      Like, is this information important to
11 the discussion?  Yes, that's why it's here.
12    Q.   Is every study or journal article listed
13 under the Medical Literature portion important to
14 your opinions in this case?
15    A.   So everything listed here is important.
16 I guess, you know, the -- the stuff that I sign,
17 and if you look at the contract -- I think it's in
18 there -- you know, and then certainly whenever
19 I -- you know, it's, you know, based on my -- my
20 current knowledge which can change based on future
21 publications, right?
22      I mean, if you're asking me if all of
23 these studies are weighted the same, the answer is
24 no.  Systematic reviews, randomized controlled
25 trials are going to be much higher evidence than

Peter Jeppson, MD, FACOG, FACS

Page 42

1 some case series. This includes a lot of
2 different information.
3      When looking at medical literature, some
4 information is better obtained from case series
5 and from these kind of less well designed studies.
6 Things like adverse events and those kinds of
7 things typically are not well represented in a
8 randomized controlled trial.
9      A randomized controlled trial might only
10 have 20 patients per arm, and so you're only
11 looking at a total of 40 patients, whereas you can
12 get essentially a case series or a population
13 based study out of Scandinavia with 20 patients.
14 But you can get population based studies that
15 would have a huge number of patients that it would
16 be more important to me as I make opinions
17 regarding adverse events.
18      So does that -- again, I feel like I'm
19 not understanding the question. Are the things in
20 here important? Yes, I think they are important,
21 or they wouldn't be included. Do I think that
22 these are the most important? Well, I think that
23 these are important studies that we should
24 discuss.
25      I agree, I don't want to go itemized line

Page 43

1 by line. I don't want to do that. But, you know,
2 if there's a study of ten patients on a given
3 topic, that might be important for that one point,
4 but not important to everything. It's a
5 composite. That's how medicine is practiced. I
6 feel like I'm missing the -- I don't understand.
7      Q.   I mean, certainly I'm going to have some
8 questions later about, you know, level 1 data and
9 the difference between randomized controlled
10 trials and, you know -- and other case reports and
11 smaller studies. We'll talk about the
12 significance of that later, and I understand that.
13      Let me ask this: Have you read every
14 study listed under the Medical Literature portion
15 of the reliance list?
16      A.   I have certainly referenced all of them.
17 You know, have I read through all of them from
18 front to back? Some I probably reviewed abstract,
19 but many of these, yes, I will have read through.
20 But, again, that's the same way that I would write
21 a manuscript for a journal, right?
22      As we've discussed, there's 24 hours in a
23 day, and I have a lot going on, so am I aware of
24 what's here, and is here important for the
25 reference? Yes, it is, but I don't -- so, yes,

Page 44

1 I'm aware of the information here, and I have read
2 through the information. Some would be skimmed
3 more quickly, and some would be delved into in
4 depth.
5      Q.   You mentioned earlier that you provided
6 some medical literature to Ethicon for them to add
7 to this list.
8      Do you recall that?
9      A.   Yeah. I remember saying that, yes, sir.
10      Q.   When would you have done that, and which
11 of these pieces of medical literature would fall
12 under that category?
13      A.   That I -- I did not keep an itemized
14 list, as we discussed with my billing, but as far
15 as the generation of the drafting of the report
16 goes, when I would generate -- when I would submit
17 the reports to Ethicon, they would compile the
18 information in a materials list.
19      Q.   Without saying that the studies listed or
20 the literature listed on the reliance list are not
21 significant, okay, is it fair to say that the
22 materials, the medical literature, provided in the
23 binders T-3 through T-6 are more significant to
24 your opinions than those from the medical
25 literature on the reliance list that did not make

Page 45

1 it into those binders?
2      A.   I -- I -- I don't know that I can say
3 that. For me, what's in the binders is
4 information that is important, but just because
5 something wasn't cited or referenced doesn't mean
6 that it's not important. It may not have just
7 made the cut for -- for the report.
8      I don't know if that makes sense.
9      Q.   Sure. What was the basis for the cut?
10      A.   For me, the -- I forget the length of the
11 reports. There's somewhere around 15 pages each.
12 As a general -- I mean, you can't put everything
13 in a report. So as far as what's the basis, I
14 think I put in the information that I think is
15 pertinent to the discussion, so -- but I -- does
16 that make sense?
17      Q.   It does. And it may be just semantics
18 that we're circling through here.
19      And again, whether it's no significance,
20 more significant, this isn't a gotcha trap or
21 anything like that. This is simply I'm trying to
22 help my firm and other firms when they see you
23 down the road prepare for that. That's why we're
24 here today.
25      A.   And again, just to be clear, I don't feel

Peter Jeppson, MD, FACOG, FACS

Page 46

1  like you're trying to get me.
2      Q.   Sure.
3      A.   I don't feel like I'm trying to skirt
4  something or that I'm trying to outsmart you
5  because I don't think I can.  I am not a lawyer.
6  I'm just trying to answer the question as you
7  asked, but I think it is important for other
8  lawyers and people asking me things to understand
9  the knowledge that I have can -- is not all
10 completely referenced here.
11          Does that make sense?
12     Q.   Sure.  And that's a different thing.
13 You're saying that the knowledge that you have in
14 forming the basis of your opinions is not just in
15 the reliance list; it's your education and your
16 experience and your experience with patients and
17 other things?
18     A.   That is what I'm saying.
19     Q.   Sure.  And I understand that.  I
20 understand that, and I'm not trying to marry --
21 first of all, you're definitely smarter than I am.
22     A.   I don't think so.
23     Q.   Second, I'm not trying to marry you to
24 your opinion being solely from coming from the
25 documents or items listed in the reliance list as

Page 47

1  T-2, okay?  That's not what I'm doing.  I am
2  simply trying to establish what needs to be
3  reviewed down the road when these cases go to
4  trial.
5          What I don't want to have happen, for
6  example, is there would be some study buried in
7  here that's not in there anywhere that we don't
8  talk about today when I'm asking you what's
9  significant, and at trial, that be the -- what's
10 held up, and we've not reviewed it, or other
11 lawyers have not reviewed it thoroughly.  That's
12 it.  That's all I'm doing, okay?
13     A.   Okay.
14          MR. KOOPMANN:  Just wait for a question.
15     BY MR. BRADFORD:
16     Q.   So -- and with that foundation, I don't
17 know how to ask it other than I've asked it in
18 terms of what's more significant.  I've asked it
19 in terms of what's more important.
20          Are there studies within this reliance
21 list of medical literature that reach a level of
22 importance to you to support your opinions if
23 these cases are tried?
24          MR. KOOPMANN:  Objection.  You can go
25 ahead.

Page 48

1      A.   Sorry.  So I'm not sure that I understand
2  what you're asking.  You're asking if there are --
3  if there's material here that would be important
4  to me that's not in the -- I'm sorry.  I don't --
5  I really didn't --
6      BY MR. BRADFORD:
7      Q.   Sure.
8      A.   I don't understand the difference between
9  what you're asking and what I'm answering.
10     Q.   Dr. Jeppson, would you agree that the
11 studies that are most important to your opinions
12 are contained within the citations to your report
13 and the additional literature of your studies
14 contained within the binders you brought today?
15     A.   Yeah.  I think -- yes, I think that would
16 be a fair statement.  I've included the stuff that
17 would be most important to me in the reports, but
18 that's not everything.
19     Q.   Okay.  Thank you, Doctor.
20          I want to move forward to the portion of
21 the reliance list under Production Materials.
22 It's about two-thirds, three-quarters of the way
23 through it.
24          Dr. Jeppson, contained within what's
25 categorized as Production Materials are many

Page 49

1  internal corporate documents, correct?
2      A.   Yes, sir.
3      Q.   Okay.  Did you do any independent search,
4  dive, look into those internal Ethicon documents,
5  or were those documents that were provided to you
6  by Ethicon?
7      A.   These are documents that were provided to
8  me by Ethicon.  I -- again, for internal
9  documents, really for any corporation, I would not
10 have access to, you know.  I did not --
11     Q.   And that's my point.  You're relying upon
12 Ethicon to provide you whatever internal corporate
13 documents they want you to have, correct?
14     A.   For the internal documents, I would be
15 relying upon Ethicon or Johnson & Johnson based on
16 what they have.  I do think that for this matter
17 it's in their best interest to be transparent.  If
18 they don't provide information to me, then, at
19 some point, it will come out, you know, in trial
20 or whatnot.
21          So -- but, yes, I am assuming that they
22 would be transparent with me in the relationship
23 that has been established.
24     Q.   Regarding internal Ethicon or Johnson &
25 Johnson documents, is it correct that, if they

Peter Jeppson, MD, FACOG, FACS

Page 50

1  don't provide that to you, you can't review it?
2      A.   That is correct, in contrast to the
3  medical literature which is readily available,
4  yes, these would be internal documents.
5      Q.   Is it also correct that Ethicon and
6  Johnson & Johnson choose which internal documents
7  to provide you?
8      A.   So, you know, as I mentioned before, I do
9  think that is true, but I also think that it is in
10  Johnson & Johnson's or Ethicon's best interest to
11  provide all pertinent information so that, as an
12  expert witness, I can have access to that and have
13  reviewed it.
14      Q.   And I agree with you about that, but
15  my -- the question is simpler than that.  Ethicon
16  or Johnson & Johnson choose which internal
17  documents to provide for your review?
18      A.   Like I said, yes, I think that is up to
19  them.
20      Q.   Have you personally reviewed each of the
21  items listed under the Production Materials
22  category of the reliance list?
23      A.   So I think it was probably -- it might
24  have been longer than six months ago for this
25  stuff, but, yes, when I went into -- to agreement

Page 51

1  with Ethicon to be an expert witness, I was
2  provided the information, and I reviewed it.  And
3  that would have been around, you know, this time
4  last year.  I forget when this was signed.  Was it
5  April?
6          So it probably would have been, you know,
7  May-ish or somewhere around there, April or May or
8  somewhere in there that I received the information
9  and reviewed it.
10      Q.   And the time for that would be contained
11  within the billing records you provided me?
12      A.   I don't know that I actually included
13  that time in my billing.  What I included in the
14  billing was everything that I reviewed for the
15  reports and put together for the reports.
16          So -- but, yes, I did spend time going
17  through all of this.
18      Q.   Have you submitted billing invoices to
19  Ethicon other than the one provided here today
20  attached as Exhibit T-7?
21      A.   The invoice for today is related to the
22  expert reports, and so that's what is billed
23  there.  I have provided some review of patients.
24  I've been deposed on Silva, and so that -- that I
25  have done, but not in relation to an expert report

Page 52

1  or --
2      Q.   Maybe I'm not -- if you've worked on
3  Silva, for example, or other case-specific --
4      A.   Yes.
5      Q.   -- what we call case-specific in our
6  business, I'm not interested in that, okay?
7      A.   Okay.  So I have not billed for anything
8  other than case-specific to Ethicon.
9      Q.   Okay.  So the -- your review of the items
10  and documents listed under the Productions
11  Material category of the reliance list -- I just
12  want to be sure I understand -- that's not
13  included in the billing on -- that you provided
14  today, correct?
15      A.   That's probably an oversight on my part.
16  What's included there is, when they asked me to
17  generate an expert report, from that time forward,
18  I tracked the time spent and added to, but I did
19  not go back through.
20          I think in part -- you know, part of
21  doing anything is having the foundation or
22  understanding to be able to do a job.  So I did
23  not go back retrospective to a prior time with
24  this billing.
25      Q.   Do you have any recollection of how much

Page 53

1  time you would have spent reviewing the documents
2  or items listed under Production Materials?
3      A.   I don't recall.  You know, it would have
4  been probably a half day or a day's worth to look
5  through and read them, to skim through and to --
6  to get things, and then I've gone back later, but,
7  yeah, I don't recall.
8      Q.   When you say you've gone back later, what
9  do you mean by that?
10      A.   So I've gone back through and flipped
11  through the folders to look at either particular
12  things or to try to refresh my memory on, you
13  know, certain things, on certain information.
14      Q.   Would that be captured in the billing
15  that you provided?
16      A.   That would be captured in the billing
17  provided.  If it was done during the time that I
18  was generating reports, it would be captured here.
19      Q.   And then I want to move on to the portion
20  of the reliance list regarding company witness
21  depositions.
22          Would you agree there's an alphabetized
23  list of company witness depositions that were
24  taken?
25      A.   Yes, I would agree.

Peter Jeppson, MD, FACOG, FACS

Page 54

1    Q.   All right.  And when would you have
2  received those deposition transcripts?
3    A.   So that would have been back at the
4  beginning as well along with the production
5  materials.
6    Q.   Okay.  And did you read each of the
7  depositions listed in the Company Depositions
8  Witness portion of your reliance list?
9    A.   I reviewed the depositions that I got.  I
10  reviewed all of the information that I received,
11  but this would have been a while ago.  It probably
12  would have been around last April that I reviewed
13  this information.
14    Q.   All right.  And that would not be
15  contained within the billing records you provided,
16  today, correct?
17    A.   That is correct.
18    Q.   And you have not billed Ethicon for that
19  time, correct?
20    A.   If it was pertinent to case-specific,
21  then it would have been billed for the
22  case-specific.
23         Does that make sense?
24    Q.   It does.  And I guess I'm going to need
25  to ask -- I wanted to avoid it, but there's the

Page 55

1  case that you were deposed on obviously, Silva,
2  correct?
3    A.   Yes.
4    Q.   How many other case-specific -- strike
5  that.
6         How many other individual cases has
7  Ethicon hired you to review?
8    A.   I don't remember offhand.  I would have
9  to look.  I would -- I would -- you know, a very
10  rough guess, I would say probably seven or eight,
11  and some, you know, reached settlement before
12  moving to deposition, and others are still
13  ongoing.
14    Q.   Sitting here today, do you have any
15  independent thought or memory as to which of these
16  depositions listed under Company Witness
17  Depositions, if any, would have been relevant to
18  and billed for any of the individual cases you
19  reviewed for Ethicon?
20    A.   That I don't remember, but, again, you
21  know, in reviewing the production list and the
22  deposition list, I view that as necessary to be an
23  expert witness, and if I'm hired by someone to do
24  a job, I need to do my due diligence so that I
25  understand what I'm doing.

Page 56

1         Does that make sense?
2    Q.   Sure.
3    A.   So that wouldn't necessarily -- you know,
4  like I -- just my personality, I wouldn't
5  necessarily track all of that.  It's like me doing
6  my -- investing in my knowledge and ability.
7         Does that make sense?
8    Q.   Yes, it does.
9         How much time did you spend reviewing the
10  depositions provided to you listed under the
11  Company Witness Deposition portion of your
12  reliance list?
13    A.   That, I don't remember.  Ballpark, I'm
14  sure I spent several hours going through it, but
15  I -- you know, was it two hours or four hours?  I
16  don't know.  It wouldn't have been more than a
17  half day I don't think.  I tend to try to be very
18  efficient with things, so my guess would be a
19  couple of hours.
20    Q.   And these deposition transcripts, Ethicon
21  chose which ones to provide you, correct?
22    A.   As we discussed with the production
23  materials, yes, the -- I did not do an independent
24  law search, so they were provided, yes.
25    Q.   All right.  And to save us a little time,

Page 57

1  are the same answers you gave regarding the
2  production materials for internal documents, are
3  those the same answers regarding these deposition
4  transcripts?
5    A.   They would -- they would be very similar,
6  yes.
7         MR. KOOPMANN:  I'm going to object to
8  that last question as vague, but it's fine.
9         MR. BRADFORD:  Yeah.  Let me ask --- I'll
10  go through the questions then.
11  BY MR. BRADFORD:
12    Q.   Dr. Jeppson, Ethicon chose which company
13  witness deposition transcripts to provide to you,
14  correct?
15    A.   They provided the depositions to me, yes.
16    Q.   And they chose which ones to provide to
17  you, correct?
18    A.   That is correct, they did.
19    Q.   All right.  Moving beyond the deposition
20  portion of your reliance list, we -- there's an
21  Other Materials section that the first page looks
22  to be a lot of industry organization -- strike
23  that.  That's not accurate.
24         I don't want to ask you about all these
25  things.  I'm trying to find a general way to go

Peter Jeppson, MD, FACOG, FACS

Page 58

1  through this, okay?
2      So the next page -- or, the first page of
3  Other Materials, that looks to be industry or
4  medical organization presentations or position
5  statements and things like that, correct?
6      A.   Yeah.  And I don't know if there's any
7  industry unless you include the FDA as industry.
8      Q.   That's what I did.
9      A.   But, yeah, essentially these are going to
10 be position statements from medical societies,
11 medical organizations, and then the FDA is
12 basically what's here.  There is some industry as
13 well, yeah, you're right, Boston Scientific.
14     Q.   Okay.  So did Ethicon provide you
15 digital, hard, electronic copies of all of the
16 items listed on the first two and a half pages of
17 Other Materials?
18     A.   So this is -- this is where I get
19 confused, and I don't mean to be hard.  But, yes,
20 they did provide them to me, but many of these I
21 would be aware of, and I would have included to
22 give them which they then compiled and gave back.
23     Does that make sense?
24     Q.   Sure.  Some of this is publically
25 available?

Page 59

1      A.   Yes.  Much of this -- I mean, the vast
2  majority of this is publically available.  All the
3  FDA, all the society position statements, all of
4  this is -- you know, ABOG, all this is going to
5  be, and it will either be publically available or
6  available through membership to the organizations,
7  and I belong to most of these.
8      Q.   Sure.  All right.  I want to move -- I
9  want to look to -- on Other Materials, there's a
10 break, and I've got some notes on here.  You're
11 welcome to see them.  I don't care.
12     But under Other Materials, it is the
13 third to last page, okay?  There's some CFR
14 sections and then Batiste, B-A-T-I-S-T-E, trial
15 opening presentation and some other things.
16     And, again, are these materials that
17 Ethicon provided to you, or did you ask for any of
18 this from them?
19     A.   This list under Other Materials, much of
20 this was provided by Ethicon.  Again, this is
21 pertinent to, I think, understanding the devices
22 and potentially, you know, risks associated or,
23 you know, what was provided to providers, you
24 know, like a lot these -- or, some of these
25 anyways would be things included in the device,

Page 60

1  you know, the device labeling and those types of
2  things --
3      Q.   Sure.
4      A.   -- but the majority of these, yes, were
5  provided by Ethicon.
6      Q.   Okay.  Specifically I want to ask you
7  about, do you know what the Batiste trial is?
8      A.   I don't recall the Batiste trial offhand,
9  no.
10     Q.   That's something Ethicon chose to provide
11 you, correct?
12     A.   That is correct.
13     Q.   You didn't ask for that; did you?
14     A.   I did not.
15     Q.   Do you know why they wanted you to see
16 that?
17     A.   I don't recall.  I'd have to go back and
18 refresh my memory what the Batiste trial is.  Then
19 I can answer that question.
20     Q.   I want to ask about the excerpts from the
21 deposition of Kimberly Kenton, M.D.  Do you know
22 why Ethicon thought you should see that?
23     A.   I don't.  I know Dr. Kenton, but I don't
24 know why those excerpts in particular.
25     Q.   And is the same true for the Heniford DBD

Page 61

1  transcription?
2      A.   Yes.
3      Q.   Do you recall sitting here today what
4  that is?
5      A.   I'd have to refresh my memory.
6      Q.   And do you recall sitting here today what
7  the Pence, P-E-N-C-E, direct slides are?
8      A.   And then, again, my same statement.  I
9  would need to go back and review to refresh my
10 memory.
11     Q.   Is the same true for Perry, P-E-R-R-Y,
12 versus Ethicon closing statement?
13     A.   Yes.
14     Q.   All right.  And there's an additional
15 list of deposition testimony provided here as
16 well, correct?
17     A.   Yes.
18     Q.   And I will represent to you -- well,
19 actually that's not true.  I can't say that, but
20 there are some company witnesses in there.
21     Under the deposition testimony listed on
22 the last -- the second to last page and the last
23 page, those are depositions or portions of
24 deposition testimony Ethicon chose to provide you?
25     A.   Yes.

Peter Jeppson, MD, FACOG, FACS

Page 62

1   Q.   And you reviewed those?

2   A.   I did.

3   Q.   And just so we're clear, this isn't

4   something you asked for Ethicon to give you; they

5   chose to give that to you, correct?

6   A.   That is correct.

7   Q.   And I'm sorry. I misspoke. Just so the

8   record's clear, I said "the second to last page

9   and the last page," and I was wrong. The last

10  page is actually some expert reports from MDL wave

11  cases.

12       Do you see that?

13  A.   Yes.

14  Q.   And did you review those expert reports?

15  A.   I did.

16  Q.   Do you recall how much time you would

17  have taken reviewing those expert reports?

18  A.   I don't recall. Many of these are

19  reports that would have been included with the

20  case-specific. You know, each case would have an

21  expert witness. So I would have reviewed, you

22  know, just looking at the many -- many of them

23  I've seen a couple of times with those

24  case-specific, but I did read through them.

25       MR. BRADFORD: We've been going a little

Page 63

1   over an hour. Let's take a couple of minutes.

2       THE WITNESS: Yeah, sure. Thank you.

3       MR. KOOPMANN: That's what I was just

4   going to suggest.

5       (Whereupon, a brief recess is taken.)

6   BY MR. BRADFORD:

7   Q.   Dr. Jeppson, when Ethicon approached you

8   about becoming an expert in this case, what about

9   that was interesting to you?

10  A.   From my perspective, my concern is that

11  mesh not be an option for patients, and based on

12  the medical literature for midurethral sling and

13  sacrocolpopexy, mesh should be an option. And so

14  I am concerned particularly with the class action

15  lawsuits that were filed in Washington and other

16  states that, if these very good options are taken

17  away from women, we will set ourselves back, you

18  know, 20, 30 years in what we can offer patients.

19       And so, from my perspective, you know,

20  essentially the opinions in that that I have

21  provided are in line with all of the national and

22  international organizations, and so I want to

23  report that there are benefits of these options

24  for patients. That's what's appealing to me.

25  Q.   I'm sure you're aware -- I would like to

Page 64

1   say three weeks ago, but it was probably six weeks

2   ago now -- that the synthetic mesh vaginal POP

3   kits are no longer allowed to be used; you're

4   aware of that?

5   A.   That was mid April, yes.

6   Q.   Time goes.

7   A.   Yes.

8   Q.   Have you heard amongst your colleagues

9   any discussion about a similar fate for synthetic

10  meshes for stress urinary incontinence implanted

11  vaginally?

12  A.   There have been discussions about that

13  for quite a while actually, but since the report

14  came out on -- and it's the banning of the sale of

15  pre-made kits to be used transvaginally. But

16  after that came out, AUGS put out two -- they're

17  not position statements, but the president of AUGS

18  put out two statements regarding mesh. AAGL did

19  as well. That's two As and a G and an L. AAGL

20  did as well.

21       And the second issue from AUGS was

22  specific to discussions that were had by AUGS

23  leadership and the FDA. And one of the points in

24  that communication was specific to the concern

25  that many providers have in the United States that

Page 65

1   midurethral slings will be taken from the market.

2       That is not what the FDA said, but there

3   is concern that that could be a -- you know, an

4   indicator of things to come. And the medical

5   community, I would say is -- the vast majority of

6   the medical community would not agree with that

7   based on the evidence and what has been published

8   regarding slings in particular.

9   Q.   Do you have any understanding as to the

10  prevalence of midurethral synthetic sling use over

11  time?

12  A.   Well, it has increased over time. It

13  was -- I mean, it was first reported in the '90s,

14  right, and so prior to that, it wasn't available.

15  And now, I mean, the position statements are that

16  it's the standard of care for most women.

17  Q.   Do you have any -- strike that.

18       TVT came on the market in 1998?

19  A.   Yeah. It was around '97, '98, somewhere

20  around there.

21  Q.   And TVT-O came on the market in 2004?

22  A.   So, yeah. So the Monarc, I think, was

23  2001 or so, but, yeah, so around that, the late

24  '90s, early 2000s.

