# Exhibit B

1

1        Uncertified Rough Draft Transcript

2        Uncertified transcript disclaimer in

3    the matter of In Re Ethicon Pelvic Repair

4    System Products Liability Litigation.

5            The following transcript(s) of

6    proceedings, or any portion thereof, in

7    the above-entitled matter, taken on this

8    date, is being delivered unedited and

9    uncertified by the official court reporter

10   at the request of counsel.

11           The purchaser agrees not to

12   disclose this uncertified and unedited

13   transcript in any form (written or

14   electronic) to anyone who has no

15   connection to this case.  This is an

16   unofficial transcript, which should not be

17   relied upon for purposes of verbatim

18   citation of testimony.

19           This transcript has not been

20   checked, proofread or corrected.  It is a

21   draft transcript, not a certified

22   transcript.  As much, it may contain

23  computer—generated mistranslation of

24  stenotype code or electronic transmission

2

1  errors, resulting in inaccurate or

2  nonsensical word combinations, or

3  untranslated stenotype symbols which

4  cannot be deciphered by non—steno typists.

5  Corrections will be made in the

6  preparation of the certified transcript,

7  resulting in differences in content, page

8  line numbers, punctuation and formatting.

9       This uncertified and unedited

10  transcript contains no appearance page,

11  index or certification page.

12

13

14

15

16

17

18

19

20

21

22

23

24

                                    3

1   BY MR. DeGREEFF:

2        Q.    Good morning, doctor.

3              Can you tell us your name?

4        A.    Lawrence Lind, L-I-N-D.

5        Q.    And Dr. Lind, you have been

6   hired as a general liability expert for

7   Ethicon in this litigation.

8              True?

9        A.    Yes.

10       Q.    Have you also served as a

11  case-specific expert for Ethicon in

12  various cases in this litigation?

13       A.    I have.

14       Q.    How many?

15       A.    About four to -- four to six

16  cases.

17       Q.    Have you ever been hired as an

18  expert witness for any other transvaginal

19   mesh manufacturer?

20      A.    No.

21      Q.    And understanding I'm not asking

22   you about consulting.  I'm just asking you

23   about litigation expert.

24      A.    No, I have not.

                                         4

1      Q.    Do you have an understanding of

2   what you were hired to do on behalf of

3   Ethicon in this litigation?

4      A.    Yes.

5      Q.    What is that?

6      A.    To give opinions regarding

7   efficacy and safety of mesh and sling

8   products.

9      Q.    Any particular mesh and sling

10   products or just mesh and sling products

11   generally?

12      A.    So by that you mean did I

13   dedicate a deposition on the TVT where

14   we're talking about the sling family,

15   TVT-O, TVT-Abbrevo and TVT-Exact.

16      Q.    Doctor, you've been deposed

17    before today?

18        A.    I had a deposition on the TVT

19    and in medical malpractice cases I've been

20    deposed.

21        Q.    Other than the general

22    deposition you gave on the TVT in 2017.

23            Is that right?

24        A.    '17 or '18.

5

1            MS. GERSTEL:  It was '17, yes.

2    BY MR. DeGREEFF:

3        Q.    Other than that deposition, have

4    you been deposed on any Ethicon mesh

5    product?

6        A.    Prolift.

7        Q.    And that was also the general

8    deposition you gave in 2017?

9        A.    Yes.

10        Q.    Have you given any case-specific

11    expert depositions on behalf of Ethicon in

12    this litigation?

13            THE WITNESS:  In Tays, right?

14        Did we do a deposition in Tays?

15          MS. GERSTEL:  That was in New

16     Jersey.  The Carolyn Tays matter in

17     New Jersey.

18  BY MR. DeGREEFF:

19     Q.    So I think the answer is yes,

20  you've been deposed before?

21     A.    Yes, in one case.

22          MS. GERSTEL:  Could I just state

23     for the record that the 2017

24     deposition that Dr. Lind gave, it was

                                        6


1     on TVT and Gynemesh, actually, not

2     Prolift.

3          MR. DeGREEFF:  Okay.

4  BY MR. DeGREEFF:

5     Q.    Have you ever been deposed

6  previously as an expert for any other

7  transvaginal mesh manufacturer?

8     A.    There was a communication

9  between myself and I was working on

10  research and development for a vaginal

11  mini sling for Boston Scientific and some

12  of the feedback I gave in a research lab

13    was of interest to the counsels.  So I was

14    deposed to answer questions regarding my

15    feedback on -- at the research phase of a

16    mini sling.

17         Q.    And what was the mini sling

18    product?

19         A.    At the time, I don't recall.  I

20    don't know if it was named at the time.

21    It was early in the research and

22    development.

23         Q.    So you were deposed in the

24    Boston Scientific transvaginal mesh

                                            7

1    litigation?

2         A.    Yes.

3         Q.    What was the subject matter of

4    that deposition?

5         A.    It was my positive and negative

6    feedback for improvements and design on

7    the device at a research and design lab.

8         Q.    The design of a Boston

9    Scientific product.

10              Is that right?

11      A.      Yes.

12      Q.      What was your involvement in the

13  design of that Boston Scientific product?

14      A.      They -- the phase that they had

15  prototypes for, they asked me to use the

16  device on cadavers and comment on the

17  handling, the ease of placing the sling,

18  potential improvement, potential problems,

19  things that could be improved.

20      Q.      And you pointed out problems.

21          Is that right?

22          MS. GERSTEL:  Objection.

23      A.      I pointed out beneficial aspects

24  and areas that I thought might be

                                        8

1  improved.

2      Q.      What were the beneficial aspects

3  of the Boston Scientific sling that you

4  pointed out?

5      A.      I thought the shape of the

6  handle was favorable for being able to

7  plant the anchor at a good angle to the

8  obturator membrane.  I thought they had

9    some -- a line at the midline I thought

10    was very helpful in helping to keep the

11    sling 50 percent on each side.

12              And the remainder of the

13    positive and negatives I don't recall.

14    This was about five years ago.

15    Q.    Are those two positives you just

16    pointed out, are those design aspects of

17    any of the TVT slings?

18              MS. GERSTEL:  Object to form.

19    A.    You know, I don't use mini

20    slings presently.  So I haven't been

21    looking at them and comparing them for

22    quite a number of years.  It's within the

23    aspect of slings that I look at, I don't

24    have comparisons.

9

1    Q.    Well, the TVT mini slings -- the

2    TVT-S, which is the Ethicon mini sling, is

3    off the market, right?

4    A.    Yes.

5    Q.    So you wouldn't be using

6    something that's off the market?

7      A.    Correct.

8      Q.    And my question was the mini

9   slings you're talking about, for example

10  the handles, are the handles on the TVT

11  products similar?

12           MS. GERSTEL:  Object to form.

13     A.    I haven't seen them for several

14  years.  So I wouldn't have enough recall

15  to compare them.

16     Q.    Well, do you currently use TVT

17  products, TVT sling products?

18     A.    Yes.

19     Q.    What about the aspect you were

20  talking about with the midline --

21           MR. DeGREEFF:  Strike that.

22     Q.    So, this was a transobturator

23  placement device.

24           Is that right?

10

1      A.    Yeah.  With the mini slings,

2   it's the -- you're placing it to the

3   transobturator membrane without

4   perforating it completely.  So it does go

5     to the obturator membrane, but not through

6     it.

7         Q.    Is it a good or bad thing to go

8     through the transobturator membrane?

9             MS. GERSTEL:  Object to the

10            form.

11        A.    The key aspect in designing the

12    mini slings as I do recall giving input,

13    is that you've got to get the anchor set.

14    So it's got to go through -- you know,

15    there's an interior and a posterior aspect

16    of the obturator membrane with the muscle

17    between it.  So you have to get through

18    the internal membrane for the anchor to be

19    seated nicely.  Otherwise it will pull

20    out.

21        Q.    Right.

22            I think you told me you've given

23    one general liability deposition on the

24    TVT and Gynecare product on behalf of

                                              11

1     Ethicon and four to five case-specific

2     depositions on behalf of Ethicon

3    previously.

4              Is that correct?

5    A.    Those are case reports.

6              MS. GERSTEL:  Objection.

7    A.    They have not gone to

8    deposition.

9              MR. DeGREEFF:  Strike that.  My

10        fault.

11             Fair point.

12             THE WITNESS:  Okay.

13   BY MR. DeGREEFF:

14   Q.    So, how many depositions have

15   you given total on behalf of TVM

16   manufacturers in litigation brought by

17   women against them claims complications?

18             MS. GERSTEL:  Object to the

19        form.

20   A.    So, there's the -- there's the

21   Gynemesh and TVT.  There's the one

22   case-specific report and there's today.

23   Q.    Have you ever testified at trial

24   for any manufacturer of transvaginal mesh?

12

1     A.     No.

2     Q.     Have you ever been an expert

3   witness in cases unrelated to transvaginal

4   mesh?

5     A.     Yes.

6     Q.     What kind of cases?

7     A.     I take malpractice cases, both

8   plaintiff and defendant cases, for various

9   law firms in the area that know me and

10   decide when the problem of interest is in

11   my area.

12     Q.     How many times have you been a

13   expert in med-mal cases?

14     A.     I would say two or three cases a

15   year for the last ten years.

16     Q.     So 20 to 30 total probably?

17     A.     Yes.

18     Q.     Of those 20 to 30, how many have

19   been on behalf of the plaintiff, the

20   injured party?

21     A.     Two.

22     Q.     And what kind of cases were

23   those?

24     A.     A woman was in labor and the

1    baby was stuck and the maneuvers used to,

2    you know, panicked to get the baby out

3    were excruciatingly outside of the usual

4    protocols, and she endured premise pelvic

5    floor injury.

6            And the second one was a

7    laparoscopic case with a patient with five

8    or six previous surgeries with a bowel

9    injury.  There was steps taken to verify

10   safety of a laparoscopic case in a patient

11   with a difficult abdomen.

12   Q.    So, of the 20 to 30 med-mal

13   cases you've been an expert in, only two

14   of them you're the plaintiff's expert?

15   A.    Correct.

16   Q.    Is it fair for me to assume you

17   understand how this process works, the

18   deposition process, so we don't have to go

19   through the rules?

20   A.    Absolutely.

21   Q.    Okay.

22   A.    I will be a good exchange

23   partner in this process.

24        Q.      Perfect.

                                                14

1                Sir, have you ever been sued?

2        A.      I had —— as a resident, I was

3    named in three cases.  And one of them

4    settled.  The settling had nothing to do

5    with my role in the case.  And the other

6    two I got dropped.

7                And since that time, I have not

8    been sued.

9        Q.      What was the claim —— were the

10   three cases like companion cases or

11   something?

12       A.      One was a very difficult case

13   with a mother came in sepsis in labor with

14   twins in labor, and it was clear that she

15   was septic.  The vaginal delivery went

16   routinely, but the high risk maternal

17   fetal medicine doctor was suspicious that

18   she probably had group A strep and was in

19   tremendous danger of serious

20   complications, and both she and the baby

21   died.

22     Q.    What were the allegations

23   against you in that case?

24     A.    I don't -- they never questioned

15

1   me for anything I did wrong.  I think they

2   wanted to know what my role was in surgery

3   to see if I was more involved with

4   something that might be tangible to the

5   outcome, and I assisted with the delivery

6   as a secondhand.  So my role was felt to

7   be minimal.

8         The second one was a patient had

9   a abnormal bleeding after a C-section and

10  I was called with the GYN oncology team to

11  help do some artery ligation to reduce

12  bleeding and in the process of the

13  procedure, the femoral nerve was

14  compressed.  So she had some lack of

15  sensation in the -- you know, we saved

16  her -- well, may have saved her life.  We

17  controlled the bleeding, but in the

18  process of controlling the bleeding, we

19  kinked and caused some pressure on one --

20    the nerves to the vessels of one of her

21    legs.  It was diagnosed in the recovery

22    room and she had to go back and have that

23    released, but she did fine, but she did

24    have to go back.

                                          16

1         Q.    When you serve as an expert in a

2    case, is it your goal to promote the

3    truth?

4         A.    Yes.

5         Q.    And not to be an advocate or

6    promoter for one side or the other?

7         A.    Correct.

8         Q.    You agree that an expert's

9    opinion should be unbiased and objective?

10        A.    I agree.

11        Q.    When you gave your opinions in

12   this litigation, you wanted to be as

13   accurate as possible.

14              Is that fair?

15        A.    Yes.

16        Q.    And you want to be as thorough

17   in your review of the available

18   information, documents and literature as

19   possible.

20       Correct?

21   A.   Yes.

22   Q.   And you wanted to make sure you

23   got all of the information and considered

24   all the information that was pertinent to

                                          17

1   your opinions, right?

2       MS. GERSTEL:  Object to the

3    form.

4   A.   I would describe that -- the

5   answer to your question is yes.  However,

6   as these interviews or depositions

7   continue, areas of interest where the

8   other party feels I have not been as

9   thorough have come to attention.  So I

10  have continued my research and continued

11  my reading and added to my knowledge and

12  resources to be able to be more complete

13  than I was even at the time of the report.

14  Q.   So, you reviewed additional

15  information after you had already issued

16    your opinions?

17        A.    Yes.

18              MS. GERSTEL:  Objection.

19    BY MR. DeGREEFF:

20        Q.    And did you change your opinions

21    based on any of that additional

22    information?

23        A.    No.

24        Q.    I take it what you actually did

                                            18


1    was just add some stuff to your reliance

2    list.

3              Is that fair?

4              MS. GERSTEL:  Object to form.

5        A.    Well, things were added to the

6    reliance list and some were just added to

7    my general knowledge just to enable me to

8    be more informed on issues that were

9    brought to my attention that I had

10   authority on, but not as much authority on

11   as I would like to to be authoritative at

12   a higher level.

13       Q.    So following depositions, you

14    went and educated yourself better for the

15    next deposition, is what you did?

16            MS. GERSTEL:  Object to the

17        form.

18        A.    I had interest in being educated

19    for the sake of being educated and

20    knowledgeable for my practice and

21    teaching, as well as for the depositions,

22    yes.

23        Q.    Did you want to make sure you

24    had an understanding of both sides of the

                                          19

1    story before you gave your opinions?

2        A.    Yes.

3        Q.    The relevant information that

4    you'd want to consider when rendering your

5    opinions would include Ethicon internal

6    documents.

7            Is that fair?

8            MS. GERSTEL:  Object to the

9        form.

10        A.    That's a piece amongst a much

11    larger group of documents, which is

12    scientific literature.  But those would be

13    included, yes.

14        Q.    Sure.

15              And it would also include

16    medical literature?

17        A.    Sure.

18        Q.    Would also include standards and

19    testing performed on the products?

20        A.    Yes.

21        Q.    Would it include making sure you

22    understand the differences between the

23    products?

24        A.    Yes.

                                              20


1         Q.    Do you agree that opinions

2    should be able to be substantiated by the

3    totality of the most relevant available

4    data and information?

5              MS. GERSTEL:  Object to the

6         form.

7         A.    Yes.

8         Q.    As a physician, your patient's

9    safety is the most important thing.

10          Fair?

11     A.     Yes.

12     Q.     And would it be unfair for a

13 physician to promote a position that

14 jeopardizes the health or safety of his

15 patients?

16     A.     I'm sorry.  Could you repeat

17 that?

18     Q.     Would it be unfair for a

19 physician to promote a position that is

20 adverse or could jeopardize the health or

21 safety of his patients?

22          MS. GERSTEL:  Object to the

23     form.

24     A.     If the information he was given

                                          21


 1 was incorrect, that would not be

 2 appropriate.

 3     Q.     I think we're saying the same

 4 thing, but I'm not sure.  Let me ask --

 5     A.     I'm not sure either.

 6     Q.     Let me ask my question again.

 7          A physician shouldn't --

8          MR. DeGREEFF:  Let me ask it

9     maybe in a easy area way.

10   BY MR. DeGREEFF:

11        Q.    A physician should not promote a

12   position that is adverse to the health,

13   safety and welfare of their patients.

14          Is that fair?

15          MS. GERSTEL:  Object to the

16     form.

17   A.    I can agree with that.

18          MR. DeGREEFF:  Let's do some

19     housekeeping and mark some of this

20     stuff you brought with you here.

21          (Lind Exhibit 1, Notice to Take

22     Deposition of Lawrence Lind, MD, was

23     marked for identification, as of this

24     date.)

                                                22


1    BY MR. DeGREEFF:

2         Q.    Dr. Lind, I'm going to hand you

3    what I marked as Deposition Exhibit 1.

4    That is the notice for your deposition

5    today.

6              Have you seen that before?

7      A.    Yes.

8      Q.    When did you first see it?

9      A.    A few weeks ago, a month ago.

10     Q.    Who provided it to you?

11     A.    Diana.

12     Q.    That would be counsel for

13 Ethicon that's here with you today?

14     A.    Counsel for Ethicon.

15     Q.    And did you bring --

16           MR. DeGREEFF:  In fairness to

17     you, so, you've brought some things

18     with you today, correct.

19     A.    Yes.

20     Q.    One of the things is a flash

21 drive, and I'm going to mark it as

22 deposition Exhibit 2.

23           (Lind Exhibit 2, flash drive,

24     was marked for identification, as of

                                            23


1      this date.)

2 BY MR. DeGREEFF:

3      Q.    Can you tell me what is on this

4      flash drive?

5          A.    That is a reliance list.

6          Q.    So this would be all of the

7      materials that are identified on the

8      reliance list?

9          A.    Those are all the materials on

10     the existing reliance list.  There are

11     materials that I reviewed since that was

12     created that are in my head that are also

13     part of my knowledge and information I

14     would share today that are not on the

15     reliance list.

16         Q.    Okay.  We're going to get to

17     that in a minute.  I just want to make

18     sure I understand what's on the flash

19     drive.

20              The flash drive includes

21     everything that's on the written

22     supplemental exhibit list.

23              Fair?

24         A.    Yes.

                                              24


1          Q.    Then you brought a couple other

2    things with you that appear to be

3    invoices.

4             Is that correct?

5    A.    Yes.

6             (Lind Exhibit 3, invoice of Dr.

7        Lind dated August 29, 2017, was marked

8        for identification, as of this date.)

9    BY MR. DeGREEFF:

10    Q.    Can you tell me what Exhibit 3

11    is, doctor?

12    A.    This is an invoice for review of

13    relevant literature and summary of opinion

14    statements regarding the defense expert

15    report on TVT and TVT-Exact.

16    Q.    So is that one of your invoices

17    with regard to preparation of your TVT

18    products expert report?

19    A.    Yes.

20    Q.    The general report, correct?

21    A.    This would be the report we're

22    looking at today.

23    Q.    Correct.

24             And this would be the bill for

25

1    the report regarding the general liability

2    opinions you're giving in the litigation

3    as a whole.

4            Fair?

5            Not case-specific.

6    A.    Yes.

7            (Lind Exhibit 4, invoice of Dr.

8       Lind dated July 1, 2019, was marked

9       for identification, as of this date.)

10   BY MR. DeGREEFF:

11   Q.    Then can you tell me what

12   Exhibit 4 is, please, doctor.

13   A.    This is a bill for a

14   case-specific report.  The case-specific

15   report appears to be an error.  This is

16   additional records that were reviewed for

17   this preparation.

18   Q.    Okay.  So, Exhibit 4 is an

19   additional invoice for review of records

20   related to your general report on the TVT

21   products.

22           Fair?

23   A.    Yes.

24   Q.    So it says case-specific, but

26

1    that's an error.

2         A.    Yes.

3         Q.    It should be generic report?

4         A.    Correct.

5         Q.    Is there anything else that you

6    brought with you today?

7         A.    I have my general report as it

8    was served to you.

9         Q.    Okay.

10        A.    I prepared just an index.  It

11   just helps me when you ask me about a

12   certain topic, it lets me go to a spot in

13   my report more quickly.

14             I have a 2008 and a 2015 IFU.

15             And I have the articles that are

16   referenced in my report.

17             And I have an index of those

18   articles so I can go to them quickly when

19   we want to discuss them.

20        Q.    Is everything you have in front

21   of you included on the flash drive?

22        A.    I believe it is.  And the flash

23   drive probably has more articles than are

24   here.

27

1        Q.    Is the index included on the

2   flash drive?

3              THE WITNESS:  I don't know the

4        answer to that.

5              MS. GERSTEL:  It should be, but

6        I can confirm that.

7              MR. DeGREEFF:  It's okay.  Let's

8        just go ahead and mark it.

9              (Lind Exhibit 5, handwritten

10       Report Index of Dr. Lind, was marked

11       for identification, as of this date.)

12             MR. DeGREEFF:  And I'll let you

13       continue to use it, obviously.

14             THE WITNESS:  Do you want a copy

15       so you have one to keep?

16             MR. DeGREEFF:  No, that's okay.

17   BY MR. DeGREEFF:

18       Q.    Doctor, I've marked deposition

19   Exhibit 5.

20             Can you tell me what that is?

21      A.    It's a long report, you know,

22   50-plus pages, and we're here to have a

23   several-hour discussion about what's in

24   the report, amongst other things you may

28

1    want to discuss.  And it was -- I found

2    from the past experience that hunting for

3    areas that we're talking about is useful

4    to just have a one-page thing that lets me

5    go to the spot a little more quickly.

6       Q.    Okay.  So, this is

7    essentially -- Exhibit 5 is essentially a

8    skeleton outline of your report so that

9    you can --

10      A.    Right.

11      Q.    -- find things more quickly?

12      A.    Right.

13            Now, I will say, for complete

14   disclosure, sometimes when we go to the

15   report, we will go to an area of the

16   report and the key thing's going to be to

17   discuss what's in that section.  So

18   sometimes I have written maybe three words

19    that reminds me of what the study is

20    talking about in that section.  My goal

21    there is to get to that and I say let me

22    go to the study and we've got to go

23    through the binders and find it and locate

24    it and I want to review it.  I can save us

                                              29

1    that time.

2           So there are a few words here

3    and there that just remind me of what an

4    article said.

5       Q.    Okay.  Fair enough.

6           So, sir, this is a pretty simple

7    question.

8           You're being paid to serve as a

9    expert witness for Ethicon in this

10    litigation.

11          True?

12      A.    Yes.

13      Q.    And, so, other than Exhibit 3

14    and Exhibit 4, have you sent any bills for

15    your work on the TVT product general

16    expert report?

17    A.    Let me just -- may I just see

18  those one more time?

19    Q.    (Handing.)

20    A.    (Perusing document.)

21          I have not.

22    Q.    Have you incurred any more time

23  to date that you have not billed for yet?

24    A.    Yes.

                                           30

1    Q.    About how much time is that?

2    A.    About 25 hours.

3    Q.    Will you be billing that 25

4  hours at $500 an hour?

5    A.    I will.

6    Q.    And is $500 an hour your rate?

7    A.    Yes.

8    Q.    What is your rate for the

9  deposition here today?

10    A.    Seven thousand five hundred.

11    Q.    So it's 7,500 is your rate for a

12  full-day deposition.

13          Is that correct?

14    A.    Yes, it is.

15     Q.     Okay.  So, check my math, but

16  that's about another $20,000?

17     A.     About right.

18     Q.     So that would be initially to

19  the 10,500 and 16,000 that are set forth

20  in Exhibits 4 and 3?

21     A.     Yes.

22     Q.     So that's, what?  $46,500,

23  roughly, that you've billed —— that you

24  will have billed to date once those

31

1  invoices go out for your work on the TVT

2  general expert report?

3     A.     Yes.

4     Q.     How much did you ——

5            MR. DeGREEFF:  Strike that.

6     Q.     Did you do any additional report

7  related to the Gynecare mesh products?

8            By that I mean I guess the POP

9  products.

10    A.     We have a Gynemesh general

11  report.

12    Q.     And was that also done in this

13    litigation for Ethicon?

14         A.    Yes.

15         Q.    And those were general expert

16    opinions?

17         A.    Yes.

18         Q.    What did you -- how much have

19    you billed to date for your work on that?

20         A.    I don't recall specifically.  It

21    was two years ago.  It would be in the

22    same ballpark.  Maybe just slightly less

23    because it was four products and I think

24    it was a little bit less, but it was in

                              32

1    the same ballpark.

2         Q.    So 40 to $50,000?  Somewhere in

3    there?

4         A.    I would say 30 to 50 is the

5    range I could support.

6         Q.    Who would know the exact answer

7    to that question?

8         A.    I could go back to my bank

9    records.  And am certain that whether it's

10    the counsel's office or accounting or

11    Gynecare's accounting, I'm sure they would

12    have it as well.  I know I would have it

13    if I reviewed my bank records.

14        Q.    When were you first approached

15    to serve as an expert for Ethicon in the

16    transvaginal mesh litigation?

17        A.    About three-and-a-half years

18    ago.

19        Q.    My math's not very good, but

20    would that be the beginning of 2016?

21        A.    Somewhere in the 2016.

22        Q.    And you've also done multiple

23    case-specific expert reports on behalf of

24    Ethicon litigation.

                                              33

1             Right?

2        A.    Yes.

3        Q.    Approximately how much have you

4    billed them for preparing those reports?

5        A.    If you put all these together,

6    you put everything together, I think we're

7    probably in the 200 to $250,000 range.  If

8    you put everything you've already, you

9    know, kind of itemized and now tried to

10   expand to the case-specific, say from when

11   I started my relationship with them til

12   now for invoices related to pelvic mesh

13   expert review and participation, it's 200

14   to 250,000.

15       Q.    And that is since the beginning

16   of 2016?

17       A.    Yes.

18       Q.    I just want to make sure I

19   understand what you're saying.  I think I

20   do.

21            So, since you were first

22   contacted by Ethicon to serve as an expert

23   in this litigation in early 2016, you've

24   been paid roughly 200 to $250,000 for your

34

1    work as an expert witness?

2        A.    Yes.

3        Q.    And that would not include any

4    consulting work you've done for them.  It

5    would just be in relation to being a

6    litigation expert?

7      A.     This is everything from 2016 and

8      current.  Consulting work that I did for

9      Ethicon is more than a decade ago.  So

10     this is excluding what was done in the

11     2000 to 2010 was different type of work

12     where I was working with them on product

13     development and all the slings that we

14     discussed.

15     Q.     Well, the last time you worked

16     for Ethicon wasn't in 2010.

17            Right?

18     A.     I don't recall exactly when.  It

19     was probably earlier than that.

20     Q.     Well, it was actually later than

21     that.

22            Right?

23            MS. GERSTEL:  Object to the

24     form.

                                              35

1      A.     As a consultant?

2             I don't recall precisely.

3      Q.     As you sit here right now, do

4      you have any understanding of how much you

5    were paid by Ethicon when working for them

6    under a consulting agreement, master

7    consulting agreement, any other such

8    verbiage they used, did you have any idea

9    how much they paid you?

10    A.    You know, I don't have an

11    accounting on it on hand.

12    I would estimate in the 20 to

13    35,000 range.

14    Q.    Well, in 2011 alone it was over

15    a hundred thousand.

16    Right?

17    MS. GERSTEL:  Objection.

18    A.    I would have to review that.

19    Q.    Okay.  We'll get to that.

20    Do you keep any kind of

21    itemization of your item spent on --

22    MR. DeGREEFF:  Strike that.

23    Q.    So your invoices are broken

24    down, you know, fairly broadly on

36

1    Exhibit 3 and 4.

2    Do you have any -- do you submit

3    any kind of a more detailed itemization to

4    Ethicon?

5         A.    I don't.

6         Q.    Do you have a more detailed

7    itemization?

8         A.    The documents that go into

9    making one of those invoices are marked

10   individually.  I'll get a binder and I'll

11   go through it and I'll just mark on the

12   front how many hours and then I take those

13   handwritten totals and make a common

14   invoice.

15        Q.    Okay.  So, is there -- I mean,

16   when you write out your handwritten, do

17   you write out what you did?

18        A.    Yeah.  I write review of binder.

19   You know, TVT literature, review of

20   literature search on my own, TVT

21   complications.  Whatever the category is

22   that I've taken as a meaningful piece of

23   work, I package it and make that a, you

24   know, a time element package that's useful

37

1     to put a signature on.  Or it might be

2     where I have everything I have to look at

3     and I'll go through everything that I have

4     and I'll mark what I've looked at.

5          Q.    When you're keeping those notes,

6     do you write down, for example, like if

7     you have a call with defense counsel?

8          A.    If I have a what?

9          Q.    A call with defense counsel.

10         A.    There are some -- there are some

11    invoices that have phone meeting or in

12    person meeting with counsel.

13         Q.    Where are those invoices?

14         A.    I think those are on some of the

15    case-specific and I think on the -- they

16    may be on the invoice for the Gynemesh.  I

17    think it includes one preparatory session

18    that was listed, as I recall.  I'm not

19    certain of that.

20              MR. DeGREEFF:  Have we -- have

21         those been produced?

22              MS. GERSTEL:  At his Gynemesh

23         deposition, we produced invoices.  I

24         can't tell you specifically what they

```
 1      were, but I know that we did produce

 2      invoices at his Gynemesh deposition.

 3           MR. DeGREEFF:  Okay.  What about

 4      the case-specific?

 5           MS. GERSTEL:  The one

 6      case-specific deposition that he's

 7      had, it was the Tays deposition in the

 8      New Jersey litigation, and we did

 9      produce invoices related to his work

10      in the Tays matter at that deposition.

11           MR. DeGREEFF:  Okay.  Yeah,

12      that's our case.

13 BY MR. DeGREEFF:

14      Q.   How many hours would you say --

15 we'll get to this.

16           But how many hours would you say

17 since you started working with Ethicon in

18 2016 that you've spent working as an

19 expert witness for them?

20           MS. GERSTEL:  Objection.

21      A.   Two hundred thousand divided by

22 five hundred.  Whatever it is.

23           I'm also not great at quick
```

24   math.

1              200 to 250,000 divided by 500.

2    So 500 times -- 500.

3        Q.    Five hundred hours or so?

4        A.    Yeah.

5        Q.    I guess 400 to 500?

6        A.    Yeah.  Yes.

7        Q.    And in this litigation --

8              MR. DeGREEFF:  Strike that.

9        Q.    In preparation of the report

10   we're here about today, which is the TVT

11   general report, based on your Exhibit 3

12   and Exhibit 4, it looks like you spent

13   about 53 hours, plus the 25 that you've

14   spent since then.

15              Is that right?

16       A.    What's on those two plus 25.

17       Q.    So double check me, but that's,

18   what?  78?

19       A.    21 and 32 is 53 and 25.

20              Yeah, about 78.

21       Q.    How much of that 78 hours was

22    spent --

23              MR. DeGREEFF:  Strike that.

24        Q.    How much of that 78 hours was

                                                    40

1    spent in actual drafting and preparation

2    of the report itself?

3        A.    One-third.

4        Q.    25 to 30 hours?

5        A.    Yes.

6        Q.    And the rest of it was spent

7    doing what?

8        A.    Research and reading.

9        Q.    Did you prepare the reliance

10   list?

11       A.    The reliance list has articles

12   provided by counsel, as well as several --

13   many, many that I found on my own, Pub Med

14   searches that I felt were relevant.

15       Q.    Who drafted the reliance list?

16       A.    Counsel.

17       Q.    That's counsel for Ethicon?

18       A.    Yes.

19       Q.    I guess when I ask that

20   question, to be clear, who drafted the

21   supplemental reliance list?

22        A.    I would come up with more

23   articles and would say they're relevant,

24   and then they would be added by counsel

                                        41

1   for Ethicon.

2        Q.    So counsel for Ethicon drafted

3   the supplemental reliance list?

4        A.    Yes.

5        Q.    So, the other it's like 45, 50

6   hours --

7              MR. DeGREEFF:  Strike that.

8        Q.    The other 50 hours or so were

9   spent in review of the materials on the

10   reliance list?

11        A.    Finding the materials and

12   reviewing them, yes.

13        Q.    Does that 50 hours include any

14   time preparing for your deposition with

15   counsel?

16        A.    Yes.  We met twice.

17        Q.    About how long did you meet each

18  time?

19      A.    Four hours.

20      Q.    So that's about eight hours

21  total?

22      A.    Yes.

23      Q.    And when were those meetings?

24      A.    Last week and the week before.

                                          42

1       Q.    Where were they?

2       A.    They both -- one was here.  One

3  was in my office.

4       Q.    That eight hours was included in

5  the 78 we discussed earlier.

6             Right?

7       A.    Yes.

8       Q.    So, more like 40 hours probably

9  locating and reviewing the materials in

10  the reliance list?

11      A.    Sounds about right.

12      Q.    Any phone calls with counsel

13  included in that 78 hours?

14      A.    One or two brief, minutes,

15  minutes on each.

16      Q.      During your meetings with

17   counsel, were there any specific documents

18   you were shown?

19      A.      We went over the —— certainly

20   the two binders here which are the

21   references that relate to my expert

22   report.  There were various other —— many,

23   many of the document from the reliance

24   list.

43

1           I was shown some company

2    documents.

3           There was —— we reviewed IFUs.

4      Q.      So, the binders you referenced

5    are the binders of literature you've got

6    in front of you?

7      A.      Yes.

8      Q.      What company documents were you

9    shown?

10     A.      Testimony by, you know,

11   certainly not comprehensive, by selected

12   administrators in Ethicon and what they

13   had to say about —— in their depositions

14   or what they might have said in developing

15   the products, some extracts of e-mails.

16        Q.    So you were shown some

17   deposition testimony?

18        A.    Yes.

19        Q.    You were shown some e-mail

20   extracts?

21        A.    Yes.

22        Q.    Anything else?

23        A.    No, I don't think so.

24        Q.    Who selected the documents you

                                                44

1   were shown?

2        A.    You know, I asked for a few

3   things.  I had -- I had -- I asked if --

4   you know, what documents, you know, have

5   come under scrutiny in other depositions

6   are the ones that I might want to look at,

7   and counsel had some documents that she

8   recommended I see.

9        Q.    So counsel selected some of the

10   documents and you selected some of the

11   documents?

12      A.    I said show me —— I said show me

13   the good stuff and show me the bad stuff.

14      Q.    And then from there, it was

15   selected by defense counsel?

16      A.    It was kind of a combination of

17   things I was curious about and things she

18   thought would be relevant.

19      Q.    So, I think the answer to my

20   question is yes.  Right?  That defense

21   counsel selected some of the documents you

22   were shown?

23          MS. GERSTEL:  Object to the

24      form.

                                    45

1      A.    No.  I think the answer is that

2   I requested to see certain types of

3   documents, and she selected others.

4      Q.    That's the same thing.

5          Then there was another category

6   of things you said you reviewed that you

7   were shown.

8          What was it?

9          We had the binders, the internal

10   documents.  I believe there was something

11   else you noted.

12       A.    There were e-mails, some

13   testimony.  Looked at IFUs, which are

14   company documents, a subset of the company

15   documents.

16       Q.    What e-mails were you shown?

17       A.    There were some members of the

18   development team giving opinions as to

19   whether or not an issue was stiff.  There

20   were some e-mails talking about whether a

21   certain design of a sling might cause

22   pain, should we be designing it that way.

23   It was a -- certainly a small subset of

24   review as I was told the size of the

46

1   company documents that existed and the

2   testimonies that were weeks long.  So it

3   certainly was not comprehensive.

4       Q.    These were e-mails and documents

5   by Ethicon employees?

6       A.    Yes.

7       Q.    And what did the Ethicon

8    employees have to say about the stiffness

9    of the mesh?

10          MS. GERSTEL:  Object to the

11     form.

12     A.    There was concern of differences

13    between machine-cut mesh and laser-cut

14    mesh and if laser cut mesh was stiffer,

15    might it be an issue in planning for the

16    products it was planned for use in.

17     Q.    So, the Ethicon employees in the

18    materials you reviewed were concerned

19    about laser cut mesh being stiffer?

20          MS. GERSTEL:  Object to the

21     form.

22     A.    It was expressed as one of the

23    concerns.

24     Q.    And why were they concerned

                                              47


1    about the stiffness of mesh?

2     A.    You know, there was conjecture

3    that if it was stiffer, it might behave

4    differently in clinical performance.

5     Q.    So, your understanding of the

6   e-mails you reviewed from the Ethicon

7   employees was that they were concerned

8   that stiffer mesh would lead to more

9   complications.

