# EXHIBIT  D

Charles Hanes, II, M.D.

1            UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                 CHARLESTON DIVISION

4

     IN RE:  ETHICON, INC., * MASTER FILE NO. 2:12-MD-02327

5    PELVIC REPAIR SYSTEM    *    MDL 2327

     PRODUCTS LIABILITY     *  JOSEPH R. GOODWIN

6    LITIGATION             * U. S. DISTRICT JUDGE

7

     THIS DOCUMENT RELATES TO ALL CASES.

8

9

10

11

12

13

14           The deposition of CHARLES HANES, II, M.D.,

15           taken at Helmsing, Leach, Herlong, Newman &

16           Rouse, 150 Government Street, Suite 200,

17           Mobile, Alabama, on the 12th day of July, 2019,

18           commencing at approximately 9:30 a.m.

19

20

21

22

23

24

Charles Hanes, II, M.D.

```
 1                  A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3              WAGSTAFF & CARTMELL, LLP
               Attorneys at Law
 4              4740 Grand Avenue, Suite 300
               Kansas City, Missouri 64112
 5              BY:  Diane K. Watkins, Esquire
                    dwatkins@wcllp.com
 6
 7    FOR THE DEFENDANTS:
 8              BUTLER SNOW, LLP
               Attorneys at Law
 9              One Federal Place
               1819 5th Avenue North, Suite 1000
10              Birmingham, Alabama  35203
               BY:  James C. Barton, Jr., Esquire
11                  Jim.barton@butlersnow.com
12
13
14
15
16
17
               LOIS ANNE ROBINSON, RPR, RDR, CRR
18              COURT REPORTER
19
20
21
22
23
24
```

Charles Hanes, II, M.D.

```
 1                      I N D E X

 2   EXAMINATION                              PAGE

 3    By Ms. Watkins                           5

 4    By Mr. Barton                           99

 5

 6                      * * * * * *

 7   EXHIBITS

 8   Deposition Exhibit Number 1              5

 9      Flash drive - Reliance materials

10   Deposition Exhibit Number 2              5

11      Curriculum vitae

12   Deposition Exhibit Number 3              5

13      Charles R. Hanes, II, M.D., Invoice of 5/28/19

14   Deposition Exhibit Number 4              5

15      General Materials List In Addition to Materials Referenced in

16      Report

17   Deposition Exhibit Number 5              5

18      General TVT TVT-O TVT-EXACT TVT-ABBREVO Expert Report

19   Deposition Exhibit Number 6              5

20      General Prolift Prolift+M Expert Report

21   Deposition Exhibit Number 7              6

22      Notice of Deposition

23   Deposition Exhibit Number 8             22

24      Master consulting agreement dated 3/1/2007
```

Charles Hanes, II, M.D.

1                    I N D E X - (Continued)

2    Deposition Exhibit Number 9                    22

3      Master consulting agreement dated 2/9/2007

4    Deposition Exhibit Number 10                   22

5      Master consulting agreement dated  2/1/2009

6    Deposition Exhibit Number 11                   22

7      Master consulting agreement dated 1/25/2010

8    Deposition Exhibit Number 12                   22

9      Master consulting agreement dated 2/1/2011

10   Deposition Exhibit Number 13                   88

11     "Evaluation and management of Mid-Urethral Sling

12       Complications"

13   Deposition Exhibit Number 14                   88

14     ACOG Practice Bulletin - November 2017

15

16

17

18

19

20

21

22

23

24

Charles Hanes, II, M.D.

```
 1              (EXHIBITS 1 THROUGH 6 WERE

 2              MARKED FOR IDENTIFICATION.)

 3                 CHARLES HANES, II, M.D.,

 4              the witness, after having first been

 5     duly sworn to tell the truth, the whole truth,

 6     and nothing but the truth, was examined and

 7     testified as follows:

 8                      EXAMINATION

 9     BY MS. WATKINS:

10     Q        Good morning, Doctor.

11     A        Good morning.

12     Q        Can you hear me okay?

13     A        I can.

14     Q        Okay.  As we discussed before we went

15     on the record, I am attending by phone, so if at

16     any point you cannot hear me, will you please let

17     me know?

18     A        I certainly will.

19     Q        Okay.  And if you don't understand any

20     of my questions, will you please let me know?

21     A        Certainly.

22     Q        Okay.  And you've done a report setting

23     forth your opinions regarding the Prolift and the

24     Prolift + M; correct?
```

Charles Hanes, II, M.D.

```
 1    A          Correct.

 2    Q          At this time, do you have any changes

 3    or additions to your Prolift report?

 4    A          Not at this point.  Yes.

 5    Q          Okay.  And you've also done a report

 6    setting forth your opinions on the TVT, the

 7    TVT Obturator, the TVT EXACT, and the TVT

 8    ABBREVO; correct?

 9    A          Correct.

10    Q          And do you have any changes or

11    additions to that report at this time?

12    A          No.

13    Q          Okay.  And have you seen the deposition

14    notice for your deposition here today?

15               Yes.

16    MS. WATKINS:

17    Q          And, Madam Court Reporter, Miss Lois,

18    have we marked that as an exhibit yet?

19    THE COURT REPORTER:

20               Not yet.  I'll make it Number 7.

21               (EXHIBIT NUMBER 7 WAS

22               MARKED FOR IDENTIFICATION.)

23    MS. WATKINS:

24               Number 7.
```

Charles Hanes, II, M.D.

```
 1   Q         The court reporter has marked the
 2   Notice of Deposition as Exhibit 7.  And have you
 3   seen Exhibit A, Doctor, to that notice, which is
 4   on page 6 that's titled "Schedule A"?
 5   MR. BARTON:
 6              And, Diane, just for the record, we did
 7   file, I think, objections and responses to the
 8   deposition notice and documents requested, and
 9   you should have received that.  Did you receive
10   that?
11   MS. WATKINS:
12              I believe so.  Understood.
13   MR. BARTON:
14              Okay.  Great.
15   A         So, yes.  I'm looking at page 6.
16   MS. WATKINS:
17   Q         Okay.  Have you brought the responsive
18   materials with you here today?
19   A         Yes.
20   Q         Okay.  And what have you brought to the
21   deposition?
22   A         We brought a CV, the general documents,
23   the invoice, and the -- yeah, the copy of the
24   general reference materials.
```

Charles Hanes, II, M.D.

1    Q        Okay.  And, for the record, I

2    believe -- and correct me if I'm wrong, please --

3    that we've marked the flash drive.  It was

4    Exhibit 1.

5    A        Yes.

6    Q        Is that correct?

7    A        Was that Exhibit 1?  Yes.

8    Q        And does the flash drive contain the

9    reliance materials for your Prolift and TVT

10   reports?

11   A        It appears to, yes.

12   Q        Okay.  And have we marked your invoice

13   as Exhibit 2?

14   A        Yes.

15   Q        Okay.  And I want to talk for a minute

16   about the invoice.  The invoice appears to have

17   two line items, one pertaining to your Prolift

18   report and one pertaining to your TVT report.

19   Correct?

20   A        Correct.

21   Q        And the first line item lists 5-11

22   through 5-17, preparation of TVT report, 25.4

23   units, $450 cost per unit, which equals

24   $11,430.00; correct?

Charles Hanes, II, M.D.

```
 1    A        Yes.

 2    Q        Okay.  I assume the units are the hours

 3    spent?  Is that correct?

 4    A        That is correct.

 5    Q        And does the preparation of the TVT

 6    report include reviewing materials or simply

 7    drafting the report?

 8    A        Reviewing materials.

 9    Q        Okay.  And drafting it?

10    A        Correct.

11    Q        Okay.  And, then, so I assume the 5-11

12    through 17, was that May 11th through May 17th

13    working on it?

14    A        Yes.

15    Q        Okay.  And then the next line item is

16    May 17th through 26th, preparation of Prolift

17    report.  And, so, did you spend 18.4 hours

18    reviewing materials and preparing the Prolift

19    report?

20    A        I did.

21    Q        Okay.  And that cost per unit for both

22    of those reports was $450 per hour?

23    A        Correct.

24    Q        Okay.  So for Prolift, the total amount
```

Charles Hanes, II, M.D.

1    was $8,280.00; correct?

2    A          Correct.

3    Q          So for your TVT -- or for the TVT time,

4    referring to the TVT family of products that

5    you've included in your report, for the TVT and

6    Prolift report, your review of materials and then

7    drafting the report, the --

8               Well, strike that.

9               The total amount that you've spent for

10   those two reports is contained within those

11   invoices.  Is that -- or that invoice.  Is that

12   correct?

13   A          That is correct.

14   Q          Okay.  And, then, is your CV, which

15   we've marked as Exhibit 3, current as of today?

16   A          Yes, it is.

17   Q          Okay.  And I noticed -- we noticed

18   your -- or -- excuse me -- we marked your general

19   materials list as Exhibit 4, but I was provided

20   with a supplemental materials list a couple days

21   ago.  Have you been provided with that

22   supplemental list?

23   A          I'm not aware of that.

24   Q          Okay.  And does the general materials

Charles Hanes, II, M.D.

 1    list that you have, marked as Exhibit 4, apply to

 2    both the Prolift report and the TVT report?

 3    A        I believe so, yes.

 4    Q        Okay.  When were you first contacted by

 5    Ethicon's counsel regarding serving as a general

 6    causation expert in the Ethicon litigation?

 7    A        It was -- I would think it was either

 8    right at the end of April or the beginning of

 9    May.

10    Q        Of 2018?

11    A        Yes.  No.  2019.

12    Q        Okay.  And we talked a little bit about

13    your invoice.  Have you or are you going to bill

14    Ethicon anything in addition to the invoice that

15    you've marked as Exhibit 2 for your services as a

16    general causation expert in the Ethicon

17    litigation?

18    A        I'll bill them for our time today and

19    preparation for this deposition.

20    Q        Okay.  How much time did you spend

21    preparing for the deposition?

22    A        Three hours.

23    Q        And when was that?

24    A        Yesterday evening, or afternoon.

Charles Hanes, II, M.D.

```
 1   Q          And what did you do to prepare?

 2   A          Mr. Barton and I spent some time

 3   discussing the materials.

 4   Q          Did you meet with Mr. Barton for three

 5   hours?

 6   A          Yes.

 7   Q          Aside from meeting with Mr. Barton and

 8   reviewing your reports, did you review anything

 9   else?

10   A          No.

11   MS. WATKINS:

12              Madam court reporter, if you don't mind

13   marking what I've emailed to you which is titled

14   "Supplemental General Materials List" -- it has

15   Dr. Hanes' name at the top -- as Exhibit 8, I

16   would appreciate it, when you get a moment.

17   THE COURT REPORTER:

18              I do not have one named that, I don't

19   think.  I have other things, but I don't have

20   that.

21   MS. WATKINS:

22              Okay.  That's fine.

23   Q          Okay.  Dr. Hanes, aside from meeting

24   with Dr. Barton -- excuse me -- Mr. Barton
```

Charles Hanes, II, M.D.

```
 1    yesterday, have you had communications with

 2    counsel for Ethicon regarding this litigation?

 3    A          Regarding these general reports or --

 4               Be more -- what -- I'm not sure I

 5    understand.

 6    Q          Well, you said your first contact was,

 7    I believe, in April of May of 2019.  And, at that

 8    time, who was your contact person as far as

 9    Ethicon's attorney?

10    A          Jordan Walker.

11    Q          Okay.  And did you have any phone

12    conferences with Jordan Walker about the general

13    expert reports that you were going to be

14    drafting?

15    A          No, not --

16               I mean, we've talked subse- -- we've

17    talked a couple of times in the -- in the course

18    of this whole process.  But at the time of

19    initial contact, it was just a request for me to

20    do the general reports, and that -- that was it.

21    Q          Okay.  Aside from the work that

22    we've -- you've done for the general causation

23    expert report, have you done any other work for

24    the Ethicon transvaginal mesh litigation?
```

```
 1   A        Yes.  I've done some case-specific

 2   reports.

 3   MR. BARTON:

 4            And, Diane --

 5   MS. WATKINS:

 6   Q        Do you know how many case-specific

 7   reports you've done?

 8   MR. BARTON:

 9            Diane, excuse me for a second, since

10   you can't see me.  Let me just interject an

11   objection to "work for."  I mean, he's a paid

12   outside --

13   MS. WATKINS:

14            Understood.  I can rephrase my --

15   MR. BARTON:

16            -- consultant.

17   MS. WATKINS:

18            I'll withdraw my question.

19   MR. BARTON:

20            Okay.  Thank you.

21   MS. WATKINS:

22   Q        Doctor, it's my understanding that you

23   have been retained in certain cases to do

24   case-specific reports in the Ethicon litigation.
```

