# EXHIBIT B

Bruce S. Kahn, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3                     CHARLESTON DIVISION

 4

 5   IN RE: ETHICON INC., PELVIC )    Master File No.
                                      2:12-MD-02327
 6   REPAIR SYSTEM PRODUCTS      )    MDL No. 2327

 7   LIABILITY LITIGATION        )    JOSEPH R. GOODWIN
                                      U.S. DISTRICT JUDGE

 8

 9   THIS DOCUMENT RELATES TO    )

10   ALL WAVE 11 DEFENDANTS AND  )

11   SUBSEQUENT WAVE CASES AND   )

12   PLAINTIFFS                  )

13   _____)

14

15

16      VIDEOTAPED DEPOSITION OF BRUCE S. KAHN, M.D.

17                  SAN DIEGO, CALIFORNIA

18                THURSDAY, AUGUST 1, 2019

19                      11:04 A.M.

20

21

22

23

24   Reported by: Leslie A. Todd, CSR 5129
```

Page 2

1  Deposition of BRUCE S. KAHN, M.D., held:
2
3
4
5      BOWMAN & BROOKE, LLP
6      750 B Street
7      San Diego, California 92101
8
9
10
11
12   Pursuant to notice, before Leslie Anne Todd, Court
13 Reporter in and for the State of California, who
14 officiated in administering the oath to the witness.
15
16
17
18
19
20
21
22
23
24

Page 3

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFFS:
4      MICHAEL R. CLINTON, ESQUIRE
5      PERDUE & KIDD
6      777 Post Oak Boulevard, Suite 450
7      Houston, Texas 77056
8      (713) 520-2500
9
10 ON BEHALF OF THE DEFENDANTS:
11     BARRY J. KOOPMANN, ESQUIRE
12     BOWMAN AND BROOKE, LLP
13     150 South Fifth Street
14     Suite 3000
15     Minneapolis, Minnesota 55402
16     (612) 339-8682
17
18 ALSO PRESENT:
19     JIM LOPEZ (Videographer)
20
21
22
23
24

Page 4

1           C O N T E N T S
2  EXAMINATION OF BRUCE S. KAHN, MD          PAGE
3    By Mr. Clinton                    6
4    By Mr. Koopmann                  179
5
6
7
8           E X H I B I T S
9         (Attached to transcript)
10 KAHN DEPOSITION EXHIBITS                  PAGE
11 No. 1   Second Amended Notice to Take
12         Deposition of Bruce Kahn, M.D.     14
13 No. 2   Invoices of Bruce Kahn, M.D. to
14         Butler Snow                       18
15 No. 3   Various e-mails                   21
16 No. 4   Bruce S. Kahn, M.D., F.A.C.O.G.
17         Curriculum Vitae                  25
18 No. 5   Folder produced by Dr. Kahn at
19         deposition                        70
20 No. 6   General Materials List in Addition
21         to Materials Referenced in Report  80
22 No. 7   General Expert Report of Bruce S.
23         Kahn, M.D.                       103
24 No. 8   Flash drive                      184

Page 5

1           P R O C E E D I N G S
2           ------------------
3           THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Jim Lopez.  I'm the videographer
5  for Golkow Litigation Services.  Today's date is
6  August 1st, 2019, and the time is approximately
7  1:04 p.m.
8           This video deposition is being held in
9  San Diego, California, in the matter of In Re:
10 Ethicon Inc. Pelvic Repair System Product Liability
11 Litigation, MDL No. 2327, documents related to all
12 Wave 11 and subsequent wave cases and plaintiff, for
13 the United States District Court for the Southern
14 District of West Virginia, Charleston Division.
15          The deponent is Dr. Bruce Kahn.
16          Counsel will be noted on the stenographic
17 record.
18          Will counsel please identify themselves.
19          MR. CLINTON:  Michael Clinton with the
20 Perdue & Kidd Law Firm on behalf of the plaintiffs in
21 this litigation.
22          MR. KOOPMANN:  Barry Koopmann from the
23 Bowman & Brooke Law Firm on behalf of Ethicon and
24 Johnson & Johnson.

Page 22

1 involvement in the litigation.
2     MR. CLINTON: Is the -- I will work
3 backwards.
4     Is the flash drive limited to only
5 documents that have been sent to him or is it
6 everything that's in the reliance list?
7     MR. KOOPMANN: It is everything that's in
8 the reliance list. And the reliance list says here
9 are the materials that Dr. Kahn is relying on in
10 addition to the materials that he cites in his
11 report.
12     MR. CLINTON: Right.
13     MR. KOOPMANN: So I think between those
14 two binders that contain his report in the cited
15 materials and the USB drive, you would have
16 everything that he's considered if you include this
17 folder.
18     THE WITNESS: Right. And now that you
19 mention it, that actually might be responsive to --
20     MR. KOOPMANN: Number 2?
21     THE WITNESS: -- number 2. So I'm happy
22 to -- I apologize.
23     MR. CLINTON: No, nothing to apologize
24 for, Doctor. If you don't mind, can I take a look at

Page 23

1 that.
2 BY MR. CLINTON:
3     Q   Doctor, while I'm just peeking at it,
4 will you describe to me what is this folder?
5     A   This is a file that I've had for -- since
6 probably around 2000 that -- back before the use of
7 computers, this is a file I kept to track things on
8 -- with regard to -- what does the tab on the file
9 say?
10    Q   "TVT."
11    A   This is my file on TVT. So this is a
12 file that has various articles, booklets, things like
13 that that I would collect of something I thought was
14 important and worth putting in the file.
15        There's also many copies in there of a
16 few things that I thought were important. The reason
17 there's copies of it is because in the teaching that
18 I do, those things were something I would give out to
19 residents that I thought were important. So where
20 there's multiple copies of a few of them, and then
21 there's other pertinent -- other things in there.
22        So this goes back to around 2001, 2002, I
23 think, and it was something that I had added to for a
24 while, and at some point, you know, as we all

Page 24

1 switched to using electronic files more, I just
2 didn't touch that for many years.
3     Q   Okay.
4     A   So -- but when this litigation came up,
5 and I was asked specifically actually for the
6 California AG case, the same sort of thing, I
7 happened to find that file and said, Well, I guess
8 this is part of that request.
9     Q   Okay.
10    A   And you requested the same. So...
11        MR. CLINTON: At the chance of upsetting
12 somebody in this office, I would like to get a copy
13 of what's in here.
14        MR. KOOPMANN: That's fine. We can do
15 that.
16        MR. CLINTON: Okay. If you don't mind,
17 I'll hand it back to you, and if we could do that,
18 and we'll just look at it later in the day.
19        MR. KOOPMANN: Sure. We'll have a copy
20 made during a break.
21        MR. CLINTON: Sure, that's fine.
22 BY MR. CLINTON:
23    Q   Okay. Dr. Kahn, I'm going to mark
24 Exhibit 4 to your deposition, which is your CV. And

Page 25

1 you've got one there in your binder, but this is
2 the -- I believe the same copy, and this is what was
3 produced with your report.
4        (Exhibit No. 4 was marked for
5        identification.)
6        MR. CLINTON: Oh. Here you go.
7        MR. KOOPMANN: Thank you.
8 BY MR. CLINTON:
9    Q   Dr. Kahn, just generally, will you
10 explain to the jury what it is that you do for a
11 living.
12    A   I'm a gynecologist, and I practice
13 gynecology and urogynecology.
14    Q   What is the difference between gynecology
15 and urogynecology, for those in the jury who may not
16 know the difference?
17    A   So my basic training after medical school
18 was in obstetrics and gynecology, and that's the --
19 you finish a four-year residency, and after that you
20 are board eligible. You're eligible to become a
21 board certified obstetrician/gynecologist. You can
22 take care of patients in -- in obstetrics and in
23 gynecology and in general gynecologic problems.
24        There are subspecialty certifications

Page 26

1 available which stem from a basic obstetrics and
2 gynecology specialty.  There -- when I finished my
