# EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 3                     CHARLESTON DIVISION
 4
 5    IN RE: ETHICON, INC.,      )  Master File No.
      PELVIC REPAIR SYSTEM       )  2:12-MD-02327
 6    PRODUCTS LIABILITY         )  MDL 2327
      LITIGATION                 )
 7                               )  JOSEPH R. GOODWIN
      ------------------------------)  U.S. DISTRICT JUDGE
 8                               )
      THIS DOCUMENT RELATES TO   )
 9    WAVE 11 CASES              )
                                 )
10
11                         - - -
12               Monday, August 12, 2019
13                         - - -
14
15
16        DEPOSITION OF RICHARD M. WASSERMAN, M.D.,
17   held at Greenberg Traurig, 10845 Griffith Peak Drive,
18   Suite 600, Las Vegas, Nevada, commencing at
19   9:31 a.m., on the above date, before Janet C. Trimmer,
20   NV CCR 864.
21
22                         - - -
23
24              GOLKOW LITIGATION SERVICES
            phone 877.370.DEPS  /  fax 917-591-5672
25                   deps@golkow.com
```

Page 2

APPEARANCES

On behalf of the Plaintiffs:
WAGSTAFF & CARTMELL, LLP
BY: ANDREW N. FAES, ESQ.
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(818) 701-1100
afaes@wcllp.com

On behalf of the Defendants:
BOWMAN AND BROOKE LLP
BY: BARRY J. KOOPMANN, ESQ.
150 South Fifth Street
Suite 3000
Minneapolis, Minnesota 55402
(612) 339-8682
barry.koopmann@bowmanandbrooke.com

Page 3

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| RICHARD M. WASSERMAN, M.D. | BY MR. FAES | 5 |
| | Afternoon Session | 139 |
| | BY MR. KOOPMANN | 262 |
| | BY MR. FAES | 275 |

EXHIBITS

| NUMBER | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 1 | 6 | "Notice to Take Deposition of Richard M. Wasserman, M.D. FACOG" |
| Exhibit 2 | 9 | "Richard Wasserman, M.D., FACOG, FPMRS, General Report Regarding TVT, TVT-EXACT, TVT-Obturator, and TVT-Abbrevo Mid-Urethral Slings" |
| Exhibit 3 | 9 | Curriculum Vitae of Richard M. Wasserman, M.D. FACOG |
| Exhibit 4 | 9 | "Richard Wasserman, General Materials List, in Addition to Materials Referenced in Report" |
| Exhibit 5 | 9 | "Richard Wasserman, Supplemental General Materials List, in Addition to Materials Referenced in Report" |
| Exhibit 6 | 9 | Dr. Richard Wasserman, M.D., Invoice, dated 1-3-2019 |
| Exhibit 7 | 9 | Compilation of e-mails |
| Exhibit 8 | 10 | Letter dated 12-1-18 from Jeffrey L. Clemons, M.D., to Attorney General of Washington |

Page 4

EXHIBITS (CONTINUED)

| NUMBER | PAGE | DESCRIPTION |
|---|---|---|
| Exhibit 9 | 10 | Flash drive (retained by counsel) |

INFORMATION REQUESTED

| Page | Line |
|---|---|
| 19 | 12 |
| 22 | 14 |

Page 5

1  Las Vegas, Nevada; Monday, August 12, 2019
2             -oOo-
3
4  Whereupon --
5      (In an off-the-record discussion held prior
6  to the commencement of the proceedings, counsel agreed
7  to waive the court reporter's requirements under Rule
8  30(b)(5)(A) of the Federal Rules of Civil Procedure.)
9
10      RICHARD M. WASSERMAN, M.D.
11  having been first duly sworn to testify to the truth,
12  was examined and testified as follows:
13
14         EXAMINATION
15
16  BY MR. FAES:
17    Q.  Good morning, Dr. Wasserman.  Could you state
18  your full name for the record, please?
19    A.  Richard Marc Wasserman.
20    Q.  You have been hired as a general liability
21  expert for Ethicon in this litigation; is that
22  correct?
23    A.  Yes.
24    Q.  And you produced an expert report that's
25  dated March 21st of 2019; right?

Page 26

1  A. I do. I think an expert opinion should be
2  unbiased and objective, yes.
3  Q. Okay. And when you gave your opinions in
4  this litigation, you wanted those opinions to be as
5  accurate as possible; right?
6  A. Yes.
7  Q. You wanted to be as thorough in your review
8  of the available information, documents, and
9  literature as possible; right?
10  A. Yes.
11  Q. And you wanted to make sure that you got all
12  of the information on the pertinent issues in the case
13  before giving your opinions; right?
14    MR. KOOPMANN: Object to form.
15    THE WITNESS: Yes.
16  BY MR. FAES:
17  Q. Do you feel like you have all of the
18  pertinent information that you need in order to issue
19  your opinions in this case?
20  A. I feel as though the documents that I have
21  reviewed are adequate for my being able to form an
22  opinion on these four products.
23  Q. Is it fair to say that you want to get both
24  sides of the story before issuing your opinions in
25  this case?

Page 27

1  A. I don't really understand what you mean by
2  "both sides of the story."
3  Q. Well, it's fair to say that you want to
4  consider both information that supports your opinions
5  that the TVT devices are safe and effective, and you
6  want to look at any information that suggests that the
7  devices are not safe and effective; right?
8  A. I look at all information, all the
9  information that was provided, yes.
10  Q. Okay. And you would want to look at all of
11  the information that supports that there might be a
12  defect or problem with the TVT products as well as
13  information that suggests that there isn't a defect or
14  problem with the TVT devices; right?
15  A. Well, I would look at the quality
16  information; correct. It's a question of all
17  information versus quality information. I'm sure that
18  there's information out there that is not high-quality
19  information. So non-high-quality information is -- I
20  don't think I would put much weight on that.
21  Q. Okay. What do you consider to be
22  not-high-quality information? Do you have any
23  examples of materials in this case that you reviewed
24  that you considered to be not high quality?
25  A. There's a number of stuff that I've reviewed

Page 28

1  for this case. Some of it is high quality; some of it
2  is not high quality. I don't have a list of what
3  specific ones offhand.
4  Q. Okay. In general, are there any sources or
5  items that you consider to be not high quality?
6  A. Generally, let's talk about high quality.
7  High quality is like the level I type studies, the
8  Cochrane databases, the meta-analysis, the statements
9  from the societies. That, I would consider to be
10  higher quality as opposed to non-level-I-type
11  material.
12  Q. Okay. Do you consider testimony from Ethicon
13  medical directors to be high-quality evidence?
