# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
 2           SOUTHERN DISTRICT OF WEST VIRGINIA
 3                    AT CHARLESTON
 4     ----------------------------:
       IN RE: ETHICON, INC. PELVIC  :
 5     REPAIR SYSTEM PRODUCTS        : MASTER FILE
       LIABILITY LITIGATION         : No. 2:12-MD-02327
 6     _____:
                                     : MDL 2327
 7                                   : JOSEPH R. GOODWIN
       This document relates        : US DISTRICT JUDGE
 8                                   :
       to Wave 11 Cases             :
 9                                   :
       ----------------------------:
10
11                   August 7, 2019
12
13          Deposition of LAWRENCE LIND, M.D.,
14     held at 30 Cutter Mill Road, Great Neck,
15     New York, commencing at 12:57 p.m., on the
16     above date, before Marie Foley, a
17     Registered Merit Reporter, Certified
18     Realtime Reporter and Notary Public.
19
20                     -  -  -
21          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
23             Deps@golkow.com
24
```

Page 2

1   A P P E A R A N C E S:

2

3   WAGSTAFF & CARTMELL LLP

4   BY: DAVID C. DeGREEFF, ESQUIRE

5     4740 Grand Avenue

6     Suite 300

7     Kansas City, Missouri  64112

8     816.701.1100

9     ddegreeff@wcllp.com

10    Representing the Plaintiff

11

12

13

14  RIKER, DANZIG, SCHERER,

15  HYLAND, PERRETTI, LLP

16  BY: DIANA KATZ GERSTEL, ESQUIRE

17    Headquarters Plaza

18    One Speedwell Avenue

19    Morristown, New Jersey  07962-1981

20    973.538.0800

21    dgerstel@riker.com

22    Representing the Defendant

23

24

---

Page 3

1          - - -

2       TRANSCRIPT INDEX

3            PAGE

4   APPEARANCES....................... 2

5   INDEX OF EXHIBITS................ 4 - 8

6   EXAMINATION OF LAWRENCE LIND, M.D.:

7   BY:  MR. DeGREEFF................ 10, 368,

8             374

9   BY:  MS. GERSTEL.................. 363, 370

10  SIGNATURE PAGE................... 375

11  ERRATA........................... 376

12  REPORTER'S CERTIFICATE........... 377

13

14  EXHIBITS WITH ORIGINAL TRANSCRIPT

15

16          - - -

17

18

19

20

21

22

23

24

---

Page 4

1          - - -

2       E X H I B I T S

3          - - -

4   NO.      DESCRIPTION           PAGE

5   Lind       Notice to Take Deposition   29

6   Exhibit 1   of Lawrence Lind, MD

7

8   Lind       Flash drive              30

9   Exhibit 2

10

11  Lind       Invoice of Dr. Lind dated   31

12  Exhibit 3   August 29, 2017

13

14  Lind       Invoice of Dr. Lind dated   32

15  Exhibit 4   July 1, 2019

16

17  Lind       Handwritten Report Index   34

18  Exhibit 5   of Dr. Lind

19

20  Lind       Curriculum Vitae of Dr. Lind  68

21  Exhibit 6

22

23

24

---

Page 5

1          - - -

2       E X H I B I T S

3          - - -

4   NO.      DESCRIPTION           PAGE

5   Lind       Defense Expert General    145

6   Exhibit 7   Report of Lawrence Lind, M.D.

7            re TVT, TVT-O, TVT-Exact and

8            TVT-Abbrevo, June 24, 2019

9

10  Lind       Lawrence Lind Supplemental   146

11  Exhibit 8   General Materials List in

12            Addition to Materials

13            Referenced in Report

14

15  Lind       Placeholder for production   182

16  Exhibit 9   by the witness

17

18  Lind       Consulting Agreement dated   293

19  Exhibit 10  as of January 3, 2002

20            between Lawrence Lind, M.D.

21            and Ethicon, Inc., Bates

22            No. ETH.MESH.16009738 to

23            16009743

24

---

Lawrence Lind, M.D.

Page 6

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION            PAGE
Lind        Clinical Study Agreement       300
Exhibit 11  between Gynecare and North
            Shore University Hospital,
            Bates No. ETH.MESH.00412092
            to 00412098

Lind        Secrecy Agreement dated       307
Exhibit 12  January 19, 2004 between
            Gynecare and Lawrence
            Lind, MD, Bates No.
            ETH.MESH.09464276 to
            09464279

Lind        E-mail chain ending June      313
Exhibit 13  15, 2004, Bates No.
            ETH.MESH.11003781 to
            11003783

Page 8

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION            PAGE
Lind        Master Consulting Agreement    342
Exhibit 18  between Lawrence Lind and
            Ethicon, Inc. Dated July
            10, 2010, Bates No.
            ETH.MESH.06216861 to
            06216869

Lind        Master Consulting             345
Exhibit 19  Agreement between Lawrence
            Lind and Ethicon, Inc.
            dated August 31, 2010,
            Bates No. ETH.MESH.02030557
            to 02030566

Lind        EWHU HCP Cognos report run    352
Exhibit 20  11/17/10

Page 7

- - -
E X H I B I T S
- - -

NO.        DESCRIPTION            PAGE
Lind        Q CDA Log, Bates No.          318
Exhibit 14  ETH.MESH.15359953 to
            15359976

Lind        E-mail chain ending           324
Exhibit 15  October 1, 2010, Bates No.
            ETH.MESH.03642725 to
            03642726

Lind        E-mail chain ending April     328
Exhibit 16  28, 2010, Bates No.
            ETH.MESH.02033638 to
            02033639

Lind        E-mail chain ending May       336
Exhibit 17  10, 2010, Bates No.
            HMESH_ETH_03111719

Page 9

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
Page  Line
164   7
164   19
165   9
165   15
166   19

REQUEST FOR PRODUCTION OF DOCUMENTS
Page  Line
- -none- -

STIPULATIONS
Page  Line
- -none- -

QUESTIONS MARKED
Page  Line
- -none- -

Lawrence Lind, M.D.

1           - - -
2        12:57 p.m.
3     Great Neck, New York
4           - - -
5  LAWRENCE LIND, M.D., the Witness herein,
6    having been first duly sworn by a
7    Notary Public in and of the State of
8    New York, was examined and testified as
9    follows:
10  EXAMINATION BY
11  MR. DeGREEFF:
12     Q.   Good morning, doctor.
13          Can you tell us your name?
14     A.   Lawrence Lind, L-I-N-D.
15     Q.   And Dr. Lind, you have been
16  hired as a general liability expert for
17  Ethicon in this litigation.
18          True?
19     A.   Yes.
20     Q.   Have you also served as a
21  case-specific expert for Ethicon in
22  various cases in this litigation?
23     A.   I have.
24     Q.   How many?

1     A.   About four to -- four to six
2  cases.
3     Q.   Have you ever been hired as an
4  expert witness for any other transvaginal
5  mesh manufacturer?
6     A.   No.
7     Q.   And understanding I'm not asking
8  you about consulting.  I'm just asking you
9  about litigation expert.
10     A.   No, I have not.
11     Q.   Do you have an understanding of
12  what you were hired to do on behalf of
13  Ethicon in this litigation?
14     A.   Yes.
15     Q.   What is that?
16     A.   To give opinions regarding
17  efficacy and safety of mesh and sling
18  products.
19     Q.   Any particular mesh and sling
20  products, or just mesh and sling products
21  generally?
22     A.   So by that you mean did I
23  dedicate a deposition on the TVT where
24  we're talking about the sling family,

1  TVT-O, TVT-Abbrevo and TVT-Exact.
2     Q.   Doctor, you've been deposed
3  before today?
4     A.   I had a deposition on the TVT,
5  and in medical malpractice cases I've been
6  deposed.
7     Q.   Other than the general
8  deposition you gave on the TVT in 2017.
9          Is that right?
10     A.   '17 or '18.
11          MS. GERSTEL:  It was '17, yes.
12  BY MR. DeGREEFF:
13     Q.   Other than that deposition, have
14  you been deposed on any Ethicon mesh
15  product?
16     A.   Prolift.
17     Q.   And that was also the general
18  deposition you gave in 2017?
19     A.   Yes.
20     Q.   Have you given any case-specific
21  expert depositions on behalf of Ethicon in
22  this litigation?
23          THE WITNESS:  In Tays, right?
24  Did we do a deposition in Tays?

1          MS. GERSTEL:  That was in New
2  Jersey.  The Carolyn Tays matter in
3  New Jersey.
4  BY MR. DeGREEFF:
5     Q.   So I think the answer is yes,
6  you've been deposed before?
7     A.   Yes, in one case.
8          MS. GERSTEL:  Could I just state
9  for the record that the 2017
10  deposition that Dr. Lind gave, it was
11  on TVT and Gynemesh, actually.  Not
12  Prolift.
13          MR. DeGREEFF:  Okay.
14  BY MR. DeGREEFF:
15     Q.   Have you ever been deposed
16  previously as an expert for any other
17  transvaginal mesh manufacturer?
18     A.   There was a communication
19  between myself and I was working on
20  research and development for a vaginal
21  mini sling for Boston Scientific, and some
22  of the feedback I gave in a research lab
23  was of interest to the counsels.  So I was
24  deposed to answer questions regarding my

Lawrence Lind, M.D.

Page 14

1  feedback on -- at the research phase of a
2  mini sling.
3      Q.   And what was the mini sling
4  product?
5      A.   At the time, I don't recall.  I
6  don't know if it was named at the time.
7  It was early in the research and
8  development.
9      Q.   So you were deposed in the
10  Boston Scientific transvaginal mesh
11  litigation?
12      A.   Yes.
13      Q.   What was the subject matter of
14  that deposition?
15      A.   It was my positive and negative
16  feedback for improvements and design on
17  the device at a research and design lab.
18      Q.   The design of a Boston
19  Scientific product.
20          Is that right?
21      A.   Yes.
22      Q.   What was your involvement in the
23  design of that Boston Scientific product?
24      A.   They -- the phase that they had

Page 15

1  prototypes for, they asked me to use the
2  device on cadavers and comment on the
3  handling, the ease of placing the sling,
4  potential improvement, potential problems,
5  things that could be improved.
6      Q.   And you pointed out problems.
7          Is that right?
8          MS. GERSTEL:  Objection.
9      A.   I pointed out beneficial aspects
10  and areas that I thought might be
11  improved.
12      Q.   What were the beneficial aspects
13  of the Boston Scientific sling that you
14  pointed out?
15      A.   I thought the shape of the
16  handle was favorable for being able to
17  plant the anchor at a good angle to the
18  obturator membrane.  I thought they had
19  some -- a line at the midline I thought
20  was very helpful in helping to keep the
21  sling 50 percent on each side.
22          And the remainder of the
23  positive and negatives I don't recall.
24  This was about five years ago.

Page 16

1      Q.   Are those two positives you just
2  pointed out, are those design aspects of
3  any of the TVT slings?
4          MS. GERSTEL:  Object to form.
5      A.   You know, I don't use mini
6  slings presently.  So I haven't been
7  looking at them and comparing them for
8  quite a number of years.  It's within the
9  aspect of slings that I look at, I don't
10  have comparisons.
11      Q.   Well, the TVT mini slings -- the
12  TVT-S, which is the Ethicon mini sling, is
13  off the market.
14          Right?
15      A.   Yes.
16      Q.   So you wouldn't be using
17  something that's off the market?
18      A.   Correct.
19      Q.   And my question was the mini
20  slings you're talking about, for example
21  the handles, are the handles on the TVT
22  products similar?
23          MS. GERSTEL:  Object to form.
24      A.   I haven't seen them for several

Page 17

1  years.  So I wouldn't have enough recall
2  to compare them.
3      Q.   Well, do you currently use TVT
4  products, TVT sling products?
5      A.   Yes.
6      Q.   What about the aspect you were
7  talking about with the midline --
8          MR. DeGREEFF:  Strike that.
9      Q.   So, this was a transobturator
10  placement device.
11          Is that right?
12      A.   Yeah.  With the mini slings,
13  it's the -- you're placing it to the
14  transobturator membrane without
15  perforating it completely.  So it does go
16  to the obturator membrane, but not through
17  it.
18      Q.   Is it a good or bad thing to go
19  through the transobturator membrane?
20          MS. GERSTEL:  Object to the
21  form.
22      A.   The key aspect in designing the
23  mini slings as I do recall giving input,
24  is that you've got to get the anchor set.

Lawrence Lind, M.D.

1  So it's got to go through -- you know,
2  there's an interior and a posterior aspect
3  of the obturator membrane with the muscle
4  between it.  So you have to get through
5  the internal membrane for the anchor to be
6  seated nicely.  Otherwise it will pull
7  out.
8      Q.   Right.
9          I think you told me you've given
10 one general liability deposition on the
11 TVT and Gynecare product on behalf of
12 Ethicon and four to five case-specific
13 depositions on behalf of Ethicon
14 previously.
15         Is that correct?
16     A.   Those are case reports.
17     MS. GERSTEL:  Objection.
18     A.   They have not gone to
19 deposition.
20     MR. DeGREEFF:  Strike that.  My
21 fault.
22         Fair point.
23     THE WITNESS:  Okay.
24

1  BY MR. DeGREEFF:
2      Q.   So, how many depositions have
3  you given total on behalf of TVM
4  manufacturers in litigation brought by
5  women against them claiming complications?
6      MS. GERSTEL:  Object to the
7  form.
8      A.   So, there's the -- there's the
9  Gynemesh and TVT, there's the one
10 case-specific report, and there's today.
11     Q.   Have you ever testified at trial
12 for any manufacturer of transvaginal mesh?
13     A.   No.
14     Q.   Have you ever been an expert
15 witness in cases unrelated to transvaginal
16 mesh?
17     A.   Yes.
18     Q.   What kind of cases?
19     A.   I take malpractice cases, both
20 plaintiff and defendant cases, for various
21 law firms in the area that know me and
22 decide when the problem of interest is in
23 my area.
24     Q.   How many times have you been a

1  expert in med-mal cases?
2      A.   I would say two or three cases a
3  year for the last ten years.
4      Q.   So 20 to 30 total probably?
5      A.   Yes.
6      Q.   Of those 20 to 30, how many have
7  been on behalf of the plaintiff, the
8  injured party?
9      A.   Two.
10     Q.   And what kind of cases were
11 those?
12     A.   A woman was in labor and the
13 baby was stuck, and the maneuvers used to,
14 you know, panicked to get the baby out
15 were excruciatingly outside of the usual
16 protocols, and she endured tremendous
17 pelvic floor injury.
18         And the second one was a
19 laparoscopic case with a patient with five
20 or six previous surgeries with a bowel
21 injury.  There was steps taken to verify
22 safety of a laparoscopic case in a patient
23 with a difficult abdomen.
24     Q.   So, of the 20 to 30 med-mal

1  cases you've been an expert in, only two
2  of them you're the plaintiffs' expert?
3      A.   Correct.
4      Q.   Is it fair for me to assume you
5  understand how this process works, the
6  deposition process, so we don't have to go
7  through the rules?
8      A.   Absolutely.
9      Q.   Okay.
10     A.   I will be a good exchange
11 partner in this process.
12     Q.   Perfect.
13         Sir, have you ever been sued?
14     A.   I had -- as a resident, I was
15 named in three cases.  And one of them
16 settled.  The settling had nothing to do
17 with my role in the case.  And the other
18 two I got dropped.
19         And since that time, I have not
20 been sued.
21     Q.   What was the claim -- were the
22 three cases like companion cases or
23 something?
24     A.   One was a very difficult case

Lawrence Lind, M.D.

1  with a mother came in sepsis in labor with
2  twins in labor, and it was clear that she
3  was septic.  The vaginal delivery went
4  routinely, but the high risk maternal
5  fetal medicine doctor was suspicious that
6  she probably had group A strep and was in
7  tremendous danger of serious
8  complications, and both she and the baby
9  died.
10      Q.   What were the allegations
11  against you in that case?
12      A.   I don't -- they never questioned
13  me for anything I did wrong.  I think they
14  wanted to know what my role was in surgery
15  to see if I was more involved with
16  something that might be tangible to the
17  outcome.  And I assisted with the delivery
18  as a second hand.  So my role was felt to
19  be minimal.
20          The second one was a patient had
21  a abnormal bleeding after a C-section, and
22  I was called with the GYN oncology team to
23  help do some artery ligation to reduce
24  bleeding, and in the process of the

1  procedure, the femoral nerve was
2  compressed.  So she had some lack of
3  sensation in the -- you know, we saved
4  her -- well, may have saved her life.  We
5  controlled the bleeding, but in the
6  process of controlling the bleeding, we
7  kinked and caused some pressure on one --
8  the nerves to the vessels of one of her
9  legs.  It was diagnosed in the recovery
10  room and she had to go back and have that
11  released, but she did fine, but she did
12  have to go back.
13      Q.   When you serve as an expert in a
14  case, is it your goal to promote the
15  truth?
16      A.   Yes.
17      Q.   And not to be an advocate or
18  promoter for one side or the other?
19      A.   Correct.
20      Q.   You agree that an expert's
21  opinion should be unbiased and objective?
22      A.   I agree.
23      Q.   When you gave your opinions in
24  this litigation, you wanted to be as

1  accurate as possible.
2          Is that fair?
3      A.   Yes.
4      Q.   And you want to be as thorough
5  in your review of the available
6  information, documents and literature as
7  possible.
8          Correct?
9      A.   Yes.
10      Q.   And you wanted to make sure you
11  got all of the information and considered
12  all the information that was pertinent to
13  your opinions, right?
14          MS. GERSTEL:  Object to the
15      form.
16      A.   I would describe that -- the
17  answer to your question is yes.  However,
18  as these interviews or depositions
19  continue, areas of interest where the
20  other party feels I have not been as
21  thorough have come to attention.  So I
22  have continued my research and continued
23  my reading and added to my knowledge and
24  resources to be able to be more complete

1  than I was even at the time of the report.
2      Q.   So, you reviewed additional
3  information after you had already issued
4  your opinions?
5      A.   Yes.
6          MS. GERSTEL:  Objection.
7  BY MR. DeGREEFF:
8      Q.   And did you change your opinions
9  based on any of that additional
10  information?
11      A.   No.
12      Q.   I take it what you actually did
13  was just add some stuff to your reliance
14  list.
15          Is that fair?
16          MS. GERSTEL:  Object to form.
17      A.   Well, things were added to the
18  reliance list and some were just added to
19  my general knowledge just to enable me to
20  be more informed on issues that were
21  brought to my attention that I had
22  authority on, but not as much authority on
23  as I would like to to be authoritative at
24  a higher level.

Lawrence Lind, M.D.

Page 26

1    Q.   So following depositions, you
2  went and educated yourself better for the
3  next deposition, is what you did?
4         MS. GERSTEL:  Object to the
5     form.
6     A.   I had interest in being educated
7  for the sake of being educated and
8  knowledgeable for my practice and
9  teaching, as well as for the depositions,
10  yes.
11    Q.   Did you want to make sure you
12  had an understanding of both sides of the
13  story before you gave your opinions?
14    A.   Yes.
15    Q.   The relevant information that
16  you'd want to consider when rendering your
17  opinions would include Ethicon internal
18  documents.
19         Is that fair?
20         MS. GERSTEL:  Object to the
21     form.
22    A.   That's a piece amongst a much
23  larger group of documents, which is
24  scientific literature.  But those would be

Page 27

1  included, yes.
2     Q.   Sure.
3         And it would also include
4  medical literature?
5     A.   Sure.
6     Q.   Would also include standards and
7  testing performed on the products?
8     A.   Yes.
9     Q.   Would it include making sure you
10  understand the differences between the
11  products?
12    A.   Yes.
13    Q.   Do you agree that opinions
14  should be able to be substantiated by the
15  totality of the most relevant available
16  data and information?
17         MS. GERSTEL:  Object to the
18     form.
19    A.   Yes.
20    Q.   As a physician, your patient's
21  safety is the most important thing.
22         Fair?
23    A.   Yes.
24    Q.   And would it be unfair for a

Page 28

1  physician to promote a position that
2  jeopardizes the health or safety of his
3  patients?
4     A.   I'm sorry.  Could you repeat
5  that?
6     Q.   Would it be unfair for a
7  physician to promote a position that is
8  adverse or could jeopardize the health or
9  safety of his patients?
10         MS. GERSTEL:  Object to the
11     form.
12    A.   If the information he was given
13  was incorrect, that would not be
14  appropriate.
15    Q.   I think we're saying the same
16  thing, but I'm not sure.  Let me ask --
17    A.   I'm not sure either.
18    Q.   Let me ask my question again.
19         A physician shouldn't --
20         MR. DeGREEFF:  Let me ask it
21     maybe in a easier way.
22    Q.   A physician should not promote a
23  position that is adverse to the health,
24  safety and welfare of their patients.

Page 29

1         Is that fair?
2         MS. GERSTEL:  Object to the
3     form.
4     A.   I can agree with that.
5         MR. DeGREEFF:  Let's do some
6     housekeeping and mark some of this
7     stuff you brought with you here.
8         (Lind Exhibit 1, Notice to Take
9     Deposition of Lawrence Lind, MD, was
10     marked for identification, as of this
11     date.)
12  BY MR. DeGREEFF:
13    Q.   Dr. Lind, I'm going to hand you
14  what I marked as Deposition Exhibit 1.
15  That is the notice for your deposition
16  today.
17         Have you seen that before?
18    A.   Yes.
19    Q.   When did you first see it?
20    A.   A few weeks ago, a month ago.
21    Q.   Who provided it to you?
22    A.   Diana.
23    Q.   That would be counsel for
24  Ethicon that's here with you today?

Lawrence Lind, M.D.

Page 30

1    A.    Counsel for Ethicon.
2    Q.    And did you bring -- in fairness
3  to you, so, you've brought some things
4  with you today.
5        Correct?
6    A.    Yes.
7        MR. DeGREEFF:  One of the things
8  is a flash drive, and I'm going to
9  mark it as deposition Exhibit 2.
10       (Lind Exhibit 2, flash drive,
11       was marked for identification, as of
12       this date.)
13  BY MR. DeGREEFF:
14   Q.    Can you tell me what is on this
15  flash drive?
16   A.    That is a reliance list.
17   Q.    So this would be all of the
18  materials that are identified on the
19  reliance list?
20   A.    Those are all the materials on
21  the existing reliance list.  There are
22  materials that I reviewed since that was
23  created that are in my head that are also
24  part of my knowledge and information I

Page 31

1  would share today that are not on the
2  reliance list.
3    Q.    Okay.  We're going to get to
4  that in a minute.  I just want to make
5  sure I understand what's on the flash
6  drive.
7        The flash drive includes
8  everything that's on the written
9  supplemental exhibit list.
10       Fair?
11   A.    Yes.
12   Q.    Then you brought a couple other
13  things with you that appear to be
14  invoices.
15       Is that correct?
16   A.    Yes.
17       (Lind Exhibit 3, invoice of Dr.
18       Lind dated August 29, 2017, was marked
19       for identification, as of this date.)
20  BY MR. DeGREEFF:
21   Q.    Can you tell me what Exhibit 3
22  is, doctor?
23   A.    This is an invoice for review of
24  relevant literature and summary of opinion

Page 32

1  statements regarding the defense expert
2  report on TVT and TVT-Exact.
3    Q.    So is that one of your invoices
4  with regard to preparation of your TVT
5  products expert report?
6    A.    Yes.
7    Q.    The general report, correct?
8    A.    This would be the report we're
9  looking at today.
10   Q.    Correct.
11       And this would be the bill for
12  the report regarding the general liability
13  opinions you're giving in the litigation
14  as a whole.
15       Fair?
16       Not case-specific.
17   A.    Yes.
18       (Lind Exhibit 4, invoice of Dr.
19       Lind dated July 1, 2019, was marked
20       for identification, as of this date.)
21  BY MR. DeGREEFF:
22   Q.    Then can you tell me what
23  Exhibit 4 is, please, doctor?
24   A.    This is a bill for a

Page 33

1  case-specific report.  The case-specific
2  report appears to be an error.  This is
3  additional records that were reviewed for
4  this preparation.
5    Q.    Okay.  So, Exhibit 4 is an
6  additional invoice for review of records
7  related to your general report on the TVT
8  products.
9        Fair?
10   A.    Yes.
11   Q.    So, it says case-specific, but
12  that's an error.
13   A.    Yes.
14   Q.    It should be generic report?
15   A.    Correct.
16   Q.    Is there anything else that you
17  brought with you today?
18   A.    I have my general report as it
19  was served to you.
20   Q.    Okay.
21   A.    I prepared just an index.  It
22  just helps me when you ask me about a
23  certain topic, it lets me go to a spot in
24  my report more quickly.

Page 34

1    I have a 2008 and a 2015 IFU.
2    And I have the articles that are
3 referenced in my report.
4    And I have an index of those
5 articles so I can go to them quickly when
6 we want to discuss them.
7    Q.   Is everything you have in front
8 of you included on the flash drive?
9    A.   I believe it is.  And the flash
10 drive probably has more articles than are
11 here.
12    Q.   Is the index included on the
13 flash drive?
14    THE WITNESS:  I don't know the
15 answer to that.
16    MS. GERSTEL:  It should be, but
17 I can confirm that.
18    MR. DeGREEFF:  It's okay.  Let's
19 just go ahead and mark it.
20    (Lind Exhibit 5, handwritten
21 Report Index of Dr. Lind, was marked
22 for identification, as of this date.)
23    MR. DeGREEFF:  And I'll let you
24 continue to use it, obviously.

Page 35

1    THE WITNESS:  Do you want a copy
2 so you have one to keep?
3    MR. DeGREEFF:  No, that's okay.
4 BY MR. DeGREEFF:
5    Q.   Doctor, I've marked Deposition
6 Exhibit 5.
7    Can you tell me what that is?
8    A.   It's a long report, you know,
9 50-plus pages, and we're here to have a
10 several-hour discussion about what's in
11 the report, amongst other things you may
12 want to discuss.  And it was -- I found
13 from the past experience that hunting for
14 areas that we're talking about is useful
15 to just have a one-page thing that lets me
16 go to the spot a little more quickly.
17    Q.   Okay.  So, this is
18 essentially -- Exhibit 5 is essentially a
19 skeleton outline of your report so that
20 you can --
21    A.   Right.
22    Q.   -- find things more quickly?
23    A.   Right.
24    Now, I will say, for complete

Page 36

1 disclosure, sometimes when we go to the
2 report, we will go to an area of the
3 report and the key thing's going to be to
4 discuss what's in that section.  So
5 sometimes I have written maybe three words
6 that reminds me of what the study is
7 talking about in that section.  My goal
8 there is to get to that and I say let me
9 go to the study, and we've got to go
10 through the binders and find it and locate
11 it and I want to review it.  I can save us
12 that time.
13    So there are a few words here
14 and there that just remind me of what an
15 article said.
16    Q.   Okay.  Fair enough.
17    So, sir, this is a pretty simple
18 question.
19    You're being paid to serve as a
20 expert witness for Ethicon in this
21 litigation.
22    True?
23    A.   Yes.
24    Q.   And, so, other than Exhibit 3

Page 37

1 and Exhibit 4, have you sent any bills for
2 your work on the TVT product general
3 expert report?
4    A.   Let me just -- may I just see
5 those one more time?
6    Q.   (Handing.)
7    A.   (Perusing document.)
8    I have not.
9    Q.   Have you incurred any more time
10 to date that you have not billed for yet?
11    A.   Yes.
12    Q.   About how much time is that?
13    A.   About 25 hours.
14    Q.   Will you be billing that 25
15 hours at $500 an hour?
16    A.   I will.
17    Q.   And is $500 an hour your rate?
18    A.   Yes.
19    Q.   What is your rate for the
20 deposition here today?
21    A.   Seven thousand five hundred.
22    Q.   So it's 7,500 is your rate for a
23 full-day deposition.
24    Is that correct?

Lawrence Lind, M.D.

Page 38

1    A.   Yes, it is.
2    Q.   Okay.  So, check my math, but
3  that's about another $20,000?
4    A.   About right.
5    Q.   So that would be initially to
6  the 10,500 and 16,000 that are set forth
7  in Exhibits 4 and 3?
8    A.   Yes.
9    Q.   So that's, what?  $46,500,
10 roughly, that you've billed -- that you
11 will have billed to date once those
12 invoices go out for your work on the TVT
13 general expert report?
14   A.   Yes.
15   Q.   How much did you --
16     MR. DeGREEFF:  Strike that.
17   Q.   Did you do any additional report
18 related to the Gynecare mesh products?
19     By that I mean I guess the POP
20 products.
21   A.   We have a Gynemesh general
22 report.
23   Q.   And was that also done in this
24 litigation for Ethicon?

Page 39

1    A.   Yes.
2    Q.   And those were general expert
3  opinions?
4    A.   Yes.
5    Q.   What did you -- how much have
6  you billed to date for your work on that?
7    A.   I don't recall specifically.  It
8  was two years ago.  It would be in the
9  same ballpark.  Maybe just slightly less
10 because it was four products, and I think
11 it was a little bit less, but it was in
12 the same ballpark.
13   Q.   So 40 to $50,000?  Somewhere in
14 there?
15   A.   I would say 30 to 50 is the
16 range I could support.
17   Q.   Who would know the exact answer
18 to that question?
19   A.   I could go back to my bank
20 records.  And am certain that whether it's
21 the counsel's office or accounting or
22 Gynecare's accounting, I'm sure they would
23 have it as well.  I know I would have it
24 if I reviewed my bank records.

Page 40

1    Q.   When were you first approached
2  to serve as an expert for Ethicon in the
3  transvaginal mesh litigation?
4    A.   About three-and-a-half years
5  ago.
6    Q.   My math's not very good, but
7  would that be the beginning of 2016?
8    A.   Somewhere in the 2016.
9    Q.   And you've also done multiple
10 case-specific expert reports on behalf of
11 Ethicon litigation.
12     Right?
13   A.   Yes.
14   Q.   Approximately how much have you
15 billed them for preparing those reports?
16   A.   If you put all these together,
17 you put everything together, I think we're
18 probably in the 200 to $250,000 range.  If
19 you put everything you've already, you
20 know, kind of itemized and now tried to
21 expand to the case-specific, say from when
22 I started my relationship with them til
23 now for invoices related to pelvic mesh
24 expert review and participation, it's 200

Page 41

1  to 250,000.
2    Q.   And that is since the beginning
3  of 2016?
4    A.   Yes.
5    Q.   I just want to make sure I
6  understand what you're saying.  I think I
7  do.
8      So, since you were first
9  contacted by Ethicon to serve as an expert
10 in this litigation in early 2016, you've
11 been paid roughly 200 to $250,000 for your
12 work as an expert witness?
13   A.   Yes.
14   Q.   And that would not include any
15 consulting work you've done for them.  It
16 would just be in relation to being a
17 litigation expert?
18   A.   This is everything from 2016 and
19 current.  Consulting work that I did for
20 Ethicon is more than a decade ago.  So
21 this is excluding what was done in the
22 2000 to 2010 was different type of work
23 where I was working with them on product
24 development and all the slings that we

Lawrence Lind, M.D.

Page 42

1  discussed.
2  Q.  Well, the last time you worked
3  for Ethicon wasn't in 2010.
4      Right?
5  A.  I don't recall exactly when.  It
6  was probably earlier than that.
7  Q.  Well, it was actually later than
8  that.
9      Right?
10     MS. GERSTEL:  Object to the
11 form.
12 A.  As a consultant?
13     I don't recall precisely.
14 Q.  As you sit here right now, do
15 you have any understanding of how much you
16 were paid by Ethicon when working for them
17 under a consulting agreement, master
18 consulting agreement, any other such
19 verbiage they used?  Did you have any idea
20 how much they paid you?
21 A.  You know, I don't have an
22 accounting on it on hand.
23     I would estimate in the 20 to
24 35,000 range.

Page 43

1  Q.  Well, in 2011 alone it was over
2  a hundred thousand.
3      Right?
4      MS. GERSTEL:  Objection.
5  A.  I would have to review that.
6  Q.  Okay.  We'll get to that.
7      Do you keep any kind of
8  itemization of your time spent on --
9      MR. DeGREEFF:  Strike that.
10 Q.  So, your invoices are broken
11 down, you know, fairly broadly on
12 Exhibit 3 and 4.
13     Do you have any -- do you submit
14 any kind of a more detailed itemization to
15 Ethicon?
16 A.  I don't.
17 Q.  Do you have a more detailed
18 itemization?
19 A.  The documents that go into
20 making one of those invoices are marked
21 individually.  I'll get a binder and I'll
22 go through it and I'll just mark on the
23 front how many hours, and then I take
24 those handwritten totals and make a common

Page 44

1  invoice.
2  Q.  Okay.  So, is there -- I mean,
3  when you write out your handwritten, do
4  you write out what you did?
5  A.  Yeah.  I write review of binder.
6  You know, TVT literature, review of
7  literature search on my own, TVT
8  complications.  Whatever the category is
9  that I've taken as a meaningful piece of
10 work, I package it and make that a, you
11 know, a time element package that's useful
12 to put a signature on.  Or it might be
13 where I have everything I have to look at
14 and I'll go through everything that I have
15 and I'll mark what I've looked at.
16 Q.  When you're keeping those notes,
17 do you write down, for example, like if
18 you have a call with defense counsel?
19 A.  If I have a what?
20 Q.  A call with defense counsel.
21 A.  There are some -- there are some
22 invoices that have phone meeting or
23 in-person meeting with counsel.
24 Q.  Where are those invoices?

Page 45

1  A.  I think those are on some of the
2  case-specific and I think on the -- they
3  may be on the invoice for the Gynemesh.  I
4  think it includes one preparatory session
5  that was listed, as I recall.  I'm not
6  certain of that.
7      MR. DeGREEFF:  Have we -- have
8  those been produced?
9      MS. GERSTEL:  At his Gynemesh
10 deposition, we produced invoices.  I
11 can't tell you specifically what they
12 were, but I know that we did produce
13 invoices at his Gynemesh deposition.
14     MR. DeGREEFF:  Okay.  What about
15 the case-specific?
16     MS. GERSTEL:  The one
17 case-specific deposition that he's
18 had, it was the Tays deposition in the
19 New Jersey litigation, and we did
20 produce invoices related to his work
21 in the Tays matter at that deposition.
22     MR. DeGREEFF:  Okay.  Yeah,
23 that's our case.
24

Page 46

BY MR. DeGREEFF:

Q. How many hours would you say -- we'll get to this, but how many hours would you say since you started working with Ethicon in 2016 that you've spent working as an expert witness for them?

MS. GERSTEL: Objection.

A. Two hundred thousand divided by 500. Whatever it is.

I'm also not great at quick math.

200 to 250,000 divided by 500. So 500 times -- 500.

Q. Five hundred hours or so?

A. Yeah.

Q. I guess 400 to 500?

A. Yeah. Yes.

Q. And in this litigation --

MR. DeGREEFF: Strike that.

Q. In preparation of the report we're here about today, which is the TVT general report, based on your Exhibit 3 and Exhibit 4, it looks like you spent about 53 hours, plus the 25 that you've

Page 47

spent since then.

Is that right?

A. What's on those two plus 25.

Q. So double check me, but that's, what? 78?

A. 21 and 32 is 53 and 25.

Yeah, about 78.

Q. How much of that 78 hours was spent --

MR. DeGREEFF: Strike that.

Q. How much of that 78 hours was spent in actual drafting and preparation of the report itself?

A. One-third.

Q. 25 to 30 hours?

A. Yes.

Q. And the rest of it was spent doing what?

A. Research and reading.

Q. Did you prepare the reliance list?

A. The reliance list has articles provided by counsel, as well as several -- many, many that I found on my own Pub Med

Page 48

searches that I felt were relevant.

Q. Who drafted the reliance list?

A. Counsel.

Q. That's counsel for Ethicon?

A. Yes.

Q. I guess when I ask that question, to be clear, who drafted the supplemental reliance list?

A. I would come up with more articles and would say they're relevant, and then they would be added by counsel for Ethicon.

Q. So counsel for Ethicon drafted the supplemental reliance list?

A. Yes.

Q. So, the other it's like 45, 50 hours --

MR. DeGREEFF: Strike that.

Q. The other 50 hours or so were spent in review of the materials on the reliance list?

A. Finding the materials and reviewing them, yes.

Q. Does that 50 hours include any

Page 49

time preparing for your deposition with counsel?

A. Yes. We met twice.

Q. About how long did you meet each time?

A. Four hours.

Q. So that's about eight hours total?

A. Yes.

Q. And when were those meetings?

A. Last week and the week before.

Q. Where were they?

A. They both -- one was here. One was in my office.

Q. That eight hours was included in the 78 we discussed earlier.

Right?

A. Yes.

Q. So, more like 40 hours probably locating and reviewing the materials in the reliance list?

A. Sounds about right.

Q. Any phone calls with counsel included in that 78 hours?

Lawrence Lind, M.D.

Page 50

1    A.   One or two brief, minutes,
2  minutes on each.
3    Q.   During your meetings with
4  counsel, were there any specific documents
5  you were shown?
6    A.   We went over the -- certainly
7  the two binders here which are the
8  references that relate to my expert
9  report.  There were various other -- many,
10 many of the documents from the reliance
11 list.
