# EXHIBIT E

Lennox Hoyte, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF WEST VIRGINIA
 2                    CHARLESTON DIVISION
 3   IN RE: ETHICON, INC., PELVIC      Master File No.
     REPAIR SYSTEM PRODUCTS            2:12-MD-02327
 4   LIABILITY LITIGATION
                                       MDL NO. 2327
 5
                                       JOSEPH R. GOODWIN
 6   THIS DOCUMENT RELATES TO:         US DISTRICT JUDGE
     _____  _____
 7
     Theresa England v. Ethicon,
 8   Inc., et al.
     Case No. 2:15-cv-06967
 9
10                       - - -
11                  OCTOBER 22, 2019
12                       - - -
13
             Deposition of LENNOX HOYTE, MD, held at
14      Morgan & Morgan, PA, 20 North Orange Avenue, Suite
        1600, Orlando, Florida 32801, commencing at
15      11:57 a.m., on the above date, before Joan L. Pitt,
        Registered Merit Reporter, Certified Realtime
16      Reporter, and Florida Professional Reporter.
17                       - - -
18
19            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
20                 deps@golkow.com
21
22
23
24
```

Lennox Hoyte, M.D.

Page 2

1  APPEARANCES:
2
3  Counsel for the Plaintiff:
4    JOSEPH M. TARASKA, ESQUIRE
     Morgan & Morgan, PA
5    20 North Orange Avenue
     Orlando, Florida 32801-2414
6    407.420.1414
     jtaraska@forthepeople.com
7
8  Counsel for the Defendants:
9    DAVID B. THOMAS, ESQUIRE
     Thomas Combs & Spann PLLC
10   300 Summers Street, Suite 1380
     Charleston, West Virginia 25301
11   304.414.1807
     dthomas@tcspllc.com
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1             - - -
2           I N D E X
3             - - -
4  Testimony of:  LENNOX HOYTE, MD
5  DIRECT EXAMINATION BY MR. THOMAS          4
6  CROSS-EXAMINATION BY MR. TARASKA         74
7
8
9         E X H I B I T   I N D E X
10  HOYTE         DESCRIPTION         PAGE
11  No. 1  Curriculum Vitae of Lennox Hoyte, MD    4
12  No. 2  Billing Records re: Theresa England    6
13        dated 8/9/2019
14  No. 3  Expert Report of Dr. Lennox Hoyte      9
15
16
17
18
19
20
21
22
23
24

Page 4

1             - - -
2      THE COURT REPORTER:  Raise your right hand,
3  please.  Do you swear or affirm the testimony you
4  give will be the truth, the whole truth, and nothing
5  but the truth.
6      THE WITNESS:  I do.
7      THE COURT REPORTER:  Thank you.
8      LENNOX HOYTE, MD, called as a witness by the
9  Defendants, having been first duly sworn, testified as
10  follows:
11         DIRECT EXAMINATION
12  BY MR. THOMAS:
13   Q.  We're going to do three of these today, Doctor,
14  so if it seems awkward, we're going to do the same thing
15  we did last one, so bear with me.
16      State your name for the record, please?
17   A.  Lennox Hoyte.
18   Q.  And, Dr. Hoyte, we've just spent a couple hours
19  talking about another one of the plaintiffs in this
20  case, Ms. Ashbrook.  You're an expert witness also in
21  the case involving Theresa England?
22   A.  Correct.
23      (Hoyte Exhibit No. 1 was marked for
24  identification.)

Page 5

1  BY MR. THOMAS:
2   Q.  And just because these might go to different
3  places, I'll mark as Deposition Exhibit No. 1 your CV
4  that you provided to us.  Is that a complete CV?
5   A.  Yes.  It has my name spelled right.
6   Q.  Good.  I neglected to ask you this in the
7  Ashbrook deposition.  Will you update your CV now to
8  include that 2006 abstract?
9   A.  I'm going to add that as soon as I get home.
10  Do you have an extra copy?
11   Q.  I do.
12   A.  I can take that with me?
13   Q.  Yeah, you sure can.
14      Okay.  I'm not going to go through your CV -- I
15  didn't last time -- any more than I have.  Anything else
16  you'd like to add about your CV?
17   A.  Not that far back.
18   Q.  Okay.  And I have -- somewhere.  I thought I
19  was ready to do this.
20      You received a notice of deposition in this
21  case?
22   A.  Yes.
23      MR. THOMAS:  And same materials in the same box
24  that we talked about before in Ashbrook, Joe?

Lennox Hoyte, M.D.

Page 6

1          MR. TARASKA:  Yes.  Yes.

2          MR. THOMAS:  Okay.  Do you have the billing

3    records for the England case?

4          MR. TARASKA:  Yes.  There you go.

5          (Hoyte Exhibit No. 2 was marked for

6    identification.)

7    BY MR. THOMAS:

8      Q.  I'm going to mark your billing records for the

9    Theresa England case as Deposition Exhibit No. 2.

10   Two-page exhibit.

11         (Discussion off the record.)

12   BY MR. THOMAS:

13     Q.  Let me show you what's been marked as

14   Deposition Exhibit No. 2.

15     A.  Yes, sir.

16     Q.  And these have been provided to you by your

17   counsel and represented to be the billing records for

18   the Theresa England case; is that accurate?

19     A.  That is correct.

20     Q.  And so the deposition that you reviewed for

21   England July 2019, would that have been the implanting

22   physician, do you know?

23     A.  That's the patient.

24     Q.  Okay.  You reviewed the --

Page 7

1      A.  That's what I --

2      Q.  -- the plaintiff?

3      A.  That's what I believe, yes.

4      Q.  Okay.  Good.  And 14 hours for review of the

5    medical records?

6      A.  That is correct.

7      Q.  Prolift, TVT-O IFUs, two hours and a half?

8      A.  Correct.

9      Q.  It took you seven hours to do the expert

10   report?

11     A.  Correct.

12     Q.  For a total of $16,500?

13     A.  Correct.

14     Q.  And that's dated August 9, 2019.

15         Then we have a September 25, 2019.  You

16   reviewed Ethicon's expert report?

17     A.  Correct.

18     Q.  For two hours?

19     A.  Correct.

20     Q.  And you billed for that?

21     A.  Correct.

22     Q.  Are you current with plaintiff's counsel for

23   your bills?

24     A.  Same as the last.

Page 8

1      Q.  Are they paid?

2      A.  These -- everything I've submitted they've

3    paid.

4      Q.  Okay.

5      A.  Actually, I think there's one outstanding.

6      Q.  And what work have you done since your last

7    time entry on the bill?

8      A.  So let's see.  This is Ms. England.

9      Q.  That's right.

10     A.  She was a Dr. Yang patient, I believe.

11     Q.  Correct.

12     A.  So Yang's deposition, reviewed my draft report,

13   prepare for the deposition, review of the medical

14   records, did my best to understand the story of the

15   case.

16     Q.  And about how many hours have you spent since

17   your last entry on Exhibit 2?

18     A.  I don't have that tabulated.

19     Q.  Do you have a ballpark guesstimate?

20     A.  I don't.

21     Q.  Did you say you reviewed Dr. Yang's deposition?

22     A.  Again, I believe she's the implanter for

23   Mrs. England, so I believe the answer is yes.

24     Q.  Do you have a recollection of anything of

Page 9

1    significance in Dr. Yang's deposition that affected your

2    opinions in this case?

3      A.  No.

4          (Hoyte Exhibit No. 3 was marked for

5    identification.)

6    BY MR. THOMAS:

7      Q.  Doctor, Deposition Exhibit No. 3 is the report

8    that counsel's provided to us for this case.  Do you

9    recognize that as your report?

10     A.  I do.

11     Q.  Is Exhibit No. 3 a complete statement of the

12   opinions you're prepared to give in this case?

13     A.  As I said before, there is one item pertaining

14   to the uncertainty of the patient's prognosis that I

15   need to clarify.

16     Q.  Okay.  Anything else?

17     A.  The uncertainty of her prognosis, yes.

18     Q.  Is there anything else that you care to add to

19   it?

20     A.  I believe that's it, and I reserve the right to

21   add things as more information becomes available.

22     Q.  Do you have plans to do any work at this point?

23     A.  Based on the information I have, I don't have

24   any plans, based on the information I have as of today.

Lennox Hoyte, M.D.

Page 10

1    Q.   Okay.  Again, we're here for three depositions
2  today:  Messina, Ashbrook, as well as this case,
3  England.  And I'm not going to repeat a lot of the
4  questions I asked in Ashbrook, and I hope to do the same
5  for Messina to make this as short a proceeding as we
6  possibly can.  But all the answers from Ashbrook apply
7  to England and Messina and all the way around.  Does
8  that make sense?
9       MR. TARASKA:  Yes.
10      MR. THOMAS:  Okay.
11 BY MR. THOMAS:
12   Q.   Doctor, as I look at Exhibit No. 3, as I looked
13 at Exhibit No. 3, this deals primarily with the surgical
14 procedure on November 22, 2006, where Ms. England
15 received an anterior Prolift, a TVT-O, and a posterior
16 native tissue repair; is that fair?
17   A.   Procedure No. 1 on 11/22/2006.  Anterior
18 Prolift rectocele repair, TVT-O, and cystoscopy.
19   Q.   Okay.  And what was the nature of the rectocele
20 repair, the posterior repair?
21   A.   It was a so-called native tissue repair using
22 stitches and the patient's own tissue to fix the
23 posterior wall vaginal bulge.
24   Q.   Okay.  And if Ms. England presented to you

Page 11

1  today with the symptoms that she presented with in 2006,
2  is it fair to understand that you would have performed
3  this procedure using the Desara retropubic sling and a
4  laparoscopic sacrocolpopexy?
5    A.   So let's look at her complaint first.  So I
6  would have started looking at her symptomatology.  I'd
7  begin by -- I'm a tertiary referral center, so that
8  means the patient comes to me with specific complaints.
