# EXHIBIT F

Lennox Hoyte, M.D.

1              IN THE UNITED STATES DISTRICT COURT

               SOUTHERN DISTRICT OF WEST VIRGINIA

2                    CHARLESTON DIVISION

3    IN RE: ETHICON, INC., PELVIC      Master File No.

     REPAIR SYSTEM PRODUCTS            2:12-MD-02327

4    LIABILITY LITIGATION

                                       MDL NO. 2327

5

                                       JOSEPH R. GOODWIN

6    THIS DOCUMENT RELATES TO:         US DISTRICT JUDGE

     _____  _____

7

     Iretta Lynn Ashbrook v.

8    Ethicon, Inc., et al.

     Case No. 2:13-cv-10672

9

10

11                        - - -

12                  OCTOBER 22, 2019

13                        - - -

14

           Deposition of LENNOX HOYTE, MD, held at

15    Morgan & Morgan, PA, 20 North Orange Avenue, Suite

      1600, Orlando, Florida 32801, commencing at

16    9:16 a.m., on the above date, before Joan L. Pitt,

      Registered Merit Reporter, Certified Realtime

17    Reporter, and Florida Professional Reporter.

18                        - - -

19

20            GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

21                 deps@golkow.com

22

23

24

Page 2

1  APPEARANCES:

2

3  Counsel for the Plaintiff:
4    JOSEPH M. TARASKA, ESQUIRE
     Morgan & Morgan, PA
5    20 North Orange Avenue
     Orlando, Florida 32801-2414
6    407.420.1414
     jtaraska@forthepeople.com
7

8  Counsel for the Defendants:
9    DAVID B. THOMAS, ESQUIRE
     Thomas Combs & Spann PLLC
10   300 Summers Street, Suite 1380
     Charleston, West Virginia 25301
11   304.414.1807
     dthomas@tcspllc.com
12

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

1           - - -
2       I N D E X
3           - - -
4  Testimony of: LENNOX HOYTE, MD
5    DIRECT EXAMINATION BY MR. THOMAS          4
6    CROSS-EXAMINATION BY MR. TARASKA          84
7    REDIRECT-EXAMINATION BY MR. THOMAS        95
8

9

10     E X H I B I T   I N D E X
11 HOYTE        DESCRIPTION        PAGE
12 Exhibit 1  Curriculum Vitae                5
13 Exhibit 2  Billing records re: Iretta Ashbrook   7
14     dated 8/3/109
15 Exhibit 3  Billing records re: Plaintiffs   10
16     Ashbrook, England, Messina dated
17     9/25/2019
18 Exhibit 4  Expert Report of Dr. Lennox Hoyte   14
19 Exhibit 5  Abstract entitled Transobturator   75
20     Sling for the Treatment of Recurrent
21     Stress Incontinence, Rajan S., et
22     al., published in the International
23     Urogynecologic Journal 2006
24

Page 4

1           - - -
2      THE COURT REPORTER:  Raise your right hand,
3  please.  Do you swear or affirm the testimony you
4  give will be the truth, the whole truth, and nothing
5  but the truth?
6      THE WITNESS:  I do.
7      THE COURT REPORTER:  Thank you.
8      LENNOX HOYTE, MD, called as a witness by the
9  Defendants, having been first duly sworn, testified as
10 follows:
11         DIRECT EXAMINATION
12 BY MR. THOMAS:
13   Q.  Good morning, Dr. Hoyte.
14   A.  Good morning.
15   Q.  My name is David Thomas.  I represent Ethicon
16 in the Ashbrook case pending in the multidistrict
17 litigation in West Virginia.
18      I understand you're an expert witness for
19 Ms. Ashbrook; is that correct?
20   A.  I am.
21   Q.  Would you state your full name for the record,
22 please?
23   A.  My name is Lennox Hoyte.
24   Q.  And Dr. Hoyte -- it is Dr. Hoyte; correct?

Page 5

1   A.  Correct.
2      (Hoyte Exhibit No. 1 was marked for
3  identification.)
4  BY MR. THOMAS:
5   Q.  I have a CV that's been supplied to me that
6  I'll mark as Deposition Exhibit No. 1.  Is this CV
7  complete and accurate to the best of your understanding?
8   A.  Yes.  It says December 2018, and I believe it's
9  correct.
10   Q.  Okay.  Is it your practice to upgrade -- or
11 update your CV on a regular basis and add information as
12 it becomes relevant to your CV?
13   A.  That mattered when I was in academics, and I'm
14 no longer in academics.  I left in 2016.  So I'm not as
15 exact as updating, but this is substantially correct.
16   Q.  Okay.  Have you ever removed anything from your
17 CV over the years?
18   A.  I don't think I would have removed publications
19 or presentations, but I may have altered the narrative
20 from time to time.
21   Q.  Okay.
22   A.  I don't recall specifically.
23   Q.  You received the notice of deposition for this
24 case.  Have you seen the notice?

Lennox Hoyte, M.D.

Page 6

1   A.  Yes, sir.
2   Q.  Did you seek to bring information to the
3   deposition responsive to the notice of deposition?
4   A.  I gave all the information to counsel.
5        MR. THOMAS:  And, Counsel, did you bring stuff
6   for me?
7        MR. TARASKA:  I brought stuff for you.  Here's
8   a copy of Dr. Hoyte's expert testimony.
9        MR. THOMAS:  Let me just do this.  I really
10  don't want to spend a lot of time on this because
11  I'm not --
12       MR. TARASKA:  Sure.
13       MR. THOMAS:  Yeah.  And let me ask you this:
14  To the best of your knowledge, is there anything
15  that you were unable to provide other than the two
16  cases that you mentioned by e-mail yesterday?
17       MR. TARASKA:  Yeah, that I spoke with Amy
18  about?
19       MR. THOMAS:  Right.
20       MR. TARASKA:  Other than the invoices and the
21  reports that had to do with that, I think we've got
22  everything.  I think I've got it all.
23       MR. THOMAS:  Good.
24       MR. TARASKA:  The medical records are in the

Page 7

1   back, and we'll have to pull those for you.
2        MR. THOMAS:  I hope that we don't have to get
3   into those in any detail.
4        MR. TARASKA:  All right.  Good.
5        MR. THOMAS:  If we get to that point, then I'll
6   have to ask about it.
7        MR. TARASKA:  Go ahead.
8   BY MR. THOMAS:
9   Q.  In the materials that you gave to counsel, did
10  you include your billing records for this case?
11  A.  Yes, sir.
12       MR. THOMAS:  I do want to see those, Joe.
13       MR. TARASKA:  Sure.  Ashbrook and Ashbrook.
14       (Hoyte Exhibit No. 2 was marked for
15  identification.)
16  BY MR. THOMAS:
17  Q.  Doctor, counsel's given me some records I'll
18  show you.  The first record is dated August 3, 2019.
19  I've marked that as Deposition Exhibit No. 2.  What does
20  that represent?
21  A.  It looks like a bill to Attorney Taraska
22  regarding Iretta Ashbrook for activities performed
23  related to the Ashbrook matter.
24  Q.  Do you mind if I look over your shoulder and

Page 8

1   read with you?
2   A.  Not at all.
3   Q.  Thank you.  You charged a $10,000 retainer to
4   review the records in this case; is that right?
5   A.  Correct.
6   Q.  Okay.  And the entries on Exhibit No. 2
7   represent the time that you spent reviewing records and
8   preparing your expert report?
9   A.  Correct.
10  Q.  And you charged $1,000 an hour for your time?
11  A.  Correct.
12  Q.  Do you charge the same for your deposition
13  time?
14  A.  Today's deposition, being audio, it's the same
15  rate, with a three-hour minimum.
16  Q.  So in April 2019 you spent approximately seven
17  hours drafting the expert report?
18  A.  Correct.
19  Q.  Do you have anybody that assists you in your
20  review of medical records and preparation of reports in
21  this case outside of counsel?
22  A.  I don't understand the question.
23  Q.  Sure.  Did you do all this work by yourself?
24  A.  Personally, correct.

Page 9

1   Q.  Thank you.  The second page -- it seems like
2   this is the same thing.  That's what I was looking at.
3   A.  Okay.
4   Q.  It's not the same thing.
5   A.  Yes.  Yes.  Okay.  If you ask me a question,
6   I'm happy to answer.
7   Q.  Sure.  Second page of page 2 shows additional
8   charges for September 2019?
9   A.  Correct.
10  Q.  When you reviewed the case-specific defense
11  expert report, that's Ethicon's expert?
12  A.  Correct.
13  Q.  For $2,000?
14  A.  Correct.
15  Q.  And then a second --
16  A.  I can explain that.
17  Q.  Yeah.
18  A.  If you'd like.
19  Q.  Does this document relate to Ashbrook?
20  A.  So there are two activities.  So as you may be
21  aware, there are multiple things that we're talking
22  about today.
23  Q.  Right.
24  A.  And there's a general expert defense report by

Lennox Hoyte, M.D.

Page 10

1 Dr. Kenton and by Dr. Sirils that applies equally to all

2 three.

3    Q.  I see.

4    A.  So I think there was a total for this that I

5 think was divided between Ashbrook and the other

6 matters.

7    Q.  Perfect.

8    A.  So this -- a third of this should apply to

9 Ashbrook.

10    (Hoyte Exhibit No. 3 was marked for

11 identification.)

12 BY MR. THOMAS:

13    Q.  So I'm going to mark that as Deposition Exhibit

14 No. 3.

15    A.  If you don't mind putting an E at the end of my

16 name, I'd be grateful.

17    Q.  We'd be happy to.

18    A.  That happens a lot.

19    Q.  Well, I apologize for that.  We'll fix that.

20    So just so the record's clear, Deposition

21 Exhibit No. 2 contains all of the charges through

22 September 25, 2019.  They're specific to the Ashbrook

23 case?

24    A.  Yes.

Page 11

1    Q.  And Exhibit No. 3 contains four hours of time

2 that you spent reviewing the general expert reports of

3 Drs. Kenton -- I think that's Dr. Sirils --

4    A.  Correct.

5    Q.  -- of $4,000 that's to be spread among

6 different cases?

7    A.  Correct.

8    Q.  All right.  Do Exhibit Nos. 2 and 3 represent

9 the total of your billings for the Ashbrook case?

10    A.  To date, invoices that I've submitted, correct.

11    Q.  Okay.  Today is October 22?

12    A.  Correct.

13    Q.  What work have you done since your last

14 invoice?

15    A.  So prepared for this deposition, reviewed

16 additional materials, which I haven't yet tabulated.

17    Q.  Okay.  What other materials have you reviewed?

18    A.  I think there was a deposition of the

19 implanter.  There may have been additional records, and

20 I can't remember specifically.

21    Q.  Okay.

22    MR. TARASKA:  Can I help you with one thing?

23    MR. THOMAS:  Sure.

24    MR. TARASKA:  We did forward to Dr. Hoyte the

Page 12

1 report that we submitted, the Rule 26 report of

2 Mrs. Carruthers, who did the life care plan.

3    MR. THOMAS:  Okay.

4    MR. TARASKA:  So that would be something also.

5 BY MR. THOMAS:

6    Q.  And what did you do to prepare for your

7 deposition?

8    A.  Reviewed the medical records, reviewed my

9 Rule 26, I reviewed additional medical records that were

10 sent to me that I looked at, and I believe there were

11 depositions as well.

12    Q.  I don't have a deposition of an implanter in

13 this case.  Do you have a specific recollection of

14 reviewing an implanter's deposition?

15    A.  Again, I apologize.  I have the three matters

16 that are stuck in my head, so I don't --

17    Q.  And, Doctor, let me tell you something that may

18 help you understand.  As you know, there are thousands

19 of these cases, and I don't work on cases individually.

20 They've asked me to come in and take the depositions of

21 you as an expert, and I very often learn that you have

22 stuff that I don't have.  So -- just so -- there's no

23 tricks here.  I'm just trying to figure it out.

24    A.  Yeah.  I'm happy to give you a record of

Page 13

1 everything that I've worked on, and I can send that, and

2 I think counsel has it.  He sent me the information.  He

3 can give that to you.

4    Q.  My only message to you is I don't have an

5 implanter's deposition.  That doesn't mean it wasn't

6 taken and you've reviewed it.

7    A.  I'm going to say deposition.

8    Q.  Okay.  That's fine.

9    A.  I'm happy to give it to you.

10    Q.  I understand that.  I'm just making sure we're

11 talking about the same thing.

12    A.  I'm not trying to hide anything from you.  I'm

13 just --

14    Q.  And neither am I.

15    A.  Yeah.

16    Q.  For the work that you've just described that

17 you've done since your invoices described in Exhibits

18 No. 2 and 3, can you tell me generally your best

19 recollection of how much time you spent prior to your

20 deposition today?

21    A.  I don't have a number in my head.

22    Q.  Do you keep track of your time?

23    A.  I try to by individual pieces, but I don't have

24 a tabulation.

Lennox Hoyte, M.D.

Page 14

1    Q.   Do you write it down?
2    A.   Somewhere, yes.
3    Q.   Okay.  So somewhere there's a written record of
4  the time you spent on the Ashbrook case between
5  Exhibits 2 and 3 and today?
6    A.   Somewhere there may be.
7    Q.   Okay.
8    A.   And I think by the time this is all over,
9  within the next few days, there will be a tabulation of
10  the total time spent that you're happy to -- I'm happy
11  to send to counsel of record.
12        MR. TARASKA:  And I will forward that to you.
13        MR. THOMAS:  Great.
14        (Hoyte Exhibit No. 4 was marked for
15  identification.)
16  BY MR. THOMAS:
17    Q.   Let me show you now what I'm going to mark as
18  Deposition Exhibit No. 4.  Deposition Exhibit No. 4 is a
19  copy of the report that's been supplied to us.  Do you
20  recognize that as your report?
21    A.   I do.
22    Q.   In the Ashbrook case?
23    A.   With the appropriate correction of my name.
24  It's H-o-y-t-e.

