# Exhibit 9

Confidential - Subject to Stipulation and Order of Confidentiality

Page 1

- - -

|                          | :SUPERIOR COURT OF NEW JERSEY |
| IN RE:                   | :LAW DIVISION - |
| PELVIC MESH/GYNECARE     | :ATLANTIC COUNTY |
| LITIGATION               | : |
|                          | :MASTER CASE 6341-10 |
|                          | : |
|                          | :CASE NO. 291 CT |

- - -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

|                              | :Master File No. |
| IN RE: ETHICON, INC., PELVIC | :2:12-MD-02327 |
| REPAIR SYSTEM PRODUCTS       | :   MDL 2327 |
| LIABILITY LITIGATION         | : |
|                              | : |

CONFIDENTIAL-SUBJECT TO STIPULATION AND ORDER OF
CONFIDENTIALITY

- - -

November 15, 2012

- - -

Transcript of the deposition of AXEL ARNAUD, MD, called for Videotaped Examination in the above-captioned matter, said deposition taken pursuant to Superior Court Rules of Practice and Procedure by and before Ann Marie Mitchell, a Federally Approved Certified Realtime Reporter, Registered Diplomate Reporter, Certified Court Reporter, and Notary Public for the State of New Jersey, at the offices of Riker Danzig Scherer Hyland & Perretti LLP, Headquarters Plaza, One Speedwell Avenue, Morristown, New Jersey, commencing at 10:17 a.m.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph|917.951.5672 fax
deps@golkow.com

Confidential - Subject to Stipulation and Order of Confidentiality

---

Page 2

```
 1    APPEARANCES:
 2
 3    MAZIE SLATER KATZ & FREEMAN, LLC
      BY:  ADAM M. SLATER, ESQUIRE
 4    BY:  CHERYLL A. CALDERON, ESQUIRE
      103 Eisenhower Parkway
 5    Second Floor
      Roseland, New Jersey  07068
 6    (973) 228-9898
      aslater@mskf.net
 7    ccalderon@mskf.net
      Representing the Plaintiffs
 8
 9
      KLINE & SPECTER, P.C.
10    BY:  LEE BALEFSKY, ESQUIRE
      The Nineteenth Floor
11    1525 Locust Street
      Philadelphia, Pennsylvania 19102
12    (215) 772-1000
      lee.balefsky@klinespecter.com
13    Representing the Plaintiffs
14
15    RIKER DANZIG SCHERER HYLAND & PERRETTI, LLP
      BY:  MARY ELLEN SCALERA, ESQUIRE
16    BY:  MAHA KABBASH, ESQUIRE
      Headquarters Plaza
17    One Speedwell Avenue
      Morristown, New Jersey 07962
18    (973) 538-0800
      mscalera@riker.com
19    mkabbash@riker.com
      Representing Johnson & Johnson and Ethicon and
20    the Witness, Axel Arnaud, MD
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES VIA TELEPHONE:
 2
 3    WAGSTAFF & CARTMELL, LLP
      BY:  THOMAS P. CARTMELL, ESQUIRE
 4    4740 Grand Avenue
      Suite 300
 5    Kansas City, Missouri 64112
      (816) 701-1100
 6    tcartmell@wagstaffcartmell.com
      jkuntz@wagstaffcartmell.com
 7    Representing the Plaintiffs
 8
 9    VIDEOTAPE TECHNICIAN:
      CHRISTOPHER CAMPBELL
10
11
12              - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              - - -
 2            I N D E X
 3              - - -
 4
 5    Testimony of:  AXEL ARNAUD, MD
 6      By Mr. Slater           11
 7
 8              - - -
 9
         E X H I B I T S
10
11              - - -
12
13    NO.            DESCRIPTION          PAGE
```

```
13    Plaintiff's-1249  Curriculum Vitae of Axel      10
14        Arnaud, MD, 2 pages
      Plaintiff's-1250  Press Interview Frankfort     24
15        June 9, 2005, Bates
          stamped ETH.MESH.03923931
16        through ETH.MESH.03923934
17    Plaintiff's-1251  E-mail dated 29 Jan 2002,     35
          with attachment, Bates
18        stamped ETH.MESH.03909826
          through ETH.MESH.03909829
19    Plaintiff's-1252  E-mail chain, top one         51
          dated 09 Jul 2002, Bates
20        stamped ETH.MESH.03909986
          through ETH.MESH.03909990
21
      Plaintiff's-1253  PowerPoint, "The Use of       51
22        Meshes in Vaginal Prolapse
          Repair," 42 pages
23
      Plaintiff's-1254  E-mail chain, top one         70
24        dated 19 Sep 2002, Bates
          stamped ETH.MESH.03801777
25        through ETH.MESH.03801779
```

Page 5

```
 1    Plaintiff's-1255  Meeting Minutes Anterior      71
          TVM (Porthos) Chartering
 2        Concept -> Feasibility
          Kick of meeting 14th April
 3        03, Bates stamped
          ETH.MESH.03801569 through
 4        ETH.MESH.03801571
 5    Plaintiff's-1256  E-mail dated 18 Jun 2003,     89
          Bates stamped
 6        ETH.MESH.03803483
 7    Plaintiff's-1257  PowerPoint,                   89
          "ATHOS/ARAMIS/PORTHOS,
 8        Concept -> Feasibility,
          June 27, 2003," 33 pages
 9
      Plaintiff's-1258  PowerPoint,                   89
10        "ATHOS/ARAMIS/PORTHOS,
          Concept -> Feasibility,
11        June 27, 2003," 46 pages
12    Plaintiff's-1259  E-mail chain, top one        170
          dated 17 Mar 2004, Bates
13        stamped ETH.MESH.03910637
          and ETH.MESH.03910638
14
      Plaintiff's-1260  SKIPPED EXHIBIT NUMBER -
15        NO DOCUMENT
16    Plaintiff's-1261  E-mail chain, top one        242
          dated 14 Jul 2005, Bates
17        stamped ETH.MESH.03911629
          and ETH.MESH.03909830
18
      Plaintiff's-1262  E-mail chain, top one        271
19        dated 25 May 2005, Bates
          stamped ETH.MESH.03911617
20        and ETH.MESH.03911618
21    Plaintiff's-1263  E-mail chain, top one        282
          dated 25 Oct 2006, Bates
22        stamped ETH.MESH.03915722
          through ETH.MESH.03915725
23
      Plaintiff's-1264  E-mail chain, top one        291
24        dated 10 Nov 2006, Bates
          stamped ETH.MESH.03915831
25        and ETH.MESH.03915832
```

2 (Pages 2 to 5)

Confidential - Subject to Stipulation and Order of Confidentiality

|  | Page 6 |
|---|---|
| 1 | Plaintiff's-1265  E-mail chain, top one     294 |
|  | dated 15 Nov 2006, Bates |
| 2 | stamped ETH.MESH.03160750 |
|  | through ETH.MESH.03160752 |
| 3 |  |
| 4 |  |
| 5 |  |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 8 |
|---|---|
| 1 | CONFIDENTIAL DESIGNATION INDEX |
|  | - - - |
| 2 | PAGE 24 LINE 16 THROUGH PAGE 25 LINE 7 |
| 3 | PAGE 25 LINE 19 THROUGH PAGE 27 LINE 1 |
| 4 | PAGE 27 LINE 5  THROUGH PAGE 31 LINE 16 |
| 5 | PAGE 33 LINE 23 THROUGH PAGE 35 LINE 14 |
| 6 | PAGE 36 LINE 2  THROUGH PAGE 37 LINE 24 |
| 7 | PAGE 40 LINE 8  THROUGH PAGE 42 LINE 16 |
| 8 | PAGE 43 LINE 12 THROUGH PAGE 45 LINE 1 |
| 9 | PAGE 46 LINE 11 THROUGH PAGE 50 LINE 17 |
| 10 | PAGE 51 LINE 17 THROUGH PAGE 52 LINE 2 |
| 11 | PAGE 52 LINE 13 THROUGH PAGE 52 LINE 19 |
| 12 | PAGE 52 LINE 25 THROUGH PAGE 54 LINE 18 |
| 13 | PAGE 54 LINE 22 THROUGH PAGE 56 LINE 6 |
| 14 | PAGE 56 LINE 23 THROUGH PAGE 60 LINE 22 |
| 15 | PAGE 61 LINE 5  THROUGH PAGE 63 LINE 25 |
| 16 | PAGE 67 LINE 11 THROUGH PAGE 67 LINE 17 |
| 17 | PAGE 68 LINE 10 THROUGH PAGE 70 LINE 10 |
| 18 | PAGE 71 LINE 12 THROUGH PAGE 72 LINE 12 |
| 19 | PAGE 73 LINE 1  THROUGH PAGE 74 LINE 8 |
| 20 | PAGE 75 LINE 7  THROUGH PAGE 75 LINE 17 |
| 21 | PAGE 76 LINE 9  THROUGH PAGE 77 LINE 17 |
| 22 | PAGE 78 LINE 2  THROUGH PAGE 78 LINE 7 |
| 23 | PAGE 78 LINE 17 THROUGH PAGE 79 LINE 4 |
| 24 | PAGE 79 LINE 13 THROUGH PAGE 82 LINE 13 |
| 25 | PAGE 85 LINE 13 THROUGH PAGE 89 LINE 5 |

|  | Page 7 |
|---|---|
| 1 | - - - |
| 2 | DEPOSITION SUPPORT INDEX |
| 3 | - - - |
| 4 |  |
| 5 | Direction to Witness Not to Answer |
| 6 | Page Line |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 | Request for Production of Documents |
|  | Page Line |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 | Stipulations |
|  | Page Line |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 | Question Marked |
| 21 | Page Line |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 9 |
|---|---|
| 1 | PAGE 91  LINE 1  THROUGH PAGE 99  LINE 18 |
| 2 | PAGE 101 LINE 12 THROUGH PAGE 102 LINE 6 |
| 3 | PAGE 103 LINE 6  THROUGH PAGE 108 LINE 14 |
| 4 | PAGE 119 LINE 15 THROUGH PAGE 121 LINE 7 |
| 5 | PAGE 122 LINE 4  THROUGH PAGE 123 LINE 19 |
| 6 | PAGE 136 LINE 12 THROUGH PAGE 139 LINE 24 |
| 7 | PAGE 147 LINE 23 THROUGH PAGE 149 LINE 10 |
| 8 | PAGE 152 LINE 23 THROUGH PAGE 153 LINE 10 |
| 9 | PAGE 154 LINE 22 THROUGH PAGE 155 LINE 10 |
| 10 | PAGE 156 LINE 18 THROUGH PAGE 158 LINE 9 |
| 11 | PAGE 158 LINE 19 THROUGH PAGE 159 LINE 14 |
| 12 | PAGE 170 LINE 23 THROUGH PAGE 172 LINE 5 |
| 13 | PAGE 172 LINE 11 THROUGH PAGE 173 LINE 11 |
| 14 | PAGE 173 LINE 21 THROUGH PAGE 174 LINE 10 |
| 15 | PAGE 177 LINE 20 THROUGH PAGE 178 LINE 2 |
| 16 | PAGE 180 LINE 9  THROUGH PAGE 180 LINE 11 |
| 17 | PAGE 180 LINE 20 THROUGH PAGE 181 LINE 12 |
| 18 | PAGE 181 LINE 21 THROUGH PAGE 183 LINE 12 |
| 19 | PAGE 184 LINE 6  THROUGH PAGE 184 LINE 10 |
| 20 | PAGE 208 LINE 12 THROUGH PAGE 209 LINE 6 |
| 21 | PAGE 209 LINE 14 THROUGH PAGE 213 LINE 13 |
| 22 | PAGE 214 LINE 3  THROUGH PAGE 214 LINE 5 |
| 23 | PAGE 215 LINE 2  THROUGH PAGE 220 LINE 21 |
| 24 | PAGE 222 LINE 14 THROUGH PAGE 222 LINE 20 |
| 25 | (Confidential Designations continued on Page 302) |

3 (Pages 6 to 9)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 10

1           - - -
2           (Deposition Exhibit No.
3       Plaintiff's-1249, Curriculum Vitae of Axel
4       Arnaud, MD, 2 pages, was marked for
5       identification.)
6           - - -
7           THE VIDEOGRAPHER:  We are now on the
8   record.  My name is Christopher Campbell.  I'm a
9   videographer with Golkow Technologies.  Today's date
10  is November 15, 2012, and the time is 10:17.  This
11  deposition is being held in Morristown, New Jersey,
12  In Re:  Pelvic Mesh, for the Superior Court of New
13  Jersey, Atlantic County.  The deponent is Dr. Axel
14  Arnaud.
15          At this time, would counsel please
16  announce their appearance for the record.
17          MR. SLATER:  Adam Slater for
18  plaintiffs.
19          MS. CALDERON:  Cheryll Calderon for
20  plaintiffs.
21          MR. BALEFSKY:  Lee Balefsky for
22  plaintiffs.
23          MS. SCALERA:  Mary Ellen Scalera for
24  defendants Ethicon and Johnson & Johnson and the
25  witness, Axel Arnaud.

Page 11

1           MS. KABBASH:  Maha Kabbash for
2   defendants Ethicon, J&J and the witness, Axel
3   Arnaud.
4           THE VIDEOGRAPHER:  The court reporter
5   is Ann Marie Mitchell and will now swear in the
6   witness.
7           - - -
8           AXEL ARNAUD, MD, after having been
9       duly sworn, was examined and testified as
10      follows:
11          - - -
12          EXAMINATION
13          - - -
14  BY MR. SLATER:
15      Q.   Good morning.  My name is Adam
16  Slater, here to take your deposition.
17          It's Dr. Arnaud.  Correct?
18      A.   Yes, correct.
19      Q.   Dr. Arnaud, this is a deposition that
20  may be used at the trial of this case, so I'm going
21  to give you an explanation of the rules that apply
22  to a deposition so you'll understand.  Okay?
23      A.   Okay.
24      Q.   You have just taken an oath to tell
25  the truth.  And that's the same oath that you would

Page 12

1   take if you were sitting in front of the judge and
2   the jury at the trial of this case.
3           Do you understand that?
4       A.   I do.
5       Q.   As you just did, it's fine for you to
6   nod your head, but you need to also speak, because
7   even though we're videotaping, the court reporter,
8   Ann Marie, who is sitting to your left, is also
9   going to record everything you say into a
10  transcript.  So it's important that you don't just
11  nod your head but give us a clear and accurate
12  answer and a complete answer to every question I ask
13  you.  Okay?
14      A.   Okay.
15      Q.   If I ask you a question that you
16  don't understand for some reason, and it could be
17  for any number of reasons.  I, for example, might
18  try to use a medical term and I might mispronounce
19  it or I might ask you about something with medical
20  terminology and it just doesn't make sense or my
21  words just may not communicate to you.  If for any
22  reason you're unclear of what I'm asking you, just
23  please tell me that, tell me what's unclear, and
24  then I'll ask a more clear question, hopefully, and
25  that way you'll be able to give truthful and

Page 13

1   accurate testimony.  Okay?
2       A.   Okay.
3       Q.   At different times during the
4   deposition, attorneys may object to a question
5   that's asked.  Typically what they'll say is, I
6   object to the form of the question.  They're simply
7   preserving their rights for the future.  It's not
8   something that is going to stop the deposition, most
9   likely, but let the attorneys say that she has an
10  objection or he has an objection, and then we'll
11  proceed most likely to have you answer, or I may
12  reask a question at times.  Okay?
13      A.   Okay.
14      Q.   Do you have any questions of me
15  before I start asking you questions now?
16      A.   No.  I think I'm fine.
17      Q.   Great.
18          Where are you currently employed?
19      A.   I'm currently employed in Paris, in
20  France, and I have a European position.
21      Q.   What is the name of your employer?
22  Who do you work for?
23      A.   Well, I work for Ethicon, which is
24  part of Johnson & Johnson.
25      Q.   What is your title?

4 (Pages 10 to 13)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 14

1    A.    My title is EMEA medical affairs
2  director.
3    Q.    What does EMEA stand for?
4    A.    EMEA stands for Europe, Middle East
5  and Africa.
6    Q.    I've marked as an exhibit
7  Exhibit 1249, and that is in front of you.
8          Do you see the document in front of
9  you?
10    A.    I do.
11    Q.    It's been represented to me that this
12  is your current curriculum vitae, your resume of
13  your work history and your education; is that
14  accurate?
15    A.    Yes, yes.
16    Q.    I want to ask you a few questions
17  about your background before we talk more
18  specifically about the Prolift® and the development
19  of the Prolift®.  Okay?
20    A.    Sure.  Okay, okay.  Sure.
21    Q.    It says that before you joined
22  Johnson & Johnson, you had done some education.  You
23  were educated.  Correct?
24    A.    A little, yes.  A little bit.
25    Q.    You received your medical degree in

Page 15

1  1978 from the university in Marseille in France?
2    A.    Yes.
3    Q.    You then, it says, were a general and
4  digestive surgeon as of 1984.  Correct?
5    A.    Yes, yes.  Sorry.
6    Q.    And that was after you did a
7  residency in surgery from 1977 to 1984 at the
8  Assistance Publique-Hopitaux, hospital, in
9  Marseille.  Correct?
10    A.    Yes.
11    Q.    Let me ask you this.
12          Your practice as a general and
13  digestive surgeon, can you explain what that means,
14  what your medical practice was?
15    A.    Well, my medical practice was
16  essentially digestive surgery, because normally
17  general surgery doesn't mean that much.  When we say
18  general surgeon, usually must be understood as
19  digestive surgeon.  So I was a digestive surgeon
20  with some focus on colorectal, colorectal and anal
21  surgery.
22    Q.    What does it mean to be a digestive
23  surgeon?  Does that mean that you are operating
24  primarily on the digestive system?
25    A.    Yes, yes.  Absolutely.

Page 16

1    Q.    Did you do hernia surgery as part of
2  that practice?
3    A.    Yes, yes.  That's probably the part
4  that is the general surgery part, but...
5    Q.    It's indicated here that you were a
6  consultant surgeon in general and digestive surgery
7  from 1988.
8          What does that mean, to be a
9  consultant surgeon?
10    A.    Well, this is, you know, a
11  translation I made, you know, because the system in
12  the US and in France may be not the same.  What does
13  that mean?  It means that I was employed as a
14  surgeon by the University Hospital of Marseille.
15  And this employment was a lifelong employment.  So
16  unless I make something very bad, I could have
17  stayed all my life in the -- in this organization.
18    Q.    As a consultant surgeon, does that
19  basically mean -- excuse me.
20          As a consultant surgeon, does that
21  basically mean that if there was a patient in the
22  hospital and the doctor's treating that patient,
23  thought they needed a general and digestive surgeon
24  to help them to diagnose or treat the patient, they
25  would call someone like you in to help with the care

Page 17

1  of the patient?
2    A.    Yes.
3    Q.    Your CV indicates that after you had
4  done your residency through 1984 and become a
5  general and digestive surgeon, and then you were a
6  consultant beginning in 1988, it says you then
7  joined Ethicon France in September 1992; is that
8  correct?
9    A.    Yes, yes.
10    Q.    When you joined Ethicon France, that
11  was the name of the company?
12    A.    Not exactly.  It was called Ethnor,
13  Ethnor.  You know, it's just a translation in French
14  of Ethicon, because the suffix "con," in French, is
15  not so nice.  So "or" means gold.  And it has a
16  better -- it sounds better.
17    Q.    Understood.
18    A.    So Ethnor and Ethicon is just the
19  same.
20    Q.    I'm going to refer to it as Ethicon
21  for purposes of the deposition.
22          Is that fine?
23    A.    Yeah, yeah.  Ethnor is a word I have
24  not heard for many years.
25    Q.    Now, the Ethicon France that you went

5 (Pages 14 to 17)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 18

1     to work for in 1992, that is different -- a
2 different company from Ethicon in the United States.
3 They're different companies, both owned by Johnson &
4 Johnson. Correct?
5       MS. KABBASH: Objection.
6       THE WITNESS: Yes, yes. It is a --
7 well, I don't know exactly the legal organization,
8 but, of course, Ethicon France is very close to
9 Ethicon US. But it is a legally separated entity, I
10 would say.
11 BY MR. SLATER:
12       Q. When you joined Ethicon in France in
13 1992, what position did you take?
14       A. Well, I was appointed as a director
15 for surgical research.
16       Q. And it says on your resume, director
17 research and development at Ethicon France.
18       And that position involved surgical
19 research, surgical research and development?
20       A. Yes, yes.
21       Q. And am I correct that -- and I'm
22 looking at some of the things that you did, you, in
23 the early years, were working on hernia surgery and
24 advancement of hernia surgery?
25       A. Yes.

Page 19

1       Q. According to your CV, your resume, it
2 says that you were director of research and
3 development Ethicon France until 1999, and at that
4 point you became scientific director, Ethicon
5 Europe. Correct?
6       A. Yes, yes.
7       Q. What was your responsibility when you
8 became scientific director at Ethicon Europe in
9 1999?
10       A. Okay. Well, the main difference, you
11 know, in my daily job was the geographical scope.
12 Because initially I was working for France only.
13 But then a European organization started to be
14 created. So when I become the scientific director,
15 this was at the time where we created the European
16 structure. So I continued to do the same job but on
17 the broader scope, geographically speaking.
18       Q. Could you just generally tell the
19 jury what it was that you were doing as scientific
20 director, just a general description of what your
21 responsibilities were?
22       A. Yes. Well, I was essentially in
23 charge of the innovation, you know, innovation
24 coming from the field. So any time a surgeon in
25 Europe had an invention to refer to Ethicon, usually

Page 20

1 would contact the sales reps, but then the sales
2 reps would not know what to do about the idea, and
3 at the end of the day, most of the time, would end
4 up in my office.
5       Q. And then you would help to make
6 decisions about whether or not the company would be
7 interested in working with that surgeon?
8       A. Yeah, exactly.
9       Q. According to your CV, I guess the
10 name of Ethicon changed to Gynecare Europe as of
11 2001? Is that what's indicated here?
12       MS. KABBASH: Objection.
13       THE WITNESS: Yes. You know, prior
14 to this position, I was involving all aspects, all
15 the franchise of Ethicon, while after 2001, I was
16 working in a more focused area in a brand new
17 company that we had created called Gynecare. So my
18 scope geographically remained the same, Europe, but
19 focused on Gynecare, which was part of Ethicon.
20 BY MR. SLATER:
21       Q. So when you became scientific
22 director of Gynecare Europe in 2001, are you saying
23 at that point, instead of being responsible for all
24 of the Ethicon franchises or businesses in Europe,
25 you focused down into Gynecare, this newly acquired

Page 21

1 company?
2       A. Absolutely.
3       Q. And what was Gynecare's business at
4 the time you took over?
5       A. Well, I saw the creation of Gynecare,
6 I think this company acquired somewhere in
7 California. And essentially, this company, when it
8 came into Ethicon, it had two kind of products, the
9 product for abnormal uterine bleeding and also
10 product for hysteroscopy. But I was in Ethicon.
11 And I started a project coming from the European
12 field with Prof. Ulmsten in Scandinavia, which was
13 to become the TVT®.
14       So, initially, this TVT® was a
15 project I had in Ethicon. But when we acquired
16 Gynecare, at some point, the company decided that
17 this Ethicon project should move to Gynecare. So at
18 the very beginning, the Gynecare company received a
19 nice present, I would say, and that was the TVT®.
20       Q. So you were involved in developing
21 this other product, the TVT®, beginning at Ethicon,
22 and then that product was shifted to the Gynecare
23 business and you essentially went along with it?
24       A. Yes, yes. You know, a couple of
25 months after Gynecare was created, the company

Page 22

1    decided to take the TVT® project away from the
2    Ethicon franchise to give it to its subsidiary or,
3    you know, I don't know how we can call this, to its
4    franchise Gynecare, because obviously it was related
5    to women's health.
6          Q.    It says on your resume that you
7    continued in the position of scientific director
8    Gynecare Europe until 2008.  So that would be 2001
9    to 2008.
10          And then in 2008, you took your
11   current position, medical affairs director Ethicon
12   EMEA?
13         A.    Yes.
14         Q.    What is your responsibility in that
15   position, since 2008?
16         A.    Okay.  Well, in 2008, the company
17   give me some more responsibilities, so I was in some
18   way promoted to something broader, still in the EMEA
19   but broader in terms of franchise.  And the company
20   gave me two positions reporting to me.  And so I had
21   the opportunity to organize my life in the way I
22   wanted, and I decided to appoint someone whom you
23   know probably, someone to take care of the Gynecare
24   franchise.  So that's why I appointed Dr. Piet
25   Hinoul.  So Piet Hinoul succeeded to me.  I gave him

Page 23

1    all the responsibility for Gynecare when he joined
2    the company, because, of course, he's a gynecologist
3    and that was perfectly fitted.
4          And then we have two other franchise,
5    you know.  Ethicon has Gynecare on one side, another
6    one called Ethicon Products, which is the most
7    important one.  And for this, I had also an open
8    position, so I appointed someone to take care of
9    Ethicon Product.  And then we have a third company
10   called Biosurgery, Biosurgery.  It's a company that
11   is high technology company taking cake of hemostats,
12   c-lance, very complex product, with a bright future.
13   So I kept this for me.  I kept the responsibility of
14   Biosurgery for me.
15         So to summarize and to answer your
16   question, I've been heading a small team of medical
17   affairs and taking care personally of the Biosurgery
18   franchise.
19         Q.    According to your resume, from 2000
20   to 2005, you indicate one of your achievements was
21   the Prolift®, which you describe as, "A system for
22   repairing pelvic organ prolapse," and it says you
23   "initiated and set up the project with a group of 9
24   experts, management until product launch, marketed
25   worldwide."  Correct?

Page 24

1          A.    Correct.
2          Q.    I'm now going to hand you another
3    exhibit, and we're going to start to talk a little
4    bit about how that -- how the Prolift® came about.
5    And I'm going to hand you an exhibit we've marked as
6    1250.
7                     - - -
8          (Deposition Exhibit No.
9          Plaintiff's-1250, Press Interview
10         Frankfort June 9, 2005, Bates stamped
11         ETH.MESH.03923931 through
12         ETH.MESH.03923934, was marked for
13         identification.)
14                     - - -
15   BY MR. SLATER:
16         Q.    And I'm going to ask you just a
17   little bit about this document, which is a "Press
18   Interview Frankfort June 9, 2005," and was produced
19   to us as part of your files.
20         So take a look at that for a moment,
21   and then I'll have a few questions for you.  Okay?
22         A.    That was an interview of myself, I
23   guess.
24         Q.    Well, my first question --
25         A.    It looks --

Page 25

1          Q.    My first question is, what is this
2    document?
3                MS. KABBASH:  Do you need a second to
4    look at it first?
5                THE WITNESS:  Yeah.  If you can give
6    me one second.
7                MS. KABBASH:  Take a look at it.
8                MR. SLATER:  Let's go off the video.
9                THE VIDEOGRAPHER:  The time is now
10   10:35.  We are going off the record.
11                     - - -
12         (A discussion off the record
13         occurred.)
14                     - - -
15                THE WITNESS:  Okay.  I'm fine.
16                THE VIDEOGRAPHER:  The time is now
17   10:36.  We are back on the record.
18   BY MR. SLATER:
19         Q.    Exhibit 1250 is a document that's
20   titled "Press Interview Frankfort June 9, 2005."
21   And again, this was produced from your documents.
22         Do you recognize this?
23         A.    I do.  I know that this comes from my
24   computer, my writings, my style.
25         Q.    You prepared this document?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 26

1    A.    Yes, yes.
2    Q.    Was this something that you actually
3  ever delivered in the press or to the media, or is
4  it something you just prepared for some other
5  purpose?
6    A.    I do not remember.  You know, I've
7  not been in press interview for -- I've not given
8  many of them.  So most of the time I remember them,
9  but this one, I cannot remember it.
10    Q.    It's possible you did, you just don't
11 know?
12    A.    It's possible.  It's possible it was
13 a preparation for something that did not happen or
14 maybe it happened, but I do not remember.
15    Q.    The document starts off number 1,
16 "Steps of development of" the "PROLIFT," and right
17 under that, it says, "State of the Art in 2000."
18        Do you see that?
19    A.    Yes, yes.
20    Q.    And you basically, in describing the
21 state of the art in 2000 in Section A, talk about
22 the abdominal approach to repair genital prolapse,
23 and then in section B, you talk about the vaginal
24 approach to repair genital prolapse.
25        Do you see that?

Page 27

1    A.    Yes.
2    Q.    The abdominal approach would be
3  what's known as abdominal sacrocolpopexy?
4    A.    Yes, yes.
5    Q.    And about halfway down in the
6  paragraph about the abdominal approach, you state,
7  "This procedure gave excellent results but was
8  somewhat too aggressive for the older patients who
9  are numerous in this pathology."
10        Do you see that?
11    A.    Yes.
12    Q.    And at that time when you wrote this,
13 in June of 2005, that was your viewpoint.  Correct?
14 Otherwise, you wouldn't have written it in the
15 document.  Right?
16    A.    Yes, yes.
17    Q.    Then in section B, with regard to the
18 vaginal approach, you say, "The vaginal approach was
19 still is the most widely used procedure in
20 particular in the oldest patients."
21        Do you see that?
22    A.    Yes.
23    Q.    And that was true as of June of 2005
24 when you prepared this?
25        MS. KABBASH:  Objection.

Page 28

1  BY MR. SLATER:
2    Q.    You can answer.
3    A.    Yes.  Well, I think this is -- it's
4  an overall understanding of this kind of surgery at
5  that time, you know.  I'm not sure it has changed
6  much nowadays.
7    Q.    And you say right after that,
8  contrary "to the abdominal approach, a prosthesis
9  was very seldom used."
10        Do you see that?
11    A.    Yes.
12    Q.    And when you refer to a prosthesis,
13 you're talking about a graft or a mesh.  Right?
14    A.    Yes.
15    Q.    Going to the next page, about eight
16 lines down, there's a sentence that starts on the
17 left-hand side that says, "Meshes."  "Meshes were
18 used from time to time but this was usually
19 restricted to the worse patients, for example the
20 ones having already had multiple recurrences."
21        And that was true historically?
22        MS. KABBASH:  Do you see that
23 language?
24        THE WITNESS:  No, I don't.  Middle
25 of --

Page 29

1        MS. KABBASH:  That's okay.
2        THE WITNESS:  Oh, okay.  To the worse
3  patients, for example.  Yes, yes.
4  BY MR. SLATER:
5    Q.    And a little further down, you talk
6  about what you describe as the reluctance of certain
7  surgeons to use mesh, and you say "there were two
8  main reasons for that."  And then you have the two
9  little hyphen indented parts.
10        Do you see that?
11    A.    Yes, sure.
12    Q.    You say, the first reason, "The lack
13 of standardized and validated procedure using mesh."
14 And in parentheses you say, "There were basically as
15 many procedures as surgeons."
16        So that was one reason.  Right?
17    A.    Yes.
18    Q.    And the second reason, "The fear of
19 mesh-related complications."  Correct?
20    A.    Yes, correct.
21    Q.    And then you say, "And finding a
22 solution to both of" those "problems was precisely
23 the reasons why the TVM Group was set-up."  Correct?
24    A.    Correct.
25    Q.    And then in section B of this

8  (Pages 26 to 29)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 30

1  document, we now get to "The TVM Initiative," the
2  transvaginal mesh initiative. Right?
3       A.    Yes.
4       Q.    And you state, "The TVM (TransVaginal
5  Mesh) Group was set up in the early 2000s upon the
6  demand of myself (Dr." Axel "Arnaud - Gynecare
7  Europe) to a very respected expert in the field of
8  vaginal surgery," Prof. Bernard Jacquetin (Head of
9  the Department of Gynecology and Obstetrics in
10  Clermont Ferrand" in "France.)" Right?
11       A.    Right.
12       Q.    And you say the objectives of this
13  group were twofold. One, "develop a standardized
14  technique for the surgical management of urogenital
15  prolapse with meshes via the vaginal approach." And
16  you say that was the main objective. Correct?
17       A.    Correct.
18       Q.    And you then say also, "Try to better
19  understand the mechanisms of classical mesh-related
20  complications such as vaginal erosions." And that
21  was your secondary objective. Correct?
22       A.    Yes. Correct.
23       Q.    And then you give a little historical
24  information about how this all started. And you
25  say, "The Group TVM was originally composed of 6

Page 31

1  gynecologist surgeons experts in pelvic floor
2  statics and with a wide experience in the use of
3  synthetic materials. Its first meeting was held in
4  Nice on June 5th 2000."
5       So that was the first meeting of the
6  group?
7       A.    Yes.
8       Q.    And at the very bottom of the
9  document, you point out that, as the -- as time went
10  on, the group changed and grew to nine gynecologic
11  experts. And you say "Gynecare France was
12  coordinating the logistics." Correct?
13       A.    Absolutely. Correct.
14       Q.    And you had a pivotal role in
15  coordinating those logistics from day one. Correct?
16       A.    Absolutely.
17       Q.    Let me ask you this.
18       The idea for the TVM technique, was
19  it Prof. Jacquetin's idea, was it your idea or did
20  it grow through an interaction between you?
21       A.    Well, in 2000, Gynecare had in some
22  way changed the world of urinary incontinence, and I
23  heard people like Jacquetin telling me, well, Axel,
24  you have really gave -- given us the solution for
25  urinary incontinence, so urinary incontinence is no

Page 32

1  longer an issue for us. Now the real issue is
2  prolapse.
3       So, you know, I had in France a
4  couple of people I was in touch with who were pelvic
5  floor surgeon. And they were coming to me, asking
6  me, oh, could you make a mesh for me that would be
7  cut in this way, that way, that way. So they all
8  wanted a personal cut for the mesh. So Prof.
9  Jacquetin wanted a Jacquetin mesh, Prof. Ix an Ix
10  mesh. So I told these people, well, look, we as a
11  company cannot make, you know, personal products.
12  But what would be good would be to -- for you to
13  work all together and try to find out a consensual
14  procedure where you all required the same shape, the
15  same mesh, so that we could, as an industry, support
16  you and eventually offer that to the rest of the
17  world.
18       So, you know, if I try to summarize,
19  the context was incontinence, everybody was happy
20  about Gynecare saying, well, what you did is
21  fantastic. So now, could we do the same thing in
22  prolapse, which meant introducing, not a sling like
23  in incontinence, but a mesh for prolapse, because
24  prolapse is a broader anatomical issue, so a sling
25  cannot cure a prolapse probably.

Page 33

1       So I approach Jacquetin and I said,
2  well, look, you are the -- you have been using
3  meshes forever. He had probably used more meshes in
4  more than 1,000 patients. He is probably the one
5  most experienced guy at that time. He was that
6  time the most experienced guy in meshes. So I
7  talked to him, and I said, why don't we try to set
8  up a working team, a team that would work and try to
9  improve the surgery of prolapse, which at that time
10  was not very, very efficient.
11       MR. SLATER: Move to strike.
12  BY MR. SLATER:
13       Q.    Just what I did is --
14       During the deposition, I may at some
15  point ask you a question that I think is very
16  narrow, and you might talk about other things I
17  didn't ask about. And I'm just preserving my
18  rights, just like an attorney would object, I'm
19  preserving my rights.
20       Let me ask you this question as a
21  narrow question. My question -- my next question
22  is -- well, rephrase. Withdrawn.
23       If we look at the document, a little
24  bit further down on the third page, you talk about a
25  preliminary study that was done with the TVM

Page 34

1  technique, and you talk about some results from that
2  technique.
3          And one of the things you say is that
4  there was mesh exposure in that early study from
5  2002 to 2004 of 12.3 percent.  Correct?
6      A.    That's correct.
7      Q.    And mesh exposure is defined as what?
8      A.    Sorry?
9      Q.    What is mesh exposure as used here?
10  What does that mean?
11      A.    Well, mesh exposure is a word that --
12  a design condition where, when you perform the
13  vaginal examination of the patient, you find in the
14  vaginal wall a loss of substance.  And you can see
15  the mesh in the depths of this loss of substance.
16      Q.    On the next page, this is now the
17  last page of this document, there's a discussion of
18  something called shrinkage.  And we're going to put
19  that up on the screen.
20          And it says, "Shrinkage is due to an
21  excessive scarring process.  Even if most of the
22  time it is asymptomatic, in a few cases it led to
23  vaginal distortion impacting the sexual life.  Thus,
24  the procedure must be used cautiously in sexually
25  active women."

Page 35

1          Do you see that?
2      A.    Yes, I do.
3      Q.    And that was something that you
4  learned over the years as the TVM Group was
5  developing the TVM procedure.  Correct?
6          MS. KABBASH: Objection.
7          THE WITNESS: Well, at least it was
8  something we knew in -- at this time, you know.
9  Yes, yes.  Well, shrinkage is something that's not
10  absolutely new at that time, you know, because
11  people like Prof. Jacquetin have been using meshes
12  for a very long time, you know.  So they have
13  already had a good knowledge about what were the
14  possibility and what were the risks of using meshes.
15  BY MR. SLATER:
16      Q.    We're now going to go to the next
17  document, and it's marked as Exhibit 1251.
18          - - -
19          (Deposition Exhibit No.
20          Plaintiff's-1251, E-mail dated 29 Jan
21          2002, with attachment, Bates stamped
22          ETH.MESH.03909826 through
23          ETH.MESH.03909829, was marked for
24          identification.)
25          - - -

Page 36

1  BY MR. SLATER:
2      Q.    I'm going to send it over to you.
3          Exhibit 1251 is an e-mail that you
4  wrote on January 29, 2002 to Laura Angelini.  And
5  the subject, "Confidential/Project TVM."
6          Who is Laura Angelini who you wrote
7  this e-mail to in January of 2002?
8      A.    Well, Laura Angelini was the vice
9  president of marketing in -- for Gynecare in Europe.
10  And she had been my partner, my commercial partner,
11  during the development of TVT®.
12      Q.    And you attached to this e-mail a
13  document that you titled "Project TVM (TransVaginal
14  Mesh.)"  Right?
15      A.    Yes.
16      Q.    And is this the first time that you
17  formally proposed this project to the marketing arm
18  of Gynecare?
19      A.    Well, if you can give me one second,
20  just to --
21      Q.    Certainly.
22      A.    Okay.
23      Q.    Is this the first time that you
24  formally proposed the TVM project to the marketing
25  people within Gynecare?