25  Q.   Sure. The first midurethral slings were

Peter Jeppson, MD, FACOG, FACS

Page 66

1  the retropubic slings that came on the market,
2  right?
3     A.   Yes.
4     Q.   And then after that came different
5  companies' versions of transobturator slings?
6     A.   And other slings in general, yes.
7     Q.   Right.  And then after that came the mini
8  slings?
9     A.   And then mini slings came later, yes.
10    Q.   Okay.  From 1998 to 2019, do you have any
11 understanding as to the prevalence of synthetic
12 midurethral sling usage in the country?
13    A.   Do I have, like, a number treated per
14 year?
15    Q.   Sure.
16    A.   I don't recall that offhand.  I'd have to
17 look.
18    Q.   Or any understanding of any trending or
19 trendline in the use of midurethral slings for
20 stress urinary incontinence.
21    A.   So midurethral slings would have started
22 out being done by a few, kind of the trailblazers
23 and then early adopters, and then it would have
24 increased.  I will tell you from experience, based
25 on in part the FDA issuance of mesh in general,

Page 67

1  but then all of the advertisements and everything
2  that go along with that, I often see patients who
3  tell me they don't want mesh even though they
4  really don't know what it is or what that means.
5         So I would suspect that, if you were to
6  look at a trend, you would see a pretty sharp
7  increase in mesh with the 2008 FDA, and then the
8  2011 and the 2016, I suspect there's probably been
9  a little bit of a plateau or perhaps a decrease
10 would be my guess, but I would have to look at
11 that data.
12    Q.   Thank you, Doctor.
13         I have the benefit of being provided your
14 CV.  I've got a copy.  Do you have a copy of it?
15 You probably don't need it, but I've got a copy of
16 it.
17         MR. KOOPMANN:  It's in one of his
18 binders.
19         MR. BRADFORD:  I've got a copy handy.
20    A.   You can ask me.
21 BY MR. BRADFORD:
22    Q.   You probably know it, but there you go,
23 just in case.
24         I want to go through your background a
25 little bit, not in much detail, more focused on

Page 68

1  your medical training and your training through
2  residency and others that led you to be a
3  urogynecologist as you are today, okay?
4     A.   Okay.
5     Q.   When did you start medical school?
6     A.   2002.
7     Q.   All right.  When did you graduate medical
8  school?
9     A.   2006.
10    Q.   And what specialty did you decide to
11 enter into?
12    A.   Do you want, like, my whole backstory, or
13 you just want a quick --
14    Q.   Give me the cliff notes.
15    A.   So in medical school, I went through many
16 different options trying to decide what I wanted
17 to.  At the end of medical school, I was thinking
18 about either becoming a urologist or becoming an
19 OB/GYN.  The OB/GYN route was more appealing to me
20 because at the time I was considering reproductive
21 endocrinology and fertility or urogyn, and OB/GYN
22 kept both options open.  When I got into
23 residency, I actually chose to do urogynecology.
24    Q.   All right.  And you did your residency at
25 Cleveland Clinic?

Page 69

1     A.   I did Case Western Reserve MetroHealth
2  and Cleveland Clinic.  It was a combined program.
3     Q.   All right.  And then you did an
4  additional fellowship?
5     A.   Correct.  I did three years at Brown
6  University.  The hospital affiliated is Women's &
7  Infants, and I was there from 2010 to 2013.
8     Q.   All right.  I want to ask you about your
9  experience in treating stress urinary incontinence
10 and do that by time frame.
11         Okay.  So when in the course of your
12 medical school or residency or fellowship did you
13 have the occasion to first encounter patients who
14 were suffering from stress urinary incontinence?
15    A.   So it would have been as a third-year
16 medical school student in St. Louis.  I feel that
17 I was fortunate to have had the opportunity to
18 rotate with urogynecologists as a student.  That
19 would have been -- I don't remember exactly when
20 that clerkship was.  It would have been around
21 2004, maybe late 2004, early 2005.  It would have
22 been 2004.
23         And then I did a sub-I on urogynecology,
24 and that would have been in early 2005.  And
25 that's just additional -- an elective where you

Peter Jeppson, MD, FACOG, FACS

Page 70

1 spent more time with a particular field to get a
2 better idea of what it is and to decide if you
3 might want to do that.
4    Q.   All right.  And what -- actually, I
5 don't -- during that time frame before your
6 residency, what treatment options were you taught
7 or told about regarding stress urinary
8 incontinence?
9    A.   So as a medical student, I would have
10 learned about the options available at the time,
11 the midurethral sling, the Burch procedure, the
12 MMK, which predated the Burch, but is very
13 similar, and then pubovaginal slings.
14       At the time -- I'm trying to remember --
15 I'm pretty sure they were doing periurethral
16 bulking as well and then all the nonsurgical
17 options, right, like pessaries.  I know that I saw
18 pessaries as a medical student.  I know they
19 talked about Kegels in didactics and lectures.
20       So I don't know if you want me to focus
21 specific on surgery, but, you know, we covered --
22 you know, as a medical student on the clerkship, I
23 would have had learning objectives that would have
24 incorporated those, and then certainly on my sub-I
25 I did.

Page 71

1    Q.   Right.  And I am interested in both the
2 surgical and nonsurgical options, so I appreciate
3 you going through that.
4       Any other nonsurgical options?
5    A.   So are you asking at the time of being a
6 student or just in general now?
7    Q.   At the time of being a student first.
8    A.   That is a long time ago.
9    Q.   All right.  Let me skip ahead.  It
10 doesn't matter.
11    A.   Because a lot of that gets contaminated
12 because I just published a systematic review on
13 the nonsurgical treatment of urinary incontinence,
14 both stress/urgent mixed, so...
15    Q.   All right.  Let's skip ahead to your
16 residency.  Did you treat patients with stress
17 urinary incontinence during your residency?
18    A.   Yes, sir.
19    Q.   All right.  And what did you use?  What
20 did you do?
21    A.   So at the time, again, the -- there would
22 have been the nonsurgical treatments that we just
23 discussed, Kegels, behavioral modifications,
24 physical therapy, pessary.
25       In addition to the nonsurgical options,

Page 72

1 surgeries, at the time as a resident, I saw many
2 midurethral slings, both retropubic and
3 transobturator.  I also saw pubovaginal slings or
4 the -- some people call them fascial slings.  And
5 they were also doing some Virtues -- I'm trying to
6 think -- and periurethral bulking.  I saw those as
7 well.  They were using Coaptite at the time.
8    Q.   Early on during your residency, did you
9 favor any specific -- as to the surgical
10 techniques, did you favor any one over the other?
11    A.   You know, at the time, I -- mini urethral
12 slings were the most common at the time, and
13 again, being at the institutions I was, there were
14 ongoing NIH funded studies looking specifically at
15 midurethral slings and other treatment options.
16       But my opinions -- you know, it's hard to
17 go back and reflect on things in a vacuum because,
18 you know, this would have been in, you know,
19 2000 -- the first time I would have seen a sling
20 in residency probably would have been 2006 or '7,
21 but there's just been so much experience since
22 then.  It's hard to disassociate the two.
23       But midurethral sling has kind of always
24 been the gold standard treatment everywhere I've
25 been unless there were, you know, indications not

Page 73

1 to or if the patient doesn't want it.
2    Q.   When did you first hear midurethral
3 slings referred to as the gold standard?
4    A.   It would have been -- I don't think they
5 would have talked about that in St. Louis,
6 although they may have.  I don't remember.
7 Certainly in residency it was a discussion.
8 That's why most people got midurethral slings.  If
9 Burch or pubovaginal slings had been the best
10 option at the time, it would have followed the
11 evidence.
12    Q.   Are you familiar with the first piece of
13 medical literature that referred to midurethral
14 slings as the gold standard?
15    A.   I don't know.  I -- I don't remember
16 which one was the first one, so I don't know if I
17 do or don't.
18       Do you remember?  Are you asking about
19 one in particular?
20    Q.   I'm sad to report that I do.
21    A.   Yeah.
22    Q.   Do you know who authored that study?
23 Strike that.  That was a bad question.
24       Do you know who authored that piece of
25 literature?

Peter Jeppson, MD, FACOG, FACS

Page 74

1    A.   The first one that referred to it as a
2  gold standard?
3    Q.   Yes, sir.
4    A.   I don't.
5    Q.   And do you know what basis or citation
6  was given for midurethral slings to be referred to
7  as the gold standard in that first piece of
8  literature referencing it as the gold standard?
9    A.   I'd have to go back and look.  I don't
10 know which was the first.  I know there have been
11 many, many since then, including systematic
12 reviews that corroborate the findings.
13       So from forming medical opinions, I
14 suppose it's not that important to me to know who
15 first coined the phrase "gold standard," but the
16 fact that it's supported by all other medical
17 literature that I've looked at, you know, is what
18 I guess I base my opinion on.
19   Q.   When did you first start implanting
20 midurethral slings?
21   A.   So performing them would have been as a
22 resident, so probably 2007, 2008.
23   Q.   Do you recall which specific
24 manufacturers and which device you would have
25 implanted?

Page 75

1    A.   So at the time, AMS was still using the
2  Monarc.  We -- and Monarc was -- they were all
3  involved in studies at the time, but certainly I
4  used Monarc.  We used Ethicon's TVT, the original
5  TVT.  They were also using the TVT-O.  And I think
6  that was it.
7    Q.   All right.  Since that time, have you
8  implanted other different midurethral slings?
9    A.   Yes.
10   Q.   Tell me -- just list the ones that you've
11 used, and as best you can, when you've used them.
12   A.   So that was residency.  In fellowship, we
13 did some Monarcs, but they were doing more TVT-Os
14 or TVT-O Abbrevos.  And this is 2010 to 2013.  We
15 were also using the kind of standard TVT.
16   Q.   Any others?
17   A.   At the time, that was what we were using.
18   Q.   What about since then, moving from your
19 fellowship into your private practice?
20   A.   So since that time -- I operate at two
21 different hospitals.  One of the hospitals still
22 uses the Ethicon TVT.  It also has the Boston
23 Scientific Advantage Fit.
24       The other hospital where I work more
25 commonly -- or, where I operate more frequently I

Page 76

1  should say is they had the Boston Scientific
2  Advantage Fit.  Recently the hospital changed from
3  Advantage Fit to the Desara Blue, both regular and
4  the TV, which is a Caldera product.
5    Q.   And you mentioned that's the hospital you
6  do more of your surgeries at.
7    A.   Uh-huh.
8    Q.   Which hospital is that, and why do you do
9  more surgeries at one over the other?
10   A.   Just based on schedules.  There's five
11 urogynecologists here in New Mexico, accommodating
12 for or time for everyone involved having different
13 people at different places.  That hospital is
14 Sandoval Regional Medical Center.  It's up in Rio
15 Rancho, so -- I don't know -- a half hour north of
16 UNM.  And I live near there than many of my
17 colleagues, so I see patients in the clinic and
18 operate there.
19   Q.   And you entered private practice in 2013?
20   A.   So I entered -- university practice, is
21 that what you mean?
22   Q.   I appreciate the distinction because it
23 is an important one.  You left your fellowship and
24 entered university practice in 2013, correct?
25   A.   That is correct.

Page 77

1    Q.   And you've been affiliated with the
2  University of New Mexico since then?
3    A.   Yes, sir.
4    Q.   Okay.  Since you left your fellowship and
5  entered the university practice, how many
6  midurethral slings have you implanted?
7    A.   I don't know.  It's a very common
8  procedure.  I would guesstimate hundreds, if not
9  thousands, but I don't know that.  That's a guess.
10   Q.   And of those -- we can answer by number
11 or percentage, whatever is easiest for you for
12 each device.  How best could you tell or explain
13 that to me?
14   A.   So since graduating, just based on what
15 they have at the hospitals, you know, just -- I
16 would say off the record, if we weren't having a
17 conversation that's on the record, but I think
18 TVT, the original TVT, is still my preferred use
19 because that's, you know, what I used the most in
20 training.
21       Since being here in New Mexico, what I've
22 used the most is the Boston Scientific Advantage
23 Fit because that's what they've had at the
24 hospital.  You know, if you were to ask me in
25 three years, it would probably be the Desara

Peter Jeppson, MD, FACOG, FACS

Page 78

1 because we've, you know, recently switched to
2 that. So at some point, those numbers will catch
3 up and then surpass.
4        From my perspective, it's not necessarily
5 important the brand or the manufacturer. It's
6 really the placement of the -- the mesh that
7 works, so...
8        If, you know, somebody were to approach
9 the hospital and provide them a better cost than
10 the Caldera, I would go with them. I presume that
11 they have similar data.
12    Q.   Have you implanted a TVT-O since you left
13 your fellowship in 2013 and went into university
14 practice?
15    A.   TVT-O, I have not.
16    Q.   Have you implanted a TVT Abbrevo since
17 you left fellowship and went into private
18 practice?
19    A.   I have not, but only because they don't
20 have it at the hospital. And as far as the TOT
21 option goes, I prefer the Abbrevo actually. I
22 prefer the in to out.
23    Q.   Over all other transobturator slings?
24    A.   Again, I think that they are similar, but
25 just for me personally, yes, I would -- I just

Page 79

1 like -- I like the in to out. I like the
2 dissection doesn't have to be as big. You don't
3 have to get your finger in to feel it coming
4 through, and I feel it's a very good option.
5    Q.   Do you agree the Abbrevo is a mini sling?
6    A.   I think that the Abbrevo is a shorter
7 sling. I would not categorize it as a mini sling.
8 I think it's different than the mini slings.
9    Q.   Have you ever authored an article that
10 referred to the Abbrevo as a mini sling?
11    A.   I've authored -- I've been a coauthor on
12 a manuscript that looked at the TVT-O Abbrevo. I
13 don't recall if it was mentioned as a mini sling
14 in that manuscript. It may be. I think that it
15 depends on how you define mini sling.
16        And you know, it's not the full length
17 sling that is cut at the skin after implantation.
18 It's shorter than that. But it's not -- you know,
19 it doesn't have a pledget or something on the end
20 that you're sticking into a membrane or something
21 to hold it in place because, you know, like the
22 Contrasure or the TVT securities are the kind of,
23 you know, traditional, more -- I think what I
24 would refer to more commonly as a mini sling.
25 It's -- I think the mesh goes through the

Page 80

1 obturator membranes in that. I think it goes
2 further out.
3    Q.   How long is the TVT retropubic?
4    A.   I don't remember. I'd have to look at
5 the -- I'd have to look at it. And it's -- I
6 don't know how long that is.
7    Q.   All right.
8    A.   It's long enough to go through the
9 periurethral tissue, retropubically come out of
10 the pubic -- the suprapubic incision sites and
11 still extend beyond that, even in obese patients,
12 but I don't know the length.
13    Q.   All right. And do you know the length of
14 the TVT-O device?
15    A.   So the TVT-O, not the Abbrevo, would be a
16 similar length, in my opinion, because it also
17 comes all the way out through the groin incisions,
18 but, again, I don't know the full length.
19    Q.   Do you know the length of the TVT
20 Abbrevo?
21    A.   The TVT Abbrevo is shorter, and I would
22 have to look at that as well. The number -- it's
23 somewhere around -- 10 centimeters is the number
24 in my brain. It might be a little bit more or a
25 little bit less than that.

Page 81

1    Q.   It's 12. I'll represent to you that it's
2 12.
3        Since you've left -- strike that. I need
4 to lay a foundation.
5        During your fellowship, did you perform
6 any Burch procedures?
7    A.   Yes.
8    Q.   How prevalent was your Burch procedure
9 implant use during your fellowship?
10    A.   It was not -- it was not uncommon. We
11 probably did about as many Burches as I did
12 pubovaginal slings. The midurethral sling was
13 still the mainstay, but I did some pubovaginal as
14 well as some Burches. I don't recall the number
15 offhand.
16    Q.   Roughly, what percentage -- strike that.
17        Before we get there, did you perform MMK
18 during your fellowship?
19    A.   So MMK is different than Burches
20 essentially in where you place the sutures at the
21 pubic symphysis. So there is a some data that MMK
22 have higher risk as far as osteitis pubis because
23 you're putting the needle into the periosteum.
24        The Burch, you go a little bit more
25 laterally and put it into Cooper's ligaments. So

Peter Jeppson, MD, FACOG, FACS

Page 82

1 could I do an MMK? I'm certain that I could, but
2 I would choose to do a Burch over that.
3   Q.   Have you ever done an MMK?
4   A.   I have not. I've seen them done. I have
5 not done them, but the technique would not be
6 different. You're still in the same place. It's
7 just where you place your suture.
8   Q.   And during your fellowship, did you use
9 bulking agents?
10   A.   Yes.
11   Q.   And how -- is that something that you did
12 often?
13   A.   I did them more frequently in fellowship
14 than I do now.
15   Q.   All right. I'm going to ask you by
16 percentage if you can answer this for me, okay?
17     By percentage, if we look at midurethral
18 slings -- let me strike that.
19     I'm going to ask you some questions about
20 your fellowship, during your fellowship time
21 period, the surgical treatment for stress urinary
22 incontinence, okay?
23   A.   Okay.
24   Q.   Okay. And I'm going to ask about
25 midurethral slings, Burch, pubovaginal sling, MMK

Page 83

1 and bulking agents. If you could describe by
2 percentage --
3   A.   How many?
4   Q.   -- how many.
5   A.   So the thing with percentages is it's
6 proportion, right, so I think, to set the
7 foundation for this discussion, it's important to
8 state that I trained at a high volume center. As
9 far as urogynecology goes, I feel very fortunate
10 to have trained at premier institutions, Cleveland
11 Clinic and then Brown. At the time, most people
12 considered those to be one and/or two as far as
13 the best training facilities for what I do in the
14 country.
15     Number of cases per year, I don't
16 remember, but I did have to keep a case log as
17 part of being a trainee. We did a lot of slings.
18 I probably -- I probably -- you know, out of
19 everything, it was probably maybe 85 percent sling
20 would be my guess, and this is midurethral sling.
21 And I'm not differentiating between transobturator
22 versus retropubic. That would be hard for me to
23 do, and it would probably be a 50/50 breakdown
24 there, but I would have to think about that.
25     As far as the next most common option,

Page 84

1 probably periurethral bulking would be my guess.
2 Probably somewhere around 5 percent. I know my
3 numbers aren't going to add up. And then Burches
4 and pubovaginal slings would have been less
5 common, and I don't -- I don't know a percentage
6 for those. They would have been a little less
7 common than bulking, so maybe, you know, 3 percent
8 each or something like that, but that doesn't add
9 up to a hundred.
10   Q.   It's okay. It's close enough. It
11 describes it well enough for the purpose of my
12 question.
13     Now I want to ask you the same questions
14 in your university practice since you left your
15 fellowship.
16   A.   So in the systematic review that was just
17 published, we did include periurethral bulking as
18 part of that. The periurethral bulking did not
19 have very favorable outcomes. I don't do a whole
20 lot of bulking. Bulking is thought to be more
21 transient, and there are complications associated
22 with it. So I do offer bulking, but I don't
23 perform it very often, and that's by choice.
24     The -- you know, I probably still -- I
25 don't know. Probably -- I'd say I'm probably

Page 85

1 still 85 percent sling would be my guess. I'm
2 probably 10 percent Burch, and I'm probably, you
3 know, 5 percent pubovaginal sling or maybe a
4 little less than that.
5   Q.   In your personal experience in your
6 hands, since you've been in university practice,
7 how do they compare?
8   A.   In general, my patients do very well. I
9 think that there are different indications for
10 different patients. The climate that we are in, I
11 will often see patients who don't want mesh.
12     And -- you're from Florida?
13   Q.   Yes, sir. Panhandle, Pensacola.
14   A.   So New Mexico, just patient-wise, is kind
15 of like Vermont, New Hampshire or Oregon. It's
16 just a little more granola kind of like. You
17 know, naturopathic kind of stuff happens a lot
18 here. So some is patients come in, and they
19 simply don't want mesh, and so, for them, I offer
20 a pubovaginal sling or a Burch.
21     For patients who have had mesh before and
22 had problems with mesh or have a family member who
23 had problems with mesh, they also don't want mesh,
24 and I would offer them a Burch as well. But,
25 again, you know, the predominant thing that I do

Peter Jeppson, MD, FACOG, FACS

Page 86

1 is midurethral sling. Having used different
2 brands, you know, again, I'm not married to a
3 brand. It's really more the placement of the
4 device that I think is helpful, if that makes
5 sense.
6    Q.  Sure. You mentioned that your patients
7 do very with all the procedures. Strike that.
8       You don't like bulking agents, but as far
9 as the midurethral sling versus Burch or
10 pubovaginal sling, they do very well?
11    A.  So as a general rule, yes. I mean, that
12 is not to say I don't have complications.
13 Everybody does, and not every patient is
14 completely cured. I wish they were, but that's
15 not the reality of life for medicine.
16       But in general, yes, patients do well.
17    Q.  Do you agree the risk profiles are
18 different for synthetic midurethral slings as
19 compared to Burch or pubovaginal slings?
20    A.  Yeah. I think that the literature
21 supports that.
22    Q.  And does your personal experience support
23 that also?
24    A.  Unfortunately there are no surgeries that
25 do not have risks, and so it's just a matter of

Page 87

1 which risks you're assuming with different
2 procedures.
3    Q.  Have you ever done a partial or total
4 mesh removal?
5    A.  I have.
6    Q.  Okay. I want to talk to you about your
7 experience with removing synthetic meshes. When
8 did you first do that?
9    A.  So when I was a medical student, I saw a
10 mesh removed. I don't remember the brand. At the
11 time, it was a transvaginal mesh. I saw a few of
12 those. As a resident, I saw mesh removed as well
13 and as a fellow.
14       As a fellow, we did a decent amount of
15 mesh removal mostly referred in from other
16 providers that were fashioning their own mesh.
17 They weren't using a particular product, and they
18 were placing it incorrectly, and it led to
19 problems for patients, and so we would take it
20 out.
21    Q.  So that would not be the midurethral
22 slings we've been talking about today; that would
23 be a --
24    A.  A self --
25       MR. KOOPMANN: Hold on.

Page 88

1 BY MR. BRADFORD:
2    Q.  Sorry. Let me finish my question. We've
3 done so well with this. It's okay. We're doing
4 just fine.
5       When you say they would fashion it
6 themselves, what do you mean by that?
7    A.  They would take a sheet of mesh and cut a
8 portion, and then I don't know if they were using
9 a staining needle, and I don't know because I
10 didn't do it with them. They were, you know, a
11 provider in the community, and they were -- I
12 don't know if it was top down or bottom up, but
13 they -- the mesh was placed in a way that caused
14 problems for patients.
15    Q.  Did that just happen to occur in the
16 geography or geographical area close to where you
17 were doing your fellowship?
18    A.  It did for the first two years, and then
19 that provider moved, and the complications
20 stopped.
21    Q.  Okay. During your fellowship, did you
22 have the occasion to remove totally or partially
23 midurethral slings from one of the sling kits?
24    A.  Yes.
25    Q.  Okay. And how often did you do that?

Page 89

1    A.  As a referral center, you know, we would
2 get cases from all over the region. How often did
3 I do them? I don't know. It was not -- I did it
4 enough that I was very comfortable with it, but I
5 don't know a percentage.
6    Q.  Not speaking to the one particular doctor
7 who apparently there was a problem with, more the
8 traditional mesh kits, do you have an estimate as
9 to many total or partial revisions you would have
10 done as a fellow?
11       MR. KOOPMANN: Objection to form.
12    A.  I don't recall. It was -- again, it
13 was -- it was -- it was not -- I don't know the
14 number. I don't actually remember. It was not --
15 I would -- how many would I have done in all of my
16 training?
17       And we're just talking midurethral sling,
18 or we're talking any mesh type?
19 BY MR. BRADFORD:
20    Q.  Well, that's actually a good point.
21 Let's broaden it out to the POP kits also.
22    A.  So any, probably, as a fellow, I would
23 probably do one a month would be my guess. So in
24 three years, probably somewhere in the range of
25 40, something like that.