10          Is that true?

11   A.    I don't recall that wording.

12          I do recall them discussing

13   whether it would have relevance to

14   outcome, which of course would include

15   efficacy and safety, but I don't recall

16   specific wording that it would increase or

17   decrease complications.

18   Q.    So they were concerned about

19   whether there would be nor negative

20   outcomes with laser cut mesh because it

21   was stiffer?

22          MS. GERSTEL:   Object to the

23      form.

24   BY MR. DeGREEFF:

48

1   Q.    Is that your understanding?

2   A.    I'm going to stick to my answer

3   that they were concerned about whether it

4    would change efficacy and safety.  Safety

5    would, of course, include any changes in

6    positive or negative outcomes.

7        Q.    Well, I mean, someone wouldn't

8    be concerned about a positive outcome?

9            Right?

10           MS. GERSTEL:  Object to the

11       form.

12       A.    You know, one of the things that

13   I think is important to share is that when

14   these e-mails are shared, it's an

15   extracted e-mail from a sequence of

16   discussions.

17       Q.    Sir, that's not the question

18   that's pending.  We'll read my question

19   back.

20           (The requested portion of the

21       record was read by the Court Reporter.)

22       A.    I think they would be concerned

23   about a change that might be positive for

24   the mesh as well as negative for the mesh.

                                              49

1        Q.    Okay.  So, your understanding

2    from those e-mails, just to make sure I

3    understand what you're saying, is that the

4    Ethicon employees were concerned about the

5    efficacy and safety outcomes related to

6    stiffness of mesh.

7         A.    Yes.

8         Q.    And then you said that you

9    reviewed some e-mails from Ethicon

10   employees related to whether a certain

11   design -- related to certain designs of

12   mesh.

13              Is that correct?

14        A.    Yes.

15        Q.    When we're talking about

16   laser-cut mesh, some of the TVT products

17   we're here about today are laser-cut mesh.

18              Correct?

19        A.    Yes.

20        Q.    Which of the TVT sling products

21   use laser-cut mesh?

22        A.    The TVT-Exact and the Abbrevo

23   are all laser-cut.  The other two are

24   laser cut, mechanically-cut.  Some of it's

1    geographic distribution and some of it's

2    physician request.

3         Q.    So the TVT and the TVT-O have

4    both laser and mechanic-cut options?

5         A.    Yes.

6         Q.    So, the e-mails that you were

7    reviewing related to the Ethicon employees

8    discussing design of a product, can you

9    tell me what your understanding was of

10   those e-mails?

11        A.    When the obturator, the TVT-O

12   was being designed and developed, the

13   questions, and there were e-mails

14   discussing whether the passage -- the

15   difference in passage would affect, you

16   know, the leg or the groin.  I do recall

17   some discussions on that.

18        Q.    Okay.  So, the -- your

19   understanding was that the Ethicon

20   employees were discussing whether the

21   transobturator approach would lead to

22   increased groin pain.

23              Is that true?

24              MS. GERSTEL:  Object to the

51

1    form.

2       A.    I think that was one of the

3    concerns expressed in the e-mails, yes.

4       Q.    What other concerns were

5    expressed in the e-mails?

6              MS. GERSTEL:  Object to the

7       form.

8       A.    I don't recall others that are

9    coming to mind presently.

10      Q.    And the transobturator approach

11   is used by the TVT-O and TVT-Abbrevo.

12             Correct?

13      A.    Correct.

14      Q.    Are you aware of literature

15   concerning potential increased risks

16   associated with the transobturator

17   approach versus the retropubic?

18             MS. GERSTEL:  Object to the

19      form.

20      A.    Yes.

21      Q.    And what does that literature

22   say?  What are the potential increased

23   problems?

24             MS. GERSTEL:  Object to form.

                                        52

1     A.    The TVT-O has a higher increase

2   in groin pain, which is usually transient.

3   It has a higher increase in vaginal angle

4   perforations the it has a less incidence

5   in bladder injury and retropubic injuries.

6     Q.    Is there a -- are you aware of

7   literature saying that there's a two times

8   greater risk of re-operation with

9   transobturator placement versus

10  retropubic?

11            MS. GERSTEL:  Object to form.

12    A.    You know, the articles that

13  describe increased risk of operation need

14  to be looked at individually because I'm

15  aware -- the answer to your question is

16  yes, but I can't confirm that being a

17  legitimate statement because I have to

18  look at the details of the article because

19  they're very specific as to why they were

20  re-operated on and the data is mixed.

21    There is not consensus data or data at a

22    high level that suggests that the

23    re-operation rate is two times greater

24    with obturator, but there are reports.

                                                    53


1        Q.    So you are aware of the

2    literature stating that?

3        A.    Yes.

4        Q.    And is that literature contained

5    in your reliance list?

6        A.    There's a hell of lot of TVT-O

7    literature in my reliance list.  So I

8    believe a lot of it is there, yes .

9        Q.    The e-mails we just discussed by

10    the Ethicon employees with regard to the

11    laser-cut mesh or the transobturator

12    placement, are those on your reliance

13    list?

14            MS. GERSTEL:  Object to form.

15        A.    I'm trying to think if I have

16    some.  Let me just check.

17            (Pause.)

18            There are a number on the

19   reliance list, yes.

20      Q.    The internal e-mails we just

21   talked about discussed within -- with

22   Ethicon employees discussing laser-cut

23   mesh and the transobturator approach,

24   those are included on your reliance list?

54

1      A.    I'm not aware of that.  No, I

2   don't think so.

3      Q.    Did you see those documents for

4   the first time in preparation for this

5   deposition?

6      A.    I don't -- I think I may have

7   seen them prior to the TVT Retropubic

8   deposition.

9            MS. GERSTEL:  Dave, could I

10           state for the record that as the

11           reliance list was prepared by counsel,

12           I believe those e-mails are on Dr.

13           Lind's reliance list.

14           MR. DeGREEFF:  I think you can

15           probably take him through that stuff,

16           if you want.  And you're welcome to

17         state whatever you want for the

18         record, obviously.  But I'm interested

19         in what he knows.

20              MS. GERSTEL:  Okay.  I just

21         wanted to make clear that the company

22         documents that were provided to Dr.

23         Lind were put on his reliance list.

24              MR. DeGREEFF:  Gotcha.

                                          55

 1    BY MR. DeGREEFF:

 2         Q.    So, the first time you looked at

 3    the e-mails we're discussing now was in

 4    preparation for your prior deposition on

 5    the TVT and the Gynecare?

 6         A.    Yes.

 7         Q.    So the first time you saw those

 8    was after you had already rendered your

 9    opinions?

10         A.    I don't recall if it was before

11    or after.

12         Q.    Do you recall seeing them before

13    you gave your opinions?

14         A.    I don't recall.

15     Q.     Something you considered when

16  you were giving your opinions?

17            MS. GERSTEL:  Object to form.

18     A.     If I had read them, then I

19  considered it.  And if I didn't, then I

20  didn't.  And I don't remember if I saw

21  them before or after.

22     Q.     You said you also reviewed some

23  depositions in preparation for this

24  deposition.

56

1            Do you remember what depositions

2   you reviewed?

3      A.     I don't remember specifically

4   which one it was.

5      Q.     Do you remember the subject

6   matter?

7      A.     I just asked to see a deposition

8   that was on the multiple TVT products.

9      Q.     Did you review that deposition

10  in preparation for today?

11     A.     Yes.

12     Q.     When did you review it?

13     A.     Three weeks ago.

14     Q.     And you don't remember who the

15 person being deposed in that deposition

16 was?

17     A.     I don't.

18     Q.     What about the TVT products were

19 you interested in from that deposition?

20     A.     I was interested in knowing what

21 another expert did in discussing the

22 products.  I was interested in what

23 counsel was interested in focusing on.

24     Q.     So, was it another deposition

                                        57

1 taken by my firm?

2     A.     I believe it was.

3     Q.     Do you know who took the

4 deposition?

5     A.     Yes.  It was Jeff Kuntz.

6     Q.     Jeff Kuntz (different

7 pronunciation)?

8     A.     Kuntz.

9            I'm sorry if I mispronounced it.

10     Q.     What in particular was it --

11          MR. DeGREEFF:  Strike that.

12     Q.    Why did you need to see how

13 another expert --

14          MR. DeGREEFF:  Strike that.

15     Q.    Was it a plaintiff's expert or a

16 defense expert?  I assume it was a defense

17 expert since we were taking it.

18     A.    Yes.

19     Q.    Why did you need to see how

20 another Ethicon expert responded to the

21 questions they were being asked?

22          MS. GERSTEL:  Object to the

23     form.

24     A.    It's someone going through what

                                        58


1 I was going to go through.  It seemed like

2 a reasonable review method to hear what

3 counsel had to see and take a look at what

4 counsels had to say and see if I agreed

5 with what the other person said, if I

6 would have answered it differently.

7     Q.    I mean, isn't the most important

8 thing just for you to answer the questions

9    honestly?

10          MS. GERSTEL:  Object to form.

11    A.    Well, I think the importance is

12    for me to get prepared in the best way I

13    can to have the knowledge and at the same

14    time answer honestly.

15    Q.    So, the best way for you to get

16    prepared to have the knowledge for this

17    deposition was to read what another

18    Ethicon defense expert who was being paid

19    by Ethicon said in his deposition or her

20    deposition?

21          MS. GERSTEL:  Object to the

22    form.

23    A.    The best preparation was review

24    of the literature, which constituted 99

59

1    percent of my time spent.  So this was a

2    small element.

3    Q.    Is this the only deposition you

4    reviewed in getting ready for your depo?

5    A.    Yes.

6    Q.    What about expert reports, did

7      you review any expert reports in preparing

8      for your depo?

9          A.    I did not.

10         Q.    Before we move on, let me ask

11     this question.

12              With regard to the e-mails that

13     we discussed where the Ethicon employees

14     were discussing outcomes related to laser

15     cut mesh.

16              Do you agree or disagree with

17     those employees?

18              MS. GERSTEL:  Object to form.

19         A.    I don't know the full context of

20     where the e-mails were, and I don't know

21     if they were in the middle of discussions

22     of positives or negatives 'cause they're

23     single pages.  So I really can't comment

24     on them.

60

1          Q.    So you weren't shown the full

2      document?

3              MS. GERSTEL:  Object to form.

4          A.    I wasn't shown the full thread

5    of e-mails.  They were just extracted

6    pages.

7         Q.    Who extracted the pages?

8               MS. GERSTEL:  Object to form.

9         A.    I don't know what was available

10   to Ethicon and to counsel and whether I

11   got everything that they had or whether

12   some of it was extracted.

13        Q.    But the documents you were

14   provided by defense counsel to review were

15   incomplete and did not contain the rest of

16   the thread.

17               True?

18               MS. GERSTEL:  Objection.

19        A.    Some of them did and some of

20   them did not.

21               MS. GERSTEL:  Would it be a good

22        time for a break?  Or in the next few

23        minutes.

24               MR. DeGREEFF:  Sure.  This

                                              61

1         works.  Whatever.

2               (Recess taken.)

```
 3               (Lind Exhibit 6, Curriculum

 4          Vitae of Dr. Lind, was marked for

 5          identification, as of this date.)

 6  BY MR. DeGREEFF:

 7      Q.    I've just handed you what I've

 8  marked as Deposition Exhibit Number 6.

 9               Do you recognize that as your

10  current CV?

11      A.    Yes.

12      Q.    Sir, what kind of doctor are

13  you?

14      A.    I'm an obstetrician gynecologist

15  with fellowship training in female pelvic

16  medicine and reconstructive surgery.

17      Q.    Do you have any board

18  certifications?

19      A.    I'm board certified in OB-GYN

20  and I'm subspecialty certified in female

21  pelvic medicine and reconstructive

22  surgery.

23      Q.    What states are you licensed to

24  practice medicine in?
```

62

1      A.     Just New York.

2      Q.     Sir, if you look at there's a

3    portion that says teaching experience?

4      A.     Yes.

5      Q.     In the teaching experience

6    section of your CV, are any of the things

7    listed there done on behalf of Ethicon?

8      A.     The last one, the 2006 to

9    present, the bio skills training labs, we

10   set those up to teach our fellows, and

11   there's usually an educational grant

12   offered by each of the major companies

13   that supply pelvic floor products that

14   usually pick up the cost for the lab.  So

15   some of those are supported.  They

16   probably would have been between 2006 and

17   2010, some labs that were supported by

18   Ethicon.

19            The rest of them are mostly

20   academic courses that were at a facility

21   and supported by the facility.

22     Q.     Okay.

23            So, would Ethicon have -- when

24   you say "supported," you mean paid for.

1          Right?

2     A.    They cover the cost of the lab,

3  the cadaver lab for the day.  We would not

4  be getting paid for that lab, but they're

5  picking up the expense of cost to use

6  cadavers to teach.

7     Q.    What is the cost to use cadavers

8  to teach?

9     A.    A lab could be $30,000.

10    Q.    Each lab?

11    A.    Yeah.  The cost for the cadavers

12 and the people who prepare them, maintain

13 them and dispose of them is very high.

14    Q.    And Ethicon would pick up one of

15 the --

16          MR. DeGREEFF:  Strike that.

17    Q.    How many of those cadaver labs

18 per year would Ethicon pick up?

19          MS. GERSTEL:  Objection.

20    A.    They probably do one a year in

21 the general teaching sense.

22    Q.    For four years or so, is what

23 you're saying?

24          I guess how many years did they

                    64

1    do that?

2        A.    Yeah, four to six years.  And

3    the other companies would do the same.  We

4    have a lot of teaching labs.  So Boston

5    Scientific would pick up a lab.  Caldera

6    would pick up a lab.

7        Q.    Okay.

8              So, I mean, Ethicon would have

9    spent 120 to $180,000 on cadaver labs --

10       A.    Yeah.

11       Q.    -- based on what we just talked

12   about.

13             Is that correct?

14       A.    Yes.

15             But I would like to specify that

16   it was the hospital rules and compliance

17   that they would have to have absolutely no

18   input as to the material, slides, things

19   taught, and the products are not

20   exclusively theirs.  They were everything

21   that we think the students and fellows

22    need to learn.

23              MR. DeGREEFF:  I'm going to move

24         to strike that, and I'm going to ask

65

1       my question again.

2    BY MR. DeGREEFF:

3       Q.    My question was pretty simple.

4    It was just a yes or no.

5              Ethicon would have spent 120 to

6    $180,000 on cadaver labs based on our

7    discussion.

8              True?

9              MS. GERSTEL:  Object to form.

10      A.    Across those several years, yes.

11      Q.    There's also a list of lectures.

12    I guess the title is lecture

13    presentations, on your CV.

14              Do you see that?

15      A.    Yes.

16              MR. DeGREEFF:  Strike that.

17         Before I do that, let me go back.

18    BY MR. DeGREEFF:

19      Q.    Who was teaching these cadaver

20  labs that were funded by Ethicon?

21      A.    My division, which would be

22  myself and my partners.

23      Q.    Would Ethicon fund these cadaver

24  labs at the request of you and your

                                                66

1  department?

2      A.    Yes.

3      Q.    Now are the lecture presentation

4  section of your CV.

5          Do you see where I'm at?

6      A.    Yes.

7      Q.    Were some of those lectures done

8  on behalf of Ethicon?

9      A.    The ones listed here are all

10  invited lectures in academic only

11  situations and not for Ethicon.

12          I don't have listed here invited

13  Ethicon lab experiences where I taught at

14  their Ethicon teaching experiences.

15      Q.    Does the lecture presentation

16  section include lectures given on behalf

17  of any transvaginal mesh manufacturer?

18      A.    No.

19      Q.    Why did you not include in your

20   lecture presentation section those that

21   were done on behalf of transvaginal mesh

22   manufacturers?

23      A.    I guess when I'm writing an

24   academic CV, I'm thinking about my

                                        67

1   academic presentations.  And those were in

2   a consultant role, so I didn't include

3   them.

4      Q.    What is the difference between

5   the lectures you gave in a consulting role

6   versus those given in an academic setting.

7      A.    These were advised by me or

8   offered to institutions for teaching

9   purposes only or invited because of my

10   expertise to give teaching, and the others

11   were labs we set up to teach, for which we

12   couldn't have the setting of fresh

13   cadavers without the backing of companies

14   because we didn't have the money for the

15   labs and it was a unique teaching

16    situation.

17              It was really access to the

18    cadavers was the key teaching element.  So

19    it was more of a —— it was less of a

20    lecture than the opportunity to execute

21    procedures in a unique way that had really

22    not been done before to be able to do them

23    on fresh cadavers.

24        Q.    Well, when you're giving

                                                68

1    lectures as a consultant for Ethicon, you

2    were being paid, right?

3        A.    Well, let me make a distinction.

4              The labs that we're talking

5    about where I'm teaching at my lab center,

6    I'm lecturing on whatever I want for

7    pelvic reconstructive surgery on various

8    procedures.  Some of the procedures have

9    nothing to do with mesh or any product and

10   others do.

11             And in the discussions of mesh

12   products, there is not any selection for

13   that lab when Ethicon's paid for it that

14    discusses theirs only.  It's we describe

15    everything we use for the reasons we use

16    them.  So we presented it in a non-biased

17    way.

18         Q.    What you just gave the

19    explanation about, that's what you're

20    referring to in the academic setting,

21    right?

22         A.    The academic setting in my lab.

23    Now, the distinction that will also put it

24    into a teaching category is when Ethicon

69

1    wanted to teach the procedures, each of

2    these slings or the mesh procedures and

3    they wanted expert surgeons to help train

4    people on fresh cadavers.  At that would

5    be a different teaching setting which I

6    would say is teaching-slash-consulting.

7         Q.    Right.

8               When you're giving lectures as a

9    consultant, you're being paid by Ethicon

10    pursuant to the consulting agreements you

11    signed with them.

12          Right?

13    A.    Yes.

14    Q.    And they have input into the

15 materials you're using for those lectures.

16          True?

17    A.    I did not permit that.

18    Q.    Well, contractually under

19 consulting agreement, they have the right

20 to have input into those materials,

21 correct?

22          MS. GERSTEL:  Object to the

23    form.

24    A.    They could have input, but I

                                              70

1 control the slides.

2          I would never accept a company's

3 slide deck, and I never did.

4    Q.    Those two things, i.e. being

5 paid and -- being paid by Ethicon and

6 Ethicon's right to review and have input

7 in your materials, those aren't present in

8 the academic setting.

9          Right?

10      A.      Correct.

11      Q.      You have a bibliography section

12  on your CV.  I'm sure you're aware of

13  that.

14          Right?

15      A.      Yes.

16      Q.      Have you published any

17  peer-reviewed articles regarding any of

18  the Ethicon mesh slings?

19      A.      No.

20      Q.      Have you published any

21  peer-reviewed articles concerning mesh

22  slings regardless of the manufacturer?

23      A.      We contributed cases to a Solyx

24  study, which was published.

71

1       Q.      Was it peer-reviewed?

2       A.      Yes.

3       Q.      And were you the author or did

4   you just contribute in some other way to

5   that?

6       A.      I was a co-author.  I was not

7   the lead author.

8          Q.     And which one was the -- on your

9     bibliography was that particular article?

10         A.     On the second page, it says

11    Nosseir S, Serels and Lind Safety and

12    efficacy of the Solyx single-incision

13    sling.

14                And then we had another -- we

15    had a posterior presentation, which is

16    peer-reviewed for acceptance as a poster,

17    but it's not a -- published in a journal a

18    little further down by the same group.

19         Q.     And those were both with regard

20    to the Solyx?

21         A.     Yes.

22         Q.     Any others?  Any other

23    peer-reviewed articles related to mesh

24    slings that you published?

                                          72


1          A.     We did on the third page.  You

2     can see the first name Shalom where it

3     says "Visualization of synthetic mesh

4     utilizing optical coherence tomography.

5     That wasn't efficacy or complications of

6    mesh, but it was -- what we thought we

7    were trying to do there was, you know,

8    special optical tomography device that

9    would let us find the sling and we thought

10   it might be useful for it when you have to

11   go back and note a little more precisely

12   where the sling is.

13       Q.    So that would be useful for when

14   people were having complications and you

15   needed to look at the sling?

16       A.    Yes.

17       Q.    Were these two Boston Scientific

18   articles that you discussed that were

19   peer-reviewed, were they funded by Boston

20   Scientific?

21       A.    They were.

22       Q.    They were?

23       A.    Yes.

24       Q.    Do you remember how much you

                                                73


1    were paid for your work on those?

2        A.    I do not, but I do -- I can

3    clarify that the funds would go to a

4    research fund and in no way would

5    remunerate me financially.

6        Q.    Was there any other of your

7    articles in your bibliography that were

8    funded by transvaginal mesh manufacturers?

9        A.    On the second page it has

10   Cholhan and Lind, the "Prepubic Approach

11   to Mid-Urethral Slings."  That was funded

12   by Boston Scientific.

13       Q.    Okay.

14       A.    I'm scanning the rest of them.

15             (Pause.)

16             No others.

17       Q.    On the articles that you worked

18   on that were funded by transvaginal mesh

19   companies, did you do a disclosure of

20   conflict of interest?

21       A.    Yes.

22       Q.    What is the purpose of

23   disclosing that an article was funded by a

24   mesh manufacturer?

74

1        A.    Well, both at the point of

2    patient consent and at the point of

3    publication, the disclosure allows the

4    readers to understand that there was a

5    financial support by a company that has

6    relevance for the result of the study.  A

7    reader can decide whether that financial

8    disclosure introduces bias and judge that

9    as to whether or not to credit the study

10   more or less based on that.

11        Q.    When someone receives funding or

12   payment from an entity, there's potential

13   bias that can result.

14              True?

15        A.    There's the potential, yes.

16        Q.    How do you define bias?

17        A.    Bias is when a -- in the setting

18   of a study, when you're interpreting a

19   study or how you're handling your patients

20   or how you're looking at results, you have

21   a feeling or an impetus to want it to go

22   in one direction or another that may not

23   be objective.  That's if you're not

24   handling it properly.

75

1              So, if you had bias and you were

2    not able to resist bias in a study, you

3    would be influencing the study in one way

4    or another because there was financial

5    support.

6         Q.    I think you put it very well in

7    another deposition I saw that you gave.

8    Bias is -- would you agree that bias is

9    anything that affects the objectivity of

10   the outcome of a study?

11        A.    Sure.  That's one way of looking

12   at it.

13        Q.    One of the things that could

14   affect the objectivity of a study is

15   funding or payment.

16              True?

17        A.    It could, but there are defenses

18   against that.

19        Q.    Which, if any, of the articles

20   on your bibliography are relevant to the

21   TVT sling products?

22              MS. GERSTEL:  Object to form.

23        A.    Well, I think I've got a lot

24   of --

1          MR. DeGREEFF:  Strike that.  Let

2      me ask that in a more fairway.  That

3      was a pretty broad question.

4   BY MR. DeGREEFF:

5      Q.    Do any of the articles in your

6   bibliography relate to or address any of

7   the TVT products?

8      A.    I think they're not directly

9   studies on TVT products, but I think

10  they're products on —— they're studies on

11  incontinence procedures which are relevant

12  to how TVT fits into the incontinence

13  surgery products history.

14          I have a number of mesh studies

15  which are relevant to procedures with

16  mesh, whether they're prolapse procedures

17  or incontinence.

18     Q.    Well, the TVT products are not

19  for prolapse.

20          Correct?

21     A.    Correct.  I was indicating that

22  the behavior of the same type of mesh

23    would be relevant to, in a broader scope,

24    how mesh behaves.

77

1    Q.    I think you answered this, but

2    let me just confirm because you said it in

3    a better way than I did.

4          None of the articles included on

5    the bibliography are on the TVT -- any of

6    the TVT sling products.

7          Correct?

8    A.    Correct.

9    Q.    So you have not been direct --

10    you have not been involved directly in a

11    published study of any kind related to

12    the, or about the TVT products?

13    A.    Correct.

14    Q.    What are some alternatives to

15    slings?

16          MS. GERSTEL:   Object to form.

17    A.    There are, historically, there

18    are dozens and dozens of stress

19    incontinence procedures.  They include

20    Burch, needle procedure, Pereyra, Stamey,

21   pubovaginal slings, amongst others.

22        Q.    Which of the native sling --

23              MR. DeGREEFF:  Strike that.

24        Q.    Which of the alternatives to

78

1    mesh slings are still in use today?

2         A.    The pubovaginal slings are still

3    in use.  The Burch is still in use, but to

4    a much lesser degree, markedly lesser

5    degree than previously.

6         Q.    Biologic slings?

7         A.    They are used by a small number

8    of users.  They're certainly not a

9    dominant.  But in answer to your strict

10   question, yes, those are still in use.

11        Q.    And those alternatives are used

12   for the same indications as the TVT mesh

13   slings.

14              True?

15        A.    Yes.

16        Q.    Have you ever performed the

17   Burch procedure?

18        A.    Many, many times.

19        Q.      Do you still perform it?

20        A.      Yes.

21        Q.      How many times have you

22    performed it?

23        A.      In my career, 300, 400.

24        Q.      When was the last time you did

79

1     one?

2         A.      Within the last few months.

3         Q.      How many have you done this

4     year?  Any idea?

5         A.      Three or four.

6         Q.      What about have you ever done

7     the native tissue sling procedure?

8         A.      Yes.

9         Q.      Do you still do it?

10        A.      I do.

11        Q.      How many have you done?

12        A.      I did two this year.

13        Q.      How many have you done in your

14    career?

15        A.      50 to 60.

16        Q.      What about the biologic slings,

17   have you ever used one of those?

18        A.    I did not.

19        Q.    The Burch procedure and the

20   native tissue repair are still viable

21   alternatives to the TVT mesh slings that

22   are still being used.

23              Right?

24              MS. GERSTEL:  Object to form.

80

1        A.    Can you just restate that?

2        Q.    The Burch and native tissue

3   slings are still available alternatives

4   that are still in use to the TVT slings.

5              Fair?

6        A.    Yes.

7        Q.    Sir, are you involved in any

8   current research on polypropylene meshes?

9        A.    We have a -- I'm not a co-author

10   on it, but we have in our division, we

11   have some rabbits being implanted with

12   absorb -- partially absorbable and

13   absorbable mesh to analyze the biochemical

14   and histochemical changes during

15    implantation.

16          Q.    Are you involved in that at all?

17          A.    I'm involved in the chat in our

18    research sessions.  They're not my

19    project.  I'm not the mentor or co-author

20    on them.  But since it's in the division,

21    every Friday we go over products.  So I'm

22    privy to the updates and the ongoing

23    happenings on it, but I have no ownership

24    on that project.

                                    81

1          Q.    So you're not -- you've had some

2    conversations about the project, but

3    you're not involved in actually

4    administering the project.

5                Fair?

6          A.    Correct.

7          Q.    Is that project being funded by

8    a pharmaceutical company -- or, excuse me.

9    A medical device company?

10          A.    It is.  It's being funded by a

11    mesh company.

12          Q.    Which one?

13      A.    I don't know the name.

14            Again, I'm kind of peripheral on

15   this one.

16      Q.    Okay.

17            Is it Ethicon?

18      A.    It's small.  It's not one of the

19   well-known companies.

20      Q.    Have you ever written a

21   peer-reviewed journal article on

22   polypropylene mesh?

23      A.    Yes.  I have a publication on

24   the reduction of the analysis of mesh

                                        82


 1   complications with abdominal sacral

 2   suspension done in different ways for

 3   abdominal sacral suspension analyzing

 4   erosion rates.

 5      Q.    What product was at issue?

 6      A.    Gynemesh.

 7      Q.    Not the TVT products?

 8      A.    No.

 9      Q.    Have you ever written on the

10   Burch procedure?

11      A.    Yes.  I have a couple of

12   publications in my CV.

13      Q.    Were those peer-reviewed?

14      A.    Yes.

15      Q.    What was it, do you remember the

16   subject matters you were writing about?

17      A.    The Burch procedure requires a

18   fairly good size incision, and I was

19   instrumental in designing a device that

20   would allow suturing in a very small

21   space.  So once the device was approved, I

22   wrote a paper on about 90 patients to see

23   whether a Burch could be achieved in a

24   much smaller incision because with the use

                                                   83


1   of the suturing device, it would

2   facilitate the suturing without needing as

3   much space for visualization.  So the goal

4   was to see if I could take a Burch and

5   make it less invasive with an incision

6   that was less than half the size.

7      Q.    And what were the results?

8      A.    They were excellent.  We

9    achieved it.

10        Q.    So you came up with a way to

11   make the Burch a less invasive procedure?

12        A.    Yes.

13        Q.    Do you have a patent on that

14   product?

15        A.    I do not.

16        Q.    It feels like there's more to

17   that story.

18              Does someone have a patent on

19   it?

20        A.    I -- the rules for -- someone

21   has a patent on it and I was offered part

22   ownership to it.  My academic affiliation

23   and the roles for ownership of

24   intellectual property were such that

84

1    taking the intellectual property would be

2    a poor financial decision.

3        Q.    Gotcha.

4        A.    So I just came on as a

5    consultant and continued to help them

6    develop the device.

7        Q.     Which medical device company was

8   developing it?

9        A.     It was the Laurus Corporation,

10   L—A—U—R—U—S.  And we developed it with

11   them and they patented it and I did a lot

12   of —— most of the studies to show how it

13   would work and the efficacy and safety.

14   And I wish I had a part ownership because

15   they sold it to Boston Scientific for a

16   nice penny.

17        Q.     So, is that device currently in

18   use today?

19        A.     Yes, it is.

20        Q.     And when did that device get

21   developed?

22        A.     I was working on it from '94 to

23   '96 and I think it got sold to Boston

24   Scientific in '96.

85

1        Q.     And the end result was that the

2   Burch procedure, which was an alternative

3   to the TVT mesh slings, became less

4   invasive.

5          True?

6     A.    That, as well as a few vaginal

7  procedures that we also had trouble

8  suturing with.  It had more than one

9  application in addition to the Burch.

10    Q.    Were all three of those articles

11 related to that same issue?

12    A.    I think there were two on the in

13 line suturing device.  Yes, they were on

14 the issue of -- did I do sacrospinous?  I

15 think one might have been Burch and one

16 might have been sacrospinous suspension.

17 I can check on that, if it matters.

18    Q.    Yes.  I think you said three.

19 That's why I was asking.

20          (Pause.)

21    A.    There's two.  One looked at it

22 for the use in sacrospinous suspension.

23 The other one looked at it for the use in

24 Burch.

86

1     Q.    Okay.

2          And what were the findings on

3    the sacrospinous suspension?

4         A.    The procedure was able to be

5    performed with less dissection and in less

6    operative time with good efficacy and

7    minimal to no complications.  So it didn't

8    add any adverse effects and it lessened

9    the dissection and operative time.

10        Q.    And is that also a -- is that

11   procedure also a sling alternative?

12        A.    No.  That's for pelvic prolapse.

13   That's for vaginal apex prolapse.

14        Q.    Have you ever written anything

15   on the biologic tissue slings?

16        A.    I have not.

17        Q.    Do you consider yourself an

18   expert on chemical engineering?

19        A.    As it relates to slings, yes.

20        Q.    And what is the basis?  Why are

21   you an expert in chemical engineering?

22        A.    Because the issues related to

23   chemical engineering as it pertains to

24   tissue interaction with mesh and implants

87

1    has been part of my career studying,

2    implanting, taking care of patients,

3    insuring their safety and observing the

4    behavior.  So that's 25 years of

5    experience.

6        Q.    Do you have any education in

7    chemical engineering?

8        A.    I read quite a bit of literature

9    on the behavior of the mesh and how it

10   interacts with tissue.  So my education is

11   based on independent review of the

12   literature, and I do not have a Ph.D.

13       Q.    Well, I think we're talking

14   about two different things.

15            Are you talking about

16   biomaterials right now versus chemical

17   engineering?  True?

18       A.    Whether it's chemical

19   engineering or biomaterials, how they

20   relate to the behavior of slings implanted

21   in patients, I consider myself an expert.

22       Q.    You don't know anything about

23   the chemical engineering of polypropylene

24   mesh itself.

 1          True?

 2      A.    I would say that's false.

 3      Q.    Okay.  Why is it false?

 4      A.    Because I've read articles about

 5  the process of it coming from resin, how

 6  it gets transformed from resin, and how it

 7  gets made into fibrils and how it gets

 8  made into the decision to how the fibrils

 9  get made and the width of the fibrils.  So

10  I've done reading on how they take it from

11  powder and resin and transformed into

12  materials and the reasons why they make

13  decisions.

14      Q.    So, is it your testimony that

15  reading articles about how they make

16  transvaginal -- excuse me.  Polypropylene

17  mesh is why you consider yourself a

18  chemical engineering expert?

19      A.    Reading articles, seeing the

20  different outcomes of how the chemical

21  engineering goes into making products

22  different and seeing how it behaviors in

23  patients and seeing the outcomes for 25

24   years is my basis for stating I'm an

89

1   expert on that topic as it relates to mesh

2   in sling behavior.

3        Q.    And you've seen all of that in

4   your role as a physician.

5             True?

6   A.    Yes.

7        Q.    No one's ever hired you to be a

8   chemical engineering expert.

9             Right?

10   A.    No.

11        Q.    No one's ever hired you as a

12   chemical engineer.

13             Right?

14   A.    Correct.

15        Q.    When you hang your degree on the

16   wall, it doesn't say chemical engineer.

17             Right?

18   A.    It does not.

19        Q.    Do you consider yourself an

20   expert in pathology?

21   A.    As it relates to the behavior of

22    sling and mesh implanted in patients, yes.

23        Q.    In your daily practice, what is

24    it that makes you a pathology expert?

90

1        A.    The rabbit studies that we're

2    doing produce pathology slides which we

3    examine for various histochemical

4    properties, tensile strength and

5    mechanical properties, and this is a

6    routine part of the research that our

7    group does.

8        Q.    You mean the rabbit studies that

9    the other people in your group are doing.

10            Is that what we're talking

11    about?

12        A.    To distinguish though what the

13    other people are doing is I play a role in

14    responding and advising what would be

15    studied, how they're doing the study,

16    response on whether how they're getting

17    the information is correct, whether the

18    staining processes are correct.  So I'm

19    involved in the study more than just

20   listening.

21        Q.    You're not an author on that

22   study.

23             Right?

24        A.    I am not.


                                                91


 1        Q.    You are not a co-author on that

 2   study.

 3             Right?

 4        A.    I'm an advisor on that study,

 5   and I'm part of the education discussions

 6   on the process.

 7        Q.    You are not administering the

 8   study.

 9             Right?

10        A.    No.

11        Q.    I'm correct you're not

12   administering the study.

13             Right?

14        A.    Correct.

15        Q.    You don't even know who the

16   pharmaceutical company is that's funding

17   the study.

18          Fair?

19     A.    That's correct.

20          MS. GERSTEL:  Object to form.

21 BY MR. DeGREEFF:

22     Q.    Other than that, the rabbit

23 studies, what qualifies you as an expert

24 in pathology based on your daily practice?

1      A.    When I review the literature,

2 I'm aware of many articles about excision

3 of specimens, what they look like, how

4 people's opinions and how the pathology's

5 been studied on excised specimens, is

6 there inflammation, is there ingrowth, is

7 there degradation.  So I'm very

8 well-versed on the literature related to

9 pathologic specimens of mesh and sling

10 material.

11     Q.    Do you actually read the

12 histopathologic slides?

13     A.    In the studies that we do, I

14 look at the pictures along with our study

15 group, yes.

16     Q.     You're talking about the rabbit

17 thing again.

18            Right?

19     A.     Yes.

20     Q.     Do you actually review

21 histopathologic slides out of humans as

22 part of your practice?

23     A.     I do not.

24     Q.     You just read the reports that

                                    93

1 come to you from the pathologists.

2            Right?

3     A.     Correct.

4     Q.     Have you read any pathology

5 reports related to excised mesh?

6     A.     I think the Clave study is one

7 of the studies that gets into that.

8     Q.     I mean in your daily practice.

9            Have you reviewed reports,

10 pathology reports from the pathologists,

11 related to mesh that was removed from --

12     A.     Yes.

13     Q.     -- patients?

14     A.     Yes.

15     Q.     When you review those reports,

16 do they discuss inflammation of the

17 tissue?

18     A.     Sometimes inflammation is

19 mentioned, yes.

20     Q.     Do they discuss scar plating

21 related to the mesh?

22     A.     I have not read that on a

23 pathology report.