Charles Hanes, II, M.D.

```
 1   Is that correct?

 2   A       Yes.

 3   Q       And how many cases have you been

 4   retained to do case-specific expert reports in

 5   the Ethicon litigation?

 6   A       I don't know the exact number, but it's

 7   probably close to a dozen, about a dozen.

 8   Q       Have you been deposed in those cases?

 9   A       I've been deposed on one.

10   Q       Do you know the name of that case?

11   MR. BARTON:

12           Aldridge?

13   THE WITNESS:

14           Aldridge.  Yeah.  I think that's the --

15   MS. WATKINS:

16   Q       Is that Margaret Aldridge?  Does that

17   ring a bell?

18   A       I can't remember.

19   Q       Okay.  The only reason I asked is

20   because that happened to be my case, and it was

21   an Ethicon case.

22           Have you been deposed as a treating

23   physician in any of the Ethicon transvaginal mesh

24   cases?
```

Charles Hanes, II, M.D.

```
 1   A         No.

 2   MR. BARTON:

 3           Well --

 4   THE WITNESS:

 5           Oh, wait.  Excuse me.

 6   MS. WATKINS:

 7   Q         You said you have been deposed in the

 8   Aldridge case?

 9   MR. BARTON:

10           Diane, let me interrupt you, just to

11   help both of you, to be sure you're not

12   misunderstanding each other.  You asked him if he

13   had ever been deposed as a treater?

14   THE WITNESS:

15           Treating physician.

16   MS. WATKINS:

17           Yes.

18   MR. BARTON:

19           As a treating physician.  And you have

20   been deposed as an implanter.

21   MS. WATKINS:

22           Sorry.  No.  I'll rephrase.

23   MR. BARTON:

24           Right?
```

Charles Hanes, II, M.D.

```
 1   MS. WATKINS:

 2   Q          But you've been deposed in the Aldridge

 3   case; is that correct?

 4   A          That's correct.  And we're -- we're

 5   discussing.  I may have been deposed as a

 6   treating physician, and I can't remember.

 7   MR. BARTON:

 8              Diane, I believe Dr. Hanes has been --

 9              And I don't want us to trip up on

10   words.  In our shop, we often refer to the

11   doctors wearing different hats as maybe an

12   implanter, an explanter, or just a treater --

13   MS. WATKINS:

14              Right.

15   MR. BARTON:

16              -- a treater being someone who didn't

17   do surgery, didn't do an implant or an explant

18   but just a treating physician.  So I don't know

19   if Dr. Hanes is confused with that language or

20   y'all are on the same page or not.

21              But I think Dr. Hanes may have been

22   deposed in this litigation as an implanter years

23   ago.

24   MS. WATKINS:
```

Charles Hanes, II, M.D.

```
 1              Okay.  Fair enough.

 2    MR. BARTON:

 3              But you need to clarify that with him.

 4    MS. WATKINS:

 5              Some people do interpret the word

 6    "treater" differently.

 7    Q         Doctor, as an implanter or explanter or

 8    treater of a transvaginal mesh plaintiff, have

 9    you been deposed for purposes of litigation?

10    A         I honestly can't remember.  I'm sorry.

11    Q         Okay.  Fair enough.

12              And, Doctor, you are -- you know, I

13    think Ethicon's counsel may have informed you.

14    If you do not remember or you do not know the

15    answer, you are able to say that.

16    A         Okay.  Yeah.

17    Q         I appreciate your answer, though.

18              And we talked a little bit about your

19    invoice.  Is your fee schedule for review and

20    preparation of reports $450 per hour?

21    A         Yes.

22    Q         And -- and is that the same price for

23    deposition testimony?

24    A         Yes.
```

Charles Hanes, II, M.D.

1    Q        And do -- what about trial testimony?

2    A        Thus far, I've not been to trial.  But

3    I think -- I think that the charge is $5,000 per

4    day.

5    Q        Okay.  Have you ever testified at any

6    trial for any purpose, meaning not even -- not

7    limiting it to transvaginal mesh.  Any trial.

8    A        I don't believe so, no.

9    Q        Okay.  And is your charge for

10   consultation and meeting with counsel $450 per

11   hour?

12   A        Yes.

13   Q        So aside from your meeting with

14   Mr. Barton yesterday, the invoice that we've

15   marked as Exhibit 2 is what you've billed for the

16   Ethicon litigation thus far.  Is that correct?

17   A        For the preparation of the general

18   reports.

19   MR. BARTON:

20            In this case.

21   THE WITNESS:

22            Yeah, in this case.

23   MS. WATKINS:

24   Q        Right.

Charles Hanes, II, M.D.

```
 1              And, then, aside from any meeting with

 2    Mr. Barton, have you done anything else for the

 3    Ethicon litigation that you intend to bill for?

 4    A          The case-specific reports, as -- you

 5    know, if any further arise.

 6    Q          Okay.  And if there's moments of

 7    silence, Doctor, it's just because I'm going

 8    through my outline and crossing things off.  So

 9    just as an FYI.  I have not checked out.  Just

10    notes on my outline.

11              Have you been paid for the amount that

12    you've billed on the invoice that we've marked as

13    Exhibit 2?

14    A          Not to date.

15    Q          Okay.  Have you served as an expert

16    witness for any transvaginal mesh manufacturer?

17    A          No.

18    Q          And is that true with respect to

19    case-specific as well?

20    A          Correct.

21    Q          Have you been deposed as a treater,

22    implanter, or explanter in any transvaginal mesh

23    case against a manufacturer other than Ethicon?

24    A          No, I have not.
```

Charles Hanes, II, M.D.

```
1   Q        Okay.  Have you given a deposition in a

2   transvaginal mesh case prior to today, aside from

3   the one that you mentioned, which I believe is

4   Aldridge?

5   A        No, I don't believe so.

6   MR. BARTON:

7            What you said is you can't remember.

8   THE WITNESS:

9            Yeah.  I can't be certain about that,

10  but I can't recall another one.

11  MS. WATKINS:

12  Q        Have you talked to any Ethicon

13  employees in conjunction with forming your

14  opinions in the transvaginal mesh litigation?

15  A        No, I have not.

16  Q        Aside from your expert work for

17  purposes of the transvaginal mesh litigation,

18  have you been a consultant for Ethicon?

19  A        I have.

20  Q        Okay.  And Lois will have some

21  consulting agreements in front of her.

22           And, Lois, if you don't mind marking

23  those.  I believe that there are five consulting

24  agreements that we could locate.  So if you don't
```

Charles Hanes, II, M.D.

```
 1    mind, Lois, start off with the earliest, which is

 2    the February 2007 consulting agreement, and

 3    marking those 9, 10, 11, 12, 13.

 4              (EXHIBITS 8, 9, 10, 11, AND 12

 5              WERE MARKED FOR IDENTIFICATION.)

 6    MS. WATKINS:

 7    Q         Doctor, the earliest consulting

 8    agreement that we could find was February 2007.

 9    Do you believe that that was when you first

10    started working as a consultant for Ethicon or do

11    you believe that it might be sooner than that?

12    A         I think it was -- I think it was sooner

13    than that.

14    Q         Okay.  When do you think you first

15    became a consultant for Ethicon?

16    A         I think it was 1999 or possibly 2000.

17    But it was right -- right in that neighborhood.

18    Q         In '99 or 2000, what was your role as a

19    consultant for Ethicon?

20    A         I became a preceptor for instructing

21    physicians on the use of the TVT.

22    Q         The TVT retropubic?

23    A         Yes.

24    Q         And do you recall how much -- what the
```

Charles Hanes, II, M.D.

1    compensation agreement was at that time?

2    A       Diane, I think -- I think it was a

3    thousand dollars per physician trained.

4    Q       Did the physicians come to you and

5    observe you doing the procedure?

6    A       They came to me, and they -- we did a

7    multiple kind of training episode.  We had access

8    to a cadaver lab, which we took them to, and

9    instructed them on the use, in the cadaver

10   setting, and then we went and they watched live

11   surgery.  And then we had a didactic along with

12   that.

13   Q       Was that there in Mobile or was that in

14   New Jersey or elsewhere?

15   A       No.  That was in Mobile.

16   Q       Okay.

17   A       And we used the University of South

18   Alabama Medical Center Department of Anatomy for

19   the cadaver lab.

20   Q       Okay.  So from 1999 to 2000 on, did you

21   have an annual contract with Ethicon up until a

22   certain period of time, to your knowledge?

23   A       Yeah.  I think it was an annually

24   renewable contract.

Charles Hanes, II, M.D.

```
 1   Q        As a preceptor?

 2   A        Yes.

 3            Actually, it says on here -- it says on

 4   this one I'm looking at "Extend for a period of

 5   one year with automatic renewals for an

 6   additional two years."  So I guess the contract

 7   was rewritten every two or three years.

 8   Q        Okay.  So when was the last time you

 9   served as a preceptor for Ethicon?

10   A        I think it was in 2012.  Maybe 2011,

11   but right in that...

12   Q        Okay.  So is it your memory that from

13   1999 or 2000 to 2011 or 2012, you were a

14   preceptor for Ethicon during those years?

15   A        Yes.

16   Q        And aside from the TVT retropubic, are

17   there any other products that you were a

18   preceptor for?

19   A        I became -- as soon as they added the

20   TVT-O, then I was a preceptor for that.  And then

21   once the Prolift products came on board, I became

22   a preceptor for them as well.  It wasn't -- it

23   wasn't immediately after their introduction, but

24   it was maybe a year after they were on the
```

Charles Hanes, II, M.D.

```
 1    market, or thereabouts.

 2    Q         Okay.  Were you a preceptor for the TVT

 3    EXACT?

 4    A         I don't remember exactly when the EXACT

 5    came on board.  But if it came on board before

 6    2011, then I was.

 7    Q         Okay.  And, then, what about the

 8    TVT ABBREVO?

 9    A         Yes.

10    Q         And what about the TVT SECUR?

11    A         No.  I never -- I never was a preceptor

12    for that.

13    Q         Were you a preceptor for the

14    Prolift + M?

15    A         Yes.

16    Q         And did your compensation increase from

17    the thousand dollars per doctor, which was your

18    memory, from 2000 or -- excuse me -- 1999, 2000,

19    to 2011, 2012, did this increase over time?

20    A         No, it did not.

21    Q         Okay.  I want to look a little bit

22    about the consulting agreements that we were able

23    to find.  Obviously, there are totally some of

24    them out there that we couldn't find.  But the
```

Charles Hanes, II, M.D.

 1   first is dated February 9th, 2007, which we've

 2   marked as Exhibit 9, I believe.

 3   A        Yes.

 4   Q        Do you have that in front of you,

 5   Doctor?

 6   A        I do.

 7   Q        Okay.  If you don't mind just turning

 8   to --

 9            In the bottom right corner, you'll see

10   that the parties have marked these documents with

11   what we call Bates numbers, and the last three

12   are 169.

13   A        169?

14   Q        Uh-huh.

15            And let me know, please, when you get

16   to that page.