3 residency training, the subspeciality of
4 urogynecology did not -- did not exist.
5    Q   It's a more -- it's a newer concept,
6 right?
7    A   Right.
8        So in 2013 was the first year when one
9 could become board certified in urogynecology, and in
10 2013 there was a written examination that I had to
11 take to become a board certified urogynecologist, and
12 I prepared for and took that examination and passed
13 it, and was part of the first class to become a board
14 certified urogynecologist.
15       The specialty is formally referred to as
16 female pelvic medicine and reconstructive surgery.
17 But it's also known as urogynecology.  So
18 urogynecology is a subspeciality of obstetrics and
19 gynecology.
20    Q   Thank you, Doctor.
21       And your CV has references to your
22 academic work as well as appointments that you have.
23 So I want to -- I want to kind of dive in and go step
24 by step, and I understand at points in time there's

Page 27

1 probably multiple things that you were doing.
2       So I'm going to try to keep it linear in
3 terms of education, professional work as a clinician
4 as opposed to professional work as a professor, and
5 we'll kind of go about it like that.
6       Is that fair?
7    A   Sounds very fair.
8    Q   Doctor, where did you graduate from
9 undergrad?
10   A   Went to the University of California at
11 Irvine.
12   Q   And what was your degree in?
13   A   I got a degree in biological sciences --
14 a bachelor degree in biological sciences.
15   Q   And then I see on your CV that you got a
16 master's in physiology?
17   A   Yes.
18   Q   What is physiology, Dr. Kahn?
19   A   Physiology is a part of biology in
20 general, the study of the human body, how it works,
21 different parts of the body, different organs,
22 general -- how we work as individuals, humans.
23   Q   If someone doesn't go to med school after
24 that, what's a career like for someone with that

Page 28

1 master's?
2    A   Most people with that master's degree
3 will be involved in basic science research would
4 probably be the thing that they would be doing.
5 Researching in physiology, anatomy, chemistry, renal
6 diseases.  You could work on a lot of different kinds
7 of basic science things.
8        When people who do, say, for instance,
9 drug development, a lot of drugs that are developed
10 for treating something like diabetes would start in a
11 basic science lab, you know, trying to understand how
12 diabetes works in the cellular mechanism.  So that
13 might be the focus of somebody with a master's degree
14 in physiology.
15   Q   And you graduated with your master's in
16 '86; is that right?
17   A   Yes.
18   Q   And you continued your education at
19 Georgetown and went to medical school there; is that
20 right?
21   A   Yes.
22   Q   Okay.  Doctor, for those in the jury who
23 may not know, do -- in med school do you have a major
24 like you would in undergraduate?

Page 29

1    A   Generally, no.  There are some schools
2 that have -- or many schools will have a combination
3 of a PhD/MGP program.  I guess if you're going to
4 specialize, that would be a physician who wants to
5 combine clinical science and basic science perhaps a
6 little bit more.
7    Q   Or a JD/MD if you're a glutton for
8 punishment.
9    A   That's a good -- another good example.
10 So those would be kind of more subspecialty sort of
11 things.  But, no, I -- I was a -- a regular medical
12 student, if you will.
13   Q   Following your graduation from Georgetown
14 Medical School, this was 1990; is that right, Doctor?
15   A   That is correct.
16   Q   Okay.  Did your formal education continue
17 after that?
18   A   Yes.
19   Q   And where was that?
20   A   I -- my initial choice and specialty
21 after graduating from medical school was to train in
22 radiation oncology.  In order to train -- and
23 radiation oncology is the treatment of cancer
24 patients with radiation.  In order to begin radiation

Page 38

1  But we have electronic stimulators that can be useful
2  for treating incontinence now.  I'm not sure of when
3  that came on the market.
4      Q   What about surgical options during that
5  time when you first learned how to treat a woman
6  suffering from SUI?
7          And, Doctor, do you mind today if I say
8  "SUI" to keep it shorter?
9      A   That's fine.
10     Q   Okay.
11     A   So surgical options for treating stress
12 incontinence that I was exposed to and learned as a
13 resident, the Burch procedure, the -- a little bit on
14 autologous or other measures for creating slings for
15 stress incontinence, and then what was really very
16 popular at the time were the needle suspension
17 procedures, referred to as Raz or Stamey, seemed to
18 be in vogue at the time, and I had a lot of exposure
19 to those procedures.
20     Q   Have you performed all those procedures
21 in your career, Doctor?
22     A   Yes, I have.
23     Q   And were you trained to perform those
24 surgeries that you just mentioned throughout your

Page 39

1  internship, residency, and into your practice?
2      A   Yes, I was.
3      Q   Are those surgical options that you still
4  perform today?
5      A   No, they are not.
6      Q   Okay.  We can go one at a time.
7          When was the last time you performed the
8  Burch procedure?
9      A   I -- probably during my time in the Navy.
10 So my first two years out of residency, somewhere in
11 there.
12     Q   Late '90s?
13     A   Yeah, late '90s.  So I haven't performed
14 any of the procedures since 2001, 2002, 2003.  I'm
15 not sure exactly when it stopped.  But the use of the
16 slings, the TVT slings specifically, really replaced
17 those pretty quickly.
18     Q   So the best you remember, Doctor, you
19 have not performed the Burch procedure, utilizing
20 autologous slings or needle suspension surgery
21 since the time you began using TVT slings in your
22 practice?
23     A   That is correct.
24     Q   Giving a little bit of wiggle room, but

Page 40

1  for the most part, there was a fairly hard transition
2  into using the sling products?
3      A   That is correct.
4      Q   Is the Burch procedure something that is
5  still acceptable today to utilize?
6      A   Yes, it is.
7      Q   And the autologous sling, would you
8  explain what that is to the jury?
9      A   An autologous sling procedure is
10 performed when a piece of fascial tissue taken from
11 the -- and fascia is a firm piece of tissue either
12 from the abdomen or from the leg.  It can be
13 harvested and put -- placed underneath the urethra
14 through a large incision usually or a laparoscopic
15 procedure.  It can be used to offer support to the
16 urethra or some compression to the urethra to help
17 treat the incontinence.
18     Q   And is that still an acceptable surgery
19 to perform today for a woman suffering from SUI?
20     A   It is.
21     Q   It would be within the standard of care
22 to perform that surgery?
23     A   It would be.
24     Q   And the needle suspension, you referenced

Page 41

1  the Raz and the Stamey, Doctor?
2      A   Yeah.
3          Can I take a moment just to look at my --
4      Q   Yes, sir.
5      A   -- statement to make sure I didn't miss
6  anything?
7      Q   Maybe the MMK?
8      A   Right.
9      Q   So, Doctor, we're actually going to come
10 back to that.  I realize I haven't walked through
11 your work history yet.
12     A   Okay.
13     Q   Following your time at the Naval Center
14 of San Diego, Doctor, walk me through your
15 professional history, not including times that you've
16 served as a teacher, more of your clinician role.
17 Unless there is an overlap to the point that you
18 can't differentiate that.
19     A   That's fine.  I served in the Navy from
20 1996 to 1998.  Following the completion of my
21 service, I was offered a job at UCSD, offered a job