14  A. Not really, no.
15  Q. And why is that?
16  A. Because it's just the opinion of one person,
17  and as opposed to the opinion of a medical society or
18  as opposed to a level I research article. A single
19  opinion of one individual is one individual's opinion.
20  Q. So you consider the testimony of Ethicon's
21  paid medical directors that they hire to be not high
22  quality; is that accurate?
23    MR. KOOPMANN: Object to form.
24    THE WITNESS: I wouldn't place too much value
25  on that as far as evidence, as far as material that I

Page 29

1  would use into forming an opinion.
2  BY MR. FAES:
3  Q. Okay. It's fair to say that the opinions of
4  Ethicon's medical directors that Ethicon hired and
5  selected to be responsible for the transvaginal mesh
6  products, you don't consider their opinions to be high
7  quality; correct?
8    MR. KOOPMANN: Object to form.
9    THE WITNESS: I don't think that the opinion
10  of one person has much value when you look at the body
11  of literature.
12  BY MR. FAES:
13  Q. Do you consider internal documents from
14  Ethicon employees, such as engineers and people who
15  actually worked on the design of the products, to be
16  high quality?
17  A. Again, that's the opinion of one person.
18  That's not the opinion of a medical society or a large
19  data review. So I wouldn't -- I'd put that as the
20  opinion of just one person.
21  Q. Okay. So it's fair to say that you don't
22  consider the opinions of engineers who actually worked
23  on the design of the TVT products to be high quality;
24  correct?
25  A. Again, that's just the opinion of one

Page 30

1  specific individual. So when I review material for
2  forming my opinion, I would not base it on one
3  specific individual's conclusions.
4     Q. I understand that, but my question is a
5  little different and more specific than that.
6        My question is, do you consider the opinions
7  of engineers who actually worked on the design of the
8  TVT products to be of high quality?
9     A. I think that it's not that high quality. I
10 think it's just the opinion of one specific
11 individual. I don't put too much weight or value on
12 it. I've looked at those documents and I've kind of
13 looked at them, going okay, that's that guy's opinion,
14 or that one's opinion, and okay. But what does the
15 body of literature say? And the body of literature
16 differs from some of those internal documents that you
17 are alluding to.
18    Q. Okay. What about the -- if it's a -- strike
19 that.
20       What if we're talking about sworn testimony
21 from an engineer, a person who worked on the design of
22 the TVT products? Is your answer the same with regard
23 to testimony as it is to documents?
24       MR. KOOPMANN: Object to form.
25       THE WITNESS: Yes, I would agree. I think

Page 31

1  they are just the opinion of one individual, so I
2  don't put too much weight on that.
3  BY MR. FAES:
4     Q. Do you put any additional weight or consider
5  it to be of higher quality if multiple engineers who
6  worked on the design of the TVT product express the
7  same viewpoint or opinion?
8     A. Again, it's multiple individuals' opinions.
9     Q. Do you put any additional weight -- well, I'm
10 going to have to back up, because I'm not sure that
11 exactly answers my question. I understand we're
12 talking about individuals, but my question is a little
13 different.
14       My question is, does your assessment of the
15 quality of the evidence change if multiple engineers
16 or persons who worked on the actual design of the TVT
17 products expressed the same opinion?
18    A. Again, I don't put too much weight on those
19 opinions.
20    Q. But does it change at all? Does it make it
21 more or less credible if multiple persons express the
22 same opinion?
23    A. It does not.
24    Q. Okay. If multiple medical directors for
25 Ethicon and Johnson & Johnson who were responsible for

Page 32

1  overseeing the efficacy and safety of the transvaginal
2  mesh products, including the TVT, expressed the same
3  viewpoint, does that change your assessment in any way
4  of the quality of that evidence?
5     A. It does not. So the evaluation of the TVT
6  and all the products that we're talking about today,
7  there's a body of literature out there that I place a
8  high value on. Individual's specific opinions
9  regarding the TVT and comments that they have made or
10 anything that they've said as an individual, I don't
11 place too much weight on.
12    Q. Okay. Would you agree that the primary
13 responsibility of Ethicon's medical directors was to
14 ensure the safety and efficacy of the TVT products?
15       MR. KOOPMANN: Object to form. Foundation.
16       THE WITNESS: I do not know what the primary
17 responsibility of Ethicon's medical director is. I
18 can't speak to that.
19 BY MR. FAES:
20    Q. Okay. But you've reviewed testimony of some
21 of Ethicon's medical directors; right?
22    A. I have.
23    Q. Do you recall reviewing the deposition of
24 Richard Isenberg?
25    A. The name sounds familiar. I'm terrible with

Page 33

1  names. So the name sounds familiar, but I'm not sure
2  exactly which one that was.
3     Q. Do you recall that he was one of the first
4  medical directors for the Ethicon products from
5  approximately 1999 to 2000 or 2001?
6     A. That sounds about right.
7     Q. And do you remember him testifying that he
8  considered himself the chief safety officer for the
9  TVT product?
10    A. Yes, I think that was his opinion.
11    Q. Okay. Do you have any opinions as to whether
12 or not that's true, that Dr. Isenberg, as the medical
13 director for the TVT products, was the chief safety
14 officer for the TVT?
15    A. I have no opinion on that.
16    Q. If he was the chief safety officer for the
17 TVT, does that change your assessment of the
18 reliability of the information that he offers?
19    A. It does not. I don't know exactly what a
20 chief safety officer entails.
21    Q. You would agree with me that the medical
22 literature is relevant information that you would want
23 to consider prior to issuing your opinions in this
24 case; right?
25    A. Say that again?

Page 38

1  me that that's relevant information that you would
2  want to know prior to issuing your opinions, is the
3  differences between the four products that you are
4  offering opinions on; right?
5      MR. KOOPMANN: Object to the form.
6      THE WITNESS: So in regards to the four
7  products, they are all -- there are very, very subtle
8  differences between them. The relevant differences
9  are actually minimal, but there are some very subtle
10 differences, and I do believe I am aware of most of
11 them.
12 BY MR. FAES:
13     Q. Okay. And my question was, simply, that's
14 information that you would want to know and consider
15 before issuing your opinions; right?
16     A. As long as it's relevant, yes.
17     Q. Okay. Would you agree with me that each of
18 the products that you are offering an opinion on in
19 this case, the TVT, the TVT-O, the Abbrevo, and the
20 Exact have different safety profiles?
21     A. They have different safety profiles, yes,
22 there are.
23     Q. Okay. Do you think it was important, before
24 offering your opinions in this case, to understand the
25 differences between the four products that you are

Page 39

1  offering an opinion on and other polypropylene
2  mid-urethral slings?