12      I was shown some company
13 documents.
14      There was -- we reviewed IFUs.
15   Q.   So, the binders you referenced
16 are the binders of literature you've got
17 in front of you?
18   A.   Yes.
19   Q.   What company documents were you
20 shown?
21   A.   Testimony by, you know,
22 certainly not comprehensive, by selected
23 administrators in Ethicon and what they
24 had to say about -- in their depositions

Page 51

1  or what they might have said in developing
2  the products, some extracts of e-mails.
3    Q.   So you were shown some
4  deposition testimony?
5    A.   Yes.
6    Q.   You were shown some e-mail
7  extracts?
8    A.   Yes.
9    Q.   Anything else?
10   A.   No, I don't think so.
11   Q.   Who selected the documents you
12 were shown?
13   A.   You know, I asked for a few
14 things.  I had -- I had -- I asked if --
15 you know, what documents, you know, have
16 come under scrutiny in other depositions
17 are the ones that I might want to look at,
18 and counsel had some documents that she
19 recommended I see.
20   Q.   So counsel selected some of the
21 documents and you selected some of the
22 documents?
23   A.   I said show me -- I said show me
24 the good stuff and show me the bad stuff.

Page 52

1    Q.   And then from there, it was
2  selected by defense counsel?
3    A.   It was kind of a combination of
4  things I was curious about and things she
5  thought would be relevant.
6    Q.   So, I think the answer to my
7  question is yes.  Right?  That defense
8  counsel selected some of the documents you
9  were shown?
10      MS. GERSTEL:  Object to the
11   form.
12   A.   No.  I think the answer is that
13 I requested to see certain types of
14 documents, and she selected others.
15   Q.   That's the same thing.
16      Then there was another category
17 of things you said you reviewed that you
18 were shown.
19      What was it?
20      We had the binders, the internal
21 documents.  I believe there was something
22 else you noted.
23   A.   There were e-mails, some
24 testimony.  Looked at IFUs, which are

Page 53

1  company documents, a subset of the company
2  documents.
3    Q.   What e-mails were you shown?
4    A.   There were some members of the
5  development team giving opinions as to
6  whether or not a mesh was stiff.  There
7  were some e-mails talking about whether a
8  certain design of a sling might cause
9  pain, should we be designing it that way.
10      It was a -- certainly a small
11 subset of review as I was told the size of
12 the company documents that existed and the
13 testimonies that were weeks long.  So it
14 certainly was not comprehensive.
15   Q.   These were e-mails and documents
16 by Ethicon employees?
17   A.   Yes.
18   Q.   And what did the Ethicon
19 employees have to say about the stiffness
20 of the mesh?
21      MS. GERSTEL:  Object to the
22   form.
23   A.   There was concern of differences
24 between machine-cut mesh and laser-cut

Lawrence Lind, M.D.

Page 54

1  mesh, and if laser-cut mesh was stiffer,
2  might it be an issue in planning for the
3  products it was planned for use in.
4      Q.   So, the Ethicon employees in the
5  materials you reviewed were concerned
6  about laser-cut mesh being stiffer?
7          MS. GERSTEL:  Object to the
8      form.
9      A.   It was expressed as one of the
10  concerns.
11     Q.   And why were they concerned
12  about the stiffness of mesh?
13     A.   You know, there was conjecture
14  that if it was stiffer, it might behave
15  differently in clinical performance.
16     Q.   So, your understanding of the
17  e-mails you reviewed from the Ethicon
18  employees was that they were concerned
19  that stiffer mesh would lead to more
20  complications.
21         Is that true?
22     A.   I don't recall that wording.
23         I do recall them discussing
24  whether it would have relevance to

Page 55

1  outcome, which of course would include
2  efficacy and safety, but I don't recall
3  specific wording that it would increase or
4  decrease complications.
5      Q.   So they were concerned about
6  whether there would be more negative
7  outcomes with laser-cut mesh because it
8  was stiffer?
9          MS. GERSTEL:  Object to the
10     form.
11  BY MR. DeGREEFF:
12     Q.   Is that your understanding?
13     A.   I'm going to stick to my answer
14  that they were concerned about whether it
15  would change efficacy and safety.  Safety
16  would, of course, include any changes in
17  positive or negative outcomes.
18     Q.   Well, I mean, someone wouldn't
19  be concerned about a positive outcome.
20         Right?
21         MS. GERSTEL:  Object to the
22     form.
23     A.   You know, one of the things that
24  I think is important to share is that when

Page 56

1  these e-mails are shared, it's an
2  extracted e-mail from a sequence of
3  discussions.
4      Q.   Sir, that's not the question
5  that's pending.
6          MR. DeGREEFF:  We'll read my
7      question back.
8          (The requested portion of the
9      record was read by the Court Reporter.)
10     A.   I think they would be concerned
11  about a change that might be positive for
12  the mesh as well as negative for the mesh.
13     Q.   Okay.  So, your understanding
14  from those e-mails, just to make sure I
15  understand what you're saying, is that the
16  Ethicon employees were concerned about the
17  efficacy and safety outcomes related to
18  stiffness of mesh.
19     A.   Yes.
20     Q.   And then you said that you
21  reviewed some e-mails from Ethicon
22  employees related to whether a certain
23  design -- related to certain designs of
24  mesh.

Page 57

1          Is that correct?
2      A.   Yes.
3      Q.   When we're talking about
4  laser-cut mesh, some of the TVT products
5  we're here about today are laser-cut mesh.
6          Correct?
7      A.   Yes.
8      Q.   Which of the TVT sling products
9  use laser-cut mesh?
10     A.   The TVT-Exact and the Abbrevo
11  are all laser-cut.  The other two are
12  laser cut, mechanically-cut.  Some of it's
13  geographic distribution and some of it's
14  physician request.
15     Q.   So the TVT and the TVT-O have
16  both laser and mechanic-cut options?
17     A.   Yes.
18     Q.   So, the e-mails that you were
19  reviewing related to the Ethicon employees
20  discussing design of a product, can you
21  tell me what your understanding was of
22  those e-mails?
23     A.   When the obturator, the TVT-O
24  was being designed and developed, the

Page 58

1 questions, and there were e-mails
2 discussing whether the passage -- the
3 difference in passage would affect, you
4 know, the leg or the groin.  I do recall
5 some discussions on that.
6     Q.   Okay.  So, the -- your
7 understanding was that the Ethicon
8 employees were discussing whether the
9 transobturator approach would lead to
10 increased groin pain.
11        Is that true?
12        MS. GERSTEL:  Object to the
13 form.
14     A.   I think that was one of the
15 concerns expressed in the e-mails, yes.
16     Q.   What other concerns were
17 expressed in the e-mails?
18        MS. GERSTEL:  Object to the
19 form.
20     A.   I don't recall others that are
21 coming to mind presently.
22     Q.   And the transobturator approach
23 is used by the TVT-O and TVT-Abbrevo.
24        Correct?

Page 59

1     A.   Correct.
2     Q.   Are you aware of literature
3 concerning potential increased risks
4 associated with the transobturator
5 approach versus the retropubic?
6        MS. GERSTEL:  Object to the
7 form.
8     A.   Yes.
9     Q.   And what does that literature
10 say?  What are the potential increased
11 problems?
12        MS. GERSTEL:  Object to form.
13     A.   The TVT-O has a higher increase
14 in groin pain, which is usually transient.
15 It has a higher increase in vaginal angle
16 perforations.  It has a less incidence in
17 bladder injury and retropubic injuries.
18     Q.   Is there a -- are you aware of
19 literature saying that there's a two times
20 greater risk of re-operation with
21 transobturator placement versus
22 retropubic?
23        MS. GERSTEL:  Object to form.
24     A.   You know, the articles that

Page 60

1 describe increased risk of operation need
2 to be looked at individually because I'm
3 aware -- the answer to your question is
4 yes, but I can't confirm that being a
5 legitimate statement because I have to
6 look at the details of the article because
7 they're very specific as to why they were
8 re-operated on.  And the data is mixed.
9 There is not consensus data or data at a
10 high level that suggests that the
11 re-operation rate is two times greater
12 with obturator, but there are reports.
13     Q.   So you are aware of the
14 literature stating that?
15     A.   Yes.
16     Q.   And is that literature contained
17 in your reliance list?
18     A.   There's a hell of lot of TVT-O
19 literature in my reliance list.  So I
20 believe a lot of it is there, yes.
21     Q.   The e-mails we just discussed by
22 the Ethicon employees with regard to the
23 laser-cut mesh or the transobturator
24 placement, are those on your reliance

Page 61

1 list?
2        MS. GERSTEL:  Object to form.
3     A.   I'm trying to think if I have
4 some.  Let me just check.
5        (Pause.)
6        There are a number on the
7 reliance list, yes.
8     Q.   The internal e-mails we just
9 talked about discussed within -- with
10 Ethicon employees discussing laser-cut
11 mesh and the transobturator approach,
12 those are included on your reliance list?
13     A.   I'm not aware of that.  No, I
14 don't think so.
15     Q.   Did you see those documents for
16 the first time in preparation for this
17 deposition?
18     A.   I don't -- I think I may have
19 seen them prior to the TVT Retropubic
20 deposition.
21        MS. GERSTEL:  Dave, could I
22 state for the record that as the
23 reliance list was prepared by counsel,
24 I believe those e-mails are on Dr.

Lawrence Lind, M.D.

Page 62

1    Lind's reliance list.
2        MR. DeGREEFF:  I think you can
3    probably take him through that stuff,
4    if you want.
5        And you're welcome to state
6    whatever you want for the record,
7    obviously.  But I'm interested in what
8    he knows.
9        MS. GERSTEL:  Okay.  I just
10   wanted to make clear that the company
11   documents that were provided to Dr.
12   Lind were put on his reliance list.
13       MR. DeGREEFF:  Gotcha.
14   BY MR. DeGREEFF:
15   Q.   So, the first time you looked at
16   the e-mails we're discussing now was in
17   preparation for your prior deposition on
18   the TVT and the Gynecare?
19   A.   Yes.
20   Q.   So the first time you saw those
21   was after you had already rendered your
22   opinions?
23   A.   I don't recall if it was before
24   or after.

Page 63

1    Q.   Do you recall seeing them before
2    you gave your opinions?
3    A.   I don't recall.
4    Q.   Something you considered when
5    you were giving your opinions?
6        MS. GERSTEL:  Object to form.
7    A.   If I had read them, then I
8    considered it.  And if I didn't, then I
9    didn't.  And I don't remember if I saw
10   them before or after.
11   Q.   You said you also reviewed some
12   depositions in preparation for this
13   deposition.
14       Do you remember what depositions
15   you reviewed?
16   A.   I don't remember specifically
17   which one it was.
18   Q.   Do you remember the subject
19   matter?
20   A.   I just asked to see a deposition
21   that was on the multiple TVT products.
22   Q.   Did you review that deposition
23   in preparation for today?
24   A.   Yes.

Page 64

1    Q.   When did you review it?
2    A.   Three weeks ago.
3    Q.   And you don't remember who the
4    person being deposed in that deposition
5    was?
6    A.   I don't.
7    Q.   What about the TVT products were
8    you interested in from that deposition?
9    A.   I was interested in knowing what
10   another expert did in discussing the
11   products.  I was interested in what
12   counsel was interested in focusing on.
13   Q.   So, was it another deposition
14   taken by my firm?
15   A.   I believe it was.
16   Q.   Do you know who took the
17   deposition?
18   A.   Yes.  It was Jeff Kuntz.
19   Q.   Jeff Kuntz (different
20   pronunciation)?
21   A.   Kuntz.
22       I'm sorry if I mispronounced it.
23   Q.   What in particular was it --
24       MR. DeGREEFF:  Strike that.

Page 65

1    Q.   Why did you need to see how
2    another expert --
3        MR. DeGREEFF:  Strike that.
4    Q.   Was it a plaintiff's expert or a
5    defense expert?
6        I assume it was a defense expert
7    since we were taking it.
8    A.   Yes.
9    Q.   Why did you need to see how
10   another Ethicon expert responded to the
11   questions they were being asked?
12       MS. GERSTEL:  Object to the
13   form.
14   A.   It's someone going through what
15   I was going to go through.  It seemed like
16   a reasonable review method to hear what
17   counsel had to say and take a look at what
18   counsel had to say and see if I agreed
19   with what the other person said, if I
20   would have answered it differently.
21   Q.   I mean, isn't the most important
22   thing just for you to answer the questions
23   honestly?
24       MS. GERSTEL:  Object to form.

Lawrence Lind, M.D.

Page 66

1     A.   Well, I think the importance is
2   for me to get prepared in the best way I
3   can to have the knowledge and at the same
4   time answer honestly.
5     Q.   So, the best way for you to get
6   prepared to have the knowledge for this
7   deposition was to read what another
8   Ethicon defense expert who was being paid
9   by Ethicon said in his deposition or her
10   deposition?
11        MS. GERSTEL:  Object to the
12     form.
13     A.   The best preparation was review
14   of the literature, which constituted 99
15   percent of my time spent.  So this was a
16   small element.
17     Q.   Is this the only deposition you
18   reviewed in getting ready for your depo?
19     A.   Yes.
20     Q.   What about expert reports, did
21   you review any expert reports in preparing
22   for your depo?
23     A.   I did not.
24     Q.   Before we move on, let me ask

Page 67

1   this question.
2        With regard to the e-mails that
3   we discussed where the Ethicon employees
4   were discussing outcomes related to
5   laser-cut mesh.
6        Do you agree or disagree with
7   those employees?
8        MS. GERSTEL:  Object to form.
9     A.   I don't know the full context of
10   where the e-mails were, and I don't know
11   if they were in the middle of discussions
12   of positives or negatives 'cause they're
13   single pages.  So I really can't comment
14   on them.
15     Q.   So you weren't shown the full
16   document?
17        MS. GERSTEL:  Object to form.
18     A.   I wasn't shown the full thread
19   of e-mails.  They were just extracted
20   pages.
21     Q.   Who extracted the pages?
22        MS. GERSTEL:  Object to form.
23     A.   I don't know what was available
24   to Ethicon and to counsel and whether I

Page 68

1   got everything that they had or whether
2   some of it was extracted.
3     Q.   But the documents you were
4   provided by defense counsel to review were
5   incomplete and did not contain the rest of
6   the thread.
7        True?
8        MS. GERSTEL:  Objection.
9     A.   Some of them did and some of
10   them did not.
11        MS. GERSTEL:  Would it be a good
12   time for a break?  Or in the next few
13   minutes.
14        MR. DeGREEFF:  Sure.  This
15   works.  Whatever.
16        (Recess taken.)
17        (Lind Exhibit 6, Curriculum
18   Vitae of Dr. Lind, was marked for
19   identification, as of this date.)
20   BY MR. DeGREEFF:
21     Q.   I've just handed you what I've
22   marked as Deposition Exhibit Number 6.
23        Do you recognize that as your
24   current CV?

Page 69

1     A.   Yes.
2     Q.   Sir, what kind of doctor are
3   you?
4     A.   I'm an obstetrician gynecologist
5   with fellowship training in female pelvic
6   medicine and reconstructive surgery.
7     Q.   Do you have any board
8   certifications?
9     A.   I'm board certified in OB-GYN
10   and I'm subspecialty certified in female
11   pelvic medicine and reconstructive
12   surgery.
13     Q.   What states are you licensed to
14   practice medicine in?
15     A.   Just New York.
16     Q.   Sir, if you look at there's a
17   portion that says "Teaching Experience"?
18     A.   Yes.
19     Q.   In the teaching experience
20   section of your CV, are any of the things
21   listed there done on behalf of Ethicon?
22     A.   The last one, the 2006 to
23   present, the bio skills training labs, we
24   set those up to teach our fellows, and

Lawrence Lind, M.D.

Page 70

1 there's usually an educational grant
2 offered by each of the major companies
3 that supply pelvic floor products that
4 usually pick up the cost for the lab.  So
5 some of those are supported.  They
6 probably would have been between 2006 and
7 2010, some labs that were supported by
8 Ethicon.
9         The rest of them are mostly
10 academic courses that were at a facility
11 and supported by the facility.
12    Q.   Okay.
13         So, would Ethicon have -- when
14 you say "supported," you mean paid for.
15         Right?
16    A.   They cover the cost of the lab,
17 the cadaver lab for the day.  We would not
18 be getting paid for that lab, but they're
19 picking up the expense of cost to use
20 cadavers to teach.
21    Q.   What is the cost to use cadavers
22 to teach?
23    A.   A lab could be $30,000.
24    Q.   Each lab?

Page 71

1    A.   Yeah.  The cost for the cadavers
2 and the people who prepare them, maintain
3 them and dispose of them is very high.
4    Q.   And Ethicon would pick up one of
5 the --
6         MR. DeGREEFF:  Strike that.
7    Q.   How many of those cadaver labs
8 per year would Ethicon pick up?
9         MS. GERSTEL:  Objection.
10    A.   They probably do one a year in
11 the general teaching sense.
12    Q.   For four years or so, is what
13 you're saying?
14         I guess how many years did they
15 do that?
16    A.   Yeah, four to six years.
17         And the other companies would do
18 the same.  We have a lot of teaching labs.
19 So Boston Scientific would pick up a lab.
20 Caldera would pick up a lab.
21    Q.   Okay.
22         So, I mean, Ethicon would have
23 spent 120 to $180,000 on cadaver labs --
24    A.   Yeah.

Page 72

1    Q.   -- based on what we just talked
2 about.
3         Is that correct?
4    A.   Yes.
5         But I would like to specify that
6 it was the hospital rules and compliance
7 that they would have to have absolutely no
8 input as to the material, slides, things
9 taught, and the products are not
10 exclusively theirs.  They were everything
11 that we think the students and fellows
12 need to learn.
13         MR. DeGREEFF:  I'm going to move
14 to strike that, and I'm going to ask
15 my question again.
16         My question was pretty simple.
17 It was just a yes or no.
18    Q.   Ethicon would have spent 120 to
19 $180,000 on cadaver labs, based on our
20 discussion?
21         True?
22         MS. GERSTEL:  Object to form.
23    A.   Across those several years, yes.
24    Q.   There's also a list of lectures.

Page 73

1 I guess the title is "Lecture
2 Presentations," on your CV.
3         Do you see that?
4    A.   Yes.
5         MR. DeGREEFF:  Strike that.
6 Before I do that, let me go back.
7    Q.   Who was teaching these cadaver
8 labs that were funded by Ethicon?
9    A.   My division, which would be
10 myself and my partners.
11    Q.   Would Ethicon fund these cadaver
12 labs at the request of you and your
13 department?
14    A.   Yes.
15    Q.   Now are the lecture presentation
16 section of your CV.
17         Do you see where I'm at?
18    A.   Yes.
19    Q.   Were some of those lectures done
20 on behalf of Ethicon?
21    A.   The ones listed here are all
22 invited lectures in academic only
23 situations and not for Ethicon.
24         I don't have listed here invited

Lawrence Lind, M.D.

1  Ethicon lab experiences where I taught at
2  their Ethicon teaching experiences.
3     Q.   Does the lecture presentation
4  section include lectures given on behalf
5  of any transvaginal mesh manufacturer?
6     A.   No.
7     Q.   Why did you not include in your
8  lecture presentation section those that
9  were done on behalf of transvaginal mesh
10  manufacturers?
11     A.   I guess when I'm writing an
12  academic CV, I'm thinking about my
13  academic presentations.  And those were in
14  a consultant role, so I didn't include
15  them.
16     Q.   What is the difference between
17  the lectures you gave in a consulting role
18  versus those given in an academic setting.
19     A.   These were advised by me or
20  offered to institutions for teaching
21  purposes only or invited because of my
22  expertise to give teaching, and the others
23  were labs we set up to teach, for which we
24  couldn't have the setting of fresh

1  cadavers without the backing of companies
2  because we didn't have the money for the
3  labs.
4        And it was a unique teaching
5  situation.  It was really access to the
6  cadavers was the key teaching element.  So
7  it was more of a -- it was less of a
8  lecture than the opportunity to execute
9  procedures in a unique way that had really
10  not been done before to be able to do them
11  on fresh cadavers.
12     Q.   Well, when you're giving
13  lectures as a consultant for Ethicon, you
14  were being paid.
15        Right?
16     A.   Well, let me make a distinction.
17        The labs that we're talking
18  about where I'm teaching at my lab center,
19  I'm lecturing on whatever I want for
20  pelvic reconstructive surgery on various
21  procedures.  Some of the procedures have
22  nothing to do with mesh or any product and
23  others do.
24        And in the discussions of mesh

1  products, there is not any selection for
2  that lab when Ethicon's paid for it that
3  discusses theirs only.  It's we describe
4  everything we use for the reasons we use
5  them.  So we presented it in a non-biased
6  way.
7     Q.   What you just gave the
8  explanation about, that's what you're
9  referring to in the academic setting.
10        Right?
11     A.   The academic setting in my lab.
12  Now, the distinction that will also put it
13  into a teaching category is when Ethicon
14  wanted to teach the procedures, each of
15  these slings or the mesh procedures and
16  they wanted expert surgeons to help train
17  people on fresh cadavers.  That would be a
18  different teaching setting which I would
19  say is teaching-slash-consulting.
20     Q.   Right.
21        When you're giving lectures as a
22  consultant, you're being paid by Ethicon
23  pursuant to the consulting agreements you
24  signed with them.

1        Right?
2     A.   Yes.
3     Q.   And they have input into the
4  materials you're using for those lectures.
5        True?
6     A.   I did not permit that.
7     Q.   Well, contractually under
8  consulting agreement, they have the right
9  to have input into those materials.
10        Correct?
11        MS. GERSTEL:  Object to the
12     form.
13     A.   They could have input, but I
14  control the slides.
15        I would never accept a company's
16  slide deck, and I never did.
17     Q.   Those two things, i.e. being
18  paid and -- being paid by Ethicon and
19  Ethicon's right to review and have input
20  in your materials, those aren't present in
21  the academic setting.
22        Right?
23     A.   Correct.
24     Q.   You have a bibliography section

Lawrence Lind, M.D.

Page 78

1  on your CV. I'm sure you're aware of
2  that.
3      Right?
4      A.  Yes.
5      Q.  Have you published any
6  peer-reviewed articles regarding any of
7  the Ethicon mesh slings?
8      A.  No.
9      Q.  Have you published any
10  peer-reviewed articles concerning mesh
11  slings regardless of the manufacturer?
12      A.  We contributed cases to a Solyx
13  study, which was published.
14      Q.  Was it peer-reviewed?
15      A.  Yes.
16      Q.  And were you the author, or did
17  you just contribute in some other way to
18  that?
19      A.  I was a co-author. I was not
20  the lead author.
21      Q.  And which one was the -- on your
22  bibliography was that particular article?
23      A.  On the second page, it says
24  Nosseir S, Serels and Lind "Safety and

Page 79

1  efficacy of the Solyx single-incision
2  sling."
3      And then we had another -- we
4  had a poster presentation, which is
5  peer-reviewed for acceptance as a poster,
6  but it's not a -- published in a journal a
7  little further down by the same group.
8      Q.  And those were both with regard
9  to the Solyx?
10      A.  Yes.
11      Q.  Any others? Any other
12  peer-reviewed articles related to mesh
13  slings that you published?
14      A.  We did on the third page. You
15  can see the first name Shalom where it
16  says "Visualization of synthetic mesh
17  utilizing optical coherence tomography."
18  That wasn't efficacy or complications of
19  mesh, but it was -- what we thought we
20  were trying to do there was, you know,
21  special optical tomography device that
22  would let us find the sling and we thought
23  it might be useful for it when you have to
24  go back and note a little more precisely

Page 80

1  where the sling is.
2      Q.  So that would be useful for when
3  people were having complications and you
4  needed to look at the sling?
5      A.  Yes.
6      Q.  Were these two Boston Scientific
7  articles that you discussed that were
8  peer-reviewed, were they funded by Boston
9  Scientific?
10      A.  They were.
11      Q.  They were?
12      A.  Yes.
13      Q.  Do you remember how much you
14  were paid for your work on those?
15      A.  I do not, but I do -- I can
16  clarify that the funds would go to a
17  research fund and in no way would
18  remunerate me financially.
19      Q.  Was there any other of your
20  articles in your bibliography that were
21  funded by transvaginal mesh manufacturers?
22      A.  On the second page it has
23  Cholhan and Lind, the "Prepubic Approach
24  to Mid-Urethral Slings." That was funded

Page 81

1  by Boston Scientific.
2      Q.  Okay.
3      A.  I'm scanning the rest of them.
4      (Pause.)
5      No others.
6      Q.  On the articles that you worked
7  on that were funded by transvaginal mesh
8  companies, did you do a disclosure of
9  conflict of interest?
10      A.  Yes.
11      Q.  What is the purpose of
12  disclosing that an article was funded by a
13  mesh manufacturer?
14      A.  Well, both at the point of
15  patient consent and at the point of
16  publication, the disclosure allows the
17  readers to understand that there was a
18  financial support by a company that has
19  relevance for the result of the study. A
20  reader can decide whether that financial
21  disclosure introduces bias and judge that
22  as to whether or not to credit the study
23  more or less based on that.
24      Q.  When someone receives funding or

Page 82

1 payment from an entity, there's potential
2 bias that can result.
3 True?
4 A. There's the potential, yes.
5 Q. How do you define bias?
6 A. Bias is when a -- in the setting
7 of a study, when you're interpreting a
8 study or how you're handling your patients
9 or how you're looking at results, you have
10 a feeling or an impetus to want it to go
11 in one direction or another that may not
12 be objective. That's if you're not
13 handling it properly.
14 So, if you had bias and you were
15 not able to resist bias in a study, you
16 would be influencing the study in one way
17 or another because there was financial
18 support.
19 Q. I think you put it very well in
20 another deposition I saw that you gave.
21 Bias is -- would you agree that
22 bias is anything that affects the
23 objectivity of the outcome of a study?
24 A. Sure. That's one way of looking

Page 83

1 at it.
2 Q. One of the things that could
3 affect the objectivity of a study is
4 funding or payment.
5 True?
6 A. It could, but there are defenses
7 against that.
8 Q. Which, if any, of the articles
9 on your bibliography are relevant to the
10 TVT sling products?
11 MS. GERSTEL: Object to form.
12 A. Well, I think I've got a lot
13 of --
14 MR. DeGREEFF: Strike that.
15 Let me ask that in a more fair
16 way. That was a pretty broad
17 question.
18 Q. Do any of the articles in your
19 bibliography relate to or address any of
20 the TVT products?
21 A. I think they're not directly
22 studies on TVT products, but I think
23 they're products on -- they're studies on
24 incontinence procedures which are relevant

Page 84

1 to how TVT fits into the incontinence
2 surgery products history.
3 I have a number of mesh studies
4 which are relevant to procedures with
5 mesh, whether they're prolapse procedures
6 or incontinence.
7 Q. Well, the TVT products are not
8 for prolapse.
9 Correct?
10 A. Correct. I was indicating that
11 the behavior of the same type of mesh
12 would be relevant to, in a broader scope,
13 how mesh behaves.
14 Q. I think you answered this, but
15 let me just confirm because you said it in
16 a better way than I did.
17 None of the articles included on
18 the bibliography are on the TVT -- any of
19 the TVT sling products.
20 Correct?
21 A. Correct.
22 Q. So you have not been direct --
23 you have not been involved directly in a
24 published study of any kind related to

Page 85

1 the, or about the TVT products?
2 A. Correct.
3 Q. What are some alternatives to
4 slings?
5 MS. GERSTEL: Object to form.
6 A. There are, historically, there
7 are dozens and dozens of stress
8 incontinence procedures. They include
9 Burch, needle procedure, Pereyra, Stamey,
10 pubovaginal slings, amongst others.
11 Q. Which of the native sling --
12 MR. DeGREEFF: Strike that.
13 Q. Which of the alternatives to
14 mesh slings are still in use today?
15 A. The pubovaginal slings are still
16 in use. The Burch is still in use, but to
17 a much lesser degree, markedly lesser
18 degree than previously.
19 Q. Biologic slings?
20 A. They are used by a small number
21 of users. They're certainly not a
22 dominant.
23 But in answer to your strict
24 question, yes, those are still in use.

Lawrence Lind, M.D.

Page 86

1    Q.   And those alternatives are used
2 for the same indications as the TVT mesh
3 slings.
4        True?
5    A.   Yes.
6    Q.   Have you ever performed the
7 Burch procedure?
8    A.   Many, many times.
9    Q.   Do you still perform it?
10   A.   Yes.
11   Q.   How many times have you
12 performed it?
13   A.   In my career, 300, 400.
14   Q.   When was the last time you did
15 one?
16   A.   Within the last few months.
17   Q.   How many have you done this
18 year?  Any idea?
19   A.   Three or four.
20   Q.   What about have you ever done
21 the native tissue sling procedure?
22   A.   Yes.
23   Q.   Do you still do it?
24   A.   I do.

Page 87

1    Q.   How many have you done?
2    A.   I did two this year.
3    Q.   How many have you done in your
4 career?
5    A.   50 to 60.
6    Q.   What about the biologic slings,
7 have you ever used one of those?
8    A.   I did not.
9    Q.   The Burch procedure and the
10 native tissue repair are still viable
11 alternatives to the TVT mesh slings that
12 are still being used.
13       Right?
14       MS. GERSTEL:  Object to form.
15   A.   Can you just restate that?
16   Q.   The Burch and native tissue
17 slings are still available alternatives
18 that are still in use to the TVT slings.
19       Fair?
20   A.   Yes.
21   Q.   Sir, are you involved in any
22 current research on polypropylene meshes?
23   A.   We have a -- I'm not a co-author
24 on it, but we have in our division, we

Page 88

1 have some rabbits being implanted with
2 absorb -- partially absorbable and
3 absorbable mesh to analyze the biochemical
4 and histochemical changes during
5 implantation.
6    Q.   Are you involved in that at all?
7    A.   I'm involved in the chat in our
8 research sessions.  They're not my
9 project.  I'm not the mentor or co-author
10 on them.  But since it's in the division,
11 every Friday we go over products.  So I'm
12 privy to the updates and the ongoing
13 happenings on it, but I have no ownership
14 on that project.
15   Q.   So you're not -- you've had some
16 conversations about the project, but
17 you're not involved in actually
18 administering the project.
19       Fair?
20   A.   Correct.
21   Q.   Is that project being funded by
22 a pharmaceutical company -- or, excuse me.
23 A medical device company?
24   A.   It is.  It's being funded by a

Page 89

1 mesh company.
2    Q.   Which one?
3    A.   I don't know the name.
4        Again, I'm kind of peripheral on
5 this one.
6    Q.   Okay.
7        Is it Ethicon?
8    A.   It's small.  It's not one of the
9 well-known companies.
10   Q.   Have you ever written a
11 peer-reviewed journal article on
12 polypropylene mesh?
13   A.   Yes.  I have a publication on
14 the reduction of the analysis of mesh
15 complications with abdominal sacral
16 suspension done in different ways for
17 abdominal sacral suspension analyzing
18 erosion rates.
19   Q.   What product was at issue?
20   A.   Gynemesh.
21   Q.   Not the TVT products?
22   A.   No.
23   Q.   Have you ever written on the
24 Burch procedure?

Lawrence Lind, M.D.

Page 90

1    A.    Yes. I have a couple of
2  publications in my CV.
3    Q.    Were those peer-reviewed?
4    A.    Yes.
5    Q.    What was it, do you remember the
6  subject matters you were writing about?
7    A.    The Burch procedure requires a
8  fairly good size incision, and I was
9  instrumental in designing a device that
10  would allow suturing in a very small
11  space. So once the device was approved, I
12  wrote a paper on about 90 patients to see
13  whether a Burch could be achieved in a
14  much smaller incision because with the use
15  of the suturing device, it would
16  facilitate the suturing without needing as
17  much space for visualization. So the goal
18  was to see if I could take a Burch and
19  make it less invasive with an incision
20  that was less than half the size.
21    Q.    And what were the results?
22    A.    They were excellent. We
23  achieved it.
24    Q.    So you came up with a way to

Page 91

1  make the Burch a less invasive procedure?
2    A.    Yes.
3    Q.    Do you have a patent on that
4  product?
5    A.    I do not.
6    Q.    It feels like there's more to
7  that story.
8         Does someone have a patent on
9  it?
10    A.    I -- the rules for -- someone
11  has a patent on it, and I was offered part
12  ownership to it. My academic affiliation
13  and the roles for ownership of
14  intellectual property were such that
15  taking the intellectual property would be
16  a poor financial decision.
17    Q.    Gotcha.
18    A.    So I just came on as a
19  consultant and continued to help them
20  develop the device.
21    Q.    Which medical device company was
22  developing it?
23    A.    It was the Laurus Corporation,
24  L-A-U-R-U-S. And we developed it with

Page 92

1  them and they patented it, and I did a lot
2  of -- most of the studies to show how it
3  would work and the efficacy and safety.
4         And I wish I had a part
5  ownership because they sold it to Boston
6  Scientific for a nice penny.
7    Q.    So, is that device currently in
8  use today?
9    A.    Yes, it is.
10    Q.    And when did that device get
11  developed?
12    A.    I was working on it from '94 to
13  '96, and I think it got sold to Boston
14  Scientific in '96.
15    Q.    And the end result was that the
16  Burch procedure, which was an alternative
17  to the TVT mesh slings, became less
18  invasive.
19         True?
20    A.    That, as well as a few vaginal
21  procedures that we also had trouble
22  suturing with. It had more than one
23  application in addition to the Burch.
24    Q.    Were all three of those articles

Page 93

1  related to that same issue?
2    A.    I think there were two on the
3  in-line suturing device. Yes, they were
4  on the issue of -- did I do sacrospinous?
5         I think one might have been
6  Burch and one might have been sacrospinous
7  suspension. I can check on that, if it
8  matters.
9    Q.    Yes. I think you said three.
10  That's why I was asking.
11         (Pause.)
12    A.    There's two. One looked at it
13  for the use in sacrospinous suspension.
14  The other one looked at it for the use in
15  Burch.
16    Q.    Okay.
17         And what were the findings on
18  the sacrospinous suspension?
19    A.    The procedure was able to be
20  performed with less dissection and in less
21  operative time with good efficacy and
22  minimal to no complications. So it didn't
23  add any adverse effects, and it lessened
24  the dissection and operative time.

Lawrence Lind, M.D.

Page 94

1  Q.  And is that also a -- is that
2  procedure also a sling alternative?
3  A.  No.  That's for pelvic prolapse.
4  That's for vaginal apex prolapse.
5  Q.  Have you ever written anything
6  on the biologic tissue slings?
7  A.  I have not.
8  Q.  Do you consider yourself an
9  expert on chemical engineering?
10  A.  As it relates to slings, yes.
11  Q.  And what is the basis?  Why are
12  you an expert in chemical engineering?
13  A.  Because the issues related to
14  chemical engineering as it pertains to
15  tissue interaction with mesh and implants
16  has been part of my career studying,
17  implanting, taking care of patients,
18  insuring their safety and observing the
19  behavior.  So that's 25 years of
20  experience.
21  Q.  Do you have any education in
22  chemical engineering?
23  A.  I read quite a bit of literature
24  on the behavior of the mesh and how it

Page 95

1  interacts with tissue.  So my education is
2  based on independent review of the
3  literature.
4  And I do not have a Ph.D.
5  Q.  Well, I think we're talking
6  about two different things.
7  Are you talking about
8  biomaterials right now versus chemical
9  engineering?  True?
10  A.  Whether it's chemical
11  engineering or biomaterials, how they
12  relate to the behavior of slings implanted
13  in patients, I consider myself an expert.
14  Q.  You don't know anything about
15  the chemical engineering of polypropylene
16  mesh itself.
17  True?
18  A.  I would say that's false.
19  Q.  Okay.  Why is it false?
20  A.  Because I've read articles about
21  the process of it coming from resin, how
22  it gets transformed from resin, and how it
23  gets made into fibrils and how it gets
24  made into the decision to how the fibrils

Page 96

1  get made and the width of the fibrils.  So
2  I've done reading on how they take it from
3  powder and resin and transformed into
4  materials and the reasons why they make
5  decisions.
6  Q.  So, is it your testimony that
7  reading articles about how they make
8  transvaginal -- excuse me.  Polypropylene
9  mesh is why you consider yourself a
10  chemical engineering expert?
11  A.  Reading articles, seeing the
12  different outcomes of how the chemical
13  engineering goes into making products
14  different and seeing how it behaves in
15  patients and seeing the outcomes for 25
16  years is my basis for stating I'm an
17  expert on that topic as it relates to mesh
18  in sling behavior.
19  Q.  And you've seen all of that in
20  your role as a physician.
21  True?
22  A.  Yes.
23  Q.  No one's ever hired you to be a
24  chemical engineering expert.

Page 97

1  Right?
2  A.  No.
3  Q.  No one's ever hired you as a
4  chemical engineer.
5  Right?
6  A.  Correct.
7  Q.  When you hang your degree on the
8  wall, it doesn't say chemical engineer.
9  Right?
10  A.  It does not.
11  Q.  Do you consider yourself an
12  expert in pathology?
13  A.  As it relates to the behavior of
14  sling and mesh implanted in patients, yes.
15  Q.  In your daily practice, what is
16  it that makes you a pathology expert?
17  A.  The rabbit studies that we're
18  doing produce pathology slides which we
19  examine for various histochemical
20  properties, tensile strength and
21  mechanical properties, and this is a
22  routine part of the research that our
23  group does.
24  Q.  You mean the rabbit studies that

Lawrence Lind, M.D.