9  If she complained -- if she came to me with complaints
10 of a vaginal bulge and urinary incontinence and I
11 evaluated her and demonstrated that she had urodynamic
12 stress incontinence and either symptomatic Stage II
13 cystocele or rectocele or Stage III, bothersome
14 cystocele and rectocele, I would have offered her a
15 retropubic sling and very likely a sacrocolpopexy,
16 unless she had outstanding apical support, which, if she
17 did, I would have offered her an anterior posterior
18 repair with native tissue.
19   Q.   Okay.  Are you able to tell from your review of
20 the medical records in this case from 2006 whether she
21 presents with a situation where you'd recommend a
22 sacrocolpopexy or the native tissue repair?
23   A.   There is no pelvic organ prolapse quantitation
24 evaluation here, so it's difficult for me to say, so I

Page 12

1  have to go based on the presenting doctor's examination
2  of what she characterized as a Grade II rectocele and
3  Grade II cystocele, symptomatic, and the patient's
4  complaint of urinary incontinence.
5    Q.   Well, all we have is the medical records;
6  correct?
7    A.   That's what I see here.
8    Q.   Okay.  And based upon the medical records,
9  would you recommend a native tissue repair or a
10 sacrocolpopexy?
11   A.   Based on her symptomatic third-degree
12 cystocele, if it were an isolated cystocele, I would
13 offer a native tissue repair.  If she had apical
14 descent, I would offer a sacrocolpopexy.
15   Q.   Are you able to tell whether she had apical
16 descent or not?
17   A.   There's no mention of apical descent in this
18 report that I have here.
19   Q.   If you had this patient today and she did have
20 indications for a sacrocolpopexy, would you have done it
21 laparoscopically or abdominally?
22   A.   The abdominal sacrocolpopexy can be performed
23 open, laparoscopically or robotically.  My preference is
24 a robotic sacrocolpopexy.

Page 13

1    Q.   Was robotic sacrocolpopexy available in 2006?
2    A.   2006 was probably the beginnings of the margins
3  of it.  Laparoscopic would have been available in 2006.
4  I was still performing open sacrocolpopexies, so that's
5  probably what she would have gotten if she were my
6  patient and she met criteria.
7    Q.   And an open sacrocolpopexy uses mesh?
8    A.   It does use abdominally placed mesh.
9    Q.   And is it polypropylene mesh?
10   A.   Yes, sir.
11   Q.   And in 2006, do you recall what kind of mesh
12 you were using for the placement of -- for the repair
13 of -- strike that.
14        Do you recall what kind of mesh you were using
15 in 2006 for your open abdominal sacrocolpopexies?
16   A.   I do not recall.
17   Q.   Did you ever use Gynemesh PS?
18   A.   It would have been a precut Y graft, and so I
19 don't know -- I don't recall who I was using at the time
20 for that.
21   Q.   Was it polypropylene?
22   A.   Yes.
23   Q.   Was it large pore?
24   A.   Yes.

Lennox Hoyte, M.D.

Page 14

1    Q.   When you say "large pore," do you have a number
2  in mind?
3    A.   1 millimeter.
4    Q.   At least 1 millimeter, or was it 1 millimeter,
5  do you know?
6    A.   Give or take 1 millimeter.
7    Q.   Okay.  That's a satisfactory pore size for you
8  for what you're trying to do with sacrocolpopexy?
9    A.   That is my understanding, correct.
10   Q.   Well, your understanding.  I'm asking what your
11 preference is, what you --
12   A.   Large pore, lightweight, synthetic
13 polypropylene mesh.  Currently it's 21 gm/m2, made by
14 Caldera.  It's called Vertessa Lite.  There were other
15 manufacturers that made similar pore size and weight.
16 I'm not sure exactly the weight.
17   Q.   Okay.  Have you ever heard of a Caldera T-Line
18 midurethral sling?
19   A.   No.
20   Q.   Do you recall what midurethral sling you were
21 using in 2006?
22   A.   No, I don't.
23   Q.   Were you using a midurethral sling in 2006?
24   A.   Yes.

Page 15

1    Q.   Polypropylene?
2    A.   Yes.
3    Q.   Large pore?
4    A.   For synthetics, I don't recall, but I think it
5  was large pore.
6    Q.   In 2006, did you have a preference for a
7  certain kind of synthetic midurethral sling?
8    A.   I think 2006 was about 13 years ago, and I used
9  a retropubic sling at that time that was synthetic that,
10 as I recall, had adequate pore size.
11   Q.   But you don't recall what it was?
12   A.   I do not.
13   Q.   In your practice today, are you able to choose
14 the manufacturer's product that you want to use, or do
15 you have to do what the hospital says you can do?
16   A.   Well, I think it's a combination, that if the
17 hospital has a material that I don't feel comfortable
18 using for one reason or another, I would go to them and
19 tell them what I wanted.  I'm fortunate in that all the
20 hospitals I go to have the Caldera systems, and that's
21 what I feel comfortable using based on the pore size,
22 the use, the experience, and the characteristics.
23   Q.   Where were you practicing medicine in 2006?
24   A.   Tampa General Hospital.

Page 16

1    Q.   I'm sorry?
2    A.   Tampa General Hospital.
3    Q.   Thank you.  Do you know whether in 2006 the
4  hospital made the decision of the mesh that you used for
5  sacrocolpopexy and midurethral slings or whether you had
6  the choice?
7    A.   Well, I was fortunate in 2006 in that we
8  started the urogynecology program in the state of
9  Florida, in fact, at the hospital, at Tampa General, and
10 we told them what we wanted and they went and found it.
11   Q.   Okay.
12   A.   I just can't remember which one it was.
13        MR. THOMAS:  All right.  Let me go off the
14 record for a second, please.
15        (Recess from 12:13 p.m. until 12:16 p.m.)
16 BY MR. THOMAS:
17   Q.   As before, Doctor, on page 8 of your report you
18 set out a methodology -- on page 13 of your report, you
19 set out a methodology that you use when you evaluate,
20 diagnose, and treat a person with mesh-related
21 complications?
22   A.   Yes.
23   Q.   You usually rely on an interview with the
24 patient.  You've not talked with Ms. England; correct?

Page 17

1    A.   I have not.
2    Q.   You usually have a review of her personally
3  documented history.  You don't have her personally
4  documented history, but you do have her medical records?
5    A.   I have her medical records.
6    Q.   It says you reviewed her medical records -- you
7  have that -- and a detailed clinical examination when
8  possible.  You have not examined Ms. England; fair?
9    A.   I have not, and I want to point out that this
10 paragraph relates to when I evaluate patients
11 clinically.  This was not a clinical evaluation for the
12 purposes of treatment with this patient.  This was for
13 the purpose of evaluating her prognosis and her
14 treatment options.
15   Q.   Okay.  The next sentence says: "I use the
16 information that I obtained from these modalities to
17 determine the cause, treatment plan, and prognosis for
18 the patient's presenting complaint."
19        Fair?
20   A.   Correct.
21   Q.   Okay.  Now, you reviewed the operative report
22 for the November 22, 2006, procedure?
23   A.   Correct.
24   Q.   Do you see anything remarkable about the

Lennox Hoyte, M.D.

Page 18

1  procedure in itself?
2      A.  It says the procedure was an anterior Prolift
3  and rectocele repair and a TVT-O procedure with
4  cystoscopy.
5      Q.  Do you have any criticisms or complaints about
6  the care and treatment provided by the implanting
7  surgeon on November 22, 2006?
8      A.  I do not.
9      Q.  As far as you can tell from your review of the
10  medical records, she did everything she was supposed to
11  do to implant the anterior Prolift?
12      A.  It looks like she followed the IFU.
13      Q.  And as far as you can tell from your review of
14  the medical records, she did everything she was supposed
15  to do for the implantation of the TVT-O?
16      A.  It looks like she did.
17      Q.  And there are different kinds of native tissue
18  repairs, aren't there?
19      A.  Well, it depends on what you're repairing.
20      Q.  Well, the posterior repair for the rectocele
21  that was done on Ms. England, is there anything unusual
22  about the nature of the repair that was done on
23  November 22, 2006?
24      A.  It looks like a posterior colporrhaphy to me.

Page 19

1      Q.  Within the standard of care in 2006?
2      A.  I would say yes, based on what I can see.
3      Q.  Anything different about what she did in 2006
4  than what you would do in a native tissue repair in
5  2019?
6      A.  Well, you do the posterior dissection, you take
7  the mucosa off, you identify the defect, and you close
8  it, and then you close the mucosa.  That's how it's
9  done.
10      Q.  So she did everything in 2006 as you'd do it
11  today?
12      A.  That's how it's done, correct.
13      Q.  Do you agree that there were no complaints from
14  Ms. England related to this procedure from November 22,
15  2006, until March 26, 2004?
16      A.  12/15/2006 feeling something sharp sticking out
17  at Postop Day 4.  Postop Week 4.  Sex not painful.  Just
18  some itching afterwards.  No defects.  History of a
19  kidney stone.  Stent placed.  Unrelated.  Kidney stone.
20  Hot flashes.  Normal vaginal fault.  We're up to 2010.
21      Vaginal dryness 2014.  Urinary urgency.  Eight
22  years postoperatively is when we begin to see symptoms,
23  and the exam documents that in 3 of 2014.
24      Q.  That's my point.  March 26, 2014, following the

Page 20

1  November 22, 2006, surgery is the first complaint by
2  Ms. England related to the implant; is that fair?
3      A.  That I would relate to the implant, and it's
4  not surprising, correct.
5      Q.  Okay.  And she presents with vaginal dryness
6  and urinary urgency?
7      A.  That's what the complaint is listed as.
8      Q.  Do you have a reason to disagree with that?
9      A.  That's what I said.
10      Q.  You said it's "listed as."
11      A.  That's what I listed.  Then that means I agree.
12      Q.  Okay.  Thank you.
13      A.  Not trying to be difficult, sir.
14      Q.  Neither am I, I assure you.
15      A.  Yeah.
16      Q.  Is vaginal dryness a symptom of implant for --
17  a Prolift implant or a TVT-O implant?
18      A.  No.
19      Q.  What's the cause of vaginal dryness?
20      A.  So as women enter menopause, the vaginal
21  tissues, which are normally -- which are extremely
22  sensitive to estrogen, estrogen levels drop in the
23  menopause, and when the estrogen levels drop, the
24  vaginal tissue thins out.  Women experience that as

Page 21

1  vaginal dryness.  Some people experience that with
2  reversible pain with intercourse due to the atrophy or
3  dryness.