Page 15

1    Q.   Let's do that right now just so we fix that.  I
2  apologize for that.
3    A.   I know the version without an E is a very
4  Southern name, and so I'm not surprised that a good
5  Southern gentleman like yourself might make some
6  assumptions.
7    Q.   Where do you think I'm from, Doctor?
8    A.   You sound to me like a fine Southern gentleman.
9    Q.   Well, that's nice of you to say.
10    A.   That's all I'm going to say.
11    Q.   My home's West Virginia.
12    A.   That's the South, isn't it?
13    Q.   Well, it depends on who you ask.  It depends on
14  who you ask.
15        And, Doctor, your report, Deposition Exhibit
16  No. 4, is that a complete representation of the opinions
17  you're prepared to give in this case?
18    A.   I think the opinions I expressed herein are
19  generally complete.  If I could, I would tell you that
20  I've said in the end here that the prognosis is
21  uncertain, and I would basically want to clarify that.
22  Otherwise, I would say it represents my opinions.
23    Q.   Okay.  And we'll get to that, so I will give
24  you that chance.

Page 16

1    A.   I appreciate it.
2    Q.   Do you have any further work that you're
3  prepared to do on the Ashbrook case beyond what you've
4  expressed in your report?
5    A.   As I've said, I'm reserving the right to
6  augment my report as more information, data findings
7  become available.
8    Q.   Okay.  Anything in particular you have in mind?
9    A.   Well, I wouldn't have it in mind if it wasn't
10  before me, so it would have to come before me.
11    Q.   Okay.
12    A.   And then I --
13    Q.   There's nothing that you plan to do with
14  respect to the Ashbrook report until something's brought
15  to your attention; is that fair?
16    A.   I think that's what I said, yeah.
17    Q.   Okay.  Doctor, there are three depositions
18  today:  The Messina case, the Ashbrook case, the England
19  case.  A lot of the questions that I'm going to ask will
20  apply to all three.  I'm going to try to avoid
21  duplication, but so know that when I ask you questions
22  about general information, it may apply equally to the
23  other two cases as well.
24    A.   I'm not sure I understand.

Page 17

1    Q.   Sure.  I'm going to talk to you a little bit
2  about your background and history --
3    A.   Correct.
4    Q.   -- in Ashbrook.
5    A.   Correct.
6    Q.   I may not ask you about them in Messina and
7  England, but whatever you say in the Ashbrook case will
8  apply equally to Messina and England.
9    A.   I'm just going to ask you gentlemen --
10        MR. TARASKA:  That's acceptable.
11        MR. THOMAS:  I'm just trying to avoid
12  duplications.
13        MR. TARASKA:  That's good, yeah.
14  BY MR. THOMAS:
15    Q.   Okay.  Let's look at page 3 of Exhibit No. 4,
16  please.
17    A.   Yes, sir.
18    Q.   If you'd look at page 3 in the first full
19  paragraph beginning:  "The only mesh procedures that I
20  perform are abdominal (open and robotic)
21  sacrocolpopexies, and the only types of incontinence
22  slings that I place are large pore, low stiffness
23  retropubic slings."
24        Prior depositions that I reviewed suggest that

Lennox Hoyte, M.D.

Page 18

1 your current sling of choice is the Caldera Desara. Is
2 that still your sling of choice?
3    A.  That's currently the only sling that I use --
4    Q.  Okay.
5    A.  -- for urinary incontinence.
6    Q.  Okay.  And --
7    A.  Synthetic sling.
8    Q.  And how long have you used the Caldera Desara
9 sling?
10   A.  Many years.
11   Q.  Ten?
12   A.  I can't say.
13   Q.  Okay.  Are you suggesting that had you used the
14 Caldera Desara sling for the treatment of the SUI
15 experienced by Ms. Ashbrook that she would not have
16 suffered the complications that are the subject of this
17 claim?
18   A.  I'm saying that the complications that
19 Ms. Ashbrook -- Ms. Ashbrook suffered are related
20 directly to the fact that she had a transobturator
21 transversely placed, transversely anchored sling placed
22 that caused her specific complaints that would not have
23 occurred if these were a retropubic sling that she had
24 placed because of the difference in trajectory.

Page 19

1    Q.  Okay.  So are you saying that if the surgeon
2 had used an Ethicon TVT midurethral sling placed
3 retropubically, the TVT Classic, that she would not have
4 sustained the injuries that she claims in this case?
5    A.  I'm saying that, again, her injuries relate to
6 the fact that she has a transversely placed,
7 transversely anchored midurethral sling placed.  That
8 would not have occurred if she had a retropubic sling
9 placed.
10   Q.  And if you -- as you use retropubic sling, does
11 any retropubic sling solve her problems?
12   A.  I don't understand.
13   Q.  Sure.  There are a number of slings that are
14 manufactured that are placed retropubically.  Do you
15 agree with that?
16   A.  I know of a few.
17   Q.  And I guess the Desara can be placed both
18 through the transobturator or retropubically; correct?
19   A.  I've never placed a transobturator.  I
20 understand that they do have helical passers, which I've
21 never used or seen personally.  I've heard that they
22 have helical passers for retro -- for a transobturator
23 placement.
24   Q.  So what midurethral slings do you know can be

Page 20

1 placed retropubically?
2    A.  I know that the Desara can, and I know Boston
3 Scientific has a sling that can be placed
4 retropubically.
5    Q.  Do you know the name of the Boston Scientific
6 sling that can be placed retropubically?
7    A.  I do not have it off the top of my head.
8    Q.  If -- if the surgeon had chosen the Boston
9 Scientific sling and placed it retropubically, would
10 Ms. Ashbrook have the complications that she presents
11 with today?
12   A.  Ms. Ashbrook would not have groin pain and
13 difficulty moving her lower limbs if she had a
14 retropubic sling placed properly.
15   Q.  Would she have any of the complications that
16 she presents with today if she'd had a synthetic
17 midurethral sling placed retropubically?
18   A.  Okay.  We'd have to go over the complications
19 list in order to line-by-line that if you would like.
20   Q.  Okay.  Let's go to page 25 of your report.
21 Down about three-quarters of the way down, it says:  "In
22 my opinion, her chronic pelvic pain, groin pain and
23 dyspareunia occurred because of the scarring of the
24 Gynecare TVT-Obturator mesh into the anterior vaginal

Page 21

1 wall and pelvic floor."
2       My question is:  Had the surgeon, implanting
3 surgeon, placed a synthetic midurethral sling
4 retropubically, would she have experienced chronic
5 pelvic pain, groin pain and dyspareunia?
6    A.  She would not have experienced chronic
7 pelvic -- groin pain, obturator pain and groin issues,
8 and she would be highly unlikely to experience
9 dyspareunia as a result of a retropubically placed
10 synthetic midurethral sling.
11   Q.  Okay.  Is it your opinion that there is a
12 higher risk of dyspareunia from a retropubically placed
13 synthetic midurethral sling as compared to a synthetic
14 midurethral sling placed through the transobturator?
15   A.  So I'm not sure that you want to ask that
16 question, but you're asking me if the retropubic sling
17 has a higher rate of dyspareunia?  That's what you
18 asked?
19   Q.  Well, you're correct.  Thank you.
20   A.  That's okay.
21   Q.  Doctor, is it your opinion that a synthetic
22 midurethral sling placed through the transobturator has
23 a higher incidence of dyspareunia than a synthetic
24 midurethral sling placed retropubically?

Lennox Hoyte, M.D.

Page 22

1    A.   Yes, and there's an anatomic explanation for
2  that.
3    Q.   Okay.  Is that based on your review of the
4  literature?
5    A.   That is my -- based on my review of patients
6  who have undergone transobturator slings.
7    Q.   And that's based upon your clinical experience?
8    A.   Clinical experience with patients and anatomic
9  explanation to justify and explain this.
10   Q.   Do you have any published literature to support
11 your position on that topic?
12   A.   I'm a case-specific expert, and I'm here to
13 talk to you about Ms. Ashbrook.  I'm telling you about
14 the anatomy that is relevant to the placement of the
15 transobturator sling.  It punctures the levator ani, the
16 obturator internus, and the adductor muscles.  It causes
17 pain.  It causes spasm in the levator ani muscles, spasm
18 in the levator anatomy, and increased amounts of pain
19 with intercourse penetration that does not happen with
20 retropubic slings.
21   Q.   My question, Doctor, though:  Do you have any
22 literature to support for your position that the risk of
23 dyspareunia is greater with a transobturator midurethral
24 sling as opposed to a retropubic midurethral sling?

Page 23

1    A.   So I was brought here as a case-specific
2  expert.  I was not asked to review literature.  I was
3  asked to evaluate Ms. Ashbrook and her symptoms.  So I'm
4  not prepared to talk to you about literature.
5    Q.   Okay.  Back on page 5 of your report, about
6  three-quarters of the way down, you say, "I have
7  reviewed the general and product-specific literature
8  related to the Gynecare TVT-O product."
9         What does that mean?
10   A.   So the Gynecare TVT-O product has information
11 related to the product, the Instructions for Use that I
12 have reviewed.
13   Q.   Okay.  When you say "product-specific
14 literature," does that exclude scientific studies on the
15 TVT-Obturator?
16   A.   I don't say that it excludes scientific studies
17 because my background, information set based on my
18 continued ongoing CME learning, medical learning,
19 training, and generalized keeping up with my field
20 requires that I keep current with literature.
21   Q.   Have you ever published on the midurethral
22 slings implanted transobturator -- through the
23 transobturator?
24   A.   Personal publications?

Page 24

1    Q.   Yes.
2    A.   I have not.
3    Q.   Have you ever studied personally the
4  implantation of midurethral slings through the
5  transobturator?
6    A.   Studied in detail the Instructions for Use,
7  studied in detail the anatomy, and the trajectory of
8  placement, yes.
9    Q.   Okay.  Have you ever participated in a study
10 where a cohort of patients were followed for their
11 response to implantation of a transobturator midurethral
12 sling?
13   A.   I have not participated in such a study.
14   Q.   Do you know whether or not the Desara sling
15 system was available at the time of the Ashbrook implant
16 surgery in October of 2010?
17   A.   I do not know.
18   Q.   Were you implanting midurethral slings for the
19 treatment of stress urinary incontinence in 2010?
20   A.   I was.
21   Q.   Do you know what sling you were using in 2010?
22   A.   I can't say for sure, but probably likely the
23 Desara if it was available, but I can't commit to that.
24   Q.   We spoke a minute ago that the only

Page 25

1  incontinence slings that you place are large pore, low
2  stiffness retropubic slings.  What significance is the
3  large pore aspect of that statement?
4    A.   Large pore meshes have lower risk -- have a
5  higher ability for tissue ingrowth, a lower risk of scar
6  plate formation, which tends to be painful, and a better
7  integration into tissue.  They drape with tissue better.
8    Q.   Is it fair to say the larger the pore in the
9  midurethral sling, the better tissue integration you
10 get?
11   A.   The larger the pore, the better tissue?  I just
12 know larger pore slings behave better in tissue
13 settings.
14   Q.   Okay.  What's the significance of the low
15 stiffness statement in your report, the fact it's low
16 stiffness?
17   A.   I think there's some understanding that we've
18 come by over the years that the higher stiffness the
19 material is, it tends to force the surrounding tissue to
20 conform to the material rather than the other way
21 around.  We want the stiffness to be more in line with
22 the surrounding tissue so that the foreign body drapes
23 to the tissue and not the other way around.  So low
24 stiffness matters for that reason.

Lennox Hoyte, M.D.

Page 26

1    Q.   Do you know how the pore size of the Desara
2  sling compares to the pore size of the TVT-O?
3    A.   Again, I'm case specific, so I don't have that
4  information on the top of my head.  I didn't research
5  that for this presentation.
6    Q.   Do you know how the stiffness of the Desara
7  sling compares to the stiffness of the TVT-O?
8    A.   I do not.
9    Q.   Doctor, you've told me that you understand the
10  Desara sling can also be implanted retropubically --
11  excuse me.  Strike that.
12       Doctor, you've told me, I believe, that the
13  Desara midurethral sling can also be implanted through
14  the transobturator space; correct?
15    A.   I've never seen it done myself.
16    Q.   Do you know that it can?
17    A.   I am familiar with the fact that they advertise
18  helical passers, which to me suggests that there may be
19  a transobturator version.  I've never asked about it.
20  I've never seen it.  I've never seen it performed.
21    Q.   Is it your opinion that a Desara sling
22  implanted through the transobturator can cause the same
23  symptoms that Ms. Ashbrook has presented with in this
24  case?