Page 37

1          MS. KABBASH: Objection.
2          THE WITNESS: I think so.
3  BY MR. SLATER:
4      Q.    Okay.
5      A.    I think so.
6      Q.    And in your e-mail to Laura Angelini,
7  after you tell her, "Please find attached a draft of
8  the Project TVM," you point out that -- a little
9  further down you talk about prolapse surgery, and
10  you talk about the fact that this procedure indeed
11  "is a triple operation performed in a single
12  operative session."
13          Do you see that?
14      A.    Yes, yes.  No, I...
15      Q.    You point out, "The procedure is
16  certainly not as revolutionary and 'sexy' as Ulf's
17  procedure."
18          That would be the TVT®.  Right?
19      A.    (Witness nods head.)
20      Q.    "But I think we could reach a
21  comparable level of success since the need for a
22  gold standard is even greater than it was for TVT."
23  Right?
24      A.    Right.
25      Q.    And I want to understand, the TVM

10 (Pages 34 to 37)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 38

1    procedure is a method for the treatment of pelvic
2    organ prolapse. Correct?
3        A.    Yes.
4        Q.    It was intended to be an alternative
5    procedure that gynecologic, urogynecologic or
6    urologic surgeons who would treat prolapse could
7    utilize as an alternative as compared to the
8    procedures that were available at the time.
9            Is that a fair statement?
10       A.    Yes, yes.
11       Q.    And your hope was that surgeons who
12   were gynecologists or urogynecologists or urologists
13   who treated prolapse would be interested in this
14   technique as compared to the other techniques that
15   were currently available, like what we talked about
16   in that prior document, abdominal sacrocolpopexy,
17   vaginal repairs and the like. Correct?
18       MS. KABBASH: Objection.
19   BY MR. SLATER:
20       Q.    The intention was to offer them an
21   alternative to those procedures. Correct?
22       A.    Yeah, a better alternative. An
23   alternative that would lead to much less recurrences
24   than the technique without meshes, which were not at
25   all satisfactory. You know, the intent was with the

Page 39

1    TVT®, what we brought was a procedure that gave good
2    results in 90 percent of the cases. And that was
3    very different than what was existing without the
4    sling. Without the sling, the gold standard was the
5    Burch procedure. All the surgeon knew that the
6    Burch procedure was a very poor gold standard,
7    because the rate of success was very low, and if you
8    would wait, with time, the rate of success would be
9    even lower. So the sling brought a dramatic
10   improvement in the efficacy and, more importantly,
11   in the efficacy over time, over time, on the long
12   term. So the purpose of the TVM procedure was
13   exactly the same, you know, bring more success in a
14   short term but also the guarantee of a long-term
15   success.
16       MR. SLATER: Move to strike from
17   "with the TVT®" forward.
18   BY MR. SLATER:
19       Q.    Your goal was to try to develop a
20   better alternative, that was your hope, to the
21   existing procedures. Correct?
22       A.    Yes.
23       Q.    Your expectation was that if somebody
24   was an experienced pelvic reconstructive surgeon, a
25   urogynecologist or a gynecologist or a urologist,

Page 40

1    that they would be able to understand this
2    procedure, they would be willing to understand how
3    it's done, and with some training, be able to
4    perform it. That was again your hope. Correct?
5        A.    Yeah. My hope was to offer a new
6    procedure that would be more efficient in term of
7    recurrences than the existing ones.
8        Q.    And you then say -- let's go to the
9    actual "Project TVM" document. You say that, with
10   regard to the medical background and rationale, "For
11   a manufacturer of medical devices, surgery for
12   genital prolapse is an attractive market."
13           Do you see that?
14       A.    I don't see it, but I can understand
15   it.
16       MS. KABBASH: I want to make sure
17   every time Mr. Slater asks you about language, that
18   you look for that language.
19       THE WITNESS: Yes.
20       MS. KABBASH: Okay?
21       THE WITNESS: Okay. Okay.
22   BY MR. SLATER:
23       Q.    Do you see what I just read?
24       A.    Yes, yes.
25       Q.    And what you were saying to the

Page 41

1    marketing person who you forwarded this to is that
2    you think that this is a market where the company
3    can successfully market this procedure and profit.
4    Correct?
5        MS. KABBASH: Objection.
6        THE WITNESS: Yes.
7    BY MR. SLATER:
8        Q.    You then say, "Nevertheless, it is a
9    difficult area for two main reasons."
10           Do you see that?
11       A.    Yes.
12       Q.    And the first reason you say, reason
13   A, "The use of an implant such as a mesh is not
14   established as a standard. Most of the current
15   procedures do not involve the use of any implantable
16   materials."
17           That's one of the reasons you stated
18   why this could be a difficult area. Correct?
19   That's reason A. Right?
20       A.    I'm lost, I'm lost.
21           Oh, yes. Okay, okay. A.
22       Q.    And then a little further down you
23   have a little B, the second reason why you say this
24   is a difficult area. And you say, "With regard to
25   surgical techniques, there is no gold standard."

Confidential - Subject to Stipulation and Order of Confidentiality

Page 42

1    That's what you wrote.  Correct?
2        A.    Yes.
3        Q.    And you then, at the very bottom of
4    that paragraph, you basically say that you're
5    looking to develop what you call a gold standard
6    technique, and you describe that as "a technique
7    which is sufficiently simple, safe, reproducible,
8    logical and effective that it will attract the
9    majority of the non-experts."
10        Do you see that?
11        A.    Yes.
12        Q.    And when you refer to the nonexperts,
13    you're talking about people who are surgeons but may
14    not be the top surgeons like a Prof. Jacquetin.
15    Correct?
16        A.    Of course, yes.
17        Q.    And, again, you want to be able to
18    market not just to somebody like a Prof. Jacquetin,
19    but you also want to be able to market to the
20    nonexperts, because, of course, you can market more
21    products if you can market not just to the very top
22    doctors but also to those who are what you call the
23    nonexperts.  Correct?
24        MS. KABBASH:  Objection.
25        THE WITNESS:  Yes, yes.  Of course,

Page 43

1    this is the intent.  You know, this is my intent.
2    I'm not saying at that time we were going in the
3    future, so no visibility what we were going to end
4    up with, would that be a very simple procedure,
5    would that be a very complex procedure.  But at
6    least my intent, you know, as a company was to offer
7    a procedure as simple as possible, as safe as
8    possible, as efficient as possible.  But that was
9    just a project.
10    BY MR. SLATER:
11        Q.    Understood.
12        Then on the next page you give an
13    overview of the project.  And you say, phase 1 is to
14    "Identify an expert" to "Design the procedure."  And
15    the expert you identify is Prof. Bernard Jacquetin
16    in Clermont-Ferrand, France.  Correct?
17        A.    Yes.
18        Q.    You say, "He is the undisputed leader
19    of vaginal surgery in France and a well recognized
20    international expert."
21        That's one thing you said about him.
22    Right?
23        A.    Correct.
24        Q.    "He has a unique experience of over
25    1,000 prolapse repairs using a mesh."  Right?

Page 44

1        A.    True.  Yes.
2        Q.    "He knows exactly what other
3    international experts do."  Correct?
4        A.    Yes.
5        Q.    "He is a very good friend of us," and
6    you talk about that he helped to launch the TVT® in
7    France.  Correct?
8        A.    Yes.
9        Q.    You call him "a very reliable and
10    knowledgeable person."  Correct?
11        A.    Absolutely.  Correct.
12        Q.    And you say, you say, "Most
13    importantly, he showed me a procedure which I
14    believe presents all the qualities to become a gold
15    standard."
16        And that's your reasoning for why you
17    thought he was the right person to work with.
18    Correct?
19        A.    Yes.
20        Q.    Would it be fair to say that from
21    that point forward, the description of your respect
22    for him and the reasons why you thought he should be
23    the expert at the lead of the project remain the
24    same.  You always held him in such high esteem.
25    Correct?

Page 45

1        A.    Yes.
2        Q.    And you always felt that his opinions
3    with regard to TVM and ultimately the Prolift®
4    should be respected because you held him in such
5    high esteem.  Correct?
6        MS. KABBASH:  Objection.
7        THE WITNESS:  Yes, yes.  Of course.
8    BY MR. SLATER:
9        Q.    One of the things you did, and the
10    people who worked with him as this project went on
11    did, is to rely on his input and take that into
12    account as the project went forward and as the
13    Prolift® was launched and beyond.  Correct?
14        A.    Yes, that's correct.  You know, I
15    rely on him because he's an honest person and he's a
16    real expert.  He has spent all his life doing only
17    vaginal surgery, nothing outside of that scope.  So
18    he's very reliable.
19        Of course, I was not only listening
20    to one person.  I had a group of ex -- other
21    experts.  And if Jacquetin -- I have not a blind
22    belief in what Jacquetin was saying, you know.  I
23    had sufficient experience, too, in my job for
24    innovation, you know, to understand that one single
25    person, even the most reliable person in the world,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 46

1    can be wrong.  So I used to say, if you ask one
2    person, he is a great expert, you are sure
3    80 percent.  If you ask two, we'd say that's very
4    good, you are sure 90 percent.  If you ask a third
5    person who share the same opinion, you are sure
6    100 percent.
7           So, of course, I was not blindly
8    listening to what Jacquetin was saying, but I had
9    other -- other voices talking to me, of course.
10       Q.    Understood.
11           My question really is just that you,
12   because of the things you described about him, felt
13   he should be the expert to lead this project.  And
14   as time went forward, his input continued to be a
15   very important consideration for you and the company
16   as you went forward with this project, launched the
17   Prolift® and beyond.  Correct?
18       A.    Yes.
19       Q.    You then talk about the procedure,
20   which would involve, at that point, it was three
21   steps, a vaginal hysterectomy, a cystocele or
22   anterior repair, meaning if the bladder was dropping
23   into the vaginal, a rectocele or posterior repair if
24   the rectum was dropping into the vagina.  Correct?
25   It was, at that point, thought of as three parts.

Page 47

1    Correct?
2        A.    Correct.
3        Q.    And you talked about designing the
4    products, and that's where you describe the mesh and
5    a system to fix it on both sides.
6           And, ultimately, since you had this
7    procedure, you needed the materials to execute the
8    procedure, and that would be the mesh and the
9    instruments.  Correct?
10       A.    Yes.
11       Q.    And we go to the next page.  Phase 3
12   of the project is to "Spread the technique locally"
13   and have a localized clinical trial with what you
14   proposed, to have Prof. Jacquetin do a localized
15   study with patients at his hospital.  Correct?
16       A.    Yes.
17       Q.    And the hope was to validate this by
18   getting some good early results with Prof. Jacquetin
19   to help to support this project.  Correct?
20       A.    Prof. Jacquetin and the group.
21       Q.    And the group he was working with?
22       A.    The TVM Group.
23       Q.    And then you talk about
24   "Observational clinical trial."  And you say that,
25   "This would call for an observational study

Page 48

1    performed in a single center (Pr Jacquetin)," you
2    have in parentheses, "in order to generate reliable
3    clinical data as soon as possible."
4           That's what you wrote there.
5    Correct?
6        A.    Yes.
7        Q.    You say, "This also implies an
8    aggressive product development as the clinicals
9    could hardly" start "before a specific product is
10   available," meaning we need to get this product
11   developed so we can then give it to the doctors to
12   do this study, this clinical study, with the
13   product.  Correct?
14           MS. KABBASH:  Objection.
15           THE WITNESS:  Well, that's not
16   exactly what I mean.  You know, I know that if you
17   want to start a clinical trial, you can start it
18   with product that are -- with prototypes, let's say.
19   Product that's not -- that are different from the
20   one that's going to be put on the market but are
21   similar in some way, but they are not already
22   approved for marketing.  You can start a clinical
23   trial with a product that's not yet approved.
24           So that's what I meant.  But usually,
25   if the product is not approved, then the burden, the

Page 49

1    administrative burden, it takes some time.  It's
2    more complex.  So that's what I meant, you know, by
3    saying it could hardly start before a specific
4    product is available, because, you know, the
5    administrative burden is more important.
6    BY MR. SLATER:
7        Q.    And then a little further down, you
8    say, "I do believe that long term clinical data are
9    unnecessary for a market launch of this
10   procedure/products."
11           Do you see that?
12       A.    Yes.
13       Q.    So what you're saying is you don't
14   think that long-term data would be needed in order
15   to support going to market with the product.
16   Correct?
17       A.    Correct.
18       Q.    And then you say, "Indeed, there
19   would be very little concern about the safety."
20           That's one thing you said.  Right?
21       A.    Sorry, I don't understand.
22           Yes, yes.
23       Q.    And you say, "And sufficient good
24   sense evidence that the procedure would work."
25           That's also what you said.  Right?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 50

1    A.    Yes.
2    Q.    And you're saying that on the part of
3  the surgeons who this would be marketed to.
4  Correct?
5    A.    Sorry?
6    Q.    You're saying that the surgeons that
7  you would be marketing this procedure and this
8  product to, you would not need long-term clinical
9  data in order to get them to use the product.
10  Right?
11         MS. KABBASH:  Objection.
12         THE WITNESS:  Yes.
13         But I can explain on that, you know.
14  BY MR. SLATER:
15    Q.    I certainly might ask you that in a
16  little bit.  I just want to get through this a
17  little bit.
18         In fact, when the Prolift® eventually
19  was launched, at that time there was not long-term
20  data with the actual Prolift®.  Correct?
21         MS. KABBASH:  Objection.
22         THE WITNESS:  Yes.  Of course,
23  because it was a brand new product.  So you cannot
24  have long-term data with a brand new product.  But
25  there were data on the long term for meshes that

Page 51

1  have been used by people like Jacquetin, for
2  example, have been using meshes forever.  So we had
3  a good idea of what was the long term with meshes.
4         MR. SLATER:  Move to strike from
5  "but" forward.
6         - - -
7         (Deposition Exhibit No.
8    Plaintiff's-1252, E-mail chain, top one
9    dated 09 Jul 2002, Bates stamped
10    ETH.MESH.03909986 through
11    ETH.MESH.03909990, and Deposition Exhibit
12    No. Plaintiff's-1253, PowerPoint, "The Use
13    of Meshes in Vaginal Prolapse Repair," 42
14    pages, were marked for identification.)
15         - - -
16  BY MR. SLATER:
17    Q.    I'm going to hand you the next two
18  exhibits, which actually go together.  Exhibit 1252
19  is an e-mail you wrote July 9, 2002.  So we're going
20  ahead about six or seven months.  And Exhibit 1253
21  is the PowerPoint presentation you referred to in
22  that e-mail titled "The Use of Meshes in Vaginal
23  Prolapse Repair."
24         Do you need a moment to look at
25  those?

Page 52

1    A.    Maybe the e-mail, because the
2  presentation --
3         MR. SLATER:  Go off the video.
4         THE VIDEOGRAPHER:  The time is now
5  11:07.  We are now going off the record.
6         - - -
7         (A discussion off the record
8    occurred.)
9         - - -
10         THE VIDEOGRAPHER:  The time is now
11  11:10.  We are back on the record.
12  BY MR. SLATER:
13    Q.    I've put up on the screen what we've
14  marked as Exhibit 1253, which is the presentation
15  you referred to in your July 9, 2002 e-mail.
16  Correct?
17    A.    Correct, correct.
18    Q.    And you said in the e-mail, "Please
19  find" -- you're writing to Paul Parisi.
20         Who is Paul Parisi?
21    A.    Paul Parisi is someone that was
22  working in Somerville, in the Ethicon headquarters.
23  And I believe at that time he was a professional
24  education guy.
25    Q.    You wrote to Paul Parisi and said --

Page 53

1  he had given you some information in the e-mail
2  earlier with regard to the mesh.  And you say,
3  "Please find attached the presentation I made at the
4  European Sales Meeting in Sardinia which could be
5  interesting for you.  Best regards."  Right?
6    A.    Yes, yes.
7    Q.    Just to jog your memory, at that
8  point in time, was Paul Parisi in marketing?
9    A.    I don't know.  I know Paul has been
10  probably marketing at some point, in prof ed at some
11  other point, but as prof ed, he is part of marketing
12  maybe.
13    Q.    Just a little further down in the
14  e-mail, the e-mail he had last written to you, when
15  he signed off, the signature is "Paul Parisi, New
16  Product Development Specialist, Gynecare Worldwide,
17  a division of ETHICON, a Johnson & Johnson company."
18         Does that help to refresh your memory
19  of what he was doing at that time?
20    A.    Yes.  New product development
21  specialist, probably someone in the marketing, but I
22  would not be -- I cannot speculate on that.  I don't
23  remember, you know.  It's not a title that is very
24  common in the company, at least.
25    Q.    Well, you provided this presentation

14 (Pages 50 to 53)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 54

1  regarding the use of meshes in vaginal prolapse
2  repair to the European sales meeting probably
3  sometime recent before July of 2002.
4        Why did you give that presentation to
5  the salespeople in Europe?
6        A.   Well, I gave this -- I don't
7  remember.  I gave this presentation because, of
8  course, someone asked me to do so.  But what is the
9  reason, the exact reason, I don't remember.
10       Q.   And it actually says on the
11  PowerPoint, "Sardinia, July 3rd."
12       So that's likely the day you make
13  this presentation.  Correct?  July 3, 2002?
14       A.   Yes, probably.
15       Q.   If you could turn to the third page
16  of that document, it's titled, "The Pathology."
17  Where it says "The Pathology," it talks about the
18  cystocele.
19       And what is a cystocele?
20       A.   Well, a cystocele is a prolapse of
21  the bladder wall in the vagina.
22       Q.   Then it says, "Uterine Prolapse,
23  Vaginal Vault Prolapse."
24       What is that?
25       A.   Well, you know, a prolapse is

Page 55

1  always -- well, can have three component, because
2  there are three area in the pelvis, the anterior,
3  the medial one and the posterior.  So anteriorly,
4  you have the urinary apparatus.  So it's the bladder
5  essentially.  So it could be cystocele.  And then in
6  the medial part, it is the uterus.  It's a genital
7  tract.  The uterus, if you still have it, and the
8  vaginal vault, if you do not have a uterus.  And the
9  posterior means the rectum, the digestive tract.
10       Q.   And the diagram to the left, the
11  illustration shows in simple but accurate terms the
12  anatomy of the female pelvis and the part of the
13  anatomy that's involved in pelvic organ prolapse.
14  Correct?
15       A.   Yes, yes.  The intent is to show the
16  three areas.
17       Q.   If you could, turn forward about six
18  pages or seven pages.  There's a page with the title
19  at the top, "Are there any scientific proof that
20  mesh would reduce the recurrence rate?"
21       And when you talk about a recurrence
22  rate there, you're talking about where somebody has
23  surgery to repair a prolapse and then a prolapse
24  occurs again in the future.  Correct?
25       A.   Yes.

Page 56

1        Q.   Would that include, for example, if a
2  woman had a cystocele and there was a repair of the
3  front part of the vagina, if that were to happen
4  again in the future, that would be a recurrence.
5  Correct?
6        A.   Yes.
7        Q.   If the woman had a cystocele and
8  there was a repair in the front part of the vagina
9  for the cystocele, but she were then to get a
10  rectocele in the back part of the vagina, would you
11  also call that a recurrence?
12       MS. KABBASH:  Objection.
13       THE WITNESS:  You know, it's a
14  recurrence of the prolapse.  It's not a recurrence
15  of the treated side, but it's still a recurrence --
16  for the patient, it's a recurrence of the prolapse.
17  I don't think the patient makes a difference between
18  both.  So what is -- for the patient, the patient,
19  the result is the same, whether it recur where it
20  has been repaired or whether it has recurred in
21  another area.
22  BY MR. SLATER:
23       Q.   When you talk about the recurrence
24  rate of whether a recurrence had happened again, at
25  that point in time, were you talking about

Page 57

1  anatomically simply measuring whether or not the
2  organ had dropped to a certain level where you would
3  say, oh, there's a prolapse again?  Was it an
4  anatomic measurement?
5        A.   No.  At this time, in this
6  presentation to the sales reps or to the sale force,
7  it's not an attendance of experts, you know.  I'm
8  talking generally.  I'm generally speaking about
9  recurrence.
10       Q.   Understood.
11       I'm just asking, at that point in
12  time, was your understanding when you talked about
13  recurrence, were you talking about an anatomic
14  recurrence, meaning that the anatomy had dropped to
15  a certain point so that it would measure out and you
16  would say, okay, that's a recurrence based on the
17  measurements?
18       MS. KABBASH:  Objection.
19  BY MR. SLATER:
20       Q.   Is that what was meant by recurrence
21  at that time when you used the term?
22       A.   Well, it's difficult to say what I
23  had exactly in mind, you know, but recurrence of a
24  prolapse is just same as a recurrence of a hernia,
25  you know, something is back again and the result is

Confidential - Subject to Stipulation and Order of Confidentiality

Page 58

```
 1    not optimal.
 2         Q.    When you asked the question in this
 3    PowerPoint, "Are there any scientific proof that
 4    mesh would reduce the recurrence rate," you point
 5    out, there are "No randomized studies."
 6         So those types of clinical trials had
 7    not yet been done.  Correct?
 8         A.    Yes.
 9         Q.    And you say, there are "strong
10    analogies with other areas such as:  Inguinal
11    hernia" or "Incontinence."
12         So you're drawing an analogy to those
13    other situations.  Correct?
14         A.    Absolutely, yes.
15         Q.    And then you basically say, as of
16    2002, July of 2002, from your perspective, "We can
17    realistically anticipate that meshes are the future
18    of prolapse surgery."
19         That was your viewpoint at the time.
20    Correct?
21         A.    Yes.
22         Q.    And then the PowerPoint continues
23    through the requirements for the mesh, and there's a
24    page that actually is titled "The 5 Essential
25    Product Requirements."  And you point out five
```

Page 59

```
 1    things that you describe as essential for the mesh
 2    product.  Correct?
 3         A.    Correct.
 4         Q.    And number "1.  Must resist infection
 5    as much as possible.  2.  Must incorporate the
 6    surrounding tissues.  3.  Must be histologically
 7    well tolerated.  4.  Must be soft."  And "5.  Must
 8    not shrink."
 9         That's what you felt were essential
10    requirements for the product you were trying to
11    develop.  Correct?
12         A.    Yes.
13         Q.    And if you could flip to the next
14    page, there's a discussion of product requirement 1,
15    which says, "Must resist infection."  Right?
16         A.    Yes.
17         Q.    And you say, "Why" does it need to
18    resist infection?  Because there's a "high risk
19    since "the vagina is not aseptic."
20         What does that mean?
21         A.    Well, that's a -- that means that
22    usually implants, generally speaking, what you put
23    in the human body, are put through an approach which
24    is aseptic.  The aseptic is preferred.  For example,
25    you put a heart valve, you do not go through
```

Page 60

```
 1    something that is not aseptic.
 2         But for the first time in the
 3    history, we were -- we were introducing meshes in
 4    the human body through the vaginal cavity, which is
 5    not an aseptic cavity.  It's like the mouth, the
 6    vagina.  There are bacteria, normally speaking.  So
 7    if you go through the vagina, there are bacteria.
 8    And even if you clean perfectly, you know, it's not
 9    considered an aseptic approach.  It's a septic
10    approach.
11         It would be the same, if, for
12    example, you would introduce a mesh through the
13    mouth.  And this is done in dental surgery.  I say
14    it is a unique situation.  It's not exactly the
15    word, it's a unique situation.  It also occur in
16    dental surgery where they use meshes for other
17    purpose.
18         So what I mean there is it must
19    resist infection, and this is a product requirement,
20    which is even more important in vaginal approach
21    than in inguinal hernia or incontinence -- or not
22    incontinence, or in incisional hernia, for example.
23         Q.    So you knew that when the mesh would
24    be introduced through the vagina, that it was
25    foreseeable that it could be contaminated with
```

Page 61

```
 1    bacteria, so you wanted a mesh where it would
 2    help -- it would allow the body to help resist
 3    infection from the contamination; is that correct?
 4         A.    Yes, yes.
 5         Q.    And a little below that, you talk
 6    about the interstices and micropores, and you're
 7    basically saying the size of the openings in the
 8    mesh need to be big enough so the body's defenses
 9    can get in there to try to fight the bacteria.
10         Is that a simple understanding of
11    that?
12         MS. KABBASH:  Objection.
13         THE WITNESS:  Not exactly.  So I made
14    this presentation very often, and people have been
15    very -- there have been a lot of confusion about
16    that.
17         It's not a matter of pore size.  It's
18    a matter of the mesh must not offer extremely small
19    location where the bacteria can go and get protected
20    from the macrophages.  So this slide is introducing
21    a second slide which says, look, if it is
22    monofilament, if it is monofilament, there is no
23    space for the bacteria to go.  If the mesh is made
24    of multifilament, then you have in between each
25    filament tons of spaces where the bacteria can go,
```

16 (Pages 58 to 61)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 62

1  stay forever, because the macrophages cannot go and
2  catch them.
3  BY MR. SLATER:
4      Q.    Let's go to the next page.
5          And on the next page of the
6  PowerPoint, you actually have pictures of, on the
7  top, some multifilament meshes.  Correct?
8      A.    Yes.  On the top left.  Yes.  Okay.
9      Q.    All three of them are actually
10 multifilament --
11     A.    Not the last one, not the GoreTex.
12     Q.    The bottom picture is what?
13     A.    The bottom -- the bottom picture is a
14 monofilament.
15     Q.    Which mesh is that?
16     A.    I don't know, but I believe it's one
17 of ours.
18     Q.    Let's go to product requirement 2
19 where you describe it a little bit more.  And you
20 say, it "must incorporate to the surrounding
21 tissue," because there's "less risk of rejection in
22 incorporated instead of encapsulated."  Right?
23     A.    Yes.
24     Q.    And for that you say the pores must
25 be at least 75 microns in size so that blood vessels

Page 63

1  can grow in and so that tissue can grow in and
2  incorporate the mesh with the body.  Correct?
3      A.    Correct.
4      Q.    And that's the purpose for that 75
5  micron?
6      A.    Yes.
7      Q.    Correct.  Okay.
8          Let's go to product requirement 3.
9  It says, "Must be well tolerated...in order to limit
10 the fibrosis."
11         What do you mean by that?
12     A.    Well, very simply, if you put --
13 amount of biomaterial you can put in the human body,
14 you cannot put all the material that existed in real
15 life.  Some of them are called biomaterial because
16 they are well tolerated -- they are better tolerated
17 in the -- by the human body than others.
18         So first selection is biomaterials.
19 Now, among biomaterials, the matter that can enter a
20 human body, some of them initiate more inflammation
21 than some others.  So what I mean by this was, well,
22 let's try to find -- we need a material that is
23 eliciting as little inflammatory response as
24 possible.
25     Q.    Did you learn --

Page 64

1          Well, did you know then or learn as
2  you went on that different people would have
3  different responses, their bodies would have
4  different responses so the inflammation would be
5  different from patient to patient?
6      A.    Well, of course, because this is a
7  general principle, you know, not all human being are
8  the same, so it can happen that someone tolerate
9  something better than another.
10     Q.    Did you ever make any effort,
11 beginning from the beginning of the project right
12 through, even after the Prolift® was launched, did
13 you ever make an effort to try to figure out who are
14 the people who would have a high response, who would
15 have a lot of inflammation and might be at more risk
16 as opposed to people who would have less
17 inflammation?  Was there ever any effort to try to
18 identify those patients?
19     MS. KABBASH:  Objection.
20     THE WITNESS:  Well, this is -- this
21 is somewhat idealistic.  You know, implant have been
22 used in human body forever.  And at that time, and
23 still nowadays, it's very unlikely that we can
24 predict by any kind of testing what will be the
25 reaction to an implant, you know, suture or implant,

Page 65

1  for example, that have been used forever.  And, you
2  know, in the huge majority of people, suture well
3  tolerated, but sometime a suture might be less
4  tolerated by someone.  But there is, to my best
5  knowledge or at least at that time, there was
6  absolutely no scientific testing, you know, that
7  could say, this person is going to react, this
8  person is not going to react.  And if such, it is my
9  assumption, if such kind of testing would be
10 developed one day, that would require, you know,
11 research that would come from, you know -- from
12 privatory research, not from a company perspective.
13 BY MR. SLATER:
14     Q.    All I'm asking is, because you said
15 obviously this is the -- at this point in time is
16 the first time meshes were being placed through the
17 vagina, did your company make any effort to try to
18 research, to try to figure out which women might be
19 at more risk for a high level of inflammation so
20 you'd have ability to warn them or warn doctors to
21 look out for those women?
22     MS. KABBASH:  Objection.
23 BY MR. SLATER:
24     Q.    Was an effort made to do that?
25     A.    Well, what you need to know is that

17 (Pages 62 to 65)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 66

1  we had a huge experience of meshes being placed into
2  the vagina, thousands of them, due to the TVT®
3  experience. So the TVT® experience taught us a lot.
4  And this project would never have happened if we
5  would not have had the precedent of the TVT®. So
6  the TVT® taught us infection is not an issue,
7  because in TVT® there is basically no infection.
8  Infection is not an issue. And tolerance of meshes
9  is very good. So that's -- that was the basis we
10  had at that time.
11          MR. SLATER: Move to strike.
12  BY MR. SLATER:
13      Q.    My question is simply this.
14          Did your company make any effort to
15  actually try to determine or fund any research in
16  any way to figure out which women would be the
17  higher responders and would have more inflammatory
18  response to the mesh that you were proposing to put
19  in through the TVM and the Prolift®? Specifically
20  to that, was any effort made?
21      A.    Well, we certainly made efforts in
22  preclinicals to look at the tolerance of all this
23  material. We, as Ethicon, have a huge database of
24  tolerance of biomaterial, because probably we're one
25  of the most famous company in the world in term of

Page 67

1  biomaterial. So we were using a material called
2  polypropylene. Polypropylene has been used in the
3  human body for over 30, 40 years. It's the main
4  suture used in cardiac surgery. So we have never
5  felt it was necessary to perform this kind of test
6  for the sutures. It was not necessary for the
7  slings. So this kind of testing was not considered
8  as being essential.
9          MR. SLATER: Move to strike.
10  BY MR. SLATER:
11      Q.    After you talk about product
12  requirement 3, that the mesh, "Must be well
13  tolerated...in order to limit the fibrosis," you
14  say, the "Theory" is, if you have a "Good material"
15  with a "Minimal amount" of the material, that would
16  be your best chance to limit the fibrosis. Correct?
17      A.    Yes.
18      Q.    Why did you want to limit the
19  fibrosis?
20      A.    Well, of course, we want to limit the
21  fibrosis because the vagina is a mobile structure.
22  So fibrosis mean lack of flexibility, extensibility.
23  So it's normal that you try always to limit the
24  fibrosis.
25      Q.    Did you have a specific concern that

Page 68

1  if you had fibrosis and stiffness of the implant
2  over the course of time once implanted in the woman,
3  that that could have a negative impact on her
4  function?
5      A.    Yes, of course. It is obvious for a
6  surgeon that if you perform something in the vaginal
7  cavity and this would lead to extensive fibrosis,
8  this is likely to create some problem in a sexually
9  active woman. It's rather obvious.
10      Q.    Go to the next page, please.
11          We're going to go to the next product
12  requirement 4. You stated that the implant "Must be
13  soft." And then you say that's "In order to
14  preserve the sexual life, it is essential to:
15  preserve the suppleness of the vagina" and "avoid
16  irritating spikes." Correct?
17      A.    Yes.
18      Q.    When you say it must be soft, are you
19  saying it must be soft when it goes in only or are
20  you saying it must remain soft over the course of
21  time?
22      A.    Well, of course, ideally it should
23  remain soft over the course of time. But this is
24  something we know is -- is a little bit illusory
25  because -- I don't know if that is the correct word

Page 69

1  in English, it's an illusion, because after a couple
2  of days, you know, the fibroblasts invade the
3  implant. And after some times, you know, the
4  implant cannot behave as it would have behaved in
5  the box, you know.
6          So it's -- when I say the softer, I
7  mean, well, don't use a very stiff one initially,
8  because it goes against your interest, against
9  interests of the patient. And when I say -- well,
10  the softer the better initially. But I have no -- I
11  have no, you know, vision that after a year, the
12  implant will still behave in a very elastic and
13  perfect way.
14      Q.    Let's go to the next page.
15          Product requirement 5 that the mesh
16  "Must not shrink." And you say that's because it
17  "Could deteriorate the repair and be painful for the
18  patient."
19          That's what you wrote in this
20  PowerPoint. Correct?
21      A.    Yes.
22      Q.    Then you say the "Theory" is, "The
23  reasons why meshes shrink are unclear. Shrinkage is
24  part of the healing process and cannot be avoided."
25  And then you say, "Shrinkage can be minimized by

18 (Pages 66 to 69)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 70

1   reducing the inflammatory reaction." And your
2   thought was you could do that with a "well tolerated
3   material" with "large pores." Correct?
4        A.    Yes.
5        Q.    So product requirement 5 was the mesh
6   "Must not shrink," but on the other hand, you knew
7   that shrinkage was going to happen and the mesh
8   would shrink. Correct?
9        A.    Yes.
10          MS. KABBASH: Objection.
11          MR. SLATER: Let's go off. He has to
12   change the tape.
13          THE VIDEOGRAPHER: The time is now
14   11:33. This is the end of Disk Number 1. We are
15   going off the record.
16              - - -
17          (A recess was taken from 11:33 a.m.
18   to 11:52 a.m.)
19              - - -
20          THE VIDEOGRAPHER: The time is now
21   11:52. This is the beginning of Disk Number 2. We
22   are back on the record.
23              - - -
24          (Deposition Exhibit No.
25   Plaintiff's-1254, E-mail chain, top one

Page 71

1        dated 19 Sep 2002, Bates stamped
2        ETH.MESH.03801777 through
3        ETH.MESH.03801779, and Deposition Exhibit
4        No. Plaintiff's-1255, Meeting Minutes
5        Anterior TVM (Porthos) Chartering Concept
6        -> Feasibility Kick of meeting 14th April
7        03, Bates stamped ETH.MESH.03801569
8        through ETH.MESH.03801571, were marked for
9        identification.)
10              - - -
11   BY MR. SLATER:
12        Q.    Dr. Arnaud, I've given you an e-mail
13   chain from September 2002 that we've marked as
14   Exhibit 1254.
15          Did you have a chance to look at that
16   during the break?
17        A.    I had.
18        Q.    This e-mail chain talks about the
19   regulatory background to getting product into the
20   hands of the doctors who you wanted to do clinical
21   study on the TVM technique. Correct?
22          MS. KABBASH: Objection.
23          THE WITNESS: Yes.
24   BY MR. SLATER:
25        Q.    Now, I understand you didn't work in

Page 72

1   the regulatory department, but did you have an
2   understanding of what the considerations or concerns
3   were as described in this e-mail chain in September
4   2002 about getting Gynemesh® into the hands of the
5   doctors who were going to do some clinical study on
6   the TVM technique?
7        A.    Well, to be honest, I'm not very
8   familiar with all this chain of e-mail. I know I
9   was on copy, but as you mentioned, I'm not very
10   familiar with the regulatory aspects, because, of
11   course, in our company, there are people who are
12   much more qualified than myself.
13        Q.    The material that was being used in
14   the TVM technique and that ultimately was used in
15   the Prolift® was Gynemesh® PS. Correct?
16        A.    Yes, yes.
17        Q.    At this time, in September of 2002,
18   was Gynemesh® PS cleared through the European
19   regulatory authorities for the use for pelvic floor
20   repair?
21          MS. KABBASH: Objection.
22          THE WITNESS: I don't know. I cannot
23   remember, you know. It's too long time ago and not
24   something I was really involved with.
25   BY MR. SLATER:

Page 73

1        Q.    If you could look on the second page
2   of the e-mail, it indicates, there's an e-mail from
3   someone named Manuel Vera Arcetti. And he wrote to
4   yourself and a few other people on September 18,
5   2002. And he addresses you. He says, "Axel, can
6   you approach Martin Weisberg and talk with him from
7   the clinical standpoint? Can you write the Expert
8   report yourself and co-sign with somebody from the"
9   clinical/medical affairs "team?"
10          Do you see that?
11        A.    Yes, yes.
12        Q.    And did you have an understanding of
13   why you were being asked to write a clinical expert
14   report for the proposed trial with this TVM
15   technique?
16        A.    I don't. I'm sorry, I don't.
17        Q.    Just below that in the next paragraph
18   there's a sentence that says, "We MUST have the
19   PS" -- that would be Gynemesh® PS. Correct?
20   Prolene® Soft?
21        A.    Where --
22        Q.    The next paragraph, under where it
23   says "Axel": It says, "Greg is getting back to us
24   at the end of this week with an answer on the
25   recommended approach," and "we need to make sure