Peter Jeppson, MD, FACOG, FACS

---

Page 90

1    Q.   Sure.  And that's my next question.  I
2  was going to see if we could talk briefly about
3  that, if there would be a way to do it.
4        Same question for your time in university
5  practice.  Do you do total or partial synthetic
6  mesh removal?
7    A.   It depends on the patient and what type
8  of mesh they have and what's going on with the
9  patient.
10        At the university practice, we are the
11 referral center for the region, so we get patients
12 from New Mexico, parts of Arizona, parts of Texas,
13 you know, surrounding states.  You know, patients
14 will often travel four or five hours one way to
15 come in.
16        Because of that, I think that there may
17 be -- well, I know there are people that are doing
18 things perhaps they don't do very often or perhaps
19 shouldn't do, and so I do get referrals from mesh
20 issues and mesh complications, both of the
21 transvaginal mesh as well as the sacrocolpopexy
22 mesh as well as the midurethral sling mesh.
23        Going in to take those out, it often
24 seems apparent to me that the mesh was not placed
25 correctly.  If I remove mesh and it's in front of

---

Page 91

1  the pubic ramus, that's not where it's supposed to
2  be, so it does not surprise me that the patient
3  would be having pain or issues.
4        From within my own practice, it is a rare
5  occurrence to have problems with the slings.  That
6  is not to say that I always place them correctly
7  or that my partners do.  On occasion, I've had to
8  go back and release a sling.
9        You asked about removing mesh in its
10 entirety versus partially.  I think it depends on
11 what's going on with the patient.  For patients
12 that are having pain issues from mesh, I tend to
13 try to remove as much as I possibly can.  For
14 patients that are having obstructive voiding
15 issues or other things like that, there is data to
16 suggest that potentially only taking out a small
17 portion and not all of it may actually lead to
18 better continence down the line.
19        That said, I discuss the options with the
20 patient, and I give them the option of me removing
21 as much mesh as possible versus removing just a
22 portion of.  I don't know if you want me to
23 expound on how I do that or --
24    Q.   Sure.  Well, before you do, monthly, how
25 many partial or total mesh removal surgeries do

---

Page 92

1  you do on average monthly?
2    A.   I would say I probably average one a
3  month.  And the midurethral sling removals, those
4  kind of blend together because they're fairly
5  straightforward and simple.
6        If I'm taking out mesh because someone
7  dissected and placed it in the bladder, those tend
8  to be much more memorable.  Or if they dissected
9  through and the whole mesh is coming through the
10 vagina, those are also memorable.  But I would
11 say, on average, about once a month.
12        For the midurethral sling removal, I
13 would start with a vaginal incision and would take
14 the mesh out vaginally.  If it was a
15 transobturator sling, the Savada who practiced and
16 practices at the Cleveland Clinic published, you
17 know, back in like 2001 or '3, somewhere back
18 there, that you can often just take the mesh and
19 roll it around a clamp, and you can bring it back
20 through the obturator space.  I have done that
21 successfully.
22        Retropubically, if patients want all the
23 mesh out and allow for a laparoscopic procedure
24 similar to laparoscopic Burches that I do, you can
25 make an incision through the perineum, which are

---

Page 93

1  laparoscopic, release the bladder down from the
2  retropubic space, and you can take the mesh out
3  from the retropubic space.
4    Q.   Dr. Jeppson, do you also in your
5  university practice treat stress urinary
6  incontinence -- patients with stress urinary
7  incontinence nonsurgically?
8    A.   Of course.
9    Q.   And what -- since you've been in the
10 university practice, what nonsurgical options do
11 you offer?
12    A.   So I offer patients everything for --
13 anything that's been published that has data I
14 would offer patients, so Kegel exercise.  There's
15 over-the-counter Impressa which is made by Poise.
16 It's like a tampon made specifically for stress
17 incontinence.  There's different pessaries that
18 can be used.  Pelvic floor physical therapy, we
19 have therapists that work with us.  Those are the
20 things that come to mind.
21    Q.   How do your patients generally do with
22 the nonsurgical stress urinary incontinence
23 treatments?
24    A.   I would say that my experience is similar
25 to the published data.  It depends on the severity

---

Peter Jeppson, MD, FACOG, FACS

Page 94

1 of symptoms and what's going on with the patient.
2 It also depends on the timing of the complaint.
3      If a patient has just had a baby and they
4 have stress incontinence, it's probably going to
5 improve over the course of the next six months to
6 a year.  There's data that physical therapy would
7 help that, but, you know, those will get better.
8      In general, stress incontinence will get
9 worse with age, and so, you know, a lot of
10 patients, as I've discussed, prefer holistic or
11 nonsurgical options, and so they will come in --
12 and I can't say that all, but I'd say the majority
13 of patients would prefer a nonsurgical treatment
14 to start, so I offer those, and they try that.
15      When those fail or if they aren't as
16 successful as the patient would like, then they
17 come back, and we discuss additional options.
18  Q.   What percentage of your patients if
19 offered nonsurgical options end up satisfied
20 enough to not make it forward to have surgery?
21  A.   That's a good question.  I would --
22 would -- I think my gestalt is probably 60 percent
23 of patients that come in elect for a nonsurgical
24 to start.  Probably 40 percent or so would go
25 straight for surgery, but many of those will have

Page 95

1 already tried nonsurgical options by their
2 referring providers.
3      Of those that choose nonsurgical options,
4 I don't know.  Again, it depends on the patient
5 and, you know, what their goals are, and if
6 they're, you know, trying to get back to running
7 marathons or back to cross-fit, they're much more
8 motivated than if they, you know, want to be able
9 to jump on the trampoline, you know, once a year
10 with their grand kid.  So I don't know.  Maybe 20
11 percent, 40 percent would perhaps not move on.
12 That be would my guess over the course of their
13 life.
14  Q.   Has your informed consent for midurethral
15 slings changed over time from when you first
16 started doing them as a fellow to now?
17  A.   That -- I don't think so.  The FDA
18 notices came out in 2008 and 2011, both of which I
19 was in training for.  You know, I discuss options
20 with patients.  You know, they include non-mesh as
21 well as mesh.  I don't think it's changed a whole
22 lot.
23      The conversation has perhaps become more
24 involved as patients have become more aware.  I
25 think that has probably occurred, but I think the

Page 96

1 risks that I would discuss with patients, I think,
2 you know, is more or less unchanged.
3  Q.   As part of your informed consent for
4 patients who are considering midurethral slings,
5 do you discuss with them the mesh-related risks of
6 the procedure?
7  A.   I do tell them that it is a mesh
8 procedure, and I do tell them there are risks
9 associated with mesh.
10  Q.   And what risks do you tell your patients
11 are associated with mesh when you're doing an
12 informed content for a midurethral sling?
13  A.   So in general, the risks associated with
14 mesh -- I mean, there are risks with any surgery,
15 right?  So typically, when I'm counseling, I'm
16 offering them mesh versus non-mesh, and so often I
17 will lump the initial counseling because there's
18 risk of bleeding.  There's risk of infection, you
19 know, all those things that are common to surgery
20 in general.  Those would go along with the
21 pubovaginal sling and the Burch as well and
22 recurrent UTIs, voiding dysfunction.  I mean,
23 those are kind of across the board.
24      Specific to mesh, there are risks of
25 mesh, risks of, you know, obstructive voiding

Page 97

1 patterns.  There's risks of the procedure not
2 working.  They could still leak.  There's risks of
3 developing pain or dyspareunia, you know, pain
4 with intercourse.  There are risks of mesh
5 exposure or erosion.  There are risks of mesh
6 getting into structures that it shouldn't be in,
7 the vagina or the bladder, and then very rare
8 risks, you know.  But, you know, ureteral injuries
9 have been reported.  You know, large vessel
10 injuries have been reported.  Those are very
11 uncommon.
12  Q.   You've not experienced any of those with
13 your patients, I wouldn't expect, the ureteral or
14 a major blood vessel injury?
15  A.   I have not.
16  Q.   I just want to be clear.  You mentioned
17 pain and dyspareunia.  Are those separate
18 mesh-related risks that you mention to your
19 patients?
20  A.   They can be separate.  Some patients only
21 have pain with intercourse, and if they have an
22 erosion or exposure, sometimes their partner will
23 report, you know, discomfort during intercourse,
24 but some patients will just have pain at baseline.
25      But, again, that's true after any

Peter Jeppson, MD, FACOG, FACS

Page 98

1 surgery, and that occurs after, you know, vaginal
2 prolapse or vaginal hysterectomy cases as well.
3    Q.   Certainly there can be pain from any
4 surgery, but would you agree that there can be
5 pain associated with mesh implantation?
6    A.   I would agree with that, just like with
7 any surgery.
8    Q.   Well, I'm asking a little different
9 question.  I'm not talking about a general surgery
10 risk of pain.  I'm talking about a risk specific
11 to mesh.
12    A.   There is a risk specific to mesh, and
13 that's in the published literature as well.
14 Again, just like with other procedures, there is
15 surgery-specific risks.
16    Q.   This is an important issue, so I want to
17 be sure we're not going in a circle here.
18        There's a surgery -- general surgery risk
19 of pain with surgeries, correct?
20    A.   Uh-huh.
21    Q.   And with mesh itself, in addition to the
22 general surgery risk of pain, there's also the
23 risk of mesh-related pain; isn't there?
24        MR. KOOPMANN:  Objection.  Go ahead.
25    A.   So I mean, there is, right.  Any time you

Page 99

1 implant -- any time you use an implant, there is a
2 risk of pain, and that's true for, you know, any
3 implant.  You know, again, I think that -- what I
4 would say is, you know, Burches and pubovaginal
5 slings also carry risks, right, so when I'm
6 counseling the patient or discussing these risks
7 with a patient, it's not like, you know, you can
8 have mesh which has pain, or you can have this
9 other surgery that has no risks with pain.
10        There are risks associated with any
11 surgery.  So if you're asking, is there a risk
12 specific to surgery, the answer is yes, we've
13 discussed.  Is there a risk associated with mesh
14 in particular?  Yes, there is a risk of that.
15 BY MR. BRADFORD:
16    Q.   You would agree that the synthetic
17 midurethral slings are designed to be permanent
18 implants?
19    A.   I would agree with that, yes.
20    Q.   And would you agree that patients who are
21 implanted with midurethral slings such as the TVT,
22 TVT-O or Abbrevo carry a lifelong risk of
23 dyspareunia?
24    A.   I think that women in general have a risk
25 of dyspareunia just by gender unfortunately.  I

Page 100

1 think that, if you look at the published
2 literature, most issues of complications related
3 to mesh occur within -- most of them will occur
4 within a short time frame after surgery.
5        Certainly there is a risk.  As long as
6 there's an implant, there could be issues with
7 that, and again, that is not specific to mesh.
8 That is true for any implant.
9        But, yes, the device is meant to be
10 implanted, and it's meant to be a permanent
11 implant.  So as long as the implant is there,
12 there could be issues with it.
13    Q.   You would agree, with the Burch
14 procedure, there is no permanently implanted
15 device?
16    A.   So I would not agree with that.  What I
17 would say, with the Burch procedure, people place
18 permanent sutures.  I personally use Prolene.
19 Other people I know use Gor-TEX and things like
20 that.  It's the -- the amount of material is less,
21 and how it's placed and where it's placed is
22 different, but if you were to place a dissolvable
23 or absorbable suture, you're not performing a
24 Burch or an MMK.
25        And I was in a national meeting maybe

Page 101

1 four years ago, and one of the presenters got up
2 and presented about a Burch.  And a woman from
3 England got up and kind of chastised him for not
4 doing, you know, two sutures on either side.  They
5 were permanent.  They were meant to stay in place.
6 So I don't know that I would agree that there's
7 not something permanent placed.
8    Q.   But it would be a sutures as opposed to a
9 piece of woven synthetic mesh?
10        MR. KOOPMANN:  Objection.
11    A.   It is a suture instead of a mesh, and
12 that is inherently different between the
13 procedures.
14 BY MR. BRADFORD:
15    Q.   Would you agree that the complications
16 potentially associated with the failure of a mesh
17 device necessitating removal are potentially
18 greater than when a suture has to be removed in a
19 non-mesh surgery such as Burch or a pubovaginal
20 sling?
21    A.   I don't know that I would agree with
22 that.  I think the risks are internally different.
23 I wouldn't say that they are necessarily greater.
24 Burches have a higher risk of bowel injury if
25 you're doing them laparoscopically.  If you're

Peter Jeppson, MD, FACOG, FACS

Page 102

1 doing them open, then patients tend to have more
2 pain, and there are other risks separating the
3 muscle from the pubic bone. You know, things
4 that -- they have a higher risk of infection.
5      So I don't know that -- and I've also --
6 I've also seen sutures in the bladder from MMKs
7 and Burches where the knot is placed too low, and
8 over time it's eroded into the bladder, and the
9 patient comes in with voiding dysfunction issues.
10 You go in and find they have a stone stuck to a
11 stitch that's in the bladder that needs to be
12 removed. So the risk profiles are different.
13      Q.   Would you agree that it's easier to
14 remove a suture than a woven synthetic mesh?
15           MR. KOOPMANN: Objection.
16      A.   I think that any time you discuss
17 surgery, the ability to perform a surgery is based
18 on training and ability and experience. I would
19 not say the removing of a midurethral sling is a
20 terribly difficult or challenging case. I think
21 that going into the retropubic space to take out a
22 stitch would probably take me longer than to take
23 out a midurethral sling.
24      And certainly, if all you're doing is
25 going in and releasing a portion of the sling,

Page 103

1 that would be a very quick surgery. And again,
2 you'd avoid the abdominal cavity. And that's not
3 to say that I don't think that Burches or
4 pubovaginal slings should be done. You know, I
5 think they should, but, again, there is no
6 procedure in medicine that is risk-free. There
7 just isn't. I wish there were.
8 BY MR. BRADFORD:
9      Q.   You would agree that certain procedures
10 carry more risks than others?
11      A.   I would agree that certain procedures
12 carry different risks than others, right. And so,
13 if you were to look at one risk, you know, this
14 versus that, well, yes, one will have more. But
15 if you're looking at this or this or this or this
16 or this versus that or that or that or that, you
17 have to take into account the combination of
18 potential risks.
19      And you know, I would -- would I want
20 voiding dysfunction as opposed to a bowel injury?
21 Like, I don't know. I don't really want either,
22 right, but different procedures have different
23 associated risks.
24      Q.   Do you agree that the frequency of the
25 risks is an important factor?

Page 104

1      A.   I would agree that that is an important
2 factor, yes.
3      Q.   Would you agree that the treatability of
4 certain risks should it occur is an important
5 factor?
6      A.   I think the ability to treat an issue,
7 yes, is important.
8      Q.   Do you agree that the severity of the
9 potential risk should it occur is an important
10 factor?
11      A.   Yes, I would agree with that.
12      Q.   And would you agree that the potential
13 permanency of a risk should it occur is an
14 important factor?
15      A.   I mean, you know, I think that all of
16 these things -- yes, I mean, I would agree. You
17 know, you have to take all of these different
18 things into account, but the thing that I think is
19 important to realize is that these are often
20 conflicting issues, right?
21      Like, sometimes the permanency versus the
22 severity are not necessarily the same thing. And
23 you know, I fortunately never had a patient who's
24 gotten a bowel injury and ended up with an ostomy,
25 at least not since I was a trainee. It's a

Page 105

1 terrible outcome. I hope I never have that,
2 right? And so, you know, again, I think, as a
3 surgeon, as a physician, there are certain risks
4 that I assume and that I help patients understand
5 there are risks of when making decisions, but
6 those are things that are taken into
7 consideration, yes.
8      Q.   Do you agree that if a company such as
9 Ethicon has knowledge of the frequency of a risk
10 that it had should relay that information to
11 doctors to whom it is selling --
12           MR. KOOPMANN: Objection.
13 BY MR. BRADFORD:
14      Q.   -- the device?
15      A.   I don't think so personally. You know,
16 again, as we discussed when we were going through
17 the materials form or whatever the form is called,
18 right, there's information that is necessary for a
19 company to operate.
20      As a physician, what I base my opinions
21 on and the information that I use is based on
22 what's in published literature primarily. So, you
23 know, I think that ethically, you know, if a
24 company is trying to sell something that's harmful
25 or not good, I think that's ethically wrong, but I

Peter Jeppson, MD, FACOG, FACS

Page 106

1 don't know that it's up to the -- the company to
2 contact every physician and tell them every
3 possible thing that could go wrong.
4        Based on how medicine is practiced in the
5 United States, at least based on my understanding,
6 there is the learned intermediary, which is that,
7 as physicians, we have the obligation to learn and
8 understand what we're using to treat patients.
9 And so I think that part of my training, that the
10 onus is on me to learn and know what I'm doing.
11    Q.   You work in a university setting,
12 correct?
13    A.   That is correct.
14    Q.   You're certainly aware there are other
15 physicians who implant midurethral slings that do
16 not work in university settings?
17    A.   Certainly.
18    Q.   And there are people who don't have
19 clinic a couple of days a week, that they have a
20 clinic or in the operating room every day a week
21 because they have a patient-driven practice as
22 opposed to a university setting, correct?
23    A.   Certainly, yes.
24    Q.   And you would agree that you have more
25 time based upon the nature of you being a

Page 107

1 professor, and the nature of your practice to
2 review literature as opposed to these in the
3 trenches doctors?
4        MR. KOOPMANN: Objection.
5    A.   I would disagree with that.  I would
6 think I have 24 hours a day just like anyone else.
7 I think that, if I chose to go into private
8 practice and I chose to see patients five days a
9 week for ten hours a day or 12 hours a day, that
10 would be my choice.
11        My obligation to my patients is still to
12 provide them excellent care.  So, you know, how I
13 choose to divide up my day is up to me to a
14 certain extent, but, again, I don't think that
15 the -- I don't think that it's up to Ethicon or
16 Boston Scientific or, you know, any of the drug
17 like companies.  I think it's up to physicians to
18 know what we do.  That is why I went to medical
19 school, and that's why I have a medical license,
20 and that's why I do my maintenance and
21 certification every year to keep up on these
22 things.
23        And then, being in academic practice,
24 there are benefits to keeping up on the
25 literature, sure.  Students ask me stuff.

Page 108

1 Residents ask me things.  Fellows ask me things.
2 And it kind of makes you think.
3    BY MR. BRADFORD:
4    Q.   Do you think companies have an obligation
5 to advise physicians to whom it is selling its
6 devices about the risks of the device?
7    A.   I think that companies should be
8 compliant with whatever the federal mandates are.
9 And if there are -- you know, the FDA is in place
10 for a reason, and if -- if government agencies
11 have things in place, I think that companies
12 should be compliant with said regulations.
13        That said, when we have representatives
14 from different companies come out and talk to us,
15 which they do, I always take that with a grain of
16 salt because I want to get my information from the
17 medical literature based on the studies.  You
18 know, I don't -- so, again, I guess I don't think
19 that it's up to the company to provide me all the
20 information.  I think that's up to me.
21    Q.   So just so we're clear, it's your opinion
22 that medical device companies do not have an
23 obligation to provide the risks of its products to
24 the doctors to whom it is selling them?
25    A.   I think that medical device companies

Page 109

1 have an obligation to be compliant with the
2 mandates set forth by the government in the
3 country in which they operate.  In the United
4 States, I think that, you know, if the U.S.
5 Government were to set up a mandate or a
6 requirement that companies inform and educate
7 providers, then they should be compliant with
8 that.
9        If that is not the expectation of the
10 regulators, then I think that the companies should
11 be compliant with what they think is right, and of
12 course, being ethical, but, again, I don't go to a
13 company and say, I'm going to use your drug.
14 Provide me all the information on it.  I go to the
15 lexicon, or I go to another source to find my
16 information.  I am not relying upon them telling
17 me.  That's why I went to medical school.  That's
18 why I went to residency.  That's why I did
19 fellowship.
20    Q.   Dr. Jeppson, you mentioned ethics a
21 couple of times in this deposition.  Do you think
22 it is ethical for a company to not disclose risks
23 to physicians of a product or medical device that
24 it knows about?
25        MR. KOOPMANN: Objection.

Peter Jeppson, MD, FACOG, FACS

Page 110

1   A.   So -- so, again, you know, I think
2   that -- I think that a company, you know,
3   should -- should provide information that's --
4   that's pertinent, but, you know, I don't think
5   it's possible for a company to provide all
6   possible outcomes to a surgeon.
7        So, you know, things that would be
8   reasonably associated and not commonly known, that
9   would make sense to me, right?  So you have -- you
10  know, in medical school, as I discussed before
11  with the Burch and pubovaginal sling, you have
12  risks of bleeding.  You have risks of infection.
13       Those are commonly known complications.
14  I don't need Ethicon or anyone to tell me that
15  those things can happen with surgery.  You know,
16  rare things like, you know, fistula and other
17  things that happen very, very infrequently, I also
18  know about.
19       I think that -- you know, again, I think
20  that -- I think that companies should be compliant
21  with regulations.
22  BY MR. BRADFORD:
23  Q.   Do you hold yourself out to be an expert
24  in FDA regulations?
25  A.   So what I would say is I -- as a

Page 111

1   urogynecologist, as a practicing surgeon and
2   physician, I understand the pelvis.  I know -- I
3   have a very, very sound understanding of anatomy.
4   And so, you know, as far as devices that are
5   placed in the pelvis, I feel like I understand
6   where they go and what they should do if I'm going
7   to use them.
8        Am I -- am a regulator?  I am not.  I
9   don't work for the -- actually I do think I work
10  for the Federal Government, for the university,
11  but I am not a regulatory body of the FDA to -- to
12  ensure compliance.
13  Q.   Have you ever written an IFU for a
14  product?
15  A.   I have not written an IFU for a product.
16  Q.   Have you ever designed a medical device?
17  A.   I've had discussions with people about
18  medical devices.  That's not what I choose to do
19  with my career.
20  Q.   So you have not designed a medical
21  device?
22  A.   I have placed mesh in the pelvis.  I've
23  done freehand mesh.  I've done these types of
24  things for very similar products that are
25  available on the market.  Could I develop one?  I

Page 112

1   think that I could actually.  Have I done that?
2   I've chosen not to.
3   Q.   Kind of bringing us back.  So if Ethicon
4   has knowledge of the frequency of mesh-related
5   risks, it's your opinion that it has no obligation
6   to disclose that knowledge to doctors?
7   A.   I think that they have an obligation to
8   divulge that information to -- to the entities
9   that govern them.  So if you want to sell
10  products, I think that you should demonstrate
11  the -- they have efficacy and that they are able
12  to be -- that they should be used.
13       But, again, I don't think that they have
14  an obligation to go to every physician in the
15  country who may or may not use their product and
16  educate them.
17  Q.   Well, couldn't they do that simply by
18  putting it in the IFU?
19  A.   So, again, in my opinion -- and this is
20  substantiated by the medical literature -- most
21  providers don't read the IFU.  And, you know, when
22  I was in training in Cleveland and in fellowship,
23  actually I was told that, if you're going to use a
24  device, you should read the IFU so that you know
25  what's there, but I will tell you that most people

Page 113

1   don't.
2        And so, you know, again, I think that
3   most physicians get their experience through
4   training, hopefully.  That would be the ideal.  As
5   a trainee, for things that develop after you're
6   done with training, it's up to the physician to
7   learn and augment their skill set.  So if that
8   means going and shadowing someone else or doing
9   something, I think that then you need to do that.
10       Again, I don't think that -- I would not
11  seek my medical knowledge from a medical
12  corporation.  I would seek my knowledge from the
13  literature and from other providers.
14  Q.   Could -- strike that.
15       You would agree that Ethicon has sales
16  representatives; I think you mentioned that
17  earlier, correct?
18  A.   I believe that all companies have sales
19  representatives.
20  Q.   And they call on physicians such as
21  yourself from time to time?
22  A.   Yes.
23  Q.   And they provide information and data to
24  physicians such as yourself from time to time?
25  A.   From time to time, yes.