24     Q.     Do they discuss degradation of

94

1 the mesh?

2     A.     I have not read that on a

3 pathology report.

4     Q.     What is the -- inflammation can

5 lead to pain for a woman.

6            True?

7     A.     Yes.

8     Q.     And it can lead to chronic pain.

9            Right?

10     A.     It can, yes.

11     Q.     And mesh leads to tissue --

12          MR. DeGREEFF:  Excuse me.

13     Strike that.

14     Q.    Mesh can cause tissue

15     inflammation.

16          True?

17          MS. GERSTEL:  Object to form.

18     A.    It -- I would say the mesh

19     itself doesn't cause inflammation, but it

20     could potentiate inflammation.

21     Q.    Mesh itself can cause a foreign

22     body reaction.

23          True?

24     A.    Yes.

                                                    95

1      Q.    And that can lead to

2      inflammation?

3      A.    True.

4      Q.    Do you consider yourself an

5      expert in polymer chemistry?

6      A.    As it relates to mesh and

7      slings, yes.

8      Q.    This is amazing.  If you come up

9      with a yes for that, we're -- okay.

10          What is your background in

11     polymer chemistry?

12          A.     My answers would be the same as

13     I replied previously for my background

14     for --

15          Q.     Okay.  So, your answer to -- I

16     just want to make sure anything I asked

17     you about chemistry or chemical

18     engineering.  Your answer is going to be

19     I've read articles on polypropylene mesh

20     and I listen to updates on the rabbit

21     study.

22          Right?  Those are the two

23     things?

24          MS. GERSTEL:  Object to form.

96

1          A.     No.  I would expand on that.

2          Q.     Okay.  What else?

3          A.     For 25 years, I've implanted

4     mesh.  I've looked at explanted specimens

5     and pathology reports.  I have studied the

6     literature.  I've read literature both

7     positive and negative, on various

8    engineerings, polymer chemistry and other

9    aspects of scientific ways that you can

10   analyze what happens to mesh.  I am

11   participating in a lab that implants mesh,

12   excises mesh, testing it for tensile

13   strength, looking at it under a microscope

14   for various inflammation and histochemical

15   changes and I've been studying this and

16   been participating in educational and

17   clinical and pathology education for 25

18   years.

19        Q.    That all makes you a doctor,

20   right?

21        A.    No.  I'm stating that that makes

22   me an expert.

23        Q.    What is your degree in?

24        A.    I have an MD.

                                        97


1         Q.    Okay.  What is your

2    undergraduate degree in?

3         A.    I have a bachelor of arts.

4         Q.    Do you have any educational

5    training related to chemistry or

6    engineering?

7        A.    I have 25 years of additional

8    education as described previously.

9        Q.    What you described was 25 years

10   of being a doctor.

11           Right?  That's what you're

12   relying on for being a chemist and an

13   engineer?

14       A.    That was not my answer.

15           MS. GERSTEL:  Object to form.

16   BY MR. DeGREEFF:

17       Q.    I'm considering you also

18   consider yourself a biomaterials

19   specialist based on all the stuff we

20   talked about?

21       A.    Yes.

22       Q.    Any other reasons?

23       A.    I think we've gone through them.

24       Q.    That's all of them?

                                              98


1            I'm just making sure there's not

2    anything else.

3        A.    On biomaterials I think you

4    certainly can say in that area, I have

5    published and tested things on my own,

6    published them and participated in

7    advising and testing in cadaver labs and

8    published materials on my own.  So my

9    additional evidence of expertise is

10   stronger in that area.

11        Q.    Have you ever published any

12   opinions that polypropylene mesh does not

13   degrade in the human body?

14              MS. GERSTEL:  Object to form.

15        A.    I haven't published it.

16        Q.    Do you consider yourself an FDA

17   expert?

18              MS. GERSTEL:  Object to form.

19        A.    I'm distinctly aware of FDA

20   matters and paperwork as it relates to

21   mesh products and Ethicon mesh products

22   and the rules that go into IFUs.  I would

23   not say I am a comprehensive FDA expert.

24              But I would say as it relates to

                                                99


1    the matters in this case, I would say I've

2    reviewed the pertinent documents and are

3    comfortably familiar with that.

4        Q.    What are the pertinent

5    documents?

6        A.    There's a blue book memo and a

7    second FDA document that describes what's

8    required in the release of a product, what

9    has to be on labeling, what has to be

10   included in adverse events, and as it

11   relates to this particular, you know,

12   issue at hand is what adverse events are

13   necessary to be included in an IFU.

14       Q.    Because it sounds like you're

15   not claiming you're an FDA expert.  You're

16   claiming you're an IFU expert.

17           Right?

18           MS. GERSTEL:  Object to form.

19       A.    I claim to be an FDA expert as

20   it relates to adverse reactions and the

21   rules necessary and laid out as to what

22   needs to be included.

23       Q.    How did you become aware of --

24           MR. DeGREEFF:  Strike that.

100

1    Q.    Under what circumstances did you

2    review these FDA materials related to

3    Ethicon products?

4    A.    Well, in discussing with counsel

5    became clear that, you know, what warnings

6    are in the IFU is of quick relevant to

7    these cases and I said I'd like to see the

8    FDA documents that dictate the rules.

9    Q.    Was that before or after you

10   gave your opinions?

11   A.    That was before.

12   Q.    So, what you're claiming makes

13   you an expert on the FDA is materials you

14   reviewed in preparing for to be a

15   litigation expert for Ethicon.

16         Is that right?

17   A.    Well, if someone were to ask me

18   it I'm an expert in FDA in the broad sense

19   of the word, the general everything that

20   they take care of, I would say no.

21         If I'd say as it pertains to the

22   relevant issues to the materials involved

23   in this case, I would say I have very

24   thoroughly read through the relevant

1    documents and therefore consider myself an

2    expert as it relates to mesh products and

3    adverse warnings and what needs to be

4    included.

5        Q.    Did you read the 510(k)

6    submission for this product?

7        A.    At some point I did.

8              MS. GERSTEL:  Object to form.

9    BY MR. DeGREEFF:

10       Q.    Did you read all the testing

11   submitted with the 510(k)?

12             MS. GERSTEL:  Objection.

13       A.    I don't know if I read all of

14   the testing.  I think I was made familiar

15   with some of it.

16       Q.    Do you know the difference

17   between clearance and approval of a

18   product?

19       A.    There are different pathways to

20   go through the FDA.  There's a 510(k)

21   pathway, which is based on a precedent,

22   and then there's another pathway where

23    based on data, it's you go through based

24    on your own merit and data.

                                                    102

 1        Q.    What's the other pathway called?

 2        A.    I don't know.

 3        Q.    Does 510(k) end up with approval

 4    or clearance in the end?

 5        A.    Approval.

 6        Q.    Would you be surprised to find

 7    out that 515 K ends up with clearance?

 8        A.    I'm sorry.

 9        Q.    Would you be surprised to find

10    out that 510(k) ends up with compliance,

11    not approval?

12            MS. GERSTEL:  Object to form.

13        A.    I may have that vocabulary

14    confused.

15        Q.    As a FDA expert, do you think

16    you should probably know the difference

17    between clearance and approval?

18            MS. GERSTEL:  Object to form;

19        argumentative.

20        A.    I think the key elements here

21   are what the rules are for what needs to

22   be included in an IFU, and I don't think

23   the rules of what the vocabulary term is

24   for approval versus otherwise is the key

103

1   element.  So no, I wouldn't consider that

2   eliminating myself as an expert to the

3   relevant materials.

4        Q.    What I'm taking what you're

5   saying is that you do consider yourself an

6   expert on warnings?

7        A.    Yes.

8        Q.    What risk information are

9   medical device companies required to put

10   in their IFUs?

11       A.    They're required to put in the

12   most common and adverse reactions that are

13   unique to the product, and they are not

14   required to put in things that are

15   commonly known.

16       Q.    What industry standards govern

17   warnings in medical devices?

18            MS. GERSTEL:  Object to form.

19      A.      The FDA.

20      Q.      What are the various sections of

21  the regulations that relate to warnings

22  for IFUs?

23              MS. GERSTEL:  Object to form.

24  BY MR. DeGREEFF:

104

1      Q.      And for the record, you're

2  currently look to go your report to give

3  you that answer.

4              Correct?

5      A.      That would be correct, because I

6  can't always memorize that it is 21 CFR

7  801.109 (C) and device labeling guidance

8  number G91-1.  So at times I may have to

9  refer, since I haven't memorized

10  everything that exists in all of these

11  binders in my report.

12      Q.      You think an FDA expert on

13  warnings would know that?

14              MS. GERSTEL:  Object to form;

15      argumentative.

16      A.      I think an FDA expert on the

17    entirety of the FDA would know that, but

18    that does not exclude me from being an

19    expert on the areas that I previously

20    described.

21         Q.    What departments of a medical

22    device company are involved in creating

23    warnings?

24         A.    When I have participated on

105

1    discussions about what should be included,

2    there's research and development, there

3    was regulatory, and there was compliance.

4         Q.    Have you ever read any testimony

5    from Ethicon employees regarding Ethicon's

6    position on what belongs in an IFU?

7         A.    I don't recall.

8         Q.    Have you ever drafted an IFU for

9    a medical device?

10        A.    I didn't draft it.

11             I participated in discussions

12    about what should be included and what

13    shouldn't.

14        Q.    What was your participation?

15    A.    It was in -- with Boston

16  Scientific in releasing a few of their

17  products.

18    Q.    Which products?

19    A.    It was the Advantage and then it

20  was their Prolene mesh for sacral

21  suspensions.

22    Q.    Did they pay to you do that?

23    A.    Yes.

24    Q.    How much?

                                          106

1    A.    Whatever my hourly was then.  It

2  was a little lower, $300 an hour.

3    Q.    How many hours did you spend

4  working on that IFU?

5    A.    Probably two expert sessions.  I

6  would say twelve.

7    Q.    Was that like a roundtable

8  discussion about what kind of warnings

9  should be in the IFU?

10    A.    Usually was -- it usually was a

11  couple of hours in the lab, then followed

12  up by roundtable discussion.

13     Q.     Lab so you could —— was the

14     purpose of the lab to test out the

15     implant, how it worked with the implant of

16     the device?

17     A.     Correct.

18     Q.     And after you made your

19     recommendations, you didn't have any

20     involvement in the actual drafting of the

21     IFU?

22     A.     I did not.

23     Q.     Do you agree that physicians

24     should be made aware of the significant

                                        107


1     safety risks with a product in the IFU?

2             MS. GERSTEL:  Object to form.

3     A.     Well, the definition of

4     significant is —— requires a larger

5     discussion than a yes/no question.

6     Q.     How do you define significant?

7             MS. GERSTEL:  Object to form.

8     A.     I would define it as I did

9     before, where they have to describe the

10    most common and unique adverse reactions

11    to the product, but they don't necessarily

12    have to provide -- list adverse reactions

13    that are commonly known.

14        Q.    Have you ever read the

15    deposition of Ethicon employee Catherine

16    Beef?

17        A.    I have not.

18        Q.    Is that something that's on your

19    reliance list?

20        A.    I'm not -- I don't recall seeing

21    that.  I don't know if it's on the

22    reliance list.

23        Q.    If it was her testimony that

24    physicians should be made aware of all

                                        108

1    significant safety risks associated with a

2    product in the IFU, is that something you

3    disagree with?

4            MS. GERSTEL:  Object to form.

5        A.    Yes, I disagree.

6        Q.    Do you agree that the

7    manufacturer of a medical device that's

8    going to be implanted in a woman's body is

9      required to disclose all significant risks

10     to doctors that come with the use of the

11     device?

12             MS. GERSTEL:  Object to form.

13     A.     No.

14     Q.     You do not agree?

15     A.     I do not agree.

16     Q.     Were you ever provided the

17     deposition of Ethicon's medical director

18     Dr. Weissberg?

19     A.     I don't recall it.

20     Q.     If the medical director

21     testified that that's the case, do you

22     disagree with Ethicon's medical director?

23             MS. GERSTEL:  Object to form.

24     A.     Yes.

                                        109

1      Q.     The warnings and adverse

2      reactions section should include all

3      significant risks and complications

4      related to the use of the TVT products.

5             Do you agree?

6             MS. GERSTEL:  Object to form.

7     A.     Did your statement say "all"?

8     Q.     Yes.

9     A.     I disagree.

10    Q.     Have you ever read the

11    deposition of Ethicon's medical director

12    Dr. Robinson?

13    A.     No.

14    Q.     If that was the testimony, do

15    you disagree with it?

16    A.     I disagree with it.

17    Q.     Do you agree that doctors rely

18    on medical device companies, such as

19    Ethicon, to tell them whether the products

20    they manufacture are safe?

21           MS. GERSTEL:  Object to form.

22    A.     I think the company provides a

23    small piece of a doctor's understanding

24    and learning if something is safe.  It's

                                  110


1     not the major role at all.

2     Q.     So you believe they rely on them

3     in part for that information?

4     A.     Correct.

5        Q.    Do you agree that doctors rely

6    on medical device companies, such as

7    Ethicon, to investigate and test the

8    safety of their products before putting

9    them on the market?

10            MS. GERSTEL:  Object to form.

11       A.    I think that they are interested

12   in testing prior to release, yes.

13       Q.    Is that something that you as a

14   physician want the medical device

15   providers to do?

16       A.    Yes.

17       Q.    Do you agree that the company

18   knows more about the design features and

19   potential risks of their products than

20   physicians do?

21            MS. GERSTEL:  Object to form.

22       A.    In the early development stage,

23   I would agree with you, and then when it's

24   out there, I would say there's -- you

                                          111


1    know, the doctors had the ones putting it

2    in, seeing how it behaves and seeing the

3    patients.  So there are –– I think that

4    changes.  I think it –– I think it changes

5    and the doctors can become more expert as

6    to efficacy and safety of the device and

7    how the features are paning out than the

8    companies who make it.

9         Q.    The physicians are not privy to

10   the results of the testing and studies

11   that are done by the company prior to

12   putting the product on the market.

13             True?

14             MS. GERSTEL:  Object to form.

15        A.    They're privy to some of them.

16   When you have the –– typically the lead

17   inventor or authors gather data, they're

18   usually privy to that.  When a company

19   would approach me with a product, first

20   thing I'd say is can you show me the data

21   you have on it, and they would share that.

22   So I am privy to the data they have.

23             They typically would not go

24   through all of the R&D bench testing, and

1    some other items would not be included in

2    that.

3         Q.    Right.

4               Doctors would not be privy to

5    the bench testing results done by a

6    medical device company, such as Ethicon.

7               Right?

8               MS. GERSTEL:  Object to form.

9         A.    It's not routinely offered, but

10   there are certainly many times where I've

11   asked for that type of information and

12   it's been disclosed readily.

13        Q.    But you had to ask for it.

14              True?

15        A.    Yeah.   Yes.

16        Q.    Do you agree that if there's

17   reasonable association between a product

18   and an adverse event, a company should

19   disclose that information?

20              MS. GERSTEL:  Object to form.

21        A.    You know, the reasonable

22   association specification in your question

23   stumps me a little bit because it depends.

24   It's really -- there's a continuum of how

113

1    much information they get.  And at a

2    certain point, if there's a very, very

3    strong relationship between a product and

4    an adverse event, yes, I think it should

5    be disclosed, but there's really a

6    continuum between how much they know and

7    when that should be shared.

8         Q.    Okay.

9               So, would you agree that the

10   information that a medical device

11   manufacture, such as Ethicon, includes in

12   its IFUs should not be misleading?

13              MS. GERSTEL:  Object to form.

14        A.    I could agree with that.

15        Q.    Do you agree that the

16   information a medical device manufacture

17   includes in its IFU should have a

18   scientific basis?

19              MS. GERSTEL:  Object to form.

20        A.    I think it has a scientific

21   basis, as well as a clinical experience

22   basis in terms of the things that are

23   commonly known.

24    Q.    So it should be a scientific and

114

1    clinical basis?

2    A.    I think so, yes.

3    Q.    And a medical device

4    manufacturer should put the safety of its

5    patients first.

6         True?

7         MS. GERSTEL:  Object to form.

8    A.    Yes.

9    Q.    Even above profits.

10        Fair?

11        MS. GERSTEL:  Object to form.

12    A.    Yes.

13    Q.    Do you agree that a medical

14    device company, such as Ethicon, is

15    required to make its products reasonably

16    safe?

17        MS. GERSTEL:  Object to form.

18    A.    Yes.

19    Q.    Lastly, do you agree that if a

20    medical device manufacturer sells two

21    products that do the same thing, the

22    medical device manufacturer should stop

23    selling the less safe product and only

24    sell the safer product?

115

1                MS. GERSTEL:  Object to form.

2         A.    The evidence and the data

3    distinguishing those adverse events would

4    need to be compared to get to a point

5    where it was convincing that one of them

6    definitively was as efficacious and/or

7    safer.

8                So, it's a -- it depends on the

9    level of evidence.

10        Q.    Let me ask my question again.

11               Do you agree that if a medical

12    device manufacturer sells two products

13    that do the same thing, that the medical

14    device manufacturer should stop selling

15    the less safe product, assuming it's

16    definitive, and only sell the safer

17    product?

18               MS. GERSTEL:  Object to form.

19        A.    I can't agree with that because

20    there are situations where something has a

21    higher risk, so let's say for example leg

22    pain with an obturator sling.  It's the

23    better choice, even though if you -- just

24    looking at data as a higher risk of thigh

116

1    pain or leg pain, it's the better choice

2    for a patient because the patient may have

3    retropubic problems or cancer there or

4    radiation there or hernia there.  So it

5    now becomes the better choice.  So if

6    you're just looking at the data, you'd say

7    well, higher leg pain, maybe we shunts use

8    it.  But having the two available lets you

9    go the two different routes and based on

10    patient's anatomy and doctor's

11    backgrounds, they maybe safer in different

12    doctor's hands and they also may be safer

13    based on the patient's previous surgery

14    history.

15        Q.    So you can't answer my question

16    as asked, is what you're telling me?

17        A.    No, I cannot.

18      Q.    Have you ever read the

19  deposition of Dr. Holste?

20      A.    No.

21      Q.    Was that ever provided to you by

22  the defense for review?

23      A.    Not that I recall.

24      Q.    If that was the testimony, do

117

1   you disagree?

2       A.    Yes.

3       Q.    Are you an expert on the design

4   of medical devices?

5       A.    I think I am.

6       Q.    And what qualifies you as an

7   expert on the design of medical devices?

8       A.    Well, I made a really awesome

9   suturing device that allowed people to

10  suture in really small places and made a

11  whole bunch of other people millions of

12  dollars.  And it's really cool and it

13  required some really neat engineering.

14          I think I have a unique

15  appreciates for the very significant

16    angles and spaces we're in in pelvic

17    surgery.

18              I think I have an intuitive

19    thought process as to how to think of

20    things that might let us do things more

21    easily.

22              I understand research design and

23    how to test things properly.

24              I think I have shown in my body

118

1    of work the ability to test meshes and

2    figure out how to decrease erosions, how

3    to suture in small places.  And I think

4    I've spent 25 years thinking about the

5    design of instruments and have a pretty

6    good background.

7        Q.    Have you ever designed a

8    transvaginal mesh product?

9        A.    I've proposed some and some are

10    under consideration, but none are

11    presently being adopted or funded for

12    production.

13        Q.    Have you been --

14          MR. DeGREEFF:  Strike that.

15     Q.     Have you designed any mesh

16 slings?

17     A.     The innovations that I have in

18 mind, which, you know, presently have been

19 proposed to a couple of engineers and it a

20 couple of companies, they have less to do

21 with the sling than with the trocar

22 introduction and so it's part of the sling

23 system, but it's not the mesh itself.  I

24 would say the group that we're working

                                        119


1 with, of course, my practice, you know, as

2 the role that I play in that process, you

3 know, it's a very close division.  I've

4 definitely got my eye on how absorbable

5 meshes are going to behave as we continue

6 to study them.

7     Q.     So, what are the changes to the

8 trocar that you've made in these new

9 devices that you've designed?

10     A.     I'm going to have to say that's

11 confidential.

12          Let me just clarify that to give

13    you something.

14          I think that we -- sometimes

15    when you pass a trocar and you did

16    cystoscopy because you want to see if the

17    pass went into the bladder and sometimes

18    it's missed even though trocar looks

19    pretty big under cystoscopy.  So I have a

20    design proposal that would decrease or

21    eliminate the chances of missing a very

22    small passage into the bladder.

23    Q.    What weight of mesh do you use

24    in the -- in your new products?

                                        120

1     A.    I haven't gotten to the point of

2     choosing the mesh.  I'm only designing the

3     trocar.  So the mesh would be -- there's

4     two companies it's proposed to and the

5     mesh would be whichever company decided to

6     move this forward, I'm comfortable with

7     both of their sling products.  So you have

8     both Caldera and Boston Scientific looking

9     into this.  So it would be their meshes

10     and it would just be changing the trocar

11     insertion.

12          Q.     What weight of mesh do Boston

13     Scientific and Caldera use?

14          A.     I don't have their mesh weight

15     by memory.  They're all type 1 wide pore

16     mesh.

17          Q.     Why did you not go to Ethicon

18     for their mesh?

19          A.     I've had a closer working

20     relationship with these two companies for

21     the past five, six years.

22          Q.     Does the Ethicon product have

23     smaller pore mesh than BSC and Caldera?

24          A.     They're pretty close.  I think

                                                   121


 1     Caldera is less, is smaller.  I don't

 2     recall where Boston Scientific is related

 3     to TVT.

 4          Q.     Well, Caldera is actually larger

 5     pore mesh than the Ethicon product.

 6               Correct?

 7          A.     I'm not sure about that.

8      Q.    What about BSC is actually a

9    larger pore mesh than Ethicon mesh too.

10             Right?

11             MS. GERSTEL:  Object to form.

12     A.    I don't have those comparisons

13    in my head.

14             What I know is that they're all

15    in the order of ten times wider pores than

16    what is felt to be the minimum necessary

17    for favorable characteristics as described

18    by AMA.

19     Q.    Regardless, when you decided you

20    needed mesh for a product you're

21    developing, you sought that mesh from

22    Caldera and Boston Scientific, not from

23    Ethicon.

24             True?

                                    122

1      A.    I wasn't seeking mesh.  I was

2    seeking someone who thought an

3    introduction needle had an advantage.

4      Q.    Okay.

5             The two companies you went to

6    for your product were Caldera and BSC, not

7    Ethicon.

8              True?

9    A.    Yes.

10   Q.    And you could have gone to

11   whatever companies you wanted to.

12             Right?

13   A.    Yes.

14   Q.    And you had a working

15   relationship with Ethicon.

16             Right?

17   A.    Yes.

18   Q.    When was this that you were

19   approaching these companies?

20   A.    In the past two years.

21   Q.    So you had a relationship with

22   the company in Ethicon that has paid you

23   200 to $250,000 as a litigation expert.

24             Right?

                                        123


1              MS. GERSTEL:  Object to form.

2    A.    Yes.

3    Q.    Has Ethicon ever asked you to

4    consult on the design of any of their mesh

5    products?

6        A.    I was in a consulting R&D

7    session on whether or not to make the

8    trocar smaller when they were considering

9    the TVT Exact.  So that's not a mesh

10   decision, but again part of the mesh

11   system.  I know they were interested in

12   what I thought of the Gynecare mesh just

13   because I had used it a lot.  So, it

14   wasn't -- the Gynemesh had been, you know,

15   a smaller cut piece of a previous type of

16   mesh they had previously used.  So they

17   were interested in a lot of my input

18   because they know I used it a lot and I

19   published on it.  So they asked if they

20   could do anything different with it and I

21   said my patients are doing extremely well,

22   so I'm happy with it.

23       Q.    Gynecare mesh were use that go

24   for pelvic organ prolapse?

                                            124

1        A.    Yes.  And there was a time when

2    I was using it for individually cut sewed

3    prolapse vaginal procedures.

4         Q.    As you sit here today, it's no

5    longer possible to use Gynecare for repair

6    of pelvic organ prolapse.

7              Correct?

8              MS. GERSTEL:  Object to form.

9         A.    I'm not doing it at all.

10        Q.    You don't have any --

11             MR. DeGREEFF:  Strike that.

12        Q.    You don't have any patents on

13   medical devices currently.

14             True?

15        A.    Correct.

16        Q.    Did you have involvement with

17   the design of the Solyx, the Boston

18   Scientific Solyx?

19        A.    We may have mentioned this

20   before.  That was the one time where I

21   was -- yes, I was in their R&D labs giving

22   them feedback on pre-release research and

23   development design phase and a positive

24   and negative feedback on it, which was on

1    their company documents, which ended up

2    with me in a deposition not on either

3    side, just called to be deposed on what I

4    had written in that R&D lab.

5         Q.    Are you familiar with the

6    industry standards that govern medical

7    device design?

8              MS. GERSTEL:  Object to the

9         form.

10        A.    I'm familiar with a number of

11   the FDA standards.

12        Q.    What are those regulatory

13   standards?

14        A.    Well, there's clearances and

15   approval processes they have to go

16   through.  There's device labeling

17   instructions.

18        Q.    Anything else that you can think

19   of?

20        A.    There's classifications that

21   tell you how much -- whether something is

22   based on something previous, how much data

23   needs to come before release.

24        Q.    Have you reviewed any Ethicon

1    internal standards on medical device

2    design?

3         A.    I don't recall.

4         Q.    Are you familiar with the stage

5    gate system?

6         A.    I am not.

7         Q.    Do you know what a clinical

8    expert report is?

9         A.    I think it's a -- it's a

10   detailed statement on where the company

11   feels a product is in terms of its

12   research and development.  I'm not certain

13   on that.

14        Q.    Have you reviewed any of

15   Ethicon's clinical expert reports related

16   to the TVT mesh sling products?

17        A.    Since the title sounds familiar,

18   I think I read one, and I don't recall

19   which one it was or any of the details,

20   but I think I -- it was in front of me at

21   one point.

22        Q.    As you sit here, you just don't

23    remember anything about what it said?

24         A.    No.

127

1          Q.    True?

2          A.    Correct.

3          Q.    Do you know what a design

4    history file is?

5          A.    No, but the name kind of gives

6    it away.  But the answer to your question

7    would be no.

8          Q.    Have you ever reviewed the

9    design history file, Ethicon's design

10   history file with regard to any of the TVT

11   products?

12         A.    I can tell you that I've read

13   quite a number of documents that describe

14   the evolution of the TVT products.  I

15   don't know if that's within that stated

16   document.

17              So, the answer is that document

18   by name I'm not familiar with, but I'm

19   certainly familiar with many documents

20   that describe the evolution of the TVT and

21    the TVT product family.

22        Q.    What is contained in the design

23    history file?

24        A.    Since I haven't seen the file,

                                            128

1    I -- I can't tell you.

2        Q.    So, as you sit here, is it fair

3    to say you don't know whether you've

4    reviewed the design history file or not?

5        A.    Correct.

6        Q.    What employees from Ethicon were

7    involved in the design of the TVT

8    products?

9        A.    Well, the key ones were Olmstead

10    for the TVT and De Lara for the obturator

11    products.

12        Q.    Have you read those depositions?

13            MS. GERSTEL:  Object to form.

14        A.    I have not read their

15    depositions, no.

16        Q.    Were those depositions given to

17    you by defense counsel?

18            MS. GERSTEL:  Object to form;

19      lack of foundation.

20      A.      I don't recall them being given

21   to me.

22      Q.      What is Med Scan?

23      A.      Is that the Canada group?

24              No?

                                                    129

1               I don't know what it is.

2       Q.      What is Provincia?

3       A.      I don't know.

4       Q.      Do you know what a design

5    failure modes and effects analysis is?

6       A.      Say it again.  Design failure?

7       Q.      Modes and effects analysis.

8       A.      I couldn't describe it to you

9    specifically.

10      Q.      Ever participated in one?

11      A.      Well, if putting something on

12   tension to seeing load failure and various

13   other changes in the characteristics of

14   the mesh when you do different things to

15   it is part of it, then yes.

16              Whether I knew that I was

17    specifically in a session that was labeled

18    that, I don't recall that it had that

19    name.

20         Q.    What are the different types of

21    failure modes and effects analysis?

22         A.    Can't answer that.

23         Q.    Just don't know?

24         A.    Correct.

                                           130

1          Q.    Did you review any of the design

2     failure modes effects analysis on the TVT

3     mesh slings?

4          A.    I may have, but not knowing it

5     had that title.

6          Q.    As you sit here, you just don't

7     know whether you did or not?

8          A.    Correct.

9          Q.    Are you aware of any company

10    other than Ethicon that marketed a -- that

11    marketed mesh that was mechanical-cut?

12               MS. GERSTEL:  Object to form.

13         A.    Caldera's is mechanically-cut.

14         Q.    Which product?

15     A.     The Desara and the Desara TV

16     Blue.  There may be others, but I know

17     that that one is.

18     Q.     Have you ever reviewed any of

19     Ethicon's internal operating procedures

20     related to design?

21     A.     I've read a lot of pages that

22     discuss how -- how a procedure is going to

23     be designed.  And again, whether it had

24     that title, I don't know.  I've recently

                                              131

1     read a number of Ethicon documents that

2     are discussing the process for design and

3     feasibility and opinions as to where the

4     product stands.

5     Q.     So you don't know if you've

6     reviewed the standard operating procedure

7     or not.

8             True?

9     A.     Specifically the document by

10     that name, no.

11     Q.     How long did it take Ethicon to

12     get the TVT-O product to market?

13     A.    I don't know.  From first

14  thought to mind to market, I don't know

15  that answer.

16     Q.    Is it ever a good idea to rush a

17  product to market?

18          MS. GERSTEL:  Object to form.

19     A.    The product's got to get to

20  market in a time frame that when it's felt

21  to be efficacious and safe.

22     Q.    Have you ever reviewed any

23  Ethicon internal documents discussing how

24  quickly they got the TVT-O to market?

                              132


1     A.    No.

2     Q.    That's not something that was

3  ever provided to you?

4     A.    Not that I recall.

5     Q.    Of the opinions you --

6     A.    I'm going to correct that.

7          I seem to now have refreshed my

8  memory.  I recall -- I can't recall

9  exactly.  The theme of one company

10  document had to do with a need to -- a

11    wish to get this removing along based on

12    competition.  I do remember a document

13    that had that type of theme.

14         Q.    Is it your understanding that

15    Ethicon wanted to get the TVT-O to market

16    as quickly as possible?

17              MS. GERSTEL:  Object to form.

18         A.    The only thing I recall was that

19    there was -- there was wording that

20    expressed a wish for it to be released and

21    the timing of the release was important

22    based on competition.

23         Q.    So they wanted to beat the

24    competitors to the market.

                                            133


1              Is that what you're saying?

2              MS. GERSTEL:  Object to form.

3         A.    I said what I said.

4         Q.    Well, they wouldn't want the

5    competitors to get there first.

6              Right?

7              MS. GERSTEL:  Object to form.

8         A.    The competitors were there.

9      Q.    Okay.

10            The opinions you're giving in

11     this litigation with regard to the TVT-O,

12     TVT-A, TVT-Exact, have you ever published

13     those in any peer-reviewed journal?

14     A.    No.

15     Q.    Have you ever been involved in

16     any clinical trials comparing midurethral

17     slings to any other pelvic surgery?

18            MS. GERSTEL:  Object to form.

19     A.    Comparative trial, no.

20     Q.    Have you ever been involved in a

21     randomized controlled trial involving

22     transvaginal mesh treatment of stress

23     urinary incontinence?

24     A.    No.

                                          134

1      Q.    What antioxidants are added to

2      the TVT mesh slings?

3      A.    I do not know.

4      Q.    What is the pore size of the

5      Prolene mesh in the TVT products?

6      A.    It's in the 1300 range.

7     Q.    And it's the same for all of the

8  sling products we're talking about, right?

9  The TVT-O, the TVT-Abbrevo and the

10  TVT-Exact?

11     A.    Yes.

12     Q.    Have you ever heard that pores

13  in mesh collapse?

14     A.    I have not.

15     Q.    Do you agree that if mesh pores

16  are not large enough, there can be an

17  increased risk of infection?

18     A.    Yes.

19     Q.    Do you agree that if pores are

20  not large enough, it increases the risk of

21  erosion?

22     A.    Potentially, secondary to the

23  first discussion we had about infection.

24     Q.    Do you agree that if pores are

                                         135


1  not large enough, there can be poor tissue

2  integration that can cause mesh rejection?

3     A.    Yes.

4     Q.    Do you agree that you can get an

5    infection with small pore mesh causing

6    extrusion?

7         A.    Yes.

8         Q.    Do you agree that mesh with

9    smaller pores tends to have a greater

10   inflammatory response than mesh with

11   larger pores?

12              MS. GERSTEL:  Object to form.

13        A.    Yes.

14        Q.    What is the weight of the mesh

15   in the TVT family of slings?

16        A.    I don't have that data.

17        Q.    Why does Ethicon call the

18   Prolene mesh used in the TVT slings old

19   construction mesh?

20              MS. GERSTEL:  Object to form;

21        lack of foundation.

22        A.    I think terminology regarding

23   the Ethicon family of meshes and names

24   given to them have mistakes and confusion,

                                        136


1    and everything we're talking about in all

2    four of these slings is type 1 wide pore

3    mesh.

4         MR. DeGREEFF:  I'll move to

5    strike as non-responsive.  That wasn't

6    the question that was asked.

7    Q.    My question was --

8         MR. DeGREEFF:  Strike that.

9    Q.    Do you know what I mean when I

10   say old construction mesh?

11        MS. GERSTEL:  Object to form.

12   A.    There are different ways the

13   meshes were put together over time.

14   They're woven differently.  They have

15   different fiber sizes, different pore

16   sizes.  So, you know, the Prolene mesh has

17   a long history to it.

18        So, the -- the way it was

19   constructed was different in older, or

20   let's say times past, was made differently

21   than it is now.

22   Q.    Well, the mesh currently used in

23   the TVT sling products was originally

24   developed for hernia repair.

137

1          True?

2     A.    Yes.

3     Q.    And it was developed for hernia

4  repair in the gut.

5          Fair?

6     A.    Yes.

7     Q.    It was not originally developed

8  or designed to be implanted in the vagina.

9          True?

10    A.    Originally, yes.

11    Q.    And the mesh used in the TVT

12 products was originally developed in 1974.

13         Is that true?

14    A.    I don't have that knowledge of

15 the date.

16    Q.    It was a long time ago, right,

17 when it was developed?

18    A.    If that's the correct date, it's

19 the number of years that it is.  It's been

20 working well for all these years.

21    Q.    It's almost a half century ago.

22         Right?

23    A.    Yeah.  It's been working well

24 for 20 years.

```
 1              MS. GERSTEL:  As someone who has

 2        gave birth close to that year, I take

 3        offense to that part.

 4              MR. DeGREEFF:  Trust me, I'm

 5        real close to that too.

 6              Anybody need to take a break?

 7              MS. GERSTEL:  Sure.

 8              (Recess taken.)

 9              (Lind Exhibit 7, Defense Expert

10        General Report of Lawrence Lind, M.D.

11        re TVT, TVT-O, TVT-Exact and

12        TVT-Abbrevo, June 24, 2019, was marked

13        for identification, as of this date.)

14              (Lind Exhibit 8, Lawrence Lind

15        Supplemental General Materials List in

16        Addition to Materials Referenced in

17        Report, was marked for identification,

18        as of this date.)

19   BY MR. DeGREEFF:

20        Q.    Sir, I'm handing you what has

21   been marked as Deposition Exhibit 7.

22              Can you tell us what that is?

23        A.    It looks like my defense expert
```

24    general report for TVT, TVT—O, TVT—Exact

139

1    and TVT—Abbrevo.

2        Q.    Sir, does this report contain

3    all of your opinions related to those

4    products?

5            MS. GERSTEL:  Object to form.

6        A.    No.

7        Q.    What isn't in your report?

8        A.    In preparing for the deposition,

9    I have continued to read, continued to

10    pull more articles, and continued to

11    educate myself.

12       Q.    Sir, do you understand that in

13   this litigation, there's a deadline for

14   disclosing expert opinions?

15       A.    Okay.

16       Q.    Do you understand that deadline

17   has passed?

18       A.    Okay.

19       Q.    So, what opinions did you not

20   include in your report that you now intend

21   to offer?