17   A        I don't see the Bates number.  Do you?

18   MR. BARTON:

19            Diane, these copies do not appear to be

20   Bates-labeled.

21   MS. WATKINS:

22            Really.

23   MR. BARTON:

24            Yeah.  Sorry about that, but I don't

Charles Hanes, II, M.D.

```
 1   see that.

 2   MS. WATKINS:

 3           The bottom right corner?

 4   THE WITNESS:

 5           No.

 6   MS. WATKINS:

 7           They're the same ones I sent the court

 8   reporter, the same ones I printed out.

 9   THE COURT REPORTER:

10           They're the ones I printed out.

11   THE WITNESS:

12           Which page do you want me to get to?

13   MS. WATKINS:

14   Q       Well, it's the --

15   MR. BARTON:

16           Well, maybe they're in the lower left.

17   THE WITNESS:

18           Let's see.

19   MS. WATKINS:

20           Well, it's the -- look at the last page

21   of the consulting agreement dated February 9th,

22   2007.

23   MR. BARTON:

24           I don't think that's a Bates label.
```

Charles Hanes, II, M.D.

```
 1   THE WITNESS:

 2           Huh-uh.

 3   MS. WATKINS:

 4           And the paragraph numbers are 5, 6, 7,

 5   8.

 6   MR. BARTON:

 7           So, Diane, I don't think these have the

 8   Bates-labeled numbers on them.  But we may be

 9   able to follow along if you just identify the

10   page you want him to look at.

11   MS. WATKINS:

12   Q       Okay.  Well, it's the fourth page from

13   the last.

14   A       Fourth page --

15           Okay.  Is that the page that's got item

16   B at the bottom?

17   Q       Yes.

18   A       Okay.

19   Q       Okay.  I'm going to ask you a little

20   bit about paragraph 8.  And that paragraph

21   describes the description of services as

22   participation in the 2007 Incontinence and Pelvic

23   Floor Summit held in St. Petersburg, Florida.

24   A       Okay.
```

Charles Hanes, II, M.D.

1    Q         Do you see that, Doctor?

2    A         Yes.

3    Q         Do you recall attending that conference

4    in St. Petersburg, Florida?

5    A         I do.

6    Q         And do you recall what your role would

7    have been at that conference?

8    A         The summit -- the summit meetings were

9    meetings that Gynecare put on for all of the

10   preceptors.  And it was an annual meeting where

11   the preceptors came together, together with the

12   representatives from the company who were

13   specifically relegated to the -- to these

14   products, and it was a meeting -- it was a

15   meeting that was put on really to, number 1,

16   update us on any -- any developments, but number

17   2 was to provide kind of a free-flowing forum for

18   discussion on products, problems, recommendations

19   of how to improve techniques, et cetera.  You

20   know, it's just a --

21           It was really a great meeting, in my

22   opinion, because it was designed to further the

23   betterment of the services that we delivered and,

24   where applicable, improve on the products.

Charles Hanes, II, M.D.

```
 1   Q        Okay.  And, based on your memory, did
 2   you attend the annual meeting from when you first
 3   started working as a preceptor in 1999 or 2000
 4   till when you last served as a preceptor in 2011
 5   or 2012?
 6   A        I think I -- yeah.  I think --
 7            I can't remember a single one of those
 8   summit meetings that I missed.  They were --
 9   Q        Okay.
10   A        They were very excellent meetings, and
11   I -- I really gained a tremendous amount from
12   attending them.
13   Q        And you mentioned a discussion at those
14   meetings of problems.  Do you recall any problems
15   that were discussed regarding the transvaginal
16   mesh product?
17   A        I don't remember any generic problems.
18   I mean, you know, people would have specific
19   things that might have arisen and they would get
20   feedback on.  But I don't remember anything that
21   was generic to the -- to the product, if that
22   makes sense.
23   Q        Yeah.
24            Do you remember anything specific to
```

Charles Hanes, II, M.D.

```
 1   any of the products that was discussed?

 2   A       Oh, gosh.  You know, I remember --

 3           For example, I do -- I do recall that

 4   there was discussion about this whole issue of

 5   mesh contracture.  And that was debated.  And, to

 6   the best of my knowledge, nobody really had

 7   any -- any knowledge or experience of having that

 8   problem.

 9           I think the general agreement was

10   whenever -- whenever there's a scar, there's

11   gonna be a contraction of the scar.  But it was

12   not a function of the mesh.  It was a function of

13   the scar.

14           So it was just never really something

15   that --

16           You know, and we were getting reports

17   like, you know, there were mesh contractures of

18   50 percent.  And that was, you know, outrageous.

19   I mean, nobody, including myself, ever

20   experienced anything like that.  So it just --

21           You know, there were things that came

22   up that were being reported, and, so, we would

23   discuss those and try to -- try to come to -- to

24   the bottom of it and some, you know -- just
```

Charles Hanes, II, M.D.

```
 1    obtain the experiential evidence that we all

 2    brought together as a group of experts around the

 3    country.

 4    Q          Okay.  And were, to your knowledge,

 5    were all of the attendees at these conferences or

 6    annual preceptors for Ethicon?

 7    A          Well, the -- the invited attendees,

 8    yes, were.  Of course, the company representative

 9    attendees were there as well.

10    Q          Okay.  And over the course of your

11    practice, including those meetings, have you

12    formed an opinion as to whether mesh can contract

13    after proper implantation?

14    A          Yeah.  I don't -- I don't -- I don't

15    believe in --

16               Like I say, I mean, there is

17    contraction associated with any scar.  I mean,

18    that's a property of healing and a property of

19    scar formation.  But contraction beyond that norm

20    that's expected as a result of the implantation

21    of the mesh I would disagree with.

22    Q          Okay.

23    A          And let me go -- can I go back a

24    minute?  You asked about the attendees.  I mean,
```

```
 1   there were occasionally --
 2              Like, I think that one time the product
 3   developer, the inventor of the TVT-O,
 4   Dr. de Leval, was there, and they would have
 5   occasional guests like that who were, you know,
 6   obviously related.  They were physicians that
 7   were related to the products.
 8   Q        Okay.  Fair enough.
 9              And, of course, throughout the
10   deposition, if you'd like to either supplement or
11   change an answer, feel free to do so.  I
12   appreciate that.
13              And just so I have an understanding of
14   your opinion about mesh contracture or
15   contraction, is it --
16              And I'm not trying to be argumentative.
17   I just want to understand what your opinion is.
18              Is it your opinion that the mesh itself
19   does not contract; it is the scar tissue that
20   contracts?
21   A        That's correct.  I mean, with the --
22   with the implantation of mesh, you have tissue
23   incorporation.  And, so, as that tissue is
24   incorporated and then that tissue becomes a part
```

```
 1   of the scarring that accompanies the incision,

 2   then it's going to -- to contract, but, again,

 3   not to any greater degree.

 4            In fact, in my opinion, the tissue

 5   incorporation keeps the mesh from contracting.

 6   It seems inconceivable to me that the mesh could

 7   contract beyond what the tissue and scarring is

 8   doing simply because the integration of the

 9   tissue with the mesh.

10   Q        Okay.  And when you attended these

11   annual Ethicon conferences, were all of the

12   products, meaning the TVT line of products and

13   the Prolift line of products, discussed?

14   A        Yes.

15   Q        Okay.

16            Okay, Doctor.  You can set aside

17   Exhibit Number 9, and I'd like to move on to

18   Exhibit Number 10, which is a consulting

19   agreement from the same year, but it's March 1st,

20   2007.  Do you have that in front of you, Doctor?

21   A        Yeah.  I've got -- maybe the --

22            The first one, you said, was 9, and the

23   one March 1, 2007, has the label 8 on it.  So

24   that was out of order.  But...
```

Charles Hanes, II, M.D.

```
 1   Q        Okay.  So that's been marked Exhibit 8?

 2   A        Yes.  And the 10 is dated 2 -- February

 3   1, '09.

 4   Q        Okay.  Okay.  I appreciate that.

 5            Okay.  If you don't mind turning three

 6   pages in, where the first couple paragraphs are

 7   numbered 11 and 12?

 8   A        Got it.

 9   Q        Okay.  And if you don't mind looking at

10   paragraph 12, six lines from the bottom, there is

11   a sentence that says -- that starts with "you

12   shall not."

13   A        Yes.

14   Q        Do you see that, Doctor?  I'm just

15   going to read that into the record and ask if

16   that's something that you agreed to with respect

17   to this consulting agreement.

18            "You shall not make any representations

19   relating to Company's products or to Company's

20   clinical outcomes unless such representations

21   have been reviewed and approved in advance by

22   Company."

23            Did I read that correctly?

24   A        Yes.
```

Charles Hanes, II, M.D.

```
 1   Q        Okay.  I'll represent to you that in

 2   each of the contracts that we've marked here

 3   today, that provision is included in there.  Was

 4   that something you agreed to as a consultant for

 5   Ethicon?

 6   A        Yes.

 7   Q        Perfect.

 8            And, then, if you don't mind turning to

 9   the -- it's called Exhibit A.

10   A        I've got it.

11   Q        It is six pages from the back.

12            Okay.  And under A4, it says

13   "Preceptor/Surgical Training," and it says,

14   "Consultant shall allow visiting surgeons and

15   visiting company sales representatives to observe

16   surgical procedures involving the practice of

17   professional education training the clinical uses

18   of various Ethicon products, and to consult with

19   consultants regarding such procedures applicable

20   patient confidentiality and consent

21   requirements."

22            Do you see that?

23   A        I do.  But on this particular copy, it

24   does not put in -- after you said "involving the
```

## Charles Hanes, II, M.D.

```
 1    practice of the clinical uses of," but it

 2    doesn't -- doesn't write in those specifics that

 3    you said.  And then it resumes, "and to consult

 4    with consultant regarding such procedures."

 5    MR. BARTON:

 6             Diane, it looks like it's blank.

 7    MS. WATKINS:

 8    Q        Okay.  And, Doctor, is this the

 9    preceptor training that you discussed earlier in

10    your deposition?

11    A        Yeah.  I believe it is.

12    Q        Okay.  And when you were a preceptor,

13    was that --

14             Well, strike that.

15             When you were a preceptor for Ethicon,

16    were you a preceptor for the Prolift product as

17    well as the TVT product?

18    A        Yes.

19    Q        And the bottom part of that paragraph

20    states, "Consultant shall allow such visits on up

21    to 15 occasions, and Company shall pay consultant

22    2,000 for each such session per eight-hour day."

23             Do you see that?

24    A        Okay.  Again, they didn't have -- my
```

Charles Hanes, II, M.D.

```
 1    copy doesn't have those blanks filled in, so --

 2    Q        That is --

 3    A        $2,000.00 for each session per

 4    eight-hour day.  So it didn't have $2,000.00.

 5    And I think I told you earlier it's one thousand

 6    per physician.  But if that's what it says, then

 7    that would be.  Because I can't --

 8    MR. BARTON:

 9             Diane, the exhibit we're looking at is

10    blank.

11    MS. WATKINS:

12             That is weird.

13             Lois, off the record real quick,

14    please.

15                    (OFF THE RECORD.)

16    MS. WATKINS:

17    Q        Okay.  Doctor, we were off the record

18    kind of clearing up some miscommunication about

19    the agreement with Ethicon, Consultant Agreement

20    dated March 1st, 2007, and it looks like you were

21    compensated, under that agreement, $2,000 for

22    each section of the preceptor for the Ethicon

23    products.  Is that correct?

24    A        Correct.
```

Charles Hanes, II, M.D.

1   Q        And do you recall, on an annual basis

2   starting in 1999 or 2000 to 2012, how much you

3   were compensated by Ethicon for your consulting

4   work on an annual basis?

5   A        I do not.

6   Q        Do you have a ballpark?

7   A        Oh, gosh.  No.  I really don't.

8   Q        Okay.  Under the terms of this March

9   2007 agreement, you were able to be compensated

10  $2,000 for each session up to 15, which would

11  obviously be 30,000.  Do you think that you would

12  have reached that 30,000?

13  A        I think I would have, yes.

14  Q        Okay.  You can set that one aside,

15  Doctor.

16           And, then, we're now gonna move on to

17  the consulting agreement dated February 1st,

18  2009, which I thought was marked as Exhibit 11.