22 at UCLA, a couple of private practice offers, but I
23 chose to go to UCSD, because I love San Diego, and I
24 went to -- to USDC for about a year and a half, and

Page 46

1 I was intrigued by the data that I had seen
2 initially, and it sounded like something that could
3 be very promising and perhaps a benefit to our
4 patients.
5    Q   When you say you were intrigued by the
6 data, I don't expect specifics from 19 years ago, but
7 what do you mean when you say that, intrigued by the
8 data?
9    A   Probably looked at some of the early data
10 produced by the doctors in Sweden, I think it is.
11 Norway, Sweden, friends and colleagues there.  So
12 probably looking at that data.
13   Q   Data regarding what?
14   A   The success that they had had with using
15 the slings.
16   Q   Okay.  Is it fair to say, Doctor, that
17 the TVT was the first sling product you had utilized
18 in your practice?  Mesh sling.
19   A   Right.  So --
20   Q   No?
21   A   Yes -- yes, first mesh sling, yes.
22   Q   First mesh sling.  And since that time --
23 and let me clarify, if I say "TVT," we're here today
24 to talk about the TVT retro- -- retropubic -- geez --

Page 47

1 TVT retropubic product, right?
2   A   Correct.
3   Q   And there are other TVT products, TVT-O,
4 TVT Exact, TVT Secure, right?
5   A   Yes.
6   Q   Okay.  Doctor, do you understand if I
7 just say "TVT," I'm talking about the TVT retropubic
8 device that you wrote a report on?
9   A   That sounds like a great plan.
10  Q   Okay.  All right.
11      Following your start of using the TVT
12 product in your practice, have you utilized any other
13 sling products for the treatment of SUI?
14  A   I have.
15  Q   Okay.  What other products have you
16 utilized?
17  A   After several years of using the Gynecare
18 Ethicon TVT sling, I learned about the product that
19 Boston Scientific was using that was similar but had
20 a few advantages and switched to using the Boston
21 Scientific product at some point, and I don't
22 remember the exact date.  2004, 2005.  It was
23 essentially the same thing, but had a couple of
24 advantages to it.  And after that, I pretty much

Page 48

1 switched to the Boston Scientific product other than
2 I think I used a little bit of Ethicon's -- their
3 single incision sling.  Sorry, I'm blanking on the
4 name of it.
5   Q   The TVT-O?
6   A   No.  Their single incision --
7   Q   I'm sorry.
8   A   Yeah.  So I used that -- I've done --
9 used that a little bit.  But since that time, for the
10 most part, most of the slings I've put in since the
11 switchover have been Boston Scientific products.
12  Q   Okay.
13  A   But I've probably put in several hundred
14 Ethicon Gynecare TVT slings.
15  Q   Correct me if I'm wrong, Doctor, if I
16 remember correctly from your general report, you say
17 that you've implanted approximately 2,000 --
18  A   That's --
19  Q   -- retropubic slings.
20  A   That's the best of my recollection.
21  Q   Of that many, what percentage would you
22 say were Gynecare TVT products?
23  A   Probably 10 percent, the first
24 10 percent.

Page 49

1   Q   It was your --
2   A   Around 200 is what -- so --
3   Q   Roughly about the first 200 of those
4 2,000?
5   A   Yes.
6   Q   If that math checks out.
7   A   That math checks.
8   Q   Doctor, can you explain to the jury --
9 we'll come back to that.
10      All right.  Doctor, so about 2000, 2004,
11 '05, the Gynecare TVT is the product -- your product
12 of choice in your practice for SUI.
13  A   Right, two -- no, that's not correct.  So
14 around 2000 when I started using it, 2000 until 2004,
15 2005.
16  Q   Right.  So I apologize if I said that
17 wrong.  From around 2002, 2004 or '05, your go-to
18 product for treatment of SUI was the Gynecare TVT.
19  A   That is correct.
20  Q   And roughly since that time, your main
21 product that you have implanted is the Boston
22 Scientific.
23  A   That's correct.
24  Q   Do you know what the product name is?

Page 58

1      MR. KOOPMANN:  Object to form,
2  foundation.
3      THE WITNESS:  I'm just -- it feels like
4  you're -- I -- I'm not quite sure how to answer your
5  question because I -- I think they would want me to
6  give my honest opinion, and I think -- and I wouldn't
7  give anything but my honest opinion about anything.
8      So I'm not quite sure how to -- how else
9  to answer that.
10 BY MR. CLINTON:
11     Q   And if your honest opinion was negative
12 about the TVT product, then they likely wouldn't want
13 you to be their expert witness.  Is that fair?
14     MR. KOOPMANN:  Object to form,
15 foundation.
16     THE WITNESS:  I wouldn't want to
17 speculate on what they would say.  I think we should
18 move on.  I don't have an answer for you on that.
19 BY MR. CLINTON:
20     Q   Doctor, if a plaintiff in this litigation
21 had approached you about serving as an expert
22 witness, would you have considered that role?
23     A   I've been approached by a few law firms
24 for cases like that actually before -- I guess I

Page 59

1  should back up -- before I had agreed to do this.  I
2  think at this point it would be a little hard to do,
3  but there are possibilities where someone may have
4  had a mesh implanted where they had a complication
5  where there's some malpractice involved, and that
6  might be something I would -- it would make sense for
7  me -- I could possibly help on that.  I think in the
8  role I'm in now, I don't think that would be quite
9  the right thing to do.  That would probably be a case
10 I shouldn't take on.
11     But I was asked to look at the -- look at
12 the data, come up with an opinion, and I've looked at
13 the data and come up with an opinion.  And I think
14 the -- you know, to summarize my opinion, I think the
15 TVT device is the most studied device for treating
16 urinary incontinence we've ever had.  I think the
17 long-term -- the midterm, the long-term data, the
18 meta-analyses, the systemic reviews, I think they all
19 support the safety and efficacy of the device.  It is
20 definitely as good and actually probably a lot better
21 overall than all the alternative procedures we have.
22     So that's my -- you know, that's the
23 summary of my opinion.  So I'm happy to talk about
24 that.  I'll -- I guess I'll add that I'm concerned

Page 60

1  that litigation like this puts -- puts patients at
2  risk if for -- if something like this were to happen
3  like what happened in the 1990s with breast
4  implants.
5      Now, breast implants are not -- breast
6  implants and the Dow Corning thing, and Dow Corning
7  went bankrupt, and then later on it was found that
8  the science actually didn't support the lawsuits that
9  were there.  While breast implants went off the
10 market, it has, you know, its own effects.  If
11 products like this were to go off the market, I think
12 it would be a huge setback for -- for women that have
13 problems with urinary incontinence.
14     So that's really a lot of why I'm here
15 today talking about this because I think that there's
16 a threat to this treatment that's been very good for
17 patients overall.  It's a reason that I basically
18 volunteer a lot of my time for the California lawsuit
19 to talk about it, because I think it really is a
20 threat to the availability of these -- of this great
21 treatment for patients.
22     MR. CLINTON:  I'm going to object to the
23 entire answer as nonresponsive.
24 BY MR. CLINTON:

Page 61

1      Q   Doctor, you -- you think highly of the
2  TVT product; is that fair?
3      A   What do you mean by "highly"?  Sorry.
4  I --
5      Q   Highly enough of it to write a report in
6  mass tort litigation surrounding the product.
7      A   Yes, I do.
8      Q   Not highly enough of it to use it in your
9  practice, though.
10     MR. KOOPMANN:  Object to form.