3      A. Again, in regards to -- going back to your
4  previous question as well, in regards to safety
5  profiles, there's such overlap and redundancy between
6  all of these products that the way that they are used,
7  their intent for use, the actual materials, that the
8  safety profiles are really very, very similar between
9  all of them. If there are subtle differences between
10 one versus another, the actual relevance of these
11 safety profiles is not significant. That was the
12 previous question. What was the most recent question?
13     Q. My question was, do you agree that it's
14 important to understand the differences between the
15 four products that you are offering an opinion on in
16 this case and other polypropylene mid-urethral slings?
17     A. These four products and other mid-urethral
18 slings, again, they are all -- the subtle differences
19 between them, although there are subtle differences, I
20 don't believe that they are very significant. I
21 believe that there's -- the differences between all of
22 them are minimal and not really clinically relevant.
23     Q. But you would agree with me that -- well,
24 strike that.
25     Would you agree with me that it was important

Page 40

1  for you to know those differences prior to issuing
2  your opinions in this case, or do you disagree with
3  that?
4      A. I don't think that the differences factor
5  into my opinion, so I don't think that they are
6  relevant, despite being subtle differences between all
7  these products. The actual safety and actual intent
8  of use, actually how they are used, they are all
9  pretty much the same. And even in regards to TVTs and
10 other non-TVT mid-urethral slings.
11     Q. And for a number of opinions in your report,
12 you actually are discussing the safety and efficacy
13 profile of mid-urethral slings in general, not
14 specifically the TVT; right?
15     A. Most of it is general, and I do believe that
16 the safety profiles of the TVT does translate to
17 almost all mid-urethral slings.
18     Q. Okay. Would you agree with me that the four
19 TVT devices that you are offering -- well, strike
20 that.
21     Would you agree with me that, for instance,
22 the TVT retropubic device has a different safety
23 profile than, say, the --
24     A. I --
25     MR. KOOPMANN: Wait.

Page 41

1      MR. FAES: Strike that. Let me restart.
2      THE WITNESS: Okay. Sorry.
3  BY MR. FAES:
4      Q. Would you agree with me that the TVT
5  retropubic device, the TVT Classic, has a different
6  safety profile than, say, the AMS SPARC?
7      A. Yes.
8      Q. Would you agree with me that the TVT
9  retropubic has a different safety profile than the
10 Boston Scientific Advantage?
11     A. On certain components, yes. On the basic
12 structure in regards to placement, on how they are
13 placed and where they are placed, it's the principles,
14 I believe, are the same for all of these.
15     However, there might be subtle differences in
16 regards to whether you are taking the transobturator
17 route or the retropubic route, but the sling itself is
18 the same for all of them.
19     How it's placed and where it's placed, yeah,
20 there are a couple of differences there and things you
21 have to watch out for when you are actually placing
22 them. However, the actual sling itself is the same
23 for all.
24     Q. So you would agree with me that the four TVT
25 products that you are offering an opinion on have a

Page 42

1 different safety profile than other full-length
2 polypropylene mid-urethral slings; right?
3     A. Say that again.
4     Q. You would agree with me that the four TVT
5 products that you are offering an opinion on in this
6 case have different safety profiles than some of the
7 other full-length polypropylene mid-urethral slings
8 that are still on the market; right?
9     A. I do not. I think that they are pretty much
10 all the same. I think that all mid-urethral slings,
11 the safety in regards to these products are -- and
12 we're talking about the TVT, the macroporous, all of
13 those, that they are all pretty much the same.
14        In regards to the subtle differences, like
15 with the SPARC and when you asked me earlier with
16 regards to the SPARC and the traditional classic TVT,
17 it's just how it's placed, and that's more of a
18 technical issue of the placement itself than how you
19 are doing it, the mechanics of doing it. It's not at
20 all for the actual sling itself. The safety profile
21 for the actual sling is similar throughout.
22     Q. Okay. So when you issued your opinions in
23 this case, is it fair to say that you didn't do a
24 comparison of the safety profile between the -- say,
25 the TVT and the TVT-Exact sling versus the other

Page 43

1 retropubic slings that are available?
2     A. I have looked at literature that does compare
3 different companies' products as well.
4     Q. Okay. And did you -- what was -- how did you
5 conclude, upon looking at that data, that there was no
6 difference in the safety profile between the TVT and
7 TVT-Exact versus the other --
8     A. Companies? Sorry.
9     Q. -- retropubic slings?
10     A. They are all -- based upon the literature,
11 they are all kind of the same in regards to risks of
12 the sling itself.
13        In regards to placement of the sling, in
14 regards to where it goes and what structures are
15 involved and the dissection involved and which
16 direction you choose to place the sling, that is
17 different between them. However, the actual sling
18 itself, they are the same.
19     Q. Okay. So you said a minute ago all
20 retropubic slings are kind of the same. Are you
21 saying they are kind of the same or they are all the
22 same?
23     A. Sorry. All the slings are the same, yes.
24     Q. For retropubic?
25     A. For all -- macroporous polypropylene slings

Page 44

1 pretty much -- they are the same. The actual sling
2 itself is the same. How you implant that sling, how
3 you -- where you place that sling, there are subtle
4 differences.
5     Q. Okay. And just to be clear, my question is
6 specific to the safety profile. You are saying that
7 the safety profile is the same of all the
8 polypropylene full-length mid-urethral slings?
9     A. Yes.
10     Q. Is your answer the same if we're comparing
11 the retropubic slings to, say, mini-slings such as the
12 TVT-Secur, Altis RS?
13     A. Yes, I believe the safety profile is the same
14 in regards to the sling itself, as opposed to the
15 mini-sling, which I was not offering an opinion on
16 here today. The mini-sling, it's the same material.
17 So I do think that the sling itself is equally as safe
18 as the retropubic.
19        As far as placement goes, as far as location,
20 as far as how it's placed and the actual placement
21 itself, there are differences between that.
22     Q. And your answer is the same even with regard
23 to slings that are no longer on the market, such as
24 the Bard Align or the AMS SPARC; right?
25     A. I'm not familiar with the Bard Align. I

Page 45

1 don't know that one. The other ones, the macroporous,
2 large-pore polypropylene, their safety profile is the
3 same for all of these mid-urethral slings.
4     Q. Even if they are no longer being sold;
5 correct?
6     A. The fact that they are being sold or not
7 being sold is -- doesn't factor in.
8     Q. And you have an understanding that some of
9 the retropubic slings are no longer on the market --
10 right? -- such as the AMS SPARC?