Page 98

1  the other people in your group are doing.
2      Is that what we're talking
3  about?
4      A.   To distinguish though what the
5  other people are doing is I play a role in
6  responding and advising what would be
7  studied, how they're doing the study,
8  response on whether how they're getting
9  the information is correct, whether the
10  staining processes are correct.  So I'm
11  involved in the study more than just
12  listening.
13      Q.   You're not an author on that
14  study.
15      Right?
16      A.   I am not.
17      Q.   You are not a co-author on that
18  study.
19      Right?
20      A.   I'm an advisor on that study,
21  and I'm part of the education discussions
22  on the process.
23      Q.   You are not administering the
24  study.

Page 99

1      Right?
2      A.   No.
3      Q.   I'm correct you're not
4  administering the study.
5      Right?
6      A.   Correct.
7      Q.   You don't even know who the
8  pharmaceutical company is that's funding
9  the study.
10      Fair?
11      A.   That's correct.
12      MS. GERSTEL:  Object to form.
13  BY MR. DeGREEFF:
14      Q.   Other than that, the rabbit
15  studies, what qualifies you as an expert
16  in pathology based on your daily practice?
17      A.   When I review the literature,
18  I'm aware of many articles about excision
19  of specimens, what they look like, how
20  people's opinions and how the pathology's
21  been studied on excised specimens, is
22  there inflammation, is there ingrowth, is
23  there degradation.  So I'm very
24  well-versed on the literature related to

Page 100

1  pathologic specimens of mesh and sling
2  material.
3      Q.   Do you actually read the
4  histopathologic slides?
5      A.   In the studies that we do, I
6  look at the pictures along with our study
7  group, yes.
8      Q.   You're talking about the rabbit
9  thing again.
10      Right?
11      A.   Yes.
12      Q.   Do you actually review
13  histopathologic slides out of humans as
14  part of your practice?
15      A.   I do not.
16      Q.   You just read the reports that
17  come to you from the pathologists.
18      Right?
19      A.   Correct.
20      Q.   Have you read any pathology
21  reports related to excised mesh?
22      A.   I think the Clave study is one
23  of the studies that gets into that.
24      Q.   I mean in your daily practice.

Page 101

1      Have you reviewed reports,
2  pathology reports from the pathologists,
3  related to mesh that was removed from --
4      A.   Yes.
5      Q.   -- patients?
6      A.   Yes.
7      Q.   When you review those reports,
8  do they discuss inflammation of the
9  tissue?
10      A.   Sometimes inflammation is
11  mentioned, yes.
12      Q.   Do they discuss scar plating
13  related to the mesh?
14      A.   I have not read that on a
15  pathology report.
16      Q.   Do they discuss degradation of
17  the mesh?
18      A.   I have not read that on a
19  pathology report.
20      Q.   What is the -- inflammation can
21  lead to pain for a woman.
22      True?
23      A.   Yes.
24      Q.   And it can lead to chronic pain.

Lawrence Lind, M.D.

Page 102

1    Right?
2    A.    It can, yes.
3    Q.    And mesh leads to tissue --
4         MR. DeGREEFF:  Excuse me.
5    Strike that.
6    Q.    Mesh can cause tissue
7    inflammation.
8         True?
9         MS. GERSTEL:  Object to form.
10   A.    It -- I would say the mesh
11   itself doesn't cause inflammation, but it
12   could potentiate inflammation.
13   Q.    Mesh itself can cause a foreign
14   body reaction.
15        True?
16   A.    Yes.
17   Q.    And that can lead to
18   inflammation?
19   A.    True.
20   Q.    Do you consider yourself an
21   expert in polymer chemistry?
22   A.    As it relates to mesh and
23   slings, yes.
24   Q.    This is amazing.  If you come up

Page 103

1    with a yes for that, we're -- okay.
2         What is your background in
3    polymer chemistry?
4    A.    My answers would be the same as
5    I replied previously for my background
6    for --
7    Q.    Okay.  So, your answer to -- I
8    just want to make sure anything I asked
9    you about chemistry or chemical
10   engineering, your answer is going to be
11   I've read articles on polypropylene mesh
12   and I listen to updates on the rabbit
13   study.
14        Right?  Those are the two
15   things?
16        MS. GERSTEL:  Object to form.
17   A.    No.  I would expand on that.
18   Q.    Okay.  What else?
19   A.    For 25 years, I've implanted
20   mesh.  I've looked at explanted specimens
21   and pathology reports.  I have studied the
22   literature.  I've read literature, both
23   positive and negative, on various
24   engineerings, polymer chemistry and other

Page 104

1    aspects of scientific ways that you can
2    analyze what happens to mesh.  I am
3    participating in a lab that implants mesh,
4    excises mesh, testing it for tensile
5    strength, looking at it under a microscope
6    for various inflammation and histochemical
7    changes, and I've been studying this and
8    been participating in educational and
9    clinical and pathology education for 25
10   years.
11   Q.    That all makes you a doctor,
12   right?
13   A.    No.  I'm stating that that makes
14   me an expert.
15   Q.    What is your degree in?
16   A.    I have an MD.
17   Q.    Okay.
18        What is your undergraduate
19   degree in?
20   A.    I have a bachelor of arts.
21   Q.    Do you have any educational
22   training related to chemistry or
23   engineering?
24   A.    I have 25 years of additional

Page 105

1    education as described previously.
2    Q.    What you described was 25 years
3    of being a doctor, right?
4         That's what you're relying on
5    for being a chemist and an engineer?
6    A.    That was not my answer.
7         MS. GERSTEL:  Object to form.
8    BY MR. DeGREEFF:
9    Q.    I'm asking you also consider
10   yourself a biomaterials specialist based
11   on all the stuff we talked about?
12   A.    Yes.
13   Q.    Any other reasons?
14   A.    I think we've gone through them.
15   Q.    That's all of them?
16        I'm just making sure there's not
17   anything else.
18   A.    On biomaterials I think you
19   certainly can say in that area, I have
20   published and tested things on my own,
21   published them and participated in
22   advising and testing in cadaver labs and
23   published materials on my own.  So my
24   additional evidence of expertise is

Lawrence Lind, M.D.

1  stronger in that area.
2      Q.   Have you ever published any
3  opinions that polypropylene mesh does not
4  degrade in the human body?
5          MS. GERSTEL:  Object to form.
6      A.   I haven't published it.
7      Q.   Do you consider yourself an FDA
8  expert?
9          MS. GERSTEL:  Object to form.
10     A.   I'm distinctly aware of FDA
11 matters and paperwork as it relates to
12 mesh products and Ethicon mesh products
13 and the rules that go into IFUs.
14         I would not say I am a
15 comprehensive FDA expert.
16         But I would say, as it relates
17 to the matters in this case, I would say
18 I've reviewed the pertinent documents and
19 are comfortably familiar with that.
20     Q.   What are the pertinent
21 documents?
22     A.   There's a Blue Book memo and a
23 second FDA document that describes what's
24 required in the release of a product, what

1  has to be on labeling, what has to be
2  included in adverse events, and as it
3  relates to this particular, you know,
4  issue at hand is what adverse events are
5  necessary to be included in an IFU.
6      Q.   Because it sounds like you're
7  not claiming you're an FDA expert.  You're
8  claiming you're an IFU expert.
9          Right?
10         MS. GERSTEL:  Object to form.
11     A.   I claim to be an FDA expert as
12 it relates to adverse reactions and the
13 rules necessary and laid out as to what
14 needs to be included.
15     Q.   How did you become aware of --
16         MR. DeGREEFF:  Strike that.
17     Q.   Under what circumstances did you
18 review these FDA materials related to
19 Ethicon products?
20     A.   Well, in discussing with counsel
21 became clear that, you know, what warnings
22 are in the IFU is of quick relevant to
23 these cases and I said I'd like to see the
24 FDA documents that dictate the rules.

1      Q.   Was that before or after you
2  gave your opinions?
3      A.   That was before.
4      Q.   So, what you're claiming makes
5  you an expert on the FDA is materials you
6  reviewed in preparing for to be a
7  litigation expert for Ethicon.
8          Is that right?
9      A.   Well, if someone were to ask me
10 if I'm an expert in FDA in the broad sense
11 of the word, the general everything that
12 they take care of, I would say no.
13         If I'd say as it pertains to the
14 relevant issues to the materials involved
15 in this case, I would say I have very
16 thoroughly read through the relevant
17 documents and therefore consider myself an
18 expert as it relates to mesh products and
19 adverse warnings and what needs to be
20 included.
21     Q.   Did you read the 510(k)
22 submission for this product?
23     A.   At some point I did.
24         MS. GERSTEL:  Object to form.

1  BY MR. DeGREEFF:
2      Q.   Did you read all the testing
3  submitted with the 510(k)?
4          MS. GERSTEL:  Objection.
5      A.   I don't know if I read all of
6  the testing.  I think I was made familiar
7  with some of it.
8      Q.   Do you know the difference
9  between clearance and approval of a
10 product?
11     A.   There are different pathways to
12 go through the FDA.  There's a 510(k)
13 pathway, which is based on a precedent,
14 and then there's another pathway where
15 based on data, it's you go through based
16 on your own merit and data.
17     Q.   What's the other pathway called?
18     A.   I don't know.
19     Q.   Does 510(k) end up with approval
20 or clearance in the end?
21     A.   Approval.
22     Q.   Would you be surprised to find
23 out that 510(k) ends up with clearance?
24     A.   I'm sorry.

Lawrence Lind, M.D.

Page 110

1    Q.    Would you be surprised to find
2  out that 510(k) ends up with compliance,
3  not approval?
4        MS. GERSTEL:  Object to form.
5    A.    I may have that vocabulary
6  confused.
7    Q.    As a FDA expert, do you think
8  you should probably know the difference
9  between clearance and approval?
10       MS. GERSTEL:  Object to form;
11  argumentative.
12   A.    I think the key elements here
13  are what the rules are for what needs to
14  be included in an IFU, and I don't think
15  the rules of what the vocabulary term is
16  for approval versus otherwise is the key
17  element.
18       So no, I wouldn't consider that
19  eliminating myself as an expert to the
20  relevant materials.
21   Q.    What I'm taking what you're
22  saying is that you do consider yourself an
23  expert on warnings?
24   A.    Yes.

Page 111

1    Q.    What risk information are
2  medical device companies required to put
3  in their IFUs?
4    A.    They're required to put in the
5  most common and adverse reactions that are
6  unique to the product, and they are not
7  required to put in things that are
8  commonly known.
9    Q.    What industry standards govern
10  warnings in medical devices?
11       MS. GERSTEL:  Object to form.
12   A.    The FDA.
13   Q.    What are the various sections of
14  the regulations that relate to warnings
15  for IFUs?
16       MS. GERSTEL:  Object to form.
17  BY MR. DeGREEFF:
18   Q.    And for the record, you're
19  currently looking to your report to give
20  you that answer.
21       Correct?
22   A.    That would be correct, because I
23  can't always memorize that it is
24  21 CFR 801.109(c) and device labeling

Page 112

1  guidance number G91-1.  So at times I may
2  have to refer, since I haven't memorized
3  everything that exists in all of these
4  binders in my report.
5    Q.    You think an FDA expert on
6  warnings would know that?
7        MS. GERSTEL:  Object to form;
8  argumentative.
9    A.    I think an FDA expert on the
10  entirety of the FDA would know that, but
11  that does not exclude me from being an
12  expert on the areas that I previously
13  described.
14   Q.    What departments of a medical
15  device company are involved in creating
16  warnings?
17   A.    When I have participated on
18  discussions about what should be included,
19  there's research and development, there
20  was regulatory, and there was compliance.
21   Q.    Have you ever read any testimony
22  from Ethicon employees regarding Ethicon's
23  position on what belongs in an IFU?
24   A.    I don't recall.

Page 113

1    Q.    Have you ever drafted an IFU for
2  a medical device?
3    A.    I didn't draft it.
4        I participated in discussions
5  about what should be included and what
6  shouldn't.
7    Q.    What was your participation?
8    A.    It was in -- with Boston
9  Scientific in releasing a few of their
10  products.
11   Q.    Which products?
12   A.    It was the Advantage and then it
13  was their Prolene mesh for sacral
14  suspensions.
15   Q.    Did they pay you to do that?
16   A.    Yes.
17   Q.    How much?
18   A.    Whatever my hourly was then.  It
19  was a little lower, $300 an hour.
20   Q.    How many hours did you spend
21  working on that IFU?
22   A.    Probably two expert sessions.  I
23  would say twelve.
24   Q.    Was that like a roundtable

Lawrence Lind, M.D.

Page 114

1  discussion about what kind of warnings
2  should be in the IFU?
3      A.   Usually was -- it usually was a
4  couple of hours in the lab, then followed
5  up by roundtable discussion.
6      Q.   Was the purpose of the lab to
7  test out the implant, how it worked with
8  the implant of the device?
9      A.   Correct.
10     Q.   And after you made your
11 recommendations, you didn't have any
12 involvement in the actual drafting of the
13 IFU?
14     A.   I did not.
15     Q.   Do you agree that physicians
16 should be made aware of the significant
17 safety risks with a product in the IFU?
18         MS. GERSTEL:  Object to form.
19     A.   Well, the definition of
20 significant is -- requires a larger
21 discussion than a yes/no question.
22     Q.   How do you define significant?
23         MS. GERSTEL:  Object to form.
24     A.   I would define it as I did

Page 115

1  before, where they have to describe the
2  most common and unique adverse reactions
3  to the product, but they don't necessarily
4  have to provide -- list adverse reactions
5  that are commonly known.
6      Q.   Have you ever read the
7  deposition of Ethicon employee Catherine
8  Beef [ph]?
9      A.   I have not.
10     Q.   Is that something that's on your
11 reliance list?
12     A.   I'm not -- I don't recall seeing
13 that.  I don't know if it's on the
14 reliance list.
15     Q.   If it was her testimony that
16 physicians should be made aware of all
17 significant safety risks associated with a
18 product in the IFU, is that something you
19 disagree with?
20         MS. GERSTEL:  Object to form.
21     A.   Yes, I disagree.
22     Q.   Do you agree that the
23 manufacturer of a medical device that's
24 going to be implanted in a woman's body is

Page 116

1  required to disclose all significant risks
2  to doctors that come with the use of the
3  device?
4          MS. GERSTEL:  Object to form.
5      A.   No.
6      Q.   You do not agree?
7      A.   I do not agree.
8      Q.   Were you ever provided the
9  deposition of Ethicon's medical director
10 Dr. Weissberg?
11     A.   I don't recall it.
12     Q.   If the medical director
13 testified that that's the case, do you
14 disagree with Ethicon's medical director?
15         MS. GERSTEL:  Object to form.
16     A.   Yes.
17     Q.   The warnings and adverse
18 reactions section should include all
19 significant risks and complications
20 related to the use of the TVT products.
21     Do you agree?
22         MS. GERSTEL:  Object to form.
23     A.   Did your statement say "all"?
24     Q.   Yes.

Page 117

1      A.   I disagree.
2      Q.   Have you ever read the
3  deposition of Ethicon's medical director
4  Dr. Robinson?
5      A.   No.
6      Q.   If that was the testimony, do
7  you disagree with it?
8      A.   I disagree with it.
9      Q.   Do you agree that doctors rely
10 on medical device companies, such as
11 Ethicon, to tell them whether the products
12 they manufacture are safe?
13         MS. GERSTEL:  Object to form.
14     A.   I think the company provides a
15 small piece of a doctor's understanding
16 and learning if something is safe.  It's
17 not the major role at all.
18     Q.   So you believe they rely on them
19 in part for that information?
20     A.   Correct.
21     Q.   Do you agree that doctors rely
22 on medical device companies, such as
23 Ethicon, to investigate and test the
24 safety of their products before putting

Lawrence Lind, M.D.

Page 118

1  them on the market?
2      MS. GERSTEL: Object to form.
3      A.   I think that they are interested
4  in testing prior to release, yes.
5      Q.   Is that something that you as a
6  physician want the medical device
7  providers to do?
8      A.   Yes.
9      Q.   Do you agree that the company
10  knows more about the design features and
11  potential risks of their products than
12  physicians do?
13      MS. GERSTEL: Object to form.
14      A.   In the early development stage,
15  I would agree with you, and then when it's
16  out there, I would say there's -- you
17  know, the doctors had the ones putting it
18  in, seeing how it behaves and seeing the
19  patients. So there are -- I think that
20  changes. I think it -- I think it changes
21  and the doctors can become more expert as
22  to efficacy and safety of the device and
23  how the features are panning out than the
24  companies who make it.

Page 119

1      Q.   The physicians are not privy to
2  the results of the testing and studies
3  that are done by the company prior to
4  putting the product on the market.
5      True?
6      MS. GERSTEL: Object to form.
7      A.   They're privy to some of them.
8  When you have the -- typically the lead
9  inventor or authors gather data, they're
10  usually privy to that. When a company
11  would approach me with a product, first
12  thing I'd say is can you show me the data
13  you have on it, and they would share that.
14  So I am privy to the data they have.
15      They typically would not go
16  through all of the R&D bench testing, and
17  some other items would not be included in
18  that.
19      Q.   Right.
20      Doctors would not be privy to
21  the bench testing results done by a
22  medical device company, such as Ethicon.
23      Right?
24      MS. GERSTEL: Object to form.

Page 120

1      A.   It's not routinely offered, but
2  there are certainly many times where I've
3  asked for that type of information and
4  it's been disclosed readily.
5      Q.   But you had to ask for it.
6      True?
7      A.   Yeah.   Yes.
8      Q.   Do you agree that if there's
9  reasonable association between a product
10  and an adverse event, a company should
11  disclose that information?
12      MS. GERSTEL: Object to form.
13      A.   You know, the reasonable
14  association specification in your question
15  stumps me a little bit because it depends.
16  It's really -- there's a continuum of how
17  much information they get. And at a
18  certain point, if there's a very, very
19  strong relationship between a product and
20  an adverse event, yes, I think it should
21  be disclosed, but there's really a
22  continuum between how much they know and
23  when that should be shared.
24      Q.   Okay.

Page 121

1      So, would you agree that the
2  information that a medical device
3  manufacture, such as Ethicon, includes in
4  its IFUs should not be misleading?
5      MS. GERSTEL: Object to form.
6      A.   I could agree with that.
7      Q.   Do you agree that the
8  information a medical device manufacture
9  includes in its IFU should have a
10  scientific basis?
11      MS. GERSTEL: Object to form.
12      A.   I think it has a scientific
13  basis, as well as a clinical experience
14  basis in terms of the things that are
15  commonly known.
16      Q.   So it should be a scientific and
17  clinical basis?
18      A.   I think so, yes.
19      Q.   And a medical device
20  manufacturer should put the safety of its
21  patients first.
22      True?
23      MS. GERSTEL: Object to form.
24      A.   Yes.

Lawrence Lind, M.D.

Page 122

1    Q.   Even above profits.
2         Fair?
3         MS. GERSTEL:  Object to form.
4    A.   Yes.
5    Q.   Do you agree that a medical
6    device company, such as Ethicon, is
7    required to make its products reasonably
8    safe?
9         MS. GERSTEL:  Object to form.
10   A.   Yes.
11   Q.   Lastly, do you agree that if a
12   medical device manufacturer sells two
13   products that do the same thing, the
14   medical device manufacturer should stop
15   selling the less safe product and only
16   sell the safer product?
17        MS. GERSTEL:  Object to form.
18   A.   The evidence and the data
19   distinguishing those adverse events would
20   need to be compared to get to a point
21   where it was convincing that one of them
22   definitively was as efficacious and/or
23   safer.
24        So, it's a -- it depends on the

Page 123

1    level of evidence.
2    Q.   Let me ask my question again.
3         Do you agree that if a medical
4    device manufacturer sells two products
5    that do the same thing, that the medical
6    device manufacturer should stop selling
7    the less safe product, assuming it's
8    definitive, and only sell the safer
9    product?
10        MS. GERSTEL:  Object to form.
11   A.   I can't agree with that because
12   there are situations where something has a
13   higher risk, so let's say for example leg
14   pain with an obturator sling.  It's the
15   better choice, even though if you -- just
16   looking at data as a higher risk of thigh
17   pain or leg pain, it's the better choice
18   for a patient because the patient may have
19   retropubic problems or cancer there or
20   radiation there or hernia there.  So it
21   now becomes the better choice.  So if
22   you're just looking at the data, you'd say
23   well, higher leg pain, maybe we shouldn't
24   use it.  But having the two available lets

Page 124

1    you go the two different routes, and based
2    on patient's anatomy and doctor's
3    backgrounds, they may be safer in
4    different doctors' hands and they also may
5    be safer based on the patient's previous
6    surgery history.
7    Q.   So you can't answer my question
8    as asked, is what you're telling me?
9    A.   No, I cannot.
10   Q.   Have you ever read the
11   deposition of Dr. Holste?
12   A.   No.
13   Q.   Was that ever provided to you by
14   the defense for review?
15   A.   Not that I recall.
16   Q.   If that was the testimony, do
17   you disagree?
18   A.   Yes.
19   Q.   Are you an expert on the design
20   of medical devices?
21   A.   I think I am.
22   Q.   And what qualifies you as an
23   expert on the design of medical devices?
24   A.   Well, I made a really awesome

Page 125

1    suturing device that allowed people to
2    suture in really small places and made a
3    whole bunch of other people millions of
4    dollars.  And it's really cool and it
5    required some really neat engineering.
6         I think I have a unique
7    appreciation for the very significant
8    angles and spaces we're in in pelvic
9    surgery.
10        I think I have an intuitive
11   thought process as to how to think of
12   things that might let us do things more
13   easily.
14        I understand research design and
15   how to test things properly.
16        I think I have shown in my body
17   of work the ability to test meshes and
18   figure out how to decrease erosions, how
19   to suture in small places.  And I think
20   I've spent 25 years thinking about the
21   design of instruments and have a pretty
22   good background.
23   Q.   Have you ever designed a
24   transvaginal mesh product?

Lawrence Lind, M.D.

1    A.   I've proposed some and some are
2  under consideration, but none are
3  presently being adopted or funded for
4  production.
5    Q.   Have you been --
6       MR. DeGREEFF:  Strike that.
7    Q.   Have you designed any mesh
8  slings?
9    A.   The innovations that I have in
10  mind, which, you know, presently have been
11  proposed to a couple of engineers and to a
12  couple of companies, they have less to do
13  with the sling than with the trocar
14  introduction, and so it's part of the
15  sling system, but it's not the mesh
16  itself.  I would say the group that we're
17  working with, of course, my practice, you
18  know, as the role that I play in that
19  process, you know, it's a very close
20  division.  I've definitely got my eye on
21  how absorbable meshes are going to behave
22  as we continue to study them.
23    Q.   So, what are the changes to the
24  trocar that you've made in these new

1  devices that you've designed?
2    A.   I'm going to have to say that's
3  confidential.
4       Let me just clarify that to give
5  you something.
6       I think that we -- sometimes
7  when you pass a trocar and you did
8  cystoscopy because you want to see if the
9  pass went into the bladder and sometimes
10  it's missed even though trocar looks
11  pretty big under cystoscopy.  So I have a
12  design proposal that would decrease or
13  eliminate the chances of missing a very
14  small passage into the bladder.
15    Q.   What weight of mesh do you use
16  in the -- in your new products?
17    A.   I haven't gotten to the point of
18  choosing the mesh.  I'm only designing the
19  trocar.  So the mesh would be -- there's
20  two companies it's proposed to, and the
21  mesh would be whichever company decided to
22  move this forward, I'm comfortable with
23  both of their sling products.  So you have
24  both Caldera and Boston Scientific looking

1  into this.  So it would be their meshes
2  and it would just be changing the trocar
3  insertion.
4    Q.   What weight of mesh do Boston
5  Scientific and Caldera use?
6    A.   I don't have their mesh weight
7  by memory.  They're all type 1 wide pore
8  mesh.
9    Q.   Why did you not go to Ethicon
10  for their mesh?
11    A.   I've had a closer working
12  relationship with these two companies for
13  the past five, six years.
14    Q.   Does the Ethicon product have
15  smaller pore mesh than BSC and Caldera?
16    A.   They're pretty close.  I think
17  Caldera is less, is smaller.  I don't
18  recall where Boston Scientific is related
19  to TVT.
20    Q.   Well, Caldera is actually larger
21  pore mesh than the Ethicon product.
22       Correct?
23    A.   I'm not sure about that.
24    Q.   What about BSC is actually a

1  larger pore mesh than Ethicon mesh too.
2       Right?
3       MS. GERSTEL:  Object to form.
4    A.   I don't have those comparisons
5  in my head.
6       What I know is that they're all
7  in the order of ten times wider pores than
8  what is felt to be the minimum necessary
9  for favorable characteristics as described
10  by AMA.
11    Q.   Regardless, when you decided you
12  needed mesh for a product you're
13  developing, you sought that mesh from
14  Caldera and Boston Scientific, not from
15  Ethicon.
16       True?
17    A.   I wasn't seeking mesh.  I was
18  seeking someone who thought an
19  introduction needle had an advantage.
20    Q.   Okay.
21       The two companies you went to
22  for your product were Caldera and BSC, not
23  Ethicon.
24       True?

Lawrence Lind, M.D.

Page 130

1    A.   Yes.
2    Q.   And you could have gone to
3  whatever companies you wanted to.
4        Right?
5    A.   Yes.
6    Q.   And you had a working
7  relationship with Ethicon.
8        Right?
9    A.   Yes.
10   Q.   When was this that you were
11 approaching these companies?
12   A.   In the past two years.
13   Q.   So you had a relationship with
14 the company in Ethicon that has paid you
15 200 to $250,000 as a litigation expert.
16       Right?
17       MS. GERSTEL:  Object to form.
18   A.   Yes.
19   Q.   Has Ethicon ever asked you to
20 consult on the design of any of their mesh
21 products?
22   A.   I was in a consulting R&D
23 session on whether or not to make the
24 trocar smaller when they were considering

Page 131

1  the TVT Exact.  So that's not a mesh
2  decision, but again part of the mesh
3  system.  I know they were interested in
4  what I thought of the Gynecare mesh just
5  because I had used it a lot.  So, it
6  wasn't -- the Gynemesh had been, you know,
7  a smaller cut piece of a previous type of
8  mesh they had previously used.  So they
9  were interested in a lot of my input
10 because they know I used it a lot and I
11 published on it.  So they asked if they
12 could do anything different with it, and I
13 said my patients are doing extremely well,
14 so I'm happy with it.
15   Q.   Gynecare mesh you were using
16 that for pelvic organ prolapse?
17   A.   Yes.  And there was a time when
18 I was using it for individually cut sewed
19 prolapse vaginal procedures.
20   Q.   As you sit here today, it's no
21 longer possible to use Gynecare for repair
22 of pelvic organ prolapse.
23       Correct?
24       MS. GERSTEL:  Object to form.

Page 132

1    A.   I'm not doing it at all.
2    Q.   You don't have any --
3        MR. DeGREEFF:  Strike that.
4    Q.   You don't have any patents on
5  medical devices currently.
6        True?
7    A.   Correct.
8    Q.   Did you have involvement with
9  the design of the Solyx, the Boston
10 Scientific Solyx?
11   A.   We may have mentioned this
12 before.  That was the one time where I
13 was -- yes, I was in their R&D labs giving
14 them feedback on pre-release research and
15 development design phase and a positive
16 and negative feedback on it, which was on
17 their company documents, which ended up
18 with me in a deposition not on either
19 side, just called to be deposed on what I
20 had written in that R&D lab.
21   Q.   Are you familiar with the
22 industry standards that govern medical
23 device design?
24       MS. GERSTEL:  Object to the

Page 133

1  form.
2    A.   I'm familiar with a number of
3  the FDA standards.
4    Q.   What are those regulatory
5  standards?
6    A.   Well, there's clearances and
7  approval processes they have to go
8  through.  There's device labeling
9  instructions.
10   Q.   Anything else that you can think
11 of?
12   A.   There's classifications that
13 tell you how much -- whether something is
14 based on something previous, how much data
15 needs to come before release.
16   Q.   Have you reviewed any Ethicon
17 internal standards on medical device
18 design?
19   A.   I don't recall.
20   Q.   Are you familiar with the stage
21 gate system?
22   A.   I am not.
23   Q.   Do you know what a clinical
24 expert report is?

Lawrence Lind, M.D.

Page 134

1    A.   I think it's a -- it's a
2  detailed statement on where the company
3  feels a product is in terms of its
4  research and development.  I'm not certain
5  on that.
6    Q.   Have you reviewed any of
7  Ethicon's clinical expert reports related
8  to the TVT mesh sling products?
9    A.   Since the title sounds familiar,
10 I think I read one, and I don't recall
11 which one it was or any of the details,
12 but I think I -- it was in front of me at
13 one point.
14   Q.   As you sit here, you just don't
15 remember anything about what it said?
16   A.   No.
17   Q.   True?
18   A.   Correct.
19   Q.   Do you know what a design
20 history file is?
21   A.   No, but the name kind of gives
22 it away.  But the answer to your question
23 would be no.
24   Q.   Have you ever reviewed the

Page 135

1  design history file, Ethicon's design
2  history file, with regard to any of the
3  TVT products?
4    A.   I can tell you that I've read
5  quite a number of documents that describe
6  the evolution of the TVT products.  I
7  don't know if that's within that stated
8  document.
9        So, the answer is that document
10 by name I'm not familiar with, but I'm
11 certainly familiar with many documents
12 that describe the evolution of the TVT and
13 the TVT product family.
14   Q.   What is contained in the design
15 history file?
16   A.   Since I haven't seen the file,
17 I -- I can't tell you.
18   Q.   So, as you sit here, is it fair
19 to say you don't know whether you've
20 reviewed the design history file or not?
21   A.   Correct.
22   Q.   What employees from Ethicon were
23 involved in the design of the TVT
24 products?

Page 136

1    A.   Well, the key ones were Olmstead
2  for the TVT and De Lara for the obturator
3  products.
4    Q.   Have you read those depositions?
5        MS. GERSTEL:  Object to form.
6    A.   I have not read their
7  depositions, no.
8    Q.   Were those depositions given to
9  you by defense counsel?
10       MS. GERSTEL:  Object to form;
11 lack of foundation.
12   A.   I don't recall them being given
13 to me.
14   Q.   What is Med Scan?
15   A.   Is that the Canada group?  No?
16       I don't know what it is.
17   Q.   What is Provincia?
18   A.   I don't know.
19   Q.   Do you know what a design
20 failure modes and effects analysis is?
21   A.   Say it again.  Design failure?
22   Q.   Modes and effects analysis.
23   A.   I couldn't describe it to you
24 specifically.

Page 137

1    Q.   Ever participated in one?
2    A.   Well, if putting something on
3  tension to seeing load failure and various
4  other changes in the characteristics of
5  the mesh when you do different things to
6  it is part of it, then yes.
7        Whether I knew that I was
8  specifically in a session that was labeled
9  that, I don't recall that it had that
10 name.
11   Q.   What are the different types of
12 failure modes and effects analysis?
13   A.   Can't answer that.
14   Q.   Just don't know?
15   A.   Correct.
16   Q.   Did you review any of the design
17 failure modes effects analysis on the TVT
18 mesh slings?
19   A.   I may have, but not knowing it
20 had that title.
21   Q.   As you sit here, you just don't
22 know whether you did or not?
23   A.   Correct.
24   Q.   Are you aware of any company

Lawrence Lind, M.D.

Page 138

1  other than Ethicon that marketed a -- that
2  marketed mesh that was mechanical-cut?
3        MS. GERSTEL:  Object to form.
4     A.  Caldera's is mechanically-cut.
5     Q.  Which product?
6     A.  The Desara and the Desara TV
7  Blue.  There may be others, but I know
8  that that one is.
9     Q.  Have you ever reviewed any of
10  Ethicon's internal operating procedures
11  related to design?
12    A.  I've read a lot of pages that
13  discuss how -- how a procedure is going to
14  be designed.  And again, whether it had
15  that title, I don't know.  I've recently
16  read a number of Ethicon documents that
17  are discussing the process for design and
18  feasibility and opinions as to where the
19  product stands.
20    Q.  So you don't know if you've
21  reviewed the standard operating procedure
22  or not.
23        True?
24    A.  Specifically the document by

Page 139

1  that name, no.
2     Q.  How long did it take Ethicon to
3  get the TVT-O product to market?
4     A.  I don't know.  From first
5  thought to mind to market, I don't know
6  that answer.
7     Q.  Is it ever a good idea to rush a
8  product to market?
9        MS. GERSTEL:  Object to form.
10    A.  The product's got to get to
11  market in a time frame that when it's felt
12  to be efficacious and safe.
13    Q.  Have you ever reviewed any
14  Ethicon internal documents discussing how
15  quickly they got the TVT-O to market?
16    A.  No.
17    Q.  That's not something that was
18  ever provided to you?
19    A.  Not that I recall.
20    Q.  Of the opinions you --
21    A.  I'm going to correct that.
22        I seem to now have refreshed my
23  memory.  I recall -- I can't recall
24  exactly.  The theme of one company

Page 140

1  document had to do with a need to -- a
2  wish to get this moving along based on
3  competition.  I do remember a document
4  that had that type of theme.
5     Q.  Is it your understanding that
6  Ethicon wanted to get the TVT-O to market
7  as quickly as possible?
8        MS. GERSTEL:  Object to form.
9     A.  The only thing I recall was that
10  there was -- there was wording that
11  expressed a wish for it to be released and
12  the timing of the release was important
13  based on competition.
14    Q.  So they wanted to beat the
15  competitors to the market.
16        Is that what you're saying?
17        MS. GERSTEL:  Object to form.
18    A.  I said what I said.
19    Q.  Well, they wouldn't want the
20  competitors to get there first.
21        Right?
22        MS. GERSTEL:  Object to form.
23    A.  The competitors were there.
24    Q.  Okay.

Page 141

1        The opinions you're giving in
2  this litigation with regard to the TVT-O,
3  TVT-A, TVT-Exact, have you ever published
4  those in any peer-reviewed journal?
5     A.  No.
6     Q.  Have you ever been involved in
7  any clinical trials comparing midurethral
8  slings to any other pelvic surgery?
9        MS. GERSTEL:  Object to form.
10    A.  Comparative trial, no.
11    Q.  Have you ever been involved in a
12  randomized controlled trial involving
13  transvaginal mesh treatment of stress
14  urinary incontinence?
15    A.  No.
16    Q.  What antioxidants are added to
17  the TVT mesh slings?
18    A.  I do not know.
19    Q.  What is the pore size of the
20  Prolene mesh in the TVT products?
21    A.  It's in the 1300 range.
22    Q.  And it's the same for all of the
23  sling products we're talking about, right?
24  The TVT-O, the TVT-Abbrevo and the

Lawrence Lind, M.D.

Page 142

1  TVT-Exact?
2      A.   Yes.
3      Q.   Have you ever heard that pores
4  in mesh collapse?
5      A.   I have not.
6      Q.   Do you agree that if mesh pores
7  are not large enough, there can be an
8  increased risk of infection?
9      A.   Yes.
10     Q.   Do you agree that if pores are
11 not large enough, it increases the risk of
12 erosion?
13     A.   Potentially, secondary to the
14 first discussion we had about infection.
15     Q.   Do you agree that if pores are
16 not large enough, there can be poor tissue
17 integration that can cause mesh rejection?
18     A.   Yes.
19     Q.   Do you agree that you can get an
20 infection with small pore mesh causing
21 extrusion?
22     A.   Yes.
23     Q.   Do you agree that mesh with
24 smaller pores tends to have a greater

Page 143

1  inflammatory response than mesh with
2  larger pores?
3          MS. GERSTEL:  Object to form.
4      A.   Yes.
5      Q.   What is the weight of the mesh
6  in the TVT family of slings?
7      A.   I don't have that data.
8      Q.   Why does Ethicon call the
9  Prolene mesh used in the TVT slings old
10 construction mesh?
11         MS. GERSTEL:  Object to form;
12     lack of foundation.
13     A.   I think terminology regarding
14 the Ethicon family of meshes and names
15 given to them have mistakes and confusion,
16 and everything we're talking about in all
17 four of these slings is type 1 wide pore
18 mesh.
19         MR. DeGREEFF:  I'll move to
20     strike as non-responsive.  That wasn't
21     the question that was asked.
22     Q.   My question was --
23         MR. DeGREEFF:  Strike that.
24     Q.   Do you know what I mean when I

Page 144

1  say old construction mesh?
2          MS. GERSTEL:  Object to form.
3      A.   There are different ways the
4  meshes were put together over time.
5  They're woven differently.  They have
6  different fiber sizes, different pore
7  sizes.  So, you know, the Prolene mesh has
8  a long history to it.
9          So, the -- the way it was
10 constructed was different in older, or
11 let's say times past, was made differently
12 than it is now.
13     Q.   Well, the mesh currently used in
14 the TVT sling products was originally
15 developed for hernia repair.
16     True?
17     A.   Yes.
18     Q.   And it was developed for hernia
19 repair in the gut.
20     Fair?
21     A.   Yes.
22     Q.   It was not originally developed
23 or designed to be implanted in the vagina.
24     True?

Page 145

1      A.   Originally, yes.
2      Q.   And the mesh used in the TVT
3  products was originally developed in 1974.
4      Is that true?
5      A.   I don't have that knowledge of
6  the date.
7      Q.   It was a long time ago, right,
8  when it was developed?
9      A.   If that's the correct date, it's
10 the number of years that it is.  It's been
11 working well for all these years.
12     Q.   It's almost a half century ago.
13     Right?
14     A.   Yeah.  It's been working well
15 for 20 years.