4      Q.  Does vaginal dryness also contribute to pelvic
5  pain?
6      A.  Pain with intercourse is what I said.
7      Q.  I understand that.
8      A.  Not necessarily pelvic pain.
9      Q.  But unrelated to dyspareunia, can vaginal
10  dryness contribute to pelvic pain?
11      A.  Not so much pain, but pressure.  Women report a
12  feeling of pressure that is remedied when you treat them
13  with an appropriate course of vaginal estrogen.
14      Q.  And is the urinary urgency that's reported on
15  March 26, 2014, related to the implant in 2006?
16      A.  It could be related to the implant, or it could
17  be related to the vaginal dryness.  Those are both
18  possibilities.
19      Q.  No way to tell from your review of the medical
20  records?
21      A.  Until you treat it with vaginal estrogen.
22  One's cured.  The other one's not.
23      Q.  Okay.  What's remarkable about her exam in
24  March 2014?

Lennox Hoyte, M.D.

Page 22

1    A.   There was a ridge effect in the anterior wall
2  and there was a tender anterior wall with bleeding to
3  speculum examination.  There was an irregular surface
4  and mesh palpable just below surface beginning to erode
5  along suture line, midline.
6    Q.   Can the atrophic vaginal walls and vaginal
7  dryness contribute to the bleeding?
8    A.   It could, to bleeding on speculum.  That's
9  one -- certainly a possibility.  So can mesh erosion.
10   Q.   Okay.  And is the plan an appropriate
11 recommendation for the conditions with which she
12 presented?
13   A.   The plan was listed as starting vaginal
14 estrogen and following up in three months.  It's what I
15 would have done.
16   Q.   Seen by Dr. Halcomb on December 3, 2014, and
17 there's a palpable mesh through the anterior compartment
18 wall and palpable mesh through the -- twice.  Is that
19 because there's two findings of that, or is that just a
20 mistake?
21   A.   Cut and paste.  Fingers a little too vigorous.
22   Q.   Okay.  When you see exam, palpable mesh through
23 the anterior compartment wall, and then an assessment of
24 pelvic mesh erosion, doesn't a mesh erosion mean it's

Page 23

1  coming through the pelvic -- through the anterior
2  compartment wall as opposed to just being palpable?
3    A.   So, in my experience, you can have a palpable
4  erosion and you can have a visual erosion.  So a
5  palpable erosion is with a gloved finger you can
6  actually feel the edges of the mesh, depending on the
7  color or the appearance of it, that you couldn't see
8  with the speculum and the naked eye.
9    Q.   Okay.  So erosion/exposure typically I
10 associate with mesh coming through the tissue and being
11 exposed so that it could be seen with the naked eye.  Is
12 that different from what you have with an erosion or
13 exposure?
14   A.   Those don't all go together.  So there's a way
15 to have mesh eroded so that your best efforts to look
16 with the speculum you can't actually see it because of
17 the geographic location and the speculum disallows you
18 from being able to see it, but when you put your finger
19 in, you can palpate raw edges of mesh.  So you can have
20 an erosion and not see it.
21        With a speculum exam, you might be able to
22 see -- you can feel it and you might be able to see it
23 if you put a cystoscope in the vagina and co-opt the
24 vagina, for example.  You can't always see it.

Page 24

1    Q.   Okay.  Are you able to tell from your review of
2  the medical records whether the mesh erosion could be
3  seen or merely palpated?
4    A.   So on exam, it says palpable mesh through
5  anterior compartment wall, thick ridge, no prolapse.  In
6  the assessment of mesh erosion, I could see the surgeon
7  saying that he or she is assessing mesh erosion because
8  of the palpation, not the visual.
9    Q.   But you're not able to tell from the medical
10 records whether it's visible, as in gone through the
11 tissue, or whether it's only palpable, meaning you felt
12 it through the tissue; is that fair?
13   A.   I just have to go with Dr. Halcomb saying, "I
14 can palpate raw edges of mesh," and, in fact, when you
15 put your finger in, you can actually feel the points of
16 the mesh edges through.
17   Q.   Does it say you can palpate raw edges of mesh,
18 or just palpable mesh?
19   A.   I'm telling you I can palpate raw edges of
20 mesh, so I see that if the surgeon is saying he or she
21 palpates it, that may be what they're thinking of.
22   Q.   But you don't know?
23   A.   I don't know that for a fact.
24   Q.   Thank you.

Page 25

1    A.   In that case.
2    Q.   Okay.  So Dr. Halcomb referred Ms. England to
3  Dr. Zimmerman?
4    A.   Yes.
5    Q.   And Dr. Zimmerman examined her on December 29,
6  2014?
7    A.   Correct.
8    Q.   And down under exam, it says "pinpoint exposure
9  of Prolift material."  What does that mean?
10   A.   So that means when Dr. Zimmerman looked, he can
11 see a small area through which he can see mesh, which he
12 called the Prolift mesh.
13   Q.   "Impression.  Exposure/erosion of urogynecology
14 graft material.  Plan.  Cystoscope and revise the
15 exposed area of the mesh."
16        Why is it important to revise a pinpoint
17 exposure of Prolift material?
18   A.   So the mesh is exposed into the vagina.  The
19 doctor is assessing that that mesh erosion is the cause
20 of her pelvic pain and he's proposing to excise that
21 eroded area so as to remove the source of what he
22 considers to be the source of her pelvic pain.
23   Q.   So is it your judgment that Dr. Zimmerman
24 considered this pinpoint exposure to be the source of

Lennox Hoyte, M.D.

Page 26

1  her pelvic pain?
2      A.   That is my judgment.
3      Q.   Okay.
4      A.   He remarked that there was thickness/stiffness
5  of the anterior vaginal wall, tenderness in the right
6  mid to apical anterior vaginal wall, and exposure, which
7  he probably, when he put it all together, he said that's
8  the cause of her pain.
9      Q.   Okay.  So on January 20, 2015, Dr. Zimmerman
10  conducts his first revision procedure?
11      A.   I see that.
12      Q.   And was that in the office, or was that under
13  anesthesia?
14      A.   I can't tell here.  I would -- I would say that
15  because of the cystotomy repair it would have to be --
16  have been done under anesthesia.  I don't think a
17  surgeon would be doing this type of intervention in the
18  office.
19      Q.   Okay.  And a cystotomy is what?
20      A.   A tear in the bladder or a cut in the bladder.
21      Q.   And the cystotomy occurred during the mesh
22  removal process; correct?
23      A.   Yes, they occur.  And I've seen them occur
24  personally when the mesh is deeply imbedded in the

Page 27

1  bladder muscularis and underneath the mucosa.  Trying to
2  remove it will cause a tear.
3      Q.   You don't know how this cystotomy occurred, do
4  you?
5      A.   We could look at her record.  Let's see.
6          Mesh transcending under -- transcending bladder
7  muscularis.  If that statement is made, then what that
8  means is that when that mesh was removed the bladder
9  muscularis was injured and that's where the cystotomy
10  occurred.
11      Q.   Do you know how the cystotomy occurred other
12  than your review of the medical records?
13      A.   I wasn't there, so I wouldn't know.
14      Q.   Exactly.  That's my point.  Do you know what
15  the circumstances were for Dr. Zimmerman to put a hole
16  in her bladder?
17      A.   Yes.
18      Q.   What were they?
19      A.   The mesh is transcending in the bladder
20  muscularis.  He removed the mesh.  The bladder
21  muscularis got interrupted, and that caused the
22  cystotomy.
23      Q.   How do you know that the cystotomy occurred
24  when he removed the mesh from the bladder?

Page 28

1      A.   It's the only way that it could happen.
2      Q.   It could be an error in surgical technique?
3      A.   That is possible but highly unlikely given the
4  setting that the mesh was deeply embedded in the bladder
5  muscularis.
6      Q.   Do you agree that a cystotomy is a risk of any
7  pelvic floor surgery?
8      A.   We say that to our patients.  Low risk, but a
9  risk.
10      Q.   And that's a risk that's also contained in the
11  Instructions for Use?
12      A.   I believe it is, yes.
13      Q.   Okay.
14      A.   In the Instructions for Use for the TVT-O, and
15  I believe also the Prolift.  We can look at that in
16  detail if you like.
17      Q.   Right.  I think we understand that.
18          The development of fistulas is also a known
19  risk for all pelvic floor surgery; correct?
20      A.   That is correct.  Different risk profile
21  depending on the procedure, but a risk --
22      Q.   And the development of fistulas is also a risk
23  of --
24          MR. TARASKA:  He wasn't quite finished.

Page 29

1          MR. THOMAS:  Oh, I apologize.
2          THE WITNESS:  I forget what I was saying.
3          MR. TARASKA:  Do you want to read it back?  You
4  just overspoke the last three words.
5          MR. THOMAS:  I didn't mean to interrupt, Joe.
6  Sorry.
7          (The following answer was read by the
8  reporter:)
9      A.   That is correct.  Different risk profile
10  depending on the procedure, but a risk --
11          THE WITNESS:  Depending on whether you're doing
12  native tissue repair versus mesh surgery, versus
13  anterior versus posterior repair.  For example, in a
14  posterior repair, the cystotomy risk is low.  In an
15  anterior repair, it's a little bit higher.  In an
16  anterior repair with mesh excision, it's even
17  higher.
18  BY MR. THOMAS:
19      Q.   And the development of fistulas is a risk
20  that's contained in the Instructions for Use?
21      A.   I think we agreed on that.
22      Q.   I didn't remember if we had or not.  I know we
23  had for the cystotomy.
24      A.   Yeah.

Lennox Hoyte, M.D.

Page 30

1    Q.   But also the fistula?
2    A.   So I would say yes, and I think we have to
3  agree that there are different IFUs that go with
4  different periods in time, and so you would want to
5  match the IFU of this period of 2006 with the risk
6  profile here, because I know the IFUs changed at
7  different points as people learned more about the
8  complication risk profile.
9    Q.   If I suggested to you 2006 -- and, actually, it
10 should probably even be -- well, it is 2006.  The
11 cystotomy occurred in 2012; correct?
12   A.   As a result of a 2006 placement.
13   Q.   2015.  I'm sorry.
14   A.   That would be governed by the 2006 IFU.
15   Q.   I'm not going to argue with you.
16   A.   I apologize.  I'm just trying to be clear.
17   Q.   And you are.  I'm thinking about too many
18 things.