Page 27

1    A.   I think I've said before that Ms. Ashbrook's
2  symptoms are related to the trajectory of the mesh that
3  she had placed.  So the trajectory is a side to side
4  going through the levator ani, obturator internus,
5  obturator externus, adductor magnus, and groin tissues.
6  The sling placed in that trajectory would create very
7  likely the kinds of complications Ms. Ashbrook had.
8    Q.   And do you know the trajectory of the Desara
9  sling system when its placed through the transobturator?
10    A.   Again, I've said I've never seen placement of a
11  Desara sling.  I've not read the IFU for transobturator
12  placement of the Desara sling.  I have read the IFU for
13  the transobturator placement of the TVT-O, and that goes
14  through the muscles and tissues that I described
15  earlier.
16    Q.   And the Desara sling is polypropylene?
17    A.   Yes.
18    Q.   And is the TVT-O polypropylene?
19    A.   That is my best understanding.
20    Q.   Do you have any complaint with the materials
21  used in the TVT-O device?
22    A.   I use polypropylene in other applications such
23  as the Desara sling and sacrocolpopexy mesh.  Therefore,
24  I do not have complication -- I'm sorry, I do not

Page 28

1  have -- I'm sorry, what was your question?
2    Q.   You don't have any complaints about the
3  materials?
4    A.   About polypropylene as a material, I do not.
5    Q.   Okay.  Do you have any information that the
6  pore size of the TVT-O is larger than the Desara?
7    A.   I don't have that information.
8    Q.   Do you have any information that the TVT-O is
9  less stiff than the Desara?
10    A.   I don't have that information.
11    Q.   Those would be good things as far as you're
12  concerned?
13    A.   What would be good things?
14    Q.   Large pore size and less stiff.
15    A.   I think that's what I said earlier in my report
16  regarding retropubic slings.
17    Q.   You also say that you like to have large pore
18  polypropylene slings which come enclosed in plastic
19  sheaths designed to protect the sling materials from the
20  vaginal fluids and bacteria during placement.  That's on
21  page 4 of your report.
22       Do you know the TVT-O comes enclosed in a
23  plastic sheath?  Did you know that?
24    A.   I'm sure it does.

Page 29

1    Q.   Is the use of the sling with a TVT-O any
2  different from the use of the sling in the Caldera sling
3  that you use?
4    A.   I don't understand the question.
5    Q.   Sure.  Is there any difference in the sheath on
6  the TVT-O as compared to the sheath on the Caldera sling
7  that you use?
8    A.   So since I haven't analyzed the TVT-O in
9  comparison to the Caldera, I would have to trust that
10  Ethicon would make a plastic sheath, if they're making
11  it, that would be satisfactory.
12    Q.   Do you know whether Ethicon used the plastic
13  sheath before Caldera did?
14    A.   I would have to say that Johnson &
15  Johnson/Ethicon has been making slings before Caldera
16  was making slings, and if I believe that statement, then
17  I believe Johnson & Johnson has had a sheath in the
18  earlier slings.  That's from my recollection.
19    Q.   Okay.  Let's go to page 8 of your report,
20  please.  Page 8 of your report has a paragraph that
21  begins:  "When I evaluate, diagnose, and treat women."
22       This is the methodology that you use to
23  diagnose and treat a patient; is that fair?
24    A.   Yes.  When a patient comes to me in my -- in a

Lennox Hoyte, M.D.

Page 30

1  clinical setting, yes.
2     Q.  And you say you usually rely on an interview
3  with the patient; correct?
4     A.  In a clinical setting, correct.
5     Q.  You've not interviewed Ms. Ashbrook in this
6  case; correct?
7     A.  I've not talked to Ms. Ashbrook.
8     Q.  A review of her personally documented history.
9  Do you have a personally documented history from
10  Ms. Ashbrook?
11     A.  I have her medical records with her
12  questionnaires that she completed.
13     Q.  Do you have anything that she personally
14  documented her history for you?
15     A.  Not for me personally.  I have not talked to
16  Ms. Ashbrook.
17     Q.  And you reviewed her medical records?
18     A.  I did.
19     Q.  And a detailed clinical examination when
20  possible.  You've not been able to do a detailed
21  clinical examination; is that fair?
22     A.  I did not.  She was not my clinical patient.
23     Q.  If she was your clinical patient, you'd like to
24  do all four of these before you would diagnose and treat

Page 31

1  her; correct?
2     A.  When a patient comes to me for clinical care
3  and treatment and management, I do these things.
4     Q.  Okay.  A few minutes ago you told me that you'd
5  like to correct something in the report or supplement
6  something in your report about her prognosis?
7     A.  Correct.
8     Q.  I believe you said her prognosis was uncertain?
9     A.  Correct.
10     Q.  What would you like to say about that in
11  addition to your report?
12     A.  So I would like to say that as a care provider,
13  as a doctor, my job -- and I believe it's my role to
14  give hope to patients and look for ways to cure them,
15  and so that is my bias or my intent.  When I reviewed
16  Ms. Ashbrook's case and I think about the totality of
17  patients that I've seen, I would say that it's highly
18  unlikely that Ms. Ashbrook is going to be cured
19  permanently of her symptoms, that her symptoms and
20  complaints are likely -- more likely than not to be
21  permanent.
22     Q.  Is that a medical opinion to a reasonable
23  degree of certainty?
24     A.  Yes, sir.

Page 32

1     Q.  How can you give that opinion without
2  interviewing her and doing a detailed clinical
3  examination, which is your normal methodology?
4     A.  So what I've said before is that in a multitude
5  of patients that I've seen with similar conditions to
6  Ms. Ashbrook, who I've evaluated, it is highly unlikely
7  that those patients stand to be permanently cured.
8  Ms. Ashbrook's history, physical presentation and
9  symptoms as documented and evaluated by competent
10  physicians confirm for me that she is substantially
11  similar to patients that I've seen.  I've seen patients
12  just like her, and she is unlikely to be permanently
13  cured.
14     Q.  You've never met Ms. Ashbrook?
15     A.  I have not.
16     Q.  You've not read any depositions of any treating
17  physicians for Ms. Ashbrook?
18     A.  I can't tell you that I have or have not,
19  because I don't have that information off the top.  I
20  did read in detail the physicians' records.
21     Q.  And you don't have any recollection of reading
22  the deposition of Ms. Ashbrook, do you?
23     A.  I believe I read her deposition, I think that's
24  on the form that you talked about.

Page 33

1     Q.  Not in your report?
2     A.  I'm sorry?
3     Q.  There's no -- there's no reference to her
4  deposition in your report.
5     A.  But I did read her deposition.  It's -- I think
6  it's in the invoices.
7     Q.  Okay.  What is it about what you read in her
8  deposition that causes you to believe that she's highly
9  unlikely to recover from her symptoms?
10     A.  I'm reviewing the records of the physicians who
11  have treated her over the course of multiple treatments.
12  I think she's had a number of surgeries, and she
13  continues to have complaints.
14     Q.  Okay.
15     A.  Up until the last -- after six surgeries,
16  getting Procedure No. 8 by Dr. Reynolds, she continues
17  to have retention, recurrent vaginal pain, recurrent
18  UTI, dyspareunia, and chronic constipation.  Her
19  symptoms persist.  It's like seven interventions -- like
20  eight interventions.  The likelihood of her getting
21  cured after another -- eight interventions is extremely
22  low.  It's more likely than not her symptoms are
23  permanent.
24     Q.  What kind of pain medications does Ms. Ashbrook

Lennox Hoyte, M.D.

Page 34

1 take currently?

2 A. I would have to look at that with you in the

3 record.

4 Q. Okay. Do you know whether she's ever had

5 injections for pelvic pain?

6 A. We can look and see here. Cystoscopy. She's

7 had Botox injection of the bladder. She's had multiple

8 of those.

9 Q. Are those for pain?

10 A. Botox injections is for overactive bladder.

11 Left groin pain, paresthesias, constipation. I don't

12 see any injections.

13 Q. Okay. Is Ms. Ashbrook sexually active?

14 A. I do not know the status, but she did report

15 that she felt pain with sexual intercourse.

16 Q. Do you know the last time she had pain with

17 sexual intercourse?

18 A. I would not know since I've not asked her that

19 question.

20 Q. And you're aware she has a hernia?

21 A. Shall we look and see where that is?

22 Q. Do you recall that she has a hernia?

23 A. I recall a hernia in one of my reviews for

24 today, but I would have to have you show me that.

Page 35

1 Q. Okay. Doctor, let's talk about your chronology

2 that begins on page 8 of your report. How did you go

3 about preparing this chronology?

4 A. I reviewed in detail Ms. Ashbrook's medical

5 records from 12/16/2009 relevant to her pelvic floor

6 issues all the way up through the most current record I

7 have, which is on 11/01/2018 with Dr. Reynolds. So I

8 reviewed the medical records and I make -- I developed a

9 chronology from the medical records.

10 Q. And what did you deem relevant to put in your

11 chronology?

12 A. Medical records that I have related to

13 Ms. Ashbrook's pelvic issues, issues between the belly

14 button and the upper thighs. I did not focus on her

15 thyroid disease or breast reduction, for example. I

16 took records related to her pelvic floor complaints.

17 Q. All right. If you go to page 9 of your report,

18 I think that's Exhibit No. 4, we have an implant on

19 October 29, 2010, by Dr. Viner; correct?

20 A. Yes, sir.

21 Q. And then other than an auto crash, the next

22 entry you have is on June 14, 2010, where there's a

23 revision of that TVT-O implant; correct?

24 A. Can you say the date that you're referring to,

Page 36

1 please?

2 Q. June 14, 2012.

3 A. Yes, sir.

4 Q. Do you know what happened in the year and a

5 half between October 29, 2010, and June 14, 2012, that

6 caused the revision surgery to take place?

7 A. Well, in 6/14/2012 Ms. Ashbrook has reported as

8 having dyspareunia and stress incontinence as well as a

9 sebaceous cyst. I would think that dyspareunia and

10 stress incontinence -- that developed during that period

11 of time and stress incontinence persisted.

12 Q. No evidence of erosion or exposure, is there?

13 A. Between 2010 and 2012 I don't see that matter

14 discussed here.

15 Q. You don't have any other information that

16 suggests that she had an erosion or exposure of her

17 TVT-O between the implant on October 29, 2010, and the

18 procedure with Dr. Windisch and Dr. Case on June 14,

19 2012?

20 A. I don't have any documentation of that.

21 Q. So in your -- based on your review of the

22 medical records, what were the indications that

23 suggested that removal of the sling was appropriate?

24 A. Procedure No. 2 described dyspareunia and the

Page 37

1 doctor who reviewed this believed that her dyspareunia

2 was related to her sling. That would be the reason that

3 I would remove it.

4 Q. Okay.

5 A. But I'm not that doctor.

6 Q. Okay. And your analysis of her situation may

7 have been different?

8 A. If I examined her, I might have had a different

9 opinion.

10 Q. And you may have had a different procedure if

11 you differed with the opinions of Dr. Case and

12 Dr. Windisch?

13 A. If I differed. I'm not sure I would have

14 differed.

15 Q. Okay. What is it about her presentation on

16 June 14, 2012, other than dyspareunia and stress

17 incontinence suggests that the sling should be revised?

18 A. I think dyspareunia and stress incontinence in

19 the setting of a retro -- a transobturator sling that a

20 surgeon felt to be the source of the dyspareunia, I

21 think is sufficient.

22 Q. Okay. Now, on page 10 you say that

23 Dr. Windisch removed the transobturator vaginal sling

24 and placed a pubovaginal sling using cadaveric fascia

Lennox Hoyte, M.D.

Page 38

1 Repliform. Repliform is a brand name?
2    A. It's a type of cadaveric fascia.
3    Q. Okay. Is that a brand name of a manufacturer's
4 cadaveric fascia that they sell?
5    A. I've heard that name before as a brand name.
6 I've not used it myself.
7    Q. Okay. Did you determine whether, in fact,
8 Dr. Windisch did remove the TVT-O on June 14, 2012?
9    A. So I was not asked to determine if he removed
10 the TVT-O. His operative report says that that's what
11 he did, and he described it in detail. And I would have
12 here to depend on the pathology report from what he
13 extracted to determine if he or she actually got the
14 mesh material. It's been my experience that sometimes
15 you think you have mesh and you don't.
16    Q. Okay. Well, let's look at the pathology
17 report.
18    A. Okay.
19    Q. It's on page 10. Is there any mention of mesh?
20    A. There's not.
21    Q. Did you make any determination at all for
22 purposes of your review of the medical records whether
23 Dr. Windisch did, in fact, remove the Ethicon TVT-O
24 during the surgery of June 14, 2012?