19 (Pages 70 to 73)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 74

```
 1    that they understand the timing implications of
 2    this.  We MUST," in all capital letters, "MUST have
 3    the PS material by early October for the TVM team."
 4              Do you see that?
 5        A.    Yes, I do.
 6        Q.    Now, the reference to PS would be
 7    Prolene® Soft Mesh.  Correct?
 8        A.    Yes.  I guess, yes.
 9        Q.    And Prolene® Soft Mesh was a hernia
10    mesh, a mesh that was developed for hernia, and then
11    ultimately, when that mesh was going to be used for
12    pelvic floor, the company named it Gynemesh® PS.
13    Correct?
14              MS. KABBASH:  Objection.
15              THE WITNESS:  It's my broad
16    understanding.  I don't know the detail, you know.
17    Sometimes the product might be essentially the same
18    but differ by some characteristic, some minor
19    characteristics.  Or I cannot, you know, tell you
20    with 100 percent certainty the two products are the
21    same, but I guess they are very similar at least,
22    because Gynemesh® called Gynemesh® PS, so PS means
23    Prolift® Soft.
24    BY MR. SLATER:
25        Q.    Why was it at that point in time in
```

Page 75

```
 1    September of 2002 was it so important to have the
 2    material, the mesh material, to the TVM team by
 3    early October?  Why was that timing so strict?
 4        A.    Well, I have no idea.  You know, I
 5    suspect, but it's only speculation, that it was for
 6    a matter of respecting the delay of the project.
 7        Q.    Do you remember?  Obviously you were
 8    involved and you were addressed in that e-mail.  Was
 9    one of the considerations to try to make sure you
10    moved along quickly?
11              MS. KABBASH:  Objection.
12              THE WITNESS:  I don't know honestly.
13    This is not really the area I was very much
14    involved.  You know, I was essentially taking care
15    of the medical aspect.  Everything else linked to
16    regulatory affairs, well, I had enough work to do
17    without, you know, taking care of that.
18    BY MR. SLATER:
19        Q.    Well, one of the things you had to
20    do, though, in your position was to interact with
21    people in various departments.  You had to interact
22    with the marketing people.  You had to interact with
23    the regulatory people.  That was part of what you
24    did.  Right?
25        A.    Yes, yes.
```

Page 76

```
 1        Q.    And you understood that you had to
 2    have -- well, rephrase.
 3              You had to understand what their
 4    considerations were so that you would all be aligned
 5    on moving the project forward efficiently.  Right?
 6        A.    Yes.
 7              MS. KABBASH:  Objection.
 8    BY MR. SLATER:
 9        Q.    And if you go to the next e-mail,
10    which is actually on the first page, because it goes
11    in reverse order, there's an e-mail in the middle of
12    the page from Marie-Jose Plique dated September 19,
13    2002.  And she addresses yourself and some others
14    and says, "The first option is definitively the
15    best."
16              And she's talking about there were
17    two options described here as to how to get the
18    material cleared or be able to be allowed to use the
19    material for the European Union clinical trial for
20    the TVM technique.  Correct?
21              MS. KABBASH:  Objection.
22              THE WITNESS:  I don't know.
23    BY MR. SLATER:
24        Q.    Well, she says, "I am concerned by
25    delay regarding labelling and IFU translation."  Do
```

Page 77

```
 1    you see that?  Do you see that sentence?  It's the
 2    first sentence of her e-mail.
 3        A.    Oh, yeah, yeah.  "I am concerned by
 4    delay" -- okay.
 5        Q.    Again, does this refresh your
 6    recollection as to why there was concern about delay
 7    and why things needed to move quickly?
 8              MS. KABBASH:  Objection.
 9              THE WITNESS:  Not really.
10    BY MR. SLATER:
11        Q.    In the next e-mail at the top of the
12    page, again, Manuel Vera Arcetti --
13              And who was that person, do you
14    remember?
15        A.    It was a marketing person.
16        Q.    Generally on a product -- well,
17    rephrase.
18              And on this product, the marketing
19    people would have a great deal of input into
20    bringing the product -- the project along.  Correct?
21        A.    Well, of course, when we were
22    developing a project, there were different kind of
23    people, and there was always a person representing
24    marketing in the project team.  So Manuel Vera
25    Arcetti was the marketing person in charge of being
```

20 (Pages 74 to 77)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 78

1  in the team, you know.
2      Q.    And in Manuel's e-mail, September 19,
3  2002, he says, again, at the very end of that
4  e-mail, "We need to ensure that some PS material is
5  available for Axel & Jacquetin by early October."
6          Do you see that?
7      A.    Yes.
8      Q.    So it was clearly a priority to make
9  sure that the material, the mesh material, would get
10  to Prof. Jacquetin and the group to start clinical
11  trial with the TVM technique by October.  There was
12  a push to get that done.  Right?
13          MS. KABBASH:  Objection.
14          THE WITNESS:  It's possible, but I
15  don't remember.
16  BY MR. SLATER:
17      Q.    Well, that's what the e-mail says
18  certainly.  Correct?
19      A.    Yes, that's correct.
20      Q.    I'm now going to hand you what I've
21  marked as Exhibit 1255.  And we're going to fast
22  forward a little now from September 2002 to this
23  document, which is the meeting minutes of the
24  kickoff meeting that took place April 14, 2003 for
25  what the project was now referred to as anterior

Page 79

1  TVM, it gets the name Porthos, chartering concept -
2  feasibility.
3          Do you see that?
4      A.    Yes.
5      Q.    And that's just part of the way that
6  things work within Gynecare and Ethicon, that when a
7  project is going forward, it gets a code name
8  basically, and it goes by that name until the end,
9  and then ultimately a marketing name would be
10  assigned to the product if it goes to market.
11  Correct?
12      A.    Yes, that's correct.
13      Q.    Let's look at the team members that
14  we have on this document, a few of them.
15          You have US marketing, Paul Parisi is
16  part of the team.  Right?
17      A.    Right.
18      Q.    From clinical, we have Cyrus Guidry.
19  Correct?
20      A.    Yes.
21      Q.    From regulatory, we have Sean
22  O'Bryan.  Correct?
23      A.    Correct.
24      Q.    From research and development, it
25  says Axel Arnaud.  Right?

Page 80

1      A.    Yes.
2      Q.    Again, at this point, you're the
3  scientific director of Gynecare.  Correct?
4      A.    Yes.
5      Q.    Also from research and development we
6  have Scott Ciarrocca.  Correct?
7      A.    Correct.
8      Q.    And also from research and
9  development we have Gene Kammerer.  Correct?
10      A.    Yes.
11      Q.    And if you turn to the next page, the
12  minutes, first there's a "Briefing" listed under the
13  "Agenda."  And then there's a section, "Discussion
14  highlights."  And the first discussion highlight
15  from that April 14, 2003 meeting says, "Kit content"
16  and "concept."
17          Do you see that?
18      A.    Yes.
19      Q.    And at this meeting, it was
20  discussed, "Current anterior TVM kit layout as used
21  by Groupe TVM may not justify premium price.
22  Challenge to" research and development "to come up
23  with concepts that add more value and fit
24  strategically with posterior TVM," which was then
25  code named Aramis, and something else called

Page 81

1  Mulberry.
2          Do you see that?
3      A.    Yes, I do.
4      Q.    And you had an understanding as of
5  that time that the marketing people wanted research
6  and development to come up with concepts with this
7  TVM system, which was ultimately the Prolift®, that
8  would allow them to charge more money for it.
9  Correct?
10          MS. KABBASH:  Objection.
11  BY MR. SLATER:
12      Q.    That's what they're saying when they
13  say to justify a premium price.  Correct?
14      A.    Give me one second.
15          Well, I can't speculate -- if I
16  remember correctly, of course, in the TVM, in the
17  Prolift®, you have two part.  One is the mesh and
18  the other one is the other tools.  So I believe at
19  that time the only product was fixed was the design
20  of the mesh.  But in our experience, have been
21  involved in many project, you know, to offer a
22  precut mesh, this is not a very good business for a
23  company, because, you know, a precut mesh, it can be
24  copied in different countries.  You know, in country
25  with a low level of resources, people will just take

21 (Pages 78 to 81)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 82

1    a pair of scissors and cut a regular piece of mesh.
2         So I think what he means was, well,
3    this project is going to cost a lot of money, so on
4    the other hand, we need to provide at the end of the
5    day something that is profitable.  If it's just --
6    the matter is just to provide a precut mesh, this is
7    not something that's very attractive as a company.
8         So that's my understanding of this
9    first line.  So not just a precut, but we need to
10   provide more -- you know, we need to provide tools
11   that makes it a little bit more attractive, you
12   know, and easy to handle.  But that's my
13   interpretation for what they say.
14        Q.    And at this time, in April of 2003,
15   Gynemesh® PS, which was sold as just a rectangular
16   shape of mesh, that was being made available on the
17   market to pelvic floor surgeons to cut and shape as
18   they wanted to, to use as they saw fit.  Correct?
19   That was on the market offered by your company.
20   Right?
21        A.    Yes, absolutely correct.  But with
22   the Gynemesh® PS as it existed, the size was too
23   small to get, you know, the same product that we
24   were thinking about.
25        Q.    And certainly you understood and the

Page 83

1    team understood at that time that you were
2    anticipating charging significantly more money for
3    the Prolift® kit than what you were charging for
4    Gynemesh®.  Correct?
5         MS. KABBASH:  Objection.
6         THE WITNESS:  Well, of course
7    Gynemesh®, what was Gynemesh®?  Gynemesh® was a
8    textile, piece of textile, sold on the market to be
9    used in the pelvic floor.  But no technique was
10   associated to this.  It was something for the
11   surgeon.  If you wish to use a piece of mesh, you
12   have Gynemesh®.  So Gynemesh® was not a very
13   sophisticated product.  It was just, you know, an
14   adjunct for the repair.
15        What we had in mind was to develop a
16   full procedure, a full solution, so something which
17   is much more attractive.  Because the issue with
18   Gynemesh® was that there was no technique described
19   to use it, so it was for individual surgeon who
20   had -- who felt the need to use a textile with their
21   own technique.  Well, what was our purpose with
22   Prolift® was completely different.  It was not just
23   to just provide a piece of textile to the surgeon.
24   It was -- our goal was to provide an alternative to
25   a colporrhaphies that can be reproduced all over the

Page 84

1    world, that can be told in textbook, can be
2    explained in prof ed, you know.
3         So we are not talking at all about
4    the same thing.  You know, the objective was a
5    little bit more ambitious, you know, to provide
6    clinical trial, to really change the rule of the
7    game in this surgery.
8    BY MR. SLATER:
9         Q.    So if somebody were to suggest to you
10   that the Prolift® was not significantly different in
11   any way from the Gynemesh®, you would strongly
12   disagree with that?
13        MS. KABBASH:  Objection.
14        THE WITNESS:  Well, it depends what
15   you mean by Prolift®, because Prolift® is both a
16   procedure and a product, so...
17   BY MR. SLATER:
18        Q.    I'll answer your question, make it
19   clearer.
20        If somebody were to say the Prolift®,
21   the entire system, including the procedure, the mesh
22   and the instruments as it was sold, as compared to
23   Gynemesh® as it was sold, if someone were to say the
24   Prolift® did not have any significant differences
25   from Gynemesh®, you would disagree with that

Page 85

1    statement?
2         MS. KABBASH:  Objection.
3         THE WITNESS:  Well, there are aspects
4    that are similar.  The material is the same, so the
5    tolerance is likely to be the same.  Now, the size
6    is completely different.  The aim of the Prolift®
7    was to create a barrier to all the potential defects
8    in the pelvic floor, a whole barrier.  So that was
9    not all the case with the Gynemesh®.  So in some
10   way, the mesh is the same, but the technique is
11   completely different.
12   BY MR. SLATER:
13        Q.    Let's go to the second part of the
14   "Discussion highlights," "Clinical trials."
15        Do you see that, back in the document
16   here, in the middle of the second page?
17        A.    Yes, yes.
18        Q.    It says, "Groupe TVM," that's Prof.
19   Jacquetin and the French surgeons and European
20   surgeons you were working with.  Correct?
21        A.    Yes.  You can say French surgeon,
22   because they were all --
23        Q.    They were all French?
24        A.    -- they were only French.
25        Q.    It says, "Groupe TVM (+ 3 US

22 (Pages 82 to 85)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 86

1  surgeons) will conduct clinician sponsored clinical
2  trial on the procedure."
3          And that's referring to the TVM
4  procedure. Correct?
5      A.   Yes, yes.
6      Q.   And at that point, it was projected
7  that this would occur in September 2003 with a
8  three-month follow-up. Correct? That's what it
9  states in the minutes?
10     A.   Yes.
11     Q.   And then it says, per the discussion,
12 "From a marketing point of view," and then it says,
13 Paul and Celine, which that's Paul Parisi and Celine
14 Buard, they were the two marketing people at the
15 meeting, "this will be sufficient data to launch the
16 product."
17         Do you see that?
18     A.   Yes.
19     Q.   So the marketing people weighed in at
20 this meeting and said, look, in order for us to
21 market this product, we just need three-month data
22 on the TVM procedure. Correct?
23         MS. KABBASH: Objection.
24         THE WITNESS: Yes. That's what I
25 read.

Page 87

1  BY MR. SLATER:
2      Q.   And then it says, "Accordingly,
3  additional clinical trials will not be part of the
4  project plan, nor in the budget."
5          That's what was discussed at the
6  meeting. Correct?
7          MS. KABBASH: Objection.
8          THE WITNESS: That's what I read,
9  yes.
10 BY MR. SLATER:
11     Q.   That's what the minutes reflect.
12 Right?
13     A.   Yes.
14     Q.   And then if you go to the next page,
15 it says, "Pipeline Committee's approval: May 2nd."
16         And that's one of the things that a
17 project has to do when it goes through Gynecare or
18 Ethicon, it has to go through different committees.
19 And one of the committees would be the pipeline
20 committee. Correct?
21     A.   Yes.
22     Q.   That was anticipated to be May 2nd,
23 according to this, May 2, 2003. Correct?
24     A.   Yes.
25     Q.   And then it says, "Stage Gate

Page 88

1  Review," which would be another step the project
2  would have to go through for approval, was
3  anticipated to take place on June 27, 2003.
4  Correct?
5      A.   Yes. Absolutely, yes.
6          But just to comment, you know, this
7  is the first meeting. So marketing people make
8  suggestion, but then there is a process of approval
9  of the project that might change the scope
10 completely. So the opinion of Paul Parisi and
11 Celine Buard were preliminary opinion, you know,
12 before it goes through a long stagegate process. So
13 that's what I wanted to say.
14     Q.   What we do learn from that part of
15 the document, though, is that the marketing people
16 weigh in heavily from their perspective of what type
17 of clinical data they thought they would need in
18 order to be able to successfully market the product.
19 Correct?
20         MS. KABBASH: Objection.
21         THE WITNESS: No. I --
22 BY MR. SLATER:
23     Q.   That's part of the process?
24         MS. KABBASH: Objection.
25         THE WITNESS: No, I won't agree with

Page 89

1  that. I don't think the marketing people have had
2  any influence in this. You know, I think this is
3  essentially a medically-driven project. And I don't
4  remember any influence marketing could have in this
5  project.
6          MR. SLATER: Let's just go off for a
7  moment.
8          THE VIDEOGRAPHER: The time is now
9  12:11. We are going off the record.
10         - - -
11         (Deposition Exhibit No.
12 Plaintiff's-1256, E-mail dated 18 Jun
13 2003, Bates stamped ETH.MESH.03803483;
14 Deposition Exhibit No. Plaintiff's-1257,
15 PowerPoint, "ATHOS/ARAMIS/PORTHOS, Concept
16 -> Feasibility, June 27, 2003," 33 pages,
17 and Deposition Exhibit No.
18 Plaintiff's-1258, PowerPoint,
19 "ATHOS/ARAMIS/PORTHOS, Concept ->
20 Feasibility, June 27, 2003," 46 pages,
21 were marked for identification.)
22         - - -
23         MS. KABBASH: 1257 is a draft?
24         MR. SLATER: 1258, based on what you
25 guy produced, is the final.

23 (Pages 86 to 89)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 90

1    MS. KABBASH: So the 1257 says June
2    27 on it.
3        MR. SLATER: They both say that,
4    because that's the day of the meeting.
5        MS. KABBASH: Oh, I see.
6        MR. SLATER: Got it?
7        So 1257 is the one that was attached
8    to the June 18 e-mail. The metadata shows 1258 to
9    be the last version that existed before the meeting.
10   This is June 25th.
11       MS. KABBASH: Okay.
12       MR. SLATER: I mean, I have no
13   problem with telling you that.
14       MS. KABBASH: Okay.
15       MR. SLATER: And I have the metadata
16   here. And there was nothing else produced, so this
17   would have to be the final. If it's not, you guys
18   have it somewhere in a shoebox.
19           - - -
20       (A discussion off the record
21       occurred.)
22           - - -
23       THE VIDEOGRAPHER: The time is now
24   12:18. We are back on the record.
25   BY MR. SLATER:

Page 91

1    Q.    I've handed you three exhibits.
2    Exhibit 1256 is an e-mail dated June 18, 2003. And
3    it was written by group by Scott Ciarrocca to a whole group
4    of people, and one of them is yourself. Right?
5    A.    Correct.
6    Q.    And it's regarding the stategate
7    presentation that we were just talking about, that
8    meeting that was scheduled now for June 27, 2003, to
9    keep the project moving forward through the steps
10   that the company requires at the different steps of
11   the project. Right?
12   A.    Right.
13       MS. KABBASH: Objection.
14   BY MR. SLATER:
15   Q.    And the e-mail from Scott Ciarrocca
16   says, "All...please find a draft presentation for
17   the combined Athos/Porthos Stagegate on June 27."
18   And we have on the screen the PowerPoint
19   presentation that he's referring to. We have the
20   front page.
21       Do you see that?
22   A.    Yes.
23   Q.    Just very briefly, what did Athos
24   stand for and what did Porthos stand for, if you
25   remember?

Page 92

1    A.    I do.
2    Q.    Please tell us.
3    A.    I don't know in English, but, you
4    know, it's The Three Musketeers. It's the name of
5    the --
6        MS. KABBASH: The Three Musketeers?
7    That's what we call them, too.
8        THE WITNESS: In English it works?
9    Three Musketeers from French author.
10   BY MR. SLATER:
11   Q.    And the name Athos was given to what
12   part of the TVM?
13   A.    I think I remember, because I fight
14   with the company, I said Athos should be anterior,
15   but I guess Athos was posterior. And Porthos was
16   anterior, if I remember correctly. And I did not
17   find that very good.
18   Q.    Well, do this. Turn to page 4. And
19   let's go to page 4 of the PowerPoint. I just turned
20   to the page and saw that we actually have it listed.
21       So according to this, the original
22   pelvic -- the "Project Evolution" is described.
23       Do you see that?
24   A.    Yes.
25   Q.    And it says, "Original" pelvic floor

Page 93

1    repair "Projects Approved For Concept Efforts in
2    November 2002." And at that point, it was listed as
3    three, Athos, which was for vault suspension or
4    apical defect repair.
5        That would be the top of the vagina.
6    Correct?
7    A.    Yes.
8    Q.    Aramis for the posterior defect,
9    which would be if there was a rectocele. Correct?
10   A.    Yes.
11   Q.    And Porthos or Porthos, anterior
12   defect, that would be for a cystocele, the bladder
13   dropping down. Correct?
14   A.    Yes, yes.
15   Q.    If we forward turn now to the
16   "Unified Project Objective," page 7.
17       And what this states is, the unified
18   project objective at this stagegate meeting was to
19   be -- "To Develop A Proprietary Set Of Procedures
20   And Tools For Performing Standardized Mesh Repair Of
21   Pelvic Floor Defects That Satisfies The Identified
22   Unmet Needs."
23       That was the definition of what the
24   objective was. Correct?
25   A.    Correct.

24  (Pages 90 to 93)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 94

```
 1        Q.    It then says, in the first bullet
 2  point under that, "510(k) Regulatory Approval And CE
 3  Mark."
 4             Do you see that?
 5        A.    Yes.
 6        Q.    And the second bullet point says,
 7  "Provide Data From A Multi-Site" European
 8  Union/United States "Physician-Sponsored Clinical
 9  Trial To Support The Launch."
10             That was the second thing that was
11  expected to be done.  Correct?
12             MS. KABBASH:  Objection.
13             THE WITNESS:  Yes.
14  BY MR. SLATER:
15        Q.    The third thing, "Complete All
16  Development Work By" third quarter 2004.
17             That's what it says.  Right?
18        A.    Yes.
19        Q.    So these were some projected things
20  that needed to be done over the course of time with
21  this project?
22             MS. KABBASH:  Objection.
23             THE WITNESS:  Well, it seems to be.
24  BY MR. SLATER:
25        Q.    Okay.
```

Page 95

```
 1             Now, just to stay sequential through
 2  this PowerPoint, could you turn to the next page?
 3  And it's Page 8, and it actually has an anatomical
 4  illustration of the TVM procedure, the total
 5  procedure.  And if you would, just if you need to
 6  confirm it, Exhibit 1258 is the final, according to
 7  what's been produced to us, the final version of
 8  this presentation that was actually submitted or
 9  presented at that stagegate meeting June 27, 2003.
10             And on page 8 of both of these,
11  there's actually a picture that depicts the total
12  procedure.  Correct?
13        A.    Yes, yes.  Seems correct, yes.
14        Q.    And does this accurately represent
15  what would be done in the total TVM, ultimately
16  named the total Prolift®?  Is this illustration
17  accurate?  I'm not saying it covers every small
18  detail, but is it a fair representation of what the
19  procedure ultimately does?
20        A.    To my best knowledge, it is.  You
21  know, I'm not saying that the -- it is the final
22  design of the product, but at that time, that was
23  the -- I know very well this drawing, because I ask
24  an artist to do them.  But, you know, I know that
25  this is early stage.  Probably the final product was
```

Page 96

```
 1  maybe different from what is there.  It was
 2  different.  But the basic principle of what we tried
 3  to achieve are in this, I believe.
 4        Q.    When you look at these diagrams of
 5  the total procedure based on the fact that you
 6  actually commissioned these illustrations and you
 7  know what the final Prolift® procedure was, are
 8  there any significant differences between what is
 9  depicted here and what one would depict for the
10  total Prolift® procedure at this level?
11        A.    I need some time, because very
12  technical.
13             Well, the global idea is there, you
14  know, so...  That's all I can say, you know, the
15  global idea of the Prolift® is in this drawing.
16        Q.    Fair enough.  And that's what I was
17  asking.
18             If you then turn to page 10?
19             MS. KABBASH:  Are you back on the
20  draft now, Adam, or on --
21             MR. SLATER:  Yes.
22  BY MR. SLATER:
23        Q.    On page 10 again, do we see a
24  similarly fair representation of the posterior TVM
25  procedure, as it ultimately was -- and as it was
```

Page 97

```
 1  ultimately marketed as the Prolift®?
 2             MS. KABBASH:  Objection.
 3             THE WITNESS:  I think on this slide,
 4  we see two variation, potential variation, you know.
 5  In the middle, the fixation is done by straps passed
 6  in the sacrospinous ligament.  In the right-sided
 7  drawing, there seems to be a direct fixation by a
 8  mechanical mean to the sacrospinous ligament.  So
 9  it's two potential variation of the same -- for
10  achieving the same goal.
11  BY MR. SLATER:
12        Q.    At that time, the thought was to use
13  a fastener device to actually fasten the strap to
14  the sacrospinous ligament.  That was the plan at
15  that time.  Correct?
16             MS. KABBASH:  Objection.
17             THE WITNESS:  No.  You know, that's
18  very important point for, you know, the TVM Group.
19  And if I can try to explain you.  They did not want
20  to have a mechanical attachment, because in
21  Jacquetin experience, Jacquetin was used to put the
22  mesh that was attached by suture to the two arcus
23  tendineus.  And when the tissue postoperatively
24  shrink, you know, it pulls on the fixation and can
25  lead to pain.
```

Confidential - Subject to Stipulation and Order of Confidentiality

Page 98

1        So that's why the TVM Group wanted
2   and preferred to have an attachment that was going
3   to be done by passing an arm through the ligament
4   and rely on the friction of the arm; because they
5   believed that this would be a more, let's say,
6   flexible and adaptive way, if -- when the tissue
7   start to contract in the wound healing phase. So
8   there was -- this was a key point for us that we
9   should have no direct fixation to the ligament but
10  rather, you know, strap that goes through it and a
11  certain amount of adaptation in the postoperative
12  phase.
13  BY MR. SLATER:
14      Q.    Why was it that this stagegate
15  presentation, and many of the discussions I've seen
16  in the documents describe attempting to use a
17  fastener to attach the strap to the sacrospinous
18  ligament? Was that an idea that came from within
19  Gynecare and Ethicon but something that was
20  different from how Prof. Jacquetin was doing the
21  procedure?
22      A.    Well, I don't know exactly, but, you
23  know, basically all the means have been thought
24  about and maybe an alternative could be to have a
25  fastener with a shortly absorbable product, for

Page 99

1   example, so --
2       Q.    Well, if you look at the next page,
3   you see the fastener gun. I mean, this was a
4   prototype that your company was trying to develop.
5   And the thought, at that point, was to use a
6   fastener and to attach the strap to the sacrospinous
7   ligament. Ultimately that idea was dropped, but
8   that was the thought at that time. Right?
9       MS. KABBASH: Objection.
10      THE WITNESS: Yeah. You know, at
11  that time, we were in the -- really in the phase
12  where everything was open for.
13  BY MR. SLATER:
14      Q.    Well, you're about to hopefully, from
15  your perspective, based on the documents we've seen,
16  you're hoping to go to clinical trials within a few
17  months. Right?
18      A.    Yes.
19      Q.    And let me understand this.
20          When Prof. Jacquetin developed the
21  TVM technique with his group, was there a fastener
22  that would fasten the strap to the sacrospinous
23  ligament or was he passing it through the ligament?
24      A.    Passing it through the ligament.
25      Q.    Whose idea was it to try to use a

Page 100

1   fastener device to fasten the strap to the ligament?
2   Where did that idea come from?
3       A.    I don't know. But, of course, it's
4   the most obvious idea. If you want to affix
5   something, you use a fastener. But I'm sure that
6   maybe the engineer in Somerville made this fastener.
7   When they presented that to the group, I don't
8   remember specifically, but I'm sure the group was
9   strongly preferring, you know, the mesh going
10  through the ligament.
11      Q.    Do you know why the fastener device
12  and the fastener system was not used with the
13  Prolift®? Do you know why that idea was dropped?
14  You ran the project, so I'm asking you.
15      A.    No, no. I understand. I believe,
16  you know, the engineer used to come to France with a
17  lot of device of possible solution, and probably
18  this one was one of them. But I'm sure the TVM
19  Group would have rejected this, because they didn't
20  want to have a fixed attachment.
21      Q.    Well, the TVM Group certainly knew
22  that your company was proceeding with this project
23  with the fastener device and the fastener system
24  included. They must have known that your company
25  was proceeding with that assumption. Right?

Page 101

1       MS. KABBASH: Objection.
2       THE WITNESS: Yeah, but, you know, I
3   think what you see there is not a functional device.
4   It's just, you know, this kind of device they can
5   make in a couple of minutes with a machine and come
6   back in France and show this to the doctor, say,
7   what would you -- would you like to have such a
8   system. And the doctor might say, no, we don't
9   want. We want something that go through the
10  ligament.
11  BY MR. SLATER:
12      Q.    So during the development of this
13  project, at the point that the June 27, 2003
14  stagegate meeting took place, the idea of fastening
15  the posterior straps to the sacrospinous ligament
16  was under consideration. Correct?
17      A.    I don't know. I was not in the
18  meeting.
19      Q.    It's in the PowerPoint that was
20  presented. Right?
21      A.    Yeah, yeah. It was presented as a
22  potential solution, I think, but...
23      Q.    And ultimately that idea was dropped.
24  Right?
25      A.    I don't -- it was dropped for sure,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 102

1    because this was not in the final product. For what
2    reason -- you know, I know the reason. The reason
3    was that the group was very attached to the idea of
4    something being mobile through the ligament instead
5    of something being strongly fixed in the ligament to
6    avoid, you know, pain.
7        Q.    And the group and yourself and the
8    others within the company were very cognizant and
9    aware that if the straps that would be used to help
10   to secure what would ultimately be the Prolift®
11   device, if they would get tight and there would be
12   pulling on them, that that could cause pain to
13   patients. Correct?
14       A.    Yes, yes. That was well known from
15   the experience of Jacquetin. So that's why we
16   didn't want to replicate the same mistake of a tight
17   fixation to the ligament.
18       Q.    So it was very important to make sure
19   that any surgeon who would ultimately use the
20   Prolift® would know that if tension or tightness of
21   the straps occurred, that that could cause pain to
22   patients. Right?
23       A.    Absolutely. This was quite obvious
24   for surgeon.
25       Q.    Well, it was certainly --

Page 103

1            It was certainly obvious to yourself
2    and the TVM Group. Correct?
3        MS. KABBASH: Objection.
4        THE WITNESS: Yes, yes.
5    BY MR. SLATER:
6        Q.    Let's go to page 13, which is the
7    "TVM Procedure: Anterior."
8            And, again, is this a representation
9    of what the procedure was thought to be at that
10   time?
11       A.    Yes, yes, it is.
12       Q.    Are there any significant differences
13   between what is illustrated here and what ultimately
14   was marketed as the Prolift® procedure?
15       MS. KABBASH: Objection.
16       THE WITNESS: But to my best
17   knowledge, I don't see major, you know, the
18   principle on there.
19   BY MR. SLATER:
20       Q.    If you could, turn to page 20. On
21   page 20 is a list of resources and manpower.
22           This just lists the people who are
23   working on this project. Correct?
24       A.    Absolutely, yes.
25       Q.    Now, you're not listed on there, but

Page 104

1    obviously you were at the head of this project,
2    along with Ophelie Berthier had a very important
3    role as well. Correct?
4        MS. KABBASH: Objection.
5        MR. SLATER: Well, let me rephrase
6    the question.
7    BY MR. SLATER:
8        Q.    You're not listed on this list, but
9    obviously, you had significant involvement. Right?
10       A.    Yes, yes. I'm a little bit upset to
11   see this, because I'm wondering why I didn't appear
12   there. But that was in June 2003, and -- well,
13   clearly, I was still in the project, you know.
14       Q.    Some of the people listed here
15   include medical affairs, Marty Weisberg. From
16   corporate product characterization, which says CPC,
17   you have Elizabeth Vailhe. From PL, you have Scott
18   Ciarrocca. From Gynecare R&D, you have Gene
19   Kammerer. And from regulatory affairs, you have
20   Sean O'Bryan.
21           That's some of the people listed
22   here. Right?
23       A.    Yes, yes.
24       Q.    And if you could turn to the next
25   page, there's a timeline. And it matches up with

Page 105

1    the final version on page 32. If you need to
2    compare them, I believe there are a few differences
3    in the dates. So let's look at page 32 of the final
4    version, which is 1258.
5            The timeline is listed there. There
6    are some "Milestones."
7            Do you see that?
8        A.    Yes, yes.
9        Q.    And the milestones as projected in
10   June of 2003 were to get the clinical study
11   initiated and started by September 2003. Correct?
12       A.    Yes.
13       Q.    And to get the 510(k) submission for
14   what would ultimately be the Prolift® filed by
15   January 2004.
16           That's what's listed on this
17   document. Correct?
18       MS. KABBASH: Objection.
19       THE WITNESS: Can you repeat that?
20   BY MR. SLATER:
21       Q.    Sure.
22           On this document, this stagegate
23   presentation that was made, one of the milestones
24   that's listed is 510(k) submission, and that's dated
25   as January 2004. Right?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 106

1    A.   Yes.
2    Q.   And the next entry says, "510(k)
3    Approval," May 2004.  Correct?
4    A.   Yes.
5    Q.   And, again, this is for the project
6    that ultimately was the Prolift®.  Correct?
7         MS. KABBASH:  Objection.
8    BY MR. SLATER:
9    Q.   That's what this presentation is.
10   Right?
11   A.   Yeah, I think so.
12   Q.   And that they were anticipating at
13   that point a product launch in September 2004.
14        That was the milestone that was set
15   at that time.  Correct?
16   A.   Well, that's what's on this document.
17   Q.   Go to page 23, if you could.  It's
18   titled "Critical Assumptions:  Project."
19        MS. KABBASH:  In the final?
20        MR. SLATER:  It's page 34 in the
21   final, which is fine, you can look at that, because
22   I'm only going to point to a couple.
23   BY MR. SLATER:
24   Q.   So let's look at the final version of
25   this presentation that was submitted.  And we'll

Page 107

1    just put the final version up on the board now.
2         The first critical assumption for
3    this project, the first bullet point says, "US
4    Regulatory Pathway Is 510(k)."
5         That's what's listed here.  Correct?
6    A.   Correct.
7    Q.   Two further down, two bullet points
8    down, it says, "Clinical Trial Of Implants With 6
9    Month Follow-Up Will Be Sufficient To Support
10   Launch."
11        That's another critical assumption.
12   Right?
13   A.   Yes.
14   Q.   It says "Clinical" -- rephrase.
15        The clinical assumptions for the
16   project, the fourth bullet point indicates,
17   "Clinical Trial Will Not Be Required For Fasteners
18   Or Ancillary Components."
19        Do you see that?
20   A.   Yes.
21   Q.   So at that point, it was anticipated
22   that the fasteners would be part of this system.
23   Correct?
24        MS. KABBASH:  Objection.
25   BY MR. SLATER:

Page 108

1    Q.   That's why it's listed there.  Right?
2    A.   Yes.  It may be, you know.  Maybe.
3    But the fastener or the ancillary component.  So it
4    does not mean that at this time we had decided there
5    should be a fastener.
6    Q.   The ancillary components are the
7    instruments.  Correct?
8    A.   Yes.
9    Q.   The fifth bullet point under the
10   critical assumptions for this project says, "No
11   Major Competitive Offerings With Similar Features"
12   or "Advantages Enter The Market Ahead Of Us."
13        Do you see that?
14   A.   Yes, yes.
15   Q.   And do you recall that that was very
16   important to Gynecare and Ethicon, that this project
17   would get to the market first?  That was one of the
18   things you wanted to accomplish?
19   A.   Well, to be honest, we had absolutely
20   no doubt that we were the only one working in this
21   area.
22   Q.   You thought you were the only one?
23   A.   Absolutely.
24   Q.   Do you recall the AMS Apogee® and
25   Perigee®?

Page 109

1    A.   Yes.
2    Q.   Do you recall that they got to the
3    market actually before the Prolift® did?
4    A.   Yes.
5    Q.   And when did you first learn of the
6    existence of the Apogee® and Perigee® projects?
7    A.   When they entered the market.
8    Q.   Your company didn't know in advance
9    that AMS was working on the Apogee® and Perigee®?
10        MS. KABBASH:  Objection.
11        THE WITNESS:  Not at all.
12   BY MR. SLATER:
13   Q.   If someone in Ethicon or Gynecare
14   knew that the Apogee® and Perigee® projects were
15   underway and those products were going to be going
16   to the market soon, nobody informed you is what
17   you're telling me?
18   A.   No.  It was a surprise, you know, to
19   see that the work we have been conducting for more
20   than five years suddenly arrived on the market.  And
21   I know how it worked, but I keep it for myself.
22   Q.   When you say you know how it worked,
23   what do you mean by that?
24   A.   At some point, there has been some --
25   you know, how can I say that in English?  Some, you

28 (Pages 106 to 109)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 110

1 know, the confidentiality of what we were doing was
2 broken. And this is probably the very likely reason
3 why this went in this way.
4          MS. KABBASH: Dr. Arnaud, I want to
5 remind you in your testimony that you are not
6 supposed to guess on anything that Mr. Slater asks
7 you. So obviously if you know facts, you testify
8 about them. But nobody wants you to guess.
9          THE WITNESS: Yeah. You know, I'll
10 tell you. Prof. Jacquetin was so excited to come on
11 the market -- no, not to come on the market, to show
12 his procedure to the surgical community, at some
13 point he made presentation of these pictures. And
14 he thought, very naively, that because a patent has
15 been filed, he could do it. So as early as 2003, he
16 showed that in some meetings. So, of course, that
17 was not a very good idea. And that's probably why
18 the things went in that way.
19 BY MR. SLATER:
20     Q.     That's your understanding?
21     A.     My understanding, yes.
22     Q.     Did you ever discuss this with Prof.
23 Jacquetin?
24     A.     Yes.
25     Q.     And did he acknowledge to you that

Page 111

1 that had occurred?
2     A.     Yes.
3     Q.     Did you ever pin down who it was that
4 watched that presentation and brought the
5 information to AMS?
6     A.     Well, you know, it was public --
7 public presentation, so...
8     Q.     So whoever attended could have had --
9 could have shared that information with AMS?
10     A.     Yes, yes.
11     Q.     Did you know before the AMS product
12 got on the market that Prof. Jacquetin had shared
13 that information in a public meeting?
14     A.     Yes, yes. He had shared some
15 information, some drawing, you know. And he not
16 say, well, I'm working with Ethicon on that, but the
17 drawing were quite self-explanatory. You know, the
18 drawing he showed me have been shared before the
19 product launch in some medical event.
20     Q.     Did you know that that had occurred
21 and that AMS was aware of your project before the
22 AMS products came to the market?
23     A.     I don't know.
24     Q.     You don't remember?
25     A.     I don't know if AMS was aware of what

Page 112

1 we were doing, but it was not a big secret what we
2 were doing, but we thought we were such in advance,
3 you know, because we were working for five years --
4 for three, four years on that that no one could come
5 on the market before us.
6          So this assumption that is there, you
7 know, is something I see in every single
8 presentation of a project. When you look at the
9 risk of the project, it's a general topic. If
10 someone come on the market before us, it's going to
11 lead us to reconsider all the plan. You know, it's
12 a general item that is in all the projects that is
13 not going to be very good for us if someone come on
14 the market before us.
15     Q.     When the AMS products came on the
16 market, the Apogee® and Perigee®, you said you were
17 surprised?
18     A.     We were in some way, yes.
19     Q.     Were you concerned now that AMS had
20 gotten to the market with a kit comprised of mesh to
21 repair prolapse before you had gotten to the market?
22 Was that a concern?
23          MS. KABBASH: By the way, when you
24 say "you," you're talking about him personally.
25 Right?