Peter Jeppson, MD, FACOG, FACS

Page 114

1    Q.   And certainly, you would agree that
2  Ethicon could put a card within each synthetic
3  mesh device that lists the frequency information
4  it knows; couldn't it?
5    A.   So, you know, again, getting back to --
6  you know, I've performed systematic reviews.  I've
7  done systematic reviews looking specifically at
8  adverse events.  If you were to take a snapshot of
9  the medical literature at any given time and then
10  redo that six months later, you will find that
11  there's a shift based on what has been published,
12  right?
13        There are -- also, it's impossible, in my
14  opinion, to tell a given provider or physician
15  what their complication rates may or may not be.
16  As we have discussed, I know that there are
17  providers in communities where I've learned that
18  have much higher complication rates than I do.  So
19  if I were to look at a card in an IFU and it tells
20  me that the complication rate is 2 percent, and I
21  look at my own patient population and I have a
22  complication rate of 90 percent because I'm a
23  terrible surgeon, the card is not accurate, right?
24        Conversely, if as a good, trained
25  physician, if I know what I'm doing and I'm doing

Page 115

1  things that I know how to do and something says it
2  has a complication rate of 10 percent, maybe my
3  complication rate is 2 or 3 percent.
4        So I don't think that -- again, I do not
5  believe the onus is on a company to provide all
6  rates of all possible outcomes be they good or bad
7  to physicians.  I think it's up to the physician
8  to look at the literature and know what they're
9  doing.  And if a surgeon can't do that, they
10  probably shouldn't be doing the procedure.
11    Q.   So instead of the company telling
12  surgeons what it knows, the surgeon should do
13  additional homework to figure that out even though
14  the company already knows it; is that your
15  testimony?
16    A.   I don't think that's what I'm saying.
17  What I'm saying is that it's not up to the company
18  to compile all that information and divulge all
19  that information.  I think that a -- again, I
20  think that there are inherent differences between
21  what a company has an obligation to and what a
22  provider has obligation to.
23        And so, again, you know, should a
24  company, if they have a product that's causing
25  harm, should they recall it?  Yes.  Should they go

Page 116

1  around and educate every physician in the world
2  that they have a terrible product?  Probably not.
3        I think they withdraw it from the market.
4  If there's data to support they have a good
5  product that also has some associated
6  complications or harms, well, then it's up to the
7  physician to weigh the risks and benefits.
8        And again, this is not specific to mesh
9  litigation.  This is true across the board for
10  heart surgery or for neural implants or anything.
11  I mean, there are no surgical procedures that do
12  not carry risks.
13        (Whereupon, a brief recess is taken from
14  12:04 p.m. to 12:17 p.m.)
15  BY MR. BRADFORD:
16    Q.   Thank you, Doctor.  Back after a quick
17  break.
18        There are terms that we hear a lot in
19  this case.  It's erosion, extrusion and exposure.
20        Do you use those interchangeably or do
21  they have different meaning to you?
22    A.   I think that, in general, for most
23  practitioners, they are interchangeable.  If you
24  look at the medical literature, they do tend to
25  have more specific meaning, but the meaning is

Page 117

1  defined by the particulars studies.  So if you
2  were to tell me exposure versus erosion versus
3  extrusion, I would probably think you're talking
4  about the same thing.  In the literature, some
5  people say exposure if it's a parent right after
6  surgery, whereas erosion might be if it occurs at
7  a later time, but I think most practitioners use
8  them the same.
9    Q.   Okay.  I'm going to ask you a couple of
10  questions and the only reason I ask that is
11  because I'm going to ask you some questions about
12  erosion, and I don't want to give you a
13  hypothetical.  I just want to make sure we're
14  talking about the same thing.
15        So by "erosion, for these questions, I'm
16  referencing erosions, extrusions, exposures, okay?
17    A.   Okay.
18    Q.   Specifically as to the risk for the
19  Ethicon TVT, TVT-O and Abbrevo midurethral slings,
20  if the company has knowledge about the frequency
21  of erosions, would you agree that's something the
22  company should share with doctors to whom it sells
23  the products?
24    A.   Yeah.  Again, based on the way that the
25  regulations are set up, as a physician, if I have

Peter Jeppson, MD, FACOG, FACS

Page 118

1 a complication, I'm not reporting that to the
2 company. I'm taking care of the patient. I'm
3 treating things, right? So if the company is
4 doing those independent trials and studies, those
5 could be published.
6 　　　If -- if they're doing the regulatory
7 requirements to get through to market, then,
8 again, those should be looked at by the regulatory
9 agencies.
10 　　　So, again, you know, I think that as a
11 provider, what I care about more is what's
12 happening in practice. And so if, you know,
13 again, I can give you the Scandinavian data is a
14 good example. If, you know, you have Sweden or a
15 country that has universal healthcare and they
16 track their outcomes, and they post, you know,
17 rates based on 50,000 women, I'm going to care a
18 whole lot more about that than if the company
19 said, Oh, we did this study and we had 12 women
20 per arm and this is our rate. Does that make
21 sense?
22 　　　So what I care about is what the rates
23 are, but I expect and anticipate that I will get
24 better information from the medical community than
25 I would get from the manufacturer. Does that make

Page 119

1 sense?
2 　Q.　It does.
3 　　　In this case, you've had the opportunity
4 that almost all practitioners have not had in that
5 you've had a chance to look into the underbelly of
6 the corporate documents and corporate depositions,
7 correct?
8 　A.　Yes, sir.
9 　Q.　And would you agree that puts you in a
10 unique position to know more about what the
11 company knows about its products and devices,
12 specifically these slings than the average
13 practitioner?
14 　A.　I would agree that I know more than the
15 average practitioner, but I would say that it
16 hasn't changed my practice. It's not like I've
17 discovered something and was like, oh, if everyone
18 knew this, it would be this big huge conspiracy
19 and then everyone would change the way they
20 practice.
21 　　　I still base my practice on the medical
22 literature. So are the company documents
23 interesting? Yeah, I'm kind of a geek in that
24 way. I do like to know things, but, again, does
25 it change the practice of medicine? No, it

Page 120

1 doesn't.
2 　Q.　Dr. Jeppson, as an expert in this
3 litigation, is there anything that you have seen
4 from the company documents you think should be
5 made known to the doctors who use the Ethicon
6 midurethral slings?
7 　A.　You know, again, I -- I can't really
8 think of anything. You know, in -- in looking
9 through the documents and looking at the internal,
10 yeah, there were some, you know, offhand comments
11 and those kind of things and, unfortunately, those
12 kind of things do happen.
13 　　　Do I think that would be important for
14 all practitioners to know? I don't think so.
15 And, again, I'm basing my decisions and my
16 treatment on high-quality data, right? Like the
17 systematic reviews, the randomized controlled
18 trials. And so if there's some small absurd or,
19 you know, whatever, like, it doesn't really impact
20 the overall efficacy or risk profile, you know,
21 risk/benefit profile of the device.
22 　Q.　Sure. Is there anything in the corporate
23 documents that you've seen that you think Ethicon
24 should tell doctors who used the midurethral
25 slings about?

Page 121

1 　A.　Not that I recall right now. I can't
2 think of anything, no.
3 　Q.　Dr. Jeppson, is there anything that
4 you've seen in the corporate depositions that
5 you've reviewed that you think Ethicon should
6 advise doctors to whom it sells its midurethral
7 slings?
8 　A.　I can't think of anything offhand, no.
9 　Q.　You mentioned a word in the doctrine
10 earlier and, of course, we're all -- everybody
11 here is at least familiar with that, but I want to
12 ask you some questions beyond that.
13 　　　Do you think that the patients who are
14 considering what to do for their stress urinary
15 incontinence deserve to know about the risks that
16 Ethicon knows regarding its midurethral slings?
17 　A.　I think that patients need to know
18 information that impacts them and their ability to
19 make a decision. Ideally, I would love if
20 patients knew everything, right? They know
21 everything. They come to me and they're really
22 coming to me as a technician. That is not how
23 medicine works.
24 　　　And, you know, in having had, you know,
25 thousands of discussions with patients regarding

Peter Jeppson, MD, FACOG, FACS

Page 122

1  healthcare, there's a point in a conversation
2  where their eyes will kind of glaze over and they
3  just can't -- they can't process the information
4  and they don't have the underlying medical
5  knowledge to make the -- the discrimination
6  between various amounts of information.
7         And oftentimes, a patient will say, Well,
8  Doctor, what would you do?  And then I would tell
9  them, Well, I am not -- I can't be paternalistic.
10  I'm not here to make a decision for you.  You
11  know, this is the information and you need to make
12  a decision.
13         So, you know, again, I don't -- you know,
14  I don't think that patients should be going to a
15  company to ask the company what they should do.  I
16  think that patients should talk to their doctor
17  and make a decision based on what their individual
18  goals are and what they hope to achieve.
19  Q.   I'm actually asking the opposite.
20         I'm asking should the company let
21  patients know, be it through the patient brochures
22  or other ways, of the risks it knows about its
23  products?
24         MR. KOOPMANN:  Objection.  Go ahead.
25  A.   You know, again, I -- I think that -- I

Page 123

1  think that there are regulations in place for a
2  reason.  And I think if you're asking me
3  philosophically if the U.S. should change the way
4  medicine is practiced in the U.S., I think that is
5  a different conversation.  The way things are in
6  the United States, for better or worse, is that
7  you have a patient and you have a doctor and you
8  have a physician/patient relationship interaction.
9  That's where patients come to get their
10  information.  That's where they come to get the
11  diagnoses.  They aren't going to random companies
12  saying, You know, maybe I have high blood
13  pressure, maybe I have cholesterol, you know, what
14  should I do?  What information can you provide me?
15         They go to their doctor and they say, you
16  know, I'm here for my annual exam.  And the
17  physician will say, you know, We did the lab test
18  and you have high cholesterol.  We need to treat
19  you.
20         So, you know, again, I don't -- I don't
21  know how the company would go to all potential
22  patients.  And, again, I don't think companies
23  need to.  I think that, again, based on how
24  medicine is practiced in the United States, it's
25  physician to patient.

Page 124

1  BY MR. BRADFORD:
2  Q.   This is a direct question.
3         Ethically, should a company warn patients
4  or advise patients of the risks of its products
5  that it knows about?
6         MR. KOOPMANN:  Objection.
7  A.   So, again, and as a direct answer, no --
8  nothing in medicine is without risk.  And so if
9  you're asking companies to provide risks, you
10  should also ask them to provide benefits, but I
11  don't think that that is the -- the obligation of
12  a company.
13         I think a company should look at what
14  they have.  They should provide information to the
15  regulatory bodies.  I don't think that they need
16  to be involved directly with patient care.  I
17  think that's a physician's job.
18  BY MR. BRADFORD:
19  Q.   Are you familiar with patient brochures
20  for the TVT, TVT-O and the Abbrevo?
21  A.   I've looked at them, yes.
22  Q.   Do you agree that the information in the
23  patient brochures should be accurate?
24  A.   I think that the information should be
25  accurate, yes.

Page 125

1  Q.   Do you agree that the information in the
2  patient brochures should be thorough?
3  A.   So, you know, we touched on this earlier.
4         You know, I think -- and going back to
5  the very beginning conversation, it's not possible
6  for any one document to have everything in it that
7  it needs.  I mean, documents aren't inherent
8  living documents.  And as more information comes
9  out, I mean, you just -- I don't know how you
10  would keep a document up-to-date always, you know?
11  And so I think that the -- and I think I said this
12  before, I think that the information for providers
13  should include the information that's, you know,
14  reasonably associated but not commonly known with
15  the -- that -- that procedure, so...
16         Again, based on medicine in the U.S., I
17  think a lot of that falls to the physician.
18  Q.   The patient brochure is intended to be
19  directed from the company to the consumer, the
20  consumer being the patient, correct?
21  A.   So are you talking about the IFU?
22  Q.   No.  The patient brochures.
23  A.   So the patient brochures, again, I would
24  look at patient brochures -- and this is not
25  specific to Ethicon and this is just my opinion.

Peter Jeppson, MD, FACOG, FACS

Page 126

1 You know, if you're providing information directly
2 to a consumer, I would look at that as being
3 marketing material. This is kind of how I would
4 think that to be developed and distributed.
5        You're -- you have a product and
6 you're -- you know, you're marketing it to
7 potential people.
8    BY MR. BRADFORD:
9    Q.   Do you think the information contained in
10 this marketing material should be accurate?
11    MR. KOOPMANN: Objection.
12    A.   I think it depends on how you define
13 accuracy, but, yes, it should be. It should be.
14    BY MR. BRADFORD:
15    Q.   Do you think the information provided in
16 these marketing materials like patient brochures
17 should be truthful?
18    A.   Well, yes, I don't think that they should
19 deceive people.
20    Q.   Do you think if the company knows that
21 there's a risk range of erosion for its
22 midurethral slings, that it should put that risk
23 range percentage in the patient brochures?
24    A.   So, you know, again, I think that's a
25 discussion for a physician and a patient as

Page 127

1 opposed to -- but, yeah, I mean, if patients want
2 to -- to find the information, you know, I don't
3 think that the onus is on the manufacturer to
4 provide that to them.
5        You know, again, I know you're talking
6 about erosions, but, again, as I discussed
7 earlier, decisions aren't made in a vacuum. In
8 general, the risks of midurethral slings are
9 outweighed by the benefits, which is why they're
10 considered the standard of care by all the
11 national and international organizations. And so,
12 counter, you know, part of being truthful is also
13 not dissuading people to do something that would
14 be beneficial. So if you're asking them to only
15 put bad information in patient brochures, I don't
16 think that's right either.
17    Q.   My question is very direct.
18    A.   Okay.
19    Q.   Do you think that a company like Ethicon,
20 if it knows of a range of percentages of the risk
21 of erosion for its midurethral slings, that it
22 should put that in its patient brochures?
23    MR. KOOPMANN: Objection. Go ahead.
24    A.   So I think that my answer before was also
25 direct. I think that it's not up to the company

Page 128

1 to provide all information for patients.
2    BY MR. BRADFORD:
3    Q.   So that means no?
4    A.   Well, so I think that they should provide
5 balanced information.
6    Q.   Sure. Fair and balanced?
7    A.   If they're going to -- but again, I don't
8 think that the -- I don't think that is on the
9 corporation. I think that is on the physician to
10 provide options for a sling, but also for a Burch
11 and a pubovaginal sling and, you know, if I'm
12 looking at a patient brochure and it tells me that
13 the erosion risk is X, but I don't know what my
14 other options are and whether or not the success
15 rates are comparable between those, I think it's
16 out of context and I don't think it's particularly
17 beneficial, so...
18    Q.   Have you seen a patient brochure as you
19 described as a marketing piece that does not
20 provide the benefit of the device?
21    A.   I have seen many brochures that do not
22 comment on alternatives. Most do not.
23    Q.   "Alternatives," meaning other treatment
24 options?
25    A.   Correct.

Page 129

1    Q.   I'm talking about the benefits of that
2 device. For example, a patient brochure for the
3 TVT or the TVT-O or the Abbrevo, those are quite
4 good at talking about the benefits of those
5 devices and what good can come to a woman's life
6 from having them implanted, right?
7    A.   Uh-huh. Okay.
8    Q.   Would you agree with that?
9    A.   I think, again, I think that -- I don't
10 think that -- so speaking for myself personally as
11 a consumer, I would not go --
12    Q.   I don't mean to interrupt you, Doctor.
13 And I haven't done this today and I'm very careful
14 not to --
15    A.   Sorry.
16    Q.   -- but the question is specific as to the
17 Ethicon midurethral sling brochures you've seen.
18    A.   Yes.
19    Q.   Would you agree that those sling
20 brochures -- strike that.
21        Would you agree that the brochures for
22 the Ethicon midurethral slings do a good job of
23 advising of the benefits in the good things that
24 can happen to women if they choose to have those
25 devices implanted for their stress urinary

Peter Jeppson, MD, FACOG, FACS

Page 130

1 incontinence?

2    A. I think that they do describe benefits,
3 yes.

4    Q. Okay. And you would agree that they
5 should also describe the risks in addition to
6 describing the benefits to be fair and balanced,
7 right?

8    A. So, I think that the patient should know
9 what the risks are. Again, I know that we're
10 talking about erosion. And so, you know, if
11 you -- if you say that the brochure should include
12 all risks of erosion, where does that stop, and
13 how much information should be included and how
14 much shouldn't? And why would erosion be selected
15 as different than bleeding risk or infection risk
16 or UTI risk?

17      Like, how would you determine what should
18 and should not be included? You know, like,
19 again, I think that that is the purpose of a
20 physician. Do I provide these brochures to my
21 patients? No. If they want them, they can get
22 them, but, again, I think that my purpose as a
23 physician when I provide patient education, it
24 comes from the national societies.

25    Q. Doctor, I'm asking specifically as to the

Page 131

1 brochures that you've seen.

2    A. Yes.

3    Q. Okay. Do you think -- and this is
4 simple. If they should, they should. If they
5 shouldn't, they shouldn't.

6      Do you think that Ethicon, in addition to
7 providing the benefits of its midurethral slings
8 in its patient brochures, should also provide the
9 risks including the percentage range of erosion
10 for its midurethral slings?

11      MR. KOOPMANN: Objection. Go ahead.

12    A. So, again, I don't think it's possible
13 for a patient brochure to include all pertinent
14 information.

15 BY MR. BRADFORD:

16    Q. I'm asking specifically as to the risk
17 range for erosions -- that's it -- that they're
18 currently aware of.

19      MR. KOOPMANN: Same objection.

20    A. Yeah. My counterquestion would be, Why
21 is an erosion risk any different than other risks
22 associated with said device? Like, why -- how
23 would you -- like, if you're going to fault
24 someone for not including the information, they
25 can't include everything, I don't think.

Page 132

1      So, again, I don't -- you know, if --
2 if -- if the company wanted to include that
3 information, I think that would be fine. I think
4 that would be up to them and to their, you know,
5 marketing.

6      You know, from my perspective as far as
7 patient care goes, I don't rely on the patient
8 brochures and I don't direct patients to them. I
9 would direct them to information that's going to
10 come from, you know, an entity that will provide
11 all information regarding multiple options.

12 BY MR. BRADFORD:

13    Q. I -- I'm going to ask again.

14      Direct question, specifically as to the
15 risk of erosion. In the patient brochures for its
16 midurethral slings, in addition to providing the
17 benefits of the slings, should Ethicon provide the
18 percentage risk range of erosion as well?

19      MR. KOOPMANN: Objection. Go ahead.

20 BY MR. BRADFORD:

21    Q. I'm going to ask this until I get a
22 direct answer, and we may be here all afternoon.
23 That's fine. I mean, I think the answer is no,
24 but you won't say it. So --

25    A. But --

Page 133

1      MR. KOOPMANN: Objection. Go ahead.

2    A. So I don't think it's wrong for them to
3 include it, but I don't think it needs to be
4 included.

5 BY MR. BRADFORD:

6    Q. Fair enough. That's good enough. I
7 don't care what your answer is. I just want it,
8 right? So if your answer is yes, that's great.
9 If your answer is no, that's great. I don't
10 really care. I just want to know what it is. So
11 I think you answered, so we can move on.

12      Do you agree that with the TVT device,
13 there is the risk of foreign body response
14 resulting in inflammation?

15    A. I think similar to any implant, there is
16 a risk of reaction to.

17      In general, if you're asking my opinion
18 about polypropylene, you know, the suture has been
19 around since like the 1950s. That is what I
20 choose to use for my Burch surgeries as well, and
21 so, you know, I don't see a whole lot of
22 inflammation.

23    Q. All right. I'm going to ask the question
24 again.

25      For the TVT midurethral sling, do you

Peter Jeppson, MD, FACOG, FACS

Page 134

1 think there's a risk of foreign body response
2 resulting in inflammation?
3        MR. KOOPMANN: Objection. Go ahead.
4    A.   So, you know, again, I think that in the
5 short-term after surgery, any time anyone has
6 surgery, there are risks of inflammation as part
7 of the healing process. Long-term, when I've gone
8 into take a mesh out, I don't see a lot of
9 indication of inflammation or foreign body
10 reaction.
11 BY MR. BRADFORD:
12    Q.   You would agree that the Prolene mesh in
13 the TVT is the same Prolene mesh that's in the
14 TVT-O?
15    A.   They're very similar, I believe, yes.
16    Q.   Are they identical?
17    A.   I don't know that. I don't know the
18 chemical composite, but I presume them to be very
19 similar.
20    Q.   Do you understand that the Prolene mesh
21 in the TVT is the same as the TVT Abbrevo?
22    A.   It's a type 1 polypropylene mesh, yes.
23    Q.   And do you agree it's essentially the
24 same -- the mesh, itself, is the same whether it's
25 the TVT, the TVT-O or the TVT-O Abbrevo?

Page 135

1    A.   They are all very similar meshes, yes.
2    Q.   Would you agree that for the TVT device,
3 there's a risk of foreign body response resulting
4 in extrusion, erosion or exposure?
5    A.   Any time mesh is implanted, there's a
6 risk of, you know, exposure.
7    Q.   Would you agree for the TVT, there is the
8 risk of foreign body response resulting in fistula
9 formation?
10    A.   So fistula formation is a risk from a
11 sling placement. I don't think it's a risk from
12 the sling itself. I think it's a risk from the
13 implantation and the dissection as the sling is
14 placed between the vaginal epithelium and the
15 urethra.
16    Q.   Do you agree with the TVT, there is the
17 risk of mesh extrusion, exposure or erosion into
18 the vagina or other structures or organs?
19    A.   There is -- there is a risk of a mesh
20 exposure in the vagina with placement of any mesh,
21 yes.
22    Q.   Would you agree that with the TVT,
23 there's the risk of acute and/or chronic pain?
24    A.   Yes. And as we discussed, I think that's
25 similar with any surgery. All surgeries carry

Page 136

1 risk of pain.
2    Q.   Would you agree that with the TVT, there
3 is a separate, specific mesh-related risk for
4 acute and/or chronic pain?
5    A.   Mesh has its own inherent risks, yes.
6    Q.   Which included acute or chronic pain?
7    A.   Yeah -- yes. Pain can be associated with
8 them, yes.
9    Q.   Would you agree that the TVT comes with
10 the risk of pain with intercourse, which in some
11 patients may not resolve?
12    A.   That is a risk.
13    Q.   Would you agree with the TVT that there's
14 the risk of neuromuscular problems including acute
15 and/or chronic pain in the groin, thigh, leg,
16 pelvic and/or abdominal area?
17    A.   I think it depends on where the mesh is
18 placed, but, yes, you know, again, I think we're
19 splitting hairs on where the pain can be, but, yes
20 pain is associated with slings or surgery.
21    Q.   Would you agree with the risks I've just
22 outlined come with the risk that they might
23 require surgical treatment?
24    A.   Yes, that is a risk.
25    Q.   Would you agree that with the TVT,

Page 137

1 there's a risk of one or more revision surgeries
2 that might be necessary to treat the adverse
3 reactions or risks we've just talked about?
4    A.   Yeah, I think that is true for the other
5 antiincontinence procedures as well.
6    Q.   But you would agree that there's a
7 mesh-specific risk for one or more revision
8 surgeries to treat the risk we've described?
9    A.   Yes, mesh does have inherent risks.
10    Q.   Would you agree that in cases in which
11 the Prolene mesh needs to be removed in part or in
12 whole, significant dissection may be required?
13    A.   I think it depends on how you define
14 "significant," but in order to remove mesh, it
15 would need to be dissected free.
16    Q.   Do you agree that with the TVT, there
17 comes the risk of excessive contraction or
18 shrinkage of the tissues surrounding the mesh?
19    A.   That has not been my experience.
20    Q.   Do you agree that Ethicon knew of all of
21 the risks we just described -- strike that.
22        Do you agree that Ethicon knew of all of
23 the risks that I just went through before the TVT
24 originally went on the market?
25        MR. KOOPMANN: Objection.

Peter Jeppson, MD, FACOG, FACS

Page 138

1    A.   I know that I've looked at many of
2 documents.  I don't know that I've seen all.  I
3 don't know that I know everything that Ethicon may
4 or may not have known at the time.
5         Again, what I've told you, you know, I
6 base my knowledge on the medical literature, you
7 know.  And so I'm not basing things on a study
8 that was done back in '93.  I'm basing things on
9 systematic reviews that were published more
10 recently with the composite of risks and benefits.
11 So I can't speak for Ethicon.  I don't know -- I
12 don't know what they did or didn't know.
13 BY MR. BRADFORD:
14    Q.   When did you first consent a patient for
15 the use of a midurethral sling?
16    A.   It was probably in residency, 2006, 2007.
17    Q.   Dr. Jeppson, I went through a list of
18 risks just a minute ago.
19         To avoid having to go through -- well,
20 let me strike that and try to lay a foundation.
21         Do the same risks apply for the TVT-O as
22 well?
23    A.   Yeah, any -- any -- yes.  There are risks
24 associated with midurethral slings that would be
25 similar between retropubic versus transobturator.

Page 139

1    Q.   Correct.  And the list that I just went
2 through, that would apply to the TVT-O as well?
3    A.   My answers would be the same, yes.
4    Q.   And is the same true for the Abbrevo,
5 that the risks would be the same for the TVT or
6 Abbrevo?
7    A.   They would be similar, yes.
8    Q.   Well, similar is not the same so what
9 would be different regarding the TVT-O?
10    A.   The TVT-O versus TVT-O Abbrevo; is that
11 what you're asking me?
12    Q.   I'm sorry.  That's horribly unclear.  I
13 apologize.
14         I'm just going to go through it,
15 Dr. Jeppson.
16         For the TVT-O, do you agree that there's
17 the risk of foreign body response resulting in
18 inflammation?
19    A.   Yeah.  Again, as we discussed for the
20 retropubic sling, it depends if you're talking
21 acute right after the time of surgery versus
22 remote from, but any time a foreign body is
23 placed, there is potential for reaction.
24    Q.   And do you agree for the TVT-O there
25 comes the risk of extrusion, erosion and exposure?

Page 140

1    A.   So, yeah, again, there are risks inherent
2 to mesh, which include exposure.
3    Q.   And would you agree that with the TVT-O,
4 there comes the risk of a foreign body response
5 resulting in fistula formation?
6    A.   Again, I don't think that it results in
7 fistula.  I think that fistula have been
8 associated with.  It seems that most of the
9 publications I have seen in personal experience is
10 based on where the mesh is placed as opposed to
11 the mesh causing the fistula, but it is a
12 possibility.
13    Q.   Doctor, do you agree that the TVT-O comes
14 with the risk of mesh extrusion, exposure or
15 erosion into the vagina or other structures or
16 organs?
17    A.   Yes, there's risks associated with mesh,
18 yes.
19    Q.   Do you agree that the TVT-O comes with
20 the risk of acute and/or chronic pain?
21    A.   That is a risk of any surgery, yes.
22    Q.   And would you agree that there's the
23 mesh-specific risk with the TVT-O of acute and/or
24 chronic pain?
25    A.   That is a risk, yes.