22      A.    I just have a little more detail

23  on some adverse events and some -- it's

24  really the studies are in there and it's

140

1  really just a little more in-depth

2  understanding of what the studies have

3  shown.

4           So, I'm not adding studies to

5  the report.  I'm just a little more

6  familiar with the drill-down ordeal of

7  what's within the studies.

8      Q.    I think we're talking about two

9  different things, and you're talking about

10  the materials you relied on in support of

11  your opinions.

12          Correct?

13      A.    Correct.

14      Q.    I'm talking about the opinions

15  you've given in your report, the general

16  opinions regard to the TVT, TVT-O, the

17  TVT-Exact and TVT-Abbrevo.

18          Are all of those opinions that

19  you intend to give at trial contained in

20    this report?

21        A.    Well, if the legal rules are

22    such that those are the limits, then those

23    will have to be the limits.

24              I have additional thoughts, and

                                           141

1    you will guide me as to the legal process.

2        Q.    Have you been asked by defense

3    counsel to provide any additional

4    opinions?

5        A.    No.

6        Q.    Is it your intention at trial to

7    provide any opinions that are not

8    contained in your report?

9              MS. GERSTEL:  Object to form.

10        A.    I will follow whatever the legal

11    guidelines are.  And if I'm able to speak

12    opinions that are not specifically in

13    there, I will, and if I'm instructed that

14    I'm not allowed to do it, I'll follow the

15    instructions.

16        Q.    Okay.  Well, tell me what the

17    additional opinions are that you have as

18    you sit here that are not contained in

19    your report.

20          MS. GERSTEL:  Object to form;

21    asked and answered.

22    A.    There are details, there are

23    studies which I discuss in here and I give

24    opinions were those reports, and I have

                                    142

1    more information from those same studies

2    which I feel is additive to my opinions.

3          Q.    Do those studies, in any way,

4    alter your opinions?

5          A.    They strengthen my opinions in

6    the same direction.

7          Q.    So none of your opinions

8    contained in your report are going to

9    change?

10          A.    Correct.

11          Q.    So there is no new category of

12    opinion that you plan to provide.  What

13    you're saying is you believe that you have

14    a better understanding now of some of the

15    materials you've -- or, I guess, materials

16    you've already cited in your report.

17          Fair?

18    A.    I think I have information that

19    strengthens the opinions that I give.

20    Q.    Okay.

21          But nothing will alter the

22    opinions?

23    A.    Correct.

24    Q.    Have you prepared any kind of a

143

1     supplemental report?

2     A.    No.

3     Q.    So, what is it that you want to

4     add to the report that strengthens your

5     analysis of these materials?

6          MS. GERSTEL:  Object to form.

7     A.    Well, for example, you know, a

8     report quoted often is the Schimpf

9     meta-analysis and a high rate of leg or

10    groin pain.

11    Q.    Okay.

12    A.    And that kind of jumped off the

13    page at me as something that seemed out of

14    line with a lot of the reading I have done

15    and my personal experience.  So I decided

16    to explore that pain because I think we

17    can all agree that if someone has an

18    incision in the groin, it would make sense

19    that they would have pain, some degree.

20    Let's not say much degree.  Anywhere you

21    have an incision there's going to be pain

22    immediately postoperatively.

23             For the -- for the TVT, there's

24    pain where the trocars come out of the

144

1    suprapubic region.  Right after and for

2    the groin where it comes out.  And what's

3    of important interests is how severe is

4    the pain and how long does it last.  So

5    that number that jumps off the page which

6    a lot of people react to as a high leg

7    pain rate, I wanted to explore that

8    further.  So I researched and found the

9    seven randomized control trials that go

10    into making that 16.7 percent and the data

11    from those trials clearly indicates that

12  clearly the preponderance, or at least 90

13  percent of the data shows that all of the

14  pain goes away within a few weeks to a

15  month.  So, most of the data supporting

16  that 16.7 is transient pain, which I think

17  is very relevant as opposed to just the

18  number of 16.7.  In the Ford Cochrane

19  analysis, which is also included several

20  times in my report, supports that leg pain

21  tends to be transient.  So that's one

22  example of an expansion or a deeper dive

23  into a study to say what is the 16.7

24  percent in the Schimpf article mean, and

145

1  doing some real research, we can say

2  what's the body of literature that goes

3  into the real number.

4      Q.    What other opinions do you want

5  to add?

6      A.    I would say I've seen an article

7  by Teo which is quoted and it certainly

8  sparks a lot of attention because it's a

9  trial where they decided to stop the

10    trial, feeling it would be immoral to

11    continue the trial because they had read

12    other articles that showed a high

13    incidence of groin pain and that it would

14    be -- it would be immoral to continue the

15    trial.

16              I said well, let me look into

17    it.  It really seems, again, what was the

18    data that was so alarming and what was

19    going on in their study.  And in their

20    study, when they stopped the trial, almost

21    all the patients who had groin pain had it

22    resolved within a couple of weeks and

23    there was only one patient who had chronic

24    groin pain and it was a patient in the TVT

146

1    group.  So I thought it was very

2    interesting that a study that is quoted

3    often as who you how problematic that is a

4    study had to be stopped because of the

5    high level of groin pain reported

6    elsewhere was in the middle of a study

7    demonstrating extremely little groin pain

8    and the only patient having prolonged

9    problems was in the other group.  So I

10   think it's -- my main message is that if

11   you dive into deeper into the literature,

12   the specifics about the groin pain and how

13   often it is severe or prolonged very

14   strongly is compelling that the pain is

15   transient.

16       Q.   Okay.  What else?  What other

17   opinions do you want to add?

18       A.   I would add an opinion on the

19   Okulu article.  Okulu used Vypro and

20   absorbable mesh compared to two others for

21   a sling and it's a very strongly presented

22   as evidence that there was a better

23   material, better alternative to the TVT

24   type mesh for slings.  And I think it's,

147

1    number one, it's unreasonable to use that

2    as evidence that a TVT could be done

3    better with this material because the --

4    in taking a deeper dive it became clear to

5    me this they don't do a procedure that

6   looks anything like a TVT.  They make a

7   vaginal flap, a very large vaginal flap

8   and open a big incision, which TVT does

9   not.  They cut out and island of vaginal

10  tissue and they sew a piece of this mesh

11  on top of the vaginal tissue and then they

12  use sutures it make a hammock out of it.

13         So, the procedure, while in that

14  study shall I get that it showed that the

15  absorbable mesh had some favorable

16  characteristics compared to the

17  non-absorbable, it was describing a

18  procedure that someone invented that

19  doesn't exist anywhere else in the

20  literature.  So I wanted to look a little

21  further into, you know, what is the

22  evidence for Vypro and the absorbable

23  meshes because the case that there's an

24  alternative that's more favorable is very

148

1   important, I think, to our discussion in

2   weighing the pluses and minuses here.  So

3   a did a literature search on Vypro mesh

4    and there are 72 articles on a Pub Med

5    search.  If you look for Vypro.  And while

6    there are a -- if you research midurethral

7    sling, you'll get about 4,000 and when you

8    research Vypro mesh, you'll get 72.  And

9    there are precisely two articles related

10   to slings, and there are three articles,

11   there are more articles in the Vypro Pub

12   Med search on using it for mosquito

13   netting than there are on using it for

14   slings much and the remainder of this are

15   related to non-incontinence procedures.

16          So, I think it's -- my main

17   opinion that I'm adding is that the main

18   study used that's comparative is on a

19   procedure that doesn't resemble a TVT at

20   all.  So I think it's unfair to say that

21   for a TVT this would be better.  And that

22   the data that's available for Vypro in the

23   incontinence world is microscopically

24   small compared to unprecedented data in

149

1    favor of the TVT product which we're

2    discussing.  So that's an additional

3    opinion I would give.

4        Q.    How many of those articles

5    related to the TVT are long-term

6    randomized controlled trials with safety

7    as the primary endpoint?

8            MS. GERSTEL:  Object to form.

9        A.    About 85.

10       Q.    Which long-term randomized

11   control trials exist on the TVT?

12           MS. GERSTEL:  Objection to form.

13       A.    417 had I believe 81 or 85

14   randomized controlled, I can't name them

15   all, and they had about 13,000 patients.

16       Q.    Anything else you want to add?

17           I just want to know so I can

18   move to have them stricken.

19           MS. GERSTEL:  I'm sorry?

20           MR. DeGREEFF:  I just want to

21       know so I can move to have them

22       stricken.

23   BY MR. DeGREEFF:

24       Q.    Doctor, were all these articles

                                    150

1   that you're talking about now available to

2   you before you rendered your opinions in

3   this case?

4        A.    The Okulu article was available

5   and is quoted in my paper, but in

6   reviewing my expert report and preparing

7   for this, I read through that article and

8   I -- when I noticed that it didn't look

9   anything like a sling and that it was new

10  information for me, that it really was not

11  a minimally invasive TVT type procedure, I

12  said to myself gosh, if this is so

13  different, I'm curious how much we know

14  about this.  So I looked further.

15            So, in reviewing my present

16  statements, new curious tees developed, so

17  I researched them.

18       Q.    Yeah, that's information that

19  was available to you though prior to

20  issuing your opinions.

21            Right?

22       A.    I guess the whole world of

23  articles was available to me.

24       Q.    Nothing new came out between the

1    time you wrote your report and now.

2            Right?

3        A.    Well, there have been articles

4    that have come out, but not -- I don't

5    think we're speaking about new articles

6    that came out that are relevant to your

7    discussion right now.

8        Q.    None of the articles that you

9    have now reviewed and wish to add opinions

10   on were unavailable at the time you

11   originally authored your opinions.

12           True?

13           MS. GERSTEL:  Object to form.

14       A.    That's correct.

15       Q.    This was something that you

16   decided to look in after having been

17   deposed previously on the TVT.

18           Is that fair?

19       A.    Well, from a time sequence, it

20   would be after the TVT, but it wasn't from

21   the TVT that had me do it.  I was reading

22   my report four days ago and these elements

23    just came to mind.  So this was based on

24    things that came to mind in reading

                                                152

 1    through my report preparing this week.

 2         Q.    Because those articles that you

 3    now seek to attack, those results are bad

 4    for the TVT products.

 5              Right?

 6              MS. GERSTEL:  Object to form.

 7         A.    Which articles are bad?

 8         Q.    The ones you're talking about

 9    that you now wish to further clarify.

10              Those results are adverse to the

11    TVT products.

12              Right?

13              MS. GERSTEL:  Object to form.

14         A.    Well, I think they're -- I think

15    they're kind of good for my argument

16    because they -- Okulu really doesn't

17    describe a TVT procedure.  So I would

18    consider it a strong defense that we're

19    trying to suggest something's an

20    alternative when it's really not doing the

21    procedure that we're interested in.

22         Q.    No, I understand you think you

23    can attack those conclusions somehow.

24              But my question is the reason

                                            153


1     you started looking into those articles is

2     because the results on their face are bad

3     for the TVT products.

4              True?

5              MS. GERSTEL:  Object to form.

6         A.    The studies didn't make sense to

7     me.  The reason I locked at everything I

8     had in my report and if something came to

9     me that seemed curious or in question,

10    like the 16.7 percent erosion, it just

11    didn't seem right.  So I'm a curious guy

12    and I look into things and I looked into

13    it.  I didn't go after it because it was

14    negative.  I went after it 'cause it

15    didn't make sense to me.

16        Q.    But it was negative.

17             Right?

18        A.    I would say the Schimpf article

19    was misleading.

20        Q.    Is 16.8 erosion rate, is that an

21    acceptable rate to you?

22            MS. GERSTEL:  Object to form.

23        A.    It's a rate that's misleading

24    because that's immediately postoperative

154

1    and that's what's wrong with her data.

2        Q.    I understand that you want to

3    attack an author who wrote a -- something

4    that was actually published on the TVT

5    products.

6            My question is 16.8 percent

7    erosion, is that an acceptable erosion

8    rate to you?

9            MS. GERSTEL:  Erosion?

10        A.    Are you speaking of erosion or

11    leg pain because the Schimpf?

12        Q.    I'm sorry.  Leg pain.

13            MR. DeGREEFF:  Strike that.

14        Let's start over.

15        A.    So, my answer to that would be

16    in the immediate postoperative period, I

17   think it's a very low rate of pain where

18   there's an incision and completely

19   acceptable.

20          If that is prolonged or severe

21   and prolonged, I would consider that

22   unacceptable.

23   Q.   What is an acceptable rate of

24   chronic groin or leg pain?

155

1    A.   Well, everyone would have a

2    different cutoff because you're balancing

3    the risks and benefits of each sling.

4          So, you know, I think that in

5    the 2 to 4 percent range is acceptable,

6    and we have to accept that in the

7    understanding that we are decreasing

8    bladder perforations, bowel perforations

9    with the TVTs.  So it's not just does the

10   patient have leg pain.  It's what we're

11   trading.

12          MR. DeGREEFF:  Move to strike

13      non-responsive.

14   Q.   My question was just simply what

15    is an acceptable rate in your mind of

16    chronic groin and leg pain from a TVT

17    implant?

18         MS. GERSTEL:  Object to the

19    form.

20    A.    I would say in the 2 to 3

21    percent.

22    Q.    So, your report, which is

23    Exhibit 7, is 57 pages long.

24         True?

                                    156


1    A.    Yes.

2    Q.    I believe we discussed

3    earlier --

4         MR. DeGREEFF:  Well, strike

5    that.

6    Q.    Who wrote that report?

7    A.    I did.

8         MS. GERSTEL:  Objection; subject

9    to privilege.

10   BY MR. DeGREEFF:

11   Q.    Did you write the whole thing?

12        MS. GERSTEL:  Objection.

13      Subject to privilege under the Federal

14      Rules of Civil Procedure.

15           Don't answer.

16           MR. DeGREEFF:  I can ask that.

17      I don't get to see drafts, but I can

18      ask who wrote it.

19           MS. GERSTEL:  No, you can't ask

20      about the report writing process.

21           MR. DeGREEFF:  I absolutely can,

22      but that's not where I'm going with

23      this anyway.

24  BY MR. DeGREEFF:

                                         157

1       Q.    Who wrote that report?

2            MS. GERSTEL:  Objection.

3            Don't answer.  Subject to

4       peripheral.

5   BY MR. DeGREEFF:

6       Q.    Are you going to choose to

7   accept your counsel's request that you not

8   answer my absolutely proper question.

9       A.    Yes.

10           MR. DeGREEFF:  Moving forward,

11      you guys won't get anything from us.

12   BY MR. DeGREEFF:

13      Q.    So, did you actually physically

14   write every word of it?

15            MS. GERSTEL:  Objection.  Same

16      basis.

17            Don't answer.

18      A.    I'm declining to answer.

19      Q.    Are there any parts of that

20   report that came from other people's

21   reports?

22            MS. GERSTEL:  Same objection.

23            Don't answer.

24            MR. DeGREEFF:  I absolutely can

                                              158


1      ask that.  That is 100 percent

2      correct.  If he's pulled pieces of a

3      report from other individuals' expert

4      reports, I have every right to know

5      that.

6            MS. GERSTEL:  It's all covered

7      by --

8            MR. DeGREEFF:  No, it's not

9          covered by that.

10               MS. GERSTEL:  It is.

11               MR. DeGREEFF:  No, it's really

12          not.

13               MS. GERSTEL:  It is.  I'm

14          directing him not to answer.

15               MR. DeGREEFF:  Okay.

16    BY MR. DeGREEFF:

17          Q.    Why do you think your counsel

18    doesn't want you to tell me who wrote your

19    report?

20               MS. GERSTEL:  Objection.

21          A.    I don't know whether there are

22    legal guidelines that she feels give that

23    that's the way it's supposed to go.

24          Q.    Do you think if you wrote the

                                         159

1    whole thing, she'd let you answer?

2               MS. GERSTEL:  Objection.

3               Don't answer that.

4          A.    I'm declining to answer.

5          Q.    So, it took you 25 hours to

6    write a 57-page report.

7            Is that right?

8     A.    Right.

9     Q.    Your report also has a reliance

10    list along with it.  That's Exhibit 8.

11           Correct?

12    A.    Right.

13    Q.    Are you aware it was amended

14    five days ago?

15    A.    I remember I had come up with

16    some articles that I had wanted to

17    include.

18    Q.    What was added to it?

19    A.    I don't recall specifically at

20    the moment.

21    Q.    Who chose the materials that

22    were added to it?

23    A.    I did.

24    Q.    All of them?

                                              160

1     A.    All of them.

2     Q.    Who drafted the additions to the

3     reliance list?

4     A.    The reliance list, the typed

5   reliance list was done by counsel.

6        Q.   Okay.

7        A.   The input to the reliance list

8   this week was mine.

9        Q.   So, this reliance list was

10  supplemented because you came up with

11  additional articles that you reviewed in

12  preparation for your deposition.

13            Is that true?

14            MS. GERSTEL:  Object to the

15       form.

16       A.   I think there's also one or two

17  that were in my report which we did not

18  have on there.  So there were a couple of

19  articles that I added and a couple that

20  were erroneously that were not added that

21  were already on the report.

22       Q.   Okay.

23            So, is everything --

24            MR. DeGREEFF:  Strike that.

                                        161


1        Q.   Does your supplemental reliance

2   list, together with your report, contain

3    everything that you reviewed in rendering

4    your general opinions?

5        A.    As I stated previously, I have

6    read additional materials all week and

7    have some other things in my head, and I

8    do understand that you have legal reasons

9    for why I may or may not be able to use

10    those you, but -- so there would be some

11    that I reviewed that are not in there.

12        Q.    Well, your reliance list was

13    just supplemented five days ago.

14        Have you reviewed additional

15    materials since then?

16        A.    I have.

17        Q.    The materials that you added to

18    your reliance list, were you directed by

19    counsel to look into certain issues?

20        MS. GERSTEL:  Objection.

21    BY MR. DeGREEFF:

22        Q.    Is that why you started to look

23    into them?

24        MS. GERSTEL:  Objection.  That's

162

1    will go under privilege.

2    Communications between experts and

3    counsel are privileged.

4          MR. DeGREEFF:  That's a

5    privilege?

6          MS. GERSTEL:  Yes, under the

7    rules.  We can look at it right now.

8          MR. DeGREEFF:  Not if they rely

9    on it.

10         MS. GERSTEL:  I'm sorry?

11         MR. DeGREEFF:  Not if they rely

12    ton.  If he takes actions what you're

13    telling him to do.

14         MS. GERSTEL:  No, communications

15    between expert and counsel are

16    privileged.

17         MR. DeGREEFF:  If you provide

18    information ultimate relied on, then

19    I'm entitled to discovery.

20         MS. GERSTEL:  The communications

21    are qualified under peripheral except

22    to the extent that they pertain to --

23         MR. DeGREEFF:  I'm not asking

24    what was said.  I'm asking if he was

163

1    directed to do a search.

2         MS. GERSTEL:  That pertains to

3         communication between me and him.

4         MR. DeGREEFF:  You and I are

5         going to have to disagree on that.

6    BY MR. DeGREEFF:

7         Q.    In rendering the general

8    opinions that you've got in your report,

9    is everything that you relied on in giving

10   those opinions contained in your reliance

11   list or the report itself?

12        MS. GERSTEL:  Object to the

13        form.

14        A.    Say that again.

15        Q.    Is everything you relied on in

16   rendering your opinions --

17        MR. DeGREEFF:  Strike that.

18        Q.    Are all the materials you relied

19   on in rendering the opinions in your

20   report contained in either your report or

21   the supplemental reliance list?

22        A.    No, 'cause I also depend on

23   knowledge learned from courses, books,

24    reading, education, clinical experience,

164

1    discussion with other experts, all the

2    time I spent in R&D labs.

3              So, my reliance is not just on

4    articles.  So I've had 25 years of

5    learning that come from sources that are

6    other than articles.

7       Q.    Let's try this again.  I think

8    if you listen to my question, it will be

9    okay.

10             Are all of the materials,

11   materials, you're not a material, as far

12   as I'm aware of, but are all of the

13   materials you relied on in rendering the

14   opinions in your report contained in

15   either the supplemental reliance list or

16   the report itself?

17      A.    When I go to courses, there are

18   materials, entire binders that have

19   information.

20      Q.    Are those on your reliance list?

21      A.    No.  I've learned them over the

22   years.

23        Q.     Why not?

24        A.     Because they're in my brain.  I

                                                     165

1    have them.

2         Q.     Do you understand that I have

3    the right to understand and know about and

4    see all of the materials you relied on in

5    reaching your opinion?

6         A.     I think you're totally

7    reasonable, and I am certainly not trying

8    to be difficult.  But when you say when I

9    made opinions, what I have told you I also

10   have from opinions which is the knowledge

11   that's in my brain from the sum total of

12   places I've gathered information, that's

13   part of where my opinions came from.

14        And if the word "materials" is

15   something for us to focus on, in many of

16   the places where I learned there were

17   materials.  I can't produce them.  If that

18   makes it illegal to be part of this, you

19   know, you'll instruct me on that, and you

20    and Diana will discuss that.  But my

21    opinions have a lot that comes from a lot

22    of different sources of learning that

23    don't have materials that can be put into

24    the reliance list.

166

1         Q.    I want a copy of the materials

2    you're talking about that I haven't seen.

3              Do you have copies of them?

4         A.    I have some of them.  Yeah.

5              MR. DeGREEFF:  I would like you

6         to give your counsel all of them and

7         then she can produce them to me.

8              Is that okay with you?

9              THE WITNESS:  I'll give you what

10        I have, just clarifying that it won't

11        be the full complement of every

12        educational piece that I have.  But I

13        do have quite a few.

14             MR. DeGREEFF:  Whatever you

15        claim to be relying on, I want to see

16        a copy of it.  So please give it to

17        your counsel.

18          MS. GERSTEL:  Are you talking

19     about every textbook he read in

20     medical school?

21          MR. DeGREEFF:  Right.  Or at

22     least identify it.  They haven't been

23     identified.

24          Well, I mean if we're going to

                                    167


1      play this game, we're going to play

2      this game.

3           MS. GERSTEL:  I'm not trying to

4      play a game.

5           MR. DeGREEFF:  If that's the way

6      we're going to play, if that is the

7      game you want to play, then that is

8      the game we're going to play.

9           MS. GERSTEL:  I'm not trying to

10     play a game.

11          I'm just saying that he's a

12     urogynecologist and his opinions on

13     urogynecology are based in part on his

14     sum total of experience in practice

15     and in learning as a urogynecologist.

16          MR. DeGREEFF:  That's not the

17          response to my question.  My question

18          is very simple.

19   BY MR. DeGREEFF:

20       Q.    What materials am I going to see

21   that you're going to talk about at trial

22   in support of your opinions that are not

23   included in either your reliance list,

24   your supplemental reliance list, or your

                                        168

1    report?

2        A.    Well, I would say if I rendered

3    the opinions from the items that I learned

4    outside of these materials that you have

5    in front of them, they're going to be

6    presented in the same way as part of my

7    experience and knowledge as a

8    urogynecologist.  I'm not going to show up

9    with binders and binders of things that

10   you haven't had a chance to look at in the

11   proper process.

12       Q.    Well, if there are materials

13   that you are going to rely on that are not

14    on your reliance list, identify them and

15    give them to your counsel, please.

16              So, can you identify them right

17    now for me?

18              MS. GERSTEL:  Objection.

19    A.    There's binders and binders of

20    course materials I've taken every year I

21    take one or two courses.  There's the --

22    every year I update and I get the binder

23    for the female pelvic medicine fellowship

24    board certification course.  It's, you

                                        169

1    know, it's like three of these binders.

2    And, yeah, I mean, I'll get you -- if you

3    said you want everything that I have, I'll

4    get you everything I have.

5    BY MR. DeGREEFF:

6    Q.    Are those things on your

7    reliance list?

8    A.    Well, I would say that the

9    course, let's say the 2018 fellowship

10    review course binder instruction and

11    educational materials, that is not on my

12    reliance list.  There are certainly

13    hundreds of articles from that course that

14    are on my reliance list because a number

15    of topics in that course are slings,

16    efficacy and safety of slings and, you

17    know, all the sections that have to do

18    with mesh and slings are in that course.

19            I would ask if you like, if

20    we're going to do that, I would take out

21    the things that have to do with

22    constipation and, you know, things that

23    don't have to do with mesh or slings just

24    so that it's not like this (indicating).

170

1    But if you want it all, I'll follow

2    instructions.

3        Q.    Right.  So, this is not supposed

4    to be a difficult question.  I mean, what

5    I'm trying to figure out is what I'm going

6    to see at trial and what you're going to

7    discuss at trial.  This is the

8    supplemental reliance list as I know it,

9    and this is what has been provided to us

10     as the things you relied on.  And I am not

11     including your experience and learning and

12     knowledge and all those things because I

13     understand there's not a material for

14     that.

15             I'm trying it figure out what

16     materials that I'm going to look at at

17     trial or that you could potentially be

18     using at trial that are not included in

19     your supplemental reliance list or your

20     report.

21     A.     I think we can safely say what

22     you have in front of you are the

23     materials, or the scientific materials

24     that are going to come forward.

171

1             I cannot separate the literature

2     from opinions I'm going to have based on

3     every other source and way that I learned,

4     that those are not going to be opinions.

5     But from the standpoint of materials, I

6     think you have what I'm going to present

7     to the court.

8                The only clarification I would

9      give there is that these articles in and

10     of themselves have references.  So those

11     references I would consider as part of

12     what I might reference.  Meaning in the

13     bibliography of an article, it may

14     describe the articles that are support

15     itself, and I may speak to articles that

16     are in the bibliography that are not --

17     that you don't have as a full.

18        Q.    So, it's your belief that by

19     closing an article as something you relied

20     on, that you're therefore disclosing, for

21     example if there's a hundred citations for

22     it, you're disclosing all of those?

23        A.    Well, if I'm reading a Schimpf

24     article and we're discussing Schimpf and

172

1      we're discussing Schimpf which is an

2      article I've disclosed and it is relevant

3      to discussing the data that she disclose,

4      for example the leg pain data, and it's

5      part of my knowledge that the articles

6    that comprise the 16.7 percent have

7    information X, Y and Z, I consider that

8    fair game.  If it's not legally, you'll

9    inform me.

10       Q.    Okay.

11             So, are you needing to update or

12   supplement your reliance list?  Is that

13   what you're telling me?

14             MS. GERSTEL:  Objection.

15             THE WITNESS:  Am I supposed to

16       answer that?

17             MS. GERSTEL:  No, go ahead.

18       A.    If I had the opportunity, given

19   that your goal is to have everything that

20   would be presented, I would update it.

21       Q.    Can you update this and provide

22   me a final reliance list that will include

23   everything that you intend to rely on?

24       A.    I'd be happy to do that.  And I

173

1    promise that between now and any

2    subsequent time we meet there won't be ten

3    more to add.  So I would be happy to, I

4    think, come together on what this

5    discussion's been and if was given the

6    opportunity to update it, I would add

7    about ten articles and we could call that

8    yes, you have in front of you the articles

9    I would rely on.

10        Q.    Okay.

11        A.    The materials.

12        Q.    Well, let's do that because I

13   want a final materials list.  So, I mean,

14   that's the goal.

15        A.    Okay.

16              MR. DeGREEFF:  How soon can we

17        get that?

18              THE WITNESS:  In a few days.

19              MS. GERSTEL:  Yeah.

20              MR. DeGREEFF:  Okay.  That's

21        fine.

22              So, I'm going to mark a blank

23        document as Exhibit 9, and then we can

24        provide the supplemental materials

                                      174


1        list to the --

2          THE WITNESS:  I'm making myself

3     a homework note.

4          MR. DeGREEFF:  –– to the court

5     reporter.

6          Sir, for the record, can we

7     agree that you are going to provide

8     what is going to be a final reliance

9     list to your counsel to be provided to

10    me and the court reporter?

11         THE WITNESS:  Yes.

12         MR. DeGREEFF:  Thank you.

13         And we will mark that as

14    Deposition Exhibit Number 9.

15         (Lind Exhibit 9, placeholder for

16    production by the witness, was marked

17    for identification, as of this date.)

18 BY MR. DeGREEFF:

19    Q.    Looking at Exhibit 8, the

20 current version of the supplemental

21 reliance list, that reliance list is more

22 than a hundred pages long.

23         Right?

24    A.    I believe you.

175

1      Q.    Is it fair to say it includes

2   thousands of documents and materials?

3      A.    Yes.

4      Q.    Who chose the documents on that

5   reliance list?

6      A.    I chose the vast majority and

7   counsel suggested some additional.

8      Q.    You chose the vast majority of

9   the internal Ethicon documents that are on

10   that reliance list?

11      A.    No.  Of the -- of the scientific

12   literature.

13            I didn't choose any of the

14   Ethicon documents.

15      Q.    Okay.

16            So, of the documents on your

17   reliance list, is it fair to say that the

18   portion you provided input on is the

19   medical literature section?

20      A.    Yes.

21      Q.    And the remainder of it was

22   chosen by defense counsel?

23      A.    The -- for the most part, yes.

24      Q.    What percentage of the medical

1   literature would you say you chose?

2       A.    75 percent.

3       Q.    Who chose the remaining 25

4   percent?

5       A.    Counsel.

6       Q.    What was the methodology you

7   applied for choosing the medical

8   literature that was included in the

9   reliance list?

10      A.    You know, I started -- I like to

11  start on my own.  I started on my own

12  doing my Pub Med searches on the different

13  products, then the different products plus

14  complications, and from those choosing

15  articles that I wanted.  And when I got to

16  areas where I felt that I was incomplete

17  or didn't really have -- didn't seem to

18  have authoritative understand, I'd say do

19  you have anything on this.  Then they

20  would provide materials.

21          So, you know, it was kind of a

22  back-and-forth.  It was really -- I was

23    trying to tell my story and when my story

24    had gaps, I said do we have more

177

1    information that I'm not finding on this.

2    It's hard when you try to do a -- you

3    know, the limitation where requests were

4    made, it's really just a function of how

5    large the literature is.  When you put in

6    midurethral slings, you get 4,000 on Pub

7    Med.  So, I was very, very diligent in

8    preparing this report, but when going

9    through 4,000 on a midurethral sling

10    search and, you know, several hundred when

11    you put in a TVT-O search, a TVT-O

12    complication search, FDA, you know,

13    notifications list, you know, it's just --

14    the reality is unless I had a full-time

15    job, I could review 10,000 documents and

16    figure out which were relevant.  So I

17    pulled the ones which clearly looked right

18    to me.  I tried to point more towards the

19    randomized controlled trials, that sort of

20    thing.

21          So, I created a story.  And when

22   the story had areas where I didn't feel I

23   had good literature, I said do you have

24   articles that I don't in this area and

178

1   they -- sometimes they said yes, and

2   sometimes they said no.

3       Q.    Did you ever inquire as to

4   defense counsel's methodology for

5   selecting the literature included in the

6   reliance list?

7       A.    No.

8       Q.    I think you said you spent about

9   40 hours reviewing the materials on the

10   reliance list.

11          Is that correct?

12       A.    Right.

13       Q.    Fair to say you did not review

14   every document on that 102-page

15   supplemental reliance list?

16       A.    I scanned the title of every

17   article and decided which ones I wanted to

18   look into further.

19      Q.      Okay.  So, fair to say you did

20   not review in detail every piece of

21   medical literature included on that

22   supplemental reliance list?

23      A.      That's fair to say.

24      Q.      Did you review all of the

                                                      179


1   nonmedical literature documents?

2      A.      I'm not sure which ones you're

3   referring to specifically.

4      Q.      Okay.  Well, anything that's not

5   designated as medical literature on your

6   report, did you review all of those

7   documents?

8              MS. GERSTEL:  Object to form.

9      A.      Well, I think I stated

10   previously that I reviewed some Ethicon

11   internal documents and did not review

12   others.

13      Q.      So, it's reasonable to say that

14   you didn't review everything on your

15   reliance list.

16              Right?

17          MS. GERSTEL:  Object to form.

18     A.    I read the titles of each and

19 selected the ones I thought were most

20 pertinent.

21     Q.    I'm not talking about just

22 medical literature.

23          I'm saying you didn't review all

24 of the documents on this 102-page reliance

                                        180


 1 list in 40 hours.

 2          Right?

 3     A.    In detail, no.

 4     Q.    That would have been essentially

 5 impossible?

 6     A.    Thousands of hours.

 7     Q.    Right.

 8          Would have taken thousands of

 9 hours to review all those, right?

10     A.    In detail to really read through

11 an article in depth.

12     Q.    Because if you've got thousands

13 of documents on your reliance list --

14     A.    It's ten minutes per, minimum.

15    Q.    Right.

16          So you're looking at 10,000

17    hours to review all those documents.

18          Right?

19    A.    Correct.

20    Q.    And you essentially did what you

21    could in 40 hours.

22          Right?

23          MS. GERSTEL:  Object to form.

24    A.    I spent the time I felt

                                            181

1     necessary to do an excellent job on -- on

2     the task, understanding that reading every

3     item available on it provided in the world

4     or on the reliance list was not possible.

5     Q.    What percentage of the medical

6     literature on your supplemental reliance

7     list did you actually review in detail?

8           MS. GERSTEL:  Object to form.

9     A.    In detail, I would say 30

10    percent.

11    Q.    What percentage of the total

12    documents on the reliance list, all of

13    them including the internal documents and

14    everything else that's on there, did you

15    actually review in detail?

16          MS. GERSTEL:  Object to form.

17    A.    I can't give you a percentage on

18    it.

19    Q.    How did you decide which

20    articles to review in detail and which

21    ones not to?

22    A.    The quality level of the study

23    was the primary, meta-analysis, systematic

24    reviews or randomized control trials, and

                              182

1    then of course I was interested on the --

2    I mean, I -- those are all the comparative

3    trials.  And then in those comparative

4    trials, I wasn't seeing a lot of themes

5    which I know are being proposed as

6    problems or negative aspects of some of

7    the products.  So I looked for -- I did

8    a -- I did a search on complications.  So

9    I went through complication articles on my

10    search and decided to pick out ones that I

11    should review that seemed to be at odds

12    with the randomized controlled trials.

13         Q.    Did you review all of the

14    articles that were selected and provided

15    by defense counsel?

16              MS. GERSTEL:  Object to form.

17         A.    I would say I reviewed every

18    title and decided, based on the time frame

19    I had, which ones were relevant and

20    comprehensively reviewed a very good

21    fraction of them, but not all of them.

22         Q.    You have on your reliance list

23    17 pages -- excuse me.  On your

24    supplemental reliance list 17 pages of

183

1    what are referred to as production

2    materials.  I think it's around page 75,

3    if that helps.

4         A.    In this document?

5         Q.    Yes.  In Exhibit 8.

6         A.    Do you want to show me where

7    that is?

8         Q.    I'll try.

9            (Pause.)

10    Q.    I'll start over.

11            You have often Exhibit 8, which

12    is the supplemental reliance list that's

13    currently available, 17 pages of what are

14    referred to as production materials.

15            Do you see where I'm at?

16    A.    Yep.

17    Q.    And that's hundreds of documents

18    listed on there, right?

19    A.    Yep.

20    Q.    What qualifies as a production

21    material, for purposes of this reliance

22    list?

23    A.    I don't know what definition

24    they give to qualify it as a production

184

1    document.  It's a term you're using that

2    I'm not aware is how it's used for

3    selection.

4    Q.    Well, it's not a term I'm using.

5    It's a term that's on the reliance list.

6    A.    Where is that term?

7     Q.     At the top there (indicating).

8     A.     It says "Production Materials."

9            So, let's see what we got here.

10           This would appear to be internal

11    documents describing various aspects of

12    bringing product to study, to develop, to

13    bring forward.

14     Q.     Was today the first time you

15    knew there was a heading for production

16    materials on your supplemental reliance

17    list?

18           MS. GERSTEL:  Object to form.

19     A.     On the heading, I had not seen

20    the heading.  I've seen this list of

21    documents, and I've read a good fraction

22    of them.

23     Q.     You didn't know there was a

24    heading because you didn't draft it.

                                            185

1            Right?

2            MS. GERSTEL:  Object to form.

3     A.     I didn't know there was a

4     heading because when you turn it over,

5     it's so thick that it's covered by the

6     stapled area.

7            So, in looking over this to look

8     at each number, the heading on the page

9     was not particularly of importance to me

10    when I was reviewing it.