19  But I'm clearly off on my exhibits, I think.

20  A        Yeah.  It's number 10.

21  Q        Okay.  Thank you.

22  A        And 11, Exhibit 11 is 1-25-10.

23  Q        Okay.  Then I'm one off on all mine.

24  Okay.

Charles Hanes, II, M.D.

```
 1              And, Doctor, we could not find any
 2   consulting agreement for the year 2008.  Is it
 3   your belief and memory that, from when you first
 4   started working as a preceptor for Ethicon in
 5   1999 or 2000 to 2012, you were a preceptor every
 6   year?
 7   A        Yes.
 8   Q        Okay.  And, so, there likely is a
 9   contract out there somewhere for 2008, based on
10   your memory; is that correct?
11   A        I guess, unless -- you know, in this
12   first paragraph, it says "automatic renewals for
13   two years."  So I don't know if that would mean
14   that there wouldn't be another written contract.
15   Q        Okay.  Understood.
16            Okay.  If you don't mind turning to the
17   third-to-the-last page, which my copy, in the
18   bottom right-hand corner, ends with 792.  Let me
19   know when you're there, please, Doctor.
20   A        Is that Exhibit A again?
21   Q        It is the third-from-the-last page.
22   The bottom, in the right-hand corner, is 702, and
23   it's the fourth paragraph, under Services and
24   Fees.
```

Charles Hanes, II, M.D.

```
 1    A         Is that "you and company"?  Is that
 2    paragraph 20?
 3    Q         Paragraph 4.  It's A4 under Exhibit A.
 4    A         Oh, I've gotcha.  Okay.  Oh, yeah.
 5    Gotcha.
 6    Q         Okay.  And this, again, discusses your
 7    preceptor role with Ethicon.  And just to kind of
 8    circumvent additional questions, from the time
 9    you served as a preceptor starting in '99 or 2000
10    to 2012, did you cover the TVT line of products
11    as well as the Prolift products as a preceptor
12    during all of those years?
13    MR. BARTON:
14              Object to the form.
15              Go ahead.
16    A         I did.
17    MS. WATKINS:
18    Q         Okay.  And under the terms of this
19    contract, in the summer of --
20              Excuse me.  Strike that.
21              Under the terms of this contract from
22    February 2009, you are to be compensated $2,000
23    for each session for an eight-hour day up to 12.
24    Do you see that?
```

Charles Hanes, II, M.D.

```
 1    A         I do.

 2    Q         And do you think that you would have

 3    reached that maximum of 24,000 for that year?

 4    A         Yes.

 5    Q         Okay.  Let's look at the next page --

 6    MR. BARTON:

 7              Diane, can you hear me?  This is Jim.

 8    MS. WATKINS:

 9              Yeah, Jim.

10    MR. BARTON:

11              Just let me interrupt for one second,

12    because I may have misunderstood.  And I

13    apologize.  And I apologize for interrupting if I

14    have misunderstood.  But was the prior question

15    that you asked him whether he was a consultant

16    for Ethicon for the TVT family of products as

17    well as Prolift through the entire time he was a

18    consultant for Ethicon?  Because I don't --

19              That wouldn't be correct.  You weren't

20    a consultant for them on Prolift until it was --

21    until it was available; right?

22    THE WITNESS:

23              Yeah.  Till -- yeah, till after it was

24    available.  Yeah.
```

1    MR. BARTON:

2           Till after it was available.  And he

3    had asked and answered that previously.

4           Did I misunderstand your question and

5    his answer, Diane?  I just want to be sure you're

6    not miscommunicating.

7    MS. WATKINS:

8           No, I -- that's fair.  So I assume

9    we're still on the record.

10   Q      So, Doctor, from the time Prolift was

11   available to when it was not available, when you

12   were serving as a preceptor, was Prolift included

13   as one of the products that you were a preceptor

14   for?

15   A      Again, I would -- I would say,

16   basically, that's true.  But I didn't -- I did

17   not become a preceptor for Prolift immediately

18   upon its introduction to the market.  I was about

19   a year into it before I became a preceptor.

20   Q      Okay.  Fair enough.

21          And, then, on the consultant agreement

22   dated February 1st, 2009, if you don't mind

23   turning to the second-to-last page, at the top

24   it's paragraph 5, Advisory Board.

Charles Hanes, II, M.D.

```
 1    A          Yeah.

 2    Q          Let me know when you're there, Doctor.

 3               Okay.  And that states, in part,

 4    "Consultant shall participate in various opinion

 5    meetings organized throughout the year for

 6    ProfEd," which would be Professional Ed,

 7    "training."

 8               Do you see that?

 9    A          Yes.

10    Q          And it also states that "Company shall

11    pay consultant $2,000 per eight-hour day for each

12    such meeting."

13               Do you believe that you did serve as a

14    consultant in these Professional Ed trainings for

15    $2,000.00 per day?

16    A          Yes.

17    Q          And do you recall what your role would

18    be in those meetings?

19               The reason I ask, it seems to be

20    different than the preceptor paragraph.

21    A          Yeah.  I think it falls under two

22    categories.  One -- one would be meetings that

23    were out of town in other locations where they

24    would put on a bigger meeting and invite
```

Charles Hanes, II, M.D.

```
 1    potential user doctors to and have a large

 2    cadaver lab setting, and there would be a number

 3    of us preceptors who were there because of the

 4    volume of the -- the volume of attendants.

 5    Q        Okay.

 6    A        So that was one aptly -- one instance

 7    of that.  And, then, another, I presume, by

 8    ProfEd -- I'm not --

 9             Well, yeah.  ProfEd training.  Yeah.

10    So those were training meetings.  So that would

11    be it.  Yeah.  And there were a number of

12    locations over the years that I went to to help

13    put on those courses.

14    Q        Okay.  Were any of those overseas?

15    A        No.

16    Q        And, at the bottom of that page, the

17    very last section, "The Parties agree that the

18    compensation paid to consultant shall not exceed

19    20,000" -- strike that -- "shall not exceed

20    26,000 per year, except as may be mutually agreed

21    in writing by the parties."

22             Do you have an understanding or memory

23    of how much you would have received in 2009 with

24    respect to that 26,000?
```

Charles Hanes, II, M.D.

```
 1   A         I don't specifically, but I -- I think

 2   that I probably maxed out on most of the years.

 3   Q         Okay.  And, then, not to belabor this,

 4   but we have two more that we were able to find.

 5   So if you don't mind turning to the next

 6   consulting agreement, which is dated

 7   January 25th, 2010.

 8   A         Correct.

 9   Q         Which I think you told me we've marked

10   as Exhibit 11, I believe?

11   A         Yes.

12   Q         And if you don't mind turning to -- in

13   the bottom right corner, it ends with 598, and it

14   is four pages from the back.

15   A         Yeah.  Is that the Services and Fees

16   again?

17   Q         Yes, uh-huh.

18   A         Okay.

19   Q         Paragraph 1 is the Company-sponsored

20   Speaker Program, which is checked "yes" now, and

21   it says, "Consultant shall make such

22   presentations on two occasions.  The presentation

23   will review pelvic floor repair and stress

24   urinary incontinence."
```

Charles Hanes, II, M.D.

```
 1              Do you see that?

 2    A         Yes.

 3    Q         And do you -- do you have a memory as

 4    to what those speaker programs would have

 5    involved?

 6    A         Those were where I was invited to go

 7    out of town and make a presentation to a

 8    physician group.

 9    Q         And looks like that, for each such

10    speaking engagement, you were paid $3,000 per

11    eight-hour day plus out-of-pocket expenses.

12    Correct?

13    A         Correct.

14    Q         Okay.  And it also states in that

15    paragraph that there were two occasions that you

16    were to do that, which would obviously be $6,000.

17    Do you think that you would have maxed out that

18    6,000?

19    A         Gosh, I -- you know, I don't know.

20    I -- I mean, when I think back on it, I can only

21    think of a couple of occasions where I went out

22    of town.

23              Well, yeah.  Maybe two or three or four

24    where I actually went out of town to do something
```

```
 1   like that.  So --

 2   MR. BARTON:

 3             Over all the years?

 4   THE WITNESS:

 5             Yeah, over all the years.

 6   MS. WATKINS:

 7   Q         On those occasions you were paid the

 8   $3,000.00 per day plus out-of-pocket expenses?

 9   A         I presume, yes.

10   Q         And you were still, if you look under

11   paragraph 4, still doing the preceptor work, but

12   in this year it looks like you had 16 occasions,

13   paid at $3,000.00 per session.  Do you see that?

14   A         Yeah.  I do.  I had forgotten that --

15   Q         Did you want to --

16   A         Yeah.  I had forgotten that they went

17   up on --

18   Q         Yeah.  I guess due to inflation, maybe.

19   Do you think that you would have maxed that out

20   for the 16 sessions at 3,000 per session?

21   A         I -- I would guess I did.

22   Q         Okay.  And if you don't mind turning to

23   the next page --

24   MR. BARTON:
```

Charles Hanes, II, M.D.

1           Now, you're not supposed to guess.  So

2    if you don't remember, say you don't remember.

3    But don't guess.

4    MS. WATKINS:

5    Q          It looks like you were also, under

6    paragraph 8, it states, "Consultant shall perform

7    other services designated below for dollar amount

8    varies per hour," and it includes Faculty

9    Training Meetings and Educational Summit/Forums.

10   Negotiated rate to be no more than the maximum of

11   $375 rate/per hour."

12           Do you see that?

13   A          I do.

14   Q          Okay.  And I assume those would have

15   been the TVT family of products and the Prolift

16   products.  Is that correct?

17   A          It would be.

18   Q          Okay.  And, then, the last line of that

19   page states, "The parties agree that compensation

20   paid to consultant shall not exceed $60,000 per

21   year except as may be mutually agreed in writing

22   by the parties."

23           Do you think that you would have maxed

24   out that $60,000 per year in 2010?

Charles Hanes, II, M.D.

```
 1   A          I don't think I -- I don't think I ever
 2   got that much.  But I -- I don't know for sure.
 3   Q          Do you have a memory as to the maximum
 4   amount per year, when you were working as a
 5   consultant for Ethicon, that you would have
 6   received?
 7   A          No, I don't.
 8   Q          Do you think that at any point you
 9   would have received $60,000 per year from Ethicon
10   working as a consultant?
11   A          Like I said, I don't -- I don't -- I
12   don't recall ever receiving that much.  That
13   seems like more than --
14              I could be wrong, but I don't remember
15   that.
16   Q          Okay.  You can set that aside, and
17   we'll go to the last one, which is dated
18   February 1st, 2011.
19   A          Yes.
20   Q          Okay.  And if you don't mind going to
21   that Exhibit A, which in the bottom right corner
22   is -- page is 267.
23   A          Okay.
24   Q          Again, company-sponsored speaking --
```

Charles Hanes, II, M.D.

1    speaker programs is checked, and it states that

2    you shall make presentations on three occasions

3    for $3,000.00 per eight-hour day plus

4    out-of-pocket expenses.

5           Do you believe that you would have

6    maxed out those three occasions for 2011?

7    A       I don't think so.

8    Q       Okay.  Well, why do you think that's

9    not the case?

10   A       I just don't recall doing three

11   out-of-town meetings to -- for educational

12   purposes.  I -- I don't -- I don't recall ever

13   doing that.  I --

14          When I think back on it, you know, I

15   can -- I can recall maybe three or four times

16   over the course of the entire time that I went

17   out of town to do a presentation.

18   MR. BARTON:

19          And how many years was that?

20   THE WITNESS:

21          Over a period of --

22   MS. WATKINS:

23   Q       And, then, under the preceptor portion,

24   it looks like, for the year 2011, "Consultant

Charles Hanes, II, M.D.

1    shall allow such visits on up to 12 occasions and

2    the company shall pay consultant $3,000 for each

3    session per eight-hour day."

4              Do you believe that you would have done

5    the 12 occasions at $3,000 per session?

6    A        I think so.

7    Q        Okay.  And, if you don't mind, Doctor,

8    please turn to the next page.  Under Paragraph B,

9    it says that your compensation paid to consultant

10   shall not exceed $51,000 per contract term.  Do

11   you believe that you would have maxed out the

12   51,000 in 2011?

13   A        I don't think so.  I don't think I

14   reached that number.

15   Q        Okay.  And, then, you mentioned that

16   you were also a consultant with Ethicon in 2012.

17   Do you recall your role -- we cannot find a

18   contract for that.  Do you recall your role as a

19   consultant for Ethicon in 2012?

20   A        Well, now, I'm not -- I'm not sure if I

21   actually did any consulting in 2012.  My -- my

22   recollection is that the preceptor relationship

23   terminated either late in 2011 or early in 2012.