11     THE WITNESS:  There is --
12     MR. CLINTON:  Strike that.
13 BY MR. CLINTON:
14     Q   Doctor, why don't you utilize the TVT
15 product in your practice anymore?
16     A   That's a good question.
17     The reason I switched from using the TVT
18 device to the Boston Scientific product had nothing
19 to do with how well or how safe that the TVT was.  I
20 think it was safe at that time.  I think it remains
21 to be a safe device.
22     The reason I switched was the Boston
23 Scientific product had a -- at least one little
24 advantage for putting it in that made the procedure

Page 62

1 actually a little bit easier to complete.
2  Q   And what was that, Doctor?
3  A   The design of the product had -- the
4 design of the original TVT product had trocars that
5 you would put in, and they were metal trocars, and
6 you would put in -- I'm sorry, it was a trocar, it
7 was one trocar came with the kit, if I remember
8 correctly.  You would put a trocar in, and it was
9 back through the retropubic area, and what you would
10 do after putting in the trocar, you would leave the
11 trocar there, you would fill the bladder up, and you
12 would look to make sure that there was no injury to
13 the bladder.  And once you had assured -- were
14 assured there was no injury to the bladder, then you
15 would empty the bladder.
16       And then you would put it in the other
17 side, and then you would do another cystoscopy to
18 look and make sure there was no injury to the other
19 side.  And it worked well and it was a great
20 procedure.
21       But Boston Scientific came up with this
22 innovation where they put a little sheath over the
23 trocar so you could actually put in one side, and
24 then put in -- with a sheath, and then the sheath

Page 63

1 would be sitting in there.  And this is not the
2 sheath covering the mesh.  This is the sheath
3 covering the trocar.
4  Q   Covering the trocar.
5  A   And you could put the -- put the trocar
6 in once and put the trocar in a second time and do
7 one cystoscopy, and it made it just a quicker
8 procedure.  And that really was probably one of the
9 main reasons I -- I was enamored with that.  It's a
10 really cool trick, I like that.  And it was -- I mean
11 it could -- that's really probably the main reason I
12 switched from one product to another.
13  Q   What advantage does the -- the sheath
14 give you as the surgeon?
15  A   Right.  So it was -- was and I think
16 remains or it does remain a blue color.  It was
17 easier to see if you had an injury.  But the sheath
18 actually -- so again, you can leave it in there, and
19 if the sheath's there and if there was a bladder
20 injury, even with or without the sheath, if you --
21 with the original TVT trocar, if you were to put --
22 place the trocar and you had injured the bladder, you
23 can safely remove it and replace it, the lateral, the
24 trocar, and it's -- it is a complication of the

Page 64

1 surgery, but it's a very minor complication and
2 usually is -- resolves in four or five days with a
3 catheter treatment.  It's not a big deal either way.
4 But the sheath actually being in there, if -- if you
5 find injury to the bladder, you simple pull the
6 sheath out and then you can replace it.  So it's a --
7 it was really a nice time-saving trick in surgery.
8       The procedure is essentially the same.
9 The -- the TVT mesh itself, it -- Boston Scientific,
10 their mesh is polypropylene.  Ethicon's is Prolene.
11 They -- I think both products work well.  The
12 long-term data for both products is it works well.
13 There's no complications with it, so I never had any
14 issues with the mesh itself.
15  Q   Is -- is it your belief, Doctor, that the
16 TVT product is not made of polypropylene?
17  A   It's made of a polypropylene, and my
18 understanding is it has some other things coated on
19 it, I believe.
20  Q   What other things are coated on it?
21  A   A couple of different antioxidants, and
22 I'd have to refer back if -- you want me to do that?
23  Q   Sure, that would be fine.
24       MR. CLINTON:  We're actually right at an

Page 65

1 hour.  Barry, if you want -- you want to get that
2 copied?
3       MR. KOOPMANN:  Sure, if you want.
4       MR. CLINTON:  Sure.
5       THE VIDEOGRAPHER:  With the approval of
6 all counsel, going off the record.  The time is
7 approximately 2:08 p.m.
8       (Recess.)
9       THE VIDEOGRAPHER:  With the approval of
10 counsel, back on the record.  The time is
11 approximately 2:21 p.m.  This marks the beginning of
12 recording media number 2.
13 BY MR. CLINTON:
14  Q   All right, Dr. Kahn, we're back on the
15 record.  Are you ready to proceed?
16  A   I am.
17  Q   We left off and you were looking for
18 something that you wanted to, I think, cite to
19 based on the questions.  Did you find it?
20  A   I did.
21  Q   Okay.  And what was that?
22  A   Ethicon Products Worldwide Prolene Resin
23 Manufacturing Specifications.
24       MR. CLINTON:  And, Leslie, would you mind

Page 66

1 reading back to me what the question was?
2        (Whereupon, the requested record was
3        read.)
4        THE WITNESS: Okay. And a better term I
5 think is "additives."
6        It has a couple of additives, but -- and
7 those additives include calcium stearate, 0.25 to
8 0.35 percent, a lubricant to help reduce tissue drag
9 and promote tissue passage. Another chemical is --
10        I'm going to give you the acronym. Is
11 that all right?
12 BY MR. CLINTON:
13    Q   That's fine.
14    A   DLTDP, 0.04 -- zero to 0.6 percent. It's
15 an antioxidant to improve long-term storage of the
16 resin and the fiber, and to reduce potential
17 oxidative reaction in ultraviolet light --
18        THE REPORTER: Excuse me, Doctor. Can I
19 get you to --
20        THE WITNESS: Sorry.
21        THE REPORTER: -- start that, "an
22 antioxidant."
23        THE WITNESS: An antioxidant to improve
24 long-term storage of the resin and the fiber to

Page 67

1 reduce the potential oxidative reaction with
2 ultraviolet light.
3        Santonox, S-A-N-T-O-N-O-X, 0.1 to 0.3
4 percent. An anticoagulant to promote stability
5 during compounding and extrusion.
6        Procol, P-R-O-C-O-L, LA-10, 0.25 to 0.35
7 percent. A lubricant to help reduce tissue drag and
8 promote tissue passage.
9        Last is CPC pigment, 0.55 percent max, a
10 colorant to enhance visibility.
11 BY MR. CLINTON:
12    Q   And when was it that you learned about
13 the additives that you just explained, Doctor?
14    A   Not until preparation for this case.
15    Q   And, I apologize, you said that was --
16    A   These cases.
17    Q   -- about a year ago when you were
18 approached or a year and a half?
19    A   A year and a half ago.
20    Q   Before you were approached, Doctor, about
21 a year and a half ago, you had not implanted the TVT
22 in about a 15-year period, is that right, 14, 15
23 years?
24        MR. KOOPMANN: Object to form.

Page 68

1        Go ahead.
2        THE WITNESS: Closer to ten years. 2004,
3 2014 -- yeah, 15 years. Okay. I'm sorry.
4 BY MR. CLINTON:
5    Q   Yeah, I'm going to ask --
6    A   Time flies.
7    Q   Doctor, am I correct that you -- with the
8 exception of a little overlap in time when the
9 transition occurred, that you have not implanted a
10 TVT product in -- in the last ten years?
11    A   Yeah, there was a TVT secure product that
12 I had some experience with. I'm not sure exactly
13 when that happened.
14    Q   But the TVT retropubic that your report
15 is on, you have not implanted one of those in at
16 least ten years?
17    A   That's correct.
18    Q   And possibly up to 13, 14, 15 years?
19    A   That's correct.
20    Q   Did you keep up with literature about the
21 TVT product after the time you stopped utilizing it
22 in your practice?