11     A. The AMS, MonArc, and SPARC, yes.
12     Q. And you have an understanding that the Bard
13 Align and the Bard Align TO are no longer on the
14 market. I think you said you weren't too familiar --
15     A. I'm not too familiar -- sorry. I'm not very
16 familiar with the Bard product. However, the AMS
17 products, I am aware that they are no longer on the
18 market.
19        My understanding is that it has to do with
20 marketing or business stuff from AMS, but I don't
21 really know too much about that.
22     Q. And where do you have that understanding
23 from?
24     A. You know, I'm just kind of guessing, I guess.
25 I'm just kind of guessing. I'm not 100 percent sure.

Page 46

1     MR. KOOPMANN: Don't do that.
2     THE WITNESS: Okay. Sorry.
3 BY MR. FAES:
4   Q. So it's fair to say that -- strike that.
5     Would the answer to my question be the same
6 if I'm asking if you've done a comparison between --
7 in terms of the safety profile between the TVT-O and
8 Abbrevo versus other obturator slings that are still
9 on the market such as the Boston Scientific Lynx or
10 any other obturator slings on the market?
11   A. I feel that they are equivalent in safety.
12   Q. Okay. So is it fair to say that, because you
13 are offering an opinion in this case that the four TVT
14 products that you are offering an opinion on, TVT,
15 TVT-Exact, TVT-O, and TVT-Abbrevo, are all safe and
16 effective and they have the same safety profile as
17 other full-length mid-urethral slings; is it your
18 testimony that all full-length mid-urethral slings are
19 safe and effective?
20   A. So as far as all ones, I am not saying all.
21 I don't know what you mean by "all." But I do know
22 that, the ones I am familiar with, they are equally as
23 safe in regards to the sling itself.
24     In regards to placement of the sling, again,
25 there are subtle differences and there are different

Page 47

1 things you need to watch out or look for on the
2 different locations and placement and how they are
3 placed in regards to the procedure itself.
4     But they are all -- the macroporous
5 mid-urethral slings, as far as my knowledge goes and
6 my familiarity with the products that are out there, I
7 don't know if there's other products out there that
8 I'm not aware of, so that's why I can't say all.
9   Q. Well, so it's fair to say that if all
10 mid-urethral slings have the same safety profile as
11 the four TVT products you are offering an opinion on,
12 and the four TVT products you are offering an opinion
13 on are all safe and effective, then all mid-urethral
14 slings must be safe and effective; right?
15   A. I would have to review specific -- I did a
16 lot of work on these four specific ones, so I reviewed
17 a lot of information on those. So my opinion today is
18 based on these, but if I were to do a review of those
19 others, I would have to come to that opinion after
20 reviewing all of the literature on those.
21     So my opinion today is just on these four
22 products. So to place my opinion on other products
23 that are not included in this review would be a little
24 presumptuous, but I do think that mid-urethral slings
25 made out of macroporous mesh generally are, but I

Page 48

1 would have to review all the literature in order to
2 address one specific sling that you are referring to.
3   Q. In doing your -- well, strike that.
4     I think you state in your report, if I can
5 find it -- Doctor, in your report on page 2 you state
6 you choose to use Ethicon's TVT, TVT-Exact, TVT-O, and
7 TVT-Abbrevo devices "to treat my patients' stress
8 urinary incontinence"; right?
9   A. Page what?
10   Q. Page 2.
11     MR. KOOPMANN: I'll object to the form just
12 to the extent I think you said "choose" and it says
13 "chose."
14     MR. FAES: Oh, strike that. Good catch
15 there, Barry. Thanks.
16   Q. So your report here says that you chose to
17 use Ethicon's TVT, TVT-Exact, TVT-O, and TVT-Abbrevo
18 devices to treat your patients' stress urinary
19 incontinence; right?
20   A. Yes.
21   Q. Do you choose --
22     Thank you, Barry.
23     Do you still choose to use all four of those
24 devices in your practice currently?
25   A. Currently I'm not using these products.

Page 49

1   Q. Okay. Why not?
2   A. Because when I moved here -- I've been here
3 in Las Vegas practicing here for about three years
4 now, and the contracts from the hospitals were
5 directed toward different products. So the hospitals
6 have now got a better deal from a different product,
7 and that's the only reason why I'm not using any of
8 these products. Were they available at my hospitals
9 that I work out of, I would absolutely use them.
10     MR. FAES: Well, thank you, Barry. I would
11 have just blown right past that if you hadn't pointed
12 that out.
13   Q. So what products are you currently using in
14 your practice to treat stress urinary incontinence?
15   A. Currently the hospitals have contracts with a
16 retropubic mid-urethral sling company and
17 transobturator mid-urethral sling company named
18 Caldera.
19   Q. So right now, currently, you are exclusively
20 using Caldera products to treat SUI; is that accurate?
21   A. That is accurate. That's what the hospitals
22 have the best contract with.
23   Q. Okay. And specifically what products do they
24 have for the retropubic and the obturator approach?
25   A. They have, it's a mid-urethral sling, the

Page 94

1 still use it, but I do think that mid-urethral slings
2 are a far better route to go for stress urinary
3 incontinence.
4   Q. But if a physician were to perform the Burch
5 procedure for the treatment of stress urinary
6 incontinence today, would you agree with me that that
7 would still be within the standard of care?
8   A. I think that the standard of care is a
9 mid-urethral sling. I think that the standard of care
10 is a mid-urethral sling. Is a Burch procedure an
11 option for certain surgeons? Sure. That's up to
12 them.
13       But in regards -- in my practice and in
14 regards to my understanding of how most physicians and
15 surgeons that take care of urinary incontinence, I
16 would say that mine and my colleagues' standard of
17 care is a mid-urethral sling.
18   Q. Would you agree with me that if a physician
19 chose to use the Burch procedure for the treatment of
20 stress urinary incontinence today, that would not be
21 below the standard of care?
22   A. Well, you know, I don't know, on that. I
23 don't want to, like, argue with a different surgeon,
24 but I do think that they are choosing a procedure that
25 has more morbidity and less efficacy, so I would kind

Page 95

1 of wonder why they would choose a procedure that
2 didn't work as well and that has more morbidity. So I
3 do think it's probably below the standard of care. I
4 don't think standard of care is kind of like this
5 written-in-stone thing.
6       I think that most contemporary active
7 surgeons that take care of stress urinary incontinence
8 would use a mid-urethral sling. I think that if you
9 use a Burch procedure as your primary procedure for
10 stress incontinence, you are an outlier, it's an
11 outlier. I would say it would lie outside the
12 standard of care.
13   Q. So it would be your opinion that a surgeon
14 that uses the Burch procedure for their primary
15 procedure currently is not a contemporary active
16 physician?