16         MS. GERSTEL:  As someone who has
17     gave birth close to that year, I take
18     offense to that part.
19         MR. DeGREEFF:  Trust me, I'm
20     real close to that too.
21         Anybody need to take a break?
22         MS. GERSTEL:  Sure.
23         (Recess taken.)
24         (Lind Exhibit 7, Defense Expert

Page 146

1    General Report of Lawrence Lind, M.D.
2    re TVT, TVT-O, TVT-Exact and
3    TVT-Abbrevo, June 24, 2019, was marked
4    for identification, as of this date.)
5        (Lind Exhibit 8, Lawrence Lind
6    Supplemental General Materials List in
7    Addition to Materials Referenced in
8    Report, was marked for identification,
9    as of this date.)
10   BY MR. DeGREEFF:
11   Q.   Sir, I'm handing you what has
12   been marked as Deposition Exhibit 7.
13       Can you tell us what that is?
14   A.   It looks like my defense expert
15   general report for TVT, TVT-O, TVT-Exact
16   and TVT-Abbrevo.
17   Q.   Sir, does this report contain
18   all of your opinions related to those
19   products?
20       MS. GERSTEL:  Object to form.
21   A.   No.
22   Q.   What isn't in your report?
23   A.   In preparing for the deposition,
24   I have continued to read, continued to

Page 147

1    pull more articles, and continued to
2    educate myself.
3    Q.   Sir, do you understand that in
4    this litigation, there's a deadline for
5    disclosing expert opinions?
6    A.   Okay.
7    Q.   Do you understand that deadline
8    has passed?
9    A.   Okay.
10   Q.   So, what opinions did you not
11   include in your report that you now intend
12   to offer?
13   A.   I just have a little more detail
14   on some adverse events and some -- it's
15   really the studies are in there and it's
16   really just a little more in-depth
17   understanding of what the studies have
18   shown.
19       So, I'm not adding studies to
20   the report.  I'm just a little more
21   familiar with the drill-down ordeal of
22   what's within the studies.
23   Q.   I think we're talking about two
24   different things, and you're talking about

Page 148

1    the materials you relied on in support of
2    your opinions.
3        Correct?
4    A.   Correct.
5    Q.   I'm talking about the opinions
6    you've given in your report, the general
7    opinions with regard to the TVT, TVT-O,
8    the TVT-Exact and TVT-Abbrevo.
9        Are all of those opinions that
10   you intend to give at trial contained in
11   this report?
12   A.   Well, if the legal rules are
13   such that those are the limits, then those
14   will have to be the limits.
15       I have additional thoughts, and
16   you will guide me as to the legal process.
17   Q.   Have you been asked by defense
18   counsel to provide any additional
19   opinions?
20   A.   No.
21   Q.   Is it your intention at trial to
22   provide any opinions that are not
23   contained in your report?
24       MS. GERSTEL:  Object to form.

Page 149

1    A.   I will follow whatever the legal
2    guidelines are.  And if I'm able to speak
3    opinions that are not specifically in
4    there, I will, and if I'm instructed that
5    I'm not allowed to do it, I'll follow the
6    instructions.
7    Q.   Okay.  Well, tell me what the
8    additional opinions are that you have as
9    you sit here that are not contained in
10   your report.
11       MS. GERSTEL:  Object to form;
12       asked and answered.
13   A.   There are details, there are
14   studies which I discuss in here and I give
15   opinions from those reports, and I have
16   more information from those same studies
17   which I feel is additive to my opinions.
18   Q.   Do those studies, in any way,
19   alter your opinions?
20   A.   They strengthen my opinions in
21   the same direction.
22   Q.   So none of your opinions
23   contained in your report are going to
24   change?

Lawrence Lind, M.D.

Page 150

1    A.    Correct.
2    Q.    So there is no new category of
3  opinion that you plan to provide.  What
4  you're saying is you believe that you have
5  a better understanding now of some of the
6  materials you've -- or, I guess, materials
7  you've already cited in your report.
8         Fair?
9    A.   I think I have information that
10 strengthens the opinions that I give.
11   Q.    Okay.
12        But nothing will alter the
13 opinions?
14   A.    Correct.
15   Q.    Have you prepared any kind of a
16 supplemental report?
17   A.    No.
18   Q.    So, what is it that you want to
19 add to the report that strengthens your
20 analysis of these materials?
21        MS. GERSTEL:  Object to form.
22   A.    Well, for example, you know, a
23 report quoted often is the Schimpf
24 meta-analysis and a high rate of leg or

Page 151

1  groin pain.
2    Q.    Okay.
3    A.    And that kind of jumped off the
4  page at me as something that seemed out of
5  line with a lot of the reading I have done
6  and my personal experience.  So I decided
7  to explore that pain because I think we
8  can all agree that if someone has an
9  incision in the groin, it would make sense
10 that they would have pain, some degree.
11 Let's not say much degree.  Anywhere you
12 have an incision there's going to be pain
13 immediately postoperatively.
14        For the -- for the TVT, there's
15 pain where the trocars come out of the
16 suprapubic region.  Right after and for
17 the groin where it comes out.  And what's
18 of important interest is how severe is the
19 pain and how long does it last.  So that
20 number that jumps off the page which a lot
21 of people react to as a high leg pain
22 rate, I wanted to explore that further.
23 So I researched and found the seven
24 randomized control trials that go into

Page 152

1  making that 16.7 percent, and the data
2  from those trials clearly indicates that
3  clearly the preponderance, or at least 90
4  percent of the data shows that all of the
5  pain goes away within a few weeks to a
6  month.  So, most of the data supporting
7  that 16.7 is transient pain, which I think
8  is very relevant as opposed to just the
9  number of 16.7.
10        In the Ford Cochrane analysis,
11 which is also included several times in my
12 report, supports that leg pain tends to be
13 transient.  So that's one example of an
14 expansion or a deeper dive into a study to
15 say what is the 16.7 percent in the
16 Schimpf article mean, and doing some real
17 research, we can say what's the body of
18 literature that goes into the real number.
19   Q.    What other opinions do you want
20 to add?
21   A.    I would say I've seen an article
22 by Teo which is quoted and it certainly
23 sparks a lot of attention because it's a
24 trial where they decided to stop the

Page 153

1  trial, feeling it would be immoral to
2  continue the trial because they had read
3  other articles that showed a high
4  incidence of groin pain and that it would
5  be -- it would be immoral to continue the
6  trial.
7         I said well, let me look into
8  it.  It really seems, again, what was the
9  data that was so alarming and what was
10 going on in their study.  And in their
11 study, when they stopped the trial, almost
12 all the patients who had groin pain had it
13 resolved within a couple of weeks and
14 there was only one patient who had chronic
15 groin pain and it was a patient in the TVT
16 group.  So I thought it was very
17 interesting that a study that is quoted
18 often as how problematic that is a study
19 had to be stopped because of the high
20 level of groin pain reported elsewhere was
21 in the middle of a study demonstrating
22 extremely little groin pain and the only
23 patient having prolonged problems was in
24 the other group.  So I think it's -- my

Lawrence Lind, M.D.

Page 154

1  main message is that if you dive into
2  deeper into the literature, the specifics
3  about the groin pain and how often it is
4  severe or prolonged very strongly is
5  compelling that the pain is transient.
6      Q.   Okay.  What else?  What other
7  opinions do you want to add?
8      A.   I would add an opinion on the
9  Okulu article.  Okulu used Vypro and
10  absorbable mesh compared to two others for
11  a sling, and it's a very strongly
12  presented as evidence that there was a
13  better material, better alternative to the
14  TVT type mesh for slings.  And I think
15  it's, number one, it's unreasonable to use
16  that as evidence that a TVT could be done
17  better with this material because the --
18  in taking a deeper dive it became clear to
19  me that they don't do a procedure that
20  looks anything like a TVT.  They make a
21  vaginal flap, a very large vaginal flap
22  and open a big incision, which TVT does
23  not.  They cut out an island of vaginal
24  tissue and they sew a piece of this mesh

Page 155

1  on top of the vaginal tissue and then they
2  use sutures it make a hammock out of it.
3      So, the procedure, while in that
4  study, I get that it showed that the
5  absorbable mesh had some favorable
6  characteristics compared to the
7  non-absorbable, it was describing a
8  procedure that someone invented that
9  doesn't exist anywhere else in the
10  literature.  So I wanted to look a little
11  further into, you know, what is the
12  evidence for Vypro and the absorbable
13  meshes because the case that there's an
14  alternative that's more favorable is very
15  important, I think, to our discussion in
16  weighing the pluses and minuses here.
17      So I did a literature search on
18  Vypro mesh and there are 72 articles on a
19  Pub Med search.  If you look for Vypro.
20  And while there are a -- if you research
21  midurethral sling, you'll get about 4,000
22  and when you research Vypro mesh, you'll
23  get 72.  And there are precisely two
24  articles related to slings, and there are

Page 156

1  three articles, there are more articles in
2  the Vypro Pub Med search on using it for
3  mosquito netting than there are on using
4  it for slings.  And the remainder of this
5  are related to non-incontinence
6  procedures.
7      So, I think it's -- my main
8  opinion that I'm adding is that the main
9  study used that's comparative is on a
10  procedure that doesn't resemble a TVT at
11  all.  So I think it's unfair to say that
12  for a TVT this would be better.  And that
13  the data that's available for Vypro in the
14  incontinence world is microscopically
15  small compared to unprecedented data in
16  favor of the TVT product which we're
17  discussing.  So that's an additional
18  opinion I would give.
19      Q.   How many of those articles
20  related to the TVT are long-term
21  randomized controlled trials with safety
22  as the primary endpoint?
23      MS. GERSTEL:  Object to form.
24      A.   About 85.

Page 157

1      Q.   Which long-term randomized
2  control trials exist on the TVT?
3      MS. GERSTEL:  Objection to form.
4      A.   417 had I believe 81 or 85
5  randomized controlled, I can't name them
6  all, and they had about 13,000 patients.
7      Q.   Anything else you want to add?
8      I just want to know so I can
9  move to have them stricken.
10      MS. GERSTEL:  I'm sorry?
11      MR. DeGREEFF:  I just want to
12  know so I can move to have them
13  stricken.
14  BY MR. DeGREEFF:
15      Q.   Doctor, were all these articles
16  that you're talking about now available to
17  you before you rendered your opinions in
18  this case?
19      A.   The Okulu article was available
20  and is quoted in my paper, but in
21  reviewing my expert report and preparing
22  for this, I read through that article and
23  I -- when I noticed that it didn't look
24  anything like a sling and that it was new

Lawrence Lind, M.D.

Page 158

1  information for me, that it really was not
2  a minimally invasive TVT type procedure, I
3  said to myself gosh, if this is so
4  different, I'm curious how much we know
5  about this.  So I looked further.
6       So, in reviewing my present
7  statements, new curiosities developed, so
8  I researched them.
9    Q.   Yeah, that's information that
10 was available to you though prior to
11 issuing your opinions.
12      Right?
13   A.   I guess the whole world of
14 articles was available to me.
15   Q.   Nothing new came out between the
16 time you wrote your report and now.
17      Right?
18   A.   Well, there have been articles
19 that have come out, but not -- I don't
20 think we're speaking about new articles
21 that came out that are relevant to your
22 discussion right now.
23   Q.   None of the articles that you
24 have now reviewed and wish to add opinions

Page 159

1  on were unavailable at the time you
2  originally authored your opinions.
3       True?
4       MS. GERSTEL:  Object to form.
5    A.   That's correct.
6    Q.   This was something that you
7  decided to look into after having been
8  deposed previously on the TVT.
9       Is that fair?
10   A.   Well, from a time sequence, it
11 would be after the TVT, but it wasn't from
12 the TVT that had me do it.  I was reading
13 my report four days ago and these elements
14 just came to mind.  So this was based on
15 things that came to mind in reading
16 through my report preparing this week.
17   Q.   Because those articles that you
18 now seek to attack, those results are bad
19 for the TVT products.
20      Right?
21      MS. GERSTEL:  Object to form.
22   A.   Which articles are bad?
23   Q.   The ones you're talking about
24 that you now wish to further clarify.

Page 160

1       Those results are adverse to the
2  TVT products.
3       Right?
4       MS. GERSTEL:  Object to form.
5    A.   Well, I think they're -- I think
6  they're kind of good for my argument
7  because they -- Okulu really doesn't
8  describe a TVT procedure.  So I would
9  consider it a strong defense that we're
10 trying to suggest something's an
11 alternative when it's really not doing the
12 procedure that we're interested in.
13   Q.   No, I understand you think you
14 can attack those conclusions somehow.
15      But my question is the reason
16 you started looking into those articles is
17 because the results on their face are bad
18 for the TVT products.
19      True?
20      MS. GERSTEL:  Object to form.
21   A.   The studies didn't make sense to
22 me.  The reason I looked at everything I
23 had in my report and if something came to
24 me that seemed curious or in question,

Page 161

1  like the 16.7 percent erosion, it just
2  didn't seem right.  So I'm a curious guy
3  and I look into things, and I looked into
4  it.  I didn't go after it because it was
5  negative.  I went after it 'cause it
6  didn't make sense to me.
7    Q.   But it was negative.
8       Right?
9    A.   I would say the Schimpf article
10 was misleading.
11   Q.   Is 16.8 erosion rate, is that an
12 acceptable rate to you?
13      MS. GERSTEL:  Object to form.
14   A.   It's a rate that's misleading
15 because that's immediately postoperative,
16 and that's what's wrong with her data.
17   Q.   I understand that you want to
18 attack an author who wrote something that
19 was actually published on the TVT
20 products.
21      My question is 16.8 percent
22 erosion, is that an acceptable erosion
23 rate to you?
24      MS. GERSTEL:  Erosion?

Lawrence Lind, M.D.

Page 162

1   A.   Are you speaking of erosion or
2   leg pain?  Because the Schimpf --
3   Q.   I'm sorry.  Leg pain.
4      MR. DeGREEFF:  Strike that.
5   Let's start over.
6   A.   So, my answer to that would be
7   in the immediate postoperative period, I
8   think it's a very low rate of pain where
9   there's an incision and completely
10  acceptable.
11     If that is prolonged or severe
12  and prolonged, I would consider that
13  unacceptable.
14  Q.   What is an acceptable rate of
15  chronic groin or leg pain?
16  A.   Well, everyone would have a
17  different cutoff because you're balancing
18  the risks and benefits of each sling.
19     So, you know, I think that in
20  the 2 to 4 percent range is acceptable,
21  and we have to accept that in the
22  understanding that we are decreasing
23  bladder perforations, bowel perforations
24  with the TVTs.  So it's not just does the

Page 163

1   patient have leg pain.  It's what we're
2   trading.
3      MR. DeGREEFF:  Move to strike
4   non-responsive.
5   Q.   My question was just simply what
6   is an acceptable rate in your mind of
7   chronic groin and leg pain from a TVT
8   implant?
9      MS. GERSTEL:  Object to the
10  form.
11  A.   I would say in the 2 to 3
12  percent.
13  Q.   So, your report, which is
14  Exhibit 7, is 57 pages long.
15  True?
16  A.   Yes.
17  Q.   I believe we discussed
18  earlier --
19     MR. DeGREEFF:  Well, strike
20  that.
21  Q.   Who wrote that report?
22  A.   I did.
23     MS. GERSTEL:  Objection.
24  Subject to privilege.

Page 164

1   BY MR. DeGREEFF:
2   Q.   Did you write the whole thing?
3      MS. GERSTEL:  Objection.
4   Subject to privilege under the Federal
5   Rules of Civil Procedure.
6      Don't answer.
7      MR. DeGREEFF:  I can ask that.
8   I don't get to see drafts, but I can
9   ask who wrote it.
10     MS. GERSTEL:  No, you can't ask
11  about the report writing process.
12     MR. DeGREEFF:  I absolutely can,
13  but that's not where I'm going with
14  this anyway.
15  BY MR. DeGREEFF:
16  Q.   Who wrote that report?
17     MS. GERSTEL:  Objection.
18     Don't answer.
19     Subject to privilege.
20  BY MR. DeGREEFF:
21  Q.   Are you going to choose to
22  accept your counsel's request that you not
23  answer my absolutely proper question?
24  A.   Yes.

Page 165

1      MR. DeGREEFF:  Moving forward,
2   you guys won't get anything from us.
3   BY MR. DeGREEFF:
4   Q.   So, did you actually physically
5   write every word of it?
6      MS. GERSTEL:  Objection.  Same
7   basis.
8      Don't answer.
9   A.   I'm declining to answer.
10  Q.   Are there any parts of that
11  report that came from other people's
12  reports?
13     MS. GERSTEL:  Same objection.
14     Don't answer.
15     MR. DeGREEFF:  I absolutely can
16  ask that.  That is 100 percent
17  correct.  If he's pulled pieces of a
18  report from other individuals' expert
19  reports, I have every right to know
20  that.
21     MS. GERSTEL:  It's all covered
22  by --
23     MR. DeGREEFF:  No, it's not
24  covered by that.

Lawrence Lind, M.D.

Page 166

1    MS. GERSTEL:  It is.
2    MR. DeGREEFF:  No, it's really
3  not.
4    MS. GERSTEL:  It is.  I'm
5  directing him not to answer.
6    MR. DeGREEFF:  Okay.
7  BY MR. DeGREEFF:
8    Q.  Why do you think your counsel
9  doesn't want you to tell me who wrote your
10  report?
11    MS. GERSTEL:  Objection.
12    A.  I don't know whether there are
13  legal guidelines that she feels give that
14  that's the way it's supposed to go.
15    Q.  Do you think if you wrote the
16  whole thing, she'd let you answer?
17    MS. GERSTEL:  Objection.
18    Don't answer that.
19    A.  I'm declining to answer.
20    Q.  So, it took you 25 hours to
21  write a 57-page report.
22    Is that right?
23    A.  Right.
24    Q.  Your report also has a reliance

Page 167

1  list along with it.  That's Exhibit 8.
2    Correct?
3    A.  Right.
4    Q.  Are you aware it was amended
5  five days ago?
6    A.  I remember I had come up with
7  some articles that I had wanted to
8  include.
9    Q.  What was added to it?
10    A.  I don't recall specifically at
11  the moment.
12    Q.  Who chose the materials that
13  were added to it?
14    A.  I did.
15    Q.  All of them?
16    A.  All of them.
17    Q.  Who drafted the additions to the
18  reliance list?
19    A.  The reliance list, the typed
20  reliance list was done by counsel.
21    Q.  Okay.
22    A.  The input to the reliance list
23  this week was mine.
24    Q.  So, this reliance list was

Page 168

1  supplemented because you came up with
2  additional articles that you reviewed in
3  preparation for your deposition.
4    Is that true?
5    MS. GERSTEL:  Object to the
6  form.
7    A.  I think there's also one or two
8  that were in my report which we did not
9  have on there.  So there were a couple of
10  articles that I added and a couple that
11  were erroneously that were not added that
12  were already on the report.
13    Q.  Okay.
14    So, is everything --
15    MR. DeGREEFF:  Strike that.
16    Q.  Does your supplemental reliance
17  list, together with your report, contain
18  everything that you reviewed in rendering
19  your general opinions?
20    A.  As I stated previously, I have
21  read additional materials all week and
22  have some other things in my head, and I
23  do understand that you have legal reasons
24  for why I may or may not be able to use

Page 169

1  those, but -- so there would be some that
2  I reviewed that are not in there.
3    Q.  Well, your reliance list was
4  just supplemented five days ago.
5    Have you reviewed additional
6  materials since then?
7    A.  I have.
8    Q.  The materials that you added to
9  your reliance list, were you directed by
10  counsel to look into certain issues?
11    MS. GERSTEL:  Objection.
12  BY MR. DeGREEFF:
13    Q.  Is that why you started to look
14  into them?
15    MS. GERSTEL:  Objection.  That's
16  will go under privilege.
17  Communications between experts and
18  counsel are privileged.
19    MR. DeGREEFF:  That's a
20  privilege?
21    MS. GERSTEL:  Yes, under the
22  rules.
23    We can look at it right now.
24    MR. DeGREEFF:  Not if they rely

Lawrence Lind, M.D.

Page 170

1    on it.
2        MS. GERSTEL:  I'm sorry?
3        MR. DeGREEFF:  Not if they rely
4    on it.  If he takes actions what
5    you're telling him to do.
6        MS. GERSTEL:  No, communications
7    between expert and counsel are
8    privileged.
9        MR. DeGREEFF:  If you provide
10   information that's ultimately relied
11   on, then I'm entitled to discovery.
12       MS. GERSTEL:  The communications
13   are qualified under privilege except
14   to the extent that they pertain to --
15       MR. DeGREEFF:  I'm not asking
16   what was said.  I'm asking if he was
17   directed to do a search.
18       MS. GERSTEL:  That pertains to
19   communication between me and him.
20       MR. DeGREEFF:  You and I are
21   going to have to disagree on that.
22   BY MR. DeGREEFF:
23   Q.   In rendering the general
24   opinions that you've got in your report,

Page 171

1    is everything that you relied on in giving
2    those opinions contained in your reliance
3    list or the report itself?
4        MS. GERSTEL:  Object to the
5    form.
6    A.   Say that again.
7    Q.   Is everything you relied on in
8    rendering your opinions --
9        MR. DeGREEFF:  Strike that.
10   Q.   Are all the materials you relied
11   on in rendering the opinions in your
12   report contained in either your report or
13   the supplemental reliance list?
14   A.   No, 'cause I also depend on
15   knowledge learned from courses, books,
16   reading, education, clinical experience,
17   discussion with other experts, all the
18   time I spent in R&D labs.
19       So, my reliance is not just on
20   articles.  So I've had 25 years of
21   learning that come from sources that are
22   other than articles.
23   Q.   Let's try this again.  I think
24   if you listen to my question, it will be

Page 172

1    okay.
2        Are all the materials,
3    materials, you're not a material, as far
4    as I'm aware of, but are all of the
5    materials you relied on in rendering the
6    opinions in your report contained in
7    either the supplemental reliance list or
8    the report itself?
9    A.   When I go to courses, there are
10   materials, entire binders that have
11   information.
12   Q.   Are those on your reliance list?
13   A.   No.  I've learned them over the
14   years.
15   Q.   Why not?
16   A.   Because they're in my brain.  I
17   have them.
18   Q.   Do you understand that I have
19   the right to understand and know about and
20   see all of the materials you relied on in
21   reaching your opinion?
22   A.   I think you're totally
23   reasonable, and I am certainly not trying
24   to be difficult.  But when you say when I

Page 173

1    made opinions, what I have told you I also
2    have from opinions which is the knowledge
3    that's in my brain from the sum total of
4    places I've gathered information, that's
5    part of where my opinions came from.
6        And if the word "materials" is
7    something for us to focus on, in many of
8    the places where I learned there were
9    materials.  I can't produce them.  If that
10   makes it illegal to be part of this, you
11   know, you'll instruct me on that, and you
12   and Diana will discuss that.  But my
13   opinions have a lot that comes from a lot
14   of different sources of learning that
15   don't have materials that can be put into
16   the reliance list.
17   Q.   I want a copy of the materials
18   you're talking about that I haven't seen.
19       Do you have copies of them?
20   A.   I have some of them.  Yeah.
21       MR. DeGREEFF:  I would like you
22   to give your counsel all of them and
23   then she can produce them to me.
24       Is that okay with you?

Lawrence Lind, M.D.

Page 174

1    THE WITNESS: I'll give you what
2  I have, just clarifying that it won't
3  be the full complement of every
4  educational piece that I have. But I
5  do have quite a few.
6    MR. DeGREEFF: Whatever you
7  claim to be relying on, I want to see
8  a copy of it. So please give it to
9  your counsel.
10   MS. GERSTEL: Are you talking
11 about every textbook he read in
12 medical school?
13   MR. DeGREEFF: Right. Or at
14 least identify it. They haven't been
15 identified.
16   Well, I mean, if we're going to
17 play this game, we're going to play
18 this game.
19   MS. GERSTEL: I'm not trying to
20 play a game.
21   MR. DeGREEFF: If that's the way
22 we're going to play, if that is the
23 game you want to play, then that is
24 the game we're going to play.

Page 175

1    MS. GERSTEL: I'm not trying to
2  play a game.
3    I'm just saying that he's a
4  urogynecologist, and his opinions on
5  urogynecology are based in part on his
6  sum total of experience in practice
7  and in learning as a urogynecologist.
8    MR. DeGREEFF: That's not the
9  response to my question. My question
10 is very simple.
11 BY MR. DeGREEFF:
12   Q.   What materials am I going to see
13 that you're going to talk about at trial
14 in support of your opinions that are not
15 included in either your reliance list,
16 your supplemental reliance list, or your
17 report?
18   A.   Well, I would say if I rendered
19 the opinions from the items that I learned
20 outside of these materials that you have
21 in front of them, they're going to be
22 presented in the same way as part of my
23 experience and knowledge as a
24 urogynecologist.

Page 176

1    I'm not going to show up with
2  binders and binders of things that you
3  haven't had a chance to look at in the
4  proper process.
5    MR. DeGREEFF: Well, if there
6  are materials that you are going to
7  rely on that are not on your reliance
8  list, identify them and give them to
9  your counsel, please.
10 BY MR. DeGREEFF:
11   Q.   So, can you identify them right
12 now for me?
13   MS. GERSTEL: Objection.
14   A.   There's binders and binders of
15 course materials I've taken every year I
16 take one or two courses. There's the --
17 every year I update and I get the binder
18 for the female pelvic medicine fellowship
19 board certification course. It's, you
20 know, it's like three of these binders.
21   And, yeah, I mean, I'll get
22 you -- if you said you want everything
23 that I have, I'll get you everything I
24 have.

Page 177

1  BY MR. DeGREEFF:
2    Q.   Are those things on your
3  reliance list?
4    A.   Well, I would say that the
5  course, let's say the 2018 fellowship
6  review course binder instruction and
7  educational materials, that is not on my
8  reliance list. There are certainly
9  hundreds of articles from that course that
10 are on my reliance list because a number
11 of topics in that course are slings,
12 efficacy and safety of slings, and, you
13 know, all the sections that have to do
14 with mesh and slings are in that course.
15   I would ask if you like, if
16 we're going to do that, I would take out
17 the things that have to do with
18 constipation and, you know, things that
19 don't have to do with mesh or slings just
20 so that it's not like this (indicating).
21 But if you want it all, I'll follow
22 instructions.
23   Q.   Right. So, this is not supposed
24 to be a difficult question. I mean, what

Lawrence Lind, M.D.

Page 178

1  I'm trying to figure out is what I'm going
2  to see at trial and what you're going to
3  discuss at trial.
4        This is the supplemental
5  reliance list as I know it, and this is
6  what has been provided to us as the things
7  you relied on.  And I am not including
8  your experience and learning and knowledge
9  and all those things because I understand
10 there's not a material for that.
11       I'm trying to figure out what
12 materials that I'm going to look at at
13 trial or that you could potentially be
14 using at trial that are not included in
15 your supplemental reliance list or your
16 report.
17    A.   I think we can safely say what
18 you have in front of you are the
19 materials, or the scientific materials
20 that are going to come forward.
21       I cannot separate the literature
22 from opinions I'm going to have based on
23 every other source and way that I learned,
24 that those are not going to be opinions.

Page 179

1  But from the standpoint of materials, I
2  think you have what I'm going to present
3  to the court.
4        The only clarification I would
5  give there is that these articles in and
6  of themselves have references.  So those
7  references I would consider as part of
8  what I might reference.  Meaning in the
9  bibliography of an article, it may
10 describe the articles that are supporting
11 itself, and I may speak to articles that
12 are in the bibliography that are not --
13 that you don't have as a full.
14    Q.   So, it's your belief that by
15 disclosing an article as something you
16 relied on, that you're therefore
17 disclosing, for example if there's a
18 hundred citations for it, you're
19 disclosing all of those?
20    A.   Well, if I'm reading a Schimpf
21 article and we're discussing Schimpf and
22 we're discussing Schimpf which is an
23 article I've disclosed and it is relevant
24 to discussing the data that she discloses,

Page 180

1  for example the leg pain data, and it's
2  part of my knowledge that the articles
3  that comprise the 16.7 percent have
4  information X, Y and Z, I consider that
5  fair game.
6        If it's not legally, you'll
7  inform me.
8     Q.   Okay.
9        So, are you needing to update or
10 supplement your reliance list?  Is that
11 what you're telling me?
12       MS. GERSTEL:  Objection.
13       THE WITNESS:  Am I supposed to
14 answer that?
15       MS. GERSTEL:  No, go ahead.
16    A.   If I had the opportunity, given
17 that your goal is to have everything that
18 would be presented, I would update it.
19    Q.   Can you update this and provide
20 me a final reliance list that will include
21 everything that you intend to rely on?
22    A.   I'd be happy to do that.
23       And I promise that between now
24 and any subsequent time we meet there

Page 181

1  won't be ten more to add.  So I would be
2  happy to, I think, come together on what
3  this discussion's been, and if was given
4  the opportunity to update it, I would add
5  about ten articles and we could call that
6  yes, you have in front of you the articles
7  I would rely on.
8     Q.   Okay.
9     A.   The materials.
10    Q.   Well, let's do that because I
11 want a final materials list.  So, I mean,
12 that's the goal.
13    A.   Okay.
14       MR. DeGREEFF:  How soon can we
15 get that?
16       THE WITNESS:  In a few days.
17       MS. GERSTEL:  Yeah.
18       MR. DeGREEFF:  Okay.  That's
19 fine.
20       So, I'm going to mark a blank
21 document as Exhibit 9, and then we can
22 provide the supplemental materials
23 list to the --
24       THE WITNESS:  I'm making myself

Lawrence Lind, M.D.

Page 182

1    a homework note.
2         MR. DeGREEFF:  -- to the court
3    reporter.
4         Sir, for the record, can we
5    agree that you are going to provide
6    what is going to be a final reliance
7    list to your counsel to be provided to
8    me and the court reporter?
9         THE WITNESS:  Yes.
10        MR. DeGREEFF:  Thank you.
11        And we will mark that as
12   Deposition Exhibit Number 9.
13        (Lind Exhibit 9, placeholder for
14   production by the witness, was marked
15   for identification, as of this date.)
16   BY MR. DeGREEFF:
17   Q.   Looking at Exhibit 8, the
18   current version of the supplemental
19   reliance list, that reliance list is more
20   than a hundred pages long.
21        Right?
22   A.   I believe you.
23   Q.   Is it fair to say it includes
24   thousands of documents and materials?

Page 183

1    A.   Yes.
2    Q.   Who chose the documents on that
3    reliance list?
4    A.   I chose the vast majority, and
5    counsel suggested some additional.
6    Q.   You chose the vast majority of
7    the internal Ethicon documents that are on
8    that reliance list?
9    A.   No.  Of the -- of the scientific
10   literature.
11        I didn't choose any of the
12   Ethicon documents.
13   Q.   Okay.
14        So, of the documents on your
15   reliance list, is it fair to say that the
16   portion you provided input on is the
17   medical literature section?
18   A.   Yes.
19   Q.   And the remainder of it was
20   chosen by defense counsel?
21   A.   The -- for the most part, yes.
22   Q.   What percentage of the medical
23   literature would you say you chose?
24   A.   75 percent.

Page 184

1    Q.   Who chose the remaining 25
2    percent?
3    A.   Counsel.
4    Q.   What was the methodology you
5    applied for choosing the medical
6    literature that was included in the
7    reliance list?
8    A.   You know, I started -- I like to
9    start on my own.  I started on my own
10   doing my Pub Med searches on the different
11   products, then the different products plus
12   complications, and from those choosing
13   articles that I wanted.  And when I got to
14   areas where I felt that I was incomplete
15   or didn't really have -- didn't seem to
16   have authoritative understanding, I'd say
17   do you have anything on this.  Then they
18   would provide materials.
19        So, you know, it was kind of a
20   back-and-forth.  It was really -- I was
21   trying to tell my story, and when my story
22   had gaps, I said do we have more
23   information that I'm not finding on this.
24        It's hard when you try to do

Page 185

1    a -- you know, the limitation where
2    requests were made, it's really just a
3    function of how large the literature is.
4    When you put in midurethral slings, you
5    get 4,000 on Pub Med.  So, I was very,
6    very diligent in preparing this report,
7    but when going through 4,000 on a
8    midurethral sling search and, you know,
9    several hundred when you put in a TVT-O
10   search, a TVT-O complication search, FDA,
11   you know, notifications list, you know,
12   it's just -- the reality is unless I had a
13   full-time job, I could review 10,000
14   documents and figure out which were
15   relevant.  So I pulled the ones which
16   clearly looked right to me.  I tried to
17   point more towards the randomized
18   controlled trials, that sort of thing.
19        So, I created a story.  And when
20   the story had areas where I didn't feel I
21   had good literature, I said do you have
22   articles that I don't in this area, and
23   they -- sometimes they said yes and
24   sometimes they said no.

Lawrence Lind, M.D.

1    Q.   Did you ever inquire as to
2  defense counsel's methodology for
3  selecting the literature included in the
4  reliance list?
5    A.   No.
6    Q.   I think you said you spent about
7  40 hours reviewing the materials on the
8  reliance list.
9         Is that correct?
10   A.   Right.
11   Q.   Fair to say you did not review
12  every document on that 102-page
13  supplemental reliance list?
14   A.   I scanned the title of every
15  article and decided which ones I wanted to
16  look into further.
17   Q.   Okay.  So, fair to say you did
18  not review in detail every piece of
19  medical literature included on that
20  supplemental reliance list?
21   A.   That's fair to say.
22   Q.   Did you review all of the
23  nonmedical literature documents?
24   A.   I'm not sure which ones you're

1  referring to specifically.
2    Q.   Okay.  Well, anything that's not
3  designated as medical literature on your
4  report, did you review all of those
5  documents?
6         MS. GERSTEL:  Object to form.
7    A.   Well, I think I stated
8  previously that I reviewed some Ethicon
9  internal documents and did not review
10  others.
11   Q.   So, it's reasonable to say that
12  you didn't review everything on your
13  reliance list.
14        Right?
15        MS. GERSTEL:  Object to form.
16   A.   I read the titles of each and
17  selected the ones I thought were most
18  pertinent.
19   Q.   I'm not talking about just
20  medical literature.
21        I'm saying you didn't review all
22  of the documents on this 102-page reliance
23  list in 40 hours.
24        Right?

1    A.   In detail, no.
2    Q.   That would have been essentially
3  impossible?
4    A.   Thousands of hours.
5    Q.   Right.
6         Would have taken thousands of
7  hours to review all those, right?
8    A.   In detail to really read through
9  an article in depth.
10   Q.   Because if you've got thousands
11  of documents on your reliance list --
12   A.   It's ten minutes per, minimum.
13   Q.   Right.
14        So you're looking at 10,000
15  hours to review all those documents.
16        Right?
17   A.   Correct.
18   Q.   And you essentially did what you
19  could in 40 hours.
20        Right?
21        MS. GERSTEL:  Object to form.
22   A.   I spent the time I felt
23  necessary to do an excellent job on -- on
24  the task, understanding that reading every

1  item available on it provided in the world
2  or on the reliance list was not possible.
3    Q.   What percentage of the medical
4  literature on your supplemental reliance
5  list did you actually review in detail?
6         MS. GERSTEL:  Object to form.
7    A.   In detail, I would say 30
8  percent.
9    Q.   What percentage of the total
10  documents on the reliance list, all of
11  them including the internal documents and
12  everything else that's on there, did you
13  actually review in detail?
14        MS. GERSTEL:  Object to form.
15   A.   I can't give you a percentage on
16  it.
17   Q.   How did you decide which
18  articles to review in detail and which
19  ones not to?
20   A.   The quality level of the study
21  was the primary, meta-analysis, systematic
22  reviews or randomized control trials, and
23  then of course I was interested on the --
24  I mean, I -- those are all the comparative

Lawrence Lind, M.D.

Page 190

1 trials. And then in those comparative
2 trials, I wasn't seeing a lot of themes
3 which I know are being proposed as
4 problems or negative aspects of some of
5 the products. So I looked for -- I did
6 a -- I did a search on complications. So
7 I went through complication articles on my
8 search and decided to pick out ones that I
9 should review that seemed to be at odds
10 with the randomized controlled trials.
11    Q.   Did you review all of the
12 articles that were selected and provided
13 by defense counsel?
14       MS. GERSTEL:  Object to form.
15    A.   I would say I reviewed every
16 title and decided, based on the time frame
17 I had, which ones were relevant and
18 comprehensively reviewed a very good
19 fraction of them, but not all of them.
20    Q.   You have on your reliance list
21 17 pages -- excuse me.  On your
22 supplemental reliance list 17 pages of
23 what are referred to as production
24 materials.  I think it's around page 75,

Page 191

1 if that helps.
2    A.   In this document?
3    Q.   Yes.  In Exhibit 8.
4    A.   Do you want to show me where
5 that is?
6    Q.   I'll try.
7       (Pause.)
8    Q.   I'll start over.
9       You have on Exhibit 8, which is
10 the supplemental reliance list that's
11 currently available, 17 pages of what are
12 referred to as production materials.
13       Do you see where I'm at?
14    A.   Yep.
15    Q.   And that's hundreds of documents
16 listed on there, right?
17    A.   Yep.
18    Q.   What qualifies as a production
19 material, for purposes of this reliance
20 list?
21    A.   I don't know what definition
22 they give to qualify it as a production
23 document.  It's a term you're using that
24 I'm not aware is how it's used for

Page 192

1 selection.