19   A.   Must be having too much fun.
20   Q.   Was the January 20, 2015, procedure successful?
21   A.   Well, the diagnosis was not given, so I would
22 judge success based on the cure of the diagnosis.  I
23 would go back and say the impression was
24 exposure/erosion of gynecology graft material and the

Page 31

1  plan was to revise the exposed area of mesh.
2        According to this, I would say that he was
3  successful, because he did revise the exposed area of
4  mesh, if that was his intention.
5    Q.   Is there any way to tell what mesh was taken
6  out in this procedure on January 20, 2015?  Is it just
7  Prolift mesh?
8    A.   The doctor described "attempt made to remove
9  all available Prolift material.  Deep, superficial
10 lateral arms transected."
11       That implies to me that since he didn't talk
12 about the suburethral area that he did not operate in
13 the geographical neighborhood of the TOT mesh.
14   Q.   Okay.  The doctor doesn't make any reference he
15 did not excise any TVT material, you're deducing that
16 from the records; is that fair?
17   A.   I'm looking at his words.  "Attempt made to
18 remove all available Prolift material.  Deep,
19 superficial lateral arms transected.  Mesh was bunched.
20 Mesh transcending bladder muscularis."
21       All of this geographic activity was not
22 conducted in the area of the midurethra, which is where
23 the TOT -- the TVT-O would be.
24   Q.   It says the mesh was bunched.  What does that

Page 32

1  mean?
2    A.   Yeah.  The mesh is described as being intended
3  to lay flat underneath the tissues, and so you would
4  expect that if the mesh is laying flat there would be
5  one layer of unfolded synthetic material underneath the
6  bladder.  What we have seen is that sometimes the mesh
7  material, over time, when you go back to get it, is
8  folded over and crumpled on itself, and that is
9  described as bunching.
10   Q.   Can it also be a problem with placement?
11   A.   Can it?  So is it possible?  So there's a way
12 to take the mesh and fold it over and then implant it,
13 in which case it would be folded over, but the
14 likelihood of flat-placed mesh as described by a surgeon
15 being bunched as a result of surgical technique is
16 extremely low.
17   Q.   Okay.  You don't -- you've not seen the mesh
18 that was bunched; correct?
19   A.   I did not see it for this particular patient.
20   Q.   Yeah.  Is there any explanation given in the
21 medical records about whether the mesh was bunched over
22 time or whether it was bunched during placement?
23   A.   There's no way to know that from this
24 description.

Page 33

1    Q.   Okay.
2        MR. THOMAS:  Is the mesh removed from
3  Ms. England available for analysis, do you know?
4        MR. TARASKA:  You mean today?
5        MR. THOMAS:  Uh-huh.
6        MR. TARASKA:  Not to my knowledge.  Do you want
7  me to check?
8        MR. THOMAS:  Just curious.  Yes.
9        MR. TARASKA:  Okay.
10       MR. THOMAS:  And I apologize for not knowing
11 enough about this case, but typically the meshes are
12 removed and then sent and analyzed by different
13 people.
14       MR. TARASKA:  I don't think so, but I'll check
15 for us.
16       MR. THOMAS:  Thank you.
17 BY MR. THOMAS:
18   Q.   But you've not seen it and not been -- not
19 asked to see it, I guess?
20   A.   I did not look at any explanted material from
21 this patient.
22   Q.   Okay.  Following the procedure with
23 Dr. Zimmerman on February 12, 2015 -- excuse me.  Strike
24 that.

Lennox Hoyte, M.D.

1    Following the procedure with Dr. Zimmerman on
2  January 20, 2015, there were a couple of postop visits?
3    A.  Excuse me.  Just bear with me for a second.
4    Q.  Sure.
5    A.  1/20/2015.
6    Q.  I'm on page 20 and 21.
7    A.  20, 21.  Okay.  Postop visit Dr. Zimmerman.
8  Three weeks.  Yes.
9    Q.  Anything remarkable about the postop visit on
10  February 12?
11    A.  Complaint of bladder spasms and then a
12  quarter-sized granuloma bed in the anterior wall, mesh
13  filaments are seen in the apical right side of the bed,
14  the bladder wall is intact, tenderness in the area of
15  healing to palpation is what I see.
16    Q.  And what's remarkable about the exam, in your
17  opinion?
18    A.  There's -- three weeks postoperatively, I still
19  expect to see healing.  I wouldn't expect to see mesh
20  filaments in the right apical part of the bed.
21    Q.  Would those be Prolift mesh?
22    A.  Well, it is anterior and it's apical, which
23  means it was not the transobturator, and then it would
24  have to be the Prolift.

1    Q.  Okay.
2    A.  Assuming that she had no intervening procedures
3  to implant more mesh.
4    Q.  Well, there's no record of any intervening
5  procedures; correct?
6    A.  That's my point.
7    Q.  And the plan is to continue some medications,
8  and then there's a preop on April 2, 2015; correct?
9    A.  Yes.
10    Q.  And "dry," is that vaginal dryness?  Is that
11  how you --
12    A.  That's how I would interpret that.
13    Forgive me.  "Dry."  Dry could mean not
14  leaking, as in no urinary incontinence, or vaginal
15  dryness, and it's unclear from this.
16    Q.  Okay.  And as you look at "vaginal pain," it
17  says "deep, central vaginal, persistent"?
18    A.  Correct.
19    Q.  What does that mean to you?
20    A.  The patient is describing that the vaginal pain
21  is deep inside the vagina in the midline.  Persistent
22  means it's not going away, it's always there.
23    Q.  And where is that related to the implants that
24  she had?  Which implant is that related to, if you're

1  able to tell?
2    A.  So deep would imply the Prolift.  Central
3  vaginal, persistent would -- well, deep and central
4  vaginal would imply the Prolift.
5    Q.  Okay.
6    A.  Near the opening would imply the TVT-O.
7    Q.  So as you read the medical record entry on
8  April 2, 2015, it's your opinion that he's referring to
9  mesh from the Prolift that's causing these symptoms?
10    A.  That is what I would conclude based on what I'm
11  reading.
12    Q.  And so then we go to Procedural No. 3 on
13  April 22, 2015 --
14    A.  Yes.
15    Q.  -- where there's excision of urogynecological
16  mesh and a cystoscopy?
17    A.  Correct.
18    Q.  Was that procedure successful?
19    A.  If we look at what the plan was, it's mesh
20  excision under anesthesia, and he described excision of
21  urogynecologic mesh, and so I would have to say that the
22  procedure was successful because he did what he planned
23  to do.
24    Q.  Was this in the office, or was it in the

1  operating room, do you know?
2    A.  It says mesh excision under anesthesia would be
3  the plan, and I don't know of any surgeons that would
4  attempt this extent of surgical activity without
5  anesthesia.
6    Q.  Under findings for the April 22 visit, it says:
7  "2-centimeter area of mesh exposure in anterior vaginal
8  wall 10 o'clock to 2 o'clock."
9    Does that give you enough information to
10  determine which mesh was removed?
11    A.  Yes.
12    Q.  What does that tell you?
13    A.  So usually when surgeons talk about the
14  anterior vaginal wall they're talking about the proximal
15  vaginal wall, not the bladder neck, and since the
16  Prolift would have been placed in the proximal anterior
17  vaginal wall, I would think that he's talking about the
18  Prolift.
19    Q.  All right.  And "permanent suture at the level
20  of the trigone," what does that mean?
21    A.  That means that the surgeon cystoscopically is
22  looking and seeing suture in the trigone through the
23  bladder.
24    Q.  And which mesh, if either, would that apply to?

Lennox Hoyte, M.D.

Page 38

1    A.   So at the level of the trigone the suture --
2  the mesh filaments actually look like suture because of
3  the shape and so forth.   At the level of the trigone,
4  the only thing that would be there would be Prolift.
5    Q.   Okay.   So nine days later is a postop visit
6  with Dr. Adam.   Do you see that?
7    A.   Yes.
8    Q.   "Significant urinary leakage since last night.
9  Increasing suprapubic pain.   Severe nocturnal enuresis
10 last night.   Insensible urine leaks throughout the day."
11       What is enuresis?
12   A.   Urine coming out without knowledge.   And
13 nocturia, you wake up wet, basically.
14   Q.   Got it.   So this is when Dr. Adam, anyway, his
15 impression is that she has a vesicovaginal fistula;
16 correct?
17   A.   That's what he says.
18   Q.   What is a vesicovaginal fistula?
19   A.   So "vesico" is -- "vesi" means bladder.
20 "Vaginal" means vagina.   Fistula is abnormal connection.
21 So you could sound this out as an abnormal connection
22 between the bladder and the vagina.   It's a hole.
23   Q.   What's the result of a vesicovaginal fistula?
24   A.   Significant urine -- copious amounts of urine

Page 39

1  in the vaginal vault.   So urine, instead of coming out
2  the urethra, goes through the opening of the fistula and
3  ends up in the vagina, and it's uncontrolled.
4    Q.   Are you able to tell from your review of the
5  medical records how that happened?
6    A.   Yes.
7    Q.   How did it happen?
8    A.   I believe that the vesicovaginal fistula
9  occurred as a result of the dissection of the deeply
10 embedded anterior wall mesh that transgressed into the
11 bladder such that when it was dissected out the hole
12 was -- occurred.
13   Q.   And that would have been from the January 20,
14 2015, procedure?
15   A.   It could have been from any of the procedures
16 subsequent to Dr. Yang's initial procedure.
17       Well, the first surgery from Dr. Zimmerman,
18 Procedure No. 2, where the mesh was dissected out and
19 the cystotomy was repaired on 1/20/2015, the fistula was
20 discovered at 5/1, about four months later.   It could
21 have been just the cystotomy repair broke down over that
22 four-month period, or it could have been related to
23 Procedure No. 3 in which there was mesh circumscribed
24 and dissected out.

Page 40

1    Q.   Do you have an opinion based on your review of
2  the medical records as to which procedure caused the
3  vesicovaginal fistula?
4    A.   I couldn't say.
5    Q.   Anything about the location of the
6  vesicovaginal fistula relative to the two procedures
7  that allows you to have an opinion in that regard?
8    A.   Both procedures occurred in the same
9  neighborhood, as near as I can tell, geographically
10 speaking, so either of them could have been responsible.