Page 39

1    A. Well, if he or she sent everything that they
2 removed from the anterior vagina wall, the pathology
3 report says there's no mesh identified. That indicates
4 to me that what was sent to the pathologist did not
5 contain mesh, if I believe the pathologist, of which I
6 do.
7    Q. A little different question to you, Dr. Hoyte,
8 and that is: Do you have an opinion as to whether
9 Dr. Windisch removed the Ethicon TVT-O mesh during the
10 procedure on June 14, 2012?
11    A. I do.
12    Q. What is the opinion?
13    A. It appears very likely that he did not.
14    Q. And also the Windisch operative report suggests
15 that there was a placement of a pubovaginal sling using
16 cadaveric fascia Repliform. Do you have an opinion as
17 to whether Dr. Windisch did, in fact, place the
18 pubovaginal sling using the cadaveric fascia?
19    A. I do.
20    Q. What is that?
21    A. From the operative report, he describes placing
22 it. I believe it.
23    Q. Okay. So if your opinion is Dr. Windisch did
24 not remove the TVT-O and did place a cadaveric sling,

Page 40

1 that means Dr. Windisch put the cadaveric sling on top
2 of the TVT-O?
3    A. Not necessarily.
4    Q. What does that mean?
5    A. Well, the urethra is 3 to 4 centimeters long.
6 The TVT-O is designed and called a midurethral sling,
7 which implies that it's placed somewhere 2 to
8 3 centimeters distal to the bladder neck. Pubovaginal
9 slings are usually placed at the bladder neck, which is
10 a different location anatomically to the TVT-O. So it
11 would be impossible to place a retropubic sling over a
12 transobturator sling. They would collide.
13    Q. Okay. So is it your opinion that Dr. Windisch
14 placed the pubovaginal sling in addition to the TVT-O
15 sling that was already present?
16    A. He didn't place the TVT-O sling. Is that what
17 you're saying?
18    Q. No. Did Dr. Windisch leave the TVT-O in? I
19 think we decided that's what you believe.
20    A. I believe he did not remove it.
21    Q. Okay. So Dr. Windisch then placed the
22 pubovaginal sling in addition to the TVT-O sling that
23 was already there placed by Dr. Viner in October 2010?
24    A. I'm confused by the "in addition to." I'm

Page 41

1 going to say that this doctor of this patient had placed
2 a pubovaginal sling and did not remove the previously
3 existing transobturator sling.
4    Q. Thank you for clarifying my bad question.
5 That's exactly what I wanted to understand. Thank you.
6       What are the risks of complications of having
7 two slings in a person at the same time?
8    A. What are the risks of complications of having
9 two slings at the same time? I have to tell you that I
10 get a number of patients coming to my practice that have
11 had second slings placed over initial slings. I
12 personally would not do it, because what I've seen in
13 those cases is that the two slings fight with each
14 other, to use a medical term, and they tend to
15 counteract the behaviors of each other. And so I'm not
16 sure that that is something that I would do. Actually,
17 I'm pretty clear that's not something I would do. I
18 have seen lots of patients with transobturator and
19 retropubic slings in place.
20    Q. And what kind of symptoms do those cause?
21    A. I don't know that I could tell you what kind of
22 symptoms they cause. I've seen persistent stress
23 incontinence in that setting.
24    Q. Well, it's fair to say if the goal of the 2014

Lennox Hoyte, M.D.

Page 42

1  surgery was to remove the TVT-O because of the
2  dyspareunia and stress urinary incontinence she
3  complained of when she saw Dr. Windisch, that they
4  didn't accomplish that?
5      A.  They did not accomplish removal of the TVT-O
6  sling I think is what I can safely say.
7      Q.  And I think we also decided that the reason for
8  the procedure was to remove the TVT-O to treat her
9  dyspareunia and her stress urinary incontinence; fair?
10     A.  So in looking at the diagnoses of dyspareunia
11  and stress incontinence, I think the attempt at removal
12  of the TVT-O would be to address the dyspareunia, and
13  the placement of the retropubic sling, pubovaginal sling
14  would be to address the stress incontinence.  That would
15  be my understanding of the intention of the physician,
16  but I'm not him.
17     Q.  Does a cadaveric pubovaginal sling present any
18  risk of dyspareunia?
19     A.  I think we talked earlier that the retropubic
20  sling, which the pubovaginal sling is a type, does not
21  traverse the levator ani, obturator internus, adductus,
22  obturator externus, or exit on the groin, dramatically
23  reducing the risk of dyspareunia.
24     Q.  But there's still a risk of dyspareunia from

Page 43

1  the placement of a retropubic pubovaginal sling?
2      A.  I think most surgeons will agree that vaginal
3  sling surgery carries a risk, however small, of
4  dyspareunia.
5      Q.  Were there any complications in the June 14,
6  2012, surgery to -- with a plan to remove the TVT-O and
7  then implanted the pubovaginal sling?
8      A.  What do you mean by "complication"?
9      Q.  Did anything go wrong?
10     A.  Not from the operative report.
11     Q.  Do you recall in the operative report that she
12  tore the urethra during the surgery?
13     A.  Yes.  You're absolutely correct.  Here is --
14  sling was noted to be sopped in close to the urethra, a
15  tear in the urethra was noted while freeing up the
16  sling, and it was closed with Chromic suture.
17         I just have to tell you that in terms of when
18  you dictate an operative report, complications usually
19  in the medical space refer to things that require
20  subsequent multiple interventions, where you're unable
21  to close a wound, for example, so you have to wake the
22  patient up with a wound open.
23     Q.  I see.
24     A.  A complication from my point of view is

Page 44

1  something that transcends the actual surgical procedure.
2  If you have a tear in the urethra, that's a known risk
3  of explantation attempts, and you repair it
4  intraoperatively, which this doctor did.  So it would
5  not be considered a complication from a medical practice
6  point of view.
7      Q.  So after the June 4, 2012, procedure, there are
8  a number of office visits that you report in your
9  chronology.
10         MR. TARASKA:  David, I had mentioned to the
11     Doc, but it's your call, that usually about every
12     hour we take three or four minutes to get up and
13     stretch around and come back, but if you're at a
14     place where you want to keep going --
15         MR. THOMAS:  Have we been going for an hour?
16         MR. TARASKA:  Yeah.
17         MR. THOMAS:  Let's just -- we'll do that.
18     That's fine.
19         MR. TARASKA:  If you don't mind.
20         MR. THOMAS:  Not at all.
21         THE WITNESS:  I know you guys like to ask a
22     question before you go on break.  Do you want to do
23     that?  It's up to you.
24         MR. TARASKA:  I don't mean to interrupt your

Page 45

1  question.
2      THE WITNESS:  I'm your man servant.
3      MR. THOMAS:  Hardly, but I appreciate it.
4  Short answer, yes.
5      (Recess from 10:09 a.m. until 10:15 a.m.)
6  BY MR. THOMAS:
7      Q.  Doctor, obviously from the time that
8  Dr. Windisch performed the second procedure on June 14,
9  2012, and did not remove the Gynecare TVT-O and in your
10  opinion placed the pubovaginal sling, using cadaveric
11  fascia, until November 30, 2015, when Ms. Ashbrook saw
12  Dr. Reynolds and had another revision procedure, she has
13  a number of office visits where she has certain
14  complaints that you've recorded in your chronology;
15  fair?
16     A.  Yes.
17     Q.  Are you able to determine the cause of the
18  symptoms with which she presented --
19     A.  Yes.
20     Q.  -- at those interim periods?
21         What are they?  What's the cause of her
22  symptoms?
23     A.  Well, for example, 3/21/2013 with Dr. Ballert,
24  persistent daily stress and urge incontinence,

Lennox Hoyte, M.D.

Page 46

1 persistent left groin pain and dyspareunia, groin pain
2 and dyspareunia, definitely unquestionably attributable
3 to the transverse TVT-O mesh that is still in place that
4 you and I agreed was not explanted at that second
5 surgery, daily stress incontinence, urge incontinence,
6 probably related to some combination of the
7 pubovaginal -- lack of function of the TVT-O sling and
8 the pubovaginal sling, urinary urgency, severe
9 constipation directly related to the fact that the TVT-O
10 arms actually stab through the levator ani muscles
11 causing spasm in the levator ani muscles. Women with
12 spasm in levator ani are known to have severe
13 constipation and difficulty emptying their bowels due to
14 coarctation of the anorectal angle. Tender left pelvic
15 muscles, palpable scar in the area of prior sling,
16 tender left side, tender on right, all related and
17 attributable to the transobturator sling.
18      Q.  Is it your opinion that if the TVT-O had been
19 removed, as Dr. Windisch stated in her operative report
20 of 2012, that Ms. Ashbrook would not have experienced
21 these symptoms?
22      A.  Not correct.
23      Q.  What is it -- what is your opinion?
24      A.  Well, the transobturator sling passage, as we

Page 47

1 discussed, scars into the levator ani, obturator
2 internus, and groin tissues. The act of removal of the
3 insulting factor by itself does not make the symptoms go
4 away. Many times those women can have improvement after
5 removal plus additional therapy, but they never return
6 to pristine preimplantation conditions.
7      Q.  And that's based upon your clinical experience?
8      A.  Clinical experience, absolutely correct.
9      Q.  Is it based on any literature review?
10      A.  Well, as we've talked earlier, I'm not here to
11 talk to you about literature review. I'm talking about
12 Ms. Ashbrook in the setting of my clinical experience
13 with over -- well over 800 explantations of vaginal
14 foreign bodies.
15      Q.  Okay. So if the literature reported different
16 experiences -- strike that.
17      So which of these symptoms -- strike that.
18      Looking at the December 6, 2012, office visit
19 with Dr. Windisch, there's a report of dyspareunia. Do
20 you see that?
21      A.  Yes, sir.
22      Q.  Is there a report of dyspareunia any -- strike
23 that. I'm sorry. I made a mistake.
24      Is the significance of the placement of the

Page 48

1 pubovaginal sling in your opinion the fact that it was
2 placed retropubically as opposed to through the
3 transobturator?
4      A.  What do you mean by "significance"?
5      Q.  In terms of impact on Ms. Ashbrook and the
6 problems that she experienced.
7      A.  I'm not sure I understand the question.
8      Q.  Can you place a pubovaginal sling through the
9 transobturator? Is that done?
10      A.  It's a definitional issue. The statement
11 pubovaginal sling implies a retropubic placement.
12      Q.  Thank you. Are there biologics or native
13 tissue repairs -- strike that.
14      Can the Repliform sling be placed through the
15 transobturator?
16      A.  So by "can," is there a way to use a helical
17 passer to place a Repliform?
18      Q.  Good question. Good issue. Is it accepted
19 standard of care to place a cadaveric sling through the
20 transobturator?
21      A.  I want to try to answer that question.
22      Q.  Okay.
23      A.  I recall there was a product by Bard that was a
24 porcine sling, that I recall -- and, please, you know, I

Page 49

1 might have to be corrected on this -- had a
2 transobturator placement component. I forget the name
3 of it, but it was made by Bard Urological, and it was a
4 porcine sling type material that had a retropubic
5 placement, and it may have had helical passers for
6 transobturator placement. I can't recall specifically.
7      Q.  Okay. Let's go to your entry on March 21,
8 2013, which is the second opinion from Dr. Ballert. On
9 exam, she shows tenderness at midurethral with palpable
10 scarring. Are you able to determine whether the
11 tenderness results from the TVT-O or the pubovaginal
12 sling?
13      A.  I'm able to determine.
14      Q.  How?
15      A.  Because the TVT-O is a midurethral sling. It
16 anchors into the levator ani, obturator internus,
17 adductor muscles and groin tissues. It is present at
18 the midurethra. If there's palpable scarring, she's
19 actually -- he or she is actually palpating the TVT-O
20 sling. Tender levator muscles on left and on right go
21 with the scarring of the TVT-O into the levator ani on
22 left and right, leading to spasm, scarring, and pain.
23      Q.  Anything about the urethral tear that occurred
24 in the implant that would contribute to the scarring at

Lennox Hoyte, M.D.

Page 50

1  the mid urethra?

2      A.  So the midurethral tear was repaired in

3  multiple layers using really fine chromic suture.  That

4  closure would happen at the level of the mucosa and the

5  muscularis.  When the vaginal mucosa is closed over

6  that, the likelihood of appreciating a scar there would

7  be low.

8      Q.  How low?

9      A.  I think extremely low.

10      Q.  So low that you shouldn't consider it as a

11  source of scarring?

12      A.  So it's much more likely that what she palpated

13  in the tenderness of the mid urethra wasn't even the

14  sling, transverse sling rather than the repair from the

15  urethral tear.  In addition to tender levator ani

16  muscles, that would definitely not have been

17  attributable to the midurethral tear.

18      Q.  In March and May, Ms. Ashbrook is to see her

19  gynecologist about a potential concurrent oophorectomy.

20  Do you see that on your entry of May 21, 2013?

21      A.  Yes.

22      Q.  What's an oophorectomy?

23      A.  Removal of an ovary.

24      Q.  And based upon the symptoms that Dr. Ballert

Page 51

1  found in March and May of 2013 where there's a plan to

2  see her gynecologist for a concurrent oophorectomy, why

3  would that be a plan based on her symptoms?

4      A.  Often when you go to see a gynecologist and

5  they evaluate you, sometimes that evaluation is with

6  imaging.  If the imaging demonstrated an ovarian cyst of

7  the right morphology, the suggestion would be to have

8  that evaluated possibly for removal of the ovary.  It

9  would not necessarily be related to her urgent stress

10  incontinence or levator ani pain or dyspareunia.

11      Q.  But it is a potential source of her pain;

12  correct?

13      A.  I don't see that.

14      Q.  Why not?

15      A.  Because the ovary sits high up inside the

16  pelvis, and the pain that this patient was experiencing

17  was the levator ani.  The ovary pain would probably be

18  related to something like ovarian torsion, which was not

19  described here.  Looking at this from a gynecologist's

20  eyes, the oophorectomy would probably be associated with

21  an ovarian cyst, which was probably seen on imaging.

22      Q.  And this is based on your review of the medical

23  records?

24      A.  This is based on my eyes looking at this as a

Page 52

1  gynecologist.

2      Q.  Okay.  Is it your review of the medical records

3  in March and April of 20- -- excuse me -- March and May

4  of 2013 that she's experiencing pain from the ovary,

5  remaining ovary?

6      A.  There is nothing in this record that I looked

7  at, that I documented, that I transcribed, that tells me

8  that the pain is from the ovary.

9      Q.  But is she experiencing any pain from the

10  ovary?

11      A.  It was not described, and the likelihood of an

12  ovary causing midurethral tenderness, levator muscle

13  tenderness and pain at prior sling site is extremely

14  low.

15      Q.  So why would you remove an ovary if it's not

16  causing any problems?

17      A.  So as a gynecologist, women in certain age

18  groups are not supposed to have cysts on the ovaries.