Page 113

1          MR. SLATER: Right. Well, I'll ask
2 the question clean.
3 BY MR. SLATER:
4     Q.     At the time the AMS products came to
5 market, were you, and to your knowledge other people
6 within the company, now concerned because AMS had
7 gotten to the market first with a kit for the
8 treatment of prolapse?
9     A.     Well, first of all, we were
10 disappointed in some way, but on the other hand, you
11 know, their device seemed to us to be so far away
12 from where we were, we have been designing, so let's
13 say, simple, or what can I say, so unattractive to
14 us that we -- in some way, we were a little bit
15 upset they were before us, but on the other way, a
16 little bit reassured that they have a device that
17 would probably be much less attractive for surgeon
18 done the one that was in the development phase.
19     Q.     Were there significant differences
20 between the AMS Apogee® and Perigee® and the
21 Prolift® systems?
22          MS. KABBASH: Objection.
23 BY MR. SLATER:
24     Q.     From your perspective, were there
25 significant differences?

29 (Pages 110 to 113)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 114

1    A.    Well, as I can remember, the most
2  significant difference was in the tools. You know,
3  our tools were much more advanced, to my best
4  recall, you know. We had been working on the tools,
5  which was the major challenge, one of the major
6  challenge for R&D, the tools. And the AMS tools
7  were not that innovative. And also we were
8  confident our mesh was a very good mesh. And I'm
9  not saying superior, but an excellent product.
10   Q.    Did you feel that the Prolift®
11  procedure for implanting the mesh had significant
12  differences from your perspective as compared to the
13  procedure --
14   A.    Sorry.
15   Q.    Sorry. I will reask the question.
16   A.    Excuse me.
17   Q.    No problem.
18        When you looked at the AMS product,
19  did it come with a procedure as well, a procedure to
20  place that mesh, like the Prolift® which had a
21  procedure dedicated to the Prolift®?
22   A.    I think so, yes. It was something
23  very similar.
24   Q.    Were there any differences that you
25  thought were significant between the methods by

Page 115

1  which the Apogee® and Perigee® would be put in the
2  body versus the Prolift®?
3        MS. KABBASH: Objection.
4        THE WITNESS: That's a long, long
5  time. But, you know, what I remember is that we
6  were confident our product would be much better on
7  the market for three -- for a couple of reason.
8  First of all, tools are more advanced. It seems to
9  us that what AMS was putting on the market was what
10  our project was one year ago, you know, so more
11  advanced tools for us, better mesh and also clinical
12  data that were ongoing. So we were upset, but we
13  were quite confident that this would not be a major
14  competitor.
15  BY MR. SLATER:
16   Q.    When you compare the AMS products,
17  the Apogee® and Perigee®, versus the Prolift®, the
18  size of the mesh is different. Correct?
19   A.    I think so.
20   Q.    And the tools were very different.
21  Correct?
22        MS. KABBASH: Objection.
23        THE WITNESS: Well --
24  BY MR. SLATER:
25   Q.    I'll ask it differently. She

Page 116

1  objected, so I'm going to ask.
2        Were the tools very different as
3  between the Prolift® and the AMS products on the
4  other hand, the Apogee® and Perigee®?
5    A.    Well, to my best remembering, because
6  there have been so many of these products, you know,
7  the Bard product, the Boston product, our product
8  were innovative, you know, with this cannula, and
9  their product has nothing -- their tools add, to my
10  best knowledge, nothing really exciting. This was
11  very -- very simple tools to put the mesh in place.
12  And we have an advanced tool to make the life of the
13  surgeon easier and the risk of the procedure lower.
14  So we were working in a way to help the surgeon to
15  put the mesh in place with reproducibility and
16  safety.
17   Q.    So when you compare the tools between
18  the Prolift® and what went on the market with the
19  Apogee® and Perigee®, from your perspective, the
20  tools were very different. You felt the AMS tools
21  were much simpler, as compared to the tools with the
22  Prolift® that you felt were much more advanced.
23        MS. KABBASH: Objection.
24  BY MR. SLATER:
25   Q.    Is that a fair summary?

Page 117

1    A.    Well, their tool were basic tool that
2  did not provide any -- much additional value for the
3  surgeon. Our tools have been such more extensively
4  and were providing easiness to put the mesh in.
5    Q.    What was the specific difference in
6  the tools, if you can recall?
7    A.    Yes, I can recall.
8        You know, what is difficult when you
9  are performing this operation is to pass seamlessly
10  in a way and then go back in the other way. So all
11  the challenge was, well, if you have a needle, if
12  you go that way, it's fine, it's easy, but now if
13  you want to go back, you cannot go back easily. So
14  all the change of our engineer was, well, once I've
15  done that, how could I take this 180 percent return
16  way, you know. So that was the challenge. That's
17  why the cannula was there and this very clever
18  system was developed.
19        And to my best knowledge, that was
20  not the case in the AMS system. You know, the AMS
21  system had no solution for going one way and getting
22  back the other way.
23   Q.    When the AMS Apogee® and Perigee®
24  came to the market, did the team that was developing
25  the Prolift® feel at that point that you needed to

30 (Pages 114 to 117)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 118

1  move quickly to get to the market as quickly as
2  possible?
3      A.    Well, I would say no, because, you
4  know, in a big company, to move quicker is extremely
5  difficult, you know.  To accelerate -- in a small
6  company, you probably can accelerate.  In this case,
7  well, they are on the market, fine.  It's a matter
8  of a couple of months or what.  We were confident
9  that they were on the market, fine, but what we were
10  going to introduce on the market would be so much
11  better and so much more attractive for the surgeon,
12  it wasn't a big issue to have them on the market.
13  It's a disappointment but not an issue.
14      Q.    In order to get the Prolift® to the
15  market quicker once the AMS products were now on the
16  market, was the decision made not to follow the US
17  regulatory pathway of getting the 510(k)?
18          MS. KABBASH:  Objection.
19          THE WITNESS:  No, no, no.  That --
20  no.
21  BY MR. SLATER:
22      Q.    Were you involved in the decision not
23  to seek 510(k) clearance in the US for the Prolift®?
24      A.    No, I was not at all involved in this
25  kind of decision, because as you see, I'm not even

Page 119

1  in the team, so it's really a US issue.
2      Q.    Were you told at any time before the
3  Prolift® was launched that Gynecare was not going to
4  seek 510(k) clearance for the Prolift®?  Were you
5  aware of that?
6      A.    Absolutely not.
7      Q.    When did you first learn that the
8  Prolift® was initially marketed in the United States
9  without 510(k) clearance?
10          MS. KABBASH:  Objection.
11          THE WITNESS:  Well, I learned
12  something like that recently looking at, you know,
13  on the web, maybe last year.  So very recently.
14  BY MR. SLATER:
15      Q.    If you could turn to the next page of
16  the final presentation, page 35.  Again, this is the
17  stagegate presentation of June 27, 2003 for the
18  project that ultimately was the Prolift®.  I just
19  want to ask a couple more questions about these
20  critical assumptions regarding the product.
21          It says in the fourth bullet point,
22  there was an assumption that was described as
23  critical "Creates No Additional Problems Possible
24  With Needle Passage Through Obturator Foramen," and
25  then in parentheses, "Bladder, Vessel, Nerve,

Page 120

1  Urethral Perforation."
2          Do you see that?
3      A.    Yes.
4      Q.    And what is that telling us?  What
5  was that assumption?
6      A.    Sorry, I don't understand.
7      Q.    What does that mean?  Basically I'm
8  asking you, what does that mean?
9      A.    Okay.  We were assuming that the
10  product we were going to develop would not create
11  additional problem with the needle -- okay.
12          You know, passage through the
13  obturator foramen is something that was not new,
14  because it was used by the people for the sling
15  surgery, incontinence surgery.  So going through the
16  obturator foramen was something well known, but we
17  did not want to add additional risk, because instead
18  of one passage, there will be two passage.  So if
19  two passage was a -- we knew that one passage was
20  safe, but we could not accept a second passage could
21  be dangerous.  That's basically what it means.
22      Q.    The fifth bullet point on the
23  critical product assumptions says, "Creates No
24  Additional Complications," and then it says,
25  "Erosion" and "pain."

Page 121

1          What does that mean?
2          MS. KABBASH:  Objection.
3          THE WITNESS:  So we are assuming the
4  product would not create additional complications.
5  Additional to what, I don't know, because I was not
6  in this meeting.  But I guess it is -- I make a
7  guess.  We knew --
8          MS. KABBASH:  I don't want you to
9  guess.  If you're going to guess, I don't want you
10  to answer the question.
11          MR. SLATER:  You shouldn't cut him
12  off in the middle of an answer.
13          MS. KABBASH:  If it's a guess, I
14  absolutely should.  If he's saying --
15          MR. SLATER:  No, you actually
16  shouldn't.  You really shouldn't stop your witness
17  in the middle of an answer, because he may -- you
18  don't know what he's going to say.
19          MS. KABBASH:  Adam, I think in
20  instructions you have appropriately instructed
21  witnesses not to guess or speculate --
22          MR. SLATER:  I didn't tell him that.
23          MS. KABBASH:  -- and that's
24  completely appropriate on your part, so I just want
25  to reinforce that.

31 (Pages 118 to 121)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 122

1        MR. SLATER: I didn't instruct him
2   not to guess.
3   BY MR. SLATER:
4        Q.    Let me ask you this. I'll ask you a
5   fresh question.
6           One of the critical product
7   assumptions was that this Prolift® would not create
8   additional complications, and two examples given
9   here are erosion and pain. Correct?
10       A.    Yes. That's what is written.
11       Q.    And was the feeling of the team that
12  if the Prolift® was creating erosions and pain, that
13  that would be a problem?
14          MS. KABBASH: Objection.
15          THE WITNESS: Well, let's go back to
16  my answer. Well, I was not at this meeting. I
17  don't understand very well what is additional
18  complication. Additional to what? To what is
19  existing? To what is known? I don't know.
20  BY MR. SLATER:
21       Q.    Well, this presentation was e-mailed
22  to you on June 18, 2003, the draft was, and on page
23  24, that exact language appears.
24          If you had read it, what would you --
25          If you had a concern about that

Page 123

1   language, would you have brought that to someone's
2   attention?
3        A.    You mentioned page 24?
4        Q.    What I'm saying is, that language
5   that I just showed you was provided to you on June
6   18, a week before this document was finalized.
7        A.    Yes. Well, I can't answer that. You
8   know, when I receive such a document, I might read
9   it, might not read it. If I read it, if I see
10  something that is completely wrong on a medical
11  standpoint, then I'm going to write and say, well,
12  there is on page 35 something completely wrong.
13          But in this case, you know, no
14  additional complication, my -- it seemed obvious for
15  me to understand that we do not want this product to
16  dramatically increase the risk of erosion, of
17  complication, which is a fair assumption. So no
18  reason for me to write to the author and say, well,
19  look, there is something unclear there, you know.
20       Q.    You certainly felt throughout this
21  that if it turned out that with the Prolift®, there
22  were high levels of erosion or women suffering from
23  very significant chronic disabling pain, that would
24  have been of great concern to you. Right?
25       A.    Well, that's something I need to make

Page 124

1   clear. When we develop something, we do not develop
2   that to see a lot of people having big trouble. So
3   erosion, well, most of the time, it is a
4   complication that is minimum, not all the time, but
5   most of the time. So -- and, you know, we were
6   aware of these erosions. But it was -- you know,
7   this was not considered by the experts what a large
8   experience as a project killer, because erosion was
9   seen by the team as, well, a postoperative problem
10  but which, in most of the cases, was something that
11  was easily managed by the doctor.
12       Q.    Were you aware that there were some
13  women that would get multiple recurrence erosions
14  that would not be easily managed? Were you aware
15  that that would happen to some women?
16       A.    Well, what we knew at that time was
17  what Dr. Cosson was telling us. He made a
18  presentation saying, well, erosion in 75 percent of
19  the cases are going to be cured by the first
20  excision. And so in 25 percent, it's not going to
21  be cured and there will be a new excision and the
22  repair, and that will, again, cure a majority of the
23  patient. So, of course, like everywhere in surgery,
24  there might be situation where something that is
25  usually minimal could become a bit more severe.

Page 125

1        Q.    Did you ever make an effort to --
2   well, rephrase.
3           You knew that the Prolift® was
4   intended to go into a woman's body permanently.
5   Right?
6        A.    Yes.
7        Q.    And you knew that the risk of erosion
8   was not just a short-term risk, but it was a
9   lifetime risk. Correct?
10          MS. KABBASH: Objection.
11          THE WITNESS: Well, no. It was
12  considered by the expert as a postoperative
13  complication, not something that's going to occur
14  ten years after.
15  BY MR. SLATER:
16       Q.    That's what your understanding was at
17  the time?
18       A.    Yes.
19       Q.    Did you later come to learn that that
20  understanding was incorrect and that erosions could
21  occur years and years after the Prolift® would be
22  placed in a woman's body?
23       A.    Yes. Of course, you know -- let's
24  take infection of meshes. This is something that
25  occur most of the time post-operatively, but there

Confidential - Subject to Stipulation and Order of Confidentiality

Page 126

1    have been description of cases where the infection
2    can occur 20 years after during an infection.
3             So as a doctor, what we considered
4    was erosion, this is something that is essentially a
5    postoperative complication, a wound healing problem.
6    And the fact it could occur long term after the
7    procedure is something we can think about, but, you
8    know, what the expert, including Jacquelin, whether
9    long-term experience, it didn't see that as a major
10   issue. So if it is occur in one patient out of one
11   million, well, that's part of surgery. You know, in
12   surgery you can have long-term complication. But we
13   had sufficient confidence from Jacquetin experience,
14   he has been using meshes for more than 10, 20 years,
15   all his lifelong years he has been using them.
16             Jacquetin was a very honest guy.
17   If -- he would not have hidden and would never have
18   entered this project if he was convinced that meshes
19   could lead to erosion on the long term and that
20   would be a big issue, you know. So we had to rely
21   on the experts.
22        Q.    So you relied on Prof. Jacquetin, as
23   you said, for the understanding that erosions with
24   this material, with this procedure, from your
25   perspective, was not a big concern?

Page 127

1             MS. KABBASH: Objection.
2             THE WITNESS: We didn't all rely on
3    Jacquetin only. We relied on a pool of surgeon with
4    experience with meshes.
5    BY MR. SLATER:
6        Q.    You just told me for a while that you
7    relied on Jacquetin with his experience using
8    meshes. That was a very important factor in making
9    your decisions as to whether or not this was a safe
10   product. Right?
11       A.    Yeah, let me correct. I mention
12   Jacquetin because he's the oldest of the group. He
13   has probably the longest experience. But many of
14   the others had been using meshes for a very long
15   time. And, you know, when you develop a project,
16   you need to rely on the experts. I'm not an expert.
17       Q.    Well, the other thing you could rely
18   on is you could have done long-term clinical studies
19   with the Prolift® to see whether and to what extent
20   there would have been a long-term risk of erosion.
21   You could have done that before you launched the
22   product but chose not to. Right?
23             MS. KABBASH: Objection.
24             THE WITNESS: You know --
25   BY MR. SLATER:

Page 128

1        Q.    Isn't that true? Is the answer to my
2    question yes?
3             MS. KABBASH: Let him answer the
4    question.
5             MR. SLATER: Well, it's a yes or no
6    question.
7             THE WITNESS: This is -- no, it's not
8    a yes or no question.
9    BY MR. SLATER:
10       Q.    It is, though, because I'm asking you
11   yes or no. So I'm --
12             MS. KABBASH: He's explained to you
13   that he believes it's not a yes or no.
14             MR. SLATER: I'm going to withdraw
15   the question and ask it again.
16   BY MR. SLATER:
17       Q.    One of the things you could have done
18   before you launched the Prolift® would have been to
19   have a long-term clinical study done with the
20   Prolift® before you launched it. That was an option
21   you had. Correct?
22             MS. KABBASH: Objection.
23             THE WITNESS: Ideally in a medical
24   device industry, you could always think about long
25   term; but long term, what does that mean? Are we

Page 129

1    going to run a study for 20 years? It's just --
2    ideal world, but we need to be in some way
3    realistic. We had expert telling us we have been
4    using meshes for years and we are still using them.
5    So if they are still using them, it means that they
6    are not as an expert afraid of this complication.
7    Point number one.
8             We are long-term experience of a
9    sling being in the pelvic floor with -- for urinary
10   incontinence. You know, the experience of Ulmsten
11   was back from 1995. So at some point, you know, the
12   company can say, well, I'm going to set up a trial
13   for the next 20 years, but that's not very realistic
14   in our world.
15   BY MR. SLATER:
16       Q.    Do I understand you correctly --
17             MR. SLATER: Well, let me move to
18   strike first that long answer.
19   BY MR. SLATER:
20       Q.    Before you launched the Prolift®, was
21   it your understanding that the risk of erosion was a
22   short-term risk and was not a long-term risk,
23   erosion of the mesh you were going to use in the
24   Prolift®? Was that your understanding?
25       A.    Yes.

33 (Pages 126 to 129)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 130

1    Q.    If Prof. Jacquetin had informed you
2  that he was concerned that the Prolift®, as it was
3  going to be marketed with the Gynemesh® PS mesh,
4  presented too high a risk of erosion and that the
5  material needed to be changed, and if you knew that
6  before you launched the Prolift®, would you have
7  waited to launch the Prolift® to try to develop a
8  better material before putting it in women's bodies?
9        MS. KABBASH:  Objection.
10        THE WITNESS:  If this would have been
11  the case, you know, if the experts would have told
12  me, Dr. Arnaud, the material is not appropriate but
13  you're about to launch, you know what I would have
14  done?  I would have informed my company at the best
15  level of the -- what Jacquetin told me.  And after,
16  the company takes the decision.  But as a medical
17  doctor, I would have said, wait, stop, alert.  The
18  team in France is alerting that the material is
19  inadequate.  That's what I would have done.
20  BY MR. SLATER:
21    Q.    If Prof. Jacquetin had told you that
22  the material that was going to be used in the
23  Prolift®, the Gynemesh® PS, from his perspective
24  would need to be replaced as soon as possible, if he
25  said, you know, I'm okay with you launching the

Page 131

1  product, but I just want you to know, we need to get
2  a better material here, would you, as a medical
3  doctor looking out for the safety of patients, have
4  said, you know what, in that case, let's not launch
5  the product so quick, let's figure out if there's a
6  better material we have available to us, and even if
7  it takes a little more time, it's better to launch
8  it with the safest material we have, would you have
9  made that decision?
10        MS. KABBASH:  Objection.
11        THE WITNESS:  Okay.  Let me be clear
12  on this.  If Prof. Jacquetin would have told me, we
13  have plenty of complication with this matter, there
14  is something wrong, you shouldn't have launched the
15  product.  This is one point.
16        Now, if Dr. Jacquetin would have told
17  me, well, you know, we still have some erosion, we
18  need to think about a next generation of material,
19  that wouldn't have shocked me, because I've heard
20  forever, you know, the surgeon, any time the
21  procedure lead to a complication, saying, well, we
22  need to think about a new generation of material,
23  because the dream -- their dream is that with a new
24  material, everything will disappear.
25        But as I told them very often, what

Page 132

1  is important in the mechanism of erosion, for
2  example, is to understand what is the mechanism of
3  erosion.  Is it because they incise the vagina not
4  deeply enough, for example?  Or is it mesh related?
5  Because if it is related to the surgical technique,
6  we can change the mesh 20 times, they will not
7  change the rate of erosion.
8        So I don't know if my answer is a
9  little bit too complex, but, you know, as long as we
10  don't know what is the mechanism of a complication,
11  we cannot go blindly and change the mesh, change the
12  mesh.  So that's why Jacquetin would not have told
13  me we need absolutely a new mesh.  He might have
14  told me, but I would have told him, well, dear
15  professor, first of all, we -- you should give me
16  confidence that you have fixed all the surgical
17  problem, that it is a reasonable -- it is reasonable
18  to think that some other material could be better.
19  But so far, there is no reason to believe that the
20  polypropylene mesh we were using could be replaced
21  by something significantly better.
22        MR. SLATER:  Move to strike.
23  BY MR. SLATER:
24    Q.    When you launched the Prolift®, you
25  did not understand the mechanism of erosion.

Page 133

1  Correct?
2        MS. KABBASH:  Objection.
3        THE WITNESS:  When we launched the
4  Prolift®, we have different -- we are --
5  BY MR. SLATER:
6    Q.    You had theories, but you didn't
7  understand it.  Correct?
8    A.    Yeah, theories, but in medicine,
9  there are so many area where everything is based on
10  theory, because if we knew the truth all the time in
11  medicine, that would be very simple.  But in
12  medicine, very often, you have to make assumptions.
13        So erosion could have three
14  mechanisms.  So we knew the three of them.
15        MR. SLATER:  Can you read back the
16  beginning of that answer, please, for me, Ann Marie?
17  After I said it was a theory.
18             - - -
19        (The court reporter read the
20        pertinent part of the record.)
21             - - -
22        MS. KABBASH:  Adam, we're getting --
23        MR. SLATER:  I'm going to finish this
24  document.  It will take a few more minutes, but I'm
25  finishing this document.  I'm not leaving it open.

34 (Pages 130 to 133)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 134

1    BY MR. SLATER:
2        Q.    At the time the Prolift® was
3    launched, you had several theories of mechanisms
4    that could lead to erosion, but you didn't feel
5    confident that you understood the mechanism of
6    erosion.
7            Is that a true statement?
8            MS. KABBASH: Objection.
9            THE WITNESS: By the time we launched
10   this product, we were considering erosion as a
11   complication that occurred in about 10 percent of
12   the cases and which was not in the vast majority of
13   the case a big issue.  So when you put it in the
14   balance, because surgery is always a matter of
15   balance between the risk and the benefit.  When you
16   put it in the balance of the risk in front of the
17   benefits, which is less recurrence, we were
18   considering this was an acceptable complication.
19           So now, if based on that, if we
20   could, of course, find a way to move from 10 percent
21   to 0 percent, that would have been wonderful.  So we
22   tried to make our best efforts to understand the
23   mechanism of erosion.  And we had only theory for
24   sure, because we don't know the truth, why is there
25   an erosion.  There are different explanation.  But,

Page 135

1    again, this was considered as an acceptable risk,
2    because in most of the cases was a minor
3    complication.
4            MR. SLATER: Move to strike.
5            Ann Marie, can you read my question
6    back?
7    BY MR. SLATER:
8        Q.    I'm just going to ask you if you
9    could, Doctor, I think you could probably answer
10   with a yes or a no.  I'm going to ask you to do that
11   if you can.  Okay?  She's going to read the question
12   back to you again.
13           - - -
14           (The court reporter read the
15           pertinent part of the record.)
16           - - -
17           MS. KABBASH: Objection.
18           THE WITNESS: My answer is erosion
19   was an acceptable minor complication most of the
20   time.  And the fact we did not understand perfectly
21   the mechanism of erosion was not considered as a
22   major issue because we were addressing a
23   complication that was acceptable in the benefit/risk
24   balance.
25           MR. SLATER: Move to strike.

Page 136

1            I'm going to ask the question be read
2    back again and ask you to answer it, please.
3            - - -
4            (The court reporter read the
5            pertinent part of the record.)
6            - - -
7            MS. KABBASH: Objection.
8            THE WITNESS: We did not understand
9    the mechanism of erosion.  Also, we have the three
10   options.
11   BY MR. SLATER:
12       Q.    Turn to page 36 of the PowerPoint,
13   the final PowerPoint that was presented to the
14   stagegate committee on June 27, 2003.
15           MS. KABBASH: The final page, you
16   said?
17           MR. SLATER: Page 36.
18   BY MR. SLATER:
19       Q.    It's titled "Critical Assumptions:
20   Market."
21           Do you see that?
22       A.    This one.  Okay.
23       Q.    And the first critical assumption for
24   marketing was, "Product Features Will Justify A
25   Premium Price As Compared To GYNEMESH PS Sheets."

Page 137

1            That was one of the critical
2    assumptions.  Correct?
3        A.    Yes.
4        Q.    The second one listed here is,
5    "Multiple Kits Will Be Required To Fully Exploit"
6    the "Market."
7            Do you see that?
8        A.    Yes.
9        Q.    And one of the goals of your company
10   was to fully exploit the market for the sale of mesh
11   for pelvic floor repair.  Correct?
12           MS. KABBASH: Objection.
13           THE WITNESS: Fully exploit the
14   market means that if you -- if the market wants only
15   anterior or only posterior and you come on the
16   market with a total one, you're not going to satisfy
17   the market.  And there was a big difference between
18   the philosophy of this repair in the different
19   countries.
20   BY MR. SLATER:
21       Q.    Let's look at the next page, page 37.
22   This is the "Risk Assessment."
23           Do you see this?
24       A.    Yes.
25       Q.    This is the risk assessment at the

35 (Pages 134 to 137)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 138

1    time of stagegate presentation, June 27, 2003. And
2    I'm going to go to the third one.
3            Do you see the third one?
4    "Erosion/Recurrences due to mesh used."
5            Do you see that?
6        A.    Yes.
7        Q.    And the probability of that risk
8    occurring was rated as an M, which would mean
9    medium. Right?
10       A.    Yes.
11       Q.    And the impact in terms of what that
12   would do to the project was described, "Need to go
13   back into Concept Stage. Delayed launch and
14   increased resources."
15           Do you see that?
16       A.    Yes.
17       Q.    So it's saying here that if there
18   were erosion and recurrences due to the mesh used,
19   due to the material itself, you would need to go
20   back into the concept stage, delay launch, increase
21   resources and essentially figure out if there's
22   another material to use. Correct?
23           MS. KABBASH: Objection.
24           THE WITNESS: Well, that's not my
25   vision, you know, because erosion --

Page 139

1    BY MR. SLATER:
2        Q.    That's what it says in this
3    presentation. Right?
4        A.    Yes, yes. You know, the presentation
5    probability is medium. So we knew that erosion
6    would not -- would very likely to be part of the
7    complication of this procedure.
8        Q.    But that's not what it says here. It
9    says, the risk that erosion or recurrences are due
10   to the mesh used, due to the material. And if that
11   were to occur, the impact was to go back to the
12   concept stage, delay launch, increase resources and
13   to continue to study. Right?
14           MS. KABBASH: Objection.
15           THE WITNESS: My understanding is
16   that if we knew that there was an erosion rate which
17   was considered acceptable, let's say 10 percent.
18   Now, if we developed this project and we end up with
19   40 percent erosion, that means we need to go back to
20   the concept stage because we have increased the
21   erosion rate, the product has increased the erosion
22   rate that is new and accepted by too much. And we
23   need to go back to the concept. That's what it
24   means.
25   BY MR. SLATER:

Page 140

1        Q.    What if the erosion rate that you saw
2    in clinical study was 30 percent? Would that have
3    been too high?
4            MS. KABBASH: Objection.
5            THE WITNESS: Well, 30 percent,
6    that's high. But the experience of most of the
7    surgeon was something in between 5 and 10 percent.
8    BY MR. SLATER:
9        Q.    If you saw in clinical study with
10   this mesh material, the Gynemesh® PS with the TVM
11   procedure, an erosion rate of 25 percent, would that
12   have been too high and would you have had to go back
13   to the concept stage?
14           MS. KABBASH: Objection.
15           THE WITNESS: If I would see a
16   surgeon telling me I have 25 percent erosion rate, I
17   would have paid him a visit to try to understand why
18   he has an excessive erosion rate, because 25 for a
19   single surgeon is more than the average.
20   BY MR. SLATER:
21       Q.    If the -- rephrase.
22           If there was a clinical study with
23   the TVM technique and Gynemesh® PS being used, and
24   the erosion rate was 20 percent, would that have
25   been too high to be acceptable to you?

Page 141

1            MS. KABBASH: Objection.
2            THE WITNESS: You know, it's
3    difficult to talk about numbers, but 20 percent is
4    still acceptable.
5    BY MR. SLATER:
6        Q.    Acceptable to who?
7            MS. KABBASH: Objection.
8    BY MR. SLATER:
9        Q.    Well, let me rephrase that.
10           20 percent would be acceptable to
11   you? A 20 percent erosion rate with the Prolift®
12   would be acceptable to you?
13           MS. KABBASH: Objection.
14           THE WITNESS: You know, 5 percent is
15   great. 10 percent is the average. 20 percent is
16   the upper limit. Now, if someone had 50 percent,
17   there is something wrong. We need to understand
18   why.
19   BY MR. SLATER:
20       Q.    Well, let's talk about 20 percent.
21           If the very top surgeons in the
22   world, the best at performing the TVM procedure,
23   people like Prof. Jacquetin and his group, if they
24   were getting -- with the TVM technique and Gynemesh®
25   PS mesh, if they were getting an erosion rate of

36 (Pages 138 to 141)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 142

1  20 percent or more, if had you seen those rates,
2  would you have said, this is a product we should not
3  market, we need to continue to study it before we
4  put it on the market, where there's going to be
5  surgeons who are not going to be as skilled as them
6  who would likely have higher erosion rates? Is that
7  the decision you would have made if you saw those
8  rates?
9       MS. KABBASH: Objection.
10      THE WITNESS: Well, I cannot
11 speculate about the decision.
12 BY MR. SLATER:
13      Q.   Well, I want you to tell me what you
14 would have done knowing everything you knew before
15 you launched the Prolift®, if those were the rates
16 of erosion you saw with people like Prof. Jacquetin,
17 the best in the world at performing this, would you
18 have said, we don't -- we shouldn't launch this, we
19 should wait?
20      MS. KABBASH: Objection.
21 BY MR. SLATER:
22      Q.   It's a straightforward question. I'd
23 like a yes or no answer, please.
24      A.   Yes. No. You won't get it from me,
25 but what I want to tell you is, first of all,

Page 143

1  20 percent, I think that's what we got in the first
2  two clinical trials, something around 20 percent.
3  But we need to consider that you are talking about
4  the best experts in the world, but the best expert
5  in the world in their early phase of performing a
6  new procedure. So 20 percent with great expert, but
7  great expert with a new procedure, they are still
8  beginners. Now, a couple of years after the same --
9  you know the Altman study. The Altman study showed
10 that the rate in the hands of all surgeon in
11 Scandinavia was 3 percent, so --
12      Q.   Doctor, I don't mean to interrupt
13 you, but the tape is about to end, and I really -- I
14 asked you a very simple question.
15      If Prof. Jacquetin and his group in
16 2004 were getting 20 percent erosion rates, and you
17 would have known that other surgeons not as skilled
18 would end up likely with higher rates, would you
19 have said, this is not safe enough, I advocate we
20 don't launch yet, yes or no?
21      MS. KABBASH: Objection.
22      THE WITNESS: 20 percent, in the
23 hands of beginners?
24 BY MR. SLATER:
25      Q.   Jacquetin in 2004.

Page 144

1       A.   Jacquetin in 2004 was using a brand
2  new product with brand new tools, and -- well, he
3  was not a beginner, but he was in some way a
4  beginner with the new material.
5       But 20 percent, I tell you we
6  observed it and we continued the project, because we
7  had very good -- very good -- we have very good
8  indication this was going to decrease.
9       MR. SLATER: Move to strike.
10      He has to change the tape.
11      THE VIDEOGRAPHER: The time is now
12 1:23. We are going off the record.
13      MS. KABBASH: In light of that, Adam,
14 I think that the witness needs some lunch. It's
15 almost 1:30 now.
16      MR. SLATER: I'm finishing this
17 document.
18      MS. KABBASH: Adam, you can finish
19 the document after lunch. We've been going at this
20 for three hours now. It's 1:30. We never go longer
21 than this and let the witnesses not eat. So let's
22 take a lunch break.
23      MR. SLATER: If you would like to
24 take lunch, I'll take it. I can't stop you from
25 leaving.

Page 145

1       MS. KABBASH: Good.
2       THE WITNESS: Let's take lunch then.
3       MS. KABBASH: I don't want Dr. Arnaud
4  to go back to France and say those Americans didn't
5  feed me.
6              - - -
7       (A luncheon recess was taken from
8       1:24 p.m. to 2:09 p.m.)
9              - - -
10      THE VIDEOGRAPHER: The time is now
11 2:09. This is the beginning of Disk Number 3. We
12 are back on the record.
13 BY MR. SLATER:
14      Q.   You would expect and you would have
15 expected at the time of launch that surgeons not as
16 accomplished or as experienced with the TVM
17 technique as Dr. Jacquetin would have higher rates
18 of complications and erosion. Correct?
19      MS. KABBASH: Objection.
20      THE WITNESS: Could you say that
21 again? Sorry.
22 BY MR. SLATER:
23      Q.   At the time of the launch of the
24 Prolift®, did you expect that surgeons less
25 experienced than Prof. Jacquetin and his group with

37 (Pages 142 to 145)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 146

1  the Prolift® procedure would have higher rates of
2  complications such as erosion?
3      A.    Well, I think you're assuming that
4  the surgical technique, the -- is related --
5      Q.    I'm just asking a yes or no question.
6      A.    Yes.
7      Q.    I'm not assuming anything.
8      A.    So it's no, because, you know --
9      Q.    I didn't ask why.
10      A.    -- we don't know.
11          MS. KABBASH: Adam, let him complete
12  his question. You asked him to give complete and
13  accurate answers. He's trying to do that.
14          MR. SLATER: Hang on. Hang on.
15  BY MR. SLATER:
16      Q.    Look, if I ask for a yes or no and
17  you go off and talk about something I didn't ask
18  about, with all due respect, then I have to go and
19  strike it and start over again, and I really -- I
20  know you have to fly back to France tomorrow.
21      A.    Okay.
22      Q.    So in the interest of time, the
23  attorneys sitting next to you can ask you questions
24  at the end if they want to, and they can go into
25  anything that they've -- you know, that they feel

Page 147

1  like they need to cover with you or that they think
2  you're eager to talk about. But I'm trying to focus
3  the deposition so I can get through my question.
4  That's all.
5          MS. KABBASH: And I appreciate that,
6  Adam, but at the same time, he didn't even get to
7  the point in his answer where we knew exactly what
8  his answer was going to be.
9          MR. SLATER: I asked for yes or no,
10  though, and so I was already going to strike the
11  answer, so why bother.
12          MS. KABBASH: To allow him to answer
13  the question.
14          MR. SLATER: Then I'm going to tell
15  you right now, I don't guarantee you're going to
16  make the flight tomorrow. If counsel is going to
17  encourage you to give long answers that I didn't ask
18  for, I'm just -- I'm trying to be as nice as I can
19  about it, but I have to do my job.
20          THE WITNESS: I'll do my best.
21  BY MR. SLATER:
22      Q.    Fair enough. That's all I could ask.
23          Let's look at the stagegate
24  presentation, Exhibit 1258. Let's go to page 37.
25  One of the risks identified is that the

Page 148

1  "Procedures," meaning the Prolift® procedures, "do
2  not gain acceptance among lesser-skilled" (non key
3  opinion leader) "surgeons."
4          Do you see that?
5      A.    Yes.
6      Q.    The hope was that the Prolift® could
7  be marketed not only to the highest skilled surgeons
8  but also to the lesser skilled surgeons as well.
9  Correct?
10          MS. KABBASH: Objection.
11          THE WITNESS: Yes.
12  BY MR. SLATER:
13      Q.    And here it says, the probability of
14  that would be low, but if it were to happen, the
15  project would need to go back into the concept
16  stage, delay the launch, increase resources,
17  reevaluate the project.
18          That's what's written here. Correct?
19      A.    Correct.
20      Q.    And it says, the mitigation strategy
21  would be to get VOC, voice of customer, from the
22  non-key opinion leaders to find out why they have
23  that viewpoint, that they're not accepting it, and
24  aggressive marketing and professional education
25  strategy. Correct?