Page 141

1    Q.   Do you agree that the TVT-O comes with
2 the risk of pain with intercourse which in some
3 patients may not resolve?
4    A.   That is a risk, yes.
5    Q.   Do you agree with the TVT-O, there comes
6 the risk of neuromuscular problems, including
7 acute and/or chronic pain in the groin, thigh,
8 leg, pelvic and/or abdominal area?
9    A.   Again, similar to my prior statement, it
10 depends on where the mesh is placed, but there is
11 a risk of pain with mesh placement.
12    Q.   You would agree that the TVT-O comes with
13 the risk of adverse reactions that might require
14 surgical treatment?
15    A.   Repeat operation is a risk of really any
16 surgery, but in this case, that is also true.
17    Q.   And would you agree that with the TVT-O
18 there comes the risk of one or more revision
19 surgeries that may be necessary to treat the
20 adverse reactions or risks we've just gone
21 through?
22    A.   Yeah, and, again, I would say it's
23 similar to Burch or pubovaginal sling.  Those
24 risks are the same.  They all carry risk.
25    Q.   You would agree that it is easier to

Peter Jeppson, MD, FACOG, FACS

Page 142

1  remove a suture than a woven synthetic mesh that
2  has tissue integrated through it?
3       MR. KOOPMANN:  Objection.
4       A.   Again, I think that I said this before,
5  but not necessarily; depends on where the suture
6  is placed and how it was placed.  It depends on
7  where the mesh is and where it was placed and how,
8  but it's not necessarily harder.  Sometimes it can
9  be easier.
10      BY MR. BRADFORD:
11      Q.   You would agree with the TVT-O comes the
12  risk of, in cases in which the Prolene mesh needs
13  to be removed in part or whole, significant
14  dissection might be required?
15      A.   Again, it depends on how you define
16  significant, but the mesh would need to be
17  dissected free to be removed.
18      Q.   And, Doctor, do you agree with the TVT-O,
19  excessive contraction or shrinkage of the tissue
20  surrounding the mesh is a risk?
21      A.   And, again, I have not really seen that.
22      In the medical literature, there is a
23  report of a, you know, mesh shrinking maybe 10
24  percent.  Pubovaginal slings shrink a lot over the
25  course of the first few months to year.  And so

Page 143

1  slings, midurethral slings shrink much less than
2  pubovaginal slings.
3       Q.   I hate to do this, but I'm going to have
4  to ask you the same questions for the Abbrevo
5  since there's multiple products.  I would rather
6  not, but somebody is going to yell at me in the
7  Abbrevo case if I don't do it, okay?
8       A.   That's fine.
9       Q.   Doctor, you would agree with the TVT
10  Abbrevo that there's the risk of foreign body
11  response resulting in inflammation?
12      A.   Again, it depends on if you're talking
13  about acute or chronic.  At the time of surgery,
14  there's always a risk of inflammation that kind of
15  goes with surgery.  Long term, there is a risk
16  with any foreign body.
17      Q.   Do you agree with the TVT Abbrevo, there
18  comes the risk of foreign body response resulting
19  in extrusion, erosion or exposure?
20      A.   Again, you know, there is a risk inherent
21  with mesh that there can be, you know, erosion or
22  exposure when mesh is placed.
23      Q.   With the TVT Abbrevo, there comes the
24  risk of foreign body response resulting in fistula
25  formation?

Page 144

1       A.   And, again, I'm not certain that the
2  fistula formation is related specific to the
3  foreign body reaction.  I think it's based more on
4  where the device is placed, but it is a risk at
5  the time of the sling surgery.
6       Q.   And you would agree regarding the TVT
7  Abbrevo that it comes with the risk of mesh
8  extrusion, exposure or erosion into the vagina or
9  other structures or organs?
10      A.   Again, as we discussed, there are risks
11  inherently associated with mesh and erosion is one
12  of those.
13      Q.   You would agree with the TVT Abbrevo,
14  there comes the risk of acute and/or chronic pain?
15      A.   Yes.  There's a risk of pain with any
16  surgical intervention.
17      Q.   And regarding the TVT Abbrevo mesh,
18  there's a mesh-specific risk of acute and/or
19  chronic pain, correct?
20      A.   That is correct.  There's a mesh --
21  there's a risk inherent to mesh, yes.
22      Q.   And you would agree with the TVT Abbrevo,
23  there's the risk of pain with intercourse which in
24  some patients may not resolve?
25      A.   Again, inherent to mesh, there are risks,

Page 145

1  yes.
2       Q.   You would agree with the TVT Abbrevo --
3  strike that.
4       You would agree with the TVT Abbrevo,
5  there's the risk of neuromuscular problems
6  including acute and/or chronic pain in the groin,
7  thigh, leg, pelvic and/or abdominal area?
8       A.   Again, it depends on where the mesh is
9  placed, but mesh does carry inherent risks as does
10  any surgery.
11      Q.   Doctor, you would agree that with the TVT
12  Abbrevo, there comes the risk that those adverse
13  reactions I just mentioned might require surgical
14  treatment?
15      A.   And, again, yes, that is a risk of any
16  surgery as a possibility of repeat surgery.
17      Q.   And there's a mesh-specific risk as well
18  with the TVT Abbrevo?
19      A.   There is a mesh-specific risk, yes.
20      Q.   Doctor, would you agree that's there's --
21  strike that.
22      Doctor, with the TVT Abbrevo, do you
23  agree there's the risk of one or more revision
24  surgeries may be necessary to treat the adverse
25  reactions or risks we've just gone through?

Peter Jeppson, MD, FACOG, FACS

Page 146

1    A.   And, again, I would agree with that, but
2  also state that that is also possible with any
3  surgical intervention.
4    Q.   But you would agree there's a
5  mesh-specific component to that as well, correct?
6        MR. KOOPMANN:  Objection.
7    A.   And, again, mesh does have inherent
8  risks.
9  BY MR. BRADFORD:
10   Q.   Including one or more revisions
11 surgeries, correct?
12   A.   This is a possibility.
13   Q.   You would agree that with the TVT Abbrevo
14 in cases in which the Prolene mesh needs to be
15 removed in part or in whole, significant
16 dissection may be required?
17   A.   Again, I think it depends on how you
18 define "significant," but the mesh would need to
19 be dissected free to be removed.
20   Q.   And you would agree with the TVT Abbrevo
21 that there's a risk of excessive contraction or
22 shrinkage of the tissue surrounding the mesh?
23   A.   And, again, similar to the others, the
24 midurethral slings, I have not seen that.
25        Again, in the literature, it's a 10

Page 147

1  percent -- the mesh contracts by 10 percent over
2  the course of the first year, which is
3  significantly less than pubovaginal slings, which
4  are set much more loosely because they do contract
5  so much.
6    Q.   Doctor, do you understand or know that
7  Ethicon knew of the risks and adverse reactions
8  we've gone through regarding the TVT-O before the
9  time the TVT-O was launched?
10       MR. KOOPMANN:  Objection.
11   A.   You know, again, I've seen some internal
12 documents from Ethicon.  I do not remember
13 everything.  I'd have to go back and look and I
14 don't pretend to know everything Ethicon did or
15 didn't know at the time.
16 BY MR. BRADFORD:
17   Q.   Doctor, do you agree that Ethicon knew of
18 all the risks regarding the TVT Abbrevo we just
19 went through before the time of launch?
20       MR. KOOPMANN:  Objection.
21   A.   You know, again, I don't know what they
22 did or didn't know.
23 BY MR. BRADFORD:
24   Q.   When you've removed midurethral slings or
25 portions of midurethral slings in surgeries, is it

Page 148

1  fair to say that you've looked at those -- you've
2  looked at what was explanted, correct?
3    A.   I always look at what I remove, yes.
4    Q.   Right.  And do you look at it with a
5  microscope or do you just do a gross look with the
6  naked eye?
7    A.   I do gross and send it to pathology.
8    Q.   Right.  And it's pathology's job, it's
9  their job to look under the microscope and
10 describe what's there?
11   A.   You know, so that is a pathologist's job
12 is to look at pathologic specimens and then to say
13 what they are.  And I don't make it a habit to
14 look under the microscope to see what's there.  I
15 have looked in publications to see, you know,
16 what's reported in that, but, yeah, I don't -- I
17 don't think that I need to look under the
18 microscope to know that it's mesh.
19   Q.   Is it fair to say that you would need to
20 look under the microscope to see whether the mesh
21 has degraded?
22   A.   I think that if you were to determine
23 degradation, I think you probably need a scanning
24 electron microscope, not just a typical light
25 microscope that would be in most universities'

Page 149

1  labs.
2    Q.   Fair enough.
3        So is it fair to say that to be able to
4  see degradation on a piece of excised mesh and
5  tissue, you would need an electron microscope?
6    A.   I think that if -- so what I think is
7  that you can look at published literature to see
8  what happens to the mesh.  I don't think that
9  every specimen would need to be analyzed.
10   Q.   Yeah.  And let me tell you why I'm asking
11 you these questions, okay?
12   A.   Okay.
13   Q.   Because every time we take one of these
14 doctors who's taken this out, they get a series of
15 questions from Ethicon lawyers to say, did you see
16 any degradation, did you see banding, did you see
17 roping, fraying, curling, et cetera, et cetera.
18       So -- and I'm asking you these questions
19 because I want to know your opinions as to whether
20 or not you see that with the naked eye or whether
21 you would need to actually look under an electron
22 microscope to see those things, okay?
23   A.   Yeah.
24   Q.   So I'm not trying to dig into the
25 literature on this.

Peter Jeppson, MD, FACOG, FACS

Page 150

1    A.   So I think that the surface -- like, to
2  see degradation at the surface structure, you
3  would need a scanning electron microscope.  I
4  think to see the -- the roping, curling, fraying,
5  I don't think that you would need a microscope to
6  see that.  I don't think you'd need a scanning
7  electron microscope to see that.
8          I think some of that could be visualized
9  with the naked eye.  I think some of that could be
10 visualized just by histologic specimens, you know,
11 by trans -- you know, by dissection evaluation,
12 but I think that I have not seen a lot of that
13 when I've removed.  I don't really see roping and
14 curling and fraying when I'm taking mesh out.  It
15 seems to be fairly well-incorporated, which is
16 what it's supposed to do.
17   Q.   All right.  Are you aware of how the --
18 strike that.
19          Are you familiar with the terms laser cut
20 and mechanically cut?
21   A.   Yes.
22   Q.   Okay.  I'm going to ask you some
23 questions about that.
24          When did you first become aware of that
25 the TVT-O -- strike that.

Page 151

1          Do you have an understanding as to
2  whether or not the TVT-O device at different time
3  periods was laser cut or mechanically cut?
4    A.   So prior to initiating my relationship
5  with Ethicon, I did not know.
6          Subsequent to that time, I am aware that
7  the TVT-O Abbrevo is laser cut and always has been
8  and that the other options have transitioned over
9  time.  Again, looking at the medical literature,
10 the, you know, large randomized controlled trials
11 funded by the NAH as well as the systematic
12 reviews based on my understanding of when that
13 transitioned, there is not a significant
14 difference in rates of complications based on
15 whether a mesh was laser cut or mechanically cut.
16   Q.   All right.  Doctor, so before Ethicon
17 hired you to become an expert in this case and you
18 were provided internal information, you had no
19 idea that the TVT-O at different time periods came
20 with laser cut or mechanically cut, correct?
21   A.   I don't think it's clinically relevant.
22   Q.   I appreciate that opinion, but --
23   A.   So -- so -- so --
24   Q.   My question is more direct than that.
25   A.   So I had heard of the two different

Page 152

1  types, but I didn't know which was which with
2  which sling.  Did that answer the question?
3    Q.   A little bit.  Let me ask it again so the
4  record's clear.
5          Before you were hired as an expert for
6  Ethicon, you did not know which meshes were laser
7  cut versus mechanically cut, correct?
8    A.   Correct.  I don't think, yeah, I don't
9  think it's clinically relevant and I did not know.
10   Q.   Based upon your review of internal
11 Ethicon documents, was Ethicon concerned about the
12 difference between mechanically cut mesh and the
13 laser cut mesh?
14   A.   I think that they had -- they wouldn't
15 have changed from one to the other or back if they
16 didn't have reason to, so I'm sure there was some
17 sort of internal dialogue that prompted that.  And
18 I think that some of that came from physician
19 feedback based on, you know, kind of what they had
20 seen at the time of opening the devices.
21   Q.   Do you have an understanding as to
22 whether or not laser cut mesh is stiffer than
23 mechanically cut mesh?
24   A.   You know, again, this relates to the
25 question you'd asked me before about, you know,

Page 153

1  percentiles or proportions.  You know, stiffness
2  is relative.  So do I think that there's a
3  clinically-significant difference in the stiffness
4  between a mechanically cut and a laser cut?  I
5  don't think it clinically matters.
6          If you were to look at the, you know,
7  like, engineering profiles and, you know, the --
8  you may see the difference, but, again, I don't
9  think that it's clinically -- I don't think that
10 it clinically matters.
11   Q.   Excluding clinical significance for the
12 purposes of this question, you would agree that
13 laser cut mesh is stiffer than mechanically cut
14 mesh?
15   A.   Yeah.  I think that there is data to show
16 that laser cut is slightly stiffer than
17 mechanically cut, but, again, I would say that I
18 don't think that it matters.
19   Q.   Would you agree that with mechanically
20 cut mesh comes the risk of particle loss?
21   A.   So at the time of surgery when I've
22 opened mechanically cut meshes, sometimes you can
23 see some -- some particle loss there.  I don't
24 know, you know, but, again, I've not seen any
25 literature that reports on those particles causing

Peter Jeppson, MD, FACOG, FACS

1  any issue or any problem.
2      Moreover, once the device is open, any
3  particle loss that's there would not be implanted
4  in the patient because it would stay on the back
5  table.
6      Q.  If a mechanically cut mesh was subject to
7  particle loss within the packaging itself, would
8  you agree that there could also be particle loss
9  once implanted?
10     A.  You know, again, I would say that based
11 on published literature pre- and post-mechanical
12 versus laser cut, there is no clinical data to
13 substantiate that and so I would say it probably
14 doesn't matter.
15     Q.  Are you aware of any study that -- strike
16 that.
17     Are you aware of any literature or study
18 which has looked at the difference between
19 mechanically cut TVT-O and laser cut TVT-O?
20     A.  I know that I have seen studies on that,
21 yes.
22     Q.  Specifically looking at the clinical
23 differences between the two?
24     A.  So, again, the TVT-O Abbrevo has always
25 been laser cut.

1      Q.  Sure.  I'm sorry.  Let me re-ask my
2  question.  This was specifically -- this was
3  specific as to the TVT-O.
4      A.  So, again, what I was saying is pertinent
5  to this though because the TVT-O Abbrevo has
6  always been laser cut.  So, again, if you're
7  looking at studies pre- and post-mechanical to
8  laser, I am not aware of any clinical trials that
9  show any significant difference.
10     Are there studies that look specifically
11 at the composition of the slings regarding
12 stiffness, et cetera?  Yes, I'm sure that there
13 are, but, again, I don't think that they matter
14 clinically.
15     Q.  Are you aware of any studies regarding
16 the clinical significance of particle loss from
17 mechanically cut mesh?
18     A.  Again, I know that it has been studied
19 and, again, I remember seeing some internal
20 documents.  I'd have to refresh my memory on
21 exactly what they said.  But, again, I base my
22 medical knowledge on a composite of information
23 including systematic reviews like, you know,
24 Cochrane reviews or other reviews and when you
25 look back at the adverse events or the risks

1  associated with slings, it doesn't come out that,
2  oh, they changed from mechanical cut to laser cut
3  or from laser cut to mechanical cut or this one
4  had particle loss and, therefore, the risks are
5  different.
6      Clinically, they behave the same.  So
7  from a -- I am a clinician.  From a clinical
8  perspective, I don't think it matters.  From a
9  scientific perspective, if you want to get into
10 the science and everything and look at all the
11 basic science stuff, you know, it's interesting,
12 but I don't think that it impacts patient care.
13     Q.  Sitting here today, do you recall the
14 name of any study specifically that compared TVT-O
15 mechanically cut versus TVT-O laser cut?
16     A.  I don't remember names.
17     Q.  Are you aware of a study comparing the
18 erosion risk between TVT-O mechanically cut versus
19 TVT-O laser cut?
20     A.  So, again, I have probably seen studies
21 regarding that, you know, and this gets back into
22 what we were discussing earlier regarding level of
23 evidence, which we haven't gotten back to.
24     There -- the medical -- the composite of
25 medical literature, it grows at such a rapid rate,

1  it's impossible to keep up with everything.  So
2  could there possibly be some case series or some
3  small comparative cohort study that demonstrates
4  difference?  It's possible.
5      Again, looking at level 1 evidence, the
6  big RCTs and the big systematic reviews, that has
7  not been an issue.  So, again, I would say it's
8  not clinically important.
9      Q.  Do you agree that if a company has two
10 different products that both do the same thing and
11 have the same efficacy but one has a greater risk
12 than the other that the company should only offer
13 doctors the product with less risk?
14     A.  I think that's a very simplistic view.
15 Having heard many physicians discuss these issues,
16 different surgeons feel that different products
17 behave differently in different hands.  So, again,
18 this gets back to the question of should the
19 company provide risks?  I think that risks are
20 somewhat dependant upon the person implanting
21 them.  So, you know, like, for example, with the
22 Caldera sling that I'm currently using, they have
23 several different trocar types not because one is
24 safer or more dangerous but to accommodate the
25 desires of the surgeon based on their experience

Peter Jeppson, MD, FACOG, FACS

Page 158

1 and training.
2      So, you know, again, I would not say that
3 they should remove -- so, again, from an ethical
4 perspective, you know, you want to provide the
5 best care to patients.  I think that that can be
6 accommodated differently by different providers
7 based on different products.
8    Q.   So the answer's no?
9        MR. KOOPMANN:  Object to form.
10   A.   Well, but the question you asked is, you
11 know, do I think that companies should provide
12 something unsafe?  Well, I don't think that the
13 company should ever do that.
14 BY MR. BRADFORD:
15   Q.   Let me ask my question again.
16      Would you agree that if a company has two
17 different products that both do the same thing and
18 have the same efficacy but one has a greater risk
19 profile than the other, the company should only
20 offer doctors the product with the less risk?
21       MR. KOOPMANN:  Objection.
22   A.   But, again, I think that's a very
23 simplistic view.  So what I may think is the best
24 may not be what my colleagues thinks is the best
25 and I've had those discussions with them.  So,

Page 159

1 again, I think that it's up to the surgeon to know
2 what device they're using and what the risks are
3 associated and have those discussions with their
4 patients.
5      You know, if you want it pure black and
6 white that one is good and one is bad, well, they
7 shouldn't use the bad one, but medicine is not
8 that way.  Medicine, there's a lot of gray.  So
9 again, I think that physicians should know what
10 they're using when they implant it.
11 BY MR. BRADFORD:
12   Q.   So the answer is no?
13       MR. KOOPMANN:  Objection.
14   A.   Again, I --
15 BY MR. BRADFORD:
16   Q.   How about the answer is yes, no, or I
17 can't answer the question?  Maybe that's a better
18 way to do this.  I mean --
19   A.   But I think I did answer the question.
20   Q.   I know, with a philosophical point of
21 view that's not answering the question.
22      I mean, look, I've told you, I don't care
23 whether you answer yes, no, I don't know, but the
24 question is direct.  I'm going to ask it one more
25 time.

Page 160

1      If a company has two different products
2 that both do the same thing and have the same
3 efficacy but one has a greater risk than the
4 other, one has a greater risk profile than the
5 other, do you agree the company should only offer
6 doctors the product with the lesser risk profile?
7       MR. KOOPMANN:  Objection.
8   A.   So, you know, I know you want a yes or a
9 no or I can't answer, but I don't think any of
10 those are the answer.  I think that when I offer
11 products or surgeries to patients, there are
12 different surgeries that could be better for one
13 patient versus another.  So should I not offer
14 that particular surgery to anyone?  I don't think
15 so.
16      So, you know, again, I think that -- I
17 understand that you're painting it as black and
18 white, but the practice of medicine is not that
19 and so I guess if you're pushing and making me
20 answer, I guess I would say I can't answer that,
21 but I would say that I feel that I have answered
22 it and I think that it depends on the product and
23 the patient and the physician.
24 BY MR. BRADFORD:
25   Q.   I'm not asking about the surgery.  I'm

Page 161

1 asking about the device itself.
2   A.   But the devices are surgeries.  They
3 are -- I mean --
4   Q.   Okay.
5   A.   -- you can't -- you can't -- we're asking
6 about surgical implantation of a device.  It is a
7 surgery.
8   Q.   Do you agree that a suture is a medical
9 device?
10   A.   So I just had this conversation in the OR
11 on Monday.  I think that suture is -- so I don't
12 list suture as a device when I do the operative
13 report.  I do say what I use.  I say if it was a
14 Vicryl or a Monocryl or a silk or whatever.
15      I think a device is typically more
16 involved than a simple suture.
17   Q.   You wrote an abstract comparing Abbrevo
18 to TVT-O, correct?
19   A.   Yes.
20   Q.   And in that abstract, the conclusion was
21 that the Abbrevo had the same efficacy as the
22 TVT-O, correct?
23   A.   It showed similar efficacy, yes.
24   Q.   But that the Abbrevo was safer in that
25 the Abbrevo did not cause the risk of groin pain

Peter Jeppson, MD, FACOG, FACS

Page 162

1 that came with the TVT-O because it's shorter and
2 did not enter as far into the obturator -- the
3 transobturator space, correct?
4    A.   It didn't traverse quite as many muscles,
5 about a 10 percent difference.  I think it was
6 like 9 percent for the full length and like 1 or 2
7 percent for the short, but this is a retrospective
8 study comparing two different slings but
9 retrospectively, and I think -- I can't remember
10 how many patients we had.  It was like maybe 100
11 per arm or something like that over the course of
12 seven or eight years.
13       So, you know, again, does -- you know, if
14 I were to -- and I think I told you this before,
15 if I were choosing, you know, just based on my
16 choice and not on, you know, what the hospital had
17 contracted, I like the TVT-O Abbrevo.  I think
18 it's a great product.
19       Would I base all of the medical knowledge
20 on that particular publication?  I would not.  I
21 would look at the composite, you know, and
22 literature.  So, again, I like the TVT-O Abbrevo.
23 I don't think that means that the TVT-O is a bad
24 product.
25    Q.   Do you think the TVT-O Abbrevo is as

Page 163

1 effective as the TVT-O?
2    A.   In that study that we looked at, we found
3 similar efficacy.
4    Q.   Outside of that study?
5    A.   In general, I think that they are similar
6 efficacy, yes.
7    Q.   Would you agree that TVT-O Abbrevo is
8 safer?
9    A.   I think that if you're looking at the
10 issue of groin pain, again, our studies showed
11 that there was less groin pain associated with the
12 Abbrevo than with the full length.
13    Q.   Sounds like you're -- I hate to say this
14 -- but minimizing the significance of your own
15 study because it was a retrospective study over
16 only 250 patients; is that correct?
17    A.   I don't think I'm minimizing it.  I think
18 that I'm interpreting the data, which is what I do
19 as a physician.  You would never -- I don't think
20 you would find a physician who would say the
21 retrospective study provides as much information
22 as a systematic review, for example, but it does
23 depend on which outcomes you're looking at.  And
24 sometimes retrospective studies or case controlled
25 studies can, but in general, I would not -- I

Page 164

1 don't base all of my medical knowledge on anything
2 even if I've published it because it's a
3 composite.
4    Q.   How long a study does it take for you to
5 consider it to be long-term study?
6    A.   So -- so I think that's an arbitrary
7 question.  I don't know if you're asking me
8 because that particular study --
9    Q.   I'm not -- it just happened to be my next
10 question.  I'm not criticizing you about the study
11 or your work.
12    A.   That's okay.  I'm not -- I'm not
13 defensive.
14    Q.   I'm not suggesting that's a long- or a
15 short-term study.  It was the next question so put
16 that study away.  In general, how long --
17    A.   So I think that -- I think that what is
18 considered long-term or short-term depends on the
19 outcome you're looking at.  If you're looking at
20 perioperative outcomes like bleeding and things
21 like that, a long-term study is probably going to
22 be two weeks.  If you haven't had bleeding by
23 weeks, you're probably not going to have bleeding
24 from the surgery.  Whereas with, you know, other,
25 like, long-term outcomes, I would want to see

Page 165

1 things at, you know, a year to two years, five
2 years.
3       I'd love to see studies that follow
4 patients out 20, 30 years.  Those are very
5 expensive and hard to find, but in general, in my
6 mind, short-term, I would say probably somewhere 6
7 to 12 months.  Long-term would be beyond that, but
8 it would depend on the specific outcome that
9 you're asking me about.
10    Q.   How long should a company study a product
11 before it launches it?
12    A.   So I don't think that's up to me.  I
13 think that's up to Federal regulators and I think
14 that they have mechanisms in place to determine
15 that.  And, again, as I've said, I think the
16 companies should follow the Federal mandates.
17    Q.   As an expert in this case and a teaching
18 physician at the University of New Mexico, do you
19 think a company should launch a midurethral sling
20 without it being studied?
21       MR. KOOPMANN:  Objection.  Go ahead.
22    A.   So if we're talking specific about
23 midurethral sling, the way that things were set up
24 back in the '90s and early 2000s was to
25 demonstrate that the device had similar efficacy

Peter Jeppson, MD, FACOG, FACS

Page 166

1  to a predicate device and if that could be
2  demonstrated, it could go to market.
3        So, again, I'm suggesting that companies
4  should follow the mandate of the -- the government
5  organizations to which they subscribe. I don't
6  know exactly what was done in Scandinavia or in
7  England or in Europe, but -- to get approval for
8  the same slings. So, again, I would say that if
9  you're going to market and sell a product in a
10  nation, you should follow the mandates of that
11  government. And, again, I don't think it's fair
12  to say that they didn't have any data. If we're
13  talking specific about the sling, there were
14  predicate devices and they followed the mandates
15  of the time.
16  BY MR. BRADFORD:
17    Q.  Do you know what the predicate device was
18  for the TVT?
19    A.  I've heard. I don't -- I don't remember
20  off the top of my head. I know I read it as a --
21  as a fellow and probably as a resident. I didn't
22  review it again for this.
23    Q.  Do you believe that the TVT was
24  substantially similar to this claimed or alleged
25  predicate device?