11    Q.     I mean, you had seen the

12    supplemental reliance list before today.

13           Right?

14    A.     Yes.

15    Q.     Was there a staple on the page

16    then?

17    A.     There was a clip or a staple or

18    something.

19    Q.     Who selected the document --

20           MR. DeGREEFF:  Strike that.  I

21    think we already talked about this.

22    Q.     The documents included in this

23    production materials section were selected

24    by defense counsel.

                                        186


1            Correct?

2     A.     The internal documents were all

3    selected by counsel.

4        Q.    Did you review all of these --

5              MR. DeGREEFF:  Strike that.

6        Q.    Did you review any of these

7    documents included in the production

8    materials section?

9        A.    Yes.

10       Q.    What percentage of them?

11       A.    20 percent.

12       Q.    And how did you select which

13   documents you reviewed?

14       A.    You know, based on what I was

15   reading.  I asked for a number of topics.

16   I'd say, you know, tell me, you know, I

17   was particularly interested in discussions

18   of laser-cut mesh.  I said are there any

19   internal documents describing concerns

20   about the thigh and the obturator.

21             So, a good fraction of them were

22   things I came upon where I felt like I

23   wanted to know what was going on in the

24   decision-making, and then others were

187

1    offered by counsel.

2         Q.    Well, you didn't select any of

3    the internal documents.

4              Right?

5              MS. GERSTEL:  Objection; asked

6         and answered.

7         A.    I selected the topic.  The

8    information and then the internal document

9    was provided on the several topics that I

10   asked about.

11        Q.    Were you given any kind of

12   access to the document production database

13   so that you could do your own search for

14   documents?

15        A.    I was given a binder of enormous

16   numbers of company documents, and I

17   discussed that I –– it would be impossible

18   for me to review all of them.  So it would

19   have to be a combination of things I was

20   interested in and things that counsel

21   thought was most relevant for us to

22   discuss given reasonable but pretty

23   significant preparation.

24        Q.    My question is, I apologize.

                                            188

```
 1              Were you given access to there's
 2    an online database where all of the
 3    documents were produced.
 4              Were you given access to that
 5    online database so you could do your own
 6    searches?
 7        A.    The online database, no.
 8        Q.    There's around 81 depositions on
 9    your reliance list.  It's towards the end.
10    It's after the production materials
11    section.
12              So, that is a section on your
13    reliance list that includes about 81
14    depositions.
15              Correct?
16        A.    I'll trust your number.
17        Q.    Does it look reasonable?
18        A.    Yep.
19        Q.    Fair to say you didn't read all
20    of those?
21        A.    I did not read all of those.
22        Q.    Who chose the depositions that
23    were included on this reliance list?
```

24      A.      As stated previously, there are

189

1      certain topics I asked for, which would be

2      a smaller subset which -- which I asked

3      for which generated some of these.

4            Now, they probably would have

5      been on the comprehensive list they were

6      planning to include, but I requested,

7      let's say, 10 or 20 documents, or 10 or 20

8      categories of documents and they were

9      provided, and the rest were electively

10      provided by counsel.

11      Q.      For example, did you review Meng

12      Chen's depositions?

13      A.      I don't recall.

14      Q.      Who's Laura Angelini?

15      A.      I don't recall.

16      Q.      Did you read all of the Piet

17      Hinoul depositions?

18      A.      I didn't read all of it.  I read

19      some sections.

20      Q.      How many of these depositions

21      but actually read?

22     A.     I would say I read parts of 10.

23     Q.     Which 10?

24     A.     Arnaud sounds familiar, Hinoul,

190

1    Charlotte Owens sounds familiar, David

2    Robinson.

3         Q.     Well, David Robinson sounds

4    familiar because I asked you about the

5    medical director Dr. Robinson earlier.

6              Correct?

7              MS. GERSTEL:  Object to form.

8         A.     No, I recall independently that

9    that was one of the ones that I had read.

10        Q.     How did you select the

11   depositions that you read?

12        A.     It would come up in a topic.  It

13   would come up in a topic, you know, set up

14   as what was —— what was Ethicon concerned

15   about when they were making the obturator

16   sling, and then some deposition testimony

17   or internal documents were sent on that.

18             What other questions did I ask?

19             I was curious what the, you

20   know, lead directors of the

21   administration's opinions and thought

22   processes were on the topics that are

23   being raised in this litigation.  So then

24   some of the directors' transcripts were

191

1   provided.

2       Q.    So, did you review depositions

3   where Ethicon employees were expressing

4   concerns about making the TVT-O?

5       A.    Yes.

6       Q.    What were your understanding of

7   the concerns they were expressing?

8       A.    They were concerned about groin

9   pain.

10       Q.    Anything else they were

11   concerned about?

12       A.    There were concerns whether the

13   laser-cut mesh was stiffer and if it was

14   stiffer, if it would change the behavior

15   and/or success or adverse reactions in the

16   procedure.

17       Q.    And those were -- those concerns

18  were expressed in the -- by Ethicon

19  employees in the depositions you read?

20      A.    I'm mixing together in my mind

21  the depositions versus e-mails.  So this

22  is just -- to me it's just in my head as

23  internal documents.

24      Q.    Okay.

192

1          Did you specifically request by

2   name any of the depositions that are

3   included in the reliance list?

4       A.    I requested by topic 'cause I

5   didn't know the names of the players I

6   mean, looking back, I remember interacting

7   with some of these people when I was

8   helping to teach some of their labs and

9   that sort of stuff, so I remember some of

10  the names, but I didn't have any reason to

11  select the names that I knew.  There were

12  topics that I was interested in.

13      Q.    Then there are six pages of,

14  quote, other materials, right after the

15  depositions.

16    A.    Okay.

17    Q.    What's included in the other

18  materials section?

19          MS. GERSTEL:  Object to form.

20    A.    This looks like authoritative

21  articles or materials from authoritative

22  entities, such as FDA, ACOG, AUA, the

23  other quality and research and scientific

24  administrative agencies and female pelvic

                                        193

1  medicine.

2          There are some studies, a lot of

3  guidelines, position statements, bulletins

4  by the authoritative societies.

5    Q.    Who chose those materials?

6          MS. GERSTEL:  Objection.

7    A.    Those are mostly by me.  I had

8  put them in my report by my own

9  discretion, and I was being followed very

10  closely in our societies the growing,

11  growing support of the midurethral sling

12  based object its data, safety and efficacy

13  profiles.  So the -- it was a very strong

14    part of my report was to -- it was a very

15    strong part of my report to -- so, these

16    are mostly requested by me because --

17    either provided by me or requested by me

18    because they came across through my

19    societies with a very, very strong

20    repeated, repeated support for the case

21    for the midurethral sling being important

22    to preserve and important to clarify for

23    the educational world, the patient world.

24        Q.    You asked for Dr. Elliott's

194

1    curriculum vitae?

2        A.    No.  Again, if we're going to go

3    item by item, I can tell you whether I

4    requested it.  I'm talking about the

5    dominant fraction of these are things that

6    I provided or requested.  I did not

7    request all of them.

8        Q.    What percentage of them did you

9    request?

10        A.    The first page is about half.

11    The second page is a quarter.  The third

12    page is a third.  The page that's got

13    Daniel Elliott, I would say none.

14        Q.    Is it fair to say you requested

15    less than half of the materials included

16    in -- the documents included in the other

17    materials section of your reliance list?

18            MS. GERSTEL:  Objecting to the

19        form.

20        A.    Somewhere between 30 and 50

21    percent.

22        Q.    And what percentage of these

23    materials did you actually review?

24        A.    The ones that I requested I

195

1    reviewed.

2        Q.    And the rest of them were put on

3    the reliance list by defense counsel.

4            Is that correct?

5        A.    Yes.

6        Q.    For example, there are some

7    things in the other materials that say,

8    for example, excerpts from Budke trial

9    transcript.

10          Who would have done these

11   excerpts?  Is that something you did?

12       A.    I don't know.

13       Q.    Who would have chosen the

14   excerpts that were used?

15       A.    I don't have the answer to that.

16       Q.    Do you remember reviewing any

17   excerpts from trial transcripts?

18       A.    There were one or two trial

19   transcripts which I did review.  I can't

20   tell you which ones.

21       Q.    So, on the very last page of

22   Exhibit 8, your supplemental reliance

23   list, there's a number of expert reports

24   listed.

                                            196


1          Do you see that?

2       A.    Got it.

3       Q.    Did you review all these expert

4   reports?

5       A.    I didn't review all of them, no.

6       Q.    Why was it important to you to

7   review expert reports?

8      A.    It would educate me on the

9  opinions of the plaintiff experts as to

10  what they felt was most relevant and what

11  the arguments were on the plaintiff's

12  side.

13      Q.    And which ones did you review?

14      A.    When I was doing my Prolift

15  general report, I read Garely and Elliott.

16  I remember those names.  We had one

17  Rosenzweig report because it was

18  associated with one of the case-specific

19  reports.  He was the case-specific expert,

20  so I read his report when I read that.  So

21  I read three or four.

22      Q.    So you read three or four of the

23  maybe 30 or so that are on here?

24      A.    Right.

197

1      Q.    Did the plaintiff's expert

2  reports that you read reference documents

3  that were contrary to your opinions in

4  this case?

5      A.    Yes.

6     Q.     Are those documents, are they

7   referenced on your reliance list?

8     A.     I have a lot of -- I was pretty

9   good on my report about putting in, you

10  know, negative articles that are of

11  question.

12         I would say that there are

13  negative articles in a more comprehensive

14  list on there.  They're not all in my

15  report.  But I did select articles which I

16  felt were either I found on my own or that

17  I was -- saw were focuses of plaintiff's

18  reports and chose to comment on them.

19    Q.     So the plaintiff's experts are

20  medical literature and documents in their

21  reports that were adverse or contrary to

22  your opinions that were not included on

23  your reliance list or in your report.

24         True?

198

1         MS. GERSTEL:  Object to the

2   form.

3     A.     Some are included and some are

4    not included.  Correct.

5         Q.    Did you review those documents

6    or pieces of medical literature that were

7    contrary to your opinions?

8         A.    I read through a good fraction

9    of them on the reports that I read.

10        Q.    How did you get the internal

11   documents that they referenced?  Did you

12   ask defense counsel for them?

13        A.    When I thought it was relevant.

14        Q.    Were those documents provided?

15        A.    When asked for, yes.

16        Q.    Did you pull each of the

17   deposition citations in the plaintiffs'

18   expert reports?

19             MS. GERSTEL:  Objection.

20        A.    I did not pull every one.  I

21   pulled a good fraction of them based on

22   what the title were and the time

23   constraints.

24             So the answer is I did not pull

                                             199

1    all of them.  I pulled a very good

2    fraction of them.

3         Q.    Of the deposition excerpts?

4         A.    The depositions, I'm sorry.

5               The expert reports was a good

6    fraction.  The deposition excerpts, if

7    there was a reference to an internal -- a

8    few.  A few.  I can't say that was

9    comprehensive.  And the deposition reports

10   at times were so extensive, you know, it

11   could be a week-long deposition that

12   sometimes the purpose of that review was

13   not to comprehensively understand all the

14   depositions that went on.  It was to get a

15   flavor for what kind of discussions, you

16   know, the employees, the administrators

17   were having related to the topic, just to

18   get a flavor for what was going on

19   internally there.  They're extremely long

20   and not possible to drill down on and

21   examine comprehensively.

22              So I would say on the except

23   reports I pulled a good fraction.  On the

24   deposition reports, a very small number.

 1      Q.    Okay.

 2            So, why are there so many

 3      documents on your reliance list if you're

 4      not relying on them?

 5            MS. GERSTEL:  Objection to form.

 6      A.    You know, in discussions, when

 7      we bring a topic and, you know, if I say

 8      that, you know, I've seen this internal

 9      document and I think it's relevant, I'd

10      like to have access to the documents if I

11      choose to review them.  So then they are

12      added.

13            So, you know, there are times

14      where I'm in the discovery process and

15      putting together the report process and I

16      say gosh, I see that there's this internal

17      document that talks about X.  I say well,

18      I'd like to see internal documents that

19      discuss, you know, A, B, C.  So these are

20      added.  And then the ones that I see

21      pertinent I review and the ones that just

22      don't make the cut based on trying to do

23      an excellent job, but having a body of

24      literature and internal documents that's,

1   you know, a four-year Ph.D. thesis worth

2   of true deep dive, you have to make your

3   choices.

4        Q.    I mean, fair to say you're

5   obviously not relying on them if you

6   haven't reviewed them.

7              Right?

8              MS. GERSTEL:  Object to form.

9        A.    I am not relying on articles

10  that I haven't reviewed.

11             Of course I would ask the

12  question am I permitted to review those

13  and use them moving forward, but I guess

14  this is really not the place for that

15  question.  I'll take that up with counsel.

16       Q.    Yeah.  I'll let you take that up

17  with her.

18             I want to look at Exhibit 7,

19  which is your report, if you don't mind.

20       A.    Sure.

21       Q.    On page 15 under complications.

22             Are you following me?

23   A.   Mm-hm.

24   Q.   There's a section where you say:

202

1   Surgeons should also advise their patients

2   of their own success and complication

3   rates as well as rates that are published

4   in the peer-reviewed literature.  In our

5   practice, the complication rates with TVT,

6   TVT-O, TVT-Exact, and TVT-Abbrevo are

7   infrequent and almost without exception

8   complications can be resolved with the

9   patient remaining content and pain free.

10        Did I read that correctly?

11   A.   Yes.

12        MS. GERSTEL:  I'll just state it

13   was continent, not content.

14        MR. DeGREEFF:  Continent.

15   That's a great point.  Content is

16   different.

17   BY MR. DeGREEFF:

18   Q.   So, is it your intention to give

19   opinions on complication rates with the

20   TVT products in your practice?

21     A.     The main thrust of giving

22  opinions on complication rates comes from

23  the enormous data.

24          In my practice, I have not

                                        203

1  collected the patients and organized them

2  in a systematic trial where I have a

3  quantified, reviewed and seen how many

4  come back and systematically recorded

5  their efficacy and safety.

6          It is our routine practice to

7  have them come back at three months, six

8  months, one year and two years and the

9  patients come back in high frequency.  Do

10  I know it's 99 percent, do I know it's 90

11  percent?  I don't.  I know it's a high

12  fraction.  I know that the patients are --

13  I know that the complication rates are

14  low.

15          We have a quarterly Pelvic

16  Surgeon Society meeting in Manhattan, and

17  we have an agreement with all the local

18  experts where maintaining patients'

19   confidentiality, we will let each other

20   know if problems and complications have

21   come in that we're not aware about.

22        So, I don't have an organized

23   statistical study to tell you on my

24   patients.

204

1        I will state from my practice of

2   seeing them regularly and insuring that

3   they come back at those intervals, that I

4   feel very confident that my efficacy and

5   safety reflects that of the literature.

6   Q.   Okay.  So, I think that was a

7   long way of saying, and maybe I'm wrong,

8   but I think it was a long way of saying

9   that you are not going to give opinions

10   regarding your personal complication rates

11   in your practice.

12   A.   I don't think that's what I said

13   at all.

14        MS. GERSTEL:  Objection.

15   BY MR. DeGREEFF:

16   Q.   Okay.  Well, how do you track

17      the success and complication rates in your

18      patients?  What's your systematic method?

19              MS. GERSTEL:  Object to form.

20      A.      The patients are not recorded in

21      a long-term spreadsheet with data.

22              My way of tracking complications

23      is making sure they come back and there's

24      a reminder on the electronic medical

                                                205

1       record, if they don't make the

2       appointment, we call them to come back,

3       and we get back well over 90 percent of

4       our surgical patients at a year or two

5       years.

6               So, I know and I see them at one

7       year and two years and I know if they're

8       having problems.  So, if I have a -- my

9       own patients and I have 90 to 95 percent

10      of them back and I have to do one mesh

11      exposure, I feel pretty confident that my

12      mesh exposure rate is doing well.  It is

13      not statistically quantified, but it is,

14      by virtue of the surveillance in our

15    office, pretty tightly assured that I'm

16    seeing over 90 percent of my patients

17    back.

18    BY MR. DeGREEFF:

19        Q.    So, this is essentially

20    anecdotal.  You don't have any spreadsheet

21    or statistical analysis or tracking system

22    with regard to complications with mesh

23    patients that you can point me to or show

24    me?

206

1            MS. GERSTEL:  Object to form.

2        A.    I can point you to the number of

3    cases I've done and the number of mesh

4    erosions that have been revised.  I can

5    statistically quantify.  I can quantify, I

6    can search for bladder injury and I can

7    quantify that and give it to you over and

8    N, which would be the total number.  I can

9    quantity tie prolonged catheterization due

10    to voiding dysfunction.  So, these are

11    all --

12        Q.    Well, you need a numerator and a

13    denominator, right?

14        A.    Mm-hm.

15        Q.    How do you track your patients

16    that are lost to follow-up?

17        A.    I would have to see if they --

18    on the EMR if they showed up.

19        Q.    So, all of this you're talking

20    about is not an analysis that you've done

21    currently.

22            True?

23        A.    Correct.

24        Q.    You don't have any kind of

                                            207


1    internal registry tracking your patients

2    to see what complications they've had

3    over, say, a five-year period?

4        A.    That is correct.  The

5    preponderance of my opinion is based on

6    the 4,000 articles on midurethral slings

7    that are published.

8        Q.    That's different.

9            You being able to opine about

10    literature is different.  I'm asking about

11    your personal complication rates.

12          You have no systematic method in

13    place at your facility for tracking

14    complication rates and those that are lost

15    to follow-up.

16          True?

17          MS. GERSTEL:  Object to form.

18    A.    I have a systematic method of

19    following up to make sure that over 90

20    percent of my patients return and I know

21    how they're doing.  It is not recorded,

22    collected, and it has not been made into a

23    study with a numerator and a denominator.

24    Q.    And you haven't tracked patients

                                          208


1     that are lost to follow-up, true?  We

2     don't know what their ultimate results

3     were?

4     A.    We call all of them back and we

5     get almost all of them back.  We get over

6     90 percent of them back.  That I know.

7     And most studies of two years don't do

8     better than 90 percent.

9      Q.    What I'm hearing you say, and I

10   think what we agree on, is that you have

11   not done any kind of formal analysis and

12   you have no tracking system in place with

13   regard to the complications for your

14   patients related to the TVT products.

15            True?

16            MS. GERSTEL:  Object to form.

17      A.    I would say I haven't done a

18   formal analysis.  I would say I have a

19   tracking system to insure that I'm

20   capturing my patients.

21      Q.    And that tracking system is just

22   you know how many of your patients have

23   come back?

24            MS. GERSTEL:  Object to form.

                                        209


1      A.    Right.  And then I know -- and I

2   know on those patients if they have

3   problems.

4      Q.    What does the literature say

5   about the average rate of patients that

6   are lost to follow-up?

7        A.      It's quite variable.

8        Q.      How do you track the

9   complication rates in your patients with

10   regard to specific mesh products?

11        A.      Well, I use the same mesh

12   products most commonly.

13        Q.      For example, what's your

14   tracking system on the number of TVT-Os

15   that have been implanted and whether they

16   have had complications or not?

17        A.      The system would be the same as

18   I recorded -- as I responded before, is I

19   would have the patients back and see how

20   they're doing.

21        Q.      Okay.

22        A.      It's not systematic, but it's

23   systematic that they come back.

24        Q.      How do you track whether the

                                            210

1   mesh implanted in your patients is

2   mechanical or laser cut?

3              MS. GERSTEL:  Object to form.

4        A.      I know the products I'm using.

5      Q.     For example, if you use TVT-O,

6   how do you know whether you've used a

7   mechanical-cut or layers cut TVT-O?  How

8   do you track that?

9      A.     It's marked on the box.

10      Q.     Yeah.  But what's your tracking

11   system?

12      A.     I don't care which one it is.

13      Q.     So there isn't one, right?

14      A.     It's not a clinically relevant

15   distinction for me.

16      Q.     My question was a little

17   different than that.

18           My question is there is no

19   tracking system in place for your patients

20   with regard to whether there's been

21   mechanical or layers cut mesh used.

22           True?

23      A.     True.

24      Q.     You implant Ethicon slings as

                                    211


1   part of your practice.

2           Right?

3      A.    Yes.

4      Q.    How many, let's start with just

5    slings first, how many slings would you

6    say you've implanted since you started

7    using them?

8            MS. GERSTEL:  Object to form.

9      A.    It's in the 2800 to 3500 range.

10     Q.    And we're talking about mesh

11   slings, right?

12     A.    Yes.

13     Q.    When did you first begin

14   implanting mesh slings in women?

15     A.    Well, the TVT we first started

16   implanting in 2000, but we had been doing

17   some patch cut slings with suture before.

18   So there was some modifications.  But in

19   terms of the TVT slings and the slings --

20   the midurethral slings that were created

21   to be individual units and made for that

22   purpose, around that time.

23     Q.    That was in?  I didn't catch the

24   time.  Late 90 or 2000?

212

1     A.    2000.

2     Q.    Which of the TVT line of slings

3  have you implanted?

4     A.    I have implanted all of them.

5     Q.    So you've implanted the TVT?

6     A.    Mm-hm.

7     Q.    The TVT-O?

8     A.    Mm-hm.

9     Q.    The TVT-Abbrevo?

10    A.    Yes.

11    Q.    And the TVT-Exact?

12    A.    Yes.

13    Q.    Which of those do you currently

14  use?

15    A.    I use the TVT-Exact.

16    Q.    When did you stop using the TVT?

17    A.    I was an avid TVT user, and then

18  I liked the idea of a smaller needle.  I

19  thought the procedure could be done with a

20  smaller needle.  So I proposed that to

21  Ethicon.  They declined that idea.  So I

22  proposed it to Boston Scientific and they

23  made the Advantage Fit.  So when the

24  Advantage Fit came out and was a very -- I

```
1    thought very similar in every way with a

2    number of very nice changes that I liked,

3    I switched to the -- staying retropubic, I

4    switched to the Advantage Fit.

5         Q.    Okay.

6               And that is a Boston Scientific

7    product?

8         A.    Correct.  And then --

9         Q.    And when did you switch to that

10   from the TVT?

11        A.    I don't know exact time.  Four

12   years later, five years later.

13        Q.    So in 2004, 2005?

14        A.    2005, 2006 range.

15        Q.    So you have not used the TVT

16   since 2006?

17        A.    I still use the TVT-Exact.

18        Q.    Right.

19              But you haven't used the TVT,

20   was my question?

21        A.    Correct.

22        Q.    And what were the advantages of

23   the -- I guess what was better about the
```

1   versus the Ethicon TVT?

2           MS. GERSTEL:  Object to form.

3       A.    I liked that it had blue sleeves

4   over the introducer, which were easier to

5   see in the bladder if you had a bladder

6   perforation.  The other color could get

7   lost in the background of the bladder and

8   be missed.

9           I liked that the blue tubes

10  allowed you to twist and untwist the sling

11  so when that it's wrapped around the

12  urethra and there are little tiny twists

13  to it you could align it more perfectly.

14          And I liked that it was 2.3

15  millimeters instead of 5.  That was a

16  significantly, significantly different

17  smaller needle.

18      Q.    So, the smaller needle was --

19  what's the advantage of the smaller

20  needle?

21      A.    It's, you know, it passes

22    through the tissues easier.  It makes a

23    smaller puncture in the skin.  You need a

24    smaller exit.  And it lets you -- again,

215

1    the subtleties of the case require you to

2    move this needle, thread it between the

3    bladder and the pubic bone and when you

4    fail, you get a bladder perforation.  So

5    with the smaller needle, I felt, based on

6    the cadaver labs, that you could thread

7    that space a little more easily and then

8    if you do get a puncture in the bladder,

9    you get a 2.3 millimeter puncture instead

10    of a 5.  So when you take it out, the

11    bladder constricts at that point and I

12    felt that I did like that -- you know,

13    when you did have a bladder perforation

14    inadvertently, I liked that I went through

15    with a needle that was half the size.

16        Q.    And then what is the -- you said

17    that the Advantage Fit, the Boston

18    Scientific product, allowed for better

19    alignment of the sling versus the TVT?

20      A.    Well, the data and the results I

21   was having on the TVT and the data I was

22   aware of spoke to the fact that however

23   that kit is made to work, it's working

24   extremely well.

                                                216


1            There are times when you're

2    getting to your final moment when you're

3    going to decide is the sling exactly where

4    I like it fit, how loose is it, how tight

5    is it, how is it lying flat.  And there

6    are times where one arm doesn't seem to be

7    perfectly parallel with the other arm.

8    And once you've gone through with the

9    product, if it just has a sheathe on it,

10   you can't rotate it.  You can't straighten

11   those out.

12            So this is just a visual, a

13   visual thing that aesthetically looks like

14   if you want a sling to lay around, you'd

15   like it to look like that rather than

16   slightly turned.  So those tubes, because

17   they had some memory to them, allowed you

18    to make those turns and adjustment and

19    have the mesh visually appear to be

20    flatter when you pulled it through the

21    canals they seemed a little bit askew.

22         Q.    These are the tubes on the

23    Advantage Fit?

24         A.    Yes.

                                          217

1          Q.    Why is it important for the

2     tensioning to be correct on the sling?

3          A.    Well, because every sling --

4     every single sling ends up too loose, just

5     right, or too tight.  So you got to use

6     the teaching on had you to do the

7     procedure and to leave it truly tension

8     free to try to get the results that the

9     original procedure was producing.

10         Q.    What happens if there's too much

11    tension on a sling?

12         A.    In the middle case, the patient

13    would have a little difficulty voiding,

14    need a catheter for a couple of days.  In

15    a moderate case she'll need it for a week.

16    And in a more significant case, she's not

17    able to regain normal voiding function and

18    you have to release the sling.

19        Q.    And by release it, you mean

20    removal or revision surgery?

21        A.    Yes.  There are some people who

22    describe in the short-term as putting a

23    obturator in the urethra and pulling

24    downward to loosen it and there's little

218

1    data on that and I don't favor that.  But

2    yes, I would generally be talking about

3    revision surgery if they had retention.

4        Q.    And these things you liked about

5    the Advantage Fit by Boston Scientific

6    were things that you had brought to

7    Ethicon and they declined to do?

8        A.    Only the narrow needle was my

9    idea.  The things having to do with the

10    tube were theirs.

11        Q.    And the needle was important for

12    reducing the extent of surgical

13    complications.

14             Is that kind of the deal?

15     A.    Yeah.

16     Q.    Which is a patient safety issue?

17     A.    Yes.

18     Q.    So, when did you start

19   implanting the TVT-O?

20     A.    I started implanting about a

21   year after it was released.  2005, 2006.

22     Q.    Did you implant -- I mean, how

23   many TVT-Os would you say you've

24   implanted?

                                    219


1     A.    About 150 to 200.

2     Q.    At some point, did you stop

3   using the TVT-O?

4     A.    I did.

5     Q.    When was that?

6     A.    We -- we were approached with a

7   problem with cost issues where we had

8   seven or eight doctors and each one

9   wanting three different slings.  So the

10   hospital had an inventory which they felt

11   was impossible and they said we need you

12    to get together with your data, individual

13    preferences and options for slings and

14    come up with what you want.  And the

15    Caldera, I would seen the Caldera product

16    line and it was very, very favorable in

17    our review.  It was favorable because of

18    cost.  It was favorable because it comes

19    with one piece of mesh that can affix to

20    reusable instruments that let you do every

21    sling, inside-out sling, outside-in sling,

22    top-down retropubic, bottom-up retropubic,

23    all.  At any time in the case you could

24    switch.  So it was very flexible in terms

                                         220

1    of what you could use it for.  It was

2    quite a bit of a cost and it met many

3    doctors' needs all at once.  So we trimmed

4    down our product line and gave up the

5    TVT-O.

6         Q.    And when was that?

7         A.    I can't tell you exactly.  It

8    was -- I don't know exactly.

9         Q.    Last five years?  Last ten

10    years?

11         A.    I would say five years ago to

12    six years ago.

13         Q.    Did you compare the Caldera to

14    the -- the Caldera is a sling.

15               Correct?

16         A.    Yes.

17         Q.    And was it the Desara that you

18    chose?

19         A.    Yes.

20         Q.    And is it -- did you, before

21    choosing it and eliminating the TVT-O at

22    your hospital, did you look into the

23    safety and efficacy comparison at all?

24         A.    We used it in a lab about 20

                                        221


1     times and looked at it in the hand and

2     looked at biochemical properties an

3     determined it was not the same, but very

4     similar.

5               At that point when Caldera had

6     come out, we really had data from most of

7     the sling products that they were

8     relatively equivalent in efficacy and

9     safety.

10          In answer to your question, they

11    did not have significant data on it, no.

12    Q.    When did you start using the

13    TVT-Abbrevo?

14    A.    You know, when it came out, the

15    concept was appealing and I would

16    alternate between my slings, giving it a

17    try.  I used it probably 30 or 40 times.

18    I thought it was a very nice sling.  I

19    thought I was -- with my other obturator

20    slings, I wasn't having groin pain.  So I

21    kind of thought to myself we have some

22    data on Abbrevo.  It's clearly not going

23    through all the same tissues.  So we have

24    the potential advantage that it's not

222

1     going all the way through the muscles, so

2     maybe it's leg groin pain.  So how well is

3     it anchored.

4          We did have some studies to show

5     relevant equivalency to full-length

6    obturator slings, but I felt that from

7    doing obturator slings and not having

8    groin pain other than from the first week

9    or two, I felt more secure having a

10   full-length sling.  So I just decided

11   mostly to stay with that.

12          I do occasionally order it just

13   for the sake of fellow teaching to show

14   the variety of the sling.

15   Q.    The TVT-Abbrevo is not a

16   full-length sling.

17          Correct?

18          MS. GERSTEL:  Object to the

19   form.

20   A.    Correct.

21   Q.    How long is the TVT-Abbrevo?

22   A.    I don't know the exact length.

23   I'd guess at 12 or 15, but I don't know

24   the exact length.

                                        223

1    Q.    I think your report does much I

2    think it's 12 centimeters according to

3    your report.

4      A.     Yeah, that's what I recall.

5      Q.     Does that sound accurate?

6      A.     Sounds about right.

7      Q.     What is the length of a

8   full-length TVT sling?

9      A.     I think it's in the 23 to 25.

10  Somewhere in that range.

11     Q.     And what was the length of the

12  TVT-S, the mini sling?

13         MS. GERSTEL:  Objection.

14     A.     That, I don't know.  That was

15  shorter.  I didn't use many of those.

16     Q.     Fair to say that the TVT-Abbrevo

17  is closer in length to the TVT-S mini

18  sling than it is to the full-length TVTs?

19         MS. GERSTEL:  Objection.

20     A.     I'd have to put the numbers on

21  paper, but I don't think the size

22  comparison is the relevant issue.

23     Q.     Yeah, that wasn't my question.

24         My question is is it fair to say

                                        224


1   that the TVT-Abbrevo is closer in length

2    to the TVT-S mini sling than it is to the

3    TVT full-length slings?

4              MS. GERSTEL:   Objection.

5        A.    I would actually say no, I

6    disagree with that because let me -- I

7    will say out of the box the answer is yes,

8    but when you talk about the full-length

9    TVT is meant to be very, very long so that

10   if you have an obese patient, the mesh can

11   emerge from the abdominal wall which has

12   very variable size.  So when you talk

13   about how much is cut off and how much is

14   left in the body, I would suggest that the

15   length of the mini TVT or the TVT Secure,

16   which is going to the undersurface of the

17   pubic bone where it's at a junction with

18   the obturator muscle and the TVT-Abbrevo

19   is going to perforate the muscle, those

20   are, you know, a centimeter apart.

21              In terms of the part that's left

22   in the patient, I think they're probably

23   pretty similar.

24        Q.    When did you start using the

225

1    Abbrevo?

2         A.     2006.

3         Q.     When did you stop?

4         A.     2010.

5                These are approximates.

6         Q.     Yeah, sure.

7                You said you were more

8    comfortable using a full-length sling.

9                Why is that?

10        A.     To be clear, my vast

11   preponderance of slings are retropubic,

12   and the reason for that is I started using

13   it in 2000.  I had 600, 800 cases done

14   before any obturator sling came out.  I

15   was thrilled with my results.  I went from

16   doing a Burch with a full incision with an

17   open laparotomy to a the TVT sling, which

18   was 15 minutes.  I was not hitting the

19   bladder 'cause my skills are good.  I was

20   getting extremely low complication rates.

21   So I had something that the patients

22   were -- had very fast recovery.  Took me

23   15 minutes to do.  And when the obturator

24   came out, I said to myself that's pretty

226

1    cool.  That's very interesting.  I'm going

2    to select my patients to do that when I

3    have anatomy that gives me a reason not to

4    do the one I like because the one I like

5    it would be hard for me in my personal

6    experience to improve upon it because 15

7    minutes, loving my results and almost

8    complication free, no reason to change.

9          So, I used my —— mostly did my

10   obturator slings when someone had a

11   heroin, had a previous hernia repair, they

12   had a previous retropubic surgery like a

13   Burch or a Marshall-Marchetti, abdominal

14   wall surgery with mesh, reasons to stay

15   away from the target zone for the

16   retropubic regular TVT.

17   Q.    Again, I appreciate that.  My

18   question was different though.

19         My question was your testimony

20   earlier was that you felt more comfortable

21   with a full-length sling.

22         Why would you prefer a

23    full-length sling over a shorter sling?

24              MS. GERSTEL:  Object to form.

                                        227

 1        A.    Well, in the case of the

 2   retropubic -- are we talking obturator or

 3   retropubic or just across the board?  Do

 4   you want to break it down?

 5        Q.    I'm talking about the

 6   TVT-Abbrevo.

 7        A.    The Abbrevo.

 8              So, I wasn't having any

 9   significant groin pain past the immediate

10   perioperative period with the full-length

11   sling.  So, since I wasn't having problems

12   with the potential problem with the

13   full-length sling, the only reason to go

14   to Abbrevo is that you're concerned with

15   groin pain or you're having groin pain and

16   you want to see if you can reduce that by

17   having a thread going through instead of a

18   piece of mesh.

19              So, since I wasn't having the

20   pain that would lead you to Abbrevo, I

21    said to myself I have some studies, but

22    they're very early studies and few about

23    the Abbrevo.  Does it hold as well.  So I

24    said the Abbrevo is not going through all

228

1     the anchoring tissues.  So, since I'm not

2     having groin problems, I'll stay with the

3     full-length sling because I don't feel I

4     need to move away from a groin pain

5     problem because I wasn't having it.

6         Q.    Okay.

7               Yet the TVT-Abbrevo was brought

8     up by Ethicon in response -- it was

9     supposed to reduce the groin pain

10    associated with the TVT-O and other

11    obturator devices.

12              True?

13    A.    Yes.

14              THE WITNESS:  I'm going to take

15         a break just for the bathroom, if I

16         may.

17              (Recess taken.)

18    BY MR. DeGREEFF:

19    Q.    When did you begin using the
20  TVT-Exact?
21    A.    When it came out, I was using
22  Caldera and I was using the Advantage Fit.
23  So I mixed it in for teaching purposes.  I
24  liked the idea that I was getting the

                                           229

1   Ethicon product back because, you know, it
2   owned the data.  So now we kind of took
3   the things that Advantage Fit had kind of
4   changed that I liked.  I really liked the
5   slimmer needle for my, again, teaching
6   situation, residents and fellows.  So now
7   I had the original with a slimmer needle
8   and with tubes.  So that we kind of
9   brought back the two things.  So I started
10  using that a bit more frequently.
11    Q.    And you started that when?
12    A.    Pretty soon after it came out.
13  I usually -- most things I'm the kind of
14  person that says let my other expert
15  buddies get 50, 70 cases done and make
16  sure everybody's having a nice time with

17    it and then I join in.

18        Q.    And how many have you put in at

19    this point, do you think?

20        A.    Three hundred.

21        Q.    And how many, I never asked you,

22    how many of the original TVT did you put

23    in?

24        A.    That was before there was a

                                            230

1     competitor.  So like ten to -- like 500 to

2     600.

3         Q.    The TVT and the TVT-Exact are

4     placed by retropubic approach.

5              Correct?

6         A.    Yes.

7         Q.    And the TVT-O and the TVT-A were

8     transobturator approach?