24   And I can't remember.

Charles Hanes, II, M.D.

```
 1   Q        Okay.  Is there a reason why it

 2   terminated?

 3   A        Well, that was when the products, the

 4   Prolift products were removed from the market.

 5   And by that time, there really wasn't any need

 6   for training on the TVT products because they had

 7   been so universally adopted.  It'd become

 8   products of choice and, you know, in a lot of

 9   people's view, the gold standard.

10   Q        Okay.  And I should have asked you this

11   at the beginning of this line of questioning, but

12   what led to you becoming a consultant for

13   Ethicon?

14   A        I'm sorry.  What?

15   Q        What led to you becoming a consultant

16   for Ethicon?  Like, how did that come about?

17   A        That came about because, very early on

18   after the introduction of the product, I -- I

19   got -- I can't remember exactly, but I think that

20   I went to a meeting and I was -- was very

21   infatuated with the concept, and I ended up going

22   to a company-sponsored cadaver lab for training

23   purposes, and I quickly embraced the product

24   because at that point in time the incontinence
```

## Charles Hanes, II, M.D.

```
 1    procedures I was doing were the Burch procedures
 2    through open incision, and I also had done a few
 3    laparoscopic Burches.
 4            But -- but the simplicity of the TVT,
 5    the midurethral sling, that whole concept was so
 6    appealing because of being minimally invasive,
 7    and the preliminary data that was coming out of
 8    Europe that was available to us was very
 9    encouraging in terms of efficacy.
10            And, so, I got on board pretty quickly.
11    And, because of that, I -- and I -- I was asked
12    and I expressed an interest in becoming a
13    preceptor just because I believed so much in the
14    product.
15            As soon as I began using it, the
16    feedback I was getting from my patients totally
17    reinforced all of the good reports that I was --
18    I was hearing.  And, so, I was pretty
19    enthusiastic about it.
20    Q       Okay.  And have you been a consultant
21    for any other transvaginal mesh company?
22    A       I have not.
23    Q       Okay.  If you guys are okay with it,
24    we've been going about an hour and 20 minutes.
```

Charles Hanes, II, M.D.

```
1    Maybe we can take a 5-minute break for the
2    bathroom?
3    A        Sure.
4    Q        Okay.  I'll be back in five.
5                  (BRIEF RECESS.)
6    MS. WATKINS:
7    Q        Okay, Doctor.  We're back on the record
8    from a short break.  And I asked you some
9    questions at the beginning of the deposition
10   about a supplemental general materials list that
11   I was served with a couple of days ago.  And, as
12   we sit here today, it's my understanding that you
13   have not seen that.  Is that correct?
14   A        Oh, no.  I've seen the general
15   materials list.
16   Q        Okay.  I received a supplemental one.
17   A        Oh, the supplemental.  Yeah.  No, I --
18   I don't think I've seen that.
19   Q        Okay.  So, as we sit here today, your
20   general materials list is your reliance list;
21   correct?
22   A        Correct.
23   Q        And does it include everything that you
24   are relying on in forming your general causation
```

Charles Hanes, II, M.D.

1    opinions in this litigation?

2    A       It does.

3    Q       Did you prepare that reliance list?

4    A       No, I did not.

5    Q       Do you have an understanding as to who

6    prepared it?

7    A       I believe it was prepared by Butler

8    Snow, but I -- I'm not certain.

9    Q       Okay.  Is it your understanding that

10   Butler Snow picked the materials listed on the

11   reliance list?

12   MR. BARTON:

13           What was the question?

14   A       Say -- repeat that, please.

15   MS. WATKINS:

16   Q       Yes.

17           Do you have an understanding as to who

18   picked the materials listed on the reliance list?

19   A       I don't -- I don't know who -- who was

20   responsible for that.

21   Q       Have you reviewed every item on the

22   materials list?

23   A       No.

24   Q       Did you review any Ethicon corporate

Charles Hanes, II, M.D.

```
 1   documents in forming your general causation
 2   opinions?
 3   A        I did not specifically review any
 4   Ethicon documents.
 5   Q        Did you review any depositions in
 6   forming your general causation opinions in this
 7   litigation?
 8   A        I reviewed some of the other general
 9   reports, general expert reports on these
10   products.  I did.
11   Q        Okay.  Did you review any deposition
12   testimony?
13   A        In preparing these documents, no, I did
14   not.
15   Q        Okay.  Bear with me, Doctor.
16            Did you ask to see any Ethicon
17   corporate documents before preparing your general
18   causation reports?
19   A        No.
20   Q        Did you ask to review any depositions
21   of any corporate witnesses before preparing your
22   reports?
23   A        No.
24   Q        Have you at any point reviewed any
```

1  medical literature that has called into question

2  the safety of Ethicon transvaginal mesh products?

3  A        I've reviewed tons of literature that

4  have referred to the products, as well as

5  potential problems and complications, just in the

6  course of my career, yes.

7  Q        Okay.  Have you reviewed any medical

8  literature that indicates that, after a proper

9  implantation, the mesh used in Ethicon's TVT-O

10  and Prolift products can degrade?

11  A        I've seen claims to that effect, but I

12  have not --

13          Well, I've seen some of the plaintiffs'

14  expert witnesses' reports that have alleged that.

15  I -- in my personal experience, I -- I don't

16  believe any of that.  It just doesn't hold water

17  with me.

18  Q        Okay.  So, just so that I have an

19  understanding, as far as medical literature, have

20  you seen any medical literature indicating that

21  Ethicon's mesh can degrade after a proper

22  implantation?

23  A        No, I have not.

24  Q        Have you seen any medical literature

Charles Hanes, II, M.D.

```
 1    indicating that a properly placed Ethicon mesh

 2    product can rope or curl after implantation?

 3    A         I can't say that I've seen any

 4    literature that has said that.

 5    Q         Have you seen any medical literature

 6    indicating that a properly placed Ethicon mesh

 7    product can shrink or contract after

 8    implantation?

 9    A         You know, I can't specifically recall

10    that.  As I mentioned earlier, those were

11    certainly points of discussion.  But I -- I can't

12    recall a specific article, for example, that

13    would have elaborated on that.

14    Q         Okay.  Have you reviewed any medical

15    literature indicating that a properly placed

16    Ethicon mesh product can migrate after

17    implantation?

18    A         No.

19    Q         Have you seen any medical literature

20    indicating that a properly placed Ethicon mesh

21    product can bunch up after implantation?

22    A         No.

23    Q         And only two more.  Have you seen any

24    medical literature indicating that a properly
```

```
 1    placed Ethicon mesh product can harden or stiffen
 2    after implantation?
 3    A       No.
 4    Q          Have you seen any medical literature
 5    indicating that a properly placed Ethicon mesh
 6    product can fray after implantation?
 7    A       No.
 8    Q          Switching gears slightly, do you know
 9    whether the mesh used for the TVT line of
10    products is mechanical cut, laser cut, or both?
11    A       Yes.
12    Q          Okay.  What is your understanding as to
13    that?
14    A          Well, the mechanical cut is -- is,
15    like, cut with scissors or a knife; whereas,
16    laser cut uses a laser.  The mechanical cut has
17    edges that aren't necessarily intact.  They may
18    have loose ends on the edges.  Whereas, the laser
19    cut is -- it doesn't.  All the edges -- each
20    little fiber comes together.  And there are
21    properties of -- the laser cut's generally a
22    little bit stiffer in its physical properties.
23    But those are the main things that stand out to
24    me.
```

Charles Hanes, II, M.D.

```
 1   Q        Do you have an understanding as to

 2   whether there's any difference with respect to

 3   the risks associated with a mechanical cut versus

 4   laser cut?

 5   A        I am not aware, and I don't believe

 6   there are any difference in risks.

 7   Q        And if I were to ask you the same thing

 8   with respect to the Prolift product, would your

 9   answers be the same?

10   A        Yes.

11   Q        Okay.  Have you reviewed any Ethicon

12   corporate documents indicating that physicians

13   reported to Ethicon that its mechanical-cut mesh

14   had properties similar to a Scotch Brite pad?

15   A        I haven't seen anything to that effect.

16   Q        Okay.  Have you reviewed any medical

17   articles that have discussed the edges of the TVT

18   and Prolift mesh being abrasive and sharp?

19   A        Say the question again, please.

20   Q        Sure.

21            Have you reviewed any medical articles

22   that have discussed the edges of the TVT and

23   Prolift mesh being abrasive and sharp?

24   A        I have not seen any medical literature
```

Charles Hanes, II, M.D.

1   that says that.

2   Q        Okay.  I want to switch gears a little

3   bit and talk about your own use of transvaginal

4   mesh products.  Over the course of your practice,

5   what transvaginal mesh products have you used to

6   treat stress urinary incontinence and pelvic

7   organ prolapse in women?

8   A        I've used the Ethicon products;

9   specifically, the retropubic TVT, the TVT EXACT,

10  the TVT-O, the TVT ABBREVO.  I used the TVT SECUR

11  briefly.

12           And then I have used some of the other

13  products.  Like, I believe I tried the

14  single-incision AMS product.  And I can't

15  remember the brand name of that.  But I didn't --

16  I didn't like it.  I -- I may have --

17           And, then, I am currently using a

18  product by Coloplast that's called the Altus

19  midurethral sling.

20  Q        Okay.  And have you used any

21  transvaginal mesh product to treat pelvic organ

22  prolapse?

23  A        I've used the Prolift products, all of

24  the Prolift products, anterior, posterior, total,

Charles Hanes, II, M.D.

1    Prolift, Prolift + M.  I've used the Boston

2    Scientific Uphold.  I have tried the Boston

3    Scientific -- I think it was the Pinnacle, maybe.

4              But, again, I -- any deviation I made

5    from the Prolift products was really just

6    experimental to see whether or not I felt like

7    they were as good as the Prolift products.  And,

8    so, I --

9              But that was the extent of it.  I

10   thought the Prolift products were excellent

11   products and did what I expected them to do and

12   gave me the results that I expected them to give.

13   Q        And when was the last time you

14   implanted a product from the TVT line of

15   products?

16   A         Probably within the last several

17   months.

18   Q        And you mentioned that you currently

19   implant the Coloplast Altus.  Is that your first

20   choice currently in treating stress urinary

21   incontinence in women --

22   A        It is.

23   Q        -- currently?

24   A        Yes.

Charles Hanes, II, M.D.

```
 1    Q          Why is that?

 2    A          It's because it's a single-incision

 3    sling, which I had totally sworn off until it

 4    came on the market, because I had tried

 5    periodically -- I tried the TVT SECUR, I tried

 6    this AMS product, and I didn't like them because

 7    they were not adjustable.  In other words, you

 8    could insert them and tighten them up, but if you

 9    determined that they needed to be looser, you

10    couldn't loosen them without taking them out.

11               And this Altus sling is a totally

12    adjustable midurethral sling that's in the same

13    conformity as a transobturator approach, and you

14    can tension it or loosen it.  So it has

15    everything I like, and it's minimally invasive.

16    It's -- I had --

17               My product of choice had become the TVT

18    ABBREVO, which I think is an excellent product,

19    as I also think the TVT EXACT is an excellent

20    product.  But -- but the Coloplast, because of

21    its even less-invasive properties, is why I have

22    embraced it.

23    Q          Okay.  In your current practice, what

24    treatment --
```

Charles Hanes, II, M.D.

```
 1              Well, strike that.

 2              In your current practice, what surgical

 3     treatment options do you use to treat pelvic

 4     organ prolapse?

 5     A        I use a variety.  I use -- if it's a

 6     reconstructive procedure, then I -- the native

 7     tissue repairs that I do are the anterior and

 8     posterior colporrhaphies, the apical suspension

 9     procedures or uterosacral ligament suspension,

10     and sacrospinous ligament suspension.

11              And then I do, if I feel like mesh is

12     appropriate, then I do a sacrocolpopexy that I do

13     transvaginally.

14     Q        Okay.  Do you also do abdominal

15     sacrocolpopexies?

16     A        I don't.

17     Q        Okay.  Why is that?

18     A        Because the vaginal sacrocolpopexy is

19     better.

20     Q        Okay.  And can you explain why it's

21     better?

22     A        Yeah.  That's a very biased statement.

23     But it, in my opinion, it's -- it is better

24     because it's a more direct, less invasive
```