23    A   Yes. In the sense that I continued to
24 read about the treatment of stress urinary

Page 69

1 incontinence in general, the outcomes -- you know,
2 the long-term studies that were being performed. You
3 know, short-term studies were being performed,
4 comparative studies, meta-analyses. So I -- I
5 continued to look at that literature, and have
6 continued to look at that literature since I was
7 trained.
8    Q   The way that you keep up with all the
9 changing surgeries and changing knowledge in the
10 industry; is that fair?
11    A   I don't understand your -- what you said.
12    Q   Well, that your -- if I understand you
13 right, you kept up with literature about the TVT in
14 the general sense that you keep up with all the
15 products that are changing in your industry.
16    A   Yes. I --
17    Q   Not -- no deep dives into the TVT product
18 specifically until work started for this case.
19        MR. KOOPMANN: Object to form.
20        THE WITNESS: That's correct.
21 BY MR. CLINTON:
22    Q   This folder of information that you keep
23 on the TVT, Doctor, that --
24        MR. CLINTON: Barry, do you mind if I

Page 90

1  don't really -- it's not -- I guess, you know -- am I
2  being compensated for that work?  I mean I get paid
3  for the patient visit, but there's no -- I'm not
4  getting any honorariums or anything from Boston
5  Scientific.
6       So I'm not quite sure what -- you want to
7  rephrase -- reask the question again?  I -- tell
8  them -- ask them what?  What is it --
9    Q   Do you disclose to your patients in which
10 you implant a Boston Scientific product the
11 connections and the work that you're doing with
12 Boston Scientific?
13   A   That I'm writing an article that I've
14 been involved in research with them?  Sometimes,
15 but not as a general rule.
16   Q   And if I understand --
17   A   Unless that patient is involved in the
18 research.  Absolutely if the patient is involved in
19 the research project.
20   Q   Sure.
21   A   But a patient I saw last week with
22 incontinence, I -- I may bring it up.  It's not
23 something I keep a secret.  It's -- but it's not
24 something -- it's -- there's no conflict as far as me

Page 91

1  receiving any payment from Boston Scientific.
2  It's -- I'm excited about the research I do, so I
3  will often talk about research I'm doing.
4       But actually that research on their sling
5  is -- it's completed and we're just writing it up at
6  this point.  So it's not -- the work I'm doing now is
7  simply writing, and, you know, so -- does that answer
8  your question?
9    Q   I'm not sure.
10   A   You want to try it again?
11   Q   Not really.  Your --
12   A   I'm trying.
13   Q   Are you?
14   A   I don't quite get it, you know.
15   Q   So, Doctor, the research that you did --
16 so the reliance list, we talked about the documents
17 you had, documents that were provided to you, and
18 documents that you went and found on your own.
19 Literature research, things like that.  That's fair?
20   A   (The witness nods.)
21   Q   What did you do to perform your own
22 research?
23   A   Starting with internet-based searches,
24 looking for whatever topic I'm trying to look at

Page 92

1  with -- you know, in the realm of TVTs, whether it be
2  complications or -- I honestly had to learn a lot
3  about -- in reviewing some of the plaintiffs' expert
4  reports, a lot of that information was new
5  information, and I wanted to go out and see if there
6  was anything, you know, to these things about
7  degradation and fraying.
8       And, you know, this was all kind of
9  things that I hadn't really heard much about in the
10 past, and I hadn't had any clinical problems
11 regarding them.  So I did spend a fair amount of time
12 seeing -- searching out to see what there was that I
13 could find, you know, anything out there that I'm
14 kind of missing.  That would be a good example of
15 something.  So mostly internet searches.  And then
16 when I would -- you know, go find -- look for the
17 article and see if there was anything there.
18      But I -- I can't remember any specifics
19 for you, but that's the basic mechanism.  It was
20 basically using an internet search.
21   Q   You mentioned a few topics that you --
22 that were somewhat new to you in reading the
23 plaintiffs' expert reports, and you identified
24 degradation and fraying.  Is that right?

Page 93

1    A   Correct.
2    Q   Are there other subjects that you -- that
3  were somewhat new to you that you had to go and dive
4  into research?
5    A   I'm blanking on some of the terms they
6  used at this point, but there were several terms that
7  have been thrown around.
8    Q   Roping and curling?
9    A   That sounds familiar.
10   Q   In your research about these subjects,
11 such as degradation, fraying, would you ask Ethicon
12 to -- to provide you internal documents about these
13 subjects?
14   A   They were provided to me, and I didn't
15 ask them for additional stuff, but I reviewed a lot
16 of internal documents related to that.
17   Q   They were provided to you?
18   A   Correct.
19   Q   Did you ask about what type of
20 information was being provided to you?
21   A   I don't understand your question.
22   Q   So documents were being provided to you
23 about these subjects.  Were you asking -- did you
24 ever ask, Do I have everything on this?

Page 98

1 and forth to me isn't good science. What to me is
2 good science comes back to that pyramid of literature
3 we're talking about of, you know, what does the data
4 really show. What does the data show for clinical
5 trials, reports, meta-analyses, things like that.
6     So I think these things are good to look
7 at, but I don't think there was -- I think I got a
8 good flavor from what was provided to me of what some
9 of the contradictory e-mails and things back and
10 forth had to do. So I did get a good look at I think
11 some of the -- you know, what are supposedly damning
12 internal e-mails or things that -- the concerns that
13 people had that I think were also used by the
14 plaintiffs' experts to make them sound as if they
15 were representing prospective randomized trials when
16 they really weren't. They were just a conversation
17 that two people had by e-mail with a concern about
18 something.
19   Q  So concern within a company about a
20 particular complication, that's not of any relevance
21 to you?
22     MR. KOOPMANN: Object to form.
23     THE WITNESS: What is of relevance to me
24 as a practicing gynecologist would be things that are

Page 99

1 going to have impact -- reasonably associated impact.
2 Okay?
3     So if someone had a concern about
4 fraying, I understand that, and I read through a lot
5 of that material. But when it comes to clinical
6 care, there -- the literature doesn't show there's
7 any -- anything to it. From my perspective, in my
8 opinion, I don't think that the -- that whole fraying
9 argument, there's just nothing to it when it comes to
10 clinical -- clinical application.
11 BY MR. CLINTON:
12   Q  Have you ever done any studies on the
13 fraying of mesh or polypropylene, Doctor?
14   A  I guess you could say I've done a pretty
15 good study for 20, 25 years with my own patients, and
16 I have not found that to be a problem.
17     MR. CLINTON: Object to form.
18 BY MR. CLINTON:
19   Q  Doctor, have you ever conducted a study
20 specifically geared at looking at fraying of mesh or
21 polypropylene?
22     MR. KOOPMANN: Object to form.
23     THE WITNESS: I have not.
24 BY MR. CLINTON:

Page 100

1   Q  Doctor, have you ever --
2   A  But again, I want to go back to adding
3 that, you know, it's something that I've paid
4 attention to in my clinical care of patients, and it
5 just hasn't been an issue.
6   Q  Were you looking for fraying in the mesh
7 in 2000 when you began using the TVT product?