17   A. No. I think there are a lot of contemporary
18 active physicians that do use Burch procedures, but I
19 think that those physicians would be considered an
20 outlier in regards to how to address stress
21 incontinence. I think in their hands they think that
22 is the best for their patients, but I think that the
23 bulk of surgeons that take care of stress incontinence
24 will choose a mid-urethral sling for their patient --
25 for most of their patients.

Page 96

1   Q. Well, do you believe that being an outlier or
2 someone who doesn't go with conventional wisdom with
3 regard to a surgical procedure is falling below the
4 standard of care?
5   A. You keep referring to the standard of care as
6 this rock-defined thing, and I don't really have a
7 black-and-white definition of standard of care. I
8 don't really know if there's a black-and-white
9 definition of -- however, I would think that in -- if
10 I were talking to a colleague and they said that they
11 still did a Burch procedure as their primary
12 procedure, I would think that they are not choosing
13 the optimal -- not choosing the best procedure for
14 stress urinary incontinence due to the efficacy and
15 complications.
16   Q. So if I understand you correctly, you are
17 saying that you don't have a black-and-white
18 definition of the standard of care. Is that accurate?
19   A. No. I mean, I do think that the mid-urethral
20 sling is the -- the reason why I'm kind of dancing
21 around this is I hate to criticize other physicians
22 and other surgeons in their choice on what to do for
23 their patients, and I hate providing commentary for --
24 if it's a colleague or somebody, if that's what they
25 think is best.

Page 97

1       But it's my opinion that the standard of care
2 today for stress urinary incontinence is a
3 mid-urethral sling, and I would say that the surgeon
4 that chooses a Burch procedure for a mid-urethral
5 sling is kind of -- is performing outside the standard
6 of care.
7   Q. So it's -- is it your opinion that a
8 physician that chooses a Burch procedure over a
9 mid-urethral sling is essentially committing
10 malpractice?
11   A. No, absolutely not.
12   Q. Would you agree with me that using a --
13   A. I don't think that it is malpractice, but I
14 do think that it's an option that they can pursue for
15 their patients, but I think that there are better
16 choices.
17   Q. Do you believe that the Burch procedure is a
18 reasonable treatment option for a patient who does not
19 want mesh for the treatment of their stress urinary
20 incontinence?
21   A. Yes.
22   Q. If a patient came to you and after going
23 through the various options and informed consent with
24 you, they told you that they didn't want to have a
25 mesh sling for the treatment of their stress urinary

Page 98

1  incontinence, what other options would you present to
2  them at that point?
3     A. I would be hard-pressed to perform a Burch
4  procedure now, and the reason why is because I would
5  tell them, I would say, look, there's a better
6  procedure out there that holds less morbidity, that
7  works better than a Burch procedure.
8        So in my practice and with my patient in
9  front of me, I would say I wouldn't want to do a Burch
10 procedure on you simply because it's -- I have a
11 better option, and I wouldn't want to do a procedure
12 on a patient that I think is going to have a higher
13 risk with a lower efficacy. And if there are concerns
14 about the mesh, I would try to address those concerns
15 specifically.
16    Q. If a patient ultimately decided that they
17 wanted to proceed with a non-mesh surgery for their
18 stress urinary incontinence, whether it be a Burch
19 procedure or an autologous fascial sling, would you
20 refer that patient to another doctor in order to
21 perform those procedures?
22    A. I wouldn't refer, but I would try to convince
23 them that there's better procedures out there and I
24 don't feel comfortable performing a procedure on
25 somebody that has better options.

Page 99

1     Q. When you --
2     A. If they choose to pursue treatments
3  elsewhere, I guess that's up to them.
4     Q. When you present surgical treatment options
5  for the management of a patient's stress urinary
6  incontinence during your informed consent discussions,
7  is the polypropylene sling the only surgical option
8  that you present to your patients?
9     A. I present them the best option out there, and
10 that is the best option. So do I present them with
11 alternative options? No, typically I do not, and the
12 reason why is because I do think that this is the best
13 option for patients.
14       I mean, they used to do MMKs in the past too
15 for -- and I don't think Marshall, Marchetti and
16 Krantz are doing MMKs either, because there are better
17 options out there.
18    Q. So if after having an informed consent
19 discussion about the risks and benefits of mesh
20 surgery, a patient said no, thank you, Doctor, I would
21 like a different option than mesh to treat my stress
22 urinary incontinence, would you tell them about other
23 surgical mesh procedures or would you just say, well,
24 that's the only option I have?
25    A. No. I would tell them, I would say, look,

Page 100

1  the mesh procedure is the best, least morbid, most
2  effective procedure out there. There are other
3  options. There are other alternative procedures for
4  stress incontinence. However, they are inferior
5  procedures, and I don't feel comfortable performing an
6  inferior procedure on you to address something.
7     Q. If a patient asked what those inferior
8  procedures are, would you describe those, what you
9  believed --
10    A. Sure.
11    Q. -- are inferior procedures to them?
12    A. Yes, I would.
13    Q. And what are the other alternative procedures
14 that you would describe?
15    A. The ones we just talked about. There's a
16 Burch procedure, autologous sling. I wouldn't bring
17 up an MMK. Those procedures are really not good.
18    Q. Okay. And if upon hearing those alternative
19 options of a native tissue sling or a Burch procedure,
20 a patient was interested in those options and wanted
21 to explore them further, what would you do at that
22 point, other than try to convince them that the sling
23 is a better option?
24    A. You know, I'd have to be in the situation and
25 really talk with the patient to get a sense of

Page 101

1  understanding. So honestly, I don't know what I would
2  do.
3     Q. But ultimately, if a patient came to you and
4  said, Look, Doctor, I've researched the options on my
5  own, and I want either a Burch or a native tissue
6  sling, you would essentially at this point refuse to
7  do either of those procedures on your patients?
8     A. I would do my best to convince them that
9  there are other procedures out there that are
10 superior. Would I do that? It depends on the
11 patient. It depends on what's going on. It depends
12 on the larger clinical picture. But it is something
13 that is available but I don't think is the optimal
14 choice.
15    Q. Do you feel like you could still do a --
16 competently do a Burch procedure or a native tissue
17 sling despite not having done one since 2006?
18    A. Burch procedure I could do. Burch procedure
19 I could do. Yeah, I could do both of those, yes.
20 They are both -- technically they are not that
21 challenging of a procedure, so yes, I could do both.
22    Q. So if a patient ultimately insisted on one of
23 those procedures, would you attempt to do those
24 procedures yourself, or would you feel more
25 comfortable referring that patient to a physician that

Richard M. Wasserman, M.D.

Page 230

1  mesh is the cause of the dyspareunia? I do not.