2    Q.   Well, it's not a term I'm using.
3 It's a term that's on the reliance list.
4    A.   Where is that term?
5    Q.   At the top there (indicating).
6    A.   It says "Production Materials."
7       So, let's see what we got here.
8       This would appear to be internal
9 documents describing various aspects of
10 bringing product to study, to develop, to
11 bring forward.
12    Q.   Was today the first time you
13 knew there was a heading for production
14 materials on your supplemental reliance
15 list?
16       MS. GERSTEL:  Object to form.
17    A.   On the heading, I had not seen
18 the heading.
19       I've seen this list of
20 documents, and I've read a good fraction
21 of them.
22    Q.   You didn't know there was a
23 heading because you didn't draft it.
24       Right?

Page 193

1       MS. GERSTEL:  Object to form.
2    A.   I didn't know there was a
3 heading because when you turn it over,
4 it's so thick that it's covered by the
5 stapled area.
6       So, in looking over this to look
7 at each number, the heading on the page
8 was not particularly of importance to me
9 when I was reviewing it.
10    Q.   I mean, you had seen the
11 supplemental reliance list before today.
12       Right?
13    A.   Yes.
14    Q.   Was there a staple on the page
15 then?
16    A.   There was a clip or a staple or
17 something.
18    Q.   Who selected the document --
19       MR. DeGREEFF:  Strike that.  I
20 think we already talked about this.
21    Q.   The documents included in this
22 production materials section were selected
23 by defense counsel.
24       Correct?

Lawrence Lind, M.D.

Page 194

1    A.   The internal documents were all
2    selected by counsel.
3        Q.   Did you review all of these --
4            MR. DeGREEFF:  Strike that.
5        Q.   Did you review any of these
6    documents included in the production
7    materials section?
8        A.   Yes.
9        Q.   What percentage of them?
10       A.   20 percent.
11       Q.   And how did you select which
12   documents you reviewed?
13       A.   You know, based on what I was
14   reading.  I asked for a number of topics.
15   I'd say, you know, tell me -- you know, I
16   was particularly interested in discussions
17   of laser-cut mesh.  I said are there any
18   internal documents describing concerns
19   about the thigh and the obturator.
20           So, a good fraction of them were
21   things I came upon where I felt like I
22   wanted to know what was going on in the
23   decision-making, and then others were
24   offered by counsel.

Page 195

1        Q.   Well, you didn't select any of
2    the internal documents.
3            Right?
4            MS. GERSTEL:  Objection; asked
5    and answered.
6        A.   I selected the topic.  The
7    information and then the internal document
8    was provided on the several topics that I
9    asked about.
10       Q.   Were you given any kind of
11   access to the document production database
12   so that you could do your own search for
13   documents?
14       A.   I was given a binder of enormous
15   numbers of company documents, and I
16   discussed that I -- it would be impossible
17   for me to review all of them.  So it would
18   have to be a combination of things I was
19   interested in and things that counsel
20   thought was most relevant for us to
21   discuss given reasonable but pretty
22   significant preparation.
23       Q.   My question is, I apologize.
24           Were you given access to there's

Page 196

1    an online database where all of the
2    documents were produced?  Were you given
3    access to that online database so you
4    could do your own searches?
5        A.   The online database, no.
6        Q.   There's around 81 depositions on
7    your reliance list.  It's towards the end.
8    It's after the production materials
9    section.
10           So, that is a section on your
11   reliance list that includes about 81
12   depositions.
13           Correct?
14       A.   I'll trust your number.
15       Q.   Does it look reasonable?
16       A.   Yep.
17       Q.   Fair to say you didn't read all
18   of those?
19       A.   I did not read all of those.
20       Q.   Who chose the depositions that
21   were included on this reliance list?
22       A.   As stated previously, there are
23   certain topics I asked for, which would be
24   a smaller subset which -- which I asked

Page 197

1    for which generated some of these.
2            Now, they probably would have
3    been on the comprehensive list they were
4    planning to include, but I requested,
5    let's say, 10 or 20 documents, or 10 or 20
6    categories of documents and they were
7    provided, and the rest were electively
8    provided by counsel.
9        Q.   For example, did you review Meng
10   Chen's depositions?
11       A.   I don't recall.
12       Q.   Who's Laura Angelini?
13       A.   I don't recall.
14       Q.   Did you read all of the Piet
15   Hinoul depositions?
16       A.   I didn't read all of it.  I read
17   some sections.
18       Q.   How many of these depositions
19   did you actually read?
20       A.   I would say I read parts of ten.
21       Q.   Which ten?
22       A.   Arnaud sounds familiar, Hinoul,
23   Charlotte Owens sounds familiar, David
24   Robinson.

Lawrence Lind, M.D.

Page 198

1    Q.   Well, David Robinson sounds
2  familiar because I asked you about the
3  medical director Dr. Robinson earlier.
4         Correct?
5         MS. GERSTEL:  Object to form.
6    A.   No.  I recall independently that
7  that was one of the ones that I had read.
8    Q.   How did you select the
9  depositions that you read?
10   A.   It would come up in a topic.  It
11 would come up in a topic, you know, set up
12 as what was -- what was Ethicon concerned
13 about when they were making the obturator
14 sling, and then some deposition testimony
15 or internal documents were sent on that.
16        What other questions did I ask?
17        I was curious what the, you
18 know, lead directors of the
19 administration's opinions and thought
20 processes were on the topics that are
21 being raised in this litigation.  So then
22 some of the directors' transcripts were
23 provided.
24   Q.   So, did you review depositions

Page 199

1  where Ethicon employees were expressing
2  concerns about making the TVT-O?
3    A.   Yes.
4    Q.   What was your understanding of
5  the concerns they were expressing?
6    A.   They were concerned about groin
7  pain.
8    Q.   Anything else they were
9  concerned about?
10   A.   There were concerns whether the
11 laser-cut mesh was stiffer and if it was
12 stiffer, if it would change the behavior
13 and/or success or adverse reactions in the
14 procedure.
15   Q.   And those were -- those concerns
16 were expressed in the -- by Ethicon
17 employees in the depositions you read?
18   A.   I'm mixing together in my mind
19 the depositions versus e-mails.  So this
20 is just -- to me it's just in my head as
21 internal documents.
22   Q.   Okay.
23        Did you specifically request by
24 name any of the depositions that are

Page 200

1  included in the reliance list?
2    A.   I requested by topic 'cause I
3  didn't know the names of the players.
4         I mean, looking back, I remember
5  interacting with some of these people when
6  I was helping to teach some of their labs
7  and that sort of stuff, so I remember some
8  of the names, but I didn't have any reason
9  to select the names that I knew.  There
10 were topics that I was interested in.
11   Q.   Then there are six pages of,
12 quote, other materials, right after the
13 depositions.
14   A.   Okay.
15   Q.   What's included in the other
16 materials section?
17        MS. GERSTEL:  Object to form.
18   A.   This looks like authoritative
19 articles or materials from authoritative
20 entities, such as FDA, ACOG, AUA, the
21 other quality and research and scientific
22 administrative agencies and female pelvic
23 medicine.
24        There are some studies, a lot of

Page 201

1  guidelines, position statements, bulletins
2  by the authoritative societies.
3    Q.   Who chose those materials?
4         MS. GERSTEL:  Objection.
5    A.   Those are mostly by me.  I had
6  put them in my report by my own
7  discretion.  And I was being followed very
8  closely in our societies the growing,
9  growing support of the midurethral sling
10 based on its data, safety and efficacy
11 profiles.  So the -- it was a very strong
12 part of my report was to -- it was a very
13 strong part of my report to -- so, these
14 are mostly requested by me because --
15 either provided by me or requested by me
16 because they came across through my
17 societies with a very, very strong
18 repeated, repeated support for the case
19 for the midurethral sling being important
20 to preserve and important to clarify for
21 the educational world, the patient world.
22   Q.   You asked for Dr. Elliott's
23 curriculum vitae?
24   A.   No.  Again, if we're going to go

Lawrence Lind, M.D.

Page 202

1  item by item, I can tell you whether I
2  requested it.
3       I'm talking about the dominant
4  fraction of these are things that I
5  provided or requested.  I did not request
6  all of them.
7     Q.   What percentage of them did you
8  request?
9     A.   The first page is about half.
10  The second page is a quarter.  The third
11  page is a third.  The page that's got
12  Daniel Elliott, I would say none.
13     Q.   Is it fair to say you requested
14  less than half of the materials included
15  in -- the documents included in the other
16  materials section of your reliance list?
17       MS. GERSTEL:  Objection to the
18     form.
19     A.   Somewhere between 30 and 50
20  percent.
21     Q.   And what percentage of these
22  materials did you actually review?
23     A.   The ones that I requested I
24  reviewed.

Page 203

1     Q.   And the rest of them were put on
2  the reliance list by defense counsel.
3       Is that correct?
4     A.   Yes.
5     Q.   For example, there are some
6  things in the other materials that say,
7  for example, excerpts from Budke trial
8  transcript.
9       Who would have done these
10  excerpts?  Is that something you did?
11     A.   I don't know.
12     Q.   Who would have chosen the
13  excerpts that were used?
14     A.   I don't have the answer to that.
15     Q.   Do you remember reviewing any
16  excerpts from trial transcripts?
17     A.   There were one or two trial
18  transcripts which I did review.  I can't
19  tell you which ones.
20     Q.   So, on the very last page of
21  Exhibit 8, your supplemental reliance
22  list, there's a number of expert reports
23  listed.
24       Do you see that?

Page 204

1     A.   Got it.
2     Q.   Did you review all these expert
3  reports?
4     A.   I didn't review all of them, no.
5     Q.   Why was it important to you to
6  review expert reports?
7     A.   It would educate me on the
8  opinions of the plaintiff experts as to
9  what they felt was most relevant and what
10  the arguments were on the plaintiff's
11  side.
12     Q.   And which ones did you review?
13     A.   When I was doing my Prolift
14  general report, I read Garely and Elliott.
15  I remember those names.  We had one
16  Rosenzweig report because it was
17  associated with one of the case-specific
18  reports.  He was the case-specific expert,
19  so I read his report when I read that.  So
20  I read three or four.
21     Q.   So you read three or four of the
22  maybe 30 or so that are on here?
23     A.   Right.
24     Q.   Did the plaintiff's expert

Page 205

1  reports that you read reference documents
2  that were contrary to your opinions in
3  this case?
4     A.   Yes.
5     Q.   Are those documents, are they
6  referenced on your reliance list?
7     A.   I have a lot of -- I was pretty
8  good on my report about putting in, you
9  know, negative articles that are of
10  question.
11       I would say that there are
12  negative articles in a more comprehensive
13  list on there.  They're not all in my
14  report.  But I did select articles which I
15  felt were either I found on my own or that
16  I was -- saw were focuses of plaintiff's
17  reports and chose to comment on them.
18     Q.   So the plaintiff's experts are
19  medical literature and documents in their
20  reports that were adverse or contrary to
21  your opinions that were not included on
22  your reliance list or in your report.
23       True?
24       MS. GERSTEL:  Object to the

Lawrence Lind, M.D.

Page 206

1   form.
2       A.    Some are included and some are
3   not included.  Correct.
4       Q.    Did you review those documents
5   or pieces of medical literature that were
6   contrary to your opinions?
7       A.    I read through a good fraction
8   of them on the reports that I read.
9       Q.    How did you get the internal
10  documents that they referenced?  Did you
11  ask defense counsel for them?
12      A.    When I thought it was relevant.
13      Q.    Were those documents provided?
14      A.    When asked for, yes.
15      Q.    Did you pull each of the
16  deposition citations in the plaintiffs'
17  expert reports?
18          MS. GERSTEL:  Objection.
19      A.    I did not pull every one.  I
20  pulled a good fraction of them based on
21  what the titles were and the time
22  constraints.
23          So the answer is I did not pull
24  all of them.  I pulled a very good

Page 207

1   fraction of them.
2       Q.    Of the deposition excerpts?
3       A.    The depositions, I'm sorry.
4           The expert reports was a good
5   fraction.  The deposition excerpts, if
6   there was a reference to an internal -- a
7   few.  A few.  I can't say that was
8   comprehensive.  And the deposition reports
9   at times were so extensive, you know, it
10  could be a week-long deposition that
11  sometimes the purpose of that review was
12  not to comprehensively understand all the
13  depositions that went on.  It was to get a
14  flavor for what kind of discussions, you
15  know, the employees, the administrators
16  were having related to the topic, just to
17  get a flavor for what was going on
18  internally there.  They're extremely long
19  and not possible to drill down on and
20  examine comprehensively.
21          So I would say on the expert
22  reports, I pulled a good fraction.  On the
23  deposition reports, a very small number.
24      Q.    Okay.

Page 208

1           So, why are there so many
2   documents on your reliance list if you're
3   not relying on them?
4           MS. GERSTEL:  Objection to form.
5       A.    You know, in discussions, when
6   we bring a topic and, you know, if I say
7   that, you know, I've seen this internal
8   document and I think it's relevant, I'd
9   like to have access to the documents if I
10  choose to review them.  So then they are
11  added.
12          So, you know, there are times
13  where I'm in the discovery process and
14  putting together the report process and I
15  say gosh, I see that there's this internal
16  document that talks about X.  I say well,
17  I'd like to see internal documents that
18  discuss, you know, A, B, C.  So these are
19  added.  And then the ones that I see
20  pertinent I review and the ones that just
21  don't make the cut based on trying to do
22  an excellent job, but having a body of
23  literature and internal documents that's,
24  you know, a four-year Ph.D. thesis worth

Page 209

1   of true deep dive, you have to make your
2   choices.
3       Q.    I mean, fair to say you're
4   obviously not relying on them if you
5   haven't reviewed them.
6           Right?
7           MS. GERSTEL:  Object to form.
8       A.    I am not relying on articles
9   that I haven't reviewed.
10          Of course I would ask the
11  question am I permitted to review those
12  and use them moving forward, but I guess
13  this is really not the place for that
14  question.  I'll take that up with counsel.
15      Q.    Yeah.  I'll let you take that up
16  with her.
17          I want to look at Exhibit 7,
18  which is your report, if you don't mind.
19      A.    Sure.
20      Q.    On page 15 under
21  "Complications."
22          Are you following me?
23      A.    Mm-hm.
24      Q.    There's a section where you say:

Lawrence Lind, M.D.

Page 210

1  Surgeons should also advise their patients
2  of their own success and complication
3  rates as well as rates that are published
4  in the peer-reviewed literature.  In our
5  practice, the complication rates with TVT,
6  TVT-O, TVT-Exact, and TVT-Abbrevo are
7  infrequent, and almost without exception
8  complications can be resolved with the
9  patient remaining content and pain free.
10      Did I read that correctly?
11      A.   Yes.
12      MS. GERSTEL:  I'll just state it
13  was continent, not content.
14      MR. DeGREEFF:  Continent.
15  That's a great point.  Content is
16  different.
17  BY MR. DeGREEFF:
18      Q.   So, is it your intention to give
19  opinions on complication rates with the
20  TVT products in your practice?
21      A.   The main thrust of giving
22  opinions on complication rates comes from
23  the enormous data.
24      In my practice, I have not

Page 211

1  collected the patients and organized them
2  in a systematic trial where I've
3  quantified, reviewed and seen how many
4  come back and systematically recorded
5  their efficacy and safety.
6      It is our routine practice to
7  have them come back at three months, six
8  months, one year and two years, and the
9  patients come back in high frequency.  Do
10  I know it's 99 percent?  Do I know it's 90
11  percent?  I don't.  I know it's a high
12  fraction.  I know that the patients are --
13  I know that the complication rates are
14  low.
15      We have a quarterly Pelvic
16  Surgeon Society meeting in Manhattan, and
17  we have an agreement with all the local
18  experts where, maintaining patients'
19  confidentiality, we will let each other
20  know if problems and complications have
21  come in that we're not aware about.
22      So, I don't have an organized
23  statistical study to tell you on my
24  patients.

Page 212

1      I will state from my practice of
2  seeing them regularly and insuring that
3  they come back at those intervals, that I
4  feel very confident that my efficacy and
5  safety reflects that of the literature.
6      Q.   Okay.  So, I think that was a
7  long way of saying, and maybe I'm wrong,
8  but I think it was a long way of saying
9  that you are not going to give opinions
10  regarding your personal complication rates
11  in your practice.
12      A.   I don't think that's what I said
13  at all.
14      MS. GERSTEL:  Objection.
15  BY MR. DeGREEFF:
16      Q.   Okay.  Well, how do you track
17  the success and complication rates in your
18  patients?  What's your systematic method?
19      MS. GERSTEL:  Object to form.
20      A.   The patients are not recorded in
21  a long-term spreadsheet with data.
22      My way of tracking complications
23  is making sure they come back.  And
24  there's a reminder on the electronic

Page 213

1  medical record, if they don't make the
2  appointment, we call them to come back,
3  and we get back well over 90 percent of
4  our surgical patients at a year or two
5  years.
6      So, I know and I see them at one
7  year and two years and I know if they're
8  having problems.  So, if I have a -- my
9  own patients and I have 90 to 95 percent
10  of them back and I have to do one mesh
11  exposure, I feel pretty confident that my
12  mesh exposure rate is doing well.  It is
13  not statistically quantified, but it is,
14  by virtue of the surveillance in our
15  office, pretty tightly assured that I'm
16  seeing over 90 percent of my patients
17  back.
18      Q.   So, this is essentially
19  anecdotal.  You don't have any spreadsheet
20  or statistical analysis or tracking system
21  with regard to complications with mesh
22  patients that you can point me to or show
23  me?
24      MS. GERSTEL:  Object to form.

Lawrence Lind, M.D.

Page 214

1    A.   I can point you to the number of
2  cases I've done and the number of mesh
3  erosions that have been revised.  I can
4  statistically quantify.
5      I can quantify, I can search for
6  bladder injury and I can quantify that and
7  give it to you over an N, which would be
8  the total number.  I can quantify
9  prolonged catheterization due to voiding
10 dysfunction.
11     So, these are all --
12   Q.   Well, you need a numerator and a
13 denominator, right?
14   A.   Mm-hm.
15   Q.   How do you track your patients
16 that are lost to follow-up?
17   A.   I would have to see if they --
18 on the EMR if they showed up.
19   Q.   So, all of this you're talking
20 about is not an analysis that you've done
21 currently.
22     True?
23   A.   Correct.
24   Q.   You don't have any kind of

Page 215

1  internal registry tracking your patients
2  to see what complications they've had
3  over, say, a five-year period?
4    A.   That is correct.
5      The preponderance of my opinion
6  is based on the 4,000 articles on
7  midurethral slings that are published.
8    Q.   That's different.
9      You being able to opine about
10 literature is different.  I'm asking about
11 your personal complication rates.
12     You have no systematic method in
13 place at your facility for tracking
14 complication rates and those that are lost
15 to follow-up.
16     True?
17     MS. GERSTEL:  Object to form.
18   A.   I have a systematic method of
19 following up to make sure that over 90
20 percent of my patients return and I know
21 how they're doing.  It is not recorded,
22 collected, and it has not been made into a
23 study with a numerator and a denominator.
24   Q.   And you haven't tracked patients

Page 216

1  that are lost to follow-up, true?  We
2  don't know what their ultimate results
3  were?
4    A.   We call all of them back, and we
5  get almost all of them back.  We get over
6  90 percent of them back.  That I know.
7  And most studies of two years don't do
8  better than 90 percent.
9    Q.   What I'm hearing you say, and I
10 think what we agree on, is that you have
11 not done any kind of formal analysis and
12 you have no tracking system in place with
13 regard to the complications for your
14 patients related to the TVT products.
15     True?
16     MS. GERSTEL:  Object to form.
17   A.   I would say I haven't done a
18 formal analysis.  I would say I have a
19 tracking system to insure that I'm
20 capturing my patients.
21   Q.   And that tracking system is just
22 you know how many of your patients have
23 come back?
24     MS. GERSTEL:  Object to form.

Page 217

1    A.   Right.  And then I know -- and I
2  know on those patients if they have
3  problems.
4    Q.   What does the literature say
5  about the average rate of patients that
6  are lost to follow-up?
7    A.   It's quite variable.
8    Q.   How do you track the
9  complication rates in your patients with
10 regard to specific mesh products?
11   A.   Well, I use the same mesh
12 products most commonly.
13   Q.   For example, what's your
14 tracking system on the number of TVT-Os
15 that have been implanted and whether they
16 have had complications or not?
17   A.   The system would be the same as
18 I recorded -- as I responded before, is I
19 would have the patients back and see how
20 they're doing.
21   Q.   Okay.
22   A.   It's not systematic, but it's
23 systematic that they come back.
24   Q.   How do you track whether the

Lawrence Lind, M.D.

Page 218

1  mesh implanted in your patients is
2  mechanical or laser cut?
3          MS. GERSTEL: Object to form.
4      A.  I know the products I'm using.
5      Q.  For example, if you use TVT-O,
6  how do you know whether you've used a
7  mechanical-cut or laser-cut TVT-O?  How do
8  you track that?
9      A.  It's marked on the box.
10     Q.  Yeah.  But what's your tracking
11 system?
12     A.  I don't care which one it is.
13     Q.  So there isn't one, right?
14     A.  It's not a clinically relevant
15 distinction for me.
16     Q.  My question was a little
17 different than that.
18         My question is there is no
19 tracking system in place for your patients
20 with regard to whether there's been
21 mechanical or laser-cut mesh used.
22         True?
23     A.  True.
24     Q.  You implant Ethicon slings as

Page 219

1  part of your practice.
2          Right?
3      A.  Yes.
4      Q.  How many, let's start with just
5  slings first, how many slings would you
6  say you've implanted since you started
7  using them?
8          MS. GERSTEL: Object to form.
9      A.  It's in the 2800 to 3500 range.
10     Q.  And we're talking about mesh
11 slings, right?
12     A.  Yes.
13     Q.  When did you first begin
14 implanting mesh slings in women?
15     A.  Well, the TVT we first started
16 implanting in 2000, but we had been doing
17 some patch cut slings with suture before.
18 So there was some modifications.  But in
19 terms of the TVT slings and the slings --
20 the midurethral slings that were created
21 to be individual units and made for that
22 purpose, around that time.
23     Q.  That was in?  I didn't catch the
24 time.  Late '90s or 2000?

Page 220

1      A.  2000.
2      Q.  Which of the TVT line of slings
3  have you implanted?
4      A.  I have implanted all of them.
5      Q.  So you've implanted the TVT?
6      A.  Mm-hm.
7      Q.  The TVT-O?
8      A.  Mm-hm.
9      Q.  The TVT-Abbrevo?
10     A.  Yes.
11     Q.  And the TVT-Exact?
12     A.  Yes.
13     Q.  Which of those do you currently
14 use?
15     A.  I use the TVT-Exact.
16     Q.  When did you stop using the TVT?
17     A.  I was an avid TVT user, and then
18 I liked the idea of a smaller needle.  I
19 thought the procedure could be done with a
20 smaller needle.  So I proposed that to
21 Ethicon.  They declined that idea.  So I
22 proposed it to Boston Scientific, and they
23 made the Advantage Fit.  So when the
24 Advantage Fit came out and was a very -- I

Page 221

1  thought very similar in every way with a
2  number of very nice changes that I liked,
3  I switched to the, staying retropubic, I
4  switched to the Advantage Fit.
5      Q.  Okay.
6          And that is a Boston Scientific
7  product?
8      A.  Correct.  And then --
9      Q.  And when did you switch to that
10 from the TVT?
11     A.  I don't know exact time.  Four
12 years later, five years later.
13     Q.  So in 2004, 2005?
14     A.  2005, 2006 range.
15     Q.  So you have not used the TVT
16 since 2006?
17     A.  I still use the TVT-Exact.
18     Q.  Right.
19         But you haven't used the TVT,
20 was my question?
21     A.  Correct.
22     Q.  And what were the advantages of
23 the -- I guess what was better about the
24 Advantage Fit Boston Scientific sling

Lawrence Lind, M.D.

Page 222

1  versus the Ethicon TVT?
2       MS. GERSTEL:  Object to form.
3    A.   I liked that it had blue sleeves
4  over the introducer, which were easier to
5  see in the bladder if you had a bladder
6  perforation.  The other color could get
7  lost in the background of the bladder and
8  be missed.
9       I liked that the blue tubes
10  allowed you to twist and untwist the sling
11  so when that it's wrapped around the
12  urethra and there are little tiny twists
13  to it, you could align it more perfectly.
14       And I liked that it was 2.3
15  millimeters instead of 5.  That was a
16  significantly, significantly different
17  smaller needle.
18    Q.   So, the smaller needle was --
19  what's the advantage of the smaller
20  needle?
21    A.   It's, you know, it passes
22  through the tissues easier.  It makes a
23  smaller puncture in the skin.  You need a
24  smaller exit.  And it lets you -- again,

Page 223

1  the subtleties of the case require you to
2  move this needle, thread it between the
3  bladder and the pubic bone, and when you
4  fail, you get a bladder perforation.  So
5  with the smaller needle, I felt, based on
6  the cadaver labs, that you could thread
7  that space a little more easily and then
8  if you do get a puncture in the bladder,
9  you get a 2.3 millimeter puncture instead
10  of a 5.  So when you take it out, the
11  bladder constricts at that point.  And I
12  felt that I did like that -- you know,
13  when you did have a bladder perforation
14  inadvertently, I liked that I went through
15  with a needle that was half the size.
16    Q.   And then what is the -- you said
17  that the Advantage Fit, the Boston
18  Scientific product, allowed for better
19  alignment of the sling versus the TVT?
20    A.   Well, the data and the results I
21  was having on the TVT and the data I was
22  aware of spoke to the fact that however
23  that kit is made to work, it's working
24  extremely well.

Page 224

1       There are times when you're
2  getting to your final moment when you're
3  going to decide is the sling exactly where
4  I like it fit, how loose is it, how tight
5  is it, how is it lying flat.  And there
6  are times where one arm doesn't seem to be
7  perfectly parallel with the other arm.
8  And once you've gone through with the
9  product, if it just has a sheathe on it,
10  you can't rotate it.  You can't straighten
11  those out.
12       So this is just a visual, a
13  visual thing that aesthetically looks like
14  if you want a sling to lay around, you'd
15  like it to look like that rather than
16  slightly turned.  So those tubes, because
17  they had some memory to them, allowed you
18  to make those turns and adjustment and
19  have the mesh visually appear to be
20  flatter.  When you pulled it through the
21  canals they seemed a little bit askew.
22    Q.   These are the tubes on the
23  Advantage Fit?
24    A.   Yes.

Page 225

1    Q.   Why is it important for the
2  tensioning to be correct on the sling?
3    A.   Well, because every sling --
4  every single sling ends up too loose, just
5  right, or too tight.  So you got to use
6  the teaching on how to do the procedure
7  and to leave it truly tension free to try
8  to get the results that the original
9  procedure was producing.
10    Q.   What happens if there's too much
11  tension on a sling?
12    A.   In the mild case, the patient
13  would have a little difficulty voiding,
14  need a catheter for a couple of days.  In
15  a moderate case, she'll need it for a
16  week.  And in a more significant case,
17  she's not able to regain normal voiding
18  function and you have to release the
19  sling.
20    Q.   And by release it, you mean
21  removal or revision surgery?
22    A.   Yes.  There are some people who
23  describe in the short-term as putting a
24  obturator in the urethra and pulling

Lawrence Lind, M.D.

Page 226

1 downward to loosen it. And there's little
2 data on that and I don't favor that. But
3 yes, I would generally be talking about
4 revision surgery if they had retention.
5 Q. And these things you liked about
6 the Advantage Fit by Boston Scientific
7 were things that you had brought to
8 Ethicon and they declined to do?
9 A. Only the narrow needle was my
10 idea. The things having to do with the
11 tube were theirs.
12 Q. And the needle was important for
13 reducing the extent of surgical
14 complications.
15 Is that kind of the deal?
16 A. Yeah.
17 Q. Which is a patient safety issue?
18 A. Yes.
19 Q. So, when did you start
20 implanting the TVT-O?
21 A. I started implanting about a
22 year after it was released. 2005, 2006.
23 Q. Did you implant -- I mean, how
24 many TVT-Os would you say you've

Page 227

1 implanted?
2 A. About 150 to 200.
3 Q. At some point, did you stop
4 using the TVT-O?
5 A. I did.
6 Q. When was that?
7 A. We -- we were approached with a
8 problem with cost issues where we had
9 seven or eight doctors and each one
10 wanting three different slings. So the
11 hospital had an inventory which they felt
12 was impossible, and they said we need you
13 to get together with your data, individual
14 preferences and options for slings and
15 come up with what you want.
16 And the Caldera, I had seen the
17 Caldera product line and it was very, very
18 favorable in our review. It was favorable
19 because of cost. It was favorable because
20 it comes with one piece of mesh that can
21 affix to reusable instruments that let you
22 do every sling, inside-out sling,
23 outside-in sling, top-down retropubic,
24 bottom-up retropubic, all. At any time in

Page 228

1 the case you could switch. So it was very
2 flexible in terms of what you could use it
3 for. It was quite a bit of a cost and it
4 met many doctors' needs all at once. So
5 we trimmed down our product line and gave
6 up the TVT-O.
7 Q. And when was that?
8 A. I can't tell you exactly. It
9 was -- I don't know exactly.
10 Q. Last five years? Last ten
11 years?
12 A. I would say five years ago to
13 six years ago.
14 Q. Did you compare the Caldera to
15 the -- the Caldera is a sling.
16 Correct?
17 A. Yes.
18 Q. And was it the Desara that you
19 chose?
20 A. Yes.
21 Q. And is it -- did you, before
22 choosing it and eliminating the TVT-O at
23 your hospital, did you look into the
24 safety and efficacy comparison at all?

Page 229

1 A. We used it in a lab about 20
2 times and looked at it in the hand and
3 looked at biochemical properties and
4 determined it was not the same, but very
5 similar.
6 At that point when Caldera had
7 come out, we really had data from most of
8 the sling products that they were
9 relatively equivalent in efficacy and
10 safety.
11 In answer to your question, they
12 did not have significant data on it, no.
13 Q. When did you start using the
14 TVT-Abbrevo?
15 A. You know, when it came out, the
16 concept was appealing and I would
17 alternate between my slings, giving it a
18 try. I used it probably 30 or 40 times.
19 I thought it was a very nice sling. I
20 thought I was -- with my other obturator
21 slings, I wasn't having groin pain.
22 So, I kind of thought to myself
23 we have some data on Abbrevo. It's
24 clearly not going through all the same

Lawrence Lind, M.D.

Page 230

1  tissues.  So we have the potential
2  advantage that it's not going all the way
3  through the muscles, so maybe there will
4  be less leg groin pain, but how well is it
5  anchored.
6      We did have some studies to show
7  relevant equivalency to full-length
8  obturator slings, but I felt that from
9  doing obturator slings and not having
10  groin pain other than from the first week
11  or two, I felt more secure having a
12  full-length sling.  So I just decided
13  mostly to stay with that.
14      I do occasionally order it just
15  for the sake of fellow teaching to show
16  the variety of the sling.
17  Q.  The TVT-Abbrevo is not a
18  full-length sling.
19  Correct?
20      MS. GERSTEL:  Object to the
21  form.
22  A.  Correct.
23  Q.  How long is the TVT-Abbrevo?
24  A.  I don't know the exact length.

Page 231

1  I'd guess at 12 or 15, but I don't know
2  the exact length.
3  Q.  I think your report does.  I
4  think it's 12 centimeters, according to
5  your report.
6  A.  Yeah, that's what I recall.
7  Q.  Does that sound accurate?
8  A.  Sounds about right.
9  Q.  What is the length of a
10  full-length TVT sling?
11  A.  I think it's in the 23 to 25.
12  Somewhere in that range.
13  Q.  And what was the length of the
14  TVT-S, the mini sling?
15      MS. GERSTEL:  Objection.
16  A.  That, I don't know.  That was
17  shorter.  I didn't use many of those.
18  Q.  Fair to say that the TVT-Abbrevo
19  is closer in length to the TVT-S mini
20  sling than it is to the full-length TVTs?
21      MS. GERSTEL:  Objection.
22  A.  I'd have to put the numbers on
23  paper, but I don't think the size
24  comparison is the relevant issue.

Page 232

1  Q.  Yeah, that wasn't my question.
2      My question is is it fair to say
3  that the TVT-Abbrevo is closer in length
4  to the TVT-S mini sling than it is to the
5  TVT full-length slings?
6      MS. GERSTEL:  Objection.
7  A.  I would actually say no, I
8  disagree with that because let me -- I
9  will say out of the box the answer is yes,
10  but when you talk about the full-length
11  TVT is meant to be very, very long so that
12  if you have an obese patient, the mesh can
13  emerge from the abdominal wall which has
14  very variable size.  So when you talk
15  about how much is cut off and how much is
16  left in the body, I would suggest that the
17  length of the mini TVT or the TVT Secure,
18  which is going to the undersurface of the
19  pubic bone where it's at a junction with
20  the obturator muscle, and the TVT-Abbrevo
21  is going to perforate the muscle, those
22  are, you know, a centimeter apart.
23      In terms of the part that's left
24  in the patient, I think they're probably

Page 233

1  pretty similar.
2  Q.  When did you start using the
3  Abbrevo?
4  A.  2006.
5  Q.  When did you stop?
6  A.  2010.
7      These are approximates.
8  Q.  Yeah, sure.
9      You said you were more
10  comfortable using a full-length sling.
11      Why is that?
12  A.  To be clear, my vast
13  preponderance of slings are retropubic,
14  and the reason for that is I started using
15  it in 2000.  I had 600, 800 cases done
16  before any obturator sling came out.  I
17  was thrilled with my results.  I went from
18  doing a Burch with a full incision with an
19  open laparotomy to the TVT sling, which
20  was 15 minutes.  I was not hitting the
21  bladder 'cause my skills are good.  I was
22  getting extremely low complication rates.
23  So I had something that the patients
24  were -- had very fast recovery.  Took me

Lawrence Lind, M.D.

Page 234

1  15 minutes to do.  And when the obturator
2  came out, I said to myself that's pretty
3  cool.  That's very interesting.  I'm going
4  to select my patients to do that when I
5  have anatomy that gives me a reason not to
6  do the one I like because the one I like
7  it would be hard for me in my personal
8  experience to improve upon it because 15
9  minutes, loving my results and almost
10  complication free, no reason to change.
11      So, I used my -- mostly did my
12  obturator slings when someone had a
13  hernia, had a previous hernia repair, they
14  had a previous retropubic surgery like a
15  Burch or a Marshall-Marchetti, abdominal
16  wall surgery with mesh, reasons to stay
17  away from the target zone for the
18  retropubic regular TVT.
19      Q.  Again, I appreciate that.  My
20  question was different though.
21      My question was your testimony
22  earlier was that you felt more comfortable
23  with a full-length sling.
24      Why would you prefer a

Page 235

1  full-length sling over a shorter sling?
2      MS. GERSTEL:  Object to form.
3      A.  Well, in the case of the
4  retropubic -- are we talking obturator or
5  retropubic or just across the board?
6      Do you want to break it down?
7      Q.  I'm talking about the
8  TVT-Abbrevo.
9      A.  The Abbrevo.
10      So, I wasn't having any
11  significant groin pain past the immediate
12  perioperative period with the full-length
13  sling.  So, since I wasn't having problems
14  with the potential problem with the
15  full-length sling, the only reason to go
16  to Abbrevo is that you're concerned with
17  groin pain or you're having groin pain and
18  you want to see if you can reduce that by
19  having a thread going through instead of a
20  piece of mesh.
21      So, since I wasn't having the
22  pain that would lead you to Abbrevo, I
23  said to myself I have some studies, but
24  they're very early studies and few about

Page 236

1  the Abbrevo.  Does it hold as well.  So I
2  said the Abbrevo is not going through all
3  the anchoring tissues.  So, since I'm not
4  having groin problems, I'll stay with the
5  full-length sling because I don't feel I
6  need to move away from a groin pain
7  problem because I wasn't having it.
8      Q.  Okay.
9      Yet the TVT-Abbrevo was brought
10  up by Ethicon in response -- it was
11  supposed to reduce the groin pain
12  associated with the TVT-O and other
13  obturator devices.
14      True?
15      A.  Yes.
16      THE WITNESS:  I'm going to take
17  a break just for the bathroom, if I
18  may.
19      (Recess taken.)
20  BY MR. DeGREEFF:
21      Q.  When did you begin using the
22  TVT-Exact?
23      A.  When it came out, I was using
24  Caldera and I was using the Advantage Fit.

Page 237

1  So I mixed it in for teaching purposes.  I
2  liked the idea that I was getting the
3  Ethicon product back because, you know, it
4  owned the data.  So now we kind of took
5  the things that Advantage Fit had kind of
6  changed that I liked.  I really liked the
7  slimmer needle for my, again, teaching
8  situation, residents and fellows.  So now
9  I had the original with a slimmer needle
10  and with tubes.  So that we kind of
11  brought back the two things.  So I started
12  using that a bit more frequently.
13      Q.  And you started that when?
14      A.  Pretty soon after it came out.
15  I usually -- most things I'm the kind of
16  person that says let my other expert
17  buddies get 50, 70 cases done and make
18  sure everybody's having a nice time with
19  it and then I join in.
20      Q.  And how many have you put in at
21  this point, do you think?
22      A.  Three hundred.
23      Q.  And how many, I never asked you,
24  how many of the original TVT did you put

Lawrence Lind, M.D.

Page 238

1  in?
2     A.   That was before there was a
3  competitor.  So like ten to -- like 500 to
4  600.
5     Q.   The TVT and the TVT-Exact are
6  placed by retropubic approach.