11 If you want to look at the one that was closest to the
12 discovery of the fistula, it would have been the third
13 procedure done by Dr. Zimmerman.
14   Q.   When you say "closest," you're talking about in
15 time?
16   A.   In time.   Proximity.
17   Q.   Not in geography?
18   A.   The geography appeared to be the same in both
19 cases.
20   Q.   For either the January 20, 2015, or the
21 April 22, 2015, procedures, is there any suggestion that
22 her prolapse has returned?
23   A.   I don't see anything in the diagnoses that says
24 prolapse has returned.

Page 41

1    Q.   Is there any suggestion in the medical records
2  for the January 20 procedure or the April 22 procedure
3  that her stress urinary incontinence has returned?
4    A.   I don't see any mention of stress incontinence
5  or prolapse in either of those dates.
6    Q.   So Dr. Adam takes over on May 6, 2015.   Do you
7  see that?
8    A.   I see a procedure with Dr. Adam, yes.
9    Q.   Do you know why Dr. Adam took over?
10   A.   I wasn't there, so I wouldn't know.
11   Q.   Have you read any of the depositions that would
12 suggest to you why?
13   A.   I don't recall seeing in a deposition why the
14 take-over happened.   I suspect that Dr. Adam is a
15 urogynecologist more senior and more experienced than
16 Dr. Zimmerman who has expertise in repairing
17 vesicovaginal fistulas and reimplanting ureters and so
18 forth and that's the reason why Dr. Adam took over.
19   Q.   And Dr. Adam, on May 6, 2015, attempted to
20 repair the vesicovaginal fistula?
21   A.   "Procedure."   Say again.   The date?
22   Q.   May 6, 2015.
23   A.   He didn't attempt to repair it then.   He
24 performed a cystoscopy in an attempt, which is what I

Lennox Hoyte, M.D.

Page 42

1 would do, to map the vesicovaginal fistula.
2    Q.   Okay.  Anything else remarkable about the
3 cystourethroscopy on May 6?
4    A.   He noted there was a 1-centimeter vesicovaginal
5 fistula above the interureteric 1 centimeter from the
6 right ureteric orifice.  He thought he saw possible mesh
7 erosion into the trigone and mesh erosion at
8 1:00 o'clock to the right ureteric orifice.
9    Q.   And the possible mesh exposure into the trigone
10 area and the area of small mesh erosion at 1:00 o'clock
11 to the right UO, what is right UO?
12    A.   Ureteric orifice.  It's the tube that brings
13 urine from the kidney.
14    Q.   Is that the Prolift, or is it the TVT-O?
15    A.   In that location, it would not be the TVT-O.
16 It more likely is the Prolift.
17    Q.   On May 14, Dr. Adam does attempt to repair the
18 vesicovaginal fistula; correct?
19    A.   So he describes an exploratory laparotomy, he
20 catheterized the ureters, and he talks about a repair
21 with omental flap.
22    Q.   And what's the significance of a repair with
23 the omental flap?
24    A.   In the past, many of these fistulas, when they

Page 43

1 occurred, occurred as a result of radiation to the
2 pelvis and they were -- they had a hard time getting
3 these fistulas to heal because of insufficient blood
4 flow.  So the theory behind the omental flap is if you
5 brought down a piece of omentum, which is a very highly
6 vascularized tissue, and you interposed it between the
7 repair of the bladder opening and the vaginal opening
8 that the blood flow would help heal the attempt at
9 repair.  And this is what Dr. Adam applied here in an
10 attempt to ensure that the fistula would -- once closed,
11 would stay and heal.
12    Q.   Do you agree with that procedure?
13    A.   It's a standard procedure that's used by
14 urogynecologists and urologists.
15    Q.   It says "vaginal and bladder mesh excision."
16 Are you able to tell whether that mesh that was excised
17 in the May 14 procedure was Prolift or the TVT?
18    A.   From this explanation, I do not have a
19 geographic location.  However, if the mesh is being
20 excised from the bladder, it is more likely to be from
21 the Prolift.  I'm not sure about the vaginal side, if
22 there were reflections of the same material.  So I'm
23 pretty sure, from the bladder side, bladder mesh
24 excision is referring to the Prolift.

Page 44

1    Q.   Under findings, a 1-centimeter supratrigonal
2 fistula, just to the right of midline, is that the same
3 location as the prior fistula?
4    A.   Well, "prior."  This is the same fistula.
5    Q.   It's the same fistula?
6    A.   Well, you know, Dr. Adam talked about the
7 fistula that he identified on cystoscopy.
8    Q.   Got it.
9    A.   And so it looks like he's talking about the
10 same fistula from 5/6/2015.
11    Q.   Are you able to tell from this description how
12 it relates to the hole that Dr. Zimmerman put in the
13 bladder with his first revision surgery?
14    A.   Well, let's go back to that.  Dr. Zimmerman.  A
15 cystotomy occurred.  He doesn't give me a geography in
16 his 1/20/2015 surgery, so I don't know where that
17 opening is.
18    Q.   Okay.  It also says "bunched up mesh on the
19 right with detrusor muscle, adjacent to right ureter"?
20    A.   So we're back to Dr. Adam on 5/14?
21    Q.   Yes.  Page 24.  Right in the middle of the
22 page.
23    A.   "Bunched up mesh on the right within the
24 detrusor muscle."  Again, the mesh is embedded into the

Page 45

1 bladder muscularis and adjacent to the right ureter.
2    Q.   And, again, is that the Prolift?
3    A.   Very -- yes.
4    Q.   Anything remarkable about the technique that
5 was used?
6    A.   I think he did a standard technique for an open
7 fistula repair.
8    Q.   Towards the end of the description of the
9 procedure, you say "cystotomy repair was continued."
10       Does that give you any information to suggest
11 that he was repairing the initial problem created by
12 Dr. Zimmerman, or is cystotomy the same thing as
13 fistula?
14    A.   So let's look there.  Fistula located after he
15 opened the bladder.  1 centimeter from the right
16 ureteric orifice.  1.5 from the left ureteric orifice.
17 Fistula tract was removed with care taken to avoid
18 ureters.  A sheet of mesh was seen in the detrusor
19 muscle on the right.  The mesh was dissected off the
20 detrusor muscle and the epithelium.  1-by-2-centimeter
21 mesh excised.  The epithelium was mobilized on the
22 vaginal side.  Mobilized for bladder closure.  Small
23 piece of mesh excised from the left side.  Mobilized --
24 bladder closed.  Mesh palpable on right close to ureter.

Lennox Hoyte, M.D.

Page 46

1 Right ureter was reimplanted. Bowel repacked. So
2 forth. Neocystotomy. Neocystotomy and spatulated --
3 Foley changed to three-way. Cystotomy repair was
4 continued.
5     What this implies to me is that he partially
6 completed the cystotomy repair, went ahead and
7 reimplanted the ureter, and then continued with the
8 repair.
9     Q.  So we've seen vesicovaginal fistula and we've
10 seen cystotomy. Are those synonymous?
11     So when he's repairing the cystotomy, is he
12 repairing the hole that Dr. Zimmerman put in the bladder
13 in the very first procedure?
14     A.  So in order to do the repair of the
15 vesicovaginal fistula, you'll notice along this
16 dissection he said a clamshell opening of the bladder.
17 He actually put a cystotomy in in order to get to the
18 area to repair it. So it was an intentional cystotomy
19 so he can actually see.
20     Because normally when you go in, to look down
21 you're actually seeing the front part of the bladder.
22 The problem is behind. So many surgeons, to get to that
23 area, will actually open the bladder so they can see the
24 defect. So it's like coming through the roof here to

Page 47

1 look at a defect in this table, fixing it, as opposed to
2 going underneath.
3     Q.  Dr. Zimmerman's cystotomy was inadvertent?
4     A.  Correct.
5     Q.  Dr. Adam's cystotomy was intentional in order
6 to complete the procedure?
7     A.  Correct. And that's a standard of care
8 technique. It's employed by many urologists and
9 urogynecologists.
10     Q.  And following this procedure by Dr. Adam -- it
11 was not successful; is that correct?
12     A.  Well, let's see. The intent for Dr. Adam in
13 Procedure No. 5 is vesicovaginal fistula repair with
14 omental flap, mesh excision, and reimplant the ureters.
15 At the end of that procedure, there was urinary -- so
16 we're going to 6/12, which is follow-up from that
17 procedure a month later. There's urinary leakage. The
18 patient believes it's transurethral. May we move on?
19     Q.  Sure.
20     A.  So bladder spasm. Physically active.
21 Medications. No evidence of recurrent vesicovaginal
22 fistula.
23     So based on this visit of 6/12/2015, I believe
24 that the repair from 5/14, at least a month later, was

Page 48

1 holding.
2     Q.  Okay. Let's go down.
3     A.  Which means it was successful.
4     Q.  Go down to 12/20/2016. Dr. Adam again says
5 that there's a recurrent vesicovaginal fistula.
6     A.  So a month -- a year -- 5/14 to 12/20, so
7 that's 18 months later, he's saying that there's a
8 vesicovaginal fistula that's recurring.
9     Yes. So at some point his repair, which seemed
10 to have been intact a few months later, 18 months later
11 was no longer intact.
12     Q.  What explanation do you have for a recurrent
13 vesicovaginal fistula like this?
14     A.  They're very, very -- oh, sorry.
15     Q.  Go ahead. I finished.
16     A.  They're extremely difficult to repair and stay
17 repaired because of the location, the thinness of the
18 tissues involved, and the fact that to do the repair you
19 have to put tissues under tension, and tissues do not
20 repair well when they're under tension.
21     Vesicovaginal fistulas historically have been
22 very difficult to keep intact when you repair them, so
23 I'm not surprised that he had to come back.
24     Q.  And do you have any medical records for

Page 49

1 Ms. England since December 2016?
2     A.  These are -- I believe these are all the
3 records I have. One of our patients I got sent a
4 second -- a subsequent set of medical records, which I
5 reviewed, but they were mostly primary care. So I don't
6 have any records, I know this, for this patient, that's
7 related to pelvic floor issues.
8     Q.  Okay. So it's fair to understand that your
9 analysis of her medical records insofar as you reviewed
10 her complaints in this case ends on December 20, 2016?