19  So cysts on the ovaries are reserved for women that are

20  premenopausal or still ovulating.  If you have a woman

21  who's postovulatory or postmenopausal with an ovarian

22  cyst, that raises suspicion for a tumor.  Then a

23  gynecologist that's competent would recommend evaluation

24  or removal of that ovary.

Page 53

1      Q.  July 28, 2014, you note CT of the abdomen and

2  pelvis, left flank pain, worsening left lower quadrant

3  pain.  Impression is moderate diverticulitis of

4  descending colon.  Is moderate diverticulitis of

5  descending colon an explanation for left flank pain and

6  worsening left lower quadrant pain in the opinion of the

7  physician who made that note?

8      A.  So left flank pain, that implies pain in the

9  abdomen, back of the abdomen, lower quadrant pain

10  implies pain in the abdomen, is consistent with

11  diverticulitis, in my opinion.

12      Q.  Okay.  And is the same with the worsening left

13  lower quadrant pain -- is that also consistent with

14  diverticulitis of the descending colon?

15      A.  So left lower quadrant pain could be caused by

16  diverticulitis of the descending colon, yes.

17      Q.  So you have no reason to disagree with that

18  entry by the doctor?

19      A.  I would make that same conclusion or raise that

20  same concern.

21      Q.  So the next -- strike that.

22          The next entry that I want to talk about is

23  November 30, 2015, the procedure by Dr. Reynolds.  And

24  in this procedure Dr. Reynolds removed the

Lennox Hoyte, M.D.

Page 54

1  transobturator sling, the TVT-O; correct?  Page 14.
2      A.  On page 15, I see the pathology report says
3  vaginal mesh, two pieces.  This leads me to conclude
4  that he did remove a synthetic foreign body from
5  underneath the urethra.
6      Q.  And if you look on page 14, it says that he
7  placed an autologous rectus fascial sling; correct?
8      A.  Well, on page 14 it says he harvested it, but
9  I'm going to agree with you that the goal of harvesting
10  it was to actually place it.  And here it is on page 15
11  he describes placing it.
12      Q.  Was it placed retropubically?
13      A.  Yes.
14      Q.  Any indication that he removed the previous
15  pubovaginal sling placed by Dr. Windisch?
16      A.  I'm reading the report.  I apologize.
17         There was no definitive statement that that
18  previous sling was removed.  However, you need to
19  understand that biologic slings like the Repliform are
20  notorious for actually being autolyzed by tissues.  So
21  you place them and you come back later and they're gone
22  because they've been digested by the body.  So he may
23  not have had to remove that.
24      Q.  Explain what that means, please, the autolyzed

Page 55

1  by the body.
2      A.  The body produces enzymes that can digest
3  tissues in the same way that it destroys bacteria from
4  infection, for example.  What some of us have realized
5  is that placement of cadaveric materials like Repliform,
6  Tutoplast and some of the other named cadaveric tissues
7  is that you come back later, months later or years
8  later, and you find that the previously placed material
9  that was in there has been destroyed by the immune
10  system, the body's immune system.  Autolysis means
11  digested.
12      Q.  So why would you use a cadaveric sling to treat
13  stress urinary incontinence?
14      A.  I don't use them.
15      Q.  Is that why?
16      A.  I don't use them because I've not found them to
17  be effective, and I also know from my own experience
18  going back to look for these slings.  And we've used
19  them in the past in sacrocolpopexies, for example.  And
20  you go back, and they're just not there.  They've been
21  ingested.  So I'm not surprised that the Tutoplast --
22  the Repliform sling was not even present when the doctor
23  came in to do the autologous rectus fascial sling.
24  Synthetic slings, however, tend to be around for long

Page 56

1  periods of time.
2      Q.  They're supposed to be permanent?
3      A.  That is the idea.
4      Q.  March 25, 2016.
5      A.  Page 15?
6      Q.  That's correct.  There's a CT scan and a left
7  inguinal hernia; correct?
8      A.  Page 16, yes.
9      Q.  And you discount any role that this hernia
10  plays in her left-sided groin pain; correct?
11      A.  Well, I agree with Dr. Poulose, who is the
12  general surgeon, who said that chronic pain is not due
13  to hernia.  It's more consistent with neuropathic pain.
14  That's that doctor's version, and I would agree with
15  that wholeheartedly.  I would have arrived at that
16  conclusion independently without even having read this.
17      Q.  You typically would have required your own
18  physical examination of the patient before reaching that
19  conclusion, wouldn't you?
20      A.  If this were my patient that came to see me
21  clinically, I would evaluate the CT scan, look at her
22  history of having a transobturator tape-type sling
23  placed, in the setting of her history of groin pain,
24  look at the CT scan and go, yeah, no, that's not it,

Page 57

1  it's the sling.
2      Q.  Okay.  Doctor, as I look through your
3  chronology, your last complaint of dyspareunia is
4  April 2013.  Do you know whether that's true or not?
5      A.  Well, not my complaint.  This is her talking to
6  her physical therapist.  I'm just writing the notes
7  down, writing the documentation down.
8      Q.  What I'm trying to understand is, when you
9  prepared this chronology, it was your goal to record all
10  the symptoms that you related to the implant of the
11  TVT-O, and at least from my review of your records, the
12  last complaint of dyspareunia in your chronology of her
13  medical records is April 2013.
14      A.  And I'm glad you said it that way, because I'm
15  basically documenting what was documented, and here the
16  physical therapist says dyspareunia.  Let me look.
17  Left-sided groin pain, inguinal pain, mixed urinary
18  incontinence, vaginal itching, burning on urination,
19  abnormal uterine bleeding, urge incontinence, urge
20  incontinence, worsening of incontinence, constipation,
21  left groin pain.  I'm just following through.  Chronic
22  pelvic pain is here on 4/5/2019.  And so I don't
23  document anything from the records specifically relating
24  to dyspareunia, but that is not uncommon with patients

Lennox Hoyte, M.D.

Page 58

1 as they reorder their symptoms based on what they
2 perceive to be the severity and the most urgent.
3    Q.   That's why you conduct your own interview and
4 your own examination of the patient; correct?
5    A.   Well, that's called a differential diagnosis.
6 The patients -- and we see this quite common in
7 medicine.  If you think -- the patient comes to tell you
8 about the thing that's most bothersome to them at the
9 time.  So, for example, a physical therapist would ask
10 the question, are you having pain with intercourse?  A
11 general surgeon would not.  Dr. Reynolds may not have
12 asked that question because he or she was more focused
13 on the urge incontinence.  So the fact that it's not
14 stated or documented does not mean that it wasn't
15 present.
16    Q.   Well, stated differently, the fact that it's
17 not present doesn't mean that she had it.
18       Say it a different way, the fact that the
19 complaint of dyspareunia does not appear after
20 April 2013 -- let me ask it again.
21       Is there any evidence in the records, Doctor,
22 that she had dyspareunia after April 2013?
23    A.   The records do not state it, but the fact that
24 the records do not state it may actually mean that the

Page 59

1 question was not asked.
2    Q.   Okay.
3    A.   And she did not volunteer it.
4    Q.   Do you have an opinion whether she has
5 dyspareunia today?
6    A.   I can't answer that question.
7    Q.   Because you don't have information from her to
8 understand the answer?
9    A.   Well, as you say in your business, asked and
10 answered.  This was not asked, and it was not
11 answered --
12    Q.   Okay.
13    A.   -- by the patient.
14    Q.   Okay.  Let's go to page --
15    A.   She does note chronic pelvic pain, however.
16    Q.   But not dyspareunia?
17    A.   Correct.
18    Q.   And that's at her last visit on April 5, 2019;
19 correct?
20    A.   And if you would notice -- that's correct --
21 she's being followed at Vanderbilt for pelvic floor
22 issues, which include pelvic pain and dyspareunia, which
23 implies that this physician who is actually treating
24 her -- when you say that, it means I'm treating her for

Page 60

1 the things that we're talking about here.  Other people
2 are treating her for the things like chronic pelvic pain
3 issues, being followed at Vanderbilt.
4    Q.   But there's nothing after April of 2013 that
5 says she's been treated for dyspareunia.
6    A.   So let me say again.  So as a physician or a
7 surgeon, when you treat a patient for a specific issue,
8 as per Dr. Betsy Reynolds, who says wellness exam,
9 reports five to six times daily chronic pelvic pain,
10 overactive bladder, those are the things she's talked to
11 me about that I'm willing to consider.  When I say she's
12 being followed someplace else for pelvic floor issues,
13 which include chronic pelvic pain, dyspareunia and groin
14 pain, that means that somebody else is taking care of
15 that, and I'm not going to focus on it.
16    Q.   Let's go to page 25 of your report, please.
17 Down three-quarters of the way down, it says:  "In my
18 opinion, her chronic pelvic pain, groin pain, and
19 dyspareunia occurred because of the scarring of the
20 Gynecare TVT-Obturator mesh into the anterior vaginal
21 wall and pelvic floor, obturator, and groin issues,
22 followed by postimplantation contraction of the
23 TVT-Obturator mesh, which placed traction on the pelvic
24 floor, obturator, groin muscles, and tissues."

Page 61

1       What's the evidence for this statement?  What's
2 the evidence for the statement that the mesh had scarred
3 into the pelvic floor or side wall muscles?
4    A.   Anatomic and physiologic.  Everybody agrees
5 that healing occurs via scarring.  Everyone agrees that
6 the meshes and the polypropylene materials for TVT work
7 because of tissue ingrowth.  There's no discussion about
8 that.  Everyone agrees that healing involves
9 contraction.  And so by extension, the mesh material is
10 passed through the levator ani, the obturator internus,
11 the adductors and the groin tissues.  It scars into
12 place in those tissues.  In the healing process, the
13 mesh contracts.  With such contraction, it pulls
14 anatomically on the levator ani, obturator internus and
15 adductor muscles and the groin tissues.  With such
16 contraction, there's spasm of the levator ani, the
17 obturator internus and the adductor muscles.  With
18 spasm, there is tenderness and pain with attempts of
19 penetration and with movement.
20    Q.   You agree that none of the operative reports
21 indicate any evidence that the mesh had scarred into the
22 pelvic floor or side wall muscles?
23    A.   The obturator reports -- the obturator -- the
24 operative reports would not have mentioned that, but the

Lennox Hoyte, M.D.

Page 62

1  scarring is implied by virtue of the placement of the
2  mesh, the knowledge that tissue ingrowth is critical to
3  the functioning of these meshes, the fact of this
4  contracture after healing, and scarring.  That's an
5  anatomic and physiologic fact set.
6      Q.  So is it your opinion that mesh scars into the
7  pelvic floor or side wall muscles of every person who
8  receives a TVT-Obturator?
9      A.  The whole selling point for the meshes that are
10  placed is that they work by tissue ingrowth.  There's no
11  taping.  There was no suturing of TVT meshes for the
12  reason that it scars into place into tissues.  That's
13  how it works, so that's a fact.
14     Q.  So why does not everybody who received a TVT-O
15  have chronic pelvic pain, groin pain, dyspareunia?  If
16  it occurs in everybody, why didn't --
17     A.  Scarring occurs in everyone.  The different
18  humans -- people have different heights.  People have
19  different shaped noses.  They have different shoulders.
20  Some are broad.  Some are narrow.  Different humans
21  react differently to clinical settings.  Pain levels are
22  different in people.  But I tell you that it's a fact
23  that the TVT-O -- and Johnson & Johnson knows this.
24  Every mesh manufacturer knows this.  They work by

Page 63

1  scarring into place.  And, in fact, if you look at the
2  IFU, the IFU says don't put sutures in this mesh,
3  because it scars into place.
4      Q.  So why does it happen in Ms. Ashbrook and not
5  other people who have good results or outcomes with the
6  TVT-O?
7      A.  What do you mean?  We don't know that it
8  doesn't happen in those people.
9      Q.  Why do -- why does Ms. Ashbrook have chronic
10  pelvic pain, groin pain and dyspareunia of the TVT-O
11  when others do not?
12     A.  How do we know that others do not?
13     Q.  Randomized clinical trials.
14     A.  Uh-huh.
15     Q.  Do you know whether there have been any
16  randomized clinical trials done with the TVT-O?
17     A.  I'm told and I've read from your reports that
18  there is lots of them.  I'm telling you again
19  anatomically that the fact is the TVT-O is supposed to
20  work by tissue ingrowth.  That means scarring.  You know
21  and Ethicon knows and every doctor knows that healing
22  happens by contracture.  If I scar into a muscle and I
23  contract, then that will cause pain.
24     Q.  But you've not reviewed the randomized clinical

Page 64

1  trials?
2      A.  I'm here as a case-specific expert talking
3  about Ms. Ashbrook and her examination and her symptoms.
4      Q.  So the answer is no, you have not reviewed the
5  randomized clinical trials?
6      A.  I can't answer that question because I'm here
7  as a case-specific expert.  I'm not a general expert.
8      Q.  Are you familiar with what is known as a
9  Cochrane Review?
10     A.  I've used that system.
11     Q.  What is a Cochrane Review?
12     A.  It is an attempt by people who consider
13  themselves to be qualified to review clinical data to
14  review the -- what they consider to be the universe of
15  data and trials to indicate whether a process or a
16  technique or a procedure has clinical support or not,
17  clinical trial support or not.
18     Q.  And you've used Cochrane Reviews in your
19  practice?
20     A.  Generally speaking as part of my CME and
21  learning, reference is made to Cochrane Reviews and
22  other trials.
23     Q.  Do you find Cochrane Reviews to be
24  authoritative?