Page 149

1      A.    Yes.
2      Q.    So basically this is saying, if
3  lesser-skilled surgeons are not adopting the
4  Prolift®, one of the things we want to do is talk to
5  them and find out why, and the other thing we want
6  to do is market aggressively to them and also factor
7  that into our professional education strategy.
8  Correct?
9          MS. KABBASH: Objection.
10          THE WITNESS: Correct.
11  BY MR. SLATER:
12      Q.    Did you believe that the Prolift®
13  procedure was a complex procedure?
14          MS. KABBASH: Objection.
15          THE WITNESS: Yes. The Prolift® is
16  rather complex if compared to the TVT®, for example.
17  It's complex because you have three compartments to
18  treat, and in the middle sometime you have the
19  uterus still in place, sometimes you don't. So
20  there is a lot of variation, which makes it a little
21  bit more complex to -- of the whole picture, you
22  know, for whole cases, while incontinence just very
23  simple. It's just a standardized procedure. In
24  most of the cases, there is no variation. In
25  Prolift®, of course, is more complex because it's

38 (Pages 146 to 149)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 150

```
 1    three procedure in one in some way.
 2         MR. SLATER:  Move to strike.
 3    BY MR. SLATER:
 4         Q.    And I'll tell you, the reason I'm
 5    doing it is because if you keep feeding in testimony
 6    about the TVT®, which I have not asked you any
 7    questions about, I'm going to strike every single
 8    one of those answers.  I understand that part of the
 9    preparation for this deposition was to have you talk
10    as much as you could about the TVT® or maybe for
11    whatever reason you are.  This trial is about the
12    Prolift®, and I'm going to keep striking answers
13    that invoke your TVT® history.  There will be a time
14    and place for that, but that's what I'm striking in
15    part your answer, because you're throwing in
16    comparisons to the TVT®.
17         MS. KABBASH:  Dr. Arnaud, I'm going
18    to remind you, he can move to strike, he can do
19    whatever he wants that he feels he needs to protect
20    his legal rights.  Your obligation is to answer the
21    questions truthfully as best you can.  So don't let
22    his motions to strike be anything more than a legal
23    procedure in this deposition.  That's what they are.
24    Okay?  Thank you.
25    BY MR. SLATER:
```

Page 151

```
 1         Q.    As far as pelvic reconstructive
 2    procedures go, when the Prolift® went on the market,
 3    as compared to other procedures that were available,
 4    was it a complex procedure for prolapse repair?
 5         A.    Complex means that you make a
 6    comparison, more complex than a colporrhaphy
 7    probably.  Is it -- it's probably -- is it more
 8    complex than the sacrocolpopexy?  I don't know.
 9    Sacrocolpopexy is complex as well.  So it is -- the
10    level of complexity is somewhat in the range of
11    sacrocolpopexy, I would say.
12         Q.    You and your company certainly
13    expected that a surgeon who was skilled and
14    experienced in performing surgeries like abdominal
15    sacrocolpopexy and colporrhaphy would be able to
16    fully understand the Prolift® procedure.  Correct?
17         MS. KABBASH:  Objection.
18         THE WITNESS:  Well, not really,
19    because sacrocolpopexy in -- you know, there are two
20    categories of surgeon.  The one are more vaginalists
21    and the ones that are more abdominalists, let's say,
22    so -- at least in Europe, it's very rare to find a
23    surgeon that is offering to his patient both
24    approach.  So the whole categorizing either
25    vaginalist or abdominalist.
```

Page 152

```
 1         So we were expecting that the
 2    vaginalist will -- are experienced, will cope quite
 3    easily with the procedure.
 4    BY MR. SLATER:
 5         Q.    In your medical practice, you were a
 6    general and digestive surgeon.  Correct?
 7         A.    Correct.
 8         Q.    You were not a gynecologist.
 9    Correct?
10         A.    I was not.
11         Q.    You did not treat gynecologic
12    conditions.  Correct?
13         A.    Yes.  No prolapse for sure.
14         Q.    You did not perform urologic
15    procedures.  Correct?
16         A.    Correct.
17         Q.    You were able, when you were
18    presented with this procedure, to understand it once
19    it was presented to you, to understand what would be
20    done.  Correct?
21         A.    Yes.  I was a bit -- yes, because I
22    have seen so many of them.
23         Q.    Let's go to the risk assessment
24    document.
25         The last risk, "Additional risk by
```

Page 153

```
 1    obturator passage," that's referring to the risk
 2    that by making the obturator passes, there would be
 3    additional risks compared to other prolapse
 4    surgeries or compared to what?
 5         MS. KABBASH:  Objection.
 6         THE WITNESS:  It's comparing --
 7    excuse me, for -- with TVT-O®.  So TVT-O® you pass
 8    once and it's safe.  But here, in Prolift®, we have
 9    to pass twice.  So that the second passage may --
10    could have been a -- you know, an increased risk.
11    BY MR. SLATER:
12         Q.    Were there any prolapse surgeries
13    before the Prolift® came on the market where
14    obturator passages would occur?
15         A.    Well, of course, the Apogee®,
16    Perigee®, the Apogee®.  Otherwise, no.  It was brand
17    new.
18         Q.    There were not obturator passages
19    with colporrhaphy or ligament suspension.  Correct?
20         A.    Yes.  Correct.
21         Q.    If the obturator passages -- well,
22    rephrase.  Let me ask you this.
23         As compared to colporrhaphy, with or
24    without uterosacral or sacrospinous ligament
25    fixation, would there be more risk of injury due to
```

39 (Pages 150 to 153)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 154

1    the obturator passages with the Prolift® simply by
2    virtue of the fact that there weren't obturator
3    passages with those other procedures?
4             MS. KABBASH: Objection.
5             THE WITNESS: I'm not sure I
6    understand the question.  Of course, if there is no
7    passage in the obturator foramen, there is no risk
8    specific to that.
9    BY MR. SLATER:
10        Q.    So as compared to native tissue
11   repairs, the obturator passages with the Prolift®
12   introduced a new risk.  Correct?
13            MS. KABBASH: Objection.
14            THE WITNESS: Yes.  Of course, if you
15   introduce two needles in the obturator foramen,
16   you -- any time you pass a needle somewhere in the
17   body, you introduce a risk.
18   BY MR. SLATER:
19        Q.    These documents you can put aside.
20            I'm going to hand you an exhibit
21   marked previously as Exhibit 620.
22            Exhibit 620 is two e-mails sent in
23   July of 2003.  In the first e-mail, Scott Ciarrocca
24   writes to Prof. Jacquetin and Dr. Cosson, and he
25   copies yourself, and basically asks about whether or

Page 155

1    not Jacquetin and Cosson had seen slippage of the
2    implants.
3             Do you see that?
4             And then in the response, Prof.
5    Cosson responds and says he hasn't seen slippage of
6    the implants as described by Scott Ciarrocca, and
7    Prof. Cosson states, "The problems are more erosion,
8    retraction."
9             Do you see that?
10        A.    Yes.
11        Q.    So certainly, as of July of 2003, if
12   not before that, your company was on notice that
13   with the use of the implants, the Gynemesh® implants
14   being used with the TVM procedure, the problems they
15   were seeing were erosion and retraction.  Correct?
16            MS. KABBASH: Objection.
17            THE WITNESS: Yeah, that's correct.
18   The erosion was not a surprise, you know.  And
19   retraction is a normal -- is a normal wound healing
20   process.  So nothing was really -- nothing was
21   really a surprise for us.
22   BY MR. SLATER:
23        Q.    Well, one of the things that you
24   learned as this project went on was that retraction
25   could cause significant complications for a patient.

Page 156

1    Correct?
2             MS. KABBASH: Objection.
3             THE WITNESS: Well, we didn't learn
4    that from the experience.  That was already well
5    known, you know, by vaginal surgeon, that anything
6    you do through the vagina can lead to a retraction
7    and sexual complication, because that's the function
8    of the vagina.  So we did not learn that due to this
9    experience.  We already knew that.
10   BY MR. SLATER:
11        Q.    So you already knew that with the use
12   of the Gynemesh® PS through the vagina, one of the
13   potential risks was retraction of the mesh leading
14   to pain with sexual intercourse.  Correct?
15        A.    Yeah.  Any retraction, excessive
16   retraction of the mesh, can lead to some local
17   complication.
18        Q.    And, actually, Prof. Cosson says, "It
19   is possible to have a recurrence but it is usually
20   due to a retraction of the mesh and the arms of the
21   meshes are still in place even in those cases."
22            So he's saying, in his experience,
23   recurrences are usually due to retraction of the
24   Gynemesh®.  Correct?
25            MS. KABBASH: Objection.

Page 157

1             THE WITNESS: Well, that's, of
2    course, a point that is important, you know.  If the
3    goal of the Prolift® is to create a mechanical
4    barrier to all the possible defect, if the mesh
5    retracts too much, it's not a mesh which retract --
6    if the tissue scarring lead to a retraction of the
7    mesh and then the defect is not fully covered, then
8    you have a risk of recurrence.
9    BY MR. SLATER:
10        Q.    I'm going to hand you Exhibit 455.
11            Exhibit 455 is a series of three
12   e-mails in February of 2004.  And the first e-mail
13   was from Scott Ciarrocca to Jacquetin and Cosson,
14   again, you're copied, asking about tissue tearing.
15            Do you see that at the bottom of the
16   page?
17        A.    Yes.
18        Q.    And Scott Ciarrocca says to them,
19   "Since you became aware of the potential for tissue
20   tearing during strap placement, have you been able
21   to observe this phenomenon in surgery?"
22            And then Cosson responds, in the
23   middle of the page, and we're going to put that up
24   on the screen, one moment.
25            Prof. Cosson responds on February 5,

40 (Pages 154 to 157)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 158

1    2004 to Scott Ciarrocca, and you're copied along
2    with some others, with regard to tissue tearing
3    during strap placement, "Yes many times
4    unfortunately, with in these cases the problem of
5    the mesh being to large at the end of the procedure,
6    already shrinking...I think that it is a major
7    concern."
8         Do you see that?
9         A.    Yes.
10        Q.    So first question, certainly you were
11   aware that with placement of the straps with this
12   procedure, the TVM procedure, tissue could be torn.
13   Correct?
14        A.    Correct.
15        Q.    And that could cause, obviously,
16   injury to a patient.  Correct?
17        A.    Yes.  That's why we develop specific
18   tool to put it in place.
19        Q.    And he says that actually was
20   happening many times, unfortunately.  That's what --
21        A.    Yes.
22        Q.    -- Prof. Cosson says.
23        Then he says, "In these cases the
24   problem of the mesh being to large at the end of the
25   procedure, already shrinking...I think that it is a

Page 159

1    major concern."
2         What is he referring to there?
3         A.    I tried to understand.  I don't -- I
4    cannot.  I don't know what he's saying, you know,
5    the mesh already shrinking at the end of the
6    procedure.  That does not -- seems to be -- to make
7    a lot of sense, because the mesh cannot shrink
8    first, and at the end of the procedure, there is no
9    wound healing.  So I don't know what he's saying,
10   but I know what they are talking about.  They are
11   talking about tearing the tissue during the strap
12   placement.
13        Q.    Now, let me ask you a few questions
14   about this e-mail.
15        It was known by you that you were
16   putting the Prolift® out when you marketed the
17   Prolift®, the three different systems, the total,
18   the anterior and the posterior.  Correct?
19        A.    Yes.
20        Q.    And those systems each had one size.
21   They were not sold in various sizes.  Correct?
22        A.    Yes.
23        Q.    And you certainly knew that it would
24   be necessary for surgeons to trim the mesh or cut
25   the mesh back in some patients, because there may be

Page 160

1    extra mesh or too much mesh, and the surgeon
2    wouldn't want to leave the extra mesh.  Correct?
3         A.    Yes.  It's normal practice if you
4    feel the mesh is too large, you can cut a little bit
5    of it.
6         Q.    And it was understood that if the
7    mesh were not to have a sufficient size, either
8    because the person was large or because it had been
9    cut too small, that if the mesh then contracted,
10   that could lead to pain.  Correct?
11        A.    Yes.  If the mesh contract and it
12   pulls on fixed attachment, that would lead to pain.
13   That's why we develop this concept of the strap
14   going through the ligaments.
15        Q.    Well, even with the straps going
16   through the sacrospinous ligaments for support, if
17   the mesh had been cut back too small and then
18   contracted, you knew that could cause pain to a
19   patient.  Correct?
20        A.    I'm not sure I understand, but, of
21   course, if the mesh retracts and is not covering the
22   wound defect, then you have a risk of recurrence.
23        Q.    You also have a risk that once the
24   mesh has now been incorporated into the pelvis, that
25   if it retracts, it could then pull against nerves

Page 161

1    and against tissue and could cause pain.  Correct?
2         A.    Yes.  Well, I cannot speculate about
3    the reason for pelvic pain.  You have plenty of
4    reason that can lead to pelvic pain, so --
5         Q.    I'm not asking you to speculate.  I'm
6    asking about retraction of a Prolift® that has been
7    cut back and now it's retracting even smaller.  You
8    knew that could cause pain to a patient.  Right?
9         A.    I don't understand what you mean.
10   Because any time there is a retraction of the mesh,
11   whether it has been cut back or not, it is something
12   that is a potential source of pain among the others.
13        Q.    So whether the mesh had been trimmed
14   or not, it presents a risk that when there's
15   retraction or contraction of the mesh, that can lead
16   to pain for the patient.  Correct?
17        A.    Yeah.  Any time there is -- the mesh
18   pulls on this attachment, there is a potential risk
19   of pain.
20        Q.    At any time during the point -- well,
21   rephrase.
22        At any time before the Prolift® was
23   launched, did you attempt to study in any way
24   whether there could be established a safe and
25   effective way to remove Prolift® mesh, some or all.

41 (Pages 158 to 161)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 162

1  of it, in the case that a patient had complications?
2  Did you specifically study the question of what do
3  you do to get the mesh out if it needs to be cut out
4  of the woman's body because it's causing her
5  complications?
6        MS. KABBASH:  Objection.
7        THE WITNESS:  Well, we did not
8  specifically study this issue, but, of course, for
9  the surgeons who were using Prolift® in the early
10  stage, this was a question they had; because when
11  you are a surgeon, you put something in the body, it
12  is a normal question to think about what you would
13  do if there was a complication.  It's absolutely
14  normal, you know, a surgeon think about what he
15  would do if something goes wrong.
16  BY MR. SLATER:
17        Q.    Ethicon, Gynecare, sold the Prolift®
18  to be put into women's bodies.  Correct?
19        A.    Yes.
20        Q.    Ethicon knew that for some of those
21  women, some of the mesh, and in some of them maybe
22  even all the mesh, would need to be removed if the
23  women had complications.  That was foreseeable.
24  Right?
25        A.    Well, I disagree with that, because

Page 163

1  if you have an erosion, you do not need to remove
2  the mesh.  If you have a retraction, what you need
3  is try to fight against the fibrosis.  So maybe a
4  dilation, mechanical dilatation.  Removing the mesh
5  is something that would be a last resort.
6        Q.    Did you know before the Prolift® was
7  launched that there were going to be some patients
8  for whom doctors would need to cut out some of the
9  mesh and remove some of the mesh because the women
10  either had retraction or had dyspareunia or had
11  erosions?  Did you know that?
12        A.    Well, of course --
13        MS. KABBASH:  Objection.
14        THE WITNESS:  -- this is a general
15  principle in surgery.  Any time you put an implant,
16  you should think about how to remove it if something
17  goes wrong.
18  BY MR. SLATER:
19        Q.    And as a manufacturer selling the
20  Prolift®, Ethicon needed to think about that
21  subject.  Right?
22        MS. KABBASH:  Objection.
23        THE WITNESS:  Not specifically in
24  this case, you know, because the kind of
25  complication we had did not indicate that removal of

Page 164

1  the full mesh would be needed.
2  BY MR. SLATER:
3        Q.    I didn't ask about the full mesh.
4        Any of the mesh.  Part of the mesh.
5  Did you ever think about, how can we give
6  instructions -- well, rephrase.
7        With regard to removing part of the
8  mesh, did you make any effort to try to establish
9  whether it could be safe and effective for a surgeon
10  to remove the parts of the mesh that would need to
11  be removed, if that was what needed to be done?  Did
12  you even look at that subject and study it as a
13  company --
14        MS. KABBASH:  Objection.
15  BY MR. SLATER:
16        Q.    -- before you sold the product to be
17  paid for it?  Did you even look at that subject?
18        MS. KABBASH:  Objection.
19        THE WITNESS:  My answer to you is, I
20  know you don't want me to talk about slings, but
21  let's talk about the slings --
22  BY MR. SLATER:
23        Q.    Well, no.  Let's talk about the
24  Prolift®, with all due respect, because that's what
25  my question is.

Page 165

1        A.    Yes.  But, you know, what we -- our
2  way of thinking for Prolift® was absolutely derived
3  from what we learned from slings.  So it's very
4  difficult for me to give you explanation without
5  advocating what happened with slings.
6        Q.    Well --
7        A.    With slings, we never had to remove a
8  sling.  We had to cut the sling, we had to arrange
9  the sling, but to remove the whole sling, I'm not
10  aware of such case.
11        Q.    Why do you keep saying remove the
12  whole sling?  I keep telling you my question is not
13  limited to removing the entire mesh, it's trying to
14  remove parts of it.  So let me try to ask you a
15  different question.
16        Did you know there were some women
17  who would have contracted mesh that would cause pain
18  and doctors would need to try to remove the part
19  that was causing pain?
20        A.    For sure.  If mesh is responsible of
21  something, and you need to remove part of it, it's
22  just general surgery, you know.  You make an
23  incision and you dissect the mesh and you cut it.
24        Q.    Did you think it was just a simple
25  thing, a doctor could go in --

42 (Pages 162 to 165)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 166

1    A.    Absolutely not.
2    Q.    -- and easily remove the mesh?
3    A.    No one could imagine it would be
4    simple.
5    Q.    Did you ever study the question of
6    whether or not there was a safe and effective way to
7    remove parts of the Prolift® if necessary after it
8    was integrated, scarified, fibrosed?  Did you ever
9    look at that subject?
10   A.    Of course we consider that.
11   Q.    Okay.
12         How?  Did you study it?  If anyone
13   studied it, tell me who studied that subject?
14   A.    No.  But, you know, studying a
15   subject does not mean you are going to find a
16   solution for it.
17   Q.    Did you try to find a solution?
18   A.    You know, for a surgeon, the solution
19   is simple.  You implant something.
20   Q.    But I'm asking you.  You were the
21   person that was the lead of this entire effort to
22   get the Prolift® out.  You started it from day one.
23   You were part of the company that sold the product
24   and put it in people's hands to put in patients'
25   bodies.

Page 167

1    So didn't you think you had a
2    responsibility to try to figure out, well, if
3    there's complications, can we tell the surgeons how
4    to treat the complications safely with our product
5    that we're going to be paid money for?
6    MS. KABBASH:  Objection.
7    THE WITNESS:  Well, I think my
8    company has done a lot to -- in part, you know,
9    Prof. Cosson, to let people know the type of
10   complication, the way they should behave in
11   professional education.
12   BY MR. SLATER:
13   Q.    So tell me what specifically in
14   professional education occurred that was sponsored
15   by your copy reviewed professional education where
16   doctors were explained, here's how you safely and
17   effectively remove parts of the Prolift® mesh if
18   there's a complication like a retraction, here's
19   what you do.  That didn't happen.  Right?
20   A.    No.  What we did is --
21   Q.    Is the answer to my question, that
22   didn't happen?
23   A.    What?
24   Q.    What I just asked you, sir.
25   MS. KABBASH:  Adam, you've asked him

Page 168

1    what has been done, and he's about to tell you what
2    he believes has been done.  So just let him complete
3    his answer.
4    MR. SLATER:  I just -- no, that's not
5    what happened.
6    THE WITNESS:  You asked me two
7    questions.  That's why.
8    BY MR. SLATER:
9    Q.    Then fine.  I will rephrase it.
10   Let's come back to the question I
11   asked you before.
12   A.    Okay.
13   Q.    Neither the IFU, the surgical
14   technique guide or anything that was provided with
15   the product when someone would buy it, when the
16   surgeon would actually get the product, explained
17   here's how you can safely and effectively remove
18   parts of the mesh if necessary if your patient has
19   complications.  Your company gave no information on
20   that.  Correct?
21   MS. KABBASH:  Objection.
22   THE WITNESS:  Well, you know, the
23   role of a company is not to teach surgery to
24   surgeon.
25   MR. SLATER:  Move to strike.

Page 169

1    THE WITNESS:  You know --
2    BY MR. SLATER:
3    Q.    Am I accurate that your company gave
4    no information on that subject?
5    A.    My company did not give maybe this
6    information in the IFU but made huge efforts to set
7    up professional education in order for -- to -- for
8    the experts like Prof. Cosson, who wrote articles in
9    a journal about the classification of the
10   complication and the way to manage the complication,
11   because we knew as a company that management of the
12   complication was part of the success of this
13   procedure.  Because an erosion is not a big deal
14   most of the time, providing you explain to people
15   how to manage them.
16   MR. SLATER:  Can you read that back
17   to me, please, Ann Marie?
18   - - -
19   (The court reporter read the
20   pertinent part of the record.)
21   - - -
22   BY MR. SLATER:
23   Q.    Part of the success of the procedure,
24   as you called it, and as you marketed the Prolift®,
25   was for the complications to be safely and

43 (Pages 166 to 169)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 170

1  effectively manageable.  Right?
2       A.    Yes.
3       Q.    And if complications that women were
4  going to suffer would in some cases not be able to
5  be safely and effectively managed, that would be a
6  problem with the Prolift®.  Correct?
7       MS. KABBASH:  Objection.
8       THE WITNESS:  Of course, if there
9  were a huge complication, very important
10  complication, that was not our goal in developing
11  this procedure.
12  BY MR. SLATER:
13       Q.    I've marked Exhibit 1259, which is an
14  e-mail -- a couple e-mails in March of 2004.
15                    - - -
16       (Deposition Exhibit No.
17       Plaintiff's-1259, E-mail chain, top one
18       dated 17 Mar 2004, Bates stamped
19       ETH.MESH.03910637 and ETH.MESH.03910638,
20       was marked for identification.)
21                    - - -
22  BY MR. SLATER:
23       Q.    In this e-mail, somebody named Wessel
24  Van Dijk asked some questions of you.
25             Who was Wessel Van Dijk?

Page 171

1       A.    He was a guy from the Netherlands and
2  I think was working for prof ed for Gynecare.
3       Q.    And he asked you some questions that
4  he called some critical customer questions having to
5  do with Gynemesh® and this procedure.  Correct?
6       A.    Yes, yes.
7       Q.    And you provided a response at the
8  top of the page.
9             You provided your response at the top
10  of the page.  And I'm going to go through a little
11  bit of what you told Mr. Van Dijk in March of 2004,
12  about a year before the Prolift® was launched.
13             First, you talk about the differences
14  between old and new Gynemesh®.
15             What are you talking about there?
16       A.    I think at some point we had a
17  product called Gynemesh®, which was a heavyweight
18  polypropylene mesh, just a precut mesh of
19  heavyweight polypropylene.  And the new -- when I
20  say new, is Gynemesh® PS.  So the old one is heavy,
21  the new one is light.
22       Q.    One of the things you say, and I
23  assume this would apply to Gynemesh® PS or the
24  Prolift® or any mesh used for pelvic floor repair,
25  correct me if I'm wrong, that you "need a product

Page 172

1  which is as 'light' as possible."  You put light in
2  quotes.  "The idea being to try to reduce the
3  foreign body reaction as much as possible in order
4  to avoid scar tissue."  Am I correct?
5       A.    Yes.
6       Q.    And one of the goals with the
7  Prolift® was to avoid scar tissue that would cause
8  pain or other complications for the patient.
9  Correct?
10       A.    Yes.
11       Q.    You say a little further down,
12  "Erosion of the vagina is very common with any type
13  of meshes."  Right?
14       A.    Right.
15       Q.    When you say the word "erosion"
16  there, are you using the word "erosion" to mean
17  exposure?  Are you saying it -- what do you --
18  rephrase.
19             When you use the word "erosion"
20  there, what do you mean by that?
21       A.    Well, for me, erosion and mesh
22  exposure is just the same.
23       Q.    So you're talking about when the mesh
24  actually comes through and it's exposed into the
25  vagina?

Page 173

1       A.    Yes.  There is a loss of substance in
2  the depth of which you can see the mesh.
3       Q.    And you say here in your March 17,
4  2004 e-mail, "Erosion of the vagina," which you say
5  is the same as exposure of the mesh into the vagina,
6  "is very common with any type of meshes."  Correct?
7       A.    Yes.
8       Q.    And that would hold true with the
9  Prolift®.  Correct?
10       A.    Yes.  Very common with any type of
11  mesh.
12       Q.    So if anybody were to say that the
13  risk of the Prolift® mesh becoming exposed or
14  eroding into the vagina is slight, that wouldn't be
15  accurate, because as you state here, it's common.
16  Correct?
17       MS. KABBASH:  Objection.
18       THE WITNESS:  Yes, it was common.
19  Common means it's not rare.
20  BY MR. SLATER:
21       Q.    You say a little below that, "Nobody
22  really knows the precise mechanism by which it
23  occurs," talking about erosion.  Correct?
24       A.    Yes.
25       Q.    And you say, "It used to be viewed as

Confidential - Subject to Stipulation and Order of Confidentiality

Page 174

1  an infectious complication.  It is more likely to be
2  a vaginal wound dehiscence due to ischemia of the
3  wound edges or infection."
4          Do you see that?
5      A.   Yes.
6      Q.   What are you referring to?  Let's
7  take it one at time.  When you say "vaginal wound
8  dehiscence," are you talking about at the site of
9  the incision itself opening up?
10     A.   Yes, yes.
11     Q.   So you're saying when there is an
12  erosion or an exposure into the vagina, it's more
13  likely to be either due to the actual incision
14  opening up and letting the mesh through or due to an
15  infection of the mesh?
16     A.   Yes.
17     Q.   And when you talk about an infection
18  of the mesh, what are you talking about?
19     A.   Okay.  You know, if you have an
20  infection of the mesh, if you think theoretically
21  you have an infection of the mesh, total infection
22  with pus and the mesh being very easy to remove,
23  being in the middle of the pus, that is something
24  that is not what I'm talking about, because we did
25  not observe that.

Page 175

1          But you could think about, you know,
2  a local infection, like you can have after a
3  laparotomy, you can have a small partial infection
4  of the wound.  So what happened if you got that?
5  Suddenly the pus goes out, and in laparotomy, you
6  will see it.  But in the vagina, you can imagine,
7  there is a localized infection.  And at some point
8  the pus expel, no one see it, not even the patient,
9  you know, a couple of cubic centimeter of pus.  And
10  then since it's open, it heals, because any time --
11  you know, when you have an abdominal infection, you
12  just cut the suture.  It opens.  If you open the
13  wound infection, you get cured.
14         So in my opinion was that there might
15  be in a similar way as what I described for an
16  abdominal incision, if you make a vaginal incision,
17  you may have a localized infection that finally
18  handled by an opening, which no one recognize
19  because minor event.  And then it get cured, it's
20  cleaned.  And at the end of the day, if you put a
21  speculum and you look, you would find a hole and the
22  mesh in the depths of the hole.  So that was one of
23  the possibility for explaining the erosion.
24     Q.   And you said here, you thought it was
25  likely that that was -- that if you have erosions

Page 176

1  into the vagina, from your perspective, it's likely
2  either because the incision actually opened up and
3  let the mesh through or this process with infection
4  that you just described would happen?
5      A.   Yeah.  First one is infection.
6  Second one would be because during the incision,
7  there is a kind of devascularization.  So at the end
8  of the day, when you suture the vagina, there is
9  part of it which is not -- no longer vascularized.
10  And most of the incision will heal, but there will
11  be a kind of defect in the healing, because there is
12  some kind of devascularization.  So these are the
13  two main mechanism.  And why we do not believe that
14  it could be kind of mechanical erosion, you know,
15  with the vagina -- friction of the vagina on the
16  mesh is because all the -- all the erosion are
17  occurring in the line -- on the line of the
18  incision.  You know, if it was mechanical, it could
19  be a side, but it is always on the line of the
20  incision.  So it's an issue with the incision.  At
21  the incision level, let's say.
22     Q.   That's where it happens at the
23  incision, and then the alternative would be where
24  there's this infection that you described where --
25     A.   Yes.  Whether it's infection or a

Page 177

1  lack of vascularization, it's always in the -- on
2  the incision line.
3      Q.   And what you're saying is where an
4  infection would lead to an erosion into the vagina,
5  you likely wouldn't see the evidence of the
6  infection, you would just see the aftermath or the
7  result, which would be the exposure of the mesh?
8      A.   Sorry.  I did not capture you.
9      Q.   That's okay.
10         If I understood correctly, you're
11  saying that if you have an infection of the mesh
12  that leads to an exposure of the mesh into the
13  vagina, you're saying you likely would not see any
14  evidence of the infection, but, clinically, you
15  would see the exposure of the mesh, and that's what
16  tells you that this had occurred.
17         Am I understand you correctly?
18     A.   If the theory of the infection is
19  good, that's the way.
20     Q.   And you certainly felt, at the time
21  you wrote this e-mail, that that was -- you thought
22  that was a accurate explanation.  Correct?
23     A.   At the time of this e-mail, I
24  strongly believed it should be one of the two -- of
25  the two, not another one.

45 (Pages 174 to 177)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 178

1    Q.    And do you still feel that way?
2    A.    Yes.
3    Q.    And let me understand, if a woman
4    were to have some sort of an opening in the vaginal
5    skin, the vaginal covering --
6    A.    Yes.
7    Q.    -- that could allow bacteria to get
8    through to the mesh, which could allow mesh to
9    become infected and then could create an erosion
10   into the vagina.  Correct?
11   A.    Not really, because when a mesh
12   become infected, you can have a local infection or a
13   whole infection of the mesh.  But if this happened,
14   but very likely it was not a whole infection,
15   because otherwise, if you have a whole infection of
16   the mesh, this is a major event, cannot be -- cannot
17   go unknown, you know.  The patient would have a
18   fever, a lot of things.  So it can only be a minor
19   event, very localized; because if there was an
20   infection of the whole mesh, then we would know.
21   Q.    Did you have an understanding that
22   you could get contamination of the Prolift® mesh and
23   it could develop, maybe not a big, full-blown
24   infection that would be apparent, but a chronic
25   low-grade infection that could exist on the mesh?

Page 179

1    A.    That's always a possibility with an
2    implant, to have a kind of chronic infection, even
3    if it's not been proven.  It is something likely
4    to -- possibility to occur with any implant, you
5    know.  Inguinal hernia, this might happen.
6    Q.    And you wouldn't necessarily see any
7    obvious signs of infection if that happened.  It
8    could just exist at a subclinical level?
9    A.    That's what I think.
10   Q.    Okay.
11   A.    That's been my theory very often to
12   say -- to try to explain why some center are more
13   complication than others.  I say, well, maybe there
14   is a difference in the theater with regard to
15   infection.  Of course, it's speculation.  It's --
16   you know, we try to understand why things are going,
17   and we are obliged to make some hypotheses.
18   Q.    Well, you've certainly studied the
19   Prolift® and studied the complications and have
20   focused on this, so to the best of your experience,
21   that's what you think occurs.  Correct?
22   A.    Yes.
23          MR. SLATER:  Go off the video for a
24   second.
25          THE VIDEOGRAPHER:  The time is now

Page 180

1    2:51.  We are going off the record.
2          - - -
3          (A discussion off the record
4    occurred.)
5          - - -
6          THE VIDEOGRAPHER:  The time is now
7    2:59.  We are back on the record.
8    BY MR. SLATER:
9    Q.    In front of you is Exhibit 1181,
10   which is two e-mails dated May 10, 2004.  The first
11   one was written by Ophelie Berthier.
12          Who is Ophelie Berthier?
13   A.    She was the European product manager
14   that was in charge of the commercialization of the
15   Prolift®.
16   Q.    That would be --
17          As a product manager, she would be
18   somebody in the marketing department.  Correct?
19   A.    Yes.
20   Q.    Ophelie Berthier, on May 10, 2004,
21   wrote to Zenobia Walji, also in marketing in the
22   United States, as well as Giselle Bonet in
23   marketing, Gene Kammerer from research and
24   development and yourself.  And the subject, "Mesh
25   for TVM."  Right?

Page 181

1    A.    Yes.
2    Q.    I'm just going to put it up,
3    highlight a bit of it, and I'm going to ask you
4    about it.
5          Okay.  The e-mail start -- I'm going
6    to start over.
7          In the May 10, 2004 e-mail, Ophelie
8    Berthier writes to yourself and the others,
9    addresses obviously to Zenobia Walji in marketing,
10   "I know you are working on new mesh materials with
11   Gene and I'd like to share with you the inputs of Pr
12   Jacquetin and Dr Cosson."
13          And Ophelie Berthier would have
14   spoken directly with Jacquetin and Cosson
15   periodically.  Right?
16   A.    Yes, yes.  They were French people
17   and Ophelie was based in France, so...
18   Q.    And Gene is Gene Kammerer from
19   research and development.  Correct?
20   A.    Yes.
21   Q.    And this indicates that, with regards
22   to Prof. Jacquetin and Dr. Cosson, "their main
23   concern is now" --
24          I'll start over.
25          This e-mail indicates, with regards

Confidential - Subject to Stipulation and Order of Confidentiality

Page 182

1 to Prof. Jacquetin and Dr. Cosson, "Their main
2 concern is now the shrinkage of the mesh which may
3 lead to pain and dyspareunia...Indeed now that they
4 have tremendously improved the technique and lowered
5 the erosion rate what needs to be improved is the
6 shrinkage of the mesh (in this case gynemesh soft)."
7 That's what she communicated per
8 Jacquetin and Cosson. Correct?
9 A. Correct.
10 Q. And certainly as of May 2004, you
11 were aware that you needed to find a way to either
12 improve or reduce the rate or consequences of the
13 shrinkage of the Gynemesh® Soft Mesh or to find
14 another mesh material for the Prolift®. You were
15 aware that that was something that needed to be
16 accomplished. Correct?
17 MS. KABBASH: Objection.
18 THE WITNESS: Well, what this may
19 says is we make big progress for erosion. Fine. So
20 now the main concern is becoming shrinkage. Should
21 get nothing very new. This e-mail is not saying we
22 have discovered shrinkage can occur. It says, now
23 that we have made progress in the erosion, advance,
24 improvement, now the main concern becomes -- the
25 number one concern becomes shrinkage.

Page 183

1 Now, all this discussion about
2 shrinkage and the mesh, again, is backed on the fact
3 that people wrongly believed that the only thing
4 that can prevent shrinkage is a new mesh. But this
5 is not -- this is not a good way of thinking, you
6 know. Before you can say a new mesh is going to
7 improve the shrinkage, you should identify what is
8 the mechanical -- mechanism of the shrinkage. It's
9 sure that bad mesh can improve fibrosis and very
10 likely improve the shrinkage, but this does not mean
11 that by changing the mesh you are going to have less
12 shrinkage.
13 BY MR. SLATER:
14 Q. You never in fact figured out a way
15 to reduce the rates of shrinkage with the Prolift®
16 when it used Gynemesh® Prolene® Soft Mesh. Right?
17 MS. KABBASH: Objection.
18 THE WITNESS: We always thought about
19 that, but there is a difference between being aware
20 of a potential issue and finding a solution. So
21 finding a solution for shrinkage, shrinkage is made
22 of -- is a natural -- no, sorry. There is a natural
23 process of wound healing, which is always associated
24 with shrinkage, whether you use a mesh or not. So
25 the mesh in the worst case can aggravate the case.

Page 184

1 But, you know, it does not mean that by changing the
2 mesh, shrinkage is not going to occur.
3 BY MR. SLATER:
4 Q. In fact, your thinking at the time --
5 well, rephrase.
6 You knew at the time that shrinkage,
7 as stated in this e-mail, could lead to pain.
8 Correct?
9 A. That's not new. Shrinkage can lead
10 to pain.
11 Q. And you knew that shrinkage could
12 lead to dyspareunia. Correct? Shrinkage could lead
13 to that. Correct?
14 A. Not new. The vagina is a cavity. If
15 there's a shrinkage, the cavity can become smaller.
16 Q. You knew that shrinkage could lead to
17 recurrence of the prolapse. Correct?
18 A. Correct.
19 Q. You knew that shrinkage could lead to
20 erosion?
21 A. Well, for me, it's not obvious, no.
22 Shrinkage and erosion, I don't know. Maybe, but --
23 no idea.
24 Q. You knew that shrinkage could lead to
25 anatomic distortion of the vagina. Correct?

Page 185

1 A. Yes.
2 Q. You knew that shrinkage of the mesh
3 could lead to the need to operate on the patient
4 again to try to remove part of the mesh. Correct?
5 A. In the worst case, possibly. It's a
6 possibility.
7 Q. Well, you knew that would happen to
8 some women?
9 A. Of course, because it's a
10 possibility.
11 Q. You knew that for some women, they
12 wouldn't just need one surgery to try to remove
13 contracted mesh but that they could need to undergo
14 multiple surgeries. Right? You knew that was
15 something that could happen to some women. Right?
16 A. Well, you know, basically what I knew
17 is that with any surgical procedure, we could have
18 complication, and that could lead to reoperation.
19 Q. I'm asking about the Prolift® now.
20 And you knew with the Prolift® --
21 A. Of course we knew that if it is an
22 operation, then there are possibility to
23 reoperation.
24 Q. You knew with the Prolift® that when
25 the mesh contracted and shrunk, that a woman could

Confidential - Subject to Stipulation and Order of Confidentiality

Page 186

1    go through one surgery and that -- to remove part of
2    the mesh and that might not fix her and that some
3    women in fact would need to undergo multiple
4    surgeries in an effort to remove mesh that had
5    contracted.  You knew that would happen to some
6    women.  Correct?
7         A.    Yeah.  We knew that in the same way
8    you knew any time you use a mesh, a graft, an
9    implant, there might be complication and multiple
10   need to -- for reoperation.  That's not -- that was
11   not new.  That's just the rule of the game with all
12   implants.
13        Q.    And you knew that these complications
14   that could occur due to contraction of the mesh
15   could cause a woman's quality of life to be
16   permanently damaged.  Right?
17             MS. KABBASH:  Objection.
18   BY MR. SLATER:
19        Q.    Some women would have permanent
20   damage to their quality of life.  You knew that.
21   Right?
22             MS. KABBASH:  Objection.
23             THE WITNESS:  Well, you know any time
24   you go to surgery, you know that you can have
25   complication.