Page 167

1    A.  So as with a lot of medical -- pardon me.
2        With a lot of pelvic mesh, many of the
3  predicate devices were subsequently removed from
4  the market and so I do know that. But, again, I
5  am not here to criticize nor to substantiate the
6  way the government mandated things should be done
7  at the time. And for the midurethral sling, I
8  think it's turned out quite well. There's a lot
9  of data to show that it's safe and effective. You
10  know, we have 25 years of data. Would that be how
11  I would design things if I were to do something
12  now? I probably wouldn't, but, again, things are
13  different now.
14    Q.  You're here as an expert in this case to
15  talk about the TVT-O device, correct?
16    A.  Yes.
17    Q.  And to talk about the TVT-O device from
18  its beginning to present, right?
19    A.  Uh-huh.
20    Q.  Is that correct?
21    A.  Yes.
22    Q.  And to talk about the safety of the TVT-O
23  device from its beginning to the present, correct?
24    A.  Uh-huh, yep.
25    Q.  And the efficacy of the TVT-O device from

Page 168

1  its beginnings to the present?
2    A.  Yes.
3    Q.  And the same is true for the TVT-O and
4  the Abbrevo, correct?
5    A.  Yes.
6    Q.  Okay. So I'm going to ask the questions
7  again not -- strike that.
8        Do you have an opinion one way or the
9  other as to whether a company should have
10  performed a randomized controlled trial on a
11  product before it launches it?
12    A.  Again, my feeling is the same. I think
13  that a company should follow the requirements to
14  get something to market. And if the requirements
15  by the governing organization are that it requires
16  a randomized controlled trial, then that's what it
17  needs.
18        If you were to look at the way most
19  things get to market, most things don't start with
20  randomized controlled trials. Most things start
21  with animal studies and then very small case
22  series and you work your way up through safety and
23  then get things to market, so...
24    Q.  So the answer is no?
25    A.  I don't think that -- I don't think an

Page 169

1  RCT is always required to get something to market,
2  no. I think that they should follow whatever the
3  requirements are.
4    Q.  And if the requirements -- if a product
5  can come to market without an RCT, you're okay
6  with that?
7    A.  If a product has gone through the
8  regulatory board and has met the requirements to
9  go to market, then I think that it can go to
10  market.
11    Q.  I'm cutting out the regulations, any FDA
12  requirements, any of that stuff, okay. I'm asking
13  you as an expert in this case and as a teaching
14  professor at the University of New Mexico, do you
15  think a company should be able to launch a product
16  without performing randomized controlled trials?
17        MR. KOOPMANN: Objection. Go ahead.
18    A.  Again, I -- I don't know how to answer it
19  differently.
20        I don't think that a randomized
21  controlled trial is always needed to get something
22  to market. That doesn't mean that no testing
23  should be done and there are cases where an RCT
24  should be done, but I don't -- I can't provide
25  blankets statements that would say, yes, always

Peter Jeppson, MD, FACOG, FACS

Page 170

1 or, no, never because the truth lies in the
2 middle.
3     BY MR. BRADFORD:
4     Q.   Are you aware that the predicate device
5 for the TVT was the ProteGen sling?
6     A.   I've heard of ProteGen sling, yes.
7     Q.   And were you aware that the ProteGen
8 sling was removed from the market?
9     A.   Yes.
10     Q.   Do you think that a device should be
11 allowed to be marketed -- strike that.
12         Do you think that a device should be
13 brought to market when it's predicate device was
14 removed from the market for safety and efficacy
15 issues?
16     A.   So I would say that hindsight is always
17 20/20 and if you're looking at things from a
18 historical perspective, again, I would probably
19 design things differently.
20         I would say that at the time that the
21 mandates were met.  And so, you know, if that's
22 not how things should be done, and they should be
23 changed moving forward, and that is what has
24 happened.
25     Q.   I'm going to ask you some questions from

Page 171

1 your report, first on the midurethral sling report
2 for the TVT, the TVT-O and Abbrevo.
3     A.   Okay.
4     Q.   Before I do this, I want to go through
5 the CV a little bit.
6         MR. BRADFORD:  I'll mark it as the next
7 exhibit.
8         (Exhibit Jeppson T-10, Dr. Jeppson's
9 Curriculum Vitae, marked for identification.)
10         MR. BRADFORD:  To save you some time,
11 I'll go ahead and mark the thumb drive also.
12         (Exhibit Jeppson T-11, Thumb drive,
13 marked for identification.)
14     BY MR. BRADFORD:
15     Q.   I've marked Dr. Jeppson's CV that he
16 provided as Exhibit T-10 and the thumb drive that
17 they brought with them as T-11 and I think we'll
18 be taking a break now.
19         MR. KOOPMANN:  And just for the record,
20 before we take a break, there's a password for
21 that thumb drive and I've got it here.
22         MS. BAGGETT:  You don't want to read it
23 on the record, I don't think.  We'll take a
24 picture of it.
25         MR. KOOPMANN:  Yeah.

Page 172

1         (Whereupon, a brief recess is taken from
2 1:24 p.m. to 1:44 p.m.)
3     BY MR. BRADFORD:
4     Q.   You would agree in serving as an expert
5 witness in cases like this that you have an
6 obligation to look at all information relevant to
7 the topic or subject, correct?
8     A.   Yes.
9     Q.   And that you have an obligation to look
10 at information that both supports your positions
11 and does not support your positions or opinions,
12 correct?
13     A.   I would want to have a balanced view,
14 yes.
15     Q.   Right, and that's my next question.  You
16 agree that in serving as an expert in cases like
17 these, the goal and what you're required to do is
18 come to fair and balanced conclusions considering
19 all data made available to you?
20     A.   So I agree with that to a certain point,
21 you know, and, again, I alluded to this or maybe I
22 said it expressly.  Not all information carries
23 the same weight.
24     Q.   Sure.
25     A.   Right?  And so part of being fair and

Page 173

1 balanced is adequate weight to different
2 forms of evidence.
3     Q.   Fair enough.
4         Regarding medical literature, is it
5 important to you to consider whether the study or
6 literature article are funded?
7     A.   Certainly.
8     Q.   And is it important for you to consider
9 who is funding articles or pieces of medical
10 literature?
11     A.   Yes.
12     Q.   And is it also important to you to
13 consider if the authors have any financial
14 incentive regarding medical device if they do
15 research upon it and publish that research?
16     A.   Yes.  When we do systematic reviews,
17 there's many different types of bias, but
18 certainly those are types of bias or potential
19 biases.
20     Q.   Do you have an understanding as to the
21 pore says of the Prolene mesh used in the TVT,
22 TVT-O and Abbrevo?
23     A.   Yes.
24     Q.   What is that?
25     A.   It's roughly 1.3 millimeters or 1300

Peter Jeppson, MD, FACOG, FACS

Page 174

1 microns.
2    Q.    And do you have an understanding as to
3 the weight of the Prolene mesh used in the TVT,
4 TVT-O and TVT Abbrevo?
5    A.    I've seen that number.  I can't remember
6 that offhand, but I have seen that.
7    Q.    Is the weight of the Prolene used
8 significant to you?
9    A.    I think that there's an interest there,
10 again, in kind of the geeky, nerdy theory sort of
11 way, but, again, as I was discussing earlier,
12 really what matters is the clinical implications
13 and the clinical outcomes.  And so I don't know
14 that I -- you know, a practicing physician needs
15 to know how much a certain segment of mesh weighs
16 to know whether or not it's effective based on
17 trials.
18    Q.    Do you think pore size is significant
19 regarding meshes used in midurethral slings?
20    A.    I think the pore size is important in
21 that it's been demonstrated that when pore sizes
22 become too small, complications become higher and
23 that's why there's type 1 mesh, type 2, type 3,
24 type 4.
25        Type 1 mesh is when the pore size is

Page 175

1 greater than 75 microns.  Type 3 or, you know, as
2 it gets below 10 microns is when you get worried
3 about the host immune, you know, the -- like
4 microphages, that stuff, not being able to get
5 into the mesh to fight infection.  All the meshes
6 we're discussing are type 1 polypropylene, which
7 are much higher than the requisite 75 microns.
8    Q.    Do you consider the Prolene mesh used in
9 the TVT-O to be a heavyweight mesh?
10    A.    I do not.
11    Q.    Do you consider it to be a lightweight
12 mesh?
13    A.    I consider it to be a type 1 mesh.
14    Q.    And that's from the Amid classification?
15    A.    Correct.  It was published in '97 or '98.
16    Q.    In your review of internal Ethicon
17 documents, did you come across anywhere the
18 company referenced the Prolene mesh used in the
19 TVT, TVT-O and Abbrevo as heavyweight mesh?
20    A.    I did see documents that referred to it
21 that way, yes.
22    Q.    Do you disagree with those documents?
23    A.    I think that when looking at documents,
24 it's easy to take things out of context.  I don't
25 particularly care what one, you know, researcher

Page 176

1 said to another researcher regarding internal
2 documents.  If you have a device that weighs, you
3 know, 1 gram and you have another device that
4 weighs .9 grams, you can say one was heavy and one
5 was light, right?  It's all relative, but, again,
6 from a clinical perspective, I don't think that
7 matters.
8    Q.    In your review of the corporate
9 depositions you were provided, did you come across
10 any of those where Ethicon scientists said that
11 the Prolene mesh was heavyweight?
12    A.    Yeah, I remember seeing internal
13 documents, yes.
14    Q.    Do you remember seeing any deposition
15 transcripts where the scientists were asked about
16 it and testified that the Prolene mesh was
17 heavyweight?
18    A.    I remember seeing that.  I don't recall
19 if they were in depositions or if it was in
20 internal e-mails, but I know that I saw it.  I'd
21 have to go back and look at the documents to
22 refresh my memory.
23    Q.    Do you recall seeing any internal
24 documents where the Prolene mesh was referred to
25 as small-pore?

Page 177

1    A.    That I don't recall.  And if they did, I
2 would disagree with that.  Again, just based on
3 the Amid classification of greater than 75
4 microns, I think larger than that's a type 1
5 polypropylene mesh.
6    Q.    Do you recall in your review of the
7 internal documents any documents referring to
8 Prolene mesh as microporous?
9    A.    So I don't recall that, no.
10    Q.    Do you recall in reviewing the
11 depositions you were provided from the Ethicon
12 corporate witnesses, Ethicon scientists or other
13 high-level people referring to the Prolene mesh as
14 small-pore?
15    A.    I remember weight, heavy and light.  I do
16 not remember porosity being discussed.  I'd have
17 to go back and review that.
18    Q.    Do you agree that the TVT-O device comes
19 with the risk of -- strike that.
20        Do you know whether or not the IFU for
21 the TVT-O, when it came on the market, described
22 the risk of groin pain or leg pain?
23    A.    I've looked at the IFUs.  I looked at an
24 earlier version and a more updated version, but I
25 don't recall offhand.  I'd have to go back and

Peter Jeppson, MD, FACOG, FACS

Page 178

1 look.
2   Q.  Let me -- Doctor, if the TVT-O IFU, when
3 it came to market, did not reference the risk of
4 groin pain, should it have?
5   A.  So as we discussed earlier, you know, I
6 think the -- I don't think the purpose of the IFU
7 is to provide physicians with all possible
8 outcomes or all possible complications.
9       You know, again, I think that if there
10 are things that are, you know, reasonably or
11 somewhat associated with, that would be worth
12 mentioning.
13      Again, I would -- I would say that they
14 should follow whatever the government mandates are
15 for the IFU.  Again, just talking to people, I
16 think most physicians don't really reference the
17 IFU very often, if they ever read it at all.
18   Q.  Doctor, do you recall when the first
19 TVT-O randomized controlled trial was published?
20   A.  I don't recall.  The transobturator
21 sling, it was, I think, first approved in 2001.
22 TVT-O, the first publication, I'd have to look.
23 My guess is probably 2005 or '6 would be my guess,
24 but I don't know that.
25   Q.  If the risk of groin pain is not in the

Page 179

1 IFU and there's no publications about it, how are
2 doctors supposed to know that if the company
3 doesn't tell them?
4   A.  So I think that with risks with any
5 surgery, not everything is always known at the
6 outset of a given surgery.  And that is true
7 historically for all surgeries.
8       I think that part of using new devices
9 is, you know -- part of studying new devices is to
10 find out what the outcomes are.  I think, you
11 know, again, we've talked about this, and I don't
12 know whether or not Ethicon had data to report
13 that they knew specifically about groin pain and
14 if they had the known rates of that.  But, again,
15 I don't think that it's up to the -- the company
16 to provide all data to physicians.
17   Q.  Specifically as to groin pain with the
18 TVT-O, I mean, that's a problem, right?  If the
19 device comes on the market and there's no warning
20 of groin pain and it takes some time for that to
21 become published on, like, that's a problem for
22 those doctors to use it during that time window
23 and a problem for the unfortunate patients who are
24 implanted and don't know that, right?
25       MR. KOOPMANN:  Objection.

Page 180

1   A.  So I think that that is true for any
2 medication or device, which is why you have
3 medications that go through all the premarket data
4 and get to market and then later are recalled.
5       It's not possible to know everything from
6 the outset.  I would say that, you know, I wish
7 that there were procedures that did not have risks
8 or complications, but that is not the case.  And
9 so, again, you know, I know that you're focusing
10 on the -- the groin pain issues, but, again, when
11 looking at antiincontinence surgeries, the
12 composite must be weighed and other surgeries also
13 have complications.
14 BY MR. BRADFORD:
15   Q.  Groin pain is specific to the TVT-O,
16 correct?
17   A.  Based on where it is placed, there -- it
18 does have a risk over retropubic slings, yes.
19   Q.  Do you think patients should be used as
20 guinea pigs during that window of time between
21 launch and when the literature catches up if the
22 company doesn't warn of the risk?
23       MR. KOOPMANN:  Objection.
24   A.  So I think that the term "guinea pig" is
25 a sensationalized term.  I think that if you don't

Page 181

1 have medical progress, we would all be stuck in
2 the 1800s without anesthesia and without
3 appropriate surgeries.  So to a certain extent,
4 the practice of medicine is a practice.
5 Unfortunately, it is -- it is not completely
6 precise and, unfortunately, there have been
7 mistakes made.  You can look back at history to
8 see evidence of those.
9       And I don't think that patients should be
10 used as guinea pigs, but I also don't think that
11 patients should forego useful treatment options in
12 fear of not providing -- in fear of possible
13 harms.
14 BY MR. BRADFORD:
15   Q.  The retropubic -- the TVT retropubic was
16 already on the market when the O came out, right?
17   A.  It was.
18   Q.  Should companies develop products just
19 for market share as opposed to patient efficacy?
20       MR. KOOPMANN:  Objection.
21   A.  So I don't know that the devices were
22 developed specifically for market share.
23       If you're looking specific at the TVT-O,
24 the Monarc had already been on the market, I
25 believe, for a couple of years, maybe two or three

Peter Jeppson, MD, FACOG, FACS

Page 182

1 years before they got the TVT-O to market.  So
2 there was already a device on the market that was
3 similar to.
4        As a practicing physician, there are
5 times when I would prefer a transobturator sling
6 over a retropubic sling.  And so, again, there are
7 benefits to both.  And so, I don't -- I guess I
8 don't know how to answer that question.  I think
9 both -- both procedures are good procedures and
10 they need to be selected in appropriate patients.
11 BY MR. BRADFORD:
12    Q.   Do you -- did Ethicon ever provide you
13 any documents that outlined why it developed and
14 brought the TVT over market?
15    A.   I don't recall seeing those.  I may have
16 seen them.  I don't recall.
17    Q.   If there were documents where Ethicon
18 stated it brought that device to market because it
19 was losing market share to its competitors'
20 obturator devices, would that surprise you?
21    A.   No.  I don't think that would surprise
22 me, but I don't know that it was losing the
23 retropubic market.  It was losing the
24 transobturator market would be my suspicion and I
25 would have to go back and review those documents.

Page 183

1 And as is the case with many corporations not
2 simply in medicine, if Apple has the best phone,
3 well, Google will probably get involved or
4 Microsoft may.  You know, market forces are at
5 play, but I wouldn't say that's to the detriment
6 of patients.  It's providing options.
7    Q.   Do you agree that companies such as
8 Ethicon should put patient safety first?
9    A.   So I think that patient safety should
10 always be an important consideration.
11    Q.   Do you agree that companies such as
12 Ethicon should always put patient safety first?
13    A.   So, again, when we're talking about
14 safety, I presume you're discussing the composite
15 of risks and benefits, right?  So, you know,
16 again, I agree with being safe, but there are
17 inherent risks or benefits to any surgery or any
18 procedure.  And so, you know, there is -- in the
19 history, there is no -- well, I can't say that.  I
20 don't like to make absolutes.
21        It is unlikely that there is anything
22 that only provides benefit and has no risk and
23 that would be true here as well.
24    Q.   Stress urinary incontinence is not life
25 threatening; is it?

Page 184

1    A.   It is a quality-of-life issue.
2    Q.   Right.  And the implantation of
3 midurethral slings for stress urinary incontinence
4 is an elective procedure, correct?
5    A.   It is elective.  It's not mandatory.
6    Q.   In your report you reference regarding
7 duloxetine, that it's approved for use in Europe,
8 but considered off-label for treatment of SUI in
9 the U.S.  Do you recall that?
10    A.   Yes.
11    Q.   Do you have an opinion as to whether
12 European safety standards are higher than those in
13 the United States?
14    A.   So as my opinion, I think that European
15 standards differ from the U.S.  I don't know that
16 they're higher or lower.
17        If looking at -- I mean, if you look
18 across the board at like genetically modified
19 food, they don't allow that at all.  The U.S.
20 does.  I don't know if one is better than the
21 other, but they do have different regulatory
22 bodies, which is -- you know, I was talking about
23 earlier, right?  I think that companies should be
24 beholden to their government.
25    Q.   You mentioned FDA standards and approval

Page 185

1 processes or clearance processes actually several
2 times today.  Would you agree that those are the
3 minimum standard?
4    A.   I don't know that I have an opinion on
5 that.  I think that there are standards in place
6 that should be met.  I think that if -- I guess if
7 you don't meet those and you can't get to market
8 and so I guess by definition, they would be a
9 minimum.
10    Q.   You would agree there's no requirement
11 for a company to stop there and not warn of risk
12 it knows about, correct?
13    A.   I don't know that I understand the
14 question.
15    Q.   Sure.
16        A company could certainly meet the
17 minimum standard to have a product to the market
18 but also warn of the risk it knows about; couldn't
19 it?
20    A.   So a company can, yeah.  It's possible.
21    Q.   And you would agree as a practicing
22 doctor, that would be optimal for a company to
23 actually warn of the risks it knows about,
24 correct?
25        MR. KOOPMANN:  Objection.

Peter Jeppson, MD, FACOG, FACS

Page 186

1    A.   So, again, I don't -- I guess I don't
2  know if you're suggesting that they report to the
3  government body that provides approval or who it
4  is that you are suggesting that they need to
5  inform, right?  Like --
6    BY MR. BRADFORD:
7    Q.   More information is better, right?
8       MR. KOOPMANN:  Objection.
9    A.   I don't know that that's true to be
10  honest.  I think that as a physician, I want as
11  much information as I could possibly get.
12       As a -- as a patient, it's hard to take
13  in -- it's hard to drink from a firehose.  It's
14  hard to take in all possible information over the
15  course of 30 minutes or 15 minutes.
16       So, you know, I think that pertinent
17  information is important.  I don't think it's
18  possible to know everything, even for physicians,
19  or for companies or for patients, so...
20    BY MR. BRADFORD:
21    Q.   Would you agree that erosions are the
22  most common risk with midurethral slings?
23    A.   I don't think so.  I think --
24    Q.   What do you consider would be a more
25  common risk?

Page 187

1    A.   I think UTI is probably a higher risk
2  than erosion.
3    Q.   Would you agree that erosion is the
4  second highest risk from midurethral slings?
5    A.   So erosion risk, depending on what study
6  you look at, is going to be somewhere between 1 to
7  3 percent in most studies.  There are outlier
8  studies that have higher rates than that, but many
9  of the risks associated with any surgery are going
10  to be kind of in that 3 to 5 percent range.  So it
11  is a risk.  I don't know if it's the most common
12  or second-most common.  It's a known risk.
13    Q.   And being either the most common or
14  second-most common risk, do you agree that
15  patients deserve to know what the company knows
16  about that risk?
17       MR. KOOPMANN:  Objection.
18    A.   So, again, I think that -- again, perhaps
19  it's a philosophical discussion, but based on how
20  medicine is practiced in the United States, I
21  think patients have conversations with their
22  physicians to learn the information that's
23  pertinent to them and their care.  So, again, I
24  don't know that a company can or should provide
25  all information that it possibly can to

Page 188

1  physicians.
2       As we discussed, my day starts usually
3  around 5:30 and ends around 10:00.  I don't want
4  constant communication or constant updates from a
5  company that we did such and such study of five
6  people and we have this outcome.  Again, I would
7  base things on high-level evidence, systematic
8  reviews, level 1 evidence.
9       So, you know, is more information good?
10  Yeah, but there's a point at which you can't
11  get -- I mean, you can't have everything.
12    BY MR. BRADFORD:
13    Q.   Well, certainly more information about
14  one of the most common risks should be shared by
15  the company; shouldn't it?
16       MR. KOOPMANN:  Objection.
17    A.   But, again, I would -- I guess I would
18  counter it with, who are they sharing the
19  information?  Are they providing it to government
20  organizations so that they are -- that the mandate
21  or they cover the approval and the sale, and if
22  they don't --
23    BY MR. BRADFORD:
24    Q.   To doctors and patients.
25    A.   So, again, as we've discussed, I think

Page 189

1  that physicians and patients get their information
2  from different locations than from companies.  I
3  do.
4    Q.   What is your opinion as to the erosion
5  rate for the TVT?
6    A.   So midurethral slings in general are
7  going to be somewhere around 1 to 3 percent risk
8  of erosion or exposure or whatever you want to
9  call it.
10    Q.   Sure.  And so is that the same opinion
11  you would have for the TVT retropubic?
12    A.   In general, they're going to be pretty
13  similar.
14    Q.   Is that the same opinion for the TVT-O?
15    A.   You know, again, for -- for midurethral
16  sling mesh looking at systematic reviews, the
17  rates quoted are usually somewhere around 2
18  percent, you know, plus or minus, so 1 to 3
19  percent.
20    Q.   So it's your opinion that there's no
21  difference or distinction from the erosion risk
22  for the TVT, the TVT-O or the Abbrevo from the
23  general midurethral sling population?
24    A.   I think they share similar risk, yes.
25    Q.   What mesh are you using for your

Peter Jeppson, MD, FACOG, FACS

Page 190

1  abdominal sacrocolpopexy?
2     A.   So I'm using the Coloplast Empathy.  It's
3  the Restorelle.  Empathy was the prior company.
4  It's Restorelle mesh.  I use the Restorelle Y or
5  the Restorelle M.
6     Q.   And how long have you been using that
7  mesh for your abdominal procedures?
8     A.   When I came to New Mexico, they had
9  transitioned and so I've used it since I came
10  here.
11        In fellowship, I used a combination of
12  Restorelle and the -- the -- I'm blanking on the
13  name -- the Ethicon product, not the Prolene, but
14  the Gynecare mesh.  It was the Gynecare.  I used
15  that in fellowship and I used that in residency as
16  well.
17     Q.   The Gynecare PS?
18     A.   Yes.
19     Q.   What is the pore size for the Restorelle
20  Y mesh that you're using?
21     A.   The Restorelle Y is -- it's like 1800
22  microns.
23     Q.   And what about for the Gynecare PS?
24     A.   The Gynemesh is similar.  I think it's
25  somewhere around 2,000, but I'd have to double

Page 191

1  check that.
2     Q.   What's the weight of the Restorelle Y
3  mesh that you're using?
4     A.   The Restorelle is like 18 -- I always
5  forget the units -- 18 grams per meter square or
6  something like that.
7     Q.   I think that's right.
8        How about the weight of the Gynemesh PS?
9     A.   And the Gynecare, I've looked at that as
10  well and I don't remember.  I know it's higher
11  than that.  The Restorelle is the lowest weight on
12  the market.  And some people think that's good.
13  Some people think it's bad, but anyways, for the
14  Gynecare, I don't remember offhand.  80 is in my
15  brain, but that may not be right.  It might be 80
16  grams per meter squared, but I'd have to look.
17     Q.   Have you ever used Prolene for a
18  sacrocolpopexy procedure?
19     A.   In training, I did.
20     Q.   When was that?
21     A.   In residency and fellowship.
22     Q.   When was the last time you used Prolene
23  for the sacrocolpopexy?
24     A.   It would have been back in the 2012-ish
25  probably.