9         A.    Yes.

10        Q.    I can we may have talked about

11    this already, but it's all a blur because

12    it's been four hours.

13             The transobturator approach has

14    a higher re-operation rate.

15          Correct?

16     A.    Yes.

17     Q.    It's understood typically that

18   the slings placed using the transobturator

19   approach are less durable than those using

20   the retropubic.

21          True?

22          MS. GERSTEL:  Object to the

23   form.

24     A.    The data's mixed on that.  There

                                          231

1   are RCTUs that show them to have equal

2   efficacy at two and five years and there

3   are RCTs that show somber durability of

4   the TVT-O over time.  That's as I recall

5   the literature.

6     Q.    Of the greater durability of the

7   retropubic over time?

8     A.    Right.  But that's not the

9   dominance of the data.  The preponderance

10   of the data shows relatively equivalent

11   rates and Ford and Cochrane's analysis

12   shows that.

13    Q.    So the data shows that the

14  devices placed via the retropubic approach

15  are equally or more durable than those

16  placed via the transobturator.

17         Correct?

18    A.    Yes.

19    Q.    Are you aware of studies finding

20  the rate of re-operation twice as high

21  with the transobturator approach?

22         MS. GERSTEL:  Objection; asked

23     and answered.

24    A.    I am aware that there are

                                          232


1   studies showing that.  I don't believe

2   that that is the collective data of all

3   the meta-analysis, but there are studies

4   that do show that.

5     Q.    Okay.

6          When you were implanting the

7   TVT-O and the TVT-Abbrevo, did you advise

8   your patients that there was a potential

9   increased risk with the obturator

10  approach?

11          MS. GERSTEL:  Object to form.

12     A.     I advised them of both

13 techniques and I advised them of

14 advantages and disadvantages of both.  So

15 I did include the proposed advantages of

16 the TVT-O, and I did tell them the

17 proposed adverse reactions associated with

18 each, because they have a little different

19 profile, each of the slings.

20     Q.     What were the differences in

21 potential adverse events between the TVT

22 appeared the TVT-O?

23     A.     Southbound the TVT has a higher

24 incidence of organ injury, bladder injury

                                    233

1 and voiding dysfunction.

2          The TVT-O has a higher incidence

3 of vaginal sulcus perforation, sometimes

4 called an angle needle introduction, groin

5 pain, I would usually describe to them as

6 typically transient and in rare cases

7 prolonged and with those being the major

8 differences.

9      Q.     Was the major reason for those

10   deferences the retropubic versus the

11   transobturator approach for placement?

12      A.     It was the anatomic pathway?

13      Q.     Would the problems associated --

14   that you would have told your --

15             MR. DeGREEFF:  Strike that.

16      Q.     Would the differences from an

17   adverse event standpoint between the TVT

18   and the TVT-Abbrevo have been similar to

19   the ones we just discussed?

20      A.     I think they would be similar,

21   but I think the data bears out, and it

22   makes sense, that you would have a

23   somewhat lesser chance of having groin

24   pain.

234

1      Q.     Do you consent the patients to

2   the implant procedure prior to implanting

3   mesh slings into object to form?

4      A.     Hundred percent.

5             MR. DeGREEFF:  What's the

6      objection?

7          MS. GERSTEL:  I'm sorry?

8          MR. DeGREEFF:  What's the

9     objection?

10         MS. GERSTEL:  You said do you

11    consent patient to the implant

12    procedure.  I'm a little confused by

13    exactly what you mean by that.

14         But my objection's on the

15    record.

16    BY MR. DeGREEFF:

17    Q.    As part of your consent process,

18    you explain to them the risks and

19    complications that Ethicon mesh slings can

20    cause?

21    A.    Yes.

22    Q.    What risks and complications do

23    you tell them are associated with the

24    TVT-O?

                                          235

1     A.    The TVT-O, I tell them you can

2     have bleeding.  You can have pain.  You

3     can have dyspareunia.  You can have groin

4     pain that is usually transient, but can in

5  some cases be longer standing and require

6  revision.  You could require revision for

7  a failure of the procedure, for the

8  procedure being too tight.  I inform them

9  of the chance of exposure-slash-erosion.

10  I tell them there's a chance of voiding

11  dysfunction.  There's a chance of puncture

12  of the urethra or the bladder.

13      Q.    Those are all complication that

14  is could be caused by the TVT-O mesh

15  sling.

16          True?

17      A.    Yes.

18      Q.    When you advise them about pain,

19  do you advise them about the potential for

20  chronic pain?

21      A.    I tell them there's a potential,

22  but it's rare.

23      Q.    And what about dyspareunia, do

24  you advise them of the potential for

236

1  chronic and ongoing dyspareunia?

2      A.    I do.

3      Q.     Exposure and erosion, what is

4   exposure and erosion?

5      A.     Well, you could probably ask ten

6   experts and get ten different answers, but

7   I would put it this way.

8             Exposure, literally the

9   definition of the word means you can see

10  the mesh.  So, let's say the wound is open

11  somewhere.  How it got opened we're not

12  talking about, but you can see the mesh.

13            In erosion you're also seeing

14  mesh.  And I would say the distinction I

15  make when you try to think of

16  pathophysiology is that when you do a

17  vaginal procedure, you make a single

18  incision through a very thin tissue.  As

19  opposed to the belly where you go through

20  three or four layers.  So it is a

21  dependent position and you cannot put a

22  wound dressing on it to support it like

23  you do elsewhere.  So it is vulnerable to

24  fluid collecting.

1              I'll try to speed this up.

2              A wound can open and if a wound

3    opens and you have a wound failure because

4    your enclosure wasn't good or you had some

5    fluid collection, the wound opens.  Then

6    you'll have an exposure.  To me that

7    usually looks like the -- the wound looks

8    innocent.  It doesn't show signs of

9    inflammation, of an active process.  It

10   just looks like a wound that's separated.

11             When I think of erosion, I think

12   of a more active process.  The body didn't

13   like the material that was in there or it

14   got infected.  There's a reaction going on

15   and the tissue looks much different.  It

16   looks inflamed.  It looks like it's

17   pushing it out as opposed to the walls of

18   the wounds that opened and the exposure

19   that's just kind of dangling there free.

20   And in an erosion everything there seems

21   to be more of an active process.

22             So, I don't think there's a

23   strict scientific or medical definition of

24   it.  I try to look at it this way and

1    that's from the vaginal exposure.

2              In terms of an erosion into the

3    urethra or into the bladder, you know,

4    those are even tougher because, you know,

5    in the case I described to you, you can

6    just have a wound that opens.  So

7    hypothetically, on an erosion to an

8    internal organ, the mesh is moving from

9    one place to another.  It was my strong

10   belief that most erosions to internal

11   organs were there when the patient left

12   the operating room.

13        Q.    Mesh can lead to mesh erosion.

14              True?

15              MS. GERSTEL:  Object to form.

16        A.    I would say that I've never seen

17   a mesh placed flight place lead to erosion

18   if erosion is an active process.

19        Q.    You can't have mesh erosion or

20   mesh exposure without mesh.

21              Fair?

22        A.    Right.  Correct.

23        Q.    And transvaginal mesh can cause

24    foreign body reaction, right?  Like we

1     talked about earlier.

2          A.     Yes.

3          Q.     And that can cause inflammation?

4          A.     Yes, it can.

5          Q.     And that can cause chronic pain?

6          A.     It can.

7          Q.     Are the complications that you

8     tell your patients are associated or

9     caused by the TVT-Abbrevo similar to what

10    you advise them on the TVT-O?

11         A.     I explain to them the

12    difference.  I explain that they have a

13    light -- a likelihood, but not -- of less

14    chance of having groin pain, but not no

15    chance.

16         Q.     But other than groin pain, would

17    the other complications that we talked

18    about being caused by the TVT-O remain the

19    same for the TVT-Abbrevo?

20         A.     Yes.

21         Q.     I'm just trying to make it so

22    you don't have to go through them all

23    again.

24            With regard to the TVT-Exact,

                                        240

1    how would the -- when you -- the

2    complications that you tell your patients

3    are caused by the TVT-Exact, how would

4    that be different than the TVT-O?

5        A.    I tell them they're very

6    similar.  I say this is an evolution of a

7    device and this one is a little bit

8    slimmer.  Other than it being slim E it's

9    the exact same procedure.  I feel in my

10   hands that it lets me go through the

11   spaces a little more easier, and if there

12   is an inadvertent puncture of the bladder,

13   which does happen in a few percentage

14   cases, I like the fact that the hole is

15   smaller and it heals spontaneously.

16       Q.    Other than those differences,

17   would the complications caused by the

18   TVT-Exact that you consent your patients

19   to be the same as what we discussed with

20   the TVT-O?

21        A.    Yes.

22        Q.    And the things we've discussed,

23   these complications we've discussed with

24   regard to that you consent your patients

                                             241

1    on for the TVT products, those are things

2    that are not good for the patients.

3              Right?

4              MS. GERSTEL:  Object to form.

5         A.    Well, when I'm consenting them

6    and telling them a list of adverse

7    reactions, by definition adverse reactions

8    are not good for the patients, but they're

9    a known risk and they're part of risk

10   benefits of trying to get the benefit of

11   being dry.

12        Q.    As part of your practice, you

13   treat women suffering from complications

14   caused by mesh slings.

15             Right?

16        A.    I do.

17        Q.    In fact, you're at a tertiary

18  care hospital.

19       Right?

20  A.   Yes.

21  Q.   And you're actually referred

22  mesh complications from other places in

23  the State of New York.

24       Right?

242

1   A.   I am.

2   Q.   Are there any other states other

3   than New York that you receive referrals

4   of women suffering from mesh complications

5   from?

6   A.   1996 I -- well, before the

7   mesh -- you still had other meshes then,

8   but, you know, 96 to 2005 I was one of

9   like five people in the area.  So I had

10  people from multiple, multiple states.  So

11  now we've got good trained people in a lot

12  of places, so they come from far less

13  often, but I still will get people from

14  New Jersey, Pennsylvania, Upstate New

15  York.

16    Q.    Okay.

17          There are doctors in referral

18    centers like yours for women suffering

19    from mesh complications in states all over

20    the United States.

21          Correct?

22    A.    There are many now, yes.

23    Q.    And how many referrals a year do

24    you receive from women suffering from mesh

                                          243


1    complications?

2    A.    It's decreased quite a bit over

3    the last five years.  I think over the

4    last five years the people knowing how to

5    do them right are doing them more often

6    and people who is techniques perhaps

7    weren't as good are doing them less often.

8          So I would say right now I get

9    between five and ten a year.

10    Q.    Do you know what mesh products

11    have been pulled off the market in the

12    last five years?

13          MS. GERSTEL:  Object to form.

14      A.    I might not be able to name them

15   all, but I know a lot of them.

16      Q.    Do you think that has anything

17   to do with the decrease in the number of

18   women you're seeing with mesh

19   complications?

20      A.    No.

21            Pardon me.  Referring to

22   decrease you're referring to slings or

23   vaginal mesh or both?

24      Q.    I'm referring, in that question,

                              244


1    I was referring to transvaginal mesh,

2    period.

3       A.    So, then, no.  I would correct

4    my answer.  I'm sorry.

5             Yes, I think with the removal

6    and direction not to use those products

7    and taken off, it's decreased the access.

8             And I certainly wish they'd do

9    that to the machine guns that have been

10   going off in the last couple of weeks.

11      Q.    What complications caused by

12    mesh slings do you treat in your practice?

13         A.     Retention, obstruction,

14    exposure-slash-erosion, dyspareunia.  I'm

15    not seeing a lot of groin pain.

16    Occasionally urethral erosion.

17         Q.     How about chronic UTI?

18         A.     The chronic UTI is a tough one

19    when you have to try to attribute it to

20    mesh.  When you see patients that have

21    slings in place that have chronic UTI.

22    So, if you have something related to the

23    mesh that explains it, so they're

24    retaining urine and they're not emptying

245

1    and the natural flow process and cleansing

2    process isn't working, you know, you say

3    releasing this would probably help.

4              It's sometimes hard when you get

5    a patient who has chronic UTIs and there's

6    no obstruction.  They empty well.  The

7    cystoscopy's clear.  There's no exposure.

8    They're not behave inflamed or infected.

9    So it's hard.  Sometimes we have to make

10    decisions that we don't see something that

11    would make sense that it would be from the

12    sling and you have to judge that.

13            So when there's an obstruction

14    an retention, makes sense.  Obviously when

15    there's a piece of mesh in the bladder,

16    makes sense.

17            We do have situations where

18    patient comes in and says I have

19    infections.  Is this from my mesh.  And we

20    do our assessment and I don't find

21    something that logically attributes to it

22    and you have to decide what to do with it.

23        Q.    Have you seen pieces of mesh in

24    the bladder?

                                              246

1        A.    Yes.

2        Q.    How about inflammation, you

3    treat women suffering from inflammation

4    from mesh?

5        A.    Whether the patients come with,

6    like I said, exposure, erosion, most of

7    them are quiet exposure.  They notice it

8    because either they felt it when they were

9    touching themselves or the partner felt

10   it.  Most of the time mesh exposure is

11   found innocently.  They didn't know it was

12   there.

13              When you talk about

14   inflammation, I would say in a small

15   fraction of the exposure-slash-erosions

16   they come in and it seems hotter.  That's

17   the one I would say where I was speaking

18   before I'd say this seems to be more of a

19   this one's being extruded because it seems

20   like an active process and they're

21   sensitive and inflamed.  But that's a

22   minority.

23       Q.    But I think the answer is yes,

24   you do treat women that have inflammation

                                           247

1    caused by mesh?

2        A.    Yes.

3        Q.    Do you perform surgery to treat

4    transvaginal mesh complications?

5        A.    Yes.

6      Q.    How about treatment of

7    transvaginal mesh complications caused by

8    mesh slings?

9            MS. GERSTEL:  Object to form.

10     A.    Yes.

11     Q.    What kind of surgeries do you

12   perform?

13     A.    If they're too tight, I loosen

14   them.  If they're in the bladder, we take

15   it out of the bladder and repair the

16   bladder.  If it's in the sulcus and it's

17   uncomfortable with vaginal pain, we have

18   to refresh the sulcus and sometimes the --

19   you might be through into the vagina and

20   sometimes it might be behind the vagina.

21   So not a true exposure, but as

22   uncomfortable.  So sometimes we have to

23   release the side band.  I've had to do one

24   groin exploration.

                                      248


1      Q.    What do you mean by groin

2    exploration?

3      A.    An obturator sling who had

4    discomfort by the groin that it was

5    persistent.

6    Q.   Have you done removals or

7    revisions related to the TVT mesh

8    products?

9    A.   The retropubic?

10    Q.   Any of the products in the line.

11    A.   Yes.

12    Q.   How many?

13    A.   20 to 30.

14    Q.   Mesh slings, generally speaking,

15    how many removal or revision surgeries do

16    you think you've done?

17    A.   In total?

18    Q.   Yes.

19    A.   I haven't quantified it.  It's

20    five it ten a year now.  It was ten a year

21    earlier.

22    I would say hundred to 150.

23    Q.   So, you currently do five to ten

24    mesh sling removals per year?

249

1    A.   Some kind of revision.

2      Q.    What are typically the

3    indications for revision of the TVT mesh

4    sling products?

5      A.    The number one indication truly

6    is that their doctor saw it and told them

7    that your mesh is exposed, you should have

8    it taken out.  So they come asymptomatic

9    and worried about their mesh.  So we have

10   a chat about if you're okay and you're

11   fine and you're in the having any

12   symptoms, you don't have to do anything

13   about it.  Half of those patients will say

14   let's get it out, I don't want it there.

15   And half will say hey, if I'm feeling

16   great, let's leave it.

17            So, the most common indication

18   is referred from a physician for something

19   they didn't know about 'cause they —— the

20   physician —— their primary care OB—GYN saw

21   an exposure.

22     Q.    So the most common is they're

23   referred for mesh exposure?

24     A.    Yeah.

1      Q.    And what other indications lead

2   to removal of the TVT mesh slings?

3      A.    They have pain or dyspareunia or

4   the partner felt something.

5      Q.    And you've revised TVT mesh

6   slings based on all of those indications.

7           True?

8      A.    I wouldn't be able to say for

9   every single one of those indications,

10   there was a TVT product.  That's -- that's

11   too exact to say that for every one of

12   those it was a TVT.  You know, they come

13   and sometimes we could have the op report,

14   sometimes we don't.  Sometimes we know

15   exactly which sling it was; times we

16   don't.  We do our best to get operative

17   reports.  Sometimes we get them; sometimes

18   we can't.  Sometimes they've had stuff

19   done in another country.

20      Q.    These would all be examples of

21   reasons you've revised mesh slings.

22           True?

23      A.    Yes.

24      Q.    What percentage of your practice

1  is related to treating transvaginal mesh

2  complications?

3          MS. GERSTEL:  Object to the

4      form.

5          Is that all transvaginal mesh?

6          MR. DeGREEFF:  Right.

7          MS. GERSTEL:  I'll just object

8      to the extent it's outside the scope

9      of this deposition.

10     A.    I'd see about 200 a month.  I'll

11 see one every other month.  One out of 300

12 to four hundred.  It's pretty low.

13     Q.    That's related to transvaginal

14 mesh complications generally speaking?

15     A.    Yeah.

16     Q.    Have you ever treated a patient

17 with mesh that --

18          MR. DeGREEFF:  Strike that.

19     Q.    Have you ever -- well, yeah.

20          Have you ever seen a patient

21 with mesh that is roped, curled, frayed,

22 deformed, folded or wrinkled?

23      A.     I've never witnessed those

24    things.

                                          252


 1      Q.     Do you agree that those things

 2    increase the risk of pain for a woman?

 3      A.     I don't know that those have

 4    been assessed in the patient in a study.

 5    These all seem to be things of excised

 6    mesh and I think the mesh sits differently

 7    in the body when it's excised.  So I don't

 8    see it roped and curled and all of that.

 9    It takes the shape of the tissue it's in.

10      Q.     So you've never seen or never

11    treated a patient that had mesh that was

12    deformed?

13      A.     How do you define deformed?

14      Q.     How do you define deformed?

15    You're the doctor.

16      A.     I will say on some prolapse

17    cases, if you have a piece of mesh that's

18    attached and the attachment released, so

19    if the procedure fails, then the -- then

20    the mesh will come upon itself and have

21   some folding.  I've seen folding on a mesh

22   failure because the attachment points have

23   released, but I don't see curling and

24   roping and what those things are that are

253

1   described.  I don't see them.

2       Q.    You've never seen any of those

3   with regard to mesh slings?

4       A.    I've seen mesh folded on itself

5   when there was a prolapse failure.  So the

6   mesh that was attached got released and it

7   came back upon itself and folded.

8       Q.    I'm talking about mesh slings

9   now.

10          You're never seen a mesh sling

11   that was roped or curled or frayed or

12   anything?

13      A.    I don't know if you consider

14   roping.  When a sling is tight and you're

15   going to release it, when you say that

16   patient and it's tight and you go and look

17   at -- and you release it, it looks a

18   little narrower.  I don't know if that's

19    roping or curling.  It does look a little

20    narrower when it -- when it -- when the

21    tissue contracts and the sling contract

22    with it or whatever reason for that

23    patient and the small fraction that end up

24    too tight and you have to go back, it

254

1     looks a little slimmer.

2         Q.    Well, that's contraction of the

3     mesh.

4               Correct?

5         A.    I don't know that it's

6     contracture.  The mesh looks smaller.

7         Q.    So you're saying when it

8     contracts and it gets under greater

9     tension, it looks thinner?

10        A.    I don't know if it's an

11    inflammatory response that encases it.  I

12    don't know if it's a tissue response.  I

13    don't think we have studied that.  And to

14    know what I'm referring to what's

15    happening at that point.  It just looks a

16    little slimmer.

17    Q.    But you've seen mesh slings that

18  have changed shape, that look slimmer.

19          True?

20    A.    When I take out patients that

21  have obstructions, they look a little

22  slimmer under the urethra.

23    Q.    In your experience removing the

24  TVT products, were you able to remove all

255

1  of the mesh?

2    A.    There are times where you decide

3  that you need to remove all the mesh and

4  times when you decide you don't need to.

5          When I decide a patient needs it

6  to be removed, I have removed all of it.

7    Q.    You agree that physicians are

8  often unable to remove all the mesh?

9    A.    It depends on their training.

10  The patient having a revision is best off

11  with someone with extensive experience in

12  handling this.

13    Q.    Well, there are times when it's

14  just not -- when you're just not able to

15    remove all of the mesh.

16          True?

17    A.    I have never had a case where I

18    couldn't remove the sling in totality when

19    I needed to.

20    Q.    It is challenging to remove all

21    of the mesh from a woman who's suffering

22    complications.

23          Is that a true statement?

24    A.    There's some dissections that

256

1    are more difficult than others, but I

2    don't consider it to be an extremely

3    difficult procedure.

4    Q.    For example, you know that

5    there's -- with the TVT-O product, you can

6    never safely removal all of the mesh from

7    inside a woman once it's implanted.

8          Right?

9    A.    I agree.

10    Q.    Okay.

11    A.    The problem you're having and to

12    clarify that disagreement is that there

13    are surgeons who are taking out mesh and

14    they really only have the training to take

15    it out from the middle of the vagina as

16    far out laterally as they can reach and

17    then there are surgeons who know how to

18    get behind the pubic bone and get what's

19    behind the pubic bone and get what's

20    wrapping around the descending pubic

21    ramus.  I've had obturators that were

22    taken out in totality several times.

23        Q.    You had some that you couldn't

24    take out in totality?

                                      257

1         A.    No.

2         Q.    Okay.

3         A.    Now, microscopically, do I know

4    that there's nothing there, it seemed to

5    us that there was nothing more there.  A

6    continuous band of ribbon.

7         Q.    Doctor, have you ever been

8    employed by a medical device company?

9         A.    As a consultant, not on a

10    payroll.

11      Q.    I understand the consultant.

12            I'm saying have you ever been an

13  actual employee of a medical device

14  company?

15      A.    No.

16      Q.    You have been a consultant for a

17  medical device company.

18            Correct?

19      A.    Yes.

20      Q.    Which ones?

21      A.    The Laurus Corporation, Boston

22  Scientific, Ethicon, Caldera.

23      Q.    What about Asera?

24      A.    No.

                                        258

1       Q.    You've never been a consultant

2   for Asera?

3       A.    When AMS was around, I had a

4   couple, very few.  So very briefly you

5   could add it to the list, American Medical

6   Systems.

7             Asera, no.

8       Q.    Okay.

9      A.    Do they go by another name?

10     Q.    Not that I know of.

11     A.    No.

12     Q.    When did you start working for

13  Caldera?  I guess start consulting for

14  Caldera?

15     A.    About five, six years ago.

16     Q.    So 2013, 2014?  Something like

17  that?

18     A.    About that.

19     Q.    What did Caldera have you doing?

20     A.    Well, as I said, we got involved

21  in them first in a non- -- I got involved

22  with them first in a non-consulting way.

23  I liked their set of mesh kits, their

24  ability to do everything in one kit, less

                                        259


1  expense and flexibility of the kid.  So

2  they're a small company and he said, you

3  know, I like to do design innovation.  Can

4  we take a look at your products and talk

5  about what can be improved.

6             So, if you take a look -- not

7    that you would take a look to do their

8    history, you'll see that Caldera now has a

9    blue sheathe covered narrow sling, which

10   was my original wish back with Gynecare

11   and Boston Scientific.  We -- they wanted

12   to be also involved in the abdominal sack

13   correctly suspension market.  We talked

14   about the weight and veracity of their

15   mesh and how it handled and how it might

16   be marked and colored and helped them

17   develop the mesh for sacral suspension.

18          We talked about what's unique

19   about their trocar delivery flexibility

20   and what could be added to that to

21   continue to improve the flexibility

22   options for patients.  For instance, took

23   the obturator trocars and said, you know,

24   every woman's not the same size.  Let's

                                    260

1    make different sizes.  So there are some

2    measurements we can use different sizes.

3          So we've done a lot of different

4    things that are tweaking things.  Some

5   have been adopted.  Some are in the

6   thought process.  Some have been rejected.

7       Q.    So, were you essentially -- were

8   you helping them with product design, or

9   were you helping them with research and

10  development?

11          I mean, do you know how were you

12  classified there?

13      A.    It really is research and

14  development.  It's trying to decide on new

15  products and how to alter products to

16  improve them.

17      Q.    Were you working on sling

18  products?

19      A.    Sling and mesh products for

20  sacral suspension.

21      Q.    And what were your -- what did

22  you tell them about the weight of their

23  mesh?  You mentioned that as one of the

24  things you were talking to them about.

                                    261

1       A.    I said there seems to be, you

2   know, across the slings -- across the very

3   popular area of abdominal sacral

4   suspensions is a huge broad area of stuff

5   that's really, really lithe, that I

6   thought was too lithe to things that were

7   really stiff and I thought their mesh

8   handled well and was within the realm of

9   acceptable weight and handling and I liked

10  it.

11          MS. GERSTEL:  Could I just note

12      for the record I don't know the extent

13      to which any work that Dr. Lind did

14      with any company is confidential.

15      He's obviously taken on oath to tell

16      truth.  I don't think I'm in a

17      position to direct him not to answer

18      any of those questions, but I also

19      don't know if we might need to seek

20      that some of this testimony be kept

21      confidential.

22          I just want to say that for the

23      record.  I'm just not sure.  I just

24      want to state for the record I might

262

1     need to explore that after this

2     deposition.  I'm not going to direct

3     him not to answer the question.

4          MR. DeGREEFF:  I mean, if you

5     want to move to have it sealed or

6     something.  We may agree to that.  I

7     just don't know what it is.  If

8     there's some reason for that, then

9     yeah, we can talk about it.

10          MS. GERSTEL:  All right.

11   BY MR. DeGREEFF:

12     Q.    So, what were the improvements

13   that you suggested to slings?

14     A.    For Caldera?

15     Q.    Yeah.  I mean, you told me that

16   you were looking at ways to improve kind

17   of the slings that were currently on the

18   market.

19          What were some of your suggested

20   improvements?

21     A.    Well, the ones that are already

22   out there are ideas that I am holding

23   confidential.  They haven't been put out

24   there yet.

1                   They adopted some things that

2      were already there with other slings which

3      was the narrow trocar and a colored

4      sheathe that could be identified.  So

5      those aren't hidden or protected ideas.

6      They're -- there are some ideas on the

7      table about how to, one, make the sling

8      passage more comfortable in the

9      postoperative setting for pain; and two,

10     to identify an inadvertent pass in the

11     bladder that you might miss.

12          Q.    Anything about the mesh material

13     itself?

14          A.    No.

15          Q.    Are you still consulting for

16     Caldera?

17          A.    Yes.

18          Q.    So basically 2013 to 2014 to

19     present you've been consulting for

20     Caldera?

21          A.    Yes.

22          Q.    How much are you being paid by

23     Caldera?  Is there some sort of a yearly

24     consulting rate or something like that?

264

1         A.     It's an hourly rate.  Just based

2     on ‡ la carte services given.

3         Q.     What is your hourly rate with

4     them?

5         A.     Four hundred an hour.

6         Q.     How many hours a year since 2013

7     or 2014 do you think you've spent working

8     with Caldera?

9         A.     It varies.  You know, if we're

10    in the middle of a product that they've

11    bought into, it could be 50 hours in a

12    year.

13           Last year was only seven or

14    eight hours.  So it varies quite a bit.

15        Q.     Are you aware of multiple years

16    working for them where you made more than

17    $20,000?

18        A.     Maybe two.

19        Q.     How far do you think you've been

20    paid by Caldera sense you started working

21    for them?

22   A.   Fifty.  50,000.

23   Q.   You use Caldera slings.

24        Right?

265

1   A.   I do.

2   Q.   Is the Desara your sling of

3   choice?

4        MS. GERSTEL:  Object to form.

5   A.   It's the one I use most

6   commonly.

7   Q.   What percentage of the time do

8   you use the Desara?

9   A.   75 percent.

10   Q.   What percentage of the time do

11   you use one of the Ethicon TVT slings?

12   A.   Ten percent.

13   Q.   And what are the other products

14   you use?  The other sling products you

15   use?

16   A.   I use Boston Scientific, Caldera

17   and the Exact.

18   Q.   So, you would use the BSC you

19   use, is that the Advantage Fit?

20     A.     Yes.

21     Q.     What are the differences between

22  the Desara and the TVT slings?

23     A.     Well, the meshes are different.

24  The shape of the trocars are similar.  The

                                        266


1   pathways are similar.  The Caldera is

2   reusable trocars and comes with the

3   ability to change direction, size and

4   shape of your trocars.  The Caldera for

5   the obturator has inside-out and

6   outside-in.  Those are the major -- those

7   are the differences I can think of.

8      Q.     How are the meshes different

9   between the TVT slings and the Caldera?

10     A.     Well, the present mesh I like to

11  use for Ethicon is the TVT-Exact.  So it's

12  laser-cut and the Caldera is

13  mechanically-cut.

14     Q.     Any other differences?

15     A.     I'm sure there's a chart I've

16  seen where their pour Ross tee and pore

17  size have some other differences.  So they

18    do, you know, on a -- on a chart of

19    mechanical properties they differ.

20         Q.    The Desara is larger pore mesh

21    than the TVT-Exact.

22              True?

23         A.    I think we had that one before,

24    and I thought we had -- I thought that was

                                                   267

1     the other way around, but I could be

2     mistaken.

3          Q.    Is the Desara more resistant to

4     deformation than the TVT sling products?

5          A.    I'm not aware of that being

6     studied officially or by myself.  I don't

7     notice a difference clinically.

8          Q.    So you're not aware of

9     literature that says it is?

10         A.    I don't know if one of the

11    mechanical studies that pulled on each

12    thing described it in a certain way.

13              I do remember in that same

14    article that has the chart that says the

15    pore sizes and the weight, I think it also

16    discussed what happened to them under

17    stress and it probably shows different

18    properties.  I don't remember when it

19    shows.

20              It behaves the same in the

21    patient for me.

22        Q.    Are you aware that Caldera makes

23    the claim that their product, their TVT

24    product is -- that the Desara is more

                                        268

1     resistant to deformation than the TVT

2     products?

3         A.    I wasn't aware of that.

4         Q.    So you don't have any idea what

5     that claim is based on?

6         A.    I do not.

7         Q.    Do you have any reason to

8     disagree with Caldera?

9         A.    I would just ask them to show me

10    what it's based on.

11        Q.    Do you disagree with them or no?

12        A.    I don't have the knowledge to

13    agree or disagree.

14     Q.    So, you use the Desara because

15    it's --

16            MR. DeGREEFF:  Strike that.

17     Q.    So the Desara is a

18    mechanical-cut mesh.

19            Is that correct?

20     A.    Yes.

21     Q.    The TVT-Exact is laser-cut.

22            True?

23     A.    Yes.

24     Q.    The TVT-Abbrevo is laser-cut?

269

1     A.    Yes.

2     Q.    And the TVT-O has both laser-cut

3    and mechanical-cut options.

4            Right?

5     A.    Yes.

6     Q.    You said you worked for Boston

7    Scientific as a consultant.

8            Is that true?

9     A.    Yes.

10     Q.    When did you start working for

11    Boston Scientific as a consultant?

12      A.      That was a ways back.

13              So, they sold the device that I

14      helped make was sold in 1996 or '97.  So

15      1998 they asked me to come on since I had

16      helped to make the device together and we

17      started -- I started doing that study

18      about the using that device to make first

19      it was in a scientific role doing studies,

20      the two studies for the sacrospinous

21      suspension and for the mini incisional

22      Burch procedure.  And as that relationship

23      grew, we started talking about, you know,

24      how they could improve their pelvic floor

                                            270

1       products.  I had gone to Ethicon as the

2       theme continues, I had gone to Ethicon

3       about making the needle smaller and they

4       didn't want to.  So we made the Advantage

5       Fit together.

6       Q.      Okay.  And, so, that would have

7       been like 1996 that you started consulting

8       with BSC?

9       A.      '96 or '97 is when they sold the

10   device.  So my consulting would have

11   started in like '98.  Somewhere in that

12   range.

13        Q.    Okay.  So you were not

14   consulting with them before they sold the

15   device?

16        A.    Correct.

17        Q.    So 1998 until when did you stop

18   consulting with BSC?

19        A.    Four years ago.

20        Q.    So 2015-ish?  Is that correct?

21        A.    Yeah, around that time.  It's

22   all approximates.

23        Q.    It sounds like were you doing

24   R&D type work for them, or was there some

                                        271


1   other aspect of it?

2        A.    I was teaching in labs trying to

3   teach people good -- the best technique,

4   or at least my best technique for placing

5   slings and doing the sacrospinous

6   suspension.  So a lot of lab work

7   teaching.

8          I was working on R&D for the
9    slim sling.  Wasn't that extensive.  We
10   were just making the needle narrow and
11   putting the tube on it.  You know, as far
12   as a change, it's a significant change in
13   a product.
14          They asked for my opinion on
15   some of the -- I was involved in the
16   development.  They asked for my opinion on
17   some of the vaginal mesh products when
18   they started making those.
19   Q.    So it sounds like they were
20   asking you for input on just kind of the
21   use of the device as well as some R&D
22   aspect.
23          Is that fair?
24   A.    Product development and

                                          272


1    teaching.
2    Q.    And you currently use the BSC
3    Advantage.
4          Right?
5    A.    To a small degree.

6      Q.     And were you being paid by BSC

7  as a consult for that 17-year span, I'm

8  assuming?

9      A.     Yes.

10      Q.     How much do you think you were

11  paid in that 17 years by BSC?

12      A.     That wasn't high volume per

13  year.  I mean, ten a year, approximate.

14      Q.     Ten thousand a year?

15      A.     Ten thousand a year if I was

16  involved in a project.  Maybe it was 20 on

17  a year where we were more involved in

18  focusing on something.

19      Q.     So, over 15 years, maybe 150 to

20  200,000?

21      A.     15 years, yeah, somewhere in

22  that range.

23      Q.     What are the differences between

24  the BSC Advantage sling and the TVT

                                              273


1  products?

2           MS. GERSTEL:  Objection; asked

3      and answered, I think.

4                THE WITNESS:  Yeah, it was?

5                I'll answer it.

6        A.     So, the Boston Sci slings are

7   all laser-cut.  The central portion of the

8   sling is also heat treated potentially to

9   make it a little more robust in that area.

10  So it is stiffer for sure.

11               Other than that, the TVT-Exact

12  and the TVT have a very similar shape, a

13  very similar angle.  You know, when I was

14  consulting with Boston Sci, we were

15  basically making a TVT that was skinnier.

16  So the shape was similar.  The arc of the

17  needle is similar.  You know, the porosity

18  of the mesh is slightly different.  I

19  can't tell you what it is, but it's all

20  within the type one mesh characteristics.

21               Those are the major differences.

22       Q.     You said you did some consulting

23  for AMS.

24               Is that right?

                                          274


1        A.     Very little.

2    Q.    When did you start that?

3    A.    It was in the vaginal mesh era.

4    They asked me to come up and do one or two

5    labs to see what I thought of their

6    vaginal mesh.  It was a one or two-gig

7    thing.

8    Q.    What did they pay you for doing

9    those labs?

10    A.    I think 3500.

11    Q.    Total or each?

12    A.    Each one.

13          That includes a trip to

14    Minnesota in the winter.  So you could say

15    I paid them.

16    Q.    So roughly seven grand total

17    with them?

18    A.    Yeah.

19    Q.    Have you done anything with them

20    since then?

21    A.    No.

22    Q.    How many -- since you've been

23    acting as an expert witness for Ethicon, I

24    believe you said you've given your general

275

1    opinion and then there's been four or five

2    case-specifics.

3             True?

4    A.    Yes.

5    Q.    Have you ever told Ethicon no

6    when they came to you and asked you to

7    give an opinion on a specific -- in favor

8    of a specific case?

9    A.    Of a case?

10            I think we had one where, you

11   know, the materials were sent and then

12   they said look at the other ones first

13   because we're working on this.  I glanced

14   at the case and looked at some of the key

15   things and I said this one may be a tough

16   one and they ended up closing that case

17   before I ever lent the opinion.

18            So, there are discussions

19   sometimes where I tell them that, you

20   know, this case looks a little difficult.