Charles Hanes, II, M.D.

```
 1    procedure, shorter operating times, less

 2    morbidity, and gives full access to the anterior

 3    and posterior compartments, as well as the apex,

 4    so that a concurrent anterior/posterior repair

 5    becomes a natural part of the procedure.

 6    Whereas, with the abdominal approach, most

 7    people, if they need an additional rectocele

 8    repair, for example, they would do their

 9    abdominal colpopexy and then come below and do a

10    separate incision for the rectocele repair.  So

11    that --

12              That's pretty much my answer.  I mean,

13    I think -- I think it's a superior operation.

14    Q        Okay.  And do you, out of those

15    treatment options, do you consider one of them to

16    be the gold standard for the treatment of pelvic

17    organ prolapse in women?

18    A         Well, I think your question needs to be

19    more specific as to where the prolapse is.  I

20    mean, if it's --

21              I don't know if you want to specify.  I

22    mean, the heart of prolapse repair is the apex.

23    And I -- I presume that you're comfortable with

24    that.  I mean, you can do anterior and posterior
```

Charles Hanes, II, M.D.

```
 1   repair, and everybody does.  But, you know, if

 2   the apex is not well suspended, then your

 3   repair's gonna fail.

 4           So, in my opinion, the way I would

 5   answer your question is limiting it to apical

 6   repairs, apical suspensions.  And I think the

 7   gold standard is universally recognized as the

 8   sacrocolpopexy.

 9   Q       Okay.  And is that treatment option as

10   effective as the Prolift product?

11   A       I think it's as effective, yes.

12   Q       And is it as safe as the Prolift

13   product?

14   A       I think that they're all safe,

15   relatively safe.  I mean, you know, every

16   operation has its peculiarities, and -- but I --

17   in my -- in my hands and in my experience,

18   they're all -- the safety profile is very

19   acceptable.

20   Q       Okay.  Are there risks associated with

21   the Prolift product that are not associated with

22   the sacrocolpopexy?

23   A       You know, that's a --

24           Yeah.  I think every operation has
```

Charles Hanes, II, M.D.

```
 1   peculiarities, specific nuances that may make its

 2   risks a little bit different.  But, all in all, I

 3   would say the risks are very comparable between.

 4   Q        Hello?

 5   A        I -- you want me to go a little bit

 6   further into that?

 7   Q        Oh, no.  I'm sorry.  I didn't know if

 8   the phone cut out.  I just wanted to make sure

 9   you were done with your answer, Doctor.

10   A        So I -- I think that, you know, the

11   risks associated with Prolift are risks that are

12   pretty much associated with any -- with the

13   sacrocolpopexy, for example.  I think -- I think

14   they're very comparable.

15            In fact, actually, let me -- let me

16   back up a little bit.  I think that in today's

17   world, and, actually, in the world that we were

18   in during those years of Prolift, the abdominal

19   sacrocolpopexy was frequently done as an open

20   procedure.  The laparoscopic approach was done by

21   those who were well trained and able to do

22   laparoscopic -- complex laparoscopic surgery with

23   the knot tying.  The robot hadn't really come

24   into play.
```

Charles Hanes, II, M.D.

```
 1              So I would say that the large majority

 2    of sacrocolpopexies at that point in time were

 3    done as -- through open incisions.  And,

 4    therefore, the morbidity associated with that was

 5    significantly higher -- significantly higher --

 6    than the Prolift procedures.

 7              Prolift, because it's minimally

 8    invasive compared to the sacrocolpopexy, had a

 9    much lower morbidity.

10    Q        Okay.  Is a risk associated with

11    Prolift that is not associated with the

12    sacrocolpopexy mesh erosion?

13    A        No.  You could have mesh erosions with

14    sacrocolpopexy, too.

15    Q        Okay.

16    A        Yeah.  That's a very accepted risk.

17    Q        Okay.  In your current practice, we

18    talked about some of the transvaginal mesh

19    treatment options you use to treat stress urinary

20    incontinence, but do you have any other treatment

21    options that you use to treat stress urinary

22    incontinence?

23    A        I occasionally will do a Burch

24    procedure, but I probably don't do more than
```

Charles Hanes, II, M.D.

```
 1    one -- one a year, if that.

 2    Q         Is the Burch procedure a safe surgical

 3    treatment option to treat stress urinary

 4    incontinence in women?

 5    A         It's -- well, it's -- I mean, when you

 6    say "safe," it -- it has its own set of potential

 7    complications.  It's much more invasive than the

 8    midurethral sling, and, because of that, it's not

 9    as safe, I guess --

10              I mean, if safe includes increased

11    morbidity, which, in my mind, it does, then I

12    would say it's not as safe as a midurethral

13    sling.

14    Q         But, just generally speaking, is it a

15    safe procedure that you feel comfortable using to

16    treat stress urinary incontinence in your

17    patients even though it's --

18    A         Yes.

19    Q         -- infrequently?

20              Okay.  Do you keep a patient registry

21    for the patients in whom you have implanted

22    transvaginal mesh products?

23    A         No.

24    Q         So is it fair to say that you can't say
```

Charles Hanes, II, M.D.

1    with accuracy what your complication rates are

2    with respect to the transvaginal mesh products

3    that you have implanted?

4    MR. BARTON:

5            Object to the form.

6    A        Yeah.  I -- I would not be able to

7    hazard a guess on what my complication rate is.

8    I think it's -- it's a -- you know, it would be

9    considered a very acceptable rate, but I -- I

10   don't know specifically what it would be.

11   MS. WATKINS:

12   Q        Okay.  In your practice, do you perform

13   mesh excision procedures?

14   A        I do.

15   Q        Okay.  And do you perform mesh revision

16   procedures?

17   A        I do.

18   Q        And just for the sake of the jury, can

19   you explain the difference between an excision

20   procedure and a revision procedure?

21   A        Certainly.  A revision procedure would

22   be a procedure where there may be a --

23           Two, I guess, cases that would be

24   representative would be a small mesh exposure in

Charles Hanes, II, M.D.

```
 1    which case you could excise that exposure and

 2    then close the tissue back over that defect and

 3    leave the bulk of the mesh to do the job and

 4    provide the function for which it was implanted;

 5    whereas, a --

 6              What was the term you used for --

 7              Was it a --

 8    Q       A revision?

 9    A       Versus --

10    Q       Excision.

11    A       Excision.  So the excision would be

12    where the product was being removed or at least a

13    significant part of the product was being

14    removed.  And the most notable examples of that

15    would be if there were -- for example, with

16    the -- with the midurethral sling, if the sling's

17    too tight and the patient's complaint is

18    difficulty emptying her bladder, then one of the

19    things that we do is just go in and transect the

20    sling, which loosens it a little bit, but it

21    leaves the bulk of it -- leaves the entirety of

22    it in, but just loosening it that way usually

23    provides relief to where they're voiding normally

24    but preserves the function of preventing stress
```

```
 1    incontinence.

 2    Q          Okay.  And do you have an estimate as

 3    to how many mesh excision procedures you have

 4    performed?

 5    A          I don't.

 6    Q          Do you think it's over a hundred?

 7    A          Yes.

 8    Q          Over two hundred?

 9    A          Well, probably.  But I -- you know,

10    over the course of years, I really don't have an

11    accurate way to estimate that.

12    Q          Okay.  But you think it's --

13    A          Certainly over a hundred.

14    Q          Okay.  And what about mesh revision

15    procedures?  Do you have an estimate as to how

16    many of those you've performed?

17    A          That would be over a hundred as well.

18    Q          Okay.  And do you believe that you have

19    excised and revised mesh from both the TVT line

20    of products and the Prolift line of products?

21    A          I have.

22    Q          Okay.  And what are the reasons, in

23    your practice, why you've recommended mesh

24    excision and revision procedures to your
```

Charles Hanes, II, M.D.

```
 1   patients?

 2   A          Well, it goes back to my answer

 3   earlier.  There are a variety of reasons.  It can

 4   be difficulty voiding.  It could be mesh

 5   exposure.  It could be discomfort or pain with

 6   intercourse.  I think those would be -- those --

 7   that would represent the majority of reasons.

 8   Q          Okay.  And this is a little bit of a

 9   similar question, and I apologize if it seems

10   somewhat repetitive, but what complications

11   caused by transvaginal mesh have you seen in your

12   practice?

13   A          Are you referring to operative

14   complications or postoperative complications?

15   Q          Postoperative complications.

16   A          Okay.  So I would say those primarily

17   fall into those categories that I just said,

18   either mesh exposure, voiding dysfunction, which,

19   again, is just difficulty urinating because the

20   -- a sling may be in too tight, or pain --

21   usually pain with intercourse.

22   Q          Have you, in your practice, seen just

23   pelvic pain, separate and apart from pain with

24   intercourse, as a complication associated with
```

Charles Hanes, II, M.D.

1    transvaginal mesh?

2    A         I have, yes.

3    Q         Okay.  And you mentioned voiding

4    dysfunction due to the product's being too tight.

5    Is it your opinion that in those cases that is

6    surgeon error, or can the product become too

7    tight after implantation?

8    A         I think it's mostly where it was

9    probably put in a little bit too tight.  I think

10   it's -- I think that's the usual.  I don't

11   think -- I'm not sure that I've seen -- or, if I

12   have, it's been very, very rare where somebody's

13   had a sling in for a period of time that's worked

14   optimally and then suddenly had a voiding

15   difficulty.

16   Q         Do you agree that a woman can develop

17   mesh complications five or more years after

18   implantation?

19   A         I think the literature says -- it

20   supports that mesh erosions can occur over time,

21   and I think that's usually related to other

22   factors, like vaginal atrophy.  It can be related

23   to -- well, I guess vaginal atrophy is probably

24   the biggest one.  And I think smoking also is a

Charles Hanes, II, M.D.

```
 1   risk factor for delayed exposures.  So I think

 2   there are some variables that enter into that.

 3   Q          Okay.  Do you agree that a woman can

 4   develop mesh complications ten or more years

 5   after implantation?

 6   A          Well, the time frame, I don't -- I

 7   don't think -- I'm not aware that there's

 8   anything saying what number of years.  I mean, I

 9   think it can happen probably any time.  Again,

10   it's a function of things that, in my -- in my

11   mind, are not mesh-related.  They're more related

12   to other things, like vaginal atrophy.

13   Q          Do you agree that it is difficult to

14   fully remove a transvaginal mesh device from a

15   woman's body?

16   A          I think it's -- I think it's a surgical

17   procedure that sometimes can be very difficult.

18   But I think that, in my -- in my hands, I feel

19   very comfortable removing whatever needs to be

20   removed and feel like if I need to remove it, I

21   can get it.  You know, it's not like -- it's not

22   like you do an operation and it's suboptimal and

23   that you can't get the mesh that you've gone to

24   get.  Sometimes it takes longer, it's more
```

Charles Hanes, II, M.D.

1    technically difficult, but I --

2             In other words, I find reports of

3    patients who've had mesh excision procedures

4    that -- where it hasn't been removed.  And I

5    think that's a function of an inadequate surgery.

6             But I think that if somebody knows what

7    they're doing and how to do it, that it should be

8    able to be done.

9    **Q        Okay.  Have you ever been able to fully**

10   **remove a transvaginal mesh device from a**

11   **patient's body?**

12   A        I have fully removed on maybe two

13   occasions that I can think of where I actually

14   did it through combined incisions of vaginal and

15   retropubic in one case and vaginal and groin

16   incisions in another case.  But those were very

17   unusual, and I -- I find -- I find that that is

18   totally unnecessary.  And I think the -- I think

19   that the bulk of opinion from physicians who do

20   this kind of surgery would say you remove that

21   part of the mesh that's in contact with the

22   vagina, and as far as dealing with the arms that

23   go distal to -- to the -- to the vagina, there's

24   no merit in removing that.