8   A  I was looking for how my patients were
9 doing and to seeing if there were problems.
10     MR. CLINTON: I'm going to object to
11 form -- I mean, I object as nonresponsive.
12     MR. KOOPMANN: Hold on. Let him answer
13 the question, and then move to strike if you want to
14 move to strike and object as nonresponsive.
15 BY MR. CLINTON:
16   Q  You may continue, Doctor.
17     MR. KOOPMANN: Thank you.
18 BY MR. CLINTON:
19   Q  We're getting into that area where I'm
20 asking questions and you're giving answers about
21 something -- something else. So -- and I appreciate
22 you want to give a full and accurate answer.
23     Were you looking for fraying of the TVT
24 product when you began implanting it in 2000?

Page 101

1   A  Again, my answer would be that I was
2 looking for any complications that my patients may
3 have. Fraying was not something that -- unless I was
4 looking for it, but if fraying were causing problems
5 for my patients, I certainly would be interested in
6 looking at that, and I was looking at that carefully
7 to see if my patients were having any problems with
8 their surgery.
9   Q  Doctor, you testified previously that
10 fraying was a new concept to you that you first heard
11 about in reading the plaintiffs' expert reports. Did
12 I have that wrong?
13     MR. KOOPMANN: Object to form.
14     THE WITNESS: No, that's correct.
15 BY MR. CLINTON:
16   Q  Okay. Were you looking specifically for
17 fraying of the mesh when you began implanting it in
18 2000?
19   A  I was looking for problems -- any
20 problems my patients might be having with surgery.
21   Q  Did you know to look for fraying of the
22 TVT product?
23   A  I was looking for their clinical
24 outcomes.

Page 102

1    MR. CLINTON: Objection. Nonresponsive.
2 BY MR. CLINTON:
3    Q   Doctor, were you looking for fraying of
4 the TVT product in 2000 when you began implanting it
5 in your patients?
6    A   I was looking for any problems they might
7 have, including something like fraying that I may not
8 have been aware of.
9        But, again, I was looking for any
10 clinical problems they might be having.
11   Q   What did you do to look for fraying in
12 2000, Doctor?
13   A   I was just seeing how my patients were
14 doing. I wanted to see if they -- if -- was their
15 sling working well, were they having any problems
16 from it, were they having any complications from it,
17 were they satisfied with their treatment.
18   Q   Doctor, do you want to change your
19 testimony earlier about fraying being a new concept
20 to you when you began your work in this case?
21       MR. KOOPMANN: Object to form.
22       THE WITNESS: No, I don't think I need
23 to.
24 BY MR. CLINTON:

Page 103

1    Q   All right. Let's get into the report.
2        (Exhibit No. 7 was marked for
3        identification.)
4        MR. CLINTON: I have a clean copy for
5 you.
6 BY MR. CLINTON:
7    Q   Doctor, how long -- not in terms of hours
8 accumulated, but start to finish, how long did you
9 work on your general report?
10   A   Approximately 20 hours.
11   Q   And again, from -- if you start on
12 August 1st, and you work days, weeks, months, from
13 start to finish, how long was it? Not an
14 accumulation of hours, just over how much time?
15   A   Several weeks.
16   Q   Did you write the general report, Doctor,
17 regarding the TVT device?
18   A   I did.
19   Q   Did you write every word of it?
20   A   I did.
21   Q   What type of review process did you do to
22 make sure it was accurate?
23   A   I -- I don't quite understand your
24 question.

Page 104

1    Q   Poor question.
2        Following, let's say, what would have
3 been a first draft of your -- of your general report,
4 what did you do to go back through and review and
5 edit it?
6    A   Like I would write any paper, I go back
7 and, you know, edit -- I look at paragraphs, I look
8 at references, I look at word choice, I look at
9 sentence structure.
10   Q   A true proofreading?
11   A   Right, and I try to -- try to write well.
12   Q   At least you said "write well" and not
13 "write good."
14       So, Doctor, you did have the chance to
15 proofread your general report before it was
16 submitted; is that fair?
17   A   That's fair.
18   Q   Okay. After you had done your research
19 and investigation, Doctor, of all the materials
20 available to you, did you ever ask for additional
21 materials that supported the opinions that you began
22 to develop?
23   A   It kind of goes back to the question you
24 were asking earlier, that in developing my opinions,

Page 105

1 I was researching it while I was developing my
2 opinions. So...
3    Q   Right. And so -- hypothetically, so your
4 -- well, not hypothetically.
5        One of your opinions is about the TVT
6 product does not cause dyspareunia. Is that fair?
7    A   That's fair.
8    Q   Okay. And after you've done research and
9 investigation and you start to come up with that
10 opinion, you start to form that opinion, did you ever
11 reach out to Ethicon and say, My opinion on
12 dyspareunia is this. Do you have anything else to
13 help support that opinion?
14   A   I did not.
15   Q   Were any opinions in your report supplied
16 to you?
17   A   They were not.
18   Q   Were there any phrases that were supplied
19 to you that you should use in your report?
20   A   No, not that I recall.
21   Q   Is your report the result of careful
22 consideration of the materials available to you?
23   A   I believe it is.
24   Q   Did you draft this report with the

Page 126

1  BY MR. CLINTON:
2     Q   What about -- what about your research
3  regarding lightweight mesh, when did that begin?
4     A   Again, it goes back -- I can't tell you
5  how many years, but it's something that has been, you
6  know, discussed in the literature and at meetings and
7  with colleagues for a long time.  So I can't give you
8  a precise --
9     Q   And what is beneficial about lightweight
10 mesh?
11    A   The macroporous and lightweight mesh
12 allows the integration into the tissue better than
13 the smaller or the older microporous things.  An
14 example is the use of Gore-Tex is something that is a
15 macroporous product that had been used for -- you
16 know, had been tried for treatment of incontinence,
17 and it didn't work well, wasn't incorporated in the
18 tissue, was encapsulated.
19        And so the large pore lightweight mesh
20 such as what's the TVT is made of avoids those
21 problems, allowing tissue integration.
22    Q   What allows -- what allows the tissue
23 integration?  What about the larger pore size?
24    A   I think the basic understanding has to do

Page 127

1  with the idea that the inflammatory response that
2  happens acutely can allow macrophages to come in.
3  There's -- tissue actually grows in and around the
4  mesh product as -- you know, it grows in between the
5  mesh product as opposed to being stuck on the
6  outside.  So...
7     Q   And then that's more regarding the pore
8  size.  What about being lightweight?  Lightweight
9  versus a heavier weight mesh, why does that matter?
10    A   I think it's the -- the same idea.  It's
11 going to have, you know, allow the -- the mesh to be
12 there a little bit easier, allow integration, and I
13 think they're really connected, the two answers.  So
14 I'm not sure there's really a different answer for
15 those two.
16    Q   Well, what specifically was negative
17 about a heavier weight mesh?
18    A   Again, I think it was all part of --
19 heavier weight mesh is going to be a denser mesh with
20 smaller pores.  So I think the two go hand in hand a
21 little bit.  I'm not sure how to differentiate that
22 further for you.
23    Q   And then in that first sentence I read,
24 Doctor, it's known for its excellent

Page 128