2      Q. Would you agree that a woman can experience
3  scar plate formation from a mesh implanted in the
4  vagina?
5      A. I don't think that scar plate formation
6  really exists. I don't really buy into that.
7      Q. Would you agree that a woman can experience
8  scarring from mesh following implantation?
9      A. Yes, with all surgeries there's scarring
10 associated with it.
11     Q. Would you agree with me that women can
12 experience chronic or long-term dyspareunia from that
13 scarring?
14     A. With any surgery there can be some pain
15 associated with intercourse. Whether or not you are
16 using a mesh or -- or you are using mesh, there's
17 higher dyspareunia rates associated with Burch
18 procedures, higher dyspareunia rates associated with
19 pubovaginal slings.
20        So I don't think that's something unique to
21 the mesh procedure. I think it's something inherent
22 in all procedures in the vaginal area.
23     Q. But you would agree with me that a woman can
24 experience chronic or long-term dyspareunia from
25 scarring that comes from the mesh; right?

Page 231

1         MR. KOOPMANN: Object to form.
2         THE WITNESS: No. I think that it's scarring
3  from surgery, not necessarily from the mesh, because
4  when you look at these dyspareunia rates and you look
5  at the other procedures that have been used in the
6  past in regards to dyspareunia, mid-urethral slings
7  actually have the lowest dyspareunia rate when you
8  start comparing things out. So I think it's inherent
9  of surgery, not at all the mesh.
10 BY MR. FAES:
11     Q. Would you agree with me that frayed edges of
12 a mesh can injure a woman's vagina?
13     A. I don't think that the frayed edges are a
14 factor.
15     Q. So you believe that if a TVT or other mesh
16 becomes frayed, that that fraying can't injure a
17 woman's vagina?
18        MR. KOOPMANN: Object to form.
19        THE WITNESS: Do I think fraying can -- so in
20 regards to frayed edges, I think -- you know, I think
21 that the mesh can have an exposure. I think you can
22 have poor healing. I don't necessarily think that
23 it's the frayed edge itself. I mean, exposures do
24 happen, and I wouldn't necessarily point the finger at
25 a frayed edge.

Page 232

1  I would say it's more a part of the healing
2  process. Any time you implant something, if it
3  doesn't heal properly, it may result in a low
4  percentage -- it can result in an exposure. But just
5  like a Burch procedure, you can get an exposure too.
6  With an allograft or a xenograft you can get exposures
7  too.
8         So in regards to the frayed edge
9  specifically, I think it's anything that's implanted
10 can have an exposure.
11 BY MR. FAES:
12     Q. So you would agree with me -- well, strike
13 that.
14        First of all, do you believe that a TVT mesh
15 edge can become frayed?
16     A. If you pull on a TVT too hard, in
17 nonphysiologic conditions it can become a little
18 stretched out.
19     Q. So is it your opinion that the only way that
20 a TVT mesh edge can become frayed is if you pull it
21 too much?
22     A. In clinical practice, the way that the sling
23 was actually intended to be used, you should not have
24 edges that are frayed, because there's no excessive
25 force on the device. It should scar in nicely.

Page 233

1      Q. So you would agree with me that if you took,
2  for example, a TVT or TVT-O mechanically-cut mesh out
3  of the box and the edges were frayed before you
4  implanted it in the patient, then you wouldn't use
5  that device in a patient and you would get another
6  one?
7      A. What do you mean by "frayed"?
8      Q. I mean, that there's frayed rough edges of
9  the mesh that are visible prior to implanting it in
10 the patient.
11        MR. KOOPMANN: Object to form.
12        THE WITNESS: I mean, that hasn't happened.
13 The edges of the mechanically-cut mesh are -- they are
14 pretty straight across, and I don't think that when
15 placed properly, I don't -- I haven't found them to be
16 frayed. I think we're talking about two different
17 things.
18        I think that the fraying that I'm referring
19 to is if you put an excessive amount of force on -- a
20 nonclinical excessive force on the sling, it can
21 stretch out and become unravelled a little bit, but
22 the ones that come out of the box that are
23 mechanically cut are fine.
24 BY MR. FAES:
25     Q. You state in your expert report that you have

Page 234

1  seen no evidence in your practice or the published
2  literature indicating that particle loss occurs in the
3  body.
4      You have never reviewed or read any documents
5  from Ethicon indicating that particles can migrate
6  through the vaginal tissue and cause pain?
7    A.  You know, I've seen some internal documents
8  that referenced that, but that's not what I feel to be
9  the case.
10   Q.  Have you ever encountered a sealed blister or
11 sealed box of TVT or TVT-O that had loose particles
12 floating around in the package before you used it?
13   A.  I don't think I have.  Honestly, I haven't
14 really looked, but I don't recall seeing anything like
15 that.
16   Q.  If you were to encounter that, would you
17 still go ahead and use the device, or would you
18 consider that fine, that there's particles floating
19 around in the box that aren't attached to the mesh?
20   A.  Again, this is kind of a hypothetical type of
21 a situation that you are throwing out there, so I
22 don't know.  I don't know.
23   Q.  Okay.  So you say it's a hypothetical.
24 You've never actually seen internal documents from
25 Ethicon and Johnson & Johnson where sealed blister

Page 235

1  packs of TVT-O were returned to Ethicon and
2  Johnson & Johnson for precisely that reason, because
3  there were particles, items floating around in the
4  package?
5    A.  I may have glanced over one of that in the
6  review materials that have been provided, but you
7  know, I didn't really pay too much attention to it.
8    Q.  If you were to encounter that situation in
9  your clinical practice today, would you consider that
10 to be a defect or problem with the mesh, or would you
11 just go ahead and use it in your patient and
12 figure it's fine?
13      MR. KOOPMANN:  Object to form.
14      THE WITNESS:  Again, if there's little
15 particles floating around there, would I use it?  If
16 the mesh looked okay and if it was intact, yeah, sure.
17 BY MR. FAES:
18   Q.  Okay.  While you state that you have seen no
19 evidence in your practice or published literature
20 indicating that particle loss occurs in the body,
21 would you agree with me that if particle loss is
22 occurring in the package, in the blister package
23 before you even place it in a patient, that that's
24 evidence that the mesh is at least physically
25 degrading?

Page 236

1      MR. KOOPMANN:  Object to form.
2      THE WITNESS:  No.
3  BY MR. FAES:
4    Q.  So you don't consider particle loss in a
5  blister package to be evidence of physical degradation
6  of the mesh?
7    A.  I do not, but again, you are throwing out
8  these hypotheticals at me, and I'm going -- you know,
9  I'm kind of making it up as I go, honestly.
10   Q.  Okay.  Well, I mean, they are not
11 hypothetical because they have actually occurred.