7        Correct?
8     A.   Yes.
9     Q.   And the TVT-O and the TVT-A were
10  transobturator approach?
11     A.   Yes.
12     Q.   I think we may have talked about
13  this already, but it's all a blur because
14  it's been four hours.
15        The transobturator approach has
16  a higher re-operation rate.
17        Correct?
18     A.   Yes.
19     Q.   It's understood typically that
20  the slings placed using the transobturator
21  approach are less durable than those using
22  the retropubic.
23        True?
24        MS. GERSTEL:  Object to the

Page 239

1  form.
2     A.   The data's mixed on that.  There
3  are RCTUs that show them to have equal
4  efficacy at two and five years, and there
5  are RCTs that show some better durability
6  of the TVT-O over time.  That's as I
7  recall the literature.
8     Q.   Of the greater durability of the
9  retropubic over time?
10     A.   Right.  But that's not the
11  dominance of the data.  The preponderance
12  of the data shows relatively equivalent
13  rates, and Ford and Cochrane's analysis
14  shows that.
15     Q.   So the data shows that the
16  devices placed via the retropubic approach
17  are equally or more durable than those
18  placed via the transobturator.
19        Correct?
20     A.   Yes.
21     Q.   Are you aware of studies finding
22  the rate of re-operation twice as high
23  with the transobturator approach?
24        MS. GERSTEL:  Objection; asked

Page 240

1  and answered.
2     A.   I am aware that there are
3  studies showing that.  I don't believe
4  that that is the collective data of all
5  the meta-analysis, but there are studies
6  that do show that.
7     Q.   Okay.
8        When you were implanting the
9  TVT-O and the TVT-Abbrevo, did you advise
10  your patients that there was a potential
11  increased risk with the obturator
12  approach?
13        MS. GERSTEL:  Object to form.
14     A.   I advised them of both
15  techniques, and I advised them of
16  advantages and disadvantages of both.  So
17  I did include the proposed advantages of
18  the TVT-O, and I did tell them the
19  proposed adverse reactions associated with
20  each, because they have a little different
21  profile, each of the slings.
22     Q.   What were the differences in
23  potential adverse events between the TVT
24  and the TVT-O?

Page 241

1     A.   So, the TVT has a higher
2  incidence of organ injury, bladder injury
3  and voiding dysfunction.
4        The TVT-O has a higher incidence
5  of vaginal sulcus perforation, sometimes
6  called an angle needle introduction, groin
7  pain, I would usually describe to them as
8  typically transient and in rare cases
9  prolonged, and with those being the major
10  differences.
11     Q.   Was the major reason for those
12  differences the retropubic versus the
13  transobturator approach for placement?
14     A.   It was the anatomic pathway?
15     Q.   Would the problems associated --
16  that you would have told your --
17        MR. DeGREEFF:  Strike that.
18     Q.   Would the differences from an
19  adverse event standpoint between the TVT
20  and the TVT-Abbrevo have been similar to
21  the ones we just discussed?
22     A.   I think they would be similar,
23  but I think the data bears out, and it
24  makes sense, that you would have a

Lawrence Lind, M.D.

Page 242

1  somewhat lesser chance of having groin
2  pain.
3      Q.   Do you consent the patients to
4  the implant procedure prior to implanting
5  mesh slings?
6          MS. GERSTEL:  Object to form.
7      A.   Hundred percent.
8          MR. DeGREEFF:  What's the
9  objection?
10         MS. GERSTEL:  I'm sorry?
11         MR. DeGREEFF:  What's the
12 objection?
13         MS. GERSTEL:  You said do you
14 consent patient to the implant
15 procedure.  I'm a little confused by
16 exactly what you mean by that.
17         But my objection's on the
18 record.
19 BY MR. DeGREEFF:
20     Q.   As part of your consent process,
21 you explain to them the risks and
22 complications that Ethicon mesh slings can
23 cause?
24     A.   Yes.

Page 243

1      Q.   What risks and complications do
2  you tell them are associated with the
3  TVT-O?
4      A.   The TVT-O, I tell them you can
5  have bleeding.  You can have pain.  You
6  can have dyspareunia.  You can have groin
7  pain that is usually transient, but can,
8  in some cases, be longer standing and
9  require revision.  You could require
10 revision for a failure of the procedure,
11 for the procedure being too tight.  I
12 inform them of the chance of
13 exposure-slash-erosion.  I tell them
14 there's a chance of voiding dysfunction.
15 There's a chance of puncture of the
16 urethra or the bladder.
17     Q.   Those are all complications that
18 could be caused by the TVT-O mesh sling.
19 True?
20     A.   Yes.
21     Q.   When you advise them about pain,
22 do you advise them about the potential for
23 chronic pain?
24     A.   I tell them there's a potential,

Page 244

1  but it's rare.
2      Q.   And what about dyspareunia, do
3  you advise them of the potential for
4  chronic and ongoing dyspareunia?
5      A.   I do.
6      Q.   Exposure and erosion, what is
7  exposure and erosion?
8      A.   Well, you could probably ask ten
9  experts and get ten different answers, but
10 I would put it this way.
11         Exposure, literally the
12 definition of the word means you can see
13 the mesh.  So, let's say the wound is open
14 somewhere.  How it got opened we're not
15 talking about, but you can see the mesh.
16         In erosion you're also seeing
17 mesh.  And I would say the distinction I
18 make when you try to think of
19 pathophysiology is that when you do a
20 vaginal procedure, you make a single
21 incision through a very thin tissue.  As
22 opposed to the belly where you go through
23 three or four layers.  So it is a
24 dependent position, and you cannot put a

Page 245

1  wound dressing on it to support it like
2  you do elsewhere.  So it is vulnerable to
3  fluid collecting.
4          I'll try to speed this up.
5          A wound can open and if a wound
6  opens and you have a wound failure because
7  your enclosure wasn't good or you had some
8  fluid collection, the wound opens.  Then
9  you'll have an exposure.  To me that
10 usually looks like the -- the wound looks
11 innocent.  It doesn't show signs of
12 inflammation, of an active process.  It
13 just looks like a wound that's separated.
14         When I think of erosion, I think
15 of a more active process.  The body didn't
16 like the material that was in there or it
17 got infected.  There's a reaction going on
18 and the tissue looks much different.  It
19 looks inflamed.  It looks like it's
20 pushing it out as opposed to the walls of
21 the wounds that opened and the exposure
22 that's just kind of dangling there free.
23 And in an erosion everything there seems
24 to be more of an active process.

Lawrence Lind, M.D.

Page 246

1    So, I don't think there's a
2  strict scientific or medical definition of
3  it. I try to look at it this way, and
4  that's from the vaginal exposure.
5    In terms of an erosion into the
6  urethra or into the bladder, you know,
7  those are even tougher because, you know,
8  in the case I described to you, you can
9  just have a wound that opens. So
10  hypothetically, on an erosion to an
11  internal organ, the mesh is moving from
12  one place to another. It was my strong
13  belief that most erosions to internal
14  organs were there when the patient left
15  the operating room.
16    Q.   Mesh can lead to mesh erosion.
17    True?
18    MS. GERSTEL:  Object to form.
19    A.   I would say that I've never seen
20  a mesh placed in the right place lead to
21  erosion if erosion is an active process.
22    Q.   You can't have mesh erosion or
23  mesh exposure without mesh.
24    Fair?

Page 247

1    A.   Right. Correct.
2    Q.   And transvaginal mesh can cause
3  foreign body reaction, right? Like we
4  talked about earlier.
5    A.   Yes.
6    Q.   And that can cause inflammation?
7    A.   Yes, it can.
8    Q.   And that can cause chronic pain?
9    A.   It can.
10    Q.   Are the complications that you
11  tell your patients are associated or
12  caused by the TVT-Abbrevo similar to what
13  you advise them on the TVT-O?
14    A.   I explain to them the
15  difference. I explain that they have a
16  light -- a likelihood, but not -- of less
17  chance of having groin pain, but not no
18  chance.
19    Q.   But other than groin pain, would
20  the other complications that we talked
21  about being caused by the TVT-O remain the
22  same for the TVT-Abbrevo?
23    A.   Yes.
24    Q.   I'm just trying to make it so

Page 248

1  you don't have to go through them all
2  again.
3    With regard to the TVT-Exact,
4  how would the -- when you -- the
5  complications that you tell your patients
6  are caused by the TVT-Exact, how would
7  that be different than the TVT-O?
8    A.   I tell them they're very
9  similar. I say this is an evolution of a
10  device and this one is a little bit
11  slimmer. Other than it being slimmer,
12  it's the exact same procedure. I feel in
13  my hands that it lets me go through the
14  spaces a little more easier, and if there
15  is an inadvertent puncture of the bladder,
16  which does happen in a few percentage
17  cases, I like the fact that the hole is
18  smaller and it heals spontaneously.
19    Q.   Other than those differences,
20  would the complications caused by the
21  TVT-Exact that you consent your patients
22  to be the same as what we discussed with
23  the TVT-O?
24    A.   Yes.

Page 249

1    Q.   And the things we've discussed,
2  these complications we've discussed with
3  regard to that you consent your patients
4  on for the TVT products, those are things
5  that are not good for the patients.
6    Right?
7    MS. GERSTEL:  Object to form.
8    A.   Well, when I'm consenting them
9  and telling them a list of adverse
10  reactions, by definition adverse reactions
11  are not good for the patients, but they're
12  a known risk and they're part of
13  risk-benefits of trying to get the benefit
14  of being dry.
15    Q.   As part of your practice, you
16  treat women suffering from complications
17  caused by mesh slings.
18    Right?
19    A.   I do.
20    Q.   In fact, you're at a tertiary
21  care hospital.
22    Right?
23    A.   Yes.
24    Q.   And you're actually referred

Lawrence Lind, M.D.

Page 250

1  mesh complications from other places in
2  the State of New York.
3       Right?
4    A.  I am.
5    Q.  Are there any other states other
6  than New York that you receive referrals
7  of women suffering from mesh complications
8  from?
9    A.  1996 I -- well, before the
10  mesh -- you still had other meshes then,
11  but, you know, '96 to 2005 I was one of,
12  like, five people in the area.  So I had
13  people from multiple, multiple states.  So
14  now we've got good trained people in a lot
15  of places, so they come from far less
16  often, but I still will get people from
17  New Jersey, Pennsylvania, Upstate New
18  York.
19    Q.  Okay.
20       There are doctors in referral
21  centers like yours for women suffering
22  from mesh complications in states all over
23  the United States.
24       Correct?

Page 251

1    A.  There are many now, yes.
2    Q.  And how many referrals a year do
3  you receive from women suffering from mesh
4  complications?
5    A.  It's decreased quite a bit over
6  the last five years.  I think over the
7  last five years the people knowing how to
8  do them right are doing them more often
9  and people whose techniques perhaps
10  weren't as good are doing them less often.
11       So I would say right now I get
12  between five and ten a year.
13    Q.  Do you know what mesh products
14  have been pulled off the market in the
15  last five years?
16       MS. GERSTEL:  Object to form.
17    A.  I might not be able to name them
18  all, but I know a lot of them.
19    Q.  Do you think that has anything
20  to do with the decrease in the number of
21  women you're seeing with mesh
22  complications?
23    A.  No.
24       Pardon me.  Referring to

Page 252

1  decrease you're referring to slings or
2  vaginal mesh or both?
3    Q.  I'm referring, in that question,
4  I was referring to transvaginal mesh,
5  period.
6    A.  So, then no.  I would correct my
7  answer.  I'm sorry.
8       Yes, I think with the removal
9  and direction not to use those products
10  and taken off, it's decreased the access.
11       And I certainly wish they'd do
12  that to the machine guns that have been
13  going off in the last couple of weeks.
14    Q.  What complications caused by
15  mesh slings do you treat in your practice?
16    A.  Retention, obstruction,
17  exposure-slash-erosion, dyspareunia.  I'm
18  not seeing a lot of groin pain.
19  Occasionally urethral erosion.
20    Q.  How about chronic UTI?
21    A.  The chronic UTI is a tough one
22  when you have to try to attribute it to
23  mesh when you see patients that have
24  slings in place that have chronic UTI.

Page 253

1       So, if you have something
2  related to the mesh that explains it, so
3  they're retaining urine and they're not
4  emptying and the natural flow process and
5  cleansing process isn't working, you know,
6  you say releasing this would probably
7  help.
8       It's sometimes hard when you get
9  a patient who has chronic UTIs and there's
10  no obstruction.  They empty well.  The
11  cystoscopy's clear.  There's no exposure.
12  They're not behaving inflamed or infected.
13  So it's hard.  Sometimes we have to make
14  decisions that we don't see something that
15  would make sense that it would be from the
16  sling and you have to judge that.
17       So when there's an obstruction
18  and retention, makes sense.  Obviously
19  when there's a piece of mesh in the
20  bladder, makes sense.
21       We do have situations where
22  patient comes in and says I have
23  infections, is this from my mesh.  And we
24  do our assessment and I don't find

Lawrence Lind, M.D.

Page 254

1 something that logically attributes to it,
2 and you have to decide what to do with it.
3     Q.   Have you seen pieces of mesh in
4 the bladder?
5     A.   Yes.
6     Q.   How about inflammation, you
7 treat women suffering from inflammation
8 from mesh?
9     A.   Whether the patients come with,
10 like I said, exposure, erosion, most of
11 them are quiet exposure.  They notice it
12 because either they felt it when they were
13 touching themselves or the partner felt
14 it.  Most of the time mesh exposure is
15 found innocently.  They didn't know it was
16 there.
17        When you talk about
18 inflammation, I would say in a small
19 fraction of the exposure-slash-erosions
20 they come in and it seems hotter.  That's
21 the one I would say where I was speaking
22 before I'd say this seems to be more of a
23 this one's being extruded because it seems
24 like an active process and they're

Page 255

1 sensitive and inflamed.  But that's a
2 minority.
3     Q.   But I think the answer is yes,
4 you do treat women that have inflammation
5 caused by mesh?
6     A.   Yes.
7     Q.   Do you perform surgery to treat
8 transvaginal mesh complications?
9     A.   Yes.
10     Q.   How about treatment of
11 transvaginal mesh complications caused by
12 mesh slings?
13        MS. GERSTEL:  Object to form.
14     A.   Yes.
15     Q.   What kind of surgeries do you
16 perform?
17     A.   If they're too tight, I loosen
18 them.  If they're in the bladder, we take
19 it out of the bladder and repair the
20 bladder.  If it's in the sulcus and it's
21 uncomfortable with vaginal pain, we have
22 to refresh the sulcus and sometimes the --
23 you might be through into the vagina and
24 sometimes it might be behind the vagina.

Page 256

1 So not a true exposure, but as
2 uncomfortable.  So sometimes we have to
3 release the side band.  I've had to do one
4 groin exploration.
5     Q.   What do you mean by "groin
6 exploration"?
7     A.   An obturator sling who had
8 discomfort by the groin that it was
9 persistent.
10     Q.   Have you done removals or
11 revisions related to the TVT mesh
12 products?
13     A.   The retropubic?
14     Q.   Any of the products in the line.
15     A.   Yes.
16     Q.   How many?
17     A.   20 to 30.
18     Q.   Mesh slings, generally speaking,
19 how many removal or revision surgeries do
20 you think you've done?
21     A.   In total?
22     Q.   Yes.
23     A.   I haven't quantified it.  It's
24 five to ten a year now.  It was ten a year

Page 257

1 earlier.
2        I would say hundred to 150.
3     Q.   So, you currently do five to ten
4 mesh sling removals per year?
5     A.   Some kind of revision.
6     Q.   What are typically the
7 indications for revision of the TVT mesh
8 sling products?
9     A.   The number one indication truly
10 is that their doctor saw it and told them
11 that your mesh is exposed, you should have
12 it taken out.  So they come asymptomatic
13 and worried about their mesh.  So we have
14 a chat about if you're okay and you're
15 fine and you're not having any symptoms,
16 you don't have to do anything about it.
17 Half of those patients will say let's get
18 it out, I don't want it there.  And half
19 will say hey, if I'm feeling great, let's
20 leave it.
21        So, the most common indication
22 is referred from a physician for something
23 they didn't know about 'cause they -- the
24 physician -- their primary care OB-GYN saw

Lawrence Lind, M.D.

Page 258

1  an exposure.
2      Q.    So the most common is they're
3  referred for mesh exposure?
4      A.    Yeah.
5      Q.    And what other indications lead
6  to removal of the TVT mesh slings?
7      A.    They have pain or dyspareunia or
8  the partner felt something.
9      Q.    And you've revised TVT mesh
10  slings based on all of those indications.
11      True?
12      A.    I wouldn't be able to say for
13  every single one of those indications
14  there was a TVT product.  That's -- that's
15  too exact to say that for every one of
16  those it was a TVT.
17      You know, they come and
18  sometimes we could have the op report;
19  sometimes we don't.  Sometimes we know
20  exactly which sling it was; sometimes we
21  don't.  We do our best to get operative
22  reports.  Sometimes we get them; sometimes
23  we can't.  Sometimes they've had stuff
24  done in another country.

Page 259

1      Q.    These would all be examples of
2  reasons you've revised mesh slings.
3      True?
4      A.    Yes.
5      Q.    What percentage of your practice
6  is related to treating transvaginal mesh
7  complications?
8      MS. GERSTEL:  Object to the
9  form.
10      Is that all transvaginal mesh?
11      MR. DeGREEFF:  Right.
12      MS. GERSTEL:  I'll just object
13  to the extent it's outside the scope
14  of this deposition.
15      A.    I'd see about 200 a month.  I'll
16  see one every other month.  One out of 300
17  to 400.  It's pretty low.
18      Q.    That's related to transvaginal
19  mesh complications generally speaking?
20      A.    Yeah.
21      Q.    Have you ever treated a patient
22  with mesh that --
23      MR. DeGREEFF:  Strike that.
24      Q.    Have you ever -- well, yeah.

Page 260

1      Have you ever seen a patient
2  with mesh that is roped, curled, frayed,
3  deformed, folded or wrinkled?
4      A.    I've never witnessed those
5  things.
6      Q.    Do you agree that those things
7  increase the risk of pain for a woman?
8      A.    I don't know that those have
9  been assessed in the patient in a study.
10  These all seem to be things of excised
11  mesh and I think the mesh sits differently
12  in the body when it's excised.  So I don't
13  see it roped and curled and all of that.
14  It takes the shape of the tissue it's in.
15      Q.    So you've never seen or never
16  treated a patient that had mesh that was
17  deformed?
18      A.    How do you define "deformed"?
19      Q.    How do you define "deformed"?
20  You're the doctor.
21      A.    I will say on some prolapse
22  cases, if you have a piece of mesh that's
23  attached and the attachment released, so
24  if the procedure fails, then the -- then

Page 261

1  the mesh will come upon itself and have
2  some folding.  I've seen folding on a mesh
3  failure because the attachment points have
4  released, but I don't see curling and
5  roping and what those things are that are
6  described.  I don't see them.
7      Q.    You've never seen any of those
8  with regard to mesh slings?
9      A.    I've seen mesh folded on itself
10  when there was a prolapse failure.  So the
11  mesh that was attached got released and it
12  came back upon itself and folded.
13      Q.    I'm talking about mesh slings
14  now.
15      You're never seen a mesh sling
16  that was roped or curled or frayed or
17  anything?
18      A.    I don't know if you consider
19  roping.  When a sling is tight and you're
20  going to release it, when you see that
21  patient and it's tight and you go and look
22  at -- and you release it, it looks a
23  little narrower.  I don't know if that's
24  roping or curling.  It does look a little

Lawrence Lind, M.D.

Page 262

1 narrower when it -- when it -- when the
2 tissue contracts and the sling contracts
3 with it for whatever reason for that
4 patient and the small fraction that end up
5 too tight and you have to go back, it
6 looks a little slimmer.
7    Q.   Well, that's contraction of the
8 mesh.
9       Correct?
10    A.   I don't know that it's
11 contracture.  The mesh looks smaller.
12    Q.   So you're saying when it
13 contracts and it gets under greater
14 tension, it looks thinner?
15    A.   I don't know if it's an
16 inflammatory response that encases it.  I
17 don't know if it's a tissue response.  I
18 don't think we have studied that.  And to
19 know what I'm referring to what's
20 happening at that point.  It just looks a
21 little slimmer.
22    Q.   But you've seen mesh slings that
23 have changed shape, that look slimmer.
24       True?

Page 263

1    A.   When I take out patients that
2 have obstructions, they look a little
3 slimmer under the urethra.
4    Q.   In your experience removing the
5 TVT products, were you able to remove all
6 of the mesh?
7    A.   There are times where you decide
8 that you need to remove all the mesh and
9 times when you decide you don't need to.
10       When I decide a patient needs it
11 to be removed, I have removed all of it.
12    Q.   You agree that physicians are
13 often unable to remove all the mesh?
14    A.   It depends on their training.
15 The patient having a revision is best off
16 with someone with extensive experience in
17 handling this.
18    Q.   Well, there are times when it's
19 just not -- when you're just not able to
20 remove all of the mesh.
21       True?
22    A.   I have never had a case where I
23 couldn't remove the sling in totality when
24 I needed to.

Page 264

1    Q.   It is challenging to remove all
2 of the mesh from a woman who's suffering
3 complications.
4       Is that a true statement?
5    A.   There's some dissections that
6 are more difficult than others, but I
7 don't consider it to be an extremely
8 difficult procedure.
9    Q.   For example, you know that
10 there's -- with the TVT-O product, you can
11 never safely removal all of the mesh from
12 inside a woman once it's implanted.
13       Right?
14    A.   I agree.
15    Q.   Okay.
16    A.   The problem you're having, and
17 to clarify that disagreement, is that
18 there are surgeons who are taking out mesh
19 and they really only have the training to
20 take it out from the middle of the vagina
21 as far out laterally as they can reach,
22 and then there are surgeons who know how
23 to get behind the pubic bone and get
24 what's behind the pubic bone and get

Page 265

1 what's wrapping around the descending
2 pubic ramus.
3       I've had obturators that were
4 taken out in totality several times.
5    Q.   You had some that you couldn't
6 take out in totality?
7    A.   No.
8    Q.   Okay.
9    A.   Now, microscopically, do I know
10 that there's nothing there, it seemed to
11 us that there was nothing more there.  A
12 continuous band of ribbon.
13    Q.   Doctor, have you ever been
14 employed by a medical device company?
15    A.   As a consultant, not on a
16 payroll.
17    Q.   I understand the consultant.
18       I'm saying have you ever been an
19 actual employee of a medical device
20 company?
21    A.   No.
22    Q.   You have been a consultant for a
23 medical device company.
24       Correct?

Lawrence Lind, M.D.

Page 266

1    A.    Yes.
2    Q.    Which ones?
3    A.    The Laurus Corporation, Boston
4  Scientific, Ethicon, Caldera.
5    Q.    What about Asera?
6    A.    No.
7    Q.    You've never been a consultant
8  for Asera?
9    A.    When AMS was around, I had a
10  couple, very few. So very briefly you
11  could add it to the list, American Medical
12  Systems.
13        Asera, no.
14    Q.    Okay.
15    A.    Do they go by another name?
16    Q.    Not that I know of.
17    A.    No.
18    Q.    When did you start working for
19  Caldera? I guess start consulting for
20  Caldera?
21    A.    About five, six years ago.
22    Q.    So 2013, 2014? Something like
23  that?
24    A.    About that.

Page 267

1    Q.    What did Caldera have you doing?
2    A.    Well, as I said, we got involved
3  in them first in a non -- I got involved
4  with them first in a non-consulting way.
5  I liked their set of mesh kits, their
6  ability to do everything in one kit, less
7  expense and flexibility of the kit. So
8  they're a small company. And I said, you
9  know, I like to do design innovation. Can
10  we take a look at your products and talk
11  about what can be improved.
12        So, if you take a look -- not
13  that you would take a look to do their
14  history, you'll see that Caldera now has a
15  blue sheathe covered narrow sling, which
16  was my original wish back with Gynecare
17  and Boston Scientific.
18        We -- they wanted to be also
19  involved in the abdominal sacral
20  suspension market. We talked about the
21  weight and veracity of their mesh and how
22  it handled and how it might be marked and
23  colored and helped them develop the mesh
24  for sacral suspension.

Page 268

1        We talked about what's unique
2  about their trocar delivery flexibility
3  and what could be added to that to
4  continue to improve the flexibility
5  options for patients. For instance, took
6  the obturator trocars and said, you know,
7  every woman's not the same size. Let's
8  make different sizes. So there are some
9  measurements we can use different sizes.
10        So we've done a lot of different
11  things that are tweaking things. Some
12  have been adopted. Some are in the
13  thought process. Some have been rejected.
14    Q.    So, were you essentially -- were
15  you helping them with product design, or
16  were you helping them with research and
17  development?
18        I mean, do you know how were you
19  classified there?
20    A.    It really is research and
21  development. It's trying to decide on new
22  products and how to alter products to
23  improve them.
24    Q.    Were you working on sling

Page 269

1  products?
2    A.    Sling and mesh products for
3  sacral suspension.
4    Q.    And what were your -- what did
5  you tell them about the weight of their
6  mesh? You mentioned that as one of the
7  things you were talking to them about.
8    A.    I said there seems to be, you
9  know, across the slings -- across the very
10  popular area of abdominal sacral
11  suspensions is a huge broad area of stuff
12  that's really, really lithe, that I
13  thought was too lithe to things that were
14  really stiff, and I thought their mesh
15  handled well and was within the realm of
16  acceptable weight and handling and I liked
17  it.
18        MS. GERSTEL: Could I just note
19  for the record I don't know the extent
20  to which any work that Dr. Lind did
21  with any company is confidential.
22  He's obviously taken on oath to tell
23  the truth. I don't think I'm in a
24  position to direct him not to answer

Lawrence Lind, M.D.

Page 270

1  any of those questions, but I also
2  don't know if we might need to seek
3  that some of this testimony be kept
4  confidential.
5      I just want to say that for the
6  record. I'm just not sure. I just
7  want to state for the record I might
8  need to explore that after this
9  deposition. I'm not going to direct
10 him not to answer the question.
11     MR. DeGREEFF: I mean, if you
12 want to move to have it sealed or
13 something, we may agree to that. I
14 just don't know what it is. If
15 there's some reason for that, then
16 yeah, we can talk about it.
17     MS. GERSTEL: All right.
18 BY MR. DeGREEFF:
19     Q.   So, what were the improvements
20 that you suggested to slings?
21     A.   For Caldera?
22     Q.   Yeah. I mean, you told me that
23 you were looking at ways to improve, kind
24 of, the slings that were currently on the

Page 271

1  market.
2      What were some of your suggested
3  improvements?
4      A.   Well, the ones that are already
5  out there are ideas that I am holding
6  confidential. They haven't been put out
7  there yet.
8      They adopted some things that
9  were already there with other slings which
10 was the narrow trocar and a colored
11 sheathe that could be identified. So
12 those aren't hidden or protected ideas.
13 They're -- there are some ideas on the
14 table about how to, one, make the sling
15 passage more comfortable in the
16 postoperative setting for pain; and two,
17 to identify an inadvertent pass in the
18 bladder that you might miss.
19     Q.   Anything about the mesh material
20 itself?
21     A.   No.
22     Q.   Are you still consulting for
23 Caldera?
24     A.   Yes.

Page 272

1      Q.   So, basically 2013 to 2014 to
2  present you've been consulting for
3  Caldera?
4      A.   Yes.
5      Q.   How much are you being paid by
6  Caldera? Is there some sort of a yearly
7  consulting rate or something like that?
8      A.   It's an hourly rate. Just based
9  on à la carte services given.
10     Q.   What is your hourly rate with
11 them?
12     A.   Four hundred an hour.
13     Q.   How many hours a year since 2013
14 or 2014 do you think you've spent working
15 with Caldera?
16     A.   It varies. You know, if we're
17 in the middle of a product that they've
18 bought into, it could be 50 hours in a
19 year.
20     Last year was only seven or
21 eight hours. So it varies quite a bit.
22     Q.   Are you aware of multiple years
23 working for them where you made more than
24 $20,000?

Page 273

1      A.   Maybe two.
2      Q.   How far do you think you've been
3  paid by Caldera since you started working
4  for them?
5      A.   Fifty. 50,000.
6      Q.   You use Caldera slings.
7      Right?
8      A.   I do.
9      Q.   Is the Desara your sling of
10 choice?
11     MS. GERSTEL: Object to form.
12     A.   It's the one I use most
13 commonly.
14     Q.   What percentage of the time do
15 you use the Desara?
16     A.   75 percent.
17     Q.   What percentage of the time do
18 you use one of the Ethicon TVT slings?
19     A.   Ten percent.
20     Q.   And what are the other products
21 you use? The other sling products you
22 use?
23     A.   I use Boston Scientific, Caldera
24 and the Exact.

Lawrence Lind, M.D.

Page 274

1    Q.   So, you would use the BSC you
2  use, is that the Advantage Fit?
3    A.   Yes.
4    Q.   What are the differences between
5  the Desara and the TVT slings?
6    A.   Well, the meshes are different.
7  The shape of the trocars are similar.  The
8  pathways are similar.  The Caldera is
9  reusable trocars and comes with the
10 ability to change direction, size and
11 shape of your trocars.  The Caldera for
12 the obturator has inside-out and
13 outside-in.
14      Those are the major -- those are
15 the differences I can think of.
16   Q.   How are the meshes different
17 between the TVT slings and the Caldera?
18   A.   Well, the present mesh I like to
19 use for Ethicon is the TVT-Exact.  So it's
20 laser-cut and the Caldera is
21 mechanically-cut.
22   Q.   Any other differences?
23   A.   I'm sure there's a chart I've
24 seen where their porosity and pore size

Page 275

1  have some other differences.  So they do,
2  you know, on a -- on a chart of mechanical
3  properties they differ.
4    Q.   The Desara is larger pore mesh
5  than the TVT-Exact.
6      True?
7    A.   I think we had that one before,
8  and I thought we had -- I thought that was
9  the other way around, but I could be
10 mistaken.
11   Q.   Is the Desara more resistant to
12 deformation than the TVT sling products?
13   A.   I'm not aware of that being
14 studied officially or by myself.  I don't
15 notice a difference clinically.
16   Q.   So you're not aware of
17 literature that says it is?
18   A.   I don't know if one of the
19 mechanical studies that pulled on each
20 thing described it in a certain way.
21      I do remember in that same
22 article that has the chart that says the
23 pore sizes and the weight, I think it also
24 discussed what happened to them under

Page 276

1  stress and it probably shows different
2  properties.  I don't remember what it
3  shows.
4      It behaves the same in the
5  patient for me.
6    Q.   Are you aware that Caldera makes
7  the claim that their product, their TVT
8  product is -- that the Desara is more
9  resistant to deformation than the TVT
10 products?
11   A.   I wasn't aware of that.
12   Q.   So you don't have any idea what
13 that claim is based on?
14   A.   I do not.
15   Q.   Do you have any reason to
16 disagree with Caldera?
17   A.   I would just ask them to show me
18 what it's based on.
19   Q.   Do you disagree with them or no?
20   A.   I don't have the knowledge to
21 agree or disagree.
22   Q.   So, you use the Desara because
23 it's --
24      MR. DeGREEFF:  Strike that.

Page 277

1    Q.   So the Desara is a
2  mechanical-cut mesh.
3      Is that correct?
4    A.   Yes.
5    Q.   The TVT-Exact is laser-cut.
6      True?
7    A.   Yes.
8    Q.   The TVT-Abbrevo is laser-cut?
9    A.   Yes.
10   Q.   And the TVT-O has both laser-cut
11 and mechanical-cut options.
12      Right?
13   A.   Yes.
14   Q.   You said you worked for Boston
15 Scientific as a consultant.
16      Is that true?
17   A.   Yes.
18   Q.   When did you start working for
19 Boston Scientific as a consultant?
20   A.   That was a ways back.
21      So, they sold the device that I
22 helped make was sold in 1996 or '97.  So
23 1998 they asked me to come on since I had
24 helped to make the device together, and we

Lawrence Lind, M.D.

Page 278

1  started -- I started doing that study
2  about the using that device to make first
3  it was in a scientific role doing studies,
4  the two studies for the sacrospinous
5  suspension and for the mini incisional
6  Burch procedure.  And as that relationship
7  grew, we started talking about, you know,
8  how they could improve their pelvic floor
9  products.
10      I had gone to Ethicon, as the
11  theme continues, I had gone to Ethicon
12  about making the needle smaller and they
13  didn't want to.  So we made the Advantage
14  Fit together.
15      Q.   Okay.  And, so, that would have
16  been like 1996 that you started consulting
17  with BSC?
18      A.   '96 or '97 is when they sold the
19  device.  So my consulting would have
20  started in like '98.  Somewhere in that
21  range.
22      Q.   Okay.  So you were not
23  consulting with them before they sold the
24  device?

Page 279

1      A.   Correct.
2      Q.   So 1998 until when did you stop
3  consulting with BSC?
4      A.   Four years ago.
5      Q.   So 2015-ish?  Is that correct?
6      A.   Yeah, around that time.
7          It's all approximates.
8      Q.   It sounds like were you doing
9  R&D type work for them, or was there some
10  other aspect of it?
11      A.   I was teaching in labs trying to
12  teach people good -- the best technique,
13  or at least my best technique for placing
14  slings and doing the sacrospinous
15  suspension.  So a lot of lab work
16  teaching.
17          I was working on R&D for the
18  slim sling.  Wasn't that extensive.  We
19  were just making the needle narrow and
20  putting the tube on it.  You know, as far
21  as a change, it's a significant change in
22  a product.
23          They asked for my opinion on
24  some of the -- I was involved in the

Page 280

1  development.  They asked for my opinion on
2  some of the vaginal mesh products when
3  they started making those.
4      Q.   So it sounds like they were
5  asking you for input on just kind of the
6  use of the device as well as some R&D
7  aspect.
8          Is that fair?
9      A.   Product development and
10  teaching.
11      Q.   And you currently use the BSC
12  Advantage.
13          Right?
14      A.   To a small degree.
15      Q.   And were you being paid by BSC
16  as a consultant for that 17-year span, I'm
17  assuming?
18      A.   Yes.
19      Q.   How much do you think you were
20  paid in that 17 years by BSC?
21      A.   That wasn't high volume per
22  year.  I mean, ten a year, approximate.
23      Q.   Ten thousand a year?
24      A.   Ten thousand a year if I was

Page 281

1  involved in a project.  Maybe it was 20 on
2  a year where we were more involved in
3  focusing on something.
4      Q.   So, over 15 years, maybe 150 to
5  200,000?
6      A.   15 years, yeah, somewhere in
7  that range.
8      Q.   What are the differences between
9  the BSC Advantage sling and the TVT
10  products?
11          MS. GERSTEL:  Objection; asked
12      and answered, I think.
13          THE WITNESS:  Yeah, it was?
14      I'll answer it.
15      A.   So, the Boston Sci slings are
16  all laser-cut.  The central portion of the
17  sling is also heat-treated potentially to
18  make it a little more robust in that area.
19  So it is stiffer for sure.
20          Other than that, the TVT-Exact
21  and the TVT have a very similar shape, a
22  very similar angle.  You know, when I was
23  consulting with Boston Sci, we were
24  basically making a TVT that was skinnier.

Lawrence Lind, M.D.

Page 282

1  So the shape was similar.  The arc of the
2  needle is similar.  You know, the porosity
3  of the mesh is slightly different.
4       I can't tell you what it is, but
5  it's all within the type one mesh
6  characteristics.
7       Those are the major differences.
8   Q.   You said you did some consulting
9  for AMS.
10      Is that right?
11  A.   Very little.
12  Q.   When did you start that?
13  A.   It was in the vaginal mesh era.
14 They asked me to come up and do one or two
15 labs to see what I thought of vaginal
16 vaginal mesh.  It was a one or two gig
17 thing.
18  Q.   What did they pay you for doing
19 those labs?
20  A.   I think 3500.
21  Q.   Total or each?
22  A.   Each one.
23      That includes a trip to
24 Minnesota in the winter.  So you could say

Page 283

1  I paid them.
2   Q.   So roughly seven grand total
3  with them?
4   A.   Yeah.
5   Q.   Have you done anything with them
6  since then?
7   A.   No.
8   Q.   How many -- since you've been
9  acting as an expert witness for Ethicon, I
10 believe you said you've given your general
11 opinion and then there's been four or five
12 case-specifics.
13      True?
14  A.   Yes.
15  Q.   Have you ever told Ethicon no
16 when they came to you and asked you to
17 give an opinion on a specific -- in favor
18 of a specific case?
19  A.   Of a case?
20      I think we had one where, you
21 know, the materials were sent and then
22 they said look at the other ones first
23 because we're working on this.  I glanced
24 at the case and looked at some of the key

Page 284

1  things and I said this one may be a tough
2  one, and they ended up closing that case
3  before I ever lent the opinion.
4       So, there are discussions
5  sometimes where I tell them that, you
6  know, this case looks a little difficult.
7       MS. GERSTEL:  I'll just state
8   not to reveal any discussions with
9   counsel.
10      THE WITNESS:  Right.
11 BY MR. DeGREEFF:
12  Q.   So they settled that case before
13 you had to say no, basically?
14  A.   I didn't say that I said no.  I
15 was evaluating it, but they settled the
16 case before I got deeper.
17  Q.   So the answer is no, you've
18 never told them no on any case they've
19 asked you to be an expert witness on?
20  A.   At this point, no.
21  Q.   In all the case-specific reports
22 you've done for Ethicon, you've ultimately
23 concluded that the product, i.e. the mesh
24 manufactured by Ethicon, was not the cause

Page 285

1  of the plaintiff's complications.