11     A.  That's what I can say.
12     Q.  All right. Now, it's fair to understand that
13 there are no complaints of a cystocele or a rectocele in
14 the medical records since the implant on November 22,
15 2006; correct?
16     A.  I have not seen any further recurrences of
17 cystocele or rectocele.
18     Q.  And there's no mention of stress urinary
19 incontinence in the medical records since the implant on
20 November 22, 2006; agree?
21     A.  I would agree that we haven't seen that.
22 However, it's going to be difficult to document stress
23 incontinence, or notice it, if there's a fistula,
24 because that's the low -- the resistance path would be

Lennox Hoyte, M.D.

Page 50

1 the fistula, so you wouldn't know.
2    Q.   Do you agree that there's been no complaint of
3 dyspareunia or vaginal pain in the medical records since
4 2015 at the time of the diagnosis of the atrophic
5 vaginitis?
6    A.   Say the date, please.
7    Q.   Yeah.  2015.
8    A.   23?  22?  21?
9    Q.   22.
10    A.   Vaginal pain, inflammation.  I'm going to tell
11 you up front that this patient probably wasn't going to
12 be pain with dyspareunia.  It was going to be the
13 leakage related to the fistula.  So she's very unlikely
14 going to be talking about dyspareunia, because she's
15 probably going to be focused on the leakage.  So,
16 correct, no documentation.
17    Q.   Based upon going through the procedures that
18 we've just discussed, we didn't identify anytime, based
19 on your review of the medical records, that the TVT-O
20 was removed; fair?
21    A.   I'm going to say yes, there's nothing related
22 to that.
23    Q.   Do you have any opinion that the TVT-O caused
24 any of the symptoms that she presents with?

Page 51

1    A.   Well, I -- let me look, please.
2        I don't have anything that says that palpation
3 of the TVT-O replicated her symptoms of pain and so
4 forth.  And reference keeps being made to a tender
5 anterior wall spanning foreign body.  So I don't think
6 that there was a specific treatment of the TVT-O
7 sufficient here for me to point to that, because the
8 primary focus for this patient has been addressing the
9 fistula.
10    Q.   All right.  So is it fair to understand that
11 you do not have an opinion in this case that the TVT-O
12 caused any of the symptoms or complaints that
13 Ms. England makes in this case?
14    A.   Just give me a moment.
15        So I'm very clear that I see complications
16 related to the Prolift, but to go along with your line
17 of questioning, I don't see anything specific that I can
18 point to as a TVT-O.  My best understanding is she still
19 has the TVT-O in place, and my best understanding also
20 is that I can't really talk to her TVT-O-related
21 symptoms, because the focus in front of us right here is
22 the Prolift and the fistulas that was caused by it.
23    Q.   Just to be clear, it's fair to understand that
24 you do not have any opinions that the TVT-O implanted in

Page 52

1 Ms. England caused any of the problems or symptoms that
2 are the subject of her complaint in this case; is that
3 true?
4    A.   So symptoms.  Fistula, mesh erosion into the
5 bladder/vagina, recurrent pelvic pain radiating down
6 legs, that could be either Prolift or TVT-O.  Recurrent
7 rectal and sacrum pain, I don't know the answer.
8 Rectocele, no.  Dyspareunia, possibly.
9    Q.   Do you have an opinion to a reasonable degree
10 of medical certainty that the TVT-O caused any of the
11 symptoms about which Ms. England complains in this case?
12    A.   I'm actually looking through here.  I can't see
13 it today.
14    Q.   Okay.  Isn't the primary driver of all the
15 procedures subsequent to the initial revision surgery
16 the attempts to repair the hole that Dr. Zimmerman
17 placed in Ms. England's bladder in the first procedure?
18    A.   I'm sorry.  Say that again.
19    Q.   Isn't the primary driver of the revision
20 procedures after the first Zimmerman procedure to repair
21 the fistulas?
22    A.   The procedures that are subsequent here are
23 repairing fistulas and extracting mesh, removing mesh.
24 The fistula happened as a result of the Prolift mesh

Page 53

1 being embedded.  The subsequent procedure was to remove
2 Prolift mesh because it caused her -- it was symptomatic
3 for her.  As a result of that, there was a hole, and
4 that led to the subsequent surgeries.
5    Q.   Okay.  And the hole in the bladder can occur
6 with any midurethral sling; correct?
7    A.   No.
8    Q.   It cannot?
9    A.   Well, the hole in the bladder is in the
10 bladder.  A midurethral sling hole would be at the
11 bladder neck or distal, because that's where the
12 midurethral sling passes.
13    Q.   So there's no risk of a cystotomy with a
14 midurethral sling?
15    A.   Not this kind of cystotomy.  Retropubic slings
16 require cystoscopies because sometimes the retropubic
17 sling can traverse the anterior aspect of the bladder
18 dome, which is different than this area.
19    Q.   But you can have a cystotomy with a retropubic
20 sling?
21    A.   It's highly unlikely because of the trajectory
22 of the retropubic sling in this area.  So between the --
23 we're talking about between the vagina and the bladder.
24 The likelihood of a cystotomy there is low.  The

Lennox Hoyte, M.D.

Page 54

1 likelihood of a cystotomy at the lateral aspects of the
2 anterior dome is present with retropubic slings.
3     Q.  Okay.  Wherever you have the cystotomy, there's
4 a risk of cystotomy with any kind of midurethral sling;
5 correct?
6     A.  Well, I'll give you this:  One of the things
7 that people advertise with transobturator-type slings is
8 that the need for cystoscopy is at the discretion of the
9 surgeon because the risk is lower.  That's one of the
10 arguments that people make for TOTs.  So TOTs tend to
11 have a lower risk for cystotomy, I think was your
12 question.
13     Q.  Yes, that's fine.  The risk of cystotomy can
14 happen with a Birch procedure?
15     A.  Absolutely.
16     Q.  The risk of cystotomy can happen with a Kelly
17 plication?
18     A.  Very low possibility.
19     Q.  And can cystotomy occur with a sacrocolpopexy?
20     A.  Yes.
21     MR. TARASKA:  When you get to your natural
22 stopping point, we're over an hour now.
23     MR. THOMAS:  Do it?
24     MR. TARASKA:  Do you want to do it?

Page 55

1     MR. THOMAS:  Yes.
2     (Recess from 1:07 p.m. until 1:14 p.m.)
3 BY MR. THOMAS:
4     Q.  Doctor, had Ms. England had a sacrocolpopexy in
5 2006 as opposed to a Prolift, could she have suffered
6 the same mesh exposure issues as she did with the
7 Prolift?
8     A.  So sacrocolpopexy has a 3 to 5 percent risk of
9 mesh exposure.  Smaller risk of exposure into the
10 bladder.  Certainly vaginal exposure.  Yes.
11     MR. THOMAS:  I have to hear my question again
12 to make sure I understood the answer.
13     (The following question was read by the
14 reporter:)
15     Q.  Doctor, had Ms. England had a
16 sacrocolpopexy in 2006 as opposed to a Prolift,
17 could she have suffered the same mesh exposure
18 issues as she did with the Prolift?
19     MR. TARASKA:  I'm sorry.  Could you read that
20 again?
21     (The following question was read by the
22 reporter:)
23     Q.  Doctor, had Ms. England had a
24 sacrocolpopexy in 2006 as opposed to a Prolift,

Page 56

1 could she have suffered the same mesh exposure
2 issues as she did with the Prolift?
3     MR. TARASKA:  So form.
4 BY MR. THOMAS:
5     Q.  And so there's nothing about the Prolift as
6 compared to the sacrocolpopexy in 2006 that would have
7 precluded mesh attaching to the bladder which would
8 require a revision as Dr. Zimmerman did in 2015?
9     A.  Different geographical location.
10 Sacrocolpopexy exposure would be more likely to be near
11 the apex or the upper vagina and the upper bladder dome,
12 which is much more accessible abdominally for repair.
13 The repair profile would have been dramatically
14 different.
15     Q.  In the instance of a mesh erosion or a mesh
16 exposure involving sacrocolpopexy, there's a risk of
17 cystotomy?
18     A.  So the question is during the repair of an
19 erosion --
20     Q.  Yes.
21     A.  -- is there a risk of cystotomy?
22     Q.  Let me ask it again.  I'm sorry.  You're
23 exactly right.
24     Doctor, you agree that the use of mesh in a

Page 57

1 sacrocolpopexy presents a risk of mesh erosion or mesh
2 exposure?
3     A.  Mesh is a foreign body and its use carries a
4 risk of mesh exposure and mesh erosion.
5     Q.  And to the extent that there is a mesh erosion
6 and a mesh exposure and a decision is made to repair
7 that mesh erosion or mesh erosion, there is a risk of
8 cystotomy?
9     A.  So if the mesh is eroded into the vagina,
10 repairing the mesh erosion involves dissecting the mesh
11 off the vagina abdominally and reclosing the vagina.
12 The risk of cystotomy in that setting is extremely low.
13     If the erosion is into the bladder, then, by
14 definition, in order to repair that erosion, you have to
15 lift the bladder off the mesh in order to reclose it,
16 and that is equivalent to a cystotomy, but it's not a
17 cystotomy that you made.  It exists because of the
18 exposure.
19     Q.  And to the extent that there's a cystotomy that
20 turns into a fistula -- strike that.
21     There is nothing about -- let me start over
22 again.
23     Doctor, to the extent that Ms. England had had
24 a sacrocolpopexy in 2006 as opposed to the Prolift, is

Lennox Hoyte, M.D.

Page 58

1 there anything about that procedure that would have
2 prevented her from having a revision surgery of the
3 sacrocolpopexy mesh that would have resulted in the
4 fistulas that she later had?
5    A.   Let me see if I can bust the question up so I
6 can answer it.  If she had a sacrocolpopexy in 2006 and
7 it eroded --
8    Q.   Yes.
9    A.   -- is there a risk that that erosion would lead
10 to a fistula?
11    Q.   Correct.
12    A.   There is a risk, an extremely low risk of
13 fistula formation, but whenever you repair the bladder
14 in proximity to the vagina in the place where the
15 bladder and the vagina are and share a wall, there is a
16 risk of a fistula.
17        Lifting the bladder off the sacrocolpopexy
18 mesh, repairing an erosion, would require that doc to
19 basically bring that peritoneum around to isolate the
20 repair suture line from the sacrocolpopexy mesh, which
21 is what we do when we have a sacrocolpopexy mesh
22 exposure into the bladder.