Page 65

1      A.  What do you mean by "authoritative"?
2      Q.  Useful in your field to help you make decisions
3  about care and treatment of patients.
4         MR. TARASKA:  Form objection.
5         THE WITNESS:  Yeah, it's -- they're -- they
6      highlight studies and trials related to specific
7      areas, and I have learned to go and look at what
8      they've reported.  And when I have a true question,
9      I would go back to the source data.
10  BY MR. THOMAS:
11     Q.  Have you reviewed the Cochrane Reviews on
12  midurethral slings?
13     A.  I can't talk about that for this, because I'm a
14  case-specific expert.
15     Q.  Can you answer the question?  You won't answer
16  the question or you can't answer the question?
17     A.  What is the question?
18     Q.  Have you -- have you reviewed any Cochrane
19  Reviews on midurethral slings?
20     A.  I have not reviewed Cochrane Reviews on
21  midurethral slings for the purpose of this case.
22     Q.  Are you familiar with the Cochrane Reviews on
23  midurethral slings?
24     A.  I'm familiar that such reviews exist as part of

Lennox Hoyte, M.D.

Page 66

1 my background.
2 Q. Have you ever studied the Cochrane Reviews for
3 midurethral slings comparing retropubic slings to TVT-O
4 slings?
5 A. Not specifically for this case.
6 Q. How about any time?
7 A. Over the course of my multitude of years in
8 FPMRS, I'm sure that I have.
9 Q. Do you have any recollection of what the
10 Cochrane Reviews show comparing retropubic approach as
11 compare to the obturator approach?
12 A. I have a recollection that the retropubic
13 approach is substantially different from the
14 transobturator approach. I have a recollection that
15 they're lumped together as the general topic of
16 midurethral slings of which the majority of those
17 studies refer to retropubic slings, which is not the
18 sling that's used in Ms. Ashbrook. The conclusions from
19 retropubic slings were applied to midurethral slings as
20 a group, when, in fact, the majority of the data
21 supports retropubic slings, not transobturator slings.
22 Q. Is that your understanding of the Cochrane
23 Reviews?
24 A. That is my understanding of the Cochrane

Page 67

1 Review. The bulk of the data relates to retropubic
2 slings, and was aggregated and said to apply to the term
3 midurethral slings, of which there are two varieties,
4 substantially different trajectories. You can't apply
5 data from a retropubic sling to a transobturator sling,
6 because they're different.
7 Q. Page 26 of your expert report. Right in the
8 middle of the page, you say: "Iretta Ashbrook's
9 persistent groin pain, pelvic pain, chronic dyspareunia,
10 and constipation would not have occurred with a native
11 tissue repair like the Burch colposuspension or a
12 retropubic sling."
13      It is fair that pelvic pain is a risk factor
14 for the Burch or the retropubic sling; correct?
15 A. So pelvic pain is a risk factor for gynecologic
16 surgery. The size of the pelvic pain and the amount and
17 the likelihood and the extent are substantially
18 different depending on which surgery you do. I can do a
19 surgery on the vagina that overtightens the vaginal
20 caliber that would make it 100 percent likely that she
21 has dyspareunia and pelvic pain. I can do that same
22 surgery in a more -- in a less vigorous fashion that
23 would make the risk of her having chronic pelvic pain
24 substantially less.

Page 68

1 Q. So is it your testimony that groin pain, pelvic
2 pain and chronic dyspareunia and constipation are risk
3 factors with any gynecological surgery, but they are
4 less with a Burch or a retropubic sling than with a
5 TVT-O?
6 A. I didn't say that.
7 Q. I'm asking you that.
8 A. That's not what I'm saying.
9 Q. Okay. Are groin pain, pelvic pain, chronic
10 dyspareunia, and constipation risks of the Burch
11 colposuspension?
12 A. Highly unlikely.
13 Q. Based on your clinical experience or
14 literature?
15 A. Clinical experience, anatomy, and physiology.
16 Q. But not a review of the literature?
17 A. Clinical experience, anatomy and physiology.
18 Q. All right. And is it your opinion that
19 persistent groin pain, chronic dyspareunia, and
20 constipation are not risk factors with retropubic sling
21 or that they're less?
22 A. So you're talking about the outcome being a
23 risk factor? Please clarify your question.
24 Q. Do you have a risk -- does the retropubic sling

Page 69

1 present a risk of groin pain, pelvic pain, chronic
2 dyspareunia and constipation?
3 A. Extremely low.
4 Q. And when you say "extremely low," how does it
5 compare to the risk for pelvic pain as presented by the
6 TVT-O?
7 A. We talked earlier and I reiterate again that
8 the TVT-O trajectory courses through the levator ani,
9 the obturator internus, the obturator externus and the
10 adductors as well as the groin tissues. Those
11 particular tissues, when the TVT-O scars into place and
12 contracts, causes spasm in the obturator internus and
13 levator ani muscles and the groin tissues, leading to an
14 extremely high risk of pain in those tissues. The pain
15 is not transient. It is long term.
16 Q. Is the risk of chronic dyspareunia less for a
17 retropubic sling than it is for a sling placed through
18 the obturator?
19 A. I think if you look at the anatomy, you can't
20 help but agree that the likelihood of causing chronic
21 dyspareunia from a retropubic sling appropriately placed
22 is a different profile than compared to a TVT-O.
23 Q. Do you know what the scientific studies of the
24 literature say on the topic?

Lennox Hoyte, M.D.

Page 70

1    A.  I'm not here to talk about scientific studies.

2    Q.  Well, do you know?

3    A.  The setting -- I understand that, just as a

4  background matter, groin pain tends to be higher in

5  transobturator.

6    Q.  I'm talking about chronic dyspareunia.

7    A.  Chronic dyspareunia, I don't know that I know

8  the answer to that question.

9    Q.  You agree that any current stress urinary

10  incontinence Ms. Ashbrook suffers is a result of the

11  failure of the autologous fascial sling, not the TVT?

12      MR. TARASKA:  Could you say that again?  I lost

13    that.

14  BY MR. THOMAS:

15    Q.  Do you agree that any current stress urinary

16  incontinence Ms. Ashbrook has is the result of a failure

17  of the autologous fascial sling, not the TVT-O?

18    A.  I do not agree.

19    Q.  Why is that?

20    A.  Because the initial persistence of her stress

21  incontinence came after the TVT-O procedure.  Subsequent

22  procedures, the pubovaginal sling with the Repliform,

23  and then the autologous fascial slings were attempts to

24  correct that persistent stress incontinence.

Page 71

1    Q.  Recurrence is a known risk of any treatment for

2  stress urinary incontinence, isn't it?

3    A.  Recurrence of the stress incontinence, yes.

4    Q.  Do you agree that rates of postoperative void

5  dysfunction, urgency and retention is lower with the

6  TVT-O than with an autologous sling or the Burch

7  colposuspension?

8    A.  I would agree with the autologous sling.  I'm

9  not sure about the Burch colposuspension.

10    Q.  Do you have any literature support for your

11  suggestion or your opinion that the TVT-O causes

12  problems with bowel movements or constipation?

13    A.  I have anatomic reasons for telling you why

14  that is in the setting of clinical experience with many

15  hundreds of patients who present with TVT-O type

16  insertions that come in with chronic constipation that

17  they did not have before.

18    Q.  Do you have any medical literature, published

19  studies, published papers which support your opinion

20  that TVT-O causes problems with bowel movements or

21  constipation?

22    A.  You've asked a number of times about published

23  studies.  In order to have a published study that's

24  validated, the published study has to be asking the

Page 72

1  right questions.  So the question of did you have

2  constipation before, are you examined and validated to

3  have no constipation, have the procedure intervention

4  and then evaluated constipation specifically, I've not

5  seen a piece of literature that specifically targets

6  constipation as a primary outcome related to the

7  placement of the TVT-O.  So the fact there's no data on

8  or no literature can also mean that the question has not

9  been adequately asked or vetted.

10    Q.  What would you prescribe to address her current

11  condition?  How would you treat her today?

12    A.  Well, I think we talked about -- well, let me

13  see if we talked about that.

14    Q.  You told me before that her outcome was

15  uncertain.  You've told me -- you've told me a minute

16  ago that you thought it was unlikely that she would

17  recover.  I don't think we've talked about what you

18  would try to treat, how you would try to treat

19  Ms. Ashbrook.

20    A.  So Ms. Ashbrook's chronic pelvic pain, groin

21  pain, and pain with intercourse, she's not had a course

22  of vaginal estrogen, which would have been the first

23  thing that I would try.  It makes her vaginal atrophy an

24  unlikely cause of her dyspareunia.  It's more likely

Page 73

1  than not that her pain are due to the vaginal wall

2  scarring from the TVT-Obturator and the subsequent

3  surgeries to remove the expanding mesh.

4      Ms. Ashbrook very likely has remaining arms of

5  the TVT-Obturator sling embedded in her groin, because

6  these would not removed by her explanting surgeon.  The

7  attempt that I would make would be to locate those arms

8  in the groin and explant those via groin dissection.

9  However, despite that explantation, I would hope that

10  there would be a likelihood of improvement.  However, I

11  believe the injury caused by the scarring due to the

12  placement trajectory is more likely than not to cause

13  permanent injury to her.

14    Q.  How do you know the extent of the mesh that is

15  left in her body?

16    A.  How do I know?

17    Q.  Uh-huh.

18    A.  So the mesh placement involves passing through

19  the levator ani, the obturator internus, the adductors,

20  and the groin tissues.  I know and we know from the

21  placement that the arms of the mesh occur in the vagina

22  and also in the groin tissues.  I know from the

23  operative report that the doctor described dissecting

24  the mesh to the obturator internus, mostly to the pelvic

Lennox Hoyte, M.D.

Page 74

1 side wall specifically, which says that there are
2 remnants of the mesh arms in lateral to the obturator
3 internus muscles and in the groin tissues. They remain,
4 and they're the cause of her groin pain.
5 Q. And how do you know that they are the cause of
6 her groin pain?
7 A. Because they pass through the adductor muscles
8 and the groin tissues probably -- actually scarred into
9 place, which exacerbate -- which causes her groin pain.
10 Foreign body in the groin causes groin pain.
11 Q. And is it your opinion that there's no other
12 reasonable explanation for the cause of her groin pain?
13 A. In my field, there's a methodology called
14 Bayesian analysis, B-a-y-e-s-i-a-n, which starts with a
15 prior probability of something being the cause of a
16 problem. She has an insult and a foreign body embedded
17 in her groins, which cause pain. She is having the pain
18 consistent with that foreign body embedded in her
19 groins. Therefore, that is the source of her pain. It
20 is not from an injury. It is not from an
21 inconsequential hernia. It is related to the foreign
22 body that's embedded therein.
23 Q. That's based on your review of the medical
24 records?

Page 75

1 A. Based on my review of the medical records and
2 the fact that the trajectory of the TVT-O is very clear.
3   (Hoyte Exhibit No. 5 was marked for
4 identification.)
5 BY MR. THOMAS:
6 Q. You worked at Brigham & Williams -- excuse me.
7 You worked at Brigham & --
8 A. Brigham & Women's.
9 Q. I've been there. I know exactly where it is.
10 Doctor, you've worked at Brigham & Women's
11 Hospital before; correct?
12 A. Correct.
13 Q. And did you work with a Dr. Rajan, R-a-j-a-n?
14 A. Sujatha Rajan, yes.
15 Q. And did you work with a Dr. Shah, S-h-a-h?
16 A. I have.
17 Q. I'm going to hand you what I've marked as
18 Deposition Exhibit No. 5. Deposition Exhibit No. 5 is
19 an abstract of an article published in the International
20 Urogynecologic Journal in 2006. Do you see that?
21 A. I see that.
22   MR. TARASKA: Okay. I'm going to ask for a
23 short break so he can read the entire document that
24 you gave him.

Page 76

1   MR. THOMAS: He doesn't need to yet. I mean,
2 if he wants to read it, he's certain to, but I --
3   MR. TARASKA: I want him to read it before he
4 answers any questions about it, so --
5   MR. THOMAS: I don't --
6   MR. TARASKA: Well, you're going to ask him --
7   MR. THOMAS: You're -- with all due respect, I
8 don't think it's right to do so unless he asks to do
9 it, and I'm disappointed that you interjected
10 yourself in the deposition, because I don't think
11 it's appropriate.
12   MR. TARASKA: Okay. Here in Florida, if you
13 hand the doctor a document, which is a piece of
14 literature, he has the right to stop and review the
15 entire document before he answers any questions on
16 it. I would like him to do that at this point. I
17 think that's fair. I don't think it's fair to ask
18 him questions on something he hasn't read, so that
19 he has an opportunity to understand the context of
20 your question. So I am asking that you give him
21 that opportunity now.
22   MR. THOMAS: I will certainly do that, but I
23 will note that he is an author on this study.
24   MR. TARASKA: That's fine. That's fine.

Page 77

1   THE WITNESS: So do I have time?
2   MR. TARASKA: Yes. Take your time to read it.
3   MR. THOMAS: Take your time.
4   MR. TARASKA: Which one is it, David? Is it
5 249 or 250? 250; right?
6   MR. THOMAS: Yes.
7   MR. TARASKA: Thanks.
8   (Recess from 11:00 a.m. until 11:02 a.m.)
9 BY MR. THOMAS:
10 Q. Doctor, directing your attention to Exhibit No.
11 5, in addition to Dr. Rajan and Dr. Shah, it shows
12 L. Hoyte. Is that you?
13 A. That would be me.
14 Q. Okay. And this is an abstract in 2006. When I
15 looked at your CV, it's not on your CV.
16 A. That is correct.
17 Q. Why not?
18 A. I totally didn't remember it.
19 Q. Okay. Do you still adopt this work that you
20 did and published in 2006?
21 A. The work is published. It has my name on it.
22 I have to stand by it.
23 Q. Okay.
24 A. I'm not trying to hide anything, but I just

Lennox Hoyte, M.D.