Page 187

1    BY MR. SLATER:
2         Q.    Sir, I'm asking about Prolift®.
3         A.    The Prolift® is a surgical procedure,
4    so the complication are possible, like with every
5    surgical procedure.
6             MR. SLATER:  Move to strike.
7    BY MR. SLATER:
8         Q.    You knew with the Prolift® that if a
9    woman had contraction of the mesh, that the
10   complications could lead to permanent damage to her
11   quality of life.  You knew for some women that would
12   happen.  Correct?
13        A.    Not correct, because if you have a
14   complication, you go and see your surgeon and you
15   ask the surgeon to find a solution to your
16   complication.  So what you're saying is, you have a
17   complication, so now it's forever.  Well, if I have
18   a complication after a procedure, I go back to my
19   surgeon and ask him to try to correct the
20   consequence of his procedure.  So if I have big
21   shrinkage after a procedure, I would visit my
22   surgeon, say, Doctor, look, my vagina is a problem,
23   what can you do for me.  That's all I know.
24        Q.    And you knew, as the scientific
25   director for Gynecare when the Prolift® was going to

Page 188

1    market, that for some women, regardless of how many
2    surgeons they went to and how many procedures they
3    had by surgeons who were trying to help them, that
4    some of them would be left with permanent
5    complications and permanent damage to their quality
6    of life.  Correct?
7         A.    No.  Well, I could not imagine such a
8    worst case, even if in surgery you can always
9    imagine the worst, the worst being the death.  Of
10   course, the worst can always happen, but, you know,
11   I could not imagine that this would be something
12   that is very common.  It might happen, because any
13   single surgical procedure can lead to complication.
14   And some of them can be terrible, even an
15   appendectomy, an amygdalectomy.  So of course when
16   you're developing a new procedure, you have to
17   assume that at some point, there might be terrible
18   complication, and the death is one of them.  You
19   know, any time you go for surgery, you can die from
20   the anesthesiology.
21        So, of course, we knew that
22   complication would occur, because this is related to
23   any surgical procedure, so -- well, it may be that
24   there will be very bad retraction and it could be --
25   you know, the surgeon always find a solution to the

Page 189

1    complication, so...
2         Q.    Is your testimony that the last thing
3    you said, the surgeon always finds a solution to the
4    complication?
5         A.    With time.
6         Q.    You knew that for some women, when
7    they had contraction of the Prolift® mesh, despite a
8    surgeon or multiple surgeons of very high skill
9    levels, for some of those women, a solution would
10   not be able to be found and they'd be left with
11   permanent pain and permanent damage to their quality
12   of life.  Correct?
13             MS. KABBASH:  Objection.
14             THE WITNESS:  Yeah.  But this is 2012
15   and we are talking about in 2004, so --
16   BY MR. SLATER:
17        Q.    Well, you knew that --
18        A.    -- it is always easier after eight
19   years to say, oh, that's the situation.  But when
20   you are in 2000 -- if you had been in 2004, you
21   know, we were -- our goal was to develop a good
22   procedure for women all over the world.
23        And now you're telling me eight years
24   after, oh, you know, some people have had terrible
25   result.  I can understand that, but, you know,

48 (Pages 186 to 189)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 190

1  that's something that happen with any kind of
2  surgery.
3      Q.    Are you saying that when the Prolift®
4  was launched, that you didn't know that some women
5  would end up with the type of very serious, lifelong
6  complications that I just described?
7          MS. KABBASH: Objection.
8  BY MR. SLATER:
9      Q.    And that you only learned that over
10  the course of time after the Prolift® had been on
11  the market for years? Is that what you're telling
12  me?
13          MS. KABBASH: Objection.
14          THE WITNESS: What I'm telling you is
15  that when you are talking about surgery --
16  BY MR. SLATER:
17      Q.    I'm talking about the Prolift®, and I
18  asked you a specific question. I'd appreciate you
19  answering that question, sir.
20      A.    Okay. Prolift® is one of the
21  surgical procedure. All surgical procedure can give
22  complications. Some of them be minor, some of them
23  being terrible. So why would I have thought in 2004
24  that Prolift® would be the only procedure in the
25  world that would not give any severe complication?

Page 191

1      Q.    Nobody asked you that, with all due
2  respect. I'm going to ask the court reporter to
3  read my question back to you and just ask you to
4  answer it directly, please.
5      A.    Okay.
6          - - -
7          (The court reporter read the
8          pertinent part of the record.)
9          - - -
10          THE WITNESS: Okay. Let me answer
11  very precisely. I did not imagine that there would
12  be sequelae, and when I mean sequelae, something
13  that cannot be arranged, improved by anyone, that
14  women would end up with a sequelae which is so
15  severe that their life would be completely
16  disturbed.
17          You know, because I and all the
18  experts also believed that if something would occur,
19  they would be able to find a solution. Otherwise,
20  you know, these people are not -- they are honest
21  individual, honest doctor, you know. If they are --
22  thought one second that they could really hurt very
23  badly and forever women in a significant number, not
24  in an exceptional case, they would not have
25  supported us.

Page 192

1          MR. SLATER: Ann Marie, can you read
2  me back his answer. There's going to come a point
3  when I'm going to move to strike, I just have to
4  figure out which -- where I lost, because I lost
5  track of the spot.
6          - - -
7          (The court reporter read the
8          pertinent part of the record.)
9          - - -
10          MR. SLATER: I'm going to move to
11  strike from the word "otherwise" forward.
12  BY MR. SLATER:
13      Q.    So if I understand correctly, it was
14  your assumption when the Prolift® was launched to
15  the market in March of 2005 that to the extent a
16  woman did have serious complications, that surgeons
17  out there in the surgical community would figure out
18  the way to treat those complications?
19      A.    Yes.
20          MS. KABBASH: Objection.
21  BY MR. SLATER:
22      Q.    What did Ethicon -- well, let me
23  rephrase.
24          Before the Prolift® was launched,
25  Ethicon did not figure out the methods that would be

Page 193

1  able to safely and effectively treat women who had
2  the very serious complications like we've been
3  speaking about. Ethicon and you assumed that
4  surgeons would develop those remedies as time went
5  on.
6          Do I understand?
7          MS. KABBASH: Objection.
8          THE WITNESS: I understand what you
9  mean.
10  BY MR. SLATER:
11      Q.    Am I correct?
12      A.    You're correct. If you're a medical
13  device manufacturer, it's -- what can I say? It's
14  not necessarily your role, you know, to find the
15  solution for the complications of the surgical
16  procedure. So if there is a retraction, what can a
17  manufacturer do? Nothing. It's the surgeon who's
18  going to resect the piece of the mesh. It's not the
19  manufacturer. What can a manufacturer say? There's
20  nothing we can do.
21      Q.    The manufacturer could warn the
22  surgeons and the patients and tell them there are
23  some complications that are so severe, we can't tell
24  you how to safely and effectively treat those, and
25  there's no established way that we know of. You

49 (Pages 190 to 193)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 194

1    could warn about that.  Right?
2         A.    Well, you know, what you are asking
3    is should we warn that death is possible after a
4    Prolift®?  Because it's possible.  You can die from
5    the anesthesiology.  Should we warn that a death is
6    possible as a manufacturer?  Or is it obvious that
7    any time you have an anesthesiology, you can die?
8         Q.    You warn in the IFU that there could
9    be bleeding from the procedure, so why not warn that
10   there are some women whose complications could be so
11   severe that, at this point, you can't advise of a
12   solution to fix that, that some of the solutions may
13   not be able to be safely and effectively treated?
14   If you're going to warn something as obvious as you
15   can get bleeding, why not warn about the most
16   catastrophic complications maybe being untreatable?
17        A.    Because I told you, we are not
18   imagining that the sequelae would be a possibility.
19   Because if you have a contraction, you still have --
20   when you have a complication in surgery, you still
21   have possibility to treat complication.  The surgeon
22   are able to treat complication.
23             So, of course, understand, you have
24   had cases where there is a retraction.  The woman
25   has seen the best experts.  And after multiple

Page 195

1    procedures, she still have a problem.  That's fine.
2    But that's in 2012.  In 2004, we might not imagine
3    that this could happen.
4         Q.    Well, let's not talk about might not.
5             The Prolift® went on the market, give
6    or take, on March 10, 2005.
7             As of that day, as of when the
8    Prolift® was going on the market, did your company
9    realize that there were some women who would have
10   these very serious complications, that despite
11   multiple surgeries, multiple doctors trying to treat
12   it, the women would not get better and they would
13   end up with these very serious, permanent,
14   life-altering damage?
15        A.    In 2005 we could rely on the expert
16   opinion --
17        Q.    I'm asking if you knew it.
18        A.    -- and the clinical data.
19        Q.    I'm asking if you knew that.
20             Did you know it when the Prolift® was
21   launched?
22        A.    When the Prolift® was launched, what
23   we knew was the expert opinion and the clinical
24   data, we are in the clinical data, I don't think we
25   heard any of these cases.

Page 196

1         Q.    I'm going to ask my question again.
2             Did you know that there were some
3    women that would end up with these very serious
4    complications that could not be treated, despite
5    surgeons operating multiple times, despite multiple
6    doctors trying, and that some women who would have
7    Prolift® complications would be left with permanent,
8    life-altering damage?  Did you know that would
9    happen to some women as of the day the Prolift® was
10   launched?  Did you know that would happen?
11            MS. KABBASH:  Objection.
12            THE WITNESS:  Well, we knew that --
13   what we knew, sorry, was that a retraction could
14   occur, that this retraction could, in the worst
15   case, have some consequence like dyspareunia, but we
16   thought that this kind of complication would not be
17   severe enough to reach what you are describing but
18   would be a complication that would be managed in
19   some way by a dilatation or by some kind of
20   reoperation in the same way that the erosion were
21   managed by a simple excision and a new suture.
22            So we were not imagining that the
23   worst could happen.  We are not thinking in that
24   way.  But, of course, you can always imagine the
25   worst.  We could imagine that some woman would have

Page 197

1    died from the procedure.  So, you know --
2    BY MR. SLATER:
3         Q.    Did you learn over the course of time
4    after the Prolift® went on the market that some
5    women were having these very serious complications,
6    that despite intensive treatment by very good
7    doctors, the women couldn't get better and they were
8    left with permanent, life-altering damage?  Did you
9    learn that over time that that was happening?
10            MS. KABBASH:  Objection.
11            THE WITNESS:  Well, you know, from
12   2008, I left Gynecare.  But, of course, I knew
13   that -- I know that any time you put the device in
14   the hand of the entire world, there will be some
15   complications somewhere.  Now, I also know that it
16   depends very much on the way it is performed.  I
17   also -- I also know that -- well, it depends very
18   much on the way it is being performed.
19   BY MR. SLATER:
20        Q.    Well, you knew that doctors of
21   varying skill levels from varying backgrounds would
22   do the Prolift® procedure.  Right?
23        A.    Yes.
24        Q.    You knew some would be more skillful
25   than others.  Right?

50 (Pages 194 to 197)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 198

1    A.    That's a general rule in surgery.
2  You know, you have good surgeon, bad surgeon.
3    Q.    You knew that doctors would exercise
4  surgical judgment from patient to patient based on,
5  for example, anatomic variation.  Correct?
6    A.    Yes.
7    Q.    You knew that in fact the patients
8  would have anatomic variations from patient to
9  patient and that could make the surgery more
10  complicated.  Right?
11    A.    Yes.  That's normal in surgery.
12  You're not all the same.
13    Q.    I'm talking about the Prolift® now.
14        And you knew that because of anatomic
15  variations, that that could create complications for
16  some patients.  Correct?
17    A.    No, not correct.  Anatomic variation
18  do not create complication to patient.  It create
19  difficulty for the surgeon, which is very different.
20    Q.    Well, the more difficulty for the
21  surgeon, the higher the risk of a complication.
22  Correct?
23    A.    Yes.
24    Q.    So if you have anatomic variations
25  that create difficulty, that will increase the risk

Page 199

1  of complications.  Correct?
2        MS. KABBASH:  Objection.
3        THE WITNESS:  You know, anatomic
4  variation, that's part of the daily routine of the
5  surgeon.  You know, all patients are different, so
6  why is that different for Prolift® and for
7  appendectomy than for any procedure.  Anatomic
8  variation is like, you know, weather condition
9  for the --
10  BY MR. SLATER:
11    Q.    Well, I'll tell you how it's
12  difficult.
13        With an appendectomy, there's a
14  procedure a doctor performs and removes the
15  appendix.  With the Prolift®, they take the mesh and
16  the instruments that your company sold, potentially
17  for several thousand dollars, and puts it into a
18  woman's body.  So there's a difference between
19  someone taking a product that your company puts out
20  there and says this is a safe and effective product,
21  you should put this into your patient's body, or
22  says to the patient, you should let this be put in
23  your body.  There's a big difference between that
24  and someone going in and having a surgical procedure
25  performed where a manufacturer like Ethicon isn't

Page 200

1  making money off the procedure being done.
2        Isn't there a big difference?
3        MS. KABBASH:  Objection.
4        THE WITNESS:  Yes.  You make
5  comparison that -- there is a difference, yes.
6  There is a difference.  We're not talking about the
7  same thing.
8  BY MR. SLATER:
9    Q.    And, therefore, your company had a
10  responsibility to make sure, number one, before this
11  Prolift® went on the market, that you had thoroughly
12  studied it and understood the full range of
13  complications before you would put it on the market
14  and represent to patients and surgeons that you put
15  your company's name behind it and said, this is a
16  safe product, it's an effective product, and it will
17  be safe for the rest of your life because it's
18  permanent.  You agree with that.  Right?  You needed
19  to thoroughly study it before you made those
20  representations.  Right?
21    A.    Well, I think when you say a product
22  is safe and effective, are you going to say, nothing
23  is going to happen with this?
24    Q.    Well, you, in fact, didn't know what
25  was going to happen with the Prolift®.  Isn't that

Page 201

1  what you're telling me?  You didn't understand the
2  mechanism of erosion.  Right?  You couldn't figure
3  out a way to reduce shrinkage of the mesh.  Right?
4  Those are two things you've admitted to me.  Right?
5        MS. KABBASH:  Objection and
6  objection.
7        THE WITNESS:  Yes, yes.
8  BY MR. SLATER:
9    Q.    And you didn't have an understanding
10  about long-term consequences in terms of what
11  complications women would actually suffer as the
12  years went on.  Correct?
13        MS. KABBASH:  Objection.
14  BY MR. SLATER:
15    Q.    You didn't know.  Right?
16    A.    We didn't know -- you know, when you
17  are designing a product, when you are an inventor,
18  you don't know what's going to happen in 20 years,
19  because you don't have a crystal ball.
20    Q.    And if you don't know, if you don't
21  know why erosion happens, if you don't understand a
22  way to reduce shrinkage, if you don't know what the
23  long-term consequences are going to be, how do you
24  put the product on the market, sir?  How do you sell
25  that to put into patients' bodies?  Why don't you

51 (Pages 198 to 201)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 202

```
 1    just wait and study it for a while and learn about
 2    it so that you can really be sure about these
 3    things?  Why not do that?
 4              MS. KABBASH:  Objection to this line
 5    of questioning as argumentative.
 6    BY MR. SLATER:
 7         Q.    Why didn't you do?
 8         A.    I will answer as to that.
 9         Q.    Why didn't you do that?
10              MS. KABBASH:  Objection.
11              THE WITNESS:  You know, when you open
12    the abdominal cavity, there is 15 percent risk of
13    incisional hernia.  15 percent risk of incisional
14    hernia.  So if I understood you correctly, you
15    should ask us, why didn't you study suture more then
16    before you sell them to close the abdominal cavity.
17    Because at some point, we need to close the
18    abdominal cavity.
19    BY MR. SLATER:
20         Q.    But your company didn't create that
21    procedure.  Surgeons created that procedure and used
22    sutures as a part of that procedure.  Your company
23    sold the Prolift® procedure to the world.  It's a
24    big difference, isn't it?
25              MS. KABBASH:  Objection.
```

Page 203

```
 1              THE WITNESS:  Yeah, but our
 2    company --
 3    BY MR. SLATER:
 4         Q.    Isn't it a big difference?
 5              MS. KABBASH:  Objection.
 6              THE WITNESS:  Our company did not
 7    create the procedure.
 8    BY MR. SLATER:
 9         Q.    Your company sold the procedure.
10         A.    A group of expert created a
11    procedure.
12         Q.    With your input, with your company
13    creating the instruments for them, and your company
14    sold it to make money.  Right?  It's a true
15    statement.  Right?
16         A.    Our company --
17              MS. KABBASH:  First of all, Adam,
18    you're getting very argumentative.  Second, let him
19    finish his response before you ask him another
20    question.
21    BY MR. SLATER:
22         Q.    I'll ask you a clean question.
23              Your company took Prof. Jacquetin's
24    work, and then together you developed this procedure
25    over several years, and your company developed the
```

Page 204

```
 1    instruments and then your company sold the Prolift®
 2    as an integrated system to make money.  So your
 3    company was going to profit from it and, frankly,
 4    all the surgeons that worked on this project with
 5    you also stood to gain notoriety and to make money
 6    as well.  So all of you had a financial incentive as
 7    this went forward; isn't that true?
 8              MS. KABBASH:  Objection.
 9              THE WITNESS:  Well, that's a very,
10    very bad vision of this project.  This project was,
11    essentially and first of all, developed to offer a
12    solution as an alternative to a very bad result for
13    other procedures.  That's what was developed.  It
14    was not developed for Prof. Jacquetin, Group TVM to
15    make money or Ethicon to make money.  For the three
16    years of this project, Ethicon was not even aware of
17    my work with these people.
18    BY MR. SLATER:
19         Q.    Let me ask you this.
20              When you put the product out on the
21    market and you represented to surgeons and you
22    represented to patients these are the risks of
23    things that may happen to you, in reality, you
24    really didn't understand the risks very well?
25    Because it was so new, you really didn't understand
```

Page 205

```
 1    very well the risks.  Right?
 2              MS. KABBASH:  Objection.
 3              THE WITNESS:  No.  We perfectly
 4    understood that there was some risk.  The erosion
 5    was not new for Jacquetin and his group, who had
 6    been using meshes for years, so --
 7    BY MR. SLATER:
 8         Q.    But Dr. Arnaud --
 9              MS. KABBASH:  Let him finish.
10              THE WITNESS:  -- erosion was well
11    known.
12    BY MR. SLATER:
13         Q.    It was well known to this group, but
14    they didn't even understand why it was happening?
15              MS. KABBASH:  Objection.
16              THE WITNESS:  Well, you know, very
17    often in medicine, you can imagine in surgery, the
18    number of situation where you have complication.
19    And after half a century, you still do not know why
20    you have this complication.
21    BY MR. SLATER:
22         Q.    But in this case, rather than you
23    sitting there and staying out of it, your company
24    got involved and mass marketed their procedure.
25    There's a big difference than Jacquetin as a doctor
```

52 (Pages 202 to 205)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 206

1   experimenting or doing whatever he was doing off in
2   his hospital in France, it's very different than
3   your company buying the assignment of the patent and
4   selling the product on a mass basis throughout the
5   world.
6           Isn't it very different?
7           MS. KABBASH: Objection.
8   BY MR. SLATER:
9       Q.   You put it in --
10          Because of your company's work, it
11   went into my clients' bodies. It wouldn't have
12   otherwise.
13          MS. KABBASH: Objection.
14   BY MR. SLATER:
15      Q.   Isn't your company a big player in
16   this?
17          MS. KABBASH: Objection.
18   BY MR. SLATER:
19      Q.   Don't you have a role?
20          MS. KABBASH: Objection as
21   argumentative, asked and answered.
22   BY MR. SLATER:
23      Q.   Do you agree with me?
24      A.   You know, very frankly, what I can
25   say is erosion, we knew. Retraction, we knew. I

Page 207

1   don't think we have -- I have done anything to
2   anyone, and our role was not -- because we're only
3   focused on those case who have had very bad result.
4   But there are also a lot of people who have
5   benefitted from this procedure. And in front of
6   that, you know, if you take colporrhaphies, the gold
7   standard, colporrhaphies there is also complication
8   and has a very high rate of recurrence. And when
9   you have a recurrence, you take a reoperation, you
10   take a new risk, and you can also have a lot of
11   complication with this procedure.
12          So I understand that now you're
13   telling me I'm a very bad boy, should never have
14   done that, but I do not feel guilty, because I feel
15   that we have offered to the world a procedure.
16   Maybe things have not gone perfectly well, but, you
17   know, we are not -- I have done anything, we have
18   tried to do our best not to make money, but, first
19   of all, as a doctor, as this group of TVM are
20   doctors, they are absolutely not interested in the
21   money they would make. They have done this work
22   three years, meeting all over the time and never
23   receiving a single Euro from us. And while -- I
24   think the vision you are giving is not
25   representative of what happened.

Page 208

1           MR. SLATER: Let's take a break.
2           THE VIDEOGRAPHER: The time is now
3   3:31. This is the end of Disk Number 3. We are now
4   off the record.
5               - - -
6           (A recess was taken from 3:31 p.m. to
7   3:48 p.m.)
8               - - -
9           THE VIDEOGRAPHER: The time is now
10   3:48. We are back on the record.
11   BY MR. SLATER:
12      Q.   I've given you Exhibit 3005, which is
13   a July 16, 2004 e-mail from Laura Angelini, who
14   you've told me is from marketing, and it was sent to
15   several people, including yourself. Correct?
16      A.   Yes.
17      Q.   The subject line says, "D'Art." Or
18   is it D'Art? How do you pronounce that?
19      A.   D'Art.
20      Q.   D'Art.
21      A.   D'Art.
22          MS. KABBASH: By far says it better
23   than any other witness in this litigation.
24          MR. SLATER: I'm now going to start
25   over. Rephrase.

Page 209

1   BY MR. SLATER:
2       Q.   Now I'm looking at Exhibit 3005 that
3   you have in front of you. It's a July 16, 2004
4   e-mail from Laura Angelini to yourself and several
5   others regarding "D'Art - Conversation with Prof.
6   Jacquetin."
7           And what is that, D'Art? What does
8   that signify?
9       A.   D'Art is one of the nickname of the
10   project I see of the Prolift®.
11          MS. KABBASH: Oh, I'm sorry. I think
12   we have to --
13   BY MR. SLATER:
14      Q.   And Laura Angelini in this e-mail
15   starts off, "Dear All, This is to let you know that
16   today I had a phone conversation with Prof.
17   Jacquetin regarding some of the recent information
18   that have been circulating on TVM."
19          And it's a long e-mail, but I'm going
20   to just draw your attention to a couple specific
21   things. If you go a little bit more than halfway
22   down, there's a sentence that starts, "In
23   particular." So if you go about halfway down, and
24   it's just to the right of the middle of the page, it
25   says, "In particular." And it's up on the screen as

Confidential - Subject to Stipulation and Order of Confidentiality

Page 210

1   well.
2       A.   Okay.
3       Q.   And Laura Angelini says, per Prof.
4   Jacquetin, July 2004, "In particular, in his opinion
5   we should focus on reducing the stiffness of the
6   area after the incorporation of the material and the
7   shrinking effect.  What he is really aiming at (i.e.
8   the unmet need) is to ensure a good sexual activity
9   post surgery especially considering that young women
10  might go into prolapse repair."
11          Do you see that?
12      A.   Yes.
13      Q.   So that was what he was focusing,
14  this should be the focus going forward.  Correct?
15      A.   Correct.
16      Q.   And then if you go down a little bit
17  further, it says, about five lines further down, six
18  lines further down, "He wants us to launch TVM but
19  remain open to look immediately into what can be
20  improved and be proactive and not reactive about
21  that.  And he feels that improvement in the
22  materials is what the next frontier is."
23          Do you see that?
24      A.   Yes.
25      Q.   And you certainly knew that, that was

Page 211

1   Prof. Jacquetin's feeling at that time.  Correct?
2       A.   Yes, yes.
3       Q.   And would you agree with me, that was
4   also your feeling, that there was a need to improve
5   the material, the mesh material, in the Prolift® or
6   in the product that you were developing that
7   ultimately was launched as the Prolift® about eight
8   months later?
9       A.   Yes.  Providing everything is not
10  perfect, you always have a need to improve.
11      Q.   Well, you knew here, about eight
12  months before the Prolift® was actually launched,
13  that there was already a need to improve the mesh
14  material in order to reduce the stiffness of the
15  area of the implant after the material would be
16  incorporated with the body and after the scar tissue
17  would form and the shrinkage would happen.  Correct?
18      A.   Yeah, that's correct.
19      Q.   And if in fact it turned out that you
20  couldn't improve that and you couldn't reduce the
21  shrinking effect, that would have been something you
22  would have had to take into consideration as you
23  went forward and say, well, if we can't reduce this,
24  maybe that's a reason that we should go a different
25  direction.  Right?

Page 212

1           MS. KABBASH:  Objection.
2           THE WITNESS:  What he's saying, he's
3   saying, well, I'm fine with the erosion now, and, of
4   course, again, since there are two complication,
5   erosion and shrinkage, so if he's happy with
6   erosion, he moves to shrinkage, because everybody in
7   life wants to have something perfect.  So in his
8   mind, it seems from what he wrote that he was okay
9   with putting the product on the market, but he was
10  emphasizing that we should in the future -- where we
11  should in the future try to improve the product.
12  And he knew that improving a product was not a
13  matter of a couple of weeks or months.  It could
14  take years.
15          So what I take of this message is,
16  fine, it can go on the market, but we should start
17  to look for a better material.  And I put better in
18  brackets, because in the mind of the doctors, since
19  they were not able to find -- to improve the
20  technique, it mean for them that probably the issue
21  was coming from the material, which, again, as a
22  deduction is not necessarily right.
23          So Prof. Jacquetin is an idealist
24  guy, and he is never satisfied unless he got the
25  perfection.  So he's telling us, well, guys, you

Page 213

1   should work on the new material, but, you know, I
2   was not really 100 percent convinced that any change
3   in the material would lead to no shrinkage.  Why is
4   that?  It's because shrinkage is normal.  Shrinkage
5   of a wound is a normal way of healing.  You know,
6   any wound in the body heal with shrinkage, so --
7   BY MR. SLATER:
8       Q.   But when you have mesh there, it's a
9   very different phenomenon, isn't it?
10      A.   That's what you say, but are you sure
11  about that?
12      Q.   Well, isn't it?
13          MS. KABBASH:  Objection.
14  BY MR. SLATER:
15      Q.   If you put the mesh in, and the mesh
16  is all around the vagina and the bladder and all
17  within the pelvis, and the natural healing is not
18  just limited to where incisions were made but
19  actually is -- you have an inflammatory reaction,
20  which is with the entire mesh.  And that's what
21  happens.  Right?
22      A.   That's what you say.
23      Q.   Well, that's what you know, isn't it?
24      A.   No.  I don't know.
25      Q.   You don't believe --

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 214

1    A.    I know very little.  You know, I'm
2  more a --
3    Q.    Well, I'm going to show you the
4  documents, Doctor.  I mean, so let's make this
5  simple.
6         You know that the Prolift® mesh
7  incites a chronic inflammatory reaction throughout
8  where the Prolift® mesh is, and it's not limited
9  just to the incision sites, it's throughout where
10  the mesh is in the body.  That's happening, so the
11  body is scarring all around all of the mesh,
12  integrating all the mesh, wherever it is in the
13  pelvis.  That's true, isn't it?
14         MS. KABBASH:  Objection.
15         THE WITNESS:  I don't know.
16  BY MR. SLATER:
17    Q.    Well, how else is the mesh going to
18  become integrated and develop a scar net if it's not
19  happening across all of the mesh?  It has to happen
20  with all the mesh, doesn't it?
21    A.    I cannot follow you on that, you
22  know.  It's intimate process of wound healing.  You
23  are making some assumption.  And, well, we need more
24  detailed discussion on that.  I'm not saying you are
25  wrong, but I'm saying, well, I don't know -- I don't

Page 215

1  really understand what you're saying.
2    Q.    Well, a moment ago you said that this
3  was his viewpoint, he's an idealist about switching
4  the material.  But look at the e-mail again.
5    A.    Yes.
6    Q.    Look at the e-mail.  Right below what
7  I just read.  "He feels that improvement in the
8  materials is what the next frontier is."  That's
9  right below where he says, "Remain open to look
10  immediately into what can be improved
11  and...proactive about that."
12         Look at what Laura Angelini says
13  right below that.  "I have mentioned that we agree
14  with him and actually we are already working in that
15  sense, Gene," meaning Gene Kammerer, "I mentioned
16  that you run this effort for Gynecare and offered
17  him to meet you during ICS."
18         In fact, Gene Kammerer was already
19  working on and looking at the potential that
20  Ultrapro® mesh could have lower rates of erosion and
21  lower rates of contraction if used in the Prolift
22  than Gynemesh® PS.  He was already looking at that,
23  wasn't he?
24    A.    Yeah.  Isn't that normal, that a
25  company, knowing that there are -- there are some

Page 216

1  reasons that are not perfect is working for a next
2  generation in order to improve these things.  But
3  Gene was working on that.  But, you know, there is
4  no guarantee that at some point, it will change
5  anything to the picture, because this is, again,
6  with the assumption that the material at the end of
7  the day was important.  And that's something I'm not
8  sure about.  I do not agree with Jacquetin.  You
9  know, on a scientific basis, you need to know the
10  mechanism.  And while it's nice to say Prof.
11  Jacquetin feel that by changing the material we are
12  going to change the way it work, but if I go in the
13  upper part of the message, you know, what he's
14  saying, he's saying, well, now I have a new
15  material, the Prolene® Soft, and the Prolene® Soft
16  I'm very happy, because the erosion rate has
17  decreased.  Nevertheless, I don't know if this is
18  due to the new material or this -- or whether this
19  is due to my improved technique.
20    Q.    Well, shouldn't you, as a company
21  that's going to sell the product, learn the answers
22  to these questions before you put the product on the
23  market and sell it?  Don't you have a responsibility
24  to understand what's happening with your product and
25  your system before you sell it?

Page 217

1         MS. KABBASH:  Objection.
2         THE WITNESS:  To what question are
3  you talking about?
4  BY MR. SLATER:
5    Q.    Well, let's look at what we
6  specifically were talking about here.  Let me
7  withdraw that and I'll ask you a new question.
8         This is eight months before the
9  Prolift® was ever launched.  So it's not like the
10  product was on the market and then somebody came up
11  with the idea, hey, there's a way to improve the
12  material, let's look at it.  This is eight months
13  before you launched it.
14         Didn't you have a responsibility at
15  that point to say, let's look into this and let's
16  figure out what the best material is before we sell
17  this?  Shouldn't that have been what you did?
18         MS. KABBASH:  Objection.
19         THE WITNESS:  If Prof. Jacquetin
20  would have come to us and said, well, look, Axel,
21  this is -- there is a big issue.  The erosion rate
22  is too high.  There are retraction.  I think we
23  should look for a better material.  Then the things
24  would have been different.  But that is not what he
25  was saying.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 218

1    BY MR. SLATER:
2        Q.    Does Prof. Jacquetin run your
3    company?
4        A.    No.
5        MS. KABBASH: Objection.
6    BY MR. SLATER:
7        Q.    Sir, sir, Prof. Jacquetin told you
8    clearly, not just here, but you know he told you
9    multiple times, the shrinkage cannot be fixed with
10   this mesh material. We need to find a different
11   mesh material that won't have this shrinkage,
12   because it's creating an unmet need. We can't
13   ensure good sexual activity post-surgery, especially
14   for young women, any woman but especially for young
15   women who have a long life ahead of them. He told
16   you that.
17           Don't you, as a company, have an
18   obligation to study this and figure the answers out,
19   is this the best mesh? Or maybe we don't sell it,
20   because we can't stop this complication from
21   occurring? Don't you have to look at those
22   questions?
23       MS. KABBASH: Objection, compound,
24   asked and answered, argumentative and
25   mischaracterization.

Page 219

1           MR. SLATER: I'll rephrase. I'll
2    withdraw the question and ask it again.
3    BY MR. SLATER:
4        Q.    This is eight months before the
5    Prolift® was launched. You could have studied other
6    available mesh materials. You could have
7    commissioned a clinical study using different
8    alternatives like Prolift® with Gynemesh® PS,
9    Prolift® with Ultrapro®, Prolift® with another mesh
10   material you thought might be good. You could have
11   studied it for longer. You could have taken some
12   time and tried to figure out what really is the best
13   available mesh material, because there are serious
14   problems with the Gynemesh® PS that we can't fix.
15   We can't fix the shrinkage. So let's take a look
16   and figure it out before we go to market. You could
17   have done that. Right?
18       MS. KABBASH: Objection.
19       THE WITNESS: You could always have
20   done everything. But, you know, at some point,
21   where were we standing there? We're standing with
22   clinical experience. The erosion rate was now fixed
23   to a low level. There was some shrinkage, nothing
24   massive. We have -- when I'm talking about Prof.
25   Jacquetin, I'm not talking -- I'm talking about,

Page 220

1    rather, on the TVM Group. So it's not the opinion
2    of one single person, it's opinion of ten expert or
3    nine or ten expert that were meeting on a regular
4    basis. And none of them told us, you know, you
5    should not go on the market. This is dangerous.
6    This is not at all what we heard.
7           What we heard was, we are very happy.
8    The technique is nice. The erosion rate is fine.
9    We have some retraction. Most of the time it is not
10   an issue. They never found -- they never found
11   these exceptional cases you just mentioned prior to
12   this question. So --
13   BY MR. SLATER:
14       Q.    How do you know they never had a case
15   like that? How do you know they didn't have
16   patients where they couldn't cure the complications
17   from retractions or exposures or erosions?
18       A.    At least on July 16, 2004, I never
19   heard about that and never mentioned that. You
20   cannot find an e-mail I think where they would
21   mentioned such.
22       Q.    So those types of complications, the
23   really serious ones like we've been discussing, they
24   only started happening once the mesh was packaged as
25   the Prolift® and began to be sold, and it was only

Page 221

1    after the Prolift® was on the market that you
2    started to see those types of complications?
3        MS. KABBASH: Objection.
4        THE WITNESS: Usually the
5    exceptional --
6    BY MR. SLATER:
7        Q.    Is that what happened?
8        MS. KABBASH: Objection.
9        THE WITNESS: -- the exceptional
10   complication occur when you sell to a huge lot of
11   people, you know. As soon as you are in a clinical
12   trial, if something occur in 0.001 percent, if you
13   have a study with 100 patients, very unlikely you
14   will find this complication. It's a general
15   principle in medicine. And we have seen that many
16   time.
17          You know, with the slings,
18   exceptional complication occurs. But they occur
19   because they are used by hundred and hundred of
20   thousands of patients. But what you're talking is
21   an exceptional situation. It's very exceptional.
22   So --
23   BY MR. SLATER:
24       Q.    Well, as -- I'm sorry.
25       A.    So maybe in a big country like the

56 (Pages 218 to 221)

Page 222

1    US, you can collect some cases, but what is
2    exceptional is not something that is detected by the
3    clinical trials.
4         Q.    Did you ever -- right now, here we
5    are, November 15, 2012.
6              As you sit here now, did your company
7    ever make an effort to identify how many women would
8    suffer the very serious complications that would
9    cause permanent impairment?
10        A.    I don't know.
11        Q.    Did you ever make an effort to
12   quantify that?
13        A.    I don't know.
14        Q.    And let's look now -- well, let me
15   ask you this.
16             You just testified earlier that Prof.
17   Jacquetin and his group were very happy with their
18   erosion rate that they had established with the TVM
19   technique using Gynemesh® PS.  Right?
20        A.    That's what I read in this e-mail.
21        Q.    Are you aware that their erosion rate
22   at one year in the TVM study, if you counted all the
23   exposures of mesh into the vagina that occurred as
24   of one year, it was 20.7 percent of the women?
25             MS. KABBASH: Objection.

Page 223

1              THE WITNESS:  Yes, I am aware of
2    that.
3    BY MR. SLATER:
4         Q.    And it's your testimony to this jury
5    that that's acceptable to you?  That the top
6    surgeons in the world, the very best, had a
7    20.7 percent erosion rate at one year, yes or no,
8    that's acceptable to you?
9         A.    What I observe --
10        Q.    Is that acceptable to you?
11        A.    Yes.
12        Q.    Let me ask you this.
13             And you knew, you knew, that their
14   erosion rate and their exposure rate would be better
15   and lower than other surgeons who weren't as
16   experienced and didn't have years of working in
17   developing this procedure so you could foresee that
18   likely the erosion and exposure rates out in the
19   community when you marketed this on a widespread
20   basis would be even higher than 20 percent.  You
21   knew that.  Right?
22             MS. KABBASH: Objection.
23             THE WITNESS:  This is not correct at
24   all.
25   BY MR. SLATER:

Page 224

1         Q.    So you didn't anticipate that Prof.
2    Jacquetin and his group would have a lower exposure
3    rate than surgeons out in the community?
4         A.    No.
5              MS. KABBASH: Objection.
6              THE WITNESS:  This is not correct,
7    because --
8    BY MR. SLATER:
9         Q.    Fine.  Your answer's no.
10        A.    -- the study you're mentioning is not
11   performed with the Prolift® system.  It's performed
12   with tools that were very difficult to handle, that
13   were creating some tears in the tissue.  And that's
14   exactly the reason why we developed specific adduct
15   tools, in order to improve the way this procedure
16   was made to avoid the tear in the tissue.  So the
17   20 percent rate is not reflecting the situation with
18   the Prolift®.
19             On top of that, you are talking about
20   a key expert.  But, once again, a key expert that is
21   starting a procedure is a beginner.  He is not --
22        Q.    Doctor, he's been doing the procedure
23   since 2003 when they perfected their procedure,
24   so-called perfected it.  So he had been doing it for
25   over a year.