Page 192

1     Q.   Why did you change to the Y mesh?
2     A.   It's what they have at my institution.
3     Q.   Does it work better?
4     A.   I think that they're similar.  Again, I
5  haven't seen data that says that one is better
6  than the other.  There are risks and benefits to
7  different meshes.  Some people think the
8  lightweight mesh might be better.  Some people
9  think the lighter weight mesh may lead to higher
10  failure rates, and there's data to support one/or
11  the other, but it's not conclusive.
12     Q.   What do you think?
13     A.   I think that if you know where you're
14  putting the mesh and you know how to place it, I
15  don't think it matters much.
16     Q.   In your review of the Ethicon internal
17  documents, did you see any documents referencing
18  what Dr. Nilsson thought about mini slings?
19     A.   Not that I recall.  I'm sure that I saw
20  it.  I don't remember.
21     Q.   Yeah, and Dr. Nilsson -- you're familiar
22  with Dr. Nilsson, of course?
23     A.   Yes.
24     Q.   What's your understanding of who
25  Dr. Nilsson is and what's significant about him

Page 193

1  regarding midurethral slings?
2     A.   So I could be wrong.  My recollection of
3  Dr. Nilsson, I think they're -- I'd actually have
4  to look.  In my brain, they're a German surgeon,
5  but I could be wrong.  I'd have to look.
6     Q.   All right.  You cite Nilsson's reports
7  and studies in your report on slings; is that
8  correct?
9     A.   Uh-huh.
10     Q.   I was directing you to page 10.
11     A.   Is this it?
12     Q.   Yeah.
13     A.   I have to look.  Yep.
14     Q.   All right.  So does that jog your memory
15  as to who Dr. Nilsson is?
16     A.   So with -- with many of the references, I
17  don't necessarily know them personally or who they
18  are.  So, you know, like if you were to ask me,
19  you know, the details from a study, you know, I
20  could certainly do that.  If you're asking about
21  him personally, I don't know Dr. Nilsson
22  personally.
23     Q.   Do you know what significance, if any,
24  Dr. Nilsson had regarding the TVT sling?
25     A.   I don't remember.

Peter Jeppson, MD, FACOG, FACS

Page 194

1    Q.   Okay.  In your review of the Ethicon
2  documents, did you come across anything
3  referencing Dr. Nilsson's thoughts about
4  mechanical cut mesh versus laser cut mesh?
5    A.   You know, again, as we've discussed, I
6  don't think there's much clinical significance
7  between the two.  And so I'm sure that I looked at
8  the document because I looked through everything
9  that I was sent.  This was somewhere around a year
10 ago.  I do not remember the details.
11   Q.   Okay.  I'm going to ask my question again
12 so we can get a direct answer to this.
13        Sitting here today, do you recall seeing
14 anything in the internal Ethicon documents
15 regarding what Dr. Nilsson thought about
16 mechanically cut mesh versus laser cut mesh?
17   A.   I do not recall.
18   Q.   Sitting here today, do you have any
19 memory -- strike that.
20        Do you know who Dr. Deleval is?
21   A.   Again, I've heard of the name, and I
22 don't know if Deleval is a he or she.  They did
23 the TVT-O similar to Delorme with the AMS Monarc.
24 Delorme is a name I remember because they were
25 kind of the first.  Deleval is, I think, specific

Page 195

1  to Ethicon's product.
2    Q.   In your review of Ethicon's internal
3  documents, do you recall seeing anything about
4  what about Dr. Deleval thought about mechanically
5  cut mesh versus laser cut mesh?
6    A.   Again, I've looked at the data for laser
7  cut versus mechanical cut.  It doesn't stick in my
8  head because I don't think it matters.
9        So in reviewing the data, you know, I
10 know that they did look at that as we discussed
11 earlier.  I'm sure that Ethicon had a reason for
12 going from mechanically cut to laser cut.  I don't
13 remember all of those details.
14   Q.   Okay.  I'm going to ask it again.
15        Do you recall in your review of the
16 Ethicon internal documents what thoughts, if any,
17 Dr. Deleval had regarding mechanically cut mesh
18 versus laser cut mesh?
19   A.   I do not remember.  I would have to
20 refresh my memory.
21   Q.   You reference ACOG and AUA and AUGS and
22 SUFU in your report regarding midurethral slings.
23        Do you have an understanding whether or
24 not their more recent position statements include
25 mini slings as being acceptable devices?

Page 196

1    A.   So the data on mini slings, most of the
2  it is based on two devices.  And so if you look at
3  the Cochrane reviews in that, Steven Jeffries
4  presented on that at AUGS a few years ago.
5        So the data on mini slings was not as
6  promising, but I've heard that there may be newer
7  mini slings that are more promising.  In my
8  personal practice, I don't use mini slings just
9  based on the data.  If that changes, I would
10 consider using them.  And to answer your question,
11 I don't believe that ACOG or AUGS or IUGA or SGS
12 or any of these have changed their position on
13 midurethral slings.
14   Q.   You state in your report on pages 13 into
15 14 that, "Polypropylene monofilament, large pore
16 mesh is commonly accepted around the world as the
17 best material available for midurethral slings."
18        Do you see that?
19   A.   I agree with the statement, but I don't
20 see where you're talking.  It's on page 13.
21   Q.   And carrying into 14.  Sorry.
22   A.   Yeah.
23   Q.   Doctor, you're aware that in many parts
24 of the world, midurethral synthetic slings are not
25 allowed to be sold, right?

Page 197

1    A.   I have heard that, yes.
2    Q.   So that's not an accurate statement that
3  it's commonly accepted around the world as the
4  best material available for midurethral slings; is
5  it?
6    A.   Well, so I would say "commonly accepted
7  around the world" means most places, not
8  everywhere.  And I think that it is still accepted
9  as the best possible treatment option.
10       I know the UK did not allow the sale of
11 them for a while.  My understanding is that now
12 they are back with restrictions as to who can
13 place them, again, based on the data.  But, you
14 know, I'm referencing Ford's paper from 2017,
15 which is a Cochrane review.  So, you know, based
16 on what Ford recorded in their Cochrane review, I
17 would agree with their statement, but that is not
18 to say that every single country everywhere offers
19 it, but that may not be true.
20   Q.   You reference in the bottom paragraph on
21 page 14 in the section is your response to
22 contentions by plaintiffs' experts --
23   A.   Uh-huh.
24   Q.   -- that -- I'm just going to read this.
25 "Likewise, the extensive data supporting the

Peter Jeppson, MD, FACOG, FACS

Page 198

1 safety and efficacy of midurethral slings does not
2 support the theory that Prolene, polypropylene in
3 the slings is cytotoxic or elicits an intense
4 chronic foreign body reaction."
5   Do you see that?
6 A.   Yes.
7 Q.   Okay.  Removing the qualifier "intense"
8 away, would you agree that the Prolene mesh used
9 in the TVT, the TVT-O and the Abbrevo does elicit
10 a chronic foreign body reaction?
11   MR. KOOPMANN:  Objection.
12 A.   So, again, I think the question, at least
13 for me, from my perspective, the question becomes
14 a clinical question.  If there was a lot of
15 cytotoxicity, if there were problems caused by the
16 mesh, the complication rates and the issues seen
17 with the mesh would be much, much higher.  The
18 fact that, you know, the erosion rates I quoted
19 were, you know, 1 to 3 percent, it would make me
20 think that it's not -- that there may be a
21 reaction to a foreign material, but it's not
22 clinically important or clinically relevant.
23   In the pathology reports that I review
24 when I take out mesh, they do comment on, you
25 know, some inflammation around the mesh, but,

Page 199

1 again, from a microscopic view, if you're looking
2 immediately adjacent to the mesh, if there's a
3 foreign body, it wouldn't surprise me if there was
4 some sort of reaction there, but it does not
5 matter clinically because all these patients are
6 not becoming eroded and extruded and getting
7 infected and the rates are very low.
8 BY MR. BRADFORD:
9 Q.   The people from whom the mesh is removed
10 are certainly having complications from the mesh,
11 be it erosions or pain or dyspareunia, correct?
12   MR. KOOPMANN:  Objection.
13 A.   So certainly there are patients who have
14 problems or complications with any surgery.  The
15 same could be said for people with vaginal slings
16 or Burch procedures.  There are also complications
17 or adverse events that can be associated and
18 happen with those.  But, again, I don't think you
19 should throw the baby out with the bath water and
20 say because there's a very, very low risk of
21 complication, that no one should have the sling or
22 that it shouldn't be on the marked because then
23 you're discounting the 90-plus percent of women
24 who have had significant improvement and
25 significant benefit who now will be denied the

Page 200

1 opportunity for a very good treatment.
2   I certainly wish that there were no
3 complications, but, again, there are no surgeries
4 that don't.  In the Schimpf article, which is also
5 a reference to -- maybe it was on -- notes on this
6 page as well, you know, their conclusion is the
7 midurethral sling is the best option, and that's a
8 systematic review and they compared it to Burch
9 and pubovaginal slings.
10 BY MR. BRADFORD:
11 Q.   I'll save my questioning for you on
12 Schimpf in detail for another time --
13 A.   Okay.
14 Q.   -- and the flaws within Schimpf's
15 analysis.
16   My question -- backing up -- was
17 specifically regarding the chronic foreign body
18 reaction.  Let me ask it again.
19   You would agree that the Prolene
20 polypropylene used in the TVT, the TVT-O and the
21 Abbrevo elicit a chronic foreign body reaction?
22 A.   So, again, I think any time a foreign
23 body is implanted in the human body, there would
24 be expected to be some sort of reaction to it.  I
25 do not think it clinically important.

Page 201

1 Q.   You would agree that reaction for the
2 midurethral slings is a chronic foreign body
3 reaction?
4 A.   As we discussed earlier, the midurethral
5 sling is meant to be permanent.  It does not
6 dissolve and go away.  So, you know, it's a
7 chronic device.
8 Q.   Are you familiar with Vypro?
9 A.   I've heard of Vypro.  It's the mesh that
10 I believe has Vicryl strands that dissolve and go
11 away.
12 Q.   Are you familiar with Ultrapro?
13 A.   It's similar.
14 Q.   Do you have any understanding as to why
15 Ethicon developed Vypro and Ultrapro?
16 A.   There were theories -- as we've discussed
17 with the Restorelle mesh, there were some theories
18 that perhaps less mesh is better than more mesh.
19 Q.   Do you agree with that?
20 A.   Again, I would base things based on the
21 data.  There's not a lot of data to support the
22 quote/unquote lighter weight meshes.  If there's
23 data to show that they are as effective with a
24 better safety profile, then I would say they
25 should be used.  Until such time as that can be

Page 202

1 demonstrated, I would stick with what is tried and
2 true, so...
3    Q.   You would agree that the Burch procedure
4 and pubovaginal slings in native tissue repair was
5 tried and true before Ethicon decided to use
6 hernia mesh in the pelvic floor; wouldn't you?
7    A.   So what I would say is the Burch was
8 first described back in the '60s.  Pubovaginal
9 sling, I think was in the '60s or '70s, but I
10 don't remember exact, I think, '70s, '74 is in my
11 brain.
12    What I would say is if it was as
13 effective, it would still be considered the gold
14 standard and the midurethral sling would not have
15 taken off to the extent that it has.  Burches are
16 a much more invasive procedure than a midurethral
17 sling; so are pubovaginal slings.  And, again,
18 when looking at the data, the midurethral sling
19 performs better.  So, again, I am a proponent of
20 things being done safely, but I am also a
21 proponent of medical progress.  And I sure hope
22 that in 2050, we are not practicing exactly the
23 same way we are in 2020 because I hope we've made
24 progress in that time.
25    So, you know, to go back and say that the

Page 203

1 midurethral sling should never have been developed
2 because there was an option, I don't think is an
3 accurate statement.
4    Q.   That's a good point.
5    You would agree that there are advances
6 in medicine generally as time goes on, correct?
7    A.   That has been the case and I hope that
8 that continues.
9    Q.   And you would agree that there have been
10 advances in polypropylene compositions for meshes
11 used in the human body, correct?
12    A.   I don't know if that is true.  The
13 polypropylene mesh Prolene suture was first sold
14 back in like the -- like in '54, quite a while
15 ago, 60 years ago.  And, again, I have not delved
16 -- delved, is that a word -- I have not gotten
17 into the chemical composition of all the different
18 variations of Prolene, but essentially, Prolene
19 suture is what was used in Prolene mesh.
20    Q.   Let me ask a better question.
21    Specifically as to woven polypropylene
22 synthetic meshes, okay --
23    A.   Okay.
24    Q.   -- you would agree that there have been
25 developments over the past 20 years in woven

Page 204

1 polypropylene synthetic meshes; wouldn't you?
2    MR. KOOPMANN:  Objection.
3    A.   So I think that there are different ways.
4 There are knits.  There are weaves.  There are
5 different substances, you know, aside from Prolene
6 that have been used in meshes and so, yes, there
7 have been variations and options.
8 BY MR. BRADFORD:
9    Q.   You would agree that it would not be
10 proper for a company to not change its mesh
11 because it would lose the studies and the data it
12 had for previous mesh?
13    MR. KOOPMANN:  Objection.
14    A.   So, you know, again, going back to the
15 prior line of questioning, you know, I think that,
16 unfortunately, in medicine, there are no way to
17 make advancements without doing studies.  So, you
18 know, on the one hand, you know, we shouldn't have
19 developed a mesh because we had the Burch and the
20 pubovaginal sling, but on the other hand, we
21 should throw out all the data on the mesh in -- to
22 replace it with a different mesh.
23    I think that, you know, if data emerges
24 and if things progress and we find that there's a
25 different mesh that is more suitable with a better

Page 205

1 risk/benefit profile, then, yes, we should convert
2 to that.  Until such time, the risk/benefit
3 profile for the current meshes available are quite
4 good, which is why people aren't jumping to get
5 away from them.
6 BY MR. BRADFORD:
7    Q.   In your review of Ethicon's internal
8 documents, did you see anything that referenced
9 Ethicon's desire not to change the Prolene mesh
10 used in the TVT because it had all those years of
11 data and it didn't want to lose that.  Did you see
12 that?
13    A.   I don't recall that, but it would make
14 sense to me.  And as an aside, you know, I'm
15 surprised that someone hasn't purchased AMS's
16 Monarc because there are years and years of data.
17 It's one of the most studied products that was on
18 the market that's been -- the company just stopped
19 making it.  So, you know, it wouldn't surprise me
20 if a company has something that has a good safety
21 profile, a good risk/benefit profile to not want
22 to go away from that.  That would make sense, but
23 I don't remember seeing that specific
24 communication.
25    BY MR. BRADFORD:

Peter Jeppson, MD, FACOG, FACS

Page 206

1    Q.   If there's a safer mesh available for
2  midurethral slings, Ethicon should use it;
3  shouldn't they?  Let me ask a better question,
4  sorry.
5        If there is a safer mesh that has the
6  same or similar efficacy for its midurethral
7  slings, Ethicon should use that mesh; shouldn't
8  it?
9    A.   So, again, if we're talking hypothetical
10 or theoretic, yes, if you can find something that
11 is a safer and better, but I think that if you
12 have something that is already safe and good, you
13 need to demonstrate similar efficacy and similar
14 safety before you jump to said product.
15   Q.   You reference in your report on page 16
16 that it is, quote, "Pure speculation or conjecture
17 to purport or state that mesh slings with larger
18 pore sizes or lighter weight mesh than the typical
19 type 1 polypropylene mesh would have been safer or
20 more effective."
21      Do you see that?
22   A.   Yep, I see it.
23   Q.   You would agree there in internal Ethicon
24 documents that show the company knew the larger
25 pored, lighter weight mesh was safer; don't you?

Page 207

1    A.   I don't know that I would agree with
2  that.
3        I would say, again, when I'm making my
4  medical decisions, I'm basing it on primarily
5  level 1 evidence.  There is a lot of good evidence
6  supporting the use of midurethral slings.  I have
7  not seen in published research studies or
8  published data that show that a larger pore mesh
9  is safer or more effective.  So, you know, again,
10 if they have internal documents that show that,
11 then they should continue to do studies and bring
12 it to market.  Until such time, I think that what
13 we have is what should be used.
14   Q.   You would agree that the IFU for the TVT,
15 the TVT-O and the TVT Abbrevo state that Prolene
16 mesh elicits a minimal inflammatory reaction in
17 tissue based on animal studies, correct?
18   A.   That rings a bell.  That sounds right.
19 I'd have to look at the IFU, but I believe that to
20 be the case.
21   Q.   Right.  And the IFU goes on further to
22 say that, "The reaction is transient," correct?
23   A.   So, again, as we had discussed earlier,
24 any time a surgery is performed, there are healing
25 factors and healing issues related to the

Page 208

1  immediacy after surgery and then longer term.  So,
2  you know, I think that as far as, you know,
3  transient, there's a transient healing period
4  after any surgery that is transient and patients
5  heel.
6        You know, we've talked earlier about the
7  chronic nature of the implanted device.  The
8  device is permanent.  It is meant to stay in place
9  for a long -- for -- really for life.  It's not
10 intended to be removed.  So as such, there is a
11 transient healing, but then there's a chronic
12 device in place.
13   Q.   What's "transient" mean to you?
14   A.   "Transient" to me means something that
15 would last for a certain period of time and then
16 pass.
17   Q.   And it's your opinion that Prolene mesh
18 elicits a minimal inflammatory reaction?
19   A.   My clinical experience is that, yes, it
20 does elicit a minimally inflammatory response.
21 There's not a lot of inflammation around mesh.
22 Even when you go in and take it out, there's not
23 all this like grossly evident irritation
24 inflammation.
25   Q.   Is it your opinion that that reaction is

Page 209

1  transient in the TVT, TVT-O and Abbrevo?
2    A.   Again, during the healing process, the
3  healing process is a transient period.
4        THE COURT REPORTER:  I think I need five
5  minutes.
6        MR. BRADFORD:  Sure.
7        (Whereupon, a brief recess is taken from
8  2:36 p.m. to 2:43 p.m.)
9  BY MR. BRADFORD:
10   Q.   All right, Doctor, we're getting there.
11      You've got some opinions regarding
12 general sacrocolpopexy for prolapse, correct?
13   A.   Yes, sir.
14   Q.   All right.  I don't want to get a whole
15 lot deep into that.  I've asked some questions a
16 little bit about it already, but you agree that
17 the procedure itself is better to repair prolapse
18 abdominally than vaginally; wouldn't you?
19   A.   I think it depends on the patient, their
20 age and the degree or stage of prolapse.
21   Q.   Tell me more about that.
22   A.   So I think that the medical literature
23 supports the safety and efficacy of
24 sacrocolpopexy.  There are Cochrane reviews and
25 other systematic reviews that consider it the gold

Peter Jeppson, MD, FACOG, FACS

## Page 210

1  standard, and many providers think it's the gold
2  standard. I think it's a very good option. I
3  also think that vaginal surgeries can be good
4  options for certain patients.
5       The long-term success rates of
6  sacrocolpopexy are better. It's a more durable
7  procedure, but there are different risks
8  associated with the different procedures.
9    Q. Would you agree that if the doctor
10 decides to use Prolene mesh in a sacrocolpopexy
11 procedure, that's the same Prolene mesh that's
12 used in the TVT and the TVT-O and the Abbrevo,
13 correct?
14   A. Again, it's the type 1 polypropylene
15 mesh. The chemical composition, it's very
16 similar, if not in the same, but I'd have to look.
17   Q. Right. And I'm -- essentially Prolene is
18 Prolene, right?
19   A. So polypropylene, you know, in general,
20 they are similar. It does depend on if it's
21 knitted or woven or pore size, you know, that kind
22 of stuff does come into play. So, yeah, you can't
23 blanketly say that they're always the same, but
24 type 1 polypropylene mesh, they should be similar.
25   Q. If a surgeon uses Prolene mesh, the

## Page 211

1  Ethicon Prolene mesh for an abdominal procedure
2  for prolapse, that's a different cut and a
3  different size, but it's the same core mesh that's
4  used in the TVT, correct?
5    A. Again, my understanding is they are very
6  similar.
7    Q. I'm going to ask you about degradation.
8  We talked -- we kind of bounced -- touched on it,
9  but I want to ask you some questions about
10 degradation for the Prolene mesh.
11      Do you agree that Prolene mesh degrades
12 in the body?
13   A. So I don't think that it does degrade in
14 the body.
15   Q. Have you seen any internal Ethicon
16 documents that are contrary to your opinion?
17   A. I have.
18   Q. And have you seen any Ethicon witness --
19 corporate witness depositions that are contrary to
20 your opinion?
21   A. Yeah, there are some contrarian views.
22 Based on clinical experience and based on overall
23 published literature, it is intended to be a
24 permanently-implanted device, but I don't go back
25 later and find mesh that needs to be removed and

## Page 212

1  take it out and find that it's disintegrating and
2  falling apart. It has very similar properties
3  when removed as though it did when it was placed.
4    Q. Let me ask you some questions about mesh
5  contraction.
6       You would agree that the Prolene mesh
7  contracts when implanted in the body?
8    A. So in the literature that I have reviewed
9  and data that I reviewed from studying for my
10 boards, you know, it's about 10 percent over the
11 first year.
12   Q. In your review of Ethicon internal
13 documents, did you come across any that find a
14 higher rate of contraction than 10 percent?
15   A. So there are reports, I think some that
16 go up to 30 percent.
17      Again, based on clinical experience and
18 having implanted many, many different
19 sacrocolpopexy meshes and followed patients over a
20 long period of time and seen patients back by my
21 partners who have treated them many, many years
22 ago, there is not significant clinical
23 contracture. So, you know, if mesh were
24 contracting by 50 percent, you'd expect to see
25 significantly higher complication rates, which we

## Page 213

1  don't see.
2    Q. So in your practice, you've not seen that
3  clinically, correct?
4    A. Clarify what? What do you mean I haven't
5  seen?
6    Q. Thank you.
7       In your practice, it's your testimony
8  that you have not seen contraction rates or
9  contraction amounts of more than 10 percent,
10 correct?
11   A. So, you know, again, it's a proportion,
12 but based on my clinical experience, I would say
13 that it's in line with the literature that I've a
14 seen that quotes somewhere around 10 percent.
15   Q. I believe your reliance list indicates
16 you reviewed the work and deposition of
17 Drs. Klinge and Klosterhalfen.
18      Do you recall what they said about mesh
19 degradation and contraction?
20   A. I'd have to review it to refresh my
21 memory.
22   Q. Sitting here today, do you know how
23 Dr. Klinge is?
24   A. I've heard the name, but I don't recall
25 details.

Peter Jeppson, MD, FACOG, FACS

Page 214

1    Q.   Sitting here today, do you know who
2  Dr. Klosterhalfen is?
3    A.   So I don't remember for sure.  I -- I
4  could take a guess, but I don't remember exactly
5  who Dr. Klosterhalfen is; a German surgeon maybe.
6  I think that sounds more like her name, but I
7  don't remember.
8    Q.   I hate to do this just after the other
9  break, but I'm going to take a step out and go
10  through some notes.  I think I'm about done.
11      MR. KOOPMANN:  Sure.
12      (Whereupon, a brief recess is taken from
13  2:50 p.m. to 2:59 p.m.)
14  BY MR. BRADFORD:
15    Q.   Doctor, I'm going to ask some questions
16  about Exhibit T-10.
17    A.   Okay.
18    Q.   That's your CV, correct?
19    A.   Yes, sir.
20    Q.   All right.  And on there you listed a lot
21  of things.  I want to go through a couple to make
22  sure I've got a thorough understanding of certain
23  parts.
24      On page -- I'm sorry.  The pages aren't
25  numbered, but on the portion under, "Invited

Page 215

1  Lectures" --
2    A.   Yep.
3    Q.   Let me tell you what I've done.  I've
4  looked through it to try to identify what has to
5  do with stress urinary incontinence, midurethral
6  slings or other treatments for stress urinary
7  incontinence, okay?
8    A.   Okay.
9    Q.   And under, "Invited Lectures," I see the,
10  "November 2014, Cadaveric Lab Presentation," you
11  did in Vancouver, correct?
12    A.   Yes.
13    Q.   That's the only one I see for your
14  invited lectures that has anything to do with
15  stress urinary incontinence, synthetic meshes or
16  nonsynthetic meshes or surgical or nonsurgical
17  treatment of SUI.  Am I missing any?
18    A.   No.
19    Q.   All right.  I want to next talk about the
20  publications that are peer reviewed.
21    A.   Okay.
22    Q.   The first one you're listed as an author
23  and a string of others, correct?
24    A.   I'm listed as -- I'm an author or
25  coauthor of all of these.