21            MS. GERSTEL:  I'll just state

22       not to reveal any discussions with

23       counsel.

24            THE WITNESS:  Right.

276

1   BY MR. DeGREEFF:

2       Q.    So they settled that case before

3   you had to say no basically?

4       A.    I didn't say that I said no.  I

5   was evaluating it, but they settled the

6   case before I got deeper.

7       Q.    So the answer is no, you've

8   never told them no on any case they've

9   asked you to be an expert witness on?

10      A.    At this point, no.

11      Q.    In all the case-specific reports

12  you've done for Ethicon, you've ultimately

13  enclosed that the product, i.e. the mesh

14  manufactured by Ethicon, was not the cause

15  of the plaintiff's complications.

16          True?

17          MS. GERSTEL:  Object to form.

18      A.    Yes.

19      Q.    Have you ever given the opinion

20  that one of Ethicon's mesh products caused

21  a woman's pain or other complications?

22      A.    Well, the product used by a

23    surgeon and the use of the product not

24    being used correctly is different than the

277

1    product itself causing the damage.  So I

2    never have thought that the product itself

3    caused the damage.

4         Q.    But you've blamed the doctor in

5    some of them, in some of your --

6         A.    I didn't blame the doctor.  I

7    assessed the materials and assessed that

8    the technique issues were problematic.

9         Q.    So you blamed the doctor

10   ultimately and said that it was the

11   doctor's fault?

12            MS. GERSTEL:  Object to form.

13   BY MR. DeGREEFF:

14        Q.    True?

15        A.    Sometimes it was a technique

16   problem.  Sometimes it was a concomitant

17   procedure and it may not be the doctor's

18   fault.  If you do a posterior repair, you

19   can have dyspareunia and it doesn't mean

20   the doctor was faulty.  It's a known

21   complication of other gynecologic

22   procedures that happen concurrently with

23   the mesh procedure.  So it's not

24   necessarily that I'm blaming the doctor.

278

1        Q.    Have you ever given the opinion

2    that any mesh product caused a woman's

3    injury?

4        A.    I've never given the opinion

5    that a mesh product separate from the

6    procedure caused an injury.

7        Q.    You've given the opinion that

8    the opinion was somehow done wrong and

9    that was the cause?

10            MS. GERSTEL:  Object to form.

11       A.    If there's a problem with a

12   procedure when you're using mesh it can

13   lead to complications.  It wouldn't happen

14   if the procedure was done right.  The mesh

15   characteristics I don't think would have

16   harmed the woman.

17       Q.    Do you have any understanding

18   why you were chosen as an expert witness

19   for Ethicon in this litigation?

20       A.   I've got a good reputation in

21   the field for 23 years.  I do good

22   clinical work.  I publish.  I'm easy to

23   get along with.

24       Q.   And you have a been an Ethicon

279

1   consultant or expert witness for 17 years

2   now.

3            Is that right?

4       A.   Well, the expert witness now is

5   for about three, three-and-a-half years.

6   And the Ethicon consulting was from, I

7   would have to look back at the transcript.

8   It was probably five to ten years.

9   They're not continuous, but --

10      Q.   Well, you started in 2002

11   consultant for them.

12           Right?

13      A.   Approximately that.

14      Q.   You consulted with them until

15   roughly 2012.

16           Right?

17      A.    Well, I think there was -- in

18   2012, I think that might have been the --

19   there was a big gap.  So yes, from a time

20   frame, you go to 2012.  But I think if

21   you've got the records from when I worked

22   for them, there was a pretty big gap.  I

23   was not doing a lot of Gynecare work for a

24   few years and then they asked me and asked

280

1   me if I would come take a look -- I think

2   there's one data point that's make that go

3   look extend.  So it may be five to eight

4   years and not twelve years just because I

5   think that 2012 is an outlier.  But you'd

6   have to look at -- I know you have the

7   records of everything that I've done.  So

8   we'd have to look more closely at it.

9      Q.    So we're looking at eight to

10   eleven years where you were either a

11   consultant or an expert for Ethicon in the

12   last 17.

13           Right?

14      A.    Sounds about right.

15    Q.    And you've been using their

16  product since 2000?

17    A.    Yes.

18          MR. DeGREEFF:  We can take a

19    break.

20          (Recess taken.)

21  BY MR. DeGREEFF:

22    Q.    Sir, do you remember doing any

23  work for Astellas?

24    A.    Yes.

                                    281


1     Q.    And what was that?

2     A.    A pharmaceutical company made a

3  drug for the overactive bladder.

4     Q.    Do you do some consulting for

5  them, it looks like?

6     A.    Yes.

7     Q.    And when did you do that?

8     A.    I don't know the exact years.

9  It would probably be like three years ago

10  to six years ago, so.

11    Q.    2013 to 2016?

12    A.    Yeah.

13    Q.    Do you have any idea how much

14  you were paid by them?

15    A.    Maybe 5,000 a year.

16    Q.    So maybe 15 total?

17    A.    Yeah.

18    Q.    I want to discuss, you told me

19  earlier you were paid about 50,000 by

20  Caldera.

21         Do you remember that?

22    A.    Yes.

23    Q.    I want to talk to you about

24  that.

                              282


1          Do you remember being paid $6500

2  by Caldera in 2013?

3    A.    I wouldn't be able to recall the

4  yearly in this meeting.

5    Q.    Do you know what the open

6  payments data is on the CMS website?

7    A.    I assume it's a public record of

8  what I've been paid for various

9  activities.

10    Q.    Right.

11          If Caldera reported that they

12   paid you $6,500 in 2013, would you

13   disagree with that?

14       A.   I would have to check my

15   records.  I don't know that those records

16   are -- I do know that some of the online

17   records of what I've been allegedly paid

18   were wrong.

19          So, I would say that we are

20   discussing consulting years ago, ranges

21   and payments, and I would suggest that I

22   come up with the actual payments from

23   payroll would be something I'd like to do.

24       Q.   So you want to go chase down for

                                        283


1    me all of your accounting records for

2    everything you've received from all of

3    these pharmaceutical companies?

4           MS. GERSTEL:  Object to form.

5        A.   Well, I don't know we're -- you

6    know, we're guessing at a lot of

7    activities with a lot of companies across

8    20 years.  It seems like the -- I don't

9      know how often target they would be.

10          I do know the online stuff, I

11     looked one time it was off by a digit and

12     we do have to contact them much there was

13     one time I had to contact them to make it

14     corrected.

15     Q.    Well, in 2014, do you remember

16     being paid $25,000 by Caldera?

17     A.    I don't remember the yearly

18     number.

19     Q.    Does that sound inaccurate to

20     you?

21     A.    There was a year or two where I

22     was doing a lot of work.

23     Q.    In 2015 do you remember being

24     paid $25,000 again by Caldera?

284

1      A.    I don't remember the number, but

2      it's plausible.  As I said, there were a

3      couple of years where it was heavy.

4      Q.    In 2016, do you recall being

5      paid $18,600 by Caldera?

6      A.    It's certainly possible.

7      Q.    In 2017, do you recall being

8    paid $8,000 by Caldera?

9      A.    That sounds familiar.

10     Q.    So I get more like $80,000 paid

11   to you by Caldera.

12           Does that sound accurate to you?

13     A.    It sounds like the records you

14   have show that.

15     Q.    Do you disagree with that?  Does

16   that sound out of line?

17     A.    It may be right.  It may be plus

18   or minus 20.

19           I will go to their accounting

20   and ask them.

21           It doesn't sound erroneous.

22           MR. DeGREEFF:  Sir, I'm going to

23      hand you what I'm going to mark as

24      Deposition Exhibit 10.

                                        285


1           (Lind Exhibit 10, Consulting

2      Agreement dated as of January 3, 2002

3      between Lawrence Lind, M.D. and

4      Ethicon, Inc., Bates No.

5          ETH.MESH.16009738 to 16009743, was

6          marked for identification, as of this

7          date.)

8      BY MR. DeGREEFF:

9          Q.    Sir, does this appear to be a

10     consulting agreement between you and

11     Ethicon?

12         A.    Looks like it.

13         Q.    What is the date of that?

14         A.    2002.

15         Q.    January 3rd of 2002?

16         A.    Yep.

17         Q.    Does that sound familiar as

18     about the time you started working for

19     Ethicon as a consultant?

20         A.    It's about where I thought it

21     was.

22                And it looks clearly it's a

23     document that's real.

24         Q.    If you look at under Section 1

                                              286


1      Consultant, my only question is with that

2      paragraph is there's a spot in it that

3      says:  Keep records of hours worked and

4      cost of materials used.

5              Was that something that you

6      would have done?

7      A.    You know, the consulting for

8      them was not at home working on documents.

9      They would call me to do a lab.  It was a

10     half-day lab.  They'd pay $3,000 and it

11     was a one at a time thing.

12             So, there really wasn't any

13     recordkeeping much you'd go.  You'd submit

14     one at a time.  It wasn't a kind of like a

15     cumulative work that was being added that

16     you recorded.  So I would say I kept

17     records, but it was one at a time and once

18     you did it, I didn't keep track after

19     that.

20     Q.    So I guess my question is are

21     there any records in existence that would

22     have a detail of the hours worked under

23     this consulting agreement?

24     A.    I don't have it and I don't know

287

1    if Ethicon would have it.

2        Q.    Would that have been something

3    you would have submitted to Ethicon?

4        A.    As I said, it was a one day at a

5    time type of working agreement.  So even

6    though it's instructing to keep hours, I

7    think that's requesting to kind of keep

8    the accounting in order.  The way I

9    worked, it was just a, you know, once

10   every few weeks or few months, they asked

11   me to come to do something and I went and

12   I submitted for that one day.

13          So, there were not -- there

14   aren't records, I don't have a spreadsheet

15   or a record of the hours worked.

16       Q.    Okay.

17          I don't see that I ever asked

18   you that, but how much do you think you

19   were paid by Ethicon as a consultant?  Not

20   as a expert witness, but as a consultant?

21       A.    I don't know.  It started a long

22   time ago.  Spanned a long period.  There

23   were periods with big gaps where I didn't

24   do much at all, and there were periods

1    where I did a lot.

2              So I really cannot conjure a

3    guess.  I don't know if it's 20,000 or a

4    hundred thousand.  I really don't know.

5         Q.    And who would know that answer,

6    if not you?

7         A.    I don't know if Ethicon has the

8    records or if their accounting goes back

9    that far.

10        Q.    So, if you look at page 3 of

11   this agreement, the term of the agreement

12   commenced on January 3rd of 2002 and seems

13   to have terminated on February 28th of

14   2002.

15             Do you have any idea why it was

16   so short?

17        A.    You know, I'd have to read the

18   whole agreement.

19             As I recall, there was a time

20   where anyone -- the contracts they had had

21   things that said you couldn't work with

22   anyone else.  So, I said well, you know, I

23   have ideas I'm working on and you're

24    rejecting them.  So, I don't know if

289

1    that's why.

2              So this may have been made

3    because I didn't agree to some of the

4    terms of their long-term agreement, but

5    they wanted me to come for this one

6    session, so we made a short-term contract.

7    So it does seem odd.

8        Q.    I think the situation you're

9    talking about was in 2010.

10             And maybe if you turn to page 4

11    of Exhibit 10, that will kind of clarify

12    it for you.  If you look at 6 and 7,

13    paragraph 6 and 7.

14        A.    Yeah, it looks like it's an

15    invitation to go to one session, abdominal

16    guides training session.

17        Q.    That's what I was going to ask.

18             So, it looks like they were

19    paying you $3,000 for coming to a

20    abdominal guides training session?

21        A.    Right.

22      Q.     Did you get that $3,000 just to

23  show up, or did you have to teach?

24      A.     I was definitely teaching

                                            290

1   abdominal guides.  They weren't -- I would

2   be one of the people teaching it, not

3   learning how to do it.

4       Q.     How long was that training

5   session?

6       A.     They usually were a half-day to

7   six hours.  Four to six hours.

8       Q.     Where did those take place?

9       A.     They were in a number of

10  locations.  It was various places that had

11  access to cadavers.  So I don't know where

12  it took place, but the closest it would be

13  in 2000 -- it wasn't on Long Island until

14  later in our agreements because we didn't

15  have cadaver labs.  So it would either be

16  Manhattan, New Jersey.

17      Q.     Somewhere in the New York

18  metropolitan area?

19      A.     Yeah.  I wasn't flying for this.

20      Q.    And they were essentially paying

21   you $3,000 for a half-day participation?

22      A.    Well, as I said, it would be

23   four to six hours, plus the transportation

24   and time.  So, you know, door to door, it

291

1   would certainly be more than eight hours.

2      Q.    Did they pay you for your

3   transportation and hourly rate also?

4      A.    They paid the amount and then

5   just incurred costs for transition.  It

6   wasn't an hourly rate on top of that.

7      Q.    So $3,000 for roughly eight

8   hours.

9            Is that right?

10   A.    Yeah.

11         MR. DeGREEFF:  I'm going to hand

12      you what I've marked as Deposition

13      Exhibit 11.

14         (Lind Exhibit 11, Clinical Study

15      Agreement between Gynecare and North

16      Shore University Hospital, Bates No.

17      ETH.MESH.00412092 to 00412098, was

18      marked for identification, as of this

19      date.)

20  BY MR. DeGREEFF:

21      Q.    Can you tell me what that is?

22      A.    Clinical study agreement.

23      Q.    And the term of that agreement

24  is April 4th, 2002 through the end of

292

1   June, through June 30th of 2004.

2           Correct?

3       A.    Right.

4       Q.    This was between Gynecare, which

5   is a division of Ethicon, correct?

6       A.    Yes.

7       Q.    And your institution with you

8   and Dr. Garely designated as the looks

9   like the primary people in charge of this?

10      A.    Investigators.

11      Q.    Is that correct?

12          Who is Dr. Alan Garely?  Do you

13  know him?

14      A.    He was a previous partner in my

15  practice, and he know practices in

16    Manhattan and south shore of Long Island.

17        Q.    Do you know him personally?

18        A.    You know, I mean, we were

19    partners for three years.  So I did know

20    him personally.  We don't socialize at

21    present.

22        Q.    Is he a good doctor?

23        A.    He's a good surgeon.  I don't

24    think -- again, I haven't seen him take

                          293

1    care of patients in 15 years.

2        Q.    I mean, do you have any

3    criticisms of him as a physician?

4            MS. GERSTEL:  Object to form.

5        A.    He could get upset with someone

6    and then it wasn't a good scene.

7        Q.    Okay.  That's not really him as

8    a surgeon.  It sounds like maybe you --

9        A.    I haven't seen him in a

10    practicing situation for 15 years.  So I

11    really don't think I can say anything.

12        Q.    Okay.

13            So, Dr. Garely was one of the

14    investigators hired by Ethicon to do this

15    clinical study agreement with you ——

16         A.    Yes.

17         Q.    I mean to do this clinical study

18    with you.

19              Do you know when was the last

20    time you spoke to Dr. Garely?

21         A.    A couple months ago.

22         Q.    Do you know whether he currently

23    uses the TVT-O, TVT or TVT-Abbrevo?

24         A.    I don't.

                                                    294


1          Q.    Have you ever been provided with

2     any of the testimony or documentation of

3     what he told Ethicon about those devices?

4          A.    I think I saw one of his mesh

5     reports.  I don't think I saw a sling

6     report.

7          Q.    So, as you sit here, do you have

8     any idea what he told Ethicon about the

9     TVT-O, TVT-E and TVT-Abbrevo?

10         A.    I don't.

11         Q.    Is it your understanding that

12    Dr. Garely is now a plaintiff's expert in

13    the transvaginal mesh litigation?

14         A.    I do understand that.

15         Q.    And you reviewed his report?

16         A.    I reviewed his mesh report.

17         Q.    When you say "his mesh report,"

18    are you talking about with regard to the

19    Prolift?

20         A.    Yes.

21         Q.    So, this is a former consultant,

22    or I guess someone who is a former

23    investigator on a study done by Ethicon

24    who's now providing testimony for the

                                              295

1    women injured by Ethicon devices.

2              Is that right?

3              MS. GERSTEL:  Object to form.

4         A.    Looks like he was a previous

5    participant in this study and he is now a

6    plaintiff's expert, as you described.

7         Q.    Well, plaintiff meaning the

8    women who are claiming injuries.

9              True?

10      A.    Yes.

11      Q.    If you look at paragraph 1 where

12   it says:  Performance of study.

13            As the principal investigator,

14   you were to perform the study in

15   accordance with the protocol.

16            Right?

17      A.    Right.

18      Q.    Who determined the protocol?

19      A.    I would have to look at the

20   protocol to comment on that.  But I would

21   say that any study I enrolled in, I would

22   have to believe that it was a protocol

23   that I agreed with.  So there can be

24   suggestions from a company as to what they

                                    296


1   might want to happen, but I would never

2   have a -- subject my patients to any

3   protocol that I didn't specifically take

4   responsible for if I was a principal

5   investigator.

6       Q.    Well, Ethicon determined the

7   protocol that was used.

8          Right?

9     A.     I am ultimately responsible for

10   the protocol that gets submitted to the

11   IRB.

12    Q.     I understand.

13    A.     How much of the protocol was

14   created by them and edited by me or

15   created totally by me I don't think we can

16   answer at this meeting.

17    Q.     At you look at paragraph 3

18   Financial Consideration and Payment

19   Schedule.

20          You see where I'm at?

21    A.     Mm-hm.

22    Q.     It says:  The total price for

23   the conduct and the completion of study as

24   well as the payment schedule is outlined

                                        297

1    in Schedule B.

2           Did I read that correctly?

3     A.     Yep.

4     Q.     Look at Schedule B, if you

5    would.  It's on page 6.

6          Are you there?

7     A.    Yes.

8     Q.    It appears that the total

9  payment being made by Ethicon is $11,000.

10         Is that correct?

11    A.    That's the planned -- that's the

12 budget for the -- for the study.  Right.

13         How much was actually paid with

14 how many subjects, we don't know.  This is

15 the schedule of payments ahead of time of

16 what would be paid.  Each line item would

17 have to be carried out to be paid that.

18 It's not paid in advance, so.

19    Q.    Okay.  That's the project the

20 $11,000 for the payment for the study?

21    A.    Right.

22    Q.    And this was between 2002 and

23 2004 that you were conducting this study?

24    A.    Yes.

                              298

1     Q.    So, the title of the study is "A

2  clinical assessment of patients undergoing

3  Gynecare TVT with abdominal guides for the

4    treatment of stress urinary incontinence."

5         Correct?

6    A.    Right.

7    Q.    And what was the ultimate goal

8    of the study?

9    A.    You know, they had a retropubic

10   sling, the standard TVT that went from

11   bottom up, from the vagina upward, and

12   there were a -- from the urology teaches

13   of slings of long ago there's a different

14   way of passing a sling that started from

15   the top down, which a lot of urologists

16   favor.  So the -- it was a design of

17   appear instrument by Gynecare to try to

18   add that to their product line and to give

19   those who felt that that was a safer

20   passage the opportunity to go from the top

21   down.  So the purpose of this study was to

22   look at efficacy of safety of a sling that

23   went from the top down rather than the

24   bottom up.

299

1    Q.    And what was the result?

2      A.    I don't think it got off the

3   ground and got enough numbers for

4   enrollment, because I don't think I ever

5   saw a publication from it.

6            MR. DeGREEFF:  Sir, I'm going to

7        hand you what's been marked as

8        deposition Exhibit 12.

9            (Lind Exhibit 12, Secrecy

10       Agreement dated January 19, 2004

11       between Gynecare and Lawrence Lind,

12       MD, Bates No. ETH.MESH.09464276 to

13       09464279, was marked for

14       identification, as of this date.)

15   BY MR. DeGREEFF:

16      Q.    Can you tell me what that is?

17      A.    It's a privacy agreement to

18   discuss intellectual property.

19      Q.    It's actually better than that.

20   It's called a Secrecy Agreement.

21            Right?

22      A.    That's how they titled it.

23      Q.    And that's between you and

24   Gynecare.

1           Correct?

2      A.   Right.

3      Q.   And Gynecare is a part of

4  Ethicon?

5      A.   Yes.

6      Q.   I want to ask you a couple of

7  questions.

8           First is in paragraph 1 on the

9  front page.

10          You see where I'm at?

11     A.   Yep.

12     Q.   It states that it's to determine

13  whether to enter into a mutually

14  attractive business arrangement.

15          Did I read that correctly?

16     A.   I see it.

17     Q.   What does that mean?  What was

18  the mutually attractive business

19  arrangement that you were trying to decide

20  whether to enter into with Ethicon?

21          MS. GERSTEL:  Object to form.

22     A.   This is 2004.  So this may have

23  been when I wanted to propose to them the

24  slim modification of the TVT.  So I was

1   disclosing some personal information that

2   I didn't have intellectual property on,

3   but I had drawings.  I had writings.  I

4   had sealed documentation that I had come

5   up with this idea.

6           So, I don't know for sure, but I

7   think that this is a scenario to sit down

8   and talk about an idea that I had and, you

9   know, usually in this situation, if a

10  company likes your idea, then they

11  purchase it from you and there's a

12  business arrangement made.  I've never had

13  one of those arrangements, but I'm

14  extrapolating.  I can't say for certain

15  that's what we were doing here.  But this

16  sounds like a scenario where I'm

17  presenting them with an idea and they're

18  going to decide whether there's something

19  mutually agreeable that would come out of

20  this.

21          MS. GERSTEL:  I'm just going to

22      place a late objection that that -- I

23    believe that that's a

24    mischaracterization of the document

302

1    and the agreement.

2  BY MR. DeGREEFF:

3    Q.    So, would you have been asking

4  them to partner up on your idea?  Is that

5  kind of what you were doing?

6        MS. GERSTEL:  Object to the

7    form.

8    A.    Well, when you have an idea, you

9  want to present it.  And I'm not in a

10  position to take a idea and make it into a

11  sling.  So you go to a reputable company

12  that's right now the leader in sling

13  products and you bring your idea to them

14  to see whether they like it.

15        So, partner up, you could call

16  it partner up or you could call it a

17  routine scenario where someone with an

18  idea brings an idea to a company and if

19  it's deemed valuable, there's a business

20  arrangement made to purchase the

21    intellectual property and there's a

22    financial arrangement made with them.

23        Q.    Well, if they're the leader

24    currently, then why didn't you go to them

                                            303

1    with your current device?  Why did you go

2    to BSC and Caldera instead?

3        A.    Because my relationships with

4    them are more current.

5        Q.    It states:  The parties further

6    agree not to disclose the relationship

7    between the parties or the existence of

8    this agreement to any third party without

9    the consent of the other.

10            And there's a three-year

11    effective date on that.

12            Did I read that correctly?

13    A.    Yeah.

14        Q.    So, you weren't even, under this

15    secrecy agreement, you weren't even

16    allowed to disclose that you had a

17    relationship with Ethicon.

18            Is that what this says?

19     A.    It says that I would have to

20  tell them if I was telling someone else.

21     Q.    So, when you were offering your

22  patients the TVT sling devices, did you

23  disclose to them that you had a consulting

24  relationship with Ethicon and several

304

1  other sling manufacturers?

2     A.    I did and I do.

3     Q.    Did this prohibit you from doing

4  that?

5          MS. GERSTEL:  Object to the

6     form.

7     A.    No.

8     Q.    Why do you disclose your

9  consulting relationship with Ethicon and

10  other sling manufacturers to your

11  patients?

12     A.    Because you want to make sure I

13  have a discussion that lets them know I

14  work towards betterment and improvement of

15  these products all the time.  That means I

16  work with the companies.  And there are

17   payments made sometimes for that

18   consulting work, and I don't want them to

19   discover that and feel that I hid

20   something that they would think was, you

21   know, financial motivation.  I tell them

22   the relationship.  I tell them why I use

23   the product, and I tell them why I'm

24   working with them.

305

1      Q.    Okay.

2      A.    Seems like the responsible thing

3   to do.

4      Q.    Right.

5            Because being paid by somebody

6   can create a bias towards using a product.

7            Right?

8      A.    Correct.

9            MR. DeGREEFF:  I'm going to mark

10      for you deposition Exhibit 13.

11           (Lind Exhibit 13, e-mail chain

12      ending June 15, 2004, Bates No.

13      ETH.MESH.11003781 to 11003783, was

14      marked for identification, as of this

15      date.)

16  BY MR. DeGREEFF:

17      Q.    So, I have handed you what

18  appears to be an exchange, an e-mail

19  exchange from it's the June of 2004 date

20  range.

21            Does that look accurate?

22      A.    This is 2004 communications,

23  right.

24      Q.    And if you look at the initial

                              306

1   two e-mails on the chain, meaning the

2   earliest in time, you are a recipient on I

3   guess two of the three earliest you're a

4   recipient on those e-mails.

5             Correct?

6       A.    Please find the attached signed

7   contract for your Gynemesh procedure

8   videos.  The original and copies have been

9   sent to Jeff Kraut by the courier.

10            I see that.

11      Q.    And if you look the to line,

12  this e-mail was sent to you.

13          Correct?

14     A.    Which line?

15          Yes.

16     Q.    And who is Giselle Bonet?

17     A.    I don't recall.

18     Q.    And the subject line of this

19   exchange is called "Procedure Videos

20   Signed Contract."

21          Did I read that correctly?

22     A.    Yep.

23     Q.    I mean, did you do some form of

24   a video for Ethicon?

                                        307


1      A.    I don't think I did a beginning

2    to end video.  I think perhaps maybe in a

3    lab they were filming some steps of

4    anatomic passage of something.

5          I -- I don't -- I cannot recall

6    a video that's got my name on it or in the

7    credits that the video maker of one of

8    these sling videos.

9          I think that sometimes when you

10   go to their labs and you work on stuff,

11   they ask you to sign permissions, or if,

12   you know, maneuvers you've done or —— or

13   anatomy you've shown might be used fors

14   videos, and this might be like a little

15   segment video permission.  But I do not

16   recall a video with my name on it that I

17   made for —— you know, beginning to end for

18   Ethicon.

19        Q.    Well, if you look a little

20   further up in the chain on the same page,

21   there's an e-mail to you that says:

22   Larry.

23             That's you, right?

24        A.    Yeah.

                                            308


1         Q.    Would like to process this

2    payment in June.  Need paperwork back

3    before 6/21.

4              Did I read that correctly?

5         A.    Yep.

6         Q.    So, were you paid to do this

7    video?

8         A.    I don't know what I was doing

9    there.  There's some -- I don't know -- I

10   don't know what this -- I don't know what

11   this is.

12        Q.    Okay.

13        A.    I really don't know what it is.

14        Q.    If you look on the next page,

15   there's an e-mail -- I mean on the front

16   page, I guess.  There's an e-mail to you

17   on June 11th from Marianne Kaminski with

18   Ethicon stating:  We have the signed

19   contract.  We will process the payments.

20             Did I read that correctly?

21        A.    Okay.

22        Q.    So, appears you were paid for

23   doing a Gynecare -- excuse me.  A Gynemesh

24   procedure video.

                                    309

1             Right?

2        A.    There's something I was doing

3    that was either used as part of a video or

4    participated in making a video.  But as I

5    said, I don't recall.

6             As I've described it, it could

7    just be segments of something I did in lab

8    that was filmed.

9          I don't believe that I made them

10   a video from beginning to end.  But I was

11   clearly, by this set of e-mails, paid for

12   work I did that was used as or as part of

13   creating a video.

14   Q.    I really ask because I'm

15   wondering if I'm in the presence of a

16   movie star.  That's really where I was

17   going with that.  And if I could get an

18   autograph maybe later.

19   A.    Well.

20   Q.    All right.

21   A.    But I do look like a couple of

22   them.

23         MR. DeGREEFF:  Sir, I'll

24   happened you what I'll marked as

                                        310

1    deposition Exhibit 14.

2          (Lind Exhibit 14, Q CDA Log,

3    Bates No. ETH.MESH.15359953 to

4    15359976, was marked for

5          identification, as of this date.)

6     BY MR. DeGREEFF:

7          Q.    This is titled Q CDA log.

8                Have you ever seen this before?

9          A.    May have.

10         Q.    If you look on page 11, the

11    Bates number at the bottom of it has a

12    last three of '963.

13         A.    Are they numbered?

14         Q.    Down here (indicating).  The

15    Bates number ends in '963.  That's called

16    a Bates number.

17         A.    Okay.

18         Q.    If you look at the second column

19    over, it says:  With whom.

20         A.    Got it.

21         Q.    And then one, two, three, fourth

22    one down says:  Dr. Larry Lind.

23                I'm assuming that's you?

24         A.    Yes.

                                       311


1          Q.    And that shows that there's a

2     topic next to it that says:  Evaluating

3    information for discussions regarding

4    device evaluations.

5              Do you know what that means?

6         A.    Sounds like I'm looking at their

7    devices an discussing it.

8         Q.    If you look at the column next

9    to that, it says type and SA is written.

10             Do you know what that means?

11        A.    Nope.

12        Q.    Does it mean secrecy agreement?

13             MS. GERSTEL:  Objection.

14        A.    I don't know.

15        Q.    Then there's a column further

16   over that has a term that says:  Term and

17   it says 3.

18             Do you see that?

19        A.    Yep.

20        Q.    And it shows date and years

21   columns that says 12/19/define to

22   12/20/2012.

23             Do you see that?

24        A.    Yep.

312

1    Q.    So, were you under some form of

2    an agreement with them from 12/19 of 2009

3    to 12/20 of 2012?

4    A.    Looks like they have a contract.

5    I don't know if this CDA log is accurate.

6    I'd like to see that contract.

7         I can certainly tell you between

8    those years, I do not have a lot of

9    activity with them.  That's for sure.

10   Q.    If you look at the originator

11   column, who is V. Zaddem?

12   A.    I don't know what her position

13   is now.  I recall her name.

14   Q.    Is it an Ethicon employee?

15   A.    I assume it was someone

16   organizing or handling the contract, but I

17   don't know who it is.

18   Q.    Do you know who Pete DeCosta is?

19   A.    I do not.

20   Q.    During this three years --

21        MR. DeGREEFF:  Strike that.

22   Q.    Do you have any idea how much

23   you were being paid under this three years

24   of contracts?

313

1      A.    I think there were very few

2    events.  I was usually paid in the same

3    amount by them.

4      Q.    The person below you on this

5    list is Dr. Elizabeth Kavaler.

6            Do you know her?

7      A.    Yes.

8      Q.    How do you know her?

9      A.    She was a urologist in

10   Manhattan.  So we -- I get some of her

11   patients, she gets some of mine, and when

12   we do this pelvic floor society meeting in

13   the city, she sometimes attends.  I think

14   she was -- I think she was at the Prosima

15   lab that I did with them in this time

16   period, and I think that was probably the

17   only thing that I did with them in this

18   time period.  I'm guessing, but I remember

19   I wasn't doing a lot and they really

20   wanted me to look at this Prosima.

21     Q.    Are you aware that she's also a

22   witness for Ethicon in the transvaginal

23   mesh litigations?

24      A.      Yes.

                                                     314


1       Q.      And you're aware that she was

2       also a consultant for Ethicon prior to

3       becoming an expert witness?

4       A.      Yes.

5       Q.      Are you aware of any expert

6       witness for Ethicon in this litigation

7       that was not a paid consultant first?

8               MS. GERSTEL:  Objection.

9       A.      I don't have an answer to that.

10      Q.      Then if you look a couple pages

11      later where it says '965 as the last three

12      of the Bates number.

13      A.      Okay.

14      Q.      There's another in the column

15      that says with whom, if you go four down,

16      it says Lawrence Lind.

17              I'm assuming that's also you?

18      A.      I see it.

19      Q.      And a the column that says topic

20      says:  Provide consulting services to

21      Ethicon on behalf of Ethicon.

22          Did I read that correctly?

23     A.     I see it.

24     Q.     It looks like you were under a

315

1     master consulting agreement from 8/31 of

2     2010 to 12/31 of 2011.

3     A.     I see it.

4     Q.     Does it sound accurate?

5     A.     Yes.

6     Q.     What did you do for Ethicon as

7     part of the consulting services from 2010

8     to 2011?

9     A.     I don't recall.

10     Q.     So, this was a second agreement

11     with Ethicon that was covering the years

12     2010 to 2011.

13          Right?

14          We just looked at another one.

15     A.     Those are the dates.

16     Q.     Do, during that time period, you

17     had multiple agreements with Ethicon?

18     A.     It looks like I had these two.

19          MR. DeGREEFF:  Sir, I'm handing

20          you what I've marked as deposition

21          Exhibit 15.

22                  (Lind Exhibit 15, e-mail chain

23          ending October 1, 2010, Bates No.

24          ETH.MESH.03642725 to 03642726, was

                                              316

1           marked for identification, as of this

2           date.)

3    BY MR. DeGREEFF:

4           Q.    Sir, I acknowledge that you are

5    not on this document.  And really what I

6    want to ask you is there's a discussion

7    here about you, about your contract in

8    which some employees of Ethicon state

9    they're going to look to terminate the

10   marketing contract with you.

11                  Do you see where I'm at on that?

12          A.    Looking to terminate it.

13          Q.    Yes.

14          A.    Okay.

15          Q.    Do you see where I'm at?

16          A.    Yep.

17          Q.    And it looks like the reason,

18    based on the e-mail above that, the reason

19    that they wanted to terminate the

20    marketing contract is because you had

21    signed an R&D agreement under which you

22    were going to get a different rate.

23             Right?

24    A.    I wasn't aware as of this date

                                                    317

1    that I had a marketing agreement.  My

2    understanding was always as consulting

3    services for education and research and

4    development.  So I would need to see the

5    marketing agreement.  I haven't seen

6    anything that we've looked at today that

7    says marketing.

8             I do here that they seem to feel

9    that I had one and that they want to

10   change it.

11   Q.    Why do you think they considered

12   you to have a marking contract?

13            What kind of marketing were you

14   doing for them?

15            MS. GERSTEL:  Objection.

16      A.    I wasn't.

17      Q.    Were you giving lectures for

18 them?

19      A.    In labs I would teach the

20 surgery and give educational lectures.  I

21 consider that education.  If you consider

22 it marketing at the same time, that's a --

23 I don't know if that's a legal term or a

24 judgment call of what you're doing, but I

                                   318

1 was educating.

2      Q.    In 2010, you were, based on this

3 e-mail, you were also consulting for

4 Boston Scientific.

5            Right?

6      A.    Yes.

7      Q.    And you were wanting to craft

8 the language of your consulting --

9            MR. DeGREEFF:  Strike that.

10      Q.    You were wanting to craft the

11 language of your R&D agreement with

12 Ethicon to avoid any conflict to what you

13 were doing for Boston Scientific.

14          Is that something you remember?

15          MS. GERSTEL:  Objection.

16     A.    Yes.  The contract said I

17     couldn't work with anyone else on slings

18     or incontinence materials, but I was

19     already doing that with Boston Scientific.

20     So I asked them to restrict the scope to

21     repair a prolapse.

22     Q.    And if you look on the earliest

23     e-mail on this exhibit, it says:  There's

24     a master consulting agreement for Dr.

319

1      Lind.  And it says:  The contract term is

2      one year beginning 2/25/10 and ending

3      2/25/11.

4           Did I read that correctly?

5      A.    Yep.

6      Q.    So that would be a third

7      contract during that same time period.

8           Right?

9      A.    That's what the e-mail says.

10          I haven't seen any contracts.

11          MR. DeGREEFF:  Sir, I'm going to

12          hand you what I've marked as

13          deposition Exhibit 16.

14              (Lind Exhibit 16, e-mail chain

15          ending April 28, 2010, Bates No.

16          ETH.MESH.02033638 to 02033639, was

17          marked for identification, as of this

18          date.)

19  BY MR. DeGREEFF:

20      Q.    This again is this is an e-mail

21  about an edit you were requesting to a

22  contract in April of 2010.

23              Right?

24      A.    Yep.

                                    320

1       Q.    If you look at this first

2   e-mail, the longer one, it says:  I found

3   Dr. Lind has existing contacts with ProfEd

4   and marking activities for product

5   evaluation, written materials, market

6   reviews, advisory boards and company

7   sponsored speaker programs at a rate of 15

8   hundred dollars a day.

9               Did I read that correctly?

10      A.      Mm-hm.

11      Q.      Company sponsored speaking

12  programs, were you speaking on behalf of

13  the company, of Ethicon?