Charles Hanes, II, M.D.

```
 1   Q         Okay.  With respect to the two

 2   procedures in which you fully removed a

 3   transvaginal mesh device, would you consider them

 4   complicated procedures?

 5   A         Not -- no, not necessarily.  No.

 6   Q         Okay.  Would you consider them complex

 7   procedures?

 8   A         No.

 9   Q         Okay.  Bear with me, Doctor.  I'm going

10   through my outline here.

11             Is chronic pelvic pain a risk of the

12   TVT line of products?

13   A         Chronic pelvic pain is a risk of any

14   vaginal surgery, any pelvic reconstructive

15   surgery.  So it is one of those acceptable risks

16   that goes along with this -- this specialty.

17   Q         Is the same true with respect to the

18   Prolift product?

19   A         Yes.

20   Q         Okay.  Are there risks associated with

21   the presence of a properly placed Ethicon

22   transvaginal mesh product within a woman's

23   pelvis?  What I mean by that is are there risks

24   associated with the presence of the product
```

Charles Hanes, II, M.D.

1   **separate and apart from the cervical procedure?**

2   A        Well, I think what you're alluding to,

3   is there a risk of mesh as opposed to no mesh in

4   a surgical procedure?  Is that another way of

5   asking that question?

6   Q        I think so.  **I think we're basically on**

7   **the same page.  I guess my question is:  Is the**

8   **presence of the polypropylene mesh from Ethicon's**

9   **product within a woman's pelvis associated with**

10  **any risk to the woman, separate and apart from --**

11  MR. BARTON:

12          I'm gonna object to the form.

13  A        I think -- I think the use of mesh

14  carries its own set of potential problems, which

15  we've alluded to earlier, in that there's a risk

16  of mesh exposure.  There's, you know -- there are

17  some inherent risks associated with the use of

18  mesh, yes.

19  MS. WATKINS:

20  Q        Okay.  **And I don't mean to cover ground**

21  **we've already talked about, but you mentioned**

22  **exposure.  Can that also include erosion into**

23  **surrounding organs?**

24  A        It can include that.  I've never

Charles Hanes, II, M.D.

```
 1    seen --
 2            Well, no.  I take it back.  I've seen a
 3    mesh in the urethra.  But I don't think -- I do
 4    not think that that was a function of migration
 5    of the mesh.  I think it was a function of an
 6    improper insertion.  So --
 7    Q       Okay.
 8    A       -- I don't -- I don't believe -- I know
 9    that there are reports of mesh in organs and, you
10    know, that's something that can happen.  But I
11    think it happens as a result of improper
12    implantation.
13    Q       Okay.  So do you believe that there
14    are --
15            Well, strike that.
16            Do you believe that a properly placed
17    Ethicon transvaginal mesh product can cause
18    complications for a woman after implantation?
19    A       Well, we've talked about that a little
20    bit in that, you know, you asked about delayed
21    erosions down the road.  So, yes.
22    Q       Okay.  Anything aside from delayed
23    erosions?
24    A       I think --
```

Charles Hanes, II, M.D.

1    MR. BARTON:

2                Object to the form.

3    A        I think that's the -- the primary one

4    that would be a remote complication, yes.

5    Q        Can a properly placed Ethicon

6    transvaginal mesh product cause urinary

7    dysfunction after implantation?

8    A        Yeah.  Again, I mean, we -- we

9    mentioned that.  That would be the reason that we

10   would do a sling revision --

11   Q        Okay.

12   A        -- where the mesh was inserted and it's

13   too tight.

14   Q        Can a properly placed Ethicon

15   transvaginal mesh product cause chronic pelvic

16   pain for a woman?

17   A        It can.  But, again, I think that that

18   goes back to, a lot of times, to the insertion

19   where it was under too much tension to begin

20   with.

21   Q        Okay.  Have you reviewed any medical

22   literature that has discussed fibrotic bridging

23   or scar plate formation around transvaginal mesh

24   after it's been implanted?

Charles Hanes, II, M.D.

1    A          I'm familiar -- I'm familiar with that,

2    yes.  I can't say that I've -- I can't say that

3    I've seen any articles that specifically address

4    that.

5    Q          So you've seen it in your practice?

6    A          I've seen -- yeah.  I've seen patients

7    who have had issues with some --

8               I can't remember what the terminology

9    you used, where --

10   Q          I used fibrotic bridging and scar plate

11   formation.

12   A          Fibrotic.  Yeah.  And I think that

13   usually is a function of the mesh being put in

14   under too much tension.

15   Q          Okay.  And can scar plate that forms

16   around mesh inside a woman's vagina cause chronic

17   pelvic pain?

18   A          It can.  But, you know, I don't --

19   I'm -- I'm not sold on the scar plate issue.  I

20   think that with the large-pore monofilament

21   meshes that are in the Ethicon products, I'm

22   not -- I have not personally seen a scar plate.

23   And, now, I've seen it on other products, but I

24   don't think I've seen that on the Gynemesh or

Charles Hanes, II, M.D.

```
 1   Gynemesh PS.

 2   Q          Okay.  Do you have an understanding as

 3   to whether there are differences in the pore size

 4   between the mesh for the Ethicon product versus

 5   the Coloplast Altus product?

 6   A          Yeah.  I'm aware of that.

 7   Q          Okay.  What is the difference in pore

 8   size, if any?

 9   A          The Ethicon mesh has a considerably

10   larger pore size.

11   Q          Than the Altus?

12   A          Than the Altus, yeah.

13   Q          Okay.  And do you have an understanding

14   as to what the pore size of the Ethicon mesh is?

15   A          You know, I -- I don't specifically

16   know, but I know that it's greater than 75

17   microns, because that's kind of the -- that's

18   kind of the standard for it becoming a

19   macroporous mesh.  And it's considerably larger

20   than 75 microns.

21   Q          Okay.  Do you have an understanding of

22   the weight of the Ethicon mesh?

23   A          It's --

24   MR. BARTON:
```

Charles Hanes, II, M.D.

```
 1              Object to the form.

 2    A        It -- you know, that's all --

 3              I don't -- I don't know in terms of

 4    grams per square meter, which I think is the

 5    standard for measurement.  But I think it's in

 6    the intermediate category between lightweight and

 7    heavyweight.

 8    MS. WATKINS:

 9    Q        Okay.  And do you have an understanding

10    as to the flexibility or stiffness of the Ethicon

11    mesh?

12    MR. BARTON:

13              Object to the form.

14    A        I don't -- I don't know any of the --

15    enough about that to really be able to comment.

16    MS. WATKINS:

17    Q        Okay.  Have you done any lunch or lab

18    research related to polypropylene?

19    A        Have I done any lab research related?

20    Q        Yes.

21    A        I have not.

22    Q        Do you consider yourself an expert on

23    polypropylene?

24    A        I -- I consider that I have
```

Charles Hanes, II, M.D.

```
 1    considerable expertise, based on my experience
 2    and based on the multiple laboratory training and
 3    educational events that I've been to.
 4    Q         Okay.  But do you agree that you are
 5    not an expert in materials science?
 6    A         I -- again, I would say that I have
 7    considerable expertise.  I mean, where do you
 8    draw the line of being an expert?  I don't know
 9    where that line would be.
10    Q         Okay.  Have you reviewed the design
11    specifications for the TVT line of products?
12    A         By design specifications, I think I'm
13    very familiar with those, based on the training
14    and the corporate events that I attended.  They
15    went into considerable detail about the design
16    aspects.
17    Q         Okay.  Would the same be true with
18    respect to the Prolift product?
19    A         Yes.
20    Q         And are you an expert in warnings?
21    A         In what?
22    Q         Warnings.
23    A         Warnings?
24    Q         Yes.
```

Charles Hanes, II, M.D.

```
 1   A          Like in the IFU?  Are you referring to

 2   that?

 3   Q          Yes.

 4   A          Yeah, I would say --

 5              Again, I mean, I would draw the line.

 6   I have considerable expertise because I -- in the

 7   course of training doctors, we discuss those

 8   repeatedly.

 9   Q          Okay.  Have you ever been --

10              Well, strike that.

11              Have you ever drafted a warning for a

12   medical device or pharmaceutical company's

13   product?

14   A          No, I have not.

15   Q          Are you an FDA regulatory expert?

16   A          I'm not -- I would go back and frame

17   that as I'm very familiar and feel like I have

18   some expertise in FDA dealings.  But, again, to

19   say I'm an expert, I don't know where you draw

20   the line on that.

21   Q          Okay.  Have you personally interacted

22   with the FDA with respect to any medical devices

23   or pharmaceutical products?

24   A          No.
```

Charles Hanes, II, M.D.

```
 1   Q        Okay.  Have you published any medical

 2   literature about any of Ethicon's products?

 3   A        No.

 4   Q        Okay.  I'm almost done, Doctor, so bear

 5   with me here.

 6   MS. WATKINS:

 7            Lois, do you mind marking as -- I guess

 8   it would be Exhibit 13, maybe?

 9   THE COURT REPORTER:

10            Yes, ma'am.

11   MS. WATKINS:

12            There's two items of literature there.

13   One it titled "Evaluation and Management of

14   Midurethral Sling Complications."

15   THE COURT REPORTER:

16            Right.

17   MS. WATKINS:

18            If you don't mind marking that as an

19   exhibit and then the ACOG Practice Bulletin as an

20   exhibit and letting me know what those numbers

21   are, I'd appreciate it.

22   THE COURT REPORTER:

23            Okay.  In that order, Number 13, and,

24   then, ACOG is 14.
```

Charles Hanes, II, M.D.

```
 1   MS. WATKINS:

 2           Thanks.

 3           (EXHIBITS 13 AND 14 WERE

 4           MARKED FOR IDENTIFICATION.)

 5   MS. WATKINS:

 6   Q       Okay.  Doctor, we've marked as Exhibit

 7   13 an April 2016 article titled "Evaluation and

 8   Management of Midurethral Sling Complications."

 9           Do you have that in front of you?

10   A       I do.

11   Q       Okay.  Have you seen this document

12   before?

13   A       I think I have.  I'm pretty certain I

14   have.

15   Q       Okay.  Did you review it in forming

16   your opinions in this litigation?

17   A       I'm not sure if this is one of them

18   that I reviewed in -- specifically in this

19   litigation.

20   Q       Do you know whether this is on your

21   reliance list that we've marked as an exhibit

22   here today?

23   A       I don't know that.

24   Q       Okay.  If you don't mind turning to the
```

Charles Hanes, II, M.D.

1    second page of that.  And I want to look at

2    the -- on the left column, the first full

3    paragraph.  I'm gonna read something and ask you

4    whether you agree with that.

5              Are you on the second page, Doctor?

6    A         I am.

7    Q         Okay.  I'm gonna read the

8    paragraph or -- excuse me -- the sentence that

9    starts with "nonetheless."

10   A         Okay.

11   Q         "Nonetheless, certain complications

12   from midurethral sling surgery are unique to the

13   use of polypropylene mesh.  These can include

14   mesh exposure, chronic pelvic pain, and

15   dyspareunia, which are the most common, as well

16   as mesh contracture, organ perforation, and/or

17   neuromuscular injury."