1  biocompatibility.  What research have you done
2  regarding the biocompatibility of the TVT product?
3        Strike that.
4        When did your research begin about the
5  biocompatibility of the TVT product?
6     A   Probably about the time I started
7  performing the TVT procedure back around 2000.
8     Q   And when you say that, are you
9  referencing your clinical experience?
10    A   Right.  Clinical experience and -- and
11 research and -- and attendance at meetings and, you
12 know, are we having problems with this implant in
13 patients.  So --
14    Q   Do you have any --
15    A   -- it goes back to the breadth and depth
16 of my -- you know, my clinical activity in general
17 going way back when.  So...
18    Q   Other than clinical experience in
19 implanting the mesh and monitoring patients who have
20 it implanted, do you have any training in the
21 biocompatibility of products implanted in the body?
22    A   Sure.  It really goes back to my -- my
23 experience, you know, as a physician, becoming a
24 physician.  While I don't do research on, you know,

Page 129

1  the polymers, I -- I do research with patients.  I
2  take care of patients, clinical taking care of
3  patients.  And so you have to understand it really
4  goes hand in hand.  If you don't have an
5  understanding of biocompatibility of something you're
6  putting in a patient, if you're not following them
7  clinically, then it -- you wouldn't be performing
8  your duties as a physician well.
9     Q   So is your opinion about the
10 biocompatibility of TVT solely based on your
11 experience as a clinician?
12        MR. KOOPMANN:  Object to form.
13        THE WITNESS:  No.  Because in addition to
14 that, in developing my opinion here, I've been
15 provided a lot of additional information to -- and
16 found additional information on my own to develop the
17 opinions I've provided here.
18 BY MR. CLINTON:
19    Q   Have you ever performed your own research
20 on the biocompatibility of certain materials in the
21 body?
22    A   I performed my research in the form that
23 we discussed, that it's -- it's clinically -- I'm
24 taking care of patients every day.

Page 130

1  Q  Have you ever been part of any specific
2  research regarding polypropylene and its
3  biocompatibility?
4  A  I have.
5  Q  Okay.
6  A  In the things we just talked about
7  that --
8  Q  Your clinical experience and --
9  A  -- my trial we just finished, the
10 FDA-required trial that we just -- we just finished
11 on the single incision sling.
12 Q  Okay.  And explain -- explain your role
13 as it relates to biocompatibility of the product.
14 A  So these patients in this study, we
15 followed them very closely for any problems that they
16 have regarding the implant of the sling.  So did they
17 have any problems with mesh exposure, did they have
18 any problems with inflammation, did they have
19 problems with detection.  These would be things that
20 would be part of nonbiocompatibility, if you will.
21 Q  And was that solely based on objective --
22 I'm sorry, strike that.
23    Was that solely based on subjective
24 reports from the participants?

Page 131

1  A  No.  They were followed closely
2  objective- -- I mean, at six-month intervals for
3  three years.
4  Q  All right.  And what was done to monitor
5  it?
6  A  Physical -- I mean, it was a combination
7  of subjective -- of questionnaires and physical
8  examination.  So there's a combination of things that
9  were looked at, at each visit they come in for.
10 Q  And what's being done in the examination?
11 A  For patients that were in the -- the
12 trial for the sling specifically, it's looking and
13 doing a vaginal exam, seeing if it's there, seeing if
14 there is any exposure of the mesh material, assessing
15 for symptoms that they're having, pain problems.  You
16 know, a whole host of things like that.  So...
17 Q  Other than in a clinical setting, have
18 you done any research on the biocompatibility of the
19 TVT in the body?
20 A  Such as what?
21 Q  Their -- anything.
22 A  I would go back to the research that I --
23 the reading I do.  So --
24 Q  The reading and clinical experience?

Page 132

1  A  Right.
2  Q  Do you have any specific training in
3  the -- in biocompatibility of products, medical
4  products?
5     MR. KOOPMANN:  Object to form.
6     THE WITNESS:  I -- I think so.  I think
7  going back to my residence training.  I mean,
8  that's -- it goes back that far.  I think that there
9  is a significant amount of biocompatibility training
10 involved in taking care of patients and putting these
11 implants in.
12 BY MR. CLINTON:
13 Q  Continuing on in that paragraph, Doctor,
14 half -- it's about halfway down and halfway across
15 the line, "The fact that the device" -- do you see
16 that?
17 A  Mm-hmm.
18 Q  "The fact that the device is made from
19 Prolene polypropylene is comforting for surgeons, as
20 the integrity and biocompatibility of the material is
21 well known."
22    Can you explain that a little more?
23 A  I -- do you have a specific question?
24 Q  Regarding the biocompatibility of the

Page 133

1  material being well known, what's your basis for that
2  opinion?
3  A  The TVT device and -- and other mesh
4  products, they are the most studied treatment for
5  urinary incontinence that -- that we've ever had.
6  Q  And is the fact that it's the most
7  studied, is that only a good thing to you?
8  A  It's the most studied and -- and those
9  studies show that it really has been the -- the
10 treatment we have that is the most effective with the
11 least amount of complications.
12 Q  Do all of the studies show that?
13 A  No, they do not.  But -- but when you
14 look on balance, you know, there -- there are going
15 to be studies that show that -- that it doesn't work
16 that well, and those -- most of those studies that
17 show that it doesn't work that well are going to be
18 in that lower level of type of study probably where
19 it's a retrospective study or -- but when we start
20 looking at higher level studies, such as
21 meta-analysis and systemic reviews, on balance you're
22 going to find that this really is safe and effective
23 relative to other procedures that we had in the past
24 or that we still have.

Bruce S. Kahn, M.D.

Page 150

1   any reaction there.
2       Yes, dyspareunia happens after surgery,
3   no matter what it is.
4       But I think, to answer your question, I
5   don't think there's any inherent characteristic of
6   the device that would cause the dyspareunia.
7       Q   So, Doctor, is it your -- is it your
8   opinion that the risk of dyspareunia is the same
9   across all SUI surgeries, mesh or non-mesh?
10      A   I don't know if it's the same.  Actually,
11  it -- I think with some of the other procedures you
12  may have some increased risk.
13      But the -- the underlying statement there
14  is that pain is a risk of surgery, any vaginal
15  surgery, whether it be a sling or any other repair,
16  there is a risk of dyspareunia.
17      Q   And there's no inherent -- there's no
18  inherent characteristic of the TVT device that would
19  cause pelvic pain.
20      A   That is my opinion.
21      Q   There is no inherent characteristic of
22  the TVT device that causes vaginal pain.
23      A   That is my opinion.
24      Q   There is no inherent characteristic of

Page 151

1   the TVT device that causes dyspareunia.
2       A   Did you just ask that question again?
3       Q   Vaginal pain and then I went to
4   dyspareunia.  Pelvic pain, vaginal pain, dyspareunia.
5       A   Yes.  That I --
6       Q   I mean I'll ask it so it's clean.
7       And, Doctor, there's -- it's your opinion
8   that there's no inherent characteristics of the TVT
9   device that cause dyspareunia?
10      A   That is true.
11      Q   Any --
12      A   That's my opinion.