12   A.  And I'm kind of guessing about these things
13 and I'm going -- and honestly, I don't really know,
14 but I wouldn't think that anything is degrading.
15   Q.  Okay.  What would you need to see in order
16 for you to think that a TVT mesh was physically
17 degrading?
18   A.  What would I need to see in order to think
19 that it's degrading?
20   Q.  I mean, if particles falling off the mesh
21 isn't evidence of degradation to you, what is?
22   A.  I haven't really thought about that.  What
23 would I need?  Well, so now I'm trying to address a
24 hypothetical with another hypothetical.  So if I took
25 the mesh out of the box and I touched the mesh and I

Page 237

1  crinkled it up and it dissipated, I think that
2  possibly would degrade, but that doesn't happen.  I'm
3  just making stuff up.
4    Q.  So hypothetically --
5    A.  I've got an idea.  If I got a box and it was
6  packed with a mesh and then I opened it up and the
7  handles were just there and there was no mesh there,
8  that would be degraded.  You know, I'm answering these
9  what I think is kind of an off hypothetical question
10 with off hypothetical answers, and I'm sorry I'm doing
11 that but it's...
12   Q.  So hypothetically, if you picked up the mesh
13 and it completely fell apart in your hands, it would
14 be evidence to you of physical degradation; right?
15   A.  It's a goofy answer because I think it's kind
16 of a goofy question.  No offense.  I'm sorry.  But I'm
17 just kind of making stuff up, and I'm sorry about
18 that.
19   Q.  But just to be clear, just particles falling
20 off of the mesh wouldn't be physical evidence to you
21 of physical degradation?
22   A.  If there were a couple of fibers, no, it
23 would not.
24   Q.  Okay.  Do you know whether or not Ethicon
25 actually has design and manufacturing specifications

Page 246

1  not popping up in my head right now.
2     Q.  Are you aware that the TVT mesh tested
3  moderately or markedly cytotoxic on four separate
4  occasions prior to the TVT being launched in the
5  United States?
6     A.  So in regards to previous studies on
7  cytotoxicity, the body of knowledge, the evidence
8  right now in regards to use of a mid-urethral sling is
9  that it is not cytotoxic.
10        The previous studies that were done in the
11 past, I'm sure there's lots of studies that looked
12 at -- I'm elaborating too much.  I feel that the body
13 of knowledge in regards to cytotoxicity and the TVT is
14 that it's not cytotoxic.
15        When you look at this and you say, okay,
16 99.8 percent or 99.2 percent of the patients do not
17 have an erosion or, you know, very, very low
18 percentage of patients have an erosion, it says to me,
19 hey, it's not cytotoxic.
20        The erosion I do not feel is a result of
21 cytotoxicity.  An erosion has to do with healing, has
22 to do with other issues other than -- not
23 cytotoxicity.
24     Q.  Well, you would agree with me that if the
25 mesh material were cytotoxic, that an erosion could

Page 247

1  be -- strike that.
2         You would agree with me that if a mesh
3  material were implanted that were cytotoxic, a mesh
4  exposure could be a potential result of exposure to
5  that cytotoxic substance; right?
6     A.  I would be guessing.  I don't know the answer
7  to that.  That's a hypothetical that I have no idea.
8  I'm just guessing.
9     Q.  Okay.
10    A.  And earlier I was talking about if you placed
11 a cytotoxic substance next to the mesh, it would cause
12 necrosis.  Again, on that one I'm guessing too.  No
13 one would place chemotherapy agents intentionally to
14 see if it necrosed vaginal tissue.  It's just not
15 done.  These are kind of hypothetical situations that
16 I'm kind of making up to say, you know, well, maybe,
17 but the reality is that this is not cytotoxic, this is
18 not what's causing necrosis, this is not causing these
19 erosions.
20    Q.  As an expert for Ethicon and
21 Johnson & Johnson who is giving the opinion that the
22 mesh is not cytotoxic, how do you explain the four
23 separate tests that Ethicon and Johnson & Johnson did
24 that showed that the TVT mesh was markedly or
25 moderately cytotoxic?

Page 248

1     A.  Which ones are you talking about?
2     Q.  First of all, are you aware --
3     A.  Yes.
4     Q.  -- that there have been four separate tests?
5     A.  Yes.  In the '90s, I don't really place too
6  much value on those based upon the current body of
7  evidence, which says that it is not cytotoxic.
8     Q.  Are you aware of any cytotoxicity testing
9  that Ethicon and Johnson & Johnson have done after the
10 launch of the TVT mesh in the United States,
11 specifically with regard to cytotoxicity?
12    A.  I'm sure I've read a couple of those as well.
13    Q.  You believe you have seen cytotoxicity tests
14 done on the TVT mesh after 1998?
15    A.  I'm trying to think.
16    Q.  I'd sure like to see them if they are out
17 there.
18    A.  You know, it's not jumping out right this
19 second.  Everything is kind of meshing in my head.
20    Q.  I'm talking specifically about cytotoxicity.
21    A.  I understand.  Everything is kind of getting
22 mixed up in my head as we're speaking --
23    Q.  And you understand, from your review of the
24 records, that one of the industry standard ways to
25 check for cytotoxicity that's required is an ISO

Page 249

1  elution test; right?
2     A.  I mean, I think that was in one of the
3  articles, yes.
4     Q.  Okay.  And are you aware of any instance
5  where Ethicon and Johnson & Johnson shared the results
6  of its positive cytotoxicity tests with the TVT mesh
7  with the FDA?
8     A.  You know, again, those studies are kind of
9  jumping away from me right now.  I can look them up,
10 but...
11    Q.  Well, let me ask you this:
12        Do you believe that those results should have
13 been shared or disclosed with the FDA?
14        MR. KOOPMANN:  Object to form.  Foundation.
15        THE WITNESS:  As of right now I'm kind of
16 getting flustered in regards to what I read and those
17 specific studies.
18 BY MR. FAES:
19    Q.  Do you believe that the results of the
20 cytotoxicity testing where the mesh tested cytotoxic
21 on four separate occasions should be shared or
22 disclosed to doctors who might choose to use the
23 device?
24    A.  Well, I kind of focus on the bulk of the
25 data, and the bulk of the data, the bulk of the

Page 250

1 level I data. And as a clinician, cytotoxicity
2 doesn't happen. It is not an issue in regards to how
3 we use this mesh, in regards to how it's implanted,
4 and in regards to healing.
5     The mesh itself is actually really well
6 tolerated in its appropriate use, and I don't feel as
7 though it is cytotoxic. I think that most of the
8 time, with a very, very low erosion rate, a very low
9 exposure rate, that it isn't cytotoxic.