2       True?
3       MS. GERSTEL:  Object to form.
4   A.   Yes.
5   Q.   Have you ever given the opinion
6  that one of Ethicon's mesh products caused
7  a woman's pain or other complications?
8   A.   Well, the product used by a
9  surgeon and the use of the product not
10 being used correctly is different than the
11 product itself causing the damage.  So I
12 never have thought that the product itself
13 caused the damage.
14  Q.   But you've blamed the doctor in
15 some of them, in some of your --
16  A.   I didn't blame the doctor.  I
17 assessed the materials and assessed that
18 the technique issues were problematic.
19  Q.   So you blamed the doctor
20 ultimately and said that it was the
21 doctor's fault?
22      MS. GERSTEL:  Object to form.
23
24 BY MR. DeGREEFF:

Lawrence Lind, M.D.

Page 286

1    Q.   True?
2    A.   Sometimes it was a technique
3  problem.  Sometimes it was a concomitant
4  procedure and it may not be the doctor's
5  fault.  If you do a posterior repair, you
6  can have dyspareunia and it doesn't mean
7  the doctor was faulty.
8        It's a known complication of
9  other gynecologic procedures that happen
10 concurrently with the mesh procedure.  So
11 it's not necessarily that I'm blaming the
12 doctor.
13   Q.   Have you ever given the opinion
14 that any mesh product caused a woman's
15 injury?
16   A.   I've never given the opinion
17 that a mesh product separate from the
18 procedure caused an injury.
19   Q.   You've given the opinion that
20 the procedure was somehow done wrong and
21 that was the cause?
22        MS. GERSTEL:  Object to form.
23   A.   If there's a problem with a
24 procedure when you're using mesh, it can

Page 287

1  lead to complications.  It wouldn't happen
2  if the procedure was done right.
3        The mesh characteristics I don't
4  think would have harmed the woman.
5    Q.   Do you have any understanding
6  why you were chosen as an expert witness
7  for Ethicon in this litigation?
8    A.   I've got a good reputation in
9  the field for 23 years.  I do good
10 clinical work.  I publish.  I'm easy to
11 get along with.
12   Q.   And you've been an Ethicon
13 consultant or expert witness for 17 years
14 now.
15        Is that right?
16   A.   Well, the expert witness now is
17 for about three, three-and-a-half years.
18 And the Ethicon consulting was from, I
19 would have to look back at the transcript.
20 It was probably five to ten years.
21 They're not continuous, but --
22   Q.   Well, you started in 2002 as a
23 consultant for them.
24        Right?

Page 288

1    A.   Approximately that.
2    Q.   You consulted with them until
3  roughly 2012.
4        Right?
5    A.   Well, I think there was -- in
6  2012, I think that might have been the --
7  there was a big gap.  So yes, from a time
8  frame, you go to 2012.  But I think if
9  you've got the records from when I worked
10 for them, there was a pretty big gap.  I
11 was not doing a lot of Gynecare work for a
12 few years and then they asked me and asked
13 me if I would come take a look -- I think
14 there's one data point that's making that
15 look extended.  So it may be five to eight
16 years and not twelve years just because I
17 think that 2012 is an outlier.  But you'd
18 have to look at -- I know you have the
19 records of everything that I've done.  So
20 we'd have to look more closely at it.
21   Q.   So we're looking at eight to
22 eleven years where you were either a
23 consultant or an expert for Ethicon in the
24 last 17.

Page 289

1        Right?
2    A.   Sounds about right.
3    Q.   And you've been using their
4  product since 2000?
5    A.   Yes.
6        MR. DeGREEFF:  We can take a
7  break.
8        (Recess taken.)
9  BY MR. DeGREEFF:
10   Q.   Sir, do you remember doing any
11 work for Astellas?
12   A.   Yes.
13   Q.   And what was that?
14   A.   A pharmaceutical company made a
15 drug for the overactive bladder.
16   Q.   Do you do some consulting for
17 them, it looks like?
18   A.   Yes.
19   Q.   And when did you do that?
20   A.   I don't know the exact years.
21 It would probably be like three years ago
22 to six years ago, so.
23   Q.   2013 to 2016?
24   A.   Yeah.

Lawrence Lind, M.D.

Page 290

1    Q.   Do you have any idea how much
2  you were paid by them?
3    A.   Maybe 5,000 a year.
4    Q.   So maybe 15 total?
5    A.   Yeah.
6    Q.   I want to discuss, you told me
7  earlier you were paid about 50,000 by
8  Caldera.
9       Do you remember that?
10    A.   Yes.
11    Q.   I want to talk to you about
12  that.
13       Do you remember being paid $6500
14  by Caldera in 2013?
15    A.   I wouldn't be able to recall the
16  yearly in this meeting.
17    Q.   Do you know what the open
18  payments data is on the CMS website?
19    A.   I assume it's a public record of
20  what I've been paid for various
21  activities.
22    Q.   Right.
23       If Caldera reported that they
24  paid you $6,500 in 2013, would you

Page 291

1  disagree with that?
2    A.   I would have to check my
3  records.  I don't know that those records
4  are -- I do know that some of the online
5  records of what I've been allegedly paid
6  were wrong.
7       So, I would say that we are
8  discussing consulting years ago, ranges
9  and payments, and I would suggest that I
10  come up with the actual payments from
11  payroll would be something I'd like to do.
12    Q.   So you want to go chase down for
13  me all of your accounting records for
14  everything you've received from all of
15  these pharmaceutical companies?
16       MS. GERSTEL:  Object to form.
17    A.   Well, I don't know we're -- you
18  know, we're guessing at a lot of
19  activities with a lot of companies across
20  20 years.  It seems like the -- I don't
21  know how on target they would be.
22       I do know the online stuff, I
23  looked one time it was off by a digit, and
24  we do have to contact them.  There was one

Page 292

1  time I had to contact them to make it
2  corrected.
3    Q.   Well, in 2014, do you remember
4  being paid $25,000 by Caldera?
5    A.   I don't remember the yearly
6  number.
7    Q.   Does that sound inaccurate to
8  you?
9    A.   There was a year or two where I
10  was doing a lot of work.
11    Q.   In 2015 do you remember being
12  paid $25,000 again by Caldera?
13    A.   I don't remember the number, but
14  it's plausible.  As I said, there were a
15  couple of years where it was heavy.
16    Q.   In 2016, do you recall being
17  paid $18,600 by Caldera?
18    A.   It's certainly possible.
19    Q.   In 2017, do you recall being
20  paid $8,000 by Caldera?
21    A.   That sounds familiar.
22    Q.   So, I get more like $80,000 paid
23  to you by Caldera.
24       Does that sound accurate to you?

Page 293

1    A.   It sounds like the records you
2  have show that.
3    Q.   Do you disagree with that?  Does
4  that sound out of line?
5    A.   It may be right.  It may be plus
6  or minus 20.
7       I will go to their accounting
8  and ask them.
9       It doesn't sound erroneous.
10       MR. DeGREEFF:  Sir, I'm going to
11  hand you what I'm going to mark as
12  Deposition Exhibit 10.
13       (Lind Exhibit 10, Consulting
14  Agreement dated as of January 3, 2002
15  between Lawrence Lind, M.D. and
16  Ethicon, Inc., Bates No.
17  ETH.MESH.16009738 to 16009743, was
18  marked for identification, as of this
19  date.)
20  BY MR. DeGREEFF:
21    Q.   Sir, does this appear to be a
22  consulting agreement between you and
23  Ethicon?
24    A.   Looks like it.

Lawrence Lind, M.D.

Page 294

1    Q.   What is the date of that?
2    A.   2002.
3    Q.   January 3rd of 2002?
4    A.   Yep.
5    Q.   Does that sound familiar as
6   about the time you started working for
7   Ethicon as a consultant?
8    A.   It's about where I thought it
9   was.
10        And it looks clearly it's a
11   document that's real.
12    Q.   If you look at under Section 1
13   "Consultant," my only question is with
14   that paragraph is there's a spot in it
15   that says:  Keep records of hours worked
16   and cost of materials used.
17        Was that something that you
18   would have done?
19    A.   You know, the consulting for
20   them was not at home working on documents.
21   They would call me to do a lab.  It was a
22   half-day lab.  They'd pay $3,000 and it
23   was a one-at-a-time thing.
24        So, there really wasn't any

Page 295

1   recordkeeping.  You'd go.  You'd submit
2   one at a time.  It wasn't a kind of like a
3   cumulative work that was being added that
4   you recorded.
5        So, I would say I kept records,
6   but it was one at a time, and once you did
7   it, I didn't keep track after that.
8    Q.   So I guess my question is are
9   there any records in existence that would
10   have a detail of the hours worked under
11   this consulting agreement?
12    A.   I don't have it, and I don't
13   know if Ethicon would have it.
14    Q.   Would that have been something
15   you would have submitted to Ethicon?
16    A.   As I said, it was a
17   one-day-at-a-time type of working
18   agreement.  So even though it's
19   instructing to keep hours, I think that's
20   requesting to kind of keep the accounting
21   in order.  The way I worked, it was just
22   a, you know, once every few weeks or few
23   months they asked me to come to do
24   something and I went and I submitted for

Page 296

1   that one day.
2        So, there were not -- there
3   aren't records, I don't have a spreadsheet
4   or a record of the hours worked.
5    Q.   Okay.
6        I don't see that I ever asked
7   you that, but how much do you think you
8   were paid by Ethicon as a consultant?  Not
9   as a expert witness, but as a consultant?
10    A.   I don't know.  It started a long
11   time ago.  Spanned a long period.  There
12   were periods with big gaps where I didn't
13   do much at all, and there were periods
14   where I did a lot.
15        So I really cannot conjure a
16   guess.  I don't know if it's 20,000 or a
17   hundred thousand.  I really don't know.
18    Q.   And who would know that answer,
19   if not you?
20    A.   I don't know if Ethicon has the
21   records or if their accounting goes back
22   that far.
23    Q.   So, if you look at page 3 of
24   this agreement, the term of the agreement

Page 297

1   commenced on January 3rd of 2002 and seems
2   to have terminated on February 28th of
3   2002.
4        Do you have any idea why it was
5   so short?
6    A.   You know, I'd have to read the
7   whole agreement.
8        As I recall, there was a time
9   where anyone -- the contracts they had had
10   things that said you couldn't work with
11   anyone else.  So, I said well, you know, I
12   have ideas I'm working on and you're
13   rejecting them.  So, I don't know if
14   that's why.
15        So this may have been made
16   because I didn't agree to some of the
17   terms of their long-term agreement, but
18   they wanted me to come for this one
19   session, so we made a short-term contract.
20        So it does seem odd.
21    Q.   I think the situation you're
22   talking about was in 2010.
23        And maybe if you turn to page 4
24   of Exhibit 10, that will kind of clarify

Lawrence Lind, M.D.

Page 298

1  it for you.  If you look at 6 and 7,
2  paragraph 6 and 7.
3      A.   Yeah, it looks like it's an
4  invitation to go to one session, abdominal
5  guides training session.
6      Q.   That's what I was going to ask.
7          So, it looks like they were
8  paying you $3,000 for coming to a
9  abdominal guides training session?
10     A.   Right.
11     Q.   Did you get that $3,000 just to
12 show up, or did you have to teach?
13     A.   I was definitely teaching
14 abdominal guides.  They weren't -- I would
15 be one of the people teaching it, not
16 learning how to do it.
17     Q.   How long was that training
18 session?
19     A.   They usually were a half-day to
20 six hours.  Four to six hours.
21     Q.   Where did those take place?
22     A.   They were in a number of
23 locations.  It was various places that had
24 access to cadavers.  So I don't know where

Page 299

1  it took place, but the closest it would be
2  in 2000 -- it wasn't on Long Island until
3  later in our agreements because we didn't
4  have cadaver labs.  So it would either be
5  Manhattan, New Jersey.
6      Q.   Somewhere in the New York
7  metropolitan area?
8      A.   Yeah.  I wasn't flying for this.
9      Q.   And they were essentially paying
10 you $3,000 for a half-day participation?
11     A.   Well, as I said, it would be
12 four to six hours, plus the transportation
13 and time.  So, you know, door to door, it
14 would certainly be more than eight hours.
15     Q.   Did they pay you for your
16 transportation and hourly rate also?
17     A.   They paid the amount and then
18 just incurred costs for transition.  It
19 wasn't an hourly rate on top of that.
20     Q.   So $3,000 for roughly eight
21 hours.
22          Is that right?
23     A.   Yeah.
24          MR. DeGREEFF:  I'm going to hand

Page 300

1  you what I've marked as Deposition
2  Exhibit 11.
3          (Lind Exhibit 11, Clinical Study
4      Agreement between Gynecare and North
5      Shore University Hospital, Bates No.
6      ETH.MESH.00412092 to 00412098, was
7      marked for identification, as of this
8      date.)
9  BY MR. DeGREEFF:
10     Q.   Can you tell me what that is?
11     A.   Clinical study agreement.
12     Q.   And the term of that agreement
13 is April 4th, 2002 through the end of
14 June, through June 30th of 2004.
15          Correct?
16     A.   Right.
17     Q.   This was between Gynecare, which
18 is a division of Ethicon, correct?
19     A.   Yes.
20     Q.   And your institution with you
21 and Dr. Garely designated as the, looks
22 like, the primary people in charge of
23 this?
24     A.   Investigators.

Page 301

1      Q.   Is that correct?
2          Who is Dr. Alan Garely?  Do you
3  know him?
4      A.   He was a previous partner in my
5  practice, and he now practices in
6  Manhattan and south shore of Long Island.
7      Q.   Do you know him personally?
8      A.   You know, I mean, we were
9  partners for three years.  So I did know
10 him personally.  We don't socialize at
11 present.
12     Q.   Is he a good doctor?
13     A.   He's a good surgeon.  I don't
14 think -- again, I haven't seen him take
15 care of patients in 15 years.
16     Q.   I mean, do you have any
17 criticisms of him as a physician?
18          MS. GERSTEL:  Object to form.
19     A.   He could get upset with someone,
20 and then it wasn't a good scene.
21     Q.   Okay.  That's not really him as
22 a surgeon.  It sounds like maybe you --
23     A.   I haven't seen him in a
24 practicing situation for 15 years.  So I

Lawrence Lind, M.D.

Page 302

1 really don't think I can say anything.
2     Q.    Okay.
3         So, Dr. Garely was one of the
4 investigators hired by Ethicon to do this
5 clinical study agreement with you --
6     A.    Yes.
7     Q.    I mean to do this clinical study
8 with you.
9         Do you know when was the last
10 time you spoke to Dr. Garely?
11     A.    A couple months ago.
12     Q.    Do you know whether he currently
13 uses the TVT-O, TVT or TVT-Abbrevo?
14     A.    I don't.
15     Q.    Have you ever been provided with
16 any of the testimony or documentation of
17 what he told Ethicon about those devices?
18     A.    I think I saw one of his mesh
19 reports.  I don't think I saw a sling
20 report.
21     Q.    So, as you sit here, do you have
22 any idea what he told Ethicon about the
23 TVT-O, TVT-E and TVT-Abbrevo?
24     A.    I don't.

Page 303

1     Q.    Is it your understanding that
2 Dr. Garely is now a plaintiff's expert in
3 the transvaginal mesh litigation?
4     A.    I do understand that.
5     Q.    And you reviewed his report?
6     A.    I reviewed his mesh report.
7     Q.    When you say "his mesh report,"
8 are you talking about with regard to the
9 Prolift?
10     A.    Yes.
11     Q.    So, this is a former consultant,
12 or I guess someone who is a former
13 investigator on a study done by Ethicon
14 who's now providing testimony for the
15 women injured by Ethicon devices.
16         Is that right?
17         MS. GERSTEL:  Object to form.
18     A.    Looks like he was a previous
19 participant in this study and he is now a
20 plaintiff's expert, as you described.
21     Q.    Well, plaintiff meaning the
22 women who are claiming injuries.
23         True?
24     A.    Yes.

Page 304

1     Q.    If you look at paragraph 1 where
2 it says:  Performance of study.
3         As the principal investigator,
4 you were to perform the study in
5 accordance with the protocol.
6         Right?
7     A.    Right.
8     Q.    Who determined the protocol?
9     A.    I would have to look at the
10 protocol to comment on that.  But I would
11 say that any study I enrolled in, I would
12 have to believe that it was a protocol
13 that I agreed with.  So there can be
14 suggestions from a company as to what they
15 might want to happen, but I would never
16 have a -- subject my patients to any
17 protocol that I didn't specifically take
18 responsibility for if I was a principal
19 investigator.
20     Q.    Well, Ethicon determined the
21 protocol that was used.
22         Right?
23     A.    I am ultimately responsible for
24 the protocol that gets submitted to the

Page 305

1 IRB.
2     Q.    I understand.
3     A.    How much of the protocol was
4 created by them and edited by me or
5 created totally by me I don't think we can
6 answer at this meeting.
7     Q.    If you look at paragraph 3
8 "Financial Consideration and Payment
9 Schedule."
10         You see where I'm at?
11     A.    Mm-hm.
12     Q.    It says:  The total price for
13 the conduct and the completion of study as
14 well as the payment schedule is outlined
15 in Schedule B.
16         Did I read that correctly?
17     A.    Yep.
18     Q.    Look at Schedule B, if you
19 would.  It's on page 6.
20         Are you there?
21     A.    Yes.
22     Q.    It appears that the total
23 payment being made by Ethicon is $11,000.
24         Is that correct?

Lawrence Lind, M.D.

Page 306

1    A.   That's the planned -- that's the
2  budget for the -- for the study.  Right.
3        How much was actually paid with
4  how many subjects, we don't know.  This is
5  the schedule of payments ahead of time of
6  what would be paid.  Each line item would
7  have to be carried out to be paid that.
8  It's not paid in advance, so.
9    Q.   Okay.  That's the projected
10  $11,000 for the payment for the study?
11    A.   Right.
12    Q.   And this was between 2002 and
13  2004 that you were conducting this study?
14    A.   Yes.
15    Q.   So, the title of the study is "A
16  clinical assessment of patients undergoing
17  Gynecare TVT with abdominal guides for the
18  treatment of stress urinary incontinence."
19        Correct?
20    A.   Right.
21    Q.   And what was the ultimate goal
22  of the study?
23    A.   You know, they had a retropubic
24  sling, the standard TVT that went from

Page 307

1  bottom up, from the vagina upward, and
2  there were a -- from the urology teachings
3  of slings of long ago, there's a different
4  way of passing a sling that started from
5  the top down, which a lot of urologists
6  favor.  So the -- it was a design of an
7  instrument by Gynecare to try to add that
8  to their product line and to give those
9  who felt that that was a safer passage the
10  opportunity to go from the top down.
11        So, the purpose of this study
12  was to look at efficacy of safety of a
13  sling that went from the top down rather
14  than the bottom up.
15    Q.   And what was the result?
16    A.   I don't think it got off the
17  ground and got enough numbers for
18  enrollment, because I don't think I ever
19  saw a publication from it.
20        MR. DeGREEFF:  Sir, I'm going to
21    hand you what's been marked as
22    Deposition Exhibit 12.
23        (Lind Exhibit 12, Secrecy
24    Agreement dated January 19, 2004

Page 308

1  between Gynecare and Lawrence Lind,
2  MD, Bates No. ETH.MESH.09464276 to
3  09464279, was marked for
4  identification, as of this date.)
5  BY MR. DeGREEFF:
6    Q.   Can you tell me what that is?
7    A.   It's a privacy agreement to
8  discuss intellectual property.
9    Q.   It's actually better than that.
10  It's called a Secrecy Agreement.
11        Right?
12    A.   That's how they titled it.
13    Q.   And that's between you and
14  Gynecare.
15        Correct?
16    A.   Right.
17    Q.   And Gynecare is a part of
18  Ethicon?
19    A.   Yes.
20    Q.   I want to ask you a couple of
21  questions.  First is in paragraph 1 on the
22  front page.
23        You see where I'm at?
24    A.   Yep.

Page 309

1    Q.   It states that it's to determine
2  whether to enter into a mutually
3  attractive business arrangement.
4        Did I read that correctly?
5    A.   I see it.
6    Q.   What does that mean?  What was
7  the mutually attractive business
8  arrangement that you were trying to decide
9  whether to enter into with Ethicon?
10        MS. GERSTEL:  Object to form.
11    A.   This is 2004.  So this may have
12  been when I wanted to propose to them the
13  slim modification of the TVT.  So I was
14  disclosing some personal information that
15  I didn't have intellectual property on,
16  but I had drawings.  I had writings.  I
17  had sealed documentation that I had come
18  up with this idea.
19        So, I don't know for sure, but I
20  think that this is a scenario to sit down
21  and talk about an idea that I had.  And,
22  you know, usually in this situation, if a
23  company likes your idea, then they
24  purchase it from you and there's a

Lawrence Lind, M.D.

Page 310

1 business arrangement made. I've never had
2 one of those arrangements, but I'm
3 extrapolating. I can't say for certain
4 that's what we were doing here. But this
5 sounds like a scenario where I'm
6 presenting them with an idea and they're
7 going to decide whether there's something
8 mutually agreeable that would come out of
9 this.
10      MS. GERSTEL: I'm just going to
11      place a late objection that that -- I
12      believe that that's a
13      mischaracterization of the document
14      and the agreement.
15 BY MR. DeGREEFF:
16   Q.   So, would you have been asking
17 them to partner up on your idea? Is that
18 kind of what you were doing?
19      MS. GERSTEL: Object to the
20      form.
21   A.   Well, when you have an idea, you
22 want to present it. And I'm not in a
23 position to take a idea and make it into a
24 sling. So you go to a reputable company

Page 311

1 that's right now the leader in sling
2 products, and you bring your idea to them
3 to see whether they like it.
4      So, partner up, you could call
5 it partner up or you could call it a
6 routine scenario where someone with an
7 idea brings an idea to a company and if
8 it's deemed valuable, there's a business
9 arrangement made to purchase the
10 intellectual property and there's a
11 financial arrangement made with them.
12   Q.   Well, if they're the leader
13 currently, then why didn't you go to them
14 with your current device? Why did you go
15 to BSC and Caldera instead?
16   A.   Because my relationships with
17 them are more current.
18   Q.   It states: The parties further
19 agree not to disclose the relationship
20 between the parties or the existence of
21 this agreement to any third party without
22 the consent of the other.
23      And there's a three-year
24 effective date on that.

Page 312

1      Did I read that correctly?
2   A.   Yeah.
3   Q.   So, you weren't even, under this
4 secrecy agreement, you weren't even
5 allowed to disclose that you had a
6 relationship with Ethicon.
7      Is that what this says?
8   A.   It says that I would have to
9 tell them if I was telling someone else.
10   Q.   So, when you were offering your
11 patients the TVT sling devices, did you
12 disclose to them that you had a consulting
13 relationship with Ethicon and several
14 other sling manufacturers?
15   A.   I did and I do.
16   Q.   Did this prohibit you from doing
17 that?
18      MS. GERSTEL: Object to the
19      form.
20   A.   No.
21   Q.   Why do you disclose your
22 consulting relationship with Ethicon and
23 other sling manufacturers to your
24 patients?

Page 313

1   A.   Because I want to make sure I
2 have a discussion that lets them know I
3 work towards betterment and improvement of
4 these products all the time. That means I
5 work with the companies. And there are
6 payments made sometimes for that
7 consulting work, and I don't want them to
8 discover that and feel that I hid
9 something that they would think was, you
10 know, financial motivation. I tell them
11 the relationship. I tell them why I use
12 the product, and I tell them why I'm
13 working with them.
14   Q.   Okay.
15   A.   Seems like the responsible thing
16 to do.
17   Q.   Right.
18      Because being paid by somebody
19 can create a bias towards using a product.
20      Right?
21   A.   Correct.
22      MR. DeGREEFF: I'm going to mark
23      for you Deposition Exhibit 13.
24      (Lind Exhibit 13, e-mail chain

Lawrence Lind, M.D.

1   ending June 15, 2004, Bates No.
2   ETH.MESH.11003781 to 11003783, was
3   marked for identification, as of this
4   date.)
5   BY MR. DeGREEFF:
6   Q.   So, I have handed you what
7   appears to be an exchange, an e-mail
8   exchange from it's the June of 2004 date
9   range.
10        Does that look accurate?
11   A.   This is 2004 communications,
12   right.
13   Q.   And if you look at the initial
14   two e-mails on the chain, meaning the
15   earliest in time, you are a recipient on,
16   I guess two of the three earliest you're a
17   recipient on those e-mails.
18        Correct?
19   A.   Please find the attached signed
20   contract for your Gynemesh procedure
21   videos.  The original and copies have been
22   sent to Jeff Kraut by the courier.
23        I see that.
24   Q.   And if you look the "to" line,

1   this e-mail was sent to you.
2        Correct?
3   A.   Which line?
4        Yes.
5   Q.   And who is Giselle Bonet?
6   A.   I don't recall.
7   Q.   And the subject line of this
8   exchange is called "Procedure Videos
9   Signed Contract."
10        Did I read that correctly?
11   A.   Yep.
12   Q.   I mean, did you do some form of
13   a video for Ethicon?
14   A.   I don't think I did a
15   beginning-to-end video.  I think perhaps
16   maybe in a lab they were filming some
17   steps of anatomic passage of something.
18        I -- I don't -- I cannot recall
19   a video that's got my name on it or in the
20   credits that the video maker of one of
21   these sling videos.
22        I think that sometimes when you
23   go to their labs and you work on stuff,
24   they ask you to sign permissions, or if,

1   you know, maneuvers you've done or -- or
2   anatomy you've shown might be used for
3   videos, and this might be like a little
4   segment video permission.
5        But I do not recall a video with
6   my name on it that I made for -- you know,
7   beginning to end for Ethicon.
8   Q.   Well, if you look a little
9   further up in the chain on the same page,
10   there's an e-mail to you that says:
11   Larry.
12        That's you, right?
13   A.   Yeah.
14   Q.   (Reading) Would like to process
15   this payment in June.  Need paperwork back
16   before 6/21.
17        Did I read that correctly?
18   A.   Yep.
19   Q.   So, were you paid to do this
20   video?
21   A.   I don't know what I was doing
22   there.  There's some -- I don't know -- I
23   don't know what this -- I don't know what
24   this is.

1   Q.   Okay.
2   A.   I really don't know what it is.
3   Q.   If you look on the next page,
4   there's an e-mail -- I mean on the front
5   page, I guess.  There's an e-mail to you
6   on June 11th from Marianne Kaminski with
7   Ethicon stating:  We have the signed
8   contract.  We will process the payments.
9        Did I read that correctly?
10   A.   Okay.
11   Q.   So, appears you were paid for
12   doing a Gynecare -- excuse me.  A Gynemesh
13   procedure video.
14        Right?
15   A.   There's something I was doing
16   that was either used as part of a video or
17   participated in making a video.  But as I
18   said, I don't recall.
19        As I've described it, it could
20   just be segments of something I did in a
21   lab that was filmed.
22        I don't believe that I made them
23   a video from beginning to end.  But I was
24   clearly, by this set of e-mails, paid for

Lawrence Lind, M.D.

Page 318

1  work I did that was used as or as part of
2  creating a video.
3      Q.   I really ask because I'm
4  wondering if I'm in the presence of a
5  movie star.  That's really where I was
6  going with that.  And if I could get an
7  autograph maybe later.
8      A.   Well.
9      Q.   All right.
10     A.   But I do look like a couple of
11 them.
12         MR. DeGREEFF:  Sir, I'll
13 happened you what I've marked as
14 Deposition Exhibit 14.
15         (Lind Exhibit 14, Q CDA Log,
16 Bates No. ETH.MESH.15359953 to
17 15359976, was marked for
18 identification, as of this date.)
19 BY MR. DeGREEFF:
20     Q.   This is titled "Q CDA log."
21         Have you ever seen this before?
22     A.   May have.
23     Q.   If you look on page 11, the
24 Bates number at the bottom of it has a

Page 319

1  last three of '963.
2      A.   Are they numbered?
3      Q.   Down here (indicating).  The
4  Bates number ends in '963.  That's called
5  a Bates number.
6      A.   Okay.
7      Q.   If you look at the second column
8  over, it says:  With whom.
9      A.   Got it.
10     Q.   And then one, two, three, fourth
11 one down says:  Dr. Larry Lind.
12         I'm assuming that's you?
13     A.   Yes.
14     Q.   And that shows that there's a
15 topic next to it that says:  Evaluating
16 information for discussions regarding
17 device evaluations.
18         Do you know what that means?
19     A.   Sounds like I'm looking at their
20 devices and discussing it.
21     Q.   If you look at the column next
22 to that, it says "type" and "SA" is
23 written.
24         Do you know what that means?

Page 320

1      A.   Nope.
2      Q.   Does it mean secrecy agreement?
3         MS. GERSTEL:  Objection.
4      A.   I don't know.
5      Q.   Then there's a column further
6  over that has a term that says "term" and
7  it says "3."
8         Do you see that?
9      A.   Yep.
10     Q.   And it shows date and years
11 columns that says 12/19/2009 to
12 12/20/2012.
13         Do you see that?
14     A.   Yep.
15     Q.   So, were you under some form of
16 an agreement with them from 12/19 of 2009
17 to 12/20 of 2012?
18     A.   Looks like they have a contract.
19 I don't know if this CDA log is accurate.
20 I'd like to see that contract.
21         I can certainly tell you between
22 those years, I do not have a lot of
23 activity with them.  That's for sure.
24     Q.   If you look at the originator

Page 321

1  column, who is V. Zaddem?
2      A.   I don't know what her position
3  is now.
4         I recall her name.
5      Q.   Is it an Ethicon employee?
6      A.   I assume it was someone
7  organizing or handling the contract, but I
8  don't know who it is.
9      Q.   Do you know who Pete DeCosta is?
10     A.   I do not.
11     Q.   During this three years --
12         MR. DeGREEFF:  Strike that.
13     Q.   Do you have any idea how much
14 you were being paid under this three years
15 of contracts?
16     A.   I think there were very few
17 events.  I was usually paid in the same
18 amount by them.
19     Q.   The person below you on this
20 list is Dr. Elizabeth Kavaler.
21         Do you know her?
22     A.   Yes.
23     Q.   How do you know her?
24     A.   She was a urologist in

Lawrence Lind, M.D.

Page 322

1  Manhattan.  So we -- I get some of her
2  patients, she gets some of mine, and when
3  we do this Pelvic Floor Society meeting in
4  the city, she sometimes attends.  I think
5  she was -- I think she was at the Prosima
6  lab that I did with them in this time
7  period, and I think that was probably the
8  only thing that I did with them in this
9  time period.  I'm guessing, but I remember
10  I wasn't doing a lot.  And they really
11  wanted me to look at this Prosima.
12      Q.   Are you aware that she's also a
13  witness for Ethicon in the transvaginal
14  mesh litigations?
15      A.   Yes.
16      Q.   And you're aware that she was
17  also a consultant for Ethicon prior to
18  becoming an expert witness?
19      A.   Yes.
20      Q.   Are you aware of any expert
21  witness for Ethicon in this litigation
22  that was not a paid consultant first?
23          MS. GERSTEL:  Objection.
24      A.   I don't have an answer to that.

Page 323

1      Q.   Then if you look a couple pages
2  later where it says '965 as the last three
3  of the Bates number.
4      A.   Okay.
5      Q.   There's another in the column
6  that says with whom, if you go four down,
7  it says "Lawrence Lind."
8          I'm assuming that's also you?
9      A.   I see it.
10      Q.   And the column that says "topic"
11  says:  Provide consulting services to
12  Ethicon on behalf of Ethicon.
13          Did I read that correctly?
14      A.   I see it.
15      Q.   It looks like you were under a
16  master consulting agreement from 8/31 of
17  2010 to 12/31 of 2011.
18      A.   I see it.
19      Q.   Does it sound accurate?
20      A.   Yes.
21      Q.   What did you do for Ethicon as
22  part of the consulting services from 2010
23  to 2011?
24      A.   I don't recall.

Page 324

1      Q.   So, this was a second agreement
2  with Ethicon that was covering the years
3  2010 to 2011.
4          Right?
5          We just looked at another one.
6      A.   Those are the dates.
7      Q.   So, during that time period, you
8  had multiple agreements with Ethicon?
9      A.   It looks like I had these two.
10          MR. DeGREEFF:  Sir, I'm handing
11  you what I've marked as Deposition
12  Exhibit 15.
13          (Lind Exhibit 15, e-mail chain
14  ending October 1, 2010, Bates No.
15  ETH.MESH.03642725 to 03642726, was
16  marked for identification, as of this
17  date.)
18  BY MR. DeGREEFF:
19      Q.   Sir, I acknowledge that you are
20  not on this document.  And really what I
21  want to ask you is there's a discussion
22  here about you, about your contract, in
23  which some employees of Ethicon state
24  they're going to look to terminate the

Page 325

1  marketing contract with you.
2          Do you see where I'm at on that?
3      A.   Looking to terminate it.
4      Q.   Yes.
5      A.   Okay.
6      Q.   Do you see where I'm at?
7      A.   Yep.
8      Q.   And it looks like the reason,
9  based on the e-mail above that, the reason
10  that they wanted to terminate the
11  marketing contract is because you had
12  signed an R&D agreement under which you
13  were going to get a different rate.
14          Right?
15      A.   I wasn't aware as of this date
16  that I had a marketing agreement.  My
17  understanding was always as consulting
18  services for education and research and
19  development.  So I would need to see the
20  marketing agreement.  I haven't seen
21  anything that we've looked at today that
22  says marketing.
23          I do see here that they seem to
24  feel that I had one and that they want to

Lawrence Lind, M.D.

Page 326

1  change it.
2      Q.   Why do you think they considered
3  you to have a marking contract?
4          What kind of marketing were you
5  doing for them?
6          MS. GERSTEL:  Objection.
7      A.   I wasn't.
8      Q.   Were you giving lectures for
9  them?
10     A.   In labs I would teach the
11 surgery and give educational lectures.  I
12 consider that education.  If you consider
13 it marketing at the same time, that's a --
14 I don't know if that's a legal term or a
15 judgment call of what you're doing, but I
16 was educating.
17     Q.   In 2010, you were, based on this
18 e-mail, you were also consulting for
19 Boston Scientific.
20         Right?
21     A.   Yes.
22     Q.   And you were wanting to craft
23 the language of your consulting --
24         MR. DeGREEFF:  Strike that.

Page 327

1      Q.   You were wanting to craft the
2  language of your R&D agreement with
3  Ethicon to avoid any conflict to what you
4  were doing for Boston Scientific.
5          Is that something you remember?
6          MS. GERSTEL:  Objection.
7      A.   Yes.  The contract said I
8  couldn't work with anyone else on slings
9  or incontinence materials, but I was
10 already doing that with Boston Scientific.
11 So I asked them to restrict the scope to
12 repair a prolapse.
13     Q.   And if you look on the earliest
14 e-mail on this exhibit, it says:  There's
15 a master consulting agreement for Dr.
16 Lind.
17         And it says:  The contract term
18 is one year beginning 2/25/10 and ending
19 2/25/11.
20         Did I read that correctly?
21     A.   Yep.
22     Q.   So that would be a third
23 contract during that same time period.
24         Right?

Page 328

1      A.   That's what the e-mail says.
2          I haven't seen any contracts.
3          MR. DeGREEFF:  Sir, I'm going to
4  hand you what I've marked as
5  Deposition Exhibit 16.
6          (Lind Exhibit 16, e-mail chain
7  ending April 28, 2010, Bates No.
8  ETH.MESH.02033638 to 02033639, was
9  marked for identification, as of this
10 date.)
11 BY MR. DeGREEFF:
12     Q.   This again, this is an e-mail
13 about an edit you were requesting to a
14 contract in April of 2010.
15         Right?
16     A.   Yep.
17     Q.   If you look at this first
18 e-mail, the longer one, it says:  I found
19 Dr. Lind has existing contacts with ProfEd
20 and marketing activities for product
21 evaluation, written materials, market
22 reviews, advisory boards and company
23 sponsored speaker programs at a rate of
24 $1500 a day.

Page 329

1          Did I read that correctly?
2      A.   Mm-hm.
3      Q.   Company sponsored speaking
4  programs, were you speaking on behalf of
5  the company, of Ethicon?
6      A.   Only at labs.
7      Q.   At labs?
8      A.   Yes.
9      Q.   And again, they're considering
10 you to have a contract for marketing
11 activities.
12         Right?
13     A.   It does indicate that.  I do not
14 recall ever working on marketing.
15     Q.   Certainly it appears that
16 Ethicon believed that they had a marketing
17 contract with you.
18         Right?
19         MS. GERSTEL:  Objection.
20     A.   I think what happened is we got
21 involved in a time frame where companies
22 and hospitals and doctors started
23 recognizing compliance, and so that
24 wording had to be very specific.  So, they

Lawrence Lind, M.D.

Page 330

1 might have had stuff in the previous
2 agreements that had to do with marketing,
3 et cetera, et cetera, which is consulting
4 that I do not do. I only do work with the
5 R&D people. In fact, I don't interact
6 with the marketing people. It's part of
7 the rules.
8         So this is, I think, something
9 to get the accounting and compliance in
10 order that my role is for R&D, which is
11 what it always was.
12     Q.    Whatever the case may be, we
13 looked at multiple e-mails now where
14 Ethicon refers to one of their contracts
15 with you as a marketing contract.
16         Right?
17         MS. GERSTEL: Objection.
18     A.    I think those referrals to my
19 contracts and my role in there are wrongly
20 described.