23    Q.   Doctor, do you have an opinion about what it is
24 about the Prolift that caused these erosions or

Page 59

1 exposures?
2    A.   Yes.
3    Q.   What is it?
4    A.   When you take a foreign body and you place it
5 transvaginally, you cannot fully sterilize the vagina,
6 as I've pointed out in my reports.  There's a constant
7 bacterial load in the vagina even in the midst of full
8 attempts at sterilization.  So by placing extensive
9 amounts of mesh transvaginally as you do with the
10 Prolift, you are basically bringing contaminants and
11 vaginal fluids into the repair area.
12        Then when you anchor the Prolift in a
13 side-to-side fashion as is the case with Ms. England,
14 you actually put traction on the arms.  The arms of the
15 synthetic mesh have a different characteristic once you
16 put them under traction, because that's the way you
17 place them.  They are much more prone to creating
18 painful scars, and because of the bunching up, as we've
19 seen from the descriptions, they create a higher risk of
20 nonhealing vaginal tissue and erosions as well as
21 bladder misbehavior in terms of, like, erosions or
22 bunching.
23        The placement technique for the Prolift and the
24 large mesh load that's placed with the Prolift and the

Page 60

1 fact that the arms are placed -- you have to pull the
2 arms through in order to get them placed -- creates an
3 environment in the vagina that makes them prone to
4 erosion.
5    Q.   Is there any different risk that the Prolift
6 presents to a patient different from the risk that is
7 presented by the mesh used in sacrocolpopexy, or is it
8 just a matter of quantity?
9    A.   Dramatic difference.
10    Q.   What is the different risk?
11    A.   The sacrocolpopexy mesh is placed through a
12 clean environment.  The transvaginal Prolift mesh is
13 placed through a contaminated environment.  The
14 anchoring of the Prolift mesh is a side-to-side
15 transverse anchoring that involves scarring into the
16 pelvic sidewalls, pelvic floor muscles, such that when
17 the mesh contracts it actually pulls the muscles to the
18 midline as it heals, in addition to the bacterial and
19 vaginal fluid contamination.
20        It's a different animal compared to when you
21 place a sacrocolpopexy mesh vertically.  When that mesh
22 contracts, it pulls the vagina upwards and lengthens it
23 more.
24    Q.   But the risk is the same, that is, the risk of

Page 61

1 exposure or erosion; correct?
2    A.   No, absolutely not.
3    Q.   How is the risk different?  Tell me that.
4    A.   So when you -- let me reiterate.  When you
5 place a synthetic polypropylene mesh through the abdomen
6 as we've been doing since the 1960s, it's placed through
7 a clean environment that's fully sterilized.  When you
8 place that same polypropylene material through a
9 contaminated environment that is not completely -- that
10 is not completely sterilized, you bring vaginal fluids
11 and bacteria along with it.
12        When you place a sacrocolpopexy mesh, you place
13 it vertically through the abdomen.  When it contracts,
14 as it does when it heals, all foreign bodies --
15 meshes do, it pulls the vagina upward to fully lengthen
16 it.  When the mesh placed with a Prolift contracts, it
17 pulls the vaginal walls inward to what's the midline,
18 causing pain and contractures.
19        It's a different route for the same material.
20 The route is different, and that makes a huge
21 difference.
22    Q.   You mentioned earlier in your deposition that
23 you wanted to update your report to refer to, I believe,
24 her prognosis?

Lennox Hoyte, M.D.

Page 62

1    A.  Correct.

2    Q.  What is the change that you'd like to make?

3    A.  It is not a change.  It's an augmentation.  I

4  have noted that her prognosis is uncertain.  I want to

5  emphasize that, as a physician, my job is to provide

6  hope to patients.  So I don't give up if the patient

7  doesn't give up.  We keep looking for ways to make their

8  symptoms better and improved.

9        In the case of Ms. England, it is more likely

10  than not that her injuries and her symptoms will be

11  permanent, not temporary.

12    Q.  Let's talk about that.  Are the symptoms you're

13  referring to on page 27 of your report?

14    A.  Urinary retention, we don't have the ability to

15  evaluate that right now because the last thing we did

16  was look at her fistula repair, so we don't know what

17  that is.

18    Q.  I don't mean to interrupt you.

19    A.  Sure.

20    Q.  I direct you to page 27.  Are the symptoms that

21  are present on page 27 those that you claim are ones

22  that you can't treat?

23    A.  I didn't say we can't treat them.

24    Q.  Unlikely to be successful?

Page 63

1    A.  Her symptoms are likely to be permanent.

2    Q.  Got it.  So are these the symptoms to which

3  you're referring on page 27?

4    A.  Let's look at them.  I see new

5  symptoms/problems since TVT-O/ Prolift procedure.  I

6  have a list there.  That's the list that I'm going

7  through with you.

8    Q.  Good.  Is that a good place to go?

9    A.  So there's there, and then there's the -- so

10  we've got areas in 27.  If you want to go through with

11  me line by line, I'll tell you.

12    Q.  What I'd like to know is what it is that you

13  claim that she experiences in 2019 that you can treat

14  which you're unlikely to be able to be successful in

15  treating.

16    A.  That's what I'm going through with you.

17    Q.  Thank you.  Good.

18    A.  So the urinary retention, we're not going to

19  know about that until the fistula is completely healed.

20        The fistula, we've seen that it's recurred

21  already multiple times.  We don't know if this is going

22  to recur or not.  The likelihood of the fistula

23  recurring is high.

24        The mesh erosion into the bladder.  She still

Page 64

1  has multiple arms of transvaginal mesh remaining in her

2  groins and pelvic tissues.  The likelihood of those

3  meshes eroding again is high, again.

4    Q.  Why?

5    A.  Because mesh keeps eroding, as you've seen in

6  these cases.  There's been multiple surgeries in an

7  attempt to remove things, and the doctor comes back

8  later and says, "Oh, yeah, there's another piece."  That

9  keeps going on as long as there's mesh remaining in the

10  body in proximity to surface tissues.

11        Recurrent vaginal/pelvic pain, onset 2014,

12  radiating down to her legs, that is very likely to

13  continue.  That ain't going to be cured.  The reason why

14  we're not talking about it here is because the focus is

15  on this lady's fistulas.

16        You have to revisit back this patient's

17  complaints of pain.  There was never a documentation

18  that the pain was resolved.  There's just been no

19  complaints of it, because she wasn't asked because

20  everyone's focused on her fistulas.

21    Q.  Stop just a second there.  I want to make sure

22  the record's clear.

23    A.  Sure.

24    Q.  There's no record that she continues to

Page 65

1  experience vaginal/pelvic pain that radiate down her

2  legs after 2014, is there?

3    A.  You're absolutely correct, but there's no

4  documentation that that has resolved, because she has

5  bigger problems to contend with now.  We're talking

6  about fistulas and leakage.  That's a bigger deal than

7  "pain radiating down my leg."  If the fistulas ever

8  resolve, ever, then we go back to whether or not she

9  still has.  Nobody's asked her that.

10    Q.  Okay.

11    A.  Recurrent rectal and sacral pain, you know, we

12  didn't talk very much about that, but the Prolift is a

13  side-to-side spanning anatomically.  This is arms of

14  this mesh that is anchored from the left-sided pelvic

15  side wall to the right-sided pelvic side wall.  It's a

16  very tight bow tie around the patient's rectum, which is

17  very likely a cause of her rectal and sacral pain.  I

18  see these in patients a lot.

19    Q.  When was the last time that was reported in the

20  medical records?

21    A.  That's what I'm saying.  I'm just saying this

22  was once reported.  Nobody ever documented that this was

23  cured.  Nobody asked.  There's no place where -- "Is

24  your rectum and sacrum pain gone?"  Nobody's asked that

Lennox Hoyte, M.D.

Page 66

1  question.
2     Q.  And there's no evidence that it continued
3  either, is there?
4     A.  Well, no, there's no evidence anybody asked her
5  about it.
6     Q.  Thank you.
7     A.  Right.  Rectocele is native tissue repair.
8  Probably resolved.
9        Dyspareunia, I don't think that's likely to
10 resolve.  No one's asked her about that, again, because
11 everyone's here focused on Ms. England's fistula.
12       And the last record we have is a fistula
13 repair.  Nobody's gone through and asked her are these
14 symptoms still here.
15    Q.  Okay.
16    A.  So her vaginal dryness could be resolved, will
17 be resolved with vaginal estrogen.
18       Urinary urgency, possibly resolved with vaginal
19 estrogen if she's treated.
20       Vaginal pain and pelvic pain with sexual
21 intercourse, I don't think so.
22    Q.  Again, those are the same things we just talked
23 about.  There's no documentation of the last three in
24 the last several years?

Page 67

1     A.  Either way.
2     Q.  Correct.
3     A.  Right.  Nobody's asked her about it.
4     Q.  Anything else?
5     A.  We went through the list, didn't we?
6     Q.  I just want to make sure that you have an
7  opportunity to address everything that you'd like to
8  talk about in terms of her prognosis.
9     A.  So the most important thing I want to tell you
10 is the permanence of her symptoms.
11    Q.  Okay.  Any recommendation from you about her
12 future care and treatment?
13    A.  I would want to follow up and see what the
14 status of her fistula is, because right now that's the
15 most important and concerning issue with her.  Once her
16 fistula is resolved, I would seek to bring her in and
17 walk through with her her list of complaints and see
18 what's persisting and what's not, and I would gear
19 treatment based on what the answers to those questions
20 are, and that evaluation.
21    Q.  Do you know how Ms. England was employed?  Do
22 you know what she did for a living?
23    A.  I'm sure I do, because I did read her
24 deposition, but, you know, lots of these ladies today

Page 68

1  were nurses, and I don't know -- I didn't put down what
2  she did here for a living.
3     Q.  Okay.  Do you know the last time she took
4  prescription pain medications?
5     A.  I do not.  I know she was on Lortab for
6  migraine headaches is what I was -- is what I
7  understood.
8     Q.  Do you know where the current source, location,
9  of her pain is today?