Page 78

1  didn't have it included.
2      Q.   Okay.
3      A.   Good of you to find it.
4      Q.   Under objective, the objective of the work that
5  you did with these other folks was to evaluate the
6  efficacy of the transobturator (TOT) sling for recurrent
7  stress urinary incontinence.
8      A.   Correct.
9      Q.   And TVT-O is a transobturator sling; correct?
10     A.   Correct.
11     Q.   And what was your role in this study?
12     A.   I was on the faculty at Brigham & Women's
13  Hospital in the urogynecology group with Neeraj Kohli,
14  who's an author under -- senior author of that.
15     Q.   What role did you play in the study?
16     A.   I probably was an advisor to the study.
17     Q.   Do you remember?
18     A.   I don't.
19     Q.   Okay.  And under materials and methods, the
20  abstract reports that a retrospective multicenter study
21  of consecutive TOT slings performed for recurrent stress
22  incontinence over a 48-month period was performed.
23  Patients were considered for this study if they
24  underwent a TOT sling following prior antiincontinence

Page 79

1  procedure.
2          How many patients were in the study?  If you
3  look on the next page, I think it says 47.
4      A.   I thought it was 48, but let me see.  47
5  patients were included.
6      Q.   Okay.  And you've now had a chance to review
7  this study.  Does it refresh your recollection about
8  what happened?
9      A.   It does not.  It was in 2006.
10     Q.   Okay.  Of the 47 patients, right in the middle
11  they report what happened in terms of intraoperative
12  issues and postoperative issues.  Do you see that?
13  Right in the middle.  "There were no intraoperative
14  complications."
15     A.   Okay.  I see that.
16     Q.   Which means what?  There were no intraoperative
17  complications?
18     A.   That's the problem.  I don't know what that
19  means.
20     Q.   Okay.
21     A.   No one knows what that means.
22     Q.   Okay.  Postoperatively one patient had sling
23  erosion and two patients had incomplete bladder
24  emptying.  Urge incontinence was reported by 34 patients

Page 80

1  (72 percent) preoperatively, by 18 (38 percent)
2  postoperatively.  Four patients (8 1/2 percent)
3  developed de novo urge incontinence symptoms.
4          What's the purpose of reporting that
5  information in an abstract like this?
6      A.   So the purpose of reporting that -- first, de
7  novo urge incontinence symptoms is not defined.  We
8  don't know what the parameters of that means.  We don't
9  have a definition of what it meant before or after the
10  fact.  The purpose would be to say -- an attempt to say
11  by the authors that whatever was defined as urge
12  incontinence is an occurrence.  They're attempting, I
13  think, here to say -- if you read it on face value, it
14  says urge incontinence existed preoperatively, but half
15  of them essentially didn't have it postoperatively.
16  That's an attempt to say, I believe, that the TVT,
17  quote, cured urge -- TOT cured urge incontinence.  But
18  there's no supporting data to tell me in the -- I
19  couldn't repeat this experiment just from reading this
20  here.
21     Q.   Well, it's an abstract.  It's not a full study;
22  correct?
23     A.   Well, abstract is preliminary data for work
24  that you would undertake.

Page 81

1      Q.   So the conclusion that's reached in the
2  abstract that's published in the International
3  Urogynecologic Journal in 2006 says:  "The
4  transobturator midurethral sling appears to be an
5  effective and safe option for the treatment of recurrent
6  stress urinary incontinence" -- "stress incontinence in
7  women."  Let me start over again.  I read that wrong.
8          Conclusion reads:  "The transobturator
9  midurethral sling appears to be an effective and safe
10  option for the treatment of recurrent stress
11  incontinence in women with urethral hypermobility and
12  normal urethral function."
13         Do you agree with that statement?
14     A.   I see that that statement is made, but one of
15  the things you might want to notice is that the
16  objective was to evaluate the efficacy for recurrent
17  stress incontinence, and the conclusion talks about
18  safety.
19     Q.   Well, does it?  It says -- I don't mean to stop
20  you there, but it says, the transobturator midurethral
21  sling appears to be an effective -- that's efficacy,
22  isn't it?
23     A.   Yes.  But it was not defined.
24     Q.   Okay.  Do you disagree with that statement with

Lennox Hoyte, M.D.

Page 82

1   your name on this abstract?
2       A.   My name's on the abstract, but I'm telling you
3   about the nature of an abstract.  The conclusions are
4   not supported by what's -- it's not supported.  It's not
5   set up to arrive at a conclusion.
6       Q.   Okay.
7       A.   So we can say it's appears to be effective.
8   Appears.  So as far as I can tell looking at this from a
9   bird's-eye view, I put in 47 TOTs -- somebody put in 47
10  TOTs, because I didn't do any surgeries with this
11  procedure.  This is a retrospective study of surgeries
12  performed by Drs. Miklos and Kohli.  And in retrospect,
13  going back, this is not a prospective trial.  It's not
14  Level 1 data.  It's probably Level 3 or 4 data.  And
15  you're telling me that it's an effective and safe option
16  for the treatment.  It's an abstract.  You can't -- I
17  don't know what else to say.
18      Q.   Well, you published it, didn't you?
19      A.   It's an abstract, so...
20      Q.   You didn't say you can't rely on it.
21      A.   We submitted this.  They submitted this with --
22  and I was a party to it, but it is an abstract.  It's
23  not a prospective.  It's Level 4 data.
24      Q.   As a matter of fact, you say at the end,

Page 83

1   "Larger prospective and comparison studies are needed in
2   order to confirm these preliminary results."
3       A.   Confirm, which means these results are
4   extremely preliminary, and none of these results talk
5   about how they arrive at the parameters for saying that
6   it's effective.  Effective means 30 percent cure rate.
7   Effective means 40 percent cure rate.  Safe means -- I
8   don't know what safe means in the setting of 48-month
9   data.
10      Q.   And do you know the extent to which larger
11  prospective and comparison studies have been done in
12  order to confirm these results?
13      A.   I have not.  It's a good pickup.  I have to add
14  this to my CV, and I must apologize to everybody else.
15  I've told erroneously that I've not had a study in my
16  name.
17      Q.   And so do you agree with this statement:  The
18  midurethral sling is the most studied surgery to treat
19  stress urinary incontinence and there have been over
20  2,000 articles published about it?
21      A.   So when you lump retropubic slings with
22  transobturator slings and call them midurethral slings
23  inappropriately, yes, there's 2,000 studies.  Nobody's
24  going to argue with that.  The bulk of those studies

Page 84

1   relate to the retropubic sling, which is not the sling
2   that's the subject of Ms. Ashbrook.
3       Q.   I see.  So do you know of any studies that have
4   compared the obturator approach versus the retropubic
5   approach?
6       A.   Those studies exist.  I know them.  I can't
7   quote them off the top of my head.
8       Q.   You've not considered those in your report,
9   though?  Those are not contained in your report?
10      A.   Remember, I'm a case specific.  I did not go to
11  the literature here.
12      Q.   Okay.
13      A.   I think if we were to do that and review all of
14  the 2,000 studies that Dr. Kenton, for example, your
15  expert, referenced -- we can review each one of those
16  individually and see what category they fall into and
17  what the impact is on Ms. Ashbrook's outcome, but absent
18  that, I don't think we're in a position to discuss this.
19          MR. THOMAS:  Doctor, that's all the questions I
20  have.
21          MR. TARASKA:  Thank you.  I have a couple.
22              CROSS-EXAMINATION
23  BY MR. TARASKA:
24      Q.   Doctor, let me refer back to this abstract that

Page 85

1   was discussed with you by Mr. Thomas.  There's a
2   sentence here on the second page that says:  "Mean
3   duration of follow-up was 30 weeks.  The range is 4 to
4   90."
5           What does that mean, "mean duration of
6   follow-up"?
7       A.   So mean is a fancy word for average, generally
8   speaking, so -- which means 50 percent of the patients
9   were followed for less than 30 weeks and 50 percent were
10  more.  If you average the length of follow-up, you'll
11  see that the range it's as few of four weeks of
12  follow-up and as long as 90 weeks, which if you did the
13  math, that works out to -- I don't know in months.  On
14  the average, patients were followed for 30 weeks.
15      Q.   So does this mean that these 47 patients, after
16  they had this operation with the TVT-O, were only
17  followed for that period of time, at least as reported
18  in this study?
19      A.   Well, it wasn't a TVT-O.  It was a TOT.  And I
20  apologize.  I'm not sure -- but it's the trajectory that
21  we're talking about.  Some patients were followed for as
22  few as four weeks.  Some were followed for as long as 90
23  weeks.  We don't even know the distribution of whether
24  they were 90 percent of them were followed for four

Lennox Hoyte, M.D.

Page 86

1  weeks and 1 percent for 90 weeks or 90 percent for 90
2  weeks and 1 percent -- I just don't know.
3      Q.  So what happened to these patients at two years
4  out or three years out?
5      A.  Unspecified.
6      Q.  Am I correct that some of the problems that can
7  occur with this particular type of implantation can be
8  seen years out as the mesh erodes and causes problems
9  with the muscles through which it has been implanted?
10         MR. THOMAS:  Object to form of the question.
11         THE WITNESS:  I think in Ms. Ashbrook's case
12     the implantation was in 2010, and the beginnings of
13     her issues with explantation began in 2012.  I think
14     many years can go by before patients are able to
15     correlate their symptoms or the complaints with the
16     fact that it may be -- it may be the implantation
17     that's the problem.
18  BY MR. TARASKA:
19     Q.  Let me rephrase that question.  I had a form
20  objection.
21         Do patients -- do some patients who have had
22  this implantation -- let me strike that.
23         Let me rephrase it this way:  Am I correct that
24  the mean follow-up on this study was 30 weeks; is that

Page 87

1  correct?
2      A.  On average patients were followed for 30 weeks.
3      Q.  Some as few as four weeks?
4      A.  Correct.
5      Q.  Some as long as 90 weeks?
6      A.  That is correct.
7      Q.  All right.  Am I --
8      A.  90 weeks is about 11 months.
9      Q.  No.  Yeah, it's a little longer than that.  52
10  weeks in a year.
11     A.  Two years, three years.  You can tell I'm a
12  doctor and not a mathematician.  Two years.
13     Q.  So what was the outcome of these patients two
14  years, three years, four years in this cohort study
15  after the implantation of this device?
16     A.  No one knows from this abstract.
17     Q.  Okay.  And do some patients actually begin to
18  exhibit at least and report the symptomatology, such as
19  Mrs. Ashbrook has, years after the implantation?
20     A.  Yes.
21     Q.  Well, she would be outside this range, wouldn't
22  she?
23     A.  Let's see.  So the professor -- the counsel
24  corrected me in that 90 weeks is just under two years.

Page 88

1  Ms. Ashbrook's second surgery occurred about -- so
2  10/29/2010 to 6/14/2012 is about two years.
3      Q.  Okay.  All right.  How many surgeries have you
4  performed, do you believe, in your career to try and
5  explant this type of material from human beings?
6         MR. THOMAS:  Object to the form of the
7     question.
8         THE WITNESS:  Answer?
9  BY MR. TARASKA:
10     Q.  Yes, sir.
11     A.  Okay.  I stopped counting at over 800
12  transvaginal mesh implantations.  That was several years
13  prior.
14     Q.  And as you discussed with Mr. Thomas today the
15  basis for your opinions, were you taking into account
16  these hundreds of opportunities that you have had to
17  actually examine and view human beings who have had
18  implantations?
19         MR. THOMAS:  Object to the form of the
20     question.
21         THE WITNESS:  Women with transvaginal mesh
22     helped me to form my opinions, yes.
23  BY MR. TARASKA:
24     Q.  Since 2006 when this abstract was published,

Page 89

1  how many human beings do you think you've had the
2  opportunity to actually work with and try to explant
3  materials such as occurred with Mrs. Ashbrook?
4         MR. THOMAS:  Object to the form of the
5     question.
6         THE WITNESS:  Well over 800.
7         MR. TARASKA:  Can you tell me what was wrong
8     with the form of that question?
9         MR. THOMAS:  Sure.  Material in Ms. Ashbrook
10     covers all kinds of mesh for all kind of reasons.
11         MR. TARASKA:  Good question.
12  BY MR. TARASKA:
13     Q.  Let me rephrase that.  Since 2006, how many
14  women have you had the opportunity to examine and work
15  with in an attempt to explant the type of material that
16  was implanted in Mrs. Ashbrook that was done with the
17  TVT-O sling that was put into her?
18     A.  Okay.  So I can answer that explantation of
19  transvaginal mesh products are well over 800.  I do not
20  have an exact breakdown of transobturator sling type
21  explantations.  However, they are in the hundreds.
22     Q.  Thank you, sir.  There was some discussion
23  early on in the discussion of polypropylene -- help me
24  with the pronunciation --

Lennox Hoyte, M.D.