Page 225

1         A.    Yeah.
2         Q.    And he was the person who created the
3    procedure.
4              Who other than him would be better
5    than him at it?
6         A.    You're right.  But in the trial
7    you're mentioning, is that a trial of Prof.
8    Jacquetin or is that a trial of a group of surgeons?
9         Q.    I'm asking about the TVM study that
10   your company sponsored.
11        A.    Yes, I'm talking about that.  And in
12   the TVM study, it's not a Jacquetin study.  It's a
13   study of a whole group of people who did not
14   necessarily -- who were not necessarily performing
15   the same procedure.  All these eight people are
16   there to learn the new procedure.
17        Q.    Are you saying that --
18        A.    So they were in the learning phase of
19   a procedure.  And despite being in the learning
20   phase with bad instruments, they end up with
21   20 percent of erosion, which, again, is not a killer
22   for the project, because 20 percent of a minor
23   complication, that should not be viewed as a killer.
24        Q.    So you're telling me that the TVM
25   study that the French surgeons performed, they were

57 (Pages 222 to 225)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 226

1  in their learning phase, they were using what you
2  just called, and I'm quoting you, bad tools?
3       A.    Inadequate tools.
4       Q.    Bad tools, inadequate tools.
5  Correct?
6       A.    Yes.
7       Q.    And is it your testimony that you
8  cannot take the TVM studies that were sponsored by
9  your company to study this TVM procedure with the
10 Gynecare PS, you can't use those to project what
11 would happen with the Prolift®?
12       MS. KABBASH:  Objection,
13 mischaracterization.
14       THE WITNESS:  Well, I can't make a
15 projection.  If you give to these people better
16 tools and more experience, it's very likely that the
17 result will improve.  And that's what happened after
18 a while.  You know, they were pioneer using tools
19 that were very rudimentary.  They were -- all of
20 them, most of them, if not Prof. Jacquetin, most of
21 them, including in the US and Europe, they were
22 beginner, beginning, pioneer in a new procedure.  So
23 it's not big surprise that they got 20 percent of
24 erosion rate.  That's not very shocking for me.
25       BY MR. SLATER:

Page 227

1       Q.    So they were pioneers.
2            In essence, this was in the
3  experimental phase?
4       MS. KABBASH:  Objection.
5       THE WITNESS:  This was a clinical
6  trial in the early phase of the project.  So it was
7  a pioneering phase for sure.
8  BY MR. SLATER:
9       Q.    Pioneering, would that be equivalent
10 to experimental?
11       MS. KABBASH:  Objection.
12 BY MR. SLATER:
13       Q.    They were in the experimental phase?
14       A.    They were in clinical research.
15       Q.    Would you consider the TVM study to
16 have been an experimental phase in the development
17 of this procedure, the actual US and French TVM
18 studies?
19       A.    Well, I don't understand what you
20 mean by experimental phase.  It's very simple.  It's
21 a clinical trial to test a new procedure.
22       Q.    When I say experimental, I'm saying
23 there's not enough data to be able to give an
24 expectation to a patient as to what the risks and
25 benefits of the procedure would be, since it's in

Page 228

1  such an early phase that it would be, quote/unquote,
2  experimental.
3            Was that --
4            Is that a fair description of the TVM
5  studies, the US and French?
6       A.    Can you repeat that, because --
7       Q.    Sure.
8       A.    I tell you why we have a --
9       Q.    I'll slow down.
10       A.    Experimental and clinical trial means
11 something different, so please, if you could say
12 that in a --
13       Q.    Would you -- well, rephrase.
14            Was the US and French TVM study
15 experimental in the sense that if a patient were to
16 ask, well, what should I expect my outcome to be,
17 the surgeons would have to say, look, this is really
18 at a phase where we can't give you a good
19 expectation of what the risks are and the benefits.
20 We know what we hope will happen, but we're still
21 learning and still experimenting, so we're not
22 able to give you expectations.
23            Would that be a fair statement for
24 the TVM studies?
25       MS. KABBASH:  Objection.

Page 229

1       THE WITNESS:  I'm not sure I
2  understand, but, you know, for the patient, it
3  was -- they were entering a clinical trial.  In a
4  clinical trial, you do not necessary carry a special
5  risk, you know.  They were operated by the best
6  expert doing a new procedure.  So that's something
7  that happen in medicine every day.
8  BY MR. SLATER:
9       Q.    Were those patients in the TVM study
10 told that the doctors were in their learning phase
11 using what you've termed as bad or inadequate tools
12 and that they could expect an erosion rate
13 potentially of 20 percent or more into their vagina
14 of the mesh?  Were they told those risks?
15       MS. KABBASH:  Objection.
16       THE WITNESS:  Well, I don't have the
17 informed consent, you know, that they received and
18 utilized, but I --
19 BY MR. SLATER:
20       Q.    They should have been told that.
21 Right?
22       MS. KABBASH:  Objection.
23       THE WITNESS:  I guess the surgeon did
24 what they had to do.
25 BY MR. SLATER:

Confidential - Subject to Stipulation and Order of Confidentiality

Page 230

1      Q.     Well, your company --
2          Since you're involved with the trial,
3   your company actually had to pass on each of the
4   informed consent forms.  Right?
5          MS. KABBASH:  Objection.
6          THE WITNESS:  Probably.
7   BY MR. SLATER:
8      Q.    So you would agree the consent forms
9   should have disclosed to the patients that the
10  physicians were in their early learning phase, that
11  the tools were inadequate or bad tools, as you've
12  described them, and that they could expect a rate of
13  exposure of the mesh into their vagina of 20 percent
14  or more?
15         MS. KABBASH:  Objection.
16         THE WITNESS:  Well, no.  I cannot
17  agree with such an exaggerated situation.
18  BY MR. SLATER:
19     Q.    I'm using your words, sir.
20         MS. KABBASH:  Objection.
21         THE WITNESS:  Okay.  Maybe my word
22  were exaggerating then.
23         But, you know, they were using the
24  tools they would have used normally first.  So it's
25  rudimentary tool with regard to the project, but

Page 231

1   this was a tool they were using in their practice.
2   So each surgeon took the tool they were used to use
3   in their practice, so no new tool.  And they were
4   doing a procedure.  So these people were used to do
5   procedure with meshes.  They were not complete
6   beginner.  So they were -- they change their
7   technique.  So, yes, for the patient, it is
8   different than if there were using the technique
9   they were routinely using.
10  BY MR. SLATER:
11     Q.    Did each of the surgeons in the
12  French and US study use different techniques to
13  place the mesh as part of the studies, or did they
14  all follow exactly the same procedure?
15     A.    Well, you know, they try to follow
16  the same procedure, of course.
17     Q.    Was anything ever done to try to
18  monitor to see if any of them were varying the
19  procedure in any way?
20     A.    No.
21     Q.    I'm going to hand you a document I've
22  marked as Exhibit 619.  Well, somebody marked it, it
23  might have been me, at a prior deposition.
24         And this is an e-mail chain from
25  January 11, 2005 to January 13, 2005.  So now we're

Page 232

1   about two months before the Prolift® was launched.
2   And if you could, turn to the second page of the
3   e-mail.
4          On January 11, 2005, here the first
5   e-mail of the chain, you wrote an e-mail to Ophelie
6   Berthier regarding the Prolift® IFU.  Correct?
7      A.    Yes.
8      Q.    And you knew what the IFU was.
9   Right?
10     A.    Yes.
11     Q.    That would be the instructions for
12  use that would be given to doctors so they would
13  understand from Gynecare what are the risks, what
14  are the warnings, what do I need to know, what's the
15  most important information I need to know about the
16  Prolift®.  Right?
17     A.    Yes.
18     Q.    And you wrote in this e-mail,
19  "Ophelie: I suggest to propose to add the following
20  to the new version of the IFU:
21         "WARNING: Early clinical experience
22  has shown that the use of a mesh through a vaginal
23  approach can occasionally/uncommonly lead to
24  complications such as vaginal erosion and retraction
25  which can result in an anatomical distortion of the

Page 233

1   vaginal cavity that can interfere with sexual
2   intercourse.  Clinical data suggest the risk of such
3   a complication is increased in case of associated
4   hysterectomy.  This must be taken in consideration
5   when the procedure is planned in a sexually active
6   woman."
7          And then you close by saying,
8   "Regards Axel."  Correct?"
9      A.    Correct.
10     Q.    And then if we follow the e-mail
11  chain up, we see Ophelie Berthier forwarding that
12  proposed warning that you had written to be included
13  in the IFU to Scott Ciarrocca, who was one of the
14  project leaders on the project.  Correct?
15     A.    Yes.
16     Q.    And the reason you wrote that e-mail
17  and proposed that warning was obviously because you
18  thought it would be a good thing to put it into the
19  IFU.  Correct?
20         MS. KABBASH:  Objection.
21         THE WITNESS:  That's not correct,
22  because the reason for this e-mail is that Ophelie
23  Berthier was working next door to me, asked me
24  assistance, because the TVM Group has found in their
25  early experience that hysterectomy was associated

Confidential - Subject to Stipulation and Order of Confidentiality

Page 234

1   with a higher rate of erosion. So Jacquetin was
2   recommending that we should put this information in
3   the IFU. So Ophelie Berthier was in a hurry because
4   the new IFU was about to be edited, asked me
5   assistance and asked me, Axel, could you just reword
6   the warning section in order to include this
7   information about the associated hysterectomy. So
8   that's what I did. I rewrote the warning and I
9   added this associated hysterectomy information. But
10  then my understanding of this is that it was not
11  included in the new IFU.
12  BY MR. SLATER:
13      Q.    You can actually see, if you go up to
14  the next e-mails in the chain, if you go to the top
15  of the first page of Exhibit 619, that what happened
16  was it was decided by Scott Ciarrocca and Sean
17  O'Bryan that since the IFUs had already been
18  printed, they would put the warning in the next IFU.
19  That's what it says here. Correct?
20      MS. KABBASH: Objection.
21  BY MR. SLATER:
22      Q.    Correct?
23      A.    Yes, but, again --
24      Q.    That's what it says in the e-mail.
25  Right?

Page 235

1       A.    Again, what's important is the
2   difference in between the existing IFU and what I
3   wrote. And the difference for me is only about
4   hysterectomy. So the information about hysterectomy
5   was based on data that were not very strong data,
6   and -- but we thought this still should not be --
7   should be told to the surgeon, because it could be
8   useful. If, for example, they were hesitating to
9   perform a hysterectomy or not to perform a
10  hysterectomy, which is a big debate in this area,
11  they might be inclined to not to do the
12  hysterectomy, because the hysterectomy gave more
13  erosion. So that's the purpose of this -- of all
14  these e-mail chain.
15          And my understanding is that at some
16  point, the people in Somerville said, well, it's too
17  late, the IFU has been printed, but we offer a
18  solution, and the solution is to put that in the
19  prof ed, education material, the surgical technique.
20  We'll introduce that as a warning or we'll inform
21  the -- we will communicate this information by
22  another way than by the IFU.
23      Q.    Okay.
24      A.    That's my understanding.
25      Q.    Let's look at what the e-mail

Page 236

1   actually says when you wrote him -- when you wrote
2   the e-mail and when Ophelie wrote it back in January
3   of 2005. Let's look at the actual words that you
4   folks used.
5       A.    Yeah.
6       Q.    In your e-mail you wrote to Ophelie
7   Berthier and said, "I suggest to propose to add the
8   following to the new version of the IFU."
9           So you're telling her in the e-mail
10  I'm proposing this warning. Correct? That's what
11  the e-mail says. Right?
12      A.    Yes, yes.
13      Q.    And then you write out a detailed
14  warning. Correct?
15      A.    Yes, yes. Because she was asking me
16  to write an IFU that -- a warning that would include
17  the hysterectomy issue. So I wrote it.
18      MR. SLATER: Move to strike from
19  "because" forward.
20  BY MR. SLATER:
21      Q.    So after you send this e-mail to
22  Ophelie Berthier, she forwards it to Scott
23  Ciarrocca. And right there at the top of the second
24  page, she says, "Here is the adding sentence Axel is
25  proposing to incorporate in the IFU."

Page 237

1           So you were proposing to add this
2   language to the IFU. Correct?
3       MS. KABBASH: Objection.
4   BY MR. SLATER:
5       Q.    That is what you were doing. Right?
6       A.    No. I was rewriting the warning in
7   the IFU. It does not mean that this was not already
8   in the IFU. A lot of what I'm writing was obviously
9   in the IFU. The only thing that was not in the IFU
10  was the associated hysterectomy.
11      Q.    Doctor, I know the IFU by heart. So
12  let's not do that. Okay? It doesn't say anything
13  in the IFU about vaginal anatomic distortion. Those
14  words do not appear in the IFU. Correct?
15      A.    Yeah, but, you know --
16      Q.    Doctor, stick with my question.
17      A.    I stick with you.
18      Q.    Those words don't appear in the IFU.
19  Right?
20      A.    Of course not all the words appear in
21  the IFU.
22      Q.    Well, you know what? Let's stick
23  with the words I actually asked you about, with all
24  due respect.
25          Nowhere in the IFU does it say that a

60 (Pages 234 to 237)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 238

1    woman can end up with vaginal erosion and retraction
2    which can result in an anatomical distortion of the
3    vaginal cavity that can interfere with sexual
4    intercourse? It doesn't say that in the IFU.
5    Right?
6              MS. KABBASH: Objection.
7              THE WITNESS: Well, the IFU --
8    BY MR. SLATER:
9        Q.    Doctor, why are you saying "but"?
10   With all due respect?
11             MS. KABBASH: Adam --
12             MR. SLATER: No, no, no.
13             MS. KABBASH: -- let him respond to
14   your question.
15             MR. SLATER: No. Listen. This is
16   what we're going to do.
17   BY MR. SLATER:
18       Q.    You want to go back to France
19   tomorrow, and you're asking me to finish by 3:00.
20   So let's play on a field where you have a shot at
21   it. Okay?
22             If I ask you a yes or no question,
23   don't start the answer with "but" and go off to your
24   talking point, with all due respect, because you're
25   never going to get done, because I'm going to take

Page 239

1    my deposition. Okay? That's what I'm here to do.
2    So I don't care what they told you in the other room
3    to not answer my questions directly. I don't
4    appreciate it. Okay?
5              You're testifying in a trial right
6    now. And you have an obligation to answer my
7    questions directly. So if they want to ask you
8    something later, they can ask you whatever they want
9    when I get done with my deposition. They'll do it
10   then. But if I ask you, is the words -- do those
11   words appear, it's a simple yes or no. If they want
12   to ask you later some other question, they can ask
13   you later. You are never going to get done, with
14   all due respect, if I can't get direct answers to
15   incredibly simple questions.
16             I'm asking you if words that I'm
17   reading appears in the e-mails, for example, I can't
18   get an answer.
19             MR. SLATER: Counsel, I know what
20   you're going to say. I don't care. I'm going to
21   ask a new question and let's hope that we can move
22   forward through this, because I will go all night if
23   I have to and all day tomorrow.
24             So here we go.
25             MS. KABBASH: You will ask a new

Page 240

1    question after I get done putting something on the
2    record.
3              First --
4              MR. SLATER: I don't even want to
5    hear it.
6              MS. KABBASH: I don't care if you
7    want to hear it.
8              MR. SLATER: I don't want to hear it.
9    I'm not getting responsive testimony. I'm not going
10   to stand for it.
11             MS. KABBASH: First of all, please
12   stop asking questions argumentatively and
13   belligerently.
14             MR. SLATER: I'm not doing either
15   one.
16             MS. KABBASH: Second --
17             MR. SLATER: And this is on video,
18   you can hear my voice.
19             MS. KABBASH: -- of all, please stop
20   pointing your finger aggressively at the witness and
21   at me.
22             MR. SLATER: Oh stop.
23             MS. KABBASH: And, third of all,
24   please stop threatening the witness with how long
25   this deposition is going to take.

Page 241

1              MR. SLATER: I am not threatening.
2              MS. KABBASH: His --
3              MR. SLATER: I'm trying to be
4    courteous. And if I can't get direct answers, it's
5    going to be impossible to finish.
6              MS. KABBASH: His obligation is to
7    answer the questions truthfully and completely, not
8    to answer them in the order of words in which you
9    would like.
10             MR. SLATER: I don't understand that.
11   I don't understand that.
12             MS. KABBASH: I'm sorry that you
13   don't understand that.
14             MR. SLATER: If I ask him is today
15   Thursday, and I get a "but" to answer the answer,
16   but, you know, it's closer to Friday -- it's getting
17   close to Friday, is that responsive?
18             MS. KABBASH: I am asking you to take
19   it down a notch, Adam. Okay? I've put my objection
20   on the record. Go ahead.
21   BY MR. SLATER:
22       Q.    All right.
23             Dr. Arnaud, on January 11, 2005, you
24   sent an e-mail to Ophelie Berthier, and you told her
25   you were proposing the following warning be added to

61 (Pages 238 to 241)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 242

1    the Prolift® IFU.  Correct?
2        A.    Correct.
3        Q.    When you used those words, you meant
4    what you were saying.  Right?
5        A.    Yes.
6        Q.    And then she forwarded that warning
7    and that language to Scott Ciarrocca.  Correct?
8        A.    Correct.
9        Q.    And then later in the e-mail chain,
10   you see Scott Ciarrocca and Sean O'Bryan pointing
11   out that since they've already printed the Prolift®
12   IFUs, they're not going to include it in this
13   version, they'll include it in the next revision.
14   Correct?
15       A.    Correct.
16                - - -
17              (A discussion off the record
18       occurred.)
19                - - -
20   BY MR. SLATER:
21       Q.    I'm marking now as Exhibit 1261
22   e-mails from July of 2005.
23                - - -
24              (Deposition Exhibit No.
25       Plaintiff's-1261, E-mail chain, top one

Page 243

1              dated 14 Jul 2005, Bates stamped
2              ETH.MESH.03911629 and ETH.MESH.03909830,
3              was marked for identification.)
4                - - -
5              MR. SLATER:  For the record, 1260
6    just got skipped.
7    BY MR. SLATER:
8        Q.    Now, Exhibit 1261 starts off with an
9    e-mail that was written by Dennis Miller, who was a
10   doctor who worked with Ethicon.  Correct?  An
11   outside doctor who acted as an investigator and a
12   consultant.  Correct?
13       A.    Well, I suppose so, yes.
14       Q.    And following these e-mails from him,
15   Cheryl Bogardus forwarded that on to you and asked
16   you if you could provide some references that Dennis
17   Miller asked for that he wanted to use going
18   forward.  Right?
19       A.    Yes.  Right.
20       Q.    And then you e-mailed back.  And
21   let's go about halfway through your e-mail of July
22   14, 2005.
23              In that e-mail, you say that you
24   agree with some of the things that -- or you agree
25   with Dennis Miller 200 percent, that Jan Deprest

Page 244

1    from Belgium.
2              And who is that?
3        A.    Jan Deprest, he's a gynecologist from
4    Belgium, Leuven, Belgium, and he has a particularity
5    to have a lab.  And the specialization of this lab
6    is to study meshes and biomaterial, but including
7    meshes more specifically.
8        Q.    You point out that "Jan Deprest from
9    Belgium is an exceptional guy, probably the surgeon
10   in the world that know the most about mesh
11   biocompatibility and tolerance."
12              That's what you said.  Right?
13       A.    Yes.
14       Q.    And then a little further down, you
15   say, "I visited him recently with Gene Kammerer."
16              So you're pointing out that yourself
17   and Gene Kammerer met with Jan Deprest.  Correct?
18       A.    Yes, yes.
19       Q.    And you met with him "in order to
20   define how we could start working closer to him.
21   One of the underlying" ideas "we had with Gene is to
22   have him screen for us various mesh prototypes in
23   order to define which would be the best for reducing
24   mesh shrinkage."  Correct?
25       A.    Yes.

Page 245

1        Q.    So, again, in July of 2005 here,
2    you're continuing to try to find a way to reduce
3    mesh shrinkage and particularly with the Prolift® as
4    well.  Correct?
5        A.    Yes.
6        Q.    I'm now going to give you an exhibit,
7    actually, a pair of exhibits.  One is Exhibit 222,
8    which is really just to tell us what the next
9    exhibit is, which is Exhibit 495.
10              And for the record, Exhibit 222 is an
11   e-mail from Giselle Bonet, dated January 17, 2005.
12   And it's with regard to the beta launch meeting to
13   be held January 19th to the 21st.  And it attaches
14   an agenda which shows that on January 19, 2005 you
15   would be presenting a presentation called "Graft or
16   No Graft."  Correct?
17       A.    Yes, that's correct.
18       Q.    And Exhibit 495 is that presentation
19   that you gave during the beta launch, "Graft or No
20   Graft."  Correct?
21       A.    Yes, yes.
22       Q.    And the beta launch meeting was a
23   meeting that was focused on the initial launch of
24   the Prolift®, which was targeted to a selected small
25   group of surgeons.  Correct?

Confidential - Subject to Stipulation and Order of Confidentiality

Page 246

1    A.    Yeah, yes. I think it's correct.
2    Q.    And let's look at the "Graft or No
3  Graft" presentation.
4          We have up on the screen now the
5  cover of your PowerPoint that you gave January 19,
6  2005 at the beta launch meeting. Correct?
7    A.    Correct.
8    Q.    And let's turn now to the first page
9  after the cover.
10          When you gave that presentation, the
11  question one you put in there, right on the first
12  page, "Surgery or Abstention."
13          That's the first question that would
14  have to be asked. Right?
15    A.    Absolutely.
16    Q.    And then on the next page, you have a
17  scale weighing the risks and the benefits.
18          And that's a question that any
19  surgical decision has to ask is what are the risks
20  and benefits of the options for this patient.
21  Correct?
22    A.    Cannot agree more than that with you.
23    Q.    Let's go to the next page.
24          The next page, you have a Latin term
25  at the top, it's pronounced primum non nocere?

Page 247

1    A.    Yes.
2    Q.    What does it mean?
3    A.    First of all, do not harm.
4    Q.    First do no harm?
5    A.    Do no harm, yes.
6    Q.    And that's a principle that
7  physicians are supposed to follow at all times.
8  Correct?
9    A.    It is correct.
10    Q.    It's a principle that a company like
11  Gynecare or Ethicon should follow as well. Correct?
12    A.    If physicians follow it, the company
13  should follow it.
14    Q.    And under first do no harm, you say,
15  "Pelvic organ prolapse is a functional disorder not
16  a life threatening disease."
17          And you're saying that because you
18  want to put it in perspective. Correct?
19    A.    Correct.
20          MS. KABBASH: Objection.
21  BY MR. SLATER:
22    Q.    And number one you say, "Abstention
23  is always a possibility." Right?
24    A.    Right.
25    Q.    Abstention is always a possibility

Page 248

1  meaning you don't need to have surgery because,
2  again, it's a functional disorder, not a
3  life-threatening disease. Correct?
4    A.    Yes. You know, what I mean surgery
5  is not -- you can always -- it's not
6  life-threatening, so you're not going to die with
7  this. So surgery is not mandatory. It's just your
8  choice.
9    Q.    And then you say number 2, under the
10  heading of "Primum non nocere," first do not harm,
11  you say, "Whatever the treatment, it must not create
12  serious complications." Right?
13    A.    Yes.
14    Q.    And that was a principle that you
15  certainly feel applies to surgeons. Correct?
16    A.    Yes.
17    Q.    And you certainly believe that with
18  any system or procedure or product that Gynecare or
19  Ethicon would market, that principle should hold
20  true as well. Correct?
21          MS. KABBASH: Objection.
22          THE WITNESS: This is the absolute
23  goal of a surgeon.
24  BY MR. SLATER:
25    Q.    In marketing any procedure or any

Page 249

1  device, certainly Gynecare and Ethicon, if they're
2  going to offer it, they would not want to be
3  offering something that's going to create serious
4  complications. Correct?
5          MS. KABBASH: Objection.
6          THE WITNESS: Again, you know, any
7  time you talk about surgery, you can have serious
8  complication. Everything is a matter of how often
9  does that happen. You know, this is the ultimate
10  objective of a surgeon and should be the ultimate
11  objective of a company.
12          Now, we are not in an ideal world.
13  Even with the best procedure, the lightest
14  procedure, the less dangerous procedure, you may end
15  up with something wrong. That's, you know, the
16  general situation in surgery.
17          So what I'm writing there is my
18  philosophy, and I guess the philosophy of my company
19  is, of course, in what we are doing, we are trying
20  to do the best for the patients.
21  BY MR. SLATER:
22    Q.    Did you know at that time when you
23  gave this presentation that the use of the Prolift®
24  could result in serious complications for patients,
25  complications related to the Prolift® procedure and

63 (Pages 246 to 249)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 250

1  the Prolift® instruments and the Prolift® mesh
2  itself?
3      A.     Forever, I've always known that
4  Prolift® being a surgical procedure could lead in
5  complication and, in the worst case, could be
6  bad complication.  But that's not -- that's not
7  specific to Prolift®.
8          MR. SLATER:  Move to strike from
9  "but" forward.
10  BY MR. SLATER:
11      Q.    With regard to the Prolift®, and with
12  regard to the procedure, the actual technique and
13  method, the mesh itself and the instruments that
14  your company sold for the unique use with the
15  Prolift®, what were the serious complications you
16  knew, as of the launch of the Prolift®, that could
17  occur due to the Prolift® surgery?
18      A.    There are two aspect in your
19  question.  There are complication we knew because
20  they occurred, and there are complication we could
21  anticipate.  You know, for example --
22      Q.    I just want a list, the best list you
23  can give me.
24      A.    No.  I give you an example.  You pass
25  needles through the obturator foramen.  So even in

Page 251

1  the clinical trial, you have had no complication.
2  But you know from a large experience in passing a
3  needle in the foramen, in the obturator foramen, in
4  the TVT-O®, that it could happen that maybe you can
5  hurt the pudendal nerve.  So I know that probably it
6  is something that can happen.  Is it going to
7  happen?  I don't know.  But you know any time you
8  operate someone, something might go wrong.
9          So your question, you know, was I
10  aware of a potential complication?  Yes, I was aware
11  of complication that have already occurred, like
12  erosion; but I could also imagine other
13  complication, as I told you, including death,
14  because there is an anesthesiology, so death is a
15  potential complication.
16          So if I understood you correctly, I
17  should have stop everything by saying, well, first
18  primum non nocere.  We know that it's a functional
19  disease, we know that the patient can die from the
20  anesthesia, so stop it, no operation, death, finish.
21  This project is dead.  And the surgeon should not
22  operate these people.
23          The fact is that the surgeon operate
24  people with prolapse and get sometimes bad result,
25  whether they use a mesh or not a mesh.  You know, if

Page 252

1  you perform a colporrhaphy, you can end up with a
2  death, you can end up with complication, so -- but
3  that's not -- does not mean that the guy who made
4  the colporrhaphy is not following this nice
5  principle primum non nocere, but, of course, after a
6  while you could say, oh, if I knew I would have had
7  this complication, I should not have operated this
8  lady.  That's fine, but that's not practical.
9          MR. SLATER:  Move to strike.
10  BY MR. SLATER:
11      Q.    One of the things your company had to
12  decide was, are we going to put the Prolift® systems
13  on the market and sell it to be put into patients'
14  bodies.  You had to make your own independent
15  assessment of whether or not you felt that the risks
16  were outweighed by the benefits such that would you
17  sell this.  Right?
18      A.    Yes, yes, absolutely.
19      Q.    And when you did that, what was your
20  understanding, at the time the product was first
21  marketed, as to the Prolift®-specific complications,
22  the serious complications, that could occur as a
23  result of a woman having a Prolift® put in her body
24  with the Prolift® technique, inclusive of the
25  Prolift® mesh and the Prolift® instruments?  What

Page 253

1  were the serious complications that could result
2  from that, if you're able to tell me?
3      A.    Serious complication, I can give you
4  a very long list of what could have happened.  You
5  know, any -- you pass a needle.  So you pass a
6  needle, not only one, you pass two, three, three
7  passage.  So any time you pass a needle, if you --
8  you can catch a vessel, you can catch a nerve, you
9  can catch the bowel, the bladder, you know.  There's
10  plenty of risk.  The issue -- the question is how to
11  manage them.  Is Prolift® a procedure that is
12  sufficiently reproducible, sufficiently well
13  described in order to make this complication remain
14  exceptional?
15          MR. SLATER:  Move to strike.
16  BY MR. SLATER:
17      Q.    Can you go to the page that's titled
18  "Hazards of the Use of Grafts for Vaginal POP
19  Repair"?
20                  - - -
21          (A discussion off the record
22          occurred.)
23                  - - -
24          THE WITNESS:  I got it.
25          MS. KABBASH:  Axel, next time you

Confidential - Subject to Stipulation and Order of Confidentiality

Page 254

1    have to put page numbers on your presentations.
2        THE WITNESS: Yes.
3    BY MR. SLATER:
4        Q.    In the "Graft or No Graft"
5    presentation you presented to the beta launch
6    meeting on January 19, 2005, one of the slides says,
7    "Hazards of the Use of Grafts for Vaginal" prolapse
8    "Repair."
9        And the first hazard you listed is
10   "Graft Infection." Correct?
11       A.    Correct.
12       Q.    And that was one of the risks that
13   you knew at the time, that the mesh could become
14   contaminated and lead to an infection. Correct?
15       A.    Yes.
16       Q.    The second hazard you listed is
17   "Vaginal Erosion." Correct?
18       A.    Yes.
19       Q.    And then you list three ways that you
20   question that it may occur, "infectious," "ischemic"
21   or "mechanical." Correct?
22       A.    That's what we already discussed.
23       Q.    And the third hazard you listed is
24   "Vaginal Retraction." Correct?
25       A.    Yes.

Page 255

1        Q.    When you refer to vaginal retraction,
2    what are you referring to? Are you talking about
3    where the mesh retracts and causes an anatomic
4    distortion of the vagina?
5        A.    I'm talking about, you know, there is
6    a dissection. We put a mesh. There is a wound
7    healing, and the wound healing process might be
8    excessive and lead to some kind of retraction, of
9    local retraction.
10       Q.    If you go forward about another ten
11   pages, there's a heading that says, "Reasons to be
12   Cautious about Biological Grafts."
13       Number 7. It's number 7.
14       A.    This one?
15       Q.    Yep.
16       A.    Got it. Oh, yes.
17       Q.    In your presentation, part of your
18   presentation was with regard to biological grafts.
19   Correct?
20       A.    Yes.
21       Q.    And with regard to those, you're
22   saying to the people at the meeting, you need to
23   be -- people need to be cautious about those,
24   because there's a "Lack of Long-Term Outcome Data."
25   Correct?

Page 256

1        A.    Correct.
2        Q.    That's because you believe any time
3    there's any sort of a graft, whether it's synthetic,
4    biologic or anything, if there's a lack of long-term
5    outcome data, you need to be cautious about using
6    that. Correct?
7        MS. KABBASH: Objection.
8        THE WITNESS: Well, this is
9    different. You know, we are talking about a
10   biological graft. So biological graft are very new
11   product. You know, synthetic grafts have been used
12   since the 1960s, where biologic graft are just brand
13   new, maybe a couple of years. So I'm just
14   emphasizing in this slide that with biological
15   graft, there is a lack of long-term data, you know.
16   Nobody knows exactly what it's going to be in the
17   long term. Why, we have much more long-term data
18   with meshes. Polypropylene meshes have been used
19   since the 1960s. And the first implantation was in
20   the 1940s, so that's what I mean.
21   BY MR. SLATER:
22       Q.    You had no long-term data for the
23   Prolift® itself when it was launched. Correct?
24       MS. KABBASH: Objection.
25       THE WITNESS: Well, the Prolift® is a

Page 257

1    procedure, you know. We had long-term data about
2    polypropylene mesh. It has been used forever.
3    BY MR. SLATER:
4        Q.    Is the answer to my question yes, you
5    had no long-term data regarding the Prolift® when
6    you launched it?
7        MS. KABBASH: Objection.
8        THE WITNESS: No. We had no
9    long-term data, because, of course, we launched it,
10   so how can you have long-term data if you launch a
11   product? We had long-term data about the material
12   used in the product.
13       MR. SLATER: Move to strike from
14   "because" forward.
15   BY MR. SLATER:
16       Q.    I'm now going to show you --
17       I'll hand you an exhibit I marked as
18   485 at a prior deposition. And this is a document
19   titled "Next Generation Mesh Discussion, March 10,
20   2005."
21       And you attended this meeting along
22   with a few other people, including Gene Kammerer.
23   Correct?
24       A.    Yes. I just try to remember where it
25   was, but yes, probably. If my name is there,

65 (Pages 254 to 257)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 258

1  there's no doubt I was there.
2      Q.    And right in number 1, under "Current
3  Priorities," it says, "For competitive reasons, the
4  most immediate need is to complete a Technical
5  Assessment of Ultra-Pro and compare with GYNEMESH PS
6  to determine if Ultra-Pro could be an alternative or
7  additional material suitable for Pelvic Floor
8  Surgery."
9          Do you see that?
10     A.    Yes.
11     Q.    When they talk about competitive
12  reasons, they're talking about competition with
13  other manufacturers.  Correct?
14     A.    Sorry?
15     Q.    When you talk about competitive
16  reasons, that signifies competition with other
17  manufacturers.  Correct?
18     A.    Yes.
19     Q.    And it says, "The most immediate need
20  is to complete a Technical Assessment of Ultra-Pro"
21  to "compare" that "with GYNEMESH PS" to see "if" the
22  "Ultra-Pro could be an alternative or additional
23  material" as compared to Gynemesh® PS.  Correct?
24     A.    Correct.
25     Q.    This is the subject that had been

Page 259

1  discussed going back into 2004 by Gene Kammerer.
2  Correct?
3      A.    Yes.  It does not change, you know.
4  Same discussion was going over and over.
5      Q.    I'm now going to show you a document
6  we've marked as Exhibit 1187.
7          Exhibit 1187 is a document titled
8  "Use of ULTRAPRO Mesh for Pelvic Organ Prolapse...
9  Repair through a Vaginal Approach."  And it's
10  authored by yourself and Gene Kammerer May 13, 2005.
11  Correct?  Correct?
12     A.    Sorry, sorry.  Yes, correct.
13     Q.    No problem.
14         Let's look at the beginning under
15  "Background."
16         In the fourth line or fifth line,
17  actually, you point out that "Mesh exposure is
18  rather common."
19         Do you see that?
20     A.    Yes.
21     Q.    So to represent to patients or
22  physicians that mesh exposure was rare or that there
23  was only a slight risk of mesh exposure would be
24  incorrect.  Right?
25         MS. KABBASH:  Objection.

Page 260

1          THE WITNESS:  To say that to who?
2  BY MR. SLATER:
3      Q.    To say to doctors or to patients that
4  mesh exposure, there's only a slight risk, would be
5  inaccurate, because as you state here, it's rather
6  common.  Correct?
7          MS. KABBASH:  Objection.
8          THE WITNESS:  Well, if I would talk
9  to a doctor and to a patient, I would make a
10  distinction.
11  BY MR. SLATER:
12     Q.    Well, it would be completely
13  misleading to say to a patient, for example, in a
14  patient brochure for the Prolift® that there's only
15  a slight risk of mesh exposure since, as you state
16  here, it is rather common.  Correct?
17         MS. KABBASH:  Objection.
18         THE WITNESS:  Well, I don't feel that
19  is correct.  Because, you know, it's a matter of
20  perspective.  If you talk to a patient, if you
21  consider that the erosion is going to occur in
22  10 percent of the case, on a patient perspective,
23  you mean that in nine case out of ten you won't have
24  the erosion.  So it's not very common.  It's rare.
25         If you speak to a surgeon who operate

Page 261

1  500 cases a year and he got 10 percent of erosion,
2  he's going to get 50 such women coming back to his
3  office, saying, well, look, Doctor, I have a problem
4  with the erosion.  So in a surgeon's perspective,
5  it's not uncommon, it's something that occur, if you
6  see what I mean.
7  BY MR. SLATER:
8      Q.    You said in this document on May 13,
9  2005, two months after the Prolift® was put on the
10  market, that mesh exposure is rather common.  Right?
11     A.    Yeah, it's rather common.  I'm not
12  saying it's common, it's very common, it's rather
13  common.  It's not something very rare.  And, you
14  know, we are always talking about the same thing.
15  We are talking about something in the range of 5 to
16  15 percent.  So how can I qualify that?  Not --
17  isn't it true that this is rather common, 5 to
18  15 percent?  I think it's the good wording.
19     Q.    In your wording, rather common
20  doesn't mean slight.  Right?
21         MS. KABBASH:  Objection.
22         THE WITNESS:  Slight?  I have a
23  problem with the English.  Slight, what does that --
24  BY MR. SLATER:
25     Q.    Slight, very small.