Page 216

1    Q.   Correct.
2      And that one is regarding pelvic organ
3  prolapse surgery, correct?
4    A.   Which one?
5    Q.   The first one.
6    A.   Oh, No. 1?
7    Q.   Yes, sir.
8    A.   Yes.
9    Q.   And the second one involves prolapse
10  severity, correct?
11    A.   Yep.
12    Q.   Okay.  And as you look through this with
13  me, I'm looking for prolapse, SUI, treatment,
14  meshes, non-meshes, nonsurgical, surgical
15  whatever, okay?
16    A.   Okay.
17    Q.   Just to be sure I'm not missing any,
18  there's No. 1, No. 2, No. 22?  Take your time.
19  I'm not trying to rush you.
20    A.   Yeah.
21    Q.   On the page you're looking at now,
22  Doctor, I have No. 22 marked?
23    A.   Yep.
24    Q.   We've talked a bit about that study;
25  haven't we?

Page 217

1    A.   We have.
2    Q.   And I have No. 29 marked.
3    A.   Okay.
4    Q.   Any others on that page involving the
5  topics that we -- that I mentioned just earlier?
6    A.   So you said 21.  21 is prolapse.  22 is
7  sling.  23 is prolapse.
8    Q.   26 is prolapse also?  I think I looked at
9  this for slings actually.
10    A.   Okay.  29 is sling.
11    Q.   Any others?
12    A.   I don't know.  There are -- maybe they're
13  not.  I thought I put them on.  I have -- but I
14  don't see them, but they're treatment of urinary
15  incontinence, but there is Annals of Internal
16  Medicine that has been published recently and
17  another -- those are all on urinary incontinence,
18  but they're not surgical.  I don't know if that
19  matters.
20    Q.   It does.  No, I'm curious about them.
21      MR. BRADFORD:  Can you get them to me?
22      MR. KOOPMANN:  Yeah.
23    A.   I don't know if -- I always keep my CV
24  updated.  I'm surprised that they're not here.
25      MR. KOOPMANN:  I can get you an updated

Peter Jeppson, MD, FACOG, FACS

Page 218

1  CV once he adds those.
2      MR. BRADFORD:  Sure.
3      A.   I don't know where they went though.
4  That's the weird thing.  They should be on here.
5  Yeah, there's -- there are three more.  One is a
6  PCORI-NIH funded study about nonsurgical treatment
7  of SUI -- of UI, just in general.
8  BY MR. BRADFORD:
9      Q.   That is on here.
10     A.   Is that on here somewhere?  It should be
11 under, "Publications," though.  That would be
12 listed as a funding source, but the study is done
13 and published and so it should be somewhere right
14 around 7 and it's not.
15     MR. KOOPMANN:  Is it in the CV that's
16 been included in the binders?
17     THE WITNESS:  Oh, maybe.  It might be in
18 the updated one.  Let me see.  No, this is the
19 same one.  I must -- it must have been omitted.
20 Those are abstracts.  Yeah, it's -- so this is an
21 outdated CV.  So 9 and 10 and 13 are nonsurgical
22 treatments of urinary incontinence in women.
23     So one is an update for the AHRQ and
24 PCORI.  It's an NIH funding organization.  That
25 was published in August of 2018.

Page 219

1      And then No. 9 is, "Adverse events
2  associated with nonsurgical treatments of urinary
3  incontinence in women; a systematic review."  That
4  was accepted to the Journal of General Internal
5  Medicine.  And then there's a, "Nonsurgical
6  treatment for urinary incontinence in women;
7  systematic review and network metaanalysis," and
8  that was in the Annals of Internal Medicine.
9      So I think those are pertinent, but this
10 is my most recent.  I'm not sure how old this CV
11 is, March of '18.  So this CV is a year old.  This
12 one is my recent.
13 BY MR. BRADFORD:
14     Q.   It's dated April 12th of '19?
15     A.   Yeah.
16     Q.   So we have that so there's no reason to
17 mark it separately?
18     A.   Correct, it's already marked.
19     Q.   And then regarding the grants, we
20 mentioned the AHRQ grant for, "Nonsurgical
21 treatments for urinary incontinence in adult
22 women," correct?
23     A.   Yep.
24     Q.   And then on No. 4, there's an NIH grant
25 regarding pelvic floor disorders.

Page 220

1      Did that carry over into some of the
2  issues that you're giving opinions about today?
3      A.   I don't think so.
4      Q.   It didn't read like it would, but I
5  wanted to double check.
6      A.   Yeah, I'm not speaking for -- for them.
7      Q.   Great.
8      A.   That's what these studies came from.
9  Nos. 1 and 2 were PFDN studies.
10     Q.   Under your abstracts, I want to ask you
11 about No. 21.
12     A.   Okay.
13     Q.   Okay.  What do you remember, if anything,
14 about that post or presentation?
15     A.   So that post or presentation became the
16 publication that you asked me about earlier.
17     Q.   Thank you.
18     A.   It's just the same project.  Typically
19 with research, you get results.  You submit to a
20 meeting, present at the meeting and then go on to
21 publication.
22     Q.   Thank you, Doctor.
23     And then on No. 28?
24     A.   Yep.
25     Q.   Okay.  It's -- what do you recall, if

Page 221

1  anything, about that oral presentation?
2      A.   I can remember everything about it.  Do
3  you want me to tell you about it?
4      It was also published, but that was
5  published in Obstetrics and Gynecology.  So if you
6  go to my publication list, it will be No. 29.
7      Q.   Let me ask a couple of questions about
8  it.
9      We did a search of you and that actually
10 showed up in Ethicon's database and the -- and I
11 found it actually way, way too early this morning
12 and it -- do you recall on the schedule, it was
13 under a session titled Tips and Tricks.  Do you
14 recall that?
15     A.   Yeah, it was at SGS.
16     Q.   And what are Tips and Tricks?
17     A.   So different medical societies have --
18 their meetings are planned different ways.  Tip
19 and Trick could be more like a way to handle
20 something maybe in a new or novel way or something
21 different than has been described before.
22     Q.   Right.  Sometimes that can be different
23 from what's in the IFU, for example?
24     A.   Potentially, yeah.
25     Q.   All right.  And do you recall how long

Peter Jeppson, MD, FACOG, FACS

Page 222

1  that presentation was?
2      A.   I don't recall, five minutes, five to
3  eight minutes would be my guess.
4      Q.   That's about what I thought too.  We can
5  put the CV away.  Put the binder back up too
6  before I lose it.
7          Dr. Jeppson, these slings that you've
8  talked about today, they are identified as being
9  tension-free, correct?
10     A.   Yes.
11     Q.   Would you agree that they're not truly
12  tension-free?
13     A.   I think it depends on how you define
14  "tension."  When I place them and when I teach the
15  fellows and residents how to place them, we do
16  want them to be tension-free or not tight, I guess
17  would be the synonym.  If they're too tight, they
18  tend to be obstructive and patients have a hard
19  time voiding.  So you want it quote/unquote tight
20  enough that they don't leak but not so tight that
21  they can't pee.
22     Q.   So is it fair to say you want them
23  tensioned enough that they work but not so
24  tensioned that it causes obstruction or other
25  problems?

Page 223

1      A.   I think that is what I'm saying, but, you
2  know, I think that is tension-free.  They should
3  just kind of sit underneath the urethra.  They
4  should be at the midurethra.
5      Q.   Doctor, do you agree that in certain
6  patients the midurethral slings that we've talked
7  about today can cause nerve entrapment?
8      A.   So I think there can be neurogenic pain
9  issues.  When I think of a nerve entrapment, I
10  think of actually placing a suture or something
11  around a nerve to -- to wrap around and entrap it.
12         Based on the anatomy, there are, of
13  course, nerves everywhere in the body and in the
14  pelvis, but there's not a discrete nerve that
15  would be wrapped around.  It's not like when you
16  do a laparoscopy in closed in port sites, you can
17  close the ilioinguinal or hypogastric nerves and
18  it's things like that that would cause quite a bit
19  of pain.  There's not a discreet nerve like that.
20  These would be branches of the pudendal nerve,
21  which comes in from the lateral side walls and
22  migrates medially.
23     Q.   So there can be branches of nerves that
24  might be entrapped or encapsulated in mesh in
25  certain patients?

Page 224

1      A.   So, you know, any time anyone has
2  surgery, there is a risk of, you know, abdominal
3  incisions, everything.  There are nerves in the
4  area because there are nerves for sensation in the
5  body.  I don't know that I would expect them to be
6  encapsulated or entrapped.  They are probably
7  severed or interrupted as the mesh passes, but,
8  again, the mesh burden or the mesh diameter is so
9  small that the -- it does not effect any major
10  nerves.  It shouldn't effect major nerves.
11     Q.   Would you agree that the contraction
12  process can affect the nerves of the pelvic floor?
13     A.   So, you know, again, as we've discussed,
14  you know, I think mesh does contract to a certain
15  extent during the healing phase and after
16  implantation.  We've discussed that the pain is a
17  known risk factor of mesh insertion and mesh
18  placement.  Could some of that be due to the
19  slight contraction?  Possibly.  Could it be due to
20  the surgical implantation?  Possibly.  You know,
21  again, these risks are present with pubovaginal
22  slings, which are placed in a very similar
23  location and different nerve issues could be found
24  with Burch surgeries, which are placed in, you
25  know, a different location but still would

Page 225

1  traverse the abdominal wall and pelvis.
2      Q.   Would you agree that if the pore size is
3  too small for a synthetic mesh, it can increase
4  the risk of infection, erosions and exposures?
5          MR. KOOPMANN:  Objection.  Go ahead.
6      A.   So that has been demonstrated by the Amid
7  and subsequent papers and, you know, there's quite
8  a bit of literature around that.  Again, I think
9  it depends on how you define, you know,
10  quote/unquote, too small.  But in general, a type
11  1 mesh is greater than 75 microns.
12  BY MR. BRADFORD:
13     Q.   Would you agree that in general a less
14  stiff mesh is better?
15     A.   So, you know, again, stiffness is
16  somewhat relative.  From the perspective of, you
17  know, physiologic range in the human body, you
18  know, I don't know that there's a whole lot of
19  difference in the different types of meshes that
20  we were discussing.  You know, the perfect mesh
21  would be just the right stiffness, not too stiff,
22  not to lacks.  But, again, you know, I don't know
23  how you're defining "stiff."  Meshes are
24  inherently stiffer than the human body, which is
25  why they're used because the human body is having

Peter Jeppson, MD, FACOG, FACS

Page 226

1  issues with leaking and prolapse.
2  Q.   You would agree that meshes closer to
3  replicating the tissue within the pelvis or pelvic
4  floor is better than overly-stiff mesh?
5  MR. KOOPMANN:  Objection.
6  A.   So, again, I think that when we're
7  talking about mesh and what's been published on
8  mesh, I would defer to the medical literature as
9  to, you know, what is the best.
10  You know, mesh has been shown to be
11  better than biologics, certainly for slings and
12  for sacrocolpopexy.  So, you know, again, it needs
13  to be stiff enough.  You don't want it to be too
14  stiff, but it all depends on how you define
15  "stiff" and what stiffness is.
16  BY MR. BRADFORD:
17  Q.   I think I've been through this, but
18  briefly, you've never helped a company get a
19  product through the 510(k) process; have you?
20  A.   So the 510(k) process for meshes was
21  replaced by the 522 process.  Some of the
22  organizations have collected data for those types
23  of things.  I have been involved in studies
24  through the PFDN, looking specifically at pelvic
25  mesh that I think will be used for their 522

Page 227

1  processes.  Part of the FDA mandate that came out
2  on April 16th or 15th, whenever that was, is that
3  the companies need to continue those studies and
4  continue to follow patients.  So I have not been
5  paid by the companies to perform those studies or
6  to report on them, but I have been involved in
7  studies that will be used by companies for their
8  products, so...
9  Q.   You haven't been hired in this case to
10  serve as an expert regarding the FDA; have you?
11  MR. BRADFORD:  Counsel, can you help us
12  on this one?
13  MR. KOOPMANN:  I will stipulate that he
14  is not being disclosed as an FDA regulatory
15  expert.
16  BY MR. BRADFORD:
17  Q.   And you're not an expert regarding the
18  PMA approval or clearance process; are you?
19  A.   So, again, I would defer to the
20  regulatory bodies regarding those.
21  MR. BRADFORD:  Thank you, Doctor.  Those
22  are all the questions I have.  I appreciate your
23  time.
24  THE WITNESS:  Thank you.
25  EXAMINATION BY MR. KOOPMANN:

Page 228

1  Q.   Just some brief followup and, again,
2  reminder to try to direct your answers to the
3  court reporter since I'm sitting next to you.
4  And just for the record, my name is Barry
5  Koopmann and I represent Ethicon and Johnson &
6  Johnson and I have some follow-up questions for
7  you, Dr. Jeppson, okay?
8  A.   Okay.
9  Q.   Just so I'm clear, did you review more
10  medical literature than the medical literature
11  that has been included in these binders today?
12  A.   Yes.
13  Q.   Have you also in the course of your work
14  in the pelvic mesh litigation over the past year
15  or so reviewed several plaintiffs' experts'
16  reports?
17  A.   Yes.
18  Q.   And do some of those plaintiffs' experts'
19  reports that you've read reference internal
20  Ethicon or Johnson & Johnson company documents?
21  A.   Yes, they do.
22  Q.   And did those reports sometimes
23  paraphrase and or even quote those internal
24  company documents?
25  A.   Yes.

Page 229

1  Q.   And you've reviewed those reports in the
2  course of forming your opinions in this case; is
3  that true?
4  A.   Yes.
5  Q.   When you have a patient referred to you
6  to treat a complication after a pelvic surgery,
7  whether it's mesh or non-mesh and you didn't
8  perform the initial surgery that was done to treat
9  that patient's incontinence or prolapse, do you
10  try to get the medical records from that initial
11  surgery done by some other surgeon if you're
12  thinking about removing some portion of the mesh
13  from that patient?
14  A.   Yes.  I would always prefer to know what
15  was placed and how it was placed.  It's not always
16  possible, but I would prefer that.
17  Q.   One of the -- you were asked some
18  questions earlier about studies that you've looked
19  at that compare laser cut mesh versus mechanically
20  cut mesh.  Do you remember those questions
21  generally?
22  A.   Yes.
23  Q.   In your midurethral sling general report,
24  did you cite a study by an author, lead author
25  named Rusavy titled, "Are the same tapes really

Peter Jeppson, MD, FACOG, FACS

Page 230

1 the same?  Ultrasound study of laser cut and
2 mechanically cut TVT-O postoperative behavior"?
3    A.   Yes.
4    Q.   And what's your recollection of what that
5 study showed with respect to laser cut versus
6 mechanically cut slings?
7    A.   So I would have to review it for the full
8 details, but my general recollection is that there
9 is a difference between the two, but it doesn't
10 seem to be clinically important.
11    Q.   Do the systematic reviews and
12 metaanalyses that you've relied on in the course
13 of forming your opinions in this case, do those
14 look at all of the available information that
15 meets the authors' inclusion criteria regardless
16 of whether it's favorable or not favorable
17 regarding the device?
18       MR. BRADFORD:  Form.
19    A.   I'm sorry.  Could you repeat the
20 question?
21    BY MR. KOOPMANN:
22    Q.   Sure.  Do the systematic reviews and
23 metaanalyses that you've relied on, looked at, for
24 the purpose of forming your opinions in this case,
25 do those look at all of the available information

Page 231

1 that meets the authors' inclusion criteria
2 regardless of whether it's favorable or not
3 favorable regarding the device?
4       MR. BRADFORD:  Form.
5    A.   Yes, yes.  That is how systematic reviews
6 are designed.
7    BY MR. KOOPMANN:
8    Q.   You were asked some questions earlier
9 about sort of a hypothetical situation where if
10 there's a mesh with similar efficacy -- if there
11 are two meshes with similar efficacy, should the
12 company use the mesh that has -- that is safer?
13 Do you remember those questions generally?
14    A.   Yes.
15    Q.   Could one study show that one mesh is
16 safer than the mesh that's used in the TVT, TVT-O
17 or TVT Abbrevo mesh in your opinion at this point?
18       MR. BRADFORD:  Form.
19    A.   So I think that composite knowledge is
20 what is important for medical care.  And so I
21 would not base, you know, my foundation of
22 knowledge on one study but rather the composite
23 information from a multitude of studies,
24 preferably high-quality studies such as randomized
25 controlled trials or systematic reviews as I've

Page 232

1 discussed previously.
2    BY MR. KOOPMANN:
3    Q.   Could one company e-mail indicating that
4 one mesh is safer than the mesh in the TVT, TVT-O
5 or TVT Abbrevo establish for you that that mesh is
6 safer than the TVT, TVT-O or TVT Abbrevo mesh?
7       MR. BRADFORD:  Form.
8    A.   No.  That would represent one person's
9 opinion and may be interesting but would not
10 overly sway the large body of evidence.
11    BY MR. KOOPMANN:
12    Q.   Do your general reports regarding the
13 TVT, TVT-O and TVT Abbrevo and your report
14 regarding the Prolene mesh and Gynemesh PS as used
15 in sacrocolpopexy procedures, do they contain your
16 opinions regarding the safety and efficacy of
17 those mesh products?
18    A.   Yes.
19    Q.   And do you hold the opinions that you set
20 forth in your general reports that have been
21 marked as exhibits today to a reasonable degree of
22 medical certainty?
23    A.   Yes.
24    Q.   And do you hold the opinions that you've
25 offered today in this deposition to a reasonable

Page 233

1 degree of medical certainty?
2    A.   Yes.
3    Q.   Generally speaking, what are the bases
4 for the opinions that you've offered here today in
5 terms of your background information?
6    A.   So as previously discussed, you know, my
7 medical knowledge is based on a composite of life
8 experience, patient treatment, review of medical
9 literature, medical school learning, residency and
10 fellowship, as well as, you know, textbook reading
11 and keeping up with the literature in general.  So
12 it's the composite of experience and knowledge.
13    Q.   Would it also be based in part on
14 discussions that you've had with colleagues within
15 the urogynecologic community?
16    A.   Yes.
17       MR. BRADFORD:  Form.
18    A.   Yes.
19    BY MR. KOOPMANN:
20    Q.   Do you practice evidence-based medicine?
21       MR. BRADFORD:  Form.
22    A.   I try to practice evidence-based
23 medicine.
24    BY MR. KOOPMANN:
25    Q.   What does "evidence-based medicine" mean?

Peter Jeppson, MD, FACOG, FACS

Page 234

1    A.   "Evidence-based medicine" means that
2 essentially there is a -- it's not a moving
3 target, but it's a continuously progressing target
4 where if you practice medicine based on the
5 evidence of today, you will probably be out of
6 date by, you know, the year 2030.  So
7 evidence-based medicine means keeping up with
8 publications, keeping up with the medical
9 literature, keeping up with the experiences of
10 others, as well as myself, and modifying practice
11 based on new innovations and new publications as
12 they come out.
13    Q.   Within the practice of evidence-based
14 medicine, is some evidence thought of as being
15 more powerful than other evidence?
16    A.   Yes.
17    Q.   What are the highest levels of evidence
18 within the practice of evidence-based medicine?
19    A.   So in general, the highest level of
20 evidence would be considered systematic reviews
21 and metaanalyses.  Cochrane reviews are a form of
22 systematic review.  It only includes randomized
23 controlled trials.  Sometimes there are advantages
24 for that.  Sometimes there are disadvantages for
25 that, but in general, randomized -- in general,

Page 235

1 systematic reviews are going to be the highest.
2         Randomized controlled trials are also a
3 very good form of evidence, a very high-level,
4 level 1 evidence.  Beyond that, there are, you
5 know, comparative cohort studies, case control,
6 case series, you know, and expert opinion would
7 probably be down at the bottom.
8    Q.   Where do internal company e-mails,
9 documents or PowerPoint presentations fall within
10 that hierarchy?
11    MR. BRADFORD:  Form.
12    A.   They don't.  They are not on the list.
13 BY MR. KOOPMANN:
14    Q.   Are levels of evidence important in
15 assessing the safety and efficacy of the devices
16 that you've written your reports about?
17    A.   Yes.  My opinions are based on level 1
18 evidence essentially.
19    Q.   Are Cochrane reviews, randomized
20 controlled trials and systematic reviews and
21 metaanalyses, in your opinion, reliable in
22 determining the safety and efficacy of the devices
23 that you've written your reports about?
24    MR. BRADFORD:  Form.
25    A.   Yes.

Page 236

1 BY MR. KOOPMANN:
2    Q.   And why is that?
3    A.   Again, as we discussed, it's the highest
4 level of evidence.  So the level 1 evidence would
5 be better than, you know, some case series or case
6 report of one patient where something unfortunate
7 happened.
8         Ideally, you know, the medical opinions
9 and the practice of medicine should be based on
10 high-level evidence.
11    Q.   And what sort of evidence did you focus
12 on in your research done to form the opinions that
13 you've expressed here today in the deposition and
14 in your general reports?
15    A.   So as much as possible, level 1 evidence.
16    Q.   Are the complications that you've seen in
17 your practice with the use of the TVT, TVT-O and
18 TVT Abbrevo devices and the Prolene mesh and
19 Gynemesh PS consistent with the warnings listed in
20 the adverse reactions section of those products'
21 IFUs?
22    MR. BRADFORD:  Form.
23    A.   Yes.
24    MR. KOOPMANN:  All right.  Those are all
25 the questions I have for you.  Thank you,

Page 237

1 Dr. Jeppson.
2    THE WITNESS:  Thank you.
3    MR. BRADFORD:  Bear with me one second.
4 I don't have any questions.
5    MR. KOOPMANN:  We'll read and sign.
6    (Time noted:  3:29 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Peter Jeppson, MD, FACOG, FACS

## Page 238

```
 1        IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2               CHARLESTON DIVISION
 3     MASTER FILE NO:  2:12-MD-02327
 4
       IN RE: ETHICON, INC., PELVIC REPAIR
 5   SYSTEM PRODUCTS LIABILITY LITIGATION   MDL 2327
 6
 7      CERTIFICATE OF COMPLETION OF DEPOSITION
 8     I, DANA N. SREBRENICK, RPR, CLR, CRR, NM CCR
      #513, DO HEREBY CERTIFY that on Thursday,
 9   May 16, 2019, the Deposition of PETER JEPPSON, MD,
      FACOG, FACS was taken before me at the request of,
10   and sealed original thereof retained by:
11     BRAD BRADFORD, ESQ.
          ATTORNEY FOR PLAINTIFFS
12     AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
         17 East Main Street, Suite 200
13       Pensacola, Florida 32502
14       I FURTHER CERTIFY that copies of this
      Certificate have been mailed or delivered to all
15   Counsel, and parties to the proceedings not
      represented by counsel, appearing at the taking of
16   the Deposition.
17      I FURTHER CERTIFY that examination of this
      transcript and signature of the witness was
18   requested by the witness and all parties present.
19     On _____, 2019, a letter was mailed or
      delivered to BARRY J. KOOPMANN, ESQ., regarding
20   obtaining signature of the witness, and
      corrections, if any, were appended to the original
21   and each copy of the Deposition.
22      I FURTHER CERTIFY that the recoverable cost of
      the original and one copy of the Deposition,
23   including exhibits, to BRAD BRADFORD, ESQ., is
      $_____.
24
         I FURTHER CERTIFY that I did administer the oath
25   to the witness herein prior to the taking of this
```

## Page 239

```
 1   stenographic shorthand the questions and answers
      set forth herein, and the foregoing is a true and
 2   correct transcript of the proceeding had upon the
      taking of this Deposition to the best of my
 3   ability.
 4      I FURTHER CERTIFY that I am neither employed by
      nor related to nor contracted with (unless
 5   excepted by the rules) any of the parties or
      attorneys in this case, and that I have no
 6   interest whatsoever in the final disposition of
      this case in any court.
 7
 8   _____
         DANA N. SREBRENICK, CRR, CLR
 9       NM CCR #513
         License Expires:  12/31/2019
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 240

```
 1            - - - - - -
 2            E R R A T A
 3            - - - - - -
 4   PAGE  LINE  CHANGE
 5   ___  ____  _____
 6     REASON: _____
 7   ___  ____  _____
 8     REASON: _____
 9   ___  ____  _____
10     REASON: _____
11   ___  ____  _____
12     REASON: _____
13   ___  ____  _____
14     REASON: _____
15   ___  ____  _____
16     REASON: _____
17   ___  ____  _____
18     REASON: _____
19   ___  ____  _____
20     REASON: _____
21   ___  ____  _____
22     REASON: _____
23   ___  ____  _____
24     REASON: _____
25
```

## Page 241

```
 1      ACKNOWLEDGMENT OF DEPONENT
 2
 3      I,_____, do hereby
 4   certify that I have read the foregoing pages, and that
 5   the same is a correct transcription of the answers
 6   given by me to the questions therein propounded, except
 7   for the corrections or changes in form or substance, if
 8   any, noted in the attached Errata Sheet.
 9
10
11   _____
12   [WITNESS NAME]              DATE
13
14
15   Subscribed and sworn to
16   before me on this _____day
17   of_____,20___, by _____
18   _____,
19   proved to me on the basis of satisfactory
     evidence to be the person(s) who appeared before me.
20
21      Signature _____
22
23
24
25
```