14      A.      Only at labs.

15      Q.      At labs?

16      A.      Yes.

17      Q.      And again, they're considering

18  you to have a contract for marketing

19  activities.

20              Right?

21      A.      It does indicate that.  I do not

22  recall ever working on marketing.

23      Q.      Certainly it appears that

24  Ethicon believed that they had a marketing

321

1  contract with you.

2              Right?

3              MS. GERSTEL:  Objection.

4      A.      I think what happened is we got

5  involved in a time frame where companies

6  and hospitals appeared doctors started

7  recognizing compliance, and so that

8    wording had to be very specific.  So, they

9    might have had stuff in the previous

10   agreements that had to do with marketing,

11   et cetera, et cetera, which is consulting

12   that I do not do.  I only do work with the

13   R&D people.  In fact, I don't interact

14   with the marketing people.  It's part of

15   the rules.

16          So this is, I think, something

17   to get the accounting and compliance in

18   order that my role is for R&D, which is

19   what it always was.

20      Q.    Whatever the case may be, we

21   looked at multiple e-mails now where

22   Ethicon refers to one of their contracts

23   with you as a marketing contract.

24          Right?

                                            322

1           MS. GERSTEL:  Objection.

2       A.    I think those referrals to my

3    contracts and my role in there are wrongly

4    described.

5       Q.    Regardless, that is the

6    terminology Ethicon is using, right?

7        A.    And I am challenging it.

8        Q.    Then if you look at down below

9    there's an asterisk that says:  These

10   activities are unique to Dr. Lind because

11   he uses competitor devices regularly.

12             Did I read that correctly?

13       A.    Yes.

14       Q.    And as we discussed earlier, you

15   use primarily the Caldera device

16   currently.

17             Right?

18       A.    Currently.

19             At the time of this contract, I

20   think they were more interested in the

21   cadaver lab projects I did with Boston

22   Scientific.

23       Q.    Gotcha.

24             So, this says:  Here is what I

                                        323


1    recently learned from Scott Jones in

2    marketing.

3             Do you know Scott Jones?

4      A.     No.

5      Q.     It says:  In 2009, the doctor

6  agreed to $1500 a day for Ad Board work,

7  which was the rate all participants

8  received for that event.

9             Did I read that correctly?

10     A.     Everything you're reading you're

11  reading correctly.

12     Q.     So, were you being paid $1500 a

13  day for advisory board work?

14     A.     That's what it says.

15     Q.     And what does that advisory

16  board work mean?

17     A.     You come and look at products.

18  You may be in a lab working on

19  development, discussing the products in

20  the setting of a cadaver lab.  You may be

21  sitting around a table with other experts

22  holding mesh, feeling mesh, holding

23  devices, giving feedback as to what works,

24  what doesn't work, which directions can

                                    324

1  they go.

2      Q.    And then the last sentence on

3    this page leading to the next page says:

4    Over the past weekend, doctor made a

5    comment to one of our associates that he

6    was angered that he had signed at such a

7    low rate.  Especially since he is

8    compensated by our competitors at three

9    thousand dollars a day for working with

10   R&D.

11            Did I read that correctly?

12     A.    Yes.

13     Q.    So, you were upset that you were

14   only getting paid 15 hundred dollars a day

15   by Ethicon when your competitors were

16   paying you $3,000 a day.

17            Right?

18            MS. GERSTEL:  Objection.

19     A.    I see the facts that are on this

20   sheet.

21     Q.    Is that your recollection?

22     A.    I don't have independent

23   recollection.

24     Q.    Do you have any reason to

325

1    dispute this?

2        A.    Not really.

3        Q.    And what competitors were paying

4    you $3,000 a day in 2009 and 2010?

5        A.    Probably Boston Scientific.

6        Q.    It also says:  Also, this

7    surgeon has tried our pelvic floor

8    products many times, but he prefers to use

9    our competitors' products.

10             Did I read that correctly?

11       A.    Yes.

12       Q.    And then they go on to say:

13   What I found out is that ProfEd, I guess

14   professional he had care and caution and

15   marketing used to use Dr. Lind heavily as

16   a KOL similar to how Dr. Vincent Lucente

17   is consulted currently.  However, they do

18   not anticipate his services as specified

19   in his existing contracts because he does

20   not use Ethicon's PFR kits.

21             Did I read that correctly?

22       A.    Yep.

23       Q.    Do you know what a KOL is?

24       A.    Key opinion leader.

326

1      Q.    Were you a key opinion leader

2   for Ethicon?

3      A.    I was a consultant.  If they

4   called me that, they chose to call me

5   that.

6            It wasn't a badge you earned.

7      Q.    Do you disagree that you were a

8   key opinion leader for Ethicon?

9      A.    I think at times they thought I

10  was and at times they thought I wasn't.

11  When I came to them with the slim sling

12  design, they told me to get lost, so.

13     Q.    Okay.

14     A.    My opinions weren't very

15  well-respected or received then.

16     Q.    So you were a key opinion leader

17  for Ethicon when you were agreeing with

18  them.

19            Is that what you're saying?

20            MS. GERSTEL:  Objection.

21     A.    I don't have an answer for that.

22     Q.    And it seems here that

23    professional education and marketing were

24    using you heavily.

327

1          Correct?

2     A.    That's what it reads.

3     Q.    Who is Dr. Vincent Lucente?

4     A.    He's a urogynecologist in

5  Pennsylvania.

6     Q.    Was he a key opinion leader for

7  Ethicon?

8          MS. GERSTEL:  Objection.

9     A.    I guess he was.

10          THE WITNESS:  I'm sorry.  I know

11     time is getting tight.  I'm going to

12     use the restroom.

13          MS. GERSTEL:  Okay.

14          (Recess taken.)

15          (Lind Exhibit 17, e-mail chain

16     ending May 10, 2010, Bates No.

17     HMESH_ETH_03111719, was marked for

18     identification, as of this date.)

19  BY MR. DeGREEFF:

20     Q.    Sir, I've just handed you what

21    I've marked Deposition Exhibit 17.

22          Do you see that?

23    A.    Yep.

24    Q.    This is some e-mail exchanges

                                              328

1     from April of 2010.

2           Correct?

3     A.    These are e-mails from 2010,

4     yes.

5     Q.    And the first e-mail on the

6     chain is an e-mail that you sent to

7     Vincenza Zaddem.

8           Right?

9     A.    I reviewed the contract.

10    Q.    At you just look at the to/from

11    line and the e-mail.

12    A.    Yeah.  I see the one with me to

13    Zaddem, yes.

14    Q.    And who is Zaddem?

15    A.    I don't know.

16    Q.    Really my only question is if

17    you look at that, you say:  I reviewed the

18    contract.

19          Correct?

20      A.   Yes.

21      Q.   And then under item 17, the

22  paragraph that starts with the words "item

23  17," the last sentence is:  The value of

24  the contract does not justify exclusive

329

1  services.

2           Did I read that correctly?

3      A.   Yes.

4      Q.   What was the value of this

5  contract?

6           MS. GERSTEL:  Objection.

7      A.   The value of the contract had

8  standard terms of just hourly rate for --

9  for work done.  It entire set -- this

10  entire conversation is about what we were

11  eluding to before insofar as I do

12  consulting with other companies on

13  incontinence and prolapse.  The way that

14  they had the contract written, I wouldn't

15  be able to work with anyone else on

16  incontinence and prolapse so, what I was

17  telling them was that you need to, as you

18  have in the previous one where it says the

19  contract must be limited to anchoring

20  devices for prolapse, something specific

21  that we're working on that makes it

22  specific to what I'm doing for Ethicon,

23  because I couldn't sign the contract

24  because it made it so I couldn't work with

330

1  anyone else.  It wasn't like I was being

2  offered $40,000 or some big sum to have an

3  exclusivity arrangement.

4           What I meant by exclusive

5  services meaning exclusive of other

6  companies.  That's just a standard

7  contract.  Didn't work.

8           So, you know, I remember this

9  freshly now.  We went back and forth,back

10  and forth.  And they said, Everyone just

11  signs theses.  I said, Well, maybe

12  everyone doesn't read it.  If your

13  contract says I can't work with anyone

14  else, then I won't work with anyone else.

15    So if you want me to look at these

16    anchoring devices, which is what they

17    wanted me to do, then make the language

18    for the anchoring device, but don't make

19    it to cover that you can't work on anyone

20    else for anything else that you do.

21            So really it was just the

22    wording of their contract meant that I

23    could work with anyone on incontinence and

24    prolapse, and I was asking them to make a

                                              331

1    contract that was just specific to what

2    they wanted me to look at, which was an

3    anchoring device.

4        Q.    And these amounts you're being

5    paid for consulting work, that's above and

6    beyond what you're being paid as a

7    physician.

8            True?

9        A.    Yes.  With the only

10    clarification to make when we went to

11    the -- when we were doing the study, the

12    study payments are a hundred percent paid

13    to the hospital research fund, and there's

14    no compensation part out of that for me.

15         Q.    Okay.

16               And what amount would have

17    justified exclusivity?

18         A.    I actually -- it's -- I wouldn't

19    do that.  I think with -- you've just gone

20    through a whole bunch of papers showing

21    that I've worked with a lot of different

22    companies on consulting arrangements, and

23    what I'll tell you is that when I have an

24    idea and I find the person I can work with

                              332

1    on it, I go there.  So it's not a matter

2    of trying to just make money off of

3    everyone.  There's different opportunities

4    at different times with different

5    companies are ready for different ideas.

6    So -- so, I never considered an exclusive

7    agreement with anyone, which is why I

8    couldn't tested the wording in the

9    contract.

10         Q.    Everything we've gone through, I

11   mean, you've been paid over half a million

12   dollars as on behalf of the transvaginal

13   mesh world, if you will.

14        Right?

15        MS. GERSTEL:  Objection.

16   BY MR. DeGREEFF:

17   Q.    The manufacturers?

18        MS. GERSTEL:  Objection.

19        MR. DeGREEFF:  Strike that.

20   I'll reword that.

21   BY MR. DeGREEFF:

22   Q.    Based on everything we've been

23   through, you've been paid over a half

24   million dollars by transvaginal mesh

                                    333

1   manufacturers.

2        True?

3        MS. GERSTEL:  Objection.

4   A.    I don't know if that's accurate.

5   It's definitely in the hundreds of

6   thousands.  I don't know how many it is.

7   I would have to be —— I don't know how

8   many occasions I saw each of these

9    Gynecare contracts.  I don't have the

10   listed payments for.  There's a lot of

11   years of contracts, and I'm not sure how

12   frequent those were.

13        Q.    Well, when you add in what

14   you've been paid as an expert witness,

15   it's pretty clear you've been paid over a

16   half million dollars by the transvaginal

17   mesh industry.

18             Right?

19             MS. GERSTEL:  Objection.

20        A.    You may have been adding those.

21   Somewhere between three hundred and six

22   hundred I would agree with somewhere in

23   there.  I just don't want to agree to a

24   number that I haven't quantified with a

334

1    little more conviction.

2              MR. DeGREEFF:  I've handed you

3         what's been marked as Deposition

4         Exhibit 18.

5              (Lind Exhibit 18, Master

6         Consulting Agreement between Lawrence

7          Lind and Ethicon, Inc. Dated July 10,

8          2010, Bates No. ETH.MESH.06216861 to

9          06216869, was marked for

10         identification, as of this date.)

11    BY MR. DeGREEFF:

12         Q.    Sir, do you see that this is a

13    master consulting agreement between you

14    and Ethicon?

15         A.    Right.

16         Q.    And it's dated July 10th --

17    well, it says it commences July 10th of

18    2010 and continues through December 31st

19    of 2011?

20         A.    Right.

21         Q.    My question is if you look at

22    where it's Bates numbered '868 at the

23    bottom?

24         A.    Okay.

                                        335


1          Q.    This talks about the fact that

2     you're being retained, the box where it

3     says yes, you're being retained at a rate

4     of $437.50 per hour.

5            Correct?

6      A.    That's what it says.

7      Q.    And it lays out the description

8  of your services and the fact that it will

9  be an estimate of 120 hours of work

10  maximum over the life of this contract?

11      A.    That's what it says.

12      Q.    And that's estimate, obviously.

13      A.    Yes.

14      Q.    And then it says:  The parties

15  agree that compensation paid to consultant

16  shall not exceed $52,500 per contract

17  term.

18      A.    Right.

19      Q.    Did I read that correctly?

20      A.    Yes.

21      Q.    And the contract term was a

22  little over a year.

23            Is that right?

24      A.    Yes.

                                        336


1      Q.    Were you paid this full $52,500?

2      A.    I would strongly doubt that in

3    2010.

4        Q.    If you could look at the next

5    page.  I guess they were authorizing you

6    to be paid 52,500 for the year under this

7    contract.

8              Right?

9        A.    They were offering that to be a

10    max based on the hourly fee.

11        Q.    If you look at Exhibit B, this

12    titled Conflict of Interest Certification?

13        A.    Yeah.

14        Q.    And it states, and this is

15    supposed to be from you.

16              Correct?

17              MR. DeGREEFF:  Let's do this.

18         This one is unsigned.  So let's give

19         you this one.

20              Sir, I'm going to what kind you

21         what's been marked as deposition

22         Exhibit 19.

23              (Lind Exhibit 19, Master

24         Consulting Agreement between Lawrence

337

1     Lind and Ethicon, Inc. Dated August

2     31, 2010, Bates No. ETH.MESH.02030557

3     to 02030566, was marked for

4     identification, as of this date.)

5   BY MR. DeGREEFF:

6     Q.    Deposition Exhibit 19 is another

7   master consulting agreement between you

8   and Ethicon.

9           Correct?

10    A.    Right.

11    Q.    And it's dated -- it says it

12  commences August 31st of 2010 and

13  continues through December 31st of 2011.

14          Right?

15    A.    Yeah.  This is kind of confusing

16  that they have like fresh contracts every

17  month.  But be that as it may.

18    Q.    Right.

19          And this contract is signed by

20  you.

21          Correct?  Bates number '562.

22    A.    Yes.

23    Q.    Then if you look at Bates number

24  '564, this has the same language about

```
 1    payment to you.

 2              Correct?

 3              MS. GERSTEL:  Objection.

 4    A.    Right.

 5    Q.    Again you're being paid $437.50

 6    an hour?

 7    A.    Yep.

 8    Q.    And you've got another maximum

 9    cap of $52,500 per contract term?

10    A.    Correct.

11    Q.    Again, that contract term is a

12    little over a year?

13    A.    Okay.

14    Q.    Is that correct?

15    A.    Yes.

16    Q.    Then if you look at the next

17    page, it's got an Exhibit B titled

18    Conflict of Interest Certification.

19              Correct?

20    A.    Right.

21    Q.    And that is signed by you?

22    A.    Yes.

23    Q.    And that includes language that
```

24    states:  In assuming contractual

1    obligations to Ethicon Inc., the

2    undersigned health care professional.

3         That's you, right?

4    A.    Yes.

5    Q.    Agrees that financial ties

6    between the health care professional and

7    industry may create conflicts of interest,

8    both real and perceived.

9         Did I read that correctly?

10    A.    Yes.

11    Q.    This is essentially Ethicon

12    acknowledging that payments to physicians,

13    such as --

14         MR. DeGREEFF:  Strike that.

15    Q.    This is Ethicon acknowledging

16    that payments to physicians can create

17    conflicts of interest.

18         Right?

19         MS. GERSTEL:  Objection.

20    A.    Got it.

21    Q.    Is that correct?

22          MS. GERSTEL:  Objection.

23     A.    Which sentence are you reading

24     again?

340

1      Q.    Where it states:  The

2      undersigned health care professional

3      agrees that financial ties between the

4      health care professional and industry may

5      create conflicts of interest, both real

6      and perceived?

7      A.    Okay.  I agree.  I agree that's

8      what it says.

9      Q.    And is this essentially Ethicon

10     acknowledging that payments to physicians

11     can create conflicts of interest?

12          MS. GERSTEL:  Objection.

13     A.    That they may create conflicts

14     of interest, yes.

15     Q.    We just talked about you've been

16     paid between three hundred and 600,000 by

17     the transvaginal mesh industry.

18          Right?

19          MS. GERSTEL:  Objection.

20      A.    By estimates, it seems it would

21   be in that range.

22      Q.    And you've been a consultant for

23   four transvaginal mesh companies.

24            Right?

                                              341


1     A.    Yes.

2     Q.    You've been a consultant for

3   Ethicon.

4           Right?  True?

5     A.    Yes.

6     Q.    Caldera?

7     A.    Yes.

8     Q.    Boston Scientific?

9     A.    Yes.

10    Q.    AMS?

11    A.    Yes.

12    Q.    And you've been referred to as a

13   key opinion leader for Ethicon products by

14   internal Ethicon employees.

15           Right?

16    A.    Yes.

17    Q.    And you've been referred to as

18    having a marketing contract with Ethicon

19    by Ethicon employees.

20          Right?

21    A.    Referred to, yes.

22    Q.    And we've looked at multiple

23    consulting agreements that you've signed

24    with Ethicon.

342

1           True?

2     A.    Yes.

3     Q.    And you've signed a conflict of

4     interest statement from Ethicon based on

5     the fact that payments to health care

6     providers can create conflicts of

7     interest, both real and perceived.

8           Right?

9     A.    Correct.

10    Q.    Despite all of that, you were

11    ultimately hired by Ethicon to act as a

12    expert in this litigation.

13          Right?

14          MS. GERSTEL:  Objection.

15    A.    I'm not sure why it's despite

16    this.  But I was hired by Ethicon to be in

17    this role that I am now.

18            I'm not sure how your one thing

19    with the word despite, I'm not sure how

20    that fits into the question.

21    Q.    You've now been hired by Ethicon

22    to serve as an expert in this transvaginal

23    mesh litigation.

24            Right?

                                         343


1     A.    Yes.

2     Q.    And do you have any

3     understanding of why Ethicon did not get a

4     physician who did not have a consulting

5     agreement with prior to hiring them as an

6     expert witness in the litigation?

7             MS. GERSTEL:  Objection; lack of

8       foundation.

9     A.    I would be conjecturing.  I

10    don't have factual knowledge.

11            Is there a question on this?

12    Q.    We had several questions on it.

13    A.    Okay.

14          MR. DeGREEFF:  Last I want to

15     show you deposition Exhibit 20.  I so

16     marked that.

17          (Lind Exhibit 20, EWHU HCP

18     Cognos report run 11/17/10, was marked

19     for identification, as of this date.)

20 BY MR. DeGREEFF:

21     Q.   If you look at the second page,

22 you'll find your name towards the bottom.

23     A.   Okay.

24     Q.   This shows two separate -- this

                                   344

1 reflects the two separate contracts of

2 52,500.

3          Correct?

4     A.   Right.

5     Q.   For a total of 105,000?

6     A.   Right.

7     Q.   So you had been authorized by

8 Ethicon for up to $105,000 of payment for

9 a little over a year.

10          Right?

11          MS. GERSTEL:  Objection.

12      A.    I think this is misleading.  The

13  maximal allowed in the contract was that

14  amount, and this reflects nothing in the

15  way of what I actually received.

16      Q.    That wasn't my question.

17            You were authorized by Ethicon

18  for up to $105,000 worth of payment in one

19  year.

20            Right?

21            MS. GERSTEL:  Objection.

22      A.    If I worked $437 an hour to get

23  to $105,000.

24      Q.    For if they wanted pay you

                                            345


1  $3,000 to show up to a lecture.

2            Right?

3            MS. GERSTEL:  Objection.

4      A.    The contract had an hourly rate.

5      Q.    Okay.

6            Why was there two different

7  agreements?  Did you use all of one of

8  them?

9            MS. GERSTEL:  Objection.

10    A.    It looks to me like on the first

11    one I hadn't signed the institutional

12    compliance that I -- that my working for

13    them did not violate institutional

14    compliance for doing consulting work.  So

15    one of them had a signature and one of

16    them did not.  So I think they sent a

17    whole new contract to have me sign that

18    last page, is what I -- it looks like to

19    me from the two.

20    Q.    Why does this spreadsheet

21    reflect that you had two separate --

22          MS. GERSTEL:  Objection.

23    A.    Well, we looked at two separate

24    ones and you'll see -- one of them the

                                            346

1    last page is not signed and one of them

2    the page is signed.  So they made two

3    contracts for that amount.  I'm guessing

4    that the first one they considered to be

5    legally not binding because I didn't sign

6    that required field and they made another

7    one and it's showing up on here because

8   two contracts were drawn.  But it's --

9   it's line items on a spreadsheet.  I can't

10  account for them.  I can -- I am one

11  thousand percent sure I didn't come

12  anywhere close to this kind of money from

13  2010 on with Ethicon.

14       Q.    That assumption is based on --

15  what you just said requires us to assume

16  that we have received all of the documents

17  that we would need to show the signing of

18  that contract.

19            Correct?

20            MS. GERSTEL:  Objection.

21       A.    Yeah, I agree.  We don't right

22  now between us have the accounting

23  accurate payroll of what was paid.  But

24  just knowing what I was doing with time in

347

1   2010 onward, I feel fairly confident, but

2   I don't have your objective proof, that I

3   came nowhere near that, but I am very

4   confident of that.

5        Q.    Is there a single long-term

6   randomized controlled trial specifically

7   addressing the TVT-O?

8       A.    TVT-O has in the range of 40 to

9   50 randomized trials.  I'd have to go

10  through them to figure out how far the

11  long-term is.

12      Q.    What about a single randomized

13  control trial specifically addressing the

14  TVT-O with safety as the primary endpoint?

15          MS. GERSTEL:  Objection.

16      A.    Safety is a primary endpoint in

17  many of the randomized controlled studies.

18  Whether they listed efficacy first and

19  safety as second, I would have to go

20  through each report, but safety was

21  reported in a very large number of them.

22          I will agree that in some of

23  them the adverse events data was not

24  accurately reported, which is why we rely

                                          348


1   on Cochrane and excellent meta-analysis so

2   that they include studies that have the

3   data we need.

4      Q.     What is your definition of

5    primary endpoint?  Because I think it may

6    be different than mine.

7      A.     Primary endpoint is the first

8    and -- first priority end point result

9    you're looking for in a study.

10     Q.     Right.

11            And you think there's a single

12   long-term randomized study out there with

13   safety as the primary endpoint on the

14   TVT-O product?

15     A.     I don't think it's as a primary

16   endpoint because it's pretty traditional

17   to do efficacy and then safety.  But a

18   second endpoint doesn't diminish its

19   value, statistical value.

20     Q.     So the answer to my question as

21   asked is no.

22            Right?

23            MS. GERSTEL:  Objection.

24     A.     I would have to look through all

349

1    the randomized studies to do that.  I

2    don't know that offhand.

3            Certainly most of them don't

4    have it as the primary.

5    Q.    What about is there a single

6    randomized controlled trial with safety as

7    the primary endpoint that specifically

8    addresses the TVT-Abbrevo?

9            MS. GERSTEL:  Objection.

10   A.    I think your primary endpoint is

11   a -- from the challenging the data on this

12   as a primary endpoint is on the verge of

13   incredible.

14   Q.    Okay.  I appreciate your

15   thoughts on that.  I really do.

16           MR. DeGREEFF:  And I'll move to

17       strike it.  But I do want an answer to

18       my question.

19   A.    I would have to review each of

20   them to see which ones have primary

21   endpoints.  I don't know off the top of my

22   head if they have primary endpoints.  So I

23   don't know the answer to that question.

24   Q.    And then same question for

350

1   TVT-Exact, is there a single long-term

2   randomized controlled trial with safety as

3   the primary endpoint specifically

4   addressing the TVT-Exact?

5        A.    That one I think I could tell

6   you is no.

7        Q.    Is there a single long-term

8   randomized controlled study with safety as

9   the primary endpoint that looks at the

10  TVT?

11            MS. GERSTEL:  Objection.

12       A.    I'd have to look at the -- each

13  randomized study.  I can't answer that off

14  the top of my head.

15       Q.    There's not one you could think

16  of?

17       A.    Not off the top of my head.

18       Q.    Ethicon has never done a study

19  with the primary endpoint was to determine

20  where or not laser-cut mesh is stiffer or

21  safer than mechanical-cut mesh.

22            Right?

23            MS. GERSTEL:  Objection.

24       A.    I seem to recall there being

1    some internal study of the laser-cut mesh.

2    I can't recall all the details on it, but

3    I think they did study the properties.  If

4    I recall, and again it's off the top of my

5    head, I would have to find the document.

6    I think it was determined that they felt

7    it would not be a significant difference.

8         Q.    Are you talking about testing or

9    a study?

10              MS. GERSTEL:  Objection.

11       A.    Mechanical testing.

12       Q.    I'm talking about a study.

13              Ethicon's never done a study

14   where the primary endpoint is to determine

15   whether or not lays cut mesh is stiffer

16   and less safe than mechanical-cut mesh.

17              Correct?

18              MS. GERSTEL:  Objection.

19       A.    A study in humans?  What type of

20   study.

21       Q.    Any kind of study.

22       A.    Well, a lab is a study.

23      Q.      Well, lab's a benchtop, right?

24      A.      A study is when you investigate

352

1      to find answers.  It doesn't matter what

2      location it's in, whether it's a lab or in

3      a human.  It can be a study.

4      Q.      I think you and I define a study

5      different.

6              You're talking about benchtop

7      testing.

8              Right?

9      A.      I'm talking about comparing

10      properties.  You compare one thing against

11      another is the definition of a study.

12      Q.      So anything that's ever done at

13      Ethicon is a study, even if they're just

14      doing it on a bench?

15              MS. GERSTEL:  Objection.

16      A.      Well, if we're just chatting

17      about the study, it's not a study.  If

18      they have two products and they're

19      comparing how it behaves in different

20      circumstances, that's a study.

21    Q.    So, I guess can you answer my

22  question or not?

23          And my question is Ethicon has

24  never done a study where the primary

353

1  endpoint is to determine whether or not

2  laser-cut mesh is stiffer and less safe

3  than mechanical-cut mesh?

4          MS. GERSTEL:  Objection.

5  BY MR. DeGREEFF:

6    Q.    True?

7          MS. GERSTEL:  Asked and

8      answered.

9    A.    If I'm recalling correctly, and

10  I cannot put my reputation on it, I think

11  the bench work study that they did looked

12  at stiffness, but they couldn't, by that

13  study, evaluate safety.

14    Q.    We talked earlier about the

15  Ethicon employees' e-mails about concerns

16  about the outcomes related to stiffness of

17  the mesh.

18          Right?

19          MS. GERSTEL:  Objection.

20      A.   We had that discussion, I do

21  recall.

22          MR. DeGREEFF:  I'm good.  We can

23      be done.

24          MS. GERSTEL:  I have like five

                                    354


1      minutes.

2              Do you want to take a break, or

3      should I just start?

4          MR. DeGREEFF:  Go for it.

5          MS. GERSTEL:  I know we're all

6      running on fumes.

7   EXAMINATION

8   BY MS. GERSTEL:

9      Q.   Dr. Lind, you were asked some

10  questions about the Advantage Fit Boston

11  Scientific sling that you had a role in

12  developing.

13          Is that correct?

14      A.   Yes.

15      Q.   Is it your opinion, despite that

16  role in developing the Advantage Fit

17   sling, that retropubic TVT is the gold

18   standard?

19          MR. DeGREEFF:  I'm going to

20      object to form.

21   BY MS. GERSTEL:

22      Q.    For surgical treatment of stress

23   urinary incontinence in women?

24      A.    Yes.

                                          355


1       Q.    Did the vast majority of your

2    patients have excellent results with

3    retropubic TVT?

4           MR. DeGREEFF:  Object to form.

5       A.    Yes.

6       Q.    And, doctor, you were asked some

7    questions regarding Abbrevo being a

8    shorter sling than TVT-O and TVT-Exact.

9           Do you recall that?

10      A.    Yes.

11      Q.    Is it correct that even though

12   Abbrevo is not as long as a TVT-Exact or a

13   TVT-O or a retropubic TVT that it is not a

14   mini sling?

15          MR. DeGREEFF:  Object to form.

16     A.    I agree with that.

17          MR. DeGREEFF:  You want to just

18     give me an ongoing objection to

19     leading?

20          MS. GERSTEL:  Yes.  Although I

21     disagree that was leading.

22          MR. DeGREEFF:  Well, you can't

23     testify for him.

24          MS. GERSTEL:  I'm not testifying

                                        356

1      for him.

2           MR. DeGREEFF:  That's what

3      you're doing right now.

4           MS. GERSTEL:  I am not

5      testifying for him.  I asked him --

6           MR. DeGREEFF:  I'll just keep

7      objecting.  That's fine.

8      BY MS. GERSTEL:

9      Q.    Doctor, you were asked some

10     questions regarding your own experience

11     and results treating patients with TVT-O,

12     TVT-Exact and TVT-Abbrevo.

13          Is that correct?

14     A.    Yes.

15     Q.    Is your own experience with

16     TVT-O, TVT-Abbrevo and TVT-Exact

17     consistent with what you have opined on as

18     to the safety and efficacy of those

19     products as based on the highest levels of

20     medical literature?

21          MR. DeGREEFF:  Object to form.

22     A.    Yes.

23     Q.    Doctor, you were asked some

24     questions about what you have and have not

                              357


1     reviewed --

2          MS. GERSTEL:  Strike that.

3     Q.    Doctor, you were asked some

4     questions regarding your supplemental

5     materials list.

6          Correct?

7     A.    Yes.

8     Q.    And you were asked some

9     questions regarding which of the documents

10    on that list you had or had not reviewed.

11        Correct?

12    A.    Yes.

13    Q.    Doctor, is it true that you read

14  many, many medical articles and company

15  documents and depositions and other such

16  materials sense you began your expert work

17  with Ethicon?

18        MR. DeGREEFF:  Object to form.

19    A.    Yes.

20    Q.    As you sit here today, is it

21  true that you may or may not recall

22  specific documents that you have reviewed

23  that are listed on your materials list?

24        MR. DeGREEFF:  Object to form.

                                    358


1    A.    That's true.

2    Q.    And is that particularly true if

3  you weren't shown the document when asked

4  if you had or had not reviewed them?

5        MR. DeGREEFF:  Object to form.

6    A.    Yes.

7    Q.    I think that this was adequately

8  covered by plaintiff's counsel's

9    questioning.

10          But, doctor, were you asked some

11   questions regarding whether you had --

12          MS. GERSTEL:  Well, strike that.

13   Q.    Doctor, earlier in this

14   deposition you testified regarding closer

15   analysis that you have done recently of

16   the Schimpf, Teo and Okulu articles.

17          Is that correct?

18   A.    Yes.

19   Q.    After that closer analysis of

20   those articles, did your opinions as

21   expressed in your report that's been

22   marked as Exhibit 8, did your opinions

23   change as a result of that closer analysis

24   of those articles?

                                            359

1    A.    It didn't.  It became

2    strengthened with regards to the safety

3    profile of the TVT-O.

4          MS. GERSTEL:  That's all I have.

5          MR. DeGREEFF:  I just have two

6       questions.

7  FURTHER EXAMINATION

8  BY MR. DeGREEFF:

9      Q.    Which device did you agree with

10  counsel was the gold standard device?

11      A.    I would say the retropubic TVT

12  as well as the TVT-O.

13      Q.    Okay.

14          Why are you not using the gold

15  standard device?

16          MS. GERSTEL:  Objection.

17      A.    I do use the TVT-Exact, which I

18  consider to be the extremely similar

19  device with a modification that I like,

20  which is a narrower shaft.

21      Q.    You use it in one out of ten of

22  your patients?

23      A.    Right.

24      Q.    Why would you not use the gold

360

1  standard device in all of your patients?

2          MS. GERSTEL:  Objection.

3      A.    Because there was a -- there was

4  a decision at one point to bring on

5      Caldera for financial reasons.  At that

6      point, we were asked to convert over to

7      that and see if it met our needs.  It met

8      my needs, and I like the flexibility, and

9      I started using it for good fraction of my

10     cases.

11         Q.    Are you breaching the standard

12     of care by not using the gold standard

13     device?

14             MS. GERSTEL:  Objection.

15         A.    I'm using an FDA—approved device

16     that I feel is excellent for its intended

17     purposes, and it's been performing well

18     for several years.

19         Q.    Yes or no, you are not using

20     what you just testified is the gold

21     standard device.

22             Correct?

23             MS. GERSTEL:  Objection.

24         A.    I'm using the TVT—Exact in one

                                            361


1      tenth of my cases, yes.

2          Q.    In 90 percent of your cases, you

3    are not using the device you have just

4    testified is the gold standard device.

5            Right?

6            MS. GERSTEL:  Objection.

7    A.    Correct.

8    Q.    You were asked by your counsel

9    if --

10           MR. DeGREEFF:  Strike that.  It

11       doesn't matter.

12           All right.  I'm done.

13           MS. GERSTEL:  I just have one

14       follow-up.

15   FURTHER EXAMINATION BY

16   MS. GERSTEL:

17   Q.    Doctor, this isn't a document

18   that we have marked as an exhibit in this

19   deposition, but are you familiar with the

20   AUGS SUFU position statement on

21   midurethral slings?

22   A.    Actually, I need it -- I think I

23   answered incorrectly on your last

24   question.

362

1    MR. DeGREEFF:  Well, we've got a

2    different question pending now.  So if

3    your counsel wants to clear something

4    up with you, she can ask you a

5    question.

6    THE WITNESS:  It has to do with

7    the gold standard.

8    MS. GERSTEL:  Go ahead.

9    MR. DeGREEFF:  No, she can ask

10    you a question if she wants to ask you

11    something about it.

12 BY MS. GERSTEL:

13    Q.    Doctor, what were you going to

14 say?

15    MR. DeGREEFF:  I'm going to

16    object to the form.  That's open-ended

17    and allows for a narrative response.

18    A.    Well, the TVT by Ethicon has the

19 preponderance of the data.  The

20 meta-analyses that go over all the slings

21 and all the data for slings certifies

22 polyester synthetic midurethral slings as

23 the gold standard of care.  The

24 meta-analysis do not specify Gynecare TVT

363

1    as the standard of care.  So, Ford and

2    Cochrane specify that tapes that pass in

3    the obturator pathway and in the

4    retropubic pathway and then they give

5    their -- they give their affirmation and

6    every authoritative agency that's

7    approving and ratifying midurethral slings

8    as the standard of care ratifies

9    midurethral slings.  So, it is while

10   the -- I would certainly agree that the

11   largest amount of data on midurethral

12   slings comes from Ethicon, the number of

13   time and decades and years and studies

14   that have proven that the result are

15   similar make it a midurethral sling

16   appeared not necessarily a Gynecare TVT

17   midurethral sling which is the standard of

18   care.

19            So in that regard, I continue to

20   use the standard of care.

21            MR. DeGREEFF:  Okay.  I'm going

22       to ask a follow-up question.  I'll let

23       your counsel finish.

24          MS. GERSTEL:  Okay.

                                              364


 1  BY MS. GERSTEL:

 2      Q.    Doctor, I think you anticipated

 3  what my question was going to be.

 4            First, doctor, I believe that

 5  you just misspoke now when you said

 6  polyester.

 7            Did you mean polypropylene?

 8      A.    Yes.

 9      Q.    And, doctor, I'll just re-ask

10  that question.

11            Are you familiar with the AUGS

12  SUFU position statement on mesh

13  midurethral slings?

14      A.    Yes.

15      Q.    And does that position statement

16  refer to polypropylene type 1 macroporous

17  mesh midurethral slings regardless of

18  root, transvaginally or retropubic, as the

19  gold standard in surgical treatment for

20  stress urinary incontinence in women?

21      A.    Yes, it does.

22      Q.    And do you agree with that

23   opinion?

24      A.    I do.

                                                        365


1            MS. GERSTEL:  That's all I have.

2            MR. DeGREEFF:

3    FURTHER EXAMINATION

4    BY MR. DeGREEFF:

5       Q.    Doctor, you are now withdrawing

6    your earlier statement that the TVT

7    products are the gold standard.

8            Correct?

9            MS. GERSTEL:  Objection.

10      A.    I would say based on the

11   meta-analysis, yes.

12      Q.    What your testimony is is that

13   you believe midurethral slings to be the

14   gold standard.

15           Right?

16      A.    Yes.

17           MR. DeGREEFF:  No further

18      questions.

19

20

21

22

23

24