18             Do you agree with that statement?

19   A         Um, I don't -- you know, I don't think

20   that those complications are unique to the use of

21   polypropylene mesh.  In other words, chronic

22   pelvic pain and dyspareunia is -- is a notable

23   complication of any pelvic reconstructive

24   surgery.  Organ perforation, also, and

Charles Hanes, II, M.D.

```
 1   neuromuscular injury for reconstructive surgery.

 2   Q        Okay.  The next sentence reads:  "Other

 3   complications may include de novo urgency and/or

 4   urgency urinary incontinence, urinary tract

 5   infection, and/or urinary obstruction."

 6            Do you agree with that sentence?

 7   A        Well, those are complications that can

 8   occur with midurethral slings.  But, again, they

 9   can occur with other operations that are for the

10   correction of incontinence.  And, in fact, I

11   think those complications are probably more

12   frequent with the Burch procedure.

13            Urinary tract infections accompany most

14   every operation in which an in-dwelling Foley

15   catheter was inserted.

16            Urgency incontinence is a frequent

17   accompaniment of any kind of incontinence

18   surgery.

19            So I don't -- I don't think any of

20   those are specific to midurethral sling.  They

21   certainly can happen with midurethral sling.

22   Q        Okay.  If you don't mind turning to the

23   second-to-last page of that document.  And in the

24   left-hand upper portion of that, it says
```

Charles Hanes, II, M.D.

```
 1    "Conclusions."  If you don't mind letting me know

 2    when you're there, Doctor, I appreciate it.

 3    A         Oh, yeah.  I've gotcha.

 4    Q         Okay.  Good.

 5              The first sentence reads,

 6    "Complications from midurethral slings are not

 7    rare."

 8              Do you agree with that statement?

 9    A         I think that -- I don't know what the

10    definition of "rare" would be.  I mean, there's

11    certainly complications that go along with any

12    surgery.  So I don't -- I think that's a vague

13    statement.

14    Q         Okay.  And, then, two sentences down,

15    it states, "However, if a patient does have

16    post-operative concerns, providers should have a

17    high index of suspicion for mesh-related

18    complications."

19              Do you agree with that statement?

20    A         I think that if -- if mesh is used, as,

21    obviously, this is talking about the midurethral

22    sling, so there are certain complications that

23    are specific to mesh, but there are also

24    complications that are -- that accompany any
```

Charles Hanes, II, M.D.

```
 1    surgery for the correction of incontinence.
 2              So, yeah.  I mean, I think you have to
 3    be aware of the peculiar mesh-related potential
 4    complications and be knowledgeable about those.
 5    Q        Okay.  The next sentence reads, "The
 6    management of midurethral sling complications is
 7    challenging and may warrant referral for
 8    specialist care.  Unfortunately, these
 9    complications are not always reversible and can
10    be quite debilitating for patients."
11              Do you agree with that statement?
12    A        By and large, I --
13              I'd have to break it up.  I think that
14    for the general OB-GYN practitioner, I think a
15    lot of them are not comfortable or would not be
16    the right ones to do a mesh excision, a
17    midurethral sling excision.
18              As far as the reversibility, I think
19    that if an adequate excision -- if an excision is
20    indicated and if an adequate excision is
21    performed, in my experience, I'm not -- I'm not
22    convinced that I've ever seen anybody that has
23    not -- where their symptoms have not been
24    reversible.
```

Charles Hanes, II, M.D.

```
 1    Q        Okay.

 2    A        I suppose there are --

 3             I don't -- you know, I wouldn't want to

 4    make that a universal statement.  I'm sure there

 5    may be exceptions, but -- but I think it's rare.

 6    Q        Okay.  And, Doctor, you can set that

 7    one aside, please.

 8             And, then, if you don't mind moving on

 9    to Exhibit 14, the ACOG Practice Bulletin dated

10    November 2017 --

11    A        Uh-huh.  Okay.

12    Q        -- regarding pelvic organ prolapse.

13    A        Yes.

14    Q        Do you have that in front of you?

15    A        Yes.

16    Q        And, Doctor, are you a member of ACOG?

17    A        I am.

18    Q        Okay.  And have you seen this document

19    before?

20    A        I have.

21    Q        Okay.  And are you also a member of

22    AUGS?

23    A        I am.

24    Q        Okay.  If you don't mind turning to, on
```

Charles Hanes, II, M.D.

```
 1    the bottom right corner -- I guess it's the only

 2    one that has a number on it, it's E243.

 3    A         Yeah, I'm there.

 4    Q         Oh, you are.  Good.

 5              All right.  This is under the section

 6    that reads "What are the complications of pelvic

 7    organ prolapse surgery and how are they managed?"

 8    A         Yes.

 9    Q         And I'm gonna read from the second full

10    paragraph under that section and then ask you to

11    agree with some of those sentences.

12              "There are unique complications

13    associated with synthetic mesh when they are used

14    in pelvic organ prolapse surgery.  These include

15    mesh contracture and erosion into the vagina,

16    urethra, bladder, and rectum."

17              Do you agree with those statements?

18    A         Again, I would -- I would have to

19    disagree with the whole mesh contracture thing.

20    I --

21              In principal, you know, I think it's

22    more accurate to say scar contracture.  And that

23    goes back to our discussion earlier.  I think

24    once the mesh is in place, within two weeks you
```

Charles Hanes, II, M.D.

```
 1    have tissue incorporation into the mesh, and,

 2    therefore, the mesh itself can't contract.  It's

 3    the scar that contracts.  And the scar

 4    contracture is a function of a surgical incision

 5    and not -- and not of the mesh.  And that's my

 6    opinion and that's my experience.

 7              As far as erosions into the vagina,

 8    that's, you know, what we talked about earlier

 9    with mesh exposure.

10              With POP surgery, I've never seen

11    erosion into the urethra.  As I mentioned

12    earlier, I saw a transurethral sling, but I think

13    that was a function of improper insertion.  But

14    I've never seen that with the POP surgery.  And

15    I've never seen erosion into the bladder or

16    rectum.

17              Again, I think that if -- if that

18    occurs, it more than likely is a function of

19    improper insertion as opposed to migration.  I

20    don't -- I do not believe it's possible for mesh,

21    once it's integrated with tissue, to migrate

22    anywhere.

23    Q         Okay.  Are you familiar with any

24    medical literature indicating that a properly
```

1   placed transvaginal mesh product can migrate

2   after implantation?

3   A        No.  That's what I say.  I don't

4   believe that's possible.

5   Q        Okay.  The next sentence reads, "The

6   rate of mesh erosion is approximately 12 percent

7   after vaginal mesh prolapse surgery."

8            Do you agree with that statement?

9   A        I think that's a -- that's a figure

10  that is debatable.  I mean, I think there --

11  there are figures that are tossed out, and I've

12  seen figures ranging from 5 percent or even as

13  low as 3 percent in some series.  But I think 12

14  percent would be upper limits.

15  Q        Do you have any reason to disagree with

16  that number?

17  A        Well, I don't know -- you know, I don't

18  know where they got that number.  If it's a

19  meta-analysis over a voluminous amount of

20  reports, then I wouldn't refute that.

21           Actually, they reference it as number

22  41, so let's see what it says.  So 41 says --

23           Oh, that's -- yeah.  That's the

24  systematic review.  And I think that was in the

Charles Hanes, II, M.D.

```
 1    Cochrane database.  So, you know, I think that's

 2    certainly reputable.

 3           But I -- I think that the -- probably

 4    the difficulty with that figure is that it

 5    doesn't take into account the experience of the

 6    users, its multiple users and those with lots of

 7    experience and also those with very little.  So

 8    I, in my opinion, I think that number's high.

 9    Q       Okay.  And, then, the next sentence

10    reads, "When mesh is used for anterior vaginal

11    wall prolapse repair, there is an 11 percent risk

12    of mesh erosion, with 7 percent of these cases

13    requiring surgical correction."

14           Do you have any reason to disagree with

15    those numbers?

16    A       Again, I kind of resort to the -- my

17    same answer.  I -- I think to say that using mesh

18    in the anterior compartment is gonna subject

19    somebody to 11 percent risk of erosion is

20    probably not an accurate statement if it comes

21    from somebody that's experienced.  In fact, I

22    know plenty of doctors who routinely use mesh in

23    the anterior compartment and don't have exposure

24    rates near -- near like that.
```

Charles Hanes, II, M.D.

```
 1              So I think when you're taking the --

 2    the bulk of the literature and taking all users

 3    and coming up with a cumulative number, I'm not

 4    gonna say that's not accurate, but I don't think

 5    it reflects the experience of experienced users.

 6    Otherwise, I don't think they'd be putting it in.

 7    Q        Okay.  And the next sentence reads,

 8    "The rate of dyspareunia is approximately 9

 9    percent after vaginal mesh prolapse surgery."

10              Do you agree with that number?

11    A        I think that -- that may be a good

12    number.  But, also, I think that you can find

13    numbers that are comparable and sometimes even

14    higher with other pelvic reconstructive

15    procedures.  The posterior repair, for example,

16    is notorious for causing dyspareunia, and that's

17    a native tissue repair.  So, yeah.

18    Q        Okay.  And the last sentence I'm gonna

19    ask you about is what reads:  "Multiple

20    procedures often are required to manage

21    mesh-related complications."

22              Do you agree with that statement?

23    A        I think that in a lot of cases it has

24    required multiple procedures.  But, again, I
```

Charles Hanes, II, M.D.

```
 1    would -- I would say in the hands of somebody

 2    that's experienced in doing this type of surgery,

 3    that it's rare that one procedure is not going to

 4    provide the benefit that you're looking for.

 5    Q         Okay.  Doctor, I don't believe I have

 6    any additional questions.  Thank you for your

 7    time.  And, again, I'm greatly sorry for being

 8    late today.

 9    A         Well, it's perfectly all right.  And I

10    appreciate your being polite over the telephone.

11    MR. BARTON:

12              Can we go off the record for a second,

13    Diane?

14    MS. WATKINS:

15              Sure.

16                   (OFF THE RECORD.)

17                     EXAMINATION

18    BY MR. BARTON:

19    Q         Doctor, in previous examination by

20    plaintiffs' counsel today, she referred you to a

21    sentence in one of your -- the consulting

22    agreements with Ethicon, and the sentence reads,

23    "You shall not make any representation relating

24    to Company's products or to Company's clinical
```

Charles Hanes, II, M.D.

```
 1    outcomes unless such representations have been

 2    reviewed and approved in advance by Company."

 3              Did I read that correctly?

 4    A        Yes.

 5    Q        Did that sentence and that part of the

 6    consulting agreement, in your recollection, ever

 7    come into play in your performance as a

 8    consultant for Ethicon?  And, if so, how?

 9    A        I don't think it came into play.  I

10    mean, I think -- the way I -- the way I construe

11    that is that in these formal

12    training/preceptor/visiting doctor relationship,

13    that I needed to utilize the materials, the

14    PowerPoint, the IFU, and stay on point with that.

15    It didn't -- it didn't preclude me from going off

16    label at times.  If somebody asked me a question,

17    I -- I was free to give them my opinion.  And I

18    can't say -- I mean, there were times maybe it

19    wasn't off label.

20              But I never -- I never did deviate from

21    saying my opinion and never, even when company

22    representatives were there, which they frequently

23    were --

24              The representatives were there during
```

Charles Hanes, II, M.D.

1    these training sessions a lot of times, and, you

2    know, that was never an issue.

3    MR. BARTON:

4              That's all I have.

5    MS. WATKINS:

6              No questions.

7              (Deposition concluded at 11:55 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Charles Hanes, II, M.D.

```
 1              C E R T I F I C A T E

 2     STATE OF ALABAMA)

 3     COUNTY OF MOBILE)

 4

 5           I do hereby certify that the above and

 6     foregoing transcript of proceedings in the matter

 7     aforementioned was taken down by me in machine

 8     shorthand, and the questions and answers thereto

 9     were reduced to writing under my personal

10     supervision, and that the foregoing represents a

11     true and correct transcript of the proceedings

12     given by said witness upon said hearing.

13           I further certify that I am neither of

14     counsel nor of kin to the parties to the action,

15     nor am I in anywise interested in the result of

16     said cause.

17           Signed this 15th day of July, 2019.

18

19           Lois Anne Robinson

             LOIS ANNE ROBINSON, RDR

20           COURT REPORTER, NOTARY PUBLIC

             STATE OF ALABAMA AT LARGE

21           ACCR# 352; EXPIRES 9/30/19

22

23

24
```

Charles Hanes, II, M.D.

```
 1              E R R A T A   P A G E

 2

 3              I, CHARLES HANES, II, M.D., the witness

     herein, have read the transcript of my testimony,

 4   and the same is true and correct, to the best of my

     knowledge, with the exceptions of the following

 5   changes noted below, if any:

 6   Page/Line  Change                    Reason

 7   _____  _____   _____

 8   _____  _____   _____

 9   _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21

                        _____
22                      CHARLES HANES, II, M.D.

23

24
```

```
 1

 2                    DECLARATION OF WITNESS

 3

 4          I, the undersigned, declare under penalty

 5    of perjury that I have read the foregoing

 6    transcript, and I have made any corrections,

 7    additions, or deletions that I was desirous of

 8    making; that the foregoing is a true and correct

 9    transcript of my testimony contained herein.

10          EXECUTED this _____ day of _____,

11    2019, at _____, _____.
                     (City)                   (State)

12

13

14

15

16

                     _____

17                    CHARLES HANES, II, M.D.

18

19

20

21

22

23

24
```