13      Q   Any pelvic pain that occurs following a
14  TVT implant has nothing to do with the TVT product
15  itself.
16      A   Again, I think you can have pain develop
17  from any procedure that you have done in the vagina,
18  whether there's mesh used or not.
19      Q   If there is a TVT product implanted, not
20  talking about other products, in an instance where a
21  woman has a TVT product implanted, it's your
22  testimony there is nothing about that product and no
23  case that the TVT product causes the pelvic pain?
24      A   I don't think there's -- I'm going to

Page 152

1   just stick to my statement here.  I don't think
2   there's any inherent characteristic of the device
3   that would cause vaginal pain or dyspareunia.
4       Q   Meaning that it's --
5       A   Do you have anything specific you're
6   trying to ask about with inherent characteristics of
7   the device?
8       Q   Well, just -- I want to make sure I'm --
9   I'm not misinterpreting "inherent characteristic."
10      I mean the -- the TVT device, there's
11  nothing about the TVT device, the actual mesh product
12  implanted, there's nothing about that that causes
13  pelvic pain.
14      A   That I -- there's no inherent
15  characteristic that I know of that -- that is related
16  to that.  So if there's something else that you're --
17  characteristic you're interested in asking about --
18      Q   This is -- this is my -- this is my
19  chance to make sure I understand, and that the
20  country understands, your opinions that are in
21  your -- in your report.
22      Moving on to the next section, "Erosion
23  or Exposure."  It's going to be a similar line of
24  questioning, Doctor.

Page 153

1       The first sentence reads:  "Mesh erosions
2   or exposures are not attributable to any alleged
3   defect in the TVT or any inherent characteristic in
4   the TVT device."
5       Did I read that correctly?
6       MR. KOOPMANN:  Object to form.
7       MR. CLINTON:  Did I not --
8       MR. KOOPMANN:  You almost did.
9       MR. CLINTON:  I will try it again.
10  BY MR. CLINTON:
11      Q   "Mesh erosions or exposures are not
12  attributable to an alleged defect in the TVT or any
13  inherent characteristic in the TVT device."
14      Did I read that correctly?
15      A   Yes.
16      Q   Okay.  Is it fair that this breaks down
17  the same way that the previous statement about pelvic
18  pain does, that it's not attributable to a defect or
19  any inherent characteristic of the device?
20      MR. KOOPMANN:  Object to form.
21      Go ahead.
22      THE WITNESS:  I would agree with that
23  statement.  That's what it says.
24  BY MR. CLINTON:

Page 182

1 level of surety from higher level type evidence, such
2 as systematic reviews, meta-analyses, prospective
3 clinical trials, giving them much more credence than
4 studies that are case series, case reports,
5 retrospective reviews, things like that.
6   So that level of evidence really -- and
7 that kind of goes through any time we're looking at
8 any problem, we want to address that literature that
9 way.
10   Q   Did you read depositions of the
11 plaintiffs' experts in addition to their reports?
12   A   I did.
13   Q   You were asked some questions by
14 Mr. Clinton earlier about the Erosion or Exposure
15 section of your report on page 18.
16   Do you recall that questioning generally?
17   A   I do.
18   Q   Six lines up from the bottom of that
19 paragraph, did you note: "Patient factors such as
20 vaginal atrophy, diabetes and smoking can contribute
21 to mesh exposures or erosions, as can technique
22 related factors such as superficial dissection during
23 mesh placement."
24   A   Yes --

Page 183

1   MR. CLINTON:  Object to form.
2   THE WITNESS:  Yes.  And thank you for
3 pointing that out.  I was -- meant to include that in
4 my original statement.  I knew there were some other
5 things there, and I couldn't quite think of them.  I
6 was drawing a blank, and fortunately, in my writing I
7 had it there.  I should have gone and looked for
8 that.
9   But those are very -- other risk factors
10 for developing the erosions or exposures.
11 BY MR. KOOPMANN:
12   Q   Between your report marked as Exhibit 7
13 and the testimony that you provided today, does that
14 contain your opinions regarding the TVT device as you
15 sit here today?
16   A   Yes, it does.
17   Q   Do you hold all of the opinions that
18 you've offered to a reasonable degree of medical
19 certainty?
20   A   I do.
21   MR. KOOPMANN:  Those are all my
22 questions.  Thanks, Dr. Kahn.
23   THE WITNESS:  Thanks.
24   MR. CLINTON:  Nothing else.

Page 184

1   THE VIDEOGRAPHER:  With the approval of
2 counsel, this concludes today's video deposition.
3 The time is approximately 4:36 p.m.  We're now off
4 the record.
5   (A discussion was held off the record.)
6   MR. CLINTON:  I'm marking as Exhibit 9
7 the flash drive that Dr. Kahn brought to the
8 deposition today.
9   (Exhibit No. 9 was marked for
10   identification.)
11   (Whereupon, the deposition of
12   BRUCE STEVEN KAHN, M.D., was
13   concluded at 4:39 p.m.)

Page 185

1   CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2   The undersigned Certified Shorthand Reporter
3 does hereby certify:
4   That the foregoing proceeding was taken before
5 me at the time and place therein set forth, at which
6 time the witness was duly sworn; That the testimony
7 of the witness and all objections made at the time of
8 the examination were recorded stenographically by me
9 and were thereafter transcribed, said transcript
10 being a true and correct copy of my shorthand notes
11 thereof; That the dismantling of the original
12 transcript will void the reporter's certificate.
13   In witness thereof, I have subscribed my name
14 this date:  August 2, 2019.
15
16   _____
17   LESLIE A. TODD, CSR, RPR
18   Certificate No. 5129
19 (The foregoing certification of
20 this transcript does not apply to any
21 reproduction of the same by any means,
22 unless under the direct control and/or
23 supervision of the certifying reporter.)
24

Page 186

1       INSTRUCTIONS TO WITNESS
2   Please read your deposition over carefully and
3 make any necessary corrections. You should state the
4 reason in the appropriate space on the errata sheet
5 for any corrections that are made.
6 After doing so, please sign the errata sheet
7 and date it.
8   You are signing same subject to the changes you
9 have noted on the errata sheet, which will be
10 attached to your deposition. It is imperative that
11 you return the original errata sheet to the deposing
12 attorney within thirty (30) days of receipt of the
13 deposition transcript by you. If you fail to do so,
14 the deposition transcript may be deemed to be
15 accurate and may be used in court.

Page 187

1     - - - - - -
2       E R R A T A
3     - - - - - -
4 PAGE LINE CHANGE
5 \_\_\_\_ \_\_\_\_ _____
6 REASON: _____
7 \_\_\_\_ \_\_\_\_ _____
8 REASON: _____
9 \_\_\_\_ \_\_\_\_ _____
10 REASON: _____
11 \_\_\_\_ \_\_\_\_ _____
12 REASON: _____
13 \_\_\_\_ \_\_\_\_ _____
14 REASON: _____
15 \_\_\_\_ \_\_\_\_ _____
16 REASON: _____
17 \_\_\_\_ \_\_\_\_ _____
18 REASON: _____
19 \_\_\_\_ \_\_\_\_ _____
20 REASON: _____
21 \_\_\_\_ \_\_\_\_ _____
22 REASON: _____
23 \_\_\_\_ \_\_\_\_ _____
24 REASON: _____

Page 188

1     ACKNOWLEDGMENT OF DEPONENT
2   I,_____, do hereby
3 certify that I have read the foregoing pages, and
4 that the same is a correct transcription of the
5 answers given by me to the questions therein
6 propounded, except for the corrections or changes in
7 form or substance, if any, noted in the attached
8 Errata Sheet.
9
10 _____
11 BRUCE S.KAHN, M.D.     DATE
12
13
14 Subscribed and sworn to
15 before me this
16 _____day of_____,20\_\_\_.
17 My commission expires:_____
18 _____
19 Notary Public