10     When you think about it, if a product is
11 cytotoxic, and 99 percent of the time there's no
12 erosion, there is no reaction, it's inert. And to say
13 that something is cytotoxic, I would expect 99 percent
14 of the time for there to be something going on, and
15 there isn't.
16   Q. So, well, you would agree with me that it's
17 not -- the TVT mesh isn't well tolerated in the 2 to
18 3 percent of people that have an erosion or exposure;
19 right?
20   A. No, I don't say that either. I'm not saying
21 that that's cytotoxicity. I don't think that it's
22 cytotoxicity that's causing the erosion. I think that
23 is scarring and healing that is causing the erosion.
24 I think that it's just sometimes it doesn't heal as
25 well as you would like. I don't think that's a

Page 251

1 function of the mesh. I think that's a function of
2 all implantable devices, and anything you implant can
3 have an erosion, can have an exposure. I don't think
4 that it's cytotoxicity from the mesh that's
5 contributing to -- when you -- like I said, again,
6 when you look at the body of knowledge, how well it is
7 tolerated, you kind of come to the conclusion that
8 it's inert.
9   Q. What type of frequency and complications
10 would you need to see from a mesh before you would
11 start to consider that the material may be cytotoxic?
12   A. You know, that's a hypothetical question
13 again. I don't have a pre-set number of what I would
14 say or not say. All I know is that the exposure rate
15 for the TVT is low, it's very low. It's inert. It is
16 well tolerated in the body. It does not cause
17 cytotoxicity. When you look at complications from
18 alternative procedures, things like pubovaginal slings
19 and Burch procedures, there's way more complications
20 with those.
21   Q. So you would agree with me that you can't
22 articulate any objective standard for the type and
23 frequency of complications that you would need to see
24 from a mesh before you would start to consider that
25 it's cytotoxic; right?

Page 252

1   MR. KOOPMANN: Object to form.
2   Go ahead.
3   THE WITNESS: In regards to -- again, it's a
4 hypothetical situation that I'm kind of like
5 scratching my head about, because I don't think this
6 is a cytotoxic agent.
7     So if you are saying, okay, this noncytotoxic
8 agents, how many erosions, what percentage of erosions
9 would you have to see in order to say it's cytotoxic.
10 You know, I don't know, because I have no idea what a
11 cytotoxic substance would do in the vagina, because
12 this isn't cytotoxic.
13 BY MR. FAES:
14   Q. So what objective standard are you applying
15 for your opinion that the TVT mesh is not cytotoxic?
16   A. I'm applying the medical societies, I'm
17 applying the literature that's out there that
18 repeatedly over and over says there's no cytotoxicity,
19 that this is well tolerated in the vagina, that it's
20 compatible with its intended use.
21   Q. So what would you need to see in order for
22 you to reconsider your position that the mesh is
23 cytotoxic?
24   A. I don't know. I don't have an answer to that
25 question because it's what I would think is an obscure

Page 253

1 hypothetical situation.
2   Q. You stated that you believe that the erosion
3 rate for the TVT products is low. Is that accurate?
4   A. That is correct.
5   Q. Do you have an opinion that you intend to
6 offer in this case as to what you believe the erosion
7 rate is for the TVT retropubic?
8   A. I think I quoted right around under
9 2 percent.
10   Q. So you believe it's under 2 percent?
11   A. Yes.
12   Q. Is your answer the same with regard to the
13 TVT-O?
14   A. Yes.
15   Q. The same with regard to the Abbrevo?
16   A. Yes.
17   Q. Same with regard to the Exact?
18   A. Yes.
19   Q. Would you agree with me that your opinion
20 that the erosion rate is low and is less than
21 2 percent is part of the reason for your conclusion
22 that the TVT devices are safe?
23   A. That is one specific complication regarding
24 the TVT, and I think that is a low, easily fixable,
25 low-severity complication. When you talk about

Page 282

1  Q.  And the Schimpf study, that is also a
2  meta-analysis and not a randomized controlled trial
3  with a primary endpoint of safety; right?
4  A.  Correct.  And again, I place high value on
5  meta-analyses.
6      MR. FAES:  That's all the further questions I
7  have.
8      MR. KOOPMANN:  I'd like to have the witness
9  read and sign.
10     And just for the record, just so we're clear,
11 USB drive, Deposition Exhibit 9, you want to retain
12 that, Andy?
13     MR. FAES:  Yes.  Unless you want me to send
14 it to her for some reason.  I'm just going to put it
15 on the Cloud and it's going to sit in my desk drawer
16 with 500 other drives that I've gotten from defense
17 lawyers over the past five years.
18     MR. KOOPMANN:  I think you should save this
19 so we have some record.
20     MR. FAES:  Yeah.  It will be in the drawer
21 along with all the other ones, and also be in the
22 Cloud, because we all live forever on the cloud.
23     MR. KOOPMANN:  You might want to write
24 "Wasserman" or something on there.
25     MR. FAES:  That's a good idea.

Page 283

1     MR. KOOPMANN:  There is a password for it
2  that I'll tell you off the record.
3     MR. FAES:  Okay.
4     (End of proceedings at 5:29 p.m.)
5
6         *   *   *   *   *

Page 284

1         DECLARATION OF DEPONENT
2  PAGE LINE  CHANGE     REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19     I, RICHARD M. WASSERMAN, M.D., deponent
   herein, do hereby certify and declare under penalty of
20 perjury the within and foregoing transcription to be
   my deposition in said action; that I have read,
21 corrected and do hereby affix my signature to said
   deposition.
22
23     _____
24     RICHARD M. WASSERMAN, Deponent
25     Date:_____

Page 285

1     I, the undersigned, a Certified Shorthand
2  Reporter of the States of Nevada and California,
3  Registered Professional Reporter, and Certified
4  Realtime Reporter, do hereby certify:
5     That the foregoing proceedings were taken
6  before me at the time and place herein set forth; that
7  any witnesses in the foregoing proceedings, prior to
8  testifying, were duly sworn; that a record of the
9  proceedings was made by me using machine shorthand
10 which was thereafter transcribed under my direction;
11 that the foregoing transcript is a true record of the
12 testimony given.
13     Further, that before completion of the
14 proceedings, review of the transcript was requested.
15     I further certify I am neither financially
16 interested in the action nor a relative or employee
17 of any attorney or party to this action.
18     IN WITNESS WHEREOF, I have this date
19 subscribed my name.
20 Dated:  08-19-2019
21
22
23     _____
24     JANET C. TRIMMER, RPR, CRR
       NV CCR No. 864, CA CSR 4008
25