21     Q.    Regardless, that is the
22 terminology Ethicon is using, right?
23     A.    And I am challenging it.
24     Q.    Then if you look at down below

Page 331

1 there's an asterisk that says: These
2 activities are unique to Dr. Lind because
3 he uses competitor devices regularly.
4         Did I read that correctly?
5     A.    Yes.
6     Q.    And as we discussed earlier, you
7 use primarily the Caldera device
8 currently.
9         Right?
10     A.    Currently.
11         At the time of this contract, I
12 think they were more interested in the
13 cadaver lab projects I did with Boston
14 Scientific.
15     Q.    Gotcha.
16         So, this says: Here is what I
17 recently learned from Scott Jones in
18 marketing.
19         Do you know Scott Jones?
20     A.    No.
21     Q.    It says: In 2009, the doctor
22 agreed to $1500 a day for Ad Board work,
23 which was the rate all participants
24 received for that event.

Page 332

1         Did I read that correctly?
2     A.    Everything you're reading you're
3 reading correctly.
4     Q.    So, were you being paid $1500 a
5 day for advisory board work?
6     A.    That's what it says.
7     Q.    And what does that advisory
8 board work mean?
9     A.    You come and look at products.
10 You may be in a lab working on
11 development, discussing the products in
12 the setting of a cadaver lab. You may be
13 sitting around a table with other experts
14 holding mesh, feeling mesh, holding
15 devices, giving feedback as to what works,
16 what doesn't work, which directions can
17 they go.
18     Q.    And then the last sentence on
19 this page leading to the next page says:
20 Over the past weekend, doctor made a
21 comment to one of our associates that he
22 was angered that he had signed at such a
23 low rate. Especially since he is
24 compensated by our competitors at $3,000 a

Page 333

1 day for working with R&D.
2         Did I read that correctly?
3     A.    Yes.
4     Q.    So, you were upset that you were
5 only getting paid $1500 a day by Ethicon
6 when your competitors were paying you
7 $3,000 a day.
8         Right?
9         MS. GERSTEL: Objection.
10     A.    I see the facts that are on this
11 sheet.
12     Q.    Is that your recollection?
13     A.    I don't have independent
14 recollection.
15     Q.    Do you have any reason to
16 dispute this?
17     A.    Not really.
18     Q.    And what competitors were paying
19 you $3,000 a day in 2009 and 2010?
20     A.    Probably Boston Scientific.
21     Q.    It also says: Also, this
22 surgeon has tried our pelvic floor
23 products many times, but he prefers to use
24 our competitors' products.

Lawrence Lind, M.D.

Page 334

1      Did I read that correctly?
2   A.   Yes.
3   Q.   And then they go on to say:
4   What I found out is that ProfEd - I guess
5   professional education - and marketing
6   used to use Dr. Lind heavily as a KOL
7   similar to how Dr. Vincent Lucente is
8   consulted currently.  However, they do not
9   anticipate his services as specified in
10  his existing contracts because he does not
11  use Ethicon's PFR kits.
12     Did I read that correctly?
13  A.   Yep.
14  Q.   Do you know what a KOL is?
15  A.   Key opinion leader.
16  Q.   Were you a key opinion leader
17  for Ethicon?
18  A.   I was a consultant.  If they
19  called me that, they chose to call me
20  that.
21     It wasn't a badge you earned.
22  Q.   Do you disagree that you were a
23  key opinion leader for Ethicon?
24  A.   I think at times they thought I

Page 335

1   was and at times they thought I wasn't.
2   When I came to them with the slim sling
3   design, they told me to get lost, so.
4   Q.   Okay.
5   A.   My opinions weren't very
6   well-respected or received then.
7   Q.   So you were a key opinion leader
8   for Ethicon when you were agreeing with
9   them.
10     Is that what you're saying?
11     MS. GERSTEL:  Objection.
12  A.   I don't have an answer for that.
13  Q.   And it seems here that
14  professional education and marketing were
15  using you heavily.
16     Correct?
17  A.   That's what it reads.
18  Q.   Who is Dr. Vincent Lucente?
19  A.   He's a urogynecologist in
20  Pennsylvania.
21  Q.   Was he a key opinion leader for
22  Ethicon?
23     MS. GERSTEL:  Objection.
24  A.   I guess he was.

Page 336

1      THE WITNESS:  I'm sorry.  I know
2   time is getting tight.  I'm going to
3   use the restroom.
4      MS. GERSTEL:  Okay.
5      (Recess taken.)
6      (Lind Exhibit 17, e-mail chain
7   ending May 10, 2010, Bates No.
8   HMESH_ETH_03111719, was marked for
9   identification, as of this date.)
10  BY MR. DeGREEFF:
11  Q.   Sir, I've just handed you what
12  I've marked Deposition Exhibit 17.
13     Do you see that?
14  A.   Yep.
15  Q.   This is some e-mail exchanges
16  from April of 2010.
17     Correct?
18  A.   These are e-mails from 2010,
19  yes.
20  Q.   And the first e-mail on the
21  chain is an e-mail that you sent to
22  Vincenza Zaddem.
23     Right?
24  A.   I reviewed the contract.

Page 337

1   Q.   If you just look at the to/from
2   line and the e-mail.
3   A.   Yeah.  I see the one with me to
4   Zaddem, yes.
5   Q.   And who is Zaddem?
6   A.   I don't know.
7   Q.   Really my only question is if
8   you look at that, you say:  I reviewed the
9   contract.
10     Correct?
11  A.   Yes.
12  Q.   And then under item 17, the
13  paragraph that starts with the words "item
14  17," the last sentence is:  The value of
15  the contract does not justify exclusive
16  services.
17     Did I read that correctly?
18  A.   Yes.
19  Q.   What was the value of this
20  contract?
21     MS. GERSTEL:  Objection.
22  A.   The value of the contract had
23  standard terms of just hourly rate for --
24  for work done.  It entire set -- this

Lawrence Lind, M.D.

Page 338

1 entire conversation is about what we were
2 eluding to before insofar as I do
3 consulting with other companies on
4 incontinence and prolapse. The way that
5 they had the contract written, I wouldn't
6 be able to work with anyone else on
7 incontinence and prolapse. So what I was
8 telling them was that you need to, as you
9 have in the previous one where it says the
10 contract must be limited to anchoring
11 devices for prolapse, something specific
12 that we're working on that makes it
13 specific to what I'm doing for Ethicon,
14 because I couldn't sign the contract
15 because it made it so I couldn't work with
16 anyone else. It wasn't like I was being
17 offered $40,000 or some big sum to have an
18 exclusivity arrangement.
19      What I meant by exclusive
20 services meaning exclusive of other
21 companies. That's just a standard
22 contract. Didn't work.
23      So, you know, I remember this
24 freshly now.

Page 339

1      We went back and forth, back and
2 forth. And they said, Everyone just signs
3 these. I said, Well, maybe everyone
4 doesn't read it. If your contract says I
5 can't work with anyone else, then I won't
6 work with anyone else. So if you want me
7 to look at these anchoring devices, which
8 is what they wanted me to do, then make
9 the language for the anchoring device, but
10 don't make it to cover that you can't work
11 on anyone else for anything else that you
12 do.
13      So really it was just the
14 wording of their contract meant that I
15 could work with anyone on incontinence and
16 prolapse, and I was asking them to make a
17 contract that was just specific to what
18 they wanted me to look at, which was an
19 anchoring device.
20   Q.   And these amounts you're being
21 paid for consulting work, that's above and
22 beyond what you're being paid as a
23 physician.
24      True?

Page 340

1   A.   Yes. With the only
2 clarification to make when we went to
3 the -- when we were doing the study, the
4 study payments are a hundred percent paid
5 to the hospital research fund, and there's
6 no compensation part out of that for me.
7   Q.   Okay.
8      And what amount would have
9 justified exclusivity?
10   A.   I actually -- it's -- I wouldn't
11 do that. I think with -- you've just gone
12 through a whole bunch of papers showing
13 that I've worked with a lot of different
14 companies on consulting arrangements, and
15 what I'll tell you is that when I have an
16 idea and I find the person I can work with
17 on it, I go there. So it's not a matter
18 of trying to just make money off of
19 everyone. There's different opportunities
20 at different times with different
21 companies are ready for different ideas.
22      So -- so, I never considered an
23 exclusive agreement with anyone, which is
24 why I contested the wording in the

Page 341

1 contract.
2   Q.   Everything we've gone through, I
3 mean, you've been paid over half a million
4 dollars as on behalf of the transvaginal
5 mesh world, if you will.
6      Right?
7      MS. GERSTEL: Objection.
8 BY MR. DeGREEFF:
9   Q.   The manufacturers?
10      MS. GERSTEL: Objection.
11      MR. DeGREEFF: Strike that.
12 I'll reword that.
13   Q.   Based on everything we've been
14 through, you've been paid over a half
15 million dollars by transvaginal mesh
16 manufacturers.
17      True?
18      MS. GERSTEL: Objection.
19   A.   I don't know if that's accurate.
20 It's definitely in the hundreds of
21 thousands. I don't know how many it is.
22 I would have to be -- I don't know how
23 many occasions I saw each of these
24 Gynecare contracts. I don't have the

Lawrence Lind, M.D.

Page 342

1  listed payments for.  There's a lot of
2  years of contracts, and I'm not sure how
3  frequent those were.
4      Q.   Well, when you add in what
5  you've been paid as an expert witness,
6  it's pretty clear you've been paid over a
7  half million dollars by the transvaginal
8  mesh industry.
9      Right?
10     MS. GERSTEL:  Objection.
11     A.   You may have been adding those.
12 Somewhere between 300 and 600 I would
13 agree with somewhere in there.  I just
14 don't want to agree to a number that I
15 haven't quantified with a little more
16 conviction.
17     MR. DeGREEFF:  I've handed you
18     what's been marked as Deposition
19     Exhibit 18.
20     (Lind Exhibit 18, Master
21     Consulting Agreement between Lawrence
22     Lind and Ethicon, Inc. Dated July 10,
23     2010, Bates No. ETH.MESH.06216861 to
24     06216869, was marked for

Page 343

1      identification, as of this date.)
2  BY MR. DeGREEFF:
3      Q.   Sir, do you see that this is a
4  master consulting agreement between you
5  and Ethicon?
6      A.   Right.
7      Q.   And it's dated July 10th --
8  well, it says it commences July 10th of
9  2010 and continues through December 31st
10 of 2011?
11     A.   Right.
12     Q.   My question is if you look at
13 where it's Bates numbered '868 at the
14 bottom.
15     A.   Okay.
16     Q.   This talks about the fact that
17 you're being retained, the box where it
18 says yes, you're being retained at a rate
19 of $437.50 per hour.
20     Correct?
21     A.   That's what it says.
22     Q.   And it lays out the description
23 of your services and the fact that it will
24 be an estimate of 120 hours of work

Page 344

1  maximum over the life of this contract?
2      A.   That's what it says.
3      Q.   And that's the estimate,
4  obviously.
5      A.   Yes.
6      Q.   And then it says:  The parties
7  agree that compensation paid to consultant
8  shall not exceed $52,500 per contract
9  term.
10     A.   Right.
11     Q.   Did I read that correctly?
12     A.   Yes.
13     Q.   And the contract term was a
14 little over a year.
15     Is that right?
16     A.   Yes.
17     Q.   Were you paid this full $52,500?
18     A.   I would strongly doubt that in
19 2010.
20     Q.   If you could look at the next
21 page.  I guess they were authorizing you
22 to be paid 52,500 for the year under this
23 contract.
24     Right?

Page 345

1      A.   They were offering that to be a
2  max based on the hourly fee.
3      Q.   If you look at Exhibit B, this
4  is titled "Conflict of Interest
5  Certification"?
6      A.   Yeah.
7      Q.   And it states, and this is
8  supposed to be from you.
9      Correct?
10     MR. DeGREEFF:  Let's do this.
11 This one is unsigned.  So let's give
12 you this one.
13     Sir, I'm going to hand you
14 what's been marked as Deposition
15 Exhibit 19.
16     (Lind Exhibit 19, Master
17 Consulting Agreement between Lawrence
18 Lind and Ethicon, Inc. Dated August
19 31, 2010, Bates No. ETH.MESH.02030557
20 to 02030566, was marked for
21 identification, as of this date.)
22 BY MR. DeGREEFF:
23     Q.   Deposition Exhibit 19 is another
24 master consulting agreement between you

Lawrence Lind, M.D.

Page 346

1  and Ethicon.
2      Correct?
3   A.  Right.
4   Q.  And it's dated -- it says it
5  commences August 31st of 2010 and
6  continues through December 31st of 2011.
7      Right?
8   A.  Yeah.  This is kind of confusing
9  that they have like fresh contracts every
10  month.
11      But be that as it may.
12  Q.  Right.
13      And this contract is signed by
14  you.
15      Correct?  Bates number '562.
16  A.  Yes.
17  Q.  Then if you look at Bates number
18  '564, this has the same language about
19  payment to you.
20      Correct?
21      MS. GERSTEL:  Objection.
22  A.  Right.
23  Q.  Again you're being paid $437.50
24  an hour?

Page 347

1   A.  Yep.
2   Q.  And you've got another maximum
3  cap of $52,500 per contract term?
4   A.  Correct.
5   Q.  Again, that contract term is a
6  little over a year?
7   A.  Okay.
8   Q.  Is that correct?
9   A.  Yes.
10  Q.  Then if you look at the next
11  page, it's got an Exhibit B titled
12  "Conflict of Interest Certification."
13      Correct?
14  A.  Right.
15  Q.  And that is signed by you?
16  A.  Yes.
17  Q.  And that includes language that
18  states:  In assuming contractual
19  obligations to Ethicon Inc., the
20  undersigned health care professional.
21      That's you, right?
22  A.  Yes.
23  Q.  (Reading) Agrees that financial
24  ties between the health care professional

Page 348

1  and industry may create conflicts of
2  interest, both real and perceived.
3      Did I read that correctly?
4   A.  Yes.
5   Q.  This is essentially Ethicon
6  acknowledging that payments to physicians,
7  such as --
8      MR. DeGREEFF:  Strike that.
9   Q.  This is Ethicon acknowledging
10  that payments to physicians can create
11  conflicts of interest.
12      Right?
13      MS. GERSTEL:  Objection.
14  A.  Got it.
15  Q.  Is that correct?
16      MS. GERSTEL:  Objection.
17  A.  Which sentence are you reading
18  again?
19  Q.  Where it states:  The
20  undersigned health care professional
21  agrees that financial ties between the
22  health care professional and industry may
23  create conflicts of interest, both real
24  and perceived.

Page 349

1   A.  Okay.  I agree.  I agree that's
2  what it says.
3   Q.  And is this essentially Ethicon
4  acknowledging that payments to physicians
5  can create conflicts of interest?
6      MS. GERSTEL:  Objection.
7   A.  That they may create conflicts
8  of interest, yes.
9   Q.  We just talked about you've been
10  paid between 300 and 600,000 by the
11  transvaginal mesh industry.
12      Right?
13      MS. GERSTEL:  Objection.
14  A.  By estimates, it seems it would
15  be in that range.
16  Q.  And you've been a consultant for
17  four transvaginal mesh companies.
18      Right?
19  A.  Yes.
20  Q.  You've been a consultant for
21  Ethicon.
22      Right?  True?
23  A.  Yes.
24  Q.  Caldera?

Lawrence Lind, M.D.

Page 350

1    A.    Yes.
2    Q.    Boston Scientific?
3    A.    Yes.
4    Q.    AMS?
5    A.    Yes.
6    Q.    And you've been referred to as a
7  key opinion leader for Ethicon products by
8  internal Ethicon employees.
9        Right?
10   A.    Yes.
11   Q.    And you've been referred to as
12 having a marketing contract with Ethicon
13 by Ethicon employees.
14       Right?
15   A.    Referred to, yes.
16   Q.    And we've looked at multiple
17 consulting agreements that you've signed
18 with Ethicon.
19       True?
20   A.    Yes.
21   Q.    And you've signed a conflict of
22 interest statement from Ethicon based on
23 the fact that payments to health care
24 providers can create conflicts of

Page 351

1  interest, both real and perceived.
2        Right?
3    A.    Correct.
4    Q.    Despite all of that, you were
5  ultimately hired by Ethicon to act as a
6  expert in this litigation.
7        Right?
8        MS. GERSTEL:  Objection.
9    A.    I'm not sure why it's despite
10 this.  But I was hired by Ethicon to be in
11 this role that I am now.
12       I'm not sure how your one thing
13 with the word "despite," I'm not sure how
14 that fits into the question.
15   Q.    You've now been hired by Ethicon
16 to serve as an expert in this transvaginal
17 mesh litigation.
18       Right?
19   A.    Yes.
20   Q.    And do you have any understanding
21 of why Ethicon did not get a physician who
22 did not have a consulting agreement with
23 prior to hiring them as an expert witness
24 in the litigation?

Page 352

1        MS. GERSTEL:  Objection; lack of
2  foundation.
3    A.    I would be conjecturing.  I
4  don't have factual knowledge.
5        Is there a question on this?
6    Q.    We had several questions on it.
7    A.    Okay.
8        MR. DeGREEFF:  Last I want to
9  show you Deposition Exhibit 20.  I so
10 marked that.
11       (Lind Exhibit 20, EWHU HCP
12 Cognos report run 11/17/10, was marked
13 for identification, as of this date.)
14 BY MR. DeGREEFF:
15   Q.    If you look at the second page,
16 you'll find your name towards the bottom.
17   A.    Okay.
18   Q.    This shows two separate -- this
19 reflects the two separate contracts of
20 52,500.
21       Correct?
22   A.    Right.
23   Q.    For a total of 105,000?
24   A.    Right.

Page 353

1    Q.    So you had been authorized by
2  Ethicon for up to $105,000 of payment for
3  a little over a year.
4        Right?
5        MS. GERSTEL:  Objection.
6    A.    I think this is misleading.  The
7  maximal allowed in the contract was that
8  amount, and this reflects nothing in the
9  way of what I actually received.
10   Q.    That wasn't my question.
11       You were authorized by Ethicon
12 for up to $105,000 worth of payment in one
13 year.
14       Right?
15       MS. GERSTEL:  Objection.
16   A.    If I worked $437 an hour to get
17 to $105,000.
18   Q.    Okay.
19       Or if they wanted pay you $3,000
20 to show up to a lecture.
21       Right?
22       MS. GERSTEL:  Objection.
23   A.    The contract had an hourly rate.
24   Q.    Okay.

Lawrence Lind, M.D.

Page 354

1   Why was there two different
2 agreements?  Did you use all of one of
3 them?
4       MS. GERSTEL:  Objection.
5   A.   It looks to me like on the first
6 one I hadn't signed the institutional
7 compliance that I -- that my working for
8 them did not violate institutional
9 compliance for doing consulting work.
10      So one of them had a signature
11 and one of them did not.  So I think they
12 sent a whole new contract to have me sign
13 that last page, is what I -- it looks like
14 to me from the two.
15  Q.   Why does this spreadsheet
16 reflect that you had two separate --
17      MS. GERSTEL:  Objection.
18  A.   Well, we looked at two separate
19 ones, and you'll see one of them the last
20 page is not signed and one of them the
21 page is signed.  So they made two
22 contracts for that amount.  I'm guessing
23 that the first one they considered to be
24 legally not binding because I didn't sign

Page 355

1 that required field, and they made another
2 one and it's showing up on here because
3 two contracts were drawn.
4       But it's -- it's line items on a
5 spreadsheet.  I can't account for them.  I
6 can -- I am 1,000 percent sure I didn't
7 come anywhere close to this kind of money
8 from 2010 on with Ethicon.
9   Q.   That assumption is based on --
10 what you just said requires us to assume
11 that we have received all of the documents
12 that we would need to show the signing of
13 that contract.
14      Correct?
15      MS. GERSTEL:  Objection.
16  A.   Yeah, I agree.  We don't right
17 now between us have the accounting
18 accurate payroll of what was paid.  But
19 just knowing what I was doing with time in
20 2010 onward, I feel fairly confident, but
21 I don't have your objective proof, that I
22 came nowhere near that, but I am very
23 confident of that.
24  Q.   Is there a single long-term

Page 356

1 randomized controlled trial specifically
2 addressing the TVT-O?
3   A.   TVT-O has in the range of 40 to
4 50 randomized trials.  I'd have to go
5 through them to figure out how far the
6 long-term is.
7   Q.   What about a single randomized
8 control trial specifically addressing the
9 TVT-O with safety as the primary endpoint?
10      MS. GERSTEL:  Objection.
11  A.   Safety is a primary endpoint in
12 many of the randomized controlled studies.
13 Whether they listed efficacy first and
14 safety as second, I would have to go
15 through each report, but safety was
16 reported in a very large number of them.
17      I will agree that in some of
18 them the adverse events data was not
19 accurately reported, which is why we rely
20 on Cochrane and excellent meta-analysis so
21 that they include studies that have the
22 data we need.
23  Q.   What is your definition of
24 primary endpoint?  Because I think it may

Page 357

1 be different than mine.
2   A.   Primary endpoint is the first
3 and -- first priority end point result
4 you're looking for in a study.
5   Q.   Right.
6       And you think there's a single
7 long-term randomized study out there with
8 safety as the primary endpoint on the
9 TVT-O product?
10  A.   I don't think it's as a primary
11 endpoint because it's pretty traditional
12 to do efficacy and then safety.  But a
13 second endpoint doesn't diminish its
14 value, statistical value.
15  Q.   So the answer to my question as
16 asked is "no."
17      Right?
18      MS. GERSTEL:  Objection.
19  A.   I would have to look through all
20 the randomized studies to do that.  I
21 don't know that offhand.
22      Certainly most of them don't
23 have it as the primary.
24  Q.   What about is there a single

Lawrence Lind, M.D.

Page 358

1 randomized controlled trial with safety as
2 the primary endpoint that specifically
3 addresses the TVT-Abbrevo?
4        MS. GERSTEL:  Objection.
5     A.   I think your primary endpoint is
6 a -- from the challenging the data on this
7 as a primary endpoint is on the verge of
8 incredible.
9        MR. DeGREEFF:  Okay.  I
10 appreciate your thoughts on that.  I
11 really do.  And I'll move to strike
12 it.  But I do want an answer to my
13 question.
14     A.   I would have to review each of
15 them to see which ones have primary
16 endpoints.  I don't know off the top of my
17 head if they have primary endpoints.  So I
18 don't know the answer to that question.
19     Q.   And then same question for
20 TVT-Exact.
21        Is there a single long-term
22 randomized controlled trial with safety as
23 the primary endpoint specifically
24 addressing the TVT-Exact?

Page 359

1     A.   That one I think I could tell
2 you is no.
3     Q.   Is there a single long-term
4 randomized controlled study with safety as
5 the primary endpoint that looks at the
6 TVT?
7        MS. GERSTEL:  Objection.
8     A.   I'd have to look at the -- each
9 randomized study.  I can't answer that off
10 the top of my head.
11     Q.   There's not one you could think
12 of?
13     A.   Not off the top of my head.
14     Q.   Ethicon has never done a study
15 with the primary endpoint was to determine
16 where or not laser-cut mesh is stiffer or
17 safer than mechanical-cut mesh.
18        Right?
19        MS. GERSTEL:  Objection.
20     A.   I seem to recall there being
21 some internal study of the laser-cut mesh.
22 I can't recall all the details on it, but
23 I think they did study the properties.  If
24 I recall, and again it's off the top of my

Page 360

1 head, I would have to find the document.
2 I think it was determined that they felt
3 it would not be a significant difference.
4     Q.   Are you talking about testing or
5 a study?
6        MS. GERSTEL:  Objection.
7     A.   Mechanical testing.
8     Q.   I'm talking about a study.
9        Ethicon's never done a study
10 where the primary endpoint is to determine
11 whether or not laser-cut mesh is stiffer
12 and less safe than mechanical-cut mesh.
13        Correct?
14        MS. GERSTEL:  Objection.
15     A.   A study in humans?
16        What type of study.
17     Q.   Any kind of study.
18     A.   Well, a lab is a study.
19     Q.   Well, lab's a benchtop, right?
20     A.   A study is when you investigate
21 to find answers.  It doesn't matter what
22 location it's in, whether it's a lab or in
23 a human.  It can be a study.
24     Q.   I think you and I define a study

Page 361

1 different.
2        You're talking about benchtop
3 testing.
4        Right?
5     A.   I'm talking about comparing
6 properties.  You compare one thing against
7 another is the definition of a study.
8     Q.   So anything that's ever done at
9 Ethicon is a study, even if they're just
10 doing it on a bench?
11        MS. GERSTEL:  Objection.
12     A.   Well, if we're just chatting
13 about the study, it's not a study.
14        If they have two products and
15 they're comparing how it behaves in
16 different circumstances, that's a study.
17     Q.   So, I guess can you answer my
18 question or not?
19        And my question is Ethicon has
20 never done a study where the primary
21 endpoint is to determine whether or not
22 laser-cut mesh is stiffer and less safe
23 than mechanical-cut mesh?
24        MS. GERSTEL:  Objection.

Lawrence Lind, M.D.

Page 362

BY MR. DeGREEFF:

1 BY MR. DeGREEFF:
2    Q.   True?
3       MS. GERSTEL:  Asked and
4    answered.
5    A.   If I'm recalling correctly, and
6 I cannot put my reputation on it, I think
7 the bench work study that they did looked
8 at stiffness, but they couldn't, by that
9 study, evaluate safety.
10    Q.   We talked earlier about the
11 Ethicon employees' e-mails about concerns
12 about the outcomes related to stiffness of
13 the mesh.
14       Right?
15       MS. GERSTEL:  Objection.
16    A.   We had that discussion, I do
17 recall.
18       MR. DeGREEFF:  I'm good.  We can
19 be done.
20       MS. GERSTEL:  I have like five
21 minutes.
22       Do you want to take a break, or
23 should I just start?
24       MR. DeGREEFF:  Go for it.

Page 363

1       MS. GERSTEL:  I know we're all
2    running on fumes.
3 EXAMINATION BY
4 MS. GERSTEL:
5    Q.   Dr. Lind, you were asked some
6 questions about the Advantage Fit Boston
7 Scientific sling that you had a role in
8 developing.
9       Is that correct?
10    A.   Yes.
11    Q.   Is it your opinion, despite that
12 role in developing the Advantage Fit
13 sling, that retropubic TVT is the gold
14 standard?
15       MR. DeGREEFF:  I'm going to
16 object to form.
17 BY MS. GERSTEL:
18    Q.   For surgical treatment of stress
19 urinary incontinence in women?
20    A.   Yes.
21    Q.   Did the vast majority of your
22 patients have excellent results with
23 retropubic TVT?
24       MR. DeGREEFF:  Object to form.

Page 364

1    A.   Yes.
2    Q.   And, doctor, you were asked some
3 questions regarding Abbrevo being a
4 shorter sling than TVT-O and TVT-Exact.
5       Do you recall that?
6    A.   Yes.
7    Q.   Is it correct that even though
8 Abbrevo is not as long as a TVT-Exact or a
9 TVT-O or a retropubic TVT that it is not a
10 mini sling?
11       MR. DeGREEFF:  Object to form.
12    A.   I agree with that.
13       MR. DeGREEFF:  You want to just
14 give me an ongoing objection to
15 leading?
16       MS. GERSTEL:  Yes.  Although I
17 disagree that was leading.
18       MR. DeGREEFF:  Well, you can't
19 testify for him.
20       MS. GERSTEL:  I'm not testifying
21 for him.
22       MR. DeGREEFF:  That's what
23 you're doing right now.
24       MS. GERSTEL:  I am not

Page 365

1 testifying for him.  I asked him --
2       MR. DeGREEFF:  I'll just keep
3 objecting.  That's fine.
4 BY MS. GERSTEL:
5    Q.   Doctor, you were asked some
6 questions regarding your own experience
7 and results treating patients with TVT-O,
8 TVT-Exact, and TVT-Abbrevo.
9       Is that correct?
10    A.   Yes.
11    Q.   Is your own experience with
12 TVT-O, TVT-Abbrevo, and TVT-Exact
13 consistent with what you have opined on as
14 to the safety and efficacy of those
15 products as based on the highest levels of
16 medical literature?
17       MR. DeGREEFF:  Object to form.
18    A.   Yes.
19    Q.   Doctor, you were asked some
20 questions about what you have and have not
21 reviewed --
22       MS. GERSTEL:  Strike that.
23    Q.   Doctor, you were asked some
24 questions regarding your supplemental

Lawrence Lind, M.D.

Page 366

1  materials list.
2       Correct?
3    A.   Yes.
4    Q.   And you were asked some
5  questions regarding which of the documents
6  on that list you had or had not reviewed.
7       Correct?
8    A.   Yes.
9    Q.   Doctor, is it true that you read
10 many, many medical articles and company
11 documents and depositions and other such
12 materials since you began your expert work
13 with Ethicon?
14      MR. DeGREEFF:  Object to form.
15   A.   Yes.
16   Q.   As you sit here today, is it
17 true that you may or may not recall
18 specific documents that you have reviewed
19 that are listed on your materials list?
20      MR. DeGREEFF:  Object to form.
21   A.   That's true.
22   Q.   And is that particularly true if
23 you weren't shown the document when asked
24 if you had or had not reviewed them?

Page 367

1       MR. DeGREEFF:  Object to form.
2    A.   Yes.
3    Q.   I think that this was adequately
4  covered by plaintiff's counsel's
5  questioning.
6       But, doctor, were you asked some
7  questions regarding whether you had --
8       MS. GERSTEL:  Well, strike that.
9    Q.   Doctor, earlier in this
10 deposition you testified regarding closer
11 analysis that you have done recently of
12 the Schimpf, Teo, and Okulu articles.
13      Is that correct?
14   A.   Yes.
15   Q.   After that closer analysis of
16 those articles, did your opinions as
17 expressed in your report that's been
18 marked as Exhibit 8, did your opinions
19 change as a result of that closer analysis
20 of those articles?
21   A.   It didn't.  It became
22 strengthened with regards to the safety
23 profile of the TVT-O.
24      MS. GERSTEL:  That's all I have.

Page 368

1       MR. DeGREEFF:  I just have two
2  questions.
3  FURTHER EXAMINATION BY
4  MR. DeGREEFF:
5    Q.   Which device did you agree with
6  counsel was the gold standard device?
7    A.   I would say the retropubic TVT
8  as well as the TVT-O.
9    Q.   Okay.
10      Why are you not using the gold
11 standard device?
12      MS. GERSTEL:  Objection.
13   A.   I do use the TVT-Exact, which I
14 consider to be the extremely similar
15 device with a modification that I like,
16 which is a narrower shaft.
17   Q.   You use it in one out of ten of
18 your patients?
19   A.   Right.
20   Q.   Why would you not use the gold
21 standard device in all of your patients?
22      MS. GERSTEL:  Objection.
23   A.   Because there was a -- there was
24 a decision at one point to bring on

Page 369

1  Caldera for financial reasons.  At that
2  point, we were asked to convert over to
3  that and see if it met our needs.  It met
4  my needs, and I like the flexibility, and
5  I started using it for good fraction of my
6  cases.
7    Q.   Are you breaching the standard
8  of care by not using the gold standard
9  device?
10      MS. GERSTEL:  Objection.
11   A.   I'm using an FDA-approved device
12 that I feel is excellent for its intended
13 purposes, and it's been performing well
14 for several years.
15   Q.   Yes or no, you are not using
16 what you just testified is the gold
17 standard device.
18      Correct?
19      MS. GERSTEL:  Objection.
20   A.   I'm using the TVT-Exact in
21 one-tenth of my cases, yes.
22   Q.   In 90 percent of your cases, you
23 are not using the device you have just
24 testified is the gold standard device.

Lawrence Lind, M.D.

Page 370

1     Right?
2         MS. GERSTEL: Objection.
3     A.    Correct.
4     Q.    You were asked by your counsel
5  if --
6         MR. DeGREEFF: Strike that. It
7     doesn't matter.
8         All right. I'm done.
9         MS. GERSTEL: I just have one
10    follow-up.
11 FURTHER EXAMINATION BY
12 MS. GERSTEL:
13    Q.    Doctor, this isn't a document
14 that we have marked as an exhibit in this
15 deposition, but are you familiar with the
16 AUGS SUFU position statement on
17 midurethral slings?
18        THE WITNESS: Actually, I need
19    it -- I think I answered incorrectly
20    on your last question.
21        MR. DeGREEFF: Well, we've got a
22    different question pending now. So if
23    your counsel wants to clear something
24    up with you, she can ask you a

Page 371

1    question.
2         THE WITNESS: It has to do with
3     the gold standard.
4         MS. GERSTEL: Go ahead.
5         MR. DeGREEFF: No, she can ask
6     you a question if she wants to ask you
7     something about it.
8  BY MS. GERSTEL:
9     Q.    Doctor, what were you going to
10 say?
11        MR. DeGREEFF: I'm going to
12    object to the form. That's open-ended
13    and allows for a narrative response.
14    A.    Well, the TVT by Ethicon has the
15 preponderance of the data. The
16 meta-analyses that go over all the slings
17 and all the data for slings certifies
18 polyester synthetic midurethral slings as
19 the gold standard of care. The
20 meta-analysis do not specify Gynecare TVT
21 as the standard of care.
22        So, Ford and Cochrane specify
23 that tapes that pass in the obturator
24 pathway and in the retropubic pathway, and

Page 372

1  then they give their -- they give their
2  affirmation and every authoritative agency
3  that's approving and ratifying midurethral
4  slings as the standard of care ratifies
5  midurethral slings.
6         So, it is -- while would
7  certainly agree that the largest amount of
8  data on midurethral slings comes from
9  Ethicon, the number of time and decades
10 and years and studies that have proven
11 that the results are similar make it a
12 midurethral sling and not necessarily a
13 Gynecare TVT midurethral sling which is
14 the standard of care.
15        So, in that regard, I continue
16 to use the standard of care.
17        MR. DeGREEFF: Okay. I'm going
18    to ask a follow-up question. I'll let
19    your counsel finish.
20        MS. GERSTEL: Okay.
21 BY MS. GERSTEL:
22    Q.    Doctor, I think you anticipated
23 what my question was going to be.
24        First, doctor, I believe that

Page 373

1  you just misspoke now when you said
2  "polyester."
3         Did you mean polypropylene?
4     A.    Yes.
5     Q.    And, doctor, I'll just re-ask
6  that question.
7         Are you familiar with the AUGS
8  SUFU position statement on mesh
9  midurethral slings?
10    A.    Yes.
11    Q.    And does that position statement
12 refer to polypropylene type 1 macroporous
13 mesh midurethral slings regardless of
14 route, transvaginally or retropubic, as
15 the gold standard in surgical treatment
16 for stress urinary incontinence in women?
17    A.    Yes, it does.
18    Q.    And do you agree with that
19 opinion?
20    A.    I do.
21        MS. GERSTEL: That's all I have.
22
23
24

Page 374

1   FURTHER EXAMINATION BY
2   MR. DeGREEFF:
3       Q.   Doctor, you are now withdrawing
4   your earlier statement that the TVT
5   products are the gold standard.
6           Correct?
7       MS. GERSTEL:  Objection.
8    A.   I would say based on the
9   meta-analysis, yes.
10      Q.   What your testimony is is that
11  you believe midurethral slings to be the
12  gold standard.
13          Right?
14   A.   Yes.
15      MR. DeGREEFF:  No further
16  questions.
17          (Deposition adjourned at
18  approximately 7:57 p.m.)
19
20
21
22
23
24

Page 375

1       A C K N O W L E D G M E N T
2
3   STATE OF          )
4                    :ss
5   COUNTY OF         )
6
7       I, LAWRENCE LIND, M.D., hereby
8   certify that I have read the transcript of
9   my testimony taken under oath in my
10  deposition of August 8, 2019; that the
11  transcript is a true and complete record
12  of my testimony, and that the answers on
13  the record as given by me are true and
14  correct.
15
16
17      _____
18          LAWRENCE LIND, M.D.
19  Signed and subscribed to before me this
20  _____ day of _____, 2019.
21
22  _____
23  Notary Public, State of
24

Page 376

1           E R R A T A
2   PAGE / LINE / CHANGE   /   REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Page 377

1         C E R T I F I C A T E
2   STATE OF NEW YORK
3   COUNTY OF NEW YORK
4
5       I, Marie Foley, RMR, CRR, a
6   Certified Realtime Reporter and Notary
7   Public within and for the State of New
8   York, do hereby certify:
9       THAT LAWRENCE LIND, M.D., the
10  witness whose deposition is hereinbefore
11  set forth, was duly sworn by me and that
12  such deposition is a true record of the
13  testimony given by the witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that I am
17  in no way interested in the outcome of
18  this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 16th day of
21  August, 2019.
22
23      _____
24          MARIE FOLEY, RMR, CRR

Lawrence Lind, M.D.

Page 378

1        LAWYER'S NOTES

2    PAGE / LINE

3    ____ ____ _____

4    ____ ____ _____

5    ____ ____ _____

6    ____ ____ _____

7    ____ ____ _____

8    ____ ____ _____

9    ____ ____ _____

10   ____ ____ _____

11   ____ ____ _____

12   ____ ____ _____

13   ____ ____ _____

14   ____ ____ _____

15   ____ ____ _____

16   ____ ____ _____

17   ____ ____ _____

18   ____ ____ _____

19   ____ ____ _____

20   ____ ____ _____

21   ____ ____ _____

22   ____ ____ _____

23   ____ ____ _____

24   ____ ____ _____