10    A.  I do not.
11    Q.  Do you know what the plaintiff understood about
12 the risks of the surgery that she had in 2006?
13    A.  I believe that she was explained that things
14 could go wrong, and she probably went through the
15 consent form as Dr. Yang -- this is Dr. Yang's
16 patient -- had discussed with her.  I don't have a
17 recollection of what her understanding was.
18    Q.  Do you know whether she had chronic pelvic pain
19 in the 1980s?
20    A.  Let's look.  I'm looking at this patient who
21 had a transabdominal hysterectomy with left
22 salpingo-oophorectomy in 1988, probably performed for
23 pelvic pain.  That procedure will be curative if that
24 were the case.

Page 69

1     Q.  Do you know anything about her chronic pelvic
2  pain in the 1980s other than your entry on page 14 about
3  her prior history in 1988?
4     A.  I do not.  I do know in 2006 she denies
5  bleeding, denies pelvic pain, status post hysterectomy
6  with LSO.  No abnormal symptoms.  She didn't have pelvic
7  pain on that visit.
8     Q.  Other than the abdominal hysterectomy and the
9  left salpingo-oophorectomy in 1988, do you have any
10 other information about sources of chronic pain in the
11 1980s?
12    A.  She had a cholecystectomy.  That could
13 cause pain.
14    Q.  That was in 2006; correct?
15    A.  I'm sorry.  2006.  I apologize.
16    Q.  Anything else?
17    A.  There's nothing else that I have here from
18 that.
19    Q.  Do you know whether she had pain with
20 intercourse in the 1980s?
21    A.  I do not.
22    Q.  Do you know if she was ever diagnosed with
23 chronic pelvic pain in the 1980s?
24    A.  I do not.  I suspect with the abdominal

Lennox Hoyte, M.D.

Page 70

1 hysterectomy and left salpingo-oophorectomy many of
2 those procedures are performed as a result of pain with
3 intercourse related to touching of the uterus during
4 sexual activity, which is resolved when the uterus is
5 removed.
6    Q.  Do you know why Dr. Zimmerman didn't remove all
7 the mesh during his first revision surgery?
8    A.  Since I'm not Dr. Zimmerman, I would not.
9 However, my understanding is that many docs are under
10 the impression that if you only expose the -- remove the
11 exposed mesh the patient is likely to be cured.  I do
12 not subscribe to that school of thought.
13    Q.  So you would have done a different revision
14 surgery than Dr. Zimmerman did?
15    A.  When patients come to me with mesh exposure and
16 mesh complications, my understanding and belief from my
17 clinical experience is that the entire exposed mesh
18 needs to be removed.  I don't think that's a universally
19 subscribed principle.
20    Q.  When you say "the entire exposed mesh," are you
21 talking about the area of the exposure or the entire
22 mesh needs to be removed?
23    A.  So I'm referring to the fact that mesh in one
24 location has an exposure.  That entire mesh needs to

Page 71

1 come out.  If she has a mesh in that location, like a
2 Prolift, and a TVT that's not exposed, I would leave the
3 TVT alone and I would remove the Prolift.
4    Q.  You would remove the entire Prolift for a small
5 exposure?
6    A.  And I say that because my experience is that if
7 you don't, then the remaining areas, as we've seen with
8 Ms. England, will continue to ex -- will continue to
9 present as exposed.
10       And subsequent removal of partially removed
11 mesh is much harder to accomplish than initial removal
12 of the intact mesh.  So you make life more difficult for
13 the patient if you fail to remove the entire mesh that
14 is having the complication.
15    Q.  What is your understanding of the training,
16 education, and experience of Dr. Yang with the Prolift
17 and TVT-O?
18    A.  This is my understanding from her deposition.
19 She was trained in incontinence and prolapse procedures
20 in her residency.  She went to courses sponsored by
21 Ethicon and what she described as major GYN societies
22 for implantation of mesh.  She did not have any specific
23 training in mesh removal.
24       We're talking about Dr. Yang; correct?

Page 72

1    Q.  Uh-huh.
2    A.  But she reported performing a number of these
3 mesh placement and TVT procedures.  She also reported
4 that she had training from one of her senior partners in
5 her practice.
6    Q.  Did you find her qualified to perform this kind
7 of surgery?
8    A.  I did not find her unqualified.
9    Q.  Okay.  Did you find from your review of her
10 deposition that she was knowledgeable of the risks of
11 pelvic floor surgery generally?
12    A.  Yes.
13    Q.  Did you find from a review of her deposition
14 that she was knowledgeable of the risks of TVT-O?
15    A.  Yes.
16    Q.  Did you find from a review of her deposition
17 that she was knowledgeable of the risks of Prolift?
18    A.  Yes.
19    Q.  And did you find from a review of her
20 deposition that she was knowledgeable of the risks of
21 native tissue repair?
22    A.  I believe so, yes.
23    Q.  Do you know whether Dr. Yang stands by her
24 decision to implant the Prolift and the TVT-O in

Page 73

1 Ms. England?
2    A.  I think there are parts of her deposition where
3 she said she stands by it.
4    Q.  Doctor, going to page 5 of your report, please,
5 Exhibit 3 --
6       MR. TARASKA:  By the way, I have a form
7    objection that I simply missed, I'll just put it on
8    now, as to what Dr. Yang's thoughts are about
9    whether she stands by or doesn't stand by any
10    earlier decision.  One practitioner commenting on
11    another.  Go ahead.
12       MR. THOMAS:  Okay.  Sure.
13 BY MR. THOMAS:
14    Q.  In the Ashbrook case, you say you review the
15 general and product-specific literature related to the
16 Gynecare TVT-O and Prolift products.  I just want to
17 make sure.  That does not include any of the studies
18 published in the literature about the safety and
19 efficacy of either the TVT-O or the Prolift?
20    A.  First, again, there's no definitive safety
21 studies performed on the Prolift product.  Generally
22 speaking, in my background study of keeping up with my
23 CME and just going along with my recredentialing, I'm
24 obliged to follow the literature and keep up with it.  I

Lennox Hoyte, M.D.

Page 74

1  did not do that specifically for this case, but I did
2  review the TVT-O and Prolift IFU and the methods of
3  implantation in detail.
4        Q.   Here's what I'm trying to avoid, and if I need
5  to, I will.  In the Ashbrook case, we decided that you
6  were here for a case-specific report, you were relying
7  on your clinical experience and not relying upon any of
8  the published studies on the safety and efficacy of
9  midurethral slings.
10        Is that the same in England for the TVT-O?
11        A.   This is the same for the three depositions that
12  we're doing today.
13        Q.   And is it the same for the Prolift as well?
14        A.   Absolutely.
15        Q.   Thank you.
16        MR. THOMAS:  Give me just a second.  I might be
17  finished.
18        (Discussion off the record.)
19        MR. THOMAS:  I'm going to stop, Doctor.  Thank
20  you.
21              CROSS-EXAMINATION
22  BY MR. TARASKA:
23        Q.   I just have a couple questions.
24        You mentioned that in your clinical practice

Page 75

1  you attempt to interview patients and evaluate them
2  through physical exam; is that correct?
3        A.   Yes.
4        Q.   And that applies when you are treating the
5  patient?
6        A.   Correct.
7        Q.   In this particular case, after reviewing the
8  medical records of this woman, Mrs. England, do you feel
9  that you have sufficient information upon which to base
10  your opinions as you have provided them to us today and
11  in your report?
12        A.   I do.
13        Q.   And do you feel that your opinions are within a
14  reasonable medical certainty?
15        A.   Yes.
16        Q.   Sir, do you have any criticisms of the other
17  physicians who have treated Mrs. England throughout her
18  time since the implantation of these devices?
19        A.   With respect to the physicians that I -- whose
20  records I reviewed, I do not.
21        Q.   Thank you, sir.
22        There's been a question about the fistula
23  caused during Dr. Zimmerman's procedure, I believe.  Do
24  you recollect that line of questions?

Page 76

1        A.   Yes.
2        Q.   All right, sir.  Do you have any criticism of
3  the fact that a fistula was caused during that
4  particular procedure?
5        A.   Well, the fistula was not caused during that
6  procedure.  There was a cystotomy sustained as a result
7  of attempting to dissect the mesh out from underneath
8  the bladder.  That cystotomy was repaired and that
9  cystotomy over time evolved into a fistula, as they can.
10        Q.   Do you have any criticism of the fact that what
11  occurred during that procedure eventually evolved into a
12  fistula?
13        A.   I do not.
14        MR. TARASKA:  Thank you, sir.
15        MR. THOMAS:  I have nothing further.  Thank
16  you, Doctor.
17        (Whereupon, the deposition concluded at
18  1:43 p.m.)
19
20
21
22
23
24

Page 77

1           C E R T I F I C A T E
2
3        I, JOAN L. PITT, Registered Merit Reporter,
4  Certified Realtime Reporter, and Florida Professional
5  Reporter, do hereby certify that, pursuant to notice,
6  the deposition of LENNOX HOYTE, MD, was duly taken on
7  October 22, 2019, at 11:57 a.m., before me.
8        The said LENNOX HOYTE, MD, was duly sworn by me
9  according to law to tell the truth, the whole truth, and
10  nothing but the truth, and thereupon did testify as set
11  forth in the above transcript of testimony.  The
12  testimony was taken down stenographically by me.  I do
13  further certify that the above deposition is full,
14  complete, and a true record of all the testimony given
15  by the said witness.
16
17        _____
18        JOAN L. PITT, RMR, CRR, FPR
19
20        (The foregoing certification of this transcript
21  does not apply to any reproduction of the same by any
22  means, unless under the direct control and/or
23  supervision of the certifying reporter.)
24

Lennox Hoyte, M.D.

## INSTRUCTIONS TO WITNESS

    Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

    After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

    It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

## ACKNOWLEDGMENT OF DEPONENT

    I, _____, do hereby acknowledge that I have read the foregoing pages, 1 - 81, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____   _____

LENNOX HOYTE, MD                DATE

Subscribed and sworn to before me this
____ day of _____, 20___.
My Commission expires: _____

_____

Notary Public

          - - - - - -
          E R R A T A
          - - - - - -
PAGE  LINE  CHANGE
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____
____  ____  _____
REASON: _____

          LAWYER'S NOTES
PAGE  LINE
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____