Page 90

1    A.  Polypropylene.
2    Q.  -- polypropylene slings.  Does a polypropylene
3  sling, in your opinion and your experience, create a
4  problem with the type of implantation that occurs in a
5  TVT-O implantation?
6    A.  So I think what I said is that polypropylene as
7  a material has been used as an implant both as sutures
8  and as synthetic mesh materials in humans for quite some
9  time.  Polypropylene retropubic slings have been used in
10  women to address stress urinary incontinence.  When
11  placed retropubically, they seem to perform and behave
12  better than when they're placed in a side-to-side or
13  transobturator-type configuration.  In the case of
14  Ms. Ashbrook, she has a side-to-side transobturator
15  configuration of a polypropylene sling, and they are a
16  different animal, in my opinion, to retropubic
17  polypropylene slings.
18    Q.  Why, anatomically and physiologically, does
19  that occur?
20    A.  The retropubic placement of the polypropylene
21  sling goes through the vagina, it goes through
22  paraurethral tissues, it goes up through the space of
23  Retzius, which is a potential space between the pubic
24  bones and the bladder, and it exits out through the

Page 91

1  rectus tendon, the anterior abdominal wall subcutaneous
2  tissues and hides under the anterior abdominal wall
3  skin.  There's no transgression into skeletal muscle for
4  this procedure when done appropriately.
5    In the transobturator case, the transobturator
6  version of the sling lies underneath the vaginal mucosa
7  for the distance from the mid urethra to the pelvic side
8  wall.  It goes into the levator ani, the obturator
9  internus, obturator externus, adductor muscles and groin
10  tissues.  It perforates and scars into place in multiple
11  muscle systems that critically affect function like
12  sexual function, defecatory function, movement, for
13  example, getting in and out of a car, and body
14  stabilization.  It is a different trajectory.
15    Q.  What is it about the use of polypropylene in
16  the type of implantation that she had that can cause
17  additional problems?
18    A.  I think the polypropylene in of itself is
19  designed to work by scarring and tissue ingrowth.  In
20  the space of Retzius there's less critical tissues that
21  are ingrown to compared to the transobturator version in
22  which case there's, as I said, levator ani, obturator
23  internus, obturator externus, abductor muscles and groin
24  tissues.  There's much more scarring into tissues that

Page 92

1  have critical function.
2    Q.  You were asked about interviewing and
3  evaluating this woman, Mrs. Ashbrook.  Do you believe
4  that you are able to render appropriate medical opinions
5  within a reasonable degree of medical certainty as you
6  have today without interviewing her or evaluating her?
7    A.  Yes.  Based on the extensive documentation that
8  was provided by her board-certified physicians and
9  surgeons, I have the information I need in order to
10  render an opinion more likely than not.
11    Q.  You were asked questions about the implanting
12  surgeons and the explanting surgeons.  Do you have any
13  criticisms of these surgeons?
14    A.  I do not insofar as their surgical technique
15  and judgment is concerned.  I do not.
16    Q.  Okay, sir.  And you were asked about one of the
17  surgeons, Windisch, I believe, whether or not he had
18  actually explanted the mesh material.  Do you recall
19  those questions?
20    A.  Yes.
21    Q.  All right.  From your own experience, sir, can
22  you describe for us the difficulty in explanting mesh
23  material once it has been implanted for this period of
24  time as it was with Mrs. Ashbrook?

Page 93

1    MR. THOMAS:  Object to form of the question.
2    MR. TARASKA:  Can you tell me what's wrong with
3  the form?
4    MR. THOMAS:  Sure.  It's a general question.
5  This is case-specific.  Unless he has an opinion of
6  the difficulty of removing Ms. Ashbrook's mesh,
7  which he can't because he wasn't there, his opinion
8  is not appropriate.
9    MR. TARASKA:  Okay.  I'm going to let the
10  question stand, and then I'll rephrase for
11  follow-up.
12  BY MR. TARASKA:
13    Q.  Go ahead, sir.
14    A.  Okay.  So in my abundant experience explanting
15  transobturator-type slings, side-to-side placed slings,
16  I note that they're extremely difficult to locate
17  intraoperatively.  They're described as midurethral
18  slings.  However, I've seen placements as distal as
19  within .5 centimeters of the urethral meatus all the way
20  up to the bladder neck.  Techniques for highlighting or
21  causing the sling to show itself, very varied.  They're
22  unpredictable.  Sometimes you can go in and attempt to
23  locate the sling material, but they're very, very
24  difficult to locate.

Lennox Hoyte, M.D.

Page 94

1    Q.  Do you have an opinion, sir, based on
2  reasonable medical probability, as to why it was
3  difficult to extract or explant the mesh material in
4  Mrs. Ashbrook?
5       MR. THOMAS:  Same objection.
6  BY MR. TARASKA:
7    Q.  And I'm talking about the TVT-O sling material
8  that was implanted in her.
9       MR. THOMAS:  Same objection.
10      THE WITNESS:  As I said before, they're
11  difficult to locate, in my experience.  It takes
12  quite a lot of experience, judgment to attempt to
13  locate these transobturator slings.  And there has
14  been no formal educational process that I know of
15  that was designed to help surgeons locate and
16  explant transobturator slings.
17  BY MR. TARASKA:
18    Q.  What is it about the TVT-O mesh material that
19  was put into Mrs. Ashbrook and the manner in which it
20  was put in that makes it so difficult to extract?
21    A.  Well, first, it's difficult to locate.  I think
22  having located it, then it's difficult to extract from
23  the imbedding in the groin and pelvic side wall tissues
24  because of the path, the blind placement path going

Page 95

1  after that.  The sling arms that are laterally placed
2  involves dissection, which necessarily has to be blind
3  and puts tissues at risk, nerves and blood vessels at
4  risk for injury, permanent injury.  So it's difficult to
5  locate, and it's difficult to extract in its most
6  lateral aspects.
7       MR. TARASKA:  Those are the only questions I
8  have.  Thank you, sir.
9         REDIRECT-EXAMINATION
10  BY MR. THOMAS:
11    Q.  I have a couple follow-up questions for you,
12  Doctor.  Did I understand you correctly to say that
13  you've explanted hundreds of Ethicon TVT-Os?
14    A.  That's not what I said.
15    Q.  I didn't think you did.  What did you say?
16    A.  I said I've explanted over 800 transvaginal
17  mesh products.  I lost count about three or four years
18  ago.  I don't have an exact number of how many of those
19  are transobturator-placed devices.  However, that number
20  is in the hundreds.
21    Q.  Okay.  And my question is:  How many of those
22  are Ethicon TVT-Os?
23    A.  Difficult to know.
24    Q.  Do you have any idea?

Page 96

1    A.  Difficult to know.
2    Q.  Are you able, when you explant meshes placed in
3  the obturator, to determine the kind of mesh that it is,
4  the manufacturer of the mesh?
5    A.  Yes.
6    Q.  Do you make a note in your medical records of
7  the kind of mesh that it is?
8    A.  So there was one particular manufacturer, who
9  is not Ethicon, whose name I won't call, that has a very
10  distinctive appearance to their mesh.  When I extract
11  from that manufacturer, it's very clear who that is.
12    Q.  Who is that?
13    A.  It's not Ethicon.  It's Coloplast.
14    Q.  Okay.
15    A.  Other meshes sometimes are differentiated on
16  their color.  Some are blue.  Some are white.  But just
17  looking at the appearance of the mesh, one is not able
18  to tell who manufactured it.
19    Q.  Okay.
20    A.  And one does not always have access to the
21  operative reports.  In cases where I do have access to
22  the operative report, I've seen a number of them that
23  said Johnson & Johnson or Ethicon, but I don't have a
24  number.  I don't keep track of those.

Page 97

1    Q.  Do you have any idea how many there are, how
2  many Ethicon TVT-O meshes you've explanted?
3    A.  I couldn't say because I don't have that
4  documentation.
5    Q.  Okay.  Would your medical records that you
6  maintain for the patients in which you've explanted
7  these meshes identify the mesh that you explanted?
8    A.  If they have their operative reports with them,
9  they would.  My operative reports do not, as a matter of
10  course, state what manufacturer I think it is.
11    Q.  Is there any way that I can determine from a
12  review of medical records in your possession whether or
13  how many TVT-O meshes you explanted for woman over the
14  years?
15    A.  I don't know how you would be able to do that
16  unless you go -- went after the implanting operative
17  reports.
18    Q.  And is there any way that you can tell from
19  your review of your medical records whether or how many
20  Ethicon TVT-O meshes you've explanted from women?
21    A.  As I've said before, I don't keep track of that
22  in the medical records.  The only time I would have that
23  awareness is if I had cause to review the operative
24  report of the implantation.

Lennox Hoyte, M.D.

Page 98

1    Q.   And if you had cause to review the operative
2    report from the implantation, is that included in your
3    medical records?
4    A.   It is the -- the review of the operative report
5    sometimes is.  The product is not.
6    Q.   The name of the product is not?
7    A.   The manufacturer product name is not.
8    Q.   Okay.  So neither you nor I have any way of
9    going back through the medical records that you have to
10   determine which of your patients have had a TVT-O
11   removed; is that fair?
12   A.   Unless the operative implanting report is also
13   present.
14   Q.   And you don't know whether you have that or
15   not --
16   A.   I don't.
17   Q.   -- until you look at it?
18   A.   I don't routinely get them.
19   Q.   Okay.  And if I were to ask you to produce for
20   me patient files for every patient where you've removed
21   a TVT-O from a patient, could you do that?
22   A.   So you say to me give me a list of all the
23   TVT-O patients that you've operated on to remove their
24   product?

Page 99

1    Q.   Yes.
2    A.   I don't know how I would do that.
3    Q.   Okay.  So, likewise, you couldn't give me the
4    files or the operative notes or any information that you
5    have about those patients that I can go in and look at
6    the individual circumstances of each of those mesh
7    removals; is that fair?
8    A.   So I think to do that you would have to go to
9    Judge Goodwin and subpoena every single explant that
10   I've done and then go to their records and subpoena the
11   implantation and then look at them that way.  I think
12   that's highly unlikely.
13   Q.   Highly unlikely because you wouldn't give them
14   to me or I wouldn't be able to figure it out because
15   Judge Goodwin wouldn't allow it?
16   A.   I don't see Judge Goodwin allowing that, but if
17   he said do it, then we can do it.  You and I could spend
18   120 hours and do that.
19   Q.   And we could figure out whether TVT-Os were
20   explanted?  I thought you just told me we couldn't.
21   A.   So we would get my operative reports.  We would
22   get the implanting operative reports, and we would sit
23   down and review all of them together with the
24   information on the stickers for the product that was put

Page 100

1    in.  And we can go through and pick out Altis, Supris,
2    Aris, Prolift, and all the other products.  We can do
3    that.  That would be the rest of our lives.
4    Q.   But as I understand it, there's no way to -- I
5    thought you told me before you couldn't tell whether
6    they were --
7    A.   From my reports I can't tell.  If you were
8    determined to do it and you had the right amount of
9    time, we could get a subpoena that would go and find all
10   of their implanting reports, and we can review them and
11   see what was implanted.
12   Q.   And my question is simply this:  From your
13   records, the records that you maintain for the patients
14   where you've explanted these meshes, neither you --
15   A.   We can't do that.
16   Q.   We can't figure out what mesh it was?
17   A.   There's not enough information.  Generally
18   speaking, unless in that report there is an implanter's
19   report which says, "And I implanted a TVT-O from Johnson
20   & Johnson" or "I implanted a TVT-O Abbrevo," so forth.
21   Some of those records exist.  I don't know which ones
22   there are.
23       MR. THOMAS:  Okay.  That's all the questions I
24   have.  Thank you.

Page 101

1        MR. TARASKA:  Thanks.  That's all I have too.
2        (Whereupon, the deposition concluded at
3    11:32 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Lennox Hoyte, M.D.

Page 102

1        C E R T I F I C A T E

2

3        I, JOAN L. PITT, Registered Merit Reporter,

4    Certified Realtime Reporter, and Florida Professional

5    Reporter, do hereby certify that, pursuant to notice,

6    the deposition of LENNOX HOYTE, MD, was duly taken on

7    October 22, 2019, at 9:16 a.m., before me.

8        The said LENNOX HOYTE, MD, was duly sworn by me

9    according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17   _____

18        JOAN L. PITT, RMR, CRR, FPR

19

20        (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

---

Page 103

1           INSTRUCTIONS TO WITNESS

2

3

4        Please read your deposition over carefully and

5    make any necessary corrections.  You should state the

6    reason in the appropriate space on the errata sheet for

7    any corrections that are made.

8

9        After doing so, please sign the errata sheet

10   and date it.  It will be attached to your deposition.

11

12        It is imperative that you return the original

13   errata sheet to the deposing attorney within thirty (30)

14   days of receipt of the deposition transcript by you.  If

15   you fail to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

---

Page 104

1        - - - - - -

2        E R R A T A

3        - - - - - -

4    PAGE  LINE  CHANGE

5    ____  ____  _____

6    REASON: _____

7    ____  ____  _____

8    REASON: _____

9    ____  ____  _____

10   REASON: _____

11   ____  ____  _____

12   REASON: _____

13   ____  ____  _____

14   REASON: _____

15   ____  ____  _____

16   REASON: _____

17   ____  ____  _____

18   REASON: _____

19   ____  ____  _____

20   REASON: _____

21   ____  ____  _____

22   REASON: _____

23   ____  ____  _____

24   REASON: _____

---

Page 105

1           ACKNOWLEDGMENT OF DEPONENT

2

3        I, _____, do hereby

4    acknowledge that I have read the foregoing pages,

5    1 - 106, and that the same is a correct transcription of

6    the answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached Errata

9    Sheet.

10

11

12   _____  _____

13   LENNOX HOYTE, MD                 DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   ____ day of _____, 20___.

20   My Commission expires: _____

21

22   _____

     Notary Public

23

24

Lennox Hoyte, M.D.

Page 106

1          LAWYER'S NOTES
2   PAGE  LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____