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Stipulation and Order of Confidentiality

Page 262

1    A.    Very small.
2        MS. KABBASH: Objection.
3        THE WITNESS: No. Rather common
4    means that, you know, it can occur on a regular
5    basis. It's not something that you see once a year.
6    BY MR. SLATER:
7        Q.    A little further down you say, "Mesh
8    retraction," which you say in quotes, ('"shrinkage')
9    is a more uncommon complication but it is considered
10   more serious. It can cause a vaginal anatomic
11   distortion, which may eventually have a negative
12   impact on sexual life. Its treatment is difficult."
13       That's what you wrote in this report.
14   Correct?
15       A.    Yes.
16       Q.    And you knew at that point that the
17   treatment of mesh retraction, also known as
18   shrinkage, is difficult. Right?
19       A.    Yeah, of course. You know, I don't
20   know, but I suspect it was not easy. You know, as a
21   surgeon, I imagine if you put a mesh anywhere in the
22   body, if you want to remove it, it's difficult for
23   just one reason. It's because the mesh is, by
24   essence and by design, a matter that is incorporated
25   and not encapsulated. If it was encapsulated, it

Page 263

1    would be very easy. You just take a forceps and
2    take it off. If it is incorporated, by definition,
3    the excision will be more difficult, because there
4    is no dissection plan.
5        Q.    It can be a very damaging surgery
6    when you have to try to remove, or when the surgeon
7    has to try to remove, retracted or shrunken mesh
8    that is causing complications. That can cause a lot
9    of damage to the patient, just removing the part of
10   the mesh. Right?
11       MS. KABBASH: Objection.
12       THE WITNESS: Of course. But the
13   purpose of putting a mesh in the body is not to
14   remove it. It's to cure a disease. If for any
15   reason you are to remove part of it, it can be more
16   or less difficult, depending where is the part that
17   you need to remove. You know, if it's very
18   superficial, it may be very easy. If it is in the
19   depths of the obturator foramen, then it might be
20   difficult. I don't know. But I just as a surgeon
21   can say, well, it could be easy, but in sometime it
22   will be difficult. And I can imagine difficult
23   situation.
24   BY MR. SLATER:
25       Q.    Did you ever make an effort to

Page 264

1    specifically speak to surgeons who were experienced
2    in removing Prolift® mesh when women had
3    complications to try to learn from them the
4    difficulties they faced in actually removing the
5    mesh? Did you actually specifically look into that
6    issue at any time?
7        A.    We did not specifically do that,
8    because, you know, it's something --
9        Q.    I didn't ask you why. I just asked
10   if you did it.
11       You said you didn't. Right?
12       A.    We didn't.
13       Q.    I'm going to show you an exhibit
14   that's been marked at a prior deposition.
15       I show you an exhibit that was marked
16   at a prior deposition, Exhibit 287. And what that
17   is is a photograph of mesh that was removed from a
18   woman at the Mayo Clinic in Rochester, Minnesota, a
19   woman who was having complications. And that's mesh
20   that had actually been removed from her body. And
21   you can see the mesh with the tissue and the blood
22   and the fibrosis, everything right on it.
23       You see that. Right?
24       A.    Yes.
25       Q.    When the Prolift® was launched, did

Page 265

1    you understand that there were women who would have
2    complications that would cause surgery that would be
3    invasive enough that something like that would have
4    to be cut out of their body? Did you understand
5    that at the time of launch?
6        MS. KABBASH: Objection.
7        THE WITNESS: You know, we have
8    already discussed that, but this, for me, you know,
9    as a surgeon, is nothing very, very rare, you know.
10   It's a piece of mesh that has been resected. It
11   could be something that occur in urinary repair.
12   And any time you use a mesh, you can end up with a
13   complication that oblige you to remove part of the
14   mesh. So this is not something -- it's regrettable
15   but not something that really is extremely shocking
16   for me.
17   BY MR. SLATER:
18       Q.    So you knew at the time of the launch
19   of the Prolift® that this would be the result of
20   surgery for women, some women, who would have
21   complications due to the Prolift®. That was known
22   at the time the product was launched by you.
23   Correct?
24       MS. KABBASH: Objection.
25       THE WITNESS: At the time we launched

67 (Pages 262 to 265)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 266

1    the Prolift®, we knew that implanting a mesh in the
2    human body, whether you do it in the inguinal area,
3    in the abdominal wall, in the vaginal wall, may
4    result in the need to remove it.
5           So your question, I can say, yes, we
6    knew, because it's obvious that when you implant
7    something, you might have, if something -- if
8    something goes wrong, to excise it.
9    BY MR. SLATER:
10          Q.    You knew that in order to remove mesh
11   to this extent, that would take, in many cases, a
12   great deal of surgical skill by the surgeon who
13   would have to now try to remove part of the mesh.
14   Correct?
15          A.    Correct.
16          Q.    And it would, therefore, be important
17   to tell the surgeons who were going to consider
18   using this on their patients that they would need to
19   be familiar with how to treat these complications
20   and how to do this type of surgery.  Correct?  You
21   want to tell them.  Right?
22          A.    No, no, this is not correct for me,
23   because, you know, surgeon are not children.  You
24   know, they know -- when you are a responsible
25   surgeon, when you implant something in the body, you

Page 267

1    cannot tell me that a normal surgeon do not ask
2    himself how he's going to remove it if something
3    goes wrong.  This is absolutely basic, you know,
4    ethical responsibility of any surgeon.  So no
5    surgeon is relying on Ethicon to know how to remove
6    the Prolift® if it does not go smoothly.  You know,
7    I cannot agree with you on that.
8          Q.    Are you --
9                Is it your viewpoint that any surgeon
10   who would be able to put a Prolift® in would be
11   proficient enough to remove mesh such as this?
12          A.    Well, again, if you don't feel you
13   are competent enough to assume both the operation
14   and the consequence of the operation, then you
15   should not carry it.
16          Q.    Did your company ever explain, with
17   regard to the Prolift®, what it would take and what
18   could be the difficulties in actually removing
19   Prolift® mesh from a woman's body if necessary, part
20   of the mesh, revising part of the mesh, for example,
21   like this, did your company, in a copy reviewed
22   material, something official from the company, ever
23   explain that?
24          MS. KABBASH:  Objection.
25          THE WITNESS:  Ever explain, you mean

Page 268

1    how it -- how difficult it would be?
2    BY MR. SLATER:
3          Q.    What you would actually be -- need to
4    do in order to safely and effectively, if possible,
5    remove mesh like this?  Did your company ever in an
6    official document explain that?
7          A.    No.  Because it is impossible to
8    explain what kind -- you know, a complication might
9    occur anywhere.  So how can a company says --
10   describe the way you should remove this part or this
11   part or this part.  It's just impossible.  It is
12   just basic surgery.
13          If you have a complication in the
14   obturator foramen, well, you're a surgeon.  You need
15   to go there.  And it is not a company is going to
16   tell you how to remove the mesh.  You know, I cannot
17   agree with you, because the surgeon, if he use it,
18   he put it in place, he should know how to do without
19   complication.  That's the basis of surgery.  Like a
20   guy who pilot a plane, he should be able to take
21   care of the plane whatever the weather condition
22   are.  You know, if the condition are bad, you cannot
23   say, oh, the manufacturer of the plane did not tell
24   me that the -- what to do when there is a storm.
25   That's I think a fair comparison.

Page 269

1           You know, if I'm a surgeon, it is my
2    responsibility to put this in the body, but also my
3    responsibility to know how to remove it, or at least
4    then if I don't know, I can always ask for
5    assistance by a senior surgeon, by an expert.  But,
6    you know, I don't think it would come to the mind of
7    a surgeon facing a case where he need to remove the
8    mesh in a very difficult area to ask Ethicon how to
9    do it.
10          Q.    Well, Ethicon never even tried to
11   figure out whether there was any suggestions that
12   could be given to surgeons to help them to safely
13   and effectively remove Prolift® mesh.  That's
14   something Ethicon never made an effort to do.
15   Correct?
16          MS. KABBASH:  Objection.
17          THE WITNESS:  Well, I don't think we
18   ever did that, you know, because, you know, we sell
19   suture.  We don't put in the IFU how to remove a
20   suture if there is a complication, because this is
21   just basic principle of surgery.
22          MR. SLATER:  Move to strike from
23   "because" forward.
24   BY MR. SLATER:
25          Q.    The removal of Prolift® mesh when a

68 (Pages 266 to 269)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 270

1    woman has complications can go way beyond basic
2    surgery or even sophisticated surgery can become
3    incredibly complex.  Right?
4        A.    Right.
5        Q.    Now, looking at Exhibit 1187 again,
6    the one in front of you, you have a line towards the
7    bottom of the first page, under "Physical Comparison
8    to Gynemesh PS," "In summary our conclusions are
9    that placing the UltraPro within the pelvic floor as
10   a direct substitution for the Gynemesh PS is very
11   reasonable."  Correct?
12       MS. KABBASH:  You know what, Adam?
13   I'm sorry, I lost you.  Can you tell me where you
14   are again?  Sorry.
15   BY MR. SLATER:
16       Q.    In Exhibit 1187, your May 13, 2005
17   report on the use of Ultrapro® mesh for pelvic organ
18   prolapse repair through a vaginal approach, you say,
19   in the bottom of the first page, "In summary our
20   conclusions are that placing the UltraPro within the
21   pelvic floor as a direct substitution for the
22   Gynemesh PS is very reasonable."
23       That's the conclusion you drew in
24   this document.  Correct?
25       A.    Yes.

Page 271

1        MR. SLATER:  Go off the video.
2        THE VIDEOGRAPHER:  The time is now
3    5:01.  We are going off the record.
4             - - -
5        (A recess was taken from 5:01 p.m. to
6        5:15 p.m.)
7             - - -
8        THE VIDEOGRAPHER:  The time is now
9    5:15.  We are back on the record.
10            - - -
11       (Deposition Exhibit No.
12       Plaintiff's-1262, E-mail chain, top one
13       dated 25 May 2005, Bates stamped
14       ETH.MESH.03911617 and ETH.MESH.03911618,
15       was marked for identification.)
16            - - -
17   BY MR. SLATER:
18       Q.    I've given you Exhibit 1262, which is
19   two e-mails in May of 2005.  The first e-mail Cheryl
20   Bogardus wrote to you May 23, 2005.
21       Who is she?
22       A.    US marketing person.
23       Q.    And she asked you for some
24   information regarding the history of the adoption of
25   mesh in the hernia market to see if it would help

Page 272

1    her to be able to project how many physicians would
2    start to use mesh for vaginal repair of prolapse.
3    Correct?
4        A.    Yes.
5        Q.    And you say in your e-mail back to
6    her, "We must be careful in comparing prolapse and
7    hernia repair."
8        That's right up at the top.  Right?
9        A.    Yes.
10       Q.    You say that you see more of a
11   similarity between hernia repair and the adoption of
12   mesh for that as compared to the use of mesh for
13   stress urinary incontinence.
14       That's what you say.  Correct?
15       A.    Yes, yes.
16       Q.    Then we go down to the bottom, where
17   it says, "Prolapse repair."  You say at the first
18   bullet point, there's a little asterisk, "The
19   procedure which we bring is well described, it makes
20   sense but it is not as easy to reproduce and to
21   perform as the TVT or the Lichtenstein," which was a
22   hernia procedure.  Correct?
23       A.    Yes.
24       Q.    And then in the next bullet point,
25   you say, "With the procedure," talking about the TVM

Page 273

1    procedure, "it is very likely that the recurrence
2    rate will decrease but there is a price to pay for
3    that which is the possibility of mesh-related
4    complications, such as mesh exposure and possible
5    dyspareunias; neither Lichtenstein nor TVT were
6    associated with mesh-related complications."
7        That's what you state.  Correct?
8        A.    Yes.
9        Q.    So you're basically differentiating
10   and saying that with the TVM procedure and the use
11   of mesh to treat prolapse through the vagina, there
12   are differences that make it less comparable to the
13   use of mesh for hernia or for stress incontinence.
14   Correct?
15       MS. KABBASH:  Objection.
16       THE WITNESS:  Yes.
17   BY MR. SLATER:
18       Q.    Then on the next page, going over in
19   terms of projecting how many surgeons would adopt
20   the use of mesh for the treatment of prolapse
21   through the vagina, you basically said that she
22   should stay conservative, and she had projected
23   ultimately over the next ten years, 36 percent of
24   the repairs being the use of mesh through the
25   vagina.  And you basically say, you know, based on

69 (Pages 270 to 273)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 274

1  what I've just analyzed for you, you think that's a
2  reasonable projection over the next ten years, the
3  36 percent.  Correct?
4      A.    Correct, yes.
5      Q.    And that's in May of 2005.  Correct?
6      A.    Yes.
7      Q.    Now I'm going show you a document
8  we've marked as Exhibit 439.  And this is a couple
9  e-mails in November of 2005.  And on the second page
10  is your e-mail of November 23, 2005 to Giselle Bonet
11  regarding, "Subject:  PROLIFT improvements," Dr.
12  Eberhard from Switzerland.
13         And you talk about the fact that he's
14  someone you had an interesting meeting with, he's "a
15  very good surgeon with a large experience with both"
16  the "Perigee and" the "Anterior Prolift," and you
17  point you out he had performed over 70 Prolifts®.
18  Correct?
19      A.    Yes, yes.
20      Q.    And you point out in fact that he's
21  what you call a good friend of Gynecare.  Right?
22      A.    Yes.
23      Q.    And you say the reason why you
24  visited him relates to suggestions he wanted to make
25  regarding Prolift® improvement here in November of

Page 275

1  2005.  Correct?
2      A.    Yes.
3      Q.    A little further down, you know, he
4  talks a little about his preferences according to
5  what you relayed here.  And a little further down
6  there's a sentence that says, "I also tried to
7  explain that our device is designed to be safe even
8  in the less skilled hands."
9         Do you see that, about halfway
10  through?
11      A.    Yes, yes.
12      Q.    And that's one of the design goals of
13  the Prolift®, it was intended that it would be used
14  by less skilled surgeons, not just the most highly
15  skilled?
16      MS. KABBASH:  Objection.
17      THE WITNESS:  Yes.  Of course, we
18  were not interested in providing a device for the
19  ten more experienced surgeon in the world.  We would
20  like to have a broader market.
21  BY MR. SLATER:
22      Q.    He points out to you in point 2,
23  you're relating obviously what he said, that he
24  believed the guide was too sharp.  And you describe
25  that.  Correct?

Page 276

1      A.    Yes, correct.
2      Q.    You say, "This is unnecessary,"
3  according to Prof. Eberhard, and it "presents a risk
4  for the vessel or bowel perforation," and he had
5  suggested a blunter guide.  Correct?
6      A.    Yes, yes.
7      Q.    Also, Prof. Eberhard suggested "A
8  plastic sheath (as in" the "TVT) would protect the
9  straps during the procedure."  Right?
10      A.    Yes.
11      Q.    He also, one of his criticisms was
12  that "The curvature of the guide is not ideal in
13  particular for the anterior superficial passage."
14  Correct?
15      A.    Yes.
16      Q.    And then he pointed out in number
17  5 -- well, rephrase.
18         In this e-mail of November 23, 2005,
19  when you're relating Jacob Eberhard, Prof. Jacob
20  Eberhard's criticisms of the Prolift®, you listed
21  number 5.  You say, "He believes that, after
22  retrieval of the cannula, the straps take a
23  rope-like shape which is not optimal in his
24  opinion."
25         Do you see that?

Page 277

1      A.    Yes, yes.
2      Q.    And that's referring to when the
3  cannula is actually pulled back off of the mesh, it
4  actually looks like it's roped and actually is a
5  rope-like shape.  Correct?
6      A.    Correct.
7      Q.    Next I'm going to show you an exhibit
8  I've marked as Exhibit 807.  This is January 12,
9  2006, minutes of a telephone conference.  And I can
10  tell you, I'm simply going to ask you just two or
11  three questions, so I think you'll be okay without
12  having to read through the whole document.
13         At the very beginning, with regard to
14  TVM, David Robinson "reported on his and" Cyrus
15  Guidry's "review of the French data received from
16  PJ," and that would be Peter Jones, according to the
17  people who attended this meeting.  Correct?
18      A.    Probably, yes.
19      Q.    And it says, "Failure rate 18.6%.  US
20  study failure rate appears to be 13.3% at this
21  stage."
22         Do you see that?
23      A.    Yes, yes.
24      Q.    And when they're talking about
25  failure rate, they're talking about anatomic

70 (Pages 274 to 277)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 278

1      recurrence of prolapse.  Correct?
2          A.    Yes, yes.
3          Q.    And it says here, David Robinson's
4      "opinion is that these rates are presentable; could
5      be better, but not a disaster."
6              Do you see that?
7          A.    Yes.
8          Q.    Certainly that's not a ringing
9      endorsement of the efficacy of the Prolift®, that
10     the failure rates in the two studies were
11     18.6 percent, 13.3 percent, and one of the medical
12     directors in Ethicon Women's Health & Urology was
13     saying the rates could be better, but they're not a
14     disaster.  Right?
15             MS. KABBASH:  Objection.
16             THE WITNESS:  Right.  That's what is
17     written.
18     BY MR. SLATER:
19         Q.    And then further down, there's a
20     heading, "Prolift."  "Agreed that it is still to
21     continue unaffected by TVM output."
22             Do you see that?
23         A.    I see it, but I'm not sure I
24     understand what it mean, agreed --
25             Okay.

Page 279

1          Q.    And what that's referring to is,
2      despite the disappointing data coming from the TVM
3      study, it was agreed by this group to continue to
4      market the Prolift®.  Correct?
5              MS. KABBASH:  Objection.
6              THE WITNESS:  Yes.
7      BY MR. SLATER:
8          Q.    Let me give you what we've marked as
9      Exhibit 808.  And this is a chain of e-mails in
10     which you are copied on some of them, starting with
11     the e-mail at the bottom of the first page.  And I'm
12     going to go actually deeper into the chain, to an
13     earlier e-mail.  It's actually the first one in the
14     chain, which is at the end, from Bob Roda to Peter
15     Meier and several other people.  And it's dated
16     January 24, 2006.
17             Who is Bob Roda?
18         A.    Bob Roda is a marketing person from
19     the US.
20         Q.    He points out in this e-mail,
21     "Peter" -- and he's writing to Peter Meier.
22             Who's Peter Meier?
23         A.    Peter Meier is -- he's a medical
24     doctor that works in the R&D for Gynecare in Europe.
25         Q.    Is he somebody that you've worked

Page 280

1      with in the past?
2          A.    Yes.
3          Q.    Is he somebody who you respect?
4          A.    Yes.
5          Q.    And here Bob Roda says to Peter
6      Meier, and obviously copies a few other people, the
7      subject is "TVM discussions."
8              "Peter, I am coming back from the TVM
9      meeting in Paris and wanted to reach out to you
10     regarding a few ideas."
11             Do you see that?
12         A.    Yes, yes.
13         Q.    Do you remember a meeting that took
14     place in Paris in January 2006 to talk about issues
15     with the Prolift®?
16             MS. KABBASH:  Objection.
17             THE WITNESS:  I don't.  I had so many
18     meeting, but --
19     BY MR. SLATER:
20         Q.    Do you recall that in January 2006,
21     there was concern with the company, based not only
22     on the results of the TVM study, but also on the
23     information you were getting back from surgeons and
24     from the adverse event reporting, there were
25     concerns that the Prolift® needed to be modified or

Page 281

1      something needed to be done if it was going to stay
2      on the market?
3              MS. KABBASH:  Objection.
4              THE WITNESS:  Well, I don't recall
5      that.  I don't think there was anything very new,
6      you know.  We were aware of erosion, of contraction,
7      and the discussion was ongoing, how to improve --
8      improve the situation.
9      BY MR. SLATER:
10         Q.    I'm going to put up a part of this
11     e-mail on the screen.  And this is the first
12     paragraph.  It says, "Peter, I am coming back from
13     the TVM meeting in Paris and wanted to reach out to
14     you regarding a few ideas.  The group is strongly
15     looking forward to the potential for new materials
16     for the Prolift product."
17             And when they talk about "the group,"
18     that's the TVM Group.  Correct?
19         A.    Yes.
20         Q.    And it says, "Their main concern is
21     the" belief "that the Prolene Soft material" -- and
22     the Prolene® Soft material is the material in the
23     Prolift®.  Correct?
24         A.    Correct.
25         Q.    "Their main concern is the" belief

71 (Pages 278 to 281)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 282

1    "that the Prolene Soft material over time contracts.
2    Thus creating the potential for failures and/or
3    erosions. What they would like to see is what
4    materials that we might be able to create that would
5    provide the scaffolding for the repair without the
6    limitations they feel Prolene soft has."
7            Do you see that?
8        A.    Yes.
9        Q.    And this is the concern that the TVM
10   Group and Prof. Jacquetin in particular were
11   expressing going back to May of 2004. I showed you
12   those materials earlier. Correct?
13       A.    Yes.
14       Q.    So the same discussion is still going
15   on, can we find another material that will reduce
16   these complications. That conversation is still
17   going. Right?
18       A.    Yes, yes.
19       Q.    I'm now going to show you a document
20   we've marked as 1263.
21             - - -
22           (Deposition Exhibit No.
23       Plaintiff's-1263, E-mail chain, top one
24       dated 25 Oct 2006, Bates stamped
25       ETH.MESH.03915722 through

Page 283

1        ETH.MESH.03915725, was marked for
2        identification.)
3             - - -
4    BY MR. SLATER:
5        Q.    This is an e-mail from Ophelie
6    Berthier to you, at least that's at the top of the
7    first page, forwarding you the first draft of the
8    clinical strategy for Project Lightning.
9            Do you see that?
10       A.    Yes.
11       Q.    And Project Lightning was the code
12   name that your company came up with for the project
13   that ultimately resulted in the replacement of the
14   Gynemesh® PS mesh material with Ultrapro®, which was
15   marketed as the Prolift+M®. Correct?
16       A.    Yes.
17       Q.    And this is the concept that had been
18   discussed going back to 2004 in some e-mails that
19   we've seen. Correct?
20       A.    Yes, yes.
21       Q.    And in this clinical strategy, if we
22   look, there is a discussion of the fact that the
23   mesh, through the TVM technique, according to this
24   strategy says, "It significantly reduces recurrences
25   compared to traditional POP repairs," but "it can

Page 284

1    lead to other complications such as mesh exposure
2    and mesh retraction."
3            Do you see that?
4        A.    Yes.
5        Q.    And what it says here is, "Mesh
6    exposure is a common complication which can be
7    managed by excision and closure." Correct? That's
8    what it says here?
9        A.    Yes, yes.
10       Q.    So, again, we see your company
11   internally recognizing that mesh exposure is common.
12           Do you see that?
13       A.    Yeah. We've already discussed that.
14   You know, instead of playing on words, common,
15   rather common, more common, very common, the company
16   knew that the rate of erosion was something around
17   10 percent, so...
18       Q.    The next thing this document says,
19   "Mesh retraction ('shrinkage') is less common but it
20   is considered more serious. It can cause vaginal
21   anatomic distortion, which may eventually have a
22   negative impact on sexual function. Its treatment
23   is difficult. Additionally, the scar plate that
24   forms with in-growth of tissue into the mesh can
25   cause stiffness of the vagina that further impacts

Page 285

1    sexual function in a negative manner."
2            Do you see that?
3        A.    Yes.
4        Q.    And it was understood that with the
5    Prolift®, this was a problem that your company was
6    attempting to address and had been attempting to
7    address for two years. Right?
8            MS. KABBASH: Objection.
9            THE WITNESS: Yes. It has been
10   attempting to address it since the beginning of the
11   project, because this was known before, before we
12   even start the project. Any time you operate
13   someone through the vagina, even more if you put a
14   mesh inside, you could end up with excessive
15   scarring retroaction. In a sexually active woman,
16   it could have no impact, but it could also have some
17   kind of impact. There is nothing new in this
18   e-mail, you know, with regard to what we have
19   already discussed.
20   BY MR. SLATER:
21       Q.    Doctor, when you say there's nothing
22   new, you're not saying just because it's understood
23   that there are certain complications with regard to,
24   for example, the Prolift® that was developed, that
25   that makes it acceptable to you, just because the

Confidential - Subject to Stipulation and Order of Confidentiality

Page 286

1  complications are known to occur.  Right?
2      MS. KABBASH:  Objection.
3  BY MR. SLATER:
4      Q.    Reask the question?
5      A.    Yes, please.
6      Q.    Sure.
7          When you say, well, the complication
8  was known, you're not saying just because it's known
9  that a complication can occur, that makes it
10 acceptable.  Right?
11     A.    A complication can be acceptable, can
12 be accepted in surgery.  Again, I take a comparison.
13 If you open the abdomen, you end up with 15 percent
14 of incisional hernia.  This is a complication that
15 occur in 15 percent of the case.  It's a serious
16 complication.  Nevertheless, it is accepted when a
17 surgeon opens the abdomen everywhere in the world
18 every day.
19         So, you know, I think there is a
20 misunderstanding between us, but a complication does
21 not -- the word "complication" does not necessarily
22 mean it is very serious issue.  It can be a
23 complication that is accepted because it is
24 tolerable, because when you put it in the
25 benefit/risk balance, it does not bring the balance

Page 287

1  in the wrong position.
2      MR. SLATER:  Move to strike the
3  discussion of abdominal surgery.
4  BY MR. SLATER:
5      Q.    With regard to the Prolift®, your
6  company had to do a risk/benefit analysis and decide
7  whether or not, from your company's perspective, the
8  complications were acceptable before you would put
9  it in the market and represent to the world it's a
10 safe product.  Right?
11     MS. KABBASH:  Objection.
12     THE WITNESS:  Yes.  Probably.
13 BY MR. SLATER:
14     Q.    And in doing that, and in making that
15 decision to say we're going to sell the Prolift®, it
16 was done understanding that mesh exposure was a
17 common complication, and mesh retraction, which was
18 less common than exposure, was more serious, it
19 could cause vaginal anatomic distortion, which could
20 have a negative impact on sexual function, and that
21 the treatment of that complication is difficult.
22         That was all known.  Correct?
23     A.    Yes, that was all known.
24     Q.    It was also known, as stated here,
25 that, "The scar plate that forms with in-growth of

Page 288

1  tissue into the mesh can cause stiffness of the
2  vagina that further impacts sexual function in a
3  negative manner."
4          That was known.  Right?
5      A.    Yes.
6      Q.    And then it says here, "In an effort
7  to minimize these complications, the use of a
8  lighter-weight alternative mesh for" pelvic organ
9  prolapse "repair is being explored.  This mesh would
10 serve to replace the Gynecare Gynemesh PS used
11 within the Gynecare Prolift Pelvic Floor Repair
12 system." Right?
13     A.    Yes.
14     Q.    That was the purpose of Project
15 Lightning and ultimately resulted in the Prolift+M®.
16 Correct?
17     A.    Yes.
18     Q.    And this was something that was being
19 discussed in your company a year or more before the
20 Prolift® even was put on the market.  Right?
21     A.    Yes.  That was discussed even before
22 we put it on the market.
23     Q.    If we look now at Exhibit 1157.
24         I'm just going to take you --
25 rephrase.

Page 289

1          Exhibit 1157, which I put in front of
2  you, at the top of the first page is an e-mail from
3  Gene Kammerer dated February 13, 2006.  And he wrote
4  it to you and some other people regarding "TVM
5  discussions," these discussions that had taken place
6  in Paris.  And he says, "This would be an excellent
7  opportunity to gather some voice of customer for"
8  next generation "mesh, and to resurrect the
9  project."
10         And at the bottom of that e-mail,
11 towards the bottom, there's a paragraph that says --
12 we're going to put it up on the screen.
13         The paragraph says, "I met with both
14 Dr. Cosson and Prof. Jacquetin at the Paris meeting
15 in 2004.  They expressed and interest in a new mesh
16 to control and reduce scar contraction.  This led
17 us, Axel and I to investigate the" Ultrapro® versus
18 Prolene® Soft "conversion.  The results of the
19 investigation showed us that it could be done and we
20 could possibly get an enhanced product.  The team
21 wanted to move forward, but then everyone got
22 re-assigned, and so the project kind of went into
23 limbo."
24         And that is what happened.  Correct?
25     MS. KABBASH:  Objection.

Confidential - Subject to Stipulation and Order of Confidentiality

Page 290

1    THE WITNESS: I don't know if the
2  project went into limbo, because at the end of the
3  day, it finally came on the market.
4  BY MR. SLATER:
5    Q.    Well, the project is now just
6  starting to again be discussed two years later.
7  Right?
8    MS. KABBASH: Objection.
9    THE WITNESS: Yes.
10  BY MR. SLATER:
11    Q.    And that project is a follow-on to
12  discussions that took place with Prof. Jacquetin and
13  Cosson in 2004, where they had expressed an interest
14  in a new mesh to control and reduce scar
15  contraction. Right?
16    MS. KABBASH: Objection.
17    THE WITNESS: Yes, they expressed
18  interest.
19    MS. KABBASH: I think we probably
20  want to stop in the next couple minutes, Adam.
21    MR. SLATER: I have about three more
22  documents, four more documents, so why don't we do
23  that.
24    MS. KABBASH: Well, let's see how
25  long it goes. I don't want to take too much longer.

Page 291

1    MS. SCALERA: Let's start and see --
2    MR. SLATER: I don't care about the
3  time.
4    MS. SCALERA: Let's not go past 20
5  minutes.
6    MR. SLATER: Oh, we'll be done in 20
7  minutes.
8    MS. KABBASH: Are you okay for
9  another 20 minutes?
10    THE WITNESS: Yes, yes.
11    MR. SLATER: He wants to keep going.
12    I would if I was you. That's smart,
13  rather than going nuts tomorrow afternoon.
14    THE WITNESS: I'm warm now,
15  so...
16    MS. KABBASH: As long as you're okay.
17    - - -
18    (Deposition Exhibit No.
19  Plaintiff's-1264, E-mail chain, top one
20  dated 10 Nov 2006, Bates stamped
21  ETH.MESH.03915831 and ETH.MESH.03915832,
22  was marked for identification.)
23    - - -
24  BY MR. SLATER:
25    Q.    Exhibit 1264 at the top is an e-mail

Page 292

1  from Ophelie Berthier to you dated November 10,
2  2006. And she just says, for your information.
3  She's forwarding you another e-mail. Right? Do you
4  see that?
5    A.    I think so.
6    Q.    The e-mail she forwarded you had been
7  written by Allison London Brown, marketing
8  director -- worldwide marketing director from
9  Ethicon Women's Health & Urology. Right?
10    A.    Right.
11    Q.    And I want to draw your attention to
12  her 2007 priorities. One of the things she says is,
13  "Need clinical immediately on UltraPRO - prove
14  concept of less dense mesh." And then she says --
15    Do you see that?
16    A.    Yes.
17    Q.    So she's looking to get clinical
18  backup as soon as possible to support the concept of
19  Ultrapro®. Correct?
20    A.    Yes.
21    Q.    And then she says, "PROLIFT data -
22  either internal or external - needed for continued
23  market development and acceptance."
24    So she's looking for data to be
25  developed and provided to help to develop the

Page 293

1  marketing to give to surgeons to try to persuade
2  them to use the Prolift®. Right?
3    MS. KABBASH: Objection.
4    THE WITNESS: Well, to develop the
5  acceptance of the product, of the procedure,
6  because -- it was not obvious, you know. It's a big
7  move. From colporrhaphy to this procedure is a big
8  move. So it's normal that we have to make effort
9  to -- if we want to be successful with this
10  procedure.
11  BY MR. SLATER:
12    Q.    And this is not at the point of
13  launch, of course. This is a year -- more than a
14  year-and-a-half after the product had been launched
15  already. Right? After the Prolift® procedure had
16  been launched?
17    A.    Yes.
18    Q.    And then the next thing she says, let
19  me ask you about that. She says, "We will build
20  market awareness and push" -- excuse me, let me
21  start over.
22    In this e-mail where the subject is
23  "2007 Priorities for" pelvic floor repair, at the
24  end of the e-mail, she says, "We will build market
25  awareness and push education on the 'Mesh is not

Confidential - Subject to Stipulation and Order of Confidentiality

Page 294

1  Bad' message throughout the year with efforts around
2  PFA and continue to drive sales of PROLIFT and
3  GYNEMESH PS."
4      Do you see that?
5  A.   Where is PFA?
6      MS. KABBASH:  This line.
7      THE WITNESS:  Yes.
8  BY MR. SLATER:
9  Q.    So part of the marketing strategy for
10 2007 was to get out a message to doctors that mesh
11 is not bad.  Right?
12     MS. KABBASH:  Objection.
13     THE WITNESS:  Right.
14 BY MR. SLATER:
15 Q.    I am going to give you a document --
16 I'm going to mark it, because I don't have marked
17 copies, as Exhibit 1265.  And I'll just state for
18 the record this is the same document that was
19 previously marked as Exhibit 1099.
20             - - -
21     (Deposition Exhibit No.
22     Plaintiff's-1265, E-mail chain, top one
23     dated 15 Nov 2006, Bates stamped
24     ETH.MESH.03160750 through
25     ETH.MESH.03160752, was marked for

Page 295

1        identification.)
2             - - -
3  BY MR. SLATER:
4  Q.    And what I'd like to do is draw your
5  attention to the second page where you wrote an
6  e-mail on November 13, 2006.  And the subject of
7  your e-mail is "Pelvic Floor/Mesh Strategy."
8      Do you see that, page 2?
9  A.   Yes.
10 Q.    You point out in the first paragraph
11 under "Lightning," which, again, was the product
12 that led to the Prolift+M®.  Correct?
13 A.   Sorry?
14 Q.    Lightning was the project that led to
15 the Prolift+M®.  Correct?
16 A.   Yes.
17 Q.    You say in that paragraph in part,
18 second sentence, "We set up a meeting with some
19 experts, including" Jan "Deprest and we asked them
20 how we could improve the Prolift mesh."
21     Do you see that?
22 A.   Yes.
23 Q.    And Jan Deprest is this person who
24 you told me earlier is one of the foremost experts
25 regarding biocompatibility of meshes?

Page 296

1  A.   Exactly, yes.
2  Q.    And you say, "It came up that there
3  are two issues with Prolift:  erosion and
4  shrinkage."  Right?
5  A.   Yes, yes.
6  Q.    So, again, there's this recurring
7  issue of erosion and shrinkage with Prolift® which
8  goes back all the way to the beginning that was
9  issues that you knew you were going to deal with,
10 with this product and this system.  Correct?
11     MS. KABBASH:  Objection.
12     THE WITNESS:  Yes.
13 BY MR. SLATER:
14 Q.    And it says, "Regarding erosions,
15 whether a change in the mesh could result in any
16 improvement is unknown as there is no certitude that
17 the problem is mesh-related.  It could as well be a
18 surgical issue."
19     Again pointing out that you still
20 don't have an understanding really of exactly what
21 leads to mesh erosion?  There's just theories?
22 A.   Yes.  We still don't have it in 2012.
23 Q.    And then you say, "The responsibility
24 of the mesh seems to be more established regarding
25 a "shrinkage and further to the expert's discussion,

Page 297

1  it was speculated that Ultrapro could be a solution
2  for this problem, which is less common but can be
3  more severe than erosion."
4      And this was confirmed to you in the
5  meeting with Jan Deprest who, again, you had said
6  you have great respect for who's a worldwide
7  authority.  Correct?
8  A.   Correct.
9      MR. SLATER:  You can take that
10 document down.
11 BY MR. SLATER:
12 Q.    I'm handing you a document I've
13 marked as exhibit -- wait a second.  We may have
14 just gone through that, so one second.
15     MR. SLATER:  Go off the video for a
16 second.
17     THE VIDEOGRAPHER:  The time is now
18 5:45.  We are going off the record.
19             - - -
20     (A discussion off the record
21     occurred.)
22             - - -
23     (Deposition adjourned at
24     approximately 5:48 p.m.)
25

75 (Pages 294 to 297)

Confidential - Subject to Stipulation and Order of Confidentiality

Page 298

```
 1              CERTIFICATE
 2
 3          I, ANN MARIE MITCHELL, a Notary
 4   Public and Certified Court Reporter of the State of
 5   New Jersey, do hereby certify that prior to the
 6   commencement of the examination, AXEL ARNAUD, MD was
 7   duly sworn by me to testify to the truth, the whole
 8   truth and nothing but the truth.
 9          I DO FURTHER CERTIFY that the
10   foregoing is a verbatim transcript of the testimony
11   as taken stenographically by and before me at the
12   time, place and on the date hereinbefore set forth,
13   to the best of my ability.
14          I DO FURTHER CERTIFY that I am
15   neither a relative nor employee nor attorney nor
16   counsel of any of the parties to this action, and
17   that I am neither a relative nor employee of such
18   attorney or counsel, and that I am not financially
19   interested in the action.
20
21
22   _____
23   ANN MARIE MITCHELL, CRR, RDR, CCR
     Notary Number: 2356252
24   Notary Expiration: February 22, 2017
     CCR Number: 30XI00212000
25
```

Page 300

```
 1        - - - - - -
           E R R A T A
 2        - - - - - -
 3   PAGE LINE CHANGE
 4   ___ ___ _____
 5   REASON _____
 6   ___ ___ _____
 7   REASON _____
 8   ___ ___ _____
 9   REASON _____
10   ___ ___ _____
11   REASON _____
12   ___ ___ _____
13   REASON _____
14   ___ ___ _____
15   REASON _____
16   ___ ___ _____
17   REASON _____
18   ___ ___ _____
19   REASON _____
20   ___ ___ _____
21   REASON _____
22   ___ ___ _____
23   REASON _____
24   ___ ___ _____
25   REASON _____
```

Page 299

```
 1        INSTRUCTIONS TO WITNESS
 2
 3          Please read your deposition over
 4   carefully and make any necessary corrections. You
 5   should state the reason in the appropriate space on
 6   the errata sheet for any corrections that are made.
 7          After doing so, please sign the
 8   errata sheet and date it.  It will be attached to
 9   your deposition.
10          It is imperative that you return the
11   original errata sheet to the deposing attorney
12   within thirty (30) days of receipt of the deposition
13   transcript by you.  If you fail to do so, the
14   deposition transcript may be deemed to be accurate
15   and may be used in court.
16
17
18
19
20
21
22
23
24
25
```

Page 301

```
 1
 2        ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do hereby
 5   certify that I have read the foregoing pages, 1 -
 6   302, and that the same is a correct transcription of
 7   the answers given by me to the questions therein
 8   propounded, except for the corrections or changes in
 9   form or substance, if any, noted in the attached
10   Errata Sheet.
11
12
13   _____
14   AXEL ARNAUD, MD        DATE
15
16
17   Subscribed and sworn
     to before me this
18   _____ day of _____, 20____.
19   My commission expires:_____
20
21   _____
     Notary Public
22
23
24
25
```