# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

IN RE: C. R. BARD, INC., PELVIC        MDL NO. 2187
REPAIR SYSTEM PRODUCTS
LIABILITY LITIGATION

**THIS DOCUMENT RELATES TO:**

---

**ALL WAVE 9 CASES IDENTIFIED IN
EXHIBIT A**

---

## DEFENDANT C.R. BARD'S MOTION TO EXCLUDE OR LIMIT CERTAIN OPINIONS AND TESTIMONY OF BRUCE ROSENZWEIG, M.D.

**GREENBERG TRAURIG, LLP**
Terminus 200
3333 Piedmont Road, N.E., 25th Floor
Atlanta, Georgia 30305
(678) 553-2100

**REED SMITH LLP**
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071
(213) 457-8000

*Attorneys for Defendant C. R. Bard, Inc.*

COMES NOW Defendant C. R. Bard, Inc. ("Bard"), and, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, respectfully moves the Court for an order excluding the expert opinions and testimony of Plaintiff's proffered expert, Dr. Bruce Rosenzweig, M.D.

This Motion, as explained in more detail in the attached Memorandum of Law in Support, is based on the grounds that the Court should exclude opinions for which Dr. Rosenzweig does not have a reliable basis and/or that are not supported by sufficient facts or data. Dr. Rosenzweig should also not be permitted to offer opinions that were not disclosed in his Rule 26 Expert Report or disclaimed in deposition. This motion is supported by the Memorandum of Law in Support, attached exhibits, and all other papers and pleadings on file in this action.

WHEREFORE, for the reasons set forth above and in the accompanying Memorandum of Law in Support, Bard respectfully requests that this Court enter an Order excluding the opinions and testimony that Dr. Rosenzweig may provide at trial.

Dated: August 15, 2019

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

/s/ Lori G. Cohen

Lori G. Cohen
Terminus 200
3333 Piedmont Road, N.E., Suite 2500
Atlanta, Georgia 30305
(678) 553-2100
CohenL@gtlaw.com

Michael K. Brown
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, California 90071-1514
(213) 457-8000
mkbrown@reedsmith.com

*Attorneys for Defendant C. R. Bard, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2019, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

*/s/ Lori G. Cohen* _____

Lori G. Cohen
GREENBERG TRAURIG, LLP

*Attorney for Defendant C. R. Bard, Inc.*

# EXHIBIT A

| PLAINTIFF | CURRENT CIVIL ACTION # | WAVE |
|---|---|---|
| Carillo, Cathleen | 2:13-cv-29841 | 9 |
| Cespedes, Pastora | 2:13-cv-21538 | 9 |
| Chrastecky, Donna | 2:12-cv-06841 | 9 |
| Katsiafas, Gladys E. | 2:13-cv-13586 | 9 |
| Santiago, Jenny | 2:13-cv-10496 | 9 |
| Smith, Becky | 2:15-cv-16402 | 9 |
| Wilson, Wanda | 2:13-cv-32972 | 9 |

Case 2:12-md-02327   Document 752-1   Filed 06/18/19   Page 1 of 924 PageID #: 11745

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

IN RE: C.R.BARD, INC. PELVIC REPAIR

SYSTEMS PRODUCTS LIABILITY

LITIGATION

MDL NO. 2187

THIS DOCUMENT RELATES TO ALL WAVE 1 AND WAVE 2 CASES

### <u>RULE 26 EXPERT REPORT OF BRUCE A. ROSENZWEIG, M.D.</u>

The following report is provided pursuant to Rule 26 of the Federal Rules of Civil Procedure.

## I.  Qualifications

I am currently an Assistant Professor of Obstetrics and Gynecology at Rush University Medical Center in Chicago, Illinois. I received my MD degree in 1984 from the University of Michigan in Ann Arbor, Michigan. Following graduation from medical school, I completed an Obstetrics and Gynecology Residency at Michael Reese Hospital in Chicago. In 1988, I attended a one year pelvic surgery fellowship at State University of New York in Syracuse, New York. Following that fellowship, I attended a two year Urogynecology and Urodynamics fellowship at UCLA Harbor General Hospital in Torrance, California. After graduating from the Urogynecology fellowship, I became a faculty member at the University of Illinois in Chicago. I

started an Urogynecology program at the University of Illinois and also was the residency program director.

In 1998, I went into private practice, and subsequently established a private practice at Rush University Medical Center. I have also worked at John H. Stroger Hospital here in Chicago from May 2003 until November 2010 and Weiss Memorial Hospital as Associate Chair of Gynecology from February 2011 until July 2012. I have published numerous articles and given numerous lectures on the topics of pelvic organ prolapse, urinary incontinence and repair of pelvic organ prolapse.

Throughout my career, I have performed over a thousand pelvic floor surgical procedures, including abdominal sacrocolpopexy, uterosacral suspensions, sacrospinous ligament fixations, native tissue repairs, biological graft repairs and synthetic mesh repairs. I have also used numerous synthetic pelvic mesh products. In addition, I have performed over 300 surgeries dealing with complications related to synthetic mesh.

I was invited and attended a Bard Avaulta training seminar. In addition, I was also invited by Ethicon to train and attended both its Gynecare Prolift Training Seminar and TVT Obturator Seminar in Belgium.

A copy of my CV and Fee Schedule is attached as Exhibit "A" and a copy of my testimony for the last four years is attached as Exhibit "B". The documents I relied on for this report are contained in Exhibit "C" as well as those documents cited throughout this Report.

## I.      Summary of Opinions

In formulating my opinions and preparing this report, I reviewed scientific literature, corporate documents from Bard, sample products, depositions of Bard employees and have used

my experience, training and general knowledge of the gynecology literature over the last 20 years.  The corporate documents, sample products and depositions were supplied to me by counsel.  A list of Bard corporate documents and depositions reviewed for this report is attached hereto as Exhibit "B"; all other materials reviewed are listed at the end of this report. All opinions I have are to a reasonable degree of medical and scientific certainty.  I understand discovery is still ongoing in this case and I reserve my right to amend my opinions if further information is provided in any form including, but not limited to corporate documents, depositions and the expert reports of both Plaintiff and Defense experts.

In general, my expert opinions can be summarized as follows[1]:

A) Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence because it was never meant to be used inside the human body, it degrades, causes chronic foreign body reactions, fibrotic bridging, mesh shrinkage, deformation, rolling, curling, folding, cording and roping of the mesh;

B) Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence due to the lack of adequate studies supporting its safety and efficacy including Bard's lack of consideration of problems and complications associated with implanting its products through the obturator space;

C) Bard's Disclosures of Warnings, Adverse Reactions and mesh complications in its Align Instructions for Use ("IFU") were inadequate based on the adverse reactions/risks and mesh complications known to Bard from the time the Align was first sold and marketed until present day;

D) Bard did not disclose information to physicians in its IFUs regarding characteristics of the polypropylene in Align's mesh that make it unsuitable for its intended application as a permanent prosthetic implant for stress urinary incontinence, including that it degrades, causes chronic foreign body reactions, fibrotic bridging, mesh shrinkage, deformation, cording, rolling, roping and curling of the mesh;

E) Bard did not inform physicians and their patients that Manufacturer Safety Data Sheets (MSDSs) for the polypropylene resin used to manufacture the Align polypropylene mesh warned against use of the mesh in a permanently implanted

---

[1] This is not intended to be an exhaustive recitation of my opinions in this case. The full scope of my opinions is described in further detail in this report.

medical device and that is was not to be exposed to peroxides (which exist in a woman's pelvis);

F) Bard's Patient Brochures overstate the benefits of the Align, understate the risks and misstate information related to success rate.

## II. <u>Background</u>[2]

### 1. *Stress Urinary Incontinence*

Approximately one of three women over the age of 45 years old has some form of urinary incontinence. The majority of those women do not seek medical advice or treatment for a variety of reasons.

In a continent individual, increased abdominal pressure is evenly distributed over the bladder, bladder neck, and urethra. The urethral sphincter is thus able to withstand this pressure and maintain continence. In a person with pure stress urinary incontinence, either the urethra is hypermobile and/or the sphincter is intrinsically deficient. In urethral hypermobility, the urethrovesical junction (UVJ) is displaced extra-abdominally, and the increased intra-abdominal pressure is unevenly distributed such that the sphincter can no longer withstand the pressure and urine leaks. With intrinsic sphincter deficiency (ISD), the UVJ may not be hypermobile; however, the maximal urethral closing pressure, the Valsalva leak-point pressure, or both are too low to withstand the increase in intra-abdominal pressure and, thus, urine leaks past the sphincter

Stress urinary incontinence (SUI) is the involuntary leakage of urine during moments of physical activity that increases abdominal pressure, such as coughing, sneezing, laughing, or

---

[2] See generally, FDA.gov (2013) Stress Urinary Incontinence, , WebMD.com (2013) Mechanical Devices for Urinary Incontinence in Women, Netdoctor.com (2013) Stress Urinary Incontinence Pelvic Floor Exercises, Emedicine-Medscape.com (2013) Burch Colposuspension and Womensdoctor.com (2013)
Burch Procedure and Paravaginal Repair, Emedicine-Medscape.com (2013) Vaginal Sling Procedures and Womensdoctor.com (2013) Burch Procedure and Paravaginal Repair, Wikipedia.org (2013) Urinary Incontinence.

exercise, in the absence of a bladder contraction. It has been estimated that 14% of women have SUI. SUI is a common type of urinary incontinence in women. Urodynamic proven SUI is found in approximately 50 % of women presenting for evaluation of urinary incontinence. Symptomatic women with SUI have social or hygienic consequence from their urine loss. SUI can happen when pelvic tissues and muscles, which support the bladder and urethra, become weak and allow the bladder "neck" (where the bladder and urethra intersect) to descend during bursts of physical activity (urethral hypermobility). This descent can prevent the urethra from working properly to control the flow of urine. SUI can also occur when the sphincter muscle that controls the urethra weakens(intrinsic sphincter deficiency). The weakened sphincter muscle is not able to stop the flow of urine under normal circumstances, and when there is an increase in abdominal pressure. Weakness may occur from pregnancy, childbirth, aging, or prior pelvic surgery. It has been estimate that a majority of women have a combination of urethral hypermobility and ISD. Other risk factors for SUI include chronic coughing or straining, constipation, obesity and smoking. Finally occult or latent SUI is defined as a positive stress test, loss of urine with increased intra-abdominal pressure and between 350-450cc volumes in the bladder, after the repositioning of pelvic organ prolapse (usually accomplished with a ring pessary carefully positioned as to avoid compression of the urethra) in an otherwise clinically continent patient.

2. _Nonsurgical Treatment of SUI_

There are numerous non-surgical treatments available to woman with SUI. The first is Pelvic Floor Exercises**.** This is a type of exercise to strengthen the pelvic floor by contracting and relaxing the levator muscles that surround the opening of the urethra, vagina, and rectum. These

exercises, commonly referred to as Kegel exercises, improve the pelvic floor muscles' strength and function. Kegel exercises can improve over-active bladders by increasing urethral resistance with can trigger the bladder to relax.

The second treatment is the pessary. A pessary is a removable device that is inserted into the vagina against the vaginal wall and urethra to support the bladder neck. This helps reposition the urethra to reduce SUI. These can be made of rubber, latex or silicon. Inserted into the vagina, a pessary rests against the back of the pubic bone and supports the bladder. Pessaries are available in various forms, including donut and cube shapes, and must be fitted by a healthcare provider. Some women who have stress incontinence use a pessary just during activities that are likely to cause urine leakage, such as jogging. Special incontinence pessaries have a 'knob', which fits under the urethra to elevate the midurethra to prevent urine loss.

Transurethral Bulking Agents are also a non-surgical treatment. Bulking agent injections are applied around the urethra and make the space around the urethra thicker, thus helping to control urine leakage. The effects are usually not permanent.

Next is behavioral modification, this includes avoiding activities that trigger episodes of leaking. Lifestyle modification can improve stress incontinence symptoms and include quitting smoking, weight loss, and allergy treatment during seasonal allergies.

The fifth treatment is urinary seals. These are adhesive foam pads, which women place over the urethral opening. The pad creates a seal and prevents the leakage of urine, providing incontinence treatment. The pad is removed before urination and replaced with a new one

afterward. The pad can be worn during exercise or physical activity, but not during sexual intercourse.

Another treatment is a urethral insert**.**  An urethral insert is a thin, flexible tube that is solid rather than hollow (like a catheter) is placed into the urethra to block the leakage of urine These small plugs are inserted into the urethra by women to prevent leakage, and are removed prior to urination. These inserts can be uncomfortable and may increase the risk of urinary tract infection.

Lastly, there is the bladder neck support device**.** This device is a flexible ring with two ridges. Once inserted into the vagina, the ridges press against the vaginal walls and support the urethra. By lifting the bladder neck, it provides better bladder control in women suffering from stress incontinence. The device needs to be sized to fit, and must be removed and cleaned after urination. Bladder neck support devices can be uncomfortable and may cause urinary tract infections.

### 3. *Surgical Treatment*

#### a. *The Burch Colposuspension*

Retropubic approaches for the treatment of stress urinary incontinence include the Burch retropubic urethropexy (both open and laparoscopic) and the Marshall-Marchetti-Krantz (MMK) procedure. The goal of both of these procedures is to suspend and stabilize the urethra so that the urethrovesical junction (UVJ) and proximal urethra are replaced intra-abdominally and to recreate a firm backstop for intra-abdominal pressure. This anatomic placement allows normal

pressure transmission during periods of increased intra-abdominal pressure restoring continence in a previously incontinent, hypermobile UVJ.

The Burch procedure was described in 1961. Initially, Burch described attaching the paravaginal fascia to the arcus tendineus. However, this was later changed the point of attachment to Cooper's ligaments because these were felt to provide more secure fixation points, and less chance of infection as seen with the prior MMK procedure.

Patients with type III stress urinary incontinence (a fixed, nonfunctioning proximal urethra) are not ideal candidates for a Burch procedure as no hypermobility exists to correct.

For the Burch procedure, a low Pfannestiel incision is made above the pubic bone in order to enter the space of Retzius (the anatomical space between the pubic bone and the bladder above the peritonium in order to suspend the bladder and/or to perform a paravaginal repair. The procedure involves placing permanent stitches adjacent to the neck of the bladder and either proximal or distal to the bladder neck stitches on each side and suturing them Cooper's ligament which is attached to the pubic bone. The paravaginal repair is very similar except that the stitches are attached to the arcus tendentious linea pelvis. The likelihood of success of the Burch and the paravaginal repair procedures is reported to be 80-90% in most cases. Success means total elimination of the incontinence and patient satisfaction score greater than 90%. Improved means significant reduction of urine loss and greater than 70% improvement of patient satisfaction scores. Additionally, these retropubic procedures can be accomplished by the laparoscopic route. With respect to the selection of synthetic absorbable suture versus non-absorbable suture, and braided versus monofilament, no prospective randomized blinded data exist to suggest superiority of one suture material over another. However, recognized risks are associated with

bone anchors. Modifications in the technique can be used if co-existent central defect cystocele is present and obliteration of the cul-de-sac can be performed to prevent enterocele or posterior vaginal wall prolapse after Burch colposuspension.

### b. *Pubovaginal sling procedures*

Pubovaginal slings have excellent overall success and durable cure. The procedure involves placing a band of autologous, allograft, xenograft or synthetic material directly under the bladder neck (ie, proximal urethra) or mid-urethra, which acts as a physical support to prevent bladder neck and urethral descent during physical activity. This is brought up through the rectus fascia. The sling also may augment the resting urethral closure pressure with increases in intra-abdominal pressure.

Von Giordano is usually credited with performing the first pubovaginal sling operation in 1907, using a gracilis muscle graft around the urethra. In 1914, Frangenheim used rectus abdominis muscle and fascia for pubovaginal slings. In 1942, Aldridge, Millin, and Read corrected urinary incontinence using fascial slings. In 1965, Zoedler and Boeminghous first introduced synthetic slings.

Historically, surgeons have used the fascia lata sling for recurrent SUI after a failed anti-incontinence operation. Furthermore, this operation is used extensively for the treatment of primary ISD. If the abdominal tissues are weak and attenuated or if the vaginal tissues are atrophied or in short supply, constructing a pubovaginal sling from the leg fascia lata can be performed. This procedure is more involved than the creation of the rectus fascial sling as it

requires a second incision to harvest the fascia lata and healing in an area remote for the index procedure.

An alternative to a long rectus sling is construction of a short sling from a much smaller piece of abdominal fascia (rectus fascia suburethral sling). The surgical procedure is similar to that used for the rectus fascia pubovaginal sling, except that the harvested fascial tissue is much smaller and the operation time shorter. The advantage of this procedure is its simplicity. No extensive dissection in the suprapubic area is necessary, and the postoperative result is similar to that of the full-length fascial strip sling.

An alternative to a long fascia lata sling is the use of a postage stamp–sized patch of fascia lata from the outer thigh (fascia lata suburethral sling). The surgical procedure is similar to that for the fascia lata pubovaginal sling, except the harvested fascia is much smaller. This operation does not require extensive dissection in the thigh area, and the postoperative result is similar to that of the full-length fascia lata strip sling. Postoperative convalescence is shorter than that of the fascia lata pubovaginal sling procedure.

The vaginal wall suburethral sling helps restore urethral resistance by increasing urethral compression and improving mucosal coaptation of the bladder neck. This operation is attractive because it is simple and easy to perform. Postoperative complications are minimal, and the recuperative period is short. Vaginal sling surgery is relatively contraindicated in elderly women with atrophic vaginitis. If recognized before surgery, the atrophied vaginal wall may be revitalized with the administration of vaginal estrogen cream or tablets for 3-6 months.

A clear contraindication to pubovaginal sling surgery is pure urge incontinence or mixed urinary incontinence (MUI) in which urge is the predominant component. An inherent risk of any sling procedure is de novo or worsening urge symptoms; thus, surgeons must identify and treat the presence of an urge component before surgery.

Conversely, poor detrusor function is a relative contraindication to pubovaginal sling surgery because the potential for urinary retention is increased. Women with absent or poor detrusor function in the presence of SUI are at a higher risk of experiencing prolonged postoperative urinary retention.

    *c. Midurethral Synthetic Slings*

Based on the "Integral theory of female incontinence," Prof. Ulmsten developed a midurethral procedure to treat stress urinary incontinence. The first reports of this procedure appeared in 1996 as an intravaginal slingoplasty. The "tape'" was place through a small vaginal incision at the midurethra, brought through the urogenital diaphragm through the retropubic space and exited through small suprapubic incisions. The operation was theorized to correct incontinence by recreating the midurethral support of the pubourethral ligament and also by creating a midurethral hammock for support of the urethra during stress events. The procedure was described to have a success rate of 85-90% with an additional 5-10% significantly improved. The Gynecare TVT system was introduced in the US in November of 1998. Early studies showed that the risk of bladder perforation during the procedure occurred 5-10% of cases and vascular injury with /without hematoma formation occurred in 2-5% of patients.

In an attempt to decrease the risk of bladder perforation and vascular injury, a 'top-down' approach to trocar placement was promoted as the SPARC procedure, introduced in the US in

2001 by American Medical Systems (AMS). The next modification of the midurethral sling came in 2001 when Delorme described his results for the use of the obturator membrane and inner thigh for passage of the sling material. The proposed advantage was avoidance of the retropubic space, thus avoiding bladder perforation and retropubic vascular injury. The trocars were passed from the inner thigh through the obturator membrane from an "outside – in direction".

The next modification came from de Leval in 2003, with the "inside-out" trocar placement for the transobturator sling. The final modification came around 2006 with the release of the mini-slings, or single incision slings, which use support devices at the ends of shorter mesh lengths to accomplish fixation without the need for a secondary cutaneous exit point. The mini-slings could be placed in a retropubic or "U" fashion or a hammock or "H" fashion.

### d. *Align Urethral Support Systems*

The Align Urethral Support System is a synthetic suburethral sling device intended for the treatment of SUI. The surgical kit consists of: Align Urethral Support System, Retropubic; Align Urethral Support System, Suprapubic; Align Urethral Support System, Retropubic & Suprapubic; Align TO Urethral Support System, Hook; Align TO Urethral Support System, Halo; and Align TO Urethral Support System, Hook & Halo. All references to "Align" or "Align mesh" in this report are referring to the above variations of the device unless specified.

## III. **Expert Opinions**

    **A. Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence because it was never meant to be used inside the human body, degrades, causes chronic foreign body reactions, fibrotic bridging, mesh shrinkage, and deformation including**

**fraying, rolling, roping and curling of the mesh, and loss of pore size with tension.**

Polypropylene mesh like that contained in the Align has many well-known characteristics that should have caused Bard to avoid its use in a product intended for permanent implantation into the human vaginal floor. These characteristics include the following: (1) never meant to be used inside the human body; (2) degradation of the mesh; (3) chronic foreign body reaction; (4) roping, curling, cording, rolling, deformation, loss of pore size with tension, abrasiveness, and fraying of the mesh; (5) shrinkage of the encapsulated mesh, (6) fibrotic bridging leading to scar plate formation and mesh encapsulation, and (7) Infections.

As a result of these and other inadequacies with the mesh, and for the reasons set forth below, it is my opinion to a reasonable degree of medical certainty that the polypropylene mesh in the Align causes a multitude of injuries, including but not limited to the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethera, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. These types of life-altering complications do not occur or occur extremely rarely in the alternative surgical treatments for stress urinary incontinence (such as the Burch procedure). When synthetic mesh is not involved in surgical treatment for SUI, like with the Burch and other alternative procedures, it is much easier to treat any resulting patient complications. This difference in a physician's ability to treat any resulting complications from SUI surgery is a key component for physicians in evaluating the safety of the Align device.

As a result, Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women, and Bard failed to act as a reasonable and prudent medical device manufacturer by manufacturing and selling its mesh in a permanent prosthetic implant like Align.

1. *Bard's Align Mesh was never meant to be used inside the human body*

Phillips Sumika Marlex Polypropylene resin HGX-030-01[3] was used by Bard to manufacture the polypropylene mesh contained in the Align as well as many other polypropylene meshes manufactured by Bard. (AVA20626470; 5/10/2013 Britton deposition, pp. 35-6). According to Phillips Sumika and their material safety data sheet dated February 13, 2008, this polypropylene resin should never have been used for human medical device implant applications. The MSDS for Marlex Polypropylene (including HGX-030-01) stated explicitly the following medical application caution:

> **"Do not use this Phillips Sumika Polypropylene Company material in medical applications involving permanent implantation in the human body** or permanent contact with internal body fluids or tissues." (emphasis added)

> "Do not use Phillips Sumika Polypropylene Company material in medical applications involving brief or temporary implantation in the human body or contact with internal body fluids or tissues unless the material has been provided directly from Phillips Sumika Polypropylene Company under an agreement which expressly acknowledges the contemplated use. Phillips Sumika Polypropylene Company makes no representation, promise, express warranty or implied warranty concerning the suitability of this material for the use in implantation in the human body or contact with internal body fluids or tissues." (AVA2E1281085).

In fact Bard knew about this and concealed its use of this HGX-030-01 resin from the supplier. An email chain from March 31, 2004 between William Grennan to Thiemo Blank and Roger Darois states as follows: "Bill I can assure you that I understand the sensitivity of

---

[3] Marlex HGX-030-01 was manufactured for use in woven industrial fabric and bags, rope and cordage, woven carpet backing and woven geotextile fabrics.

the supplier issues and therefore won't contact the supplier directly." Later on Bill writes to Thiemo: "Once again we need to be certain that we don't contact the resin supplier directly due to the sensitivity of our implant application." From Bill Grennan, "This way we avoid potential confidentiality issues - since we do not need to contact the manufacturer or disclose the material name and source of our microinjection partner." The last communication in this email chain is Roger Darois to Thiemo Blank stating: "We have full bio testing on file for permanent implant we could share with you. IMPORTANT…The suppliers will likely not be interested in a medical application due to the product liability concerns. We purchased our polypropylene monofilament from an extrusion supplier who purchases resin directly from the resin manufacturers. Thus, it is likely that they don't know of our implant application. Please do NOT mention Davol's name in any discussions with these manufacturers. In fact, I would advise purchasing the resin through a third party, not the resin supplier to avoid a supply issue once the medical application is discovered." (AVA2E8262831-834).

In an additional email chain from Jim Brann to Roger Darois and Don Weber dated November 27, 2007, Jim Brann writes: "OK from Jack Meyers that Bard would indemnify Shakespeare…Shakespeare has responded that under no circumstances, even with indemnification from us and/or Genzyme will they produce another lot". In reply Roger Darois writes: "Genzyme and Secant know that we are "vertically integrated" with respect to PP monofilament extrusion but DO NOT know that Red Oaks is our extrusion supplier (captive with Davol owned assets) or that Red Oaks purchases the Phillips Marlex resin without Phillips knowledge for its use in a medical device. We need to keep this proprietary." Later in the email he writes: "**Shakespeare's management obtained a copy of Phillips MSDS data**

sheet which specifically discloses that this resin should not be used in medical applications**….One last item…we need to ensure that none of the Red Oaks name labeling on spools, sipping containers [sic], packing slips, etc. makes it to Secant to maintain our confidential extrusion source until we make a conscious decision to share this with them in the future." (emphasis added) (AVA2E8766667-68).

The question becomes why is it that the Polypropylene resin manufacturers would not want this material to be used for permanent human placement. An Engineering Bulletin from Propex entitled "EB-405, The durability of Polypropylene Geotextile's for Waste Containment Application" from 2011, states that "polypropylene is vulnerable to the following substances: highly oxidized substances such as (peroxide)…certain chlorinated hydrocarbons (halogenated hydrocarbons), and certain aromatic hydrocarbons."[4]

Importantly, the MSDS for the polypropylene used in Align states: "**Incompatibility With Other Materials:** May react with oxygen and strong oxidizing agents, such as chlorates, nitrates, peroxides, etc." (AVA2E1281089).

It is well known that the vagina is a ready source for peroxide. In fact the vagina is a ready source of hydrogen peroxide production. In a paper titled, "The in vitro effects of hydrogen peroxide on vaginal microbial communities,"[5] the amount of hydrogen peroxide produced by the lactobacillus species is reported. The paper states, "Hydrogen Peroxide reached concentrations of from 0.05 to 1.0 mM, which under intensive aeration increases even up to 1.8 mM." This work confirmed the earlier research in the paper titled, "Hydrogen peroxide produced by Lactobacillus species as a regulatory molecule for vaginal micro-flora.[6]"

---

[4] The reference to this information is from Schneider H. "Long Term Performance of Polypropylene Geosynthetics," Linz Austria, 1989.
[5] M Strus in FEMS Immunol Med Microbiol, 2006 October; 48(1:56-63).
[6] Med Dosw Microbiol. 2004:56(1):67-77.

The human body also contains other agents, such as hydrocarbons and various bacteria that impacts the MSDS discussed above and the explicit warnings contained therein.[7]

Given the information available to Bard concerning the dangers of polypropylene coupled with the explicit warning and other contents of the MSDS, at a minimum, Bard should have conducted clinically relevant testing to determine if naturally occurring conditions in the vagina could cause polypropylene used in Align to alter inside the woman's body (as well as other complications), and if so, what materials are released into the body as a result, and what impact would those materials have on the body.

It is with a reasonable degree of medical certainty that the effect of chemical and biological alterations of polypropylene can cause the product to either fail or undergo significant change such as shrinkage, breakage or flaking, all of which are likely to contribute to an increase in the severity and duration of inflammation in the patient implanted with a polypropylene pelvic mesh. This could also lead to products leaching out and getting absorbed into the blood stream, which could cause an immunological response. Finally the worst case scenario would be these degradation products or these leach agents could in fact be toxic.

C.R. Bard, Inc. did not undertake any long term testing to determine whether or not these warnings on the polypropylene resin manufacturers MSDS were associated with long term consequences for permanent human use. There is enough evidence that polypropylene in the

---

[7] HB Moon, "Occurrence and accumulation patterns of polycyclic aromatic hydrocarbons and synthetic musk compounds in adipose tissues of Korean females" 2011; "Determination of volatile purgeable halogenated hydrocarbon in human adipose tissue and blood stream," from Bulletin of Environmental Contamination and Toxicology Volume 23 Issue 1 pp 244 – 249 published in 1979; Environmental Health Perspective's, Vol. 60 pp. 127-131, Henry Anderson, "Utilization of Adipose Tissue Biopsy and Characterizing Human Halogenated Hydrocarbon Exposure", N. Das, Journal Biotechnology Research International 2010, Vol 2011, Article ID 941810 titled, "Review Article: Microbial Degradation of Petroleum Hydrocarbons Contaminant: An Overview", "Health, Safety and Environment Fact Sheet: Hazardous Substances from CAW/TCA." (www.caw.ca) August 2011, D. Lithner, 2011, entitled "Environmental and Health Hazards of Chemicals in Plastic Polymers and Products", University of Gothenburg.

right circumstances can be altered and these circumstances are readily found in the female vagina and pelvis. Therefore any polypropylene implanted in the female pelvis will expose the polypropylene to both chemical and biological alteration. It is with a reasonable degree of medical and scientific certainty the complications associated with the use of polypropylene products are the direct result of exposure to chemical and biological alteration of the Align products and therefore the manufacturers warning is a reasonable prohibition against the use of these products.

### 2. *The Polypropylene Mesh in Align Degrades Over Time*

The placement of permanent polypropylene mesh in the human vagina creates problems because of the chemical composition and structure of the mesh and the physiological conditions of the vagina and the surrounding tissues. There have been numerous studies over the last 30 years which have shown polypropylene to be chemically reactive and not inert, with flaking and fissuring demonstrated by scanning electron microscopy, which leads to degradation and release of toxic compounds into pelvic tissues. This process enhances the inflammatory and fibrotic reactions within the tissues in the pelvic floor, causing a multitude of problems.[8] There have been recent studies suggesting that oxidation of the mesh occurs because of the polypropylene and the conditions in which it is placed.[9] The oxidation causes the mesh to degrade, crack and break apart.[10] In another recent study, 100 pelvic mesh implants were compared and over 20%

---

[8] See e.g. Coda A, Hernia 2003;7:29; Jongebloed, WL, "Degradation of Polypropylene in the Human Eye: A SEM Study," <u>Doc Ophthalmol.</u>, 1986 64(1:143-152); Skrypunch, OW, "Giant Papillary Conjunctivitis from an Exposed Prolene Suture," <u>Can J Ophthalmology</u>, 198621:(5: 189-192).
[9] Costello C, Bachman S, Grant S, Cleveland D, Loy T, Ramshaw B, "Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Mesh Explants from a Single Patient," <u>Surgical Innovation</u>, 2007, 143: 168-176).
[10] <u>Id</u>.

showed degradation to mesh fibers.[11] As discussed in the prior section, because of the structural complexities of the vagina and the nature of the chemicals ordinarily found in the vagina and its surrounding tissues, there are several reasons why polypropylene presents unique problems when placed in the vagina.

The available peer-reviewed literature regarding degradation/oxidation of polypropylene in the human body goes back 50 years and has been reported in numerous such publications. [12] Two noteworthy articles regarding degradation in explanted surgical meshes (hernia and pelvic floor) are the Clave article and the research and numerous articles out of doctors at the University of Missouri in the Department of Biological Engineering and in the Department of General Surgery.

In his 2007 paper, "Characterization of Heavyweight and Lightweight Polypropylene Prosthetic Implants from a Single Patient," Prof. C.R. Costello at the University of Missouri reported that hernia mesh made of polypropylene oxidized and degraded as a result of the metabolites produced by phagocytic cells during the body's inflammatory reaction to the mesh. High-magnification photographs showed cracking and peeling of the polypropylene fibers. Bard should have been aware of this article and related research out of the University of Missouri in the Department of Biological Engineering and in the Department of General Surgery. Covidien, a company Bard worked with to market, design, manufacture and supply mesh products sold by Bard provided funding for the research and were given regular presentations on the research and

---

[11] Clavé A, Yahi H, Hammou JC, Montanari S, Gounon P, Clavé H, "Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants,: Int Urogynecol J 21:261-270 2007
[12] See e.g. Liebert T, Chartoff R, Costgrove S, "Subcutaneous Implants of Polypropylene Filaments," J Biomed Mater Res. 1976 (10:939-951); Williams D, "Review of Biodegradation of Surgical Polymers,". J Materials Sci, 1982 (17:1233-1246); Oswald, HJ, Turi, E, "The Deterioration of Polypropylene By Oxidative Degradation," Polymer Eng Sci, 1965 (5:152-158).

its findings. (AVAMTHE_00143146, AVAMTHE_00143147, AVAMTHE 00143143, AVAMTHE_00143075).

Covidien's Global Medical Director, Dr. Ross Segan, had "a great deal of respect for" the doctors and engineers conducting the research at the University of Missouri. (AVAMTHE00143143). Dr. Segan stated in March 2008:

> [the research] is generating substantial evidence that is proving useful in understanding and ultimately enhancing the body of knowledge used in the design, fabrication and application of biomaterials. For the research below, the following conclusions can be drawn:
> - Polypropylene mesh utilized for hernia repair undergoes physiochemical changes as a result of processes which occur in vivo. The mesh is involved in the generation of chronic inflammatory reactions observed. A loss of material compliance occurs during material degradation. Mesh contraction and migration are possible which may result in hernia recurrence. The MCL testing confirmed the above processes and changes observed are likely due to oxidation.

(Id.)

In one 2008 report to Covidien, the researchers wrote "these explants show evidence of degradation…on the PP [polypropylene] mesh." (AVAMTHE_00143147). The researchers reported cracking, flaking, change in properties and loss of mass. In another report, the researchers concluded polypropylene mesh degraded over time inside the human body and under "Future Directions" called for investigating the "correlation between mesh degradation and clinical outcomes, pain, infection, recurrence." To this day, Bard has not conducted any testing evaluating degradation of the mesh used in its products and its correlation to patient complaints like chronic pain.

Another article by A Clave, "Polypropylene as a Reinforcement in Pelvic Surgery is Not Inert: Comparative Analysis of 100 Explants," also displayed high magnification photos of polypropylene fibers from explanted meshes and, in this case, the meshes were explanted from women's pelvic floor tissue. *International Urogynecology Journal*, 2010 (21:261-270). The

heavyweight meshes showed even greater cracking than the lower density meshes, but according to Clave, all 84 of the polypropylene explants examined showed degradation. Oxidation of the implanted mesh due to free radical attack through the synthesis of peroxides, superoxides and hypochlorous acid during the chronic inflammatory phase was listed as just one potential cause for the oxidative degradation within the "septic environment" in which the pelvic meshes are placed.

Bard had intimate knowledge of the Clave article. In a March 2010 email, less than two months after Clave was published, the Lead Development Engineer at Bard, Henry Holsten, stated he needed to review the Clave article and requested it be sent to him. (AVE2E0900248). The same day Claire Gloeckner responded, "One of the authors is from your old haunt. I'll have to read this." Holsten then forwards the Clave article on to senior Bard employees Bobby Orr, Laura Bigby, Adam Silver and Magnus Persson stating "Interesting article …" (Id.) Of note, Bobby Orr had recently been working on ways to change the pelvic mesh products Bard was marketing to make them safer and reduce patient complications. He wrote in a March 2009 memo:

> Material selection to date is associated with various morbidities including dyspareunia, pain, erosion, extrusion, dehiscence, and abscess to name a few. It is the appropriate choice of materials for a specific anatomical space as well as a repeatable surgical procedure that reduce failures and result in improved clinical outcomes.

(AVA2E0087159).

After Holsten forwarded the Clave article to senior Bard employees, the Director of Marketing for Women's Health, Adam Silver, responded, "Very interesting. Reinforces why we are working on low density, macroporous PP implants." He continued, "Is this the scarring and 'bridging fibrosis' that we speak about and are trying to reduce…?" (Id.) Not one of the senior

Bard employees on the email exchange expressed surprise, challenged the findings of Clave, or expressed any disagreement. Nor did any of the individuals express a need for Bard to conduct any studies to analyze degradation. The subject title of the email exchange was "Clave 2010 Polypropylene as reinforcement in pelvic surgery is not inert."

Later in 2010, just months after Bard circulated the Clave article around, senior engineers and executives at Bard were spending time and resources in evaluating mesh coating technology that would allegedly be "inherently more resistant to degradation…." (AVA2E8310677, AVA2E8310682, AVA2E8751394). Bard found the technology to be "very intriguing for pelvic floor mesh coating" and worked to get in place legal contracts with the company promoting the technology. (Id.) Roger Darois, Vice President, Research and Advanced Technologies, wrote in response to Bobby Orr, "the more I learn, the more interested I become." (Id.) Darois continued, "[T]he added benefit of a mesh with much less potential for erosion, is worth a serious look." With additional analysis, Darios believed, "The expectation is that less fibrosis and scarring would result in less wound contracture and, ultimately, less mesh shrinkage." (Id.) Moreover, Bard had been evaluating mesh technology which would be allegedly resistant to degradation as early as 2008. (Product promoted "does not degrade in the body over time like polypropylene and polyester") (AVA2E9120617, AVA2E9120618, AVA2E9120651, AVA2E9120652)

This raises the question, if Bard believes the mesh used in its Align products does not degrade in the human body why were top engineers and executives at the company evaluating and interested in mesh that would be allegedly be resistant to degradation just months after the Clave article was circulated at Bard?

Two years later, in February 2012, Bard once again discusses the Clave article. (AVA2E8647113) This time Claire Huntington, from The Medicines and Healthcare Products

Regulatory Agency, a United Kingdom health organization, inquires as to Bard's knowledge of the Clave article. Ms. Huntington writes:

> Please find attached a paper suggesting that PP used in vaginal meshes is not inert. Please could you provide me with your comments on this issue <u>and also</u> tell me about any testing you have carried out to show that the meshes used do not shrink.

(emphasis added). Adam Silver and Bobby Orr, the same senior employees who discussed the Clave article in 2010, are once again included in the email exchange. Bard responds internally to the MHRA request by writing in part, "This is a curious question out of the blue at this particular point in time." (Id.) Adam Silver then asks Bobby Orr and others to help respond to the MHRA request.

Bard, drawing on the resources of several different departments at Bard Medical, responded to the MHRA a few weeks after getting the request regarding the Clave article. Scott Robirds, Vice President of Regulatory and Clinical Affairs at Bard, signed the response. Mr. Robirds wrote in Bard's response that the MHRA "requested our comments on an article sent to us suggesting that polypropylene used in vaginal mesh is not inert…Attached please find Bard's response to the above requests." (AVA2E8428025).

Bard specifically includes the Align sling in their response. (AVA2E8428028). Bard begins their response by writing, "Comments on mesh shrinkage article." The subject matter of the Clave article is not whether mesh shrinks, but rather the mesh used in women is inert or subject to degradation. The title of the article is "Polypropylene as a reinforcement in pelvic surgery is not inert: comparative analysis of 100 explants." The only reference to mesh shrinkage in the article is detailing the variety of complications associated with the 100 explants Clave analyzes for degradation.

Bard then writes, "Thank you for bringing this article to our attention." Bard senior employees of course already had reviewed and circulated the article 2 years earlier in 2010 and found it to be very interesting. Bard then lists several papers discussing the topic of mesh shrinkage but none that discuss mesh degradation. Bard concludes their response to the Clave article by writing, "Testing carried out on our meshes. Bard has not conducted any testing to evaluate our synthetic vaginal meshes for mesh shrinkage."

Not once in Bard's response does Bard deny the findings of the Clave article or comment on degradation of the polypropylene mesh used in Align. Nor does Bard take issue with any of the methodology or analyses used in the Clave article. It simply says it is aware of a few articles related to mesh shrinkage and has not performed any testing evaluating its mesh products for shrinkage.

More recent literature published since the 2010 Clave article by chemists, engineers and medical doctors, including both urologists and urogynecologists, who have examined mesh removed from patients has confirmed degradation of polypropylene mesh. And just over a month ago, Dr. Shelby Thames, a polymer chemist hired by the pelvic mesh company Ethicon to testify as an expert witness testified under oath that all polypropylene mesh products degrade except for mesh manufactured by Ethicon. (Huskey v. Ethicon Trial, September 2, 2014, Dr. Shelby Thames, Pg 110:7-111:3).

Given the information available to Bard in the scientific and medical literature concerning the potential for degradation of polypropylene, it is my opinion to a reasonable degree of medical certainty that Bard should have conducted clinically relevant testing to determine if naturally occurring conditions in the vagina could cause polypropylene to degrade and if so, what the quantity and quality of the products of degradation would be, whether they

would be released into surrounding tissues and/or migrate in the woman's body, what the clinical implications for the woman would be and whether some women's body's would react differently to the mesh and the degradative process and its by-products.

This is especially true given the fact that Bard knew degradation of its mesh could occur well before Bard ever brought Align to market.   Bard, as early as 2002, knew of the risk of degradation. (AVA20130034). In a risk assessment for a Bard polypropylene mid-urethal sling completed in 2001 and approved by Bard's Medical Affairs Director, Product Engineer and Senior Quality Engineer in January 2002, Bard identified "degradation of device implanted" and "biodegradation" dangers associated with the properties of the device. It listed "permanent disability" as one of the consequences of degradation. (Id.)

Interestingly, despite years of the scientific literature, its own internal documents and reports from consultants that state degradation of the mesh occurs, Bard's Instructions for Use (IFU) continues to this day to be silent on the issue of warning of degradation.  In addition, it was known in the literature as far back as 1986 that degradation of Prolene sutures was due to enzymatic action. [13]  To this day, Bard denies the polypropylene mesh used in Align is subject to degradation inside the human body.[14]

It is my opinion to a reasonable degree of medical certainty that the effect of degradation of the Bard Align mesh in a woman's tissues can lead to a greater foreign body reaction, enhanced inflammatory response and excessive scarring, which can lead to severe complications in patients, including the including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction,

---

[13] Jongebloed, WL, "Degradation of Polypropylene in the Human Eye: A SEM Study," Doc Ophthalmol., 1986 64(1:143-152)
[14] See e.g., Bracken, 6-24-14, pg. 101:11-16

urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethera, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the polypropylene in Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women, and Bard failed to act as a reasonable and prudent medical device manufacturer by manufacturing and selling its mesh in a permanent prosthetic implant like Align.

### 3. Chronic Foreign Body Reaction

The human body has a natural and fairly predictable "host defense response" to any foreign object placed inside of it. Whether a splinter or a surgical mesh, the human body will send white blood cells to attack the invader and, if the products of inflammation cannot ward off or destroy the invader, including the invader is anything from bacteria to prosthetic implants, the initial acute inflammatory phases is followed by a chronic inflammatory phase. Therefore, with the placement of something like a permanent surgical mesh in human tissues, there will be a chronic or permanent foreign body reaction to the implant, as well as a chronic inflammatory response by the body.[15] A review of medical literature and presentations produced by Defendants shows repeated references to this chronic foreign body reaction. (e.g. PELVALE_00015747 ("However, complications have been associated with the use of synthetic mesh, including *chronic foreign body response*, intestinal fistula, erosion of mesh into viscera,

---

[15] Klinge U, Klosterhalfen B, Muller M, Ottinger A, Schumpelick V, "Shrinking of Polypropylene Mesh In Vivo: An Experimental Study in Dogs,". Eur J Surg 1998 (164: 965-969); Klinge U, Klosterhalfen B, Muller M, Schumpelick V, "Foreign Body reaction to Meshes Used for the Repair of Abdominal Wall Hernias,"; Eur J Surg, 1998 (164:951-960); Klostherhalfen,B, Junge, K, Klinge, U, "The lightweight and large porous mesh concept for hernia repair," Expert Rev. Med. Devices, 2005 2(1); Binnebosel M, von Trotha K, Jansen P, Conze J, Neumann U, Junge K, "Biocompatibility of prosthetic meshes in abdominal surgery" Semin Immunopathol, 2011 (33:235-243); Eth.Mesh.03658577 (Biocompatibility of Ultrapro).

and mesh shrinkage or migration. (emphasis added) "[16], AVA20465450, AVAMDL2_00024296, AVAMNET_00596232, PELVALE_00014502 "*chronic foreign-body reaction* of prosthetic mesh is avoided (emphasis added)" with use of biologics[17], PELVBUN_00036596).

In 2008, just a year after Bard launched Align, Bard's engineers and doctors were evaluating meshes that allegedly "minimize[d] chronic foreign body reaction." (AVA2E9120617, AVA2E9120618, AVA2E9120651, AVA2E9120652). Bard traveled to San Francisco, noted the product "claims reduced foreign body response," and when Dr. Ross evaluated the product, he "liked its feel and compliance." (AVA2E9120618). The subject product promotional material Bard was evaluating stated "minimizing chronic foreign body reaction helps reduce the risk of pain and complications and is key to a durable, comfortable long-term repair. Foreign body reaction depends not only on the material, but also on the total surface area in contact with the host issues." (AVA2E9120652). Bobby Orr, an engineer at Bard considered to be the person "most knowledgeable with the organization" on the issue of selection of biomaterials for pelvic mesh[18], wrote in several company-wide memorandums that limiting the total weight of mesh implant and adjusting design features such as pore size could reduce the foreign body response seen with synthetic pelvic mesh. (e.g. AVA2E0074398; AVA2E0087168).

For the reasons set forth above and in other sections of this report, it is my opinion to a reasonable degree of medical certainty that the polypropylene mesh in the Align creates a

---

[16] The reference document cites to for support: Cassar K, Munro A. Surgical treatment of incisional hernia. Br J Surg. May 2002; 89(5):534-545; Klinge U, Klosterhalfen B, Muller M, Schumpelick V. Foreign body reaction to meshes used for the repair of abdominal wall hernias. Eur J Surg. Jul 1999;165(7):665-673.

[17] This statement is pulled from an article authored by Dr. Bruce Ramshaw and others at the University of Missouri. These are the same researchers who received funding from Covidien to research explanted mesh and for whom Dr. Ross Segan declared his great deal of respect for.

[18] Deposition of Ronald Bracken, the Bard Vice President of Research and Development Pg 70, Line 3-17

chronic foreign body reaction which can lead to severe complications in patients, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethra, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the polypropylene in Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women, and Bard failed to act as a reasonable and prudent medical device manufacturer by manufacturing and selling its mesh in a permanent prosthetic implant like Align.

### *4. Roping, curling, cording, rolling, deformation, abrasiveness, fraying*

Bard's Align mesh is designed to lay flat under the urethra. A flat mesh is designed to distribute pressure equally over the area of reinforcement and allows for a simpler conformational substrate for intended successful tissue in-growth. Failure of the mesh to lay flat under the urethra results in deformation along the width of the Align sling known as curling, cording, rolling, or roping. Curling of the width of the sling causes the edges to come closer together to decrease the effective sling width and alters the conformational structure for tissue in-growth. Cording and/or roping represents advanced curling to the point where the sling has minimal effective sling width. These deformities result in a dysfunction of applied forces and focal increases in pressure at localized points. In addition to curling and cording of the sling along one axis, twisting along the other axis results in further deterioration which results in

frayed and sharp edges. When this happens, the patient can suffer erosions, pain, returning or worsening incontinence or voiding/outlet obstruction.

Bard knew that polypropylene mesh can become distorted or deformed (resulting in bunching, rolling, curling, banding, unraveling and so forth) once implanted in the human body as early as 2002. In a Design Summary from 2002, Project Engineer Doug Evans wrote, "While some doctors are satisfied with the results they've achieved with synthetic mesh sling kits, other doctors are adamantly opposed to synthetic materials due to the higher potential for complications. Some of the complications include urethral or vaginal wall erosion due to the mesh and infection or foreign body reaction around the mesh. In some cases of erosion, mesh has been observed to unravel creating a sharp 'fishing line' effect, which can slice through the patient's tissue." (AVA2E0822631). In a patent application from 2007, it was stated: "patches for use in surgical procedures can be made from synthetic mesh material, for example, polypropylene. Although easy to sterilize and inexpensive, synthetic material has a number of shortcomings. Perhaps most important, when synthetic mesh material is used as a support member, the roughness of the synthetic mesh may lead to abrasion of patient's tissue, and that can [cause] infection and/or erosion of the tissue." (AVA2E6681921-22). And in a March 2006 Bard Global Research & Design presentation, the limitations of synthetic material were noted as including: "cannot provide functionality…not effective in young/active patients". (AVA2E8019305). In fact, Bard acknowledged deformation, curling and cording as a problem that it wanted to avoid during its design and development of Align. (AVA2E0121601, AVA2E0001303).

Bard employee Walter Freitag, a member of the engineering team for the development of Align agreed in his deposition that one of the purposes of creating Align was to try to and

prevent cording and fraying when implanting the mesh. (Deposition pgs. 42:24 – 43:5). Engineers developing Align identified mesh cording as a serious risk to the patient in that the "potential effects of failure" caused by Align cording or twisting included "Device erosion" as well as "Incontinence persists or reoccurs." (AVA2E7497195) Walter Freitag agreed in his deposition that cording of Align would "increase your potential occurrence for erosion to the extent something like that happens." (Depo. Pg. 79, line 1-6).

But, shortly after the launch of Align into the market, Bard began receiving complaints from doctors about the product. Between June 2007 and February 2009, Bard received 197 complaints related to failures of various aspects of the Align product, including the connector, needles, the mesh, the procedure itself, and the introducer tubing. (AVA2E0714700) Walter Freitag, a Bard engineer involved in certain redesign projects related to Align, stated in his deposition that the 197 complaints received were "significant". (Depo. Pg. 67 line 6-8). More specifically, Bard received reports of curling, cording, roping, rolling and related deformation issues with Align shortly following the launch of Align and continued to receive those reports throughout the marketing of Align. (e.g. AVA2E0106090, AVA2E0106022, AVA2E1237504, AVA2E1443939, AVA2E6677897). It is clear that deformation of the Align mesh is a problem that has persisted since the launch of the product to the current day. It is also evident that Bard knew internally that Align did not perform well related to curling and cording. In a 2007 Design Qualification and Competitive Product Test, the Align decreased in width from 11.85 mm to 7.39 mm with 5 pounds of force. (AVA20037209; see also AVA2E0107296; AVA2E0391171).

Before and after pictures from Bard's internal testing show Align was subject to significant deformation at 5 lbs of force:



(AVA2E0391171)

Other Bard testing shows there must be a force of 4.46 lbs in order to just remove the protective sheath from the Align mesh. (AVA20029480).  To compound the problems with the mesh itself cording and curling, the sheath design for Align increased the likelihood of the Align mesh cording or rolling.   Many complaints were made by surgeons about their difficulty removing the mesh from the sheath and Bard engineers recognized that difficulty placing the mesh related to the sheath could result in the "mesh cords or twists" which could cause erosions, recurrence of incontinence, and retention.  (AVA2E7497195) The sheath design, specifically its

difficulty in removing the sheath, further increases the risk for the mesh to curl and cord during placement of the mesh. Bard's internal testing indicated that with sheath insertion force of 2.56 lbs, sheath removal force of 4.46 lbs, and mesh pull out force of 1.56 lbs that the sheath itself would deform into an "S" shape. (AVA20029480). The Vice President of Research and Development at Bard, Ronald Bracken, testified that the sheath needed to have been designed so that it can be removed without damaging the mesh, harming the patient or affecting mesh placement. (Depo. Pg. 165, Line 9 – Line 21).

When a mesh sling like Align curls or cords, it can also result in fraying of the mesh and "shedding of polypropylene particles." Both of these failure modes were recognized by Bard engineers during the design phase. (AVA2E7497194). Fraying occurs when the mesh takes a shape that it was not designed to take, such as curling. As a result of fraying, particles can be shed from the device. Bard acknowledged that Marlex Polypropylene has several negative characteristics when compared to Polyester mesh including; (1) More rigid and more aggressive for the tissue (barbed wire effect), (2) Undoing when being stretched, and (3) Detachment of particles or spikes when being cut. (AVAMDL2_00448083). Another negative consequence of cording and curling while in the body is alteration of the original pore size due to a contracted or deformed sling. Alteration of effective pore size further exacerbates the inability of the body to incorporate well into the body's tissue and undergo tissue remodeling resulting in an increased inflammatory response. Bracken, Bard's Vice President of Research and Development for the Bard Medical Division between 2006 and 2011 and responsible for the development of all Bard mesh products between June 2009 and October 2011, admitted that a mesh's inability to integrate well into the tissue and undergo tissue remodeling around it can result in adverse events

such as vaginal erosions, urethral erosions, bladder erosions, and chronic pain. (Depo. Pg. 46:15 – 47: 8, Pg. 47:25 – 48:3, Pg 62:4 – 12).[19]

Not surprisingly, Bard received numerous reports of the difficulty removing the sheath, deformation of the Align mesh, and the effect these had on patient consequences and physicians' use of the Align. In an Executive Summary documenting the performance of Align in the field, Bard stated, "There was discussion about *retention issues* with the Align RP and SP kits. It is clear that the amount of force required to remove the sheaths coupled with the smaller needle tract[20] has played a role in this occurrence. (emphasis added)" (AVAE0266592)

Bard received curling and roping complaints from physicians shortly after marketing Align and continue to receive these complaints from physicians to this day. In August 2007, Bard noted, "Physicians have noticed that the mesh will curl and roll…." (AVA2E0106090). In December 2007, Bard noted similar concerns. (AVA2E0106022). One physician reported the Align mesh "curls up on the edges" and refused to use the Align sling again. (AVA2E1237504). Bard continued to receive additional curling and deformation complaints, including Bard employees observing first-hand the Align mesh curling or rolling. (e.g. AVA2E1443939 "Dr. King had issues with our mesh 'rolling'; AVA2E6677897 "Just did a sling where the mesh rolled a bit second time better. I think that the sling tracked wrong and turned while removing the

---

[19] Bracken also testified that it was the job of the Bard engineers who developed Align to "design out or minimize as much as risk as possible." (Bracken Depo. Pg 153:4-10)

[20] In comparison to other slings, for example the TVT, the Align uses smaller trocars to place the sling. Bard was not alone in recognizing the potential complications caused by the smaller passage created to place the sling with the Align trocars. Kawasaki et al., *Comparing the risk of urethrolysis for the treatment of voiding dysfunction between two retropubic mesh slings: a case-control study*, Int Urogynecol J (2013) ("Given the narrower path that 3-mm trocars create for the sling to follow, we hypothesized that the Bard Align system may lead to a tighter sling placement.") The tighter the sling is placed, the more likely retention is a complication.

sheaths.") Notably, some physicians were refusing to use the Align because of the sheath and curling issues.[21]

For the reasons set forth above, it is my opinion to a reasonable degree of medical certainty that the polypropylene mesh in the Align products has several characteristics that make it improper for use in the body including curling, cording, roping, abrasiveness, fraying, and deformation. These unwanted characteristics can lead to, among other things, an increased inflammatory response (fraying) and/or increased pressure on the urethra (roping or curling) or loss of pore size (roping or curling), and can lead to a multitude of injuries, including such as multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. Moreover, none of the above risks specific to mesh deformation occur with alternative surgical treatments for stress urinary incontinence (such as the Burch procedure).

5. *Mesh contracture and shrinkage*

Mesh contracture or shrinkage is an event that takes place after the implantation of mesh and relates to the wound healing process that occurs after the surgical trauma of implanting a foreign body made of polypropylene in the sensitive tissues of the vagina and the pelvis. By

---

[21] (AVA2E1494100) ("Dr. Pang – evaluated and did not like. Sheath issue." "Lost Dr. Olsen back to TVT because of sheath issues." "Dr. Sangai and Merchia switched to Coloplast because of sheath issues." "Docs (Spawn & Powell) had sheath issues and switched to TVTO." "Dr. Hazelbacker had some issues with the sheath." "I just spoke with Dr. Chauhdry and he informed me he had a couple erosions with Align & has switched back to TVT." "Dr. Razvi had trouble with our mesh curling up." "McGowen has not been doing very many slings – has had a bunch of sling failures with Align.")

1998, polypropylene mesh was known to contract or shrink 30-50%.[22]  This research was confirmed by William Cobb and his colleagues[23] one of which was Dr. Heniford. All three authors on the paper cited above, Cobb, Heniford, and Kercher, have worked for Bard or Covidien.[24] Contraction or shrinkage has been shown to draw nerves close to the midurethral sling mesh both in the transobturator application[25] and for retropubic application.[26].  Mesh contraction can be a permanent ongoing process which can create further problems and complications which do not become evident until years after implantation (Letouzey 2008). Furthermore, contraction or shrinkage is closely related to the pore size of the mesh. (e.g. AVA2E0074398). Small pores lead to fibrotic bridging leading to scar plates, mesh encapsulation and shrinkage or contraction of the mesh, which is a compound and combines with the effect of the normal wound healing process that is already occurring in the tissue.

A Sofradim document from 2004, touting a new polyester mesh product stated: "Surgeons have used polypropylene mesh as a reinforcement device, but the material is known to shrink, contract, and stiffen. Because scar tissue shrinks as it matures, the scar tissue that develops around the mesh can be expected to decrease the surface area of that mesh. Shrinkage of polypropylene mesh by more than 50% has been documented in animal models. This process leads to a loss of compliance of the abdominal wall. Encapsulation and contraction can also

---

[22] Klinge, U, "Shrinking of Polypropelen Mesh in Vivo: An Experimental Study in Dogs," Eur J Surg, 1998 (164:965-969); Jacquetin, B, "Complications of Vaginal Mesh: Our Experience," Intl Urogyn J, 2009 (20:893-6); Tunn, R, "Sonomorphological Evaluation of Polypropylene Mesh Implants After Vaginal Mesh Repair in Women with Cystocele or Rectocele," Ultrasound Obstetrics Gynecol, 2007 (29:449-452).

[23] Cobb W, Kercher K, Heniford T. The Argument for Lightweight Polyropylene Mesh in Hernia Repair. Surgical Innovation. 2005; 12(1):T1-T7

[24] See e.g. AVAMLEF_00002317, PELVCRA_00002557, PELVCRA_00002645, PELVCRA_00002644, PELVCRA_00041336, AVAMMEN_00000009, AVAMTHE_00053657, AVAMMON_00005453, AVA2E9222030, AVA2E9224472, AVAMTHE_00028083, AVAMNET_00453669.

[25] Corona, R, et al., "Tension-free Vaginal Tapes and Pelvic Nerve Neuropathy," J Min Invas.Gynecol, 2008 (15:3 262-267); Parnell, BA, et al.,"Genitofemoral and Perineal Neuralgia after Transobturator Midurethral Sling," Obstet Gynecol, 2012 (119:428-431).

[26] (Heise CP, et al., "Mesh Inguinodynia: A New Clinical Syndrome After Inguinal Herniorrhaphy?" J Am Coll Surg 1998 (187:5 514-8); Voeller, GR, Surg. Technol. Intl. 2003.

"drag" the nerves into the mesh in the scarring process and lead to pain for the patient." (AVAMDL2_00398613). Sofradim and Bard knew that polypropylene creates an inflammatory response in the human body and undergoes degradation in the human body. The "Sofradim Polyester" document contains pictures of polypropylene inguinal hernia mesh explants with these captions: 1)"extensive fibrotic scar"; 2) "polypropylene devices contracted and migrated"; 3) "folds in mesh: contraction, shrinkage"; and 4) "polypropylene device encapsulated and shrunken."(AVAMDL2_00398613). Moreover, in 2008, Bard employee Bobby Orr stated in a company memo that shrinkage for mesh is between 30-50% and is "directly correlated to scar plate formation," It went on to state that larger pores and lighter weight mesh should reduce shrinkage. (AVA2E0074398).

Despite this safety concern, "Bard has not conducted any testing to evaluate our synthetic vaginal meshes for mesh shrinkage." (AVA2E8428025, AVA2E8428028). This is what Bard told Claire Huntington, from The Medicines and Healthcare Products Regulatory Agency, a United Kingdom health organization, who inquired in 2012 as to "any testing you [Bard] have carried out to show that the meshes used do not shrink." (AVA2E8647113). This is further confirmed by a 2006 email where Bard stated, "We have no hard data with numbers as far as the % of shrinkage. We have some anecdotal evidence that it shrinks 'A very small amount,' but that's about it. Sorry." (AVA2E0058215).

It is my opinion to a reasonable degree of medical certainty that as a result of multiple internal documents and articles, and the scientific literature as a whole, Bard was or should have been aware that shrinkage of its Align mesh not only could, but would, occur and that this shrinkage could lead to painful complications in women implanted with Align, such as multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain,

recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethera, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. Moreover, none of the above risks specific to mesh shrinkage occur with alternative surgical treatments for stress urinary incontinence (such as the Burch procedure).

As a result, the polypropylene in Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women, and Bard failed to act as a reasonable and prudent medical device manufacturer by manufacturing and selling its polypropylene mesh in a permanent prosthetic implant like Align by choosing not to do any testing to determine how much polypropylene shrinks, at what rate it shrinks, or what effect shrinkage has on the female pelvis.

### 6. *Fibrotic Bridging, Pore Size, and Density*

Fibrotic bridging occurs when the fibers surrounding the pores of the mesh are too close together to allow the tissue in the pore enough room to recover from the trauma of tissue damage due to implanting a surgical prosthetic device. Pores that are large enough for good, newly-vascularized tissue tend to be filled with fatty tissue versus small pores that become filled with scarred or fibrotic tissue. In those instances, the scar forms across the pores or "bridges" from one side of the pore to the other. This can occur either due to the granulomas around the mesh fibers joining together or due to densely-formed fibroblast plugs between these granulomas. Either way, such bridging can lead to the creation of a rigid scar plate that can encapsulate the mesh with scar tissue. Simply put, small mesh pores that cause fibrotic bridging turn the mesh

into a solid sheet of scar tissue and there is no space or room for tissue to grow into the mesh, which is the intended purpose of the mesh.  The fibrotic bridging and scar plate prevents tissue in-growth and causes complications, including, among other things, pain with the rigid mesh, shrinkage, contraction of the mesh, erosions due to mechanical irritation in the tissue of a rigid, scar-plated mesh, nerve entrapment, chronic pain and dyspareunia.

Bard knew that pore size is crucial to the proper function of surgical mesh. Bard knew adequately sized pores allow in-growth of tissue, fight bacteria, and prevent scarification. Bard documents show that the company recognized the need to have large pores (3-5 mm) to avoid contraction and what is described as "scar plate formation." (AVA2E0074398). In a September 2, 2008 Memo from engineer Bobby Orr to Scott Britton, just a year after Bard launched Align, Orr lays out Bard's knowledge and opinions concerning this issue. (AVA2E0087163).  Orr stated there is a "direct relationship of the healing characteristics to implant load and the associated design features. Foreign body response can be reduced by limiting the total weight of mesh implant and adjusting design features such as pore size, elasticity, and implant height."   Orr goes on to list the design features that should be in mesh to accomplish these goals. The most notable are "Large pore – 3-5 mm" and "Light weight – the mesh should be less than 35 g/m2". (AVA2E0087164).  Orr summarized, "Mesh products designed to date are over engineered with regard to strength for biologic requirement.  In addition, the pore size results in formation of scar plate that is rigid and does not integrate well over time with the host tissue." (AVA2E0074398).  [27]

---

[27] Orr was considered by Mr. Ronald Bracken, the Bard Vice President of Research and Development, to be the "most knowledgeable with the organization" on the issue of selection of biomaterials for pelvic mesh.  (Depo. Pg 70, Line 3-17). Additionally, Dr. Ross testified in his deposition, "…because I was a big believer that none of the mesh out on the market right now are the - - the pores are large enough…Most people talk two millimeters based on the Belgian work." (5/10/12 Ross Deposition, pp. 59-60; 65)

Despite this, Bard developed a small pore and highly dense mesh for Align. According to its own internal testing, Align has 2 pore sizes with one of the pores in the Align mesh averaging in size .048(H)  x .039(W) and the other pore averaging .044(H) x .016(W) when measured in inches. (AVA2E0107283).   It not only falls short of Bobby Orr's standard of 3-5 mm but it fails in comparison to the two other products that were examined, the Ethicon TVT and the Sofradim Uretex. When the density of the mesh used in Align was measured, it was found to have almost doubled Orr's standard, measuring 61 g/m2. (AVA2E0107294). Additionally, as previously described, the mesh would not recover to its original size when of force is placed upon it, making it stiff, rigid and virtually non-elastic.

Orr's Memo is buttressed by medical literature and by Bard's own development of lightweight large pore meshes to treat disorders other than stress urinary incontinence. Bard's reliance on Davol Large Pore Soft Mesh, a mesh released in 2006 for hernia repair, testing showed shrinkage, but a much smaller rate of shrinkage when compared to the 30-50% seen with other polypropylene mesh like Align. The Davol Large Pore Soft Mesh has a pore size of 2.5 mm, much larger than the pore sizes in Align, and just short of the pore size recommended by Orr.  Thus, the larger pore size resulted in reduced mesh shrinkage, just as Orr stated in his memo. In 2005, in developing and testing the Large Pore Soft Mesh, Bard found the mesh to exhibit "the most favorable tissue compliance and histology results." (AVA2E9241429). The Large Pore Soft mesh was released to patients more than a year before Bard ever marketed Align.

Bard also designed other lightweight large pore meshes including the Alyte pelvic organ prolapse repair device and the Nuvia SI device for pelvic organ prolapse repair. The Alyte mesh has significantly larger pores (2.78 mm in the anterior/posterior vaginal flaps) and is significantly

lighter in weight (17.67 g/m$^2$ in the vaginal flaps) than the Align products. In addition, the Nuvia SI product is a larger pore mesh (3.165 mm x 4.278 mm) with tube-shaped arms. Unfortunately, none of these products Bard was developing were ever developed to treat stress urinary incontinence. Not only did Bard know about the problems with heavy weight, small pore mesh used in Align, it also had information and knowledge regarding superior mesh designs to prevent fibrotic bridging and scar plating. Specifically, Bard knew that light weight, large pore mesh could decrease the likelihood of foreign body reaction, fibrotic bridging and scar plating. Despite its knowledge about the problems related to heavy weight, small pore mesh like the Align mesh and the problems it causes in pelvic tissues and patients, Bard has done nothing to change the mesh and continues to promote and sell the product with the same, heavy weight small pore mesh.

In summary, for the reasons set forth above, it is my opinion to a reasonable degree of medical certainty that the polypropylene mesh in the Align causes fibrotic bridging in the body, resulting in an increased inflammatory response leading to a multitude of injuries, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethera, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, the polypropylene in Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence in women, and Bard failed to act as a reasonable and prudent medical device manufacturer by manufacturing and selling its polypropylene mesh in a permanent prosthetic implant like Align.

7. *Infections and Bio-films*

The placement of midurethral slings, including Align, violates one of the most basic tenets of surgical teachings in that it is the placement of a permanent implant into the human through a "clean contaminated" surgical field, i.e. the vagina, which is not sterile and can never be completely sterilized. Therefore, implantation through the vagina is contraindicated for every procedure and implantation. Bard knew as early as 2001 that synthetic slings, like Align, created a "high risk of erosion and infection." (AVA2E0391932)

In Align, the weave of the mesh produces very small interstices which allow bacteria to enter and to hide from the host defenses designed to eliminate them. The bacteria can secrete anencasing polysaccharide slime (biofilm), which further serves to shield the bacteria from destruction by white blood cells and macrophages.[28] The effect and consequences of biofilm to increase the foreign body reaction, resulting in chronic infections, chronic inflammation, erosions, and mesh and scar contracture should be well known to Bard. Importantly, the biofilm actually serves as a protection for the bacteria surrounding the mesh fibers against the body's host defense response (white blood cells), which are intended to destroy foreign invaders like bacteria. Thus, the weave induces the creation of a shield against the body's defenses to the bacteria entrained in the woven mesh, inhibiting the body's ability to fight off the infective agents within the mesh.

The large surface area promotes wicking of fluids and bacteria and is a "bacterial super highway" which provides a safe haven for bacteria which attached themselves to the mesh during

---

[28] Osterberg B, et al., "Effect of Suture Materials on Bacterial Survival in Infected Wounds: An Experimental Study," Acta. Chir. Scand 1979 (145:7 431-434); Merritt K, "Factors Influencing Bacterial Adherence to Biomaterials," J Biomat Appl 1991 (5:185-203); An, Y, "Concise Review of Mechanisms of Bacterial Adhesion to Biomaterial Surfaces," J Biomed Mater Res (Appl Biomat), 1998 (43:338-348); The TVM Group: J. Berrocal, et al. Conceptual advances in the surgical management of genital prolapsed, J Gynecol Obsted Biol Reprod 2004: 33:577-587.

the insertion process.[29]  Reducing surface area could reduce the amount of chronic inflammation. Additionally, the size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses leading to numerous complications.[30]

There have been numerous peer-reviewed journal articles regarding secondary-mesh related infections and the dangers of implanting surgical mesh in a clean/contaminated field.  At an AUA meeting, Dr. Shah and his colleagues reported on the "Bacteriological Analysis of Explanted Transvaginal Meshes," which included explanted samples of both SUI slings and prolapse meshes.  Of the 50 explants examined, 52% of those explanted due to patient complaints' of painful mesh were infused with pathogenic organisms, 20% of those explanted due to vaginal erosions had pathogenic organism, and 83% of those explanted due to urinary tract erosions were contaminated with pathogenic organisms.[31]

When polypropylene particles separate from the surface of the mesh fiber due to degradation, the surface area of the mesh is greatly increased thus providing even greater areas for bacterial adherence to the mesh, more elution of toxic compounds from the polypropylene, and also more of the free toxic polypropylene itself, all of which increases the inflammatory reaction and intensity of the fibrosis.[32]  This cracking of the mesh surface also provides safe harbors for infectious bacteria to proliferate.

Bard never performed any long-term, clinical studies to determine whether the warnings given them through the peer-reviewed literature were accurate, namely that mesh-related

---

[29]  Klinge, U, et al., "Do Multifilament Alloplastic Meshes Increase the Infection Rate?  Analysis of the Polymeric Surface, the Bacteria Adherence, and the In Vivo Consequences in a Rat Model," J Biomed Mater Res, 2002 (63:765-771); Vollebregt, A, et al., "Bacterial Colonisation of Collagen-Coated Polypropylene Vaginal Mesh:  Are Additional Intraoperative Sterility Procedures Useful?" Int Urogyn J, 2009 (20:1345-51).
[30]  Klinge, supra, at n 26; Vollebregt, supra, n. 26.

[31]  Shah, K., et al., Bacteriological Analysis of Explanted Transvaginal Meshes (Abstract 1144)
[32]  Jongebloed, supra; Sternschuss, G, Ostergard, DR, Patel H, "Post-Implantation Alterations of Polypropylene in the Human," J Urology, 2012 (188:27-32); Clave, supra, at 6.

infections are real; that they cause patient injury in the form mesh erosions and recurrent, late infections; and that the transvaginal implantation through and into the non-sterile, contaminated vagina is below the standard of care for any surgical technique, especially one used to treat non-life threatening conditions, such as stress urinary incontinence and when other SUI treatments exist.

Therefore, it is my opinion to a reasonable degree of medical certainty that the Align mesh is susceptible to biofilm formation due to the weave of the mesh allowing the infiltration, harboring, and protection of bacterial contaminants; the degraded mesh surface harboring bacteria; the passage through and into a clean/contaminated field; and after exposure/erosion of the mesh into the vagina or other organs, further contamination of the mesh with a multitude of vaginal flora that further increases the risk of harmful and recurrent infections in women.

Accordingly, the Align is not safe for its intended purpose of implantation into a woman's pelvic tissues and can lead to severe complications in patients, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing problems, injury to ureters, bladder and urethera, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others. As a result, Bard failed to act as a reasonable and prudent medical device manufacturer.

**B. Bard's Align mesh is not suitable for its intended application as a permanent prosthetic implant for SUI in the human body due to the lack of adequate studies supporting its safety and efficacy including Bard's lack of consideration in implanting its products through the obturator space.**

A reasonable and prudent medical device manufacturer should have adequate safety data to support its products before urging surgeons to use them permanently on patients.[33] From internal Bard documents that I have had the opportunity to review, it appears Bard did not adequately understand the importance of clinical data when using medical devices permanently implanted in humans. As far back as October 2006 when the Align product was in development, a presentation to the Bard Management Board regarding discussions with doctors at the AUGS convention included the following passage, "Data, like always, is going to be very important with these things. We as a division need to step it up in this department. We always release products with no data." (AVA2E1262455).

In an October 17, 2008 email, over a year after Bard began marketing and selling the Align, Bard biomaterials engineers Drs. Claire Gloeckner and Chuck Thomas exchanged emails concerning the "criticality" of certain mesh studies:

> "Dan Delaney stopped by to ask about what I know about the pressures seen by the pelvic floor in the worst case. He wants to know for his clinicals. I told him that you and I were going to make an exhaustive study of it. I admit I've not done anything; I have been trying to get these TMs done first, but now I've been encouraged. Please continue to remind me. I think it is an important study not just for corkscrew, but everything we do with pelvic floor and sling implants. **And should have been done before, but that's par for the**

---

[33] See e.g. AVA2E6022750, "New devices should only be introduced to the market after appropriate trials were conducted."; Boyles et al., *Complications associated with transobturator sling procedures*, Int Urogynecol J 2007, 18: 19-22; Cornelis et al., *The introduction of mid-urethral slings: an evaluation of literature*, Int Urogynecol J (2014) "clinicians and their professional organizations should only choose devices that have adequate clinical data to support their efficacy and safety"; Abrams et al., *Synthetic Vaginal Tapes for Stress Incontinence: Proposals for Improved Regulation of New Devices in Europe*, European Urology 60 (2011) 1207-1211 "Manufacturers' responsibilities should include the following tasks: testing the device thoroughly, including carrying out appropriate clinical trials, before placing on market." "The need for randomized controlled trials (RCTs) at an early stage of development of any new device, with significant new features compared with existing tapes, was felt be essential. The clinicians expressed regret about the number of low-quality studies, usually case series, published in the literature."

**course.**" (AVA2E8019849) (emphasis added)

Thomas responded, "If both us keep bring it up in the presence of Bobby and Scott, maybe the criticality of the study (guys this is not a corkscrew-based effort) will finally start to sink in…" (Id.)

As of May 2008, a year after Bard had launched Align, Bard discussed internally that they had "no data" supporting Align ("Not data yet."). Internal emails suggest that Bard was depending on others to possibly conduct clinical trials, saying "We will just have to watch the journals."[34] (AVA2E7512442). But in 2012, Bard was still commenting on the lack of data to support the merits of Align. In a May 2012 email, Melissa Johnson, the Associate Director of Marketing at Bard, writes, "We have been selling Align for 5 years without data on the merits of the overall design and benefits of the products."

Moreover, Bard did not take into account the special anatomical considerations of inserting polypropylene mesh through the obturator space when producing its Align transobturator product ("TO"). Bard knew of the unique anatomy and concerns of the obturator space including the various nerves in the obturator passage. (e.g. AVA2E0821827, AVA2E7514843). Bard was aware of literature reporting complications associated with the obturator space and specifically the concern of passing large needles through the obturator space. AVA2E6022748; AVA2E6022750, AVA2E6509507). In one exchange discussing an article related to mesh passing through the obturator space Bard stated, "Read the Results and discussion portion and you will gain a much better understanding of why certain complications

---

[34] An independent study was performed at the Mayo Clinic and published in 2014 that evaluated the Align sling. The study found the overall continence rate to be 35.8% for Align. Additionally, the study found there to be a 4.6% reoperation rate for erosion compared to a 0% reoperation rate for AMS MiniArc. (Madsen et. al., "A cohort study comparing a single-incision sling with a retropubic midurethral sling," Int Urogynecol J (2014) 25;351-358.)

arise with TO slings. This also goes into depth with the anatomy of the TO region and where our needles are being placed." (AVA2E6509507) The attached articled noted when using an obturator approach the "edge of the tape may catch or entrap nerves." (Id.)

Much of this literature was published and available to Bard prior to Bard marketing the Align TO. In 2006, about a year before Bard launched Align, an article titled, "Complications associated with transobturator sling procedures" was published where the authors stated, and "New devices should only be introduced to the market after appropriate trials were conducted…" (AVA2E6022750)[35] Bard also knew, or should have known, prior to launching Align, "There [was] scant literature describing trans-obturator tape systems and the associated complications." (AVA2E6022836, see also AVA2E6022750, Boyles et al., Complications associated with transobturator sling procedures, Int'l Urogyn Journal 2007, 18: 19-22, published online March 28, 2006). Still, Bard conducted no special clinical testing related to mesh traversing through obturator space and the potential for complications to develop in women from mesh traversing and being implanted in the obturator space.

In one internal presentation, Bard mimicked surgeons who were concerned about using an obturator product stating "There are nerves, arteries and veins running through the obturator canal. That approach doesn't sound very safe." (AVA2E7523267).

Bard did not adequately address and mitigate the risks of using an obturator approach with Align.  Bard did not conduct adequate testing and made no additional warnings in its Instructions for Use with the Align TO product despite being on notice of the unique risks and

---

[35] The authors also noted, "The initial TVT and TOT approvals were based on their similarity to a device with complications so significant as to require market recall." (Id.)

complications associated with using the obturator approach. Shortly after launching Align, surgeons reported to Bard,

> "Continue to have negative feedback regarding the connection pieces for Align. The green tube disconnects or breaks away from the needle as they are being passed….It appears that the passage way we are creating with the Align TO is too small as the mesh folding over back behind the obturator which in turn makes the middle section of the mesh fold and makes the sheath hard to remove."

(AVA2E6673232)

Bard likes to claim that clinical data isn't always necessary for their products because they have other means to determine safety. But these other means have inherent limitations, especially when compared to the value of clinical data. Internal documents at Bard show Bard is aware of the limitations of this approach. When pressed by the FDA regarding safety data for the Align, Bard admitted their means of testing a new sheath used on Align was inadequate and not representative of real-world in-vivo applications seen in clinical use by doctors. (AVA2E9150772) ("The original test method used… was determined… was too slow compared to the actual forces seen when the sheath was pulled through tissue during clinical use"). This is just one example of how mechanical testing with no patients falls short of clinical data.

Bard also relied on testing using animals like rats and rabbits. But again, Bard noted the limitations in getting "accurate measurements" from rats noting their anatomy was too small in comparison to humans and would sometimes only follow the animals for 30 days. (AVA2E8310678, AVA2EO087170). Align of course is intended to be a permanent implant. And, importantly, in 2009, Bard noted future testing by Bard should "Improve animal model and mechanical tests to be more sensitive to pore size." (AVA2E0087116). Bard recognized the problems created by not having clinical data supporting the use of its products and the potential safety issues for women, but was focused on the marketing problems created by the lack of data. A marketing

presentation with a slide titled "Customer Profile" described the "Difficult selling situation with minimal published data and no RCTs" to "Dr. Evidence." (AVA2E0537089). Bard also knew before it launched Align of the concern in the medical community related to launching medical devices, specifically mid-urethral slings, without appropriate clinical data being developed prior to releasing to patients.36 (e.g. AVA2E6022750).

Issues such as chronic pain, dyspareunia, shrinkage, degradation, deformation of the mesh (folding, bending, bunching, and cording), inflammatory reactions, and impact on sexual function, bladder, and bowel function should have been studied by Bard prior to marketing Align. Outcomes and complications should have been resolved prior to marketing. Contingency plans should have been in place on how to manage these complications and how to inform physicians on how to deal with these complications. This is especially true given Bard's own assessment of its knowledge and expertise in mesh development, or lack thereof. (AVA2E8049153) ("No expertise in mesh development – no facility for mesh design – limited R&D testing facilities for mesh").

> **C.** **Bard's Warnings and Disclosures of Adverse Events in its Align IFU Have Been Inadequate Based on the Adverse Reactions and Risks Associated with the Align That Have Been Known to Bard from the time the Align was first sold and marketed.**
>
> > *1.* *Bard failed to include multiple adverse reactions and risks associated with the Align in the IFU.*

The purpose of the IFU is for a medical device manufacturer to provide physicians with the information necessary for them to make decisions regarding the medical device for a particular patient. In addition, the IFU should disclose adverse reactions and risks known to the

---

36 "New devices should only be introduced to the market after appropriate trials were conducted." (AVA2E6022750) Boyles, "Complications associated with transobturator sling procedures" Intl Urog Journal 2006

medical device manufacturer to the physician so that the risks can be relayed to the patient and an informed decision regarding the use of the product can be reached. In making an informed decision of whether or not to use a particular product, the physician must be warned not only of the potential adverse events that may be associated with the product, but also the frequency, severity, duration and potential permanence of those adverse events. If a medical device manufacturer knows that the design features of its product cause or increase the risk of a complication, or present a risk unique to that product's design, then it should state so. Likewise, if a manufacturer knows that a complication can be chronic, severe or permanent, it should provide that information.

Throughout my education, training, surgical and clinical practice, I have reviewed numerous IFUs for a variety of products, including mesh products, in order to understand the proper way to use the device and to gain knowledge about the complications and adverse events associated with a device. I have extensive clinical experience with IFUs and instructing patients about the adverse events/risks contained in the IFU. I have gained expertise in IFUs through my extensive clinical experience reviewing IFUs and consenting patients regarding IFUs, including pelvic mesh patients. I have reviewed multiple IFUs distributed by Bard, including products like the Align and Avaulta.

Brian Barry, Bard's Vice president of regulatory affairs testified that all serious events that Bard knew about related to its pelvic floor products should be included in the IFU.[37] Similarly, George Cavagnaro, Bard's former Vice President of Marketing, testified that Bard as the manufacturer, was required to tell their customers about all of the serious complications that could occur with its pelvic floor products, and that the Code of Federal Regulations required it.[38]

---

[37] Barry, 11/30/2012, 303:4-304:5
[38] Cavagnaro, 8/20/12, 92:25-93:8

From May of 2007 to the present day, there have been three versions of the Bard Align IFU. These include the following versions: May, 2007, February, 2008 and, April 2010. A chart showing the Adverse Reactions/Risks section for each version of the Align Instructions for Use is set forth below.

| Product | Production Prefix | Start Bates | End Bates | First Use Date | Last Use Date | Adverse Reactions / Risks |
|---------|-------------------|-------------|-----------|----------------|---------------|---------------------------|
| Align[39] | AVA2E | 7187375 | 7187425 | 05/2007 | 01/2008 | * Postoperative hematoma, which may occur following the implant procedure. * Temporary urinary retention, bladder outlet obstruction, and voiding difficulties associated with over-correction/too much tension placed on the mesh sling implant * Perforations or lacerations of vessels, nerves, bladder or any viscera, which may occur during introducer needle passage * Transitory local irritation at the operative wound site, which may elicit a foreign body response that leads to inflammation, infection, or erosion of the implant |
| Align | AVA2E | 7197320 | 7197670 | 02/2008 | 03/2010 | * Postoperative hematoma, which may occur following the implant procedure. * Temporary urinary retention, bladder outlet obstruction, and voiding difficulties associated with over-correction/too much tension placed on the mesh |

_____

[39] The Adverse Reactions/Risks section for both the Align retropubic and Align transobturator are the same. (AVA2E7187314; AVA2E7197671; AVA2E7220413)

| | | | | | | sling implant<br>* Perforations or lacerations of vessels, nerves, bladder or any viscera, which may occur during introducer needle passage<br>* Transitory local irritation at the operative wound site, which may elicit a foreign body response that leads to inflammation, infection, or erosion of the implant |
|---|---|---|---|---|---|---|
| *Align* | AVA2E | 7220464 | 7220514 | 04/2010 | Present | * Postoperative hematoma, seroma, abscess or fistula formation, or scarring which may occur following the implant procedure<br>* Urinary retention, bladder outlet obstruction and other voiding dysfunctions. These conditions may be associated with over-correction/ too much tension placed on the implant.<br>* Perforations or lacerations of vessels, nerves, bladder, bowel, urethra, or any viscera, which may occur during the implantation procedure<br>* Irritation at the operative would site which may elicit a foreign body response that leads to wound dehiscence, inflammation and/or infection<br>* Extrusion through the vaginal epithelium or erosion into surrounding viscera and/or mucosa<br>* Inflammation, sensitization, pain, dyspareunia, scarification, contraction, device migration |

| | | | | | | and failure of the procedure resulting in recurrence of incontinence. |
|---|---|---|---|---|---|---|
| | | | | | | |

In the two versions of the Align IFU from May of 2007 through early 2010, the Adverse Reactions/Risks section has remained exactly the same. The April, 2010 Align IFU included a number of additional Adverse Reactions which were not included in previous versions of the Align IFUs

<u>ADVERSE REACTIONS ADDED TO APRIL 2010</u>

- Postoperative seroma, abscess or fistula formation which may occur following the implant procedure
- Perforations of the bowel, or urethra during the implantation procedure
- Irritation at the post-operative wound side that leads to wound dehiscence
- Extrusion through vaginal epithelium or erosion into surrounding viscera and/or mucosa
- Inflammation, sensitization, pain dyspareunia, scarification, contraction, device migration and failure of the procedure resulting in recurrence of incontinence.

Bard added these adverse reactions in response to the October 20, 2008 FDA public health notification warning healthcare practitioners about serious complications associated with transvaginal mesh placement of surgical mesh in repair of Pelvic Organ Prolapse and Stress Urinary Incontinence. (AVA2E7198423, AVA2E7198364). While the April, 2010 Align IFU update was in improvement over previous versions of the Align IFU, all of these added adverse reactions were known to Bard or should have been known to Bard at the launch of the Align, either through the medical literature, or complaints and experience it received in marketing and distributing the Uretex sling since 2003, which was a mid-urethral sling made of polypropylene.

Thus, these adverse events should have been included in the IFU since the time of the launch of the Align in May of 2007.[40]

In addition to these new Adverse reactions, Bard removed the modifier "temporary" from its warning of potential urinary retention, also the modifier "transitory" from its warning regarding potential irritation at the operative wound site. Bard knew or should have known at the time of the launch of the Align products in 2007 that the adverse reaction of urinary retention could be chronic or permanent rather than temporary, and that irritation at the operative wound site could be chronic, thus those warnings should have excluded the modifiers "temporary" and "transitory" at launch.

Despite only listing the above adverse reactions/risks, it is clear that Bard knew or should have known about a significant number of other risks associated with the Align at the time the Align was first sold, marketed and launched which never appeared in the Adverse Events section of the IFU:

> Infection
> Permanent Pelvic Pain
> Urinary Problems
> Erosions that can decrease a patient's quality of life
> Chronic dyspareunia
> Need for additional surgeries
> Need for removal of the device
> Urinary Tract Infections
> Dysuria
> DeNovo Urgency
> Mesh Exposure
> Narrowing of the vaginal wall
> Erosion which can occur at any time in the future
> Contracture of the mesh causing pain
> Complications making it impossible to have sexual relations
> Worsening Incontinence
> Permanent leg pain

---

[40] It is the manufacturer's responsibility to ensure the IFU is "comprehensive and regularly updated" Abrams et al., Synthetic Vaginal Tapes for Stress Incontinence: Proposals for Improved Regulation of New Devices in Europe, European Urology 60 (2011) 1207-1211.

Permanent groin pain

Yet, virtually none of these were in the Adverse Events section of the Align IFU at launch. Additionally, Bard was aware of all of the risks outlined in the PHN at the time of the launch of the Align line of products.  In other words, Bard had knowledge of all of the risks listed in the 2008 PHN at the time it launched the Align. In addition, Bard did not include: "permanent, lifelong, worsening and debilitating pain", lifelong risk of surgical repairs for erosions, "severe or chronic inflammation," collapse under strain and cause fibrotic bridging, that the product can degrade, severe erosion, or cording, particle loss in the IFU.  Former Vice President of Regulatory Affairs, Brian Barry, agreed if Bard knew that woman could suffer pain, chronic pain, and severe pain with the use of one of their medical devices, that information should have been in the IFU.[41]

Interestingly, in 2009, Bard added numerous adverse reactions and risks to its Patient Brochures that were never disclosed in previous versions of the Patient Brochures.  For some reason, though, not all of these adverse reactions and risks have been disclosed in the Align IFUs.  These risks are as follows:


**From Patient Brochures**

2007[42]
Difficulty urinating
Infection
Post-op discomfort

---

[41] Barry, 308:8-20
[42] AVA20252441; 03/07  Stress Urinary Incontinence Brochure

2009[43]

Localized fluid collection (blood, pus, clear serous fluid)
Erosion of the Graft into surrounding tissues
Difficulty Urinating
Given the permanency of a mesh implant, post procedure removal of the mesh
may be difficult
Infection

For a surgeon to properly inform the patient of all the known risks involved in any procedure involving an implantable medical device, the surgeon relies upon the manufacturer to be aware of and convey all characteristics of its products that could impact safety and efficacy. Specifically, surgeons rely on the "Adverse Events/Risks" section of a medical device IFU to gain knowledge regarding adverse events or undesirable effects that the company knows are associated with the product.

If you compare the adverse reactions/risks in the Align IFUs to the adverse reactions/risks Bard knew at the time of the launch of Align, it is clear that there are numerous adverse events/risks absent from the IFU that should have been included. For some reason, Bard chose to exclude from the IFU multiple adverse reactions and risks that even Bard's own employees in senior management admit should have been included.

Even though Bard changed its Patient Brochures in 2009 to include a few additional significant adverse events/risks, it did not update its IFU until 2010, and then did not include all of the risks it knew were associated with the device, specifically the difficulty in removing the device. This is true despite the fact that Bard had internal discussions about updating the IFU early in 2009 after the 2008 FDA Public Health Notification (PHN). In fact, Bard employees specifically stated that Bard was making changes to the IFU to address potential issues raised in the 2008 Public health notification from an FDA Standpoint, and that the changes to the IFU

---

[43] Bard Stress Urinary Incontinence Brochure, 08/09

were not being made because of customer complaints or new clinical data, Bard simply wanted to update its warnings and precautions section to me more in line with the PHN.[44]  While the April, 2010 IFU update did contain additional valuable safety information, it should not have taken nearly 18 months from the issuance of the 2008 PHN to make these changes, and the updated IFU is still inadequate as it still omits a number of important safety risks.  Even though it took nearly 18 months to finally implement the IFU, and having an updated patient brochure that was launched in August of 2009, Bard still considered further delaying the launch of the new IFU even further because it did not want to incur $18,000 in scrap costs from having to dispose of the old IFUs.[45]

Despite these discussions and Bard's knowledge of serious, devastating and life-changing adverse events/risks, to this day, Bard has not updated or changed its IFU to include all of the important serious adverse events associated with the Align of which it is aware, including the frequency, duration and severity of those risks.   The bottom line is that Bard has clearly failed to adequately warn physicians about the nature and the significance of adverse events and risks associated with the Align,  including permanent, lifelong and debilitating pelvic pain, lifelong sexual complications and dysfunction (including but not limited to dyspareunia),  worsening incontinence, the lifelong risk of multiple surgeries, the need for removal of the device, the difficulty removing the device, the lifelong risk of erosions, and the risk of serious complications that could negatively impact a patient's quality of life.  For this reason, Bard's IFU is, and has always been, inadequate and defective.  Furthermore, Bard deviated from the standard of care required of a reasonable medical device manufacture by failing to adequately disclose these

---

[44] AVA2E9204782
[45] AVA2E0841257, AVA2E0841077

known adverse reactions and risks to physicians and, as a result, has denied physicians and patients the ability to make an informed choice regarding the use of the Align.

### 2. *The adverse reaction and risks, described in the Bard Patient Brochures are grossly inadequate and lack fair balance*

To make an informed choice about a medical device, a patient must have a thorough understanding of the risks and benefits of the device. The patient brochure(s) in this case is considered patient labeling, which should provide the risks and benefits associated with the device in a manner that is meaningful to the user. The Risks and benefits should be conveyed in an effective and meaningful way to the use in deciding whether to use a device, or undergo a procedure that uses the device.[46] Bard's patient brochure(s) for the Align products are woefully inadequate to that task as they fail to fairly communicate even a representative sample of the risks associated with the Align device. The risks section of the patient brochure in place at the time of the Align launch in May of 2007 reads as follows:[47]

**As with all surgery, a sling procedure carries some potential risk. Although infrequent, side effects can include bladder injury, post-op discomfort, difficulty urinating, and infection. Be sure to speak with your physician to ensure that you fully understand all possible risks involved.**

The patient brochure was updated in August, 2009 to read as follows:

**As with any surgical procedure, the sling procedure itself has the risk of complications such as the use of anesthesia, the surgical approach used, and how pre-existing conditions affect the outcome. Your physician can further explain your specific risks and can provide you a list of warnings associated with the procedure.**

**Like with any surgical procedure, there are risks associated with the use of a permanent mesh, man-made or natural tissue implant. Complications can**

---

[46] Guidance on Medical Device Patient Labeling; Final Guidance for Industry and FDA Reviewers. April 19, 2001
[47] AVA20252441; 03/07 Patient Brochure

> include localized fluid collection (blood, pus, clear serous fluid), erosion of the graft into surrounding tissues, infection, inflammation, pain (including pain with intercourse), perforation of neighboring tissues or organs, difficulty urinating, and failure of the procedure resulting in recurrence of incontinence. Given the permanency of a mesh implant, post-procedure removal of implant may be difficult.

This section of the patient brochure has not been updated since August of 2009. The patient brochures do not give the patient a thorough understanding of the risks of the device. The patient brochure fails to inform the patients of many of the risks Bard knew of including:

Seroma
Abscess or fistula formation
Scarring
Sensitization
Scarification
Contraction
Device Migration

In the October 20, 2008 Public Health Notification, the FDA recommended that patients receive a copy of the product IFU before deciding whether or not to receive a synthetic sling product. Bard could have easily ensured this would happen by including the IFU or at least the Adverse Events section of the IFU within the patient brochure itself, as other manufacturers of sling products have done, but chose not to. This deprived patients of an opportunity to fairly evaluate the risks and benefits of the device from a review of the patient labeling, as required by the FDA guidance documents. Bard failed to include the significant adverse events and risks associated with the Align, including the frequency, duration and severity of those risks.

For these reasons, Bard's Patient Brochure(s) is, and has always been, inadequate and defective. Furthermore, Bard deviated from the standard of care required of a reasonable medical device manufacture by failing to adequately disclose these known risks to patients and,

as a result, has denied patients the ability to make an informed choice regarding the use of the Align.

**D) Bard did not disclose information to physicians in its IFUs regarding characteristics of the polypropylene in Align's mesh that make it unsuitable for its intended application as a permanent prosthetic implant for stress urinary incontinence, including that it degrades over time, causes chronic foreign body reactions, fibrotic bridging, deformation, cording, rolling, roping and curling of the mesh and that Bard failed to conduct any clinical testing prior to releasing Align**

As discussed infra, the goal of the IFU is to communicate the most important safety risks attributable to the Align device and that an IFU should never exclude known hazards or complications. In addition, an IFU should not knowingly underestimate the risks of using the product. Again, this is true because it is imperative for physicians to know about hazards and harms related to a product so that they can have an accurate conversation with their patient about the use of the product. If a physician does not have important safety information, he/she cannot pass that information to their patient so that an informed decision can be made about the use of the product.

As discussed infra, Bard knew about significant harms and hazards related to the polypropylene mesh used in the Align. These harms and hazards include, but are not limited to, that the mesh degrades, causes chronic foreign body reactions, fibrotic bridging, and deformation, fraying, roping, cording and curling, rolling, and loss of pore size. However, despite its knowledge regarding these harms/hazards as discussed, Bard never disclosed this

information to physicians in its IFU.[48]  As a result, physicians are not able to have a fully informed conversation with their patients about the safety of the Align device.  By inadequately disclosing this information, Bard failed to act in as a reasonable and prudent medical device manufacturer.

> **E) Bard did not inform physicians and their patients that Manufacturer Safety Data Sheets (MSDSs) for the polypropylene resin used to manufacture the Align polypropylene mesh warned against use of the mesh in a permanently implanted medical device and that is was not to be exposed to peroxides (which exist in a woman's pelvis)**

Despite the warning in the MSDS for the polypropylene resin used to manufacture the Align mesh, there is no evidence that Bard informed surgeons about this important information. In fact, Bard went to lengths to conceal the information. (see infra).  This information includes the prohibition against using the material in medical applications inside the human body[49] and its incompatibility with other materials[50], like peroxides found in the vagina.

Bard did not undertake any long term testing to determine whether or not these warnings on the polypropylene resin manufacturer MSDS were associated with long term patient consequences. (see infra)  Given the information available to Bard concerning the potential for degradation of polypropylene coupled with the explicit warning and other contents of the MSDS, at a minimum, Bard should have conducted clinically relevant testing related to the

---

[48] Bard also failed to state in the Align IFU Bard had not conducted any clinical trials on the product. In 2009, Bard circulated an IFU template to update the Align IFU that included the following precaution, " _____ has not been evaluated in human subjects for the treatment of stress urinary incontinence. (Only add to IFUs for new products)" (AVA2E3511988, AVA20247705, AVA20158474).

[49] "**Do not use this Phillips Sumika Polypropylene Company material in medical applications involving permanent implantation in the human body** or permanent contact with internal body fluids or tissues." (emphasis added) (AVA2E1281085)

[50] The MSDS for the polypropylene used in Align states: "**Incompatibility With Other Materials:** May react with oxygen and strong oxidizing agents, such as chlorates, nitrates, peroxides, etc." (AVA2E1281089)

naturally occurring conditions in the vagina and its relationship to degradation of polypropylene and the warnings in the MSDS.

Clearly, these facts are critical information relevant to both the surgeon evaluating his or her treatment options and to the patient's informed consent decisions. The fact that this information has not been disclosed to physicians in any manner (IFUs, direct letters or promotional materials) is especially concerning in light of the long-term complications associated with Align and the lack of adequate testing with Align. For the surgeon to properly inform the patient of all the known risks involved in any procedure involving an implantable medical device, the surgeon relies upon the manufacturer to be aware of and convey all characteristics of its products that could impact safety and efficacy.

Because Bard failed to disclose this information, even going to lengths to hide this information, Bard failed to act like a reasonable and prudent medical device manufacturer.

**F) Bard's Patient Brochures overstate the benefits of the Align, understate the risks and misstate information related to success rate**

Bard's patient brochures for the Align are misleading. For example, in a 2007 Align patient brochure, Bard represents to patients and physicians that on average 85% of patients are dry after treatment. (AVA20252441) This claim includes no citation to any data or study. We know from the date of the brochure, just months after the Align was released, that the claim is not based on the performance of the Align product. Bard had conducted no clinical trials on Align prior to marketing it, and at this point no long-term clinical trials had been reported for Align success rates. Interestingly, in the same brochure, Bard highlights "not all urethral slings are identical in their material and design" and the Align "includes a synthetic mesh sling that is

uniquely knitted." But Bard still supports the marketing claim that 85% of patients are dry after treatment, with data from other urethral slings with different materials and designs, including products manufactured by other companies. This claim undoubtedly gives women the false impression that this claim is based on 85% of Align patients (or at the very least Bard patients) being treated successfully.

What is also not adequately explained to patients is that this "dry rate" is a combination of patients who are "cured" and those who are considered "improved," a fact that is not disclosed in advertisements directed at patients, but is generally disclosed in advertisements directed at doctors. Nor does Bard disclose whether the rate is based on the subjective dry rates (or how the patients feel) or an objective scoring guide. Further, Bard does not disclose to patients or physicians that the studies or authors they rely on for the marketing claim so that doctors can easily examine the studies or authors for bias and mesh industry funding. Bard also does not inform patients of the existence of other long-term studies which show a much lower success rate for slings.

Bard also states in the brochure, "Urethral slings have had an impressive performance over the year. They have been used successfully in hundreds of thousands of patients in the U.S. and around the word…." Again, this claim undoubtedly gives women the false impression that the Align product (or at the very least Bard products) has been used in hundreds of thousands of women across the world when in reality the product was just launched without any clinical data.

The same brochure falls short on listing the applicable complications that can arise with the Align. It states, "As with all surgery, a sling procedure carries some potential risk. Although infrequent, side effects can include bladder injury, post-op discomfort, difficulty urinating, and infection." The statement minimizes the risks by stating all surgery carries risks, they are

potential and it just some risk. It also misleads the patient to believe all complications are limited to post-op discomfort when they are not. It also misleads the patient to believe there are no risks unique to synthetic mesh surgery – they are not – without implantation of the Align synthetic mesh a patient has no risk or erosion, shrinkage of the mesh, and inability to remove the mesh. In fact, the brochure is completely silent on chronic pain, the requirement for multiple surgeries and the inability to ever completely remove the mesh implanted in the women's pelvis.

The patient brochures contain the tagline "Regaining Control. Restoring Your Lifestyle." This further gives the patient the false impression that complications are rare, and minimizes the invasiveness, recovery time and potential complications with the procedure. Specifically, this tagline misleads patients into thinking that they will never again have to deal with the symptoms of stress urinary incontinence or other urinary symptoms when the clinical studies show that anywhere between 19% and 37% of patients in clinical studies still have some stress urinary symptoms after treatment. Further, it minimizes the patients' consideration of the possibility that they may have new symptoms to manage as a result of their operation, including but not limited to potential recurrent urinary tract infections, new urge incontinence, dyspareunia, chronic pain, erosions, and urinary retention.

Other statements in the brochure give women a false impression of the surgery in general and recovery time. The brochure states it can be implanted in within 30 minutes, is minimally invasive with "tiny" incisions, with the patient returning home in a just a few hours. It is not unusual for women to take 4 weeks or longer before they can safely return to work after the Align procedure, particularly in jobs that require physical exertion as part of the job functions. Further, the recovery time varies from patient to patient, with some patients taking 8 weeks or even longer to completely heal and return to normal activities. Moreover, Bard failed to disclose

in its patient brochures that Bard did not conduct any clinical trials on Align prior to releasing Align to patients.

Because of the reasons stated above, Bard failed to include fairly balanced material in their brochures.

## CONCLUSION

Bard has marketed and sold the Align despite the fact that it is contains numerous characteristics that make it unsuitable for implantation in a woman's vagina. These characteristics include the following: manufactured from material never meant to be used inside the human body; degradation of the mesh; chronic foreign body reaction; roping, curling, cording, deformation, loss of pore size with tension, fraying and rolling of the mesh; shrinkage of the encapsulated mesh; fibrotic bridging leading to scar plate formation and mesh encapsulation; and Infections.

Not only does Bard sell a product which should never be put in the vagina, it failed to inform physicians and their patients about numerous risks associated with the product despite the fact that they knew of all of these risks before the product was launched. Additionally, Bard marketed its product with promotional pieces that did not fairly disclose the complications of its products.

As a result of these failures as fully set forth in this report, the Align has caused and will continue to cause a multitude of injuries in women, including the possibility of multiple erosions that can occur throughout one's lifetime, chronic and debilitating pelvic pain, recurrence, worsening incontinence, dyspareunia that can be chronic, wound infection, rejection of the mesh, sexual dysfunction, urinary and defecatory dysfunction, vaginal scarring, wound healing

problems, injury to ureters, pelvic abscess formation, risk of infection, and/or the need for additional surgeries, among others.

For the reasons set forth throughout this entire report, Bard failed to act like a prudent medical device manufacturer.

I am providing my expert opinion regarding the use of transvaginal synthetic mesh for stress urinary incontinence, specifically use of the Align products made by C.R. Bard, Inc. All opinions I have are to a reasonable degree of medical certainty. I understand discovery is still ongoing in this case and I reserve my right to amend my opinions if further information is provided in any form including, but not limited to corporate documents, depositions and the expert reports of both Plaintiff and Defense experts. My opinions are based upon my background, training and experience as well as the relevant medical literature and relevant discovery.

I declare under penalty of perjury that the foregoing is true and correct.

This 9th day of October 2014

Bruce Rosenzweig, M.D.

# EXHIBIT C

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carlson v. Boston Scientific Corp., S.D.W.Va., April 28, 2015

2014 WL 186872
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia.

In re ETHICON, INC., PELVIC REPAIR
SYSTEM PRODUCTS LIABILITY LITIGATION
This Document Relates to Carolyn Lewis, et al.
v. Ethicon, Inc., et al. Case No. 2:12–cv–4301.

Master File No. 2:12–MD–02327.
|
MDL No. 2327.
|
Jan. 15, 2014.

**Attorneys and Law Firms**

D. Renee Baggett, Bryan F. Aylstock, Aylstock Witkin Kreis & Overholtz, Pensacola, FL, David P. Matthews, Julie L. Rhoades, Matthews & Associates, Houston, TX, John P. Harloe, Tim K. Goss, L. Banno, Freese & Goss, Kevin L. Edwards, Peter De La Cerda, Edwards & De La Cerda, Dallas, TX, Calle Mendenhall, Richard Arthur Freese, Freese & Goss, Birmingham, AL, Jeffrey M. Kuntz, Thomas P. Cartmell, Wagstaff & Cartmell, Kansas City, MO, for Carolyn Lewis, et al.

Christy D. Jones, Anita Modak-Truran, Laura H. Dixon, William M. Gage, Butler Snow, Ridgeland, MS, David B. Thomas, Philip J. Combs, Susan M. Robinson, Thomas Combs & Spann, Charleston, WV, Kari L. Sutherland, Butler Snow, Oxford, MS, Susanna Moore Moldoveanu, Butler Snow, Memphis, TN, Erik W. Legg, Michael J. Farrell, Farrell White & Legg, Huntington, WV, Tracy G. Weiss, Reed Smith, Philadelphia, PA, for Ethicon, Inc., et al.

**MEMORANDUM OPINION AND ORDER**

JOSEPH R. GOODWIN, District Judge.

**(*Daubert* Motions)**

**\*1** Pending before the court are defendants Ethicon, Inc. and Johnson & Johnson, Inc.'s (collectively "Ethicon")

Motion to Limit the Opinions and Testimony of Prof. Dr. Med. Uwe Klinge [Docket 132]; Motion to Preclude or, in the Alternative, Motion to Limit Testimony of Prof. Dr. Med. Bernd Klosterhalfen [Docket 134]; Motion to Exclude Sherry A. Latham and Frank R. Tinari, Ph.D. [Docket 136]; Motion to Exclude the Opinions and Testimony of Dr. Thomas Mühl [Docket 137]; Motion to Exclude Nicholas Jewell [Docket 139]; Motion to Exclude Certain Opinions of Michael Thomas Margolis, M.D. [Docket 142]; Motion to Exclude Peggy Pence, Ph.D. [Docket 144]; Motion to Exclude Bruce Rosenzweig, M.D. [Docket 152]; and Motion to Exclude Cheryl D. Blume, Ph.D. [Docket 169]. Also pending before the court is Plaintiff Carolyn Lewis's Motion to Exclude Kevin Ong, Ph.D. from Testifying as an Expert Witness [Docket 146].

As set forth below, Ethicon's motions with respect to Dr. Pence [Docket 144] and Dr. Blume [Docket 169] are **GRANTED**. Ethicon's motions with respect to Dr. Klinge [Docket 132], Dr. Klosterhalfen [Docket 134], Ms. Latham and Dr. Tinari [Docket 136], Dr. Jewell [Docket 139], Dr. Margolis [Docket 142], and Dr. Rosenzweig [Docket 152] are **GRANTED in part** and **DENIED in part**. Ethicon's motion with respect to Dr. Mühl [Docket 137] is **DENIED**. The plaintiffs' motion with respect to Dr. Ong [Docket 146] is **DENIED**.

**I. Background**

This case is one of over 40,000 assigned to me by the Judicial Panel on Multidistrict Litigation. This case arises out of injuries allegedly sustained from the implantation of a pelvic mesh product, Ethicon's Gynecare TVT ("TVT"), to treat stress urinary incontinence. The complaint alleges the following causes of action: 1) negligence; 2) strict liability—design defect; 3) strict liability—manufacturing defect; 4) strict liability—failure to warn; 5) breach of express warranty; 6) breach of implied warranty; 7) loss of consortium; and 8) punitive damages. (*See* Compl. [Docket 1] ). The plaintiffs, as well as Ethicon, have retained experts to render opinions regarding the elements of these causes of action. The instant motions involve the parties' efforts to exclude or limit the opinions and testimony of many of these experts.

**II. Legal Standard**

Under Federal Rule of Evidence 702, expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue" and (1) is "based

Case 2:12-md-02327 Document 9075-13 Filed 01/10/20 Page 77 of 924 PageID #: 212884

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...

upon sufficient facts or data" and (2) is "the product of reliable principles and methods" which (3) has been reliably applied "to the facts of the case." Fed.R.Evid. 702. A two-part test governs the admissibility of expert testimony. The evidence is admitted if it "rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of expert testimony does not have the burden to "prove" anything. He must, however, "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Maryland Cas. Co. v. Therm–O– Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998).

**\*2** The district court is the gatekeeper. It is an important role: "[E]xpert witnesses have the potential to be both powerful and quite misleading[;]" the court must "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir.2001) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) and *Daubert,* 509 U.S. at 588, 595). I "need not determine that the proffered expert testimony is irrefutable or certainly correct"—"[a]s with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir.2006) (quoting *Daubert,* 509 U.S. at 596); *see also Maryland Cas. Co.,* 137 F.3d at 783 (noting that "[a]ll *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful").

*Daubert* mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003) (quoting *Daubert,* 509 U.S. at 593–94).

Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not

on the conclusions reached." *Westberry,* 178 F.3d at 261 (quoting *Daubert,* 509 U.S. at 594–95); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We agree with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' ") (citation omitted); *see also Crisp,* 324 F.3d at 266 (noting "that testing of reliability should be flexible and that *Daubert's* five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, *Daubert* also explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. The consideration has been aptly described by Judge Becker as one of fit. Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

**\*3** *Daubert,* 509 U.S. at 591–92 (internal citations and quotation marks omitted).

### III. The Defendants' *Daubert* Motions

Ethicon seeks to limit or exclude the testimony of Dr. Thomas Miihl, Dr. Uwe Klinge, Dr. Bernd Klosterhalfen, Sherry A. Latham, Dr. Frank D. Tinari, Dr. Nicholas Jewell, Dr. Michael Thomas Margolis, Dr. Peggy Pence, Dr. Bruce Rosenzweig, and Dr. Cheryl D. Blume. I address each proposed expert in turn.

### A. Dr. Thomas Muhl

Ethicon challenges Dr. Miihl's opinions regarding "effective porosity." For the reasons stated below, Ethicon's motion [Docket 137] is **DENIED.**

Dr. Mühl holds a Ph.D. in electrical engineering and, along with Dr. Uwe Klinge, developed a concept called "effective porosity," which is defined as a percentage of the area of mesh that has a pore size of greater than one

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 78 of 924 PageID #: 212885

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...

millimeter in all directions. (Mühl Report [Docket 137–1], at 2). The effective porosity threshold is based on the theory that pores should be at least one millimeter in all directions in order to (1) prevent "fibrotic bridging" (the merging of granuloma across pores that prevents tissue from filling the pores) and (2) permit tissue ingrowth. (*See* Mühl Report [Docket 137–1], at 2). Dr. Mühl uses the test to determine that Ethicon's TVT has an effective porosity of 0.0%. (Mühl Report [Docket 137–1], at 8–9).

Under the *Daubert* analysis, I must determine that an expert witness is qualified to offer his or her opinions, and that his or her opinions are both relevant—helpful to the jury to understand a fact in issue—and reliable—methodologically sound. Ethicon does not argue that Dr. Mühl is unqualified to render these opinions or that his opinions are unhelpful. Rather, Ethicon argues that Dr. Mühl's opinions are unreliable because they are not generally accepted, they do not take into account the range of forces exerted on mesh *in vivo,* the one millimeter measurement is arbitrary, and Ethicon's competitor partially financed the development of the theory. (*See generally* Defs.' Mem. of Law in Supp. of Mot. to Limit the Ops. and Test. of Prof. Dr. Thomas Mühl [Docket 138] ("Defs.' Mem. re: Mühl")). Ethicon brings these challenges to the same opinions held by Drs. Klinge and Klosterhalfen. Therefore, the analysis that follows applies equally to the effective porosity opinions of Drs. Mühl, Klinge, and Klosterhalfen.

First, Ethicon argues that Dr. Mühl's opinions are not reliable because they are not generally accepted. The concept of effective porosity is apparently adopted only in articles authored by Drs. Mühl and Klinge, and it is used only by a single manufacturer, FEG Textiltechnik ("FEG"), a company affiliated with Drs. Mühl and Klinge. But general acceptance is merely one factor a court should consider in determining admissibility of expert testimony. A court should consider numerous factors, none of which is dispositive, in determining whether an expert's methods pass muster under *Daubert. See United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003). In addition to general acceptance, a court should consider whether an expert's theories have been "subjected to peer review and publication." *Daubert,* 509 U.S. at 593. Dr. Mühl's effective porosity theories are published in several peer-reviewed articles. (*See, e.g.,* Mühl Dep. [Docket 161–6], at 244:14–245:19; Klinge Report [Docket 132–1], at 18 (citing Mühl T. et al., *New Objective Measurement to*

*Characterize the Porosity of Textile Implants,* J. Biomed. Mater. Res. Part B: Applied Biomaterials 176–183 (2007)), *id.* (citing J. Otto et al., *Elongation of Textile Pelvic Floor Implants Under Load is Related to Complete Loss of Effective Porosity, thereby Favoring Incorporation of Scar Plates,* J. Biomed. Mater. Res. Part A 1–6 (2013))).

**\*4** Second, Ethicon argues that these opinions are unreliable because Drs. Mühl and Klinge have contradicted themselves in the past by stating that pores measuring less than one millimeter can be effective. (*See* Defs.' Mem. re: Mühl [Docket 138], at 8). An expert's contradictory prior statements may indicate that the expert's methods are unreliable, but that is not necessarily dispositive. The relevant inquiry is whether the proffered opinions are sufficiently reliable under *Daubert.* Dr. Klinge explained in his deposition that they adopted the one millimeter parameters in reliance on the Conze study and his research with Dr. Bernd Klosterhalfen. (*See* Klinge Dep. [Docket 161–10], at 376:14–377:16; 663:13–664:3). With support from a peer-reviewed publication, I am not convinced that opinions regarding the one millimeter parameters are unreliable.

Third, Ethicon suggests that the methods for testing effective porosity are unreliable because they were developed for FEG, a direct competitor of Ethicon. But as Ethicon admits, "a proffered expert witness's financial interest often goes to the weight rather than the admissibility of testimony." (Defs.' Mem. re: Mühl [Docket 138], at 7). "[I]t is well-settled that an expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." *Grant Thornton, LLP v. F.D.I.C.,* 297 F.Supp.2d 880, 884 (S.D.W.Va.2004) (Faber, J.). Ethicon is free to highlight this conflict of interest on cross-examination.

Fourth, Ethicon contends that even if I permit Dr. Mühl to testify about his effective porosity opinions, I should still prohibit his opinions regarding "effective porosity under strain" because they fail to take into account the wide range of physical forces exerted on implanted mesh. (*See* Defs.' Mem. re: Mühl [Docket 138], at 9–11). In order to test the TVT mesh's effective porosity while subjected to the mechanical forces of the human body, Dr. Mühl applied uniaxial forces (pulling from one side) between a range of 102 grams and 1,000 grams to the mesh. Ethicon argues that, in the human body, meshes are

Case 2:12-md-02327 Document 9075-13 Filed 01/10/20 Page 79 of 924 PageID #: 212886

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...

subject to forces from multiple directions simultaneously and that the actual forces to which urethral slings are subjected are estimated to be less than 50 grams. (*See* Defs.' Mem. re: Mühl [Docket 138], at 10). The plaintiffs retort that Ethicon used the same uniaxial loads to test its own products. (*See, e.g.,* Mühl Report [Docket 137–1], at 6 ("Ethicon's manner of applying uniaxial loads to Ethicon mesh to determine the behavior of mesh is strikingly similar to our test method.")). Further, Dr. Klinge explained that because slings are only one centimeter wide, any force attempting to make a sling wider will be very small (*see* Klinge Dep. [Docket 161–10], at 483:7–9), and the downward forces exerted on the sling by the pelvic floor will create a largely uniaxial strain (*id.* at 482:22–438:5). Finally, Dr. Mühl's expert report cites a published study employing similar uniaxial tensile testing methods to analyze Ethicon slings. (*See* Mühl Report [Docket 137–1], at 6).

**\*5** Lastly, Ethicon argues that Dr. Mühl impermissibly relied on unreliable medical opinions of Dr. Klinge, but Ethicon does not point to any specific statements or opinions that it challenges. (*See* Defs.' Mem. re: Mühl [Docket 138], at 11). In any event, I address Ethicon's challenges to Dr. Klinge below.

Ethicon's arguments do not convince me that Dr. Mühl's opinions regarding effective porosity are unreliable. I therefore **FIND** that Dr. Mühl's opinions regarding effective porosity are not excluded.

**B. Dr. Uwe Klinge**
Ethicon moves to bar Dr. Klinge from testifying about (1) Ethicon's knowledge and state of mind, (2) the TVT product's propensity to cause secondary infections, (3) degradation and fraying of the TVT mesh, (4) porosity and pore deformation, (5) an alternative design, and (6) an analysis of a collection of TVT mesh explants. As discussed below, Ethicon's motion [Docket 132] is **GRANTED in part** and **DENIED in part.**

**i. Opinions Related to the Ethicon's Knowledge, State of Mind, and Corporate Conduct**
Throughout his expert report, Dr. Klinge discusses Ethicon's knowledge, state of mind, and corporate conduct. (*See, e.g.,* Klinge Report [Docket 132–1], at 10 ("Ethicon employees have testified that Ethicon knew before launch of its pelvic meshes ... that in some women,

there would be a severe FBR [foreign body reaction] and chronic life-altering inflammatory reaction ...."); *id.* ("As evidenced in countless pages of deposition testimony of Ethicon employees and internal Ethicon documents, Ethicon was aware that meshes with lighter weight and larger pores ... lessened the risk of injury to patients."); Klinge Report [Docket 132–2], at 38 ("Internal documents reveal that there was knowledge of not only the degradative effects of polypropylene in surgical mesh but also that Ethicon's PVDF mesh, Pronova, was more elastic and demonstrated less degradation than polypropylene."); *id.* at 50 ("Ethicon was aware of the formation of biofilms on its transvaginally-placed meshes as noted by the TVM Group, the surgeons who [were the] inventors of Ethicon's prolapse repair kit, Prolift."); Klinge Report [Docket 132–3], at 54 ("Ethicon was aware of the difficulties in defining the biomechanical requirements of the human pelvis."); *id.* at 64 ("Ethicon knew the importance of a pelvic mesh that was stretchable in all directions ...."); *id.* at 88 ("Ethicon was aware of the challenges and uncertainties of designing a safe mesh for the pelvic floor....")). Dr. Klinge also opines on what course of action Ethicon should have taken, stating "a reasonable mesh manufacturer should be less concerned about how its mesh design compares to its competition, and less concerned about telling a 'nice story' to physicians to justify selling 'inferior' meshes and more concerned with how its product affects the patients in which it will be permanently implanted." (*Id.* at 48–49).

**\*6** While an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible—Ethicon's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury. *See, e.g., In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 547 (S.D.N.Y.2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony ... the question of intent is a classic jury question and not one for the experts.") (internal quotation marks omitted); *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) (precluding testimony as to "the knowledge, motivations, intent, state of mind, or purposes of" a company and its employees because it "is not a proper subject for expert or even lay testimony"). Accordingly, Dr. Klinge's

Case 2:12-md-02327 Document 9075-13 Filed 01/10/20 Page 80 of 924 PageID #: 218887

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...

opinions related to Ethicon's knowledge, state of mind, or corporate conduct are **EXCLUDED.**

### ii. Secondary Infections

Dr. Klinge opines that Ethicon's product is "susceptible to an increased risk of secondary, mesh-related infections...." (Klinge Report [Docket 132–1], at 4). Ethicon argues that Ms. Lewis did not suffer from a secondary, mesh-related infection, and therefore that Dr. Klinge's opinions on the product's associated risk of developing such infections are irrelevant. (*See* Defs.' Mem. of Law in Supp. of Mot. to Limit the Op. and Test. of Prof. Dr. Med. Uwe Klinge [Docket 133] ("Defs.' Mem. re: Klinge"), at 9). The plaintiffs retort that "[e]ven if Ms. Lewis has not yet had an infection due to her mesh implant, Dr. Klinge has testified that she is at an increased risk of infection over the course of the remainder of her life." (*See* Pls.' Resp. in Opp. To Defs.' Mot. to Limit the Op. and Test. of Prof. Dr. Med. Uwe Klinge [Docket 160], at 9).

An expert witness will be permitted to testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or *to determine a fact in issue* [.]" Fed.R.Evid. 702 (emphasis added). In his deposition, Dr. Klinge testified that "there can be some infections manifesting after two years, 50 years, with a foreign body with an implant." But his opinions appear to be limited to cases where the mesh remains in the body. (*See* Klinge Dep. [Docket 160–3], at 282:19–283:2 ("[I]f you're 80 years old, the lifelong risk [of developing an infection] fortunately is small, is shorter, but if you're 20 years old and you expect that this implant has to work there for another 70 years, of course, the risk is higher to experience an infection than in the old patient.")). Dr. Klinge does not offer opinions on secondary infections where the mesh has been explanted, as is the case with Ms. Lewis. Dr. Klinge's opinions regarding secondary infections therefore do not fit the facts of this case, and they are **EXCLUDED.**

### iii. Degradation and Fraying of Polypropylene Mesh

**\*7** Dr. Klinge opines that the TVT device is defective because it degrades *in vivo* and is subject to fraying and particle loss. (*See* Klinge Report [Docket 132–1], at 4). Ethicon argues that these opinions should be excluded because Dr. Klinge cannot tie degradation, fraying, or

particle loss to any particular clinical complication, [1] and his methods are unreliable.

First, Ethicon ignores Dr. Klinge's statements that clearly ascribe particular complications to degradation, fraying, and particle loss. For instance, he states that "such oxidation and degradation, depending upon the severity, can [create] an enhanced inflammatory tissue response due to increased surface area as well as the lack of a smooth surface coming into contact with the tissue." (Klinge Report [Docket 132–2], at 37). Second, Dr. Klinge's opinions are based, at least in part, on peer-reviewed, published literature. (*See* Klinge Report [Docket 132–2], at 33 (citing studies by Williams et al., Liebert et al., and Oswald et al.)). I therefore **FIND** that Dr. Klinge is permitted to testify generally about polypropylene's tendency to degrade, fray, or lose particles and its effect on the human body. [2]

### iv. Effective Porosity and Pore Deformation

Dr. Klinge opines that after implantation, the effective porosity of the TVT mesh is insufficient, and that "[u]nder minimal strain, the TVT mesh pores deform and collapse thereby increasing the risk of injury to patients in which it is implanted...." (Klinge Report [Docket 132–2], at 2). These opinions are similar to those held by Dr. Thomas Miihl, and the parties brief these opinions in relation to Dr. Miihl's expert report. Therefore, for the reasons discussed in relation to Dr. Miihl, I **FIND** that Dr. Klinge is permitted to testify about effective porosity and pore deformation.

### v. PVDF Alternative Design

Dr. Klinge intends to testify that mesh made of polyvinylidene fluoride, or PVDF, was a feasible alternative design to Ethicon's TVT. (*See* Klinge Report [Docket 132–3], at 84–88). Ethicon argues that this opinion is unreliable because it is based on Drs. Klinge's and Miihl's effective porosity studies. However, in his expert report, Dr. Klinge cites several academic articles and studies for the propositions that PVDF does not degrade like polypropylene and that PVDF meshes show little signs of surface cracking, inflammation, or scar formation after implantation. (*See, e.g.,* Klinge Report [Docket 132–3], at 86 (citing Klink, C. et al., *Comparison of Long–Term Biocompatibility of PVDF and PP Meshes,* Journal of Investigative Surgery 24:292–299 (2011);

Silva, R. et al., *Degradation Studies of Some Polymeric Biomaterials: Polypropylene (PP) and Polyvinylidene Difouride (PVDF),* Material Science Forum 593–543 (2007); Klinge, U. et al., *PVDF as a New Polymer for the Construction of Surgical Meshes,* Biomaterials 23:3487–3493 (2002)). Therefore, I **FIND** Dr. Klinge's opinions regarding a PVDF alternative design should not be excluded as unreliable.

### vi. Opinions Related to Analysis of Pelvic Mesh Explants

**\*8** Dr. Klinge bases various opinions on his analysis of a collection of TVT mesh explants at the Institute for Pathology, Diiren. (*See* Klinge Report [Docket 132–3], at 69). Ethicon argues that Dr. Klinge should not be permitted to testify about his analysis of the explants because he is unqualified and his opinions are unreliable.

Ethicon believes Dr. Klinge is unqualified to offer opinions about his analysis of the explants because he is not a pathologist. (*See* Defs.' Mem. re: Klinge [Docket 133], at 19). Experts may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. Dr. Klinge's practice focuses on hernia repair, and he has implanted and studied the Prolene mesh used in the TVT many times. (*See* Klinge Report [Docket 132–1], at 5–6). He is the author or co-author of "over 100" peer-reviewed publications which involve hernia and/or surgical mesh.

I need not decide whether Dr. Klinge is qualified to offer opinions regarding his examination of explants because his opinions are unreliable. Dr. Klinge states that he examined 485 explants from the mesh collection at the Institute for Pathology, Düren. Of the 485 meshes examined, Dr. Klinge reports that "a severe fibrosis was seen in > 60% of the TVT-devices.... Erosion was seen in 20% of the TVT samples...." (Klinge Report [Docket 132–3], at 69). But Dr. Klinge does not state how he selected these particular explants, or whether 485 is a large sample size of the Institute's collection. He also offers opinions derived from an analysis of 22 explanted TVT and TVT–O samples. (*See* Klinge Report [Docket 132–3], at 69 ("All sections showed an intense and chronic foreign body reaction with an inflammatory infiltrate close to the polymer fibers....")). Again, Dr. Klinge does not explain how he selected these 22 particular samples. There are no assurances that Dr. Klinge—or plaintiffs' counsel—did not opportunistically choose samples while ignoring others that might have weakened or disproved

his theories. In short, there are no indications that Dr. Klinge's analyses of the mesh implants were controlled for error or bias. In *Daubert,* the Supreme Court stated that the "court ordinarily should consider the potential rate of error." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 594, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Without any explanation of the method for selecting the explants or the potential error rate in the conclusions drawn from the explants, Dr. Klinge's opinions are simply unreliable and are **EXCLUDED.**

### C. Dr. Bernd Klosterhalfen

Ethicon brings two separate challenges to Dr. Klosterhalfen's testimony. First, Ethicon argues that Dr. Klosterhalfen should not be permitted to testify because the plaintiffs failed to submit a complete expert report pursuant to Federal Rule of Civil Procedure 26(a)(2). Second, Ethicon argues that, even if Dr. Klosterhalfen is permitted to testify, his opinions fail to satisfy the *Daubert* reliability and relevancy requirements. For the reasons discussed below, Ethicon's motion [Docket 134] is **GRANTED in part** and **DENIED in part.**

### i. Expert Reports under Rule 26(a)(2)

**\*9** According to Ethicon, the plaintiffs have failed to submit a sufficient expert report for Dr. Klosterhalfen, thus rendering him unable to testify. Under Rule 26, "a party must disclose to the other parties the identity of any witness it may use at trial...." Fed.R.Civ.P. 26(a)(2) (A). In addition to disclosing the identity of a witness, when "the witness is one retained or specially employed to provide expert testimony," a party must provide a written report regarding the witness. Fed.R.Civ.P. 26(a) (2)(B). That report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" *Id.* "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c).

Ethicon argues that the plaintiffs have not provided a report that meets the requirements of Rule 26(a)(2) (A). The plaintiffs provided a report on October 14, 2013, in response to which Ethicon moved for an order compelling the plaintiffs to supplement their disclosures. Magistrate Judge Eifert agreed with Ethicon and ordered

the plaintiffs to supplement this report. (*See* Order [Docket 97] ). Ethicon claims that the supplemented report is insufficient and that Dr. Klosterhalfen should be barred from testifying.

The plaintiffs argue that Dr. Klosterhalfen is a percipient fact witness, not a retained expert, and therefore he is not required to submit a detailed expert report pursuant to Rule 26(a)(2)(B). Dr. Klosterhalfen consulted for Ethicon from 1998 to 2011. During that time, Ethicon asked Dr. Klosterhalfen to analyze explanted pelvic mesh samples. Dr. Klosterhalfen also discussed with Ethicon potential changes to Ethicon's mesh. (*See* Defs.' Mem. of Law in Supp. of Their Mot. to Preclude or, in the Alterative, Mot. to Limit Test. of Prof. Dr. Med. Bernd Klosterhalfen [Docket 135] ("Defs.' Mem. re: Klosterhalfen"), at 8).

Where an expert is also a percipient fact witness, courts distinguish between "a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony." *Downey v. Bob's Disc. Furniture Holdings, Inc.,* 633 F.3d 1, 6 (1st Cir.2011). "The distinguishing characteristic between expert opinions that require a report and those that do not is whether the opinion is based on information the expert witness acquired through percipient observations or whether, as in the case of retained experts, the opinion is based on information provided by others or in a manner other than by being a percipient witness to the events in issue." *U.S. v. Sierra Pac. Indus.,* CIV S–09–2445 KJM EF, 2011 WL 2119078, at *4 (E.D.Cal. May 26, 2011).

Ethicon argues that a number of Dr. Klosterhalfen's opinions go beyond his relationship with Ethicon and therefore require a detailed expert report. Ethicon contends that Dr. Klosterhalfen's opinions are based in part on a polypropylene degradation study he conducted with Dr. Klinge, as well as Dr. Klosterhalfen's collection of explanted meshes that he maintained outside his relationship with Ethicon. Regardless of whether the plaintiffs violated Rule 26(a)(2)(B), the violation was harmless. In determining whether the nondisclosure of evidence is substantially justified or harmless under Rule 37(c), a district court must consider

**\*10** (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3)

the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.

*Hoyle v. Freightliner, LLC,* 650 F.3d 321, 329 (4th Cir.2011). There is no risk that Ethicon will be surprised by Dr. Klosterhalfen's testimony. Dr. Klosterhalfen's deposition and his expert testimony recently given at trial in *Cisson v. C.R. Bard,* No. 2:11–cv–195, provide Ethicon with full disclosure of Dr. Klosterhalfen's opinions and their basis. Further, Dr. Klosterhalfen's testimony will not disrupt the trial. Thus, I will not exclude Dr. Klosterhalfen's testimony under Rule 37(c).

### ii. Opinions Regarding Secondary Infections

Dr. Klosterhalfen's expert report states that Ethicon "knew that biofilm formation due to bacteria adherence led to secondary, potential mesh-related infections" (Klosterhalfen Report [Docket 134–1], ¶ 10) and that he told Ethicon "that in virtually 100% of [the meshes listed in an explant report] he found a secondary, mesh-related infection." (*Id.* ¶ 6). Ethicon argues that these opinions are improper because they are unhelpful and irrelevant. I agree. As I previously discussed, an expert's opinions on Ethicon's knowledge or state of mind are not helpful to the jury. *See* Fed.R.Evid. 702. Further, secondary infections are not "a fact in issue" in this case. *Id.* Three separate physicians, Dr. Zimmern, Dr. Sexton, and Dr. Zheng, testified that Ms. Lewis did not suffer from a secondary infection. (*See* Zimmern Dep. [Docket 134–12], at 42:4–6; Sexton Rep. [Docket 134–13], at 4; Zheng Rep. [Docket 134–15], at 8). The plaintiffs do not dispute this testimony. Therefore Dr. Klosterhalfen's opinions relating to secondary infections are **EXCLUDED**.

### iii. Opinions Related to Polypropylene's Propensity to Degrade

Dr. Klosterhalfen opines that polypropylene "is not inert and degrades in vivo over time." (Klosterhalfen Report [Docket 134–1], ¶ 14). This degradation, he contends, "adds to a chronic inflammatory process that is long term and induces scarification, contraction of the tissues, pain, and infection, both clinical and subclinical." (*Id.*)

Ethicon first argues that these opinions are irrelevant because Dr. Klosterhalfen "cannot say with any probability that degradation caused Mrs. Lewis' injuries." (Defs.' Mem. re: Klosterhalfen [Docket 135], at 15). It is true that none of Dr. Klosterhalfen's opinions directly address Ms. Lewis's particular injuries. Therefore, I **FIND** that Dr. Klosterhalfen's testimony is limited to opinions regarding polypropylene degradation and its effects *generally.*

Second, Ethicon argues that these opinions are unreliable because they are not generally accepted or supported by the scientific literature. Dr. Klosterhalfen's deposition testimony, although vague, appears to show the opposite:

> **\*11** Q: What evidence do you have that any degradation in the polypropylene mesh adds to a chronic inflammatory process?

> A: Well, you'll see what happens is this degradation that you have of flaking or shaving of small particles of the surface of the polypropylene's fiber, *and in literature, there are a couple of studies* and especially what I told you in the hip prosthesis where different groups, including a group I participated in, I don't know when, 2004 or 2005, I don't remember, with some orthopedic surgeons from the Essen University where you can see that small particles of phagotypes and activate macrophages, and interesting in *these studies* is that the activation of the cells is independent from the material used.

(Klosterhalfen Dep. [Docket 134–7], at 438:4–21 (emphasis added)). Dr. Klosterhalfen also testified that other studies, which he could not name, and his personal experience examining tissue samples support his opinions. (*See id.* at 443:13–444:21). I am not able to determine the *specific* bases for Dr. Klosterhalfen's opinions because his expert report does not elaborate. Based on the record before me, I cannot determine whether Dr. Klosterhalfen's opinions are sufficiently reliable. Therefore, I reserve this ruling for trial.

### iv. Opinions Related to Effective Porosity

Dr. Klosterhalfen's expert report states that "to avoid bridging fibrosis and shrinkage, a polypropylene mesh product ... must have class 'A' pores with pore size of 3 millimeters in all directions or greater and an effective pore size greater than 1 millimeter in all directions

after tissue integration." (Klosterhalfen Report [Docket 134–1], ¶ 13). Ethicon challenges these opinions by incorporating by reference its arguments against Dr. Miihl's effective porosity opinions. Therefore, for the same reasons discussed above in relation to Dr. Miihl, I **FIND** that Dr. Klosterhalfen's testimony regarding effective porosity should not be excluded.

### D. Sherry A. Latham

Ethicon moves to exclude Ms. Latham's opinions in their entirety. For the reasons discussed below, Ethicon's motion [Docket 136] is **GRANTED in part** and **DENIED in part.**

Ms. Latham is a certified life care planner and a registered nurse. Her expert report sets forth detailed opinions on future projected care—a "life care plan"—for Ms. Lewis. The life care plan discusses and provides expected costs for "reasonable and necessary goods and services related to the impairments associated with [Ms. Lewis's] complications associated with her vaginal mesh." (Latham Report [Docket 136–1], at 12).

Ms. Latham's report provides a comprehensive summary of services that she opines that Ms. Lewis will require. For example, Ms. Latham projects that Ms. Lewis and her husband will require psychological and sexual therapy evaluations followed by psychological and sexual therapy treatment sessions for the next twenty-four years. (*See id.* at 117). Ms. Latham also projects that Ms. Lewis will require various medical supplies; drugs; such as Ambien, Citalopram, Hydrocodone, and Valium; and specific surgical procedures, such as Botox injections to the bladder, Coaptite injections to the bladder and sphincter, and "future mesh related surgery interventions for incontinence." (*Id.* at 117–18). Ms. Latham originally opined that Ms. Lewis will need an ATV with a rifle mount and a truck ramp for the ATV, (*id.* at 31), but she has since removed this item from her amended report.

**\*12** Ethicon argues that Ms. Latham's life care plan is outside the scope of her expertise and lacks medical foundation. To be admissible, Ms. Latham's opinions and life care plan must be based on "reliable principles and methods" reliably applied to the facts of this case. Fed.R.Evid. 702. Because much of Ms. Latham's life care plan describes particular medical procedures and services, there must be a medical foundation for her recommendations. In other words, a doctor or medical

expert must opine to a reasonable degree of medical certainty that the items listed in the life care plan are necessary. Ms. Latham herself admits that "ideally" she bases life care plans on "medical foundation" provided by a "medical doctor." (Latham Dep. [Docket 136–2], at 105:12–21). Yet at her deposition, Ms. Latham admitted that "the entire life care plan [for Ms. Lewis] is pending medical foundation." (*Id.* at 225:18–19). Ms. Latham stated that no healthcare provider recommended the particular services set out in the life care plan. (*Id.* at 220–227).

In response, the plaintiffs argue that Ms. Latham's report is in fact supported by Dr. Zimmern, who explanted Ms. Lewis' TVT mesh, and Dr. Margolis. The plaintiffs point to the following portion of Dr. Zimmern's deposition, arguing that it supports Ms. Latham's recommendations for counseling, physical therapy, and pain treatment:

> Q: Let's talk about what the future holds in terms of what she needs for therapy. As she heals from this procedure, would you recommend therapy for her?
>
> A. Well, if she's fine, I mean, if she has minimal incontinence, can resume sexual activity, the pain is gone, she needs nothing else.
>
> Q. Okay. Have you had patients that have had problems resuming sexual relations after a long period of time or not?
>
> A. We have.
>
> Q. Have you recommended counseling for those patients?
>
> pA. Well, they can have counseling, they can have physical therapy, they can have, you know, treatment to help with the pain, yeah.
>
> Q. Is that something you would recommend for her?
>
> A. If that becomes the case, yes.
>
> Q. And much of this depends on your future visits with her?
>
> A. That's correct.
>
> Q. Is there any way to tell the jury whether Ms. Lewis is going to need future procedures following this explant?

> A. I don't have a crystal ball, I'm sorry. I can't answer that, no.
>
> Q. I understand that you have—
>
> A. I hope in my heart that she won't, but if she does, you know, there are options to manage her complaints. Because we do see those things happening, but, you know.
>
> Q. What do you see happening with patients such as this? And I guess I refer you to—
>
> A. Yeah, all the risks that we discussed with her. So persistent pain, persistent dyspareunia, continued incontinence, infection.
>
> Q. So the potential exists for continued chronic pain or continued dyspareunia?
>
> A. Correct.

(Zimmern Dep. [Docket 136–4], at 140:2–141:16). This testimony does not provide a reliable medical foundation for Ms. Latham's expert report. Rather than providing an opinion to a reasonable degree of medical certainty, Dr. Zimmern merely states that there is "potential" for continued chronic pain and continued dyspareunia.

**\*13**  On the other hand, Dr. Margolis's expert report does provide a medical foundation for *some* of Ms. Latham's life care plan items. Dr. Margolis states in his report that the following treatments are reasonably medically certain: (1) follow-up visits at two weeks, six weeks, and then as needed, (2) prescription pain medication, "typically Vicodin, 30–40 pills," (3) antibiotics to prevent urinary tract infection, and (4) physical therapy to "break up scarring in her vagina ... and to strengthen her pelvic floor muscles." (Margolis Report [Docket 143–2], at 10). Although Dr. Margolis, a paid expert, seems to contradict Dr. Zimmern, a treating physician, Dr. Margolis's opinions are sufficiently reliable. He bases his opinions on his examination of Ms. Lewis and his knowledge and experience as a pelvic surgeon and urogynecologist with experience implanting and removing sling systems. Therefore Ms. Latham's cost projections related to Dr. Margolis's specific recommendations do not lack a medical foundation. I **FIND** that only Ms. Latham's recommendations that are very specifically grounded in

Dr. Margolis's medical opinions are not excluded, and that the residue of her opinions is **EXCLUDED.**

**E. Frank D. Tinari, Ph.D.**
Ethicon moves to exclude Dr. Tinari's opinions in their entirety. For the reasons discussed below, Ethicon's motion [Docket 136] is **GRANTED in part** and **DENIED in part.**

Dr. Tinari, an economist, provides opinions regarding the total cost of lifetime care for Ms. Lewis, discounted to present value. He bases his expert report entirely on the life care plan provided by Ms. Latham. (*See* Tinari Report [Docket 136–6], at 3). As I discussed above, many opinions of Ms. Latham are excluded because they lack medical foundation and are therefore unreliable. Accordingly, Mr. Tinari's opinions, which are based on Ms. Latham's life care plan, are also unreliable. Thus Mr. Tinari's opinions are **EXCLUDED** where they are based on items in Ms. Latham's report that are also excluded.

**F. Nicholas Jewell, Ph.D.**
Ethicon seeks to exclude Dr. Jewell's testimony entirely. For the reasons stated below, Ethicon's motion [Docket 139] is **GRANTED in part** and **DENIED in part.**

Dr. Jewell is a biostatistician and professor at the University of California, Berkeley. Dr. Jewell examines the methodology and scientific validity of certain studies regarding the safety and efficacy of the TVT. Quoting from the plaintiffs' brief, the studies are as follows:

1. *Ulmsten Studies:* Beginning in 1996, Professor Ulmsten published a series of papers, including the initial proof of concept studies used to create the [TVT] and submitted for marketing authorization;

2. *Ward–Hilton Studies:* In 2002, [ ] Drs. Ward and Hilton published the first in a series of papers comparing TVT to Burch colposuspension. This constituted the largest randomized comparator study and was sponsored by Ethicon;

   **\*14** 3. *TVT World Registry:* In 2011, Ethicon created and sponsored the TVT World Registry, the largest registry tracking the safety of its devices;

4. *Nilsson Studies:* In 2013, the last publication of the case series by Professor Nilsson was published. For more than 17 years, Ethicon has repeatedly relied upon this series of studies to support its claim that long-term clinical evidence proves TVT has a 97% success rate, and its claim that TVT is the "gold standard."

(Pls.' Resp. in Opp. to Defs.' Mot. to Exclude Nicholas P. Jewell [Docket 162] ("Pls.' Mem. re: Jewell"), at 4–5). Many of Ethicon's experts rely on these studies. (*See id.* at 5–6 (citing five Ethicon experts who relied on the studies)). Dr. Jewell opines that these studies contained methodological flaws, "systematically overstate the effectiveness of TVT," and therefore do not "provide an adequate basis for determining the safety or efficacy of TVT." (Jewell Report [Docket 139–7], at 3).

Ethicon first argues that Dr. Jewell's opinions are unreliable because he focuses on a limited number of studies while ignoring the rest of the scientific literature. (*See* Defs.' Mem. in Supp. of Mot. to Exclude Dr. Nicholas P. Jewell [Docket 140] ("Defs.' Mem. re: Jewell"), at 13). From Ethicon's brief:

> [Dr.] Jewell does not assess the TVT studies from an epidemiological perspective nor does he engage in a systematic review of the literature. Instead, what [Dr.] Jewell seeks to do is to raise questions about the validity of only five cherrypicked data sets (out of more than a hundred) while simultaneously purposefully ignoring the other information available. This is not the methodology of epidemiology....

(*See* Defs.' Mem. re: Jewell [Docket 140], at 13). The plaintiffs retort that Dr. Jewell was not tasked with opining on the overall safety and efficacy of the TVT, but with examining the methodology of the studies that Ethicon intends to introduce. (*See* Pls.' Mem. re: Jewell [Docket 162], 4). I agree with the plaintiffs. Ethicon will proffer at least some of these studies to show that the TVT was safe and effective and therefore not defectively designed. The plaintiffs intend to use Dr. Jewell to point out problems with these studies. This type of evidence is "classic rebuttal expert testimony." *In re Silicone Gel Breast Implants Products Liab. Litig.,* 318 F.Supp.2d 879, 898 (C.D.Cal.2004) (where defendants proffered fifteen studies concluding that silicone breast implants do not cause cancer, plaintiff's expert testified that the studies

Case 2:12-md-02327  Document 9075-1  Filed 01/10/20  Page 86 of 924 PageID #: 212893

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...  2018  WL  ... 42 of 124 PageID #: 214021

reached no conclusions about cancer). Of course, Ethicon is free to proffer or discuss additional studies, beyond those analyzed by Dr. Jewell, which it contends support the safety and efficacy of the TVT.

Second, Ethicon contends that Dr. Jewell's opinions are unhelpful because, while Dr. Jewell criticizes the methodology used in the studies he examined, he cannot quantify the impact of the alleged methodological failures on the outcomes of the studies. (*See* Defs.' Mem. re: Jewell [Docket 140], at 14). For example, when asked what impact a financial conflict of interest had on the Ulmsten studies, Dr. Jewell replied that "I, of course, have no specific information for any—for this specific study that I'm aware of." (Jewell Dep. [Docket 139–8], at 76:12–14). But Dr. Jewell's inability to precisely quantify the effect of particular methodological errors or biases does not render his opinions unhelpful. He identifies several specific problems with each set of studies and then posits that the evidence in the studies "is insufficient to support widespread use [of the TVT] in general patients...." (Jewell Report [Docket 139–7], at 18). For example, he opines that the Nilsson and Ulmsten studies "suffer from statistically unsound study design (lack of comparator, lack of well-defined inclusion/ exclusion criteria, unblinded enrollment, etc.), conduct (e.g., unblended outcome assessment, biased data capture, unblinded determination of home visitation, alterations of study endpoints) and reporting of the results (improper statistical analysis, incomplete or altered reporting of adverse events)." (Jewell Report [Docket 139–7], at 19). Dr. Jewell similarly points out specific flaws in the methodology of the other studies. His opinions are therefore sufficiently helpful to the jury in evaluating the weight of Ethicon's evidence that these particular studies support the safety and efficacy of the TVT.

**\*15** Third, Ethicon believes that Dr. Jewell's testimony should be excluded under Federal Rule of Evidence 403 because it will confuse and mislead the jury. I disagree. The jury should be permitted to understand the strengths and weaknesses of the evidence.

Finally, Ethicon briefly argues that if I permit Dr. Jewell to testify, I should limit the following opinions: (1) Ethicon deceived the FDA, (2) Dr. Ulmsten intentionally structured his studies to report better outcomes, (3) the Ulmsten and Nilsson studies did not use a comparator arm, (4) surgeons and investigators were not blinded,

(5) study results were not reported on a center-by-center basis, (6) information contained in device brochures was improper, and (7) a clinician reading the Tincello 2011 article would be misled. (*See* Defs.' Mem. re: Jewell [Docket 140], at 18–19). Ethicon argues that these opinions are inadmissible because Dr. Jewell is not qualified to render them (opinion 2), they are based on improper methodology (opinions 3–5), and they are not helpful (opinions 1, 6–7). (*See id.*). The plaintiffs failed to respond to any of these arguments. I agree with Ethicon's arguments, and these opinions are **EXCLUDED.**

### G. Dr. Michael Thomas Margolis

Dr. Margolis is a pelvic surgeon and a urogynecologist with experience implanting and removing sling systems. He also examined Ms. Lewis after her TVT device was removed. Ethicon argues that parts of his planned testimony either exceed his qualifications, are unhelpful to the jury, or are not set out in his expert report. For the reasons stated below, Ethicon's motion [Docket 142] is **GRANTED in part** and **DENIED in part.**

#### i. Ethicon's Knowledge and State of Mind

Dr. Margolis offers numerous opinions regarding Ethicon's state of mind and its knowledge of risks associated with the TVT. (*See, e.g.,* Margolis Report [Docket 142–2] at 5 ("Ethicon knew of these risks ...."), *id.* at 6 ("Ethicon possessed evidence that the risk of vaginal scarring was greater than disclosed ...."), *id.* at 11 ("Ethicon failed to disclose risk information available to Ethicon in its TVT Instructions for Use."). As I previously discussed, expert opinions on Ethicon's knowledge or state of mind are not helpful to the jury. *See* Fed.R.Evid. 702. Further, Dr. Margolis is qualified as a physician; he is not qualified by "knowledge, skill, experience, training or education" to opine on Ethicon's state of mind or knowledge. *Id.* Therefore these opinions are **EXCLUDED.**

#### ii. Opinions Related to the Failure to Warn

Dr. Margolis opines that Ethicon failed to warn either Ms. Lewis or her implanting physician about risks associated with the TVT. (*See* Margolis Report [Docket 142–2], at 5 ("Because Ethicon knew of these risks, they should have been put in the IFU"), *id.* at 6 ("Mrs. Lewis suffered injuries that were not disclosed to her by Ethicon"), *id.* at 11 ("Ethicon failed to disclose risk information");

Margolis Supp. Report [Docket 142–3], at 3 ("[T]o a reasonable degree of medical certainty, Ethicon failed to act appropriately in informing physicians and their patients about these known risks."). Dr. Margolis also opines that the lack of these warnings caused Ms. Lewis's injuries. (*See* Margolis Report [Docket 142–2], at 6 ("Mrs. Lewis was unable to make a fully informed decision about having the TVT implanted.... [T]he inadequate disclosure of these risks were a substantial factor and/or cause [of] Mrs. Lewis' injuries.").

**\*16** Ethicon argues that Dr. Margolis should be barred from testifying about the sufficiency of warnings that accompanied the TVT because the warnings are not a fact in issue. I agree. I granted summary judgment to Ethicon on the plaintiffs' failure to warn claims. Therefore, Dr. Margolis's opinions on the TVT's warnings are no longer relevant to a fact in issue and they are **EXCLUDED.**

### iii. Historical Commentary

Ethicon argues that the following statements are merely a historical narrative of the evidence and are therefore unhelpful to the jury. I quote directly from Ethicon's brief:

— "Ms. Lewis's implanting physician, Muriel Boreham, testified that she was unaware of many of the risks listed below prior to the time she implanted Ms. Lewis' TVT" (Expert Report, p. 5);

— "... Ethicon did not have any procedure or Professional Education program to teach doctors how to properly remove TVT mesh slings when known complications occurred" (id. at 6);

— Inadmissible hearsay that "[Manufacturers of polypropylene resin stated that it should not be used in the human body" (id.); and

— Inadmissible hearsay testimony about alleged complaints made by patients to Ethicon's Associate Medical Director (Supp.Report, p. 2).

(Mem. in Supp. of Mot. to Exclude Certain Ops. of Michael Thomas Margolis, M.D. [Docket 143], at 8–9). It is true that "[a]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on the record of evidence." *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009). But that is not the case here. These statements provide the factual basis for Dr. Margolis's opinions and are therefore

helpful for the jury to understand Dr. Margolis's opinions. Further, if Ethicon contends that certain statements are inadmissible hearsay, it may object to them at trial. A *Daubert* motion is not the proper method of excluding hearsay. Therefore, these opinions are not excluded.

### iv. Opinions Related to Product Marketing

Dr. Margolis briefly states that the growing population of postmenopausal women "provides an attractive target for marketing campaigns by device manufacturers seeking to capture a high market share...." (Margolis Report [Docket 142–2], at 4). Although Dr. Margolis cites two peer-reviewed journal articles for his claim, Ethicon rightly argues that marketing is not Dr. Margolis's field of expertise. Further, as I have previously ruled, to the extent that this opinion reflects Ethicon's motives, intent, or state of mind, it is not properly the subject of expert testimony. Accordingly, these opinions are **EXCLUDED.**

### v. Opinions Regarding Increased Use of Synthetic Slings

Dr. Margolis's expert report states that "[i]ndications for synthetic sling procedures became liberalized due to several factors." (Margolis Report [Docket 142–2], at 5). Ethicon takes issue with one factor in particular: Dr. Margolis's opinion that "[s]lings pay more to physicians than the more time-consuming Burch procedure." (Margolis Report [Docket 142–2], at 5). This opinion does not appear to be reliable. Dr. Margolis stated that he based this statement on information he obtained from his "payer," and that he does not have any general information to support it. (*See* Margolis Dep. [Docket 142–4], at 143:16). Further, Dr. Margolis is not an expert on medical device payment practices. Therefore, this opinion is **EXCLUDED.**

### vi. Opinions Not Expressed in the Expert Report

**\*17** Ethicon states that Dr. Margolis expressed opinions in his deposition that are not present in his expert report. (*See, e.g.,* Margolis Dep. [Docket 142–5], at 82:16–23 (traditional Burch procedure is the "gold standard"), 91:18–92:2 (TVT should be pulled from the market), 116:9–118:21 (midurethral synthetic slings should be pulled from the market)). Under Rule 26, expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for

them." Fed.R.Civ.P. 26(a)(2)(B)(i). Thus, these opinions are **EXCLUDED.**

Ethicon argues that Dr. Margolis also failed to discuss the TVT's effectiveness in his expert report. This is not true. His entire expert report focuses on the effectiveness of the TVT with respect to Ms. Lewis. (*See, e.g.,* Margolis Report [Docket 142–2], at 11 ("Carolyn Lewis developed numerous complications set forth above as a result of the TVT device being implanted into her body.")). Further, Dr. Margolis is qualified to comment on the effectiveness of the TVT. He has explanted over 200 mesh slings, including the TVT device. (Margolis Report [Docket 142–2], at 3). He has additionally observed "numerous" sling and mesh procedures involving TVT products and studied "textbooks, publications, IFU[ ]s (including those from J & J/Ethicon for the TVTs), surgical videos, cadaver dissections and countless operative reports...." (Margolis Report [Docket 142–2], at 4). I therefore **FIND** that Dr. Margolis's opinions related to the effectiveness of Ethicon's TVT should not be excluded.

### H. Peggy Pence, Ph.D.

Dr. Pence is a toxicologist with significant knowledge and experience with the FDA's regulatory processes. She has "reviewed or contributed substantially to the development of product labeling, including not only adverse reaction content but also contraindications and warnings, nonclinical toxicology and clinical studies information, and product use instructions." (Pence Report [Docket 144–3], at 4). Dr. Pence offers four separate opinions: (1) Ethicon failed to conduct appropriate testing of the TVT device, (2) the TVT system was misbranded due to a failure to warn, (3) the TVT system was misbranded as a result of false and misleading labeling, and (4) the TVT system was misbranded due to Ethicon's failure to meet the postmarket vigilance standard of care and manage risk. Ethicon seeks to exclude Dr. Pence's testimony in its entirety. For the reasons stated below, Ethicon's motion [Docket 144] is **GRANTED.**

#### i. Opinions Related to Ethicon's Failure to Conduct Appropriate Testing

Dr. Pence's first opinion is that Ethicon

failed to perform testing that was critical to learning the long-term safety for the TVT permanent implant. Ethicon fell below the standard of care required of a reasonably prudent medical device manufacturer. Moreover, Ethicon failed to comply with its own credo, specifically, that the company's first responsibility is to the doctors and patients who use Ethicon's products.

 **\*18**  (Pence Report [Docket 144–3], at 53). To arrive at this conclusion, Dr. Pence "principally looked at 510(k) applications, the documentation in Ethicon's 510(k) and related files, and the FDA's searchable 510(k) database." (Pence Report [Docket 144–3], at 39). Dr. Pence then analyzes particular risks associated with the TVT and implies that Ethicon should have performed certain tests. (*See, e.g.,* Pence Report [Docket 144–3], at 47 ("I reviewed no evidence of any studies conducted to determine long-term whether the fraying and the particles lost inside the body might cause deleterious effects."), *id.* at 51 ("Dr. Robinson testified that he was not aware of any long-term study undertaken by Ethicon to determine whether or not the TVT mesh is clinically cytotoxic in women.")).

Ethicon argues that Dr. Pence is not qualified to offer this opinion because she is not a biomedical engineer or a doctor, and she has no experience or training designing products or treating urinary incontinence. (*See* Mem. in Supp. of Mot. to Exclude Peggy Pence [Docket 145], at 3). I disagree. While it is true that Dr. Pence is not a doctor or biomedical engineer, she has more than forty years of experience in the research and development of pharmaceuticals and medical devices. (*See* Pence Report [Docket 144–3], at 1). She founded and presides over a company that provides "advice, guidance, and product development services to pharmaceutical/biopharmaceutical and medical device companies in the areas of strategic planning, preclinical testing, clinical trials design and conduct, and regulatory matters involving the U.S. Food and Drug Administration (FDA)...." (Pence Report [Docket 144–3], at 1). Dr. Pence has "designed clinical trials for diseases of the female genital system and [has] been involved in both preclinical and/or clinical testing of novel medical devices and biologics for wound healing applications, including both deep wounds and surgical incisions." (Pence Report [Docket 144–3], at 1). This experience is relevant to her opinion that Ethicon failed to act as a reasonably prudent manufacturer in testing the TVT, and she is therefore

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 89 of 924 PageID #: 212896

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in...  Case 2:12-md-02327... Page 89 of 924 PageID #: 212896

qualified to testify by her "knowledge, skill, experience, training, or education[.]" Fed.R.Evid. 702.

Although Dr. Pence is qualified to offer her opinion that Ethicon failed to conduct appropriate tests of the TVT, she must still exercise sound methodology in arriving at that opinion. Ethicon argues Dr. Pence's opinion is unreliable because it is merely *ipse dixit,* unsupported by any particular regulations or authorities. (*See* Mem. in Supp. of Mot. to Exclude Peggy Pence [Docket 145], at 4). I agree. As stated above, Dr. Pence analyzes a number of risks with the TVT and then states that particular tests were not conducted to investigate those risks. However, Dr. Pence does not explain the bases for her opinion that Ethicon's testing was inadequate. She points to nothing requiring such testing. She does not point to other manufacturers' testing practices. She simply notes that the tests were not done, and then declares that "in my professional opinion" Ethicon failed to adequately test. Without citing Dr. Pence's report, the plaintiffs argue that

> **\*19** [t]hrough her experience developing drugs and devices and bringing them to market, Dr. Pence is able to inform the jury that the practice within the medical device industry is to consider what is known about the product and its components and predicates, to look at the existing medical literature regarding the product or similar products, and to assess what additional information needs to be obtained through testing to determine if the product is safe for its intended use.

(Pls.' Resp. in Opp. To Ethicon's Mot. to Exclude Peggy Pence [Docket 166], at 23). This broad statement does not convince me that Dr. Pence's analysis is based on a reliable methodology "reliably applied ... to the facts of the case." Fed.R.Evid. 702. Accordingly, Dr. Pence's opinion that Ethicon failed to conduct appropriate testing of the TVT device is **EXCLUDED.**

#### ii. Opinions Related to FDA Regulatory Process
Dr. Pence's last three opinions largely involve FDA regulations and requirements. For instance, her second

opinion is that Ethicon violated Section 502 of the Food, Drug and Cosmetic Act ("FDCA") because its IFU was inadequate. ((Pence Report [Docket 144–3], at 84). Her third opinion is that Ethicon violated section 301(a) of the FDCA by utilizing "promotional labeling that was false and misleading" and failing to "reveal material facts." (Pence Report [Docket 144–3], at 89). Her fourth opinion is that "Ethicon deviated from the standard of care by its failure to report to the FDA a number of adverse events and malfunctions that met the criteria for Medical Device Reporting, rendering the TVT devices misbranded as a result of failure to furnish information requested under Section 519 of the FDCA." (Pence Report [Docket 144–3], at 109).

These opinions are **EXCLUDED** because they are not helpful to the jury. First, whether Ethicon violated particular sections of the FDCA or failed to furnish information to the FDA are not facts in issue in this case under Federal Rule of Evidence 702. The plaintiffs have not brought any claims based on Ethicon's violations of the FDCA. Second, to the extent that these opinions relate to either the plaintiffs' failure to warn claims or their breach of warranties claims, they are also not helpful to the jury and they will confuse and mislead the jury. As discussed in my Memorandum Opinion and Order (Motions for Summary Judgment), those claims are no longer pending.

#### I. Bruce Rosenzweig, M.D.
Dr. Rosenzweig is a urogynecologist and professor of obstetrics and gynecology. He offers several different opinions, each of which Ethicon contends are improper: (1) the TVT mesh is not suitable for permanent implantation to treat SUI, (2) the TVT's IFU was inadequate, (3) Ethicon did not disclose in the IFU particular characteristics of the TVT that render it unsuitable for permanent implantation, (4) Ethicon failed to adequately explain to physicians how to properly "tension" the TVT, (5) Ethicon did not warn physicians or patients about the polypropylene Manufacturer Safety Data Sheet admonition against using polypropylene for permanent implantation in the human body, (6) Ethicon did not properly inform physicians and patients that polypropylene mesh is cytotoxic, (7) the TVT promotional materials were inaccurate and failed to reveal material facts about complications and conflicts of interest, and (8) patient brochures overstated the benefits of the TVT and understated the risks. (*See* Rosenzweig Report [Docket

152–2], at 3). Ethicon seeks to exclude Dr. Rosenzweig because it argues that he is not qualified and his opinions are unreliable and unhelpful. For the reasons discussed below, Ethicon's motion [Docket 152] is **GRANTED in part** and **DENIED in part.**

#### i. Opinions Related to Ethicon's Failure to Warn

**\*20**  Most of Dr. Rosenzweig's opinions relate to the plaintiffs' failure to warn claims. (*See, e.g.,* Rosenzweig Report [Docket 152–2], at 3 ("Ethicon's Disclosures of Adverse Reactions and mesh complications in its TVT Instructions for Use ('IFU') were inadequate.... Ethicon did not disclose information to physicians in its IFUs regarding characteristics of polypropylene....)). In fact, the plaintiffs admit that "[t]he only testimony offered by Dr. Rosenzweig that is not focused on the TVT's warnings is his opinion that the TVT mesh is not suitable for its intended use." (Mem. in Opp. To Defs.' Mot. to Exclude Bruce Rosenzweig, M.D. from Testifying as an Expert Witness [Docket 164], at 6).

An expert opinion must "help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed.R.Evid. 702. I granted summary judgment to Ethicon on the plaintiffs' failure to warn claims. Therefore Dr. Rosenzweig's opinions that relate to warnings, the IFU, TVT promotional materials, or patient brochures are **EXCLUDED.**

#### ii. Opinion That TVT Mesh Not Suitable for Its Intended Use

As the plaintiffs admit, the only opinion offered by Dr. Rosenzweig that is not related to the TVT's warnings is his opinion that the TVT "is not suitable for its intended application as a permanent prosthetic implant for stress urinary incontinence because it degrades over time, causes chronic foreign body reactions, fibrotic bridging, mesh contracture/shrinkage, fraying, particle loss, roping and curling of the mesh, and loss of pore size with tension [.]" (Rosenzweig Report [Docket 152–2], at 3).

Ethicon argues that this opinion exceeds Dr. Rosenzweig's qualifications because he "has never performed any pathological analysis on a removed TVT or implant" and "he has never performed any research or development with respect to polypropylene at all." (Mem. in Supp. of Mot. to Exclude Bruce Rosenzweig, M.D. [Docket 153] ("Defs.' Mem. re; Rosenzweig"), at 4). I disagree. Simply

because Dr. Rosenzweig has not personally performed pathology research on polypropylene explants does not necessarily render him unqualified under Rule 702 to offer opinions regarding the suitability of the TVT device for implantation. An expert may be qualified by "knowledge, skill, experience, training, or education[.]" Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989).

Dr. Rosenzweig has "performed over a thousand pelvic floor surgical procedures," and "over 200 surgeries dealing with complications related to synthetic mesh, including the removal of numerous TVT devices." (Rosenzweig Report [Docket 152–2], at 2). Dr. Rosenzweig testified that as early as 2004 or 2005, he determined, as a result of explanting mesh products, that polypropylene degrades in the human body. (Rosenzweig Dep. [Docket 164–2], at 57:25–58:13). Further, he cites dozens of studies and academic papers in his expert report to support his opinion that vaginally implanted polypropylene mesh degrades. (*See* Rosenzweig Report [Docket 152–2], at 12–21). I therefore **FIND** that Dr. Rosenzweig is qualified to offer the opinion that the TVT is not suitable for permanent implantation to treat stress urinary incontinence.

#### iii. Ethicon's corporate knowledge and state of mind

**\*21**  Ethicon complains that Dr. Rosenzweig's opinions are riddled with improper testimony regarding Ethicon's corporate knowledge and state of mind. (*See, e.g., id.* at 18 ("Ethicon knew degradation of its mesh could occur."); *id.* at 35 ("Ethicon ... knew ... that the TVT mesh would rope, curl and become deformed when under tension")). As I have previously discussed, these opinions do not assist the jury. Accordingly, they are **EXCLUDED.**

#### iv. Legal opinions

Dr. Rosenzweig's expert report repeatedly states that "Ethicon failed to act as a reasonable and prudent medical device manufacturer." (*Id.* at 13, 20–21, 23, 26, 30, 32, 39, 53, 54, 58, 64). These statements draw legal conclusions from the facts. In the Fourth Circuit, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006).

Case 2:12-md-02327   Document 9075-1   Filed 01/10/20   Page 91 of 924 PageID #: 212898

In re Ethicon, Inc., Pelvic Repair System Products Liability..., Not Reported in F.Supp....

Whether Ethicon failed to act as a reasonable and prudent medical device manufacturer is a question for the jury. To be clear, Dr. Rosenzweig may offer opinions that, as a physician, he does not believe the TVT is suitable for treatment of stress urinary incontinence, but his opinions cannot be phrased as legal conclusions. Therefore, these statements are **EXCLUDED.**

### v. Narrative testimony

Ethicon argues that much of Dr. Rosenzweig's expert report is a summary of company documents, exhibits, and websites. Ethicon does not point to any particular documents or exhibits from which it believes Dr. Roesnzweig improperly testifies. Ethicon is primarily concerned with Dr. Rosenzweig's reliance on internet materials for background information on stress urinary incontinence. For instance, Dr. Rosenzweig cites toFDA.gov andWebMD.com in his section titled "Background and Treatment Options for Stress Urinary Incontinence." (*See* Rosenzweig Report [Docket 152–2], at 4–5). Ethicon contends that "experts in the field of urogynecology [do not] rely on such layperson websites in their practice." (Defs.' Mem. re; Rosenzweig [Docket 153], at 17). That may be true. Nonetheless, Dr. Rosenzweig's reliance on these materials is simply to provide background information related to stress urinary incontinence, which is helpful to the jury to understand the plaintiffs' design defect claims. His opinions relevant to the plaintiffs' causes of action, namely that the TVT is defectively designed, are not based on these sources. Therefore, I **FIND** that Dr. Rosenzweig's reliance on websites is not improper.

### J. Cheryl D. Blume, Ph.D.

Dr. Blume is offered as an expert on medical device and pharmaceutical regulatory requirements. She proffers three main opinions: (1) "Ethicon inadequately disclosed the safety risks associated with the TVT device to both healthcare professionals and their patients at the time of and following its launch," and (2) "Ethicon's promotion of the TVT device to physicians and patients was ... improper because they promoted the product in a manner that overstated the benefits and understated the risks so that physicians and patients were not provided proper information to fully address the risks and benefits of TVT implantation," and (3) "Ethicon's postmarketing surveillance and quality assurance activities underestimated the risks of the

TVT...." (Blume Report [Docket 169–1], ¶¶ 15–17). Ethicon moves to exclude Dr. Blume's testimony in its entirety. For the reasons discussed below, Ethicon's motion [Docket 169] is **GRANTED.**

**\*22** Ethicon first argues that Dr. Blume is unqualified to proffer her opinions because she is not a medical doctor, she has not worked directly with implanted mesh, she was not involved in the regulation of the TVT device, and she is unfamiliar with treatments for stress urinary incontinence. (*See* Mem. in Supp. of Mot. to Exclude Cheryl D. Blume, Ph.D. [Docket 170], at 3–4).

I need not decide whether Dr. Blume is qualified because her opinions do not relate to facts in issue. Each of Dr. Blume's proffered opinions relates to the plaintiffs' failure to warn or breach of warranty claims, which are no longer pending. Therefore, these opinions are **EXCLUDED** because they do not "help the trier of fact to understand the evidence or to determine a fact in issue [.]" Fed.R.Evid. 702.

### IV. The Plaintiff's *Daubert* Motions

The plaintiffs have moved to exclude only Dr. Kevin Ong.

### A. Kevin Ong, Ph.D.

Dr. Ong is a mechanical engineer specializing in the field of biomedical engineering. He provides consulting for, among other things, medical device product design, development, preclinical testing, failure and risk analysis, and regulatory approval. (*See* Ong Report [Docket 154–2], at 8). Dr. Ong opines that there is no evidence "that the alleged degradation of Ms. Lewis' mesh had any clinically relevant effects on mechanical properties of the mesh itself, such as stiffness, elasticity, and resistance to break." (*See id.* at 30). Dr. Ong further contends that "[s]ynthetic meshes, including polypropylene meshes, cause a mild inflammatory response for tissue in-growth to occur. The extent of inflammatory response is related to patient-specific factors including repair site location, previous medical history, and tissue quality." (*Id.*). The plaintiffs argue that Dr. Ong should be excluded because his opinions are based on unreliable methods and they go beyond Dr. Ong's qualifications and expertise. For the reasons stated below, the plaintiff's motion [Docket 146] is **DENIED.**

### i. Medical opinions

As stated above, Dr. Ong is a mechanical engineer with significant expertise with medical devices. Yet Dr. Ong offers several medical opinions. He concludes that "[s]ynthetic meshes, including polypropylene meshes, cause a mild inflammatory response for tissue ingrowth to occur. The extent of inflammatory response is related to patient-specific factors including repair site location, previous medical history, and tissue quality." (*See* Ong Report [Docket 154–2], at 30). Further, in section 3.2 of his report, he opines that "there is no recognized link between infection, the TVT mesh products, and Ms. Lewis' complaints." (*See id.* at 28). Dr. Ong is qualified to render these opinions. As a biomedical engineer, Dr. Ong is required to understand how materials interact with the body. He has examined "hundreds" of explanted meshes. (Ong Dep. [Docket 158–8], at 96:14–16). He has also taken courses in foreign body response and tissue inflammation. (Id. at 87:5–19). I **FIND** that Dr. Ong is qualified by his "knowledge, skill, experience, training, or education" to offer these opinions. Fed.R.Evid. 702.

### ii. Opinions Related to Degradation of Polypropylene

**\*23** The majority of Dr. Ong's report is devoted to his examination and testing of Ms. Lewis's explanted TVT mesh. From this testing, Dr. Ong draws the conclusion that "there is no reliable scientific evidence of physical degradation of the polypropylene mesh surface. The alleged degradation is an artifact from biological matter on the fiber surface, while any observed inflammatory effect can be associated with the normal healing process." (Ong Report [Docket 154–2], at 27).

In order to reach the conclusion that Ms. Lewis's mesh did not exhibit evidence of physical degradation of the polypropylene surface, Dr. Ong developed a twenty-step test whereby he soaked the explanted mesh in a series of chemicals. These chemicals removed the mesh's cracked outer layer. Dr. Ong maintains that this outer layer consisted entirely of biological material, although he did not chemically test the removed material. (*See* Ong Dep. [Docket 154–1], at 71:13–23). After the mesh was "cleaned" (the outer layer was removed), Dr. Ong examined the remaining mesh and determined that the polypropylene "remained intact":

> Regions of cracked material similar to the coating or

shell illustrated in Dr. Jordi's SEM images, and described by him as degraded polypropylene, were initially observed. Chemical processing removed the gross tissue, and in some areas revealed fibers with clean, smooth surfaces. Successive soaking of the explant sample in the reagents moved portions of the surface coating or shell. There was no evidence of gradient-type, ductile damage. Instead, the clean and smooth exposed regions in the explant that became further visible after the chemical processing steps, had the appearance of exemplar fibers coated with a layer of different material. The exemplar sample was also not visibly affected by the treatments, further demonstrating the chemical resistance of polypropylene.

(Ong Report [Docket 154–2], at 21–22).

The plaintiffs argue that Dr. Ong's conclusion that Ms. Lewis's mesh had not degraded is unreliable because Dr. Ong did not test the outer materials he removed from the explant. Dr. Ong admits that, as an expert witness for the C.R. Bard MDL, he did test the materials removed from explanted mesh. (*See* Ong Dep. [Docket 154–1], at 72:6–19). In this case, however, testing the removed material was not "the scope of [his] involvement in this matter." (*Id.* at 72:18–19).

The fact that he failed to test the removed material in this case does not render his methods unreliable. Dr. Ong states that he visually inspected the removed material and determined that it was biological material. Further, after removing the outer layer, Dr. Ong observed that the mesh was intact with "clean and smooth" surfaces that showed "no evidence of gradient-type, ductile damage." (Ong Report [Docket 154–2], at 22). Whether or not he chemically tested the removed material, Dr. Ong observed that the mesh was fully intact. If the mesh explant was fully intact, the removed materials could not have contained portions of the polypropylene. Although Dr. Ong's methods appear to provide strong ammunition

for cross-examination, I **FIND** that they should not be excluded as unreliable pursuant to *Daubert*.

### V. Conclusion

**\*24** As set out above, Ethicon's motions with respect to Dr. Pence [Docket 144] and Dr. Blume [Docket 169] are **GRANTED.** Ethicon's motions with respect to Dr. Klinge [Docket 132], Dr. Klosterhalfen [Docket 134], Ms. Latham and Dr. Tinari [Docket 136], Dr. Jewell [Docket 139], Dr. Margolis [Docket 142], and Dr. Rosenzweig [Docket 152] are **GRANTED in part** and **DENIED in part.** Ethicon's motion with respect to Dr. Mühl [Docket 137] is **DENIED.** The plaintiffs' motion with respect to Dr. Ong [Docket 146] is **DENIED.**

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 186872

### Footnotes

1    Ethicon also argues that these opinions should be excluded as irrelevant because the plaintiffs' design defect claims are preempted insofar as they are based on the composition of the Prolene Mesh. Ethicon's argument is fully set out in a motion for partial summary judgment [Docket 128], and I address it in my Memorandum Opinion and Order (Motion in Limine No. 1, Summary Judgment Motions on 510(k) Issue).

2    Although Ethicon asserts that Dr. Klinge's specific causation opinion should be excluded, he offers none on this topic in his report.

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

🟨 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Trevino v. Boston Scientific Corporation, S.D.W.Va., May 19, 2016

29 F.Supp.3d 691

United States District Court, S.D. West Virginia.

Jo HUSKEY, et al., Plaintiffs,

v.

ETHICON, INC., et al., Defendants.

Civil Action No. 2:12–cv–05201.

|

Signed July 8, 2014.

**Synopsis**

**Background:** Patient brought action as part of multidistrict litigation against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation. Manufacturer moved to exclude expert testimony.

**Holdings:** The District Court, Joseph R. Goodwin, J., held that:

[1] urogynecologist was qualified to testify as to adequacy of warnings;

[2] urogynecologist's specific causation testimony was unreliable;

[3] biomedical engineer was not qualified to testify as to failure to test;

[4] obstetrician's opinion that degradation caused patient's symptoms was reliable; and

[5] toxicologist was not qualified to testify as to biocompatability.

Motion granted in part and denied in part.

West Headnotes (54)

**[1]** **Evidence**

🔑 Matters involving scientific or other special knowledge in general

**Evidence**

🔑 Necessity and sufficiency

Under the *Daubert* test for determining admissibility of expert testimony, a two-part test governs the admissibility of expert testimony; the evidence is admitted if it rests on a reliable foundation and is relevant.

Cases that cite this headnote

**[2]** **Evidence**

🔑 Preliminary evidence as to competency

**Evidence**

🔑 Necessity and sufficiency

Under the *Daubert* test for determining admissibility of expert testimony, the proponent of expert testimony does not have the burden to prove anything; however, he must come forward with evidence from which the court can determine that the proffered testimony is properly admissible.

Cases that cite this headnote

**[3]** **Evidence**

🔑 Necessity and sufficiency

Under the *Daubert* test for determining admissibility of expert testimony, the court need not determine that the proffered expert testimony is irrefutable or certainly correct, since expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.

4 Cases that cite this headnote

**[4]** **Evidence**

🔑 Necessity and sufficiency

The specific factors under the *Daubert* test for determining the relevance and reliability of expert testimony include: (1) whether the particular scientific theory can be tested; (2) whether the theory has been subjected to peer review and publication; (3) the known

or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

Cases that cite this headnote

**[5]** **Evidence**
👉 Necessity and sufficiency
The inquiry to be undertaken in the *Daubert* test for determining admissibility of expert testimony is a flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached.

Cases that cite this headnote

**[6]** **Evidence**
👉 Medical testimony
"Differential diagnosis," or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.

5 Cases that cite this headnote

**[7]** **Evidence**
👉 Matters directly in issue
**Evidence**
👉 Necessity and sufficiency
Under the *Daubert* test for determining admissibility of expert testimony, expert opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.

1 Cases that cite this headnote

**[8]** **Evidence**
👉 Medical testimony
A surgical mesh manufacturer's own experts failed to distinguish between a generic version of a biomaterial and the manufacturer's version used in its mesh product that was treated with two proprietary antioxidants,

and thus the failure of patient's experts to make a distinction between the two did not render their testimony inadmissible under the *Daubert* test for determining admissibility of expert testimony in patient's action against manufacturer for injuries allegedly sustained as a result of degradation of her mesh following implantation.

Cases that cite this headnote

**[9]** **Evidence**
👉 Due care and proper conduct in general
**Evidence**
👉 Medical testimony
Under the *Daubert* test for determining admissibility of expert testimony, a urogynecologist and professor of obstetrics and gynecology was qualified to testify as to adequacy of surgical mesh manufacturer's warnings for a surgical mesh product in patient's action to recover damages for injuries sustained after mesh allegedly degraded following implantation.

2 Cases that cite this headnote

**[10]** **Evidence**
👉 Due care and proper conduct in general
**Evidence**
👉 Medical testimony
Under the *Daubert* test for determining admissibility of expert testimony, a urogynecologist and professor of obstetrics and gynecology who regularly encountered cytotoxicity in his practice, including in women who had mesh implants, was qualified to testify in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to whether an internal document created by surgical mesh manufacturer indicated that one of its products was cytotoxic.

Cases that cite this headnote

**[11]** **Evidence**

👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the testimony of a urogynecologist and professor of obstetrics and gynecology who regularly encountered cytotoxicity in his practice, including in women who had mesh implants, that an internal document from surgical mesh manufacturer indicated that the mesh was cyctotoxic, was reliable in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[12]**     **Evidence**
👉 Due care and proper conduct in general

**Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a urogynecologist and professor of obstetrics and gynecology who regularly encountered cytotoxicity in his practice, but who had no experience or knowledge on the appropriate testing a medical device manufacturer should undertake, was not qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to whether surgical mesh manufacturer failed to appropriately test for cytotoxicity.

3 Cases that cite this headnote

**[13]**     **Evidence**
👉 Due care and proper conduct in general

**Evidence**
👉 Medical testimony

Under the rule governing admissibility of expert testimony and the *Daubert* test for determining admissibility of expert testimony, the opinion of a urogynecologist and professor of obstetrics and gynecology that surgical mesh manufacturer failed to warn that its product was riskier for certain

populations was not helpful to jury in patient's action to recover damages for injuries sustained allegedly as a result of implantation of the mesh, where jury was free to read, and capable of understanding, manufacturer's internal reports upon which expert relied. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[14]**     **Evidence**
👉 Due care and proper conduct in general

**Evidence**
👉 Physical facts

Under the rule governing admissibility of expert testimony, and the *Daubert* test for determining admissibility of expert testimony, a urogynecologist and professor of obstetrics and gynecology who performed over a thousand pelvic floor surgical procedures, and over 200 surgeries dealing with complications related to synthetic mesh, including the removal of numerous mesh devices, was qualified to testify as to degradation and fraying of mesh material in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[15]**     **Evidence**
👉 Medical testimony

Under the rule governing admissibility of expert testimony, and the *Daubert* test for determining admissibility of expert testimony, the specific causation testimony of a urogynecologist and professor of obstetrics and gynecology, that degradation and fraying of surgical mesh manufacturer's product implanted in patient caused patient's injuries, was unreliable in patient's action against manufacturer, where the mesh was discarded before it could be examined, urogynecologist failed to establish causal connection between mesh and patient's symptoms, and failed to

rule out alternative competing explanations. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[16]** Evidence
👉 Due care and proper conduct in general

Evidence
👉 Medical testimony

Under the rule governing admissibility of expert testimony, and the *Daubert* test for determining admissibility of expert testimony, the general causation testimony of a professor of chemical and biomolecular engineering with a doctorate in chemical engineering and a post-doctoral degree in biomedical engineering, that surgical mesh manufacturer's mesh product could degrade over time following implantations, was helpful to jury in patient's action to recover damages for injuries allegedly sustained as a result of implantation of the mesh. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[17]** Evidence
👉 Medical testimony

Under the rule governing admissibility of expert testimony, and *Daubert* test for determining admissibility of expert testimony, a rebuttal report filed by consultant of chemical and polymer process and product design issues with doctorate in chemical engineering challenging expert testimony proffered by surgical mesh manufacturer regarding its mesh product's vulnerability to oxidation once implanted was reliable in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where it criticized the methods used by manufacturer's experts, including that the manufacturer's experts chose to rely on sources that favored specific data while ignoring others. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[18]** Evidence
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a biomedical engineer's testimony as to leaching of chemicals from implanted surgical mesh was unreliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where engineer could not name the specific chemical that supposedly leached from mesh into patient's body due to oxidation process.

1 Cases that cite this headnote

**[19]** Evidence
👉 Physical facts

Evidence
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a biomedical engineer was not qualified to testify, in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, as to manufacturer's alleged failure to test its mesh product for degradation following implantation, where patient failed to proffer any relevant work or educational experience on the part of the engineer that would make him qualified, and engineer merely gave vague answers to questions regarding his experience working with the materials used to manufacture the mesh product.

1 Cases that cite this headnote

**[20]** Evidence
👉 Due care and proper conduct in general

Evidence
👉 Physical facts

Under the *Daubert* test for determining admissibility of expert testimony, a

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 99 of 924 PageID #: 212906
Case 2:12-md-02327 Document 7522-4 Filed 06/05/19 Page 98 of 424 PageID #: 117894

Huskey v. Ethicon, Inc., 29 F.Supp.3d 691 (2014)

biomedical engineer was not qualified to testify as to a safer alternative design for surgical mesh manufacturer's product in patient's action against manufacturer to recover damages for injuries allegedly sustained as a result of degradation of the mesh after it was implanted, where engineer refused to offer suggestions of alternative materials.

Cases that cite this headnote

[21] **Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a biomedical engineer's testimony that surgical mesh manufacturer's product was defective was unreliable in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where engineer admitted that he could not testify to a reasonable degree of medical certainty that mechanically cut mesh was safer than the laser-cut mesh used by manufacturer.

Cases that cite this headnote

[22] **Evidence**
👉 Due care and proper conduct in general

Under the rule governing admissibility of expert testimony, and *Daubert* test for determining admissibility of expert testimony, obstetrician and gynecologist who studied etiology of pelvic and vaginal pain and was director of division of medical school was qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to etiology of problems associated with the implantation of mesh products in gynecologic surgery. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

[23] **Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the expert opinion of an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain, that patient's dyspareunia and daily pain resulted from degradation of manufacturer's surgical mesh product following implantation, was reliable, where obstetrician was aware of and sufficiently accounted for patient's symptoms prior to implantation of the mesh.

1 Cases that cite this headnote

[24] **Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the differential diagnosis by an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain concluding that patient's dyspareunia and daily pain resulted from degradation of manufacturer's surgical mesh product following implantation was reliable, where obstetrician relied on accepted scientific principles and research to rule out alternative competing explanations.

Cases that cite this headnote

[25] **Evidence**
👉 Medical testimony

An obstetrician and gynecologist who studied etiology of pelvic and vaginal pain used scientifically reliable principles to rule out endometriosis as a cause of a patient's pelvic pain in his differential diagnosis, and thus his ruling out of endometriosis was reliable under the *Daubert* test for determining admissibility of expert testimony in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where obstetrician conducted a physical examination of patient and reviewed her medical history.

Cases that cite this headnote

**[26]** **Evidence**
👈 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a physician need not conduct every possible test to rule out all possible causes of a patient's illness, so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.

Cases that cite this headnote

**[27]** **Evidence**
👈 Medical testimony

There was no indication that obstetrician and gynecologist who studied etiology of pelvic and vaginal pain consulted surgical mesh manufacturer's information regarding use of its mesh product, and thus physician's testimony as to the information's accuracy was unreliable under the *Daubert* test for determining admissibility of expert testimony in patient's action to recover damages for injuries sustained after mesh allegedly degraded following implantation.

1 Cases that cite this headnote

**[28]** **Evidence**
👈 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a urologist who was a pioneer in sling surgery for women with sphincter incontinence was qualified to testify in patient's action to recover damages for injuries sustained after manufacturer's surgical mesh product allegedly degraded following implantation as to adequacy of manufacturer's warnings regarding use of mesh in such surgeries.

Cases that cite this headnote

**[29]** **Evidence**
👈 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the opinion of an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain that complications from procedures involving surgical mesh were underreported was reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where he relied on numerous peer reviewed studies that supported his testimony.

Cases that cite this headnote

**[30]** **Evidence**
👈 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, the testimony of an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain that mesh related complications would increase in frequency over time was not relevant to patient's claims in her action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[31]** **Evidence**
👈 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain was qualified to testify as to what he an other physicians knew about frequency of complications related to surgical mesh, in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where what the physicians knew about dangers of mesh products was related to the applicable standard of care.

Cases that cite this headnote

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**[32]** Evidence

  🔑 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the testimony of an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain as to complication rates from surgical mesh implantation was unreliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where obstetrician did not explain his methodology, and admitted the impossibility of creating an accurate complication rate.

3 Cases that cite this headnote

**[33]** Evidence

  🔑 Necessity and sufficiency

Whether an expert may rely on particular information under the rule governing bases of an expert's opinion testimony is a different question from whether an expert's opinion has a reliable basis under the rule governing admissibility of expert testimony. Fed.Rules Evid.Rules 702, 703, 28 U.S.C.A.

1 Cases that cite this headnote

**[34]** Evidence

  🔑 Due care and proper conduct in general

Evidence

  🔑 Physical facts

Under the *Daubert* test for determining admissibility of expert testimony, an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain but who did not have a background in polymer chemistry was not qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to alleged defects in mesh including shrinkage and degradation following implantation.

Cases that cite this headnote

**[35]** Evidence

  🔑 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain but who had no marketing experience was not qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to manufacturer's attempts to market its mesh products.

Cases that cite this headnote

**[36]** Evidence

  🔑 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain but who had no experience in testing medical devices was not qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to alternative testing that manufacturer should have undertaking for its mesh products.

4 Cases that cite this headnote

**[37]** Evidence

  🔑 Due care and proper conduct in general

Evidence

  🔑 Medical testimony

Under the rule governing admissibility of expert testimony, and the *Daubert* test for determining admissibility of expert testimony, testimony of an obstetrician and gynecologist who studied etiology of pelvic and vaginal pain as to complexity of surgical procedures to implant mesh products was irrelevant to patient's action against surgical mesh

manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[38]** **Evidence**
👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a board-certified medical toxicologist with no experience in biocompatibility was not qualified to testify as to biocompatibility of manufacturer's surgical mesh product in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

2 Cases that cite this headnote

**[39]** **Evidence**
👉 Due care and proper conduct in general
**Evidence**
👉 Physical facts

Under the *Daubert* test for determining admissibility of expert testimony, a board-certified medical toxicologist with no experience biochemistry or polymer chemistry was not qualified to testify as to alleged lack of degradation of surgical mesh following implantation in patient's action against manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[40]** **Evidence**
👉 Medical testimony

Under *Daubert* test for determining admissibility of expert testimony, a board-certified medical toxicologist's testimony that surgical mesh manufacturer's mesh product did not degrade following implantation was unreliable in patient's action against manufacturer to recover damages for injuries

sustained after mesh allegedly degraded following implantation, where toxicologist's statement was unsupported and conclusory.

Cases that cite this headnote

**[41]** **Evidence**
👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a board-certified urologist specializing in pelvic floor medicine and reconstructive surgery who performed over 1,500 operations involving implantation of surgical mesh and over 50 partial mesh explantations was qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation that she had not witnessed degradation of surgical mesh products.

Cases that cite this headnote

**[42]** **Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, a board-certified urologist's use of her own clinical experience to opine that she had not witnessed degradation of surgical mesh was reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where urologist specialized in pelvic floor medicine and reconstructive surgery and had performed over 1,500 surgical mesh implantations.

Cases that cite this headnote

**[43]** **Evidence**
👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, opinion of board-certified urologist specializing in pelvic floor medicine and reconstructive surgery challenging differential diagnosis

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 103 of 924 PageID #: 212910
Huskey v. Ethicon, Inc., 29 F.Supp.3d 691 (2014)

Case 2:12-md-02327-4 Filed 09/12/19 Page 13 of 21 PageID #: 117693

of patient's symptoms from alleged mesh degradation following implantation, that patient had interstitial cystitis, was based on mere speculation, and thus was not reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[44]**   **Evidence**
   👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, opinion of board-certified urologist specializing in pelvic floor medicine and reconstructive surgery challenging differential diagnosis of patient's symptoms from alleged mesh degradation following implantation, that endometriosis could explain patient's symptoms, was not reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation, where urologist admitted that patient had not had any issues with endometrial tissue prior to implantation.

Cases that cite this headnote

**[45]**   **Evidence**
   👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, opinion of board-certified urologist specializing in pelvic floor medicine and reconstructive surgery challenging differential diagnosis of patient's symptoms from alleged mesh degradation following implantation, that diverticulosis contributed to patient's chronic pelvic pain, was reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[46]**   **Evidence**
   👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, opinion of board-certified urologist specializing in pelvic floor medicine and reconstructive surgery challenging differential diagnosis of patient's symptoms from alleged mesh degradation following implantation, that patient's emotional stress explained her chronic pelvic pain, was mere speculation, and thus was not reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[47]**   **Evidence**
   👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, opinion of board-certified urologist specializing in pelvic floor medicine and reconstructive surgery challenging differential diagnosis of patient's symptoms from alleged mesh degradation following implantation, that patient's two prior back surgeries partially explained her chronic pelvic pain, was mere speculation that was not made to a reasonable degree of medical certainty, and thus was not reliable in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[48]**   **Evidence**
   👉 Due care and proper conduct in general

Under the rule governing admissibility of expert testimony, opinion by board-certified infectious disease specialist who was a professor at a university Department of medicine, that there was no convincing data that transvaginal surgical mesh resulted in "subclinical" infection, was relevant in patient's action against surgical mesh

manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[49]** Evidence

👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a board-certified infectious disease specialist who was a professor at a university department of medicine was qualified to testify about infections resulting from implantation of surgical mesh in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[50]** Evidence

👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a pathologist who examined over 100 explanted surgical meshes was qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to reasons why, form a pathologist's perspective, patients required excision of surgical mesh.

Cases that cite this headnote

**[51]** Evidence

👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, a pathologist who examined over 100 explanted surgical meshes was not qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation as to whether patients who had mesh implanted experienced pain.

**[52]** Evidence

👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the testimony of a pathologist who examined over 100 explanted surgical meshes, that over half of the patients seeking transvaginal mesh revisions did so "for legal purposes" to advance claims, was unreliable speculation in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation.

Cases that cite this headnote

**[53]** Evidence

👉 Due care and proper conduct in general

Under the *Daubert* test for determining admissibility of expert testimony, an obstetrician and gynecologist who specialized in female urinary incontinence and pelvic organ prolapse and who implanted over 750 surgical mesh devices was qualified to testify in patient's action against surgical mesh manufacturer to recover damages for injuries sustained after mesh allegedly degraded following implantation that he had not witnessed degradation of the devices.

Cases that cite this headnote

**[54]** Evidence

👉 Medical testimony

Under the *Daubert* test for determining admissibility of expert testimony, the testimony of an obstetrician and gynecologist who specialized in female urinary incontinence and pelvic organ prolapse and who implanted over 750 surgical mesh devices, that he had never witnessed degradation of the mesh devices and that there was a lack of evidence of degradation, was reliable in patient's action against surgical mesh manufacturer to recover damages for injuries

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

sustained after mesh allegedly degraded following implantation.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*699** Aleksandra M.S. Vold, Siprut, Corey G. Raines, Edward A. Wallace, Mark R. Miller, Michael H. Bowman, Timothy E. Jackson, Wexler Wallace, James B. Zouras, Stephan Zouras, Chicago, IL, Jeffrey M. Kuntz, Thomas P. Cartmell, **\*700** Brian J. Madden, Diane K. Watkins, Wagstaff & Cartmell, Kansas City, MO, D. Renee Baggett, Daniel J. Thornburgh, Aylstock Witkin Kreis & Overholtz, Pensacola, FL, Fidelma L. Fitzpatrick, Michaela Shea McInnis, Robert J. McConnell, Motley Rice, Providence, RI, for Plaintiffs.

Christy D. Jones, William M. Gage, Butler Snow, Ridgeland, MS, David B. Thomas, Philip J. Combs, Susan M. Robinson, Thomas Combs & Spann, Charleston, WV, Kimberly C. Metzger, Nancy Menard Riddle, ICE Miller, Indianapolis, IN, Kari L. Sutherland, Butler Snow, Oxford, MS, Susanna Moore Moldoveanu, Butler Snow, Memphis, TN, for Defendants.

## MEMORANDUM OPINION AND ORDER

### (*Daubert* Motions)

JOSEPH R. GOODWIN, District Judge.

Pending before the court are the defendants' (1) Motion to Limit the Testimony of Bruce Rosenzweig, M.D. [Docket 149]; (2) Motion to Limit the Testimony of Prof. Dr. Med. Bernd Klosterhalfen [Docket 152]; (3) Motion to Exclude Opinion Testimony of John F. Steege, M.D. [Docket 155]; (4) Motion to Exclude Certain Opinions of Jerry G. Blaivas, M.D. [Docket 157]; (5) Motion to Exclude the Opinions and Testimony of Dr. Scott Guelcher, Ph.D. [Docket 181]; (6) Motion to Exclude the Opinions and Testimony of Dr. Russell Dunn, Ph.D., P.E. [Docket 183]; and (7) Motion to Exclude the Opinions and Testimony of Dr. Abhay Pandit, Ph.D. [Docket 185]; and the plaintiffs' (1) Motion to Exclude the Opinions and Testimony of Michael Greenberg, M.D., M.P.H. [Docket 165]; (2) Motion to Exclude Certain Opinions and

Testimony of Christina Pramudji, M.D. [Docket 167]; (3) Motion to Exclude the Opinions and Testimony of Harry Johnson, Jr., M.D. [Docket 169]; (4) Motion to Exclude the Opinions and Testimony of Daniel J. Sexton, M.D. [Docket 171]; and (5) Motion to Exclude the Opinions and Testimony of Wenxin Zheng, M.D. [Docket 175].

For the reasons explained below, the defendants' motions with respect to Dr. Rosenzweig [Docket 149], Dr. Dunn [Docket 183], Dr. Steege [Docket 155], and Dr. Pandit [Docket 185] are **GRANTED in part** and **DENIED in part.** The defendants' motion with respect to Dr. Klosterhalfen [Docket 152] is **DENIED in part** and **RESERVED in part.** The defendants' motion with respect to Dr. Blaivas [Docket 157] is **GRANTED in part** and **DENIED in part** and **RESERVED in part.** The defendants' motion with respect to Dr. Guelcher [Docket 181] is **DENIED.** The plaintiffs' motion with respect to Dr. Greenberg [Docket 165] is **GRANTED.** The plaintiffs' motions with respect to Dr. Pramudji [Docket 167] and Dr. Zheng [Docket 175] are **GRANTED in part** and **DENIED in part.** The plaintiffs' motions with respect to Dr. Sexton [Docket 171] and Dr. Johnson [Docket 169] are **DENIED.**

### I. Background

This case is one of more than 60,000 in seven MDLs that have been assigned to me by the Judicial Panel on Multidistrict Litigation. This case involves surgical mesh products manufactured and sold by the defendants, Ethicon, Inc. and Johnson & Johnson, Inc. (collectively, "Ethicon"), to treat female stress urinary incontinence. The device at issue is Ethicon's Gynecare TVT Obturator ("TVT–O"), which was implanted in the plaintiff, Ms. Huskey. The TVT–O is a medical device that includes a mechanism used to place a mesh tape, or sling, under the urethra to provide support to the urethra. The parties have brought **\*701** several *Daubert* challenges to proposed experts.

### II. Legal Standards

**[1]** **[2]** Under Federal Rule of Evidence 702, expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue" and (1) is "based upon sufficient facts or data" and (2) is "the product of reliable principles and methods" which (3) has been reliably applied "to the facts of the case." Fed.R.Evid. 702. A two-part test governs the admissibility of expert testimony. The evidence is admitted if it "rests on

a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of expert testimony does not have the burden to "prove" anything. He must, however, "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Md. Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998).

**[3]**  The district court is the gatekeeper.[1] It is an important role: "[E]xpert witnesses have the potential to be both powerful and quite misleading[;]" the court must "ensure that any and all scientific testimony … is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir.2001) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) and *Daubert,* 509 U.S. at 588, 595, 113 S.Ct. 2786). I "need not determine that the proffered expert testimony is irrefutable or certainly correct"—"[a]s with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir.2006) (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786); *see also Md. Cas. Co.,* 137 F.3d at 783 (noting that "[a]ll *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable … and helpful").

**[4]**  *Daubert* mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003) (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

**[5]**  Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry,* 178 F.3d at 261 (quoting *Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We agree

with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, **\*702** and the subject of his testimony.' ") (citation omitted); *see also Crisp,* 324 F.3d at 266 (noting "that testing of reliability should be flexible and that *Daubert's* five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, *Daubert* also explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. The consideration has been aptly described by Judge Becker as one of fit. Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786 (internal citations and quotation marks omitted).

**[6]**  Finally, in several of the instant *Daubert* motions, a specific scientific methodology comes into play, dealing with differential diagnoses or etiologies. "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry,* 178 F.3d at 262. The Fourth Circuit has stated that:

> A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Id.* A reliable differential diagnosis passes scrutiny under *Daubert*. An unreliable differential diagnosis is another matter:

A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. However, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." The alternative causes suggested by a defendant "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony," unless the expert can offer "no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause."

*Id.* at 265–66 (internal citations omitted).

### III. Ethicon's *Daubert* Motions

Ethicon seeks to limit or exclude the testimony of Dr. Bruce Rosenzweig, Dr. Bernd Klosterhalfen, Dr. Scott Guelcher, Dr. Russell Dunn, Dr. Abhay Pandit, Dr. John F. Steege, and Dr. Jerry G. Blaivas. I will address each proposed expert in turn.

**[7]** Before I begin, I will address two arguments that apply to many of Ethicon's *Daubert* motions. First, as I have repeated throughout these MDLs, I will not permit the parties to use experts to usurp the jury's fact-finding function to determine Ethicon's state of mind, or whether Ethicon acted reasonably. *See, e.g., In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611, 629 (S.D.W.Va.2013); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at *6, *21 (S.D.W.Va. Jan. 15, 2014). While an expert may testify as to a review of internal corporate documents solely for the **\*703** purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible—Ethicon's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury. Similarly, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006). I will not repeatedly parse the expert reports and depositions of each expert in relation to this same objection. I trust that able counsel in this matter will tailor expert testimony at trial accordingly.

**[8]** Second, Ethicon repeatedly argues that expert opinions relating to polypropylene do not apply to the Prolene mesh used in the TVT–O. Ethicon states that experts testifying about polypropylene fail "to account for the important chemical differences between generic polypropylene and PROLENE, which is an isotactic form of polypropylene that has been treated with two proprietary antioxidants." (*See* Defs.' Mem. of Law in Supp. of Mot. to Exclude the Test. and Ops. of Dr. Scott Guelcher, Ph.D. [Docket 182], at 4). This appears to be an argument wholly conceived by lawyers, unfounded in science. The experts in this case, including Ethicon's experts, testify as to "polypropylene" and its propensities. This is a strong indication that Ethicon's argument is disingenuous. For example, Dr. Michael Greenberg, an Ethicon expert, writes in his report that "polypropylene is a safe biomaterial with an extensive history of use inside the human body." (Greenberg Report [Docket 211–4], at 14). Another Ethicon expert, Dr. Harry Johnson writes that "[p]olypropylene is the most used material for pelvic floor repair." (Johnson Report [Docket 212–2], at 24). Further, Dr. Christina Pramudji writes in support of Ethicon that "[p]olypropylene material is safe and effective as a surgical implant." (Pramudji Report [Docket 209–5], at 25). It is clear that the experts in this case do not consider Prolene to be different from polypropylene for the purposes of their opinions in this case. Therefore, to the extent that Ethicon contends that an expert's opinions are unreliable or unhelpful because they do not account for the "important chemical differences" between polypropylene and Prolene, this argument is rejected.

### A. Dr. Bruce Rosenzweig

Dr. Rosenzweig is a urogynecologist and professor of obstetrics and gynecology. He offers several different opinions, each of which Ethicon contends is improper: (1) opinions regarding the sufficiency of warnings set out in the TVT–O Instructions for Use ("IFU") and other promotional materials, (2) opinions that Ethicon failed to provide adequate training, (3) opinions that the TVT–O causes an increased risk of infection, (4) opinions that the TVT–O degrades in vivo and is subject to fraying and particle loss, and (5) opinions regarding mesh shrinkage or contracture. I will address each opinion in turn.

## 1. Opinions Related to Sufficiency of Warnings on the IFU and Promotional Materials

**[9]**  Dr. Rosenzweig opines that the TVT–O's IFU was inadequate, that Ethicon failed to inform patients and physicians about particular risks of the TVT–O, and that the TVT–O's marketing materials were inaccurate or incomplete. (*See* Rosenzweig Report [Docket 201–1], at 3). Ethicon first argues generally that Dr. Rosenzweig is not qualified to testify about product warnings because he has not drafted an IFU. While it is true that Dr. Rosenzweig has not personally drafted an **\*704** IFU, Dr. Rosenzweig's testimony reveals that he has consulted on product warnings in the past:

Q. Have you ever prepared IFUs?

A. Well, I did work with Gish Biomedical to get the information that they needed to put in the amnioinfusion catheter IFU.

Q. Did you actually draft the IFU?

A. No, I did not. I worked as a consultant on that.

Q. Have you ever drafted an IFU?

A. No, I have not.

Q. Have you ever drafted a patient brochure?

A. I worked on the amnioinfusion catheter brochures, yes.

(Rosenzweig Dep. [Docket 149–3], at 53:17–54:4). Dr. Rosenzweig also testified that he served on another company's scientific advisory committee that worked on similar documents. (*See id.* at 54:10–12). In his expert report, Dr. Rosenzweig states that he has reviewed "numerous" IFUs for a "variety of products including mesh products in order to understand the proper way to use the device and to gain knowledge about the complications and adverse events associated with the device." (Rosenzweig Report [Docket 201–1], at 55). Further, as a urogynecologist, Dr. Rosenzweig is qualified to opine about the risks of the TVT–O and pelvic mesh surgery and whether those risks were adequately expressed on the TVT–O's IFU. I therefore **FIND** that Dr. Rosenzweig is qualified to testify generally on

the adequacy of the TVT–O's product warnings and marketing materials. [2]

Finding Dr. Rosenzweig qualified to opine generally about the TVT–O's warnings and marketing materials, I now turn to Ethicon's specific objections in relation to particular product warning opinions.

### a. Cancer

The plaintiffs state that Dr. Rosenzweig will not testify about cancer. (*See* Pls.' Resp. to Defs.' Mot. to Limit the Test. of Bruce Rosenzweig, M.D. ("Pls.' Resp.") [Docket 200], at 6). Accordingly, Ethicon's motion on this subject is **DENIED as moot.**

### b. Cytotoxicity

**[10]**  Dr. Rosenzweig states in his expert report that an internal Ethicon document suggested that polypropylene mesh was cytotoxic. (*See* Rosenzweig Report [Docket 201–1], at 105). Cytotoxicity refers to a material's potential to cause cell death. Dr. Rosenzweig writes that Ethicon failed to undertake testing "to determine whether the marked cytotoxicity found in the TVT mesh had long term consequences for permanent human use." (*Id.* at 105–06). He then opines that Ethicon failed to act as a "reasonably prudent medical device manufacturer" because it "failed to inform physicians and their patients about the risk of its mesh being cytotoxic[ ]." (*Id.* at 106).

According to Ethicon, cytotoxicity testing "does not represent in vivo testing, and toxicological experience is required to extrapolate the results to humans." (Mem. in Supp. of Mot. to Limit the Test. of Bruce Rosenzweig, M.D. ("Defs.' Mem.") [Docket 150], at 6). Ethicon therefore argues that this testimony exceeds Dr. Rosenzweig's qualifications because he does **\*705** not have toxicological experience, and he admits that he has never conducted toxicity or cytotoxicity testing of mesh. (*See* Rosenzweig Dep. [Docket 149–3], at 222:4–6). Ethicon also argues that this testimony is unreliable because the internal Ethicon study cited by Dr. Rosenzweig states that "this clinical data provides important evidence that the cytotoxicity of the [polypropylene] mesh observed in vitro does not translate into any clinical significance or adverse patient

outcomes." (Cytotoxicity Risk Assessment for the TVT (Ulmsten) Device [Docket 149–8], at 2).

I **FIND** that Dr. Rosenzweig is qualified to offer the opinion that Ethicon failed to inform physicians about the risk that the TVT–O is cytotoxic. Although Dr. Rosenzweig is not a toxicologist, he stated that he regularly encounters cytotoxicity in his practice, including in women who have polypropylene mesh implants. (*See* Rosenzweig Aff. [Docket 201–4] ¶ 4). He also stated that he has removed mesh implants, including the TVT, as a result of cytotoxicity. (*See id.*).

 [11]   I further **FIND** that this opinion is sufficiently reliable. Dr. Rosenzweig relies on an internal Ethicon finding that the mesh used in the TVT–O was cytotoxic. Further, Dr. Rosenzweig states that the potential for cytotoxicity is important information that physicians need to know. (*See* Rosenzweig Report [Docket 201–1], at 106). To the extent that Ethicon believes cytotoxicity is not clinically significant, it may cross examine Dr. Rosenzweig on that issue. Therefore, Ethicon's motion with respect to Dr. Rosenzweig's opinions about the failure to warn about cytotoxicity is **DENIED.**

 [12]   However, I **FIND** that Dr. Rosenzweig is not qualified to opine that Ethicon's testing was insufficient. There is no indication that Dr. Rosenzweig has any experience or knowledge on the appropriate testing a medical device manufacturer should undertake. Therefore, Dr. Rosenzweig's testimony that Ethicon failed to appropriately test for cytotoxicity is **EXCLUDED.**

### c. TVT–O Appropriateness for Certain Populations

 [13]   Dr. Rosenzweig will also testify that "Ethicon promoted the TVT–O as a 'reproducible' technique that was appropriate for all patients," when in fact it was less efficacious for certain types of women, including obese women, older women, active women, diabetics, smokers, Asian women, and African–American women. (Rosenzweig Report [Docket 201–1], at 77–80). He claims that Ethicon should have warned physicians of risks to these different populations. In support, he simply reviews deposition testimony and internal documents of Ethicon employees expressing concerns about the TVT–O's adaptability to different populations. For instance, Dr. Rosenzweig quotes deposition testimony of Ethicon's

Medical Director to show that "obese patients do not fare well with these devices." (*Id.* at 77). He also reviews a document wherein the inventor of the TVT–O stated that the TVT–O was inappropriate for treatment in younger, active women. (*See id.* at 78).

As the plaintiffs concede, much of this opinion is not relevant to Ms. Huskey's case and should be excluded. (*See* Pls.' Resp. [Docket 200], at 8–9). The only part that is relevant is the TVT–O's appropriateness for younger, active women, a category into which Ms. Huskey falls. But it is not helpful to the jury to have Dr. Rosenzweig read a document explaining what the inventor of the TVT–O thought about this. The jury is capable of reading that document itself. *See In re Prempro Prods. Liab. Litig.,* 554 F.Supp.2d 871, 887 (E.D.Ark.2008); Fed.R.Evid. 702 ("the expert's **\*706** scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence"). Therefore, Dr. Rosenzweig's opinion that Ethicon should have warned that the TVT–O could be more dangerous for certain populations is **EXCLUDED.**

### d. Adverse Event Reporting

Dr. Rosenzweig opines that "Ethicon's collection and reporting of adverse events and complications to physicians and patients was incomplete, inaccurate, and misleading." (Rosenzweig Report [Docket 201–1], at 98). Ethicon argues that Dr. Rosenzweig is unqualified to offer this opinion, and it is unreliable. The plaintiffs concede that Dr. Rosenzweig will not offer this opinion at trial. (Pls.' Resp. [Docket 200], at 9–10). Therefore, this aspect of Ethicon's motion is **DENIED as moot.**

### 2. Failure to Provide Adequate Training

Dr. Rosenzweig opines that Ethicon "failed to provide adequate training" to physicians regarding the use of the TVT–O. (Rosenzweig Report [Docket 201–1], at 3). However, instead of commenting on the quality of training, Dr. Rosenzweig reviews corporate documents showing that Ethicon cut funding for professional trainings which Dr. Rosenzweig says "contrasted" with Ethicon's corporate credo. (*See* Rosenzweig Report [Docket 201–1], at 74–77). Not only is this opinion simply a narrative review of corporate documents, which is

not helpful to the jury, but it is unreliable because Dr. Rosenzweig fails to describe the basis for his opinion that Ethicon's training was inadequate. Therefore, this opinion is **EXCLUDED.**

### 3. Infections

Dr. Rosenzweig opines that the TVT–O mesh and implantation procedure carry an increased risk of infection. (*See id.* at 26). Ethicon argues that this opinion is not helpful to the jury because Ms. Huskey has not suffered from a mesh-related infection. However, the plaintiffs clearly indicated on their Plaintiff Fact Sheet that Ms. Huskey suffered from an infection. (*See* Pl. Fact Sheet [Docket 161–2], at 6). Further, Dr. Siddique, who partially explanted Ms. Huskey's mesh, testified that Ms. Huskey's eroded mesh caused an infection. (*See* Siddique Dep. [Docket 227–2], at 41:2–14). He also testified that Ms. Huskey suffered from chronic inflammation caused by a chronic infection of the eroded mesh. (*See* Siddique Dep. [Docket 201], at 63:8–11). Therefore, contrary to Ethicon's arguments, infections are a fact in issue in this case, and Ethicon's motion, as presented on this issue, is **DENIED.**

### 4. Degradation and Fraying

**[14]**    Dr. Rosenzweig will testify that the TVT–O is defective because its mesh degrades in vivo and is subject to fraying and particle loss. (*See* Rosenzweig Report [Docket 201–1], 11–20, 34–46). Further, Dr. Rosenzweig will testify that Ms. Huskey's mesh degraded, frayed, and lost particles.

Ethicon first argues that Dr. Rosenzweig is unqualified to offer these opinions because he does not have a background in polymer chemistry, has never studied biomaterials, and has never done any bench or lab research regarding polypropylene. I disagree. As I stated in relation to *Lewis v. Johnson & Johnson,*

> Simply because Dr. Rosenzweig has not personally performed pathology research on polypropylene explants does not necessarily render him unqualified under Rule 702 to offer opinions regarding the suitability of the TVT device for implantation. An expert may be qualified by "knowledge, skill,

experience, training, or education." Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed **\*707** about all details of the issues raised in order to offer an expert opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989).

Dr. Rosenzweig has performed over a thousand pelvic floor surgical procedures, and over 200 surgeries dealing with complications related to synthetic mesh, including the removal of numerous TVT devices. Dr. Rosenzweig testified that as early as 2004 or 2005, he determined, as a result of explanting mesh products, that polypropylene degrades in the human body. Further, he cites dozens of studies and academic papers in his expert report to support his opinion that vaginally implanted polypropylene mesh degrades. I therefore **FIND** that Dr. Rosenzweig is qualified to offer the opinion that the TVT is not suitable for permanent implantation to treat stress urinary incontinence.

*In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at \*20 (S.D.W.Va. Jan. 15, 2014) (internal citations and quotation marks omitted). I **ADOPT** that holding here.

With respect to Dr. Rosenzweig's general causation opinions that the mesh used in the TVT–O degrades, frays, and loses particles, Ethicon contends that these opinions are not helpful to the jury. According to Ethicon, "neither Dr. Rosenzweig nor any of Plaintiffs' other experts can reliably testify (1) that the mesh in Ms. Huskey's TVT–O device *actually* degraded, frayed, or lost particles, or (2) that any such degradation, fraying, or particle loss proximately caused Ms. Huskey's injuries." (Defs.' Mem. [Docket 150], at 13). Ethicon is incorrect that Dr. Rosenzweig's *general causation* testimony—that the TVT–O mesh can degrade, fray, or lose particles—should be excluded under Rule 702 simply because the plaintiffs might fail to carry their burden as to *specific causation*— that Ms. Huskey was injured by the TVT–O mesh. If Ethicon believes the plaintiffs ultimately fail to carry their burden, they are free to make that argument at trial. [3]

**[15]**    With respect to Dr. Rosenzweig's specific causation opinions, Ethicon contends that they are unreliable because none of the plaintiffs' experts tested Ms. Huskey's explanted mesh. The parties agree that Ms. Huskey's mesh was discarded by the hospital before the parties had an opportunity to test it. Therefore, Ethicon argues that there

is no way to test any of Dr. Rosenzweig's opinions about Ms. Huskey's mesh. *See Daubert,* 509 U.S. 579, 593, 113 S.Ct. 2786 (1993) ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.").

I **FIND** that Dr. Rosenzweig's specific causation testimony on degradation, fraying, and particle loss is not sufficiently reliable under Rule 702.[4] Although he has not examined Ms. Huskey's mesh, he formed his opinion by conducting an examination of Ms. Huskey and determining that the tissues surrounding the remaining mesh were tender. (*See* Rosenzweig Dep. [Docket 149–2], at 281:25–282:5; 283:16–22). He stated that "[w]hen I examine **\*708** her, I feel a very tender band along the left side of the vagina. That could represent mesh that's frayed, pieces of mesh that are still there, or a scar plate that formed when—before it was excised." (Rosenzweig Dep. [Docket 201–9], at 255:7–11). He agreed that tenderness during an examination can result from "numerous things," including degradation. (Rosenzweig Dep. [Docket 149–2], at 282:7–9). He then stated that of his more than 200 explant surgeries, it is "not [ ] infrequent" that he sees actual degradation on the explanted mesh. (Rosenzweig Dep. [Docket 201–9], at 275:15–276:14). Based on that experience, and his "work in seeing mesh degradation," he opined that Ms. Huskey's remaining mesh is "more likely than not undergoing degradation." (*Id.* at 276:16–277:3). Finally, when counsel suggested that he was essentially guessing whether Ms. Huskey's mesh had degraded, he stated that "I'm using my experience, my medical knowledge, to make an opinion with a reasonable degree of medical certainty." (Rosenzweig Dep. [Docket 149–2], at 283:12–14).

That is not enough to indicate that his opinions are reliable. In addition to the fact that Dr. Rosenzweig has not seen or tested Ms. Huskey's mesh, he does not explain how tenderness indicates that Ms. Huskey's mesh has degraded. Nor does he attempt to rule out the other potential causes for tenderness that he identified, even though he admits there could be "numerous" others. (Rosenzweig Dep. [Docket 149–2], at 282:7); *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 202 (4th Cir.2001) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered

alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.").

Quite simply, Dr. Rosenzweig is using other explants to draw an inference about Ms. Huskey's explant. But he does not say precisely how often he finds degradation on explants. He simply states that such a finding is "not [ ] infrequent." (Rosenzweig Dep. [Docket 201–9], at 275–76). Without proper indicia of reliability, Dr. Rosenzweig's specific causation theories regarding degradation, fraying, and particle loss are **EXCLUDED.** This result does not, as the plaintiffs suggest, unfairly punish them for a missing piece of evidence over which they had no control. Rule 702 and *Daubert* are clear that an expert's testimony must be based on "reliable principles and methods." Fed.R.Evid. 702. That is not present here.

### B. Dr. Bernd Klosterhalfen

Dr. Klosterhalfen offers general causation opinions related to infection, degradation, particle loss, shrinkage, and effective porosity of the TVT–O mesh. This is not the first time I have reviewed *Daubert* challenges to Dr. Klosterhalfen's opinions on these topics. *See In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 617–22 (S.D.W.Va.2013); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at \*10–11 (S.D.W.Va. Jan. 15, 2014). Wisely wanting to avoid rehashing old arguments, most of Ethicon's motion argues that Dr. Klosterhalfen's opinions are not helpful to the jury in this case because (1) Ms. Huskey did not develop an infection in this case, and (2) the plaintiffs cannot link degradation, particle loss, shrinkage, or effective porosity to Ms. Huskey's injuries. (*See* Mem. in Supp. of Mot. to Limit Test. of Prof. Dr. Med. Bernd Klosterhalfen [Docket 154], at 3, 5, 11–12). First, as I have already explained, there is evidence that Ms. Huskey developed an infection in connection with her TVT–O implant. Second, simply because Dr. Klosterhalfen's opinions are **\*709** limited to general causation does not mean they are not helpful to the jury. If Ethicon believes the plaintiffs cannot establish that the TVT–O caused Ms. Huskey's injuries, it can address this issue at trial.

Ethicon also challenges the reliability of two of Dr. Klosterhalfen's opinions: those based on degradation and those based on effective porosity. Ethicon argues that Dr. Klosterhalfen's testimony about surface degradation

should be excluded because Dr. Klosterhalfen "cannot reliably testify that degradation has any clinical significance." (*Id.* at 9). The plaintiffs failed to respond to this argument. Without a full expert report, [5] I am unable to determine the full scope of Dr. Klosterhalfen's opinions and their foundation. Therefore, I **RESERVE** for trial my ruling on Dr. Klosterhalfen's degradation opinions.

Ethicon also argues that Dr. Klosterhalfen's testimony about effective porosity is unreliable because in his deposition, "Plaintiffs failed to elicit any testimony that Dr. Klosterhalfen was familiar with the details of" the studies on which those studies are based. (*Id.* at 12). But an expert witness is not required to be familiar with the particular details of the studies on which he bases his opinion, as long as an expert in that particular field reasonably relies on the opinions contained in those studies. *See* Fed.R.Evid. 703; *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1, 9 (1st Cir.2001) ("[W]hen an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion."). Ethicon also argues that Dr. Klosterhalfen's opinions are not reliable because they have not been "validated." The plaintiffs fail to respond to this argument, and without an expert report, I again cannot determine the precise bases for these opinions. I therefore also **RESERVE** this ruling for trial.

Accordingly, Ethicon's motion to exclude Dr. Klosterhalfen is **DENIED in part** with the caveat that I **RESERVE RULING** on the admissibility of Dr. Klosterhalfen's degradation and effective porosity opinions.

### C. Dr. Scott Guelcher

**[16]** Dr. Guelcher holds a Ph.D. in chemical engineering and a post-doctoral degree in biomedical engineering. He is currently a professor of chemical and biomolecular engineering. He offers the following opinions in this case: (1) the human body "does not stop responding" to mesh until it is removed entirely, (2) the "dynamic environment where these meshes are implanted coupled with the chronic response of the body leads to polymer instability, embrittlement, structural degradation and other changes," (3) it is not possible to guarantee that the TVT–O will perform its intended function after implantation, and (4) the TVT–O mesh is not inert and

can change after implantation, which may lead to adverse events for the patient. (Guelcher Report [Docket 203–1], at 3).

**\*710** Ethicon first argues that Dr. Guelcher's general causation testimony is not helpful to the jury because the plaintiffs cannot prove specific causation and because no expert can say that degradation is clinically significant. As I have already explained, general causation opinions are helpful to the jury and fit the facts of this case regardless of whether the plaintiffs may ultimately fail to carry their burden to show that Ms. Huskey was harmed by her TVT–O implant.

Second, Ethicon argues that Dr. Guelcher's opinions are unreliable and unhelpful because they relate only to generic polypropylene, not Prolene mesh. This argument, too, has already been rejected. Therefore, Ethicon's motion to exclude Dr. Guelcher is **DENIED.**

### D. Dr. Russell Dunn

Dr. Dunn holds a Ph.D. in chemical engineering and consults on chemical and polymer process and product design issues. (*See* Dunn Report [Docket 202–1], at 1). He will opine that Ethicon's risk assessment process for the TVT–O was inadequate and that the TVT–O is defective. (*See id.* at 4). Dr. Dunn also filed a rebuttal report challenging the opinions of several of Ethicon's experts. Ethicon challenges Dr. Dunn's risk assessment opinion, his opinion at his deposition that polyvinylidene fluoride, or PVDF, is a safer alternative design, and his rebuttal of Ethicon's experts.

#### 1. Risk Assessment Opinions

Dr. Dunn offers opinions regarding Ethicon's risk assessment process—which he calls "Failure Mode & Effects Analysis"—during the design of the TVT–O. He opines that Ethicon's "design documents did not contemplate several [Failure Mode & Effects Analysis] issues and that Ethicon did not have an adequate quality system in place" with respect to Prolene. (Dunn Report [Docket 202–1], at 15). He contends that Ethicon's risk assessment processes failed to account for "polypropylene's inherent tendency to oxidize." (*Id.*). Ethicon argues that this opinion is not helpful to the

jury because Dr. Dunn fails to articulate any effect a different quality control process would have had on the TVT–O's design. (*See* Mem. in Supp. of Defs.' Mot. to Exclude the Test. and Ops. of Dr. Russell Dunn, Ph.D., P.E. ("Defs.' Mem.") [Docket 184], at 14). Ethicon frames the issue incorrectly. An expert's testimony must help the jury to "understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This testimony assists the jury in determining whether Ethicon was negligent in designing the TVT–O. Therefore, Ethicon's motion to exclude Dr. Dunn's risk assessment opinions is **DENIED.**

### 2. Safer Alternative Designs

Although his expert report does not contain any opinions about safer alternative designs, Dr. Dunn testified in his deposition that mesh using PVDF would be a safer alternative design for the TVT–O. (*See* Dunn Dep. [Docket 183–3], at 123:8–20). Ethicon argues that any opinions related to safer alternative designs should be excluded because Dr. Dunn did not disclose them in his expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and because they are unreliable. The plaintiffs did not respond to this argument. Accordingly, Dr. Dunn's opinions regarding safer alternative designs are **EXCLUDED.**

### 3. Rebuttal Report

**[17]** Dr. Dunn rebuts the opinions of Ethicon's experts, Dr. Kevin Ong, Dr. Shelby Thames, and Timothy Ulatowski. Specifically, he criticizes the conclusions that these experts draw about the Ethicon canine study and Prolene's vulnerability to oxidation. (*See* Dunn Rebuttal Report **\*711** [Docket 202–2], at 1–2). Ethicon contends that this rebuttal report is unreliable because it is not supported by scientific literature. (*See* Defs.' Mem. [Docket 184], at 17).

Despite Ethicon's objection, I **FIND** that Dr. Dunn's rebuttal report has sufficient indicia of reliability. His rebuttal report simply criticizes the methods Ethicon's experts used to come to their conclusions. Dr. Dunn writes that the Ethicon canine study failed "to recount its materials and methods of reproducibility" and used "a control group that does not comport with the implanted Prolene samples." (Dunn Rebuttal Report [Docket 202–

2], at 1). He contends that Ethicon's experts ignored polypropylene's propensity to degrade, despite the use of antioxidants. (*See id.*). He cites several scientific studies for his opinions and states that the sources relied on by Ethicon's experts "favor specific data while ignoring others[.]" (*Id.*). Therefore, Ethicon's motion on this issue is **DENIED.**

### E. Dr. Abhay Pandit

Dr. Pandit is a biomedical engineer. He plans to testify that the TVT–O was defectively designed and that Ethicon failed to adequately test the TVT–O. Ethicon moves to preclude Dr. Pandit's testimony in its entirety.

### 1. Leaching Chemicals

**[18]** Dr. Pandit opines that the TVT–O is defective because, among other things, when polypropylene degrades in vivo, "chemicals are produced that leach into the surrounding tissues." (Pandit Report [Docket 207–1], at 6). He states that Ethicon failed to perform appropriate tests for "these chemicals and their effects." (*Id.*). Ethicon argues that these opinions are unreliable. Dr. Pandit cites no scientific support for these opinions, and he was unable to name which particular chemicals are produced:

> Q. Do you have an opinion, to a reasonable degree of scientific certainty, that when oxidation occurs breaking the chemical bonds, that chemicals are produced that leach into the surrounding tissues?
>
> A. Yeah.
>
> Q. What chemicals?
>
> A. I'm not so sure which ones they are.

(Pandit Dep. [Docket 185–3], at 162:15–22). It is clear from this exchange that Dr. Pandit's opinions on chemical leaching and Ethicon's failure to test for such leaching are not reliable. Therefore, these opinions are **EXCLUDED.**

### 2. Failure to Test

**[19]** Dr. Pandit claims that Ethicon failed to adequately test the TVT–O. For instance, he states that pre-clinical

testing was inadequate; Prolene mesh was not tested for shrinkage, degradation, or stiffening; the "inside-out approach" for surgical implantation was not tested appropriately; and the trocar design was not tested appropriately. (Pandit Report [Docket 207–1], at 1–2). Ethicon contends that Dr. Pandit is not qualified to offer these opinions because he failed to identify any specific experience, training, or education in designing or testing implantable devices. In his expert report, Dr. Pandit simply states, without elaboration, that he "has extensive experience in the design and testing of implantable medical devices, including surgical mesh." (*Id.* at 1). The plaintiffs failed to attach Dr. Pandit's curriculum vitae to his expert report, so I am unable to verify this statement. When asked about this statement at his deposition, Dr. Pandit's response was vague:

> Q. What experience do you have in the design and testing of surgical mesh used for the treatment of stress urinary incontinence specifically?
>
> **\*712** A. So my experience in testing of implantables is a very fundamental approach of looking at host responses in the body. So I'm an expert in host responses. I design material for host response to understand what the host response is. And the approach I take is, you know, is looking at the principles involved in how one does the studies for the intended applications. So in the context of surgical meshes, I would have had implanted surgical meshes in quite a few projects before, and looking at what the host response is.

(*See* Pandit Dep. [Docket 185–2], at 24:14–25:5). He also stated that he has "used polypropylene several times" in the last 22 years in "multiple situations in the body." (*Id.* at 25:16–17, 24–25).

In light of Dr. Pandit's vague explanations and plaintiffs' counsels' failure to attach Dr. Pandit's curriculum vitae, I am unable to determine what precise qualifications he has to opine about designing or testing implantable medical devices. Therefore, the plaintiffs failed to carry their burden to demonstrate that Dr. Pandit should be permitted to testify on this issue, and Dr. Pandit's opinions regarding testing are **EXCLUDED.** *See Md. Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998) ("As in all questions of admissibility, the proffering party must come forward with evidence from which the court

can determine that the proffered testimony is properly admissible.").

### 3. Safer Alternative Designs

**[20]** Although he did not discuss safer alternative designs in his expert report, Dr. Pandit testified in his deposition that Ethicon should have used materials other than Prolene in the TVT–O. Ethicon contends that these opinions should be excluded because they were not contained in his expert report and because they are unreliable.

Whether or not these opinions should be excluded for failing to appear in Dr. Pandit's expert report, they are unreliable. Dr. Pandit refused to say which particular materials would be suitable as an alternative design:

> Q. Can you tell me today what modified synthetic materials that you have described that may have these additives or changes that may be appropriate for the use in the treatment of stress urinary incontinence?
>
> A. Yes. One other ideas could be, I don't want to give Ethicon ideas on what they should be doing.
>
> Q. Sorry, you're going to have to.
>
> A. I mean I'm giving our IP to them, telling them what they should be doing in terms of constructs.

(Pandit Dep. [Docket 185–2], at 38:8–19). The plaintiffs state that "Dr. Pandit identified PVDF and relied upon Ethicon documents which compare the mechanical properties and in vivo reactivity of polypropylene and PVDF." (Pls.' Resp. to Defs.' Mot. to Exclude the Test. and Ops. of Dr. Abhay Pandit, Ph.D. [Docket 207], at 19). But the plaintiffs do not cite to any portion of Dr. Pandit's expert report or deposition for this statement. Without an explanation from Dr. Pandit about which particular materials would be suitable alternative designs, these opinions are unreliable and are **EXCLUDED.**

### 4. Laser Cutting Mesh

**[21]** In his deposition, Dr. Pandit stated that the TVT–O was defective because it uses laser-cut mesh. (*See* Pandit Dep. [Docket 185–2], at 69:16–22; 99:3–101:17).

He also claimed that Ethicon failed to test the effects of laser cutting. (*See id.* at 99:10–12). He opines that "laser treatment does damage [to] polymer structures" **\*713** and that antioxidants are lost as a result of laser cutting. (*Id.* at 99:20–21; 100:4–10). However, Dr. Pandit admitted that he could "absolutely not" testify to a reasonable degree of medical certainty that laser-cut mesh is safer than mechanically cut mesh. (*Id.* at 100:21). Therefore, this opinion is unreliable and is **EXCLUDED.**

### 5. Cancer

The plaintiffs state that Dr. Pandit will not opine about the TVT–O's potential to cause cancer. (*See* Pls.' Resp. [Docket 207], at 17). Ethicon's motion on this issue is accordingly **DENIED as moot.**

### F. Dr. John F. Steege

Dr. Steege is an obstetrician and gynecologist. He teaches and studies the etiology or "causes" of chronic pelvic pain, vaginal pain, and sexual pain. (*See* Steege Report [Docket 210–3], at 1). In his expert report, Dr. Steege discusses the etiology of problems associated with using mesh in gynecologic surgery. (*See id.* at 2–11). In addition, Dr. Steege opines that the TVT–O IFU failed to reflect potential mesh-related complications. (*See id.* at 11–12). Finally, Dr. Steege provides an assessment of Ms. Huskey's current medical condition. (*See id.* at 12–18).

Ethicon moves to exclude Dr. Steege's opinions entirely. Ethicon argues that Dr. Steege's general opinions regarding mesh complications exceed the scope of his qualifications and do not fit this case because he cannot connect his general criticisms of the TVT–O to Ms. Huskey's alleged injuries. In addition, Ethicon argues that Dr. Steege's specific causation opinions are unreliable because: (1) Ms. Huskey did not disclose her prior history of chronic pelvic pain to Dr. Steege, and (2) Dr. Steege did not conduct a proper differential diagnosis to rule out alternative causes of Ms. Huskey's chronic pelvic pain. Finally, Ethicon claims that Dr. Steege's opinions regarding the TVT–O IFU are unreliable because he did not review the IFU before completing his written expert report.

### 1. General Causation Opinions

**[22]** In his report, Dr. Steege provides several opinions regarding alleged problems associated with surgically implanted mesh, including "[c]hronic inflammation of native tissue surrounding the mesh"; "[s]hrinkage and deformation of mesh"; "[d]irect trauma to nerves, incurred during the mesh implantation or explanation process"; "[n]erve irritation, distortion, and entrapment in the mesh and the surrounding fibrosis"; "[m]esh-related neuropathy"; and "[a]lteration of the function of surrounding organs due to any or all of" the above-described mechanisms. (Steege Report [Docket 210–3], at 2).

Ethicon contends that Dr. Steege is unqualified to offer these general causation opinions because he has never performed a TVT, TVT–O, or mesh-related procedure to treat SUI (*see* Steege Dep. [Docket 210–2], at 113:14–114:2); he has not taught any courses or conducted any studies regarding the TVT–O implantation procedure (*see id.* at 136:17–137:16); and he has not handled explanted mesh, examined the biomechanical properties of mesh, or performed degradation testing of mesh (*see id.* at 156:16–19, 242:17–21).

After reviewing Dr. Steege's report and curriculum vitae, I **FIND** that Dr. Steege is qualified to opine on the etiology of problems associated with the implantation of mesh products in gynecologic surgery. An expert may be qualified by "knowledge, skill, experience, training, or education [.]" Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard,* **\*714** *Inc.,* 878 F.2d 791, 799 (4th Cir.1989). Dr. Steege is a renowned teacher and physician who specializes in the etiology of chronic pelvic pain, vaginal pain, and sexual pain. He is the Director of the Division of Laparoscopy and Pelvic Pain at the University of North Carolina at Chapel Hill and a professor of obstetrics and gynecology. (*See* Steege Report [Docket 210–3], at 1). He has published a textbook and several book chapters and scientific papers on chronic pelvic pain. (*See* Steege CV [Docket 210–1], at 3–13). In 2009, as part of the American College of Obstetrics and Gynecology's "Clinical Expert Series," Dr. Steege discussed the relationship between mesh and the occurrence of new dyspareunia. (*Evaluation and*

*Treatment of Dyspareunia,* 113 Obstetrics & Gynecology: Clinical Expert Series 1124, 1133 (2009) [Docket 210–3] ). He concluded that:

> [m]ultiple studies of mesh placement in pelvic support surgeries demonstrate that new dyspareunia after surgery is substantially more common with these techniques compared with those that do not use mesh material. It would seem, therefore, that complications after mesh placement deserve much more detailed study and that the use of mesh should be a last resort, rather than the first procedure done.

(*Id.*). In addition, Dr. Steege has treated 15–20 patients who complained of pain after being implanted with a mesh product. (*See* Steege Dep. [Docket 210–2], at 153–56).

Ethicon also argues that Dr. Steege's general causation opinions do not fit the facts of this case and are therefore unhelpful. Ethicon contends that because Dr. Steege has not examined Ms. Huskey's explanted mesh, he cannot connect his general causation opinions to Ms. Huskey's injuries. I have already rejected this argument and thus **FIND** that Dr. Steege's general causation opinions are helpful.

### 2. Specific Causation Opinions

Dr. Steege provides a case-specific assessment of Ms. Huskey. After reviewing Ms. Huskey's medical history and conducting a physical, abdominal, and gynecological examination, Dr. Steege concludes that "more likely than not her current dyspareunia and daily pain is in response to the initial mesh placement and multiple mesh excisional procedures required in an attempt to treat and manage her symptoms." (Steege Report [Docket 210–3], at 17). He also testified to a "reasonable degree of medical certainty" that "Mrs. Huskey's pelvic and vaginal pain are caused by the Ethicon TVT–O polypropylene sling[.]" (Steege Dep. [Docket 210–2], at 318:13–18). Ethicon contends that these specific causation opinions are unreliable because Ms. Huskey did not disclose to Dr. Steege her prior history of chronic pelvic pain, and because Dr. Steege did not conduct a proper differential diagnosis. For the reasons that follow, I reject Ethicon's arguments.

#### a. Ms. Huskey's Prior Medical History

**[23]** Ethicon claims that Dr. Steege did not have sufficient facts to formulate a reliable opinion because Ms. Huskey did not inform Dr. Steege that she had chronic pelvic pain prior to her TVT–O implantation. "It is generally held that relevant testimony from a qualified expert may be received if and only if he is in possession of such facts as would enable him to express a reasonably accurate conclusion as distinguished from mere conjecture." *Horton v. W.T. Grant Co.,* 537 F.2d 1215, 1218 (4th Cir.1976). According to Ethicon, this prior history of chronic pain suggests that the TVT–O is not the primary cause of Ms. Huskey's current pain symptoms.

Ethicon references Ms. Huskey's December 2010 emergency room visit as evidence of her prior history of chronic pelvic **\*715** pain. On December 13, 2010, Ms. Huskey visited the Decatur Memorial Hospital Emergency Room due to abdominal pain. (*See* Emergency Triage Notes [Docket 230–1] ). According to the emergency room triage notes, Ms. Huskey complained of an "acute worsening of chronic left lower quadrant pain[.]" (*Id.* at 2). A subsequent colonoscopy suggested that diverticulitis was a possible source of Ms. Huskey's December 2010 pain. (*See* Steege Report [Docket 210–3], at 12).

Ethicon claims that Ms. Huskey did not inform Dr. Steege that she had chronic pelvic pain prior to her TVT–O implantation. Contrary to Ethicon's assertions, Dr. Steege does reference the December 2010 incident in his expert report. (*See id.*). In addition, Dr. Steege testified that he was aware of this incident but did not consider it to be related to Ms. Huskey's current symptoms:

Q: Did Ms. Huskey have pelvic pain at any point before her TVT–O?

A. According to her history with us, she did—she did not really. *She had that episode of left quadrant pain that was really rather separate from subsequent events.*

...

Q. Did Mrs. Huskey report to you that she had chronic abdominal pain at any point prior to her TO implantation?

A. We discussed the episode of the left lower quadrant pain that she had. She did not describe it as chronic.

...

Q. Did Mrs. Huskey report to you that she had any type of history of pelvic pain before her TVT–O?

A. I think we covered that.

Q. Oh, I did?

A. Yeah.

Q. She didn't report that to you?

A. No.

(Steege Dep. [Docket 210–2], at 253:2–17, 258:1–8 (emphasis added)). Because Dr. Steege was aware of Ms. Huskey's prior pelvic pain, **I FIND** that he had the facts necessary to render a sufficiently reliable opinion regarding the cause of Ms. Huskey's current symptoms.

### b. Differential Diagnosis

 **[24]**  Ethicon also maintains that Dr. Steege failed to perform a proper differential diagnosis to rule out other possible causes of Ms. Huskey's chronic pelvic pain. In particular, Ethicon contends that Dr. Steege did not conduct a sufficient examination to rule out endometriosis as an alternative cause of Ms. Huskey's condition. Ethicon also claims that Dr. Steege did not explain the methodology he used to form his specific causation opinion.

In his report, Dr. Steege acknowledges several alternative causes of Ms. Huskey's pain. (*See* Steege Report [Docket 210–3], at 16–17). He also reviewed Ms. Huskey's medical history and conducted a musculoskeletal, abdominal, and gynecological examination. (*Id.* at 16). He described the examination procedures and their results. (*Id.*). He then concluded as follows:

> There is likely a neuropathic component to [Ms. Huskey's] pain, although we could not document a single nerve injury. The clinical diagnosis of a direct nerve injury is made when there are signs of

motor weakness and/or sensory loss, however the diagnosis of nerve entrapment from progressive scarring in the pelvis is more challenging. This is because it is the nature for cutaneous sensory dermatomes to overlap and, as many of the nerves in the pelvis do not have motor innervation, it is difficult to differentiate between them. Also, some nerves with both sensory and motor function can be damaged even if there is no loss in motor function. Despite some **\*716** mild hyperalgesia, she also had a normal neurosensory exam. Regardless, more likely than not her current dyspareunia and daily pain is in response to the initial mesh placement and multiple mesh excisional procedures required in an attempt to treat and manage her symptoms. These conclusions are based on my knowledge of pelvic neuroanatomy, the inflammatory response of tissue to foreign bodies, and my professional opinion. These opinions are supported by well-established scientific principles accepted by the medical community and published in the scientific literature. In reaching these conclusions, I was able to rule out other causes of her pelvic pain and sexual pain, including, but not limited to, her back condition, her history of back surgery, her sacro-iliac dysfunction, her history of pelvic surgery, and diverticulitis.

(*Id.* at 17).

Although Dr. Steege did not provide a detailed explanation as to why he ruled out these alternative causes, he bases his conclusions on accepted scientific principles and research. In addition, he reviewed Ms. Huskey's medical history and conducted three diagnostic examinations to determine the cause of Ms. Huskey's pain. Although he did not clearly connect these scientific studies and examinations to his opinion, it cannot be

said that he provided "*no* explanation" as to why he ruled out alternative causes. *See, e.g., Heller v. Shaw Indus.,* 167 F.3d 146, 156 (3d Cir.1999) ("Dr. Papano did not offer detailed explanations for why he concluded that these were not the causes of plaintiff's illness, but his responses [during cross-examination], grounded in the alleged temporal relationship, the results of Todd's testing showing a reduction in VOCs when the carpet was removed, and Heller's medical history and physical examination, certainly are more than '*no* explanation.' "). Accordingly, I **FIND** that Dr. Steege used a sufficiently reliable methodology to ascertain the cause of Ms. Huskey's chronic pelvic pain.

 [25]   Ethicon also argues that Dr. Steege failed to conduct a sufficient examination to exclude endometriosis as a source of Ms. Huskey's chronic pelvic pain. In his deposition, Dr. Steege testified that "I would [ ] comment that neither patient we're dealing with [including Ms. Huskey] had endometriosis for the record." (Steege Dep. [Docket 210–2], at 161:20–21). Dr. Steege testified that endometriosis is a common health problem for women. (*See id.* at 161:10–19). He also conceded that endometriosis can cause chronic pelvic and lower back pain. (*See id.* at 161–62:15–8). Dr. Steege testified that endometriosis can be diagnosed with a physical examination, but that the condition is often diagnosed by reviewing the patient's history and conducting a diagnostic laparoscopy:

Q. And how is endometriosis usually diagnosed?

A. Sometimes by physical examination, more often by history combined with usually a diagnostic laparoscopy.

Q. Say again. A laparoscopic?

A. Diagnostic laparoscopy.

Q. This is an area I'm not versed in too well, so can you tell me what is a diagnostic laparoscopy.

A. That's—I'm also puzzled as to why it's germane to this because it kind of isn't.

...

Q. How do you determine whether or not a patient has endometriosis?

A. By taking a history and physical exam in detail and those where it's clinically relevant a high index of suspicion and do a laparoscopy. Typically the person who comes to see me, **\*717** though, has already had the diagnosis made because they've had four laparoscopies, some of which they didn't need. So I don't need another one.

Q. So would you say then a majority of your patients who have—who come to you, they've already had a laparoscopy?

A. Majority being over half, I would say that's probably true.

Q. Has Mrs. Huskey ever had a prior laparotomy?

A. I don't believe she had, but then to save you some breath, I've seen very few 54–year–olds with endometriosis, okay? We can cut to the quick a little bit.

(*Id.* at 9–10:16–1, 170–71:13–4).

Dr. Steege further testified that "I would say that the decision to do a laparoscopy is based on the totality of the history and physical exam to see if there's enough evidence to support the possibility. You certainly do not laparoscope every patient with pelvic pain." (*Id.* at 164:1–6). In addition, during his deposition, Dr. Steege referred to a study indicating that physicians relying on a patient's history and physical examination correctly diagnosed endometriosis eighty percent of the time. (*See id.* at 164–65:9–21). In Ms. Huskey's case, although he conducted a physical examination of Ms. Huskey, Dr. Steege did not conduct a diagnostic laparoscopy to determine whether she had endometriosis. (*See id.* at 10:16–18; *see also* Steege Report [Docket 210–3], at 16). However, he noted that it was unlikely that a fifty-four year old with a hysterectomy could have endometriosis. (*See* Steege Dep. [Docket 210–2], at 187:18–23, 322:14–19).

 [26]   "[A] physician need not conduct every possible test to rule out all possible causes of a patient's illness, 'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.' " *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 156 (3d Cir.1999) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 761 (3d Cir.1994)). Here, although Dr. Steege did not conduct a laparoscopy, he did conduct a physical

examination and reviewed Ms. Huskey's history, which Dr. Steege demonstrated is a reliable means of diagnosing endometriosis. Accordingly, I **FIND** that Dr. Steege used a reliable methodology to exclude endometriosis as a possible source of Ms. Huskey's chronic pelvic pain.

### 3. IFU Opinions

**[27]** Dr. Steege opines that the TVT–O IFU did not accurately reflect the potential complications of implanting the TVT–O, such as chronic pelvic pain, vaginal pain, dyspareunia, persistent leg and groin pain, partner pain, vaginal scarring, shrinkage, degradation, chronic foreign body response, and removal difficulty. (*See* Steege Report [Docket 210–3], at 11–12). Ethicon claims that these opinions are unreliable because he did not review the IFU before completing his expert report.

During his deposition, Dr. Steege testified that he did not review the TVT–O IFU until after he had completed his expert report:

Q. When did you review that TVT–IFU, before or after you issued your report?

A. After.

Q. And so the IFU for TVT–O did not have a role in the formulation of your opinions that you issued in your report in this case, correct?

A. They have a role in my general testimony about the case but not in the report. I didn't have them for the report.

**\*718** Q. The opinions that you formed in this case you formed those before reviewing the TVT–O IFU, correct?

A. The report opinions, yes, correct.

Q. And those opinions were not only formed but reduced to writing even before you reviewed the TVT–O IFU, correct?

A. You know, to be honest I don't remember if I reviewed it before or not, you know, it's all—this is a large pile of information so I can't tell you what data I reviewed, each individual piece. And I also reviewed the IFUS from a number of different products that

—and they're all generally pretty much the same. So which of those I read—reviewed before or after, I couldn't tell you.

(Steege Dep. [Docket 210–2], at 112–13:6–4). Clearly, Dr. Steege did not have sufficient facts or data if he did not even review the TVT–O IFU in formulating his opinions. Accordingly, Dr. Steege's opinions concerning the TVT–O IFU are **EXCLUDED.**

### G. Dr. Jerry G. Blaivas

Dr. Blaivas is a urologist and one of the pioneers of sling surgery for women with sphincter incontinence. (*See* Blaivas Report [Docket 214–1], at 1). He has extensive experience treating patients with complications related to synthetic sling surgery. (*See id.* at 2–3). Ethicon seeks to exclude parts of Dr. Blaivas's testimony because they exceed his qualifications, are unhelpful to the jury, or are not set out in his expert report. I will address Ethicon's arguments in turn.

### 1. Opinions Related to Product Warnings

**[28]** Dr. Blaivas opines that Ethicon failed to warn physicians about particular complications with the TVT–O. For example, Dr. Blaivas states in his report that:

6. *Ethicon should have warned physicians and patients about the possibility of serious and life-style altering complications* (e.g. 9, 21–33). Ethicon knew or should have known about the potential for serious complications from mesh slings, such as the Gynecare TVT–O, *because of the known experience with Mersilene, Marlex and silastic slings that were performed during the last three decades of the 20th century, and more recently the Protegen and Mentor ObTape slings.*

...

11. *Ethicon did not warn doctors and patients about the chronic and lifestyle altering nature of the complications associated with its products ...*

12. *Ethicon did not warn doctors and patients about the difficulty removing their products ... and the poor or*

less than optimal results when excision or revision becomes warranted due to complications.

...

16. From a scientific and ethical perspective, *Ethicon should have had a high index of suspicion relating to the product defects based on previous experience with predicate products.... Since many of these complications occurred many months or years after the original surgery, Ethicon should have taken appropriate measures to investigate this and also warn physicians and patients about the possibility of these late-onset complications.* At the very least there should have been a simple statement about the possibility that such complications could arise in the future after months, years, or even decades and **\*719** that the technique is new, so long term studies are not yet available to determine the ultimate safety and efficacy. The many serious complications that I have seen and that occurred with the two plaintiffs discussed in this report do not appear in any study.

...

25. The TVT–O IFUs state that "animal studies show that implantation of PROLENE mesh elicits a minimal inflammatory reaction in tissues, which is transient and is followed by the deposition of a thin layer of tissue, that can grow through the interstices of the mesh, thus incorporating the mesh into adjacent tissue. The material is not absorbed, nor is it subject to degradation or weakening by the action of tissue enzymes." *Despite literature to the contrary, Ethicon never changed the IFU to reflect: 1) the inflammatory response is persistent and not transient; 2) the mesh creates dense scar tissue not a "thin layer of tissue"; and 3) the material is, in fact, subject to degradation* [.]

...

32. I have reviewed the Material Safety Data Sheet for the polypropylene used in the Gynecare TVT–O medical device.... Ethicon IFUs do not include the toxic and carcinogenic warnings contained in the MSDSs. Ethicon marketing materials for doctors and patients do not include the toxic and carcinogenic warnings contained in the MSDSs.

...

Ethicon did not adequately warn doctors and patients about the kind of complications experienced by Mrs. Huskey....

(Blaivas Report [Docket 214–1], at 7–13 (emphasis added)). [6]

Ethicon first challenges Dr. Blaivas's qualifications to give these opinions because Ethicon argues that Dr. Blaivas is not an expert on product warnings. But Dr. Blaivas need not be an expert on product warnings per se. Rather, as a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU. Dr. Blaivas is qualified to render an opinion as to the completeness and accuracy of Ethicon's warning and—"it follows from that —the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits" of the TVT–O was when the warnings were published. *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,* MDL 1203, 2000 WL 876900, at \*11 (E.D.Pa. June 20, 2000). I therefore **FIND** that Dr. Blaivas is qualified to render opinions about the adequacy of the TVT–O's IFU.

Ethicon also maintains that these opinions are unhelpful. First, Ethicon argues that testimony about warnings is irrelevant because there is no evidence that Ms. Huskey's implanting physician relied on the warnings or that she would have changed her decision to implant the device if given "adequate" warnings. I rejected this argument in my opinion ruling on Ethicon's summary judgment motion, entered **\*720** today. Second, Ethicon contends that any opinions about its alleged failure to warn about infections are irrelevant because there is no evidence that Ms. Huskey suffered from a mesh-related infection. However, Ms. Huskey clearly indicated on her Plaintiff Fact Sheet that she had an infection. (*See* Pl. Fact Sheet [Docket 161–2], at 6). In addition, Dr. Siddique, Ms. Huskey's explanting physician, testified that his operative report noted a "chronically infected space with woody edematous tissue." (Siddique Dep. [Docket 214–6], at 33:20–25). Therefore, contrary to Ethicon's arguments, infections are a fact in issue in this case.

#### 2. Opinions Relating to Complications

Ethicon argues that several of Dr. Blaivas's opinions concerning mesh-related complications should be excluded because they are unreliable or irrelevant.

#### a. Alleged Under–Reporting of Mesh Complications

[29] Dr. Blaivas opines that "[m]esh complications are significantly under-reported." (Blaivas Report [Docket 214–1], at 7). Ethicon argues that this opinion is unreliable because it is based on Dr. Blaivas's personal conversations with other physicians, but Dr. Blaivas could not identify which particular doctors had discussed this issue with him. (*See* Blaivas Dep. [Docket 214–2], at 108–10).

Dr. Blaivas did not rely *solely* on personal conversations with other physicians. He also relied on peer-reviewed studies, including two studies that compared independent reports of complications to the complications reported in the peer-reviewed literature. (*See* Blaivas Report [Docket 214–1], at 7). In the first study, the authors compared mesh-related complications reported in the scientific literature to complications reported to the Manufacturer and User Facility Device Experience ("MAUDE") database. (*See* Donna Y. Yeng et al., *Presentation and Management of Major Complications of Midurethral Slings: Are Complications Under–Reported?* 52 J. Urology 46, 46 (2007) [Docket 157–9] ). In particular, the authors reviewed twenty-eight scientific studies involving the TVT, SPARC, Uratape, Monarc, Obtape, SAFYRE, and I–Stop mesh slings. (*See id.* at 47). Out of the 11,806 patients reviewed, only 86 had reported complications. (*See id.*). The MAUDE database, however, revealed a total of 928 reported complications (700 TVT, 66 SPARC, 1 TVT–O, 149 ObTape, and 12 Monarc slings). (*See id.*). The study ultimately concluded that "[a]lthough rare, major complications of midurethral slings are more common than appear in the literature." (*Id.* at 46). In another study, researchers analyzed Medicare claims from 1999–2001 and concluded that the "complication rates within 1 year after sling surgery among Medicare beneficiaries were found to be higher than those reported in the clinical literature." (Anger et al., *Complications of Sling Surgery Among Female Medicare Beneficiaries,* 109 Obstetrics & Gynecology 707, 707 (2007) [Docket 157–10] ).

Ethicon incorrectly asserts that these studies are irrelevant because they did not review the TVT–O specifically. Dr.

Blaivas's opinion is that "mesh complications" are under-reported. Such an opinion is clearly supported by these studies. For these reasons, I reject Ethicon's arguments and **FIND** that this opinion is sufficiently reliable.

#### b. Increasing Frequency of Mesh Complications

[30] In his report, Dr. Blaivas opines that "[i]n the future, there will be an increasing number of patients who have failed initial treatments and an increasing number of 'mesh cripples[.]' " ( **\*721** Blaivas Report [Docket 214–1], at 4). Ethicon argues that this opinion is irrelevant to Ms. Huskey's claims. I agree. Whether future patients may face increasing rates of mesh-related complications will not help the jury decide the issues in this case. Accordingly, this opinion is **EXCLUDED.**

#### c. Other Physicians's Knowledge

[31] In his report, Dr. Blaivas states that "[i]n the academic circles in which I travel, this and other serious mesh complications were already well known and many of us educators included warnings in our lectures about the use of mesh for the surgical treatment of stress incontinence." (Blaivas Report [Docket 214–1], at 8). Ethicon argues that Dr. Blaivas "is not in a position to provide a reliable assessment concerning what [physicians] knew or did not know." (Mem. in Supp. of Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. ("Defs.' Mem.") [Docket 158], at 9). I disagree. As a urologist, Dr. Blaivas is certainly fit to testify what other physicians knew as it relates to the standard of care for designing a mesh product and warning about its potential risks.

#### d. Ethicon's Alleged Downplaying of Complications

Dr. Blaivas writes that Ethicon downplayed mesh-related complications. For example, Dr. Blaivas stated in his report that "Ethicon's marketing materials suggest that these complications occur mostly because of faulty surgical technique performed by inexperienced or poorly trained surgeons...." (Blaivas Report [Docket 214–1], at 7). However, according to Dr. Blaivas's first-hand experience and discussion with other physicians, complications can occur "even in experienced hands and when proper surgical technique is used." (*Id.*). In

addition, Dr. Blaivas stated that during lectures, "industry representatives would challenge our opinions and data about mesh complication and literally attempt to trivialize them," and that he "witnessed company representatives first hand downplaying these complications in public at post graduate seminars...." (*Id.* at 8–9).

These statements are not expert opinions. Dr. Blaivas is not using his "scientific, technical, or other specialized knowledge" in making these statements. Fed.R.Evid. 702. Therefore, I will not address the admissibility of this testimony here.

### e. Complication Rates

**[32]** Ethicon argues Dr. Blaivas's opinions regarding complication rates should be excluded because they were not included in his report and his opinions are unreliable. I **FIND** that Dr. Blaivas's opinions on complication rates are unreliable. In discussing complication rates, Dr. Blaivas did not explain his methodology and admitted that it was impossible to calculate an accurate complication rate:

> A: I mean, just to be fair, I mean, I haven't said you should never use it. I mean, look, my contention is that this information should be available not just to the experts but to the implanting doctors worldwide and to the patients.
>
> And I can't tell you if it's 1 percent or 9 percent. I can't tell you that it's going to—I hope it doesn't, maybe after ten years it will be 20 percent, or maybe some of them will get better. I don't know. All I can tell you right now is that it's very clear to me that these kinds of things happen, at the very least, in the single digit percent rate.

(Blaivas Dep. [Docket 214–2], at 189:11–190–4). In light of this testimony, Dr. Blaivas's opinions regarding complication rates are **EXCLUDED.**

### *722 3. Opinions Regarding the Increased Incidence of Complications Related to the Transobturator Approach

Dr. Blaivas opines that the transobturator approach used to implant the TVT–O "increases the risk of nerve injury, leg pain, chronic pain, dyspareunia, and vaginal scarring/

banding." (Blaivas Report [Docket 214–1], at 5). Dr. Blaivas does not cite any medical literature to support this statement, but rather cites Ethicon's internal documents. Ethicon contends that these opinions are unreliable because a physician would not utilize internal company documents to form an opinion about medical device complications. *See* Fed.R.Evid. 703 (allowing experts to rely on inadmissible evidence that is of the kind that is *reasonably* relied on by experts in the field).

**[33]** Rule 703 addresses the circumstances in which an expert may rely on inadmissible evidence to formulate an opinion. "However, the question whether the expert is relying on a *sufficient* basis of information—whether admissible information or not—is governed by the requirements of Rule 702." Fed.R.Evid. 702, advisory committee's note. In other words, whether an expert may rely on particular information is a different question from whether an expert's opinion has a reliable basis. Therefore, I **FIND** that Dr. Blaivas's opinions are not unreliable simply because he relied on internal Ethicon documents.

### 4. Opinions Relating to Mesh Shrinkage and Degradation

**[34]** Dr. Blaivas provides several opinions on mesh shrinkage and degradation. He opines that "mesh shrinks unpredictably and asymmetrically, influenced by individual response, bacterial contamination, anatomical location, and time." (Blaivas Report [Docket 214–1], at 9). In addition, he opines that "polypropylene degrades in vivo," "resulting in stiffening of the mesh, perpetuation of the inflammatory response, creation of a nidus for bacteria and other organisms, and the production of unknown and potentially toxic chemicals." (*Id.*).

Ethicon argues that Dr. Blaivas is unqualified to opine about these topics because he is not a "bio/polymer" chemist and has no background in polymer science. (*See* Defs.' Mem. [Docket 158], at 12). The plaintiffs contend that Dr. Blaivas has "personally experienced" degradation and shrinkage in his patients. (Pls. Opp. to Def. Ethicon's Mot. and Mem. of Law in Supp. of Its Mot. to Exclude the Ops. and Test. of Jerry Blaivas, M.D. ("Pls.' Resp.") [Docket 214], at 16). But this particular experience is not set out in Dr. Blaivas's expert report. Further, the citation to Dr. Blaivas's deposition provided by the plaintiffs does not relate to degradation. Rather, it relates to Dr. Blaivas's experience with pubovaginal autologous slings. (*See id.*

(citing Blaivas Dep. [Docket 214–3], at 347:17–21, 350:14–353:11)). I am unable to locate any reference whatsoever to degradation in Dr. Blaivas's deposition.

The plaintiffs also indicate that Dr. Blaivas cited several scientific studies to support his opinions. But whether an expert's opinions are supported by scientific literature is an issue of reliability, not his qualifications. Here, in light of his lack of experience with mesh degradation or shrinkage, I **FIND** that Dr. Blaivas is unqualified to opine about these topics, and these opinions are **EXCLUDED.**

### 5. Opinions Related to Product Marketing

[35]     Ethicon challenges Dr. Blaivas's statement that "synthetic slings were revived, reinvented and promoted by industry through pervasive advertising and inducements **\*723** to physicians to perform such surgeries." (Blaivas Report [Docket 214–1], at 2). Dr. Blaivas cites no authority for this position. Moreover, as Ethicon correctly notes, Dr. Blaivas has no expertise in marketing and therefore is unqualified to make such a broad statement. Accordingly, this opinion is **EXCLUDED.**

### 6. Hypothetical Clinical Testing

[36]     Dr. Blaivas opines that "[a]ppropriate and unbiased clinical testing, if performed, would have shown the problems and complications associated with synthetic slings, including the Gynecare TVT–O." (*Id.* at 8). Dr. Blaivas suggests that Ethicon should have conducted "long-term clinical trials or at least monitor[ed] complications through a registry." (*Id.*). Ethicon argues that Dr. Blaivas's opinions are speculative because he "did not perform any of these hypothetical 'unbiased test[s],' and he does not identify any third-party unbiased testing in support of his conclusions." (Defs.' Mem. [Docket 158], at 15).

Notwithstanding Ethicon's reliability challenge, I **FIND** that Dr. Blaivas is not qualified to render opinions relating to the product testing. There is no indication in the record that Dr. Blaivas has any experience or knowledge on the appropriate testing a medical device manufacturer should undertake. Therefore, this opinion is **EXCLUDED.**

### 7. The Competence of Other Physicians in the TVT–O Procedure

[37]     Dr. Blaivas states in his report that:

> Claims that make the procedure sound as if it is safer and easier to perform than it actually is are misleading. See above. The goal was sound—a simple, safe, efficacious, outpatient procedure that required minimal surgical skills and could be mastered by surgeons with little training. But the truth is very different. The fact is, it is not so easy to learn these techniques and the ergonomics of the trocars is such that it is easy to misguide them and end up in the wrong place. *Because the company so trivialized the learning curve and potential complications, many surgeons with inadequate skill and experience perform these surgeries.*

(Blaivas Report [Docket 214–1], at 10 (emphasis added)).

Ethicon argues that this opinion is irrelevant. I agree. Testimony regarding the competence of other physicians will not assist the jury in determining the issues in this case. Accordingly, this opinion is **EXCLUDED.**

### 8. Alternative Procedures

Dr. Blaivas opines that Ms. Huskey would not have suffered complications if an alternative procedure, such as implantation of a pubovaginal fascial sling, had been used. (*See* Blaivas Report [Docket 214–1], at 13). Dr. Blaivas writes that pubovaginal slings "using autologous fascia are as effective as synthetic slings" and "are safer than synthetic slings." (*See id.* at 7–8). Ethicon asserts that these conclusions are unreliable because they are not supported by the literature Dr. Blaivas cites. In particular, Ethicon contends that the primary study cited by Dr. Blaivas deals with "intrinsic sphincter deficiency," not stress urinary incontinence. (Defs.' Mem. [Docket 158], at 17).

It is not clear to me whether this study, *Pubovaginal Fascial Sling for the Treatment of All Types of Stress Urinary Incontinence: Surgical Technique and Long–Term Outcome,* which was authored in part by Dr. Blaivas, applies to stress urinary incontinence or sphincteric incontinence. Despite the study's title, it states that "[t]his article provides an update on **\*724** the surgical technique and long-term outcome of the full-length autologous rectus fascial sling in the treatment of women with *sphincteric incontinence.*" (*See* Blaivas et al., *Pubovaginal Fascial Sling for the Treatment of All Types of Stress Urinary Incontinence: Surgical Technique and Long–Term Outcome* [Docket 263–2], at 7 (emphasis added)). Yet, the study also appears to state that it advocates for the use of autologous fascial slings, "[n]o matter what the type" of incontinence. (*Id.* at 14). At the end of the study, in the section titled "References," it cites to several other articles that, by their titles, appear to deal with all types of stress urinary incontinence. (*See id.* at 15 (citing Chaikin et al., *Pubovaginal Fascial Sling for All Types of Stress Urinary Incontinence: Long–Term Analysis,* 160 J. Urology 1312 (1998); Cross et al., *Our Experience with Pubovaginal Slings in Patients with Stress Urinary Incontinence,* 159 J. Urology 1195 (1998)).

Although Ethicon argued in its moving brief that Dr. Blaivas's study applied only to sphincteric incontinence (*see* Defs.' Mem. [Docket 158], at 17), the plaintiffs failed to address this argument in their response (*see* Pls.' Resp. [Docket 214], at 19–20). The plaintiffs again failed to address this argument after I ordered additional briefing on the reliability of Dr. Blaivas's opinions about pubovaginal slings. (*See* Notice of Supp. Facts and Test. Relating to Defs.' Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. [Docket 263–1], at 2–3). Accordingly, I **RESERVE** ruling on the reliability of Dr. Blaivas's opinions about pubovaginal slings using autologous fascia until trial. I will conduct a hearing on this issue before Dr. Blaivas is called to testify.

### IV. Plaintiffs' Daubert Motions

I now turn to the plaintiffs' *Daubert* challenges against Ethicon's expert witnesses. The plaintiffs seek to exclude Dr. Michael Greenberg, Dr. Christina Pramudji, Dr. Daniel J. Sexton, Dr. Wenxin Zheng, and Dr. Harry Johnson.

### A. Dr. Michael Greenberg

Dr. Greenberg is a board-certified medical toxicologist. He plans to testify that polypropylene mesh is safe for its intended use and that it does not cause cancer, systemic disease, or toxicological harm in humans. (*See* Greenberg Report [Docket 211–4], at 14–15). The plaintiffs move to exclude Dr. Greenberg's opinions as irrelevant and exceeding his qualifications. For the reasons discussed below, Dr. Greenberg is **EXCLUDED** as an expert in this case.

### 1. Cancer, Systemic Disease, Toxicological Harms

The plaintiffs argue that Dr. Greenberg's opinions relating to polypropylene's propensity to cause cancer, systemic disease, or toxicological harm are irrelevant in this case and unhelpful to the jury. Ethicon asserts that Dr. Greenberg should be permitted to testify about these topics because Ethicon cannot anticipate whether the plaintiffs' experts will opine on them. The plaintiffs concede that they are not claiming that the TVT–O caused cancer, systemic disease, or toxicological harm. (*See* Reply. Mem. in Supp. of Pls.' Mot. to Exclude the Ops. and Test. of Michael Greenberg, M.D., M.P.H. [Docket 229], at 1 ("Plaintiffs do not, and never have, claimed that the TVT–O caused any of those three injuries in Mrs. Huskey.")). No party's experts will be permitted to testify about irrelevant subjects such as these. Accordingly, Dr. Greenberg's opinions about cancer, systemic disease, and toxicological harms are **EXCLUDED.**

### 2. "Biocompatibility" and Degradation Opinions

 [38]  Dr. Greenberg seeks to testify that "[b]iocompatibility testing of polypropylene **\*725** mesh has been conducted and has concluded that the materials used in [polypropylene] mesh are safe as clinically intended." (Greenberg Report [Docket 211–4], at 15). He further states that the "accessories" used for mesh implantation "have also undergone biocompatibility testing and [have been] determined to be safe as clinically intended." (*Id.*). The plaintiffs believe that Dr. Greenberg is unqualified to offer these opinions because he is not an expert in biocompatibility. Dr. Greenberg admitted as much in his deposition:

Q. Have you ever testified about the biocompatibility of a medical device before?

A. Not that I can recall.

Q. And would you agree with me that you're not qualified as a biomaterials expert in this case, correct?

A. I am not a biomaterials expert.

...

Q. What is the current working definition of biocompatibility that biomaterial experts use?

A. I would have to ask a biomaterials expert that question. I don't know the answer to that.

(Greenberg Dep. [Docket 166–2], at 125:13–22; 139:25–140:5). Accordingly I **FIND** that Dr. Greenberg is not qualified to offer biocompatibility opinions.

[39] The plaintiffs also challenge Dr. Greenberg's qualifications to offer opinions related to degradation and the reliability of those opinions. Dr. Greenberg reviews several studies that claim to show that polypropylene degrades in vivo. (*See* Greenberg Report [Docket 211–4], at 41–46). He points out methodological flaws in each of these studies, and then concludes that there "is no evidence that any of the medical complaints offered by Plaintiff Jo Beth Huskey are due to degradation of pelvic mesh or due to any alleged toxicity related to implanted pelvic mesh." (Greenberg Report [Docket 211–4], at 15).

[40] Dr. Greenberg's background in toxicology does not qualify him to render opinions about polypropylene degradation. He is not a biochemist or polymer scientist. Even if Dr. Greenberg were qualified, his opinions on degradation are not reliable. In his deposition, he could not explain the basis for his degradation opinions:

Q. Do you believe that polypropylene can be degraded as a result of metabolites produced by phagocytic cells during the body's inflammatory reaction to mesh?

A. Not to any clinically important extent.

Q. Why do you say that?

A. *Because that's what I believe.*

(Greenberg Dep. [Docket 166–2], at 129:22–130:7 (emphasis added)).

Ethicon's briefing confirms that Dr. Greenberg's opinions about biocompatibility and degradation are unreliable and exceed his qualifications. For instance, Ethicon contends that the plaintiffs' motion is a "straw man" that misconstrues the scope of Dr. Greenberg's opinions. (Defs.' Resp. in Opp. to Pls.' Mot. to Exclude the Ops. and Test. of Michael Greenberg, M.D., M.P.H. ("Greenberg Resp.") [Docket 211], at 4). Ethicon states that, as a board-certified medical toxicologist, Dr. Greenberg is qualified to opine that the TVT–O does not cause cancer, systemic disease, or toxicological harm, and therefore that polypropylene is biocompatible and does not degrade:

> Dr. Greenberg is ... generally qualified, by his training, education, and experience, to opine about whether polypropylene implants such as TVT–O can cause cancer, systemic disease, or other toxicological **\*726** harms.... Dr. Greenberg's opinions concerning degradation and biocompatibility are necessary corollaries of this conclusion: *if polypropylene implants do not cause cancer, systemic disease, or other toxicological harms in humans, then polypropylene implants are biocompatible and do not degrade (if at all) in any medically or toxicologically significant way.*

(*Id.* at 6 (emphasis added)). This recitation by Ethicon shows that Dr. Greenberg's conclusion that polypropylene is biocompatible and does not degrade is *ipse dixit.* Accordingly, these opinions are **EXCLUDED.**

### 3. FDA Regulatory Reliance Materials

The plaintiffs further challenge Dr. Greenberg's review of the TVT–O regulatory history. This review includes a discussion about the FDA's approval of polypropylene sutures as safe and effective. (*See* Greenberg Report [Docket 211–4], at 19–21). Ethicon argues that this discussion is relevant to his opinions about cancer, systemic disease, and toxicological harms and that "it is

reasonable for a toxicologist to rely upon data concerning Prolene's safety and efficacy in assessing the toxicological effects of polypropylene implants." (Greenberg Resp. [Docket 211], at 8). As I have already discussed, cancer, systemic disease, and toxicological harms are not at issue in this case. Therefore, any testimony related to these topics and the materials or information used in forming opinions on these topics is not helpful to the jury. Therefore, these opinions are **EXCLUDED.**

### B. Dr. Christina Pramudji

Dr. Pramudji is a board-certified urologist specializing in pelvic floor medicine and reconstructive surgery. The plaintiffs' *Daubert* challenges against Dr. Pramudji concern two areas: (1) polypropylene degradation in vivo, and (2) alternative causes to Ms. Huskey's injuries. Ethicon subsequently withdrew Dr. Pramudji as an expert on chemical degradation of polypropylene, but reserves the right to call Dr. Pramudji to testify whether she has observed degradation in her clinical practice. (*See* Notice of Withdrawal of Certain Expert Ops. of Dr. Christina Pramudji and Dr. Wenxin Zheng [Docket 267] ).

### 1. Degradation Opinions

[41]   Dr. Pramudji plans to testify that she has "not seen evidence of mesh degradation in [her] clinical practice." (Pramudji Report [Docket 205–5], at 2). First, the plaintiffs argue that this opinion exceeds Dr. Pramudji's qualifications because she lacks experience, knowledge, training, or education in the "chemical properties" of polypropylene mesh. (Mem. in Supp. of Pls.' Mot. to Exclude Certain Ops. and Test. of Christina Pramudji, M.D. [Docket 168], at 4). But Dr. Pramudji need not be qualified to such a specific degree. As a physician specializing in pelvic floor medicine, she has performed 1,500 to 2,000 mesh implant surgeries, including 700 involving the TVT–O. (*See* Pramudji Dep. [Docket 209–1], at 55, 115). She has also performed 10 to 20 complete mesh explants and 50 to 60 mesh revisions or partial explants. (*See id.* at 54). Further, Dr. Pramudji has examined meshes she has removed from patients, as well as 10 to 20 images of polypropylene mesh provided by pathologists. (*See id.* at 140). I therefore **FIND** that Dr. Pramudji is qualified by her medical experience to testify

whether she has observed mesh degradation in her clinical practice.

[42]   Second, the plaintiffs challenge the reliability of this opinion. District courts have "considerable leeway" in applying *Daubert's* reliability factors. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167 (1999). Here, Dr. Pramudji's opinion is **\*727** limited to the fact that she has not observed degradation in her clinical practice. Obviously this type of opinion is not subject to testing or peer-review. Therefore, I **FIND** that drawing on her own clinical experience is a sufficiently reliable method of forming this particular opinion.

### 2. Alternative Causes of Ms. Huskey's Injuries

Dr. Pramudji also plans to opine about several alternative causes of Ms. Huskey's injuries. In "attacking the differential diagnosis performed by the plaintiff's expert, the defendant may point to a plausible cause of the plaintiff's illness other than the defendant's actions." *In re Digitek Prods. Liab. Litig.,* 821 F.Supp.2d 822, 838 (S.D.W.Va.2011) (quoting *Kannankeril v. Terminix Intern., Inc.,* 128 F.3d 802, 808 (3rd Cir.1997)). In her deposition and expert report, Dr. Pramudji stated that several ailments other than the TVT–O could be causing Ms. Huskey's chronic pain. The plaintiffs challenge several of those potential alternative causes as unreliable: interstitial cystitis, endometriosis, diverticulosis, emotional stress, and two prior back surgeries. I will address them each in turn. However, I emphasize that to the extent the plaintiffs believe Dr. Pramudji's alternative diagnoses are incorrect, that is a topic for cross-examination.

### a. Interstitial Cystitis

[43]   Although Ms. Huskey has not been diagnosed with interstitial cystitis (*see* Pramudji Dep. [Docket 209–1], at 229:18–24), Dr. Pramudji contends that it could be a cause of Ms. Huskey's pelvic pain. She explained that Ms. Huskey has "pain with bladder filling ... and there's not too many things that cause that. But interstitial cystitis is the main thing that causes that." (*Id.* at 212:11–16). She further explained her potential diagnosis of interstitial cystitis:

A. And it's a diagnosis of symptoms, basically. Pain with bladder filling, urgency, frequency. She doesn't really have as much urgency/frequency now, so it's a diagnosis that I would kind of watch a patient and see, maybe try some local treatments with some bladder instillations to calm down the bladder with local anesthetic; something, you know, not too invasive to try to see if that gives her relief.

But that said, you know, if she does have interstitial cystitis, that would definitely cause this chronic pelvic pain, that deep central pain that she's described to me and to others, and oftentimes, that goes hand-in-hand with levator spasm, where they both kind of interplay with each other.

(*Id.* at 212:18–213:10). This testimony appears to be nothing more than speculation. Dr. Pramudji admits that she would "kind of watch a patient" to determine whether she has interstitial cystitis. After her examination of Ms. Huskey, Dr. Pramudji wrote that Ms. Huskey had "possible chronic interstitial cystitis," and that Ms. Huskey "needs to be evaluated by a urologist for this condition." (Pramudji IME Rep. [Docket 209–6], at 5). These statements indicate that Dr. Pramudji's possible diagnosis of interstitial cystitis is unreliable and is **EXCLUDED.**

**b. Endometriosis**

[44]   Dr. Pramudji maintains that Ms. Huskey's pelvic pain is a possible symptom of endometriosis. (*See* Pramudji Dep. [Docket 209–1], at 209:5–12). However, Dr. Pramudji conceded that it "doesn't sound like endometriosis but it's something that would be on a long differential diagnosis list." (*Id.* at 206:12–15). Further, Dr. Pramudji agreed that it was "a good indication" that Ms. Huskey did not have endometriosis **\*728**  because her medical records did not reflect any problems with her endometrial tissue at the time of her hysterectomy. (*Id.* at 209:20–210:4). Dr. Pramudji then acknowledged that she was not "aware of any reports in the medical literature or any reports elsewhere of endometriosis developing for the first time after a hysterectomy was performed[.]" (*Id.* at 210:6–11). Ethicon does not offer any response or argue that Dr. Pramudji's opinion on endometriosis is reliable. Accordingly, this opinion is **EXCLUDED.**

**c. Diverticulosis**

[45]   Dr. Pramudji contends that Ms. Huskey's diagnosed diverticulosis is a contributing cause to her muscle spasms, which cause chronic pelvic pain. (*See* Pramudji Dep. [Docket 209–1], at 197:18–198:15). The plaintiffs argue that this opinion is unreliable speculation because Ms. Huskey's diverticulosis is under control. However, Ms. Huskey's medical records reflect that she experienced a "flare-up" of her diverticulosis in 2012 or 2013. (*See* Pramudji Dep. [Docket 209–1], at 200). Dr. Pramudji testified that diverticulosis can flare up as a result of Ms. Huskey's chronic constipation. (*See id.* at 201:1–10). Further, Dr. Pramudji stated that Ms. Huskey does not keep her chronic constipation "managed very well at all times." (*Id.* at 201:9). Because Dr. Pramudji is able to explain the basis for her medical opinion that diverticulosis is a contributing cause of Ms. Huskey's pain, I **FIND** that her opinion contains sufficient indicia of reliability.

**d. Emotional Stress**

[46]   Dr. Pramudji opines that Ms. Huskey's pelvic pain is at least exacerbated by stress. (*See* Pramudji Dep. [Docket 209–1], at 186:10–187:11). The plaintiffs argue that this opinion is "pure speculation" because no medical record "contains notation of stress levels in relation to physical pain; nor does any medical record contain notation of physical health concerns specifically as related to stress levels." (Mem. in Supp. of Pls.' Mot. to Exclude Certain Ops. and Test. of Christina Pramudji, M.D. [Docket 168], at 9). While Dr. Pramudji might base her opinions outside of documents in the medical record, such as her own examination of Ms. Huskey, Dr. Pramudji's opinion here appears to be speculation:

Q. Okay. What's the cause of that muscle spasm?

A. That muscle spasm, I suspect it's related to the SI joint issue that she has causing pelvic tilt. She wears a belt all the time. She has a slightly abnormal gait. I don't know if that goes back to the motor vehicle accident she was in. And I think just the overall upregulation in her pelvic area, I think the stress, that's where she's carrying her stress that she's under. You know, it's like some people carry it in their neck

muscles where they'll get a tight neck or a headache, some people carry it in their pelvic floor muscles, that's where their stress will manifest, and she's a very stressed person. Seemed somewhat depressed, in my opinion. And so I think that's exacerbating it, not causing it but exacerbating it.

(Pramudji Dep. [Docket 209–1], at 186:10–187:5). There is no explanation as to how Dr. Pramudji knows that Ms. Huskey "carries" her stress in her pelvic area. Dr. Pramudji is simply guessing and providing nothing more than "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. Accordingly, I **FIND** that this opinion is unreliable, and it is **EXCLUDED.**

### *729 e. Two Prior Back Surgeries

**[47]** Finally, the plaintiffs seek to exclude as unreliable Dr. Pramudji's opinion that prior back surgeries contribute to Ms. Huskey's pain. Dr. Pramudji admits that this opinion is not made to a reasonable degree of medical certainty:

Q. Okay. Do you believe that the back surgery that she had in 1997 and 2000 has any correlation or any connection to the pelvic pain that she's currently experiencing?

A. I'm not—I'm not sure about that. It's a possible etiology. I think her pain is multifactorial. It's hard to really dissect it out completely.

Q. Okay, so hard to dissect out. But would you agree with me that you can't say to a reasonable degree of medical certainty that the back surgery in 1997 is causally related to her current pelvic pain issues?

A. I can't say that it's not either.

Q. Okay. But I'm asking if you can say that it is.

A. I can't say one way or another.

Q. Can't say one way or the other, okay.

A. No.

(Pramudji Dep. [Docket 209–1], at 194:17–195:16). Not only is her opinion speculation, but it is not helpful to the jury because it is not made to a reasonable degree of

medical certainty. Further, Dr. Pramudji admits that Ms. Huskey's back surgeries are not among the possible causes of her muscle spasms that cause her pelvic pain:

Q. So am I correct in saying that your opinion is that there's not a single cause to the muscle spasm that she was experiencing, but there are multiple causes that working in connection with each other are causing this muscle spasm that she's having? Is that right?

A. Correct, uh-huh.

Q. And then that muscle spasm that she's having is the source of most of her both dyspareunia and chronic pelvic pain that she's currently having?

A. Correct.

Q. Okay. And you gave me then a list of the issues or a list of the conditions that you believe were all working in conjunction with each other to cause this levator muscle spasm?

A. Correct.

Q. Is that right?

A. Yes.

Q. Okay. So what's not on that list is the back surgery from #97 to 2000. Is that right?

A. Uh-huh.

(*Id.* at 198:3–199:3). For these reasons, I **FIND** that Dr. Pramudji's opinion that Ms. Huskey's prior back surgeries contribute to her pelvic pain is unreliable, and it is **EXCLUDED.**

### C. Daniel J. Sexton

Dr. Sexton is an infectious disease specialist. The plaintiffs challenge his opinions that (1) Ms. Huskey did not experience an infection from the TVT–O, and (2) that incidences of infection using the TVT–O are low.

### 1. Opinions about Ms. Huskey's Infections

**[48]** The plaintiffs' main challenge is that Dr. Sexton's opinions about infections are unhelpful because they

"relate to post-operative surgical site infections (SSIs)—which Ms. Huskey does not claim she incurred." (Mem. of Law in Supp. of Pls.' Mot. to Exclude the Ops. and Test. of Daniel J. Sexton, M.D. ("Pls.' Mem.") [Docket 172], at 4).

**\*730** Dr. Sexton will testify in various ways that Ms. Huskey did not experience an infection from her TVT–O implant. The plaintiffs argue that these opinions are unhelpful because Dr. Sexton defines "infection" very narrowly. He states that "[i]n order to speak sensibly about infection issues ... it is important to understand the definition of what is and is not an infection[.]" (Sexton General Report [Docket 208–1], at 13). He then provides a definition of "post-operative surgical site infection" taken from the Centers for Disease Control and Prevention and its National Healthcare Safety Network. He states that post-operative surgical site infections "can be superficial (incisional), deep (below fascial planes) or in the organ space (i.e. in anatomical spaces below the incision where they usually manifest as a discrete abscess)." (*Id.*). Dr. Sexton then states that he will confine his opinions to this definition: "My discussion and analysis will utilize the CDC/NHSN definitions for postoperative surgical site infections discussed previously that are widely and nearly universally used by experts and researchers throughout the United States and the world." (Sexton General Report [Docket 208–1], at 16). Further, when reviewing Ms. Huskey's medical records, Dr. Sexton states that Ms. Huskey did not experience an infection under the "standard CDC criteria for a surgical site infection." (Sexton Huskey Report [Docket 208–2], at 13).

The plaintiffs maintain that Dr. Sexton's opinions are inapplicable because Ms. Huskey has not experienced a surgical site infection; rather, her "infection is related to the body's reaction to the TVT–O mesh itself." (Reply Mem. in Supp. of Pls.' Mot. to Exclude the Ops. and Test. of Daniel J. Sexton, M.D. [Docket 235], at 4). In other words, they argue that Dr. Sexton opines about a type of injury that Ms. Huskey does not claim to have experienced. The plaintiffs thus seek to exclude Dr. Sexton's infection opinions because they will not help the jury determine a fact in issue. *See* Fed.R.Evid. 702. The plaintiffs offer a different definition of "infection," taken from Dorland's Medical Dictionary, which they say is applicable to this case:

> Invasion and multiplication of microorganisms or parasites in body tissues; it may be

clinically inapparent (*subclinical* infection) or remain localized with cellular injury due to competitive metabolism, toxins, intracellular replication, or antigen-antibody reaction. Infections remain localized, subclinical, and temporary if the body's defense mechanisms are effective. However, they may persist, become symptomatic, and spread by extension to become acute, subacute, or chronic disease states. A local infection may also become systematic when the microorganisms gain access to the lymphatic system or the bloodstream.

(Pls.' Mem. [Docket 172], at 5 (emphasis added)).

Despite Dr. Sexton's express language purportedly limiting his opinions to "post-operative surgical site infections," he offers opinions related to "subclinical" infections, which fall within the plaintiffs' proposed definition. For instance, he opines that there is no "convincing clinical data" that transvaginal mesh results in "sub-clinical" infections. (Sexton General Report [Docket 208–1], at 23). He stated the same in his deposition:

Q. Dr. Sexton, as part of your evaluation of this case, did you review Ms. Huskey's medical records?

A. I did.

Q. Did you find any support for the proposition that Ms. Huskey suffered from a subclinical infection?

A. No. She had an erosion.

**\*731** (Sexton Dep. [Docket 208–3], at 201:24–202:5). Because subclinical infections undisputedly relate to the plaintiffs' claims, Dr. Sexton's opinions are helpful.

In any event, assuming Dr. Sexton's definition for "infection" excludes the plaintiffs' alleged injury, his opinions remain helpful to the jury. Whether or not Ms. Huskey suffered an infection is precisely a fact in issue. Dr. Sexton's definition of infection is "widely and nearly universally" utilized by other experts. Dr. Sexton,

a qualified expert on infections, should be permitted to give his expert opinion that Ms. Huskey did not experience an infection. To the extent that the plaintiffs believe Dr. Sexton's opinions improperly exclude the *precise* type of infection they allege, they are free to bring this out on cross-examination. Accordingly, I **FIND** that Dr. Sexton's opinions about Ms. Huskey's infections are helpful and should not be excluded.

## 2. Rates of Mesh–Related Infection Associated with TVT–O

[49] Next the plaintiffs challenge Dr. Sexton's opinions about the rate of mesh-related infections associated with the TVT–O. Dr. Sexton's expert report states that the rate of surgical infections, urinary tract infections, and vaginal yeast infections associated with the TVT–O is "low" and "equivalent to or lower than the comparable rate for the prior gold standard treatment for SUI, the Burch colposuspension." (Sexton General Report [Docket 208–1], at 5).

The plaintiffs first argue that Dr. Sexton is not qualified to render these opinions because he has little experience with transvaginal mesh; he is not a urologist, gynecologist, or urogynecologist; and he has never implanted a pelvic mesh device. (*See* Pls.' Mem. [Docket 172], at 6). I disagree. Dr. Sexton need not be an implanting surgeon to opine about infections associated with the TVT–O. Dr. Sexton is highly qualified to offer infection opinions. He is a board-certified infectious disease specialist and a professor at Duke University's Department of Medicine and the Division of Infectious Diseases. (*See* Sexton General Report [Docket 208–1], at 2). He is the author of over 200 "articles, editorials, and letters" on infectious diseases in peer-reviewed journals. (*See id.* at 2–3). He has written more than 50 book chapters, presented scientific papers, and lectured on infectious diseases. (*See id.* at 3).

Further, these opinions are reliable. Dr. Sexton cites nearly a dozen academic studies to explain that the risk of infection following implantation of the TVT–O is low. (*See, e.g.,* Sexton General Report [Docket 208–1], at 17–23 (citing Paraiso 2004, Ward 2002, Martinez–Fornes 2009, El–Barky 205, Valpas 2003, Cheng 2010, Neuman 2012, Liapis 2002, Laurikainen 2014). He explains how the data and findings in each one of these studies supports his opinions.

I therefore **FIND** that Dr. Sexton's opinions about the rates of mesh-related infections associated with the TVT–O should not be excluded.

### 3. Physician Organization Statements and Guidelines

Finally, the plaintiffs seek to exclude Dr. Sexton's references to physician organization statements and guidelines promoting the safety and efficacy of the TVT–O, including those of the American Urogynecologic Society, the American Urological Association, the European Association of Urology, and the United Kingdom's National Institute for Health Care & Excellence. (*See* Sexton General Report [Docket 208–1], at 8–10). Dr. Sexton writes that these organizations "recognize that the use of synthetic mid-urethral slings is the current **\*732** standard treatment for SUI[.]" (Sexton General Report [Docket 208–1], at 8).

These statements are not expert opinions. Dr. Sexton is not using his "scientific, technical, or other specialized knowledge" in making these statements. Fed.R.Evid. 702. Therefore, I will not address the admissibility of this testimony here.

### D. Dr. Wenxin Zheng

Dr. Zheng is a pathologist offered to testify that the TVT–O is biocompatible. He states that polypropylene mesh "elicits an expected inflammatory response" that is mild to minimal and that the TVT–O's pores are large enough to allow "appropriate tissue integration and to allow the body's immune response to minimize potential infection." (Zheng Report [Docket 176–1], at 9).

#### 1. Qualifications for Particular Opinions

[50] The plaintiffs argue that eleven separate opinions proffered at deposition exceed Dr. Zheng's qualifications as a pathologist. (*See* Pls.' Mem. of Law in Supp. of Their Mot. to Exclude the Ops. and Test. of Wenxin Zheng, M.D. ("Pls.' Mem.") [Docket 176], at 3). Ethicon conceded that Dr. Zheng will not opine on several of these topics. [7] Accordingly, the plaintiffs' motion is **DENIED as**

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 131 of 924 PageID #: 212938
Huskey v. Ethicon, Inc., 29 F.Supp.3d 691 (2014)
Case 2:12-md-02327 Document 7477-4 Filed 03/21/19 Page 33 of 34 PageID #: 117888

**moot** with respect to the following opinions: (1) whether heavy or light-weight mesh is preferable, (2) whether complications for mesh devices were underreported by manufacturers including Ethicon, (3) the causes of mesh erosion and whether the TVT–O causes erosion, (4) electron microscopy, (5) opinions requiring expertise of a materials expert, an expert on medical devices, or a biomedical engineer, (6) opinions related specifically to Ms. Huskey's pathology, (7) the surgical standard of care for Ms. Huskey's procedures and precise details of surgical techniques, and (8) that the TVT–O is the gold standard for treatment of SUI.

I will address the three remaining statements individually. First, the plaintiffs argue that Dr. Zheng is not qualified to tell the jury the "clinical reasons why patients such as Mrs. Huskey require excision of their Ethicon mesh medical devices." (*Id.* at 2). I disagree. Dr. Zheng has examined over one hundred explanted meshes. (*See* Zheng Dep. [Docket 176–2], at 24:4–10). I therefore **FIND** that he is qualified to testify from a pathologist's perspective why patients require excisions.

 [51]  Second, the plaintiffs argue that Dr. Zheng is not qualified to testify whether transvaginal mesh devices can cause pain. The plaintiffs point to the following testimony, which is vague and contradictory:

> Q. So you're telling me that as a pathologist you are not able to tell whether a patient is having pain and you receive a mesh specimen, whether it's related to the pain or not?
>
> A. Correct. But let me add something. But if the histological evidence or pathological evidence is obvious, then that can be consistent with the clinical symptoms such as pain. If there's no, you know, evidence to support, then usually there's no linkage between the finding-pathological finding and the clinical pain.

(Zheng Dep. [Docket 176–2], at 46:17–47:1). Although Dr. Zheng contradicts himself, he does admit that he is not able to tell from a mesh sample whether a patient is experiencing pain. Further, **\*733** Ethicon does not point to anything in the record indicating that he is qualified to testify whether transvaginal mesh devices cause pain. For these reasons, I **FIND** that Dr. Zheng is not qualified to opine whether transvaginal mesh devices cause pain, and such opinions are **EXCLUDED.**

Third, the plaintiffs contend that Dr. Zheng is not qualified to opine about "the impact of patients' hypersensitive responses to Ethicon's mesh devices." (Pls.' Mem. [Docket 176], at 3). I cannot determine from the parties' briefing or Dr. Zheng's deposition testimony precisely what the plaintiffs seek to exclude or why they believe Dr. Zheng is unqualified. Therefore, the plaintiffs' motion on this issue is **DENIED.**

### 2. Reliability of Particular Opinions

 [52]  Finally, the plaintiffs move to exclude several opinions as unreliable. The plaintiffs state that

> Dr. Zheng acknowledged in his deposition that the human vagina is a non-sterile environment. *Yet, the Zheng Report does not countenance that devices implanted there are not suitable to that environment and could potentially cause serious infections in women implanted with them such as Mrs. Huskey* ....
>
> Likewise lacking are Dr. Zheng's opinions regarding whether the TVT–O device's lack of elasticity caused Mrs. Huskey's symptoms. Dr. Zheng testified that the vagina needs to maintain elasticity to preserve vital function. However, *nowhere in his report does he acknowledge that devices implanted in the vagina also need to maintain elasticity.*

(Pls.' Mem. [Docket 176], at 4 (emphasis added)). These are not proper challenges to Dr. Zheng's methodology. In reality, they are disputes with the conclusions Dr. Zheng reached. The plaintiffs' motion on these issues is **DENIED.**

The plaintiffs also challenge the reliability of Dr. Zheng's opinion that as many as fifty percent of women seeking transvaginal mesh revisions do so "for legal purposes" to advance claims. (Zheng Dep. [Docket 176–2], at 25:19–25). Ethicon does not respond to this argument. This opinion is clearly unreliable and unhelpful, and it is **EXCLUDED.**

### E. Dr. Harry Johnson

 [53]  Dr. Harry Johnson is an obstetrician and gynecologist who specializes in female urinary incontinence and pelvic organ prolapse. (*See* Johnson

Report [Docket 212–2], at 1). Dr. Johnson opines that the scientific literature does not indicate that Prolene mesh degrades in the body. In addition, Dr. Johnson opines that if mesh does degrade in vivo, the literature does not demonstrate that it has any clinical significance. Specifically, Dr. Johnson states that:

> In this section [of the TVT IFU], Ethicon reports that animal studies have shown minimal inflammatory reaction in tissues and stimulates the disposition of a thin fibrous layer of tissue that can grow through the interstices of the mesh, that is incorporating the mesh into the adjacent tissue. This is important to me as there will be no persistent or acute inflammatory response affecting the vagina and bladder in the patient. This is consistent with what I have seen in my practice and in the literature. I have seen no persistent inflammatory responses that have clinically affected any of my patients. Ethicon also states that the mesh is not subject to degradation, meaning that it is a permanent mesh and will not change in character over time. There is no data on Prolene mesh indicating that it degrades in the body. There are no studies in the literature showing degradation **\*734** of mesh that is of any clinical significance. In my experience and review of the available medical literature, serious complications of TVT are very uncommon. The major intraoperative complications are very rare for midurethral slings like TVT. There is no procedure or device that has a better benefit risk ratio than TVT for SUI. As such, it developed into the gold standard procedure for treatment of SUI 5–6 years after introduction and has remained the gold standard procedure for the last 10 years.

(Johnson Report [Docket 212–2], at 20). [8] During his deposition, Dr. Johnson testified that he has "never seen any evidence that particle loss has any clinical significance in patients." (Johnson Dep. [Docket 212–1], at 162:1–6). The plaintiffs argue that Dr. Johnson is not qualified to opine on mesh degradation and particle loss and that his opinions on this subject are unreliable.

The plaintiffs contend that Dr. Johnson is unqualified to opine about polypropylene because he is not a biomaterials expert. (*See* Johnson Dep. [Docket 212–1], at 162:14–16 ("Q: Okay. You're not a biomaterials expert, are you? A: Um, I'm a clinical medical expert.")). The plaintiffs also point to testimony showing that Dr. Johnson is unfamiliar with the chemical composition of polypropylene. (*See* Johnson Dep. [Docket 170–3], at 162:17–163:1, 164:8–165:1). [9]

However, as I stated in relation to Dr. Rosenzweig's opinion on degradation, an expert "need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989). Simply because Dr. Johnson cannot describe the chemical properties of polypropylene does not render him unqualified to testify that he has not experienced mesh degradation in his practice.

Dr. Johnson has implanted at least 750 TVT or TVT–O devices, treated patients with mesh-related complications, and has performed 25–30 revisions of polypropylene slings. (*See* Johnson Dep. [Docket 236–1], at 71:21–72:19). Dr. Johnson is also the co-principal investigator and founding member of the Urinary Incontinence Treatment Network ("UITN"), which was established by the National Institute of Diabetes, Digestive and Kidney Diseases in 2000. (*See* Johnson Report [Docket 212–2], at 1). Under the direction of the National Institute of Health, the UITN has conducted several randomized, surgical trials comparing different treatments for urinary incontinence including fascial slings, Burch colposuspension, and midurethral synthetic slings, including the TVT, TVT–O, and Monarc slings. (*See id.* at 2). Accordingly, I **FIND** that Dr. Johnson's research and clinical experience qualifies him to render opinions regarding the lack of mesh degradation and particle loss.

[54]   With respect to reliability, the plaintiffs contend that Dr. Johnson is simply speculating that polypropylene does not degrade or lose particles because he has not seen degradation or particle loss in his practice. They also contend that Dr. **735 Johnson failed to support his opinion with scientific literature. I disagree.

Dr. Johnson writes that "[t]here are no studies in the literature showing degradation of mesh that is of any clinical significance." (*Id.* at 20). He bases this opinion on his review of scientific literature as well as his clinical experience. (*See id.;* Johnson Dep. [Docket 170–3], at 163 ("Again, I've never seen any evidence of degradation in a patient. I'm not sure that has any clinical significance.")). Although Dr. Johnson's opinion is not subject to testing and it is not supported by peer-reviewed literature *affirmatively* stating that degradation lacks clinical significance, district courts have "considerable leeway" in applying *Daubert's* reliability factors. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167 (1999). Here, Dr. Johnson offers an opinion about the lack of evidence of clinically significant degradation based on his clinical experience and his review of the scientific literature. This type of opinion is obviously not subject to testing or peer-review. Therefore, drawing on clinical experience and a review of relevant literature is a sufficiently reliable method of forming this particular opinion. *See DeKeyser v. Thyssenkrupp Waupaca, Inc.,* 747 F.Supp.2d 1043, 1050 (E.D.Wis.2010).

The plaintiffs also contend that Dr. Johnson's opinion is unreliable because he did not review internal Ethicon documents that refute his conclusion. (*See* Reply Mem. in Supp. of Pls.' Mot. to Exclude Certain Ops. and Test. of Harry Johnson Jr., M.D. [Docket 236], at 4). But here, Dr. Johnson's failure to review particular documents goes to the weight of his opinion, not its admissibility. For these reasons, I **FIND** that Dr. Johnson's opinion about degradation is sufficiently reliable.

### V. Conclusion

I emphasize that my rulings *excluding* expert opinions under Rule 702 and *Daubert* are dispositive of their admissibility in this case, but that my rulings *not to exclude* expert opinions are not dispositive of their admissibility. In other words, to the extent that certain expert opinions might be cumulative or might confuse or mislead the jury, they may still be excluded under Rule 403 or some other evidentiary rule.

I am particularly concerned about cumulative testimony. For instance, the plaintiffs offer at least five experts to opine on degradation, three experts on the insufficiency of Ethicon's warnings, and three experts on safer alternative designs. The defendants offer three experts on degradation. The parties will not be permitted to call all of these experts at trial, and they should plan accordingly.

For the reasons stated above, Ethicon's motions with respect to Dr. Rosenzweig [Docket 149], Dr. Dunn [Docket 183], Dr. Steege [Docket 155], and Dr. Pandit [Docket 185] are **GRANTED in part** and **DENIED in part.** Ethicon's motion with respect to Dr. Klosterhalfen [Docket 152] is **DENIED in part** and **RESERVED in part.** Ethicon's motion with respect to Dr. Blaivas [Docket 157] is **GRANTED in part** and **DENIED in part** and **RESERVED in part.** Ethicon's motion with respect to Dr. Guelcher [Docket 181] is **DENIED.** The plaintiffs' motion with respect to Dr. Greenberg [Docket 165] is **GRANTED.** The plaintiffs' motions with respect to Dr. Pramudji [Docket 167] and Dr. Zheng [Docket 175] are **GRANTED in part** and **DENIED in part.** The plaintiffs' motions with respect to Dr. Sexton [Docket 171] and Dr. Johnson [Docket 169] are **DENIED.**

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

**All Citations**

29 F.Supp.3d 691

Footnotes

1    With more than 60,000 cases related to surgical mesh products currently pending before me, this gatekeeper role takes on extraordinary significance. Each of my evidentiary determinations carries substantial weight with the remaining surgical mesh cases. Regardless, while I am cognizant of the subsequent implications of my rulings in these cases, I am limited to the record immediately before me and the arguments of counsel.

2    Ethicon argues that my decision in the *In re C.R. Bard* MDL to preclude Dr. Bob Shull from testifying about product warnings should control here. *See In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611 (S.D.W.Va.2013). But there, Dr. Shull *admitted* that he had not developed product warnings, had no experience in that area, and did not hold himself out as an expert in product warnings. *See id.* Dr. Rosenzweig has made no similar admissions. Therefore, my holdings regarding Dr. Shull are inapposite.

3    My holding here also applies to Ethicon's argument that I should exclude as unhelpful Dr. Rosenzweig's general causation opinions that the TVT–O mesh shrinks and contracts in vivo. (*See* Defs.' Mem. [Docket 150], at 19).

4    Because I exclude Dr. Rosenzweig's specific causation opinions for being unreliable, I do not discuss whether they should also be excluded under Federal Rule of Civil Procedure 37(c) as a result of Dr. Rosenzweig's failure to disclose these opinions in his expert report.

5    As in *In re C.R. Bard* and *Lewis v. Johnson & Johnson,* the plaintiffs have again failed to provide a full expert report for Dr. Klosterhalfen. Although they have repeatedly argued that Dr. Klosterhalfen is a "percipient fact witness" under no obligation to provide a report, many of his opinions appear to go beyond his status as a fact witness. I previously found that such a failure is harmless under Federal Rule of Civil Procedure 37(c). *See In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* No. 2:12–cv–4301, 2014 WL 186872, at *10 (S.D.W.Va. Jan. 15, 2014). Despite this prior holding, I will not tolerate continued violations of the plaintiffs' obligation to provide a full expert report under Rule 26. The plaintiffs are advised to provide a more thorough expert report for Dr. Klosterhalfen in future cases.

6    Ethicon argues that some of this testimony is inadmissible evidence of Ethicon's corporate knowledge or state of mind. As I previously stated, I will not parse expert reports in relation to this objection. However, the parties are cautioned that experts must offer opinions that utilize their "scientific technical, or other specialized knowledge[.]" Fed.R.Evid. 702.

7    I note that Ethicon's concessions are limited to the precise statements identified in the plaintiffs' motions. Therefore, this ruling does not exclude testimony outside the literal scope of these statements.

8    It appears that Dr. Johnson's opinions apply equally to the TVT and the TVT–O IFU. (*See* Johnson Report [Docket 212–2], at 20–21).

9    The plaintiffs' counsel initially attached a rough draft of this deposition transcript to their motion, stating that they would supplement the record with the final transcript at the court's request. This is not a request the court should have to make. In the future, counsel should supplement the record with final drafts as soon as they become available, without prompting from the court.

---

**End of Document**                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT E**

🟨 KeyCite Yellow Flag - Negative Treatment
Distinguished by Carlson v. Boston Scientific Corp., S.D.W.Va., April 28, 2015

2014 WL 3361923
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia.

Tonya EDWARDS, et al., Plaintiffs,

v.

ETHICON, INC., et al., Defendants.

Civil Action No. 2:12–CV–09972.
|
Signed July 8, 2014.

**Attorneys and Law Firms**

Breanne Michelle Vandermeer, Christina Lewis, Jeffery J. Larrimore, John Fabry, Mark R. Mueller, William L. Hurlock, Mueller Law, Austin, TX, for Plaintiffs.

Christy D. Jones, William M. Gage, Butler Snow, Ridgeland, MS, David B. Thomas, Philip J. Combs, Susan M. Robinson, Thomas Combs & Spann, Charleston, WV, Nancy Karen Deming, S. Eric Rumanek, Troutman Sanders, Atlanta, GA, Kari L. Sutherland, Butler Snow, Oxford, MS, Susanna Moore Moldoveanu, Butler Snow, Memphis, TN, for Defendants.

**MEMORANDUM OPINION & ORDER**

(***Daubert*** **Motions**)

JOSEPH R. GOODWIN, District Judge.

 **\*1** Now before the court are several motions filed by the defendants to limit or exclude the testimony of the plaintiffs' proposed experts. For the reasons set forth below, Ethicon's Motion to Exclude the Opinion Testimony of John F. Steege, M.D. [Docket 73] and Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Scott Guelcher, Ph.D. [Docket 97] are **DENIED.** Ethicon's Motion to Limit the Testimony of Bruce Rosenzweig, M.D. [Docket 75] and Motion to Exclude Testimony of Vladimir Iakovlev, M.D. [Docket 85] are **DENIED in part, DENIED as moot in part,** and **GRANTED in part.** Ethicon's Motion to Exclude Certain Opinions of Jerry G. Blaivas, M.D. [Docket 77] is

**DENIED in part, GRANTED in part,** and **RESERVED in part.** Ethicon's Motion to Exclude Ronald Luke, JD, PhD [Docket 79] and Motion to Limit the Testimony of Prof. Dr. Bernd Klosterhalfen are **DENIED in part** and **RESERVED in part.** Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Russell Dunn, Ph.D., P.E. [Docket 91] is **GRANTED in part and DENIED in part.** And Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Abhay Pandit, Ph.D. [Docket 95] is **GRANTED in part** and **DENIED as moot in part.**

**I. Background**

This case is one of more than 60,000 in seven MDLs that have been assigned to me by the Judicial Panel on Multidistrict Litigation. This case involves surgical mesh products manufactured and sold by the defendants, Ethicon, Inc. and Johnson & Johnson, Inc. (collectively, "Ethicon"), to treat female stress urinary incontinence. The device at issue is Ethicon's Gynecare TVT Obturator ("TVT–O"), which was implanted in the plaintiff, Ms. Edwards. The TVT–O is a medical device that includes a mechanism used to place a mesh tape, or sling, under the urethra to provide support to the urethra. The defendants have filed several motions to exclude or limit the testimony of the plaintiffs' proposed experts pursuant to Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**II. Standard of Review for *Daubert* Motions**

Under Rule 702, expert testimony is admissible if it will "help the trier of fact to understand the evidence or to determine a fact in issue" and (1) is "based upon sufficient facts or data" and (2) is "the product of reliable principles and methods" which (3) has been reliably applied "to the facts of the case." Fed.R.Evid. 702. A two-part test governs the admissibility of expert testimony. The evidence is admitted if it "rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The proponent of expert testimony does not have the burden to "prove" anything. He must, however, "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Md. Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998).

The district court is the gatekeeper.[1] It is an important role: "[E]xpert witnesses have the potential to be both

powerful and quite misleading [;]" the court must "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir.2001) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) and *Daubert,* 509 U.S. at 588, 595). I "need not determine that the proffered expert testimony is irrefutable or certainly correct"-"[a]s with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir.2006) (quoting *Daubert,* 509 U.S. at 596); *see also Md. Cas. Co.,* 137 F.3d at 783 (noting that "[a]ll *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful").

 **\*2** *Daubert* mentions specific factors to guide the overall relevance and reliability determinations that apply to all expert evidence. They include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003) (quoting *Daubert,* 509 U.S. at 593–94).

Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry,* 178 F.3d at 261 (quoting *Daubert,* 509 U.S. at 594–95); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We agree with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' ") (citation omitted); *see also Crisp,* 324 F.3d at 266 (noting "that testing of reliability should be flexible and that *Daubert's* five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, *Daubert* also explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.

> The consideration has been aptly described by Judge Becker as one of fit. Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert,* 509 U.S. at 591–92 (internal citations and quotation marks omitted).

Finally, in several of the instant *Daubert* motions, a specific scientific methodology comes into play, dealing with differential diagnoses or etiologies. "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry,* 178 F.3d at 262.

The Fourth Circuit has stated that:

> A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

 **\*3** *Id.* A reliable differential diagnosis passes scrutiny under *Daubert.* An unreliable differential diagnosis is another matter:

> A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. However, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." The alternative causes suggested by a defendant "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony," unless the expert can offer "no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause."

*Id.* at 265–66 (internal citations omitted).

### III. Discussion

Ethicon has moved to limit or exclude the testimony of several of the plaintiffs' proposed experts. Each motion is addressed below.

Before I begin, I will address two arguments that apply to many of Ethicon's *Daubert* motions. First, as I have repeated throughout these MDLs, I will not permit the parties to use experts to usurp the jury's fact-finding function to determine Ethicon's state of mind, or whether Ethicon acted reasonably. *See, e.g., In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611, 629 (S.D.W.Va.2013); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at *6, 21 (S.D.W.Va.Jan.15, 2014). While an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible—Ethicon's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury. Similarly, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006). I will not repeatedly parse the expert reports and depositions of each expert in relation to this same objection. I trust that able counsel in this matter will tailor expert testimony at trial accordingly.

Second, Ethicon repeatedly argues that expert opinions relating to polypropylene do not apply to the Prolene mesh used in the TVT–O. Ethicon states that experts testifying about polypropylene fail "to account for the important chemical differences between generic polypropylene and PROLENE, which is an isotactic form of polypropylene that has been treated with two proprietary antioxidants." (*See* Defs.' Mem. of Law in Supp. of Mot. to Exclude the Test. and Ops. of Dr. Scott Guelcher, Ph.D. [Docket 98], at 4). This appears to be an argument wholly conceived by lawyers, unfounded in science. The experts in this case, including Ethicon's experts, testify as to "polypropylene" and its propensities. This is a strong indication that Ethicon's argument is disingenuous. It is clear that the experts in this case do not consider Prolene to be different from polypropylene

for the purposes of their opinions in this case. Therefore, to the extent that Ethicon contends that an expert's opinions are unreliable or unhelpful because they do not account for the "important chemical differences" between polypropylene and Prolene, this argument is rejected.

**\*4** Third, Ethicon argues repeatedly that several of the plaintiffs' experts should be excluded because the testing Dr. Iakovlev performed on Ms. Edwards's explant allegedly rendered the explant untestable. As more fully set forth in Section III.F., *infra,* Dr. Iakovlev's opinions regarding Ms. Edwards's mesh pass muster under Federal Rule of Evidence 702. Therefore, any arguments that other experts' testimony should be excluded because Dr. Iakovlev's testimony is inadmissible are denied.

### A. Motion to Exclude Opinion Testimony of John F. Steege, M.D.

Dr. Steege is an obstetrician and gynecologist. He teaches and studies the etiology or "causes" of chronic pelvic pain, vaginal pain, and sexual pain. (*See* Steege Report [Docket 73–6], at 1). In his expert report, Dr. Steege discusses the etiology of problems associated with using mesh in gynecologic surgery. (*See id.* at 2–11). In addition, Dr. Steege opines that the TVT–O IFU failed to reflect potential mesh-related complications. (*See id.* at 11–12). Finally, Dr. Steege provides an assessment of Ms. Edwards's current medical condition. (*See id.* at 18–23).

Ethicon moves to exclude Dr. Steege's opinions entirely. Ethicon argues that Dr. Steege's specific causation opinions are unreliable because Dr. Steege did not conduct a proper differential diagnosis to rule out alternative causes of Ms. Edwards's chronic pelvic pain. Ethicon also contends that Dr. Steege's general opinions regarding mesh complications exceed the scope of his qualifications. In addition, Ethicon argues that certain of Dr. Steege's general opinions regarding mesh are unreliable because they are based upon the unreliable methodology of other designated experts. Finally, Ethicon argues that Dr. Steege's general opinions are irrelevant to the plaintiffs' claims and should be excluded because they are cumulative. For the reasons discussed below, Ethicon's motion [Docket 73] is **DENIED.**

### 1. General Causation Opinions

In his report, Dr. Steege provides several opinions regarding alleged problems associated with surgically implanted mesh, including: "[c]hronic inflammation of native tissue surrounding the mesh"; "[s]hrinkage and deformation of mesh"; "[d]irect trauma to nerves, incurred during the mesh implantation or explanation process"; "[n]erve irritation, distortion, and entrapment in the mesh and the surrounding fibrosis"; "[m]esh-related neuropathy"; and "[a]lteration of the function of surrounding organs due to any or all of" the above-described mechanisms. (Steege Report [Docket 73–6], at 2).

Ethicon contends that Dr. Steege is unqualified to offer these general causation opinions because he has never performed a TVT, TVT–O, or mesh-related procedure to treat SUI (*see* Steege Dep. [Docket 73–5], at 113:14–114:2); has not taught any courses or conducted any studies regarding the TVT–O procedure. (*see id.* at 136:17–137:16); and has not handled explanted mesh, examined the biomechanical properties of mesh, or performed degradation testing of mesh (*see id.* at 156:16–19, 242:17–21).

**\*5** After reviewing Dr. Steege's report and curriculum vitae, I **FIND** that Dr. Steege is qualified to opine on the etiology of problems associated with the implantation of mesh products in gynecologic surgery. An expert may be qualified by "knowledge, skill, experience, training, or education [.]" Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989). Dr. Steege is a renowned teacher and physician who specializes in the etiology of chronic pelvic pain, vaginal pain, and sexual pain. He is the Director of the Division of Laparoscopy and Pelvic Pain at the University of North Carolina at Chapel Hill and a professor of obstetrics and gynecology. (*See* Steege Report [Docket 73–6], at 1). In addition, Dr. Steege has treated 15–20 patients who complained of pain after being implanted with a mesh product. (*See* Steege Dep. [Docket 73–5], at 153–56).

Ethicon also argues that Dr. Steege's general causation opinions do not fit the facts of this case and are therefore unhelpful. Ethicon contends that because Dr. Steege has not examined Ms. Edwards's explanted mesh, he cannot connect his general causation opinions to Ms. Edwards's injuries. Therefore, Ethicon concludes that Dr. Steege's general causation opinions are irrelevant to the plaintiffs' claims. Ethicon is incorrect that Dr. Steege's *general causation* testimony—that the TVT–O mesh can degrade, fray, or lose particles—should be excluded under Rule 702 simply because the plaintiffs' may fail to carry their burden as to *specific causation*—that Ms. Edwards was injured by the TVT–O mesh. If Ethicon believes the plaintiffs ultimately fail to carry their burden, it is free to make that argument at trial.

Based upon the foregoing, I **FIND** that Dr. Steege is qualified to testify regarding mesh degradation.

### 2. Specific Causation Opinions

Dr. Steege provides a case-specific assessment of Ms. Edwards. After reviewing Ms. Edwards's medical history and conducting a physical, abdominal, and gynecological examination, Dr. Steege concludes that Ms. Edwards's "persistent sexual discomfort, pelvic pain, and groin pain are the result of a neuropathy from the transobturator sling procedure and mesh excision, most likely from an obturator nerve injury." (Steege Report [Docket 73–6], at 22). He also concluded "to a reasonable degree of medical certainty" that "Ms. Edwards had scarring and inflammation from synthetic mesh placed through the obturator." (*Id.*). Finally, Dr. Steege concluded that Ms. Edwards's "pelvic pain, and sexual symptoms are secondary to the placement and subsequent excision of the sling and, more likely than not, obturator neuropathy." (*Id.* at 23). These conclusions were based on Dr. Steege's "knowledge of pelvic neuroanatomy, the inflammatory response of tissue to foreign bodies, and [his] professional opinion." (*Id.*). Ethicon claims that Dr. Steege's specific causation opinion is unreliable because Dr. Steege did not properly conduct a differential diagnosis. For the reasons that follow, I reject Ethicon's arguments.

**\*6** Ethicon claims that Dr. Steege did not properly conduct a differential diagnosis of Ms. Edwards because he did not consider other factors that could have caused her injury. Specifically, Ethicon claims that Dr. Steege did not attempt to rule out other potential sources of Ms.

Edwards's chronic pain and did not conduct a sufficient examination to rule out endometriosis as an alternative cause.

In his report, Dr. Steege acknowledges several alternative causes of Ms. Edwards's pain. Specifically, Dr. Steege's report notes that Ms. Edwards had three vaginal deliveries, underwent several surgeries, and suffers from chronic neck pain. (*See* Steege Report [Docket 73–6], at 18–23). Dr. Steege has testified that he "very carefully" examined Ms. Edwards's medical records before coming to his conclusion. (Steege Dep. [Docket 108–2], at 299:3–5). He also testified that, based on his clinical experience, it would be very rare for orthopedic conditions to cause pelvic spasms and pain. (*Id.* at 30:1–31:2). Dr. Steege concluded:

> I believe [Ms. Edwards's] groin pain, pelvic pain, and sexual symptoms are secondary to the placement and subsequent excision of the sling and, more likely than not, obturator neuropathy. These conclusions are based off of my knowledge of pelvic neuroanatomy, the inflammatory response of tissue to foreign bodies, and my professional opinion. These opinions are supported by well-established scientific principles accepted by the medical community and published in the scientific literature. In reaching these conclusions, I considered and ruled out other causes of chronic neuropathic pain.

(Steege Report [Docket 73–6], at 23).

While Dr. Steege did not provide a detailed explanation as to why he ruled out these alternative causes, he bases his conclusions on accepted scientific principles and research. In addition, he reviewed Ms. Edwards's medical history and conducted a diagnostic examination to determine the cause of Ms. Edwards's pain. (*See* Steege Report [Docket 73–6], at 18–23). Although he did not clearly connect these scientific studies and examinations to his opinion, it cannot be said that he provided *no explanation* as to why he ruled out alternative causes. *See, e.g., Heller v. Shaw Indus.*, 167 F.3d 146, 156 (3d Cir.1999) ("Dr. Papano did not offer detailed explanations for why he concluded

that these were not the causes of plaintiff's illness, but his responses [during cross-examination], grounded in the alleged temporal relationship, the results of Todd's testing showing a reduction in VOCs when the carpet was removed, and Heller's medical history and physical examination, certainly are more than '*no* explanation.' "). Accordingly, I **FIND** that Dr. Steege used a sufficiently reliable methodology to ascertain the cause of Ms. Edwards's chronic pelvic pain.

Ethicon also argues that Dr. Steege failed to conduct a sufficient examination to exclude endometriosis as a source of Ms. Edwards's chronic pelvic pain. In his deposition, Dr. Steege testified that "I would [ ] comment that neither patient we're dealing with [including Ms. Edwards] had endometriosis for the record." (Steege Dep. [Docket 73–5], at 161:20–21). Dr. Steege testified that endometriosis is a common health problem for women. (*See id.* at 161:10–19). Dr. Steege testified that endometriosis can be diagnosed with a physical examination, but that the condition is often diagnosed by reviewing the patient's history and conducting a diagnostic laparoscopy:

> **\*7** Q. How do you determine whether or not a patient has endometriosis?
>
> A. By taking a history and physical exam in detail and those where it's clinically relevant a high index of suspicion and do a laparoscopy. Typically the person who comes to see me, though, has already had the diagnosis made because they've had four laparoscopies, some of which they didn't need. So I don't need another one.

(Steege Dep. [Docket 108–2], at 170:11–24).

Dr. Steege further testified that "I would say that the decision to do a laparoscopy is based on the totality of the history and physical exam to see if there's enough evidence to support the possibility. You certainly do not laparoscope every patient with pelvic pain." (*Id.* at 164:1–5). In addition, during his deposition, Dr. Steege referred to a study indicating that physicians relying on a patient's history and physical examination correctly diagnosed endometriosis eighty percent of the time. (*See id.* at 164–65:9–21). In Ms. Edwards's case, although he conducted a physical examination of Ms. Edwards, he did not conduct a diagnostic laparoscopy to determine whether she had endometriosis. (*See* Steege Report [Docket 73–6], at 21).

"[A] physician need not conduct every possible test to rule out all possible causes of a patient's illness, 'so long as he or she employed sufficient diagnostic techniques to have good grounds for his or her conclusion.' " *Heller,* 167 F.3d at 156 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 761 (3d Cir.1994)). Here, although Dr. Steege did not conduct a laparoscopy, he did conduct a physical examination and review Ms. Edwards's history, which Dr. Steege demonstrated is a reliable means of diagnosing endometriosis. Accordingly, I **FIND** that Dr. Steege used a sufficiently reliable methodology to exclude endometriosis as a possible source of Ms. Edwards's chronic pelvic pain.

### 3. Opinions Relying on Dr. Iakovlev's Testimony

Ethicon also argues that certain of Dr. Steege's opinions should be excluded because they are based upon Dr. Iakovlev's testimony, which Ethicon contends is unreliable. As fully set forth below, Dr. Iakovlev's testimony regarding Ms. Edwards's explant survives Ethicon's challenge. Additionally, Ethicon's argument that Dr. Steege based his opinions on Dr. Iakovlev's findings is simply incorrect. Dr. Steege testified that he reviewed Dr. Iakovlev's report and photographs of Ms. Edwards's mesh. (*See* Steege Dep. [Docket 108–2], at 117–18). However, Dr. Steege explicitly stated that his opinions "were not dependent upon" the materials sent to him by Dr. Iakovlev. (*Id.* at 119). Rather, the materials provided by Dr. Iakovlev "reinforced" Dr. Steege's opinions and "supported [his] opinions strongly." (*Id.* at 119:22–24, 120: 11–17). I therefore **FIND** that Ethicon's motion on this issue is without merit.

### 4. Cumulative Nature of Dr. Steege's Opinions

Finally, Ethicon argues that certain of Dr. Steege's opinions should be excluded because they overlap with the opinions of Dr. Rosenzweig, another of the plaintiffs' experts. Ethicon argues that "[a]llowing each of these ... designated experts to opine on the same general, non-plaintiff—specific subject matters would constitute a needless presentation of cumulative evidence." (Mem. in Supp. of Defs.' Mot. to Exclude the Op. Test. of John F. Steege, M.D. [Docket 74], at 14). Some of Dr. Steege's and Dr. Rosenzweig's opinions are similar in nature. To that end, the parties have been warned that repetitive

expert testimony will not be allowed. However, without knowing the order in which the plaintiffs' experts will testify or precisely to what each expert will testify, I cannot deny Dr. Steege's testimony on this basis alone. Therefore, Ethicon's motion on this point is **DENIED.**

### B. Motion to Limit the Testimony of Bruce Rosenzweig, M.D.

**\*8** Dr. Rosenzweig is a urogynecologist and professor of obstetrics and gynecology. He offers several different opinions, each of which Ethicon contends is improper: (1) opinions regarding the sufficiency of warnings set out in the TVT–O Instructions for Use ("IFU") and other promotional materials; (2) opinions that Ethicon failed to provide adequate training; (3) opinions that the TVT–O causes an increased risk of infection; (4) opinions that the TVT–O degrades in vivo and is subject to fraying and particle loss; and (5) opinions regarding mesh shrinkage or contracture. For the reasons discussed below, Ethicon's motion [Docket 75] is **GRANTED in part, DENIED in part,** and **DENIED as moot in part.**

### 1. Opinions Related to Sufficiency of Warnings on the IFU and Promotional Materials

Dr. Rosenzweig opines that the TVT–O's IFU was inadequate, that Ethicon failed to inform patients and physicians about particular risks of the TVT–O, and that the TVT–O's marketing materials were inaccurate or incomplete. (*See* Rosenzweig Report [Docket 75–1], at 3). Ethicon first argues generally that Dr. Rosenzweig is not qualified to testify about product warnings because he has not drafted an IFU. While it is true that Dr. Rosenzweig has not personally drafted an IFU, Dr. Rosenzweig's testimony reveals that he has consulted on product warnings in the past:

Q. Have you ever prepared IFUs?

A. Well, I did work with Gish Biomedical to get the information that they needed to put in the amnioinfusion catheter IFU.

Q. Did you actually draft the IFU?

A. No, I did not. I worked as a consultant on that.

Q. Have you ever drafted an IFU?

A. No, I have not.

Q. Have you ever drafted a patient brochure?

A. I worked on the amnioinfusion catheter brochures, yes.

(Rosenzweig Dep. [Docket 75–3], at 53:17–54:4). Dr. Rosenzweig also testified that he served on another company's scientific advisory committee that worked on similar documents. (*See id.* at 54:10–12). In his expert report, Dr. Rosenzweig states that he has reviewed "numerous" IFUs for a "variety of products including mesh products in order to understand the proper way to use the device and to gain knowledge about the complications and adverse events associated with the device." (Rosenzweig Report [Docket 75–1], at 55). Further, as a urogynecologist, Dr. Rosenzweig is qualified to opine about the risks of the TVT–O and pelvic mesh surgery and whether those risks were adequately expressed on the TVT–O's IFU. I therefore **FIND** that Dr. Rosenzweig is qualified to testify generally on the adequacy of the TVT–O's product warnings and marketing materials. [2]

Finding Dr. Rosenzweig qualified to opine generally about the TVT–O's warnings and marketing materials, I now turn to Ethicon's specific objections in relation to particular product warning opinions.

### 2. Cancer

The plaintiffs state that Dr. Rosenzweig will not testify about cancer. (*See* Pls.' Resp. to Defs.' Mot. to Limit the Test. of Bruce Rosenzweig, M.D. [Docket 106], at 7). Accordingly, Ethicon's motion on this subject is **DENIED as moot.**

### 3. Cytotoxicity

**\*9** Dr. Rosenzweig states in his expert report that an internal Ethicon document suggested that polypropylene mesh was cytotoxic. (*See* Rosenzweig Report [Docket 75–1], at 105). Cytotoxicity refers to a material's potential to cause cell death. Dr. Rosenzweig writes that Ethicon failed to undertake testing "to determine whether the marked cytotoxicity found in the TVT mesh had long term consequences for permanent human use." (*Id.* at 105–06). He then opines that Ethicon failed to act as a "reasonably prudent medical device manufacturer" because it "failed

to inform physicians and their patients about the risk of its mesh being cytotoxic[ ]." (*Id.* at 106).

According to Ethicon, cytotoxicity testing "does not represent *in vivo* testing, and toxicological experience is required to extrapolate the results to humans." (Mem. in Supp. of Mot. to Limit the Test. of Bruce Rosenzweig, M.D. [Docket 76], at 6). Ethicon therefore argues that this testimony exceeds Dr. Rosenzweig's qualifications because he does not have toxicological experience, and he admits that he has never conducted toxicity or cytotoxicity testing of mesh. (*See* Rosenzweig Dep. [Docket 75–3], at 222:4–6). Ethicon also argues that this testimony is unreliable because the internal Ethicon study cited by Dr. Rosenzweig states that "this clinical data provides important evidence that the cytotoxicity of the [polypropylene] mesh observed in vitro does not translate into any clinical significance or adverse patient outcomes." (Cytotoxicity Risk Assessment for the TVT (Ulmsten) Device [Docket 75–7] ).

I **FIND** that Dr. Rosenzweig is qualified to offer the opinion that Ethicon failed to inform physicians about the risk that the TVT–O is cytotoxic. Although Dr. Rosenzweig is not a toxicologist, he stated that he regularly encounters cytotoxicity in his practice, including in women who have polypropylene mesh implants. (*See* Rosenzweig Aff. [Docket 106–6] ¶ 4). He also stated that he has "removed mesh implants, including the TVT, as a result of cytotoxicity." (*Id.* at ¶ 4).

I also **FIND** that this opinion is sufficiently reliable. Dr. Rosenzweig relies on an internal Ethicon finding that the mesh used in the TVT–O was cytotoxic. Further, Dr. Rosenzweig states that the potential for cytotoxicity is important information that physicians need to know. (*See* Rosenzweig Report [Docket 75–1], at 106). To the extent that Ethicon believes cytotoxicity is not clinically significant, it may cross examine Dr. Rosenzweig on that issue. Therefore, Ethicon's motion with respect to Dr. Rosenzweig's opinions about the failure to warm about cytotoxicity is *DENIED*.

However, I **FIND** that Dr. Rosenzweig is not qualified to opine that Ethicon's testing was insufficient. There is no indication that Dr. Rosenzweig has any experience or knowledge on the appropriate testing a medical device manufacturer should undertake. Therefore,

Dr. Rosenzweig's testimony that Ethicon failed to appropriately test for cytotoxicity is **EXCLUDED.**

### 4. TVT–O Appropriateness for Certain Populations

**\*10** Dr. Rosenzweig will also testify that "Ethicon promoted the TVT–O as a 'reproducible' technique that was appropriate for all patients," when in fact it was less efficacious for certain types of women, including obese women, older women, active women, diabetics, smokers, Asian women, and African–American women. (Rosenzweig Report [Docket 75–1], at 77–80). He claims that Ethicon should have warned physicians of risks to these different populations. In support, he simply reviews deposition testimony and internal documents of Ethicon employees expressing concerns about the TVT–O's adaptability to different populations. For instance, Dr. Rosenzweig quotes deposition testimony of Ethicon's Medical Director to show that "obese patients do not fare well with these devices." (*Id.* at 77). He also reviews a document wherein the inventor of the TVT–O stated that the TVT–O was inappropriate for treatment in younger, active women. (*See id.* at 78).

As the plaintiffs concede, much of this opinion is not relevant to Ms. Edwards's case and should be excluded. (*See* Pls.' Resp. to Defs.' Mot. to Limit the Test. of Bruce Rosenzweig, M.D. [Docket 106], at 8–9). The only portions of this opinion that are relevant are the TVT–O's appropriateness for younger, active women, and the TVT–O's appropriateness for obese women, categories into which Ms. Edwards falls. But it is not helpful to the jury to have Dr. Rosenzweig read a document explaining what the inventor of the TVT–O thought about this. The jury is capable of reading that document itself. *See In re Prempro Prods. Liab. Litig.,* 554 F.Supp.2d 871, 887 (E.D.Ark.2008); Fed.R.Evid. 702 ("the expert's scientific, technical, or other specialized knowledge" must "help the trier of fact to understand the evidence"). Therefore, Dr. Rosenzweig's opinion that Ethicon should have warned that the TVT–O could be more dangerous for certain populations is **EXCLUDED.**

### 5. Adverse Event Reporting

Dr. Rosenzweig opines that "Ethicon's collection and reporting of adverse events and complications to physicians and patients was incomplete, inaccurate, and misleading." (Rosenzweig Report [Docket 75–1], at 98). Ethicon argues that Dr. Rosenzweig is unqualified to offer

this opinion and it is unreliable. The plaintiffs concede that Dr. Rosenzweig will not offer this opinion at trial. (Pls.' Resp. [Docket 106], at 10). Therefore, this aspect of Ethicon's motion is **DENIED as moot.**

### 6. Failure to Provide Adequate Training

Dr. Rosenzweig opines that Ethicon "failed to provide adequate training" to physicians regarding the use of the TVT–O. (Rosenzweig Report [Docket 75–1], at 3). However, instead of commenting on the quality of training, Dr. Rosenzweig reviews corporate documents showing that Ethicon cut funding for professional trainings which Dr. Rosenzweig says "contrasted" with Ethicon's corporate credo. (*See id.* at 74–77). Not only is this opinion simply a narrative review of corporate documents, which is not helpful to the jury, but it is unreliable because Dr. Rosenzweig fails to describe the basis for his opinion that Ethicon's training was inadequate. Therefore, this portion of Dr. Rosenzweig's opinion is **EXCLUDED.**

### 7. Infections

**\*11** Dr. Rosenzweig opines that the TVT–O mesh and implantation procedure carry an increased risk of infection. (*See id.* at 26). Ethicon does not challenge the reliability of this opinion; rather, it argues that this opinion is not helpful to the jury because Ms. Edwards has not suffered from a mesh-related infection. However, Ms. Edwards's medical records indicate that she has suffered from infections. For example, the progress notes from an examination of Ms. Edwards the month after her implant state that she suffered from a primary infection after her surgery. (*See* Kaiser Permanente Progress Notes [Docket 106–15], at 2). Additionally, a pathology report on Ms. Edwards indicated that she was suffering from "soft tissue with chronic inflammation and focal foreign body giant cell reaction" (Emory Healthcare Pathology Report [Docket 106–16] ) and Dr. Rosenzweig stated in his deposition that chronic inflammation can be a sign of infection (*see* Rosenzweig Dep. [Docket 106–12], at 25:10–22). Therefore, contrary to Ethicon's arguments, infections are a fact in issue in this case, and Ethicon's motion, as presented on this issue, is **DENIED.**

### 8. Degradation and Fraying

Dr. Rosenzweig will testify that the TVT–O is defective because its mesh degrades in vivo and is subject to fraying

and particle loss. (*See* Rosenzweig Report [Docket 75–1], 11–20, 34–46). Ethicon first argues that Dr. Rosenzweig is unqualified to offer these opinions because he does not have a background in polymer chemistry, has never studied biomaterials, and has never done any bench or lab research regarding polypropylene. I disagree. As I stated in relation to *Lewis v. Johnson & Johnson,*

> Simply because Dr. Rosenzweig has not personally performed pathology research on polypropylene explants does not necessarily render him unqualified under Rule 702 to offer opinions regarding the suitability of the TVT device for implantation. An expert may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989).

> Dr. Rosenzweig has performed over a thousand pelvic floor surgical procedures, and over 200 surgeries dealing with complications related to synthetic mesh, including the removal of numerous TVT devices. Dr. Rosenzweig testified that as early as 2004 or 2005, he determined, as a result of explanting mesh products, that polypropylene degrades in the human body. Further, he cites dozens of studies and academic papers in his expert report to support his opinion that vaginally implanted polypropylene mesh degrades. I therefore **FIND** that Dr. Rosenzweig is qualified to offer the opinion that the TVT is not suitable for permanent implantation to treat stress urinary incontinence.

**\*12** *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at *20 (S.D.W.Va.Jan.15, 2014) (internal citations and quotation marks omitted). I **ADOPT** that holding here.

With respect to Dr. Rosenzweig's general causation opinions that the mesh used in the TVT–O degrades, frays, and loses particles, Ethicon contends that these opinions are not helpful to the jury. According to Ethicon, "neither Dr. Rosenzweig nor any of Plaintiffs' other experts can reliably testify (1) that the mesh in Ms. Edwards['s] TVT–O device *actually* degraded, frayed, or lost particles, or (2) that any such degradation, fraying, or particle loss proximately caused Ms. Edwards' [s] injuries." (Mem. in Supp. of Mot. to Limit the Test. of

Bruce Rosenzweig, M.D. [Docket 76], at 12). As with Dr. Steege's testimony, discussed above, Ethicon is incorrect that Dr. Rosenzweig's *general causation* testimony—that the TVT–O mesh can degrade, fray, or lose particles—should be excluded under Rule 702 simply because the plaintiffs' might fail to carry their burden as to *specific causation*—that Ms. Edwards was injured by the TVT–O mesh. If Ethicon believes the plaintiffs ultimately fail to carry their burden, it is free to make that argument at trial.

Based upon the foregoing, I **FIND** that Dr. Rosenzweig may testify regarding mesh degradation.

### C. Motion to Exclude Certain Opinions of Jerry G. Blaivas, M.D.

Dr. Blaivas is a urologist and one of the pioneers of sling surgery for women with sphincter incontinence. (*See* Blaivas Report [Docket 77–1], at 1). He has extensive experience treating patients with complications related to synthetic sling surgery. (*See id.* at 2–3). Ethicon seeks to exclude parts of Dr. Blaivas's testimony because they exceed his qualifications, are unhelpful to the jury, or are not set out in his expert report. For the reasons discussed above, Ethicon's motion [Docket 77] is **GRANTED in part, DENIED in part,** and **RESERVED in part.**

#### 1. Opinions Related to Product Warnings

Dr. Blaivas opines that Ethicon failed to warn physicians about particular complications with the TVT–O. For example, Dr. Blaivas states in his report that:

> 6. *Ethicon should have warned physicians and patients about the possibility of serious and life-style altering complications* (e.g.9, 21–33). Ethicon knew or should have known about the potential for serious complications from mesh slings, such as the Gynecare TVT–O, *because of the known experience with Mersilene, Marlex and silastic slings that were performed during the last three decades of the 20th century, and more recently the Protegen and Mentor ObTape slings.*

> ...

> 11. *Ethicon did not warn doctors and patients about the chronic and lifestyle altering nature of the complications associated with its products ...*

12. *Ethicon did not warn doctors and patients about the difficulty removing their products ... and the poor or less than optimal results when excision or revision becomes warranted due to complications.*

**\*13** ...

16. From a scientific and ethical perspective, *Ethicon should have had a high index of suspicion relating to the product defects based on previous experience with predicate products.... Since many of these complications occurred many months or years after the original surgery, Ethicon should have taken appropriate measures to investigate this and also warn physicians and patients about the possibility of these late-onset complications.* At the very least there should have been a simple statement about the possibility that such complications could arise in the future after months, years, or even decades and that the technique is new, so long term studies are not yet available to determine the ultimate safety and efficacy. The many serious complications that I have seen and that occurred with the two plaintiffs discussed in this report do not appear in any study.

...

25. The TVT–O IFUs state that "animal studies show that implantation of PROLENE mesh elicits a minimal inflammatory reaction in tissues, which is transient and is followed by the deposition of a thin layer of tissue, that can grow through the interstices of the mesh, thus incorporating the mesh into adjacent tissue. The material is not absorbed, nor is it subject to degradation or weakening by the action of tissue enzymes." *Despite literature to the contrary, Ethicon never changed the IFU to reflect: 1) the inflammatory response is persistent and not transient; 2) the mesh creates dense scar tissue not a 'thin layer of tissue'; and 3) the material is, in fact, subject to degradation* [.]

...

32. I have reviewed the Material Safety Data Sheet for the polypropylene used in the Gynecare TVT–O medical device.... Ethicon IFUs do not include the toxic and carcinogenic warnings contained in the MSDSs. Ethicon marketing materials for doctors and

patients do not include the toxic and carcinogenic warnings contained in the MSDSs.

...

*Ethicon did not adequately warn doctors and patients about the kind of complications experienced by Mrs. Edwards ....*

(Blaivas Report [Docket 77–1], at 7–16 (emphasis added)). [3]

Ethicon first challenges Dr. Blaivas's qualifications to give these opinions because Ethicon argues that Dr. Blaivas is not an expert on product warnings. But Dr. Blaivas need not be an expert on product warnings per se. Rather, as a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU. Dr. Blaivas is qualified to render an opinion as to the completeness and accuracy of Ethicon's warning and—"it follows from that —the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits" of the TVT–O was when the warnings were published. *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.,* MDL 1203, 2000 WL 876900, at \*11 (E.D.Pa. June 20, 2000). I therefore **FIND** that Dr. Blaivas is qualified to render opinions about the adequacy of the TVT–O's IFU.

**\*14** Ethicon contends that any opinions about its alleged failure to warn about infections are irrelevant because there is no evidence that Ms. Edwards suffered from a mesh-related infection. However, as discussed in Section III.B.7, *supra,* there is evidence that Ms. Edwards suffered from infection following her implant. Therefore, contrary to Ethicon's arguments, infections are a fact in issue in this case.

### 2. Opinions Relating to Complications
Ethicon argues that several of Dr. Blaivas's opinions concerning mesh-related complications should be excluded because they are unreliable or irrelevant.

#### a. Alleged Under–Reporting of Mesh Complications
Dr. Blaivas opines that "[m]esh complications are significantly under-reported." (Blaivas Report [Docket 77–1], at 7). Ethicon argues that this opinion is unreliable

because it is based on Dr. Blaivas's personal conversations with other physicians, but Dr. Blaivas could not identify which particular doctors had discussed this issue with him. (*See* Blaivas Dep. [Docket 77–2], at 108–09).

Dr. Blaivas did not rely *solely* on personal conversations with other physicians. He also relied on peer-reviewed studies, including two studies that compared independent reports of complications to the complications reported in the peer-reviewed literature. (*See* Blaivas Report [Docket 77–1], at 7). In the first study, the authors compared mesh-related complications reported in the scientific literature to complications reported to the Manufacturer and User Facility Device Experience ("MAUDE") database. (*See* Donna Y. Deng et al., *Presentation and Management of Major Complications of Midurethral Slings: Are Complications Under–Reported?* 52 J. Urology 46, 46 (2007) [Docket 77–7] ). In particular, the authors reviewed twenty-eight scientific studies involving the TVT, SPARC, Uratape, Monarc, Obtape, SAFYRE, and I–Stop mesh slings. (*See id.* at 47). Out of the 11,806 patients reviewed, only 86 had reported complications. (*See id.*). The MAUDE database, however, revealed a total of 928 reported complications (700 TVT, 66 SPARC, 1 TVT–O, 149 ObTape, and 12 Monarc slings). (*See id.*). The study ultimately concluded that "[a]lthough rare, major complications of midurethral slings are more common than appear in the literature." (*Id.* at 46). In another study, researchers analyzed Medicare claims from 1999–2001 and concluded that the "complication rates within 1 year after sling surgery among Medicare beneficiaries were found to be higher than those reported in the clinical literature." (Anger et al., *Complications of Sling Surgery Among Female Medicare Beneficiaries,* 109 Obstetrics & Gynecology 707, 707 (2007) [Docket 77–8] ).

Ethicon incorrectly asserts that these studies are irrelevant because they did not review the TVT–O specifically. Dr. Blaivas's opinion is that "mesh complications" are under-reported. Such an opinion is clearly supported by these studies. For these reasons, I reject Ethicon's arguments and **FIND** that this opinion is sufficiently reliable.

#### b. Increasing Frequency of Mesh Complications

**\*15** In his report, Dr. Blaivas opines that "[i]n the future, there will be an increasing number of patients who have failed initial treatments and an increasing number of 'mesh cripples[.]' " (Blaivas Report [Docket 77–1], at 4). Ethicon argues that this opinion is irrelevant to Ms.

Edwards's claims. I agree. Whether future patients may face increasing rates of mesh-related complications will not help the jury decide the issues in this case. Accordingly, this opinion is **EXCLUDED.**

#### c. Other Physicians' Knowledge

In his report, Dr. Blaivas states that "[i]n the academic circles in which I travel, this and other serious mesh complications were already well known and many of us educators included warnings in our lectures about the use of mesh for the surgical treatment of stress incontinence." (Blaivas Report [Docket 77–1], at 8). Ethicon argues that Dr. Blaivas "is not in a position to provide a reliable assessment concerning what [physicians] knew or did not know." (Mem. in Supp. of Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. [Docket 78], at 8). I disagree. I **FIND** that, as a urologist, Dr. Blaivas is fit to testify what other physicians knew as it relates to the standard of care for designing a mesh product and warning about its potential risks.

#### d. Ethicon's Alleged Downplaying of Complications

Dr. Blaivas writes that Ethicon downplayed mesh-related complications. For example, Dr. Blaivas stated in his report that "Ethicon's marketing materials suggest that these complications occur mostly because of faulty surgical technique performed by inexperienced or poorly trained surgeons...." (Blaivas Report [Docket 77–1], at 7). However, according to Dr. Blaivas's first-hand experience and discussion with other physicians, complications can occur "even in experienced hands and when proper surgical technique is used." (*Id.*). In addition, Dr. Blaivas stated that during lectures, "industry representatives would challenge our opinions and data about mesh complication and literally attempt to trivialize them," and that he "witnessed company representatives first hand downplaying these complications in public at post graduate seminars...." (*Id.* at 8–9).

These statements are not expert opinions. Dr. Blaivas is not using his "scientific, technical, or other specialized knowledge" in making these statements. Fed.R.Evid. 702. Therefore, I will not address the admissibility of this testimony here.

#### e. Complication Rates

Case 2:12-md-02327 Document 9075-15 Filed 01/10/20 Page 147 of 924 PageID #: 212954
Edwards v. Ethicon, Inc., Not Reported in F.Supp.3d (2014)
2014 WL 3361923

Ethicon argues Dr. Blaivas's opinions regarding complication rates should be excluded because they were not included in his report and because his opinions are unreliable. I **FIND** that Dr. Blaivas's opinions on complication rates are unreliable. In discussing complication rates, Dr. Blaivas did not explain his methodology and admitted that it was impossible to calculate an accurate complication rate:

> A: I mean, just to be fair, I mean, I haven't said you should never use it. I mean, look, my contention is that this information should be available not just to the experts but to the implanting doctors worldwide and to the patients.
>
> **\*16** And I can't tell you if it's 1 percent or 9 percent. I can't tell you that it's going to-I hope it doesn't, maybe after ten years it will be 20 percent, or maybe some of them will get better. I don't know. All I can tell you right now is that it's very clear to me that these kinds of things happen, at the very least, in the single digit percent rate.

(Blaivas Dep. [Docket 77–2], at 189:11–190–4). In light of this testimony, Dr. Blaivas's opinions regarding complication rates are **EXCLUDED.**

### 3. Opinions Regarding the Increased Incidence of Complications Related to the Transobturator Approach

Dr. Blaivas opines that the transobturator approach used to implant the TVT–O "increases the risk of nerve injury, leg pain, chronic pain, dyspareunia, and vaginal scarring/banding." (Blaivas Report [Docket 77–1], at 5). Dr. Blaivas does not cite any medical literature to support this statement, but rather cites Ethicon's internal documents. Ethicon contends that these opinions are unreliable because a physician would not utilize internal company documents to form an opinion about medical device complications. *See* Fed.R.Evid. 703 (allowing experts to rely on inadmissible evidence that is of the kind that is *reasonably* relied on by experts in the field).

Rule 703 addresses the circumstances in which an expert may rely on inadmissible evidence to formulate an opinion. "However, the question whether the expert is relying on a *sufficient* basis of information—whether admissible information or not—is governed by the requirements of Rule 702." Fed.R.Evid. 702, advisory committee's note. In other words, whether an expert may

rely on particular information is a different question from whether an expert's opinion has a reliable basis. Therefore, I **FIND** that Dr. Blaivas's opinions are not unreliable simply because he relied on internal Ethicon documents.

### 4. Opinions Relating to Mesh Shrinkage and Degradation

Dr. Blaivas provides several opinions on mesh shrinkage and degradation. He opines that "mesh shrinks unpredictably and asymmetrically, influenced by individual response, bacterial contamination, anatomical location, and time." (Blaivas Report [Docket 77–1], at 9). In addition, he opines that "polypropylene degrades in vivo," "resulting in stiffening of the mesh, perpetuation of the inflammatory response, creation of a nidus for bacteria and other organisms, and the production of unknown and potentially toxic chemicals." (*Id.*).

Ethicon argues that Dr. Blaivas is unqualified to opine about these topics because he is not a "bio/polymer" chemist and has no background in polymer science. (*See* Mem. in Supp. of Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. [Docket 78], at 11). The plaintiffs contend that Dr. Blaivas has "personally experienced" degradation and shrinkage in his patients. (Pls. Opp. to Def. Ethicon's Mot. and Mem. of Law in Supp. of Its Mot. to Exclude the Ops. and Test. of Jerry Blaivas, M.D. [Docket 104], at 4, 14). But this particular experience is not set out in Dr. Blaivas's expert report. Further, the citation to Dr. Blaivas's deposition provided by the plaintiffs does not relate to degradation. Rather, it relates to Dr. Blaivas's experience with pubovaginal autologous slings. (*See id.* at 14 (citing Blaivas Dep. [Docket 104–1], at 294:21–297:5, 314:1–319:2)). I am unable to locate any reference whatsoever to degradation in Dr. Blaivas's deposition.

**\*17** The plaintiffs also indicate that Dr. Blaivas cited several scientific studies to support his opinions. But whether an expert's opinions are supported by scientific literature is an issue of reliability, not his qualifications. Here, in light of his lack of experience with mesh degradation or shrinkage, I **FIND** that Dr. Blaivas is unqualified to opine about these topics, and these opinions are **EXCLUDED.**

### 5. Opinions Related to Product Marketing

Ethicon challenges Dr. Blaivas's statement that "synthetic slings were revived, reinvented and promoted by industry

through pervasive advertising and inducements to physicians to perform such surgeries." (Blaivas Report [Docket 77–1], at 2). Dr. Blaivas cites no authority for this position. Moreover, as Ethicon correctly notes, Dr. Blaivas has no expertise in marketing and therefore is unqualified to make such a broad statement. Accordingly, this opinion is **EXCLUDED.**

### 6. Hypothetical Clinical Testing

Dr. Blaivas opines that "[a]ppropriate and unbiased clinical testing, if performed, would have shown the problems and complications associated with synthetic slings, including the Gynecare TVT–O." (*Id.* at 8). Dr. Blaivas suggests that Ethicon should have conducted "long-term clinical trials or at least monitor[ed] complications through a registry." (*Id.*). Ethicon argues that Dr. Blaivas's opinions are speculative because he "did not perform any of these hypothetical 'unbiased test[s],' and he does not identify any third-party unbiased testing in support of his conclusions." (Mem. in Supp. of Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. [Docket 78], 13).

Notwithstanding Ethicon's reliability challenge, I **FIND** that Dr. Blaivas is not qualified to render opinions relating to the product testing. There is no indication in the record that Dr. Blaivas has any experience or knowledge on the appropriate testing a medical device manufacturer should undertake. Therefore, this opinion is **EXCLUDED.**

### 7. The Competence of Other Physicians in the TVT–O Procedure

Dr. Blaivas states in his report that:

> Claims that make the procedure sound as if it is safer and easier to perform than it actually is are misleading. See above. The goal is sound—a simple, safe, efficacious, outpatient procedure that required minimal surgical skills and could be mastered by surgeons with little training. But the truth is very different. The fact is, it is not so easy to learn these techniques and the ergonomics of the trocars is such that it is easy to misguide them and end up in the

> wrong place. *Because the company so trivialized the learning curve and potential complications, many surgeons with inadequate skill and experience perform these surgeries.*

(Blaivas Report [Docket 77–1], at 10 (emphasis added)).

Ethicon argues that this opinion is irrelevant. I agree. Testimony regarding the competence of other physicians will not assist the jury in determining the issues in this case. Accordingly, this opinion is **EXCLUDED.**

### 8. Alternative Procedures

**\*18** Dr. Blaivas opines that Ms. Edwards would not have suffered complications if an alternative procedure, such as implantation of a pubovaginal fascial sling, had been used. (*See id.* at 13). Dr. Blaivas writes that pubovaginal slings "using autologous fascia are as effective as synthetic slings" and "are safer than synthetic slings." (*See id.* at 7–8). Ethicon asserts that these conclusions are unreliable because they are not supported by the literature Dr. Blaivas cites. In particular, Ethicon contends that the primary study cited by Dr. Blaivas deals with "intrinsic sphincter deficiency," not stress urinary incontinence. (Mem. in Supp. of Mot. to Exclude Certain Ops. of Jerry G. Blaivas, M.D. [Docket 78], at 15).

It is not clear to me whether this study, *Pubovaginal Fascial Sling for the Treatment of All Types of Stress Urinary Incontinence: Surgical Technique and Long–Term Outcome,* which was authored in part by Dr. Blaivas, applies to stress urinary incontinence or sphincteric incontinence. Despite the study's title, it states that "[t]his article provides an update on the surgical technique and long-term outcome of the full-length autologous rectus fascial sling in the treatment of women with *sphincteric incontinence.*" (*See* Blaivas et al., *Pubovaginal Fascial Sling for the Treatment of All Types of Stress Urinary Incontinence: Surgical Technique and Long–Term Outcome,* at 7 (emphasis added)). Yet, the study also appears to state that it advocates for the use of autologous fascial slings, "[n]o matter what the type" of incontinence. (*Id.* at 14). At the end of the study, in the section titled "References," it cites to several other articles that, by their titles, appear to deal with all types of stress urinary incontinence. (*See id.* at 15 (citing Chaikin et al., *Pubovaginal Fascial Sling for All Types of Stress Urinary Incontinence: Long–Term Analysis,* 160 J. Urology 1312

(1998); Cross et al., *Our Experience with Pubovaginal Slings in Patients with Stress Urinary Incontinence,* 159 J. Urology 1195 (1998)).

Although Ethicon argued in its moving brief that Dr. Blaivas's study applied only to sphincteric incontinence (*see* Defs.' Mem. [Docket 78], at 17), the plaintiffs failed to address this argument in their response (*see* Pls.' Resp. [Docket 104], at 19–20). Accordingly, I **RESERVE** ruling on the reliability of Dr. Blaivas's opinions about pubovaginal slings using autologous fascia until trial. I will conduct a hearing on this issue before Dr. Blaivas is called to testify.

### D. Motion to Exclude Ronald Luke, JD, PhD

Ethicon moves to exclude the testimony of Ronald Luke, J.D., Ph.D. in its entirety. Dr. Luke provides two economic opinions in his Report of Economic Damages to Tonya Edwards ("Luke Report"): an opinion regarding Ms. Edwards's past and future loss of earning capacity and an opinion regarding Ms. Edwards's future medical expenses. (*See* Luke Report [Docket 79–1], at 1). Ethicon argues that Dr. Luke's opinions should be excluded because "his opinions are based on speculation, conjecture and assumptions not based in the record." (Mem. in Supp. of Mot. to Exclude Ronald Luke [Docket 80], at 2). Specifically, they argue that "no treating physician or expert has opined that Plaintiff is permanently disabled, which is the operative assumption for Dr. Luke's loss of earning capacity opinion. Further, no treating physician has adopted the pseudo-life care plan prepared by Dr. Luke; nor does Dr. Luke cite to anything in the record supporting the medical treatment plan" he has identified. (*Id.*). For the reasons discussed below, Ethicon's motion [Docket 79] is **DENIED in part and RESERVED in part.**

### 1. Lost Future Earning Capacity

 **\*19** Dr. Luke's opinion regarding Ms. Edwards's earning capacity was based on several assumptions. For the purposes of the report, Dr. Luke's consulting group assumed as follows:

> We assume that, but for the adverse effects of the mesh implant, Ms. Edwards could have begun work as a cardiovascular technician in January, 2010. The analysis

described below assumed that but for the adverse effects of the procedures[,] Ms. Edwards' [s] earning capacity is that of a cardiovascular technician. We further assume that she has no residual earning capacity because her pain and other adverse effects of the procedures prevent her from working.

(Luke Report [Docket 79–1], at 2). Ethicon argues that these assumptions render Dr. Luke's opinion inadmissible because no expert will testify that Ms. Edwards is permanently disabled.

Georgia law allows for recovery of future earnings when a person is disabled, either permanently or temporarily. "Recovery for 'lost earning capacity' is ... a separate element of damages recovery of which physical injury to the plaintiff resulting in a permanent or total physical disability is the essential element." *Myrick v. Stephanos,* 220 Ga.App. 520, 472 S.E.2d 431, 434 (Ga.App.1996) (quoting *Leggett v. Benton Bros. Drayage & Storage Co.,* 138 Ga.App. 761, 227 S.E.2d 397, 400 (Ga.App.1976)). Recovery for " 'loss of future earnings' is available where there is proof of loss of definite earnings that would have been received in the future but for an injury, even though the injury is not permanent." *Id.* "Although in general, all future earnings or diminished future earnings are uncertain and difficult of ascertainment, this does not mean that a plaintiff should be denied a recovery. In order to recover, however, there must be evidence from which the jury can estimate, or reasonably infer the loss or decrease in the earning capacity." *Super Disc. Markets, Inc. v. Coney,* 210 Ga.App. 659, 436 S.E.2d 803, 804 (Ga.App.1993) (citations omitted). Most importantly, "expert opinion testimony is *not* required to establish the permanency of an injury." *Id.* (emphasis added) (citing *Macon R. & Light Co. v. Streyer,* 123 Ga. 279, 51 S.E. 342 (Ga.1905); *S. Ry. Co. v. Claridy,* 124 Ga. 958, 53 S.E. 461 (Ga.1906)).

Ethicon does not appear to contest that Ms. Edwards is currently unable to work. In Georgia, "[p]ermanent injuries may be proved either by the opinions of physicians, or by proof of facts from which a jury would be authorized to infer that the injuries were permanent." *S. Ry. Co. v. Claridy,* 124 Ga. 958, 53 S.E. 461, 462 (Ga.1906). The plaintiffs intend to present the testimony

of Ms. Edwards, Mr. Edwards, and Dr. Steege to support their argument that Ms. Edwards is permanently —or at least temporarily—unable to work. Prior to her injury, Ms. Edwards completed the training to become a cardiovascular technician. In her deposition, Ms. Edwards testified that since her implant surgery, she has suffered from pain and incontinence that render her unable to begin work as a technician. (*See* Tonya Edwards Dep. [Docket 105–1], at 111:15–21). Mr. Edwards also testified that Ms. Edwards still suffers from incontinence and is unable to do everyday housework without experiencing pain and incontinence. (*See* Gary Edwards Dep. [Docket 105–2], at 131:22–132:4, 132:24–133:11). Additionally, Dr. Steege's report states: "While we can likely improve [Ms. Edwards's] quality of life and provide coping skills and behavior modification to manage her pain, a goal of no pain is unrealistic. Though her pain may improve with a series of treatments, very few chronic pain conditions resolve once centralization of pain occurs." (Steege Report [Docket 105–3], at 22). Notably, Ethicon does not challenge Dr. Luke's methodology or qualifications in determining Ms. Edwards's possible lost future earnings. Because Georgia law does not require expert testimony for the jury to estimate or reasonably infer lost earning capacity or loss of future earnings, I **FIND** that Dr. Luke may testify with regard to these topics.

#### 2. Future Medical Expenses

**\*20** Dr. Luke's expert report also addresses potential future medical expenses that Ms. Edwards will require. Ethicon contends that Dr. Luke's opinions are irrelevant because they are based on speculation and not supported by the plaintiffs' medical experts.

"Georgia law requires a claimant to prove with reasonable certainty not only that he will sustain future medical expenses, but also the amount of such expenses." *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1507 (11th Cir.1985) (citations omitted). This means that witnesses must testify to a reasonable degree of certainty as to what future medical necessities the plaintiff may require. *See id.* (finding that "the jury had no evidence upon which to base awards for future medical expenses" because "no witness predicted appellees' future medical expenses with any degree of certainty"); *see also Wayco Enters., Inc. v. Crews,* 155 Ga.App. 775, 272 S.E.2d 745, 747 (Ga.App.1980) ("Where no evidence is presented from which the jury can ascertain except by mere speculation and conjecture that the plaintiffs would ever have future medical expenses, a

charge on this subject is erroneous."). Therefore, without a medical expert testifying as to Ms. Edwards's future medical needs, Dr. Luke's opinions regarding her future medical expenses are irrelevant.

Dr. Luke's report provides "current prices for a list of medical services provided by counsel" which Dr. Luke assumes "are medically necessary and appropriate to meet Ms. Edwards'[s] future medical needs[.]" (Luke Report [Docket 79–1], at 6). The plaintiffs argue that "Dr. Luke's assumptions are fact questions in this specific case about which the jury will make findings based on all the evidence in the case. For each assumption, Plaintiffs have admissible evidence on which the jury could base a finding that makes the assumption accurate." (Pls.' Mem. in Opp. to Defs.' Mot. to Exclude Ronald Luke, JD, PhD [Docket 105], at 11). However, the plaintiffs do not point to a single assumption by Dr. Luke that is supported by medical testimony. It is the plaintiffs' duty to demonstrate that proper foundation exists for their expert testimony. *See* Fed.R.Evid. 602, 702. However, it is possible that the plaintiffs will present evidence at trial to support Dr. Luke's testimony. If the plaintiffs present evidence indicating *to a reasonable degree of certainty* that Ms. Edwards will require *specific* medical expenses in the future, Dr. Luke's testimony on those expenses may be helpful to the jury. However, the plaintiffs are cautioned that the evidence indicating Ms. Edwards's need for medical expenses must be presented before Dr. Luke's testimony regarding their cost. I therefore **RESERVE RULING** on this part of Ethicon's motion.

#### E. Motion to Limit the Testimony of Prof. Dr. Med. Bernd Klosterhalfen

Dr. Klosterhalfen offers general causation opinions related to infection, degradation, particle loss, shrinkage, and effective porosity of the TVT–O mesh. This is not the first time I have reviewed *Daubert* challenges to Dr. Klosterhalfen's opinions on these topics. *See In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 617–22 (S.D.W.Va.2013); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* 2:12–MD–02327, 2014 WL 186872, at \*10–11 (S.D.W.Va. Jan.15, 2014). Wisely wanting to avoid rehashing old arguments, most of Ethicon's motion argues that Dr. Klosterhalfen's opinions are not helpful to the jury in this case because (1) Ms. Edwards did not develop an infection in this case, and (2) the plaintiffs cannot link

degradation, particle loss, shrinkage, or effective porosity to Ms. Edwards's injuries. (*See* Mem. in Supp. of Mot. to Limit Testimony of Prof. Dr. Med. Bernd Klosterhalfen [Docket 82], at 3, 5, 11–12). First, as I have already explained, there is evidence that Ms. Edwards developed an infection in connection with her TVT–O implant. Second, simply because Dr. Klosterhalfen's opinions are limited to general causation does not mean they are not helpful to the jury. If Ethicon believes the plaintiffs cannot establish that the TVT–O caused Ms. Edwards's injuries, it can address this issue at trial.

 **\*21** Ethicon also challenges the reliability of two of Dr. Klosterhalfen's opinions: those based on degradation and those based on effective porosity. Ethicon argues that Dr. Klosterhalfen's testimony about surface degradation should be excluded because Dr. Klosterhalfen "cannot reliably testify that degradation has *any* clinical significance." (*Id.* at 11). The plaintiffs failed to respond to this argument. Without an expert report,[4] I am unable to determine the full scope of Dr. Klosterhalfen's opinions and their foundation. Therefore, I **RESERVE** for trial my ruling on Dr. Klosterhalfen's degradation opinions.

Ethicon also argues that Dr. Klosterhalfen's testimony about effective porosity is unreliable because in his deposition, "Plaintiffs failed to elicit any testimony that Dr. Klosterhalfen was familiar with the details of" the studies on which those opinions are based. (*Id.* at 14). But an expert witness is not required to be familiar with the particular details of each of the studies on which he bases his opinion, as long as an expert in that particular field reasonably relies on the opinions contained in those studies. *See* Fed.R.Evid. 703; *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.,* 240 F.3d 1, 9 (1st Cir.2001) ("[W]hen an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion."). Ethicon also argues that Dr. Klosterhalfen's opinions are not reliable because they have not been "validated." The plaintiffs fail to respond to this argument, and without an expert report, I again cannot determine the precise bases for these opinions. I therefore also **RESERVE** this ruling for trial.

Accordingly, Ethicon's motion to exclude Dr. Klosterhalfen [Docket 81] is **DENIED in part** with the caveat that I **RESERVE RULING** on the admissibility of Dr. Klosterhalfen's degradation and effective porosity opinions.

### F. Motion to Exclude Testimony of Vladimir Iakovlev, M.D.

Ethicon seeks to exclude the testimony of Vladimir Iakovlev, M.D., in its entirety. Dr. Iakovlev is a pathologist. Ethicon argues that "Dr. Iakovlev's proposed testimony goes well beyond his expertise, has no basis for his proposed testimony, much of which is irrelevant, and his opinions are unsupported speculation concerning subjects that are well beyond his expertise." (Mot. to Exclude Test. of Vladimir Iakovlev, M.D. [Docket 85], at 1). Ethicon also argues that Dr. Iakovlev should not be able to testify because his tests on Ms. Edwards's mesh rendered it unable to be tested by any other experts. For the reasons discussed below, Ethicon's motion [Docket 85] is **GRANTED in part, DENIED in part,** and **DENIED as moot in part.**

### 1. Dr. Iakovlev's Method of Testing

First, Ethicon argues that Dr. Iakovlev's opinions should be excluded because the actions he took to test the TVT–O that had been explanted from Ms. Edwards rendered the device untestable by anyone else. One of Ethicon's experts, Shelby F. Thames, Ph.D., stated in her expert report:

> **\*22** I have been unable to physically and chemically examine the Tonya Edwards explant due to the destructive and compromising methodology used by plaintiff's representatives in handling the sample(s). There was no explant distribution or sample splitting made available to the defendants. The entire sample was maintained by plaintiff's counsel and their experts. The explant sample(s) has been physically and chemically altered irreversibly in such a way that prohibits me from observing, testing, and evaluating the explant in its condition and state at explantation. Accordingly, I cannot reach reliable, scientifically valid conclusions via attempting to

evaluate the explant in its present state.

(Thames Report [Docket 85–2], at 25).

After Ms. Edwards had the TVT–O removed in January 2012, her explant was placed into formalin for preservation. (Iakovlev Dep. [Docket 85–3], at 194). Plaintiffs' counsel then sent the explant to Dr. Iakovlev for analysis. (*Id.*). Dr. Iakovlev then processed the mesh using what he refers to as "standard procedures." (*Id.* at 195). Dr. Iakovlev took the explant out of the formalin, took gross photographs of the explant, examined it, and made measurements. (*Id.*). After that, Dr. Iakovlev sectioned the mesh and then processed and dehydrated it by exposing it to several solutions of formalin and several concentrations of alcohol. (*Id.* at 197–199). Dr. Iakovlev then covered the explant in melted paraffin, a hydrocarbon wax, and sectioned the paraffin blocks to make slides. (*Id.* at 194–97, 210–13). The paraffin holds the tissue so that it can be cut for slides. (*Id.* at 199). This is the same process that Ethicon's expert pathologist, Wenxin Zheng, M.D., uses to prepare explants for analysis, and is the industry standard. (*See* Zheng Dep. [Docket 112–1], at 49–53; Iakovlev Dep. [Docket 85–3], at 211).

Although Ethicon argues that Dr. Iakovlev's processing of the explant rendered it untestable by any other experts, Dr. Zheng testified that, following Dr. Iakovlev's procedure, he had sufficient material from the explant to make his evaluation. (*See* Zheng Dep. [Docket 112–1], at 130). Dr. Zheng primarily relied upon the slides made by Dr. Iakovlev but also admitted that he had sufficient material to cut more slides. (*Id.* at 131, 263–64). Furthermore, this is not a challenge to the reliability of Dr. Iakovlev's testing. I therefore **FIND** that Dr. Iakovlev's processing of Ms. Edwards's explant does not require Dr. Iakovlev to be disqualified as an expert witness.

### 2. Dr. Iakovlev's Expertise

Second, Ethicon argues that Dr. Iakovlev's proposed testimony goes beyond his expertise with regard to the clinical effects of objects removed from the body. However, the plaintiffs have stated that they will not be introducing testimony regarding these issues. (*See* Pls.' Resp. to Defs.' Ethicon Inc. and Johnson & Johnson's Mot. to Exclude Dr. Vladimir Iakovlev [Docket 112], at 5 n. 3). Therefore, this portion of Ethicon's motion is **DENIED as moot.**

### 3. Dr. Iakovlev's Analysis of Pelvic Mesh Explants Generally

**\*23** Third, Ethicon argues that Dr. Iakovlev lacks reliable methodology for his proposed testimony regarding his general review of pelvic mesh explants. In preparing his expert report, Dr. Iakovlev examined approximately 130 mesh explants, approximately sixty percent of which were transvaginal. (*See* Iakovlev Report [Docket 85–1], at 2). The total number included a mixture of hernia meshes, transvaginal meshes for pelvic organ prolapse, stress urinary incontinence slings from other manufacturers, and six TVT and TVT–O meshes produced by Ethicon. (*See id.*). Ethicon argues that because Dr. Iakovlev's sample was not a large, randomly-selected sample of Ethicon TVT–O meshes used to treat stress urinary incontinence, he cannot (and did not) calculate statistically reliable results. The plaintiffs argue that Dr. Iakovlev's experience examining transvaginal mesh generally aided him in forming his opinion regarding Ms. Edwards's mesh.

To the extent that Ethicon seeks to exclude Dr. Iakovlev's opinions regarding the other explants he examined, I agree that those opinions are inadmissible. Dr. Iakovlev "has given no explanation as to whether [his] is a representative sample size or how he chose the particular explants analyzed." *Lewis v. Ethicon, Inc.,* No. 2:12–cv–4301, 2014 U.S. Dist. LEXIS 15288, at \*2559 (S.D .W.va. Feb. 3, 2014). "Therefore, I have no information as to the 'potential rate of error' inherent in [his] observations." *Id.* (citing *Daubert,* 509 U.S. at 594). Dr. Iakovlev testified that approximately 80% of the explanted transvaginal mesh slings in his collection were provided by law firms. (*See* Iakovlev Dep. [Docket 85–3], at 155–57). He further testified that he does not know what methodology the plaintiffs' attorneys employed when determining which explants to send him. (*See id.* at 161). Dr. Iakovlev has testified that he requested the plaintiffs' attorneys provide him with all of the mesh explants in their possession; however, he also testified that he has no way of knowing whether they provided him with all of the explanted meshes and does not know how many explanted meshes the attorneys collected in total. (*See* Iakovlev Dep. [Docket 85–3], at 155–57). "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d

244, 250 (4th Cir.1999) (citations omitted). The plaintiffs have not demonstrated that Dr. Iakovlev's opinions regarding pelvic mesh explants other than Ms. Edwards's were derived using scientific methods. Therefore, Dr. Iakovlev's opinions regarding transvaginal mesh generally are **EXCLUDED**. [5]

To the extent that Ethicon seeks to exclude all of Dr. Iakovlev's testimony because of the sample size he used, their argument is without merit. Dr. Iakovlev may not testify regarding his general conclusions about mesh because his choice of samples lacks scientific methodology. However, that is not a reason to exclude his testimony about Ms. Edwards's mesh, which was made after a review of her explant. Therefore, Ethicon's motion is **DENIED** to the extent that it seeks to exclude Dr. Iakovlev's testimony regarding Ms. Edwards's explant due to the unreliability of his samples.

#### 4. Dr. Iakovlev's Analysis of Ms. Edwards's Mesh

**\*24** Fourth, Ethicon argues that Dr. Iakovlev's opinions regarding Ms. Edwards's explant are speculative and beyond his expertise. They attack different parts of Dr. Iakovlev's opinion, arguing: (1) that he is unqualified to render an opinion regarding his degradation "bark" theory; (2) that he conducted insufficient testing to support his "bark" theory; (3) that his methods of identifying "bark" as degraded polypropylene are unfounded and unreliable; (4) that his degradation opinion is speculation and not reliable expert testimony; (5) that his cause-of-erosion opinion is unreliable; (6) that his cause-of-pain-and-dyspareunia opinion is unreliable; (6) that his ischemia opinion is unreliable; (7) that his edema opinion is unreliable; (8) that his smooth muscle opinion is unreliable; and (8) that his opinion regarding Ms. Edwards's post-explant condition is unreliable. Essentially, all of these arguments can be broken up into two categories: qualifications and reliability. The plaintiffs have agreed that Dr. Iakovlev will not be asked questions regarding "his mesh design analysis and knitting observations, the cause of the erosion suffered by Ms. Edwards, the 'stretch test' performed on a new TVT–O mesh, or urinary symptoms experienced by Ms. Edwards." (Pls.' Resp. to Defs.' Ethicon Inc. and Johnson & Johnson's Mot. to Exclude Dr. Vladimir Iakovlev [Docket 112], at 5–6 n. 3). Therefore, those sections of Ethicon's motion are **DENIED as moot.**

#### A. Dr. Iakovlev's Qualifications to Render an Opinion Regarding Polypropylene Degradation

Ethicon argues that Dr. Iakovlev is unqualified to render an opinion regarding whether there was degraded polypropylene "bark" surrounding Ms. Edwards's mesh. Dr. Iakovlev is a pathologist. Ethicon argues that because Dr. Iakovlev is not a materials scientist and did not submit Ms. Edwards's mesh for chemical testing, he is not qualified to opine that he found degraded polypropylene "bark" when examining Ms. Edwards's explant.

A pathologist is a clinician who provides diagnoses for patient care based on the examination of specimens they receive and relevant clinical information. (*See* Zheng Dep. [Docket 112–1], at 20). Dr. Iakovlev testified that "[e]verything which is taken out of the human body or taken off a human body at the time of death comes for a pathology co-examination, so we have to correlate the devices with the changes in the body, and this is part of our training as pathologists." (Iakovlev Dep. [Docket 112–2], at 30). According to Ethicon's expert, Dr. Zheng, vaginal mesh "just represent[s] a kind of foreign body" for a pathologist to examine. (Zheng Dep. [Docket 112–1], at 46). "[A] pathologist typically deals with many kinds of foreign or medical device[s] removed or explanted from patients.... So overall TVT or mesh-related product is part of those medical devices removed and then submit[ted] to the pathology department. The[] pathologist has expertise to examine them[.]" (*Id.*). Dr. Zheng has also testified that pathologists can help diagnose clinical problems, including symptoms such as pain and bleeding. (Zheng Dep. [Docket 112–1], at 22). Dr. Iakovlev teaches a course on clinical pathology. (*See* Iakovlev Dep. [Docket 112–2], at 143).

**\*25** Ethicon does not question Dr. Iakovlev's pathology credentials; rather, it only argues that as a pathologist, he is unqualified to render an opinion regarding whether the polypropylene in Ms. Edwards's explant degraded. However, Ethicon's own pathology expert agrees that pathologists are qualified to examine explanted mesh, and Ethicon points to nothing that states the contrary. For this reason and in light of Dr. Iakovlev's experience as a pathologist, I **FIND** that Dr. Iakovlev is qualified to testify regarding degradation.

#### B. The Reliability of Dr. Iakovlev's Opinions Regarding Ms. Edwards's Mesh

Ethicon also argues that Dr. Iakovlev's various opinions regarding Ms. Edwards's mesh are unreliable. First, they argue that Dr. Iakovlev did not sufficiently test Ms. Edwards's mesh to determine if the "bark" he saw was degraded polypropylene. As discussed above, Dr. Iakovlev is a pathologist, not a materials scientist. He makes his determinations by processing and analyzing explants from the human body. As additionally discussed above, the process Dr. Iakovlev used to analyze the explant is the industry standard in pathology.

Dr. Iakovlev and Dr. Zheng disagree regarding whether the "bark" observed by Dr. Iakovlev is degraded polypropylene. Dr. Zheng also saw the same "bark" rim around the explant that Dr. Iakovlev saw. (*See* Zheng Dep. [Docket 112–1], at 238–244). However, Dr. Zheng hypothesizes that the rim is degenerated collagen, not degraded polypropylene. (*See id.* at 238–40). Mere disagreement among experts is not, in itself, a reason to exclude an expert's testimony. *See Daubert,* 509 U.S. at 580 (stating that the court's "focus must be solely on principles and methodology [the experts use], not on the conclusions that they generate").

The remainder of Ethicon's arguments relate to the reliability of Dr. Iakovlev's opinions regarding cause-of-erosion, smooth muscle, pain, dyspareunia, edema, and ischema. Ethicon's arguments regarding Dr. Iakovlev's cause-of-erosion opinion and smooth muscle opinion are **DENIED as moot** because the plaintiffs have agreed not to question Dr. Iakovlev on these issues.

Ethicon argues that Dr. Iakovlev's opinions regarding the cause of Ms. Edwards's pain and dyspareunia are unreliable because Dr. Iakovlev does not offer a scientific basis for connecting what he sees in the microscope with pain. In his report and at his deposition, Dr. Iakovlev identified areas where he found nerves grown into the pores of Ms. Edwards's explant. (*See* Iakovlev Report [Docket 85–1], at 65–66; Iakovlev Dep. [Docket 112–2], at 243). Dr. Iakovlev opines that "[i]n cases of nerve entrapment, either ingrown or immobilized in the scar or a deformation, movement or external pressure applied to the tissue deforms or moves the mesh and the force can be transferred directly to the nerves." (Iakovlev Report [Docket 85–1], at 4). Dr. Iakovlev also opines that where the nerves connect to the mesh, "an external pressure (intercourse) can compress the nerves against the hardened mesh." (*Id.* at 18). Dr.

Iakovlev asserted in his report that "[t]he association of nerve entrapment with pain is well established in medicine and became a common knowledge." (Iakovlev Report [Docket 85–1], at 4). Ethicon does not dispute this contention or point to scientific literature stating the contrary. As the Supreme Court has noted, "[a] reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *Daubert,* 509 U.S. at 594. Therefore, Dr. Iakovlev's statement that it is common knowledge that nerve entrapment can cause pain is not excluded merely because he does not cite to specific medical literature. I therefore **FIND** that Dr. Iakovlev may testify regarding the cause of Ms. Edwards's pain.

**\*26** Ethicon next argues that Dr. Iakovlev's ischemia and edema opinions are unreliable because they are unsupported. Dr. Iakovlev opines that "ischemia was at least an intermittent contributor to pain experienced by Ms. Edwards." (Iakovlev Dep. [Docket 85–1], at 56). Ischemia is a "vascular mechanism of pain in [the] human body." (Iakovlev Report [Docket 85–1], at 5). Dr. Iakovlev "detected thrombosed capillaries in [the] Ethicon TVT–O mesh of Mrs. Edwards, which indicates occurrence of circulatory disturbances around the mesh structure." (*Id.*). Dr. Iakovlev bases his opinion on his observation that "[t]here are several thrombosed capillaries and an area of fat degeneration/necrosis" and states that "[n]erve ingrowth shows that the mesh is innervated and the tissue can deliver sensory signal of ischemia." (*Id.*). Ethicon argues that the only evidence of the "several thrombosed capillaries" consists of one single, microscopic slide, and that there is no evidence that capillaries would be perceptible to Ms. Edwards. However, Ethicon does not point to any scientific literature or other authority stating this is insufficient. Notably, Ethicon does not question the methods Dr. Iakovlev used or his qualifications to make these determinations. Rather, Ethicon simply disagrees with Dr. Iakovlev's ultimate opinions. Because Dr. Iakovlev's opinion is based on reliable methodology and evidence, whether there is sufficient evidence to show that Ms. Edwards was suffering from ischemia, edema, and pain can be dealt with by Ethicon on cross-examination. I **FIND** that Dr. Iakovlev may testify regarding ischemia and edema.

Finally, Ethicon argues that Dr. Iakovlev's opinions regarding Ms. Edwards's condition post-explant are unsupported. In his report, Dr. Iakovlev notes that there was a part of Ms. Edwards's mesh that could not be removed from her body. Dr. Iakovlev states that "[t]he remaining part of the mesh can have all of the described above findings to cause her persistent pain. There is a reasonable degree of medical certainty that the remaining mesh parts with the associated involvement of the nerves, muscles and vasculature cause the present symptoms [.]" (Iakovlev Report [Docket 85–1], at 56). However, Dr. Iakovlev is a pathologist, not a treating physician, and he has never examined Ms. Edwards. He has thus never examined the mesh that remains inside Ms. Edwards. Dr. Iakovlev also does not cite to any specific findings to support his opinion that the mesh remaining in Ms. Edwards is causing her pain. Dr. Iakovlev's opinions regarding the mesh remaining inside of Ms. Edwards after her explant are therefore **EXCLUDED.**

### G. Motion to Exclude the Opinions and Testimony of Dr. Russell Dunn, Ph.D., P.E.

Dr. Dunn holds a Ph.D. in chemical engineering and consults on chemical and polymer process and product design issues. (*See* Dunn Report [Docket 91–1], at 1). He will opine that Ethicon's risk assessment process for the TVT–O was inadequate and that the TVT–O is defective. (*See id.* at 4). Dr. Dunn also filed a rebuttal report challenging the opinions of several of Ethicon's experts. Ethicon challenges Dr. Dunn's risk assessment opinion, his opinion at his deposition that polyvinylidene fluoride, or PVDF, is a safer alternative design, and his rebuttal of Ethicon's experts. For the reasons discussed below, Ethicon's motion [Docket 91] is **GRANTED in part** and **DENIED in part.**

#### 1. Risk Assessment Opinions

**\*27** Dr. Dunn offers opinions regarding Ethicon's risk assessment process—which he calls "Failure Mode & Effects Analysis"—during the design of the TVT–O. He opines that Ethicon's "design documents did not contemplate several [Failure Mode & Effects Analysis] issues and that Ethicon did not have an adequate quality system in place" with respect to Prolene. (Dunn Report [Docket 91–1], at 15). He contends that Ethicon's risk assessment processes failed to account

for "polypropylene's inherent tendency to oxidize." (*Id.*). Ethicon argues that this opinion is not helpful to the jury because Dr. Dunn fails to articulate any effect a different quality control process would have had on the TVT–O's design. (*See* Mem. in Supp. of Defs.' Mot. to Exclude the Test. and Ops. of Dr. Russell Dunn, Ph .D., P.E. [Docket 92], at 14–15). Ethicon frames the issue incorrectly. An expert's testimony must help the jury to "understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. This testimony assists the jury in determining whether Ethicon was negligent in designing the TVT–O. Therefore, Ethicon's motion to exclude Dr. Dunn's risk assessment opinions is **DENIED.**

#### 2. Safer Alternative Designs

Although his expert report does not contain any opinions about safer alternative designs, Dr. Dunn testified in his deposition that mesh using PVDF would be a safer alternative design for the TVT–O. (*See* Dunn Dep. [Docket 91–2], at 123:8–20). Ethicon argues that any opinions related to safer alternative designs should be excluded because Dr. Dunn did not disclose them in his expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and because they are unreliable. The plaintiffs did not respond to this argument. Accordingly, Dr. Dunn's opinions regarding safer alternative designs are **EXCLUDED.**

#### 3. Rebuttal Report

Dr. Dunn rebuts the opinions of Ethicon's experts, Dr. Kevin Ong, Dr. Shelby Thames, and Timothy Ulatowski. Specifically, he criticizes the conclusions that these experts draw about the Ethicon canine study and Prolene's vulnerability to oxidation. (*See* Dunn Rebuttal Report [Docket 91–13], at 1–2). Ethicon contends that this rebuttal report is unreliable because it is not supported by scientific literature. (*See* Mem. in Supp. of Defs.' Mot to Exclude the Test. and Ops. Of Dr. Russell Dunn, Ph.D., P.E. [Docket 92], at 17–19).

Despite Ethicon's objection, I **FIND** that Dr. Dunn's rebuttal report has sufficient indicia of reliability. His rebuttal report simply criticizes the methods Ethicon's experts used to come to their conclusions. Dr. Dunn writes that the Ethicon canine study failed "to recount its materials and methods of reproducibility" and used "a control group that does not comport with the implanted Prolene samples." (Dunn Rebuttal Report [Docket 91–

13], at 1). He contends that Ethicon's experts ignored polypropylene's propensity to degrade, despite the use of antioxidants. (*See id.* at 1). He cites several scientific studies for his opinions and states that the sources relied on by Ethicon's experts "favor specific data while ignoring others[.]" (*Id.*). Therefore, Ethicon's motion on this issue is **DENIED.**

### H. Motion to Exclude the Opinions and Testimony of Dr. Abhay Pandit, Ph.D.

**\*28** Dr. Pandit is a biomedical engineer. He plans to testify that the TVT–O was defectively designed and that Ethicon failed to adequately test the TVT–O. Ethicon moves to preclude Dr. Pandit's testimony in its entirety. For the reasons set forth below, Ethicon's motion [Docket 95] is **GRANTED in part** and **DENIED as moot in part.**

#### 1. Leaching Chemicals

Dr. Pandit opines that the TVT–O is defective because, among other things, when polypropylene degrades in vivo, "chemicals are produced that leach into the surrounding tissues." (Pandit Report [Docket 95–1], at 6). He states that Ethicon failed to perform appropriate tests for "these chemicals and their effects." (*Id.*). Ethicon argues that these opinion are unreliable. Dr. Pandit cites no scientific support for these opinions, and he was unable to name which particular chemicals are produced:

> Q. Do you have an opinion, to a reasonable degree of scientific certainty, that when oxidation occurs breaking the chemical bonds, that chemicals are produced that leach into the surrounding tissues?
>
> A. Yeah.
>
> Q. What chemicals?
>
> A. I'm not so sure which ones they are.

(Pandit Dep. [Docket 95–3], at 162:15–22). It is clear from this exchange that Dr. Pandit's opinions on chemical leaching and Ethicon's failure to test for such leaching are not reliable. Therefore, these opinions are **EXCLUDED.**

#### 2. Failure to Test

Dr. Pandit claims that Ethicon failed to adequately test the TVT–O. For instance, he states that pre-clinical

testing was inadequate; Prolene mesh was not tested for shrinkage, degradation, or stiffening; the "inside-out approach" for surgical implantation was not tested appropriately; and the trocar design was not tested appropriately. (Pandit Report [Docket 95–1], at 1–2). Ethicon contends that Dr. Pandit is not qualified to offer these opinions because he failed to identify any specific experience, training, or education in designing or testing implantable devices. In his expert report, Dr. Pandit simply states, without elaboration, that he "has extensive experience in the design and testing of implantable medical devices, including surgical mesh." (Pandit Report [Docket 95–1], at 1). The plaintiffs failed to attach Dr. Pandit's curriculum vitae to his expert report, so I am unable to verify this statement. When asked about this statement at his deposition, Dr. Pandit's response was vague:

> Q. What experience do you have in the design and testing of surgical mesh used for the treatment of stress urinary incontinence specifically?
>
> A. So my experience in testing of implantables is a very fundamental approach of looking at host responses in the body. So I'm an expert in host responses. I design material for host response to understand what the host response is. And the approach I take is, you know, is looking at the principles involved in how one does the studies for the intended applications. So in the context of surgical meshes, I would have had implanted surgical meshes in quite a few projects before, and looking at what the host response is.

**\*29** (*See* Pandit Dep. [Docket 95–2], at 24:14–25:5). He also stated that he has "used polypropylene several times" in the last 22 years in "multiple situations in the body." (*Id.* at 25:16–17, 24–25).

In light of Dr. Pandit's vague explanations and plaintiffs' counsels' failure to attach Dr. Pandit's curriculum vitae, I am unable to determine what precise qualifications he has to opine about designing or testing implantable medical devices. Therefore, the plaintiffs failed to carry their burden to demonstrate that Dr. Pandit should be permitted to testify on this issue and Dr. Pandit's opinions regarding testing are **EXCLUDED.** *See Md. Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998) ("As in all questions of admissibility, the proffering party must come forward with evidence from which the court can determine that the proffered testimony is properly admissible.").

### 3. Safer Alternative Designs

Although he did not discuss safer alternative designs in his expert report, Dr. Pandit testified in his deposition that Ethicon should have used materials other than Prolene in the TVT–O. Ethicon contends that these opinions should be excluded because they were not contained in his expert report and because they are unreliable.

Whether or not these opinions should be excluded for failing to appear in Dr. Pandit's expert report, they are unreliable. Dr. Pandit refused to say which particular materials would be suitable as an alternative design:

Q. Can you tell me today what modified synthetic materials that you have described that may have these additives or changes that may be appropriate for the use in the treatment of stress urinary incontinence?

A. Yes. One other ideas could be, I don't want to give Ethicon ideas on what they should be doing.

Q. Sorry, you're going to have to.

A. I mean I'm giving my IP to them, telling them what they should be doing in terms of constructs.

(Pandit Dep. [Docket 95–2], at 38:8–19). The plaintiffs state that "Dr. Pandit identified PVDF and relied upon Ethicon documents which compare the mechanical properties and *in vivo* reactivity of polypropylene and PVDF." (Pls.' Resp. to Defs.' Mot. to Exclude the Testimony and Opinions of Dr. Abhay Pandit, Ph.D. [Docket 109], at 18). But the plaintiffs do not cite to any portion of Dr. Pandit's expert report or deposition for this statement. Without an explanation from Dr. Pandit about which particular materials would be suitable alternative designs, these opinions are unreliable and are **EXCLUDED.**

### 4. Laser Cutting Mesh

In his deposition, Dr. Pandit stated that the TVT–O was defective because it uses laser-cut mesh. (*See* Pandit Dep. [Docket 95–2], at 69:16–22; 99:3–101:17). He also claimed that Ethicon failed to test the effects of laser cutting. (*See id.* at 99:10–12). He opines that "laser treatment does damage [to] polymer structures" and that antioxidants are lost as a result of laser cutting. (*Id.* at 99:20–21; 100:4–10). However, Dr. Pandit admitted that he could "absolutely

not" testify to a reasonable degree of medical certainty that laser-cut mesh is safer than mechanically cut mesh. (*Id.* at 100:21). Therefore, this opinion is unreliable and is **EXCLUDED.**

### 5. Cancer

**\*30** The plaintiffs state that Dr. Pandit will not opine about the TVT–O potential to cause cancer. (*See* Pls.' Resp. to Defs.' Mot. to Exclude the Testimony and Opinions of Dr. Abhay Pandit, Ph.D. [Docket 109], at 17). Ethicon's motion on this issue is accordingly **DENIED as moot.**

### I. Motion to Exclude the Opinions and Testimony of Dr. Scott Guelcher, Ph.D.

Dr. Guelcher holds a Ph.D. in chemical engineering and a post-doctoral degree in biomedical engineering. He is currently a professor of chemical and biomolecular engineering. He offers the following opinions in this case: (1) the human body "does not stop responding" to mesh until it is removed entirely, (2) the "dynamic environment where these meshes are implanted coupled with the chronic response of the body leads to polymer instability, embrittlement, structural degradation and other changes," (3) it is not possible to guarantee that the TVT–O will perform its intended function after implantation, and (4) the TVT–O mesh is not inert and can change after implantation, which may lead to adverse events for the patient. (Guelcher Report [Docket 97–1], at 3).

Ethicon first argues that Dr. Guelcher's general causation testimony is not helpful to the jury because the plaintiffs cannot prove specific causation and because no expert can say that degradation is clinically significant. As I have already explained, general causation opinions are helpful to the jury and fit the facts of this case regardless of whether the plaintiffs may ultimately fail to carry their burden to show that Ms. Edwards was harmed by her TVT–O implant.

Second, Ethicon argues that Dr. Guelcher's opinions are unreliable and unhelpful because they relate only to generic polypropylene, not Prolene mesh. This argument, too, has already been rejected. Therefore, Ethicon's motion to exclude Dr. Guelcher is **DENIED.**

#### IV. Conclusion

I emphasize that my rulings *excluding* expert opinions under Rule 702 and **Daubert** are dispositive of their admissibility in this case, but that my rulings *not to exclude* expert opinions are not dispositive of their admissibility. In other words, to the extent that certain expert opinions might be cumulative or might confuse or mislead the jury, they may still be excluded under Rule 403 or some other evidentiary rule.

I am particularly concerned about cumulative testimony. For instance, the plaintiffs offer at least five experts to opine on degradation, three experts on the insufficiency of Ethicon's warnings, and three experts on safer alternative designs. The defendants offer three experts on degradation.The parties will not be permitted to call all of these experts at trial, and they should plan accordingly.

For the reasons set forth above, Ethicon's Motion to Exclude the Opinion Testimony of John F. Steege, M.D. [Docket 73] and Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Scott Guelcher, Ph.D.

[Docket 97] are **DENIED.** Ethicon's Motion to Limit the Testimony of Bruce Rosenzweig, M.D. [Docket 75] and Motion to Exclude Testimony of Vladimir Iakovlev, M.D. [Docket 85] are **DENIED in part, DENIED as moot in part,** and **GRANTED in part.** Ethicon's Motion to Exclude Certain Opinions of Jerry G. Blaivas, M.D. [Docket 77] is **DENIED in part, GRANTED in part,** and **RESERVED in part.** Ethicon's Motion to Exclude Ronald Luke, JD, PhD [Docket 79] and Motion to Limit the Testimony of Prof. Dr. Bernd Klosterhalfen are **DENIED in part** and **RESERVED in part.** Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Russell Dunn, Ph.D., P.E. [Docket 91] is **GRANTED in part** and **DENIED in part.** And Ethicon's Motion to Exclude the Opinions and Testimony of Dr. Abhay Pandit, Ph.D. [Docket 95] is **GRANTED in part** and **DENIED as moot in part.**

 **\*31** The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

#### All Citations

Not Reported in F.Supp.3d, 2014 WL 3361923

---

Footnotes

1   With more than 60,000 cases related to surgical mesh products currently pending before me, this gatekeeper role takes on extraordinary significance. Each of my evidentiary determinations carries substantial weight with the remaining surgical mesh cases. Regardless, while I am cognizant of the subsequent implications of my rulings in these cases, I am limited to the record immediately before me and the arguments of counsel.

2   Ethicon argues that my decision in the C.R. Bard MDL to preclude Dr. Bob Shull from testifying about product warnings should control here. *See In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611 (S.D.W.Va.2013). But there, Dr. Shull *admitted* that he had not developed product warnings, had no experience in that area, and did not hold himself out as an expert in product warnings. *See id.* Dr. Rosenzweig has made no similar admissions. Therefore, my holdings regarding Dr. Shull are inapposite.

3   Ethicon argues that some of this testimony is inadmissible evidence of Ethicon's corporate knowledge or state of mind. As I previously stated, I will not parse expert reports in relation to this objection. However, the parties are cautioned that experts must offer opinions that utilize their "scientific technical, or other specialized knowledge [.]" Fed.R.Evid. 702.

4   As in *In re C.R. Bard* and *Lewis v. Johnson & Johnson,* the plaintiffs have again failed to provide a full expert report for Dr. Klosterhalfen. Although they have repeatedly argued that Dr. Klosterhalfen is a "percipient fact witness" under no obligation to provide a report, many of his opinions appear to go beyond his status as a fact witness. I previously found that such a failure is harmless under Federal Rule of Civil Procedure 37(c). *See In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.,* No. 2:12–cv–4301, 2014 WL 186872, at *10 (S.D.W.Va.Jan.15, 2014). Despite this prior holding, I will not tolerate continued violations of the plaintiffs' obligation to provide a full expert report under Rule 26. The plaintiffs are advised to provide a more thorough expert report for Dr. Klosterhalfen in future cases.

5   Although Dr. Iakovlev may not testify to his opinions regarding mesh generally, his experience reviewing the mesh in his collection may be relevant to his qualifications. The plaintiffs may ask Dr. Iakovlev questions regarding his review of mesh generally to lay the foundation for his testimony, but are warned not to ask him any opinions he may have come to based on this review.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    23

Case 2:12-md-02327 Document 9075-15 Filed 01/10/20 Page 159 of 924 PageID #: 212966
Case 2:12-md-02327 Document 9075-15 Filed 06/13/19 Page 159 of 924 PageID #: 117696
Edwards v. Ethicon, Inc., Not Reported in F.Supp.3d (2014)

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT F**

KeyCite Yellow Flag - Negative Treatment
Distinguished by Franco v. Boston Scientific Corporation, S.D.W.Va., June 13, 2016

54 F.Supp.3d 501
United States District Court,
S.D. West Virginia,
Charleston Division.

Jacquelyn TYREE, et al., Plaintiffs,

v.

BOSTON SCIENTIFIC CORPORATION, Defendant.

Civil Action No. 2:12−cv−08633.
|
Signed Oct. 17, 2014.
|
As Amended Oct. 29, 2014.

**Synopsis**

**Background:** In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), parties sought to exclude expert opinions.

**Holdings:** The District Court, Joseph R. Goodwin, J., held that:

[1] experts' testimony regarding corporate conduct and ethics was inadmissible;

[2] district court would not exclude all expert testimony opining that polypropylene mid-urethral slings were defective;

[3] opinion that patient's symptoms and resulting diagnoses, and treatment for urinary complications and pelvic pain complications were all directly attributable to implantation of polypropylene surgical mesh was based on reliable pathology methods;

[4] expert opinion that polypropylene was not suitable as a permanent implant was reliable;

[5] expert opinion on carcinogenicity of polypropylene was inadmissible;

[6] opinion that patient's delayed-onset of voiding dysfunction most likely stemmed from sling contracting and shrinking inside her body was reliable;

[7] patient's failure to timely disclose rebuttal witness was not substantially justified and was not harmless; and

[8] expert was not qualified to testify regarding design of transvaginal mesh.

Motions granted in part and denied in part.

West Headnotes (72)

**[1]** **Evidence**
👉 Necessity and sufficiency

In carrying out its role as gatekeeper, the court need not determine that the proffered expert testimony is irrefutable or certainly correct; as with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[2]** **Evidence**
👉 Determination of question of competency

Ultimately, the district court has broad discretion in determining whether to admit or exclude expert testimony, and the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[3]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of

of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), experts' testimony regarding corporate conduct and ethics was inadmissible, as testimony would not assist jury, although experts could testify about review of internal corporate documents solely for purpose of explaining basis for opinions. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[4]**     **Evidence**
          👉 Matters directly in issue

Opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[5]**     **Evidence**
          👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), district court would not exclude all expert testimony opining that polypropylene mid-urethral slings were defective, although manufacturer argued that opinion had not been tested, was not based on published-peer-reviewed literature, and was not generally accepted in the relevant medical and scientific communities, since district court was required to perform analysis of admissibility on individualized basis. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[6]**     **Evidence**
          👉 Necessity and sufficiency

**Evidence**
          👉 References to authorities on subject

An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead selectively chooses

his support from the scientific landscape. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[7]**     **Evidence**
          👉 Necessity and sufficiency

If the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[8]**     **Evidence**
          👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that polypropylene mid-urethral slings were not safe and effective for treatment of SUI was unreliable, and thus was inadmissible, since expert ignored peer-reviewed literature supporting conclusion that polypropylene slings were safe and effective. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[9]**     **Evidence**
          👉 Medical testimony

**Evidence**
          👉 Experiments and results thereof

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding complication rates of pain in women with polypropylene mesh and slings was unreliable, and thus was inadmissible, since expert gave no scientific basis for disagreeing with contrary studies showing lower complication

rates of pain in women with polypropylene slings. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[10]** Evidence

👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding high complication rates in women with polypropylene mesh products, which was based on "giving the benefit of the doubt to the patient" was not based on reliable method, and thus was inadmissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[11]** Evidence

👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding lack of sound scientific evidence supporting the use of polypropylene mesh in treating SUI was inconsistent with deposition testimony where expert admitted that there were studies supporting use of polypropylene in SUI, and thus was inadmissible as untrustworthy and unreliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[12]** Evidence

👉 References to authorities on subject

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert testimony that another procedure was more effective than polypropylene slings was founded in scientific

literature, and thus was admissible; expert cited in his report several scientific, peer-reviewed sources showing that procedure had high success rates. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[13]** Evidence

👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that another procedure was more effective than polypropylene slings was relevant, and thus was admissible, since product at issue was sling used to treat SUI. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[14]** Evidence

👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that other slings were more effective than polypropylene slings in the treatment of SUI was unreliable, and thus inadmissible; expert's reasoning as to why other sling had lower complication rate than polypropylene slings, because other sling used no polypropylene mesh and, thus, had no mesh-related complications, was unscientific and could be reached by jury without expert testimony, and expert did not cite any studies involving use of other sling to treat SUI. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[15]** Evidence

👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer

of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that infection rate of polypropylene mesh was up to 100% was unreliable, and thus inadmissible, since opinion was based on study that did not support expert's findings. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[16]** **Evidence**
👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that the complication rate of urethral obstruction was greater than ten percent was unreliable, and thus inadmissible, since opinion was not based on scientific study. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[17]** **Evidence**
👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding percentage or number of manufacturer's products expert had removed was unreliable, and thus inadmissible; expert testified that he could not identify mesh brand by sight after explanation, and tried to get operative records from implant with product manufacturing information but did not know how often he actually received information. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[18]** **Federal Civil Procedure**
👉 Failure to respond;sanctions

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that patient had chronic pelvic pain would not be excluded under rule governing disclosure of experts, since according to expert's report on patient, her vaginal exam revealed that, "Palpation of the obturator foramen bilaterally through the vaginal wall does reproduce her pain." Fed.Rules Civ.Proc.Rule 26(a)(2)(B)(i), 28 U.S.C.A.

Cases that cite this headnote

**[19]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to testify regarding mesh degradation, mesh contraction, and mesh migration; expert had 30 years' experience as a clinical pathologist, and had knowledge of and experience with pelvic mesh explants in particular, having examined 50 explant samples over the past five years. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[20]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to opine on the causal relationship between transvaginal mesh implantation and tissue response; manufacturer argued that expert was not gynecologist, obstetrician, urogynecologist, or a surgeon, however, expert's extensive experience and knowledge in field of pathology, which included examined fifty pathology samples from mesh

removals, qualified him to submit opinions. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[21]** **Evidence**
    👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert's methodology of using pathology reports to formulate his opinions was unreliable, and thus opinion that pathology reports of excised products made by manufacturer were consistent with acute, sub-acute, and chronic categories of the disease process was inadmissible, since it lacked standards to govern process of selecting sample of pathology reports to be evaluated. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[22]** **Evidence**
    👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert's opinion regarding properties of polypropylene mesh or the clinical responses to mesh implants were not inadmissible as litigation driven, since expert based opinion on his professional experience with mesh pathology samples examined during his practice. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[23]** **Evidence**
    👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress

urinary incontinence (SUI), expert opinion that patient's symptoms of pain, infection, dyspareunia, voiding dysfunction and resulting diagnoses, and her medical treatment for urinary complications and pelvic pain complications were all directly attributable to the implantation of polypropylene surgical mesh was based on reliable pathology methods; expert reached his opinion by reviewing pathology slides and correlating that with the patient's symptoms, and challenges to accuracy of diagnostic conclusion were better suited for cross-examination. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[24]** **Evidence**
    👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), experts' opinions that polypropylene was susceptible to oxidation and degraded by an oxidative mechanism in the body, analysis of explanted mesh showed clear sign of oxidative degradation, and manufacturer's sling was defective and not suitable to serve as a permanent implant were unreliable, and thus inadmissible; experts failed to control for error or bias or determine statistical significance of results of testing and did not establish or adhere to testing protocols. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[25]** **Evidence**
    👉 Medical testimony

**Evidence**
    👉 Experiments and results thereof

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress

urinary incontinence (SUI), expert opinion that polypropylene was not suitable as a permanent implant was reliable; expert cited eight different studies supporting his proposition that polypropylene was not suitable as a permanent implant, many of which were the same peer-reviewed, published literature relied upon by other experts in previous multidistrict litigation trials, and studies were reasonably relied upon in the field of polymer science. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[26]** **Evidence**
 👉 Matters directly in issue

**Products Liability**
 👉 Implants and prosthetic devices

**Products Liability**
 👉 Negligence

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), question of whether manufacturer failed to act as a reasonable and prudent medical device manufacturer was question for jury, and thus expert's opinions that manufacturer failed to act as reasonable and prudent medical device manufacturer were inadmissible, since opinions drew legal conclusions from the facts. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[27]** **Evidence**
 👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to testify that manufacturer did not conduct adequate testing of product prior to placing them on the market, product was inadequately labeled, patients

could not adequately consent to the surgical implantation of product due to the misbranding of these products, and manufacturer failed to meet postmarket vigilance standard of care for their products, leading to further misbranding, although expert did not have medical degree; expert had over 40 years of experience in the research and development of medical devices, and over that time, she had accumulated knowledge that was relevant to case, such as design of clinical trials for diseases of the female genital system, clinical testing of novel medical devices, and the content of product labeling. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[28]** **Evidence**
 👉 Due care and proper conduct in general

**Evidence**
 👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinions that manufacturer should have performed adequate preclinical and clinical testing of products prior to marketing to ensure devices were reasonably safe for permanent implantation and by its failure to do so, manufacturer fell below the standard of care required of a reasonably prudent medical device manufacturer, were relevant and reliable; opinion was backed by authoritative studies that recommended the performance of clinical trials and long-term follow-ups before using polypropylene mesh. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[29]** **Evidence**
 👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to

treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding labeling of product was relevant to patients' failure to warn claim, since testimony could help guide jury in claims considering appropriateness of product labeling. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[30]** **Evidence**
👉 Tendency to mislead or confuse

**Evidence**
👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding labeling of product was not reliable, and thus was inadmissible, since only basis for opinion on adequacy of product labeling was violation of Food, Drug, and Cosmetic Act (FDCA) and Food and Drug Administration (FDA) regulations, which was not probative to the claims, asserting a violation of the FDCA was a legal conclusion, not an expert opinion, and expert testimony about requirements of the FDCA, which were not at issue in case, could lead to more confusion about the failure-to-warn claim than enlightenment. Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Fed.Rules Evid.Rules 403, 702, 28 U.S.C.A.

Cases that cite this headnote

**[31]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that manufacturer deviated from standard of care by its failure to report to Food and Drug Administration (FDA) a number of adverse

events that met criteria for Medical Device Reporting, rendering devices misbranded as a result of failure to furnish information requested under Food, Drug, and Cosmetic Act (FDCA) was not relevant and thus inadmissible; patients were not bringing claims under FDCA, testimony on whether or not manufacturer complied with FDCA would constitute an impermissible legal conclusion rather than an expert opinion, and opinion testimony on reporting regulations within the FDCA had little probative value compared to the substantial risk of jury confusion. Food, Drug, and Cosmetic Act, § 1 et seq., 21 U.S.C.A. § 301 et seq.; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[32]** **Evidence**
👉 Knowledge, experience, and skill in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to opine as to behavior of polypropylene mesh inside of the human body; expert held a Ph.D. in biomedical engineering and was on the faculty of a joint department within two universities, he conducted postdoctoral research focusing on exploring the mechanisms of biomaterial associated fibrosis, and had authored several book chapters and peer-reviewed articles on biomaterials and biomedical engineering. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[33]** **Evidence**
👉 Experiments and results thereof

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding

behavior of polypropylene mesh inside of the human body was based on unreliable methodology, and thus was inadmissible; expert deviated from protocols calling for use of saline bath as part of testing to help better replicate physiological environment of the human body without scientific basis, expert's sample size of one was insufficient to perform statistical analysis, testing was not up to peer reviewed standards, and testing failed to replicate physiological multi-directional forces in the female pelvic floor. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[34]** **Evidence**
👉 Experiments and results thereof

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding a mechanical mismatch between the mesh and the human body and the adverse in vivo effects resulting from that mismatch was unreliable; expert based his elastic modulus calculations of mesh on his methodologically flawed and unreliable testing, and testing did not replicate the forces and environment of the human body. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[35]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to opine regarding "defective" qualities of polypropylene mesh used in sling, such as its "impurity" and its tendency to shrink, degrade, and oxidize; expert had performed countless pelvic reconstruction surgeries, instructed others on the performance of surgeries, participated in the development of

pelvic mesh devices, and authored several peer-reviewed articles on safety and efficacy of polypropylene mesh products, and any challenge to his demonstrated expertise was better suited for cross examination. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[36]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was not qualified to opine regarding manufacturer's alleged noncompliance with Food and Drug Administration (FDA) regulations, particularly as they related to product labeling; although patients contended that expert's experience as a urogynecological surgeon made him "extremely well suited" to describe the information that manufacturer should have included on the directions for use and brochure for sling, expert was not expert in FDA regulations, and his understanding of medical device warnings did not exceed knowledge of physicians in general. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[37]** **Evidence**
👉 References to authorities on subject

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding "defective" qualities of polypropylene mesh used in sling, such as its "impurity" and its tendency to shrink, degrade, and oxidize, were reliable; although expert's opinions conflicted with the position statements of several urogynecological professional societies, he nevertheless found support for his opinions

in several peer-reviewed articles. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[38]**    **Evidence**
    👈 Necessity and sufficiency
**Evidence**
    👈 References to authorities on subject

An expert may support his opinions with resources other than the results of his scientific experimentation or testing. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[39]**    **Evidence**
    👈 Tendency to mislead or confuse
**Evidence**
    👈 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion on carcinogenicity of polypropylene was inadmissible, since none of the patients claimed that sling caused cancer, and mention of cancer would confuse jury. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[40]**    **Evidence**
    👈 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to testify regarding mesh design, mesh deformation, and polypropylene degradation; expert was pathologist, and in expert report, expert stated that his professional activities included diagnostic examination of specimens removed surgically or by biopsies from the human body, where his annual practice

volume amounted to 5000 cases. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[41]**    **Evidence**
    👈 Medical testimony
**Evidence**
    👈 Experiments and results thereof

Expert lacked reliable methodology for his general causation opinions related to his review of explanted mesh as part of study, and thus opinions were inadmissible in multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), since expert provided no information on how the mesh explants were chosen or prepared for examination, and provided no information as to potential rate of error. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[42]**    **Evidence**
    👈 Experiments and results thereof

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion drawn from mechanical testing of manufacturer's slings was not reliable; expert developed and performed stretch test himself, without taking care to standardize his method or results, expert had no knowledge of whether his methodology was generally accepted in the medical community, and tests failed to replicate the forces in the female pelvic floor because he measured uniaxial forces, while the forces in the female pelvic floor were generally multi-directional. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[43]** **Evidence**

🔑 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that polypropylene mid-urethral slings were not safe to treat SUI was reliable, although scientific literature was not predominant basis of opinion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[44]** **Evidence**

🔑 Necessity and sufficiency

General acceptance is not a necessary precondition to the admissibility of scientific evidence under the Federal Rule of Evidence governing expert testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[45]** **Evidence**

🔑 Necessity and sufficiency

**Evidence**

🔑 References to authorities on subject

An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead selectively chooses his support from the scientific landscape. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[46]** **Evidence**

🔑 Necessity and sufficiency

If the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[47]** **Evidence**

🔑 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was not qualified to opine as to design of sling, although expert had experience removing SUI devices and observed complications during removal process and worked in developing autologous rectus fascial sling operation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[48]** **Federal Civil Procedure**

🔑 Failure to respond; sanctions

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was unqualified to opine as to mesh shrinkage and degradation due to his failure to disclose his particular experience with these matters in his expert report. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[49]** **Evidence**

🔑 Matters directly in issue

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinions that manufacturer failed to provide adequate instructions and did not include adequate warnings were improper legal conclusions and thus inadmissible, since issue of whether manufacturer failed to warn was question for the jury. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[50]**   **Evidence**
   👈 Matters directly in issue

If an expert's opinion supplies the jury with no information other than the witness's view of how the verdict should read, then the testimony is essentially a legal conclusion that is better handled by the judge and, coming from the witness, will be of little assistance to the jury. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[51]**   **Evidence**
   👈 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinions that manufacturer knew the complication rates, yet failed to include them in the warnings and/or labeling, was aware of debilitating outcomes, ignored the numerous red flags raised by multiple agencies, publications and physicians, used anti-warnings to deliberately misrepresent dangerous products as safe, and refused to perform clinical testing to help identify risks was inadmissible as improper state of mind testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[52]**   **Evidence**
   👈 Due care and proper conduct in general

The defendant's knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[53]**   **Evidence**
   👈 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to offer general causation testimony on the properties of polypropylene mesh, based on his clinical experience and his analysis of scientific literature and academic papers. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[54]**   **Evidence**
   👈 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that patient's delayed-onset of voiding dysfunction most likely stemmed from sling contracting and shrinking inside her body was reliable, and thus admissible, although expert failed to physically examine patient; expert adequately considered and eliminated alternate causes of patient's symptoms in making his differential diagnosis, expert thoroughly considered patient's medical history and test results in light of applicable publications, and deposition testimony and expert report suggested scientific connection between patient's voiding dysfunction and contracture of sling. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[55]**   **Evidence**
   👈 Medical testimony

A reliable differential diagnosis requires the expert to determine the possible causes for the patient's symptoms and then eliminate each of these potential causes until reaching one that cannot be ruled out or determining which of

those that cannot be considered is the most likely. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[56]    Evidence**
    👉 Medical testimony

A physician may reach a reliable differential diagnosis without personally performing a physical examination. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[57]    Evidence**
    👉 Medical testimony

Any potential errors in a doctor's differential diagnosis affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[58]    Evidence**
    👉 Medical testimony
**Evidence**
    👉 References to authorities on subject

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that presence of a midurethral sling caused patient's dyspareunia, pelvic pain, urinary incontinence, and other complications was based on reliable facts, and thus was admissible; although he did not rely on particular studies in preparing his report, expert stated that he read peer-reviewed literature and scientific studies on midurethral slings "very, very frequently" in his clinical practice, which involved treating women with urologic dysfunction, and prior to meeting patient, expert reviewed her medical records, when patient arrived for her physical examination, expert took her medical history, and performed 2.5–hour physical

examination of patient, and expert considered and ruled out past history of ovarian cysts, patient's obesity, and considered fact that patient never shared her complaints of pelvic pain with her treating physicians. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[59]    Evidence**
    👉 Medical testimony

To be admissible, an expert's differential diagnosis must, at a minimum, take serious account of other potential causes of the patient's symptoms. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[60]    Federal Civil Procedure**
    👉 Failure to respond;sanctions

Thirty-day time limit to serve rebuttal report in multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI) began to run when expert supplemented report after personally examining patient, rather than at expert's deposition, since expert did not offer new opinions in deposition that were not previously discussed in expert reports. Fed.Rules Civ.Proc.Rule 26(a)(2)(D)(ii), 28 U.S.C.A.

101 Cases that cite this headnote

**[61]    Federal Civil Procedure**
    👉 Failure to respond;sanctions

The five factors the court must consider to determine whether the failure to identify witness was substantially justified or is harmless are: (1) the surprise to the party against whom the witness was to have testified, (2) the ability of the party to cure that surprise, (3) the extent to which allowing the testimony would disrupt the trial, (4) the explanation for the party's failure to name the

witness before trial, and (5) the importance of the testimony. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

Cases that cite this headnote

**[62]** **Federal Civil Procedure**
👉 Failure to respond;sanctions

Patient's failure to disclose rebuttal witness within 30 days of expert's supplemental report in multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI) was not substantially justified and was not harmless, as required to strike rebuttal witness report; although once manufacturer disclosed expert opinions related to examination of patient, it should have expected that patient might choose to rebut those opinions, allowing an improper rebuttal expert at late stage would likely prejudice manufacturer's ability to properly challenge rebuttal witness, and rebuttal witness's report was not necessarily crucial to patient's ability to be heard on the merits of her case. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

Cases that cite this headnote

**[63]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion regarding state of mind of manufacturer of polypropylene used by mesh sling manufacturer would not assist jury, and therefore was inadmissible. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[64]** **Evidence**
👉 Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert opinion that raw polypropylene was not hazardous based on anecdotal evidence involving other material safety data sheets (MSDS) was inadmissible; although warning provided in MSDS was relevant, expert was not required to discuss MSDSs generally or issue of whether polypropylene required an MSDS because of its hazardous nature, and narrative review of the history and development of MSDSs and who used them in the field was not helpful to the jury. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

33 Cases that cite this headnote

**[65]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert testimony regarding Food and Drug Administration (FDA) regulatory process and manufacturer's regulatory activities was inadmissible, since FDA clearance process did not relate to safety or efficacy of product. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[66]** **Evidence**
👉 Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was qualified to testify that there was no evidence that accused sling was defective or unreasonably dangerous and claims that polypropylene implanted in the pelvic floor degraded, significantly contracted, caused systematic

infection, and/or cancer was not supported in the medical or scientific community; expert was accomplished urogynecologist, had experience treating women for pelvic organ prolapse and urinary incontinence and performing mesh revision surgeries once or twice a month for ten years, expert served on university faculties, published peer-reviewed articles concerning mesh and sling procedures, and served as a reviewer for scientific journals. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[67] **Evidence**
&#128073; Medical testimony

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert failed to provide sound basis for opinions regarding physical properties of polypropylene, and thus opinions were unreliable, since opinions regarding polypropylene were general and did not relate to particular patient. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

[68] **Evidence**
&#128073; Due care and proper conduct in general

Expert was not qualified to testify in multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI) regarding design of transvaginal mesh, since expert did not have experience with sling design. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[69] **Evidence**
&#128073; Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer

of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was not qualified to testify regarding directions for use of mesh sling, since expert did not have experience drafting directions for use or expertise as to inclusion of complication rates in directions for use. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[70] **Evidence**
&#128073; Due care and proper conduct in general

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert was not qualified to testify regarding directions for use of mesh sling, although expert indicated he had "expertise" in process of writing patient handouts warning against drug complications, his experience appeared to be limited to his review and distribution of these handouts, rather than contribution to the drafting. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[71] **Evidence**
&#128073; Due care and proper conduct in general

Expert was qualified to testify in multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI) regarding his opinion that mesh sling did not shrink, contract, degrade, or cause systemic infections, although expert had not personally performed pathology research on polypropylene explants, since expert had performed almost 3,000 sling procedures, and clinical practice largely focused on the treatment of female urinary incontinence over the last twenty years, and expert cited numerous studies and academic papers throughout his expert report to support

his opinion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[72] **Evidence**
👉 Medical testimony

**Evidence**
👉 References to authorities on subject

In multidistrict litigation action alleging products liability claims against manufacturer of transvaginal surgical mesh used to treat pelvic organ prolapse and stress urinary incontinence (SUI), expert's clinical experience and review of the scientific literature were sufficiently reliable bases for opinion that mesh sling did not shrink, contract, degrade, or cause systemic infections. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*513** Fidelma L. Fitzpatrick, Jonathan D. Orent, Providence, RI, Fred Thompson, III, Mount Pleasant, SC, Harry F. Bell, Jr., Charleston, WV, for Plaintiffs.

**\*514** Eric M. Anielak, Jon A. Strongman, Matthew D. Keenan, Robert T. Adams, Shook Hardy & Bacon, Kansas City, MO, Lindsey M. Saad, Flaherty Sensabaugh & Bonasso, Morgantown, WV, Michael Bonasso, Flaherty Sensabaugh & Bonasso, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

### (*Daubert* Motions)

JOSEPH R. GOODWIN, District Judge.

The following motions have been brought by the defendant, Boston Scientific Corporation ("BSC"): (1) Defendant's Motion to Exclude Plaintiffs' Experts' Opinion that Polypropylene Mid–Urethral Slings Are

Defective [Docket 227]; (2) Defendant's Motion to Exclude the Opinions and Testimony of Michael Thomas Margolis, M.D. [Docket 237](3) Defendant's Motion to Exclude the Opinions and Testimony of Richard W. Trepeta, M.D. [Docket 235]; (4) Defendant's Motion to Exclude the Opinions and Testimony of Jimmy W. Mays, Ph.D. and Samuel P. Gido, Ph.D. [Docket 221]; (5) Defendant's Motion to Exclude the Opinions and Testimony of Peggy Pence, Ph.D., RAC, FRAPS [Docket 219]; (6) Defendant's Motion to Exclude the Opinions and Testimony of Thomas H. Barker, Ph.D. [Docket 223]; (7) Defendant's Motion to Exclude the Opinions and Testimony of Donald R. Ostergard, M.D. [Docket 217]; (8) Defendant's Motion to Exclude the Opinions and Testimony of Vladimir Iakovlev, M.D. [Docket 225]; (9) Defendant's Motion to Exclude the Opinions and Testimony of Jerry Blaivas, M.D. [Docket 239]; (10) Defendant's Motion to Exclude the Opinions and Testimony of Alison Vredenburgh, Ph.D., CPE [Docket 241]; (11) Defendant's Motion to Exclude the Opinions and Testimony of Bruce Allen Rosenzweig, M.D. [Docket 251]; (12) Defendant's Motion to Exclude the Opinions of Christopher Walker, M.D. [Docket 247]; and (13) Defendant's Motion to Strike Rebuttal Report of Dr. Abbas Shobeiri [Docket 400].

The following motions have been brought by the plaintiffs: (1) Plaintiffs' Motion to Exclude the Testimony of Stephen H. Spiegelberg, Ph.D. [Docket 215]; (2) Plaintiff's Motion to Exclude the Testimony of Stephen F. Badylak, D.V.M., Ph.D., M.D. [Docket 213]; (3) Plaintiffs' Motion to Exclude the Testimony of Gary L. Winn, Ph.D. [Docket 229]; (4) Plaintiffs' Motion to Exclude or Limit Testimony of Christine Brauer, Ph.D. [Docket 231]; (5) Plaintiffs' Motion to Limit the Testimony of Patrick Culligan, M.D. [Docket 233]; and (6) Plaintiffs' Motion to Limit the Testimony of Lonny Green, M.D. [Docket 354].

For the reasons explained below, the defendant's motion with respect to Plaintiffs' Experts' Opinion that Polypropylene Mid–Urethral Slings Are Defective [Docket 227] is **DENIED**. The defendant's motion with respect to Dr. Margolis [Docket 237] is **GRANTED IN PART** and **DENIED IN PART** and **RESERVED IN PART**. The defendant's motion with respect to Dr. Trepeta [Docket 235] is **GRANTED IN PART** and **DENIED IN PART**. The defendant's motion with respect to Drs. Mays and Gido [Docket 221] is **GRANTED IN**

**PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Pence [219] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Barker [Docket 223] is **GRANTED.** The defendant's motion with respect to Dr. Ostergard [Docket 217] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Iakovlev [Docket 225] is **GRANTED.** The defendant's motion with respect to Dr. **\*515** Blaivas [Docket 239] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Vredenburgh [Docket 241] is **GRANTED.** The defendant's motion with respect to Dr. Rosenzweig [Docket 251] is **DENIED.** The defendant's motion with respect to Dr. Walker [Docket 247] is **DENIED.** The defendant's motion to strike the rebuttal report of Dr. Shobeiri [Docket 400] is **GRANTED.**

The plaintiffs' motion with respect to Dr. Spiegelberg [Docket 215] is **RESERVED IN PART** and **GRANTED IN PART.** The plaintiffs' motion with respect to Dr. Badylak [Docket 213] is **RESERVED IN PART** and **GRANTED IN PART.** The plaintiffs' motion with respect to Dr. Winn [Docket 229] is **GRANTED.** The plaintiffs' motion with respect to Dr. Brauer [Docket 231] is **GRANTED.** The plaintiffs' motion with respect to Dr. Culligan [Docket 233] is **GRANTED.** The plaintiffs' motion with respect to Dr. Green [Docket 354] is **GRANTED IN PART** and **DENIED IN PART.**

### I. Background

This consolidated case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse and stress urinary incontinence. In the seven MDLs, there are over 60,000 cases currently pending, over 13,000 of which are in the Boston Scientific Corporation MDL, MDL 2326. In this particular case, the four consolidated plaintiffs were surgically implanted with the Obtryx Transobturator Mid–Urethral Sling System ("the Obtryx"), a mesh product manufactured by BSC. (*See* Pretrial Order # 78 [Docket 9], at 1–2).[1] All of the plaintiffs received their surgeries in West Virginia. They claim that as a result of implantation of the Obtryx, they have experienced "erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain,

pudendal nerve damage, pelvic floor damage, and chronic pelvic pain." (*Id.* at 4 (quoting the master complaint)). The plaintiffs allege negligence; strict liability for design defect; strict liability for manufacturing defect; strict liability for failure to warn; breach of express warranty; breach of implied warranty; and punitive damages. (*Id.* at 2). The spouse of one plaintiff (Ms. Tyree) has also alleged loss of consortium. (*Id.*). The parties have retained experts to render opinions regarding the elements of these causes of action, and the instant motions involve the parties' efforts to exclude or limit the experts' opinions and testimony pursuant to *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### II. Legal Standard

Under Federal Rule of Evidence 702, expert testimony is admissible if the expert **\*516** is "qualified ... by knowledge, skill, experience, training, or education," and if his testimony is (1) helpful to the trier of fact in understanding the evidence or determining a fact in issue; (2) "based upon sufficient facts or data"; and (3) "the product of reliable principles and methods" that (4) have been reliably applied "to the facts of the case." Fed.R.Evid. 702. The U.S. Supreme Court established a two-part test to govern the admissibility of expert testimony under Rule 702—the evidence is admitted if it "rests on a reliable foundation and is relevant." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. The proponent of expert testimony does not have the burden to "prove" anything to the court. *Md. Cas. Co. v. Therm–O–Disc, Inc.,* 137 F.3d 780, 783 (4th Cir.1998). He or she must, however, "come forward with evidence from which the court can determine that the proffered testimony is properly admissible." *Id.*

**[1]** The district court is the gatekeeper.[2] It is an important role: "[E]xpert witnesses have the potential to be both powerful and quite misleading[;]" the court must "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir.2001) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) and *Daubert,* 509 U.S. at 588, 595, 113 S.Ct. 2786). In carrying out this role, I "need not determine that the proffered expert testimony is irrefutable or certainly correct"—"[a]s with all other admissible evidence, expert testimony is subject to testing by 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *United States v. Moreland,* 437

F.3d 424, 431 (4th Cir.2006) (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786); *see also Md. Cas. Co.,* 137 F.3d at 783 (noting that "[a]ll *Daubert* demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable ... and helpful").

*Daubert* mentions specific factors to guide the court in making the overall reliability determinations that apply to expert evidence. These factors include (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *United States v. Crisp,* 324 F.3d 261, 266 (4th Cir.2003) (quoting *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

Despite these factors, "[t]he inquiry to be undertaken by the district court is 'a flexible one' focusing on the 'principles and methodology' employed by the expert, not on the conclusions reached." *Westberry,* 178 F.3d at 261 (quoting *Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786); *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ( "We agree with the Solicitor General that '[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' ") (citation omitted); *see also Crisp,* 324 F.3d at 266 (noting **\*517** "that testing of reliability should be flexible and that *Daubert's* five factors neither necessarily nor exclusively apply to every expert").

With respect to relevancy, *Daubert* further explains:

> Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. The consideration has been aptly described by Judge Becker as one of fit. Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... Rule 702's helpfulness standard requires a valid scientific connection to the

pertinent inquiry as a precondition to admissibility.

*Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786 (internal citations and quotation marks omitted).

Finally, in several of the instant *Daubert* motions, a specific scientific methodology comes into play, dealing with differential diagnoses or etiologies. "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry,* 178 F.3d at 262. The Fourth Circuit has stated that:

> A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.

*Id.* A reliable differential diagnosis passes scrutiny under *Daubert.* An unreliable differential diagnosis is another matter:

> A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. However, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." The alternative causes suggested by a defendant "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony," unless the expert can offer "no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause."

*Id.* at 265–66 (internal citations omitted).

 **[2]**   Ultimately, the district court has broad discretion in determining whether to admit or exclude expert testimony, and the "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Cooper,* 259 F.3d at 200 (quoting *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167).

[3] Before I review these motions, I begin by addressing three arguments that apply to many of the parties' *Daubert* objections. First, as I have maintained throughout these MDLs, I will not permit the parties to use experts to usurp the jury's fact-finding function by allowing an expert to testify as to a party's state of mind or on whether a party acted reasonably. *See, e.g., Huskey v. Ethicon, Inc.,* 29 F.Supp.3d 691, 702–03, 2:12–cv–05201, 2014 WL 3362264, at *3 (S.D.W.Va. July 8, 2014); *Lewis et al. v. Ethicon, Inc.,* 2:12–cv–4301, 2014 WL 186872, at *6, *21 (S.D.W.Va. Jan. 15, 2014); *In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611, 629 (S.D.W.Va.2013). Although an expert may testify about his or her review of internal **\*518** corporate documents solely for the purpose of explaining the basis for his or her opinions—assuming the opinions are otherwise admissible—a party's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury.

[4] Second, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006). I have diligently applied this rule to previous expert testimony, and I continue to adhere to it in this case. I will not parse the expert reports and depositions of each expert in relation to these same objections. I trust that able counsel in this matter will tailor expert testimony at trial accordingly.

Last, with respect to the arguments that certain experts' testimony is litigation driven, I note that an expert's formulation of his or her opinion for the purposes of litigation does not, by itself, justify that expert's exclusion. *See Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II* "), 43 F.3d 1311, 1317 (9th Cir.1995) ("That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture."). This concern, however, does have a role in applying *Daubert. See Hoffman v. Monsanto Co.,* No. 2:05–CV–00418, 2007 WL 2984692, at *3 (S.D.W.Va. Oct. 11, 2007) (considering in the *Daubert* analysis "[w]hether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" (quoting Fed.R.Evid. 702 advisory committee's note)). In sum, I will not exclude an expert on the sole basis that the opinion arose during litigation, so long as it is otherwise reliable. But I will consider the independence of an expert's testimony as evidence that his "research comports with the dictates of good science." *Daubert II,* 43 F.3d at 1317. Having addressed these universal objections, I now turn to BSC's *Daubert* motions.

### III. BSC's *Daubert* Motions

In this case, BSC seeks to limit or exclude certain opinion testimony of Dr. Michael Thomas Margolis; Dr. Richard W. Trepeta; Drs. Jimmy W. Mays and Samuel P. Gido; Dr. Peggy Pence; Dr. Thomas H. Barker; Dr. Donald R. Ostergard; Dr. Vladimir Iakovlev; Dr. Jerry Blaivas; Dr. Alison Vredenburgh; Dr. Bruce Allen Rosenzweig; Dr. Christopher Walker; and Dr. Abbas Shobeiri. BSC also seeks to preclude the plaintiffs' experts from opining on the alleged defects of polypropylene mid-urethral slings.

#### A. Motion to Exclude Plaintiffs' Experts' Opinion that Polypropylene Mid–Urethral Slings are Defective

[5] BSC moves to preclude any of plaintiffs' experts from opining that polypropylene mid-urethral slings are defective. BSC argues that this opinion should be excluded because it "has not been tested, is not based on published-peer-reviewed literature, and is not generally accepted in the relevant medical and scientific communities." (BSC's Mem. of Law in Support of its Mot. to Exclude Pls.' Experts' Op. That Polypropylene Mid–Urethral Slings Are Defective [Docket 228], at 2–3). The plaintiffs in *Sanchez* presented the same arguments. *See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at *4–5 (S.D.W.Va. September 29, 2014). I **ADOPT** my reasoning in *Sanchez:*

**\*519** Rule 702, by its plain terms, contemplates *Daubert* challenges directed at the opinions of *specific* experts, not the opinions of a collection of experts. While these experts may have come to similar conclusions, it is not the conclusions that the court must assess, but the reliability of the methods and procedures underpinning those conclusions. *Daubert,* 509 U.S. at 595 [113 S.Ct. 2786] ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Two experts may come to a similar conclusion, but one or both experts' methodology in reaching that conclusion may be unreliable. Rule 702 directs the court to determine

whether *an expert* is qualified, whether his or her opinions are the product of reliable methodology, and whether the opinions will be helpful to the jury. *See* Fed.R.Evid. 702. I can only conduct the required *Daubert* analysis on an individualized basis.

*Id.* at *5. Therefore, I **DENY** BSC's motion on the grounds explained in Sanchez.

### B. Motion to Exclude the Opinions and Testimony of Michael Thomas Margolis, M.D. [3], [4]

BSC moves to exclude the opinions and testimony of Michael Thomas Margolis, M.D. Dr. Margolis is a pelvic floor surgeon and urogynecologist. He seeks to offer several opinions regarding polypropylene mesh slings, alternative procedures, and complications associated with mesh products. BSC argues that Dr. Margolis's opinions are unreliable because he failed to consider scientific literature contrary to his opinions and failed to provide any scientific basis for other opinions. (*See* Def. BSC's Mem. of Law in Supp. of Its Mot. to Exclude the Ops. and Test. of Michael Thomas Margolis, M.D. ("BSC's Mem. re: Margolis") [Docket 238], at 2). BSC also contends that Dr. Margolis's specific causation opinions as to Ms. Tyree, Ms. Moore, and Ms. Campbell should be excluded because "he has not reliably applied his methodology to the facts of the cases" and did not perform a proper differential diagnosis. (*Id.*). In addition, BSC contends that Dr. Margolis's opinions "either (1) constitute legal opinions, (2) fall outside the scope of his expertise, or (3) consist of speculation regarding Boston Scientific's knowledge, intent and/or state of mind." (*Id.*). Finally, BSC argues that Dr. Margolis seeks to offer opinions that were not disclosed in his expert report. (*Id.*).

I have previously reviewed the opinion testimony of Dr. Margolis under *Daubert. See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at *10–19 (S.D.W.Va. Sept. 29, 2014). The parties in this case assert arguments on the admissibility of Dr. Margolis's expert opinion that I addressed in *Sanchez.* To the extent that there are **\*520** differences in fact or exhibits, the court does not find them sufficiently material to this case. Thus, I **ADOPT** my prior ruling on Dr. Margolis as follows and thereby **GRANT IN PART, DENY IN PART,** and **RESERVE IN PART** BSC's motion. I will address additional arguments raised by the parties in this case below.

### 1. BSC Argues That Dr. Margolis Failed to Consider Contrary Scientific Studies in Forming His Opinions

BSC argues that Dr. Margolis failed to consider scientific studies that were contrary to his opinions without a scientific basis for doing so.

**[6]** **[7]** An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead "selectively [chooses] his support from the scientific landscape." *In re Rezulin Products Liab. Litig.,* 369 F.Supp.2d 398, 425 (S.D.N.Y.2005) (quotations omitted). "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Id.; see also Abarca v. Franklin Cnty. Water Dist.,* 761 F.Supp.2d 1007, 1066 n. 60 (E.D.Cal.2011) ("A scientist might well pick data from many different sources to serve as circumstantial evidence for a particular hypothesis, but a reliable expert would not ignore contrary data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." (quotations omitted)); *Rimbert v. Eli Lilly & Co.,* CIV 06–0874 JCH/ LFG, 2009 WL 2208570, at *14 n. 19 (D.N.M. July 21, 2009) *aff'd,* 647 F.3d 1247 (10th Cir.2011) ("[A]n expert who chooses to completely ignore significant contrary epidemiological evidence in favor of focusing solely on non-epidemiological studies that support her conclusion engages in a methodology that courts find unreliable.").

#### a. Opinion that Polypropylene Mid–Urethral Slings Are Not Safe and Effective for SUI

**[8]** First, BSC contends that Dr. Margolis's opinion that polypropylene mid-urethral slings are not safe and effective for the treatment of SUI is unreliable because he ignored peer-reviewed literature indicating otherwise. I addressed this argument in *Sanchez:*

BSC's argument focuses on Dr. Margolis's testimony regarding the *Nilsson* seventeen-year follow-up study, which supports the conclusion that polypropylene slings are safe and effective. (*See* Margolis Dep. [Docket 132–2], at 193:5–20). Dr. Margolis rejected the *Nilsson* study without explaining a scientific basis for doing so. Instead, he merely indicated that he had "serious

questions about the bias, the potential for bias and also the—the data in this article" but would not elaborate further:

Q: You believe that this particular study is—is not reliable; is that your opinion?

A: I question the reliability.

Q: And you won't tell me why?

A: I question it, and that's all I can say.

...

Q: So what you're telling the judge is I am dismissing this paper and not considering it reliable, but I'm not going to tell you why?

A: Sure. I don't have to tell you why I don't consider something to be authoritative. I mean, I don't consider that to be a valid study. I have concerns about it. I have a right to hold that opinion. And I do hold that opinion.

**\*521** Q: All right. Are there and—

A: I don't consider it authoritative and I consider it potentially flawed and potentially biased. That's my opinion. Right or wrong, that's my opinion.

(*Id.* at 196:1–3, 16–20; 199:10–22).

*Sanchez,* 2014 WL 4851989, at \*12. I **ADOPT** this reasoning here and find his method to be unreliable. Therefore, this opinion is **EXCLUDED.**

### b. Opinion Regarding the Complication Rates of Pain in Women with Polypropylene Mesh and Slings

 **[9]**   BSC also argues that Dr. Margolis did not consider contrary studies showing lower complication rates of pain in women with polypropylene slings. In *Sanchez,* I cited to Dr. Margolis's deposition testimony, which reveals that he gives no scientific basis for disagreeing with these studies:

Q: Would you agree that there are studies that show that the rates of pain with polypropylene slings are in the low single digits?

...

A: I—there are studies.

Q: And do you discount those studies?

A: I disagree with those studies.

Q: And why?

A: Because that's not what I have seen, read, studied, observed, and that's not biologically plausible.

( [Margolis Dep. [Docket 132–2],] at 239:2–13). Without further explanation for his disagreement with these studies, Dr. Margolis's method is unreliable.

*Sanchez,* 2014 WL 4851989, at \*13. I **ADOPT** this reasoning here. His opinion is **EXCLUDED.**

### c. Opinions Regarding General Complication Rates in Women with Polypropylene Mesh

 **[10]**    **[11]**   BSC also challenges Dr. Margolis's general opinions regarding high complication rates in women with polypropylene mesh products. In *Sanchez,* I cited to Dr. Margolis's deposition testimony, where he explains his belief that studies indicating low single digit complication rates are not accurate because complications are underreported and data is possibly fabricated. *See Sanchez,* 2014 WL 4851989, at \*13. I also find that Dr. Margolis's method of "[g]iv[ing] the benefit of the doubt to the patient" is unreliable:

Dr. Margolis explains that, when forming his opinion about the complication rates of a medical procedure, he "give[s] the benefit of the doubt to the patient." ( [Margolis Dep. [Docket 132–2],] at 259:7–9). In other words, he "assume[s] the worst-case scenario" and errs on the side of opining as to a higher complication rate to better protect a patient. (*Id.* at 259:11–259:23). Dr. Margolis eventually admits that he has been evaluating the literature and forming his opinions for this case according to that principle as well. (*See id.* at 259:20–260:14). "[G]iv[ing] the benefit of the doubt to the patient" is not a scientific basis for determining the complication rates associated with a mesh device. (*Id.* at 259:8–9).

*Sanchez,* 2014 WL 4851989, at \*14. I **ADOPT** this reasoning here. Dr. Margolis's opinions as to this matter are **EXCLUDED.**

## 2. BSC Argues that Dr. Margolis Failed to Provide Any Scientific Basis For His Other Opinions

BSC next argues that Dr. Margolis failed to offer any scientific basis for his **\*522** other opinions and based them solely on his experience.

### a. Opinion Concerning the Lack of Sound Scientific Evidence Supporting the Clinical Benefits of Polypropylene Mesh in SUI

BSC challenges the reliability of Dr. Margolis's opinions concerning a lack of sound scientific evidence supporting the use of polypropylene mesh in treating SUI. (*See* BSC's Mem. re: Margolis [Docket 238], at 10–11). BSC points to Dr. Margolis's deposition testimony where he admits that there, in fact, are studies supporting the use of polypropylene in SUI. I addressed this argument in *Sanchez:*

> Inconsistent statements of a witness may be addressed on cross-examination. *See Daubert,* 509 U.S. at 596 [113 S.Ct. 2786] ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) ("[E]valuating the reliability of scientific methodologies and data does not generally involve assessing the *truthfulness* of the expert witnesses ..."). However, here, Dr. Margolis's inconsistencies seem to directly shed light on the unreliability of his method. Even if Dr. Margolis is stating that there is a lack of *credible* evidence, as the plaintiffs argue, it is still unclear why Dr. Margolis believes these studies lack credibility. As a result, Dr. Margolis's opinions are rendered untrustworthy and unreliable.

*Sanchez,* 2014 WL 4851989, at *14. I **ADOPT** this reasoning here. Therefore, his opinions as to this matter are **EXCLUDED.**

### b. Opinion that the Burch Procedure is More Effective than Polypropylene Mesh Slings

**[12]** BSC challenges Dr. Margolis's opinion that the Burch procedure is more effective than polypropylene slings. BSC argues that this opinion is unreliable because Dr. Margolis could not identify direct comparison studies of the Burch procedure and the use of slings in his deposition. (*See* BSC's Mem. re: Margolis [Docket 238], at 11). In *Sanchez,* I nevertheless found his opinion to be reliable because his opinion was founded in scientific literature:

> Dr. Margolis cited in his report several scientific, peer-reviewed sources showing that the Burch procedure has high success rates. (*See* Margolis Report [Docket 58–1], at 9 n. 6 (citing J.W. Ross, *Post Hysterectomy Total Vaginal Vault Prolapse Repaired Laparoscopically.*)) Presented at 2nd World Symposium on Laparoscopic Hysterectomy, American Association of Gynecologic Laparoscopists, New Orleans, LA (Apr. 7–9, 1995) (reporting 93% success rate for laparoscopic Burch and 90% for open Burch in the treatment of SUI); Romano S. Bustan et al., *Burch Laparoscopic Procedure for Repairing Proven Stress Incontinence—Report of 32 Cases,* Harefuah 139 (9–10), 350–2, 407 (2000) (reporting 97% cure rate); E.G. Jacome et al., *Laparoscopic Burch Urethropexy in a Private Clinical Practice,* J. Am. Assoc. Gynecol. Laparosc. 6(1): 39–44 (1999) (reporting cure rate of 94% for laparoscopic Burch); R.D. Moore et al., *Laparoscopic Burch Colposuspension for Recurrent Stress Urinary Incontinence,* Jourdan of the Am. Assoc. of Gyneco. Laparasc. 8, no. 8:389–92 (2001) (reporting 90% objective cure rate in patients having repeat Burch procedure laparoscopically); Todd R. Jenkins and C.Y. Liu, *Laparoscopic Burch Colposuspension* **\*523** , 4 Current Opinion in Obstetrics & Gynec.

314, 314–18 (2007) (literature review noting a finding of cure rates between 76% to 95% for laparoscopic Burch procedures). In addition, Dr. Margolis testified that the Burch procedure success rates reported in the data are higher than the rates for the polypropylene sling. (*See* Margolis Dep. [Docket 132–1], at 136:12–16).

*Sanchez,* 2014 WL 4851989, at *15. I **ADOPT** this reasoning here and find his opinion reliable.

[13] Also, unlike my ruling in *Sanchez,* I find Dr. Margolis's opinion relevant in this case. *Sanchez* dealt with the Pinnacle device for the treatment of POP, and, since Dr. Margolis opined about the Burch procedure and polypropylene mesh slings in the treatment of SUI, I found that his opinion was irrelevant to Ms. Sanchez's claims. (*See id.*). However, the product at issue in this case is the Obtryx, which is a sling that treats SUI. As a result, Dr. Margolis's opinion that the Burch procedure is more effective than polypropylene mesh slings is relevant here. Therefore, I **DENY** BSC's motion with respect to this matter.

### c. Opinion that Xenform Slings are More Effective than Polypropylene Slings

[14] BSC challenges Dr. Margolis's opinion that Xenform slings are more effective than polypropylene slings in the treatment of SUI. BSC's argument focuses on Dr. Margolis's comparison of the different complication rates associated with Xenform slings versus polypropylene slings and his failure to identify studies involving Xenform slings. (*See* BSC's Mem. re: Margolis [Docket 238], at 12). I addressed these arguments in *Sanchez:*

Although Dr. Margolis has experience in this area, his method of comparing the complication rates of Xenform and polypropylene slings is problematic. In his deposition, Dr. Margolis explained that the 4% complication rate for Xenform slings is, in fact, "the complication rate that I understand all surgeons have when they take any patient into an operating room, whether it's vaginal surgery, abdominal surgery, bladder surgery, brain surgery, or toe surgery." (Margolis Dep., [Docket 132–1], at

122:18–24). His reasoning as to why Xenform has a lower complication rate than polypropylene slings is simply because Xenform uses no polypropylene mesh and, thus, has no mesh-related complications. (*See id.* at 123:22–124:11). This logic is not scientific. Dr. Margolis's conclusion that Xenform does not have mesh-related complications because it is not made from mesh could be reached by a jury without expert testimony.

Moreover, Dr. Margolis cannot cite a single study involving use of Xenform slings to treat SUI. When asked if he could point to a study, Dr. Margolis responded "I am not prepared to present any studies to you today. I don't know any off the top of my head." (*Id.* at 133:14–19). When asked if he had seen any studies, Dr. Margolis testified "I'm sure I have. I don't have any names for you today." (*Id.* at 133:20–24). Without a scientific basis, Dr. Margolis's method is unreliable.

*Sanchez,* 2014 WL 4851989, at *16. I **ADOPT** this reasoning here. Therefore, his opinion regarding Xenform slings is **EXCLUDED.**

### d. Opinion that the Infection Rate of Polypropylene Mesh is Up to 100%

[15] BSC next challenges Dr. Margolis's opinion that the infection rate of polypropylene mesh is up to 100%. (*See* BSC's **\*524** Mem. re: Margolis [Docket 238], at 12). As in *Sanchez,* BSC points to a slide presentation that Dr. Margolis has given which cites a study finding infection rates of 0% to 8%. (*See id.*). I addressed this issue in *Sanchez:*

Dr. Margolis's inconsistent presentation does not automatically render his method unreliable. In his report, Dr. Margolis does cite to scientific studies to support his opinion. (*See* Margolis Report [Docket 58–1], at 16) (describing the *Vollebregt* study finding 83.6% of implants contained bacteria during surgical implantation, the *Boulanger* study finding 100% of mesh explants removed in the study due to complications contain bacteria, the *Shah* and *Badlani* study finding infection in mesh patients).

However, as BSC points out, the study which Dr. Margolis cites to support his 100% figure is not directly applicable. The *Boulanger* study did not find that 100%

of the mesh systems explanted for the study were infected; the study found that 100% of the mesh systems were contaminated with bacteria. (*See* Margolis Report [Docket 58–1], at 16; Boulanger et al., *Bacteriological Analysis of Meshes Removed for Complications After Surgical Management of Urinary Incontinence or Pelvic Organ Prolapse,* 19 Int'l Urogynecol J. 827, 827 (2008) [Docket 58–5] ). The authors of the *Boulanger* study are not certain that bacteria contamination leads to infection. (*See* Boulanger, *supra,* at 827, 830) (stating that the "exact role" of bacterial contamination "is not yet clear" and "must be explored by other experimental studies"). They even write that "[i]nfection is a rare complication of retropubic mid-urethral slings (0.7% of cases)" and that their "findings concur with previously published data" on this subject. (Boulanger, *supra,* at 830).

The *Boulanger* study does not support the opinion that there is a 100% infection rate in women who undergo mesh implantation surgery. Therefore, Dr. Margolis's methodology of basing his opinion on this study is unreliable.

*Sanchez,* 2014 WL 4851989, at *17. I **ADOPT** this reasoning here. Therefore, his opinion as to this matter is **EXCLUDED.**

### *e. Opinion that the Complication Rate of Urethral Obstruction is Greater than Ten Percent with Polyproylene Mid–Urethral Slings*

**[16]** BSC challenges Dr. Margolis's opinion that the complication rate of urethral obstruction is greater than ten percent. (*See* BSC's Mem. re: Margolis [Docket 238], at 13). As in *Sanchez,* BSC supports its argument by quoting Dr. Margolis's deposition testimony:

Q: ... [A]re you offering an opinion as to how frequently shrinkage of a polypropylene midurethral sling chokes off the vagina as a result of shrinkage?

A: Yes.

Q: How often?

A: Greater than ten percent.

Q: And is there a study that you're relying upon for that?

A: I'm looking. And I'm not finding it right now. So I don't have a study for you at this time.

(Margolis Dep. [Docket 237–3], at 262:6–16). The plaintiffs in *Sanchez* did not respond to this argument, and I found this opinion to be unreliable. *See Sanchez,* 2014 WL 4851989, at *17. In this case, the plaintiffs in response cite to Dr. Margolis's deposition testimony regarding mesh shrinkage and studies concerning mesh shrinkage to demonstrate that Dr. Margolis's opinion is, in fact, reliable. (*See* Pls.' **\*525** Resp. in Opp'n to BSC's Mot. to Exclude the Opinions & Testimony of Michael Thomas Margolis, M.D. ("Pls. Resp. re: Margolis") [Docket 283], at 13–15).

However, the deposition testimony cited by the plaintiffs does not provide scientific support for Dr. Margolis's opinion. It only references studies that report a variety of mesh shrinkage rates, without any support for his opinion that slings cause urethral obstruction in 10% of the cases. (*See id.*). For the reasons stated above and in *Sanchez,* I find Dr. Margolis's opinion on this matter to be unreliable and, therefore, **EXCLUDED.**

### *f. Opinion on the Percentage or Number of BSC Products Dr. Margolis Has Removed*

**[17]** BSC challenges Dr. Margolis's opinion on the percentage or number of BSC products that he has removed. (*See* BSC's Mem. re: Margolis [Docket 238], at 13). I agreed with BSC in *Sanchez* on this point:

Dr. Margolis testified that he has removed approximately 300 polypropylene mesh and sling products "throughout the last 15 or so years" and gives his "best guess" that 10% to 15% of those were Boston Scientific. (Margolis Dep. [Docket 132–1], at 74:23–76:1). Dr. Margolis explained that "[t]he exact numbers of each [product] I don't keep track of." (*Id.* at 74:11–19). When asked how he arrived at that 10% to 15% figure for Boston Scientific products, Dr. Margolis testified that these percentages are just to his "best recollection":

Q: Have you tried to do a system—did you go back and try to do some kind of systematic count, or are you just doing that from recollection in terms of the percentage of Boston Scientific products?

A: Best recollection.

(*Id.* at 76:13–18). Dr. Margolis testified that he cannot identify the mesh brand by sight after explantation, and he "tr[ies] to get the operative records from the implant" with the product manufacturing information but does not know how often he receives these records for his patients. (*Id.* at 76:2–9, 77:14–78:2).

As a result, BSC argues that Dr. Margolis's opinion as to the number or percentage of BSC products he has removed is unreliable ...

Without a reliable basis, Dr. Margolis's opinions may be erroneous. *See Lewis, et al. v. Ethicon, Inc.,* 2:12–cv–4301, 2014 WL 186872, at *8 (S.D.W.Va. Jan. 15, 2014) (excluding expert's "analyses of the mesh implants" because they were not "controlled for error or bias"). Therefore, his opinions are **EXCLUDED.**

*Sanchez,* 2014 WL 4851989, at *18. I **ADOPT** this reasoning here. His opinions as to this matter are **EXCLUDED.**

### g. Plaintiffs' Argument Regarding the Daubert Analysis of Dr. Margolis in Lewis

The plaintiffs in this case make an additional argument regarding Dr. Margolis's expert opinions. The plaintiffs contend that "this Court has already decided that Dr. Margolis' methodology and qualifications are sufficient to defeat challenges under *Daubert* and Rule 702" in *Lewis* and that, therefore, his testimony should be admitted in this case. (*See* Pls. Resp. re: Margolis [Docket 283], at 6 (citing *Lewis v. Ethicon, Inc.,* No. 2:12–cv–04301, 2014 WL 186872, at *15–17) (S.D.W.Va. Jan. 15, 2014)).

However, *Lewis* was a different case involving a different plaintiff, a different defendant, and a different product. Also, in *Lewis,* Dr. Margolis submitted a different expert report which included expert **\*526** opinions specific to the plaintiff in *Lewis.* As a result, I reject this argument.

### h. Plaintiffs' Argument Regarding Dr. Margolis's Experience and Kumho Tire

Next, the plaintiffs in this case make an additional argument in response to BSC's contention that Dr. Margolis failed to provide any scientific basis for some of his opinions. (BSC's Mem. re: Margolis [Docket 238], at 2). The plaintiffs argue that Dr. Margolis's experience alone is enough basis for his opinions. Several times, the plaintiffs quote the Supreme Court in *Kumho Tire* stating "an expert might draw a conclusion from ... extensive and specialized experience." (Pls. Resp. re: Margolis [Docket 283], at 2, 9, 12, 14, 16 (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999))).

However, "[p]roposed testimony must be supported by appropriate validation—*i.e.,* 'good grounds' based on what is known." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786. Dr. Margolis writes that he "considered the scientific literature" in forming his opinions, (*see* Margolis Report [Docket 237–1], at 5), yet, as I discuss in *Sanchez,* he is unable to provide scientific support for some of his opinions. *See Sanchez,* 2014 WL 4851989, at *14–18. Even though Dr. Margolis has experience, he must still base his opinions on a reliable, scientific method. (*See Daubert,* 509 U.S. at 590, 113 S.Ct. 2786 ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.")). The plaintiffs' argument is unavailing.

### 3. Specific Causation Opinions as to Ms. Campbell, Ms. Moore, and Ms. Tyree

BSC argues that Dr. Margolis's specific causation opinions as to Ms. Campbell, Ms. Moore, and Ms. Tyree should be excluded as unreliable. In particular, BSC makes the following arguments: (1) Dr. Margolis's specific causation opinions should be excluded because his general causation opinions are unreliable; (2) Dr. Margolis did not perform a proper differential diagnosis in regards to Ms. Campbell, Ms. Moore, and Ms. Tyree; (3) Dr. Margolis inconsistently applied his methodology in evaluating the plaintiffs; and (4) Dr. Margolis's opinions regarding the plaintiffs' complications are unreliable. (BSC's Mem. re: Margolis [Docket 238], at 14–18).

Ms. Moore is no longer a plaintiff in this case. Therefore, BSC's motion as to Dr. Margolis's opinions related to Ms. Moore is **DENIED AS MOOT.** As in *Sanchez,* I

Case 2:12-md-02327   Document 9075-1   Filed 01/10/20   Page 185 of 924 PageID #: 212902

Tyree v. Boston Scientific Corp., 54 F.Supp.3d 501 (2014)   Case 2:12-md-02327   Document 5319-1   Filed 03/13/19   Page 25 of 924 PageID #: 117990

**RESERVE** my ruling on Dr. Margolis's remaining specific causation opinions until trial.

### 4. BSC Argues that Dr. Margolis Offers Opinions Outside of His Area of Expertise

BSC argues that several of Dr. Margolis's opinions should be excluded because they are outside his area of expertise. (*See* BSC Mem. re: Margolis [Docket 238], at 19). In particular, BSC challenges Dr. Margolis's opinions as to: "biomaterials, adequate pore size, adequate weight of polypropylene, polypropylene degradation, biocompatibility of polypropylene, medical device design and development, and marketing." (*Id.* (internal citations omitted)). As in *Sanchez,* the plaintiffs conceded that Dr. Margolis will not be offering these opinions at trial. (*See* Pls.' Resp. re: Margolis [Docket 283], at 19). Therefore, this aspect of BSC's motion is **DENIED AS MOOT.**

### 5. Impermissible Expert Opinions As To BSC's State of Mind

BSC also argues that Dr. Margolis seeks to offer testimony as to BSC's state of mind, knowledge, and intent during product **\*527** development. As I explained in *Sanchez,* expert testimony about a defendant company's state of mind is impermissible. In *Lewis,* I excluded state of mind testimony of Dr. Margolis because "he is not qualified ... to opine on Ethicon's state of mind or knowledge." *Lewis,* 2014 WL 186872, at \*15. The plaintiffs concede that Dr. Margolis will not be offering these opinions at trial. (*See* Pls.' Resp. re: Margolis [Docket 283], at 19). Therefore, this aspect of BSC's motion is **DENIED AS MOOT.**

### 6. Opinions Offered by Dr. Margolis That Were Not Disclosed in His Expert Report

 [18]   BSC argues that "Dr. Margolis testified to numerous opinions during his most recent depositions that he did not disclose in his Rule 26 expert report." (BSC's Mem. re: Margolis [Docket 238], at 20). However, BSC only points to his opinion on banding and his opinion that Ms. Campbell has chronic pelvic pain. (*See id.*) "Under Rule 26, expert reports must contain 'a complete statement of all opinions the witness will express and the basis and

reasons for them.' " *Lewis,* No. 2:12–cv–4301, 2014 WL 186872, at \*17 (citing Fed.R.Civ.P. 26(a)(2)(B)(i)).

In regards to banding, Dr. Margolis does mention banding in his case-specific report for Ms. Tyree. (*See History and Physical re: Jacquelyn Tyree* in Margolis Report [Docket 237–1], at App. D). Therefore, although I reserve my ruling on Dr. Margolis's remaining specific causation opinions until trial, I **FIND** that his banding opinions as to Ms. Tyree should not be excluded under BSC's Rule 26 reasoning here.

However, Dr. Margolis admits that he did not include in his report his opinion that Ms. Campbell has chronic pelvic pain:

> Q: In Ms. Tyree's case, you stated in your impression/ plan that she had chronic pelvic pain. You make no such reference here. Does that mean that you—your opinion is that in Ms. Campbell's case, she does not have chronic pelvic pain related to her sling?
>
> A: No.
>
> Q: Why did you not include it?
>
> A: Error on my part. Failure to include that in there. It was a typo. My mistake.

(Margolis Dep. II [Docket 237–5], at 255:4–16) (objections omitted). However, according to Dr. Margolis's report on Ms. Campbell, her vaginal exam revealed that, "Palpation of the obturator foramen bilaterally through the vaginal wall does reproduce her pain." (*See History and Physical re: Carol Campbell* in Margolis Report [Docket 237–1], at App. D). Although I reserve my ruling on Dr. Margolis's remaining specific causation opinions until trial, I **FIND** that his opinion that Ms. Campbell has chronic pelvic pain should not be excluded under BSC's Rule 26 argument.

Therefore, for the reasons stated above and in *Sanchez,* I **GRANT IN PART** and **DENY IN PART** and **RESERVE IN PART** BSC's Motion to Exclude the Opinions and Testimony of Michael Thomas Margolis, M.D. *See Sanchez,* 2014 WL 4851989, at \*10–19.

### C. Motion to Exclude the Opinions and Testimony of Richard W. Trepeta, M.D.

In this case, the plaintiffs offer Dr. Trepeta to testify as an expert witness on the general pathology of vaginal

mesh implantation (*see generally* Trepeta General Report [Docket 235–1] ) and on the specific pathology of Plaintiff Jeanie Blankenship (*see generally* Trepeta Specific Report [Docket 235–2] ). Among other things, Dr. **\*528** Trepeta is a board-certified pathologist and a Fellow with the College of American Pathologists and the International Society for the Study of Vulvovaginal Disease. As part of his fellowship, he "establishes criteria and terminology for the diagnosis of vulvar and vaginal diseases." (Trepeta General Report [Docket 235–1], at 2). Dr. Trepeta also examines vulvar-vaginal pathology samples through his private practice. (*See id.*). BSC moves to exclude Dr. Trepeta as an expert witness, raising two primary objections: (1) Dr. Trepeta is not qualified to opine on the properties of polypropylene mesh or the clinical responses to mesh implants; and (2) Dr. Trepeta's opinions are unreliable, irrelevant, and not helpful to the jury. (*See generally* BSC's Mem. in Supp. of its Mot. to Exclude Richard W. Trepeta ("BSC's Mem. re: Trepeta") [Docket 236] ). As further explained below, I **GRANT In PART** and **DENY IN PART** BSC's Motion to Exclude Dr. Trepeta [Docket 235].

### 1. Dr. Trepeta's Qualifications

BSC begins by contending that Dr. Trepeta's background in pathology does not qualify him under Federal Rule of Evidence 702 to render the opinions he sets forth in his expert reports on the properties of polypropylene and the human clinical response to polypropylene implants.

#### a. Properties of Polypropylene Mesh

[19]   In his general report, Dr. Trepeta opines about mesh degradation, mesh contraction, and mesh migration. He states that "[d]egradation occurs as either fragmentation of the mesh or oxidation [of the mesh] release[s] chemical components from the mesh into surrounding tissues," and "[m]esh contraction and shrinkage cause the mesh to be significantly decreased in its physical size." (Trepeta General Report [Docket 235–1], at 5). BSC asserts that Dr. Trepeta is not qualified to put forth these opinions because he is not a material scientist, biochemist, or biomedical engineer. (*See* Trepeta Dep. [Docket 235–3], at 100:20–101:1). Furthermore, he has no training in polymer science or biomedical engineering and has

not performed mechanical or chemical testing of mesh products. (*See id.* at 100:2–11).

In *Sanchez, et al. v. Boston Scientific Corp.,* I assessed this argument and disagreed with BSC:

> In making [its] argument, however, BSC downplays Dr. Trepeta's knowledge, training, and experience as a clinical pathologist. In general, a clinical pathologist "will be knowledgeable in the areas of chemistry, hematology, microbiology, ... serology, immunology, and other special laboratory studies." 33 Am.Jur. *Trials* § 17 (1986); *see also* Coll. of Am. Pathologists, *CAP Fact Sheet,* http://www.cap.org (last visited Sept. 22, 2014) ("[Clinical pathologists] are involved in a broad range of disciplines, including surgical pathology, cytopathology, ... clinical chemistry, microbiology, immunopathology, and hematology."). Dr. Trepeta's thirty years' experience as a clinical pathologist therefore demonstrates sufficient knowledge to provide expert testimony about the chemistry and surgical pathology of materials like transvaginal mesh. Moreover, Dr. Trepeta has knowledge of and experience with pelvic mesh explants in particular, having examined fifty explant samples over the past five years. (*See* Trepeta General Report [Docket 86–1], at 2). According to Dr. Trepeta, by examining the mesh explants under a microscope, he has witnessed the polypropylene's chemical changes. (*See* Trepeta Dep. [Docket 110–3], at 217:14–19). Given Dr. Trepeta's knowledge and experience **\*529** as an anatomical and clinical pathologist, I **FIND** that he is qualified to testify about mesh degradation, mesh shrinkage, and mesh migration, and I therefore **DENY** BSC's motion in this respect.

No. 2:12–cv–05762, 2014 WL 4851989, at *20 (S.D.W.Va. Sept. 29, 2014). I **ADOPT** this holding here.

#### b. The Human Clinical Response to Polypropylene Mesh

[20]   Dr. Trepeta also opines that the "human body's pathological response to implantation of polypropylene mesh as well as the inherent physical properties of the mesh cause permanent injuries resulting in distortion of the pelvic architecture, sexual dysfunction, persistent pain, scarring, and alteration of bowel and bladder function." (Trepeta General Report [Docket 235–1], at 6). BSC contends that Dr. Trepeta is not qualified to

present this opinion because Dr. Trepeta does not treat patients for these conditions and has limited familiarity with the symptoms of stress urinary incontinence and pelvic organ prolapse. (*See* Trepeta Dep. [Docket 235–3], at 109:21–23). In short, BSC argues that Dr. Trepeta is not a gynecologist, obstetrician, urogynecologist, or a surgeon, and as a result, Dr. Trepeta's opinions about the clinical response to mesh should be excluded.

In *Sanchez,* I addressed this argument and held:

> Dr. Trepeta's extensive experience and knowledge in the field of pathology qualify him to submit these opinions. Part of pathology involves reaching a diagnosis through "clinical and pathologic correlation." [ (*See* Trepeta Dep. [Docket 86–3], at 11:10–14) ]. Dr. Trepeta frequently engages in this process by providing clinical consultations to physicians, which require him to examine clinical information (through specimens, reports, or physician findings) and reach a pathologic diagnosis about a patient. (*See id.*). Dr. Trepeta applied this pathologic process in reaching his conclusions about the human clinical responses to polypropylene vaginal mesh. He examined fifty pathology samples from mesh removals and opines that he observed injuries "consistent with the pathological process of tissue response and/or injury due to polypropylene." (Trepeta General Report [Docket 86–1], at 2). He also compared medical literature to these observations and concluded that his pathological findings "are well described in the published literature." (*Id.*). Dr. Trepeta's understanding and application of the pathologic process qualify him to opine on the causal relationship between transvaginal mesh implantation and tissue response. Therefore, I **DENY** BSC's motion on this point.

2014 WL 4851989, at *20 (footnote omitted). I **ADOPT** this holding here.

### 2. The Reliability and Relevance of Dr. Trepeta's Opinions

Next, BSC raises several objections to the reliability and relevancy of Dr. Trepeta's opinion testimony. I addressed each of these objections in *Sanchez* and consequently rely on *Sanchez* to explicate my conclusions here.

#### a. Reliability of Dr. Trepeta's Methodology in Formulating His Opinions

**[21]** BSC contends that Dr. Trepeta's method of using pathology reports to formulate his opinions is unreliable. Dr. Trepeta used various resources to reach his expert opinion. First, Dr. Trepeta has studied over fifty mesh explant samples in his private practice. Dr. Trepeta received these samples from physicians about once **\*530** a month over the past five years. (Trepeta Dep. [Docket 235–3], at 61:10–12). He examined these samples under a microscope, identified any abnormalities, and concluded that the samples presented injuries "consistent with the pathological process of tissue response and/or injury due to polypropylene." (Trepeta General Report [Docket 235–1], at 2). Second, Dr. Trepeta studied the medical literature on mesh implantation and determined that his pathological findings correspond with the published research on mesh erosion and exposure in the vaginal wall. (*Id.* at 2–3). Third, Dr. Trepeta reviewed twenty-four pathology reports that he received from the plaintiffs' counsel and ascertained that "the pathology reports of excised Boston Scientific Products ... are consistent" with the acute, sub-acute, and chronic categories of the disease process. (*Id.* at 4).

As I held in *Sanchez:*

> BSC's strongest objection to Dr. Trepeta's methodology focuses on this third source of information. BSC argues that the twenty-four pathology reports were unreliable because: they were "hand-selected by Plaintiffs' counsel"; Dr. Trepeta only relied on seventeen of the twenty-four reports; and Dr. Trepeta did not review the medical records of any of the probed patients. (BSC's Mem. re: Trepeta [Docket 235], at 11–12). The plaintiffs respond that these pathology reports only supplemented Dr. Trepeta's opinion and that the main thrust of Dr. Trepeta's opinion comes from his review of fifty mesh explants over the past five years and from his study of medical literature. Moreover, the plaintiffs argue that BSC's chosen expert, Dr. Badylak, agreed that review of pathology reports of vaginal tissue taken from polypropylene explants is an accepted method for reaching a pathologic conclusion on tissue response to polypropylene. (*See* Pls.' Resp. in Opp. to Def.'s Mot. to Exclude Dr. Trepeta [Docket 110], at 13).

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 188 of 924 PageID #: 212995
*Tyree v. Boston Scientific Corp.*, 54 F.Supp.3d 501 (2014)
Case 2:12-md-02327 Document 9075-1 Filed 09/13/19 Page 29 of 924 PageID #: 147995

The fact that each side's pathologist accepts this practice suggests that it is accepted by the general community of pathologists. *See Daubert,* 509 U.S. at 594 [113 S.Ct. 2786] ("Widespread acceptance can be an important factor in ruling particular evidence admissible...."). But Dr. Trepeta's review of the pathology reports still has a fatal deficiency in that it lacked standards to govern the process of selecting the sample of pathology reports to be evaluated. *See id.* (listing as a factor in evaluating an expert's opinion the "existence and maintenance of standards controlling the technique's operation"). The plaintiffs do not explain how or why they chose these twenty-four reports for Dr. Trepeta's review, and without such an explanation, I have no way of assessing the potential rate of error or the presence of bias. *See id.* (stating that the "court ordinarily should consider the potential rate of error"). I confronted a similar situation in *Lewis, et al. v. Ethicon, Inc.* and excluded the expert opinion on hand-selected ex plant samples because "[t]here are no assurances that [plaintiffs' counsel] did not opportunistically choose samples while ignoring others that might have weakened or disproved [the expert's] theories." No. 2:12–cv–4301, 2014 WL 186872, at *8 (S.D.W.Va. Jan. 15, 2014). Here, I similarly have no way to ensure that the plaintiffs' counsel did not provide Dr. Trepeta with only those pathology reports that tended to strengthen, rather than refute, Dr. Trepeta's opinions. Accordingly, Dr. Trepeta's opinions derived from his review of the twenty-four pathology reports are **EXCLUDED.**

2014 WL 4851989, at *22. I **ADOPT** this holding, accepting Dr. Trepeta's opinions ***531** as reliable apart from those opinions based on his review of the twenty-four pathology reports.

### b. Litigation Driven Opinions

[22] BSC also argues Dr. Trepeta's opinions are unreliable because they are litigation-driven. Specifically, BSC asserts that Dr. Trepeta's "familiarity with the literature on polypropylene mesh comes only from his research and reading in connection with this litigation." (BSC's Mem. re: Trepeta [Docket 236], at 10). As in *Sanchez,* I disagree. Dr. Trepeta has largely based his opinions on his professional experience with mesh pathology samples examined during his practice. (Trepeta Report [Docket 235–1], at 2). In addition, he testified

that he has "looked at mesh removed from the bodies of female vaginal walls under the microscope" and has seen degradation. (Trepeta Dep. [Docket 280–3], at 216:14–19). These activities occurred outside of this litigation. Thus, I **FIND** that Dr. Trepeta's opinions are not litigation-driven and **DENY** BSC's motion on this point.

### c. Dr. Trepeta's Specific Causation Opinion

[23] Dr. Trepeta also offers a specific causation opinion concerning Ms. Blankenship. Dr. Trepeta opines that Ms. Blankenship's

> symptoms of pain, infection, dyspareunia, voiding dysfunction and resulting diagnoses, and her medical treatment for urinary complications and pelvic pain complications are all directly attributable to the implantation of polypropylene surgical mesh in the Obtryx Trans–Obturator Tape surgical kit implanted April 8, 2009.... My personal experience as a pathologist with special training and focus on pathology of the vagina, as well as my knowledge and training, also evidences the known complications directly attributable to the pathological tissue response to a polypropylene implant such as [that] implanted in Ms. Blankenship.

(Trepeta Specific Report [Docket 235–2], at 4). Dr. Trepeta adds that the complications associated with the human body's pathologic response to the implantation of polypropylene mesh were present in Ms. Blankenship's medical records. (*Id.* at 5). BSC argues that Dr. Trepeta's specific causation opinion is unreliable because: (1) his general causation opinion is unreliable; (2) he is not qualified to determine medical causation; and (3) he failed to conduct a reliable differential diagnosis.

Apart from Dr. Trepeta's review of the twenty-four pathology reports, I concluded that Dr. Trepeta's general causation opinion was reliable. Therefore, BSC's first argument fails. BSC's second argument also lacks merit because, as I have explained previously, a pathologist's job is to determine medical causation. *See In re C.R.*

*Bard, Inc.,* 948 F.Supp.2d 589, 621 (S.D.W.Va.2013) ("Dr. Klosterhalfen's very job as a pathologist qualifies him to opine on [medical causation]."); *see also* Coll. of Am. Pathologists, *CAP Fact Sheet,* http://www.cap.org (last visited Oct. 17, 2014) ("[Clinical pathologists] are physicians who use laboratory medicine and technology to identify and diagnose disease."). While Dr. Trepeta admits that examining women to diagnose pelvic pain and dyspareunia would go beyond his expertise as a pathologist, (*see* Trepeta Dep. [Docket 235–4], at 17:7–13, 20:6–9), Dr. Trepeta's opinion in this case is not based on his examination of women. Rather, he reaches his opinion by "review[ing] pathology slides and [correlating] that with the patient's symptoms." (*Id.* at 16:18–20). (*See also* Trepeta Dep. [Docket 280–5], at 46:18–21 ("Pathology is all about explaining clinical findings through tissue examination.")). Indeed, **\*532** Dr. Trepeta applied this procedure in diagnosing Ms. Blankenship-he "personally reviewed three slides" belonging to Ms. Blankenship and observed reactions "typical of the reaction observed to polypropylene mesh." (Trepeta Report [Docket 235–2], at 4). In sum, as a pathologist, Dr. Trepeta is qualified to opine on medical causation based on his review of pathology slides.

BSC's final argument that Dr. Trepeta did not engage in a proper differential diagnosis presents a closer question. Dr. Trepeta admits that he did not "try to make a clinical diagnosis as to why Miss Blankenship was having pelvic pain and pain on intercourse prior to receiving her Obtryx sling." (Trepeta Dep. [Docket 235–4], at 45:17–20). On the other hand, he explains that the foreign material present in Ms. Blankenship's pathology slides is "consistent with the Obtryx sling" because "by process of elimination, the patient has not had any other synthetic material implanted in that site." (Trepeta Dep. [Docket 280–5], at 85:18–20). Reviewing Dr. Trepeta's report and deposition testimony as a whole, I find that Dr. Trepeta has based his opinion in large part on reliable pathology methods —he reviewed pathology slides, considered the possible causes for the inflammation, and came to a diagnostic conclusion. (*See* Trepeta Rep. [Docket 235–2], at 4 (concluding that Ms. Blankenship's tissue inflammation appeared consistent with typical polypropylene mesh reactions)). Challenges to the accuracy of the diagnostic conclusion are better suited for cross-examination. Thus, I **DENY** BSC's motion to exclude Dr. Trepeta's specific causation opinions. [5]

In conclusion, Dr. Trepeta's general causation opinions satisfy *Daubert,* apart from his opinions based on the pathologic reports selected by the plaintiffs' counsel for his review, which are **EXCLUDED.** Dr. Trepeta's specific causation opinions likewise meet the standards of *Daubert.* Accordingly, BSC's Motion to Exclude the Opinions and Testimony of Dr. Trepeta [Docket 235] is **GRANTED IN PART** and **DENIED IN PART.**

### D. Motion to Exclude the Opinions and Testimony of Jimmy W. Mays, Ph.D. and Samuel P. Gido, Ph.D.

BSC seeks to exclude the opinions of Dr. Jimmy W. Mays and Dr. Samuel P. Gido. Dr. Mays is a Distinguished Professor of Chemistry at the University of Tennessee, and Dr. Gido is an Associate Professor of Polymer Science and Engineering at the University of Massachusetts Amherst. (Mays & Gido Report [Docket 221–1], at 2, 4). Both have worked extensively in the area of polymer materials. Drs. Mays and Gido issued a joint expert report examining and assessing the polypropylene material mesh BSC used in the Obtryx product. (*Id.* at 5). In their report, Drs. Mays and Gido conclude that (1) polypropylene is susceptible to oxidation and degrades by **\*533** an oxidative mechanism in the body; (2) analysis of explanted BSC Obtryx mesh shows clear sign of oxidative degradation; and (3) the Obtryx is thus defective and not suitable to serve as a permanent implant. (*Id.*). The report states that Drs. Mays and Gido relied upon their training and experience, provided materials, and underlying data from the testing in forming their opinions. (*Id.*). However, as discussed below, the deposition testimony proves otherwise. The reasoning in *Sanchez* substantially reflects the court's view of these issues as presented in this case. To the extent that there are differences in fact and exhibits, the court does not find them sufficiently material. The *Sanchez* excerpts quoted throughout are to explicate the conclusions the court reaches below.

BSC argues that Drs. Mays and Gido's testing and the clinical conclusions drawn from that testing must be excluded because their testing is unreliable and their opinions are irrelevant. (BSC's Mem. of Law in Supp. of its Mot. to Exclude the Ops. & Test. of Jimmy W. Mays, Ph.D & Samuel P. Gido, Ph.D. ("BSC's Mem. re: Mays & Gido") [Docket 222], at 2). Additionally, BSC argues that Drs. Mays and Gido's opinions are unreliable because they are litigation driven, as well as a poor fit that would not be helpful to the jury. (*Id.*). Finally, the defendant

argues that some of the opinions offered by Drs. Mays and Gido should be excluded because they opine about BSC's state of mind and make inadmissible legal conclusions. (*Id.*).

### 1. Chemical & Microscopic Testing

#### a. Background

As BSC takes particular issue with Drs. Mays and Gido's testing of the Obtryx explants, I will briefly discuss their testing procedures and results. Drs. Mays and Gido received exemplars of Obtryx products on September 24, 2013. (Mays & Gido Report [Docket 221–1], at 24). These exemplars were used as a control. (*Id.* at 18). The plaintiffs' counsel, Ms. Jennifer Black, arranged for Drs. Mays and Gido to also receive Obtryx mesh explants from Steelgate, a repository for explanted transvaginal mesh. (Aff. of Jennifer Black [Docket 272–7], ¶¶ 5–6, 12). Ms. Black identified the available BSC Obtryx explants by cross-referencing the firm's client list with the patient list retained by Steelgate. (*Id.* ¶¶ 9–11). Ms. Black determined that there were a total of fourteen such explants at Steelgate. (*Id.* ¶ 8). After identifying these explants, Ms. Black requested that the explants be sent to Dr. Gido with the appropriate chain of custody. (*Id.* ¶ 12).

On October 1, 2013, Dr. Gido received the fourteen explants. (Mays & Gido Report [Docket 221–1], at 24). The explants were sealed in plastic containers and came with chain of custody documentation. (*Id.*). Only eleven of the fourteen explants contained mesh suitable for testing. (*Id.*). Dr. Gido proceeded to conduct three microscopic analyses of the eleven explants: (1) Scanning Electron Microscopy ("SEM") to take pictures of the mesh fibers at high magnification and compare those images to the images published in the literature; (2) Energy Dispersive Spectroscopy ("EDS") to determine if there was oxygen in the mesh fibers; and (3) Transmission Electron Microscopy ("TEM") to identify amorphous regions in the mesh fibers that are more susceptible to oxidation. (*Id.* at 18).

Utilizing Steelgate's chain of custody, Dr. Gido sent the samples to Dr. Mays on October 22, 2013. (*Id.*). Only four of the samples sent by Dr. Gido had sufficient amounts of polypropylene mesh adequate for testing by Dr. Mays. Dr. Mays conducted three chemical analyses

of the four samples: (1) Fourier Transform Infrared **\*534** Spectroscopy ("FTIR"), a testing instrument that uses infrared to identify chemical groups containing oxygen; (2) Gel Permeation Chromotography ("GPC"), a test that separates molecules by size and quantifies the molecular weight of the polymer, which allowed Dr. Mays to estimate the reduction in molecular weight of the polypropylene explants; and (3) Thermogravimetric Analysis ("TGA") to determine if there were other additives or inorganic materials in the mesh. (Mays Dep. [Docket 221–2], at 49–50).

Drs. Mays and Gido included the following summary of results in their expert report:

| SAMPLE | LENGTH OF TIME IMPLANTED | IMPLANT TIME CLASSIFICATION | MODEL | Cracking Observed by SEM | Oxidation in Fibers Observed by EDS | Oxidation in Fibers Observed by FTIR | Mn from GPC | Mw from GPC | Mw/Mn from GPC |
|---|---|---|---|---|---|---|---|---|---|
| Oxbryx Control | — | None | | 0 | no | no | 1,080,000 | 377,000 | 4.26 |
| Pinnacle Control 1 | — | None | | 0 | trace amounts | no | 1,151,000 | 388,000 | 5.97 |
| Pinnacle Control 2 | — | None | | 0 | no? | not tested | | | |
| XP-1 | 1 YR, 4 MOS. | Short | Obtryx Halo | 0 | yes | not tested | | | |
| XP-2 | 1 YR, 6.5 MOS. | Short | Obtryx | 0 | yes | not tested | | | |
| XP-3 | 1 YR, 7 MOS. | Short | pinnacle | 0 | yes | yes | 648,000 | 291,000 | 3.44 |
| XP-4 | 1 YR, 8 MOS. | Short | Pinnacle | 3 | yes | not tested | | | |
| XP-5 | 2 YRS, 2.5 MOS. | Intermediate | Pinnacle | 0 | yes | not tested | | | |
| XP-6 | 2 YRS, 11 MOS. | Intermediate | Pinnacle | 0 | yes | not tested | | | |
| XP-7 | 3 YRS, 3 MOS. | Intermediate | Pinnacle | 4 | yes | yes | 847,000 | 344,000 | 3.95 |
| XP-8 | 4 YRS, 1 MO. | Long | Pinnacle | 5 | not tested | yes | 735,000 | 326,000 | 3.53 |
| XP-9 | 4 YRS, 4 MOS. | Long | Pinnacle | 4 | yes | not tested | | | |
| XP-10 | 4 YRS, 5 MOS. | Long | Pinnacle | 3 | yes | yes | 742,000 | 314,000 | 3.91 |
| XP-11 | 4 YRS, 9 MOS. | Long | Obtryx Halo | 5 | yes | not tested | | | |

**\*535** (Mays & Gido Report [Docket 221–1], at 19). However, Dr. Mays did not include the protocol or results of the TGA or TEM in the expert report. Instead, for the TGA, he produced that information to BSC in the form of his handwritten notes, which were taken from his lab notebook. (Mays Dep. [Docket 221–1], at 49–50).

#### b. Reliability

**[24]** With respect to the reliability of Drs. Mays and Gido's testing, BSC makes several specific arguments. However, I have previously reviewed the reliability of Drs. Mays and Gido's testing under *Daubert* and found their opinions unreliable because they (1) failed to control for error or bias and (2) did not establish or adhere to testing protocols. *See Sanchez,* 2014 WL 4851989, at *26. In *Sanchez,* I made the following findings:

##### i. Lack of Control for Error or Bias

Although plaintiffs' counsel selected the samples, counsel explained that these were the only Pinnacle and Obtryx samples available in the Steel gate repository. Therefore, unlike *Lewis,* where Dr. Klinge did not

indicate whether the meshes examined constituted a large sample size of the repository's collection, here, these were the only samples available for testing. Furthermore, certain samples were not tested because they did not have enough mesh, not because of bias. Despite the differences in these two cases, the fact that Drs. Mays and Gido's sample was not very large or randomly selected affects the reliability of their testing. *See Edwards v. Ethicon,* No. 2:12–cv–09972, 2014 WL 3361923, at *39 (S.D.W.Va. July 8, 2014) (excluding plaintiffs' expert's analysis of pelvic mesh explants generally). Drs. Mays and Gido "[have] given no explanation as to whether [theirs] is a representative sample size.... Therefore I have no information as to the potential rate of error inherent in [their] observations." *Lewis,* 2014 WL 186872, at *8. Additionally, Drs. Mays and Gido have no knowledge of how the material they examined was explanted or how it was preserved and handled before reaching their lab. (Mays Dep. [Docket 99–1], at 304–05).

Dr. Gido conducted EDS testing to differentiate between polypropylene fibers and biological material. In their report, Drs. Mays and Gido state that "the presence or absence (or near absence) of nitrogen as detected by EDS is the key discriminator between clean polypropylene fibers from which valid conclusions can be drawn or biomaterial covered fiber from which conclusions are less straightforward." (Mays & Gido Report [Docket 98–1], at 31). At his deposition, Dr. Gido acknowledged that on a relatively clean sample "there might be a little blip of nitrogen [in the EDS] and **\*536** the question is, you know, is that nitrogen statistically significant." (Gido Dep. [Docket 99–2], at 154). However, Dr. Gido never determined the significance of potential "blips," although the data was available. (*Id.* ("I did not do that analysis, although the data is all there, and if that analysis needs to be done, I would contend it is not a new opinion.")).

Similarly, in their report, Drs. Mays and Gido state that "[w]e need to base our conclusions related to fiber degradation on clean polypropylene fibers and make sure we are not looking at biological films coating the fibers." (Mays & Gido Report [Docket 98–1], at 31). However, both Dr. Mays and Dr. Gido admit in their depositions that their inconsistent bleach treating techniques may have failed to remove all biologic material from the test samples. (*See* Mays

Dep. [Docket 99–1], at 208; *see also* Gido Dep. [Docket 99–2], at 165). When asked explicitly whether they completed a statistical analysis or calculated a rate of error based on their tests, Dr. Gido admitted they did not. (Gido Dep. [Docket 99–2], at 154–55).

The key *Daubert* inquiry is "whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert II,* 43 F.3d at 1317. The small sample size and Drs. Mays and Gido's failure to determine the statistical significance of their results call into the question the reliability of their methods. Although *Daubert* is a flexible inquiry, these facts weigh heavily against the reliability of their opinions.

*ii. Failure to Establish or Adhere to Testing Protocol*

First and most simply, Dr. Mays states that "SEM is a very common tool," but when asked if he prepared any written methodology before completing the SEM testing, he admits that he did not. (Mays Dep. [Docket 99–1], at 162). In addition, Dr. Mays and Dr. Gido both reference Dr. Gido's completely subjective cracking standard he came up with for purposes of their testing. Dr. Mays admits that the standard cannot be found in any published material, and Dr. Gido admits that he has never created or used a cracking standard before. (*See id.* at 18; *see also* Gido Dep. [Docket 99–2], at 161).

Expanding on the brief discussion above, while the samples were with Dr. Gido for testing, Dr. Mays asked Dr. Gido to try bleach cleaning one of the explants to see if it was effective. (Gido Dep. [Docket 99–2], at 167). Dr. Gido used a 6% bleach concentration on explanted sample 11. (*See id.* at 193; Mays & Gido Addendum Report [Docket 111–5], at 2). In comparison, Dr. Mays used a 7.8% concentration to clean the explants and controls before testing. (*See* Mays & Gido Report [Docket 98–1], at 33). The bleach treatments were clearly inconsistent. Additionally, Drs. Mays and Gido have no explanation as to why a discussion of this testing was "mistakenly" omitted from their original report. (Mays Dep. [Docket 99–1], at 202).

Another mistake occurred after Dr. Gido returned the samples, and he discovered that he failed to conduct an EDS test on one of them, which he

attributed to a mere oversight. (Gido Dep. [99–2], at 214–15). Finally, Dr. Mays conducted TGA testing on the explants to determine what additives were in the mesh, but for some reason did not include the results in their expert report. (*Compare* Mays Dep. [Docket 99–1], at 50, *with* Mays & Gido Report [Docket 98–1] ).

**\*537** Although Drs. Mays and Gido performed tests that are supported by the literature, the haphazard application of these tests, errors, and changes to their report lead to the conclusion that their methodology is unreliable. Vigorous adherence to protocols and controls are the hallmarks of "good science." *See Black v. Rhone–Poulenc, Inc.,* 19 F.Supp.2d 592, 603 (S.D.W.Va.1998). Accordingly, I **FIND** that the testing performed by Drs. Mays and Gido is unreliable, and therefore, **EXCLUDED.**

*Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at *26–28 (S.D.W.Va. Sept. 29, 2014). The parties in this case assert the same arguments regarding the reliability of Drs. Mays and Gido's testing that I addressed in *Sanchez.* Therefore, I **ADOPT** my prior ruling on the reliability of Drs. Mays and Gido's testing.

### 2. Expert Opinions Not Based on Testing [6]

#### a. Background

While BSC argues that Drs. Mays and Gido's unreliable testing should be excluded entirely, the plaintiffs respond by explaining that the testing "merely confirmed what [Drs. Mays and Gido] have long known because of their training, experience, and peer-reviewed published scientific literature." (Pls.' Mem. in Opp'n to Def.'s Mot. to Exclude Test. of Pls.' Expert ("Pls.' Mem. re: Mays & Gido") [Docket 272], at 4). [7] The plaintiffs contend that both the expert report and depositions support this explanation; however, they conveniently choose to cite only Dr. Mays's deposition in support of their proposition. (*See id.* at 4–5; *see also* Mays Dep. [Docket 272–5], at 65 ("I believe all of my conclusions are ones that one could reach simply by looking at published literature on polypropylene that's been implanted into the human body combined with the knowledge of chemistry and polymer science and the behavior of polymeric materials."); *id.* at 140 ("So my opinion is based on my

experience as a scientist, as a chemist. It's based on all the literature we looked at. It's based also on the testing that we did in this report."); *id.* at 260 ("My opinion in this case, and it was my opinion before I got involved in this case, is that polypropylene is so fundamentally susceptible to oxidative degradation that it's a poor choice for permanent implant where there's going to be tissue ingrowth.")).

The plaintiffs fail to point out or cite Dr. Gido's deposition testimony, which takes the opposite position. Dr. Gido explicitly states that "we're making this statement based on our own study and our own results. **\*538** We're not getting it from the literature." (Gido Dep. [Docket 221–3], at 233). While Dr. Mays describes the testing as "confirmatory," Dr. Gido highlights the fact that he completed the testing first and then "got into the literature." (Mays Dep. [Docket 272–5], at 65; Gido Dep. [Docket 221–3], at 50). Dr. Gido admits that he had not reached his opinions before testing and emphasizes how important the data was in drafting his portions of the report. (*See* Gido Dep. [Docket 221–3], at 51 ("I would suspect the same—you know, I would probably conclude that there would likely be a problem with polypropylene, but I would not be as sure of it as I am having seen data that I took with my own hands and seen Dr. Mays's data.")). Based on the depositions, Drs. Mays and Gido clearly have different opinions regarding the nature and influence of the testing they performed.

I have determined that Drs. Mays and Gido's testing was unreliable, and Dr. Gido states that his opinions are based solely on the testing. Accordingly, I **FIND** that Dr. Gido's opinions are **EXCLUDED.** However, as discussed more fully below, because Dr. Mays indicates that he relied primarily on other scientific sources, I **FIND** that Dr. Mays is permitted to testify generally about polypropylene degradation based on his experience and review of the literature.

#### b. Reliability

BSC argues that Dr. Mays's opinions are not reliable because they are litigation driven, not scientific, and not fair and balanced. With respect to the argument that Dr. Mays's expert testimony is litigation driven, I refer back to my above ruling that an expert's formulation of his opinion for the purposes of litigation does not,

by itself, justify that expert's exclusion. As I **FIND** Dr. Mays's opinions otherwise reliable, I need not address this argument further.

 **[25]**  Next, BSC contends that Dr. Mays "selectively cite[s] several articles" and "fail[s] to include contrary statements or literature in [his] report." (BSC's Mem. re: Mays & Gido [Docket 222], at 14). I have previously reviewed the reliability of Dr. Mays's opinions under *Daubert. See Sanchez,* 2014 WL 4851989, at *29. The parties in this case assert the same arguments regarding the reliability of Dr. Mays's expert opinions that I addressed in *Sanchez.* In *Sanchez,* I ruled as follows:

> Dr. Mays cites eight different studies supporting his proposition that polypropylene is not suitable as a permanent implant, many of which are the same peer-reviewed, published literature relied upon by other experts in previous MDL trials. *See Lewis,* 2014 WL 186872, at *11 (discussing plaintiffs' expert Dr. Uwe Klinge). Clearly these are studies reasonably relied upon in the field of polymer science. Additionally, Appendix C of the report lists 68 scholarly articles Dr. Mays considered in making his opinions, as well as hundreds of other documents. (Mays & Gido Expert Report App. C [Docket 111–3], at 1–22). If [BSC] take[s] issue with Dr. Mays's failure to review or cite particular documents, this goes to the weight of his opinion, not its admissibility, and can be addressed on cross-examination.

*Sanchez,* 2014 WL 4851989, at *51.

Finally, BSC argues that Dr. Mays's opinions are a poor fit and would not be helpful to a jury because Dr. Mays was not able to correlate degradation to any clinical symptoms in an individual patient. However, as I stated in *Sanchez,*

> I have repeatedly held that general causation testimony, including degradation opinions, is admissible under Rule 702, even if the plaintiffs might fail to carry **\*539** their burden as to specific causation. *See, e.g., Huskey,*

[29 F.Supp.3d at 712] 2014 WL 3362264, at *13. Additionally, in his deposition, Dr. Mays references complications that can arise in patients as a result of degradation. (Mays Dep. [Docket 99–1], at 131 ("I'm saying that degradation is the root cause of these devices failing to function the way they are designed in some cases and then the device not functioning properly is part of the problem.")). To the extent that BSC believes degradation is not clinically significant, it may cross examine Dr. Mays on that issue.

Dr. Mays explicitly states that he relied not only on his knowledge and experience, but also on scientific literature, which are sufficiently reliable methods of forming his particular opinion. Accordingly, I **FIND** that Dr. Mays is permitted to testify generally that polypropylene is susceptible to oxidation and degrades, without specifically referencing the unreliable testing he conducted with Dr. Gido.

*Sanchez,* 2014 WL 4851989, at *51–52. Therefore, I **ADOPT** my prior ruling on Dr. Mays, as stated in *Sanchez,* and **FIND** that his opinions based on his experience and review of scientific literature should not be excluded.

### 3. State of Mind

Dr. Mays offers two opinions regarding BSC's state of mind and its knowledge of risks associated with polypropylene. (*See* Mays & Gido Report [Docket 221–1], at 5 ("BSC did not take into account polypropylene's propensity for oxidation during design of its Pinnacle and Obtryx mesh."); *id.* at 17 ("If the developers of Pinnacle and Obtryx were ignorant of this information on implantation of PP materials then they were incompetent to be in their line of business. If they were aware of these facts and chose to proceed anyway, they were taking an unconscionable, calculated gamble with the lives and wellbeing of others for the sake of their own profits.")). As I previously discussed, expert opinions on BSC's knowledge or state of mind are not helpful to the jury. *See* Fed.R.Evid. 702. Therefore, these opinions are **EXCLUDED.**

### 4. Legal Opinions

[26]  Dr. Mays offers two opinions that draw legal conclusions from the facts. (*See* Mays & Gido Report [Docket 221–1], at 17; *id.* at 19 ("The results of our own testing completely support and greatly strengthen this opinion that choice of PP as the material for the explants we tested rendered them unacceptably susceptible to degradation and was thus *incompetent and or negligent.*") (emphasis added)). In the Fourth Circuit, "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006). Whether BSC failed to act as a reasonable and prudent medical device manufacturer is a question for the jury. To be clear, Dr. Mays may offer opinions that, as a polymer scientist, he does not believe the Obtryx is suitable to serve as a permanent implant, but his opinions cannot be phrased as legal conclusions. Therefore, these statements are **EXCLUDED.**

**E. Motion to Exclude the Opinions and Testimony of Dr. Peggy Pence**

Dr. Pence works as a clinical and regulatory consultant, providing "advice, guidance, and product development services to pharmaceutical/biopharmaceutical and medical device companies in the areas of strategic planning, preclinical testing, clinical trials, design and conduct, and regulatory matters involving the [ **\*540** FDA]." (Pence Report [Docket 219–1], at 1). During her career, she has accumulated knowledge about and experience with the testing requirements for medical devices; the development and content of product labeling; and the procedures necessary to comply with regulatory and industry standards, including those set forth by the FDA. (*See id.* at 1–4). In this matter, Dr. Pence offers four opinions: (1) BSC did not conduct adequate testing of the Obtryx product prior to placing them on the market; (2) the Obtryx product was inadequately labeled; (3) patients could not adequately consent to the surgical implantation of the Obtryx due to the misbranding of these products; and (4) BSC failed to meet the postmarket vigilance standard of care for their products, leading to further misbranding. BSC seeks to exclude Dr. Pence's testimony in its entirety.

I have previously reviewed the opinion testimony of Dr. Pence under *Daubert. See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at \*32–36 (S.D.W.Va. Sept. 29, 2014). The reasoning in *Sanchez* substantially reflects the court's view of this

issue as presented here. To the extent that there are differences in fact and exhibits, the court does not find them sufficiently material as to the ruling on Dr. Pence. Therefore, I **ADOPT** my prior ruling on Dr. Pence as follows and thereby **GRANT IN PART** and **DENY IN PART** her expert opinion.

**1. Dr. Pence's Qualifications**

[27]  I first address BSC's argument that this court should exclude Dr. Pence's opinions because she lacks the qualifications necessary to make them. BSC maintains that Dr. Pence's work as a researcher and consultant does not qualify her to opine about the safety and efficacy of mesh products, as she attempts to do in her expert report. In BSC's view, without a medical degree and without experience in the development of polypropylene mesh, Dr. Pence's opinions on BSC's medical devices cannot withstand *Daubert.*

In *Sanchez,* I ruled as follows, and I **ADOPT** that ruling here:

> The absence of a medical degree on Dr. Pence's curriculum vitae does not call into doubt Dr. Pence's demonstrated knowledge about and experience with medical devices like the [Obtryx]. Dr. Pence has over forty years of experience in the research and development of medical devices. (Pence Report [Docket 118–1], at 1). Over that time, she has accumulated knowledge that is relevant to this case, such as the design of clinical trials for diseases of the female genital system, the clinical testing of novel medical devices, and the content of product labeling. Accordingly, ... I **FIND** that Dr. Pence is qualified to render the opinions set forth in her expert report, including her opinions about the safety and efficacy of mesh products and the sufficiency of BSC's product branding.

*Sanchez,* 2014 WL 4851989, at \*33.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## 2. Dr. Pence's Opinions on Appropriate Pre–Market Testing

**[28]** Having found that Dr. Pence is qualified to offer these opinions, I next address whether her opinions are relevant and reliable.

In her report, Dr. Pence opines:

> BSC should have performed adequate preclinical and clinical testing of the Obtryx Sling and Pinnacle PFR Kits prior to marketing to ensure the devices were reasonably safe for permanent implantation. By its failure to do so, BSC fell below the standard of care required of a reasonably prudent medical device manufacturer.

**\*541** (Pence Report [Docket 219–1], at 44). In reaching this conclusion, Dr. Pence considered the risks associated with polypropylene mesh (*id.* at 31–36); the statements in Material Safety Data Sheets provided by the polypropylene supplier in 2004 indicating that polypropylene should not be used for permanent implantation in the human body (*id.* at 36–40); and the developmental history of BSC products (*id.* at 41–43).

In *Lewis, et al. v. Ethicon,* Dr. Pence gave a similar opinion. No. 2:12–cv–4301, 2014 WL 186872, at \*18–19 (S.D.W.Va. Jan. 15, 2014). She opined that the defendant did not conduct the required investigative tests on the specific risks of a transvaginal mesh product, but she failed to support this opinion with any authority suggesting that the performance of such tests was needed. *Id.* at \*18. Without a reliable foundation, I excluded Dr. Pence's opinion as unreliable. *Id.* at \*19. Here, BSC argues that Dr. Pence's expert report should again be excluded as unreliable because it fails to point to any authority requiring BSC to perform the tests that Dr. Pence believes should have been conducted. The plaintiffs counter that Dr. Pence has revised her report to fix the deficiencies identified in *Lewis.* This time around, the plaintiffs argue, Dr. Pence has "clearly demonstrated that her methodology and opinions were not based upon her review of a "voluminous amount of peer-reviewed

scientific articles, data, government codes and regulation, deposition testimony provided in this litigation, and internal documents received from BSC." (Pls.' Resp. in Opp. To Def.'s Mot. to Exclude Dr. Peggy Pence [Docket 274], at 5).

In *Sanchez,* I agreed with the plaintiffs and concluded that

> Dr. Pence's bolstered expert report [Docket 118–1] has tempered my previous concerns about the reliability of her opinion on this issue. Dr. Pence has cited to multiple sources that stress the importance of running clinical trials before incorporating mesh materials into a surgical product. For instance, she describes a 2006 study conducted by the French National Authority for Health ("HAS"), in which it evaluated the safety and efficacy of vaginally implanted mesh for the treatment of genital prolapse. (Pence Report [Docket 118–1], at 9). HAS concluded that "the use of mesh implants for transvaginal correction of genital prolapse remained a matter of clinical research" and recommended prospective studies on the anatomical and functional outcomes of mesh implantation, the mid- to long-term effects, possible adverse events like erosion, and the management of erosions and retractions. (*Id.* at 10). Dr. Pence also discusses the recommendations of the National Institute for Health and Care Excellence, which include the warning that transvaginal mesh repair "should be used with special arrangements for clinical governance, consent and audit or research." (*Id.* at 43).

> In contrast with *Lewis,* Dr. Pence's opinion in this case is backed by authoritative studies that recommend the performance of clinical trials and long-term follow-ups before using polypropylene mesh. Thus, her opinion on the inadequacy of BSC's pre-market testing is more than a bare declaration of her professional opinion. Accordingly, I **FIND** that Dr. Pence's methodology is reliable under *Daubert* and **DENY** BSC's motion with respect to this opinion.

*Sanchez,* 2014 WL 4851989, at \*34. I **ADOPT** this ruling here.

### \*542 3. Dr. Pence's Opinions on the Adequacy of BSC's Product Labels

**[29]** Dr. Pence proffers two opinions regarding the labeling of the Obtryx. First, she states that "BSC

marketed [these products] without adequate instructions for use throughout the life of these products ..., in particular, without adequate warnings, precautions, and information about the likelihood and extent of potential risks." (Pence Report [Docket 219–1], at 62). Second, she states that "patients implanted with the Obtryx Sling or Pinnacle mesh were prevented from ... giving true informed consent as a result of BSC's inadequate professional and patient labeling." (*Id.* at 63). She then offers a list of warnings and risks that she believes should have been included in the products' instructions for use ("IFU") and patient brochures.

BSC asserts that these opinions should be excluded because they relate to BSC's deviation from the branding requirements of the Food, Drug, and Cosmetic Act ("FDCA"), which is irrelevant in this case and consequently unhelpful to the jury. The plaintiffs agree that whether BSC violated the FDCA is not relevant and that Dr. Pence will not offer an opinion on that issue. The plaintiffs stress, however, that Dr. Pence's testimony about labeling is relevant to the plaintiffs' failure to warn claim. To assess the validity of this claim, the jury will need to understand what information should be included in IFUs and patient brochures but was not included by BSC—the plaintiffs argue that Dr. Pence can provide such understanding to the jury. I agree that such testimony might help guide the jury in reaching a verdict on these state law claims, which consider the appropriateness of product labeling, and as such, her opinions are relevant.[8] *See, e.g., Church v. Wesson,* 182 W.Va. 37, 385 S.E.2d 393, 396 (1989) (explaining that in failure to warn cases, "the focus is not so much on a flawed or physical condition of the product, as on its unsafeness arising out of failure to adequately label, instruct or warn" (quoting *Morningstar v. Black & Decker Mfg. Co.,* 162 W.Va. 857, 253 S.E.2d 666, 682 (1979))).

**[30]** BSC adds that even if Dr. Pence's opinions on BSC's labeling practices are relevant, they lack a reliable basis. In BSC's view, Dr. Pence does not provide any authority supporting her assertion that BSC's labeling fell short of the standard of care, and instead, she simply insists that BSC "should have gone further." (Def.'s Mem. in Supp. of its Mot. to Exclude the Ops. and Test. of Peggy Pence ("BSC's Mem. re: Pence") [Docket 220], at 8 (quoting Pence Dep. [Docket 219–3], at 328:3)). In response, the plaintiffs point to Dr. Pence's reliance on medical publications and the FDA's Manufacturer and User Facility Device Experience ("MAUDE") database as evidence that Dr. Pence supported her opinions with authority. (*See* Pence Report [Docket 219–1], at 49–50).

Again, the reasoning in *Sanchez* reflects the court's view of this issue as presented here, and I **ADOPT** the *Sanchez* ruling as quoted below:

> Indeed, Dr. Pence cites to various publications and data throughout her report. However, the information she references—literature and data on the reported **\*543** complications associated with Pinnacle mesh—does not go to the heart of her opinion—that BSC failed to meet the "standard of care required of a medical device manufacturer" in its deficient labeling of its product. (*Id.* at 63). In other words, although this authority demonstrates that complications occurred, it does not provide any guidance as to whether these complications should have been included as warnings in the Pinnacle's IFU. Eliminating this peripheral information, Dr. Pence is left with *ipse dixit* sources like "the standard of care" (*id.*) and "a matter of ethics" (*id.* at 61), both of which fall short of *Daubert's* reliability prong. *See Daubert,* 509 U.S. at 594 [113 S.Ct. 2786] (explaining the importance of ascertainable "standards" to govern the expert's methodology in reaching his opinion).

Dr. Pence also utilizes FDCA provisions and FDA regulations to craft criteria for the information that should be included in medical device labeling. (*See* Pence Report [Docket 118–1], at 62 n. 257–59, 63 n. 260–61). As explained above, this may very well be relevant to the state law claim of failure to warn. *Daubert,* however, advises courts to keep in mind the other rules of evidence when evaluating expert testimony. *See Daubert,* 509 U.S. at 595 [113 S.Ct. 2786] ("Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules...."). Rule 403, which permits exclusion of relevant evidence "if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed.R.Evid. 403, carries particular significance in *Daubert* decisions because "[e]xpert evidence can be both powerful and quite misleading." *Daubert,* 509 U.S. at 595 [113 S.Ct. 2786] (internal quotations omitted). Here, expert testimony about the requirements of the FDCA, which are not at issue in this case, could lead to more confusion about the failure-to-warn claim than enlightenment. The jury might think that

the FDA regulations *govern* warning requirements in [West Virginia], whereas Dr. Pence is actually using the FDA regulations as a *model* for the contents of labeling materials. Given that the probative value of expert testimony on FDA requirements is substantially outweighed by the risk of jury confusion, I cannot admit Dr. Pence's testimony as it relates to the FDCA or FDA regulations. *See Lewis v. Johnson & Johnson,* 991 F.Supp.2d 748, 755 (S.D.W.Va.2014) (agreeing that "alleged shortcomings in FDA procedures are not probative to a state law products liability claim") (internal quotations omitted).

In sum, the only basis for Dr. Pence's opinions on the adequacy of BSC's product labeling is violation of the FDCA and FDA regulations. Such a violation, however, is not probative to the claims at issue. Moreover, asserting a violation of the FDCA is a legal conclusion, not an expert opinion. Accordingly, Dr. Pence's opinion testimony on BSC's labeling practices, both in the IFU and the patient brochure, is **EXCLUDED.**

*Sanchez,* 2014 WL 4851989, at *35–36.

### 4. Opinion on Postmarket Vigilance

**[31]** In her last opinion, Dr. Pence proffers that BSC "deviated from the standard of care by its failure to report to [the] FDA a number of adverse events that met the criteria for Medical Device Reporting, rendering the Obtryx and Pinnacle devices misbranded as a result of failure to furnish information requested under Section 519 of the FDCA." (*See* Pence Report [Docket 219–1], at 91). BSC argues that whether BSC "reported certain adverse events to **\*544** the FDA is not helpful to the jury" in determining whether BSC provided adequate warnings or whether its products were defective. (*See* BSC's Mem. re: Pence [Docket 220], at 9).

For the reasons explained in *Sanchez,* I agree with BSC.

Dr. Pence cites to FDA public health notifications, the FDA's corporate warning letter to BSC, and the FDCA's Medical Device Reporting regulations. Contrary to the plaintiffs' assertions, however, the FDCA's reporting requirements and BSC's alleged violation of them have minimal relevance. First, the plaintiffs have not brought any claims concerning

the FDCA. Second, even if an explanation of BSC–FDA communications could shed light on the state law claims at issue, testimony on whether or not BSC complied with the FDCA would constitute an impermissible legal conclusion rather than an expert opinion. And finally, ... opinion testimony on the labyrinth of reporting regulations within the FDCA has little probative value compared to the substantial risk of jury confusion, particularly when both parties agree that "whether, how, and when BSC communicated safety information to the FDA is irrelevant." (*See* Pls.' Resp. re: Pence [Docket 122], at 17). Accordingly, ... I **EXCLUDE** Dr. Pence's opinions on postmarket vigilance.

*Sanchez,* 2014 WL 4851989, at *36.

In conclusion, Dr. Pence can testify on pre-market testing, but her other opinions on the adequacy of product labels and the reporting of adverse events to the FDA are **EXCLUDED.** As such, BSC's Motion to Exclude Peggy Pence [Docket 219] is **GRANTED IN PART** and **DENIED IN PART.**

### F. Motion to Exclude the Opinions and Testimony of Thomas H. Barker, Ph.D.

BSC moves to exclude the opinions and testimony of Thomas H. Barker, Ph.D. Dr. Barker is a biomedical engineer who seeks to opine as to the behavior of polypropylene mesh inside of the human body. (*See* Barker Report [Docket 223–1], at 1, 4–5). He bases his opinions on mechanical stress tests that he conducted on the Obtryx and Pinnacle products, his experience, scientific literature, and internal documents. (*See id.* at 3). BSC argues that Dr. Barker's opinions are unreliable and irrelevant. In particular, BSC argues that Dr. Barker's testing methodology was flawed, that his opinions are litigation driven, that he is unqualified to opine as to polypropylene and product design, and that Dr. Barker seeks to offer impermissible state of mind testimony.

I have previously reviewed the opinion testimony of Dr. Barker under *Daubert. See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at *5–10 (S.D.W.Va. Sept. 29, 2014). The parties in this case assert arguments on the admissibility of Dr. Barker's expert opinion that I addressed in *Sanchez.* To the extent that there are differences in fact or exhibits, the court does not find them sufficiently material to this case. Thus, I

**ADOPT** my prior ruling on Dr. Barker as follows and thereby **GRANT** BSC's motion. I will address additional arguments raised by the parties in this case below.

### 1. Qualifications

**[32]**   BSC challenges Dr. Barker's qualifications. In *Sanchez,* I found Dr. Barker qualified to opine as to the properties of polypropylene, and I **ADOPT** the same reasoning here:

> Dr. Barker holds a Ph.D. in biomedical engineering and is currently on the faculty **\*545** of a joint department within the Georgia Institute of Technology and Emory University School of Medicine. He states in his expert report that his research focuses on
>
> > the effects of mechanical forces and tissue/material mechanical properties (e.g. stiffness) on the host response. I am trained and have extensive expertise in the evaluation of biomaterial mechanical properties, biomaterial/implant design, the foreign body host response, and human tissues under repair and fibrosis, including analyses of cell/molecular biological outcomes.
>
> ( [Barker Report [Docket 71–1],] at 2). He conducted postdoctoral research focusing on "exploring the mechanisms of biomaterial associated fibrosis (e.g. the foreign body response)." (*Id.*). Additionally, Dr. Barker has authored several book chapters and peer-reviewed articles on biomaterials and biomedical engineering. (*See id.*).

*Sanchez,* 2014 WL 4851989, at \*5–6. As I note in *Sanchez,* even though Dr. Barker is qualified, I must still determine that his method is reliable. *Id.* at \*6.

### 2. Admissibility of Opinions Based on Dr. Barker's Mechanical Testing

**[33]**   BSC argues that Dr. Barker's opinions based on his mechanical testing are unreliable and irrelevant. In particular, BSC argues that Dr. Barker's testing is flawed because it "1) does not replicate the published protocol he claims to have followed; 2) fails to utilize a sufficient sample size; 3) fails to meet the standards required for publication in a peer-reviewed journal; and 4) does

not replicate the physiological environment or forces experienced in the female pelvic floor." (Def. BSC's Mem. of Law in Supp. of Its Mot. to Exclude the Ops. and Test. of Thomas H. Barker, Ph.D. ("BSC's Mem. re: Barker") [Docket 224], at 5). In *Sanchez,* BSC raised the same arguments.

#### *a. Dr. Barker Failed to Follow Published Protocols*

BSC argues that Dr. Barker's failure to soak the pieces of mesh in a saline bath, contrary to published protocols, is unreliable. The Shepherd and Moalli protocols call for the use of a saline bath as part of testing to help better replicate the physiological environment of the human body. In *Sanchez,* I found that this deviation from protocols without a scientific basis rendered his method flawed:

> > His only reasoning was that Georgia Tech denied him permission to submerge its equipment in saline, a "potentially corrosive" solution. (*Id.* at 197:20–198:21). The difference in the results obtained by Dr. Barker and by Drs. Shepherd and Moalli further demonstrate the unreliability of his method. Dr. Barker's tests revealed two to four times more relative elongation of the mesh than Drs. Shepherd and Moalli's tests. (*See* Shepherd, *supra,* at 617; Moalli, *supra,* at 662; Barker Report [Docket 71–1], at 21).

*Sanchez,* 2014 WL 4851989, at \*7. Moreover, I found that the use of a saline bath to replicate the human body was particularly important because Dr. Barker seeks to opine as to the in vivo effects of mesh. *See id.*

In this case, the plaintiffs in response raise an additional argument as to this matter. They submit an exhibit that seems to refute my finding. (*See* Pls.' Ex. D [Docket 267–4] ). The plaintiffs provide a portion of Dr. Barker's testimony "in a recent trial pelvic mesh trial[.][sic]" where he explains that he did follow a published testing protocol and that he did, in fact, soak the mesh in a saline bath for testing. (Pls.' Resp. to Def.'s Mot. to Exclude the **\*546** Ops. And Test. of Dr. Barker ("Pls.' Resp. re: Barker"), [Docket 267], at 14; *see* Pls.' Ex. D [Docket

267–4], at 1073:5–12, 1073:19–1074:4). In their response, the plaintiffs also assert that "Dr. Barker pre-soaked the mesh in a saline solution to mimic the bodily fluids, just as performed by Dr. Moalli at the University of Pittsburgh." (Pls.' Resp. re: Barker [Docket 267], at 14).

However, this prior testimony is at odds with Dr. Barker's expert report and deposition in this case. In his expert report, Dr. Barker writes that, "[p]rior to this case, I have never given sworn testimony in a litigation proceeding." (Barker Report [Docket 267–1], at 3). Therefore, it is unclear when and why Dr. Barker provided the testimony that the plaintiffs attached in their Exhibit D [Docket 267–4]. Also, the plaintiffs provide very minimal information about his previous testimony. Exhibit D contains merely three pages of a transcript and contains no case name. The only identification of the case is in the plaintiffs' response, where they reference "Ex. D; pgs. 1072–1074 of *Albright v. BSC.*" (Pls.' Resp. re: Barker [Docket 267], at 14). The plaintiffs provide no citation number for "*Albright v. BSC*" and give no information about whether Dr. Barker conducted additional testing for *Albright* or submitted a different expert report in *Albright*.

Furthermore, the plaintiffs attached portions of Dr. Barker's deposition for this case which contradict his *Albright* testimony. In his deposition for this case, Dr. Barker testifies that he did *not* soak the mesh that he tested in a saline bath:

> Q: It goes on to say that, [t]he mesh was allowed to sit in the 37–degree Celsius saline bath for 10 minutes prior to testing. Correct?
>
> A: Correct.
>
> Q: Obviously, in your test the mesh did not sit in any 37–degree Celsius saline bath prior to testing; is that right?
>
> A: That's correct.

(Barker Dep. [Docket 267–2], at 202:13–21). Also, in their response, the plaintiffs actually reference the fact that Dr. Barker failed to use a saline bath. (*See, e.g.,* Pls.' Resp. re: Barker [Docket 267], at 14 ("Moreover, the only reason Dr. Barker did not submerge BSC's meshes in a saline bath was because Georgia Tech ... has a policy that forbids the submersion followed in the Moalli Protocol")

(citations omitted)). As a result, the plaintiffs' argument is inconsistent and unavailing.

For the reasons stated above and in *Sanchez,* I find Dr. Barker's methodology to be unreliable.

### b. Dr. Barker Failed to Use a Sufficient Sample Size

BSC next argues that Dr. Barker failed to use a sufficient sample size when he tested one piece of Obtryx mesh and 2 pieces of Pinnacle mesh. In *Sanchez,* I agreed with this argument, especially since Dr. Barker admitted that a statistical test cannot be performed on a sample size of one:

> Dr. Barker admits that having a sample size of one is "insufficient to perform statistical analysis." (Dr. Barker Dep. [Docket 71–4], at 233:17–234:5). As a result, it is difficult to predict whether his results were merely chance occurrences. Dr. Barker explains that he wanted additional materials and he would have conducted additional testing if they had been provided:
>
> > Q: In fact, a lot of the results that Dr. Moalli has published that are different than your results, don't you think you need to test another piece of Obtryx mesh to confirm or not confirm **\*547** the results that you got based on your N equals 1?
> >
> > A: I would have liked to have been provided with materials, additional materials to do additional testing.
>
> (*Id.* at 233:3–12) (objections omitted).

*Sanchez,* 2014 WL 4851989, at \*7–8. As a result, Dr. Barker's sample size was a flaw in his method.

### c. Dr. Barker's Testing Failed to Meet Peer Reviewed Standards

BSC argues that Dr. Barker's testing was flawed because it was not up to peer-reviewed standards. In *Sanchez,* I noted that Dr. Barker admits to this in his deposition testimony:

> Q: Would you agree with me that your testing that you performed on the Obtryx with an N of 1 wouldn't meet standards to be published in a peer-reviewed journal?

A: I would.

Q: And would you agree with me that your testing that you did on Pinnacle with an N of 2 wouldn't meet the standards to be published in a peer reviewed journal?

A: I would agree.

*Id.* at *8 (citing Barker Dep. in *Sanchez* [Docket 71–4], at 301:20–302:5). I **ADOPT** this same reasoning here and find that this factor weighs against finding Dr. Barker's method reliable.

### d. Dr. Barker's Testing Did Not Replicate In Vivo Conditions

BSC argues that Dr. Barker's method is flawed because it failed to replicate the physiological multi-directional forces in the female pelvic floor. In *Sanchez,* I agreed that Dr. Barker's uniaxial testing was unreliable to base opinions on the behavior of the mesh in vivo:

> [B]ecause Dr. Barker's method did not account for the multi-directional forces inside of the female pelvis, his opinions about the effect of the mesh once implanted in vivo are unreliable and do not survive *Daubert* scrutiny. Even Drs. Shepherd and Moalli note that their studies do not conclusively reveal the mesh's behavior in the human body. (*See* Shepherd, *supra,* at 619 (stating that "this experimental setup allows us to draw only preliminary conclusions about the various meshes"); Moalli, *supra,* at 663 (noting that "the behavior of these slings in vivo and after incorporation into host tissue may be inferred, but is not directly apparent from these studies")).

*Sanchez,* 2014 WL 4851989, at *9. I **ADOPT** this reasoning from *Sanchez* here, and based on the above four arguments I **FIND** Dr. Barker's method to be unreliable.

### e. Plaintiffs Argue that Dr. Barker's Method Was Generally Accepted

In this case, the plaintiffs raise an additional argument as to the reliability of Dr. Barker's method. The plaintiffs contend that Dr. Barker's testing was generally accepted within the scientific community. (Pls.' Resp. re: Barker [Docket 267], at 11–12). In support, the plaintiffs point

to Dr. Barker's deposition testimony, where he explains that his general method of testing material—reading relevant scientific literature, developing a testing protocol, and then conducting "cyclic tensile testing and stress deformation analyses" in accordance with the developed testing protocol—is generally accepted within his field. (Barker Dep. [Docket 267–2], at 324:7–327:16). The plaintiffs argue that general acceptance "definitively forecloses a *Daubert* challenge." (Pls.' Resp. re: Barker [Docket 267], at 12).

**\*548** The trial judge must "ensur[e] that an expert's testimony ... rests on a reliable foundation" and has "flexib[ility]" in making this assessment. *Daubert,* 509 U.S. at 594, 597, 113 S.Ct. 2786. Even if cyclic tensile testing and stress deformation analyses are generally accepted in the bioengineering field, the plaintiffs' argument does not cure the fatal deficiency in Dr. Barker's method—that he failed to take measures to replicate the human body when forming and providing opinions as to the mesh's behavior in vivo. For the reasons stated above and in *Sanchez,* I find Dr. Barker's methodology to be unreliable. *See Sanchez,* 2014 WL 4851989, at *5–10.

Therefore, as I concluded in *Sanchez,* Dr. Barker's method was unreliable and his opinions based on this method are **EXCLUDED.**

### 3. Admissibility of Opinion Regarding the Mechanical Mismatch Between the Mesh and the Human Body

**[34]** BSC challenges Dr. Barker's opinion regarding a mechanical mismatch between the mesh and the human body and the adverse in vivo effects resulting from that mismatch. BSC argues that it is unreliable. In *Sanchez,* I agreed because Dr. Barker based his calculation as to the mesh on his unreliable testing:

> [H]e based his elastic modulus calculations of the Pinnacle mesh on his methodologically flawed and unreliable testing ... Furthermore, as explained above, Dr. Barker's testing does not replicate the forces and environment of the human body and, therefore, his opinions regarding the mesh's effects in vivo are unreliable.

*Id.* at *9. I **ADOPT** this reasoning here and find that Dr. Barker's opinions based on the mechanical mismatch are unreliable and, thus, **EXCLUDED.**

#### 4. BSC Argues that Dr. Barker's Opinions are Litigation Driven

BSC also argues that "Dr. Barker's opinions are unreliable because they are litigation driven[.]" (BSC's Mem. re: Barker [Docket 224], at 2). BSC raised this same argument in *Sanchez,* and, thus, I **ADOPT** my reasoning:

> [O]therwise reliable expert testimony will be admitted even if litigation driven. Because I find Dr. Barker's opinions to be otherwise unreliable and inadmissible, I need not address this argument.

*Sanchez,* 2014 WL 4851989, at *9.

#### 5. Relevancy of Dr. Barker's Opinions Based on His Testing of the Pinnacle

Dr. Barker tested both the Pinnacle and Obtryx products. The Obtryx is a product at issue in this case, but the Pinnacle device is not at issue in this case. Because I find his opinions to be unreliable, I need not address the relevancy of Dr. Barker's opinions based on his testing of the Pinnacle device. *See Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786 (noting reliability and relevancy requirement for expert testimony).

#### 6. Plaintiffs' Relevancy Argument Regarding *Lewis v. Ethicon*

In this case, the plaintiffs raise an additional argument as to the relevancy of Dr. Barker's testimony. The plaintiffs argue that "[t]he crux of Dr. Barker's opinions, and hence his role in this case, is to provide expert evidence of the precise design engineering failure in BSC's meshes." (Pls.' Resp. re: Barker [Docket 267], at 17). As a result, the plaintiffs contend that "Dr. Barker's opinions provide the precise evidence that the plaintiff in *Lewis v. Ethicon* lacked and warranted a directed verdict[,]" and that,

therefore, his testimony **\*549** is helpful to a jury. (*Id.* (citing *Lewis* trial transcript)).

As I explained in *Sanchez,* I find Dr. Barker's method to be unreliable, and I exclude his opinions on this basis. As a result, I do not need to address the relevancy of Dr. Barker's testimony. *See Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786 (noting requirement that expert testimony be both reliable and relevant). However, I note that the portions of the *Lewis* trial transcript in which the plaintiffs cite in support of their argument refer to specific causation. (*See* Pls.' Ex. E *Lewis* Trial Tr. [Docket 267–5], at 60:5–22, 62:10–15). Dr. Barker does not offer specific causation opinions here.

#### 7. Dr. Barker's Proposed State of Mind Testimony

BSC argues that Dr. Barker is unqualified to opine as to product design or testing and that his proposed state of mind testimony is inadmissible. In *Sanchez,* BSC made these same arguments. However, I did not reach the issue of Dr. Barker's qualifications as to product design or testing because I found his state of mind testimony to be impermissible expert testimony:

> Dr. Barker contends that "BSC designed the Pinnacle ... to meet the specification of substantial similarity to products pre-existing on the market, rather than engage in the engineering and design process of development of a safe and effective medical product (even for one similar to a pre-existing product in the market)" and that this "is inconsistent with appropriate medical device design principles."

> (Barker Report [Docket 71–1], at 4, 15). These opinions relate to the state of mind of BSC and are, thus, **EXCLUDED.**

*Sanchez,* 2014 WL 4851989, at *10. I **ADOPT** this reasoning from Sanchez in this case.

Therefore, I **GRANT** BSC's Motion to Exclude the Opinions and Testimony of Thomas H. Barker, Ph.D. on the grounds explained above and in *Sanchez. See id.* at *5– 10.

#### G. Motion to Exclude the Opinions and Testimony of Donald R. Ostergard, M.D.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

As one of the five founders of the American Urogynecological Society, Dr. Ostergard is a seasoned obstetrician and gynecologist, having practiced in the field since 1970. He has also assumed several academic roles, most recently serving as a professor of obstetrics, gynecology, and women's health at the University of Louisville. The plaintiffs offer Dr. Ostergard to testify as an expert witness on the properties of polypropylene; the design of the Obtryx sling; the regulatory process of the FDA, specifically with regard to product labeling; and the motives and ethics of BSC. (*See generally* Ostergard Report [Docket 217–2] ). BSC seeks to exclude Dr. Ostergard's expert opinions under *Daubert.* I address BSC's arguments in turn.

### 1. Dr. Ostergard's Qualifications

 [35]    Although Dr. Ostergard has an impressive background as a physician, BSC argues that his medical training does not qualify him under Federal Rule of Evidence 702 to render the opinions set forth in his expert report.

#### a. Opinions on the Properties of Polypropylene and the Obtryx Product Design

First, Dr. Ostergard offers opinions on the "defective" qualities of the polypropylene mesh used in the Obtryx sling, such as its "impurity" and its tendency to **\*550** shrink, degrade, and oxidize. (Ostergard Report [Docket 217–2], ¶ 10). BSC moves to exclude these opinions because Dr. Ostergard's clinical experience "does not qualify him to testify as to the specific chemical composition and attributes of polypropylene." (BSC's Mem. of Law in Supp. of Its Mot. to Exclude the Ops. and Test. of Donald R. Ostergard, M.D. ("BSC's Mem. re: Ostergard") [Docket 218], at 5). In short, BSC argues that because Dr. Ostergard is not a biomaterials expert, he cannot testify about the properties of polypropylene.

I can dispose of BSC's objection by referring back to my ruling on a prior *Daubert* challenge brought against Dr. Ostergard:

> It is difficult to deride Dr. Ostergard's qualifications generally. He has performed thousands of pelvic organ prolapse surgeries. He has used a variety of synthetic

and biologic materials in pelvic reconstruction, including polypropylene mesh. He has extracted polypropylene mesh products from patients. He has treated them for mesh-related complications. He also performed preliminary theoretical work on a new pelvic mesh device for American Medical Systems.

> Dr. Ostergard has conducted scanning electron microscope imaging of mesh. He is also participating in an on-going study of its degradation characteristics in conjunction with his University of Louisville colleagues. Finally, Dr. Ostergard has published, in a peer reviewed setting, on a variety of synthetic and natural materials used in pelvic reconstruction surgery dating back to the 1980s. *I conclude that Dr. Ostergard's qualifications are sufficient to testify about polypropylene.*

(*Jones v. Bard, Inc., et al.,* No. 2:11–cv–00114 [Docket 391], at 6 (S.D.W.Va. Jan. 6, 2014) (footnote omitted) (emphasis added)).

Dr. Ostergard also opines about the "procedure design promoted by BSC." (Ostergard Report [Docket 217–2], ¶ 12). He concludes that insertion of the Obtryx through the vagina, a "contaminated surgical field," is "dangerous" and that the proximity of the Obtryx to various pelvic organs and vessels creates a "risk of injury." (*Id.*). BSC argues that Dr. Ostergard has no experience in designing mesh products, and consequently, he lacks the qualifications necessary to opine on alleged design defects of the Obtryx. The plaintiffs respond by pointing to Dr. Ostergard's extensive knowledge of the pelvic anatomy and pelvic reconstructive surgery. Furthermore, the plaintiffs emphasize Dr. Ostergard's published research on polypropylene materials, as well as his experience with the development of other mesh devices.

After reviewing Dr. Ostergard's curriculum vitae, I conclude that Dr. Ostergard is qualified to provide opinion testimony on the design of polypropylene slings. He has performed countless pelvic reconstruction surgeries, instructed others on the performance of these surgeries, participated in the development of pelvic mesh devices, and authored several peer-reviewed articles on the safety and efficacy of polypropylene mesh products. As I explained in *Jones,* any challenge to his demonstrated expertise is "better suited for cross examination." (*Jones,* No. 2:11–cv–00114 [Docket 391], at 9).

In conclusion, I **FIND** that Dr. Ostergard is qualified to opine on the properties of polypropylene and the design of the Obtryx sling.

### b. Opinions on FDA Regulatory Requirements and Product Labeling

 **[36]**    Dr. Ostergard also comments on BSC's alleged noncompliance with FDA **\*551** regulations, particularly as they relate to product labeling. BSC disputes Dr. Ostergard's qualifications to opine on these matters, asserting that his "familiarity" with the warnings on mesh implant products does not rise to the level of expertise under *Daubert*. (BSC's Mem. re: Ostergard [Docket 218], at 7). The plaintiffs, on the other hand, contend that Dr. Ostergard's experience as a urogynecological surgeon makes him "extremely well suited" to describe the information that BSC should have included on the directions for use and brochure for the Obtryx sling. (Pls.' Opp. to BSC's Mot. to Exclude Dr. Ostergard ("Pls.' Resp. re: Ostergard") [Docket 286], at 8). Moreover, Dr. Ostergard has "taken a course on the FDA process" and reviewed internal BSC documents that, in the plaintiffs' view, give him the knowledge of the regulatory process needed to support his opinions. (*Id.*).

Without more, however, Dr. Ostergard's distinguished career as a urogynecologist cannot uphold his opinions on product warnings and FDA compliance. First, Dr. Ostergard admitted that he is "not an expert in FDA regulations." (Ostergard Dep. [Docket 217–1], at 395:23–25). Second, his understanding of medical device warnings does not exceed the knowledge of physicians in general. That is, he has never drafted a device warning, and he only knows the "information that would be useful to the physician and his counseling of patients." (*Id.* at 402:15, 20–23). [9] This minimal experience with medical device warnings and FDA regulations does not satisfy the "knowledge, skill, experience, training, or education" required under Rule 702. *See, e.g., In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 611 (S.D.W.Va.2013) ("Despite his stellar qualifications as a urogynecologist, Dr. Shull is unqualified to testify on the specific issue of product warnings, as evidenced by his lack of familiarity with the process."). Accordingly, I **EXCLUDE** Dr. Ostergard's opinion testimony as it relates to product labels, the Obtryx's directions for use, and FDA compliance.

Having excluded Dr. Ostergard's FDA opinions for insufficient expertise, I do not need to consider *Daubert's* follow-up question of whether these opinions would be helpful to the jury. My ruling in *Sanchez,* however, provides an analysis on the issue that I could easily apply here. *See Sanchez et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at \*35 (S.D.W.Va. Sept. 29, 2014) ("Given that the probative value of expert testimony on FDA requirements is substantially outweighed by the risk of jury confusion, I cannot admit Dr. Pence's testimony as it relates to the FDCA or FDA regulations.").

### 2. Reliability of Dr. Ostergard's Opinions on Polypropylene

 **[37]**    Next, BSC argues that this court should exclude Dr. Ostergard's opinions on polypropylene—that it is toxic, impure, and subject to degradation and shrinkage—because his opinions do not satisfy *Daubert's* reliability prong. Specifically, according to BSC, these opinions are unreliable because (1) they are not generally accepted in the medical community; (2) Dr. Ostergard has not conducted testing to support these theories; and (3) Dr. Ostergard has based his opinions on selective review of scientific literature. The plaintiffs claim that BSC's objections concern **\*552** the weight, not the admissibility, of Dr. Ostergard's opinions.

As an initial matter, general acceptance is merely one factor a court should consider in determining admissibility of expert testimony. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ( "[*Daubert's* ] list of factors was meant to be helpful, not definitive. Indeed, those factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged."). Here, although Dr. Ostergard's opinions conflict with the position statements of several urogynecological professional societies, he nevertheless finds support for his opinions in several peer-reviewed articles. (*See* Ostergard Report [Docket 217–2], at ¶ 10 (citing to various publications that corroborate his opinions on polypropylene mesh)). Consequently, that Dr. Ostergard belongs to the minority does not, in itself, render his opinion unreliable. Instead, I defer to the other *Daubert* factors and leave the profession's acceptance (or lack thereof) of Dr. Ostergard's opinions as a possible basis for impeachment at trial.

[38] Further challenging the reliability of Dr. Ostergard's opinions, BSC contends that Dr. Ostergard has "conducted no testing on whether Boston Scientific mesh products in fact display the defects he describes." (BSC's Mem. re: Ostergard [Docket 218], at 9). An expert, however, may support his opinions with resources other than the results of his scientific experimentation or testing. *See Daubert,* 509 U.S. at 592, 113 S.Ct. 2786 ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." (internal citations omitted)). In fact, "numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts." *Monsanto Co. v. David,* 516 F.3d 1009, 1015 (Fed.Cir.2008) (listing relevant case law). In *Jones,* I ruled that Dr. Ostergard's reliance on the analyses of others, when considered alongside his own peer-reviewed research, satisfied the reliability requirements of *Daubert.* (*See Jones,* No. 2:11–cv–00114 [Docket 391], at 8). Revisiting Dr. Ostergard's list of publications on polypropylene mesh, (*see* Ostergard Curriculum Vitae [Docket 286–2], at 24), I again conclude that Dr. Ostergard's opinions have reliable support.

Finally, BSC asserts that Dr. Ostergard has "misinterpreted" the medical articles he relied on in reaching his opinions, and as a result, his opinions are unreliable. (BSC's Mem. re: Ostergard [Docket 218], at 10). BSC's argument misplaces my role under *Daubert.* As the gatekeeper of expert testimony, I need not concern myself with the "correctness of the expert's conclusions" and should instead focus on the "soundness of his methodology." *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1318 (9th Cir.1995) ( "*Daubert II* "). As explained above, the review of other professionals' research can form a sound and reliable basis for an expert opinion. Here, Dr. Ostergard conducted a thorough review of others' medical research in establishing his opinions. (*See* Ostergard Curriculum Vitae [Docket 217–2], at 148–56 (providing a list of medical literature that Dr. Ostergard considered in writing his expert report)). Whether Dr. Ostergard correctly interpreted this research has no bearing on the admissibility of his opinions. Accordingly, BSC's objection has no merit, and I **FIND** that Dr. Ostergard's opinions on the properties of polypropylene are reliable. [10]

**\*553** [39] This holding, however, does not apply to Dr. Ostergard's opinion on the carcinogenicity of polypropylene. Although the plaintiffs point to several studies connecting polypropylene to cancer, (*see* Pls.' Resp. re: Ostergard [Docket 286], at 15 n. 74), none of the plaintiffs in this case have claimed that the Obtryx sling caused cancer. Thus, "[t]he mention of cancer in the context of this case ... would, at a minimum, offend Rule 702 and confuse the jury on a matter with scant probative value." (*Jones,* No. 2:11–cv–00114 [Docket 391], 8 n. 4). All of Dr. Ostergard's opinions on the carcinogenicity of polypropylene are **EXCLUDED.**

### 3. Admissibility of Dr. Ostergard's Opinions on BSC's State of Mind

BSC asserts that a majority of Dr. Ostergard's expert report consists of impermissible opinion testimony on the "intentions and motivations of Boston Scientific." (BSC's Mem. re: Ostergard [Docket 218], at 13). The plaintiffs admit that Dr. Ostergard seeks to provide insight into BSC's "intent, motives (including financial motives), or ethics" for the purpose of opining on "what information BSC *should* have known" and "*should* have done" as a manufacturer of mesh devices. (Pls.' Mem. re: Ostergard [Docket 286], at 16). In the plaintiffs' view, such opinion testimony is admissible because it is relevant to the issue of punitive damages and will help the jury understand the medical language in many of BSC's internal documents. (*Id.*).

I disagree. As I have consistently held throughout these MDL cases, the defendant's "knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *Lewis,* 2014 WL 186872, at *6 (citing to *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 547 (S.D.N.Y.2004), which ruled that "the question of intent is a classic jury question and not one for the experts"). Accordingly, Dr. Ostergard's opinions related to BSC's intent, motives, ethics, and corporate conduct—including any comments about what BSC "knew or should have known"—are **EXCLUDED.**

In sum, BSC's Motion to Exclude the Opinions and Testimony of Dr. Ostergard [Docket 217] is **GRANTED IN PART** and **DENIED IN PART.**

## H. Motion to Exclude the Opinions and Testimony of Vladimir Iakovlev, M.D.

BSC seeks to exclude the opinions of Dr. Vladimir Iakovlev. Dr. Iakovlev is an anatomical pathologist and director of Cytopathology at the Department of Laboratory Medicine at St. Michael's Hospital in Toronto, Canada. (Iakovlev Report [Docket 225–1], at 1). In his expert report, Dr. Iakovlev describes a study he participated in with Dr. Robert Bendavid beginning in 2012, "to investigate the morphological specifics of tissue before and after the inguinal hernia surgery, with and without the use of the mesh." (*Id.* at 2). Based on this study, as well as his analysis of published literature and patient records, **\*554** Dr. Iakovlev concludes that complications of mesh placement in the body include: (1) pain; (2) urinary symptoms; (3) mesh hardening, deformation, and formation of nodule/mass; and (4) mucosal lesions and/or post-coital bleeding. (*Id.* at 3). BSC argues that Dr. Iakovlev's general causation opinions and "stretch test" are scientifically unreliable. (BSC's Mem. of Law in Supp. of its Mot. to Exclude the Ops. & Test. of Vladimir Iakovlev, M.D. ("Def.'s Mem. re: Iakovlev") [Docket 226], at 1–2). Additionally, BSC contends that, as a pathologist, Dr. Iakovlev is unqualified to opine on mesh design, mesh deformation, and polypropylene degradation. (*Id.*). For the reasons discussed below, BSC's motion [Docket 268] is **GRANTED.**

### 1. Qualifications as a Pathologist

**[40]** BSC argues that Dr. Iakovlev is unqualified to render opinions on mesh design, mesh deformation, and polypropylene degradation. (Def.'s Mem. re: Iakovlev [Docket 226], at 7–9). Dr. Iakovlev is a pathologist. BSC argues that because Dr. Iakovlev does not have a degree in physics, engineering, or biomaterials and only recently became familiar with the basic manufacturing principles for synthetic mesh, he is not qualified to opine on the design, deformation, and degradation of mesh explants. (*Id.*).

A pathologist is a clinician who provides diagnoses for patient care based on the examination of specimens they receive and relevant clinical information. *Edwards v. Ethicon,* No. 2:12–cv–09927, 2014 WL 3361923, at *24 (S.D.W.Va. July 8, 2014) (citation omitted). In his

expert report, Dr. Iakovlev states that his "professional activities include diagnostic examination of specimens removed surgically or by biopsies from the human body, where [his] annual practice volume amounts to 5000 cases." (Iakovlev Expert Report [Docket 225–1], at 1). Dr. Iakovlev also teaches a course on anatomic pathology and cytology. (*Id.* at 29). BSC does not question Dr. Iakovlev's pathology credentials; rather, it only argues that as a pathologist, he is unqualified to render these opinions. However, throughout these MDLs, I have allowed numerous pathologists to testify regarding the properties of polypropylene mesh. *See, e.g., Sanchez,* 2014 WL 4851989, at *19–20 (discussing Dr. Richard W. Trepeta); *In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 621 (S.D.W.Va.2013) (discussing Dr. Bernd Klosterhalfen). In fact, in *Edwards,* I determined that Dr. Iakovlev was qualified to render an opinion regarding polypropylene degradation based on his experience as a pathologist. *See Edwards,* 2014 WL 3361923, at *24–25. The fact that Dr. Iakovlev took the time to familiarize himself with BSC's manufacturing process in no way diminishes his qualifications. Therefore, I **FIND** that Dr. Iakovlev is qualified to testify regarding mesh design, mesh deformation, and polypropylene degradation. [11]

### 2. General Causation Opinions Related to Bendavid Study

**[41]** Next, BSC argues that Dr. Iakovlev lacks reliable methodology for his general causation opinions related to his review of explanted mesh as part of the Bendavid study. In preparing his expert report, Dr. Iakovlev examined over 100 mesh explants, approximately twenty percent of which were polypropylene and some fraction of which were transvaginal. (Iakovlev Report [Docket 225–1], at 2; Iakovlev Dep. [Docket 225–3], at 55, 243). The explanted mesh types included woven, **\*555** knitted, printed, GoreTex, combined designs of different manufacturers, and 21 samples from BSC. (Iakovlev Report [Docket 225–1], at 2; Iakovlev Dep. [Docket 225–3], at 320). BSC argues that because the study was not confined to polypropylene mesh and Dr. Iakovlev provides no information on how the mesh explants were chosen, the results are irrelevant and unreliable. The plaintiffs contend that Dr. Iakovlev's independent scientific testing is grounded in reliable methodology because he saw nerve entrapment, nerve ingrowth and degradation in 100% of the BSC explants. (Pls.' Opp. to Def.'s Mot. to Exclude the Ops. & Test. of Vladimir

Tyree v. Boston Scientific Corp., 54 F.Supp.3d 501 (2014)

Iakovlev, M.D. ("Pls.' Opp. re: Iakovlev") [Docket 268], at 9).

Although BSC fails to cite to any testimony from Dr. Iakovlev supporting its premise, I agree that Dr. Iakovlev provides no information on how the mesh explants were chosen or prepared for examination. (Def.'s Mem. re: Iakovlev [Docket 226], at 5–6). Dr. Iakovlev testified that the 21 BSC samples he examined were provided by plaintiffs' counsel. (Iakovlev Dep. [Docket 268–2], at 42). I also note, in his deposition for *Edwards*, Dr. Iakovlev further testified that he requested all available meshes for examination, but had no way of knowing what methodology the plaintiffs' lawyers employed in providing him with the number of meshes they did. (*Id.* at 157–61). Dr. Iakovlev "has given no explanation as to whether [his] is a representative sample size or how he chose the particular explants analyzed." *Lewis,* 2014 WL 186872, at *8. "Therefore, I have no information as to the 'potential rate of error' inherent in [his] observations." *Id.* (citing *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786). By simply highlighting the fact that Dr. Iakovlev performed an independent analysis, the plaintiffs have not demonstrated that Dr. Iakovlev's opinions regarding pelvic mesh explants were derived using scientific methods. Therefore, Dr. Iakovlev's general causation opinions related to the Bendavid study are **EXCLUDED.** [12]

Unlike his opinions in *Edwards,* it is unclear which of Dr. Iakovlev's opinions relate to specific plaintiffs in the current litigation or whether he reviewed samples separate from the Bendavid study. In *Edwards,* I allowed Dr. Iakovlev to testify regarding Ms. Edward's mesh because his specific causation opinions did not present the same reliability concerns as his general causation opinions. 2014 WL 3361923, at *23 ("Dr. Iakovlev may not testify regarding his general conclusions about mesh because his choice of samples lacks scientific methodology. However, this is not a reason to exclude his testimony about Ms. Edward's mesh, which was made after a review of her explant."). Here, when discussing polypropylene degradation and his polarization technique, Dr. Iakovlev refers to the 21 BSC samples provided to him by plaintiffs' counsel. (Iakovlev Dep. [Docket 225–3], at 412). In his expert report, when discussing mesh design, Dr. Iakovlev states he examined a "variety" of BSC devices, but fails to indicate their source. Without more information, I must assume that Dr. Iakovlev's additional opinions are based on his general review of mesh explants as part

of the Bendavid study, which I have determined to be unreliable. Therefore, I **FIND** that Dr. Iakovlev's opinions on mesh design, mesh deformation, and polypropylene degradation should also be **EXCLUDED.** [13]

**\*556  3. Deformation Opinions Based on Stretch Test**

[42]    BSC challenges the reliability of Dr. Iakovlev's opinions drawn from his mechanical testing of BSC slings. Dr. Iakovlev tested one sling and one Uphold. (Iakovlev Dep. [Docket 225–3], at 349). Dr. Iakovlev performed a "stretch test" on the mesh to simulate forces acting on the device in the body and confirm his hypothesis that mesh deforms after stretching forces are applied to it. (Iakovlev Report [Docket 225–1], at 7; Iakovlev Dep. [Docket 225–3], at 350). Dr. Iakovlev placed the mesh on a flat surface against a scale and secured the ends with clamps. (Iakovlev Dep. [Docket 225–3], at 345). Then, by pulling the clamps apart, he stretched the mesh to 120% of its original length. (*Id.*). Dr. Iakovlev observed permanent bowing, lengthening, and raised edges, which he opines is similar to the natural deformation that takes place inside the human body. (Iakovlev Report [Docket 225–1], at 7). Dr. Iakovlev also points out that when the clamps were released the mesh did not return to its original length and shape. (*Id.* at 7–8).

In particular, BSC makes the following arguments as to why Dr. Iakovlev's testing was methodologically flawed: (1) his testing method was not based on any testing standards and did not have a written protocol; (2) he did not regulate or measure how much force he applied to the mesh samples; (3) he set clamps on the mesh, but cannot provide measurements; (4) he intended to stretch the mesh to reach 120% of the original length, but does not know how he arrived at that result or how to repeat the test; (5) he could not describe or comprehend how he controlled his test for confirmation bias; (6) he does not know whether mesh responds to stretching with clamps the same way it does when implanted in the human body, nor has he done mechanical testing on mesh in the body; (7) he cannot validate that stretching mesh on a machine replicates the behavior of mesh in the body because he only measured unilateral forces, and not forces from multiple directions or the amount of force used; and (8) he has no knowledge of any general acceptance of his methodology in the scientific community. (Def.'s Mem. re: Iakovlev [Docket 226], at 7). BSC's objections can be

divided into two categories: (1) testing standards and (2) in vivo environment.

### a. Testing Standards

Many of BSC's arguments incorporate Dr. Iakovlev's failure to adhere to testing standards or a written protocol.[14] In his deposition, Dr. Iakovlev states that he developed the stretch test method; however, he failed to follow a written protocol other than the brief description included in his expert report. (Iakovlev Dep. [Docket 225–3], at 345). When describing the methodology he employed, Dr. Iakovlev admits that he did not wear gloves, clean or sterilize the mesh, or use machinery to regulate the amount of force exerted. (*Id.* at 347–48). Dr. Iakovlev insists that because the criterion for the test was length rather than force, the regulation of force was irrelevant. (*Id.* at 348). Nevertheless, Dr. Iakovlev readily admits that he developed and performed the stretch test himself, without taking care to standardize his method or the results. (*Id.* at 345, 350). Additionally, Dr. Iakovlev has no knowledge of whether his methodology is  **\*557** generally accepted in the medical community. (*Id.* at 350). Finally, when asked how he can be sure his results were not caused by the way he pulled the mesh, Dr. Iakovlev's only response is that the stretch test was a simulation, which I **FIND** insufficient to establish reliability. (*Id.* at 351–52).

### b. In Vivo Environment

BSC's remaining two arguments are in regard to Dr. Iakovlev's failure to replicate an in vivo environment.[15] Although Dr. Iakovlev states that he performed the stretch test to simulate forces acting on the device in the body, BSC contends that Dr. Iakovlev has no way of knowing whether mesh responds to stretching with clamps the same way it does when implanted inside of a woman. (Def.'s Mem. re: Iakovlev [Docket 226], at 7). BSC further argues that Dr. Iakovlev's tests failed to replicate the forces in the female pelvic floor because he measured uniaxial forces, while the forces in the female pelvic floor are generally multi-directional. (*See id.*).

The mere fact that Dr. Iakovlev's study was uniaxial does not alone render his methodology unreliable; however, the fact that he did not account for multi-directional

forces inside of the female pelvis weighs heavily against admissibility. Much like his response to BSC's question regarding confirmation bias, when asked about the way mesh responds inside and outside of the body, Dr. Iakovlev states that "the assumption is that if the forces are similar, the behavior will be similar. That's a limitation of all experimental studies." (Iakovlev Dep. [Docket 225–3], at 352). Dr. Iakovlev's "assumption" that the force he applied by pulling on the clamps accurately represents the forces inside the human body is hardly sufficient to survive *Daubert* scrutiny. Accordingly, I **FIND** that Dr. Iakovlev's opinions based on his "stretch test" are unreliable and thus, **EXCLUDED.**

### I. Motion to Exclude the Opinions and Testimony of Jerry Blaivas, M.D.

Dr. Jerry Blaivas is a pelvic surgeon and urologist. The plaintiffs offer Dr. Blaivas to opine as to general and specific causation. He seeks to offer opinions regarding the complications of synthetic slings and prolapse kits, BSC's warnings to physicians and patients, the removal of slings, the safety and efficacy of pubovaginal slings using autologous fascia and native tissue prolapse repair, and BSC's awareness of complications relating to its products. (*See* Blaivas Report [Docket 239–1], at 3–4).

BSC contends that Dr. Blaivas's testimony should be excluded as unreliable. In particular, BSC makes the following arguments: (1) his opinions are not generally accepted within his field; (2) he improperly discounted contrary studies; (3) he fails to support his opinions with peer-reviewed literature; and (4) he failed to consider any studies using the Obtryx. (BSC's Mem. in Supp. of Its Mot. to Exclude the Ops. and Test. of Jerry Blaivas, M.D. ("BSC's Mem. re: Blaivas") [Docket 240], at 1–2). Also, BSC argues that Dr. Blaivas's specific causation opinions as to Ms. Hendricks should be excluded because he did not perform a proper differential diagnosis. (*See id.* at 2). Finally, BSC argues that "Dr. Blaivas seeks to offer opinions that (1) constitute legal opinions, (2) fall outside the scope of his expertise; or (3) consist of speculation regarding Boston Scientific's knowledge, intent, and/or state of mind." (*Id.*).

### **\*558** 1. Opinion that Polypropylene Mid–Urethral Slings Are Not Safe In the Treatment of SUI

[43]    BSC challenges Dr. Blaivas's opinion that polypropylene mid-urethral slings are not safe to treat SUI. BSC makes several sub-arguments as to this point.

### a. General Acceptance

First, BSC argues that the opinion "is unreliable because it is not generally accepted in the relevant medical and scientific communities and ... conflicts with the findings of a FDA Advisory Panel and leading urogynecological and urological organizations" of which is he a member (*Id.* at 5). BSC notes that the FDA Advisory Panel and organizations, including the American Urogynecologic Society ("AUGS") and the American Urological Association ("AUA"), have released findings and statements stating that polypropylene slings are safe and effective and are the "worldwide standard of care for the surgical treatment of stress urinary incontinence." (*Id.* at 5–6). BSC contends that Dr. Blaivas discounts these findings and statements with unfounded accusations of bias. (*See id.* at 6). Also, at his deposition, Dr. Blaivas testified that the majority of physicians performing surgery to treat SUI use synthetic mesh slings and think that using polypropylene mesh slings are safe. (*See* Blaivas Dep. II [Docket 239–6], at 511:12–23).

[44]    " 'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence...." *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. As a result, even if Dr. Blaivas's opinion is not generally accepted, that factor alone does not dictate a finding of unreliability. Furthermore, as I explain above in my ruling on BSC's Motion to Exclude Plaintiffs' Experts' Opinion that Polyprolylene Mid–Urethral Slings are Defective [Docket 227], BSC is seeking to challenge Dr. Blaivas's conclusion rather than his methodology. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). Therefore, this argument has no merit.

### b. Failing to Consider Contrary Scientific Literature

Second, BSC argues that "Dr. Blaivas inexplicably dismisses and fails to consider published, peer-reviewed literature demonstrating polypropylene mid-urethral

slings are safe and effective." (BSC's Mem. re: Blaivas [Docket 240], at 5). In particular, BSC contends that Dr. Blaivas discounts the Nilsson study, the Delorme study, and the Ulmsten study with unsupported allegations of bias. (*See id.* at 9–10).

[45]    [46]    An expert's opinion may be unreliable if he fails to account for contrary scientific literature and instead "selectively [chooses] his support from the scientific landscape." *In re Rezulin Products Liab. Litig.,* 369 F.Supp.2d 398, 425 (S.D.N.Y.2005) (quotations omitted). "[I]f the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Id.; see also Abarca v. Franklin Cnty. Water Dist.,* 761 F.Supp.2d 1007, 1066 n. 60 (E.D.Cal.2011) ("A scientist might well pick data from many different sources to serve as circumstantial evidence for a particular hypothesis, but a reliable expert would not ignore data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." (quotations omitted)); *Rimbert v. Eli Lilly & Co.,* CIV 06–0874 JCH/L FG, **\*559** 2009 WL 2208570, at \*14 n. 19 (D.N.M. July 21, 2009) *aff'd,* 647 F.3d 1247 (10th Cir.2011) ( "[A]n expert who chooses to completely ignore significant contrary epidemiological evidence in favor of focusing solely on non-epidemiological studies that support her conclusion engages in a methodology that courts find unreliable.").

However, contrary to BSC's contentions, Dr. Blaivas provided more than mere blanket accusations of bias for discounting these studies. He *explained why* he suspected bias. Dr. Blaivas explained that Dr. Delorme was an inventor of the approach being studied and stated that "to conclude after [looking at] 32 patients by the inventor of the operation that it's safe and effective stretches credibility in my judgment." (Blaivas Dep. I [Docket 239–4], at 293:20–22; *see id.* at 292:9–294:19). Similarly, Dr. Blaivas claims that the Ulmsten study was "one of the studies I referred to that I believe to be completed and to get paid had to show a complication rate that was comparable to the last study ... I think this study is ethically challenged." (*Id.* at 287:15–20). In regards to the Nilsson follow-up study, Dr. Blaivas testified that its methodology was, in fact, problematic because "[t]wenty-one of the patients were lost to follow-up." (Blaivas Dep. II [Docket 239–6], at 392:5). He explained further:

A: ... All those patients that they did follow-up, no complications, no serious complications in all of their patients but one that had a minor complication, yet, there's 21 patients that they cannot account for and we are to assume that it's safe because they didn't include them. All 21 of them could have had another operation for the same thing. All 21 of them could have died from an infection from this. We don't know that. How can we possibly say that that's safe.

(*Id.* at 392:9–17). If BSC seeks to challenge Dr. Blaivas's allegations of bias as to these studies, it may do so on cross examination. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### c. Not Based on Scientific Literature

In another section of its memorandum, BSC argues that Dr. Blaivas's opinion that polypropylene mid-urethral slings are not safe to treat SUI is based only on his experience. (BSC's Mem. re: Blaivas [Docket 240], at 5–6). Dr. Blaivas testifies that he "remember[s] [his] opinions about the safety were not based predominantly on the medical literature." (Blaivas Dep. II [Docket 239–6], at 434:22–23). In support of its argument, BSC further cites to Dr. Blaivas's deposition testimony demonstrating that he could not identify which articles on his list he relied upon in forming this opinion and explained that "I guess I can't answer your question fairly without looking at each article, but I do believe that I will find some." (Blaivas Dep. I [Docket 239–4], at 150: 3–5; *see* BSC's Mem. re: Blaivas [Docket 250], at 12).

Dr. Blaivas's failure to recall which articles supported his opinion as to safety is an insufficient reason to find his methodology unreliable. Dr. Blaivas has extensive experience, (*see* Blaivas Report [Docket 239–1], at Ex. A (Dr. Blaivas's curriculum vitae)), has authored peer-reviewed articles on this subject (*see* Blaivas Dep. I

[Docket 239–4], at 149:16–23), and considered scientific literature in forming his opinions as evidenced by his relied upon list (*see* Blaivas Report [Docket 239–1], at Ex. B). The fact that the scientific literature was not the "predominant[ ]" basis of **\*560** his opinion does not thereby render it unreliable. (Blaivas Dep. II [Docket 239–6], at 434:23).

Therefore, I **FIND** that Dr. Blaivas's opinion that polypropylene mid-urethral slings are not safe in the treatment of SUI is sufficiently reliable to pass *Daubert* scrutiny.

### 2. Failure to Base Opinion on Published, Peer–Reviewed Literature

BSC also argues that Dr. Blaivas did not base his opinions on peer-reviewed literature. (BSC's Mem. re: Blaivas [Docket 240], at 10). In support, BSC cites to portions of Dr. Blaivas's testimony where he discusses his relied upon list in another case, *Hall.* (*See id.* at 11; Blaivas Dep. I [Docket 239–4], at 105:10–11). It does not reveal that he based his opinions on experience alone:

Q: Okay. And you said that your opinions in these matters are based upon the 36 medical literature items that you've attached, correct?

A: No, I don't think I said that. What I said is that these are supporting documents for my opinions. Many, if not most of my opinions come from my own experience with patients, talking to other doctors, particularly other experts about what they're seeing and, you know, conducting courses, inviting speakers, listening to lectures, et cetera. That's where —and—and having lived through the evolution of— the evolution of slings. In fact, I think that—I think these papers were mostly chosen as the best we could find in the peer-review literature to support those— my opinions, but I would not at all rely on these papers to substantiate my opinions. If none of these papers existed, my opinions would be the same.

(*Id.* at 106:5–107:1) (objection omitted). This demonstrates that Dr. Blaivas at least reviewed and considered the literature on his list. These studies supported his opinions. Whether or not his conclusions exactly comport with the conclusions reached in the studies is not determinative of my *Daubert* analysis. I am

to assess the reliability of Dr. Blaivas's method, not the accuracy of the conclusions that he reaches. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

Next, BSC challenges Dr. Blaivas's opinion that "[p]ubovaginal slings using autologous fascia are a safer alternative to synthetic slings [.]" (Blaivas Report [Docket 239–1], at 4). In support of its argument, BSC cites to Dr. Blaivas's deposition testimony, where he states that "there are no head-to-head studies" comparing the two slings and that he was unable to name studies finding that pubovaginal slings are safe. (Blaivas Dep. II [Docket 239–6], at 380:25). As I explain above, I do not find this deposition testimony to be dispositive. Therefore, I **FIND** Dr. Blaivas's opinion that pubovaginal slings are safer than polypropylene slings survives *Daubert* scrutiny.

### 3. Dr. Blaivas's Qualifications to Opine on the Design of the Obtryx Slings or the Adequacy of Its Warnings

BSC argues that Dr. Blaivas is unqualified to opine as to the design of the Obtryx or the adequacy of its warnings. BSC challenges several opinions in Dr. Blaivas's report:

> BSC did not warn physicians and patients about the possibility of serious and life-style altering complications including, chronic, debilitating pain, dyspareunia, nerve injuries, vaginal scarring, bladder dysfunction, the need for **\*561** multiple corrective surgeries, and others.
>
> ...
>
> BSC did not warn physicians about the possibility that these complications could occur months, years, or decades after placement of the devices, such as the Pinnacle and Advantage.
>
> ...
>
> BSC did not warn doctors and patients about the difficulty removing their products and the less than optimal results when excision or revision became warranted due to complications.
>
> ...

> A permanent device, such as BSC Advantage and Pinnacle, should not have been designed to be placed in a surgically contaminated field ...

(Blaivas Report [Docket 239–1], at 3–5; *see* BSC's Mem. re: Blaivas [Docket 240], at 13–14). I have previously found Dr. Blaivas qualified to testify as to the adequacy of warnings. *See Huskey, et al. v. Ethicon, Inc., et al.,* 29 F.Supp.3d 691, 719–20, No. 2:12–cv–05201, 2014 WL 3362264, at \*20 (S.D.W.Va. July 8, 2014). As I explained in *Huskey* with respect to a different product's warnings:

> [A]s a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU. Dr. Blaivas is qualified to render an opinion as to the completeness and accuracy of Ethicon's warnings and—"it follows from that—the extent to which any inaccuracies or omissions could either deprive a reader or mislead a reader of what the risks and benefits" of the TVT–O was when the warnings were published.

*Id.* at 719, 2014 WL 3362264, at \*20 (citation omitted). Here, the same reasoning applies. Therefore, I **FIND** Dr. Blaivas qualified to testify as to the adequacy of the Obtryx warnings.

**[47]** As for product design, BSC contends that Dr. Blaivas lacks design experience and has not implanted an Obtryx sling or BSC pelvic mesh product. (*See* BSC's Mem. re: Blaivas [Docket 240], at 13; Blaivas Dep. I [Docket 239–4], at 26:22–23 ("Q: Have you ever done an Obtryx surgery? A: Have not.")). Dr. Blaivas's experience removing SUI devices and observing complications during the removal process does not alone render him qualified to opine as to design. Dr. Blaivas worked in developing the autologous rectus fascial sling operation. However, this experience in developing procedures does not make him an expert in the design of a medical *device.* (*See* Blaivas Report [Docket 239–1], at 1–2). As a result, Dr. Blaivas lacks the "knowledge, skill, experience, training, or education" as to product design that Federal Rule of Evidence 702 requires. Fed.R.Evid. 702. His opinions related to product design are **EXCLUDED.**

### 4. BSC Argues Dr. Blaivas's Opinions Are Legal Conclusions

BSC argues that Dr. Blaivas seeks to offer opinions that are legal conclusions. BSC challenges only one opinion: "Claims that make the procedure appear safer and easier to perform than it actually is are misleading." (Blaivas Report [Docket 239–1], at 4). The plaintiffs interpret this opinion as Dr. Blaivas commenting "that BSC downplayed the difficulties associated with the surgical implantation of the Obtryx device." (Pls.' Opp'n to Def. BSC's Mot. and Mem. of Law in Supp. of its Mot. to Exclude the Ops. and Test. of Jerry Blaivas, M.D. ("Pls. Resp. re: Blaivas") [Docket 279], at 17). I recently explained that Dr. Blaivas's opinion on downplaying complications based on his personal experience **\*562** is not an expert opinion and declined to address its admissibility. *See Huskey,* 29 F.Supp.3d at 721, 2014 WL 3362264, at \*22. Therefore, I will not address the admissibility of this testimony here.

### 5. BSC Argues Dr. Blaivas's Opinions Are Outside of His Expertise

 **[48]**    BSC argues that Dr. Blaivas's opinions as to polypropylene mesh shrinkage and degradation are beyond his expertise because Dr. Blaivas admits in his deposition that he is not an expert in biomaterials and that he read and relied upon other experts' depositions in educating himself on degradation. (*See* Blaivas Dep. II [Docket 239–6], at 482:12–13 (testifying "I mean, the biochemistry and stuff was over my head"); *id.* at 481:4–48:3). BSC also cites to Dr. Blaivas's deposition testimony which reveals that he has not performed tests on shrinkage, he has "never looked for any" studies finding that mesh shrinks asymmetrically, and he could not recall the details of a particular study on mesh shrinkage. (*See id.* at 458:12–14, 459:6–8, 465:8–466:2). In response, the plaintiffs point to Dr. Blaivas's experience removing SUI devices and personally observing degradation. (*See* Pls. Resp. re: Blaivas [Docket 279], at 14).

In *Huskey,* I found that Dr. Blaivas was unqualified to opine as to mesh shrinkage and degradation due to his failure to disclose his particular experience with these matters in his expert report. 29 F.Supp.3d at 722–23, 2014 WL 3362264, at \*23–24. I **ADOPT** this reasoning here. Therefore, I **FIND** that Dr. Blaivas is not qualified to opine as to these matters.

### 6. Dr. Blaivas's State of Mind Testimony

BSC argues that Dr. Blaivas seeks to offer state of mind testimony. (*See* BSC's Mem. re: Blaivas [Docket 240], at 17–18). As I explain above, this testimony is impermissible expert testimony. The plaintiffs concede that Dr. Blaivas will not offer state of mind testimony. (*See* Pls. Resp. re: Blaivas [Docket 279], at 17). Therefore, BSC's motion with regard to this matter is **DENIED AS MOOT.**

### 7. BSC Argues That Dr. Blaivas's Opinions Do Not Fit the Facts of the Case

BSC also argues that Dr. Blaivas's opinions do not fit the facts of the case because he cannot recall whether he has reviewed any studies concerning the safety and efficacy of the Obtryx. (*See* Blaivas Dep. I [Docket 239–4], at 334:20–25). Even if this is the case, Dr. Blaivas's opinions as to polypropylene mesh slings generally are still helpful to a jury here.

### 8. Dr. Blaivas's Specific Causation Opinions as to Ms. Hendricks

BSC challenges Dr. Blaivas's specific causation opinions as to Ms. Hendricks. Ms. Hendricks is no longer a plaintiff in this case. Therefore, BSC's motion with respect to this matter is **DENIED AS MOOT.**

### 9. Dr. Blaivas's References to POP and the Pinnacle

Dr. Blaivas's report contains references to POP, the Pinnacle device, and the Advantage product. (*See, e.g.,* Blaivas Report [Docket 239–1], at 3–4). In this case, the product at issue is the Obtryx which is used to treat SUI. I find that Dr. Blaivas's references to POP, the Pinnacle, and the Advantage are immaterial to my *Daubert* ruling here. Many of his opinions apply to both synthetic slings and prolapse kits and merely refer to the Pinnacle and Advantage devices as examples of such. (*See, e.g., id.* at 3 (opining that "[s]ynthetic slings and prolapse kits, such as [BSC's] Pinnacle and Advantage devices, cause **\*563** serious and life-style altering complications ...")).

Therefore, BSC's Motion to Exclude the Opinions and Testimony of Jerry Blaivas, M.D., is **GRANTED IN PART** and **DENIED IN PART**.

### J. Motion to Exclude the Opinions and Testimony of Alison Vredenburgh, Ph.D., CPE

Dr. Vredenburgh works as a consultant and researcher in the field of "human factors," providing business guidance on matters such as product warning design, injury prevention, risk management, and warning effectiveness. (*See* Vredenburgh Curriculum Vitae [Docket 241–1], at 2 (describing Dr. Vredenburgh's current consulting position)). The plaintiffs offer Dr. Vredenburgh to provide expert testimony on "BSC's management of hazards related to its transvaginal mesh products." (Pls.' Opp. to BSC's Mot. to Exclude Dr. Vredenburgh ("Pls. Mot. re: Vredenburgh") [Docket 284], at 2). In sum, Dr. Vredenburgh opines that "BSC failed to effectively control the hazards present in its transvaginal mesh products at issue in this litigation, including its design and hazard communication (including instructions, training, and warnings) of the Obtryx." (Vredenburgh Report [Docket 241–3], at 3).

BSC's objections to this expert testimony fall into four categories: (1) Dr. Vredenburgh is not qualified to offer the opinions set forth in her report; (2) Dr. Vredenburgh's opinions are not helpful to the jury; (3) Dr. Vredenburgh did not support her opinions with reliable methodology; and (4) Dr. Vredenburgh's opinions are not proper for expert testimony because they assert legal conclusions and opine about BSC's state of mind. Because I find that Dr. Vredenburgh's opinions are improper and therefore not helpful to the jury as prescribed by Federal Rule of Evidence 702, I need not address BSC's arguments regarding Dr. Vredenburgh's qualifications and the reliability of her methods. As further explained below, I **GRANT** BSC's Motion to Exclude the Opinions and Testimony of Dr. Vredenburgh [Docket 242].

### 1. Improper Legal Conclusions

[49] [50] Rule 702 provides that an expert witness may testify in the form of an opinion if his or her "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a). If, for instance, an expert's opinion "supplies the

jury with no information other than the witness's view of how the verdict should read," then the testimony is essentially a legal conclusion "that is better handled by the judge and, coming from the witness, will be of little assistance to the jury." *United States v. Offill,* 666 F.3d 168, 175 (4th Cir.2011). Dr. Vredenburgh's testimony collapses under this rule. Instead of simply outlining her opinion on the vital parts of a product warning, Dr. Vredenburgh's report goes a step further, concluding that BSC "failed to provide adequate instructions" and "did not include adequate warnings." (Vredenburgh Report [Docket 241–3], at 5). As I held in *In re C.R. Bard, Inc.,* "whether [the defendant] failed to warn [is a] question[ ] for the jury, not for Dr. [Vredenburgh]." 948 F.Supp.2d 589, 629 (S.D.W.Va.2013); *see also Strong v. E.I. DuPont de Nemours Co.,* 667 F.2d 682, 686 (8th Cir.1981) ("[T]he question of whether the lack of warnings rendered the ... products unreasonably dangerous is not the kind of issue on which expert assistance is essential for the trier of fact. The jury was capable of drawing its own inferences from the available evidence."). Accordingly, I **\*564 EXCLUDE** Dr. Vredenburgh's opinions, as they are all based on legal conclusions.

### 2. Improper State of Mind Testimony

[51] Dr. Vredenburgh's expert report also offers opinions on BSC's state of mind and corporate conduct. Specifically, Dr. Vredenburgh states that BSC: "*knew* the complication rates, yet failed to include them in the warnings and/or labeling"; "*was aware* of debilitating outcomes"; "*ignored* the numerous red flags raised by multiple agencies, publications and physicians"; used "anti-warnings" to "*deliberately misrepresent* dangerous products as safe"; and "*refused* to perform Clinical Testing to help identify risks." (Vredenburgh Report [Docket 241–3], at 10–24 (emphasis added)).

[52] As I have previously stressed, the defendant's "knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury." *In re C.R. Bard, Inc.,* 948 F.Supp.2d at 611 (citing to *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 546 (S.D.N.Y.2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.")). The reasonableness of conduct and a party's

then-existing state of mind "are the sort of questions that lay jurors have been answering without expert assistance from time immemorial." *Kidder v. Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.,* 14 F.Supp.2d 391, 404 (S.D.N.Y.1998). Here, opinions on BSC's alleged corporate misconduct and improper decisions are strewn throughout Dr. Vredenburgh's report, largely supported by various BSC internal documents. (*See, e.g.,* Vredenburgh Report [Docket 241–3], at 6 (citing to the depositions of BSC corporate executives)). While internal corporate documents and executives' testimony are certainly relevant in this case, such evidence "should be presented directly to the jury, not through an expert." *In re C.R. Bard, Inc.,* 948 F.Supp.2d at 628. Thus, I **EXCLUDE** Dr. Vredenburgh's opinions on BSC's state of mind, corporate knowledge, business failures, and the like.

In conclusion, Dr. Vredenburgh's expert report provides legal conclusions about whether BSC acted appropriately and opines about BSC's corporate ethics. The jury is capable of evaluating the evidence on these subjects without the help of an expert. Furthermore, the court believes her testimony as offered would mislead and confuse the jury, even if arguably adequate under *Daubert.* Therefore, I **GRANT** BSC's Motion to Exclude the Opinions and Testimony of Dr. Vredenburgh [Docket 241].

## K. Motion to Exclude the Opinions and Testimony of Bruce Allen Rosenzweig, M.D.

Dr. Rosenzweig is a urogynecologist and a professor of obstetrics and gynecology in Chicago, Illinois. The plaintiffs offer Dr. Rosenzweig as an expert witness on general causation and on specific causation for Ms. Blankenship. (*See* Rosenzweig Report on Jeanie Blankenship ("Rosenzweig Report re: Blankenship") [Docket 273–1], at 4–6 (opining that, with a reasonable degree of medical certainty, the Obtryx device implanted in Ms. Blankenship caused her injuries)). BSC attacks the reliability of Dr. Rosenzweig's specific causation opinions, as well as the general causation opinions underlying them. I address BSC's objections below, beginning with Dr. Rosenzweig's general causation opinions.

### 1. General Causation Opinions

**[53]** Dr. Rosenzweig's expert reports primarily focus on diagnosing the particular **\*565** symptoms of Ms. Blankenship, but he supports these diagnoses with an analysis of the medical literature on polypropylene transvaginal mesh and mid-urethral slings. BSC's general causation objection arises from Dr. Rosenzweig's assessment of this literature. BSC argues that Dr. Rosenzweig "relied on inferior studies and failed to read more complete studies which came to conclusions opposite of his own," and as a result, his opinions are unreliable and incomplete. (BSC's Mem. of Law in Supp. of Its Mot. to Exclude the Test. of Dr. Rosenzweig ("BSC's Mem. re: Rosenzweig") [Docket 252], at 6–7).

I disagree with BSC's contentions for several reasons. First, I have considered Dr. Rosenzweig as a general causation expert three times in the past, and on each occasion, I have admitted his general causation testimony on the properties of polypropylene mesh. *See Lewis, et al. v. Ethicon, Inc.,* No. 2:12–cv–4301, 2014 WL 186872, at \*20 (S.D.W.Va. Jan. 15, 2014) (finding that Dr. Rosenzweig is qualified to offer the opinion that vaginally implanted polypropylene mesh degrades, based on his clinical experience and his analysis of scientific literature and academic papers); *Edwards v. Ethicon, Inc.,* 2:12–cv–09972, 2014 WL 3361923, at \*11 (S.D.W.Va. July 8, 2014) (same); *Huskey v. Ethicon, Inc.,* 29 F.Supp.3d 691, 707–08, 2:12–cv–05201, 2014 WL 3362264, at \*8 (S.D.W.Va. July 8, 2014) (same). BSC has not distinguished Dr. Rosenzweig's opinions in this case from the opinions I have admitted in prior MDLs.

In an attempt to discredit Dr. Rosenzweig's review of the relevant literature, BSC emphasizes Dr. Rosenzweig's failure to read the Litwiller paper, an unpublished study that included 954 patients with the Obtryx sling. (Rosenzweig Dep. [Docket 251–2], at 139:18–140:1). But BSC has not demonstrated the relevance of this study to Dr. Rosenzweig's opinions in this case. Furthermore, BSC has not explained why Dr. Rosenzweig's unfamiliarity with this single study renders his opinion unreliable as a whole.

Without a demonstrated reason for abandoning my prior holdings, I **DENY** BSC's motion with respect to Dr. Rosenzweig's general causation opinions.

### 2. Specific Causation Opinions

**[54]  [55]  [56]**  BSC next asks this court to exclude Dr. Rosenzweig's specific causation opinions about Ms. Blankenship because Dr. Rosenzweig failed to conduct a reliable differential diagnosis. A reliable differential diagnosis requires the expert to "determin[e] the possible causes for the patient's symptoms and then eliminat[e] each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be considered is the most likely." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999). Although BSC makes much of the fact that Dr. Rosenzweig does not have a physician-patient relationship with Ms. Blankenship, Fourth Circuit law provides that "a physician may reach a reliable differential diagnosis without personally performing a physical examination." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 203 (4th Cir.2001). As such, Dr. Rosenzweig's failure to physically examine Ms. Blankenship does not per se render his specific causation testimony unreliable, especially when he reached his opinions by studying the records of other physicians who examined the two women. *See Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807 (3d Cir.1997), *as amended* (Dec. 12, 1997), ("[A] physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available.").

**\*566**  BSC argues that the court should nevertheless exclude Dr. Rosenzweig because he did not adequately consider and eliminate alternative causes for the exhibited symptoms. As explained below, I do not find this argument persuasive.

After her pelvic surgery, Ms. Blankenship developed suprapubic and pelvic pain and a delayed-onset voiding dysfunction. Dr. Rosenzweig opines that these symptoms directly resulted from the Obtryx implantation. BSC asserts that Dr. Rosenzweig has overlooked several symptoms that Ms. Blankenship experienced before her Obtryx sling surgery, including pelvic pain and dyspareunia. But Dr. Rosenzweig's report and deposition testimony confirm that Dr. Rosenzweig did in fact consider these symptoms in reaching his conclusions.

First, Dr. Rosenzweig acknowledged that Ms. Blankenship had pre-implant pelvic pain and dyspareunia. (*See* Rosenzweig Dep. [Docket 273–2], at 153:10–16 (agreeing that Ms. Blankenship complained of pelvic discomfort and pain with sex two days prior to her pelvic surgery)). He then excluded this pain as the cause of Ms. Blankenship's current problems, explaining that someone with pre-implant pain could still experience "an increase in that pain" after transvaginal mesh placement. (*Id.* at 156:16–19). Furthermore, in his expert report, Dr. Rosenzweig explicitly lists Ms. Blankenship's prior medical problems and eliminates them as possible causes of current pain:

> Ms. Blankenship did not have, or subsequently develop, any medical or historical factors which increased her risk for developing suprapubic and pelvic pain and a voiding dysfunction. Review of her medical history reveals the following: macular degeneration, urinary tract infections, and human papilloma virus. None of these factors increased the risk for voiding dysfunction. To a reasonable degree of medical certainty, there is no other reasonable cause for the suprapubic and pelvic pain and the voiding dysfunction other than the Obtryx, given Ms. Blankenship's medical history.

(Rosenzweig Report re: Blankenship [Docket 273–1], at 5).

**[57]**  While a more detailed account from Dr. Rosenzweig might be desired, *Daubert* does not require additional explanation at this time. *Edwards v. Ethicon, Inc.,* 2:12–cv–09972, 2014 WL 3361923, at *6 (S.D.W.Va. July 8, 2014) (admitting the specific causation opinion of Dr. Steege, even though he "did not provide a detailed explanation" as to why he ruled out alternative causes, because "he based his conclusions on accepted scientific principles and research"). Rather, any potential errors in a doctor's differential diagnosis "affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony." *Westberry,* 178 F.3d at 265 (internal quotations omitted). Therefore, I **FIND** that Dr. Rosenzweig adequately considered and eliminated alternate causes of Ms. Blankenship's symptoms such that his differential diagnosis is reliable.

BSC raises two other arguments against Dr. Rosenzweig's specific causation opinion. First, BSC asserts that Dr. Rosenzweig has no scientific evidence to support his opinion that Ms. Blankenship's mesh contracted and shrunk after implantation because he did not examine Ms. Blankenship or her mesh implant. In response, the plaintiffs refer to trial testimony from another MDL trial, *Lewis, et al. v. Ethicon, Inc.,* in which I allowed Dr. Rosenzweig to offer an opinion on mesh shrinkage based on a study by Carl Gustaf Nilsson. (*See* Transcript [Docket 273–5], at 136:15–139:9). This previous trial testimony has little value here as the plaintiffs have taken **\*567** it out of context. In *Lewis,* I allowed Dr. Rosenzweig to provide a *general* causation opinion that transvaginal mesh can shrink over time. *See Lewis,* 2014 WL 186872, at \*20 (permitting Dr. Rosenzweig's opinion testimony that transvaginal mesh "is not suitable for its intended application ... because it [can lead to] mesh contracture/shrinkage"). Here, however, Dr. Rosenzweig has offered a *specific* causation opinion—that Ms. Blankenship's delayed-onset voiding dysfunction most likely stemmed from "the Obtryx sling contracting and shrinking inside her body." (Rosenzweig Report re: Blankenship [Docket 273–1], at 6). Thus, the plaintiffs' reference to the *Lewis* trial is not instructive.

Although the trial transcript provides no assistance, Dr. Rosenzweig's deposition testimony and expert report suggest a scientific connection between Ms. Blankenship's voiding dysfunction and contracture of the Obtryx that can withstand *Daubert.* According to Dr. Rosenzweig:

(1) Ms. Blankenship had abnormal urodynamic flow patterns, which indicate a voiding dysfunction caused by mesh contraction (*see* Rosenzweig Dep. [Docket 273–2], at 165:8–166:15 (explaining that "bi-peaked" flow pattern is "a sign of voiding dysfunction"));

(2) Several medical studies, including the Nilsson study, demonstrate that if "delayed-onset voiding dysfunction is diagnosed," then "sling contraction/ shrinkage occurred" (Rosenzweig Report re: Blankenship [Docket 273–1], at 5); and

(3) the explant operative report reviewed by pathologist Dr. Richard Trepeta evidences that "Ms. Blankenship's body reacted to the shrinkage and contracture by developing peri-urethral scarring," which is "the foreseeable pathological response to

transobturator mesh placement that shrinks and contracts" (*id.* at 6).

Dr. Rosenzweig's analysis has plenty of gaps that BSC can capitalize on during cross-examination. But *Daubert* only requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Dr. Rosenzweig thoroughly considered Ms. Blankenship's medical history and test results in the light of the applicable publications, thereby establishing "medical evidence as to what caused [Ms. Blankenship's] specific injuries"—that is enough to get through *Daubert's* gate. *See Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 201 (rejecting expert testimony that "simply failed to provide any medical evidence as to what caused [the plaintiff's] specific injuries").

Finally, BSC disputes Dr. Rosenzweig's conclusion that Ms. Blankenship's sling was cut by Dr. Lassere during Ms. Blankenship's revision surgery on July 11, 2012. Dr. Lassere testified that he "could not find the sling," and so, in BSC's view, Dr. Rosenzweig's conclusion otherwise is an *ipse dixit* opinion. (BSC's Mem. re: Rosenzweig [Docket 252], at 14). The fact that Dr. Rosenzweig's testimony counters that of Dr. Lassere does not dictate admissibility. *See Crowley v. Chait,* 322 F.Supp.2d 530, 533–54 (D.N.J.2004) ("Listening to testimony and deciding whether it is contradictory is the 'quintessential jury function of determining credibility of witnesses.' " (internal quotations omitted)). Moreover, although Dr. Rosenzweig was not present at the revision surgery, Dr. Rosenzweig supports his conclusion with scientific methodology—he examined Ms. Blankenship's medical records and pathology reports, applied his clinical expertise to those findings, and concluded that Dr. Lassere must have cut Ms. Blankenship's **\*568** sling in the revision surgery. (*See* Rosenzweig Dep. [Docket 251–2], at 158:23–159:2 (using his clinical experience to conclude that even though Dr. Lassere could not find the sling, he likely was still able to transect it); *id.* at 163:19–24 (explaining that part of "revision surgery" requires "releas[ing] the sling"); Rosenzweig Report re: Blankenship [Docket 273–1], at 6 (relying on Dr. Richard Trepeta's pathology report from Ms. Blankenship's explant to conclude that the revision surgery removed part of the Obtryx)). Therefore, BSC's objection to Dr. Rosenzweig's testimony on the revision surgery has no merit.

In sum, these final two arguments do not change my conclusion that Dr. Rosenzweig's specific causation opinions about Ms. Blankenship are reliable. Accordingly, I **DENY** BSC's motion to exclude Dr. Rosenzweig [Docket 251] and **FIND** that Dr. Rosenzweig can testify about the general causation and specific causation opinions set forth in his expert report.

### L. Motion to Exclude the Opinions and Testimony of Christopher Walker, M.D.

 **[58]**    Dr. Walker is a board certified urogynecologist whom the plaintiffs hired to physically examine Plaintiff Chris Renee Wilson. Ms. Wilson alleges that her Obtryx mesh implant has led to dyspareunia, pelvic pain, urinary incontinence, and other complications. On May 2, 2014, Dr. Walker examined Ms. Wilson and recorded his results. (*See generally* Walker Report [Docket 270–2] ). The plaintiffs now offer Dr. Walker as an expert on specific causation for Ms. Wilson.

Dr. Walker opines that based on his evaluation, "the presence of a midurethral sling" has caused the problems that Ms. Wilson currently experiences. (*See* Walker Dep. [Docket 270–1], at 40:18–20; *see also* Walker Report [Docket 270–2], at 9 (concluding that Ms. Wilson has "genito-urinary mesh implant complication")). BSC objects to Dr. Walker's opinion testimony, asserting that Dr. Walker's opinions are not based on reliable facts and that Dr. Walker failed to conduct a proper differential diagnosis in reaching his conclusion. As explained below, I disagree and **DENY** BSC's Motion to Exclude the Testimony of Christopher Walker, M.D. [Docket 247].

BSC first argues that Dr. Walker "failed to rely on *any* studies and/or medical literature regarding polypropylene transvaginal mesh and mid-urethral slings, including the Obtryx, in forming his opinions," and as a result, his opinions "are not based on reliable facts or data." (BSC's Mem. in Supp. of Its Mot. to Exclude the Test. of Christopher Walker, M.D. ("BSC's Mem. re: Walker") [Docket 248], at 5). As an initial matter, Dr. Walker's deposition testimony suggests that BSC's contention is not wholly accurate. Dr. Walker stated that although he did not rely on particular studies in preparing his report for this case, he reads peer-reviewed literature and scientific studies on midurethral slings "very, very frequently" in his clinical practice, which involves treating women with urologic dysfunction. (Walker Dep. [Docket 270–1], at 15:12–17). Dr. Walker also answered multiple questions

about the American Urogynecology Society's ("AUGS") statement on the use of midurethral slings for SUI. (*See id.* at 120:21–125:15 (evaluating each paragraph of the AUGS's statement)). Additionally, he explained that in his practice, he has relied on the research of Dr. Shlomo Raz, whom he described as one of the "leading authorities" in the urogynecological field. (*Id.* at 27:8–28:7).

In any event, peer-reviewed literature is merely one tool an expert witness can use to support his or her opinion. For instance, when providing a specific causation **\*569** opinion, as Dr. Walker is in this case, experts often utilize differential diagnosis, a methodology that courts have accepted under *Daubert. See Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir.2001) (confirming that a reliable differential diagnosis "provides a valid foundation for an expert opinion under Rule 702"). A reliable differential diagnosis generally involves the performance of physical examinations, the taking of medical histories, and the review of clinical tests. *Id.* While integrating scientific literature into the process might bolster the credibility of an expert's opinion, the absence of scholarly references in an expert report does not invariably exclude an otherwise reliable differential diagnosis. *See Cavallo v. Star Enter.,* 892 F.Supp. 756, 774 (E.D.Va.1995), *aff'd in relevant part,* 100 F.3d 1150, 1159 (4th Cir.1996) ("[I]f a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened."); *see also Heller v. Shaw Indus. Inc.,* 167 F.3d 146, 154 (3d Cir.1999) (concluding that *Daubert* does not require a physician to "rely on definitive published studies before concluding that exposure to a particular object or chemical was the most likely cause of a plaintiff's illness").

Here, Dr. Walker relied on three sources in reaching his specific causation opinion about Ms. Wilson. Prior to meeting Ms. Wilson, Dr. Walker reviewed her medical records. (Walker Dep. [Docket 270–1], at 34:17). Then, when Ms. Wilson arrived for her physical examination, Dr. Walker took her medical history. (*See* Walker Report [Docket 270–2], at 3–5 (recording Ms. Wilson's past medical history, including her gynecological, obstetric, surgical, social, and family history)). Finally, Dr. Walker performed a 2.5–hour physical examination of Ms. Wilson. (*See id.* at 6–9 (describing the physical examination and recording his findings)). Courts consistently accept this methodology as a reliable foundation for opining what illness a patient

has contracted. *See, e.g., In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 762 (3d Cir.1994) (concluding that a physician should examine the patient or review the patient's medical records, in addition to seeking a patient's self-report of symptoms, to determine that a patient is ill and what illness the patient has contracted). Thus, Dr. Walker's alleged failure to rely on peer-reviewed literature in reaching his conclusion does not compel me to exclude his opinion.

**[59]** Next, BSC argues that this court should exclude Dr. Walker's opinion because his differential diagnosis did not "properly rule out other causes" of some of Ms. Wilson's complaints. (BSC's Mem. re: Walker [Docket 248], at 8). To be admissible, an expert's differential diagnosis must, at a minimum, "take serious account of other potential causes" of the patient's symptoms. *Cooper,* 259 F.3d at 202. Here, Dr. Walker's deposition testimony verifies that he has satisfied this requirement.

In his review of Ms. Wilson's medical records and history, Dr. Walker documented all of Ms. Wilson's prior medical problems and subsequently "eliminated [them] as a pathology." (Walker Dep. [Docket 270–1], at 64:17–22). Then, in concluding that the midurethral sling was the source of Ms. Wilson's pain, Dr. Walker explained that he considered "all the other comorbidities,[16] but at the end of the day, it didn't change [his] opinion." (*Id.* at 102:17– **\*570** 103:1).16 Specifically, he considered and ruled out Ms. Wilson's past history of ovarian cysts, (*id.* at 102:13– 17 (explaining that he "factored [the presence of ovarian cysts] into his differential diagnosis")), and Ms. Wilson's obesity (*id.* at 86:7–11). He even considered the fact that Ms. Wilson never shared her complaints of pelvic pain with her treating physicians:

> Q: Okay. Did it strike you as unusual that she's giving you complaints in your evaluation of her while she has a lawsuit pending for certain medical complaints that she's not mentioned to any other doctors that she has seen? Does that raise a red flag in your mind?
>
> A: It didn't raise a red flag in my mind, sir, because of the amount of time I had to spend with her.... I spent around two and a half hours with this lady during the encounter, so I was able to unearth a lot of information from her....

> Q: Did it—was it important to you to note, though, that these were not complaints that she had made to any other doctors?
>
> A: I took it into consideration, but it wasn't—it didn't change my overall impression of what was happening, sir.

(*Id.* at 61:8–62:6). In short, Dr. Walker did precisely what a differential diagnosis requires—he evaluated Ms. Wilson's medical records, took her medical history, performed a physical examination, and, accounting for other potential causes of Ms. Wilson's condition, ultimately concluded that her pain arises from mid urethral sling complications. (*Id.* at 40:13– 30). Accordingly, I **FIND** that Dr. Walker conducted a proper differential diagnosis such that his specific causation opinion satisfies the reliability prong of *Daubert.*

BSC asks the court, in the event that it admits Dr. Walker's opinions, to limit his testimony to a specific causation opinion on Ms. Wilson. Dr. Walker's expert report does not appear to offer opinions unrelated to Ms. Wilson, and the plaintiffs agree to limit Dr. Walker's testimony accordingly. In conclusion, BSC's Motion to Exclude the Opinions and Testimony of Dr. Walker [Docket 247] is **DENIED.**

### M. Motion to Strike the Rebuttal Report of Dr. Abbas Shobeiri

Pending before the court is Defendant BSC's Motion to Strike Rebuttal Report of Dr. Abbas Shobeiri. As discussed below, BSC's Motion to Strike [Docket 400] is **GRANTED.**

#### 1. BSC's Motion to Strike

On August 29, 2014, the plaintiff served a rebuttal expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(D)(ii) for Dr. Abbas Shobeiri specific to Jacquelyn Tyree. BSC seeks an order striking this report on the grounds that (1) it is untimely under the court's Docket Control Order and Rule 26(a)(2)(D); (2) it is not proper rebuttal evidence as defined by the Federal Rules of Civil Procedure; and (3) under Rule 37(c)(1), the delay is unjustified and prejudicial. (*See generally* Def.'s Mot. to Strike & Incorporated Mem. of Law in Supp. of Its Mot.

to Strike Rebuttal Report of Dr. Abbas Shobeiri ("Def.'s Mot. Strike") [Docket 400] ).

First, BSC contends that the court directed rebuttal reports be served by July 1, 2014, and the plaintiff did not serve Dr. Shobeiri's report until August 29, 2014. In the alternative, under Rule 26(a)(2)(D), BSC maintains that even in the absence of the court's order, the plaintiff was required to serve the rebuttal report on August 16, 2014, 30 days after BSC served Dr. Green's supplemental report. In opposition, the plaintiff contends that Dr. **\*571** Shobeiri's report was timely because it was filed within 30 days of Dr. Green's August 16, 2014 deposition, in which she argues Dr. Green offered new, additional opinions. (Pl.'s Resp. in Opp. to BSC's Mot. to Strike Rebuttal Report of Dr. Abbas Shobeiri ("Pl.'s Resp. Opp.") [Docket 407], at 6.)

Next, BSC argues that in addition to the plaintiff's failure to meet deadlines, Dr. Shobeiri's report is not proper rebuttal evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B)." Fed. R. Civ. Proc. 26(a)(2)(D)(ii). BSC takes issue with the plaintiff's failure to identify what Dr. Shobeiri's report is intended to rebut.

(Def.'s Mot. Strike [Docket 400], at 5). The plaintiff argues, however, that "it is irrelevant that the same evidence might also support the case in chief." (Pl.'s Resp. Opp. [Docket 407], at 7.)

Finally, BSC contends that the plaintiff offers no explanation or substantial justification for the delay, and BSC will likely be prejudiced because trial is imminent. (Def.'s Mot. Strike [Docket 400], at 7). The plaintiff rejects BSC's argument by utilizing five factors courts should consider in determining whether a flawed disclosure is either substantially justified and/or harmless pursuant to *Hoyle v. Freightliner, LLC,* 650 F.3d 321 (4th Cir.2011). (Pl.'s Resp. Opp. [Docket 407], at 9.)

### 2. Procedural Background

The court established its initial schedule for expert disclosures on March 28, 2014. (Pretrial Order # 87 [Docket 39] ). This schedule was modified several times by agreement of the parties and orders of the court. On July 23, 2014, the court issued a Second Amended Docket Control Order setting the following deadlines:

| | |
|---|---|
| Plaintiffs' Expert Reports | May 11, 2014 |
| Defendant's Expert Reports/Rebuttal Expert Reports | June 1, 2014 |
| Plaintiffs' Rebuttal Expert Reports | July 1, 2014 |
| Completion of Expert Discovery | August 1, 2014 |
| *Daubert* Motions & Non–*Daubert* Dispositive Motions | August 1, 2014 |
| *Daubert*-based Dispositive Motions & Motions *in Limine* | August 28, 2014 |

(Pretrial Order # 106 [Docket 204] ).

BSC met the June 1, 2014 deadline by serving its expert reports, including Dr. Green's. However, Dr. Green required additional time to complete individual medical examinations ("IME"), which took place during the week of July 13, 2014. (Pl.'s Resp. Opp. [Docket 407], at 3).

Dr. Green examined Ms. Tyree on July 15, 2014, and BSC served Dr. Green's IME report on July 17, 2014. Dr. Green was deposed on July 19–20, 2014. However, the parties were unable to complete the deposition and did not discuss Ms. Tyree specifically. (*Id.*). Subsequently, the parties agreed to continue Dr. Green's deposition on August 16, 2014, and the court extended the relevant

motion deadlines for Dr. Green accordingly. (*Id.; see also* Pretrial Order # 106 [Docket 204], at 3 (extending deadline for *Daubert* motions related to Dr. Green to August 21, 2014)). On August 16, 2014, the parties completed Dr. Green's deposition, which included a specific discussion of Ms. Tyree. (Pl.'s Resp. Opp. [Docket 407], at 3–4). On August 29, 2014, the plaintiff disclosed Dr. Shobeiri as a rebuttal expert. (Def.'s Mot. Strike [Docket 400], at 3).

### 3. Discussion

#### a. Timeliness

The plaintiff clearly missed the deadline to serve Dr. Shobeiri's rebuttal report under **\*572** the Docket Control Order. However, common sense dictates that if the court extended the deadlines for Dr. Green, it likewise extended the deadlines for rebuttals to Dr. Green. *See 103 Investors I, L.P. v. Square D Co.,* 372 F.3d 1213, 1216–17 (10th Cir.2004) ("We see no reason why the Second Amended Scheduling Order should have created a situation in which Investors' rebuttal reports would be due *prior* to the deadline for Square D's initial expert reports. Such a scenario would put Investors in the impossible situation of attempting to rebut something that it had not yet seen."). Therefore, the plaintiff was no longer bound by the Docket Control Order, and Rule 26(a)(2)(D)(ii) governed instead.

[60] Absent a court order, disclosures must be made at least 90 days before trial or if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party, within 30 days after the other party's disclosure. Fed.R.Civ.P. 26(a)(2)(D)(ii). Here, BSC served Dr. Green's expert report on June 1, 2014. However, Dr. Green also supplemented his expert report on July 17, 2014, after personally examining Ms. Tyree. Because the plaintiff is rebutting Dr. Green's opinions specific to his examination of Ms. Tyree, the plaintiff should have served a rebuttal report on August 16, 2014, within 30 days of the supplemental report from Dr. Green. However, the plaintiff did not serve Dr. Shobeiri's rebuttal until August 29, 2014. The plaintiff instead asserts that she had 30 days from Dr. Green's deposition to serve a rebuttal because Dr. Green offered new opinions during his deposition that were not included in his supplemental report.

After thoroughly reviewing Dr. Green's original report, supplemental report, and extensive deposition testimony, I **FIND** that he did not offer any new opinions in his deposition that were not previously discussed in his expert reports. The plaintiff takes issue with Dr. Green's deposition testimony on (1) marked scarring; (2) banding; (3) the presence of sling arms; (4) the palpability of sling arms; and (5) area of pain. (*See* Pl.'s Resp. Opp. [Docket 407], at 3–4). However, as BSC clearly lays out in its Reply [Docket 411], Dr. Green previously addressed all five of these issues in his supplemental report. (*See* Def.'s Reply in Supp. of Its Mot. to Strike Rebuttal Report of Dr. Abbas Shobeiri ("Def.'s Reply") [Docket 411], at 5; *see also* Green IME re: Tyree [Docket 400–3], at 4). In accordance with Rule 26, the plaintiff should have served Dr. Shobeiri's rebuttal report no later than August 16, 2014, 30 days after being served with Dr. Green's supplemental report. Because the plaintiff served Dr. Shobeiri's report on August 29, 2014, I **FIND** that Dr. Shobeiri's rebuttal is untimely. In light of this finding, I need not address whether it was a proper rebuttal. However, the inquiry does not end at timeliness.

#### b. Federal Rule of Civil Procedure 37(c)(1)

[61] Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) ... the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, *unless the failure was substantially justified or is harmless.*" Fed.R.Civ.P. 37(c)(1) (emphasis added); *see Hoyle v. Freightliner, LLC,* 650 F.3d 321, 329 (4th Cir.2011). The five factors I must consider to determine whether the failure was substantially justified or is harmless are:

> (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that **\*573** surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.

*Id.* at 329 (quoting *S. States Rack & Fixture v. Sherwin–Williams Co.,* 318 F.3d 592, 596 (4th Cir.2003)). With the

above standards in mind, I will proceed to review Dr. Shobeiri's report.

 **[62]**  With respect to the first factor, BSC's supposed surprise at the disclosure of a rebuttal expert is unfounded. Although Dr. Shobeiri's original expert report served on June 1, 2014, included conclusions specific to Ms. Tyree, it did not include conclusions based on a physical examination. Once BSC disclosed Dr. Green's expert opinions related to the examination of Ms. Tyree, it should have expected that Ms. Tyree might choose to rebut those opinions. Nevertheless, the remaining factors weigh heavily against admissibility.

Turning to the second and third factors, the trial is currently set to begin on November 3, 2014, and I will not move it. Accordingly, allowing an improper rebuttal expert at this stage would likely prejudice BSC's ability to properly challenge Dr. Shobeiri. Under the fourth factor, the only explanation the plaintiff offers for her failure to disclose Dr. Shobeiri's rebuttal report within 30 days of Dr. Green's supplemental report is the same explanation I rejected above in regard to timeliness. The final factor to consider is the importance of the disputed evidence. The plaintiffs' expert, Dr. Margolis, opines on specific causation regarding Ms. Tyree based on a physical examination. (*See* Margolis Report [Docket 237–1], at 68–70). As discussed more fully *supra* related to Dr. Margolis, I have reserved ruling on the admissibility of Dr. Margolis's specific causation opinions at this time. Therefore, Dr. Shobeiri's report is not necessarily crucial to the plaintiff's ability to be heard on the merits of her case. In sum, applying the five-factor test, I **FIND** that the plaintiff's failure to disclose Dr. Shobeiri within 30 days of Dr. Green's supplemental report was not substantially justified and is not harmless. Accordingly, BSC's motion is **GRANTED.**

### IV. Plaintiffs' *Daubert* Motions

The plaintiffs move to limit or exclude the testimony of Dr. Stephen H. Spiegelberg; Dr. Stephen F. Badylak; Dr. Gary L. Winn; Dr. Christine Brauer; Dr. Patrick Culligan; and Dr. Lonny Green.

### A. Motion to Exclude the Opinions and Testimony of Stephen H. Spiegelberg, Ph.D.

The plaintiffs seek to exclude the opinions of Dr. Stephen H. Spiegelberg. Dr. Spiegelberg is a chemical

engineer who has extensive experience in polymer science. In his expert report, Dr. Spiegelberg concludes that polypropylene is a safe biomaterial for use in BSC's pelvic mesh devices and polypropylene remains the state of the art for synthetic graft materials. On June 2, 2014, Dr. Spiegelberg filed a supplemental report because the deposition of Frank Zakrzewski, corporate representative for Chevron Phillips Chemical Company ("Chevron Phillips"), provides additional support for the following two opinions: (1) The Medical Application Caution in the Material Safety Data Sheet ("MSDS") for Marlex HGX–030–01 polypropylene resin has no scientific or medical basis; (2) The Advantage and Polyform meshes comprising BSC's pelvic mesh devices contain two different antioxidants; therefore, BSC mesh does not undergo oxidative degradation in vivo. (Spiegelberg Supplemental Report [Docket 215–1], at 1). The plaintiffs argue that (1) Dr. **\*574** Spiegelberg's opinions regarding position statements by medical organizations; and (2) his state of mind or intent opinions related to the MSDS should be struck. (Pls.' Mem. of Law in Supp. of their Mot. to Exclude the Ops. & Test. of Stephen H. Spiegelberg, Ph.D. ("Pls.' Mem. re: Spiegelberg") [Docket 216], at 1). I review each of these objections in turn.

### 1. Opinions Regarding Position Statements by Medical Organizations

The plaintiffs seek to exclude Dr. Spiegelberg's references to physician organization statements promoting the safety and efficacy of polypropylene material, including those of the American Urogynecological Society ("AUGS") and the Society for Female Urology and Urodynamics ("SUFU"). Dr. Spiegelberg writes that "this history of safe use has been recognized by leading medical organizations for the treatment of female pelvic floor disorders." (Spiegelberg Supplemental Report [Docket 215–1], at 3).

Plaintiffs argue that Dr. Spiegelberg's characterization and use of these statements should be excluded because Dr. Spiegelberg is unqualified and lacks reliable methodology. As I indicated previously during these MDLs, position statements are not expert opinions. *Huskey v. Ethicon, Inc.,* 29 F.Supp.3d 691, 731–32, No. 2:12–cv–05201, 2014 WL 3362264, at \*33 (S.D.W.Va. Jul. 8, 2014). Dr. Spiegelberg is not using his "scientific, technical, or other specialized knowledge" in making these

statements. Fed.R.Evid. 702. Therefore, I will not address the admissibility of this testimony here and **RESERVE** this ruling for trial.

### 2. Opinions Related to Chevron Phillips's State of Mind or Intent

 **[63]**  The plaintiffs also seek to exclude Dr. Spiegelberg's opinions in both his expert and supplemental report related to the MSDS created by Chevron Phillips, the company whose polypropylene BSC used in the manufacturing of POP mesh. The plaintiffs argue that these MSDS opinions are a "backdoor attempt" to opine about Chevron Phillips's state of mind or intent. (Pls.' Mem. re: Spiegelberg [Docket 216], at 7). The majority of Dr. Spiegelberg's expert report properly reviews BSC records, scientific literature, and other expert reports to come to his conclusions. Section I (Polypropylene Raw Material was Appropriate for Use in Boston Scientific's Devices), however, crosses the line into state of mind.

Although Dr. Spiegelberg's opinion, that the Medical Application Caution was not added for any scientific reason, could have been based on the analysis present throughout his report, instead, he specifically refers to a history of "liability concerns." (Spiegelberg Report [Docket 215–13], at 40 ("Resin manufacturers, mindful of Dow Corning's lawsuits involving their supply of silicone for breast implants, are often reluctant to supply raw material for medical devices based purely on liability concerns, rather than performance concerns.")). Dr. Spiegelberg infers that Chevron Phillips added the Medical Application Caution because it was concerned with liability merely because it is his personal belief and he discovered no evidence to the contrary.

In his supplemental report, Dr. Spiegelberg reiterates his belief that Chevron Phillips "did not add the statement based on any scientific or medical *concerns* with transvaginal mesh." (Spiegelberg Supplemental Report [Docket 215–1], at 3 (emphasis added)). He bolsters this conclusion by relying on a deposition that is both vague and unclear. Dr. Spiegelberg filed a supplemental report after reviewing the deposition of Mr. Zakrzewski. While Dr.  **\*575** Spiegelberg states that the deposition provides additional support for his opinions, it is in fact an unreliable source. Mr. Zakrzewski clearly indicates that he has no knowledge of who wrote the MSDS

or why it was written. (*See* Zakrzewski Dep. [Docket 215–14], at 45). Dr. Spiegelberg uses the deposition to unequivocally opine that there is no scientific evidence behind the MSDS; however, Mr. Zakrzewski only states that he was not aware of any scientific testing. (*Id.* at 47). Mr. Zakrzewski's statements are inconclusive and in no way enable Dr. Spiegelberg to infer that Chevron Phillips lacked a scientific basis in adding the caution.

While an expert may testify as to a review of internal corporate documents solely for the purpose of explaining the basis for his opinions—assuming the opinions are otherwise admissible—Chevron Phillips's knowledge, state of mind, alleged bad acts, failures to act, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury. *See, e.g., In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 547 (S.D.N.Y.2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony ... the question of intent is a classic jury question and not one for the experts.") (internal quotation marks omitted); *In re Fosamax Prods. Liab. Litig.,* 645 F.Supp.2d 164, 192 (S.D.N.Y.2009) (precluding testimony as to "the knowledge, motivations, intent, state of mind, or purposes of" a company and its employees because it "is not a proper subject for expert or even lay testimony"). Accordingly, I **FIND** that Dr. Spiegelberg's opinions related to Chevron Phillips's state of mind or intent associated with the MSDS should be **EXCLUDED.**

### B. Motion to Exclude the Opinions and Testimony of Stephen H. Badylak, D.V.M., Ph.D., M.D.

The plaintiffs seek to exclude the opinions of Dr. Stephen H. Badylak. Dr. Badylak is a medical doctor and biomaterials expert with research experience related to polypropylene. In his expert report, Dr. Badylak concludes that (1) polypropylene mesh is an appropriate implantable material to reinforce soft tissue; (2) there is no evidence that Advantage or Polyform mesh experience any form of device failure; (3) pathologic evaluation of the mesh shows no evidence of physical fracture, deformation, failure, or polypropylene degradation; (4) BSC reasonably relied on a preclinical study in proceeding to market with the Advantage and Polyform mesh; (5) BSC's design history files are complete; (6) Type–1 polypropylene mesh is non-toxic, non-carcinogenic, and non-degradable in the body; (7) implanting the mesh transvaginally does not increase risk of infection; (8) the design and testing of

the BSC devices complied with accepted industry and scientific standards; and (9) examination of two specimens is consistent with the expected response to polypropylene material and does not evidence product defect. (Badylak Report [Docket 215–13], at 4, 8, 10–17).

On June 16, 2014, Dr. Badylak filed a supplemental report because the deposition of Frank Zakrzewski provides additional support for Dr. Badylak's opinion that the Medical Application Caution in the MSDS for the raw polypropylene material used in BSC's surgical mesh was not based upon or supported by safety concerns, scientific testing, or scientific data. (Badylak Supplemental Report [Docket 215–1], at 1).

The plaintiffs argue that (1) Dr. Badylak's opinions regarding position statements by medical organizations; and (2) his state of mind or intent opinions related **\*576** to MSDS should be struck. (Pls.' Mem. of Law in Supp. of their Mot. to Exclude the Ops. & Test. of Stephen F. Badylak, D.V.M., Ph.D., M.D. ("Pls.' Mem. re: Badylak") [Docket 214], at 1–2). I review these objections in turn.

### 1. Opinions Regarding Position Statements by Medical Organizations

The plaintiffs seek to exclude Dr. Badylak's references to physician organization statements promoting the safety and efficacy of polypropylene material, including those of AUGS and SUFU. Dr. Badylak writes that "[t]his resin has a long history of safe and effective use in the body and continues to be used today." (*Id.* at 3). He subsequently quotes the same position statement regarding polypropylene that Dr. Spiegelberg references in his testimony. As discussed more fully *supra* related to Dr. Spiegelberg's expert opinions and consistent with those findings, I will not address the admissibility of this testimony here because position statements are not expert opinions. *Huskey,* 29 F.Supp.3d at 731–32, 2014 WL 3362264, at \*33. I **RESERVE** these evidentiary rulings for trial.

### 2. Opinions Related to Chevron Phillips's Knowledge, State of Mind, and Corporate Conduct

The plaintiffs also seek to exclude Dr. Badylak's opinions in both his expert and supplemental report related to

the MSDS created by Chevron Phillips, the company whose polypropylene Boston Scientific used in the manufacturing of POP mesh. The plaintiffs argue that these MSDS opinions are a "backdoor attempt" to opine about Chevron Phillips's state of mind or intent. (Pls.' Mem. re: Badylak [Docket 214], at 7). A portion of the MSDS testimony in Dr. Badylak's report, as well as all MSDS testimony in the supplemental report are almost identical to Dr. Spiegelberg's testimony. (Badylak Report [Docket 215–13], at 7 ("I have not seen any evidence to indicate the additional language was supported by safety concerns or other scientific data."); Badylak Supplemental Report [Docket 215–1], at 1, 3 ("Mr. Zakrzewski's testimony lends additional support to my opinion that the medical application statement in the MSDS for the raw polypropylene material used in Boston Scientific's surgical mesh was not based upon, nor supported by, safety concerns, scientific testing or data.")). As discussed more fully *supra* related to Dr. Spiegelberg's expert opinions and consistent with those findings, I **FIND** that Dr. Badylak's opinions related to Chevron Phillips's state of mind or intent associated with the MSDS should be **EXCLUDED.**

### C. Motion to Exclude the Opinions and Testimony of Gary L. Winn, Ph.D.

**[64]** The plaintiffs seek to exclude the opinions of Dr. Gary L. Winn. Dr. Winn is a professor in Industrial and Management Systems Engineering in the Safety Management program at West Virginia University who has approximately 30 years of experience in safety, health, and training. (Winn Report [Docket 229–1], at 1). In his expert report, Dr. Winn offers opinions with regard to the nature and purpose of Material Safety Data Sheets ("MSDS") and as to the MSDS for polypropylene used by BSC in the manufacture of its pelvic mesh products. (*Id.*). The plaintiffs argue that the MSDS is relevant and should be admitted, but that Dr. Winn's opinions should be struck entirely because (1) he is unqualified; (2) his methodology is unreliable; and (3) his opinions are impermissible legal conclusions and factual narratives speculating about Chevron Phillips's knowledge. (Pls.' Mem. of Law in Supp. of their Mot. to Exclude the Ops. & Test. of Gary L. Winn, Ph.D ("Pls.' Mem. **\*577** re: Winn") [Docket 230], at 2–3). BSC opposes all of the plaintiffs' arguments regarding Dr. Winn, but also acknowledges that "Dr. Winn's testimony and his opinions concern one thing—the MSDS." (Def.'s Mem. in Opp. to Pls.' Mot. to Exclude the Ops. & Test. of Gary

L. Winn, Ph.D. ("Def.'s Mem. re: Winn") [Docket 281], at 10).

Both parties devote significant portions of their memoranda to arguing for or against the relevance of the MSDS. These arguments are not appropriate for a *Daubert* motion. Rule 702, by its plain terms, contemplates *Daubert* challenges directed at the opinions of *specific* experts, not the opinions of a collection of experts. The court must determine whether *an expert* is qualified, whether his opinions are the product of reliable methodology, and whether those opinions will be helpful to the jury. *See* Fed.R.Evid. 702. I can only conduct the required *Daubert* analysis on an individualized basis.

However, because I have determined that the MSDS is relevant, (*see* Mem. Op. & Order re: MSDS [Docket 443] ), I must now examine the remaining arguments regarding the admissibility of Dr. Winn's expert opinions under *Daubert.* As BSC points out, had I excluded the MSDS, Dr. Winn's opinions would not have been necessary. (Def.'s Mem. re: Winn [Docket–281], at 2).

In his expert report, Dr. Winn describes (1) the development of the hazard communication standard; (2) the standardization of the content of MSDSs; and (3) uses of MSDSs in the field. (Winn Report [Docket 229-1], at 3–8). Dr. Winn concludes that raw polypropylene is not hazardous based on anecdotal evidence involving other MSDSs; and therefore, the 2004 Chevron Phillips MSDS is extraneous. (*Id.* at 8–10). Although I believe that the warning provided in the MSDS is relevant, I do not believe an expert is required to discuss MSDSs generally or the issue of whether polypropylene requires an MSDS because of its hazardous nature. A narrative review of the history and development of MSDSs and who uses them in the field is not helpful to the jury. The pertinent issue is that the MSDS contained a warning (Medical Application Caution) allegedly not heeded by BSC, not that an MSDS itself existed. This warning from the supplier could have taken any form. [17] Accordingly, I **FIND** that Dr. Winn's opinions regarding MSDSs should be excluded in their entirety.

### D. Motion to Exclude the Opinions and Testimony of Christine Brauer, Ph.D.

**[65]** The plaintiffs seek to exclude or limit the expert opinions of Dr. Christine Brauer. Dr. Brauer is a former

FDA employee and regulatory consultant who offers opinions regarding the FDA regulatory process and BSC's regulatory activities. Plaintiffs argue that Dr. Brauer's "opinion testimony regarding: (1) the FDA regulatory scheme; (2) the FDA clearance of BSC devices at issue in this litigation; (3) BSC's Directions for Use, Patient Labeling and Patient Brochures; (4) FDA MAUDE Database and MDR Reports; (5) FDA Advisory Panel Meetings; and (6) BSC's Corporate Warning Letter" should be excluded in its entirety. (Pls.' Mem. of Law in Supp. of Mot. to Exclude, or Limit the Test. of BSC's Expert Christine Brauer, Ph.D. [Docket 232], at 1–2).

**\*578** I have previously reviewed the opinion testimony of Dr. Brauer under *Daubert. See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, 2014 WL 4851989, at \*36–37 (S.D.W.Va. Sept. 29, 2014). While the parties in this case have not relied on precisely the same arguments, my reasoning and conclusions from *Sanchez* still govern. Furthermore, to the extent that there are differences in fact and exhibits, the court does not find them sufficiently materially. The *Sanchez* excerpts quoted below are to explicate the conclusions the court reaches on the issue of Dr. Brauer's expert opinions:

I have repeatedly and thoroughly considered the admissibility of the FDA's 510(k) process, and I have consistently found that the 510(k) process does not relate to safety or efficacy. *Lewis v. Johnson & Johnson,* 991 F.Supp.2d 748, at 753–56 (S.D.W.Va.2014). Therefore, the parties may not present evidence regarding the 510(k) clearance process or subsequent FDA enforcement actions. This is consistent with prior rulings by this court. *See, e.g., Cisson v. C.R. Bard, Inc.,* No. 2:11–cv–00195, [2013 WL 3821280, at \*7] 2013 U.S. Dist. LEXIS 102699, at \*22 (S.D.W.Va. July 23, 2013) ("The FDA 510(k) process does not go to safety and effectiveness and does not provide any requirements on its own. Basically, it has no operative interaction with state tort laws.") (internal reference omitted); Order, *Cisson v. C.R. Bard, Inc.,* No. 2:11–cv–00195 (S.D.W.Va. July 1, 2013), [Docket 309], at 3–4 ("Under United States Supreme Court precedent, the FDA 510(k) process does not go to whether the product is safe and effective.... Because the FDA 510(k) process does not go to whether the [mesh] products are safe and effective and the 510(k) process does not impose any requirements on its own, the 510(k) process is inapplicable to this case. This evidence is excluded under Federal Rule of Evidence

402 as irrelevant, and under Rule 403 for the reasons previously stated, including the very substantial dangers of misleading the jury and confusing the issues."); Mem. Op. & Order, *Cisson v. C.R. Bard, Inc.,* No. 2:11–cv–00195 (S.D.W.Va. June 27, 2013) [Docket 302], at 3–4 (holding that evidence regarding the 510(k) process and enforcement should be excluded under Rule 403); Mem. Op. & Order, *Huskey v. Ethicon, Inc.,* No. 2:12–cv–05201 [2014 WL 1883784] (S.D.W.Va. May 12, 2014) [Docket 223], at 1 ("This is not the first time I am confronted with determining the admissibility of evidence relating to marketing clearance under the FDA's 510(k) process ... In all previous cases, I excluded all evidence relating to the 510(k) process because it does not go to the safety and efficacy of medical devices and because of the potential to mislead and confuse the jury."). Accordingly, I **FIND** that Dr. Brauer's opinions should be excluded in their entirety.

*Sanchez,* 2014 WL 4851989, at *36–37. Therefore, I **ADOPT** my prior ruling on Dr. Brauer, as stated in Sanchez, and **EXCLUDE** her opinions in their entirety.

### E. Motion to Limit the Opinions and Testimony of Patrick Culligan, M.D.

The plaintiffs move to limit the opinions and testimony of Patrick Culligan, M.D. Dr. Culligan is a urogynecologist. He offers eleven opinions relating to polypropylene mid-urethral slings and traditional procedures to treat SUI, the risks associated with pelvic surgeries and mesh, BSC's Obtryx device, and the Obtryx directions for use ("DFU"). (*See* Culligan Report [Docket 233–2], at 15–16). The plaintiffs challenge Dr. Culligan's opinions **\*579** about the "physical properties of polypropylene, the design of the Obtryx, the Obtryx DFU, and the Obtryx patient brochure." (Pls.' Mot. to Limit the Ops. & Test. of Patrick Culligan, M.D. [Docket 233], at 2). In particular, the plaintiffs argue that he is unqualified to testify as to these matters. (*See id.*). The plaintiffs also assert that Dr. Culligan fails to provide sufficient support for his conclusions and that, therefore, his opinions should be excluded as unreliable. (*See id.*).

### 1. Opinions Regarding the Physical Properties of Polypropylene

In his expert report, Dr. Culligan opines that "[t]here is no evidence that Obtryx is defective

or unreasonably dangerous" and "[t]he claims that polypropylene implanted in the pelvic floor degrades, significantly contracts, causes systematic infection, and/or cancer is not supported in the medical or scientific community." (Culligan Report [Docket 233–2], at 16). The plaintiffs argue that these opinions should be excluded because Dr. Culligan lacks qualifications to opine as to these matters and because the opinions are based on an unreliable method.

#### *a. Qualifications*

**[66]**  Dr. Culligan is an accomplished urogynecologist. (*See id.* at Ex. A (Dr. Culligan's curriculum vitae)). He has experience treating women for POP and urinary incontinence, (*see id.* at 1), and performing mesh revision surgeries once or twice a month for approximately the last ten years. (*See* Culligan Dep. [Docket 277–3], at 58:15–21). Dr. Culligan has served on university faculties, published peer-reviewed articles concerning mesh and sling procedures, and served as a reviewer for scientific journals. (*See* Culligan Report [Docket 233–2], at 2–8). He also relied upon scientific literature in forming his opinions. (*See id.* at 1–16, Ex. B). In fact, the "[p]laintiffs do not challenge Dr. Culligan's qualifications as a urogynecologist." (*See* Pls.' Mem. of Law in Supp. of Their Mot. to Limit the Ops. & Test. of Patrick Culligan, M.D. ("Pls.' Mem. re: Culligan") [Docket 234], at 5). Instead, the plaintiffs challenge his qualifications to opine as to the properties of polypropylene.

Dr. Culligan testified that he is not an expert in materials:

Q: And does the pore size change after implantation?

A: Well, we're beginning to get into a line of questioning that would require me to be more of a materials expert, which I'm not.

* * *

Q: Do you know if the Obtryx sling is heated in any fashion when it's manufactured?

A: I—I don't know the specifics of the manufacturing process for these. I'm not a materials or manufacturing expert.

Q: And that's a good point. Maybe I should have asked that at the beginning, could have saved some time. Are you an expert in biomaterials?

A: No, I'm not an expert in biomaterials.

(Culligan Dep. [Docket 233–3 & 233–4], at 57:9–15, 325:9–20) (objections omitted). However, this testimony is not dispositive. *See Huskey, et al. v. Ethicon, Inc., et al.,* 29 F.Supp.3d at 734–35, No. 2:12–cv–05201, 2014 WL 3362264, at *36 (finding Dr. Johnson qualified to opine about polypropylene notwithstanding his deposition testimony "Q: Okay. You're not a biomaterials expert, are you? A: Um, I'm a clinical medical expert."). I have previously found certain medical doctors qualified to opine as to polypropylene. *See* **\*580** *Jones v. Bard, Inc., et al.,* No. 2:11–cv–00114, [Docket 391], at 6–9 (finding Dr. Ostergard qualified to opine as to polypropylene and product design); *Huskey,* 29 F.Supp.3d at 733–35, 2014 WL 3362264, at *35–37 (finding Dr. Johnson qualified to opine as to mesh degradation). Dr. Culligan has similar types of experience as these prior experts. *See Jones,* No. 2:11–cv–00114, [Docket 391], at 1, 6–7 (noting Dr. Ostergard's performance of thousands of POP surgeries, SEM imaging of mesh, participation in an ongoing degradation study, and practice of 45 years); *Huskey,* 29 F.Supp.3d at 734–35, 2014 WL 3362264, at *36 (noting Dr. Johnson's experience implanting at least 750 TVT and TVT–O devices, performance of 25–30 polypropylene sling revisions, and research on urinary incontinence treatments).

Therefore, I **FIND** that Dr. Culligan is qualified to testify as to the opinion that "[t]here is no evidence that Obtryx is defective or unreasonably dangerous" and "[t]he claims that polypropylene implanted in the pelvic floor degrades, significantly contracts, causes systematic infection, and/or cancer is not supported in the medical or scientific community." (Culligan Report [Docket 233–2], at 16).

### *b. Reliability*

**[67]**  The plaintiffs also argue that Dr. Culligan's opinions regarding the physical properties of polypropylene nevertheless lack a reliable scientific foundation. (Pls.' Mem. re: Margolis [Docket 234], at 10–12). I agree.

Although Dr. Culligan is qualified to testify about polypropylene, his method is unreliable. In *Huskey,* I found that "drawing on clinical experience and a review of relevant literature is a sufficiently reliable method of forming" a similar opinion regarding degradation. *See Huskey,* 29 F.Supp.3d at 735, 2014 WL 3362264, at *36. However, even if Dr. Culligan considered both scientific literature and his experience, his deposition testimony reveals flaws in his method:

Q: And does that pore size change after implantation?

A: Well, we're beginning to get into a line of questioning that would require me to be more of a materials expert, which I'm not.

Q: Okay.

A: So—but I can give you my clinical opinion.

Q: Go ahead.

A: That, no I don't believe the pore size changes from any of my clinical experience with the products.

Q: And what do you base that opinion on?

A: My only experience with your question would have to do with removing products and just examining them grossly whenever I've had to do that.

(Culligan Dep. [Docket 233–3 & 233–4], at 57:9–58:4) (objections omitted). Dr. Culligan's opinions regarding polypropylene are general and do not relate to a particular plaintiff. Basing an opinion on "gross [ ]" examinations of products "whenever [he] had to do that" is not a reliable scientific methodology to reach these generalized conclusions. (*See id.* at 58:1–4). Dr. Culligan elaborates further:

Q: ... [Y]ou said you grossly examined some mesh that you've explanted. Have you ever tried to determine in any measurement form whether the shape or size of the mesh has changed significantly?

A: No. It wouldn't be relevant to what I'm talking about because if I remove part of a piece of mesh, I'm removing part of that mesh and I wouldn't have any way to measure that against how that specific part **\*581** that I removed was sized, you know, when it was placed. It's—it's impossible to make a before and after comparison like that.

(*Id.* at 428:16–429:6). Dr. Culligan fails to provide a sound basis for his opinions. His method is unreliable, and, therefore, his opinions as to the properties of polypropylene are **EXCLUDED.**

### 2. Opinions Regarding the Design of Transvaginal Mesh

[68] Also, Dr. Culligan contends that "Boston Scientific's decision to design and market the Obtryx incorporating a Type I mesh was reasonable and appropriate." (*Id.* at 15). The plaintiffs challenge Dr. Culligan's qualifications and the reliability of this opinion.

First, the plaintiffs argue that Dr. Culligan lacks qualifications to opine as to the design of transvaginal mesh. In support, the plaintiffs point to deposition testimony of Dr. Culligan, where he admits that he is not an expert in design and where he is unable to answer questions concerning pore size, contraction, and the word "detanged," which the plaintiffs contend are "important design components." (Pls.' Mem. re: Culligan [Docket 234], at 8–9).

Dr. Culligan states that he is no expert in product design:

Q: Okay. Are you an expert in the design of slings?

A: I'm not sure quite how to answer that. I have never designed one that was manufactured, but I certainly have preferences. And as a surgeon I am certainly an expert on how to implement designs. So it's—it's—I hope you understand there's a—sort of an overlap there.

Q: Let me see if I can make it easier. You're not an expert in determining the appropriate pore size, for example, for slings, are you?

A: Well, as I mentioned earlier today, there tends to be a sort of a classification system for the mesh products. And the mesh products that are available tend to fall within the pore size that's thought of as the Type I mesh material. So I would not be in a position to determine the pore size of a sling. I don't manufacture slings.

Q: And that goes back to the fact that you're not an expert in biomaterials; correct?

A: Correct. I'm not a biomedical engineer.

(Culligan Dep. [Docket 233–3 & 233–4], at 326:17–327:24) (objections omitted). In *Jones,* I found Dr. Ostergard, also a urogynecologist, qualified to testify about product design based on his knowledge and experience. *See Jones,* No. 2:11 –cv–00114, [Docket 391], at 8–9. However, Dr. Ostergard had performed sling product design work "namely, a polytetrafluoroethylene suburethral sling in the 1980s, along with ... design theory work for AMS[.]" *Id.* at 9. Here, Dr. Culligan admits that he lacks experience with sling design. The fact that he has design "preferences" as a practicing doctor in itself does not render him an expert in product design. (Culligan Dep. [Docket 233–3 & 233–4], at 326:23). Therefore, I **FIND** that Dr. Culligan is not qualified to opine as to product design.

As a result, I do not need to address the reliability of Dr. Culligan's opinion that "Boston Scientific's decision to design and market the Obtryx incorporating a Type I mesh was reasonable and appropriate." (Culligan Report [Docket 233–2], at 15). It is **EXCLUDED.**

### *582 3. Opinions as to the Obtryx DFU

[69] The plaintiffs also challenge Dr. Culligan's opinion that "[t]he DFU for the Obtryx adequately warns of all potential complications" and that "[i]t is not appropriate to include rates of complications for a procedure in product labeling[.]" (*Id.* at 16). Dr. Culligan based his opinion on the adequacy of the Obtryx DFU on "carefully reading the DFU and realizing, with my knowledge of slings and their potential complications, that the DFU adequately covered them." (Culligan Dep. [Docket 233–3 & 233–4], at 259:3–10). He also notes that he based his opinion on a description for use. (*Id.* at 259:19). The plaintiffs argue that Dr. Culligan lacks qualifications to opine as to the DFU and that his opinions as to the Obtryx DFU are unreliable.

As for qualifications, Dr. Culligan has "participated in the drafting of a DFU." (*Id.* at 260:4–5). However, he testified that he hired a regulatory consultant that wrote the first draft and that he "then ... just worked on the specific wording of that document." (*Id.* at 260:13–16). Also, he admits that he is "not an expert in the drafting of DFUs." (*Id.* at 261:5–6). Dr. Culligan further

testifies about his lack of expertise as to the inclusion of complication rates in DFUs:

> Q: In general, do directions for use include complications to your knowledge?
>
> A: I—I guess I can't really answer for all directions of use. I'm not an expert on what directions of use are supposed to include. I'm thinking about my knowledge of my own, you know, document and certainly include information about how to avoid or by the proper use implying how to avoid complications. I—you know, I'm not sure—
>
> Q: Okay. Fair enough.
>
> A: —what you want.

(*Id.* at 305:16–306:8) (objections omitted). Dr. Culligan does not have the "knowledge, skill, experience, training, or education" to opine as to the Obtryx DFU. Fed.R.Evid. 702; *see In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 607 (S.D.W.Va.2013) (finding Dean Altenhofen, M.D., unqualified to opine as to adequacy of warnings). Therefore, I **FIND** that Dr. Culligan is unqualified to testify as to these opinions. As a result, I need not address the plaintiffs' argument that Dr. Culligan's opinions as to the Obtryx DFU are unreliable. These opinions are **EXCLUDED.**

### 4. Opinions as to the Obtryx Patient Brochure

In his deposition, Dr. Culligan testified that he may offer opinions about the Obtryx Patient Brochure. (*See* Culligan Dep. [Docket 233–3 & 233–4], at 148:13–18). However, he was unable to state an opinion on the Obtryx Patient Brochure in his deposition because he was not provided with a copy of it. (*See id.* at 155:15–19). Even so, Dr. Culligan included no opinions about the Obtryx Patient Brochure in his expert report. "Under Rule 26, expert reports must contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.' " *Lewis v. Ethicon, Inc.,* 2:12–cv–4301, 2014 WL 186872, *17 (S.D.W.Va. Jan. 15, 2014) (citing Fed.R.Civ.P. 26(a)(2)(B)(i)). In considering the factor test set forth in *Hoyle v. Freightliner, LLC,* it does not appear that Dr. Culligan's omission was "substantially justified or harmless." *Id.* at *9–10 ("In determining whether the nondisclosure of evidence is substantially justified or

harmless under Rule 37(c), a district court must consider '(1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; **\*583** (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony.' ") (citing *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 329 (4th Cir.2011)). Dr. Culligan's deposition does not even provide the specific opinion which Dr. Culligan would offer at trial regarding the brochure. Dr. Culligan's testimony as to this matter is **EXCLUDED.** Therefore, I need not address his qualifications to opine as to the Obtryx Patient Brochure or the plaintiffs' reliability argument.

### 5. Dr. Culligan's References to POP

In his expert report, Dr. Culligan writes about POP and the treatment of POP. (*See, e.g.,* Culligan Report [Docket 233–2], at 13). The product at issue in this case is the Obtryx to treat SUI. I do not find Dr. Culligan's references to POP and POP treatments to be material to my *Daubert* ruling here. The plaintiffs challenge his opinions that relate to the Obtryx and slings generally.

Therefore, the plaintiffs' Motion to Limit the Opinions and Testimony of Patrick Culligan, M.D., is **GRANTED.**

### F. Motion to Limit the Opinions and Testimony of Lonny Green, M.D.

In this case, BSC offers Dr. Green to testify as an expert witness on (1) common female pelvic floor disorders; (2) treatment for SUI; (3) treatment options for urge incontinence; (4) midurethral slings as the standard of care in treatment of SUI; (5) treatment for POP; (6) risks of pelvic surgery; and (6) specific causation opinions related to the plaintiff, Ms. Hendricks. (*See generally* Green Report [Docket 354–1] ). Dr. Green is a board-certified urologist and the Director of the Virginia Women's Continence Center, a division of the Virginia Women's Center, in Richmond, Virginia. (*Id.* at 1). Dr. Green "treat[s] a wide range of female pelvic floor disorders" and has "extensive experience with the device at issue in this case, the Obtryx Transobturator Mid–Urethral Sling." (*Id.*).

The plaintiffs move to limit or exclude the opinions of Dr. Green, raising three primary objections: (1) Dr. Green is not qualified to opine on the adequacy of the Obtryx Directions for Use ("DFU") and these opinions are not the product of a reliable methodology; (2) Dr. Green is not qualified to offer opinions on the significance of the FDA 510(k) clearance; and (3) Dr. Green is not qualified to offer opinions that the Obtryx does not shrink, contract, degrade, or cause systemic infections and these opinions are methodologically flawed and lack any reliable bases. (*See generally* Pls.' Mem. of Law in Supp. of their Joint Mot. to Limit the Ops. & Test. of Lonny Green, M.D. ("Pls.' Mem. re: Green") [Docket 355] ). I review these objections in turn.

### 1. Obtryx DFU

#### a. Qualifications

 [70]   First, the plaintiffs argue that Dr. Green is not qualified to offer opinions on the Obtryx DFU because he has never written a DFU and could not describe the general requirements for a DFU during his deposition. (Pls.' Mem. re: Green [Docket 355], at 5). BSC contends that Dr. Green need not be a warnings or regulatory expert "to offer competent, helpful testimony on the subject of what risks [BSC] should have warned against for the Obtryx." (Mem. in Opp. to Pls.' Mot. to Limit the Ops. & Test. of Dr. Lonny Green, M.D. ("Def.'s Mem. re: Green") [Docket 361], at 2–3).

Author and astronomer, Carl Sagan, popularized the aphorism, "Absence of evidence is not evidence of absence." Carl Sagan, *The Demon–Haunted World: Science* **\*584** *as a Candle in the Dark* 213 (1996). Sagan's aphorism illustrates the logical fallacy that a premise is not necessarily true merely because it has yet to be proven false. Instead, there is often insufficient investigation and information to come to a conclusive determination. Sagan's musings are relevant here because for the first time during these MDLs, the plaintiffs have challenged the defendant's attempt to offer experts seeking to opine on the adequacy of product warnings. In the past, I allowed a doctor to testify that the DFU was inadequate because it failed to warn against risks the doctor observed in his or her own practice. In contrast, now I must determine whether the same kind of doctor is instead qualified to offer his expert opinion that the warnings

were in fact adequate. There is a clear distinction. The plaintiffs' experts observed certain risks and complications in their practice and then sought to opine that those risks should have been included in the product warnings. In the present case, BSC's experts have observed certain risks and complications in their practice, which are warned of in the DFU, and therefore deduce that there are no other possible risks or complications that should have been included. The plaintiffs' experts address a discrete risk which they have personally observed, while BSC's experts' opinions attempt to encompass all possible risks, none of which they have personally observed. Accordingly, I **FIND** that without additional expertise in the specific area of product warnings, a doctor, such as a urologist or urogynecologist, is not qualified to opine that a product warning was adequate, merely because it included the risks he has observed in his own practice.

In his expert report, Dr. Green discusses the risks of pelvic surgery and states that "[a]ll of the aforementioned potential complications are adequately warned of in the [DFU] for the Obtryx sling." (Green Report [Docket 354–1], at 16–18). Dr. Green fails to address the significance of complications he has not seen in his practice, and which are not warned of in the DFU. In his deposition, Dr. Green admits he has never drafted a DFU for a medical device or pharmaceutical. (Green Dep. [Docket 354–3], at 532). Although Dr. Green indicates he has "expertise" in the process of writing patient handouts warning against drug complications, his experience appears to be limited to his review and distribution of these handouts, rather than contribution to the drafting. (*Id.*). Accordingly, I **FIND** that Dr. Green is not qualified to opine on the adequacy of product warnings, and therefore, his opinions related to the Obtryx DFU should be **EXCLUDED.**

### 2. FDA 510(k) Clearance

Second, the plaintiffs object to Dr. Green's opinions and testimony regarding the FDA because he is not an expert on the 510(k) clearance process. (Pls.' Mem. re: Green [Docket 355], at 7). However, I need not reach the second issue in light of BSC's statement that it does not intend to elicit testimony from Dr. Green on the 510(k) clearance process. (Def.'s Mem. re: Green [Docket 361], at 5–6). Furthermore, even if Dr. Green does attempt to offer testimony on the FDA 510(k) clearance process, his testimony will be inadmissible for two reasons. First, these

opinions were not present in his expert report. Under Rule 26, expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed.R.Civ.P. 26(a)(2)(B)(i). Second, as discussed more fully *supra* related to Dr. Brauer's expert opinions and consistent with those findings, the parties may not present evidence regarding the FDA 510(k) clearance process.

**\*585 3. Mesh Shrinkage, Degradation, & Infections**

*a. Qualifications*

**[71]** Lastly, the plaintiffs argue that Dr. Green is not qualified to opine that the Obtryx does not shrink, contract, degrade, or cause systemic infections because he is not a pathologist and "has never looked at any mesh (explanted from a patient or otherwise) under a microscope." (Pls.' Mem. re: Green [Docket 355], at 9). I disagree. Simply because Dr. Green has not personally performed pathology research on polypropylene explants does not necessarily render him unqualified under Rule 702 to offer opinions on the suitability of the Obtryx device. An expert may be qualified by "knowledge, skill, experience, training, or education[.]" Fed.R.Evid. 702. "One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an [expert] opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.,* 878 F.2d 791, 799 (4th Cir.1989).

Dr. Green has performed almost 3,000 sling procedures, and his clinical practice has "largely focused on the treatment of female urinary incontinence" over the last twenty years. (Green Report [Docket 354–1], at 1; Green Dep. [Docket 361–3], at 390). Further, Dr. Green cites numerous studies and academic papers throughout his expert report to support his opinion that the Obtryx is both safe and effective. I therefore **FIND** that Dr. Green is qualified to offer the opinion that the Obtryx mesh does not shrink, contract, degrade, or cause systemic infections.

*b. Reliability*

**[72]** The plaintiffs also argue that Dr. Green "has not utilized any method—let alone a reliable method—to reach the conclusions outlined in his report." (Pls.'

Mem. re: Green [Docket 355], at 10). Dr. Green plans to testify that he has not seen "evidence of polypropylene degradation, systemic infection, or other unexpected reactions" and that "[t]he Obtryx has proven to be safe and efficacious for the treatment of female SUI." (Green Report [Docket 354–1], at 15). District courts have "considerable leeway" in applying *Daubert's* reliability factors. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. Here, Dr. Green's opinion is partially based on the fact that he has observed minimal complications in his clinical practice. Obviously, this type of opinion is not subject to testing or peer review. Additionally, Dr. Green explains that his "clinical experience with the Obtryx is on par with the findings in [the] studies" he cites throughout his expert report. Therefore, I **FIND** Dr. Green's clinical experience and review of the scientific literature are sufficiently reliable bases in forming this particular opinion.

In conclusion, (1) Dr. Green's DFU opinions are excluded; (2) BSC has conceded that Dr. Green will refrain from testifying about the FDA 510(k) clearance process; and (3) Dr. Green's opinions on the suitability of the Obtryx are not excluded under *Daubert.* Accordingly, the plaintiffs' Motion to Limit the Opinions and Testimony of Lonny Green, M.D. [Docket 335] is **GRANTED IN PART** and **DENIED IN PART.**

**V. Effect of *Daubert* Rulings**

I emphasize that my rulings *excluding* expert opinions under Rule 702 and *Daubert* are dispositive of their admissibility in these cases, but my rulings *not to exclude* expert opinions are not dispositive of their admissibility. In other words, to the extent that certain opinions might be cumulative or might confuse or mislead the jury, they may still be excluded under Rule 403 or some other evidentiary rule. I will take up these issues as they arise.

**\*586 VI. Conclusion**

To reiterate: The defendant's motion with respect to Plaintiffs' Experts' Opinion that Polypropylene Mid–Urethral Slings Are Defective [Docket 227] is **DENIED.** The defendant's motion with respect to Dr. Margolis [Docket 237] is **GRANTED IN PART** and **DENIED IN PART** and **RESERVED IN PART.** The defendant's motion with respect to Dr. Trepeta [Docket 235] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Drs. Mays and Gido [Docket 221] is **GRANTED IN PART** and **DENIED**

**IN PART.** The defendant's motion with respect to Dr. Pence [219] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Barker [Docket 223] is **GRANTED.** The defendant's motion with respect to Dr. Ostergard [Docket 217] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Iakovlev [Docket 225] is **GRANTED.** The defendant's motion with respect to Dr. Blaivas [Docket 239] is **GRANTED IN PART** and **DENIED IN PART.** The defendant's motion with respect to Dr. Vredenburgh [Docket 241] is **GRANTED.** The defendant's motion with respect to Dr. Rosenzweig [Docket 251] is **DENIED.** The defendant's motion with respect to Dr. Walker [Docket 247] is **DENIED.** The defendant's motion to strike the rebuttal report of Dr. Shobeiri [Docket 400] is **GRANTED.** The plaintiffs' motion with respect to Dr. Spiegelberg [Docket 215] is **RESERVED**

**IN PART** and **GRANTED IN PART.** The plaintiffs' motion with respect to Dr. Badylak [Docket 213] is **RESERVED IN PART** and **GRANTED IN PART.** The plaintiffs' motion with respect to Dr. Winn [Docket 229] is **GRANTED.** The plaintiffs' motion with respect to Dr. Brauer [Docket 231] is **GRANTED.** The plaintiffs' motion with respect to Dr. Culligan [Docket 233] is **GRANTED.** The plaintiffs' motion with respect to Dr. Green [Docket 354] is **GRANTED IN PART** and **DENIED IN PART.**

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

**All Citations**

54 F.Supp.3d 501

Footnotes

1    I originally consolidated the cases of eleven plaintiffs implanted with the Obtryx. (*See* Pretrial Order # 78 [Docket 9], at 1 (naming Canterbury, Billings, Sexton, Hendricks, Moore, Tyree, Campbell, Blankenship, Pugh, Workman, and Wilson as consolidated plaintiffs)). Four plaintiffs now remain in this action. (*See* Pretrial Order # 94 [Docket 67], at 1 (removing *Sexton* case from the consolidated West Virginia cases); Stipulation of Dismissal [Docket 104] (dismissing the claims of Donna Billings with prejudice); Order Dismissing Canterbury Plaintiff [Docket 107], at 1 (dismissing the claims of Karen Canterbury with prejudice); Stipulation of Dismissal [Docket 123] (dismissing the claims of Neasha Workman with prejudice); Stipulation of Dismissal With Prejudice [Docket 426] (dismissing with prejudice the claims of Sharon Pugh, et al.); Stipulation of Dismissal With Prejudice [Docket 433] (dismissing plaintiff Tammy Hendricks with prejudice); Stipulation of Dismissal With Prejudice [Docket 427] (dismissing plaintiff Dreama Moore with prejudice)).

2    With more than 60,000 cases related to surgical mesh products currently pending before me, this gatekeeper role takes on extraordinary significance. Each of my evidentiary determinations carries substantial weight with the remaining surgical mesh cases. Regardless, while I am cognizant of the subsequent implications of my rulings in these cases, I am limited to the record immediately before me and the arguments of counsel.

3    I ruled in *Sanchez* on *Daubert* motions related to Dr. Margolis, Dr. Trepeta, Drs. Mays and Gido, Dr. Pence, and Dr. Barker. In *Sanchez,* I relied on excerpts of deposition testimony from these experts, most, but not all of which excerpts are attached as exhibits in this case. However, because the depositions cited in *Sanchez* are the same depositions taken on the same date, I have relied on some excerpts from *Sanchez* here. Also, I note that as to Drs. Margolis and Barker, the parties attached additional deposition testimony as exhibits in this case.

4    On October 6, 2014, the plaintiffs in *Sanchez* filed a Motion for Reconsideration for Dr. Margolis, Dr. Slack, and Dr. Barker. *See Sanchez, et al. v. Boston Scientific Corp.,* No. 2:12–cv–05762, [Docket 149]. I denied the motion on October 17, 2014. *See Sanchez,* No. 2:12–cv–05762, [Docket 151]. To the extent the arguments raised in the Motion for Reconsideration related to Dr. Margolis and Dr. Barker overlap (there is no motion in this case related to Dr. Slack) or may have been raised in this case, I incorporate my findings here.

5    This holding is distinguishable from *Sanchez,* in which I excluded Dr. Trepeta's specific causation opinions. 2014 WL 4851989, at *23–24. In *Sanchez,* Dr. Trepeta did not examine any pathology slides in applying a differential diagnosis, instead supporting his opinion with Ms. Sanchez's medical records. *Id.* at *23. Although his failure to review Ms. Sanchez's tissue was not determinative in *Sanchez,* it contributed to the unreliability of his differential diagnosis in the face of damaging testimony. Here, however, Dr. Trepeta observed Ms. Blankenship's slides under a microscope, detected a foreign material, and concluded that the foreign material was polypropylene from the Obtryx sling by applying a process of elimination. Dr. Trepeta's personal review of the pathology slides brings a scientific basis to his correlation of Ms. Blankenship's symptoms and the presence of the mesh, which was lacking in *Sanchez.*

6    I previously allowed a joint expert report, *see In re C.R. Bard, Inc.,* 948 F.Supp.2d 589, 644 (S.D.W.Va.2013) (discussing the "Exponent Experts"), and there is "no reason to think the practice [is] always and inherently impermissible" under Rule 26. *Dale K. Barker Co., P.C. v. Valley Plaza,* 541 Fed.Appx. 810, 815 (10th Cir.2013) (explaining that "[c]o-authored expert reports aren't exactly uncommon"). For example, in *Barker,* the Tenth Circuit allowed a joint report when both experts "reviewed the same materials, and, working together, came to the same opinions." *Id.* at 816. However, when a joint report is not built on a reliable foundation, and instead, is confusing and contradictory, it becomes problematic and potentially inadmissible. *See id.* ("[I]f, for example, it isn't clear whether both experts adhere to all of the opinions in the report and they do not delineate which opinions belong to which expert." (citing *Dan v. United States,* No. CIV 01–25 MCA/LFG–ACE, 2002 WL 34371519, at *2–3, *5 (D.N.M. Feb. 6, 2002))).

7    Plaintiffs also argue that in addition to Drs. Mays and Gido's reliance on other sources, their testing is reliable, which is the same argument I considered and rejected above.

8    In *Lewis, et al. v. Ethicon, Inc.,* I concluded that Dr. Pence's opinions on product labeling would "confuse and mislead the jury" because the state law claims of failure to warn and breach of warranty no longer existed in the case. 2:12–cv–4301, 2014 WL 186872 (S.D.W.Va. Jan. 15, 2014). Here, however, the failure to warn claim is still pending, and so my conclusions in *Lewis* are inapposite on this point.

9    The fact that Dr. Ostergard took a single online course on the FDA regulatory process—a course that is freely available to the public—does not alter my conclusion that Dr. Ostergard lacks the qualifications necessary to opine about BSC's compliance with FDA regulations.

10    BSC also argues that Dr. Ostergard's opinions on the properties of polypropylene are irrelevant because he has not specifically applied his opinions to the plaintiffs. There is no indication in Dr. Ostergard's expert report that he is offering a specific causation opinion. If at trial, however, Dr. Ostergard attempts to transform his general causation opinion on the properties of mesh—which is certainly relevant to the question of whether mesh is defective—into a specific causation opinion, a proper objection can be brought at that time.

11    BSC does not object to Dr. Iakovlev's qualifications in relation to his general causation opinions or "stretch" test.

12    This holding is consistent with my previous exclusion of Dr. Iakovlev's opinions regarding transvaginal mesh generally. *See Edwards,* 2014 WL 3361923, at *23.

13    Even if Dr. Iakovlev's mesh design and deformation opinions were not based on an unreliable sample, they would still be inadmissible because of his subjective and conclusory approach. (*See* Iakovlev Dep. [Docket 225–3], at 330–31 (stating his opinion is based solely on touch and comparing the mesh to a sweater or scarf)).

14    BSC arguments 1–5, 8.

15    BSC arguments 6–7.

16    "Comorbidity" refers to a "coexisting" disease or condition in the same individual. Jose M. Valderas, et al., *Defining Comorbidity: Implications for Understanding Health and Health Services,* 7 Annals of Fam. Med. 357, 357 (2009).

17    In fact, in another pleading, there is evidence of an agreement between BSC and its supplier indicating it was BSC's responsibility to determine the suitability of polypropylene application. (*See* Agreement [Docket 287–6], at 3–4; *see also* Winn Report [Docket 229–1], at 10).

---

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

In The Matter Of:

*In Re: CR Bard 200*

_____

# Bruce Rosenzweig, M.D.

October 29, 2014

_____

## Tiffany Alley Global Reporting & Video

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308


770.343.9696

www.tiffanyalley.com

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE:  C.R. BARD, INC.,

PELVIC REPAIR SYSTEM PRODUCTS

LIABILITY LITIGATION

                 MDL NO. 2187

THIS DOCUMENT RELATES TO ALL

CASES IN MDL NO. 2187


    The videotaped deposition of BRUCE ALAN

ROSENZWEIG, M.D., called for examination

pursuant to the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before BRENDA S.

TANNEHILL, CSR, at 320 North Dearborn Street,

Chicago, Illinois, on October 29, 2014 at the

hour of 9:38 o'clock a.m.

REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR

LICENSE NO.  084-003336

Page 2

1  APPEARANCES:
   WAGSTAFF & CARTMELL, LLP
2    BY MR. THOMAS P. CARTMELL and
   MR. JEFFREY M. KUNTZ
3    4740 Grand Avenue, Suite 300
   Kansas City, Missouri 64112
4    (816) 701-1100
   tcartmell@wagstaffcartmell.com
5    jkuntz@wcllp.com
       -and-
6    CLARK LOVE HUTSON
   BY MR. WILLIAM W. LUNDQUIST
7    400 Louisiana Street, Suite 1600
   Houston, Texas 77002
8    (713) 757-1400
   WLundquist@TrialLawFirm.com
9        Representing the Plaintiffs;
10   GREENBERG TRAURIG, LLP
   MR. THOMAS J. MAZZIOTTI
11    3333 Piedmont Road, NE, Suite 2500
   Atlanta, Georgia 30305
12    (678) 553-2101
   mazziottitt@gtlaw.com
13        Representing the Defendant.
14  Also Present:  Mr. Kevin Ingstrup,
           Videographer
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
2  WITNESS              EXAMINATION
3  BRUCE ALAN ROSENZWEIG, M.D.
4    By Mr. Mazziotti              7
5
6
7          E X H I B I T S
8  NUMBER              MARKED FOR ID
9  Rosenzweig Deposition
10  Exhibit
11  No. #1    Expert Report          13
12  No. #2    Notice of Deposition    37
13  No. #3    Curriculum Vitae        97
14  No. #4    Testimony History      122
15  No. #5    Reliance documents     122
16  No. #6    Supplemental reliance  122
17        Documents
18  No. #7    Updated Testimony History  123
19
20
21
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  We are on the
2  record, and the time is approximately 9:38 a.m.
3  This is the beginning of Disc 1 for the
4  deposition of Bruce Rosenzweig.
5        Would Counsel please identify
6  themselves and who they represent for the
7  record.
8        MR. CARTMELL:  Tom Cartmell for the
9  plaintiffs.
10        MR. KUNTZ:  Jeff Kuntz for the
11  plaintiffs.
12        MR. MAZZIOTTI:  Tom Mazziotti on behalf
13  of C.R. Bard.
14        THE VIDEOGRAPHER:  Thank you.
15        Would the court reporter please swear
16  in the witness.
17            (Whereupon, the witness was
18            duly sworn.)
19        MR. MAZZIOTTI:  Good morning,
20  Dr. Rosenzweig.
21        Let me reintroduce myself on the
22  record.  My name is Tom Mazziotti.  We met
23  briefly before the deposition.  I represent
24  C.R. Bard, and I'm here to ask you some
25  questions today as it relates to your opinions

Page 5

1  in the MDL pending in West Virginia with
2  C.R. Bard.
3        Before we get started, I just want to
4  put some stipulations on the record just so
5  we're all in agreement with Counsel so then I'll
6  start asking some questions.
7        This will be the deposition of
8  Dr. Rosenzweig taken pursuant to agreement of
9  counsel and followed up by notice.  This
10  deposition is taken for purposes of
11  cross-examination, discovery and all other
12  purposes allowable under the Federal Rules of
13  Civil Procedure and the MDL pending in West
14  Virginia.  All objections will be made in
15  accordance with the Federal Rules of Civil
16  Procedure, if that's agreeable with all counsel.
17        MR. CARTMELL:  That is agreeable.
18        MR. MAZZIOTTI:  And all other
19  formalities are waived.
20        Dr. Rosenzweig, would you like to read
21  and sign?
22        MR. CARTMELL:  He will read and sign.
23        MR. MAZZIOTTI:  And that can be in
24  front of any notary public.
25        THE WITNESS:  Thank you.

Page 6

1     MR. MAZZIOTTI:  Doctor, I know you've
2  been deposed before and you know how the
3  interaction and the communication works, but let
4  me tell you a little bit about my mannerisms.
5     I have a tendency to talk fast when I
6  get excited sometimes.  Sometimes I ask
7  questions that are convoluted and may not make
8  any sense.  If for any reason you don't
9  understand my question, will you please let me
10  know?
11     THE WITNESS:  That is fair.
12     MR. MAZZIOTTI:  If you do answer, we're
13  going to assume that you understood my question
14  so that's why it's important to let me know.
15     THE WITNESS:  That is also fair.
16     MR. MAZZIOTTI:  Also, I have a tendency
17  to start a question and you're going to know
18  exactly where I'm going and I'm going to pause
19  trying to figure out how to finish my question,
20  and you're going to want to jump in and answer
21  it.  If you can do us a favor and wait until I
22  finish my question and then answer, that way,
23  the record will read more clearly.  Okay?
24     THE WITNESS:  Fantastic.
25     And please feel free to interrupt if I

Page 7

1  do start beforehand.
2     MR. MAZZIOTTI:  I will do that.
3     And the last thing -- there are other
4  things that may come up during the deposition,
5  but the last thing I'll bring up is this is not
6  a marathon.  If you need to take a break for any
7  reason, please let me know.  I'm happy to
8  accommodate you.  If you need to take a call for
9  any reason, just let me know.  All right?
10     THE WITNESS:  Thank you.
11     MR. MAZZIOTTI:  The only issue will be
12  if there's a question pending, please answer
13  that, then we'll take the break.
14     THE WITNESS:  Okay.
15     MR. MAZZIOTTI:  Can you state your full
16  name for the record?
17     THE WITNESS:  Bruce Alan Rosenzweig.
18     BRUCE ALAN ROSENZWEIG, M.D.,
19  called as a witness herein, having been first
20  duly sworn, was examined and testified as
21  follows:
22          EXAMINATION
23  BY MR. MAZZIOTTI:
24     Q.   And Dr. Rosenzweig, where do you
25  currently live?

Page 8

1     A.   My home residence is 175 East Delaware
2  Place.  That's the Hancock Building here in
3  Chicago.
4     Q.   How many times do you think you've been
5  deposed over the course of your medicolegal
6  review career?
7     A.   Someone told me that they found
8  something like 80 depositions, and I thought
9  that might be a little bit low so it's probably
10  close to 100 depositions.
11     Q.   In the context of the vaginal mesh
12  litigation, Ethicon, Bard, any of these other
13  manufacturers, about how many depositions do you
14  think you've given in those matters?
15     A.   This is number seven.
16     Q.   The other depositions that you've given
17  in the vaginal mesh litigation, have all of
18  those been with Ethicon?
19     A.   Four Ethicon, one Boston Scientific,
20  one AMS, and then we're here today.
21     Q.   Nobody from the Bard litigation has
22  deposed you before?
23     A.   That is correct.  We've had several
24  depositions scheduled, and those did not go
25  forward.

Page 9

1     Q.   I think the latest one that you had was
2  earlier this month in the ▆▆▆▆▆▆ versus Ethicon
3  matter?
4     A.   That is correct.
5     Q.   Who deposed you on behalf of Ethicon?
6     A.   Helen Kathryn --
7     MR. CARTMELL:  Downs?
8     THE WITNESS:  -- Downs.
9     Thank you.
10  BY MR. MAZZIOTTI:
11     Q.   Other than testifying in -- well,
12  strike that.
13     In the vaginal mesh litigation, I take
14  it you've been testifying strictly on behalf of
15  the plaintiffs or the patients?
16     A.   That is correct.
17     Q.   Have you ever testified on behalf of a
18  medical device company?
19     A.   I was involved in a patent infringement
20  case regarding an amnioinfusion catheters.  I
21  don't think that got to the point of
22  depositions, but I was hired for one side that
23  was involved with another company that said they
24  had -- were infringing upon the patent rights of
25  another company.

Page 10

1    Q.   Do you remember who that medical device
2    company was?
3    A.   No.  I think one of them was Utah
4    Medical, but --
5    Q.   And how long ago was that?
6    A.   Probably about six or seven years ago.
7    Q.   So if I understand, you've never given
8    a deposition on behalf of a medical device
9    company?
10   A.   That is correct.
11   Q.   And you've been retained by a medical
12   device company one time involving a patent
13   infringement case?
14   A.   That is correct.
15   Q.   Otherwise, you've never been retained
16   by a medical device company to render any
17   opinions in litigation?
18   A.   That is correct.
19   Q.   The other cases where you've given
20   expert testimony, has that been as a treating
21   physician -- well, strike that.
22       Have you ever given expert testimony as
23   a treating physician?
24   A.   Yes.
25   Q.   How often does that happen?

Page 11

1    A.   I have been involved as a respondent in
2    discovery twice, and I've been named twice in
3    medical malpractice litigation.  One case, it
4    was when I was a resident, and so I was dropped
5    from the case after I gave a deposition, and the
6    other one settled before trial.
7    Q.   And so you've been named as a defendant
8    in medical malpractice litigation two times
9    before?
10   A.   That is correct.
11   Q.   One time dropped after your deposition,
12   you said?
13   A.   That is correct.
14   Q.   And the other time, it resolved prior
15   to trial?
16   A.   That is correct.
17   Q.   Have you given expert testimony
18   regarding the standard of care either for or
19   against a doctor?
20   A.   That is correct.
21   Q.   Typically, when you do that, are you
22   for or against the doctor?
23   A.   I've given probably more depositions
24   and trial testimonies for plaintiffs but --
25   well, before I got involved in the product

Page 12

1    liability, I was doing maybe 60 percent
2    plaintiff, 40 percent defense work.  I still
3    have one or two defense cases that are pending
4    in medical malpractice.
5    Q.   Typically, are they in -- what type of
6    cases?  What's the nature of the practice?
7    A.   Earlier on in my career, I did some
8    obstetrical cases.  Part of my contracts was to
9    cover labor and delivery.  I did that up to
10   about eight years ago when I was able to get
11   myself out of contracts requiring me to spend a
12   night in Labor & Delivery attending to
13   deliveries.  So the work I do now is mostly
14   gynecologic and urogynecologic expert witness.
15   Q.   I saw somewhere in here you were
16   retained and gave a deposition in a Georgia
17   case, ███████ versus -- I think it's ██████?
18   A.   Okay.
19   Q.   Well, I was going to ask you if you
20   remember who was involved, but it sounds like
21   you don't?
22   A.   No.
23   Q.   Okay.  I'm from Georgia.  I don't know
24   if you know that or not.  That's why.
25   A.   Yeah, I remember that from your

Page 13

1    introduction.
2    Q.   Okay.  What I'm going to hand you is --
3    we're going to mark as Exhibit 1 as the expert
4    report you've prepared regarding your general
5    opinions in this case.
6    A.   That is correct.
7            (Whereupon, Rosenzweig
8            Deposition Exhibit No. 1 was
9            marked for identification.)
10   BY MR. MAZZIOTTI:
11   Q.   And we'll get into it in greater detail
12   today, but is that the most recent and up to
13   date as far as your opinions and the -- your
14   general opinions in the case?
15   A.   That is correct.
16   Q.   I saw that you had a supplement
17   yesterday, but that related to documents you
18   relied on?
19   A.   That is correct.
20   Q.   We'll get into it in greater detail,
21   but what I want to do is just make sure I
22   understand the scope of your opinions just to
23   kind of map out where we're going to go today,
24   if you'd turn to Page 3.
25   A.   I will use the exhibited copy.

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

---

Page 14

1   Q. And midway on the page, it says, "In
2 general, my expert opinions can be summarized as
3 follows." And if you want, take a look at those
4 A through F.
5     Is that generally what you're planning
6 on rendering opinions about in this case?
7   A. That is correct.
8   Q. And we'll get into the specifics later
9 on. Is there anything else you would like to
10 add before we move on today?
11   A. No. I'll add any additional things in
12 response to your questions.
13   Q. Okay. Let me switch gears real fast.
14     Tell me what you did to prepare for
15 today.
16   A. Well, I've been involved in this
17 process for over three years now.
18   Q. When you say "this process," what do
19 you mean?
20   A. The product liability litigation.
21   Q. For vaginal mesh products?
22   A. That is correct.
23     I have reviewed thousands, if not close
24 to tens of thousands, of documents. I have
25 reviewed most -- but I'm surprised when somebody

---

Page 15

1 puts a paper that I haven't seen yet -- if not
2 the vast majority of the literature on this
3 process.
4     So preparing specifically for today's
5 deposition, I got a good night's sleep last
6 night.
7   Q. Were there any documents or articles,
8 any literature specifically you reviewed in the
9 last couple weeks just to refresh your memory?
10   A. There are by my count about five Align
11 papers.
12     There's the Madsen study that was
13 E-published in 2013 and then came out earlier
14 this year so I took a look at that.
15     There's an abstract by Steffens that
16 was originally presented at an ICS meeting, I
17 think, in 2010, 2011. I reviewed that.
18     Dr. Kawasaki wrote a paper on you
19 urethrolysis comparing the Align with the TVT.
20 I looked at that.
21     There is a paper by Ungerlucan out of
22 Turkey that is a randomized trial between a
23 biological and the obturator Align. I looked at
24 that.
25   Q. What was the name of that? I'm sorry.

---

Page 16

1 I don't know if I heard that.
2   A. The author's name, it's
3 U-n-g-e-r-l-u-c-a-n, if I -- I apologize today.
4 We're going to probably go through a lot of
5 literature, and I apologize for not being able
6 to pronounce the names correctly.
7   Q. That's fine.
8   A. And so we might have just a little bit
9 of trouble with that, but I think that might
10 be -- there's another Italian paper that dealt
11 with only Align products, and it really wasn't a
12 very good paper so we're probably not going to
13 want to talk about that.
14   Q. And I'm sorry. Just to keep you
15 focused, we'll get into what generally you
16 looked at, --
17   A. Right.
18   Q. -- but specifically for today, these
19 five items you've mentioned, you reviewed those
20 in the last couple weeks to prepare for today?
21   A. To just reacquaint myself with the
22 literature. It's difficult being involved with
23 many plaintiffs who have been injured by
24 transvaginal mesh products, slings and pelvic
25 organ prolapse mesh.

---

Page 17

1     I'm continually looking at documents
2 that cross over between all the different forms
3 of litigation so it's difficult for me to say,
4 you know, that I looked specifically at this for
5 this deposition.
6     You know, I reviewed a variety of
7 different internal corporate documents and
8 several depositions, but I had already reviewed
9 and looked at just about every corporate
10 deposition from medical directors to engineers
11 to, you know, other key personnel at Bard for
12 the Avaulta cases I was involved in last year
13 and the Align case that I was involved with
14 earlier this year that I had been scheduled for
15 depositions on, but the cases settled in the
16 weeks before my deposition.
17   Q. In this particular matter that you've
18 been designated as an expert, are you going to
19 give opinions about the Avaulta product?
20   A. General causation opinions?
21   Q. Right.
22   A. Not specifically. Today, we're talking
23 about my Align general causation opinions.
24   Q. That was my understanding, too. I just
25 wanted to make sure.

---

Page 18

1    A.   Right.
2         When we get to case-specific cases
3    regarding the Avaulta products, I will be giving
4    general opinions about my opinions about the
5    Avaulta products and polypropylene in general,
6    why polypropylene is not a suitable product for
7    a permanently-implanted device to treat pelvic
8    organ prolapse.
9         And lot of -- I mean, there's a lot of
10   crossover.  I mean, the Avaulta product is just
11   more polypropylene than a sling product.  If you
12   look at the arms of the Avaulta, according to
13   Bobby Orr's deposition testimony, the arms of
14   Avaulta is the Align sling.
15        And so there is a lot of crossover
16   between the opinions about polypropylene in
17   general and the products in specific so we will
18   get into some general causation opinions.
19        As I say, I drafted three different
20   Avaulta reports that we never got -- I never got
21   deposed on.
22        I looked at Dr. Elliott's Avaulta
23   report.  A lot of the opinions in Dr. Elliott's
24   report are similar because it's a similar entity
25   to the reports that I had written before on

Page 19

1    Avaulta.
2         So long answer to say today, we're
3    going to be -- I'll be giving opinions about
4    Align.  When we get to a case specific about
5    Avaulta, if you want to ask me general causation
6    about Avaulta, I'd be more than happy to answer
7    that.
8         Q.   Just so I'm clear for today, your
9    Rule 26 report in this matter that we've marked
10   as Exhibit 1, that is dedicated solely to the
11   Align product?
12        A.   The Align product line, yes.
13        Q.   Correct.  Because it did not mention
14   anything about the Avaulta product line?
15        A.   That is correct.
16        Q.   All right.  And I don't know how we got
17   there because we were talking about depositions,
18   but let me go back to that line of questioning.
19        A.   No.  Actually, I think you started
20   about what I had reviewed for today, and so we
21   kind of got off on that tangent.
22        Q.   Okay.  So just to, I guess, I think you
23   said reacquaint yourself, before today, you
24   reviewed five, as you called it, Align papers:
25   The Madsen study, an abstract by Steffens, the

Page 20

1    Kawasaki article, a Turkey -- and that's where
2    we gave -- tried to spell a name -- a Turkey
3    study and then an Italian paper?
4         A.   That is correct.
5         Q.   Any other papers, articles, literature,
6    what have you, that you reviewed to help
7    reacquaint yourself to answer questions today on
8    the Align product?
9         A.   Specifically for today, no, but as you
10   probably got a flavor for, we're going to be
11   talking about a lot of literature today.
12        Q.   I can't wait.
13        A.   Okay.
14        MR. CARTMELL:  Me, neither.
15   BY MR. MAZZIOTTI:
16        Q.   And you wanted to see if we could get
17   through this in 13 so we'll see.
18        A.   We could probably be done with this in
19   three, you know.
20        Q.   I'm sure, but I've got to answer to
21   people back home.
22        A.   I know you do.
23        Q.   As far as any other documents you may
24   have reviewed, was there anything else?  I don't
25   know.  There could have been notes, records

Page 21

1    anything like that.
2         A.   No, and I think that the supplemental
3    reliance list added an expert report from a
4    chemical engineer that was filed discussing the
5    MSDS and the Technical Safety Manual -- I think
6    that's what it's called -- that goes along with
7    the MSDS which we'll get into when we talk about
8    the MSDS part of my report.
9         And then there was an e-mail string
10   from Adam Silver to Dr. Goldberg that I think
11   was added on which I also looked at.
12        Q.   How about depositions, did you look at
13   any specific depositions to refresh your memory
14   for the deposition today?
15        A.   I'm probably going to butcher their
16   names.
17        Q.   I'm fine with that, but the court
18   reporter may take issue, but we'll go
19   phonetically.
20        A.   It's not Duncan, but --
21        MR. CARTMELL:  Bracken?
22        THE WITNESS:  Bracken, that was it.
23   His deposition.
24        And there was another specifically
25   discussing MSDS.  There was another deposition

Page 22

1    that I reviewed, and I'm blocking on it.
2    There's just so many names, --
3    BY MR. MAZZIOTTI:
4        Q.   Sure.
5        A.   -- and I apologize for that.
6        Q.   No, I understand.  And the reason I'm
7    asking this, I know there's a universe of
8    documents out there that we could fill this
9    room, --
10       A.   Right.
11       Q.   -- but specifically, if there was a
12   subset that you would have reviewed to help
13   refresh your memory, kind of focus your efforts
14   here today.
15       A.   Right.
16            The Bracken deposition and another
17   engineer at Bard specifically dealing with the
18   MSDS issue, but I don't remember what that
19   person's name is.
20       Q.   Did you specifically ask to look at
21   those depositions for today, or were they
22   provided to you to take a look at to refresh
23   your memory?
24       A.   They were provided for me to take a
25   look at.

Page 23

1        Q.   How about the five pieces of literature
2    we talked about earlier?
3        A.   No.  Those were in my collection.
4        Q.   Okay.  Is there a reason why you
5    selected those five?  Is it because they were of
6    the Align products?
7        A.   Yeah, those are the five articles that
8    I could find that specifically dealt with the
9    Align product.
10       Q.   Have you ever given opinions about the
11   Align product previously either by deposition or
12   a Rule 26 report, something like that?
13       A.   Not a Rule 26 report but a -- I was
14   designated as an expert in Texas.  It was a case
15   of ████████ and she had an Align product,
16   and we were close to giving a deposition on it
17   and you guys decided --
18       Q.   That's what I understand.
19       A.   -- that you didn't want to do a
20   deposition.
21       Q.   Yeah, it didn't go forward.
22       A.   Right.
23       Q.   So at least any sworn testimony you
24   have not given on the Align product as of yet?
25       A.   That is correct.  This is the first

Page 24

1    time you guys have had a chance to talk to me.
2        Q.   I feel special.
3        A.   But seeing the track record, I was
4    surprised you showed up today, I mean.
5        Q.   Why is that?
6        A.   Well, I've had a number of -- I've had
7    two depositions that were cancelled -- that were
8    cancelled because the case settled right
9    beforehand so I thought, you know, third time's
10   a charm, but. . .
11       Q.   Well, you got lucky, and here I am.
12       A.   Okay.
13       Q.   Did you look at any other expert
14   reports for today?  You mentioned Dr. Elliott?
15       A.   That is correct, but that's Avaulta.
16       Q.   Okay.  How about any other type of
17   pathology?
18       A.   And actually, I did review Dr. Blaivas'
19   expert report.  I'm sorry.
20       Q.   I was going to ask you about him.
21            Why did you review Dr. Blaivas' expert
22   report?
23       A.   I was asked to take a look at that.
24       Q.   Do you know Dr. Blaivas?
25       A.   I had met him several years back.  I

Page 25

1    don't say that I know him personally, but I do
2    know him by his reputation.
3        Q.   Did you speak with any experts in
4    preparation for today?
5        A.   No, sir.
6        Q.   We've talked about depositions, we've
7    talked about literature.  Any other documents
8    that you may have reviewed to prepare in
9    rendering your opinions here today?
10       A.   There's an exhaustive list of internal
11   documents that I've looked at, and so there were
12   some that I had looked at over the last few
13   weeks in order to, A, get the report done, and
14   B, to get ready for this deposition.
15       Q.   And when you say "internal documents,"
16   Bard internal documents?
17       A.   That is correct.
18       Q.   Anything else?
19       A.   Not that I can recall.
20       Q.   Have you actually looked and examined
21   the Align products or product line?
22       A.   Have I held one in my hand?
23       Q.   Right, and taken a look.
24       A.   Yes, I have.
25       Q.   Have you done any type of other

Page 26

1  examination or testing other than visually?
2      A.   No.
3      Q.   Did you go back and review any of your
4  prior testimony, be it in Ethicon, AMS, Boston
5  Scientific or otherwise?
6      A.   Well, I do have a trial coming up next
7  week with Boston Scientific so in preparing for
8  that, I'm, you know, re-reviewing my deposition
9  in that case, but my depositions and trial
10  testimony are fairly crystalized in my mind so I
11  don't really need to look at that too much.
12      Q.   Has your testimony from what you recall
13  ever varied or have your opinions changed in the
14  vaginal mesh litigation?
15      A.   In what respect?
16      Q.   I don't know.  An opinion you
17  previously held you decided, well, the
18  literature has come out such that I'm going to
19  change my opinion either to polypropylene, what
20  your opinions have been before, anything like
21  that?
22      A.   Generally, no.
23      Q.   Does anything stand out that you
24  originally held an opinion and it's not quite as
25  strong as you once thought?

Page 27

1      A.   No.  I think my opinions have only
2  gotten stronger.  I think the literature is only
3  supporting more and more the ideas about
4  polypropylene degradation, contraction,
5  deformation, chronic foreign body reaction,
6  chronic inflammation and chronic subclinical
7  infection.
8          I mean, if you look at Abbott's paper
9  that came out, Marcus-Braun's paper,
10  Dr. Blaivas' paper, Rogo-Gupta's paper and all
11  these long-term case series which if you look at
12  Ogah's, O-g-a-h's, Cochrane analysis from 2009,
13  2010, she states very clearly that if you look
14  at the several hundred prospective, randomized,
15  controlled trials, the data is moderate at best
16  and that these papers cannot be looked at for
17  long-term complications associated with mesh,
18  and therefore, the best way to track these is by
19  databases or by registries.
20          When you go back and look at the half a
21  dozen or so registry papers that have been
22  written, Tamussino's Austrian registry both on
23  retropubic and obturator slings, the Dyrkorn
24  Norwegian registry, the Kuuva Finnish registry,
25  the Collinet French registry, they say very

Page 28

1  clearly we do not track long-term complications
2  so what you have to look at is the subset of
3  literature that has been coming out about
4  long-term complications associated with mesh
5  products.
6          And that has only crystalized the
7  knowledge that there is a difference between --
8  when we say every surgery has risks, every
9  surgery does have risks, but when you look at
10  the Burch procedure, when you look at the
11  pubovaginal slings, when you look at native
12  tissue repairs, you know in the first six weeks
13  after surgery whether or not somebody has a
14  complication.
15          Yes, all surgery has complications, but
16  when you look at Marcus-Braun's paper and
17  Abbott's paper, over 50 percent of mesh
18  complications, whether it's slings or
19  transvaginal mesh, show up over two years after
20  implantation.  This is at a time when most
21  doctors are not anticipating a surgical
22  complication to show up.
23          So we've already seen in the Burch, the
24  pubovaginal sling, the native tissue repairs
25  that you're going to know if you have a

Page 29

1  complication early.  And yes, all surgery does
2  have complications, but we're not expecting
3  these long-term, life-altering, life-threatening
4  complications that we see that are showing up
5  frequently two years after the procedure.
6          So that, I think, is the most
7  crystalizing information that has come out over
8  the last three or four years about the
9  difference in when these complications show up,
10  the severity of these complications.
11          And the other thing that the Abbott
12  paper showed very clearly is that the vast
13  majority of these patients, over 75 percent of
14  patients, are not going back to even the same
15  facility, let alone the same doctor where they
16  had it implanted so doctors don't know about
17  these complications.
18      Q.   In the last year roughly from October
19  of 2013 till the present, October -- what is
20  it -- 29th, 2014, has there been any updated
21  literature that you're relying on today?
22      A.   It's all on my reliance list.
23      Q.   Does anything stand out over the last
24  year?
25      A.   Well, we're in 2014.  I don't think

In Re: CR Bard 200    Bruce Rosenzweig, M.D.    10/29/2014

Page 30

1  that there's any dispute that degradation
2  happens with polypropylene products. We can
3  debate the extent of degradation, we can debate
4  how much the mesh degrades, but we know that
5  degradation happens.
6  Q. And we'll talk about -- I trust me,
7  we're going to get to the literature.
8  A. Great.
9  Q. I just want to know, since October
10  of 2013, are you familiar with any papers,
11  articles, studies that have come out in the last
12  year regarding vaginal mesh that you're relying
13  on?
14  A. They're on my reliance list.
15  Q. Okay. Your reliance list is, like, 50
16  pages or so, so I was just curious if there's
17  anything in the last year.
18  A. We have -- excuse me. Specifically
19  talking about Align?
20  Q. No. Just talking about vaginal mesh,
21  polypropylene.
22  A. Okay. Well, I think the Madsen paper
23  about the Align product which came out
24  E-published last year and came out in a hard
25  copy this year shows all of the internal

Page 31

1  documents' concerns about the Align product
2  shows up in a paper on 200 patients that had
3  Aligns: 50 percent satisfaction rate,
4  65 percent failure rate, 28 percent of patients
5  had a complication that showed up after
6  discharge from the hospital; 9.2 percent of
7  patients had a complication that needed a
8  surgical procedure, 5 percent of patients had an
9  erosion that required surgery.
10  Now, we know that erosions about
11  50 percent of the time or more need surgical
12  management so they had a 10 percent erosion
13  rate.
14  And the other thing is the Stevenson
15  abstract showed that at one year, 11 percent of
16  patients had obstructed voiding.
17  Obstructed voiding is due to mesh
18  contraction or deformation, and we know that
19  there was a problem with the sheath removal
20  which leads to tensioning issues and roping,
21  curling and deformation. The mesh curled up
22  into a C, it curled into an S or curled into a
23  W, an accordion.
24  All those things increase the risk of
25  problems associated with it, erosion. And when

Page 32

1  I talk about erosion, I'm kind of lumping it
2  together with extrusion and exposure.
3  And we'll talk about whether it's
4  vaginal erosion or urethral erosion, but the
5  Madsen paper showed that all of the concerns
6  that were very explicitly shown in the internal
7  documents, when you have a clinical study, those
8  clinical -- that clinical study showed that
9  there was clinical reasons to have those
10  concerns.
11  Q. I want to move to strike that only
12  because I'll tell you ultimately where I'm going
13  here.
14  MR. CARTMELL: I think he's just asking
15  for the names --
16  THE WITNESS: Okay.
17  MR. CARTMELL: -- if you can recall
18  them. If you can't recall them, then tell
19  him, --
20  THE WITNESS: All right.
21  MR. CARTMELL: -- but I don't think he
22  wants to go through the documents.
23  THE WITNESS: I got it. Okay. I'm
24  sorry. I misunderstood. I thought you wanted
25  me to go --

Page 33

1  BY MR. MAZZIOTTI:
2  Q. Yeah, and I'll tell you where I'm
3  going.
4  A. Okay.
5  Q. As you know, you've been deposed
6  several times on vaginal mesh.
7  A. That's correct.
8  Q. And you've been asked several questions
9  about literature, you know, and some of it we'll
10  revisit today, some we won't. And so in other
11  words, I don't want to go over stuff that you've
12  been deposed 20 times about, if this article
13  says this, you agree. You've answered those.
14  A. I'm very -- I misunderstood the nature
15  of your question.
16  Q. I can tell you're not doing it on
17  purpose.
18  A. And so besides the Madsen paper, there
19  are a few other papers that have come out. I
20  think we talked about the Abbott paper and a few
21  of the other long-term complication papers, but,
22  I mean, -- but I think just about all of the
23  literature I've talked about before.
24  Q. Yeah, and that's where I'm going
25  because I'm trying to hone in on things that

Page 34

1  need to be discussed versus questions about the
2  AUGA position papers and all that that you've
3  answered on multiple occasions.
4      A.   Got it.
5      Q.   And I can't promise I won't bring that
6  up later on and ask you to reconcile opinions,
7  but for the most part, I'm trying to keep away
8  from that.
9      A.   I didn't realize that was what you were
10  asking.
11      Q.   That's fine.
12          So the Madsen paper obviously is one
13  that's come out at least within the last year
14  that you've reviewed.  Is there anything else
15  that stands out?  And I understand there's so
16  much literature out there, but. . .
17      A.   No.
18      Q.   Okay.  I think you said before you have
19  not gone back and looked at any trial testimony
20  you've given in preparation for your deposition
21  today?
22      A.   Preparation for today, no, but
23  obviously, having just been at trial a month
24  ago, I reviewed all of my prior testimony, you
25  know, for the trial testimony that I gave about

Page 35

1  a month ago so, I mean, it's pretty fresh in my
2  memory.
3      Q.   Okay.  Did you take any notes with
4  regard to your opinions you're going to give
5  today?
6      A.   No, sir.
7      Q.   Do you feel like all of that is
8  crystalized, as you said, in your head?
9      A.   Yes, sir.
10      Q.   How about for the specific plaintiffs
11  later on, how are you going to testify as to the
12  specific plaintiffs?
13      A.   What I did as I was going through the
14  records, I started to prepare my, you know, case
15  report from the records and then added
16  deposition testimony to it so it started out as
17  a draft and then just kept, you know, moving on
18  to the final product.
19      Q.   Just kind of looked at your Rule 26
20  report?
21      A.   That is correct.
22      Q.   And used that as a road map?
23      A.   That is correct.
24      Q.   Who did you speak with in preparation
25  for your deposition today?

Page 36

1      A.   Mr. Kuntz.
2      Q.   Okay.  How long did you all meet?
3      A.   Maybe three or four hours.
4      Q.   And other than the articles you
5  mentioned, the depositions, any other documents
6  he showed you or you reviewed?
7      A.   Again, the internal documents, the
8  depositions that we mentioned earlier this
9  morning and the expert reports.
10      Q.   When you say "the expert reports,"
11  other than Elliott and Blaivas, who else did you
12  look at?
13      A.   The one that was supplemented on the
14  supplemental list, the chemical --
15      Q.   The chemical engineer?
16      A.   Right.
17      Q.   Okay.  Did that assist you at all?  The
18  chemical engineer expert report, did that assist
19  you at all in your opinions?
20      A.   No.  I will get into my opinions about
21  the MSDS when we get to that point of our
22  discussion.
23      Q.   All right.  I'm going to hand you -- I
24  think we're on two -- what we're going to mark
25  as Exhibit No. 2 which is your notice of

Page 37

1  deposition.
2          (Whereupon, Rosenzweig
3           Deposition Exhibit No. 2 was
4           marked for identification.)
5      THE WITNESS:  Yes.  Thank you.
6  BY MR. MAZZIOTTI:
7      Q.   Have you seen that before today?
8      A.   Yes, I have.
9      Q.   Okay.  When did you see this one?
10      A.   I think right after it came out,
11  Mr. Kuntz showed it to me.
12      Q.   Did you and have to obtain any
13  documents as a result of the notice of
14  deposition?
15      A.   Well, I provided you with my curriculum
16  vitae and a list of my trial testimony.
17      Q.   Okay.  Anything else that you did to
18  comply with the notice of deposition?
19      A.   I think that we discussed that the
20  materials that I reviewed for the case-specific
21  portion will be brought as discs, any billing
22  information will be supplied by the individual
23  attorneys, and I think that there really was not
24  anything else that there was to bring.
25      Q.   Okay.  Your CV, the one that you

In Re: CR Bard 200                Bruce Rosenzweig, M.D.                10/29/2014

Page 38

1  brought today, is from August 2013.  I think we
2  talked about it earlier.  That's your most
3  recent CV?
4      A.   That is correct.
5      Q.   Is there anything you would want to add
6  to it?
7      A.   No.
8      Q.   We asked for articles, presentations,
9  other writings from 2002 to the present.
10     A.   And those would have been on reflected
11  on my CV.
12     Q.   Okay.  Do you still have copies of
13  materials?  Because I went through your CV and
14  we'll go through it a little bit later, and
15  there's several about, you know, vaginal mesh,
16  pelvic obstruction, things of that nature.  Do
17  you have any articles about that back in your
18  personal files, anything like that?
19     A.   Articles about?
20     Q.   Yeah, your articles from your CV that
21  would be responsive to Exhibit A to the notice
22  of deposition.
23     A.   There's nothing that I wrote that has
24  been in the last five years.
25     Q.   And as for your complete and entire

Page 39

1  file, I take it that's what the documents you
2  relied on is, that list?
3      A.   That is correct.
4          And since the documents that I looked
5  at, all the depositions and internal documents,
6  would probably take up about six boxes, I
7  thought to save my back or somebody, you know,
8  bringing all those in, I mean, they're all laid
9  out there.  And I think if there's a specific
10  one that you want to talk about, you're going to
11  show it to me and we can discuss it in specific.
12     Q.   As far as your review, do you typically
13  do it electronically, or do you look at paper
14  documents?
15     A.   Well, I'm going to start to convert
16  over to electronic.  So I used to do it all on
17  paper, and now I'm moving -- I finally got a
18  tablet, and I'm going to start to read off of a
19  tablet.
20          I find paper easier for me to read.
21  Reading things on the computer gives me a
22  headache, but I'm trying to be more green and
23  save storage space so I'm going to start to do
24  things more electronically.
25     Q.   Do you highlight, take notes, put tabs

Page 40

1  on your paper files?
2      A.   I just highlight.
3      Q.   So for example, in these specific
4  plaintiff cases, when you produce a CD or
5  produce them electronically, is it copied where
6  it shows your highlights?
7      A.   No, no.
8      Q.   Is there a way other than looking at
9  your paper file to see where you've highlighted
10  or tabbed?
11     A.   I don't tab.  It's just highlight.
12     Q.   All right.
13     A.   But, you know, again, with the -- what
14  I did with the case specific with the medical
15  records and the depositions, if it was something
16  I wanted to add to the report, I took it out and
17  put it in the report.
18     Q.   Do you keep a subject folder or do you
19  have someplace dedicated in your office where
20  you have all the literature you're reviewing as
21  it relates to vaginal mesh?
22     A.   I do have binders with literature on,
23  you know, pelvic floor mesh, retropubic slings,
24  obturator slings, yes.
25     Q.   And where do you keep this, these

Page 41

1  binders?
2      A.   In my office.
3      Q.   Is it just like --
4      A.   And now they're in a box that's going
5  to be going to West Virginia.
6      Q.   Okay.  Are these articles, studies and
7  literature you have selected that you find
8  relevant to your opinions or, is this just all
9  the literature that's out there on vaginal mesh
10  whether it's related to your opinions or not?
11     A.   I've got binders that are kind of like
12  specific, my go-to articles.  I have binders
13  that are just articles in general, and then I
14  have a file drawer with stuff that I've looked
15  at and I'm probably not going to look at again.
16     Q.   Do you maintain any articles that
17  support vaginal mesh as a safe product?
18     A.   There are articles out that talk about
19  the efficacy and the short-term safety of
20  transvaginal mesh products, and yes, I'm very
21  willing to talk about those.
22     Q.   But do you keep copies of those in your
23  binders, or is that kept elsewhere?
24     A.   Of course.
25     Q.   That's what I'm -- you've got the

Page 42

1   universe of literature as it relates to vaginal
2   mesh?
3       A.   That is correct.
4       Q.   Okay.  Because I didn't know whether in
5   these binders you hand selected some and there
6   didn't put others in your research file.
7       A.   Again, I have various, you know, places
8   where things are disorganizedly organized so
9   that I can, you know, find easily if I want to
10  re-review or reference something, but no, I
11  would never discount any article.
12          There are in the universe of articles a
13  number of articles that talk about, you know,
14  the efficacy of slings and transvaginal mesh
15  products and the short-term safety of it.
16      Q.   For example, -- and this is really
17  where I'm going -- in the documents you rely,
18  those articles that you say support the
19  short-term safety of the products, those were
20  not listed on your list of documents relied upon
21  for your opinions, right?
22          MR. CARTMELL:  Object to the form.
23          THE WITNESS:  There are articles that
24  are probably in the reliance list that discuss
25  all of that.

Page 43

1          I really can't, you know, point to
2   specific articles.  I mean, again, there's a
3   finite universe of literature which I've read
4   and I am very happy to discuss.  I have always
5   acknowledged that, you know, that there are
6   studies that -- you know, short-term and
7   long-term studies that talk about the efficacy
8   of these products and that there are published
9   articles that show a complication rate that they
10  discuss that I would be very happy to discuss
11  with you and show you why some of the other
12  studies point to a different opinion.
13      Q.   My question specifically, though, is:
14  The position statement by the American
15  Urogynecologic Society, that's not listed in
16  your documents relied upon, right?
17      A.   I have discussed that on numerous
18  occasions, and I'll be very happy to discuss it
19  with you.
20          MR. CARTMELL:  He just wants to know if
21  it's on your reliance list, if you remember.
22          THE WITNESS:  I don't recall, but
23  obviously, I have discussed that article at
24  numerous times.
25

Page 44

1   BY MR. MAZZIOTTI:
2       Q.   Right.  I'm just -- what I'm getting
3   again to is what you maintain versus what is on
4   your list of documents relied upon.  And you
5   said, for example, you maintain the universe of
6   articles and literature as it relates to vaginal
7   mesh in these binders, remember?
8       A.   That is correct.
9       Q.   And but you may not necessarily rely
10  upon certain of those articles or literature in
11  rendering your opinions; is that a fair
12  statement?
13          MR. CARTMELL:  Object to the form.
14          THE WITNESS:  I mean, when I write a
15  report?
16  BY MR. MAZZIOTTI:
17      Q.   Correct.
18          There's two different issues here.  One
19  is you've got literature at home that you review
20  to keep yourself abreast of the vaginal mesh
21  products, right?
22      A.   That is correct.
23      Q.   Then you prepare a list of documents
24  that you've relied upon for your specific
25  opinions in litigation?

Page 45

1       A.   That is correct.
2       Q.   The document list that identifies the
3   documents you've relied upon for litigation, is
4   that a subset of the documents you have in your
5   binders?
6       A.   Obviously, yes.  I mean, I've got many,
7   many, many more articles than what I might use
8   on a reliance list to, you know, put reports
9   together.
10      Q.   That was my question, whether it's a
11  subset or it's lock, stock and barrel.
12      A.   No.  I think that -- you said there's
13  what, 500 or so things on the reliance list.  I
14  mean, if we put everything down there, it
15  would -- you know, it would be unwieldy to go
16  through.
17      Q.   Okay.  We were going through the
18  Exhibit A to the notice of deposition, and what
19  you're saying is everything that would be
20  responsive to Exhibit A -- not everything but
21  what you have that would be responsive to
22  Exhibit A, you referred me to the exhibit to
23  your expert report that identifies the documents
24  relied on?
25      A.   That is correct.

Page 46

1    Q.   Invoicing and bills just go to the
2  specific law firms?
3    A.   That is correct.
4    Q.   How are you being compensated with
5  regard to your opinions today that are your
6  general opinions in this case?  Is it divvied up
7  among the law firms?  How does that work?
8    A.   Yes, that -- I mean, well, today, the
9  opinions for the general causation will be
10  billed to the MDL.
11    Q.   Okay.  And then the specific plaintiffs
12  will be billed to the specific plaintiff law
13  firms?
14    A.   That is correct.
15    Q.   How much time have you put into the
16  Bard litigation?
17    A.   To the general causation?
18    Q.   Yeah.  Well, yeah, let's start there,
19  for the general causation opinions.
20    A.   To get this report done and to prepare
21  for today, you know, maybe 30 to 40 hours.
22    And as I said before, you know, I had
23  spent a significant amount of time last summer
24  with the Avaulta report and over the last two
25  years with the Texas Align litigation so that

Page 47

1  there really was not, you know, a significant
2  amount more that I needed to do to get this
3  report, you know, together and to get ready for
4  today's deposition.
5    Q.   Has there been anything removed from
6  your file with regard to your general opinions?
7  For example, the things you've identified on
8  your list and what you're going to produce by
9  CD, has there been anything that's been taken
10  out?
11    A.   Not that I can recall, no.
12    Q.   How did the list come about which is
13  attached to your expert report?  Did you prepare
14  that, or did somebody else prepare that?
15    A.   I think that is just an on -- a growing
16  list of things that have been discussed and
17  used, you know, from the very first report that
18  I put together.
19    Q.   Do you believe you've got all the
20  documents and testimony and literature you need
21  in order to give full and complete opinions here
22  today on the Align product?
23    A.   I don't think that there's too much
24  else that I haven't looked at.
25    Q.   Okay.  So that's a yes?

Page 48

1    A.   That's a yes, yeah.
2    Q.   Anything that you want to look at just
3  because it may crystallize your opinions or
4  otherwise?
5    A.   No, sir.
6    Q.   Have you prepared -- excuse me.
7    Have you prepared any diagrams or
8  illustrations or anything like that with regard
9  to the Bard product?
10    A.   No, sir.
11    Q.   How about correspondence, is there any
12  correspondence between the law firms and you by
13  e-mail, letters or otherwise?
14    A.   Correspondence?
15    Q.   Correct.
16    A.   Yes.
17    Q.   Are those -- where are those kept?
18  Where is the correspondence kept?
19    MR. CARTMELL:  I missed the question.
20  Is it correspondence between him and the
21  attorneys?
22    MR. MAZZIOTTI:  Correct.
23    MR. CARTMELL:  There's an agreement in
24  this litigation, and I think it's also
25  consistent with Rule 26 that none of the

Page 49

1  correspondence from either side between the law
2  firms and the attorneys with experts is
3  discoverable.
4    MR. MAZZIOTTI:  Okay.  I wasn't aware
5  of that so I will --
6    THE WITNESS:  That's why I was kind of
7  waiting for him to say something because I was
8  about to say that from my understanding isn't
9  discoverable.
10  BY MR. MAZZIOTTI:
11    Q.   I wasn't going to go into the
12  correspondence.  I didn't know if you kept it
13  separately, but regardless, --
14    A.   Usually, my convention is to try to
15  clean out my in box daily, weekly and monthly
16  so. . .
17    Q.   And I don't know if you can answer this
18  question, but you might.
19    When were you first contacted with
20  regard to giving opinions in Bard litigation
21  generally?
22    A.   Fall of 2012 possibly.
23    Q.   And who contacted you?
24    A.   Mr. Kuntz.
25    Q.   Do you know how Mr. Kuntz obtained your

Page 50

1    name, found your name?
2        A.   I really don't recall.
3        Q.   What were you told by Mr. Kuntz at that
4    time?
5        A.   I really don't recall.
6        Q.   Some experts have a process by which
7    when they get a call or a case in, they follow a
8    certain way of doing things.  Do you have
9    something like that?
10       A.   No.
11       Q.   Okay.  At that point in the Fall
12   of 2012, you had already been rendering opinions
13   on behalf of patients in vaginal mesh
14   litigation, right?
15       A.   That is correct.
16       Q.   You realized that Mr. Kuntz represented
17   patients in vaginal mesh litigation?
18       A.   That is correct.
19       Q.   Had you worked with Mr. Kuntz or his
20   firm prior to the Fall of 2012?
21       A.   No.
22       Q.   Do you know what you were specifically
23   asked to do?
24       A.   Specifically review documents and to
25   generate a report for a plaintiff who was

Page 51

1    injured with an Avaulta product.
2        Q.   Which plaintiff was this?
3        A.   Rhonda Painter.
4        Q.   And when you say "documents," do you
5    remember what documents you were provided
6    originally?
7        A.   A number of corporate documents
8    followed by depositions.
9        Q.   As far as the Painter case, I know you
10   were not deposed, but did you ever have any type
11   of disclosure or report?
12       A.   From my understanding, that case -- you
13   can help me with the proper term.  The Painter
14   case, it was not dismissed, but it was removed
15   from the MDL.
16       Q.   Okay.
17       A.   This was a New Jersey MDL.
18       Q.   It was sent back?
19       A.   Right.  And I think the reason is
20   because the implanting surgeon died before he
21   could give testimony so according to Colorado
22   law, it --
23            MR. CARTMELL:  I think it was just
24   removed as a Bellwether so it was proceeding in
25   discovery, and because of that, it was removed

Page 52

1    as a Bellwether and discovery stopped.
2            MR. MAZZIOTTI:  Got it.  Okay.
3    BY MR. MAZZIOTTI:
4        Q.   As far as since the Fall of 2012, have
5    you been working with Mr. Kuntz and his firm on
6    the Bard litigation?
7        A.   No.
8        Q.   Was there a time where you got a call
9    specifically about reviewing the Align product?
10       A.   Yes, and I -- well, actually, to look
11   at case specifics and then to do the general
12   causation for Align.
13       Q.   When did the call come in for the Align
14   product?
15       A.   I can't really remember.
16       Q.   Have you been predominantly working
17   with Mr. Kuntz and his firm?
18       A.   Predominant?  I mean, we've done a lot
19   of Ethicon work together.
20       Q.   As far as the C.R. Bard matter, though,
21   is Mr. Kuntz typically the one who communicates
22   with you or his firm, or are there other law
23   firms communicating directly with you?
24       A.   On this or previously?
25       Q.   On this, the Bard Align report that

Page 53

1    you've done.
2        A.   With Mr. Kuntz's firm.
3            Sorry.  I didn't mean to imply he's
4    like the senior partner in the firm.
5            MR. CARTMELL:  Make sure you're not
6    making his head any bigger.
7            MR. MAZZIOTTI:  Make sure Mr. Kuntz
8    gets a promotion and paid more.
9            MR. KUNTZ:  It's clearly obvious.
10   There was one of us at the World Series game and
11   one of us in Chicago last night.
12            THE WITNESS:  I think when he gets
13   back, he's going to go and kind of chip
14   "Cartmell" off of the front door and put
15   "Kuntz."
16   BY MR. MAZZIOTTI:
17       Q.   Have you worked with Mr. Cartmell
18   before?
19       A.   Yes.  That would be in the same, you
20   know, --
21       Q.   Ethicon work?
22       A.   -- the same circumstances.  They're at
23   the same firm.
24       Q.   I don't want to leave him out.
25            Who else plaintiff firm-wise have you

Page 54

1  worked with in vaginal mesh litigation whether
2  it's Ethicon, Boston Scientific, AMS?
3      A.  With Bard, I've worked with
4  Mr. Cartmell's firm, Doug Migliori with Motley
5  Rice, Amy Gunn.  And these were on the New
6  Jersey MDLs.  And Mike Gallagher's firm on the
7  Align.
8          With AMS, I've worked with Clark, Love,
9  Hutson, with Jim Purdue's firm and again with
10  Motley Rice on the AMS West Virginia MDL.
11          As far as Boston Scientific, I've
12  worked with Clark, Love, Hutson and Motley Rice.
13          And then, you know, we'll be dealing
14  with all the case-specific firms, you know, on
15  the Bard litigation, but those are the big firms
16  that are kind of coordinating things.
17      Q.   And how much do you charge for your
18  review?
19      A.   I charge $750 an hour for review,
20  $1,500 an hour for depositions and $10,000 a day
21  for trial testimony.
22      Q.   As far as -- and we'll start with trial
23  testimony.
24          When you say $10,000 a day, does that
25  include travel?  Obviously, you've got to go up,

Page 55

1  I would assume, the day before.  Is that $10,000
2  because you're traveling, or is that billed at a
3  separate amount?
4      A.   Well, usually, the day before trial, I
5  get there early, we spend the rest of the day
6  getting ready.
7          Sometimes in His Honor Judge Goodwin's
8  court, if your final witness finishes up at
9  4:45, your next witness had better be ready to
10  go, and so -- which is what happened in the last
11  trial.  I got 20 minutes of trial testimony in
12  and we stopped for the day, and then I was back
13  on the witness stand the next day.
14          So obviously, it might be the same in
15  all federal court, but in Judge Goodwin's court,
16  you have to be ready to go the day before just
17  in case there is -- testimony goes quick and you
18  need to have a witness ready to go.
19      Q.   I find that true in most courts.
20          So when that situation happens and you
21  fly in, what is the 10,000-a-day trial?  What do
22  you mean by that?  Is that when you're actually
23  at the courthouse?  I mentioned travel time.  Is
24  that billed any differently?
25      A.   No.  If I'm going to be there for two

Page 56

1  or three days, I mean, it's up to the attorney's
2  discretion how many days they would like me to
3  be there, and so I bill at a daily rate.
4      Q.   Okay.  So when you travel, that whole
5  day you block out, and that's billed as 10,000?
6      A.   It all depends.
7          Let's say I'm going to leave at
8  7:00 o'clock at night and I'm back at
9  7:00 o'clock the next day.  That's one day.  If
10  I'm going to be leaving early in the morning and
11  be working the rest of the day, that's going to
12  be billed as a full day.
13      Q.   Okay.  In a situation like you just
14  mentioned, you fly in, you meet with the firm
15  the night before, you stay and give 20 minutes
16  of testimony on the next day and then you have
17  to come back and give testimony the following
18  day, how is that billed?
19      A.   That would be for three days.
20      Q.   All right.  So do you even have a rate
21  for travel time to trial?
22      A.   Again, if I'm flying out in the
23  evening, that probably meant that I would be
24  able to be in my office and taking care of
25  patients so that would not be a day, and I

Page 57

1  wouldn't bill for travel.
2      Q.   As far as when you travel, do you
3  insist on flying business class, or does it
4  matter?
5      A.   To get in and out of West Virginia,
6  there's a little puddle jumper that flies
7  directly from Chicago so there's -- I think they
8  have Economy Plus, but Economy Plus is about the
9  same as the regular economy so it's not a very
10  luxurious travel so no, I don't -- if someone
11  offers to fly me first class, I won't turn that
12  down, but I have no conditions that that is part
13  of my, you know, travel stipulation.
14      Q.   That's not a set policy for you?
15      A.   That's correct.
16      Q.   Some experts actually do, just so you
17  know.
18      A.   I might have to start adding that in.
19          MR. CARTMELL:  No, please don't.
20  BY MR. MAZZIOTTI:
21      Q.   Yes.  Send that bill to Mr. Kuntz, too.
22          THE WITNESS:  You've really moved up.
23  That's great.
24  BY MR. MAZZIOTTI:
25      Q.   Now, as far as the -- you said you

Page 58

1 spent approximately 30 to 40 hours in
2 preparation for this litigation, the Bard
3 litigation where you're giving Align opinions?
4     A.  Right.  The general causation, getting
5 the report together and getting the opinions
6 together today, yes.
7     Q.  And I don't recall, when were you first
8 contacted to render opinions in vaginal mesh
9 litigation generally?
10     A.  That would have been -- I think I
11 testified before it was, like, 2011.
12     Q.  So since 2011, how much have you billed
13 to vaginal mesh litigation either through
14 review, giving depositions, trial testimony?
15     A.  How many hours have I billed?
16     Q.  How much?
17     A.  I don't really have a good number I
18 could give you.
19     Q.  I saw something at least as of last
20 year, you were approaching 600, 700,000.
21         Do you think you've earned over a
22 million dollars testifying in vaginal mesh
23 litigation?
24     A.  I can't really -- I don't know.
25     Q.  You would agree, though, it's over

Page 59

1 $750,000 at this point?
2     A.  I would agree with that, yes.
3     Q.  Is there a way to track that down and
4 figure it out?
5     A.  Possibly, yes.  It all gets paid into
6 my corporation, and, you know, it just goes in
7 as a lump sum.  The same thing with, you know,
8 my patient fees and the like so it would be very
9 difficult to tease out.
10     Q.  Do you have any partners?
11     A.  No.
12     Q.  So when you say it's paid to your
13 corporation, ultimately, that's flowed to you
14 personally?
15         MR. CARTMELL:  Object to the form.
16         THE WITNESS:  I pay myself, I pay my
17 staff, I pay my expenses, my malpractice
18 insurance.
19 BY MR. MAZZIOTTI:
20     Q.  Okay.  But, like, an income statement,
21 basically, your income is -- I'm sorry.  Profit
22 and loss.  Profit is X dollars, you subtract
23 your expenses, and then what's left over is what
24 you get, right?
25     A.  That would be profit that would be

Page 60

1 taxable, but we try to keep that -- as you
2 probably know from having a business, your
3 end-of-the-year profits, we try to keep that as
4 low as possible so most of that would have been
5 already paid out as salary.
6     Q.  To you or -- because the way I look at
7 it -- what's the name of your corporation?
8     A.  Bruce A. Rosenzweig M.D., P.C.
9     Q.  Okay.  So that corporation brings in
10 money through your practice and through your
11 medicolegal review.  Any other sources of
12 income?
13     A.  Sometimes if I give a lecture, I get an
14 honorarium for that.  I don't do that very much
15 anymore.
16     Q.  So once that income comes in, then you
17 pay your expenses either from office space rent,
18 employees.  How many employees do you have?
19     A.  Three.
20     Q.  Okay.  Are they nurses?  What are their
21 roles?
22     A.  I have a nurse, I have a secretary who
23 does just about everything, and then my wife
24 runs a weight loss clinic through my office.
25     Q.  Now, does that income go into your PC

Page 61

1 or is that separate?
2     A.  That goes in through the PC.
3     Q.  Okay.  Is your wife an employee, or is
4 she a partner or a shareholder, I guess?
5         That's a tricky question, isn't it?
6     A.  It is.
7     Q.  I finally got you one.
8     A.  Is she in the room?
9         No.  She's an employee.
10     Q.  Okay.
11     A.  But obviously, she's a partner.
12     Q.  Right.
13         So once you pay all of that, you know,
14 your employees and your expenses, whatever's
15 left after, of course, you pay Uncle Sam, comes
16 to you?
17     A.  That would be paid as a salary.  Now,
18 whatever profit there is I can take as a profit
19 distribution after taxes are paid.
20     Q.  Okay.  So the check that I'm -- not me
21 personally, but the check that gets written for
22 your time today, it goes to your PC?
23     A.  That is correct.
24         That's the politically correct PC way
25 of doing it.

Page 62

1    Q.   That's right.
2        Now, as far as some experts, they
3    donate or contribute to specific charities with
4    their medicolegal review.  Do you do that?
5    A.   I know that some have a chairman's tax
6    or a dean's tax that comes out of any outside
7    work.  Those might be employees of an
8    institution.  I don't have any of those
9    stipulations.
10    Q.   Okay.  So in other words, it's not as
11   though you've got -- you do your medicolegal
12   review, and the proceeds from that either go to
13   an institution or to a charity of your choice?
14    A.   If I choose to donate to a charity, I
15   will do that.
16    Q.   But that's not why you do medicolegal
17   review?
18    A.   To donate to charities?
19    Q.   Correct.
20    A.   No.
21    Q.   I only bring that up because some
22   experts actually do that so I always want to
23   know.
24    A.   Okay.  I'm learning some new things
25   every day.

Page 63

1    Q.   Yeah.  See?
2        MR. CARTMELL:  When we get to a
3    restroom break, but go ahead.
4        MR. MAZZIOTTI:  Okay.  Let's go ahead.
5    That's fine.  I need to take a comfort break,
6    too, so let's go ahead and take a break.
7        THE VIDEOGRAPHER:  The time is 10:44.
8    We are off the record.
9        (Whereupon, a short recess
10            was taken.)
11       THE VIDEOGRAPHER:  The time is 10:56.
12   We are back on the record.
13   BY MR. MAZZIOTTI:
14    Q.   Dr. Rosenzweig, we were talking about
15   your rate and fees.  The $1,500 an hour rate for
16   deposition testimony, how did you come about
17   that calculation or that amount?
18    A.   Well, it's time away from my office,
19   time that I'm not able to see patients.  Also,
20   you know, there is a lot involved in getting
21   ready for a deposition so that's how I
22   calculated that fee.
23    Q.   How about the 750 an hour for review?
24    A.   Well, again, it's time away from my
25   patients, time that, you know, I can't be taking

Page 64

1    care of patients, but this has actually kind of
2    spilled over even more from just a normal
3    weekday into weekends, late evenings so it's,
4    you know, more than just, you know, compensation
5    for time away from my practice.
6    Q.   And the $10,000 a day for trial
7    testimony, how did you come up with that
8    calculation?
9    A.   Again, it's, you know, time away from
10   my practice.  You know, if I'm traveling, you
11   know, I need to have somebody that is covering
12   my practice, and so, you know, there's an
13   agreement, you know, with them if they need to
14   do anything for patients, you know, to be able
15   to compensate someone that's covering my
16   practice.
17    Q.   And according to at least the note I
18   have that's been produced, you require a $15,000
19   retainer?
20    A.   That is correct.
21    Q.   Is that true for even cases where you
22   would give opinions in medical malpractice or
23   otherwise?
24    A.   No.  I mean, it would all depend on,
25   like, the size of the file.

Page 65

1    Q.   Okay.  So basically, walk me through
2    this.  Is it if it's a product liability case,
3    or is this vaginal mesh litigation oriented,
4    this fee arrangement?
5    A.   No.  I mean, it depends on, like, the
6    size of the case.  I mean, obviously, it's going
7    to cover the X number of hours that is
8    anticipated that it might take to, you know, get
9    all the materials reviewed, all the documents
10   reviewed, you know, the report put together.
11       You know, as you know from medical
12   malpractice, you don't put together a, you know,
13   50-to-90-page report with a reliance list that
14   is --
15    Q.   Right.
16    A.   -- 500, you know, things long so. . .
17    Q.   Do you currently have any other types
18   of cases where you're giving expert opinions
19   other than the vaginal mesh litigation?
20    A.   No.
21    Q.   Prior to becoming 100 percent vaginal
22   mesh litigation and medicolegal work, what was
23   your billable rate?
24    A.   500 an hour, $1,000 an hour for
25   depositions and $5,000 a day for trial

Page 66

1  testimony.
2      Q.   Was there a retainer involved?
3      A.   Usually somewhere between 2,500 and
4  5,000.
5      Q.   How long have you been doing
6  medicolegal review?
7      A.   Since the early to mid 90s.
8      Q.   It would be fair to say over your
9  medicolegal career, you've earned over a million
10  dollars doing this?
11      A.   It's 20 years so probably.
12      Q.   Okay.  Do you think it might be 2
13  million?
14      A.   I can't really say.
15      Q.   Okay.  I think we talked about the
16  vaginal mesh litigation.  Do you think by the
17  end of 2014, you will have earned over a million
18  dollars in giving testimony?
19      MR. CARTMELL:  Object to the form.
20      THE WITNESS:  You know, I don't really
21  know what's going to happen over the next couple
22  of months.
23  BY MR. MAZZIOTTI:
24      Q.   Okay.  Do you know how much you earned
25  last year from vaginal mesh litigation?

Page 67

1      A.   I think that when I broke it down, you
2  know, maybe 300, 400,000, I think.
3      Q.   I mean, I know you've been asked this
4  question before; it's not a surprise.
5      A.   Right.  And, you know, I've pretty much
6  given the same answer.  It's very difficult to,
7  you know, put together an exact number for you.
8      Q.   And I don't think I've asked you
9  specifically as it relates to the C.R. Bard
10  litigation.  How much have you billed the
11  plaintiffs' counsel for your testimony in doing
12  C.R. Bard litigation?
13      MR. CARTMELL:  Object to the form.
14      THE WITNESS:  Since the end of 2012
15  until present --
16  BY MR. MAZZIOTTI:
17      Q.   Yes.
18      A.   -- or in just this --
19      Q.   Well, that's a good point.  Let's break
20  it up.
21      I think you said you spent 30 to
22  40 hours in this particular case working on the
23  general causation opinions.
24      A.   That is correct.
25      MR. CARTMELL:  Okay.  Object to the

Page 68

1  form just to the extent that it misstates his
2  testimony.
3      MR. MAZZIOTTI:  Okay.
4  BY MR. MAZZIOTTI:
5      Q.   And I want to make sure I'm clear.  I
6  may have.  That's why.  Let me ask you again.
7      Did I misstate that?
8      A.   No, I think I did state that I spent
9  about 30 to 40 hours on, you know, getting this
10  report done and getting ready for today's
11  deposition for the general causation.
12      Q.   And then in addition to that, you would
13  have spent time in the specific plaintiff cases?
14      A.   That is correct.
15      Q.   And I'll ask you those questions
16  tomorrow, how much time you spent on those.
17      A.   And, you know, each one -- each of t he
18  individual attorneys will be available to
19  provide you with the billing statements, and
20  that's going to be even more difficult to tell
21  you the number of hours cumulatively or even in
22  an individual case.  I mean, they'll be able to
23  send you the bills that I've supplied.
24      Q.   Thanks for the heads up.  So I'll bring
25  it up tomorrow, but I'm sure -- so you won't be

Page 69

1  able to tell me for each plaintiff how much
2  time?
3      A.   No.
4      Q.   And I'll just go to the plaintiff law
5  firm and whatever the invoice is?
6      A.   That's what we've agreed upon.
7      Q.   Okay, fair enough.
8      The 30 to 40 hours, though, in this
9  case, that's less than what you otherwise would
10  have billed because you had already had this,
11  you know, knowledge about the literature and
12  about C.R. Bard, right?
13      A.   That is correct.  As I stated before, I
14  worked on Avaulta cases last year and an Align
15  case for approximately two years before both of
16  those cases settled.
17      Q.   In addition to the 30 to 40 hours that
18  you worked preparing the general causation
19  opinions in this case, how many hours have you
20  worked on C.R. Bard matters reviewing documents,
21  preparing opinions in Avaulta --
22      A.   From 2012?
23      Q.   Correct.
24      A.   I would say that I must have read at
25  least 15 corporate depositions from Laura Bigby

Page 70

1  to Bobby Orr to the consultant Jim Ross, to
2  Cabolari (phonetic) to Contra, and the number of
3  documents -- you know, the number of documents
4  that's in the reliance list is not nearly the
5  total number of documents that I've looked at.
6      Q.   Do you think it's over 500 hours you've
7  put in?
8      A.   I can't really tell you.
9      Q.   Over -- and I don't need a specific
10  number, but can you give me a ballpark?  Would
11  it be over 200, 300, how many weeks, months?
12     A.   You know, I don't think I could -- I
13  mean, this has been going on, you know, with
14  Bard since 2012 so it's difficult to tell you
15  exactly the number of hours.
16     Q.   If I wanted to find out, how could I
17  find out?
18     A.   I don't think that -- I don't know.
19     Q.   Okay.
20     A.   You might -- you know, you might want
21  to ask some of the other attorneys if they
22  will -- in settled cases if they, you know,
23  still have the billing sheets, the invoices that
24  I sent them.  I don't know if they do.
25     Q.   It would have been a lot of hours,

Page 71

1  though?
2      A.   Yes, sir.
3      Q.   This has been time consuming, right?
4      A.   Yes, sir.
5      Q.   Now, as far as how you bill, do you
6  keep time sheets?  How do you keep track of your
7  time?
8      A.   When I am working on something, I keep
9  a rudimentary time sheet, add up the hours, send
10  in the invoice, and then the time sheets are
11  destroyed and I -- you know, the invoice that I
12  send I also destroy.
13     Q.   Why do you destroy the invoice?
14     A.   I don't need it anymore.
15     Q.   How about for depositions?
16     A.   How about for?
17     Q.   Depositions, keeping your invoices for
18  depositions when you get asked that question.
19     A.   If I don't have them, then I can't
20  supply it.
21     Q.   Exactly.  Maybe you want to keep
22  those -- well, maybe you don't want to keep
23  those invoices.
24     A.   I find that, you know, it's easier for
25  me to keep my files down with all the other

Page 72

1  information I'm trying to keep track of.
2      Q.   Do you ever go back and look so that
3  you can answer the question how much time you've
4  spent on a particular file?  Do you ever refresh
5  your memory on that before a deposition?
6      A.   I mean, I have a general idea about how
7  much time I spent on this case before, you know,
8  coming in today for a deposition.
9      Q.   So when you say 30 to 40 hours, is
10  there an invoice that memorializes that time?
11     A.   That will probably go out at the end of
12  our deposition with the deposition time added
13  on, yes.
14     Q.   Okay.  But prior to today and your
15  deposition time, have you prepared any invoices?
16     A.   For this, no.
17     Q.   Do you keep --
18         MR. CARTMELL:  And just so you know, I
19  think this has been the standard practice.
20         I'll get the invoices and provide them
21  to you.  I mean, honestly, with this tsunami
22  order, it's been a little bit different because
23  there's so many different firms that he's
24  reviewing for and doing things for so I don't
25  have them all currently, or else I would have

Page 73

1  provided them to you.
2          MR. MAZZIOTTI:  And that's fine.  I
3  just want to make sure I know where they are or
4  how I can find them later on.  That's all.
5          MR. CARTMELL:  Yeah, I'll get them for
6  you.
7          MR. MAZZIOTTI:  Yeah, but that's
8  helpful.  Now I know where to go and find this
9  stuff.
10  BY MR. MAZZIOTTI:
11     Q.   I'm going to switch gears to -- oh, one
12  last question.
13         Who paid your retainer for your
14  C.R. Bard general causation opinions?
15     A.   I didn't send a retainer for that.
16     Q.   Why is that?
17     A.   I just started working on that, and
18  every now and then, I, you know, don't ask for a
19  retainer so . . .
20     Q.   Are there -- well, and I may have asked
21  you this already, and I can't remember.
22         When were you first contacted about
23  doing or providing opinions specifically for the
24  Align product that's reflected in your Rule 26
25  report?

Page 74

1    A.  Right, and I think I already answered
2  that with sometime in May of this year.
3    Q.  Okay.  And that would have been
4  Mr. Kuntz as well?
5    A.  That is correct.
6    Q.  Let's talk about C.R. Bard now.  Do you
7  know anybody that's employed there now
8  currently?
9    A.  Not specifically, no.
10    Q.  And I understand you review
11  depositions, you know people by name, who they
12  are at C.R. Bard, but as far as having a
13  professional or personal relationship with
14  anybody at C.R. Bard, you don't have anybody?
15    A.  Not that I know specifically, no.
16    Q.  Have you ever spoken directly with
17  anybody employed by C.R. Bard?
18    A.  In what respect?
19    Q.  Just generally in your medical practice
20  about any of their products.
21    A.  We use their catheters so a rep comes
22  by with catheters.  I mean, obviously, I've had
23  reps come by my office in the past, but, you
24  know, that's the only interaction I would have
25  with anybody from C.R. Bard.

Page 75

1    Q.  And the reps that come by your office,
2  you don't have any negative opinions about them,
3  do you?
4    A.  No.
5    Q.  All right.  Do you use any of their
6  pelvic products?
7    A.  I did use their PelviSoft until it was
8  no longer available because they decided not to
9  sell it anymore.
10    Q.  In your career, have you ever used the
11  Align product?
12    A.  I went to an -- oh, the Align, no.
13    Q.  Then was it 2005 you went to -- is it
14  the Avaulta product?
15    A.  That is correct, and --
16    Q.  Go ahead.
17    A.  I know I used more ProLift.
18    I think that, you know, I did a couple
19  of Avaulta that was supplied as a -- you know, a
20  gift, if you will.
21    And I'm pretty sure, you know, the
22  first time that I actually, you know, saw the
23  Align product, I think that the rep brought that
24  to the office, you know, just as kind of like,
25  A, a demonstration, and B, if we wanted to use

Page 76

1  it on a surgery so . . .
2    Q.  And now, I'm sorry.  You have or you
3  have not used the Align product?
4    A.  I have not.
5    Q.  The Avaulta product you have used
6  previously, though?
7    A.  Yes.  My recollection is I did a couple
8  of Avaulta products, a couple of Avaulta
9  implantations.
10    Q.  How long ago would that have been?
11    A.  That would have been -- I stopped using
12  sling products, if I remember correctly, you
13  know, 2006, 2007, and about, you know, 2008, I
14  stopped using pelvic organ prolapse mesh.
15    Q.  Were you using pelvic organ prolapse
16  mesh up until that time?
17    A.  Up until I stopped using pelvic organ
18  prolapse mesh products, yes.
19    Q.  And simple question.  Why did you stop
20  using it at that particular time?
21    A.  Well, I started to see, like I was
22  seeing with sling products, the significant
23  life-altering complications that were associated
24  with the pelvic organ prolapse products.
25    Q.  Prior to that time, did you have a

Page 77

1  positive opinion about those products?
2    A.  I had a guarded opinion, but, you know,
3  there was -- back in the early 2000s, there were
4  a few papers that came out that discussed the
5  possibility of objective results from native
6  tissue repair being problematic and that mesh
7  products could make the objective results
8  better, and so I thought it would be worth a try
9  to see if this was actually the case.
10    And objectively, pelvic organ prolapse
11  products do give a better objective result,
12  however, in my experience and in the experience
13  of the literature is there is no difference in
14  the patient's subjective results so that when
15  you look at my clinical experience and the
16  experience in the literature, patients'
17  subjective results are the same with pelvic
18  organ prolapse products and native tissue
19  repair, however, the complications are much
20  greater and the need to reoperate on patients
21  for complications is much greater with pelvic
22  organ prolapse products.
23    Q.  Are you familiar with any physicians in
24  the Chicago area that still use pelvic organ
25  prolapse -- I'll just say POP -- mesh?

Page 78

1    A.   That I personally know, no.
2    Q.   It is still within the standard of
3  care, however, to continue to use vaginal mesh?
4    A.   That is correct.
5    Q.   We were talking about your contact with
6  C.R. Bard, and going back to 2005, do you
7  remember who trained you?
8    A.   I went to a course here in Chicago.  I
9  don't remember who the speakers were.  I might
10 be wrong on this, but I know when I went to the
11 ProLift course which I went to first before I
12 went to the Avaulta course.
13      And I know the ProLift course, we had a
14 cadaver dissection.  I'm pretty sure that the
15 Avaulta course, there was a cadaver dissection
16 along with it, but I can't remember who the
17 speakers were and the proctors were.
18   Q.   In your career, do you know how many
19 times you have implanted the Avaulta product?
20   A.   As I say, there's probably only a
21 handful.
22      I know we had a ProLift product, and
23 that was the first one I was trained on.  I had
24 gone through the Surgical Committee to get that,
25 you know, approved for the hospital.  And I know

Page 79

1  Rush's position was that if we have one, we're
2  probably not going to get contracts to have
3  multiple different products that do the same
4  thing so I don't think we ever had an Avaulta
5  product, and so the only products that I would
6  have implanted were provided by the company
7  through the sales rep.
8    Q.   Okay.  Who did Rush use, what
9  manufacturer?
10   A.   The ProLift which was Ethicon.
11   Q.   Okay.  Typically, is that -- your
12 experience with vaginal mesh products, is it
13 mostly with Ethicon?
14   A.   That is correct.
15   Q.   So what about Boston Scientific, have
16 you ever implanted one of their products?
17   A.   No.
18   Q.   How about AMS?
19   A.   I did two Monarchs as a preceptor.
20 When I was at Stroger Hospital, we had a
21 preceptor program where any new attending had to
22 be precepted for, I think, the first month so a
23 senior person would go in and assist in surgical
24 procedures, and we did two Monarchs.
25   Q.   How many pelvic mesh implants have you

Page 80

1  done in your career?
2    A.   Are we talking about slings, or are we
3  talking about POP mesh, or are we talking about
4  both?
5    Q.   Fair point.  I want to know about both,
6  but however you want to break it down.
7    A.   I have done -- the estimate I've given
8  is about 15 to 20 retropubic TVT slings from
9  Ethicon, about 40 to 50 TVT obturator slings,
10 maybe as many as a dozen ProLift.  And, you
11 know, again, my recollection is I did a handful
12 of Avaultas.
13   Q.   When would have been the last -- well,
14 strike that.
15      2008 would have been the last time --
16 or prior to 2008, I think you said -- you used
17 an Avaulta sling?
18   A.   Avaulta pelvic organ prolapse product.
19 Avaulta isn't a sling.
20   Q.   Oh, that's right.
21   A.   To my best recollection, yes.
22   Q.   Do you remember complications related
23 to the Avaulta product, any specifics?
24   A.   Not specifically but complications from
25 pelvic organ prolapse products in general.

Page 81

1    Q.   I'm going to switch gears a little bit.
2       You don't consider yourself an expert
3  in biomechanics, do you?
4    A.   Biomechanics?
5    Q.   Correct.
6    A.   No.
7    Q.   You don't have any specific education
8  or training in material science?
9    A.   That is correct.
10   Q.   Biomedical engineering?
11   A.   That is correct.
12   Q.   Biomechanical analysis?
13   A.   That is correct.
14   Q.   Do you have any training on the design
15 of medical devices?
16   A.   Well, I did design and patent an
17 amnioinfusion catheter back when I was a
18 resident.  We went through the 510(k) process in
19 1986.
20      The company that made it is a company
21 called Gish Biomedical.  I worked with them to
22 bring the product to market, I worked with them
23 on the information that ultimately went into the
24 instructions for use.
25   Q.   As far as vaginal mesh, have you ever

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

Page 82

1  designed a product like that?
2      A.   Back in the late 80s, I published with
3  Mickey Karram and Narender Bhatia a paper on
4  pubovaginal slings using Gortex so, I mean, I
5  think at that point, the idea of the postage
6  stamp pubovaginal sling had already been
7  discussed.  I don't know if we tweaked it, but
8  we did do some work on that.
9      So I don't know if that answers your
10 question, but that would be the only thing that
11 I would have contributed about a synthetic sling
12 product.
13     Q.   Other than that, has anybody ever
14 approached you about designing or modifying a
15 vaginal mesh product?
16     A.   No.
17     Q.   Do you hold yourself out as an expert
18 in the design of vaginal mesh products?
19     A.   I don't understand that question.
20     Q.   Are you going to come in in this
21 particular case and offer opinions about -- I
22 understand you have negative opinions, but are
23 you going to come in and say that the design is
24 somehow deficient for the Bard vaginal mesh?
25     A.   The design of putting polypropylene

Page 83

1  through muscle, yes, I think I've testified that
2  there is a significant body of literature that
3  shows that the persistent groin pain, leg pain
4  and pelvic pain, one of the things that it's
5  associated with is in mesh through muscles, and
6  that is a design of the obturator sling.
7      The retropubic slings actually go
8  through two muscle groups, the urogenital
9  diaphragm and the rectus muscle, and that
10 contributes to the pelvic pain, the groin pain,
11 levator pain that patients suffer from.
12     So I will give opinions about the
13 design features of the sling and mesh products
14 that are defective.
15     I have not been approached to try to
16 design a mesh product.  So I do think I am an
17 expert on the design mesh products that lead to
18 complications; I've testified about that before.
19     Q.   Are you saying that under no
20 circumstances should a vaginal mesh product be
21 implanted in a patient?
22     A.   I've testified before to the fact that
23 there are probably circumstances where a
24 polypropylene-based product would have utility
25 in a patient.

Page 84

1      I use polypropylene suture exceedingly
2  rarely in certain patients who have had multiple
3  surgical procedures where I am worried about a
4  fascial closure.
5      I envision that there would be certain
6  situations in patients where a midurethral sling
7  would have a greater utility for the patient if
8  the patient understands that the nature of
9  polypropylene itself is dangerous.
10     I could envision a patient that the use
11 of a pelvic organ prolapse product would be a
12 utility for a patient.
13     I mean, it's just like giving a patient
14 a chemotherapeutic drug that has utility in
15 certain situations.  You wouldn't give someone a
16 chemotherapeutic drug to treat a cold.
17     Q.   What are the circumstances in which you
18 think it would be appropriate to use a vaginal
19 mesh product?
20     A.   There would be a circumstance where
21 someone might have had recurrent prolapse, has
22 adequate vaginal tissue, has minimal
23 comorbidities and understands the short-term and
24 long-term risks associated with that and
25 understands the long-term risk of polypropylene,

Page 85

1  understands that there is no defined, accepted,
2  tested way to remove the product if there is a
3  complication; if they have a complication that
4  there is no guarantee and in my opinion and
5  what's been in the literature, it is exceedingly
6  difficult to remove the product in its entirety
7  if it needs to be removed, and there is a
8  growing list of indications for removal.
9      If that patient is willing to accept
10 all those risks as defined and it's indicated,
11 then that would be a situation where a pelvic
12 organ prolapse product made of polypropylene
13 could be used.
14     Q.   I want to make sure I've got this
15 right.  So you mentioned the circumstances would
16 be somebody that has a recurrent prolapse.  So
17 you wouldn't use it as a first-line procedure if
18 somebody came in and it was the first time with
19 a prolapse?
20     A.   I don't use the product, period.
21            (Interruption.)
22            THE VIDEOGRAPHER:  I'm sorry.
23 BY MR. MAZZIOTTI:
24     Q.   All right.  Let me ask this question
25 again.

Page 86

1      MR. CARTMELL:  Hold on.  Let me finish
2 that.
3      MR. MAZZIOTTI:  Okay.
4      MR. CARTMELL:  That was classic.  The
5 "F" bomb was excellent.
6      MR. MAZZIOTTI:  For the record, that
7 also was Mr. Kuntz.
8      MR. KUNTZ:  Now everybody's picking on
9 me.
10      THE VIDEOGRAPHER:  Thank you.
11 BY MR. MAZZIOTTI:
12      Q.   Doctor, I was asking you about the
13 circumstances where it would be agreeable with
14 you to use a polypropylene mesh product.
15      A.   You're asking about a hypothetical
16 situation, yes.
17      Q.   I am, I am because I do understand --
18 well, let me ask you, under no circumstances
19 would you ever use -- you personally ever use a
20 polypropylene mesh product?
21      A.   That is correct.
22      Q.   Okay.  However, you do agree that it is
23 within the standard of care that in
24 circumstances that a physician does implant a
25 polypropylene mesh product?

Page 87

1      MR. CARTMELL:  Object to form.
2      THE WITNESS:  That is correct, in a
3 very small universe of patients, yes.
4 BY MR. MAZZIOTTI:
5      Q.   And that's where I'm going next.  And
6 so the circumstances where it would be within
7 the standard of care for a physician to use a
8 polypropylene vaginal mesh product -- well,
9 strike that.
10      It would not be within the standard of
11 care to use a polypropylene vaginal mesh product
12 for a patient who has a prolapse for the first
13 time?
14      A.   It is my opinion that the risk of using
15 that in a primary prolapse patient exceeds the
16 benefits, however, it has not been defined as
17 outside the standard of care.
18      Q.   Okay.  Thanks for that clarification.
19      So it is at least within the standard
20 of care currently that somebody with a primary
21 prolapse for the physician to use a
22 polypropylene vaginal mesh product?
23      MR. CARTMELL:  Object to the form.
24      THE WITNESS:  I think the last American
25 College of Obstetrics and Gynecology, their

Page 88

1 statement on pelvic organ prolapse advised that
2 one needs to look at this for -- use pelvic
3 organ prolapse products in a limited group of
4 patients as I described, recurrent prolapse that
5 might have risk from other surgeries, however,
6 did not make a prohibition on using it as a --
7 for a case of primary prolapse.
8 BY MR. MAZZIOTTI:
9      Q.   You're a member of ACOG, right?
10      A.   No, I am not.
11      Q.   You're not.
12      Were you ever a member of ACOG?
13      A.   Yes.
14      Q.   Why did you stop your membership?
15      A.   It was -- I mean, everything I could
16 get from being a member of ACOG I could get from
17 not being a member of ACOG.
18      Q.   Was it ACOG's position and specifically
19 related to vaginal mesh, did that have any
20 impact on your wanting to be a member of ACOG?
21      A.   No.
22      Q.   Okay.  We got into this discussion
23 where you said there are circumstances for
24 implanting polypropylene mesh products, and what
25 I wrote down and I want to make sure I

Page 89

1 understand, one is with a recurrent prolapse
2 where there is informed consent as to both the
3 short-term and the long-term potential
4 complications, somebody with --
5      A.   And the risk of not being able to
6 remove the product if a complication arises that
7 requires removal.  I mean, that's an important
8 thing.
9      I can't think of any other device that
10 is implanted in a patient that with this many
11 years in, there is no known and accepted way of
12 removing the product completely should a
13 complication arise.
14      Q.   Okay.  In addition, you said also
15 somebody with minimum or minimal comorbidities?
16      A.   That is correct.
17      Q.   What do you mean by "minimum
18 comorbidities"?
19      A.   Well, we know with Higgins' 2011 paper
20 that patients that have a pain syndrome before
21 they have mesh placement are at greater risk for
22 having pain after the mesh is placed so someone
23 with headaches, migraines, fibromyalgia, back
24 pain, any pain, -- it doesn't have to be in the
25 pelvis -- they're at increased risk for pain.

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

Page 90

1    We know that smoking can increase the
2 risk of complications; we know that obesity can
3 increase the risk of complications, make it more
4 difficult for placement; we know that diabetes
5 is a -- can be problematic because of wound
6 healing leading to erosions; we know that
7 vaginal atrophy can be problematic in patients
8 and that these are things that would be
9 important to see in a document that a physician
10 gets before implanting the device such as in
11 instructions for use instead of a generalized
12 statement about that, you know, patients should
13 be selected based on, you know, their current
14 status to give physicians a better idea about
15 what the risks are of certain comorbidities.
16    Q.   So when you say the patient needs to
17 have minimal comorbidities, you're saying they
18 shouldn't be a smoker, they should not be obese,
19 they should not have diabetes, they should not
20 have vaginal atrophy and they should not have a
21 pain syndrome before implant?
22    A.   Well, I just was listing the things to
23 you that, you know, can be associated with
24 significant problems postoperatively.
25    Q.   And so -- yeah, but that goes to my

Page 91

1 question.  What I want to know is what do you
2 mean by minimum comorbidities?  Do you mean they
3 don't have this medical history, or do you mean
4 something else?
5    A.   Well, again, as I stated before, I
6 don't use these products and I don't recommend
7 these products to my patients so that we're
8 talking about a hypothetical situation.
9         And I do agree that there will be a
10 certain small group of patients that the use of
11 a pelvic organ prolapse product or a midurethral
12 sling might be beneficial knowing the risks
13 associated with it, and I am giving you a list
14 of things that are associated with both slings
15 and pelvic organ prolapse products that can be
16 associated with morbidity.
17        Now, obviously, you can't take
18 everyone's morbidity away.  You know, there are
19 patients that are going to accept a surgical
20 procedure in the face of these morbidities, but
21 I was listing to you the morbidities that are
22 associated with complications.  I will agree
23 with you that those add to the challenges with
24 any surgical procedure.
25    Q.   Let me ask you this way then.

Page 92

1    You agree at a minimum, it is a
2 clinical judgment that a physician has to make
3 as to whether the patient fits the profile of
4 implanting a polypropylene vaginal mesh product?
5         MR. CARTMELL:  Object to the form.
6         THE WITNESS:  It is a judgment if the
7 physician has all of the information to be able
8 to make that decision and to be able to impart
9 that information onto the patient.
10 BY MR. MAZZIOTTI:
11    Q.   Well, assuming they do, --
12         MR. CARTMELL:  Hold on.  Were you done?
13 Go ahead.
14 BY MR. MAZZIOTTI:
15    Q.   I do want to keep going.  Assuming they
16 do --
17         MR. CARTMELL:  Well, I want -- if you
18 weren't finished, go ahead.
19         THE WITNESS:  I've totally lost my
20 train of thought.
21 BY MR. MAZZIOTTI:
22    Q.   I apologize.  If you want, read it
23 back, and then that might refresh your memory.
24         (Whereupon, the record was read
25           as requested.)

Page 93

1 BY MR. MAZZIOTTI:
2    Q.   Did that help?
3    A.   Nah.  Go ahead and ask your next
4 question.
5    Q.   Yeah, what I'm just going to add --
6 assume that I'll ask the same question but I'm
7 going to just add, assuming that a physician
8 does have all the information and they're
9 knowledgeable, can -- it is a clinical judgment
10 of the physician as to whether or not it would
11 be appropriate to implant a vaginal mesh
12 product, a polypropylene vaginal mesh product,
13 with his patient?
14    A.   In a very specific sense, yes.
15    Q.   Now, would you feel comfortable --
16 let's say a plaintiff firm comes to you
17 involving a vaginal implant and there's
18 complications.  Would you feel comfortable
19 testifying as to the standard of care as to
20 whether or not that patient fit the profile or
21 the circumstances as you've put it of being a
22 candidate for a vaginal mesh polypropylene
23 product?
24         MR. CARTMELL:  Object to form.
25         THE WITNESS:  So when we're in our

Page 94

1   case-specific discussions, are you going to ask
2   me if I took into consideration the patient's
3   smoking history and their diabetes as leading to
4   a complication in this case?  And yes, I do do
5   that in reviewing the patient's history,
6   reviewing the patient's prior medical problems.
7          It's the same thing that I do when I am
8   dealing with patients in my office.  I mean,
9   that is how I practice.  I consider all of those
10  historical factors, what the patient's current
11  condition is in deciding how to treat the
12  patient.
13  BY MR. MAZZIOTTI:
14     Q.   Because I'm trying to flesh out if
15  there's a -- what you meant by "circumstances,"
16  and it may be one of those questions I've got to
17  ask tomorrow when we get to a specific plaintiff
18  so --
19     A.   I think that would probably be a good
20  place for that discussion.
21     Q.   Yeah, I will table that until tomorrow,
22  then maybe we can pursue that.  All right.
23          In your trial -- well, strike that.
24          In your vaginal mesh trial work as an
25  expert, has a court ever qualified you as an

Page 95

1   expert to talk about the design of vaginal mesh?
2          MR. CARTMELL:  Object to the form.
3          THE WITNESS:  And I don't understand --
4          MR. CARTMELL:  Just to the extent -- I
5   think you're asking him to give legal sort of
6   conclusions.
7          MR. MAZZIOTTI:  Let me ask it a
8   different way.
9   BY MR. MAZZIOTTI:
10     Q.   When you went to trial for Ethicon in
11  the Ethicon case, were you able to render
12  opinions about the design of the Ethicon
13  product?
14     A.   Yes.
15     Q.   Do you know if the other side
16  challenged whether or not you could give those
17  opinions?
18     A.   In something like a Daubert motion?
19     Q.   Correct.
20     A.   I am fairly certain that they tried to
21  challenge that, yes.
22     Q.   Was there ever a hearing where you were
23  called to come in and testify before trial about
24  your specific opinions and whether you could say
25  it in front of a jury?

Page 96

1     A.   No.
2     Q.   And you've never worked for a medical
3   device company, correct?
4     A.   I told you about Gish Biomedical which
5   is the product that I invented and helped work
6   with them while they were, you know, bringing
7   the product to market.
8          I also worked with a company called
9   EMPI.  They made an electrical stimulator.  I
10  was on their scientific advisory board.
11     Q.   I used the word "work" inartfully.
12          You've never been employed -- you've
13  never been an employee of a medical device
14  company?
15     A.   Oh, no.
16     Q.   Okay.  But you brought up a good point.
17  You have worked with medical device companies in
18  developing products?
19     A.   That is correct.
20     Q.   The Gish Biomedical work, that was for
21  the meconium aspirator set?
22     A.   No.  That was for the amnioinfusion
23  catheter.
24          The meconium aspirator, we talked to a
25  company in St. Louis, but unfortunately, the

Page 97

1   embodiment became someone else's product.
2     Q.   Okay.  So I skipped over Number 1 which
3   I shouldn't have.
4          So the double-lumen amnioinfusion
5   catheter, that's where you worked with Gish in
6   1998?
7     A.   No.  1989.
8     Q.   All right.  Let me mark as Exhibit 3
9   your CV.  Maybe you can help me out.
10          (Whereupon, Rosenzweig
11          Deposition Exhibit No. 3 was
12          marked for identification.)
13          THE WITNESS:  Sure.
14          We got the patent on the amnioinfusion
15  catheter in 1988.  I worked with Gish Biomedical
16  in 1989 through -- typographical error.  I am --
17  BY MR. MAZZIOTTI:
18     Q.   That's okay.  That's what I'm reading
19  from.
20     A.   Right.  I apologize for that.  The
21  patent is from 1988.
22     Q.   Okay.  So Number 1 under Inventions and
23  Patents, that's 1988?
24     A.   Yes.
25     Q.   Okay.

Page 98

1    A.   Nobody has brought that to my attention
2  yet.
3    Q.   Well, I feel better.  All right.
4         Does this encompass your experience
5  working with medical device -- well, strike
6  that.
7         I'm looking at Page 6 of Exhibit 3
8  which is your most recent CV, and under
9  Inventions and Patents, you list two things:
10  One, the double-lumen amnioinfusion catheter
11  from 1988; and two, the meconium aspirator set
12         Does that encompass your experience
13  with designing or developing a medical device?
14    A.   That is correct.
15    Q.   Okay.  So since 1988, you have not been
16  involved with developing medical devices?
17    A.   That is correct.
18    Q.   Have you been asked to do so since
19  1988?
20    A.   No.
21    Q.   Have you ever been a consultant for a
22  company that designs pelvic mesh?
23    A.   No.
24    Q.   Have you ever spoken at conferences or
25  lectures about the design of pelvic mesh?

Page 99

1    A.   No.
2    Q.   Have you ever lectured to plaintiffs'
3  associations about pelvic mesh?
4    A.   Have I ever --
5    Q.   There's plaintiff organizations around
6  the country.  Some are national, some are local,
7  some are statewide, and occasionally, they'll
8  invite physicians and experts as speakers to
9  talk about topics.
10         Have you ever been invited by a
11  plaintiff lawyer or law firm to come speak to
12  attorneys about pelvic mesh litigation,
13  complications, anything like that?
14    A.   I've given, you know, talks involving a
15  specific litigation to groups of attorneys that
16  were involved in that litigation.
17    Q.   Okay.  That's a little bit different.
18    A.   And that's why --
19    Q.   It sounds like that's a little -- it
20  sounds like you haven't gone and spoken to a
21  group of attorneys?
22    A.   No.
23    Q.   When you've spoken, it's pretty much
24  you're in litigation and you're working with the
25  attorneys about the topics in that case?

Page 100

1    A.   That is correct.
2    Q.   Okay.  And since the last time you were
3  asked this question, and I don't know when it
4  was, but have you published on the subject of
5  pelvic mesh litigation?
6    A.   No.
7    Q.   Have you ever put together any types of
8  protocols, quality assurance or anything like
9  that as it relates to polypropylene vaginal
10  mesh?
11    A.   No.
12    Q.   Have you ever done any testing
13  specifically on the Align product?  We talked
14  about the visual inspection, but have you
15  actually tested it?
16    A.   No.
17    Q.   Have you ever done any testing or lab
18  work on any polypropylene vaginal mesh product?
19    A.   No.
20    Q.   Just real quickly to run the gauntlet
21  of questions about where you feel qualified and
22  where you don't, you are not a pathologist,
23  right?
24    A.   That is correct.
25    Q.   Not a radiologist?

Page 101

1    A.   That is correct.
2    Q.   Not a neuroradiologist?
3    A.   That is correct.
4    Q.   Bacteriologist?
5    A.   That is correct.
6    Q.   Microbiologist?
7    A.   That is correct.
8    Q.   Epidemiologist?
9    A.   Not by specific training.
10    Q.   Have you ever been -- have you ever
11  rendered expert opinions in epidemiology?
12    A.   Well, I think a lot of the opinions
13  that we talk about have an epidemiologic basis.
14    Q.   How so?
15    A.   Well, epidemiology is looking at how an
16  event affects a population, and I think we're
17  going to be talking about the literature showing
18  that how the event of either a placement of a
19  sling or a POP product affects the population of
20  people that has been -- has had that product.
21         And so no, I am not an epidemiologist,
22  but I do read epidemiologic research and look at
23  that effect of an event on a population such as
24  my patients in taking care of patients.
25    Q.   I think we're on the same page then.

Page 102

1    A.   Okay.
2    Q.   You've looked at the literature, and
3  you're able to analyze it and distill it as far
4  as your opinions based on the literature and the
5  studies that have been available to you?
6    A.   That is correct.
7    Q.   As far as being involved in the actual
8  studies pulling together the information, that's
9  typically not what you have done?
10    A.   You mean pulling together the
11  information to write an epidemiological report?
12    Q.   Correct.
13    A.   That is correct, and I don't have a
14  degree in epidemiology.
15    MR. MAZZIOTTI:   Let's take a break.
16  We're running out of tape, and we've got people
17  knocking.
18    THE VIDEOGRAPHER:   That's the end of
19  Disc Number 1.  The time is 11:46.  We are off
20  the record.
21    (Whereupon, a short recess
22    was taken.)
23    THE VIDEOGRAPHER:   This is the
24  beginning of Disc Number 2.  The time is 11:53.
25  We're back on the record.

Page 103

1  BY MR. MAZZIOTTI:
2    Q.   Okay.  Doctor, we're talking about your
3  qualifications and areas where you've rendered
4  expert testimony before and where you haven't.
5    With regard to FDA issues, do you hold
6  yourself out as an expert in FDA regulations,
7  things of that nature?
8    A.   No, sir.
9    Q.   You mentioned earlier -- it may be in
10  your report -- opinions about IFUs?
11    A.   Yes.
12    Q.   Okay.  Do you hold opinions with regard
13  to the Align IFU?
14    A.   That is correct.
15    Q.   Tell me where you draw the distinction
16  with what you believe should be in the IFU
17  versus what the FDA requires or their
18  regulations.
19    A.   Well, all the components that the --
20    MR. CARTMELL:   I apologize for
21  interrupting.  Let me interject an objection to
22  the form of that.
23    MR. MAZZIOTTI:   Okay.
24    MR. CARTMELL:   And for the record, I
25  don't think there's a regulation that requires

Page 104

1  anything in a warning.
2    MR. MAZZIOTTI:   Okay.
3    THE WITNESS:   An IFU is supposed to
4  contain the indications, the contraindications,
5  the adverse reactions and patients that should
6  not have the device.  It should give a
7  description how the device is used, how it is
8  placed.
9    An IFU should include warnings and
10  adverse events, it should include all the
11  warnings and adverse events that are known and
12  that would be important for a patient to know.
13  It should not knowingly exclude adverse events
14  and warnings and contraindications that are
15  known.
16    I've used IFUs my entire career.  I
17  have used IFUs in my medical practice to discuss
18  with patients the procedure that we are -- the
19  procedure or the use of the medical device,
20  whether it's, you know, a surgically-implanted
21  or nonsurgically-implanted device.  I use that
22  to give an informed consent with my patients.
23  So therefore, I find that I am an expert in
24  instructions for use.
25

Page 105

1  BY MR. MAZZIOTTI:
2    Q.   Have you ever drafted an IFU for a
3  medical device?
4    A.   As I say, I was involved with the
5  instructions for use on the amnioinfusion
6  catheter.  I didn't actually, you know, write
7  out the instructions for use but was part of the
8  discussions about what would go in the
9  instructions for use.
10    Having been the one that invented it,
11  we would know how to place it, what the risks
12  are, et cetera and so forth.
13    Q.   And that's the 1988 patent we talked
14  about earlier?
15    A.   That is correct.
16    Q.   Other than that, have you been involved
17  in drafting IFUs for a medical device?
18    A.   No.
19    Q.   You mentioned that you use IFUs to
20  review procedures with patients as part of the
21  informed consent?
22    A.   The information in the instructions for
23  use, yes.
24    Q.   Is that generally accepted among
25  physicians with vaginal -- polypropylene vaginal

Page 106

1   mesh implants?
2      MR. CARTMELL: Object to the form.
3      THE WITNESS: I would say that
4   physicians use what is commonly described as a
5   package insert, instructions for use, directions
6   for use, in their everyday practice whether
7   they're prescribing a medication or whether
8   they're using a product.
9   BY MR. MAZZIOTTI:
10    Q. It sounded like you were implying
11   that -- well, let me ask you this way.
12      It would not be below the standard of
13   care if a physician or a surgeon did not use an
14   IFU to give informed consent to a patient?
15      MR. CARTMELL: Object to the form.
16      THE WITNESS: I think we're probably
17   going to be discussing that more specifically
18   when we get into the case-specific part of this
19   discussion.
20      I don't -- I would not opine that
21   because a physician did not specifically review
22   the instructions for use prior to the
23   implantation of this specific device that that
24   would be a deviation in the standard of care
25   with a specific patient.

Page 107

1   BY MR. MAZZIOTTI:
2    Q. Yeah. And we will on specific
3   patients, but generally speaking, with regard to
4   the Align product, it would be within the
5   standard of care for a surgeon to give informed
6   consent without actually having to go through
7   the IFU specifically?
8      MR. CARTMELL: You're talking about
9   with that specific patient?
10      MR. MAZZIOTTI: Just generally
11   speaking, and let me see if I can ask it better.
12   BY MR. MAZZIOTTI:
13    Q. Generally speaking, you're not saying
14   it's below the standard of care for a surgeon if
15   he doesn't go through the IFU when giving
16   informed consent to a patient?
17    A. You mean holding the IFU in front of
18   them and going through that?
19    Q. Not holding but going over each of the
20   items that are in the IFU.
21      MR. CARTMELL: Object to the form just
22   because I think it's vague and ambiguous. I'm
23   having trouble understanding if you mean with
24   each patient, they need to get out the IFU and
25   go through it with the patient.

Page 108

1      THE WITNESS: That's what I'm having
2   trouble with, too.
3      MR. MAZZIOTTI: I'm having -- that's my
4   question.
5      MR. CARTMELL: Okay.
6   BY MR. MAZZIOTTI:
7    Q. You said, you know, you -- IFUs -- you
8   use an IFU to go over informed consent with your
9   patients. I think you said something like that,
10   right?
11    A. That is the information that is
12   contained in the IFU, yes.
13    Q. Okay. All right. So then my question
14   is: Are you saying that the IFU -- that the
15   physicians rely on the IFU -- well, strike that.
16   I didn't like where that was going, either.
17    A. Yeah, I didn't like where that was
18   going, either.
19    Q. Are you saying that an IFU should be
20   relied upon by a surgeon when giving informed
21   consent to a patient on a procedure?
22    A. The IFU should be relied upon, however,
23   you don't -- the question that -- the thing that
24   we're grappling with is you don't have to have
25   that sitting in front of you and reading off

Page 109

1   line by line.
2    Q. Okay. I understand. So what I'm -- go
3   ahead.
4    A. Now, we do know in the 2008 FDA
5   statement that it was recommended that the
6   patients be given a copy of the instructions for
7   use.
8    Q. In your experience -- well, do you give
9   patients IFUs to review for procedures?
10    A. Patients get what's called a package
11   insert which is the instructions for use of a
12   medication every time they get a prescription.
13      There are certain devices that the
14   patient picks up. I don't put in IUDs anymore,
15   but this is a specific area where the patient
16   picks up the IUD, the instruction for use is
17   attached to it, the patient brings into the
18   office and they get a copy of their instructions
19   for use.
20      The information in the instructions for
21   use is important to give to the patient so they
22   know all the risks that are known associated
23   with the device, that they know what the
24   complications are associated with the device so
25   that they can make an informed decision, but no,

Page 110

1  it is not outside the standard of care to have
2  relied upon having read that before when giving
3  patients information about the instructions for
4  use.
5      Q.   A couple of points.  One, it's not
6  required for a physician to give a patient an
7  IFU before doing a medical procedure?
8      A.   That is correct.
9      Q.   Two, in your experience, have you found
10 your patients review IFUs?
11     A.   In my experience, yes.
12         I get phone calls when patients get
13 home and they've got a medication and they open
14 up the package insert and they read it and they
15 call back and they say, "Wait a minute, I just
16 read about, you know, this that we had talked
17 about in the office."
18         And so yes, I do find that patients are
19 becoming much more interested in having all the
20 information that is available before making a
21 decision about using a medication and a medical
22 device.
23     Q.   And you added that last part because I
24 was going to ask you specifically with regard to
25 medical devices.

Page 111

1      A.   Yes.
2      Q.   Let's take medication out.
3      A.   Okay.
4      Q.   With regard to medical devices, do you
5  routinely give your patients the IFU for a
6  medical device when you're going to do a
7  procedure?
8      A.   The one that is the easiest is when we
9  use an electrical stimulator inside the -- in
10 the office.  And yes, the patient is given a
11 copy of that.
12         The ones that the patient is given from
13 a surgical procedure, it's offered, and it's up
14 to the patient to decide if they want it or not,
15 but usually, the ones -- the devices we do --
16 that we use in the office, yes, they do get
17 those.
18     Q.   Is it a customary practice not just in
19 your office but if you're doing an outpatient
20 procedure at a hospital or a surgical center --
21 and I don't know if you do any at a surgical
22 center, but is it your customary practice when
23 you're doing a procedure to give the IFU when
24 it's outside the office?
25         MR. CARTMELL:  Object to form.

Page 112

1          THE WITNESS:  It all depends on the
2  patient.
3  BY MR. MAZZIOTTI:
4      Q.   Okay.  You've never worked for the FDA,
5  right?
6      A.   That is correct.
7      Q.   Have you ever been a consultant for the
8  FDA?
9      A.   No, I have not.
10     Q.   Have you ever had to testify before the
11 FDA on any issues?
12     A.   No, I have not.
13     Q.   Have you ever held yourself out as an
14 expert in industry standards as it relates to
15 medical device companies?
16         MR. CARTMELL:  Object to the form.
17         THE WITNESS:  Sorry.  In what respect
18 are you talking about?
19 BY MR. MAZZIOTTI:
20     Q.   In what regulations that perhaps govern
21 whatever -- well, strike that.
22         With regard to FDA regulations, have
23 you ever held yourself out as an expert in what
24 is required in order for a medical device
25 company to market one of its devices?

Page 113

1      A.   No, I have not.
2      Q.   You don't consider yourself a human
3  factors expert, do you?
4      A.   A human?
5      Q.   Do you know what a human factors expert
6  is?
7      A.   No, I do not.
8      Q.   Okay.  How about pain management?
9      A.   I do not run a pain clinic.  I have a
10 number of patients that have chronic pain,
11 issues with chronic pain, that I manage.
12         I don't have advanced training in pain
13 management, however, having been practicing
14 gynecology and urogynecology for close to
15 25 years, I have dealt with chronic pelvic pain
16 and pain issues in my patients, and I do get
17 patients referred to me with certain pain issues
18 such as chronic pelvic pain, painful bladder
19 syndrome, interstitial cystitis so I do have a
20 lot of experience with it.
21     Q.   Do you ever refer patients to pain
22 clinics?
23     A.   Yes, I do.
24     Q.   When do you do that?  At what point
25 does it get to the point where you believe you

Page 114

1   need to refer them out?
2       A.   When a patient is going to be on
3   chronic medication for pain, I think it's
4   preferable for the patient to be seen at a pain
5   clinic such as if someone's going to be on
6   chronic narcotic use.
7           It's becoming a growing issue, giving
8   patients pain medications.  They're much more
9   highly regulated now than they were before, and
10  I think that there are certain caveats with
11  certain medications that it's better to send a
12  patient to a pain specialist at a pain clinic
13  that is recognized as such so that you're not
14  getting as many phone calls about prescriptions.
15      Q.   With regard to pelvic pain and as
16  relates to the vaginal mesh products we've
17  talked about today, is that something you feel
18  comfortable having opinions about, how to manage
19  chronic pelvic pain like that?
20      A.   Yes.
21      Q.   Are you going to offer opinions
22  about -- well, let me ask you this way.
23          In your report, you talk about what
24  should have been in the IFUs and other
25  literature for physicians, and I'm paraphrasing.

Page 115

1   Is that a correct characterization?
2       A.   What should have been in IFUs, yes.
3           The second part is what should have
4   been in the literature?
5       Q.   Yeah.
6           Are you going to testify that what is
7   in IFUs or what Bard made available would have
8   impacted implanting physicians' decision making
9   on implanting vaginal mesh?
10          MR. CARTMELL:  Object to the form.
11          THE WITNESS:  I still don't understand
12  your question.
13  BY MR. MAZZIOTTI:
14      Q.   In other words, are you going to go a
15  step further and say that this information been
16  in an IFU, these physicians would not have used
17  vaginal mesh?
18      A.   I think that those questions were asked
19  the individual physicians, and those are part of
20  the case-specific reports.
21          If a physician stated that if he had
22  known that the polypropylene in the Align or the
23  Avaulta was specifically not meant to be placed
24  in a human being because of -- the manufacturer
25  said that it should not be used for a medical --

Page 116

1   permanent medical application, if they testified
2   that that would have changed their use of the
3   product, I will testify to that.
4           If they state that they knew that the
5   mesh degraded, that the mesh contracted, that it
6   was associated with a chronic foreign body
7   reaction, chronic inflammatory reaction, chronic
8   subclinical infection, that the mesh deformed,
9   it roped and curled and then led to these
10  life-altering complications, if they were to
11  testify to the fact that they did not know that
12  it was difficult to remove the sling products or
13  the pelvic organ prolapse products in its
14  entirety, then I will use that testimony.
15          Now, obviously, I have been dealing
16  with this and I have read and seen more
17  materials, internal documents, deposition
18  testimony, medical literature than the vast
19  majority of physicians so I do have more
20  information than other doctors.  So that while
21  what I know versus what other doctors know, I
22  have just had a -- been able to read and
23  understand more of the information, but if a
24  doctor specifically testified that this would
25  make -- would have changed their decision, then

Page 117

1   that is in my report.
2       Q.   Yeah.  I mean, in short, what my
3   question was, though, you're not going to come
4   in and opine that had -- hypothetically in a
5   case, had the physician known this, this
6   physician would not have implanted the vaginal
7   mesh?  You're going to defer to the physician on
8   that question?
9       A.   That is correct because, you know, as
10  I've stated, I've stated in my report, when I
11  started to see the degree of complications --
12  and obviously, they were referred to me because
13  I've been in Chicago for a number of years, I've
14  trained, you know, hundreds of residents, and
15  the vast majority refer their patients to me so
16  I see -- I have dealt with more complications
17  associated with vaginal mesh products than most
18  people have so I have made the decision not to
19  use slings and pelvic floor mesh products
20  because I had seen more complications.
21          Now, I have more information than the
22  vast majority of physicians in gynecology and
23  urogynecology, but I am not going to opine
24  about -- I cannot get into another physician's
25  head, and so --

Page 118

1    Q.   That's really what my question is.   And
2  I apologize, but that was a long answer to a
3  very, I thought, simple question, and that is:
4  You're not going to come to trial and say had
5  they had this information, the physician would
6  have made a different decision on whether or not
7  to implant the vaginal mesh; you're going to
8  defer to the implanting physician?
9        MR. CARTMELL:   Object to the form.
10        THE WITNESS:   We can wait for a second.
11        MR. CARTMELL:   Actually, I think this
12  is an issue that's been taken up in the motions
13  in limine, and Goodwin is the one that is --
14  he's only had to testify to what Goodwin allows
15  him to, and I think that issue has been taken up
16  so it's kind of a legal issue.
17        MR. MAZZIOTTI:   Okay, okay.
18        I would like -- just let's get an
19  answer to that and whatever, and I obviously
20  don't know.
21        MR. CARTMELL:   We're not going to ask
22  him to say what a specific doctor in each case
23  should have done.
24        We're asking him to offer -- he is
25  asking -- offering opinions about what the

Page 119

1  IFU -- what warnings and adverse risks and
2  information should have been in the IFU, --
3        MR. MAZZIOTTI:   Right.
4        MR. CARTMELL:   -- but he's not going to
5  say this Dr. X should have done this because I
6  don't think he's going to be allowed to do that.
7        MR. MAZZIOTTI:   And that's why I say
8  had Dr. X known what I believe should be in the
9  IFU, this never would have happened, he's not
10  going to -- well, let me tell you what my
11  question is going to be.
12        Will he testify that based on what
13  information he believes should be in the IFU,
14  had the implanting physician had that
15  information, it would have changed his decision
16  to proceed with the procedure, or is he going to
17  defer to the implanting physician to answer that
18  question?
19        MR. CARTMELL:   Well, I think this is in
20  his reports and testimony.   He may have
21  testified that I think a reasonable physician
22  with all of the information wouldn't have done
23  it, but ultimately, --
24        MR. MAZZIOTTI:   Okay.
25        THE WITNESS:   That was about to be my

Page 120

1  answer.
2        MR. MAZZIOTTI:   Okay.
3        MR. CARTMELL:   Right.   I think he's
4  testified like that before.
5        Now, that's a whole nother issue on --
6  I can't remember what he's testified to at
7  trial, but I think in his reports, he has said
8  what a reasonable physician he believes would
9  have done given all of this information.
10        MR. MAZZIOTTI:   Okay.
11        THE WITNESS:   And that is the answer
12  I --
13  BY MR. MAZZIOTTI:
14    Q.   Okay.   And that will go into the
15  specific cases that we'll discuss later on?
16    A.   That is correct.
17    Q.   Okay.   Do you have an opinion about
18  Bard, C.R. Bard, generally, you know, as a
19  corporate citizen, good, bad, indifferent?
20    A.   Not that's outside of what is detailed
21  in my report.
22    Q.   Generally what are you referring to
23  when you say what's detailed in your report?
24    A.   There are -- you know, if you want to
25  pull to a specific, you know, paragraph, --

Page 121

1    Q.   I think I know what you're referring
2  to.
3    A.   Okay.
4    Q.   There's e-mail cited, things like that,
5  but are you going to come in and have any
6  criticisms about Bard being a bad corporate
7  citizen or they're a bad company because they
8  are manufacturing vaginal mesh?
9    A.   The only thing I will opine to is what
10  is in my report.
11        MR. MAZZIOTTI:   Okay.   I'm about to
12  delve into the report.   I don't know.   It's
13  12:15.   I was trying to kind of mop up some
14  things to get us to 12:30, but the next part is
15  probably going to be the bulk of the day.   So
16  should we take a break now for lunch?
17        MR. CARTMELL:   That sounds fine.   Let's
18  do that.
19        MR. MAZZIOTTI:   Okay.
20        THE VIDEOGRAPHER:   The time is 12:16.
21  We are off the record.
22        (Whereupon, a luncheon recess
23          was taken.)
24
25

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

Page 122

1          (Whereupon, Rosenzweig
2          Deposition Exhibit Nos. 4-6
3          were marked for
4          identification.)
5      THE VIDEOGRAPHER:  The time is 1:17.
6 We are back on the record.
7 BY MR. MAZZIOTTI:
8      Q.  Okay, Dr. Rosenzweig.  Let's go ahead
9 and talk about your expert report and the
10 attachments that were provided in this case.
11      We've already talked about Exhibit 1 or
12 identified Exhibit 1 as your Rule 26 report.
13      Exhibit 3 is your CV to the deposition,
14 but it was Exhibit A to your report, just so you
15 know.
16      A.  Okay.
17      Q.  Exhibit B to your report is your
18 testimony history which, actually, I think you
19 provided an updated copy to me?
20      A.  That is correct.
21      Q.  All right.  So what I'm going to now do
22 is mark as Exhibit 7 your updated testimony
23 history.
24
25

Page 123

1          (Whereupon, Rosenzweig
2          Deposition Exhibit No. 7 was
3          marked for identification.)
4 BY MR. MAZZIOTTI:
5      Q.  Exhibit 5 is the documents you've
6 relied on in this case; is that right?
7      A.  That is correct.
8      Q.  And that is Exhibit C to your Rule 26
9 report?
10      A.  That is correct.
11      Q.  And then Exhibit 6 should be over
12 there, and that's what we received yesterday as
13 a supplement to the documents you relied on in
14 this case; is that right?
15      A.  That is correct.
16      Q.  And as I mentioned, Exhibit 7 is your
17 updated testimony history.  And I'm going to
18 hold onto this for a minute if I ask any
19 questions about it.
20      All right.  In your Rule 26 report, I
21 noticed you have no damages opinions in this
22 case, correct, for each plaintiff, things like
23 that.
24      You're not going to come in and provide
25 any type of opinion of what the value is of any

Page 124

1 damages?
2      A.  That is correct.
3      Q.  You're not going to come in -- excuse
4 me.
5      You're not going to come in and talk
6 about whether or not Bard violated any FDA
7 regulations, correct?
8      A.  That is correct.
9      Q.  You're not going to talk about the
10 quality -- I'm sorry.
11      You're not going to talk about the
12 complaint-handling system for Bard, correct?
13      A.  I do not have that in my report so I
14 don't think I will be talking about that.
15      Q.  And let me be a little bit clearer.
16      You made reference about how the
17 complaints were provided to Bard, but you're not
18 going to come in and talk about whether or not
19 their complaint-handling system was deficient in
20 any way?
21      A.  I will state that what is in my report
22 is what I will be giving testimony about.
23      Q.  All right.  Nothing more, nothing less?
24      A.  There might be less, but yeah, what is
25 in my report or what gets supplemented in my

Page 125

1 report is what I'm going to be discussing.
2      Q.  Who helped you prepare your Rule 26
3 report?
4      MR. CARTMELL:  I'm going to object.
5      I mean, I do think this type of
6 stuff gets into that Rule 26 supplement to the
7 rule and maybe the agreement.
8      I mean, I don't think there's any
9 secret that the lawyers, you know, have worked
10 on the reports with the experts, but I really
11 don't know that this is an area of examination
12 that we contemplated your side or our side
13 getting into.
14      MR. MAZZIOTTI:  I had thought this was
15 an area that was something we could get into.
16 As to who prepared the report, I don't --
17      MR. CARTMELL:  Well, he prepared the
18 report, but it sounds like what you want to get
19 into is, you know, communications between the
20 attorneys and drafts.
21      I mean, we have agreed that -- and I
22 think the rule now is essentially this -- that
23 we're not going to get into all that stuff.
24      MR. MAZZIOTTI:  Let me see if I can
25 handle it this way --

Page 126

1     MR. CARTMELL: Okay.
2     MR. MAZZIOTTI: -- and ask him, you
3 know.
4 BY MR. MAZZIOTTI:
5     Q.  Did you draft the Rule 26 report on
6 your computer?
7     A.  Well, this report is a compilation that
8 has many features of other reports that I have.
9 Did I type it on my computer, no.
10    Q.  Did you type the report?
11    MR. CARTMELL:  Again, I think this is
12 outside of -- I think you are getting into
13 information that is contrary to the agreement we
14 have and the rule so I don't want him to testify
15 to that stuff.
16    MR. MAZZIOTTI:  Let me ask you, when
17 you say the agreement you have, is it in an
18 order, or is this something that you've agreed
19 to with the --
20    MR. KUNTZ:  That's the new Federal Rule
21 26.  It's nothing about -- the only thing you
22 can get is a final draft.  You don't get any
23 drafts, you don't get any communications about
24 drafts.  The only communications you get between
25 witness and the lawyer relate to compensation

Page 127

1 and paying them.  That's the new Rule 26.
2     MR. MAZZIOTTI:  But I haven't -- I'm
3 not getting into that.
4     MR. CARTMELL:  Well, you are.
5     I mean, I don't understand how there
6 could be any relevance to whose attorney or
7 whose -- excuse me -- whose computer the final
8 draft, you know, came from or any of that stuff.
9 I don't understand what possible relevance that
10 has.  I mean, if you can tell me --
11    MR. MAZZIOTTI:  Well, I mean, I think I
12 can get into -- I know the rule changed and it's
13 all work product, and that part I get, but
14 there's plenty of case law, and I think the rule
15 does not prohibit getting into with an expert
16 how the report came about.
17    Now, whether the communications, who
18 said what, is this the attorney's word or your
19 work, you know, that's a fine line, but I'm not
20 going to say with the prior drafts what was on
21 the prior draft, what did counsel change, what
22 did you discuss with counsel about.  I'm not
23 planning on getting into that.
24    All I'm planning on getting into is who
25 drafted the report, is it your work product or

Page 128

1 is it -- "work product" is the wrong word.  Is
2 it your opinions.
3     MR. CARTMELL:  Okay.  I mean, I don't
4 think it's a problem for you to ask him if these
5 are your opinions and if he drafted the report.
6     I don't think beyond that there's
7 anything that you would ask that would be
8 relevant and wouldn't basically be beyond our
9 agreement and the rule.  So if you want to ask
10 him if he drafted it, if he -- if they're his
11 opinions, I'm fine with that, but anything
12 beyond that I'm not going to let him answer.
13    You can make your record, and then
14 we'll just take it up.
15    MR. MAZZIOTTI:  Okay.  How about did
16 any of his colleagues assist him in preparing
17 the report?
18    THE WITNESS:  No.
19 BY MR. MAZZIOTTI:
20    Q.  Okay.  And when was the last time
21 before today you looked at your Rule 26 reports?
22    A.  Yesterday or the day before yesterday.
23    Q.  And is there anything that you wanted
24 to change, tailor or revise about your Rule 26
25 report?

Page 129

1     A.  No, sir.
2     Q.  Anything stand out that may have been
3 corrected at the time and now you think it's
4 incorrect or needs to be changed?
5     A.  No.
6     Q.  You had mentioned earlier today
7 something about a Madsen article?
8     A.  Yes.
9     Q.  Is that the one that studied baboons,
10 or is that a separate article?
11    A.  No.  It was a randomized trial
12 comparing the Align sling with the MiniArc.
13    Q.  Okay.
14    MR. CARTMELL:  Did you say baboons?
15    MR. MAZZIOTTI:  Yeah.  That's the only
16 one we found.
17 BY MR. MAZZIOTTI:
18    Q.  Tell me about this Madsen article.  How
19 do you spell it, M-a-t-t-s-o-n?
20    A.  M-a-d-
21    Q.  M-a-d --
22    A.  -- s-e-n.
23    Q.  -- s-e-n, okay.
24    Because M-a-t-t-s-o-n talks about
25 baboons.

Page 130

1     A.   Right. That's not the one I was
2 referring to.
3       MR. CARTMELL: Are you familiar with
4 that one?
5       MR. LUNDQUIST: Yeah.
6       THE WITNESS: I actually know Jamie
7 McGregor who is the curator for the Denver Zoo
8 and did a lot of work on the -- no, it's
9 actually quite interesting work on --
10       MR. MAZZIOTTI: Yeah, guys. Stop
11 laughing at my questions.
12       THE WITNESS: -- vaginal infections and
13 preterm labor but nothing -- and there's
14 actually some work on prolapse, but that's not
15 the Madsen article I was referring to.
16 BY MR. MAZZIOTTI:
17     Q.   Okay. All right.
18       Tell me about the Madsen article you
19 were referring to.
20     A.   That is a paper that came out of the
21 Mayo Clinic on 200 patients randomized to either
22 the Align or the MiniArc.
23     Q.   And tell me -- summarize for me what
24 the conclusions were about that.
25     A.   Patient satisfaction rate for the Align

Page 131

1 was -- well, the basic conclusion was that the
2 Align performed better than the MiniArc, but if
3 you drill down into the data, only 50 percent of
4 patients with Align were satisfied; the failure
5 rate was close to 64 percent; 28 percent of
6 patients had post discharge complications. The
7 reoperation rate for complications was over 9
8 percent, close to 10 percent. About 4 percent
9 of patients had voiding dysfunction, and 5
10 percent of patients need to be reoperated on for
11 erosions.
12       And as I stated before, the literature
13 shows that approximately 50 percent of patients
14 who have an erosion end up being operated on so
15 you can extrapolate that the erosion rate
16 associated with the Align is close to 10
17 percent.
18     Q.   Okay. Did you look behind the article
19 as far as the underlying date to figure out when
20 you say there were complications afterwards
21 whether or not the participants in the study had
22 the similar complaints before having an Align
23 implanted?
24     A.   In what respect?
25       So are you saying that if somebody had

Page 132

1 pelvic pain due to an ovarian cyst and then
2 developed pain due to an ovarian cyst on
3 occasion and now has chronic pelvic pain, if
4 that was described in the article?
5     Q.   That's an example of what I was talking
6 about.
7     A.   Yes, and I don't think they had the
8 methodology to look at that.
9     Q.   And you said it very quickly.
10 50 percent satisfied, and you said something
11 about 60 percent -- what was it?
12     A.   Failure rate.
13     Q.   And how was it defined, failure rate?
14     A.   If you would like to pull out the
15 article, we could discuss it specifically.
16     Q.   I have a baboon article, but I don't
17 think that's going to help us. Hopefully, I'll
18 be getting the article in the next several
19 minutes, but until that time, --
20     A.   If I remember correctly, that this was
21 subjective, and I don't think they had an
22 objective arm to it, but to be more specific, it
23 would be very important to have the article in
24 front of us to discuss it in more detail.
25     Q.   Did you include that article in your

Page 133

1 documents relied on?
2     A.   I am very sure that's in my documents
3 that I relied on.
4     Q.   As far as the order of the documents
5 you've relied on, is it in any particular order
6 we can look right now and see if it's in there?
7     A.   I don't think it's in any -- I don't
8 think it's in alphabetical order.
9     Q.   Okay. Is it Madsen co-authored by
10 El-Nashar, A Cohort Study Comparing a
11 Single-Incision Sling With a Retropubic
12 Midurethral Sling?
13     A.   That is correct.
14     Q.   And it looks like it's 2014?
15     A.   Yes, but if you look, it was
16 E-published in 2013.
17     Q.   And it was specifically dealing with
18 the Align, you say?
19     A.   That is correct.
20     Q.   As far as your opinions, do you believe
21 polypropylene should be used in human beings?
22     A.   In my report, I state that
23 polypropylene is not a suitable product for the
24 intended application as a permanent prosthetic
25 implant for stress urinary incontinence and

Page 134

1  pelvic organ prolapse for the variety of reasons
2  that I lay out in my report.
3      Q.   Okay.  Let's just go in, I guess,
4  chronological order in your report here.
5      A.   Okay.
6      Q.   Now, I take it based on what you've
7  written, the first line of addressing stress
8  urinary incontinence is to go the nonsurgical
9  route?
10     A.   I think that it's preferable to try
11  nonsurgery on patients to treat their stress
12  urinary incontinence.
13         If you have a dedicated program to
14  treating stress urinary incontinence
15  nonsurgically, you can have a fairly vibrant
16  success rate from nonsurgical management.
17     Q.   What is the success rate for stress
18  urinary incontinence with a nonsurgical
19  treatment?
20     A.   Which one are you talking about?
21     Q.   Is there a way to put them all
22  together, or will each one of them have
23  different success rates?
24     A.   They all have different success rates.
25     Q.   Let's start with the first one, and

Page 135

1  that's the Kegel exercises?
2      A.   Kegel exercises are pelvic floor
3  rehabilitation.  It has about a 50 percent
4  success rate.
5         Now, there are certain instances where
6  the long-term success rate is actually
7  comparable to the short-term success rate.
8         There are various institutions that
9  have a dedicated pelvic floor rehabilitation
10  program.  The Scandinavians do a very good job
11  of that.  They have almost a pelvic floor
12  personal trainer that works with them, and they
13  actually show a fairly good long-term success
14  rate from pelvic floor exercise.
15     Q.   Okay.  For the Align and the pelvic
16  mesh, the success rate is greater than
17  50 percent, correct?
18     A.   Well, we talked about the Madsen
19  article that showed a 65 percent failure rate.
20         There's another study that puts the
21  success rate at around 70 percent, but I would
22  agree with you that surgical management does
23  have a greater success rate than nonsurgical
24  management.
25     Q.   Okay.  And to make sure I understand

Page 136

1  what you're saying, other than -- can you think
2  of another article or literature other than the
3  Madsen one where --
4      A.   Are you talking about Align, or are we
5  going to talk about retropubic slings or
6  obturator slings in general?
7      Q.   Good point.  What I want to talk right
8  now is about Align.
9      A.   Okay.  As I stated earlier today, the
10  articles that I described earlier were the only
11  articles specifically that dealt with Align, and
12  if you look, you have about anywhere from a
13  40-to-70-percent success rate from Align
14  products.
15     Q.   40 to 70 percent?
16     A.   That is correct.
17     Q.   Based on those articles?
18     A.   That is correct.
19     Q.   As far as the pelvic mesh, the success
20  rate surgical versus nonsurgical is what I want
21  to talk about now generally.
22     A.   Okay.
23     Q.   The success rate for the surgical
24  route, that's greater than 50 percent?
25     A.   Well, it all depends on how you look at

Page 137

1  it and what parameters that you use.
2         If you use a composite index, -- and
3  that's the Barber study, that's the Richter
4  study -- you see anywhere from a
5  60-to-65-percent success rate from retropubic or
6  obturator slings if you use a composite index,
7  meaning that if you look at subjective outcomes,
8  objective outcomes including a stress test, pad
9  weight test and whether or not the patient was
10  reoperated on and whether the patient states
11  that she's completely dry.
12         If you use just one parameter such as
13  pad test or a positive or negative stress test,
14  your success rate is going to go up so that a
15  lot of the longer-term studies like Nilsson's
16  17-year study only uses one parameter to
17  quantify success rate.
18         The more parameters that you use to
19  quantify success rate, your success rate goes
20  down.
21     Q.   Can you cite to me literature that says
22  the success rate long term for vaginal mesh
23  products is less than 50 percent?
24     A.   The Richter two-year study shows that
25  there's a 60 percent success rate when you use a

Page 138

1   composite index from slings.
2       Q.   Okay.  So based on what you're telling
3   me, at least with regard to the pelvic floor
4   exercises, the surgical route has a higher
5   success rate?
6       A.   That is correct.
7       Q.   You also mentioned in your report --
8   and it's not numbered, but I believe it's
9   roughly Page 6, the pessary or pessary?
10          MR. CARTMELL:  Pessary.
11  BY MR. MAZZIOTTI:
12      Q.   Right?
13      A.   That is correct.
14      Q.   Okay.  What is the success rate for the
15  pessary?
16      A.   Well, if you have a properly-fitted
17  pessary, your success rate is going to be
18  virtually 100 percent.
19      Q.   Do you use pessaries?
20      A.   That is correct.
21      Q.   You do?
22      A.   Yes, sir.
23      Q.   How frequently?
24      A.   I have one of the largest pessary
25  populations in the United States, give or take.

Page 139

1       Q.   What do you mean by that, you're one of
2   the --
3       A.   I have people that come from around the
4   country to get pessaries fit at my institution
5   because -- my practice because we have a very
6   dedicated program and a very good success rate
7   with pessaries.  And we're talking about
8   pessaries for stress urinary incontinence.
9           You understand the reason why the
10  pessary works for stress urinary incontinence is
11  that it causes a certain degree of obstruction
12  to the urethra when the pessary is in place, and
13  therefore, in order to -- when a patient desires
14  to void, they can simply take out their pessary
15  and then pee and then replace the pessary.
16      Q.   Are there any long-term complications
17  of using a pessary?
18      A.   If a pessary is used properly, then the
19  long-term complications could be a vaginal
20  discharge or erosion of the lining of the vagina
21  called the vaginal mucosa.
22          And what we talk about as this kind of
23  erosion is that there's a slight sloughing of
24  the vaginal mucosa associated with a pressure
25  phenomenon.  Those are seen in patients that

Page 140

1   have more of a neglected pessary that's been
2   left in too long and not cleaned.
3           If someone is very active with their
4   pessary, they remove it on a frequent basis,
5   nightly, weekly, you are going to have virtually
6   no complications associated with it.
7       Q.   How about an increased rate of urinary
8   tract infections?
9       A.   The only reason you would get an
10  increase in urinary tract infections is if the
11  pessary is obstructing the urethra and the
12  patient isn't able to completely empty their
13  bladder.
14          Sometimes you would use a pessary in
15  that respect to obstruct the urethra, but then
16  the patient just has to take the pessary out to
17  void.
18          Now, I will agree with you in the
19  general use of the pessaries for the treatment
20  of pelvic organ prolapse, not for the treatment
21  of stress urinary incontinence because to treat
22  stress urinary incontinence, you're using a
23  different kind of pessary with a different kind
24  of mechanism.  You're not using it to hold
25  something up, you're using it to close off the

Page 141

1   urethra.  So in that respect, patients know that
2   they're going to take it out, pee and then put
3   it back in again.
4       Q.   Going back to the pelvic floor
5   exercises, what is the -- we talked about the
6   success rate for stress urinary incontinence.
7   Is it successful for prolapse?
8       A.   There's limited data, if you will, on
9   using pelvic floor exercises to treat prolapse.
10          There is no disadvantage to doing
11  pelvic floor exercise in a patient that has
12  prolapse, but the chances just by strengthening
13  up the pelvic floor muscles of having a
14  significant impact on prolapse is very limited.
15      Q.   What was that last part again?
16      A.   Is very limited.
17      Q.   Has it even been studied?
18      A.   I bet at some point, we could probably
19  pull out a paper that talked about the utility
20  of pelvic organ -- pelvic floor rehabilitation
21  on prolapse, but as I said before, the chances
22  of you having a significant impact with pelvic
23  floor exercise on prolapse is very limited.
24      Q.   I take it you disagree with the
25  statement that surgery is a more effective

Page 142

1  treatment for stress urinary incontinence than
2  pelvic floor exercises?
3      A.   I don't think I disagreed with that.
4      Q.   Okay.  Good.
5      A.   I think we both agreed that the success
6  rate is better, however, as a first-line
7  therapy, I think that nonsurgical management is
8  a better option than surgery to treat stress
9  urinary incontinence.
10     Q.   If the nonsurgical route doesn't work,
11  what do you do?
12     A.   Then you can offer the patient surgery.
13     Q.   And what type of surgery are you
14  mentioning?
15     A.   What type of surgery do I talk to my
16  patients about?
17     Q.   Yeah.
18     A.   Well, I talk to my patients about all
19  the various options for them.
20          My primary operation is a Burch
21  procedure.  I use the pubovaginal sling as my
22  salvage procedure.  And as I've testified to
23  before, when I use a pubovaginal sling which is
24  different from the use of pubovaginal slings for
25  the primary treatment of stress urinary

Page 143

1  incontinence, this is my salvage operation, and
2  I tend to put it in with a little bit more
3  tension on the urethra because these are
4  patients that have recurrent, severe stress
5  urinary incontinence.  They have very few other
6  options available to them, and therefore, when I
7  counsel the patient about this procedure, they
8  know that they might have an increased risk of
9  obstruction.
10          The other choice to them is either an
11  artificial urinary sphincter or periurethral
12  injection therapy.
13          So if they choose the pubovaginal
14  sling, they realize -- and we deal with this --
15  that they might have an increased risk of
16  obstructed voiding because of the way that we
17  are using it and that we teach them how to do
18  intermittent self-catheterization, or they might
19  need to have a bladder catheterization for a
20  longer time after surgery.
21     Q.   When you call it a salvage operation,
22  what you're saying is it's the last option for
23  the patient?
24     A.   One of the last options.
25          As I say, in that caveat would be an

Page 144

1  artificial urinary sphincter which is kind of
2  like a blood pressure cuff that goes around the
3  urethra.  There's a reservoir of water that
4  fills up the cuff to close off the urethra, and
5  the patient hits a pump mechanism to take the
6  water out of the cuff, put it in the reservoir,
7  and then the patient can pee.
8          Periurethral injections are a very nice
9  form of therapy.  They can help increase the
10  continence mechanism.  The one downside is that
11  it tends not to have a long-term effectiveness
12  and needs to be repeated.
13     Q.   You mentioned in your report the
14  transurethral bulking agents as an option?
15     A.   That's what I was just talking about,
16  yes.
17     Q.   And so my question was:  Long term,
18  that's not necessarily -- does not have a higher
19  success rate than going the surgical route with
20  pelvic mesh?
21     A.   That is correct, there is a greater
22  decay from that.
23     Q.   And it's not generally as effective,
24  either, correct?
25     A.   That can be debated what the initial

Page 145

1  success is, but I would agree with you that your
2  success rate for that category of therapy is not
3  as good as the other forms of therapy or the
4  other forms of surgery.
5      Q.   You talked about or talk about
6  behavioral modification, lifestyle modification.
7          Quitting smoking, what does that do as
8  far as stress urinary incontinence and pelvic
9  prolapse?
10     A.   Well, number one, smoking is associated
11  with upper respiratory problems so smokers tend
12  to have more cough.  More cough means you are
13  increasing the frequency with which somebody is
14  increasing their intra-abdominal pressure which
15  causes leaking.
16          Secondly, there is some data that
17  nicotine can inhibit the contraction of pelvic
18  floor muscles, and therefore, that might help or
19  that might increase the chance of actually
20  leaking with coughing and sneezing.
21          So therefore, quitting smoking as a
22  general health issue is positive, decreasing the
23  chances of having an upper respiratory ailment
24  which can decrease the frequency with which
25  somebody coughs, and lastly, the possibility of

In Re: CR Bard 200 — Bruce Rosenzweig, M.D. — 10/29/2014

Page 146

1 impairing pelvic floor muscle contractility.
2     Q.   And what about weight loss, obesity,
3 how does that impact when you're talking about
4 behavioral modification?
5     A.   Yes.
6         The data has shown that when somebody
7 loses weight, their incontinence gets better.
8     Q.   And why is that?
9     A.   The theories are -- and I'll give you
10 the short answer.  We don't know.
11        The theory is that maybe with increased
12 weight, you have increase in intra-abdominal
13 pressure and you put more pressure on the
14 bladder, that you have more concomitant ailments
15 such as respiratory disease which is why you got
16 obese in the first place because you couldn't
17 exercise.  You might have more likely incidence
18 of diabetes which, again, can have a little bit
19 of impact on pelvic floor musculature.
20        But the short answer is I don't think
21 we know the exact mechanism by which it works;
22 we just know that it does work.
23     Q.   And the last thing, you mentioned
24 allergy treatment during seasonal allergies?
25     A.   That is correct, but the same thing as

Page 147

1 we talked about before with smoking.  If someone
2 has a significant amount of sneezing and
3 coughing, they're going to leak more frequently
4 if they leak due to sneezing and coughing during
5 allergy season.
6     Q.   Let's talk about the surgical options.
7         You mentioned the Burch procedure, and
8 you state the likelihood of success of the Burch
9 and the paravaginal repair procedures is
10 reported to be 80 to 90 percent in most cases?
11     A.   That is correct.
12     Q.   Okay.  Where do you get that
13 information from?
14     A.   Well, if we look at some of the
15 longer-term studies, there have been roughly
16 five prospective, randomized trials comparing
17 the midurethral sling with the Burch procedure.
18        There's the Hilton study, there's a
19 Turkish study, there is a Scottish study, and
20 those are the five-year studies and then several
21 other three-year studies.  And those studies,
22 when you take it together, it shows that there's
23 anywhere from an 80-to-90-percent success rate.
24     Q.   Has that been your experience as well?
25     A.   That is correct.

Page 148

1     Q.   The pubovaginal sling procedures,
2 explain that.
3     A.   Well, again, there are multiple
4 different ways of doing a pubovaginal sling
5 procedure.
6         The procedure that I started doing was
7 what we described before which was in the
8 article that we published in the early 90s which
9 was suspending a postage stamp size piece of
10 Gortex from suspensory sutures to the rectus
11 fascia.
12        Currently, when I do mine, I take --
13 harvest a strip of rectus fascia and tunnel it
14 underneath the proximal urethra and suspend it
15 from the rectus fascia attachment.
16     Q.   You also have down the Align urethral
17 support systems as an option, right?
18     A.   I discuss that in the report.
19     Q.   And then you go on in your opinions --
20 I think in the first one -- that it was not
21 intended to be a permanent prosthetic implant
22 for stress urinary incontinence.  What is that
23 based on?
24     A.   Well, if you continue reading, it
25 states because it degrades, it shrinks or

Page 149

1 contracts, it causes a chronic foreign body
2 reaction, chronic inflammation, chronic
3 subclinical infection, and it deforms, it frays,
4 it ropes, it curls.  And when that happens, it
5 loses pore size or it increases tension.
6     Q.   Is it your opinion that the mesh
7 changes or that it changes as the result of the
8 healing of the wound?
9     A.   The size gets smaller, the pore size
10 gets less.
11        When I explant them, they go in -- the
12 Align out of the box is 1.2 centimeters wide.
13 When I take these things out of the body,
14 they're about 4 to 5 millimeters wide so whether
15 it's the external contraction from scar plating
16 contracting versus whether there is some
17 internal property that takes place, I would say
18 it's the former over the latter, but the end
19 result is that it's smaller.
20        I can't tell you when I put a wool
21 sweater in the dryer why it comes out as an
22 extra large -- or goes in as an extra large and
23 comes out as a small.  It's just whether you
24 lose the distance between individual fibers or
25 it's that the fibers actually get smaller.  It's

Page 150

1  just that we know that it is smaller.
2      So whether it's an external force, an
3  internal force, I think that the current
4  understanding is that it's an external force
5  that is making it smaller due to contraction of
6  scar plating.
7      Q.   And your opinion is it doesn't
8  necessarily matter what causes the result, it is
9  the result that's the issue?
10     A.   That is correct.  It's the result that
11  is the issue that leads to the clinical
12  manifestations that have been shown in studies,
13  obstructed voiding, erosion.
14         When I talk about erosion, I'm meaning
15  either vaginal erosion which is currently
16  extrusion, exposure or urethral bladder erosion
17  which is through a viscus.
18         Pain is another result of contraction.
19     Q.   But the question was what causes the
20  contraction of the mesh, and based on your
21  response, you're not sure, but the result's the
22  same, and that's the issue?
23         MR. CARTMELL:  Object to the form.
24         THE WITNESS:  And again, I think that
25  the external force of scarring and scar plate

Page 151

1  formation is the force behind contraction.
2  BY MR. MAZZIOTTI:
3      Q.   You mention in your report that the
4  Align mesh was never meant to be used inside of
5  the human body?
6      A.   That is correct.
7      Q.   And that's because of the
8  polypropylene?
9      A.   That is because of the MSDS that states
10  quite clearly that this is not -- do not use
11  this product for an application involving brief
12  or temporary implantation in the human body or
13  in contact with internal body fluids or tissue.
14     Q.   Do you know the basis for that
15  statement?
16         MR. CARTMELL:  Object to the form.
17         THE WITNESS:  There is a -- from the
18  depositions I've read, there is a technical
19  safety manual that goes along with the MSDS that
20  states that because polypropylene can be
21  attacked by oxidizing agents, halogenated
22  hydrocarbons, strong acids that it causes
23  breakdown of the product and the elements inside
24  polypropylene to leach out, that that makes it
25  unsuitable for a medical application.

Page 152

1      There are various grades of plastics.
2  There's medical grade, you know, consumer grade,
3  there's some that are dishwasher safe, there's
4  some that are microwave safe because it's been
5  studied to be when you put your spaghetti into a
6  polypropylene container, put it in the microwave
7  that bad things don't leach out and things don't
8  get in, and that is why something has been
9  deemed to be safe for that application.
10  BY MR. MAZZIOTTI:
11     Q.   And polypropylene's been used in other
12  medical applications for decades, right?
13     A.   That is correct.
14     Q.   What is your opinion as to why it's
15  appropriate in some instances and not in this
16  case?
17     A.   It has been shown that polypropylene
18  suture from back after it first -- polypropylene
19  suture first came out on the market -- first,
20  polypropylene has been shown to degrade when
21  exposed to peroxides and halogenated
22  hydrocarbons and highly-aromatized hydrocarbons.
23         We know that the vagina is a ready
24  source of peroxides.  The lactobacillus takes
25  glycogen made by the vaginal epithelium and

Page 153

1  converts that glycogen to peroxides so just
2  putting it in the vagina exposes it to
3  peroxides.
4         White blood cells, the macrophages, the
5  monocytes, when they go to a foreign body, they
6  start to break down that foreign body by sending
7  out peroxides and --
8      Q.   An inflammatory response?
9      A.   -- hydrochloric acids.  Exactly.  That
10  breaks down polypropylene.
11         From Liebert's, Schneider's, Williams'
12  and Oswald's studies from the 70s, we know that
13  peroxides will break down polypropylene.
14         Someone at William & Mary in a paper in
15  the mid 90s said that we are doing a study based
16  on reports in the literature of sutures for
17  cardiac applications, ophthalmologic
18  applications that are starting to degrade and
19  break, and so they did a study on the
20  degradation of polypropylene suture in an animal
21  model.
22         So the long history of safety of
23  polypropylene in the body I do not think is
24  devoid of literature that it might not be safe.
25  It has been shown to degrade, it has been known

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

Page 154

1    to degrade ever since polypropylene was first
2    used as a plastic, and the environment in the
3    human body plus in the vagina is ripe for
4    degradation of polypropylene.
5        Q.   It's used in hernia repairs, right?
6        A.   Yes, it has been.
7        Q.   It's used in brain shunts?
8        A.   That is correct.
9        Q.   And you mentioned earlier it's used in
10   sutures, right?
11       A.   That is correct.
12       Q.   And it's within the standard of care --
13   well, you can't testify whether it's standard of
14   care to be used in brain shunts, right?
15       A.   I'm not a neurosurgeon.
16       Q.   But you do know it's acceptable to be
17   used with brain shunts, right?
18       MR. CARTMELL:  Object to form.
19       THE WITNESS:  I know that polypropylene
20   suture has been used in a variety of different
21   surgical applications, but the answer to your
22   question was whether it was a safe product.
23       If something degrades that is supposed
24   to be there as a permanent application, that is
25   a problem.  And when people have looked at what

Page 155

1    actually leaches out of polypropylene during the
2    degradation process, they have no idea.
3        Litner in her master's thesis says that
4    when you put an element like polypropylene in
5    the human body and it starts to degrade, we have
6    no idea what the leachates are, we don't know
7    what the antioxidants do, we don't know what the
8    stabilizers do, we don't know what -- the other
9    compounds that makes it bendable so that it can
10   be knitted or woven into its final product.
11       That are a litany of additives that are
12   added to the final polypropylene product that we
13   have absolutely no idea what that does to the
14   human body.
15       Does it cause cancer?  We know that
16   there is a variety of literature on cancer
17   associated with polyester which is another
18   plastic.
19       Ben Ishtar in the mid 90s looked at
20   angiosarcomas associated with polyester used as
21   cardiac shunts and found that while many foreign
22   bodies in the human body, it takes 30 years for
23   them to create cancer that polyester was
24   creating angiosarcomas in just eight years of
25   application.

Page 156

1        There have been squamous cell
2    carcinomas from polyester of the skin.  There
3    have been bowel cancers associated with
4    polyester sutures that were used in a bowel
5    surgical application.  So polyester is just a
6    different variety of a plastic.
7        And now if you want to talk about the
8    data on cancer associated with polypropylene,
9    there are several different papers that talk
10   about cancer associated with polypropylene.
11   BY MR. MAZZIOTTI:
12       Q.   I think I was asking you about
13   polypropylene being used in other procedures,
14   one with hernia repair.  You agree that's an
15   acceptable practice, to use polypropylene in
16   hernia repairs?
17       MR. CARTMELL:  Object to the form.
18       THE WITNESS:  I know a number of
19   surgeons that are using polypropylene for hernia
20   applications with a great deal of caution.
21       We know that hernia -- polypropylene
22   for hernias contracts, it draws nerves in.
23       There's a specific entity called
24   inguinodynia, pain along the inguinal area where
25   hernia mesh has been placed, and it started to

Page 157

1    come out in the late 90s when people started
2    using a lot more hernia mesh, a pain entity,
3    chronic pain syndrome, that was diagnosed from
4    this hernia mesh.
5    BY MR. MAZZIOTTI:
6        Q.   Yet it's still being used in hernia
7    repairs, correct?
8        A.   That is correct.
9        Q.   It hasn't been banned in the human
10   body, using polypropylene in the human body, has
11   it?
12       A.   What was that?
13       Q.   Polypropylene has not been banned as a
14   substance to be used in the human body in
15   medical procedures, correct?
16       A.   For -- are we going to talk about POP
17   again because we know --
18       Q.   I'm asking the general question.
19       A.   We know that the FDA has said in order
20   to use polypropylene for pelvic organ
21   prolapse --
22       MR. MAZZIOTTI:  Mark that.
23       THE WITNESS:  -- that the manufacturers
24   have to now show that it is safe and effective.
25       It is not considered to be safe and

Page 158

1 effective which is the 522 order, and more and
2 more doctors have abandoned using polypropylene
3 for pelvic organ prolapse, and it is not a
4 reasonable alternative to use that for pelvic
5 organ prolapse.
6      MR. MAZZIOTTI: All right. Move to
7 strike that last question, but I think my
8 question was --
9      MR. CARTMELL: It's not banned.
10      MR. MAZZIOTTI: Yeah, poly --
11      MR. CARTMELL: He just wants to know if
12 it's been banned.
13      THE WITNESS: It's been banned in
14 Scotland.
15 BY MR. MAZZIOTTI:
16      Q. Other than Scotland, has it been
17 banned --
18      A. I know that Australia is looking at the
19 use of polypropylene in a vaginal application
20 very strongly.
21      Q. But here in the United States and
22 everywhere else except -- where was it,
23 Switzerland?
24      A. Scotland.
25      Q. -- Scotland -- it has not been banned

Page 159

1 in the use --
2      A. UCLA has banned the -- oh, I'm sorry.
3      MR. CARTMELL: He just wants to know
4 anywhere other than Scotland specifically --
5      THE WITNESS: On a national level?
6      MR. CARTMELL: In the U.S., has it been
7 banned?
8      THE WITNESS: There are certain
9 institutions that have banned it, yes.
10 BY MR. MAZZIOTTI:
11      Q. Okay. And you mentioned UCLA?
12      A. That is correct.
13      Q. Any other institutions?
14      A. There are others that I've heard about
15 that I can't remember right off the top of my
16 head.
17      Q. And there are a lot of other
18 institutions that have not banned it, correct?
19      A. That is correct.
20      Q. Did you ever review any Chevron
21 Phillips depositions that talked about why this
22 MSDS caution statement was in there?
23      A. I reviewed Dr. Zakrewski's deposition.
24      Q. Well, what did you take away from
25 Dr. Zakrewski's -- and we'll get you the

Page 160

1 spelling -- what his reason why the medical
2 caution language was in there?
3      A. If you would like to pull out the exact
4 place that he discusses that, it would be much
5 more helpful than for me to try to go from my
6 memory.
7      Q. That's why we asked you to bring your
8 case file with you. I don't have it; I've got
9 cites to it. I can cite to it and tell you he
10 says that it was for litigation purposes, that
11 it was added -- it was not added -- it was not
12 added due to any scientific testing, scientific
13 data, scientific concerns or any other
14 scientific basis. Is that consistent with your
15 memory?
16      A. I do remember that he testified to
17 that, yes.
18      Q. Okay. So when you rely on the MSDS,
19 you do understand it wasn't meant to be a
20 scientific statement that polypropylene's not
21 meant to be used in the human body?
22      MR. CARTMELL: Object to the form.
23      THE WITNESS: Well, that is something
24 that I would have liked to have known, that the
25 MSDS contained the language that it was not

Page 161

1 suitable for permanent implantation.
2 BY MR. MAZZIOTTI:
3      Q. What do you mean, that's something you
4 would liked to have known?
5      A. I was never told that when I went to
6 the Avaulta course, I never was told that when I
7 went to the ProLift course. I was never told
8 that there was a concern about using this as a
9 permanent implantation as a medical device
10 because -- and the reason is I did when I first
11 read this what I think a reasonable doctor would
12 do is I went back and I found why a petroleum
13 company might put that in their warnings.
14      And there's a very nice paper that is
15 in my reference list from a polypropylene or a
16 petroleum company that says that polypropylene
17 is attacked by peroxides, and I know that the
18 vagina is a ripe source of peroxides so if
19 you're going to break down something, you might
20 want to know what happens with it.
21      There's another MSDS that says that
22 it's associated with sarcomas in rats. That's
23 something that's important for me to know so
24 that I can give that information to my patients.
25 There are some patients that absolutely don't

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

Page 162

1   want to be exposed to anything that is
2   associated with cancer even if that says that
3   it's been shown to have caused sarcomas in
4   laboratory rats.
5       Q.   Do you know if Chevron actually knew
6   that the polypropylene was being used in
7   transvaginal mesh?
8       A.   From the internal documents that I saw
9   is that when Chevron or Phillips Sumika which I
10  think is the parent company of Chevron Phillips
11  found out that it was being used in a medical
12  application, they terminated the agreement which
13  tells me that no, they probably didn't know
14  because once they did find out, they didn't want
15  it used anymore.
16      Q.   Okay.  So do you know one way or the
17  other if Chevron knew that its polypropylene was
18  being used in transvaginal mesh?
19          MR. CARTMELL:  Objection to asked and
20  answered.
21          THE WITNESS:  All I can say is that
22  there's a significant amount of e-mails that say
23  that Chevron found out about our medical
24  application, and they don't want to even give us
25  one last run if we indemnify them from

Page 163

1   liability.
2   BY MR. MAZZIOTTI:
3       Q.   Would it surprise you if Chevron did
4   know it was being used in transvaginal mesh?
5           MR. CARTMELL:  Object to the form.
6           THE WITNESS:  If you have such a
7   document, I would be very happy to take a look
8   at it.
9   BY MR. MAZZIOTTI:
10      Q.   Would it surprise you if Chevron knew
11  polypropylene was being used in transvaginal
12  mesh?
13          MR. CARTMELL:  Object to the form.
14          THE WITNESS:  If you have such a
15  document, I'd like to see that, but from what I
16  saw in their -- in the Bard internal documents
17  that they seemed to be surprised that it was a
18  medical application and did not want to be
19  involved with a medical application after they
20  found out that it was being used in a medical
21  application.
22  BY MR. MAZZIOTTI:
23      Q.   You don't know one way or the other,
24  though?
25      A.   No.

Page 164

1       Q.   Okay.  Are you a member of the American
2   Urogynecologic Society?
3       A.   No.
4       Q.   You're familiar with their position
5   statements, correct?
6       A.   That is correct.
7       Q.   And you're aware that they are
8   agreeable with polypropylene vaginal mesh being
9   implanted?
10          MR. CARTMELL:  Object to the form.
11          THE WITNESS:  They state in -- you're
12  talking about the 2014 position statement,
13  right?
14  BY MR. MAZZIOTTI:
15      Q.   Well, there are several, but 2014, yes,
16  we'll go with that one.
17      A.   It states that according to the FDA
18  website which they must agree with because they
19  put it in their statement that the safety and
20  efficacy of slings has been demonstrated up to
21  one year, up to one year.  They don't state that
22  it's safe and effective for the life of the
23  patient.
24          A 45-year old gets a polypropylene
25  vaginal mesh product placed.  The average life

Page 165

1   expectancy for a female in the United States is
2   about 85 years of age.  That means it's going to
3   be there for 40 years.  I would like to know and
4   my patients would like to know that the safety
5   and efficacy has been demonstrated not up to one
6   year but for the life of the patient.
7       Q.   You agree that the position statement
8   states polypropylene material is safe and
9   effective as a surgical implant?
10      A.   And then they go on to say that the
11  safety and efficacy has been demonstrated up to
12  one year.
13      Q.   No.
14          Polypropylene material has been used in
15  most surgical specialties including general
16  surgery, cardiovascular surgery, transplant
17  surgery, ophthalmology, otolaryngology,
18  gynecology and urology for over five decades?
19      A.   That's what that states, and I think
20  we've talked about some of the data on those
21  five decades.
22      Q.   Well, do you agree that it's safe and
23  effective as a surgical implant or it has been
24  safe and effective as a surgical implant for
25  over five decades?

Page 166

1 MR. CARTMELL: Object to form.

2 THE WITNESS: It's been used for five

3 decades. I think we've talked about the data

4 that will question whether or not it actually is

5 safe and effective.

6 BY MR. MAZZIOTTI:

7 Q. Just so -- you disagree with that

8 statement then?

9 A. I agree that that's what it states. I

10 disagree with that statement.

11 Q. Specifically what article or literature

12 are you referring to with regard to pelvic mesh

13 and polypropylene?

14 A. About its safe and efficacy?

15 Q. Correct, specifically with pelvic mesh

16 in humans. Let me also qualify it there.

17 A. Okay. What complication do you want me

18 to start with?

19 MR. CARTMELL: I'm unclear about what

20 the question is.

21 THE WITNESS: And how much time can I

22 have?

23 MR. CARTMELL: Hold on.

24 BY MR. MAZZIOTTI:

25 Q. Okay. When you say poly -- when you

Page 167

1 disagree, I understand you agree this is what it

2 states, but when you disagree that polypropylene

3 material is safe and effective as a surgical

4 implant, what specific literature are you

5 referring to as it relates to pelvic mesh

6 implants?

7 A. The data that shows that it degrades,

8 it contracts, it deforms and it sets up a

9 chronic foreign body reaction, chronic

10 inflammation, chronic subclinical infection

11 which explains why you get vaginal erosions or

12 extrusions, you get urethral or bladder

13 erosions, you get chronic pain, you get

14 dyspareunia, you get overactive bladders, you

15 get obstructed voiding, you have patients that

16 you cannot take this mesh out of.

17 That's why I say that this is -- and it

18 is an unsafe product for permanent implantation

19 as a device to treat stress urinary incontinence

20 and pelvic organ prolapse.

21 All the literature is in my report.

22 Now, if you want to talk about what specific,

23 you know, degradation, I think we've talked

24 about it.

25 Q. Correct.

Page 168

1 A. Contraction, we've known that mesh

2 contracts since the 90s. The early papers came

3 out, Ahmed's paper, Klinge and Klosterhalfen's

4 paper, Cobb's paper. It's all over my report

5 about contraction of mesh. The mesh contracts

6 30 to 50 percent. Okay?

7 Chronic foreign body reaction, we know

8 that from Klinge and Klosterhalfen's work that

9 the chronic foreign body reaction doesn't ever

10 go away.

11 We know that subclinical infection can

12 cause various entities such as overactive

13 bladders, erosions.

14 We know that degradation actually

15 causes significant clinical entity such as

16 recurrent severe erosions that can't be treated.

17 That was Wang's 2004 paper.

18 So if you would like me to go on and

19 name every single paper, I mean, it's in my

20 report.

21 Q. Where in your report? Maybe that's the

22 way to do it. Show me where it is in your

23 report.

24 MR. CARTMELL: Just so it's clear, you

25 have his report that cites some --

Page 169

1 MR. MAZZIOTTI: Correct.

2 MR. CARTMELL: -- literature. You also

3 have an exhibit attached to -- with hundreds if

4 not a thousand articles.

5 Do you want him to go through his

6 reliance list and tell you every single article

7 that he relies on for support that he thinks --

8 MR. MAZZIOTTI: No.

9 MR. CARTMELL: -- the benefits are

10 outweighed by the risks?

11 MR. MAZZIOTTI: No.

12 BY MR. MAZZIOTTI:

13 Q. When you refer to it being in your

14 report, are you referring -- I assumed -- and

15 maybe that's a mistake -- that it's in the

16 actual written report, not where you have cites

17 in your report where you make a statement and

18 you cite to it.

19 A. Yes.

20 Q. That's what I'm referring, not to the

21 documents that are attached or the list of

22 documents you relied on.

23 A. No, it's all spelled out in my report.

24 Q. And give me an example of what you're

25 talking about.

Page 170

1   Are you saying it's in the -- when you
2 say it's spelled out in your report, are you
3 referring to the attachment, or are you
4 referring to the report itself?
5  A. No. To the report itself when I talk
6 about degradation, when I talk about
7 deformation, when I talk about chronic foreign
8 body, chronic infection, chronic inflammation.
9  Q. Then let's go there. Let's get what
10 you're referring to so I know when you say "It's
11 in my report" what you mean by that.
12  A. Okay. We're going to be here for a
13 couple of days.
14   MR. CARTMELL: See, I think you guys
15 aren't communicating.
16   MR. MAZZIOTTI: Yeah.
17   MR. CARTMELL: We can go off the record
18 if you want. Here -- do you want to go off the
19 record?
20   MR. MAZZIOTTI: Yeah, let's go off the
21 record. And I don't disagree. I'm just trying
22 to get on the same page.
23   MR. CARTMELL: I know.
24   THE VIDEOGRAPHER: The time is 2:11.
25 We are off the record.

Page 171

1   (Whereupon, a short recess
2   was taken.)
3   THE VIDEOGRAPHER: The time is 2:19.
4 We're back on the record.
5 BY MR. MAZZIOTTI:
6  Q. Okay. Dr. Rosenzweig, basically what I
7 was asking, when you say "It's in my report" for
8 something you said related to an example, -- and
9 I don't know specifically what we were talking
10 about -- I'm curious what you mean by that,
11 "It's in my report." Can you give me an example
12 of what you mean by "Here's my support for that
13 opinion"?
14  A. Sure.
15   If you want to go to "Degradation," the
16 support for my opinion are in all the footnotes
17 that I described in the bottom of the page plus
18 the additional material in my reliance list.
19  Q. Have you conducted any research to
20 determine whether polypropylene actually causes
21 cancer?
22  A. Have I done any --
23  Q. Research.
24  A. Bench research, not just reviewing the
25 literature?

Page 172

1  Q. Well, my question first is research.
2 I'm going to get to review -- your literature
3 review in a second.
4  A. No, I have not.
5  Q. Now we're going to talk about
6 literature review, and I understand from prior
7 depositions you talked about an association?
8  A. That is correct.
9  Q. Okay. Other than you have testified
10 that there could be an association between
11 polypropylene and cancer, are you aware of any
12 literature that says that polypropylene causes
13 cancer?
14  A. That direct causation has not been --
15 has not been uncovered yet, but we're starting
16 to get more and more data out. And, you know,
17 just like with the polyester that I discussed
18 before that there has been shown to be a
19 causal -- a stronger association, maybe even a
20 causal effect between polyester and certain
21 cancers. We might find that out in the future
22 about polypropylene.
23  Q. But as we sit here on October 29 of
24 2014, there's no literature at this time that
25 polypropylene causes cancer, correct?

Page 173

1  A. In humans.
2  Q. In humans.
3  A. Because there is data that it can cause
4 cancer in laboratory rats and in household pets.
5  Q. Okay. To be clear, as we sit here
6 today in 2014, there's no literature that states
7 there is a causal effect between polypropylene
8 and cancer in humans -- well, strike that. I
9 want to make it even more specific.
10   As we sit here in 2014, there's no
11 literature that says polypropylene used in
12 vaginal mesh causes cancer in humans?
13  A. That is correct.
14  Q. Do you know whether or not OSHA
15 classifies polypropylene as a carcinogen?
16  A. OSHA, no. The International Agency on
17 Research in Cancer in 1998 says that it is
18 potentially carcinogenic.
19  Q. My question was OSHA.
20  A. Okay.
21  Q. OSHA doesn't classify polypropylene as
22 a carcinogen, right?
23  A. That is correct, but I don't know if
24 OSHA is responsible for classifying things as
25 carcinogenic or not.

Page 174

1    Q.   But you agree with my statement?
2    A.   That is correct.
3    Q.   You said something about International
4 something or other that --
5    A.   Agency for Research in Cancer, yes.
6    Q.   Okay.  And you said -- what is it you
7 said about that particular entity?
8    A.   In 1998, they said that it was
9 potentially carcinogenic because they looked at
10 the data on rats and they found that when you
11 take a product like silicone and implant it
12 subcutaneously in rats, it causes sarcomas 7
13 percent of the time.
14        When you take polypropylene and put it
15 subcutaneously in rats, it causes sarcomas
16 70 percent of the time so it's 10 times more
17 carcinogenic in rats than another plastic like
18 silicone.
19   Q.   And that was a 1998 article?
20   A.   That is correct.
21   Q.   Since that time, have they published
22 anything stronger than it potentially causes
23 cancer?
24   A.   No.
25   Q.   Do you agree that polypropylene is not

Page 175

1 listed as a carcinogen by the National
2 Toxicology Program?
3    A.   That is correct.
4    Q.   I think I may have asked you this in a
5 different way.
6        What is the percentage of complications
7 with women that have Align implants, if you
8 know?
9    A.   What is the complications?
10   Q.   The complication rate.
11   A.   Right.
12        The best study that we have is the
13 Madsen paper that we talked about:  28 percent
14 of women post discharge developed a
15 complication.
16   Q.   I'm sorry.  28 percent?
17   A.   That is correct.
18        10 percent -- close to 10 percent
19 required surgery for that complication whether
20 it's obstructed voiding, whether it's a vaginal
21 erosion.
22   Q.   Other than Madsen, can you point to any
23 other articles for me to look at?
24   A.   Regarding Align specifically?
25   Q.   Correct.

Page 176

1    A.   No.
2        About the complication rate?
3    Q.   That's right.
4    A.   I think that might be the best article
5 that -- or the more pivotal article.  There are
6 other, you know, studies that are out there that
7 discuss complications but not into the detail
8 that the Madsen paper did.
9    Q.   Do you agree that vaginal mesh has also
10 had a positive impact in women when it's been
11 implanted?
12   A.   Now, are we talking -- you keep saying
13 "vaginal mesh."
14   Q.   Right.
15   A.   Are we talking about slings, are we
16 going to be talking about POP, or are we going
17 to be mixing it up?
18   Q.   Yeah, let's not.  Fair point.
19   A.   Because I know we did that earlier
20 today, particularly when we were talking about
21 standard of care and things like that, and, you
22 know, I mean, I might have to try to, you know,
23 focus my answer.  You know, I think when I said
24 no, I don't think --
25   Q.   I understand, I understand.

Page 177

1    A.   -- that POP mesh is a reasonable
2 alternative and therefore would probably not be
3 within the standard of care, I think that with
4 slings that we're getting a growing body of
5 literature that is starting to influence doctors
6 about how reasonable it is to put in suburethral
7 slings made of polypropylene.
8        So if we can do that from now on,
9 just --
10   Q.   If I do that, correct me like you're
11 doing here.
12        MR. CARTMELL:  And just so you know, I
13 mean, I was going to actually follow up on that
14 because when you were talking about standard of
15 care, he was talking about POP, and I noticed
16 that.  So if you want it clarified on the
17 record, I think he just did, but he was
18 answering you related to POP is my only point.
19        MR. MAZZIOTTI:  Right, right.  And I
20 think I understood it that way earlier so I
21 think we were on the same page.
22        THE WITNESS:  But now that we're kind
23 of like -- right.  That's why I thought I wanted
24 to really kind of -- because, you know, you keep
25 asking me about vaginal mesh products, and now I

Page 178

1  want to know are we talking about slings, are we
2  talking --
3  BY MR. MAZZIOTTI:
4      Q.  Right.
5      A.  -- about POP, are we talking about in
6  general.
7      Q.  And fair enough.
8          The polypropylene, --
9      A.  Yes.
10     Q.  -- whether it's slings, POP, whatever
11 it is, your opinions regarding polypropylene in
12 those products doesn't matter if it's a sling or
13 otherwise, right?
14     A.  That is correct.
15     Q.  Okay.  That's why I was saying it
16 broadly, but now I really want to focus on your
17 opinions in this case as it relates to the Align
18 products.
19     A.  Okay.
20     Q.  Okay.  So now that we're clear on that.
21     A.  Okay.
22     Q.  And I've since forgotten what my
23 question was.
24         MR. MAZZIOTTI:  Can I go back?  A
25 little bit farther up?

Page 179

1          MR. CARTMELL:  Oh, has it helped women.
2          MR. MAZZIOTTI:  Yeah.
3  BY MR. MAZZIOTTI:
4      Q.  Okay.  All right.
5          Do you agree that the Bard sling
6  product has also helped women?
7      A.  If you look at midurethral slings in
8  general, I don't think anybody will argue that
9  it has an efficacy associated with it.
10     Q.  So you agree with my statement?
11         MR. CARTMELL:  Object to the form.
12         THE WITNESS:  That it is an effective
13 product for treating stress urinary
14 incontinence, I will not argue with that
15 statement.
16 BY MR. MAZZIOTTI:
17     Q.  Okay.  How about POP?
18     A.  The efficacy compared to native tissue
19 repairs, I would say objectively, for the
20 anterior compartment, the data says that you do
21 get a greater efficacy for objective recurrence
22 of prolapse, not subjective recurrence of
23 prolapse.
24         And the Mayer Cochrane analysis shows
25 that you double the rate of surgery with POP

Page 180

1  mesh products because of the need to reoperate
2  for complications such as a 10 to 15 percent
3  vaginal erosion rate, 15 percent dyspareunia
4  rate, obstructive voiding, overactive bladders,
5  chronic pelvic pain, vaginal scarring.
6      Q.  Can you go to Page 14 of your report?
7  It's under the section "Bard's Align mesh was
8  never meant to be used inside the human body"?
9      A.  Yes.
10     Q.  You talked a little bit about the MSDS,
11 but then you refer to e-mail chains with
12 C.R. Bard?
13     A.  That is correct.
14     Q.  All right.  You don't know what these
15 individuals were thinking when they wrote these
16 e-mails, correct?
17     A.  I do not.  All I did was read the
18 e-mails and let the words that were in the
19 e-mails speak for themselves.
20     Q.  And you're not -- well, when you say
21 that, let's look at some of the statements
22 you've made.
23         You said, "In fact, Bard knew about
24 this and concealed its use."  Did I read that
25 right?

Page 181

1      A.  And where are we?
2      Q.  I'm sorry.  We're still on Page 14
3  under that subheading of one.
4      A.  Okay.
5      Q.  And if you look at the bottom where it
6  says, "In fact, Bard knew about this and
7  concealed its use of this," and you have a cite,
8  resin from the supplier?
9      A.  That is correct.
10     Q.  Okay.  So you are saying that Bard knew
11 about these things and intentionally concealed?
12     A.  From reading the e-mails, that is my
13 opinion, yes.
14     Q.  Do you truly believe that is what these
15 people knew in the e-mails when they sent them?
16     A.  When I read the e-mails, that is what I
17 understood the e-mail chain to be stating.
18     Q.  And are your opinions based on what you
19 believe Bard knew at the time when they were
20 sending -- these employees were sending the
21 e-mails?
22     A.  Can you repeat that question?
23     Q.  Sure.
24         Are you basing your opinions -- when
25 you make the statement "Bard knew about it," is

In Re: CR Bard 200                Bruce Rosenzweig, M.D.                10/29/2014

1  that based on these e-mails when you are opining
2  what they knew at that time?
3     A.   These e-mails, internal documents,
4  deposition testimony.
5     Q.   Are you going to come to trial and
6  opine what you believe Bard knew and when?
7     A.   Regarding the --
8        MR. CARTMELL:  I'll just object and
9  make a record that this has been taken up by
10 Dr. -- or excuse me -- by Judge Goodwin multiple
11 times, and, you know, Judge Goodwin ultimately
12 will decide what he can testify to, but you have
13 his opinions in the report.
14       MR. MAZZIOTTI:  Right.  And I still --
15 I have that understanding as well, and I
16 believe -- well, I can do this outside the
17 presence of the doctor, but I wasn't expecting
18 him to say he'd come in and he's going to
19 testify what Bard knew and when and his
20 subjective opinions about that.  I don't know if
21 he's going to do that or not.
22       MR. CARTMELL:  Well, Judge Goodwin has
23 not ruled that in these cases that he's
24 testifying in.  He may rule that way, and, of
25 course, if he does, then obviously, the doctor

1  will not be allowed to testify in that regard.
2        He has, though, made statements in his
3  reports that you have, and so I think all he can
4  say is what his opinions are.  He can't say what
5  he'll be allowed to testify to at trial.
6        MR. MAZZIOTTI:  Let me --
7        MR. CARTMELL:  I will say as an
8  attorney that I believe there is good support
9  for him being able to testify to what Bard knew
10 in the case law.  Obviously, it may depend on
11 how the law applies in each specific case.
12       He's testifying in general --
13       MR. MAZZIOTTI:  Okay.
14       MR. CARTMELL:  -- so we will be taking
15 the position that he should be able to testify
16 about those things in his report.
17       MR. MAZZIOTTI:  Right.  And that's why
18 I'm asking these questions, in the event,
19 however it works out --
20       MR. CARTMELL:  I don't think you need
21 to ask him.  In the event that the case law
22 allows it, then our intent is to have him
23 testify to what he states in his report.
24 BY MR. MAZZIOTTI:
25    Q.   All right.  And what you state in your

1  report, that's based on the e-mails?
2     A.   The internal documents, the deposition
3  testimonies.
4        MR. CARTMELL:  I guess just to make it
5  clear, Tom, I don't want to say it too strongly,
6  we have heard Judge Goodwin's ruling, and so I
7  can't say for sure we will ask him to do that
8  given the prior, but I don't want to eliminate
9  the chance that we might ask to do that, I
10 guess.
11       MR. MAZZIOTTI:  Right.  And I
12 understand the statements and your opinions.
13 The question is more of what is it based on.
14       THE WITNESS:  And that's what I told
15 you it was based on.
16       MR. MAZZIOTTI:  Correct.  And that's
17 why --
18       MR. CARTMELL:  I understand.
19 BY MR. MAZZIOTTI:
20    Q.   In your report, you mentioned -- and
21 it's Page 17 -- that Bard should have conducted
22 clinically-relevant testing to determine if
23 naturally-occurring conditions in the vagina
24 could cause polypropylene used in Align to alter
25 inside the woman's body.

1        Is that based on any particular
2  regulation, or is that just your opinion?
3     A.   We know that mesh degrades, contracts,
4  creates a chronic foreign body reaction, chronic
5  inflammation, chronic subclinical infection, and
6  it deforms, it ropes, it curls, it frays.
7        Based on my clinical experience, my
8  review of the literature, internal documents and
9  deposition testimony from scientists and medical
10 directors of Bard, that's the basis for that
11 statement.
12    Q.   But there's also been a universe of
13 literature and studies that support the use of
14 mesh inside the human body, correct?
15    A.   There's been estimated to be about
16 2,000 studies on slings, several hundred
17 prospective, randomized, controlled trials.
18       When Dr. Ogah, O-g-a-h, did a Cochrane
19 analysis which is a validated method of
20 obtaining facts from the literature, it pools
21 literature together and allows you to draw
22 conclusions from that, found that the majority
23 of papers on slings were of a moderate level of
24 scientific validity; a lot of them were poor;
25 there were very few that had large enough

Bruce Rosenzweig, M.D.

Page 186

1  numbers of patients to draw meaningful
2  conclusions; the follow up was short term.
3      We know from Nilsson's 17-year study
4  that one out of 50 patients that showed up at
5  17 years had a vaginal erosion/extrusion
6  exposure of mesh.  So we know that these
7  products continue to undergo these changes
8  throughout a woman's life for the 40 plus years
9  that this is in the patient's body, and so
10  therefore, those issues should have been
11  studied.
12      Q.   But that's not based on any law or
13  regulation that's based on what you believe
14  as --
15      A.   That's based on my clinical experience,
16  my review of the literature, my review of
17  internal documents, my review of deposition
18  testimony.
19      Q.   Tell me about your opinion about the
20  chronic foreign body inflammation.
21      A.   Well, when you put a synthetic object
22  in the body, it's like how the body responds to
23  a splinter.  If you pull that splinter out right
24  after it goes in, you might have a little area
25  of redness that gets better after a couple of

Page 187

1  days.  As long as that splinter is in there, the
2  body is going to try to either destroy it or
3  wall it off.
4      What the body does, it goes through an
5  initial inflammatory response and then sends out
6  the more permanent defenders, the macrophages
7  and the monocytes and they come together and
8  form a multinucleated giant cell which then
9  surrounds the mesh.  And it then develops a
10  capsule around it so you get some fibrosis.  And
11  this is what's called a granuloma.  That
12  reaction continues.
13      It's been shown in several studies,
14  those that are not only identified in the body
15  of my report but also in my reliance list.  It's
16  been shown by a Dr. Klinge, Klosterhalfen,
17  several other investigators, that this chronic
18  foreign body reaction does not go away; it stays
19  there and it continues at a level for the life
20  of the foreign body.
21      Q.   Is that true of all foreign bodies that
22  are implanted?
23      A.   There are some that tend to be more
24  reactive than others so you might have a foreign
25  body that has a higher level of reactivity with

Page 188

1  the body and there are some that have a lower
2  level of reactivity with the body so that the
3  body's foreign body reaction then dies out.
4  With polypropylene, it doesn't die out.
5      Q.   But you agree Bard did test the
6  polypropylene before implanting -- before it
7  went to market?
8      A.   Are you talking about --
9      MR. CARTMELL:  Object to the form.
10      THE WITNESS:  Are you talking about the
11  rabbit studies where they put it in for anywhere
12  from four to seven weeks?  So you're saying that
13  we can correlate four to seven weeks of mesh
14  inside a rabbit with 45 plus years inside a
15  human.
16      And secondly, if we're going to use a
17  rabbit model to say whether polypropylene is
18  safe or effective, we should be able to use a
19  rat model and dogs and cats that develop
20  sarcomas from polypropylene.
21      The transponders that the cats and dogs
22  have in their bodies so if they get lost, they
23  go to the ASPCA and they can scan it and find
24  out who the owner is, --
25

Page 189

1  BY MR. MAZZIOTTI:
2      Q.   Right.
3      A.   -- those are wrapped in polypropylene,
4  and cats and dogs have been developing sarcomas
5  from that polypropylene.  The sarcoma was on the
6  polypropylene around these transponders.
7      So if we're going to use an animal
8  model to say that, you know, four weeks inside
9  of a rabbit is okay, we should use a cat or a
10  dog where that polypropylene has been in there
11  for eight to ten years and are developing
12  sarcomas from it as a pretty good model of what
13  the long-term complications are in an animal
14  model.
15      Q.   Is that your understanding as to the
16  only testing that Bard did for these products?
17      MR. CARTMELL:  Object to the form.
18      Just to be clear, are you including
19  bench testing and things like that?
20      MR. MAZZIOTTI:  Yeah, I'm including all
21  testing.
22  BY MR. MAZZIOTTI:
23      Q.   I forgot what the question was, but it
24  was something to the effect:  You would agree
25  that Bard did test the polypropylene products

Page 190

1 before they went to market, something along
2 those lines, and you brought up a rabbit.
3    A.   You're talking about all poly -- you're
4 talking about all polypropylene?
5         I mean, there's a sheep study on the
6 Avaulta, there was a rabbit study on the
7 Avaulta.  There was, you know, bench
8 cytotoxicity studies which is a very short-term
9 cytotoxicity study, but yes, there were those
10 studies that we mentioned.  There were no human
11 trials before these products were launched.
12    Q.   You're not suggesting that any time a
13 medical device is used and goes to market that
14 it has to be tested on humans, are you?
15    A.   There's a growing body of literature.
16 There's a paper by Abrams, there's several
17 others that are in my reliance list that are
18 suggesting that it is safer for patients if the
19 specific product is looked at before a product
20 is launched because each manufacturer of a mesh
21 product touts the difference of their mesh
22 product, either the weave, the pore size, the
23 density of the mesh and says that mine is
24 different from the others but turns around and
25 says that we're all the same because let's look

Page 191

1 at somebody who's got other data.
2         So yes, there is a growing concern in
3 the medical literature about testing each
4 individual device in humans before it's released
5 to the general population.
6    Q.   I understand your statement about the
7 literature.  Is it your opinion that before a
8 medical device is to be used in humans, it must
9 be tested on humans?
10    A.   That's a different question than what
11 you asked me the first time.  You asked me if
12 there are any regulations about that.  I think
13 that was the question that you asked before.
14    Q.   Well, regardless, let's go with my last
15 question.
16    A.   Okay.  My opinion is yes, we need human
17 data on a medical device before it goes to
18 market.  And that's what my patients would like
19 to know, has something been studied before it
20 was ever implanted in the general population.
21         People that are involved in research
22 testing, they know that they're involved in a
23 research study, and they're willing to accept
24 the risks of being involved in a research study.
25         Patients who are being implanted with a

Page 192

1 device that hasn't been studied don't have the
2 benefit of knowing what the response is to
3 something.  And when I talk to patients about
4 that, they would like to know that there is
5 data, human data, on a product to show not only
6 is it effective which is what most of the data
7 that we have on vaginal mesh products and slings
8 in specific but also is it safe.
9    Q.   I just want to make sure I understood
10 what you just said.
11         It's your opinion any time a medical
12 device is going to be implanted into a human,
13 there needs to be clinical trials involving that
14 device on humans?
15    A.   That is my opinion.
16    Q.   And that's based on your experience,
17 not based on -- well, strike that.
18         What is that based on?
19    A.   As I said, there is a growing body of
20 literature particularly about these products
21 that says -- I think it's in Abrams' study --
22 that less than 17 percent of the devices that
23 came out for transvaginal mesh had any kind of
24 human data on it.
25         And there's a growing concern amongst

Page 193

1 doctors that are actually writing papers about
2 this saying that yes, we need to have clinical
3 human data before products are released so that
4 we know what the risks are, we know what the
5 benefits are so we can counsel our patients
6 about what those are so they can make an
7 informed decision.
8    Q.   I'm not sure if you put it in your
9 report, but are you aware of what a 510(k)
10 submission is?
11    A.   I think I testified earlier that on the
12 amnioinfusion catheter, my coinventor and I
13 actually submitted for a 510(k).
14    Q.   Okay.  I just want to make sure there's
15 a foundation for the question.
16         So you're familiar with that process?
17    A.   That is correct.
18    Q.   Okay.  Any time a device is going to be
19 used for implant in a human, it should not be
20 allowed to go through the 510(k) process?
21         MR. CARTMELL:  Well, object to the
22 form.
23         THE WITNESS:  I mean, that's a
24 decision -- you're asking me about my opinion
25 and the opinion of doctors that are writing

Page 194

1 about that in the literature. Okay?
2      Now, that is the 510(k) process
3 or the -- which is a clearance to sell the
4 product or a premarket approval process, that's
5 a regulatory issue.
6 BY MR. MAZZIOTTI:
7    Q.  Correct.
8    A.  I'm telling you from a medical
9 perspective as a doctor that's giving patients
10 information so they can make an informed
11 decision about having a medical device implanted
12 permanently in their body which had no clinical
13 data, and 17 years out, we have no known,
14 reliable, valid way of taking out these products
15 in totality when a patient has a complication.
16      That is why my opinion and others'
17 opinions are that devices should be studied
18 before they are out.
19      Now, the 510(k) process is nice when
20 you have, like, a surgical drape that you're
21 just kind of changing the shape so that it
22 doesn't have to go through a whole clearance
23 process, but when we're talking about a
24 permanently-implanted medical device, yeah, I
25 would like to see human data.

Page 195

1      MR. MAZZIOTTI: I'm going to move to
2 strike.
3 BY MR. MAZZIOTTI:
4    Q.  I was just asking if you had an opinion
5 on it, and I think you said, "510(k), that's
6 regulatory, that's not my -- within my area of
7 testimony"?
8    A.  How the decisions are made about what
9 needs a 510(k), what needs premarket approval,
10 that is not what I'm going to testify on.
11      What I'm going to testify is on by my
12 clinical experience, my medical knowledge, my
13 daily interaction with patients.
14    Q.  How long do these -- with your opinion
15 that there needed to be studies before medical
16 devices are implanted in humans, how long do
17 those clinical studies last?
18    A.  If you have a permanent device that's
19 going to be in for 40 years in the average
20 woman, give or take, I think you should have
21 long-term data. Long-term data is five to ten
22 years.
23      May I explain why that is?
24    Q.  Let me ask you that.
25    A.  Okay.

Page 196

1    Q.  That way, it's not -- we'll get to
2 that.
3      So you're saying for a clinical trial,
4 you would -- for a medical device that's going
5 to be implanted in somebody for long term, you
6 want five to ten years of clinical trials,
7 correct?
8    A.  That is correct.
9    Q.  Okay. And why is that?
10    A.  Well, because when we look
11 retrospectively at these devices, slings and
12 mesh devices, over 50 percent of these
13 complications start showing up after two years.
14 It's Marcus-Braun's study and some of the other
15 large cohorts of patients that have
16 complications.
17      You're not going to pick that up in one
18 to two years which is what the average study --
19 I mean, a lot of the studies pretty good on
20 vaginal mesh is only six months. And, you know,
21 most of the studies on slings are just one year.
22      With the obturator sling, there's only
23 one seven-year study, and the cohort on the
24 17-year data which was the 11-year data, the
25 seven-year data, the five-year data and the

Page 197

1 two-year data is a group of 91 patients.
2      Now, there are problems with that data
3 which have been discussed in other reports and
4 other testimony, but that is the long-term data
5 that we're talking about.
6    Q.  And the Align, how long has the Align
7 been out?
8    A.  Since 2007.
9    Q.  Okay. So we have that data now,
10 correct? Basically, under your clinical trial
11 of five to ten years, the Align's been out for
12 more than five years, right?
13    A.  Right, but we don't have prospective,
14 randomized, controlled trials that tell us.
15      We have the Madsen paper. We have the
16 Madsen paper that says that 28 percent of
17 patients have a postdischarge complication, 10
18 percent of patients need to go back to the
19 operating room to fix a long-term complication,
20 5 percent surgical need for erosions and only a
21 50 percent satisfaction rate and a
22 less-than-50-percent success rate.
23    Q.  Are there any other papers that
24 contradict the Madsen paper?
25    A.  That contradict it?

In Re: CR Bard 200                     Bruce Rosenzweig, M.D.                     10/29/2014

Page 198

1    Q.   Correct.
2    A.   There are other papers that show
3  different data.
4         The Stevens paper shows that there's an
5  11 percent obstructed voiding rate at one year.
6  That shows that this mesh curls, ropes, deforms,
7  increases tension with difficult sheath removal,
8  the things that I talk about in my report.
9    Q.   And it also shows that the majority of
10 patients that have an Align do not have
11 complications?
12   A.   You mean more than 50 percent?
13   Q.   Well, I mean, yeah, more than -- well,
14 you said 10 percent so 90 --
15        MR. CARTMELL:  In that paper?
16        THE WITNESS:  That's returning to the
17 operating room for surgical complication, okay,
18 or for a complication that needs surgery for a
19 complication to fix.
20        That is actually a pretty significance
21 number.  As a clinician, that is a pretty
22 significant number, and that is a number that I
23 think would worry my patients if I told them
24 that I'm going to put this in, it's minimally
25 invasive, it takes me 20 to 25 minutes to do,

Page 199

1  and then you have a 10 percent chance of going
2  back to the operating room to have a surgical
3  procedure to fix something.
4  BY MR. MAZZIOTTI:
5    Q.   Based on Madsen?
6    A.   That is correct.
7        MR. MAZZIOTTI:  Okay.  Let's take a
8  break.
9        MR. CARTMELL:  Okay.
10       THE VIDEOGRAPHER:  This is the end of
11 Disc Number 2.  The time is 2:55.  We are off
12 the record.
13           (Whereupon, a short recess
14            was taken.)
15       THE VIDEOGRAPHER:  This is the
16 beginning of Disc Number 3.  The time is 3:15.
17 We are back on the record.
18 BY MR. MAZZIOTTI:
19   Q.   Doctor, with regard to your opinion
20 about polypropylene and it causing -- well,
21 being associated with cancer, are you familiar
22 with any literature that contradicts that
23 opinion?
24   A.   Are you discussing the
25 point-counterpoint in the international journal?

Page 200

1    Q.   No.  I'm -- does that contradict your
2  opinion?
3    A.   Well, it's opinions that people had
4  written about it, but, you know, one of the
5  problems I had with that is there is some
6  literature that's out there that the authors
7  obviously didn't see and therefore, you know,
8  didn't talk about the association that we had
9  talked about before.
10   Q.   Is that the only literature you can
11 think of that disagrees with your opinion that
12 there's an association between polypropylene and
13 cancer?
14   A.   I think there are other people that
15 have opined that there might not be an
16 association.
17   Q.   When you say "other people," is this in
18 literature, or is this in testimony in
19 litigation?
20   A.   I think in the literature, too.
21   Q.   Okay.  I neglected to ask you about how
22 you came about putting together the list of
23 documents, preparing your report.
24        I think you said you were contacted in
25 March of 2014 about this lawsuit or about this

Page 201

1  litigation?
2    A.   I think I said in May.
3    Q.   In May, something like that.  All
4  right.
5        So when did you first start receiving
6  records in this case?
7    A.   Records, you mean case-specific
8  records, or are you talking about internal
9  documents?
10   Q.   Documents that helped you form your
11 opinions that resulted in the Rule 26 report
12 we've marked as Exhibit 1.
13   A.   The general causation report?
14   Q.   Correct.
15   A.   And again, we had already talked about
16 that I had already worked on and reviewed a
17 plethora of literature or a plethora of
18 documents regarding the Align for other cases
19 that I worked on and Avaulta for other cases
20 that I worked on.
21   Q.   I thought -- and it's my mistake.  I
22 thought you said it was Avaulta that you had
23 worked on before.  You've also worked on an
24 Align case?
25   A.   That is correct.

Page 202

```
 1    Q.   Okay.  So what did you already have in
 2  your possession that -- and you can be general.
 3  Well, let me ask it, then we'll go forward.
 4        What did you already have in your
 5  possession before you were contacted in March
 6  of 2014 about this particular piece of
 7  litigation?
 8    A.   May.
 9    Q.   Golly.
10        MR. CARTMELL:  It starts with an M.
11        THE WITNESS:  Right.
12        MR. MAZZIOTTI:  Yeah.
13        MR. CARTMELL:  Don't be so picky.
14        THE WITNESS:  I'm sorry.  I just want
15  it to be correct.
16        MR. CARTMELL:  I'm kidding, I'm
17  kidding.
18  BY MR. MAZZIOTTI:
19    Q.   I want you to be correct, too.
20    A.   You know, again, I had reviewed just
21  about all the depositions of, you know, key Bard
22  personnel.
23    Q.   Was that -- again, listen to my
24  question.  I think you're talking about
25  something different.
```

Page 203

```
 1    A.   Yes.
 2    Q.   Prior to May 2014, did you already have
 3  those depositions of Bard key personnel that you
 4  had reviewed?
 5    A.   Yes.
 6    Q.   Okay.
 7    A.   I had them, I reviewed them.  I had the
 8  vast majority of the internal documents from
 9  over a year before.
10    Q.   I guess the better way to ask it then,
11  since May of 2014, what documents have you
12  received?
13    A.   I can't tell you which ones, you know,
14  have the Bates stamp on it.
15        I'd received other documents.  Most of
16  them I had previously reviewed so it was just a
17  compilation of things that we were going to be
18  using in my report, but the vast majority I had
19  already looked at.
20    Q.   What went into your preparation of this
21  report?  How did you go about doing it?
22    A.   How did I go about doing that?
23    Q.   Preparing it, drafting it, right.
24    A.   Well, a lot of the information
25  regarding polypropylene has been in other
```

Page 204

```
 1  reports that I have written.
 2    Q.   Did you have access to other expert
 3  reports when you drafted your Rule 26 report?
 4    A.   No.  Well, I had access to other
 5  expert -- you know, I've reviewed in other
 6  litigations expert reports, but those did not --
 7  I did not use those in drafting this specific
 8  report.
 9    Q.   Do you know if your report mirrors any
10  of the other expert reports in this litigation?
11    A.   I would not be surprised if other
12  reports kind of cite the same internal documents
13  and deposition testimony.
14        I don't know if other people have read
15  my reports that have liked various sections of
16  my reports and have subsequently used those, but
17  I do not know if my report -- I think my report
18  is pretty unique so I don't know if -- yeah.
19    Q.   In other words, you think your report's
20  independent of other reports?
21    A.   For me, it is, yes.
22    Q.   Okay.  That's what I'm asking, for you.
23    A.   Yes.
24    Q.   Okay.  You would agree that there's
25  also literature out there that says Bard mesh is
```

Page 205

```
 1  intended to be used in the human body?
 2    A.   There is --
 3    Q.   There is -- let me say it this way.
 4        You had mentioned how the mesh product
 5  which contains polypropylene was not intended to
 6  be used in the human body permanently.  Did I
 7  summarize that fairly accurately?
 8    A.   I think as a transvaginal application.
 9    Q.   Okay.  I like the way you said that.
10    A.   Thank you.
11    Q.   But there is literature out there that
12  says it is okay to use polypropylene in
13  transvaginal mesh?
14    A.   There are studies that might come to
15  the conclusion that there is an efficacy
16  associated with the use of polypropylene
17  transvaginally.
18        They might have looked at very
19  short-term safety issues, however, if we look at
20  long-term safety issues, I think that if you
21  look at this long enough, you're going to find
22  some significant safety issues associated with
23  the product.
24    Q.   But in all fairness, you don't know
25  whether there's going to be these long-term
```

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

Page 206

1  complications just like they don't know there
2  will not be long-term complications, correct?
3      A.  No, I --
4      MR. CARTMELL:  Object to the form.
5  Go ahead.
6      THE WITNESS:  I think that we have a
7  very good understanding that mesh contracts,
8  degrades, deforms and sets up a chronic foreign
9  body, chronic inflammatory, chronic infectious
10  response.  Each of those will set up -- is
11  associated with the clinical complications that
12  we see.
13      There is no time where you can say that
14  a woman is out of risk for developing a
15  complication such as pain, erosion, extrusion.
16      And there's a paper by Hinoul -- and
17  I'm mispronouncing his name -- from Scandinavia
18  where there was a bladder erosion nine years out
19  in their 10-year follow-up data so that we don't
20  know how many patients are ultimately going to
21  end up with a significant complication from
22  their transvaginal mesh.
23      We do know from the data that's out
24  there that there are going to be a significant
25  number of women that are going to have problems

Page 207

1  with their transvaginal mesh.
2  BY MR. MAZZIOTTI:
3      Q.  How can you say you know they're going
4  to -- prospectively, how do you say you know
5  they're going to have problems?
6      A.  Well, we know that there is no -- from
7  Nilsson's 17-year data, we know that erosions
8  can continue to occur, erosions to the vagina,
9  erosions into the urethra, contraction.
10      Latowski's -- that's pronounced
11  wrong -- it's part of the French TVM group --
12  showed that mesh continues to contract when
13  following it ultrasonographically up to eight
14  years.  The linear contraction goes up.
15      Petri's 2012 study says voiding
16  obstruction keeps going up every year.
17      So we do know that the longer you look
18  at the data on transvaginal mesh products,
19  slings and POP mesh, the risk doesn't go down,
20  it doesn't go to zero, and contraction,
21  degradation is going to continue for the life of
22  the product, chronic foreign body reaction is
23  going to continue for the product.
24      Chronic subclinical infection, Wang's
25  2008 paper showed that subclinical infections

Page 208

1  are associated with overactive bladders and that
2  these overactive bladders can't be treated
3  medically and that when you have to take out the
4  mesh to get the overactive bladder to go away,
5  in 80 percent of the time that they did that, it
6  was associated with bacteria, 50 percent of the
7  time, it was staph aureus.
8      So there is no period where you can say
9  vaginal mesh is now completely risk free, and
10  there is very good data that if contraction,
11  obstructive voiding goes up with time that the
12  number of complications is only going to go up
13  with time.
14      Q.  Can you as a physician identify which
15  patients you believe are going to have
16  complications?
17      A.  No, and that's a problem.  I can't sit
18  down and look at a patient and say, "You are at
19  higher risk or lower risk from complications
20  associated with these products" which I can do
21  with other surgeries.
22      Q.  Okay.  Are you aware that the FDA
23  Advisory Committee found in 2011 that the safety
24  and efficacy of midurethral slings such as the
25  Align had already been established and did not

Page 209

1  require additional studies?
2      MR. CARTMELL:  Object to the form.  I
3  think that misstates the evidence.
4      You can answer.
5      THE WITNESS:  They do state that safety
6  and efficacy has been demonstrated up to one
7  year.
8  BY MR. MAZZIOTTI:
9      Q.  And then after that, your opinion is --
10  well, strike that.
11      Are you aware of any studies or
12  literature that have opined that the Align --
13  well, strike that.
14      Are you aware of any studies or
15  literature that says vaginal mesh is safe long
16  term?
17      A.  There are long-term studies, okay.
18  Very few.  There's a seven-year study on the
19  obturator sling.  There's a 17-year study on the
20  retropubic sling.  There is a dearth of
21  five-year studies on transvaginal mesh.
22      So no, we don't have something that
23  says that there is a period of time where the
24  patient is now risk free.
25      And that goes back to Abbott's study,

Page 210

1  Marcus-Braun's study that tells you that the
2  majority of complications start showing up two
3  years afterwards, and that Abbott study says
4  75 percent of patients don't go back to the same
5  doctor or the same clinic so that the people
6  that are writing the studies have only a
7  25 percent chance of picking up all of the
8  complications that are out there.
9      So if we say that the long-term risk of
10 voiding obstruction is 5 percent which is when
11 you take all the data on retropubic slings,
12 we're probably only capturing a quarter of it.
13     When we say that the long-term risk of
14 pain -- and that's from Laurikainen's paper,
15 groin pain -- is 5 percent, it's probably four
16 times that or five times that based on what
17 Abbott's study found.
18     When we say that the risk of nerve
19 injury from an obturator sling, that's based on
20 Brubaker's two-year analysis of the TOMAS data
21 showed that the risk of nerve injury is -- at
22 two years is 2 percent, it's probably higher
23 than that.
24     So that's where I say that there is
25 evidence from long-term data that's out there.

Page 211

1  And when you show that most of the patients
2  aren't even going back to the same institution,
3  the risk of these complications is much higher
4  than we know about and doesn't ever go down to
5  zero.
6      Q.   Going back to my question, and that was
7  simply are you aware of any literature or
8  studies that state that vaginal mesh is safe
9  long term, I think you mentioned there were two
10 studies; is that right?
11     A.   The two -- the long --
12         MR. CARTMELL:  No.  I'll just object to
13 the extent it misstates his testimony.
14         MR. MAZZIOTTI:  Yeah, and I don't mean
15 to.  That's why I said "is that right."
16         THE WITNESS:  The longest-term study on
17 vaginal mesh products is the Nilsson 17-year
18 data, at 17 years, one out of 50 patients
19 had a vaginal mesh erosion.
20     We don't know what happened to the
21 remainder of the cohort.  And this cohort
22 started out as 141 patients, and then after a
23 year, there was only 91 still in the cohort.  We
24 don't know what happened to the -- excuse me.
25 Sorry.  It started out as 131.  At the end of

Page 212

1  one year, it was down to 91 patients.
2      We don't know what happened to the
3  other 40 patients so when we talk about the
4  Nilsson data, there's a cohort of that original
5  Nilsson data that's missing, and we have
6  absolutely no idea what happened to them.
7  BY MR. MAZZIOTTI:
8      Q.   Other than the Nilsson study, was there
9  another study you were referring to earlier?
10     A.   That was the 17 -- excuse me --
11 seven-year transobturator sling study.  It's
12 Athanasiou.  It's an Egyptian study.  That's the
13 two longest-term data points that we have for
14 vaginal mesh products.
15     Q.   And you agreed earlier there is
16 literature out there that states that the
17 vaginal mesh that contains polypropylene is safe
18 for use in the human body, right?
19         MR. CARTMELL:  Object to the form.  I
20 think it's been asked and answered.
21         MR. MAZZIOTTI:  It has.  It's setting
22 up my next question.
23 BY MR. MAZZIOTTI:
24     Q.   Do you recall testifying to that
25 statement earlier?

Page 213

1      A.   I said it has been shown to be
2  effective.  Okay?  The efficacy no one is
3  arguing about.
4      Q.   Okay.
5      A.   The safety, because the vast majority
6  of studies are poor and they don't have
7  long-term follow up, that the safety has not
8  been established.
9      Q.   And you answered my question, and let
10 me make sure where I was going.
11     You dispute those statements because,
12 first of all, it's not long term, right?
13     A.   That is correct.
14     Q.   And you said something about those
15 studies are poor.  What do you mean by that?
16     A.   Well, of a moderate to poor.
17     That's Dr. Ogah who did the Cochrane
18 analysis in 2009, their assessment of reviewing
19 the quality of the literature, that it was
20 moderate and there was a significant amount that
21 was of a lower grade and then there were few
22 good long -- or good studies, but the vast
23 majority of studies are too short term to give
24 you a definitive idea of safety.  That was the
25 big conclusion:  We don't have safety data.

Page 214

1    And I agree with that from what I see
2  every day in my practice.
3     Q.   And that's where you mentioned earlier
4  you would like to have studies that are -- or at
5  least be able to study it for a five-to-ten-year
6  period?
7     A.   That's not just what I say.  That's
8  what the French regulatory agency said back in
9  2006 or 2007.
10    Q.   Yeah, but I'm here deposing you and
11  what your opinions are.
12    A.   Right.  And that helps me base my
13  opinions on what a French regulatory agency said
14  seven years ago, that we need five-to-ten-year
15  data to be able to state whether this is
16  actually a safe or effective product.
17    Q.   You said something about where there
18  were complications or something that it was
19  probably four to five times greater.  Do you
20  remember saying something like that?
21    A.   Yes.  That is based on the Abbott paper
22  that says that 75 percent of patients did not go
23  back to their -- even the institution, let alone
24  the doctor that implanted their mesh product.
25         And their conclusion was that doctors

Page 215

1  do not know the complications that they're
2  generating by their mesh products, and so
3  they're going to continue to think that their
4  experience is that patients are complication
5  free when the doctor is going to a different
6  doctor or institution 75 percent of the time to
7  treat their complications which means that
8  complications are under reported by
9  three-quarters.
10         MR. CARTMELL:  Just to make it clear,
11  you said doctors are going to different doctors.
12         THE WITNESS:  I mean, yeah, patients
13  are going to different doctors.  Thank you.
14  BY MR. MAZZIOTTI:
15    Q.   I think you said the conclusion you can
16  make is that complications are going under
17  reported?
18    A.   That is correct.  I think everybody
19  says that.  I think that's what the FDA says.
20  That was Boyles' 2007 analysis of the mod
21  database that for every one complication that's
22  reported, there are 10 to 100 that go
23  unreported.  That's Kessler's assessment, and
24  that's the British version of the FDA said that
25  100 complications get reported.

Page 216

1     Q.   And that's what I wanted to ask you
2  about.  When you say it's four to five times
3  greater, 10 to 100 are not getting reported,
4  what is that based on?
5         You mentioned something, the British,
6  but other than -- tell me what you mean by that.
7     A.   Boyles' 2007 -- B-o-y-l-e-s -- did a
8  mod analysis on transobturator slings and said
9  we're starting to see a new group of
10  complications such as necrotizing fasciitis,
11  obturator abscesses, chronic pain, groin pain,
12  dyspareunia, difficulty walking and said that
13  when we looked at the mod data bank, the
14  conclusion was and from other information that
15  for every one complication that's reported,
16  there's ten to a hundred that are going
17  unreported.
18         That's the same thing that the FDA
19  said, Dr. Kessler said and the British.
20         Now, the number that I gave you was
21  based on Abbott's study that only 25 percent of
22  patients actually when they had a complication
23  went back to their original facility where it
24  was implanted.  The other 75 percent went to
25  somebody else to actually get that complication

Page 217

1  taken care of.
2     Q.   And the complications you're talking
3  about, you are saying they are directly causally
4  related to the vaginal mesh implanted?
5     A.   That is correct.
6     Q.   You said something that's interesting I
7  hadn't heard about.  Are you saying that there
8  is a potential that vaginal mesh can cause
9  necrotizing fasciitis?
10    A.   Well, in my report, I talk about that,
11  first of all, the vagina can never be
12  sterilized.
13    Q.   I'm just asking about necrotizing
14  fasciitis.
15    A.   We're going to get there.
16         Bacteria adhere to the mesh when it's
17  being implanted, and then bacteria go through
18  two phases.  There's a short-term reversible
19  phase and long-term irreversible phase.  Okay?
20         It then surrounds itself by a
21  polysaccharide substance called a biofilm.
22         THE COURT REPORTER:  A poly?
23         THE WITNESS:  Polysaccharide,
24  p-o-l-y-s-a-c-c-h-a-r-i-d-e.
25         For reasons later, the bacteria can go

In Re: CR Bard 200 Bruce Rosenzweig, M.D. 10/29/2014

Page 218

1  from its cocoon to a subclinical infection to a
2  clinically-apparent infection.
3        And remember I told you about the Wang
4  study that showed that when he explanted the
5  mesh with the overactive bladders, 50 percent of
6  the time, it was associated with staph aureus?
7        Staph aureus is one of the pathogens
8  that's associated with necrotizing fasciitis,
9  and so there are reports in the literature about
10  necrotizing fasciitis associated with slings.
11  BY MR. MAZZIOTTI:
12     Q.   Are you an infectious disease expert?
13     A.   No, but I've treated necrotizing
14  fasciitis my entire career.
15     Q.   That's a very rare condition?
16     A.   That is a very rare condition.
17     Q.   Yeah.  I mean, if you did a swab test
18  of any of our skin right here, you're going to
19  pull staph, aren't you?
20     A.   That is correct.
21     Q.   Okay.  And there's no documented cases
22  that you're aware of that vaginal mesh caused --
23  complications from vaginal mesh caused
24  necrotizing fasciitis?
25     A.   I think there's about a half a dozen

Page 219

1  case reports in the literature about that.
2     Q.   How would I find those, go to PubMed?
3     A.   PubMed, necrotizing fasciitis,
4  transvaginal mesh.
5     Q.   Have you ever had a patient that had
6  necrotizing fasciitis from a vaginal mesh
7  complication?
8     A.   No, but I've worked as an expert
9  witness on a case of necrotizing fasciitis
10  associated with a retropubic sling.
11     Q.   Was that a medical malpractice case?
12     A.   That is correct.
13     Q.   How long ago was that one?
14     A.   I don't think it's on that list.  It
15  was a while back.
16     Q.   Going to Point 4 in your report about
17  roping, curling, cording, rolling, deformation,
18  abrasiveness, fraying, we talked a little bit
19  about this earlier, and that is when the wound
20  is healing, that also causes it to shrink and
21  has other impacts on the mesh, but you're saying
22  over the long term, this is different?
23     A.   Not when the wound is healing so it's
24  not just the vaginal incision and the exit
25  points.  We're talking about the entire length

Page 220

1  of the mesh.
2        So I just wanted to clarify that so
3  that you don't come -- we don't get into a
4  discussion later on saying that it's just where
5  the mesh came out suprapubically or inside the
6  groin or right along the incision.  That's where
7  this contraction is taking place.  It's taking
8  place along the entire length of the mesh.
9     Q.   Do you have an understanding as to why
10  that is happening?
11     A.   Along the entire length of the mesh?
12     Q.   Correct.
13     A.   Well, because the entire length of the
14  mesh is setting up a chronic foreign body
15  reaction which means that the granulomas are
16  surrounding the mesh.  They get close enough
17  together so that there's no space in between
18  them, scarring happens around that, and you get
19  scar plate formation.  As the scar plate
20  matures, it contracts and therefore contracts
21  the mesh.
22     Q.   In some circumstances, is the foreign
23  body reaction a positive thing?
24     A.   If you have tuberculosis, it's a
25  positive thing.

Page 221

1     Q.   But other than tuberculosis?
2     A.   If you have a piece of shrapnel in your
3  body or a retained sponge and it creates a
4  foreign body reaction and walls it off so that
5  it mitigates your symptoms, that would be a
6  positive thing.
7     Q.   In the context of vaginal mesh, do all
8  patients have this foreign body reaction, or is
9  it that only a select number have a negative
10  complication due to the foreign body reaction?
11     A.   All patients because it is a foreign
12  body will develop a foreign body reaction.  Not
13  every patient is going to develop a negative
14  reaction to the foreign body reaction.
15     Q.   What are the rates of complications due
16  to the foreign body response?
17     A.   Okay.  The foreign body response leads
18  to mesh contraction.  We've already talked about
19  mesh contraction can lead to obstructive
20  voiding, can lead to erosion through the bladder
21  or the urethra, can lead to vaginal
22  erosion/extrusion, can lead to pain through the
23  insertion site through muscle, can drag nerves
24  into the mesh or allow a nidus for
25  neo-innervation to happen and then creates pain.

Page 222

1    Q.   I understand what you said.  My
2  question deals with what is the incidence or the
3  rate in which that happens, what is the
4  percentage of patients that have that
5  complication?
6    A.   We've already talked about the under
7  reporting.  We've already talked about from
8  Abbott's study that the number of patients that
9  goes back to the original place where things
10  were implanted is one-quarter of the total
11  number of complications.
12      So what is the rate of obstructive
13  voiding from a suburethral sling?
14      If you look at the 10-year data,
15  Stanson's paper showed that there was a ten-fold
16  increase in obstructive voiding from year one to
17  year ten.
18      So if we add all that together, I would
19  say that -- and obstructive voiding is
20  contraction.  The mesh contracts, it's going to
21  obstruct the voiding.
22      We know from Petri's paper in 2012 that
23  obstructive voiding just goes up with the length
24  of time after a sling is placed.
25      So if we say that the long-term data

Page 223

1  shows that 4 to 5 percent of patients that
2  actually report back to the same facility have
3  obstructive voiding, it's probably four to ten
4  times that amount of patients that have
5  obstructive voiding, but a number of them have
6  already been taken care of.
7      If we talk about erosion, the long-term
8  risk of erosion is anywhere -- well, we know
9  from the Align product that at least 10 percent
10  of patients in Madsen's paper had an erosion so
11  that might be double that amount.  So all of
12  these complications probably happened about
13  20 percent of the time.
14      According to Abbott's paper, 70 percent
15  of the patients have multiple complaints when
16  they come in to someone with a mesh issue.  So
17  if we look at each individual one, then we could
18  say that the chance of having a complication is
19  probably -- if it's 20 percent individually,
20  it's probably adding another third to that so
21  maybe a third to 30 to 40 percent of patients
22  long term are ultimately going to end up with a
23  complication that is going to have an impact on
24  their quality of life, impact on their health
25  and is going to be definitely difficult to treat

Page 224

1  because we have no standardized way of removing
2  transvaginal mesh once it's placed and no
3  reliable way to remove it once it's in place.
4    Q.   If I understand what you just said,
5  your opinion is that 30 to 40 percent of the
6  patients that have a vaginal mesh litigation
7  implant will have a complication long term?
8    A.   I think that when all is said and done,
9  we're going to get pretty close to that number,
10  yes.
11    Q.   And that's based on Abbott and you
12  mentioned another article?
13    A.   The long-term data that shows voiding
14  obstruction is Svenningsen's paper, Olson's
15  paper, Hinoul's paper, Kuuva's paper.  You can
16  put all those together and get your long-term
17  obstruction rate.  Petri's data shows that it
18  keeps going up with time.
19      Your rate of dyspareunia, five-year
20  dyspareunia, Angioli's paper, gives you about a
21  5 percent rate of dyspareunia from their study.
22      The rate of nerve injury and pain,
23  that's Brubaker's two-year analysis of the TOMAS
24  data.  "TOMAS" means transobturator midurethral
25  slings.  It was a prospective, randomized --

Page 225

1    Q.   Slow down.  She's going to have to try
2  to get this down so slow down.
3    A.   It is a prospective, randomized,
4  controlled trial of retropubic slings and
5  midurethral slings.  2 percent of patients at
6  two years had nerve pain that was not going to
7  go away.  They had 10 percent risk of nerve
8  symptoms in the first two years.
9      The risk of groin pain, that's
10  Laurikainen's five-year study of transvaginal
11  obturator slings, it shows that at the five-year
12  rate, 5 percent of patients are going to have
13  groin pain and leg pain.
14      There is a French study that came out
15  early in the 2000s that showed that with
16  retropubic slings, 30 percent of women have pain
17  post retropubic slings.
18      So again, if we look at the factor that
19  there's a significant under reporting of these
20  and the patients aren't going back to the same
21  facility, you can see that their true risk is
22  much higher than that.  And while most patients
23  come in with multiple complaints so we can drop
24  that down by a little bit because patients are
25  going to come in with groin pain and nerve pain

Page 226

1  and dyspareunia or erosion dyspareunia or
2  infection dyspareunia.
3       And I didn't even, you know, talk about
4  the clinically-apparent infection rate is about
5  1 percent long term. And that's from
6  de Tayrac's paper in 2012.
7       We can see that there's a significant
8  breadth of complications that women are going to
9  potentially develop from slings. We're not even
10  talking about the risk of erosion dyspareunia is
11  at least five times higher with vaginal mesh
12  products than with slings.
13       MR. CARTMELL: Okay. She's tired.
14       THE WITNESS: Are you tired? I'm
15  sorry. That was a lot of data to throw out
16  there.
17  BY MR. MAZZIOTTI:
18       Q.  My question was -- let's try this
19  again.
20       MR. MAZZIOTTI: Can you possibly go
21  back up to it? I hate to interrupt.
22       MR. CARTMELL: Off the record.
23       (Whereupon, a discussion was
24       had off the written record.)
25       THE WITNESS: I'm sorry. I've got a

Page 227

1  lot of papers that are running around in my
2  head.
3  BY MR. MAZZIOTTI:
4       Q.  I understand. I understand.
5       If I understood you earlier, you
6  mentioned that there's only two long-term
7  studies -- well, strike that.
8       Have there been any recent studies that
9  have come out -- I'm not talking about the one,
10  I think, years ago -- within the last five years
11  that you're aware of that contradict your
12  opinions about these long-term complications?
13       A.  No. All the studies that are coming
14  out right now are like Abbott's studies,
15  Marcus-Braun's study, Rogo-Gupta's study,
16  Blaivas' study that are all looking at these,
17  you know, long-term complications that they're
18  seeing in their institutions and saying that we
19  are starting to see an increase in the number of
20  people that are coming to our institutions with
21  mesh complications.
22       There are now centers that are
23  dedicated just to managing mesh complications.
24  There's one in Kansas City.
25       I spend a growing amount of time -- I

Page 228

1  see at least three new patients a week right now
2  that have sling and mesh complications.
3       So yes, the case series which is why I
4  brought up that Ogah paper before that says the
5  studies really don't track long-term
6  complications, we need databases and registries,
7  but the registries that were published say we
8  don't track long-term complications.
9       So basically, we are left with these
10  case series that are coming out that are saying
11  what we're experiencing is an ever-increasing
12  number of patients coming to our institutions
13  with sling and mesh complications.
14       Q.  Do you know Dr. Blaivas is identified
15  as an expert in this litigation?
16       A.  That is correct. And it's Blaivas.
17       Q.  Blaivas. I'm sorry.
18       A.  That's okay.
19       Q.  The other doctors you mentioned, are
20  they testifying in vaginal mesh litigation?
21       A.  Dr. Abbott, I don't think so. And that
22  paper is Dr. Mickey Karram. I think Dr. Barber
23  is part of that, Rogo-Gupta, I think he worked
24  with Raz. I know that Raz doesn't testify in
25  this litigation. Dr. Brubaker doesn't testify

Page 229

1  in this litigation.
2       So no, I think that the vast majority
3  of the doctors that are writing these papers
4  that are critical of transvaginal mesh are not
5  testifying as experts.
6       Q.  There were a couple in there I wasn't
7  sure where you were going. Other than Blaivas,
8  the other ones, you're not aware of them
9  testifying in vaginal mesh litigation?
10       A.  That is correct.
11       Q.  You agree as your --
12       MR. KUNTZ: Go ahead. I'm not
13  testifying.
14  BY MR. MAZZIOTTI:
15       Q.  Yeah, it's only what you know.
16       You agree that you're looking at this
17  in hindsight, correct, the complications to
18  vaginal mesh litigation?
19       A.  I know I'm looking at it prospectively
20  by what walks in through the door of my office
21  every day.
22       Q.  No, I agree you're giving opinions
23  prospectively about these, but it's based on
24  what you're seeing in your office today and
25  going back?

Page 230

1    I mean, you've got to have
2 complications in order for you to observe them,
3 right?
4    A.    That is correct, which is why I stopped
5 using these products over seven years ago,
6 because of the kind of complications that I was
7 seeing, because of the life-altering
8 complications that I was seeing that had a
9 significant impact on patients' quality of life.
10    Q.    Do you feel as though you're a more
11 conservative physician than others that are out
12 there either prescribing or implanting?
13        MR. CARTMELL:    Object to form.
14        THE WITNESS:    Conservative in -- what
15 do you mean?
16 BY MR. MAZZIOTTI:
17    Q.    With regard to vaginal mesh.
18        It seems like -- were you one of the
19 first ones who stopped using vaginal mesh in
20 your practice?
21        MR. CARTMELL:    Object to the form.
22        THE WITNESS:    I can't say that.  I can
23 tell you when I stopped using it.
24 BY MR. MAZZIOTTI:
25    Q.    That was what, 2008, I think?

Page 231

1    A.    All mesh products, yes, and 2006, 2007
2 for slings.
3    Q.    Do you get a sense of what other
4 physicians are doing with their practices as it
5 relates to vaginal mesh?
6    A.    Currently?
7    Q.    Currently.
8    A.    Yes.
9    Q.    Okay.  What is that?
10    A.    Particularly for pelvic organ prolapse
11 mesh?
12    Q.    Yes.
13    A.    The sense that I get is that the
14 opinion is that it is not reasonable to implant
15 polypropylene products for the treatment of
16 stress urinary incontinence -- I mean for pelvic
17 organ prolapse.
18    Q.    How about stress urinary incontinence?
19    A.    I think that there is a growing concern
20 and that unfortunately, doctors don't have all
21 the information.  I don't think they have the
22 time to digest the information that I've had.
23        I've also had the opportunity to see
24 many, many things that would change doctors'
25 opinions about the use of slings for the

Page 232

1 treatment of stress urinary incontinence, and I
2 think that more doctors are starting to find
3 that it is an unreasonable treatment for stress
4 urinary incontinence because the risks are
5 significant and the risks outweigh the benefits.
6    Q.    How did you originally get involved
7 with testifying as an expert in vaginal mesh
8 litigation?
9    A.    How did I originally get involved?
10    Q.    Right.
11    A.    I don't remember, actually.
12    Q.    Do you remember when you were first
13 contacted about testifying and rendering
14 opinions?
15    A.    I know that the first person that
16 talked to me about it was Ben Anderson.
17    Q.    Do you know how he found your name?
18    A.    I think I've said this before, that I
19 had a patient that had a vaginal mesh product
20 that had a significant complication, we treated
21 her, we got her better.  So that might be how he
22 heard about me.
23    Q.    And how long ago was that?
24    A.    2011.
25    Q.    What information -- and feel free to

Page 233

1 look at your report.
2        What information do you rely on to
3 support the opinion that Bard knew about
4 degradation of the polypropylene?
5    A.    There are internal documents where they
6 talk about mesh degradation which I think is
7 outlined in my report.
8    Q.    Well, let's go to that.
9    A.    Do you remember what section that is?
10    Q.    I don't.  I'm looking for it right now.
11    A.    It's either two or three.
12    Q.    Two, and Page 18 I have.
13        Go ahead and point me.  What are you
14 referring to?
15    A.    Would you like me to just read the
16 whole thing?
17    Q.    Well, first point me to the page you're
18 talking about and the paragraph.
19    A.    Well, the paragraph starts --
20 unfortunately, I apologize for not numbering the
21 pages.
22        It's Section 2, "Polypropylene mesh in
23 Align degrades over time."  We talk about or --
24 excuse me.  I talk about Dr. Costello's paper
25 from the University of Missouri.  He was someone

Page 234

1  that Bard had worked with in the past.  There's
2  an excerpt here from Dr. Segan, Covidien's
3  global medical director, who talks about mesh
4  degradation.
5      There's documents that talk about
6  knowing about ClavÈ's article about mesh
7  degradation, and there is a response to the MHRA
8  who saw ClavÈ's article and asked:  Well, what
9  did Bard know about mesh degradation.
10      And so those are the various things
11  that are in the report that discusses what
12  information, scientific knowledge that Bard had
13  about mesh degradation.
14      Q.  Is your opinion on what Bard should
15  have done based on what you believe Bard knew,
16  what you were just referring to, how Bard should
17  have responded?
18      A.  Well, that goes back to the fact that
19  it's been well known since the 70s polypropylene
20  degrades when exposed to an oxidizing
21  environment and that Bard should have studied
22  what effect placing polypropylene in the vagina
23  has on the product to know to what extent the
24  degradation takes place, what happens to the
25  mesh once it degrades, what comes out of the

Page 235

1  mesh once it degrades:  Is that cytotoxic, does
2  that cause cancer, does that cause pain, does
3  that cause dyspareunia, does that cause all of
4  the life-altering and life-changing
5  complications that patients undergo that have
6  had vaginal mesh products.
7      Q.  But my question was a little bit
8  different.  Your opinions that you just read in
9  Section 2 about what Bard knew, are your
10  opinions -- the opinions that you've voiced on
11  what Bard should have done, are those based on
12  what you believe Bard knew at that time?
13      A.  They're based on what Bard -- what
14  information was available at the time that you
15  decide to sell a product for permanent
16  implantation of women that cannot be reliably
17  taken out to know what effect degradation has on
18  that product so that doctors can be warned,
19  patients can be warned before they get the
20  product implanted about what effect degradation
21  is going to have.
22      Q.  Is it reasonable in your opinion for
23  Bard to rely on animal studies with regard to
24  pelvic mesh?
25      A.  Well, the animal studies that we had

Page 236

1  from the 90s showed that polypropylene implanted
2  in rats causes cancer in rats so that's an
3  animal study that if you rely on you could say
4  there's an increased risk of cancer.
5      Secondly, as we talked about earlier,
6  the studies in the animal models are all short
7  term.  Okay?
8      You're not reproducing the normal
9  environment inside a woman's vagina with the
10  bacteria, with the peroxides so therefore, it
11  would be very difficult to say an animal model
12  where the mesh is going to be in for two, four,
13  six, eight weeks reproduces what will happen in
14  the female pelvis for 45 years.
15      Q.  Would it be reasonable to do an animal
16  study for a five-to-ten-year period and base
17  your decisions on those studies?
18      A.  We have those where polypropylene,
19  again, is implanted on part of the chips in
20  animals and they're developing sarcomas from
21  that.
22      No, an animal model is not the same as
23  humans.  It can give you some basic information
24  about safety, it can give you basic information
25  about complications from the material, but it's

Page 237

1  not going to tell you how it works in the human.
2      Q.  Okay.  So in short, it's unreasonable
3  to base opinions on implanting a medical device
4  and complications related to it based on animal
5  studies?
6      MR. CARTMELL:  Object to the form.  I
7  think it's vague and ambiguous with respect to
8  what opinions you're talking about.
9      MR. MAZZIOTTI:  Well, I think --
10      MR. CARTMELL:  Are you talking about
11  just degradation, or are you talking about
12  everything?
13      MR. MAZZIOTTI:  I'm talking about what
14  he just testified to.
15      What was that last sentence?
16      MR. CARTMELL:  I just didn't want --
17  you were talking about degradation, and now
18  you've kind of broadened your question.
19      MR. MAZZIOTTI:  I did.
20      MR. CARTMELL:  I don't want --
21      MR. MAZZIOTTI:  You know I did.
22      Let's go back to the last sentence.
23  BY MR. MAZZIOTTI:
24      Q.  I'm going to read what you said and
25  then we'll flesh this out a little bit.

Page 238

1        Okay.  Doctor, we were talking about
2    animal studies, and you said, "It's not going to
3    tell you how it works in the human"?
4        A.   Not how it works.  Okay?  It's not
5    going to tell you what are the long-term risks
6    associated with it in a human.
7             I mean, if this is a short-term
8    implantable device that is easily removed, then
9    you might be able to use an animal model, but
10   this is going to be in a human being for
11   45 years.
12       You'll get data.  As a physician
13   talking to patients about putting a permanent
14   device in their vagina, I don't think that my
15   patients would want that based on five years of
16   an animal model, and I would look at that and
17   say those are data points, but I want to know
18   what the data shows in humans.
19            And people that have looked at that
20   such as the French agency that we talked about,
21   we started to see complications and said we need
22   to study this five to ten years so we know what
23   we're dealing with.
24            I would not solely base placing a
25   permanently-implanted device on animal data.

Page 239

1        Q.   That also includes whether or not mesh
2    causes cancer, correct?  You can't rely solely
3    on animal models?
4        A.   That is correct.
5        Q.   All right.  I'm going to switch gears
6    and talk about your CV.
7             MR. CARTMELL:  That was why you widened
8    the scope of that question.
9             MR. MAZZIOTTI:  Well, that's why you
10   objected.  Well, you know, I'm not here to --
11            MR. CARTMELL:  I'm kidding.
12            MR. MAZZIOTTI:  -- trick him.  I don't
13   like when people do that to me.
14            MR. CARTMELL:  We've got to have fun
15   every now and then.
16            MR. MAZZIOTTI:  True, although this
17   isn't very fun.
18            THE WITNESS:  It's not?
19   BY MR. MAZZIOTTI:
20       Q.   All right.  Let me see what exhibit
21   we're going to talk about here.  Exhibit 3, your
22   CV.
23            All right.  Tell me -- I didn't really
24   see it here, but tell me generally what you do
25   on a day-in-and-day-out basis professionally.

Page 240

1        A.   I see patients in my office on Mondays
2    and -- excuse me -- Tuesdays and Fridays.  I
3    operate on Wednesdays and Thursdays,
4    predominantly on Thursdays.  And Monday is, as
5    call it, my administrative day.
6        Q.   And when you say "administrative day,"
7    is that when you're working on medicolegal work?
8        A.   Part of what I do on that day is work
9    on medicolegal work.  I also up until recently
10   was a preceptor for medical students and I would
11   meet with them on Mondays, but they would be in
12   my office on Tuesdays and Fridays and with me in
13   the operating room, but currently, that,
14   unfortunately, is taken up with doing this kind
15   of work.
16       Q.   Where are the medical students, what
17   university?
18       A.   Rush University.
19       Q.   Do you have a title there?
20       A.   Yes.  I am assistant professor at Rush
21   University Medical Center.
22       Q.   Are you in the Obstetrics and
23   Gynecology Department?
24       A.   That is correct.
25       Q.   Are you board certified?

Page 241

1        A.   In obstetrics and gynecology, yes.
2        Q.   And do you have to update your
3    certification?
4        A.   That is correct.
5        Q.   When is the next time you take your
6    boards?
7        A.   I just recertified for six years last
8    year, but I have to do annual exercises, if you
9    will, but the next time -- to keep my
10   certification going, but the next time I have to
11   take an exam is in six years.
12       Q.   Tell me generally what your patient
13   population is.  In other words, what type of
14   cases are you seeing?  You know, are you seeing
15   complicated gynecology patients?  Give me a
16   flavor again of what you're doing when you see
17   patients in the office.
18       A.   I would say that probably 50 to
19   60 percent of my patients are urogynecological.
20   The remainder are gynecological.
21            I do everything from routine annual
22   exams up to complicated issues such as chronic
23   pelvic pain, fibroids, endometriosis in my
24   gynecologic patients.
25            There's a lot of overlap particularly

Page 242

1   with endometriosis and chronic pelvic pain.
2   They have interstitial cystitis, painful bladder
3   syndrome.  I take care of prolapse.
4        As I said before, an increasing amount
5   of my time is taken up with mesh-related
6   complications.  And I treat stress urinary
7   incontinence and other forms of incontinence.
8      Q.   What percentage of your patients are
9   coming to you for mesh-related complications?
10     A.   As I said, I see about three new
11  patients a week right now that have mesh-related
12  complications.  I see 15 new patients a week so
13  maybe a fifth of my new patients are
14  mesh-related complications.
15     Q.   And what are the range of complications
16  you're seeing?
17     A.   From mesh?
18     Q.   Correct.
19     A.   Significant extrusions.
20        I just did a surgery where we had a
21  patient whose mesh eroded into her bladder with
22  a stone on it so we did that with the urologist.
23  We lasered the stone off, and then we were able
24  to laser the mesh out of their bladder, out of
25  her bladder so that she didn't need an open

Page 243

1   procedure.
2        I have had a few patients that have
3   come to me that have recurrent infections in
4   their ischiorectal fossa from their slings, but
5   the vast majority of patients I see have pain.
6   And that's dyspareunia, pelvic pain, pain
7   walking, pain doing their activities, but
8   chronic pelvic pain and dyspareunia is probably
9   the biggest group of patients that I see right
10  now.
11     Q.   When you're talking about pain related
12  to mesh, what is the -- what is it specifically
13  about the mesh that's causing the pain?
14     A.   Number one, the mesh is placed inside
15  the vagina.  The vagina compared to other parts
16  of the body is highly innervated.  Okay?  That's
17  for the normal sexual response, plus, it's a
18  feedback mechanism for the birth process.  And
19  so you're placing mesh in a very -- an area with
20  a lot of nerves that are already there.
21        We talked about that the mesh degrades,
22  it contracts, it sets up a chronic foreign body
23  reaction, chronic inflammation, chronic
24  subclinical infection, and it ropes, deforms,
25  curls and frays.

Page 244

1        The nervous system is kind of a sentry.
2   We have the first responders, if you will, which
3   are the white blood cells that go in.
4        And then we have the sentries that are
5   back here which are the nerves, and they send
6   out little offshoots that go close to an area of
7   irritation which is a chronic foreign body,
8   chronic foreign body reaction.  And it's been
9   shown in pathology that these nerves are
10  actually growing into the mesh.
11        And also what happens is when the nerve
12  hits the mesh, if there's a scarification around
13  it, it creates a bud called a neuroma.  Both of
14  those things increase the pain associated with
15  the mesh.
16        Sometimes what happens is when the mesh
17  contracts, it takes a nerve that's close to it
18  and draws it nearer to the mesh, and that
19  creates pain.
20        Obviously, we have all had a splinter
21  or a cut, and it's not just the area that's cut
22  that hurts, it's the area around it because what
23  the white blood cells do is they release
24  substances that tell the body there's something
25  there, and it's picked up as pain.  So just

Page 245

1   having the inflammation, just having the chronic
2   foreign body reaction, contraction, degradation,
3   deformation, all of these things lead to pain.
4      Q.   When you -- well, have you done any
5   explants of 100 percent, take the whole -- all
6   the mesh out?  Have you done any of those?
7      A.   I've tried to, yes.  Have I been
8   successful at getting all the mesh out, probably
9   not because remember, the mesh is degrading so
10  it's brittle, it's falling apart so there's
11  pieces of it that are probably still left in
12  place.
13        It also flakes.  When you're pulling
14  the sheath off, the mesh actually flakes off at
15  the time of insertion so those are also in
16  there.  And I've had patients that have had
17  little flakes of mesh all over their vagina and
18  in their pelvis that you can't pull all those
19  out.
20        There's mesh in muscle, and that is
21  Tommaselli's paper that says t h at if you put
22  mesh through muscle, you're invariably going to
23  have pain.  Mesh in muscle causes pain.
24        In the obturator, you're going through
25  four different muscle groups, sometimes five:

Page 246

1  The obturator internus, the obturator externus,
2  the adductor brevis, the gracilis muscles,
3  sometimes the adductor longus.
4         The retropubic mesh goes through two
5  different muscle groups:  The urogenital
6  diaphragm and the rectus muscle.
7         Your Avaulta goes through even more
8  because you have not two arms from an obturator
9  sling but four arms that are all going through
10  the same area so you're going to hit at least
11  five different muscle groups.
12        It's very difficult to take mesh out of
13  muscle without harming the muscle so once you
14  have the mesh inside of muscle, it's going to be
15  there.
16        I just did a retropubic removal where
17  the mesh was so deeply ingrained in the
18  urogenital diaphragm that I just had to leave it
19  there because there was no other way I could get
20  it out without destroying this woman's
21  urogenital diaphragm.
22     Q.   When you remove the mesh, does that
23  decrease the symptoms?
24     A.   If you look at the literature, it says
25  that when you remove mesh, you're probably going

Page 247

1  to have about a 60 percent resolution of pain.
2  I think that is encouraging but an
3  overestimation.
4         I've seen patients that have gotten
5  better, and the longer I follow them, their pain
6  has come back again.
7         I think that the chances of truly
8  treating mesh-related pain is less than
9  40 percent.
10        And I think that the other studies that
11  are starting to come out are starting to show
12  that once you have pain because when there's a
13  chronic pain, you centralize the pain so the
14  nervous system is just -- the central nervous
15  system is just firing more frequently, and even
16  though you take out the nidus, that
17  centralization is still going to be there which
18  means that these women, even though the root of
19  that pain is gone, their central nervous system
20  is still firing.
21     Q.   My question -- and I appreciate what
22  you've read, but specifically in your
23  experience, when you've removed the mesh, has
24  that decreased the complications or -- well,
25  strike that.

Page 248

1         In your experience, when you have
2  removed mesh, has that lessened the
3  complications?
4     A.   I thought we were just talking about
5  pain.
6     Q.   Yeah, we'll start with pain.
7     A.   I would say that you have about a
8  40 percent chance of significantly diminishing
9  or getting rid of the pain, and probably about
10  another 40 percent are going to have some
11  element of pain that's not as bad as it was, and
12  20 percent are going to have the same degree of
13  pain as before.
14     Q.   Have you written or published any
15  papers or articles about your experience with
16  vaginal mesh?
17     A.   No, sir.
18     Q.   No articles about degradation?
19     A.   No, sir.
20     Q.   No articles about the particles
21  breaking off with the vaginal mesh, anything
22  like that?
23     A.   No, sir.
24     Q.   What percentage of your operations deal
25  with explant or complications related to vaginal

Page 249

1  mesh?
2     A.   I'm doing about one a month right now,
3  and so it's about 20 percent of my surgical
4  procedures.  And that's an explant.  That's not
5  doing nerve blocks and trigger point injections.
6     Q.   Okay.  Let's talk about that then.
7         So you did mention the trigger point
8  injections and nerve blocks.  How frequently are
9  you doing that?
10     A.   Probably one to two a week.
11     Q.   And is that related to vaginal mesh
12  patients?
13     A.   That is correct.
14        MR. LUNDQUIST:  Tom, you've been
15  respectful of Dr. Rosenzweig, and so I'll be
16  very respectful in lodging this objection.
17        How much longer do you anticipate
18  spending on the general causation side of this?
19        MR. MAZZIOTTI:  I don't know what you
20  mean.  You mean how much later for this
21  deposition?
22        MR. LUNDQUIST:  I'll tell you what I
23  mean.  There were 25 individual clients noticed
24  beginning today, 13 of which were mine.  I've
25  been here since approximately 11:30 this

Page 250

1  morning, and we're still talking about the
2  doctor's qualifications and his resume versus
3  the report itself.
4       I'm not chastising you, but I
5  understand you've got standing orders here. My
6  concern that is shared with the counsel
7  representing these individual plaintiffs is we
8  gave three days for Dr. Rosenzweig. We've now
9  been told he's going to be -- you all have got
10 two and a half with him, and we haven't even
11 started on the specific causation reports.
12 That's my concern.
13      So, you know, I can't shut you down on
14 this general causation stuff. My point is, you
15 know, he's ready to testify about these 25 folks
16 or certainly 13 that I represent, and I'm trying
17 to figure out when you anticipate moving on into
18 those reports.
19      MR. MAZZIOTTI: I think we talked about
20 this yesterday. My goal was to do general
21 causation today and to begin with specific
22 causation or the specific plaintiffs tomorrow.
23      I thought I made that very clear to you
24 yesterday, and I said if I can get through my
25 outline today, I don't expect to go into your

Page 251

1  credentials and qualifications and all that
2  during the specific plaintiffs. I will wrap up
3  all of that today. And I don't think that's a
4  big surprise that I'm going into his
5  qualifications and all that.
6       And I understand he's testified a lot
7  of times. Some depositions I've seen, some I
8  haven't so I'm not sure what your objection or
9  your point is.
10      MR. LUNDQUIST: My concern is the
11 request by Bard for 35 hours with the good
12 doctor. That's my concern because --
13      MR. MAZZIOTTI: I'm not sure I made
14 that request. I said, you know, first -- go
15 ahead. I'm sorry. I didn't mean to interrupt.
16      MR. LUNDQUIST: My concern is when are
17 we going to -- can I anticipate that the doctor
18 who's prepared on my 13 cases, that he will be
19 able to do that either later today or tomorrow
20 is my question.
21      MR. MAZZIOTTI: Yeah, my goal is to,
22 like I said, finish up general causation today,
23 go into specific tomorrow, get through as many
24 as I can tomorrow. I mean, I don't know how
25 many that is.

Page 252

1       I don't anticipate lingering -- to be
2  honest with you, I think a lot of these
3  questions were pretty straightforward, and you
4  elaborated, and has increased the time here
5  today.
6       So, you know, I don't know of any other
7  expert you all identified that has 26 plaintiffs
8  for specific causation. I think most of them
9  have a lot less. So this is a unique situation.
10      MR. LUNDQUIST: Okay. And I think the
11 position both of leadership and the plaintiffs
12 that are represented -- that have retained
13 Dr. Rosenzweig as a specific causation expert is
14 we're going to be finished.
15      I know Mr. Kuntz and Mr. Cartmell have
16 covered an additional day at some point in the
17 future, and our position is we're going to be
18 done.
19      So I appreciate your position; I know
20 you know mine. I've been patiently hearing all
21 your questions here today, and that's fine, but
22 know that he is ready to proceed on the specific
23 causation reports. He'll be ready tomorrow, and
24 after that, my firm will be done whether or not
25 Bard likes it, and, you know, you're going to

Page 253

1  get your extra day, and that's going to be that.
2       MR. MAZZIOTTI: So you're saying I
3  don't have seven hours with general causation?
4       MR. LUNDQUIST: I think now you've got
5  three and a half days on everything including
6  general causation.
7       You can spend -- well, Mr. Cartmell may
8  disagree with me, but, you know, you can use
9  this time however you deem fit. My problem
10 is an hour per report is unreasonable.
11      MR. CARTMELL: I would probably say you
12 don't have more than seven hours on general
13 causation.
14      MR. MAZZIOTTI: Oh, I'm not going
15 over -- like I said, I'm going to wrap it up.
16      MR. CARTMELL: I didn't think you were.
17 I'm just saying.
18      MR. MAZZIOTTI: That's how I planned
19 it, and then, you know, getting into this, we
20 see 26 plaintiffs, and, you know, it is what it
21 is.
22      MR. CARTMELL: But I do, you know,
23 agree. I mean, are you thinking longer than the
24 two and a half days now to get through all the
25 case specific?

Page 254

1    MR. LUNDQUIST:  Well, three and a half,
2  actually.
3    MR. MAZZIOTTI:  Why don't we go off the
4  record while we're doing this?
5    THE VIDEOGRAPHER:  The time is 4:23.
6  We're off the record.
7        (The following proceedings were
8        held off the video record.)
9    MR. MAZZIOTTI:  Go off the video
10  record.  We can stay on this one.  I'd like to
11  perfect this.
12    I mean, I don't know the specific
13  orders, but my understanding is general
14  causation is one day.
15    I think if you were to ask around the
16  other depositions, most depositions are going
17  over one day so I think I'm being very
18  reasonable.
19    I could spend ten days with this
20  doctor.  I mean, you ask him, quite frankly,
21  what color is the sun, and he gives you a
22  history lesson on paint.
23    So, you know, I hear what you're
24  saying, but you've been at this deposition, too.
25  You've seen the struggles I've had.  I ask him a

Page 255

1  question, and he goes off on tangents.  So I
2  don't know what to tell you.
3    If you want to ask the doctor to be a
4  little more direct in his responses, that's
5  fine.  It could speed things up, but, I mean,
6  you know, I'm asking my questions.
7    I just finished his report.  I don't
8  think I've wasted any time with, you know,
9  extraneous stuff earlier in the day.
10    MR. CARTMELL:  Well, just to respond to
11  that, I disagree with your classification about
12  how he responds.  I think that you're asking
13  some very broad questions, and I do think he's
14  going into a lot of depth about studies and
15  things like that to make sure you have the
16  information that he intends to offer so I don't
17  think he's being unresponsive to you at all.  I
18  think he's maybe being a little more long winded
19  than you would like, but look, I do think seven
20  hours for the general is the max, and that is --
21  it sounds like you're agreeing to that.
22    MR. MAZZIOTTI:  That's what I'm in for.
23    MR. CARTMELL:  The question becomes
24  after that point how reasonable is it to go
25  longer than, you know, three days for, you know,

Page 256

1  one doctor on these case specifics so I don't
2  know that we'll be able to nail that down right
3  now.
4    MR. MAZZIOTTI:  I agree.
5    MR. CARTMELL:  We are hoping we can
6  knock it out this week just because his schedule
7  and, of course, everybody else's.
8    MR. MAZZIOTTI:  You know, I think I got
9  an e-mail.  I don't know --
10    MR. KUNTZ:  It was from me.  We offered
11  another date just because of the half-day issue
12  Friday, which it is what it is.
13    MR. MAZZIOTTI:  Right.
14    MR. KUNTZ:  We learned about it late,
15  but that's fine.  We've offered another date.
16    My problem in the whole situation comes
17  up is his time, trial testimony, and we did
18  offer six dates that were never accepted or
19  responded to in early October.
20    I don't know if you were part of that
21  or not, but it's neither here nor there, but we
22  can't keep -- this is now nine days we'll have
23  offered for him, and we can't just keep offering
24  days.  So I think my e-mail set forth plaintiff
25  plans to go forward and then one more day will

Page 257

1  be offered, and that's it.  If you guys want
2  more than that, then you can go take it up with
3  the Court.
4    MR. MAZZIOTTI:  I think we can figure
5  out some of this more tomorrow depending -- you
6  know, if the plaintiffs go more quickly, which I
7  expect they will -- I hope they will -- if they
8  don't, then we'll have to address it with the
9  Court, obviously.
10    But to go back to your point, I'm not
11  sure what you're saying, if you want me to move
12  on and stop my questions on general causation
13  and begin specific or what that was about.
14    MR. LUNDQUIST:  Well, I can't stop you
15  from continuing this examination.  I think
16  Mr. Cartmell probably could, but --
17    MR. MAZZIOTTI:  Just so we're clear, I
18  haven't gone over seven hours.
19    MR. LUNDQUIST:  No, you definitely have
20  not.
21    I do disagree with you on one point.  I
22  believe leadership has made clear across the
23  board there is not an expert that is being
24  presented for more than three days.  I could be
25  mistaken on that, but in talking with leadership

In Re: CR Bard 200   Bruce Rosenzweig, M.D.   10/29/2014

Page 258

1 this morning with their office, that's what I
2 was informed.
3   So to get seven full hours with
4 Dr. Rosenzweig on the general causation report
5 which we -- you know, he is going over a lot of
6 the literature that he has in past trials and
7 past reports, and then to suggest that we need
8 an hour for some reports that have at their core
9 maybe two to three pages of substance related to
10 medical record summaries, you know, to get an
11 extra 25 hours we don't believe that's
12 reasonable.
13   MR. MAZZIOTTI:  And this is what I
14 said, I think, the other day as well.  At $1,500
15 an hour, I don't want to go 25 hours.
16   MR. LUNDQUIST:  I think it's a thousand
17 an hour.
18   THE WITNESS:  No.  It's 15.
19   MR. CARTMELL:  Please.
20   MR. MAZZIOTTI:  I'd take it at 1,000 an
21 hour, but seriously, I am not aware of any other
22 expert that has -- and you all, I haven't looked
23 at them.  You all know more than I do, but I
24 don't think there's another expert with 26
25 specific plaintiffs, and I think that is a

Page 259

1 unique situation to our doctor here.
2   And I understand three days, you know,
3 if you've got two, three patients, six patients
4 that's a far cry from 26.  I don't think we want
5 to take, like I said, an hour and add that up
6 and whatever -- 35, I think you said.  I don't
7 think we will be using 35 hours, but again, I am
8 certainly not leadership on the Bard side.
9   MR. CARTMELL:  How long have we gone on
10 the video?
11   THE VIDEOGRAPHER:  Five hours.
12   MR. CARTMELL:  Just five hours, like
13 right at five hours?
14   THE VIDEOGRAPHER:  Pretty much.  1:56,
15 1:56, and I'm at 1:08 now.
16   MR. MAZZIOTTI:  I suspect I'll go about
17 another hour or so, maybe less.  Clearly, I'm
18 wrapping it up.
19   MR. CARTMELL:  Got you.
20   MR. MAZZIOTTI:  I'm on to
21 qualifications versus opinions.
22   MR. KUNTZ:  Just one final thing.
23   My point is I'm not going to keep
24 running out days for him.  I mean, I've given
25 you six that weren't accepted.  I gave you three

Page 260

1 that you took, and that last minute was a half
2 day.  I get it.  And now I've given you a choice
3 of one more day and two days to pick from, and
4 my point is I'm done and he's done giving out
5 dates.
6   MR. MAZZIOTTI:  Just so I understand,
7 after -- you've given me November 10th and
8 November 12th.
9   MR. KUNTZ:  Right.
10   MR. MAZZIOTTI:  Are you saying select
11 one, select both?
12   MR. KUNTZ:  Select one.
13   MR. MAZZIOTTI:  Select one?
14   MR. KUNTZ:  Right.
15   MR. LUNDQUIST:  Just to be clear, Tom,
16 that was an effort to compromise.  We understood
17 your position and the position on Monday
18 afternoon that you all were only going to be
19 available till Friday midafternoon.  And that's
20 fine even though all these different lawyers
21 came out to meet with Dr. Rosenzweig over the
22 last week to get him ready for these three days,
23 that's fine.  We appreciate the scheduling with
24 this PTR, but, you know, tomorrow is going to be
25 the end of it with my firm, as I have made

Page 261

1 clear.
2   And I'm sure you respect your position
3 as I respect yours.  I don't agree with it; I
4 know you don't agree with mine, but it is what
5 it is.
6   So just try to move things along with
7 if we can because, obviously, a lot of
8 methodology and basis for his opinions and the
9 case specifics you're going through right now.
10   MR. MAZZIOTTI:  Correct.
11   MR. LUNDQUIST:  That's okay.  Just
12 wanted to make clear we need to move this along
13 and he's ready to go into the case specifics if
14 you are this evening.  If not, that's okay, and
15 we can move forward first thing tomorrow
16 morning.
17   MR. MAZZIOTTI:  Let me ask you this.
18 Tomorrow, we start at 9:30 and we go
19 till we finish all 13?
20   MR. LUNDQUIST:  I mean, within reason,
21 sure.  I think some of it's going to be up to
22 Dr. Rosenzweig.  I don't want to keep him
23 till -- I will talk to the doctor about that.  I
24 think we're not going to keep him up here till
25 8:00 p.m.

Page 262

1    THE WITNESS:  I think we can get
2  through the 13 tomorrow.
3    MR. MAZZIOTTI:  Me, too.  In seven
4  hours?
5    THE WITNESS:  I think so.
6    MR. MAZZIOTTI:  And I say seven hours.
7  If it goes over seven, I'm okay with it.
8    THE WITNESS:  I'm okay with it.  If we
9  want to just finish up general causation today,
10  that would be great.
11    MR. MAZZIOTTI:  And do the 13 tomorrow?
12    THE WITNESS:  And do the 13 tomorrow.
13  Is that okay with you?
14    MR. LUNDQUIST:  That has to be okay
15  with me.
16    THE WITNESS:  You know, what you've
17  done and what I've done is gotten the literature
18  discussion that we're going to use tomorrow in
19  the case specifics done.
20    MR. MAZZIOTTI:  I think so.
21    THE WITNESS:  And so I don't have to
22  revisit that.  We're going to deal with specific
23  things in the records and talk about that, and I
24  think as Will was alluding to, I think that's
25  going to go a lot quicker.

Page 263

1    MR. MAZZIOTTI:  I agree, and I hope so,
2  too.  I mean, I think tomorrow is more
3  clinically based than what we're talking about
4  here.
5    THE WITNESS:  And we won't need to be
6  going into the kind of detail that we went into
7  today.
8    MR. MAZZIOTTI:  Yeah.
9    THE WITNESS:  Right?  I think that's --
10    MR. MAZZIOTTI:  Maybe it's just
11  premature to think of the worst right now.
12    I mean, if we get through with yours, I
13  suspect, Will, you're not going to chime in
14  anymore on this issue, and maybe others will,
15  but anyway. . .
16    MR. LUNDQUIST:  I think you've already
17  got an agreement from the lawyers that we're
18  scheduled from tomorrow to come back for one of
19  those extra days Jeff proposed.  It may be a
20  moot point.  If we're doing six tomorrow, that
21  will be a problem, but I think we've hashed that
22  out ad nauseam.
23    (The following proceedings were
24    had on both the video and
25    written record.)

Page 264

1    THE VIDEOGRAPHER:  The time is 4:34.
2  We're are back on the record.
3  BY MR. MAZZIOTTI:
4    Q.  Doctor, going to a point that was made,
5  Friday afternoon, is there going to be a fee for
6  time that wasn't -- that's not being used?
7  Because I'm just curious.  I thought it was
8  $1,500 an hour, if we end early, we end early.
9    MR. KUNTZ:  I was kidding, Tom.  Sorry.
10    MR. MAZZIOTTI:  I just want to make
11  sure I know what we're in for here when the bill
12  comes.
13    MR. KUNTZ:  He is not charging for the
14  afternoon.  I've told him to specifically not
15  bill you.
16    MR. MAZZIOTTI:  Okay.  All right.
17  Good.
18  BY MR. MAZZIOTTI:
19    Q.  We were talking about your -- what you
20  do with your clinical practice.  We talked about
21  your -- I think we -- just to summarize where we
22  are, I think we talked about the vaginal mesh
23  complications you see.
24    You mentioned extrusions, recurrent
25  infections.  Anything else?

Page 265

1    A.  Pain, dyspareunia.
2    Q.  Is there a general way to ask this, or
3  is this a specific plaintiff question, the cause
4  of dyspareunia as it relates to vaginal mesh?
5    A.  Well, I think we discussed pain, and
6  obviously, when you are irritating nerves that
7  are going to be touched on, if you will, during
8  the act of sexual intercourse, that's going to
9  generate pain.
10    When the mesh contracts and scars and
11  forms a hard entity inside the vagina, that's
12  going to cause pain.  So whether it's nerve
13  irritation, nerve entrapment, scarification,
14  those are some of the ways that pain with
15  intercourse can generated.
16    Now, another thing, too, is that mesh
17  in the levator muscles, the obturator internus
18  muscle, when you hit that area, if there's -- or
19  excuse me -- when there is inflammation, chronic
20  foreign body reaction, mesh degradation, mesh
21  contraction, that can be the nidus of pain when
22  in the act of intercourse the penis hits that
23  trigger point of the insertion of the mesh
24  inside the vagina.
25    Q.  Any other vaginal mesh complications

Page 266

1  that you address in your daily practice that we
2  have not talked about?
3      A.   There are overactive bladders, stretch
4  urinary incontinence, defecation disorders
5  associated with transvaginal mesh which are
6  different from, you know, some of the sling
7  complications.
8      Q.   Going to your educational background,
9  you're a zoology major; is that right?
10     A.   I was, yes.
11     Q.   Okay.  Did you have plans to go into
12  something other than medicine with zoology?
13     A.   No.
14         MR. CARTMELL:  Zookeeper.
15  BY MR. MAZZIOTTI:
16     Q.   Zookeeper, yeah.  Okay.
17         How did you think of that one?
18     A.   It hit all the core requirements that
19  you need to go to medical school so whether it
20  was biology, zoology, chemistry, they all have a
21  common pathway into medical school.
22     Q.   All right.  And you did a one-year
23  fellowship in pelvic surgery?
24     A.   That is correct.
25     Q.   And a two-year fellowship in urology

Page 267

1  and gynecology?
2      A.   That is correct.
3      Q.   In your advise -- well, not advisory
4  boards.  Your journal editorial boards, do you
5  still sit on the Journal of Gynecologic Surgery?
6      A.   I don't -- no.
7      Q.   Are you a reviewer at all?
8      A.   Not for that journal.
9          The journals I review for are
10  Obstetrics and Gynecology and the American
11  Journal of Obstetrics and Gynecology, though
12  it's been a while since I've gotten a paper from
13  the American Journal.
14     Q.   What journals do you subscribe to?
15     A.   I have the Journal of Female Pelvic
16  Medicine, what's called the AUGS Journal, that I
17  subscribe to, the American Journal of Obstetrics
18  and Gynecology.  I get the Green Journal.  Those
19  are the three peer-reviewed journals.
20         I also get some throw-away journals
21  which are the non-peer-reviewed journals.
22     Q.   Are they generally relied upon in your
23  specialty?
24     A.   Which?
25     Q.   All of those journals.  Are there some

Page 268

1  that are and some that are not?
2      A.   Well, obviously, the throw-away
3  journals are more review type articles or, you
4  know, opinion type articles, where the American
5  Journal of Female Pelvic Medicine, the
6  Obstetrics and Gynecology which we call it the
7  Green Journal, I mean, those two, the Green and
8  the Gray Journal -- American Journal of
9  Obstetrics and Gynecology is called the Gray
10  Journal, the Green Journal is Obstetrics and
11  Gynecology -- those are the two more widely-read
12  journals in obstetrics and gynecology.
13     Q.   Your review of these journals or your
14  membership to -- not membership.  You're no
15  longer a member.  Let's go back.
16         Your review of the Green Journal, I
17  think you said, does that have discussions about
18  vaginal mesh, or is that just general obstetrics
19  and gynecology issues?
20     A.   It all depends on what the editor sends
21  me to review.
22     Q.   Does the editor typically send you
23  cases that deal with vaginal mesh because of
24  your background?
25     A.   Typically, no.

Page 269

1      Q.   Have you reviewed any articles dealing
2  with vaginal mesh?
3      A.   I probably have, you know -- excuse
4  me -- a few years back.  None within like the
5  last three to five years that I can remember.
6      Q.   I think you said you're an associate or
7  assistant professor?
8      A.   Associate, yes.
9      Q.   What does that entail?
10     A.   What chores do I have for that?
11     Q.   Yeah.  What does that mean?  When your
12  title is assistant professor, what goes into
13  that?
14     A.   That was given to me when I started
15  practicing at Rush.
16     Q.   And how long ago was that?
17     A.   12 years ago.
18     Q.   Do any fellows come through your
19  practice?
20     A.   Geriatrics fellows.  There's no urogyne
21  fellowship at Rush.
22     Q.   Obviously, there's a board
23  certification for urogynes out there?
24     A.   That is correct.
25     Q.   Could you take that?

Page 270

1    I understand you're not board
2  certified?
3    A.   That is correct.
4    Q.   Could you take that?  Could you sit for
5  those boards?
6    A.   Yes.
7    Q.   Is there a reason why you don't?
8    A.   I haven't taken it yet.
9    Q.   Do you intend to?
10    A.   I have until June of or July of 2015 to
11  take what's called the grandfather's exam, and I
12  haven't decided yet.
13    Q.   There's multimedia -- were you a
14  filmmaker at one point?
15    A.   I always had an interest in filmmaking,
16  and luckily, when I left the University of
17  Illinois to start in private practice, I had a
18  little bit more free time, got to know a few
19  filmmakers in the City of Chicago and had the
20  opportunity to explore an interest that I had
21  since I was young.
22    Q.   Do you still do that?
23    A.   No.
24    Q.   Under "Presentations and Invited
25  Lectures," I see several references to

Page 271

1  evaluation and management of urinary
2  incontinence.  Do you have any materials related
3  to when you're doing these presentations and
4  lectures?
5    A.   No.
6    Q.   Do you have any publications that you
7  would deem relevant to your opinions here, that
8  you've offered here today?
9    A.   Well, I think we talked about the
10  article on pubovaginal slings that I wrote with
11  Mickey Karram and Narender Bhatia back in the
12  early 90s, and that would be about it.
13      Well, there's -- you know, we might get
14  into this in the case-specific stuff.  There's
15  the neurological control of micturition.  You
16  know, there are several articles that deal
17  with -- and also prolapse and I'll call it
18  stress urinary incontinence.  I mean, there's
19  stuff that touches on it but nothing, like, you
20  know, that deal specifically with transvaginal
21  mesh.
22    Q.   Just the modality generally or the
23  condition generally?
24    A.   The condition of stress urinary
25  incontinence and prolapse generally, yes.

Page 272

1    Q.   Okay.  Not as it specifically relates
2  to complications from vaginal mesh or the need
3  for vaginal mesh?
4    A.   That is correct.
5    Q.   Are there any presentations or lectures
6  that you would want to add to your CV?
7    A.   No.
8        (Interruption.)
9        MR. CARTMELL:  Do you need to answer
10  it?
11        THE WITNESS:  Yeah.
12        Could we go off for a quick minute?
13        THE VIDEOGRAPHER:  The time is 4:45.
14  We are off the record.
15        (Whereupon, a short recess
16        was taken.)
17        THE VIDEOGRAPHER:  The time is 4:54.
18  We're back on the record.
19  BY MR. MAZZIOTTI:
20    Q.   Dr. Rosenzweig, do you have -- do you
21  consider any journals authoritative in the field
22  of urogynecology?
23    A.   I mean, there are good journals.  We've
24  talked about Female Pelvic Medicine, the
25  international journal, Journal of Urology,

Page 273

1  Neurourology and Urodynamics.  I mean, they all
2  have really good articles in them.
3    Q.   Do you consider any of them
4  authoritative?
5    A.   As far as?
6    Q.   As far as we'll start with pelvic mesh
7  information.
8    A.   They all have good articles in there.
9    Q.   But you would not consider them
10  authoritative?
11    A.   I think they're all good journals,
12  yeah.  They all have good information in there.
13    Q.   Did you do any independent research for
14  your opinions?  I know this goes back years and
15  years, but was there something with regard to
16  the Align product that you felt like you needed
17  to go independently research?
18    A.   The only thing I looked for are the
19  studies on Align.
20    Q.   Exhibit C to your report is your
21  reliance list, and you supplemented it again
22  yesterday.  Did you review each and every one of
23  those documents cited?
24    A.   In my reliance list?
25    Q.   Correct.

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

Page 274

1    A.   At some point, yes.
2    Q.   Okay.  What do you mean by "at some
3  point"?
4    A.   I might not have looked at them in the
5  last week, but, you know, there is a lot of
6  stuff that I, you know, still know from, you
7  know, having reviewed it like Das' article about
8  bacterial degradation of mesh, Strus' article
9  about peroxide levels in the vagina.  I haven't
10  looked at that maybe in a year, but I still know
11  it.
12    Q.   For example, there's nothing listed in
13  your reliance list that you have not reviewed?
14    A.   That is correct.
15    Q.   Okay.  And the documents you've listed,
16  have you reviewed them in their entirety, or
17  would it be portions?
18    A.   The clinical studies I've read pretty
19  closely.  I mean, there might be some where, you
20  know, for the 300th time where they go over the
21  background of slings, and I might not have read
22  their rendition of history, but the important
23  parts, yes.
24        Now, there might be some documents,
25  internal documents, depositions, that I might

Page 275

1  have scanned a little bit quicker than others,
2  but, I mean, the literature, I've read that
3  pretty thoroughly.
4    Q.   As far as depositions, were there any
5  that you specifically sought out or asked for?
6    A.   No.
7    Q.   The ones that you mentioned you might
8  have scanned, can you tell me which ones that
9  might be?
10    A.   No.
11    Q.   For example, is it certain, I guess,
12  types of witnesses that you may have scanned?
13    A.   Right, getting into, you know, like
14  their background and, you know, long, exhaustive
15  history of all the companies that they've worked
16  for, that's not really anything that I would
17  want to read in depth.
18    Q.   You mentioned earlier today that you
19  spent approximately 30 to 40 hours prior to
20  sitting down for your deposition today on this
21  particular piece of litigation, right?
22        MR. CARTMELL:  Again, I'd object that
23  that misstates his testimony.  You guys have
24  talked about it, though.
25        Remember, he's got that year before

Page 276

1  where he spent a lot of time.
2        MR. MAZZIOTTI:  Yeah.
3        MR. CARTMELL:  I just want that to be
4  clear.
5        MR. MAZZIOTTI:  That's what I'm trying
6  to figure out.
7  BY MR. MAZZIOTTI:
8    Q.   So maybe it was this way.
9        You billed for approximately 30 to
10  40 hours before your deposition today in this
11  piece of litigation.  Did I say that right?
12    A.   I think the question, I spent about 30
13  to 40 hours getting the report together, getting
14  ready for today's deposition.
15    Q.   How long did you spend working on the
16  report, the Rule 26 report itself?
17    A.   Specifically, I can't really tease that
18  out.
19    Q.   I know you mentioned you've sent
20  invoices.  How much depth do you get in when you
21  send invoices?
22    A.   How much depth?
23    Q.   Yeah.  How much detail?
24    A.   You're going to get copies of those so
25  you can see for yourself how much detail that

Page 277

1  they have.
2    Q.   Well, can you give me a preview?  I
3  mean, do you say X number of hours, Rule 26
4  report, or do you just say X number of hours for
5  Bard litigation?
6    A.   X number of hours for Bard litigation.
7    Q.   In other words, there's no way that I
8  can go back and piece together how long you
9  worked on the Rule 26 report?
10    A.   That is correct.
11    Q.   Can you give me a guesstimate on what
12  you believe you spent doing the Rule 26 report?
13    A.   Well, again, there's reviewing the
14  materials, there's sitting down and, you know,
15  the discussions about what would be appropriate
16  to put in and what wouldn't be appropriate to
17  put in so -- and again, I reviewed most of this
18  material before, if not all of it, before, so
19  that what I was spending time reading was in
20  re-reviewing things that it might have been a
21  while that I hadn't seen.
22    Q.   How many conversations have you had
23  with counsel related to this particular piece of
24  litigation?
25    A.   This particular piece of litigation?

Page 278

1    Q.   Correct.
2    A.   Half a dozen.
3    Q.   And would it have been with Mr. Kuntz
4  each time?
5    A.   Or an associate or Mr. Cartmell.
6    Q.   Have you met with other plaintiffs'
7  counsel in preparation for giving your testimony
8  in this litigation?
9    A.   That is correct.
10   Q.   How long did you meet with them?
11   A.   For the case specifics?
12   Q.   Correct.
13   A.   Maybe four hours apiece.
14   Q.   Where did you meet?
15   A.   In my office.
16   Q.   My firm has an office across the river.
17  Is there a particular reason you preferred
18  having your deposition at the Westin?
19        MR. CARTMELL:  Well, I think that was
20  actually maybe our decision, the lawyers.
21        MR. MAZZIOTTI:  Oh, okay.
22        MR. CARTMELL:  Yeah.
23        MR. MAZZIOTTI:  I thought it was your
24  decision, but I guess not.
25        Is there any particular reason you all

Page 279

1  didn't want to --
2        THE WITNESS:  I don't think they're
3  allowed to testify.
4  BY MR. MAZZIOTTI:
5    Q.   In your opinion, should every pelvic
6  floor surgeon have completed a fellowship?
7    A.   In my opinion, should every pelvic
8  surgeon have completed a fellowship in pelvic
9  surgery?
10   Q.   Correct.
11   A.   I don't think that really has a lot of
12  bearing on what we're talking about.
13        I think that now that there's a
14  board-approved fellowship in urogynecology and
15  reconstructive pelvic surgery, I think that
16  there will be more carving out, if you will,
17  what urogynecologists, reconstructive pelvic
18  surgeons do versus what general OB/GYNs will do.
19  I think it's going to be very difficult for the
20  urogynecology board and general OB/GYN to kind
21  of carve that out.
22        Having done a fellowship, I think that
23  it gives one a better insight into the anatomy,
24  complications associated with it, but it's a
25  difficult answer.  I mean, yes for complicated

Page 280

1  pelvic floor surgery, no for less complicated
2  pelvic floor surgery.
3    Q.   Let me ask it this way.
4        Do you believe that there should be
5  some minimum credentialing type of requirements
6  for a surgeon to do transvaginal mesh
7  procedures?
8    A.   Credentialing is a very, very difficult
9  issue.  We all know that.  I mean, I think we --
10  the goal would be to try to find a reliable way
11  to assure that somebody has the skill sets that
12  they're asking for credentialing for.
13        I know that there was some push to even
14  for general credentialing have doctors precepted
15  by someone else on a frequent basis every two to
16  four years.  It's difficult, though I think that
17  would be helpful.
18   Q.   Do you think there should be minimum
19  qualifications to do transvaginal mesh implants?
20   A.   Well, I think transvaginal mesh
21  implants, there is a current concern about
22  transvaginal mesh usage.  Whether it's a
23  reasonable alternative to treat pelvic organ
24  prolapse is -- I think there's a growing
25  agreement of the reasonableness to implant

Page 281

1  transvaginal mesh products.
2        I think that if there was a development
3  of a product that was not associated with the
4  significant complications that we see that has
5  been significantly tested with long-term data,
6  then it might be beneficial to have a
7  credentialing where there's a limited number of
8  people that are actually able to use the
9  product.
10   Q.   The state of the environment today,
11  would you recommend that surgeons have some
12  minimum qualification to do transvaginal mesh
13  procedures?
14   A.   And again, I don't think anybody's
15  going to be able to agree on what those minimal
16  qualifications are.
17   Q.   Well, that wasn't my question.  Do you
18  think there should be, though?
19        If you were the king, would you have
20  some type of minimum qualifications in order for
21  a physician to do a transvaginal mesh procedure?
22   A.   I think that is an interesting starting
23  point.  I think it would be very difficult to
24  get an agreement about what those minimal
25  qualifications are.

Page 282

1    Q.  Do you agree that physicians and
2  surgeons out there doing transvaginal mesh
3  implants receive information through medical
4  literature and other sources?
5        MR. CARTMELL:  Object to form.
6        THE WITNESS:  And by "other sources,"
7  what are you talking about?
8  BY MR. MAZZIOTTI:
9    Q.  Well, I want to do it one step at a
10  time.
11        There's medical literature out there on
12  transvaginal mesh complications, how to do it,
13  et cetera, right?
14    A.  That's correct.
15    Q.  And that's available to surgeons who
16  are doing implants?
17    A.  That is correct.
18    Q.  There's also literature by each medical
19  device company for their products, correct?
20    A.  Literature?
21    Q.  Correct.  Brochures, IFUs?
22        MR. CARTMELL:  Object to the form.
23        THE WITNESS:  That's not literature.
24  BY MR. MAZZIOTTI:
25    Q.  Okay.  There's IFUs and there's

Page 283

1  brochures that medical device companies provide
2  for vaginal mesh?
3    A.  That is correct.
4    Q.  And that's also available to surgeons?
5    A.  That is correct.
6    Q.  And a reasonably-prudent surgeon who
7  is -- and gynecologist who recommends vaginal
8  mesh should be aware of the state of medical
9  literature out there on the subject?
10        MR. CARTMELL:  Object to the form.
11        THE WITNESS:  In a very narrow scope,
12  yes.
13  BY MR. MAZZIOTTI:
14    Q.  What do you mean by "narrow scope"?
15    A.  Well, it all depends on someone's
16  accessibility to that.  It all depends on how
17  much information is actually in the IFUs and in
18  the brochures.
19        You know, an IFU should not knowingly
20  avoid listing complications that are known that
21  a patient needs to know about, shouldn't
22  downplay the risk of certain complications.
23  Brochures shouldn't give information that is
24  knowingly underestimating the frequency,
25  severity, treatability and long-term longevity

Page 284

1  of complications so in the ideal world, when all
2  of that information is available, doctors can
3  rely on it.
4    Q.  It would be unreasonable for a doctor
5  to rely solely on an IFU in recommending a
6  procedure, agree?
7    A.  If that was the document, then you
8  could probably rely on it, yes.  If you talked
9  about the severity, the frequency, the
10  treatability and there was information in there
11  about how to treat the complications and how
12  long you would expect these complications to
13  last or when you could expect to see them, then
14  you might be able to use that as the source of
15  information.
16    Q.  Would a reasonably-prudent -- if I
17  understand, you're saying a reasonably-prudent
18  physician can rely solely on an IFU in making a
19  medical decision with a patient?
20    A.  With an ideal IFU.
21    Q.  In your experience, do IFUs qualify as
22  ideal as you just stated?
23    A.  I think in my report, I discussed the
24  deficiencies in the IFUs that we're speaking
25  about right now.

Page 285

1    Q.  You discussed the deficiencies as you
2  saw it in the Bard IFU, right?
3    A.  That is correct.
4    Q.  Okay.  And my understanding based on
5  what you just testified to is that in your
6  experience, IFUs by other device companies meet
7  these standards or criteria you articulate in
8  your report?
9        MR. CARTMELL:  Object to the form.
10        THE WITNESS:  I'm only discussing right
11  now the IFUs that we have in front of us right
12  now.
13        If you wanted to pull out an IFU from a
14  different medical product, we could discuss
15  whether it is a good enough standalone document
16  to give patients a reasonable informed consent.
17  BY MR. MAZZIOTTI:
18    Q.  As a general rule then, you can't
19  testify that an IFU alone would be sufficient
20  for a medical doctor to make a decision?
21    A.  Make a decision about whether to give
22  a -- whether or not they're going to use the
23  device and how to give the patient informed
24  consent?
25    Q.  Correct.

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 306 of 924 PageID #: 213143

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

Page 286
1     A.    If all the information that needs to be
2   in there, they could use that document.
3     Q.    Tell me what information must be in
4   there.
5       MR. CARTMELL:   Object to the form, and
6   it's been asked and answered.
7       THE WITNESS:   How to do the procedure,
8   the adverse -- the appropriate patient
9   population, contraindications for which patients
10  you should not use the product on, adverse
11  events, complications, warnings and precautions
12  that have all been known risks with frequency,
13  severity, duration, treatability and how to
14  treat complications.   Then it would be a
15  document that could be relied upon to give
16  patients informed consent.
17  BY MR. MAZZIOTTI:
18     Q.    What is the basis for that opinion that
19  an IFU needs to contain all of that information?
20     A.    What is the basis for that?   Well, you
21  asked me what an ideal -- as a standalone
22  document --
23     Q.    Right.
24     A.    -- why that would need to be in there.
25       Because that is the kind of information

Page 287
1   that you need to be able to give a patient
2   informed consent.
3     Q.    And is there any literature or support
4   out there that says these are the -- this is the
5   information that should be in an IFU?   In other
6   words, are there any standards about what should
7   be in an IFU?
8     A.    There's a blue book that is put out by
9   the FDA that says what should be in an IFU.
10     Q.    Anything else?
11     A.    Right now, not that I'm aware of, but
12  what we were talking about was the ideal IFU to
13  be used as a standalone document to be giving
14  patients informed consent about a medical
15  device.
16     Q.    How about not the ideal but an
17  acceptable IFU?   If it complies with the blue
18  book, is that an acceptable IFU in your opinion?
19     A.    We would have to look at that IFU to
20  find out what was -- what's in there and what is
21  known.
22       The same thing that I did with my
23  report:   Look at the IFU, look at what was known
24  at the time that a product came out onto the
25  market, what is the information that has been

Page 288
1   generated prior to that and since that time to
2   be able to make sure that all the information
3   that a doctor needs to decide whether or not
4   this is an appropriate treatment for the patient
5   and device to be implanted permanently in a
6   patient and to be able to give the patient
7   informed consent so that they can make a
8   reasonable decision about whether or not they
9   want this implanted in, then yes, that would be
10  an adequate IFU.
11     Q.    Have you ever testified as an expert on
12  the adequacy of an IFU?
13     A.    Have I testified about IFUs?
14     Q.    In an expert capacity.
15     A.    That is correct.
16     Q.    Okay.   In what cases?
17     A.    In the Huskey v. Ethicon case.
18     Q.    Any other cases?
19     A.    Currently, no.
20       You mean trial testimony?
21     Q.    Right.   No.   I'm just wondering -- I
22  assumed --
23       MR. CARTMELL:   Are you including
24  depositions?
25

Page 289
1   BY MR. MAZZIOTTI:
2     Q.    Yeah.   In vaginal mesh litigation,
3   you've been held out as an expert in the
4   adequacy of IFUs?
5     A.    That is correct.
6     Q.    Outside of the vaginal mesh litigation,
7   have you been retained as an expert in the
8   adequacy of IFUs?
9     A.    No.
10     Q.    I think I asked you earlier, but it was
11  on a different topic.   Do you know if your
12  testimony was limited in any way with regard to
13  your opinions on IFUs in the Ethicon case?
14     A.    In the first trial, I think that it was
15  deemed moot.   And in the second trial, I don't
16  think I was limited.
17     Q.    Okay.   Do you know why it was deemed
18  moot in the first trial?
19     A.    I think that calls for a legal analysis
20  that I don't --
21     Q.    Well, I'm not asking for your opinion.
22  I'm saying if you knew why, and if you don't,
23  that's fine.
24     A.    I don't know why.
25     Q.    Okay.   Have you ever not been able to

Page 290

1  give an opinion, an expert opinion, on the
2  adequacy of an IFU?
3      A.   Have I ever not been?
4      Q.   Let me ask you this.
5          Have you ever been prevented from
6  giving an opinion on the adequacy of an IFU?
7      A.   Not that I'm aware of.
8          MR. CARTMELL:  Just in fairness to you,
9  in that Lewis trial in the MDL -- actually, it's
10 in the Ethicon MDL -- there was a Daubert order
11 that I'm not sure if you read, but the doctor in
12 that case -- the ruling was based on what the
13 implanting doctor said in that case specifically
14 related to whether or not there was a review or
15 any reliance on the IFU.
16         MR. MAZZIOTTI:  Got it.  And I think
17 that goes to something we can cover tomorrow. I
18 think we're on the same page.
19         MR. CARTMELL:  Yeah, it's not
20 something that -- obviously, it's legal in
21 nature and not something I think the doctor
22 knows much about.
23 BY MR. MAZZIOTTI:
24     Q.   In other words, I think what you're
25 saying is, if you know, if a treating physician

Page 291

1  is provided with information and said that would
2  not have impacted their decision, does that have
3  any effect on your opinion on IFUs here?
4          MR. CARTMELL:  Object to the form.
5  BY MR. MAZZIOTTI:
6      Q.   In other words, you list the
7  information about what needs to be in an IFU and
8  what Bard should have done, right?
9      A.   That is correct.
10     Q.   Do you feel still -- well, that's a
11 question for tomorrow.
12     A.   Okay.
13         MR. LUNDQUIST:  Get your zingers out
14 now, man.  Don't save the tough ones for
15 tomorrow.
16         MR. MAZZIOTTI:  I'm just looking real
17 fast to see if I've missed anything.
18         MR. CARTMELL:  Okey-doke.
19 BY MR. MAZZIOTTI:
20     Q.   Doctor, are there any opinions we
21 haven't discussed today that in the back of your
22 mind you're ready to voice and I just haven't
23 asked you about?
24         MR. CARTMELL:  Object to form.
25         THE WITNESS:  I think there are a

Page 292

1  number of questions I've been asked before that
2  you haven't asked me today.
3  BY MR. MAZZIOTTI:
4      Q.   That deal with the literature?
5      A.   A little bit of that, other things.
6      Q.   Such as?  What comes to mind?
7      A.   Nothing specifically.
8      Q.   You opened the door, Doctor.  What
9  comes to mind?
10     A.   Nothing specifically.
11     Q.   How about generally?
12     A.   Nothing generally.
13     Q.   Are there any opinions you wish to
14 express while we're here today that I haven't
15 otherwise asked you about?
16     A.   About what?
17     Q.   About the Chicago Cubs.  What do you
18 think?  About Bard mesh litigation.
19         MR. CARTMELL:  Do you mean other than
20 what's contained in his report?
21         MR. MAZZIOTTI:  Well, obviously the
22 report's the starting point, but other opinions
23 that we're here today -- and I know there's some
24 opinions I didn't get into.  I get that.
25         THE WITNESS:  All right.

Page 293

1  BY MR. MAZZIOTTI:
2      Q.   But is there anything else you wish to
3  elaborate on -- we'll put it this way.  You wish
4  to elaborate on that you talked about earlier
5  today.
6      A.   No.
7      Q.   Have you ever advertised for your
8  services?
9      A.   No.
10     Q.   Listed with an expert database?
11     A.   Someone listed me back in the late 90s
12 on the Pennsylvania Physicians For Legal Review.
13 I was with them for about, I don't know, six
14 months or a year and decided not to be
15 associated with them.
16     Q.   When you say someone listed you, was
17 that without your permission?
18     A.   I have a vague recollection of there
19 wasn't a lot of discussion about that, but then
20 I told them please don't send me anymore, you
21 know, work.
22         I don't know if they listed me or just,
23 you know, used me as a resource and I decided I
24 did not want to be involved with them.
25     Q.   Who was that group?

Page 294

1    A.   Pennsylvania Physicians For Legal
2  Review.  I don't even know if they're an entity
3  anymore.
4    Q.   At some point, you knew you knew they
5  were listing with you.  Did you ask to be
6  removed once you found out?
7    A.   I don't know if they listed or what
8  that was involved with, but I just told them I
9  didn't want to be involved with them anymore.
10    Q.   Did you ever get any cases from them?
11    A.   Yes, I did.
12    Q.   How many?
13    A.   I can't remember.  That was back
14  16 years ago.
15    Q.   Have you ever turned down cases for
16  review?
17    A.   Yes.
18    Q.   What were the circumstances?
19    A.   You mean turned down a case that I'd
20  already reviewed or said, "No, I'm too busy, I
21  can't do any reviews"?
22    Q.   No -- well, both, actually, but what I
23  was asking you more specifically, was there a
24  reason you would turn down a case?
25    A.   If I either thought that there wasn't a

Page 295

1  deviation form the standard of care or that the
2  deviation in the standard of care did not
3  proximally cause the damage that the patient was
4  thinking or if I thought that there was a clear
5  deviation in the standard of care and I could
6  not support the opinions that there was not a
7  deviation in the standard of care.  So I've
8  turned down both plaintiff and defense cases.
9    Q.   Have you ever turned down a vaginal
10  mesh case?
11    A.   Yes.
12    Q.   Was there a particular reason for that?
13    A.   Yes.
14    Q.   And what was that?
15    A.   There isn't enough time in the day to
16  do everything people would like me to do.
17    Q.   When you say Bard did not adequately
18  understand the importance of clinical data when
19  using medical devices permanently implanted in
20  humans, what's that based on?
21    A.   That there were no clinical trials for
22  the Avaulta product before launch, and there
23  were no clinical trials on the Align before it
24  was launched.
25    Q.   Is it your opinion that physicians were

Page 296

1  not appropriately warned of the risks associated
2  with vaginal mesh?
3         MR. CARTMELL:  Are you talking about
4  the Align?
5         MR. MAZZIOTTI:  Yes.
6         THE WITNESS:  From the IFU?
7  BY MR. MAZZIOTTI:
8    Q.   Based on the IFU specifically, you do
9  not believe there were adequate warnings to the
10  physician?
11    A.   That is correct.
12    Q.   How specific does the IFU need to be to
13  get into the risks associated with vaginal mesh
14  specifically with Align?
15    A.   How specific?
16    Q.   Yeah.
17    A.   Do you want to deal, like, with the IFU
18  line by line?
19    Q.   If that's how you have to answer the
20  question, but I want to know what level of
21  detail are you talking about.
22    A.   Regarding?
23    Q.   The risks.
24    A.   The risks associated with it?
25    Q.   Correct.

Page 297

1    A.   All known risks have to be in the IFU.
2    Q.   And what known risks were not in there?
3    A.   If you want to pull out the IFU, or we
4  can talk about what is listed in my report.  I
5  mean, I think all that is detailed in my report.
6  We could go to that page in my report and talk
7  about that specifically.
8    Q.   Well, was the potential for dyspareunia
9  in there?
10    A.   In which iteration?
11    Q.   All of them.
12    A.   No.
13         MR. CARTMELL:  It's all in his report,
14  all his opinions.
15  BY MR. MAZZIOTTI:
16    Q.   At what level does the risk need to be
17  in order to be required to be in an IFU?
18    A.   What level of risk?  You mean what
19  frequency does it have to happen, what's the
20  severity, what's the treatability and what's the
21  long-term sequelae of that?
22    Q.   No.
23         Should cancer -- a potential of a
24  long-term risk of cancer be in the Bard IFU?
25    A.   I think the association that would help

Page 298

1  doctors understand what -- you know, it's just a
2  line: There's been an association between
3  polypropylene mesh and sarcomas in rats.
4      Q.  So that should be in the IFU?
5      A.  I think that would be very helpful for
6  me to use that information to counsel patients
7  about the safety a medical device.
8      Q.  But that wasn't my question, would it
9  be helpful.
10      Are you saying that Bard should have in
11  its IFU on the Align product that there is a
12  potential association between cancer and
13  propylene?
14      A.  By stating that there is laboratory
15  evidence in rats, yes.
16      Q.  So the answer to my -- I'm just
17  confused and want to make sure.
18      The answer to the question is yes, it
19  should be in there?
20      A.  That there is an association, and that
21  association has been shown with laboratory
22  evidence in rats.
23      Q.  That's kind of what I was getting at.
24  So if that needs to be in there and there's an
25  association, not a -- at least a proven causal

Page 299

1  connection?
2      A.  There are patients that would not want
3  to have a device even if there is the slightest
4  risk of it causing cancer.  That is a decision
5  that the patient should be able to make, what
6  level of risk that they are going to accept.  It
7  is not for me to decide what is a level of risk
8  that my patient accepts.
9      Q.  So if it's a slight risk, it should be
10  in the IFU?
11      A.  If it's a severe risk, it should be in
12  the IFU.
13      The risk of nausea after surgery is
14  something I discuss with patients, but that's
15  just a caveat of surgery.
16      Q.  Correct, but what you're talking about
17  are complications --
18      A.  If there's a risk of dying, I explain
19  to my patients there's a risk of dying with
20  every surgery, albeit small, and therefore, that
21  is a significant risk for them.  And patients
22  go, "Okay, I understand that."
23      Q.  I get the risks associated with
24  surgery.  That's a separate -- that's an
25  informed consent on the surgery.

Page 300

1      A.  Right.
2      Q.  I'm talking about the IFU.
3      And you said a little bit earlier if
4  it's a slight risk, it should be in the IFU; is
5  that --
6      MR. CARTMELL:  Object to the form.
7      THE WITNESS:  If it's a -- if the
8  implication is severe.  Okay?
9  BY MR. MAZZIOTTI:
10      Q.  Right.
11      A.  Just like the MSDS warning that this is
12  not a device that should be permanently
13  implanted inside of people, that should be in
14  the IFU.
15      Doctors and patients should know about
16  that, that the risk of dyspareunia is lifelong
17  and that it might not be able to be corrected,
18  that I'm putting a device in that there is no
19  known way of taking it out and that taking it
20  out could actually worsen problems that you're
21  having.
22      I think I go over the list of things
23  that should have that never appeared in the IFU:
24  Infection, permanent pelvic pain, urinary
25  problems, erosion, chronic dyspareunia, need for

Page 301

1  additional surgeries, need for removal, urinary
2  tract infections, dysuria, de novo urgency, mesh
3  erosions, narrowing of the vagina, just to name
4  a few.
5      Q.  Should the risk -- should there be some
6  sufficient reliability and acceptance among your
7  peers before it goes in an IFU?
8      A.  Reliability, no.
9      What should be in the IFU is what is
10  known to the company about the risks associated
11  with the device.
12      There doesn't have to be a causal
13  relationship.  It's just that it has to be
14  associated with it.  And it's information that
15  patients need to know about making an informed
16  decision.
17      Q.  And I'm sure you know there's
18  disagreement with what the MSDS says and why
19  it's there and the relationship with cancer so
20  my question is:  What if there's disagreement
21  among medical experts as to what the
22  consequences are, the risks are?  Why would it
23  be in an IFU if it's debatable?
24      A.  It is up to the patient to decide what
25  risks they are willing to take.  It's up to the

Page 302

1  patient to decide what they are going to do with
2  their body with a device that is permanently
3  implanted for the rest of their life that there
4  is no acceptable way to take out.
5      When you tell a patient, "This is going
6  to be in your body forever, and I can't reliably
7  take it out," I think that debatable information
8  is fair game to give to a patient.
9      And I know that my patients feel that
10 way when I discuss with them what the risks are
11 because I still talk to patients about the risks
12 of midurethral slings and I give them that
13 information, and patients tell me they don't
14 want it.
15     Q.  The more information, the better is
16 what you're saying in the IFUs?
17     A.  That is correct.
18     Q.  Even if the IFUs going on for pages and
19 pages and pages?
20     A.  There are pages and pages and pages in
21 inserts for medications.
22     Q.  I'll switch gears, and then we're about
23 done.
24     How many times do you believe you've
25 served as an expert?  Over a dozen, two dozen?

Page 303

1      A.  Served as an expert in what respect?
2      Q.  Medicolegal review in cases,
3  litigation.
4      A.  From the early 90s?
5      Q.  Right.
6      A.  How many that I reviewed, how many I
7  was deposed in or how many I went to trial on?
8      I've testified before that I used to do
9  maybe a maximum of like 15 to 20 -- reviewed 15
10 to 20 cases a year.  That's dropped, you know,
11 down to zero right now for medical malpractice.
12     Q.  Right.  So how many times since the
13 early 90s, do you think, over a hundred?
14     A.  Cases I reviewed for medical
15 malpractice, yes.
16     Q.  In medicolegal whether it's medical
17 malpractice, product liability, whatever.
18     A.  Wrongful death cases, --
19     Q.  Right.
20     A.  -- disability insurance and those kind
21 of things, yes.
22     Q.  Over 200?
23     A.  Reviewed?
24     Q.  Correct.
25     A.  Yes.

Page 304

1      Q.  Over 300?
2      A.  Individual cases?
3      Q.  Correct.
4      A.  Yes.
5      Q.  I'm going to keep going up until you
6  say that's about right.  Over 400?
7      A.  I don't know.
8      Q.  How many depositions do you think
9  you've given in your career?
10     A.  You've already asked me that.
11     Q.  "I think I did 90," I think you said.
12 Does that sound right?
13     A.  Somewhere around 80, yes.
14     Q.  Okay.  And the vast majority of those
15 would have been on behalf of the plaintiff?
16     MR. CARTMELL:  Object to the form.
17 BY MR. MAZZIOTTI:
18     Q.  I think that's a different question.
19     Earlier, you said, "I'm 60 percent
20 plaintiff, 40 percent defendant," right?
21     A.  For reviewing, yes.
22     Q.  For the depositions, though, the vast
23 majority are for plaintiff?
24     A.  There are more plaintiff depositions
25 out there than defense depositions, yes.

Page 305

1      Q.  80 to 90 percent?
2      A.  Maybe 75 to 80 percent.
3      Q.  I think you said you've never had your
4  opinion limited due to a Daubert challenge or a
5  challenge to your qualifications to your
6  knowledge?
7      A.  To my knowledge, no.
8      Q.  To your knowledge, that is a correct
9  statement?
10     A.  To my knowledge, I mean, my --
11     MR. CARTMELL:  I just explained to you
12 what happened in the Lewis case.  I don't know
13 whether he knows about that or not.  It's
14 really, I think, irrelevant.
15     MR. MAZZIOTTI:  I understand the Lewis
16 case, but I'm wondering if there's --
17     MR. CARTMELL:  It's a legal question.
18 You're asking him for a legal opinion.
19     MR. MAZZIOTTI:  I'm not.  I'm really
20 not.  I'm asking -- I'm not asking you were you
21 not qualified.  I'm asking if you know if a -- I
22 mean, I have never, ever had that one objected
23 to.
24     I'm asking him if a court in a case in
25 which he has testifying has ever limited his

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 311 of 924 PageID #: 213148
Case 2:12-md-02327 Document 7262-3 Filed 06/19/19 Page 30 of 924 PageID #: 146648

In Re: CR Bard 200          Bruce Rosenzweig, M.D.          10/29/2014

Page 306

1  opinion to his knowledge.
2       THE WITNESS:  To my knowledge, no.
3       MR. MAZZIOTTI:  I'm not asking him what
4  was the basis for it and do you agree with the
5  legal analysis.
6       THE WITNESS:  To my knowledge, no.
7  BY MR. MAZZIOTTI:
8     Q.   Okay.  And I understand the other one.
9  That's why I said "to your knowledge."
10      MR. CARTMELL:  Well, he actually has
11  knowledge now because I said it in front of him,
12  and you were sitting right across from me when I
13  said it.
14      MR. MAZZIOTTI:  All right.  Doctor, I
15  appreciate your time.  Hold on.
16      Okay.  I'm finished.  Thank you for
17  your time today.
18      THE WITNESS:  Thank you, sir.
19      MR. CARTMELL:  Thanks.
20      We'll reserve all questions.
21      THE VIDEOGRAPHER:  That's the end of
22  the deposition.  The time is 5:34.
23      We are off the record.
24            (FURTHER DEPONENT SAITH NOT)
25

Page 307

1       C E R T I F I C A T E
2
3     I, BRENDA S. TANNEHILL, do hereby certify
4  that heretofore, to-wit, on October 29, 2014,
5  personally appeared before me, at 320 North
6  Dearborn Street, Chicago Illinois, BRUCE ALAN
7  ROSENZWEIG, M.D., in a cause now pending and
8  undetermined in the United States District
9  Court, Southern District of West Virginia,
10  In Re:  C.R. Bard, Inc., Pelvic Repair System
11  Products Liability Litigation.
12     I further certify that the said witness
13  was first duly sworn to testify the truth, the
14  whole truth and nothing but the truth in the
15  cause aforesaid; that the testimony then given
16  by said witness was reported stenographically by
17  me in the presence of the said witness, and
18  afterwards reduced to typewriting by
19  Computer-Aided Transcription, and the foregoing
20  is a true and correct transcript of the
21  testimony so given by said witness as aforesaid.
22     I further certify that the signature to
23  the foregoing deposition was not waived by
24  counsel for the respective parties.
25     I further certify that the taking of this

Page 308

1  deposition was pursuant to Notice, and that
2  there were present at the deposition the
3  attorneys hereinbefore mentioned.
4     I further certify that I am not counsel
5  for nor in any way related to the parties to
6  this suit, nor am I in any way interested in the
7  outcome thereof.
8     IN TESTIMONY WHEREOF:  I have hereunto
9  set my hand and affixed my seal this 31st  day
10  of October , 2014.
11
12
13
14
15
16
17
18
19
20      _____
21
          Brenda S. Tannehill
22
23
24
25

Page 309

1  TO: Thomas Cartmell
2  Re: Signature of Deponent Bruce Rosenzweig, M.D.
3  Date Errata due back at our offices:  12/1/2014
4
5  Greetings:
6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF
7  transcript, noting any changes or corrections on the
   attached PDF Errata.  The deponent may fill out the
8  Errata electronically or print and fill out manually.
9
   Once the Errata is signed by the deponent and notarized,
10  please mail it to the offices of Tiffany Alley (below).
11
   When the signed Errata is returned to us, we will seal
12  and forward to the taking attorney to file with the
   original transcript.  We will also send copies of the
13  Errata to all ordering parties.
14
   If the signed Errata is not returned within the time
15  above, the original transcript may be filed with the
   court without the signature of the deponent.
16
17
18  Please send completed Errata to:
19  Tiffany Alley Global Reporting & Video
20  730 Peachtree St. NE, Ste 470
21  Atlanta, GA 30308
22  (770) 343-9696
23
24
25

In Re: CR Bard 200    Bruce Rosenzweig, M.D.    10/29/2014

Page 310

1   ERRATA
2   I, the undersigned, do hereby certify that I have read the
    transcript of my testimony, and that
3
4   ___ There are no changes noted.
5   ___ The following changes are noted:
6
    Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7   Procedure and/or OCGA 9-11-30(e), any changes in form or
    substance which you desire to make to your testimony shall
8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any
9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.
10
11  Page _____ Line _____ Change _____
12  _____
13  Reason for change _____
14  Page _____ Line _____ Change _____
15  _____
16  Reason for change _____
17  Page _____ Line _____ Change _____
18  _____
19  Reason for change _____
20  Page _____ Line _____ Change _____
21  _____
22  Reason for change _____
23  Page _____ Line _____ Change _____
24  _____
25  Reason for change _____

Page 311

1   Page _____ Line _____ Change _____
2   _____
3   Reason for change _____
4   Page _____ Line _____ Change _____
5   _____
6   Reason for change _____
7   Page _____ Line _____ Change _____
8   _____
9   Reason for change _____
10  Page _____ Line _____ Change _____
11  _____
12  Reason for change _____
13  Page _____ Line _____ Change _____
14  _____
15  Reason for change _____
16  Page _____ Line _____ Change _____
17  _____
18  Reason for change _____
19
20  _____
        DEPONENT'S SIGNATURE
21
    Sworn to and subscribed before me this ___ day of
22  _____, _____.
23
    _____
24  NOTARY PUBLIC
25  My Commission Expires:_____

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

---

**$**

**$1,000** 65:24

**$1,500** 54:20
63:15 258:14
264:8

**$10,000** 54:20,24
55:1 64:6

**$15,000** 64:18

**$5,000** 65:25

**$750** 54:19

**$750,000** 59:1

---

**1**

**1** 13:3,8 19:10
97:2,22 102:19
122:11, 201:12
226:5

**1,000** 258:20

**1.2** 149:12

**10** 31:12 131:8,
174:16 175:18
180:2 197:17
198:14 199:1
215:22 216:3
223:9 225:7

**10,000** 56:5

**10,000-a-day**
55:21

**10-year** 206:19
222:14

**100** 8:10 65:21
138:18 215:22,
25 216:3 245:5

**10:44** 63:7

**10:56** 63:11

**10th** 260:7

**11** 31:15 198:5

**11-year** 196:24

**11:30** 249:25

**11:46** 102:19

**11:53** 102:24

**12** 269:17

**12:15** 121:13

**12:16** 121:20

**12:30** 121:14

**12th** 260:8

**13** 20:17 249:24
250:16 251:18
261:19 262:2,
11,12

**131** 211:25

**14** 180:6 181:2

**141** 211:22

**15** 69:25 80:8
180:2,3 242:12
258:18 303:9

**16** 294:14

**17** 184:21 186:5
192:22 194:13
211:18 212:10

**17-year** 137:16
186:3 196:24
207:7 209:19
211:17

**175** 8:1

**18** 233:12

**1986** 81:19

**1988** 97:15,21,23
98:11,15,19

105:13

**1989** 97:7,16

**1998** 97:6 173:17
174:8,19

**1:08** 259:15

**1:17** 122:5

**1:56** 259:14,15

---

**2**

**2** 36:25 37:3
66:12 102:24
199:11 210:22
225:5 233:22
235:9

**2,000** 185:16

**2,500** 66:3

**20** 33:12 55:11
56:15 66:11
80:8 198:25
223:13,19
248:12 249:3
303:9,10

**200** 31:2 70:11
130:21 303:22

**2000s** 77:3
225:15

**2002** 38:9

**2004** 168:17

**2005** 75:13 78:6

**2006** 76:13 214:9
231:1

**2007** 76:13 197:8
214:9 215:20
216:7 231:1

**2008** 76:13

80:15,16 109:4
230:25

**2009** 27:12
213:18

**2010** 15:17 27:13

**2011** 15:17
58:11,12 89:19
208:23 232:24

**2012** 49:22
50:12,20 52:4
67:14 69:22
70:14 207:15
222:22 226:6

**2013** 15:13 29:19
30:10 38:1
133:16

**2014** 29:20,25
66:17 133:14
164:12,15
172:24 173:6,10
200:25 202:6
203:2,11

**2015** 270:10

**25** 113:15 198:25
210:7 216:21
249:23 250:15
258:11,15

**26** 19:9 23:12,13
35:19 48:25
73:24 122:12
123:8,20 125:2,
6 126:5,21
127:1 128:21,24
201:11 204:3
252:7 253:20
258:24 259:4
276:16 277:3,9,
12

---

**28** 31:4 131:5 175:13, 197:16

**29** 172:23

**29th** 29:20

**2:11** 170:24

**2:19** 171:3

**2:55** 199:11

**3**

**3** 13:24 97:8,11 98:7 122:13 199:16 239:21

**30** 46:21 58:1 67:21 68:9 69:8, 17 72:9 155:22 168:6 223:21 224:5 225:16 275:19 276:9,12

**300** 67:2 70:11 304:1

**300th** 274:20

**35** 251:11 259:6, 7

**3:15** 199:16

**4**

**4** 131:8 149:14 219:16 223:1

**4-6** 122:2

**40** 12:2 46:21 58:1 67:22 68:9 69:8,17 80:9 136:15 165:3 186:8 195:19 212:3 223:21

224:5 247:9 248:8,10 275:19 276:10,13 304:20

**40-to-70-percent** 136:13

**400** 304:6

**400,000** 67:2

**45** 236:14 238:11

**45-year** 164:24

**4:23** 254:5

**4:34** 264:1

**4:45** 55:9 272:13

**4:54** 272:17

**5**

**5** 31:8 123:5 131:9 149:14 197:20 210:10, 15 223:1 224:21 225:12

**5,000** 66:4

**50** 28:17 30:15 31:3,11 80:9 131:3,13 132:10 135:3,17 136:24 137:23 168:6 186:4 196:12 197:21 198:12 208:6 211:18 218:5 241:18

**50-to-90-page** 65:13

**500** 45:13 65:16, 24 70:6

**510(k)** 81:18 193:9,13,20 194:2,19 195:5, 9

**522** 158:1

**5:34** 306:22

**6**

**6** 98:7 123:11 138:9

**60** 12:1 132:11 137:25 241:19 247:1 304:19

**60-to-65-percent** 137:5

**600** 58:20

**64** 131:5

**65** 31:4 135:19

**7**

**7** 122:22 123:2, 16 174:12

**70** 135:21 136:15 174:16 223:14

**700,000** 58:20

**70s** 153:12 234:19

**75** 29:13 210:4 214:22 215:6 216:24 305:2

**750** 63:23

**7:00** 56:8,9

**8**

**80** 8:8 147:10 208:5 304:13 305:1,2

**80-to-90-percent** 147:23

**80s** 82:2

**85** 165:2

**8:00** 261:25

**9**

**9** 131:7

**9.2** 31:6

**90** 147:10 198:14 304:11 305:1

**90s** 66:7 148:8 153:15 155:19 157:1 168:2 236:1 271:12 293:11 303:4,13

**91** 197:1 211:23 212:1

**9:30** 261:18

**9:38** 4:2

**A**

**a.m.** 4:2

**abandoned** 158:2

**Abbott** 29:11 33:20 210:3 214:21 224:11 228:21

**Abbott's** 27:8 28:17 209:25 210:17 216:21 222:8 227:14

**able** 12:10 16:5 56:24 63:19 64:14 68:22 69:1 89:5 92:7,8 95:11 102:3 116:22 140:12 183:9,15 188:18 214:5,15 238:9 242:23 251:19 256:2 281:8,15 284:14 287:1 288:2,6 289:25 299:5 300:17

**about** 6:4 8:13 10:6 12:10 14:6 15:10 16:13 17:9,19,23 18:4, 16 19:3,4,6,14, 17,20 20:11 21:7,12 23:1,2, 10 24:16,20 25:6,7 28:3 29:8,16 30:6,19, 20,23 31:1,10 32:1,3 33:9,12, 20,22,23 34:1, 25 35:10 36:20 38:2,15,17,19 39:6,10 41:18, 21 42:13 43:7 47:12 48:11 49:8 52:9 57:8 60:23 63:14,16, 23 66:15 68:9 69:11,12 71:15, 16 72:6 73:22

74:6,20 75:2 76:13 77:1 78:5 79:15,18 80:2,3, 5,8,9 82:11,14, 21 83:12,18 84:3 86:12,15 90:12,14 91:8 95:1,12,23 96:4 98:25 99:3,9,12, 25 100:14,21 101:13,17 103:2,10 105:8, 14 107:8 110:3, 16,17,21 112:18 113:8 114:14, 17,18,22,23 117:24 119:25 120:17 121:6,11 122:9,11 123:19 124:6,9,11,14, 16,18,22 126:21,23 127:16,22 128:15,24 129:7,18,24 130:18,24 131:8 132:6,11 134:20 135:3,18 136:4, 5,8,12,21 139:7, 22 140:7 141:5, 19 142:16,18 143:7 144:15 145:5 146:2,3 147:1,6 150:14 156:7,10,12 157:16 159:14, 21 161:8 162:23 164:12 165:2,20 166:3,14,19 167:22,24 168:5

169:25 170:6,7 171:10 172:5,7, 22 174:3,7 175:13 176:2, 15,16,20 177:6, 14,15,25 178:1, 5 179:17 180:10,23 181:6,11,25 182:20 183:16 185:15 186:19 188:8,10 190:3, 4 191:3,6,12 192:3,20 193:1, 6,24 194:1,11, 23 195:8 197:5 198:8 199:20 200:4,8,9,21,22, 25 201:8,15 202:6,21,24 203:21,22 211:4 213:3,14 214:17 216:2 217:3,7, 10,13 218:3,9, 25 219:1,16,19, 25 221:18 222:6, 223:7,12 224:20 226:3,4, 10 227:9,12 229:23 231:18, 25 232:13,16,22 233:3,6,18,23, 24 234:3,5,6,9, 13 235:9,20 236:5,24,25 237:8,10,11,13, 17 238:1,13,20 239:6,21 242:10 243:11,13,21 247:1 248:4,7,9,

15,18,20 249:2, 3,6 250:1,15,19 255:11, 256:14 257:13 259:16 262:23 263:3 264:19,20,22 266:2 268:17 271:9,12 272:24 274:7,9 275:24 276:12 277:15 279:12 280:21 281:24 282:7 283:21 284:9, 11,25 285:21 287:6,12,14,16 288:8,13 290:22 291:7,23 292:11,15,16, 17,18 293:4,13, 19 296:3,21 297:4, 298:7 299:16 300:2,15 301:10,15 302:11,22 304:6 305:13

**Abrams** 190:16

**Abrams'** 192:21

**abrasiveness** 219:18

**abreast** 44:20

**abscesses** 216:11

**absolutely** 155:13 161:25 212:6

**abstract** 15:15 19:25 31:15

**accept** 85:9 91:19 191:23

Case: 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 316 of 924 PageID #: 213123
Case 2:12-md-02327 Document 9252-3 Filed 06/18/20 Page 315 of 924 PageID #: 216958

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

299:6

**acceptable**
154:16 156:15
287:17,18 302:4

**acceptance**
301:6

**accepted** 85:1
89:11 105:24
256:18 259:25

**accepts** 299:8

**access** 204:2,4

**accessibility**
283:16

**accommodate**
7:8

**accordance** 5:15

**according** 18:12
51:21 164:17
223:14

**accordion** 31:23

**accurately** 205:7

**acids** 151:22
153:9

**acknowledged**
43:5

**ACOG** 88:9,12,
16,17,20

**ACOG'S** 88:18

**across** 257:22
278:16 306:12

**act** 265:8,22

**active** 140:3

**activities** 243:7

**actual** 102:7
169:16

**actually** 19:19
24:18 25:20
52:10 55:22
57:16 62:22
64:1 75:22 77:9
83:7 100:15
107:6 118:11
122:18 130:6,9,
14 135:6,13
145:19 149:25
155:1 162:5
166:4 168:14
171:20 177:13
193:1,13 198:20
214:16 216:22,
25 223:2 232:11
244:10 245:14
254:2 278:20
281:8 283:17
290:9 294:22
300:20 306:10

**ad** 263:22

**Adam** 21:10

**add** 14:10,11
38:5 40:16 71:9
91:23 93:5,7
222:18 259:5
272:6

**added** 21:3,11
35:15 72:12
110:23 155:12
160:11,12

**adding** 57:18
223:20

**addition** 68:12
69:17 89:14

**additional** 14:11
171:18 209:1

252:16 301:1

**additives** 155:11

**address** 257:8
266:1

**addressing**
134:7

**adductor** 246:2,
3

**adequacy** 288:12
289:4,8 290:2,6

**adequate** 84:22
288:10 296:9

**adequately**
295:17

**adhere** 217:16

**administrative**
240:5,6

**advanced** 113:12

**adverse** 104:5,
10,11,13 119:1
286:8,10

**advertised** 293:7

**advise** 267:3

**advised** 88:1

**advisory** 96:10
208:23 267:3

**affects** 101:16,19

**after** 11:5,11
28:13,19 31:5
37:10 61:15,19
89:22 143:20
152:18 163:19
186:24,25
196:13 209:9
211:22 255:24
260:7 299:13

**afternoon**
260:18 264:5,14

**afterwards**
131:20 210:3

**again** 36:7 40:13
41:15 42:7 43:2
44:3 54:9 56:22
63:24 64:9 68:6
80:11 85:25
91:5 126:11
141:3,15 146:18
148:3 150:24
157:17 201:15
202:20,23
225:18 236:19
241:16 247:6
259:7 273:21
275:22 277:13,
17 281:14

**against** 11:19,22

**age** 165:2

**agency** 173:16
174:5 214:8,13
238:20

**agents** 144:14
151:21

**ago** 10:5,6 12:10
34:24 35:1
76:10 214:14
219:13 227:10
230:5 232:23
269:16,17
294:14

**agree** 33:13
58:25 59:2
86:22 91:9,22
92:1 135:22
140:18 145:1

156:14 164:18 165:7,22 166:9 174:1,25 176:9 179:5,10 188:5 204:24 214:1 229:11,16,22 253:23 256:4 261:3,4 263:1 281:15 282:1 284:6 306:4

**agreeable** 5:16, 17 86:13 164:8

**agreed** 69:6 125:21 126:18 142:5 212:15

**agreeing** 255:21

**agreement** 5:5,8 48:23 64:13 125:7 126:13,17 128:9 162:12 263:17 280:25 281:24

**ahead** 63:3,4,6 75:16 92:13,18 109:3 122:8 206:5 229:12 233:13 251:15

**Ahmed's** 168:3

**ailment** 145:23

**ailments** 146:14

**Alan** 7:17,18

**albeit** 299:20

**Align** 15:10,19, 23 16:11 17:13, 23 18:14 19:4, 11,12,24 20:8 23:6,9,11,15,24 25:21 30:19,23

31:1 46:25 47:22 52:9,12, 13,25 54:7 58:3 69:14 73:24 75:11,12,23 76:3 103:13 107:4 115:22 129:12 130:22, 25 131:2,4,16, 22 133:18 135:15 136:4,8, 11,13 148:16 149:12 151:4 175:7,24 178:17 180:7 184:24 197:6 198:10 201:18,24 208:25 209:12 223:9 233:23 273:16,19 295:23 296:4,14 298:11

**Align's** 197:11

**Aligns** 31:3

**all** 5:5,11,14,16, 18 7:9 8:17 17:2 19:16 27:10 28:15 29:1,22 30:25 31:24 32:5,20 33:22 34:2,24 35:7 36:2,17,19,23 39:5,8,16 40:12, 20 41:8 42:25 47:19 54:14 55:15 56:6,20 59:5 61:13 64:24 65:9 72:25 73:4 75:5

85:10,24 92:7 93:8 94:9,22 97:8 98:3 103:19 104:10 108:13 109:22 110:19 112:1 119:22 120:9 122:21 123:20 125:23 127:13, 24 130:17 134:21,24 136:25 142:18 158:6 167:21 168:4 169:23 171:16 179:4 180:14,17 183:3,25 187:21 189:20 190:3,4, 25 201:3 202:21 205:24 210:7,11 213:12 217:11 221:7,11 222:18 223:11 224:8,16 227:13,16 231:1,20 235:3 236:6 239:5,20, 23 244:20 245:3,5,8,17,18 250:9 251:1,3,5 252:7,20 253:24 255:17 258:22, 23 260:18,20 261:19 264:16 266:18,20,22 267:7,25 268:20 273:1,8,11,12 275:15 277:18 278:25 280:9 283:15,16 286:1,12,19

288:2 292:25 297:1,5,11,13, 306:14,20

**allergies** 146:24

**allergy** 146:24 147:5

**allow** 221:24

**allowable** 5:12

**allowed** 119:6 183:1,5 193:20 279:3

**allows** 118:14 183:22 185:21

**alluding** 262:24

**almost** 135:11

**alone** 285:19

**along** 21:6 78:16 151:19 156:24 190:1 220:6,8, 11 261:6,12

**alphabetical** 133:8

**already** 17:8 28:23 50:12 60:5 69:10 73:21 74:1 82:6 122:11 201:15, 16 202:1,4 203:2,19 208:25 221:18 222:6,7 223:6 243:20 263:16 294:20 304:10

**also** 6:15,16 21:11 48:24 63:19 71:12 86:7 89:14 96:8

138:7 166:16
169:2 176:9
179:6 185:12
187:15 192:8
198:9 201:23
204:25 219:20
231:23 239:1
240:9 244:11
245:13,15
267:20 271:17
282:18 283:4

**alter** 184:24

**alternative**
158:4 177:2
280:23

**although** 239:16

**always** 43:4
62:22 270:15

**am** 24:11 43:4
71:8 83:16 84:3
86:17 88:10
91:13 94:7
95:20 97:16
101:21 117:23
133:2 240:20
258:21 259:7

**ambiguous**
107:22 237:7

**American** 43:14
87:24 164:1
267:10,13,17
268:4,8

**amnioinfusion**
9:20 81:17
96:22 97:4,14
98:10 105:5
193:12

**among** 46:7
105:24 301:6,21

**amongst** 192:25

**amount** 46:23
47:2 55:3 63:17
147:2 162:22
213:20 223:4,11
227:25 242:4

**AMS** 8:20 26:4
54:2,8,10 79:18

**Amy** 54:5

**analysis** 81:12
179:24 185:19
210:20 213:18
215:20 216:8
224:23 289:19
306:5

**analyze** 102:3

**anatomy** 279:23

**Anderson**
232:16

**Angioli's** 224:20

**angiosarcomas**
155:20,24

**animal** 153:20
189:7,13
235:23,25
236:3,6,11,15,
22 237:4 238:2,
9,16,25 239:3

**animals** 236:20

**annual** 241:8,21

**another** 9:23,25
16:10 21:24,25
22:16 117:24
135:20 136:2
150:18 155:17

161:21 174:17
212:9 223:20
224:12 248:10
256:11,15
258:24 259:17
265:16

**answer** 6:12,20,
22 7:12 19:2,6
20:7,20 49:17
67:6 72:3 118:2,
19 119:17
120:1,11 128:12
146:10,20
154:21 176:23
209:4 272:9
279:25 296:19
298:16,18

**answered** 33:13
34:3 74:1
212:20 213:9
286:6

**answering**
177:18

**answers** 82:9

**anterior** 179:20

**anticipate**
251:17 252:1

**anticipated** 65:8

**anticipating**
28:21

**antioxidants**
155:7

**any** 5:24 6:8 7:6,
9 8:12 10:16
14:11 15:7,8
20:5,23 21:13
23:23 24:13,16
25:3,7,25 26:3

29:20 30:1,10
34:19 35:3 36:5
37:12,21 38:17
41:16 42:11
48:7,11 51:10
53:6 55:24
59:10 60:11
62:6,8 65:17
72:15 74:20
75:2,5 77:23
79:21 80:23
81:7,14 88:19
89:9, 91:24
100:7,12,17,18
111:21 112:11
121:5 123:18,25
124:6,20 125:8
126:22,23
127:6,8 128:16
133:5,7 139:16
159:13,20
160:12,13
171:19,22
172:11 175:22
185:1 191:12
192:11,23
193:18 197:23
199:22 204:9
209:11,14 211:7
218:18 227:8
245:4,6 248:14
252:6 255:8
258:21 265:25
269:1,18 271:2,
6 272:5,21
273:3,13 275:4
278:25 287:3,6
288:18 289:12
290:15 291:3,20
292:13 294:10,

21

**anybody** 74:7, 14,17,25 82:13 179:8

**anybody's** 281:14

**anymore** 60:15 71:14 75:9 109:14 162:15 263:14 293:20 294:3,9

**anything** 14:9 19:14 20:24 21:1 25:18 26:20, 29:23 30:17 34:14 37:17,24 38:5, 18 47:5,9 48:2,8 64:14 99:13 100:8 104:1 128:7,11,23 129:2 162:1 174:22 248:21 264:25 275:16 287:10 291:17 293:2

**anyway** 263:15

**anywhere** 136:12 137:4 147:23 159:4 188:11 223:8

**apart** 245:10

**apiece** 278:13

**apologize** 16:3, 22:5 92:22 103:20 118:2 233:20

**appeared** 300:23

**application** 116:1 133:24 151:11,25 152:9 154:24 155:25 156:5 158:19 162:12,24 163:18,19,21 205:8

**applications** 152:12 153:17, 18 154:21 156:20

**applies** 183:11

**appreciate** 247:21 252:19 260:23 306:15

**approached** 82:14 83:15

**approaching** 58:20

**appropriate** 84:18 93:11 277:15,16 286:8 288:4

**appropriately** 296:1

**approval** 194:4 195:9

**approved** 78:25

**approximately** 4:2 58:1 69:15 131:13 249:25 275:19 276:9

**area** 77:24 109:15 125:11, 15 186:24 195:6

243:19 244:6, 21,22 246:10 265:18

**areas** 103:3

**aren't** 170:15 211:2 218:19 225:20

**argue** 179:8,14

**arguing** 213:3

**arise** 89:13

**arises** 89:6

**arm** 132:22

**arms** 18:12,13 246:8,9

**around** 99:5 135:21 139:3 144:2 187:10 189:6 190:24 220:18 227:1 244:12,22 254:15 304:13

**arrangement** 65:4

**article** 20:1 33:12 42:11 43:23 129:7,10, 18 130:15, 131:18 132:4, 15,16,18,23,25 135:19 136:2 148:8 166:11 169:6 174:19 176:4,5 224:12 234:6,8 271:10 274:7,8

**articles** 15:7 20:5 23:7 30:11

36:4 38:8,17,19, 20 41:6,12,13, 16,18 42:12,13, 18,23 43:2,9 44:6,10 45:7 136:10,11,17 169:4 175:23 248:15,18,20 268:3,4 269:1 271:16 273:2,8

**articulate** 285:7

**artificial** 143:11 144:1

**as** 4:25 7:19, 10:20,22 11:1,7 13:3,13 14:2 17:18 18:19 19:10,24 20:9, 23 23:14, 26:24, 25 33:5 35:8,11, 13,16,22 36:25 37:13,21 38:25 39:12 40:20 41:17 42:1 44:6 46:22 51:9,24 52:1,4,20 54:11, 22 56:5,12 57:2, 9,25 58:19 59:7 60:1,3,4,5 61:17,18 62:2, 10 65:11 67:9 69:13 71:5 74:4, 12 75:19,24 78:20 79:19 80:10 81:25 82:17 85:10,17 87:16 88:4,6 89:2 90:10 91:5 92:3,25 93:10,

19,21 94:3,24, 25 99:8 100:9 101:23 102:3,4, 7 103:6 105:4, 20 106:4 112:13,14,23 113:18 114:5, 13,14,15 117:9 120:18 122:12, 22 123:12, 125:16 131:12, 19 133:4,20,24 136:9,19 137:12 139:22 141:21 142:6,21,22 143:25 144:14, 23 145:3,7,8,21 146:15,25 147:24 148:17 149:7,21,22,23 152:14 154:2,24 155:20 157:13 161:8, 165:9,23, 24 167:3,5,19 168:12,15 172:23 173:5, 10,15,21,24 175:1 178:17 180:2 182:15 183:7 186:14 187:1 189:12,15 192:19 194:9 198:21 201:12 205:8 206:15 208:14,24 211:22,25 216:10 219:8 220:9,19 228:15 229:5,11 230:10 231:4 232:7

236:5,22 238:12,20 240:4 241:22 242:4,10 244:25 248:11, 13 251:23,24 252:13 258:14 260:25 261:3 262:24 265:4 272:1 273:5,6 275:4 284:14, 21,22 285:1,18 286:21 287:13 288:11 289:3,7 292:6 293:23 301:21 302:25 303:1

**ask** 4:24 6:6 12:19 19:5 24:20 68:6,15 70:21 73:18 85:24 86:18 91:25 93:3,6 94:1,17 95:7 107:11 110:24 114:22 118:21 123:18 126:2,16 128:4,7,9 183:21 184:7,9 195:24 200:21 202:3 203:10 216:1 254:15, 20,25 255:3 261:17 265:2 280:3 290:4 294:5

**asked** 24:23 38:8 50:23 67:3,8 71:18 73:20 98:18 100:3 115:18 160:7

162:19 175:4 191:11,13 212:20 234:8 275:5 286:6,21 289:10 291:23 292:1,2,15 304:10

**asking** 5:6 22:7 32:14 34:10 86:12,15 95:5 118:24,25 156:12 157:18 171:7 177:25 183:18 193:24 195:4 204:22 217:13 255:6, 280:12 289:21 294:23 305:18, 20,21,24 306:3

**ASPCA** 188:23

**aspirator** 96:21, 24 98:11

**assessment** 213:18 215:23

**assist** 36:17,18 79:23 128:16

**assistant** 240:20 269:7,12

**associate** 269:6,8 278:5

**associated** 27:17 28:4 31:25 76:23 83:5 84:24 90:23 91:13,14,16, 109:22,24 116:6 117:17 131:16 139:24 140:6

145:10 155:17, 20 156:3,8,10 161:22 162:2 179:9 199:21 205:16,22 206:11 208:1,6, 20 218:6,8, 219:10 238:6 244:14 266:5 279:24 281:3 293:15 296:1, 13,24 299:23 301:10,14

**association** 172:7,10,19 200:8,12,16 297:25 298:2, 12,20,21,25

**associations** 99:3

**assume** 6:13 55:1 93:6

**assumed** 169:14 288:22

**assuming** 92:11, 15 93:7

**assurance** 100:8

**assure** 280:11

**at** 14:3 15:14,16, 20,23 16:16 17:1,4,9,11 18:12,22 21:11, 12 22:17,20,22, 25 23:23 24:13, 23 25:11,12 26:11 27:8,11, 14,15,16,20 28:2,9,10,11,16, 20 31:15 34:13,

In Re: CR Bard 200   Bruce Rosenzweig, M.D.   10/29/2014

19,23 35:19
36:12,17,19
39:5,13 40:8
41:15 43:23
44:19 47:24
48:2 50:3, 52:11
53:10,22 55:2,8,
23 56:3,7,8
58:19 59:1 60:6
64:17 69:24
70:5 72:11
74:12,14 76:20
77:15 79:20
82:5 87:19 88:2
89:21,25 92:1
98:7,24 101:15,
22 102:2
111:20,21
113:24 114:4,12
120:6 128:21
129:3 130:11
132:8 135:21
136:25 137:7
138:3 139:4,5
141:18 153:14
154:25 155:19
158:18 163:8
172:24 174:9
175:23 179:7
180:21 181:5,19
182:2 183:5
186:4 190:19
191:1 196:11
198:5 203:19
205:18,19,21
208:18 210:21
211:18,25 214:4
216:13 222:14
223:9,17 225:5,
11,18 226:11

227:16 228:1
229:16,19 233:1
235:12,14
238:16,19
240:20 245:8,
14,21 246:10,24
252:16 254:24
255:17 258:8,
14,20,23
259:13,15
261:18 267:7
269:15,21
270:14 274:1,2,
4,10 278:18
282:9 287:19,
23,24 294:4
297:16 298:23,
25

**Athanasiou**
212:12

**atrophy** 90:7,20

**attached** 47:13
109:17 169:3,21

**attachment**
148:15 170:3

**attachments**
122:10

**attacked** 151:21
161:17

**attending** 12:12
79:21

**attention** 98:1

**attorney** 127:6
183:8

**attorney's** 56:1
127:18

**attorneys** 37:23
48:21 49:2

68:18 70:21
99:12,15,21,25
125:20

**AUGA** 34:2

**AUGS** 267:16

**August** 38:1

**aureus** 208:7
218:6,7

**Australia** 158:18

**Austrian** 27:22

**author's** 16:2

**authoritative**
272:21 273:4,10

**authors** 200:6

**available** 68:18
75:8 102:5
110:20 115:7
143:6 235:14
260:19 282:15
283:4 284:2

**Avaulta** 17:12,
19 18:3,5,10,12,
14,20,22 19:1,5,
6,14 24:15
46:24 51:1
69:14,21 75:14,
19 76:5,8 78:12,
15,19 79:4
80:17,18,19,
115:23 190:6,7
201:19,22 246:7
295:22

**Avaultas** 80:12

**average** 164:25
195:19 196:18

**avoid** 283:20

**aware** 49:4
164:7 172:11
193:9 208:22
209:11,14 211:7
218:22 227:11
229:8 258:21
283:8 287:11
290:7

**away** 34:7 63:18,
24 64:5,9 91:18
159:24 168:10
187:18 208:4
225:7

---

**B**

---

**B-o-y-l-e-s** 216:7

**baboon** 132:16

**baboons** 129:9,
14,25

**back** 19:18
20:21 24:25
26:3 27:20
29:14 34:19
38:17 39:7
51:18 53:13
55:12 56:8,17
63:12 72:2 77:3
78:6 81:17 82:2
92:23 102:25
110:15 122:6
141:3,4 152:18
161:12 171:4
178:24 197:18
199:2,17 209:25
210:4 211:2,6
214:8, 216:23
219:15 222:9
223:2 225:20

226:21 229:25
234:18 237:22
244:5 247:6
257:10 263:18
264:2 268:15
269:4 271:11
272:18 273:14
277:8 291:21
293:11 294:13

**background**
266:8 268:24
274:21 275:14

**bacteria** 208:6
217:16,17,25
236:10

**bacterial** 274:8

**Bacteriologist**
101:4

**bad** 120:19
121:6, 152:7
248:11

**ballpark** 70:10

**bank** 216:13

**banned** 157:9,13
158:9,12,13,17,
25 159:2,7,9,18

**Barber** 137:3
228:22

**Bard** 4:13,24 5:2
8:12,21 17:11
22:17 46:16
48:9 49:20 52:6,
20,25 54:3,15
58:2 67:9,
69:12,20 73:14
74:6,12,14,17,
25 78:6 82:24
115:7 120:18

124:6,12,17
163:16 179:5
180:12,23
181:6,10,19,25
182:6,19 183:9
184:21 185:10
188:5 189:16,25
202:21 203:3
204:25 233:3
234:1,9,12,14,
15,16,21 235:9,
11,12,13,23
251:11 252:25
259:8 277:5,6
285:2 291:8
292:18 295:17
297:24 298:10

**Bard's** 180:7

**barrel** 45:11

**base** 214:12
236:16 237:3
238:24

**based** 90:13
102:4 119:12
134:6 136:17
138:2 148:23
150:20 153:15
181:18 184:1,
13,15 185:1,7
186:12,13,15
192:16,17,18
199:5 210:16,19
214:21 216:4,21
224:11 229:23
234:15 235:11,
13 237:4 238:15
263:3 285:4
290:12 295:20
296:8

**basic** 131:1
236:23,24

**basically** 59:21
65:1 128:8
171:6 197:10
228:9

**basing** 181:24

**basis** 101:13
140:4 160:14
185:10 239:25
261:8 280:15
286:18,20 306:4

**Bates** 203:14

**bearing** 279:12

**became** 97:1

**because** 18:24
19:13,17 23:5
24:8 32:12
33:25 38:13
42:4 48:3 49:7
51:20,25 55:2
60:6 62:21
69:10 72:22
75:8 86:17 90:5
94:14 106:21
107:22 110:23
115:24 117:9,
12,20 119:5
121:7 129:24
139:5 140:21
143:3, 146:16
148:25 151:7,9,
20 152:4 157:17
161:10 162:14
164:18 173:3
174:9 176:19
177:14,24 180:1
190:20,25

196:10 213:5,11
220:13 221:11
224:1 225:24
230:6,7 232:4
244:22 245:9
246:8,19 251:12
256:6,11 264:7
268:23 286:25
306:11

**becomes** 255:23

**becoming** 65:21
110:19 114:7

**before** 4:23 5:3
6:2 8:22 11:6,9,
25 14:10 17:16
18:25 19:23
26:20 33:23
34:18 37:7
46:22 51:20
53:18 55:1,4,16
56:15 58:11
67:4 69:13,15
72:5,7 78:11
83:18,22 89:20
90:10,21 91:5
95:23 103:4
110:2,7,20
112:10 114:9
120:4 128:21,22
131:12,22
141:21 142:23
147:1 148:7
172:18 188:6
190:1,11,19
191:4,7,13,17,
19 193:3 194:18
195:15 200:9
201:23 202:5
203:9 228:4

232:18 235:19
242:4 248:13
275:25 276:10
277:18 292:1
295:22,23 301:7
303:8

**beforehand** 7:1
24:9

**begin** 250:21
257:13

**beginning** 4:3
102:24 199:16
249:24

**behalf** 4:12 9:5,
14,17 10:8
50:13 304:15

**behavioral** 145:6
146:4

**behind** 131:18
151:1

**being** 16:5,22
46:4 77:6 88:16,
17 89:3 93:21
102:7 115:24
121:6 131:14
156:13 162:6,
11,18 163:4,11,
20 164:8 169:13
183:9 191:24,25
199:21 217:17
238:10 255:17,
18 257:23 264:6

**beings** 133:21

**believe** 47:19
103:16 113:25
119:8 133:20
138:8 181:14,19
182:6,16 183:8

186:13 234:15
235:12 257:22
258:11 277:12
280:4 296:9
302:24

**believes** 119:13
120:8

**Bellwether**
51:24 52:1

**below** 106:12
107:14

**Ben** 155:19
232:16

**bench** 171:24
189:19 190:7

**bendable** 155:9

**beneficial** 91:12
281:6

**benefit** 192:2

**benefits** 87:16
169:9 232:5

**besides** 33:18

**best** 27:15,18
80:21 175:12
176:4

**bet** 141:18

**better** 55:9 77:8,
11 90:14 98:3
114:11 131:2
142:6,8 146:7
186:25 203:10
232:21 247:5
279:23 302:15

**between** 15:22
17:2 18:16 28:7
48:12,20 49:1
66:3 125:19

149:24 172:10,
20 173:7 200:12
220:17 298:2,12

**beyond** 128:6,8,
12

**Bhatia** 82:3
271:11

**big** 54:15 213:25
251:4

**Bigby** 69:25

**bigger** 53:6

**biggest** 243:9

**bill** 56:3 57:1,21
71:5 264:11,15

**billable** 65:23

**billed** 46:10,12
55:2,24 56:5,12,
18 58:12,15
69:10 276:9

**billing** 37:21
68:19 70:23

**bills** 46:1 68:23

**binders** 40:22
41:1,11,12,23
42:5 44:7 45:5

**biofilm** 217:21

**biological** 15:23

**biology** 266:20

**Biomechanical**
81:12

**biomechanics**
81:3,4

**Biomedical**
81:10,21 96:4,
20 97:15

**birth** 243:18

**bit** 6:4 8:9 16:8
38:14 72:22
81:1 99:17
124:15 143:2
146:18 178:25
180:10 219:18
225:24 235:7
237:25 270:18
275:1 292:5
300:3

**bladder** 113:18
140:13 143:19
146:14 150:16
167:12 206:18
208:4 221:20
242:2,21,24,25

**bladders** 167:14
168:13 180:4
208:1,2 218:5
266:3

**Blaivas** 24:24
36:11 228:14,
16,17 229:7

**Blaivas'** 24:18,
21 27:10 227:16

**block** 56:5

**blocking** 22:1

**blocks** 249:5,8

**blood** 144:2
153:4 244:3,23

**blue** 287:8,17

**board** 96:10
240:25 257:23
269:22 270:1
279:20

**board-approved**

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 324 of 924 PageID #: 213131
Case 2:12-md-02327 Document 9252-3 Filed 06/18/20 Page 323 of 924 PageID #: 216963

In Re: CR Bard 200          Bruce Rosenzweig, M.D.          10/29/2014

279:14

**boards** 241:6
267:4 270:5

**Bobby** 18:13
70:1

**bodies** 155:22
187:21 188:22

**body** 27:5 83:2
116:6 149:1,13
151:5,12,13
153:5,6,23
154:3 155:5,14,
22 157:10,14
160:21 167:9
168:7,9 170:8
177:4 180:8
184:25 185:4,14
186:9,20,22
187:2,4,14,18,
20,25 188:1,2,3
190:15 192:19
194:12 205:1,6
206:9 207:22
212:18 220:14,
23 221:3,4,8,10,
12,14,16,17
243:16,22
244:7,8,24
245:2 265:20
302:2,6

**body's** 188:3

**bomb** 86:5

**book** 287:8,18

**Boston** 8:19
26:4,7 54:2,11
79:15

**both** 27:22 69:15
80:4,5 89:2

91:14 142:5
244:13 260:11
263:24 294:22
295:8

**bottom** 171:17
181:5

**bowel** 156:3,4

**box** 41:4 49:15
149:12

**boxes** 39:6

**Boyles'** 215:20
216:7

**Bracken** 21:21,
22 22:16

**brain** 154:7,14,
17

**breadth** 226:8

**break** 7:6,13
63:3,5,6 67:19
80:6 102:15
121:16 153:6,
13, 161:19
199:8

**breakdown**
151:23

**breaking** 248:21

**breaks** 153:10

**brevis** 246:2

**brief** 151:11

**briefly** 4:23

**bring** 34:5 37:24
62:21 68:24
81:22 160:7

**bringing** 39:8
96:6

**brings** 60:9
109:17

**British** 215:24
216:5,19

**brittle** 245:10

**broad** 255:13

**broadened**
237:18

**broadly** 178:16

**brochures**
282:21 283:1,
18,23

**broke** 67:1

**brought** 37:21
38:1 75:23
96:16 98:1
190:2 228:4

**Brubaker**
228:25

**Brubaker's**
210:20 224:23

**Bruce** 4:4 7:17,
18 60:8

**bud** 244:13

**Building** 8:2

**bulk** 121:15

**bulking** 144:14

**Burch** 28:10,23
142:20 147:7,8,
17

**business** 57:3
60:2

**busy** 294:20

**butcher** 21:15

**C**

**C.R.** 4:13,24 5:2
52:20 67:9,
69:12,20 73:14
74:6,12,14,17,
25 78:6 120:18
180:12

**Cabolari** 70:2

**cadaver** 78:14,
15

**calculated** 63:22

**calculation**
63:17 64:8

**call** 7:8 50:7
52:8,13 110:15
143:21 240:5
268:6 271:17

**called** 7:19 19:24
21:6 81:21
95:23 96:8
109:10 139:21
156:23 187:11
217:21 244:13
267:16 268:9
270:11

**calls** 110:12
114:14 289:19

**came** 15:13 27:9
30:23,24 37:10
77:4 85:18
127:8,16 130:20
152:19 168:2
192:23 200:22
220:5 225:14
260:21 287:24

**can** 5:23 6:21

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

7:15 14:2 25:19
30:2,3 32:17
33:16 39:11
42:9 47:11
49:17 51:13
61:18 70:10
72:3 73:4 90:1,
2,5,7,23 91:15
93:9 94:22 97:9
107:11 109:25
118:10 125:24
126:22 127:10,
12 128:13
131:15 133:6
134:15 136:1
137:21 139:14
142:12 144:7,9,
25 145:17,24
146:18 151:20
160:9 161:24
166:21 168:11
170:17 171:11
173:3 175:22
177:8 178:24
180:6 181:22
182:12,16 183:3
188:13,23
193:5,6 200:10
202:2 206:13
207:3, 208:8,14,
20 209:4 215:15
217:8,11,25
221:19,20,21,
22,23 224:15
225:21,23
226:7,20 230:22
235:18,19
236:23, 250:24
251:17,24
253:7,8 254:10

256:5 257:2,4
261:7,15 262:1
265:15,21 269:5
275:8 276:25
277:2,8,11
284:2,18 288:7
290:17 297:4

**can't** 20:12
32:18 34:5 43:1
52:15 58:24
63:25 66:14
70:8 71:19
73:21 78:16
89:9 91:17
120:6 149:20
154:13 159:15
168:16 183:4
184:7 203:13
208:2,17 230:22
239:2 245:18
250:13 256:22,
23 257:14
276:17 285:18
294:13,21 302:6

**cancelled** 24:7,8

**cancer** 155:15,
16,23 156:8,10
162:2 171:21
172:11,13,25
173:4,8,12,17
174:5,23 199:21
200:13 236:2,4
239:2 297:23,24
298:12 299:4
301:19

**cancers** 156:3
172:21

**candidate** 93:22

**cannot** 27:16
117:24 235:16

**capacity** 288:14

**capsule** 187:10

**capturing**
210:12

**carcinogen**
173:15,22 175:1

**carcinogenic**
173:18,25
174:9,17

**carcinomas**
156:2

**cardiac** 153:17
155:21

**cardiovascular**
165:16

**care** 11:18 56:24
64:1 78:3 86:23
87:7,11,17,20
93:19 101:24
106:13,24
107:5,14 110:1
154:12,14
176:21 177:3,15
217:1 223:6
242:3 295:1,2,5,
7

**career** 8:6 12:7
66:9 75:10
78:18 80:1
104:16 218:14
304:9

**Cartmell** 4:8
5:17,22 9:7
20:14 21:21
32:14,17,21
42:22 43:20

44:13 48:19,
51:23 53:5,14,
17 57:19 59:15
63:2 66:19
67:13,25 72:18
73:5 86:1,4
87:1,23 92:5,12,
17 93:24 95:2,4
103:20,24
106:2,15 107:8,
21 108:5 111:25
112:16 115:10
118:9,11,21
119:4,19 120:3
121:17 125:4,17
126:1,11 127:4
128:3 129:14
130:3 138:10
150:23 151:16
154:18 156:17
158:9,11 159:3,
6 160:22 162:19
163:5,13 164:10
166:1,19,23
168:24 169:2,9
170:14,17,23
177:12 179:1,11
182:8,22 183:7,
14,20 184:4,18
188:9 189:17
193:21 198:15
199:9 202:10,
13,16 206:4
209:2 211:12
212:19 215:10
226:13,22
230:13,21
237:6,10,16,20
239:7,11,14
252:15 253:7,

Case 2:12-md-02327  Document 9075-1  Filed 01/10/20  Page 326 of 924 PageID #: 213133
Case 2:12-md-02327  Document 7452-3  Filed 06/08/20  Page 325 of 924 PageID #: 246068

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

11,16,22 255:10,23 256:5 257:16 258:19 259:9,12,19 266:14 272:9 275:22 276:3 278:5,19,22 282:5,22 283:10 285:9 286:5 288:23 290:8,19 291:4,18,24 292:19 296:3 297:13 300:6 304:16 305:11, 17 306:10,19

**Cartmell's** 54:4

**carve** 279:21

**carving** 279:16

**case** 9:20 10:13 11:3,5 12:17 13:5,14 14:6 17:13 19:4 23:14 24:8 26:9 27:11 40:14 46:6 50:7 51:9, 12,14 52:11 55:17 65:2,6 68:22 69:9,15, 19 72:7 77:9 82:21 88:7 94:4 95:11 99:25 117:5 118:22 122:10 123:6, 14,22 127:14 152:16 160:8 178:17 183:10, 11,21 201:6,24 219:1,9,11 228:3,10 253:25

256:1 261:9,13 262:19 278:11 288:17 289:13 290:12,13 294:19,24 295:10 305:12, 16,24

**case-specific** 18:2 37:20 54:14 94:1 106:18 115:20 201:7 271:14

**cases** 10:19 12:3, 6,8 17:12,15 18:2 40:4 64:21 65:18 68:13 69:14,16 70:22 120:15 147:10 182:23 201:18, 19 218:21 241:14 251:18 268:23 288:16, 18 294:10,15 295:8 303:2,10, 14,18 304:2

**cat** 189:9

**category** 145:2

**catheter** 81:17 96:23 97:5,15 98:10 105:6 193:12

**catheterization** 143:19

**catheters** 9:20 74:21,22

**cats** 188:19,21 189:4

**causal** 172:19,20 173:7 298:25 301:12

**causally** 217:3

**causation** 17:20, 23 18:18 19:5 46:9,17,19 52:12 58:4 67:23 68:11 69:18 172:14 201:13 249:18 250:11,14,21, 251:22 252:8, 13,23 253:3,6, 13 254:14 257:12 258:4 262:9

**cause** 155:15 168:12 173:3 184:24 217:8 235:2, 265:3,12 295:3

**caused** 162:3 218:22,23

**causes** 139:11 145:15 149:1 150:8,19 151:22 168:15 171:20 172:12,25 174:12,15,22 219:20 239:2 245:23

**causing** 199:20 243:13 299:4

**caution** 156:20 159:22 160:2

**caveat** 143:25 299:15

**caveats** 114:10

**CD** 40:4 47:9

**cell** 156:1 187:8

**cells** 153:4 244:3,23

**center** 111:20,22 240:21

**centers** 227:22

**centimeters** 149:12

**central** 247:14, 19

**centralization** 247:17

**centralize** 247:13

**certain** 44:10 50:8 84:2,5, 90:15 91:10 95:20 109:13 113:17 114:10, 11 135:5 139:11 159:8 172:20 275:11 283:22

**certainly** 250:16 259:8

**certification** 241:3,10 269:23

**certified** 240:25 270:2

**cetera** 105:12 282:13

**chain** 181:17

**chains** 180:11

**chairman's** 62:5

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

challenge 95:21
305:4,5

challenged 95:16

challenges 91:23

chance 24:1
145:19 184:9
199:1 210:7
223:18 248:8

chances 141:12,
21 145:23 247:7

change 26:19
127:21 231:24

changed 26:13
116:2,25 119:15
127:12 129:4

changes 186:7

changing 194:21

characterization
115:1

charge 54:17,19

charging 264:13

charities 62:3,18

charity 62:13,14

charm 24:10

chastising 250:4

check 61:20,21

chemical 21:4
36:14,15,18

chemistry
266:20

chemotherapeuti
c 84:14,16

Chevron 159:20
162:5,9,10,17,
23 163:3,10

Chicago 8:3
53:11 57:7
77:24 78:8
117:13 270:19
292:17

chime 263:13

chip 53:13

chips 236:19

choice 62:13
143:10 260:2

choose 62:14
143:13

chores 269:10

chronic 27:5,6
113:10,11,15,18
114:3,6,19
116:6,7 132:3
149:1,2 157:3
167:9,10,13
168:7,9 170:7,8
180:5 185:4,5
186:20 187:17
206:8,9 207:22,
24 216:11
220:14 241:22
242:1 243:8,22,
23 244:7,8
245:1 247:13
265:19 300:25

chronological
134:4

circumstance
84:20

circumstances
53:22 83:20,23
84:17 85:15
86:13,18,24
87:6 88:23

93:21 94:15
220:22 294:18

cite 137:21 160:9
169:18 181:7
204:12

cited 121:4
273:23

cites 160:9
168:25 169:16

citizen 120:19
121:7

City 227:24
270:19

Civil 5:13,15

clarification
87:18

clarified 177:16

clarify 220:2

Clark 54:8,12

class 57:3,11

classic 86:4

classification
255:11

classifies 173:15

classify 173:21

classifying
173:24

Clavé's 234:6,8

clean 49:15

cleaned 140:2

clear 19:8 68:5
168:24 173:5
178:20 184:5
189:18 215:10
250:23 257:17,
22 260:15

261:1,12 295:4

clearance 194:3,
22

clearer 124:15

clearly 6:23
27:13 28:1
29:12 53:9
151:10 259:17

clients 249:23

clinic 60:24
113:9 114:5,12
130:21 210:5

clinical 32:7,8,9
77:15 92:2 93:9
150:11 168:15
185:7 186:15
192:13 193:2
195:12,17
196:3,6 197:10
206:11 264:20
295:18,21,23

clinically 263:3

clinically-
apparent 218:2
226:4

clinically-
relevant 184:22

clinician 198:21

clinics 113:22

close 8:10 14:23
23:16 113:14
131:5,8,16
140:25 144:4
175:18 220:16
224:9 244:6,17

closely 274:19

**closure** 84:4

**co-authored** 133:9

**Cobb's** 168:4

**Cochrane** 27:12 179:24 185:18 213:17

**cocoon** 218:1

**cohort** 133:10 196:23 211:21, 23 212:4

**cohorts** 196:15

**coinventor** 193:12

**cold** 84:16

**colleagues** 128:16

**collection** 23:3

**College** 87:25

**Collinet** 27:25

**color** 254:21

**Colorado** 51:21

**come** 7:4 26:18 29:7 30:11 33:19 34:13 47:12 52:13 56:17 63:16 64:7 74:23 75:1 82:20, 95:23 99:11 117:3 118:4 121:5 123:24 124:3,5, 18 139:3 157:1 182:5,18 187:7 205:14 220:3 223:16 225:23, 25 227:9 243:3

**comes** 60:16 61:15 62:6 74:21 93:16 149:21,23 234:25 256:16 264:12 292:6,9

**comfort** 63:5

**comfortable** 93:15, 114:18

**coming** 26:6 28:3 72:8 227:13,20 228:10,12 242:9

**Committee** 78:24 208:23

**common** 266:21

**commonly** 106:4

**communicates** 52:21

**communicating** 52:23 170:15

**communication** 6:3

**communications** 125:19 126:23, 24 127:17

**comorbidities** 84:23 89:15,18 90:15,17 91:2

**companies** 96:17 275:15 283:1 285:6

**company** 9:18, 23,25 10:2,9,12, 16 79:6 81:20 96:3,8,14,25

98:22 112:25 121:7 161:13,16 162:10 282:19 301:10

**comparable** 135:7

**compared** 179:18 243:15

**comparing** 15:19 129:12 133:10 147:16

**compartment** 179:20

**compensate** 64:15

**compensated** 46:4

**compensation** 64:4 126:25

**compilation** 126:7 203:17

**complaint-handling** 124:12, 19

**complaints** 124:17 131:22 223:15 225:23

**complete** 38:25 47:21

**completed** 279:6,8

**completely** 89:12 137:11 140:12 208:9

**complicated** 241:15,22 279:25 280:1

**complication** 28:14,22 29:1 31:5,7 33:21 43:9 85:3 89:6, 13 94:4 166:17 175:10,15,19 176:2 194:15 197:17,19 198:17,18,19 206:15,21 215:4,21 216:15,22,25 219:7 221:10 222:5 223:18,23 224:7 232:20

**complications** 27:17 28:1,4,15, 18 29:2,4,9,10, 17 76:23 77:19, 21 80:22,24 83:18 89:4 90:2, 3 91:22 93:18 99:13 109:24 116:10 117:11, 16,20 131:6,7, 20 139:16,19 175:6,9 176:7 180:2 196:13,16 198:11 206:1,2, 11 208:12,16,19 210:2,8 211:3 214:18 215:1,7, 8,16,25 216:10 217:2 218:23 221:15 222:11 223:12 226:8 227:12,17,21,23 228:2,6,8,13 229:17 230:2,6, 8 235:5 236:25

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

237:4 238:21 242:6,9,12,14, 15 247:24 248:3,25 264:23 265:25 266:7 272:2 279:24 281:4 282:12 283:20,22 284:1,11,12 286:11,14 299:17

**complies** 287:17

**comply** 37:18

**components** 103:19

**composite** 137:2, 6 138:1

**compounds** 155:9

**compromise** 260:16

**computer** 39:21 126:6,9 127:7

**concealed** 180:24 181:7,11

**concern** 161:8 191:2 192:25 231:19 250:6,12 251:10,12,16 280:21

**concerns** 31:1 32:5,10 160:13

**conclusion** 131:1 205:15 214:25 215:15 216:14

**conclusions** 95:6 130:24 185:22

186:2

**concomitant** 146:14

**condition** 94:11 218:15,16 271:23,24

**conditions** 57:12 184:23

**conducted** 171:19 184:21

**conferences** 98:24

**confused** 298:17

**connection** 299:1

**consent** 89:2 104:22 105:21 106:14 107:6,16 108:8,21 285:16,24 286:16 287:2,14 288:7 299:25

**consequences** 301:22

**conservative** 230:11,14

**consider** 81:2 94:9 113:2 272:21 273:3,9

**consideration** 94:2

**considered** 157:25

**consistent** 48:25 160:14

**consultant** 70:1 98:21 112:7

**consumer** 152:2

**consuming** 71:3

**contact** 78:5 151:13

**contacted** 49:19, 23 58:8 73:22 200:24 202:5 232:13

**contain** 104:4 286:19

**contained** 108:12 160:25 292:20

**container** 152:6

**contains** 205:5 212:17

**contemplated** 125:12

**context** 8:11 221:7

**continence** 144:10

**continually** 17:1

**continue** 78:3 148:24 186:7 207:8,21,23 215:3

**continues** 187:12,19 207:12

**continuing** 257:15

**Contra** 70:2

**contract** 207:12

**contracted** 116:5

**contractility** 146:1

**contracting** 149:16

**contraction** 27:4 31:18 145:17 149:15 150:5, 18,20 168:1,5 207:9,14,20 208:10 220:7 221:18,19 222:20 245:2 265:21

**contracts** 12:8, 11 79:2 149:1 156:22 167:8 168:2,5 185:3 206:7 222:20 243:22 244:17 265:10

**contradict** 197:24,25 200:1 227:11

**contradicts** 199:22

**contraindication s** 104:4,14 286:9

**contrary** 126:13

**contribute** 62:3

**contributed** 82:11

**contributes** 83:10

**control** 271:15

**controlled** 27:15 185:17 197:14 225:4

In Re: CR Bard 200          Bruce Rosenzweig, M.D.          10/29/2014

**convention**
  49:14

**conversations**
  277:22

**convert** 39:15

**converts** 153:1

**convoluted** 6:7

**coordinating**
  54:16

**copied** 40:5

**copies** 38:12
  41:22 276:24

**copy** 30:25
  109:6,18 111:11
  122:19

**cording** 219:17

**core** 258:8
  266:18

**corporate** 17:7,9
  51:7 69:25
  120:19 121:6

**corporation**
  59:6,13 60:7,9

**correct** 8:23 9:4,
  16 10:10,14,18
  11:10,13,16,20
  13:6,15,19 14:7,
  22 19:13,15
  20:4 23:25
  24:15 25:17
  33:7 35:21,23
  38:4 42:3 44:8,
  17,22 45:1,25
  46:3,14 48:15,
  22 50:15,18
  57:15 61:23,24
  62:19 64:20

67:24 68:14
69:13,23 74:5
75:15 78:4
79:14 81:5,9,11,
13 86:21 87:2
89:16 95:19
96:3,19 98:14,
17 100:1,24
101:1,3,5,7
102:6,12,13
103:14 105:15
110:8 112:6
115:1 117:9
120:16 122:20
123:7,10,15,22
124:2,7,8,12
133:13,19
135:17 136:16,
18 138:6,13,20
144:21,24
146:25 147:11,
25 150:10 151:6
152:13 154:8,11
157:7,8,15
159:12,18,19
164:5,6 166:15
167:25 169:1
172:8,25
173:13,23
174:2,20 175:3,
17,25 177:10
178:14 180:13,
16 181:9 184:16
185:14 193:17
196:7,8 197:10
198:1 199:6
201:14,25
202:15,19 206:2
213:13 215:18
217:5 218:20

220:12 228:16
229:10,17 230:4
239:2,4 240:24
241:4 242:18
249:13 261:10
266:24 267:2
269:24 270:3
272:4 273:25
274:14 277:10
278:1,9,12
279:10 282:14,
17,19,21 283:3,
5 285:3,25
288:15 289:5
291:9 296:11,25
299:16 302:17
303:24 304:3
305:8

**corrected** 129:3
  300:17

**correctly** 16:6
  76:12 132:20

**correlate** 188:13

**correspondence**
  48:11,12,14,18,
  20 49:1,12

**Costello's**
  233:24

**cough** 145:12

**coughing** 145:20
  147:3,4

**coughs** 145:25

**could** 20:16,18,
  25 23:8 51:21
  58:18 70:12,16
  77:7 84:10
  85:13 88:15,
  95:16,24 125:15

127:6 132:15
139:19 141:18
172:10 184:24
223:17 236:3
254:19 255:5
257:16,24
269:25 270:4
272:12 284:8,13
285:14 286:2,15
295:5 297:6
300:20

**couldn't** 146:16

**counsel** 5:5,9,16
  67:11 127:21,22
  143:7 193:5
  250:6 277:23
  278:7 298:6

**count** 15:10

**country** 99:6
  139:4

**couple** 15:9
  16:20 66:21
  75:18 76:7,8
  110:5 170:13
  186:25 229:6

**course** 8:5 41:24
  61:15 78:8,11,
  12,13,15 161:6,
  7 182:25 256:7

**court** 4:15 21:17
  55:8,15 94:25
  217:22 257:3,9
  305:24

**courthouse**
  55:23

**courts** 55:19

**cover** 12:9 65:7
  290:17

**covered** 252:16

**covering** 64:11, 15

**Covidien's** 234:2

**create** 155:23

**creates** 185:4 221:3,25 244:13,19

**creating** 155:24

**credentialing** 280:5,8,12,14 281:7

**credentials** 251:1

**criteria** 285:7

**critical** 229:4

**criticisms** 121:6

**cross** 17:2

**cross-examination** 5:11

**crossover** 18:10, 15

**cry** 259:4

**crystalized** 26:10 28:6 35:8

**crystalizing** 29:7

**crystallze** 48:3

**Cubs** 292:17

**cuff** 144:2,4,6

**cumulatively** 68:21

**curator** 130:7

**curious** 30:16 171:10 264:7

**curled** 31:21,22 116:9

**curling** 31:21 219:17

**curls** 149:4 198:6 243:25

**current** 90:13 94:10 150:3 280:21

**currently** 7:25 65:17 72:25 74:8 87:20 148:12 150:15 231:6,7 240:13 288:19

**curriculum** 37:15

**customary** 111:18,22

**cut** 244:21

**CV** 37:25 38:3, 11,13,20 97:9 98:8 122:13 239:6,22 272:6

**cyst** 132:1,2

**cystitis** 113:19 242:2

**cytotoxic** 235:1

**cytotoxicity** 190:8,9

---

**D**

**daily** 49:15 56:3 195:13 266:1

**damage** 295:3

**damages** 123:21 124:1

**dangerous** 84:9

**Das'** 274:7

**data** 27:15 131:3 141:8 145:16 146:6 156:8 160:13 165:20 166:3 167:7 172:16 173:3 174:10 179:20 191:1,17 192:5, 6,24 193:3 194:13,25 195:21 196:24, 25 197:1,2,4,9 198:3 206:19,23 207:7,18 208:10 210:11,20,25 211:18 212:4,5, 13 213:25 214:15 216:13 222:14,25 224:13,17,24 226:15 238:12, 17,18,25 281:5 295:18

**database** 215:21 293:10

**databases** 27:19 228:6

**date** 13:13 131:19 256:11, 15

**dates** 256:18 260:5

**Daubert** 95:18 290:10 305:4

**damages** 123:21 124:1

**day** 54:20,24 55:1,4,5,12,13, 16 56:5,9,11,12, 16,18, 62:25 64:6 65:25 121:15 128:22 214:2 229:21 240:5,6,8 252:16 253:1 254:14,17 255:9 256:25 258:14 260:2,3 295:15

**day-in-and-day-out** 239:25

**days** 56:1,2,19 170:13 187:1 250:8 253:5,24 254:19 255:25 256:22, 257:24 259:2,24 260:3, 22 263:19

**de** 226:6 301:2

**deal** 143:14 156:20 248:24 262:22 268:23 271:16,20 292:4 296:17

**dealing** 22:17 54:13 94:8 116:15 133:17 238:23 269:1

**deals** 222:2

**dealt** 16:10 23:8 113:15 117:16 136:11

**dean's** 62:6

**dearth** 209:20

death 303:18

debatable
301:23 302:7

debate 30:3

debated 144:25

decades 152:12
165:18,21,25
166:3

decay 144:22

decide 111:14
182:12 235:15
288:3 299:7
301:24 302:1

decided 26:17
75:8 270:12
293:14,23

deciding 94:11

decision 92:8
109:25 110:21
115:8 116:25
117:18 118:6
119:15 193:7,24
194:11 278:20,
24 284:19
285:20,21 288:8
291:2 299:4
301:16

decisions 195:8
236:17

decrease 145:24
246:23

decreased
247:24

decreasing
145:22

dedicated 19:10
40:19 134:13

135:9 139:6
227:23

deem 253:9
271:7

deemed 152:9
289:15,17

deeply 246:17

defecation 266:4

defective 83:14

defendant 11:7
304:20

defenders 187:6

defense 12:2,3
295:8 304:25

defer 117:7
118:8 119:17

deficiencies
284:24 285:1

deficient 82:24
124:19

defined 85:1,10
87:16 132:13

definitely 223:25
257:19

definitive 213:24

deformation
27:5 31:18,21
170:7 219:17
245:3

deformed 116:8

deforms 149:3
167:8 198:6
206:8 243:24

degradation
27:4 30:1,3,5
153:20 154:4

155:2 167:23
168:14 170:6
171:15 207:21
233:4,6 234:4,7,
9,13,24 235:17,
20 237:11,17
245:2 248:18
265:20 274:8

degrade 152:20
153:18,25 154:1
155:5

degraded 116:5

degrades 30:4
148:25 154:23
167:7 185:3
206:8 233:23
234:20,25 235:1
243:21

degrading 245:9

degree 102:14
139:11 248:12

Delaware 8:1

deliveries 12:13

delivery 12:9,12

delve 121:12

demonstrated
164:20 165:5,11
209:6

demonstration
75:25

density 190:23

Denver 130:7

Department
240:23

depend 64:24
183:10

depending 257:5

depends 56:6
65:5 112:1
136:25 268:20
283:15,16

DEPONENT
306:24

deposed 6:2 8:5,
22 9:5 18:21
33:5,12 51:10
303:7

deposing 214:10

deposition 4:4,
23 5:7,10 7:4
10:8 11:5,11
12:16 13:8 17:5,
10,16 18:13
21:14,23,25
22:16 23:11,16,
20 25:14 26:8
34:20 35:16,25
37:1,3,14,18
38:22 45:18
47:4 63:16,21
68:11 72:5,8,12,
15 97:11 116:17
122:2,13 123:2
159:23 182:4
184:2 185:9
186:17 204:13
249:21 254:24
275:20 276:10,
14 278:18
306:22

depositions 8:8,
10,13,16,24
9:22 11:23 17:8,
15 19:17 21:12,
13 22:21 24:7

25:6 26:9 36:5,8
39:5 40:15 51:8
54:20 58:14
69:25 71:15,17,
18 74:11 151:18
159:21 172:7
202:21 203:3
251:7 254:16
274:25 275:4
288:24 304:8,
22,24,25

**depth** 255:14
275:17 276:20,
22

**described** 132:4
136:10 148:7
171:17

**description**
104:7

**design** 81:14,16
82:18,23,25
83:6,13,16,17
95:1,12 98:25

**designated** 17:18
23:14

**designed** 82:1

**designing** 82:14
98:13

**designs** 98:22

**desires** 139:13

**destroy** 71:12,13
187:2

**destroyed** 71:11

**destroying**
246:20

**detail** 13:11,20
132:24 176:7

263:6 276:23,25
296:21

**detailed** 120:20,
23 297:5

**determine**
171:20 184:22

**develop** 188:19
221:12,13 226:9

**developed** 132:2
175:14

**developing**
96:18 98:13,16
189:4,11 206:14
236:20

**development**
281:2

**develops** 187:9

**deviation** 106:24
295:1,2,5,7

**device** 9:18 10:1,
8,12,16 18:7
89:9 90:10 96:3,
13,17 98:5,13
104:6,7,19,21
105:3,17
109:23,24
110:22 111:6
112:15,24 161:9
167:19 190:13
191:4,8,17
192:1,12,14
193:18 194:11,
24 195:18 196:4
237:3 238:8,14,
25 282:19 283:1
285:6,23 287:15
288:5 298:7
299:3 300:12,18

301:11 302:2

**devices** 81:15
98:16 109:13
110:25 111:4,15
112:25 192:22
194:17 195:16
196:11,12
295:19

**devoid** 153:24

**diabetes** 90:4,19
94:3 146:18

**diagnosed** 157:3

**diagrams** 48:7

**diaphragm** 83:9
246:6,18,21

**didn't** 23:19,21
34:9 42:4,6
49:12 53:3
73:15 105:6
108:16,17
162:13,14
200:7,8 226:3
237:16 239:23
242:25 251:15
253:16 279:1
292:24 294:9

**die** 188:4

**died** 51:20

**dies** 188:3

**difference** 28:7
29:9 77:13
190:21

**different** 17:2,7
18:19 43:12
44:18 72:22,23
79:3 95:8 99:17
118:6 134:23,24

140:23 142:24
148:4 154:20
156:6,9 175:5
190:24 191:10
198:3 202:25
215:5,11,13
219:22 235:8
245:25 246:5,11
260:20 266:6
285:14 289:11
304:18

**differently** 55:24

**difficult** 16:22
17:3 59:9 67:6
68:20 70:14
85:6 90:4
116:12 198:7
223:25 236:11
246:12 279:19,
25 280:8,16
281:23

**difficulty** 216:12

**digest** 231:22

**diminishing**
248:8

**direct** 172:14
255:4

**directions** 106:5

**directly** 52:23
57:7 74:16
217:3

**director** 234:3

**directors** 185:10

**disability** 303:20

**disadvantage**
141:10

**disagree** 141:24

In Re: CR Bard 200                  Bruce Rosenzweig, M.D.                  10/29/2014

166:7,10 167:1,
2 170:21 253:8
255:11 257:21

**disagreed** 142:3

**disagreement**
301:18,20

**disagrees** 200:11

**Disc** 4:3 102:19,
24 199:11,16

**discharge** 131:6
139:20 175:14

**disclosure** 51:11

**discount** 42:11

**discoverable**
49:3,9

**discovery** 5:11
11:2 51:25 52:1

**discretion** 56:2

**discs** 37:21

**discuss** 39:11
42:24 43:4,10,
18 104:17
120:15 127:22
132:15,24
148:18 176:7
299:14 302:10

**discussed** 34:1
37:19 43:17,23
47:16 77:4 82:7
172:17 197:3
265:5 284:23
285:1 291:21

**discusses** 160:4
234:11

**discussing** 21:4,
25 106:17 125:1
199:24 285:10

**discussion** 88:22
94:20 106:19
220:4 226:23
262:18 293:19

**discussions** 94:1
105:8 268:17
277:15

**disease** 146:15
218:12

**dishwasher**
152:3

**dismissed** 51:14

**disorders** 266:4

**disorganizedly**
42:8

**dispute** 30:1
213:11

**dissection** 78:14,
15

**distance** 149:24

**distill** 102:3

**distinction**
103:15

**distribution**
61:19

**divvied** 46:6

**doctor** 6:1 11:19,
22 29:15 86:12
103:2 116:24
118:22 161:11
182:17,25 194:9
199:19 210:5
214:24 215:5,6
238:1 251:12,17
254:20 255:3
259:1 261:23
284:4 285:20

288:3 290:11,
13,21 291:20
292:8 306:14

**doctor's** 250:2

**doctors** 28:21
29:16 116:20,21
158:2 177:5
193:1, 214:25
215:11,13
228:19 229:3
231:20 232:2
235:18 280:14
284:2 298:1
300:15

**doctors'** 231:24

**document** 45:2
90:9 163:7,15
284:7 285:15
286:2,15,22
287:13

**documented**
218:21

**documents**
13:17 14:24
15:7 17:1,7
20:23 22:8 25:7,
11,15,16 32:7,
22 36:5,7 37:13
39:1,4,5,14
42:17,20 43:16
44:4,23 45:3,4,
23 47:20 50:24
51:4,5,7 65:9
69:20 70:3,5
116:17 123:5,13
133:1,2,4 162:8
163:16 169:21,
22 182:3 184:2
185:8 186:17

200:23 201:9,
10,18 203:8,11,
15 204:12 234:5
273:23 274:15,
24,25

**documents'** 31:1

**dog** 189:10

**dogs** 188:19,21
189:4

**doing** 12:1 33:16
50:8 61:25 66:5,
10 67:11 72:24
73:23 110:7
111:19,23
141:10 148:4,6
153:15 177:11
203:21,22 231:4
240:14 241:16
243:7 249:2,5,9
254:4 263:20
271:3 277:12
282:2,16

**dollars** 59:22
66:10,18

**donate** 62:3,14,
18

**done** 20:18
25:13,25 46:20
52:18 53:1
68:10 80:1,7
100:12,17 102:9
118:23 119:5,22
120:9 171:22
224:8 234:15
235:11 245:4,6
252:18,24 260:4
262:17,19
279:22 291:8

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

302:23

**door** 53:14
  229:20 292:8

**double** 179:25
  223:11

**double-lumen**
  97:4 98:10

**Doug** 54:4

**down** 45:14
  57:12 59:3 67:1
  71:25 80:6
  88:25 131:3
  137:20 148:16
  153:6,10,13
  207:19 208:18
  211:4 225:1,2,
  24 250:13 256:2
  275:20 277:14
  294:15,19,24
  295:8,9 303:11

**downplay**
  283:22

**Downs** 9:7,8

**downside** 144:10

**dozen** 27:21
  80:10 218:25
  278:2 302:25

**Dr** 4:20 5:8,20
  7:24 15:18
  18:22,23 21:10
  24:14,18,21,24
  27:10 63:14
  119:5, 122:8
  159:23,25 171:6
  182:10 185:18
  187:16 213:17
  216:19 228:14,
  21,22,25 233:24

234:2 249:15
250:8 252:13
258:4 260:21
261:22 272:20

**draft** 35:17
  126:5,22 127:8,
  21

**drafted** 18:19
  105:2 127:25
  128:5,10 204:3

**drafting** 105:17
  203:23 204:7

**drafts** 125:20
  126:23,24
  127:20

**drag** 221:23

**drape** 194:20

**draw** 103:15
  185:21 186:1

**drawer** 41:14

**draws** 156:22
  244:18

**drill** 131:3

**drop** 225:23

**dropped** 11:4,11
  303:10

**drug** 84:14,16

**dry** 137:11

**dryer** 149:21

**due** 31:17 132:1,
  2 147:4 150:5
  160:12 221:10,
  15 305:4

**duly** 4:18 7:20

**Duncan** 21:20

**duration** 286:13

**during** 7:4
  146:24 147:4
  155:1 251:2
  265:7

**dying** 299:18,19

**Dyrkorn** 27:23

**dysfunction**
  131:9

**dyspareunia**
  167:14 180:3
  216:12 224:19,
  20,21 226:1,2,
  10 235:3 243:6,
  8 265:1,4 297:8
  300:16,25

**dysuria** 301:2

———————

**E**

———————

**e-mail** 21:9
  48:13 121:4
  180:11 181:17
  256:9,24

**e-mails** 162:22
  180:16,18,19
  181:12,15,16,21
  182:1,3 184:1

**E-published**
  15:13 30:24
  133:16

**each** 68:17 69:1
  107:19,24
  134:22 183:11
  190:20 191:3
  206:10 223:17
  273:22 278:4
  282:18

**earlier** 9:2 12:7
  15:13 17:14
  23:2 36:8 38:2
  103:9 105:14
  129:6 136:9,10
  154:9 176:19
  177:20 193:11
  212:9,15,25
  214:3 219:19
  236:5 255:9
  275:18 289:10
  293:4 300:3
  304:19

**early** 29:1 55:5
  56:10 66:7 77:3
  148:8 168:2
  225:15 256:19
  264:8 271:12
  303:4,13

**earned** 58:21
  66:9,17,24

**easier** 39:20
  71:24

**easiest** 111:8

**easily** 42:9 238:8

**East** 8:1

**economy** 57:8,9

**editor** 268:20,22

**editorial** 267:4

**education** 81:7

**educational**
  266:8

**effect** 101:23
  172:20 173:7
  189:24 234:22
  235:17,20 291:3

**effective** 141:25

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

144:23 157:24
158:1 164:22
165:9,23,24
166:5 167:3
179:12 188:18
192:6 213:2
214:16

**effectiveness**
144:11

**efficacy** 41:19
42:14 43:7
164:20 165:5,11
166:14 179:9,
18,21 205:15
208:24 209:6
213:2

**effort** 260:16

**efforts** 22:13

**Egyptian** 212:12

**eight** 12:10
155:24 189:11
236:13

**either** 11:18
23:11 26:19
49:1 58:13
60:17 62:12
101:18 108:16,
18 130:21
143:10 144:24
150:15 187:2
190:22 230:12
233:11 251:19
294:25

**El-nashar**
133:10

**elaborate** 293:3,
4

**elaborated** 252:4

**electrical** 111:9

**electronic** 39:16

**electronically**
39:13,24 40:5

**element** 155:4
248:11

**elements** 151:23

**eliminate** 184:8

**Elliott** 24:14
36:11

**Elliott's** 18:22,
23

**else** 14:9 20:24
25:18 34:14
36:11 37:17,24
47:14,24 72:25
91:4 158:22
264:25 280:15
287:10 293:2

**else's** 97:1 256:7

**elsewhere** 41:23

**embodiment**
97:1

**EMPI** 96:9

**employed** 74:7,
17 96:12

**employee** 61:3,9
96:13

**employees** 60:18
61:14 62:7
181:20

**empty** 140:12

**encompass** 98:4,
12

**encouraging**
247:2

**end** 66:17 67:14
72:11 102:18
131:14 149:18
199:10 206:21
211:25 223:22
260:25 264:8
306:21

**end-of-the-year**
60:3

**endometriosis**
241:23 242:1

**engineer** 21:4
22:17 36:15,18

**engineering**
81:10

**engineers** 17:10

**enough** 178:7
185:25 205:21
220:16 295:15

**entail** 269:9

**entire** 38:25
104:16 218:14
219:25 220:8,
11,13

**entirety** 85:6
116:14 274:16

**entities** 168:12

**entity** 18:24
156:23 157:2
168:15 174:7
265:11 294:2

**entrapment**
265:13

**environment**
154:2 234:21

236:9 281:10

**envision** 84:5,10

**epidemiologic**
101:13,22

**epidemiological**
102:11

**epidemiologist**
101:8,21

**epidemiology**
101:11,15
102:14

**epithelium**
152:25

**eroded** 242:21

**erosion** 31:9,12,
25 32:1,4
131:14,15
139:20,23
150:13,14,15,16
175:21 180:3
206:15,18
211:19 221:20
223:7,8,10
226:1,10 300:25

**erosion/**
**extrusion** 186:5
221:22

**erosions** 31:10
90:6 167:11,
168:13,16
197:20 207:7,8,
9 301:3

**error** 97:16

**essentially**
125:22

**established**
208:25 213:8

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

estimate 80:7

estimated 185:15

et 105:12 282:13

Ethicon 8:12,18, 19 9:2,5 26:4 52:19 53:21 54:2 79:10,13 80:9 95:10,11, 12 288:17 289:13 290:10

evaluation 271:1

even 29:14 56:20 64:2,21 68:20, 21 141:17 162:2,24 172:19 173:9 211:2 214:23 226:3,9 246:7 247:15,18 250:10 260:20 280:13 294:2 299:3 302:18

evening 56:23 261:14

evenings 64:3

event 101:16,18, 23 183:18,21

events 104:10, 11,13 286:11

ever 9:17 10:22 23:10 26:13 51:10 72:2,4 74:16 75:10 79:4,16 81:25 82:13 86:19 88:12 94:25 95:22 98:21,24 99:2,4,10 100:7,

12,17 101:10 105:2 112:7,10, 13,23 113:21 154:1 159:20 168:9 191:20 211:4 219:5 288:11 289:25 290:3,5 293:7 294:10,15 295:9 305:22,25

ever-increasing 228:11

every 17:9 28:8 62:25 73:18 109:12 168:19 169:6 207:16 214:2 215:21 216:15 221:13 229:21 239:15 273:22 279:5,7 280:15 299:20

everybody 215:18 256:7

everybody's 86:8

everyday 106:6

everyone's 91:18

everything 45:14,19,20 60:23 88:15 237:12 241:21 253:5 295:16

everywhere 158:22

evidence 209:3 210:25 298:15, 22

exact 67:7 146:21 160:3

exactly 6:18 70:15 71:21 153:9

exam 270:11

examination 7:22 26:1 125:11 257:15

examined 25:20

example 40:3 42:16 44:5 47:7 132:5 169:24 171:11 274:12 275:11

exams 241:22

exceedingly 84:1 85:5

exceeds 87:15

excellent 86:5

except 158:22

excerpt 234:2

excited 6:6

exclude 104:13

excuse 30:18 48:6 124:3 127:7 182:10 211:24 212:10 233:24 240:2 265:19 269:3

exercise 135:14 141:11,23 146:17

exercises 135:1,2 138:4 141:5,9 142:2 241:8

exhaustive 25:10 275:14

exhibit 13:3,8 19:10 36:25 37:3 38:21 45:18,20,22 97:8,11 98:7 122:2,11,12,13, 14,17,22 123:2, 5,8,11,16 169:3 201:12 239:20, 21 273:20

exhibited 13:25

exit 219:24

expect 250:25 257:7 284:12,13

expectancy 165:1

expecting 29:2 182:17

expenses 59:17, 23 60:17 61:14

experience 77:12,15,16 79:12 98:4,12 109:8 110:9,11 113:20 147:24 185:7 186:15 192:16 195:12 215:4 247:23 248:1,15 284:21 285:6

experiencing 228:11

expert 10:20,22 11:17 12:14 13:3 14:2 17:18 21:3 23:14

24:13,19,21
36:9,10,18
45:23 47:13
65:18 81:2
83:17 94:25
95:1 101:11
103:4,6 104:23
112:14,23
113:3,5 122:9
127:15 204:2,5,
6,10 218:12
219:8 228:15
252:7,13 257:23
258:22,24
288:11,14
289:3,7 290:1
293:10 302:25
303:1

**experts** 25:3
49:2 50:6 57:16
62:2,22 99:8
125:10 229:5
301:21

**explain** 148:2
195:23 299:18

**explained**
305:11

**explains** 167:11

**explant** 149:11
248:25 249:4

**explanted** 218:4

**explants** 245:5

**explicitly** 32:6

**explore** 270:20

**exposed** 152:21
162:1 234:20

**exposes** 153:2

**exposure** 32:2
150:16 186:6

**express** 292:14

**extent** 30:3 68:1
95:4 211:13
234:23

**external** 149:15
150:2,4,25

**externus** 246:1

**extra** 149:22
253:1 258:11
263:19

**extraneous**
255:9

**extrapolate**
131:15

**extrusion** 32:2
150:16 206:15

**extrusions**
167:12 242:19
264:24

---

## F

**face** 91:20

**facility** 29:15
216:23 223:2
225:21

**fact** 83:22
116:11 180:23
181:6 234:18

**factor** 225:18

**factors** 94:10
113:3,5

**facts** 185:20

**failure** 131:4
132:12,13

135:19

**fair** 6:11,15
44:11 66:8 69:7
80:5 176:18
178:7 302:8

**fairly** 26:10
95:20 134:15
135:13 205:7

**fairness** 205:24
290:8

**Fall** 49:22 50:11,
20 52:4

**falling** 245:10

**familiar** 30:10
77:23 130:3
164:4 193:16
199:21

**Fantastic** 6:24

**far** 13:13 20:23
39:12 51:9 52:4,
20 54:11,22
57:2,25 62:2
71:5 74:12
81:25 102:3,7
131:19 133:4,20
136:19 145:8
259:4 273:5,6
275:4

**farther** 178:25

**fascia** 148:11,13,
15

**fascial** 84:4

**fasciitis** 216:10
217:9,14 218:8,
10,14,24 219:3,
6,9

**fast** 6:5 14:13

291:17

**favor** 6:21

**FDA** 103:5,6,17
112:4,8,11,22
124:6 157:19
164:17 208:22
215:19,24
216:18 287:9

**features** 83:13
126:8

**federal** 5:12,
55:15 126:20

**fee** 63:22 65:4
264:5

**feedback** 243:18

**feel** 6:25 24:2
35:7 93:15,18
98:3 100:21
114:17 230:10
232:25 291:10
302:9

**fees** 59:8 63:15

**fellows** 269:18,
20

**fellowship**
266:23,25
269:21 279:6,8,
14,22

**felt** 273:16

**female** 165:1
236:14 267:15
268:5 272:24

**few** 25:12 33:19,
20 77:4 143:5
185:25 209:18
213:21 243:2
269:4 270:18

301:4

**fibers** 149:24,25

**fibroids** 241:23

**fibromyalgia**
  89:23

**fibrosis** 187:10

**field** 272:21

**fifth** 242:13

**figure** 6:19 59:4
  131:19 250:17
  257:4 276:6

**file** 39:1 40:9
  41:14 47:6
  64:25 72:4
  160:8

**filed** 21:4

**files** 38:18 40:1
  71:25

**fill** 22:8

**fills** 144:4

**filmmaker**
  270:14

**filmmakers**
  270:19

**filmmaking**
  270:15

**final** 35:18 55:8
  126:22 127:7
  155:10,12
  259:22

**finally** 39:17
  61:7

**find** 23:8 39:20
  41:7 42:9 55:19
  70:16,17 71:24
  73:4,8 104:23

110:18 162:14
172:21 188:23
205:21 232:2
280:10 287:20

**fine** 16:7 21:17
  34:11 63:5 73:2
  121:17 127:19
  128:11 252:21
  255:5 256:15
  260:20, 289:23

**finish** 6:19,22
  86:1 251:22
  261:19 262:9

**finished** 92:18
  252:14 255:7
  306:16

**finishes** 55:8

**finite** 43:3

**Finnish** 27:24

**firing** 247:15,20

**firm** 50:20 52:5,
  17,22 53:2,4,23
  54:4,6,9 56:14
  69:5 93:16
  99:11 252:24
  260:25 278:16

**firm-wise** 53:25

**firms** 46:2,7,13
  48:12 49:2
  52:23 54:14,15
  72:23

**first** 7:19 23:25
  28:12 47:17
  49:19 57:11
  58:7 75:22
  78:11,23 79:22
  85:18 87:12
  134:7,25 146:16

148:20 152:18,
19 154:1 161:10
172:1 191:11
201:5 213:12
217:11 225:8
230:19 232:12,
15 233:17 244:2
251:14 261:15
289:14,18

**first-line** 85:17
  142:6

**fit** 93:20 139:4
  253:9

**fits** 92:3

**five** 15:10 16:19
  19:24 23:1,5,7
  38:24 147:16
  165:18,21,25
  166:2 195:21
  196:6 197:11,12
  210:16 214:19
  216:2 226:11
  227:10 238:15,
  22 245:25
  259:11,12,13
  269:5

**five-to-ten-year**
  214:5,14 236:16

**five-year** 147:20
  196:25 209:21
  224:19 225:10,
  11

**fix** 198:19 199:3

**flakes** 245:13,14,
  17

**flavor** 20:10
  241:16

**flesh** 94:14
  237:25

**flies** 57:6

**floor** 40:23
  117:19 135:2,9,
  11,14 138:3
  141:4,9,11,13,
  20,23 142:2
  145:18 146:1,19
  279:6 280:1,2

**flowed** 59:13

**fluids** 151:13

**fly** 55:21 56:14
  57:11

**flying** 56:22 57:3

**focus** 22:13
  176:23 178:16

**focused** 16:15

**folder** 40:18

**folks** 250:15

**follow** 50:7
  177:13 186:2
  213:7 247:5

**follow-up** 206:19

**followed** 5:9
  51:8

**following** 56:17
  207:13 254:7
  263:23

**follows** 7:21 14:3

**footnotes** 171:16

**force** 150:2,3,4,
  25 151:1

**foreign** 27:5
  116:6 149:1
  153:5,6 155:21

In Re: CR Bard 200                     Bruce Rosenzweig, M.D.                     10/29/2014

167:9 168:7,9
170:7 185:4
186:20 187:18,
20,21,24 188:3
206:8 207:22
220:14,22
221:4,8,10,11,
12,14,16,17
243:22 244:7,8
245:2 265:20

**forever** 302:6

**forgot** 189:23

**forgotten** 178:22

**form** 42:22
44:13 59:15
66:19 67:13
87:1,23 92:5
93:24 95:2
103:22 106:2,15
107:21 111:25
112:16 115:10
144:9 150:23
151:16 154:18
156:17 160:22
163:5,13 164:10
166:1 179:11
187:8 188:9
189:17 193:22
201:10 206:4
209:2 212:19
230:13,21 237:6
282:5,22 283:10
285:9 286:5
291:4,24 295:1
300:6 304:16

**formalities** 5:19

**formation** 151:1
220:19

**former** 149:18

**forms** 17:2
145:3,4 242:7
265:11

**forth** 105:12
256:24

**forward** 8:25
23:21 202:3
256:25 261:15

**fossa** 243:4

**found** 8:7 50:1
110:9 129:16
155:21 161:12
162:11,23
163:20 174:10
185:22 208:23
232:17 294:6

**foundation**
193:15

**four** 8:19 29:8
36:3 188:12,13
189:8 210:15
214:19 216:2
223:3 236:12
245:25 246:9
278:13 280:16

**frankly** 254:20

**fraying** 219:18

**frays** 149:3
185:6 243:25

**free** 6:25 208:9
209:24 215:5
232:25 270:18

**French** 27:25
207:11 214:8,13
225:14 238:20

**frequency**

145:13, 283:24
284:9 286:12
297:19

**frequent** 140:4
280:15

**frequently** 29:5
138:23 147:3
247:15 249:8

**fresh** 35:1

**Friday** 256:12
260:19 264:5

**Fridays** 240:2,12

**from** 8:21 11:5
12:23,25 17:10
21:3,10 27:12
29:18 31:6 34:8
35:15 38:1,9,20
47:5,17 49:1,8
51:12,15 57:7
60:2,17 62:12
63:18,24 64:2,5,
9 65:11 66:25
69:22, 74:25
77:5 80:8,24
83:11 88:5,16
97:19,21 98:11
111:12 127:8
134:16 135:14
136:12,13
137:4,5 138:1
139:3 142:24
144:22 147:13,
23 148:10,
149:15 151:17
152:18 153:11,
12 156:2 157:3
159:24 160:5
161:15 162:8,25
163:15 168:8

172:6 181:8,12
185:9,20,22
186:3 188:12,20
189:5,12 190:24
203:8 206:17,
21,23 207:6
208:19 210:14,
19,25 214:1
216:14 218:1,23
219:6 222:7,13,
16,22 223:9
224:21 226:5,9
233:25 234:2
236:1,20,25
241:21 242:17
243:4 246:8
256:10 257:15
259:4 260:3
263:17,18 266:6
267:12 272:2
274:6 285:13
290:5 294:10
296:6 303:4
306:12

**front** 5:24 53:14
95:25 107:17
108:25 132:24
306:11

**full** 7:15 47:21
56:12 258:3

**fun** 239:14,17

**further** 115:15
306:24

**future** 172:21
252:17

___

**G**

___

**Gallagher's** 54:6

**game** 53:10
302:8

**gauntlet** 100:20

**gave** 11:5 12:16
20:2 34:25
216:20 250:8
259:25

**gears** 14:13
73:11 81:1
239:5 302:22

**general** 13:4,14
14:2 17:20,23
18:4,5,17,18
19:5 41:13 46:6,
9,17,19 47:6
52:11 58:4
67:23 68:11
69:18 72:6
73:14 80:25
136:6 140:19
145:22 157:18
165:15 178:6
179:8 183:12
191:5,20 201:13
202:2 249:18
250:14,20
251:22 253:3,6,
12 254:13
255:20 257:12
258:4 262:9
265:2 279:18,20
280:14 285:18

**generalized**
90:11

**generally** 14:5
16:15 26:22
49:21 58:9
74:19 105:24
107:3,10,13

120:18,22
136:21 144:23
239:24 241:12
271:22,23,25
292:11,12

**generate** 50:25
265:9

**generated**
265:15 288:1

**generating** 215:2

**Georgia** 12:16,
23

**Geriatrics**
269:20

**get** 5:3 6:6 12:10
13:11,20 14:8
16:15 18:2,18
19:4 20:16 21:7
25:13,14 30:7
36:20,21 46:20
47:2,3 50:7 57:5
59:24 60:13
63:2 65:8 71:18
72:20 73:5
78:24 79:2
88:16 94:17
106:18 107:24
109:10,12,18
110:12 113:16,
25 117:24
118:18 121:14
125:15,18,23
126:22,23,24
127:12,13 139:4
140:9 147:12
149:25 152:8
159:25 167:11,
12,13,14,15
170:22 172:2,16

179:21 187:10
188:22 196:1
208:4 216:25
217:15 220:3,
16,18 224:9,16
225:2 231:3,13
232:6,9 235:19
238:12 246:19
250:24 251:23
253:1,24 258:3,
10 260:2,22
262:1 263:12
267:18,20
271:13 276:20,
281:24 291:13
292:24 294:10
296:13 299:23

**gets** 53:8,12 59:5
61:21 90:10
124:25 125:6
146:7 149:9,10
164:24 186:25

**getting** 44:2 55:6
58:4,5 63:20
68:9,10 114:14
125:13 126:12
127:3,15,23,24
132:18 177:4
216:3 245:8
248:9 253:19
276:13 298:23

**giant** 187:8

**gift** 75:20

**Gish** 81:21 96:4,
20 97:5,15

**give** 17:19 35:4
51:21 56:15,17
58:18 60:13
64:22 70:10

77:11 83:12
84:15 90:14
95:5,16 104:6,
22 106:14 107:5
109:8,21 110:6
111:5,23 138:25
146:9 169:24
171:11 195:20
236:23,24
241:15 277:2,11
283:23 285:16,
21,23 286:15
287:1 288:6
290:1 302:8,12

**given** 8:14,16
10:7,19,22
11:17,23 23:10,
24 34:20 67:6
80:7 99:14
109:6 111:10,12
120:9 184:8
259:24 260:2,7
269:14 304:9

**gives** 39:21
224:20 254:21
279:23

**giving** 19:3
23:16 49:20
58:3,14 66:18
91:13 107:15
108:20 110:2
114:7 124:22
194:9 229:22
260:4 278:7
287:13 290:6

**global** 234:3

**glycogen** 152:25
153:1

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

**go** 8:24 13:23
16:4 21:18
23:21 26:3
27:20 32:22,25
33:11 37:12
38:14 45:15
46:1 49:11
53:13 54:25
55:10,16,18
60:25 62:12
63:3,4,6 69:4
72:2,11 73:8
75:16 79:23
83:7 92:13,18
93:3 105:8
107:6,15,25
108:8 109:2
120:14 122:8
134:3,8 137:14
148:19 149:11
160:5 164:16
168:10,18 169:5
170:9,17,18,20
171:15 178:24
180:6 187:18
188:23 191:14
193:20 194:22
197:18 202:3
203:21,22 206:5
207:19,20
208:4,12 211:4
215:22 217:17,
25 219:2 225:7
226:20 229:12
233:8,13 237:22
244:3,6 250:25
251:14,23
254:3,9 255:24
256:25 257:2,6,
10 258:15

259:16 261:13,
18 262:25
266:11,19
268:15 272:12
273:17 274:20
277:8 297:6
300:22

**go-to** 41:12

**goal** 250:20
251:21 280:10

**goes** 21:6 55:17
59:6 61:2,22
90:25 137:19
144:2 149:22
151:19 186:24
187:4 190:13
191:17 207:14
208:11 209:25
222:9,23 234:18
246:4,7 255:1
262:7 269:12
273:14 290:17
301:7

**going** 6:13,17,
18,20 12:19
13:2,3,23 16:4,
12 17:18 19:3
20:10 21:15
24:20 26:18
28:25 29:14
30:7 32:12 33:3,
24 35:4,11,13
36:23,24 39:10,
15,18,23 41:4,5,
15 45:17 47:8
49:11 53:13
55:25 56:7,10,
11 65:6 66:21
68:20 70:13

73:11 78:6 79:2
81:1 82:20,23
87:5 91:19
92:15 93:5,7
94:1 106:17
107:18,19
108:16,18
110:24 111:6
114:2,5,21
115:6,14 117:3,
7,23 118:4,7,21
119:4,6,10,11,
16 121:5,15
122:21 123:17,
24 124:3,5,9,11,
18 125:1,4,23
127:20 128:12
132:17 136:5
137:14 138:17
140:5 141:2,4
144:19 147:3
157:16 161:19
165:2 170:12
172:2,5 176:16
177:13 182:5,
18,21 187:2
188:16 189:7
192:12 193:18
195:1,10,11,19
196:4,17 198:24
199:1 203:17
205:21,25
206:20,24,25
207:3,5,16,21,
23 208:12,15
211:2,6 213:10
215:3,5,11,13,
216:16 217:15
218:18 219:16
221:13 222:20

223:22,23,25
224:9,18 225:1,
6,12,20,25
226:8 229:7,25
235:21 236:12
237:1,24 238:2,
5,10 239:5,21
241:10 245:22,
24 246:9,10,14,
25 247:17
248:10,12 250:9
251:4,17
252:14,17,25
253:1,14,15
254:16 255:14
258:5 259:23
260:18,24
261:9,21,24
262:18,22,25
263:6,13 264:4,
5 265:7,8,12
266:8 276:24
279:19 281:15
285:22 299:6
302:1,5,18
304:5

**Goldberg** 21:10

**Golly** 202:9

**gone** 34:19 78:24
99:20 247:19
257:18 259:9

**good** 4:19 15:5
16:12 58:17
94:19 96:16
120:19 135:10,
13 136:7 139:6
142:4 145:3
183:8 189:12
196:19 206:7

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

208:10 213:22
251:11 264:17
272:23 273:2,8,
11,12 285:15

**Goodwin**
118:13,14
182:10,11,22

**Goodwin's** 55:7,
15 184:6

**Gortex** 82:4
148:10

**got** 9:21 11:25
15:5 18:20
19:16,21 20:10,
20 24:11 32:23
34:4 39:17
41:11,25 44:19
45:6 47:19 52:2,
8 54:25 55:11
61:7 62:11
85:14 88:22
94:16 97:14
102:16 110:13
146:15 160:8
191:1 226:25
230:1 232:21
239:14 250:5,9
253:4 256:8
259:3,19 263:17
270:18 275:25
290:16

**gotten** 27:2
247:4 262:17
267:12

**govern** 112:20

**gracilis** 246:2

**grade** 152:2
213:21

**grades** 152:1

**grandfather's**
270:11

**granuloma**
187:11

**granulomas**
220:15

**grappling**
108:24

**Gray** 268:8,9

**great** 30:8 57:23
156:20 262:10

**greater** 13:11,
77:20,21 84:7
89:21 135:16,23
136:24 179:21
214:19 216:3

**green** 39:22
267:18 268:7,
10,16

**groin** 83:3,10
210:15 216:11
220:6 225:9,13,
25

**group** 88:3
91:10 99:21
197:1 207:11
243:9 293:25

**groups** 83:8
99:15 245:25
246:5,11

**growing** 47:15
85:8 114:7
177:4 190:15
191:2 192:19,
227:25 231:19
244:10 280:24

**guarantee** 85:4

**guarded** 77:2

**guess** 19:22 61:4
134:3 184:4,
203:10 275:11
278:24

**guesstimate**
277:11

**Gunn** 54:5

**guys** 23:17 24:1
130:10 170:14
257:1 275:23

**gynecologic**
12:14 241:24
267:5

**gynecological**
241:20

**gynecologist**
283:7

**gynecology**
87:25 113:14
117:22 165:18
240:23 241:1,15
267:1,10,11,18
268:6,9,11,12,
19

---

**H**

**half** 27:20
218:25 250:10
253:5,24 260:1
278:2

**half-day** 256:11

**halogenated**
152:21

**Hancock** 8:2

**hand** 13:2 25:22
36:23 42:5

**handful** 78:21
80:11

**handle** 125:25

**happen** 10:25
66:21 221:25
236:13 297:19

**happened** 55:10
119:9 211:20,24
212:2,6 305:12

**happening**
220:10

**happens** 30:2,5
55:20 149:4
161:20 220:18
222:3 234:24
244:11,16

**happy** 7:7 19:6
43:4,10,18
163:7

**hard** 30:24
265:11

**harming** 246:13

**harvest** 148:13

**has** 8:21 10:20
26:12,18 28:3,6,
8,13,15 29:7,20
38:23 47:5,9
64:1 70:13 71:3
72:19 82:13
84:14,21,22
85:16 87:12,16
92:2,7 94:25
98:1 101:20
118:15 120:7
126:8 127:10
135:3 138:4

140:16 141:11, 17 146:6 147:2, 24 152:8,17,20 153:25 154:6,20 156:25 157:10, 13,19 158:16,25 159:2,6 164:20 165:5,11,14,23 172:14,15,18 176:9 179:1,6, 182:9,22 183:2 187:25 189:10 190:14 191:19 194:15 197:6 203:25 209:6 212:21 213:1,7 219:21 234:23 235:17 247:6,23 248:2 252:4,7 257:22 258:6,22 262:14 278:16 280:11 281:4 287:25 298:21 301:13 305:25 306:10

**hashed** 263:21

**hasn't** 157:9 192:1

**hate** 226:21

**having** 7:19 34:23 60:2 74:12 89:22 105:10 107:6,23 108:1,3 110:2, 19 113:13 114:18 131:22 141:13,22 145:23 194:11 223:18 245:1

274:7 278:18 279:22 300:21

**he'd** 182:18

**he'll** 183:5 252:23

**he's** 32:14 53:3, 13 72:23 118:14 119:4,6,9 120:3, 6 182:18,21,23 183:12 250:9,15 251:6 255:13, 17,18 260:4 261:13 275:25

**head** 35:8 53:6 117:25 159:16 227:2

**headache** 39:22

**headaches** 89:23

**heads** 68:24

**healing** 90:6 149:8 219:20,23

**health** 145:22 223:24

**hear** 254:23

**heard** 16:1 159:14 184:6 217:7 232:22

**hearing** 95:22 252:20

**held** 25:22 26:17,24 112:13,23 254:8 289:3

**Helen** 9:6

**help** 20:6 22:12 51:13 93:2 97:9 132:17 144:9

145:18 297:25

**helped** 96:5 125:2 179:1,6 201:10

**helpful** 73:8 160:5 280:17 298:5,9

**helps** 214:12

**here** 4:24 8:2,20 12:15 22:14 24:11 25:9 32:13 44:18 47:21 78:8 134:4 158:21 170:12,18 172:23 173:5,10 177:11 214:10 218:18 234:2 239:10,21,24 244:5 249:25 250:5 252:4, 256:21 259:1 261:24 263:4 264:11 271:7,8 291:3 292:14,23

**Here's** 171:12

**herein** 7:19

**hernia** 154:5 156:14,16,19, 21,25 157:2,4,6

**hernias** 156:22

**Higgins'** 89:19

**higher** 138:4 144:18 187:25 208:19 210:22 211:3 225:22 226:11

**highlight** 39:25 40:2,11

**highlighted** 40:9

**highlights** 40:6

**highly** 114:9 243:16

**highly-aromatized** 152:22

**Hilton** 147:18

**him** 24:20,25 25:1,2 32:19 48:20 49:7 53:24 95:5 118:15,22,24 126:2,14 128:4, 10,12,16 169:5 182:18 183:9, 21,22 184:7 239:12 250:10 254:20,25 256:23 259:24 261:22,24 264:14 305:18, 24 306:3,11

**hindsight** 229:17

**Hines** 12:17

**Hinoul** 206:16

**Hinoul's** 224:15

**hired** 9:22

**his** 21:23 25:2 50:19 52:5,17, 22 53:6 55:7 68:1 93:13 119:15,20 120:7 128:10,16 160:1 168:25 169:5

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

182:13,19
183:2,4,16,23
206:17 211:13
250:2 255:4,7
256:6,17 261:8
275:23 292:20
297:13,14
305:25 306:1

**historical** 94:10

**history** 94:3,5
122:18,23
123:17 274:22
275:15

**hit** 246:10
266:18

**hits** 144:5
244:12 265:22

**hold** 82:17 86:1
92:12 103:5,12
123:18 140:24
166:23 306:15

**holding** 107:17,
19

**home** 8:1 20:21
44:19 110:13

**hone** 33:25

**honest** 252:2

**honestly** 72:21

**Honor** 55:7

**honorarium**
60:14

**hope** 257:7
263:1

**Hopefully**
132:17

**hoping** 256:5

**hospital** 31:6
78:25 111:20

**hour** 54:19,20
63:15,23 65:24
253:10 258:8,
15,17,21 259:5,
17 264:8

**hours** 36:3 46:21
58:1,15 65:7
67:22 68:9,21
69:8,17,19 70:6,
15,25 72:9
251:11 253:3,12
255:20 257:18
258:3,11,15
259:7,11,12,13
262:4,6 275:19
276:10,13
277:3,4,6
278:13

**household** 173:4

**how** 6:2,19 8:4,
13 10:5,25
19:16 21:12
23:1 24:16 30:4
35:10,11 36:2
46:4,7,15 47:12
48:11 49:25
54:17 56:2,18
58:12,15,16
60:18 63:16,21,
23 64:7 66:5,24
67:10 68:16
69:1,19 70:11,
16 71:5,6,15,16
72:3,6 73:4
76:10 79:18,25
94:9,11 101:14,
15,18 104:7

105:11 113:8
114:18 124:16
127:5,16 128:15
129:18 132:13
136:25 138:23
140:7 143:17
146:3 166:21
177:6 179:17
183:11 186:22
195:8,14,16
197:6 203:21,22
205:4 206:20
207:3,4 219:2,
13 231:18
232:6,9,17,21,
23 234:16 237:1
238:3,4 249:8,
17,20 251:24
253:18 255:12,
24 259:9 266:17
269:16 276:15,
20,22,23,25
277:8,22 278:10
282:12 283:16
284:11 285:23
286:7,13 287:16
292:11 296:12,
15,19 302:24
303:6,7,12
304:8

**however** 77:12,
19 78:3 80:6
86:22 87:16
88:5 108:22
113:13 142:6
205:19 253:9

**human** 113:2,4,5
115:24 133:21
151:5,12 154:3
155:5,14,22

157:9,10,14
160:21 180:8
185:14 188:15
190:10 191:16
192:5,12,24
193:3,19 194:25
205:1,6 212:18
237:1 238:3,6,
10

**humans** 166:16
173:1,2,8,12
190:14 191:4,8,
9 192:14 195:16
236:23 238:18
295:20

**hundred** 27:14
216:16 303:13

**hundreds** 117:14
169:3

**hurts** 244:22

**Huskey** 288:17

**Hutson** 54:9,12

**hydrocarbons**
152:22

**hydrochloric**
153:9

**hypothetical**
86:15 91:8

**hypothetically**
117:4

———————

**I**

———————

**I've** 11:2,23
14:16 20:20
24:6 25:11
33:23 41:11,14
43:3 45:6 54:3,

8,11 67:5,8
68:23 70:5
74:22 80:7 83:1,
18,22 85:14
92:19 94:16
99:14 104:16
117:10,13
142:22 151:18
159:14 160:8
178:22 204:5
218:13 219:8
226:25 231:22,
23 232:18
245:7,16 247:4
249:24 251:7
252:20 254:25
255:8 259:24
260:2 262:17
264:14 267:12
274:18 275:2
291:17 292:1
295:7 303:8

**ICS** 15:16

**idea** 72:6 82:5
90:14 155:2,6,
13 212:6 213:24

**ideal** 284:1,20,22
286:21 287:12,
16

**ideas** 27:3

**identification**
13:9 37:4 97:12
122:4 123:3

**identified** 47:7
122:12 228:14
252:7

**identifies** 45:2,
23

**identify** 4:5
208:14

**IFU** 103:13,16
104:3,9 105:2
106:14 107:7,
15,17,20,24
108:8,12,14,15,
19,22 110:7
111:5,23 115:16
119:1,2,9,13
283:19 284:5,
18,20 285:2,13,
286:19 287:5,7,
9,12,17,18,19,
23 288:10,12
290:2,6,15
291:7 296:6,8,
12,17 297:1,3,
17,24 298:4,11
299:10,12
300:2,4,14,23
301:7,9,23

**IFUS** 103:10
104:16, 105:17,
19 108:7 109:9
110:10 114:24
115:2,7 282:21,
25 283:17
284:21,24
285:6,11 288:13
289:4,8,13
291:3 302:16,18

**Illinois** 270:17

**illustrations**
48:8

**impact** 88:20
141:14,22
146:3,19 176:10
223:23,24 230:9

**impacted** 115:8
291:2

**impacts** 219:21

**impairing** 146:1

**impart** 92:8

**implant** 86:24
90:21 93:11,17
118:7 133:25
148:21 165:9,
23,24 167:4
174:11 193:19
224:7 231:14
280:25

**implantable**
238:8

**implantation**
28:20 106:23
151:12 161:1,9
167:18 235:16

**implantations**
76:9

**implanted** 29:16
78:19 79:6,16
83:21 89:10
117:6 131:23
164:9 176:11
187:22 191:20,
25 192:12
194:11 195:16
196:5 216:24
217:4,17 222:10
235:20 236:1,19
288:5,9 295:19
300:13 302:3

**implanting**
51:20 88:24
90:10 92:4
115:8,9 118:8

119:14,17 188:6
230:12 237:3
290:13

**implants** 79:25
106:1 167:6
175:7 280:19,21
282:3,16

**implication**
300:8

**imply** 53:3

**implying** 106:10

**importance**
295:18

**important** 6:14
89:7 90:9
104:12 109:21
161:23 274:22

**inartfully** 96:11

**incidence** 146:17
222:2

**incision** 219:24
220:6

**include** 54:25
104:9,10 132:25

**includes** 239:1

**including** 137:8
165:15 189:18,
20 253:5 288:23

**income** 59:20,21
60:12,16,25

**incontinence**
133:25 134:8,
12,14,18 139:8,
10 140:21,22
141:6 142:1,9
143:1,5 145:8
146:7 148:22

167:19 179:14
231:16,18
232:1,4 242:7
266:4 271:2,18,
25

**incorrect** 129:4

**increase** 31:24
90:1,3 140:10
144:9 145:19
146:12 222:16
227:19 244:14

**increased** 89:25
140:7 143:8,15
146:11 252:4

**increases** 149:5
198:7

**increasing**
145:13,14 242:4

**indemnify**
162:25

**independent**
204:20 273:13

**independently**
273:17

**index** 137:2,6
138:1

**indicated** 85:10

**indications** 85:8
104:4

**indifferent**
120:19

**individual** 37:22
68:18,22 115:19
149:24 191:4
223:17 249:23
250:7 304:2

**individually**
223:19

**individuals**
180:15

**industry** 112:14

**infection** 27:7
116:8 149:3
167:10 168:11
170:8 185:5
207:24 218:1,
226:2,4 300:24

**infections**
130:12 140:8,10
207:25 243:3
264:25 301:2

**infectious** 206:9
218:12

**inflammation**
27:6 149:2
167:10 170:8
185:5 186:20
243:23 245:1
265:19

**inflammatory**
116:7 153:8
187:5 206:9

**influence** 177:5

**information**
29:7 37:22 72:1
81:23 92:7,9
102:8,11 105:22
108:11 109:20
110:3,20 115:15
116:20,23
117:21 118:5
119:2,13,15,22
120:9 147:13
161:24 194:10

203:24 216:14
231:21,22
232:25 233:2
234:12 235:14
236:23,24
255:16 273:7,12
282:3 283:17,23
284:2,10,15
286:1,3,19,25
287:5,25 288:2
291:1,7 298:6
301:14 302:7,
13,15

**informed** 89:2
104:22 105:21
106:14 107:5,16
108:8,20 109:25
193:7 194:10
258:2 285:16,23
286:16 287:2,14
288:7 299:25
301:15

**infringement**
9:19 10:13

**infringing** 9:24

**ingrained**
246:17

**inguinal** 156:24

**inguinodynia**
156:24

**inhibit** 145:17

**initial** 144:25
187:5

**injection** 143:12

**injections** 144:8
249:5,8

**injured** 16:23
51:1

**injury** 210:19,21
224:22

**innervated**
243:16

**insert** 106:5
109:11 110:14

**insertion** 221:23
245:15 265:23

**inserts** 302:21

**inside** 111:9
151:4,23 180:8
184:25 188:14
189:8 220:5
236:9 246:14
265:11,24
300:13

**insight** 279:23

**insist** 57:3

**inspection**
100:14

**instances** 135:5
152:15

**instead** 90:11

**institution** 62:8,
13 139:4 211:2
214:23 215:6

**institutions**
135:8 159:9,13,
227:18,20
228:12

**instruction**
109:16

**instructions**
81:24 90:11
104:24 105:5,7,
9,22 106:5,22
109:6,11,18,20

110:3

**insurance** 59:18
303:20

**intend** 270:9

**intended** 133:24
148:21 205:1,5

**intends** 255:16

**intent** 183:22

**intentionally**
181:11

**interaction** 6:3
74:24 195:13

**intercourse**
265:8,15,22

**interest** 270:15,
20

**interested**
110:19

**interesting** 130:9
217:6 281:22

**interject** 103:21

**intermittent**
143:18

**internal** 17:7
25:10,15,16
30:25 32:6 36:7
39:5 149:17
150:3 151:13
162:8 163:16
182:3 184:2
185:8 186:17
203:8 204:12
233:5 274:25

**international**
173:16 174:3
272:25

**internus** 246:1
265:17

**interrupt** 6:25
226:21 251:15

**interrupting**
103:21

**Interruption**
85:21 272:8

**interstitial**
113:19 242:2

**into** 13:11,20
14:8 16:15
18:18 21:7
31:22 36:20
46:15 49:11
59:5 60:25 64:3
81:23 88:22
94:2 106:18
109:17 117:24
120:14 121:12
125:6,13,15,19,
23 126:12
127:3,12,15,23,
24 131:3 152:5
155:10 176:7
192:12 203:20
207:9 220:3
221:24 242:21
244:10 250:17,
25 251:4,23
253:19 255:14
261:13 263:6
266:11,21
269:12 271:14
275:13 279:23
292:24 296:13

**intra-abdominal**
145:14 146:12

**introduction**
13:1

**invariably**
245:22

**invasive** 198:25

**invented** 96:5
105:10

**Inventions** 97:22
98:9

**investigators**
187:17

**invite** 99:8

**invited** 99:10
270:24

**invoice** 69:5
71:10,11,13
72:10

**invoices** 70:23
71:17,23 72:15,
276:20,21

**Invoicing** 46:1

**involved** 9:19,23
11:1,25 12:20
14:16 16:22
17:12,13 63:20
66:2 99:16
102:7 105:4,16
163:19 191:21,
22,24 232:6,9
293:24 294:8,9

**involving** 10:12
93:17 99:14
151:11 192:13

**irrelevant**
305:14

**irreversible**
217:19

**irritating** 265:6

**irritation** 244:7
265:13

**ischiorectal**
243:4

**Ishtar** 155:19

**isn't** 49:8 61:5
80:19 140:12
239:17 295:15

**issue** 7:11 22:18
114:7 118:12,
15,16 120:5
145:22 150:9,
11,22 194:5
223:16 256:11
263:14 280:9

**issues** 31:20
44:18 103:5
113:11,16,17
186:10 205:19,
20, 241:22
268:19

**Italian** 16:10
20:3

**items** 16:19
107:20

**iteration** 297:10

**itself** 84:9 170:4,
5 217:20 250:3
276:16

**IUD** 109:16

**IUDS** 109:14

———————

**J**

**Jamie** 130:6

**Jeff** 4:10 263:19

**Jersey** 51:17
54:6

**Jim** 54:9 70:1

**job** 135:10

**journal** 199:25
267:4,5,8,11,13,
15,16,17,18
268:5,7,8,10,16
272:25

**journals** 267:9,
14,19,20,21,25
268:3,12,13
272:21,23
273:11

**Judge** 55:7,15
182:10,11,22
184:6

**judgment** 92:2,6
93:9

**July** 270:10

**jump** 6:20

**jumper** 57:6

**June** 270:10

**jury** 95:25

**just** 5:3,4 7:9
13:21,22 15:9
16:8,14,21 17:9,
24 18:10 19:8,
22 22:2 30:9,16,
20 32:14 33:22
34:23 35:17,19
40:2,11 41:3,8,
13 43:20 44:2
46:1 47:15 48:2
51:23 55:16
56:13 57:16
59:6 60:23 64:2,

4 67:18 68:1
69:4 72:18 73:3,
17 74:19 75:24
77:25 84:13
90:22 93:5,7
95:4 100:20
107:10,21
110:15 111:18
116:22 118:18
128:14 134:3
137:12 140:16
141:12 144:15
146:22 149:23
153:1 155:24
156:5 158:11
159:3 166:7
168:24 170:21
171:24 172:17
177:9,12,17
182:8 184:4
185:2 189:18
192:9,10 193:14
194:21 195:4
196:21 202:14,
20 203:16 206:1
211:12 214:7
215:10 217:13
219:24 220:2,4
222:23 224:4
227:23 233:15
234:16 235:8
237:11,14,16
241:7 242:20
244:21,25 245:1
246:16,18
247:14,15 248:4
253:17 255:7,10
256:6,11,23
257:17 259:12,
22 260:6,15

261:6,11 262:9
263:10 264:7,
10,21 268:18
271:22 276:3
277:4 284:22
285:5 288:21
290:8 291:16,
293:22 294:8
298:1,16 299:15
300:11 301:3,13
305:11

---

### K

**Kansas** 227:24

**Karram** 82:3
228:22 271:11

**Kathryn** 9:6

**Kawasaki** 15:18
20:1

**keep** 16:14 34:7
40:18,25 41:22
44:20 60:1,3
71:6,8,21,22,25
72:1,17 92:15
176:12 177:24
241:9 256:22,
259:23 261:22,
24 304:5

**keeping** 71:17

**keeps** 207:16
224:18

**Kegel** 135:1,2

**kept** 35:17 41:23
48:17,18 49:12

**Kessler** 216:19

**Kessler's** 215:23

**key** 17:11 202:21
203:3

**kidding** 202:16,
17 239:11 264:9

**kind** 13:23 19:21
22:13 32:1
35:19 41:11
49:6 53:13
54:16 64:1
75:24 118:16
121:13 139:22
140:23 144:1
177:22,24
192:23 194:21
204:12 230:6
237:18 240:14
244:1 263:6
279:20 286:25
298:23 303:20

**king** 281:19

**Klinge** 168:3,8
187:16

**Klosterhalfen**
187:16

**Klosterhalfen's**
168:3,8

**knew** 116:4
162:5,17 163:10
180:23 181:6,
10,15,19,25
182:2,6,19
183:9 233:3
234:15 235:9,12
289:22 294:4

**knitted** 155:10

**knock** 256:6

**knocking** 102:17

**know** 6:1,2,10,
14,17 7:7,9
12:23,24 16:1
17:4,6,11 19:16
20:19,22,25
22:7 24:9,24
25:1,2 26:8,16
28:12,25 29:16
30:4,9 31:10,18
33:5,9 34:25
35:14,17 38:15
39:7 40:13,23
42:4,7,9,13
43:1,5,6,20
45:8,15 46:21,
22 47:1,3,17
49:12,17,25
50:22 51:9
53:20 54:13,14
57:13,17 58:24
59:6,7 60:2
61:13 62:5,23
63:20,25 64:4,9,
10,11,12,13,14
65:8,10,11,12,
16 66:20,21,24
67:2,3,5,7 68:9,
17 69:11 70:3,
12,13,18,20,22,
24 71:11,24
72:7,18 73:3,8,
18 74:7,11,15,
24 75:17,18,19,
21,22,24 76:13
77:2 78:1,10,13,
18,22,25 80:5,
11 82:7,9 89:19
90:1,2,4,6,12,
13,23 91:1,18
95:15 96:6

99:14 100:3
104:12,20
105:6,11 108:7
109:4,22,23
110:16 111:21
113:5 116:11,21
117:9,14 118:20
120:18,24,25
121:1,12 122:15
125:9,11,19
126:3 127:8,12,
19 130:6 141:1
143:8 146:10,
21,22 150:1
151:14 152:2,23
153:12 154:16,
19 155:6,7,8,15
156:18,21
157:17,19
158:11,18 159:3
161:17,20,23
162:5,13,16
163:4,23 165:3,
4 167:23 168:7,
11,14 170:10,23
171:9 172:16
173:14,23 175:8
176:6,19,22,23
177:12,24 178:1
180:14 182:11,
20 186:3,6
189:8 190:7
191:19,22 193:4
196:20 200:4,7
202:20,21
203:13 204:5,9,
14,17,18 205:24
206:1,20,23
207:3,4,6,7,17
211:4,20,24

212:2 215:1
222:22 223:8
226:3 227:17
228:14,24
229:15,19
232:15,17
234:9,23 235:17
237:21 238:17,
22 239:10
241:14 249:19
250:13,15
251:14,24
252:6,15,19,20,
22,25 253:8,19,
20,22 254:12,23
255:2,6,8,25
256:2,8,9,20
257:6 258:5,10,
23 259:2 260:24
261:4 262:16
264:11 266:6
268:4 269:3
270:18 271:13,
16,20 273:14
274:5,6,7,10,20
275:13,14
276:19 277:14
280:9,13
283:19,21
289:11,17,24
290:25 292:23
293:13,21,22,23
294:2,7 296:20
298:1 301:15,17
302:9 303:10
304:7 305:12,21
**knowing** 91:12
192:2 234:6
**knowingly**
104:13 283:19,

24
**knowledge** 28:7
69:11 234:12
305:6,7,8,10
306:1,2,6,9,11
**knowledgeable**
93:9
**known** 104:11,
15 115:22 117:5
119:8 153:25
160:24 161:4
168:1 194:13
234:19 283:20
286:12 287:21,
23 297:1,2
300:19 301:10
**knows** 290:22
305:13
**Kuntz** 4:10 36:1
37:11 49:24,25
50:3,16,19 52:5,
17,21 53:7,9,15
57:21 74:4 86:7,
8 126:20 229:12
252:15 256:10,
14 259:22
260:9,12,14
264:9,13 278:3
**Kuntz's** 53:2
**Kuuva** 27:24
**Kuuva's** 224:15

---

**L**

**lab** 100:17
**labor** 12:9,12
130:13

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

**laboratory** 173:4
298:14,21

**lactobacillus**
152:24

**laid** 39:8

**language** 160:2,
25

**large** 149:22
185:25 196:15

**largest** 138:24

**laser** 242:24

**lasered** 242:23

**last** 7:3, 15:5,9
16:20 25:12
29:8,18,23
30:11,17,24
34:13 38:24
46:23,24 53:11
55:10 58:19
66:25 69:14
73:12 80:13,15
87:24 100:2
110:23 128:20
141:15 143:22,
24 146:23 158:7
162:25 191:14
195:17 227:10
237:15,22 241:7
260:1,22 274:5
284:13

**lastly** 145:25

**late** 64:3 82:2
157:1 256:14
293:11

**later** 14:8 34:6
35:11 38:14
73:4 120:15
217:25 220:4

**249:20 251:19**

**latest** 9:1

**Latowski's**
207:10

**latter** 149:18

**laughing** 130:11

**launch** 295:22

**launched**
190:11,20
295:24

**Laura** 69:25

**Laurikainen's**
210:14 225:10

**law** 46:2,7, 48:12
49:1 52:22 69:4
99:11 127:14
183:10,11,21
186:12

**lawsuit** 200:25

**lawyer** 99:11
126:25

**lawyers** 125:9
260:20 263:17
278:20

**lay** 134:2

**leach** 151:24
152:7

**leachates** 155:6

**leaches** 155:1

**lead** 83:17
221:19,20,21,22
245:3

**leadership**
252:11 257:22,
25 259:8

**leading** 90:6
94:3

**leads** 31:20
150:11 221:17

**leak** 147:3,4

**leaking** 145:15,
20

**learned** 256:14

**learning** 62:24

**least** 23:23 34:13
58:19 64:17
69:25 87:19
138:3 214:5
223:9 226:11
228:1 246:10
298:25

**leave** 53:24 56:7
246:18

**leaving** 56:10

**lecture** 60:13

**lectured** 99:2

**lectures** 270:25
271:4 272:5

**led** 116:9

**left** 59:23 61:15
140:2 228:9
245:11 270:16

**leg** 83:3 225:13

**legal** 95:5 118:16
289:19 290:20
293:12 294:1
305:17,18 306:5

**length** 219:25
220:8,11,13
222:23

**less** 69:9 124:23,

24 137:23
149:10 192:22
247:8 252:9
259:17 280:1

**less-than-50-
percent** 197:22

**lessened** 248:2

**lesson** 254:22

**let** 4:21 6:3,9,14
7:7,9 14:13
19:18 68:6
85:24 86:1,18
91:25 95:7 97:8
103:21 107:11
114:22 119:10
124:15 125:24
126:16 128:12
166:16 180:18
183:6 195:24
205:3 213:9
239:20 261:17
280:3 290:4

**let alone** 29:15
214:23

**let's** 46:18 56:7
63:4,6 67:19
74:6 93:16
102:15 111:2
118:18 121:17
122:8 134:3,25
147:6 170:9,20
176:18 180:21
190:25 191:14
199:7 226:18
233:8 237:22
249:6 268:15

**letters** 48:13

**levator** 83:11

265:17

**level** 159:5
185:23 187:19,
25 188:2 296:20
297:16,18
299:6,7

**levels** 274:9

**Lewis** 290:9
305:12,15

**liability** 12:1
14:20 65:2
163:1 303:17

**Liebert's** 153:11

**life** 164:22,25
165:6 186:8
187:19 207:21
223:24 230:9
302:3

**life-altering** 29:3
76:23 116:10
230:7 235:4

**life-changing**
235:4

**life-threatening**
29:3

**lifelong** 300:16

**lifestyle** 145:6

**like** 5:20 8:8
12:20 14:9 21:1
23:12 26:20
30:15 35:7
38:18 41:3,11
48:8 50:9 53:4
56:2,13 58:11
59:8,20 64:25
65:5 75:24
76:21 82:1

84:13 95:18
99:13,19,20
100:8 106:10
108:9,16,17
114:19 118:18
121:4 123:22
125:18 133:14
137:15 144:2
155:4 160:3
163:15 165:3,4
168:18 172:17
174:11,17
176:21 177:10,
23 186:22
189:19 191:18
192:4 194:20,25
201:3 205:9
206:1 214:4,20
227:14 230:18
233:15 239:13
251:22 253:15
254:10 255:15,
19,21 259:5,12
269:4 271:19
273:16 274:7
275:13 295:16
296:17 300:11
303:9

**liked** 160:24
161:4 204:15

**likelihood** 147:8

**likely** 146:17

**likes** 252:25

**limine** 118:13

**limited** 88:3
141:8,14,16,23
281:7 289:12,16
305:4,25

**line** 19:12,14,18
25:21 109:1
127:19 134:7
296:18 298:2

**linear** 207:14

**lines** 190:2

**lingering** 252:1

**lining** 139:20

**list** 21:3 25:10
29:22 30:14,15
36:14 37:16
39:2 42:20,24
43:21 44:4,23
45:2,8,13 47:8,
12,16 65:13
70:4 85:8 91:13
98:9 161:15
169:6,21 171:18
187:15 190:17
200:22 219:14
273:21,24
274:13 291:6
300:22

**listed** 42:20
43:15 175:1
274:12,15
293:10,11,16,22
294:7 297:4

**listen** 202:23

**listing** 90:22
91:21 283:20
294:5

**litany** 155:11

**literature** 15:2,8
16:5,22 20:5,11
23:1 25:7 26:18
27:2 28:3 29:21
30:7 33:9,23

34:16 40:20,22
41:7,9 42:1 43:3
44:6,10,19
47:20 69:11
77:13,16 83:2
85:5 101:17
102:2,4 114:25
115:4 116:18
131:12 136:2
137:21 153:16,
24 155:16
166:11 167:4,21
169:2 171:25
172:2,6,12,24
173:6,11 177:5
185:8,13,20,21
186:16 190:15
191:3,7 192:20
194:1 199:22
200:6,10,18,20
201:17 204:25
205:11 209:12,
15 211:7 212:16
213:19 218:9
219:1 246:24
258:6 262:17
275:2 282:4,11,
18,20,23 283:9
287:3 292:4

**litigation** 8:12,
17,21 9:13
10:17 11:3,8
14:20 17:3
26:14 44:25
45:3 46:16,25
48:24 49:20
50:14,17 52:6
54:1,15 58:2,3,
9,13,23 65:3,19,
22 66:16,25

67:10, 99:12,15, 16,24 100:5 160:10 200:19 201:1 202:7 204:10 224:6 228:15,20,25 229:1,9,18 232:8 275:21 276:11 277:5,6, 24,25 278:8 289:2,6 292:18 303:3

**litigations** 204:6

**Litner** 155:3

**little** 6:4 8:9 16:8 38:14 57:6 72:22 81:1 99:17,19 124:15 143:2 146:18 178:25 180:10 186:24 219:18 225:24 235:7 237:25 244:6 245:17 255:4, 270:18 275:1 292:5 300:3

**live** 7:25

**local** 99:6

**lock** 45:11

**lodging** 249:16

**long** 10:5 36:2 65:16 66:5 76:10 118:2 137:22 140:2 144:17 153:22 187:1 195:14,16 196:5 197:6 205:21 209:15

211:9,11 213:12,22 219:13, 223:22 224:7 226:5 232:23 255:18 259:9 269:16 275:14 276:15 277:8 278:10 284:12

**long-term** 27:11, 17 28:1,4 29:3 33:21 43:7 84:24,25 89:3 135:6,13 139:16,19 144:11 189:13 195:21 197:4,19 205:20,25 206:2 209:17 210:9, 13,25 213:7 217:19 222:25 223:7 224:13,16 227:6,12,17 228:5,8 281:5 283:25 297:21, 24

**longer** 75:8 143:20 207:17 247:5 249:17 253:23 255:25 268:15

**longer-term** 147:15

**longest-term** 211:16 212:13

**longevity** 283:25

**longus** 246:3

**look** 14:3 15:14

21:12 22:20,22, 25 24:13, 25:23 26:11 27:8,11, 13,20 28:2,9,10, 11,16 36:12 39:13 41:15 48:2 52:10 60:6 72:2 77:15 88:2 101:22 131:18 132:8 133:6,15 136:12,25 137:7 147:14 163:7 175:23 179:7 180:21 181:5 190:25 196:10 205:19,21 207:17 208:18 222:14 223:17 225:18 233:1 238:16 246:24 287:19,23

**looked** 15:20,23 16:16 17:4,9 18:22 25:11,12, 20 27:16 35:19 39:4 41:14 47:24 70:5 102:2 128:21 154:25 155:19 174:9 203:19 205:18 216:13 238:19 258:22 273:18 274:4,10

**looking** 17:1 40:8 98:7 101:15 158:18 229:16,19 233:10 291:16

**looks** 133:14

**lose** 149:24

**loses** 146:7 149:5

**loss** 59:22 60:24 146:2

**lost** 92:19 188:22

**lot** 16:4 18:9,15, 23 20:11 52:18 63:20 70:25 101:12 113:20 130:8 137:15 157:2 159:17 185:24 196:19 203:24 226:15 227:1 241:25 243:20 251:6 252:2,9 255:14 258:5 261:7 262:25 274:5 276:1 279:11 293:19

**Louis** 96:25

**Love** 54:8,12

**low** 8:9 60:4

**lower** 188:1 208:19 213:21

**luckily** 270:16

**lucky** 24:11

**lump** 59:7

**lumping** 32:1

**lunch** 121:16

**luncheon** 121:22

**LUNDQUIST** 130:5 249:14,22 251:10,16 252:10 253:4 254:1 257:14,19 258:16 260:15

In Re: CR Bard 200                Bruce Rosenzweig, M.D.                        10/29/2014

261:11,20
262:14 263:16
291:13

**luxurious** 57:10

---

**M**

---

**M-a-d** 129:21

**M-a-d-** 129:20

**M-a-t-t-s-o-n**
129:19,24

**M.D.** 7:18 60:8

**macrophages**
153:4 187:6

**made** 5:14 81:20
85:12 96:9
115:7 117:18
118:6 124:16
152:25 177:7
180:22 183:2
195:8 250:23
251:13 257:22
260:25 264:4

**Madsen** 15:12
19:25 30:22
32:5 33:18
34:12 129:7,18
130:15,18 133:9
135:18 136:3
175:13,22 176:8
197:15,16,24
199:5

**Madsen's**
223:10

**maintain** 41:16
44:3,5

**major** 266:9

**majority** 15:2
29:13 116:19
117:15, 185:22
198:9 203:8,18
210:2 213:5,23
229:2 243:5
304:14,23

**make** 6:7 13:21
17:25 53:5,7
68:5 73:3 77:7
85:14 88:6,25
90:3 92:2,8
116:25 128:13
135:25 169:17
173:9 181:25
182:9 184:4
192:9 193:6,14
215:10,16
255:15 261:12
264:10 285:20,
21 288:2,7
298:17 299:5

**makes** 151:24
155:9

**making** 53:6
110:20 115:8
150:5 284:18
301:15

**malpractice**
11:3,8 12:4
59:17 64:22
65:12 303:11,
15,17

**man** 291:14

**manage** 113:11
114:18

**management**
31:12 113:8,13

134:16 135:22,
24 142:7 271:1

**managing**
227:23

**manifestations**
150:12

**mannerisms** 6:4

**manual** 21:5
151:19

**manufacturer**
79:9 115:24
190:20

**manufacturers**
8:13 157:23

**manufacturing**
121:8

**many** 8:4,13
16:23 22:2 45:6,
7 56:2 58:15
60:18 69:19
70:11 72:23
78:18 79:25
89:10 114:14
126:8 155:21
206:20 231:24
251:23,25
277:22 294:12
302:24 303:6,7,
12 304:8

**map** 13:23 35:22

**marathon** 7:6

**March** 200:25
202:5

**Marcus-braun's**
27:9 28:16
196:14 210:1
227:15

**mark** 13:3 36:24
97:8 157:22

**marked** 19:9
37:4 97:12
123:3 201:12

**market** 81:22
96:7 112:25
152:19 188:7
190:1,13 191:18
287:25

**Mary** 153:14

**master's** 155:3

**material** 165:8,
14 167:3 171:18
236:25 277:18

**materials** 37:20
38:13 65:9
116:17 271:2
277:14

**matter** 9:3 17:17
19:9 52:20 57:4
150:8 178:12

**matters** 8:14
69:20

**matures** 220:20

**max** 255:20

**maximum** 303:9

**may** 6:7 7:4
20:23 21:18
25:8 44:9 48:3
68:6 73:20 74:2
94:16 103:9
119:20 129:2
175:4 182:24
183:10 195:23
201:2,3 202:8
203:2,11 253:7

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

263:19 275:12

**maybe** 12:1 36:3
46:21 67:2
71:21,22 80:10
94:22 97:9
125:7 146:11
168:21 169:15
172:19 223:21
242:13 255:18
258:9 259:17
263:10,14
274:10 276:8
278:13,20 303:9
305:2

**Mayer** 179:24

**Mayo** 130:21

**Mazziotti** 4:12,
19,22 5:18,23
6:1,12,16 7:2,
11,15,23 13:10
20:15 22:3 33:1
37:6 44:1,16
48:22 49:4,10
52:2,3 53:7,16
57:20,24 59:19
63:4,13 66:23
67:16 68:3,4
73:2,7,10 85:23
86:3,6,11 87:4
88:8 92:10,14,
21 93:1 94:13
95:7,9 97:17
102:15 103:1,23
104:2 105:1
106:9 107:1,10,
12 108:3,6
112:3,19 115:13
118:17 119:3,7,
24 120:2,10,13

121:11,19 122:7
123:4 125:14,24
126:2,4,16
127:2,11
128:15,19
129:15,17
130:10,16
138:11 151:2
152:10 156:11
157:5,22 158:6,
10,15 159:10
163:2,9,22
164:14 166:6,24
169:1,8,11,12
170:16,20 171:5
177:19 178:3,24
179:2,3,16
182:14 183:6,
13,17,24
184:11,16,19
189:1,20,22
194:6 195:1,3
199:4,7,18
202:12,18 207:2
209:8 211:14
212:7,21,23
215:14 218:11
226:17,20 227:3
229:14 230:16,
24 237:9,13,19,
21,23 239:9,12,
16, 250:19
251:13,21
253:2,14,18
254:3,9 255:22
256:4,8,13
257:4,17
258:13,20
259:16,20
260:6,10,13

261:10,17
262:3,6,11,20
263:1,8,10
264:3,10,16,18
266:15 272:19
276:2,5,7
278:21,23 279:4
282:8,24 283:13
286:17 289:1
290:16,23
291:5,16,19
292:3,21 293:1
296:5,7 297:15
300:9 304:17
305:15,19
306:3,7,14

**Mcgregor** 130:7

**MDL** 5:1,13
46:10 51:15,17
54:10 290:9,10

**MDLS** 54:6

**me** 4:21 6:4,9,14
7:7,9 8:7 12:11
14:13,14 17:3
19:5,18 20:14
22:24 24:1 30:6,
18 32:25 39:11,
20,21 45:22
48:6 51:13 56:2
57:11 61:20
65:1 68:6 69:1
70:10 71:25
85:24 86:1,9,18
91:25 94:2 95:7
97:8,9 103:15,
21 107:11
113:17 114:22
117:12,15
119:10 122:19

124:4,15 125:24
126:16 127:7,10
130:18,23
137:21 138:3
160:5 161:23
162:13 166:16,
17 168:18,22
169:24 171:11
175:23 177:10,
25 182:10 183:6
186:19 191:11
195:24 198:25
202:3 204:21
205:3 211:24
213:10 214:12
216:6 232:16,22
233:13,15,17,24
239:13,20,23,24
240:2, 241:12,
15 243:3 253:8
256:10 257:11
260:7 261:17
262:3,15 265:19
268:21 269:4,14
275:8 277:2,11
286:3,21 290:4
292:2 293:11,
20,22,23 295:16
298:6 299:7
302:13 304:10
306:12

**mean** 14:19
18:9,10 24:4
27:8 33:22 35:1
39:8 43:2 44:14
45:6,14 46:8
52:18 53:3
55:22 56:1
64:24 65:5,6
67:3 68:22

In Re: CR Bard 200                     Bruce Rosenzweig, M.D.                          10/29/2014

70:13 72:6,21
74:22 82:4
84:13 88:15
89:7,17 91:2,3
94:8 102:10
107:17,23 117:2
125:5,8,21
127:5,10,11
128:3 139:1
161:3 168:19
170:11 171:10,
12 176:22
177:13 190:5
193:23 196:19
198:12,13 201:7
211:14 213:15
215:12 216:6
218:17 230:1,15
231:16 238:7
249:20,23
251:15,24
253:23 254:12,
20 255:5 259:24
261:20 263:2,12
268:7 269:11
271:18 272:23
273:1 274:2,19
275:2 277:3
279:25 280:9
283:14 288:20
294:19 297:5,18
305:10,22

**meaning** 137:7
150:14

**meaningful**
186:1

**means** 145:12
165:2 215:7
220:15 224:24

247:18

**meant** 56:23
94:15 115:23
151:4 160:19,21
180:8

**mechanism**
140:24 144:5,10
146:21 243:18

**meconium**
96:21,24 98:11

**medical** 9:18
10:1,4,8,11,16
11:3,8 12:4
17:10 40:14
64:22 65:11
74:19 81:15
91:3 94:6 96:2,
13,17 98:5,13,
16 104:17,19
105:3,17 110:7,
21,25 111:4,6
112:15,24
115:25 116:1,18
151:25 152:2,12
157:15 160:1
161:9 162:11,23
163:18,19,20
185:9 190:13
191:3,8,17
192:11 194:8,
11,24 195:12,15
196:4 219:11
237:3 240:10,
16,21 258:10
266:19,21
282:3,11,18
283:1,8 284:19
285:14,20
287:14 295:19

298:7 301:21
303:11,14,16

**medically** 208:3

**medication**
106:7 109:12
110:13,21 111:2
114:3

**medications**
114:8,11 302:21

**medicine** 266:12
267:16 268:5
272:24

**medicolegal** 8:5
60:11 62:4,11,
16 65:22 66:6,9
240:7,9 303:2,
16

**meet** 36:2 56:14
240:11 260:21
278:10,14 285:6

**meeting** 15:16

**member** 88:9,12,
16,17,20 164:1
268:15

**membership**
268:14

**memorializes**
72:10

**memory** 15:9
22:13,23 35:2
72:5 92:23
160:6,15

**mention** 19:13
151:3 249:7

**mentioned** 16:19
24:14 36:5,8
55:23 56:14

85:15 103:9
105:19 123:16
129:6 138:7
144:13 146:23
147:7 154:9
159:11 184:20
190:10 205:4
211:9 214:3
216:5 224:12
227:6 228:19
264:24 275:7,18
276:19

**mentioning**
142:14

**mesh** 8:11,17
9:13 14:21
16:24,25 26:14
27:17 28:4,17,
19 30:4,12,20
31:17,21 33:6
38:15 40:21,23
41:9,17,20 42:2,
14 44:7,20
50:13,17 54:1
58:8,13,22 65:3,
19,22 66:16,25
76:14,16,18
77:6,25 78:3
79:12,25 80:3
81:25 82:15,18,
24 83:5,13,16,
17,20 84:19
86:14,20,25
87:8,11,22
88:19,24 89:21,
22 92:4 93:11,
12,22 94:24
95:1 98:22,25
99:3,12 100:5,
10,18 106:1

114:16 115:9,17
116:5,8 117:7,
17,19 118:7
121:8 135:16
136:19 137:22
144:20 149:6
150:20 151:4
156:25 157:2,4
162:7,18 163:4,
12 164:8,25
166:12,15
167:5,16 168:1,
5 173:12 176:9,
13 177:1,25
180:1,7 185:3,
14 186:6 187:9
188:13 190:20,
21,23 192:7,23
196:12,20 198:6
204:25 205:4,13
206:7,22 207:1,
12,18,19 208:4,
9 209:15,21
211:8,17,19
212:14,17
214:24 215:2
217:4,8,16
218:5,22,23
219:4,6,21
220:1,5,8,11,14,
16,21 221:7,18,
19,24 222:20
223:16 224:2,6
226:11 227:21,
23 228:2,13,20
229:4,9,18
230:17,19
231:1,5,11
232:7,19 233:6,
22 234:3,6,9,13,

25 235:1,6,24
236:12 239:1
242:17,21,24
243:12,13,14,
19,21 244:10,
12,15,16,18
245:6,8,9,14,17,
20,22,23 246:4,
12,14,17,22,25
247:23 248:2,
16,21 249:1,11
264:22 265:4,
10,16,20,23,25
266:5 268:18,23
269:2 271:21
272:2,3 273:6
274:8 280:6,19,
20,22 281:1,12,
21 282:2,12
283:2,8 289:2,6
292:18 295:10
296:2,13 298:3
301:2

**mesh-related**
242:5,9,11,14
247:8

**met** 4:22 24:25
278:6

**method** 185:19

**methodology**
261:8

**MHRA** 234:7

**Michelle** 23:15

**Mickey** 82:3
228:22 271:11

**Microbiologist**
101:6

**microwave**
152:4,6

**micturition**
271:15

**mid** 66:7 153:15
155:19

**midafternoon**
260:19

**midurethral**
84:6 91:11
133:12 147:17
179:7 224:24
225:5 302:12

**midway** 14:1

**might** 8:9 16:8,9
45:7 49:18
55:14 57:18
62:7 65:8 66:12
70:20 78:9
84:21 88:5
91:12 92:23
124:24 143:8,
15, 145:18,19
146:17 153:24
161:13,19
172:21 176:4,22
184:9 187:24
200:15 205:14,
18 223:11
232:21 238:9
271:13 274:4,
19,21,24,25
275:7,9 277:20
281:6 284:14
300:17

**Migliori** 54:4

**migraines** 89:23

**Mike** 54:6

**millimeters**
149:14

**million** 58:22
66:9,13,17

**mind** 26:10
291:22 292:6,9

**mine** 148:12
190:23 249:24
252:20 261:4

**Miniarc** 129:12
130:22 131:2

**minimal** 84:22
89:15 90:17
281:15,24

**minimally**
198:24

**minimum** 89:15,
17 91:2 92:1
280:5,18
281:12,20

**minute** 110:15
123:18 260:1
272:12

**minutes** 55:11
56:15 132:19
198:25

**mirrors** 204:9

**mispronouncing**
206:17

**missed** 48:19
291:17

**missing** 212:5

**Missouri** 233:25

**misstate** 68:7

**misstates** 68:1

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

209:3 211:13 275:23

**mistake** 169:15 201:21

**mistaken** 257:25

**misunderstood** 32:24 33:14

**mitigates** 221:5

**mixing** 176:17

**mod** 215:20 216:8,13

**modality** 271:22

**model** 153:21 188:17,19 189:8,12,14 236:11,22 238:9,16

**models** 236:6 239:3

**moderate** 27:15 185:23 213:16, 20

**modification** 145:6 146:4

**modifying** 82:14

**Monarchs** 79:19,24

**Monday** 240:4 260:17

**Mondays** 240:1, 11

**money** 60:10

**monocytes** 153:5 187:7

**month** 9:2 34:23 35:1 79:22

249:2

**monthly** 49:15

**months** 66:22 70:11 196:20 293:14

**moot** 263:20 289:15,18

**mop** 121:13

**morbidities** 91:20,21

**morbidity** 91:16, 18

**more** 11:23 18:11 19:6 27:3 31:11 39:22,24 45:7 47:2 53:8 64:2,4 68:20 75:17 90:3 106:17 110:19 114:8 116:16, 19,23 117:16, 20,21 124:23 132:22,24 137:18 140:1 141:25 143:2 145:12 146:13, 14,17 147:3 157:2 158:1,2 160:5 172:16 173:9 174:16 176:5 184:13 187:6,23 198:12,13 230:10 232:2 246:7 247:15 253:12 255:4,18 256:25 257:2,5, 6,24 258:23

260:3 263:2 268:3,11 270:18 279:16 294:23 302:15 304:24

**morning** 4:19 36:9 56:10 258:1 261:16

**most** 13:12 14:25 28:20 29:6 34:7 38:2 55:19 60:4 98:8 117:17 147:10 165:15 192:6 196:21 203:15 211:1 225:22 252:8 254:16 277:17

**mostly** 79:13

**motion** 95:18

**motions** 118:12

**Motley** 54:4,10, 12

**move** 14:10 32:11 158:6 195:1 257:11 261:6,12,15

**moved** 57:22

**moving** 250:17

**MSDS** 21:5,7,8, 25 22:18 36:21 151:9,19 159:22 160:18,25 161:21 180:10 300:11 301:18

**much** 26:11 30:4 34:16 46:15 47:23 54:17 58:12,16 60:14

66:24 67:5,10 68:16 69:1 72:3, 7 77:19,21 99:23 110:19 114:8 160:4 166:21 211:3 225:22 249:17, 20 259:14 276:20,22,23,25 283:17 290:22

**mucosa** 139:21, 24

**multimedia** 270:13

**multinucleated** 187:8

**multiple** 79:3 84:2 148:3 182:10 223:15 225:23

**muscle** 83:1,8,9 146:1 221:23 245:20,22,23,25 246:5,6,11,13, 14 265:18

**muscles** 83:5 141:13 145:18 246:2 265:17

**musculature** 146:19

**must** 69:24 164:18 191:8 286:3

---

**N**

**Nah** 93:3

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

**nail** 256:2

**name** 4:22 7:16 15:25 20:2 22:19 50:1 60:7 74:11 168:19 232:17 301:3

**named** 11:2,7

**names** 16:6 21:16 22:2 32:15

**narcotic** 114:6

**Narender** 82:3 271:11

**narrow** 283:11, 14

**narrowing** 301:3

**national** 99:6 159:5 175:1

**native** 28:11,24 77:5, 179:18

**naturally-occurring** 184:23

**nature** 12:6 33:14 38:16 84:8 103:7 290:21

**nausea** 299:13

**nauseam** 263:22

**nearer** 244:18

**nearly** 70:4

**necessarily** 44:9 144:18 150:8

**necrotizing** 216:10 217:9,13 218:8,10,13,24

219:3,6,9

**need** 7:6,8 31:11 34:1 47:20 55:18 63:5 64:11,13 70:9 71:14 77:20 107:24 114:1 131:10 143:19 180:1 183:20 191:16 193:2 197:18,20 214:14 228:6 238:21 242:25 258:7 261:12 263:5 266:19 272:2,9 286:24 287:1 296:12 297:16 300:25 301:1,15

**needed** 31:7 47:2 195:15 273:16

**needs** 85:7 88:2 90:16 129:4 144:12 192:13 195:9 198:18 283:21 286:1,19 288:3 291:7 298:24

**negative** 75:2 82:22 137:13 221:9,13

**neglected** 140:1 200:21

**neither** 20:14 256:21

**neo-innervation** 221:25

**nerve** 210:18,21

224:22 225:6,7, 25 244:11,17 249:5,8 265:12, 13

**nerves** 156:22 221:23 243:20 244:5,9 265:6

**nervous** 244:1 247:14,19

**neurological** 271:15

**neuroma** 244:13

**neuroradiologist** 101:2

**neurosurgeon** 154:15

**Neurourology** 273:1

**never** 10:7,15 18:20 42:11 96:2,12,13 112:4 119:9 151:4 161:5,6,7 180:8 217:11 256:18 300:23 305:3,22

**new** 51:17 54:5 62:24 79:21 126:20 127:1 216:9 228:1 242:10,12,13

**next** 26:6 55:9, 13 56:9,16 66:21 87:5 93:3 121:14 132:18 212:22 241:5,9, 10

**nice** 144:8 161:14 194:19

**nicotine** 145:17

**nidus** 221:24 247:16 265:21

**night** 12:12 15:6 53:11 56:8,15

**night's** 15:5

**nightly** 140:5

**Nilsson** 211:17 212:4,5,8

**Nilsson's** 137:15 186:3 207:7

**nine** 206:18 256:22

**Nobody** 8:21 98:1

**non-peer-reviewed** 267:21

**none** 48:25 269:4

**nonsurgery** 134:11

**nonsurgical** 134:8,16,18 135:23 136:20 142:7,10

**nonsurgically** 134:15

**nonsurgically-implanted** 104:21

**nor** 256:21

**normal** 64:2 236:8 243:17

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

**Norwegian** 27:24

**Nos** 122:2

**notary** 5:24

**note** 64:17

**notes** 20:25 35:3 39:25

**nother** 120:5

**nothing** 124:23 126:21 130:13 271:19 274:12 292:7,10,12

**notice** 5:9 36:25 37:13,18 38:21 45:18

**noticed** 123:21 177:15 249:23

**November** 260:7,8

**novo** 301:2

**now** 12:13 14:17 31:10 39:17 41:4 60:25 61:17 62:2 71:5 73:8,18 74:6,7 76:2 86:8 91:17 93:15 109:4 114:9 116:15 117:21 120:5 121:16 122:21 125:22 127:17 132:3 134:6 135:5 136:8,21 140:18 156:7 157:24 167:22 172:5 176:12 177:8,22,25 178:16,20

194:2,19 197:2, 208:9 209:24 216:20 227:14, 22 228:1 233:10 237:17 239:15 242:11 243:10 249:2 250:8 253:4,24 256:3, 22 259:15 260:2 261:9 263:11 265:16 274:24 279:13 284:25 285:11,12 287:11 291:14 306:11

**number** 8:15 24:6 42:13 51:7 58:17 67:7 68:21 70:2,3,5, 10,15 97:2,22 102:19,24 113:10 117:13 145:10 156:18 198:21,22 199:11,16 206:25 208:12 216:20 221:9 222:8,11 223:5 224:9 227:19 228:12 243:14 277:3,4,6 281:7 292:1

**numbered** 138:8

**numbering** 233:20

**numbers** 186:1

**numerous** 43:17, 24

**nurse** 60:22

**nurses** 60:20

---

**O**

**o'clock** 56:8,9

**O-g-a-h** 185:18

**O-g-a-h's** 27:12

**OB/GYN** 279:20

**OB/GYNS** 279:18

**obese** 90:18 146:16

**obesity** 146:2

**object** 42:22 44:13 59:15 66:19 67:13,25 87:1,23 92:5 93:24 106:2,15 107:21 111:25 112:16 115:10 118:9 125:4 150:23 151:16 154:18 156:17 160:22 163:5,13 164:10 166:1 179:11 182:8 186:21 188:9 189:17 193:21 206:4 209:2 211:12 212:19 230:13,21 237:6 275:22 282:5,22 283:10 285:9 286:5 291:4,24 300:6 304:16

**objected** 239:10 305:22

**objection** 103:21 162:19 249:16 251:8

**objections** 5:14

**objective** 77:5,7, 11 132:22 137:8 179:21

**objectively** 77:10 179:19

**observe** 230:2

**obstetrical** 12:8

**obstetrics** 87:25 240:22 241:1 267:10,11,17 268:6,9,10,12, 18

**obstruct** 140:15 222:21

**obstructed** 31:16,17 143:16 150:13 167:15 175:20 198:5

**obstructing** 140:11

**obstruction** 38:16 139:11 143:9 207:16 210:10 224:14, 17

**obstructive** 180:4 208:11 221:19 222:12, 16,19,23 223:3, 5

**obtain** 37:12

**obtained** 49:25

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

**obtaining** 185:20

**obturator** 27:23
40:24 80:9
137:6 196:22
210:19 225:11
245:24 246:1,8
265:17

**obvious** 53:9

**obviously** 34:12,
43:23 45:6
54:25 55:14
61:11 65:6
74:22 91:17
116:15 117:12
118:19 182:25
183:10 200:7
244:20 257:9
261:7 265:6
268:2 269:22
290:20 292:21

**occasion** 132:3

**occasionally**
99:7

**occasions** 34:3
43:18

**occur** 207:8

**October** 29:18,
19 30:9 172:23
256:19

**off** 19:21 39:18
53:14 63:8
102:19 108:25
121:21 140:25
144:4 159:15
170:17,18,20,25
187:3 199:11
221:4 226:22,24
242:23 245:14

248:21 254:3,6,
8,9 255:1
272:12,14
306:23

**offer** 114:21
118:24 142:12
255:16 256:18

**offered** 111:13
256:10,15,23
257:1 271:8

**offering** 118:25
256:23

**offers** 57:11

**office** 40:19 41:2
56:24 60:17,24
63:18 74:23
75:1,24 94:8
109:18 110:17
111:10,16,19,24
229:20,24
240:1,12 241:17
258:1 278:15,16

**offshoots** 244:6

**often** 10:25

**Ogah** 185:18
213:17 228:4

**Ogah's** 27:12

**oh** 73:11 75:12
80:20 96:15
159:2 179:1
253:14 278:21

**okay** 6:23 7:14
12:18,23 13:2
14:13 19:22
20:13 23:4
24:12,16 30:15,
22 32:16,23
33:4 34:18 35:3

36:2,17 37:9,17,
25 38:12 41:6
42:4 45:17
46:11 47:25
49:4 50:11
51:16 52:2 56:4,
13 59:20 60:9,
20 61:3,10,20
62:10,24 63:4
65:1 66:12,15,
24 67:25 68:3
69:7 70:19
72:14 74:3 79:8,
11 86:3,22
87:18 88:22
89:14 96:16
97:2,18,22,25
98:15 99:17
100:2 102:1
103:2,12,23
104:2 108:5,13
109:2 111:3
112:4 113:8
118:17 119:24
120:2,10,14,17
121:3,11,19
122:8,16 126:1
128:3,15,20
129:13,23
130:17 131:18
133:9 134:3,5
135:15,25
136:9,22 138:2,
14 142:4 147:12
159:11 160:18
162:16 164:1
166:17,25 168:6
170:12 171:6
172:9 173:5,20
174:6 178:15,

19,20,21 179:4,
17 181:4,10
183:13 189:9
191:16 193:14,
18 194:1 195:25
197:9 198:17
199:7,9 200:21
202:1 203:6
204:22,24
205:9,12 208:22
209:17 213:2,4
217:19 218:21
221:17 226:13
228:18 231:9
236:7 237:2
238:1,4 243:16
249:6 252:10
261:11,14
262:7,8,13,14
264:16 266:11,
16 272:1 274:2,
15 278:21
282:25 285:4
288:16 289:17,
25 291:12
299:22 300:8
304:14 306:8,16

**Okey-doke**
291:18

**old** 164:24

**Olson's** 224:14

**once** 26:25 60:16
61:13 162:14
224:2,3 234:25
235:1 246:13
247:12 294:6

**one** 8:19,20 9:1,
22 10:3,12 11:3,
6,11 12:3 25:22

31:15 34:12
36:13 37:9,25
39:10 44:18
52:21 53:10,11
56:9 61:7 68:17
73:11 78:23
79:1,16 83:4
88:2 89:1 94:16
105:10 110:5
111:8 112:25
118:13 129:9,16
130:1,4 134:20,
22,25 136:3
137:12,16
138:24 139:1
143:24 145:10
148:20 156:14
162:16,25
163:23 164:16,
21 165:5,12
181:3 186:4
196:17,21,23
198:5 200:4
209:6 211:18
212:1 213:2
215:21 216:15
218:7 219:13
222:16 223:17
227:9,24 230:18
243:14 249:2,
254:10,14,17
256:1,25 257:21
259:22 260:3,
11,12,13 263:18
266:17 270:14
273:22 279:23
282:9 305:22
306:8

**one-quarter**
222:10

**one-year** 266:22
**ones** 111:12,15
203:13 229:8
230:19 275:7,8
291:14

**only** 16:11 27:1,
2 28:6 32:11
62:21 74:24
78:20 79:5
82:10 118:14
121:9 126:21,24
129:15 131:3
136:10 137:16
140:9 177:18
187:14 189:16
192:5 196:20,22
197:20 200:10
208:12 210:6,12
211:23 216:21
221:9 227:6
229:15 273:18
285:10

**onto** 92:9 123:18
287:24

**open** 110:13
242:25

**opened** 292:8
**operate** 240:3
**operated** 131:14
**operating**
197:19 198:17
199:2 240:13

**operation**
142:20 143:1,21

**operations**
248:24

**ophthalmologic**
153:17

**ophthalmology**
165:17

**opine** 106:20
117:4,23 121:9
182:6

**opined** 200:15
209:12

**opining** 182:1
**opinion** 26:16,
19,24 43:12
77:1,2 85:4
87:14 120:17
123:25 149:6
150:7 152:14
171:8,13,16
181:13 185:2
186:19 191:7,16
192:11,15
193:24,25
194:16 195:4,14
199:19,23
200:2,11 209:9
224:5 231:14
233:3 234:14
235:22 268:4
279:5,7 287:18
289:21 290:1,6
291:3 295:25
305:4,18 306:1

**opinions** 4:25
10:17 13:5,13,
14,22 14:2,6
17:19,20,23
18:4,16,18,23
19:3 23:10 25:9
26:13,20 27:1
34:6 35:4 36:19,
20 41:8,10
42:21 44:11,25

46:5,6,9,19
47:6,21 48:3
49:20 50:12
58:3,5,8 64:22
65:18 67:23
69:19,21 73:14,
23 75:2 82:21,
22 95:12,17,24
101:11,12 102:4
103:10,12
114:18,21
118:25 123:21
128:2,5,11
133:20 148:19
178:11,17
181:18,24
182:13,20 183:4
184:12 194:17
200:3 214:11,13
227:12 229:22
231:25 232:14
235:8,10 237:3,
8 259:21 261:8
271:7 273:14
289:13 291:20
292:13,22,24
295:6 297:14

**opportunity**
231:23 270:20

**option** 142:8
143:22 144:14
148:17

**options** 142:19
143:6,24 147:6

**order** 25:13
47:21 72:22
112:24 126:18
133:4,5,8 134:4
139:13 157:19

158:1 230:2
281:20 290:10
297:17

**orders** 250:5
254:13

**organ** 16:25 18:8
76:14,15,17,24
77:10,18,22,24
80:18,25 84:11
85:12 88:1,3
91:11,15 116:13
134:1 157:20
158:3,5 167:20
231:10,17
280:23

**organizations**
99:5

**organized** 42:8

**oriented** 65:3

**original** 212:4
216:23 222:9

**originally** 15:16
26:24 232:6,9

**Orr** 70:1

**Orr's** 18:13

**OSHA** 173:14,
16,19,21,24

**Oswald's** 153:12

**other** 5:11,18 7:3
8:12,16 9:11
10:19 11:6,14
17:11 20:5,23
24:13,16 25:7,
25 26:1 29:11
31:14 33:10,19,
21 36:4,5,11
38:9 40:8 43:11

52:22 60:11
62:10 65:17,19
70:21 71:25
82:13 88:5 89:9
95:15 105:16
114:24 115:14
116:20,21 126:8
136:1,2 143:5,
10 145:3,4
147:21 152:11
155:8 156:13
158:16 159:4,
13,17 160:13
162:17 163:23
172:9 174:4
175:22,23 176:6
187:17 191:1
196:14 197:3,4,
23 198:2
200:14,17
201:18,19
203:15,25
204:2,4,5,10,11,
14,19,20 208:21
212:3,8 216:6,
14,24 219:21
221:1 228:19
229:7,8 231:3
241:13 242:7
243:15 246:19
247:10 252:6
254:16 258:14,
21 265:25
266:12 277:7
278:6 282:4,
285:6 287:5
288:18 290:24
291:6 292:5,19,
22 306:8

**others** 42:6
159:14 187:24
190:17,24
230:11 263:14
275:1

**others'** 194:16

**otherwise** 10:15
26:5 48:4,13
64:23 69:9
178:13 292:15

**otolaryngology**
165:17

**our** 36:21 72:12
93:25 125:12
128:8 162:23
183:22 193:5
218:18 227:20
228:12 252:17
259:1 278:20

**out** 6:19 12:11
13:23 15:13,21
22:8 26:18,23
27:9 28:3 29:7,
23 30:11,23,24
33:19 34:13,15,
35:16 37:10
39:9 40:16 41:9,
18 47:10 49:15
53:24 56:5,22
57:5 59:4,9 60:5
62:6 70:16,17
72:11 77:4
82:17 94:14
97:9 102:16
103:6 105:7
107:24 111:2
112:13,23 114:1
129:2 130:20
131:19 132:14

134:2 139:14
140:16 141:2,19
144:6 149:12,
13,21,23 151:24
152:7,19 153:7
157:1 160:3
162:11,14,23
163:20 167:16
168:3 169:23
170:2 172:16,21
176:6 183:19
186:4,23 187:5
188:3,4,24
192:23 194:13,
14,18 197:7,11
200:6 204:25
205:11 206:14,
18,23 208:3
210:8,25
211:18,22,25
212:16 220:5
225:14 226:15
227:9,14 228:10
230:11 234:25
235:17 237:25
242:24 245:6,8,
19 246:12,20
247:11,16
250:17 256:6
257:5 259:24
260:4,21 263:22
269:23 275:5
276:6,18
279:16,21
282:2,11 283:9
285:13 287:4,8,
20,24 289:3
291:13 294:6
297:3 300:19,20
302:4,7 304:25

In Re: CR Bard 200 Bruce Rosenzweig, M.D. 10/29/2014

**outcomes** 137:7, 8

**outline** 250:25

**outlined** 233:7

**outpatient** 111:19

**outside** 62:6 87:17 110:1 111:24 120:20 126:12 182:16 289:6

**outweigh** 232:5

**outweighed** 169:10

**ovarian** 132:1,2

**over** 8:5 14:17 17:2 25:12 28:17,19 29:7, 13,23 33:11 39:16 46:24 58:21,25 59:23 64:2 66:8,9,17, 21 70:6,9,11 97:2 107:19 108:8 123:11 131:7 165:18,25 168:4 196:12 203:9 219:22 230:5 233:23 245:17 253:15 254:17 257:18 258:5 260:21 262:7 274:20 300:22 302:25 303:13,22 304:1,6

**overactive** 167:14 168:12

**outline** 180:4 208:1,2,4 218:5 266:3

**overestimation** 247:3

**overlap** 241:25

**owner** 188:24

**oxidizing** 151:21 234:20

---

**P**

---

**p-o-l-y-s-a-c-c-h-a-r-i-d-e** 217:24

**P.C.** 60:8

**p.m.** 261:25

**package** 106:5 109:10 110:14

**pad** 137:8,13

**page** 13:24 14:1 98:7 101:25 138:9 170:22 171:17 177:21 180:6 181:2 184:21 233:12, 17 290:18 297:6

**pages** 30:16 233:21 258:9 302:18,19,20

**paid** 53:8 59:5, 12 60:5 61:17, 19 73:13

**pain** 83:3,4,10, 11 89:20,22,24, 25 90:21 113:8, 9,10,11,12,15, 16,17,18,21 114:3,4,8,12,15,

19 132:1,2,3 150:18 156:24 157:2,3 167:13 180:5 206:15 210:14,15 216:11 221:22, 25 224:22 225:6,9,13,16, 25 235:2 241:23 242:1 243:5,6,7, 8,11,13 244:14, 19,25 245:3,23 247:1,5,8,12,13, 19 248:5,6,9,11, 13 265:1,5,9,12, 14,21 300:24

**painful** 113:18 242:2

**paint** 254:22

**Painter** 51:3,9, 13

**paper** 15:1,18,21 16:10,12 20:3 27:8,9,10 28:16, 17 29:12 30:22 31:2 32:5 33:18, 20 34:12 39:13, 17,20 40:1,9 82:3 89:19 130:20 141:19 161:14 168:3,4, 17,19 175:13 176:8 190:16 197:15,16,24 198:4,15 206:16 207:25 210:14 214:21 222:15, 22 223:10, 224:14,15,20

226:6 228:4,22 233:24 245:21 267:12

**papers** 15:11 19:24 20:5 27:16,21 30:10 33:19,21 34:2 77:4 156:9 168:2 185:23 193:1 197:23 198:2 227:1 229:3 248:15

**paragraph** 120:25 233:18, 19

**parameter** 137:12,16

**parameters** 137:1,18

**paraphrasing** 114:25

**paravaginal** 147:9

**parent** 162:10

**Parson** 23:15

**part** 21:8 34:7 57:12 105:7,20 106:18 110:23 115:3,19 121:14 127:13 141:15 207:11 228:23 236:19 240:8 256:20

**participants** 131:21

**particles** 248:20

**particular** 17:17

In Re: CR Bard 200          Bruce Rosenzweig, M.D.          10/29/2014

67:22 72:4 76:20 82:21 133:5 174:7 185:1 202:6 275:21 277:23, 25 278:17,25 295:12

**particularly** 192:20 231:10 241:25

**partner** 61:4,11

**partners** 59:10

**parts** 243:15 274:23

**past** 74:23 234:1 258:6,7

**patent** 9:19,24 10:12 81:16 97:14,21 105:13

**Patents** 97:23 98:9

**pathogens** 218:7

**pathologist** 100:22

**pathology** 24:17 244:9

**pathway** 266:21

**patient** 59:8 83:21,25 84:7,8, 10,12,13 85:9 87:12,15 89:10 90:16 92:3,9 93:13,20 104:12 106:14,25 107:9,16,24,25 108:21 109:14, 15,17,21 110:6

111:10,12,14 114:2,4,12 130:25 137:9,10 139:13 140:12, 16 141:11 142:12 143:7,23 144:5,7 164:23 165:6 194:15 208:18 209:24 219:5 221:13 232:19 241:12 283:21 284:19 285:23 286:8 287:1 288:4,6 295:3 299:5,8 301:24 302:1,5, 8

**patient's** 77:14 94:2,5,6,10 186:9

**patiently** 252:20

**patients** 9:15 29:13,14 31:2,4, 7,8,16 50:13,17 56:25 63:19,25 64:1,14 77:20 83:11 84:2,6 87:3 88:4 89:20 90:7,12 91:7,10, 19 94:8 101:24 104:5,18,22 105:20 107:3 108:9 109:6,9, 10 110:3,10,12, 18 111:5 113:10,16,17,21 114:8 117:15 130:21 131:4,6, 9,10,13 134:11

139:25 141:1 142:16,18 143:4 161:24,25 165:4 167:15 186:1,4 191:18,25 192:3 193:5 194:9 195:13 196:15 197:1,17,18 198:10,23 206:20 208:15 210:4 211:1,18, 22 212:1,3 214:22 215:4,12 216:22 221:8,11 222:4,8 223:1,4, 10,15,21 224:6 225:5,12,20,22, 24 228:1,12 235:5,19 238:13,15 240:1 241:15,17,19,24 242:8,11,12,13 243:2,5,9 245:16 247:4 249:12 259:3 285:16 286:9,16 287:14 298:6 299:2,14,19,21 301:15 302:9, 11,13

**patients'** 77:16 230:9

**pause** 6:18

**pay** 59:16, 60:17 61:13,15

**paying** 127:1

**PC** 60:25 61:2, 22,24

**pee** 139:15 141:2 144:7

**peer-reviewed** 267:19

**peers** 301:7

**pelvic** 16:24 18:7 38:16 40:23 75:6 76:14,15, 17,24 77:10,17, 21,24 79:25 80:18,25 83:4, 10 85:11 88:1,2 91:11,15 98:22, 25 99:3,12 100:5 113:15,18 114:15,19 116:13 117:19 132:1,3 134:1 135:2,9,11,14, 15 136:19 138:3 140:20 141:4,9, 11,13,20,22 142:2 144:20 145:8,17 146:1, 19 157:20 158:3,4 166:12, 15 167:5,20 180:5 231:10,16 235:24 241:23 242:1 243:6,8 266:23 267:15 268:5 272:24 273:6 279:5,7,8, 15,17 280:1,2, 23 300:24

**pelvis** 89:25 236:14 245:18

**Pelvisoft** 75:7

**pending** 5:1,13
7:12 12:3

**penis** 265:22

**Pennsylvania**
293:12 294:1

**people** 20:21
74:11 101:20
102:16 117:18
139:3 154:25
157:1 181:15
191:21 200:3,
14,17 204:14
210:5 227:20
238:19 239:13
281:8 295:16
300:13

**per** 253:10

**percent** 12:1,2
28:17 29:13
31:3,4,6,8,11,
12,15 65:21
131:3,5,8,10,13,
17 132:10,11
135:3,17,19,21
136:15,24
137:23,25
138:18 147:10
168:6 174:13,16
175:13,16,18
180:2,3 192:22
196:12 197:16,
18,20,21 198:5,
12,14 199:1
208:5,6 210:4,7,
10,15, 214:22
215:6 216:21,24
218:5 223:1,9,
13,14,19,21
224:5,21 225:5,

7,12,16 226:5
241:19 245:5
247:1,9 248:8,
10,12 249:3
304:19,20
305:1,2

**percentage**
175:6 222:4
242:8 248:24

**perfect** 254:11

**performed** 131:2

**perhaps** 112:20

**period** 85:20
208:8 209:23
214:6 236:16

**periurethral**
143:11 144:8

**permanent**
116:1 133:24
148:21 154:24
161:1,9 167:18
187:6 195:18
235:15 238:13
300:24

**permanently**
194:12 205:6
288:5 295:19
300:12 302:2

**permanently-
implanted** 18:7
194:24 238:25

**permission**
293:17

**peroxide** 274:9

**peroxides**
152:21,24
153:1,3,7,13

161:17,18
236:10

**persistent** 83:3

**person** 79:23
232:15

**person's** 22:19

**personal** 38:18
74:13 135:12

**personally** 25:1
59:14 61:21
78:1 86:19

**personnel** 17:11
202:22 203:3

**perspective**
194:9

**pessaries** 138:19
139:4,7,8
140:19

**pessary** 138:9,
10,15,17,24
139:10,12,14,
15,17,18 140:1,
4,11,14,16,23

**Petri's** 207:15
222:22 224:17

**petroleum**
161:12,16

**pets** 173:4

**phase** 217:19

**phases** 217:18

**phenomenon**
139:25

**Phillips** 159:21
162:9,10

**phone** 110:12
114:14

**phonetic** 70:2

**phonetically**
21:19

**physician** 10:21,
23 86:24 87:7,
21 90:9 92:2,
93:7,10 106:13,
21 110:6 115:21
117:5,6,7 118:5,
8 119:14,17,21
120:8 208:14
230:11 238:12
281:21 284:18
290:25 296:10

**physician's**
117:24

**physicians** 77:23
90:14 99:8
105:25 106:4
108:15 114:25
115:16, 116:19
117:22 231:4
282:1 293:12
294:1 295:25

**physicians'**
115:8

**pick** 196:17
260:3

**picked** 244:25

**picking** 86:8
210:7

**picks** 109:14,16

**picky** 202:13

**piece** 148:9
202:6 221:2
275:21 276:11
277:8,23,25

**pieces** 23:1
245:11

**pivotal** 176:5

**place** 8:2 94:20
105:11 139:12
146:16 149:17
160:4 220:7,8
222:9 224:3
234:24 245:12

**placed** 89:22
104:8 115:23
164:25 222:24
224:2 243:14

**placement** 89:21
90:4 101:18

**places** 42:7

**placing** 234:22
238:24 243:19

**plaintiff** 12:2
40:4 46:12
50:25 51:2
53:25 68:13
69:1,4 93:16
94:17 99:5,11
123:22 256:24
265:3 295:8
304:15,20,23,24

**plaintiffs** 4:9,11
9:15 11:24
16:23 35:10,12
46:11 250:7,22
251:2 252:7,11
253:20 257:6
258:25

**plaintiffs'** 67:11
99:2 278:6

**planned** 253:18

**planning** 14:5
127:23,24

**plans** 256:25
266:11

**plastic** 154:2
155:18 156:6
174:17

**plastics** 152:1

**plate** 150:25
220:19

**plating** 149:15
150:6

**please** 4:5,15
6:9,25 7:7,12
258:19 293:20

**plenty** 127:14

**plethora** 201:17

**plus** 57:8 154:3
171:17 186:8
188:14 243:17

**point** 36:21 43:1,
12 50:11 59:1
67:19 82:5
96:16 113:24,25
136:7 141:18
175:22 177:18
219:16 233:13,
17 249:5,7
250:14 251:9
252:16 255:24
257:10,21
259:23 260:4
263:20 264:4
265:23 270:14
274:1,3 281:23
292:22 294:4

**point-
counterpoint**
199:25

**points** 110:5
212:13 219:25
238:17

**policy** 57:14

**politically** 61:24

**poly** 158:10
166:25 190:3
217:22

**polyester**
155:17,20,23
156:2,4,5
172:17,20

**polypropylene**
18:5,6,11,16
26:19 27:4 30:2,
21 82:25 84:1,9,
25 85:12 86:14,
20,25 87:8,11,
22 88:24 92:4
93:12,22 100:9,
18 105:25
115:22 133:21,
23 151:8,20,24
152:6,17,18,20
153:10,13,20,23
154:1,4,19
155:1,4,12
156:8,10,13,15,
19,21 157:10,
13,20 158:2,19
161:15,16
162:6,17 163:11
164:8,24 165:8,
14 166:13 167:2
171:20 172:11,
12,22,25 173:7,

11,15,21
174:14,25 177:7
178:8,11 184:24
188:4,6,17,20
189:3,5,6,10,25
190:4 199:20
200:12 203:25
205:5,12,16
212:17 231:15
233:4,22
234:19,22
236:1,18 298:3

**polypropylene's**
152:11 160:20

**polypropylene-
based** 83:24

**polysaccharide**
217:21,23

**pools** 185:20

**poor** 185:24
213:6,15,16

**POP** 77:25 80:3
101:19 176:16
177:1,15,18
178:5,10
179:17,25
207:19

**population**
101:16,19,23
191:5,20 241:13
286:9

**populations**
138:25

**pore** 149:5,9
190:22

**portion** 37:21

**portions** 274:17

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

**position** 34:2 43:14 79:1 88:18 164:4,12 165:7 183:15 252:11,17,19 260:17 261:2

**positive** 77:1 137:13 145:22 176:10 220:23, 25 221:6

**possession** 202:2,5

**possibility** 77:5 145:25

**possible** 60:4 127:9

**possibly** 49:22 59:5 226:20

**post** 131:6 175:14 225:17

**postage** 82:5 148:9

**postdischarge** 197:17

**postoperatively** 90:24

**potential** 89:3 297:8,23 298:12

**potentially** 173:18 174:9,22 226:9

**practice** 12:6 60:10 64:5,10, 12,16 74:19 94:9 104:17 106:6 111:18,22 139:5 156:15

214:2 264:20 266:1 269:19 270:17

**practices** 231:4

**practicing** 113:13 269:15

**precautions** 286:11

**precepted** 79:22 280:14

**preceptor** 79:19, 21 240:10

**Predominant** 52:18

**predominantly** 52:16 240:4

**preferable** 114:4 134:10

**preferred** 278:17

**premarket** 194:4 195:9

**premature** 263:11

**preparation** 25:4 34:20,22 35:24 58:2 203:20 278:7

**prepare** 14:14 16:20 25:8 35:14 44:23 46:20 47:13,14 125:2

**prepared** 13:4 48:6,7 72:15 125:16,17 251:18

**preparing** 15:4 26:7 69:18,21 128:16 203:23

**prescribing** 106:7 230:12

**prescription** 109:12

**prescriptions** 114:14

**presence** 182:17

**present** 29:19 38:9 67:15

**presentations** 38:8 270:24 271:3 272:5

**presented** 15:16 257:24

**pressure** 139:24 144:2 145:14 146:13

**preterm** 130:13

**pretty** 35:1 67:5 75:21 78:14 99:23 189:12 196:19 198:20, 21 204:18 224:9 252:3 259:14 274:18 275:3

**prevented** 290:5

**preview** 277:2

**previously** 23:11 26:17 52:24 76:6 203:16

**primary** 87:15, 20 88:7 142:20, 25

**prior** 11:14 26:4 34:24 50:20 65:21 72:14 76:25 80:16 94:6 106:22 127:20,21 172:6 184:8 203:2 275:19 288:1

**private** 270:17

**probably** 8:9 10:6 11:23 16:4, 12 20:10,18 21:15 39:6 41:15 42:24 56:23 60:2 72:11 78:20 79:2 83:23 94:19 106:16 121:15 141:18 162:13 177:2 210:12,15,22 214:19 223:3, 12,19,20 241:18 245:8,11 246:25 248:9 249:10 253:11 257:16 269:3 284:8

**problem** 31:19 128:4 154:25 208:17 253:9 256:16 263:21

**problematic** 77:6 90:5,7

**problems** 31:25 90:24 94:6 145:11 197:2 200:5 206:25 207:5 300:20,25

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

**procedure** 5:13, 16 28:10 29:5 31:8 85:17 91:20,24 104:18,19 108:21 111:7, 13,20,23 119:16 142:21,22 147:7,17 148:5, 6 199:3 243:1 281:21 284:6 286:7

**procedures** 79:24 84:3 105:20 147:9 148:1 156:13 157:15 249:4 280:7 281:13

**proceed** 119:16 252:22

**proceeding** 51:24

**proceedings** 254:7 263:23

**proceeds** 62:12

**process** 14:17,18 15:3 50:6 81:18 155:2 193:16,20 194:2,4,19,23 243:18

**proctors** 78:17

**produce** 40:4,5 47:8

**produced** 64:18

**product** 11:25 14:20 17:19 18:6,10, 19:11, 12,14 20:8 23:9,

11,15,24 25:21 30:23 31:1 35:18 41:17 47:22 48:9 51:1 52:9,14 65:2 73:24 75:11,14, 23 76:3,5 78:19, 22 79:5 80:18, 23 81:22 82:1, 12,15 83:16,20, 24 84:11,19 85:2,6,12,20 86:14,20,25 87:8,11,22 89:6, 12 91:11 92:4 93:12,23 95:13 96:5,7 97:1 100:13,18 101:19,20 106:8 107:4 116:3 127:13,25 128:1 133:23 151:11, 23 154:22 155:10,12 164:25 167:18 174:11 179:6,13 190:19,21,22 192:5 205:4,23 207:22,23 214:16,24 223:9 232:19 234:23 235:15,18,20 273:16 281:3,9 285:14 286:10 287:24 295:22 298:11 303:17

**products** 14:21 16:11,24 18:3,5, 17 23:6 25:21 28:5 30:2 41:20

42:15,19 43:8 44:21 74:20 75:6 76:8,12,18, 22,24 77:1,7,11, 18,22 79:3,5,12, 16 80:25 82:18 83:13,17 88:3, 24 91:6,7,15 96:18 114:16 116:12,13 117:17,19 136:14 137:23 177:25 178:12, 18 180:1 186:7 189:16,25 190:11 192:7,20 193:3 194:14 207:18 208:20 211:17 212:14 215:2 226:12 230:5 231:1,15 235:6 281:1 282:19

**professional** 74:13

**professionally** 239:25

**professor** 240:20 269:7,12

**profile** 92:3 93:20

**profit** 59:21,22, 25 61:18

**profits** 60:3

**program** 79:21 134:13 135:10 139:6 175:2

**prohibit** 127:15

**prohibition** 88:6

**prolapse** 16:25 18:8 76:14,15, 18,24 77:10,18, 22,25 80:18,25 84:11,21 85:12, 16,19 87:12,15, 21 88:1,3,4,7 89:1 91:11,15 116:13 130:14 134:1 140:20 141:7,9,12,14, 21,23 145:9 157:21 158:3,5 167:20 179:22, 23 231:10,17 242:3 271:17,25 280:24

**Prolift** 75:17 78:11,13,22 80:10 161:7

**promise** 34:5

**promotion** 53:8

**pronounce** 16:6

**pronounced** 207:10

**proper** 51:13

**properly** 139:18

**properly-fitted** 138:16

**property** 149:17

**proposed** 263:19

**propylene** 298:13

**prospective** 27:14 147:16 185:17 197:13

224:25 225:3

**prospectively** 207:4 229:19,23

**prosthetic** 133:24 148:21

**protocols** 100:8

**proven** 298:25

**provide** 68:19 72:20 123:24 283:1

**provided** 22:22, 24 37:15 51:5 73:1 79:6 122:10,19 124:17 291:1

**providing** 73:23

**proximal** 148:14

**proximally** 295:3

**PTR** 260:24

**public** 5:24

**publications** 271:6

**published** 43:8 82:2 100:4 148:8 174:21 228:7 248:14

**Pubmed** 219:2,3

**pubovaginal** 28:11,24 82:4,6 142:21,23,24 143:13 148:1,4 271:10

**puddle** 57:6

**pull** 120:25 132:14 141:19

160:3 186:23 218:19 245:18 285:13 297:3

**pulling** 102:8,10 245:13

**pump** 144:5

**Purdue's** 54:9

**purpose** 33:17

**purposes** 5:10, 12 160:10

**pursuant** 5:8

**pursue** 94:22

**push** 280:13

**put** 5:4 39:25 40:17 42:6 45:8, 14 46:15 47:18 53:14 65:10,12 70:7 93:21 100:7 109:14 134:21 143:2 144:6 146:13 149:20 152:5,6 155:4 161:13 164:19 174:14 177:6 186:21 188:11 193:8 198:24 224:16 245:21 277:16, 17 287:8 293:3

**puts** 15:1 135:20

**putting** 82:25 153:2 200:22 238:13 300:18

---

## Q

**qualification** 281:12

**qualifications** 103:3 250:2 251:1,5 259:21 280:19 281:16, 20,25 305:5

**qualified** 94:25 305:21

**qualify** 166:16 284:21

**quality** 100:8 124:10 213:19 223:24 230:9

**quantify** 137:17, 19

**quarter** 210:12

**question** 6:9,13, 17,19,22 7:12 33:15 43:13 45:10 48:19 49:18 61:5 67:4 71:18 72:3 73:12 76:19 82:10,19 85:24 91:1 93:4,6 100:3 108:4,13, 23 115:12 117:3,8 118:1,3 119:11,18 144:17 150:19 154:22 157:18 158:7,8 166:4, 20 172:1 173:19 178:23 181:22 184:13 189:23 191:10,13, 193:15 202:24 211:6 212:22 213:9 222:2 226:18 235:7

237:18 239:8 247:21 251:20 255:1,23 265:3 276:12 281:17 291:11 296:20 298:8,18 301:20 304:18 305:17

**questioning** 19:18

**questions** 4:25 5:6 6:7 14:12 20:7 33:8 34:1 68:15 94:16 100:21 115:18 123:19 130:11 183:18 252:3,21 255:6,13 257:12 292:1 306:20

**quick** 55:17 272:12

**quicker** 262:25 275:1

**quickly** 100:20 132:9 257:6

**quite** 26:24 130:9 151:10 254:20

**quitting** 145:7, 21

---

## R

**rabbit** 188:11, 14,17 189:9 190:2,6

**radiologist** 100:25

**Ramirez** 9:2

**randomized** 15:22 27:14 129:11 130:21 147:16 185:17 197:14 224:25 225:3

**range** 242:15

**rare** 218:15,16

**rarely** 84:2

**rat** 188:19

**rate** 31:3,4,13 43:9 56:3,20 63:15 65:23 130:25 131:5,7, 15 132:12,13 134:16,17 135:4,6,7,14,16, 19,21,23 136:13,20,23 137:5,14,17,19, 22,25 138:5,14, 17 139:6 140:7 142:6 144:19 145:2 147:23 175:10 176:2 179:25 180:3,4 197:21,22 198:5 222:3,12 224:17,19,21,22 225:12 226:4

**rates** 134:23,24 221:15

**rats** 161:22 173:4 174:10, 12,15,17 236:2 298:3,15,22

**Raz** 228:24

**re-review** 42:10

**re-reviewing** 26:8 277:20

**reacquaint** 16:21 19:23 20:7

**reaction** 27:5 116:7 149:2 167:9 168:7,9 185:4 187:12,18 188:3 207:22 220:15,23 221:4,8,10,12, 14 243:23 244:8 245:2 265:20

**reactions** 104:5

**reactive** 187:24

**reactivity** 187:25 188:2

**read** 5:20,22 6:23 39:18,20 43:3 69:24 92:22,24 101:22 110:2,14, 116:16,22 151:18 161:11 180:17,24 181:16 204:14 233:15 235:8 237:24 247:22 274:18,21 275:2,17 290:11

**reading** 39:21 97:18 108:25 148:24 181:12 277:19

**ready** 25:14 47:3 55:6,9,16,18 63:21 68:10 152:23 250:15 252:22,23 260:22 261:13 276:14 291:22

**real** 14:13 100:20 291:16

**realize** 34:9 143:14

**realized** 50:16

**really** 26:11 37:23 42:16 47:1 50:2,5 52:15 57:22 58:17,24 66:14, 20 70:8 118:1 125:10 177:24 178:16 228:5 239:23 273:2 275:16 276:17 279:11 305:14, 19

**reason** 6:8 7:7,9 22:6 23:4 51:19 140:9 160:1 161:10 261:20 270:7 278:17,25 294:24 295:12

**reasonable** 119:21 120:8 158:4 161:11 177:1,6 231:14 235:22 236:15 254:18 255:24 258:12 280:23 285:16 288:8

**reasonableness** 280:25

**reasonably-prudent** 283:6 284:16,17

**reasons** 32:9 134:1 217:25

**recall** 25:19 26:12 32:17,18 43:22 47:11 50:2,5 58:7 212:24

**receive** 282:3

**received** 203:12, 15

**receiving** 201:5

**recent** 13:12 38:3 227:8

**recently** 240:9

**recertified** 241:7

**recess** 63:9 102:21 121:22 171:1 199:13 272:15

**recognized** 114:13

**recollection** 76:7 80:11,21 293:18

**recommend** 91:6 281:11

**recommended** 109:5

**recommending** 284:5

**recommends** 283:7

**reconcile** 34:6

**reconstructive** 279:15,17

**record** 4:2,7,22 5:4 6:23 7:16 24:3 63:8,12 86:6 92:24 102:20,25 103:24 121:21 122:6 128:13 170:17,19,21,25 171:4 177:17 182:9 199:12,17 226:22,24 254:4,6,8, 258:10 263:25 264:2 272:14,18 306:23

**records** 20:25 35:14, 40:15 201:6,7,8 262:23

**rectus** 83:9 148:10,13,15 246:6

**recurrence** 179:21,22

**recurrent** 84:21 85:16 88:4 89:1 143:4 168:16 243:3 264:24

**redness** 186:25

**refer** 113:21 114:1 117:15 169:13 180:11

**reference** 42:10 124:16 161:15

**references** 270:25

**referred** 45:22 113:17 117:12

**referring** 120:22 121:1 130:2,15, 19 166:12 167:5 169:14,20 170:3,4,10 212:9 233:14 234:16

**reflected** 38:10 73:24

**refresh** 15:9 22:13,22 72:4 92:23

**regard** 35:4 46:5 47:6 48:8 49:20 103:5,12 107:3 110:24 111:4 112:22 114:15 138:3 166:12 183:1 199:19 230:17 235:23 273:15 289:12

**regarding** 9:20 11:18 13:4 18:3 30:12 175:24 178:11 182:7 201:18 203:25 296:22

**regardless** 49:13 191:14

**registries** 27:19 228:6,7

**registry** 27:21, 22,24,25

**regular** 57:9

**regulated** 114:9

**regulation** 103:25 185:2 186:13

**regulations** 103:6,18 112:20,22 124:7 191:12

**regulatory** 194:5 195:6 214:8,13

**rehabilitation** 135:3,9 141:20

**reintroduce** 4:21

**relate** 126:25

**related** 13:17 41:10 80:22 88:19 171:8 177:18 237:4 243:11 248:25 249:11 258:9 271:2 277:23 290:14

**relates** 4:25 40:21 42:1 44:6 100:9 112:14 114:16 167:5 178:17 231:5 265:4 272:1

**relationship** 301:13,19

**release** 244:23

**released** 191:4 193:3

**relevance** 127:6, 9

**relevant** 128:8 271:7

**reliability** 301:6, 8

**reliable** 194:14 224:3 280:10

**reliably** 235:16 302:6

**reliance** 21:3 29:22 30:14,15 42:24 43:21 45:8, 65:13 70:4 169:6 171:18 187:15 190:17 273:21,24 274:13 290:15

**relied** 13:18 39:2 42:20 43:16 44:4,24 45:3,24 108:20,22 110:2 123:6,13 133:1, 3,5 267:22 286:15

**relies** 169:7

**rely** 42:17 44:9 108:15 160:18 233:2 235:23 236:3 239:2 284:3,5,8,18

**relying** 29:21 30:12

**remainder** 211:21 241:20

**remember** 10:1 12:20,25 22:18 43:21 44:7 51:5 52:15 73:21 76:12 78:7,9,16

80:22 120:6
132:20 159:15
160:16 214:20
218:3 232:11,12
245:9 269:5
275:25 294:13

**removal** 31:19
85:8 198:7
246:16 301:1

**remove** 85:2,
89:6 116:12
140:4 224:3
246:22,25

**removed** 47:5
51:14,24,25
85:7 238:8
247:23 248:2
294:6

**removing** 89:12
224:1

**render** 10:16
58:8 95:11

**rendered** 101:11
103:3

**rendering** 14:6
25:9 44:11
50:12 232:13

**rendition** 274:22

**rent** 60:17

**reoperate** 77:20
180:1

**reoperated**
137:10

**reoperation**
131:7

**rep** 74:21 75:23
79:7

**repair** 77:6,19
147:9 156:14

**repairs** 28:12,24
154:5 156:16
157:7 179:19

**repeat** 181:22

**repeated** 144:12

**replace** 139:15

**report** 13:4
18:23,24 19:9
21:3,8 23:12,13
24:19,22 25:13
35:15,20 36:18
40:16,17 44:15
45:23 46:20,24
47:3,13,17
50:25 51:11
52:25 58:5
65:10,13 68:10
73:25 102:11
103:10 114:23
117:1,10
120:21,23
121:10,12
122:9,12,14,17
123:9,20
124:13,21,25
125:1,3,16,18
126:5,7,10
127:16,25
128:5,17,25
133:22 134:2,4
138:7 144:13
148:18 151:3
167:21 168:4,
20,21,23,25
169:14,16,17,23
170:2,4,5,11
171:7,11 180:6

182:13 183:16,
23 184:1,20
187:15 193:9
198:8 200:23
201:11,13
203:18,21
204:3,8,9,17
217:10 219:16
223:2 233:1,7
234:11 250:3
253:10 255:7
258:4 273:20
276:13,16
277:4,9,12
284:23 285:8
287:23 292:20
297:4,5,6,13

**report's** 204:19
292:22

**reported** 147:10
215:8,17,22,25
216:3,15

**reporter** 4:15
21:18 217:22

**reporting** 222:7
225:19

**reports** 18:20,25
24:14 36:9,10
45:8 119:20
120:7 125:10
126:8 128:21
153:16 197:3
204:1,3,6,10,12,
15,16,20 218:9
219:1 250:11,18
252:23 258:7,8

**represent** 4:6,23
250:16

**represented**
50:16 252:12

**representing**
250:7

**reproduces**
236:13

**reproducing**
236:8

**reps** 74:23 75:1

**reputation** 25:2

**request** 251:11,
14

**requested** 92:25

**require** 64:18
209:1

**required** 31:9
110:6 112:24
175:19 297:17

**requirements**
266:18 280:5

**requires** 89:7
103:17,25

**requiring** 12:11

**research** 42:6
101:22 171:19,
23,24 172:1
173:17 174:5
191:21,23,24
273:13,17

**reserve** 306:20

**reservoir** 144:3,
6

**residence** 8:1

**resident** 11:4
81:18

In Re: CR Bard 200                     Bruce Rosenzweig, M.D.                     10/29/2014

**residents** 117:14

**resin** 181:8

**resolution** 247:1

**resolved** 11:14

**resource** 293:23

**respect** 26:15
74:18 112:17
131:24 140:15
141:1 237:7
261:2,3 303:1

**respectful**
249:15,16

**respiratory**
145:11,23
146:15

**respond** 255:10

**responded**
234:17 256:19

**respondent** 11:1

**responders**
244:2

**responds** 186:22
255:12

**response** 14:12
150:21 153:8
187:5 192:2
206:10 221:16,
17 234:7 243:17

**responses** 255:4

**responsible**
173:24

**responsive** 38:21
45:20,21

**rest** 55:5 56:11
302:3

**restroom** 63:3

**result** 37:13
77:11 149:7,19
150:8,9,10,18

**result's** 150:21

**resulted** 201:11

**results** 77:5,7,
14,17

**resume** 250:2

**retained** 10:11,
15 12:16 221:3
252:12 289:7

**retainer** 64:19
66:2 73:13,15,
19

**retropubic** 40:23
80:8 83:7
133:11 137:5
209:20 210:11
219:10 225:4,
16,17 246:4,16

**retrospectively**
196:11

**returning**
198:16

**reversible**
217:18

**review** 8:6
24:18,21 26:3
39:12 44:19
50:24 54:18,19
58:14 60:11
62:4,12,17
63:23 66:6
74:10 105:20
106:21 109:9
110:10 159:20

172:2,3,6 185:8
186:16,17 267:9
268:3,13,16,21
273:22 290:14
293:12 294:2,16
303:2

**reviewed** 14:23,
25 15:8,17
16:19 17:6,8
19:20,24 20:6,
24 22:1,12 25:8
34:14,24 36:6
37:20 65:9,10
159:23 201:16
202:20 203:4,7,
16 204:5 269:1
274:7,13,16
277:17 294:20
303:6,9,14,23

**reviewer** 267:7

**reviewing** 40:20
52:9 69:20
72:24 94:5,6
171:24 213:18
277:13 304:21

**reviews** 294:21

**revise** 128:24

**revisit** 33:10
262:22

**Rhonda** 51:3

**Rice** 54:5,10,12

**Richter** 137:3,24

**rid** 248:9

**right** 7:9 16:17
17:21 18:1
19:16 22:10,15
23:22 24:8
25:23 32:20

36:16,23 37:10
40:12 42:21
43:16 44:2,21
50:14 51:19
56:20 58:4
59:24 61:12
62:1 65:15 67:5
69:12 71:3 74:1
75:5 80:20
85:15,24 88:9
94:22 97:8,20
98:3 100:23
108:10,13 112:5
120:3 122:21
123:6,14,20
124:23 130:1,17
133:6 136:7
138:12 148:17
152:12 154:5,
10,14,17 158:6
159:15 164:13
173:22 175:11
176:3,14
177:19,23
178:4,13 179:4
180:14,25
182:14 183:17,
25 184:11
186:23 189:2
197:12,13 201:4
202:11 203:23
211:10,15
212:18 214:12
218:18 220:6
227:14 228:1
230:3 233:10
239:5,20,23
242:11 243:9
256:2, 259:13
260:9,14 263:9,

11 264:16 266:9,22 275:13,21 276:11 282:13 284:25 285:2, 10,11 286:23 287:11 288:21 291:8 292:25 300:1,10 303:5, 11,12,19 304:6, 12,20 306:12,14

**rights** 9:24

**ripe** 154:3 161:18

**risk** 31:24 84:25 87:14 89:5,21, 25 90:2,3 143:8, 15 206:14 207:19 208:9,19 209:24 210:9, 13,18,21 211:3 223:8 225:7,9, 21 226:10 236:4 283:22 297:16, 18,24 299:4,6,7, 9,11,13,18,19, 21 300:4,16 301:5

**risks** 28:8,9 84:24 85:10 90:15 91:12 105:11 109:22 119:1 169:10 191:24 232:4, 238:5 286:12 296:1,13,23,24 297:1,2 299:23 301:10,22,25 302:10,11

**river** 278:16

**road** 35:22

**Rogo-gupta** 228:23

**Rogo-gupta's** 27:10 227:15

**roles** 60:21

**rolling** 219:17

**room** 22:9 61:8 197:19 198:17 199:2 240:13

**root** 247:18

**roped** 116:9

**ropes** 149:4 198:6 243:24

**roping** 31:20 219:17

**Rosenzweig** 4:4, 20 5:8,20 7:17, 18,24 13:7 37:2 60:8 63:14 97:10 122:1,8 123:1 171:6 249:15 250:8 252:13 258:4 260:21 261:22 272:20

**Ross** 70:1

**roughly** 29:18 138:9 147:15

**route** 134:9 136:24 138:4 142:10 144:19

**routine** 241:21

**routinely** 111:5

**rudimentary**

71:9

**rule** 19:9 23:12, 13 35:19 48:25 73:24 122:12 123:8,20 125:2, 6,7,22 126:5,14, 20 127:1,12,14 128:9,21, 182:24 201:11 204:3 276:16 277:3,9,12 285:18

**ruled** 182:23

**Rules** 5:12,15

**ruling** 184:6 290:12

**run** 100:20 113:9 162:25

**running** 102:16 227:1 259:24

**runs** 60:24

**Rush** 79:8 240:18,20 269:15,21

**Rush's** 79:1

_____

**S**

**s-e-n** 129:22,23

**safe** 41:17 152:3, 4,9 153:24 154:22 157:24, 25 164:22 165:8,22,24 166:5,14 167:3 188:18 192:8 209:15 211:8 212:17 214:16

**safer** 190:18

**safety** 21:5 41:19 42:15, 151:19 153:22 164:19 165:4,11 205:19,20,22 208:23 213:5,7, 24,25 236:24 298:7

**said** 9:23 11:12 19:23 34:18 35:8 44:5 45:12 46:22 57:25 67:21 80:16 88:23 89:14 108:7,9 115:25 120:7 127:18 132:9,10 141:21 153:15 157:19 171:8 174:3,6,7, 8 180:23 192:10,19 195:5 198:14 200:24 201:2,22 205:9 211:15 213:1,14 214:8,13,17 215:11,15,24 216:8,12,19 217:6 222:1 224:4,8 232:18 237:24 238:2,21 242:4,10 250:24 251:14,22 253:15 258:14 259:5,6 268:17 269:6 290:13 291:1 294:20 300:3 304:11,19 305:3 306:9,11, 13

In Re: CR Bard 200          Bruce Rosenzweig, M.D.          10/29/2014

**SAITH** 306:24

**salary** 60:5
  61:17

**sales** 79:7

**salvage** 142:22
  143:1,21

**Sam** 61:15

**same** 29:14,15
  53:19,22,23
  55:14 57:9 59:7
  67:6 77:17 79:3
  93:6 94:7
  146:25 170:22
  177:21 190:25
  204:12 210:4,5
  211:2 216:18
  223:2 225:20
  236:22 246:10
  248:12 287:22
  290:18

**sarcoma** 189:5

**sarcomas** 161:22
  162:3 174:12,15
  188:20 189:4,12
  236:20 298:3

**satisfaction** 31:3
  130:25 197:21

**satisfied** 131:4
  132:10

**save** 39:7,23
  291:14

**saw** 12:15 13:16
  58:19 75:22
  162:8 163:16
  234:8 285:2

**say** 14:18 17:3
  18:19 19:2 25:1,

15 27:25 28:8
36:10 42:18
49:7,8 51:4
54:24 56:7
59:12 66:8,14
69:24 72:9
77:25 78:20
82:23 93:16
95:24 105:4
106:3 115:15
118:4,22 119:5,
7 120:23 126:17
127:20 129:14
131:20 133:18
143:25 149:17
162:21,22
165:10 166:25
167:17 170:2,10
171:7 179:19
180:20 182:18
183:4,7 184:5,7
188:17 189:8
200:17 205:3
206:13 207:3,4
208:8,18 210:9,
13,18,24 214:7
216:2 222:19,25
223:18 228:7
230:22 236:3,11
238:17 240:6
241:18 248:7
253:11 262:6
276:11 277:3,4
293:16 295:17
304:6

**saying** 83:19
90:17 107:13
108:14,19
131:25 136:1
143:22 170:1

176:12 178:15
181:10 188:12
193:2 196:3
214:20 217:3,7
219:21 220:4
227:18 228:10
253:2,17 254:24
257:11 260:10
284:17 289:22
290:25 298:10
302:16

**says** 14:1 33:13
137:21 155:3
160:10 161:16,
21 162:2 172:12
173:11,17
179:20 181:6
190:23,25
192:21 197:16
204:25 205:12
209:15,23 210:3
214:22 215:19
228:4 245:21
246:24 287:4,9
301:18

**scan** 188:23

**Scandinavia**
206:17

**Scandinavians**
135:10

**scanned** 275:1,8,
12

**scar** 149:15
150:6,25 220:19

**scarification**
244:12 265:13

**scarring** 150:25
180:5 220:18

**scars** 265:10

**schedule** 256:6

**scheduled** 8:24
17:14 263:18

**scheduling**
260:23

**Schneider's**
153:11

**school** 266:19,21

**science** 81:8

**scientific** 8:19
26:5,7 54:2,11
79:15 96:10
160:12,13,14,20
185:24 234:12

**scientists** 185:9

**scope** 13:22
239:8 283:11,14

**Scotland** 158:14,
16,24,25 159:4

**Scottish** 147:19

**season** 147:5

**seasonal** 146:24

**second** 115:3
118:10 172:3
289:15

**secondly** 188:16
236:5

**secret** 125:9

**secretary** 60:22

**section** 180:7
233:9,22 235:9

**sections** 204:15

**see** 20:16,17 29:4
40:9 63:1,19
76:21 90:9

117:11,16
125:24 133:6
137:4 163:15
170:14 194:25
200:7 206:12
214:1 216:9
225:21 226:7
227:19 228:1
231:23 238:21
239:20,24 240:1
241:16 242:10,
12 243:5,9
253:20 264:23
276:25 281:4
284:13 291:17

**seeing** 24:3
76:22 227:18
229:24 230:7,8
241:14 242:16

**seemed** 163:17

**seems** 230:18

**seen** 15:1 28:23
37:7 114:4
116:16 117:20
139:25 247:4
251:7 254:25
277:21

**Segan** 234:2

**select** 221:9
260:10,11,12,13

**selected** 23:5
41:7 42:5 90:13

**self-
catheterization**
143:18

**sell** 75:9 194:3
235:15

**send** 57:21 68:23
71:9,12 73:15
114:11 244:5
268:22 276:21
293:20

**sending** 153:6
181:20

**sends** 187:5
268:20

**senior** 53:4
79:23

**sense** 6:8 93:14
231:3,13

**sent** 51:18 70:24
181:15 276:19

**sentence** 237:15,
22

**sentries** 244:4

**sentry** 244:1

**separate** 55:3
61:1 129:10
299:24

**separately** 49:13

**sequelae** 297:21

**series** 27:11
53:10 228:3,10

**seriously** 258:21

**served** 302:25
303:1

**services** 293:8

**set** 57:14 96:21
98:11 206:10
256:24

**sets** 206:8
243:22 280:11

**setting** 212:21
220:14

**settled** 11:6
17:15 24:8
69:16 70:22

**seven** 8:15 10:6
188:12,13
214:14 230:5
253:3,12 255:19
257:18 262:3,6,
7

**seven-year**
196:23,25
209:18 212:11

**several** 8:23 17:8
24:25 27:14
33:6,8 38:15
132:18 147:20
156:9 164:15
185:16 187:13,
17 190:16
270:25 271:16

**severe** 143:4
168:16 299:11
300:8

**severity** 29:10
283:25 284:9
286:13 297:20

**sexual** 243:17
265:8

**shape** 194:21

**shared** 250:6

**shareholder**
61:4

**she's** 61:9,
137:11 225:1
226:13

**sheath** 31:19
198:7 245:14

**sheep** 190:5

**sheet** 71:9

**sheets** 70:23
71:6,10

**short** 63:9
102:21 117:2
146:10,20 171:1
186:2 199:13
213:23 236:6
237:2 272:15

**short-term**
41:19 42:15,19
43:6 84:23 89:3
135:7 190:8
205:19 217:18
238:7

**should** 83:20
90:12,18,19,20
103:16 104:5,6,
9,10,13 108:19,
22 114:24
115:2,3,25
118:23 119:2,5,
8,13 121:16
123:11 133:21
183:15 184:21
186:10 188:18
189:9 193:19
194:17 195:20
234:14,16,21
235:11 279:5,7
280:4, 281:18
283:8,19 286:10
287:5,6,9 291:8
297:23 298:4,
10,19 299:5,9,
11 300:4,12,13,

15,23 301:5,9

**shouldn't** 90:18
97:3 283:21,23

**show** 28:19,22
29:9 39:11 43:9,
11 135:13
157:24 168:22
192:5 198:2
211:1 247:11

**showed** 24:4
29:12 31:5,15
32:5,8 36:6
37:11 135:19
186:4 207:12,25
210:21 218:4
225:15 236:1

**showing** 29:4
101:17 196:13
210:2

**shown** 146:6
150:12 152:17,
20 153:25 162:3
172:18 187:13,
16 213:1 244:9
298:21

**shows** 30:25
31:2 40:6 83:3
131:13 137:24
147:22 167:7
179:24 198:4,6,
9 223:1 224:13,
17 225:11
238:18

**shrapnel** 221:2

**shrink** 219:20

**shrinks** 148:25

**shunts** 154:7,14,
17 155:21

**shut** 250:13

**side** 9:22 49:1
95:15 125:12
249:18 259:8

**sign** 5:21,22

**significance**
198:20

**significant** 46:23
47:1 76:22 83:2
90:24 141:14,22
147:2 162:22
168:15 205:22
206:21,24
213:20 225:19
226:7 230:9
232:5,20 242:19
281:4 299:21

**significantly**
248:8 281:5

**silicone** 174:11,
18

**Silver** 21:10

**similar** 18:24
131:22

**simple** 76:19
118:3

**simply** 139:14
211:7

**since** 30:9 52:4
58:12 66:7
70:14 98:15,18
100:2 154:1
168:2 174:21
178:22 197:8
203:11 234:19
249:25 267:12
270:21 288:1
303:12

**single** 168:19
169:6

**Single-incision**
133:11

**sir** 25:5 35:6,9
48:5,10 71:2,4
103:8 129:1
138:22 248:17,
19,23 306:18

**sit** 172:23 173:5,
10 208:17 267:5
270:4

**site** 221:23

**sitting** 108:25
275:20 277:14
306:12

**situation** 55:20
56:13 85:11
86:16 91:8
252:9 256:16
259:1

**situations** 84:6,
15

**six** 10:6 28:12
39:6 196:20
236:13 241:7,11
256:18 259:3,25
263:20 293:13

**size** 64:25 65:6
148:9 149:5,9
190:22

**skill** 280:11

**skin** 156:2
218:18

**skipped** 97:2

**sleep** 15:5

**slight** 139:23
299:9 300:4

**slightest** 299:3

**sling** 18:11,14
28:24 76:12,22
80:17,19 82:6,
11 83:6,13 84:6
91:12 101:19
129:12 133:11,
12 142:21,23
143:14 147:17
148:1,4 178:12
179:5 196:22
209:19,20
210:19 212:11
219:10 222:13,
24 228:2,13
246:9 266:6

**slings** 16:24
27:23 28:11,18
40:23,24 42:14
80:2,8,9 82:4
83:7 91:14
117:19 136:5,
137:6 138:1
142:24 164:20
176:15 177:4,7
178:1,10 179:7
185:16,23 192:7
196:11,21
207:19 208:24
210:11 216:8
218:10 224:25
225:4,5,11,16,
17 226:9,12
231:2,25 243:4
271:10 274:21
302:12

**sloughing**

139:23

**slow** 225:1,2

**small** 87:3 91:10 149:23 299:20

**smaller** 149:9, 19,25 150:1,5

**smoker** 90:18

**smokers** 145:11

**smoking** 90:1 94:3 145:7,10, 21 147:1

**sneezing** 145:20 147:2,4

**Society** 43:15 164:2

**solely** 19:10 238:24 239:2 284:5,18

**somebody** 14:25 28:13 39:7 47:14 64:11 85:16,18 87:20 89:4,15 131:25 145:13,25 146:6 191:1 196:5 216:25 280:11

**somehow** 82:24

**someone** 8:7 57:10 84:15,21 89:22 97:1 140:3 147:1 153:14 223:16 233:25 280:15 293:11,16

**someone's** 114:5 283:15

**someplace** 40:19

**sometime** 74:2

**sometimes** 6:6 55:7 60:13 140:14 244:16 245:25 246:3

**somewhere** 12:15 66:3 304:13

**sorry** 15:25 16:14 24:19 32:24 53:3 59:21 76:2 85:22 112:17 124:10 159:2 175:16 181:2 202:14 211:25 226:15,25 228:17 251:15 264:9

**sort** 95:5

**sought** 275:5

**sound** 304:12

**sounded** 106:10

**sounds** 12:20 99:19,20 121:17 125:18 255:21

**source** 152:24 161:18 284:14

**sources** 60:11 282:4,6

**space** 39:23 220:17

**spaghetti** 152:5

**speak** 25:3 35:24 99:11 180:19

**speakers** 78:9,17 99:8

**speaking** 107:3, 11,13 284:24

**special** 24:2

**specialist** 114:12

**specialties** 165:15

**specialty** 267:23

**specific** 18:17 19:4 21:13 35:10,12 39:9, 11 40:3,14 41:12 43:2 44:24 46:2,11, 12 62:3 68:13 70:9 81:7 93:14 94:17 95:24 99:15 101:9 106:23,25 107:2,9 109:15 118:22 120:15, 25 132:22 156:23 167:4,22 173:9 183:11 190:19 192:8 204:7 250:11, 21,22 251:2,23 252:8,13,22 253:25 254:12 257:13 258:25 262:22 265:3 296:12,15

**specifically** 15:4, 8 16:18 17:4,22 20:9 21:24 22:11,17,20 23:8 30:18

43:13 50:22,24 67:9 73:23 74:9, 15 80:24 88:18 100:13 106:17, 21 107:7 110:24 115:23 116:24 132:15 133:17 136:11 159:4 166:11,15 171:9 175:24 243:12 247:22 264:14 271:20 272:1 275:5 276:17 290:13 292:7,10 294:23 296:8,14 297:7

**specifics** 14:8 52:11 80:23 256:1 261:9,13 262:19 278:11

**speed** 255:5

**spell** 20:2 129:19

**spelled** 169:23 170:2

**spelling** 160:1

**spend** 12:11 55:5 227:25 253:7 254:19 276:15

**spending** 249:18 277:19

**spent** 46:23 58:1 67:21 68:8,13, 16 72:4,7 275:19 276:1, 277:12

**sphincter** 143:11 144:1

**spilled** 64:2

**splinter** 186:23 187:1 244:20

**spoken** 74:16 98:24 99:20,23

**sponge** 221:3

**squamous** 156:1

**St** 96:25

**stabilizers** 155:8

**staff** 59:17

**stamp** 82:6 148:9 203:14

**stand** 29:23 55:13 129:2

**standalone** 285:15 286:21 287:13

**standard** 11:18 72:19 78:2 86:23 87:7,10, 17, 93:19 106:12,24 107:5,14 110:1 154:12,13 176:21 177:3,14 295:1,2,5,7

**standardized** 224:1

**standards** 112:14 285:7 287:6

**standing** 250:5

**stands** 34:15

**Stanson's** 222:15

**staph** 208:7

218:6,7,19

**start** 5:6 6:17 7:1 39:15,18,23 46:18 54:22 57:18 134:25 153:6 166:18 196:13 201:5 210:2 248:6 261:18 270:17 273:6

**started** 5:3 19:19 35:14,16 73:17 76:21 117:11 148:6 156:25 157:1 211:22,25 238:21 250:11 269:14

**starting** 153:18 172:15 177:5 216:9 227:19 232:2 247:11 292:22

**starts** 155:5 202:10 233:19

**state** 7:15 68:8 116:4 124:21 133:22 147:8 164:11,21 183:25 209:5 211:8 214:15 281:10 283:8

**stated** 69:13 91:5 115:21 117:10 131:12 136:9 284:22

**statement** 43:14 44:12 59:20 88:1 90:12

109:5 141:25 151:15 159:22 160:20 164:12, 19 165:7 166:8, 10 169:17 174:1 179:10,15 181:25 185:11 191:6 212:25 305:9

**statements** 68:19 164:5 180:21 183:2 184:12 213:11

**states** 27:13 137:10 148:25 151:9,20 158:21 164:17 165:1,8, 19 166:9 167:2 173:6 183:23 212:16

**statewide** 99:7

**stating** 181:17 298:14

**status** 90:14

**stay** 56:15 254:10

**stays** 187:18

**Steffens** 15:15 19:25

**step** 115:15 282:9

**sterilized** 217:12

**Stevens** 198:4

**Stevenson** 31:14

**still** 12:2 38:12 70:23 77:24 78:2 115:11

157:6 181:2 182:14 211:23 245:11 247:17, 20 250:1 267:5 270:22 274:6, 291:10 302:11

**stimulator** 111:9

**stipulation** 57:13

**stipulations** 5:4 62:9

**stock** 45:11

**stone** 242:22,23

**stop** 76:19 88:14 130:10 257:12, 14

**stopped** 52:1 55:12 76:11,14, 17 230:4,19,23

**storage** 39:23

**straightforward** 252:3

**strengthening** 141:12

**stress** 133:25 134:7,11,14,17 137:8,13 139:8, 10 140:21,22 141:6 142:1,8, 25 143:4 145:8 148:22 167:19 179:13 231:16, 18 232:1,3 242:6 271:18,24

**stretch** 266:3

**strictly** 9:14

**strike** 9:12 10:21 32:11 80:14

In Re: CR Bard 200                Bruce Rosenzweig, M.D.                10/29/2014

87:9 94:23 98:5
108:15 112:21
158:7 173:8
192:17 195:2
209:10,13 227:7
247:25

**string** 21:9

**strip** 148:13

**Stroger** 79:20

**strong** 26:25
151:22

**stronger** 27:2
172:19 174:22

**strongly** 158:20
184:5

**struggles** 254:25

**Strus'** 274:8

**students** 240:10,
16

**studied** 129:9
141:17 152:5
186:11 191:19
192:1 194:17
234:21

**studies** 30:11
43:6,7,12 102:5,
8 147:15,20,21
153:12 176:6
185:13,16
187:13 188:11
190:8,10
195:15,17
196:19,21
205:14 209:1,
11,14,17,21
210:6 211:8,10
213:6,15,22,23
214:4 227:7,8,

13,14 228:5
235:23,25
236:6,17 237:5
238:2 247:10
255:14 273:19
274:18

**study** 15:12
19:25 20:3 32:7,
8 131:21 133:10
135:20 137:3,4,
16,24 147:18,19
153:15,19
175:12 186:3
190:5,6,9
191:23,24
192:21 196:14,
18,23 207:15
209:18,19,25
210:1,3,17
211:16 212:8,9,
11,12 214:5
216:21 218:4
222:8 224:21
225:10,14
227:15,16
236:3,16 238:22

**stuff** 33:11 41:14
73:9 125:6,23
126:15 127:8
250:14 255:9
271:14,19 274:6

**subclinical** 27:6
116:8 149:3
167:10 168:11
185:5 207:24,25
218:1 243:24

**subcutaneously**
174:12,15

**subheading**
181:3

**subject** 40:18
100:4 283:9

**subjective** 77:14,
17 132:21 137:7
179:22 182:20

**submission**
193:10

**submitted**
193:13

**subscribe**
267:14,17

**subsequently**
204:16

**subset** 22:12
28:2 45:4,11

**substance**
157:14 217:21
258:9

**substances**
244:24

**subtract** 59:22

**suburethral**
177:6 222:13

**success** 134:16,
17,23,24 135:4,
6,7,13,16,21,23
136:13,19,23
137:5,14,17,19,
22,25 138:5,14,
17 141:6 142:5
144:19 145:1,2
147:8,23 197:22

**successful** 141:7
245:8

**such** 26:18 90:10
101:23 113:18
114:5,13 137:12
146:15 163:6,14
168:12,15 180:2
206:15 208:24
216:10 238:20
241:22 292:6

**suffer** 83:11

**sufficient** 285:19
301:6

**suggest** 258:7

**suggesting**
190:12,18

**suitable** 18:6
133:23 161:1

**sum** 59:7

**Sumika** 162:9

**summaries**
258:10

**summarize**
130:23 205:7
264:21

**summarized**
14:2

**summer** 46:23

**sun** 254:21

**supplement**
13:16 123:13
125:6

**supplemental**
21:2 36:14

**supplemented**
36:13 124:25
273:21

**supplied** 37:22

68:23 75:19

**supplier** 181:8

**supply** 71:20

**support** 41:17
42:18 148:17
169:7 171:12,16
183:8 185:13
287:3 295:6

**supporting** 27:3

**supposed** 104:3
154:23

**suprapubically**
220:5

**sure** 13:21 17:25
20:20 22:4 53:5,
7 68:5,25 73:3
75:21 85:14
88:25 97:13
133:2 135:25
150:21 171:14
181:23 184:7
192:9 193:8,14
213:10 229:7
251:8,13 255:15
257:11 261:2,21
264:11 288:2
290:11 301:17

**surgeon** 51:20
106:13 107:5,14
108:20 279:6,8
283:6

**surgeons** 156:19
279:18 281:11
282:2,15 283:4

**surgeries** 88:5
208:21 301:1

**surgery** 28:8,9,
13,15 29:1 31:9

76:1 141:25
142:8,12,13,15
143:20 145:4
165:16,17
175:19 179:25
198:18 242:20
266:23 267:5
279:9,15 280:1,
2 299:13,15,20,
24,25

**surgical** 28:21
31:8,11 78:24
79:23 84:3
91:19,24
111:13,20,21
135:22 136:20,
23 138:4 144:19
147:6 154:21
156:5 165:9,15,
23,24 167:3
197:20 198:17
199:2 249:3

**surgically-**
**implanted**
104:20

**surprise** 67:4
163:3,10 251:4

**surprised** 14:25
24:4 163:17
204:11

**surrounding**
220:16

**surrounds** 187:9
217:20

**suspect** 259:16
263:13

**suspend** 148:14

**suspending**
148:9

**suspensory**
148:10

**suture** 84:1
152:18,19
154:20

**sutures** 148:10
153:16 154:10
156:4

**Svenningsen's**
224:14

**swab** 218:17

**swear** 4:15

**sweater** 149:21

**switch** 14:13
73:11 81:1
239:5 302:22

**Switzerland**
158:23

**sworn** 4:18 7:20
23:23

**symptoms** 221:5
225:8 246:23

**syndrome** 89:20
90:21 113:19
242:3

**synthetic** 82:11
186:21

**system** 124:12,
19 244:1
247:14,15,19

**systems** 148:17

---
**T**
---

**tab** 40:11

**tabbed** 40:10

**table** 94:21

**tablet** 39:18,19

**tabs** 39:25

**tailor** 128:24

**take** 7:6,8, 9:13
14:3 21:18
22:22,24 24:23
35:3 39:1,6,25
61:18 63:5,6
65:8 91:17
102:15 111:2
121:16 128:14
134:6 138:25
139:14 140:16
141:2,24 144:5
147:22 148:12
149:13 159:24
163:7 167:16
174:11,14
195:20 199:7
208:3 210:11
241:5,11 242:3
245:5 246:12
247:16 257:2
258:20 259:5
269:25 270:4,11
301:25 302:4,7

**taken** 5:8,10
25:23 47:9
63:10 102:22
118:12,15
121:23 171:2
182:9 199:14
217:1 223:6
235:17 240:14
242:5 270:8
272:16

**takes** 149:17
152:24 155:22
198:25 234:24
244:17

**taking** 56:24
63:25 101:24
194:14 220:7
300:19

**talk** 6:5 16:13
21:7 24:1 30:6
32:1,3 39:10
41:18,21 42:13
43:7 74:6 95:1
99:9 101:13
114:23 122:9
124:5,9,11,18
136:5,7,21
139:22 142:15,
18 145:5 147:6
150:14 156:7,9
157:16 167:22
170:5,6,7 172:5
192:3 200:8
212:3 217:10
223:7 226:3
233:6,23,24
234:5 239:6,21
249:6 262:23
297:4,6 302:11

**talked** 23:2 25:6,
7 33:20,23 38:2
66:15 96:24
105:13 110:16
114:17 122:11
135:18 141:5,19
145:5 147:1
159:21 165:20
166:3 167:23
172:7 175:13

**talking** 17:22
19:17 20:11
30:19,20 63:14
78:5 80:2,3 91:8
101:17 103:2
107:8 112:18
124:14 132:5
134:20 136:4
139:7 144:15
146:3 164:12
169:25 171:9
176:12,15,16,20
177:14,15
178:1,2,5 188:8,
10 190:3,4
194:23 197:5
201:8 202:24
217:2 219:25
226:10 227:9
233:18 237:8,
10,11,13,17
238:1,13 243:11
248:4 250:1
257:25 263:3
264:19 279:12
282:7 287:12
296:3,21 299:16
300:2

**talks** 99:14
129:24 234:3

**Tamussino's**

180:10 200:9
201:15 221:18
222:6,7 232:16
236:5 238:20
243:21 250:19
264:20,22 266:2
271:9 275:24
284:8 293:4

27:22

**tangent** 19:21

**tangents** 255:1

**tape** 102:16

**tax** 62:5,6

**taxable** 60:1

**taxes** 61:19

**Tayrac's** 226:6

**teach** 143:17

**tease** 59:9
276:17

**technical** 21:5
151:18

**tell** 6:4 14:14
32:12,18 33:2,
16 68:20 69:1
70:8,14 103:15
127:10 130:18,
23 149:20 160:9
169:6 186:19
197:14 203:13
216:6 230:23
237:1 238:3,5
239:23,24
241:12 244:24
249:22 255:2
275:8 286:3
302:5,13

**telling** 138:2
194:8

**tells** 162:13
210:1

**temporary**
151:12

**ten** 189:11
195:21 196:6
197:11 216:16

222:17 223:3
238:22 254:19

**ten-fold** 222:15

**tend** 143:2
145:11 187:23

**tendency** 6:5,16

**tends** 144:11

**tens** 14:24

**tension** 143:3
149:5 198:7

**tensioning** 31:20

**term** 51:13
137:22 144:17
186:2 196:5
209:16 211:9
213:12,23
223:22 224:7
226:5 236:7

**terminated**
162:12

**test** 137:8,9,13
188:5 189:25
218:17

**tested** 85:2
100:15 190:14
191:9 281:5

**testified** 7:20
9:17 58:11 83:1,
18,22 116:1,24
119:21 120:4,6
142:22 160:16
172:9 193:11
237:14 251:6
285:5 288:11,13
303:8

**testify** 35:11
95:23 112:10

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

115:6 116:3,11 118:14 119:12 126:14 154:13 182:12,19 183:1,5,9,15,23 195:10,11 228:24,25 250:15 279:3 285:19

**testifying** 9:11, 14 58:22 93:19 182:24 183:12 212:24 228:20 229:5,9,13 232:7,13 305:25

**testimonies** 11:24 184:3

**testimony** 10:20, 22 11:17 18:13 23:23 26:4,10, 12 34:19,24,25 37:16 47:20 54:21,23 55:11, 17 56:16,17 58:14 63:16 64:7 66:1,18 67:11 68:2 103:4 116:14,18 119:20 122:18, 22 123:17 124:22 182:4 185:9 186:18 195:7 197:4 200:18 211:13 256:17 275:23 278:7 288:20 289:12

**testing** 26:1 100:12,17

160:12 184:22 189:16,19,21 191:3,22

**Texas** 23:14 46:25

**than** 18:11 19:6 26:1 36:4,11 40:8 45:7 64:4 65:19 69:9 82:13 105:16 114:9 116:18,20 117:17,21 131:2 135:16,23 136:1,2,24 137:23 142:1,8 144:19 158:16 159:4 160:5 172:9 174:17, 175:22 187:24 191:10 192:22 198:12,13 210:23 211:4 212:8 216:6 221:1 225:22 226:12 229:7 230:11 247:8 253:12,23 255:19,25 257:2,24 258:23 263:3 266:12 275:1 292:19 304:25

**Thank** 4:14 5:25 7:10 9:9 37:5 205:10 215:13 306:16,18

**Thanks** 68:24 87:18 306:19

**their** 21:15 60:20 62:4 74:20,21 75:5,7 79:16 87:25 90:13 94:3 96:10 103:17 106:6 109:18 116:2,25 117:15 124:19 134:11 139:14 140:3,12 145:14 146:7 161:13 163:16 164:4,19 188:22 190:21 194:12 206:19,22 207:1 213:18 214:23, 24,25 215:2,3,7 216:23 223:24 225:21 227:18 231:4 238:14 242:24 243:4,7 245:17,18 247:5,19 258:1, 8 274:16,22 275:14 282:19 302:2,3

**them** 10:3 32:18 40:5 64:13 70:24 71:19 72:20,25 73:1,4, 5 75:2 81:21,22 96:6 107:18 127:1 134:21,22 135:12 142:19 143:6,10,17 149:11 155:23 162:25 181:15 185:24 198:23 203:7,16 212:6 220:18 223:5

229:8 230:2 240:11 247:5 252:8 258:23 273:2,3,9 274:4, 16 278:10 293:13,15,20,24 294:8,9,10 297:11 299:21 302:10,12

**themselves** 4:6 180:19

**theories** 146:9

**theory** 146:11

**therapy** 142:7 143:12 144:9 145:2,3

**there's** 15:12,15 16:10 18:9 22:2, 7 25:10 30:1,16 38:15,23 39:9 43:2 44:18 45:12 48:23 57:6,7 64:12 72:23 78:20 93:17 94:15 99:5 103:25 121:4 125:8 127:14 128:6 130:13 135:20 137:25 139:23 141:8 144:3 147:18,22 152:2,3 156:23 161:14,21 162:22 172:24 173:6,10 185:12,15 190:5,15,16 192:25 193:14

196:22 198:4
200:12 204:24
205:25 206:16
209:18,19 212:4
216:16 217:18
218:21,25
220:17 225:19
226:7 227:6,24
234:1,5 236:4
241:25 244:12,
24 245:10,20
247:12 258:24
265:18 269:20,
22 271:13,14,18
274:12 277:7,
13,14 279:13
280:24 281:7
282:11,18,25
287:8 292:23
298:2,24
299:18,19
301:17,20
305:16

**therefore** 27:18
104:23 139:13
143:6 145:18,21
177:2 186:10
200:7 220:20
236:10 299:20

**thesis** 155:3

**they'll** 68:22
99:7

**they're** 30:14
39:8 41:4 53:22
89:25 93:8
106:7, 114:8
121:7 128:10
141:2 147:3
149:14 191:22,

23 207:3,5
215:1,3 227:17
235:13 236:20
273:11 279:2
280:12 285:22
294:2

**they've** 110:13
275:15

**thing** 7:3,5 29:11
31:14 59:7 79:4
82:10 89:8 94:7
108:23 121:9
126:21 146:23,
25 216:18
220:23,25 221:6
233:16 259:22
261:15 265:16
273:18 287:22

**things** 7:4 14:11
31:24 33:25
38:16 39:21,24
42:8 45:13 47:7,
16 50:8 54:16
62:24 65:16
72:24 83:4 90:8,
22 91:14 98:9
103:7 121:4,14
123:22 149:13
152:7 173:24
176:21 181:11
183:16 189:19
198:8 203:17
222:9 231:24
234:10 244:14
245:3 255:5,15
261:6 262:23
277:20 292:5
300:22 303:21

**think** 8:4,14 9:1,

21 10:3 15:17
16:9 19:19,22
21:2,5,10 27:1,2
29:6,25 30:22
32:14,21 33:20,
22 34:18 36:24
37:10,19,23
38:1 39:9 45:12
47:15,23 48:24
51:19,23 53:12
57:7 58:10,21
66:12,15,16
67:1,2,8,21 68:8
70:6,12,18
72:19 74:1
75:18,23 79:4,
22 80:16 82:5
83:1,16 84:18
87:24 89:9
94:19 95:5
101:12,16,
103:25 106:16
107:22 108:9
114:3,10 115:18
118:11,15
119:6,19,21
120:3,7 121:1
122:18 124:14
125:5,8,22
126:11,12
127:11,14
128:4,6 129:3
132:7,17,21
133:7,8 134:10
136:1 142:3,5,7
148:20 150:3,24
153:23 156:12
158:7 161:11
162:10 165:19
166:3 167:23

170:14 176:4,
23,24 177:3,17,
20,21 179:8
183:3,20 191:12
192:21 193:11
195:5,20 198:23
200:11,14,20,24
201:2 202:24
204:17,19
205:8,20 206:6
209:3 211:9
212:20 215:3,
15,18,19 218:25
219:14 224:8
227:10 228:21,
22,23 229:2
230:25 231:19,
21 232:2,18
233:6 237:7,9
238:14 247:2,7,
10 250:19 251:3
252:2,8,10
253:4,16
254:15,17
255:8,12,13,17,
18,19 256:8,24
257:4,15
258:14,16,24,25
259:4,6,7
261:21,24
262:1,5,20,24
263:2,9,11,16,
264:21,22 265:5
268:17 269:6
271:9 273:11
276:12 278:19
279:2,11,13,15,
19,22 280:9,16,
18,20,24 281:2,
14,18,22,

284:23 289:10,
14,16,19
290:16,18,21,24
291:25 292:18
297:5,25 298:5
300:22 302:7
303:13 304:8,
11,18 305:3,14

**thinking** 180:15
253:23 295:4

**thinks** 169:7

**third** 24:9
223:20,21

**thoroughly**
275:3

**though** 43:13
52:20 58:25
62:11 69:8 71:1
76:6 117:3
163:24 183:2
230:10 247:16,
18 260:20
267:11 275:24
280:16 281:18
304:22

**thought** 8:8 24:9
26:25 32:24
39:7 77:8 92:20
118:3 125:14
177:23 201:21,
22 248:4 250:23
264:7 278:23
294:25 295:4

**thousand** 169:4
258:16

**thousands**
14:23,24

**three** 14:17
20:19 29:8 36:3
56:1, 60:19
228:1 233:11
242:10 250:8
253:5 254:1
255:25 257:24
258:9 259:2,3,
25 260:22
267:19 269:5

**three-quarters**
215:9

**three-year**
147:21

**through** 16:4
20:17 32:22
38:13,14 45:16,
17 58:13 60:10,
24 61:2 65:1
78:24 79:7
81:18 83:1,5,8
97:16 107:6,15,
18,25 150:17
169:5 187:4
193:20 194:22
217:17 221:20,
22,23 229:20
245:22,24
246:4,7,9
250:24 251:23
253:24 261:9
262:2 263:12
269:18 282:3

**throughout**
186:8

**throw** 226:15

**throw-away**
267:20 268:2

**Thursdays**
240:3,4

**till** 261:19,23,24

**time** 4:2 10:12
11:11,14 24:1
28:20 31:11
46:15,23 50:4
52:8 55:23
56:21 61:22
63:7,11,18,19,
24,25 64:5,9
68:13,16 69:2
71:3,6,7,9,10
72:3,7,10,12,15
75:22 76:16,20,
25 80:15 85:18
87:13 100:2
102:19,24
109:12 121:20
122:5 128:20
129:3 132:19
143:20 166:21
170:24 171:3
172:24 174:13,
16,21 181:19
182:2 190:12
192:11 193:18
199:11,16
206:13 208:5,7,
11,13 209:23
218:6 222:24
223:13 224:18
227:25 231:22
233:23 235:12,
14 241:5,9,10
242:5 245:15
252:4 253:9
254:5 255:8
256:17 264:1,6
270:18 272:13,

17 274:20 276:1
277:19 278:4
282:10 287:24
288:1 306:15,
17,22

**time's** 24:9

**times** 8:4 11:8
33:6,12 43:24
78:19 174:16
182:11 210:16
214:19 216:2
223:4 226:11
251:7 302:24
303:12

**tired** 226:13,14

**tissue** 28:12,24
77:6,18 84:22
151:13 179:18

**title** 240:19
269:12

**today** 4:25 8:20
13:12,23 14:10,
15 16:3,18,20
17:22 19:2,8,20,
23 20:7,9,11
22:14,21 24:4,
14 25:4,9 29:21
33:10 34:21,22
35:5,25 37:7
38:1 46:5,8,21
47:22 58:6
61:22 72:8,14
114:17 128:21
129:6 136:9
173:6 176:20
249:24 250:21,
25 251:3,19,22
252:5,21 262:9
263:7 271:8

**275:**18,20
281:10 291:21
292:2,14,23
293:5 306:17

**today's** 47:4
68:10 276:14

**together** 32:2
45:9 47:3,18
52:19 58:5,6
65:10,12 100:7
102:8,10 147:22
185:21 187:7
200:22 220:17
222:18 224:16
276:13 277:8

**told** 8:7 50:3
96:4 161:5,6,7
184:14 198:23
218:3 250:9
264:14 293:20
294:8

**Tom** 4:8,12,22
184:5 249:14
260:15 264:9

**TOMAS** 210:20
224:23,24

**Tommaselli's**
245:21

**tomorrow** 68:16,
25 94:17,21
250:22 251:19,
23,24 252:23
257:5 260:24
261:15,18
262:2,11,12,18
263:2,18,20
290:17 291:11,
15

**too** 17:24 26:11
47:23 57:21
63:6 140:2
184:5 200:20
202:19 213:23
254:24 262:3
263:2 265:16
294:20

**took** 15:14 40:16
94:2 260:1

**top** 159:15

**topic** 289:11

**topics** 99:9,25

**total** 70:5 222:10

**totality** 194:15

**totally** 92:19

**touched** 265:7

**touches** 271:19

**tough** 291:14

**touts** 190:21

**Toxicology**
175:2

**track** 24:3 27:18
28:1 59:3 71:6
72:1 228:5,8

**tract** 140:8,10
301:2

**train** 92:20

**trained** 78:7,23
117:14

**trainer** 135:12

**training** 81:8,14
101:9 113:12

**transobturator**
212:11 216:8
224:24

**transplant**
165:16

**transponders**
188:21 189:6

**transurethral**
144:14

**transvaginal**
16:24 28:19
41:20 42:14
162:7,18 163:4,
11 192:23
205:8,13 206:22
207:1,18 209:21
219:4 224:2
225:10 229:4
266:5 271:20
280:6,19,20,22
281:1,12,21
282:2,12

**transvaginally**
205:17

**travel** 54:25
55:23 56:4,21
57:1,2,10,13

**traveling** 55:2
64:10

**treat** 18:7 84:16
134:11 140:21
141:9 142:8
167:19 215:7
223:25 242:6
280:23 284:11
286:14

**treatability**
283:25 284:10
286:13 297:20

**treated** 168:16
208:2 218:13

232:20

**treating** 10:20,
23 134:14
179:13 247:8
290:25

**treatment**
140:19,20
142:1,25 146:24
231:15 232:1,3
288:4

**trial** 11:6,15,24
15:22 26:6,9
34:19,23,25
37:16 54:21,22
55:4,11, 56:21
58:14 64:6
65:25 94:23,24
95:10,23 118:4
120:7 129:11
183:5 196:3
197:10 225:4
256:17 288:20
289:14,15,18
290:9 303:7

**trials** 27:15
147:16 185:17
190:11 192:13
196:6 197:14
258:6 295:21,23

**trick** 239:12

**tricky** 61:5

**tried** 20:2 95:20
245:7

**trigger** 249:5,7
265:23

**trouble** 16:9
107:23 108:2

In Re: CR Bard 200      Bruce Rosenzweig, M.D.      10/29/2014

**true** 55:19
225:21 239:16

**truly** 181:14
247:7

**trust** 30:6

**try** 49:14 60:1,3
77:8 83:15
134:10 160:5
176:22 187:2
225:1 226:18
261:6 280:10

**trying** 6:19
33:25 34:7
39:22 72:1
94:14 121:13
170:21 250:16
276:5

**tsunami** 72:21

**tuberculosis**
220:24 221:1

**Tuesdays** 240:2,
12

**tunnel** 148:13

**Turkey** 15:22
20:1,2

**Turkish** 147:19

**turn** 13:24 57:11
294:24

**turned** 294:15,
19 295:8,9

**turns** 190:24

**TVM** 207:11

**TVT** 15:19 80:8,
9

**tweaked** 82:7

**twice** 11:2

**two** 11:8 12:3
24:7 28:19 29:5
36:24 44:18
46:24 55:25
69:15 79:19,24
83:8 98:9,11
110:9 196:13,18
210:2,22 211:9,
11 212:13
217:18 225:6,8
227:6 233:11,
236:12 246:4,8
250:10 253:24
258:9 260:3
268:7,11 280:15
302:25

**two-year** 137:24
197:1 210:20
224:23 266:25

**type** 12:5 24:16
25:25 51:10
123:25 125:5
126:9,10
142:13,15
241:13 268:3,4
280:5 281:20

**types** 65:17
100:7 275:12

**typically** 11:21
12:5 39:12
52:21 79:11
102:9 268:22,25

**typographical**
97:16

---

**U**

---

**U-n-g-e-r-l-u-c-**
**a-n** 16:3

**U.S.** 159:6

**UCLA** 159:2,11

**ultimately** 32:12
59:13 119:23
182:11 206:20
223:22

**ultrasonographic**
**ally** 207:13

**Uncle** 61:15

**unclear** 166:19

**uncovered**
172:15

**under** 5:12
83:19 86:18
97:22 98:8
180:7 181:3
197:10 215:8,16
222:6 225:19
270:24

**underestimating**
283:24

**undergo** 186:7
235:5

**underlying**
131:19

**underneath**
148:14

**understand** 6:9
10:7 13:22 22:6
23:18 34:15
74:10 82:19,22
86:17 89:1 95:3
109:2 115:11
116:23 127:5,9
135:25 139:9
160:19 167:1
172:6 176:25

**U.S.** 184:12,18 191:6
222:1 227:4
250:5 251:6
259:2 260:6
270:1 284:17
295:18 298:1
299:22 305:15
306:8

**understanding**
17:24 49:8
51:12 107:23
150:4 189:15
206:7 220:9
254:13 285:4

**understands**
84:8,23,25 85:1

**understood** 6:13
177:20 181:17
192:9 227:5
260:16

**unfortunately**
96:25 233:20
240:14

**Ungerlucan**
15:21

**unique** 204:18
252:9 259:1

**United** 138:25
158:21 165:1

**universe** 22:7
42:1,12 43:3
44:5 87:3
185:12

**university**
233:25 240:17,
18,21 270:16

**unreasonable**
232:3 237:2

In Re: CR Bard 200 Bruce Rosenzweig, M.D. 10/29/2014

253:10 284:4

**unreported**
215:23 216:17

**unresponsive**
255:17

**unsafe**  167:18

**unsuitable**
151:25

**until**  6:21 67:15
75:7 76:16,17
94:21 132:19
240:9 270:10
304:5

**unwieldy**  45:15

**up**  5:9 7:4,5 12:9
13:12 24:4 26:6
28:19,22 29:4,9
31:2,5,21 46:6
54:25 55:8 56:1
57:22 62:21
64:7 67:20
68:24,25 71:9
76:16,17 96:16
109:14,16
110:14 111:13
118:12,15
121:13 137:14
140:25 141:13
144:4 164:20,21
165:5,11 167:8
176:17 177:13
178:25 182:9
186:2,4 190:2
196:13,17
206:8,10,21
207:13,14,16
208:11,12 209:6
210:2,7 212:22

213:7 220:14
222:23 223:22
224:18 226:21
228:4 240:9,14
241:22 242:5
243:22 244:25
251:2,22 253:15
255:5 256:17
257:2 259:5,18
261:21,24 262:9
301:24,25 304:5

**update**  241:2

**updated**  29:20
122:19,22
123:17

**upon**  9:24 42:20
43:16 44:4,10,
24 45:3 69:6
108:20,22 110:2
267:22 286:15

**upper**  145:11,23

**urethra**  139:12
140:11,15 141:1
144:3,4 148:14
207:9 221:21

**urethral**  32:4
150:16 167:12

**urethrolysis**
15:19

**urgency**  301:2

**urinary**  133:25
134:8,12,14,18
139:8,10 140:7,
10,21,22 141:6
142:1,9,25
143:5,11 144:1
145:8 148:22
167:19 179:13

231:16,18
232:1,4 242:6
266:4 271:1,18,
300:24 301:1

**Urodynamics**
273:1

**urogenital**  83:8
246:5,18,21

**urogyne**  269:20

**urogynecologic**
12:14 43:15
164:2

**urogynecological**
241:19

**urogynecologists**
279:17

**urogynecology**
113:14 117:23
272:22 279:14,
20

**urogynes**  269:23

**urologist**  242:22

**urology**  165:18
272:25

**us**  6:21 53:10,11
121:14 132:17,
162:24 197:14
285:11

**usage**  280:22

**use**  13:25 45:7
74:21 75:5,7,25
77:24 78:3 79:8
81:24 84:1,10,
18 85:17,20
86:14,19 87:7,
11,21 88:2
90:11 91:6,10

104:19,21,24
105:5,7,9,19,23
106:4,5,6,13,22
108:8 109:7,11,
16,19,21 110:4
111:9,16 114:6
116:2,14 117:19
137:1,2,6,12,18,
25 138:19
140:14,19
142:21,23,24
151:10 156:15
157:20 158:4,19
159:1 180:24
181:7 185:13
188:16,18
189:7,9 204:7
205:12,16
212:18 231:25
238:9 253:8
262:18 281:8
284:14 285:22
286:2,10 298:6

**used**  35:22 39:16
47:17 75:10,17
76:3,5 80:16
85:13 96:11
104:7,16,17
115:16,25
133:21 139:18
151:4 152:11
154:2,5,7,9,14,
17, 155:20
156:4,13 157:6,
14 160:21
162:6,11,15,18
163:4,11,20
165:14 166:2
173:11 180:8
184:24 190:13

In Re: CR Bard 200     Bruce Rosenzweig, M.D.     10/29/2014

191:8 193:19
204:16 205:1,
264:6 287:13
293:23 303:8

**uses** 137:16

**using** 76:11,14,
15,17,20 82:4
87:14 88:6
106:8 110:21
139:17 140:22,
24,25 141:9
143:17 156:19
157:2,10 158:2
161:8 203:18
230:5,19,23
259:7 295:19

**usually** 49:14
55:4 66:3
111:15

**Utah** 10:3

**utility** 83:24
84:7,12,14
141:19

**V**

**vagina** 139:20
152:23 153:2
154:3 161:18
184:23 207:8
217:11 234:22
236:9 238:14
243:15 245:17
265:11,24 274:9
301:3

**vaginal** 8:11,17
9:13 14:21
26:14 30:12,20
32:4 33:6 38:15

40:21 41:9,17
42:1 44:6,20
50:13,17 54:1
58:8,13,22 65:3,
19,21 66:16,25
78:3 79:12
81:25 82:15,18,
24 83:20 84:18,
22 87:8,11,22
88:19 90:7,20
92:4 93:11,12,
17,22 94:24
95:1 100:9,18
105:25 114:16
115:9,17 117:6,
17 118:7 121:8
130:12 137:22
139:19,21,24
150:15 152:25
158:19 164:8,25
167:11 173:12
175:20 176:9,13
177:25 180:3,
186:5 192:7
196:20 208:9
209:15 211:8,
17,19 212:14,17
217:4,8 218:22,
23 219:6,24
221:7,21 224:6
226:11 228:20
229:9,18
230:17,19 231:5
232:7,19 235:6
248:16,21,25
249:11 264:22
265:4,25
268:18,23
272:2,3 283:2,7
289:2,6 295:9

296:2,13

**vague** 107:22
237:7 293:18

**valid** 194:14

**validated** 185:19

**validity** 185:24

**value** 123:25

**varied** 26:13

**variety** 17:6
134:1 154:20
155:16 156:6

**various** 42:7
135:8 142:19
152:1 168:12
204:15 234:10

**vast** 15:2 29:12
116:18 117:15,
22 203:8,18
213:5,22 229:2
243:5 304:14,22

**version** 215:24

**versus** 9:2 12:17
34:1 44:3
103:17 116:21
136:20 149:16
250:2 259:21
279:18

**very** 16:12
27:13,25 29:12
32:6 33:14
41:20 43:4,10,
18 47:17 57:9
59:8 60:14 67:6
87:3 93:14
118:3 132:9,23
133:2 135:10
139:5,6 140:3

141:14,16,23
143:5 144:8
158:20 161:14
163:7 185:25
190:8 205:18
206:7 208:10
209:18 218:15,
16 236:11
239:17 243:19
246:12 249:16
250:23 254:17
255:13 279:19
280:8 281:23
283:11 298:5

**vibrant** 134:15

**video** 254:8,9
259:10 263:24

**VIDEOGRAPH
ER** 4:1,14 63:7,
11 85:22 86:10
102:18,23
121:20 122:5
170:24 171:3
199:10,15 254:5
259:11,14 264:1
272:13,17
306:21

**violated** 124:6

**Virginia** 5:1,14
41:5 54:10 57:5

**virtually** 138:18
140:5

**viscus** 150:17

**visual** 100:14

**visually** 26:1

**vitae** 37:16

**voice** 291:22

**voiced** 235:10

**void** 139:14
140:17

**voiding** 31:16,17
131:9 143:16
150:13 167:15
175:20 180:4
198:5 207:15
208:11 210:10
221:20 222:13,
16,19,21,23
223:3,5 224:13

---

**W**

**wait** 6:21 20:12
110:15 118:10

**waiting** 49:7

**waived** 5:19

**walk** 65:1

**walking** 216:12
243:7

**walks** 229:20

**wall** 187:3

**walls** 221:4

**Wang** 218:3

**Wang's** 168:17
207:24

**want** 5:3 6:20
13:21 14:3
16:13 19:5
23:19 30:9
33:11 38:5
39:10 42:9 48:2
53:24 62:22
68:5 70:20
71:21,22 73:3

80:5,6 85:14
88:25 91:1
92:15,17,22
111:14 120:24
125:18 126:14
128:9 136:7,20
156:7 161:20
162:1,14,24
163:18 166:17
167:22 169:5
170:18 171:15
173:9 177:16
178:1,16 184:5,
8 192:9 193:14
196:6 202:14,19
237:16,20
238:15,17 255:3
257:1,11 258:15
259:4 261:22
262:9 264:10
272:6 275:17
276:3 279:1
288:9 293:24
294:9 296:17,20
297:3 298:17
299:2 302:14

**wanted** 17:25
20:16 32:24
70:16 75:25
177:23 216:1
220:2 261:12
285:13

**wanting** 88:20

**wants** 32:22
43:20 158:11
159:3

**warned** 235:18,
19 296:1

**Warner** 12:17

**warning** 104:1
300:11

**warnings** 104:9,
11,14 119:1
161:13 286:11
296:9

**wasn't** 16:11
49:4,11 160:19
182:17 264:6
281:17 293:19
294:25 298:8

**wasted** 255:8

**water** 144:3,6

**way** 6:22 27:18
50:8 59:3 60:6
61:24 85:2
89:11 91:25
95:8 106:11
114:22 124:20
125:25 134:21
162:16 163:23
168:22 175:5
177:20 182:24
194:14 196:1
203:10 205:3,9
224:1,3 246:19
265:2 276:8
277:7 280:3,10
289:12 293:3
300:19 302:4,10

**ways** 148:4
265:14

**we'll** 7:13 13:11,
20 14:8 16:15
20:17 21:7,18
30:6 32:3 33:9
38:14 54:13,22

120:15 128:14
159:25 164:16
196:1 202:3
237:25 248:6
256:2,22 257:8
273:6 293:3
306:20

**we're** 5:5 6:12
8:20 13:3,23
16:4,12 17:22
19:2 20:10 29:2,
25 30:7 36:24
79:1 91:7 93:25
101:16,25
102:16,25 103:2
106:16 108:24
118:21,24
125:23 139:7
170:12 171:4
172:5,15 177:4,
22 178:20 181:2
188:16 189:7
190:25 194:23
197:5 210:12
216:9 217:15
219:25 226:9
228:11 238:23
239:21 250:1
252:14,17
254:4,6 257:17
261:24 262:18,
22 263:3,17,20
264:2,11 272:18
279:12 284:24
290:18 292:14,
23 302:22

**we've** 8:23 19:9
25:6 28:23
52:18 69:6
114:16 122:11

In Re: CR Bard 200   Bruce Rosenzweig, M.D.   10/29/2014

165:20 166:3
167:23 168:1
201:12 221:18
222:6,7 239:14
250:8 256:15
263:21 272:23

**weave** 190:22

**website** 164:18

**Wednesdays**
240:3

**week** 26:7 228:1
242:11,12
249:10 256:6
260:22 274:5

**weekday** 64:3

**weekends** 64:3

**weekly** 49:15
140:5

**weeks** 15:9
16:20 17:16
25:13 28:12
70:11 188:12,13
189:8 236:13

**weight** 60:24
137:9 146:2,7,
12

**well** 9:11 10:21
11:25 12:19
14:16 24:6,11
26:6,17 29:25
30:22 39:15
46:8,18 52:10
55:4 63:18,24
67:19 71:22
73:20 74:4
76:21 80:13
81:16 86:18
87:8 89:19

90:22 91:5
92:11,17 94:23
98:3,5 101:12,
15 103:19
106:11 108:15
109:8 112:21
114:22 119:10,
19 125:17 126:7
127:4,11 131:1
135:18 136:25
138:16 142:18
145:10 147:14,
24 148:3,24
154:13 159:24
160:23 164:15
165:22 172:1
173:8 180:20
182:15,16,22
186:21 191:14
192:17 193:21
196:10 198:13
199:20 202:3
203:24 204:4
207:6 209:10,13
213:16 217:10
220:13 223:8
227:7 233:8,17,
19 234:8,18,19
235:25 239:9,10
245:4 247:24
253:7 254:1
255:10 258:14
265:5 267:3
268:2 271:9,13
277:2,13 278:19
280:20 281:17
282:9 283:15
286:20 289:21
291:10 292:21
294:22 297:8

306:10

**went** 38:13
75:12,13 78:8,
10,11,12 81:18,
23 95:10 161:5,
7,12 188:7
190:1 203:20
216:23,24 263:6
303:7

**were** 9:24 12:15
15:7 19:17
22:21,24 23:3,5,
16 24:7 25:11
32:6 34:9 42:19
45:17 49:19
50:3,22 51:5,10
54:5 58:7,20
63:14 73:22
76:15,23 77:3
78:5,9,17 79:6
92:12 95:11,22
96:6 99:16
100:2 106:10
114:9 115:18
116:10 117:12
122:3,10 124:17
130:19,24
131:4,20 136:10
156:4 171:9
176:20 177:14,
21 180:15,18
181:19,20
185:23,24,25
190:9,10,11
200:24 202:5
203:17 212:9
213:21 214:18
222:10 228:7
229:6,7 230:18
232:12 234:16

237:17 238:1
242:23 248:4
249:23,24 252:3
253:16 254:7,15
256:18,20
260:18 263:23
264:19 270:13
275:4 281:19
287:12 294:5,18
295:21,23,25
296:9 297:2
305:20 306:12

**weren't** 92:18
259:25

**West** 5:1,13 41:5
54:10 57:5

**Westin** 278:18

**what's** 12:6
59:23 60:7
66:21 85:5
109:10 120:23
187:11 267:16
270:11 295:20
297:19,20

**whatever** 61:18
69:5 112:21
118:19 178:10
259:6 303:17

**whatever's**
61:14

**whereupon** 4:17
13:7 37:2 63:9
92:24 97:10
102:21 121:22
171:1 199:13
226:23 272:15

**whether** 28:13,
18 32:3 41:10

In Re: CR Bard 200 | Bruce Rosenzweig, M.D. | 10/29/2014

42:4 45:10 54:1
92:3 93:10,20
95:16,24 104:20
106:6,7 124:6,
18 127:17
131:21 137:9,10
149:14,16,23
150:2 154:13,22
166:4 171:20
173:14 175:19,
20 178:10
188:17 205:25
214:15 239:1
252:24 265:12
266:19 280:22
285:15,21,22
288:3,8 290:14
303:16 305:13

**which** 21:7,
27:11 30:23
31:20 36:25
43:3 47:12 50:6
51:2 55:10
78:11 79:10
84:17 96:4 97:2
98:8 109:11
122:18 134:20
142:23 144:1
145:13,14,24
146:15,18,21
148:7,8 150:15,
155:17 158:1
162:9,12 164:18
167:11 185:19
190:8 192:6
194:3,12
196:18,24 197:3
203:13 205:5
208:14,20
210:10 215:7

220:15 228:3
230:4 233:6
244:2,5,7
247:17 249:24
256:12 257:6
266:5 267:21,24
268:6 275:8
286:9 297:10
305:25

**while** 96:6
116:20 155:21
219:15 225:22
254:4 267:12
277:21 292:14

**white** 153:4
244:3,23

**who** 4:6 9:5 10:1
12:20 16:23
35:24 36:11
49:23 50:25
52:21 53:25
60:22 73:13
74:11 78:7,9,16
79:8 84:2 87:12
125:2,16
127:17,24 130:7
131:14 188:24
191:25 213:17
230:19 234:3,8
282:15 283:6,7
293:25

**who's** 191:1
251:18

**whole** 56:4 120:5
194:22 233:16
245:5 256:16

**whose** 127:6,7
242:21

**why** 6:14 12:24
18:6 23:4 24:5,
21 43:11 49:6
62:16 68:6
71:13 73:16
76:19 88:14
99:18 119:7
139:9 146:8,15
149:21 152:8,14
159:21 160:1,7
161:12 167:11,
17 177:23
178:15 184:17
194:16 195:23
196:9 211:15
220:9 228:3
230:4 239:7,9
254:3 270:7
286:24 289:17,
22,24 301:18,22
306:9

**wide** 149:12,14

**widely-read**
268:11

**widened** 239:7

**wife** 60:23 61:3

**will** 5:7,14,22
6:9,23 7:2,11
13:25 18:3,17
36:20 37:21,22
46:9,12 49:5
62:15 66:17
68:18 70:22
72:11 75:20
83:12 91:9,22
94:21 107:2
116:3,14 119:12
120:14 121:9
124:14,21,

134:22 140:18
141:8 153:13
166:4 179:8,14
182:12 183:1,7,
14 184:7 206:2,
10 221:12 224:7
236:13 241:9
251:2,18 252:24
256:25 259:7
261:23 262:24
263:13,14,21
265:7 279:16,18

**William** 153:14

**Williams'**
153:11

**willing** 41:21
85:9 191:23
301:25

**winded** 255:18

**wish** 292:13
293:2,3

**with** 5:1,5,15,16
8:18 9:23 15:19
16:9,11,21,22
17:13 20:18
21:6, 22:17 23:8
25:3 26:7 27:17
28:4 30:2,10
31:19,25 32:2
35:3,24 37:15,
18 40:13,14,22
41:14 43:11,19
46:4,24,25 47:6
48:8,25 49:2,
50:19 51:1,13
52:5,17,22,23
53:2,17 54:1,3,
4,8,9,12,14,22
56:14 59:2,7

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                        10/29/2014

62:3 64:7, 65:13
68:19 70:13
71:25 72:12,21
74:2,13,16,22,
25 76:22,24
77:17,21,23
78:5,16 79:12,
13 81:21,22
82:2 83:5 84:24
85:18 86:13
87:20 89:1,4,10,
15,19, 90:23
91:13,14,16,22,
23 93:13 94:8
96:6,8,17 97:5,
15 98:5,13,16
99:24 103:5,12,
16 104:18,22
105:4,20,
106:25 107:3,9,
23,25 108:2,8,
24 109:23,
110:24 111:4
112:22 113:11,
15,17,20
114:10,15
116:6, 117:16,
17 119:16,22
125:10 126:19
127:15,20,22
128:11 129:12
130:3 131:4,16
133:11,17
134:18,25
135:12,22
136:11 138:3
139:7,24 140:3,
6,18,23 141:22,
24 142:3 143:2,
14 144:19

145:1,11,13,20,
24 146:11
147:1,17
151:13,19
155:17,20
156:3,8,10,14,
20 160:8,14
161:20,22 162:2
163:19 164:4,8,
16,18 166:7,10,
12,15,18 169:3
172:17 174:1
175:7 177:3
179:9,10,14,25
180:11 187:25
188:2,4, 191:14,
25 193:16
195:13,14
196:22 197:2
198:7 199:19,
21,22 200:5,11
202:10 205:16,
22 206:11,21
208:1,6,11,13,
20,21 214:1
218:5,6,8,
219:10 222:2,23
223:16,22
224:18 225:15,
23,25 226:11,12
227:20 228:9,
13,24 230:17
231:4 232:7
234:1 235:23
236:9,10 237:7
238:6,23
240:11,12,14
242:1,5,21,22
243:19 244:14
248:6,15,21,25

250:6,10,21
251:11 252:2
253:3,8 254:19
255:8,11 257:2,
8,21,25 258:1,3,
24 260:21,23,25
261:3,4,6 262:7,
8,13,15,22
263:12 264:20
265:14 266:5,12
268:23 269:2
271:10,17,20
273:6,15 277:23
278:3,6,10
279:24 281:3,5
284:19,20
286:12 287:17,
22 289:12 291:1
292:4 293:10,
13,15,24 294:5,
8,9 296:2,13,14,
17,24 298:21
299:14,19,23
301:11,14,18,19
302:1,2,10
306:4

**within**  34:13
78:2 86:23 87:6,
10,19 107:4
154:12 177:3
195:6 227:10
261:20 269:4

**without**  107:6
246:13,20
293:17

**witness**  4:16,17
5:25 6:11,15,24
7:10,14,17,19
9:8 12:14 21:22

32:16,20,23
37:5 42:23
43:22 44:14
49:6 53:12 55:8,
9,13,18 57:22
59:16 66:20
67:14 87:2,24
92:6,19 93:25
95:3 97:13
106:3,16 112:1,
17 115:11
118:10 119:25
120:11 126:25
128:18 130:6,12
150:24 151:17
154:19 156:18
157:23 158:13
159:5,8 160:23
162:21 163:6,14
164:11 166:2,21
177:22 179:12
184:14 188:10
193:23 198:16
202:11,14 206:6
209:5 211:16
215:12 217:23
219:9 226:14,25
230:14,22
258:18 262:1,5,
8,12,16,21
263:5,9 272:11
279:2 282:6,23
283:11 285:10
286:7 292:25
296:6 300:7
306:2,6,18

**witnesses**  275:12

**woman**  195:20
206:14

In Re: CR Bard 200                   Bruce Rosenzweig, M.D.                   10/29/2014

| | | | |
|---|---|---|---|
| **woman's** 184:25 186:8 236:9 246:20 | 17 97:5,15 112:4 125:9 201:16,19,20,23 219:8 228:23 234:1 275:15 277:9 | **writing** 193:1,25 210:6 229:3 | 276:2,23 278:22 289:2 290:19 296:16 |
| **women** 175:7,14 176:10 179:1,6 206:25 225:16 226:8 235:16 247:18 | | **writings** 38:9 | **year** 15:14 17:12,14 29:18, 24 30:12,17,24, 25 31:15 34:13 58:20 66:25 69:14 74:2 164:21 165:6,12 196:21 198:5 203:9 207:16 209:7 211:23 212:1 222:16,17 241:8 274:10 275:25 293:14 303:10 |
| | | **written** 18:25 27:22 61:21 134:7 169:16 200:4 204:1 226:24 248:14 263:25 | |
| **won't** 33:10 34:5 57:11 68:25 263:5 | **working** 52:5,16 56:11 67:22 71:8 73:17 98:5 99:24 240:7 276:15 | | |
| | | **wrong** 78:10 128:1 207:11 | |
| **wondering** 288:21 305:16 | **works** 6:3 135:12 139:10 146:21 183:19 237:1 238:3,4 | **Wrongful** 303:18 | |
| **wool** 149:20 | | **wrote** 15:18 38:23 88:25 180:15 271:10 | |
| **word** 96:11 127:18 128:1 | **world** 53:10 284:1 | | |
| **words** 33:11 62:10 115:14 180:18 204:19 241:13 277:7 287:6 290:24 291:6 | **worried** 84:3 | ——————— | **years** 10:6 12:10 14:17 24:25 28:19 29:5,8 38:24 46:25 66:11 69:15 89:11 113:15 117:13 155:22, 24 165:2,3 186:5,8 188:14 189:11 194:13 195:19,22 196:6,13,18 197:11,12 206:18 207:14 210:3,22 211:18 214:14 225:6,8 227:10 230:5 236:14 238:11, 15,22 241:7,11 269:4,5,17 273:14,15 280:16 294:14 |
| | **worry** 198:23 | **Y** | |
| | **worsen** 300:20 | ——————— | |
| | **worst** 263:11 | **yeah** 12:25 23:7, 21 33:2,24 38:20 46:18 63:1 73:5,7 90:25 93:5 94:21 107:2 108:17 115:5 117:2 124:24 129:15 130:5,10 142:17 158:10 170:16,20 176:18 179:2 189:20 194:24 198:13 202:12 204:18 211:14 214:10 215:12 218:17 229:15 248:6 251:21 263:8 266:16 272:11 273:12 | |
| **work** 12:2,13 46:7 52:19 53:21 62:7 65:22 82:8 94:24 96:5,11, 20 100:18 127:13,19,25 128:1 130:8,9, 14 142:10 146:22 168:8 240:7,8,9,15 293:21 | **worth** 77:8 | | |
| | **wouldn't** 57:1 84:15 85:17 119:22 128:8 277:16 | | |
| | **wound** 90:5 149:8 219:19,23 | | |
| | **woven** 155:10 | | |
| | **wrap** 251:2 253:15 | | |
| | **wrapped** 189:3 | | |
| **worked** 50:19 53:17 54:1,3,8, 12 69:14,18,20 81:21,22 96:2,8, | **wrapping** 259:18 | | |
| | **write** 44:14 102:11 105:6 | | |

In Re: CR Bard 200                    Bruce Rosenzweig, M.D.                    10/29/2014

**yesterday** 13:17
123:12 128:22
250:20,24
273:22

**yet** 15:1 23:24
98:2 157:6
172:15 270:8,12

**you'd** 13:24

**You'll** 238:12

**you're** 6:17,20
14:5 28:25
29:21 30:12
33:16 35:4
39:10 40:20
45:19 47:8 53:5
55:2,22 58:3
65:18 86:15
88:9,11 90:17
95:5 99:24
102:3 107:8,13
111:6,19,23
114:13 117:3,7
118:4,7 121:1
123:24 124:3,5,
9,11,17 136:1
138:2 139:1
140:22,24,25
143:22 146:3
150:21 161:19
164:4,7,11
169:24 177:10
180:20 188:12
190:3,12
193:16,24
194:20 196:3,17
202:24 205:21
217:2 218:18,22
219:21 227:11
229:8,16,22,24

230:10 233:17
237:8 240:7
242:16 243:11,
19 245:13,22,24
246:10, 252:25
253:2 254:23
255:12,21
257:11 261:9
263:13 266:9
268:14 269:6
270:1 271:3
276:24 284:17
290:24 291:22
299:16 300:20
302:16 305:18

**you've** 6:1 8:4,
14,16 9:14 10:7,
11,15,19 11:7
13:4 16:19
17:17 33:5,8,11,
13 34:2,14,20
40:9 41:25
44:19,24 45:3
47:7,19 53:1
54:25 57:22
58:21 62:11
66:9 67:3 70:6
72:3 93:21 96:2,
12 99:23 102:2
103:3 112:4
123:5 126:18
133:5 134:6
180:22 201:23
230:1 235:10
237:18 247:22,
23 249:14 250:5
253:4 254:24,25
259:3 260:7
263:16 271:8
274:15 276:19

289:3 302:24
304:9,10 305:3

**young** 270:21

**yours** 261:3
263:12

**yourself** 19:23
20:7 44:20 81:2
82:17 103:6
112:13,23 113:2
276:25

**Z**

**Zakrewski's**
159:23,25

**zero** 207:20
211:5 303:11

**zingers** 291:13

**Zoo** 130:7

**Zookeeper**
266:14,16

**zoology** 266:9,
12,20

Case 2:10-md-02187 Document 9745-18 Filed 06/16/19 Page 1 of 124 PageID #: 116320

# EXHIBIT H

In The Matter Of:

## *In Re: CR Bard (200)*

---

# *Bruce Rosenzweig, M.D.*

October 30, 2014

---

## Tiffany Alley Global Reporting & Video

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE: C.R. BARD, INC., PELVIC
REPAIR SYSTEM PRODUCTS                    MDL No. 2187
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL
CASES IN MDL NO. 2187 AND
SPECIFICALLY TO:

███████████   Plaintiff,
vs.              CIVIL Action File No. ████████
C.R. BARD, INC., Defendant.

███████████   Plaintiff,
vs.              CIVIL Action File No. ████████
C.R. BARD, INC.,  Defendant.

███████████   Plaintiff,
vs.              CIVIL Action File No. ████████
C.R. BARD, INC., Defendant.

███████████   Plaintiffs,
vs.              CIVIL Action File No. ████████

C.R. BARD, INC., Defendant.

███████████   Plaintiff,
 vs.             CIVIL Action No. ████████
C.R. BARD, INC., Defendant.

███████████   Plaintiff,
               Civil Action File No. ████████
vs.
C.R. BARD, INC., Defendant.

███████████   Plaintiff,
               Civil Action File No. ████████
vs.
C.R. BARD, INC., Defendant.

███████████   Plaintiff,
               Civil Action File No. ████████
vs.
C.R. BARD, INC., Defendant.

The continued videotaped deposition of BRUCE ROSENZWEIG, M.D.

.

Page 397

```
                 Plaintiff,
                           Civil Action File No.
vs.
C.R. BARD, INC., Defendant.
                 Plaintiff,
                           Civil Action File No.
vs.
C.R. BARD, INC., Defendant.
                 Plaintiff,
                           Civil Action File No.
vs.
C.R. BARD, INC., Defendant.
                 Plaintiff,
                           Civil Action File No.
vs.
C.R. BARD, INC., Defendant.
                 Plaintiff,
                 Civil Action File No.
  vs.
C.R. BARD, INC., Defendant.
```
       The continued videotaped deposition of
BRUCE ROSENZWEIG, M.D., called for examination
pursuant to the Rules of Civil Procedure for the
United States District Courts pertaining to the
taking of depositions, taken before GINA M. LUORDO,
a notary public within and for the County of Cook
and State of Illinois, at 320 North Dearborn
Street, Chicago, Illinois, on the 30th day of
October, 2014, at the hour of 9:41 a.m.
Reported by:  Gina M. Luordo, CSR, RPR, CRR
License No.:  084-004143

Page 398

```
 1    APPEARANCES:
 2        CLARK LOVE HUTSON
 3        BY:  MR. WILLIAM W. LUNDQUIST
 4        440 Louisiana Street, Suite 1600
 5        Houston, Texas  77002
 6        (713) 757-1400
 7        wlundquist@triallawfirm.com
 8            Representing the Plaintiffs;
 9
10        GREENBERG TRAURIG, LLP
11        BY:  MR. THOMAS J. MAZZIOTTI
12        3333 Piedmont Road, NE, Suite 2500
13        Atlanta, Georgia  30305
14        (678) 553-2101
15        mazziottit@gtlaw.com
16            Representing the Defendant.
17
18
19
20
21
22
23
24
25    Also Present:  Mr. Ben Dixon - Videographer
```

Page 399

```
 1                 I N D E X
 2    WITNESS                    EXAMINATION
 3    BRUCE ROSENZWEIG, M.D.
 4       By Mr. Mazziotti                401
 5       By Mr. Lundquist                641
 6
 7
 8            E X H I B I T S
 9    NUMBER   DESCRIPTION              PAGE
10    No. #8   Rule 26 Expert Report for   444
11
12    No. #9   Exhibit 1 to Rule 27 Expert 444
13           Report for
14    No. #10  Rule 26 Expert Report for   501
15
16    No. #11  Exhibit 1 to Rule 26 Expert 501
17           Report for
18    No. #12  Rule 26 Expert Report for   525
19
20    No. #13  Exhibit 1 to Rule 26 Expert 525
21           Report for
22    No. #14  Rule 26 Expert Report for   547
23
24    No. #15  Exhibit 1 to Rule 26 Expert 548
25           Report for
```

Page 400

```
 1            E X H I B I T S
 2    NUMBER   DESCRIPTION              PAGE
 3    No. #16  Rule 26 Expert Report for   575
 4
 5    No. #17  Exhibit 1 to Rule 26 Expert 575
 6           Report for
 7    No. #18  Rule 26 Expert Report for   589
 8
 9    No. #19  Exhibit 1 to Rule 26 Expert 589
10           Report for
11    No. #20  Rule 26 Expert Report for   599
12
13    No. #21  Exhibit 1 to Rule 26 Expert 599
14           Report for
15    No. #22  Rule 26 Expert Report for   623
16
17    No. #23  Exhibit 1 to Rule 26 Expert 623
18           Report for
19
20
21
22
23
24
25
```



Page 401

1    THE VIDEOGRAPHER:  Good morning.  We are on the
2  record, and the time is approximately 9:41 a.m.
3  This is the beginning of day 2 of the deposition of
4  Bruce Rosenzweig, M.D.
5      Will counsel present please identify
6  themselves and who they represent for the record.
7    MR. LUNDQUIST:  Will Lunquist on behalf of
8  plaintiffs, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮  and ▮▮▮
13   MR. MAZZIOTTI:  Tom Mazziotti on behalf of C.R.
14 Bard.
15   THE VIDEOGRAPHER:  Will the court reporter
16 please swear in the witness.
17       (Whereupon, the witness was
18       sworn.)
19   MR. MAZZIOTTI:  This will be the deposition of
20 Dr. Bruce Rosenzweig taken pursuant to agreement of
21 counsel and followed up by notice.  This deposition
22 is being taken in the Bard Vaginal Mesh Litigation.
23 The deposition is being taken for purposes of
24 cross-examination, discovery and all other purposes
25 allowable under the Federal Rules of Civil

Page 402

1  Procedure.  All objections shall be made in
2  accordance with the Federal Rules of Civil
3  Procedure if that's agreeable with counsel.
4    MR. LUNDQUIST:  Agreed.
5    MR. MAZZIOTTI:  All of the formalities are
6  waived.  And Will, would you like the doctor to
7  read and sign?
8    MR. LUNDQUIST:  He would.
9    MR. MAZZIOTTI:  And that can be in front of any
10 notary public.
11     BRUCE ROSENZWEIG, M.D.,
12 having been first duly sworn, was examined and
13 testified as follows:
14       EXAMINATION
15 BY MR. MAZZIOTTI:
16   Q.  Good morning, Dr. Rosenzweig.
17   A.  Good morning.
18   Q.  Welcome back to day 2 of your deposition.
19   A.  Thank you, sir.
20   Q.  I thought we would go in order this
21 morning alphabetically, and I believe you have 13
22 with Will's firm.  So the first one I have down is
23 the -- is ▮▮▮▮▮▮▮▮▮
24   A.  That's correct.
25   Q.  Same ground rules from yesterday apply.

Page 403

1  If you do not understand my question, just let me
2  know, and I'll be happy to rephrase it, okay?
3    A.  Okay.
4    Q.  And if you answer the question, we all are
5  going to assume you understood the question?
6    A.  Yes.
7    Q.  Doctor, specifically speaking with the
8  specific plaintiffs, do you know when you were
9  first retained to provide opinions with regard to
10 them?
11   A.  Probably around ▮▮▮▮  of this year.
12   Q.  ▮▮▮  of 2014?
13   A.  That is correct.
14   Q.  Did you speak with the Clark firm?
15   A.  That is correct.
16   Q.  Who specifically at the Clark firm?
17   A.  Mr. Lundquist.
18   Q.  When did you first have a conversation
19 with Mr. Lundquist?
20   A.  I don't recall the exact date, but again,
21 in that time frame.
22   Q.  How many times have you spoken with
23 Mr. Lundquist or someone from his firm?
24     MR. LUNDQUIST:  On these specific cases,
25 obviously?

Page 404

1    THE WITNESS:  Correct.
2    MR. MAZZIOTTI:  Probably four or five times.
3  BY MR. MAZZIOTTI:
4    Q.  Is there -- and I understand that we will
5  be supplied your invoices, and just maybe to get a
6  preview of what we will be receiving, is each
7  invoice case-specific?
8    A.  No.
9    Q.  So for example, all of the work you've
10 done for the Clark firm will be listed by hours?
11   A.  That is correct.
12   Q.  So it won't be broken down by ▮▮▮▮▮▮▮
13 ▮▮▮▮▮  ▮▮▮▮▮  anything like that?
14   A.  That is correct.
15   Q.  Have you met -- strike that.
16     Have you examined any of the specific
17 patients or plaintiffs with the Clark firm?
18   A.  No, I have not.
19   Q.  And specifically we're starting with
20 ▮▮▮▮▮  ▮▮▮▮▮  so you did not meet with her?
21   A.  That is correct.
22   Q.  Have you spoken with her directly?
23   A.  No, I have not.
24   Q.  Since ▮▮▮  of 2014, how did you go about
25 reviewing for these specific plaintiff cases in

Page 405

1  order to prepare the individual reports?
2      A.  I reviewed the medical records,
3  depositions of the plaintiff, the implanter.  If
4  there was an explant, I reviewed the deposition of
5  the explanting doctor.  And by explant, I use that
6  as a term that means that a piece of mesh was taken
7  out, maybe not the entire mesh, so --
8      Q.  A revision?
9      A.  Right.  I mean, everybody uses different
10  terminology, and so when I say explant, I mean any
11  piece of mesh that was removed.  So I would
12  describe a full explant if the full mesh was taken
13  out.  I think the revision is kind of a category
14  just like saying a hysterectomy.  You don't know
15  whether it was an abdominal hysterectomy, vaginal
16  hysterectomy, supracervical hysterectomy, if the
17  ovaries were taken out, so it's kind of like -- a
18  revision is a catch-all term, if you will.
19      Q.  I understand, and we'll flush that out to
20  the extent it becomes necessary for your opinions
21  today.
22          When did you first start receiving
23  materials about these specific plaintiffs?
24      A.  I can't remember the exact time, but
25  around the summer of this year.

Page 406

1      Q.  So for example, with Ms. _____ you
2  don't know specifically when you would have
3  received her records, right?
4      A.  That is correct.
5      Q.  As far as her deposition, obviously, it
6  would have had to have been after her deposition
7  was taken?
8      A.  That is correct.
9      Q.  And as far as medical records, would they
10  be received on a rolling basis, or did you receive
11  them all at one time?
12      A.  Most of the cases I received records was
13  on a rolling basis.  I know that sometimes they're
14  difficult to obtain all the records at one time.
15      Q.  As far as your method for reviewing cases,
16  did you have separate files for each specific
17  plaintiff?
18      A.  That is correct.
19      Q.  How did you keep those files?  In other
20  words, were they in binders?  Electronic?
21      A.  Well, sometimes they were in binders.
22  Sometimes they're in folders.  There are things
23  electronic.  Obviously, with the amount of data
24  that's there, it became difficult just to keep
25  printing everything up and putting it in binders.

Page 407

1      Q.  Right.  And if I recall yesterday, you
2  mentioned you prefer, at least at this point in
3  your career, to review paper documents?
4      A.  Well, I've been doing a lot more reviewing
5  of electronic documents.
6      Q.  Do you still review paper documents, or do
7  you almost exclusively review electronic documents?
8      A.  It's both.  So you know, let's say that I
9  get a stack of records from an internist.  I mean,
10  that's pretty easy to flip through electronically
11  because, you know, mostly it's materials that might
12  not specifically relate to her current condition or
13  the current problem that she's having.  You know,
14  having reviewed records like that when they come in
15  on a patient I'm caring for in my office, I know
16  that I get a lot of superfluous information that is
17  sent that the patient doesn't know whether it's
18  important or not, and so some of that I can go
19  through very quickly on an electronic basis.
20      Q.  Sitting here today, are there particular
21  documents, depositions, anything else that would
22  provide you information that you believe you would
23  want in order to finalize your opinions with regard
24  to the specific plaintiffs?
25      A.  Obviously, you know, I know that there are

Page 408

1  some depositions that haven't been obtained yet.
2  There's some treating doctors that haven't been
3  obtained yet.  Obviously, I understand that not all
4  the medical records have been obtained.  I get
5  requests for medical records from the Marker Group
6  all the time, and you know, unfortunately, just
7  like any other busy medical office when you're
8  asked to supply five or six different sets of
9  medical records, it's very difficult to get them
10  out on a timely fashion.  So I know that there are
11  medical records out there that probably will come
12  in that I might need to review.
13          So sitting here right now, I don't think
14  there's anything that I specifically haven't seen
15  or there are any gaps, but obviously, I know from
16  having conversations with Mr. Lundquist and the
17  other attorneys that are involved there are
18  depositions that haven't been done, and there are
19  records that they haven't been able to obtain.
20      Q.  You reserve the right to supplement your
21  expert report, correct?
22      A.  I've stated that I know that, you know,
23  discovery is still ongoing, that there might be
24  things that come in.  If there's something that is
25  specifically noteworthy that would change my

Page 409

1  opinions, obviously, you will have an opportunity
2  to ask me questions again.
3     Q.  But my question is just specifically you
4  have reserved the right to supplement your
5  opinions?
6     A.  That is correct, yes.
7     Q.  And at least for today, you feel
8  comfortable enough that your opinions are
9  crystallized or firm enough in order to testify as
10  to the specific patients we'll talk about this
11  morning?
12     A.  That is correct.
13     Q.  You mentioned depositions that come in,
14  you'll review, and specifically my question before
15  dealt with are there specific depositions you're
16  thinking of that you would like to review?  You
17  mentioned treating physicians.  If those become
18  available, is that the type of deposition you would
19  want to review in order to finalize your opinions?
20     A.  If I haven't reviewed it, I would probably
21  then want to review it, yes.
22     Q.  Are there any types of depositions, as we
23  sit here today, you want to review in order
24  to -- that may potentially aid you in finalizing
25  your opinions?

Page 410

1     A.  I think, you know, again, there are some
2  treating physicians, implanting physicians that
3  have not been deposed yet from my understanding.
4  You know, those I would -- I would find important
5  to look at.
6     Q.  How about other plaintiff experts, any
7  particular specialty you would like to see in order
8  to aid your opinions in this case?
9     A.  That's a very generic term.  It's
10  difficult to give an answer.  I mean, if someone
11  went to see a pain specialist, that might be
12  important.  I don't -- I don't know if other
13  patients are having IMEs.  I don't know if -- some
14  IMEs I've been supplied with.  Some I haven't, so I
15  don't think that that is absolutely necessary for
16  me to see before I generate opinions.
17     Q.  And let me ask you this.  A similar
18  question, but different.  That really wasn't what I
19  was trying to get to.
20     A.  Sorry.
21     Q.  For retained experts by plaintiffs and
22  specifically like a materials expert who evaluate
23  polypropylene, is that a particular report or
24  deposition you would like to review in framing your
25  opinions?

Page 411

1     A.  So are you asking like if a patient had a
2  piece of the mesh explanted and it was sent to a
3  materials expert to review, would I want to see
4  their opinion about that?
5     Q.  That's a little bit different because let
6  me -- I believe I characterize that specific expert
7  as a pathologist.
8     A.  Right.
9     Q.  Okay.  So let's set aside the pathologist.
10  There's experts that have been retained in this
11  case that are going to examine or have examined the
12  qualities of the mesh, the polypropylene and have
13  been rendering or will be rendering opinions about
14  those qualities.
15     A.  Yes.
16     Q.  Are those the types of experts you would
17  want to see what their opinions are about the
18  polypropylene?
19     A.  I've read enough of those in past
20  litigation that I think I have a fairly good idea
21  about what, you know, will be in those reports.  I
22  don't think I would need to see the specific ones
23  again in this litigation.
24     Q.  You pretty much know where the battle
25  lines are in the -- as far as the materials

Page 412

1  experts?
2     MR. LUNDQUIST:  Object to form.
3     THE WITNESS:  And I think some of the material
4  experts have been the same material experts that
5  were disclosed on prior litigations that I've been
6  involved with, and I've read their reports in the
7  past.
8  BY MR. MAZZIOTTI:
9     Q.  Have you based any of your opinions on the
10  reports prepared by other experts in the past?
11     A.  In the reports that I've written or my
12  testimony at trial or in general?
13     Q.  In your testimony and your opinions in
14  this litigation with Bard, are you basing any of
15  your opinions on past depositions or reports or
16  information you've received from these retained
17  experts?
18     A.  From materials experts or pathologists?
19     Q.  Any.
20     A.  It's difficult to really --
21     MR. LUNDQUIST:  Form.
22     THE WITNESS:  -- you know, parse out.  Again,
23  I've looked at a tremendous amount of information.
24  That goes to my general fund of knowledge regarding
25  this litigation.  Obviously, you know, when I read

Page 413

1  about mesh degradation, polypropylene degradation
2  in a materials report that discusses changed
3  sensation and those kind of things, that adds to my
4  fund of knowledge. Am I relying on it specifically
5  in ▆▆▆▆▆ case report, I am not going
6  back and saying that in Dr. X's specific report,
7  when he says X, I relied on that for my opinions.
8  BY MR. MAZZIOTTI:
9     Q. I think I understand. Similar to our
10  discussion yesterday about literature, you have
11  read, for example, material experts -- materials
12  experts' reports and depositions in your vaginal
13  mesh litigation experience, right?
14    A. That is correct.
15    Q. And you have factored in those
16  depositions, opinions and testimony when you have
17  rendered your opinions in this litigation?
18    A. That is correct.
19    Q. And I asked experts generally, and
20  materials, that just comes to mind. Are there
21  other specialties or practice areas where it's
22  outside the scope of what you're comfortable
23  testifying to, but you've reviewed deposition
24  testimony, reports in framing your opinions?
25    A. Again, in adding to my general knowledge,

Page 414

1  I've read pathologists' reports that have looked at
2  explants. I've seen pain specialists' reports.
3  I've seen expert depositions from psychologists.
4  All of that adds to my general knowledge and my
5  general understanding, but I don't think in any of
6  these reports I specifically referenced any of
7  those.
8     Q. I think I understand then. So for each
9  specific plaintiff, if there's another expert like
10  a pathologist that examined the mesh, that would
11  have been identified in your list?
12    A. That is correct.
13    Q. Got it.
14       I've been handed a disc by Will this
15  morning from the Clark firm. Can you tell me
16  generally what's on this disc?
17    A. That disc will contain the medical records
18  and depositions that I reviewed for compiling the
19  report and for the deposition today.
20    Q. Okay. For each specific plaintiff?
21    A. That is correct.
22    Q. Is this a duplicate of what you've
23  identified as the documents you've relied on for
24  each plaintiff?
25    A. That is correct.

Page 415

1     Q. And we talked a little bit about this
2  yesterday. The documents that you have in front of
3  you are highlighted, but on the disc, for example,
4  there won't be any highlighting. It just has the
5  documents you've reviewed?
6     A. That is correct.
7     Q. Did you do any specific research -- strike
8  that.
9        Did you do any research specifically
10  for -- we'll start with ▆▆▆▆▆▆
11  Specifically for her case?
12    A. No. I think a lot of what we're going to
13  be talking about we've already covered yesterday.
14    Q. Okay. Good. Is there anything in your
15  file with ▆▆▆▆▆ as it relates to your
16  specific opinions about her that you did not bring
17  with you today? I understood yesterday when we
18  talked about your general opinions, that's a
19  separate matter, but specifically as it relates to
20  ▆▆▆▆▆
21    A. No.
22    Q. And just to shortcut maybe questions later
23  on today, is that going to be true for all the
24  plaintiffs you're opining about today?
25    A. That is correct. And all the same

Page 416

1  discussion that we had, you know, about materials
2  experts and stuff, that will apply to every other
3  plaintiff that we discuss today.
4     Q. And I think we talked about this
5  yesterday. As we talk today, I suspect the
6  specific plaintiffs' depositions will get shorter
7  and shorter because these types of questions I
8  won't repeat.
9     A. Excellent.
10    Q. Have you seen any of the complaints for
11  the specific plaintiffs?
12    MR. LUNDQUIST: The lawsuits.
13    THE WITNESS: Are you talking about the
14  plaintiff fact sheet that they fill out?
15  BY MR. MAZZIOTTI:
16    Q. Good point. Let me rephrase that.
17       Have you actually seen the legal document,
18  the complaint that's filed in a courthouse for each
19  of the plaintiffs?
20    A. No, I have not.
21    Q. When you spoke to the Clark firm, what was
22  your understanding as to what you were supposed to
23  do for each of their clients?
24    A. The same thing I've done for other
25  case-specific reports, review the medical records,

Page 417

1　review the depositions as they became available.
2　As I was going through the medical records, as we
3　discussed yesterday, I started to compile a draft
4　of the patient's case-specific parts. When I got
5　depositions, I added the parts to that, and then
6　the -- that was -- well, actually in Will's case,
7　it was personally transmitted, and then that was
8　finalized into the report.
9　　Q. Have you ever worked with the Clark firm
10　before you were retained in this particular piece
11　of litigation?
12　　A. Yes.
13　　Q. How many times?
14　　A. We had worked on, I think, three AMS or
15　four AMS cases in the case.
16　　Q. And AMS is also a vaginal mesh
17　manufacturer?
18　　A. That is correct.
19　　Q. Are those cases still pending?
20　　A. No, they're not.
21　　Q. They're part of the resolution?
22　　A. That is correct.
23　　Q. So when the Clark firm called you, you
24　understood that they represented patients?
25　　A. And also, I've worked with them on two

Page 418

1　Boston Scientific -- no, one Boston Scientific case
2　specific.
3　　Q. So is that case still pending?
4　　A. That is correct.
5　　Q. Have you given a deposition in that case?
6　　A. That is correct.
7　　Q. How about in the AMS cases, did you give
8　depositions before those were resolved?
9　　A. No.
10　　Q. In the Boston Scientific case where you
11　were retained by the Clark firm, generally what
12　were you identified as an expert in?
13　　A. I am both a general causation -- it's the
14　consolidated trial that's starting next week, and I
15　am a general causation expert and a case-specific
16　expert.
17　　Q. Is that the one down in Miami?
18　　A. No. That's Pinnacle.
19　　Q. And the other is West Virginia?
20　　A. Yes.
21　　Q. I'm assuming they're similar opinions to
22　what you've expressed in this case, I guess, as
23　part as a general expert as to the qualities of
24　mesh, IFUs, that type of testimony?
25　　MR. LUNDQUIST: Object to form.

Page 419

1　　THE WITNESS: I think it's specifically on the
2　qualities of mesh.
3　BY MR. MAZZIOTTI:
4　　Q. Were you asked in the Boston Scientific
5　litigation to opine on IFUs?
6　　A. I don't think that was part of my report,
7　no.
8　　Q. Were you asked to do that, though?
9　　MR. LUNDQUIST: Object to form.
10　　THE WITNESS: Not that I recall.
11　BY MR. MAZZIOTTI:
12　　Q. Other than Will, who else do you work with
13　at the Clark firm?
14　　A. Shelly Hutson.
15　　Q. Anybody else?
16　　A. Those are the two attorneys that -- there
17　are other attorneys that I might have had
18　conversations with about very specific things, but
19　those are the people I worked with.
20　　Q. When you say you were retained and are
21　testifying about the qualities of mesh, you're
22　talking erosion, degradation, curling, those types
23　of opinions?
24　　A. That is correct.
25　　Q. Are you testifying about whether or not

Page 420

1　mesh or polypropylene and vaginal mesh cause
2　cancer?
3　　MR. LUNDQUIST: Object to form.
4　　THE WITNESS: Again, I don't know all the
5　specifics of the Daubert rulings, and so it's hard
6　for me to say what has been allowed and what has
7　not been allowed in this trial.
8　BY MR. MAZZIOTTI:
9　　Q. Okay. I understand what you're saying,
10　but let me make sure I am clear.
11　　You're anticipating next week to talk
12　about the qualities of Boston Scientific's vaginal
13　mesh, right?
14　　MR. LUNDQUIST: Object to form. I mean, I
15　really do think that's a legal conclusion. I mean,
16　I think the court issued a 123-page order on this
17　issue. You know what I mean?
18　　MR. MAZZIOTTI: Here's where I'm going. In
19　other words --
20　　MR. LUNDQUIST: He's a case-specific expert in
21　the Boston case.
22　BY MR. MAZZIOTTI:
23　　Q. What I was going to say is were you
24　originally retained to give more opinions, and then
25　as you're going to trial, your opinions have

Page 421

1 changed, in other words, or have been more limited?
2   A. No. Actually --
3   MR. LUNDQUIST: It's the exact opposite
4 actually.
5   THE WITNESS: -- it's the exact opposite.
6 BY MR. MAZZIOTTI:
7   Q. Okay. That's what I wanted to find out.
8   A. I was retained as a case-specific expert,
9 and I'm allowed to give general causation
10 testimony.
11   Q. Okay. We were talking about your prior
12 work with the Clark firm and three AMS cases, one
13 Boston Scientific case, of course, these 13 Bard
14 cases. Any other cases that you've worked with the
15 Clark firm?
16   A. In the past?
17   Q. Correct.
18   A. No. I am working with them on some of the
19 Wave 3 cases.
20   Q. In Bard?
21   A. Yes. I think they're the only one with
22 the Wave 3 so far.
23   Q. I wasn't sure. I do know Bard has got
24 Wave 3, and I suspect I'll be meeting with you
25 again at some point.

Page 422

1   A. I don't think we're going to --
2   Q. I'm sorry. I didn't mean to stumble into
3 that.
4   So when they called you, the Clark firm
5 called you, you knew, of course, they represented
6 patients, right?
7   A. That is correct.
8   Q. Is there a way to figure out for ▮▮▮▮
9 ▮▮▮▮▮ how much time you spent reviewing her
10 records and preparing her report?
11   A. No, sir.
12   Q. Generally do you have an idea how much
13 time you've spent on these 13 plaintiffs reviewing
14 all their records and preparing their reports?
15   A. 40, 50 hours.
16   Q. Have you been paid for a portion or all of
17 the 40 to 50 hours?
18   A. A portion, yes.
19   Q. And I'm assuming you've been charging them
20 750 an hour for review?
21   A. That is correct.
22   Q. Same agreement about trial testimony?
23   A. That is correct.
24   Q. Did the Clark firm send you a retainer?
25   A. That is correct.

Page 423

1   Q. That was $15,000?
2   A. It was 10,000.
3   Q. Was that simply because you changed your
4 retainer from 10 to 15 recently?
5   A. The short answer is yes.
6   Q. Did you give them a break because it's the
7 Clark firm? You've been working with them. You
8 know they're going to pay?
9   A. Something to that nature.
10   Q. The 10,000, do you draw against that, for
11 example?
12   A. Of course.
13   Q. I wanted to make sure I thought that's
14 what it was, but I didn't ask it yesterday. I
15 assumed it and shouldn't assume.
16   What did you do in preparation for your
17 deposition as to the case-specific plaintiffs with
18 the Clark firm today?
19   A. I had met with Mr. Lundquist several days
20 ago. We went over the cases individually,
21 discussed them, and then I, in a final review, went
22 through the cases and to make today flow as
23 smoothly as possible, have highlighted certain
24 areas in my report so that, you know, I'm not
25 stumbling around trying to get to the specific

Page 424

1 parts of the report so that we can make this a
2 smooth process.
3   Q. Perfect. I appreciate that.
4   How long did you meet with Will or anybody
5 from the Clark firm to prepare for today?
6   A. I think we met for about six hours.
7   Q. Was that here in Chicago?
8   A. That is correct.
9   Q. At your office?
10   A. That is correct.
11   Q. Was there anybody else there with you?
12   A. No.
13   Q. And I'm sorry. The second thing you
14 mentioned, you reviewed some of the records as
15 well?
16   A. Before?
17   Q. In preparation for today.
18   A. Well, obviously, I would, you know, go
19 back -- you know, one of the things that I did was
20 try to make the report as robust as possible so
21 that, you know, as much of the information that I
22 need for my -- to help discuss my opinions is there
23 so that we don't have to be running around to
24 individual pieces of the medical record and
25 depositions. To be able to refresh things, I might

Page 425

1  have pulled out parts of the medical records or
2  deposition testimony.
3      Q.  And that was my next question.  As far as
4  any specific documents you looked at to prepare for
5  today, they would have been case-specific medical
6  records and case-specific depositions?
7      A.  That is correct.
8      Q.  How many hours did you spend in addition
9  to the six hours with Mr. Lundquist?
10     A.  Getting ready for -- like over the last
11 day or so to get ready?
12     Q.  Or if you've been preparing for the last
13 couple weeks, whatever it was.
14     A.  Again, I don't really have a good -- maybe
15 another four, five hours.
16     Q.  So approximately 10, 11 hours?
17     A.  Probably.
18     Q.  I'll ask you a general question about all
19 of the specific plaintiffs just to see if we can
20 dispense with it.  Do you know any of the treating
21 physicians?  Well, strike that.
22         I know Dr. Hoyte is referenced in one of
23 the other case-specific plaintiffs.  You do know
24 Dr. Hoyte, right?
25     A.  I've never met him.  I know of him.

Page 426

1      Q.  Do you know any of the treating
2  physicians, implanter surgeons, when you were
3  reviewing these records?
4      A.  In these cases, no.
5      Q.  We can go through each specific plaintiff,
6  but I didn't know if --
7      A.  Yeah.  No.
8      Q.  Okay.  Do you typically do an IME in your
9  litigation in vaginal mesh?
10     MR. LUNDQUIST:  Object to form.
11     THE WITNESS:  Typically, no.
12 BY MR. MAZZIOTTI:
13     Q.  Have you ever done an IME in vaginal mesh
14 litigation?
15     A.  Yes.
16     Q.  What were the circumstances?
17     A.  If I was requested to do an IME.
18     Q.  Have you ever requested to do an IME on a
19 plaintiff in vaginal mesh litigation?
20     A.  No.
21     Q.  How many times have you done an IME on a
22 plaintiff in vaginal mesh litigation?
23     MR. LUNDQUIST:  Object to form.
24     THE WITNESS:  I mean, specifically to be added
25 for a case-specific report?

Page 427

1  BY MR. MAZZIOTTI:
2      Q.  No, just if -- whether there was a report
3  or not, sometimes -- I don't know how you work, but
4  sometimes experts do an IME, and then that's their
5  only role, and they don't proceed in litigation.  I
6  don't know if you've ever been in that position.
7      A.  Well, I can say I have had patients that
8  come to me, and I suspect that was for them to get
9  an IME-type report without letting me know that
10 ahead of time.  When they call up and ask for a
11 copy of their report, it's not a typical language
12 that a patient uses.  So I think I've been used for
13 IMEs more times that I wasn't aware of it.  But the
14 times I am aware of it, I would say I've probably
15 done about 10 IMEs.
16     Q.  Are you aware of any of your patients as
17 plaintiffs in vaginal mesh litigation?
18     A.  Yes, I have found out that some of my
19 patients are plaintiffs in litigation.
20     Q.  Have you been asked to serve as an expert
21 for those specific plaintiffs as a treating
22 physician?
23     A.  As I say, I get requests from the Marker
24 Group for records quite frequently, but I have not
25 been asked yet to give any depositions.

Page 428

1      Q.  I didn't see any of these plaintiffs from
2  Chicago, so I assume you don't know them one way or
3  the other.
4      A.  That is correct.
5      MR. LUNDQUIST:  Tom, one small point of
6  clarity.  I think he did testify, and I wasn't
7  here, but he did review Dr. Elliott's report as
8  well.  I wanted to make sure it was clear in
9  preparing for this deposition, he also reviewed
10 Dr. Elliott's report.
11 BY MR. MAZZIOTTI:
12     Q.  Who is Dr. Elliott?
13     A.  Dr. Elliott is a urologist from the Mayo
14 Clinic.
15     Q.  And why did you review his report?
16     A.  Well, for a reference to be able to
17 discuss the issues of the Avaulta -- I mean, I had
18 authored two reports myself.  Dr. Elliott is an
19 Avaulta general causation expert, and to be
20 familiar with what opinions are being placed in the
21 general causation element of the Avaulta, I read
22 his report.
23     Q.  And here's how I understand that fits in,
24 and correct me if I'm wrong.  You provided general
25 opinions on the Align product yesterday?

Page 429

1   A.  That's correct.
2   Q.  Some specific plaintiffs I saw had an
3  Avaulta product as well?
4   A.  That is correct.
5   Q.  And so from that standpoint, you have
6  reviewed Dr. Elliott's general causation opinions
7  and will be factoring those in for the plaintiffs
8  that have an Avaulta product?
9   A.  That is correct.
10   Q.  And I'm also assuming you agree with
11  Dr. Elliott's opinions?
12   A.  That is correct.
13   Q.  Are there any of his opinions that you
14  disagree with that have been expressed I should
15  say?
16   A.  Not that I recall.
17   Q.  And I think you mentioned you, yourself
18  have expressed general causation opinions about the
19  Avaulta product as well?
20   A.  That is correct.  I've authored two
21  general causation reports.
22   Q.  Tell me how you went about preparing, and
23  we'll talk, I guess, about Ms. ▮▮▮▮▮▮ report
24  if that makes it easier, but how you prepare these
25  specific plaintiff reports.  How did you go about

Page 430

1  doing that?  I get it.  Let me see if I can say
2  that better.
3      When I look at these reports, you'll agree
4  a lot of them look -- there's some identical
5  language?
6   A.  That is correct.
7   Q.  And I guess we'll get into this for each
8  particular plaintiff, but if you can answer
9  generally speaking, how is it that each plaintiff
10  has a lot of the identical language in the Rule 26
11  report?
12   A.  When I review the case, the patient's
13  medical history, the depositions, I use the same
14  methodology that I use when I treat patients to
15  come up with a differential diagnosis.  What I do
16  is I look at their past problems to be able to
17  factor in whether that has any contributing -- is a
18  contributory factor to their current complaints.
19  Then I generate the opinions based on what's in the
20  medical records, what's in deposition testimony,
21  from the literature, from my clinical experience,
22  from the documents that I've reviewed from Bard and
23  from the deposition testimony to come up with the
24  conclusions about what are the problems that each
25  of these women is suffering from and what

Page 431

1  specifically caused those problems.  So I think
2  that there would be a lot of similar language
3  because I'm using the same methodology that I used
4  for each of these cases.
5   Q.  Let's do that so we don't have to do it
6  for each particular case.  Let's talk about your
7  methodology.
8      I think a word you used you have to rule
9  in, you know, a diagnosis for these particular
10  cases?
11   A.  That is correct.  That's what you do.
12  When you make a differential diagnosis, you rule in
13  and you rule out various parts of your differential
14  diagnosis to come up with the final diagnosis or
15  the conclusion and the opinions that I'm rendering.
16   Q.  So for each of these specific 13
17  plaintiffs, you did a differential diagnosis?
18   A.  That is correct.
19   Q.  Did you kind of step in the shoes of a
20  treating physician?
21   A.  That is correct.  I did the same thing
22  that I would have done if this patient came in my
23  office.
24   Q.  With the exception of actually physically
25  examining the patient?

Page 432

1   A.  That is correct.
2   Q.  And I'm assuming you -- in this particular
3  case or cases, you don't believe it would be
4  necessary to physically examine each patient?
5   A.  Well, I relied on the physical exams that
6  are described in the medical records to be able to
7  use that in lieu of me doing a physical exam
8  myself.
9   Q.  In many, if not, most of these plaintiffs,
10  you recommend counseling?
11   A.  That is correct.
12   Q.  And we'll get to the specific plaintiff,
13  but just generally speaking, is it your opinion
14  that women that have vaginal mesh complications
15  should have some type of counseling or therapy?
16   A.  I think that any woman, and this is what I
17  see frequently in my office.  We talked about this
18  yesterday.  I do see a lot of patients that come to
19  me with a chronic pain disorder or a chronic issue
20  from an event, and I think that many of them have
21  some -- if you have a chronic problem that is
22  difficult to treat, it has psychological
23  ramifications, and I recommend counseling to help
24  people deal with the psychological ramifications
25  from either chronic pain disorder, chronic voiding

Case 2:12-md-02327   Document 9252-3   Filed 06/19/20   Page 409 of 924 PageID #: 216246

In Re: CR Bard (200)          Bruce Rosenzweig, M.D.          10/30/2014

Page 433

1  disorder or other issues that we're going to be
2  discussing today.
3      Q.  In your personal practice, if you have a
4  patient who comes in with complications from
5  vaginal mesh, be it from whatever manufacturer and
6  whatever product, do you routinely recommend or
7  refer patients for counseling?
8      A.  I discuss it with them, yes.
9      Q.  Talk to me or walk me through what that
10 discussion sounds like.
11     A.  Again, once I've seen the patient and we
12 go through, you know, their symptoms, what we've
13 done for them, I explain to them, first of all, I
14 don't think you're crazy, but having a chronic
15 disorder, particularly a chronic pain disorder, can
16 lead to manifestations.  And I think we're going to
17 see this in a lot of the depositions from women and
18 their husbands that if you can't have intercourse,
19 it's going to put a detriment on one's marriage.
20     And you know, while both parts of the
21 couple love each other and they want to express
22 their love with being intimate, if that's
23 difficult, that's going to overflow into other
24 aspects of their life together.  And it's better to
25 get ahead of that with counseling than let it

Page 434

1  fester and manifest in various kind of things like,
2  you know, drinking, other counterproductive
3  activities.
4      Q.  Are you preemptive in your practice?  In
5  other words, are you addressing this with each
6  patient that has these complications before they
7  may bring it up?
8      A.  A lot of times I can get a sense from, you
9  know, patients how well they have coping
10 strategies, you know, just like I try to counsel
11 patients about quitting smoking, losing weight,
12 exercising, and we are kind of measured on that
13 with meaningful use in our medical records.
14 Obviously, in a busy practice like I have, it's
15 difficult to hit all those parameters, you know,
16 with every patient on every visit, but I do discuss
17 it.
18     And I'm pretty up-front with patients.  I
19 tell them exactly what I told you.  I don't think
20 you're crazy, but having a chronic pain disorder
21 can manifest in ways that are counterproductive.
22     Q.  Going back to my question, it sounds like
23 as part of your routine when a patient comes in
24 with vaginal mesh complications, you always bring
25 this up.  Whether they want to bring it up or not,

Page 435

1  you have a discussion with them about the potential
2  for counseling?
3      A.  That is correct.  And with any pain
4  disorder, with any chronic disorder, you know, with
5  interstitial cystitis, chronic pelvic pain,
6  endometriosis, someone that has an abuse history, I
7  think those are all pertinent patients to bring up
8  this issue with.
9      Q.  And some patients accept your
10 recommendation, and others appreciate your
11 recommendation, but don't follow up?
12     A.  That is correct.
13     Q.  Have you ever received a case from the
14 Clark firm with regard to vaginal mesh and reached
15 the conclusion the complications or complaints are
16 unrelated to vaginal mesh?
17     MR. LUNDQUIST:  Object to form.
18     THE WITNESS:  I've come up with that conclusion
19 on several occasions.  I'm not sure whether it's
20 been with the Clark firm or not.
21 BY MR. MAZZIOTTI:
22     Q.  And there was an objection.  I just want
23 to make sure we're clear.
24     So a case would come in from the Clark
25 firm.  You review it, and you reach the decision,

Page 436

1  yes, the patient has vaginal mesh, but no, the
2  complications that she is complaining about are not
3  causally related?
4      A.  That is correct.  And maybe not --
5      MR. LUNDQUIST:  Hang on.  Let me -- to the
6  extent if he has not been designated, it's
7  possible he was designated as a consulting-only
8  expert as I'm sure you can understand.  So I don't
9  want him talking about those types of instances,
10 but I think you got an answer to your question.
11     MR. MAZZIOTTI:  And I'm not going to go into it
12 in this case.
13 BY MR. MAZZIOTTI:
14     Q.  But thank you for answering that.  I don't
15 think I'm going further to anything objectionable
16 to that.
17     You are not a licensed psychologist, are
18 you?
19     A.  No.
20     Q.  You're not a licensed psychiatrist?
21     A.  No.
22     Q.  Do you have any training or certificates
23 of added qualification for counseling?
24     A.  No.
25     Q.  Have you ever done any type of counseling

Page 437

1 or therapy on a formal basis where patients come
2 directly to you for counseling?
3    **A. I've had -- any doctor is going to have**
4 **situations where a patient comes to them and that**
5 **session is to talk about the psychological and**
6 **emotional aspects of something going on in their**
7 **life whether it's a medical condition, a personal**
8 **condition, a diagnosis that they were given, and so**
9 **every physician does that. I've had to sit down**
10 **with patients and give them the diagnosis that they**
11 **have cancer. I've had patients that come and see**
12 **me because of an issue is leading to, you know, a**
13 **divorce or a separation or one of their family**
14 **members has died, and you know, they lost their**
15 **job. They've lost their house.**
16      **So there are many sessions where we're not**
17 **talking specifically about a medical condition that**
18 **they came into the office for, but we're talking**
19 **about their emotional issues. So we -- every**
20 **physician, while we don't have specific**
21 **psychological or psychiatric counseling, we spend a**
22 **fair amount of time doing just that.**
23    Q. You don't hold yourself out as an expert
24 in psychiatry, do you?
25    **A. No.**

Page 438

1    Q. Don't hold yourself out as an expert in
2 psychology?
3    **A. No.**
4    Q. Ever testified as an expert in psychology
5 or psychiatry?
6    **A. No. I've talked about how the various**
7 **issues either regarding my patient like in**
8 **disability cases and other things have -- might**
9 **have a psychological impact, but not rendering**
10 **psychological or psychiatric testimony.**
11    Q. In other words, as a physician, and
12 typically would it be as a treating physician?
13    **A. That is correct.**
14    Q. As a treating physician, you will identify
15 a potential mental health issue and then make a
16 referral?
17    **A. Well, no. I think as a gynecologist,**
18 **we're primary care providers for women. You know,**
19 **I deal with depression, anxiety, and so I feel**
20 **comfortable at least initiating a therapy for those**
21 **disorders. Obviously, I don't treat schizophrenia,**
22 **psychosis, manic depressive disorders, those kind**
23 **of things, but general counseling and basic**
24 **psychological issues, I think all of us as primary**
25 **care providers will deal with that.**

Page 439

1    Q. When you say primary care provider, you're
2 not -- you're not licensed as a family medicine
3 physician, right?
4    **A. No. As I stated, as a primary care, if**
5 **you will, the umbrella provider for women.**
6    Q. Okay. Have you ever diagnosed depression?
7    **A. Yes.**
8    Q. Do you have any specific training on
9 mental health issues, diagnosis, treatments, things
10 of that nature?
11    **A. Just through clinical experience, reading**
12 **and our continuing education and maintaining my**
13 **certificate for board certification, we have a fair**
14 **amount of information on, you know, treating**
15 **primary issues such as, you know, basic treatment**
16 **of hypertension, basic treatment of diabetes, basic**
17 **treatment of depression. So to make a long story**
18 **short, it is the basics of primary care for women**
19 **because we are one of the few providers that get to**
20 **see women on an annual basis.**
21    Q. Other than depression and anxiety
22 disorders, if there is another mental health issue,
23 that's a patient you will refer out, correct?
24    **A. Yes.**
25    Q. And do you prescribe medication for

Page 440

1 depression and anxiety disorders?
2    **A. Yes.**
3    Q. So for example, Prozac?
4    **A. That is correct.**
5    Q. You've prescribed that in the past?
6    **A. That is correct.**
7    Q. Do you have patients that you treat long
8 term for depression or anxiety disorders?
9    **A. Usually what my normal practice pattern is**
10 **is that I will get a patient started. If it looks**
11 **like they're going to need long-term therapy, I**
12 **then refer them off.**
13    Q. Have you ever prescribed medication for
14 depression or anxiety with one of your patients
15 that has a complication that you believe is caused
16 by vaginal mesh?
17    **A. I would -- I can't remember a specific**
18 **patient, but I would hazard to say the answer would**
19 **be yes.**
20    Q. In other words, you think you have, but as
21 we sit here today, you cannot think of a single
22 instance?
23    **A. I can't recall the specific patient.**
24    Q. Right. In other words, you believe you
25 have, but you don't recall the specific patient

Page 441

1 where you would have diagnosed depression or
2 anxiety disorder?
3    **A. Or continued to treat them for that**
4 **diagnosis.**
5    Q. Do you ever do any type of couples
6 therapy?
7    **A. Rudimentary at best.**
8    Q. What do you mean by that?
9    **A. If I'm, you know, counseling a patient**
10 **who, let's say, has significant dyspareunia and**
11 **significant dyspareunia from a mesh product, I do**
12 **talk to both of the members of the family about how**
13 **this might be influencing them. That's why it's**
14 **rudimentary at best. And then the next step would**
15 **be look, if this is having a significant impact on**
16 **your personal life and your emotional life**
17 **together, now we need to, you know, move up to the**
18 **next level.**
19    Q. You wouldn't feel comfortable going to
20 that next level to give marriage counseling?
21    **A. No.**
22    Q. In your experience with patients that have
23 complications with vaginal mesh, I take it you also
24 take a thorough history of what's going on in their
25 life?

Page 442

1    **A. That is correct.**
2    Q. Many times you would agree that the
3 medical problems are just a part of other things
4 going on in their lives?
5    **A. Many medical conditions have a**
6 **manifestation of personal life issues such as**
7 **stress, anxiety, sleep disorders. All can have**
8 **health manifestations, blood pressure, weight gain,**
9 **you know, so yes, there's no doubt that someone's**
10 **life condition is going to impact their health**
11 **condition.**
12    MR. MAZZIOTTI: We've been going about an hour.
13 Let's take a quick comfort break, and then I think
14 we've covered all the general stuff for the
15 plaintiffs, and then we can just hit the records
16 now.
17    THE VIDEOGRAPHER: We are off the record at
18 10:33 a.m.
19        (Whereupon, a short break was
20        taken.)
21    THE VIDEOGRAPHER: We are back on the record at
22 10:40 a.m.
23 BY MR. MAZZIOTTI:
24    Q. Dr. Rosenzweig, actually before we get
25 into Ms. &#9608;&#9608;&#9608; report, let me just --

Page 443

1 Dr. Rosenzweig, before we talk specifically about
2 Ms. &#9608;&#9608;&#9608; let me just talk to you about your
3 reports, how you prepare them, and then I won't
4 have to ask you that question for each plaintiff.
5    Under the specific -- there's Roman
6 Numeral II in your reports?
7    **A. Yes.**
8    Q. You've got the specific plaintiff, right?
9    **A. That is correct.**
10    Q. In the facts section there, you talk about
11 the medical history. Are those the facts that you
12 have found to be more pertinent than others?
13    **A. That is correct.**
14    Q. Obviously, there's more facts, but those
15 are the ones that you find significant?
16    **A. That is correct.**
17    Q. And then going to Roman Numeral III, we
18 talked briefly about this before. That's where you
19 explain your methodology on how you formed your
20 opinions for each specific plaintiff?
21    **A. That is correct.**
22    Q. And you would agree at least the first
23 part, the first paragraph in the three bullet
24 points, those are the same -- that's the same
25 language for each of the specific plaintiffs?

Page 444

1    **A. That is correct.**
2    MR. LUNDQUIST: Object to form.
3 BY MR. MAZZIOTTI:
4    Q. Other than, obviously, you change the
5 name, right?
6    **A. And whether it's an Align or Avaulta. So**
7 **there might be some subtle differences, but the**
8 **general format is the same.**
9    Q. Let's go ahead and talk about
10 Ms. &#9608;&#9608;&#9608; What I'd like to do is identify as
11 Exhibit 8 the report you have in front of you
12 because that's the one that's highlighted.
13    **A. Yes, sir.**
14        (Whereupon, ROSENZWEIG
15        Deposition Exhibit Nos. 8 and
16        9 were marked for
17        identification.)
18 BY MR. MAZZIOTTI:
19    Q. What we've done is marked as Exhibit 8
20 your highlighted copy of the Rule 26 report itself?
21    **A. Yes.**
22    Q. Exhibit 9 is your Rule 26 report and its
23 attachments?
24    **A. Yes.**
25    Q. So if you can, do me a favor. Make sure

Page 445

1    that's everything that you meant to have for your
2    full Rule 26 report.
3      **A.  That is correct.**
4      Q.  And I'm happy to let you refer to both if
5    you need to, but the more complete report has your
6    CV as well as the documents you relied on, correct?
7      **A.  That is correct.**
8      Q.  I think your fees as well?
9      **A.  That is correct.**
10     Q.  Let's go ahead and go to Exhibit 8, your
11   report.  Tell me what you've highlighted.
12     **A.  Well, obviously, her age, what medical**
13   **conditions she had before the implant, when she had**
14   **the implant done and then her follow-up after the**
15   **implant, what complaints that she was having.**
16   **Mrs. ▓▓▓▓▓ in specific had a, quote, unquote,**
17   **revision surgery for persistent pain and tenderness**
18   **on the left side of the sling and dyspareunia.**
19   **There was a small area of erosion on the left side,**
20   **and that was excised on ▓▓▓▓ 2008 and then her**
21   **follow-up visits after that.**
22     Q.  Can I see your highlighted one?
23     **A.  Sure.**
24     Q.  Thank you.
25         And if you can, maybe it's easier because

Page 446

1    what I'll do is I'll just go through the highlights
2    if I've got questions, and I can point it to you on
3    Exhibit 9 or if you want to get this back.  However
4    you want to work this to make this go easier.  And
5    we can actually try it this way and --
6      **A.  Let's try it your way first, and if it's**
7    **problematic, then we can go back to having that**
8    **copy.**
9      Q.  I've got all day.  We'll figure it out.
10         On Page 2 in that bottom of the first
11   paragraph, you've highlighted Align.  I assume
12   that's just to remind yourself of the product?
13     **A.  That is correct.**
14     Q.  Going to Roman Numeral II, the past
15   medical history, you highlighted the fact that
16   Ms. ▓▓▓▓ was a 53-year-old woman who had one
17   normal vaginal delivery.  What's the significance
18   of that?
19     **A.  Well, in a gynecological history, a**
20   **woman's gravidity, which is the number of times she**
21   **was pregnant, the parity, the number of times she's**
22   **delivered a baby, is just an important historical**
23   **parameter that we look at.**
24     Q.  The more deliveries a woman has had, that
25   seems to have a direct correlation to a pelvic

Page 447

1    organ prolapse?
2      MR. LUNDQUIST:  Object to form.
3      **THE WITNESS:  And stress incontinence.**
4    BY MR. MAZZIOTTI:
5      Q.  Well, I was going to say that next.
6      **A.  In a very general sense, yes, the more**
7    **deliveries is correlated with the more pelvic floor**
8    **damage, but there comes a point where if there's a**
9    **decreasing size of the delivering baby and there**
10   **is a decreasing length of the second stage of labor**
11   **and birth trauma, you might hit a steady state**
12   **after a certain number of deliveries.  So one**
13   **delivery could be significantly traumatic versus**
14   **the fourth delivery could be significantly**
15   **traumatic, and the first three did not have too**
16   **much pelvic floor trauma.**
17     Q.  As we go through today, I think generally
18   the patients who have received the Bard vaginal
19   mesh product, whether it's Align or Avaulta, have
20   had multiple vaginal deliveries, right?
21     **A.  I would say that as a generality, that**
22   **would be correct.**
23     Q.  Would it be unusual for a woman who has
24   only had one vaginal delivery to have stress
25   urinary incontinence or pelvic organ prolapse?

Page 448

1      **A.  No, it's not unusual.  You know, as I said**
2    **before in the answer to the previous question, we**
3    **do see women that have never had babies that have**
4    **stress incontinence, pelvic organ prolapse.  I've**
5    **taken care of women that have had 12 babies and**
6    **have no stress incontinence and no pelvic organ**
7    **prolapse.  So while there's a corollary between**
8    **vaginal delivery and pelvic floor issues, it's not**
9    **exact.**
10     Q.  What is your understanding as to the
11   indications for Ms. ▓▓▓▓ to have the Align
12   implant?
13     **A.  It states right here Ms. ▓▓▓▓▓**
14   **presented with mixed urinary incontinent symptoms.**
15   **Her stress urinary symptoms were greater than her**
16   **urge symptoms.  She had urodynamic testing, which**
17   **is a procedure that is done to check both the**
18   **filling phase of the micturition cycle, micturition**
19   **meaning the voiding cycle and then emptying.  The**
20   **specific things we look for are does the patient**
21   **leak with various activities that increase**
22   **intraabdominal pressure, are there contractions of**
23   **the bladder muscle which the patient can't make go**
24   **away on their own, what we call uninhibited bladder**
25   **contractions.  There is some debate, like**

Page 449

1  everything in medicine, whether any bladder
2  contraction is abnormal or just the ones they can't
3  make go away.
4       I think all of us as today progresses will
5  have one or two bladder contractions that we can
6  suppress, and then we'll take a break and be able
7  to void. So there are certain abnormalities you
8  can see on urodynamic testing that don't correspond
9  to the patient's symptoms that don't need to be
10  treated. Then we check where the patient's voiding
11  and see how well they void. So the assessment by
12  her physician was that she had mixed urinary
13  incontinence, but the stress component was greater
14  than the urge component.
15       Q. What was the cause of the mixed urinary
16  incontinence with the stress component greater than
17  the urge component?
18       MR. LUNDQUIST: Object to form.
19       THE WITNESS: In Ms. ███████ the exact cause?
20  Are you asking me does she have hypermobility of
21  the urethra? Does she have intrinsic sphincter
22  deficiency? Is it just the typical pelvic floor
23  damage, if you will, from having had a vaginal
24  delivery? So it's --
25

Page 450

1  BY MR. MAZZIOTTI:
2       Q. In your differential, typically a
3  competent physician is going to at least evaluate
4  what the cause of these conditions are, correct?
5       MR. LUNDQUIST: Object to form.
6       THE WITNESS: Well, one thing about stress
7  urinary incontinence and overactive bladders, we
8  have an idea of what the various causes can be. Is
9  it a stretching of the ligaments that support the
10  midurethra and bladder neck? Is it the muscle
11  function of the urethra that is not working as
12  well? Is it a combination of both?
13       The exact cause, as I say, the theories
14  are vaginal delivery, increasing intraabdominal
15  pressure from cough. You know, a lot of things
16  that we talked about yesterday all contribute to
17  stress urinary incontinence. I don't -- you know,
18  the difference between intrinsic sphincter
19  deficiency and just hypermobility of the bladder
20  neck is a corollary to the stress urinary
21  incontinence, but the exact cause, I don't
22  understand what you're asking for.
23  BY MR. MAZZIOTTI:
24       Q. Well, do you have an opinion as to what
25  was causing her mixed urinary incontinence with a

Page 451

1  stress component greater than the urge component?
2       MR. LUNDQUIST: Object to form.
3       THE WITNESS: Let me go back to a disease like
4  diabetes. I see that a patient that has an
5  elevated blood sugar. Do I know why her pancreas
6  is not making the right amount of insulin? No.
7  When I take somebody's blood pressure and it's
8  elevated, they need treatment for it. Do I know
9  the exact cause of is it their muscles or their
10  blood vessels being spasming?
11       And there are many conditions that we
12  treat that the exact pathophysiology of that for
13  the individual patient we can't really elucidate.
14  So that's why if you're asking me about the
15  pathophysiology of it, I would say more likely than
16  not, it's due to pelvic floor damage from her
17  delivery.
18  BY MR. MAZZIOTTI:
19       Q. And don't misunderstand. I'm not saying
20  you have to have an opinion. That's why I was
21  saying do you have an opinion, and it sounds
22  like --
23       A. Oh, I thought you were asking me can I
24  express with a reasonable degree of medical
25  certainty what the cause was of her mixed urinary

Page 452

1  incontinence. Over 50 percent of overactive
2  bladders, urge incontinence is idiopathic, meaning
3  we don't really have an idea of what it's causing.
4  You know, as we talked about before, there's a
5  significant corollary.
6       So I think I'll be able to give you the
7  same answer whenever we talk about, you know, what
8  was the exact cause of patient X's prolapse versus
9  the cause for stress urinary incontinence. The
10  best I'm going to be able to say is what I tell my
11  patients. Most likely it's from your deliveries,
12  having increased pelvic floor pressure due to
13  constipation, obesity, chronic, you know, coughing
14  and the like, but I can't tell you the exact
15  pathophysiologic mechanism in each individual
16  patient.
17       Q. Again, I was just interested if you had an
18  opinion, and it sounds like it's not necessarily
19  critical in order to treat Ms. ███████ but more
20  likely than not, it was from her vaginal delivery?
21       A. That is correct.
22       Q. What goes into -- well, strike that.
23       With someone like Ms. ███████
24  obviously, her physician would have talked to her
25  about how this is impacting her life, correct?

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 414 of 924 PageID #: 213281

Page 453

1  A.  That is correct.
2  Q.  When I say that, I mean the stress urinary
3  incontinence.  And then based on that, the
4  physician then would have made a determination what
5  to do next?
6  **A.  That is correct.**
7  Q.  And I think later in your report, you
8  mention that there were alternatives that should
9  have been tried before surgery?  And if you want to
10  look, go ahead.
11  **A.  And you're talking specifically about --**
12  **A.  Ms. ████**
13  **A.  No.  Which page of the report?**
14  Q.  Well, that I don't know, but typically you
15  have it later in your report where you're
16  talking about other options.
17  **A.  You mean for her current treatment?**
18  Q.  Right.  Well, if you go to the last page,
19  I think Page 8, that's one spot where it started.
20  The paragraph is it is also my opinion.
21  **A.  Oh, that a safe alternative procedure to**
22  **the midurethral sling, or are you talking about I**
23  **highly recommend the patient follow up with a**
24  **continuum of care?**
25  Q.  Well, the continuum of care, that's

Page 454

1  currently?
2  **A.  Right.  That's correct.**
3  Q.  I'm talking about when she comes in and
4  what you do next to treat her stress urinary
5  incontinence or aid it.
6  **A.  If you can point to me what you're asking**
7  **specifically about with Ms. ████.**
8  Q.  Well, what I'm trying to figure out is I
9  take it from your opinions she should never have
10  had the Align product implanted, correct?
11  **A.  That is correct.**
12  Q.  Okay.  What would you have done instead?
13  **A.  Well, I think I describe that a safer**
14  **alternative is the Burch colposuspension.**
15  Q.  On Page 8, that was the paragraph I was
16  talking about.
17  **A.  I thought you were saying, you know, or**
18  **alluding to the fact that, you know, I was opining**
19  **that the patient should have had nonsurgical**
20  **management pelvic floor therapy, which is all the**
21  **things that we discussed yesterday, so --**
22  Q.  So for Ms. ████ you would not have
23  done the nonsurgical management like pelvic floor
24  therapy and the other things we talked about
25  yesterday?

Page 455

1  **A.  No.  What this paragraph is saying is that**
2  **there was a safer alternative to -- if you're going**
3  **to -- for a surgical option.  We talked about**
4  **yesterday that in my practice, I feel that**
5  **nonsurgical therapy is the first line of therapy to**
6  **treat stress urinary incontinence.  Now, there are**
7  **some people that want to forego that for surgical**
8  **management, but you know, my opinion is that we**
9  **should try to treat stress urinary incontinence and**
10  **prolapse sort of conservatively initially and then**
11  **move to surgery.**
12  Q.  Okay.  And that's what I understood a
13  little bit, too.  So with someone like
14  Ms. ████ your first -- specifically her,
15  you've reviewed her medical records and her
16  deposition, right?
17  **A.  That is correct.**
18  Q.  And with her specifically, you would have
19  at least started the nonsurgical route?
20  **A.  Again, I am not offering any opinions**
21  **about whether that was appropriate or not for**
22  **Mrs. ████  When I was testifying yesterday, I**
23  **was telling them about how I treat patients that**
24  **come to my office.  I am not going to discuss or**
25  **opine whether or not Dr. Katz should or should not**

Page 456

1  **have done nonsurgical management before moving to a**
2  **surgical option.**
3  Q.  I think I understand.  So what -- and I
4  may have just misread your report.  You're opining
5  that she very well could have been a surgical
6  candidate, but you disagree with -- well, you don't
7  quibble that Ms. ████ was a surgical
8  candidate, and it was reasonable for her physician
9  to consider that?
10  **A.  I am not offering opinions about whether**
11  **or not she's a candidate for a surgical procedure.**
12  **I am later on offering a safer alternative to the**
13  **midurethral sling and the transobturator approach,**
14  **and that's what that paragraph described.**
15  Q.  The fact that Ms. ████ had a
16  hysterectomy in 1973, did that have any impact on
17  your opinions in this case?
18  **A.  Yes.  Obviously, someone's past surgical**
19  **history is a historical factor that I figure in**
20  **when evaluating a patient in my office and also**
21  **when I evaluate the case-specific medical history.**
22  Q.  Let me know if you need each specific
23  plaintiff, but just generally speaking, going back
24  to your prior comment, your testimony here on each
25  of these plaintiffs is not that they should have

Page 457

1 never had surgery. They very well may have been
2 surgical candidates, but the Align product just was
3 not appropriate?
4     MR. LUNDQUIST: Object to form.
5     **THE WITNESS: I don't think in any of the**
6 **reports that I put in it is my opinion with a**
7 **reasonable degree of medical certainty that the**
8 **patient was not a surgical candidate.**
9 BY MR. MAZZIOTTI:
10     Q. Other than the Burch procedure, are there
11 any other surgical options to repair
12 Ms. _____ stress urinary incontinence?
13     **A. I describe several other options. Number**
14 **one would be to use a lightweight large-pore mesh**
15 **like Ultrapro. There was a study that came out**
16 **recently comparing Ultrapro, which has about a**
17 **two-and-a-half-millimeter pore size and about**
18 **16 grams per meter square density, comparing that**
19 **with a prolene lightweight mesh, which is probably**
20 **Gynemesh PS. They didn't specifically state that,**
21 **but you could get that information from reading the**
22 **report and showed that the Ultrapro compared to the**
23 **prolene light mesh had half the rate of**
24 **complications. So that is where that opinion comes**
25 **from.**

Page 458

1     **A pubovaginal sling is also a viable**
2 **alternative. Again, as I described for you**
3 **yesterday, the way I use pubovaginal slings is as a**
4 **treatment for recurrent severe stress urinary**
5 **incontinence where the options for the patient are**
6 **very limited. But a pubovaginal sling as a primary**
7 **operation, which will be discussed by other people**
8 **in this litigation, is a viable option.**
9     Q. The surgical procedures you just
10 discussed, can you state to reasonable degree of
11 medical probability that Ms. _____ would not
12 have sustained the same complications?
13     **A. Yes, I can because both of those**
14 **procedures don't use polypropylene mesh, and both**
15 **of those procedures are not done through a**
16 **transobturator approach.**
17     Q. So it's the polypropylene and it's the
18 approach here that caused the complications for
19 Ms. _____ with regard to the Align product?
20     **A. That is correct. And now I'm at a little**
21 **bit of disadvantage if we're going to talk**
22 **specifically.**
23     Q. Yes, you are, so let me hand you back your
24 highlighting because I think we've gone over it.
25 Let me see if there's any other facts to talk

Page 459

1 about.
2     As far as the infections -- well, strike
3 that.
4     Did Ms. _____ have any infections
5 after surgery?
6     **A. Are you talking about vaginal infections**
7 **or urinary tract infections?**
8     Q. Good point. I see something about
9 complaints of infection on _____, 2008 at the
10 surgical site.
11     **A. That is correct.**
12     Q. That's unrelated to the Align product,
13 correct?
14     **A. That is correct.**
15     Q. Then _____ 2008, the following page,
16 Page 3 at the top, she had urine culture results
17 that were abnormal. Was that related to the Align,
18 or is that, again, an infection, perhaps, brewing
19 from the surgery?
20     **A. A single urinary tract infection I would**
21 **not ascribe to the Align product.**
22     Q. Four weeks after her surgery, she was
23 sexually active and experiencing dyspareunia?
24     **A. That is correct.**
25     Q. What was the cause -- well, we talked

Page 460

1 about this yesterday. Do you think with regard to
2 the dyspareunia with Ms. _____ is that due to
3 the nerves that you were talking about yesterday,
4 or was there something else?
5     **A. Well, we talked about a variety of**
6 **mechanisms by which a woman can experience**
7 **dyspareunia after mesh placement. One of the**
8 **things that we note on the visit on _____ 2008,**
9 **the sling was noted to be tight on the left side**
10 **and accompanied by tenderness. The tightness is a**
11 **sign of mesh contraction, and Dr. Jacquetin in a**
12 **2008 paper in the International Journal of**
13 **Obstetrics and -- I mean International Journal of**
14 **Urogynecology stated that if you push on the mesh**
15 **and it's tender, the mesh is the cause of the**
16 **tenderness.**
17     **So with a reasonable degree of medical**
18 **certainty, this mesh has contracted, undergone**
19 **deformation with roping and curling. We know that**
20 **the Align sling has been found by the documents we**
21 **talked about yesterday to have a propensity to rope**
22 **and curl, particularly with difficult sheath**
23 **removal. The transobturator approach makes it more**
24 **difficult to remove the sheaths. That's a paper**
25 **that Dr. Zang published in the Taiwanese Journal of**

Page 461

1  Obstetrics and Gynecology in 2011 or 2012 so that
2  we know that the mechanism is either roping or
3  curling or mesh contraction.
4      Q.  And we did talk about the literature
5  yesterday, and there's also literature out there
6  that disagrees that the mesh contracts and
7  degrades, correct?
8      A.  I think that the vast majority of
9  physicians that are working with mesh on either
10  side of the equation agree that degradation and
11  contraction takes place.  There's disagreement
12  about the extent of the degradation.  There's
13  disagreement about the extent of the contraction.
14  There's a disagreement about the frequency of
15  degradation and contraction and the length of time
16  it takes to degrade or contract, but I think that
17  there is -- there are probably people that still
18  won't agree to that, but I think that the
19  scientific studies that we talked about yesterday
20  shows that there is very significant evidence that
21  the mesh contracts, degrades, undergoes a chronic
22  foreign body reaction, chronic inflammatory
23  reaction, chronic infection, subclinical infection
24  and deforms.
25      Q.  And I understand your statement.  My

Page 462

1  question just is simply there's literature out
2  there that disagrees with it?
3      MR. LUNDQUIST:  Object to form.
4      THE WITNESS:  There is literature out there
5  that disagrees with that, but the vast majority of
6  literature agrees with that and the internal
7  documents from Bard and testimony and depositions.
8  BY MR. MAZZIOTTI:
9      Q.  I'll move to strike.  I'm specifically
10  speaking of the medical literature.  And that was
11  an objectionable question because it was vague.
12  Let me say it correctly.
13      You agree that there's medical literature
14  among the scientific medical community that
15  disagrees that polypropylene degrades and contracts
16  when implanted?
17      A.  There is literature that states that, and
18  as I said before, the vast majority of the
19  literature will agree with that it degrades and
20  contracts.
21      Q.  You mentioned the sling was tight.  That
22  also can be evidence that, perhaps, the implanting
23  surgeon had just implanted it and it was too tight?
24      A.  Yes.  I took that into consideration in
25  forming my opinions in this case, and from what I

Page 463

1  remember that the implanting surgeon was asked
2  specifically about the technique that was used,
3  looking at the operative report, I did not see that
4  there was any deviation in the standard way that an
5  obturator sling is placed.  Now, the doctor when
6  implanting a sling can only see about one to one
7  and a half centimeters in the central portion of
8  the sling.  We know from what was found when she
9  came back on this visit of █████ 10, 2008 that the
10  band was on the left side.
11      So this is in an area of the vagina where
12  the doctor can't see.  We talked about where we
13  pass these trocars to do either retropubic sling or
14  an obturator sling that there is going to be an
15  area of the sling that is blindly placed.  So if
16  roping and curling is taking place in that area,
17  the doctor can't see it.  So the doctor is only
18  going to be able to see the tension on the sling in
19  the area that they can see.  When they remove the
20  sheath, events can happen away from the area that
21  they can see that they don't have any control over.
22  Looking at the medical record, a standard technique
23  was done to avoid putting the mesh under tension.
24      Q.  And so you relied solely on the operative
25  report to rule out that the implanting surgeon

Page 464

1  simply implanted the mesh too tight?
2      MR. LUNDQUIST:  Object to form.
3      THE WITNESS:  That, and if I remember
4  correctly, the deposition testimony, he also
5  stated -- Dr. Katz also stated that it was not
6  placed too tight.
7  BY MR. MAZZIOTTI:
8      Q.  Did you rule out anything else as to the
9  cause of the mesh being too tight?  I'm sorry.  The
10  Align being too tight.
11      A.  In what respect?  I mean, it either was
12  placed too tight, or it contracted, roped or curled
13  being deformation to go from being placed under the
14  appropriate amount of tension to now being a tight
15  band that is tender.
16      Q.  And that's -- are those only two causes
17  for how the Align could be tight?  Either it was
18  implanted too tight or because of it degrading and
19  the other -- excuse me.
20      A.  Deformation, contraction, chronic foreign
21  body reaction, yes.
22      Q.  Urine culture results were positive for
23  enterococcus.  What was the -- where did that
24  organism come from?  Was that from the Align, or
25  was that from just out in the community?

Page 465

1    A.  No.  It's actually from the vagina.
2  Actually, enterococcus is a bowel -- a normal bowel
3  inhabitant.  We know that, unfortunately, the
4  vagina is not infrequently colonized by bowel
5  flora, which can then colonize the distal urethra,
6  the opening of the urethra, make its way into the
7  bladder.
8       And we can talk about this now.  There's
9  one thing that can lead to urinary tract
10  infections, and that's irregular flow in the
11  urethra.  Normally the urethra has what's called
12  laminar flow.  And if you look at a river, you will
13  see that the water in the center of the river is
14  moving faster than the water at the edge of a
15  river.  So when a woman pees, the urine, that
16  there's no abnormalities of the urethra, will come
17  out in a laminar fashion, and that will flush out
18  bacteria that's trying to get from the opening of
19  the urethra into the bladder.
20       If there's any abnormalities of the
21  urethra, that will lead to Eddy currents like you
22  see on a river by a rock, and you get backflow.
23  And bacteria can use that backflow just like fish
24  do to move upstream and get into the bladder,
25  colonize the bladder and set up a urinary tract

Page 466

1  infection.
2    Q.  On Page 3, it talks about on ███ 19,
3  2008, and then later on it talks about there's no
4  evidence of mesh erosion or infection at that time,
5  but Dr. -- well, strike it.
6       On ███ 19, 2008, you would agree at least
7  at that time there was no evidence of mesh erosion
8  or infection?
9    A.  Not that Dr. Katz was able to appreciate
10  in the office.
11    Q.  Then Dr. Katz scheduled a sling revision?
12    A.  That is correct.
13    Q.  On ███ 27th when Dr. Katz did the sling
14  revision, he did note a small area of mesh erosion,
15  and it was excised, right?
16    A.  That is correct.
17    Q.  And there were no other complications with
18  the revision?
19    A.  That is correct.  And if I'm not mistaken,
20  I think Erin is a she.
21    Q.  Did I -- okay.  Dr. Katz?
22    A.  Let's refer to Dr. Katz because you and I,
23  we --
24    Q.  I don't know Dr. Katz either.
25    A.  Right, so let's just say Dr. Katz if it's

Page 467

1  a he or she.
2    Q.  If you look on ███ 17, 2008, after the
3  revision surgery, Ms. ███████ was denying
4  complaints of dysuria, hematuria and stress urinary
5  incontinence on a post-op visit?
6    A.  That is correct.
7    Q.  And at that time, ███ 17, 2008,
8  similarly, there's no evidence of mesh erosion or
9  infection?
10    A.  That is -- clinical infection, yes.
11    Q.  But certainly no evidence of mesh erosion
12  as documented?
13    A.  That is correct, but we do know from
14  Dr. de Tayrac's study from 2012 in the
15  International Urogynecology Journal that mesh
16  erosion can reseed the remainder of the mesh with
17  bacteria and then reinoculate it to foster a
18  subclinical infection.
19    Q.  Sure, but my question was just
20  specifically Dr. Katz stated there was no evidence
21  of mesh erosion during the ███ 17, 2008 visit?
22    A.  That is correct.
23    Q.  Then later on in ███████ of 2008,
24  Ms. ███████ denied any complaints of dysuria,
25  hematuria, stress urinary incontinence or

Page 468

1  dyspareunia?
2    A.  That is correct.
3    Q.  Upon a vaginal examination, she had normal
4  genitalia?
5    A.  That is correct.
6    Q.  Again, there's no evidence of mesh
7  erosion?
8    A.  That is correct.
9    Q.  Then it looks like ███████ 26th of 2009,
10  she begins to make complaints of urgency and mild
11  stress urinary incontinence as well as vaginal
12  spotting after intercourse?
13    A.  Yes.
14    Q.  She did not have dysuria at that time, did
15  she?
16    MR. LUNDQUIST:  Object to form.
17    THE WITNESS:  It states that she denies any
18  dysuria.
19  BY MR. MAZZIOTTI:
20    Q.  And Dr. Katz, according to the records,
21  diagnosed cystitis and pelvic pain?
22    A.  That is correct.
23    Q.  Do you have an opinion what was causing
24  the pelvic pain?
25    A.  Yes, the mesh that is remaining in her

Page 469

1  pelvis, and I think we went over yesterday all the
2  mechanism behind pelvic pain from mesh.
3     Q.  Do you know if Ms. ███████ went and has
4  seen Dr. Hoyte?
5     A.  No, I do not.
6     Q.  Do you know what Ms. ███████ current
7  complaints are?
8     A.  It states that Mrs. ███████ currently is
9  unable to have intercourse without pain.  It
10 prevents her from engaging in intercourse, and it
11 has taken a toll on her marriage.  She is also
12 currently experiencing urgency and bladder leakage.
13 She states that she experiences leakage when she's
14 working as a hospice worker.  It's embarrassing,
15 and she rarely socializes because of that.
16    Q.  As far as the urgency and bladder leakage,
17 are those the same complaints that Ms. ███████
18 had before the implant?
19    A.  Yeah.  She did have urgency before the
20 sling implant.  The urodynamics found that the
21 stress urinary incontinence was more significant
22 than urge incontinence.  We spoke yesterday about
23 Dr. Wang's study that show subclinical infections
24 of the sling can lead to de novo urge incontinence
25 symptoms, which means if it can produce urge

Page 470

1  symptoms, it can actually worsen urge symptoms.
2  She had an erosion, a revision surgery.  And so
3  according to de Tayrac's study that there could be
4  a reinoculation with a subclinical infection and
5  that the remaining sling could be and more likely
6  than not is the cause of her worsening urge
7  symptoms.
8     Q.  And that's what -- I want to talk
9  specifically about Ms. ███████  As it relates to
10 her, are you saying to a reasonable degree of
11 medical probability her urgency and bladder leakage
12 is the result of the Align?
13    A.  The Align or the revision of the Align
14 from the band being tight and the erosion that was
15 found at the time of surgery.
16    Q.  And to a reasonable degree of medical
17 probability, it is not due to any type of pelvic
18 floor issue?
19    A.  That is correct because it is a worse
20 condition than it was prior to the sling being
21 implanted.
22    Q.  Same thing with the painful intercourse.
23 To a reasonable degree of medical probability, you
24 are attributing that to the Align and the
25 revisions?

Page 471

1     A.  That is correct.
2     Q.  On Page 6, you mention that Ms. ███████
3  has numerous injuries which are permanent in
4  nature.  Which specific injuries are you saying are
5  permanent?
6     A.  Well, more likely than not, the pain that
7  she's suffering from, the pain with intercourse
8  that she's suffering from, the tenderness that
9  she's suffering from is going to be either
10 longstanding or permanent.
11    Q.  Just so we're clear, you're saying to a
12 reasonable degree of medical probability, the
13 painful intercourse is longstanding or permanent
14 due to the Align product?
15    A.  That is correct.
16    Q.  You're stating to a reasonable degree of
17 medical probability, the urgency and bladder
18 leakage is long term?
19    A.  Well, according to Dr. Wang's study, when
20 he explanted the entire sling, the urgency got
21 better.  So as long as the mesh is in there with a
22 subclinical infection, her urgency is going to be
23 worsened.
24    Q.  But I want to know what -- I understand we
25 asked you about general opinions yesterday.  I want

Page 472

1  your opinion specifically about this patient.
2     A.  Specifically about this patient, if her --
3  as long as her sling is in there, more likely than
4  not she's going to have urgency.  And we talked
5  about yesterday in my experience and what the
6  literature shows that even with an explant, the
7  chances of curing dyspareunia and pelvic pain is
8  very low, so less than 40 percent chance of curing
9  her pelvic pain and dyspareunia from a full
10 explant.  And that's why I say with a reasonable
11 degree of medical certainty this is going to be
12 longstanding or permanent.
13    Q.  I understand that opinion with regard to
14 the dyspareunia, but as far as the urgency and
15 bladder leakage, is it your opinion that if the
16 Align is explanted, Ms. ███████ will continue to
17 have urgency and bladder leakage?
18    A.  According to the data, and that's -- and
19 also my experience, if the mesh is excised in toto
20 from the vagina, her urgency symptoms should get
21 better.
22    Q.  And you hold that opinion to a reasonable
23 degree of medical literature?
24    A.  Based on the literature, my clinical
25 experience, yes.

Page 473

1    Q.  That is your opinion?
2    A.  That is correct.
3    Q.  Later on Page 6, it's the third paragraph
4  or second complete paragraph, but third paragraph,
5  last sentence, you state to a reasonable degree of
6  medical certainty, no cause for the dyspareunia,
7  dysuria, tenderness, persistent pain and mesh
8  erosion exists other than the polypropylene Align
9  implant and its effects.
10    A.  That is correct.
11    Q.  What did you rule out to reach that
12  conclusion?  What are the other etiologies for
13  that?
14    A.  The etiologies for dyspareunia, dysuria,
15  tenderness?  I looked at her past medical history,
16  her past surgical history, the information that was
17  generated in her deposition, which is about a six
18  hour obtaining a medical history.  During the
19  deposition, the chief complaint was obtained, the
20  history of present illness, all the things that
21  worsened the complaint, alleviated the complaint,
22  exacerbated the complaint, the location of the
23  complaint.
24       Her past medical history or past surgical
25  history was obtained, allergies.  Social history

Page 474

1  was obtained.  An economic history was obtained.
2  It was what I do in my office to a greater degree,
3  and so that's why I feel I can rely on her
4  testimony as a valid description, which is the same
5  information I would get from obtaining a medical
6  history.
7    Q.  And I may have asked you this earlier, and
8  I, quite frankly, can't recall.  Had Ms.
9  done another surgical treatment, the Burch or one
10  of the other ones you've referred to earlier, can
11  you state to a reasonable degree of medical
12  probability it would have resolved her stress
13  urinary incontinence?
14    A.  Yes.
15    Q.  And can you state to a reasonable degree
16  of medical certainty that she would not have had
17  any complications?
18    A.  No.  There's no surgery that is completely
19  devoid of complications.  We talked about that
20  yesterday.  There's a difference between the
21  complications that happen in the acute
22  postoperative period versus the long-term
23  complications that are associated with transvaginal
24  mesh products made of polypropylene.
25    Q.  Okay.  Let's take that out of the

Page 475

1  equation.  I understand infection at the surgical
2  site.  I think we -- actually, Ms.          did
3  have that complication with regard to the surgery.
4  But as far as the complications we're referring to
5  with the dyspareunia, with the urgency and the
6  stress incontinence, are you stating to a
7  reasonable degree of medical certainty had
8  Ms.          had one of these other surgeries, she
9  would not have had these complications?  That's a
10  very poor question.  Let me say that again.
11    A.  Okay.
12    Q.  Are you saying to a reasonable degree of
13  medical certainty that had Ms.          undergone
14  the Burch procedure or another one of the
15  procedures you mentioned earlier, she would not
16  have had a complication of dyspareunia or urge and
17  stress incontinence?
18    A.  She would have not had the mesh that
19  caused the dyspareunia, yes, and I've said this
20  before.  Surgical procedures can cause pain with
21  intercourse.  We know that surgical procedures can
22  cause overactive bladders.  And if you do a
23  procedure to treat or remove the Burch stitches or
24  the pubovaginal sling, there is a chance their
25  incontinence can come back.  With a reasonable

Page 476

1  degree of medical certainty from my experience from
2  the literature, the chances of her having a delayed
3  onset of dyspareunia from a tight band inside of
4  her vagina from mesh, she would not have had that
5  with a Burch procedure or with a pubovaginal sling.
6    Q.  If I understand you correctly, you
7  attribute these complications, to a reasonable
8  degree of medical certainty, to the Align, correct?
9    A.  That is correct, not from having had a
10  surgical procedure on the pelvic floor, but
11  specifically the Align product.
12    Q.  But you cannot testify to a reasonable
13  degree of medical certainty had she, Ms.
14  undergone the Burch procedure or one of these other
15  procedures, she would not have resulted in
16  dyspareunia?
17    MR. LUNDQUIST:  Object to form.  Asked and
18  answered.
19    THE WITNESS:  Again, we talked about there is
20  a --
21  BY MR. MAZZIOTTI:
22    Q.  I know we talked about it.
23    A.  -- risk of those complications,
24  dyspareunia, pain, overactive bladders from the
25  surgical procedures that we're talking about, but

Page 477

1  she would not have had the dyspareunia from a
2  tight, contracted, deformed, subclinically infected
3  mesh. So just having had a vaginal surgery, she
4  might have had that same underlying risk of having
5  dyspareunia, which is very infrequent and very
6  easy -- is not as difficult to treat as the
7  dyspareunia associated with a contracted, infected,
8  deformed piece of mesh.
9    Q. I get that part, but my -- but you can't
10 sit here today and state to a reasonable degree of
11 medical certainty --
12   A. That there is no risk?
13   Q. No. You have to let me finish.
14   A. I'm sorry.
15   Q. I don't know if that's the answer or not.
16      But as you sit here today, you can't state
17 to a reasonable degree of medical certainty had she
18 undergone the Burch procedure, she would not have
19 sustained dyspareunia?
20   MR. LUNDQUIST: Object to form.
21   THE WITNESS: You're asking me if there is no
22 risk of --
23 BY MR. MAZZIOTTI:
24   Q. No, I'm not asking you that. I'm saying
25 to a reasonable degree of medical certainty, can

Page 478

1  you say had she undergone the Burch procedure, she
2  never would have had dyspareunia?
3    MR. LUNDQUIST: Object to form.
4    THE WITNESS: So you're saying there's no risk,
5  and I've testified to the fact that there can be
6  dyspareunia from a Burch. There can be dyspareunia
7  from a pubovaginal sling, but it happens less
8  frequently, and it's easier to deal with than from
9  a vaginal mesh product.
10 BY MR. MAZZIOTTI:
11   Q. Understood. Same question about urge and
12 stress incontinence here. You can't state to a
13 reasonable degree of medical certainty that had she
14 undergone the Burch procedure -- well, strike that.
15      The way -- she could have very well have
16 had stress incontinence and urgency after the Burch
17 procedure, right?
18   A. That is correct.
19   Q. I'm sorry. That seemed to be the more
20 coherent question.
21   A. I was just waiting for you to ask a
22 coherent question.
23   Q. Well, I've asked a few today. Give me
24 some credit.
25      Does pelvic inflammatory disease cause

Page 479

1  pelvic pain?
2    A. Yes, it does, and there is actually
3  something called chronic pelvic inflammatory
4  disease. Pelvic inflammatory disease can cause
5  pain when the infection is taking place. It can
6  cause some degree of tubal damage, and that can
7  lead to swelling of the tube. It can lead to some
8  scar tissue around it. She had pelvic inflammatory
9  disease in 2003. There is no documentation in the
10 medical literature that between 2003 and the sling
11 being placed that she had dyspareunia associated
12 with that episode of pelvic inflammatory disease.
13      So I looked at that. I took that into
14 consideration when making my differential
15 diagnosis.
16   Q. You mentioned with surgeries to the pelvic
17 floor that it can result in an overactive bladder?
18   A. That is correct.
19   Q. What is the incidence with the Burch
20 procedure resulting in an overactive bladder?
21   A. De novo overactive bladders, about 10 to
22 15 percent.
23   Q. How about resulting chronic pain?
24   A. In my experience, it happens very rarely.
25   Q. Less than 10 percent?

Page 480

1    A. Yes, less than 1 percent.
2    Q. Just to confirm, you have no criticisms of
3  Dr. Katz's treatment of Ms. ███████?
4    A. That is correct.
5    Q. Do you know what informed consent Dr. Katz
6  gave Ms. ███████?
7    A. I think that is documented in the medical
8  records, and I think that was documented in her
9  deposition testimony.
10   Q. And when you say documented, what is your
11 understanding as to what Dr. Katz advised
12 Ms. ███████ as to the complications, potential
13 complications?
14   A. If you'd like for us to look at the
15 specific informed consent that was signed and their
16 testimony about what they were -- what she was
17 told, we can do that.
18   Q. But you don't have the informed consent
19 here?
20   A. It's on the disc.
21   Q. Okay. So we would have to put in the
22 disc, look at the informed consent?
23   A. That is correct.
24   Q. And I've seen it. The informed consent
25 typically for surgery you're talking about, right,

Page 481

1  the preoperative informed consent?
2  **A. That is correct.**
3  Q. What about prior to the preoperative
4  informed consent, do you know what was discussed
5  between Dr. Katz and Ms. _____?
6  **A. That was described in the depositions.**
7  **That's described in the medical records. If you**
8  **want to talk specifically about what is documented**
9  **in the depositions and the medical records, we**
10 **can -- we would need to pull that out to look at it**
11 **specifically.**
12 Q. Well, if you're referring to
13 Ms. _____ deposition, you agree as a patient,
14 she did not have a specific recollection of the
15 informed consent provided, did she?
16 **A. That is my basic understanding of what her**
17 **testimony was.**
18 Q. It very well could have been that Dr. Katz
19 advised her of these specific risks associated with
20 this procedure?
21 MR. LUNDQUIST: Object to form.
22 **THE WITNESS: What is documented in the**
23 **deposition testimony and in the medical records, I**
24 **think, speaks for itself.**
25

Page 482

1  BY MR. MAZZIOTTI:
2  Q. Yeah, but you're -- well, it -- that does
3  speak for itself, but do you know specifically
4  what -- well, when you do an informed consent,
5  certainly you do more than what's documented in a
6  preoperative informed consent?
7  **A. That is correct.**
8  Q. And being a doctor and having testified in
9  medical malpractice cases, you do agree that not
10 everything is documented in a medical record?
11 MR. LUNDQUIST: Object to form.
12 **THE WITNESS: That is correct.**
13 BY MR. MAZZIOTTI:
14 Q. I mean, they document -- I mean, they even
15 use abbreviations, correct?
16 **A. That is correct.**
17 Q. So when you say -- when you rely on what's
18 documented, you do concede there may be additional
19 information beyond what's contained in the medical
20 record?
21 MR. LUNDQUIST: Object to form.
22 **THE WITNESS: That is correct, and that's what**
23 **goes into the testimony of both the doctor, what**
24 **the doctor said that he told her about and what she**
25 **says that she was told about. So I think those**

Page 483

1  **records will be able to speak for themselves.**
2  BY MR. MAZZIOTTI:
3  Q. I want to talk a little bit now about --
4  strike that.
5  Before we get to that, as far as what you
6  had before you prepared your report, you had all
7  the documents that you've listed in -- I think it's
8  Exhibit B or C, whatever, the documents relied on.
9  **A. Before the report was finalized, yes.**
10 Q. Okay. Let's talk about your opinions as
11 to the types of future surgeries and other things
12 you've mentioned.
13 **A. Yes.**
14 Q. I think that gets us to Page 7 and the
15 second to last paragraph.
16 **A. Yes.**
17 Q. You mention that Ms. _____ --
18 Mrs. _____ may need surgery to remove the Align
19 as well as the -- well, let's leave it there.
20 Mrs. _____ may need surgery to remove
21 the Align. Can you state to a reasonable degree of
22 probability whether or not Ms. _____ will need
23 the Align removed?
24 **A. I could say to a reasonable degree of**
25 **medical certainty that if her symptoms do not**

Page 484

1  **improve with conservative therapy, she will need**
2  **the Align removed.**
3  Q. But as we sit here, you can't state to a
4  reasonable degree of medical certainty whether
5  the -- whether other recommendations -- never mind.
6  Strike that.
7  There was an if there. You cannot state
8  to a reasonable degree of medical probability or
9  certainty that her symptoms will not improve?
10 **A. With therapy?**
11 Q. With therapy.
12 **A. I can tell you with a reasonable degree of**
13 **medical certainty that her symptoms are not going**
14 **to improve if nothing is done, okay?**
15 Q. Okay. That's a good start. Good point.
16 So without -- so without therapy, to a
17 reasonable degree of medical certainty, her
18 symptoms will not improve?
19 **A. That is correct.**
20 Q. What therapy are you referring to?
21 **A. When the -- when I treat a patient such as**
22 **this that has pain, dyspareunia from a transvaginal**
23 **mesh product, I start with therapy such as**
24 **intravaginal Valium suppositories. I use pain**
25 **modalities such as Neurontin, Cymbalta, trigger**

Page 485

1  point injections and nerve blocks, Botox
2  injections, physical therapy, biofeedback therapy.
3  And then if those are not successful in alleviating
4  their complaints, then an explant would be
5  indicated.
6       I think we might have talked about this
7  yesterday.  I think that explants -- primary
8  surgery for explants are to deal with erosions that
9  are not -- either deemed too large to be treated
10  conservatively or fail conservative therapy,
11  obstructive voiding and infection.
12     Q.  So I guess as a preliminary matter, you're
13  not stating to a reasonable degree of medical
14  certainty Mrs. ███████ will require future
15  surgery?
16     A.  That's why I think I used the term may.
17     Q.  And that's why I focused on may.
18     A.  Yes.
19     Q.  These therapies that you just discussed,
20  many of those therapies are the same ones we
21  discussed yesterday that you use as a first line of
22  treating stress urinary incontinence, right?
23     A.  No, treating complications from mesh
24  products.
25     Q.  Okay.  Which is different, right?

Page 486

1     A.  That is correct.
2     Q.  Okay.
3     A.  I mean, biofeedback, physical therapy can
4  be used to treat stress urinary incontinence, but
5  you're -- there's a different kind of biofeedback,
6  you do a different kind physical therapy than you
7  do for dyspareunia, pelvic pain, vaginal
8  contraction from mesh products.
9     Q.  And you're saying Mrs. ███████ needs one
10  of these therapies?
11     A.  One or a combination of them.
12     Q.  Do you know which one or which
13  combination?
14     A.  Well, I told you what -- I think that
15  physical therapy is -- I recommend physical therapy
16  for just about every patient that has mesh
17  complications.
18     Q.  For how long?
19     A.  Well, normally a patient has a 10-week
20  course of physical therapy.  If their symptoms have
21  resolved with that 10-week course of physical
22  therapy, then we wait to see if their symptoms
23  recur, and they might need to start physical
24  therapy again.  If they've had no improvement in
25  their symptoms, then we would move on to a

Page 487

1  different modality.  If they've had some
2  improvement, we would continue physical therapy for
3  longer.  And I should say I.  It's just a habit
4  doctors have as saying we.  I would continue the
5  physical therapy for a longer term.  I have
6  patients that have been doing physical therapy
7  weekly, twice weekly for years.
8       The next -- at the same time, I would
9  start the patient on a Valium suppository.  Valium
10  is a muscle relaxant and a nerve modulator used
11  inside the vagina.  It works very well for pelvic
12  pain and dyspareunia.  If that doesn't work, then
13  trigger point injections and nerve blocks.  If
14  there's a significant degree of pelvic floor muscle
15  spasm, Botox would become on option and finally
16  explant surgery.
17     Q.  And I think you said the continuum of care
18  you referred to prior to surgery, you recommend
19  anywhere from six months to five years?
20     A.  The continuum of care prior to surgery?
21     MR. LUNDQUIST:  Object to form.
22  BY MR. MAZZIOTTI:
23     Q.  Look at the bottom of Page 7 going into
24  Page 8, and take a second to read that.  That's
25  where I am.  And if you need to --

Page 488

1     A.  Well, I see prior to doing an explant
2  surgery.
3     Q.  Correct.
4     A.  Yes.
5     Q.  As far as where in this continuum of six
6  months to five years, that's patient specific?
7     A.  That is correct.
8     Q.  For example, you can't state for
9  Mrs. ███████ eight months will do it?
10     A.  That is correct.
11     Q.  Now, how much does it cost to do this
12  continuum of care?
13     A.  I think physical therapy is about $100 a
14  week.  Obviously, insurance, you know, various
15  insurances might pay a prorated rate for that.  One
16  month of Valium suppositories is $30, at least the
17  compounding pharmacy that we use.  Biofeedback, we
18  usually charge on a weekly basis between 75 and
19  $125 a week plus a $75 charge for the biofeedback
20  probe.  An outpatient surgery, I do my trigger
21  point injections, pudendal nerve blocks, Botox on
22  an outpatient basis.  The average outpatient cost
23  is between 5 and $10,000.
24       A sling explant can be done as an
25  outpatient, and so that would be closer to -- nerve

Page 489

1 blocks, trigger point injections are closer to like
2 the $5,000 range. Explants are probably closer to
3 the $10,000 range because it's a longer surgical
4 procedure, more anesthetic, more operating time.
5    Q. Let me stop you there. You only do the
6 explant if these other procedures don't work?
7    A. That is correct. I was just giving you,
8 you know, the whole gamut. Now, when we talk about
9 POP mesh, those are usually more extensive
10 procedures, probably need a one or two-night stay
11 in the hospital, so that would increase those costs
12 up to about the $15,000 range to $20,000 range.
13    Q. And what specifically Mrs. ████
14 needs, we -- what specifically Mrs. ████
15 needs, you can't state to a reasonable degree of
16 medical probability?
17    MR. LUNDQUIST: Object to form.
18    THE WITNESS: Well, what she specifically --
19 she definitely needs therapy because she's
20 continuing to have symptoms. You know, I would say
21 that that -- I gave you my treatment modalities.
22 Someone who examines her might say that she needs
23 an explant right now. I would not argue with that
24 if that was their impression. You know, I told you
25 how I would treat the patient. I would say with a

Page 490

1 reasonable degree of medical certainty, she needs
2 treatment.
3 BY MR. MAZZIOTTI:
4    Q. Right. I understand that part, but as far
5 as which of these treatments --
6    A. Are going to be effective for her?
7    Q. Correct.
8    A. That I can't say.
9    Q. And as far as how long, you can't say?
10    A. That is correct.
11    Q. Where does the six-month, five-year
12 continuum -- what's that based on?
13    A. That's based on my clinical experience
14 having dealt with these patients for close to
15 10 years now, maybe even over 10 years now and the
16 literature that I told you before about even with a
17 full explant that there is a poor resolution rate
18 from resolution of their pelvic pain and
19 dyspareunia so that it will be a longer-term
20 therapy than just a seven-day course of antibiotics
21 to treat a urinary tract infection.
22    Q. I'm just about finished here with
23 Mrs. ████
24       As far as your recommendations for Mr. and
25 Mrs. ████ regarding couples therapy, we talked

Page 491

1 about your opinions generally. Where do you get
2 the range at least one year and possibly five years
3 with bimonthly sessions?
4    A. Well, that is my clinical experience
5 seeing patients that have gone to therapy, that the
6 best way to get a long-term result from couples
7 therapy is about a year duration. It probably
8 takes about that long to explore all the
9 intricacies of what's leading to the problem.
10    Q. And this is one of those situations where
11 you would refer the patient out?
12    A. That is correct.
13    Q. And as far as whether it's one year or
14 five years, you would defer to whatever therapist
15 they would see as to how often and how long?
16    A. That is correct.
17    Q. Real quickly, you said there's very few
18 cities in the country that have facilities to
19 complete these surgeries. What cities are capable
20 of having an explant?
21    MR. LUNDQUIST: Object to form.
22    THE WITNESS: Well, we talked about there are
23 now pelvic floor mesh centers that are being
24 established, one in Kansas. You know, there are --
25 when I go through particularly with an obturator

Page 492

1 sling, I have patients that come from around the
2 country for me to do pelvic floor mesh explants and
3 sling explants. We talked yesterday or maybe today
4 about trying to get the arms out from Avaulta --
5 BY MR. MAZZIOTTI:
6    Q. I just want to know the cities. The
7 reason why I'm interrupting is because I'm sure the
8 videographer is about to jump up.
9    MR. LUNDQUIST: Form.
10    THE WITNESS: Well, there are various places
11 that have different approaches. UCLA does the
12 groin approach to get mesh out of the groin.
13 There's a center in Arizona that is probably at
14 best at robotic removal. There's the Kansas
15 center, Mayo.
16 BY MR. MAZZIOTTI:
17    Q. How about Rush?
18    A. I would add my center in there. You know,
19 there's a center in New York. Dr. Blaivas has a
20 tremendous amount of experience dealing with these
21 complications. So those are, you know, the general
22 ones that come to mind.
23    MR. MAZZIOTTI: Okay. Thank you.
24    THE VIDEOGRAPHER: This marks the end of
25 Tape 1. The time is 11:47 a.m. We are off the

Page 493

1  record.
2          (Whereupon, a short break was
3       taken.)
4     THE VIDEOGRAPHER:  This marks the beginning of
5  Tape 2.  The time is 11:59 a.m.  We are on the
6  record.
7  BY MR. MAZZIOTTI:
8     Q.  Okay.  Doctor, yesterday you mentioned
9  that sometimes there's complications related to an
10  implant where there's nerve injury or damage due to
11  the way it's implanted?
12     **A.  That is correct, yes.  You can actually --**
13  **there's a couple of studies, particularly in**
14  **obturator slings, that if the legs are not in the**
15  **right flexion that you can actually hit the**
16  **obturator nerve, mostly the posterior branch of the**
17  **obturator nerve.**
18     Q.  In Mrs. ███████ case, does she have
19  any type of nerve damage or nerve injury?
20     **A.  During implantation, no, but we did talk**
21  **about neo-innervation injury yesterday where nerves**
22  **grow through the mesh or around the mesh causing**
23  **neuromas, and that, I think, is a reasonable**
24  **explanation for her dyspareunia.**
25     Q.  Do you -- because that was something I

Page 494

1  mentioned earlier.  Her dyspareunia, to a
2  reasonable degree of medical probability, is that
3  the cause of her dyspareunia?
4     **A.  You said her dyspareunia is the cause of**
5  **her dyspareunia.**
6     Q.  Because here I'm confused.  That's how we
7  got into the conversation about, I think,
8  tightness, and you said that was -- and I may just
9  be wrong, but my question is simply this.  To a
10  reasonable degree of medical probability, what is
11  the cause of her dyspareunia?
12     MR. LUNDQUIST:  Object to form.
13     **THE WITNESS:  Currently or prior to the**
14  **revision?**
15  BY MR. MAZZIOTTI:
16     Q.  Let's go in chronological order.  Prior to
17  the revision.
18     **A.  There was mesh contraction, mesh**
19  **deformation and a subclinical infection.  Once the**
20  **mesh was cut, now we have the chronic irritation**
21  **from the chronic foreign body reaction leading to**
22  **irritation of nerves that are growing in or through**
23  **the mesh and neuromas.**
24     Q.  Have you -- like in a situation like
25  Mrs. ███████ have you actually gone in and

Page 495

1  removed the mesh?
2     **A.  Yes.**
3     Q.  Generally speaking, what is the recovery
4  period for the patient?
5     **A.  In respect to when, you know --**
6     Q.  How long they would be hospitalized.
7     **A.  A sling explant in the general sense if I**
8  **do it vaginally is an outpatient procedure.  If I**
9  **need to do it retropubically open, it's a one or**
10  **two-day hospital stay.  Again, if it's just the**
11  **vaginal excision, they'll probably be back to most**
12  **normal activities in two weeks.  Obviously, sexual**
13  **intercourse would -- there would be a longer time**
14  **for that.  With an open procedure, it would**
15  **probably take four to six weeks for normal**
16  **recovery.**
17     Q.  You said a lot there.  And this does apply
18  to all of them, and so let's just go ahead and
19  tackle it now.
20          Do you have an opinion with regard to
21  Mrs. ███████ if the nonsurgical therapies are
22  unsuccessful and she has to go through some type of
23  surgery to remove the mesh, do you know what
24  approach you would use?
25     **A.  For her, I would choose a vaginal**

Page 496

1  **approach.**
2     Q.  And was that the one with the one to
3  two-day hospital stay?
4     **A.  No.  That would be an outpatient**
5  **procedure.**
6     Q.  And would it be two weeks until she's back
7  to her normal routine?
8     **A.  That is correct except for sexual**
9  **intercourse.**
10     Q.  And how long until then?
11     **A.  I usually ask them to avoid sexual**
12  **intercourse for at least six weeks.**
13     Q.  In your experience, after the mesh is
14  removed, is there any remaining dyspareunia?
15     **A.  I think we talked about that before that**
16  **in my experience with pain and dyspareunia, a full**
17  **explant has a 40 percent chance of curing pain and**
18  **about a 40 percent of diminishing pain.**
19     Q.  And as far as the stress urinary
20  incontinence, that still remains as an issue that
21  needs to be addressed, correct?
22     **A.  Well, the data on explants, if you simply**
23  **cut the sling, about 10 to 20 percent of patients**
24  **will develop stress urinary incontinence.  If you**
25  **explant the sling, it's about 40 to 60 percent.**

Page 497

1  And in her case, yes, that would need to be
2  addressed. You know, there's a chance that
3  biofeedback could be helpful, stimulation,
4  medications, pelvic floor exercise, periurethral
5  injections or the more invasive procedures.
6      Q. If the nonsurgical procedures or therapies
7  don't work, what would you recommend she do after
8  explant?
9      A. To treat her stress urinary incontinence
10  specifically?
11      Q. Correct.
12      A. In her case, it would be based on her
13  urodynamic study. If she has a significant element
14  of intrinsic sphincter deficiency and a poorly
15  functioning urethra, she might be a candidate for a
16  salvage operation like my pubovaginal sling. If
17  she just had a recurrence of her stress
18  incontinence, a Burch or a -- the typical
19  pubovaginal sling would be an option.
20      Q. Have you ruled out her smoking as a
21  contributor to her current complications?
22      A. Her pelvic pain?
23      Q. Yes.
24      A. Yes. As a contributor to her stress
25  urinary incontinence, we talked about that

Page 498

1  yesterday, what effects smoking can have on stress
2  urinary incontinence. There is poor data about
3  smoking as a bladder irritant leading to frequency
4  and urgency. Yes, smokers have a higher incidence
5  of bladder cancer, but is nicotine a bladder
6  irritant, I would say that there's a possibility
7  that it could be a bladder irritant.
8      Q. Atrophic vaginitis, can that cause pelvic
9  pain?
10      A. Yes. Atrophic vaginitis can cause vaginal
11  discomfort and dyspareunia; pelvic pain, not
12  necessarily. However, it doesn't cause a firm band
13  like what Ms. ███████ had prior to her revision
14  surgery.
15      Q. So in her case, you've ruled it out?
16      A. That is correct.
17      Q. Rheumatoid arthritis?
18      A. Obviously, we know from what we talked
19  about yesterday, Dr. Windhagen's paper that
20  patients that have a pain disorder, and rheumatoid
21  arthritis would be a pain disorder before mesh
22  implant, would have a greater chance of pain after mesh
23  implant, but as a direct contributor of her
24  symptomology, no. I've ruled it out.
25      Q. The last thing, how about obesity?

Page 499

1      A. We talked about obesity and stress urinary
2  incontinence. There is some data to suggest that
3  weight loss can improve urge symptoms. As a
4  causative agent in her current stress incontinence
5  and her current urge incontinence and her current
6  dyspareunia, I would say you would have to see a
7  significant weight gain for that be a contributing
8  factor, and I haven't seen that documented in the
9  records.
10      Q. I didn't see any reference in your report
11  about her potentially developing cancer, right? Is
12  that in there?
13      A. No. That is in my general causation
14  report.
15      Q. Specifically as it relates to
16  Mrs. ███████ you're not here to say to a
17  reasonable degree of medical certainty that because
18  of the Bard Align, Mrs. ███████ will develop a
19  form of cancer?
20      A. I testified yesterday to the fact that
21  there's an association. We don't have a causative
22  relationship yet.
23      Q. And that's why I qualified it with
24  reasonable degree of medical probability. You
25  agree that's stronger than an association?

Page 500

1      A. That is correct.
2      Q. So while there may be an association,
3  you're not here to testify today that the Align
4  product to a reasonable degree of medical
5  probability will cause Mrs. ███████ to have
6  cancer?
7      A. I've said that there's an association.
8      Q. But I'm not asking about an association.
9      A. And I would agree with you. I'm not going
10  to testify to a reasonable degree of medical
11  certainty that Mrs. ███████ will develop cancer
12  from her Align sling product.
13      Q. Have we talked about all of your opinions
14  as it relates to Mrs. ███████ and the
15  complication she has sustained with her Align
16  product?
17      A. That is correct. I'd just like to add one
18  piece of literature regarding surgical correction
19  for sling complications. When you look at the
20  Abbott study, on average, patients needed one to
21  two surgical procedures to treat sling
22  complications, and for pelvic floor mesh, it was
23  about two to three. The range was much bigger.
24      So I will kind of go back to that when we
25  talk about the need for surgery as we go through

Page 501

1  more reports.  I just wanted to kind of put that
2  piece of medical literature out there.
3      Q.  And the only other thing I suspect to the
4  extent new medical records come out, additional
5  depositions come out, you'll review those?
6      A.  That is correct.
7      Q.  Is there anything you're thinking of in
8  your head about Mrs. ▓▓▓▓▓ and your opinions
9  specifically related to her that we have not
10  discussed?
11      A.  No, sir.
12      Q.  Let's switch gears and now go to Mrs.
13  ▓▓▓▓ and we're going to mark --
14      THE VIDEOGRAPHER:  We're off the record at
15  12:10 p.m.
16              (Whereupon, a short break was
17              taken.)
18      THE VIDEOGRAPHER:  We are back on the record at
19  12:11 p.m.
20              (Whereupon, ROSENZWEIG
21              Deposition Exhibit Nos. 10 and
22              11 were marked for
23              identification.)
24  BY MR. MAZZIOTTI:
25      Q.  Doctor, we have now provided to you what

Page 502

1  we've marked as Exhibit No. 10, which is your
2  highlighted report for Mrs. ▓▓▓▓▓ and then
3  also as Exhibit 11 is your full report including
4  attachments to your Rule 26 report.
5      A.  That is correct.
6      Q.  Just do me a favor.  Look at Exhibit 11.
7  Make sure that's exactly or that is your full
8  report.
9      A.  That is correct.
10      Q.  Let's go through specifically
11  Mrs. ▓▓▓▓▓ Roman Numeral II, her medical
12  history.  What did you find significant for her?
13      A.  She's a 29-year-old.  She had three
14  vaginal deliveries.  She had an obturator sling
15  placed in 2009, at the same time a
16  laparoscopic-assisted vaginal hysterectomy with
17  bilateral removal of her tubes, and her right ovary
18  was removed at the same time.  Her medical history
19  was remarkable for fibromyalgia, pelvic adhesions,
20  ovarian cyst.  She stated that she had a prior
21  history of pelvic pain, dysmenorrhea, which is pain
22  with a period, and stress urinary incontinence.
23      Q.  Fibromyalgia, do you know what that is?
24      A.  Yes, sir.
25      Q.  Does that have an impact on pelvic pain?

Page 503

1      A.  In my experience, most patients that have
2  fibromyalgia have muscle pain and extremity pain in
3  the lower extremities and their arms, not in their
4  core.
5      Q.  Did you do the same differential diagnosis
6  to rule out other causes of Mrs. ▓▓▓▓▓
7  complications?
8      A.  That is correct, including ruling out
9  endometriosis as a possible cause of her symptoms
10  and also pelvic floor adhesions and ovarian cysts
11  as a cause of her current symptoms.
12      Q.  What were the indications that you saw in
13  the records for her to have the Align implant?
14      A.  It is described that she had stress
15  urinary incontinence.
16      Q.  Was this impacting her life?
17      MR. LUNDQUIST:  Object to form.
18      THE WITNESS:  That, I think, was discussed in
19  her deposition, and I will let her deposition
20  testimony stand for itself.
21  BY MR. MAZZIOTTI:
22      Q.  And similarly, you're not saying -- you're
23  not opining whether or not she was an appropriate
24  surgical candidate?
25      A.  That is correct.

Page 504

1      Q.  Okay.  Let's go through her history then.
2  Let's go through after her implant.  What was her
3  course after the implant?  Were there
4  complications?
5      A.  Well, on the second or the first
6  postoperative day, she had difficulty urinating.  A
7  catheter was reinserted.  She was able to urinate
8  on her second postoperative day.  In ▓▓▓▓ of
9  2010, approximately one month after her surgery,
10  she was seen, and she denied any pain or
11  incontinent symptoms.
12      On ▓▓▓▓ 2011, she presented to the
13  implanting surgeon, Dr. Blackmon, who -- at which
14  time she complained of voiding dysfunction, pelvic
15  pain, dyspareunia or pain with intercourse and
16  dysuria.  She stated that by this point, the pain
17  was constant.
18      Q.  And do you know Dr. Blackmon?
19      A.  No.
20      Q.  Dr. Blackmon later did a sling revision,
21  right?
22      A.  That is correct.
23      Q.  And according to Dr. Blackmon, he did a
24  sling revision because the left side of the sling
25  seemed tight?

Page 505

1    A.  That is correct or urethral band syndrome.
2    Q.  And he released that tension?
3    A.  That is correct.
4    Q.  Do you have an opinion as to why the sling
5    was tight?
6    A.  Yes.  As we talked about before, with a
7    reasonable degree of medical certainty, there was
8    mesh shrinkage and contraction and deformation.
9    Q.  And not -- in other words, it was not
10   implanted too tight?
11   A.  Reviewing the operative report and
12   deposition testimony that was supplied later on,
13   there was no evidence that the mesh or the sling
14   was placed in a manner other than that as described
15   as standard practice.
16   Q.  Specifically you're relying on the medical
17   records for that opinion?
18   A.  The operative report, yes.
19   Q.  In _____ of 2011, Mrs. _____ goes to see
20   Dr. Lira?
21   A.  That is -- she went to see Dr. Lira for an
22   attempted revision of the sling.  The sling could
23   not be located, but there were -- there was an
24   anterior repair that was done as a, quote, unquote,
25   native tissue repair, and then adhesions were taken

Page 506

1    care of under general anesthesia.
2    Q.  And had adhesions, they -- adhesions cause
3    pelvic pain?
4    A.  That is correct, but you would expect that
5    the pelvic pain to go away after the adhesions were
6    taken care of.
7    Q.  Mrs. _____ also had a diagnosed
8    second-degree cystocele?
9    A.  That is correct.
10   Q.  Do you consider that a more severe
11   cystocele, or is that in the moderate category?
12   Where does that fall?
13   A.  I would consider that to be more moderate.
14   There are probably 40 percent of women with a
15   second-degree cystocele that are asymptomatic.
16   That comes from a Scandinavian study that looked at
17   women that present to a general gynecologist
18   office.  70 percent of women who are postmenopausal
19   have a first-degree prolapse, and approximately
20   40 percent have a second-degree prolapse and are
21   asymptomatic.
22   Q.  Can I see your exhibit just to see the
23   highlighted portion?
24   A.  Sure.
25   Q.  The ongoing complications that Mrs. _____

Page 507

1    was experiencing, is it your opinion to a
2    reasonable degree of medical certainty those were
3    related to the Align?
4    MR. LUNDQUIST:  Can he --
5    BY MR. MAZZIOTTI:
6    Q.  I'm happy to do that.  Take a look at
7    that.
8    A.  Thank you, sir.  So Mrs. _____ continues
9    to have discomfort and pain in her lower abdomen,
10   groin and vagina.  She says that she always feels
11   like she's having a Charlie horse in her vagina.
12   She cannot put weight on her right leg.  There's
13   frequent sharp pains that are almost like someone
14   is sticking a dagger in her vagina and twisting it.
15   It doubles her over.  She can't get up, and the
16   pain radiates from her vagina down her leg, and
17   she's having dyspareunia.
18   Q.  And you relate those, to a reasonable
19   degree of medical probability, to the Align?
20   A.  That is correct.
21   Q.  Similar questions with regard to the
22   informed consent.  Do you believe Mrs. _____ had
23   appropriate informed consent or -- well, let me
24   start with Dr. Blackmon.  Strike that.
25   With Dr. Blackmon, do you think he had

Page 508

1    enough information to relay to Mrs. _____?
2    A.  Dr. Blackmon was asked what he did or did
3    not know during his deposition, and I think that
4    his deposition speaks for itself.  Some of the
5    complications that he did not know were associated
6    with an Align sling.
7    Q.  I take it that because of his testimony,
8    you believe that Mrs. _____ did not have all of
9    the pertinent information in order to make a
10   decision on the implant?
11   A.  Dr. Blackmon -- there was a variety of
12   things that Dr. Blackmon testified to that he did
13   not know and, therefore, could not impart that
14   information on to Ms. _____ and therefore, she
15   had -- did not have complete information in order
16   to make an informed consent.
17   Q.  In your reading of Dr. Blackmon's
18   deposition, did he or did Dr. Blackmon testify
19   whether or not he still would have gone forward
20   with the Align implant?
21   A.  If you would like to show me that exact
22   portion of the deposition so I could testify to
23   that with certainty, I would appreciate that.
24   Q.  I do not unfortunately have it here seeing
25   that I traveled.  Do you have any recollection one

Page 509

1  way or the other?
2      **A.  Not specifically, no, but again, I will**
3  **let his deposition testimony speak for itself.**
4      Q.  Whatever he said, the record reflects?
5      **A.  That is correct.**
6      Q.  What does Mrs. ▓▓▓ currently suffer
7  from as far as complications that you relate to
8  vaginal mesh?
9      **A.  Well, she has dyspareunia and groin pain,**
10  **groin pain that radiates down her leg.  This is a**
11  **complication that is associated with not only the**
12  **transobturator mesh inside the vagina, but also**
13  **transobturator mesh in the obturator area.  We**
14  **discussed yesterday that the obturator sling goes**
15  **through four, if not five, muscle groups.  That**
16  **causes groin pain and leg pain.**
17      **We also talked about that the mesh can be**
18  **placed very close to the obturator nerve, and that**
19  **nerve can -- that nerve does innervate the inner**
20  **thigh and women can, with obturator nerve**
21  **irritation, have pain radiating down their leg.**
22      Q.  Is there any indication of obturator nerve
23  injury with Mrs. ▓▓▓
24      **A.  I didn't say that her obturator nerve was**
25  **injured.  I said her obturator nerve was irritated.**

Page 510

1      Q.  Is there any indication other than the
2  groin pain that you attribute to the obturator
3  nerve being irritated?  Is there anything else that
4  you would say is --
5      **A.  The groin pain can be either due to**
6  **obturator nerve irritation or the mesh through the**
7  **muscle groups that we talked about.  Pain radiating**
8  **down the leg is a sign of obturator nerve**
9  **irritation, yes.**
10      Q.  Could it also be a sign of fibromyalgia?
11      **A.  Yes, that could be a sign of fibromyalgia,**
12  **but you don't see groin pain and dyspareunia, as I**
13  **testified to before, specifically with**
14  **fibromyalgia.**
15      Q.  Can you have dyspareunia with --
16      **A.  And also --**
17      Q.  I'm sorry.  Go ahead.
18      **A.  Usually fibromyalgia, with a reasonable**
19  **degree of medical certainty from treating patients**
20  **with fibromyalgia, it's usually not unilateral.**
21  **It's usually bilateral.**
22      Q.  Which means both sides of the body?
23      **A.  That is correct.**
24      Q.  Does it impact, you know, the arms or the
25  legs when you say both sides of the body?

Page 511

1      **A.  That is correct.**
2      Q.  For example, is it like the left leg and
3  the right arm or the left leg and the right leg?
4      **A.  It would be -- it's more generalized.**
5  **It's not -- while a minority of patients that have**
6  **fibromyalgia might have a specific location of**
7  **their fibromyalgia, fibromyalgia is a generalized**
8  **overfiring of the nerves of the body, so you have**
9  **more of a generalized pain and discomfort, not in a**
10  **specific location.  That's the methodology that I**
11  **used to rule out fibromyalgia as a cause of her**
12  **groin pain, leg pain and pain in her one leg, her**
13  **right leg.**
14      Q.  You mentioned that you've treated patients
15  with fibromyalgia?
16      **A.  That is correct.**
17      Q.  How frequently do you do that?
18      **A.  Well, I have patients in my practice that**
19  **have fibromyalgia.  I might not specifically be the**
20  **treating doctor, but I review their fibromyalgia**
21  **symptoms.**
22      Q.  You factor in fibromyalgia on what medical
23  care you're going to provide?
24      **A.  That is correct.**
25      Q.  As far as who's directly treating the

Page 512

1  fibromyalgia, that's another doctor?
2      **A.  That is correct.**
3      Q.  As far as who is prescribing any
4  medication for the fibromyalgia, that's another
5  doctor?
6      **A.  In the vast majority of cases, yes.**
7      Q.  What would be the exception to that rule?
8      **A.  A patient who is in between doctors and**
9  **they need continuing care for their fibromyalgia.**
10      Q.   Going to your opinions under Roman Numeral
11  No. III, it is the -- on Page 5, the last
12  paragraph.  It says the majority of her
13  post-implant medical course are a direct result of
14  implanting the Align device.  What do you mean by
15  the majority of the post-implant medical course?
16      **A.  Well, she comes in on -- in ▓▓▓ of 2011**
17  **with complaints of voiding dysfunction, pelvic**
18  **pain, dysuria and dyspareunia.  She has a sling**
19  **revision on ▓▓ ▓▓ 2011.  In ▓▓▓ of 2011, she**
20  **presents to Dr. Lira with similar complaints that**
21  **she's having that she was having before with pain,**
22  **pain with urination, pain with intercourse.**
23      **Dr. Lira tries to do another explant**
24  **operation, and what we see again is that her -- as**
25  **outlined in my report, there are frequent visits**

Page 513

1 with doctors regarding the same pain that she's
2 experiencing. She then has another explant
3 operation in [REDACTED] of 2012 to do a partial
4 explant of the midurethral sling.
5 At that point, the urethra was noted to be
6 hypersuspended, which means that the mesh
7 contracted. There was banding, which means that
8 the mesh deformed. It had migrated proximally
9 towards the bladder neck, and there was chronic
10 inflammation which we talked about yesterday and
11 reactive fibrosis, which is another sign of the
12 chronic foreign body reaction.
13 On [REDACTED] 2012, she has persistent pain
14 and levator tenderness. We discussed how the sling
15 through the obturator muscles will cause levator
16 tenderness as a trigger point. When that trigger
17 point is hit, it will start to, like a wave, emit
18 out from that point to cause pain. So that's what
19 I was talking about.
20 Q. Okay. Going to Page 6, similar to what
21 you testified to with Mrs. [REDACTED] you ruled out
22 any physician error for Mrs. [REDACTED].
23 A. That is correct.
24 Q. No criticisms of Mrs. [REDACTED] surgeons or
25 treating physicians?

Page 514

1 A. That is correct.
2 Q. Going to the last paragraph on Page 6, all
3 the symptoms listed below, that's what you
4 attribute to a reasonable degree of medical
5 probability to the Align?
6 A. That is correct.
7 Q. And specifically, the polypropylene in the
8 Align implant?
9 A. That is correct, and also the
10 polypropylene going through muscles and being next
11 to nerves.
12 Q. And you ruled out as a contributing factor
13 her history of smoking?
14 A. That is correct.
15 Q. Her history of bladder infections and
16 ovarian cysts?
17 A. That is correct.
18 Q. Obesity?
19 A. That is correct.
20 Q. How did you rule out the history of
21 bladder infections and ovarian cysts as a
22 contributor to her current pain?
23 A. Well, ovarian cysts would cause episodic
24 pain. Ovarian cysts don't stay there. They come
25 and go. You know, she was 29 years old when she

Page 515

1 had her hysterectomy, so she's still going to have
2 ovarian function until the average age of menopause
3 in the United States is 51.4 years of age. So
4 she's going to continue to make cysts on and off.
5 Cysts can cause episodic pain. It's not going to
6 cause continuous unremitting pain.
7 The same thing with urinary tract
8 infections. Urinary tract infections are going to
9 cause pain while the patient has acute cystitis. I
10 didn't see any evidence that she had a chronic
11 cystitis, and that's the same reason why I ruled
12 out endometriosis. She had her uterus removed,
13 which retrograde menstruation from the uterus
14 through the tubes into the peritoneal cavity is the
15 most likely cause of endometriosis. There are some
16 other rare explanations for endometriosis such as
17 lymphatic spread and changing of the coelomic
18 epithelium, which is the embryologic origin of the
19 peritoneum, so it just spontaneously creates
20 endometriosis, but the vast majority is retrograde
21 menstruation.
22 So her hysterectomy should have solved the
23 new endometriosis. Plus, endometriosis pain is not
24 described as a muscle cramping. Charlie horse
25 symptoms is a symptom of a muscle cramping. That's

Page 516

1 more from a levator/obturator muscle cramping from
2 mesh going through muscle. So her deposition
3 testimony, what I've seen in the medical records
4 helped me rule out that endometriosis was a cause
5 of her current conditions.
6 Q. How about, again, fibromyalgia, is that
7 episodic?
8 A. Yes, fibromyalgia is episodic. Though, in
9 some patients it can be more of a continuous pain,
10 but one of the things that is -- I've seen with
11 fibromyalgia is that you have ebbs and flows in
12 symptomatology associated with it.
13 Q. In Mrs. [REDACTED] case, did you have any
14 medical records regarding her fibromyalgia and what
15 her symptoms were?
16 A. I know that was in the medical records. I
17 can't recall exactly what she was complaining of
18 with her fibromyalgia. If you would like to show
19 me one of the medical records with a visit
20 specifically regarding her fibromyalgia, then we
21 can talk about it specifically.
22 Q. Well, do you have those records? Did you
23 have access to those records?
24 A. I -- more likely than not, yes.
25 Q. And you believe you reviewed them?

Page 517

1    A.  That is correct.
2    Q.  Going to page 7 at the bottom, same
3  questions about the future of Mrs. ████ and
4  surgery and so forth.  I assume, based on our
5  earlier discussion, your opinion is that to a
6  reasonable degree of medical certainty, Mrs. ████
7  will need surgery without therapy?
8    **A.  Yes.  She's already had two explant**
9  **operations.  She continues to have pain, and she is**
10  **now developing symptomatology of mesh in the**
11  **obturator space.  And so with a reasonable degree**
12  **of medical certainty, the way to alleviate that**
13  **pain is by taking the mesh out of her inner thigh.**
14    Q.  Would you -- do you make recommendations
15  that she should go a nonsurgical route first, or do
16  you believe she needs to go ahead with surgery?
17    **A.  I -- my practice is to always try the**
18  **nonsurgical management first.  I don't think that**
19  **we will be -- it's very difficult to do a nerve**
20  **block of the obturator nerve, and so therefore, I**
21  **think that a lot of the typical therapies we would**
22  **use for vaginal pain, dyspareunia would not be as**
23  **effective for obturator repair of pain.**
24    Q.  And what I'm focused on is when you say
25  Mrs. ████ may need surgery to remove the rest of

Page 518

1  the Align, and again focusing on may, are you
2  saying --
3    **A.  In her case, I would say it's more likely**
4  **than not that she will need surgery to remove the**
5  **mesh from her right inner thigh.**
6    Q.  And you hold that opinion to a reasonable
7  degree of medical certainty?
8    **A.  That is correct.**
9    Q.  You further state in that same paragraph
10  there's a possibility of additional vaginal
11  surgeries for persistent pelvic pain?
12    **A.  And that would be to take the mesh out of**
13  **the insertion point through the obturator internus**
14  **muscle.**
15    Q.  Are you saying more likely than not to a
16  reasonable degree of medical probability that will
17  be required?
18    **A.  As I stated, you know, before that it's**
19  **very difficult to treat permanently mesh that's in**
20  **muscle conservatively.  If you have a trigger point**
21  **where the mesh is going through the muscle, as long**
22  **as that mesh is in the muscle, it's going to**
23  **continue to cause pain.  The symptomatic treatment**
24  **that we can try might be helpful, but to give a**
25  **more permanent and more complete relief, than that**

Page 519

1  mesh has to be taken out of the muscle.  So yes, I
2  **think she will need a vaginal surgery to remove**
3  **mesh from the obturator muscle.**
4    Q.  And you hold that opinion to a reasonable
5  degree of medical certainty?
6    **A.  That is correct.**
7    Q.  You state further will likely continue to
8  suffer other injuries associated with the original
9  implantation of the device.  What are you referring
10  to when you say other injuries?
11    **A.  Well, the mesh is going to continue to**
12  **degrade, contract, have a chronic inflammation,**
13  **chronic foreign body reaction, and it might**
14  **continue to deform, so therefore, it can continue**
15  **to cause pelvic floor pain, continue to cause**
16  **irritation.  She might start developing obturator**
17  **nerve irritation on the other side where the mesh**
18  **is close to the obturator nerve.**
19    Q.  And when you say may, at least as to these
20  additional injuries that you're talking about, you
21  can't state again to that reasonable degree of
22  medical certainty threshold that's going to happen?
23    **A.  With those, no, I cannot to a reasonable**
24  **degree of medical certainty.**
25    Q.  Did the obturator -- I asked you this, but

Page 520

1  I think you said no.  Did the obturator nerve
2  actually get injured?
3    **A.  Not during implantation, and it is more**
4  **likely than not irritated by the mesh in close**
5  **proximity, the mesh contraction drawing the nerve**
6  **closer or neo-innervation from the obturator nerve**
7  **going close to the mesh to, as we discussed**
8  **yesterday, that surveillance of a chronic foreign**
9  **body reaction.**
10    Q.  So in Mrs. ████ case, you're saying
11  she needs to have the mesh removed completely?
12    **A.  From -- to treat her right groin pain and**
13  **leg pain, that mesh needs to be removed from her**
14  **obturator space, yes.**
15    Q.  And if the mesh is removed from the
16  obturator space, do you have any opinions on will
17  she no longer have dyspareunia and the other
18  complications we talked about?
19    **A.  Well, the dyspareunia is going to be from**
20  **the mesh in the levator muscles, which can be taken**
21  **out at the same time as the mesh from the obturator**
22  **space.  I think I discussed before what are the**
23  **chances of having complete resolution, some**
24  **resolution or no resolution of her pain, and that's**
25  **40 percent complete resolution, 40 percent some**

Page 521

1 decrease in their pain and 20 percent no
2 resolution.
3     Q.  Have you ever been asked to give a
4 disability rating for a patient?
5     A.  I have done disability IMEs, and I don't
6 specifically recall being asked to give a
7 disability rating, but that might have been part of
8 those.
9     Q.  And the specific cases we're talking about
10 here today, have you been asked to give a
11 disability rating for any of the plaintiffs?
12     A.  No, I have not.
13     Q.  Do you intend to give one at any point?
14     A.  No, I do not.
15     Q.  Going to Page 8, you talk again about the
16 continuum of care, and we've talked about that in
17 greater detail earlier?
18     A.  That is correct.
19     Q.  I'm assuming same answers as far as they
20 could range from six months to five years, what's
21 that's based on and --
22     A.  That is correct.
23     Q.  You understand that Mrs. ████ also had a
24 history of depression?
25     A.  That is correct.

Page 522

1     Q.  I'm sorry.  Anxiety and depression.  Was
2 she taking any medication or seeking treatment
3 prior to her Align implant?
4     A.  Again, if you have a specific medical
5 record you'd like to discuss, it would be
6 beneficial for me to see that so I can talk
7 specifically about a medical record entry.
8     Q.  I'm talking generally.  I didn't know if
9 she was seeking any counseling for anxiety or
10 depression before her implant.
11     A.  As a general recollection, I would let
12 what's in the records speak for themselves.
13     Q.  I take it the counseling you're
14 recommending here is separate and apart from
15 whatever anxiety and depression she was seeking any
16 treatment for?
17     A.  That is correct and as we discussed
18 earlier.
19     Q.  Do you have an opinion as to Mrs. ████
20 prognosis?
21     A.  In what respect?
22     Q.  In respect to her quality of life
23 alleviating these complications.
24     A.  I think we discussed what's shown in the
25 literature.  I think we've discussed what's in my

Page 523

1 clinical experience, and I think we've -- I've
2 answered that question to your prior questions.
3     Q.  Well, let me ask it this way.  As far
4 as -- we talked about Mrs. ████ as far as
5 future surgeries.  Do you have a recommendation
6 what is likely to happen with Mrs. ████
7     A.  As I said before, more likely than not,
8 she's going to have a surgery to remove the sling
9 from her inner thigh and from the obturator muscle.
10     Q.  You mentioned earlier today
11 depending on the approach, the course, if she stays
12 in the hospital, outpatient, etcetera?
13     A.  Yes.
14     Q.  For Mrs. ████ do you have an opinion on
15 the approach and her recovery?
16     A.  Again, there are three ways of doing it.
17 You can do it through a groin incision where you
18 cut muscle and tendons.  You could do it through a
19 robotic approach or an open approach.  The approach
20 I do is an open approach.
21     Since it's a very complicated procedure,
22 she probably would need two to three days in the
23 hospital.  I know from having sent patients for the
24 robotic approach, they usually spend one night in
25 the hospital.  As an open procedure, it's about a

Page 524

1 two to three-hour procedure.  Robotically it's
2 about an eight-hour procedure, so they would spend
3 at least a night robotically.
4     I am generally familiar with the groin
5 approach.  Again, that would be an approach that
6 would be done with an orthopedic surgeon, and it's
7 not an approach that I'm comfortable with, but I
8 know that there are other people that do that.  And
9 I would anticipate a one to two-night stay in the
10 hospital.
11     Q.  Do you an estimate on how much it would
12 cost to have Mrs. ████ future surgeries?
13     A.  I would say that to do an obturator
14 excision would be about a 20 to $25,000 surgery.
15 You know, that's surgeon's fees, hospitalization,
16 all our time.
17     Q.  Earlier you said with Mrs. ████
18 after two weeks, etcetera, she's able to get back
19 to normal activities.  For Mrs. ████ --
20     A.  It would be a longer recovery.  She would
21 be in for four to six weeks recovery.
22     Q.  Are there any other opinions with regard
23 to Mrs. ████ that you have not expressed during
24 our discussion today?
25     A.  No, sir.

Page 525

1    Q.   Other than, perhaps, looking at additional
2  depositions or medical records that come in, any
3  other work you're preparing to do on this?
4    A.   No, sir.
5    MR. MAZZIOTTI:  Those are all the questions for
6  Mrs. ███ report.
7    THE VIDEOGRAPHER:  We are off the record at
8  12:46 p.m.
9        (Whereupon, a lunch break was
10       taken.)
11   THE VIDEOGRAPHER:  We are back on the record at
12  1:36 p.m.
13       (Whereupon, ROSENZWEIG
14       Deposition Exhibit Nos. 12 and
15       13 were marked for
16       identification.)
17  BY MR. MAZZIOTTI:
18   Q.   Okay, Doctor.  Let's talk about Mrs. ███
19   and go to her report or your report on her.
20  What we've done is we've marked as Exhibit No. 12
21  the report you brought with you that's highlighted;
22  is that right?
23   A.   That is correct.
24   Q.   And then I'm going to hand you what we've
25  marked as Exhibit 13, which is the more complete

Page 526

1  report, including the exhibits that you prepared
2  for Mrs. ███  Can you take a look at that and
3  make sure it's what it's supposed to have in there?
4    A.   That is correct.
5    Q.   As part of your report with Mrs. ███
6  the documents that you reviewed are attached to
7  Exhibit 13?
8    A.   That is correct.
9    Q.   Okay.  Let's go to your report here.
10  Starting with Page 2 under Roman Numeral II, that's
11  the medical history, right?
12   A.   Yes.
13   Q.   And that's what -- well, let's go through
14  that and talk about it in greater detail.
15       The first thing is Mrs. ███ had three
16  vaginal deliveries in her past?
17   A.   That is correct.
18   Q.   So she had a grade 3 cystocele.  That's
19  severe, isn't it?
20   A.   That would be a moderate to severe
21  cystocele.  I've seen people that have called them,
22  you know, general gynecologists that have called it
23  grade 3, but it might not be that severe.  I think
24  people collectively think that if it comes through
25  the opening of the vagina, it's grade 3, but grade

Page 527

1  3 is more than one centimeter past the hymenal
2  ring.
3    Q.   So assuming it's a moderate to severe
4  cystocele, that's something that there's got to be
5  some type of intervention to -- well, strike that.
6        You cannot do a nonsurgical intervention
7  with her?
8    A.   Yes, you can.
9    Q.   You can?
10   A.   Yes.
11   Q.   A grade 3 cystocele has a significant
12  impact on a patient in your experience?
13   A.   No.  I've seen patients with grade 4
14  cystoceles that are completely asymptomatic.
15   Q.   How about a grade 3 cystocele with a
16  vaginal vault prolapse, stress urinary
17  incontinence, urge incontinence, urethral
18  hypermobility, an intrinsic sphincter deficiency?
19  All of those conditions at once have a significant
20  impact on a patient's life?
21   A.   They can, but just each of those
22  conditions individually or the combination of those
23  could be more of an annoyance than a significant
24  impact, but I am not offering opinions about the
25  severity of those symptoms.

Page 528

1    Q.   I was just wondering, in your experience,
2  if a patient like Mrs. ███ comes to your office
3  with all of these conditions, is that something
4  that you would consider to be something that's a
5  significant impact on somebody's activities of
6  daily living?
7    MR. LUNDQUIST:  Object to form.
8    THE WITNESS:  That's what the patient will tell
9  you.  I mean, these are subjective conditions.
10  There are patients that have stress urinary
11  incontinence that manage it, and they are very
12  happy with how they're managing it.  The same thing
13  with urge incontinence and the same thing with
14  cystoceles.
15       I don't think that my opinions are related
16  to -- I think Mrs. ███ testified in her
17  deposition about what her symptom profile was like,
18  and I will refer to how she described how bad her
19  symptoms were as how it impacted her.
20  BY MR. MAZZIOTTI:
21   Q.   Fair enough.  Whatever she said how it
22  impacted her life is -- you know, you defer to what
23  she said?
24   A.   That is correct.
25   Q.   You mention that her past medical history

Page 529

1  is significant for chronic lower back pain, leg,
2  hip and neck pain, abdominal pain, urinary
3  retention, hesitancy and recurrent urinary tract
4  infections, right?
5  **A. That is correct.**
6  Q. What was, if you know, the cause of her
7  chronic lower back pain?
8  **A. I do not know the specific cause of her**
9  **chronic lower back pain.**
10  Q. How about her leg pain?
11  **A. I would opine that was probably from the**
12  **same condition that was causing her chronic lower**
13  **back pain.**
14  Q. Okay. Hip pain?
15  **A. I would say that that was the same thing**
16  **that was causing her chronic lower back pain, which**
17  **was probably some element of degenerative disc**
18  **disease, which would be the same thing with her**
19  **neck pain.**
20  Q. What about the abdominal pain?
21  **A. I don't recall the specific condition that**
22  **was associated with her abdominal pain.**
23  Q. That's something you would want to know in
24  this case in order to rule out any mesh
25  complications after the implant, right?

Page 530

1  MR. LUNDQUIST: Object to form.
2  **THE WITNESS: Again, I have looked at the**
3  **medical record and not that I specifically recall**
4  **sitting here today. Those findings are in her**
5  **medical record.**
6  BY MR. MAZZIOTTI:
7  Q. They are, and you pulled them out because
8  you found them significant, right?
9  **A. That is correct. I used those in my**
10  **differential diagnosis to determine whether or not**
11  **her current pain of pelvic pain, dysuria and**
12  **recurrent urinary tract infections were related to**
13  **the sling or not.**
14  Q. Do you recall looking at any records that
15  describe the cause of the abdominal pain?
16  **A. Specifically that stated that either**
17  **gallstones, appendicitis. We do know that she had**
18  **a laparoscopy for an adhesiolysis in** ▮ **of 2012.**
19  **She also had an abdominal hysterectomy and that she**
20  **had multiple abdominal procedures. So all of those**
21  **can be associated with abdominal pain.**
22  Q. Did Mrs. ▮ have complaints of
23  abdominal pain prior to her Align implant?
24  **A. That is what I state in the report.**
25  **That's what her past medical history signifies.**

Page 531

1  Q. Okay. I was confused. You made it sound
2  like some of these things were after.
3  **A. Well, no. Her abdominal hysterectomy and**
4  **her multiple abdominal surgeries preceded that.**
5  **She had, after the sling placed, a laparoscopic**
6  **enterolysis, which means you take adhesions down**
7  **from the small bowel to free up the small bowel.**
8  Q. And what was the reason for the Align
9  implant?
10  **A. The stress urinary incontinence that we**
11  **discussed before.**
12  Q. And again, you have no opinions one way or
13  the other about whether the surgery was
14  appropriate? In other words, the questions I asked
15  earlier today, you have no --
16  **A. Yes, that's correct. I am not going to**
17  **opine on whether or not she should or should not**
18  **have had surgery to correct her stress urinary**
19  **incontinence.**
20  Q. Going forward with her past medical
21  history -- well, strike that.
22  Do you know Dr. Leach?
23  **A. No.**
24  Q. What was the procedure Dr. Leach performed
25  with the Align?

Page 532

1  **A. A retropubic Align procedure.**
2  Q. And also an incidental cystostomy was
3  created at that time as well?
4  **A. That is correct.**
5  Q. Describe her course after the Align was
6  implanted.
7  **A. She had the Align placed on** ▮▮
8  **2010. On** ▮ **2010, she presented with**
9  **complaints of a brown vaginal discharge and burning**
10  **with urination. She had three plus red blood**
11  **cells, three plus white blood cells.**
12  Q. Can I stop you there real fast? That
13  would be something related to the surgery itself,
14  not to the mesh?
15  **A. That is correct.**
16  Q. Okay. I'm sorry. Go ahead.
17  **A. On the** ▮ **she was seen in the emergency**
18  **room with complaints of urinary retention. She was**
19  **treated for a urinary tract infection with Bactrim.**
20  **She was seen again --**
21  Q. Do you believe the urinary tract infection
22  had anything to do with the implant?
23  **A. This soon after surgery, I would not --**
24  **and only two infections, I would not opine about**
25  **the cause of these two urinary tract infections as**

Page 533

1  being due to specifically the Align.
2  Q.  Okay.  Then in ___ of 2012, there's
3  complaints of repeat bladder infections?
4  A.  That is correct.
5  Q.  Okay.  What was the cause of the bladder
6  infections?
7  A.  Well, she's complaining of bladder
8  infections, lower abdominal pain and pain radiating
9  to her flank.  That is a sign of a bacterial
10  infection in the lower urinary tract, possibly an
11  infection of the upper urinary tract, which is
12  called pyelonephritis.  This is the third
13  documented infection after the surgical procedure,
14  and so now one -- I would start to suspect that a
15  complication associated with the sling is starting
16  to cause her to have recurrent urinary tract
17  infections.
18  Q.  Didn't Mrs. ___ also have, excuse me,
19  frequent urinary tract infections prior to the
20  implant?
21  MR. LUNDQUIST:  Object to form.
22  THE WITNESS:  That is correct.
23  BY MR. MAZZIOTTI:
24  Q.  How did you rule out that the urinary
25  tract infections were something other than due to

Page 534

1  the Align?
2  A.  From her testimony, it looks like her
3  infections were occurring more frequently than they
4  were prior to the Align.
5  Q.  How much more frequently?
6  A.  That I don't recall specifically at this
7  time.
8  Q.  You have a general recollection that she
9  had more frequent urinary tract infections after
10  the Align, the implant of the Align than before?
11  A.  That is correct.
12  Q.  Did antibiotics help?
13  A.  She states that she keeps getting urinary
14  tract infections and is treated with different
15  antibiotics, however, we don't have a significant
16  number of the medical records from 2010 through
17  2012 to know exactly what the course was with each
18  of these infections that she stated in her
19  deposition that she was having.
20  Q.  What was the purpose of her being
21  scheduled for a laparoscopy with possible
22  enterolysis and lysis of adhesions?
23  A.  For abdominal and pelvic pain after
24  multiple abdominal surgeries.
25  Q.  What was the doctor looking for in doing

Page 535

1  this procedure?
2  MR. LUNDQUIST:  Object to form.
3  THE WITNESS:  A cause of the abdominal and
4  pelvic pain to rule out intraabdominal pathology.
5  BY MR. MAZZIOTTI:
6  Q.  And did the doctor rule out intraabdominal
7  pathology?
8  MR. LUNDQUIST:  Object to form.
9  THE WITNESS:  There were multiple adhesions.
10  The surgical findings were large bowel adhesions on
11  the left side of the pelvis and the pelvic side
12  wall and also bowel adhesions to the anterior
13  peritoneum.
14  BY MR. MAZZIOTTI:
15  Q.  Does that explain -- we'll start first
16  with urinary tract infections.  Would that cause
17  that?
18  A.  No.
19  Q.  How about abdominal pain?
20  A.  Adhesions can cause abdominal pain.  It
21  would be more of an intermittent pain.  What the
22  adhesions do is they stop the normal movement of
23  the bowel.  Also, when the bowel expands as
24  contents are being passed through it, that
25  expansion tugs on the adhesions, so you would have

Page 536

1  intermittent abdominal pain.
2  Q.  I think you said earlier today once you
3  remove adhesions, there shouldn't be any resulting
4  pain from adhesions?
5  A.  The pain should get better unless
6  adhesions reoccur.
7  Q.  You highlight an ER visit in ___ of 2012
8  where Mrs. or Ms. ___ is diagnosed with a
9  urinary tract infection.  What's the significance
10  of that visit to the ER?
11  A.  Well, she was seen for complaints of
12  recurrent urinary tract infections, and now she's
13  seen in the ER with another urinary tract
14  infection.
15  Q.  And does that go to your opinion that
16  she's getting more frequent urinary tract
17  infections due to the Align?
18  A.  That is correct.
19  Q.  When she later reports abdominal pain
20  increasing with lifting and rising from a stooped
21  position, what is your opinion as to the cause of
22  that?
23  A.  I have only opined that the recurrent
24  urinary tract infections, the persistent pelvic
25  pain and dysuria are associated with the Align.  I

Page 537

1 would say that abdominal pain is probably more
2 likely due to the adhesions that were noted before.
3     Q.    And your understanding as of ▓▓▓▓ of
4 2014, she's currently experiencing recurrent
5 bladder and urinary tract infections, persistent
6 pelvic pain and dysuria?
7     A.    That is correct.
8     Q.    And those are the ones you just mentioned
9 that you opine to a reasonable degree of medical
10 certainty are related to the Align implant?
11     A.    That is correct.
12     Q.    The same question about the implant, no
13 criticisms as to the surgeon?
14     A.    That is correct.
15     Q.    On Page 4 at the bottom where you're
16 talking about how Ms. ▓▓▓▓ developed bladder
17 infections, dysuria and a sensation that glass or
18 gravel was at the bottom of her stomach and pelvis,
19 that last part of the sensation that glass or
20 gravel was at the bottom of her stomach and pelvis,
21 are you saying that's also related to the Align?
22     A.    Those are the symptoms that she states
23 that the pain sensation that she currently
24 experiences are different from the pain that she
25 had before the Align.  She feels like there's glass

Page 538

1 or gravel at the bottom of her stomach and her
2 pelvis, and this is what she's been experiencing
3 after the Align procedure.
4     Q.    Could that also be due to the adhesions?
5     A.    In my experience, that is not a typical
6 feeling from adhesions.  Adhesions, particularly in
7 the bowel, one feels more of an expansion like a
8 balloon blowing up versus something that is rubbing
9 like glass or gravel.
10     Q.    Have you ever heard a patient describe
11 pelvic pain like that before when complaining about
12 complications to mesh?
13     A.    Yes.
14     Q.    Is that a common complaint?
15     A.    It seems to be either glass, fiberglass,
16 metal, sharp are consistent symptoms that I see in
17 my practice when patients come in with pain related
18 to their pelvic floor mesh and that I've seen in
19 other testimony from patients in this litigation.
20     Q.    And what is causing that feeling?  Explain
21 how the mesh -- what is it doing that makes it feel
22 that way?
23     A.    Well, we've discussed earlier the various
24 mechanisms by which pain is created.  This is
25 something called allodynia where it's -- the body

Page 539

1 perceives a nerve irritation as something -- I
2 mean, there's, obviously, not glass or gravel in
3 the vagina, but allodynia is the body that is
4 perceiving the pain as something different from
5 what it really is, and that is seen quite
6 frequently in patients that have the kind of nerve
7 injury that we were talking about before from the
8 nerves growing through mesh, mesh contracting and
9 drawing nerves closer.  Allodynia is a fairly
10 common complaint that I see with patients that have
11 had pelvic floor mesh.
12     Q.    What other causes did you rule out for her
13 pain?
14     A.    Well, I ruled out adhesions because, A,
15 those were taken care of.  I used her testimony to
16 say that the pain that she was having before her
17 surgery is different from the pain that she's
18 having after her surgery and that it has a
19 different chronicity, and it has a different
20 severity, and it has a different characteristic to
21 it and that her repeated urinary tract infections
22 are happening more frequently than they were before
23 the surgery.
24     Q.    You said a lot there.  Suppose the pain --
25 well, strike that.

Page 540

1         What about the location of the pain, does
2 that have any significance as to whether or not
3 cause -- mesh is causally related to the pain?
4     A.    Well, she's complaining of pelvic pain,
5 and the mesh is placed in the pelvis.
6     Q.    True, but the adhesions are also in that
7 area, right?
8     A.    The adhesions were noted actually in the
9 lower part of the abdomen.  They were found between
10 the large bowel and the left pelvic side wall, so
11 that is out of the pelvic area.  Also, there were
12 adhesions to the front wall called the parietal
13 peritoneum, which is the front wall of the abdomen,
14 actually, the inside of the front wall of the
15 abdomen.
16     Q.    Did she develop these adhesions after the
17 implant?
18     A.    No.  I would say that those adhesions were
19 there since her previous multiple abdominal
20 surgeries.
21     Q.    As far as the complaints of pain, however,
22 from the adhesions, that was after the implant?
23     A.    Excuse me?
24     Q.    The complaints of pain that you associated
25 with the adhesions, she did not start complaining

Page 541

1  of that pain until after the implant?
2  **A.  She was complaining --**
3  MR. LUNDQUIST:  Object to form.
4  **THE WITNESS:  She was complaining about pain,**
5  **and the doctor went in and did a diagnostic**
6  **procedure to try to find out if there was a -- what**
7  **the cause of that pain was, found adhesions and**
8  **took care of them.**
9  BY MR. MAZZIOTTI:
10  Q.  And that was after the date of implant?
11  **A.  That was, yes.**
12  Q.  I'm not sure if I asked you at the very
13  beginning of the day.  I just saw something in my
14  notes that reminded me.
15  Have you looked at any of the pathology
16  for any of the specific plaintiffs in any of the
17  mesh that's been removed?
18  **A.  No, I have not.**
19  MR. LUNDQUIST:  You're talking about the
20  specimens themselves, right?
21  MR. MAZZIOTTI:  Correct.
22  BY MR. MAZZIOTTI:
23  Q.  Going to the bottom of Page 5, same
24  questions I've been asking you throughout the day.
25  You talk about Ms. ███ may need surgery to

Page 542

1  remove the Align.  What do you mean by that?
2  **A.  Well, again, if her symptoms are to the**
3  **point where they are not controlled by the**
4  **conservative measures that we talked about, then**
5  **the mesh would need to be removed.**
6  Q.  It goes back -- again, I focus on the word
7  may.  Are you stating to a reasonable degree of
8  medical probability that Ms. ███ will require
9  surgery in the future?
10  **A.  I have not seen any specific treatment for**
11  **her pain at the current time, so therefore, if she**
12  **had tried other therapies and those did not**
13  **alleviate her symptoms, then I would be able to say**
14  **with a reasonable degree of medical certainty that**
15  **she would need that to be removed.  If medical**
16  **therapy does not work, then she would need a**
17  **surgical explant.**
18  Q.  You do not know if she's doing any
19  additional therapy at this time, right?
20  **A.  That is correct.**
21  Q.  Okay.  I am assuming you recommend that
22  she have additional therapies at this time?
23  **A.  That is correct.**
24  Q.  And similar to before, assuming the
25  therapies do not work, then you're saying more

Page 543

1  likely than not, to a reasonable degree of medical
2  certainty, surgery would be required?
3  **A.  That is correct.**
4  Q.  And I don't see the same time frame in
5  this -- well, I do.  The continuum of care
6  presurgery would be anywhere from six months to
7  five years?
8  **A.  That is correct.**
9  Q.  As far as the explant process, what
10  approach would you take with Ms. ███
11  **A.  She had a retropubic approach, so I would**
12  **go through a retropubic incision.  There are people**
13  **that can do that through a laparoscopic approach.**
14  **I've tried that, and in my hands, I don't think I**
15  **was able to get out as much of the mesh through a**
16  **laparoscopic approach.**
17  Q.  So are you saying you would not -- for
18  her, would you recommend doing a laparoscopic
19  approach or not?
20  **A.  There are -- again, there might be**
21  **physicians that feel that they can get out a**
22  **significant quantity of the mesh through the**
23  **laparoscopic approach.  The approach I use is**
24  **through a small incision above the pubic bone and**
25  **tracking it down from the muscle all the way down**

Page 544

1  **through the urogenital diaphragm to remove the**
2  **mesh.**
3  Q.  Would this be on an outpatient basis?
4  **A.  No.**
5  Q.  She would have to go in the hospital for a
6  couple days?
7  **A.  That is correct.**
8  Q.  And how long would the recovery be for
9  her?
10  **A.  Four to six weeks.**
11  Q.  The same -- talking about outcome, same
12  percentage of recovery with complications we talked
13  about earlier?
14  **A.  That is correct.**
15  Q.  I looked at your -- the documents you had
16  when you were writing your report.  I did not see
17  one where you had access to a treating physician
18  deposition.  Was there one later supplied to you?
19  MR. LUNDQUIST:  I'll just stipulate that I'm
20  not sure we actually provided him with a
21  deposition.
22  **THE WITNESS:  I didn't think that I saw one.**
23  BY MR. MAZZIOTTI:
24  Q.  And so basically my next question about
25  informed consent, do you have any opinions on

Page 545

1  whether or not Ms. ▮▮▮▮ had appropriate informed
2  consent for the implant?
3    **A. I think she testified to what she was**
4  **told, and I will let her testimony speak for**
5  **itself.**
6    Q. And similar questions. Depending on what
7  the physician testifies to, what he recalls telling
8  her, that also has an impact on whether she
9  received appropriate informed consent?
10   **A. That is correct, and I will allow that**
11  **testimony to speak for itself.**
12   Q. How long did it typically take you to
13  prepare each one of these reports?
14   **A. I think you asked me that question**
15  **earlier, and I really can't give you an estimate.**
16   Q. Are you recommending any therapy or mental
17  health therapy counseling for Ms. ▮▮▮▮ I don't
18  see it, but that doesn't mean I'm not looking in
19  the right place.
20   MR. LUNDQUIST: I'm sorry. You said mental
21  health therapy and any therapy. Are we talking
22  about --
23  BY MR. MAZZIOTTI:
24   Q. For anxiety, depression.
25   **A. You mean counseling?**

Page 546

1    Q. Counseling, correct.
2    **A. It depends on if that is something that**
3  **she's complaining of.**
4    Q. What I'm looking at, it's phrased a little
5  bit differently on Page 6.
6    **A. Yes.**
7    Q. The first full paragraph, I highly
8  recommend that this patient be followed up with
9  continuum of care, including, but not limited to,
10  physical therapy, counseling. What do you mean by
11  counseling?
12   **A. That's what we were talking about before.**
13  **I mean, that term has been in every single report.**
14  **So when we talked about counseling before, that was**
15  **what we were talking about before.**
16   Q. Before, I guess, because there was a
17  spouse involved, it was phrased a little bit
18  differently.
19   **A. There were reports -- some of the reports**
20  **with spouses are phrased slightly differently.**
21   Q. But that's what you mean then?
22   **A. Right. And the ▮▮▮▮ report has the**
23  **same wording about counseling, so we had discussed**
24  **what that entails earlier.**
25   Q. All right. With regard to Ms. ▮▮▮▮

Page 547

1  have we talked about all of your opinions that you
2  intend to express at trial about her?
3    MR. LUNDQUIST: Form.
4    **THE WITNESS: That is correct.**
5  BY MR. MAZZIOTTI:
6    Q. Is there anything else -- perhaps, look at
7  the implanting physician's deposition. Anything
8  else you would want to do prior to trial with
9  regard to Ms. ▮▮▮▮ and your opinions?
10   **A. No.**
11   Q. The next one is going to be Ms. ▮▮▮▮
12  Give me a second. I'll grab her report. Do you
13  have your report in front of you?
14   **A. It's already trying to get the exhibit**
15  **number.**
16     (Whereupon, ROSENZWEIG
17     Deposition Exhibit No. 14 was
18     marked for identification.)
19   MR. LUNDQUIST: In all fairness, Tom, this is
20  one of the first, I think, where we've seen a
21  supplemental report. There might have been one
22  other, so I don't see that he has that.
23   MR. MAZZIOTTI: I should have it over here on
24  my iPad.
25   MR. LUNDQUIST: I can give him a copy of mine

Page 548

1  as well.
2    **THE WITNESS: I think we already talked about**
3  **that.**
4     (Whereupon, ROSENZWEIG
5     Deposition Exhibit No. 15 was
6     marked for identification.)
7  BY MR. MAZZIOTTI:
8    Q. Doctor, I believe what we have now marked
9  as Exhibit 14, 14 is your copy of the ▮▮▮▮
10  Rule 26 report that's highlighted. Exhibit 15 is
11  going to be the report that was produced in this
12  litigation that has the attachments to it as well?
13   **A. That is correct.**
14   Q. If I could see your copy real fast,
15  please.
16     Also, there was a reference to a
17  supplemental report?
18   **A. That is correct.**
19   Q. I'm looking. The supplemental report, did
20  that deal with the situation with Dr. Elliott and
21  the Avaulta?
22   **A. That is correct.**
23   Q. I see you've made a handwritten note
24  Avaulta Plus?
25   **A. That is correct. It states it up above.**

Page 549

1  It's just easier for me when we're sitting here
2  today to be able to capture that more quickly.
3      Q.  Let me hand this back to you.  Tell me
4  what you found to be significant about
5  Ms. ███████ medical history.
6      A.  She had a history of hyperlipidemia,
7  hypercholesteremia, fibrocystic breast disease.
8  She had a kidney stone at the age of 12, and she
9  had a history of bacterial vaginosis.  She had
10  crampy lower abdominal pain and some pelvic pain
11  associated with her menstrual period due to
12  fibroids.  She had a prior tubal ligation and a
13  prior abdominal hysterectomy with both tubes and
14  ovaries removed in 2005.
15      Q.  What was the indication that you
16  understand for her implant of the Avaulta Plus?
17      A.  She was complaining of -- the Avaulta Plus
18  and the Align or just the Avaulta Plus itself?
19      Q.  Let's start with the Avaulta Plus.
20      A.  She had pelvic floor relaxation.  She had
21  a large rectocele and a cystocele, so she had the
22  anterior and the posterior Avaulta placed.
23      Q.  Same question that I've been asking you
24  all day.  You're not opining whether or not --
25  well, strike that.

Page 550

1      You have no criticisms that there was a
2  surgical intervention with the Avaulta Plus?
3      A.  That is correct.
4      Q.  Now, what were the indications for the
5  Align?
6      A.  Stress urinary incontinence.
7      Q.  Same question.  You're not questioning
8  whether or not it was appropriate to do surgery to
9  implant the Align?
10      A.  That is correct.
11      Q.  Tell me about her course after the
12  implant.
13      A.  The procedure was done on ███████████
14  2008.  She had a vaginal colposacropexy,
15  anterior/posterior Avaulta Plus mesh and a
16  transobturator Align procedure done.  From 2008
17  until 2012, Ms. ████████ states that her, quote,
18  unquote, life had changed.  She was experiencing
19  chronic pain, pressure and pain with intercourse.
20  It was painful to lift heavy objects and to walk.
21      Q.  Did you have any medical records between
22  ███████ 2008 until █████ of 2011?
23      A.  I don't recall specifically whether or not
24  that we had medical records from that time frame.
25      Q.  Would that be important to -- for your

Page 551

1  opinions to see what was going on in her life
2  between 2008 and █████ of 2011?
3      MR. LUNDQUIST:  Object to form.
4      THE WITNESS:  You mean as far as her medical
5  history goes --
6  BY MR. MAZZIOTTI:
7      Q.  Correct.
8      A.  -- or as far as what was going on in her
9  life?  I mean, those are two different things.
10      Q.  Well, I mean, sure, but I'm here to talk
11  about her medical history.  So from your standpoint
12  as a physician in rendering expert opinions, would
13  that have an impact on your opinions to know what's
14  going on from a medical standpoint during that
15  period of time?
16      A.  Obviously, the more information that we
17  have, that would be important to know.  If that
18  information can't be obtained, I think we can fill
19  in the gaps with deposition testimony and what her
20  current situation is.  Obviously, she ended up with
21  a mesh exposure which required surgery.  Her mesh
22  was found to be bunched and scarred.  There was
23  degeneration -- degradation of the mesh and a
24  foreign body reaction with fraying and particle
25  loss.  And so I would not envision there were

Page 552

1  events that transpired between 2008 and 2012 that
2  would have led to the degradation of her mesh.
3      Q.  When you say bunched, that's a word I
4  don't think you've used before.  I've heard other
5  phrases.
6      A.  Bunching is a sign of either contraction
7  or deformation or both.
8      Q.  Is that what led -- well, what led to the
9  explant surgery?
10      A.  Well, she was having suprapubic cramping
11  radiating into her vagina and dyspareunia that she
12  felt and also her partner felt.  And on exam, it
13  was noted that there was a
14  one-centimeter-by-two-centimeter area of mesh
15  exposure.
16      Q.  You do know that she had a history of
17  fibroids, right?
18      A.  That is correct.
19      Q.  Did you rule out her history of fibroids
20  as to her current complaints?
21      A.  Well, her fibroids were taken out in 2005
22  with an abdominal hysterectomy, so her fibroids
23  would currently not be causing problems that she
24  was having.
25      Q.  In footnote 2 on Page 2, you made a note

Page 553

1 about Ms. ███ testified that she did not
2 remember experiencing any cramping or pelvic pain
3 before her hysterectomy contrary to her medical
4 records. Why did you put that in there?
5    A. Well, obviously, a patient's view of their
6 complaints -- as I stated before, when I obtain a
7 medical history, I am using the patient's history
8 and also what's in the medical records. Sometimes
9 patients in the past have not done as good of a job
10 communicating with us as health care providers
11 about what their symptomatology is. What I found
12 with the new electronic medical records that I have
13 and my patients have access to a portal where they
14 can go in and look at their symptoms, not
15 infrequently do they find things that they would
16 like to change.
17    So it is Mrs. ███ remembrance that
18 the pain that she's having currently, she was not
19 experiencing crampy pain or pelvic pain in a query
20 to a note in the medical records prior to her
21 hysterectomy that she was having such a pain.
22    Q. As a physician, you rely on your patient
23 to provide you with whatever information they can?
24    A. That is correct.
25    Q. At least to the best of their ability?

Page 554

1    A. That is correct.
2    Q. And you rely on them being honest and
3 forthright?
4    A. That is correct.
5    Q. As far as the questioning at the
6 deposition about this particular topic with
7 cramping and pelvic pain before her hysterectomy,
8 how do you rule out then that her current
9 complications could be associated with this
10 cramping and lower abdominal and pelvic pain prior
11 to the hysterectomy?
12    A. Well, what I do is I use my clinical
13 experience, my understanding of the literature, and
14 those symptoms are not uncommon associated with
15 fibroids. Cramping pain, pain with menstruation
16 and some pelvic pain has been associated with
17 fibroids. Her fibroids were removed, and so
18 therefore, that would take out the source of that
19 cramping pain.
20    So with a reasonable degree of medical
21 certainty, either she might have remembered that
22 her pain went away when she had the hysterectomy,
23 so she might not have remembered that she had it
24 beforehand or that she was describing the cramping
25 with her period that happens with fibroids. And it

Page 555

1 was put in the medical record as cramping and
2 pelvic pain, and therefore, she recalled her
3 symptoms as being different, but when I looked
4 through this, I saw that yes, she had fibroids.
5 She had an abdominal hysterectomy.
6    There's also another entity the called the
7 post-tubal ligation syndrome where when women have
8 their tubes tied, they can develop recurrent cysts
9 and pain around the ovaries associated with the
10 tubal ligation. That could have been another
11 symptom that she was having. But then she went a
12 time without having symptoms from the hysterectomy
13 of 2005 to 2008, and so she might have just assumed
14 that because she didn't have pain after the
15 hysterectomy, she might not have been having that
16 pain before the hysterectomy.
17    Q. Do you have an understanding about the
18 pain that she described prior to the hysterectomy,
19 the quality, location, severity of it?
20    A. Well, she described that she did not
21 experience that pain prior to surgery, prior to her
22 hysterectomy.
23    Q. What about the medical records, did they
24 provide any insight?
25    A. If you'd like to point to that specific

Page 556

1 medical record, then we can talk about that.
2    Q. I'm here to ask you questions, Doctor.
3    A. Okay. Well, I'm here to answer your
4 questions truthfully, honestly and completely. In
5 order to do that, it would be very helpful to see
6 the specific medical record, and then we can talk
7 about that.
8    Q. You, as we sit here today, don't recall
9 whether or not it's even in the medical record
10 about the quality, severity, location of the pain?
11    A. Not specifically recall those discussions
12 in the medical record prior to her hysterectomy.
13    Q. And the fact that that information is not
14 contained in your report does that indicate either
15 was not important or the quality and the nature and
16 the severity were different from the type of pain
17 she is experiencing now?
18    MR. LUNDQUIST: Object to form.
19    THE WITNESS: They were different, and by my
20 reading of the past medical records and listening
21 to her deposition testimony, excuse me, reading her
22 deposition testimony, I made the assessment that
23 the pain that she was having before her
24 hysterectomy were due to her fibroids.
25

Page 557

BY MR. MAZZIOTTI:

2   Q.  And just so we're clear, after 2005 with
3 the hysterectomy and the removal of the fibroids,
4 there shouldn't be any lingering pelvic pain for
5 Ms. ▮▮▮▮▮?
6   **A.  From the fibroids, that is correct.**
7   Q.  If there was pain, it would be from some
8 other cause?
9   **A.  That is correct.**
10   Q.  Would having a tubal ligation have any --
11 would it contribute at all to any of her current
12 conditions?
13   **A.  Well, the tubal ligation was taken out**
14 **when they took out the tubes and ovaries at the**
15 **time of the hysterectomy.**
16   Q.  In '91?
17   **A.  The tubal ligation was in '91, but the**
18 **hysterectomy was in 2005, and they took out her**
19 **tubes and ovaries, which would take out the tubal**
20 **ligation.**
21   Q.  So the answer is -- the fact that they're
22 operating, would that -- does that have any impact
23 or does that contribute to any ongoing pain?
24   **A.  As I described for you before, there's**
25 **something called a post-tubal ligation syndrome**

Page 558

1 **where women develop -- because of a change in blood**
2 **flow, one of the vessels that supplies blood to the**
3 **ovary is the uteroovarian artery that goes with the**
4 **uteroovarian ligament. When you tie off the**
5 **uteroovarian ligament or when you tie off the**
6 **tubes, you disrupt blood flow to the ovary. That**
7 **can lead to a discomfort from recurrent cyst or**
8 **discomfort in general.**
9     **When you take out the tubes when you do**
10 **the hysterectomy and taking out both tubes and**
11 **ovaries, you take out that source of discomfort.**
12 **So when reviewing the medical records, I put that**
13 **in my differential diagnosis that she had a prior**
14 **tubal ligation, and she had fibroids, but then the**
15 **fact that she had a hysterectomy with the removal**
16 **of both tubes and ovaries, I was able to eliminate**
17 **that as a cause of her current pain.**
18   Q.  Does she have any other medical conditions
19 that you've ruled out as to the cause of her pelvic
20 pain?
21   **A.  She had a history of abnormal pap smears.**
22 **I was able to rule that out as a cause because she**
23 **had her cervix removed. Bacterial vaginosis**
24 **usually is a painful -- a painless discharge from**
25 **the vagina that has a fishy odor to it. So I did**

Page 559

1 not find anything else in her medical history
2 beside the fact that she had a mesh erosion
3 associated with bunching and contraction of her
4 mesh.
5   Q.  Do you know were there any measurements or
6 any indication about any shrinkage or anything like
7 that with the mesh?
8   **A.  I did not see any measurements of the**
9 **explant. I don't recall in the medical records if**
10 **it was even sent for pathology, which is not**
11 **atypical.**
12   Q.  I've got a note about in ▮▮▮▮▮ of 2013
13 where she denies having stress urinary
14 incontinence?
15   **A.  That is correct.**
16   Q.  So at least as we sit here today, it's
17 your understanding that Ms. ▮▮▮▮▮ does not have
18 stress urinary incontinence?
19   MR. LUNDQUIST: Object to form.
20   **THE WITNESS: She states in her deposition that**
21 **she continues to experience bladder leakage which**
22 **impacts her social life and sexual experience.**
23 **Now, whether that is due to an overactive bladder,**
24 **which she developed symptoms of in ▮▮▮▮▮ of 2013**
25 **where she was placed on a medication called Detrol,**

Page 560

1 **in ▮▮▮▮▮ of 2013, she continued to deny leaking**
2 **with coughing and sneezing, so it would lead me to**
3 **the conclusion that she has more of an overactive**
4 **bladder urinary urge incontinence picture than a**
5 **stress incontinence picture.**
6 BY MR. MAZZIOTTI:
7   Q.  Just generally speaking, and I don't know
8 if I asked it specifically with a plaintiff earlier
9 today or just generally, but generally speaking, I
10 think we were talking about the Burch procedure.
11 Did I ask you about that procedure generally and
12 whether or not you can say to a reasonable degree
13 of medical probability the Burch procedure won't
14 result in an overactive bladder?
15   **A.  Yes, you did ask me that question already.**
16   Q.  And what was your response?
17   **A.  And I gave you the percentage of patients**
18 **after a Burch procedure that have overactive**
19 **bladders.**
20   Q.  I recall asking you the question, but I
21 recall it being more specific to a patient. You
22 gave me generally speaking?
23   **A.  That is correct.**
24   Q.  What is Ms. ▮▮▮▮▮ prognosis?
25   **A.  She's currently suffering from pelvic**

Page 561

1  pressure.  She feels even with the explant that
2  nothing has changed.  She feels that -- she still
3  is experiencing pain and bleeding after
4  intercourse, and I think that her prognosis or it
5  is my opinion that her prognosis is that she will
6  need a mesh explant in order to relieve her of the
7  pain and the dyspareunia.
8      Q.  What is causing the bleeding after
9  intercourse?
10     A.  That is difficult for me to say by just
11  looking at what I saw in the records.  It would
12  require a more specific exam to determine what
13  actually is causing the bleeding after intercourse.
14  There are a number of things that I could suggest.
15  It could be granulation tissue.  Granulation tissue
16  that we talk about in the vagina is an exaggerated
17  healing.
18         There are two kinds of granulation tissue.
19  There's normal healing of a wound that's left open.
20  Granulation tissue is that -- a normal response is
21  that wound heals in from the bottom up or in the --
22  what we see in the vagina, we see an exaggerated
23  healing mechanism where you actually see an
24  overgrowth of tissue that's friable and bleeds.
25         So that could be what's causing the

Page 562

1  vaginal bleeding.  I've had patients that I've seen
2  that have said that they've been having vaginal
3  bleeding when they really have bleeding from
4  hemorrhoids.  So again, there could be a variety of
5  different diagnoses, but it would take an
6  examination of the vagina to state that with any
7  assuredness.
8      Q.  And because of that, at least here today,
9  you're not attributing the bleeding to a reasonable
10  degree of medical probability to the mesh?
11     A.  Not without any more specific information.
12     Q.  But the pain or the dyspareunia you are?
13     A.  That is correct.
14     Q.  And you don't need to examine her for
15  that?
16     A.  That is correct.
17     Q.  Do you know if that is due to the mesh in
18  the Avaulta, the Align, both?
19     A.  The reports from the excision is that
20  there was scarring and bunching both in the
21  anterior Avaulta and the obturator sling mesh.  I
22  would say that more likely than not because you
23  have a bigger piece of mesh that would contract,
24  degrade, deform, i.e., bunching with the pelvic
25  organ prolapse products than the sling, that more

Page 563

1  of the pain is coming from the larger implant
2  inside the vagina.
3      Q.  Which would be the Avaulta?
4      A.  That is correct.
5      Q.  All right.  Does the Avaulta need to be --
6  you said there needs to be an explant earlier.  Was
7  that the Avaulta, the Align or both?
8      A.  We know that both had undergone
9  deformation and contraction.
10     Q.  How do you know that?
11     A.  It's described in the records.
12     Q.  I didn't mean to interrupt.  Go ahead.
13     A.  And I would say with a reasonable degree
14  of medical certainty that because both have
15  undergone deformation and contraction leading to
16  symptoms that both need to be explanted.
17     Q.  And by explant, just so we're clear, you
18  mean all of it removed as much as you can?
19     A.  Yes, the majority of the vaginal implant.
20  I don't see any, at the current time, evidence of
21  irritation in the inner thigh, so at the current
22  time, I would not recommend an inner thigh
23  exploration to remove all six arms that are going
24  through the inner thigh.  However, because there
25  are six arms, four from the Avaulta, two from the

Page 564

1  obturator sling, going through the inner thigh,
2  there is a -- well, actually from the posterior,
3  that would be going through the ischial-rectal
4  fossa.  So from the four anteriorly that are also
5  going through the inner thigh, that with a
6  reasonable degree of medical certainty, those are
7  going to become symptomatic at some point.
8      Q.  Is this long term, years or shorter?
9      A.  Well, we discussed yesterday that we know
10  this process continues.  We know that contraction
11  continues.  We know that degradation continues.  We
12  know that the deformation process will continue as
13  contraction takes place.  We know that symptoms can
14  start years after the implant, so I can't tell you
15  if she's going to get symptomatic in a year or
16  10 years, but because she has six arms in her inner
17  thigh, that there's a very good chance that she
18  will become symptomatic at some point in her life,
19  and that I hold with a reasonable degree of medical
20  certainty.
21     Q.  You just don't know when.  Just at some
22  point -- the best you can say at some point in her
23  life?
24     A.  That is correct.
25     Q.  When -- on Page 7, there's a reference

Page 565

1 about the pathologist or after the specimens were
2 sent to pathology, contractions, slash, shrinkage.
3 Do you know if that's from it shrinking with the
4 wound itself, or is that from the mesh, in your
5 opinion, shrinking as well?
6    **A. We had that discussion yesterday that the**
7 **most prevalent theory is that it is from the scar**
8 **plating that happens around the mesh, that as that**
9 **contracts, it makes the mesh contract.**
10    Q. Okay. So the answer is -- if I
11 understand, the answer you just said, it's from the
12 wound itself. It's not from the mesh contracting?
13    **A. When you're talking about the wound,**
14 **you're talking about the cut that was made in the**
15 **vagina.**
16    Q. Correct.
17    **A. What you are implying by saying that the**
18 **wound healing, that it's the line that was**
19 **surgically made -- the surgical incision that was**
20 **made in the anterior wall. It doesn't just happen**
21 **in that area. You made that comment yesterday. I**
22 **corrected you on that comment yesterday. You made**
23 **the comment again today.**
24    **It's not just at the wound sites. The**
25 **entire mesh gets coated in scarring. That**

Page 566

1 **contracts. So it's not the wound. It is the**
2 **scarring around the mesh that contracts.**
3    Q. Okay. So to say it more artfully, it's
4 the scarring that contracts, and that's what causes
5 the mesh to contract?
6    **A. That is correct.**
7    Q. By tomorrow, I'll have that down.
8    **A. Perfect.**
9    Q. Of course, I'll be in Atlanta at that
10 point.
11    MR. LUNDQUIST: I know you may not be finished,
12 but may we do a five-minute breaking point right
13 now?
14    MR. MAZZIOTTI: Sure. Yeah, I'm close, but
15 that sounds good.
16    THE VIDEOGRAPHER: The time is 2:35 p.m., and
17 we are off the record.
18        (Whereupon, a short break was
19        taken.)
20    THE VIDEOGRAPHER: This marks the beginning of
21 tape 2. The time is 2:43 p.m. We're on the
22 record.
23 BY MR. MAZZIOTTI:
24    Q. Doctor, we turned to Page 8 of
25 Ms. ▮▮▮▮ report or your report of

Page 567

1 Ms. ▮▮▮▮ I thought you said earlier, and I
2 could be wrong, that she is going to need surgery
3 to remove the Avaulta mesh?
4    **A. I think I didn't -- I wasn't very clear.**
5 **She had the anterior Avaulta removed and the**
6 **obturator sling. Now, there might still be some of**
7 **the anterior mesh, and then there might still be**
8 **some of the obturator sling in. She still has the**
9 **posterior mesh.**
10    Q. The posterior mesh, is that something that
11 you believe is going to require surgery in the
12 future?
13    **A. She is still having symptoms, and she**
14 **still has a significant portion of -- I mean, the**
15 **entire posterior implant is still present. So yes,**
16 **I do think that she will need the posterior mesh**
17 **removed.**
18    Q. This is not one of those circumstances
19 where you try therapy first, and if therapy does
20 not work, surgery is required. You think surgery
21 is going to be required regardless of therapy?
22    **A. That is correct because she is still**
23 **having pain, and so yes.**
24    Q. And you hold that opinion to a reasonable
25 degree of medical probability?

Page 568

1    **A. That is correct.**
2    Q. You mentioned she'll continue to suffer
3 other injuries associated with the original
4 implantation of the devices. What injuries are you
5 referring to?
6    **A. Well, as we talked about, I think, with**
7 **one of the previous patients, she still has arms**
8 **inside of her obturator space. She still has the**
9 **whole posterior mesh. The arms are going to**
10 **continue to contract, degrade, be associated with a**
11 **chronic foreign body reaction, chronic infection,**
12 **chronic inflammation and deform. So with a**
13 **reasonable degree of medical certainty, those are**
14 **going to continue to cause problems for the**
15 **patient.**
16    Q. Later on you state that because of the
17 possibility of additional surgeries. What
18 surgeries are you referring to?
19    **A. An explant of the posterior mesh and the**
20 **explant of the arms of the anterior mesh and the**
21 **obturator sling and the explant of the arms of the**
22 **posterior mesh.**
23    Q. Then you say it is possible that scarring
24 may occur during the explant process, which can
25 lead to nerve damage and new dyspareunia. It could

Page 569

1  lead to nerve damage, but you don't know whether or
2  not it will?
3      A.  That is correct.  And we talked about
4  before that having looked at -- there is evidence
5  from scientists, not only in the literature, but
6  in -- who have done pathological explants, and it
7  shows that there are nerves growing through the
8  mesh.  So when you take the mesh out, you're
9  cutting the nerves that are grown in through the
10  mesh.  Those nerves are now damaged and will cause
11  pain.
12      Q.  Are you saying that the surgeries will
13  cause nerve damage, or it may cause nerve damage?
14      A.  That it will cause nerve damage.
15      Q.  So would you change that word from may to
16  will?
17      A.  That would be appropriate.
18      Q.  You say new dyspareunia.  What do you mean
19  by new?
20      A.  So a change in the pain that she is having
21  with intercourse.
22      Q.  What I'm focusing on is new.
23      A.  That's probably a poor choice of words.
24      Q.  The next paragraph is the same paragraph
25  you've used before about your recommendations of

Page 570

1  the continuum of care?
2      A.  That is correct.
3      Q.  Going to the following paragraph, I think
4  this deals specifically with the Avaulta.  In 2008,
5  you contend there were cost-effective alternatives
6  for the treatment of Ms. ███████  Then you talk
7  about a suture based-repair?
8      A.  That is called native tissue repair, yes.
9      Q.  And native tissue repairs also have
10  complications to them?
11      A.  That is correct.  And I think we've
12  discussed the nature of the complications
13  associated not only with the Burch, but native
14  tissue repairs as being those that we typically see
15  in the normal healing process four to six weeks
16  from surgery.
17      Q.  Correct.  We've talked about this before.
18  I think we've also talked about how you can't state
19  to a reasonable degree of medical probability
20  whether or not she would have had complications
21  with those procedures?
22      MR. LUNDQUIST:  Object to form.
23      THE WITNESS:  That you will not have any
24  complications from surgical procedure, yes.
25

Page 571

1  BY MR. MAZZIOTTI:
2      Q.  Maybe I said that wrong then.  Let me make
3  sure.  You're not saying if you have this
4  procedure, that these procedures do not carry with
5  them complications?
6      A.  That is correct.
7      Q.  Down at the bottom, you talk about the
8  Ultrapro and the Gynemesh PS Prolene?
9      A.  Yes.
10      Q.  What is that?
11      A.  Ultrapro and Gynemesh Prolene Soft, PS
12  means Prolene Soft.  Prolene is a redundancy.
13  Those are both large-pore lightweight mesh compared
14  to the Avaulta.  The pore size of Avaulta is about
15  1.4 to 1.6 millimeters.  With the Avaulta Plus
16  because you're putting a layer of collagen above
17  it, you virtually obliterate the pores.  Smaller
18  pores, heavyweight mesh is associated with a
19  greater foreign body reaction, greater mesh
20  contraction and greater inflammation, more
21  contraction and shrinkage associated with it.
22      Q.  Does the Ultrapro -- is that made out of
23  polypropylene?
24      A.  That is correct.
25      Q.  And the Gynemesh?

Page 572

1      A.  That's also made out of polypropylene,
2  yes.
3      Q.  So you would recommend using those even
4  though they have polypropylene, but because they're
5  lighter and the pore size is larger?
6      MR. LUNDQUIST:  Object to form.
7      THE WITNESS:  I did not use the term
8  recommended.  What I stated was that a feasible
9  alternative, not that I recommended it.  I was
10  describing what a feasible alternative was.
11  BY MR. MAZZIOTTI:
12      Q.  If these feasible alternatives had been
13  used, would Ms. ███████ not have had the same
14  complications?
15      A.  The data shows that larger pore, lighter
16  weight mesh is associated with fewer complications
17  than heavyweight small-pore mesh.
18      Q.  There's also literature that says that the
19  smaller pore, heavier mesh has the same success
20  rate?
21      MR. LUNDQUIST:  Object to form.
22      THE WITNESS:  That is correct, that the success
23  rate is the same, but I could take a piece of steel
24  and wrap it around, you know, place it inside the
25  vagina and hold up the vagina, but that would have

Page 573

1  significant complications to it. So heavyweight
2  small-pore mesh works the same.
3      If you look at Bobby Orr's deposition
4  testimony and also a report that in 2007 and 2008,
5  he talks about large-pore lightweight mesh has
6  fewer complications than heavyweight small-pore
7  mesh.
8  BY MR. MAZZIOTTI:
9      Q.  And I guess what --
10     A.  And that the heavyweight small-pore mesh
11 is overengineered because it was engineered for
12 hernia and that the pressures that the abdomen is
13 sustaining are much higher than what we see in the
14 pelvic floor.
15     Q.  But my understanding is there's also
16 literature out there that says the heavier
17 small-pore mesh has the -- there's no significant
18 difference in complications between that and the
19 large-pore lighter mesh?
20     A.  There might be literature that states
21 that, but the vast majority of literature, the vast
22 majority of deposition testimonies from Bard, the
23 vast majority of the internal documents from Bard,
24 the vast majority of the literature says lighter
25 weight -- lightweight large-pore mesh has fewer

Page 574

1  complications than small-pore heavyweight mesh.
2      I don't think anybody that knows about
3  mesh would say that heavyweight small-pore --
4  Dr. Heniford, one of the most experienced surgeons
5  in the United States is on video banging
6  heavyweight small-pore mesh on a Mayo stand in the
7  operating room saying that this should never be put
8  in the human body. The data on heavyweight
9  small-pore mesh is compelling.
10     Q.  And we talked about all that yesterday.
11     A.  That is correct.
12     Q.  At the bottom, you mention about -- it
13 goes into Dr. Blackmon and what Dr. Blackmon knew
14 about the risk. I thought earlier in your
15 deposition for this specific plaintiff, you said
16 you had not had an opportunity to read
17 Dr. Blackmon's deposition?
18     MR. LUNDQUIST:  Object to form.
19     THE WITNESS:  No. I think that was the last
20 case that we talked about.
21 BY MR. MAZZIOTTI:
22     Q.  And it could have been.
23     MR. LUNDQUIST:  To be fair, Dr. Blackmon is
24 actually in two of these cases, so there may be
25 some confusion as well.

Page 575

1      MR. MAZZIOTTI:  Right.
2  BY MR. MAZZIOTTI:
3      Q.  That's why I wanted to clarify that.
4      A.  Yes, I did see Dr. Blackmon's deposition.
5      Q.  In this specific case?
6      A.  That is correct.
7      Q.  I thought I had asked you in this case,
8  and that's why I wanted to bring this up.
9      A.  Yes.
10     Q.  Let's see who's next on our list here. I
11 think it's _____ Doctor, why don't we mark
12 yours as the next exhibit again.
13         (Whereupon, ROSENZWEIG
14         Deposition Exhibit Nos. 16 and
15         17 were marked for
16         identification.)
17     MR. MAZZIOTTI:  For the record, we've marked as
18 Exhibit 16 Dr. Rosenzweig's personal Rule 26 report
19 in which he's highlighted on it, and then
20 Exhibit 17 is the _____ report that is
21 complete, including its attachments.
22     THE WITNESS:  That is correct.
23 BY MR. MAZZIOTTI:
24     Q.  You've got both down there?
25     A.  Yes, sir.

Page 576

1      Q.  Let me get to it on my iPad here. Why
2  don't you go ahead for purposes of Ms. _____
3  what was her pertinent medical history?
4      A.  Mrs. _____ at the time of her implant
5  was a 61-year-old female with two vaginal
6  deliveries. She presented with a grade 2
7  cystocele, grade 1 rectocele, grade 2 uterine
8  prolapse. From my review of the records, I did not
9  see any pertinent history in her medical records
10 regarding -- that would be used to -- that could
11 explain why she developed multiple vaginal erosions
12 from her Avaulta placement.
13     Q.  She had her implant on _____ 2008 by
14 Dr. Weiss?
15     A.  That is correct.
16     Q.  And it was an Avaulta Plus anterior?
17     A.  That is correct.
18     Q.  Specifically what were the indications
19 that Dr. Weiss went forward with the implant?
20     A.  The implant was for her grade 2 cystocele.
21 She also had a concomitant vaginal hysterectomy and
22 a native tissue repair of her posterior grade 1
23 rectocele.
24     Q.  How was her course after the implant?
25     A.  Well, she stated that she felt pain in her



Page 577

1 pelvic area after her implant procedure. She had
2 surgery on the ███. She experienced difficulty
3 emptying her bladder described as urinary
4 retention. She was discharged home with the Foley
5 catheter in place. That was removed approximately
6 one week later.
7      In ███ of 2008, she presented with
8 complaints of pelvic pain and a foul-smelling
9 discharge that had resolved from a previous exam in
10 ███ ██ 2008. In ███ of 2009, she presented
11 again with a foul-smelling odor. Pelvic exam
12 revealed an atrophic vulva and vagina. Dr. Weiss
13 noted the foul-smelling discharge and prescribed
14 Flagyl for the patient.
15   Q. Let me just stop you there. What is the
16 understanding as to the cause of the discharge and
17 the odor?
18   A. It was approximately two years later that
19 a vaginal erosion or extrusion was found, so the
20 etiology of the discharge was ascribed to bacterial
21 vaginosis, and Flagyl was prescribed, which is the
22 antibiotic that treats the majority of bacterial
23 vaginosis. There are several subspecies of
24 bacterial vaginosis that are resistant to Flagyl.
25   Q. Do you have an opinion as to what caused

Page 578

1 the bacterial vaginosis?
2   A. Bacterial vaginosis is an overgrowth of
3 the normal bacteria inside the vagina. Usually
4 what causes bacterial vaginosis is when the pH of
5 the vagina rises and/or the lactobacillus, that is,
6 the normal creator of acids inside the vagina,
7 decreases. So either the pH goes up, the
8 lactobacillus goes down, gives you the same result
9 where the bad bacteria inside the vagina start to
10 overgrow.
11      On this occasion, what caused the
12 discharge, I don't think that we're going to -- we
13 have a specific etiology. I don't think that there
14 was a vaginal erosion at that point because it was
15 not described by her doctors.
16   Q. That's what I'm getting at. You can't say
17 one way or the other whether this odor and this
18 discharge, the bacterial vaginosis had anything to
19 do with the mesh?
20   A. That is correct.
21   Q. Sorry to interrupt. Keep going.
22   A. She was seen ███ 2010 with complaints
23 of back pain and pain radiating into her groin.
24 She had tenderness in the lumbosacral area of her
25 lower back. She ended up with a urinary tract

Page 579

1 infection in ███ of 2011, and then ███ ███
2 2011 a cystoscopy was performed. A vaginal exam
3 was performed, and approximately a
4 two-centimeter -- excuse me, a two-millimeter area
5 up at the top of the vagina was noted to have a
6 mesh extrusion. This was removed, but not
7 successfully removed.
8   Q. The back pain that you were talking about,
9 the radiating pain, that also was unrelated to the
10 vaginal mesh, right?
11   A. Well, the back pain most likely was due to
12 irritation of the lower back in the area where the
13 lumbar spine meets the sacral spine. The leg pain
14 most likely is related to whatever was causing that
15 pain. It could be muscle spasm. It could be some
16 disk irritation, but no, I don't think that that
17 was specifically -- I don't have any evidence that
18 that was caused specifically by the mesh.
19   Q. And therefore, you're not here opining to
20 a reasonable degree of medical certainty that the
21 back pain and the leg pain were related to the
22 mesh?
23   A. That is correct. Continue?
24   Q. Yes. I think you were on ███ 2011.
25   A. She had silver nitrate placed into the

Page 580

1 area that was bleeding inside of her vagina, and
2 she was prescribed a vaginal estrogen preparation
3 called esterase. She came back approximately six
4 months later. There was a mesh seen extruding or
5 eroding through the anterior wall of the vagina up
6 at the top of the vagina in an area that is called
7 the cuff. That is where when the cervix is removed
8 during a hysterectomy, the front wall and the back
9 wall of the vagina are brought together. Dr. Weiss
10 then grabbed that area and excised a small portion
11 of the eroded tissue.
12      In ███ she came back to see Dr. Weiss
13 again due to a persistent vaginal erosion. There
14 was an area approximately one centimeter in size on
15 the anterior vaginal wall, and Dr. Weiss decided to
16 do an excision procedure in the operating room,
17 which was done on ███ ███ 2012 where a
18 two-centimeter portion of the vaginal mesh erosion
19 was removed from the anterior vaginal wall.
20   Q. What was the -- the esterase cream, what
21 was the purpose of that? Was that related --
22 that's hormone therapy, but was that related to the
23 mesh or any complications from the mesh?
24   A. Well, that was an attempt to try to -- for
25 the vagina to heal itself by covering up the mesh



Page 581

1  with a new layer of vaginal epithelium.
2  Q.  In the ▮▮▮ 2012 paragraph, you note
3  persistent vaginal mesh erosion.  What do you mean
4  by persistent?
5  A.  Well, it was first diagnosed in ▮▮▮ of
6  2011.  It was attempted to be removed in the office
7  or treated in the office.  That was unsuccessful,
8  and she was treated with a hormone preparation to
9  try to heal the area that had eroded.  She comes
10  back into the office.  It is still present, and
11  then several months later she is back in the office
12  and an actual larger-size erosion is detected.  And
13  so this -- we do not have any evidence that it
14  healed and recurred, so with a reasonable degree of
15  medical certainty, it never healed itself, but
16  continued to get larger.
17  Q.  In the ▮▮▮ 2012 note, it says
18  there's no evidence of vaginal mesh erosion; is
19  that correct?
20  A.  That is correct.  That was after the
21  explant procedure of the two centimeters of mesh
22  from the anterior vaginal wall erosion.
23  Q.  What's the explanation as to why there's
24  no vaginal -- I'm sorry.  There's no mesh erosion
25  in 2012, but before there's these indications of

Page 582

1  erosion?
2  A.  Because the area that was eroding had been
3  excised.
4  Q.  Okay.  But -- okay.  But not the entire --
5  not the entire Avaulta mesh.  Just a portion of it?
6  A.  Approximately one-centimeter area of the
7  vagina had undergone a cytotoxic response where the
8  cells of the vagina were destroyed by the mesh, and
9  so that you have an area that's open in the vaginal
10  wall where the mesh is showing through.
11  Q.  Later on you discuss back pain again.
12  What was the -- you have lower pelvic pain in
13  ▮▮▮ of 2012.  Later on in ▮▮▮ of 2014,
14  there's references to back pain.  Are you opining
15  that both of those are related to the mesh?
16  A.  In her testimony, she is saying that she's
17  had no pain in the vagina after her last revision
18  surgery.  So I am not opining that the -- that she
19  currently has pain due to the anterior Avaulta that
20  was placed.  On that visit, could she have been
21  having pain due to two months prior to that having
22  an explant from the explant surgery?  Possibly.
23  Q.  But not to a reasonable degree of medical
24  probability?
25  A.  Well, it's not a continuous pain.  It was

Page 583

1  there in ▮▮▮ of 2012, so it -- more likely than
2  not, it was due to the explant surgery, but it is
3  more of a situational pain that we talked about
4  before and not a persistent pain.  So while it more
5  likely than not was associated with either the
6  Avaulta or the explant surgery, it is not
7  persistent.
8  Q.  And I think you were saying because it's
9  not persistent, then it would not be associated --
10  well, strike that.
11  Because it's not persistent, then it would
12  not be causally related to the mesh that's still in
13  the vagina?
14  A.  That is correct.
15  Q.  What about the back pain that you document
16  from ▮▮▮ 2014?
17  A.  It looks as though from the medical
18  records that she had tenderness in the lumbosacral
19  area, which means that either there's a muscle
20  irritation or some other low back -- cause of her
21  low back pain.
22  Q.  She had a cold, sinusitis, all that.  That
23  is more likely the cause of the back pain, correct?
24  A.  It could be muscle strain.  It could be,
25  you know, subtle disk disease.  I don't think a

Page 584

1  cold or sinusitis is going to be related to back
2  pain unless you sneeze vigorously and throw your
3  back out.
4  Q.  And neither is the vaginal mesh associated
5  with that back pain?
6  A.  I don't have enough evidence to state with
7  a reasonable degree of medical assuredness that the
8  mesh is causing that low back pain.
9  Q.  So you won't be opining that the low back
10  pain is due to the mesh?
11  A.  That is correct.
12  Q.  Let's talk about your opinions with her.
13  What is your understanding as to Ms. ▮▮▮
14  current complaints that you, and let me be clear,
15  that you say are causally related to the mesh?
16  A.  She had a persistent vaginal mesh erosion
17  that required three revision surgeries, one
18  attempted revision, two revision surgeries.  She
19  was treated with a medical cream, and she currently
20  has bladder leakage.
21  Q.  Anything else?
22  A.  Well, as we have talked about before, with
23  a reasonable degree of medical certainty, since
24  this patient had a significant erosion, there will
25  be the likelihood of a future erosion.

Page 585

1    Q.   And going to the questions we've asked
2  before, does this fall into the category of she
3  is -- she will need surgery or she will need
4  therapy, and if that doesn't work, she'll need
5  surgery?
6    **A.   Well, the therapy is more for pain.**
7  **Because she has a -- because she had a persistent**
8  **erosion that required several surgeries to treat**
9  **it, more likely than not, she's going to develop**
10  **another erosion, and so therefore, that will need**
11  **to be surgically treated.**
12    Q.   And you hold that opinion to a reasonable
13  degree of medical certainty?
14    **A.   That is correct because the process that**
15  **led to the first erosion, degradation, contraction,**
16  **chronic foreign body reaction, chronic inflammation**
17  **is ongoing.**
18    Q.   Later on, the same paragraph about the
19  continuum of care, correct, on Page 8?
20    **A.   That is correct.**
21    Q.   Did you have or do you have Dr. Weiss's
22  deposition when you say he did -- well, apparently,
23  you do.
24    **A.   That is correct.**
25    Q.   As far as the bladder leakage, is there

Page 586

1  anything you're recommending for Ms. ████████ in
2  order to assist with that?
3    **A.   Well, it would be beneficial to have**
4  **urodynamic testing to determine the causes of her**
5  **bladder leakage.  If it is an overactive bladder,**
6  **there are medications that she could use to treat**
7  **her bladder leakage.  If it is due to stress**
8  **urinary incontinence, she would either be a**
9  **candidate for conservative treatment or for a**
10  **surgical correction.**
11    Q.   On Page 7, I'm a little bit confused about
12  when you say based on literature, it's the third
13  full paragraph.  Based on literature, my experience
14  and review of Ms. ████████ medical history, it
15  is, therefore, with a reasonable degree of medical
16  certainty that Ms. ████████ Avaulta caused the
17  mesh erosion, which we've talked about?
18    **A.   That is correct.**
19    Q.   Pelvic pain, lower back pain, groin pain?
20    **A.   And she did have pelvic pain.**
21    Q.   Related to the mesh erosion?
22    **A.   That is correct.**
23    Q.   Okay.  That's what you're referring to at
24  that point?
25    **A.   That is correct.**

Page 587

1    Q.   How about the lower back pain and the
2  groin pain?
3    **A.   As I say, because of the reference to the**
4  **levator tenderness -- the lumbosacral tenderness,**
5  **it is difficult to opine about the back pain.**
6    Q.   So that particular sentence, you would not
7  say the lower back pain to a reasonable degree of
8  medical certainty is due to Ms. ████████
9  Avaulta?
10    **A.   That is correct, but the pain that she was**
11  **describing, the pressure that she was describing**
12  **along with the erosion is due to the Avaulta.**
13    Q.   Okay.  And again, I'm focusing on pain.
14  What about the groin pain?
15    **A.   Again, that was described while she was**
16  **having the erosion.**
17    Q.   So pelvic pain and groin pain while she's
18  having erosion.  Lower back pain, you would take
19  that out of the sentence?
20    **A.   Well, again, that was going on while she**
21  **was having the erosion, however, it looks like that**
22  **was from a -- there is enough evidence in the**
23  **medical -- there's enough evidence in the medical**
24  **record to add other causes into the differential**
25  **diagnosis for that.**

Page 588

1    Q.   Do you have any other opinions about
2  Ms. ████████ that we have not talked about?
3    MR. LUNDQUIST:  Just real quick, on Page 6,
4  just to clear up the report since we're moving
5  through it, the top there, I assume his opinions
6  are going to be the same on that lower back pain
7  radiating into the groin just since we're talking
8  about that precise point on Page 7.
9    MR. MAZZIOTTI:  Okay.  I'm sorry.  Where are
10  you?  On the top of Page 6 you say?
11    MR. LUNDQUIST:  Yes.  If he's making that
12  comment on Page 7, I would presume it will also be
13  on the top of Page 6.
14    **THE WITNESS:  Just the lower back pain.**
15    MR. LUNDQUIST:  Right, just so there's no
16  ambiguity as we move forward.
17    MR. MAZZIOTTI:  Okay.
18  BY MR. MAZZIOTTI:
19    Q.   Is that true, Doctor?
20    **A.   That is correct.**
21    Q.   Anything else with regard to
22  Ms. ████████
23    **A.   No.**
24    MR. MAZZIOTTI:  Why don't we take a quick break
25  here.

Page 589

1   THE VIDEOGRAPHER:  We're off the record at
2  3:17 p.m.
3                 (Whereupon, a short break was
4                 taken.)
5                 (Whereupon, ROSENZWEIG
6                 Deposition Exhibit Nos. 18 and
7                 19 were marked for
8                 identification.)
9   THE VIDEOGRAPHER:  We are back on the record at
10  3:25 p.m.
11  BY MR. MAZZIOTTI:
12   Q.  Okay, Doctor.  We're up to ██████
13  ██████
14   **A.  That is correct.**
15   Q.  And I believe, for the record, what we
16  have done is we have marked your report highlighted
17  as Exhibit 18 and then the more complete Rule 26
18  report as Exhibit 19; is that right?
19   **A.  That is correct.**
20   Q.  Great.  In her medical history, you
21  indicate four vaginal deliveries, right?
22   **A.  That is correct.**
23   Q.  And that's primarily dealing with a
24  potential contributing reason as to why the Align
25  was implanted, right?

Page 590

1   **A.  That is correct.**
2   Q.  Okay.  You also said her past medical
3  history was unremarkable?
4   **A.  That is correct, except for migraines,**
5  **hypertension and hypothyroidism.**
6   Q.  Did she have any history of pelvic pain
7  before the implant?
8   **A.  Not that I saw in the medical records.**
9   Q.  How about -- how about fibroids?
10   **A.  She had an ultrasound in 2014, which**
11  **showed a cervical fibroid and a polyp in the**
12  **cervical canal.**
13   Q.  Is that -- is that something that would be
14  significant for her medical history with regard to
15  pelvic pain?
16   **A.  Cervical fibroids can cause pelvic pain.**
17  **One, they can prolapse actually through the cervix**
18  **and cause what's called a prolapsing cervical**
19  **fibroid.  That is painful.  Two, during the**
20  **menstrual cycle, cervical fibroids can be painful.**
21  **Three, cervical fibroids can actually obstruct the**
22  **flow of the menstrual effluvium through the cervix,**
23  **and that can be associated with pain because that**
24  **can actually lead to endometriosis, but there is**
25  **actually no evidence of any of those in the medical**

Page 591

1  records.
2   Q.  You noticed she had a grade 1 cystocele
3  and a grade 2 rectocele?
4   **A.  That is correct.**
5   Q.  The grade 2 rectocele, does that fall into
6  the moderate to severe category?
7   **A.  Moderate.**
8   Q.  It falls into the moderate?
9   **A.  That is correct.**
10   Q.  How about the grade 1 cystocele, where
11  does that fall?
12   **A.  Mild.**
13   Q.  In ██████ of 2014, there's a discussion
14  about sporadic pelvic pain in the third, I'm sorry,
15  the second full paragraph, if you can go to that
16  part.  Is that highlighted in your copy?
17   **A.  Page 3 are you talking about?**
18   Q.  Yes.
19   **A.  And the second full paragraph?**
20   Q.  Correct, towards the end midway.
21   **A.  Well, it states Mrs. ██████ presented with**
22  **continuous complaints of pelvic and back pain on**
23  **██████ 2014.  That's when an ultrasound of the**
24  **pelvis showed a cervical fibroid, ovarian cyst and**
25  **polyp in the cervical canal and that she continued**

Page 592

1  to have pelvic pain and heavy periods.
2   Q.  I'm sorry.  Where are you?
3   **A.  The second full paragraph on Page 3.**
4   Q.  Did you say 2013?
5   **A.  14.  I'm sorry.**
6   Q.  I just wanted to make sure.
7   **A.  Yeah.**
8   Q.  The continued complaints of pelvic pain
9  and heavy menses, was that due to the ovarian cyst
10  or the uterine fibroids?
11   **A.  More likely than not, it was from the**
12  **cervical fibroid and not due to the ovarian cyst.**
13   Q.  And then there was a plan for a
14  hysterectomy and endometrial ablation, right?
15   **A.  That's hysteroscopy and endometrial**
16  **ablation.**
17   Q.  I'm sorry.  It's been a long day.
18      Endometrial ablation, what was the
19  reason -- well, you do that because there's --
20  because it's causing pain?
21   **A.  No.**
22   Q.  Why do you do endometrial ablation?
23   **A.  We're not talking about endometriosis**
24  **right now.  What we're doing is we're -- an**
25  **endometrial ablation is burning the lining of the**

Page 593

1 womb, so what that does is it's designed to stop
2 periods.
3     Q.   Okay.  And what is the -- going further,
4 what are the current complaints of Ms. ▓▓▓▓▓
5     A.   Well, we missed the fact that she had a
6 two-centimeter segment of exposed mesh removed in
7 ▓▓▓▓▓ of 2011.
8     Q.   If we need to --
9     A.   I'll get that.  Once we finish with this
10 record, I can answer that.
11     Q.   I'm sorry.  Go ahead.
12     A.   And the two-centimeter segment of exposed
13 mesh was removed from the -- of the sling was
14 removed in ▓▓▓▓▓ of 2011.  She states that
15 she's currently experiencing pelvic pressure and
16 pain and a pulling feeling in her pelvic area,
17 recurrent urinary retention and dyspareunia.
18     Q.   What did you do to rule out other causes
19 for these complaints?
20     A.   Well, number one, I don't see anything in
21 the medical records beside the sling that would
22 explain her feeling of difficulty emptying her
23 bladder completely and urinary retention.  It is
24 the pulling sensation from my experience dealing
25 with patients that have cervical fibroids, a polyp

Page 594

1 in the cervical canal and ovarian cysts, they don't
2 usually describe their pain as pulling.  They
3 usually describe their pain as being more of a
4 contraction-type pain, not a pulling pain.
5 Cervical polyps and cervical fibroids don't
6 typically cause dyspareunia unless they're
7 prolapsed outside the cervix in which case they can
8 cause pain with intercourse because they're taking
9 up the space inside the vagina during intercourse.
10     Q.   Going back to your -- you said something
11 about the pulling pain.  That's not how it's
12 described with polyps or fibroids?
13     A.   That is correct unless they're prolapsing
14 through the cervix.  Then you can get kind of a --
15 you know, more of a crampy labor-like pain, but
16 there's no evidence on the last exam on ▓▓▓▓▓ ▓▓▓▓▓
17 that the cervical fibroid or the polyp is actually
18 prolapsing through the cervix.
19     Q.   This is also a case where you have ruled
20 out physician error, correct?
21     A.   That is correct.
22     Q.   Going to Page 5, the third paragraph, you
23 talk about Mrs. ▓▓▓▓▓ did not have or subsequently
24 develop any medical or historical factors which
25 increased her risk for developing vaginal itching,

Page 595

1 burning, vaginal discharge, pelvic pain, cramps and
2 pelvic discomfort before Dr. Mualin excised the
3 exposed sling.
4       Are you saying that Dr. Mualin, his
5 excising the exposed sling -- well, strike that.
6       What is the cause of this vaginal itching,
7 burning, discharge, etcetera?
8     A.   That was while the mesh was exposed, and
9 then we talk about what her current complaints are
10 after the exposed mesh was excised.
11     Q.   Okay.  Those complaints went away that I
12 just read?
13     A.   That is correct, except for the pelvic
14 pain and pelvic discomfort.  So what I say
15 afterwards is that she subsequently developed or
16 she still has pelvic pain, incontinence, associated
17 pelvic pressure and dyspareunia associated with the
18 sling that's remaining in place.
19     Q.   Similar to your opinions earlier today
20 about what are the long-term -- what are your
21 long-term opinions about erosion with the sling?
22     A.   That more likely than not, she will have a
23 recurrent erosion.
24     Q.   And more likely than not --
25     A.   She will need a further explant.

Page 596

1     Q.   See, I don't need to ask you questions
2 anymore.
3       Going to the part about that Mrs. ▓▓▓▓▓
4 may need surgery?
5     A.   That is correct for the explant that we
6 talked about.
7     Q.   And that should be changed now, if I
8 understand you correctly, to she will require
9 surgery to a reasonable degree of medical
10 probability to excise the remaining mesh?
11     A.   That is correct.  Did you want to object?
12     MR. LUNDQUIST:  I'm sorry.  Maybe I heard
13 something different.  I'm sorry.  I thought you
14 testified that it would require certainly a
15 revision for sure.
16     THE WITNESS:  Revision or explant.  I mean,
17 those are interchangeable terms.
18     MR. LUNDQUIST:  I'm sorry.  I do need more
19 coffee.  My mistake.
20     THE WITNESS:  Okay.  I mean, revision is like
21 hysterectomy.  Explant is how you take it out like
22 a vaginal hysterectomy or abdominal hysterectomy.
23 BY MR. MAZZIOTTI:
24     Q.   Same questions about because of the
25 possibility of additional surgeries, it is possible

Page 597

1 that scarring may occur during the explant process
2 which can lead to nerve damage and new dyspareunia.
3 You can't say to a reasonable degree of medical
4 probability whether or not future surgeries will
5 lead to nerve damage, correct?
6    A.  That is correct.
7    Q.  And you can't say to a reasonable degree
8 of medical probability that future surgeries will
9 lead to new dyspareunia?
10    A.  New onset dyspareunia, dyspareunia that's
11 not been -- you know, that's been controlled and
12 then starting, that is correct.
13    Q.  However, I think you said earlier, in all
14 fairness, it's your opinion that -- it goes into
15 the literature what the success rate is as far as
16 doing an excision and the resulting dyspareunia?
17    A.  That is correct.
18    Q.  The 40 percent, 40 percent?
19    A.  20 percent, that is correct.
20    Q.  I'm getting it.
21    A.  And that's based on the literature and my
22 clinical experience.  I happen to think that the
23 literature is a little bit more optimistic than
24 what I see in my clinical experience because I get
25 to follow these patients a little bit longer than

Page 598

1 when somebody who is seeing a patient for an
2 explant procedure and might be writing a study
3 about it.
4    Q.  What does your experience tell you?
5    A.  That's the numbers I quoted.  In the
6 literature, it might be a little bit higher on
7 success, a little bit lower on persistent.
8    Q.  How much higher on success?
9    A.  I've seen upwards of 60 percent.
10    Q.  And how much lower on persistent?
11    A.  Then 20 percent would be persistent, and
12 20 percent would be improved.
13    Q.  Okay.
14    A.  I know we talked about that yesterday that
15 I think that the literature might be a little bit
16 high on the ability to get rid of pain that does
17 not return, so --
18    Q.  And I think your reasons for that is
19 because of the continuity of care?
20    A.  That is correct.
21    Q.  You also recommend couples therapy for
22 Mr. and Mrs. ████ right?
23    A.  That is correct.
24    Q.  As far as her future prognosis with the
25 type of procedure, what would you recommend?

Page 599

1    A.  Well, she has an obturator sling, so a
2 vaginal operation because, again, we don't have
3 evidence that she has inner thigh or obturator
4 nerve irritation at the present time.  That doesn't
5 mean that it would not or could not develop in the
6 future.
7    Q.  The rest of your report looks like your
8 similar reports on the Align product we've
9 discussed today.  If you take a moment and look, is
10 that an accurate statement?
11    A.  That is correct.
12    Q.  And rather than rehash, I will save us
13 that.  Let me see if there's anything else I want
14 to ask that is not covered in here.  That's all I
15 have on this report.
16    A.  Let me answer this.
17    THE VIDEOGRAPHER:  We are off the record at
18 3:40 p.m.
19         (Whereupon, a short break was
20         taken.)
21         (Whereupon, ROSENZWEIG
22         Deposition Exhibit Nos. 20 and
23         21 were marked for
24         identification.)
25    THE VIDEOGRAPHER:  We are back on the record at

Page 600

1 3:44 p.m.
2 BY MR. MAZZIOTTI:
3    Q.  Dr. Rosenzweig, we've marked as Exhibit 20
4 your copy of ████ ████ Rule 26 report
5 that's been highlighted and then the more complete
6 Rule 26 report produced in this case as Exhibit 21.
7 Is that right?
8    A.  That is correct.
9    Q.  Let's talk about Mrs. ████  Her
10 indications for Align was stress urinary
11 incontinence?
12    A.  Yes.
13    Q.  And urinary frequency?
14    A.  Well, she actually had mixed urinary
15 incontinence due to prolapse and a cystocele.
16    Q.  An Avaulta was used to perform the
17 anterior repair, and an Align was used to perform
18 the bladder neck suspension?
19    A.  Yes.  The Avaulta Plus was used and the
20 obturator Align.
21    Q.  Prior to the implant, did the surgeon,
22 Dr. Barbee discuss with Ms. ████ the risks and
23 benefits?
24    MR. LUNDQUIST:  Object to form.
25    THE WITNESS:  I think we've discussed this

Page 601

1 earlier. Those would be outlined in his
2 preoperative medical record, the consent form and
3 in both depositions.
4 BY MR. MAZZIOTTI:
5   Q.  So your information about informed consent
6 would be contained in the medical records, and I'm
7 looking. I don't know if he's been deposed yet, do
8 you? I'm going to look real fast.
9   MR. LUNDQUIST: I think this one is scheduled
10 for ▓▓▓▓ so no.
11   MR. MAZZIOTTI: Okay.
12 BY MR. MAZZIOTTI:
13   Q.  Looking at Exhibit C to your report, it
14 looks like what you had in preparing this
15 particular report was the deposition of
16 Ms. ▓▓▓▓ So with regard to what information
17 she had about the risks/benefits of these
18 procedures, it would have been from her deposition
19 and what the medical records contained?
20   A.  That is correct.
21   Q.  Okay. Tell me generally what you found to
22 be pertinent for her medical history.
23   A.  She had urinary tract infections and
24 occasional right lower quadrant pain.
25   Q.  And that's after the implant, correct?

Page 602

1   A.  That was prior to the implant.
2   Q.  What page are you on?
3   A.  That was at the bottom of Page 2. In
4 2007, she underwent an Avaulta and a transobturator
5 Align. Her past medical history is significant for
6 urinary tract infection and occasional right lower
7 quadrant pain.
8   On ▓▓▓▓ she was diagnosed with
9 mixed urinary incontinence, and on ▓▓▓▓
10 she underwent a laparoscopic -- total laparoscopic
11 vaginal -- actually, it's total laparoscopic
12 hysterectomy, bilateral oophorectomy, uterosacral
13 suspension and then the Avaulta anterior -- a
14 posterior repair native tissue and an enterocele
15 native repair tissue with a transobturator sling
16 placement.
17   Q.  How about her course after the implant?
18   A.  Five days later she was seen with -- she
19 went home with a Foley catheter, and she noted that
20 she was having some blood in her Foley catheter and
21 some abdominal discomfort. On ▓▓▓▓ she
22 also complained of left lower quadrant pain new
23 onset. On findings, there was no abnormal
24 findings.
25   ▓▓▓▓ 2007, she was six weeks

Page 603

1 post-op. She had left lower quadrant pain and
2 vaginal bleeding. There was a, quote, unquote,
3 intact suture that was still visible. ▓▓▓▓
4 2008, she was seen with -- in the office and exam
5 revealed a one-centimeter linear area of
6 granulation tissue. Silver nitrate was applied to
7 that area, and she was placed on Premarin, which is
8 another hormone vaginal cream.
9   She was seen two weeks later, and she
10 stated that her husband could feel, quote, unquote,
11 a suture in her vagina. A pelvic exam revealed a
12 small area of mesh erosion on the anterior midline
13 approximately four to five millimeters in diameter.
14 There was also granulation tissue surrounding it.
15   ▓▓▓▓ 2008 there was a vaginal
16 exam, which showed that the area of erosion had
17 increased in size to five millimeters by
18 10 millimeters in the anterolateral vaginal wall on
19 the left side.
20   Q.  Okay.
21   A.  The patient was then seen again in ▓▓▓▓
22 There was an erosion that was found to be one
23 centimeter by three millimeters, and the mesh was
24 excised, and the edges were reapproximated with
25 suture. ▓▓▓▓ 2008 there was visual mesh seen

Page 604

1 approximately one centimeter by three millimeters.
2 This was cauterized with silver nitrate and
3 Metrogel, and another vaginal hormone, Vagifem was
4 administered.
5   ▓▓▓▓ 2008 a vaginal exam revealed a
6 five-by-five-millimeter area of mesh erosion. This
7 was resected and the base cauterized. She was seen
8 again on ▓▓▓▓ . At this point, she was now
9 complaining of urge incontinence, again, painful
10 intercourse and vaginal bleeding. An area of
11 one-by-five-millimeter erosion was noted on the
12 vaginal apex, and this was resected. Silver
13 nitrate was applied, and Vagifem was given.
14   ▓▓▓▓ 2008 she presented again. There
15 was an area of eschar, which is an area that is
16 healing, but with more dead tissue than normal
17 granulation-type tissue. That was three by three
18 millimeters. She continued on Vagifem and
19 Metrogel.
20   She was seen ▓▓▓▓ 2008. Her
21 husband was still complaining of what we call his
22 pareunia, which is the male version of dyspareunia.
23 There was a one-by-one-millimeter area of mesh
24 exposure that was excised. And then ▓▓▓▓
25 2008 Dr. Barbee performed a partial explant where a



Page 605

1  one centimeter -- for a
2  one-centimeter-by-three-millimeter erosion.
3      Q.  As far as her other -- as far as other
4  significant issues in her past medical history,
5  it's noted that in the past, she's had a history of
6  depression.  Did you see that?
7      A.  Yes.
8      Q.  Did that factor in as far as the type of,
9  again, therapies that you believe Ms. ████
10  should have in the future?
11      A.  Well, obviously, someone that has
12  depression, if it's controlled with medications,
13  that could be therapy enough to treat specifically
14  the depression.  Counseling can also be helpful
15  with depression; however, someone that has had
16  dyspareunia from a mesh erosion from 2008 through
17  the entire year of 2008 ultimately requiring a mesh
18  explant who states that she has urinary symptoms,
19  she has pain on her right side, abdominal pain, she
20  has pelvic pain and pelvic pressure and it feels
21  like something is dropping in her pelvic area or
22  vagina and had a year of dyspareunia and her
23  husband had pain would probably need a different
24  kind of counseling than for routine depression.
25      Q.  And you saw in the records that at some

Page 606

1  point in -- it was in ████ of 2008 that the
2  husband no longer feels mesh with intercourse,
3  correct?
4      A.  That is correct.
5      Q.  But Ms. ████ dyspareunia continued.
6  Is that your understanding or not?
7      A.  In ████ of 2009, she stated that she was
8  not having dyspareunia.
9      Q.  So what is your understanding as to the
10  current complications that she claims to be
11  suffering?
12      A.  As I stated, she stated that she's having
13  abdominal pain mostly on her right side.  She has
14  pelvic pain, pelvic pressure and the feeling like
15  something is dropping.  I did not see on the last
16  noted gynecologic exam, which, by the records that
17  I saw, was ████ 2013.  It's noted that she has
18  some vaginal atrophy, vaginal dryness, but no
19  recurrence of her prolapse.
20      Q.  Does vaginal atrophy as a result in pain
21  or discomfort?
22      A.  It can, but usually with something being
23  inserted into the vagina if it's severe enough to
24  cause pain.  It doesn't cause pain all the time.
25      Q.  So you ruled that out as to the source of

Page 607

1  abdominal or pelvic pain, right?
2      A.  That is correct.
3      Q.  What is your understanding or what was the
4  cause of the abdominal pain on the right side?
5      A.  What is the cause of the abdominal pain?
6      Q.  I'm sorry.  Go ahead.
7      A.  No.  I was just trying to clarify that
8  question.
9      Q.  As part of her complaints, you said she's
10  complaining of right-sided -- right side abdominal
11  pain?
12      A.  That is correct.
13      Q.  And in your opinion, what is the cause of
14  the abdominal pain on the right side?
15      A.  Well, there are a variety of things that
16  can cause right-sided abdominal pain.  She's too
17  old to have appendicitis.  Diverticulitis, which is
18  an outpouching of the normal lining of the bowel
19  through the muscle of the bowel, can cause
20  left-sided pain.  She could have scar tissue from
21  her laparoscopic total hysterectomy, or it could be
22  due to the mesh.
23      Q.  I guess a better question I should have
24  asked, what are you going to testify to a
25  reasonable degree of medical certainty are the

Page 608

1  complications from the vaginal mesh?
2      A.  Well, multiple erosions that required
3  multiple surgery and that she has a feeling of
4  pelvic pain, pelvic pressure and a dropping
5  sensation inside of her vagina.
6      Q.  Is there anything that can be done to
7  alleviate the dropping sensation in the vagina?
8      A.  Well, obviously, by her last pelvic exam,
9  it wasn't due to recurrence of a cystocele, so it
10  is what we talked about before, an allodynia-type
11  picture where the nerves are picking up -- are
12  being irritated and sending signals to the brain of
13  discomfort that isn't due to an organic cause.
14  It's just due to nerves being irritated.  And so
15  more likely than not, this is the mesh irritating
16  nerves that the brain is picking up as something
17  being dropped when there isn't anything being
18  dropped.
19      Q.  Did you rule out any other causes of that
20  sensation of something being dropped?
21      A.  Well, my experience, patients can have
22  that sensation with prolapse, which we don't have
23  any evidence of, obstructed voiding where they have
24  a large amount of urine left over in their bladder
25  after they pee, and so their bladder now is

Page 609

1 weighing down in their vagina from having a
2 significant amount of residual, which we don't have
3 evidence of.
4      And so the last thing I'm left with is
5 that she has the mechanism by which the recurrent
6 erosions occurred, which is degradation,
7 contraction of mesh, chronic foreign body reaction,
8 chronic inflammation. Deformation of the mesh is
9 also leading to nerve irritation that the brain is
10 perceiving as a dropping sensation, pelvic pain and
11 pelvic pressure.
12    Q.  With degradation of mesh, is there -- is
13 there a certain level of pain, for example, on a
14 scale of 1 to 10 do you ever ask your patients what
15 level it is, and can you use that to rule out
16 whether or not it is due to mesh?
17    A.  I haven't seen any correlation between --
18 in the literature between the level of pain that a
19 patient describes on a scale of 1 to 10 and its
20 correlation to is it associated with mesh or is it
21 not associated with mesh.
22    Q.  And that was a poor question.  As far as
23 the quality or the location or the sensation of
24 pain, is there a common description when a patient
25 comes in describing pain that would be causally

Page 610

1 related to mesh?
2    A.  Well, again, there's what we talked about
3 before.  The stabbing, the gravel, the sitting on
4 glass, the sitting on fiberglass is a fairly
5 typical sensation. Someone that has had -- like
6 Mrs. ████ that had a year's worth of erosion, a
7 year's worth of recurrent surgery to take out the
8 mesh, a year's worth of pain associated with that,
9 that kind of sets up a sensitization where you
10 could see an allodynia.
11      So I haven't seen anything else that would
12 explain that sensation that she is having, which is
13 why I am making -- giving the opinion to a
14 reasonable degree of medical certainty that the
15 pelvic discomfort that she's having is due to
16 allodynia associated with the mesh.
17    Q.  You agree pelvic pain is a very general
18 broad description?
19    A.  That is correct.
20    Q.  And so to rule out other causes, you've
21 got to look at the patient's past medical history?
22    A.  That is correct, which I did in this case.
23    Q.  And so when a patient comes in complaining
24 of generalized pelvic pain without -- well, if a
25 patient comes in just complaining of generalized

Page 611

1 pelvic pain, there isn't a description that
2 typically is associated with vaginal mesh?
3    MR. LUNDQUIST:  Object to form.
4    THE WITNESS:  As I said, I've seen that
5 description of the sitting on glass, sitting on
6 fiberglass, sitting on razor blades.  Sitting on
7 something sharp is a typical issue.  It's not like
8 where I can say that pudendal nerve irritation or
9 genitofemoral nerve irritation or obturator nerve
10 irritation has a specific description and location.
11 I mean, these are just the general nerves of the
12 pelvis that are being irritated, and they might,
13 you know, be fed to the pudendal nerve and have a
14 particular pudendal nerve-type pain or an atypical
15 pudendal or an atypical pain appearance.
16 BY MR. MAZZIOTTI:
17    Q.  Ms. ████ did not sustain any type of
18 nerve damage, though, correct?
19    A.  During the implantation?
20    Q.  Or during any revisions.
21    A.  Well, we know that this is a highly
22 innervated area.  We know that the nerves tend to
23 grow towards and actually through the mesh.  A
24 major nerve like the obturator nerve, pudendal
25 nerve, no.  Smaller new nerves that are growing to

Page 612

1 the mesh from major nerve branches, I would say
2 more likely than not those were injured during the
3 explant procedures.
4    Q.  So what is -- what is the future prognosis
5 for Ms. ████ with regard to the pelvic pain,
6 pelvic pressure and then dropping sensation?
7    A.  Well, more likely than not, it's going to
8 continue.  Obviously, there was contraction,
9 degradation, chronic foreign body reaction, chronic
10 inflammation, deformation of the mesh that led to
11 the recurrent erosions.  So there's an abnormality
12 of this mesh because her erosions could not -- kept
13 coming back with treatment.  Therefore, that
14 abnormality is going to continue to be ongoing.
15      Now, whether that's contraction,
16 degradation, I can tell you from a paper that we
17 talked about yesterday from Dr. Wang in 2004 that
18 recurrent erosions is associated with mesh
19 degradation, and that in order to stop the
20 erosions, you have to take out the mesh.
21    Q.  I understand.
22    A.  Therefore, with a reasonable degree of
23 medical certainty for Mrs. ████ she's going to
24 need her Avaulta and Align removed to stop her from
25 having recurrent erosions.

Page 613

1    Q.  What's the reference to this left lower
2  abdominal pain you made on Page 8?
3    **A.  Well, first off, there were a couple of**
4  **mistakes that I'd like to correct.  Earlier on**
5  **Page 8, I referred to a reasonable degree of**
6  **medical certainty, no cause for Mrs. ▇▇▇▇**
7  **symptoms, and that should be Mrs. ▇▇▇▇**
8    Q.  Correct.  That's in the first paragraph?
9    **A.  Yes.  And I apologize for not catching**
10  **that earlier.  We discussed earlier that the**
11  **persistent lower quadrant pain was right-sided, and**
12  **that's where -- what it should be referenced to**
13  **here.  So I, again, apologize that, unfortunately,**
14  **Page 8 had several inaccuracies that I wanted to**
15  **clear up, and I'm very glad we got to Page 8.**
16       **We already talked about that there are**
17  **many things that can lead to persistent lower**
18  **quadrant pain.  The dyspareunia, the pelvic pain I**
19  **will attribute to the mesh.  The current erosions,**
20  **and the future erosions I will attribute to the**
21  **mesh.  The right lower quadrant pain could be due**
22  **to other sources.**
23    Q.  Okay.  Anything else on Page 8 besides
24  changing the name and then from left to right pain?
25    **A.  Nothing else.**

Page 614

1    Q.  Going to Page 9, the ongoing complications
2  that are described -- well, not described, but
3  stated, what are you referring to with the
4  complications?  Are you talking about the excision,
5  the revision?
6    **A.  The dyspareunia that she was having during**
7  **the time of the erosions and her current pelvic**
8  **complaints.**
9    Q.  And also on Page 9 where you're talking
10  about how Mrs. ▇▇▇▇ may need surgery, you're
11  saying she will require surgery to remove the rest
12  of the Avaulta and Align?
13    **A.  More likely than not, the Avaulta.**
14  **There's a possibility that the Align might need to**
15  **be removed, too, so the may should stick with the**
16  **Align.**
17    Q.  So the way that it should be worded is
18  Mrs. ▇▇▇▇ will require surgery to remove the
19  rest of the Avaulta mesh to a reasonable degree of
20  medical probability?
21    **A.  That is correct.**
22    Q.  And then as far as the Align and whether
23  or not she's going to need any surgery to remove
24  it, you cannot state to a reasonable degree of
25  medical probability if that will be necessary?

Page 615

1    **A.  That is correct because from the location**
2  **of the erosions, it looked like the erosions were**
3  **specifically associated with the Avaulta and not**
4  **the Align.**
5    Q.  Why would the erosion be on the Avaulta,
6  but not the Align?  Do you have an opinion on that?
7    **A.  Well, we talked before about the**
8  **importance of heavyweight --**
9    Q.  Correct.
10    **A.  -- small-pore mesh.  You take the Avaulta.**
11  **You put a piece of collagen on the top, which now**
12  **makes it the Avaulta Plus.  You've doubled the**
13  **thickness.  You've more than doubled the weight,**
14  **and you've obliterated the pore size.  So it only**
15  **goes to -- this is an example of that -- the hybrid**
16  **being associated with more erosions, and the**
17  **literature does support that.**
18    Q.  That part I understand.  Is there --
19  what's your explanation for why there is not
20  erosion with the Align product then?
21    **A.  Well, again, when these processes happen,**
22  **they happen at a different rate in a different**
23  **place.  And so why does one area have an erosion**
24  **and another area does not?  It's probably that**
25  **there's more contraction, more degradation**

Page 616

1  **happening in one area of the mesh than the other.**
2  **So there was probably a greater response on the**
3  **Avaulta Plus than on the Align which led to the**
4  **erosion.**
5    Q.  You agree that Ms. ▇▇▇▇ no longer has
6  stress urinary incontinence?
7    **A.  I did not see anything in her records that**
8  **states that she currently has stress urinary**
9  **incontinence.**
10    Q.  No longer has -- was it cystocele and
11  rectocele?
12    **A.  That is correct.**
13    Q.  So from the literature standpoint, this
14  would be one of those where it would be considered
15  a success, but then there's complications which you
16  would say that's not a success?
17    MR. LUNDQUIST:  Object to form.
18    MR. MAZZIOTTI:  That was a terrible question.
19  I object to myself.
20    MR. LUNDQUIST:  Sustained.
21  BY MR. MAZZIOTTI:
22    Q.  We had talked before in one of your points
23  about the literature that talk about the success
24  rate with vaginal mesh.  It sounded like it was
25  because they defined success whether or not it

Page 617

1 fixes the problem. And I may be oversimplifying
2 that, but that's kind of how I understand it.
3    **A. Well, most of the literature is short term**
4 **and that the primary outcome is success. So that**
5 **when you design a study, you have to -- you're**
6 **trying to prove something. It's easier to show**
7 **success than to do a study that looks at**
8 **complications. You need a smaller number of**
9 **patients, and so that is the -- one of the**
10 **objections with the literature is that it is**
11 **heavily focused -- virtually all the studies, the**
12 **prospective randomized control trials, the success**
13 **rate is the primary outcome variable.**
14    MR. LUNDQUIST: Tom, I'm not trying to --
15 nobody is trying to trick anybody here, but I just
16 want to make clear that the report states that she
17 currently does have urinary incontinence. So I'm
18 not sure if the doctor misspoke or you misspoke,
19 but this whole line of questioning may be a
20 little -- based upon an improper premise, I guess,
21 is my point.
22 BY MR. MAZZIOTTI:
23    Q. Then let me back up because when I asked
24 you what is she currently complaining about,
25 urinary incontinence was not mentioned?

Page 618

1    **A. And I apologize for that.**
2    Q. Now, where are you reading from so we
3 can --
4    MR. LUNDQUIST: Current testimony.
5    MR. MAZZIOTTI: What page are you on?
6    **THE WITNESS: It starts on Page 6, and she**
7 **explained that she's experiencing urinary**
8 **incontinence symptoms and on Page 7, recurrent**
9 **urinary incontinence and again on the top of**
10 **Page 9. I think the hour is --**
11 BY MR. MAZZIOTTI:
12    Q. I'm not trying to -- I was going by what
13 you told me. It says what it says. I'm not trying
14 to mislead you, not intentionally. I'll put it
15 that way.
16       Going down to the IFU here, I should have
17 asked you this earlier when you had this paragraph
18 in your reports. The IFUs that you're criticizing
19 here, is that for both that it was going to be
20 provided to the physician and the patient?
21    MR. LUNDQUIST: Object to form.
22 BY MR. MAZZIOTTI:
23    Q. Okay. You talk about on Page 9, Bard
24 failed to include significant adverse events and
25 risks in its IFU for the devices. Do you see where

Page 619

1 I'm reading from?
2    **A. Yes.**
3    Q. And so when you say Bard is not putting in
4 significant adverse events and risks in its IFUs
5 for its devices, are you saying that you're
6 critical of them because that is what the physician
7 will be relying on in speaking with the patient?
8    **A. That is correct.**
9    Q. And for example, in Ms. ███████ case,
10 is it -- is this a situation where the patient
11 would actually have a copy of the IFU?
12    MR. LUNDQUIST: Object to form.
13    **THE WITNESS: Well, again, that would be**
14 **helpful if the patient actually had a copy of the**
15 **IFU. This was implanted in 2007 before the FDA**
16 **public health notice recommended that patients be**
17 **given a copy of the IFU. If Mrs. ███████ wasn't**
18 **given a copy of the IFU, I cannot fault her**
19 **physician for not providing that to her.**
20       **But again, all the warnings that were**
21 **known at the time should be in the IFU that are**
22 **associated with the device, that a patient has**
23 **her -- a patient would need to know in order to**
24 **make an informed decision about that device. I**
25 **think we went over that in more detail yesterday in**

Page 620

1 a much more elegant way.
2 BY MR. MAZZIOTTI:
3    Q. Right. We talked about it at length
4 yesterday.
5    **A. That is correct.**
6    Q. Once the future surgery related to the
7 Avaulta is done, with regard to the pelvic pain, do
8 you have an opinion to a reasonable degree of
9 medical probability whether that will likewise
10 resolve?
11    **A. We talked about that.**
12    Q. And that goes into the 40 percent,
13 40 percent?
14    **A. That is correct.**
15    Q. How about the stress urinary incontinence,
16 the fact that she's complaining of it now, what's
17 the next step now? She's got an Align. What is a
18 physician supposed to do now?
19    **A. That is an excellent question, and first**
20 **of all, there's -- just to clarify, there are**
21 **several studies that have been published, X study,**
22 **Altman's study that show that there's a risk of --**
23 **an increased risk compared to native tissue repair**
24 **of stress urinary incontinence after pelvic floor**
25 **prolapse mesh surgery, and so this will be a very**

Page 621

1 difficult challenge to determine what is the next
2 best step.
3     My recommendation would be first try
4 nonsurgical therapy, and then I think she would be
5 a candidate for either injection therapy,
6 periurethral injection therapy or a pubovaginal
7 sling.
8     Q. The vaginal mesh in the Align, that's not
9 causing or contributing to the stress urinary
10 incontinence, is it?
11     A. No.
12     Q. The medical history of divertic -- it's
13 been a long day, diverticulitis, did you note that
14 in her records?
15     A. Yes, and I think we talked about that
16 earlier. That would be on the left side of the
17 colon, and that can lead to a left-sided abdominal
18 pain.
19     Q. So that has been ruled out as a cause of
20 her pelvic pain?
21     A. That is correct.
22     Q. As far as her ovarian cysts, history of
23 ovarian cysts, is that -- would that have been a
24 cause or a contributor to the pelvic pain?
25     A. Currently, no, because she had a bilateral

Page 622

1 oophorectomy with her hysterectomy in ███████ of
2 2007.
3     Q. I see a reference to herpes. Does that
4 have any bearing or relevance as to any of her
5 ongoing complaints or complications to the vaginal
6 mesh?
7     A. Only if she had a recurrence of her herpes
8 not associated with the vaginal mesh.
9     Q. And what would be the -- what would be the
10 complication if there was a recurrence?
11     A. She would have a painful lesion on the
12 outside of her vagina.
13     Q. But that's unrelated to the vaginal mesh.
14 That's a complication for her personally, but
15 not --
16     A. That is correct.
17     Q. Any other opinions related to
18 Ms. ███████.
19     MR. LUNDQUIST: Object to form.
20     THE WITNESS: No, sir.
21 BY MR. MAZZIOTTI:
22     Q. Other than reviewing potentially other
23 depositions related to Ms. ███████ and any updated
24 medical records, would you plan on doing anything
25 else in her case?

Page 623

1     A. No, sir.
2     MR. MAZZIOTTI: Let's take a quick break here.
3     THE VIDEOGRAPHER: We're off the record at
4 4:19 p.m.
5     (Whereupon, ROSENZWEIG
6     Deposition Exhibit Nos. 22 and
7     23 were marked for
8     identification.)
9     (Whereupon, a short break was
10     taken.)
11     THE VIDEOGRAPHER: We are back on the record at
12 4:34 p.m.
13 BY MR. MAZZIOTTI:
14     Q. Okay, Dr. Rosenzweig. We've moved on now
15 to ███████ case.
16     A. Yes.
17     Q. And I believe just for the record, let's
18 make sure we're clear. Exhibit No. 22 is your
19 highlighted Rule 26 report, correct?
20     A. That is correct.
21     Q. And Exhibit 23 is the Rule 26 report --
22 the complete Rule 26 report produced in this case,
23 correct?
24     A. That is correct.
25     Q. All right. Let's talk about her care, and

Page 624

1 we'll start, of course, like we have been. In your
2 mind, what are the pertinent facts in her medical
3 history?
4     A. She had a history of defecation
5 dysfunction, a levator spasm, vaginal atrophy,
6 psychiatric issues. Prior to her implantation, she
7 had attended pelvic floor therapy session for
8 approximately 10 weeks as a conservative treatment
9 for stress urinary incontinence. At that time she
10 was not complaining of dyspareunia, abdominal pain
11 or pelvic pain prior to her implant procedure. She
12 underwent a retropubic Align procedure for stress
13 urinary incontinence on ███████ 2011.
14     In ███ of 2012, she was having increasing
15 urinary incontinence. She was having urge, urge
16 incontinence. She was getting up at night to go to
17 the bathroom. She had urodynamics, which did not
18 show stress incontinence, but motor urge
19 incontinence. At that point, she was also
20 complaining of pelvic pain and painful intercourse
21 and was started on Detrol.
22     She does have a history of having
23 sacroiliac joint problems and having injection
24 therapy and was wearing a brace for her sacroiliac
25 problems. She also has more severe levator

Page 625

1   tenderness on a ▮▮▮▮▮ 2014 visit with
2   levator -- excuse me, pelvic floor muscle spasm,
3   dyspareunia and pelvic floor muscle weakness.
4       Q.   Okay.  And this is a case where the Align
5   was used, correct?
6       A.   That is correct.
7       Q.   And what specifically is your
8   understanding as to why the surgeon implanted the
9   Align?
10      A.   For stress urinary incontinence.
11      Q.   And as far as Ms. ▮▮▮▮ current
12  complications, what is your understanding?
13      A.   She complains of dyspareunia, inability to
14  fully empty her bladder and leaking urine, and on
15  her last visit with Dr. Lowder, they discussed a
16  mesh removal option.
17      Q.   You mentioned before that part of her
18  medical history that's pertinent is, I think,
19  psychiatric issues, correct?
20      A.   That is correct.
21      Q.   And she was hospitalized for approximately
22  three days back in 2008?
23      A.   That is correct.
24      Q.   What is the -- when you say it's
25  pertinent, what was pertinent about that as it

Page 626

1   relates to her past medical history?
2       A.   That was a notable event, and therefore, I
3   noted it in her past medical history.
4       Q.   The fact that she has had mental health
5   issues in the past, does that affect or impact how
6   she perceives pain?
7       A.   There is a possibility, though, I -- in my
8   experience with patients with psychiatric problems,
9   they don't typically have typical manifestations of
10  inappropriate response to pain.
11      Q.   The bladder issues she is currently
12  experiencing, does the fact that she smokes
13  contribute to any of those issues?
14      A.   I think we talked about yesterday about
15  the impact that smoking has on upper respiratory
16  function increasing the chances of having cough and
17  increasing intraabdominal pressure, so it can
18  increase the frequency with which someone would
19  leak with a stress incontinence episode.
20      Q.   Specifically with Ms. ▮▮▮▮ do you
21  agree that her smoking is a contributing factor to
22  her ongoing bladder issues?
23      A.   It can be a contributing factor.
24      Q.   As well as Ms. ▮▮▮▮ has been diagnosed
25  with morbid obesity, you would agree that also

Page 627

1   is a contributing factor to her ongoing bladder
2   issues?
3       A.   We've discussed that before, and as I
4   stated, there is an improvement in incontinence
5   with weight loss.
6       Q.   And I know we talked about it in the
7   context generally, but specifically as it relates
8   to Ms. ▮▮▮▮ her morbid obesity is a
9   contributing factor to her bladder issues?
10      A.   Obesity is a contributing factor to
11  urinary symptoms.  What level of contribution in
12  any individual patient is difficult to say, but I
13  would agree that both smoking and obesity are known
14  factors that impact lower urinary tract function.
15      Q.   Are you saying in Ms. ▮▮▮▮ case, it
16  also is a contributing factor?  These are also
17  contributing factors, or are you just saying
18  generally?
19      A.   Generally, but you can't say just because
20  something is a contributing factor that that is a
21  factor contributing to an individual patient.
22      Q.   Okay.  I understand.
23      A.   Salt intake increases hypertension, but I
24  can't say that patient X's hypertension is due to
25  excessive salt intake or something else.

Page 628

1       Q.   And what did you do specifically to rule
2   out other causes or contributing factors to her
3   dyspareunia and her ongoing bladder leakage?
4       A.   Well, I reviewed her medical records.  I
5   reviewed her past medical history.  She did have
6   episodes of levator spasm, defecatory dysfunction,
7   but she went through a pelvic floor therapy session
8   from ▮▮▮▮ of 2010 through ▮▮▮▮ of 2010,
9   which would have also helped any levator spasm.
10          I don't see any record prior to her sling
11  implant that she was having a recurrence of her
12  levator spasm until after the mesh was implanted.
13  And because the retropubic sling goes through the
14  urogenital diaphragm, which is a muscle that's
15  attached to the levator muscle, we talked before
16  about mesh and muscle causing muscle irritation.
17  Irritation of the urogenital diaphragm will then
18  re-irritate the levator muscle.
19          And so what we see here when she's going
20  to see Dr. Foster is that we have what is being
21  described as pelvic floor muscle spasm and marked
22  levator spasm.  So we see an elevation or a higher
23  level described as her levator spasm than what was
24  described before.  So while she might have a
25  predisposition for levator spasm, it is my opinion

Page 629

1  with a reasonable degree of medical certainty that
2  the mesh is causing this marked degree of levator
3  spasm and this pelvic floor muscle spasm that was
4  described in ███████ of 2014.
5      Q.   Ms. ████████ has a history of vaginal
6  dryness, correct?
7      A.   That is correct.
8      Q.   Vaginal dryness also can be the cause of
9  the dyspareunia, correct?
10     A.   There are two reasons why I would say that
11  it is less likely in her case that vaginal atrophy
12  is causing her complaints of dyspareunia.  Number
13  one, she's under the average age of menopause, and
14  the second is she's morbidly obese.  And the fat
15  cells actually produce estrogen, so women that are
16  obese tend to have higher circulating levels of
17  estrogen than women who are not obese, and
18  therefore, with a reasonable degree of certainty,
19  her vaginal tissue is being exposed to more
20  estrogen than a woman who is less of her weight,
21  and therefore, I would say that vaginal atrophy is
22  not a significant contributor to the current
23  dyspareunia that she's having.
24     Q.   When you say not a significant
25  contributor, you do agree, though, it is a

Page 630

1  contributor?
2      A.   It can be a contributor.  I mean, it was
3  described as mild urogenital atrophy.  And so I
4  think that a mild urogenital atrophy would have a
5  minimal impact on pelvic pain and pain during
6  intercourse.
7      Q.   The abdominal cramping that Ms. ████████
8  complains of, do you attribute that to the pelvic
9  mesh?
10     A.   She states that her abdominal pain -- she
11  had abdominal pain prior to her Align, which was
12  consistent with severe cramping due to her
13  menstrual period.  That is a typical kind of
14  complaint that we call dysmenorrhea, which is
15  cramping pain during the period.  She says that the
16  pain that she's currently having is different, so
17  by using what her testimony is and that this pain
18  that she might have had prior is different from the
19  pain that she's currently having and that the event
20  that preceded this pain was having the Align, with
21  a reasonable degree of medical certainty, this
22  abdominal or pelvic pain that she's describing is
23  due to the Align procedure for the reasons that I
24  stated earlier that she's now having marked levator
25  and pelvic floor muscle spasm due to the mesh going

Page 631

1  through the urogenital diaphragm, which is
2  connected to the levator muscles.
3      Q.   Is the cramping -- when we say cramping,
4  are you interpreting that also to be included under
5  the description of pelvic pain, or is that
6  something different?
7      A.   Reading what her testimony is, she states
8  that unlike menstrual cramps before implant, she
9  states that her pain is a different kind of cramp
10  that prevents her from standing long enough IN the
11  shower.  She must use a shower chair to prevent the
12  cramping.  She's having dyspareunia, and she's
13  having pelvic pain.
14     Q.   Have you ever had a patient that has had
15  cramping like that related to a mesh product?
16     A.   I have seen just about every kind of
17  complaints due to mesh products, yes.
18     Q.   Including the cramping that Ms. ████████
19  describes?
20     A.   Yes.
21     Q.   Is there anything in the literature that
22  describes this type of pain that attributes it to
23  vaginal mesh?
24     A.   There are a number of different studies
25  that try to quantify and qualify the kind of pain

Page 632

1  that patients complain of, however, most studies
2  just tend to lump things together as either groin
3  pain, pelvic pain without saying the nature of the
4  pain whether it's crampy, whether it was sharp
5  stabbing, whether it was dull achy.  So there isn't
6  a lot of -- we had this discussion before.  There
7  isn't a guide to say that sharp stabbing pain,
8  mesh; dull achy pain, something else.
9          And again, having listened to patients
10  complain about pain and pain symptoms, I think
11  patients do a very -- have a very hard time a lot
12  of times actually describing the characteristics of
13  their pain.  And when one patient says it's stabby,
14  another patient might describe an equal origin of
15  pain as crushing or crampy.  So there are
16  different -- there are different ways that people
17  will use to describe something that might be
18  describing the same thing, but using different
19  adjectives.
20     Q.   So --
21     A.   And when we describe -- you know, there's
22  no pain meter.  We use a scale that goes from a
23  smiley face to a frowny face with different degrees
24  in between, and the patient goes that's what my
25  pain is like.  We don't have that to describe the

Page 633

1 character of pain, so it's -- we can't look at like
2 a bomb blowing up or a knife cutting something and,
3 you know, point to what characterizes your pain.
4 We tend to rely on the patient's own description of
5 it.
6    Q.   Well, how do you then rule other things
7 out?  Is it just because the -- it's a new onset of
8 pain?
9    A.   Well, you look in the past medical history
10 to see if there was something that is associated
11 with pain.  You look at whether the patient
12 complained of the pain.  I talked about her levator
13 spasm and her defecatory dysfunction as things that
14 I looked at in her prior medical records and her
15 past medical history.
16       It appears that when she had physical
17 therapy prior, that helped her levator spasm.  She
18 is describing the spasm as being at a more elevated
19 level.  So yes, there are various things that we
20 can look at to help narrow down when the onset of
21 pain is, but it's kind of -- there are very few
22 pains that you can say beside the location of the
23 pain, what is, you know, being -- you know, what
24 the cause is of the pain.
25    Q.   Now, Ms. ███████ also complains of muscle

Page 634

1 spasms.  Are you attributing those to the vaginal
2 mesh or -- because it's a new complaint?
3    A.   The levator muscle spasm that's worse, and
4 I explained the pathophysiology of that, the mesh
5 going through the urogenital diaphragm, which is
6 attached to the levator muscles, if you irritate
7 the urogenital diaphragm, you're going to irritate
8 the levator muscles.
9    Q.   Okay.  So that's a yes?
10    A.   That is correct.
11    Q.   What about the pelvic pain radiating to
12 the legs?
13    A.   The pelvic pain, yes.  I think that
14 possibly some of the pain radiating down her legs
15 can be due to the sacroiliac joint problems that
16 she's being treated with.
17    Q.   What do you mean by that?
18    A.   Well, she has -- she's wearing a brace for
19 right sacroiliac joint problems.  That's where the
20 sacrum meets the crest of the bones here.  That can
21 irritate the nerves that are coming out of the
22 back, and that can lead to what she's describing as
23 hip pain, low joint pain, and that could lead to
24 pain radiating into her right thigh.  So that I --
25 pain in her hip, her thigh radiating down her leg I

Page 635

1 can rule out as being caused by the Align.
2    Q.   To a reasonable degree of medical
3 probability?
4    A.   That is correct.
5    Q.   On Page 6 is where you talk about what her
6 current complications are and that she's going to
7 have ongoing complications and need medical
8 treatments.  What specifically in the future, what
9 type of medical treatments are you referring to?
10    A.   Well, the same treatments that we talked
11 about for other -- you know, the other patients
12 that have or other plaintiffs that had dyspareunia
13 and pelvic pain.  With her, I would definitely
14 recommend conservative therapy with vaginal
15 suppositories, trigger point injections in the
16 urogenital diaphragm, nerve block and then as a
17 last resort, an excision.
18    Q.   And as far as the -- again, I know I've
19 asked you this, but specifically with this
20 particular patient, the prognosis of -- to
21 alleviate these complications, do you have an
22 opinion as to the success rate or any other
23 complications that may happen in the future?
24    A.   As far as related to the sling?
25    Q.   Correct.

Page 636

1    A.   Well, her pain might not be resolved with
2 conservative measures.  Her pain might not be
3 resolved with surgical extrication.  She might
4 develop other complications such as erosion,
5 obstructive voiding.  We know that with a
6 retropubic sling and an obturator sling that
7 obstructive voiding continues to go up with time.
8 We discussed that yesterday.  So all the long-term
9 risks associated with the sling products are the
10 risks that she would be exposed to.
11    Q.   And the erosion, you can't state to a
12 reasonable degree of medical probability she will,
13 in fact, have that, can you?
14    MR. LUNDQUIST:  Object to form.
15    THE WITNESS:  The mesh will continue to
16 degrade, to contract, to undergo a continual
17 foreign body reaction and to deform, and therefore,
18 with reasonable degree of medical probability, that
19 is continuing to occur inside of Ms. ███████  How
20 that manifests, whether that manifests as voiding
21 obstruction, erosion, pain, which she currently
22 has, I can say that those will continue to happen.
23 The manifestation, besides the one that she
24 currently has, I can't say to a reasonable degree
25 of medical certainty that it will definitely

Page 637

1 happen.
2 BY MR. MAZZIOTTI:
3    Q.  You said a lot there.  I want to make sure
4 I'm clear.
5    I know your opinion is that mesh degrades,
6 reacts and deforms the longer it's implanted in the
7 human body, right?  That's your opinion?
8    **A.  That is correct.**
9    Q.  As to whether or not the degrading,
10 reacting and deformation that occurs will lead to
11 manifestations --
12    **A.  Beside the ones that have already**
13 **occurred.**
14    Q.  Correct.  You can't state to a reasonable
15 degree of medical probability what is going to
16 happen going forward?
17    MR. LUNDQUIST:  Object to form.
18    **THE WITNESS:  Well -- and again, we talked**
19 **about this yesterday.  According to the Abbott**
20 **study, 70 percent of patients that present with a**
21 **complication have multiple complications.  So you**
22 **know, she has pain.  She has dyspareunia.  Those**
23 **could be looked at as two separate complications so**
24 **that, you know, there's a more than likely chance**
25 **of patients that have a single complication of**

Page 638

1 **having multiple complications, but I can't say that**
2 **with a reasonable degree of medical certainty what**
3 **those complications are going to be.**
4 BY MR. MAZZIOTTI:
5    Q.  Other than removing the Align, is there
6 another way to alleviate the dyspareunia for
7 Ms. ████?
8    **A.  We talked about the therapies,**
9 **conservative therapies, yes.**
10    Q.  And again, the success rate goes into the
11 literature you referred to earlier?
12    **A.  That is correct.  Well, that's the success**
13 **rate for surgery.  For nonsurgical therapy, it's**
14 **probably in that same order, maybe a little bit**
15 **higher risk of it not being efficacious.**
16    Q.  And specifically for Ms. ████ do you
17 have any recommendations on what you would do if
18 she was your patient?
19    **A.  I would start with Valium suppositories**
20 **and follow that up, if that didn't work, with**
21 **trigger point injection, nerve block.**
22    Q.  And give it six months to five years to
23 see if the conservative treatment works?
24    **A.  Well, you continue your treatment, if it's**
25 **working.  You're not going to go out five years and**

Page 639

1 say oh, you know, it hasn't worked.  So if it
2 **hasn't worked in a period of time, then move on to**
3 **another therapy.  I mean, the six months to five**
4 **years is if the therapy has been efficacious.**
5    Q.  Correct.  And after five years, if it's
6 not, then you consider surgery?
7    **A.  No.  Three to five years of therapy if the**
8 **therapy has been effective.  If it hasn't been**
9 **effective, you would move up the chain, you know,**
10 **quicker.**
11    Q.  I agree.  I understand what you're saying.
12    **A.  Right.**
13    Q.  We're on the same page.
14    **A.  Okay.**
15    Q.  As far as informed consent, same
16 questions.  You would get your information from the
17 medical records, Ms. ████ deposition and
18 then, of course, the surgeon?
19    **A.  That is correct.**
20    Q.  And I don't think at this point we have a
21 deposition of the surgeon?
22    **A.  That is my understanding, too.**
23    Q.  So at least for your opinions expressed in
24 this report, it's based on the medical records and
25 Ms. ████.

Page 640

1    **A.  That is correct.**
2    Q.  Have you told me all of your opinions
3 about Ms. ████ that you hold?
4    MR. LUNDQUIST:  Object to form.
5    **THE WITNESS:  That is correct.**
6    MR. MAZZIOTTI:  We can go off the video record,
7 and we'll chat on the written order.
8    THE VIDEOGRAPHER:  This marks the end of
9 tape 3.  The time is 4:59 p.m.  We are off the
10 record.
11    MR. MAZZIOTTI:  Will, we've discussed it off
12 the record.  Let's just memorialize it on the
13 record.  I'm going to at least end this portion of
14 the deposition today.  For the record, I reserve
15 and keep it open to finish the remaining specific
16 plaintiffs with the Clark firm, and specifically
17 we've done, I believe, eight.  The ones that are
18 remaining are ████ ████████ ████
19 ████ ████ and ████ ████████  Go
20 ahead, Will.
21    MR. LUNDQUIST:  I have a few questions.  I'll
22 respond in a minute.  I want to make sure the
23 record is clear.
24
25

Page 641

```
1                  EXAMINATION
2    BY MR. LUNDQUIST:
3         Q.   Doctor, you specifically prepared for
4    these 13 plaintiffs over the course of this week,
5    did you not?
6         A.   That is correct.
7         Q.   Are you prepared to continue today on the
8    remaining reports you prepared for these
9    plaintiffs, again, specifically ████ ████
10   ████ ████ ████ ████ ████ and ████
11   ████
12        A.   Yes.
13        Q.   Are all your opinions on these plaintiffs
14   reflected in your case-specific reports?
15        A.   That is correct.
16        Q.   And you are also aware that your
17   deposition for these five plaintiffs was noticed to
18   be taking place yesterday and today, correct?
19        A.   That is correct.
20        MR. LUNDQUIST:  Obviously, our position, as I
21   noted yesterday, Tom, is plaintiffs collectively
22   think we bent over backwards to offer
23   Dr. Rosenzweig now for an extra day.  We think
24   three and a half days is sufficient.  I think I've
25   given Bard and yourself fair notice that we were --
```

Page 642

```
1    I mean, it's 5:00.  We're prepared to continue for
2    a couple more hours today.
3              And I appreciate your position while I
4    disagree with it because the doctor has been
5    through a lot.  And if he's still ready to go, I
6    don't see why we would stop now, particularly given
7    it's going to mean that we come back out here, prep
8    and then again present the good doctor for this
9    issue.
10             So I think the letters and the e-mails
11   will speak for themselves, so I'll leave that to
12   the court's discretion.  But it is what it is, and
13   I certainly will let you respond if you need to,
14   but I think the record, from our standpoint, is
15   clear.
16        MR. MAZZIOTTI:  Just to be clear, we have gone
17   through eight from 9:30 until 5:00 approximately.
18   We have five more.  At this pace, we will go well
19   into the evening.  This is, of course, after a full
20   day of general questions yesterday, and then the
21   doctor has got more questions related to different
22   sets of plaintiffs tomorrow.
23             I understand that there will be another
24   day at some point with Dr. Rosenzweig, whether or
25   not it's the Clark firm or not, where we do have to
```

Page 643

```
1    come back to Chicago as well.  And I do think we've
2    gone at the fastest clip of any of the depositions
3    that have been taken so far and have been through a
4    lot to get to accommodate and try to get through
5    these 13 today.  I just don't see it happening.
6              I believe he's the only expert that has
7    been identified to give 26 specific plaintiff
8    causation opinions, so that presents a unique
9    situation.  So we agree to disagree.  I understand
10   your point as well.  I just want to make sure that
11   the record is clear that we have made significant
12   efforts to try to get through all 13 of your
13   clients today.
14        (FURTHER DEPONENT SAITH NAUGHT.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 644

```
1    STATE OF ILLINOIS )
2                      )  SS:
3    COUNTY OF C O O K )
4              I, GINA M. LUORDO, a notary public within
5    and for the County of Cook County and State of
6    Illinois, do hereby certify that heretofore,
7    to-wit, on October 30, 2014, personally appeared
8    before me, at 320 North Dearborn Street, Chicago,
9    Illinois, BRUCE ROSENZWEIG, M.D., in a cause now
10   pending and undetermined in the United States
11   District Court for the Southern District of West
12   Virginia, In Re: C.R. BARD, INC., PELVIC REPAIR
13   SYSTEM PRODUCTS LIABILITY LITIGATION.
14             I further certify that the said BRUCE
15   ROSENZWEIG, M.D. was first duly sworn to testify
16   the truth, the whole truth and nothing but the
17   truth in the cause aforesaid; that the testimony
18   then given by said witness was reported
19   stenographically by me in the presence of the said
20   witness, and afterwards reduced to typewriting by
21   Computer-Aided Transcription, and the foregoing is
22   a true and correct transcript of the testimony so
23   given by said witness as aforesaid.
24             I further certify that the signature to
25   the foregoing deposition was not waived by counsel
```

Page 645

1  for the respective parties.

2         I further certify that the taking of this

3  deposition was pursuant to notice and that there

4  were present at the deposition the attorneys

5  hereinbefore mentioned.

6         I further certify that I am not counsel

7  for nor in any way related to the parties to this

8  suit, nor am I in any way interested in the outcome

9  thereof.

10        IN TESTIMONY WHEREOF:  I have hereunto set

11  my hand and affixed my notarial seal this 3rd day

12  of November, 2014.

13

14

15

16

17

18        NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19        LIC. NO. 084-004143

20

21

22

23

24

25

---

Page 646

1  TO: William Lundquist

2  Re: Signature of Deponent Bruce Rosenzweig, M.D.

3  Date Errata due back at our offices:  12/03/2014

4

5  Greetings:

6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF

7  transcript, noting any changes or corrections on the
   attached PDF Errata.  The deponent may fill out the

8  Errata electronically or print and fill out manually.

9
   Once the Errata is signed by the deponent and notarized,

10  please mail it to the offices of Tiffany Alley (below).

11
   When the signed Errata is returned to us, we will seal

12  and forward to the taking attorney to file with the
   original transcript.  We will also send copies of the

13  Errata to all ordering parties.

14
   If the signed Errata is not returned within the time

15  above, the original transcript may be filed with the
   court without the signature of the deponent.

16

17

18  Please send completed Errata to:

19  Tiffany Alley Global Reporting & Video

20  730 Peachtree St. NE, Ste 470

21  Atlanta, GA 30308

22  (770) 343-9696

23

24

25

---

Page 647

1  ERRATA

2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that

3

4  ___ There are no changes noted.

5  ___ The following changes are noted:

6
   Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

7  Procedure and/or OCGA 9-11-30(e), any changes in form or
   substance which you desire to make to your testimony shall

8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any

9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.

10

11  Page _____ Line _____ Change _____

12                                _____

13  Reason for change _____

14  Page _____ Line _____ Change _____

15                                _____

16  Reason for change _____

17  Page _____ Line _____ Change _____

18                                _____

19  Reason for change _____

20  Page _____ Line _____ Change _____

21                                _____

22  Reason for change _____

23  Page _____ Line _____ Change _____

24                                _____

25  Reason for change _____

---

Page 648

1  Page _____ Line _____ Change _____

2                                _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5                                _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8                                _____

9  Reason for change _____

10  Page _____ Line _____ Change _____

11                                _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14                                _____

15  Reason for change _____

16  Page _____ Line _____ Change _____

17                                _____

18  Reason for change _____

19

20                                _____

                   DEPONENT'S SIGNATURE

21

   Sworn to and subscribed before me this ___ day of

22  _____, _____.

23

   _____

24  NOTARY PUBLIC

25  My Commission Expires:_____

**$**

**$10,000** 488:23
489:3

**$100** 488:13

**$125** 488:19

**$15,000** 423:1
489:12

**$20,000** 489:12

**$25,000** 524:14

**$30** 488:16

**$5,000** 489:2

**$75** 488:19

**1**

**1** 480:1 492:25
576:7,22 591:2,
10 609:14,19

**1.4** 571:15

**1.6** 571:15

**10** 423:4 425:16
427:15 460:8
463:9 479:21,25
490:15 496:23
501:21 502:1
532:7 564:16
580:17 603:3,18
606:17 609:14,
19 624:8 625:1

**10,000** 423:2,10

**10-week** 486:19,
21

**10:33** 442:18

**10:40** 442:22

**11** 425:16 501:22
502:3,6 604:20

**11:47** 492:25

**11:59** 493:5

**12** 448:5 459:15
525:14,20 549:8

**123-page** 420:16

**12:10** 501:15

**12:11** 501:19

**12:46** 525:8

**13** 402:21 422:13
431:16 513:13
525:15,25 526:7
577:10

**14** 547:17 548:9
592:5 603:15

**15** 423:4 479:22
548:5,10 576:13

**15th** 577:2

**16** 457:18
575:14,18

**17** 467:2,7,21
575:15,20

**18** 512:19 532:8
589:6,17 602:25

**19** 466:2,6 589:7,
18

**1973** 456:16

**1:36** 525:12

**2**

**2** 401:3 402:18
446:10 493:5
526:10 552:25
566:21 576:6,7,

20 591:3,5
602:3

**20** 496:23 521:1
524:14 597:19
598:11,12
599:22 600:3

**2003** 479:9,10

**2004** 612:17

**2005** 549:14
552:21 555:13
557:2,18

**2007** 602:4,25
619:15 622:2

**2008** 445:20
459:9,15 460:8,
12 463:9 466:3,
6 467:2,7,21,23
550:14,16,22
551:2 552:1
555:13 573:4
576:13 577:7,10
603:4,15,25
604:5,14,20,25
605:16,17 606:1
625:22

**2009** 468:9
502:15 577:10
606:7

**2010** 504:9 532:8
534:16 578:22
628:8

**2011** 461:1
504:12 505:19
512:16,19
550:22 551:2
579:1,2,24
581:6 593:7,14
624:13

**2012** 461:1
467:14 513:3,13
530:18 533:2
534:17 536:7
550:17 552:1
580:17 581:2,
17,25 582:13
583:1 624:14

**2013** 559:12,24
560:1 592:4
606:17

**2014** 403:12
404:24 537:4
582:13 583:16
590:10 591:13,
23 625:1 629:4

**21** 599:23 600:6

**22** 623:6,18

**22nd** 532:17
604:8

**23** 623:7,21

**24** 604:5

**24th** 594:16

**25** 581:17

**26** 430:10
444:20,22 445:2
502:4 548:10
575:18 589:17
600:4,6 623:19,
21,22

**26th** 468:9

**27** 445:20 550:22
604:14

**27th** 466:13
602:21

**28** 550:13

In Re: CR Bard (200)   Bruce Rosenzweig, M.D.   10/30/2014

**29** 459:9 514:25

**29-year-old**
502:13

**2:35** 566:16

**2:43** 566:21

---

**3**

**3** 421:19,22,24
459:16 466:2
504:12 526:18,
23,25 527:1,11,
15 591:17 592:3
640:9

**30** 579:1 604:24

**3:17** 589:2

**3:25** 589:10

**3:40** 599:18

**3:44** 600:1

---

**4**

**4** 527:13 537:15

**40** 422:15,17
472:8 496:17,
18,25 506:14,20
520:25 597:18
620:12,13

**4:19** 623:4

**4:34** 623:12

**4:59** 640:9

---

**5**

**5** 488:23 512:11
541:23 583:16
594:22 624:13

**50** 422:15,17
452:1

**51.4** 515:3

**53-year-old**
446:16

---

**6**

**6** 471:2 473:3
513:20 514:2
546:5 588:3,10,
13 618:6 635:5

**60** 496:25 598:9

**61-year-old**
576:5

**6th** 602:8

---

**7**

**7** 483:14 487:23
517:2 564:25
586:11 588:8,12
618:8

**70** 506:18 637:20

**75** 488:18

**750** 422:20

---

**8**

**8** 444:11,15,19
445:10 453:19
454:15 487:24
521:15 566:24
585:19 613:2,5,
14,15,23

**8th** 602:9

---

**9**

**9** 444:16,22
446:3 614:1,9
618:10,23

**91** 557:16,17

**9:41** 401:2

---

**A**

**a.m.** 401:2
442:18,22
492:25 493:5

**Abbott** 500:20
637:19

**abbreviations**
482:15

**abdomen** 540:9,
13,15 573:12

**abdominal**
405:15 529:2,
20,22 530:15,
19,20,21,23
531:3,4 533:8
534:23,24
535:3,19,20
536:1,19 537:1
540:19 549:10,
13 552:22
554:10 555:5
596:22 602:21
605:19 606:13
607:1,4,5,10,14,
16 613:2 621:17
624:10 630:7,
10,11,22

**ability** 553:25
598:16

**ablation** 592:14,
16,18,22,25

**able** 408:19
424:25 430:16
452:6,10 463:18
466:9 483:1
504:7 524:18
542:13 543:15
549:2 558:16,22

**abnormal** 449:2
459:17 558:21
602:23

**abnormalities**
449:7 465:16,20

**abnormality**
612:11,14

**about** 404:24
405:23 409:10
410:6 411:4,13,
17,21 413:1,10
415:1,13,16,18,
24 416:1,4,13
418:7 419:18,
21,25 420:12
421:11 422:22
424:6 425:18
427:15 429:18,
22,23,25 430:24
431:6 432:17
434:11 435:1
436:2,9 437:5,
17,19 438:6
442:12 443:1,2,
10,18 444:9
450:6,16 451:14
452:4,7,25
453:11,16,22
454:3,7,16,24
455:3,21,23

456:10 457:16,
17 459:1,6,8
460:1,3,5,21
461:4,12,13,14,
19 463:2,6,12
465:8 466:2,3
469:22 470:9
471:25 472:1,2,
5 473:17
476:19,22,25
478:11 479:21,
23 480:16,25
481:3,8 482:24,
25 483:3,10
485:6 486:16
488:13 489:8,12
490:16,22
491:1,7,8,22
492:4,8,17
493:21 494:7
496:15,18,23,
497:25 498:2,
19,25 499:1,11
500:8,13,23,25
501:8 505:6
509:17 510:7
513:10,19
516:6,21 517:3
519:20 520:18
521:9,15,16
522:7 523:4,10,
25 524:2,14
525:18 526:14
527:15,24
528:17 529:10,
20 531:13
532:24 535:19
537:12,16
538:11 539:7
540:1 541:4,19,

25 542:4
544:11,13,24
545:22 546:12,
14,15,23 547:1,
548:2 549:4
551:11 553:1,11
554:6 555:17,23
556:1,7,10
559:6,12
560:10,11
561:16 565:1,
13,14 568:6
569:3,25 570:7,
17,18 571:7,14
573:5 574:2,10,
12,14,20 579:8
583:3,15
584:12,22
585:18 586:11,
17 587:1,5,14
588:1,2,8 590:9
591:10,14,17
592:23 594:11,
23 595:9,20,21
596:3,6,24
598:3,14 600:9
601:5, 602:17
608:10 610:2
612:17 613:16
614:4,10 615:7
616:23 617:24
618:23 619:24
620:3,11,
621:15 625:25
626:14 627:6
631:16 632:10
633:12 634:11
635:5,11 637:19
638:8 640:3

**above** 543:24
548:25 571:16

**absolutely**
410:15

**abuse** 435:6

**accept** 435:9

**access** 516:23
544:17 553:13

**accompanied**
460:10

**accordance**
402:2

**according**
468:20 470:3
471:19 472:18
504:23 637:19

**accurate** 599:10

**achy** 632:5,8

**acids** 578:6

**active** 459:23

**activities** 434:3
448:21 495:12
524:19 528:5

**actual** 581:12

**actually** 416:17
417:6 421:2,4
442:24 446:5
465:1,2 470:1
479:2 493:12,15
494:25 520:2
540:8,14 544:20
561:13,23 564:2
574:24 590:17,
21,24,25 594:17
600:14 602:11
611:23 619:11,
14 629:15

632:12

**acute** 474:21
515:9

**add** 492:18
500:17 587:24

**added** 417:5
426:24 436:23

**adding** 413:25

**addition** 425:8

**additional**
482:18 501:4
518:10 519:20
525:1 542:19,22
568:17 596:25

**addressed**
496:21 497:2

**addressing**
434:5

**adds** 413:3 414:4

**adhesiolysis**
530:18

**adhesions**
502:19 503:10
505:25 506:2,5
531:6 534:22
535:9,10,12,20,
22,25 536:3,4,6
537:2 538:4,6
539:14 540:6,8,
12,16,18,22,25
541:7

**adjectives**
632:19

**administered**
604:4

**adverse** 618:24
619:4

**advised** 480:11 481:19

**affect** 626:5

**after** 406:6 445:14,21 447:12 459:5,22 460:7 467:2 468:12 478:16 496:13 497:7 498:22 504:2,3,9 506:5 524:18 529:25 531:2, 532:5,23 533:13 534:9,23 538:3 539:18 540:16, 22 541:1,10 550:11 555:14 557:2 560:18 561:3,8,13 564:14 565:1 576:24 577:1 581:20 582:17 595:10 601:25 602:17 608:25 620:24 628:12 639:5

**afterwards** 595:15

**again** 403:20 409:2 410:1 411:23 412:22 413:25 420:4 421:25 425:14 433:11 452:17 455:20 458:2 459:18 468:6 475:10 476:19 486:24 495:10 509:2 512:24

516:6 518:1 519:21 521:15 522:4 523:16 524:5 530:2 531:12 532:20 542:2,6 543:20 562:4 565:23 575:12 577:11 580:13 582:11 587:13,15,20 599:2 603:21 604:8,9,14 605:9 610:2 613:13 615:21 618:9 619:13,20 632:9 637:18 638:10

**against** 423:10

**age** 445:12 515:2,3 549:8 629:13

**agent** 499:4

**ago** 423:20

**agree** 429:10 430:3 442:2 443:22 461:10, 18 462:13,19 466:6 481:13 482:9 499:25 500:9 610:17 616:5 626:21,25 627:13 629:25 639:11

**agreeable** 402:3

**Agreed** 402:4

**agreement** 401:20 422:22

**agrees** 462:6

**ahead** 427:10 433:25 444:9 453:10 495:18 510:17 532:16 563:12 576:2 593:11 607:6 640:20

**aid** 409:24 410:8 454:5

**Align** 428:25 444:6 446:11 447:19 448:11 454:10 457:2 458:19 459:12, 17,21 460:20 464:10,17,24 470:12,13,24 471:14 472:16 476:8,11 483:18,21,23 484:2 499:18 500:3,12,15 503:13 507:3,19 508:6,20 512:14 514:5,8 518:1 522:3 530:23 531:8,25 532:1, 5,7 534:1,4,10 536:17,25 537:10,21,25 538:3 542:1 549:18 550:5,9, 16 562:18 563:7 589:24 599:8 600:10,17,20 602:5 612:24 614:12,14,16,22 615:4,6,20

616:3 620:17 621:8 624:12 625:4,9 630:11, 20,23 635:1 638:5

**all** 401:24 402:1, 5 403:4 404:9 406:11,14 408:3,6 414:4 415:23,25 420:4 422:14,16 425:18 433:13 434:15 435:7 438:24 442:7,14 446:9 449:4 450:16 454:20 469:1 473:20 483:6 491:8 495:18 500:13 508:8 514:2 524:16 525:5 527:19 528:3 530:20 546:25 547:1,19 549:24 557:11 563:5, 18,23 574:10 583:22 597:13 599:14 606:24 617:11 620:20 623:25 636:8 640:2

**allergies** 473:25

**alleviate** 517:12 542:13 608:7 635:21 638:6

**alleviated** 473:21

**alleviating** 485:3 522:23



481:13 483:5,
10,19 484:3,21,
23,25 485:12,21
487:4 488:5,24
490:4,5,9,24
491:13,15
496:19, 497:20,
24 498:3,23
499:3,15
500:14,25
502:1,3 503:9,
11 505:4,6,14,
15,24 509:7
510:12 511:11,
25 512:3,24
513:16 514:12,
21 515:24
517:22 518:18,
21,22 519:19
520:7,21 521:19
522:11,17,19
523:3,4,7,25
525:20,25 526:5
528:19 532:3,25
535:23 536:21
537:3,13 539:1,
4 540:2,21
543:9,15 548:1,
9,12 551:4,8,12
552:20 553:6,9,
10,22 554:5
555:1,3 556:8
557:24 558:17,
19,22 559:16
563:18 564:12
565:5,8 568:6
570:14 574:25
575:12,17
577:3,16,25
581:23 583:17

584:13,22
585:25 587:3
588:16 589:17,
18,24 594:2,3
597:15 598:24
600:3,6 605:3,8
606:9,12,20,25
607:9 608:16
609:10,22 611:4
614:22 621:19,
22 622:4 625:8,
11,25 626:24
627:3,7 628:21,
23 630:3 632:2,
15 633:13,18
634:22 635:1,
16,18,22,24
636:4,20 637:9,
23 639:15

**ascribe** 459:21

**ascribed** 577:20

**aside** 411:9

**ask** 409:2 410:17
423:14 425:18
427:10 443:4
478:21 496:11
523:3 556:2
560:11,15 596:1
609:14

**asked** 408:8
413:19 419:4,8
427:20,25 463:1
471:25 474:7
476:17 478:23
508:2 519:25
521:3,6,10
531:14 541:12
545:14 560:8
575:7 585:1

607:24 617:23
618:17 635:19

**asking** 411:1
449:20 450:22
451:14,23 454:6
477:21,24 500:8
541:24 549:23
560:20

**aspects** 433:24
437:6

**assessment**
449:11 556:22

**assist** 586:2

**associated**
474:23 477:7
479:11 481:19
508:5 509:11
516:12 519:8
529:22 530:21
533:15 536:25
540:24 549:11
554:9,14,16
555:9 568:3,10
570:13 571:18,
21 572:16
583:5,9 584:4
590:23 595:16,
17 609:20,21
610:8,16 611:2
612:18 615:3,16
619:22 622:8
633:10 636:9

**association**
499:21,25
500:2,7,8

**assume** 403:5
423:15 428:2
446:11 517:4

588:5

**assumed** 423:15
555:13

**assuming** 418:21
422:19 429:10
432:2 521:19
527:3 542:21,24

**assuredness**
584:7

**asymptomatic**
506:15,21
527:14

**at** 403:16
406:11,14 407:2
409:7 410:5
412:12,23 414:1
419:13 421:25
424:9 425:4
430:3,16 438:20
441:7,14
442:17,21
443:22 446:23
450:3 455:19
458:20 459:9,16
463:3,22
465:12,14
466:4,6, 467:7
468:14 473:15
475:1 479:13
480:14,22
481:10 487:8,23
488:16 491:2
492:13,14
496:12 500:19
501:14,18
502:6,15,18
504:13 506:16
507:6 513:5
517:2 519:19



618:23 619:3

**base** 604:7

**based** 412:9
430:19 453:3
472:24 490:12,
13 497:12 517:4
521:21 586:12,
13 597:21
617:20 639:24

**based-repair**
570:7

**basic** 438:23
439:15, 481:16

**basically** 544:24

**basics** 439:18

**basing** 412:14

**basis** 406:10,13
407:19 437:1
439:20 488:18,
22 544:3

**bathroom**
624:17

**battle** 411:24

**bearing** 622:4

**became** 406:24
417:1

**because** 407:11
411:5 416:7
423:3,6 431:3
437:12 439:19
444:12 445:25
458:13,24
462:11 464:18
466:22 469:15
470:19 489:3,19
492:7 493:25
494:6 499:17

504:24 530:7
539:14 546:16
555:14 558:1,22
562:8,22
563:14,24
564:16 567:22
571:16 572:4
573:11 578:14
582:2 583:8,11
585:7,14 587:3
590:23 592:19,
20 594:8 597:24
598:19 599:2
612:12 615:1
616:25 617:23
619:6 621:25
627:19 628:13
633:7 634:2

**become** 409:17
487:15 564:7,18

**becomes** 405:20

**before** 409:14
410:16 417:10
418:8 424:16
434:6 442:24
443:1,18 445:13
448:2 452:4
453:9 456:1
469:18,19
475:20 483:5,6,
9 490:16 496:15
498:21 505:6
510:13 512:21
518:18 520:22
522:10 523:7
531:11 534:10
537:2,25 538:11
539:7,16,22
542:24 546:12,

14,15,16 552:4
553:3,6 554:7
555:16 556:23
557:24 569:4,25
570:17 581:25
583:4 584:22
585:2 590:7
595:2 608:10
610:3 615:7
616:22 619:15
625:17 627:3
628:15,24 631:8
632:6

**beforehand**
554:24

**beginning** 401:3
493:4 541:13
566:20

**begins** 468:10

**behalf** 401:7,13

**behind** 469:2

**being** 401:22,23
428:20 433:22
451:10 464:9,
10,13, 470:14,
20 479:11 482:8
491:23 510:3
514:10 521:6
533:1 534:20
535:24 554:2
555:3 560:21
570:14 594:3
606:22 608:12,
14,17,20 611:12
615:16 628:20
629:19 633:18,
23 634:16 635:1
638:15

**believe** 402:21
407:22 411:6
432:3 440:15,24
507:22 508:8
516:25 517:16
532:21 548:8
567:11 589:15
605:9 640:17

**below** 514:3

**beneficial** 522:6
586:3

**benefits** 600:23

**beside** 559:2
593:21 633:22
637:12

**besides** 636:23

**best** 441:7,14
452:10 491:6
492:14 553:25
564:22 621:2

**better** 430:2
433:24 472:21
536:5 607:23

**between** 448:7
450:18 474:20
479:10 481:5
488:18,23 512:8
540:9 550:21
551:2 552:1
573:18 609:17,
18 632:24

**beyond** 482:19

**bigger** 562:23

**bilateral** 502:17
510:21 602:12
621:25

**bimonthly** 491:3

**binders** 406:20, 21,25

**biofeedback** 485:2 486:3,5 488:17,19 497:3

**birth** 447:11

**bit** 411:5 415:1 455:13 458:21 483:3 546:5,17 586:11 597:23, 25 598:6,7,15 638:14

**Blackmon** 504:13,18,20,23 507:24,25 508:2,11,12,18 574:13,23

**Blackmon's** 574:17 575:4

**bladder** 448:23, 24 449:1,5 450:10,19 465:7,19,24,25 469:12,16 470:11 471:17 472:15, 479:17, 20 498:3,5,7 513:9 514:15,21 533:3,5,7 537:5, 16 559:21,23 560:4,14 577:3 584:20 585:25 586:5,7 593:23 600:18 608:24, 25 625:14 626:11,22 627:1,9 628:3

**bladders** 450:7

452:2 475:22 476:24 479:21 560:19

**blades** 611:6

**Blaivas** 492:19

**bleeding** 561:3, 8,13 562:1,3,9 580:1 603:2 604:10

**bleeds** 561:24

**blindly** 463:15

**block** 517:20 635:16 638:21

**blocks** 485:1 487:13 488:21 489:1

**blood** 442:8 451:5,7, 532:10, 11 558:1,2,6 602:20

**blowing** 538:8 633:2

**board** 439:13

**Bobby** 573:3

**body** 461:22 494:21 510:22, 25 511:8 513:12 519:13 520:9 538:25 539:3 551:24 568:11 571:19 574:8 585:16 609:7 612:9 636:17 637:7

**bomb** 633:2

**bone** 543:24

**bones** 634:20

**Boston** 418:1,10 419:4 420:12,21 421:13

**both** 407:8 418:13 433:20 441:12 445:4 448:17 450:12 458:13,14 482:23 510:22, 25 549:13 552:7 558:10,16 562:18,20 563:7,8,14,16 571:13 575:24 582:15 601:3 618:19 627:13

**Botox** 485:1 487:15 488:21

**bottom** 446:10 487:23 517:2 537:15,18,20 538:1 541:23 561:21 571:7 574:12 602:3

**bowel** 465:2,4 531:7 535:10, 12,23 538:7 540:10 607:18, 19

**brace** 624:24 634:18

**brain** 608:12,16 609:9

**branch** 493:16

**branches** 612:1

**break** 423:6 442:13,19 449:6

493:2 501:16 525:9 566:18 588:24 589:3 599:19 623:2,9

**breaking** 566:12

**breast** 549:7

**brewing** 459:18

**briefly** 443:18

**bring** 415:16 434:7,24,25 435:7 575:8

**broad** 610:18

**broken** 404:12

**brought** 525:21 580:9

**brown** 532:9

**Bruce** 401:4,20 402:11

**bullet** 443:23

**bunched** 551:22 552:3

**bunching** 552:6 559:3 562:20,24

**Burch** 454:14 457:10 474:9 475:14,23 476:5,14 477:18 478:1,6,14,16 479:19 497:18 560:10,13,18 570:13

**burning** 532:9 592:25 595:1,7

**busy** 408:7 434:14

**C**

**C.R.** 401:13

**call** 427:10
448:24 604:21
630:14

**called** 417:23
422:4,5 465:11
479:3 526:21,22
533:12 538:25
540:12 555:6
559:25 570:8
580:3,6 590:18

**came** 431:22
437:18 457:15
463:9 580:3,12

**can** 402:9 407:18
414:15 424:1
425:19 426:5
427:7 430:1,8
433:15 434:8,21
436:8 442:7,15
444:25 445:22,
25 446:2,5,7
449:5, 450:8
451:23 454:6
458:10,13 460:6
462:22 463:6,
19,20,21 465:5,
8,9,23 467:16
469:24,25 470:1
474:3,10,15
475:20,21,
477:25 478:5,6
479:4,5,6,7,
480:17 481:10
483:21 484:12
486:3 488:24

493:12,15
498:1,8,10
499:3 506:22
507:4 509:17,
19,20 510:5,15
515:5 516:9,21
518:24 519:14
520:20 522:6
523:17 526:2
527:8,9, 530:21
532:12 535:20
543:13,21
547:25 551:18
553:14,23 555:8
556:1,6 558:7
560:12 563:18
564:13,22
568:24 590:16,
17,20,21,23,24
591:15 593:10
594:7,14 597:2
605:14 606:22
607:16,19
608:6,21 609:15
611:8 612:16
613:17 618:3
626:17,23 629:8
630:2 633:20,22
634:15,20,22
635:1 636:13,22
640:6

**can't** 405:24
433:18 440:17,
448:23 449:2
451:13 452:14
463:12,17 474:8
477:9,16 478:12
484:3 488:8
489:15 490:8,9
507:15 516:17

519:21 545:15
551:18 564:14
570:18 578:16
597:3,7 627:19,
24 633:1
636:11,24
637:14 638:1

**canal** 590:12
591:25 594:1

**cancer** 420:2
437:11 498:5
499:11,19
500:6,11

**candidate** 456:6,
8,11 457:8
497:15 503:24
586:9 621:5

**candidates** 457:2

**cannot** 440:21
476:12 484:7
507:12 519:23
527:6 614:24
619:18

**capable** 491:19

**capture** 549:2

**care** 438:18,25
439:1,4,18
448:5 453:24,25
487:17,20
488:12 506:1,6
511:23 512:9
521:16 539:15
541:8 543:5
546:9 553:10
570:1 598:19
623:25

**career** 407:3

**caring** 407:15

**carry** 571:4

**case** 410:8
411:11 413:5
415:11 417:6,15
418:1,3,5,10,22
420:21 421:13
430:12 431:6
432:3 435:13,24
436:12 456:17
462:25 493:18
497:1,12 498:15
516:13 518:3
520:10 529:24
574:20 575:5,
594:7,19 600:6
610:22 619:9
622:25 623:15,
22 625:4 627:15
629:11

**case-specific**
404:7 416:25
417:4 418:15
420:20 421:8
423:17 425:5,6,
23 426:25
456:21

**cases** 403:24
404:25 406:12,
417:15,19 418:7
421:12,14,19
423:20,22
431:4,10 432:3
438:8 482:9
512:6 521:9
574:24

**catch-all** 405:18

**catching** 613:9

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

**category** 405:13 506:11 585:2 591:6

**catheter** 504:7 577:5 602:19,20

**causally** 540:3 583:12 584:15 609:25

**causation** 418:13,15 421:9 428:19,21 429:6,18,21 499:13

**causative** 499:4, 21

**cause** 420:1 449:15,19 450:4,13,21 451:9,25 452:8, 9 459:25 460:15 464:9 473:6 475:20,22 478:25 479:4,6 494:3,4,11 498:8,10,12 500:5 503:9,11 506:2 511:11 513:15,18 514:23 515:5,6, 9,15 516:4 518:23 519:15 529:6,8 530:15 532:25 533:5,16 535:3,16,20 536:21 540:3 541:7 557:8 558:17,19,22 568:14 569:10, 13,14 577:16

583:20,23 590:16,18 594:6,8 595:6 606:24 607:4,5, 13,16,19 608:13 613:6 621:19,24 629:8 633:24

**caused** 431:1 440:15 458:18 475:19 577:25 578:11 579:18 586:16 635:1

**causes** 450:8 464:16 503:6 509:16 539:12 586:4 587:24 593:18 608:19 610:20 628:2

**causing** 450:25 452:3 468:23 493:22 529:12, 16 538:20 552:23 561:8, 13,25 579:14 584:8 592:20 621:9 628:16 629:2,12

**cauterized** 604:2,7

**cavity** 515:14

**cells** 532:11 582:8 629:15

**center** 492:13, 15,18,19

**centers** 491:23

**centimeter** 527:1 580:14 603:23 605:1

**centimeters** 463:7 581:21

**central** 463:7

**certain** 423:23 447:12 449:7 609:13

**certainly** 467:11 482:5 596:14

**certainty** 451:25 457:7 460:18 472:11 473:6 474:16 475:7,13 476:1,8,13 477:11,17,25 478:13 483:25 484:4,9,13,17 485:14 490:1 499:17 500:11 505:7 507:2 508:23 510:19 517:6,12 518:7 519:5,22,24 537:10 542:14 543:2 554:21 563:14 564:6,20 568:13 579:20 581:15 584:23 585:13 586:16 587:8 607:25 610:14 612:23 613:6 629:1,18 630:21 636:25 638:2

**certificate** 439:13

**certificates** 436:22

**certification**

439:13

**cervical** 590:11, 12,16,18,20,21 591:24,25 592:12 593:25 594:1,5,17

**cervix** 558:23 580:7 590:17,22 594:7,14,18

**chain** 639:9

**chair** 631:11

**challenge** 621:1

**chance** 472:8 475:24 496:17 497:2 498:22 564:17 637:24

**chances** 472:7 476:2 520:23 626:16

**change** 408:25 444:4 553:16 558:1 569:15,20

**changed** 413:2 421:1 423:3 550:18 561:2 596:7

**changing** 515:17 613:24

**character** 633:1

**characteristic** 539:20

**characteristics** 632:12

**characterize** 411:6

**characterizes** 633:3

Case 2:12-md-02327  Document 7282-3  Filed 06/19/20  Page 475 of 924 PageID #: 216888

In Re: CR Bard (200)                    Bruce Rosenzweig, M.D.                    10/30/2014

charge 488:18, 19

charging 422:19

Charlie 507:11 515:24

chat 640:7

check 448:17 449:10

Chicago 424:7 428:2

chief 473:19

choice 569:23

choose 495:25

chronic 432:19, 21,25 433:14,15 434:20 435:4,5 452:13 461:21, 22,23 464:20 479:3,23 494:20,21 513:9,12 515:10 519:12,13 520:8 529:1,7,9,12,16 550:19 568:11, 12 585:16 609:7,8 612:9

chronicity 539:19

chronological 494:16

circulating 629:16

circumstances 426:16 567:18

cities 491:18,19 492:6

Civil 401:25 402:2

claims 606:10

clarify 575:3 607:7 620:20

clarity 428:6

Clark 403:14,16 404:10,17 414:15 416:21 417:9,23 418:11 419:13 421:12, 15 422:4,24 423:7,18 424:5 435:14,20,24 640:16

clear 420:10 428:8 435:23 471:11 557:2 563:17 567:4 584:14 588:4 613:15 617:16 623:18 637:4 640:23

clients 416:23

Clinic 428:14

clinical 430:21 439:11 467:10 472:24 490:13 491:4 523:1 554:12 597:22, 24

close 490:14 519:18 520:4,7 566:14

closer 488:25 489:1,2 520:6 539:9

coated 565:25

coelomic 515:17

coffee 596:19

coherent 478:20, 22

cold 583:22 584:1

collagen 571:16 615:11

collectively 526:24

colon 621:17

colonize 465:5, 25

colonized 465:4

colposacropexy 550:14

colposuspension 454:14

combination 450:12 486:11, 13 527:22

come 407:14 408:11,24 409:13 427:8 430:15,23 431:14 435:18, 24 437:1,11 464:24 465:16 475:25 492:1,22 501:4,5 514:24 525:2 538:17

comes 413:20 433:4 434:23 437:4 447:8 454:3 457:24 512:16 526:24

528:2 581:9 609:25 610:23, 25

comfort 442:13

comfortable 409:8 413:22 438:20 441:19 524:7

coming 563:1 612:13 634:21

comment 456:24 565:21,22,23 588:12

common 538:14 539:10 609:24

communicating 553:10

community 462:14 464:25

compared 457:22 571:13 620:23

comparing 457:16,18

compelling 574:9

competent 450:3

compile 417:3

compiling 414:18

complain 632:1, 10

complained 504:14 602:22 633:12

complaining

In Re: CR Bard (200)     Bruce Rosenzweig, M.D.     10/30/2014

436:2 516:17
533:7 538:11
540:4,25 541:2,
4 546:3 549:17
604:9,21 607:10
610:23,25
617:24 620:16
624:10,20

**complains**
625:13 630:8
633:25

**complaint**
416:18 473:19,
21,22,23 538:14
539:10 630:14
634:2

**complaints**
416:10 430:18
445:15 459:9
467:4,24 468:10
469:7,17 485:4
512:17,20
530:22 532:9,18
533:3 536:11
540:21,24
552:20 553:6
577:8 578:22
584:14 591:22
592:8 593:4,19
595:9,11 607:9
614:8 622:5
629:12 631:17

**complete** 445:5
473:4 491:19
508:15 518:25
520:23, 525:25
575:21 589:17
600:5 623:22

**completely**
474:18 520:11
527:14 556:4
593:23

**complicated**
523:21

**complication**
440:15 475:3,16
500:15 509:11
533:15 622:10,
14 637:21,25

**complications**
432:14 433:4
434:6,24 435:15
436:2 441:23
457:24 458:12,
18 474:17,19,
21,23 475:4,9
476:7,23
480:12,13
485:23 486:17
492:21 493:9
497:21 500:19,
22 503:7 504:4
506:25 508:5
509:7 520:18
522:23 529:25
544:12 554:9
570:10,12,20,24
571:5 572:14,16
573:1,6,18
574:1 580:23
606:10 614:1,4
616:15 617:8
622:5 625:12
635:6,7,21,23
636:4 637:21,23
638:1,3

**component**

449:13,14,16,17
451:1

**compounding**
488:17

**concede** 482:18

**conclusion**
435:15,18
473:12 560:3

**conclusions**
430:24

**concomitant**
576:21

**condition** 407:12
437:7,8,17
442:10,11
470:20 529:12,
21

**conditions** 442:5
445:13 450:4
451:11 516:5
527:19,22
528:3,9 557:12
558:18

**confirm** 480:2

**confused** 494:6
531:1 586:11

**confusion**
574:25

**connected** 631:2

**consent** 480:5,
15,18,22,24
481:1,4,15
482:4,6 507:22,
23 508:16
544:25 545:2,9
601:2,5 639:15

**conservative**

484:1 485:10
542:4 586:9
624:8 635:14
636:2 638:9,23

**conservatively**
485:10 518:20

**consider** 456:9
506:10,13 528:4
639:6

**consideration**
462:24 479:14

**considered**
616:14

**consistent**
538:16 630:12

**consolidated**
418:14

**constant** 504:17

**constipation**
452:13

**consulting-only**
436:7

**contain** 414:17

**contained**
482:19 556:14
601:6,19

**contend** 570:5

**contents** 535:24

**context** 627:7

**continual** 636:16

**continue** 472:16
487:2, 515:4
518:23 519:7,
11,14,15 564:12
568:2,10,14
579:23 612:8,14

Case 2:12-md-02327   Document 7452-3   Filed 06/18/19   Page 471 of 940 PageID #: 188347









547:7,17 548:5
551:19 554:6
556:21,22
559:20 573:3,22
574:15,17
575:4,14 585:22
589:6 599:22
601:15,18 623:6
639:17,21
640:14

**depositions**
405:3 407:21
408:1,18
409:13,15,22
412:15 413:12,
16 414:3,18
416:6 417:1,5
418:8 424:25
425:6 427:25
430:13 433:17
462:7 481:6,9
501:5 525:2
601:3 622:23

**depression**
438:19 439:6,
17,21 440:1,8,
14 441:1 521:24
522:1,10,15
545:24 605:6,
12,14,15,24

**depressive**
438:22

**describe** 405:12
457:13 530:15
532:5 538:10
594:2,3 632:14,
17,21,25

**described** 432:6
456:14 458:2

481:6,7 505:14
515:24 555:18,
20 557:24
563:11 577:3
587:15 594:12
614:2 628:21,
23,24 629:4
630:3

**describes**
631:19,22

**describing**
554:24 572:10
587:11 609:25
630:22 632:12,
633:18 634:22

**description**
474:4 609:24
610:18 611:1,5,
10 631:5 633:4

**design** 617:5

**designated**
436:6,7

**designed** 593:1

**destroyed** 582:8

**detail** 521:17
526:14 619:25

**detected** 581:12

**determination**
453:4

**determine**
530:10 561:12
586:4 621:1

**detriment**
433:19

**Detrol** 559:25
624:21

**develop** 496:24
499:18 500:11
540:16 555:8
558:1 585:9
594:24 599:5
636:4

**developed**
537:16 559:24
576:11 595:15

**developing**
499:11 517:10
519:16 594:25

**deviation** 463:4

**device** 512:14
519:9 619:22,24

**devices** 568:4
618:25 619:5

**devoid** 474:19

**diabetes** 439:16
451:4

**diagnosed** 439:6
441:1 468:21
506:7 536:8
581:5 602:8
626:24

**diagnoses** 562:5

**diagnosis** 430:15
431:9,12,14,17
437:8,10 439:9
441:4 479:15
503:5 530:10
558:13 587:25

**diagnostic** 541:5

**diameter** 603:13

**diaphragm**
544:1 628:14,17
631:1 634:5,7

635:16

**didn't** 422:2
423:14 426:6
428:1 457:20
499:10 509:24
515:10 522:8
533:18 544:22
555:14 563:12
567:4 638:20

**died** 437:14

**difference**
450:18 474:20
573:18

**differences**
444:7

**different** 405:9
408:8 410:18
411:5 485:25
486:5,6 487:1
492:11 534:14
537:24 539:4,
17,19,20 551:9
555:3 556:16,19
562:5 596:13
605:23 615:22
630:16,18
631:6,9,24
632:16,18,23

**differential**
430:15 431:12,
13,17 450:2
479:14 503:5
530:10 558:13
587:24

**differently**
546:5,18,20

**difficult** 406:14,
24 408:9 410:10

412:20 432:22
433:23 434:15
460:22,24 477:6
518:19 561:10
587:5 621:1
627:12

**difficulty** 504:6
577:2 593:22

**diminishing**
496:18

**direct** 446:25
498:23 512:13

**directly** 404:22
437:2 511:25

**disability** 438:8
521:4,5,7,11

**disadvantage**
458:21

**disagree** 429:14
456:6

**disagreement**
461:11,13,14

**disagrees** 461:6
462:2,5,15

**disc** 414:14,16,
17 415:3
480:20,22
529:17

**discharge** 532:9
558:24 577:9,
13,16,20
578:12,18
595:1,7

**discharged**
577:4

**disclosed** 412:5

**discomfort**
498:11 511:9
558:7,8,11
595:2,14 606:21
608:13 610:15

**discovery** 401:24
408:23

**discuss** 416:3
424:22 428:17
433:8 434:16
455:24 522:5
582:11 600:22

**discussed** 417:3
454:21 458:7,10
481:4 485:19,21
501:10 503:18
513:14 520:7,22
522:17,24,25
531:11 546:23
564:9 570:12
599:9 600:25
613:10 625:15
627:3 636:8
640:11

**discusses** 413:2

**discussing** 433:2

**discussion**
413:10 416:1
433:10 435:1
517:5 524:24
565:6 591:13
632:6

**discussions**
556:11

**disease** 451:3
478:25 479:4,9,
12 529:18 549:7
583:25

**disk** 579:16
583:25

**disorder** 432:19,
25 433:1,15
434:20 435:4
441:2 498:20,21

**disorders**
438:21, 439:22
440:1,8 442:7

**dispense** 425:20

**disrupt** 558:6

**distal** 465:5

**divertic** 621:12

**diverticulitis**
607:17 621:13

**divorce** 437:13

**doctor** 402:6
403:7 405:5
437:3 463:5,12,
17 482:8,23,24
493:8 501:25
511:20 512:1,5
525:18 534:25
535:6 541:5
548:8 556:2
566:24 575:11
588:19 589:12
617:18

**doctors** 408:2
487:4 512:8
513:1 578:15

**document**
416:17 482:14
583:15

**documentation**
479:9

**documented**

**disk** 467:12 480:7,8,
10 481:8,22
482:5,10,18
499:8 533:13

**documents**
407:3,6,7,21
414:23 415:2,5
425:4 430:22
445:6 460:20
483:7,8 526:6
544:15 573:23

**doing** 407:4
430:1 432:7
437:22 487:6
488:1 523:16
534:25 538:21
543:18 592:24
597:16 622:24

**done** 404:10
408:18 416:24
426:13,21
427:15 431:22
433:13 436:25
444:19 445:14
448:17 454:12,
23 456:1 458:15
463:23 474:9
484:14 505:24
521:5 524:6
525:20 550:13,
16 553:9 569:6
580:17 589:16
608:6 620:7
640:17

**doubled** 615:12,
13

**doubles** 507:15

**doubt** 442:9

**down** 402:22
404:12 418:17
437:9 507:16
509:10,21 510:8
531:6 543:25
571:7 575:24
578:8 609:1
618:16 633:20
634:14,25

**Dr** 401:20
402:16 413:6
425:22,24
428:7,10,12,13,
18 429:6,11
442:24 443:1
455:25 460:11,
25 466:5,9,11,
13,21,22,24,25
467:14, 468:20
469:4,23 471:19
480:3,5,11
481:5,18 498:19
504:13,18,20,23
505:20,21
507:24,25
508:2,11,12,17,
18 512:20,23
531:22,24
548:20 574:4,
13,17,23 575:4,
18 576:14,19
577:12 580:9,
12,15 585:21
595:2,4 600:3,
22 604:25
612:17 623:14
625:15 628:20

**draft** 417:3

**draw** 423:10

**drawing** 520:5
539:9

**drinking** 434:2

**dropped** 608:17,
18,20

**dropping** 605:21
606:15 608:4,7
609:10 612:6

**dryness** 606:18
629:6,8

**due** 451:16
452:12 460:2
470:17 471:14
493:10 510:5
533:1,25 536:17
537:2 538:4
549:11 556:24
559:23 562:17
579:11 580:13
582:19,21 583:2
584:10 586:7
587:8,12 592:9,
12 600:15
607:22 608:9,
13,14 609:16
610:15 613:21
627:24 630:12,
23,25 631:17
634:15

**dull** 632:5,8

**duly** 402:12

**duplicate** 414:22

**duration** 491:7

**during** 467:21
473:18 493:20
520:3 524:23
551:14 568:24
580:8 590:19

594:9 597:1
611:19,20 612:2
614:6 630:5,15

**dysfunction**
504:14 512:17
624:5 628:6
633:13

**dysmenorrhea**
502:21 630:14

**dyspareunia**
441:10,11
445:18 459:23
460:2,7 468:1
472:7,9,14
473:6,14 475:5,
16,19 476:3,16,
24 477:1,5,7,19
478:2,6 479:11
484:22 486:7
487:12 490:19
493:24 494:1,3,
4,5,11 496:14,
16 498:11 499:6
504:15 507:17
509:9 510:12,15
512:18 517:22
520:17,19
552:11 561:7
562:12 568:25
569:18 593:17
594:6 595:17
597:2,9,10,16
604:22 605:16,
22 606:5,8
613:18 614:6
624:10 625:3,13
628:3 629:9,12,
23 635:12
637:22 638:6

**dysuria** 467:4,24
468:14,18
473:7,14 504:16
512:18 530:11
536:25 537:6,17

_____

E

**each** 404:6
406:16 414:8,
20,24 416:18,23
426:5 430:7,9,
24 431:4,6,16
432:4 433:21
434:5 443:4,20,
25 452:15
456:22,24
527:21 534:17
545:13

**earlier** 474:7,10
475:15 494:1
517:5 521:17
522:18 523:10
524:17 531:15
536:2 538:23
544:13 545:15
546:24 560:8
563:6 567:1
574:14 595:19
597:13 601:1
613:4,10 618:17
621:16 630:24
638:11

**easier** 429:24
445:25 446:4
478:8 549:1
617:6

**easy** 407:10
477:6

Case 2:12-md-02327   Document 7452-3   Filed 06/18/20   Page 88 of 940 PageID #: 213291



**error** 513:22
594:20

**eschar** 604:15

**established**
491:24

**esterase** 580:3,
20

**estimate** 524:11
545:15

**estrogen** 580:2
629:15,17,20

**etcetera** 523:12
524:18 595:7

**etiologies**
473:12,14

**etiology** 577:20
578:13

**evaluate** 410:22
450:3 456:21

**evaluating**
456:20

**even** 472:6
482:14 490:15,
16 556:9 559:10
561:1 572:3

**event** 432:20
626:2 630:19

**events** 463:20
552:1 618:24
619:4

**ever** 417:9
426:13,18 427:6
435:13 436:25
438:4 439:6
440:13 441:5
521:3 538:10
631:14

**every** 416:2
434:16 437:9,19
486:16 546:13
631:16

**everybody** 405:9

**everything**
406:25 449:1
482:10

**evidence** 461:20
462:22 466:4,7
467:8,11,20
468:6 505:13
515:10 563:20
569:4 579:17
581:13,18 584:6
587:22,23
590:25 594:16
599:3 608:23
609:3

**exacerbated**
473:22

**exact** 403:20
405:24 421:3,5
448:9 449:19
450:13,21
451:9,12 452:8,
14 508:21

**exactly** 434:19
502:7 534:17

**exaggerated**
561:16,22

**exam** 432:7
561:12 577:9,11
579:2 594:16
603:4,11,16
604:5 606:16
608:8

**examination**
402:14 468:3
562:6

**examine** 411:11
432:4 562:14

**examined**
402:12 404:16
411:11 414:10

**examines** 489:22

**examining**
431:25

**example** 404:9
406:1 413:11
415:3 423:11
440:3 488:8
511:2 609:13
615:15 619:9

**exams** 432:5

**excellent** 416:9
620:19

**except** 496:8
590:4 595:13

**exception** 431:24
512:7

**excessive** 627:25

**excise** 596:10

**excised** 445:20
466:15 472:19
580:10 582:3
595:2,10 604:24

**excising** 595:5

**excision** 495:11
524:14 562:19
597:16 614:4
635:17

**exclusively**
407:7

**excuse** 464:19
533:18 540:23
556:21 579:4
625:2

**exercise** 497:4

**exercising**
434:12

**exhibit** 444:11,
15,19,22 445:10
446:3 483:8
501:21 502:1,3,
6 506:22
525:14,20,25
526:7 547:14,17
548:5,9,10
575:12,14,18,20
589:6,17,18
599:22 600:3,6
601:13 623:6,
18,21

**exhibits** 526:1

**exists** 473:8

**expands** 535:23

**expansion**
535:25 538:7

**expect** 506:4

**experience**
413:13 430:21
439:11 441:22
460:6 472:5,19,
25 476:1 479:24
490:13 491:4
492:20 496:13,
16 523:1 527:12
528:1 538:5
554:13 559:21,
22 586:13
593:24 597:22,

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

24 598:4 608:21 626:8

**experienced** 574:4 577:2

**experiences** 469:13 537:24

**experiencing** 459:23 469:12 507:1 513:2 537:4 538:2 550:18 553:2,19 556:17 561:3 593:15 618:7 626:12

**expert** 408:21 410:22 411:3,6 414:3,9 418:12, 15,16,23 420:20 421:8 427:20 428:19 436:8 437:23 438:1,4 551:12

**experts** 410:6,21 411:10,16 412:1,4,10,17, 18 413:11,19 416:2 427:4

**experts'** 413:12

**explain** 433:13 443:19 535:15 538:20 576:11 593:22 610:12

**explained** 618:7 634:4

**explanation** 493:24 581:23 615:19

**explanations** 515:16

**explant** 405:4,5, 10,12 472:6,10 485:4 487:16 488:1,24 489:6, 23 490:17 491:20 495:7 496:17,25 497:8 512:23 513:2,4 517:8 542:17 559:9 561:1, 563:6,17 568:19,20,21,24 581:21 582:22 583:2,6 595:25 596:5,16,21 597:1 598:2 604:25 605:18 612:3

**explanted** 411:2 471:20 563:16

**explanting** 405:5

**explants** 414:2 485:7,8 492:2,3 496:22 569:6

**exploration** 563:23

**explore** 491:8

**exposed** 593:6, 12 595:3,5,8,10 629:19 636:10

**exposure** 551:21 552:15 604:24

**express** 433:21 451:24 547:2

**expressed** 418:22 429:14,

18 639:23

**extensive** 489:9

**extent** 405:20 436:6 461:12,13 501:4

**extremities** 503:3

**extremity** 503:2

**extrication** 636:3

**extruding** 580:4

**extrusion** 577:19 579:6

---

**F**

**face** 632:23

**facilities** 491:18

**fact** 416:14 446:15 454:18 456:15 478:5 499:20 556:13 557:21 558:15 559:2 593:5 620:16 626:4,12 636:13

**factor** 430:17,18 456:19 499:8 511:22 514:12 605:8 626:21,23 627:1,9,10,16, 20,21

**factored** 413:15

**factoring** 429:7

**factors** 594:24 627:14,17 628:2

**facts** 443:10,11, 14 458:25 624:2

**fail** 485:10

**failed** 618:24

**fair** 437:22 439:13 528:21 574:23

**fairly** 411:20 539:9 610:4

**fairness** 547:19 597:14

**fall** 506:12 585:2 591:5,11

**falls** 591:8

**familiar** 428:20 524:4

**family** 437:13 439:2 441:12

**far** 406:5,9,15 411:25 421:22 425:3 459:2 469:16 472:14 475:4 488:5 490:4,9,24 491:13 496:19 509:7 511:25 512:3 521:19 523:3,4 540:21 543:9 551:4,8 554:5 585:25 597:15 598:24 605:3,8 621:22 625:11 635:18, 24 639:15

**fashion** 408:10 465:17

**fast** 532:12

Case 2:12-md-02327 Document 7252-3 Filed 06/08/20 Page 91 of 940 PageID #: 210324



21 629:3 630:25

**flora** 465:5

**flow** 423:22
465:10,12
558:2,6 590:22

**flows** 516:11

**flush** 405:19
465:17

**focus** 542:6

**focused** 485:17
517:24 617:11

**focusing** 518:1
569:22 587:13

**folders** 406:22

**Foley** 577:4
602:19,20

**follow** 435:11
453:23 597:25
638:20

**follow-up**
445:14,21

**followed** 401:21
546:8

**following** 459:15
570:3

**follows** 402:13

**footnote** 552:25

**forego** 455:7

**foreign** 461:22
464:20 494:21
513:12 519:13
520:8 551:24
568:11 571:19
585:16 609:7
612:9 636:17

**form** 412:2,21
418:25 419:9
420:3,14
426:10,23
435:17 447:2
449:18 450:5
451:2 457:4
462:3 464:2
468:16 476:17
477:20 478:3
481:21 482:11,
487:21 489:17
491:21 492:9
494:12 499:19
503:17 528:7
530:1 533:21
535:2,8 551:3
556:18 559:19
570:22 572:6,21
574:18 600:24
601:2 611:3
616:17 618:21
619:12 622:19
636:14 637:17
640:4

**formal** 437:1

**formalities**
402:5

**format** 444:8

**formed** 443:19

**forming** 462:25

**forth** 517:4

**forthright** 554:3

**forward** 508:19
531:20 576:19
637:16

**fossa** 564:4

**foster** 467:17
628:20

**foul-smelling**
577:8,11,13

**found** 427:18
443:12 460:20
463:8 469:20
470:15 530:8
540:9 541:7
549:4 551:22
553:11 577:19
601:21 603:22

**four** 404:2
425:15 459:22
509:15 524:21
544:10 563:25
564:4 570:15
589:21 603:13

**fourth** 447:14

**frame** 403:21
543:4 550:24

**framing** 413:24

**frankly** 474:8

**fraying** 551:24

**free** 531:7

**frequency**
461:14 498:3
600:13 626:18

**frequent** 507:13
512:25 533:19
534:9 536:16

**frequently**
427:24 432:17
478:8 511:17
534:3,5 539:6,
22

**friable** 561:24

**from** 402:25
403:23 407:9
408:5,15 410:3
412:16,18
414:3,15 423:4
424:5 427:23
428:1,13 429:5
430:21,22,23,25
432:20,25
433:4,5,17
434:8 435:13,24
441:11 449:23
450:15 451:16
452:11,20 454:9
457:21,25
459:19 462:7,25
463:8,20
464:13,24,25
465:1,18
467:13,14
469:2,10 470:14
471:7,8, 472:9,
20 474:5 476:1,
3,4,9,24 477:1
478:6,7,8
484:22 485:23
486:8 487:19
490:18 491:6
492:1,4 494:21
498:18 500:12
507:16 509:7
510:19 513:18
515:13 516:1
518:5 519:3
520:6,12,13,15,
19,21 521:20
522:14 523:9,23
529:11 531:7
534:2,16 536:4,
20 537:24

538:6,19 539:4, 7,17 540:22 543:6,25 550:16,24 551:11,14 555:12 556:16 557:6, 558:7,24 560:25 561:21 562:3,19 563:1, 25 564:2,4 565:3,4,7,11,12 569:5,15 570:16,24 573:22,23 576:8,12 577:9 580:19,23 582:22 583:16, 17 587:22 592:11 593:13, 24 601:18 605:16 607:20 612:1,16,17, 613:24 615:1 616:13 618:2 619:1 628:8 630:18 631:10 632:22 639:16

**front** 402:9 415:2 444:11 540:12,13,14 547:13 580:8

**frowny** 632:23

**full** 405:12 445:2 472:9 490:17 496:16 502:3, 546:7 586:13 591:15,19 592:3

**fully** 625:14

**function** 450:11 515:2 626:16 627:14

**functioning** 497:15

**fund** 412:24 413:4

**further** 436:15 518:9 519:7 593:3 595:25

**future** 483:11 485:14 517:3 523:5 524:12 542:9 567:12 584:25 597:4,8 598:24 599:6 605:10 612:4 613:20 620:6 635:8,23

---

**G**

---

**gain** 442:8 499:7

**gallstones** 530:17

**gamut** 489:8

**gaps** 408:15 551:19

**gave** 480:6 489:21 560:17, 22

**gears** 501:12

**general** 412:12, 24 413:25 414:4,5 415:18 418:13,15,23 421:9 425:18 428:19,21,24

429:6,18,21 438:23 442:14 444:8 447:6 471:25 492:21 495:7 499:13 506:1,17 522:11 526:22 558:8 610:17 611:11

**generality** 447:21

**generalized** 511:4,7,9 610:24,25

**generally** 413:19 414:16 418:11 422:12 430:9 432:13 447:17 456:23 491:1 495:3 522:8 524:4 560:7,9, 11,22 601:21 627:7,18,19

**generate** 410:16 430:19

**generated** 473:17

**generic** 410:9

**genitalia** 468:4

**genitofemoral** 611:9

**get** 404:5 407:9, 16 408:4,9 410:19 416:6 423:25 425:11 427:8,23 430:1, 7 432:12 433:25 434:8 439:19 440:10 442:24

446:3 457:21 465:18,22,24 472:20 474:5 477:9 483:5 491:1,6 492:4, 12 507:15 520:2 524:18 536:5 543:15,21 547:14 564:15 576:1 581:16 593:9 594:14 597:24 639:16

**gets** 483:14 565:25

**getting** 425:10 534:13 578:16 597:20 624:16

**give** 410:10 418:7 420:24 421:9 423:6 427:25 437:10 441:20 452:6 478:23 518:24 521:3,6,10,13 545:15 547:12, 25 638:22

**given** 418:5 437:8 604:13 619:17,18

**gives** 578:8

**giving** 489:7 610:13

**glad** 613:15

**glass** 537:17,19, 25 538:9,15 539:2 610:4 611:5



In Re: CR Bard (200)          Bruce Rosenzweig, M.D.          10/30/2014

560:24 566:25

**gynecologic**
606:16

**gynecological**
446:19

**gynecologist**
506:17

**gynecologists**
526:22

**Gynecology**
461:1

**Gynemesh**
457:20 571:8,
11,25

---

### H

**habit** 487:3

**half** 457:23
463:7

**hand** 458:23
525:24 549:3

**handed** 414:14

**hands** 543:14

**handwritten**
548:23

**Hang** 436:5

**happen** 463:20
474:21 519:22
523:6 565:20
597:22 615:21,
22 635:23
636:22 637:1,16

**happening**
539:22 616:1

**happens** 478:7
479:24 554:25

565:8

**happy** 403:2
445:4 507:6
528:12

**hard** 420:5
632:11

**has** 415:4 420:6
421:23 430:10,
17 432:22 435:6
436:1,6 437:14
440:15 441:10
445:5 446:24
447:23 451:4
457:16 460:18,
20 465:11
469:3,11 471:3
484:22 486:16,
492:19 495:22
496:17 497:13
500:15 509:9
512:18 513:2,13
515:9 519:1
527:11 539:18,
19,20 545:8
546:13, 547:22
548:12 554:16
558:25 560:3
561:2 564:16
567:8,14 568:7,
8 572:19 573:5,
17,25 582:19
584:20 585:7
595:16 599:1,3
605:11,15,18,
19,20 606:13,17
608:3 610:5
611:10 616:5,8,
10 619:22
621:19 624:25

626:4,15,24
629:5 631:14
634:18 636:22,
24 637:22
639:4,8

**hasn't** 639:1,2,8

**having** 402:12
407:13,14
408:16 410:13
433:14 434:20
445:15 446:7
449:23 452:12
476:2,9 477:3,4
482:8 490:14
491:20 507:11,
17 512:21
523:23 534:19
539:16,18
552:10,24
553:18,21
555:11,12,15
556:23 557:10
559:13 562:2
567:13,23
569:4,20 582:21
587:16,18,21
602:20 606:8,12
609:1 610:12,15
612:25 614:6
624:14,15,22,23
626:16 628:11
629:23 630:16,
19,20,24
631:12,13 632:9
638:1

**hazard** 440:18

**he's** 420:20
575:19 588:11
601:7

**head** 501:8

**heal** 580:25
581:9

**healed** 581:14,15

**healing** 561:17,
19,23 565:18
570:15 604:16

**heals** 561:21

**health** 438:15
439:9,22 442:8,
10 545:17,21
553:10 619:16
626:4

**heard** 538:10
552:4 596:12

**heavier** 572:19
573:16

**heavily** 617:11

**heavy** 550:20
592:1,9

**heavyweight**
571:18 572:17
573:1,6,10
574:1,3,6, 615:8

**help** 424:22
432:23 534:12
633:20

**helped** 516:4
628:9 633:17

**helpful** 497:3
518:24 556:5
619:14

**hematuria**
467:4,25

**hemorrhoids**
562:4

**Heniford** 574:4

**here** 407:20 408:13 409:23 428:7 440:21 448:13 456:24 458:18 477:10, 16 478:12 480:19 484:3 490:22 494:6 499:16 500:3 508:24 521:10 522:14 526:9 530:4 547:23 549:1 551:10 556:2,3,8 559:16 562:8 575:10 576:1 579:19 588:25 599:14 613:13 617:15 618:16, 19 623:2 628:19 634:20

**here's** 420:18 428:23

**hernia** 573:12

**herpes** 622:3,7

**hesitancy** 529:3

**high** 598:16

**higher** 498:4 573:13 598:6,8 628:22 629:16 638:15

**highlight** 536:7

**highlighted** 415:3 423:23 444:12,20 445:11,22 446:11,15 502:2

506:23 525:21 548:10 575:19 591:16 600:5 623:19

**highlighting** 415:4 458:24

**highlights** 446:1

**highly** 453:23 546:7 611:21

**him** 425:25 436:9 544:20 547:25

**hip** 529:2,14 634:23,25

**his** 403:23 428:15,22 429:13 508:3,4, 7 509:3 588:5 595:4 601:1 604:21

**historical** 446:22 456:19 594:24

**history** 430:13 435:6 441:24 443:11 446:15, 456:19,21 473:15,16,18, 20,24,25 474:1, 6 502:12,18,21 504:1 514:13, 15,20 521:24 526:11 530:25 531:21 549:5,6, 9 551:5,11 552:16,19 553:7 558:21 559:1 576:3,9 586:14 589:20 590:3,6,

14 601:22 602:5 605:4,5 610:21 621:12,22 624:3,4,22 625:18 626:1,3 629:5 633:9,15

**hit** 442:15 447:11 493:15 513:17

**hold** 437:23 438:1 472:22 518:6 519:4 564:19 567:24 572:25 585:12 640:3

**home** 577:4 602:19

**honest** 554:2

**honestly** 556:4

**hormone** 580:22 603:8 604:3

**horse** 507:11 515:24

**hospice** 469:14

**hospital** 489:11 495:10 496:3 523:12,23,25 524:10 544:5

**hospitalization** 524:15

**hospitalized** 495:6 625:21

**hour** 422:20 442:12 473:18 618:10

**hours** 404:10 422:15,17 424:6

425:8,9,15,16

**house** 437:15

**how** 403:22 404:24 406:19 410:6 417:13 418:7 422:9,12 424:4 425:8 426:21 427:3 428:23 429:22, 24,25 434:9 438:6 441:12 443:3,19 449:11 452:25 455:23 464:17 479:23 486:18 488:11 489:25 490:9 491:15 492:17 495:6 496:10 498:25 511:17 513:14 514:20 516:6 524:11 527:15 528:12, 18,19,21 529:10 533:24 534:5 535:19 537:16 538:21 544:8 545:12 554:8 563:10 570:18 576:24 587:1 590:9 591:10 594:11 596:21 598:8,10 602:17 614:10 617:2 620:15 626:5 633:6 636:19

**however** 446:3 498:12 534:15 540:21 563:24 587:21 597:13

605:15 632:1

**Hoyte** 425:22,24
469:4

**human** 574:8
637:7

**husband** 603:10
604:21 605:23
606:2

**husbands** 433:18

**Hutson** 419:14

**hybrid** 615:15

**hymenal** 527:1

**hypercholestere
mia** 549:7

**hyperlipidemia**
549:6

**hypermobility**
449:20 450:19
527:18

**hypersuspended**
513:6

**hypertension**
439:16 590:5
627:23,24

**hypothyroidism**
590:5

**hysterectomy**
405:14,15,
502:16 515:1,22
530:19 531:3
549:13 552:22
553:3,21 554:7,
11,22 555:5,12,
15,16,18,22
556:12,24
557:3,15,18
558:10,15

576:21 580:8
592:14 596:21,
22 602:12
607:21 622:1

**hysteroscopy**
592:15

---

**I**

---

**I've** 407:4
408:22 410:14
411:19 412:5,6,
11,23 414:1,2,3,
14 416:24
425:25 427:12,
14 429:20
430:22 433:11
435:18 437:3,9,
11 438:6 446:2,
9 448:4 475:19
478:5,23 498:24
500:7 516:3,10
523:1 526:21
527:13 538:18
541:24 543:14
549:23 552:4
559:12 562:1
598:9 611:4
635:18

**i.e.** 562:24

**idea** 411:20
422:12 450:8
452:3

**identical** 430:4,
10

**identification**
444:17 501:23
525:16 547:18
548:6 575:16

589:8 599:24
623:8

**identified**
414:11,23
418:12

**identify** 401:5
438:14 444:10

**idiopathic** 452:2

**IFU** 618:16,25
619:11,15,17,
18,21

**IFUS** 418:24
419:5 618:18
619:4

**II** 443:6 446:14
502:11 526:10

**III** 443:17
512:11

**illness** 473:20

**IME** 426:8,13,
17,18,21 427:4

**IME-TYPE**
427:9

**IMES** 410:13,14
427:13,15 521:5

**impact** 438:9
441:15 442:10
456:16 502:25
510:24 527:12,
20,24 528:5
545:8 551:13
557:22 626:5,15
627:14 630:5

**impacted**
528:19,22

**impacting**
452:25 503:16

**impacts** 559:22

**impart** 508:13

**implant** 445:13,
14,15 448:12
469:18,20 473:9
493:10 498:22,
23 503:13
504:2,3 508:10,
20 514:8 522:3,
10 529:25
530:23 531:9
532:22 533:20
537:10,12
540:17,22
541:1,10 545:2
549:16 550:9,12
563:1,19 564:14
567:15 576:4,
13,19,20,24
577:1 590:7
600:21 601:25
602:1,17 628:11
631:8

**implantation**
493:20 519:9
520:3 568:4
611:19 624:6

**implanted**
454:10 462:16,
23 464:1,18
470:21 493:11
505:10 532:6
589:25 619:15
625:8 628:12
637:6

**implanter** 405:3
426:2

**implanting**
410:2 462:22

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

463:1,6,25 504:13 512:14 547:7

**implying** 565:17

**importance** 615:8

**important** 407:18 410:4,12 446:22 550:25 551:17 556:15

**impression** 489:24

**improper** 617:20

**improve** 484:1,9, 14,18 499:3

**improved** 598:12

**improvement** 486:24 487:2 627:4

**inability** 625:13

**inaccuracies** 613:14

**inappropriate** 626:10

**incidence** 479:19 498:4

**incidental** 532:2

**incision** 523:17 543:12,24 565:19

**include** 618:24

**included** 631:4

**including** 502:3 503:8 526:1 546:9 575:21

631:18

**incontinence** 447:3,25 448:4, 6 449:13,16 450:7,17,21,25 452:1,2,9 453:3 454:5 455:6,9 457:12 467:5,25 468:11 469:21, 22,24 474:13 475:6,17,25 478:12,16 485:22 486:4 496:20,24 497:9,18,25 499:2,4,5 502:22 503:15 527:17 528:11, 13 531:10,19 550:6 559:14,18 560:4,5 586:8 595:16 600:11, 15 604:9 616:6, 9 617:17,25 618:8,9 620:15, 24 621:10 624:9,13,15,16, 18,19 625:10 626:19 627:4

**incontinent** 448:14 504:11

**increase** 448:21 489:11 626:18

**increased** 452:12 594:25 603:17 620:23

**increases** 627:23

**increasing** 450:14 536:20

624:14 626:16, 17

**indicate** 556:14 589:21

**indicated** 485:5

**indication** 509:22 510:1 549:15 559:6

**indications** 448:11 503:12 550:4 576:18 581:25 600:10

**individual** 405:1 424:24 451:13 452:15 627:12, 21

**individually** 423:20 527:22

**infected** 477:2,7

**infection** 459:9, 18,20 461:23 466:1,4,8 467:9, 10,18 470:4 471:22 475:1 479:5 485:11 490:21 532:19, 21 533:10,11,13 536:9,14 568:11 579:1 602:6

**infections** 459:2, 4,6,7 465:10 469:23 514:15, 21 515:8 529:4 530:12 532:24, 25 533:3,6,8,17, 19,25 534:3,9, 14,18 535:16 536:12,17,24

537:5,17 539:21 601:23

**inflammation** 513:10 568:12 571:20 585:16 609:8 612:10

**inflammatory** 461:22 478:25 479:3,4,8,12

**influencing** 441:13

**information** 407:16,22 412:16,23 424:21 439:14 457:21 473:16 474:5 482:19 508:1,9,14,15 551:16,18 553:23 556:13 562:11 601:5, 639:16

**informed** 480:5, 15,18,22,24 481:1,4,15 482:4,6 507:22, 23 508:16 544:25 545:1,9 601:5 619:24 639:15

**infrequent** 477:5

**infrequently** 465:4 553:15

**inhabitant** 465:3

**initially** 455:10

**initiating** 438:20

**injection** 621:5,6 624:23 638:21

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

| | | | |
|---|---|---|---|
| **injections** 485:1, 2 487:13 488:21 489:1 497:5 635:15 | **insurances** 488:15 | **interrupting** 492:7 | **irregular** 465:10 |
| **injured** 509:25 612:2 | **intact** 603:3 | **interstitial** 435:5 | **irritant** 498:3,6, 7 |
| **injuries** 471:3,4 519:8,10,20 568:3,4 | **intake** 627:23,25 | **intervention** 527:5,6 550:2 | **irritate** 634:6,7, 21 |
| **injury** 493:10, 19,21 509:23 539:7 | **intend** 521:13 547:2 | **intimate** 433:22 | **irritated** 509:25 510:3 520:4 608:12,14 611:12 |
| **inner** 509:19 517:13 518:5 523:9 563:21, 22,24 564:1,5, 16 599:3 | **intentionally** 618:14 | **into** 417:8 422:2 430:7 433:23 436:11 437:18 442:25 452:22 462:24 465:6, 19,24 479:13 487:23 494:7 515:14 552:11 574:13 578:23 579:25 581:10 585:2 587:24 588:7 591:5,8 597:14 606:23 620:12 634:24 638:10 | **irritating** 608:15 |
| **innervate** 509:19 | **interchangeable** 596:17 | | **irritation** 494:20,22 509:21 510:6,9 519:16,17 539:1 563:21 579:12, 16 583:20 599:4 609:9 611:8,9, 10 628:16,17 |
| **innervated** 611:22 | **intercourse** 433:18 468:12 469:9,10 470:22 471:7,13 475:21 495:13 496:9,12 504:15 512:22 550:19 561:4,9, 13 569:21 594:8,9 604:10 606:2 624:20 630:6 | | **ischial-rectal** 564:3 |
| **inserted** 606:23 | | | **isn't** 526:19 608:13,17 611:1 632:5,7 |
| **insertion** 518:13 | | | |
| **inside** 476:3 487:11 509:12 540:14 563:2 568:8 572:24 578:3,6,9 580:1 594:9 608:5 636:19 | **interested** 452:17 | **intraabdominal** 448:22 450:14 535:4,6 626:17 | **issue** 420:17 432:19 435:8 437:12 438:15 439:22 470:18 496:20 611:7 |
| **insight** 555:24 | **intermittent** 535:21 536:1 | **intravaginal** 484:24 | **issued** 420:16 |
| **instance** 440:22 | **internal** 462:6 573:23 | **intricacies** 491:9 | **issues** 428:17 433:1 437:19 438:7,24 439:9, 15 442:6 448:8 605:4 624:6 625:19 626:5, 11,13,22 627:2, 9 |
| **instances** 436:9 | **International** 460:12,13 467:15 | **intrinsic** 449:21 450:18 497:14 527:18 | |
| **instead** 454:12 | **internist** 407:9 | **invasive** 497:5 | |
| **insulin** 451:6 | **internus** 518:13 | **invoice** 404:7 | |
| **insurance** 488:14 | **interpreting** 631:4 | **invoices** 404:5 | |
| | **interrupt** 563:12 578:21 | **involved** 408:17 412:6 546:17 | |
| | | **ipad** 547:24 576:1 | |





In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

507:23 509:3 522:1 523:3 545:4 549:3 571:2 576:1 577:15 584:14 599:13,16 617:23

**let's** 407:8 411:9 431:5,6 441:10 442:13 444:9 445:10 446:6 466:22, 474:25 483:10,19 494:16 495:18 501:12 502:10 504:1,2 525:18 526:9,13 549:19 575:10 584:12 600:9 623:2,17, 25 640:12

**letting** 427:9

**levator** 513:14, 15 520:20 587:4 624:5,25 625:2 628:6,9,12,15, 18,22,23,25 629:2 630:24 631:2 633:12,17 634:3,6,8

**levator/ obturator** 516:1

**level** 441:18,20 609:13,15,18 627:11 628:23 633:19

**levels** 629:16

**licensed** 436:17, 20 439:2

**lieu** 432:7

**life** 433:24 437:7 441:16,25 442:6,10 452:25 503:16 522:22 527:20 528:22 550:18 551:1,9 559:22 564:18, 23

**lift** 550:20

**lifting** 536:20

**ligament** 558:4,5

**ligaments** 450:9

**ligation** 549:12 555:7, 557:10, 13,17,20,25 558:14

**light** 457:23

**lighter** 572:5,15 573:19,24

**lightweight** 457:14,19 571:13 573:5,25

**like** 402:6 404:13 405:14, 17 407:14 408:7 409:16 410:7, 22,24 411:1 414:9 433:10 434:1,10,14,22 438:7 440:11 444:10 448:25 451:3,22 452:14,18, 454:23 455:13 457:15 465:21, 23 468:9 480:14 489:1 494:24

497:16 498:13 500:17 507:11, 13 508:21 511:2 513:17 516:18 522:5 528:2,17 534:2 537:25 538:7,9,11 553:16 555:25 559:6 587:21 596:20,21 599:7 601:14 605:21 606:14 610:5 611:7,24 613:4 615:2 616:24 624:1 631:15 632:25 633:1

**likelihood** 584:25

**likely** 451:15 452:11,20 470:5 471:6 472:3 515:15 516:24 518:3,15 519:7 520:4 523:6,7 537:2 543:1 562:22 579:11, 14 583:1,5,23 585:9 592:11 595:22,24 608:15 612:2,7 614:13 629:11 637:24

**likewise** 620:9

**limited** 421:1 458:6 546:9

**line** 455:5 485:21 565:18 617:19

**linear** 603:5

**lines** 411:25

**lingering** 557:4

**lining** 592:25 607:18

**Lira** 505:20,21 512:20,23

**list** 414:11 575:10

**listed** 404:10 483:7 514:3

**listened** 632:9

**listening** 556:20

**literature** 413:10 430:21 461:4,5 462:1,4,6,10,13, 17,19 472:6,23, 24 476:2 479:10 490:16 500:18 501:2 522:25 554:13 569:5 572:18 573:16, 20,21,24 586:12,13 597:15,21,23 598:6,15 609:18 615:17 616:13, 23 617:3,10 631:21 638:11

**litigation** 401:22 411:20,23 412:14,25 413:13,17 417:11 419:5 426:9,14,19,22 427:5,17,19 458:8 538:19 548:12







636:12,18,25
637:15 638:2
639:17,24

**medication**
439:25 440:13
512:4 522:2
559:25

**medications**
497:4 586:6
605:12

**medicine** 439:2
449:1

**meet** 404:20
424:4

**meeting** 421:24

**meets** 579:13
634:20

**members** 437:14
441:12

**memorialize**
640:12

**menopause**
515:2 629:13

**menses** 592:9

**menstrual**
549:11 590:20,
22 630:13 631:8

**menstruation**
515:13,21
554:15

**mental** 438:15
439:9,22
545:16,20 626:4

**mention** 453:8
471:2 483:17
528:25 574:12

**mentioned** 407:2
409:13,17
424:14 429:17
462:21 475:15
479:16 483:12
493:8 494:1
511:14 523:10
537:8 568:2
617:25 625:17

**mesh** 401:22
405:6,7,11,12
411:2,12 413:1,
13 414:10
417:16 418:24
419:2,21 420:1,
13 426:9,13,19,
22 427:17
432:14 433:5
434:24 435:14,
16 436:1 440:16
441:11,23
447:19 457:14,
19,23 458:14
460:7,11,14,15,
18 461:3,6,9,21
463:23 464:1,9
466:4,7,14
467:8,11,15,16,
21 468:6,25
469:2 471:21
472:19 473:7
474:24 475:18
476:4 477:3,8
478:9 485:23
486:8,16 489:9
491:23 492:2,12
493:22 494:18,
20,23 495:1,23
496:13 498:21,
500:22 505:8,13

509:8,12,13,17
513:6,8 516:2
517:10,13
518:5,12,19,21,
22 519:1,3,11,
17 520:4,5,7,11,
13,15,20,21
529:24 532:14
538:12,18,21
539:8,11 540:3,
5 541:17 542:5
543:15,22 544:2
550:15 551:21,
23 552:2,14
559:2,4,7 561:6
562:10,17,21,23
565:4,8,9,12,25
566:2,5 567:3,7,
9,10,16 568:9,
19,20,22 569:8,
10 571:13,18,19
572:16,17,19
573:2,5,7,10,17,
19,25 574:1,3,6,
9 578:19 579:6,
10,18,22 580:4,
18,23,25 581:3,
18,21,24 582:5,
8,10,15 583:12
584:4,8,10,15,
16 586:17,21
593:6,13 595:8,
596:10 603:12,
23,25 604:6,23
605:16,17 606:2
607:22 608:1,15
609:7,8,12,16,
20,21 610:1,8,
16 611:2,23
612:1,10,12,18,

20 613:19,21
614:19 615:10
616:1,24 620:25
621:8 622:6,8,
13 625:16
628:12,16 629:2
630:9,25
631:15,17,23
632:8 634:2,4
636:15 637:5

**met** 404:15
423:19 424:6
425:25

**metal** 538:16

**meter** 457:18
632:22

**method** 406:15

**methodology**
430:14 431:3,7
443:19 511:10

**Metrogel** 604:3,
19

**Miami** 418:17

**micturition**
448:18

**midline** 603:12

**midurethra**
450:10

**midurethral**
453:22 456:13
513:4

**midway** 591:20

**might** 407:11
408:12,23
410:11 419:17
424:25 438:8
441:13 444:7

In Re: CR Bard (200)                 Bruce Rosenzweig, M.D.                              10/30/2014

447:11 477:4
485:6 486:23
488:15 489:22
497:15 511:6,19
518:24 519:13,
16 521:7 526:23
543:20 554:21,
23 555:13,15
567:6,7 573:20
598:2,6,15
611:12 614:14
628:24 630:18
632:14,17
636:1,2,3

**migraines** 590:4

**migrated** 513:8

**mild** 468:10
591:12 630:3,4

**millimeters**
571:15 603:13,
17,18,23 604:1,
18

**mind** 413:20
484:5 492:22
624:2

**mine** 547:25

**minimal** 630:5

**minority** 511:5

**minute** 640:22

**mislead** 618:14

**misread** 456:4

**missed** 593:5

**misspoke** 617:18

**mistake** 596:19

**mistaken** 466:19

**mistakes** 613:4

**misunderstand**
451:19

**mixed** 448:14
449:12,15
451:25 600:14
602:9

**modalities**
484:25 489:21

**modality** 487:1

**moderate**
506:11,13
526:20 527:3
591:6,7,8

**modulator**
487:10

**moment** 599:9

**month** 488:16
504:9

**months** 487:19
488:6,9 521:20
543:6 580:4
581:11 582:21
638:22 639:3

**morbid** 626:25
627:8

**morbidly** 629:14

**more** 407:1
420:24 421:1
427:13 443:12,
14 445:5 446:24
447:6,7 451:15
452:19 460:23
469:21 470:5
471:6 472:3
478:19 482:5
489:4,9 497:5
501:1 506:10,13
511:4,9 516:1,9,

24 518:3,15,25
520:3 523:7
525:25 527:1,23
534:3,5,9
535:21 536:16
537:1 538:7
539:22 542:25
549:2 551:16
560:3,21 561:12
562:11,22,25
566:3 571:20
583:1,3,4,23
585:6,9 589:17
592:11 594:3,15
595:22,24
596:18 597:23
600:5 604:16
608:15 612:2,7
615:13,16,
619:25 620:1
624:25 629:19
633:18 637:24

**morning** 401:1
402:16,17,21
409:11 414:15

**most** 406:12
432:9 495:11
503:1 515:15
565:7 574:4
579:11,14 617:3
632:1

**mostly** 407:11
493:16 606:13

**motor** 624:18

**move** 441:17
455:11 462:9
465:24 486:25
588:16 639:2,9

**moved** 623:14

**movement**
535:22

**moving** 456:1
465:14 588:4

**Mualin** 595:2,4

**much** 411:24
422:9,12 424:21
447:16 488:11
500:23 524:11
534:5 543:15
563:18 573:13
598:8,10 620:1

**multiple** 530:20
531:4 534:24
535:9 540:19
576:11 608:2,3
637:21 638:1

**muscle** 448:23
487:10,14 503:2
509:15 510:7
515:24,25
516:1,2 518:14,
20,21,22 519:1,
3 523:9,18
543:25 579:15
583:19,24
607:19 625:2,3
628:14,15,16,
18,21 629:3
633:25 634:3

**muscles** 451:9
513:15 514:10
520:20 631:2
634:6,8

**must** 631:11





In Re: CR Bard (200)                Bruce Rosenzweig, M.D.                10/30/2014

474:2 506:18
528:2 581:6,7,
10,11 603:4

**often** 491:15

**oh** 451:23
453:21 639:1

**okay** 403:2,3
411:9 414:20
415:14 420:9
421:7,11 426:8
439:6 455:12
466:21 474:25
475:11 480:21
483:10 484:14,
15 485:25 486:2
492:23 493:8
504:1 513:20
525:18 526:9
529:14 531:1
532:16 533:2,5
542:21 556:3
565:10 566:3
582:4 586:23
587:13 588:9,17
589:12 590:2
593:3 595:11
596:20 598:13
601:11,21
603:20 618:23
623:14 625:4
627:22 634:9
639:14

**old** 514:25
607:17

**once** 433:11
527:19 536:2
593:9 620:6

**one** 402:22
406:11,14

418:1,17
421:12,21
424:19 425:22
428:2,5 437:13
439:19 440:14
444:12 445:22
446:16 447:12,
24 449:5 450:6
453:19 457:14
460:7 463:6
474:9 475:8,
476:14 486:9,
11,12 488:15
489:10 491:2,
10,13,24 495:9
496:2 500:17,20
504:9 508:25
511:12 516:10,
19 521:13
523:24 524:9
527:1 531:12
533:14 538:7
544:17,18,22
545:13 547:11,
20,21 558:2
567:18 568:7
574:4 577:6
578:17 580:14
590:17 593:20
601:9 603:22
605:1 615:23
616:1,14,22
617:9 632:13
636:23

**one's** 433:19

**one-by-five-
millimeter**
604:11

**one-by-one-
millimeter**
604:23

**one-centimeter**
582:6 603:5

**one-centimeter-
by-three-
millimeter** 605:2

**one-centimeter-
by-two-
centimeter**
552:14

**ones** 411:22
443:15 449:2
474:10 485:20
492:22 537:8
637:12 640:17

**ongoing** 408:23
506:25 557:23
585:17 612:14
614:1 622:5
626:22 627:1
628:3 635:7

**only** 421:21
427:5 447:24
463:6,17 464:16
489:5 501:3
509:11 532:24
536:23 569:5
570:13 615:14
622:7

**onset** 476:3
597:10 602:23
633:7,20

**oophorectomy**
602:12 622:1

**open** 495:9,14
523:19,20,25

561:19 582:9
640:15

**opening** 465:6,
18 526:25

**operating** 489:4
557:22 574:7
580:16

**operation** 458:7
497:16 512:24
513:3 599:2

**operations** 517:9

**operative** 463:3,
24 505:11,18

**opine** 419:5
455:25 529:11
531:17 532:24
537:9 587:5

**opined** 536:23

**opining** 415:24
454:18 456:4
503:23 549:24
579:19 582:14,
18 584:9

**opinion** 411:4
432:13 450:24
451:20,21
452:18 453:20
455:8 457:6,24
468:23 472:1,
13,15,22 473:1
495:20 505:4,17
507:1 517:5
518:6 519:4
522:19 523:14
536:15,21 565:5
567:24 577:25
585:12 597:14
610:13 615:6

620:8 628:25
635:22 637:5,7

**opinions** 403:9
405:20 407:23
409:1,5,8,19,25
410:8,16,25
411:13,17
412:9,13,15
413:7,16,17,24
415:16,18
418:21 419:23
420:24,25
424:22 428:20,
25 429:6,11,13,
18 430:19
431:15 443:20
454:9 455:20
456:10,17
471:25 483:10
491:1 500:13
501:8 512:10
520:16 524:22
527:24 528:15
531:12 544:25
547:1,9 551:1,
12,13 584:12
588:1,5 595:19,
21 622:17
639:23 640:2

**opportunity**
409:1 574:16

**opposite** 421:3,5

**optimistic**
597:23

**option** 455:3
456:2 458:8
487:15 497:19
625:16

**options** 453:16
457:11,13 458:5

**order** 402:20
405:1 407:23
409:9,19,23
410:7 420:16
452:19 494:16
508:9,15 529:24
556:5 561:6
586:2 612:19
619:23 638:14
640:7

**organ** 447:1,25
448:4,6 562:25

**organic** 608:13

**organism** 464:24

**origin** 515:18
632:14

**original** 519:8
568:3

**originally**
420:24

**Orr's** 573:3

**orthopedic**
524:6

**other** 401:24
406:19 408:7,17
410:6,12 412:10
413:21,23
416:2,24 418:19
419:12,17
420:19 421:1,14
425:23 428:3
433:1,21,23
434:2,5 438:8,
11 439:21
440:20,24 442:3
444:4 453:16

454:24 457:10,
11,13 458:7,25
464:19 466:17
473:8,12 474:10
475:8 476:14
483:11 484:5
489:6 501:3
503:6 505:9,14
510:1 515:16
519:8,10,
520:17 524:8,22
525:1,3 531:13,
14 533:25
538:19 542:12
547:22 552:4
557:8 558:18
568:3 578:17
583:20 587:24
588:1 593:18
605:3 608:19
610:20 613:22
616:1 622:17,22
628:2 633:6
635:11,12,22
636:4 638:5

**others** 435:10
443:12

**our** 413:9 434:13
439:12 517:4
524:16,24
575:10

**out** 405:7,13,17,
19 408:10,11
412:22 416:14
421:7 422:8
425:1 427:18
431:13 437:23
438:1 439:23
446:9 454:8

457:15 461:5
462:1,4 463:25
464:8,25 465:17
473:11 474:25
481:10 491:11
492:4,12 497:20
498:15,24
501:2,4,5 503:6,
8 511:11
513:18,21
514:12,20
515:12 516:4
517:13 518:12
519:1 520:21
529:24 530:7
533:24 535:4,6
539:12,14
540:11 541:6
543:15,21
552:19,21
554:8,18
557:13,14,18,19
558:9,10,11,19,
22 569:8 571:22
572:1 573:16
584:3 587:19
593:18 594:20
596:21 606:25
608:19 609:15
610:7, 612:20
621:19 628:2
633:7 634:21
635:1 638:25

**outcome** 544:11
617:4,13

**outlined** 512:25
601:1

**outpatient**
488:20,22,25

495:8 496:4
523:12 544:3

**outpouching**
607:18

**outside** 413:22
594:7 622:12

**ovarian** 502:20
503:10 514:16,
21,23,24 515:2
591:24 592:9,12
594:1 621:22,23

**ovaries** 405:17
549:14 555:9
557:14,19
558:11,16

**ovary** 502:17
558:3,6

**over** 423:20
425:10 452:1
458:24 463:21
469:1 507:15
547:23 608:24
619:25

**overactive** 450:7
452:1 475:22
476:24 479:17,
20,21 559:23
560:3,14,18
586:5

**overengineered**
573:11

**overfiring** 511:8

**overflow** 433:23

**overgrow** 578:10

**overgrowth**
561:24 578:2

**oversimplifying**

617:1

**own** 448:24
633:4

---

**P**

---

**p.m.** 501:15,19
525:8,12
566:16,21
589:2,10 599:18
600:1 623:4,12
640:9

**page** 446:10
453:13,18,19
459:15,16 471:2
473:3 483:14
487:23,24
512:11 513:20
517:2 521:15
526:10 537:15
541:23 546:5
564:25 566:24
585:19 586:11
588:3,8,10,12,
13 591:17 592:3
594:22 602:2,3
613:2,5,14,15,
23 614:1,9
618:5,6,8,10,23
635:5 639:13

**paid** 422:16

**pain** 410:11
414:2 432:19,25
433:15 434:20
435:3,5 445:17
468:21,24
469:2,9 471:6,
472:7,9 473:7
475:20 476:24

479:1,5,23
484:22,24 486:7
487:12 490:18
496:16,17,18
497:22 498:9,
11,20,21,22
502:21,25 503:2
504:10,15,16
506:3,5 507:9,
16 509:9,10,16,
21 510:2,5,7,12
511:9,12
512:18,21,22
513:1,13,18
514:22,24
515:5,6,9,23
517:9,13,22,23
518:11,23
519:15 520:12,
13,24 529:1,2,7,
9,10,13,14,16,
19,20,22
530:11,15,21,23
533:8 534:23
535:4,19,20,21
536:1,4,5,19,25
537:1,6,23,24
538:11,17,24
539:4,13,16,17,
24 540:1,3,4,21,
24 541:1,4,7
542:11 549:10
550:19 553:2,
18,19,21 554:7,
10,15,16,19,22
555:2,9,14,16,
18,21 556:10,
16,23 557:4,7,
23 558:17,20
561:3,7 562:12

563:1 567:23
569:11,20
576:25 577:8
578:23 579:8,9,
11,13,15,21
582:11,12,14,
17,19,21,25
583:3,4,15,21,
23 584:2,5,8,10
585:6 586:19,20
587:1,2,5,7,10,
13,14,17,18
588:6,14 590:6,
15,16,23
591:14,22
592:1,8,20
593:16 594:2,3,
4,8,11,15 595:1,
14, 598:16
601:24 602:7,22
603:1 605:19,
20,23 606:13,
14,20,24 607:1,
4,5,11,14,16,20
608:4 609:10,
13,18,24,25
610:8,17,24
611:1,14,15
612:5 613:2,11,
18,21,24 620:7
621:18,20,24
624:10,11,20
626:6,10 630:5,
10,11,15,16,17,
19,20,22 631:5,
9,13,22,25
632:3,4,7,8,10,
13,15,22,25
633:1,3,8,11,12,
21,23,24

634:11,13,14,
23,24,25 635:13
636:1,2,21
637:22

**painful** 470:22
471:13 550:20
558:24 590:19,
20 604:9 622:11
624:20

**painless** 558:24

**pains** 507:13
633:22

**pancreas** 451:5

**pap** 558:21

**paper** 407:3,6
460:12,24
498:19 612:16

**paragraph**
443:23 446:11
453:20 454:15
455:1 456:14
473:3,4 483:15
512:12 514:2
518:9 546:7
569:24 570:3
581:2 585:18
586:13 591:15,
19 592:3 594:22
613:8 618:17

**parameter**
446:23

**parameters**
434:15

**pareunia** 604:22

**parietal** 540:12

**parity** 446:21

**parse** 412:22

**part** 417:21
418:23 419:6
434:23 442:3
443:23 477:9
490:4 521:7
526:5 537:19
540:9 591:16
596:3 607:9
615:18 625:17

**partial** 513:3
604:25

**particle** 551:24

**particular**
407:20 410:7,23
417:10 430:8
431:6,9 432:2
587:6 601:15
611:14 635:20

**particularly**
433:15 460:22
491:25 493:13
538:6

**partner** 552:12

**parts** 417:4,5
425:1 431:13
433:20

**pass** 463:13

**passed** 535:24

**past** 411:19
412:7,10,15
430:16 440:5
446:14 456:18
473:15,16,24
526:16 527:1
530:25 531:20
553:9 556:20
590:2 602:5
605:4,5 610:21

626:1,3, 628:5
633:9,15

**pathological**
569:6

**pathologist**
411:7,9 414:10
565:1

**pathologists**
412:18

**pathologists'**
414:1

**pathology** 535:4,
7 541:15 559:10
565:2

**pathophysiologic**
452:15

**pathophysiology**
451:12,15 634:4

**patient** 407:15,
17 411:1 427:12
431:22,25
433:4,11 434:6,
16,23 436:1
437:4 438:7
439:23 440:10,
18,23,25 441:9
448:20,23
451:4,13 452:8,
16 453:23
454:19 456:20
457:8 458:5
472:1,2 481:13
484:21 486:16,
19 487:9 488:6
489:25 491:11
495:4 512:8
515:9 521:4
527:12 528:2,8

538:10 546:8
553:22 560:21
568:15 577:14
584:24 598:1
603:21 609:19,
24 610:23,25
618:20 619:7,
10,14,22,23
627:12,21,24
631:14 632:13,
14,24 633:11
635:20 638:18

**patient's** 417:4
430:12 449:9,10
527:20 553:5,7
610:21 633:4

**patients** 404:17
409:10 410:13
417:24 422:6
427:7,16,19
430:14 432:18
433:7 434:9,11,
18 435:7,9
437:1,10,11
440:7,14 441:22
447:18 452:11
455:23 487:6
490:14 491:5
492:1 496:23
500:20 503:1
510:19 511:5,
14,18 516:9
523:23 527:13
528:10 538:17,
19 539:6,10
553:9,13 560:17
562:1 568:7
597:25 608:21
609:14 617:9
619:16 626:8

In Re: CR Bard (200)                     Bruce Rosenzweig, M.D.                     10/30/2014

632:1,9, 635:11
637:20,25

**pattern** 440:9

**pay** 423:8
488:15

**pee** 608:25

**pees** 465:15

**pelvic** 435:5
446:25 447:7,
16,25 448:4,6,8
449:22 451:16
452:12 454:20,
23 468:21,24
469:2 470:17
472:7,9 476:10
478:25 479:1,3,
4,8,12,16 486:7
487:11,14
490:18 491:23
492:2 497:4,22
498:8,11 500:22
502:19,21,25
503:10 504:14
506:3,5 512:17
518:11 519:15
530:11 534:23
535:4,11 536:24
537:6 538:11,18
539:11 540:4,
10,11 549:10,20
553:2,19 554:7,
10,16 555:2
557:4 558:19
560:25 562:24
573:14 577:1,8,
11 582:12
586:19,20
587:17 590:6,
15,16 591:14,22

592:1,8 593:15,
16 595:1,2,13,
14,16,17 603:11
605:20,21
606:14 607:1
608:4,8 609:10,
11 610:15,17,24
611:1 612:5,6
613:18 620:7,24
621:20,24
624:7,11,20
625:2,3 628:7,
21 629:3 630:5,
8,22,25 631:5,
13 632:3
634:11, 635:13

**pelvis** 469:1
535:11 537:18,
20 538:2 540:5
591:24 611:12

**pending** 417:19
418:3

**people** 419:19
432:24 458:7
461:17 524:8
526:21,24
543:12 632:16

**per** 457:18

**perceives** 539:1
626:6

**perceiving** 539:4
609:10

**percent** 452:1
472:8 479:22,25
480:1 496:17,
18,23,25
506:14,18,20
520:25 521:1

597:18,19
598:9,11,
620:12,13
637:20

**percentage**
544:12 560:17

**Perfect** 424:3
566:8

**perform** 600:16,
17

**performed**
531:24 579:2,3
604:25

**perhaps** 459:18
462:22 525:1
547:6

**period** 474:22
495:4 502:22
549:11 551:15
554:25 630:13,
15 639:2

**periods** 592:1
593:2

**peritoneal**
515:14

**peritoneum**
515:19 540:13

**periurethral**
497:4 621:6

**permanent**
471:3,5,10,13
472:12 518:25

**permanently**
518:19

**persistent**
445:17 473:7
513:13 518:11

536:24 537:5
580:13 581:3,
583:4,7,9,11
584:16 598:7,
10, 613:11,17

**personal** 433:3
437:7 441:16
442:6 575:18

**personally** 417:7
622:14

**pertinent** 435:7
443:12 508:9
576:3,9 601:22
624:2 625:18,25

**ph** 578:4,7

**pharmacy**
488:17

**phase** 448:18

**phrased** 546:4,
17,20

**phrases** 552:5

**physical** 432:5,7
485:2 486:3,6,
15,20,21,23
487:2,5,6
488:13 546:10
633:16

**physically**
431:24 432:4

**physician** 427:22
431:20 437:9,20
438:11,12,14
439:3 449:12
450:3 452:24
453:4 456:8
513:22 544:17
545:7 551:12
553:22 618:20

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

619:6,19 620:18

**physician's**
547:7

**physicians**
409:17 410:2
425:21 426:2
461:9 513:25
543:21

**picking** 608:11,
16

**picture** 560:4,5
608:11

**piece** 405:6,11
411:2 417:10
477:8 500:18
501:2 572:23
615:11

**pieces** 424:24

**Pinnacle** 418:18

**place** 461:11
463:16 479:5
545:19 564:13
572:24 577:5
595:18 615:23

**placed** 428:20
463:5,15 464:6,
12,13 479:11
502:15 505:14
509:18 531:5
532:7 540:5
549:22 579:25
582:20 603:7

**placement** 460:7
576:12 602:16

**places** 492:10

**plaintiff** 404:25
405:3 406:17

410:6 414:9,20,
24 416:3,14
426:5,19,22
429:25 430:8,9
432:12 443:4,8,
20 456:23 560:8
574:15

**plaintiffs** 403:8
404:17 405:23
407:24 410:21
415:24 416:11,
19 422:13
423:17 425:19,
23 427:17,19,21
428:1 429:2,7
431:17 432:9
442:15 456:25
521:11 541:16
635:12 640:16

**plaintiffs'** 416:6

**plan** 592:13
622:24

**plating** 565:8

**please** 401:5,16
548:15

**plus** 488:19
515:23 532:10,
11 548:24
549:16,17,18,19
550:2, 571:15
576:16 600:19
615:12 616:3

**point** 407:2
416:16 421:25
428:5 446:2
447:8 454:6
459:8 484:15
485:1 487:13

488:21 489:1
504:16 513:5,
16,17,18
518:13,20
521:13 542:3
555:25 564:7,
18,22 566:10,12
578:14 586:24
604:8 606:1
617:21 624:19
633:3 635:15
638:21 639:20

**points** 443:24
616:22

**polyp** 590:11
593:25 594:17

**polypropylene**
410:23 411:12,
18 420:1
458:14,17
462:15 473:8
474:24 514:7,10
571:23 572:1,4

**polyps** 594:5,12

**poor** 475:10
490:17 498:2
569:23 609:22

**poorly** 497:14

**POP** 489:9

**pore** 457:17
571:14 572:5,
15,19 615:14

**pores** 571:17,18

**portal** 553:13

**portion** 422:16,
18 463:7 506:23
508:22 567:14
580:10,18 582:5

640:13

**position** 427:6
536:21

**positive** 464:22

**possibility** 498:6
518:10 568:17
596:25 614:14
626:7

**possible** 423:23
424:20 436:7
503:9 534:21
568:23 596:25

**possibly** 491:2
533:10 582:22
634:14

**post-implant**
512:13,15

**post-op** 467:5
603:1

**post-tubal** 555:7
557:25

**posterior** 493:16
549:22 564:2
567:9,10,15,16
568:9,19,
576:22 602:14

**postmenopausal**
506:18

**postoperative**
474:22 504:6,8

**potential** 435:1
438:15 480:12
589:24

**potentially**
409:24 499:11
622:22

In Re: CR Bard (200)                    Bruce Rosenzweig, M.D.                    10/30/2014

**practice** 413:21
433:3 434:4,14
440:9 455:4
505:15 511:18
538:17

**preceded** 531:4
630:20

**precise** 588:8

**predisposition**
628:25

**preemptive**
434:4

**prefer** 407:2

**pregnant** 446:21

**preliminary**
485:12

**Premarin** 603:7

**premise** 617:20

**preoperative**
481:1,3 482:6
601:2

**preparation**
423:16 424:17
580:2 581:8

**prepare** 405:1
424:5 425:4
429:24 443:3
545:13

**prepared** 412:10
483:6 526:1

**preparing**
422:10,14
425:12 428:9
429:22 525:3
601:14

**prescribe** 439:25

**prescribed**
440:5, 577:13,
21 580:2

**prescribing**
512:3

**present** 401:5
473:20 506:17
567:15 581:10
599:4 637:20

**presented**
448:14 504:12
532:8 576:6
577:7,10 591:21
604:14

**presents** 512:20

**pressure** 442:8
448:22 450:15
451:7 452:12
550:19 561:1
587:11 593:15
595:17 605:20
606:14 608:4
609:11 612:6
626:17

**pressures** 573:12

**presume** 588:12

**presurgery**
543:6

**pretty** 407:10
411:24 434:18

**prevalent** 565:7

**prevent** 631:11

**prevents** 631:10

**preview** 404:6

**previous** 448:2
540:19 568:7
577:9

**primarily**
589:23

**primary** 438:18,
24 439:1,4,15,
18 458:6 485:7
617:4,13

**printing** 406:25

**prior** 412:5
421:11 456:24
470:20 481:3
487:18,20 488:1
494:13,16
498:13 502:20
522:3 523:2
530:23 533:19
534:4 547:8
549:12,13
553:20 554:10
555:18,21
556:12 558:13
600:21 602:1
624:6,11 628:10
630:11,18
633:14,17

**probability**
470:11,17,23
471:12,17
474:12 483:22
484:8 489:16
494:2,10 499:24
500:5 507:19
514:5 518:16
542:8 560:13
562:10 567:25
570:19 582:24
596:10 597:4,8
614:20,25 620:9
635:3 636:12,18
637:15

**probably** 403:11
404:2 408:11
409:20 425:17
427:14 457:19
461:17 489:2,10
491:7 492:13
495:11,15
506:14 523:22
529:11,17 537:1
605:23 615:24
616:2 638:14

**probe** 488:20

**problem** 407:13
432:21 491:9
617:1

**problematic**
446:7

**problems**
430:16,24 431:1
442:3 552:23
568:14 624:23,
25 626:8
634:15,19

**procedure**
402:1,3 448:17
453:21 456:11
457:10 475:14,
23 476:5,10,14
477:18 478:1,
14,17 481:20
489:4 495:8,14
496:5 523:21,25
524:1,2 531:24
532:1 533:13
535:1 538:3
541:6 550:13,16
560:10,11,13,18
570:24 571:4
577:1 580:16

581:21 598:2,25 624:11,12 630:23

**procedures** 458:9,14, 475:15,20,21 476:15,25 489:6,10 497:5, 6 500:21 530:20 570:21 571:4 601:18 612:3

**proceed** 427:5

**process** 424:2 543:9 564:10,12 568:24 570:15 585:14 597:1

**processes** 615:21

**produce** 469:25 629:15

**produced** 548:11 600:6 623:22

**product** 428:25 429:3,8,19 433:6 441:11 446:12 447:19 454:10 457:2 458:19 459:12, 21 471:14 476:11 478:9 484:23 500:4, 12,16 599:8 615:20 631:15

**products** 485:24 486:8 562:25 631:17 636:9

**profile** 528:17

**prognosis** 522:20 560:24

561:4,5 598:24 612:4 635:20

**progresses** 449:4

**prolapse** 447:1, 25 448:4,7 452:8 455:10 506:19,20 527:16 562:25 576:8 590:17 600:15 606:19 608:22 620:25

**prolapsed** 594:7

**prolapsing** 590:18 594:13, 18

**prolene** 457:19, 23 571:8,11,12

**propensity** 460:21

**prorated** 488:15

**prospective** 617:12

**prove** 617:6

**provide** 403:9 407:22 553:23 555:24

**provided** 428:24 481:15 501:25 618:20

**provider** 439:1,5

**providers** 438:18,25 439:19 553:10

**providing** 619:19

**proximally** 513:8

**proximity** 520:5

**Prozac** 440:3

**PS** 457:20 571:8, 11

**psychiatric** 437:21 438:10 624:6 625:19 626:8

**psychiatrist** 436:20

**psychiatry** 437:24 438:5

**psychological** 432:22,24 437:5,21 438:9, 10,24

**psychologist** 436:17

**psychologists** 414:3

**psychology** 438:2,4

**psychosis** 438:22

**pubic** 543:24

**public** 402:10 619:16

**published** 460:25 620:21

**pubovaginal** 458:1,3,6 475:24 476:5 478:7 497:16,19 621:6

**pudendal** 488:21 611:8,13,14,15, 24

**pull** 481:10

**pulled** 425:1 530:7

**pulling** 593:16, 24 594:2,4,11

**purpose** 534:20 580:21

**purposes** 401:23,24 576:2

**pursuant** 401:20

**push** 460:14

**put** 433:19 457:6 480:21 501:1 507:12 553:4 555:1 558:12 574:7 615:11 618:14

**putting** 406:25 463:23 571:16 619:3

**pyelonephritis** 533:12

## Q

**quadrant** 601:24 602:7,22 603:1 613:11,18,21

**qualification** 436:23

**qualified** 499:23

**qualify** 631:25

**qualities** 411:12, 14 418:23 419:2,21 420:12

**quality** 522:22 555:19 556:10,

15 609:23

**quantify** 631:25

**quantity** 543:22

**query** 553:19

**question** 403:1,
4,5 409:3,14
410:18 425:3,18
434:22 436:10
443:4 448:2
462:1,11 467:19
475:10 478:11,
20,22 494:9
523:2 537:12
544:24 545:14
549:23 550:7
560:15,20
607:8,23 609:22
616:18 620:19

**questioning**
550:7 554:5
617:19

**questions** 409:2
415:22 416:7
446:2 507:21
517:3 523:2
525:5 531:14
541:24 545:6
556:2,4 596:1,
24 639:16
640:21

**quibble** 456:7

**quick** 442:13
588:3,24 623:2

**quicker** 639:10

**quickly** 407:19
491:17 549:2

**quite** 427:24
474:8 539:5

**quitting** 434:11

**quote** 445:16
505:24 550:17
603:2,10

**quoted** 598:5

---

**R**

---

**radiates** 507:16
509:10

**radiating** 509:21
510:7 533:8
552:11 578:23
579:9 588:7
634:11,14,24,25

**ramifications**
432:23,24

**randomized**
617:12

**range** 489:2,3,12
491:2 500:23
521:20

**rare** 515:16

**rarely** 469:15
479:24

**rate** 457:23
488:15 490:17
572:20,23
597:15 615:22
616:24 617:13
635:22 638:10,
13

**rather** 599:12

**rating** 521:4,7,
11

**razor** 611:6

**re-irritate**

628:18

**reach** 435:25
473:11

**reached** 435:14

**reacting** 637:10

**reaction** 461:22,
23 494:21
513:12 519:13
520:9 551:24
568:11 571:19
585:16 609:7
612:9 636:17

**reactive** 513:11

**reacts** 637:6

**read** 402:7
411:19 412:6,25
413:11 414:1
428:21 487:24
574:16 595:12

**reading** 439:11
457:21 508:17
556:20,21 618:2
619:1 631:7

**ready** 425:10,11

**real** 491:17
532:12 548:14
588:3 601:8

**really** 410:18
412:20 420:15
425:14 451:13
452:3 539:5
545:15 562:3

**reapproximated**
603:24

**reason** 492:7
515:11 531:8
589:24 592:19

**reasonable**
451:24 456:8
457:7 458:10
460:17 470:10,
16,23 471:12,16
472:10,22 473:5
474:11,15
475:7,12,25
476:7,12
477:10,17,25
478:13 483:21,
24 484:4,8,12,
17 485:13
489:15 490:1
493:23 494:2,10
499:17,24
500:4,10 505:7
507:2, 510:18
514:4 517:6,11
518:6,16 519:4,
21,23 537:9
542:7,14 543:1
554:20 560:12
562:9 563:13
564:6,19 567:24
568:13 570:19
579:20 581:14
582:23 584:7,23
585:12 586:15
587:7 596:9
597:3,7 607:25
610:14 612:22
613:5 614:19,24
620:8 629:1,18
630:21 635:2
636:12,18,24
637:14 638:2

**reasons** 598:18
629:10 630:23

**recall** 403:20 407:1 419:10 429:16 440:23, 25 474:8 516:17 521:6 529:21 530:3,14 534:6 550:23 556:8,11 559:9 560:20,21

**recalled** 555:2

**recalls** 545:7

**receive** 406:10

**received** 406:3, 10,12 412:16 435:13 447:18 545:9

**receiving** 404:6 405:22

**recently** 423:4 457:16

**recollection** 481:14 508:25 522:11 534:8

**recommend** 432:10,23 433:6 453:23 486:15 487:18 497:7 542:21 543:18 546:8 563:22 572:3 598:21,25 635:14

**recommendation** 435:10,11 523:5 621:3

**recommendations** 484:5 490:24 517:14 569:25 638:17

**recommended** 572:8,9 619:16

**recommending** 522:14 545:16 586:1

**record** 401:2,6 424:24 442:17, 21 463:22 482:10,20 493:1,6 501:14, 18 509:4 522:5, 525:7,11 530:3, 5 556:1,6,9,12 566:17,22 575:17 587:24 589:1,9,15 593:10 599:17, 25 601:2 623:3, 11,17 628:10 640:6,10,12,13, 14,23

**records** 405:2 406:3,9,12,14 407:5,9,14 408:4,5,9,11,19 414:17 416:25 417:2 422:10, 424:14 425:1,6 426:3 427:24 430:20 432:6 434:13 455:15 468:20 480:8 481:7,9,23 483:1 499:9 501:4 503:13 505:17 516:3, 14,16,19,22,23 522:12 525:2 530:14 534:16

550:21,24 553:4,8,12,20 555:23 556:20 558:12 559:9 563:11 576:8,9 583:18 590:8 591:1 593:21 601:6,19 605:25 606:16 616:7 621:14 622:24 628:4 633:14 639:17,24

**recovery** 495:3, 16 523:15 524:20,21 544:8,12

**rectocele** 549:21 576:7,23 591:3, 5 616:11

**recur** 486:23

**recurred** 581:14

**recurrence** 497:17 606:19 608:9 622:7,10 628:11

**recurrent** 458:4 529:3 530:12 533:16 536:12, 23 537:4 555:8 558:7 593:17 595:23 609:5 610:7 612:11, 18,25 618:8

**red** 532:10

**redundancy** 571:12

**refer** 433:7 439:23 440:12

445:4 466:22 491:11 528:18

**reference** 428:16 499:10 548:16 564:25 587:3 613:1 622:3

**referenced** 414:6 425:22 613:12

**references** 582:14

**referral** 438:16

**referred** 474:10 487:18 613:5 638:11

**referring** 475:4 481:12 484:20 519:9 568:5,18 586:23 614:3 635:9

**reflects** 509:4

**refresh** 424:25

**regard** 403:9 407:23 435:14 458:19 460:1 472:13 475:3 495:20 507:21 524:22 546:25 547:9 588:21 590:14 601:16 612:5 620:7

**regarding** 412:24 438:7 490:25 500:18 513:1 516:14,20 576:10

**regardless** 567:21

**rehash** 599:12

**reinoculate** 467:17

**reinoculation** 470:4

**reinserted** 504:7

**relate** 407:12 507:18 509:7

**related** 436:3 459:17 501:9 507:3 528:15 530:12 532:13 537:10,21 538:17 540:3 579:14, 580:21, 22 582:15 583:12 584:1,15 586:21 610:1 620:6 622:17,23 631:15 635:24

**relates** 415:15, 19 470:9 499:15 500:14 626:1 627:7

**relationship** 499:22

**relaxant** 487:10

**relaxation** 549:20

**relay** 508:1

**released** 505:2

**relevance** 622:4

**relied** 413:7 414:23 432:5 445:6 463:24 483:8

**relief** 518:25

**relieve** 561:6

**rely** 474:3 482:17 553:22 554:2 633:4

**relying** 413:4 505:16 619:7

**remainder** 467:16

**remaining** 468:25 470:5 496:14 595:18 596:10 640:15, 18

**remains** 496:20

**remarkable** 502:19

**remember** 405:24 440:17 463:1 464:3 553:2

**remembered** 554:21,23

**remembrance** 553:17

**remind** 446:12

**reminded** 541:14

**removal** 460:23 492:14 502:17 557:3 558:15 625:16

**remove** 460:24 463:19 475:23 483:18,20 495:23 517:25 518:4 519:2

523:8 536:3 544:1 563:23 567:3 614:11, 18,23

**removed** 405:11 483:23 484:2 495:1 496:14 502:18 515:12 520:11,13,15 541:17 542:5,15 549:14 554:17 558:23 563:18 567:5,17 577:5 579:6, 580:7,19 593:6,13,14 612:24 614:15

**removing** 638:5

**rendered** 413:17

**rendering** 411:13 431:15 438:9 551:12

**reoccur** 536:6

**repair** 457:11 505:24,25 517:23 570:8 576:22 600:17 602:14,15 620:23

**repairs** 570:9,14

**repeat** 416:8 533:3

**repeated** 539:21

**rephrase** 403:2 416:16

**report** 408:21 410:23 413:2,5, 6 414:19 417:8 419:6 422:10

423:24 424:1,20 426:25 427:2,9, 11 428:7,10,15, 22 429:23 430:11 442:25 444:11,20,22 445:2,5,11 453:7,13,15 456:4 457:22 463:3,25 483:6, 9 499:10,14 502:2,3,4,8 505:11,18 512:25 525:6, 19,21 526:1,5,9 530:24 544:16 546:13,22 547:12,13,21 548:10,11,17,19 556:14 566:25 573:4 575:18,20 588:4 589:16,18 599:7,15 600:4, 6 601:13,15 617:16 623:19, 21,22 639:24

**reporter** 401:15

**reports** 405:1 411:21 412:6, 10,11,15 413:12,24 414:1,2,6 416:25 422:14 428:18 429:21, 25 443:3, 457:6 501:1 536:19 545:13 562:19 599:8 618:18

**represent** 401:6

In Re: CR Bard (200)     Bruce Rosenzweig, M.D.     10/30/2014

**represented**
417:24 422:5

**requested**
426:17,18

**requests** 408:5
427:23

**require** 485:14
542:8 561:12
567:11 596:8,14
614:11,18

**required** 518:17
543:2 551:21
567:20,21
584:17 585:8
608:2

**requiring** 605:17

**research** 415:7,9

**resected** 604:7,
12

**reseed** 467:16

**reserve** 408:20
640:14

**reserved** 409:4

**residual** 609:2

**resistant** 577:24

**resolution**
417:21 490:17,
18 520:23,24,25
521:2

**resolve** 620:10

**resolved** 418:8
474:12 486:21
577:9 636:1,3

**resort** 635:17

**respect** 464:11
495:5 522:21,22

**respiratory**
626:15

**respond** 640:22

**response** 560:16
561:20 582:7
616:2 626:10

**rest** 517:25
599:7 614:11,19

**result** 470:12
479:17 491:6
512:13 560:14
578:8 606:20

**resulted** 476:15

**resulting** 479:20,
23 536:3 597:16

**results** 459:16
464:22

**retained** 403:9
410:21 411:10
412:16 417:10
418:11 419:20
420:24 421:8

**retainer** 422:24
423:4

**retention** 529:3
532:18 577:4
593:17,23

**retrograde**
515:13,20

**retropubic**
463:13 532:1
543:11, 624:12
628:13 636:6

**retropubically**
495:9

**return** 598:17

**revealed** 577:12
603:5,11 604:5

**review** 407:3,6,7
408:12 409:14,
16,19,21,23
410:24 411:3
416:25 417:1
422:20 423:21
428:7,15 430:12
435:25 501:5
511:20 576:8
586:14

**reviewed** 405:2,
4 407:14 409:20
413:23 414:18
415:5 424:14
428:9 429:6
430:22 455:15
516:25 526:6
628:4,5

**reviewing**
404:25 406:15
407:4 422:9,13
426:3 505:11
558:12 622:22

**revision** 405:8,
13,18 445:17
466:11,14,18
467:3 470:2,13
494:14,17
498:13 504:20,
24 505:22
512:19 584:17,
18 596:15,16,20
614:5

**revisions** 470:25
611:20

**rheumatoid**
498:17,20

**rid** 598:16

**right** 405:9
406:3 407:1
408:13,20 409:4
411:8 420:13
422:6 425:24
439:3 440:24
443:8 444:5
447:20 448:13
451:6 453:18
454:2 455:16
466:15,25
478:17 480:25
485:22,25
489:23 490:4
493:15 499:11
502:17 504:21
507:12 511:3,13
518:5 520:12
525:22 526:11
529:4,25 530:8
540:7 541:20
545:19 546:22,
25 552:17 563:5
566:12 575:1
579:10 588:15
589:18,21,25
592:14,24
598:22 600:7
601:24 602:6
605:19 606:13
607:1,4,10,14
613:21,24 620:3
623:25 634:19,
24 637:7 639:12

**right-sided**
607:10,16
613:11

**ring** 527:2



In Re: CR Bard (200)　　　　Bruce Rosenzweig, M.D.　　　　10/30/2014

478:1 480:10
482:17 483:24
487:3 489:20,
22,25 490:8,9
499:6,16 509:24
510:4,25 517:24
518:3 519:10,19
524:13 529:15
537:1 539:16
540:18 542:13
552:3 560:12
561:10 562:22
563:13 564:22
566:3 568:23
569:18 574:3
578:16 584:15
585:22 586:12
587:3,7 588:10
592:4 595:14
597:3,7 611:8
612:1 616:16
619:3 625:24
627:12,19,24
629:10,21,24
631:3 632:7
636:22,24 639:1

**saying** 405:14
413:6 420:9
451:19,21
454:17 455:1
470:10 471:4,11
475:12 477:24
478:4 486:9
487:4 503:22
518:2,15 520:10
537:21 542:25
565:17 569:12
571:3 574:7
582:16 583:8
595:4 614:11

619:5 627:15,17
632:3 639:11

**says** 413:7
482:25 507:10
512:12 572:18
573:16,24
581:17 618:13
630:15 632:13

**scale** 609:14,19
632:22

**Scandinavian**
506:16

**scar** 479:8 565:7
607:20

**scarred** 551:22

**scarring** 562:20
565:25 566:2,4
568:23 597:1

**scheduled**
466:11 534:21
601:9

**schizophrenia**
438:21

**scientific** 418:1,
10 419:4 421:13
461:19 462:14

**Scientific's**
420:12

**scientists** 569:5

**scope** 413:22

**second** 424:13
447:10 473:4
483:15 487:24
504:5,8 547:12
591:15,19 592:3
629:14

**second-degree**
506:8,15,20

**section** 443:10

**see** 410:7,11,16
411:3,17,22
425:19 430:1
432:17,18
433:17 437:11
439:20 445:22
448:3 449:8,11
451:4 458:25
459:8 463:3,6,
12,17,18,19,21
465:13, 486:22
488:1 491:15
499:6,10
505:19,21
506:22 510:12
512:24 515:10
522:6 538:16
539:10 543:4
544:16 545:18
547:22 548:14,
23 551:1 556:5
559:8 561:22,23
563:20 570:14
573:13 575:4,10
576:9 580:12
593:20 596:1
597:24 599:13
605:6 606:15
610:10 616:7
618:25 622:3
628:10,19,20,22
633:10 638:23

**seeing** 491:5
508:24 598:1

**seeking** 522:2,9,
15

**seemed** 478:19
504:25

**seems** 446:25
538:15

**seen** 408:14
414:2,3 416:10,
17 433:11 469:4
480:24 499:8
504:10 516:3,10
526:21 527:13
532:17,20
536:11,13
538:18 539:5
542:10 547:20
562:1 578:22
580:4 598:9
602:18 603:4,9,
21,25 604:7,20
609:17 610:11
611:4 631:16

**segment** 593:6,
12

**send** 422:24

**sending** 608:12

**sensation** 413:3
537:17,19,23
593:24 608:5,7,
20,22 609:10,23
610:5,12 612:6

**sense** 434:8
447:6 495:7

**sensitization**
610:9

**sent** 407:17
411:2 523:23
559:10 565:2

**sentence** 473:5
587:6,19



619:4 629:22,24

**significantly**
447:13,14

**signifies** 530:25

**silver** 579:25
603:6 604:2,12

**similar** 410:17
413:9 418:21
431:2 507:21
513:20 542:24
545:6 595:19
599:8

**similarly** 467:8
503:22

**simply** 423:3
464:1 494:9
496:22

**since** 404:24
523:21 540:19
584:23 588:4,7

**single** 440:21
459:20 546:13
637:25

**sinusitis** 583:22
584:1

**sir** 402:19
422:11 444:13
501:11 502:24
507:8 524:25
525:4 575:25
622:20 623:1

**sit** 409:23 437:9
440:21 477:10,
16 484:3 556:8
559:16

**site** 459:10 475:2

**sites** 565:24

**sitting** 407:20
408:13 530:4
549:1 610:3,4
611:5,6

**situation** 494:24
551:20 619:10

**situational** 583:3

**situations** 437:4
491:10

**six** 408:8 424:6
425:9 473:17
487:19 488:5
495:15 496:12
521:20 524:21
543:6 544:10
563:23,25
564:16 570:15
580:3 602:25
638:22 639:3

**six-month**
490:11

**size** 447:9
457:17 571:14
572:5 580:14
603:17 615:14

**slash** 565:2

**sleep** 442:7

**slightly** 546:20

**sling** 445:18
453:22 456:13
458:1,6 460:9,
20 462:21
463:5,6,8,13,14,
15,18 466:11,13
469:20,24
470:5, 471:20
472:3 475:24
476:5 478:7

479:10 488:24
492:1,3 495:7
496:23,25
497:16,19
500:12,19,21
502:14 504:20,
24 505:4,13,22
508:6 509:14
512:18 513:4,14
523:8 530:13
531:5 533:15
562:21,25 564:1
567:6,8 568:21
593:13,21
595:3,5,18,21
599:1 602:15
621:7 628:10,13
635:24 636:6,9

**slings** 458:3
493:14

**small** 428:5
445:19 466:14
531:7 543:24
580:10 603:12

**small-pore**
572:17 573:2,6,
10,17 574:1,3,6,
9 615:10

**smaller** 571:17
572:19 611:25
617:8

**smears** 558:21

**smiley** 632:23

**smokers** 498:4

**smokes** 626:12

**smoking** 434:11
497:20 498:1,3
514:13 626:15,

21 627:13

**smooth** 424:2

**smoothly** 423:23

**sneeze** 584:2

**sneezing** 560:2

**social** 473:25
559:22

**socializes** 469:15

**Soft** 571:11,12

**solely** 463:24

**solved** 515:22

**somebody** 598:1

**somebody's**
451:7 528:5

**someone** 403:23
410:10 435:6
452:23 455:13
489:22 507:13
605:11,15 610:5
626:18

**someone's** 442:9
456:18

**sometimes**
406:13,21,22
427:3,4 493:9
553:8

**soon** 532:23

**sorry** 410:20
422:2 424:13
464:9 477:14
478:19 510:17
522:1 532:16
545:20 578:21
581:24 588:9
591:14 592:2,5,
17 593:11









564:8 572:7 617:3

**terminology**
405:10

**terms** 596:17

**terrible** 616:18

**testified** 402:13 438:4 478:5 482:8 499:20 508:12 510:13 513:21 528:16 545:3 553:1 596:14

**testifies** 545:7

**testify** 409:9 428:6 476:12 500:3,10 508:18,22 607:24

**testifying** 413:23 419:21,25 455:22

**testimonies**
573:22

**testimony**
412:12,13 413:16, 418:24 421:10 422:22 425:2 430:20,23 438:10 456:24 462:7 474:4 480:9,16 481:17, 482:23 503:20 505:12 508:7 516:3 534:2 538:19 539:15 545:4,11 551:19 556:21,

22 573:4 582:16 618:4 630:17 631:7

**testing** 448:16 449:8 586:4

**than** 419:12 433:25 439:21 443:12 444:4 448:15 449:14, 16 451:1,15 452:20 457:10 465:14 469:22 470:6,20 471:6 472:3, 478:8 479:25 480:1 482:5 486:6 490:20 499:25 505:14 510:1 516:24 518:4, 15,25 520:4 523:7 527:1,23 533:25 534:3,10 539:22 543:1 560:4 562:22,25 572:17 573:6,13 583:1,5 585:9 592:11 595:22, 24 597:23,25 599:12 604:16 605:24 608:15 612:2,7 615:13 616:1,3 617:7 622:22 628:23 629:17,20 637:24 638:5

**thank** 402:19 436:14 445:24 492:23 507:8

**their** 411:4,17

412:6 416:23 422:14 427:4,11 430:16,18 433:12,18,22,24 437:6,13,14,15, 19 441:24 442:4,10 448:24 451:9 475:24 480:15 485:4 486:20,22,25 489:24 490:18 503:3 509:21 511:7,20 512:9 521:1 538:18 553:5,11,14,25 555:8 594:2,3 608:24,25 609:1 632:13

**them** 403:10 406:11 408:9 417:25 421:18 422:19 423:6,7, 21 427:8 428:2 430:4 432:20 433:8,13 434:19 435:1 437:4,10 440:12 441:3,13 443:3 486:11 495:18 496:11 516:25 526:21 530:7, 541:8 554:2 570:10 571:5 619:6

**themselves**
401:6 483:1 522:12 541:20

**theories** 450:13

**theory** 565:7

**therapies**
485:19,20 486:10 495:21 497:6 517:21 542:12,22,25 605:9 638:8,9

**therapist** 491:14

**therapy** 432:15 437:1 438:20 440:11 441:6 454:20,24 455:5 484:1,10,11,16, 20,23 485:2,10 486:3,6,15,20, 22,24 487:2,5,6 488:13 489:19 490:20,25 491:5, 517:7 542:16,19 545:16,17,21 546:10 567:19, 21 580:22 585:4,6 598:21 605:13 621:4,5, 6 624:7,24 628:7 633:17 635:14 638:13 639:3,4,7,8

**there's** 408:2,14, 24 411:10 414:9 430:4 442:9 443:5,14 447:8 448:7 452:4 458:25 461:5, 11,12,14 462:1, 13 465:8,16,20 466:3 467:8 468:6 474:18,20 478:4 486:5

In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

487:14 491:17
492:13,14,19
493:9,10,13
497:2 498:6
499:21 500:7
507:12 518:10
527:4 533:2
537:25 539:2
555:6 557:24
561:19 564:17,
25 572:18
573:15,17
581:18,23,24,25
582:14 583:19
587:23 588:15
591:13 592:19
594:16 599:13
610:2 612:11
614:14 615:25
616:15 620:20,
22 632:21
637:24

**therefore**
508:13,14
517:20 519:14
542:11 554:18
555:2 579:19
585:10 586:15
612:13,22 626:2
629:18,21
636:17

**they'll** 495:11

**they're** 406:13,
22 417:20,
421:21 423:8
440:11 528:12
557:21 572:4
594:6,8,13

**they've** 437:15

486:24 487:1
562:2

**thickness** 615:13

**thigh** 509:20
517:13 518:5
523:9 563:21,
22,24 564:1,5,
17 599:3
634:24,25

**thing** 416:24
424:13 431:21
450:6 465:9
470:22 498:25
501:3 515:7
526:15 528:12,
13 529:15,18
609:4 632:18

**things** 406:22
408:24 413:3
419:18 424:19,
25 434:1 438:8,
23 439:9 442:3
448:20 450:15
454:21,24 460:8
473:20 483:11
508:12 516:10
531:2 551:9
553:15 561:14
607:15 613:17
632:2 633:6,13,
19

**think** 408:13
410:1,15
411:20,22 412:3
413:9 414:5,8
415:12 416:4
417:14 419:1,6
420:15,16
421:21 422:1

424:6 427:12
428:6 429:17
431:1,8 432:16,
20 433:14,16
434:19 435:7
436:10,15
438:17,24
440:20,21
442:13 445:8
447:17 449:4
452:6 453:7,19
454:13 456:3
457:5 458:24
460:1 461:8,16,
18 466:20 469:1
475:2 480:7,8
481:24 482:25
483:7,14 485:6,
7,16 486:14
487:17 488:13
493:23 494:7
496:15 503:18
507:25 508:3
517:18,21 519:2
520:1,22
522:24,25 523:1
526:23,24
528:15,16 536:2
543:14 544:22
545:3,14 547:20
548:2 551:18
552:4 560:10
567:4,16,20
568:6 570:3,11,
18 574:2,19
575:11 578:12,
13 579:16,24
583:8,25
597:13,22
598:15,18

600:25 601:9
618:10 619:25
621:4,15 625:18
626:14 630:4
632:10 634:13
639:20

**thinking** 409:16
501:7

**third** 473:3,4
586:12 591:14
594:22

**thorough** 441:24

**though** 516:8
572:4 583:17
611:18 626:7
629:25

**thought** 402:20
423:13 451:23
454:17 567:1
574:14 575:7
596:13

**three** 417:14
421:12 443:23
447:15 500:23
502:13 523:16,
22 526:15
532:10,11
584:17 590:21
603:23 604:1,17
625:22 639:7

**three-hour**
524:1

**threshold** 519:22

**through** 407:10,
19 417:2 423:22
426:5 433:9,12
439:11 446:1
447:17 458:15



**traveled** 508:25

**treat** 430:14 432:22 438:21 440:7 441:3 451:12 452:19 454:4 455:6,9, 475:23 477:6 484:21 486:4 489:25 490:21 497:9 500:21 518:19 520:12 585:8 586:6 605:13

**treated** 449:10 485:9 511:14 532:19 534:14 581:7,8 584:19 585:11 634:16

**treating** 408:2 409:17 410:2 425:20 426:1 427:21 431:20 438:12, 439:14 485:22,23 510:19 511:20, 513:25 544:17

**treatment** 439:15,16,17 451:8 453:17 458:4 474:9 480:3 489:21 490:2 518:23 522:2,16 542:10 570:6 586:9 612:13 624:8 638:23,24

**treatments** 439:9 490:5 635:8,9,10

**treats** 577:22

**tremendous** 412:23 492:20

**trial** 412:12 418:14 420:7,25 422:22 547:2,8

**trials** 617:12

**trick** 617:15

**tried** 453:9 542:12 543:14

**tries** 512:23

**trigger** 484:25 487:13 488:20 489:1 513:16 518:20 635:15 638:21

**trocars** 463:13

**true** 415:23 540:6 588:19

**truthfully** 556:4

**try** 424:20 434:10 446:5,6 455:9 517:17 518:24 541:6 567:19 580:24 581:9 621:3 631:25

**trying** 410:19 423:25 454:8 465:18 492:4 547:14 607:7 617:6,14,15 618:12,13

**tubal** 479:6 549:12 557:10, 13,17,19 558:14

**tube** 479:7

**tubes** 502:17 515:14 549:13 555:8 557:14,19 558:6,9,10,16

**tugs** 535:25

**turned** 566:24

**twice** 487:7

**twisting** 507:14

**two** 417:25 419:16 428:18 429:20 449:5 464:16 495:12 496:6 500:21,23 517:8 523:22 524:1,18 532:24,25 551:9 561:18 563:25 574:24 576:5 577:18 582:21 584:18 590:19 603:9 629:10 637:23

**two-and-a-half-millimeter** 457:17

**two-centimeter** 579:4 580:18 593:6,12

**two-day** 495:10 496:3

**two-millimeter** 579:4

**two-night** 489:10 524:9

**type** 409:18 418:24 432:15

436:25 441:5 470:17 493:19 495:22 527:5 556:16 598:25 605:8 611:17 631:22 635:9

**types** 409:22 411:16 416:7 419:22 436:9 483:11

**typical** 427:11 449:22 497:18 517:21 610:5 611:7 626:9 630:13

**typically** 426:8, 11 438:12 450:2 453:14 480:25 545:12 570:14 594:6 611:2 626:9

---

**U**

**UCLA** 492:11

**ultimately** 605:17

**Ultrapro** 457:15, 16,22 571:8,11, 22

**ultrasound** 590:10 591:23

**umbrella** 439:5

**unable** 469:9

**uncommon** 554:14

**under** 401:25 443:5 463:23

464:13 506:1
526:10 629:13
631:4

**undergo** 636:16

**undergoes**
461:21

**undergone**
460:18 475:13
476:14 477:18
478:1,14 563:8,
15 582:7

**underlying**
477:4

**understand**
403:1 404:4
405:19 408:3
413:9 414:8
420:9 428:23
436:8 450:22
456:3 461:25
471:24 472:13
475:1 476:6
490:4 521:23
549:16 565:11
596:8 612:21
615:18 617:2
627:22 639:11

**understanding**
410:3 414:5
416:22 448:10
480:11 481:16
537:3 554:13
559:17 573:15
577:16 584:13
606:6,9 607:3
625:8,12 639:22

**understood**
403:5 415:17

417:24 455:12
478:11

**underwent**
602:4,10 624:12

**unfortunately**
408:6 465:3
508:24 613:13

**unilateral**
510:20

**uninhibited**
448:24

**United** 515:3
574:5

**unless** 536:5
584:2 594:6,13

**unlike** 631:8

**unquote** 445:16
505:24 550:18
603:2,10

**unrelated**
435:16 459:12
579:9 622:13

**unremarkable**
590:3

**unremitting**
515:6

**unsuccessful**
495:22 581:7

**until** 496:6,10
515:2 541:1
550:17,22
628:12

**unusual** 447:23
448:1

**up** 401:21
406:25 427:10
430:15,23

431:14 434:7,25
435:7,11,18
441:17 453:23
465:25 489:12
492:8 507:15
531:7 546:8
548:25 551:20
561:21 572:25
575:8 578:7,25
580:5,25 588:4
589:12 594:9
608:11,16 610:9
613:15 617:23
624:16 633:2
636:7 638:20
639:9

**up-front** 434:18

**updated** 622:23

**upon** 468:3
617:20

**upper** 533:11
626:15

**upstream** 465:24

**upwards** 598:9

**urethra** 449:21
450:11 465:5,6,
11,16,19,21
497:15 513:5

**urethral** 505:1
527:17

**urge** 448:16
449:14,17 451:1
452:2 469:22,
24,25 470:1,6
475:16 478:11
499:3,5 527:17
528:13 560:4
604:9 624:15,18

**urgency** 468:10
469:12,16,19
470:11 471:17,
20,22 472:4,14,
17,20 475:5
478:16 498:4

**urinary** 447:25
448:14,15
449:12,15
450:7,17,20,
451:25 452:9
453:2 454:4
455:6,9 457:12
458:4 459:7,20
465:9,25 467:4,
25 468:11
469:21 474:13
485:22 486:4
490:21 496:19,
24 497:9,25
498:2 499:1
502:22 503:15
515:7,8 527:16
528:10 529:2,3
530:12 531:10,
532:18,19,21,25
533:10,11,16,
19,24 534:9,13
535:16 536:9,
12,13,16,24
537:5 539:21
550:6 559:13,18
560:4 577:3
578:25 586:8
593:17,23
600:10,13,14
601:23 602:6,9
605:18 616:6,8
617:17,25
618:7,9 620:15,

24 624:9,13,15
625:10 627:11,
14

**urinate** 504:7

**urinating** 504:6

**urination** 512:22
532:10

**urine** 459:16
464:22 465:15
608:24 625:14

**urodynamic**
448:16 449:8
497:13 586:4

**urodynamics**
469:20 624:17

**urogenital** 544:1
628:14,17
630:3,4 631:1
634:5,7 635:16

**Urogynecology**
460:14 467:15

**urologist** 428:13

**us** 438:24 449:4
483:14 553:10
599:12

**use** 405:5
430:13,14 432:7
434:13 457:14
458:3,14 465:23
482:15 484:24
485:21 488:17
495:24 517:22
543:23 554:12
572:7 586:6
609:15 631:11
632:17,22

**used** 427:12

431:3,8 463:2
485:16 486:4
487:10 511:11
530:9 539:15
552:4 569:25
572:13 576:10
600:16,17,19
625:5

**uses** 405:9
427:12

**using** 431:3
553:7 572:3
630:17 632:18

**usually** 440:9
488:18 489:9
496:11 510:18,
20,21 558:24
578:3 594:2,3
606:22

**uterine** 576:7
592:10

**uteroovarian**
558:3,4,5

**uterosacral**
602:12

**uterus** 515:12,13

---

**V**

---

**Vagifem** 604:3,
13,18

**vagina** 463:11
465:1,4 472:20
476:4 487:11
507:10,11,14,16
509:12 526:25
539:3 552:11
558:25 561:16,

22 562:6 563:2
565:15 572:25
577:12 578:3,5,
6,9 579:5 580:1,
5,6,9,25 582:7,
8,17 583:13
594:9 603:11
605:22 606:23
608:5,7 609:1
622:12

**vaginal** 401:22
405:15 413:12
417:16 420:1,12
426:9,13,19,22
427:17 432:14
433:5 434:24
435:14,16 436:1
440:16 441:23
446:17 447:18,
20,24 448:8
449:23 450:14
452:20 459:6
468:3,11 477:3
478:9 486:7
495:11,25
498:10 502:14,
16 509:8 517:22
518:10 519:2
527:16 532:9
550:14 562:1,2
563:19 576:5,
11,21 577:19
578:14 579:2,10
580:2,13,15,18,
19 581:1,3,18,
22,24 582:9
584:4,16 589:21
594:25 595:1,6
596:22 599:2
602:11 603:2,8,

15,18 604:3,5,
10,12 606:18,20
608:1 611:2
616:24 621:8
622:5,8,13
629:5,8,11,19,
21 631:23 634:1
635:14

**vaginally** 495:8

**vaginitis** 498:8,
10

**vaginosis** 549:9
558:23 577:21,
23,24 578:1,2,4,
18

**vague** 462:11

**valid** 474:4

**Valium** 484:24
487:9 488:16
638:19

**variable** 617:13

**variety** 460:5
508:11 562:4
607:15

**various** 431:13
434:1 438:6
448:21 450:8
488:14 492:10
538:23 633:19

**vast** 461:8 462:5,
18 512:6 515:20
573:21,23,24

**vault** 527:16

**version** 604:22

**versus** 447:13
452:8 474:22
538:8



602:25 603:9
624:8

**weighing** 609:1

**weight** 434:11
442:8 499:3,7
507:12 572:16
573:25 615:13
627:5 629:20

**Weiss** 576:14,19
577:12 580:9,
12,15

**Weiss's** 585:21

**Welcome** 402:18

**well** 406:21
407:4 417:6
424:15,18
425:21 427:7
428:8,16 429:3,
19 432:5 434:9
438:17 445:6,8,
12 446:19 447:5
449:11 450:6,
12,24 452:22
453:14,18,25
454:8,13 456:5,
6 457:1 459:2,
25 466:5 468:11
471:6,19
478:14,15,23
481:12,18
482:2,4 483:19
486:14,19
487:11 488:1
489:18 491:4,22
492:10 496:22
504:5 507:23
509:9 511:18
512:16 514:23
516:22 519:11

520:19 523:3
526:13 527:5
531:3,21 532:3
533:7 536:11
538:23 539:14,
25 540:4 542:2
543:5 548:1,12
549:25 551:10
552:8,10,21
553:5 554:12
555:20 556:3
557:13 564:2,9
565:5 568:6
576:25 579:11
580:24 581:5
582:25 583:10
584:22 585:6,22
586:3 587:20
591:21 592:19
593:5,20 595:5
599:1 600:14
605:11 607:15
608:2,8,21
610:2,24 611:21
612:7 613:3
614:2 615:7,21
617:3 619:13
626:24 628:4
633:6,9 634:18
635:10 636:1
637:18 638:12,
24

**went** 410:11
423:20,21
429:22 469:1,3
505:21 541:5
554:22 555:11
576:19 595:11
602:19 619:25
628:7

**were** 403:8
405:17 406:20,
21 412:5 416:22
417:10 418:8,
11,12 419:4,8,
20 420:23
421:11 426:2,16
437:8 444:16
448:15 451:23
453:8 459:17
460:3 464:22
466:17 480:16
501:22 503:12
504:3 505:23,25
506:5 507:2
508:5 525:15
528:19 530:12
531:2 533:25
534:3,4 535:9,
10 537:2 539:7,
15,22 540:8,9,
11,18 544:16
546:12,15,19
550:4 551:25
552:21 554:17
556:16,19,24
559:5 560:10
565:1 570:5
575:15 576:18
579:8,21,24
583:8 589:7
599:23 603:24
612:2 613:3
615:2 619:20
623:7

**West** 418:19

**what's** 414:16
430:19,20
441:24 446:17
465:11 482:5,

17,19 490:12
491:9 521:20
522:12,24,25
536:9 551:13
553:8 561:25
581:23 590:18
613:1 615:19
620:16

**whatever** 425:13
433:5,6 483:8
491:14 509:4
522:15 528:21
553:23 579:14

**whenever** 452:7

**whereupon**
401:17 442:19
444:14 493:2
501:16,20
525:9,13 547:16
548:4 566:18
575:13 589:3,5
599:19,21
623:5,9

**whether** 405:15
407:17 419:25
427:2 430:17
434:25 435:19
437:7 444:6
447:19 449:1
455:21,25
456:10 483:22
484:4,5 491:13
503:23 508:19
530:10 531:13,
17 540:2 545:1,
8 549:24 550:8,
23 556:9 559:23
560:12 569:1
570:20 578:17



In Re: CR Bard (200)  Bruce Rosenzweig, M.D.  10/30/2014

491:3,25 492:20 495:14,20 496:2,16 499:23 500:9,15 502:16,22 504:15 505:6 506:14 507:21, 24,25 508:6,20, 23 509:11,20,23 510:13,15,18,20 511:15 512:17, 20,21,22 513:1, 21 515:7 516:10,12,18,19 517:11,16 519:8,23 523:6 524:4,6,7,17,22 525:21 526:5,10 527:7,13,15 528:3,12,13 529:18,22 530:21 531:20, 25 532:8,10,18, 19,22 533:15 534:14,17,21 535:16 536:8, 13,20,25 538:17 539:10 540:25 542:14 543:10 544:12,20 546:8,20,25 547:8 548:20 549:11,13,19 550:2, 551:19, 20,24 552:22 553:10,12,23 554:6,9,14,15, 16,20,25 555:9 557:2 558:3,15 559:3,7 560:2,8

561:1 562:6,24 563:13 564:5,19 568:3,6,10,12 569:21 570:4, 13,21 571:4,15, 18,21 572:16 576:5,6,19 577:4,7,11 578:19,22,25 581:1,8,14 584:5,6,12,19, 22 586:2,15 587:12 588:21 589:23 590:14, 23 591:21 593:9,25 594:8, 12 595:17,21 598:24 600:22 601:16 602:8, 15,18,19 603:4, 24 604:2,16 605:12,15 606:2, 608:22 609:4,12,20,21 610:8,16 611:2 612:5,13,18,22 614:3,15 615:3, 16,20 616:24 617:10 619:7,22 620:7 622:1,8 625:1,15 626:8, 18,19,20,25 627:5 629:1,18 630:12,20 632:23 633:11 634:16 635:13, 14,19 636:1,3,5, 7,9,18 637:20 638:2,19,20 640:16

**without** 469:9 484:16 517:7 555:12 562:11 610:24 632:3

**witness** 401:16, 17 404:1 412:3, 22 416:13 419:1,10 420:4 421:5 426:11,24 435:18 447:3 449:19 450:6 451:3 457:5 462:4 464:3 468:17 476:19 477:21 478:4 481:22 482:12, 22 489:18 491:22 492:10 494:13 503:18 528:8 530:2 533:22 535:3,9 541:4 544:22 547:4 548:2 551:4 556:19 559:20 570:23 572:7,22 574:19 575:22 588:14 596:16,20 600:25 611:4 618:6 619:13 622:20 636:15 637:18 640:5

**woman** 446:16, 24 447:23 460:6 465:15 629:20

**woman's** 446:20

**womb** 593:1

**women** 430:25 432:14 433:17

438:18 439:5, 18,20 448:3,5 506:14,17,18 509:20 555:7 558:1 629:15,17

**won't** 404:12 415:4 416:8 443:3 461:18 560:13 584:9

**wondering** 528:1

**word** 431:8 542:6 552:3 569:15

**worded** 614:17

**wording** 546:23

**words** 406:20 420:19 421:1 434:5 438:11 440:20,24 505:9 531:14 569:23

**work** 404:9 421:12 427:3 446:4 487:12 489:6 497:7 525:3 542:16,25 567:20 585:4 638:20

**worked** 417:9, 14,25 419:19 421:14 639:1,2

**worker** 469:14

**working** 421:18 423:7 450:11 461:9 469:14 638:25

**works** 487:11 573:2 638:23



Case 2:16-md-02387 Document 9745-9 Filed 06/19/19 Page 1 of 124 PageID #: 118371

# EXHIBIT I

In The Matter Of:

*In Re: CR Bard 200*

---

## Bruce Rosenzweig, M.D., Vol. III

October 31, 2014

---

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE: C.R. BARD, INC., PELVIC
REPAIR SYSTEM PRODUCTS                    MDL No. 2187
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL
CASES IN MDL NO. 2187 AND
SPECIFICALLY TO:

██████████, Plaintiff,
vs.           CIVIL Action File No. ██████████

C.R. BARD, INC., Defendant.

██████████, Plaintiff,
vs.           CIVIL Action File No. ██████████
C.R. BARD, INC., Defendant.

██████████, Plaintiff,
vs.           CIVIL Action File No. ██████████
C.R. BARD, INC., Defendant.

        The continued videotaped deposition of

BRUCE ROSENZWEIG, M.D., called for examination

pursuant to the Rules of Civil Procedure for the

United States District Courts pertaining to the

taking of depositions, taken before GINA M. LUORDO,

a notary public within and for the County of Cook

and State of Illinois, at 320 North Dearborn

Street, Chicago, Illinois, on the 31st day of

October, 2014, at the hour of 9:34 a.m.

Reported by:  Gina M. Luordo, CSR, RPR, CRR

License No.:  084-004143

.

Page 724

```
1    APPEARANCES:
2        WAGSTAFF & CARTMELL, LLP
3        BY:  MS. DIANE K. WATKINS
4        4740 Grand Avenue, Suite 300
5        Kansas City, Missouri  64112
6        (816) 701-1100
7        dwatkins@wcllp.com
8            Representing the Plaintiffs;
9
10       GREENBERG TRAURIG, LLP
11       BY:  MR. THOMAS J. MAZZIOTTI
12       3333 Piedmont Road, NE, Suite 2500
13       Atlanta, Georgia  30305
14       (678) 553-2101
15       mazziottit@gtlaw.com
16           Representing the Defendant.
17
18
19
20
21
22
23
24
25   Also Present:  Mr. Kevin Ingstrup - Videographer
```

Page 726

```
1                  E X H I B I
2    NUMBER    DESCRIPTION                    PAGE
3    No. #32   Second Supplemental Case-Specific   738
4              Rule 26 Expert Report
5    No. #33   Thumb Drive                    799
6    No. #34   Rule 26 Expert Report for      801
7              ▮▮▮▮ ▮▮▮▮▮
8    No. #35   Exhibit A - Curriculum Vitae   801
9    No. #36   Rule 26 Expert Report for      802
10             ▮▮▮▮ ▮▮▮▮
11   No. #37   Thumb Drive                    861
12   No. #38   Rule 26 Expert Report for      862
13             ▮▮▮▮ ▮▮▮
14   No. #39   Exhibit A - Curriculum Vitae   862
15   No. #40   Supplemental Rule 26 Case-Specific  863
16             Expert Report
17   No. #41   Thumb Drive                    864
18
19
20
21
22
23
24
25
```

Page 725

```
1                  I N D E X
2    WITNESS                    EXAMINATION
3    BRUCE ROSENZWEIG, M.D.
4       By Ms. Manno              727
5
6
7              E X H I B I T S
8    NUMBER  DESCRIPTION                     PAGE
9    No. #24  Amended Notice of Videotaped    728
10            Deposition
11   No. #25  Plaintiffs' Designation and     731
12            Disclosure of Case-Specific
13            Expert Witness
14   No. #26  Rule 26 Expert Report for       732
15            ▮▮▮▮ ▮▮▮▮
16   No. #27  Exhibit A - Curriculum Vitae    732
17   No. #28  Exhibit C - Materials Reviewed  735
18   No. #29  Plaintiffs' Supplemental        735
19            Designation and Disclosure of
20            Case-Specific Expert Witness for
21            ▮▮▮▮ ▮▮▮▮
22   No. #30  Materials Reviewed              737
23   No. #31  Supplemental Case-Specific      738
24            Rule 26 Expert Report for
25            ▮▮▮▮ ▮▮▮▮
```

Page 727

```
1        THE VIDEOGRAPHER:  We are on the record.  The
2    time is approximately 9:34 a.m.  This is the
3    beginning of Disc 1 for the videotaped deposition
4    of Bruce Rosenzweig.  Will counsel please identify
5    themselves and who they represent for the record.
6        MS. WATKINS:  Diane Watkins for the plaintiffs.
7        MS. MANNO:  Felicia Manno with Greenberg
8    Traurig on behalf of C.R. Bard.
9        THE VIDEOGRAPHER:  Thank you.  Will the court
10   reporter please swear in the witness.
11           (Whereupon, the witness was
12           sworn.)
13        BRUCE ROSENZWEIG, M.D.,
14   having been first duly sworn, was examined and
15   testified as follows:
16           EXAMINATION
17   BY MS. MANNO:
18       Q.  We are here this morning for a
19   continuation of the deposition that has preceded us
20   by two days; is that correct, Dr. Rosenzweig?
21       A.  That is correct.
22       Q.  And so my understanding is that we have
23   agreed that this deposition be a continuous
24   transcript for the last three days, and this is not
25   its own deposition transcript.  Is that your
```

Page 728

1  understanding?
2  **A. That is correct.**
3  Q. And I further understand that you have
4  previously testified in terms of your general
5  matters in this MDL as well as your specific
6  opinions with respect to eight plaintiffs; is that
7  correct?
8  **A. That is correct.**
9  Q. Okay. And so forgive me because there may
10 be times when I ask you things which you've
11 previously testified about, and you can alert me to
12 that fact, but what I will also say is, you know,
13 I'd like for you to provide an opinion as to the
14 specific plaintiff that we're talking about.
15 **A. Excellent.**
16 Q. You are aware of all of the rules of the
17 deposition. I'm not going to go over those with
18 you, but just let me know if you've got any
19 questions along the way, okay?
20 **A. Yes.**
21       (Whereupon, ROSENZWEIG
22       Deposition Exhibit No. 24 was
23       marked for identification.)
24 BY MS. MANNO:
25 Q. All right. So first I'd like to talk

Page 729

1  about your specific opinions with respect to
2  ▮▮▮▮▮  And just for record purposes, in front of
3  you now are several exhibits, and I just want to
4  enter those.
5       Is Exhibit No. 24 the amended notice of
6  videotaped deposition for you?
7  **A. That is correct.**
8  Q. And this is, obviously, you know, why
9  you're here today, and there were a list of items
10 on the last two or last three pages of this exhibit
11 of things you needed to bring with you, correct?
12 **A. That is correct.**
13 Q. And you've previously provided all of the
14 information applicable to your general opinion
15 report, correct?
16 **A. That is correct.**
17 Q. With respect to Ms. ▮▮▮▮▮  what materials
18 have you brought with you today?
19 **A. What has been supplied are the medical**
20 **records and depositions that I've reviewed in this**
21 **case.**
22 Q. Okay. And so what was tendered to me
23 prior to going on the record is three -- are these
24 zip drives or thumb drives?
25 **A. That is correct.**

Page 730

1  Q. USB sort of drives, and there are two that
2  are purple and one that is black. And the one that
3  is labeled black is labeled ▮▮▮▮▮ because we're
4  going to be talking about Ms. ▮▮▮▮▮ case today,
5  too, correct?
6  **A. Correct.**
7  Q. And there are two purple ones. So does
8  one of the purple ones contain all of the
9  information that you reviewed for Ms. ▮▮▮▮▮
10 **A. That is correct.**
11 Q. And the other purple one contains all of
12 the information that you've reviewed for
13 Ms. ▮▮▮▮▮
14 **A. That is correct.**
15 Q. We don't really have a way necessarily of
16 identifying. They both look the same, correct?
17 **A. That is correct.**
18 Q. So what we'll do is we will enter all of
19 these as an exhibit, and they will be marked
20 according to the plaintiff once we figure out
21 what's on there.
22       But I guess my question is on each of
23 these thumb drives, is it the complete file that
24 you had in going over or in drafting your report
25 and providing your opinions with respect to these

Page 731

1  three plaintiffs?
2  **A. That is correct.**
3  Q. I do have a question. You saw all three
4  of these plaintiffs, did you not?
5  **A. That is correct.**
6  Q. In terms of your medical records at your
7  office, I'm assuming that you made records for an
8  office visit?
9  **A. Mostly what I did was I had my previous**
10 **outline. That was the outline for my report, and**
11 **then any additional information, I transcribed that**
12 **right onto the, quote, unquote, IME that's part of**
13 **the report.**
14 Q. Okay. So we would not find in your office
15 any form -- consent forms they signed or any
16 notations of any office visit or anything like
17 that?
18 **A. That is correct.**
19       (Whereupon, ROSENZWEIG
20       Deposition Exhibit No. 25 was
21       marked for identification.)
22 BY MS. MANNO:
23 Q. So we'll enter these as the next -- I know
24 we're going a little bit out of order, but we'll
25 hold those to put exhibit stickers on those.

Page 732

1  Exhibit No. 25 in front of you, this is
2  the plaintiff's designation of disclosure of
3  case-specific expert for you in this case, correct?
4  **A.  That is correct.**
5  (Whereupon, ROSENZWEIG
6  Deposition Exhibit No. 26 was
7  marked for identification.)
8  BY MS. MANNO:
9  Q.  And then Exhibit 26, this was your
10  original case-specific Rule 26 expert report?
11  **A.  That is correct.**
12  Q.  And you have a draft in front of you that
13  you are looking at with sort of highlighting on
14  that; is that correct?
15  **A.  That is correct.**
16  Q.  And what is the different -- well, you
17  know what, let me -- because I know we'll get to
18  the supplemental, so let me go on --
19  (Whereupon, ROSENZWEIG
20  Deposition Exhibit No. 27 was
21  marked for identification.)
22  BY MS. MANNO:
23  Q.  So Exhibit 27 in front of you would be
24  Exhibit A to your initial report, which is your CV,
25  correct?

Page 733

1  **A.  That is correct.**
2  Q.  And at the last page of that, it is also
3  noting your fees for expert opinion services,
4  correct?
5  **A.  That is correct.**
6  Q.  I understand that you've previously
7  testified about sort of your overall payment
8  structure, but I do want to ask specifically with
9  respect to Ms. ▮▮▮ case, how many hours have
10  you worked on her case?
11  **A.  And as we discussed over the last day,**
12  **invoices that I have sent are going to be supplied**
13  **to you by Mr. Cartmell.  He is going to get all of**
14  **them from all the people that I've worked with and**
15  **send them to you.  I can't really give you an exact**
16  **number of hours that I have worked on it.**
17  Q.  Is it approximately 40 to 50?
18  **A.  On each specific plaintiff?**
19  Q.  Correct.
20  **A.  No.**
21  Q.  Okay.  So I'm really just interested in
22  terms of Ms. ▮▮▮ and seeing her and drafting the
23  specific report for her.
24  **A.  I really can't give you a number of hours,**
25  **doing the IME, putting the report together,**

Page 734

1  **reviewing the records, reviewing the depositions**
2  **and then putting this report together.**
3  Q.  Can you just give me your best estimate?
4  **A.  It would be very difficult to do that.**
5  **I've seen -- I've drafted a number of reports,**
6  **reviewed a number of records.  To be able to tease**
7  **out, and I testified to this yesterday when asked**
8  **the same questions about each individual plaintiff**
9  **that we did yesterday, I can't really give you an**
10  **exact number of hours that I spent on each**
11  **individual one.**
12  Q.  Okay.  Well, my understanding was that you
13  sort of got to an approximate of somewhere between
14  like 30 and 50 hours per plaintiff?
15  **A.  No.  That was 30 to 40 hours for the**
16  **general causation report.**
17  Q.  Okay.  So I mean, can you say that it's
18  under 50 hours for each specific plaintiff?
19  **A.  Per plaintiff, oh, yes.**
20  Q.  Okay.  Above 25 hours?
21  **A.  I don't think it was above 25 hours per**
22  **plaintiff.**
23  Q.  So below 25 hours is your best estimate?
24  **A.  Best estimate, yes.**
25  Q.  That's fine.

Page 735

1  So -- and at the same rates that you
2  previously testified about?
3  **A.  That is correct.**
4  (Whereupon, ROSENZWEIG
5  Deposition Exhibit No. 28 was
6  marked for identification.)
7  BY MS. MANNO:
8  Q.  Exhibit 28, and I know that we're going to
9  be moving on to your supplemental report, but is
10  Exhibit 28 an exhibit of materials that you
11  reviewed in preparation for your deposition here
12  today and in providing your specific report with
13  respect to Ms. ▮▮▮
14  **A.  That is correct.**
15  (Whereupon, ROSENZWEIG
16  Deposition Exhibit No. 29 was
17  marked for identification.)
18  BY MS. MANNO:
19  Q.  Then Exhibit 29, plaintiff's supplemental
20  designation of you, this was a supplement, correct?
21  **A.  That is correct.**
22  Q.  And then ultimately you drafted what is
23  your supplemental report?
24  **A.  That is correct.**
25  Q.  And that is sitting before you?

Page 736

1    A.  That is correct.
2    Q.  Let's mark that, please.
3    A.  My highlighted report?
4    Q.  Yes.
5    A.  There's no difference between this and the
6  supplemental report, right?
7    MS. WATKINS:  Right.
8  BY MS. MANNO:
9    Q.  And I'm not going to take that away from
10  you.  For now, you can continue to refer to it, but
11  I just want to make sure we mark it.
12    A.  Thank you.
13    Q.  What additional materials have been sort
14  of added to your list of reviewed materials in the
15  supplemental report?
16    MS. WATKINS:  Just for the record, the first
17  supplemental was simply revising a couple errors
18  referring to the general causation reports.  It
19  didn't change anything substantive.  The second
20  supplemental, which I have in my hand, lists two
21  additional sets of medical records that were
22  inadvertently left off.  Is that what you mean?
23    MS. MANNO:  So should we mark that?
24    MS. WATKINS:  Uh-huh.
25

Page 737

1    (Whereupon, ROSENZWEIG
2    Deposition Exhibit No. 30 was
3    marked for identification.)
4    MS. MANNO:  So what you're tendering to me is
5  something that I've not seen before?
6    MS. WATKINS:  Okay.  We served it yesterday,
7  but yes.
8    MS. MANNO:  Okay.  I'm so sorry.  I've not
9  gotten it.
10    MS. WATKINS:  That's okay.  The reliance list
11  is the only change.
12    MS. MANNO:  And so this is the case-specific
13  report here.
14    MS. WATKINS:  I think it's the last page.
15    MS. MANNO:  So this is a full report?
16    MS. WATKINS:  Yeah.  I did that just to be
17  complete.
18    MS. MANNO:  Okay.  So this is just sort of one
19  copy of the supplemental report with all of the
20  materials reviewed?
21    MS. WATKINS:  Correct.
22    MS. MANNO:  Let's mark it, and I'll have you
23  answer that.
24
25

Page 738

1    (Whereupon, ROSENZWEIG
2    Deposition Exhibit Nos. 31 and
3    32 were marked for
4    identification.)
5    THE WITNESS:  And the new records that were
6  added have not changed any of my opinions, so we'll
7  make that simple.  So if you haven't seen it, you
8  haven't gone through it, it's not going to change
9  my opinions, so we don't really need to -- you
10  might not want to deal with it.
11  BY MS. MANNO:
12    Q.  Did you hear Ms. Watkins's
13  representations, though, that the report is the
14  same except for additional materials being added to
15  your reliance list?
16    A.  That is correct.
17    Q.  And that is correct?
18    A.  That is correct.
19    Q.  So let's get to talking about Ms. ▮▮▮▮
20  case.  So when you did your independent medical
21  examination of her, was that the first time that
22  you met her?
23    A.  That is correct.
24    Q.  Is that the only time that you've met her?
25    A.  That is correct.

Page 739

1    Q.  And was she referred to you by plaintiff's
2  counsel or another law firm?
3    A.  By plaintiff's counsel, yes.
4    Q.  And just to be clear, with respect to
5  Ms. ▮▮▮▮ report, and what is the number that we
6  have marked your report that you're working off of?
7    A.  31.
8    Q.  So in drafting Exhibit 31, did you draft
9  that?
10    A.  Yes.
11    Q.  And did you draft it whole cloth, or
12  did -- I mean, is that a draft that has been made
13  entirely by you?
14    A.  The case report, what I did is as I was
15  going through the medical records, and, quite
16  frankly, I can't remember -- and as you probably
17  know in this litigation, things have been coming in
18  piecemeal, and there were probably some depositions
19  that haven't been done yet, so things -- I doubt
20  that any particular file came to me whole.
21    Q.  My question must have been bad.  What I'm
22  trying to get at is did you, in fact, draft Defense
23  Exhibit 31?
24    A.  Yes.
25    Q.  And so it was not drafted for you by

Page 740

1  someone else?
2  　　A.  No.
3  　　Q.  Okay.  So with respect to Ms. ████.
4  Ms. ████ had what implanted in her in terms of
5  synthetic mesh?
6  　　A.  Mrs. ████ had an Avaulta Solo and an
7  Avaulta Plus.
8  　　Q.  And which was the anterior?
9  　　A.  The anterior was the Solo.  The posterior
10  was the Plus.
11  　　Q.  So in terms of her past medical history
12  that you would consider significant, at the time
13  that you wrote your report, what conditions were
14  you aware of?
15  　　A.  Well, she had been seen six months
16  prior -- for six months, maybe a year prior, and
17  the record states that she had been complaining of
18  hip pain for six months prior to coming in on
19  29, 2008.  She also had dysfunctional
20  uterine bleeding and an endometrial polyp.  She
21  also was a former smoker, had osteoporosis and was
22  taking a medication for that called Fosamax.
23  　　Q.  Okay.  So let's talk about each of those.
24  So in terms of osteoporosis, I mean, what does that
25  or could that cause in terms of symptoms that a

Page 741

1  person would feel?
2  　　A.  Well, the vast majority of patients who
3  have osteoporosis are asymptomatic.  Most patients
4  are screened for osteoporosis based on certain risk
5  factors, being of a slight build, of a Caucasian,
6  Asian background or a smoker.  There's a test that
7  we can do, it's called a DEXA-scan, where we look
8  at the wrist and hip bone density, and it gives us
9  a number to tell somebody if their bone density is
10  normal, decreased, which is osteopenic or
11  osteoporotic.  However, there are patients that can
12  become symptomatic from osteoporosis.  As you lose
13  bone density, you can loose the thickness of the
14  spine, and therefore, they can become compressed,
15  and you can get nerve pain, back pain, leg pain.
16  　　　　Also, in its advanced stages, it can lead
17  to fracture, and you can have fractures of the
18  skeletal muscles, fractures of the hip and then
19  fractures of long bone wrists.  And particularly in
20  the elderly, that can be significantly problematic.
21  I mean, the mortality rate from a hip fracture in
22  an 80-year-old woman is not insignificant.
23  　　Q.  So would you say, though, that a
24  51-year-old having osteoporosis, is that sort of a
25  typical age in which to develop osteoporosis, or is

Page 742

1  that on the early side?
2  　　A.  It's not atypical, but I would also say
3  that it is a little bit on the early side to be
4  seeing osteoporosis.
5  　　Q.  Okay.  And so in terms of -- you said she
6  was complaining of right hip pain.  Did you know --
7  well, it's in your report that she was diagnosed
8  with greater -- is it trochanteric bursitis?
9  　　A.  Right, trochanteric.
10  　　Q.  Trochanteric, what is that?
11  　　A.  Well, that is the area of the hip where
12  the hip joint sits in the cavity that allows it to
13  move in all of its directions, and basically that
14  is an inflammation of the lining of that hip joint.
15  Obviously, orthopedics is not my area of specialty,
16  but I have a basic understanding.
17  　　Q.  So in terms of where she was experiencing
18  pain in her hip joint, what is the distance from
19  that in terms of sort of the area in which, you
20  know, you later are going to be talking about her
21  pelvic pain?
22  　　A.  From the Avaulta to the hip, we're talking
23  maybe 10 centimeters, 12 centimeters in the average
24  patient.  She weighed 116 pounds, so it was
25  probably about that average distance from the

Page 743

1  center of the pelvis to the center of the hip.
2  　　Q.  Okay.  But you're measuring to the center
3  of the hip.  I mean, could you say sort of where
4  the pain was exactly with respect to her hip?
5  　　A.  Not from what's described in the medical
6  records.
7  　　Q.  And so you said it's inflammation of the
8  hip joint, so what sort of symptoms in terms of,
9  you know, pain or whatever could be caused by that?
10  　　A.  Well, she complained of hip pain and
11  occasionally tingling.  Those are the symptoms that
12  she had due to it.
13  　　Q.  And is there anything significant about
14  the word tingling that she would describe it as
15  tingling?
16  　　A.  We had a long discussion about pain
17  yesterday and whether a specific pain
18  symptomatology is indicative of a certain
19  condition.  There are very few things, you know,
20  like a heart attack.  You have pain radiating down
21  your left arm, and that pain is described as an
22  elephant sitting on your chest.  A kidney stone,
23  you have pain that's in the back that radiates into
24  the groin.
25  　　　　So pain location and radiation gives you a

Page 744

1 better idea of what the pain is than how it is
2 characterized. We had a long discussion about this
3 yesterday that patients often do a poor job of
4 being able to say that, you know, this is crushing,
5 stabbing, burning as describing their pain. When
6 we look at pain levels, we actually have a chart
7 that goes from a smiley face to a frown, and
8 there's different gradation, and the patient points
9 to that. And we say well, that's a level 3 pain or
10 a level 4 pain.
11     So it's very difficult to say that
12 tingling of the foot means, you know, it's
13 specifically for a nerve injury, or it could just
14 be that she had been walking a lot and her foot
15 was -- might have fallen asleep that day and she
16 was just reporting that to her doctor.
17     Q. Okay. So even though tingling in the
18 right foot may have been connected with the -- is
19 it trochanteric?
20     A. Trochanteric.
21     Q. Trochanteric. That doesn't seem like how
22 it should be spelled. It could be the result of
23 that, but it also be a result of something
24 unrelated?
25     A. That is correct.

Page 745

1     Q. Okay. So in terms of the -- going back to
2 the osteoporosis, those symptoms, nerve pain, back
3 pain, leg pain, do you know whether or not she had
4 complained of those types of pains with respect to
5 her previously diagnosed osteoporosis?
6     A. According to my review of the medical
7 records and when I saw her in my office, it seems
8 like her osteoporosis is rather asymptomatic.
9     Q. So what do you base that statement on?
10     A. Well, number one, she's on treatment.
11 She's on Fosamax treatment, which is a
12 bisphosphonate. It's actually quite a good therapy
13 to increase bone density. So someone that is on
14 therapy for osteoporosis, their osteoporosis tends
15 to be asymptomatic.
16     She didn't have the typical findings of an
17 advanced osteoporosis where a woman is starting to
18 lose height, they're starting to have a -- what's
19 called a bent-over stature where they're -- because
20 they're losing density in their spinal bone,
21 they're kind of hunched forward. So I didn't see
22 any significant signs of advanced osteoporosis or
23 that her osteoporosis was starting to create
24 skeletal changes.
25     Possibly her hip pain is due to

Page 746

1 osteoporotic changes in the hip. That is a place
2 where you tend to see it, but because she's on
3 therapy, reviewing the records, using a
4 differential diagnosis that I do with patients I
5 see with osteoporosis and are on therapy, I would
6 conclude that her osteoporosis was asymptomatic.
7     Q. Okay. So you didn't do an MRI or anything
8 like that, correct?
9     A. No, I did not. MRI wouldn't -- I mean,
10 it's good for looking at bone of the spine. It's
11 better for looking at nerve irritation so that if
12 there was any kind of loss of what's called the
13 facet, which is the area where the nerves come out
14 in between the spinal processes, but I didn't do
15 any X-rays like that.
16     Q. Okay. So just go with me here. So
17 assuming that we had an individual, though, who was
18 suffering from nerve pain with respect to
19 osteoporosis, would that be limited to a certain
20 area, or could that be nerve pain in any multiple
21 places within the body?
22     MS. WATKINS: I'm just going to object to the
23 form of the question. Improper hypothetical. You
24 can answer.
25     THE WITNESS: It depends on which part of the

Page 747

1 spine is influenced. I mean, if it's a cervical
2 spine, you can get neck pain, arm pain. If it's in
3 the thoracic, you might have some chest pain, back
4 pain. If it's in the lumbar area, you could have
5 some, what's called, sciatic pain, which is pain
6 radiating down the back of the leg all the way down
7 into the foot. Having had that before, it is quite
8 painful and a burning pain.
9 BY MS. MANNO:
10     Q. Could it create any pain in which you
11 would describe that's in the pelvic area?
12     A. No, and we discussed that yesterday
13 particularly with back issues.
14     Q. And I don't want to -- I just want to sort
15 of move us along if I can, and I'm sorry for the
16 fact that I don't know everything that's been
17 covered, but ultimately the question is would it be
18 your testimony that any potential pain in the
19 pelvis could not absolutely be from osteoporosis?
20     A. I would say that with a reasonable degree
21 of medical certainty from my clinical experience
22 and review of the literature, pelvic pain would
23 be -- a cause of pelvic pain exceedingly rarely
24 would be caused by osteoporosis.
25     Q. But it's possible?

Page 748

1    A.  Yes.  I don't discount anything as being
2   possible, but I would say exceedingly rarely would
3   you see someone that might end up with such
4   osteoporosis that they end up with a pelvic
5   fracture and therefore, would have pain in their
6   pelvis.
7    Q.  Would you also agree with me that you did
8   not do sort of an analysis that would meet the
9   standard of care with respect to Ms. ███ to
10  fully understand her osteoporosis symptoms?
11    A.  And the standard of care you're saying,
12  number one, osteoporotic screening you would start
13  at or around menopause in a patient that has
14  certain risk factors.  I forget what the scale is
15  called off the top of my head to be able to look at
16  patients' risk factors and put them in a category
17  of when they need screening.  Since she already has
18  the diagnosis of osteoporosis, she's already on
19  therapy for osteoporosis.  The current protocol
20  would be to rescreen someone in five years, and so
21  since I wasn't managing her osteoporosis, I
22  complied with the standard of care, which is review
23  her symptoms, review her medications.  She's on an
24  accepted medication for osteoporosis.
25       We can debate how long you would keep

Page 749

1   someone on a bisphosphonate for the treatment of
2   osteoporosis, but no, the standard of care with
3   regard to osteoporosis on someone that's on a known
4   treatment is to review that and then make sure that
5   she follows all of the acceptable guidelines for
6   following up for osteoporosis.
7    Q.  Okay.  So let me ask it a different way.
8   Did you do any sort of analysis to determine what,
9   if any, symptoms that she was suffering due to
10  osteoporosis?
11    MS. WATKINS:  Object to the form.
12    THE WITNESS:  She didn't complain of any
13  symptoms associated with osteoporosis.  I reviewed
14  the fact that she had osteoporosis and was on a
15  medication and therefore, felt that to delve deeper
16  into that probably would not give me any additional
17  information.
18       I'm not -- I'm not going to say that -- to
19  testify that her osteoporosis contributed to her
20  pain.  I looked at that.  I considered that in part
21  of my differential diagnosis in coming up with what
22  is her current symptoms after being treated with
23  the pelvic floor mesh and her current
24  symptomatology right now.  And I think with a
25  reasonable degree of medical certainty that

Page 750

1   osteoporosis is not contributing to any of her
2   current symptomatology.
3   BY MS. MANNO:
4    Q.  I hear what you're saying, but I'm asking
5   sort of how did you conclude.  You earlier stated
6   that it is possible to have nerve pain in your
7   pelvic area as a result of osteoporosis, correct?
8    A.  Again, it's highly unlikely that you would
9   have nerve pain from osteoporosis in the pelvic
10  area.
11    Q.  But it's possible?
12    A.  It is possible.
13    Q.  And so how did you necessarily rule out
14  that her pelvic pain could have been caused by the
15  osteoporosis?
16    A.  From my clinical experience and my review
17  of the literature that she has the diagnosis.  She
18  is being treated.  There is a record later on in
19  her medical record that she has a bulging disk on
20  an MRI.  That can lead to lower extremity pain.
21  Whether or not that bulging disk is associated with
22  her osteoporosis, I would say that if you look at
23  the literature on asymptomatic patients with
24  bulging disks, probably 25 percent of asymptomatic
25  patients have a bulging disk, that -- that would

Page 751

1   explain some of her hip pain and her leg pain just
2   like her greater trochanteric bursitis.  I would
3   say that is a much more likely diagnosis for her
4   hip and leg pain.  That also has a very infrequent
5   incidence of causing pelvic pain.
6    Q.  So did you conclude based -- I mean, I
7   understand what your opinions are, but did you
8   conclude based on your medical exam of her and her
9   records that there was no possibility that
10  osteoporosis was at least a contributing factor to
11  her pelvic pain?
12    A.  As I say with a reasonable degree of
13  medical certainty based on my experience and review
14  of the literature that osteoporosis was not a
15  contributing factor.
16    Q.  Okay.  And so Doctor, I know that you are
17  well-versed in this literature, and I can't
18  possibly read all of the articles that you've read
19  to prepare for this, so let me ask it more
20  specifically.
21       Is there specific literature that you have
22  reviewed which discusses the effects of
23  osteoporosis on pelvic pain?
24    A.  Again, in advanced stages of osteoporosis,
25  you can have an element of pelvic pain.  Someone

Page 752

1 who is 51 years old who is being treated with
2 bisphosphonate with a reasonable degree of medical
3 certainty, pelvic pain would be a very unlikely
4 diagnosis caused by osteoporosis.
5    Q. And based on that conclusion, you believed
6 that Ms. ███ was not suffering from any -- at
7 least in her pelvis with respect to any effect of
8 her osteoporosis?
9    A. I, with a reasonable degree of medical
10 certainty, ruled out that her current complaints of
11 occasional stabbing pain in her pelvis is not due
12 to osteoporosis, yes.
13    Q. And to be clear, all of the opinions -- I
14 understand that all of the opinions that you intend
15 to give today are to a reasonable degree of medical
16 probability or reasonable degree of scientific
17 certainty?
18    A. That is correct.
19    Q. Okay. So you're welcome to say that, but
20 I don't think you have to qualify it if --
21    A. Each time I say that?
22    Q. You can if you want to, but I'm saying
23 that I understand that that is your opinion. To
24 the extent that you are opining where you do not
25 believe it is to a reasonable degree of medical

Page 753

1 probability or a scientific certainty, you can say
2 so.
3    A. Okay.
4    Q. So in terms of being a smoker, and I'm
5 sure you covered this ad nauseam in the last
6 couple of days, but you would agree with me that
7 that, of course, affects the health of tissues in
8 responding to a variety of things, including
9 surgery?
10    A. That is correct. We discussed the impact
11 of smoking on incontinence. We discussed the
12 impact of smoking on pelvic organ prolapse. Now,
13 remember, she was a former smoker. One of the
14 things that we do is that while the carcinogenic
15 effect of smoking still lingers, a lot of the
16 pulmonary issues from smoking tend to clear pretty
17 quickly. So chronic cough is seen -- diminishes
18 quite quickly after quitting smoking.
19    Q. Inflammation of tissues diminishes?
20    A. That is correct because that's usually
21 related to the nicotinic additives in cigarette
22 smoking.
23    Q. Ability to heal quickly, does that stick
24 around or not?
25    A. No, that doesn't. That, again, is a

Page 754

1 temporary phenomenon associated again with the
2 additives in cigarette smoking.
3    Q. I just want to detour here very quickly
4 because, you know, when you say Ms. ███ is a
5 previous smoker, you know, that's something that
6 you understand because Ms. ███ told you so,
7 correct?
8    A. That was both in her records, and that's
9 what she told me, too.
10    Q. Okay, but you didn't -- what I'm trying to
11 get at is more of a general discussion about many
12 things that you'd rely on come from your patients and
13 what they tell you, correct?
14    A. That is correct.
15    Q. You can't -- I'm sure that you trust all
16 of your patients and you believe what they're going
17 to tell you, but you can't necessarily prove or
18 disprove everything that they have told you with
19 respect to their prior history?
20    A. That is correct.
21    Q. So were you also aware that she had what
22 was called -- is it Raynaud's syndrome?
23    A. That is correct.
24    Q. What is that?
25    A. Raynaud's is a connective tissue disorder

Page 755

1 that impacts blood flow particularly to the
2 extremities and patients that develop a color
3 change in their fingers and kind of a numbness in
4 their fingers. There's other manifestations, but
5 that is more of the classic manifestation of
6 Raynaud's.
7    Q. When was she diagnosed with that?
8    A. If you'd like to show me the exact record
9 that you're referring to, I can give you the exact
10 date.
11    Q. Well, no. I think what I'm asking you is
12 if you were aware of that, how did you become aware
13 of it?
14    A. If that is in the medical records, then we
15 can discuss the exact place where that is in the
16 medical records.
17    Q. I mean, I don't see it in your report, so
18 that's why I was asking you.
19    A. Right, and that is something that when I
20 saw her, she did not tell me about when I asked her
21 about her past medical history.
22    Q. Okay. So I just want to make sure I
23 understand it. By the time that you drafted this
24 report, though, were you aware that she had had a
25 diagnosis of Raynaud's?

Case 2:12-md-02327 Document 9252-1 Filed 06/10/20 Page 548 of 924 PageID #: 213855

Page 756

1    A.  I did not see that in the medical records
2    specifically.  Again, that might have been in the
3    medical records.  Obviously, the current symptom
4    that she has of an occasional stabbing in her
5    pelvis would be highly unlikely to be due to
6    Raynaud's phenomenon.
7        Q.  What can be the -- not complications, but
8    really the symptoms of Raynaud's?
9        A.  Obviously, I don't treat Raynaud's.  I am
10   familiar with some of the symptomatology.  If you
11   would like, we can pull out a textbook on internal
12   medicine to go through the entire symptoms.
13       Q.  No, and listen, I don't -- we don't need
14   to do anything additional to what you've done.
15   What I'm really trying to explore is whether you
16   knew about this, and I think you said no, but --
17       A.  Obviously, there are a lot of things in
18   the medical records.  There are -- there are
19   probably additional diagnoses in every one of the
20   reports that I did that -- you know, and again, as
21   we talked about before, sometimes patients have a
22   history of something and they don't think that it
23   is currently active.  So when you say what medical
24   problems do you have, they, you know, often don't
25   remember at the time that you asked them that that

Page 757

1    they were diagnosed with something that is
2    currently asymptomatic.  I find that from my -- now
3    my new electronic medical record where patients can
4    go in and actually update their history when they
5    look and they say oh, yeah, I forgot to tell you
6    about this, this and this.
7        So it's not surprising that there might
8    have been something that she did not tell me about
9    that might have been a record entry in one of the
10   records.  Again, it would be highly unlikely that
11   Raynaud's related to a vaginal erosion.  And when I
12   talk erosion, I will use the old-fashion generic
13   term like fax machine to mean vaginal extrusion.  I
14   will qualify that if it's an erosion into the
15   bladder or the urethra, I just happen to use the
16   term erosion.  I know that there are newer terms,
17   that Raynaud's phenomenon would have led to that
18   more than the pelvic floor implant themselves.
19       Q.  Okay, but I guess a different of asking
20   is, you know, I'm trying to find out if Raynaud's,
21   in your opinion, could have been a contributing
22   factor, and so I'm asking you --
23       A.  To erosion and to her current symptoms of
24   occasional stabbing in her vagina?
25       Q.  Yeah, but I want to go back to my question

Page 758

1    before that.
2        A.  Okay.
3        Q.  First I wanted to figure out if you know
4    or have an opinion as to the potential symptoms of
5    Raynaud's, and I think you said you don't
6    necessarily?
7        A.  I described for you earlier the typical
8    symptoms that patients with Raynaud's have.  Again,
9    I'm a urogynecologist gynecologist.  I don't treat
10   connective tissue disorders.  I don't treat
11   autoimmune disorders.  I don't treat difficult
12   cases of arthritis, but from a gynecological,
13   urogynecological perspective, while that is
14   important to entertain in your differential
15   diagnosis of a patient's past medical history, I
16   would rule that out as a contributor to the
17   problems that she had with her vaginal mesh and her
18   current symptom of occasionally feeling a stabbing
19   pain in her pelvis.
20       Q.  But at the time that you wrote this
21   report, you weren't aware of it, so it didn't go
22   into your differential diagnosis in terms of at
23   least in your report, correct?
24       A.  As far as the things that I considered at
25   the time that -- the important things that I

Page 759

1    considered at the time of putting into my report.
2        Q.  So that's no, you didn't consider it?
3        A.  I considered all the things in the report.
4    I put the most relevant things -- I considered all
5    the things I reviewed in the records.  I put the
6    most relevant things in the report.
7        Q.  I'm not trying to be tricky, but is it a
8    fair statement that you did not consider Raynaud's?
9        A.  You will not see Raynaud's in my report,
10   that is correct.
11       Q.  So do I understand you correctly that you
12   do attribute the potential hip, you know, back
13   and/or leg pain that Ms. ███ had complained
14   about previously to potentially this osteoporosis
15   or the greater, I can't even say it, trochanteric
16   bursitis?
17       A.  That is correct and also the diagnosis
18   from her MRI in 2012 that showed that she has a
19   bulging disc.
20       Q.  Okay.
21       A.  And I think my report is quite clear that
22   I'm not opining that any of her hip pain, leg pain
23   is contributed by the device that was placed in
24   her.
25       Q.  Okay.  Thank you.  Okay.  So let's talk

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 549 of 924 PageID #: 213856

Page 760

1  about -- I'm looking at Page 3 of your report.  Oh,
2  I'm sorry.  Before we go there, how did you rule
3  out that previous uterine bleeding and the
4  endometrial polyp that you saw or that you read
5  about had anything to do with her current
6  situation?
7      A.  Well, this was diagnosed in ▇▇▇ of 2008
8  on hysteroscopy and D&C.  She had dysfunctional
9  uterine bleeding.  At the time of her implant, she
10  had an anterior and posterior repair with an
11  Avaulta Solo anterior and Avaulta Plus posterior.
12  I don't see that her uterus was removed, which is
13  not outside the standard of care.  An endometrial
14  polyp and dysfunctional uterine bleeding cause
15  bleeding symptomatology.  It can cause crampy pain
16  at the time of the bleeding.  The pain is usually
17  described as crampy.
18          Her current complaint is that she has a
19  stabbing pain, which she describes as an occasional
20  stabbing pain in her pelvis that feels like someone
21  took a knife and jabbed it in her.  That is what
22  her current complaint is.  With a reasonable degree
23  of medical certainty from review of the literature,
24  my clinical experience, dysfunctional uterine
25  bleeding and endometrial polyp would not give you

Page 761

1  those symptoms.
2      Q.  Okay.  Earlier you touched on the fact
3  that sometimes patients aren't necessarily the best
4  historians particularly during like one meeting,
5  correct?
6      A.  That is correct.
7      Q.  And they are also not as specific
8  potentially as you would like as their treating
9  physician in describing for you the perfect
10  adjective of their pain; is that fair?
11      A.  That is correct, but as I discussed
12  yesterday, the average age of menopause in the
13  United States is 51.4 years of age, and so I would
14  say that between 2008 and now, she currently stated
15  that her last menstrual period was at the age of
16  51.  So I would say that any dysfunctional uterine
17  bleeding would not be causing symptoms because
18  she's not having bleeding.
19      Q.  So are you saying that the pain that goes
20  with dysfunctional uterine bleeding only occurs
21  during the bleeding phase?
22      A.  That is correct.
23      Q.  Okay.  So during -- okay.  During the
24  placement of the Avaulta Solo and Plus, did you
25  read in the op report that the doctor stated,

Page 762

1  quote, it's Samowitz, I believe, quote, we then
2  adjusted the arms to make the graft lie flat, and
3  the distal end was then split to the length of the
4  vagina to make it the correct length of the vagina?
5  And that's in your report, so you, obviously, read
6  that, correct?
7      A.  That is correct.
8      Q.  When you saw the sentence that said we
9  then adjusted the arms to make the graft lie flat,
10  did that cause you any concern?
11      A.  No.
12      Q.  And the remainder of the sentence is the
13  distal end was then split to the length of the
14  vagina to make it the correct length of the vagina.
15  Did that cause you any concern?
16      A.  No.
17      Q.  And when he says was split to the length
18  of the vagina, what did you understand that to
19  mean?
20      A.  Well, there are various ways of, quote,
21  unquote, fitting the Avaulta.  People take out
22  wedge shapes, triangle shapes, cut it.  And this is
23  to get part of the tensioning process and the
24  process to get the Avaulta to lay flat inside the
25  vagina, which is the standard way of making sure

Page 763

1  that, A, it's laying flat and, B, it's not under
2  tension.  So I did not find anything in the
3  surgical report that was different from the
4  standard way of implanting an Avaulta.
5      Q.  You would agree with me, though, that once
6  you start -- I mean, I've heard of doctors sort of
7  cutting off the back tail, if you will, like on a
8  posterior Avaulta-type repair, but when we're
9  talking about splitting it or, you know, sort of
10  not just taking off the end, but going in terms of
11  cutting in the middle or near the midline, would
12  you agree with me that is structurally changing the
13  design of the device?
14      MS. WATKINS:  Object to the form.
15      THE WITNESS:  You would have to ask
16  Dr. Samowitz exactly how much he split.  Again, it
17  is appropriate to, quote, unquote, fit the device
18  to the vagina by modifying it from its original
19  shape.  How that is done is left up to the
20  surgeon's discretion.
21  BY MS. MANNO:
22      Q.  Okay.  But would you agree -- well, I
23  guess you don't really know how he cut it in order
24  to render an opinion about whether his doing that
25  materially changed the design of the graft?

Page 764

1    MS. WATKINS: Object to the form.
2    **THE WITNESS: Well, obviously, cutting it**
3    **changes the graft. Is that -- is that a deviation**
4    **from the typical implantation process, no, because**
5    **that is designed to be able to be cut so that it**
6    **lays flat.**
7    BY MS. MANNO:
8    Q.   Okay. But in terms of splitting it in the
9    back, I mean, you weren't there. I don't believe
10   you know exactly how much he took off or where he
11   took off, correct?
12   **A.   That is correct, and I don't remember if**
13   **it was in this much detail about exactly what he**
14   **did during his deposition. If you would like, we**
15   **can pull out that portion of his deposition and see**
16   **what he testified to.**
17   Q.   So I'm really interested in your opinions
18   as you know them, and so is it fair to say you're
19   not here to render an opinion as to whether or not
20   his cutting of this sling materially changed it or
21   not?
22   **A.   That is correct.**
23   Q.   When he says that, you know, he wanted to
24   put the Plus in the posterior because he believed
25   that the vaginal mucosa was rather atrophic and

Page 765

1    thin compared to the anterior vaginal mucosa, I had
2    a question about that because I thought is that
3    sort of an irregular type of situation where you
4    would have someone with vaginal mucosa that was
5    atrophic in one area and not in another?
6    **A.   Well, that's the doctor's assessment. I**
7    **think that would have been an appropriate question**
8    **to ask the doctor at that time. Why he felt that**
9    **one area of the vagina looked, quote, unquote,**
10   **atrophic than another part of the vagina, I can**
11   **tell from having done surgery for close to 25 --**
12   **well, actually over 25 years in the pelvis that**
13   **there might be differences in appearance between**
14   **the way the vagina looks anteriorly and the way the**
15   **vagina looks posteriorly, and that would be the --**
16   **what he saw, I think, is described in the records.**
17   **He thought it looked a little bit thinner, which is**
18   **why he decided to put the Plus posteriorly because**
19   **as he says, he felt the collagen on the Plus would**
20   **decrease the chance of having a problem.**
21   Q.   Have you in your patients seen any
22   patients where you felt like the -- that vaginal
23   atrophy differed within the vagina?
24   **A.   I've seen in my patients that there could**
25   **be a different appearance of the vaginal wall. I**

Page 766

1    **might not use the term atrophy. I might use the**
2    **term thickness.**
3    Q.   Okay. When you examined Ms. ████ did
4    you notice any difference between her anterior and
5    posterior vaginal mucosa in terms of it being or
6    appearing atrophic?
7    **A.   Not that I noted and not that I put in my**
8    **report.**
9    Q.   So immediately -- well, yes, I mean,
10   fairly close after surgery, you write that she's
11   got significant abdominal left lower quadrant pain
12   with very little flatus. That is sort of gas,
13   correct?
14   **A.   That is correct.**
15   Q.   Okay. As well as some left lower back
16   pain and spasms. Her post-void residual was zero.
17   Does that mean she was unable to urinate?
18   **A.   No. That means that there was nothing**
19   **left in her bladder at the end of urination.**
20   **That's normal.**
21   Q.   Okay. So did she have any issues after
22   the surgery or at least within, you know, a week or
23   two of the surgery of having a problem urinating?
24   **A.   Not that was documented by an abnormal**
25   **post-void residual.**

Page 767

1    Q.   Hypoactive bowel sounds in the left lower
2    quadrant, what does that signify to you?
3    **A.   That could mean that she's still on pain**
4    **medication and has hypoactive bowel sounds. It**
5    **could mean that she had just eaten and that you**
6    **don't get the hyperactive bowel sounds that we all**
7    **hear when we're hungry, and that means that our --**
8    **you know, there's what's called the gastrocolic**
9    **reflex where our stomach wants something in it, and**
10   **so it's making our bowels kind of contract a little**
11   **bit more.**
12   **Dr. Samowitz attributed it maybe to a**
13   **little bit of postoperative ileus. Usually a**
14   **postoperative ileus this far out from surgery is**
15   **usually due to pain medication, and so that's why I**
16   **concluded that he started her on Toradol, which is**
17   **a less -- has a less impact on bowel motility than**
18   **narcotic pain medications.**
19   Q.   Okay. So the postoperative ileus, is that
20   like a blockage of the intestine?
21   **A.   No. That's just the intestine slowing**
22   **down. An obstruction, a bowel obstruction is an**
23   **obstruction. An ileus just means that the bowel is**
24   **kind of still sleeping. When we put a patient to**
25   **asleep with general anesthesia, we put the patient**

Page 768

1 asleep, and we put their bowel to sleep, and then
2 the patient makes up much more quickly when we take
3 the general anesthetic away. The bowel takes a
4 little bit longer to wake up. The more
5 manipulating of the bowel, the more postoperative
6 narcotic they get, the longer an ileus can last.
7    Q. Okay. So it is not -- I mean, it seems to
8 me that your opinion is that the constipation that
9 she felt, the sort of hypoactive bowel sounds and
10 bowel not moving very quickly you're attributing to
11 the pain medication and anesthesia?
12    A. I'm attributing this to normal
13 postoperative period.
14    Q. Okay. So moving down, you say on
15 ▆▆▆▆ Ms. ▆▆▆▆ was seen by Dr. Samowitz. He
16 noted that since her surgery, she has had a sense
17 of bladder fullness and a slow stream. Does that
18 indicate to you that she was complaining of urinary
19 retention?
20    A. Urinary retention is kind of one of those
21 catch-all phrases. It means that you are retaining
22 more than a normal amount of urine. The normal
23 amount of urine that should be in the bladder after
24 peeing for a normal patient should be under 50 CC.
25    Q. Which remains?

Page 769

1    A. Which is left over at the end of peeing.
2 Now, this was done by a bladder scan, and there's
3 about a 15 percent error rate with bladder scans.
4 This close to her surgical procedure, two weeks out
5 from her surgical procedure, a post-void residual
6 of 86 CC I would not find significantly concerning.
7 So a normal patient, their post-void residual
8 should be less than 50 CC. A postoperative patient
9 can be less than 100 CC.
10    So while she is having some symptoms of a
11 voiding dysfunction and Dr. Samowitz correctly
12 addressed those symptoms, did an objective test and
13 then hypothesized that she might need a therapy to
14 help her empty her bladder better, I did not -- you
15 know, I would not conclude that she had any
16 significant abnormality of voiding at this point.
17    Q. Okay, but just -- so a month later,
18 though, ▆▆▆▆ 27th, then she has a post-void
19 residual of 90 CCs, correct?
20    A. That is correct.
21    Q. So would you agree with me, though, that a
22 symptom or complication of implanting mesh with too
23 much tension can result in a situation in which
24 you're not having -- in which you're having higher
25 post-void residual numbers?

Page 770

1    A. That could be a cause, or it could be due
2 to mesh contraction. We know that mesh contraction
3 starts immediately after the mesh is placed because
4 of the chronic foreign body reaction, which leads
5 to scarification. We know that particularly with
6 the Avaulta Plus because of the collagen layer
7 that's placed on top of it, we double the thickness
8 of the mesh. We more than double the thickness of
9 the mesh. We've obliterated the pore size. This
10 is something that we talked about yesterday.
11    Q. Right, and I kind of -- I want to move to
12 strike as nonresponsive, your portion of your
13 answer.
14    I really just want to know the answer to
15 my original question, which was can a symptom or a
16 complication of placement of mesh that is too tight
17 result in post-void residual numbers that are
18 higher than normal?
19    A. In the hypothetical case?
20    Q. Yes.
21    A. Yes.
22    Q. And so you have concluded in Ms. ▆▆▆▆
23 case that -- well, you've concluded that the
24 placement of the Avaulta was not improper, correct?
25    A. That is correct.

Page 771

1    Q. And so let's talk about that for a minute
2 because, you know, you base that -- you're not
3 present for any of these plaintiffs today for their
4 implant procedures; is that correct?
5    A. That is correct.
6    Q. So you are basing your opinion as to
7 whether or not the placement was with the correct
8 amount of tension on the op report?
9    A. That is correct.
10    Q. And what else?
11    A. And the deposition testimony of the
12 implanter.
13    Q. Okay. So of course, the deposition of the
14 implanter is what the implanter says?
15    A. That is correct.
16    Q. And in the op report, I mean, I've read a
17 lot of these now, and not one of them have I seen
18 that says I've implanted it too tightly.
19    A. Then you haven't read enough operative
20 reports. I've seen people say that I felt very
21 concerned about the possibility of recurrence, and
22 therefore, I placed it under more tension.
23    Q. More tension. Okay. Have you ever seen a
24 patient, though, that you have performed some sort
25 of removal or revision in which you thought it was

Page 772

1  implanted too tightly originally?
2      A.  That would be a patient that had symptoms
3  that were immediately after surgery.  That would be
4  a significant voiding dysfunction, and yes, those
5  patients had been referred to me to do a release
6  operation on them.
7      Q.  Okay.  And are you saying that the op
8  report -- I'm assuming that you reviewed the op
9  reports for those patients that you did revision
10  surgery for?
11      A.  The vast majority of the time when I'm
12  doing a revision or an explant surgery, I have the
13  operative report.  In an acute phase like this
14  where I see somebody that has had surgery with
15  either a transvaginal mesh or sling procedure that
16  is within the first month after surgery and they
17  have a significant post-void residual and a
18  significant voiding dysfunction, I feel that
19  that -- when we talked about this yesterday, that's
20  one of the three indications for -- in my opinion,
21  for immediate surgery.
22          If she didn't come with the operative
23  report, I would still take her to the operating
24  room and relieve the voiding obstruction.  There is
25  a significant amount of data that the longer you

Page 773

1  wait to relieve a voiding dysfunction with vaginal
2  mesh procedures, the more likely it is that it will
3  not resolve.
4      Q.  Okay.  So let me go back to -- I guess my
5  point is as follows.  Is it fair to say that you
6  have had patients of which you have done their
7  revisions or removals, you have concluded that it
8  was improperly -- it was tensioned too much upon
9  initial implantation in which you've also had op
10  reports that have said for those patients it was
11  appropriately tensioned?
12      A.  That is correct.  And those patients tend
13  to show up longer after surgery than the ones that
14  I concluded that it was due to mesh contraction
15  and --
16      Q.  I don't follow.
17      A.  Well, you missed a lot of this discussion
18  yesterday.
19      Q.  Right.  And I'm sorry for that, and I
20  don't want to get like really off track.
21      A.  There is a study by Petri that came out in
22  2012 that showed that particularly with suburethral
23  slings, you see a progressive voiding dysfunction
24  with time, and the reason for that is there's sling
25  contraction.  There's a paper by Dr. Svangenson

Page 774

1  that showed that the voiding dysfunction from year
2  one to year 10 went up tenfold.  The only reason --
3  the only explanation for that is contraction.
4      Q.  Okay.  But I'm just trying to ask you in
5  terms of the patients you've seen that you have
6  concluded that their mesh was initially placed with
7  too much tension, are you saying that you see those
8  patients soon after their surgeries or longer term?
9      A.  Soon after their surgery.
10      Q.  Okay.  That's what I was asking.
11      A.  Okay.
12      Q.  You're aware, though, of sort of
13  Ms. ████████ -- well, you're aware that ████████
14  2009 she is prescribed esterase estrogen cream?
15      A.  That is correct.
16      Q.  And what was the purpose or reason why she
17  was diagnosed with esterase?
18      MS. WATKINS:  Object to the form.
19      THE WITNESS:  Well, she's complaining of
20  urinary frequency at that point, and in patients
21  that are around the time of menopause might have a
22  slight thinning of the urethra.  Their urinary
23  frequency and urgency can be associated with a
24  hypoestrogenic state, and that would be one of the
25  indications or that it was felt that the patient

Page 775

1  might have some element of vaginal atrophy to start
2  her on estrogen cream.
3  BY MS. MANNO:
4      Q.  Okay.  So are you today providing an
5  opinion that any urinary issues, frequency, urgency
6  and nocturia, I mean, she's not complaining of
7  those now, correct?
8      A.  That is correct.  She was complaining
9  about that before, and we do know from the
10  literature that pelvic floor mesh is associated
11  with an increase in urinary symptoms, an increase
12  compared to native tissue repair and stress urinary
13  incontinence, and this is from nerve irritation in
14  the pelvic floor.
15      Q.  Right, but -- and I appreciate you going
16  on, but if you can just try to focus on my
17  questions, I will give you a chance.  You've,
18  obviously, given your opinion, but with respect to
19  urinary frequency, I mean, there are a bunch of
20  different causes of urinary frequency.  We don't
21  need to go into all of them, but do you agree that
22  there are a bunch of different causes?
23      A.  That is correct, and we went over a lot of
24  them, particularly with transvaginal mesh,
25  yesterday.

Page 776

1    Q.   So if she is being prescribed with
2  estrogen cream, I think you just said there can be
3  issues with respect to thinning of the urethral
4  tissue that can result in frequency, correct?
5    **A.   That is correct.**
6    Q.   So two and a half years later she goes to
7  Dr. Santos where she complains of the erosion,
8  urinary frequency.  You discussed in your report
9  about her husband complaining of symptoms, correct?
10   **A.   That is correct.**
11   Q.   And I do have one question, though.  At
12  the top of Page 5, you said the plan was to perform
13  urodynamics.  At that visit, surgery was
14  recommended, specifically excision of the graft
15  erosion, revision of posterior colporrhaphy and a
16  perineoplasty.  Can you tell me why the
17  perineoplasty, in your opinion, was recommended?
18   **A.   Usually perineoplasty --**
19   Q.   Perineo.  Sorry.
20   **A.   That's quite all right.  That's what I'm**
21  **here for.  Is to decrease the aperture of the**
22  **vaginal introitus, which is the opening of the**
23  **vagina.  It's more of a cosmetic procedure.**
24   Q.   Okay.  So were there any noncosmetic
25  indications for this procedure that you're aware

Page 777

1  of?
2    **A.   Many times that is kind of added to a**
3  **pelvic organ prolapse procedure to just decrease**
4  **the capaciousness of the opening of the vagina to**
5  **help decrease the symptoms of future prolapse if they**
6  **were to recur after surgery.**
7    Q.   Okay, but this was done in a removal
8  situation?
9    **A.   That is correct.**
10   Q.   Okay.  So are you aware with respect to
11  Ms. ████ whether there was any indication for
12  this that was noncosmetic?
13   **A.   Again, perineoplasties are usually added**
14  **to -- remember, she had a revision of her mesh and**
15  **a posterior colporrhaphy that was recommended.**
16  **This is what's being recommended that I might add**
17  **that in.  Usually when we discuss this, you know,**
18  **when I discuss a plan with a patient, I will tell**
19  **them that I might, depending on, you know, what I**
20  **find in the operating room, add this procedure**
21  **along with it.**
22   Q.   Ultimately she did not have this, though?
23   **A.   That is correct.**
24   MS. WATKINS:  We've been going for about an
25  hour.  Do you mind if we take a break?

Page 778

1    MS. MANNO:  No.  Go ahead.
2    THE VIDEOGRAPHER:  The time is 10:38.  We are
3  off the record.
4        (Whereupon, a short break was
5        taken.)
6    THE VIDEOGRAPHER:  The time is 10:44.  We are
7  back on the record.
8  BY MS. MANNO:
9    Q.   So let's talk about your visit with
10  Ms. ████ Doctor.  Oh, I did want to ask you this
11  before we go any farther.  You noted that she has a
12  history of herpes, correct?
13   **A.   That is correct.**
14   Q.   And did you talk to her about whether or
15  not she was still experiencing outbreaks?
16   **A.   No, we didn't talk about that, and I don't**
17  **think that that would really have a significant --**
18  **I mean, the stabbing pain that she would have**
19  **inside of her vagina is not typical for the**
20  **location of herpes.**
21   Q.   I'm just asking you whether or not you
22  discussed it with her.
23   **A.   No.  I noted the history and didn't really**
24  **discuss with her the frequency of outbreaks.**
25   Q.   Okay.  And are you aware of whether or not

Page 779

1  she's currently taking anything for that?
2    **A.   Not that was described on her current**
3  **medications.**
4    Q.   Okay.  And now I'm just speaking
5  generally, okay?  So if someone does have herpes
6  and they have an outbreak, what are the common
7  symptoms of such an outbreak?
8    **A.   Well, usually someone will have what's**
9  **called a prodrome where they know that an outbreak**
10  **is happening.  They might have a numb sensation, a**
11  **tingling sensation, a burning sensation on the area**
12  **where the vesicle is going to show up.  And we're**
13  **talking about recurrent herpes now, right?  I don't**
14  **want to get into a whole discussion of primary**
15  **herpes, which is --**
16   Q.   I'm just talking about when you say she
17  has a history of herpes, and I know we're speaking
18  generally, whatever you're talking about is what
19  I'm talking about.
20   **A.   You're asking about what are the symptoms**
21  **of herpes, and I just wanted to qualify I'm giving**
22  **you the symptoms of a recurrent herpetic outbreak,**
23  **not a primary herpetic outbreak, which you wouldn't**
24  **be dealing with this far out a history of herpes,**
25  **but I just --**

Page 780

1    Q.  I understand.
2    A.  And then the patient usually about a day
3  or two later will develop a vesicle.  By the time
4  the vesicle is there, the discomfort tends to
5  subside about one or two days after the vesicle
6  appears.  It breaks, crusts over, and then the
7  patient becomes asymptomatic again.
8    Q.  Okay.  And when a person has sort of this
9  general recurrent herpes outbreak, can it vary as
10  to where they have the vesicle?
11    A.  No.  It's usually in the same spot.
12    Q.  Which is?
13    A.  Wherever that spot is.
14    Q.  For that person?
15    A.  That is correct.
16    Q.  Okay.  And is it always an external spot,
17  or can it be an internal spot?
18    A.  Very rarely do you see herpes vesicles on
19  the cervix or inside the vagina.  The vast majority
20  are on the vulva, which is the outside of the
21  vagina.  Now, women can have herpes on their cervix
22  and be called what's called an asymptomatic shedder
23  where they don't have lesions, but the virus can
24  actually be shed from inside the vagina, but you --
25  the internal herpes is -- if you believe that

Page 781

1  school of thought of asymptomatic shredders, it
2  tends to be asymptomatic.
3    Q.  Without any sort of feeling?
4    A.  Right.
5    Q.  Okay.  So your paragraph in the middle
6  of -- middle to bottom of Page 6, you said at some
7  point after the explant surgery in 2011, the pelvic
8  pain resolved, and currently she is not having any
9  pelvic pain aside from an occasional stabbing
10  pelvic pain.
11    Did you get that information from
12  Ms. ███████
13    A.  That is correct.
14    Q.  On the day that you examined her?
15    A.  That is correct.
16    Q.  And when she said -- is the word
17  occasional her word or your word to describe what
18  was reported to you?
19    A.  Well, that's the same word that she stated
20  in her deposition, too, so that, from my
21  recollection, is the term that she used.
22    Q.  Okay.  And so you don't -- we can't put a
23  finer point on it in terms of once every month,
24  once every six months.  We can't put a finer point
25  on it?

Page 782

1    A.  I can't.  That would be a very good
2  question to ask her exactly how frequently she
3  experiences this, what is occasional for her.
4    Q.  Right.  But you did not receive any
5  information from her when you examined her to be
6  able to do that?
7    A.  I didn't delve into how much -- how
8  occasional is occasional.
9    Q.  Okay.  How much mesh remains in
10  Ms. ███████
11    A.  During the explant procedure, there were
12  two segments of 1.5 centimeters and .6 centimeters,
13  so the majority of the posterior mesh and all the
14  anterior mesh is still present.  If you would like,
15  we could pull out the box to give you the exact
16  size dimensions of how much is left over.
17    We do know that there are four arms still
18  going through the muscles of the pelvic side wall
19  into the obturator space.  I discussed that
20  yesterday.  The posterior arms go through the
21  ischial rectal fossa, and that would still be
22  there.  So the vast majority of the mesh is still
23  present.
24    Q.  And is -- maybe this is not the correct
25  scientific term, but sort of the main portion of

Page 783

1  the graft, not the arms, but the middle portion, is
2  that where these 1.5 centimeters and .6 centimeters
3  were taken from?
4    A.  That is correct.
5    Q.  Okay.  So other than those particular
6  measurements, the 1.5 and .6, the remainder of the
7  midline portions remain or --
8    A.  The body, if you will.
9    Q.  The body of it.
10    A.  Yes, of the posterior.
11    Q.  And what about the anterior?
12    A.  From the report, it was only the posterior
13  wall -- the posterior mesh that was excised because
14  that's where the erosion was.
15    Q.  So the entire anterior Avaulta Solo
16  remains?
17    A.  I did not see any indication in the
18  records that the anterior mesh was operated on.
19    Q.  Okay.  And were you able to feel during
20  your examination where the anterior -- sorry, the
21  Avaulta Solo was?
22    A.  That is correct.
23    Q.  But she had no tenderness at all where it
24  was?
25    A.  What I described in my report is that

Page 784

1   there is a nontender ridge on the posterior wall of
2   the vagina approximately one centimeter in from the
3   introitus. Otherwise, there is no palpable -- when
4   I say palpable, I mean thickened palpable mesh
5   posteriorly. Anteriorly I could feel the anterior
6   arms. The distal arms closer to the opening of the
7   vagina are also palpable, but not tender. There
8   was no exposure of the mesh, and the remainder of
9   the mesh was in its typical location.
10      Q. Okay. So really the only symptom that you
11  were able to identify is this occasional stabbing
12  pelvic pain?
13      A. That is correct.
14      Q. Were you able to reproduce it?
15      A. When I pressed on the arms, they were
16  nontender on exam.
17      Q. So you weren't able to reproduce it?
18      A. By pushing on the arms and pushing on the
19  mesh, no.
20      Q. So I know in your general report, and I'm
21  sure probably hours of testimony over the last
22  couple of days, you described why you believe the
23  Avaulta designs are flawed. You say it here on
24  Page 7, the Avaulta designs are flawed as set out
25  in my general report.

Page 785

1         I don't want to go through all of that
2   with you again, but what I do want to ask you is
3   what specifically about the Avaulta design either
4   for the Solo or Plus are you attributing directly
5   to Ms. ███████ occasional stabbing pelvic pain?
6       A. And we really delved into this in depth.
7       Q. But what about with respect to Ms. ███████
8       A. And again, this will go back to my
9   discussion about what happens with neo-innervation
10  that takes place. So when you have a foreign body,
11  what the body does, and this has been shown on
12  pathologic specimens, it's described in the
13  literature, there are little nerve roots that go
14  out to an area of irritation. And actually, when
15  mesh has been explanted, we've seen nerves actually
16  growing through the mesh pores. And also, when
17  some nerves get to the mesh, it actually forms a
18  bulbus tube called a neuroma. Both of those can be
19  irritating.
20         Now, you also have a chronic foreign body
21  reaction, chronic inflammatory reaction, chronic
22  subclinical infection. Those can cause pain.
23      Q. But what caused the pain in Ms. ███████
24      A. That's what I'm saying. With a reasonable
25  degree of medical certainty, it's the chronic

Page 786

1   foreign body reaction that's leading to nerve and
2   neo-innervation. The fact she had an erosion,
3   reseeded the mesh with bacteria further reinforcing
4   the subclinical infection, all of this is leading
5   to pain.
6       Q. So how -- what -- what specific data or
7   information can you provide that shows that
8   Ms. ███████ had a chronic foreign body reaction such
9   that it is causing her current occasional stabbing
10  pelvic pain? I know you're saying that generally
11  happens.
12      A. We know from the literature, we know from
13  my clinical experience -- actually, I should say I
14  know from the literature. I know from my clinical
15  experience. I know from reviewing the internal
16  documents and depositions that a chronic foreign
17  body response happens with mesh.
18      Q. But what did you see in terms of
19  Ms. ███████ when you examined her to be able to say
20  with any degree of certainty that she had a chronic
21  foreign body reaction?
22      A. I can't -- with the vagina intact, I can't
23  see a chronic foreign body reaction; however, the
24  pathology found chronic granulomatous giant cell
25  inflammation secondary to foreign body. That's

Page 787

1   objective evidence. At the time of explant, she
2   has a chronic foreign body reaction.
3         We know from the literature from
4   Dr. Klinge and Klosterhalfen's papers that the
5   chronic foreign body reaction doesn't go away.
6   It's going to be there, and we know that that
7   promotes chronic neo-innervation of an area. So
8   with a reasonable degree of medical certainty that
9   there are nerves that are associated with both the
10  anterior and the posterior mesh that's leading to
11  the occasional stabbing pain that she's having.
12      Q. Okay. The place that the mesh was removed
13  from, okay, was where in relation to where she's
14  describing her current stabbing pain?
15      A. Well, she's describing her current
16  stabbing pain inside of her vagina. The mesh was
17  in the vagina.
18      Q. Is she providing any more specific
19  information about where in the vagina?
20      A. No.
21      Q. So is it your opinion, I just want to make
22  sure I'm summarizing this right, that she at one
23  point had pathological results or pathology
24  results, if you will, that gave an indication, in
25  your opinion, that she was experiencing this

Page 788

1 chronic foreign body reaction, that because of
2 that, you are extrapolating that she must have this
3 chronic foreign body reaction within her entire
4 vagina?
5 **A. No. I am saying that it is shown in the**
6 **literature and my clinical experience, in internal**
7 **documents, deposition testimony that there's a**
8 **chronic foreign body reaction associated with the**
9 **mesh.**
10 Q. But with respect to Ms. ▮▮▮▮ --
11 **A. The mesh is in her vagina, so the chronic**
12 **foreign body reaction is associated with the mesh**
13 **inside of her vagina. Her pain is inside the**
14 **vagina. This chronic foreign body reaction is**
15 **going to lead to neo-innervation, which is going to**
16 **lead to pain.**
17 Q. I understand sort of what you're saying
18 generally. I am asking you how you can be certain
19 that whatever the current occasional stabbing pain
20 would be is -- you can say that I know that that is
21 chronic foreign body reaction when you're not
22 looking at the exact tissue.
23 **A. Based on the literature, my clinical**
24 **experience, internal documents and deposition**
25 **testimony that there is a chronic foreign body**

Page 789

1 **reaction that we know was going on as of ▮▮▮▮ 2011.**
2 **We know from the literature it does not go away.**
3 **We know that it leads to neo-innervation. We know**
4 **that neo-innervation causes nerves to grow into the**
5 **mesh or create neuromas around the mesh. That**
6 **causes pain.**
7 Q. So Doctor, do you have other patients that
8 you have experience with, personal experience with,
9 that have reported to you that they have stabbing
10 pain within their vagina that don't have mesh?
11 **A. Exceedingly rarely, yes. They usually**
12 **have something else inside their vagina like a**
13 **retained tampon, their diaphragm got stuck, their**
14 **pessary got stuck, but off the top of my head, I**
15 **cannot tell you that I've seen patients that**
16 **describe this scenario without something abnormal**
17 **in their vagina.**
18 Q. Okay. And so when she says pelvic pain,
19 was that her word, or is that your word, your
20 phrase?
21 **A. And what are you referring to?**
22 Q. I'm back on Page 6 where it's -- I mean, I
23 think her only current complaint is this occasional
24 stabbing pelvic pain.
25 **A. Right.**

Page 790

1 Q. So I'm trying to figure out are you
2 differentiating pelvic between vaginal pain or
3 abdominal pain? What is --
4 **A. Well, the vagina is in the pelvis. The**
5 **abdomen is -- and again, we talked about this**
6 **yesterday. The abdomen is above the pelvis.**
7 Q. So what do you mean by that?
8 **A. There's very few -- there are some**
9 **situations where I would ascribe abdominal pain to**
10 **the mesh, and we can -- we're not going to be -- I**
11 **don't think we're talking about any cases like that**
12 **today, so I think that point will be better taken**
13 **up when we have a specific case in front of us, but**
14 **her mesh is in her pelvis. It's inside of her**
15 **vagina. That's where she's stating that the pain**
16 **is going from.**
17 **I explained to you with a reasonable**
18 **degree of medical certainty, based on the**
19 **literature, my clinical experience, internal**
20 **documents, medical depositions of key scientists**
21 **and members of Bard, why that chronic foreign body**
22 **reaction, why neo-innervation takes place and why**
23 **that can cause pain.**
24 Q. Okay. Move to strike.
25 My question is when you use the phrase

Page 791

1 pelvic pain, can you tell us exactly where you're
2 talking about?
3 **A. Pelvic pain is a very general area.**
4 Q. Right. So --
5 **A. It is honed around the vagina.**
6 Q. So when you say occasional stabbing pelvic
7 pain, can you be any more specific about where
8 exactly she's experiencing this pain?
9 **A. Sitting here today, no. I think that**
10 **Mrs. ▮▮▮▮ will probably be able to do a much**
11 **better job of describing exactly where that pain**
12 **is.**
13 Q. Okay. You talk about one of your opinions
14 is that Bard failed to disclose known significant
15 adverse risk information, therefore, Ms. ▮▮▮▮ and
16 her implanting physician were unaware of this
17 information prior to implantation of the Avaulta
18 products. As a result of Bard's nondisclosure of
19 risk information, Ms. ▮▮▮▮ was unable to properly
20 consent to the procedure. And I think Dr. Samowitz
21 is deposed about this on several pages in his
22 deposition, you know, 54 through about 60 or so,
23 then again like on Pages approximately 70 to 77.
24 Then also there's an opinion or testimony provided
25 by Dr. Samowitz with respect to polypropylene and

Page 792

1  the MSDS on Page 113.  I'm assuming you read all
2  those pages?
3  **A.  That is correct.**
4  Q.  So what is your opinion and the basis of
5  your opinion with respect to whether had all of the
6  risks been disclosed to Dr. Samowitz, the risks you
7  believe should have been disclosed, how that would
8  have made a difference in terms of Dr. Samowitz and
9  Ms. ████ sort of agreeing to this procedure?
10  **A.  Right.  And I will let what he said in his**
11  **deposition, what Ms. ████ said in her deposition**
12  **speak for themselves.**
13  Q.  So do you have anything additional to add
14  other than what's in the prior deposition testimony
15  about why such an alleged failure to disclose
16  impacted or would have impacted the medical course
17  in which they proceeded?
18  **A.  I think that is described in**
19  **Dr. Samowitz's, Ms. ████ deposition and in the**
20  **medical records, and I think they speak for**
21  **themselves.**
22  Q.  And you have no additional information to
23  add?
24  **A.  I have no additional opinions to add.**
25  Q.  So I've noticed in your specific reports

Page 793

1  that you have, and maybe they're not identical, but
2  they appear to me to be identical sort of what your
3  recommendations are in terms of future medical
4  care?
5  **A.  That is correct.**
6  Q.  Are they all identical for these three
7  patients?
8  **A.  To a greater or lesser extent, yes.**
9  Q.  So for example, you have a lot of
10  statements that say, you know, more likely than
11  not, or you say may or may not be ultimately
12  successful.
13      When you use the words more likely than
14  not, is it fair to conclude that you are not then
15  making those statements to a reasonable degree of
16  medical certainty?
17  MS. WATKINS:  Object to the form.
18  **THE WITNESS:  I think we should talk in this**
19  **case, and we discussed this yesterday.  When you**
20  **look at the medical literature, when somebody has**
21  **had a complication, particularly with POP mesh, the**
22  **average number of surgeries that it takes to --**
23  **that a patient is going to have once they have a**
24  **surgical complication is two to three surgeries.**
25  **So I think with a reasonable degree of medical**

Page 794

1  certainty, I can say that more likely than not,
2  she's going to need a future surgery.
3  BY MS. MANNO:
4  Q.  Can you say with a reasonable degree of
5  medical certainty that Ms. ████ will need
6  additional surgeries?
7  **A.  Yes.**
8  Q.  And she has one complaint as of now,
9  correct?
10  **A.  That is correct.**
11  Q.  And so you are saying -- why are you
12  saying that she -- I mean, a reasonable degree of
13  medical certainty is --
14  **A.  That's based on Abbott's study that when**
15  **patients have complications such as erosions that**
16  **need surgery from POP mesh, the average number of**
17  **surgeries that patients need is two to three**
18  **surgeries during their observation period.  Now, we**
19  **do know that patients that have pelvic floor mesh,**
20  **the degradation, the contraction, the chronic**
21  **foreign body reaction, the chronic inflammatory**
22  **reaction, the deformation continues to take place.**
23  **That's Plitowski's paper that looked at the**
24  **timeline from one to eight years and found that at**
25  **each point, the percentage of mesh contraction went**

Page 795

1  **up to finally at eight years to 85 percent.  It's**
2  **with a reasonable degree of medical certainty, that**
3  **from review of the literature, from my clinical**
4  **experience, review of the internal documents and**
5  **the depositions that these problems are going to**
6  **continue.**
7      **She's already manifested one problem that**
8  **was three years from her original surgery that**
9  **showed up, and this mesh is going to be in her for**
10  **45 years continuing to degrade, continuing to**
11  **contract, continuing to shrink, continuing to have**
12  **a chronic foreign body reaction.  So with a**
13  **reasonable degree of medical certainty, I would say**
14  **that because she had the first erosion that she**
15  **will more likely than not manifest another**
16  **complication.**
17  Q.  Okay.  Move to strike the nonresponsive
18  portion of the answer.
19      The study that you just discussed said
20  that there was an average of two to three surgeries
21  required to repair all problems?
22  **A.  That is correct.**
23  Q.  So that's an average?
24  **A.  That is the average number, yes.**
25  Q.  So there were some that had one?

Page 796

1   A.   That is correct.
2   Q.   Some that may have had more than three?
3   A.   That is correct.
4   Q.   Did some have zero in that study?
5   A.   No.  These are all patients that had a
6   surgical complication.
7   Q.   So the lowest number would be one?
8   A.   That is correct.
9   Q.   And there were a number of those patients?
10   A.   For slings, yes.  For POP mesh, most
11   patients had more than one surgery.
12   Q.   I thought you said the average for the POP
13   mesh was two to three?
14   A.   That is correct.
15   Q.   But that's an average, and some of those
16   people would have had one surgery?
17   A.   Right, but since the average number is
18   over two, that means that there are more, you know,
19   two to three, so it's two and a half.  That means
20   that, you know, more had over one because the
21   average was two to three.
22   Q.   But some had one?
23   A.   That is correct.
24   Q.   Okay.  So I just want to make sure I
25   understand your wording in this.  For example, top

Page 797

1   of Page 11, I highly recommend that this patient be
2   followed up with a continuum of care, including,
3   but not limited to, physical therapy, counseling,
4   biofeedback therapy and/or Botox therapy for her
5   pain.
6          When you say counseling, do you mean like
7   a psychological counseling?
8   A.   And that depends on the impact that it
9   has.  There are patients that have chronic pain
10   disorders that manifest symptoms from that chronic
11   pain disorder.  These are recommendations if she
12   feels that her pain is severe enough to require
13   physical therapy, intravaginal suppositories for
14   Valium, Botox therapy and the like.
15   Q.   But she is not expressing -- she's not
16   expressing to you that her symptoms are that
17   severe?
18   A.   That is correct.
19   Q.   But when you say counseling, I just want
20   to be sure I know what you mean.
21   A.   We discussed that in detail yesterday.
22   Q.   Is that like a psychological or sort of
23   mental type of service?
24   A.   That could mean a variety of different
25   things, whether if there's difficulty because she's

Page 798

1   having pain with intercourse.  Many of the
2   plaintiffs describe that, you know, the stress of
3   the pain with intercourse has led to difficulties
4   in their marriage, and so that could be a variety
5   of different things that counseling can entail.
6   Q.   Okay.
7   A.   It depends on what the specific
8   symptomatology would be.
9   Q.   But counseling would be an oral
10   communication type of service?
11   A.   That is correct.
12   Q.   And you say then at the end of that
13   sentence all of the things we just listed which may
14   or may not be ultimately successful.  So I am
15   assuming that when you say may or may not be
16   ultimately successful, you are not opining that any
17   one of these things to a reasonable degree of
18   scientific certainty would be successful, correct?
19   A.   It all depends on what symptoms we're
20   talking about.  In this case, it may or may not be
21   successful to treat her pain, yes.
22   Q.   So you can't say?
23   A.   That is correct.
24   Q.   Okay.  I think I am done with Ms. ████.
25   MS. WATKINS:  I don't have any questions.

Page 799

1   MS. MANNO:  So can we just take a couple-minute
2   break and let me get my documents out?
3   MS. WATKINS:  Sure.
4   THE VIDEOGRAPHER:  The time is 11:11.  We are
5   off the record.
6              (Whereupon, a short break was
7              taken.)
8              (Whereupon, ROSENZWEIG
9              Deposition Exhibit No. 33 was
10              marked for identification.)
11   THE VIDEOGRAPHER:  The time is 11:21.  We are
12   back on the record.
13   BY MS. MANNO:
14   Q.   Okay, Doctor.  I'd like to turn to your
15   specific report with respect to ████  ████  okay?
16   A.   Yes.
17   Q.   And you have been noticed for a deposition
18   to provide specific opinions for ████  ████  and
19   you have also been disclosed by plaintiffs as an
20   expert in her case, correct?
21   A.   That is correct.
22   Q.   And sort of same drill with respect to
23   Ms. ████.
24   A.   Ms. ████ was the first one.
25   Q.   So on one of these thumb drives we are

Case 2:12-md-02327  Document 9252-3  Filed 06/18/19  Page 559 of 924 PageID #: 213866

Page 800

1  going to mark here momentarily, that is all of the
2  information that you have reviewed with respect to
3  providing specific opinion testimony for
4  ███████
5  **A. That is correct.**
6  Q. And it is everything that you have
7  reviewed specific to her in preparation for your
8  report?
9  **A. That is correct.**
10  Q. Okay. And same question with respect to
11  Ms. ██████ When you did your independent medical
12  examination of her, do you have any other documents
13  in your office that would reflect that examination?
14  **A. No.**
15  Q. Any sort of materials that she would have
16  filled out in terms of questionnaires or anything
17  like that?
18  **A. No.**
19  Q. Earlier you talked about a pain scale of a
20  happy face versus a sad face depending on how much
21  pain you were feeling. Did you go through that
22  process with Ms. ██████
23  **A. No.**
24  Q. So there's no -- other than the
25  information that is provided in your specific

Page 801

1  report, is there any other memorialization of
2  anything that Ms. ██████ told you?
3  **A. No.**
4  Q. And so let's go ahead and mark the report
5  that you have.
6  **A. I think we're on 34.**
7  (Whereupon, ROSENZWEIG
8  Deposition Exhibit Nos. 34 and
9  35 were marked for
10  identification.)
11  BY MS. MANNO:
12  Q. Is 34 sort of a clean copy of your
13  specific report in this case?
14  **A. That is correct.**
15  Q. And is contained within Exhibit 34 also
16  the exhibits?
17  **A. Yes.**
18  Q. And are those marked separately as a
19  different number? I believe 35.
20  **A. 35, yes, and the exhibits are just 35.**
21  Q. And in front of you is your highlighted
22  version just of the report, correct?
23  **A. That is correct.**
24  MS. MANNO: So let's go ahead and mark that as
25  36.

Page 802

1  (Whereupon, ROSENZWEIG
2  Deposition Exhibit No. 36 was
3  marked for identification.)
4  BY MS. MANNO:
5  Q. At the time that you prepared your
6  report -- strike that.
7  Is it fair to say that you started
8  drafting your report, but then completed it after
9  you did your own independent medical examination?
10  **A. That is correct.**
11  Q. And I'm assuming, though, that at the time
12  you finished your report and submitted it, you had
13  gone back to be sure that everything was correct
14  that you had written prior to doing the IME?
15  **A. That is correct.**
16  Q. So at the time you wrote this report or
17  completed it, what were you aware of with respect
18  to Ms. ██████ prior significant medical history?
19  **A. Her surgical history was remarkable for a**
20  **breast biopsy. She had a bilateral tubal ligation,**
21  **tonsils removed, appendectomy. She had a history**
22  **of depression, anxiety, CIN or cervical**
23  **intraepithelial neoplasia, fibrocystic breast**
24  **disease, and I described the medications she was**
25  **taking.**

Page 803

1  Q. I apologize if you went over this
2  yesterday already, but in terms of tubal ligation,
3  and I'm speaking generally now, what can be, you
4  know, complications or symptomatology following a
5  tubal ligation?
6  **A. We talked yesterday about the post-tubal**
7  **ligation syndrome. There's a slightly disrupted**
8  **blood flow to the ovaries from a tubal ligation,**
9  **and it manifests in some patients as recurrent**
10  **cysts and sometimes pelvic discomfort.**
11  Q. When you say pelvic discomfort, is that
12  different than pain?
13  **A. Yes.**
14  Q. How do you describe the difference?
15  **A. It's maybe of a lesser degree. It's like**
16  **more of an ache instead of a stab.**
17  Q. Okay. So if a patient -- I mean, is that
18  sort of your rule of thumb? If a patient says I
19  feel that it aches, you would characterize that as
20  discomfort?
21  **A. I think it's also, you know, again, of a**
22  **lesser degree.**
23  Q. Okay.
24  **A. But I don't think I have a rule of thumb**
25  **about that.**

Case 2:12-md-02327 Document 9252-1 Filed 06/18/20 Page 560 of 924 PageID #: 216367

Page 804

1    Q.   About how you describe --
2    A.   It's just a gestalt that you get that this
3  is more of an ache.  This is more of -- a
4  tenderness is something that when you push on it,
5  you know, the patient responds to that.  You know,
6  you could -- you could push on something and that
7  can elicit pain, and it's -- I think they're all
8  kind of different degrees and quantifications and
9  situationally specific, so it's difficult to sit
10  here and say I've got a standard definition of what
11  I mean by various terms all the time.
12    Q.   Okay.  And generally speaking, when a
13  patient comes into your practice and is describing
14  some sort of pain that you then seek to reproduce
15  in an examination, in those situations, do you have
16  a rule about using the smiley face chart?
17    A.   No.  I was just using that as an example
18  of things that you can use.
19    Q.   Is there sort of any rules or policies
20  within your medical practice of when you use the
21  smiley face tool or not?
22    A.   No.  That's a metric that's more used in
23  hospital settings so that they can quantify how
24  well they're doing on pain management so that, you
25  know, I try to minimize the metrics that I use in

Page 805

1  my office.
2    Q.   So when you judge a reaction to pain or,
3  you know, some sort of a tenderness, is that based
4  on what you're seeing in terms of physical reaction
5  and as reported by the patient?
6    A.   That is correct.
7    Q.   All right.  So going back to the prior
8  history for Ms. ████ you said that can be -- it
9  can end in a discomfort pain, and I'm sorry.  I
10  didn't write where.  In the pelvis?
11    A.   Well, it all depends on how low or how
12  high the uterus is, so it could either be lower
13  abdomen or pelvic.
14    Q.   And how long can those symptoms last?
15    A.   They usually start decreasing after
16  menopause because then the blood flow or the
17  ovaries tend to become smaller at that point.  A
18  hysterectomy would also decrease the pain because
19  then the blood flow would be exclusively from the
20  uterus.
21       Can I take this?
22    MS. MANNO:  Sure.  Let's go off the record.
23    THE VIDEOGRAPHER:  This is the end of disc
24  No. 1.  The time is 11:29.  We're off the record.
25

Page 806

1       (Whereupon, a short break was
2  taken.)
3    THE VIDEOGRAPHER:  The time is 11:33.  We are
4  back on the record.
5  BY MS. MANNO:
6    Q.   In terms of appendectomy, having your
7  appendix out, any lingering symptoms with respect
8  to having an appendectomy?
9    A.   Very rarely, so I would say the answer to
10  that is no unless there were significant adhesions,
11  and that would be more of an intraabdominal pain.
12    Q.   And when you say adhesions, is that
13  another sort of word for scarring?
14    A.   Right, scarring on the inside.
15    Q.   Okay.  And I'm sure you covered this
16  yesterday, but you would agree with me that
17  scarring occurs after any surgery potentially
18  inside the body?
19    A.   Yes.  Adhesions are formed by two raw
20  surfaces that come together.  You can have
21  adhesions from infection.  You can have adhesions
22  from inflammation, and you can have adhesions from
23  surgery.
24    Q.   So when you say that -- you say in your
25  opinions that mesh, you know, leads to contraction

Page 807

1  of the tissues which leads to scarring or scar
2  plate formation, correct?
3    A.   That is correct.
4    Q.   And so are you differentiating adhesions
5  from scarring in that context?
6    A.   Adhesions is between two structures.  Mesh
7  contraction, scar plate formation is a deposition
8  of collagen that surrounds the mesh completely,
9  encapsulates it and then causes -- when that
10  contracts, it causes it to shrink.
11    Q.   Okay.  So let's not talk about the porcine
12  portion, but when we're talking about regular mesh
13  and tissue sort of ingrowth, that is a scarring
14  process, correct?
15    A.   Tissue in growth, no.  What's supposed to
16  happen is that when you have an adequate pore size,
17  we went over this a lot yesterday about adequate
18  pore size, what happens is you get fat and
19  neovascularization in between the pores.  When the
20  pores are too small, what can happen is that with a
21  chronic foreign body reaction, you get macrophages,
22  monocytes that comes together and make a
23  multinucleated giant cell.
24       That forms what's called a granuloma
25  around the individual fibers of the mesh.  Then you

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 561 of 924 PageID #: 213368

Page 808

1 get a collagen deposited on the outside. Now, if
2 the fibers are too close together, these granulomas
3 meet, and then it scars over the top of it.
4 Q. So let's back up for a second. So I mean,
5 in normal native tissue repairs, Burch, things like
6 that, there is scarring of tissue that occurs
7 normally following surgeries, correct?
8 A. That is correct, but that's different from
9 scar plating --
10 Q. I understand.
11 A. -- associated with a chronic foreign body
12 reaction.
13 Q. I understand that, but in terms of
14 scarring, you hear about sort of people that have
15 mesh and that it is removed, but people don't
16 necessarily have recurrence of a prolapse because
17 there's been some scarification. You've heard
18 that, too, correct?
19 A. That is correct.
20 Q. And so when we're talking about that sort
21 of scarification, that is scarring of tissue,
22 right, or am I oversimplifying?
23 A. You're oversimplifying it. It would be a
24 much longer discussion which actually we've already
25 had on general causation.

Page 809

1 Q. Okay. Well, really where we got off on
2 this is your use of --
3 A. Adhesions.
4 Q. -- adhesions, and so --
5 A. Adhesions is a very specific thing
6 between -- intra-abdominally between two entities
7 like either two pieces of bowel or bowel and the
8 omentum, bowel and another structure. So it's
9 two -- scar tissue between two structures is the
10 definition of adhesion.
11 Q. Okay. With respect to an appendectomy, is
12 the only potential sort of result or -- I'm not
13 even going to say complication, but result of an
14 appendectomy with respect to scarring of any sort
15 is an adhesion as opposed to some other sort of
16 scarification?
17 A. The point where you cut the appendix off
18 from the cecum, you're going to get scar tissue
19 forming there as a healing process. So anytime you
20 get a wound, that wound is going to be slightly
21 different than the surrounding tissue, and
22 that's -- when you see a wound, you call it a scar.
23 So if you cut your face and that heals, you will
24 see a line, which is called a scar.
25 Q. Okay. And so you said that it would scar

Page 810

1 sort of at the place it was cut from the cecum?
2 A. That is correct.
3 Q. Okay. And so where would that place be
4 with respect to the pelvis and the abdomen?
5 A. And the cecum is where the small bowel and
6 the large bowel meet.
7 Q. Right.
8 A. And that area is somewhat fixed in the
9 right lower quadrant of the abdomen, so it's
10 outside the pelvis. Now, it can, during certain
11 disease states, be lower in the pelvis. Sometimes
12 it can move up in the pelvis because the bowel is a
13 little bit more mobile, but it would be away from
14 where we're talking in the pelvis.
15 Q. So if somebody had some scar tissue based
16 on an appendectomy that was causing them some sort
17 of pain symptoms, where would they experience that
18 pain?
19 A. Now, with virtually every appendectomy
20 where you don't have a significant size of the
21 appendix or rupture of the appendix, you see very
22 little scar tissue associated with that.
23 Q. Okay.
24 A. You would have to have a bad infection or
25 a ruptured appendix. Then you see a lot of scar

Page 811

1 tissue and a lot of adhesions. So really with an
2 appendectomy, it would be more situationally
3 specific depending on what was associated with the
4 appendix. Virtually back in the old days when we
5 would make the McBurney's incision, which was the
6 typical incision to do an appendectomy, you might
7 have some discomfort over that incision.
8 Now that the vast majority of
9 appendectomies are done laparoscopically, you don't
10 have any skin discomfort. And internally having
11 looked at a lot of laparoscopies from people that
12 had appendectomies, you also see very little scar
13 tissue around the cecum.
14 Q. If somebody did, though, have sort of a --
15 I think you said, you know, there's sort of
16 degrees in which your appendix, you know, can close
17 to rupture or rupture before the surgery. Do you
18 know sort of Ms. ███████ situation before her
19 appendectomy?
20 A. No, I do not.
21 Q. And if it had been a more serious
22 situation and she did have more significant
23 scarring and she had pain from that scarring, where
24 do you believe that it would manifest?
25 A. It would be in the right lower quadrant,

Page 812

1  but I would also have found that that might have
2  made a vaginal hysterectomy more difficult if she
3  had that highest degree like a ruptured appendix
4  because those patients tend to have a pretty
5  scarred abdomen and pelvis because when it
6  ruptures, the pelvis is kind of like the catch
7  basin for all that fluid, and you tend to get a lot
8  of scarring between the bowel and the uterus.
9      I've done hysterectomies on patients with
10  ruptured appendix.  You might be able to do it
11  laparoscopically.  I would not try it vaginally.
12  Most of the time you're going to have to do it as
13  an open procedure because of the amount of scar
14  tissue.
15      Q.  Would you have been able to tell when you
16  did your IME of Ms. █████ whether or not she had
17  significant scarring based on the appendectomy?
18      A.  No.
19      Q.  No, you wouldn't -- you weren't able to
20  tell?
21      A.  No, I wouldn't be able to tell.
22      Q.  Okay.  Based on just a vaginal approach or
23  vaginal observation?
24      A.  Based on the fact that the area of the
25  cecum can be mobile, and so pushing down on her

Page 813

1  abdomen, you might not be exactly pushing on the
2  area where the cecum is.  So it would be very
3  difficult unless the cecum was significantly fixed
4  due to scarring to actually be able to push on the
5  cecum.  I mean, to be able to say she's got cecal
6  adhesions and cecal pain from a prior appendectomy
7  would be very difficult to do on a physical exam.
8      Q.  Okay.  And so you didn't?
9      A.  That is correct.
10      Q.  In terms of the CIN, can you tell me
11  again what that -- the cervical intraepithelial
12  neoplasia?
13      A.  That is correct.
14      Q.  I actually said it right.
15      A.  Yeah.
16      Q.  So can you describe for me in a little bit
17  more detail what that is?
18      A.  What that is -- and the current theory is
19  that it is -- the genesis of cervical
20  intraepithelial neoplasia is a chronic HPV
21  infection with a high-grade type HPV where the HPV
22  DNA gets into the DNA of the cervical cells,
23  changes them into dysplastic cells and sets up an
24  immortalized clone of dysplastic cells.  And so you
25  pick this up on the pap as abnormal squamous cells,

Page 814

1  and then on a biopsy, you would see dysplastic
2  cells.
3      Q.  Obviously, that makes someone at much
4  higher risk of having cancer, cervical cancer,
5  correct?
6      A.  CIN 1, no or low-grade intraepithelial
7  neoplasia, slightly.  2 and 3 are -- you probably
8  have about a 15 to 30 percent of that untreated
9  progressing on to a higher grade in cancer.
10      Q.  And what was her treatment for the CIN?
11      A.  Well, ultimately taking out the uterus was
12  the treatment for her CIN.
13      Q.  So the cervix is different from the
14  uterus, though, correct?
15      A.  The cervix is the opening of the uterus.
16  We -- it is an anatomic location and an anatomic
17  entity, but it is called the uterine cervix because
18  basically what that means is that it's an area
19  where the uterus comes together as an opening.
20      Q.  For a baby to come out?
21      A.  Right.
22      Q.  Okay.  So when --
23      A.  And for menstrual, I used the word
24  yesterday, effluvium, your menstrual flow to come
25  out, too.  So we look at it as an anatomic site.

Page 815

1  Is it specifically different from the uterus?  No.
2  We can -- let's keep going.
3      Q.  Okay.  So -- and I don't want to skip too
4  far ahead, but ultimately Ms. █████ had a
5  transvaginal hysterectomy, correct?
6      A.  That is correct.
7      Q.  And during that hysterectomy, her cervix
8  as part of the uterus area, if you will, was
9  removed?
10      A.  That is correct.
11      Q.  And that would then, in your opinion, fix
12  any potential complications from the CIN?
13      A.  Well, there's always -- the current
14  recommendation is -- with CIN 2 to 3 that you
15  follow them up after hysterectomy with paps.
16  However, if it was just CIN 1, taking out the
17  uterus would exacerbate the possibility of future
18  dysplasia.
19      Q.  Was she CIN 1?
20      A.  I don't remember specifically, but her
21  last pap was low grade, and so more likely than
22  not -- and they didn't see on her last biopsy any
23  dysplasia, so more likely than not she was just a
24  CIN 1.
25      Q.  Okay.  So you also mentioned depression,

Page 816

1 anxiety. I'm sure you're more familiar with this
2 in the literature than I am, but in terms of
3 depression and/or anxiety being a contributing
4 factor to pain, what, in your opinion, is that
5 relationship?
6 **A. I mean, there's an association, yes. I**
7 **think that the impact of stress on various medical**
8 **conditions is pretty well-known. Stress increases**
9 **anxiety and depression, and so -- but you can't say**
10 **on an individual patient that just because she's**
11 **depressed, she's going to have either a higher or**
12 **lower pain tolerance.**
13 Q. But can you rule it out? You know, on the
14 other hand, can you rule it out as a contributing
15 factor with respect to any patient?
16 **A. As a causative factor, I can rule that**
17 **out. As a contributing factor, I always keep that**
18 **in my differential diagnosis, yes.**
19 Q. In other words, somebody who is depressed
20 or experiencing anxiety may sort of feel as though
21 they're suffering more pain than somebody without
22 depression and anxiety?
23 **A. That is called somatization, and yes.**
24 Q. And so you can't really -- is there some
25 sort of medical exam or psychological exam you can

Page 817

1 do on somebody to really figure out whether that's
2 happening?
3 **A. Unfortunately, no, because again, it's**
4 **very difficult, as we've talked about, to quantify**
5 **pain, and so therefore, it's very difficult to be**
6 **able to say with this degree of depression, because**
7 **it's very difficult to quantify depression and**
8 **anxiety, to say that this is leading to that. It**
9 **would be more of an associative factor than a true**
10 **correlation factor.**
11 Q. Okay. So the medications that Ms. ▮
12 was on is Pristiq. What is that for?
13 **A. Xanax is for anxiety. Minocycline is an**
14 **antibiotic. If I remember correctly, Pristiq is an**
15 **antidepressant medicine.**
16 Q. Okay. And vitamin E, do you know why she
17 was on vitamin E?
18 **A. Most men and women are vitamin D and**
19 **vitamin E deficient, so it might just be for**
20 **regular health.**
21 Q. But you're not exactly sure?
22 **A. No, and I don't think that has anything to**
23 **do with my opinions.**
24 Q. I'm just asking you if you know.
25 Okay. So we've already discussed sort of

Page 818

1 her pap smear low-grade squamous intraepithelial
2 lesion prior to the hysterectomy, and then she
3 underwent an colposcopy. Is a colposcopy a
4 procedure that is used to treat or somehow assess
5 the dysplasia?
6 **A. That is correct. It's a microscope where**
7 **you look at the cervix. You find areas of**
8 **irregularity that have typically been associated**
9 **with dysplastic lesions. You take a biopsy and**
10 **then have the pathologist tell you what that is.**
11 **Her biopsy came back negative.**
12 Q. And what -- how is a colposcopy done?
13 **A. It's an office procedure where you take a**
14 **machine that magnifies your view so you can look at**
15 **the cervix. You put a compound called acetic acid**
16 **on the cervix, which makes dysplastic cells white.**
17 **The theory is the reason why dysplastic cells**
18 **become white is because it has a higher**
19 **nuclear-cytoplasmic ratio, so the acetic acid takes**
20 **water out. You just have nucleus, which reflects**
21 **the light back so it looks white.**
22 Q. So does it scrape in any way?
23 **A. No. What you do is you take a biopsy,**
24 **which is kind of a tooth-looking instrument that**
25 **takes a piece of the cervix off, and that's sent on**

Page 819

1 to pathology.
2 Q. Okay. And then based on whatever that
3 shows, you may have a subsequent procedure to
4 scrape?
5 **A. No.**
6 Q. Or freeze or --
7 **A. Yes, or do an excision of the area.**
8 Q. Okay. So there's -- is there no scraping
9 in either a colposcopy or a follow-up procedure?
10 **A. That's a pap smear, the scraping.**
11 Q. No, I'm not talking about that. Is there
12 some other -- what's a LEEP procedure?
13 **A. Now, that is an excisional procedure using**
14 **a hot wire, but that's not scraping.**
15 Q. So -- but Ms. ▮ had the colposcopy,
16 and it does not appear, based on her medical
17 records, that she had any of these sort of
18 follow-up procedures we've been discussing?
19 **A. That is correct, except for her**
20 **hysterectomy.**
21 Q. Right. So on ▮, she indicates
22 she desires the hysterectomy and anterior repair.
23 And when you say plus, slash, minus sling, do you
24 mean with or without?
25 **A. Well, at that point, the plan was to do a**

Page 820

1 cystometrogram, which is a simplified version of
2 the urodynamic test to see if there was another
3 indication for urinary symptoms. She underwent
4 that procedure. It didn't show any overactivity of
5 her bladder or detrusor instability. It showed
6 normal voiding, and so that made the plus of the
7 sling --
8    Q.  Become a plus?
9    A.  Right.
10    Q.  So the question was so that meant either
11 with or without, ultimately with?
12    A.  Exactly.
13    Q.  Okay. So then she undergoes urodynamics.
14 You say which showed normal voiding and no detrusor
15 instability?
16    A.  That is correct.
17    Q.  She did leak at 130 CC, so what's the
18 significance of that?
19    A.  That is the volume that was in her bladder
20 when she leaked. It just shows that she has stress
21 urinary incontinence.
22    Q.  Is that a full bladder?
23    A.  Not completely full, no. The normal
24 capacity where someone has the urge to urinate is
25 about 250 CC.

Page 821

1    Q.  And how much total can the bladder hold
2 generally?
3    A.  The average person, about 400 CC is what
4 we call maximum cystometric capacity, which is the
5 point where we're filling you and you say please
6 stop.
7    Q.  All right. So 130, would you say that's
8 pretty low?
9    A.  There are different schools of thought
10 about what might imply an intrinsic sphincter
11 deficiency. I usually reserve the term intrinsic
12 sphincter deficiency not based on a -- specifically
13 just on a test result, which is a low pressure in
14 the bladder or a low volume in the bladder in which
15 you leak, but a set of circumstances.
16       So just like if I did an EKG and I saw
17 some abnormal changes in someone that's totally
18 asymptomatic, I wouldn't say that they're having a
19 heart attack. There might be some significant
20 changes, but if someone was having chest pain and
21 diaphoresis and had an abnormal EKG, then I would
22 say she's having a heart attack.
23       So I reserve the term intrinsic sphincter
24 deficiency for someone who has had previous
25 surgery, previous trauma, if you will, to the

Page 822

1 urethra and then has a poorly functioning urethra
2 as demonstrated by a low Valsalva leak point
3 pressure.
4    Q.  Okay. So I have a question about the
5 following paragraph where in the sort of middle
6 says it was noted that she had a grade 2
7 uterovaginal prolapse and a grade 2
8 cystourethrocele, and at that time, a vaginal
9 hysterectomy with a McCall's culdoplasty and an
10 anterior repair would be done by gynecologist,
11 Dr. Leonard Blanton and a transobturator sling
12 would be done by urologist, Dr. James Robertson.
13       I think we all found out it is really
14 Dr. Blanton that's doing most of this, correct?
15    A.  Yes.
16    Q.  Okay. So my question is the anterior
17 repair that you note, what was that intended to
18 fix?
19    A.  The grade 2 cystocele.
20    Q.  Okay. Because -- so let's talk about, and
21 forgive me if you've already discussed this, but
22 the transobturator sling is to deal with stress
23 urinary incontinence and not a cystocele, correct?
24    A.  Correct.
25    Q.  And a procedure to repair a cystocele,

Page 823

1 whether it be with mesh or without, would you agree
2 with me that somehow it can help somewhat with
3 incontinence issues, but it is not really dealing
4 with a stress urinary incontinence problem?
5    A.  That is correct. Native tissue repair has
6 been shown to have approximately a 50 percent
7 success rate for the treatment of stress urinary
8 incontinence.
9    Q.  The native tissue repair of a cystocele?
10    A.  That is correct.
11    Q.  So maybe it could help, maybe not?
12    A.  That is correct, which is why we don't
13 perform native tissue repairs, what's called an
14 anterior repair or anterior colporrhaphy, just to
15 treat stress urinary incontinence except in a very
16 select set of circumstances.
17    Q.  Maybe where really the bladder is pushing
18 and is really causing the issues with the
19 incontinence?
20    A.  No. Again, there might be a few patients
21 who that would be an acceptable alternative. They
22 understand that, you know, this is not a very good
23 long-term therapy for treatment of stress urinary
24 incontinence.
25    Q.  Okay. So just because somebody got a

In Re: CR Bard 200        Bruce Rosenzweig, M.D., Vol. III        10/31/2014

Page 824

1  cystocele repair with mesh, you would not be
2  sitting here today stating that should have been --
3  caused somebody to not have stress urinary
4  incontinence or have cured their stress urinary
5  incontinence?
6      **A. Actually, the opposite is true. There**
7  **have been several studies, which we talked about**
8  **yesterday, that shows that mesh anterior repairs**
9  **have a higher incidence of postoperative stress**
10 **urinary incontinence than native tissue repairs.**
11     Q. Okay. But my question is, I think, a
12 little bit different. Stress urinary incontinence
13 can manifest for a number of reasons, and people
14 have it completely unrelated to mesh, correct?
15     **A. That is correct.**
16     Q. And the implantation of mesh to treat a
17 cystocele is not, at least 50 percent of the time,
18 going to cure or even help somebody with stress
19 urinary incontinence?
20     **A. We talked about native tissue repairs, not**
21 **specifically the data on transvaginal mesh**
22 **anteriorly and its impact on someone that has**
23 **stress urinary incontinence. There might --**
24     Q. Did you hear my question, though?
25     **A. Yeah, I did. I'm just saying that, you**

Page 825

1  **know, the numbers that I gave you that you were**
2  **just using in that question, that was for native**
3  **tissue repairs.**
4      Q. Okay.
5      **A. There is no good data, and I might be**
6  **wrong, on taking a patient that has stress urinary**
7  **incontinence and a cystocele just doing mesh**
8  **anteriorly and what the chances are of correcting**
9  **stress urinary incontinence. I don't think that**
10 **there is any data about that, but I could be wrong.**
11     Q. Okay. So -- but I guess what I'm coming
12 down to is, you know, a patient walks in. They
13 have stress urinary incontinence and a cystocele.
14 You know, you perform -- let's just assume that a
15 physician then implants mesh on the cystocele.
16     Wouldn't you agree with me, though, that
17 that's not really the indicated treatment
18 necessarily for just the SUI?
19     **A. That would be correct, yes.**
20     Q. And just because then you had like an
21 anterior Avaulta or another sort of POP type of
22 mesh, you could continue having stress urinary
23 incontinence, which could get worse over time
24 because it wasn't treated initially appropriately?
25     **A. That is correct.**

Page 826

1      Q. Okay. I want to talk to you about during
2  the procedure, the implantation procedure, it was
3  noted that there was significant scarring at the
4  urethra-vesicle junction and the retro-obturator
5  space bilaterally. The etiology was unclear.
6      So what were you able to understand from
7  the medical records about how significant that
8  scarring was?
9      **A. I think that would be a much better**
10 **question to ask Dr. Blanton. I put that down**
11 **because it was in the operative report, and the**
12 **etiology and the significance when I put that down**
13 **in the operative report is the same question that I**
14 **have today.**
15     Q. Okay. So the urethra-vesicle junction,
16 okay, where in -- in terms of -- hang on just a
17 second. In terms of where the Align sling would
18 have been, where is the urethra-vesicle junction?
19     **A. Well, the Align sling is placed in the**
20 **midurethra. The average length of a female urethra**
21 **that's had a baby is three centimeters. So what**
22 **you're doing is you're putting it in that mid one**
23 **centimeter of the midurethra.**
24     **So the urethra-vesicle junction would be**
25 **one centimeter away from the proximal end of the**

Page 827

1  **Align sling. Now, the Align sling is**
2  **1.2 centimeters wide, so it's slightly wider than**
3  **the other sling, so it would be slightly closer to**
4  **the urethra-vesicle junction.**
5      Q. Okay. So if we have a three-inch --
6      **A. Centimeter.**
7      Q. Centimeters, okay, and the Align is going
8  in the middle --
9      **A. In the midurethra, yes.**
10     Q. And that's 1.2, then I don't know what we
11 have on either side. I'm not a math -- I was told
12 no math was involved, but it's going to be --
13     **A. .9, .9.**
14     Q. .9 on either side?
15     **A. That is correct.**
16     Q. Thank you. And so where the scarring was
17 already before the Align was placed in would be to,
18 I think you said, one -- how many centimeters away?
19     **A. About a centimeter away from where the**
20 **sling is.**
21     Q. Okay. So it's at the end of this area
22 that you're talking about?
23     **A. The urethra-vesicle junction is where the**
24 **urethra enters the bladder.**
25     Q. Okay. All right. So it's really just

Page 828

1  approximately one centimeter away?
2  **A. That is correct.**
3  Q. Okay. And she already had significant
4  scarring there prior to the placement of the Align?
5  **A. Which is what the operative report states,**
6  **yes.**
7  Q. And scarring can cause pain, can it not?
8  **A. That is correct, but she did not have pain**
9  **prior to the Align being placed.**
10  Q. Okay. Is what you're saying that if you
11  are going to have pain because of some scarring
12  that you would have it chronically?
13  MS. WATKINS: I'm just going to object to the
14  form of the question. Incomplete hypothetical.
15  You can answer.
16  **THE WITNESS: More likely than not, yes.**
17  BY MS. MANNO:
18  Q. And how do you make that determination?
19  **A. Well, unless the scarring got worse, then**
20  **it would not all of a sudden start causing pain.**
21  Q. Well, how can scarring get worse?
22  **A. There would be another impetus to cause a**
23  **scar.**
24  Q. So if the doctor cut off some of the scar
25  tissue, that's a surgical procedure, right? He's

Page 829

1  cutting?
2  **A. Right.**
3  Q. And based on that procedure, you can have
4  additional scarring, can you not?
5  **A. Well, usually when you remove scar, the**
6  **scar is removed. New scar can form, but you've**
7  **already taken out the scar that's there, so you**
8  **can't have -- you know, you can't say I had this**
9  **amount of scar and then I have now an additional**
10  **amount because you already took out the stuff that**
11  **was right there.**
12  Q. You have new scar tissue?
13  **A. You could have new scar tissue forming.**
14  Q. And at that point then, soon or soon
15  thereafter, you could then experience pain based on
16  the new scar tissue that you had not experienced
17  before?
18  **A. But in this case, the doctor didn't take**
19  **out the scar tissue at the urethra-vesicle junction**
20  **and the retro-obturator space.**
21  Q. You don't believe that he cut out any of
22  the scar tissue?
23  **A. No. It says he noted it.**
24  Q. Do you agree with the statement that the
25  body's own healing process can lead to scarring

Page 830

1  that gets worse over time?
2  **A. No. Actually, scarring tends to contract**
3  **over time.**
4  Q. Well, this says get worse, so you disagree
5  that it can get worse?
6  **A. If the impetus that caused the scar tissue**
7  **to begin with is still there, scarring will get**
8  **worse. If the impetus that caused the scar tissue**
9  **to begin with is no longer there, the scar will**
10  **remain relatively the same. And then as scarring**
11  **ages, it remodels, and it tends to contract.**
12  Q. When it contracts, can that cause
13  different symptoms or additional symptoms?
14  **A. There would be -- usually scar pain like**
15  **the scar that you have on your body tends to get**
16  **less painful with time.**
17  Q. But if the scar tissue is contracting over
18  time, can that not cause additional pain?
19  **A. If it's pulling on something, yes.**
20  Q. It also said that she had scarring at the
21  retro-obturator space bilaterally. Where is that?
22  **A. That, I think, you should direct towards**
23  **Dr. Blanton or Dr. Robertson to tell us exactly**
24  **what they mean by the retro-obturator space.**
25  Q. You can't definitively say where they

Page 831

1  mean?
2  **A. I know where the retropubic space is. I**
3  **know where the obturator space is. Again, I put**
4  **that down because that is what is described. I**
5  **know where the urethra-vesicle junction is. I was**
6  **not specifically clear about where the**
7  **retro-obturator space was by that description.**
8  Q. Have you ever heard that term before, that
9  phrase?
10  **A. That is not a term that I use, no.**
11  Q. Okay. So Ms. ▮▮▮▮▮ presents on
12  ▮▮▮▮▮ of 2010, complains of dyspareunia on
13  the left side just inside of the vagina?
14  **A. That is correct.**
15  Q. And tenderness at the side of the sling at
16  the left side. So when you have seen patients that
17  have had sling procedures that you believe they
18  were implanted with too much tension, when is the
19  typical amount of time, you know, post implant that
20  they're noting these symptoms?
21  MS. WATKINS: Object to the form.
22  **THE WITNESS: Well, we do know from the**
23  **literature, Dr. de Laval's and Larikainen's, that**
24  **there's about a 15 to 25 percent immediate**
25  **postoperative leg pain, groin pain and pelvic pain**

Page 832

1    associated with the obturator procedure.  This is
2    in that time frame of when we would consider that
3    this is a pain from --
4    BY MS. MANNO:
5        Q.  Well, it's about a year later.
6        A.  Excuse me.  I'm sorry.  If someone is
7    going to develop pain from the tension being too
8    much, it's going to show up in that time frame that
9    I was talking about, and then --
10       Q.  In what time frame?  I'm sorry.
11       A.  Well, the numbers that I was quoting was
12   like immediate to a month after the procedure.
13       Q.  Okay.
14       A.  And then that pain tends to decrease to
15   the 5 to 10 -- 5 percent groin pain that's
16   described in the literature.  So this pain, if it
17   was due to tension, should have continued to be
18   there instead of being now discovered one year
19   later.
20       Q.  Or at least when it was complained about?
21       A.  It is discovered one year later.
22       Q.  Well, I guess can you -- can you opine
23   when the symptoms began or when Ms. ████
24   described these symptoms or reported these
25   symptoms?  I mean, I just want to be clear that

Page 833

1    you're not saying that you have evidence or a
2    factual basis for saying that Ms. ████ was or was
3    not experiencing these symptoms before her
4    ████    ████ appointment.
5        A.  I don't have any evidence between the
6    implantation and the one-year-later visit of what
7    her symptoms were.
8        Q.  Okay.  Would you say --
9        A.  However, asking -- what was described in
10   the operative report about using a pair of Mayo
11   scissors at the midurethra is a standard technique
12   to avoid tension on a midurethral sling.
13       Q.  In fact, doctors have different things
14   that they use to sort of try to avoid placing too
15   much tension, correct?
16       A.  That is correct.
17       Q.  I've read things like -- is it Metzenbaum
18   scissors would I have read?
19       A.  It's a different kind of -- it's a thinner
20   scissors than Mayo scissors.
21       Q.  Okay.  What other sort of implements are
22   used?
23       A.  Hegar dilators.  Dr. de Laval
24   recommended -- that was the inventor of the -- of
25   one of the obturator slings, using a Babcock to

Page 834

1    grab the middle of the sling to avoid tension.
2        Q.  If you saw an op report that did not state
3    that any sort of implement was used, would that be
4    potentially a clue or question in your mind of
5    whether appropriate tension was used?
6        MS. WATKINS:  Object to form and foundation.
7        THE WITNESS:  If there was no description of
8    how undue tension was used or was avoided, that
9    would be something that I would use in my
10   differential diagnosis, yes.
11   BY MS. MANNO:
12       Q.  In other words, if there was no
13   description of an implement being used or another
14   way to avoid placing too much tension, that
15   might -- that might sort of go into your diagnosis
16   that, perhaps, the tension was too great?
17       MS. WATKINS:  Object to form and foundation.
18       THE WITNESS:  That is correct.  And more likely
19   than not, the implanting physician would be asked,
20   you know, what is your normal convention for
21   tensioning.  It might have been just omitted from
22   the operative report, but yes, that would go in my
23   differential diagnosis.
24   BY MS. MANNO:
25       Q.  I think you've also stated in your general

Page 835

1    report and these specific reports that the more
2    revision surgeries that somebody has, the potential
3    for more complications, correct?
4        A.  That is correct.
5        Q.  And I mean, would you agree with me that
6    the more surgeries of any kind, whether they be
7    mesh revision or additional vaginal surgeries,
8    increase the chances for more complications?
9        A.  That is -- in a general sense, that is
10   correct.
11       Q.  And can those complications be everything
12   from, you know, injury to organs to pain to
13   dyspareunia, correct?
14       MS. WATKINS:  Object to form and foundation.
15   Improper hypothetical.  You can answer.
16       THE WITNESS:  In a general hypothetical case,
17   yes.  We're not talking about the duration, the
18   severity, the treatability, but in a general sense,
19   yes.
20   BY MS. MANNO:
21       Q.  Okay.  Well, my question is the more
22   vaginal surgeries that you have, the more risks of
23   complications you can have?
24       A.  So let's talk about what specific surgery
25   we're talking about.  Most -- the risk for

Page 836

1  dyspareunia with vaginal surgery usually is caused
2  by excising too much vagina when closing the vagina
3  because that leads to stricture of the vagina and
4  makes intercourse uncomfortable.
5      Q.  And is that sort of referred to as
6  shortening of the vagina?
7      A.  Shortening or narrowing of the vagina,
8  yes.  With a posterior repair sewing the levator
9  muscles together, which used to be a standard
10  practice, leads to dyspareunia, which is why the
11  majority of physicians would not do that as part of
12  a posterior repair.
13     Q.  Okay.  I mean, and maybe I'm just speaking
14  of it too generally, but would you agree that sort
15  of any repair within the vagina using native tissue
16  or sutures, sort of non-mesh procedures, can lead
17  to dyspareunia?
18     MS. WATKINS:  Object to form and foundation.
19  Improper hypothetical.
20     THE WITNESS:  The answer is yes, and with the
21  qualifiers that, you know, what I just described as
22  being the usual causes of dyspareunia from native
23  tissue repairs.
24  BY MS. MANNO:
25     Q.  Okay.  I'm just trying to get at, you

Page 837

1  know, listen, the more that you're operating
2  internally in the vagina, the more chances you're
3  going to have a dyspareunia?
4      MS. WATKINS:  Same objection.
5      THE WITNESS:  Generally, yes.
6  BY MS. MANNO:
7      Q.  Okay.  So the skin tags that Ms. ████
8  has, you're not attributing anything with respect
9  to the skin tags to mesh, correct?
10     A.  No.
11     Q.  And the skin tags were removed which came
12  back positive for condyloma.  What is that?
13     A.  Condyloma is an external manifestation of
14  the human papilloma virus, usually a subtype 6 and
15  11, which is the lower risk type of HPV not
16  associated with cervical dysplasia or cervical
17  lesions.
18     Q.  Can the fact that one has HPV or the HP
19  virus, you know, other than -- well, can it result
20  in any symptoms that are painful?
21     A.  Unless they have a big condylomatous
22  lesion obstructing the vagina, usually it's
23  asymptomatic.
24     Q.  So it's true that a year and a half after
25  her -- well, I'm sorry.

Page 838

1      So she undergoes the sling revision
2  ████ 30, 2010, correct?
3      A.  That is correct.
4      Q.  And so a year and a half later she denies
5  any symptoms of stress urinary incontinence, stated
6  that she felt much better; is that correct?
7      A.  That is correct.
8      Q.  Do you know when Ms. ████ filed her
9  complaint in this case?
10     A.  Not specifically, no.  I think that was
11  asked in her deposition, and I read that, but
12  that's not something that I added to my
13  differential diagnosis when coming up with
14  opinions.
15     Q.  So would you agree with me, though, that
16  once somebody files a lawsuit, that, perhaps -- I
17  mean, let me back up.
18     When somebody walks into your office and
19  they are describing to you symptoms that they are
20  experiencing, you take them at their word, correct?
21     A.  That is correct.
22     Q.  Have you ever had patients come in that
23  you believe are sort of not giving you the full
24  truth, perhaps, drug-seekers or something else?
25     A.  Malingerers and the like, yes.

Page 839

1      Q.  Would you also agree with me when people
2  file a lawsuit, the intended result can include a
3  financial gain?
4      A.  In a general sense having been involved in
5  a number of situations like medical malpractice and
6  the like, I think a lot of patients want answers.
7      Q.  But would you -- strike as nonresponsive
8  to the question.
9      Is one of the potential motivators of
10  somebody who has filed a lawsuit a financial gain?
11     MS. WATKINS:  Object to form and foundation.
12     THE WITNESS:  In a general sense, that could be
13  a motivator.  In each specific sense, I don't think
14  that is for me to arbitrate on.
15  BY MS. MANNO:
16     Q.  Okay.  But when --
17     A.  But I would consider secondary and
18  tertiary gains just like the thing you described
19  before as a drug-seeker in my differential
20  diagnosis.
21     Q.  Did you consider in any of the specific
22  plaintiffs that you have seen in this case, did you
23  consider as part of your differential diagnosis the
24  fact that they had pending litigation?
25     A.  Obviously, that will be something that I

Page 840

1 consider.
2 Q. It's not in your report.
3 MS. WATKINS: Argumentative.
4 THE WITNESS: Obviously, this report is drafted
5 for litigation, okay?
6 BY MS. MANNO:
7 Q. Right.
8 A. I think that it would be unreasonable to
9 think that that wouldn't be part of my thought
10 process, you know, what other secondary or tertiary
11 gain somebody might be getting. But again, I am
12 trying to obtain the facts of the case. I'm trying
13 to obtain the facts from the medical records, from
14 the depositions and clearly state what those facts
15 are.
16 Q. Okay.
17 A. I don't --
18 Q. Here's my question. Did you -- did you
19 take into account the fact that Ms. ████ had
20 filed a lawsuit in terms of your differential
21 diagnosis in her case?
22 A. In every case that I've worked on, the
23 fact that I'm involved in this lawsuit is part of
24 the consideration in every one of my testimonies.
25 Q. Okay.

Page 841

1 A. It's part of my general causation
2 testimony. It's part of my case-specific testimony
3 that we are involved in a lawsuit, but that doesn't
4 mean that what I -- you know, there are people that
5 are going to arbitrate on what the facts are. My
6 job is to collect the facts that are in the medical
7 records, that are in testimony and in these cases,
8 part of my exam and put the facts down in an -- as
9 objective way as possible.
10 Q. Okay. So when you're reading the
11 deposition transcripts, I mean, obviously, the
12 person has filed a lawsuit if they're giving the
13 deposition?
14 A. That is correct.
15 Q. But when you're examining patients and
16 they are reporting pain to you and you are, in
17 part, forming your diagnosis and opinions based on
18 their reporting of pain, did you sort of do
19 anything objectively in your examination to
20 determine whether or not they were providing you
21 with truthful information?
22 MS. WATKINS: Object to the form. You can
23 answer.
24 THE WITNESS: I reported what the patient told
25 me and what I found on examination.

Page 842

1 BY MS. MANNO:
2 Q. When you did the examination, did you do
3 it blind? In other words, did you -- that sounds
4 wrong.
5 Did you do it in a way like when you would
6 press on something to see if there was tenderness,
7 how did you do that?
8 A. I did it in the same standard way that I
9 would do that with any patient that walked into my
10 office.
11 Q. Okay. Which is how?
12 A. Which is how it's described in my report.
13 I didn't do anything, you know, more specific. I
14 didn't -- if they said it hurt here, I didn't take
15 something sharper and probe further to see if -- if
16 someone says I feel nothing from my leg down, and I
17 would -- you know, I did not do something to see if
18 I could provoke, you know, a greater pain. I used
19 the same methodology that I do with every patient
20 that walks through my door that I've done for the
21 last 25 years of being a physician.
22 Q. When you --
23 A. And I have -- as you described before, you
24 know, numerous patients that -- not numerous
25 luckily, but a number of patients that have come to

Page 843

1 my office with chronic pain complaints, which,
2 after a certain period of time, I determined might
3 be more for secondary and tertiary gains than
4 coming to me for a primary gain of pain relief.
5 Q. But let me just -- I just want to sort of
6 tie this up so we can move on, but I mean, if you
7 feel like you need to go on, do. What I'm really
8 trying to get at is when you examine a patient and
9 you are palpating her internally, do you make
10 comments to her about sort of well, here's where
11 the mesh is, or are you just doing this in a way
12 of, you know, tell me if it hurts here, tell me if
13 it hurts here, tell me if it hurts here in a way in
14 which you are not providing information that the
15 patient can then understand as oh, that's where the
16 mesh is?
17 A. I don't provide patients on these
18 examinations with that kind of information because,
19 again, this is supposed to be independent,
20 objective. Now, when I'm treating a patient, I
21 might do things a little bit differently because
22 they might ask me where -- you know, where is this
23 mesh and, you know, ask me to opine about various
24 things to them.
25 In this situation, my role is not to treat

Page 844

1  their medical condition. My role is to gain
2  objective information and report that objective
3  information.
4      Now, if, when this litigation is over,
5  these patients want to come back and have me treat
6  them as a doctor, then I will do things in a
7  treating fashion. But objectively gaining
8  information, no, it would be more of the latter.
9  I'm just gaining information about the areas that
10  are tender, the areas that are painful.
11     Q. Okay. I just want to clear this up. I
12  kept reading like the ███ ███ 2012 report. She
13  undergoes a urethrocele repair with excision of
14  sling material. The operative report notes a
15  two-centimeter section of the Caldera sling is
16  removed. I mean, we're not dealing with a Caldera
17  here?
18     A. No.
19     Q. And then it --
20     A. But that was just described in the
21  operative report, which is why I put that in there.
22     Q. I understand. It says the operative
23  report describes that the old sling was easily
24  removed. You know, old sling, if it's the only
25  sling, I'm wondering -- there's no indication or

Page 845

1  evidence that there is any other medical device
2  implanted in Ms. ████ that is not the Align?
3      A. That is correct.
4      Q. Okay. Just to be clear. So the
5  urethrocele repair she undergoes, that occurs in
6  terms of a native tissue repair, correct?
7      A. That is correct.
8      Q. And I'm sure you probably went over this
9  yesterday, but a urethrocele repair done by native
10  tissue can lead to dyspareunia, correct?
11     A. Urethroceles, less likely because you're
12  dealing with a very small area of the vagina. A
13  cystocele repair makes a much larger incision.
14     Q. But it can lead to dyspareunia?
15     A. That is correct.
16     Q. And it can lead to vaginal pain?
17     A. That's correct.
18     Q. And pelvic pain?
19     A. That is correct.
20     Q. The fact that she smokes a half a pack of
21  cigarettes a day, I mean, you talked about earlier
22  there's a difference between former smokers and
23  current smokers. Is there also a difference
24  between current smokers that smoke a small amount
25  versus current smokers that smoke a substantial

Page 846

1  amount?
2      A. Obviously, in their risk of things like
3  lung cancer, chronic obstructive pulmonary disease
4  and how that impacts the pelvic floor, yes.
5      Q. Would you consider -- so meaning the more
6  that you smoke, the potentially more impact it can
7  have?
8      A. Right, because you will have more of a
9  chronic cough. You might have more obstructed
10  breathing, and therefore, you might put more
11  pressure on the pelvic floor.
12     Q. So would you consider half a pack a day to
13  be a substantial amount?
14     A. I think anything over no cigarettes a day
15  is a substantial amount. My mother died of lung
16  cancer.
17     Q. My father did, too, and he only smoked for
18  four years.
19     A. My mother smoked her entire life.
20     Q. Well, and so, obviously, you know, you
21  have personal feelings about this, which is
22  understandable, but would you say that a person
23  that would smoke, you know, two cigarettes a day
24  versus half a pack, the half a pack a day could
25  likely have more significant unfavorable effects?

Page 847

1      A. That is correct. Can we take a quick
2  break so I can answer this page?
3      MS. MANNO: Sure. No problem.
4      THE VIDEOGRAPHER: The time is 12:27. We are
5  off the record.
6          (Whereupon, a short break was
7          taken.)
8      THE VIDEOGRAPHER: The time is 12:30. We are
9  back on the record.
10  BY MS. MANNO:
11     Q. Okay. So Doctor, Ms. ████ you list a
12  couple of complaints that she has in here. You say
13  her main complaints are persistent microscopic
14  hematuria, which is currently being worked up. Her
15  other problem is urinary leakage, which is
16  progressively getting worse. You talk a little bit
17  more about that, and then you go on to say she's
18  got -- reports painful intercourse and then
19  persistent pelvic pain.
20     Okay. So the -- are you forming an
21  opinion as to what is causing her persistent
22  microscopic hematuria at this time?
23     A. At this time since it's currently being
24  worked up, no.
25     Q. Okay. So with respect to her urinary

**Page 848**

1   leakage, a sling is intended to assist with stress
2   urinary incontinence, but not urge incontinence; is
3   that correct?
4       **A.   That is correct.**
5       Q.   And so urge incontinence is treated how?
6       **A.   Urge incontinence is treated with**
7   **medications.  There's a device called InterStim**
8   **that can treat urge incontinence, and there is**
9   **Botox that can be injected into the bladder to**
10  **treat urge incontinence.**
11      Q.   Okay.  So a sling is really not indicated
12  for urge incontinence?
13      **A.   That is correct.**
14      Q.   And in fact, if you had a sling implanted,
15  one can continue to experience urge incontinence
16  unless they were treated with something else?
17      **A.   That is correct.  And actually, there was**
18  **a study that we've talked about earlier in the week**
19  **that a subclinical infection of the sling can cause**
20  **urge incontinence or worsen urge incontinence due**
21  **to the sling.**
22      Q.   Were you able to determine whether or not
23  Ms. ██████ had such a situation?
24      **A.   I would say more likely than not having**
25  **had several reparative procedures that the**

**Page 849**

1   **remainder of the sling in her has some clinical**
2   **infection associated with it.**
3       Q.   How do you -- how does one go about
4   determining, from a medical examination point of
5   view, whether someone has a subclinical infection?
6       **A.   From a medical examination perspective, it**
7   **would be difficult because it's subclinical.  And**
8   **this is a study by de Tayrac, which I discussed**
9   **earlier, that clinical infections from pelvic floor**
10  **mesh is about 1 percent of the time, but**
11  **subclinical infections is probably 10 times that.**
12  **They developed the model of that.**
13          **And when Wang did his study in 2008, he**
14  **had patients that had overactive bladders that**
15  **started after the sling, took out the sling because**
16  **they could not be treated and found that there was**
17  **bacteria associated with these slings and that**
18  **taking out the sling treated the overactive**
19  **bladder.**
20      Q.   But how can you say that this patient has
21  that?
22      **A.   By a reasonable degree of medical**
23  **certainty.**
24      Q.   But from the literature?
25      **A.   From the literature, my clinical**

**Page 850**

1   experience, from internal documents, and there are
2   documents that Bard knew about subclinical
3   infections.
4       Q.   What about with respect to Mrs. ██████
5   what can you tell us that is specific to her as
6   opposed to any other patient?
7       **A.   She's had several repair procedures which**
8   **reinoculates the remaining sling with bacteria.**
9       Q.   So is your -- the basis for your opinion,
10  excluding literature or, you know, someone else's
11  studies or Bard documents, just the fact that
12  Ms. ██████ has had multiple revisions?
13      **A.   I can't exclude the literature.  I can't**
14  **exclude my clinical experience.  I can't exclude**
15  **the information that I've gotten from internal**
16  **documents and testimony in forming my opinions.**
17      Q.   But with Ms. ██████ --
18      **A.   That is correct.  With an individual**
19  **patient, she's had multiple repair operations.  We**
20  **know from the literature that that can reseed the**
21  **sling with bacteria.**
22      Q.   But anything that you were able to tell in
23  terms of your examination of Ms. ██████ or looking
24  over her specific documents that can cause you to
25  say or to opine with a reasonable degree of medical

**Page 851**

1   probability or scientific certainty that Ms. ██████
2   has a clinical or subclinical infection?
3       **A.   Well, one of the manifestations would be**
4   **tenderness in the obturator muscles where the sling**
5   **is going through.  That can be due to subclinical**
6   **infection, degradation, deformation, contraction of**
7   **the mesh.**
8       Q.   What else could it be from?
9       **A.   Mesh and muscles.  It's degrading,**
10  **contracting, subclinical infection.**
11      Q.   Okay.  Is there anything else that you
12  base your opinion on that Ms. ██████ had a
13  subclinical infection other than what you told me?
14      **A.   The literature, my clinical experience,**
15  **internal documents and deposition testimony.**
16      Q.   Okay.  So are you saying that such a
17  subclinical infection is related to her urinary
18  leakage?
19      **A.   That is correct.**
20      Q.   Okay.  And are you also saying that --
21  what are the other causes of her urinary leakage?
22      **A.   Well, her recurrent stress incontinence is**
23  **due to the need to remove her contracted scarred**
24  **sling, which was causing pain and dyspareunia.**
25      Q.   What did you rule out in terms of what

Case 2:12-md-02327 Document 9252-1 Filed 06/18/20 Page 572 of 924 PageID #: 213879

Page 852

1 could be the other causes of her urinary leakage?
2 **A. Her stress urinary incontinence or her**
3 **urge incontinence?**
4 Q. Well, let's talk about both. So the
5 stress urinary incontinence, what -- I mean, you're
6 attributing this to the mesh?
7 **A. Well, now I'm attributing her stress**
8 **urinary incontinence to removal of the mesh.**
9 Q. Okay. Because the sling was implanted to
10 help resolve her stress urinary incontinence?
11 **A. And the data shows that with a simple**
12 **cutting of the sling, about 10 to 20 percent of**
13 **patients, and this is from my clinical experience**
14 **also, will then resume stress urinary incontinence**
15 **where you do a larger explant that can go up to**
16 **40 percent.**
17 Q. Because you're taking out the support
18 structure?
19 **A. Right, but you took out the support**
20 **structure because it contracted. It roped and**
21 **curled, and it was causing symptoms for that, so it**
22 **needed to be taken out.**
23 Q. Do you have evidence in this case that
24 Ms. ████ mesh roped and curled?
25 **A. Beside the fact that we know there was a**

Page 853

1 **problem with the Align sling that it was showing**
2 **roping and curling more frequently because of**
3 **difficulty with sheath removal, there was a tight**
4 **area of sling on the right side that was dissected**
5 **out. That tight area is either roping and curling**
6 **or contraction or both.**
7 Q. But do you know which?
8 **A. Well, we know it contracts.**
9 Q. Do you know which?
10 **A. We know that this sling has a propensity**
11 **for roping and curling.**
12 Q. But do you know which for Ms. ████
13 happened?
14 **A. Which one exactly? It's one or the other**
15 **or both.**
16 Q. But you don't know which for sure?
17 **A. Not for sure which one or the other or**
18 **both of the mechanisms.**
19 Q. So your opinion is that -- so basically
20 let me get this straight. Her stress urinary
21 incontinence she had before the sling. The sling
22 resolved that until it was excised or revised, and
23 then she resumed having some stress urinary
24 incontinence?
25 **A. That is correct.**

Page 854

1 Q. Okay. Urge incontinence, though, are you
2 attributing to that to anything with respect to the
3 mesh?
4 **A. We discussed that, the subclinical**
5 **infection of the remainder of the mesh.**
6 Q. So that is the rationale behind the urge
7 incontinence?
8 **A. That is correct.**
9 Q. So painful intercourse -- she said her
10 painful intercourse started before the first
11 revision surgery. It is noted with deep
12 penetration. The pain is mostly on the left side
13 at approximately the 2:00 position. She cannot
14 locate how deep in the vagina the pain starts but
15 that it's consistently in that spot.
16 Do you have an opinion as to why her
17 dyspareunia is in that particular spot?
18 **A. That's more likely than not where the mesh**
19 **is going through the obturator -- the levator**
20 **muscles and through the obturator foreman.**
21 Q. So when you say more likely than not --
22 **A. With a reasonable degree of medical**
23 **certainty.**
24 Q. Is that near -- I'm sorry. Where exactly
25 did you say it is?

Page 855

1 **A. Where the mesh goes through the obturator**
2 **internus muscle and the levator -- excuse me, the**
3 **obturator foramen.**
4 Q. Okay. Is there any other potential cause
5 why she might be experiencing that pain on the left
6 side at approximately 2:00?
7 **A. Well, when I palpated that area, I found**
8 **that it was tender on the left side over the**
9 **obturator internus muscle at the level of the**
10 **obturator foremen, which is where the mesh goes**
11 **through that location.**
12 Q. Could there be any other cause for that in
13 your opinion?
14 **A. In my opinion, no.**
15 Q. Okay. And then her last problem is her
16 persistent pelvic pain. She says that the spot
17 that is painful is the same spot that is painful
18 with intercourse. So is that -- is your opinion of
19 why she's had that persistent pelvic pain based on
20 what you just told us?
21 **A. That is correct. During intercourse, you**
22 **hit that point, and then it sets up a shock wave,**
23 **if you will, that ripples through the pelvic floor**
24 **muscles, can lead to pelvic floor spasm and lead to**
25 **the pain with intercourse that she's experiencing.**

Page 856

1    Q.   So are you ruling out all of her prior
2  procedures in terms of urethrocele anterior repair?
3    **A.   She did not have tenderness along the**
4  **anterior vaginal wall.  She had tenderness along**
5  **the left obturator foramen and the left levator --**
6  **excuse me, obturator internus muscle.**
7    Q.   So your opinion is that the prior native
8  tissue repairs that she had are not a cause of this
9  particular pain?
10   **A.   That is correct.**
11   Q.   You could not palpate any sling material
12  when you examined her; is that correct?
13   **A.   That is correct.**
14   Q.   And there was no exposure or banding, so
15  can you -- are you saying right now that she has
16  degrading mesh or roping or curling mesh?
17   **A.   Of the mesh that's remaining inside, yes.**
18  **Remember, this is an obturator sling, so we have a**
19  **significant amount of sling material in the inner**
20  **thigh, and so that material is going to continue to**
21  **degrade.  It's going to continue to contract.  It's**
22  **going to continue to deform, which is roping,**
23  **curling, fraying, and it's going to continue to**
24  **undergo a chronic foreign body reaction, chronic**
25  **inflammation, chronic subclinical infection.**

Page 857

1    Q.   But you have no information at this time
2  that the mesh in her currently is doing any of
3  those things, do you?
4    **A.   With a reasonable degree of medical**
5  **certainty because we know that this mesh had**
6  **already contracted, roped and curled and had been**
7  **seeded by several different intravaginal**
8  **operations, that more likely than not from the**
9  **literature, from my clinical experience, from**
10  **internal documents and deposition testimony, this**
11  **mesh is continuing to degrade.  It's continuing to**
12  **contract.  It's continuing to rope and curl, and**
13  **it's continuing to have a subclinical infection,**
14  **chronic foreign body reaction.**
15   Q.   Doctor, I get that all of your opinions
16  include all of those things, okay?
17   **A.   Yes.**
18   Q.   My question is, though, were you able to,
19  in your exam or your dealings with Ms. ▮▮▮▮ get
20  any information that can tell us that right now her
21  mesh is roping, curling or degrading?
22   **A.   The tenderness of the left obturator**
23  **foremen and the left levator muscles shows that**
24  **those processes that I described that you don't**
25  **want me to relist is continuing to go on.**

Page 858

1    Q.   I'm just trying to get us out of here on
2  time, okay?
3    **A.   All right.**
4    Q.   Okay.  And you -- what did you tell her to
5  do with respect to her pain?
6    **A.   Again, I was not examining her as a**
7  **treating physician.**
8    Q.   Okay.  So you didn't give her any sort of
9  recommendations?
10   **A.   No, I did not, but I've laid out what my**
11  **recommendations would be in my report.**
12   Q.   Okay.  And do you have the same rationale
13  for those recommendations for Ms. ▮▮▮▮ as you did
14  for Ms. ▮▮▮▮
15   **A.   Yes.**
16   Q.   And do you also have the same answer with
17  Ms. ▮▮▮ in terms of -- remember when I was
18  asking you, you know, what can you tell us in terms
19  of whether certain risks that you allege were not
20  given to Ms. ▮▮▮▮ and her doctor?
21   **A.   That same answer for that, but going back**
22  **to about the treatment, it is my opinion that, you**
23  **know, because her levator -- excuse me, obturator**
24  **internus muscles and obturator foramen are tender,**
25  **and that's the point tenderness, that that mesh**

Page 859

1  **should be removed from that area.  It is also my**
2  **opinion that she should be treated with medical**
3  **therapy, including vaginal suppositories, physical**
4  **therapy, trigger point injections, nerve blocks and**
5  **possible Botox therapy.**
6    Q.   Do you believe if that portion of that
7  mesh was removed that that would relieve her pain
8  at that point?
9    **A.   We discussed this yesterday.  From my**
10  **clinical experience and the literature, a full**
11  **explant will completely alleviate pain 40 percent**
12  **of the time.  About 40 percent of the time it will**
13  **diminish pain.  The degree of diminution of the**
14  **pain can be debated.  And about 20 percent of the**
15  **time it will have no effect on the pain.**
16       **Now, that does not mean, and I've seen**
17  **this in my clinical experience, and it's starting**
18  **to be reported in the literature that a significant**
19  **amount of time this pain does come back.**
20   Q.   Okay.  But the question is do you believe
21  to a reasonable degree of medical probability or
22  scientific certainty that if she had a revision at
23  the point of tenderness now that that pain would go
24  away?
25   **A.   Go away or diminish, yes.**

Case 2:12-md-02327 Document 9252-9 Filed 05/18/20 Page 56 of 924 PageID #: 213381

Page 860

1    MS. WATKINS:  I don't want to interrupt your
2  deposition, but we mentioned that we would get this
3  revision on the record.  Do you want me to do that
4  now?
5    MS. MANNO:  Go ahead.
6    MS. WATKINS:  I've been informed by Ms. ▓
7  that she is scheduled for a revision surgery on
8  ▓, 2014 with Dr. Elizabeth Harrel, and
9  Harrel is spelled H-a-r-r-e-l, and I am still
10  waiting to hear back from my client as to where
11  that surgery is going to take place.  And we will
12  inform opposing counsel of that as soon as we
13  receive that information via the procedures that
14  have been set up in the MDL.
15    MS. MANNO:  Okay.  Thank you.
16  BY MS. MANNO:
17    Q.  Doctor, you've reviewed the consent forms,
18  I am sure, and the depositions with respect to
19  consenting Mrs. ▓
20    **A.  That is correct.**
21    Q.  Not only with the implant, but with the
22  revisions, correct?
23    **A.  That is correct.**
24    Q.  And do you have an opinion as to the
25  standard of care in terms of how the patient was

Page 861

1  consented on either of those occasions?
2    **A.  I think that the medical records, the**
3  **deposition testimony will speak for themselves.**
4    Q.  So you don't have an independent opinion
5  about that?
6    **A.  From what is in the medical records and**
7  **from what is in the deposition testimony, no.**
8    Q.  Do you have any other opinions to provide
9  other than what's in your report and what you have
10  told us today about the specific causation of
11  Mrs. ▓ injuries?
12    **A.  No, I do not.**
13    MS. MANNO:  Let's go off the record for a
14  couple minutes.
15    THE VIDEOGRAPHER:  The time is 12:48.  We are
16  off the record.
17          (Whereupon, a short break was
18          taken.)
19          (Whereupon, ROSENZWEIG
20          Deposition Exhibit No. 37 was
21          marked for identification.)
22    THE VIDEOGRAPHER:  The time is 12:53.  We are
23  back on the record.
24  BY MS. MANNO:
25    Q.  Okay.  Doctor, before we go on, I just

Page 862

1  want to make sure that we put on the record that we
2  marked Ms. ▓ thumb drive with all of your
3  documents as Exhibit 37.
4          You also were disclosed as plaintiff's
5  specific expert for ▓ were you not?
6    **A.  That is correct.**
7    Q.  And you received a notice of deposition to
8  be here today for Ms. ▓ as well, correct?
9    **A.  That is correct.**
10          (Whereupon, ROSENZWEIG
11          Deposition Exhibit Nos. 38 and
12          39 were marked for
13          identification.)
14  BY MS. MANNO:
15    Q.  Okay.  And you prepared a report, which
16  again, you have the highlighted copy in front of
17  you and what I've just handed you as Exhibit 38 and
18  39.
19          And is Exhibit 38 a clean copy of your
20  final report for Ms. ▓ case?
21    **A.  That is correct.**
22    Q.  And then 39 would be the attachments in
23  terms of your CV and your reliance materials?
24    **A.  That's correct.**
25    Q.  And then let's mark your highlighted

Page 863

1  report as 40.
2          (Whereupon, ROSENZWEIG
3          Deposition Exhibit No. 40 was
4          marked for identification.)
5  BY MS. MANNO:
6    Q.  Is 40 a duplicate of 38, but with
7  highlights on it?
8    **A.  That is correct.**
9    Q.  Why did you use a highlighter?  Did you
10  use a highlighter to indicate important things or
11  things you wanted to remember or what?
12    **A.  What I wanted to be able to do is to be**
13  **able get to the areas to be able to answer your**
14  **questions without having to flip through things to**
15  **be able to expedite today.**
16    Q.  Okay.  So you highlighted certain topic
17  areas?
18    **A.  Certain topics and certain things that I**
19  **anticipate that you're going to ask me about so I**
20  **could find where that is more quickly.**
21    Q.  Okay.  So we shouldn't then assume that
22  anything that you highlighted has some sort of
23  indication of something more important; is that
24  correct?
25    **A.  That is correct.**

Page 864

1    Q.   So in terms of Ms. ████ and then we'll
2  mark her thumb drive as 41.
3                (Whereupon, ROSENZWEIG
4                Deposition Exhibit No. 41 was
5                marked for identification.)
6  BY MS. MANNO:
7    Q.   But same questions for Ms. ████  Is
8  everything that you reviewed specifically for
9  Ms. ████ report and your testimony here today
10 located on Exhibit 41?
11   **A.   That is correct.**
12   Q.   And I didn't ask you this with Ms. ████
13 I guess I could ask it for you now.  You never saw
14 her or talked to her separate and apart from your
15 independent medical exam, correct?
16   **A.   That is correct.  That answer is true for**
17 **all three plaintiffs that we're discussing today.**
18   Q.   Okay.  Excellent.  So at the time that you
19 wrote -- and again, same answer with respect to
20 that you drafted your specific report for
21 Ms. ████
22   **A.   That is correct.**
23   Q.   And at the time that you wrote the report
24 or completed the report, what were you aware of in
25 terms of Ms. ████ prior medical history?

Page 865

1    **A.   At the time of her implant, she was a**
2  **48-year-old.  She had been pregnant four times.**
3  **She had three deliveries.  Two of them were**
4  **cesarean sections.  One was a vaginal delivery.**
5  **She had a prior tubal ligation.  She weighed 147**
6  **pounds.  She denied tobacco use, and she denied any**
7  **other medical problems.**
8    Q.   Okay.  And what are her current reported
9  symptoms right now?  I believe it starts on Page 5.
10   **A.   Currently she's complaining -- she had a**
11 **vaginal mesh erosion.  She's complaining of pelvic**
12 **pain, painful urination, chronic dyspareunia,**
13 **stress urinary incontinence, urinary leakage,**
14 **urgency and recurrence of her prolapse.**
15   Q.   I'm sorry.  I was asking current
16 complaints.
17   **A.   From my medical exam.**
18   Q.   I'm sorry.  I'm on Page 5, and I'm just
19 asking sort of at the end.  I want to know not
20 what -- not yet anyway, not what she is describing
21 as complaints in the past, but what her current
22 complaints are.
23   **A.   Currently she's complaining of**
24 **dyspareunia, which has been progressively**
25 **worsening.  Dyspareunia is painful intercourse.**

Page 866

1  **She first began to feel a firm ridge that built up**
2  **on the top of her vagina close to the opening.**
3  **During intercourse, the penis would hit that area,**
4  **and it would become too painful for her to**
5  **continue.**
6        **She also leaks at what she described to me**
7  **as a bladder burst, and then she leaks.  When she**
8  **urinates, she does what's called double-voiding**
9  **which is urinating, rocking forward and then**
10 **sitting back down and continuing to urinate.  She**
11 **has occasional stress incontinence.  She does have**
12 **urgency.  She has to toilet monitor, and she has to**
13 **void frequently to avoid urgency.**
14   Q.   And when you say toilet monitor, is that
15 just make sure you go to the bathroom all the time?
16   **A.   No.**
17   Q.   What is that?
18   **A.   It's more of knowing where bathrooms are**
19 **so that if you're going to a mall, you know second**
20 **floor by Nordstrom's there's a bathroom, first**
21 **floor by Macy's there's a bathroom.  That's what**
22 **toilet monitoring is, or at least that's the way I**
23 **use the term toilet monitoring.**
24   Q.   Okay.  So the first current complaint is
25 dyspareunia.  The second is leakage, and these --

Page 867

1  we'll sort of -- I'm combining that with these
2  bladder bursts and double-urination.
3    **A.   That is correct.**
4    Q.   And then any other current complaints?
5    **A.   Well, I described for you the other**
6  **findings, painful urination, chronic dyspareunia**
7  **and her urinary symptoms.**
8    Q.   So would you consider -- so dyspareunia is
9  one.  The urinary issues, would you include dysuria
10 or painful urination within that, or is it
11 separate?
12   **A.   I would call that -- put that all together**
13 **in the urinary symptoms.**
14   Q.   Okay.  So in terms of her prior -- I know
15 you were talking to me about her prior history.
16 You have -- you talked to me about her pregnancies
17 and her deliveries, her tubal ligation.  Any other
18 significant medical history you are aware of?
19   **A.   No.**
20   Q.   In terms of ovarian cysts, those can come
21 and go, right?
22   **A.   Yes, they can.**
23   Q.   Okay.  Are ovarian cysts frequent among
24 women?
25   **A.   They're not -- I mean, every month in**

Page 868

1 order to ovulate, you make what's called a
2 follicle. Then at ovulation, the follicle bursts
3 and the egg comes out. If you want to get
4 pregnant, hopefully it gets fertilized. During
5 that process, those -- that process can get
6 deranged, and that cyst can just continue to grow
7 and make what's called a follicular cyst.
8     After you ovulate, that follicle becomes
9 what's called a corpus luteum, and that secretes
10 progesterone, which if the pregnancy happens, it
11 helps sustain the pregnancy. That can cause a
12 corpus luteum cyst. There are entities known as
13 polycystic ovarian disease where because of a
14 hormone imbalance, the ovary just keeps making
15 cysts.
16   Q. Okay.
17   A. But short answer is yes, they can come and
18 go for the normal physiologic changes of
19 fluctuating hormones in a female.
20   Q. Okay. And when you have one of these
21 cysts, can you have any symptoms that have to do
22 with pain or any urinary issues?
23   A. Pain, yes. Urinary issues, unlikely.
24   Q. Okay. What about the pain symptoms, where
25 would those -- where would those typically be in

Page 869

1 your experience?
2   A. On the side where the ovarian cyst is, so
3 that would either be in the pelvis, an area that we
4 call the adnexa, which means next to, but that
5 could either be described as pelvic pain or
6 abdominal pain.
7   Q. Okay. So you're unaware of any history
8 that Ms. ███ had with respect to ovarian cysts?
9   A. If she had ovarian cysts, that point
10 becomes moot when she had her laparoscopic
11 hysterectomy and bilateral salpingo-oophorectomy.
12 That would be important in a past notation, but
13 once you take out the ovaries, you resolve any
14 future discomfort from ovarian cysts.
15   Q. All right. So she is first seen by
16 her gynecologist, Dr. Kelly Nichols ███ 2009.
17 I said first, but I didn't mean to say that. She
18 was seen on ███ 2009; is that correct?
19   A. That is correct.
20   Q. And at that point, she's complaining of a
21 vaginal protrusion, back pain and occasional stress
22 urinary incontinence, second-degree anterior
23 prolapse and a second-degree uterine prolapse.
24     When it says second-degree anterior
25 prolapse, is that kind of vague? What does that

Page 870

1 mean?
2   A. No. That means that she has a cystocele
3 that comes down to within one centimeter of the --
4 excuse me. That comes down between one centimeter
5 of the hymenal ring and one centimeter outside the
6 hymenal ring.
7   Q. That's what anterior prolapse means?
8   A. Anterior prolapse is the same thing as
9 cystocele. Now, some people might be using the
10 Baden-Walker classification. That's the POP Q
11 classification where a second-degree cystocele
12 comes down close to the opening of the introitus.
13   Q. And so when a person is untreated for
14 stress urinary incontinence, is it your experience
15 that it gets worse over time in most cases?
16   A. Not necessarily.
17   Q. Okay. So I'm asking you about most cases.
18 Most cases it does not get worse over time, or it
19 does?
20   A. In my experience, I don't see a
21 significant worsening of stress urinary
22 incontinence over time, but I would not be
23 surprised if there's epidemiologic data. I mean,
24 overactive bladders, the incidence goes up with
25 age, and overactive bladders, you know, could get

Page 871

1 worse with time. If there is more pelvic floor
2 trauma, then stress urinary incontinence,
3 obviously, will worsen. If there's an impact on
4 loss of estrogen, stress urinary incontinence can
5 worsen, but I would say that in my experience, I
6 don't see a significant worsening of stress urinary
7 incontinence with time.
8   Q. Okay. If the -- I know you said trauma to
9 the pelvic floor, but if the pelvic floor just
10 becomes weaker over time, can that cause stress
11 urinary incontinence to get worse?
12   A. That could.
13   Q. When you write on Page 3 that Dr. Kent
14 Haggard saw Ms. ███ for mild stress urinary
15 incontinence and a cystocele that was asymptomatic,
16 but that it was a second or third-degree, what does
17 asymptomatic mean?
18   A. Well, we talked about this yesterday.
19 There are -- in an epidemiologic study, it was
20 noted that women with stage I prolapse or
21 70 percent of women that were asymptomatic had what
22 would be classified as a stage I prolapse, and
23 40 percent of asymptomatic postmenopausal women
24 actually had a stage II prolapse. So they're not
25 complaining of a bulging in their vagina. They're

1  not complaining of pressure in their vagina.
2  They're not complaining of any urinary or bowel
3  symptoms.  The most characteristic symptom of
4  prolapse is a bulging inside the vagina that
5  worsens throughout the day.
6      Q.  Okay.  Because that's what I thought, and
7  I'm reading that, you know, it's second or
8  third-degree cystocele, which sounds pretty
9  significant to me.
10     A.  We had this discussion yesterday, and I've
11 seen women with fourth-degree cystoceles that know
12 that it's there, but it's not bothering them.
13     Q.  All right.  So that's how you took that
14 note to read that it was not bothering her?
15     A.  That is correct.  It is an anatomic
16 finding that the patient knows that it's there, but
17 she does not find that it causes enough symptoms
18 that she would want something to do about it.
19     Q.  So give me one second.  Okay.  So Page 3
20 still, I'm on your third paragraph, she sees
21 Dr. Haggard for irregular bleeding, second-degree
22 uterine prolapse and a large cystocele.  I guess we
23 can't really -- can you tell from a large cystocele
24 whether or not it's increased in grade or not?
25     A.  No.

1      Q.  Okay.  And second-degree uterine prolapse,
2  now, is this -- this is what Dr. Green (sic) noted
3  on ████ ████ of 2009, correct?
4      A.  That is correct.
5      Q.  So she undergoes laparoscopic-assisted
6  vaginal hysterectomy with bilateral
7  salpingo-oophorectomy with Dr. Nichols.  Now, you
8  probably got into this already, but in terms of a
9  vaginal hysterectomy laparoscopic-assisted, you're
10 still making entry vaginally, correct, in that
11 procedure?
12     A.  That is correct.
13     Q.  And you, I'm sure, are familiar with
14 literature indicating that there can be incidence
15 of pain as a result of hysterectomies, correct?
16     A.  That is correct.
17     Q.  Okay.  And that literature talks about
18 pain where?
19     A.  Well, usually if there's going to be pain,
20 and the incidence of pain after a laparoscopic -- a
21 total laparoscopic hysterectomy or
22 laparoscopic-assisted vaginal hysterectomy is much
23 less than pain associated with an abdominal
24 hysterectomy.
25     Q.  Where would the pain be?

1      A.  Usually at the top of the vagina.
2      Q.  Is that also called the apex or the vault?
3      A.  Or the cuff.
4      Q.  Once you've taken out -- after you've had
5  a hysterectomy?
6      A.  That is correct.
7      Q.  And when you are having sexual
8  intercourse, does the penis hit the cuff or the
9  apex of the vagina?
10     A.  That is correct.
11     Q.  So you're also familiar with literature
12 that discusses dyspareunia as a result of
13 hysterectomies, correct?
14     A.  That is correct.
15     Q.  And in this case, so of the complaints
16 that she has, that first category with dyspareunia,
17 how did you rule -- well, what did you rule out in
18 terms of the causation for her dyspareunia?
19     A.  Well, in my experience and reviewing the
20 literature, the incidence of dyspareunia after a
21 laparoscopic-assisted vaginal hysterectomy is quite
22 low and tends to diminish with time after the
23 occurrence of the hysterectomy.  She developed an
24 erosion which was associated with dyspareunia, and
25 so I found compelling evidence.

1      We know that when there's an erosion,
2  intercourse can be painful.  We know before the
3  erosion, she had -- in ████ ████ of 2011, she had
4  only an occasional dyspareunia so that after the
5  erosion, she complained of much more significant
6  dyspareunia, so therefore, I could rule out the
7  hysterectomy as the cause of her dyspareunia.
8      Q.  Okay.  So let me just make sure I
9  summarize correctly.  Based on the timing in which
10 she reported having dyspareunia, which was after
11 the erosion, but --
12     A.  There is an increase in the dyspareunia
13 after the erosion, yes.
14     Q.  When did she first start to report
15 dyspareunia?
16     A.  Well, it states here her surgery was
17 ████████ of 2009.  We see that dyspareunia is
18 being described ████████ of 2010.  At the same
19 time, a ridge of mesh is also being described so
20 that we're starting to see bunching, contraction of
21 the mesh, dyspareunia associated with it.  And then
22 the dyspareunia gets worse as the further action on
23 the mesh is taking place with just contraction,
24 degradation, which finally leads to an erosion, and
25 her dyspareunia is described as worsening.

Page 876

1    Q.  Okay.  So what you're saying is after
2  she -- after it's noted on an exam by Dr. Nichols
3  that there is a ridge, that's the first time that
4  she is complaining of occasional dyspareunia?
5    **A.  That's the first time she complains of**
6  **dyspareunia.  In another note, it says she's having**
7  **occasional dyspareunia, and then her dyspareunia**
8  **actually, from at least what's described in the**
9  **records, seems to worsen, and now she's having**
10 **other symptoms, painful urination, and an erosion**
11 **is noted.**
12   Q.  Okay.  Would you agree with me, though, on
13 the first time that it's noted, at least in your
14 report, as to any complaint of dyspareunia is on
15 ▆▆▆▆▆▆ of 2011?
16   **A.  Actually, it says ▆▆▆▆▆▆, 2010 she**
17 **presents to Dr. Nichols with some dyspareunia at**
18 **the location of the cystocele repair, and there's a**
19 **ridge of mesh at that site.**
20   Q.  Okay.  I'm sorry.  I missed that.  Okay.
21 And so really the -- I mean, the only implant that
22 she had was the Avaulta Solo anterior?
23   **A.  That is correct.**
24   Q.  She never had a sling?
25   **A.  Right.  And you know that there is**

Page 877

1  **literature, Jacquetin's article from 2008 says if**
2  **you push on the mesh or if the patient complains of**
3  **pain at the site where the mesh is, the mesh is**
4  **what's causing the pain.**
5    Q.  Yes.  I'm sure that's not the only
6  article about that.
7    **A.  Okay.**
8    Q.  But that's not really not my question, and
9  I will actually move to strike your last answer.
10 My --
11   **A.  We were talking about -- this was all in**
12 **response to what methodology I used to determine**
13 **that it was the mesh and not her hysterectomy that**
14 **was leading to the dyspareunia.**
15   Q.  Okay.  So -- and I was going back to sort
16 of when she was first complaining about this, and
17 thank you for correcting me because I see that the
18 first time in your report is ▆▆▆▆▆▆.  Then
19 the next time we hear about it is --
20   **A.  That's also the time when it's noted that**
21 **there's a ridge at the mesh site.**
22   Q.  Correct.  And ▆▆▆▆▆▆ she's
23 complaining of occasional dyspareunia and of some
24 soreness and dryness; is that correct?
25   **A.  That is correct.**

Page 878

1    Q.  Okay.  And I'm sure you discussed this
2  yesterday, but dryness is a potential result of
3  menopause?
4    **A.  That is correct.**
5    Q.  And of course, dryness is a factor in
6  dyspareunia, correct?
7    **A.  That is correct.**
8    Q.  And so dryness, would you say it goes hand
9  in hand with sort of atrophying of the vaginal
10 mucosa?
11   **A.  In a general sense, yes.  I mean, there**
12 **are some patients that have atrophy and they don't**
13 **have dryness.  There are patients that have dryness**
14 **and they don't have a significant degree of**
15 **atrophy.  Dryness might be more of a**
16 **lubrication-type issue, but in the general sense,**
17 **the answer is yes.**
18   Q.  And the dryness is what makes it --
19 without lubrication is what can really cause pain
20 when you're having intercourse, correct?
21   **A.  That is correct, but that's not just an**
22 **issue in menopause.**
23   Q.  Right.  You mean the dryness?
24   **A.  That is correct.**
25   Q.  You can have dryness and not be

Page 879

1  menopausal?
2    **A.  That is correct.**
3    Q.  But dryness is one of the most common
4  symptoms or effects of menopause?
5    **A.  I would agree with that.**
6    Q.  Well, you know, thank you.  All right.
7  So -- okay.  So the reason that I asked you again
8  about sort of what she was implanted with is
9  because there are some records and some statements
10 that have made describing a sling, but there's no
11 evidence that she actually received a sling?
12   **A.  That is correct.**
13   Q.  And so when -- and we talked about this a
14 little bit earlier, but obviously, the Avaulta Solo
15 was intended to help with the cystocele, correct?
16   **A.  That is correct.**
17   Q.  But her reports of stress urinary
18 incontinence that she had, again, this would not
19 have been intended to fix that, or if it did, it
20 would have been just a nice bonus?
21   **A.  And her stress urinary incontinence**
22 **preoperatively was described as mild, mild stress**
23 **urinary incontinence, might not need to be treated**
24 **or can be easily treated nonsurgically.**
25   Q.  Okay.  But in other words, she could have

Page 880

1  very well continued to have stress urinary
2  incontinence after a cystocele repair either with
3  mesh or without, correct?
4  **A. Actually, the data on mild stress urinary**
5  **incontinence with native tissue repair shows a much**
6  **better success rate because it's mild.**
7  Q. Okay. But it's not a guarantee?
8  **A. That is correct.**
9  Q. And nobody approaches it as thinking that
10  it is, correct, or they should? They should not
11  approach it as thinking that it will solve the
12  problem?
13  **A. For a mild -- an anterior repair, native**
14  **tissue repair with mild stress urinary**
15  **incontinence, I wouldn't fault someone for doing an**
16  **anterior repair and having a good chance that the**
17  **patient would not leak afterwards. So for mild**
18  **occasional stress urinary incontinence, an anterior**
19  **repair would be an acceptable treatment.**
20  Q. Okay. All right. Fair enough. But at
21  the same time, though, it's not an expectation that
22  it will necessarily resolve the urinary
23  incontinence, the stress urinary incontinence?
24  **A. That is correct.**
25  Q. Okay. And so at the point of erosion, you

Page 882

1  cream, how long -- you know, to treat sort of
2  vaginal atrophy, how long would you want a patient
3  to be on it to determine sort of how helpful it
4  could be?
5  MS. WATKINS: Object to the form. Go ahead.
6  **THE WITNESS: The normal treatment regimen,**
7  **that was the word I was kind of searching for, the**
8  **normal treatment regimen would be to use it nightly**
9  **every night for two weeks and then decrease to**
10  **twice a week. She already had a hysterectomy, so**
11  **there would not be a prohibition about using it**
12  **every night. Now, in my experience, I've used**
13  **vaginal estrogen cream for 20 years, and I've done**
14  **a study on the impact of estrogen cream on the**
15  **lining of the uterus, which is a better biomarker**
16  **than breast tissue, and we don't see any effect on**
17  **the thickening of the lining of the womb from**
18  **intravaginal estrogen cream with the uterus intact.**
19  **So the risk of developing breast cancer is**
20  **exceedingly low, and in fact, I use it in patients**
21  **that have had a history of breast cancer as long as**
22  **they're not on a medication called aromatase**
23  **inhibitors which drops estrogen level down. Now**
24  **the -- so to --**
25

Page 881

1  say on ████████, Mrs. ██████ presented to
2  Dr. Haggard that she's got pelvic pain. She's
3  given esterase. She was given esterase previously,
4  but the cream did not work. She reported that sex
5  was unbearable. On exam, there was moderate
6  vaginal atrophy and a small piece of eroded mesh
7  near the bladder neck.
8  Okay. So Ms. ██████ I'm sure that you
9  read, has a history of breast cancer in her family,
10  correct?
11  **A. That is correct.**
12  Q. That, I think I can accurately summarize,
13  dissuaded her from taking esterase or at least
14  taking esterase as described?
15  **A. That's what she described in her**
16  **deposition, yes.**
17  Q. Okay. Do you -- maybe you review these
18  records more completely than I do, but can you tell
19  us based on your review how long, in fact, she was
20  ever on it?
21  **A. I think that was asked in her deposition,**
22  **and she was on it for a very -- for a short period**
23  **of time. I think she might have filled one**
24  **prescription and used it for less than a month.**
25  Q. Okay. So in terms of esterase or estrogen

Page 883

1  BY MS. MANNO:
2  Q. I wasn't asking about the breast tissue.
3  **A. To zip it up, that you're usually going to**
4  **start to see an effect after that two to four-week**
5  **time frame if it's going to have a significant**
6  **impact on vaginal atrophy and on vaginal dryness.**
7  Q. So is there a point at which, though, you
8  would say okay, you know, it's been about, I don't
9  know if it's a month or two months or three months,
10  of which now I feel as though we've done everything
11  we can with respect to the estrogen cream? In
12  other words, this is the -- we're going to see all
13  benefits by a certain date?
14  **A. Yes, but I personally don't recommend**
15  **patients stopping their intravaginal estrogen**
16  **because then what can happen is you're going to**
17  **revert back to your pretreatment state.**
18  Q. Okay. Fair enough. But how long would
19  you want to sort of -- you know, would you think
20  that a person sort of got whatever benefit that
21  they're going to get and be able to -- I'm not
22  describing this correctly. Like after a month, is
23  that the end of the improvement you're going to
24  see, and then you're going to sort of plateau, or
25  does it increase over a period of months?

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 580 of 924 PageID #: 213387

Page 884

1    A.  After about a month, you're probably going
2  to see about 80 percent of the maximum benefit.
3  After that, you might stay at that level.  You
4  might get up to the 100 percent benefit, but after
5  a month, you've probably seen the most bang you're
6  going to get for your buck.
7    Q.  Okay.  And so it's a fair statement,
8  though, that based on Ms. ████ reports, she
9  never took it for every single night for two weeks
10  and then even two weeks nightly for the remainder
11  of the month, correct?
12    A.  That is correct.
13    Q.  And so the fact that she had moderate
14  vaginal atrophy is not surprising, correct?
15    MS. WATKINS:  Object to the form.
16    THE WITNESS:  That is what is reported in the
17  medical record.  Now, my surprise or not, whether I
18  could have anticipated that or not, I described
19  what was in the medical record.
20  BY MS. MANNO:
21    Q.  Is your experience based on a -- like if
22  Ms. ████ had taken her esterase as directed, would
23  you have expected there to be improvement in her
24  vaginal atrophy?
25    MS. WATKINS:  Object to the form.

Page 885

1    THE WITNESS:  There is probably about a
2  60 percent chance of improving vaginal atrophy from
3  intravaginal preparations.
4  BY MS. MANNO:
5    Q.  And the vaginal mucosa, I mean, you can
6  have an erosion because of the thinning of tissue
7  because of vaginal atrophy, correct?
8    A.  That is one of the proposed mechanisms,
9  yes.
10    Q.  Okay.  And doctors use estrogen to try to,
11  this might not be the right word, but plump up or
12  increase the thickness of the tissue so that the
13  erosion resolves, right?
14    A.  It is attempted to be used as a treatment
15  for erosion, yes.
16    Q.  So can you say with any degree of
17  reasonable medical probability or to a reasonable
18  degree of scientific certainty that if Ms. ████
19  had used her esterase as directed that that could
20  have resolved her erosion?
21    A.  Resolved it or prevented it?
22    Q.  Well, you tell me either one, what you
23  think.
24    A.  Well, we know from the literature that
25  medical management of small erosions is successful

Page 886

1  maybe 50 percent of the time with slings and maybe
2  40 percent of the time with POP mesh.  Obviously,
3  the bigger the erosion, the less likely medical
4  management is going to be to resolve it.
5    Q.  And how big was it?
6    A.  I was looking -- actually, the amount that
7  was removed was 1.5 by 1 by 0.3 centimeters, and so
8  it was probably about that size of an erosion
9  because you want to take out the amount of mesh and
10  a slight excess --
11    Q.  Margin?
12    A.  -- margin, thank you, to be able to close
13  the vagina and decrease the chance of recurrence of
14  the erosion, but I did not see an exact description
15  of the size of the erosion.
16    Q.  Well, judging from the amount that was
17  removed and assuming that it was sort of within
18  standard of care for sort of how much margin you
19  remove --
20    A.  Maybe about a centimeter.  It was probably
21  about a centimeter of erosion.
22    Q.  Okay.  Would you characterize that as -- I
23  think earlier -- I don't know what your word was
24  earlier, but in minor cases of erosion or small
25  amounts, would you characterize that as such?

Page 887

1    A.  No.  In my experience, those need to be
2  managed surgically.  And estrogen, while you're
3  making the tissue healthier, improving blood flow,
4  some of the thickness, that is an erosion that is
5  not going to be treated nonsurgically.
6    Q.  One centimeter?
7    A.  That is correct.
8    Q.  Okay.  So in your paragraph on Page 4, the
9  last paragraph, it says on ████, Ms. ████
10  underwent a urethrolysis?
11    A.  Urethrolysis.
12    Q.  Oh, boy.  Urethrolysis.  What's that?
13    A.  The way -- again, I think it would be very
14  important for Dr. Padmanabhan to describe what he
15  did and why he did it, but a general
16  characterization of what urethrolysis is is to free
17  up scar tissue along the urethra to help someone
18  that has dysfunctional voiding.
19    Q.  I didn't -- I don't understand.  Free up
20  scar tissue?
21    A.  Around the urethra that's associated with
22  dysfunctional voiding.  What this doctor did and
23  why he did it, I think, is a better question to ask
24  him, but you asked me what a urethrolysis is.
25    Q.  Well, assuming this urethrolysis is what

Page 888

1 you describe it to be, would it have been indicated
2 in this situation, or would it have been within the
3 standard of care?
4    MS. WATKINS: Object to form and foundation.
5 You can answer.
6    **THE WITNESS: Again, that might have been**
7 **something that was described in the operative note**
8 **as one of the procedures that was done. From**
9 **reading the operative report, he did not do what I**
10 **would have considered a urethrolysis.**
11 BY MS. MANNO:
12    Q. What did he do?
13    **A. He removed the mesh that was eroded.**
14    Q. Okay.
15    **A. Because the mesh is placed at the bladder**
16 **neck and cephalad. Obviously, this is not the same**
17 **doctor that implanted the mesh.**
18    Q. Right.
19    **A. And so he might have been describing what**
20 **he -- and we see that it's referred to as a sling**
21 **here, so he might have thought he was dealing with**
22 **a sling erosion, not a POP mesh erosion. And when**
23 **he removed this, he thought he was clearing up some**
24 **scar tissue around the urethra, which we know that**
25 **the erosion was not around the urethra.**

Page 889

1    Q. But you're just kind of speculating as to
2 what he meant?
3    **A. That's why I said I will defer to what he**
4 **said in his testimony.**
5    Q. Okay.
6    **A. But we originally started out you asked me**
7 **what a urethrolysis is.**
8    Q. No, I understand.
9    **A. And I'm describing what he did in his**
10 **surgery.**
11    Q. Okay. And then the second sentence says
12 it was noted that Mrs. ████ had dyspareunia ever
13 since the anterior repair with mesh and
14 hysterectomy. So earlier you told me well, you
15 know, her complaints about dyspareunia happened
16 only after this ridge started with the mesh, and in
17 fact, didn't it really start, according to her and
18 according to the records of -- I call it Dr. P.
19    **A. Okay.**
20    Q. That the -- I think that's -- I thought it
21 was a she, but that she's referred to within the
22 deposition, you know, now it's happening ever
23 since the hysterectomy?
24    **A. Right. And we also know that Dr. P said**
25 **that she had a prior sling, so exactly -- I think**

Page 890

1 **that this characterization we might need to take**
2 **with a grain of salt as an example of paraphrasing**
3 **someone's history versus an exact representation of**
4 **the patient's history because it says that she had**
5 **a prior sling, and you know, then you described**
6 **that she's had dyspareunia since. Now, it doesn't**
7 **say when exactly it started. It's saying that it**
8 **was since this event.**
9    Q. You say ever since the anterior repair
10 with mesh and hysterectomy?
11    **A. That is correct, and I think that we see**
12 **from this operative report that there are some**
13 **discrepancies between what actually happened and**
14 **what's noted in this operative report. So you**
15 **know, I agree with you that's what it says.**
16    Q. Okay. Can you --
17    **A. I'm not really sure that we can say that's**
18 **exactly what it implies, and I think that the best**
19 **person to answer what exactly meant is Dr. P**
20 **and Mrs.** ████
21    Q. Did you ask Ms. ████ when the first time
22 she started experiencing dyspareunia was?
23    **A. She states that she waited approximately**
24 **two months after the surgery and was initially**
25 **tender, but once she began feeling a firm ridge on**

Page 891

1 **the top wall of the vagina, that's when intercourse**
2 **became more painful.**
3    Q. Where is that? Where are you reading
4 from?
5    **A. I'm reading from the first paragraph on**
6 **Page 6.**
7    Q. So I'm going back to the beginning of that
8 paragraph. Mrs. ████ first current complaint is
9 dyspareunia. This began after the implant surgery.
10    **A. And progressively worsened.**
11    Q. And has been progressively worsening?
12    **A. But then we drill into it a little bit**
13 **further.**
14    Q. Well --
15    **A. She says -- no.**
16    Q. Doctor, let me finish my question, please.
17    **A. Okay.**
18    Q. She said that when she first had
19 intercourse after waiting approximately two months
20 after the original surgery, it was initially
21 tender.
22    Now, based on your experience, a patient
23 has to wait approximately two months post implant
24 to have sex?
25    **A. That is correct.**

Page 892

1    Q.  That would be following the discharge
2  instructions?
3    **A.  And in my experience, if someone has**
4  **waited two months after any kind of surgery, that**
5  **first episode of intercourse might be a little bit**
6  **tender for a variety of different reasons, but she**
7  **did state very specifically that it worsened when**
8  **she began to feel a firm ridge build up on the**
9  **anterior vaginal wall close to the vaginal opening.**
10  **During intercourse, the penis would hit that ridge**
11  **and would cause her so much pain that she could not**
12  **continue to have intercourse.**
13    Q.  Okay.
14    **A.  So that tells me that the pain became**
15  **significant when the mesh contracted and deformed,**
16  **bunched, roped, curled and led to this firm ridge**
17  **that when that hit -- when intercourse hit that**
18  **area, it became painful.  That's not what you**
19  **experience after a hysterectomy.**
20    Q.  Okay.  Now -- but I do want to sort of
21  break this down because you are, I believe, opining
22  that her dyspareunia is directly and only caused by
23  this mesh; is that correct?
24    **A.  The dyspareunia that she has prior to the**
25  **explant and that she continues now because I can**

Page 893

1  **still feel that there is tenderness along the**
2  **vaginal wall, the dyspareunia that she had after**
3  **the first two months, I would consider that normal**
4  **postoperative healing pain.  That should go away.**
5    Q.  So with respect to the people that have --
6  in the studies that have pain after a hysterectomy
7  and without any mesh, is it your opinion that that
8  pain goes away?
9    **A.  Or stays the same.  It doesn't worsen.**
10    Q.  Fine.  I think we're talking about the
11  same thing, but what I am trying to get at is there
12  is complaints of some dyspareunia following a
13  procedure in which she had a hysterectomy and an
14  implant?
15    **A.  That is correct.**
16    Q.  You then state well, you know, then there
17  comes this ridge, and the dyspareunia gets worse.
18  Well, when you are making an opinion that her
19  dyspareunia in general is caused by the mesh, I am
20  wondering how you ruled out the contribution or the
21  fact that the hysterectomy and the pain following
22  the hysterectomy is not a contributing factor as to
23  some of the dyspareunia?
24    **A.  The hysterectomy could be causing some of**
25  **the dyspareunia, but she describes very clearly the**

Page 894

1  **ridge.  That ridge was palpated by Dr. P talking**
2  **about at the time of her explant surgery that there**
3  **was tethering, that there was tightness of the**
4  **mesh.  All those are signs of deformation,**
5  **contraction, degradation.**
6       **She states that when it hit this area,**
7  **that's where she felt the most pain.  So I would**
8  **say with a reasonable degree of medical certainty**
9  **that the majority of the contributor to her pain is**
10  **the mesh and not the hysterectomy.**
11    Q.  But would you also agree that there's a
12  potential minor contribution from the hysterectomy?
13    **A.  That I would say that there is a potential**
14  **very minor contribution from the hysterectomy.**
15    Q.  Okay.  So on ████, 2013, Ms. ████
16  reports that at that time, she denies any urinary
17  incontinence, hematuria or dysuria after the
18  urethrolysis.  Did I say that right this time?
19    **A.  That is correct.**
20    Q.  And mesh excision.  She reported some mild
21  increase in urgency.  And again, I mean, when
22  you're removing the -- are you -- are you saying
23  that she develops an increase -- well, I'm sorry.
24  Let me ask this.
25       The stress incontinence versus urge

Page 895

1  incontinence, the way that this paragraph reads, is
2  she denying stress urinary incontinence or urge
3  urinary incontinence the way that you write that?
4    **A.  It states that she denied any urinary**
5  **incontinence on ████**
6    Q.  Meaning either/or?
7    **A.  That is correct.**
8    Q.  Okay.  So after the mesh excision, she
9  reports mild increase in urgency.  Again, I think
10  you earlier told me, though, and we're dealing with
11  an Avaulta Solo and not a sling, but neither of
12  which are designed to treat urge incontinence?
13    **A.  That is correct, but by the same mechanism**
14  **of subclinical infection of the Avaulta, you can**
15  **then develop urge incontinence by a subclinical**
16  **infection as we described earlier for the sling.**
17    Q.  Okay.  So same questions with respect to
18  Ms. ████ and I know that you have relied on
19  literature, your training and experience, Bard
20  documents and other materials, but with respect to
21  Mrs. ████ specifically and individually, what can
22  you say in addition to what I have just mentioned
23  that you were able to tell from medical examination
24  or her own records that shows that she has a
25  subclinical infection?

Page 896

1    A.  The overactive bladder and from the prior
2 testimony that I gave about why that -- when you
3 excise mesh, you now expose the mesh to -- the
4 remainder of the mesh to the vaginal pathogens
5 which reinoculates the mesh with bacteria.
6    MS. MANNO:  So he needs to change the tape, so
7 let's go off the record so we can finish.
8    THE VIDEOGRAPHER:  This is the end of disc
9 No. 2.  The time is 1:38.  We are off the record.
10           (Whereupon, a short break was
11           taken.)
12    THE VIDEOGRAPHER:  This is the beginning of
13 disc No. 3.  The time is 1:43.  We are back on the
14 record.
15 BY MS. MANNO:
16    Q.  Okay.  Doctor, we were talking about -- I
17 believe you were saying that the subclinical
18 infection, forgive me if I'm not stating this
19 right, and you can correct me if I am, but
20 ultimately can lead to an overactive bladder, which
21 can then lead to urge incontinence; is that
22 correct?
23    A.  That is correct.
24    Q.  And what are the other causes of
25 overactive bladder?

Page 897

1    A.  There are a litany of other causes;
2 however, to make a long story short, I did not see
3 anything in the medical records and her history.
4 Obviously, another cause could just be having
5 surgery to the anterior vaginal wall and then an
6 excision of mesh from the anterior vaginal wall.
7    Q.  Could a native tissue repair to the
8 anterior wall be a cause of overactive bladder?
9    A.  It can treat an overactive bladder due to
10 cystocele.  That's a study that I wrote a few years
11 ago, but it would -- the short answer is yes, but
12 not frequently.
13    Q.  I mean, people get overactive bladder all
14 the time that don't have mesh in them, correct?
15    A.  That is correct, and as I said before, the
16 incidence of overactive bladder continues to go up
17 with age.
18    Q.  Okay.  And I know that you said that there
19 was a litany of other causes of overactive bladder.
20 In your differential diagnosis, did you rule out
21 that litany?
22    A.  That is correct.
23    Q.  Can you give me like the top, you know,
24 five?
25    A.  Neurologic condition, chronic internal

Page 898

1 irritation of the bladder, multiple sclerosis,
2 urethral obstruction.
3    Q.  Okay.  What else?  What are the next three
4 or four that you would think of?
5    A.  Chronic bladder infection.
6    Q.  That's pretty much it?
7    A.  There's a nice list.  You said five.
8    Q.  Okay.  And so those would be the top
9 things in your mind that would be causation factors
10 for --
11    A.  Yes, in a woman like Ms. █████.
12    Q.  -- overactive bladder.  What about
13 smoking?
14    A.  Actually, we discussed that yesterday.
15 Smoking is associated with bladder tumors.
16 Nicotine actually decreases muscle contraction, so
17 it could be along with the increase in coughing and
18 respiratory issues lead to stress urinary
19 incontinence.  I would not be surprised if nicotine
20 like caffeine is a bladder irritant leading to
21 frequency urgency.
22    Q.  Do you have -- I know that there's no
23 history at least noted in the medical records of
24 tobacco use for Ms. █████.  Is that your
25 understanding, too?

Page 899

1    A.  Yes.
2    Q.  What about caffeine use?
3    A.  I would not be surprised if she has used
4 caffeine.
5    Q.  Why would you say you would not be
6 surprised?  Because most people have?
7    A.  That is correct.
8    Q.  But I mean, in terms of, you know --
9    A.  The amount of coffee that she drinks per
10 day, no, I don't have information about that, but I
11 would doubt that when her urge symptoms started
12 that there would have been a significant shift in
13 her caffeine consumption.
14    Q.  Do you know one way or the other?
15    A.  No, I do not.
16    Q.  Okay.  So on Page 5, Ms. █████ was again
17 seen on ████ ██ 2013 by Dr. P.  She was noted to
18 be having considerably less pain with intercourse.
19 She had some residual pain, but she was pleased
20 with her progress.
21        Okay.  So that's a little over a year ago,
22 and you then see her █████ ██ 2014, correct?
23    A.  That is correct.
24    Q.  Okay.  So here's the question, though.
25 You put at the bottom of Page 5, and we talked

1  about this before, Mrs. ███ first current
2  complaint is dyspareunia.  This began after the
3  implant surgery and has been progressively
4  worsening.  Although, the last medical record that
5  we have by any other doctor than you said that
6  there is considerably less pain and only some
7  residual pain.
8      Did she say that something had happened or
9  that her symptoms had increasingly got worse since
10 the ███ 2013 visit?
11 **A.  Yes.  She stated that -- it's the last**
12 **line of that paragraph.  After removal surgery, it**
13 **got better, however, she noted a new ridge slightly**
14 **higher in her vagina.**
15 Q.  Okay.  And so the first ridge was where
16 exactly?
17 **A.  Where Dr. P described it, which is down by**
18 **the bladder neck, and this is slightly higher in**
19 **the vagina, and on my exam, it was -- the proximal**
20 **arms or the higher arms were exquisitely tender,**
21 **more tender compared to the distal arms, which is**
22 **closer down towards the bladder neck.**
23 Q.  What do you mean by exquisitely?
24 **A.  Very, very.**
25 Q.  Like a lot?

1  **A.  Yes.**
2  Q.  It sounds like you were -- you know, that
3  painting is exquisite.  I was just wondering how
4  you meant it in terms of describing pain.  So
5  increased?
6  **A.  Yes.**
7  Q.  So the first ridge that she had, according
8  to Dr. P's notes, would that have been something
9  that she would have been able to feel putting her
10 own, you know, fingers in her vagina?
11 **A.  More likely than not.**
12 Q.  How far up was it?
13 **A.  Well, the level of the bladder neck, as we**
14 **described before, is where the urethra meets the**
15 **bladder, and we discussed earlier.  That's**
16 **about three centimeters in from the opening of the**
17 **vagina.**
18 Q.  Okay.  So this -- you're saying now she is
19 now noting that she has a ridge slightly higher up
20 in her vagina?
21 **A.  That is correct.**
22 Q.  She said I can feel it?
23 **A.  That's where she -- well, again, that's**
24 **where I felt, and when I pushed on the arms up**
25 **above where this ridge is, it was very tender,**

1  **so --**
2  Q.  But the way I'm reading that is that she
3  is now noting that she has a ridge slightly higher
4  up in her vagina?
5  **A.  That is correct.**
6  Q.  So she told you I have a ridge higher up
7  in my vagina?
8  **A.  That is correct.**
9  Q.  How would she know she had a ridge higher
10 up in her vagina?
11 **A.  Because she had a ridge lower in the**
12 **vagina when the penis hit that, it hurt.  Now she's**
13 **describing that it hurts in the same area where I**
14 **pushed, and she might assume that it feels like a**
15 **ridge.**
16 Q.  Because she can't reach it?
17 **A.  She might be able to reach it, but I never**
18 **asked her did you actually reach up in there to**
19 **feel whether there was that same band that you felt**
20 **before.**
21 Q.  Okay.  So -- and are you -- can you say
22 whether or not Dr. P overlooked that, you know,
23 higher ridge during her exam, or are you saying
24 that it must have developed after?
25 **A.  That developed after due to continuing**

1  **contraction, degradation and deformation of the**
2  **mesh.**
3  Q.  Okay.  And so same questions are going to
4  be with respect to Ms. ███  I know that your
5  general opinion is the Avaulta design is flawed.
6  Polypropylene mesh should never have been placed,
7  and so as a result of these defects, she suffers.
8      Can you tell me specific -- because you
9  have a lot of opinions about what can happen with
10 mesh.  With respect to Ms. ███ can you tell us
11 what specific, you know, design defects or other
12 issues that you're attributing to her specific
13 injuries?
14 **A.  Her mesh contracted, which led to the**
15 **first ridge that she felt.  It contracted and**
16 **deformed, which led to the first ridge of the mesh,**
17 **and it's contracted, and that is the exquisite**
18 **tenderness that she feels on the proximal arms**
19 **of the mesh and the ridge that I feel three-quarters**
20 **of the way up the vagina, which is also exquisitely**
21 **tender.  That is due to mesh contraction,**
22 **deformation with a reasonable degree of medical**
23 **certainty because it is exquisitely tender that**
24 **there is a subclinical infection associated with**
25 **that.**

Page 904

1    Q.  Okay.  I mean, with respect to -- did Tom
2  show you the IFUs when you all met over the last
3  couple of days?
4    **A.  Yes.**
5    Q.  So in the Avaulta Solo one, and I will
6  read to you the one in Ms. ▮▮▮▮▮ case, but
7  adverse reactions, potential adverse reactions are
8  those typically associated with surgically
9  implantable materials, including hematoma, seroma,
10  mucosal or visceral erosion, infection.  Do you
11  believe that this word infection should be somehow
12  further defined?
13    **A.  Well, I would think that the assumption**
14  **would be that there would be a surgical site**
15  **infection, that describing infection that is a**
16  **surgical site infection that would show up soon**
17  **after surgery, and that would be treated, not a**
18  **subclinical infection that can manifest itself**
19  **years after the surgical procedure.**
20    Q.  But it doesn't say surgical site
21  infection, does it?
22    **A.  It says infection.**
23    Q.  Inflammation, sensitization, dyspareunia,
24  scarification and contraction, fistula formation,
25  extrusion and recurrence of vaginal wall prolapse,

Page 905

1  perforations or lacerations of vessels, nerves,
2  bladder, bowel rectum or any viscera may occur
3  during needle passage.
4        So the contraction that you're talking
5  about which you say, you know, led to a deformity
6  meaning then it caused her to ultimately have some
7  pain, would you agree with me that scarification
8  and contraction is listed in the IFU?
9    **A.  Those words are listed in the IFU.**
10    Q.  When you met with her, she denied pelvic
11  pain without intercourse?
12    **A.  That is correct.**
13    Q.  Did you want to say something else?
14    **A.  No.  That is correct.**
15    Q.  Okay.  So other than the fact that the
16  mesh contracted, do you have any other specific
17  opinions about how the design of the Avaulta led to
18  Ms. ▮▮▮▮▮ current complaints?
19    **A.  Actually, I said contraction and**
20  **deformation.**
21    Q.  I'm sorry.  So we talked about the
22  contraction.  The deformation, what is your opinion
23  with respect to how it deformed in Ms. ▮▮▮▮▮
24    **A.  Well, there's a ridge.  It's supposed to**
25  **lay flat and continue to lay flat.  There was a**

Page 906

1  **ridge that was removed initially.  There was a**
2  **ridge that I felt when I examined her.**
3    Q.  And so how -- in terms of the first ridge,
4  well, both ridges, can ridges result also from the
5  initial implantation being done with too much
6  tension?
7    **A.  No.**
8    Q.  Why not?
9    **A.  Well, tension would pull it.  It would**
10  **pull it flat.  This is when it bunches and rolls up**
11  **on itself.  Bunching, rolling, deformation --**
12    Q.  But where was the ridge?  I'm sorry.
13    **A.  -- I would not expect that to be a tension**
14  **issue.**
15    Q.  Just so I can get my head around this, the
16  ridge was -- what part of the mesh was behind the
17  first ridge?
18    **A.  The lower part between the distal arms.**
19    Q.  Okay.  So it would have been -- but it
20  would have been the central portion of the graft?
21    **A.  That is correct.**
22    Q.  Okay.  And so -- and then the second ridge
23  higher up, would that be, again, the central
24  portion of the graft?
25    **A.  More towards the proximal edge.**

Page 907

1    Q.  Okay.  I mean, I'm trying to get a sense
2  of whether or not --
3    **A.  You're saying central versus arms?**
4    Q.  Arms, correct.
5    **A.  Got it.  And I'm going central, but more**
6  **proximal in the vagina.**
7    Q.  But the mesh that you are feeling now,
8  what portion of the Avaulta Solo do you believe
9  that is?
10    **A.  The arms are tender, but the ridge is in**
11  **the central portion of the mesh.**
12    Q.  Okay.  So couldn't it be, though, that an
13  implantation with too much tension -- of course, I
14  mean, I think we've all -- you probably agreed to
15  this in the last two days that doctors knew to
16  implant this without tension so that once
17  scarification occurred, it would sit appropriately?
18    **A.  But there is no agreed-upon method to**
19  **actually describe how to put it in tension-free,**
20  **and that is -- that is -- we've discussed that**
21  **before.  That is a significant problem with these**
22  **devices.**
23    Q.  Okay.  Well, I'll move to strike the
24  nonresponsive portion of your answer.
25        My question was wasn't it well-understood,

Page 908

1  though, that these were supposed to be placed
2  without tension because once tissue ingrowth
3  occurred, scarification, it would place more
4  tension on the graft?
5      **A. So you're saying that you're agreeing that**
6  **there's contraction and shrinkage of the mesh?**
7      Q. My question is is it expected that the
8  tissue response will be to scar as part of the
9  healing process once the implant is put in?
10     **A. Well, we've known since the '90s that**
11  **contraction and shrinkage of the mesh takes place.**
12     Q. Which, of course, is in the IFU?
13     **A. But we don't know how much, so what is the**
14  **degree of looseness that you have to put it in to**
15  **avoid getting overdue tension from contraction,**
16  **shrinkage, degradation.**
17     Q. I understand that, but my question is more
18  if the sling -- I'm not talking about whether or
19  not, you know, the particular doctor, you know, how
20  he did it, but if it was placed in with too much
21  tension originally, could then the body react in
22  such a way that would cause this ridge to occur
23  either the first or the second time?
24     **A. The ridging occurs due to contraction and**
25  **deformation of the mesh.**

Page 909

1      Q. Could it be caused by the -- you know, an
2  implantation with too much tension?
3      **A. It can be caused by implanting it folded**
4  **or actually too loose.**
5      Q. Okay.
6      **A. Putting it in too tight, I would say,**
7  **would more likely than not not cause deformation;**
8  **however, I would not be able to completely rule**
9  **that out.**
10     Q. So when you say if it's implanted too
11  loosely, how could that then contribute to a ridge
12  later on?
13     **A. Well, because then it would fold on itself**
14  **when the patient wakes up, coughs and does their**
15  **activities, you know, in the immediate**
16  **postoperative period. It's like a loose bed sheet**
17  **that if you do something to it, it's going to fold**
18  **up on itself.**
19     Q. Okay. And again, you were not present for
20  the implantation?
21     **A. That is correct.**
22     Q. Same question with respect to your opinion
23  in Ms. ▮▮▮▮ case of -- you know, I think your
24  opinion is that if certain other risks had been
25  known by Dr. Haggard or disclosed to him, that that

Page 910

1  would then have resulted potentially in a different
2  choice being made by Dr. Haggard and Ms. ▮▮▮▮  Is
3  that your opinion?
4      **A. That is my opinion, and I'm going to defer**
5  **to the depositions and what's in the medical**
6  **records.**
7      Q. Okay. So you don't have any additional
8  information to offer as to causation with respect
9  to, you know, what decision would have been made
10  between doctor and patient about whether to implant
11  the sling based on risks known to the doctor?
12     **A. That has been -- that is in the**
13  **depositions, and I will defer to the depositions**
14  **for what testimony has been given.**
15     Q. So the entirety of your -- what you're
16  basing your opinion then on in Ms. ▮▮▮▮ case,
17  Ms. ▮▮▮▮ case and Ms. ▮▮▮▮ case really just
18  relies -- on this point relies exclusively on the
19  deposition testimony of the plaintiff, the
20  implanting physician and potentially the consent
21  forms; is that correct?
22     **A. That is correct.**
23     MS. MANNO: That's all I have.
24     MS. WATKINS: No questions.
25     THE VIDEOGRAPHER: That's the end of the

Page 911

1  deposition. The time is 2:03. We are off the
2  record.
3          (FURTHER DEPONENT SAITH NAUGHT.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. III     10/31/2014

---

Page 912

1  STATE OF ILLINOIS  )

2                     )  SS:

3  COUNTY OF C O O K  )

4       I, GINA M. LUORDO, a notary public within

5  and for the County of Cook County and State of

6  Illinois, do hereby certify that heretofore,

7  to-wit, on October 31, 2014, personally appeared

8  before me, at 320 North Dearborn Street, Chicago,

9  Illinois, BRUCE ROSENZWEIG, M.D., in a cause now

10 pending and undetermined in the United States

11 District Court for the Southern District of West

12 Virginia, In Re: C.R. BARD, INC., PELVIC REPAIR

13 SYSTEM PRODUCTS LIABILITY LITIGATION.

14      I further certify that the said BRUCE

15 ROSENZWEIG, M.D. was first duly sworn to testify

16 the truth, the whole truth and nothing but the

17 truth in the cause aforesaid; that the testimony

18 then given by said witness was reported

19 stenographically by me in the presence of the said

20 witness, and afterwards reduced to typewriting by

21 Computer-Aided Transcription, and the foregoing is

22 a true and correct transcript of the testimony so

23 given by said witness as aforesaid.

24      I further certify that the signature to

25 the foregoing deposition was not waived by counsel

---

Page 913

1  for the respective parties.

2       I further certify that the taking of this

3  deposition was pursuant to notice and that there

4  were present at the deposition the attorneys

5  hereinbefore mentioned.

6       I further certify that I am not counsel

7  for nor in any way related to the parties to this

8  suit, nor am I in any way interested in the outcome

9  thereof.

10      IN TESTIMONY WHEREOF:  I have hereunto set

11 my hand and affixed my notarial seal this 4th day

12 of November, 2014.

13

14

15

16

17 _____

18 NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19 LIC. NO. 084-004143

20

21

22

23

24

25

---

Page 914

1  TO: Diane Watkins

2  Re: Signature of Deponent Bruce Rosenzweig, M.D., Vol. III

3  Date Errata due back at our offices:  12/4/2014

4

5  Greetings:

6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF
   transcript, noting any changes or corrections on the
   attached PDF Errata.  The deponent may fill out the
   Errata electronically or print and fill out manually.

9

10 Once the Errata is signed by the deponent and notarized,
   please mail it to the offices of Tiffany Alley (below).

11

12 When the signed Errata is returned to us, we will seal
   and forward to the taking attorney to file with the
   original transcript.  We will also send copies of the

13 Errata to all ordering parties.

14

15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
   court without the signature of the deponent.

16

17

18 Please send completed Errata to:

19 Tiffany Alley Global Reporting & Video

20 730 Peachtree St. NE, Ste 470

21 Atlanta, GA 30308

22 (770) 343-9696

23

24

25

---

Page 915

1  ERRATA

2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that

3

4  ___ There are no changes noted.

5  ___ The following changes are noted:

6

7  Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
   Procedure and/or OCGA 9-11-30(e), any changes in form or
   substance which you desire to make to your testimony shall

8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any

9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.

10

11 Page _____ Line _____ Change _____

12 _____

13 Reason for change _____

14 Page _____ Line _____ Change _____

15 _____

16 Reason for change _____

17 Page _____ Line _____ Change _____

18 _____

19 Reason for change _____

20 Page _____ Line _____ Change _____

21 _____

22 Reason for change _____

23 Page _____ Line _____ Change _____

24 _____

25 Reason for change _____

---

In Re: CR Bard 200        Bruce Rosenzweig, M.D., Vol. III        10/31/2014

Page 916

```
 1   Page _____ Line _____ Change _____
 2   _____
 3   Reason for change _____
 4   Page _____ Line _____ Change _____
 5   _____
 6   Reason for change _____
 7   Page _____ Line _____ Change _____
 8   _____
 9   Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16   Page _____ Line _____ Change _____
17   _____
18   Reason for change _____
19
20   _____
                  DEPONENT'S SIGNATURE
21
     Sworn to and subscribed before me this ___ day of
22   _____, _____.
23
     _____
24   NOTARY PUBLIC
25   My Commission Expires:_____
```

**0**

**0.3** 886:7

**1**

**1** 727:3 805:24 814:6 815:16, 19,24 849:10 886:7

**1.2** 827:2,10

**1.5** 782:12 783:2, 6 886:7

**10** 742:23 774:2 832:15 849:11 852:12 869:16, 18

**100** 769:9 884:4

**10:38** 778:2

**10:44** 778:6

**10th** 873:3

**11** 797:1 837:15

**113** 792:1

**116** 742:24

**11:11** 799:4

**11:21** 799:11

**11:29** 805:24

**11:33** 806:3

**12** 742:23

**12:27** 847:4

**12:30** 847:8

**12:48** 861:15

**12:53** 861:22

**130** 820:17 821:7

**13th** 819:21

**147** 865:5

**15** 769:3 774:13 814:8 831:24

**16** 876:16

**16th** 877:18

**18** 860:8

**19** 899:22

**1:38** 896:9

**1:43** 896:13

**2**

**2** 814:7 815:14 822:6,7,19 896:9

**20** 852:12 859:14 882:13

**2008** 740:19 760:7 761:14 849:13 877:1

**2009** 774:14 869:16,18 873:3 875:17

**2010** 831:12 838:2 875:18 876:16

**2011** 781:7 789:1 875:3 876:15

**2012** 759:18 773:22 844:12

**2013** 894:15 899:17 900:10

**2014** 860:8 899:22

**22** 894:15

**22nd** 895:5

**23rd** 768:15 887:9

**24** 728:22 729:5

**25** 731:20 732:1 734:20,21,23 750:24 765:11, 12 831:24 842:21

**250** 820:25

**26** 732:6,9,10 899:17 900:10

**27** 732:20,23

**27th** 769:18

**28** 735:5,8,10

**29** 735:16, 740:19

**2:00** 854:13 855:6

**3**

**3** 744:9 760:1 814:7 815:14 871:13 872:19 896:13

**30** 734:14,15 737:2 814:8 838:2

**31** 738:2 739:7,8, 23

**32** 738:3

**33** 799:9

**34** 801:6,8,12,15

**35** 801:9,19,20

**36** 801:25 802:2

**37** 861:20 862:3

**38** 862:11,17,19 863:6

**39** 862:12,18,22

**4**

**4** 744:10 887:8

**40** 733:17 734:15 852:16 859:11, 12 863:1,3,6 871:23 886:2

**400** 821:3

**41** 864:2,4,10

**45** 795:10

**48-year-old** 865:2

**5**

**5** 776:12 832:15 865:9,18 899:16,25

**50** 733:17 734:14,18 768:24 769:8 823:6 824:17 886:1

**51** 752:1 761:16

**51-year-old** 741:24

**51.4** 761:13

**54** 791:22

**5th** 881:1

**6**

**6** 781:6 782:12
783:2,6 789:22
837:14 891:6

**60** 791:22 885:2

**7**

**7** 784:24

**70** 791:23 871:21

**77** 791:23

**7th** 876:15
877:22

**8**

**80** 884:2

**80-year-old**
741:22

**85** 795:1

**86** 769:6

**8th** 831:12 833:4

**9**

**9** 827:13,14

**90** 769:19

**90s** 908:10

**9:34** 727:2

**A**

**a.m.** 727:2

**Abbott's** 794:14

**abdomen** 790:5,

6 805:13 810:4,
9 812:5 813:1

**abdominal**
766:11 790:3,9
869:6 873:23

**Ability** 753:23

**able** 734:6 744:4
748:15 764:5
782:6 783:19
784:11,14,17
786:19 812:10,
15,19,21 813:4,
5 826:6 850:22
857:18 863:12,
13,15 883:21
886:12 895:23
901:9 902:17
909:8

**abnormal**
766:24 789:16
813:25 821:17,
21

**abnormality**
769:16

**about** 728:11,14
729:1 730:4
733:7 734:8
735:2 738:19
740:23 742:20,
25 743:13,16
744:2 754:11
755:20,21
756:16,21
757:6,8 759:14
760:1,5 763:9,
24 764:13 765:2
769:3 770:10
771:1,21 772:19
776:9 777:24

778:9,14,16
779:13,16,18,
19,20 780:2,5
783:11 785:3,7,
9 787:19 790:5,
11 791:2,7,13,
21,22 792:15
798:20 800:19
803:6,25 804:1,
16 807:11,12,17
808:14,20 814:8
817:4 819:11
820:25 821:3,10
822:4,20 824:7,
20 825:10
826:1,7 827:19,
22 831:6,24
832:5,9,20
833:10 835:17,
24,25 843:10,23
844:9 846:21
847:17 848:18
849:3,10 850:2,
852:4,12 858:22
859:12,14
861:5,10 863:19
867:15,16
868:24 870:17
872:18 873:17
877:6,11,16,19
879:8,13 882:11
883:2,8 884:1,2
885:1 886:8,20,
21 889:15
893:10 896:2,16
898:12 899:2,10
900:1 901:16
903:9 905:5,17,
21 908:18
910:10

**above** 734:20,21
790:6 901:25

**absolutely**
747:19

**acceptable** 749:5
823:21 880:19

**accepted** 748:24

**according**
730:20 745:6
889:17,18 901:7

**account** 840:19

**accurately**
881:12

**acetic** 818:15,19

**ache** 803:16
804:3

**aches** 803:19

**acid** 818:15,19

**action** 875:22

**active** 756:23

**activities** 909:15

**actually** 744:6
745:12 757:4
765:12 780:24
785:14,15,17
786:13 808:24
813:4,14 824:6
830:2 848:17
871:24 876:8,16
877:9 879:11
880:4 886:6
890:13 898:14,
16 902:18
907:19 909:4

**acute** 772:13

**ad** 753:5

**add** 777:16,20
792:13,23,24

**added** 736:14
738:6,14 777:2,
13 838:12

**addition** 895:22

**additional**
731:11 736:13,
21 738:14
749:16 756:14,
19 792:13,22,24
794:6 829:4,9
830:13,18 910:7

**additives** 753:21
754:2

**addressed**
769:12

**adequate**
807:16,17

**adhesion** 809:10,
15

**adhesions**
806:10,12,19,
21,22 807:4,6
809:3,4,5 811:1
813:6

**adjective** 761:10

**adjusted** 762:2,9

**adnexa** 869:4

**advanced** 741:16
745:17,22
751:24

**adverse** 791:15
904:7

**affects** 753:7

**after** 749:22
753:18 766:10,

21 768:23
772:3,16 773:13
774:8,9 777:6
780:5 781:7
802:8 805:15
806:17 815:15
832:12 837:24
843:2 849:15
868:8 873:20
874:4,20,22
875:4,10,13
876:1, 880:2
883:4,22 884:1,
3,4 889:16
890:24 891:9,
19,20 892:4,19
893:2,6 894:17
895:8 900:2,12
902:24,25
904:17,19

**afterwards**
880:17

**again** 750:8
751:24 753:25
754:1 756:2,20
757:10 758:8
763:16 777:13
780:7 785:2,8
790:5 791:23
803:21 813:11
817:3 823:20
831:3 840:11
843:19 858:6
862:16 864:19
879:7,18 887:13
888:6 894:21
895:9 899:16
906:23 909:19

**age** 741:25

761:12,13,15
870:25 897:17

**ages** 830:11

**ago** 897:11
899:21

**agree** 748:7
753:6 763:5,12,
22 775:21
806:16 823:1
825:16 829:24
835:5 836:14
838:15 839:1
876:12 879:5
890:15 894:11
905:7

**agreed** 727:23
907:14

**agreed-upon**
907:18

**agreeing** 792:9
908:5

**ahead** 778:1
801:4,24 815:4
882:5

**alert** 728:11

**Align** 826:17,19
827:1,7,17
828:4,9 845:2
853:1

**all** 728:16,25
729:13 730:8,
11,18 731:3
733:14 737:19
742:13 747:6
751:18 752:13,
14 754:15
759:3,4 767:6
775:21 776:20

782:13 783:23
785:1 786:4
792:1,5 793:6
795:21 796:5
798:13,19 800:1
804:7,11 805:7,
11 821:7 822:13
827:25 828:20
856:1 857:15,16
858:3 862:2
864:17 866:15
867:12 869:15
872:13 877:11
879:6 880:20
883:12 894:4
897:13 904:2
907:14 910:23

**allege** 858:19

**alleged** 792:15

**alleviate** 859:11

**allows** 742:12

**along** 728:19
747:15 777:21
856:3,4 887:17
893:1 898:17

**already** 748:17,
18 795:7 803:2
808:24 817:25
822:21 827:17
828:3 829:7,10
857:6 873:8
882:10

**also** 728:12
733:2 740:19,21
741:16 742:2
744:23 748:7
751:4 754:21
759:17 761:7

773:9 784:7 785:16,20 791:24 799:19 801:15 803:21 805:18 811:12 812:1 815:25 830:20 834:25 839:1 845:23 851:20 852:14 858:16 859:1 862:4 866:6 874:2,11 875:19 877:20 889:24 894:11 903:20 906:4

**alternative** 823:21

**Although** 900:4

**always** 780:16 815:13 816:17

**am** 756:9 788:5, 18 798:14,24 808:22 816:2 840:11 860:9,18 893:11, 896:19

**amended** 729:5

**among** 867:23

**amount** 768:22, 23 771:8 772:25 812:13 829:9,10 831:19 845:24 846:1,13,15 859:19 886:6,9, 16 899:9

**amounts** 886:25

**analysis** 749:8

**anatomic** 814:16,25

872:15

**and/or** 759:13 797:4 816:3

**anesthesia** 767:25 768:11

**anesthetic** 768:3

**another** 739:2 765:5,10 795:15 806:13 809:8 820:2 825:21 828:22 834:13 876:6 897:4

**answer** 737:23 746:24 770:13, 14 795:18 806:9 835:15 836:20 841:23 847:2 858:16,21 863:13 864:16, 19 868:17 877:9 878:17 888:5 890:19 897:11 907:24

**answers** 839:6

**anterior** 740:8,9 760:10,11 765:1 766:4 782:14 783:11,15,18,20 784:5 787:10 819:22 822:10, 16 823:14 824:8 825:21 856:2,4 869:22,24 870:7,8 876:22 880:13,16,18 889:13 892:9 897:5,6,8

**anteriorly**

765:14 784:5 824:22 825:8

**antibiotic** 817:14

**anticipate** 863:19

**anticipated** 884:18

**antidepressant** 817:15

**anxiety** 802:22 816:1,3,9,20,22 817:8,13

**any** 728:18 731:11,15,16 738:6 739:20 745:22 746:12, 15,20 747:10,18 749:8,9,12,16 750:1 752:6,7 759:22 761:16 762:10,15 765:21 766:4,21 769:15 771:3 775:5 776:24 778:11 781:3,8 782:4 783:17 786:20 787:18 790:11 791:7 798:16,25 800:12,15 801:1 804:19 806:7,17 809:14 811:10 815:12,22 816:15 818:22 819:17 820:4 825:10 829:21 833:5 834:3 835:6 836:15 837:20 838:5

839:21 842:9 845:1 850:6 855:4,12 856:11 857:2,20 861:8 865:6 867:4,17 868:21,22 869:7,13 872:2 876:14 885:16 892:4 893:7 894:16 895:4 900:5 905:2,16 910:7

**anything** 731:16 736:19 743:13 746:7 748:1 756:14 760:5 763:2 779:1 792:13 800:16 801:2 817:22 837:8 841:19 842:13 846:14 850:22 851:11 854:2 863:22 897:3

**anytime** 809:19

**anyway** 865:20

**apart** 864:14

**aperture** 776:21

**apex** 874:2,9

**apologize** 803:1

**appear** 793:2 819:16

**appearance** 765:13,25

**appearing** 766:6

**appears** 780:6

**appendectomies**

Case 2:12-md-02327 Document 7252-3 Filed 06/18/19 Page 593 of 924 PageID #: 213400





747:3,6,13
757:25 759:12
763:7 764:9
766:15 773:4
778:7 785:8
789:22 799:12
802:13 805:7
811:4 818:11,21
837:12 838:17
844:5 847:9
858:21 859:19
860:10 861:23
866:10 869:21
877:15 883:17
891:7 896:13

**background**
741:6

**bacteria** 786:3
849:17 850:8,21
896:5

**bad** 739:21
810:24

**Baden-walker**
870:10

**band** 902:19

**banding** 856:14

**bang** 884:5

**Bard** 727:8
790:21 791:14
850:2,11 895:19

**Bard's** 791:18

**base** 745:9 771:2
851:12

**based** 741:4
751:6,8,13
752:5 788:23
790:18 794:14
805:3 810:15

812:17,22,24
819:2,16 821:12
829:3,15 841:17
855:19 875:9
881:19 884:8,21
891:22 910:11

**basic** 742:16

**basically** 742:13
814:18 853:19

**basin** 812:7

**basing** 771:6
910:16

**basis** 792:4
833:2 850:9

**bathroom**
866:15,20,21

**bathrooms**
866:18

**became** 891:2
892:14,18

**because** 728:9
730:3 732:17
745:19 746:2
753:20 754:4,6
761:17 764:4,24
765:2,18 770:3,
6 771:2 783:13
788:1 795:14
796:20 797:25
805:16,18
808:16 810:12
812:4,5,13
814:17 816:10
817:3,6 818:18
822:20 823:25
825:20,24
828:11 829:10
831:4 836:3

843:18,21
845:11 846:8
849:7,15 852:9,
17,20 853:2
857:5 858:23
868:13 872:6
877:17 879:9
880:6 883:16
885:6,7 886:9
888:15 890:4
892:21,25 899:6
902:11,16
903:8,23 908:2
909:13

**become** 741:12,
14 755:12
805:17 818:18
820:8 866:4

**becomes** 780:7
868:8 871:10

**bed** 909:16

**before** 735:25
737:5 747:7
756:21 758:1
760:2 775:9
778:11 811:17,
18 829:17 831:8
833:3 839:19
842:23 853:21
854:10 861:25
875:2 897:15
900:1 901:14
902:20 907:21

**began** 832:23
866:1 890:25
891:9 892:8
900:2

**begin** 830:7,9

**beginning** 727:3
891:7 896:12

**behalf** 727:8

**behind** 854:6
906:16

**being** 738:14
741:5 744:4
748:1 749:22
750:18 752:1
753:4 766:5
776:1 777:16
816:3 828:9
832:7,18 834:13
836:22 842:21
847:14,23
875:18,19 906:5
910:2

**believe** 752:25
754:16 762:1
764:9 780:25
784:22 792:7
801:19 811:24
829:21 831:17
838:23 859:6,20
865:9 892:21
896:17 904:11
907:8

**believed** 752:5
764:24

**below** 734:23

**benefit** 883:20
884:2,4

**benefits** 883:13

**bent-over**
745:19

**Beside** 852:25

**best** 734:3,23,24
761:3 890:18

**better** 744:1 746:11 769:14 790:12 791:11 826:9 880:6 882:15 887:23 900:13

**between** 734:13 736:5 761:14 765:13 766:4 790:2 807:6,19 809:6,9 812:8 833:5 845:22,24 870:4 890:13 906:18 910:10

**big** 837:21 886:5

**bigger** 886:3

**bilateral** 802:20 869:11 873:6

**bilaterally** 826:5 830:21

**biofeedback** 797:4

**biomarker** 882:15

**biopsy** 802:20 814:1 815:22 818:9,11,23

**bisphosphonate** 745:12 749:1 752:2

**bit** 731:24 742:3 765:17 767:11, 13 768:4 810:13 813:16 824:12 843:21 847:16 879:14 891:12 892:5

**black** 730:2,3

**bladder** 757:15 766:19 768:17, 23 769:2,3,14 820:5,19,22 821:1,14 823:17 827:24 848:9 849:19 866:7 867:2 881:7 888:15 896:1, 20,25 897:8,9, 13,16,19 898:1, 5,12,15,20 900:18,22 901:13,15 905:2

**bladders** 849:14 870:24,25

**Blanton** 822:11, 14 826:10 830:23

**bleeding** 740:20 760:3,9,14,15, 16,25 761:17, 18,20, 872:21

**blind** 842:3

**blockage** 767:20

**blocks** 859:4

**blood** 755:1 803:8 805:16,19 887:3

**body** 746:21 770:4 783:8,9 785:10,11,20 786:1,8,17,21, 23,25 787:2,5 788:1,3,8,12,14, 21,25 794:21 795:12 806:18

**807**:21 808:11 830:15 856:24 857:14 908:21

**body's** 829:25

**bone** 741:8,9,13, 19 745:13,20 746:10

**bonus** 879:20

**both** 730:16 754:8 785:18 787:9 852:4 853:6,15,18 906:4

**bothering** 872:12,14

**Botox** 797:4,14 848:9 859:5

**bottom** 781:6 899:25

**bowel** 767:1,4,6, 17,22,23 768:1, 3,5,9,10 809:7,8 810:5,6,12 812:8 905:2

**bowels** 767:10

**box** 782:15

**boy** 887:12

**break** 777:25 778:4 799:2,6 806:1 847:2,6 861:17 892:21 896:10

**breaks** 780:6

**breast** 802:20,23 881:9 882:16, 19,21 883:2

**breathing** 846:10

**bring** 729:11

**brought** 729:18

**Bruce** 727:4,13

**buck** 884:6

**build** 741:5 892:8

**built** 866:1

**bulbus** 785:18

**bulging** 750:19, 21,24,25 759:19 871:25 872:4

**bunch** 775:19,22

**bunched** 892:16

**bunches** 906:10

**bunching** 875:20 906:11

**Burch** 808:5

**burning** 744:5 747:8 779:11

**bursitis** 742:8 751:2 759:16

**burst** 866:7

**bursts** 868:2

---

**C**

---

**C.R.** 727:8

**caffeine** 898:20 899:2,4,13

**Caldera** 844:15, 16

**call** 809:22 821:4 867:12 869:4 889:18

**called** 740:22
741:7 745:19
746:12 747:5
748:15 754:22
767:8 779:9
780:22 785:18
809:24 814:17
816:23 818:15
823:13 848:7
866:8 868:1,7,9
874:2 882:22

**came** 739:20
773:21 837:11

**can** 728:11
734:3,17 736:10
741:7,11,13,14,
15,16,17,20
746:24 747:2,15
748:25 750:20
751:25 752:22
753:1 755:9,15
756:7,11 757:3
764:15 765:10
768:6 769:9,23
770:15 774:23
775:16 776:2,4,
16 780:9,17,21,
23 785:18,22
786:7 788:18,20
790:10,23
791:1,7 794:1,4
798:5 799:1
803:3 804:7,18,
23 805:8,9,14,
21 806:20,21,22
807:20 810:10,
12 811:16
812:25 813:10,
16 815:2
816:13,14,16,25

818:14 821:1
823:2 824:13
828:7,15,21
829:3,4,6,25
830:5,12,18
832:22 835:11,
15,23 836:16
837:18,19 839:2
841:22 843:6,15
845:10,14,16
846:6 847:1,2
848:8,9,15,19
849:20 850:5,
20,24 851:5
852:15 855:24
856:15 857:20
858:18 859:14
867:20,22
868:5,6,11,17,
21 871:4,10
872:23 873:14
875:2 878:19,25
879:24 881:12,
18 883:11,16
885:5,16 888:5
890:16,17
892:25 895:14,
21 896:7,19,20,
21 897:9,23
901:22 902:21
903:8,9,10
904:18 906:4,15
909:3

**can't** 733:15,24
734:9 739:16
751:17 754:15,
17 759:15
781:22,24 782:1
798:22 816:9,24
829:8 830:25

850:13,14
872:23 902:16

**cancer** 814:4,9
846:3,16 881:9
882:19,21

**cannot** 789:15
854:13

**capaciousness**
777:4

**capacity** 820:24
821:4

**carcinogenic**
753:14

**care** 748:9,11,22
749:2 760:13
793:4 797:2
860:25 886:18
888:3

**Cartmell** 733:13

**case** 729:21
730:4 732:3
733:9,10 738:20
739:14 770:19,
23 790:13
793:19 799:20
801:13 829:18
835:16 838:9
839:22 840:12,
21,22 852:23
862:20 874:15
904:6 909:23
910:16,17

**case-specific**
732:3,10 737:12
841:2

**cases** 758:12
790:11 841:7
870:15,17,18

886:24

**catch** 812:6

**catch-all** 768:21

**category** 874:16

**Caucasian** 741:5

**causation** 734:16
736:18 808:25
841:1 861:10
874:18 898:9
910:8

**causative** 816:16

**cause** 740:25
747:23 760:14,
15 762:10,15
770:1 785:22
790:23 828:7,22
830:12,18
848:19 850:24
855:4,12 856:8
868:11 871:10
875:7 878:19
892:11 897:4,8
908:22 909:7

**caused** 743:9
747:24 750:14
752:4 785:23
824:3 830:6,8
836:1 892:22
893:19 905:6
909:1,3

**causes** 775:20,22
789:4,6 807:9,
10 836:22
851:21 852:1
872:17 896:24
897:1,19

**causing** 751:5
761:17 786:9

Case: 2:12-md-02327 Document 9075-1 Filed: 01/10/20 Page: 598 of 924 PageID #: 213405
Case 2:12-md-02327 Document 7432-1 Filed 06/08/20 Page 592 of 924 PageID #: 216892

In Re: CR Bard 200 Bruce Rosenzweig, M.D., Vol. III 10/31/2014

810:16 823:18
828:20 847:21
851:24 852:21
877:4 893:24

**cavity** 742:12

**CC** 768:24
769:6,8,9
820:17,25 821:3

**CCS** 769:19

**cecal** 813:5,6

**cecum** 809:18
810:1,5 811:13
812:25 813:2,3,
5

**cell** 786:24
807:23

**cells** 813:22,23,
24,25 814:2
818:16,17

**center** 743:1,2

**centimeter** 784:2
826:23,25
827:6,19 828:1
870:3,4,5
886:20,21 887:6

**centimeters**
742:23 782:12
783:2 826:21
827:2,7,18
886:7 901:16

**central** 906:20,
23 907:3,5,11

**cephalad** 888:16

**certain** 741:4
743:18 746:19
748:14 788:18
810:10 843:2

858:19 863:16,
18 883:13
909:24

**certainty** 747:21
749:25 751:13
752:3,10,17
753:1 760:23
785:25 786:20
787:8 790:18
793:16 794:1,5,
13 795:2,13
798:18 849:23
851:1 854:23
857:5 859:22
885:18 894:8
903:23

**cervical** 747:1
802:22 813:11,
19,22 814:4
837:16

**cervix** 780:19,21
814:13,15,17
818:7,15,16,25

**cesarean** 865:4

**chance** 765:20
775:17 880:16
885:2 886:13

**chances** 835:8
837:2

**change** 736:19
737:11 738:8
755:3 896:6

**changed** 738:6
763:25 764:20

**changes** 745:24
746:1 764:3
813:23 821:17,
20 868:18

**changing** 763:12

**characteristic**
872:3

**characterization**
887:16 890:1

**characterize**
803:19 886:22,
25

**characterized**
744:2

**chart** 744:6
804:16

**chest** 743:22
747:3 821:20

**choice** 910:2

**chronic** 753:17
770:4 785:20,
21,25 786:8,16,
20,23,24 787:2,
5,7 788:1,3,8,
11,14,21,25
790:21 794:20,
21 795:12
797:9,10 807:21
808:11 813:20
843:1 846:3,9
856:24,25
857:14 865:12
867:6 897:25
898:5

**chronically**
828:12

**cigarette** 753:21
754:2

**cigarettes**
845:21 846:14,
23

**CIN** 802:22
813:10 814:6,
10, 815:12,14,
16,19,24

**circumstances**
821:15 823:16

**classic** 755:5

**classification**
870:10,11

**classified** 871:22

**clean** 801:12
862:19

**clear** 739:4
752:13 753:16
759:21 831:6
832:25 844:11
845:4

**clearing** 888:23

**clearly** 840:14
893:25

**client** 860:10

**clinical** 747:21
750:16 760:24
786:13,14
788:6,23 790:19
795:3 849:1,9,
25 850:14
851:2,14 852:13
857:9 859:10,17

**clone** 813:24

**close** 765:11
766:10 769:4
808:2 811:16
866:2 886:12
892:9

**closer** 784:6
827:3 900:22

In Re: CR Bard 200　　　Bruce Rosenzweig, M.D., Vol. III　　　10/31/2014

closing 836:2

cloth 739:11

clue 834:4

coffee 899:9

collagen 765:19
770:6 807:8
808:1

collect 841:6

color 755:2

colporrhaphy
777:15 823:14

colposcopy
818:3,12 819:9,
15

combining 867:1

come 746:13
754:12 772:22
814:20,24
838:22 842:25
844:5 859:19
867:20 868:17

comes 804:13
807:22 814:19
870:3,4,12
893:17

coming 739:17
740:18 749:21
825:11 838:13
843:4

comments
843:10

common 779:6
879:3

communication
798:10

compared 765:1

775:12 900:21

compelling
874:25

complain 749:12

complained
743:10 745:4
759:13 832:20
875:5

complaining
740:17 742:6
768:18 774:19
775:6,8 776:9
865:10,11,23
869:20 871:25
872:1,2 876:4
877:16,23

complains 776:7
831:12 876:5
877:2

complaint
760:18,22
789:23 794:8
838:9 866:24
876:14 891:8
900:2

complaints
752:10 843:1
847:12,13
865:16,21,22
867:4 889:15
893:12 905:18

complete 730:23
737:17

completed
802:8,17 864:24

completely
807:8 820:23
824:14 859:11

881:18 909:8

complication
769:22 770:16
793:21,24
795:16 796:6
809:13

complications
756:7 794:15
803:4 815:12
835:3,8,11,23

complied 748:22

compound
818:15

compressed
741:14

concern 762:10,
15

concerned
771:21

concerning
769:6

conclude 746:6
750:5 751:6,8
769:15 793:14

concluded
767:16 770:22,
23 773:7,14
774:6

conclusion 752:5

condition 743:19
844:1 897:25

conditions
740:13 816:8

condyloma
837:12,13

condylomatous
837:21

connected
744:18

connective
754:25 758:10

consent 731:15
791:20 860:17
910:20

consented 861:1

consenting
860:19

consider 740:12
759:2,8 832:2
839:17,21,23
840:1 846:5,12
867:8 893:3

considerably
899:18 900:6

consideration
840:24

considered
749:20 758:24
759:1,3,4
888:10

consistently
854:15

constipation
768:8

consumption
899:13

contain 730:8

contained
801:15

contains 730:11

context 807:5

continuation
727:19

In Re: CR Bard 200   Bruce Rosenzweig, M.D., Vol. III   10/31/2014

**continue** 736:10 795:6 825:22 848:15 856:20, 21,22,23 866:5 868:6 892:12 905:25

**continued** 832:17 880:1

**continues** 794:22 892:25 897:16

**continuing** 795:10, 857:11, 12,13,25 866:10 902:25

**continuous** 727:23

**continuum** 797:2

**contract** 767:10 795:11 830:2,11 856:21 857:12

**contracted** 851:23 852:20 857:6 892:15 903:14,15,17 905:16

**contracting** 830:17 851:10

**contraction** 770:2 773:14,25 774:3 794:20, 806:25 807:7 853:6 875:20,23 894:5 898:16 903:1,21 904:24 905:4,8,19,22 908:6,11,15,24

**contracts** 807:10 830:12 853:8

**contribute** 909:11

**contributed** 749:19 759:23

**contributing** 750:1 751:10,15 757:21 816:3, 14,17 893:22

**contribution** 893:20 894:12, 14

**contributor** 758:16 894:9

**convention** 834:20

**copy** 737:19 801:12 862:16, 19

**corpus** 868:9,12

**correct** 727:20, 21 728:2,7,8 729:7,11,12,15, 16,25 730:5,6, 10,14,16,17 731:2,5,18 732:3,4,11,14, 15,25 733:1,4,5, 19 735:3,14,20, 21,24 736:1 737:21 738:16, 17,18,23, 744:25 746:8 750:7 752:18 753:10,20 754:7,13,14,20, 758:23 759:10,

17 761:5,6,11, 22 762:4,6,7,14 764:11,12,22 766:13,14 769:19,20 770:24,25 771:4,5,7,9,15 773:12 774:15 775:7,8,23 776:4,5,9,10 777:9,23 778:12,13 780:15 781:13, 15 782:24 783:4,22 784:13 792:3 793:5 794:9,10 795:22 796:1,3,8,14,23 797:18 798:11, 18,23 799:20,21 800:5,9 801:14, 22,23 802:10, 13,15 805:6 807:2,3,14 808:7,8,18,19 810:2 813:9,13 814:5,14 815:5, 6,10 818:6 819:19 820:16 822:14,23,24 823:5,10,12 824:14,15 825:19,25 827:15 828:2,8 831:14 833:15, 16 834:18 835:3,4,10,13 837:9 838:2,3,6, 7,20,21 841:14 845:3,6,7,10,15,

17,19 847:1 848:3,4,13,17 850:18 851:19 853:25 854:8 855:21 856:10, 12,13 860:20, 22,23 862:6,8,9, 21,24 863:8,24, 25 864:11,15, 16,22 867:3 869:18,19 872:15 873:3,4, 10,12,15,16 874:6,10,13,14 876:23 877:22, 24,25 878:4,6,7, 20,21,24 879:2, 12,15,16 880:3, 8,10,24 881:10, 884:11,12,14 887:7 890:11 891:25 892:23 893:15 894:19 895:7,13 896:19,22,23 897:14,15,22 899:7,22,23 901:21 902:5,8 905:12,14 906:21 907:4 910:21,22

**correcting** 825:8 877:17

**correctly** 769:11 817:14 875:9 883:22

**correlation** 817:10

**cosmetic** 776:23

**cough** 753:17
846:9

**coughing** 898:17

**coughs** 909:14

**could** 740:25
743:3,9 744:13,
22 746:20
747:4,10,19
750:14 757:21
765:24 767:3,5
770:1 782:15
784:5 797:24
798:4 804:6
805:12 823:11
825:10,22,23
829:13,15
839:12 842:18
846:24 849:16
851:8 852:1
855:12 856:11
863:20 864:13
869:5 870:25
871:12 875:6
879:25 882:4
884:18 885:19
892:11 893:24
897:4,7 898:17
908:21 909:1,11

**couldn't** 907:12

**counsel** 727:4
739:2,3 860:12

**counseling**
797:3,6,7,19
798:5,9

**couple** 736:17
753:6 784:22
847:12 861:14
904:3

**couple-minute**
799:1

**course** 753:7
771:13 792:16
878:5 907:13
908:12

**court** 727:9

**covered** 747:17
753:5 806:15

**crampy** 760:15,
17

**cream** 774:14
776:2 881:4
882:1,13,14,18
883:11

**create** 745:23
747:10 789:5

**crushing** 744:4

**crusts** 780:6

**cuff** 874:3,8

**culdoplasty**
822:9

**cure** 824:18

**cured** 824:4

**curl** 857:12

**curled** 852:21,24
857:6 892:16

**curling** 853:2,5,
11 856:16,23
857:21

**current** 748:19
749:22,23 750:2
752:10 756:3
757:23 758:18
760:5,18,22
779:2 786:9

787:14,15
788:19 789:23
813:18 815:13
845:23,24,25
865:8,15,21
866:24 867:4
891:8 900:1
905:18

**currently** 756:23
757:2 761:14
779:1 781:8
847:14,23 857:2
865:10,23

**cut** 762:22
763:23 764:5
809:17,23 810:1
828:24 829:21

**cutting** 763:7,11
764:2,20 829:1
852:12

**CV** 732:24
862:23

**cyst** 868:6,7,12
869:2

**cystocele** 822:19,
23,25 823:9
824:1,17 825:7,
13,15 845:13
870:2,9,11
871:15 872:8,
22,23 876:18
879:15 880:2
897:10

**cystoceles**
872:11

**cystometric**
821:4

**cystometrogram**
820:1

**cystourethrocele**
822:8

**cysts** 803:10
867:20,23
868:15,21
869:8,9,14

---

**D**

---

**D&c** 760:8

**data** 772:25
786:6 824:21
825:5,10 852:11
870:23 880:4

**date** 755:10
883:13

**day** 733:11
744:15 780:2
781:14 845:21
846:12,14,23,24
872:5 899:10

**days** 727:20,24
753:6 780:5
784:22 811:4
904:3 907:15

**de** 833:23 849:8

**deal** 738:10
822:22

**dealing** 779:24
823:3 844:16
845:12 888:21
895:10

**dealings** 857:19

**debate** 748:25

**debated** 859:14

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 603 of 924 PageID #: 213410
Case 2:12-md-02327 Document 9252-1 Filed 06/19/20 Page 603 of 924 PageID #: 216890

In Re: CR Bard 200             Bruce Rosenzweig, M.D., Vol. III             10/31/2014

791:11 804:13
838:19 865:20
879:10 883:22
888:19 889:9
901:4 902:13
904:15

**description**
834:7,13 886:14

**design**  763:13,25
785:3 903:5,11
905:17

**designation**
732:2 735:20

**designed**  764:5
895:12

**designs**  784:23,
24

**desires**  819:22

**detail**  764:13
797:21 813:17

**determination**
828:18

**determine**  749:8
841:20 848:22
877:12 882:3

**determined**
843:2

**determining**
849:4

**detour**  754:3

**detrusor**  820:5,
14

**develop**  741:25
755:2 780:3
832:7 895:15

**developed**
849:12 874:23

902:24,25

**developing**
882:19

**develops**  894:23

**deviation**  764:3

**device**  759:23
763:13,17 845:1
848:7

**devices**  907:22

**DEXA-SCAN**
741:7

**diagnosed**  742:7
745:5 755:7
757:1 760:7
774:17

**diagnoses**
756:19

**diagnosis**  746:4
748:18 749:21
750:17 751:3
752:4 755:25
758:15,22
759:17 816:18
834:10,15,23
838:13 839:20,
23 840:21
841:17 897:20

**Diane**  727:6

**diaphoresis**
821:21

**diaphragm**
789:13

**didn't**  736:19
745:16,21
746:7,14 749:12
754:10 758:21
759:2 772:22

778:16,23 782:7
805:10 813:8
815:22 820:4
829:18 842:13,
14 858:8 864:12
869:17 887:19
889:17

**died**  846:15

**differed**  765:23

**difference**  736:5
766:4 792:8
803:14 845:22,
23

**differences**
765:13

**different**  732:16
744:8 749:7
757:19 763:3
765:25 775:20,
22 797:24 798:5
801:19 803:12
808:8 809:21
814:13 815:1
821:9 824:12
833:13,19 857:7
892:6 910:1

**differential**
746:4 749:21
758:14,22
816:18 834:10,
23 838:13
839:19,23
897:20

**differentiating**
790:2 807:4

**differently**
843:21

**difficult**  734:4
758:11 804:9
812:2 813:3,7
817:4,5, 849:7

**difficulties**  798:3

**difficulty**  797:25
853:3

**dilators**  833:23

**dimensions**
782:16

**diminish**  859:13,
25 874:22

**diminishes**
753:17,19

**diminution**
859:13

**direct**  830:22

**directed**  884:22
885:19

**directions**
742:13

**directly**  785:4
892:22

**disagree**  830:4

**disc**  727:3
759:19 805:23
896:8,13

**discharge**  892:1

**disclose**  791:14
792:15

**disclosed**  792:6,
7 799:19 862:4
909:25

**disclosure**  732:2

**discomfort**
780:4 803:10,

Case 2:12-md-02327 Document 7432-6 Filed 06/18/19 Page 88 of 122 PageID #: 186961



In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. III     10/31/2014

**due** 743:12
745:25 749:9
752:11 756:5
767:15 770:1
773:14 813:4
832:17 848:20
851:5,23 897:9
902:25 903:21
908:24

**duly** 727:14

**duplicate** 863:6

**duration** 835:17

**during** 761:4,21,
23 764:14
782:11 783:19
794:18 810:10
815:7 826:1
855:21 866:3
868:4 892:10
902:23 905:3

**dysfunction**
769:11 772:4,18
773:1,23 774:1

**dysfunctional**
740:19 760:8,
14,24 761:16,20
887:18,22

**dyspareunia**
831:12 835:13
836:1,10,17,22
837:3 845:10,14
851:24 854:17
865:12,24,
866:25 867:6,8
874:12,16,18,
20,24 875:4,6,7,
10,12,15,17,21,
22,25 876:4,6,7,

14,17 877:14,23
878:6 889:12,15
890:6,22 891:9
892:22,24
893:2,12,17,19,
23,25 900:2
904:23

**dysplasia**
815:18,23 818:5
837:16

**dysplastic**
813:23,24 814:1
818:9,16,17

**dysuria** 867:9
894:17

---

### E

**each** 730:22
733:18 734:8,
10,18 740:23
752:21 794:25
839:13

**earlier** 750:5
758:7 761:2
800:19 845:21
848:18 849:9
879:14 886:23,
24 889:14
895:10,16
901:15

**early** 742:1,3

**easily** 844:23
879:24

**eaten** 767:5

**edge** 906:25

**effect** 752:7
859:15 882:16

883:4

**effects** 751:22
846:25 879:4

**effluvium**
814:24

**egg** 868:3

**eight** 728:6
794:24 795:1

**either** 772:15
785:3 805:12
809:7 816:11
819:9 820:10
827:11,14 853:5
861:1 869:3,5
880:2 885:22
908:23

**either/or** 895:6

**EKG** 821:16,21

**elderly** 741:20

**electronic** 757:3

**element** 751:25
775:1

**elephant** 743:22

**elicit** 804:7

**Elizabeth** 860:8

**else** 740:1
771:10 789:12
838:24 848:16
851:8,11 898:3
905:13

**else's** 850:10

**empty** 769:14

**encapsulates**
807:9

**end** 748:3,4
762:3,13 763:10

766:19 769:1
798:12 805:9,23
826:25 827:21
865:19 883:23
896:8 910:25

**endometrial**
740:20 760:4,
13,25

**enough** 771:19
797:12 872:17
880:20 883:18

**entail** 798:5

**enter** 729:4
730:18 731:23

**enters** 827:24

**entertain** 758:14

**entire** 756:12
783:15 788:3
846:19

**entirely** 739:13

**entirety** 910:15

**entities** 809:6
868:12

**entity** 814:17

**entry** 757:9
873:10

**epidemiologic**
870:23 871:19

**episode** 892:5

**eroded** 881:6
888:13

**erosion** 757:11,
12,14,16,23
776:7,15 783:14
786:2 795:14
865:11 874:24

In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. III     10/31/2014

875:1,3,5,11,13,
24 876:10
880:25 885:6,
13,15,20 886:3,
8,14,15,21,24
887:4 888:22,25
904:10

**erosions** 794:15
885:25

**error** 769:3

**errors** 736:17

**esterase** 774:14,
17 881:3,13,14,
25 884:22
885:19

**estimate** 734:3,
23,24

**estrogen** 774:14
776:2 871:4
881:25 882:13,
14,18,23
883:11,15
885:10 887:2

**etiology** 826:5,
12

**even** 744:17
759:15 809:13
824:18 884:10

**event** 890:8

**ever** 771:23
831:8 838:22
881:20 889:12,
22 890:9

**every** 756:19
781:23,24
810:19 840:22,
24 842:19
867:25 882:9,12

884:9

**everything**
747:16 754:18
800:6 802:13
835:11 864:8
883:10

**evidence** 833:1,5
845:1 852:23
874:25 879:11

**exacerbate**
815:17

**exact** 733:15
734:10 755:8,9,
782:15 788:22
886:14 890:3

**exactly** 743:4
763:16 764:10,
13 782:2 791:1,
8,11 813:1
817:21 820:12
830:23 853:14
854:24 889:25
890:7,18,19
900:16

**exam** 751:8
784:16 813:7
816:25 841:8
857:19 864:15
865:17 876:2
881:5 900:19
902:23

**examination**
727:16 738:21
783:20 800:12,
13 802:9 804:15
841:19,25 842:2
849:4,6 895:23

**examinations**

843:18

**examine** 843:8

**examined**
727:14 766:3
781:14 782:5
786:19 856:12
906:2

**examining**
841:15 858:6

**example** 793:9
796:25 804:17
890:2

**exceedingly**
747:23 748:2
789:11 882:20

**Excellent** 728:15
864:18

**except** 738:14
819:19 823:15

**excess** 886:10

**excise** 896:3

**excised** 783:13
853:22

**excising** 836:2

**excision** 776:14
819:7 844:13
894:20 895:8
897:6

**excisional**
819:13

**exclude** 850:13,
14

**excluding**
850:10

**exclusively**
805:19 910:18

**excuse** 832:6
855:2 856:6
858:23 870:4

**exhibit** 728:22
729:5,10 730:19
731:20,25
732:1,6,9,20,23,
24 735:5,8,10,
16,19 738:2
739:8,23 799:9
801:8,15 802:2
861:20 862:3,
11,17,19 863:3
864:4,10

**exhibits** 729:3
801:16,20

**expect** 906:13

**expectation**
880:21

**expected** 884:23
908:7

**expedite** 863:15

**experience**
747:21 750:16
751:13 760:24
786:13,15
788:6,24 789:8
790:19 795:4
810:17 848:15
850:1, 851:14
852:13 857:9
859:10,17 869:1
870:14,20 871:5
874:19 882:12
884:21 887:1
891:22 892:3,
895:19

**experienced**



10

**find** 731:14
757:2,20 763:2
769:6 777:20
818:7 863:20
872:17

**finding** 872:16

**findings** 745:16
867:6

**fine** 734:25
893:10

**finer** 781:23,24

**fingers** 755:3,4
901:10

**finish** 891:16
896:7

**finished** 802:12

**firm** 739:2 866:1
890:25 892:8,16

**first** 727:14
728:25 736:16
738:21 758:3
772:16 795:14
799:24 854:10
866:1,20,24
869:15,17
874:16 875:14
876:3,5,13
877:16,18
890:21 891:5,8,
18 892:5 893:3
900:1,15 901:7
903:15,16
906:3,17 908:23

**fistula** 904:24

**fit** 763:17

**fitting** 762:21

**five** 748:20
897:24 898:7

**fix** 815:11
822:18 879:19

**fixed** 810:8
813:3

**flat** 762:2,9,24
763:1 764:6
905:25 906:10

**flatus** 766:12

**flawed** 784:23,
24 903:5

**flip** 863:14

**floor** 749:23
757:18 775:10,
14 794:19
846:4,11 849:9
855:23,24
866:20,21
871:1,9

**flow** 755:1 803:8
805:16,19
814:24 887:3

**fluctuating**
868:19

**fluid** 812:7

**focus** 775:16

**fold** 909:13,17

**folded** 909:3

**follicle** 868:2,8

**follicular** 868:7

**follow** 773:16
815:15

**follow-up** 819:9,
18

**followed** 797:2

**following** 749:6
803:4 808:7
822:5 892:1
893:12,21

**follows** 727:15
773:5

**foot** 744:12,14,
18 747:7

**foramen** 855:3
856:5 858:24

**foreign** 770:4
785:10,20
786:1,8,16,21,
23,25 787:2,5
788:1,3,8,12,14,
21,25 794:21
795:12 807:21
808:11 856:24
857:14

**foreman** 854:20

**foremen** 855:10
857:23

**forget** 748:14

**forgive** 728:9
822:21 896:18

**forgot** 757:5

**form** 731:15
746:23 749:11
763:14 764:1
774:18 793:17
828:14 829:6
831:21 834:6,17
835:14 836:18
839:11 841:22
882:5 884:15,25
888:4

**formation** 807:2,
7 904:24

**formed** 806:19

**former** 740:21
753:13 845:22

**forming** 809:19
829:13 841:17
847:20 850:16

**forms** 731:15
785:17 807:24
860:17 910:21

**forward** 745:21
866:9

**Fosamax** 740:22
745:11

**fossa** 782:21

**found** 794:24
812:1 822:13
841:25 849:16
855:7 874:25

**foundation**
834:6,17 835:14
836:18 839:11
888:4

**four** 782:17
846:18 865:2
898:4

**four-week** 883:4

**fourth-degree**
872:11

**fracture** 741:17,
21 748:5

**fractures**
741:17,18,19

**frame** 832:2,8,10
883:5

**frankly** 739:16

**fraying** 856:23

**free** 887:16,19

**freeze** 819:6

**frequency**
774:20,23
775:5,19,20
776:4,8 778:24
898:21

**frequent** 867:23

**frequently** 853:2
866:13 897:12

**from** 733:14
736:9 741:12,21
742:18,22,25
743:5 744:7
746:18 747:19,
21 750:9,16
752:6 753:16
754:12 757:2
758:12 759:18
760:23 763:3,18
764:4 765:11
767:14 769:5
774:1 775:9,13
780:24 781:9,
11,20 782:5
783:3,12 784:2
786:12,14,15
787:3,13 789:2
794:16,24
795:3,8 797:10
803:8 805:19
806:21,22 807:5
808:8 809:18
810:1,13
811:11,23 813:6
814:13 815:1,12

826:6,25 827:19
831:22 832:3,7
834:21 835:12
836:22 840:13
842:16 849:4,6,
9,24,25 850:1,
15,20 851:8
852:13 857:8,9
859:1,9 860:10
861:6,7 864:14
865:17 869:14
872:23 876:8
877:1 881:13
882:17 885:2,24
886:16 888:8
890:12 891:4,5
894:12,14
895:23 896:1
897:6 901:16
906:4 908:15

**front** 729:2
732:1,12,23
790:13 801:21
862:16

**frown** 744:7

**full** 737:15
820:22, 838:23
859:10

**fullness** 768:17

**fully** 748:10

**functioning**
822:1

**further** 786:3
842:15 875:22
891:13 904:12

**future** 777:5
793:3 794:2
815:17 869:14

---

**G**

---

**gain** 839:3,10
840:11 843:4
844:1

**gaining** 844:7,9

**gains** 839:18
843:3

**gas** 766:12

**gastrocolic**
767:8

**gave** 787:24
825:1 896:2

**general** 728:4
729:14 734:16
736:18 754:11
767:25 768:3
780:9 784:20,25
791:3 834:25
835:9,16,18
839:4,12 841:1
878:11,16
887:15 893:19
903:5

**generally** 779:5,
18 786:10
788:18 803:3
804:12 821:2
836:14 837:5

**generic** 757:12

**genesis** 813:19

**gestalt** 804:2

**get** 732:17
738:19 739:22
741:15 747:2
754:11 762:23,
24 768:6 773:20

779:14 781:11
785:17 804:2
807:18,21 808:1
809:18,20 812:7
825:23 828:21
830:4,5,7,15
836:25 843:8
853:20 857:15,
19 858:1 860:2
863:13 868:3,5
870:18,25
871:11 883:21
884:4,6 893:11
897:13 906:15
907:1

**get all** 733:13

**gets** 813:22
830:1 868:4
870:15 875:22
893:17

**getting** 840:11
847:16 908:15

**giant** 786:24
807:23

**give** 733:15,24
734:3,9 749:16
752:15 755:9
760:25 775:17
782:15 858:8
872:19 897:23

**given** 775:18
858:20 881:3
910:14

**gives** 741:8
743:25

**giving** 779:21
838:23 841:12

Case 2:12-md-02327 Document 7452-8 Filed 06/13/19 Page 40 of 122 PageID #: 186946



Case 2:12-md-02327 Document 7252-8 Filed 06/18/19 Page 75 of 922 PageID #: 186948



**historians** 761:4

**history** 740:11
754:19 755:21
756:22 757:4
758:15 778:12,
23 779:17,24
802:18,19,21
805:8 864:25
867:15,18 869:7
881:9 882:21
890:3,4 897:3
898:23

**hit** 855:22 866:3
874:8 892:10,17
894:6 902:12

**hold** 731:25
821:1

**honed** 791:5

**hopefully** 868:4

**hormone** 868:14

**hormones**
868:19

**hospital** 804:23

**hot** 819:14

**hour** 777:25

**hours** 733:9,16,
24 734:10,14,
15,18,20,21,23
784:21

**how** 733:9 744:1,
21 748:25
750:5,13 755:12
760:2 763:16,
19,23 764:10
782:2,7,9,16
786:6 788:18
792:7 800:20

803:14 804:1,23
805:11,14
818:12 821:1
826:7 828:18,21
834:8 842:7,11,
12 846:4 848:5
849:3,20 854:14
860:25 872:13
874:17 881:19
882:1,2,3
883:18 886:5,18
893:20 901:3,12
902:9 905:17,23
906:3 907:19
908:13,19
909:11

**however** 741:11
786:23 815:16
833:9 897:2
900:13 909:8

**HP** 837:18

**HPV** 813:20,21
837:15,18

**human** 837:14

**hunched** 745:21

**hungry** 767:7

**hurt** 842:14
902:12

**hurts** 843:12,
902:13

**husband** 776:9

**hymenal** 870:5,6

**hyperactive**
767:6

**hypoactive**
767:1,4 768:9

**hypoestrogenic**

774:24

**hypothesized**
769:13

**hypothetical**
746:23 770:19
828:14 835:15,
16 836:19

**hysterectomies**
812:9 873:15
874:13

**hysterectomy**
805:18 812:2
815:5,7,15
818:2 819:20,22
822:9 869:11
873:6,9,21,22,
24 874:5,21,23
875:7 877:13
882:10 889:14,
23 890:10
892:19 893:6,
13,21,22,24
894:10,12,14

**hysteroscopy**
760:8

---

### I

**I've** 729:20
733:14 737:5,8
763:6 765:24
771:16,18,20
789:15 792:25
804:10 812:9
833:17 840:22
842:20 850:15
858:10 859:16
860:6 862:17
872:10 882:12,

13

**idea** 744:1

**identical** 793:1,
2,6

**identification**
728:23 731:21
732:7,21 735:6,
17 737:3 738:4
801:10 802:3
861:21 862:13
863:4 864:5

**identify** 727:4
784:11

**identifying**
730:16

**IFU** 905:8,9
908:12

**IFUS** 904:2

**II** 871:24

**ileus** 767:13,14,
19,23 768:6

**imbalance**
868:14

**IME** 731:12
733:25 802:14
812:16

**immediate**
772:21 831:24
832:12 909:15

**immediately**
766:9 772:3

**immortalized**
813:24

**impact** 753:10,
12 767:17 797:8
816:7 824:22
846:6 871:3

882:14 883:6

**impacted** 792:16

**impacts** 755:1
846:4

**impetus** 828:22
830:6,8

**implant** 757:18
760:9 771:4
831:19 860:21
865:1 876:21
891:9,23 893:14
900:3 907:16
908:9 910:10

**implantable**
904:9

**implantation**
764:4 773:9
791:17 824:16
826:2 833:6
906:5 907:13
909:2,20

**implanted** 740:4
771:18 772:1
831:18 845:2
848:14 852:9
879:8 888:17
909:10

**implanter**
771:12,14

**implanting**
763:4 769:22
791:16 834:19
909:3 910:20

**implants** 825:15

**implement**
834:3,13

**implements**

833:21

**implies** 890:18

**imply** 821:10

**important**
758:14,25
863:10,23
869:12 887:14

**improper** 746:23
770:24 835:15
836:19

**improperly**
773:8

**improvement**
884:23

**improving** 885:2
887:3

**inadvertently**
736:22

**incidence** 751:5
824:9 870:24
873:14, 874:20
897:16

**incision** 811:5,6,
7 845:13

**include** 839:2
857:16 867:9

**including** 753:8
797:2 859:3
904:9

**Incomplete**
828:14

**incontinence**
753:11 775:13
820:21 822:23
823:3,4,8,15,19,
24 824:4,5,10,
12,19,23 825:7,

9,13,23 838:5
848:2,5,6,8,10,
12,15,20 851:22
852:2,3,5,8,10,
14 853:21,24
854:1,7 865:13
866:11 869:22
870:14,22
871:2,4,7,11,15
879:18,21,23
880:2,5,15,18,
23 894:17,25
895:1,2,3,5,12,
15 896:21
898:19

**increase** 745:13
775:11 835:8
875:12 883:25
885:12 894:21,
23 895:9 898:17

**increased** 872:24
901:5

**increases** 816:8

**increasingly**
900:9

**independent**
738:20 800:11
802:9 843:19
861:4 864:15

**indicate** 768:18
863:10

**indicated** 825:17
848:11 888:1

**indicates** 819:21

**indicating**
873:14

**indication**
777:11 783:17

787:24 820:3
844:25 863:23

**indications**
772:20 776:25

**indicative**
743:18

**individual**
734:8,11 746:17
807:25 816:10
850:18

**individually**
895:21

**infection** 785:22
786:4 806:21
810:24 813:21
848:19 849:2,5
851:2,6,10,13,
17 854:5 856:25
857:13 895:14,
16,25 896:18
898:5 903:24
904:10,11,15,
16,18,21,22

**infections** 849:9,
11 850:3

**inflammation**
742:14 743:7
753:19 786:25
806:22 856:25
904:23

**inflammatory**
794:21

**influenced** 747:1

**inform** 860:12

**information**
729:14 730:9,12
731:11 749:17
781:11 782:5





laid 858:10

laparoscopic 869:10 873:20, 21

laparoscopic-assisted 873:5,9, 22 874:21

laparoscopically 811:9 812:11

laparoscopies 811:11

large 810:6 872:22,23

larger 845:13 852:15

Larikainen's 831:23

last 727:24 729:10 733:2,11 737:14 761:15 768:6 784:21 805:14 815:21, 22 842:21 855:15 887:9 900:4,11 904:2 907:15

later 742:20 750:18 769:17 776:6 780:3 832:5,19,21 838:4 909:12

latter 844:8

Laval 833:23

Laval's 831:23

law 739:2

lawsuit 838:16 839:2,10

840:20,23 841:3,12

lay 762:24 905:25

layer 770:6

laying 763:1

lays 764:6

lead 741:16 750:20 788:15, 16 829:25 836:16 845:10, 14,16 855:24 896:20,21 898:18

leading 786:1,4 787:10 817:8 877:14 898:20

leads 770:4 789:3 806:25 807:1 836:3,10 875:24

leak 820:17 821:15 822:2 880:17

leakage 847:15 848:1 851:18,21 852:1 865:13 866:25

leaked 820:20

leaks 866:6,7

least 751:10 752:7 758:23 766:22 824:17 832:20 866:22 876:8, 881:13 898:23

led 757:17 798:3

892:16 903:14, 16 905:5,17

LEEP 819:12

left 736:22 743:21 763:19 766:11,15,19 769:1 782:16 831:13,16 854:12 855:5,8 856:5 857:22,23

leg 741:15 745:3 747:6 751:1,4 759:13,22 831:25 842:16

length 762:3,4, 13,14,17 826:20

Leonard 822:11

lesion 818:2 837:22

lesions 780:23 818:9 837:17

less 767:17 769:8,9 830:16 845:11 873:23 881:24 886:3 899:18 900:6

lesser 793:8 803:15,22

let 728:18 732:17,18 749:7 751:19 773:4 792:10 799:2 838:17 843:5 853:20 875:8 891:16 894:24

let's 736:2 737:22 738:19 740:23 759:25

771:1 778:9 801:4,24 805:22 807:11 808:4 815:2 822:20 825:14 835:24 852:4 861:13 862:25 896:7

levator 836:8 854:19 855:2 856:5 858:23

level 744:9,10 855:9 882:23 884:3 901:13

levels 744:6

lie 762:2,9

life 846:19

ligation 802:20 803:2,5,7,8 865:5 867:17

light 818:21

like 728:13,25 731:16 734:14 743:20 744:21 746:8,15 751:2 755:8 756:11 757:13 760:20 761:4,8 763:7 764:14 765:22 767:20 772:13 773:20 782:14 789:12 790:11 791:23 797:6, 14,22 799:14 800:17 803:15 808:5 809:7 811:15 812:3,6 821:16 825:20 830:14 832:12

833:17 838:25 839:5,6,18 842:5 843:7 844:12 846:2 883:22 884:21 897:23 898:11, 20 900:25 901:2 902:14 909:16

**likely** 751:3 773:2 793:10,13 794:1 795:15 815:21,23 828:16 834:18 845:11 846:25 848:24 854:18, 21 857:8 886:3 901:11 909:7

**limited** 746:19 797:3

**line** 809:24 900:12

**lingering** 806:7

**lingers** 753:15

**lining** 742:14 882:15,17

**list** 729:9 736:14 737:10 738:15 847:11 898:7

**listed** 798:13 905:8,9

**listen** 756:13 837:1

**lists** 736:20

**litany** 897:1,19, 21

**literature** 747:22 750:17,23

751:14,17,21 760:23 775:10 785:13 786:12, 14 787:3 788:6, 23 789:2 790:19 793:20 795:3 816:2 831:23 832:16 849:24, 25 850:10,13,20 851:14 857:9 859:10,18 873:14,17 874:11,20 877:1 885:24 895:19

**litigation** 739:17 839:24 840:5 844:4

**little** 731:24 742:3 765:17 766:12 767:10, 13 768:4 810:13,22 811:12 813:16 824:12 843:21 847:16 879:14 891:12 892:5 899:21

**locate** 854:14

**located** 864:10

**location** 743:25 778:20 784:9 814:16 855:11 876:18

**long** 741:19 743:16 744:2 748:25 805:14 881:19 882:1,2, 21 883:18 897:2

**long-term** 823:23

**longer** 768:4,6 772:25 773:13 774:8 808:24 830:9

**look** 730:16 741:7 744:6 748:15 750:22 757:5 793:20 814:25 818:7,14

**looked** 749:20 765:9,17 794:23 811:11

**looking** 732:13 746:10,11 760:1 788:22 850:23 886:6

**looks** 765:14,15 818:21

**loose** 741:13 909:4,16

**loosely** 909:11

**looseness** 908:14

**lose** 741:12 745:18

**losing** 745:20

**loss** 746:12 871:4

**lot** 744:14 753:15 773:17 775:23 793:9 807:17 810:25 811:1,11 812:7 839:6 900:25 903:9

**low** 805:11

815:21 821:8, 13,14 822:2 874:22 882:20

**low-grade** 814:6 818:1

**lower** 750:20 766:11,15 767:1 805:12 810:9,11 811:25 816:12 837:15 902:11 906:18

**lowest** 796:7

**lubrication** 878:19

**lubrication-type** 878:16

**luckily** 842:25

**lumbar** 747:4

**lung** 846:3,15

**luteum** 868:9,12

---

**M**

**M.D.** 727:13

**machine** 757:13 818:14

**macrophages** 807:21

**Macy's** 866:21

**made** 731:7 739:12 792:8 812:2 820:6 879:10 910:2,9

**magnifies** 818:14

**main** 782:25 847:13

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. III          10/31/2014

**majority** 741:2
772:11 780:19
782:13,22 811:8
836:11 894:9

**make** 736:11
738:7 749:4
755:22 762:2,4,
9,14 787:21
796:24 807:22
811:5 828:18
843:9 862:1
866:15 868:1,7
875:8 897:2

**makes** 768:2
814:3 818:16
836:4 845:13
878:18

**making** 762:25
767:10 793:15
868:14 873:10
887:3 893:18

**Malingerers**
838:25

**mall** 866:19

**malpractice**
839:5

**managed** 887:2

**management**
804:24 885:25
886:4

**managing**
748:21

**manifest** 795:15
797:10 811:24
824:13 904:18

**manifestation**
755:5 837:13

**manifestations**
755:4 851:3

**manifested**
795:7

**manifests** 803:9

**manipulating**
768:5

**Manno** 727:7,17
728:24 731:22
732:8,22 735:7,
18 736:8,23
737:4,8,12,15,
18,22 738:11
747:9 750:3
763:21 764:7
775:3 778:1,8
794:3 799:1,13
801:11,24 802:4
805:22 806:5
828:17 832:4
834:11,24
835:20 836:24
837:6 839:15
840:6 842:1
847:3,10 860:5,
15,16 861:13,24
862:14 863:5
864:6 883:1
884:20 885:4
888:11 896:6,15
910:23

**many** 733:9
754:11 777:2
798:1 827:18

**margin** 886:11,
12,18

**mark** 736:2,11,
23 737:22 800:1

801:4,24 862:25
864:2

**marked** 728:23
730:19 731:21
732:7,21 735:6,
17 738:3 739:6
799:10 801:9,18
802:3 861:21
862:2,12 863:4
864:5

**marriage** 798:4

**material** 844:14
856:11,19,20

**materially**
763:25 764:20

**materials** 729:17
735:10 736:13,
14 737:20
738:14 800:15
862:23 895:20
904:9

**math** 827:11,12

**matters** 728:5

**maximum** 821:4
884:2

**may** 728:9
744:18 793:11
796:2 798:13,
14,15, 816:20
819:3 894:15
895:5 905:2

**maybe** 740:16
742:23 767:12
782:24 793:1
803:15 823:11,
17 836:13
881:17 886:1,20

**Mayo** 833:10,20

**Mcburney's**
811:5

**Mccall's** 822:9

**MDL** 728:5
860:14

**me** 728:9,11,18
729:22 732:17,
18 734:3 737:4
739:20 746:16
749:7,16 751:19
753:6 754:9
755:8,20 757:8
763:5,12 768:8
769:21 772:5
773:4 776:16
799:2 806:16
813:10,16
822:21 823:2
825:16 832:6
835:5 838:15,17
839:1,14 841:25
843:4,5,12,13,
22,23 844:5
851:13 853:20
855:2 856:6
857:25 858:23
860:3 863:19
866:6 867:15,16
870:4 872:9,19
875:8 876:12
877:17 885:22
887:24 889:6,14
891:16 892:14
894:24 895:10
896:18,19
897:23 903:8
905:7

In Re: CR Bard 200                 Bruce Rosenzweig, M.D., Vol. III                 10/31/2014

**mean** 734:17
736:22 739:12
740:24 741:21
743:3 746:9
747:1 751:6
755:17 757:13
762:19 763:6
766:9,17 767:3,
5 768:7 771:16
775:6,19 778:18
784:4 789:22
790:7 794:12
797:6,20,24
803:17 804:11
808:4 813:5
816:6 830:24
831:1 832:25
835:5 836:13
838:17 841:4,11
843:6 844:16
845:21 852:5
859:16 867:25
869:17 870:1,23
871:17 876:21
878:11,23 885:5
894:21 897:13
899:8 900:23
907:1,14

**meaning** 846:5
905:6

**means** 744:12
766:18 767:7,23
768:21 796:18,
19 814:18 869:4
870:2,7

**meant** 820:10
889:2 890:19
901:4

**measurements**

783:6

**measuring** 743:2

**mechanism**
895:13

**mechanisms**
853:18 885:8

**medical** 729:19
731:6 736:21
738:20 739:15
740:11 743:5
745:6 747:21
749:25 750:19
751:8,13 752:2,
9,15,25 755:14,
16,21 756:1,3,
18,23 757:3
758:15 760:23
785:25 787:8
790:18,20
792:16,20
793:3,16,20,25
794:5,13 795:2,
13 800:11
802:9,18 804:20
816:7,25 819:16
826:7 839:5
840:13 841:6
845:1 849:4,6,
22 850:25
854:22 857:4
859:2,21 861:2,
6 864:15,25
865:7,17 867:18
884:17,19
885:17,25 886:3
894:8 895:23
897:3 898:23
900:4 903:22
910:5

**medication**
740:22 748:24
749:15 767:4,15
768:11 882:22

**medications**
748:23 767:18
779:3 802:24
817:11 848:7

**medicine** 756:12
817:15

**meet** 748:8
808:3 810:6

**meeting** 761:4

**meets** 901:14

**members** 790:21

**memorialization**
801:1

**men** 817:18

**menopausal**
879:1

**menopause**
748:13 761:12
774:21 805:16
878:3,22 879:4

**menstrual**
761:15 814:23,
24

**mental** 797:23

**mentioned**
815:25 860:2
895:22

**mesh** 740:5
749:23 758:17
769:22 770:2,3,
8,9,16 772:15
773:2,14 774:6
775:10,24

777:14 782:9,
13,14,22
783:13,18
784:4,8,9,19
785:15,16,17
786:3,17
787:10,12,16
788:9,11,12
789:5, 790:10,
14 793:21
794:16,19,25
795:9 796:10,13
806:25 807:6,8,
12,25 808:15
824:1,8,14,16,
21 825:7,15,22
835:7 837:9
843:11,16,23
849:10 851:7,9
852:6,8,24
854:3,5,18
855:1,10
856:16,17
857:2,5,11,21
858:25 859:7
865:11 875:19,
21,23 876:19
877:2,3,13,21
880:3 881:6
886:2,9 888:13,
15,17,22
889:13,16
890:10 892:15,
23 893:7,19
894:4,10,20
895:8 896:3,4,5
897:6,14 903:2,
6,10,14,16,19,
21 906:16
907:7,11 908:6,

11,25

**met** 738:22,24 904:2 905:10

**method** 907:18

**methodology** 842:19 877:12

**metric** 804:22

**metrics** 804:25

**Metzenbaum** 833:17

**microscope** 818:6

**microscopic** 847:13,22

**mid** 826:22

**middle** 763:11 781:5,6 783:1 822:5 827:8 834:1

**midline** 763:11 783:7

**midurethra** 826:20,23 827:9 833:11

**midurethral** 833:12

**might** 738:10 744:15 748:3 756:2 757:7,9 765:13 766:1 769:13 774:21 775:1 777:16,19 779:10 811:6 812:1,10 813:1 817:19 821:10, 19 823:20 824:23 825:5

834:15,21 840:11 843:2, 21,22 846:9,10 855:5 870:9 878:15 881:23 884:3,4 885:11 888:6,19,21 890:1 892:5 902:14,17

**mild** 871:14 879:22 880:4,6, 13,14,17 894:20 895:9

**mind** 777:25 834:4 898:9

**minimize** 804:25

**Minocycline** 817:13

**minor** 886:24 894:12,14

**minus** 819:23

**minute** 771:1

**minutes** 861:14

**missed** 773:17 876:20

**mobile** 810:13 812:25

**model** 849:12

**moderate** 881:5 884:13

**modifying** 763:18

**momentarily** 800:1

**monitor** 866:12, 14

**monitoring** 866:22,23

**monocytes** 807:22

**month** 769:17 772:16 781:23 832:12 867:25 881:24 883:9,22 884:1,5,11

**months** 740:15, 16,18 781:24 883:9,25 890:24 891:19,23 892:4 893:3

**moot** 869:10

**more** 751:3,19 754:11 755:5 757:18 767:11 768:2,4,5,22 770:8 771:22,23 773:2 776:23 787:18 791:7 793:10,13 794:1 795:15 796:2, 11,18,20 803:16 804:3,22 806:11 810:13 811:2, 21,22 812:2 813:17 815:21, 23 816:1,21 817:9 828:16 834:18 835:1,3, 6,8,21,22 837:1, 2 842:13 843:3 844:8 846:5,6,8, 9,10,25 847:17 848:24 853:2 854:18,21 857:8 863:20,23

866:18 871:1 875:5 878:15 881:18 891:2 900:21 901:11 906:25 907:5 908:3,17 909:7

**morning** 727:18

**mortality** 741:21

**most** 741:3 759:4,6 796:10 812:12 817:18 822:14 835:25 870:15,17,18 879:3 884:5 894:7 899:6

**mostly** 731:9 854:12

**mother** 846:15, 19

**motility** 767:17

**motivator** 839:13

**motivators** 839:9

**move** 742:13 747:15 770:11 790:24 795:17 810:12 843:6 877:9 907:23

**moving** 735:9 768:10,14

**MRI** 746:7,9 750:20 759:18

**MSDS** 792:1

**much** 751:3 763:16 764:10, 13 768:2 769:23

773:8 782:7,9,
16 791:10
800:20 808:24
814:3 821:1
826:9 831:18
832:8 833:15
834:14 836:2
838:6 845:13
873:22 880:5
886:18 892:11
898:6 906:5
908:13,20 909:2

**mucosa** 764:25
765:1,4 766:5
878:10 885:5

**mucosal** 904:10

**multinucleated**
807:23

**multiple** 746:20
850:12,19 898:1

**muscle** 855:2,9
856:6 898:16

**muscles** 782:18
836:9 851:4,9
854:20 855:24
857:23 858:24

**must** 739:21
788:2 902:24

**N**

**narcotic** 767:18
768:6

**narrowing** 836:7

**native** 775:12
823:5,9,13
824:10,20 825:2
836:15,22

845:6,9 856:7
880:5,13 897:7

**nauseam** 753:5

**near** 763:11
854:24 881:7

**necessarily**
730:15 750:13
754:17 758:6
761:3 808:16
825:18 870:16
880:22

**neck** 747:2 881:7
888:16 900:18,
22 901:13

**need** 738:9
748:17 769:13
775:21 794:2,5,
16,17 843:7
879:23 890:1

**needed** 729:11
852:22

**needle** 905:3

**needs** 896:6

**negative** 818:11

**neither** 895:11

**neo-innervation**
785:9 786:2
787:7 788:15
789:3,4 790:22

**neoplasia** 802:23
813:12,20 814:7

**neovascularizati
on** 807:19

**nerve** 741:15
744:13 745:2
746:11,18,20
750:6,9 785:13

786:1 859:4

**nerves** 746:13
785:15,17 787:9
789:4 905:1

**Neurologic**
897:25

**neuroma** 785:18

**neuromas** 789:5

**never** 864:13
876:24 884:9
902:17 903:6

**new** 738:5 757:3
829:6,12,13,16
900:13

**newer** 757:16

**next** 731:23
869:4 877:19
898:3

**nice** 879:20
898:7

**Nichols** 869:16
873:7 876:2,17

**nicotine** 898:16,
19

**nicotinic** 753:21

**night** 882:9,12
884:9

**nightly** 882:8
884:10

**nobody** 880:9

**nocturia** 775:6

**non-mesh**
836:16

**noncosmetic**
776:24 777:12

**nondisclosure**
791:18

**nonresponsive**
770:12 795:17
839:7 907:24

**nonsurgically**
879:24 887:5

**nontender**
784:1,16

**Nordstrom's**
866:20

**normal** 741:10
766:20 768:12,
22,24 769:7
770:18 808:5
820:6,14,23
834:20 868:18
882:6,8 893:3

**normally** 808:7

**Nos** 738:2 801:8
862:11

**notation** 869:12

**notations** 731:16

**note** 822:17
872:14 876:6
888:7

**noted** 766:7
768:16 778:11,
23 822:6 826:3
829:23 854:11
871:20 876:2,
11,13 877:20
889:12 890:14
898:23 899:17
900:13

**notes** 844:14
901:8

Case 2:12-md-02327   Document 7252-8   Filed 06/18/19   Page 36 of 924 PageID #: 188939



742:5 743:2
744:17 745:1
746:7,16 749:7
751:16 752:19
753:3 754:10
755:22 757:19
758:2 759:20,25
761:2,23 763:22
764:8 766:3,15,
21 767:19
768:7,14 769:17
771:13,23 772:7
774:4,10,11
775:4 776:24
777:7,10 778:25
779:4,5 780:8,
16 781:5,22
782:9 783:5,19
784:10 787:12,
13 789:18
790:24 791:13
795:17 796:24
798:6,24
799:14,15
800:10 803:17,
23 804:12
806:15 807:11
809:1,11,25
810:3,23 812:22
813:8 814:22
815:3,25
817:11,16,25
819:2,8 820:13
822:4,16,20
823:25 824:11
825:4,11 826:1,
15,16 827:5,7,
21,25 828:3,10
831:11 832:13
833:8, 835:21

836:13,25 837:7
839:16 840:5,
16,25 841:10
844:11 845:4
847:11,20,25
851:11,16,20
852:9 854:1
855:4,15 857:16
858:2,4,8,12
859:20 860:15
861:25 862:15
863:16,21
864:18 865:8
866:24 867:14,
23 868:16,20,24
869:7,15 870:17
871:8 872:6,19
873:1,17 875:8
876:1,12,20
877:5,7,15
878:1 879:7,25
880:7,20,25
881:8,17,25
883:8,18 884:7
885:10 886:22
887:8 888:14
889:5,11,19
890:16 891:17
892:13,20
894:15 895:8,17
896:16 897:18
898:3,8 899:16,
21,24 900:15
901:18 902:21
903:3 904:1
905:15 906:19,
22 907:1,12,23
909:5,19 910:7

**old** 752:1 811:4
844:23,24

**old-fashion**
757:12

**omentum** 809:8

**omitted** 834:21

**once** 730:20
763:5 781:23,24
793:23 838:16
869:13 874:4
890:25 907:16
908:2,9

**one** 730:2,8,
734:11 737:18
745:10 748:12
753:13 756:19
757:9 761:4
765:5,9 768:20
771:17 772:20
774:2,24 776:11
780:5 784:2
787:22 791:13
794:8,24 795:7,
25 796:7,11,16,
20,22 798:17
799:24,25
826:22,25
827:18 828:1
832:18,21
833:25 837:18
839:9 840:24
848:15 851:3
853:14,17 865:4
867:9 868:20
870:3,4,5
872:19 879:3
881:23 885:8,22
887:6 888:8
899:14 904:5,6

**one-year-later**
833:6

**ones** 730:7,8
773:13

**only** 737:11
738:24 761:20
774:2,3 783:12
784:10 789:23
809:12 844:24
846:17 860:21
875:4 876:21
877:5 889:16
892:22 900:6

**onto** 731:12

**op** 761:25 771:8,
16 772:7,8
773:9 834:2

**open** 812:13

**opening** 776:22
777:4 784:6
814:15,19 866:2
870:12 892:9
901:16

**operated** 783:18

**operating**
772:23 777:20
837:1

**operation** 772:6

**operations**
850:19 857:8

**operative** 771:19
772:13,22
826:11,13 828:5
833:10 834:22
844:14,21,22
888:7,9 890:12,
14

**opine** 832:22
843:23 850:25

**opining** 752:24 759:22 798:16 892:21

**opinion** 728:13 729:14 733:3 752:23 757:21 758:4 763:24 764:19 768:8 771:6 772:20 775:5,18 776:17 787:21,25 791:24 792:4,5 800:3 815:11 816:4 847:21 850:9 851:12 853:19 854:16 855:13,14,18 856:7 858:22 859:2 860:24 861:4 893:7,18 903:5 909:22,24 910:3,4,16

**opinions** 728:6 729:1 730:25 738:6,9 751:7 752:13,14 764:17 791:13 792:24 799:18 806:25 817:23 838:14 841:17 850:16 857:15 861:8 903:9 905:17

**opposed** 809:15 850:6

**opposing** 860:12

**opposite** 824:6

**oral** 798:9

**order** 731:24 763:23 868:1

**organ** 753:12 777:3

**organs** 835:12

**original** 732:10 763:18 770:15 795:8 891:20

**originally** 772:1 889:6 908:21

**orthopedics** 742:15

**osteopenic** 741:10

**osteoporosis** 740:21,24 741:3,4,12,24, 25 742:4 745:2, 5,8,14,17,22,23 746:5,6, 747:19, 24 748:4,10,18, 19,21,24 749:2, 3,6,10,13,14,19 750:1,7,9,15,22 751:10,14,23,24 752:4,8,12 759:14

**osteoporotic** 741:11 746:1 748:12

**other** 730:11 755:4 783:5 789:7 792:14 800:12,24 801:1 809:15 816:14, 19 819:12 827:3 833:21 834:12 837:19 840:10

842:3 845:1 847:15 850:6 851:13,21 852:1 853:14,17 855:4,12 861:8, 9 865:7 867:4,5, 17 876:10 879:25 883:12 895:20 896:24 897:1,19 899:14 900:5 903:11 905:15,16 909:24

**Otherwise** 784:3

**our** 767:7,9,10

**out** 730:20 731:24 734:7 750:13 752:10 756:11 757:20 758:3,16 760:3 762:21 764:15 767:14 769:4 773:21 779:24 782:15 784:24 785:14 790:1 799:2 800:16 806:7 814:11, 20,25 815:16 816:13,14,17 817:1 818:20 822:13 829:7, 10,19,21 849:15,18 851:25 852:17, 19,22 853:5 858:1,10 868:3 869:13 874:4,17 875:6 886:9 889:6 897:20

909:9

**outbreak** 779:6, 7,9,22,23 780:9

**outbreaks** 778:15,24

**outline** 731:10

**outside** 760:13 780:20 808:1 810:10 870:5

**ovarian** 867:20, 23 868:13 869:2,8,9,14

**ovaries** 803:8 805:17 869:13

**ovary** 868:14

**over** 728:17 730:24 733:11 765:12 769:1 775:23 780:6 782:16 784:21 796:18,20 803:1 807:17 808:3 811:7 825:23 830:1,3,17 844:4 845:8 846:14 850:24 855:8 870:15, 18,22 871:10 883:25 899:21 904:2

**overactive** 849:14,18 870:24,25 896:1,20,25 897:8,9,13,16, 19 898:12

**overactivity** 820:4

**overall** 733:7

**overdue** 908:15

**overlooked** 902:22

**oversimplifying** 808:22,23

**ovulate** 868:1,8

**ovulation** 868:2

**own** 727:25 802:9 829:25 895:24 901:10

---

**P**

**P's** 901:8

**pack** 845:20 846:12,24

**Padmanabhan** 887:14

**page** 733:2 737:14 760:1 776:12 781:6 784:24 789:22 797:1 847:2 865:9,18 871:13 872:19 887:8 891:6 899:16,25

**pages** 729:10 791:21,23 792:2

**pain** 740:18 741:15 742:6, 18,21 743:4,9, 10,16,17,20,21, 23,25 744:1,5,6, 9,10 745:2,3,25 746:18,20 747:2,3,4,5,8, 10,18,22,23

748:5 749:20 750:6,9,14,20 751:1,4,5,11,23, 25 752:3,11 758:19 759:13, 22 760:15,16, 19,20 761:10,19 766:11,16 767:3,15,18 768:11 778:18 781:8,9,10 784:12 785:5, 22,23 786:5,10 787:11,14,16 788:13,16,19 789:6,10,18,24 790:2,3,9,15,23 791:1,3,7,8,11 797:5,9,11,12 798:1,3,21 800:19,21 803:12 804:7, 14,24 805:2,9, 18 806:11 810:17,18 811:23 813:6 816:4,12,21 817:5 821:20 828:7,8,11,20 829:15 830:14, 18 831:25 832:3,7,14,15, 16 835:12 841:16, 842:18 843:1,4 845:16, 18 847:19 851:24 854:12, 14 855:5,16,19, 25 856:9 858:5 859:7,11,13,14,

15,19,23 865:12 868:22,23,24 869:5,6,21 873:15,18,19, 20,23,25 877:3, 4 878:19 881:2 892:11,14 893:4,6,8,21 894:7,9 899:18, 19 900:6,7 901:4 905:7,11

**painful** 747:8 830:16 837:20 844:10 847:18 854:9,10 855:17 865:12,25 866:4 867:6,10 875:2 876:10 891:2 892:18

**pains** 745:4

**painting** 901:3

**pair** 833:10

**palpable** 784:3, 4,7

**palpate** 856:11

**palpated** 855:7 894:1

**palpating** 843:9

**pap** 813:25 815:21 818:1 819:10

**paper** 773:25 794:23

**papers** 787:4

**papilloma** 837:14

**paps** 815:15

**paragraph** 822:5 872:20 887:8,9 891:5,8 895:1 900:12

**paraphrasing** 890:2

**part** 731:12 746:25 749:20 762:23 765:10 815:8 836:11 839:23 840:9,23 841:1,2,8,17 906:16,18 908:8

**particular** 739:20 783:5 854:17 856:9 908:19

**particularly** 741:19 747:13 755:1 761:4 770:5 773:22 775:24 793:21

**passage** 905:3

**past** 740:11 753:5 755:21 758:15 865:21 869:12

**pathogens** 896:4

**pathologic** 785:12

**pathological** 787:23

**pathologist** 818:10

**pathology** 786:24 787:23 819:1

Bruce Rosenzweig, M.D., Vol. III

**patient** 742:24
744:8 748:13
767:24,25
768:2,24 769:7,
8 771:24 772:2
774:25 777:18
780:2,7 793:23
797:1 803:17,18
804:5,13 805:5
816:10,15
825:6,12 841:24
842:9,19 843:8,
15, 849:20
850:6,19 860:25
872:16 877:2
880:17 882:2
891:22 909:14
910:10

**patient's** 758:15
890:4

**patients** 741:2,3,
11 744:3 746:4
750:23,25
754:12,16 755:2
756:21 757:3
758:8 761:3
765:21,22,24
772:5,9 773:6,
10,12 774:5,8,
20 789:7,15
793:7 794:15,
17,19 796:5,9,
11 803:9 812:4,
9 823:20 831:16
838:22 839:6
841:15 842:24,
25 843:17 844:5
849:14 852:13
878:12,13
882:20 883:15

**patients'** 748:16

**payment** 733:7

**peeing** 768:24
769:1

**pelvic** 742:21
747:11,22,23
748:4 749:23
750:7,9,14
751:5,11,23,25
752:3 753:12
757:18 775:10,
14 777:3 781:7,
9,10 782:18
784:12 785:5
786:10 789:18,
24 790:2 791:1,
3,6 794:19
803:10,11
805:13 831:25
845:18 846:4,11
847:19 849:9
855:16,19,23,24
865:11 869:5
871:1,9 881:2
905:10

**pelvis** 743:1
747:19 748:6
752:7,11 756:5
758:19 760:20
765:12 790:4,6,
14 805:10
810:4,10,11,12,
14 812:5,6
869:3

**pending** 839:24

**penetration**
854:12

**penis** 866:3

874:8 892:10
902:12

**people** 733:14
762:21 771:20
796:16 808:14,
15 811:11
824:13 839:1
841:4 870:9
893:5 897:13
899:6

**per** 734:14,19,21
899:9

**percent** 750:24
769:3 795:1
814:8 823:6
824:17 831:24
832:15 849:10
852:12,16
859:11,12,14
871:21,23
884:2,4 885:2
886:1,2

**percentage**
794:25

**perfect** 761:9

**perforations**
905:1

**perform** 776:12
823:13 825:14

**performed**
771:24

**perhaps** 838:16,
24

**Perineo** 776:19

**perineoplasties**
777:13

**perineoplasty**

776:16,17,18

**period** 761:15
768:13 794:18
843:2 881:22
883:25 909:16

**persistent**
847:13,19,21
855:16,19

**person** 741:1
780:8,14 821:3
841:12 846:22
870:13 883:20
890:19

**personal** 789:8
846:21

**personally**
883:14

**perspective**
758:13 849:6

**pessary** 789:14

**Petri** 773:21

**phase** 761:21
772:13

**phenomenon**
754:1 756:6
757:17

**phrase** 789:20
790:25 831:9

**phrases** 768:21

**physical** 797:3,
13 805:4 813:7
859:3

**physician** 761:9
791:16 825:15
834:19 842:21
858:7 910:20

**physicians** 836:11

**physiologic** 868:18

**pick** 813:25

**piece** 818:25 881:6

**piecemeal** 739:18

**pieces** 809:7

**place** 746:1 755:15 785:10 787:12 794:22 810:1,3 860:11 875:23 908:3,11

**placed** 759:23 770:3,7 771:22 774:6 826:19 827:17 828:9 888:15 903:6 908:1,20

**placement** 761:24 770:16, 24 771:7 828:4

**places** 746:21

**placing** 834:14

**plaintiff** 728:14 730:20 733:18 734:8,14,18,19, 22 910:19

**plaintiff's** 732:2 735:19 739:1,3 862:4

**plaintiffs** 728:6 731:1,4 771:3 798:2 799:19 839:22 864:17

**plan** 776:12 777:18 819:25

**plate** 807:2,7

**plateau** 883:24

**plating** 808:9

**please** 727:4,10 736:2 821:5 891:16

**pleased** 899:19

**Plitowski's** 794:23

**plump** 885:11

**plus** 740:7,10 760:11 764:24 765:18,19 770:6 785:4 819:23 820:6,8

**point** 769:16 773:5 774:20 781:7,23,24 787:23 790:12 794:25 809:17 819:25 821:5 822:2 829:14 849:4 855:22 858:25 859:4,8, 23 869:9,20 880:25 883:7 910:18

**points** 744:8

**policies** 804:19

**polycystic** 868:13

**polyp** 740:20 760:4,14,25

**polypropylene** 791:25 903:6

**poor** 744:3

**poorly** 822:1

**POP** 793:21 794:16 796:10, 12 825:21 870:10 886:2 888:22

**porcine** 807:11

**pore** 770:9 807:16,18

**pores** 785:16 807:19,20

**portion** 764:15 770:12 782:25 783:1 795:18 807:12 859:6 906:20,24 907:8,11,24

**portions** 783:7

**position** 854:13

**positive** 837:12

**possibility** 751:9 771:21 815:17

**possible** 747:25 748:2 750:6,11, 12 841:9 859:5

**possibly** 745:25 751:18

**post** 831:19 891:23

**post-tubal** 803:6

**post-void** 766:16,25 769:5,7,18,25 772:17

**posterior** 740:9

**760:10,11 763:8 764:24 766:5 777:15 782:13, 20 783:10,12,13 784:1 787:10 836:8,12**

**posteriorly** 765:15,18 784:5

**postmenopausal** 871:23

**postoperative** 767:13,14,19 768:5,13 769:8 824:9 831:25 893:4 909:16

**potential** 747:18 758:4 815:12 835:2 839:9 855:4 878:2 894:12,13 904:7

**potentially** 759:14 761:8 806:17 834:4 846:6 910:1,20

**pounds** 742:24 865:6

**practice** 804:13, 20 836:10

**preceded** 727:19

**pregnancies** 867:16

**pregnancy** 868:10,11

**pregnant** 865:2 868:4

**preoperatively** 879:22

**preparation** 735:11 800:7

**preparations** 885:3

**prepare** 751:19

**prepared** 802:5 862:15

**prescribed** 774:14 776:1

**prescription** 881:24

**present** 771:3 782:14,23 909:19

**presented** 881:1

**presents** 831:11 876:17

**press** 842:6

**pressed** 784:15

**pressure** 821:13 822:3 846:11 872:1

**pretreatment** 883:17

**pretty** 753:16 812:4 872:8 898:6

**prevented** 885:21

**previous** 731:9 754:5 760:3 821:24,25

**previously** 728:4,11 729:13 733:6 735:2 745:5 759:14

881:3

**primary** 779:14, 23 843:4

**prior** 729:23 740:16,18 754:19 791:17 802:14,18 805:7 813:6 818:2 828:4,9 856:1,7 864:25 865:5 867:14,15 889:25 890:5 892:24 896:1

**Pristiq** 817:12, 14

**probability** 752:16 851:1 859:21 885:17

**probably** 739:16,18 742:25 749:16 750:24 756:19 784:21 791:10 814:7 845:8 849:11 873:8 884:1,5 885:1 886:8,20 907:14

**probe** 842:15

**problem** 765:20 766:23 795:7 823:4 847:3,15 853:1 855:15 880:12 907:21

**problematic** 741:20

**problems** 756:24 758:17 795:5,21 865:7

**procedure** 769:4,5 772:15 776:23,25 777:3,20 782:11 791:20 792:9 812:13 818:4,13 819:3,9,12,13 820:4 822:25 826:2 828:25 829:3 832:1,12 873:11 893:13 904:19

**procedures** 771:4 773:2 819:18 831:17 836:16 848:25 850:7 856:2 860:13 888:8

**proceeded** 792:17

**process** 762:23, 24 764:4 800:22 807:14 809:19 829:25 840:10 868:5 908:9

**processes** 746:14 857:24

**prodrome** 779:9

**products** 791:18

**progesterone** 868:10

**progress** 899:20

**progressing** 814:9

**progressive** 773:23

**progressively** 847:16 865:24

891:10,11 900:3

**prohibition** 882:11

**prolapse** 753:12 777:3,5 808:16 822:7 865:14 869:23,25 870:7,8 871:20, 22,24 872:4,22 873:1 904:25

**promotes** 787:7

**propensity** 853:10

**properly** 791:19

**proposed** 885:8

**protocol** 748:19

**protrusion** 869:21

**prove** 754:17

**provide** 728:13 786:7 799:18 843:17 861:8

**provided** 729:13 791:24 800:25

**providing** 730:25 735:12 775:4 787:18 800:3 841:20 843:14

**provoke** 842:18

**proximal** 826:25 900:19 903:18 906:25 907:6

**psychological** 797:7,22 816:25

**pull** 756:11

782:15 906:9,10

**pulling** 830:19

**pulmonary** 753:16 846:3

**purple** 730:2,7, 8,11

**purpose** 774:16

**purposes** 729:2

**push** 804:4,6 813:4 877:2

**pushed** 901:24 902:14

**pushing** 784:18 812:25 813:1 823:17

**put** 731:25 748:16 759:4,5 764:24 765:18 766:7 767:24,25 768:1 781:22,24 818:15 826:10, 12 831:3 841:8 844:21 846:10 862:1 867:12 899:25 907:19 908:9,14

**putting** 733:25 734:2 759:1 826:22 901:9 909:6

---

## Q

**quadrant** 766:11 767:2 810:9 811:25

**qualifiers** 836:21

**qualify** 752:20 757:14 779:21

**quantifications** 804:8

**quantify** 804:23 817:4,7

**question** 730:22 731:3 739:21 746:23 747:17 757:25 765:2,7 770:15 776:11 782:2 790:25 820:10 822:4,16 824:11,24 825:2 826:10,13 828:14 834:4 835:21 839:8 857:18 859:20 877:8 887:23 891:16 899:24 907:25 908:7,17 909:22

**questionnaires** 800:16

**questions** 728:19 734:8 775:17 798:25 863:14 864:7 895:17 903:3 910:24

**quick** 847:1

**quickly** 753:17, 18,23 754:3 768:2,10 863:20

**quite** 739:15 745:12 747:7 753:18 759:21 776:20 874:21

**quitting** 753:18

**quote** 731:12 762:1,20 763:17 765:9

**quoting** 832:11

---

## R

**radiates** 743:23

**radiating** 743:20 747:6

**radiation** 743:25

**rarely** 747:23 748:2 780:18 789:11 806:9

**rate** 741:21 769:3 823:7 880:6

**rates** 735:1

**rather** 745:8 764:25

**ratio** 818:19

**rationale** 854:6 858:12

**raw** 806:19

**Raynaud's** 754:22,25 755:6,25 756:6, 8,9 757:11,17, 20 758:5, 759:8, 9

**reach** 902:16,17, 18

**react** 908:21

**reaction** 770:4 785:21 786:1,8, 21,23 787:2,5

788:1,3,8,12,14, 21 789:1 790:22 794:21,22 795:12 805:2,4 807:21 808:12 856:24 857:14

**reactions** 904:7

**read** 751:18 760:4 761:25 762:5 771:16,19 792:1 833:17,18 838:11 872:14 881:9 904:6

**reading** 841:10 844:12 872:7 888:9 891:3,5 902:2

**reads** 895:1

**really** 733:15,21, 24 738:9 756:8, 15 763:23 764:17 770:14 773:20 778:17, 23 784:10 785:6 811:1 816:24 817:1 822:13 823:3,17,18 825:17 827:25 843:7 848:11 872:23 876:21 877:8 878:19 910:17

**reason** 773:24 774:2,16 818:17 879:7

**reasonable** 747:20 749:25 751:12 752:2,9,

15,16,25 760:22
785:24 787:8
790:17 793:15,
25 794:4,12
795:2,13 798:17
849:22 850:25
854:22 857:4
859:21 885:17
894:8 903:22

**reasons** 824:13
892:6

**receive** 782:4
860:13

**received** 862:7
879:11

**recollection**
781:21

**recommend**
797:1 883:14

**recommendation**
815:14

**recommendations** 793:3 797:11
858:9,11,13

**recommended**
776:14,17
777:15,16
833:24

**record** 727:1,5
729:2,23 736:16
740:17 750:18,
19 755:8 757:3,
9 778:3,7 799:5,
12 805:22,24
806:4 847:5,9
860:3 861:13,
16,23 862:1
884:17,19

896:7,9,14
900:4

**records** 729:20
731:6,7 734:1,6
736:21 738:5
739:15 743:6
745:7 746:3
751:9 754:8
755:14,16
756:1,3,18
757:10 759:5
765:16 783:18
792:20 819:17
826:7 840:13
841:7 861:2,6
879:9 889:18
895:24 897:3
898:23 910:6

**rectal** 782:21

**rectum** 905:2

**recur** 777:6

**recurrence**
771:21 808:16
865:14 886:13
904:25

**recurrent**
779:13,22 803:9
851:22

**reduce** 777:5

**refer** 736:10

**referred** 739:1
836:5 888:20
889:21

**referring** 736:18
755:9 789:21

**reflect** 800:13

**reflects** 818:20

**reflex** 767:9

**regard** 749:3

**regimen** 882:6,8

**regular** 807:12
817:20

**reinforcing**
786:3

**reinoculates**
850:8 896:5

**related** 753:21
757:11 851:17

**relation** 787:13

**relationship**
816:5

**relatively** 830:10

**release** 772:5

**relevant** 759:4,6

**reliance** 737:10
738:15 862:23

**relied** 895:18

**relief** 843:4

**relies** 910:18

**relieve** 772:24
773:1 859:7

**relist** 857:25

**rely** 754:12

**remain** 783:7
830:10

**remainder**
762:12 783:6
784:8 849:1
854:5 884:10
896:4

**remaining** 850:8
856:17

**remains** 768:25
782:9 783:16

**remarkable**
802:19

**remember**
739:16 753:13
756:25 764:12
777:14 815:20
817:14 856:18
858:17 863:11

**remodels** 830:11

**removal** 771:25
777:7 852:8
853:3 900:12

**removals** 773:7

**remove** 829:5
851:23 886:19

**removed** 787:12
802:21 808:15
815:9 829:6
837:11 844:16,
24 859:1, 886:7,
17 888:13,23
906:1

**removing** 894:22

**render** 763:24
764:19

**repair** 760:10
763:8 775:12
795:21 819:22
822:10,17,25
823:5,9,14
824:1 836:8,12,
15 844:13
845:5,6,9,13
850:7,19 856:2
876:18 880:2,5,
13,14,16,19

889:13 890:9
897:7

**repairs** 808:5
823:13 824:8,
10,20 825:3
836:23 856:8

**reparative**
848:25

**report** 729:15
730:24 731:10,
13 732:10,24
733:23,25
734:2,16 735:9,
12,23 736:3,6,
15 737:13,15,19
738:13 739:5,6,
14 740:13 742:7
755:17,24
758:21,23
759:1,3,6,9,21
760:1 761:25
762:5 763:3
771:8,16 772:8,
13,23 776:8
783:12,25
784:20,25
799:15 800:8
801:1,4,13,22
802:6,8,12,16
826:11,13 828:5
833:10 834:2,22
835:1 840:2,4
842:12 844:2,
12,14,21,23
858:11 861:9
862:15,20 863:1
864:9,20,23,24
876:14 877:18
888:9 890:12,14

**reported** 781:18
789:9 805:5
841:24 859:18
865:8 875:10
881:4 884:16
894:20

**reporter** 727:10

**reporting**
841:16,18

**reports** 734:5
736:18 771:20
772:9 773:10
792:25 835:1
847:18 879:17
884:8 894:16
895:9

**represent** 727:5

**representation**
890:3

**representations**
738:13

**reproduce**
784:14,17
804:14

**require** 797:12

**required** 795:21

**rescreen** 748:20

**reseed** 850:20

**reseeded** 786:3

**reserve** 821:11,
23

**residual** 766:16,
25 769:5,7,19,
25 772:17
899:19 900:7

**resolve** 773:3
852:10 869:13

880:22 886:4

**resolved** 781:8
853:22 885:20,
21

**resolves** 885:13

**respect** 728:6
729:1,17 730:25
733:9 735:13
739:4 740:3
745:4 746:18
748:9 752:7
754:19 775:18
776:3 777:10
785:7 788:10
791:25 792:5
799:15,22
800:2,10 802:17
806:7 809:11,14
810:4 816:15
837:8 847:25
850:4 854:2
858:5 860:18
864:19 869:8
883:11 893:5
895:17,20
903:4,10 904:1
905:23 909:22
910:8

**respiratory**
898:18

**responding**
753:8

**responds** 804:5

**response** 786:17
877:12 908:8

**result** 744:22,23
750:7 769:23
770:17 776:4

791:18 809:12,
821:13 837:19
839:2 873:15
874:12 878:2
903:7 906:4

**resulted** 910:1

**results** 787:23,
24

**resume** 852:14

**resumed** 853:23

**retained** 789:13

**retaining** 768:21

**retention**
768:19,20

**retro-obturator**
826:4 829:20
830:21,24 831:7

**retropubic** 831:2

**revert** 883:17

**review** 745:6
748:22,23 749:4
750:16 751:13
760:23 795:3,4
881:17,19

**reviewed** 729:20
730:9,12 734:6
735:11 736:14
737:20 749:13
751:22 759:5
772:8 800:2,7
860:17 864:8

**reviewing** 734:1
746:3 786:15
874:19

**revised** 853:22

**revising** 736:17

**revision** 771:25
772:9,12 776:15
777:14 835:2,7
838:1 854:11
859:22 860:3,7

**revisions** 773:7
850:12 860:22

**ridge** 866:1
875:19 876:3,19
877:21 889:16
890:25 892:8,
10,16 893:17
894:1 900:13,15
901:7,19,25
902:3,6,9,11,15,
23 903:15,16,19
905:24 906:1,2,
3,12,16,17,22
907:10 908:22
909:11

**ridges** 906:4

**ridging** 908:24

**right** 728:25
731:12 736:6,7
742:6,9 744:18
749:24 755:19
770:11 773:19
775:15 776:20
779:13 782:4
787:22 789:25
791:4 792:10
796:17 805:7
806:14 808:22
810:7,9 811:25
813:14 819:21
820:9 821:7
828:25 829:2,11
840:7 846:8
852:19 853:4

856:15 857:20
858:3 865:9
867:21 869:15
872:13 876:25
878:23 879:6
880:20 885:11,
13 888:18
889:24 894:18
896:19

**ring** 870:5,6

**ripples** 855:23

**risk** 741:4
748:14,16
791:15,19 814:4
835:25 837:15
846:2 882:19

**risks** 792:6
835:22 858:19
909:24 910:11

**Robertson**
822:12 830:23

**rocking** 866:9

**role** 843:25
844:1

**rolling** 906:11

**rolls** 906:10

**room** 772:24
777:20

**roots** 785:13

**rope** 857:12

**roped** 852:20,24
857:6 892:16

**roping** 853:2,5,
11 856:16,22
857:21

**Rosenzweig**
727:4,13,20

728:21 731:19
732:5,19 735:4,
15 738:1 799:8
801:7 802:1
861:19 862:10
863:2 864:3

**rule** 732:10
750:13 758:16
760:2 803:18,24
804:16 816:13,
14,16 851:25
874:17 875:6
897:20 909:8

**ruled** 752:10
893:20

**rules** 728:16
804:19

**ruling** 856:1

**rupture** 810:21
811:17

**ruptured** 810:25
812:3,10

**ruptures** 812:6

_____

**S**

**sad** 800:20

**said** 742:5 743:7
756:16 758:5
762:8 773:10
776:2,12 781:6,
16 792:10,11
795:19 796:12
805:8 809:25
811:15 813:14
827:18 830:20
842:14 854:9
869:17 871:8

889:3,4,24
891:18 897:15,
18 898:7 900:5
901:22 905:19

**salpingo-
oophorectomy**
869:11 873:7

**salt** 890:2

**same** 730:16
734:8 735:1
738:14 780:11
781:19 799:22
800:10 826:13
830:10 837:4
842:8,19 855:17
858:12,16,21
864:7,19 870:8
875:18 880:21
888:16 893:9,11
895:13,17
902:13,19 903:3
909:22

**Samowitz** 762:1
763:16 767:12
768:15 769:11
791:20,25
792:6,8

**Samowitz's**
792:19

**Santos** 776:7

**saw** 731:3 745:7
755:20 760:4
762:8 821:16
834:2 864:13
871:14

**say** 728:12
734:17 741:23
742:2 743:3

In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. III     10/31/2014

744:4,9,11
747:20 748:2
749:18 750:22
751:3,12
752:19,21 753:1
754:4 756:23
757:5 759:15
761:14,16
764:18 768:14
771:20 773:5
779:16 784:4,23
786:13,19
788:20 791:6
793:10,11
794:1,4 795:13
797:6,19
798:12,15,22
802:7 803:11
804:10 806:9,
12,24 809:13
813:5 816:9
817:6,8 819:23
820:14 821:5,7,
18,22 829:8
830:25 833:8
846:22 847:12,
17 848:24
849:20 850:25
854:21,25
866:14 869:17
871:5 878:8
881:1 883:8
885:16 890:7,9,
17 894:8,13,18
895:22 899:5
900:8 902:21
904:20 905:5,13
909:6,10

**saying** 748:11
750:4 752:22

761:19 774:7
785:24 786:10
788:5,17
794:11,12
824:25 828:10
833:1,2 851:16,
20 856:15 876:1
890:7 894:22
896:17 901:18
902:23 907:3
908:5

**says** 762:17
764:23 765:19
771:14, 803:18
822:6 829:23
830:4 842:16
844:22 855:16
869:24 876:6,16
877:1 887:9
889:11 890:4,
891:15 904:22

**scale** 748:14
800:19

**scan** 769:2

**scans** 769:3

**scar** 807:1,7
809:9,18,22,24,
25 810:15,22,25
811:12 812:13
828:23,24
829:5,6,7,9,12,
13,16,19,22
830:6,8,9,14,15,
887:17,20
888:24 908:8

**scarification**
770:5 808:17,21
809:16 904:24
905:7 907:17

908:3

**scarred** 812:5
851:23

**scarring** 806:13,
14,17 807:1,5,
13 808:6,14,21
809:14 811:23
812:8,17 813:4
826:3,8 827:16
828:4,7,11,19,
21 829:4,25
830:2,7,10,20

**scars** 808:3

**scenario** 789:16

**scheduled** 860:7

**school** 781:1

**schools** 821:9

**sciatic** 747:5

**scientific** 752:16
753:1 782:25
798:18 851:1
859:22 885:18

**scientists** 790:20

**scissors** 833:11,
18,20

**sclerosis** 898:1

**scrape** 818:22
819:4

**scraping** 819:8,
10,14

**screened** 741:4

**screening**
748:12,17

**searching** 882:7

**second** 736:19
808:4 826:17

866:19,25
871:16 872:7,19
889:11 906:22
908:23

**second-degree**
869:22,23,24
870:11 872:21
873:1

**secondary**
786:25 839:17
840:10 843:3

**secretes** 868:9

**section** 844:15

**sections** 865:4

**see** 745:21 746:2,
5 748:3 755:17
756:1 759:9
760:12 764:15
772:14 773:23
774:7 780:18
783:17 786:18,
23 809:22,24
810:21,25
811:12 814:1
815:22 820:2
842:6,15,17
870:20 871:6
875:17,20
877:17 882:16
883:4,12,24
884:2 886:14
888:20 890:11
897:2 899:22

**seeded** 857:7

**seeing** 733:22
805:4

**seek** 804:14

Case 2:12-md-02327 Document 7452-3 Filed 06/13/19 Page 98 of 122 PageID #: 186961



**signify** 767:2

**signs** 745:22
894:4

**simple** 738:7
852:11

**simplified** 820:1

**simply** 736:17

**since** 748:17,21
768:16 796:17
847:23 889:13,
23 890:6,8,
900:9 908:10

**single** 884:9

**sit** 804:9 907:17

**site** 814:25
876:19 877:3,21
904:14,16,20

**sits** 742:12

**sitting** 735:25
743:22 791:9
824:2 866:10

**situation** 760:6
765:3 769:23
777:8 811:18,22
843:25 848:23
888:2

**situationally**
804:9 811:2

**situations** 790:9
804:15 839:5

**six** 740:15,16,18
781:24

**size** 770:9
807:16,18
810:20 886:8,15

**skeletal** 741:18

745:24

**skin** 811:10
837:7,9,11

**skip** 815:3

**slash** 819:23

**sleep** 768:1

**sleeping** 767:24

**slight** 741:5
774:22 886:10

**slightly** 803:7
809:20 814:7
827:2,3 900:13,
18 901:19 902:3

**sling** 764:20
772:15 773:24
819:23 820:7
822:11,22
826:17,19
827:1,3,20
831:15,17
833:12 838:1
844:14,15,23,
24,25 848:1,11,
14,19,21 849:1,
15,18 850:8,21
851:4,24 852:9,
12 853:1,4,10,
21 856:11,18,19
876:24 879:10,
11 888:20,22
889:25 890:5
895:11,16
908:18 910:11

**slings** 773:23
796:10 833:25
849:17 886:1

**slow** 768:17

**slowing** 767:21

**small** 807:20
810:5 845:12,24
881:6 885:25
886:24

**smaller** 805:17

**smear** 818:1
819:10

**smiley** 744:7
804:16,21

**smoke** 845:24,25
846:6,23

**smoked** 846:17,
19

**smoker** 740:21
741:6 753:4,13
754:5

**smokers** 845:22,
23,24,25

**smokes** 845:20

**smoking** 753:11,
12,15,16,18,22
754:2 898:13,15

**Solo** 740:6,9
760:11 761:24
783:15,21 785:4
876:22 879:14
895:11 904:5
907:8

**solve** 880:11

**somatization**
816:23

**somebody** 741:9
772:14 793:20
810:15 811:14
816:19,21 817:1
823:25 824:3,18

835:2 838:16,18
839:10 840:11

**somehow** 818:4
823:2 904:11

**someone** 740:1
745:13 748:3,20
749:1,3 751:25
760:20 765:4
779:5,8 814:3
820:24 821:17,
20,24 824:22
832:6 842:16
849:5 850:10
880:15 887:17
892:3

**someone's** 890:3

**sometimes**
756:21 761:3
803:10 810:11

**somewhat** 810:8
823:2

**somewhere**
734:13

**soon** 774:8,9
829:14 860:12
904:16

**soreness** 877:24

**sorry** 737:8
747:15 760:2
776:19 783:20
805:9 832:6,10
837:25 854:24
865:15,18
876:20 894:23
905:21 906:12

**sort** 730:1
732:13 733:7
736:13 737:18

In Re: CR Bard 200                Bruce Rosenzweig, M.D., Vol. III                10/31/2014

741:24 742:19 743:3,8 747:14 749:8 750:5 763:6,9 765:3 766:12 768:9 771:24 774:12 780:8 781:3 782:25 788:17 792:9 793:2 799:22 800:15 801:12 803:18 804:14,19 805:3 807:13 808:14, 20 809:12,14,15 810:1,16 811:14,15,18 816:20, 817:25 819:17 822:5 825:21 833:14, 21 834:3,15 836:5,14,16 838:23 841:18 843:5,10 858:8 863:22 865:19 867:1 877:15 878:9 879:8 882:1,3 883:19, 20,24 886:17,18 892:20

**sounds** 767:1,4,6 768:9 842:3 872:8 901:2

**space** 782:19 826:5 829:20 830:21,24 831:2,3,7

**spasm** 855:24

**spasms** 766:16

**speak** 792:12,20 861:3

**speaking** 779:4, 17 803:3 804:12 836:13

**specialty** 742:15

**specific** 728:5,14 729:1 733:18,23 734:18 735:12 743:17 751:21 761:7 786:6 787:18 790:13 791:7 792:25 798:7 799:15,18 800:3,7,25 801:13 804:9 809:5 811:3 835:1,24 839:13,21 842:13 850:5,24 861:10 862:5 864:20 903:8, 11,12 905:16

**specifically** 733:8 744:13 751:20 756:2 776:14 785:3 815:1,20 821:12 824:21 831:6 838:10 864:8 892:7 895:21

**specimens** 785:12

**speculating** 889:1

**spelled** 744:22 860:9

**spent** 734:10

**sphincter** 821:10,12,23

**spinal** 745:20 746:14

**spine** 741:14 746:10 747:1,2

**split** 762:3,13,17 763:16

**splitting** 763:9 764:8

**spot** 780:11,13, 16,17 854:15,17 855:16,17

**squamous** 813:25 818:1

**stab** 803:16

**stabbing** 744:5 752:11 756:4 757:24 758:18 760:19,20 778:18 781:9 784:11 785:5 786:9 787:11, 14,16 788:19 789:9,24 791:6

**stage** 871:20,22, 24

**stages** 741:16 751:24

**standard** 748:9, 11,22 749:2 760:13 762:25 763:4 804:10 833:11 836:9 842:8 860:25 886:18 888:3

**start** 748:12

763:6 775:1 805:15 828:20 875:14 883:4 889:17

**started** 767:16 802:7 849:15 854:10 889:6,16 890:7,22 899:11

**starting** 745:17, 18,23 859:17 875:20

**starts** 770:3 854:14 865:9

**state** 774:24 834:2 840:14 883:17 892:7 893:16

**stated** 750:5 761:14,25 781:19 834:25 838:5 900:11

**statement** 745:9 759:8 829:24 884:7

**statements** 793:10,15 879:9

**states** 740:17 761:13 810:11 828:5 875:16 890:23 894:6 895:4

**stating** 790:15 824:2 896:18

**stature** 745:19

**stay** 884:3

**stays** 893:9

**stick** 753:23

**stickers** 731:25

**still** 753:15
767:3,24 772:23
778:15 782:14,
17,21,22 830:7
860:9 872:20
873:10 893:1

**stomach** 767:9

**stone** 743:22

**stop** 821:6

**stopping** 883:15

**story** 897:2

**straight** 853:20

**stream** 768:17

**stress** 775:12
798:2 816:7,8
820:20 822:22
823:4,7,15,23
824:3,4,9,12,18,
23 825:6,9,13,
22 838:5 848:1
851:22 852:2,5,
7,10,14 853:20,
23 865:13
866:11 869:21
870:14,21
871:2,4,6,10,14
879:17,21,22
880:1,4,14,18,
23 894:25 895:2
898:18

**stricture** 836:3

**strike** 770:12
790:24 795:17
802:6 839:7
877:9 907:23

**structurally**

763:12

**structure** 809:8
852:18,20

**structures** 807:6
809:9

**stuck** 789:13,14

**studies** 824:7
850:11 893:6

**study** 773:21
794:14 795:19
796:4 848:18
849:8,13 871:19
882:14 897:10

**stuff** 829:10

**subclinical**
785:22 786:4
848:19 849:5,7,
11 851:2,5,10,
13,17 854:4
856:25 857:13
895:14,15,25
896:17 903:24
904:18

**submitted**
802:12

**subsequent**
819:3

**subside** 780:5

**substantial**
845:25 846:13,
15

**substantive**
736:19

**subtype** 837:14

**suburethral**
773:22

**success** 823:7
880:6

**successful**
793:12 798:14,
16,18,21 885:25

**such** 748:3 779:7
786:8 794:15
848:23 851:16
886:25 908:22

**sudden** 828:20

**suffering** 746:18
749:9 752:6
816:21

**suffers** 903:7

**SUI** 825:18

**summarize**
875:9 881:12

**summarizing**
787:22

**supplement**
735:20

**supplemental**
732:18 735:9,
19,23 736:6,15,
17,20 737:19

**supplied** 729:19
733:12

**support** 852:17,
19

**supposed** 807:15
843:19 905:24
908:1

**suppositories**
797:13 859:3

**sure** 736:11
749:4 753:5
754:15 755:22

762:25 784:21
787:22 796:24
797:20 799:3
802:13 805:22
806:15 816:1
817:21 845:8
847:3 853:16,17
860:18 862:1
866:15 873:13
875:8 877:5
878:1 881:8
890:17

**surfaces** 806:20

**surgeon's**
763:20

**surgeries** 774:8
793:22,24
794:6,17,18
795:20 808:7
835:2,6,7,22

**surgery** 753:9
765:11 766:10,
22,23 767:14
768:16 772:3,
10,12,14,16,21
773:13 774:9
776:13 777:6
781:7 794:2,16
795:8 796:11,16
806:17,23
811:17 821:25
835:24 836:1
854:11 860:7,11
875:16 889:10
890:24 891:9,20
892:4 894:2
897:5 900:3,12
904:17

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. III          10/31/2014

**surgical** 763:3 769:4,5 793:24 796:6 802:19 828:25 904:14, 16,19,20

**surgically** 887:2 904:8

**surprise** 884:17

**surprised** 870:23 898:19 899:3,6

**surprising** 757:7 884:14

**surrounding** 809:21

**surrounds** 807:8

**sustain** 868:11

**sutures** 836:16

**Svangenson** 773:25

**swear** 727:10

**sworn** 727:12,14

**symptom** 756:3 758:18 769:22 770:15 784:10 872:3

**symptomatic** 741:12

**symptomatology** 743:18 749:24 750:2 756:10 760:15 798:8 803:4

**symptoms** 740:25 743:8,11 745:2 748:10,23 749:9,13,22 756:8,12 757:23

758:4,8 761:1, 17 769:10,12 772:2 775:11 776:9 777:5 779:7,20,22 797:10,16 798:19 805:14 806:7 810:17 820:3 830:13 831:20 832:23, 24,25 833:3,7 837:20 838:5,19 852:21 865:9 867:7,13 868:21,24 872:3,17 876:10 879:4 899:11 900:9

**syndrome** 754:22 803:7

**synthetic** 740:5

———————

**T**

**tags** 837:7,9,11

**tail** 763:7

**take** 736:9 762:21 768:2 772:23 777:25 794:22 799:1 805:21 818:9, 13,23 829:18 838:20 840:19 842:14 847:1 860:11 869:13 886:9 890:1

**taken** 778:5 783:3 790:12 799:7 806:2

847:7 852:22 861:18 874:4 884:22 896:11

**takes** 768:3 785:10 793:22 818:19,25 908:11

**taking** 740:22 763:10 779:1 802:25 814:11 815:16 825:6 849:18 852:17 875:23 881:13, 14

**talk** 728:25 740:23 757:12 759:25 771:1 778:9,14,16 791:13 793:18 807:11 822:20 826:1 835:24 847:16 852:4

**talked** 756:21 770:10 772:19 790:5 800:19 803:6 817:4 824:7,20 845:21 848:18 864:14 867:16 871:18 879:13 899:25 905:21

**talking** 728:14 730:4 738:19 742:20,22 763:9 779:13,16,18,19 790:11 791:2 798:20 807:12 808:20 810:14 819:11 827:22

832:9 835:17,25 867:15 877:11 893:10 894:1 896:16 905:4 908:18

**talks** 873:17

**tampon** 789:13

**tape** 896:6

**Tayrac** 849:8

**tease** 734:6

**technique** 833:11

**tell** 741:9 754:13,17 755:20 757:5,8 765:11 776:16 777:18 789:15 791:1 812:15, 20,21 818:10 830:23 843:12, 13 850:5,22 857:20 858:4,18 872:23 881:18 885:22 895:23 903:8,10

**tells** 892:14

**temporary** 754:1

**tend** 746:2 753:16 773:12 805:17 812:4,7

**tender** 784:7 844:10 855:8 858:24 890:25 891:21 892:6 900:20,21 901:25 903:21, 23 907:10

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. III          10/31/2014

**tendered** 729:22

**tendering** 737:4

**tenderness** 783:23 804:4 805:3 831:15 842:6 851:4 856:3,4 857:22 858:25 859:23 893:1 903:18

**tends** 745:14 780:4 830:2,11, 15 832:14 874:22

**tenfold** 774:2

**tension** 763:2 769:23 771:8, 22,23 774:7 831:18 832:7,17 833:12,15 834:1,5,8,14,16 906:6,9, 907:13, 16 908:2,4,15, 21 909:2

**tension-free** 907:19

**tensioned** 773:8, 11

**tensioning** 762:23 834:21

**term** 757:13,16 766:1,2 774:8 781:21 782:25 821:11,23 831:8,10 866:23

**terms** 728:4 731:6 733:22 740:4,11,24,25 742:5,17,19

743:8 745:1 753:4 757:16 758:22 763:10 764:8 774:5 781:23 786:18 792:8 793:3 800:16 803:2 804:11 805:4 806:6 808:13 813:10 816:2 826:16,17 840:20 845:6 850:23 851:25 856:2 858:17,18 860:25 862:23 864:1,25 867:14,20 873:8 874:18 881:25 899:8 901:4 906:3

**tertiary** 839:18 840:10 843:3

**test** 741:6 769:12 820:2 821:13

**testified** 727:15 728:4,11 734:7 735:2 764:16

**testify** 749:19

**testimonies** 840:24

**testimony** 747:18 771:11 784:21 788:7,25 791:24 792:14 800:3 841:2,7 850:16 851:15 857:10 861:3,7 864:9 889:4 896:2 910:14,19

**tethering** 894:3

**textbook** 756:11

**than** 744:1 757:18 765:10 767:17 768:22 769:8,9 770:8, 18 773:13 783:5 792:14 793:10, 13 794:1 795:15 796:2,11 800:24 803:12 815:21, 23 816:2,21 817:9 824:10 827:2 828:16 833:20 837:19 843:3 848:24 851:13 854:18, 21 857:8 861:9 873:23 881:18, 24 882:16 900:5 901:11 905:15 909:7

**thank** 727:9 736:12 759:25 827:16 860:15 877:17 879:6 886:12

**their** 741:9 744:5 745:14,20 748:5 754:19 755:3, 757:4 761:8,10 768:1 769:7 771:3 774:6,8,9,22 780:21 789:10, 12,13,17 794:18 824:4 838:20 841:18 844:1 846:2 871:25

872:1 883:15 909:14

**them** 733:14,15 748:16 756:25 764:18 771:17 772:6 775:21,24 777:19 810:16 813:23 815:15 838:20 843:24 844:6 865:3 872:12 897:14

**themselves** 727:5 757:18 792:12,21 861:3

**theory** 813:18 818:17

**therapy** 745:12, 14 746:3,5 748:19 769:13 797:3,4,13,14 823:23 859:3,4, 5

**there's** 736:5 741:6 744:8 755:4 767:8 769:2 773:24,25 788:7 790:8 791:24 797:25 800:24 803:7 808:17 811:15 815:13 816:6 819:8 831:24 844:25 845:22 848:7 866:20,21 870:23 871:3 873:19 875:1 876:18 877:21 879:10 894:11 898:7,22 905:24

908:6

**thereafter**
829:15

**therefore** 741:14
748:5 749:15
771:22 791:15
817:5 846:10
875:6

**they're** 745:18,
19,20,21 754:16
793:1 804:7,24
816:21 821:18
831:20 841:12
867:25 871:24,
25 872:2 882:22
883:21

**thickened** 784:4

**thickening**
882:17

**thickness** 741:13
766:2 770:7,8
885:12 887:4

**thigh** 856:20

**thin** 765:1

**thing** 809:5
839:18 870:8
893:11

**things** 728:10
729:11 739:17,
743:19 753:8,14
754:12 756:17
758:24,25
759:3,4,5,6
797:25 798:5,
13,17 804:18
808:5 833:13,17
843:21,24 844:6
846:2 857:3,16

863:10,11,14,18
898:9

**think** 734:21
737:14 749:24
752:20 755:11
756:16,22 758:5
759:21 765:7,16
776:2 778:17
789:23 790:11,
12 791:9,20
792:18,20
793:18,25
798:24 801:6
803:21,24 804:7
811:15 816:7
817:22 822:13
824:11 826:9
827:18 830:22
834:25 838:10
839:6,13 840:8,
9 846:14 861:2
881:12,21,23
883:19 886:23
887:13,23
889:20,25
890:11,18
893:10 895:9
898:4 904:13
907:14 909:23

**thinking** 880:9,
11

**thinner** 765:17
833:19

**thinning** 774:22
776:3 885:6

**third** 872:20

**third-degree**
871:16 872:8

**thoracic** 747:3

**though** 738:13
741:23 746:17
755:24 763:5
769:18,21
771:24 774:12
776:11 777:22
802:11 814:14
816:20 824:24
825:16 838:15
854:1 857:18
876:12 880:21
883:7,10 884:8
895:10 899:24
907:12 908:1

**thought** 765:2,
17 771:25 781:1
796:12 840:9
872:6 888:21,23
889:20

**three** 727:24
729:10,23
731:1,3 772:20
793:6,24 794:17
795:8,20 796:2,
13,19, 826:21
864:17 865:3
883:9 898:3
901:16

**three-inch** 827:5

**three-quarters**
903:19

**through** 738:8
739:15 756:12
782:18,20
785:1,16 791:22
800:21 842:20
851:5 854:19,20
855:1,11,23

863:14

**throughout**
872:5

**thumb** 729:24
730:23 799:25
803:18,24 864:2

**tie** 843:6

**tight** 770:16
853:3,5 909:6

**tightly** 771:18
772:1

**tightness** 894:3

**time** 727:2
738:21,24
740:12 752:21
755:23 756:25
758:20,25 759:1
760:9,16 765:8
772:11 773:24
774:21 778:2,6
780:3 787:1
799:4,11 802:5,
11,16 804:11
805:24 806:3
812:12 822:8
824:17 825:23
830:1,3,16,18
831:19 832:2,8,
10 843:2 847:4,
8,22,23 849:10
857:1 858:2
859:12,15,19
861:15,22
864:18,23 865:1
870:15,18,22
871:1,7,10
874:22 875:19
876:3,5,13

In Re: CR Bard 200                  Bruce Rosenzweig, M.D., Vol. III                      10/31/2014

877:18,19,20
880:21 881:23
883:5 886:1,2
890:21 894:2,
16,18 896:9,13
897:14 908:23

**timeline** 794:24

**times** 728:10
777:2 849:11
865:2

**timing** 875:9

**tingling** 743:11,
14,15 744:12,17
779:11

**tissue** 754:25
758:10 775:12
776:4 788:22
807:13,15
808:5,6,21
809:9,18,21
810:15,22
811:1,13 812:14
823:5,9,13
824:10,20 825:3
828:25 829:12,
13,16,19,22
830:6,8,17
836:15,23
845:6,10 856:8
880:5,14 882:16
883:2 885:6,12
887:3,17,20
888:24 897:7
908:2,8

**tissues** 753:7,19
807:1

**tobacco** 865:6
898:24

**today** 729:9,18
730:4 735:12
752:15 771:3
775:4 790:12
791:9 824:2
826:14 861:10
862:8 863:15
864:9,17

**together** 733:25
734:2 806:20
807:22 808:2
814:19 836:9
867:12

**toilet** 866:12,14,
22,23

**told** 754:6,9,18
801:2 827:11
841:24 851:13
855:20 861:10
889:14 895:10
902:6

**tolerance** 816:12

**Tom** 904:1

**tonsils** 802:21

**too** 730:5 754:9
769:22 770:16
771:18 772:1
773:8 774:7
807:20 808:2,18
814:25 815:3
831:18 832:7
834:14,16
836:2,14 846:17
866:4 898:25
906:5 907:13
908:20 909:2,4,
6,10

**took** 760:21

764:10,11
829:10 849:15
852:19 872:13
884:9

**tool** 804:21

**tooth-looking**
818:24

**top** 748:15 770:7
776:12 789:14
796:25 808:3
866:2 891:1
897:23 898:8

**topic** 863:16

**topics** 863:18

**Toradol** 767:16

**total** 821:1
873:21

**totally** 821:17

**touched** 761:2

**towards** 900:22
906:25

**track** 773:20

**training** 895:19

**transcribed**
731:11

**transcript**
727:24,25

**transcripts**
841:11

**transobturator**
822:11,22

**transvaginal**
772:15 775:24
815:5 824:21

**trauma** 821:25
871:2,8

**Traurig** 727:8

**treat** 758:9,10,11
798:21 818:4
823:15 824:16
843:25 844:5
848:8,10 882:1
895:12 897:9

**treatability**
835:18

**treated** 749:22
750:18 752:1
825:24 848:5,6,
849:16,18 859:2
879:23,24 887:5
904:17

**treating** 761:8
843:20 858:7

**treatment**
745:10,11
749:1,4 814:10,
12 823:7,23
825:17 858:22
880:19 882:6,8
885:14

**triangle** 762:22

**tricky** 759:7

**trigger** 859:4

**trochanteric**
742:8,9,10
744:19,20,21
751:2 759:15

**true** 817:9 824:6
837:24 864:16

**trust** 754:15

**truth** 838:24

**truthful** 841:21

**try** 775:16
804:25 812:11
833:14 885:10

**trying** 739:22
754:10 756:15
757:20 759:7
774:4 790:1
836:25 840:12
843:8 858:1
893:11 907:1

**tubal** 802:20
803:2,5,8 865:5
867:17

**tube** 785:18

**tumors** 898:15

**turn** 799:14

**twice** 882:10

**two** 727:20
729:10 730:1,7
736:20 766:23
769:4 776:6
780:3,5 782:12
793:24 794:17
795:20 796:13,
18,19,21 806:19
809:6,7,9
846:23 865:3
882:9 883:4,
884:9,10 890:24
891:19,23 892:4
893:3 907:15

**two-centimeter**
844:15

**type** 765:3
797:23 798:10
825:21 837:15

**types** 745:4

**typical** 741:25
745:16 758:7
764:4 778:19
784:9 811:6
831:19

**typically** 818:8
868:25 904:8

───────────

**U**

───────────

**Uh-huh** 736:24

**ultimately**
735:22 747:17
777:22 793:11
798:14,16
814:11 815:4
820:11 896:20
905:6

**unable** 766:17
791:19

**unaware** 791:16
869:7

**unbearable**
881:5

**unclear** 826:5

**uncomfortable**
836:4

**under** 734:18
763:1 768:24
771:22

**undergo** 856:24

**undergoes**
820:13 838:1
844:13 873:5

**understand**
728:3 733:6
748:10 751:7
752:14,23 754:6

755:23 759:11
762:18 780:1
788:17 796:25
808:10,13
823:22 826:6
843:15 844:22
887:19 889:8
908:17

**understandable**
846:22

**understanding**
727:22 728:1
734:12 742:16
898:25

**underwent**
820:3 887:10

**undue** 834:8

**unfavorable**
846:25

**Unfortunately**
817:3

**United** 761:13

**unless** 806:10
813:3 828:19
837:21 848:16

**unlikely** 750:8
752:3 756:5
757:10 868:23

**unquote** 731:12
762:21 763:17
765:9

**unreasonable**
840:8

**unrelated**
744:24 824:14

**until** 853:22

**untreated** 814:8
870:13

**up** 748:3,4
749:5,6,21
763:19 768:2,4
773:13 774:2
779:12 790:13
795:1,9 797:2
808:4 810:12
813:23,25
815:15 832:8
838:13,17 843:6
844:11 847:14,
24 852:15
855:22 860:14
866:1 870:24
883:3 884:4
885:11 887:17,
19 888:23 892:8
897:16 901:12,
19,24 902:4,6,
10,18 903:20
904:16 906:10,
23 909:14,18

**update** 757:4

**upon** 773:8

**urethra** 757:15
774:22 822:1
826:20 827:24
887:17,21
888:24,25
901:14

**urethra-vesicle**
826:4,15,18,24
827:4,23 829:19
831:5

**urethral** 776:3
898:2

**urethrocele**
844:13 845:5,9
856:2

**Urethroceles**
845:11

**urethrolysis**
887:10,11,12,
16,24,25 888:10
889:7 894:18

**urge** 820:24
848:2,5,6,8,10,
12,15,20 852:3
854:1,6 894:25
895:2,12,15
896:21 899:11

**urgency** 774:23
775:5 865:14
866:12,13
894:21 895:9
898:21

**urinary** 768:18,
774:20,22
775:5,11,12,19,
20 776:8 820:3,
21 822:23
823:4,7,15,23
824:3,4,10,12,
19,23 825:6,9,
13,22 838:5
847:15,25 848:2
851:17,21
852:1,2,5,8,10,
14 853:20,23
865:13 867:7,9,
13 868:22,23
869:22 870:14,
21 871:2,4,6,11,
14 872:2
879:17,21,23

880:1,4,14,18,
22,23 894:16
895:2,3,4
898:18

**urinate** 766:17
820:24 866:10

**urinates** 866:8

**urinating** 766:23
866:9

**urination** 766:19
865:12 867:6,
876:10

**urine** 768:22,23

**urodynamic**
820:2

**urodynamics**
820:13

**urogynecological**
758:13

**urogynecologist**
758:9

**urologist** 822:12

**us** 727:19 741:8
747:15 790:13
791:1 830:23
850:5 857:20
858:1,18 861:10
881:19 903:10

**USB** 730:1

**use** 757:12,15
766:1 790:25
793:13 804:18,
20,25 809:2
831:10 833:14
863:9,10 865:6
866:23 882:8,20
885:10 898:24

899:2

**used** 781:21
804:22 814:23
818:4 833:22
834:3,5,8,13
836:9 842:18
877:12 881:24
882:12 885:14,
19 899:3

**using** 746:3
804:16,17
819:13 825:2
833:10,25
836:15 870:9
882:11

**usual** 836:22

**usually** 753:20
760:16 767:13,
15 776:18
777:13,17 779:8
780:2, 789:11
805:15 821:11
829:5 830:14
836:1 837:14,22
873:19 874:1
883:3

**uterine** 740:20
760:3,9,14,24
761:16,20
814:17 869:23
872:22 873:1

**uterovaginal**
822:7

**uterus** 805:12,20
812:8 814:11,
14,15,19 815:1,
8,17 882:15,18

**V**

**vagina** 757:24
762:4,14,18,25
763:18 765:9,
10,14,15,
776:23 777:4
780:19,21,24
784:2,7 786:22
787:16,17,19
788:4,11,13,14
789:10,12,17
790:4,15 791:5
831:13 836:2,3,
6,7,15 837:2,22
845:12 854:14
866:2 871:25
872:1,4 874:1,9
886:13 891:1
900:14,19
901:10,17,20
902:4,7,10,12
903:20 907:6

**vaginal** 757:11,
13 758:17
764:25 765:1,4,
22,25 766:5
775:1 776:22
812:2,22,23
822:8 835:7,22
836:1 845:16
856:4 859:3
865:4,11 869:21
873:6,9,22
874:21 878:9
881:6 882:2,13
883:6 884:14,24
885:2,5,7 892:9
893:2 896:4

897:5,6 904:25

**vaginally** 812:11
873:10

**vague** 869:25

**Valium** 797:14

**Valsalva** 822:2

**variety** 753:8
797:24 798:4
892:6

**various** 762:20
804:11 816:7
843:23

**vary** 780:9

**vast** 741:2
772:11 780:19
782:22 811:8

**vault** 874:2

**version** 801:22
820:1

**versus** 800:20
845:25 846:24
890:3 894:25
907:3

**very** 734:4
743:19 744:11
751:4 754:3
766:12 768:10
771:20 780:18
782:1 790:8
791:3 806:9
809:5 810:21
811:12 813:2,7
817:4,5,7
823:15,22
845:12 880:1
881:22 887:13
892:7 893:25

894:14 900:24
901:25

**vesicle** 779:12
780:3,4,5,10

**vesicles** 780:18

**vessels** 905:1

**via** 860:13

**VIDEOGRAPH
ER** 727:1,9
778:2,6 799:4,
11 805:23 806:3
847:4,8 861:15,
22 896:8,12
910:25

**videotaped**
727:3 729:6

**view** 818:14
849:5

**virtually** 810:19
811:4

**virus** 780:23
837:14,19

**viscera** 905:2

**visceral** 904:10

**visit** 731:8,16
776:13 778:9
833:6 900:10

**vitamin** 817:16,
17,18,19

**void** 866:13

**voiding** 769:11,
16 772:4,18,24
773:1,23 774:1
820:6,14
887:18,22

**volume** 820:19

821:14

**vulva** 780:20

---

**W**

**wait** 773:1
891:23

**waited** 890:23
892:4

**waiting** 860:10
891:19

**wake** 768:4

**wakes** 909:14

**walked** 842:9

**walking** 744:14

**walks** 825:12
838:18 842:20

**wall** 765:25
782:18 783:13
784:1 856:4
891:1 892:9
893:2 897:5,6,8
904:25

**Wang** 849:13

**want** 729:3
733:8 736:11
738:10 747:14
752:22 754:3
755:22 757:25
770:11,14
773:20 778:10
779:14 785:1,2
787:21 796:24
797:19 815:3
826:1 832:25
839:6 844:5,11
857:25 860:1,3
862:1 865:19

868:3 872:18
882:2 883:19
886:9 892:20
905:13

**wanted** 758:3
764:23 779:21
863:11,12

**wants** 767:9

**wasn't** 748:21
825:24 883:2
907:25

**water** 818:20

**Watkins** 727:6
736:7,16,24
737:6,10,14,16,
21 746:22
749:11 763:14
764:1 774:18
777:24 793:17
798:25 799:3
828:13 831:21
834:6,17 835:14
836:18 837:4
839:11 840:3
841:22 860:1,6
882:5 884:15,25
888:4 910:24

**Watkins's**
738:12

**wave** 855:22

**way** 728:19
730:15 747:6
749:7 762:25
763:4 765:14
818:22 834:14
841:9 842:5,8
843:11,13
866:22 887:13

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. III          10/31/2014

895:1,3 899:14
902:2 903:20
908:22

**ways** 762:20

**we'll** 730:18
731:23,24
732:17 738:6
867:1

**we're** 728:14
730:3 731:24
735:8 742:22
763:8 767:7
779:12,17
790:10,11
798:19 801:6
805:24 807:12
808:20 810:14
821:5 835:17,25
844:16 864:17
875:20 883:12
895:10

**we've** 770:9
777:24 785:15
808:24 817:4,25
848:18 883:10
907:14,20
908:10

**weaker** 871:10

**wedge** 762:22

**week** 766:22
848:18 882:10

**weeks** 769:4
884:9,10

**weighed** 742:24
865:5

**welcome** 752:19

**well** 728:5
732:16 734:12

740:15 741:2
742:7,11 743:10
744:9 745:10
755:11 760:7
762:20 763:22
764:2 765:6,12
766:9,15 770:23
773:17 774:13,
19 779:8 781:19
787:15 790:4
804:24 805:11
809:1 814:11
815:13 819:25
828:19,21 829:5
830:4 831:22
832:5,11,22
835:21 837:19,
25 843:10
846:20 851:3,22
852:4,7 853:8
855:7 862:8
867:5 871:18
873:19 874:17,
19 875:16 879:6
880:1 885:22,24
886:16 887:25
891:14 893:16,
18 894:23
901:13,23
904:13 905:24
906:4,9 907:23
908:10 909:13

**well-known**
816:8

**well-understood**
907:25

**well-versed**
751:17

**went** 774:2

775:23 794:25
803:1 807:17
845:8

**were** 729:9
736:21 738:3,5
739:18 740:13
754:21 755:12,
24 757:1 772:3
776:24 777:6
782:11 783:3,19
784:11,14,15
791:16 795:25
796:9 800:21
801:9 802:17
806:10 825:1
826:6 831:18
833:7 837:11
841:20 848:16,
850:22 857:18
858:19 862:4,5,
12 864:24 865:3
867:15 871:21
877:11 895:23
896:16,17
900:20 901:2
908:1 909:19

**weren't** 758:21
764:9 784:17
812:19

**what's** 730:21
743:5 745:18
746:12 747:5
767:8 777:16
779:8 780:22
792:14 807:15,
24 819:12
820:17 823:13
861:9 866:8
868:1,7,9 876:8

877:4 887:12
890:14 910:5

**whatever** 743:9
779:18 788:19
819:2 883:20

**whereupon**
727:11 728:21
731:19 732:5,19
735:4,15 738:1
778:4 799:6,8
801:7 806:1
847:6 861:17,19
862:10 863:2
864:3 896:10

**Wherever**
780:13

**whether** 743:17
745:3 750:21
756:15 763:24
764:19 771:7
777:11 778:14,
21,25 792:5
797:25 812:16
823:1 834:5
835:6 841:20
848:22 849:5
858:19 872:24
884:17 902:19,
22 907:2 908:18
910:10

**which** 728:10
732:24 736:20
740:8 741:10,25
742:19 745:11
746:13,25
747:5,10 751:22
760:12,19
762:25 765:17
767:16 768:25

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. III          10/31/2014

769:1,23,24
770:4,15 771:25
773:6,9 776:22
779:15,23
780:12,20
788:15 792:17
798:13 807:1
809:24 811:5,
818:16,20,24
820:1,14 821:4,
13,14 823:12
824:7 825:23
828:5 836:9,10
837:11,15
842:11,12
843:1,14 846:21
847:14,15 849:8
850:7 851:24
853:7,9,12,14,
16,17 855:10
856:22 862:15
865:24 866:9
868:10 869:4
872:8 874:24
875:9,10,24
882:15,23
883:7,10 888:24
893:13 895:12
896:5,20
900:17,21
903:14,16,20
905:5 908:12

**while**  753:14
758:13 769:10
887:2

**white**  818:16,18,
21

**who**  727:5 741:2
746:17 752:1

816:19 821:24
823:21 839:10

**whole**  739:11,20
779:14

**why**  729:8
755:18 765:8,18
767:15 776:16
784:22 790:21,
22 792:15
794:11 817:16
818:17 823:12
836:10 844:21
854:16 855:5,19
863:9 887:15,23
889:3 896:2
899:5 906:8

**wide**  827:2

**wider**  827:2

**will**  727:4,9
728:12 730:18,
19 757:12,14
759:9 763:7
773:2 775:17
777:18 779:8
780:3 785:8
787:24 790:12
792:10 794:5
795:15 809:23
815:8 821:25
830:7,9 839:25
844:6 846:8
852:14 855:23
859:11,12,15
860:11 871:3
877:9 880:11,22
889:3 904:5
908:8 910:13

**wire**  819:14

**with**  727:7
728:6,17 729:1,
11,17,18 730:25
732:13 733:8,14
735:12 737:19
738:10 739:4
740:3 742:8
743:4 744:18
746:4,5,16,18
747:13,20
748:3,4,7,9,22
749:2,5,13,21,
22,24 750:21,23
751:12 752:1,2,
7,9 753:6 754:1,
18 755:7 756:10
757:1 758:8,17
760:5,10,22
761:20 763:5,12
765:4 766:12
767:25 769:3,
21,22 770:5
771:7 772:14,22
773:1,22,24
774:6,17,23
775:11,18,24
776:1,3 777:10,
18,21 778:9,22,
779:24 785:2,7,
9,24 786:3,17,
20,22 787:8,9
788:8,10,12
789:8 790:17
791:25 792:5
793:21,25 794:4
795:2,12 797:2
798:1,3,24
799:15,22
800:2,10,22
802:17 806:7,16

807:20 809:11,
14 810:4,19,22
811:1,3 812:9
813:21 815:14,
15 816:1,15
817:6,23 818:9
819:24 820:11
822:9,22 823:1,
2,4,18 824:1,18
825:16 829:24
830:7,9,16
831:18 832:1
835:5 836:1,8,
20 837:8,16
838:13,15 839:1
841:21 842:9,19
843:1,18
844:13,16
845:12 847:25
848:1,6,16
849:2,17 850:4,
8,17,18,21,25
852:11 853:1,3
854:2,11,22
855:18,25
857:4,19 858:5,
16 859:2 860:8,
18,21 862:2
863:6 864:12,19
867:1 868:22
869:8 870:24
871:1,7,20
872:11 873:6,7,
13,23 874:11,
16,22,24
875:21,23
876:12,17 878:9
879:5,8,15
880:2,5,14
882:18 883:11

885:16 886:1,2
888:21 889:13,
16 890:2,10,15
893:5 894:8
895:10,17,20
896:5 897:17
898:15,17
899:18,20
903:4,9,10,22,
24 904:1,8
905:7,10,23
906:5 907:13,21
908:20 909:2,22
910:8

**within** 746:21
765:23 766:22
772:16 788:3
789:10 801:15
804:20 836:15
867:10 870:3
886:17 888:2
889:21

**without** 781:3
789:16 816:21
819:24 820:11
823:1 863:14
878:19 880:3
893:7 905:11
907:16 908:2

**witness** 727:10,
11 738:5 746:25
749:12 763:15
764:2 774:19
793:18 828:16
831:22 834:7,18
835:16 836:20
837:5 839:12
840:4 841:24
882:6 884:16

885:1 888:6

**woman** 741:22
745:17 898:11

**womb** 882:17

**women** 780:21
817:18 867:24
871:20,21,23
872:11

**wondering**
844:25 893:20
901:3

**word** 743:14
781:16,17,
789:19 806:13
814:23 838:20
882:7 885:11
886:23 904:11

**wording** 796:25

**words** 793:13
816:19 834:12
842:3 879:25
883:12 905:9

**work** 881:4

**worked** 733:10,
14,16 840:22
847:14,24

**working** 739:6

**worse** 825:23
828:19,21
830:1,4,5,8
847:16 870:15,
18 871:1,11
875:22 893:17
900:9

**worsen** 848:20
871:3,5 893:9

**worsened** 891:10

892:7

**worsening**
865:25 870:21
871:6 875:25
891:11 900:4

**worsens** 872:5

**wouldn't** 746:9
779:23 812:19,
21 821:18
825:16 840:9
880:15

**wound** 809:20,
22

**wrist** 741:8

**wrists** 741:19

**write** 805:10
871:13 895:3

**written** 802:14

**wrong** 825:6,10
842:4

**wrote** 740:13
758:20 802:16
864:19,23
897:10

---

### X

**X-rays** 746:15

**Xanax** 817:13

---

### Y

**yeah** 737:16
757:5,25 813:15
824:25

**year** 740:16
774:1,2 832:5,

18,21 837:24
838:4 899:21

**years** 748:20
752:1 761:13
765:12 776:6
794:24 795:1,8,
10 842:21
846:18 882:13
897:10 904:19

**yesterday** 734:7,
9 737:6 743:17
744:3 761:12
770:10 772:19
773:18 775:25
782:20 790:6
793:19 797:21
803:2,6 806:16
807:17 814:24
824:8 859:9
871:18 872:10
878:2 898:14

**yet** 739:19
865:20

**you'd** 755:8

**you're** 729:9
737:4 739:6
743:2 748:11
750:4 752:19
755:9 764:18
768:10 769:24
771:2 774:12,13
776:25 779:18,
20 786:10
788:17,21 791:1
805:4 808:23
809:18 812:12
816:1 817:21
827:22 828:10
837:1,2,8

841:10,15
845:11 852:5,17
866:19 869:7
873:9 874:11
876:1 878:20
883:3,16,23,24
884:1,5 887:2
889:1 894:22
901:18 903:12
905:4 907:3
908:5 910:15

**you've** 728:10,
18 729:13
730:12 733:6
738:24 751:18
756:14 770:23
773:9 774:5
808:17 822:21
829:6 834:25
860:17 874:4
884:5

---

### Z

**zero** 766:16
796:4

**zip** 729:24 883:3

Case 2:12-md-02327 Document 9075-10 Filed 03/30/19 Page 4 of 224 PageID #: 116856

# **EXHIBIT J**

In The Matter Of:

## *In Re: CR Bard 200*

---

## *Bruce Rosenzweig M.D., Vol. IV*

November 29, 2014

---

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

IN RE: C.R. BARD, INC., PELVIC REPAIR MDL NO. 2187
SYSTEM PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO ALL CASES IN MDL 2187 AND SPECIFICALLY
TO:

|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |
|  | v. C.R. BARD, INC. | Case No. |

VIDEOTAPED DEPOSITION OF BRUCE ROSENZWEIG, M.D.

VOLUME 4

November 29, 2014

9:34 a.m. to 6:56 p.m

GREENBURG TRAURIG LLP

77 West Wacker Drive, Suite 3100

Chicago, Illinois 60601

Reported by:

GINA M. LUORDO, CSR, RPR, CRR

License No: 084-004143

Page 978

```
1  APPEARANCES:
2        KEITH, MILLER, BUTLER, SCHNEIDER & PAWLIK
3        BY:  MR. SEAN T. KEITH
          224 South 2nd Street
4         Rogers, Arkansas  72756
          (479) 621-0006
5         skeith@arkattorneys.com
               Representing ███ ███ and ███
6         ███
7  FLEMING NOLEN JEZ, LLP
8        BY:  MS. KAREN BEYEA-SCHROEDER
          2800 Post Oak Boulevard, Suite 4000
9         Houston, Texas  77056-6109
          (713) 621-7944
10        karen_beyea-schroeder@fleming-law.com
               Representing ████████████████
11             and ███████████
12
13  MUELLER LAW,
        BY:  MR. JEFF LARRIMORE
14        404 W. 7th Street
          Austin, Texas  78701
15        (512) 478-1236
          www.muellerlaw.com
16             Representing ██████████
17  MEYERS & FLOWERS, LLC
        BY:  MR. CRIAG D. BROWN
18        3 North Second Street, Suite 300
          St. Charles, Illinois  60174
19        (630) 232-6333
          cdb@meyers-flowers.com
20             Representing █████████ and ███
21
22
23
24
25
```

Page 979

```
1  APPEARANCES (continued):
2        GREENBERG TRAURIG, LLP,
         BY:  MS. FELICIA V. MANNO
3        77 West Wacker Drive, Suite 3100
         Chicago, Illinois  60601
4        (312) 456-8400
         mannof@gtlaw.com
5              Representing the Defendant.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  Also Present:  Mr. John Doody - Videographer
```

Page 980

```
1              I N D E X
2  WITNESS                    EXAMINATION
3  BRUCE ROSENZWEIG, M.D.
4     By Ms. Manno                985
5     By Ms. Beyea-Schroeder     1226
6     By Mr. Manno (further)     1227
7
8            E X H I B I T S
9  NUMBER    DESCRIPTION                 PAGE
10  No. #42   Notice of Deposition        985
11  No. #43   Testimonial History         985
12  No. #44   CD Regarding ██████         986
13  No. #45   Highlighted Supplemental Rule   986
14            26 Case-Specific Expert Report
15            for ███ ███
16  No. #46   Plaintiff's Response to Notice   987
17            of Continued Videotaped Deposition
18            of Dr. Bruce Rosenzweig
19  No. #47   Rule 26 Case-Specific Expert     987
20            Report for ███ ███
21  No. #48   Supplemental Rule 26            987
22            Case-Specific Expert Report
23            for ███ ███
24  No. #49   Operative Report for ███ ███   1009
25
```

Page 981

```
1            E X H I B I T S
2  NUMBER    DESCRIPTION                 PAGE
3  No. #50   CD Regarding ██████        1031
4  No. #51   Highlighted Rule 26 Case-Specific  1031
5            Expert Report for ███████
6  No. #52   Rule 26 Case-Specific          1031
7            Expert Report for ███████
8  No. #53   Highlighted Rule 26 Expert Report  1066
9            for ███████
10  No. #54   CD Regarding ███ ███       1066
11  No. #55   Rule 26 Expert Report for ███  1066
12
13  No. #56   Operative Report for ███ ███   1072
14  No. #57   Highlighted Rule 26 Expert     1091
15            Report for ███ ███
16  No. #58   CD for ███ ███              1091
17  No. #59   Rule 26 Expert Report for ███  1091
18
19  No. #60   Align IFU                     1123
20  No. #61   Highlighted Rule 26 Expert Report  1149
21            for ███
22  No. #62   CD for ██████              1149
23  No. #63   Rule 26 Expert Report for ███  1149
24            ███████
25
```



Page 982

```
 1              E X H I B I T S
 2    NUMBER    DESCRIPTION                        PAGE
 3    No. #64   Highlighted Rule 26 Expert Report  1155
 4              for ████████ ████████
 5    No. #65   CD for ████████ ████████           1155
 6    No. #66   Rule Expert Report for ████████
 7              ████████ ████████
 8    No. #67   Highlighted Rule 26 Expert Report  1194
 9              for ████████ ████████
10    No. #68   CD for ████████ ████████           1194
11    No. #69   Rule 26 Expert Report for          1194
12              ████████ ████████
13    No. #70   Rule 26 Supplemental Expert Report 1194
14              for ████████ ████████
15    No. #71   Highlighted Rule 26 Expert Report  1232
16              for ████████ ████████
17    No. #72   CD for ████████ ████████           1232
18    No. #73   Rule 26 Expert Report for ████████ 1232
19
20    No. #74   Align IFU                          1259
21    No. #75   Highlighted Rule 26 Expert Report  1275
22              for ████████ ████████
23    No. #76   CD for ████████ ████████           1275
24    No. #77   Rule 26 Expert Report for          1275
25              ████████ ████████ ████████
```

Page 983

```
 1              E X H I B I T S
 2    NUMBER    DESCRIPTION                        PAGE
 3    No. #78   Operative Report for ████████      1304
 4
 5    No. #79   Highlighted Rule 26 Expert Report  1315
 6              for ████ ████████
 7    No. #80   CD for ████ ████ ████              1315
 8    No. #81   Rule 27 Expert Report for ████████ 1315
 9              ████ ████████
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 984

```
 1       THE VIDEOGRAPHER:  We're now on the record.
 2    The time is approximately 9:34 a.m.  This is the
 3    beginning of Volume 4, Disc 1 of the video
 4    deposition of Dr. Bruce Rosenzweig.  All
 5    appearances by counsel will be reflected on the
 6    stenographic record.  Will the court reporter
 7    please swear in the witness.
 8           (Whereupon, the witness was
 9           sworn.)
10       MS. MANNO:  Okay.  For the record, this is a
11    continuation of the deposition of Dr. Bruce
12    Rosenzweig, correct?
13       THE WITNESS: Zweig.
14       MS. MANNO:  Zweig. I'm sorry.  And Counsel,
15    are we agreeable that all opinions expressed in the
16    previous days of testimony with respect to his
17    general report and any general opinions given in
18    any of the previous specific plaintiffs are
19    incorporated in this deposition?
20       MR. KEITH:  Yes.
21       MS. MANNO:  And we also agree to waive until
22    the time of trial any objections other than to form
23    and responsiveness?
24       MS. BEYEA-SCHROEDER:  Yes.
25       MR. KEITH:  Yes.
```

Page 985

```
 1       MS. MANNO:  And again, this deposition will be
 2    for all purposes previously described in the
 3    general and previous specific deposition sessions
 4    without objection?
 5       MR. KEITH:  Yes.
 6           (Whereupon, Deposition Exhibit
 7           Nos. 42 and 43 were marked for
 8           identification.)
 9           BRUCE ROSENZWEIG, M.D.,
10    having been first duly sworn, was examined and
11    testified as follows:
12              EXAMINATION
13    BY MS. MANNO:
14       Q.  Doctor, let's turn our attention to
15    plaintiff, ████ ████████ ████████.  And you did
16    an expert report on her, correct?
17       A.  That is correct.
18       Q.  And just so the record is clear, before we
19    get started with that, let's enter Exhibit 43,
20    which is what?
21       A.  An updated testimony history from 2009
22    until present.
23       Q.  And those have a couple additional entries
24    since the time of your last deposition?
25       A.  That is correct.
```

Page 986

1    Q.   And Exhibit 42 is what?
2    **A.   That is the notice for deposition for**
3 **today's deposition.**
4    Q.   Okay.  You received a copy of this?
5    **A.   That is correct.**
6    Q.   And again, consistent with the last
7 depositions, you have provided or brought with you
8 copies of everything that you relied on for each
9 particular plaintiff, correct?
10   **A.   That is correct.**
11   Q.   And in what format have you brought those
12 records?
13   **A.   Those will be in disc format.**
14   Q.   A CD, correct?
15   **A.   That is correct.**
16   Q.   So let's mark Exhibit 44.  And is that the
17 CD that you've brought for Ms. ■■■■
18   **A.   That is correct.**
19   Q.   And then let's also mark after that your
20 highlighted report as 45.
21            (Whereupon, Deposition Exhibit
22            Nos. 44 and 45 were marked for
23            identification.)
24   MR. KEITH:  Is there any reason you think we
25 need to file or mark as an exhibit the plaintiff's

Page 987

1 response to the notice that's been filed in the
2 court in regards to the objections we have for the
3 deposition?
4    MS. MANNO:  That's fine.  If you'd like to, we
5 can mark it 46.
6            (Whereupon, Deposition Exhibit
7            No. 46 was marked for
8            identification.)
9    MR. KEITH:  I'll do it at a break.  I have to
10 get a clean copy.
11   MS. MANNO:  Okay.  That's fine.
12 BY MS. MANNO:
13   MS. MANNO:  Let's mark your Rule 26
14 case-specific report for Ms. ■■■ as well as the
15 supplemental one.
16            (Whereupon, Deposition Exhibit
17            Nos. 47 and 48 were marked for
18            identification.)
19 BY MS. MANNO:
20   Q.   Doctor, can you describe for us what are
21 Ms. ■■■ current complaints?
22   **A.   Currently she has chronic dyspareunia,**
23 **vaginal tenderness and tightening, severe scarring.**
24 **She had a mesh erosion.  She has persistent pelvic**
25 **pain and urinary incontinence.**

Page 988

1    Q.   Okay.  And you're reading from your
2 report, correct?
3    **A.   That's correct.**
4    Q.   And which page are you reading from?
5    **A.   Page 9 of 13.**
6    Q.   Okay.  And you're reading from the last
7 paragraph, correct?
8    **A.   That and the paragraph above.  I think**
9 **that one of the things that we did with my report**
10 **is kind of reiterate so it's easy to find what the**
11 **current complaints are.**
12   Q.   Okay.  So in this last paragraph, when you
13 say chronic dyspareunia, vaginal tenderness and
14 tightening, severe scarring, mesh erosion,
15 persistent pelvic pain and urinary incontinence, is
16 there any other complaint that she is stating?
17   **A.   No.**
18   Q.   Okay.  So that is -- and what date or what
19 is the latest date which she was making these
20 complaints?
21   **A.   Well, I saw her on ■■■■■■ 2014 when**
22 **I did an exam in my office.**
23   Q.   And was she complaining of all of those
24 things listed in the last paragraph on Page 9 of
25 your report during the ■■■■■ visit?

Page 989

1    **A.   Beside mesh erosion, yes.**
2    Q.   That had been resolved, correct?
3    **A.   That's correct.**
4    Q.   Okay.  In terms of making your opinion
5 about the chronic dyspareunia, what did you rule
6 out?
7    **A.   Well, obviously, we had spoken before**
8 **about what are the various causes of dyspareunia.**
9 **I've ruled out the other causes of dyspareunia.**
10   Q.   Okay.  Just so -- one thing to be clear
11 about, besides the fact that it's been a month for
12 me and I may not remember everything that you've
13 said, to the extent that this deposition becomes
14 admissible in Ms. ■■■■ case or in another case,
15 there are reasons to have it in one -- stated in
16 one deposition as opposed to another, so just tell
17 me in Ms. ■■■■ case what causes of dyspareunia
18 you've ruled out for her.
19   **A.   Well, the things that I ruled in is that**
20 **she has a tender levator.  She has a very scarred**
21 **vagina.  She has a very narrow vagina.  All those**
22 **can cause pain with intercourse.  She has a history**
23 **of diverticulitis, diverticulosis.  That would not**
24 **give you -- that can cause pain, usually pain**
25 **associated with a full bowel because what that does**

Page 990

1  is put pressure on the colon and would cause pain
2  with the diverticulum, which is an outpouching of
3  the lining of the bowel.  Those are -- chronic
4  constipation is another part of her history,
5  hypothyroidism, migraine headaches, anxiety
6  disorder, I ruled all of those out as a cause of
7  her chronic pain and dyspareunia.
8      Q.  I wasn't able to write all of those down,
9  but can you take us through how you ruled those
10 out?  I mean, you said some of them the way that
11 you did, but you didn't say for others.
12     A.  Well, obviously, the most important thing
13 in ruling out other causes is what I found on
14 physical exam, and so that with a scarred vagina,
15 when you touch various muscles in various areas of
16 the vagina, it elicits pain.  That tells me that
17 that is the location of why she's having both
18 pelvic pain and dyspareunia.
19     Q.  Okay.  And where exactly did you palpate
20 that reproduced that pain?
21     A.  As I state in my exam, she has an
22 approximately one-centimeter general hiatus, which
23 is the opening of the vagina.  That's very small.
24 It only allowed one finger breadth to get inside
25 the vagina.  Yes, she does have vulvovaginal

Page 991

1  atrophy.  Vulvovaginal atrophy would not cause the
2  degree of pain that she's having.  She also had --
3      Q.  Wait.  Let me pause you.  Why not?
4      A.  It can be a contributor, but the severe
5  degree of pain that she has with the thinning --
6  with how scarred now her vagina is would not give,
7  in my clinical experience, the level of pain that
8  she has.
9      Q.  But how are you judging the level of pain
10 that she had?
11     A.  By the inability to get more than one
12 finger inside of her vagina and the tenderness that
13 she had on exam.
14     Q.  And where, in fact, did she have the
15 tenderness?
16     A.  As I state in my report, she had
17 tenderness to her levator muscles bilaterally.
18     Q.  Okay.  So earlier you said that the
19 vaginal atrophy can be a contributing factor.
20 Where would the pain be if the vaginal atrophy were
21 at play?
22     A.  It would be more of a generalized
23 discomfort, usually with more repeated motion than
24 just trying to do a simple exam with one finger.
25 So I mean, vulvovaginal atrophy doesn't usually

Page 992

1  cause pain without activity.
2      Q.  Without sexual activity?
3      A.  Well, sexual activity, exam, those kind of
4  things, and to -- unless it's such severe
5  vulvovaginal atrophy that the vagina is exceedingly
6  thinned out, which I didn't see in Ms. ▆▆▆▆
7  case, you're not going to see a significant degree
8  of pain associated with it.
9      Q.  How bad was her vaginal atrophy?
10     A.  On a scale of 1 to 10, I don't think that
11 we -- you know, we usually say mild, marked or
12 severe.  I would say that hers was probably mild
13 vulvovaginal atrophy.
14     Q.  Okay.  And did you understand that she was
15 taking anything for that?
16     A.  At the current time, not that she stated
17 the day that I saw her.
18     Q.  Okay.  Do you have any other information
19 to suggest that she is taking anything for that?
20     A.  Not that I recall specifically from her
21 medical records.
22     Q.  Okay.  I'm sorry to have interrupted you.
23 You were going through the things that you ruled
24 out.
25     A.  Well, those are -- I think that we also

Page 993

1  discussed, or actually maybe I didn't discuss, her
2  prior surgeries.  She had an umbilical hernia
3  repair.  She also had a vaginal hysterectomy at the
4  time of the mesh placement.
5      Q.  Okay.  And you and I have been over before
6  that hysterectomy can later lead to dyspareunia,
7  correct?
8      A.  That is correct.
9      Q.  So how are you able to rule out that the
10 hysterectomy was at least a contributing factor to
11 the dyspareunia?
12     A.  I would have expected that to have led to
13 the hysterectomy, pain more at the top of the
14 vagina than throughout the length of the vagina.
15 And so therefore, while it could be a contributor,
16 in Ms. ▆▆▆▆ case, I don't think it was a
17 significant contributor.
18     Q.  Okay.  And are you just basing that on the
19 fact that you believe that dyspareunia is typically
20 at the vaginal cuff based on the hysterectomy?
21     A.  In my experience, yes.
22     Q.  Do you have any scientific literature that
23 you're aware of to support that?
24     A.  There is very little scientific literature
25 except for the fact that hysterectomy can cause

Page 994

1  pain associated -- after hysterectomy.  Usually
2  that's due to scarification.  Usually it's due to
3  the reasons why you had the hysterectomy such as
4  something like endometriosis.
5        A hysterectomy -- a vaginal hysterectomy
6  in a peri or postmenopausal woman I would not
7  expect to give a significant degree of dyspareunia
8  in and of itself.  Usually hysterectomies that are
9  done for something such as pelvic inflammatory
10  disease where you have a significant degree of
11  scarring or endometriosis, those would be
12  associated with more postoperative dyspareunia.
13     Q.  Did Ms. ████ ever have endometriosis?
14     A.  Not that I'm aware of.
15     Q.  And --
16     A.  And also, in a postmenopausal woman,
17  endometriosis would be a very unlikely etiology for
18  pain because once you start losing the hormones,
19  your endometriosis starts to atrophy.
20     Q.  Okay.  Did you notice from your exam or
21  from any medical records whether or not Ms.
22  had any atrophy of her endometrium?
23     A.  Well, she doesn't have an endometrium
24  anymore.
25     Q.  Because it's taken out with the

Page 995

1  hysterectomy?
2     A.  That is correct.
3     Q.  Okay.  So once the hysterectomy happens,
4  that's really not a cause of any dyspareunia?
5     A.  The possibility of endometriosis post
6  hysterectomy -- the main theory behind
7  endometriosis is that you get what's called
8  retrograde menstruation where instead of the
9  menstrual effluvium coming out through the cervix,
10  it goes through the tubes, sets up in the
11  peritoneal cavity.  Once you remove the uterus, you
12  remove any further endometrial implant.  Once you
13  remove the estrogen, you remove any activity, the
14  cyclic increase and decrease of the endometrial
15  implant so that it no longer is symptomatic and
16  tends to atrophy just like a postmenopausal
17  uterus -- uterine lining that's still in place.
18     Q.  Okay.  So I've heard you say a couple of
19  times, and I'm sure we'll be talking like this as
20  the day goes on, but you know, the vaginal atrophy
21  or the hysterectomy could have been contributing
22  factors, but are not a significant cause.
23        Do you agree with me, though, that in
24  Ms. ████ case that the atrophy and the
25  hysterectomy are possible contributing factors?

Page 996

1     A.  Yes, but as I said before, if they are a
2  contributor -- again, this woman has a significant
3  degree of scarring.  She has a significant degree
4  of tenderness.  That is a much more significant
5  etiology in her pain and dyspareunia than the
6  possibility of a hysterectomy or the possibility of
7  vulvovaginal atrophy.
8     Q.  Okay.  But you'd also agree with me that
9  pain can also result from a variety of factors
10  working together?
11     A.  That is correct.
12     Q.  So you're not saying that one of those
13  things is the 100 percent cause, correct?
14     A.  In Ms. ████ case, I would say that the
15  overwhelming majority of her dyspareunia and pelvic
16  pain is due to scarring of her vagina, narrowing of
17  her vagina and the tenderness of her levator
18  muscles.
19     Q.  So we're going to talk about those in just
20  a second.  At any point, did you consider the
21  fibromyalgia or the chronic pelvic floor muscle
22  spasms as a potential cause of dyspareunia?
23     A.  Well, I think that her chronic pelvic
24  floor muscle spasm is due to the Avaulta placement,
25  the Avaulta erosion, the Avaulta removal surgery,

Page 997

1  the second removal surgery, and so that is why she
2  has the chronic pelvic floor muscle spasm.
3        Yes, fibromyalgia can cause pain.
4  Fibromyalgia tends to cause more widespread pain
5  such as leg pain, arm pain, back pain.  And you
6  know, I have seen women that have fibromyalgia and
7  also have some element of pelvic pain, but the vast
8  majority of pain in the instance of fibromyalgia
9  are other places beside the pelvis.
10     Q.  On the instances that you have seen a
11  connection between the fibromyalgia and pelvic
12  pain, how has the pelvic pain manifested?
13     A.  Well, it's usually intermittent.  One of
14  the things that we see with fibromyalgia is
15  patients have intermittent pain.  It's usually
16  situational.  Patients tend to have certain
17  triggers associated with that widespread pain.  So
18  the theory behind fibromyalgia, and this is just
19  the theory, nobody truly understands, it is that it
20  is an overfiring of nerves.  So it's not just a
21  constant firing, but it's an intermittent firing,
22  and it can be migratory in nature.  So someone with
23  fibromyalgia might have, you know, arm pain one
24  day, shoulder pain the next day, leg pain, back
25  pain, so it's not consistently in any one place.

1    Q.  Were you able to rule out or rule in as a
2   contributory factor the fibromyalgia in
3   Ms. [ ] pain?
4    **A.  I took that into consideration in my**
5   **differential diagnosis again for the reasons that I**
6   **stated above.  I find that if the fibromyalgia was**
7   **a contributory factor, it would be a very minimal**
8   **contributory factor.**
9        **Now, there's one thing that we do know,**
10  **and I think we probably talked about this before,**
11  **based on Withagen's study in 2011 that patients**
12  **that have pain syndromes before they have mesh**
13  **placed tend to come out of their mesh surgery with**
14  **more pain, but it's not a general pain.  It's more**
15  **pelvic pain.**
16   Q.  In other words, if a patient has a history
17  of pain problems, they are more likely to
18  experience localized pelvic pain after the
19  operation?
20   **A.  That is correct.**
21   Q.  So that's really not -- I mean, that's --
22  it's almost like a preexisting condition?
23   MR. KEITH:  Object as to form.
24   **THE WITNESS:  That is a preexisting corollary.**
25

1   BY MS. MANNO:
2    Q.  Okay.  Okay.  So let's talk about the scar
3   tissue.  Hang on one second.
4        So we talked about the dyspareunia.  The
5   vaginal tenderness and the tightening, where is it
6   that she is complaining or that you found on your
7   examination of the tenderness?
8    **A.  Well, we spoke just a few minutes ago**
9   **about the levator muscles, that's the pelvic floor**
10  **muscles, creates a basin in the pelvis which the**
11  **pelvic floor contents sit in.  We probably talked**
12  **about this before.  That is kind of the gyroscope**
13  **function that helps center your core, so it**
14  **coordinates your upper body with the lower body.**
15  **And so your pelvic floor muscles actually have a**
16  **fairly significant impact on your activities, both**
17  **upper body stability and locomotion.  Those muscles**
18  **were tender along their course inside the vagina.**
19   Q.  And you -- based on your physical
20  examination of her?
21   **A.  That is correct.**
22   Q.  Okay.  And so your -- I'm just trying to
23  figure out whether or not that tenderness that
24  you're talking about is connected to the
25  dyspareunia or these are separate things.

1    A.  No.  That's connected with the
2   dyspareunia.
3    Q.  So what you were talking about earlier,
4   you were talking about the narrowing, the scarring
5   and the tenderness and the tenderness at the
6   levator muscles.  Those are all reasons that she's
7   having the dyspareunia and the pelvic pain in your
8   opinion?
9    **A.  That is correct.**
10   Q.  Okay.  So let's talk about what causes
11  that scar tissue.  Let's take that first, okay?
12   **A.  Okay.**
13   Q.  What is your opinion as to why she has the
14  scar tissue?
15   **A.  Well, she had a polypropylene product that**
16  **was placed inside of her pelvis, which was also**
17  **coated with collagen.  So she had the Avaulta Plus**
18  **anterior and posterior, so we know that this is a**
19  **polypropylene-based product that is covered with a**
20  **collagen layer.**
21       **Unfortunately, when you sandwich the two**
22  **those of those together, you actually obliterate**
23  **practically all of the pore size, which allows good**
24  **tissue ingrowth.  Even though the collagen is --**
25  **it's cross-linked, but it tends to -- the**

1   **cross-linking just delays the process by which the**
2   **body gets rid of the collagen, but the**
3   **polypropylene is still there.**
4        **The other thing that you do is you thicken**
5   **the mesh, so both of those things together is going**
6   **to lead to increased fibrosis, increased**
7   **scarification, increased chronic foreign body**
8   **reaction.  Then you put on the fact that she had an**
9   **erosion.  She needed two surgeries to repair it.**
10  **All that together led to the pelvic floor scarring.**
11   Q.  Okay.  So your opinion is that it was the
12  initial implant and then the two surgeries to
13  repair, correct?
14   **A.  And the erosion along with -- well, that**
15  **led to the first surgery to repair it, and she**
16  **ultimately had a second surgery to repair it.**
17  **Also, dense scarring was found at the time of the**
18  **first surgery that she had.**
19   Q.  Right.  At the implant?
20   **A.  Excuse me.  Yes.**
21   Q.  So what is your opinion as to why she had
22  scarification prior to the implant?
23   **A.  No.  No.  No.  At the time of the**
24  **reparative surgery.**
25   Q.  The explant, the first explant?

Page 1002

1    A.  That is correct.
2    Q.  Okay.  So let me ask you this.  In terms
3  of the hysterectomy, can you expect a patient to
4  have scarification due to a hysterectomy?
5    A.  Not inside the vagina.
6    Q.  Where?
7    A.  At the apex of the vagina because what
8  you're doing is when you're doing a hysterectomy,
9  you're excising the cervix off the top of the
10  vagina, and you close that, which is now called the
11  cuff.  You can see scarring at that area.
12    Q.  Okay.  And that's -- I mean, I think you
13  said this last time, and if you did, I'll have you
14  say it again.  Even through repairs or surgeries in
15  the vagina that have no foreign body or no mesh, if
16  you will, you would expect to see some
17  scarification of tissues, correct?
18    A.  We've discussed that, yes.
19    Q.  So when she has the hysterectomy, you're
20  saying that the scarification, if any, would be at
21  the vaginal cuff and not down the vaginal wall?
22    A.  That is correct.
23    Q.  And so she gets the first implant.  Did
24  you -- let me just ask you a side question.  Did
25  you notice anything in your records which would

Page 1003

1  indicate that a hydrodissection was performed in
2  the implant?
3    A.  We could pull out the surgical report to
4  look at the exact method by which the surgery was
5  performed.
6    Q.  Do you know?
7    A.  Sitting here right now, I cannot tell you
8  whether or not hydrodissection and the thickness of
9  the -- the thickness to which the dissection was
10  done.
11    Q.  Okay.  And do you believe in these
12  implants that hydrodissection is important?
13    A.  One of the things that hydrodissection
14  does is it gets you into the correct plane, if you
15  will, where you are deeper below the vagina and
16  before the bladder and the rectum so that you have
17  the thickest amount of vagina to decrease the
18  chance of vaginal erosion.
19    Q.  Right, because if you're not dissecting --
20  if you're dissecting too shallowly, if you will,
21  you have a greater chance of extrusion through the
22  vaginal epithelium, correct?
23    A.  That is theorized.  I don't think that has
24  ever been proven in a prospective randomized trial.
25    Q.  Well, based on your experience of -- I

Page 1004

1  mean, you dissect --
2    A.  That is correct.
3    Q.  -- that area.  Do you hydrodissect?
4    A.  I don't place mesh.
5    Q.  Do you hydrodissect for any other reason?
6    A.  Sometimes I do, yes.
7    Q.  And why do you do that?
8    A.  Sometimes it is important to be able to
9  find the exact tissue plane that you want to get
10  in.  I think that sometimes hydrodissection can
11  make your dissection a little bit more difficult,
12  so it all depends on the situation.
13       Now, I know that it has been described
14  that in the majority of hands, hydrodissection is
15  an important part of the surgical procedure;
16  however, if you feel that you can get into the
17  appropriate plane without hydrodissection, you
18  don't need to do it.
19    Q.  Okay.  That would really, I guess, in your
20  opinion, depend on the skill of the surgeon?
21    A.  That is correct.
22    Q.  Okay.  So when -- hang on one second for
23  me.
24       Okay.  So the scarring, let's talk
25  about -- I know your opinion about the scarring

Page 1005

1  from the initial placement, but I think that you
2  just testified, and it's also in -- have you had a
3  chance, by the way, to review Bard's experts'
4  reports in response to your expert reports?
5    A.  In this case, no.
6    Q.  Do you know Dr. Van Drie?
7    A.  No.
8    Q.  Douglas Van Drie?
9    A.  No.
10    Q.  Never heard of him, or have you heard of
11  him?
12    A.  I might have heard of him, but I don't
13  know him.
14    Q.  No contact with him, or are you familiar
15  with his reputation in any way?
16    A.  No.
17    Q.  So as far as the second surgery, the first
18  one to -- the first explant, I guess, you earlier
19  testified that you think additional scar tissue
20  formed because of that?
21    A.  Are you talking about the ███████ 2011
22  surgery just so we're both on the same page because
23  there was another revision surgery on ████ ██
24  2011?
25    Q.  Hang on one second.  So I'm talking about

Page 1006

1 the 3/23/11 one.
2 **A. Okay. So Dr. Bradford describes that**
3 **there's an erosion along the posterior wall of the**
4 **vagina. He also states that the vaginal vault was**
5 **less than one finger breadth wide and that it was**
6 **even too small for virginal speculum. He finds**
7 **dense scarring along the posterior fourchette. A**
8 **layer of tissue and scarring formed over the mesh,**
9 **and he says this is the most severe reaction to**
10 **polypropylene he had ever seen postoperatively.**
11 Q. But my question was are you saying that
12 the first -- what I'm calling the first explant
13 surgery also resulted in additional scarring for
14 Ms. ███.
15 **A. Well, more likely than not, yes. I mean,**
16 **to take out -- to do an explant with that severe**
17 **degree of scarring is going to create a reaction**
18 **that is going to also lead to what was found on the**
19 **███ 2011 surgery where she underwent her**
20 **second revision.**
21 Q. Doctor, can you just say whether or not
22 you believe that?
23 **A. Yes.**
24 Q. Thank you.
25 MR. KEITH: Well, no. I'd like him to continue

Page 1007

1 to explain. I mean, finish that.
2 MS. MANNO: He's already testified about this
3 kind of stuff ad nauseam.
4 **THE WITNESS: There was -- in the**
5 **███ I just want to finish that up by**
6 **saying that there was extensive scarring found.**
7 **Dr. Bradford was the one that was at both of those**
8 **surgeries, so he could be the best one to say how**
9 **much more scarring there was at the second than on**
10 **the first one. My reading says that he found**
11 **extensive scarring on the second, and he found**
12 **dense scarring at the first. So how much more**
13 **scarring there was in this situation, I think that**
14 **would be something for Dr. Bradford to opine.**
15 BY MS. MANNO:
16 Q. Okay. But you would agree that his
17 procedure in ███ would have likely caused
18 additional scarring, correct?
19 **A. With the extent of scarring that was found**
20 **and as he said, the most severe reaction to**
21 **polypropylene he's ever seen, yes.**
22 Q. Okay. Is there a reason that you need to
23 modify that answer other than a yes or a no?
24 MR. KEITH: Object as to form.
25 **THE WITNESS: Well, doing a simple vaginal**

Page 1008

1 **surgery more likely than not is not going to lead**
2 **to a significant degree of scarification. Doing a**
3 **more complex surgery where you have a densely**
4 **scarred polypropylene is going to more likely than**
5 **not lead to more extensive scarification, which is**
6 **what he found on the ███ surgery.**
7 BY MS. MANNO:
8 Q. Okay. And let's talk about the native
9 tissue plication repair that he also performed,
10 okay?
11 **A. Yes.**
12 Q. Other than just taking out or explanting
13 mesh, this is an additional step, correct?
14 **A. That is correct.**
15 Q. And what did he do as far as his native
16 tissue plication repair?
17 **A. If you'd like to give me a copy of the**
18 **operative report, I can say exactly what the steps**
19 **were during the surgical procedure.**
20 Q. I'm just asking you in your report what
21 you mean.
22 **A. Well, it says that he performed an**
23 **anterior and posterior colporrhaphy and removed the**
24 **mesh.**
25

Page 1009

1 (Whereupon, Deposition Exhibit
2 No. 49 was marked for
3 identification.)
4 MR. KEITH: What date?
5 **THE WITNESS: It's ███ 2011.**
6 BY MS. MANNO:
7 Q. So I think my -- do you remember my
8 question? My question is what exactly did he
9 perform in terms of a native tissue plication
10 repair?
11 **A. Would you like me to read from the**
12 **operative report?**
13 Q. No. I'd like for you to summarize it.
14 **A. Well, the mucosa was incised anteriorly**
15 **taking down adhesions on the right aspects of the**
16 **vaginal vault freeing up the adhesions from the**
17 **urethrovesical angle.**
18 THE COURT REPORTER: I'm sorry, Doctor. When
19 you're reading, could you just slow down a little
20 bit.
21 **THE WITNESS: Sorry. I'm trying to keep up to**
22 **the 45-minute thing, which I think we're probably**
23 **not going to adhere on this one. The mucosa was**
24 **dissected away from the pubovesical and cervical**
25 **fascia, and the fascia was plicated in the midline**

Page 1010

1  using interrupters with 0 chromic sutures, so that
2  was the anterior native tissue repair.
3       Posteriorly a triangle of tissue was
4  dissected away. The mesh was dissected away from
5  the perirectal fascia. The dissection was carried
6  out laterally to the levator muscles. All the mesh
7  and scar tissue from the mesh as well as the
8  vaginal erosion was removed. The perirectal fascia
9  was plicated at the midline with midline Vicryl
10  sutures. The levator muscles were approximated
11  with a 0 chromic suture. The perineum and the
12  bulbocavernosus muscle was reapproximated with a
13  2-0 Vicryl suture.
14  BY MS. MANNO:
15     Q.  So I'm really just trying to -- in
16  laymen's terms, what did he do?
17     A.  He did a native tissue repair anteriorly
18  and posteriorly.
19     Q.  Great. Okay. And so when he did that
20  repair, he was using sutures to do that, correct?
21     A.  That is correct.
22     Q.  And I think you've testified about this
23  before, but if not, a native tissue repair like
24  that using sutures can lead to scarification,
25  correct?

Page 1011

1     A.  That is correct.
2     Q.  It can lead to pelvic pain, correct?
3     A.  That is correct.
4     Q.  It can lead to dyspareunia?
5     A.  That is correct.
6     Q.  Tenderness?
7     A.  That is correct.
8     Q.  Now, when he did the levator
9  approximation, do you believe that is indicated in
10  a patient who has got -- who has reported pelvic
11  floor muscle spasms and pain?
12     A.  I do not currently perform levator muscle
13  spasm -- excuse me, levator muscle plications
14  because that can be associated with dyspareunia
15  afterwards. The one thing that I found that was
16  important in this case is that he used a chromic
17  suture that is going to disappear much more quickly
18  than a delayed absorbable suture. Usually it's
19  gone within a week, so that it would be much less
20  likely than if he had used the Vicryl suture to
21  cause the kind of dyspareunia that we see with
22  levator plications.
23     Q.  Okay. What do you base that on?
24     A.  The fact that chromic suture stays around
25  for less than a week.

Page 1012

1     Q.  Okay. And the dissolvable sutures hang
2  around for how long?
3     A.  Four to six weeks or longer.
4     Q.  Okay. So what are you basing in terms of
5  any scientific data or your own experience that one
6  experiences dyspareunia less with the chromic
7  suture? Did I get that right?
8     A.  That is correct. It's just that you're
9  less likely to get banding of the levator muscles
10  if it separates quicker. It's basically not even
11  doing anything if you use a chromic suture.
12     Q.  But can you say for certain that -- well,
13  can you say whether or not this particular
14  procedure, this native tissue repair with the
15  chromic sutures could have been a contributory
16  factor towards her dyspareunia and pelvic pain?
17     A.  Yes, but very unlikely because of the fact
18  that she's -- that chromic suture was used.
19     Q.  But you can't rule that out?
20     A.  That is correct.
21     Q.  Okay. And then -- so you said that you
22  don't do them. Why don't you do them, the levator
23  plications?
24     A.  Because that can be associated with
25  dyspareunia and pain afterwards.

Page 1013

1     Q.  No matter what type of suture you use?
2     A.  I -- usually Vicryl suture is used in
3  those repairs.
4     Q.  Okay. So why don't you do them with
5  chromic sutures?
6     A.  Because it doesn't really do -- it doesn't
7  really add anything to the repair.
8     Q.  I'm confused. I mean, why do them if they
9  don't work?
10     A.  Well, it doesn't do anything to improve
11  the permanency of a posterior repair.
12     Q.  Or an anterior repair? Is it just
13  posterior?
14     A.  That is correct.
15     Q.  So it doesn't do anything to improve it?
16     A.  The long-term outcome, right. I mean, we
17  used to do Kelly-Kennedy plications, which nobody
18  really does anymore except in very certain
19  circumstances because they don't really do anything
20  for the -- to improve the long-term results of a
21  patient.
22     Q.  So do you think that this was then
23  contraindicated in Ms. ███ this type of
24  procedure?
25     A.  No.

Page 1014

1  Q.  Do you think it was unnecessary?
2  A.  That would be something to ask
3  Dr. Bradford.
4  Q.  Well, I'm asking you.  You're the expert.
5  A.  That is correct, and in this case, by
6  using chromic, you are going to, in my opinion,
7  decrease the chance of having significant pain
8  associated with that repair.
9  Q.  But it sounds like what you're saying,
10  though, is there's a strong likelihood that it
11  really won't improve her long-term outcome --
12  MR. KEITH:  Object as to form.
13  BY MS. MANNO:
14  Q.  -- correct?
15  A.  That is correct.
16  Q.  So you are then exposing her to another
17  vaginal surgery that probably won't work long term
18  that could result in pain, correct?
19  A.  No.  This was done as part of a global
20  surgery --
21  Q.  Right.
22  A.  -- that was indicated.  Now, whether or
23  not one does one step or not, people still
24  reapproximate the rectus muscle at the end of
25  abdominal surgeries.  Does it do anything?  Some

Page 1015

1  people feel that it does.  Some people feel that it
2  doesn't.
3  Q.  Do you think that this was a helpful
4  surgery for Ms. ████?
5  A.  The entire surgery, yes.
6  Q.  The levator plication?
7  A.  You're talking about a specific -- I think
8  one suture placed, whether that was helpful, the
9  global surgery helped because it treated her
10  erosion.  Whether this one aspect was helpful or
11  not is -- obviously, the next surgery that she had
12  was only a revision surgery because of more global
13  scarring that she had inside the vagina, not just
14  an area that needed to repaired at the levator
15  plication.
16  Q.  Okay, but my question really was I mean,
17  was performing a chromic suture levator plication
18  in Ms. ████ based on her history and based on her
19  reporting pelvic floor muscle spasms and pain, was
20  that within the standard of care?
21  A.  Yes.  It would not be a deviation in the
22  standard of care.
23  Q.  But it would not have been something that
24  you would have done?
25  A.  That is correct.

Page 1016

1  Q.  Now, in the second removal surgery, I
2  think you talked about that he performed this
3  inverse diamond incision; is that correct?
4  A.  You're talking about still the ████ --
5  Q.  No.  I think I'm talking about the --
6  A.  ██████████
7  Q.  I'm sorry.  I thought this was in your
8  report.  Maybe not.
9  A.  No.  The inverse diamond is the -- the
10  inverted triangle in the perineal body was in the
11  ████ --
12  Q.  In the ██████
13  A.  Yes.
14  Q.  Okay.  All right.  I'm sorry.  Then I got
15  that date wrong.  We can agree that the diamond and
16  triangle --
17  A.  There are people that do diamond
18  incisions, and there are people that do triangle
19  incisions.
20  Q.  I'm still trying to teach my son the
21  difference between a triangle and a diamond.
22  A.  Once he gets married, he'll know the
23  difference.
24  Q.  Okay.  So when Dr. Bradford does this
25  inverse diamond incision or inverse triangle

Page 1017

1  incision, does that -- can that result in a
2  narrowing down of the perineal body?
3  A.  Well, that's the way a perineorrhaphy
4  would be performed, and if there is an
5  overcorrection, that can lead to a narrowing of the
6  opening of the vagina.
7  Q.  Okay.  Can it also -- say that again, the
8  last part.  It can narrow the opening of the
9  vagina?
10  A.  That is correct.
11  Q.  So where is that?  How is that different
12  from the perineal body?
13  A.  That is at the perineal body, yes.
14  Q.  Okay.  I'm saying that incorrectly.
15  Forgive me.
16  Okay.  So that can also result -- when
17  you're saying on exam you can get one finger
18  breadth in, I'm assuming that means one finger
19  inside her vagina, correct?
20  A.  That is correct.
21  Q.  Okay.  And so the opening of the vagina
22  can be tightened and narrowed due to that as well?
23  A.  That is correct, but then you would not
24  see a -- you would have a more capacious vagina
25  behind that, which is not the case in Ms. ████

Page 1018

1    Q.  Okay.  Okay.  Then let's talk about the
2  second, and I'm calling this the levator
3  reapproximation.  That's the second surgery,
4  correct?
5    **A.  This was all one surgery.**
6    Q.  I know, but you said that he did something
7  in ▇▇▇ as well.
8    **A.  That is correct.**
9    Q.  And how do you term that surgery?
10    **A.  The ▇▇▇ ▇▇ surgery was a posterior**
11  **repair and a perineoplasty.**
12    Q.  How did he do that?
13    **A.  If you'd like to pull out that operative**
14  **report to --**
15    Q.  I don't want you to read from it.  I'm
16  asking what you know.
17    **A.  That she had a posterior repair and a**
18  **perineoplasty.  If you'd like to talk about the**
19  **specifics about what was done, it would be very**
20  **helpful to have the operative report in front of**
21  **me.**
22    Q.  But did you not review that already?
23    **A.  Yes, I did.**
24    Q.  Okay.  So what do you remember based on
25  reading it?

Page 1019

1    **A.  That she had a posterior repair and a**
2  **perineoplasty and that there was an extensive**
3  **vaginal scarring.**
4    Q.  I mean, there are different ways a
5  posterior repair can be done, correct?
6    **A.  That is correct.**
7    Q.  Do you know how it was done in this case?
8    **A.  If you would like to give me the operative**
9  **report, I can --**
10    Q.  Is it not in your report?
11    **A.  The description of the steps, no.**
12    Q.  I don't need all the description.  I guess
13  what I'm asking is like was it through a -- you
14  know, did he use sutures?  Did he use some sort
15  of --
16    **A.  If you would like me to talk about the**
17  **specifics of the operative report, then it would be**
18  **nice to have that in front of me.**
19    Q.  Do you not know already?
20    MR. KEITH:  Object as to form.  He's asked and
21  answered, and he's asked for the report.
22    MS. MANNO:  I don't know that I have the report
23  with me.  I mean, maybe it's on his CD.
24    MR. KEITH:  It is along with all the rest of
25  it.

Page 1020

1    MS. MANNO:  I thought he reviewed all that
2  already.
3    MR. KEITH:  He did.  As you're well-aware, he's
4  reviewed a lot of records.  It's, as you said, just
5  a month ago.  It's hard for you to remember certain
6  things.
7    MS. MANNO:  I don't have it with me.
8  BY MS. MANNO:
9    Q.  Okay.  What is a perineoplasty?
10    **A.  Well, it's the thing that we just**
11  **described with the last report where you make the**
12  **triangle or the diamond incision at the perineal**
13  **body, and you bring together what's usually called**
14  **the bulbocavernosus muscle, and that will decrease**
15  **the capriciousness of the vaginal opening.**
16    Q.  Okay.  Only the opening?
17    **A.  That is correct.**
18    Q.  Okay.  And what about the posterior
19  repair, that can decrease the vaginal wall,
20  correct?
21    **A.  Only if you excise too much vaginal wall.**
22    Q.  Do you know how much Dr. Bradford excised?
23    **A.  I don't specifically remember the exact**
24  **dimensions of the amount of vaginal incision from**
25  **the pathology report.**

Page 1021

1    Q.  Okay.  Doctor, are you aware that
2  Ms. ▇▇▇ suffered from pre-implant pelvic and
3  abdominal pain?
4    **A.  What are you referring to right now?**
5    Q.  Well, what are you aware of in terms of
6  what pelvic and abdominal pain she had prior to
7  implant surgery?
8    **A.  As I state in my report, she had**
9  **diverticulitis, diverticulosis, which can cause**
10  **abdominal pain.  She had, quote, unquote, a chronic**
11  **pain syndrome.**
12    Q.  What is that?
13    **A.  Well, that's kind of a catch-all phrase.**
14  **Some people -- you know, part of that could be**
15  **fibromyalgia.  Part of that could be just patients**
16  **who have pain that hasn't been categorized the**
17  **exact etiology.**
18    Q.  So she was also diagnosed before her
19  implant with severe constipation and anismus?
20    **A.  That is correct.**
21    Q.  Okay.  And do you know -- do you attribute
22  that to a particular condition that she had?
23    **A.  Well, the chronic constipation will lead**
24  **to diverticulosis of the chronic pressure inside**
25  **the bowel.  It leads to an outpouching of the**

1  mucosa through the wall of the muscle, which is
2  diverticulitis or diverticulosis. When that
3  becomes infected, it becomes diverticulitis.
4      Q.  Is diverticulitis or diverticulosis, are
5  those chronic conditions?
6      A.  Well, chronic in the respect that once
7  they're there, the only way to get rid of it is by
8  removing it surgically. Is it chronically
9  uncomfortable? No.
10     Q.  Okay. Is it sporadically uncomfortable?
11     A.  That is correct.
12     Q.  And do you also know -- and when you say
13 uncomfortable, that manifests in the abdomen and
14 pelvis?
15     A.  It all depends on where the diverticulitis
16 and the diverticulosis is. If it's closer to the
17 rectum, then it would be more pelvis. If it's
18 higher up in the sigmoid colon or the descending
19 colon, it would be higher up in the abdomen.
20     Q.  Do you know where Ms. ████ experienced
21 hers?
22     A.  I don't think it was ever diagnosed
23 exactly where the diverticulitis was, but there's
24 probably an X-ray report that will say. If I
25 remember correctly, it was more in the sigmoid

1  colon, which would make it more of an
2  intraabdominal process.
3      Q.  Do you know that for sure, or are you
4  speculating?
5      A.  No. I'm speculating.
6      Q.  Let's not do that.
7      A.  Okay.
8      MR. KEITH:  Yes, please.
9  BY MS. MANNO:
10     Q.  And then did you also know before the
11 implant she was diagnosed with having levator
12 spasms?
13     A.  If you would like to pull out the exact
14 location where that is described --
15     Q.  My only question is were you aware that
16 she had levator spasms before the implant?
17     A.  That is not described in my report. If
18 you would like to show me exactly where that is
19 described, then I could -- we could discuss that.
20     Q.  So the answer is no, you're not aware of
21 that?
22     MR. KEITH:  Object as to form.
23     THE WITNESS:  It is not in my report.
24 BY MS. MANNO:
25     Q.  If a patient had levator spasms prior to

1  an implant, what does that mean really?
2      A.  What does what mean?
3      Q.  If someone is diagnosed with having
4  levator spasms and they've never had an implant,
5  how would you describe that to a layperson what
6  that means?
7      A.  It would -- it would help me explain that
8  to a layperson to know exactly what you're talking
9  about with regard to Ms. ████  Now, sometimes
10 someone can have levator spasm after childbirth and
11 so that once the patient's pelvic floor muscles
12 resolve after childbirth, then her levator spasm
13 would go away.
14     Q.  Okay. What does a -- what is a symptom of
15 having a levator spasm?
16     A.  That you have -- I mean, it could lead to
17 a variety of different symptoms. It could be
18 something that's just noticed on pelvic exam. It
19 could be something that is so severe that it can
20 change the way they walk.
21     Q.  For Ms. ████ Doctor, and I know we
22 talked about generally your rate last time and the
23 amount of hours that you spent on each particular
24 plaintiff, and I just want to be sure that we're on
25 the same track for this one. Remind me again what

1  your rate is for review of these cases.
2      A.  $750 an hour for review, $1,500 an hour
3  for depositions and $10,000 a day for trial
4  testimony.
5      Q.  Okay. And for Ms. ████ case, about
6  how long would you say that you've spent either
7  reviewing her records, writing the report and
8  examining her?
9      A.  I can't give you an idea.
10     Q.  Do you not make invoices?
11     A.  Yes.
12     Q.  Okay.
13     A.  And Mr. Keith is going to supply you with
14 those.
15     Q.  Did you make an invoice for this case?
16     A.  I did not invoice individual cases
17 individually.
18     Q.  So how do you know how many hours you
19 spent?
20     A.  That's why I said I don't know how many
21 hours I spent.
22     Q.  So how is it that you -- I mean, when
23 you're making your invoice, what are you looking at
24 to --
25     A.  Well, the total amount of time I spent

Page 1026

1 working on the total cases that I was sent by an
2 individual person or by an individual attorney.
3    Q.  Okay.  For Mr. Keith, how many cases did
4 he send you to work on?
5    A.  Two.
6    Q.  The two that we're talking about today?
7    A.  That is correct.
8    Q.  Okay.  So for those two, how many hours
9 did you spend?
10    A.  That I can't tell you because that was
11 bundled together with a group of others that came
12 from Wagstaff & Cartmell.
13    Q.  And that's a different law firm?
14    A.  That is correct.
15    Q.  So how many came from Wagstaff?
16    A.  I think we've already gone through those
17 three of --
18    Q.  We're going to go through it again because
19 I don't remember.
20    A.  We went through three the day of
21 Halloween.
22    Q.  Those three?
23    A.  Right.
24    Q.  Two today?
25    A.  That is correct, those five.

Page 1027

1    Q.  So five all together?
2    A.  That is correct.
3    Q.  How much time for all five?
4    A.  That I can't tell you.  That would be
5 reflected in the invoices that I sent them.
6    Q.  Did you already send them?
7    A.  That is correct.
8    Q.  So you've sent the invoices, but you don't
9 know what they say?
10    A.  I can't remember.
11    Q.  Okay.
12    A.  But you're going to get a copy of the
13 invoices, so then you will know.
14    Q.  So will you -- when will you produce
15 those?
16    A.  Those will get -- I think Mr. Cartmell,
17 which is what we agreed to --
18    MR. KEITH:  We'll produce those after this
19 deposition, not today.
20    MS. MANNO:  Within how long?
21    MR. KEITH:  30 days.
22    MS. BEYEA-SCHROEDER:  We're supposed to be
23 giving them all to Mr. Cartmell and then
24 Mr. Cartmell --
25    THE WITNESS:  That's what we agreed to with Tom

Page 1028

1 on the first day of the deposition.
2 BY MS. MANNO:
3    Q.  That's fine, and I'm not getting cranky
4 with you.  What typically happens is we have these
5 depositions, and people -- and I'm not saying you
6 guys, but people promise to provide things, and
7 then we forget, and then they forget, and it never
8 happens.
9    MR. KEITH:  To be fair, both sides do that on a
10 regular basis.
11    MS. MANNO:  So I'm asking for it to be by
12 ▓▓▓▓▓▓ --
13    THE WITNESS:  Perfect.  I don't keep copies as
14 I said before in every single deposition I've been
15 in.  I don't keep any copies of invoices once they
16 get sent out, and so therefore, I can't really tell
17 you.  They will have a copy of it, and they'll be
18 more than happy to --
19 BY MS. MANNO:
20    Q.  You're just so trusting.  You just send
21 them out, and you hope they pay you what you ask
22 for?
23    A.  That is correct.
24    Q.  Okay.  Once the information for Ms. ▓▓▓▓
25 was provided to you, Doctor, did you ask for any

Page 1029

1 additional information?
2    A.  Not that I recall.
3    Q.  And let me just ask you this:  Have you
4 ever been referred any plaintiff in this mesh
5 litigation to look at and concluded that any of the
6 complaining symptoms were a result of something
7 other than mesh?
8    A.  Yes.
9    Q.  Who?
10    MS. BEYEA-SCHROEDER:  Objection.  Privileged.
11 If he's a consulting expert on those cases, then he
12 is not to divulge that information.
13    THE WITNESS:  Yes, and I wasn't even allowed to
14 testify about that in West Virginia.
15 BY MS. MANNO:
16    Q.  How many cases have you been sent total
17 with respect to mesh litigation, not just Bard, but
18 any mesh litigation?
19    A.  You really want to get that on the record?
20    Q.  Yeah.  How many plaintiffs have you
21 reviewed?
22    A.  Because they wouldn't allow that -- me to
23 testify to that in trial.
24    Q.  This is a deposition, and at trial, we'll
25 determine --

Page 1030

1    A.  I have reviewed well over 150 specific
2  cases in this mesh litigation, probably closer to
3  200.
4    Q.  Okay.  And I'm not asking for the names,
5  but of the -- out of the entirety of the amount
6  that you have reviewed, the 150 or closer to 200,
7  how many cases have you determined that one or more
8  complaints of a plaintiff was due to something
9  other than mesh?
10    A.  Well, one or more of the complaints, I
11  mean, that would be a lot more frequently.  The
12  ones that I've said that the complaints the patient
13  was having wasn't due to the mesh, probably 10 to
14  15.
15    Q.  Of the 200?
16    A.  Yes.
17    Q.  All right.  Let's move on to --
18    A.  Not bad.
19    MR. KEITH:  Do you need a quick bathroom break?
20    THE WITNESS:  No.  We'll take a break after
21  we're done with this so you can get on to your
22  flight.
23    MR. KEITH:  And I'm going to put 46 on the
24  record afterwards.  I'm going to have your
25  assistant make a copy of it.

Page 1031

1         (Whereupon, Deposition Exhibit
2              Nos. 50-52 was marked for
3              identification.)
4  BY MS. MANNO:
5    Q.  So Doctor, let's talk about the case of
6  ███████
7    A.  Yes.
8    Q.  And in front of you, you have your
9  highlighted copy of your report?
10    A.  That is correct.
11    Q.  What exhibit is that?
12    A.  51.
13    Q.  And I've also -- 50 is the CD containing
14  all of the information materials you reviewed for
15  Ms. ████
16    A.  That is correct.
17    Q.  And 53 is a copy of your clean report?
18    A.  That is correct.
19    MR. KEITH:  52 is the plaintiff's response to
20  the notice of deposition of Dr. Rosenzweig.
21    MS. MANNO:  For Ms. ████
22    MR. KEITH:  Yes.
23    MS. MANNO:  Okay.  Did you want to add
24  Ms. ████ at this point, too?
25    MR. KEITH:  I think I previously stated, but 46

Page 1032

1  is the objections to Ms. ████ specifically.
2    MS. MANNO:  Okay.  And we'll enter that later?
3    MR. KEITH:  Yes.
4    MS. MANNO:  Got it.  I didn't know if it was
5  all together or if they were by plaintiff.
6    MR. KEITH:  I did it by plaintiff.  Well, to be
7  honest, they actually are -- those two are
8  together, so I can just make that 46.  So 46, for
9  the record, is the objections by plaintiff for the
10  deposition of Dr. Rosenzweig on behalf of
11  Ms. ████ and Ms. ████ in each of those two
12  cases.
13    MS. MANNO:  Okay.  52 is now the clean copy of
14  Dr. Rosenzweig's report.
15  BY MS. MANNO:
16    Q.  Okay, Doctor.  Ms. ████ had an Align
17  sling ████ of 2009, correct?
18    A.  That is correct.
19    Q.  And do you recognize -- I didn't ask you
20  in Ms. ████ case.
21    A.  And it was specifically a retropubic Align
22  sling.
23    Q.  Okay.  I did not ask you in Ms. ████
24  case, but to the extent that we're still on the
25  record, did you know or recognize any of the

Page 1033

1  treating physicians involved in Ms. ██████ case?
2    A.  No.
3    Q.  Do you recognize any names of the
4  physicians, Thomas Bormes or Bernard Lakemaker in
5  Ms. ████ case?
6    A.  No.
7    Q.  What were you aware of in fashioning your
8  report in terms of any pertinent pre-implant
9  medical issues for Ms. ████
10    A.  Ms. ████ had type 2 diabetes, rheumatoid
11  arthritis, psoriatic arthritis.  She was on
12  insulin, methotrexate and prednisone with Cortisone
13  injections.
14    Q.  Okay.  Were you aware -- I think you may
15  have said this.  She was obese?
16    A.  Yes.
17    Q.  What about depression?
18    A.  Yes.
19    Q.  Okay.  And let's talk about depression for
20  a minute.  Can depression be a contributing factor
21  to pain, pelvic pain, dyspareunia, things like
22  that?
23    A.  Yes.
24    Q.  How so?
25    A.  Well, usually the depression is the result

Page 1034

1 of a chronic condition that is unremitting and can
2 lead to alterations in one's lifestyle,
3 dyspareunia, meaning that it's difficult for you to
4 have sexual intercourse with your significant
5 other, husband, boyfriend, what have you, and so
6 therefore, that will lead to depression. Now,
7 obviously, depression can worsen when a new chronic
8 condition comes along.
9     Q.  Earlier you were talking about how the
10 fact that if somebody has a chronic pain condition
11 prior to the implant that they can experience pain
12 more greatly afterwards.
13     MR. KEITH:  Object as to form.
14 BY MS. MANNO:
15     Q.  And if I didn't get that right, that their
16 pelvic pain can be more pronounced following the
17 surgery.  Would you agree with that?
18     A.  Based on Withagen's 2011 study, yes.
19     Q.  In terms of depression, can depression
20 similarly cause particular patients to potentially
21 experience pain more greatly than someone who is
22 not depressed?
23     A.  In a very short answer, potentially.
24     Q.  Okay.  And if you want to expound upon
25 that, feel free.

Page 1035

1     A.  That expounding would be an exceedingly
2 long answer.  The complex interaction between
3 psychological conditions, pain, manifestation of
4 disease processes, we know that chronic disease
5 processes can impact someone's psychological
6 status.  Someone's psychological status can impact
7 disease.  Obviously, depression, anxiety, stress
8 can worsen just about every medical condition, and
9 pain is not oblivious to that.
10     Q.  Okay.  Did you know that Ms. ████ was
11 taking Xanax for depression prior to her implant?
12     A.  That is correct.
13     Q.  And Vicodin as well?
14     A.  That is correct.
15     Q.  Do you know what the Vicodin was
16 prescribed for?
17     A.  Most likely her rheumatoid and psoriatic
18 arthritis.
19     Q.  Rheumatoid, and what's the other one?
20     A.  Psoriatic.
21     Q.  And how are those different?
22     MR. KEITH:  Object as to form.
23     THE WITNESS:  One has more cutaneous
24 manifestations, which is the psoriatic arthritis,
25 than rheumatoid arthritis.

Page 1036

1 BY MS. MANNO:
2     Q.  Okay.  And what does that mean?
3     A.  Well, that there are -- my
4 understanding -- obviously, this is not my area of
5 expertise, so I will give you what I understand
6 from taking care of patients with rheumatoid and
7 psoriatic arthritis.  Psoriatic arthritis, again,
8 they have not only joint pain, but skin
9 manifestations such as psoriatic plaques like
10 cirrhosis.
11     Q.  Do you know whether or not rheumatoid or
12 psoriatic arthritis can cause or contribute to
13 pelvic pain?
14     A.  It all depends on what joints are
15 involved.  If someone has hip joint manifestation,
16 the pain can be in the hips, which can then be
17 perceived by the patient as possibly being related
18 to their pelvis, but in that very limited sense,
19 more likely than not, you don't get pelvic pain.
20     Q.  Okay.  But Ms. ████ did report, prior to
21 her implant, hip pain, correct?
22     A.  That is correct.
23     Q.  So can you rule -- hip pain resulting in
24 pelvic pain, can you rule that out in Ms. ████
25 case?

Page 1037

1     A.  Most -- the vast majority of patients I
2 have seen that have hip pain do not state that the
3 pain is located in their pelvis along with their
4 hip, that it's in their hip.
5     Q.  In Ms. ████ case, can you rule out her
6 hip pain caused by her arthritis as contributing to
7 any pelvic pain she has?
8     A.  Yes, because when I asked her if -- prior
9 to her retropubic sling if she had any complaints
10 of bulging dyspareunia and pelvic pain and vaginal
11 pain, she denied that.
12     Q.  Okay.  So you're basing that on just what
13 she reported to you?
14     A.  Well, that is correct.
15     Q.  Okay.  In terms of her diabetes, okay, how
16 does diabetes relate to or impact the body's
17 ability to heal?
18     A.  I think we talked about this before, but
19 the laymen's version is that when your blood sugar
20 is elevated, it confuses white blood cells, so they
21 don't do their job as effectively, so therefore, it
22 can potentiate infection.
23     Q.  Okay.  Does it cause -- and so I want to
24 talk about healing within the body and sort of on
25 the outside of the body, right?  Is it the same --

Page 1038

1  if you're having difficulties with your diabetes,
2  if you're tricking your white blood cells as you're
3  describing, can that impact internal healing?
4  **A.  I didn't say tricking.  I said confusing.**
5  Q.  Confusing.  I'm sorry.
6  **A.  They don't do their job as effectively as**
7  **they do when blood sugar is normal.**
8  Q.  Confusing, does that impact internal
9  healing?
10 **A.  In what respect?**
11 Q.  Well, I'm asking you to tell me if
12 diabetes can impact the body's ability to heal?
13 **A.  You mean from a surgical procedure?  From**
14 **an infection that gets set up?**
15 Q.  Yes.
16 **A.  It's a very, very broad question, and I**
17 **would hate to give you cues about how to then**
18 **narrow down the question, but the short version is**
19 **yes.**
20 Q.  If you have a vaginal surgery and you have
21 diabetes, can the fact that a patient has diabetes
22 impact the healing process of the vaginal surgery?
23 **A.  Yes.**
24 Q.  And it can do so because it confuses your
25 white blood cells as you said?

Page 1039

1  **A.  In a very simplistic sense, yes.**
2  Q.  And so because of that, is the healing --
3  how is the healing impacted?
4  **A.  The patient could develop infections in**
5  **the immediate postoperative period.  The patient**
6  **could have a delay in the wound healing.  The**
7  **patient might not develop as vibrant of a scar**
8  **immediately, so scarification can be slow to**
9  **happen.  It all depends on, A, the severity of the**
10 **diabetes; B, how well-controlled it is.  I mean,**
11 **severe diabetes can be well-controlled where not as**
12 **severe diabetes can be much more difficult to**
13 **control.**
14 **So I mean, just saying diabetes, you're**
15 **really talking about a variety of different**
16 **disorders.  There isn't one etiology for diabetes.**
17 **There isn't just one single manifestation of**
18 **diabetes, so each individual diabetic is really**
19 **their own template.**
20 Q.  And within even a particular person with
21 diabetes, are there some times where the diabetes
22 can be, quote, under control or better controlled
23 versus not as well-controlled?
24 **A.  That is correct.**
25 Q.  And can that change fairly rapidly?

Page 1040

1  **A.  That is correct.**
2  Q.  And what sort of tests would you do to
3  determine whether a person's diabetes was
4  well-controlled on a given day?
5  **A.  Well, on a given day, you would just look**
6  **at their blood sugar.  If you want to get a kind of**
7  **snapshot of how well-controlled they were over the**
8  **last month, you can check their hemoglobin A1C.**
9  Q.  Are you aware of any tests like this that
10 was done for Ms. ██████ at or around the time of
11 her implant?
12 **A.  Well, obviously, in order for her to go to**
13 **the operating room, they more likely than not, and**
14 **if I remember correctly, they did have a blood**
15 **sugar level.**
16 Q.  And I don't know where you're getting that
17 from.  Can you tell me where you got that from?
18 **A.  Well, that would be from -- having**
19 **operated for 25 years as an attending physician,**
20 **doing a major surgical procedure on a diabetic, no**
21 **one is going to bring that patient to the operating**
22 **room unless they know their blood sugar is under**
23 **control.**
24 Q.  Blood sugar could be in control on Monday,
25 though, and out of control on a Thursday, correct?

Page 1041

1  **A.  That is correct.**
2  Q.  Are you aware of any follow-up testing
3  that was done for Ms. ██████ immediately following
4  her implant to make sure that her diabetes
5  continued to be well-controlled?
6  **A.  Again, having done surgery for 25 years,**
7  **it is my convention to get a postoperative day**
8  **No. 1 blood sugar and also do a blood sugar level,**
9  **which can be done rather quickly prior to surgery,**
10 **so I know exactly that their blood sugar level is**
11 **prior to surgery.**
12 Q.  Are you aware of whether or not Ms. ██████
13 was tested for her blood level near, after or in
14 the weeks that followed her implant?
15 **A.  If I remember correctly, she did have a**
16 **blood sugar prior to surgery and after her surgery.**
17 Q.  When after?
18 **A.  If you'd like to pull out the exact**
19 **records --**
20 Q.  I don't know those records.  That's why
21 I'm asking you.  I mean, are you speculating, or do
22 you know?
23 **A.  Since I don't have the lab flow sheet in**
24 **front of me to be able to say exactly when those**
25 **tests were run and exactly what those numbers were,**

Page 1042

1  it is my recollection that those were done.
2  **Specifically if we would like to look at the exact**
3  **values, then we could tell exactly for sure what**
4  **they were.**
5  Q.  I don't even know what you're referring
6  to, so I don't have the values for you.  Should
7  they speak for themselves?
8  **A.  The values will speak for themselves, yes.**
9  Q.  And when they were done?
10  **A.  And exactly when they were done.  That**
11  **would be on the lab flow sheet from the hospital.**
12  Q.  What is Humira?  Is that for arthritis?
13  **A.  Most likely, yes.**
14  Q.  Were you aware Ms. ███ had taken
15  Humira?
16  **A.  If I remember correctly, that was in the**
17  **list of medications that I cited, yes.**
18  Q.  Okay.  Were you aware she had taken Detrol
19  for overactive bladder?
20  **A.  Yes.**
21  Q.  Do you know when she took that?
22  **A.  Off the top of my head, no.  If you'd like**
23  **to pull out the exact place in the records where it**
24  **states that --**
25  Q.  Dr. Rosenzweig, let me just be clear on

Page 1043

1  something.  You're the one who has reviewed all
2  these records.  You've been paid a lot money to do
3  so.
4  **A.  That is true.**
5  Q.  When I ask you something, I'm asking
6  whether or not you know it and where you know it
7  from.  It's not from a -- it will take me all day
8  to pull all these records for you.
9  **A.  Right.  And as you know, this is not a**
10  **memory test.**
11  Q.  It is not.
12  **A.  And I am -- I would not want to make a**
13  **statement based on just the memory of all of the**
14  **documents that I've reviewed.  You're asking for a**
15  **very specific thing in the records.  What I tried**
16  **to do is put in my report all the important aspects**
17  **that would make it easier for us to go through.**
18  **Right now you're kind of playing, you know, do you**
19  **remember seeing this specific thing.**
20  Q.  Well, Dr. Rosenzweig, if you say
21  everything important is in your report, I'm asking
22  you things that are not in your report.  And if you
23  don't know them and they're not in your report,
24  then the follow-up question is why do you not think
25  that's important.  So I can't -- I cannot, you

Page 1044

1  know, bring in 800 pages to go over with you now.
2  If I have done research, let me finish and
3  I have found that Ms. ███ for example, had
4  taken Detrol and if that's not in your report, then
5  I want to ask you, okay, well, do you not think
6  that was important to include?  Why?
7  **A.  Well, Detrol is an overactive bladder**
8  **medication, okay?  She was treated for stress**
9  **urinary incontinence.  That -- the problems that**
10  **she had with a recurrent rectovaginal -- a**
11  **perirectal abscess that later developed into a**
12  **vulvar abscess, which later developed into a mesh**
13  **erosion, in my opinion, did not have anything to do**
14  **with whether or not she took Detrol.**
15  Q.  All right.  So I'm asking you the
16  overactive -- Detrol is for overactive bladder?
17  **A.  That is correct.**
18  Q.  Which results in urge incontinence,
19  correct, most of the time?
20  **A.  Actually, only 25 percent of patients that**
21  **have overactive bladders actually leak 25 to**
22  **30 percent, so most of patients that have**
23  **overactive bladders don't leak.**
24  Q.  And I'm sorry.  My fault.  I was
25  distinguishing between stress urinary incontinence

Page 1045

1  and urge incontinence.
2  So when incontinence manifests from an
3  overactive bladder, would that normally be seen as
4  an urge incontinence situation?
5  **A.  That is correct.**
6  Q.  Did you know that she had also previously
7  taken estrogen cream?
8  **A.  That is correct.**
9  Q.  Obviously, for vaginal atrophy, correct?
10  **A.  That is correct.**
11  Q.  And were you aware that she was a smoker?
12  **A.  That is correct.**
13  Q.  Do you know for how long?
14  **A.  If I remember correctly, I asked her that**
15  **during her review.  I have that she is a**
16  **one-half-pack-per-day smoker.  I do not recall when**
17  **she exactly started, but she continued to smoke a**
18  **half a pack per day.**
19  Q.  And she continues currently?
20  **A.  That is my best recollection.**
21  Q.  And when was the date of your exam?
22  **A.  That was on ███████ 2014.**
23  Q.  You saw both of these --
24  THE VIDEOGRAPHER:  2000 what?
25  **THE WITNESS:  2014.**

Page 1046

BY MS. MANNO:

2    Q.  So you saw Ms. ███ and Ms. ███ on
3  the same day?

4    **A.  That is correct.**

5    Q.  Okay.  When you saw Ms. ███ can you
6  tell us what you did in terms of your exam?

7    **A.  I obtained her medical history.  She**
8  **described what her symptoms were like before her**
9  **sling surgery, which were described as mixed**
10  **urinary incontinence where she had both stress and**
11  **urge incontinence.  We described what happened**
12  **after her surgery and then what happened after her**
13  **explant.  I obtained a post-void residual urine**
14  **volume.  She had urinated approximately 30 minutes**
15  **before she came to my office.  We did a bladder**
16  **scan.  She had 45 CC left in her bladder.**
17      **I did a pelvic exam, which noted that she**
18  **had levator tenderness, and that was -- there was a**
19  **palpable band approximately one, two centimeters in**
20  **from the introitus, which is consistent with a**
21  **tender sling.  There was no palpable material on**
22  **the right side of the urethra.**
23    Q.  Where was the band again?

24    **A.  It was one, two centimeters in from the**
25  **introitus on the left side.**

Page 1047

1    Q.  At the point of tenderness, did you feel
2  mesh through the tissue?

3    **A.  I felt a band, which more likely than not**
4  **was associated with the mesh.**

5    Q.  The band that you felt, though, I mean,
6  what I've heard before, and you can correct me if
7  I'm wrong, is that while -- even if the mesh is not
8  exposed or it's not extruding in any way, that you
9  can feel the tissue that contains the mesh within?

10    **A.  Well, if you have normal tissue**
11  **integration, you should not be able to feel the**
12  **sling.  If you feel a palpable band, it means that**
13  **you have scarification around the mesh, which we've**
14  **already discussed before.**

15    Q.  But I guess what I'm trying to get at is
16  say you have a person who has healed normally and
17  there's been proper tissue ingrowth.  In a person
18  with mesh and without mesh, does the tissue feel --
19  I mean, can you feel oh, I can tell that there's
20  mesh contained in this tissue?

21    **A.  If there is no contraction, degradation,**
22  **chronic foreign body reaction, chronic**
23  **inflammation, chronic subclinical infection or**
24  **deformation, you should not be able to feel it.**
25  **That's what normal integration means is that, you**

Page 1048

1  **know, you have just tissue that grows in, and so it**
2  **should not be palpable.**

3    Q.  So a person with mesh that has none of
4  these problems that has healed correctly versus a
5  person that does not have mesh, same tissue, you
6  know, same health of tissue would feel the same if
7  you're touching where the mesh is placed?

8    **A.  If someone has normal tissue integration**
9  **with no contraction, deformation, chronic foreign**
10  **body reaction, chronic inflammation or scar plate**
11  **formation, you should not be able to feel the mesh.**

12    Q.  And it would not feel any different from
13  the person's tissue without mesh?

14    **A.  You should feel a smooth anterior vaginal**
15  **wall, yes.**

16    Q.  Okay.  And so this leads to my question,
17  though, with Ms. ███ when you felt what you're
18  describing as a band.  How can you be sure that you
19  weren't just feeling tissue that was scarred versus
20  tissue that was surrounding mesh?

21    **A.  Well, because it felt like a band.  If you**
22  **just had a scar from the incision, that should be a**
23  **very thin line.  This was a band feeling like a**
24  **rubber band.**

25    Q.  So I've heard of, you know, sort of on the

Page 1049

1  outside of the body keloid scars, right, so when a
2  person basically overscars, right, and it makes the
3  red tougher, thicker, correct?

4    **A.  Yes.**

5    Q.  Can that type -- and maybe that's the
6  wrong word, but can that type of scarring occur in
7  individuals in their vagina?

8    **A.  I have -- I've seen exaggerated scarring**
9  **inside the vagina.  I think we talked about before**
10  **about granulation tissue, normal granulation tissue**
11  **versus excessive granulation tissue, but if -- I**
12  **have not seen typical keloids, which is on a**
13  **different -- from a different kind of squamous**
14  **mucosa than you would see inside the vaginal**
15  **squamous mucosa, but that would be a lump up, not a**
16  **lump underneath -- not a band underneath the**
17  **tissue.  So you would feel it coming down from the**
18  **surface level of the vagina --**

19    Q.  Okay.

20    **A.  -- in the situation that you described.**

21    Q.  Okay.  So I'm sorry.  I had interrupted
22  you.  So when you were -- you did your pelvic exam.
23  You felt the band.  There was some tenderness one
24  to two centimeters on the left side from the --
25  what did you say?

Page 1050

1   A.  Introitus.

2   Q.  Then on the right side, there was no

3  palpable tenderness?

4   A.  And no palpable band.

5   Q.  What are -- what is your understanding of

6  Ms. █████ current complaints?

7   A.  Mrs. █████ current complaints are

8  persistent pelvic pain and stress and urge

9  incontinence.

10   Q.  Okay.  Would you agree -- so Ms. █████

11  had her implant.  Would you agree, though, that the

12  fact that she was obese, that she was a smoker, had

13  diabetes and rheumatoid arthritis and was taking

14  immunologic medications would have increased the

15  possibility of a mesh extrusion?

16   A.  In the general sense, yes.  And as I say

17  in my report, I took all of those into

18  consideration in describing the sequence of events

19  that happened with Ms. █████  The recurrent

20  perirectal abscesses, the recurrent vulvar

21  absences --

22   Q.  Hang on.  I'll get there.  I promise.

23     But in terms of the exposure to begin

24  with, would you agree with me that all of those

25  things that I mentioned together as well as

Page 1051

1  individually would have increased her risk for the

2  exposure?

3   A.  Again, I took all of that into

4  consideration, but when you see -- the erosion was

5  the final path for the chronic infection that she

6  had, which first drained down into the perirectal

7  space, then drained to the vulva and finally broke

8  down through the vaginal wall, was all the

9  result -- the diabetes, the methotrexate, the

10  prednisone all were a contributing factor, but

11  albeit, for the mesh, that wouldn't have happened.

12   Q.  Okay.  And this is sort of an example.

13  You can say that it's in your report.  I'm just

14  asking you whether each of those things that I

15  mentioned can contribute and put a position (sic)

16  in a worse situation in terms of the risk of

17  exposure?

18   A.  In the scenario that I described before,

19  your answer is yes.

20   Q.  Thank you.

21     Do you have any opinions or criticisms

22  with respect to the initial surgery done by Thomas

23  Bormes?

24   A.  I did not find that there was any

25  difficulties in performing the procedure.  I think

Page 1052

1  the procedure was -- from my review, the surgery

2  was performed as described in the instructions for

3  use.

4   Q.  Do you have any criticisms regarding the

5  informed consent process in this case?

6   A.  I think we've discussed that before.  The

7  informed consent will speak for itself.  What she

8  knew beforehand speaks for itself.  What he

9  described for her speaks for itself.

10   Q.  I'm asking you, Doctor, whether or not you

11  have any opinions about whether anything was

12  lacking in the informed consent process in this

13  case?

14   A.  And as I've said before and in every one

15  of these case specifics, what she describes in her

16  deposition speaks for itself.  What he said in his

17  deposition speaks for itself, and what's on the

18  informed consent speaks for itself.  And therefore,

19  I am not offering any opinions about things that

20  speak for themselves.

21   Q.  So you have no opinions in any case at all

22  in this Bard litigation whether or not the informed

23  consent process was adequate or inadequate?

24   A.  They all speak for themselves.

25   Q.  That's not my question.

Page 1053

1   A.  They all speak for themselves.

2   Q.  Dr. Rosenzweig, I know what the papers say

3  as many of the medical records say what they say,

4  and you have formed opinions about those.

5   A.  That is correct.

6   Q.  My question is whether or not you are

7  saying in total that you have no opinion either way

8  in any of the Bard cases whether or not informed

9  consent processes with any patient were adequate or

10  inadequate?

11   A.  We have --

12   MR. KEITH:  Object to form.

13   THE WITNESS:  This is No. 15.  I've said the

14  same thing in the prior 14, and I'll say the same

15  thing in the last remaining eight.  That what she

16  says she was told, what he said he told her and

17  what's written on the informed consent speaks for

18  themselves.

19  BY MS. MANNO:

20   Q.  I'm going to object to nonresponsive.

21   A.  I'm not offering any opinions about

22  whether they were adequate or not.  They speak for

23  themselves.

24   Q.  In any case, you're not?

25   A.  In these cases.

Page 1054

1   Q.  Any of the Bard cases?
2   **A.  In these cases, yes.**
3   Q.  How is these different cases from any of
4   the Bard cases?
5   MR. KEITH:  He just said the previous 14, the
6   upcoming eight.
7   MS. MANNO:  Well, I'm asking him.
8   **THE WITNESS:  We haven't had an argument about**
9   **this before when I've said the exact same thing.**
10  BY MS. MANNO:
11  Q.  But you're answering my questions very
12  strangely.  I'm asking you --
13  **A.  I've said the exact same thing in every**
14  **one.**
15  Q.  Let me finish.
16  **A.  What she was told --**
17  Q.  Let me finish.
18  **A.  Yes.**
19  Q.  I understand your response of the
20  documents speak for themselves, okay?  Many of
21  these documents speak for themselves.  You, in some
22  areas, have formed opinions about certain things.
23  I am asking you very -- I'm not asking you whether
24  a document speaks for itself.  I'm asking you
25  whether in -- it sounds like in this case, you

Page 1055

1   don't have an opinion, but I'm asking you in any
2   Bard cases at all, the ones we've talked about and
3   any we're yet to talk about, whether -- I can't
4   even finish my question with you guys keep on
5   holding up your hands.
6   BY MS. MANNO:
7   Q.  I'm asking you whether you intend to
8   express an opinion either way about whether an
9   informed consent process was adequate or inadequate
10  in any of the cases which you've been retained
11  involving Bard?
12  MS. BEYEA-SCHROEDER:  Objection.
13  MR. KEITH:  Dr. Rosenzweig, let me put my
14  objection in.  He's here to testify today in
15  regards to Ms. ███ case.  You've asked him
16  that question in regards to Ms. ███ case.
17  He's answered your question.  I object to you
18  asking him about all of Bard, etcetera, etcetera.
19  That's not the purpose for which we are here.
20  MS. MANNO:  But the purpose is if he's
21  expressing opinions about informed consent
22  processes in other cases and not this one, it is
23  relevant to this case.
24  MS. KEITH:  Again, he -- okay.  Then I will
25  further object he has asked answered -- it's been

Page 1056

1   asked and answered, your question.
2   MS. MANNO:  I disagree that it's been answered.
3   MS. BEYEA-SCHROEDER:  And I'm going to object
4   to the extent that if there's Wave 4, Wave 5 and
5   there's cases where he develops opinions with
6   regard to the sufficiency of informed consent, by
7   saying all Bard cases, you're limiting him to those
8   cases that he may not have reviewed yet.
9   MS. MANNO:  I understand your objection.
10  BY MS. MANNO:
11  Q.  Any cases to date?
12  **A.  I haven't offered opinions on any cases to**
13  **date, and I don't intend to offer any opinions**
14  **today.**
15  Q.  Okay.  Is there a reason why you are
16  withholding any opinions as to the informed consent
17  process?
18  **A.  Because the informed consent speaks for**
19  **itself.  What she was told, what the patient was**
20  **told, what the doctor told her and what's in the**
21  **informed consent speaks for itself.**
22  Q.  Do you believe that an informed consent,
23  if it is describing all known risks or all risks
24  contained -- you know what, I don't want to be here
25  all day.  Never mind.

Page 1057

1       Okay.  So the current complaints you
2   talked about were the persistent pelvic pain and
3   the recurrence of the stress and urge incontinence,
4   correct?
5   **A.  That is correct.**
6   Q.  So there were no complaints made by
7   Ms. ███ for approximately 10 months after her
8   surgery; is that right?  If it refreshes your
9   memory, ███ ███, 2010 is the
10  hospitalization for the ketoacidosis and perirectal
11  abscess.
12  **A.  That is correct.**
13  Q.  And is it your opinion that this was
14  somehow related to the Align implant?
15  **A.  Yes.**
16  Q.  And what effects, if any, does diabetes
17  have on causing or -- causing an abscess?
18  **A.  Well, if there is no nidus of the**
19  **infection --**
20  Q.  I'm sorry.  What does that mean?
21  **A.  Nidus is the center, is the fulcrum, if**
22  **you will, of the infection.  Diabetes can't cause**
23  **infections.  Diabetes can worsen infections.  As I**
24  **said before, I've seen this exact same clinical**
25  **situation.  I have three patients that had**

Page 1058

1  retropubic slings that developed recurrent
2  perirectal abscesses that went away after I
3  explanted the sling.
4       And the reason that -- the mechanism is
5  that, as we talked about before, the levator
6  muscles, which is the top of the perirectal space,
7  connects with the urogenital diaphragm and that
8  because of the chronic subclinical infection
9  associated with slings, the diabetes allowed that
10  to worsen, and then it found a point of least
11  resistance to track down, which was into the
12  perirectal space.
13     Q.  How do you draw the conclusion that
14  Ms. ▇▇▇ had a subclinical infection?
15     A.  Of her sling?
16     Q.  Uh-huh.
17     A.  We went over that ad nauseam.
18     Q.  We didn't go over that with respect to
19  Ms. ▇▇▇
20     A.  Okay.  Well, with respect to mesh, we know
21  that because you're putting mesh in through a --
22     Q.  But how do you know with respect to
23  Ms. ▇▇▇ she had a subclinical infection?
24     A.  Because she manifested that by perirectal
25  abscesses.

Page 1059

1     Q.  So would you say that anybody who had a
2  mesh implant and had a perirectal abscess, the
3  perirectal abscess was a result of the mesh?
4     A.  Yes.
5     Q.  Regardless of any other cause?
6     A.  Well, unless you find, and she was worked
7  up pretty extensively to find any other cause of
8  the perirectal abscess.
9     Q.  Aren't perirectal abscesses, though, known
10  complications of diabetes?
11     A.  If there is an inciting event such as if
12  there is a leak from the colon, a perforation of a
13  diverticulum, if there's surgery in that area.  In
14  and of itself, no.
15     Q.  Do you know whether or not any of these
16  events preceded this in Ms. ▇▇▇ case?
17     A.  No.  I didn't see any evidence in the
18  literature that there was any nidus for the
19  infection except for the retropubic sling.
20     Q.  So let me read to you a sentence or two
21  sentences from Bard's expert report, okay?  And
22  I'll ask you if you agree or disagree with this.
23     A.  Okay.
24     Q.  Ms. ▇▇▇ also -- I lied.  Three
25  sentences.  Ms. ▇▇▇ also experienced a perianal

Page 1060

1  abscess requiring multiple surgeries in 2010 which
2  she relates to her Align sling.  However, perianal
3  abscesses are known complications of diabetes and
4  immune suppression starting in the cryptoglandular
5  area of the anal canal and are unrelated to her
6  retropubic sling and its location.  This is the
7  likely cause of her vaginal discharge and
8  dyspareunia.
9     So do you -- do you agree with that,
10  disagree or partially agree or disagree?
11     A.  Well, I agree that that could be a cause,
12  but then there has to be a connection between the
13  anal crypts and the perirectal space.  Secondly, I
14  would go by the fact that she had diabetes and
15  immuno -- was on multiple medications for a long
16  time prior to her sling and didn't develop
17  perirectal abscesses prior to her sling being
18  placed.
19     Q.  So are you suggesting that a particular
20  complication from diabetes should be present?  I
21  mean, is what you're saying that some new
22  complication cannot turn up at a later time?
23     A.  No.  What I did is I ruled out other
24  causes because of the temporal sequence of events
25  that took place.  She had a foreign body that picks

Page 1061

1  up bacteria that can have a passage of an infection
2  down into the perirectal space.  I've also seen
3  this on several other occasions.
4     Q.  You said three?
5     A.  Yes, where patients had retropubic slings
6  and developed recurrent perirectal abscesses.
7  These patients were extensively worked up by myself
8  and colorectal surgery, and the only thing that we
9  found as the cause of these was the sling material.
10  Once we took out the sling material, they went
11  away.
12     Q.  Okay.  Did any of those patients have
13  diabetes that you're referring to?
14     A.  One, yes.
15     Q.  How long did you follow that patient with
16  diabetes that apparently resolved after your mesh
17  removal?
18     A.  How long have I followed her?
19     Q.  To see if she had any further or
20  additional abscess.
21     A.  She's still a current patient of mine.
22  They're all current patients of mine.
23     Q.  Okay.  What is pelvic inflammatory
24  disease?
25     A.  Pelvic inflammatory disease is a condition

Page 1062

1 where bacteria from the cervix, most frequently
2 gonorrhea and chlamydia, move their way up from the
3 cervix through the uterus into the tubes and set up
4 an inflammation of the fallopian tubes.
5    Q.  Is it always caused by gonorrhea or
6 chlamydia, or can it be another bacteria?
7    A.  The majority are gonorrhea and chlamydia
8 in the initial manifestation.  Now, recurrent
9 pelvic inflammatory disease, then once you have
10 damaged tubes, can be from other bacteria, but the
11 vast majority of the time we're talking about a
12 gonococcal or a chlamydial infection.
13    Q.  What else could it be?  I understand it
14 may not be the majority of occasions.
15    A.  Occasionally you might be able to find
16 enterococcus, streptococcus, bacteroides, but the
17 vast majority of the time, and then it can become
18 secondarily infected and lead to abscess formation.
19 Those are the times where they find other bacteria.
20    Q.  Okay.  So the complications in
21 Ms. ██████ case from her abscess healing, do you
22 believe those are -- the complications of the
23 healing do you believe are related to the mesh?
24    A.  What do you mean complications of the
25 healing?

Page 1063

1    Q.  Well, didn't she have a hard time healing
2 after it?
3    A.  Well, she had recurrent infections.
4 Finally it went from perirectal to vulvar, and the
5 reason that most likely is that the tract that
6 created the point of least resistance of her
7 bacteria to travel down started to scar down so now
8 it found a tract of least resistance out to the
9 vulva.  And the final tract of least resistance was
10 through the vagina, which manifested as an erosion.
11 So that was the last of the manifestation of the
12 chronic infection of the sling.
13    Q.  Okay.  So she had one excision in ████████
14 of 2012, correct?
15    A.  That is correct.
16    Q.  And did you talk to her about -- so her
17 current complaints -- I mean, you're not surprised,
18 are you, that Ms. ███ is suffering from urge
19 incontinence as she was before, correct?
20    A.  I'm not surprised.  That is correct.
21    Q.  I mean, she had urge incontinence prior to
22 the sling, and slings are not meant to necessarily
23 cure urge incontinence, correct?
24    A.  That is correct, but we also discussed
25 before that chronic subclinical infections are

Page 1064

1 associated with urge incontinence from slings.
2    Q.  Didn't we also discuss that having de novo
3 or additional urge incontinence is a known risk of
4 any type of sling procedure?
5    A.  That is correct.
6    Q.  Okay.  And didn't we also talk about the
7 fact that recurrence stress incontinence or
8 continued urge incontinence are known risks of a
9 sling procedure?
10    A.  That is correct, particularly when you
11 have an explant procedure.
12    Q.  Particularly when the sling is
13 compromised, correct?
14    A.  That is correct.  I'm glad you used the
15 term compromised.
16    Q.  When you cut into it?
17    A.  Yes.
18    Q.  Why are you happy that I used that?
19    A.  We'll let the record speak for
20 themselves.
21    Q.  No.  I'm asking you the question.
22    A.  We'll let the record -- I think in my
23 general causation report, I just gave eight hours
24 worth of testimony why slings are compromised,
25 so --

Page 1065

1    Q.  I mean when you --
2    A.  -- I appreciate that you now are using
3 that term, too.
4    Q.  No.  Well, I'm using it in terms of like a
5 house.  If you have a table and you cut off one of
6 its legs, wouldn't you say that the table is a bit
7 compromised?
8    A.  Right, but if you built a faulty house, it
9 was compromised from the very beginning.
10    Q.  Object as nonresponsive.
11       Are you saying that the persistent pelvic
12 pain she has is coming from that area with the
13 band?
14    A.  That is correct.
15    Q.  Is that the only place of her pelvic pain
16 that you were able to reproduce during your exam?
17    A.  Her levator muscles are tender
18 bilaterally.
19    Q.  Did you talk to her about further revising
20 the sling?
21    A.  That was not the focus of my IME.  I
22 specifically told patients that I'm here to get the
23 information about her current situation, and I
24 would -- I was not entering into a doctor-patient
25 relationship where I would give them my opinions

Page 1066

1  about how to further treat them.
2  Q.  So the answer is no?
3  **A.  That is correct.**
4  Q.  Do you know Tom Giddes?
5  **A.  No.**
6  Q.  You seemed to hesitate.  Do you know of
7  him?
8  **A.  There are several Giddes that I know of,**
9  **but I'm not sure whether it's Tom.**
10  Q.  I think it's South Carolina or North
11  Carolina that he's in.
12  **A.  Then no.**
13  THE VIDEOGRAPHER:  We're off the record.  The
14  time is 11:20 a.m.
15      (Whereupon, a short break was
16      taken.)
17  THE VIDEOGRAPHER:  We're back on the record.
18  The time is 11:33 a.m.
19      (Whereupon, Deposition Exhibit
20      Nos. 53-55 were marked for
21      identification.)
22  BY MS. MANNO:
23  Q.  All right, Doctor.  Let's turn our
24  attention to Ms. ██████ ██████  For the record,
25  we've marked the clean report of yours as

Page 1067

1  Exhibit 55.  We've marked as 54 the CD of all the
2  materials you relied on and your report as 56?
3  MS. BEYEA-SCHROEDER:  53.
4  **THE WITNESS:  53.  Yes, that is correct.**
5  BY MS. MANNO:
6  Q.  Again, I'll just ask at the outset here
7  we're going to request the invoices, time sheets,
8  anything evidencing your time spent on any of the
9  five we're going to do.
10  MS. BEYEA-SCHROEDER:  Yes.
11  **THE WITNESS:  That is correct.**
12  BY MS. MANNO:
13  Q.  ██████ ██████ ██████ ██████ ██████
14  and ████ not the ████ ████
15  MS. MANNO:  Well, she is ████ ████
16  but the --
17  MS. MANNO:  Not the Attorney General ████
18  ████
19  MS. BEYEA-SCHROEDER:  Yes.
20  BY MS. MANNO:
21  Q.  We'll be asking for all of those, but fair
22  to say you've spent about the same amount of time
23  on all of these five plaintiffs that we're getting
24  ready to talk about?
25  **A.  That is correct.**

Page 1068

1  Q.  And you did not personally exam or perform
2  an IME on any of them?
3  **A.  That is correct.**
4  Q.  Okay.  So with respect to Ms. ██████  what
5  are the current complaints in which she states?
6  **A.  Pelvic pain, dyspareunia and urinary**
7  **problems.**
8  Q.  And when you say urinary problems, what
9  does that mean?
10  **A.  If I remember correctly, she's currently**
11  **complaining of urinary frequency with bladder**
12  **spasms after her surgery.**
13  Q.  Okay.  I had down that her specific
14  allegations are that there was abnormal bleeding,
15  recurrent urinary UTIs, pelvic pain and dyspareunia
16  and then emotional suffering.  Yours are somehow
17  different?
18  MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
19  **THE WITNESS:  Just that she stated in 2013 that**
20  **she was having bladder spasms after her repair**
21  **surgery.**
22  BY MS. MANNO:
23  Q.  Okay.  Do you know if she is currently
24  complaining of those, though?
25  **A.  No, I do not.**

Page 1069

1  Q.  Okay.  Okay.  So let's talk about the
2  procedure itself, okay?
3  **A.  Okay.**
4  Q.  You have -- you have stated your opinions
5  in your report, but one thing that I want to talk
6  more about is the actual procedure and the bladder
7  perforation, okay?
8  **A.  The possible bladder perforation.**
9  Q.  Okay.  So do we disagree about that?
10  **A.  I don't think that a perforation of the**
11  **bladder was ever definitively diagnosed on the**
12  **██████  2009 surgery.**
13  Q.  Okay.  So I'm going to read from
14  Dr. Berger's deposition.  Do you know Dr. Berger --
15  **A.  No, I do not.**
16  Q.  -- or of her?
17      And I'm just --
18  MS. MANNO:  Do you want a copy of this?
19  MS. BEYEA-SCHROEDER:  I'm very familiar with
20  it.  Go ahead.
21  BY MS. MANNO:
22  Q.  So beginning on about Page 100, it says:
23      Question:  Okay.  I believe there was a
24  complication with her surgery?
25      Answer:  Yes.

Page 1070

1    Okay. Can you tell me a little bit about
2  what happened with that?
3        Answer: So in placing one of the trocars,
4  I noticed some fluid in excess to what I would have
5  expected, which made me concerned that I might have
6  perforated the bladder.
7        Question: Okay.
8        Answer: And in so doing, you definitely
9  don't want to place the arm because that means it's
10 going to go through the bladder.
11       Question: Okay.
12       Answer: So I retracted the trocar, and I
13 attempted to push the bladder more away from the
14 side I was dissecting, and often you can do that
15 with a mandarin stylet.
16       What's that?
17   **A. It's just a rigid instrument that's placed**
18 **inside the bladder to move the bladder over from**
19 **one side to the other.**
20   Q. Okay. In the catheter and sort of direct
21 the bladder the opposite way. And then I did
22 another pass, and I felt like that was fine, and
23 I -- I -- I checked once placed to make sure that
24 there was no component of mesh noted in the
25 bladder.

Page 1071

1        She then goes on Page 102, Line 18:
2        Answer: All right. So then yeah, let me
3  go forward here. At this point, once all arms have
4  been pulled through, cystoscopy was performed, and
5  there was some irritation noted on both sides and a
6  site for possible prior perforation noted on the
7  left; however, there was no obvious hole, and there
8  was no -- there was clearly no mesh anywhere within
9  the bladder.
10       Question: Okay. So there was no obvious
11 place where the bladder had been perforated; is
12 that --
13       Answer: Potentially. I said there was no
14 obvious hole.
15       Question: Okay.
16       Answer: So I -- I -- I did not know
17 definitively whether I had punctured the bladder or
18 not.
19       So is that what we're basing --
20   **A. That is correct. Also, in the operative**
21 **report, it says pretty much what she said in her**
22 **deposition. There's a possible perforation.**
23   Q. Okay. And then I will -- on the operative
24 report --
25

Page 1072

1        (Whereupon, Deposition Exhibit
2         No. 56 was marked for
3         identification.)
4  BY MS. MANNO:
5    Q. Okay. We see on the operative report
6  under findings bladder perforation noted on the
7  left with the first passage, so it was removed
8  prior to any mesh placement. The bladder itself
9  was very mobile, and of note, the patient's
10 ureteral --
11   MS. BEYEA-SCHROEDER: Yes.
12   **THE WITNESS: Uh-huh.**
13   MS. MANNO: Thank you. I'm never pronouncing
14 these things correctly.
15 BY MS. MANNO:
16   Q. -- orifices were quite distal and close to
17 the bladder neck themselves. Therefore, it is not
18 sure that effuse was noted after the mesh was in
19 place on both sides.
20       Okay. So I have several questions about
21 this.
22   **A. Okay.**
23   Q. First of all, when we talk about the
24 bladder itself was very mobile, what does that
25 mean?

Page 1073

1    **A. That it could be moved from side to side.**
2    Q. Is that different -- the bladder being
3  mobile, is that an unusual occurrence, or are most
4  of our bladders mobile?
5    **A. Once you're done with doing a dissection**
6  **to be able to put the Avaulta mesh in, it would not**
7  **be an uncommon finding to see that the bladder was**
8  **mobile.**
9    Q. Okay. Well, you put a lot into that
10 statement. When you dissect someone, regardless of
11 what you're going to do, is it a common occurrence
12 that the bladder is mobile?
13   MS. BEYEA-SCHROEDER: Objection. Go ahead.
14   **THE WITNESS: Well, where the bladder is**
15 **attached to the anterior wall of the vagina, unless**
16 **that detachment is removed, that part of the**
17 **bladder would not be mobile, okay? Now, the rest**
18 **of the bladder, it's like a balloon, which has an**
19 **attachment at its base. Once the balloon is blown**
20 **up, you can move a balloon around from side to**
21 **side. So there are different areas of the bladder**
22 **that could be mobile, but in and of itself, does**
23 **that mean anything? No.**
24 BY MS. MANNO:
25   Q. So when you do these surgeries, though,

Page 1074

1  isn't the bladder supposed to be completely
2  emptied?
3      A.  You do have a catheter in.  There might be
4  times when you will distend the bladder.
5      Q.  You distend for the cystoscopy, right?
6      A.  That is correct.
7      Q.  Do you distend at any time prior to the
8  cystoscopy during the procedure?
9      A.  The way I personally do vaginal surgery, I
10  will empty the bladder to begin with.  I don't mind
11  the bladder then filling up.  And then at a certain
12  point in time, I will put a catheter back in the
13  bladder.  So I don't always have a catheter in a
14  bladder during the complete performance of all
15  vaginal surgery.
16      Q.  Perforating the bladder with a trocar is a
17  known risk of implant procedures, correct?
18      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
19      THE WITNESS:  That is correct.
20  BY MS. MANNO:
21      Q.  And that's virtually in every IFU that's
22  at issue in this case, correct?
23      A.  That is correct.
24      Q.  And one of the ways in which doctors
25  decrease the risk of perforating the bladder is to

Page 1075

1  make sure that it does not contain any fluid or is
2  the least amount of fluid possible; is that
3  correct?
4      A.  At that point of the procedure, yes, that
5  is correct.
6      Q.  Okay.  And so without -- if there is no
7  fluid in the bladder and it's not distended into a
8  balloon, would that surprise you that it was
9  mobile?
10      MS. BEYEA-SCHROEDER:  Objection.  Form.
11      THE WITNESS:  First of all, even with a Foley
12  catheter in, there's still going to be some urine
13  in the bladder.  Secondly, that description of
14  mobile, I don't -- it's an observation that when
15  Dr. Berger wanted to move the bladder over, the
16  bladder was able to be moved over.  So it wasn't
17  fixed, which would be a little bit -- which would
18  be different, and that would be something that
19  would tell me that there might have been prior
20  surgery that caused the bladder to be fixed.  So
21  saying the bladder was mobile --
22  BY MS. MANNO:
23      Q.  Well, it says very mobile, and that's why
24  I'm wondering in your medical terminology, is that
25  something unusual to see a, quote, very mobile

Page 1076

1  bladder?
2      A.  I think that what Dr. Berger actually
3  intended by saying that is a better question to ask
4  Dr. Berger.  My reading it, I didn't find anything
5  unusual, specific or concerning about saying very
6  mobile.
7      Q.  Would you agree that if you have a bladder
8  that is very mobile or somehow moves more than your
9  average bladder, that that would be an increased
10  risk of perforation during a trocar pass?
11      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
12      THE WITNESS:  I don't think there's any data to
13  support that, and while that might seem to a
14  layperson that would be the case, these trocars are
15  going lateral, not superior, so I don't -- I would
16  not expect someone describing the bladder as being
17  very mobile as being something that would increase
18  the risk of perforation.
19  BY MS. MANNO:
20      Q.  Okay.  And when -- also, the findings, it
21  says the patient's ureteral orifices were quite
22  distal and close to the bladder neck themselves.
23  What does that mean?
24      A.  Well, that's just an observation of where
25  the ureters are actually coming through the

Page 1077

1  muscularis of the bladder into the bladder itself.
2  And what does that mean?  It's just an observation.
3      Q.  Is this an unusual finding?
4      A.  In and of itself, no.
5      Q.  Why do you couch it with in and of itself?
6  Is it unusual when combined with something else?
7      A.  The ureters have to get into the bladder
8  or else urine wouldn't drain from the kidneys to
9  the bladder to be excreted.  I've seen ureters in
10  various locations and have not -- not associated
11  with any particular disease process or anatomic
12  finding.  I mean, it's like, you know, some people
13  have their eyes separated.  Some people have their
14  eyes closer together.  Does that mean anything?
15  No.
16      Q.  Well, she says the bladder itself was very
17  mobile, and of note, the patient's ureteral -- I
18  mean, of note, she's pointing this out, the
19  patient's ureteral orifices were quite distal and
20  close to the bladder neck themselves, semicolon,
21  therefore, it is not sure that effuse was noted
22  after the mesh was in place on both sides.
23      A.  Well, that we know later that within a few
24  hours after the procedure that the patient had to
25  go back to the operating room to put stents inside

Page 1078

1  the ureters because there was limited to no urine
2  output. So I think the important thing is that
3  there was a question about whether urine was
4  actually coming through the ureters at the time of
5  cystoscopy.
6      It's not the question look, they're
7  distal, and they're close to the bladder neck.
8  It's that oh, there might have been some concern
9  about, you know, urine not coming through the
10  ureters, which necessitated later on a stent being
11  placed in the ureter.
12     Q.  And the urine potentially being obstructed
13  or not coming through the ureters, could that have
14  been because -- caused by either the anatomy of
15  Ms. █████ or the injury potential injury to the
16  bladder?
17     A.  More likely than not, no.
18     Q.  Okay. Why not?
19     A.  A perforation is not going to cause or the
20  possibility of a perforation is not in and itself
21  going to cause urine to not make its way through
22  the ureters into the bladder.
23     Q.  Okay. So when you -- when somebody
24  perforates the bladder, excuse me, or scrapes the
25  bladder or potentially injures it or inflames it in

Page 1079

1  some way, what is the result? What does the
2  bladder then do?
3      A.  Heals itself.
4      Q.  What does it do in terms of healing?
5      A.  Well, the first thing is that you will get
6  a new epithelium, which is the surface layering
7  growing over the area that was irritated, scraped
8  or a hole, and then the muscle will contract around
9  underneath it and then heal itself so that the hole
10  goes away. I mean, a small puncture wound should
11  be -- with the bladder drained should heal up
12  within 24 hours.
13     Q.  Okay. And does it swell? Does the
14  bladder swell at all, the tissues once it's been
15  injured?
16     A.  The typical response to any kind of
17  irritation is tissue swelling.
18     Q.  Okay.
19     A.  The whole bladder isn't going to swell.
20  At the area of irritation, there will be tissue
21  swelling.
22     Q.  And when the tissue swells and then heals
23  itself as you have said, does that process result
24  in any scarring?
25     A.  The epithelium, no, because it has a quick

Page 1080

1  turnover, and what it will do is just grow new
2  epithelium on top of it. Now, depending on how
3  extensive it is, you might get an area of scarring,
4  but usually just the surface irritation is not
5  going to cause scarring.
6      Q.  Okay. What about a more deeper hole,
7  though?
8      MS. BEYEA-SCHROEDER: Objection. Go ahead.
9      THE WITNESS: You might get a small area of
10  scarring at the exact area of the hole, so you
11  might see like maybe a millimeter circle of
12  scarring where the hole was depending on how big it
13  was.
14  BY MS. MANNO:
15     Q.  Okay. And if you were doing a cystoscopy
16  and there had been a puncture in the bladder, at
17  what size of the puncture do you think it would
18  have to be to be visible via cystoscopy?
19     A.  Are you talking at the time of doing it?
20     Q.  So let's say the bladder is punctured,
21  okay?
22     A.  Right.
23     Q.  You do a cystoscopy within an hour or
24  30 minutes afterwards?
25     A.  Right.

Page 1081

1      Q.  How big would the puncture have to be for
2  you to be able to visualize it cystoscopically?
3      A.  You should be able to see even a small
4  several-millimeter puncture. Now, the trocar size
5  for these is approximately 5 to 8 millimeters, and
6  a perforation that large, you should be able to see
7  on cystoscopy. Obviously, not every puncture is
8  seen cystoscopically.
9      Q.  Because why?
10     A.  It might look like a fold inside the
11  bladder. You know, the bladder might be
12  contracting at that point, and so therefore, even
13  though there is a puncture in the epithelium, the
14  muscle around that puncture is contracting, and
15  therefore, you don't see fluid going out, so there
16  are a variety of reasons why you might not see it.
17     Q.  Okay. And so if you had a -- if you did
18  have a 5 to 8-millimeter puncture that was not
19  visible on cystoscopy, but that was still there,
20  when the bladder healed, would you expect an area
21  of scarring to be about 5 or 8 millimeters or less?
22     A.  You could have an area of scarring. You
23  might not see anything.
24     Q.  It just depends?
25     A.  Uh-huh.

Page 1082

1  Q.  So do you believe that when Dr. Berger is
2  concerned, I mean, I think she testified that she,
3  you know, at best may have perforated the bladder.
4  When you have done that, do you believe that it's
5  within the standard of care then to say I'm going
6  to move the bladder away and try again or to stop
7  the procedure?
8      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
9      **THE WITNESS:  There is -- we know from the**
10  **sling literature that when bladder perforations**
11  **happen anywhere from 5 to 15 percent of the time,**
12  **that what is considered the standard is you move**
13  **the bladder.  You reposition your trocar and repeat**
14  **the placement procedure.  There is no data with POP**
15  **mesh to say that you perforate the bladder, you**
16  **should not leave the mesh or you should abandon the**
17  **mesh procedure and either just close the patient up**
18  **and do this procedure on another day or use a**
19  **different form of reparative procedure.**
20  BY MS. MANNO:
21    Q.  What do you think are the risks, though,
22  of continuing with the procedure in a pelvic floor
23  mesh kit where you've injured the bladder or you've
24  perforated the bladder and you continue with the
25  procedure?  What risks and complications can result

Page 1083

1  by that decision?
2     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
3     **THE WITNESS:  Well, again, if you look at the**
4  **sling literature, it is felt that a bladder**
5  **perforation is an innocuous event that can happen**
6  **and that the risks associated with that are**
7  **minimal.  Theoretically, one could develop a**
8  **vesicovaginal fistula because of poor healing of**
9  **that tract.**
10  BY MS. MANNO:
11    Q.  So you stated in your report, excuse me,
12  that the trocar pass did not -- like that pass with
13  the needle, the mesh was not yet attached to the
14  needle when the potential perforation occurred.  Do
15  you recall that?
16    **A.  That is correct.**
17    Q.  Okay.  You said the mesh was placed after
18  she retracted it and put it through again?
19    **A.  What you do is you place your trocars, and**
20  **then you attach the mesh to the trocar, and then**
21  **you back it out.  So yes, when the trocar is**
22  **initially placed, there is no mesh attached to it.**
23    Q.  Okay.  And I just wanted to be sure that
24  when you make that statement about, you know, the
25  mesh had not been yet placed on the needle or the

Page 1084

1  trocar, are you basing that on your understanding
2  of sort of the steps in these operations or
3  anything that you read in the op report or any
4  deposition?
5  **A.  It is based on the way the procedure is**
6  **performed.**
7  Q.  Or supposed to be performed?
8  **A.  Or supposed to be performed.**
9  Q.  Okay.  Because when I was looking at the
10  op report, I couldn't tell.  The bottom of the
11  first page, excuse me, with a finger in the left
12  portion of the wound near the inferior or posterior
13  portion of the obturator foramen at the sciatic
14  notch, the Bard guide needle was then placed over
15  the ischial tuberosity and through the inferior
16  portion of the foramen until it could be palpated
17  on my finger, and then the extension portion of the
18  needle was deployed, and the mesh was pulled
19  throughout the skin in a similar fashion.  This was
20  performed on the patient's right side.  Then a stay
21  suture was placed.
22      So I can't tell whether or not she
23  had the mesh already attached to the needle or not
24  if you can give me any more clarity on that.
25  **A.  I think that Dr. Berger will give you --**

Page 1085

1  **will be the only one that would give you clarity**
2  **whether or not with -- before she repositioned the**
3  **trocar, if she had attached the mesh to it.**
4  **Obviously, if she's taking the trocar out to**
5  **reposition it, it would be exceedingly difficult to**
6  **do that with the mesh attached to it.  You would**
7  **not want to try to reposition the trocar with the**
8  **mesh attached.**
9  Q.  Okay.  I just want to make sure that
10  you're basing your conclusion that the mesh did not
11  go through the bladder and the implant because that
12  wouldn't have been the appropriate step in terms of
13  the surgery.  Does that make sense?  That wouldn't
14  have been the -- doing the appropriate steps in the
15  surgery, performing the procedure as it is meant to
16  be performed, you would not yet have the mesh on
17  the trocar at that initial pass?
18      MS. BEYEA-SCHROEDER:  Objection.
19      **THE WITNESS:  If you're repositioning the**
20  **trocar, you would not have the mesh attached.  If**
21  **you are going to bring the mesh with the trocar**
22  **through the obturator foramen or the obturator**
23  **space, then the mesh would have to be attached.**
24  BY MS. MANNO:
25    Q.  Okay.  But nothing from her op report or

Page 1086

1 her deposition states one way or the other when she
2 attached the mesh to the needle; is that correct?
3   **A. That is correct.**
4   Q. Okay. Now, let's say, you know, she
5 perforates or somehow inflames or injures the
6 bladder on that first pass. She then moves it over
7 and tries again. When the bladder comes -- you
8 know, comes back, we have a very mobile bladder,
9 right? So when it, obviously, comes back into
10 place and the placement of the mesh is near the
11 bladder, what could be the result of that injury
12 now that the mesh is right there next to it?
13   MS. BEYEA-SCHROEDER: Objection.
14   **THE WITNESS: Well, we know that every case,**
15 **the bladder and the mesh are intimately associated**
16 **with one another. The bladder is sitting on top of**
17 **the mesh. That is the idea to treat the cystocele.**
18 **As I said before, if the tract does not heal up,**
19 **you will get a vesicovaginal fistula.**
20 BY MS. MANNO:
21   Q. Could the vesicovaginal fistula then cause
22 ultimately pelvic pain, dyspareunia, erosion?
23   **A. No. It will cause leakage of urine**
24 **through the vagina.**
25   Q. Okay. What in terms -- is there anything

Page 1087

1 with respect to the injury to the bladder and the
2 healing process when the mesh is right next to it
3 that can then lead to pelvic pain or dyspareunia?
4   MS. BEYEA-SCHROEDER: Objection. Form.
5 Foundation. Go ahead.
6   **THE WITNESS: A more extensive injury of the**
7 **bladder where you have to suture the bladder**
8 **closed, if you have large enough injury to the**
9 **bladder can lead to painful bladder syndrome.**
10 BY MS. MANNO:
11   Q. Could you get painful bladder syndrome
12 from a small puncture?
13   MS. BEYEA-SCHROEDER: Objection. Form.
14 Foundation.
15   **THE WITNESS: Exceedingly unlikely.**
16 BY MS. MANNO:
17   Q. But possible?
18   MS. BEYEA-SCHROEDER: Objection.
19   **THE WITNESS: Anything is possible, but I would**
20 **say it's exceedingly unlikely.**
21 BY MS. MANNO:
22   Q. Okay. And why do you say that?
23   **A. Because small punctures -- we see small**
24 **punctures happen quite frequently. The times I've**
25 **seen painful bladder syndrome associated with**

Page 1088

1 **bladder injury have been extensive bladder**
2 **injuries.**
3   Q. So Ms. ███ had a long history of
4 dysfunctional uterine bleeding and fibroids prior
5 to the procedure?
6   **A. That is correct.**
7   Q. Okay. And can that be a contributing
8 factor to any of her current complaints?
9   **A. The -- can you repeat that question again?**
10   Q. Sure. So the current complaints you've
11 told me are the pelvic pain, dyspareunia and what
12 you described as the urinary problems?
13   **A. That is correct.**
14   Q. Can her history of dysfunctional uterine
15 bleeding and fibroids be a contributing factor to
16 any of those symptoms?
17   **A. No.**
18   Q. Okay. Why not?
19   **A. She's menopausal.**
20   Q. And so?
21   **A. You don't get dysfunctional uterine**
22 **bleeding in menopause.**
23   Q. And what about fibroids?
24   **A. Fibroids tend to shrink after menopause.**
25   Q. Do you know whether or not Ms. ███ has,

Page 1089

1 I mean, based on any examination or medical records
2 you read, whether or not she is currently dealing
3 with fibroids?
4   MS. BEYEA-SCHROEDER: Objection. Go ahead.
5   **THE WITNESS: Unless the uterus is taken out,**
6 **the fibroids don't go away. I've seen patients**
7 **that have 20-week size, and we measure it by the**
8 **size of a pregnancy, 20-week size fibroids go up to**
9 **the belly button that are completely asymptomatic**
10 **in their postmenopausal period.**
11 BY MS. MANNO:
12   Q. But do you know whether or not Ms. ███
13 currently has any fibroids of note?
14   **A. No, I do not.**
15   Q. You know, when Dr. Berger did her
16 cystoscopy, I'm sorry, I'm going back to the
17 implant surgery, she noted irritation on both sides
18 of the bladder and one side for possible prior
19 perforation noted on the left. What -- what
20 explains the irritation on both sides of the
21 bladder?
22   **A. She had a Foley catheter in. She had a**
23 **uterine -- a bladder manipulator in. I mean,**
24 **basically, you know, when these things move around,**
25 **they can scrape the lining of the bladder, and you**

Page 1090

1  can see irritation.  And if you -- when you're done
2  with a surgical procedure and you do a cystoscopy,
3  even with a -- just a Foley catheter in place,
4  you're going to see irritation in the bladder.
5      Q.  Okay.  That would heal fairly quickly?
6      A.  That is correct.
7      Q.  Okay.  And so the bladder perforations
8  were a known risk of the surgery, correct?
9      A.  That is correct.
10     Q.  And so were pelvic pain and dyspareunia,
11  correct?
12     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
13     THE WITNESS:  That is correct.
14  BY MS. MANNO:
15     Q.  As well as any recurrent urinary
16  incontinence, correct?
17     A.  That is correct.
18     Q.  And potentially UTIs?
19     A.  That is correct.
20     MS. MANNO:  All right.  That's it for this one.
21     THE VIDEOGRAPHER:  We're off the record.  The
22  time 12:02 p.m.
23        (Whereupon, a lunch break was
24        taken.)
25     THE VIDEOGRAPHER:  We're back on the record.

Page 1091

1  The time is 12:25 p.m.
2        (Whereupon, Deposition Exhibit
3        Nos. 57-59 was marked for
4        identification.)
5  BY MS. MANNO:
6      Q.  Let's turn to the case of plaintiff, ███
7  ███  We will mark your report highlighted as
8  what?
9      MS. BEYEA-SCHROEDER:  64.
10     MS. MANNO:  The disc as 65.
11     MS. BEYEA-SCHROEDER:  No. 57 is the marked
12  version of the report.  58 is the disc, and 59 is
13  the clean version of the report.
14  BY MS. MANNO:
15     Q.  Ms. ███  you have not seen personally,
16  correct?
17     A.  That is correct.
18     Q.  You never -- you've not had any contact
19  with her.  You don't know her, correct?
20     A.  That is correct.
21     Q.  Are Ms. ███ current complaints pain,
22  leakage, dyspareunia and previous erosion?
23     A.  That is correct.
24     Q.  Are you aware of any other complaints?
25     A.  Not that I'm aware of.

Page 1092

1      Q.  Okay.  And so do you know the name Dr. --
2  is it Bui, B-u-i?
3      A.  No, I do not.
4      Q.  Okay.  Some of the pre-implant medical
5  issues I wanted to talk to you about.
6        Were you aware that she had complained of
7  chronic low back pain and chronic pelvic pain prior
8  to the implant?
9      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
10     THE WITNESS:  If you would like to show me
11  where it states that she had chronic pelvic pain,
12  that would make this discussion a little bit
13  easier.
14  BY MS. MANNO:
15     Q.  Do you have anywhere in your report a note
16  that she had complained of prior chronic pelvic
17  pain?
18     A.  I have in my report that she had a
19  laparoscopy with a Nissen fundoplication, which is
20  a stomach stapling, her gallbladder removed, and
21  they took out adhesions, which would be abdominal
22  and leading to abdominal pain.  She also had GERD
23  and acid reflux.
24     Q.  Okay.  So --
25     MS. BEYEA-SCHROEDER:  The low back pain is on

Page 1093

1  Page 3 of his report.
2      MS. MANNO:  Pardon?
3      MS. BEYEA-SCHROEDER:  The low back pain is on
4  Page 3 of his report.
5      MS. MANNO:  Okay.
6      THE WITNESS:  And I was going to get to that.
7  Thank you.
8      MS. BEYEA-SCHROEDER:  Sorry.
9      THE WITNESS:  She also had renal calculi, and
10  then in 2009, she had a pelvic ultrasound due to
11  periods every other month and pain on the left side
12  of her back and that she had fibroids and ovarian
13  cysts.
14  BY MS. MANNO:
15     Q.  Okay.  Did you -- did you -- hang on just
16  a second.
17     A.  Then if you'd like me to continue to
18  testify, on ███ she was in a
19  preoperative consultation with Dr. Bui where
20  uterine fibroids, metromenorrhagia was noted, that
21  she had an abdominal wall pannus, which means that
22  she had excess fat around the lower part of her
23  abdomen and pelvic pain.
24     Q.  Okay.  So that's the only indication that
25  you have in your report of prior pelvic pain?  When

Page 1094

1  I say prior, prior to the implant.
2      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
3      THE WITNESS:  Well, again, on the day of
4  admission, it states that she had symptomatic
5  fibroids, abdominal well laxity, pelvic pain and
6  metromenorrhagia refractory to medical management.
7  BY MS. MANNO:
8      Q.  Okay.  So this all started, your response,
9  when I asked you whether you had anything in your
10  report that dealt with pelvic pain, and you have
11  read off quite a variety of things.
12     A.  That is correct.
13     Q.  The variety of things that you have read
14  off, did you read those off as potential causes of
15  pelvic pain, or why did you respond in the way that
16  you did?
17     A.  Well, those are what is documented in the
18  medical records as complaints of pelvic pain.  It
19  seems that her pelvic pain was associated with her
20  fibroids and her menorrhagia.
21     Q.  Okay.  Anything else prior to the implant?
22     A.  Also, she had a history of renal stones,
23  which could also lead to back pain and groin pain.
24     Q.  Okay.  Anything else prior to the implant
25  that you believe could be a cause of pelvic pain?

Page 1095

1      A.  No.
2      Q.  So I have that Ms. ▓▓▓ saw Dr. Kerry
3  Kirkman on ▓▓▓/08?
4      A.  That is correct, and his assessment is
5  chronic pelvic and back pain, hiatal hernia repair,
6  and she was scheduled for a total abdominal
7  hysterectomy with removal of her ovaries.
8      Q.  Okay.  And at that time she was also
9  complaining of increased urge incontinence,
10  correct?
11     A.  That is correct.
12     Q.  And she was assessed with a new problem of
13  perimenopause?
14     A.  That is correct.
15     Q.  Okay.  And just -- I know we've probably
16  been over this before, but can you just briefly
17  remind me what perimenopause means to a layperson?
18     A.  Well, there is a period of transition from
19  having normal periods to having no periods.  We
20  call that the perimenopausal time or the
21  climacteric, which is where periods start to become
22  less frequent.  A patient could develop hot
23  flashes.  Hot flashes have been known to occur five
24  years before the cessation of menses or as late as
25  five years after the cessation of menses.  They

Page 1096

1  tend to last one to two years, but can last up to
2  20 years.
3      Q.  20?
4      A.  Yes, ma'am.
5      Q.  Well, that's not good.
6          Okay.  In terms of Ms. ▓▓▓ then she was
7  scheduled for a total abdominal hysterectomy,
8  bilateral -- is it salpingo-oophorectomy?
9  Salpingo?
10     A.  Salpingo-oophorectomy.
11     Q.  Basically fallopian tubes and ovaries
12  removed on both sides, correct?
13     A.  That is correct.
14     Q.  And it says due to the four previous
15  cesarean sections as well as a hiatal hernia
16  repair.  So once a woman has a total abdominal
17  hysterectomy with the fallopian tubes and ovaries
18  removed, that's surgical menopause, correct?
19     A.  That is correct, but just to correct you,
20  she had a supracervical hysterectomy.  I know that
21  they talked about doing a total abdominal
22  hysterectomy, but --
23     Q.  Oh, right --
24     A.  -- according to the operative report, it
25  was a supracervical hysterectomy where they leave

Page 1097

1  the cervix behind.
2      Q.  And a tummy tuck at the same time?
3      A.  That is correct.
4      Q.  Okay.  And so we've already talked before
5  about potential dyspareunia as a result of the
6  hysterectomy, and you've talked about that pain
7  generally manifesting at the vaginal cuff?
8      A.  Right.
9      Q.  When the ovaries and --
10     A.  But remember her cervix was left in place,
11  so there is no vaginal cuff.  The vagina is the
12  same as what it was before.  There's still a cervix
13  poking through.  It's just the cervix has been
14  disarticulated, if you will, from the rest of the
15  uterus.
16     Q.  Okay.  So when you are leaving the cervix
17  in and you have not tied off, if you will, the
18  vaginal cuff, can having that hysterectomy not
19  removing the cervix also result in potential pelvic
20  pain?
21     A.  Potentially, yes.  There is debate about
22  whether or not pain, dyspareunia and prolapse
23  happens less frequently with a supracervical
24  hysterectomy than with a total hysterectomy.
25     Q.  Meaning that if you leave the cervix in,

Page 1098

1  potentially you have a better shot at not
2  prolapsing?
3      A.  Not prolapsing, not having pain, not
4  having dyspareunia.
5      Q.  Okay.  So leaving the cervix in may cut
6  against or may decrease your risks of pain?
7      A.  Might mitigate against those, yes.
8      Q.  And what -- so what are you basing that
9  on?
10      A.  There's been research out of France that
11  states that if you leave the cervix behind, you
12  will not detach the cardinal ligaments and the
13  uterosacral ligaments, therefore, decreasing the
14  chance of having prolapse.  They say that since you
15  do not reattach the vaginal cuff together, you have
16  an incision line that has to heal that you decrease
17  the chance of dyspareunia.  And because you have
18  less surgical disruption at the cardinal ligaments,
19  uterosacral ligaments, you may decrease chances of
20  adhesions.
21      Q.  Okay.  So you're aware of one study saying
22  this.  Do you know the name of it?
23      A.  There are actually multiple studies.
24      Q.  Do you know the names of any of them?
25      A.  Not offhand right now.

Page 1099

1      Q.  Okay.  And does the removal of the
2  fallopian tubes and/or ovaries increase your
3  potential risk of pelvic pain or dyspareunia
4  regardless of whether you're leaving the cervix in
5  or not?
6      A.  No.
7      Q.  It stays the same?
8      A.  Well, there might be disease on the
9  fallopian tubes and the ovaries, that if you take
10  out that disease, you're definitely going to
11  decrease the risk of pelvic pain, but doing a
12  salpingo-oophorectomy, there's something called --
13  that happens after hysterectomies where you change
14  the blood flow to the ovaries.  And so if you do a
15  hysterectomy and leave the ovaries behind, you can
16  have an increase in the risk of cysts on the
17  ovaries and also pain, but when you take out the
18  ovaries, that syndrome, if you will, is less likely
19  to happen or can't happen.
20      Q.  I didn't ask you this before, I don't
21  think, but can ovarian cysts cause pelvic pain?
22      A.  Not -- lower abdominal pain that could be
23  considered pelvic pain, yes, but only while the
24  cyst is there.
25      Q.  Okay.  Now, a tummy tuck, how does one --

Page 1100

1  I'm interested to hear how a tummy tuck is
2  performed and what are the potential complications
3  of a tummy tuck?
4      A.  Well, the way a tummy tuck is done is a
5  wedge of skin with fat all the way down to the
6  fascia is removed, and then the skin is brought
7  together.  What -- and I've done several cases
8  where the plastic surgeons have gone in and done
9  tummy tucks afterwards.
10      Sometimes the belly button will be then
11  advanced up so it looks like it's back in its
12  normal place.  Sometimes the belly button is
13  completely removed, and then you just don't have a
14  belly button.
15      Q.  Okay.  In terms of, though, potential
16  causes of pelvic pain later on, can a tummy tuck
17  cause potential pelvic pain?
18      A.  No.  It can cause incisional pain, and the
19  healing process can be quite uncomfortable.  You
20  have to lay in a jackknifed position where your
21  knees are close to your chest for four to five days
22  postoperatively so that you don't put pressure on
23  the incision so that it can heal or else the
24  incision might open up, and then you have a big
25  problem on your hand.  But once things heal up,

Page 1101

1  beside having pain along the incision site, you
2  would not expect to see pelvic pain associated with
3  an abdominoplasty.
4      Q.  Okay.  So just to make sure I get this
5  right, you do a tummy tuck, and you have to
6  literally like sit with your knees up to your chest
7  or as close as you can get for four to five days?
8      A.  Yes.  You cannot lay completely flat, and
9  you know, it might be even longer than that.
10      Q.  Do you have any opinions as to if that is
11  the sort of discharge instructions, if you will,
12  for a tummy tuck and getting an Align implant at
13  the same time, what -- she did get an Align
14  implant, right?
15      A.  Yes.  She got a transobturator implant,
16  yes.
17      Q.  Okay.  So do you see any issues with
18  positioning yourself like that for days after the
19  surgery when you've gotten an implant, how that
20  could affect your healing with the implant?
21      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
22      THE WITNESS:  Well, the implant is not going
23  retropubically.  It's going out to the obturator
24  space.  So where the tummy tuck was done and where
25  the obturator sling was placed are two different

Page 1102

1 locations.
2 BY MS. MANNO:
3    Q. Right, but I mean, if you were in sort of
4 an unnatural position for four to five days after
5 the surgery when you've been implanted with mesh,
6 do you foresee any issues with that?
7    A. No.
8    Q. Okay. Do you think it's in the standard
9 of care to have all of the procedures that Ms. ▇
10 had on ▇▇▇ of 2010?
11    A. I don't think it's unreasonable to do a
12 tummy tuck along with doing a hysterectomy, taking
13 out the ovaries and then following it up with an
14 incontinence operation. I do incontinence
15 operations all the time where the plastic surgeons
16 come in and do a tummy tuck.
17    Q. Okay. Would you agree with me that there
18 is no indication in the medical records that
19 Ms. ▇ was ever given systemic hormone
20 replacement after her hysterectomy or the surgical
21 menopause until like 18 months later?
22    A. I don't remember that specifically, but a
23 50-year-old who's still having periods might not
24 manifest their menopausal symptoms immediately
25 after ovaries being removed.

Page 1103

1    Q. Okay. But -- so you're not aware, at
2 least based on what you have in your report or what
3 you recall, that she got estrogen cream or estrogen
4 therapy right away?
5    A. I don't recall that specifically, no.
6    Q. Okay. And so when you have -- I mean,
7 would you agree with me that after you have a
8 hysterectomy or you have surgical menopause, that
9 it's a progression in terms of potential symptoms
10 like vaginal atrophy? In other words, it might get
11 worse over time?
12    A. I would agree with you that once -- now,
13 remember she was 50 years old when she had the
14 surgery, so the average age of menopause in the
15 United States is 51.4. If you can go to her
16 weight, she was 195 pounds. One of the things that
17 we do know is that there's peripheral conversion
18 and fat cells of estrogen, so bigger women tend to
19 have a more blunted postmenopausal response than
20 thinner women because they have more peripheral
21 conversion to estrogen so they have higher
22 circulating levels of estrogen.
23    Q. Does that mean to a layperson that like
24 fat storers help you maintain estrogen levels?
25    A. Fat storers actually produce estrogen.

Page 1104

1    Q. Okay.
2    A. So that women that tend to be bigger, if
3 you will, tend to have a more blunted response to
4 their menopause. So someone that's perimenopausal
5 who has their ovaries taken out and weighs
6 195 pounds, I would not be surprised that they
7 didn't immediately manifest postmenopausal
8 symptomology as someone that's 35 and 105 pounds
9 that has a hysterectomy and their ovaries removed.
10    Q. Okay. Fair enough. I guess my question,
11 though, is maybe more directed at, you know, if
12 you're going to have atrophying of your vaginal
13 tissue, that is something that can -- once it
14 starts happening can get worse over time?
15    A. Not necessarily.
16    Q. Can it?
17    A. It can, yes.
18    Q. Okay. That's all I'm asking.
19    A. Okay.
20    Q. So if you maybe think you don't need
21 hormones or cream at some point, you may look two
22 years later, and you may really be in a position
23 that you need it?
24    A. That is correct.
25    Q. Okay. So with respect to Ms. ▇ you

Page 1105

1 are aware that she was diagnosed with vaginal
2 atrophy, correct?
3    A. I want to make sure that I have the exact
4 time that it is noted in her records. I have that
5 on ▇ 12, 2013, her history and physical are
6 notable for atrophic vaginitis at the same time she
7 was diagnosed with the mesh erosion.
8    Q. Okay. And we've been over the fact that
9 the thinning of vaginal tissue can make extrusion
10 more likely, correct?
11    MS. BEYEA-SCHROEDER: Objection.
12    THE WITNESS: Right, but on ▇▇▇ 2012,
13 there was -- on exam, there was no mention of
14 vaginal atrophy, and she already had had a prior
15 erosion to that.
16 BY MS. MANNO:
17    Q. I understand that, but I'm -- and this is
18 one of those times where I just -- you can get
19 there. I just want to be sure that you're saying
20 what I think and that she is diagnosed at some
21 point with vaginal atrophy?
22    A. That is correct.
23    Q. And based on what you've reviewed, do you
24 agree with me that Ms. ▇ first complaint of
25 painful intercourse occurred on ▇▇▇ 2012?

Page 1106

1    A.  On or around that time.  I do have that on
2  ████████, she had complaints of
3 dyspareunia.  And so actually, on ████████
4 excuse me, ████████ 2011, it's stated after the
5 surgery, Mrs. ████ returned, and dyspareunia
6 continued, so that it was probably --
7    Q.  I'm sorry.  What date?
8    A.  ████████ 2011.
9    MS. BEYEA-SCHROEDER:  Second full paragraph on
10 Page 6 of his report.
11 BY MS. MANNO:
12    Q.  Okay.  So first, and I don't want to spend
13 time like summarizing everything, she's given
14 vaginal estrogen cream on ████ of 2011, correct?
15    A.  Actually she's -- yes, that is correct.
16    Q.  Okay.  She undergoes an excision of a
17 small mesh exposure on ████████ 2011, correct?
18    A.  That is correct.
19    Q.  Okay.  So in the early stages of vaginal
20 atrophy, Doctor, does the vaginal epithelium appear
21 to be normal, or can it appear to be normal?  In
22 other words, can the vaginal tissue begin
23 atrophying before it becomes visible?
24    A.  Well, one of the first things you would
25 probably see is loss of the typical rugae, which

Page 1107

1 are the folds inside the vagina.  So flattening out
2 of the typical folds inside the vagina would be
3 earlier, in my experience, than actually seeing a
4 thinness to the vaginal epithelium.
5    Q.  Okay.  And the thinning of the vaginal
6 epithelium could then follow?
7    A.  That is correct.
8    Q.  So by the time that Ms. ████ undergoes her
9 second mesh excision, right?
10    A.  Yes.
11    Q.  That's when had or it's first noted
12 that she has obvious exam findings consistent with
13 vaginal atrophy?
14    A.  That is correct.
15    Q.  Okay.  So I guess my question is this:
16 You know, prior to the exam finding that vaginal
17 atrophy exists, it's possible that the rugae that
18 you are referring to and then the following
19 thinning of the vaginal epithelium could have been
20 going on before she's actually found to have
21 vaginal atrophy; is that correct?
22    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
23    THE WITNESS:  I doubt that ████ 2013 when
24 it is first noted that is the first day that she
25 had vaginal atrophy, but we do know on ████████

Page 1108

1 2012, there's no mention of vaginal atrophy on
2 exam.  So more likely than not, sometime between
3 ████ 2012 and ████████ excuse me,
4 2013 vaginal atrophy started to occur.
5 BY MS. MANNO:
6    Q.  Okay.  And what is your understanding of
7 Ms. ████ compliance with taking anything for her
8 vaginal atrophy?
9    A.  I don't specifically remember in the
10 records any mention of compliance or noncompliance.
11    Q.  Okay.  I mean, is there anything in the
12 medical records to indicate that she was taking
13 estrogen cream for any length of time?
14    A.  Not that I recall.  It would be more
15 helpful if you wanted to show me something like her
16 prescription documentation --
17    Q.  I'm not aware that she did, which is why
18 I'm asking.
19    A.  -- to be able to state conclusively
20 whether or not she was complaint with her
21 medication, or she might have testified to the fact
22 how long or why she did or did not use her Estrace
23 cream after it was prescribed on ████████ 2011.
24    Q.  Okay.  But obviously, if somebody is
25 prescribed something for their vaginal atrophy and

Page 1109

1 they're not taking it, vaginal atrophy doesn't
2 usually resolve on its own, does it?
3    MS. BEYEA-SCHROEDER:  Objection.  Form and
4 foundation.
5    THE WITNESS:  Remember I testified earlier that
6 she has a reason for making her own estrogen
7 meaning that she, at least at the time of her
8 implant, was 195 pounds, so therefore, she might
9 not have as severe of a vaginal atrophy or as
10 progressive of a vaginal atrophy as someone that
11 did not have their own conversion into estrogen.
12 BY MS. MANNO:
13    Q.  But once she's diagnosed with it or
14 there's an exam finding, by that point, it's not
15 going to materially improve without treatment?
16    A.  Not necessarily.  I mean, again, if she
17 puts on weight, she's going to make more of her own
18 estrogen.
19    Q.  So how much weight would you think that it
20 would be required to gain in order to make an
21 improvement without medical therapy?
22    A.  I don't think that there is a specific
23 number.
24    Q.  So it could be one pound?  10 pounds?
25    A.  The more adipose that you have, the more



1  peripheral conversion you're going to make.
2      Q.  Can the vaginal atrophy also impact the
3  symptom of urge urinary incontinence?
4      MS. BEYEA-SCHROEDER:  Objection.  Form.
5      THE WITNESS:  Vaginal atrophy, no, but vaginal
6  atrophy is usually associated with atrophy of the
7  epithelial lining of the urethra, and that can give
8  you symptoms of urge.
9  BY MS. MANNO:
10     Q.  Okay.  Okay.  I mean, isn't it true that
11 so many women within a few years of having
12 menopause, also surgical menopause, have an
13 increase in urge urinary incontinence?
14     A.  Epidemiologic studies have shown that urge
15 incontinence -- the incidence and prevalence of
16 urge incontinence continues to go up with age.
17     Q.  Regardless of whether you're menopausal or
18 not?
19     A.  Well, obviously, you're going to get to a
20 point where the vast majority of women are
21 menopausal, and still the incidence and prevalence
22 continues to go up.
23     Q.  Okay.  So you're saying it's not due to
24 the menopause.  It's due to increasing in age or
25 potentially both?

1      A.  Well, then we're -- now, if you want to
2  talk about why age specifically can lead to urgency
3  and overactive bladders is a variety of different
4  things.  One is loss of neurologic control,
5  oversuppression of bladder contractility.  One is
6  loss of cognitive control over bladder
7  contractility, thinning of the urethra just due to
8  age, due to menopausal status, more bladder
9  irritants.  I mean, the list is fairly long.
10     Q.  Okay.
11     A.  But I will agree with you that if you have
12 vaginal atrophy because there are estrogen
13 receptors in the urethra that you will get thinning
14 of the urethral epithelium, and so the corollary is
15 that when you have atrophy of the vagina, you're
16 going to get atrophy of the urethra or the urethral
17 lining, and therefore, you're going to get more
18 urge symptoms.
19     Q.  Okay.  So did you also note in your --
20 well, did you note in your report, I'm not sure,
21 anything with respect to Ms. ███████ compliance with
22 respect to taking Vesicare for her overactive
23 bladder?
24     A.  I did not note the -- whether or not she
25 was -- the level of compliance with her Vesicare.

1      It's noted at ██████████ 2012, at that time she
2  was on Vesicare, and she noted improvement of her
3  urge symptoms on Vesicare.
4      Q.  Okay.  If I'm reporting to you that
5  Ms. ████ has reported cease taking her Vesicare,
6  would you expect the overactive bladder symptoms
7  then to come back?
8      A.  Not necessarily.  In fact, my normal
9  protocol is after six to 12 months of being on an
10 overactive bladder medication, we wean the patient
11 off of their medication, and what -- the idea is
12 unless there is an organic cause such as a
13 neurologic condition that is leading to the
14 overactive bladder, that what you then have done is
15 reset the thermostat, if you will, between the
16 brain, the sacral micturition center and the
17 bladder so that the over -- the contractions of the
18 bladder are less likely to become symptomatic.
19     Q.  What are the causes of overactive bladder?
20     A.  I think we --
21     Q.  You've got to tell me again because I
22 can't remember.
23     A.  Well, the vast majority of overactive
24 bladder are idiopathic, which means we don't know
25 what the cause is.  Upper motor neuron conditions

1  can cause it.  Any irritation of the bladder can
2  cause it.  Irritation can be from things such as
3  food and beverages and alkaline urine can cause it.
4  Again, certain upper motor neuron disorders such as
5  Parkinson's disease, strokes can cause overactive
6  bladders.  We talked about urethral epithelial and
7  vaginal atrophy associated with it, so there are a
8  variety of causes for overactive bladder.
9      Q.  So Ms. ████ overactive bladder, though,
10 was present before her sling procedure, correct?
11     A.  Her cystometrogram noted that she just had
12 a stress incontinence.
13     Q.  Okay.  But we've talked about -- so are
14 you -- are you saying that because she had the
15 Align implant, that is the cause for her having
16 overactive bladder now?
17     A.  Well, we talked about subclinical
18 infections, which can manifest as recurrent
19 erosions, also can lead to overactive bladders.
20     Q.  Okay.  But there's a whole host, and you
21 just said some of them, a whole host of reasons
22 that someone can have an overactive bladder, also
23 that it's sort of a known fact that you can have an
24 increased risk of that after a sling procedure,
25 correct?

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

Page 1114

1     MS. BEYEA-SCHROEDER: Objection.
2     THE WITNESS: That is correct.
3   BY MS. MANNO:
4     Q.  So how are you ruling out all potential
5   contributory factors or causes of her overactive
6   bladder?
7     A.  Well, she hasn't been diagnosed with an
8   upper motor neuron problem.  She hasn't been
9   diagnosed with Parkinson's.  She hasn't had a
10  stroke.  She hasn't been diagnosed with other
11  neurologic conditions.  Because her overactive
12  bladder, at least by her not taking her medication,
13  has, at least for the most part -- I mean, she was
14  on Vesicare prior to her second explant.
15        If she's currently not taking it, it means
16  that doing the explant, as what Dr. Wang found in
17  his 2008 paper on de novo urge symptoms associated
18  with subclinical infections of slings, that the
19  explanting of the mesh removed enough of the
20  bacteria that was irritating her bladder.  And so
21  therefore, it is evidence that the subclinical
22  infection of her sling which led to not only one,
23  but two erosions, also contributed to her
24  overactive bladder.
25    Q.  But didn't you just tell me that people

Page 1115

1   can resolve or get better if they take Vesicare for
2   a period of time and then they're off it?
3     A.  That is correct.
4     Q.  Okay.  So how can you be sure that if
5   there is an improvement in her overactive bladder
6   symptoms that it wasn't because she took the
7   Vesicare for a while?
8     MS. BEYEA-SCHROEDER: Objection. Go ahead.
9     THE WITNESS: Well, it also looks like that
10  when he removed a 0.6 by 0.1 by 0.1 centimeter of
11  the mesh, her overactive bladder got better, too.
12  BY MS. MANNO:
13    Q.  Okay.  But you're saying it's the sling.
14  It's the subclinical infection, which we really
15  can't put our finger on how she has that.  I'm
16  asking you --
17    A.  She had two erosions, so we know that that
18  mesh -- when there's a first erosion, you
19  reinoculate the sling with bacteria.  And then she
20  developed a second erosion from the subclinical
21  infection of the sling.  She also at that time
22  developed an overactive bladder between the first
23  and the second surgery.  That overactive bladder,
24  because she is no longer taking her Vesicare, seems
25  to have gotten better after the second explant.  So

Page 1116

1   it is reasonable for me to assume that the
2   subclinical infection of her sling was responsible
3   for her overactive bladder, which was treated by
4   Vesicare between the first and the second explant
5   operation.
6     Q.  So let me ask this because I'm just not
7   getting this.  I don't understand how you can tell
8   that just because someone has an erosion at some
9   point that they, therefore, have a subclinical
10  infection which you can't really run a test for.
11    MS. BEYEA-SCHROEDER: Objection. Go ahead.
12    THE WITNESS: Well, she has an overactive
13  bladder.
14  BY MS. MANNO:
15    Q.  But let me stop you.
16    A.  She had dyspareunia and an erosion.  The
17  erosion means that you have mesh -- a foreign body
18  being exposed into the vagina.  The vagina can
19  never be sterilized, and so therefore, there are
20  papers by de Tayrac.  We already gone over this
21  many, many --
22    Q.  I know, so can I interrupt you if you
23  don't mind?
24    A.  Yes.
25    Q.  I'm really just trying to ask you how can

Page 1117

1   you determine one individual to another that I know
2   this person, to a reasonable degree of medical
3   certainty, has a subclinical infection?  What test
4   can you run, or what examination can you perform to
5   know that?
6     MS. BEYEA-SCHROEDER: Objection. Go ahead.
7     THE WITNESS: My clinical experience, my review
8   of the literature and all of the documents that
9   I've looked at, the depositions that I've reviewed.
10  We do -- unfortunately, at this point in time, we
11  cannot take a piece of that mesh and find out if
12  there was bacteria associated with it at the time
13  of explantation.
14  BY MS. MANNO:
15    Q.  But even if there's bacteria on the mesh,
16  let's just say in a hypothetical example, there was
17  bacteria on the mesh, how do you then say -- what
18  track do you then follow that says because bacteria
19  was on Mrs. A's mesh, she, therefore, has a
20  subclinical infection?
21    MS. BEYEA-SCHROEDER: Objection. Go ahead.
22    THE WITNESS: That's the definition of
23  subclinical infection, bacteria on the mesh.
24  BY MS. MANNO:
25    Q.  But bacteria is in our body everywhere,

Page 1118

1  right, or lots of places in our body?  In our
2  mouth?
3     **A.  Yes.**
4     Q.  In our vagina?
5     **A.  Yes.**
6     Q.  So just because there's the presence of
7  bacteria, how does that then make you have a
8  subclinical infection?
9     **A.  Because it's in a localized area where the**
10  **body has set up protective mechanisms to keep it**
11  **there.  You don't have bacteria sitting on your**
12  **heart.  You don't have bacteria sitting on top of**
13  **your liver.  You don't have bacteria sitting on top**
14  **of your kidneys.**
15     Q.  But we have bacteria in our vagina?
16     **A.  That is correct.**
17     Q.  So how can you be sure that if there is
18  bacteria on mesh that was implanted in someone that
19  that person has an infection?
20     MS. BEYEA-SCHROEDER:  Objection.
21  BY MS. MANNO:
22     Q.  I don't understand.
23     **A.  Because the mesh should be separated from**
24  **the bacteria in the vagina by the vaginal**
25  **epithelium, okay?  Once that is broken down because**

Page 1119

1  **of the cytotoxic effects of the mesh, now all that**
2  **bacteria can jump into a place where it's not**
3  **supposed to be, which is further around the mesh,**
4  **reinoculate the mesh with more bacteria, and that**
5  **is an infection.**
6     Q.  Do we know -- what can you tell the jury
7  what is the basis for you saying in Ms. ▇▇▇▇ case
8  that Ms. ▇▇▇ definitively had a subclinical
9  infection?
10     MS. BEYEA-SCHROEDER:  Objection.
11     **THE WITNESS:  Two erosions and an overactive**
12  **bladder.**
13  BY MS. MANNO:
14     Q.  Okay.  And so you are dismissing all the
15  other potential causes for her overactive bladder?
16     MS. BEYEA-SCHROEDER:  Objection.
17     **THE WITNESS:  No, I am not.  I'm saying more**
18  **likely than not because of her -- because had**
19  **an erosion.  She developed an overactive bladder.**
20  **She had another erosion.  More mesh was taken out.**
21  **Her overactive bladder seems to have gotten better,**
22  **that that overactive bladder was due to a**
23  **subclinical infection of the mesh based on the**
24  **literature.**
25

Page 1120

1  BY MS. MANNO:
2     Q.  She still has mesh in her body, correct?
3     **A.  That is correct.**
4     Q.  But her overactive bladder has gotten
5  better?
6     **A.  That is correct.**
7     Q.  Exposure -- we're using the word erosion
8  here, but what we really mean for Ms. ▇▇▇ is
9  exposure, correct?
10     **A.  That is correct.**
11     Q.  Through the vaginal epithelium?
12     **A.  That is correct.**
13     Q.  That's a known risk of slings, correct?
14     **A.  That is correct.**
15     Q.  As are infections, correct?
16     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
17  BY MS. MANNO:
18     Q.  I mean, you're saying if it's exposed,
19  it's infected?
20     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
21     **THE WITNESS:  More likely than not, yes.**
22  BY MS. MANNO:
23     Q.  Okay.  So then if it's exposed, then
24  there's an infection.  That's a known risk?
25     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.

Page 1121

1     **THE WITNESS:  I -- the risk of surgical**
2  **infection is different from the risk of long-term**
3  **mesh infections.**
4  BY MS. MANNO:
5     Q.  Okay.  Well, were infections, in fact, in
6  the IFUs and a known risk of mesh sling implants?
7     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
8     **THE WITNESS:  That is correct, but not chronic**
9  **long-term subclinical infections that lead to**
10  **chronic recurrent erosions, chronic overactive**
11  **bladders, further mesh degradation, contraction,**
12  **deformation which leads to a long-term risk of**
13  **chronic debilitating dyspareunia, pelvic pain,**
14  **further risk of erosions.**
15  BY MS. MANNO:
16     Q.  Everything that's in your report?
17     **A.  That is correct.**
18     Q.  Your issue with the IFUs is that it didn't
19  contain those modifiers and the extent and length
20  to which you could have an infection?
21     MS. BEYEA-SCHROEDER:  Objection.
22     **THE WITNESS:  I think we've already gone over**
23  **that and testified to that.**
24  BY MS. MANNO:
25     Q.  Dr. Rosenzweig, you don't get to -- I

Page 1122

1  mean, I get to ask these questions. And if they're
2  objectionable such that you can't answer, the
3  plaintiff's attorneys will let us know. I promise
4  you.
5      MS. BEYEA-SCHROEDER: But if we've also gone
6  over it all, we agreed at the beginning that we're
7  not going to rehash the same material.
8      MS. MANNO: Yes, but a lot of this is with
9  respect to Ms. ▮▮▮.
10     MS. BEYEA-SCHROEDER: But you asked a general
11 question, not specifically with regard to Ms. ▮▮▮
12 and I don't think we want to go over all of the IFU
13 information all over again when I think that was
14 done on day 1.
15 BY MS. MANNO:
16     Q. Okay. So with respect to Ms. ▮▮▮ IFU,
17 is that your criticism with respect to her IFU?
18     **A. That is with respect to all of the IFUs,**
19 **okay?**
20     Q. See, that's how we get off on these
21 tangents. I'm sorry if I'm asking a general
22 question, but with Ms. ▮▮▮ IFU, and I'll just
23 represent to you unless you want to see it as an
24 exhibit, but --
25     MS. BEYEA-SCHROEDER: And when you say her IFU,

Page 1123

1  can you state which Bates or which one it is?
2      MS. MANNO: I'll just make it an exhibit.
3      MS. BEYEA-SCHROEDER: I just want to make sure
4  we're using the same IFU.
5      (Whereupon, Deposition Exhibit
6       No. 60 was marked for
7       identification.)
8      MS. BEYEA-SCHROEDER: And for the record, which
9  year is it?
10     MS. MANNO: 2009.
11     **THE WITNESS: 2009.**
12     MS. BEYEA-SCHROEDER: Thank you.
13 BY MS. MANNO:
14     Q. So the adverse events, what do you believe
15 in here was not disclosed as the known risk? I
16 asked you before were infections a known risk, and
17 you said well, not, and then you went on about
18 what -- you know, that it was chronic, long term.
19     So where in here do you feel it's
20 deficient with respect to what was a known risk in
21 terms of Ms. ▮▮▮ case?
22     MS. BEYEA-SCHROEDER: Objection. Go ahead.
23     **THE WITNESS: So here we say irritation at the**
24 **operative site may elicit a foreign body reaction**
25 **leading to a wound dehiscence, inflammation and/or**

Page 1124

1  **infection, so it's the irritation at the wound site**
2  **that is leading to infection. And again, I think**
3  **I've testified before that irrespective of the**
4  **specific case that we're dealing with, that I've**
5  **gone over all of the deficiencies that I've found**
6  **in the IFU in my prior testimony, and I will stand**
7  **by what my prior testimony was about the**
8  **deficiencies in the IFU.**
9  BY MS. MANNO:
10     Q. The two prior surgeries for repair of the
11 hiatal hernia, can that result in pelvic pain?
12     **A. No.**
13     Q. What about recurrent gastritis?
14     **A. No.**
15     Q. What about the fact that she is obese?
16     **A. And leading to pelvic pain?**
17     Q. Yes.
18     **A. I don't -- in my clinical experience, I**
19 **haven't seen that there is a particular correlation**
20 **between patients' weight and pelvic pain.**
21     Q. Do you believe that she could have pelvic
22 floor muscle dysfunction?
23     **A. From what cause?**
24     Q. I mean, do you believe that there is
25 anything indicating that she has pelvic floor

Page 1125

1  dysfunction that you've seen in her records?
2      MS. BEYEA-SCHROEDER: Objection. Go ahead.
3      **THE WITNESS: In what time frame?**
4  BY MS. MANNO:
5      Q. Well, obviously, she -- well, at any time.
6      MS. BEYEA-SCHROEDER: Objection. Go ahead.
7  BY MS. MANNO:
8      Q. You know, Dr. Rosenzweig, you laugh, but
9  you're the expert. You've read through all these
10 medical records.
11     **A. No, but you're asking for an incredibly**
12 **broad -- I mean, at any time in her life are we**
13 **talking about? I mean, dyspareunia is a sign of**
14 **pelvic floor dysfunction. So yes, with**
15 **dyspareunia, she has pelvic floor dysfunction.**
16     Q. What did you talk about earlier? Was it
17 pelvic floor --
18     **A. Spasm?**
19     Q. No.
20     **A. Levator tenderness?**
21     Q. No.
22     MS. BEYEA-SCHROEDER: Were you talking about
23 levator spasms after childbirth?
24     MS. MANNO: No.
25

1  BY MS. MANNO:
2      Q.   Well, let me ask it this way:  How would
3  you describe a urogynecologic pelvic floor
4  evaluation?  Is that a term of art?
5      **A.   How would I describe a pelvic floor**
6  **evaluation?**
7      Q.   So I'm going to read from our expert's
8  report, okay?
9      **A.   Excellent.**
10     Q.   Maybe that will make it sound more
11 understandable.  Intermittent -- in my clinical
12 experience, and this is Dr. Kathryn Arendt.  Do you
13 know who she is?
14     **A.   No.**
15     Q.   So in my clinical experience, pain related
16 specifically to the placement of a midurethral mesh
17 sling from either nerve entrapment or excess
18 tension has an onset immediately after the surgery
19 and is very specific and localized.  Intermittent
20 and more generalized pelvic pain with an onset one
21 to two years after implantation is much more likely
22 musculoskeletal in nature.
23         Would you agree with that?
24     MS. BEYEA-SCHROEDER:  Objection.
25     **THE WITNESS:  No, because if you look at the**

1  **data from Dr. Petri's study would show that**
2  **60 percent of mesh complications show up, and mesh**
3  **complications including dyspareunia, erosion,**
4  **pelvic pain, which are the most common**
5  **complications that are cited, 60 percent show up**
6  **one to five years after mesh implantation.  Another**
7  **20 percent show up after five years.**
8  **       Marcus Braun's study showed that**
9  **50 percent of mesh complications, the ones that**
10 **we've described showed up after two years.  An**
11 **Abbott study showed that the average -- the median**
12 **time for presentation was something in the**
13 **neighborhood of 18 to 24 months and that the vast**
14 **majority of patients that are going for management**
15 **of these problems, erosion, pelvic pain,**
16 **dyspareunia don't go back to the same doctor.**
17 **       So I can understand why this person would**
18 **probably not be seeing these patients in follow-up,**
19 **so this doctor probably doesn't know that all of**
20 **these patients are developing mesh contraction,**
21 **mesh degradation, chronic foreign body reaction,**
22 **which will take time to show up.**
23 BY MS. MANNO:
24     Q.   So do you disagree?
25     **A.   Yes.**

1      Q.   Let me continue.  Chronic low back pain,
2  recurrent abdominal pain, cosmetic abdominal wall
3  surgery, atrophic vaginitis and painful intercourse
4  would all put Ms. ▇▇▇ at risk for some underlying
5  pelvic floor muscle dysfunction.  Ms. ▇▇▇ has not
6  had the benefit of a urogynecologic pelvic floor
7  evaluation, but that would be most helpful in
8  defining the source of her intermittent pelvic
9  pain.
10     MS. BEYEA-SCHROEDER:  Objection.
11 BY MS. MANNO:
12     Q.   Do you agree with that or disagree?
13     **A.   I would agree that she should be evaluated**
14 **by a urogynecologist.  I would disagree by the fact**
15 **that you have -- it's a transobturator approach.**
16 **The mesh is going through five different muscle**
17 **groups, four to five different muscle groups, the**
18 **obturator internus muscle, which is a pelvic floor**
19 **muscle, the obturator externus muscle, the gracilis**
20 **muscle, the abductor brevis muscle and the adductor**
21 **magnus muscle.**
22 **       So you have mesh going through muscle.**
23 **These are very important muscles not only for**
24 **locomotion, but for the pelvic floor.  And**
25 **therefore, with mesh going through muscle, you are**

1  **going to get muscle spasm, muscle pain and muscle**
2  **irritation.**
3      Q.   Doctor, do you disagree that chronic low
4  back pain, recurrent abdominal pain, cosmetic
5  abdominal wall surgery, atrophic vaginitis and
6  painful intercourse all put Ms. ▇▇▇ at risk for
7  underlying pelvic floor dysfunction; yes or no?
8      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
9      **THE WITNESS:  Abdominal plastic surgery, no.**
10 **If she gained weight again, possibly.  Low back**
11 **pain can be misinterpreted as pelvic pain depending**
12 **on what the cause is, but the more specific thing**
13 **is that you have a transobturator sling going**
14 **through pelvic floor muscle.  So that's why I would**
15 **disagree that all these other factors besides a**
16 **transobturator sling, which has been shown to cause**
17 **chronic vaginal irritation, chronic dyspareunia in**
18 **the studies that we've talked about before, is not**
19 **the most likely factor.**
20 BY MS. MANNO:
21     Q.   Well, then let me ask it this way:  Are
22 you ruling out that all of those things are
23 potential contributory factors?
24     **A.   I have taken those into consideration,**
25 **yes, and I have looked at all those, and we've**

Page 1130

1  discussed the vast majority of those except for low
2  back pain as a cause of what her current complaints
3  are.
4    Q.  So have you concluded that they are
5  potential contributory factors or not?
6    A.  They are potentially contributory factors.
7    Q.  Okay.
8    A.  Who's next?
9    MS. MANNO:  Let's go off for one second.
10   THE VIDEOGRAPHER:  We're off the record.  The
11 time is 1:17 p.m.
12            (Whereupon, a short break was
13             taken.)
14            (Whereupon, Deposition Exhibit
15             Nos. 61-63 were marked for
16             identification.)
17   THE VIDEOGRAPHER:  We're back on the record.
18 The time is 1:19 p.m.
19 BY MS. MANNO:
20   Q.  Okay.  Let's go to plaintiff, ▮▮▮
21        ▮▮▮      You never saw Ms. ▮▮▮ correct?
22   A.  That is correct.
23   MS. BEYEA-SCHROEDER:  Just before we start, for
24 the record, Exhibit 61 we marked the highlighted
25 copy of his report for Ms. ▮▮▮ 62 is the

Page 1131

1  disc with the records and deposition transcripts
2  and the materials he reviewed, the literature, and
3  63 is the clean copy of his report just for
4  housekeeping.
5    MS. MANNO:  Great.  Excellent.
6  BY MS. MANNO:
7    Q.  Okay.  So Doctor, what are Ms. ▮▮▮
8  current complaints?
9    A.  Ms. ▮▮▮ is currently complaining of
10 some dyspareunia and persistent pain in the vagina.
11 She also has some dysuria and other voiding
12 problems.
13   Q.  What voiding problems?
14   A.  She has urinary hesitancy, urge
15 incontinence and stress incontinence.
16   Q.  Okay.  And just to be clear, what implant
17 does she have?
18   A.  She had a transobturator Align sling that
19 was placed ▮▮▮ 2009.
20   Q.  Okay.  So let's talk about -- I don't
21 think we've had a plaintiff where we've talked
22 about this.  Let's talk about multiple sclerosis,
23 and what are the potential symptoms of multiple
24 sclerosis, particularly vis-a-vis the pelvis?
25   A.  Okay.  First of all, there might be some

Page 1132

1  question about what is the exact nature of her
2  condition, and so -- while multiple sclerosis, in
3  general, can lead to overactive bladders, can lead
4  to underactive bladders or lead to overactive
5  bladders that don't completely empty.
6    Q.  And why is that?
7    A.  Why is that?
8    Q.  Uh-huh.
9    A.  Well, multiple sclerosis can be an upper
10 motor neuron disorder, a lower motor neuron
11 disorder or a mixed upper and lower motor neuron
12 disorder.
13   Q.  Can it lean to pain?
14   A.  Pelvic?
15   Q.  Well, let me ask more generally first.
16 Are you aware of any pain it can cause?
17   A.  There are patients that have multiple
18 sclerosis that have pain.
19   Q.  Okay.  Is that a generalized sort of pain
20 everywhere type of feeling or more localized in
21 your -- I would say experience.  Do you have a lot
22 of patients with MS, or is this just based on your
23 studies?
24   A.  I do have a fair number of patients that
25 have MS, and mostly pain is associated with more of

Page 1133

1  a -- the more chronicity of the disorder, so the
2  longer it's been there, the more likely the patient
3  has pain.  That might be secondary to other things
4  such as being immobilized and, you know, atrophy of
5  muscles.  So it's not like fibromyalgia where the
6  nerves are firing more.  This tends to be more of a
7  chronic opposite effect of nerves not working as
8  well.
9    Q.  Okay.  What do you know of any pelvic pain
10 association with MS?
11   A.  In my clinical experience, I haven't seen
12 a lot of pelvic pain associated with multiple
13 sclerosis.
14   Q.  Are you aware of any research or any --
15 are you aware of any data or scientific articles
16 studying the relationship between MS and pelvic
17 pain?
18   A.  Sitting here right now, no.
19   Q.  Ms., am I pronouncing this right,
20 ▮▮▮
21   A.  Yes.
22   Q.  She is a smoker as well, correct?
23   A.  That is correct.
24   Q.  And had some pre-implant depression?
25   A.  That is correct.

Page 1134

1    Q.   She also had some ovarian cysts, correct?
2    **A.   That is correct.**
3    Q.   What other pertinent previous medical
4  history do you have for Ms. ███████
5    **A.   She had a bulging disc in the L-5 to S-1**
6  **region with leg pain and left leg losing sensation.**
7    Q.   Okay.  In your report on Page 3, you
8  have -- in terms of the paragraph that starts
9  ███████ you have a past surgical history of
10 submandibular gland removal, tonsils and adenoids,
11 appendectomy, hernia repair, laparoscopic tubal
12 ligation and hysteroscopy with endometrial ovary
13 resection, correct?
14   **A.   That is correct.**
15   Q.   Would you expect that any of those
16 particular past surgeries could lead to pelvic pain
17 and/or dyspareunia?
18     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
19   **THE WITNESS:  Pelvic pain, yes.  Dyspareunia,**
20 **no.**
21 BY MS. MANNO:
22   Q.   And which of those past surgical
23 procedures could lead to the pelvic pain?
24   **A.   Well, an appendectomy, if it leads to**
25 **adhesions, depending on how severe the appendicitis**

Page 1135

1  **was that resulted in the appendectomy.  A tubal**
2  **ligation sometimes can give you the post-tubal**
3  **ligation syndrome where you develop ovarian cysts,**
4  **and those can be painful.  There is a disorder**
5  **called the post-ablation tubal ligation syndrome**
6  **where women develop scarring inside the uterus, and**
7  **they can get cyclic uterine pain from that, which**
8  **would be described as cyclic pelvic pain.**
9    Q.   You would expect that to be, excuse my
10 word, but obliterated once you have the
11 hysterectomy, correct?
12   **A.   That is correct.**
13   Q.   But the appendectomy, could -- you say if
14 there were adhesions, could lead to pelvic pain.
15 How long could that type of pelvic pain last?
16   **A.   Again, it would have to be the extent of**
17 **the disorder that led to the appendectomy.**
18   Q.   Meaning like how close the appendix was to
19 bursting or --
20   **A.   Right, how much periappendiceal infection**
21 **there was from leakage through the appendix.  That**
22 **would depend on the severity of the appendicitis.**
23 **I didn't really see anything that would be**
24 **associated with a significant infection because it**
25 **would have made the vaginal hysterectomy much more**

Page 1136

1  **difficult.  You would have more likely than not**
2  **seen significant adhesions with the uterus, which**
3  **would have made it more difficult to get the uterus**
4  **out vaginally, and I didn't see that described in**
5  **the operative report.**
6    Q.   Okay.  In terms of the tubal ligation, I
7  mean, she had a -- did she have her fallopian tubes
8  out?
9    **A.   Most likely it was done with an occlusive**
10 **procedure than with a removal procedure.  The time**
11 **when you would take out a portion of fallopian**
12 **tube, which is called a Pomeroy tubal ligation, is**
13 **done in the postpartum period.  Laparoscopic tubal**
14 **ligations usually use a device that either burns**
15 **the tube or disrupts the tube with a device.**
16   Q.   But I think my question is more once
17 you -- you say on Page 3 she had a total vaginal
18 hysterectomy.  That was not including the removal
19 of her tubes, correct?
20   **A.   Not that I saw in the operative --**
21 **described in the operative report.**
22   Q.   Okay.  So if you had -- if you had the
23 fallopian tubes remaining and you previously had a
24 laparoscopic tubal ligation, could pelvic pain
25 result from that that continued?

Page 1137

1    **A.   It could be, but it would be highly**
2  **unlikely.**
3    Q.   And why do you say it's highly unlikely?
4    **A.   Well, the tubal ligation syndrome that I**
5  **described before is usually related to ovarian**
6  **cysts, which would be cyclical in nature.  It**
7  **wouldn't be, you know, consistent in nature.**
8    Q.   So you would have the pain when you have
9  the cysts potentially?
10   **A.   Right.  Right.  And so since it didn't**
11 **look like she was having cyclical pelvic pain prior**
12 **to the surgery, just taking out the uterus, you**
13 **wouldn't do anything -- the idea is that the blood**
14 **flow that goes from the uterus to the ovary is**
15 **disrupted with a tubal ligation.  When you take out**
16 **the uterus, you're not disrupting any more blood**
17 **flow that hadn't already been disrupted, so you**
18 **wouldn't see a change in the pain.  That would have**
19 **had to have already been there.**
20   Q.   Okay.  So any pre-implant or
21 pre-hysterectomy pelvic pain shouldn't get worse is
22 what you're saying?
23   **A.   From having had the tubal ligation, that**
24 **is correct.**
25   Q.   Okay.  When you say on Page 3 Dr. Blau --

Page 1138

1  do you know Dr. Blau?
2      A.  No.
3      Q.  Explained that the uterus was causing
4  significant pain and that on CMG, no apparent
5  leakage could be verified with Valsalva up to
6  130 centimeters of water, however, the patient has
7  a classic history of incontinence with significant
8  straining, sneezing, coughing and other activities
9  of a similar nature.
10         Significant straining meaning like
11  performing Valsalva in order to urinate?
12      **A.  No, probably performing a Valsalva in**
13  **order to defecate or a Valsalva when you're lifting**
14  **something up.**
15      Q.  Okay.  So after the implant, Ms. ▮▮▮▮
16  calls Dr. Blau.  It says she complained -- on
17  ▮▮▮▮▮▮ she complained of pain.  It was noted
18  that she seemed depressed and angry.  She felt that
19  she can't urinate and also felt pressure.
20         Okay.  And so what is your opinion as to
21  the cause of her inability to urinate and pressure
22  at that time?
23      **A.  This was in the typical five days after**
24  **surgery, typical postoperative period we note that**
25  **with procedures to treat stress urinary**

Page 1139

1  **incontinence, a patient can have a short-term**
2  **delayed resumption of voiding, of normal voiding.**
3      Q.  Okay.  So that didn't seem unusual to you?
4      **A.  No.**
5      Q.  Okay.  And then ▮▮▮▮▮▮ she
6  complains of painful urination, which we are only
7  at about two and a half weeks later.  Painful
8  urination with suprapubic pain and difficulty
9  maintaining her urine stream.  On exam, the vaginal
10  vault was mildly tender, and the suture lines were
11  intact.
12         The vaginal vault being where the
13  hysterectomy would have been, correct?
14      **A.  That is correct.**
15      Q.  And could the hysterectomy have resulted
16  in the painful urination?
17      **A.  Well, it could be that.  It could be a**
18  **urinary tract infection.  It could be that she**
19  **might still have some element of incomplete**
20  **emptying, so that I would say that all this is just**
21  **part of the postoperative healing process.**
22      Q.  Okay.  Nothing out of the ordinary?
23      **A.  That is correct.**
24      Q.  Okay.  And in that same paragraph,
25  Dr. Blau further noted that Ms. ▮▮▮▮ was

Page 1140

1  sexually active and never tried the samples of
2  Vesicare I gave her last visit.
3         Okay.  So after you have a hysterectomy or
4  a sling procedure, what is the appropriate
5  discharge instructions about when you are to resume
6  sex?
7      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
8      **THE WITNESS:  I tell my patients to avoid**
9  **having intercourse four to six weeks.**
10  BY MS. MANNO:
11      Q.  So if she is reporting that she is
12  sexually active on ▮▮▮▮▮▮ that would be --
13  it's unclear to me from your report if she's
14  reporting -- if Dr. Blau is reporting she's
15  sexually active on ▮▮▮▮▮▮ or ▮▮▮▮▮▮
16      **A.**  ▮▮▮▮
17      Q.  ▮▮▮▮.  Okay.  Would you still say,
18  though, that that's right at the six-month mark?  I
19  mean six-week mark?
20      **A.  That is correct.**
21      Q.  And what can happen if you have sex too
22  early?
23      **A.  After a hysterectomy?**
24      Q.  Yes.
25      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.

Page 1141

1      **THE WITNESS:  The main thing that you worry**
2  **about is cuff dehiscence where the cuff opens up**
3  **and small bowel comes out through the vagina, and**
4  **that can be a life-threatening occurrence.**
5  BY MS. MANNO:
6      Q.  What are some of the less life-threatening
7  potential complications of having sex too soon
8  after a hysterectomy?  And I think I'll throw in
9  here and also a sling, right?  She's having sex
10  after a hysterectomy and a sling?
11      **A.  Right.**
12      Q.  What are the risks of having sex too early
13  after having had those procedures?
14      **A.  Discomfort with intercourse.  I think it's**
15  **been postulated that early resumption of**
16  **intercourse is associated with early onset mesh**
17  **erosion or extrusion or exposure.**
18      Q.  What are you basing that on?
19      **A.  What am I basing --**
20      Q.  Well, you know your articles, you know,
21  from memory, so do you have an article in mind?
22      **A.  No.  I'm just reporting the testimony of**
23  **every defense expert that says that erosions were**
24  **caused by too early intercourse.  So you asked me**
25  **what in the realm of possibilities could happen.**

1  I'm just stating what in the realm of possibilities
2  could happen based on the testimony of your
3  experts.
4      Q.  Okay.  Do you disagree with that?
5      A.  As I -- I assume in the second part of
6  the question in that vast voluminous amount of
7  research that has been done.  I don't know of any
8  prospective randomized control trials that looked
9  at early versus delayed intercourse and has proven
10  that early intercourse is associated with mesh
11  erosion.
12      Q.  Okay.  Well, doesn't it seem to make
13  sense, though, that if you have an incision, right,
14  that is healing, that if you disrupt that in any
15  way, that you can delay the healing of the
16  incision?
17      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
18      THE WITNESS:  It might make -- there might be
19  some logic behind that.  I've had some patients
20  that have come in and have told me they've had
21  intercourse after a hysterectomy within the first
22  week or so and didn't pop their cuff incision, and
23  I had a patient that had intercourse six months
24  after her hysterectomy and ended up with a vaginal
25  evisceration.

1  BY MS. MANNO:
2      Q.  So it depends on the patient a lot of
3  this, correct?
4      A.  That is correct.
5      Q.  So in your last paragraph on Page 4, you
6  talk about Ms. ████████ medical history of pain
7  with MS documented pain was limited to the hips,
8  legs and shoulders.
9          Pain in the hips, could that also be
10  either understood by her as pelvic pain or
11  potentially some contributing factor to pelvic pain
12  if it's within your hips?
13      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
14      THE WITNESS:  I would say that there is the
15  possibility that it could be misinterpreted as
16  pelvic pain.  Hip pain possibly could radiate into
17  the pelvis.
18  BY MS. MANNO:
19      Q.  When you have HPV virus, does that lead to
20  pain of any kind?
21      A.  If you have an external manifestation of
22  the human papilloma virus, the type 6 and 11 where
23  you develop a condyloma, sometimes that can be
24  painful, but just HPV on the cervix is not
25  associated with any symptomatology.

1      Q.  Condyloma meaning like warts?
2      A.  That is correct.
3      Q.  Any evidence that Ms. ████████ had warts
4  of any kind?
5      A.  No.
6      Q.  What is this ASCUS?  Her pap showed ASCUS.
7      A.  That means atypical squamous cells of
8  undetermined significance.  It's just a pathologic
9  diagnosis where the squamous cells look different,
10  but not bad enough to be called dysplastic.
11      Q.  Okay.  And then on ████ ████ Ms. ████████
12  presented to Dr. Webster reporting a recent
13  positive ANA.  Is that antinuclear antibodies?
14      A.  That is correct.
15      Q.  And what does that mean really?
16      A.  In what respect?
17      Q.  Well, what is the significance of that?
18      A.  Sometimes it could mean that they have an
19  autoimmune disorder.  Sometimes it can mean that
20  they have an abnormal test.  Sometimes it can mean
21  they took a medication that will give you a false
22  positive.  It kind of -- it's like me drawing your
23  blood sugar right now, going back to our diabetes
24  discussion, and seeing that your blood sugar is
25  150.  It doesn't tell me anything because you just

1  had lunch.  So it is an abnormality of a test that,
2  again, we see at another point it was -- turned out
3  to be negative.  So just because you see one
4  abnormal test result, that doesn't mean that you
5  have a disease process going on.
6      Q.  If she did have a disease process going
7  on, and I understand that there's, you know, a
8  chronology of her being tested for lupus and looked
9  at for lupus, and is lupus an autoimmune disorder?
10      A.  That is correct.
11      Q.  Okay.  Any other autoimmune disorders that
12  a positive ANA test can be indicative?
13      A.  We talked about rheumatoid arthritis,
14  scleroderma, Sjögren's syndrome, S-j-o -- there are
15  a variety of other autoimmune disorders that may or
16  may not have a positive ANA associated with it, and
17  there can be fluctuating levels of ANA positivity
18  associated with autoimmune disorders.
19      Q.  So if a patient had lupus, could lupus
20  then contribute to pelvic pain, vaginal pain,
21  dyspareunia?
22      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
23      THE WITNESS:  Lupus will give you a chronic
24  inflammation and can give you a chronic
25  inflammation of the peritoneum.  I would expect

Page 1146

1 more that isolated pelvic pain would be rather
2 uncommon with lupus.
3 BY MS. MANNO:
4    Q.  You would think it would be more
5 generalized?
6    A.  That is correct.
7    Q.  And on that same paragraph, on
8 examination, Dr. Webster noted a tight piriformis?
9    A.  That is correct.
10    Q.  And is that -- that's in your hip like
11 your -- what's it called, your nerve?  Piriformis
12 muscle.  Your piriformis muscle, is that what he's
13 talking about?
14    A.  Yes.
15    Q.  Okay.  And so if you have -- if you have
16 piriformis, what does that mean or what symptoms
17 might you be --
18    MS. BEYEA-SCHROEDER:  You mean a tight
19 piriformis?
20    MS. MANNO:  Pardon me?
21    MS. BEYEA-SCHROEDER:  You mean a tight
22 piriformis?
23    MS. MANNO:  Well, he said noted tight
24 piriformis, yes.  Sorry.
25

Page 1147

1 BY MS. MANNO:
2    Q.  What would that potentially result in?
3    A.  Pain with hip extension, which is what is
4 also noted.
5    Q.  A painful rectus femoris, that's one of
6 the quadriceps muscles?
7    A.  Yes.
8    Q.  So if she has all of that, are those
9 conditions in which -- I understand that you're
10 saying it can be a hip pain, but can that also then
11 be attributable to sort of the pelvis area?
12    A.  If it's rather severe, it might be
13 difficult for a patient to completely isolate where
14 that is, but it would, obviously, be starting from
15 the hip area.
16    Q.  Okay.  At one point, Dr. Galis questions
17 the -- you say considered the possibility that
18 Ms. ████████ has fibromyalgia.  Do you believe that
19 she was ever officially diagnosed with
20 fibromyalgia?
21    A.  I don't know that she was officially
22 diagnosed with fibromyalgia, and fibromyalgia --
23 there is no fibromyalgia test.  It's sort of a
24 diagnosis from exclusion.
25    Q.  Okay.  So can you sit here today and say

Page 1148

1 whether or not Ms. ████████ has fibromyalgia or
2 not?
3    A.  I cannot sit here today and say whether or
4 not she has fibromyalgia.  Also, I can't sit here
5 today and say whether or not she's got multiple
6 sclerosis.
7    Q.  Or lupus?
8    A.  Or lupus.
9    Q.  Okay.  When we talk about E. coli being in
10 a urine culture, what can be the causes for that?
11    A.  Of the E. coli being the bacteria in a
12 urine culture?
13    Q.  Well, you say on Page 7 a urine culture --
14 and this is your second paragraph down.
15 Dr. Forrest suspected a urinary tract infection as
16 the cause of dysuria and hematuria.  A urine
17 culture was positive for E. coli.
18       So I'm asking you what can be the cause of
19 having a urine culture that's positive for E. coli?
20    A.  Well, the fact that 80 percent of urine
21 cultures are positive for E. coli --
22    Q.  Means nothing?
23    A.  It means that you have a urinary tract
24 infection with E. coli.
25    Q.  Oh, okay.  So if you find E. coli in your

Page 1149

1 urine, you have a urinary tract infection?
2    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
3    THE WITNESS:  No.  There's something called
4 asymptomatic bacteruria.  Asymptomatic bacteruria
5 means that you have bacteria in your urine, and you
6 do not have symptoms.  Young reproductive-age women
7 65 percent of the time will clear that within two
8 weeks.  So you not only need bacteria, but you also
9 need symptoms to have the definition of urinary
10 tract infection or acute cystitis.
11 BY MS. MANNO:
12    Q.  But she had some symptoms of a urinary
13 tract infection?
14    A.  She had dysuria and hematuria and a
15 positive urine culture for E. coli, yes.
16    Q.  So you agree with the diagnosis that she
17 had a UTI then?
18    A.  That is correct.
19    Q.  You know, you -- earlier when I asked you
20 about the current complaints, you said dyspareunia,
21 persistent vaginal pain.  Did you say pelvic?
22 Dysuria and urinary urge SUI and hesitancy?
23    A.  That is correct.
24    Q.  But I thought that she no longer
25 complained of dyspareunia?

1    A.  After her surgery by Dr. Rosenquist on
2    ███████ excuse me, ████ 2014 where there
3  were a lysis of adhesion that was performed, she
4  states that her pain resolved after the surgery.
5    Q.  Okay.  So that's really not a current
6  complaint of hers?
7    A.  Not a -- not on a persistent basis, yes.
8    Q.  Okay.  Well, since that surgery, though,
9  what information do you have that she is
10  complaining of it even sporadically?
11    A.  If I remember her testimony in her
12  deposition, she says that she has occasional pelvic
13  pain and pain with dyspareunia.
14    Q.  Okay.  I'm sorry.  I understood that once
15  she had -- she had ovarian cysts.
16    A.  That is correct.
17    Q.  It caused her dyspareunia, and when those
18  were resolved, that resulted in improvement.  And
19  then -- I'm sorry, so I'm unaware of any.  So
20  you're saying that any complaints that she's having
21  of dyspareunia --
22    A.  Well, she's having pelvic pain,
23  intermittent pelvic pain.
24    Q.  Okay.  And maybe I'm wrong to be
25  separating that from pelvic pain like from movement

1  or sitting versus dyspareunia.
2    A.  Okay.
3    Q.  And so I was unaware that she had any
4  current complaints of dyspareunia.
5    A.  So we'll just say pelvic pain.  How about
6  that?
7    Q.  Okay.  So is it your -- based on what you
8  know of Ms. ████████ case, that she no longer
9  suffers from dyspareunia as opposed to pelvic pain?
10    A.  That is correct.
11    Q.  Okay.  Even on your Page 14, Ms. ████
12  reports her pain with intercourse resolved with the
13  surgery?
14    A.  That is correct.
15    Q.  Okay.  So she currently describes problems
16  with her bowels, correct?
17    A.  That is correct.
18    Q.  And so she's been diagnosed with having
19  irritable bowel syndrome?
20    A.  That is correct.
21    Q.  And what are the symptoms of irritable
22  bowel syndrome or IBS?
23    A.  You can have abdominal pain.  You can
24  fluctuate between constipation and diarrhea.
25    Q.  Okay.  And is that sort of consistent with

1  Ms. ████████ complaints?
2    A.  Of?
3    Q.  Of having constipation and diarrhea.
4    A.  I did not opine that the transobturator
5  sling was causing her irritable bowel symptoms.
6    Q.  Okay.  So you do not -- you are not
7  opining, in fact, that the sling is causing any
8  issues with respect to her bowel?
9    A.  That is correct.
10    Q.  Okay.  What is pelvic floor tension
11  myalgia?
12    A.  When there is pain associated with the
13  muscles of the pelvic floor due to tense muscles.
14    Q.  And what can cause that?
15    A.  What can cause that?
16    Q.  Having tense muscles in your pelvis.
17    A.  A variety of things like an obturator
18  sling going through the obturator internus muscle.
19    Q.  What else?
20    A.  Are you talking episodically or
21  chronically?
22    Q.  I don't know.  You can tell me.
23    MS. BEYEA-SCHROEDER:  Objection.
24    THE WITNESS:  Well, in someone that has a baby
25  can have tense pelvic floor muscles leading to pain

1  in their pelvic floor muscles.  Someone that has a
2  gait manifestation can occasionally develop
3  abnormalities of their pelvic floor muscles to --
4  as their body is trying to compensate for
5  abnormalities of their gait.
6  BY MS. MANNO:
7    Q.  Okay.  Anything in Ms. ████████ history
8  that leads you to believe that she could have
9  pelvic floor tension myalgia caused by something
10  other than a sling?
11    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
12    THE WITNESS:  There are other issues that could
13  potentially lead to pelvic floor muscle spasm.  You
14  might see that occasionally associated with the
15  various things that we talked about such as
16  multiple sclerosis, chronic irritation of the
17  bowel.
18  BY MS. MANNO:
19    Q.  From IBS?
20    A.  Right.
21    Q.  Okay.  And what is, I'm going to butcher
22  this word probably, coccygodynia?
23    A.  It is pain of the coccyx, which is the
24  terminal end of the bony part of the spine.
25    Q.  And so where would your pain manifest then

Page 1154

1  if you had that?
2  **A. In your back and around your rectum.**
3  Q. Okay. And anything in Ms. ▮▮▮▮
4  background to suggest that she has or could suffer
5  from that? I'm not even going to say it again.
6  **A. Well, she does have some lumbar disc**
7  **bulging in the L-5 to S-1 region. If that was due**
8  **to some kind of traumatic injury, that could also**
9  **affect the coccyx.**
10  Q. Okay. And what about proctalgia fugax,
11  what is that?
12  **A. Well, that is pain around the lower part**
13  **of the colon.**
14  Q. Okay. And anything in Ms. ▮▮▮▮
15  history to suggest that she may suffer from that?
16  **A. Well, that could be associated with**
17  **irritable bowel syndrome where you're fluctuating**
18  **between constipation and diarrhea. You can get**
19  **pain around the lower part of the colon, rectum,**
20  **sigmoid colon, anus.**
21  Q. And so if I have pain in the lower part of
22  my colon, would that be pelvic pain or abdominal
23  pain?
24  MS. BEYEA-SCHROEDER: Objection. Go ahead.
25  **THE WITNESS: Well, it's pain around your**

Page 1155

1  **rectum, pain in your bowel. That could be**
2  **abdominal pain. That could be pain in the pelvis.**
3  MS. MANNO: All right. Let's go to the next.
4  **THE WITNESS: Could we take five minutes?**
5  THE VIDEOGRAPHER: We're off the record. The
6  time is 1:53 p.m.
7  (Whereupon, a short break was
8  taken.)
9  (Whereupon, Deposition Exhibit
10  Nos. 64-66 were marked for
11  identification.)
12  THE VIDEOGRAPHER: We're back on the record.
13  The time is 2:06 p.m.
14  MS. MANNO: Do you want to put on the record
15  the exhibits?
16  MS. BEYEA-SCHROEDER: While we were off the
17  record, we marked for Exhibits 64 as the
18  highlighted copy of the ▮▮▮▮ expert report,
19  65 as the disc with the medical and depositions and
20  other materials case specific that he's reviewed
21  and 66 as the clean version of the actual expert
22  report.
23  BY MS. MANNO:
24  Q. Okay. So on to the case of plaintiff,
25  ▮▮▮▮ ▮▮▮▮ --

Page 1156

1  MS. MANNO: Does she go by ▮▮▮▮
2  MS. BEYEA-SCHROEDER: Versus Mr. ▮▮▮▮
3  MS. MANNO: Or Ms. ▮▮
4  MS. BEYEA-SCHROEDER: No. She goes by
5  ▮▮▮▮
6  BY MS. MANNO:
7  Q. Doctor, can you describe for us pertinent
8  prior medical history for Ms. ▮▮▮▮
9  **A. She, at least at the time of her**
10  **procedure, was overweight. She had Hashimoto's**
11  **disease.**
12  Q. What is that?
13  **A. Hashimoto's disease is an inflammatory**
14  **thyroid disorder most likely due to the immune**
15  **system attacking the thyroid. You can start out**
16  **with high thyroid at the early stages, and then it**
17  **burns out the thyroid, and you can get a low**
18  **thyroid. If it's only a small amount of**
19  **stimulation, it can stay a high thyroid for a**
20  **while. She has also a history of irregular**
21  **periods, depression. And those are the pertinent**
22  **parts of her medical history.**
23  Q. Okay. When she had the implant, the only
24  procedure she had was the implant; is that correct?
25  **A. She had a vaginal hysterectomy.**

Page 1157

1  Q. Oh, she did? Okay.
2  **A. Anterior colporrhaphy, posterior**
3  **colporrhaphy and a retropubic sling.**
4  Q. Okay. So vaginal hysterectomy, what was
5  removed? Uterus. What else?
6  **A. Just the uterus.**
7  Q. Okay. And she had native tissue repair
8  anteriorly and posteriorly?
9  **A. That is correct.**
10  Q. And that was to treat a cystocele and a
11  rectocele?
12  **A. That is correct.**
13  Q. And what were the degrees of the cystocele
14  and rectocele?
15  **A. I am looking for a description. I know**
16  **that it was described earlier as being a small**
17  **cystocele and a small rectocele.**
18  Q. Right. Okay. So small, one to two
19  potentially?
20  **A. Most likely, yes.**
21  Q. So I'll get to that in just a second, but
22  were -- so you were aware of a history of
23  depression since about 1990?
24  **A. That is correct.**
25  Q. And were you aware that she was taking any

Page 1158

1 medications for that?
2   A.  That is correct.  She had been taking
3 Wellbutrin and Paxil in the past, but --
4   Q.  She also had been taking Celexa at any
5 time?
6   A.  That is correct.
7   Q.  And in terms of -- you know, I haven't
8 asked you much about potential side effects from
9 medications that could result in some of these sort
10 of pelvic issues.  Are you aware of any side
11 effects of depression medications, Paxil,
12 Wellbutrin, Celexa that can result in any symptom
13 that correlates to the pelvis or any of
14 Ms. ████ complaints?
15   A.  Well, Ms. ████ is complaining of
16 pain and urinary problems.  She states that she has
17 pain in the pelvic bone, the lowest part of her
18 abdomen.  It goes through the vagina.  She also
19 has -- this pain is worse than it was before.  She
20 also has urinary problems of a weak stream and a
21 slow stream and a difficulty emptying her bladder.
22   Q.  So I'm just wondering are, you know, the
23 side effects of these types of medicines anything
24 that can result in those complaints?
25   A.  There is a medication called Cymbalta that

Page 1159

1 actually was looked at as a treatment for stress
2 urinary incontinence.  It showed promise, but it
3 never made it onto the market, if you will.
4   Q.  Is Cymbalta a drug similar to these
5 antidepressants, Wellbutrin, Celexa and Paxil?
6   A.  Similar.
7   Q.  And what would have been the thought
8 behind that it would be a treatment for SUI?
9   A.  Well, it was first being used as an
10 antidepressant, and when people are doing studies
11 on medications, they have -- they look at all types
12 of side effects such as Rogaine was not invented
13 for baldness.  It was invented as an
14 antihypertension medication, and they found that
15 men in the arms of the study that were on the
16 native compound Rogaine developed more hair growth.
17 So then they said wow, let's use it as a hair
18 growth medicine.
19      So many of the other treatments for
20 medications that weren't the original treatment is
21 based on studies that find out that oh, this can
22 actually improve women's urinary leakage with
23 coughing and sneezing.  Let's see if then we can
24 use that to treat stress urinary incontinence.
25   Q.  So what is the thought about the

Page 1160

1 ingredient or the cause in those types of medicines
2 that was helpful to SUI?
3   A.  Sympathomimetic stimulation so that if --
4 if you stimulate the alpha adrenergic, which is
5 a -- you have two different parts of the
6 involuntary nervous system.  You have
7 parasympathetic, and you have sympathetic, and they
8 tend to have opposite interactions.  So
9 parasympathetic stimulation will slow the bowel
10 down.  Sympathetic stimulation will speed the bowel
11 up.
12   Q.  You're talking about bowel, though.
13   A.  I'm going to get into the bladder.  So
14 parasympathetic -- and I might have gotten that a
15 little mixed up, but for the bladder, you
16 stimulate -- parasympathetic, it causes the bladder
17 to contract.  That's why we give an
18 antiparasympathetic medication to cause the bladder
19 to relax.
20   Q.  Wait.  I'm sorry.  So a relaxed bladder,
21 you have more problems with SUI versus a contracted
22 bladder or vice versa?
23   A.  No.  That's how you treat overactive
24 bladders.  Antiparasympathetic, which is called an
25 anticholinergic.  Sympathetic causes the bladder or

Page 1161

1 the opening of the urethra to contract.
2   Q.  So it would give a tight seal?
3   A.  Right.
4   Q.  Less leakage?
5   A.  But then there is a new sub-category of
6 the sympathetic drugs that stimulates a certain
7 receptor in the bladder called the beta 3
8 receptors, which causes the bladder to relax.
9   Q.  Okay.  So just so I'm clear, what -- is it
10 a sub-category of the sympathetic?
11   A.  It's the alpha sympathetic stimulation
12 causes the urethra to contract, and that's one of
13 the effects that duloxetine, which is the
14 medication that was used to treat stress urinary
15 incontinence, which is a lower dose than the
16 Cymbalta to treat depression.
17   Q.  Okay.  So I'm wondering, though, is
18 that -- let me see if I get this straight.  The
19 alpha sympathetic, is that right?  Alpha
20 sympathetic ingredient, if you will, of these, can
21 it have the sort of like too much of an effect like
22 yes, you're being helped with your SUI?
23   A.  Can it put you into urinary retention?  Is
24 that what you're asking me?
25   Q.  Or a weak stream or emptying issues.

Page 1162

1    A.  At very high doses, yes.
2    Q.  Okay.  Is this antisympathetic component
3  of Cymbalta present --
4    A.  It's not anti.
5    Q.  I'm sorry.  Alpha.  Alpha sympathetic, I'm
6  calling it an ingredient, maybe that's the wrong
7  word, but portion of Cymbalta, is that also present
8  in either Paxil, Wellbutrin or Celexa?
9    A.  They do have some cross-reactivity with
10  the alpha sympathomimetic nerve system.
11    Q.  What does that mean?
12    A.  Well, that's how the medication works.  It
13  reacts with the receptors, okay, and so that you
14  can get a small effect, but not to the same effect
15  that you saw with Cymbalta.
16    Q.  Meaning Cymbalta had more of that
17  ingredient or a higher dose?
18    A.  Not the ingredient, the effect on the
19  receptors.
20    Q.  So why is the effect on the receptors
21  lesser with the Wellbutrin or Celexa?
22    A.  Because they have lesser of an activity on
23  the alpha sympathomimetic system.  It's a very
24  complex thing.  It doesn't have a lot to do with
25  this case, but it depends on the affinity of the

Page 1163

1  drug to the nerves that it's reacting with.
2    Q.  So I'm just trying to get a sense of,
3  though, if Ms. ▉▉▉ is on some of these
4  antidepressants, whether that can be a contributing
5  factor towards weak stream, slow stream or emptying
6  issues?
7    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
8    THE WITNESS:  There is a very small
9  possibility.  I haven't seen it in clinical
10  practice.
11  BY MS. MANNO:
12    Q.  Meaning in your practice?
13    A.  That is correct.
14    Q.  But based on some of the studies that have
15  been done, it's a possibility?
16    MS. BEYEA-SCHROEDER:  Objection.
17    THE WITNESS:  There is a possibility, yes.
18  BY MS. MANNO:
19    Q.  Okay.  In terms of her prior medical
20  history, she had a D&C, correct?
21    A.  That is correct.
22    Q.  And again, you may have said this already,
23  and forgive me if you have, but if you have a D&C,
24  that can result in pain?
25    A.  No.

Page 1164

1    Q.  No?
2    A.  No.
3    Q.  Even at the time or shortly thereafter?
4    A.  Oh, yes.  I mean, you can have some
5  discomfort while you're doing the scraping, yes, or
6  the dilating of the cervix, but --
7    Q.  But not long term?
8    A.  That is correct.
9    Q.  And -- go ahead.
10    A.  I interpreted your question as long-term
11  pain.
12    Q.  I'm sorry.  So I was like wait a minute.
13    All right.  Tubal ligation we've already
14  talked about.  She had a tubal ligation.  Were you
15  aware of that?
16    A.  Yes.
17    Q.  And would you agree with me that
18  Ms. ▉▉▉ -- I mean, there's varying degrees
19  of depression, but would you agree with me that she
20  had pretty severe depression?
21    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
22    THE WITNESS:  I think that she would be the
23  best one to testify about the severity of her
24  depression.
25

Page 1165

1  BY MS. MANNO:
2    Q.  Would you agree with me that having to
3  quit a job due to depression and not being able to
4  go to work would be symptomatic of a major
5  depression?
6    MS. BEYEA-SCHROEDER:  Objection.  Form.
7  Foundation.  Go ahead.
8    THE WITNESS:  I think she would be the best one
9  to determine the severity of her depression.
10  BY MS. MANNO:
11    Q.  Earlier when you were talking about
12  depression, potentially like people that have
13  depression may experience pain to a greater degree
14  than nondepressed people.  Remember?  Did I
15  summarize that okay?
16    A.  To a greater or lesser extent, yes.
17    Q.  Well, you can correct me if you want, but
18  the question I'm trying to get at is the more
19  severe a depression is, can that result in the
20  experience of pain being that much greater?
21    A.  I would say that the more severe the
22  depression is, the more likely there are to be
23  physical manifestations from that.  Whether that
24  manifests in a greater degree of pain or not, it's
25  very difficult to say.

Page 1166

1   Q.   Okay.  And what are some of the physical
2   manifestations of depression?
3   **A.   Weight gain, anxiety, high blood pressure,**
4   **losing one's hair.**
5   Q.   What about lack of interest in sex?
6   **A.   That can be a corollary with depression.**
7   Q.   Based on your clinical practice, women who
8   have lost interest in sex, is there a correlation
9   between -- and I'm talking about non-mesh implant
10  patients.  Is there a correlation between
11  depression or lack of interest in sex versus
12  experienced or perceived dyspareunia at the time of
13  sex?
14      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
15  Form.
16      **THE WITNESS:  You're going to have to clean**
17  **that question up a little bit because you started**
18  **with depression, and then you talked about --**
19  BY MS. MANNO:
20      Q.  I'm sorry.  Let's just take people that
21  they express a lack of interest in sex --
22      **A.   Yes.**
23      Q.   -- whether it be from depression or any
24  other reason, lack of interest in sex.  Do you see
25  a correlation between those people and reports of

Page 1167

1   dyspareunia when they do engage in sex?
2       MS. BEYEA-SCHROEDER:  Objection.  Form.
3   Foundation.  Go ahead.
4       **THE WITNESS:  There are four categories of**
5   **sexual dysfunction.  Lack of interest and**
6   **dyspareunia are each one of the four categories.**
7   **Obviously, if pain is so -- if intercourse is so**
8   **painful, you will have a lack of interest in having**
9   **sex because it's painful.**
10  BY MS. MANNO:
11      Q.   Have you seen it work the other way
12  meaning someone has a lack of interest in sex, so
13  they then perceive dyspareunia at the time they
14  have sex?
15      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
16      **THE WITNESS:  I have seen women that have lack**
17  **of interest in sex and will state that it is due to**
18  **pain when I can't find a cause or I do not find**
19  **pain on the exam.**
20  BY MS. MANNO:
21      Q.   Like being able to reproduce it?
22      **A.   Exactly.**
23      Q.   So Ms. _____ also had
24  noninsulin-dependent diabetes mellitus?
25      **A.   That is correct.**

Page 1168

1   Q.   And is diabetes mellitus different than
2   what we've been talking about as diabetes?
3   **A.   Diabetes mellitus is just the full name of**
4   **it.**
5   Q.   And when we see that she's noninsulin
6   dependent, earlier you were talking about how
7   depending on how controlled your diabetes is, that
8   could result in a confusion to your white blood
9   cells.  Does that change your testimony when we're
10  dealing with someone with a noninsulin type of
11  diabetes?
12      **A.   That all depends on blood sugar.**
13      Q.   And so blood sugar can be controlled or
14  not well-controlled in an insulin-dependent
15  diabetic or noninsulin-dependent diabetic?
16      **A.  That is correct.**
17      Q.   Do you have records or anything in your
18  report with respect to abdominal pain that
19  Ms. _____ experienced in 2002?
20      **A.   I have that she was seen by her nurse**
21  **practitioner in _____ of 2002.  She complained of**
22  **upper abdominal pain with specific food intake.**
23      Q.   Okay.  And what about any history of cysts
24  or uterine fibroids?
25      **A.   She had a nabothian cyst, which is on the**

Page 1169

1   **cervix.  She had at least two fibroids, one that**
2   **was going into the endometrium.**
3       Q.   When you have the vaginal hysterectomy --
4   well, in Ms. _____ case, was her cervix
5   left in from her vaginal hysterectomy or not?
6       **A.   You can't do a vaginal hysterectomy and**
7   **leave the cervix in.**
8       Q.   So you can only do abdominal?
9       **A.   That's correct.**
10      Q.   Okay.  So any cysts that she would have
11  had on her cervix would have been -- the cervix
12  would have been taken out in the procedure?
13      **A.   That is correct.  And nabothian cysts only**
14  **exceedingly rarely cause pain.**
15      Q.   So let's talk about her procedure.  So --
16  and I know that you have said this before, so I'll
17  just ask you quickly, but pain pelvic pain and
18  dyspareunia certainly can be caused from native
19  tissue from one native tissue repair, correct?
20      **A.   As we -- I've said before, you can get**
21  **pain in the immediate postoperative period, and**
22  **very rarely can you get long-term pain, yes.**
23      Q.   So I'm sorry.  I misunderstood your
24  previous testimony.  I thought you -- I've asked
25  you on a number of occasions that pain -- pelvic

Page 1170

1  pain and dyspareunia can result from native tissue
2  repairs or an anterior colporrhaphy or a posterior
3  colporrhaphy?
4      A.  That is correct.
5      Q.  So did -- when you said earlier -- but you
6  think it's usually only, or you're saying it's only
7  short-term pain?
8      A.  I said that there is a less frequent
9  long-term pain.
10     Q.  Okay.  But it's certainly not unusual, is
11  it?
12     MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
13     THE WITNESS:  I said that it is possible, and
14  that was the word that you were asking me before,
15  is that possible.
16  BY MS. MANNO:
17     Q.  So what studies are you aware of that
18  have, in fact, studied and reported on pelvic pain
19  and dyspareunia following what we're calling native
20  tissue repairs?
21     A.  There are prospective randomized control
22  trials that compare the difference between pelvic
23  pain and dyspareunia associated with native tissue
24  repairs versus mesh-augmented repairs.
25     Q.  And which study is that?  And I'm not

Page 1171

1  trying to put you on the spot.  I'm sure you know.
2      A.  Right.  One of the biggest ones was the
3  Altman study in the New England Journal of Medicine
4  where there was twice the amount of dyspareunia
5  associated with mesh repairs.
6      Q.  Okay.  But was the -- okay.  But the
7  incidence of the dyspareunia or pelvic pain with
8  the native tissue repairs was not rare, was it?
9      MS. BEYEA-SCHROEDER:  Objection.  Form.
10     THE WITNESS:  That's why I used the term
11  infrequent, yes.
12  BY MS. MANNO:
13     Q.  So are you aware of any studies that have
14  been just in terms of following people that have
15  had native tissue repairs and looking long term at
16  whether they're experiencing dyspareunia or pelvic
17  pain?
18     A.  There are -- and I cannot recall them
19  right now, but there are a few that have tracked
20  patients long term, but that really would not give
21  you comparative data because all they would be able
22  to do is just say that, you know, X event happened.
23     Q.  Comparative data to mesh procedures?
24     A.  That is correct.
25     Q.  Okay.  Well, actually, that's what I'm

Page 1172

1  trying to separate out.  I'm trying to ask in terms
2  of the percentage of women that have had like an
3  anterior colporrhaphy or a posterior, how many of
4  them report dyspareunia and/or pelvic pain on a
5  long-term basis, just that set of women?
6      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
7      THE WITNESS:  That data -- those data points I
8  don't think are very well-elucidated.
9  BY MS. MANNO:
10     Q.  So are you basing your statement that
11  pelvic pain and dyspareunia resulting from native
12  tissue repairs are infrequent as compared to mesh
13  on this Altman study?
14     A.  No, on my clinical experience and on
15  what's in the literature.
16     Q.  So you've done a number of anterior and
17  posterior colporrhaphies, correct?
18     A.  That is correct.
19     Q.  And can you give any sort of percentage?
20  I know this is hard because maybe not all the
21  patients have returned to you, but any sense of how
22  many of them have had a complication of dyspareunia
23  or pain following the procedures?
24     A.  I don't see that very often in my
25  practice, and one of the -- I've opined in the past

Page 1173

1  that particularly with an anterior repair, the
2  reason why you get pain and dyspareunia is by
3  trying to take off too much vagina.  And with the
4  posterior repair, overcorrection of the levator
5  muscles leads to pain and dyspareunia.
6      Q.  So a lot of it depends on the procedure?
7      A.  That is correct.
8      Q.  And the skill of the surgeon?
9      MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
10     THE WITNESS:  I don't -- the perception of the
11  surgeon about how much vagina needs to be removed.
12  BY MS. MANNO:
13     Q.  And if you did have pain, if it were one
14  of those infrequent occasions where an anterior
15  colporrhaphy resulted in pelvic pain, would the
16  place of that pain be the same or different as
17  someone who is experiencing pain from a sling
18  operation?
19     A.  Yes.
20     Q.  Yes, it would be different, or no, it
21  would not be?
22     A.  Well, I mean, they might overlap.
23     Q.  Okay.  Can you elaborate on that a little
24  bit?
25     A.  Well, we know that if you have pain when

Page 1174

1  you palpate the sling, the sling is causing the
2  pain. We do know that slings go through -- the
3  retropubic slings go through at least two different
4  muscle groups. One is the urogenital diaphragm,
5  and the second is the rectus muscle. The
6  urogenital diaphragm is attached, as we discussed
7  earlier, to the levator muscle. So it's not
8  uncommon to get levator spasm from a retropubic
9  sling. Some of the earlier studies show that up to
10  30 percent of patients that have had retropubic
11  slings can have pelvic pain associated with it.
12      Q. Okay. Well, I'm sorry. So you said the
13  pain may overlap, so let's separate them out.
14  Let's talk about -- let's talk about the posterior
15  native repair colporrhaphy. If you -- if pain
16  results from that and/or dyspareunia, where would
17  that pain be coming from?
18      A. Most likely from the posterior wall of the
19  vagina.
20      Q. Okay. And if you are experiencing pain
21  from a retropubic sling, where would that area be?
22      A. Well, again, it would -- if you have
23  contraction, deformation, scar plate formation with
24  the sling, you're going to get pain around where
25  the sling is, but you can also get levator muscle

Page 1175

1  pain and spasm from the sling going through the
2  urogenital diaphragm and therefore, irritating the
3  levator muscles.
4      Q. When you say that the pain from a
5  posterior colporrhaphy would be the posterior wall
6  of the vagina, is that -- is that in the same area
7  as where you would have a levator muscle spasm?
8      A. No. The levator muscles would be on the
9  lateral side of the posterior wall of the vagina.
10      Q. Okay. So here's what I'm trying to get
11  at, and maybe I'm making this harder than it needs
12  to be. Say that there's a person who has a
13  retropubic sling and a posterior repair. Are
14  there -- and they are, in fact, experiencing pain
15  that you're saying -- from both, okay? There's
16  sling pain, and there is posterior repair pain.
17      What areas would overlap in the anatomy?
18  I mean, are there any areas in that same woman that
19  they're experiencing pain from both sources?
20      A. Well, first of all, if you're just looking
21  at isolated posterior repair versus isolated sling,
22  right?
23      Q. Sure.
24      A. So you would have pain along the posterior
25  native repair incision, okay? Depending on what

Page 1176

1  was done at the time of surgery, you might also
2  have some levator spasm associated with it, but
3  only if there was an aggressive levator plication
4  that was done.
5      Q. Okay.
6      A. Now, with the retropubic sling, obviously,
7  you're going to have pain in the midurethra where
8  the level of the sling is, but you could also have
9  levator muscle spasm because of the mechanism that
10  I described earlier.
11      Q. Okay. Now, would you agree with me,
12  though, that oftentimes -- I mean, when a woman is
13  stating that she is experiencing pain in the pelvis
14  can often not be as specific as one can in terms of
15  like a medical examination where you're palpating
16  certain areas?
17      MS. BEYEA-SCHROEDER: Objection. Go ahead.
18      THE WITNESS: That is correct.
19  BY MS. MANNO:
20      Q. So if somebody says look, I have pelvic
21  pain and it's been chronic, there's really no way
22  to know exactly where that pain is coming from
23  unless there is some sort of medical exam done,
24  correct?
25      A. That would be a more helpful way of

Page 1177

1  elucidating exactly where the pain is coming from.
2      Q. Okay. I mean, have you ever had anybody
3  walk in your office and say by the way, I'm having
4  a levator spasm or --
5      A. Yes, I have.
6      Q. Oh, you have? Okay. Well, that must be a
7  very astute patient, but would you say your typical
8  patient doesn't know exactly which part of their
9  anatomy is causing the pelvic pain?
10      A. I would say that there are a number of
11  patients that do not have a specific understanding
12  about what -- where the exact anatomical location
13  is for the complaint that they're having.
14      Q. Okay. And what in the records, if
15  anything -- well, you know what, before I go there,
16  let's talk about the anterior part. So in the
17  anterior colporrhaphy world, if you are
18  experiencing pain due to that, where would that be
19  coming from?
20      A. Usually along the suture line.
21      Q. Which would be where?
22      A. Along the middle portion of the vagina
23  starting at the level of the bladder neck going up
24  to the apex of the vagina.
25      Q. Is the incision that you make the same

Page 1178

1  when you're doing an anterior colporrhaphy as when
2  you are placing mesh?
3  **A.  No.  The incision you're making for the**
4  **sling is -- we're talking right now about a sling.**
5  Q.  Correct.
6  **A.  Is at the mid portion of the urethra.  For**
7  **an anterior colporrhaphy, you're trying to plicate**
8  **the bladder, so therefore, you make your incision**
9  **at the level of the bladder neck going cephalad**
10  **towards the patient's head.**
11  Q.  And so if you're getting both in the same
12  procedure, are there two incisions made?
13  **A.  Usually someone makes a single incision,**
14  **does the anterior repair first and then puts the**
15  **sling in.**
16  Q.  Through the same incision?
17  **A.  Yes.**
18  Q.  So in that instance, you would be using
19  the same incision?
20  **A.  That is correct.  Though, there are people**
21  **that might do two separate incisions --**
22  Q.  Okay.
23  **A.  -- depending on how high up they want to**
24  **do their colporrhaphy.**
25  Q.  So when you say that the pain resulting

Page 1179

1  from an anterior colporrhaphy would be at the
2  suture line, does that mean the place of incision?
3  **A.  That is correct.**
4  Q.  Anywhere else that you would experience
5  pain from the anterior colporrhaphy?
6  **A.  Well, again, the way that pain is**
7  **developed from an anterior or the most prominent**
8  **way pain is developed from an anterior colporrhaphy**
9  **is by excising too much vagina.**
10  Q.  Shortening the vagina?
11  **A.  Shortening and narrowing the vagina, so**
12  **you would feel a shortened, narrowed vagina.**
13  Q.  Okay.  And then a sling, if you were -- I
14  guess a transobturator sling would be closest to
15  the anterior colporrhaphy.  I mean, we were talking
16  about the retropubic sling, right?
17  **A.  Right.  They're both placed in the same**
18  **place there in the midurethra.**
19  Q.  So it's just a matter of how you get
20  there?
21  **A.  No.  It's how you exit.**
22  Q.  Okay.  So the pain that you talked about
23  that can result from the sling being in the --
24  **A.  We're just talking about retropubic right**
25  **now.**

Page 1180

1  Q.  Right.
2  **A.  Because you can get a whole different set**
3  **of pain from transobturator slings.**
4  Q.  Okay.  So what you said earlier --
5  **A.  I'm just talking about retropubic slings**
6  **because that's what Mrs. ██████ had is a**
7  **retropubic sling.**
8  Q.  And that would be midurethra where the
9  sling is, and then --
10  **A.  Levator muscles.**
11  Q.  Levator muscles.
12  **A.  And behind the pubic bone and up around**
13  **the top of the pubic bone.**
14  Q.  Okay.  So in Ms. ██████ case, where
15  was -- either based on her exams or her testimony,
16  where was her described pelvic pain coming from?
17  **A.  Well, we know that from 2011 to 2013, she**
18  **hasn't been to a physician, and she stated that she**
19  **is concerned about going to doctors because she**
20  **doesn't like exams.  I think I'm paraphrasing that.**
21  **I think she stated it more eloquently in her**
22  **deposition.  She states that her pain is sharp,**
23  **sudden and shooting below her pelvic bone in the**
24  **lower part of her abdomen going through the vagina.**
25  Q.  Which page of your report are you on?

Page 1181

1  MS. BEYEA-SCHROEDER:  7.
2  **THE WITNESS:  Page 7 right above opinions, and**
3  **I would like to make a quick correction where --**
4  **the second line in that paragraph, it says the pain**
5  **is sporadic since 2001.  I meant to say 2011.**
6  BY MS. MANNO:
7  Q.  Okay.
8  **A.  And I've corrected it on my highlighted**
9  **version that you guys are going to get.  I just**
10  **noticed that for the first time when I looked this**
11  **over in preparation for today.  I was like I don't**
12  **know how I didn't catch that before.**
13  MS. BEYEA-SCHROEDER:  Page 7.  Did I hand you
14  the wrong one?
15  MS. MANNO:  Yeah.  This is ██████ I'm on
16  Ms. ██████.
17  MS. BEYEA-SCHROEDER:  Did we not mark that?
18  MS. MANNO:  I thought you did.
19  MS. BEYEA-SCHROEDER:  I don't think you gave me
20  the clean copy.  I'm looking.  I'm probably holding
21  onto it.  I am.
22  MS. MANNO:  No problem.
23  BY MS. MANNO:
24  Q.  So in Exhibit 66, why don't you go ahead
25  and make that change and initial it.

Page 1182

1    A.  Okay.  Can I borrow your pen?
2    Q.  Sure.
3    A.  Thank you.  There you are.
4    Q.  Okay.  So she describes it as very sharp,
5  sudden, shooting pain below the pelvic bone in the
6  lowest part of the abdomen going through the
7  vagina?
8    A.  That is correct.
9    Q.  So where exactly is that?
10    A.  Right where the retropubic sling is going.
11  So the pelvic bone she's describing is the pubic
12  bone.  That's the bone that your belt sits on.
13    Q.  So how can you differentiate if she -- you
14  know, she has the posterior colporrhaphy?
15    A.  Right.
16    Q.  How are you able to determine that pain
17  that could be caused from -- well, how can you
18  determine that the pain that she is complaining of
19  cannot be caused at least in part by that?
20    THE WITNESS:  By the posterior colporrhaphy?
21    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
22  BY MS. MANNO:
23    Q.  Uh-huh.
24    A.  Posterior colporrhaphy is not going to
25  give you pain below the pelvic bone, which is the

Page 1183

1  pubic bone.
2    Q.  Well, that's what I'm asking, okay,
3  because --
4    A.  That incision, that repair is all in the
5  posterior wall of the vagina.
6    Q.  Okay.  What about the anterior
7  colporrhaphy?
8    A.  Remember the anterior colporrhaphy where
9  the plication is being done is higher up in the
10  vagina than where the sling is.  The retropubic
11  sling is placed in the midurethra going up behind
12  the pubic bone, which she's describing as the
13  pelvic bone.
14    Q.  But she won't yet submit to an exam?
15    A.  That is correct, but how she described
16  this tells me that this is behind the pubic bone,
17  which is exactly where the retropubic sling is
18  going, which is why I can state with a reasonable
19  degree of medical certainty that the pain that
20  she's describing, sharp, sudden, shooting pain
21  below the pubic bone from the lowest part of her
22  abdomen into the vagina is due to the retropubic
23  sling, not the anterior/posterior repair.
24    Q.  But nobody can reproduce that because
25  she's not consented to an exam?

Page 1184

1    MS. BEYEA-SCHROEDER:  Objection.
2    THE WITNESS:  That has not been reproduced in
3  an exam, or that has not been documented in an
4  exam.
5  BY MS. MANNO:
6    Q.  And no doctor has at least -- there's no
7  indication that any doctor has been able to
8  reproduce that pain, correct?
9    MS. BEYEA-SCHROEDER:  Objection.  Form.  Go
10  ahead.
11    THE WITNESS:  There is -- that has not been
12  documented in an exam.
13  BY MS. MANNO:
14    Q.  So let me read to you some portions of our
15  expert report, and you can opine as to whether you
16  agree or disagree.
17    It says Dr. Rosenzweig opines since that
18  this pain was not present before the sling, it must
19  be due to the sling, but we are not presented with
20  enough factual information to conclude what her
21  discomfort is due to, and there are no reproducible
22  physical findings described to indicate the sling
23  is the cause or a contributor.  I believe there are
24  other reasonable sources of this type of pain that
25  need to be explored.  One thing we need to consider

Page 1185

1  is pelvic floor muscle dysfunction.
2    A.  Well, pelvic floor muscle dysfunction is
3  not going to give you pain behind the pubic bone
4  that goes from the abdomen down into the vagina.
5  That is where the sling is.
6    Q.  What does -- can you tell me -- when this
7  doctor says one thing we need to consider, and did
8  I ask you already?  This is Dr. Joseph Maccarone.
9    A.  You already asked me that.
10    Q.  You're not familiar with him?
11    A.  No.
12    Q.  I think I asked you off the record, so I'm
13  asking you now.
14    A.  No.
15    Q.  Okay.  From New Jersey.  You don't know
16  him?
17    A.  No.
18    Q.  So what he says, one thing we need to
19  consider is pelvic floor muscle dysfunction.
20  Patients with urinary frequency and urgency can
21  develop a high tone PFM dysfunction, which is a
22  recognized cause of pelvic pain and something I see
23  often in my clinical practice.  None of the exams
24  evaluated her PFMs, and as such, we cannot rule out
25  PFM dysfunction as a cause of Ms. ██████████

Page 1186

1  pelvic and vaginal pain.
2      **A. I think that when Dr. Maccarone --**
3      Q. Maccarone.
4      **A. -- is deposed, he will be able -- be given**
5  **ample opportunity to explain what he's talking**
6  **about. Yes, one would need to rule out pelvic**
7  **muscle dysfunction. I think that's what he called**
8  **it.**
9      Q. What is that?
10     **A. It's that your pelvic floor muscles are**
11  **not functioning properly, but I think how he**
12  **describes it is better -- will be better elucidated**
13  **during his deposition. Now, the pain that she's**
14  **having going from sharp, stabbing, shooting from**
15  **the lower part of her abdomen behind the sling,**
16  **bone into the vagina, that's where the sling is.**
17  **And we've already talked about if the pain is where**
18  **the sling is, the sling is causing the pain, right?**
19     Q. That's what you're saying.
20     **A. That is what I'm saying. That's what I've**
21  **testified to, and that's what Jacquetin said in his**
22  **study. If you push on the sling, it causes pain.**
23  **Or if where the mesh or the sling is causes the**
24  **pain, that's what's causing the pain.**
25     Q. You drafted your report, and you put in

Page 1187

1  what you've read to me, very sharp, sudden,
2  shooting pain below the pelvic bone in the lowest
3  part of the abdomen going through the vagina. What
4  words -- you have cited deposition, Page 84,
5  Line 23 to 86.
6      **A. Yes.**
7      Q. Let me see if I can pull that.
8      MS. BEYEA-SCHROEDER: Or is it the medical
9  record?
10     BY MS. MANNO:
11     Q. You have cited here 41, deposition,
12  Page 84, Line 23 to Page 86, Line 25. Okay. So
13  just humor me for a minute.
14         Answer: In terms of -- so I want to go
15  through, I guess, each of these. In terms of pain,
16  tell me about the pain -- I'm sorry. This is the
17  question. That you're currently -- that you allege
18  you're currently experiencing.
19         Answer: The pain that I sometimes
20  experience is a very sharp, sudden, shooting pain
21  below the pelvic bone in the lowest part of my
22  abdomen, and it feels like it goes right through
23  the vagina.
24         Question: When did it start? When did
25  that start?

Page 1188

1      It started about the same time that I
2  started having recurrence, so to the best of my
3  memory, about 2011.
4      How often -- Question: How often does
5  this pain occur?
6      Answer: It's very sporadic, and it's -- I
7  can usually avoid the pain by avoiding very
8  strenuous, physically laborious activities.
9  So I'm just going to ask you is it --
10     **A. I think I quoted in my report the exact**
11  **same thing that she said in her deposition.**
12     Q. Right. So my question is is it normal or
13  common for you to have patients come in and
14  describe their pain with such specificity as to
15  where it is in relation to the pelvic bone in the
16  lowest part of her abdomen and it goes right
17  through the vagina? Is that common?
18     MS. BEYEA-SCHROEDER: Objection. Go ahead.
19     **THE WITNESS: She was asked a very specific**
20  **question, and she gave a very specific answer.**
21  BY MS. MANNO:
22     Q. Tell me about the pain that you're
23  currently -- that you allege you're currently
24  experiencing.
25     **A. Right. That's a very specific question,**

Page 1189

1  **and she gave a very specific answer.**
2      Q. So do you think, though, that a person who
3  has not consented to a medical exam -- I mean, is
4  it common for people to walk into your office
5  before you've done a medical exam and be able to
6  describe their pain so specifically in relation to
7  the pelvic bone?
8      MS. BEYEA-SCHROEDER: Objection to form.
9  Foundation.
10     **THE WITNESS: I do not find that an answer**
11  **that's outside the realm of possibilities of being**
12  **given an answer or being asked a very direct**
13  **question and giving a very direct description of**
14  **where their pain is, what their pain is like and**
15  **how often it comes. Patients can actually do that.**
16  BY MS. MANNO:
17     Q. Okay. So she says it's very sporadic. I
18  can usually avoid the pain by avoiding very
19  strenuous, physically laborious activities.
20         So if you take a woman who has very
21  strenuous, physically laborious activities, we
22  talked about -- you're smiling.
23     **A. I anticipate your question, and I'll be**
24  **able to give you my answer.**
25     Q. Excellent. Maybe you should just ask the

Page 1190

1  question and give the answers.
2      If someone has a posterior colporrhaphy
3  and an anterior colporrhaphy and is doing very
4  strenuous, physically laborious activities, would
5  that potentially increase their chances of feeling
6  pain due to those procedures?
7      MS. BEYEA-SCHROEDER: Objection. Form and
8  foundation.
9      **THE WITNESS: Possibly, but the reason why I**
10  **say it's the mesh is because the mesh is going**
11  **through the rectus muscle. Those are your six-pack**
12  **ab muscles, and therefore, doing laborious activity**
13  **is going to irritate the muscles where the mesh is**
14  **going through. A native tissue repair doesn't put**
15  **sutures through muscles. It puts sutures through**
16  **fascia, so that's why that description is more**
17  **accurately reflective of mesh going through muscle,**
18  **which is the retropubic sling, than the**
19  **anterior/posterior colporrhaphy.**
20  BY MS. MANNO:
21      Q. Do you have patients -- I mean, you know,
22  whenever I do very strenuous, physically laborious
23  activities, sometimes I have pains in my abdomen.
24  I mean, aren't there potentially a bunch of other
25  reasons for that like poor muscle tone, overdoing

Page 1191

1  it?
2      MS. BEYEA-SCHROEDER: Objection. Form.
3  Foundation.
4      **THE WITNESS: Possibly, but mesh going through**
5  **muscle is when you use -- to do activities,**
6  **strenuous activities, you're going to be engaging**
7  **your abdominal muscle, abdominal wall muscles. You**
8  **have mesh going through muscles that's deformed,**
9  **contracted, has a chronic foreign body reaction,**
10  **chronic inflammation, chronic subclinical infection**
11  **and has degraded. That's going to be -- is going**
12  **to lead to shooting pain going from where the**
13  **muscle is going through the rectus muscle into the**
14  **vagina behind the pubic bone.**
15      Q. You're not testifying that Ms. ███████
16  has had any erosion, are you?
17      **A. No. I didn't say that.**
18      Q. Okay. Well, I'm just asking then how
19  we've gotten to the fact that Ms. ███████ has a
20  subclinical infection?
21      **A. Her mesh is degraded, contracted, has a**
22  **chronic foreign body reaction, chronic**
23  **inflammation, has deformed and has subclinical**
24  **infection --**
25      Q. So --

Page 1192

1      **A. -- that is manifesting as pain.**
2      Q. Is there a pathology report on any mesh in
3  Ms. ███████
4      **A. No.**
5      Q. Is there a medical exam that any doctor
6  has felt any banding, contraction, degrading or
7  anything like that?
8      **A. No.**
9      Q. So you're just saying because she has
10  mesh, she has all those things?
11      MS. BEYEA-SCHROEDER: Objection. Foundation.
12      **THE WITNESS: More likely than not, based on my**
13  **clinical experience, the literature, review of**
14  **internal documents and deposition of key employees,**
15  **medical directors and scientists at Bard, yes.**
16  BY MS. MANNO:
17      Q. So is it your opinion, just to be clear,
18  that anybody who has this mesh, including those
19  who have no erosions, all have subclinical
20  infections?
21      MS. BEYEA-SCHROEDER: Objection. Form.
22      **THE WITNESS: Wang found that 80 percent of**
23  **patients with overactive bladders had subclinical**
24  **infections of their mesh.**
25

Page 1193

1  BY MS. MANNO:
2      Q. Is it your opinion? Is it your opinion?
3      MS. BEYEA-SCHROEDER: He's trying to explain
4  his answer.
5      **THE WITNESS: More likely than not.**
6  BY MS. MANNO:
7      Q. How did you -- did you rule out her
8  history of bladder spasms as a potential cause of
9  her pain?
10      MS. BEYEA-SCHROEDER: Objection. Go ahead.
11      **THE WITNESS: Yes.**
12  BY MS. MANNO:
13      Q. How so?
14      **A. Her bladder spasms would -- more likely**
15  **than not wouldn't lead to the pain that she is**
16  **describing, shooting down from the lower part of**
17  **her abdomen into the vagina. Bladder spasms would**
18  **be felt in the bladder.**
19      Q. Is her history of bladder spasms
20  potentially a contributing factor towards any of
21  her urinary problems? You talk about weak stream,
22  slow and problems with emptying.
23      **A. No. Actually, bladder spasms would give**
24  **you the exact opposite.**
25      Q. Okay. There is no evaluation of a

Page 1194

1  post-void residual post-op that would -- that shows
2  us an assessment of her voiding function, correct?
3  **A. That is correct.**
4  MS. MANNO: Can we go off the record.
5  THE VIDEOGRAPHER: We're off the record. The
6  time is 2:55 p.m.
7  (Whereupon, a short break was
8  taken.)
9  (Whereupon, Deposition Exhibit
10  Nos. 67-70 was marked for
11  identification.)
12  THE VIDEOGRAPHER: We're back on the record.
13  The time is 3:05 p.m.
14  MS. BEYEA-SCHROEDER: While we were off the
15  record, we marked the highlighted copy of the
16  ████████ -- ████████ report as
17  Exhibit 67, the disc with materials as 68 and the
18  clean copy of the report as 69.
19  BY MS. MANNO:
20  Q. Doctor, we are now moving on to the case
21  of ████████ and you did not perform a
22  medical examination of Ms. ████████ correct?
23  **A. That is correct.**
24  Q. And so everything you are testifying to is
25  based on records that you have reviewed and are on

Page 1195

1  Exhibit 68?
2  **A. That is correct.**
3  Q. So can you describe for us
4  Ms. ████████ current complaints that she
5  attributes to her mesh?
6  **A. Yes. She is having pain and bleeding with**
7  **intercourse and pelvic pain. She has some problems**
8  **releasing her urine. She also suffers panic**
9  **attacks when trying to have intercourse, so she has**
10  **dyspareunia and depression.**
11  Q. When you say problems releasing urine, how
12  exactly? She can't -- it's incomplete emptying or
13  that she can't when she sits down to go to the
14  bathroom, or what exactly is that?
15  **A. Well, that -- those are her words. That**
16  **would be what I would call hesitancy meaning that**
17  **there is hesitation of urine coming out when you're**
18  **trying to urinate.**
19  Q. Meaning it does eventually come out, but
20  there's a pause at the beginning?
21  **A. There's a pause at the beginning or**
22  **throughout urination.**
23  Q. Did she say which?
24  **A. No.**
25  Q. Okay. Let's talk about her prior

Page 1196

1  pertinent medical history. Were you aware of her
2  history of acute cystitis?
3  **A. That is correct.**
4  Q. What is acute cystitis?
5  **A. A urinary tract infection.**
6  Q. Is this a temporary type of situation, or
7  can it be chronic and/or long term?
8  **A. Well, in 1991, she had a cystoscopy, which**
9  **showed acute and chronic trigonitis, which is just**
10  **a chronic irritation of the base of the bladder.**
11  **After that, she was diagnosed with a urinary tract**
12  **infection. She also had kidney stones.**
13  Q. Okay. But the -- so the acute cystitis
14  versus the trigonitis, are those -- those are
15  related?
16  **A. Well, they could be related. Sometimes**
17  **chronic trigonitis could be due to a subclinical**
18  **infection in the bladder, which is why they can get**
19  **better with antibiotics, but usually it's due to an**
20  **irritation of the bladder associated with a variety**
21  **of different things, including the foods and**
22  **beverages you're eating and drinking.**
23  Q. Okay. So subclinical infection -- it
24  could be due to a subclinical, excuse me, infection
25  of the bladder. So we have talked about

Page 1197

1  subclinical infections with respect to mesh. What
2  are other causes of subclinical infections of the
3  bladder?
4  **A. What are some of the causes?**
5  Q. Uh-huh.
6  **A. The bacteria is not getting cleared out.**
7  **I think we talked about this during the other**
8  **deposition about how bacteria can go from the**
9  **distal end of the urethra, which is where you pee,**
10  **out of to the bladder.**
11  Q. Like going the reverse way on the road?
12  **A. Right, exactly. And what they do is**
13  **they're kind of like fish swimming upstream. If**
14  **there's any irregularities of the urethra, it**
15  **creates eddy currents that have backflow, and**
16  **bacteria can use those the same way that fish use**
17  **those to get upstream.**
18  Q. Is there anything in Ms. ████████
19  records that could indicate that she had just what
20  you talked about, the -- a condition that would
21  have led bacteria to basically swim upstream and
22  cause a subclinical bladder infection?
23  **A. Not that was diagnosed.**
24  Q. Do you see anything that is indicative of
25  that that wasn't diagnosed?

Page 1198

1    A.  That's usually associated with or can be
2  associated with trauma.  I didn't see that.
3  Besides having a cystoscopy in 1991, she had
4  several procedures that would require
5  catheterization, but no.
6    Q.  When did she have her child?  What year?
7    A.  Well, at the time that she had the Avaulta
8  placed, she was 31 years old, had been pregnant
9  four times, had three deliveries and one
10  miscarriage, so I can't tell you the exact dates of
11  her deliveries.  Actually, she had her second
12  delivery in 2002.
13    Q.  1998 vaginally delivered her first child.
14    A.  Okay.
15    Q.  That's what it says on your Page 3?
16    A.  That is correct.
17    Q.  Okay.  So this chronic trigonitis was
18  before her first child?
19    A.  That is correct.
20    Q.  So it could have been due to a subclinical
21  infection which got there somehow or irritation of
22  the bladder for a variety of reasons, including
23  food and beverage intake?
24    A.  The kinds of foods and beverages that you
25  take in.

Page 1199

1    Q.  That are --
2    A.  Irritating to the bladder.
3    Q.  Okay.  And so when it says chronic
4  trigonitis, I mean, is this something that she
5  could resolve, or is this something that
6  potentially hangs around for a lifetime, it's just
7  better sometimes or worse sometimes?
8    A.  There can be waxing and waning, but
9  usually this is something that will resolve.
10    Q.  And if it does resolve, it's from
11  antibiotics?
12    A.  Antibiotics, changing your diet around.
13  Your bladder heals itself.  There are a variety of
14  different reasons why it becomes less symptomatic.
15    Q.  Is there anything indicative after that
16  1991 visit that shows that Ms. ▇▇▇▇▇ continued
17  to have chronic trigonitis?
18    A.  No.
19    Q.  And so the acute cystitis, just so I'm
20  clear, we think there was a chronic trigonitis, but
21  at that time there was a bladder infection; is that
22  right?
23    A.  No.  That would be in '91, she had the
24  diagnosis of chronic and acute trigonitis, and then
25  she had an acute urinary tract infection in 1997.

Page 1200

1    Q.  All right.  And so what are you aware of
2  in terms of her history with depression and
3  anxiety?
4    A.  What am I aware of?
5    Q.  Yeah.  You noted that that was one of her
6  pertinent prior medical conditions, so what did you
7  know about that?
8    A.  That she had a history of anxiety and
9  depression.
10    Q.  Okay.  And you also noted that one of her
11  current complaints is that of depression and
12  anxiety, correct?
13    A.  Anxiety, excuse me, panic attacks when
14  trying to have intercourse.
15    Q.  Okay.  So are you differentiating that
16  from depression and anxiety?
17    A.  That is correct.  A panic attack is very,
18  very specific.
19    Q.  Okay.  And people that have depression and
20  anxiety are more susceptible to having panic
21  attacks, correct?
22    MS. BEYEA-SCHROEDER:  Objection.  Form.
23    THE WITNESS:  That I would not be able to opine
24  about.
25

Page 1201

1  BY MS. MANNO:
2    Q.  You don't have the experience in that
3  area?
4    A.  To say that patients that have anxiety and
5  depression are more likely to develop panic
6  attacks, that I can't opine about.
7    Q.  Okay.  You're not saying that there is no
8  correlation.  You just don't have enough
9  information or experience in order to opine about
10  that?
11    A.  That is correct.
12    Q.  You know, Ms. ▇▇▇▇▇ had a history of
13  infertility?
14    A.  That is correct.
15    Q.  And so -- and I'm really just asking this.
16  There are multiple causes of infertility, correct?
17    MS. BEYEA-SCHROEDER:  Objection.
18    THE WITNESS:  That is correct.
19  BY MS. MANNO:
20    Q.  Any of the -- are there any potential
21  causes of infertility or reasons for infertility
22  that could later manifest as any sort of pelvic
23  pain?
24    MS. BEYEA-SCHROEDER:  Objection.  Foundation.
25    THE WITNESS:  In general, yes.  In her case, if

Page 1202

1  I remember correctly, she had male factor
2  infertility, which is the reason for the IVF,
3  so therefore, it would not be a problem with her.
4  It would be a problem with either sperm
5  concentration or motility or other factors.
6  BY MS. MANNO:
7     Q.  Meaning her partner?  It was his issue?
8     A.  That's the male factor, yes.
9     Q.  All right.  So nothing in her records that
10 would indicate an infertility problem resulting in
11 pain?
12    A.  There was a hemorrhagic cyst that was
13 noted, which could possibly have been an
14 endometrioma, but we don't see any other evidence
15 of endometriosis.  I'll take that back.  That
16 Dr. Gatherum noted a small amount of endometriosis
17 on the left ovary at the time of the vaginal
18 hysterectomy.
19    Q.  But that would have been removed at the
20 time of the hysterectomy, correct?
21    A.  No.
22    Q.  The endometriosis, no?
23    A.  No.
24    Q.  Not in her case?
25    A.  I didn't see that he removed the

Page 1203

1  endometriosis from the left ovary.  I think it was
2  just noted that there was a small amount of
3  endometriosis at the time of doing the
4  hysterectomy.
5     Q.  Okay.  So if endometriosis then continues,
6  what can be the symptoms of ongoing or persistent
7  endometriosis?
8     A.  Well, as we talked about earlier, once you
9  take the uterus out, you're not going to continue
10 to seed the peritoneal cavity with endometrial
11 implants.  The endometriosis could be completely
12 asymptomatic, or there could be cyclic irritation
13 from the endometriosis.
14    Q.  Okay.  When you say cyclic irritation,
15 where in the pelvis would that manifest, or how
16 would that pain be described?
17    A.  Well, it would depend on where the
18 endometriosis is.  The only place that we have
19 endometriosis being determined is the ovary, so
20 that would cause pain around the ovary.
21    Q.  Okay.  And where -- when you're describing
22 sort of where the ovary is in the pelvis, where
23 would that be?
24    A.  Well, after a hysterectomy, the only
25 contact that the ovaries have with the pelvis is

Page 1204

1  called the infundibulopelvic ligament, which is
2  where the blood supply goes from the aorta on to
3  the ovaries.  So what happens is now instead of
4  being brought down into the pelvis by the uterus,
5  it is now out on the side of the pelvis attached to
6  the pelvic side wall, so it would be more lower
7  abdominal pain if you're going to get pain from the
8  ovaries after a hysterectomy.
9     Q.  Is that something that could lead to
10 dyspareunia?
11    A.  After a hysterectomy?
12    Q.  I mean, I understand what you're saying in
13 terms of like you're basically not feeling the --
14    A.  Right, but your ovaries are going to be
15 moved away from the midline because these ligaments
16 are coming down from the side wall, and so your
17 ovaries tend, after a hysterectomy, to be more
18 lateral against the side wall, so you're less
19 likely to hit it during intercourse.
20    Q.  Okay.  So it sounds like if you have pain
21 from that, it would really be more -- it would be
22 described as more of a side pain?
23    A.  That is correct.
24    Q.  So you're aware, though, prior to the
25 Avaulta placement she had a grade 3 cystocele,

Page 1205

1  correct?
2     A.  That is correct.
3     Q.  And she had a hard time urinating?
4     A.  That is correct.
5     Q.  That's how it was described, and it felt
6  like her bladder was falling.  Are you aware that
7  she did try a pessary, but noted it was
8  inconvenient?
9     A.  That is what is described, yes.
10    Q.  Okay.  Do you believe that based on her
11 age and symptoms at the time and really just only a
12 one-time trying of the pessary, do you believe that
13 this type of surgery without trying other
14 conservative methods first was within the standard
15 of care?
16    MS. BEYEA-SCHROEDER:  Objection.  Form.  Go
17 ahead.
18    THE WITNESS:  Yes.
19 BY MS. MANNO:
20    Q.  Why do you think that?
21    A.  Well, that is the discussion that the
22 surgeon performing this and the patient would get
23 into to understand that they are going to move from
24 a nonsurgical management to a surgical management.
25    Q.  I mean, you don't think that this was too

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 709 of 924 PageID #: 213516

Page 1206

1 aggressive of an approach without trying previous
2 conservative methods?
3    MS. BEYEA-SCHROEDER: Objection. Form.
4    **THE WITNESS: There are always alternatives**
5 **that can be done without taking the uterus out.**
6 **You could do a hysteropexy, but that is the**
7 **discussion that Dr. Gatherum had with**
8 **Mrs.** ▮▮▮▮ **and that will be described what's**
9 **in the records.**
10 BY MS. MANNO:
11    Q.  So I know we got into it earlier about you
12 not providing any opinions on the informed consent
13 process.  Are you also taking the position that you
14 are not opining as to the standard of care analysis
15 in terms of sort of choice of treatment in these
16 types of cases?
17    MS. BEYEA-SCHROEDER: Objection.
18 BY MS. MANNO:
19    Q.  Does that question make sense?
20    MS. BEYEA-SCHROEDER: Objection. Form.
21 Foundation.  Go ahead.
22    **THE WITNESS: I have not seen it in the IFU**
23 **that says do not use these products in women under**
24 **a certain age.  I have not seen it opined that**
25 **women under a certain age are contraindicated to**

Page 1207

1 **have these products, and so I do not -- will not be**
2 **offering opinions about that nature.**
3 BY MS. MANNO:
4    Q.  Okay.  But irrespective of what is or is
5 not in the IFU, I just want to be clear.  I'm not
6 trying to be tricky.
7    **A.  Okay.**
8    Q.  But are you intentionally refraining from
9 opining in Ms. ▮▮▮▮ case or, frankly, any
10 other case on whether or not a doctor has met the
11 standard of care with respect to their choice,
12 their recommendation of the procedure?
13    MS. BEYEA-SCHROEDER: Objection. Form.
14 Foundation.
15    **THE WITNESS: What you're saying is based on**
16 **the patient's age.**
17 BY MS. MANNO:
18    Q.  No.  I'm saying -- well, I'm saying not
19 just based on the patient's age.  I'm saying like
20 in Ms. ▮▮▮▮ case, considering her age,
21 whether or not conservative options had previously
22 been tried and exhausted and whatever other factors
23 would be relevant.  It sounds like you're not
24 offering an opinion on whether or not the doctor in
25 Ms. ▮▮▮▮ case should have recommended this

Page 1208

1 surgery at the time in which he did.
2    **A.  I am not.**
3    MS. BEYEA-SCHROEDER: Objection. Form.
4 Foundation.
5    **THE WITNESS: I'm not opining about that.**
6 BY MS. MANNO:
7    Q.  Okay.  So I want to talk to you about -- I
8 mean, we don't have to get into line by line in
9 your report because you have your report, and it's
10 quite lengthy, but it is your opinion that the mesh
11 has caused the pain and pain with intercourse and
12 bleeding, the pelvic pain and the problems
13 releasing urine, correct?
14    **A.  That is correct.**
15    Q.  As well as the panic attacks as a result
16 of the dyspareunia, correct?
17    **A.  That is correct.**
18    Q.  Okay.  So I want to read to you some
19 portions of our expert report and get your thoughts
20 about that, okay?  And this would be Dr. Clark.  Do
21 you know Dr. Clark?
22    **A.  No.**
23    Q.  Matthew Clark?
24    **A.  No.**
25    Q.  It says at the time of the surgery,

Page 1209

1 Dr. Gatherum did not perform a suspension on the
2 uterosacral ligaments, but just reattached them to
3 the vaginal cuff.  He then placed the Avaulta Plus
4 mesh in place via a full thickness vaginal
5 incision.  Ms. ▮▮▮▮ surgery was complicated
6 by a postoperative vaginal cuff infection requiring
7 antibiotics.
8        Can you talk a little bit about that,
9 about your understanding of her vaginal cuff
10 infection?
11    MS. BEYEA-SCHROEDER: Objection. Form.
12 Foundation.  Go ahead.
13    **THE WITNESS: On** ▮▮▮ **2007, Dr. Gatherum**
14 **diagnosed the vaginal cuff cellulitis and resolving**
15 **hematoma.**
16 BY MS. MANNO:
17    Q.  Okay.  And what page are you on?
18    **A.  5.**
19    Q.  Okay.  So what is vaginal cuff cellulitis?
20    **A.  That is an infection of the underlying**
21 **tissue of the vaginal epithelium that is localized**
22 **to the tissue.  It's not forming an abscess.**
23    Q.  What do you mean localized?  I don't
24 understand that last part.
25    **A.  Cellulitis is a term where you don't see a**

Page 1210

1  fluid collection which is an abscess, but there's
2  an infection because there's fever and tenderness.
3     Q.  Okay.  And this was at the vaginal cuff,
4  correct?
5     A.  That is correct.
6     Q.  And are vaginal cuff cellulitis or
7  infections there common after hysterectomies?
8     A.  They're not uncommon.  It's about -- it
9  happens about 5 percent of the time.
10    Q.  Okay.  And not to catch you off guard, but
11  what do you base that 5 percent on?
12    A.  My clinical experience and what's reported
13  in the literature.  If someone wants to say it's up
14  to 15 percent, I wouldn't argue with them.
15    Q.  Okay.  So a low percentage, but probably
16  under 20 or 15 percent?
17    A.  That is correct.  And particularly, that's
18  why we give patients prophylactic antibiotics to
19  decrease this down.  So if someone might quote a
20  higher percentage, that might have been before the
21  time of prophylactic antibiotics for vaginal
22  hysterectomies.
23    Q.  Was Ms. ████████ given prophylactic
24  antibiotics?
25    A.  More likely than not since that would, you

Page 1211

1  know, be an indication.
2     Q.  Well, are you -- do you know, or are you
3  speculating?
4     A.  I didn't look at the records specifically
5  to find out whether or not she was given
6  prophylactic antibiotics.  You would usually need
7  to find that in the anesthesia report or the
8  nursing report.
9     Q.  Okay.  So we don't know in her case as of
10  this moment?
11    A.  Not at this moment, no.
12    Q.  Okay.  And then she was diagnosed with a
13  vaginal cuff cellulitis and a resolving hematoma.
14  What does that mean?
15    A.  That there was a collection of blood at
16  the top of the cuff that was getting better.
17    Q.  Again, is a hematoma at the vaginal cuff a
18  rare occurrence with a hysterectomy?
19    A.  I would say it's not an uncommon finding.
20    Q.  Okay.  Do you have percentages for this as
21  you do with the cellulitis or not?
22    A.  No, because most people don't really look
23  at it unless it becomes symptomatic or turns into
24  an abscess.
25    Q.  Okay.  You're not opining that the vaginal

Page 1212

1  cuff cellulitis or the resolving hematoma were due
2  to the mesh, are you?
3     A.  That is correct.
4     Q.  Okay.  I'm continuing on with this.  When
5  she resumed intercourse after surgery, she had
6  bleeding and pain.  She was seen by Dr. Gatherum
7  and Dr. Cope for a second opinion within eight
8  weeks of surgery.  Both physicians noticed a ridge
9  of mesh felt in the right anterior vagina.
10       Okay.  Then Dr. Clark goes on to say at
11  the time of surgery, Dr. Gatherum also missed an
12  opportunity to perform adequate surgery for
13  Ms. ████████  Despite performing a vaginal
14  hysterectomy, he did not perform an apical
15  suspension to lift the vaginal cuff and vault.  He
16  merely reattached the ligament to the vaginal cuff.
17  Thus, he relied totally on the Avaulta mesh to
18  support the apical vagina, something it was not
19  designed to do.  The Avaulta was designed to
20  support the anterior vaginal wall.  This lack of
21  apical support via traditional gynecology
22  suspension likely led to the folding of the mesh
23  felt in the early postoperative period by both
24  Dr. Cope and Dr. Gatherum.  This missing apical
25  support placed abnormal pressure on the mesh.

Page 1213

1        And if you need me to break that down, I
2  will.
3     A.  Oh, no.
4     Q.  So what I want to ask you is do you agree
5  with that?  Partially agree?
6     A.  I agree that the mesh deformed.  It
7  folded.
8     Q.  Okay.
9     A.  I didn't see any evidence that she's got
10  apical prolapse, so therefore, it would be highly
11  unlikely that there would be excess pressure on the
12  mesh to fold.  If that is a known consequence that
13  a vault suspension needs to be done at the same
14  time as an anterior and posterior Avaulta, excuse
15  me, an anterior Avaulta, that should be expressed
16  in the instructions for use.
17    Q.  So let me ask you this:  Do you have to
18  have an apical prolapse for there to be apical
19  pressure, if you will?  I mean, do you have to have
20  a full prolapse for it to be putting pressure down?
21    MS. BEYEA-SCHROEDER:  Objection.  Form.
22  Foundation.
23    THE WITNESS:  Well, I think you're going to
24  have to ask your expert about that.  That's your
25  expert's opinion.

Page 1214

1  BY MS. MANNO:
2    Q.  Well, I'm asking you.
3    **A.  My opinion is that the mesh folded,**
4  **deformed, contracted because of a defect in the**
5  **mesh.**
6    Q.  But my question is even if you don't have
7  an apical prolapse, can there still be pressure put
8  down, bearing down from merely reattaching the
9  ligament to the cuff as opposed to doing some sort
10  of vaginal vault suspension?
11   **A.  Well, he's opining that a uterosacral**
12  **suspension should have been performed, which is the**
13  **native tissue repair, and I think that he would be**
14  **the one that would be better -- those are his**
15  **opinions, and I agree that the mesh deformed --**
16   Q.  I know, but I'm asking you.
17   **A.  -- and contracted.**
18    MS. BEYEA-SCHROEDER:  He's finishing his
19  answer.
20  BY MS. MANNO:
21   Q.  I know, but I'm asking you whether or not
22  you can have pressure put down to bear anatomically
23  from the apical vagina when it is not suspended?
24    MS. BEYEA-SCHROEDER:  Objection.  Form.
25  Foundation.

Page 1215

1    **THE WITNESS:  Well, you're going to have**
2  **pressure on all aspects of the mesh.  That's what**
3  **it's supposed to do.  If I remember correctly, it**
4  **is -- the intention of the Avaulta is to form a**
5  **supportive bridge between fascial connections to**
6  **hold up the bladder, to hold down the rectum and**
7  **also in certain forms, to hold up the apex of the**
8  **vagina.  So it's going to get pressure on it.**
9    **If pressure was going to make it curl just**
10  **by the fact that there's pressure on it, well,**
11  **that's defective.  And yes, it does cause**
12  **deformation, but it's not supposed to deform.  It**
13  **caused contraction.  It's not supposed to contract,**
14  **all of these things it's not supposed to do, and**
15  **your expert just said well, this happens showing**
16  **that there is a product defect where there's**
17  **deformation of the mesh.**
18  BY MS. MANNO:
19   Q.  Object to nonresponsive.  Move to strike.
20    So Doctor, it says after eight weeks of
21  surgery, this ridge of mesh was felt, okay, eight
22  weeks.  And I know you and I have talked before
23  about oh, well, there can be, you know, this --
24  with the Avaulta Plus, there could be this delayed
25  healing, and, you know, the tissue responds, and

Page 1216

1  therefore, then things can -- the mesh can -- I
2  don't know how you -- band.
3    **A.  Deform.**
4    Q.  Deform.  We're at eight weeks later,
5  though, which is a pretty short time frame.
6    **A.  Right.**
7    Q.  And so --
8    **A.  Deformation can happen at any point after**
9  **the implantation.**
10   Q.  Okay.  And so what is your opinion in
11  terms of how exactly this mesh within
12  Ms. ███████ deformed, as you say, so quickly?
13   **A.  How did it deform?**
14   Q.  Yes.
15   **A.  Well, that is a defect of the mesh.**
16   Q.  But how does --
17   **A.  That it folds on itself.  There's an**
18  **apical portion that just hangs out there.  That can**
19  **fold over the top, and so it is a defect of the**
20  **mesh, deformation.**
21   Q.  So it's your opinion that it just on its
22  own folded over after implantation?
23    MS. BEYEA-SCHROEDER:  Objection.  Form.
24   **THE WITNESS:  Well, how it folds on its own is**
25  **the defect.**

Page 1217

1  BY MS. MANNO:
2    Q.  I understand that you believe it is a
3  defect.  I'll asking you, though, based on what
4  you've read, what is your opinion as to how it --
5  did it spontaneously fold on itself?  Did it fold
6  on itself during implantation, or did something
7  else occur to cause it to fold on itself?
8    **A.  We know that when Dr. Gatherum put it in,**
9  **he laid it in flat.  We know that eight weeks it**
10  **was found to be folded.**
11   Q.  And we've talked about this before, but
12  you know that it was laid flat just based on what
13  he has in his operative report?
14   **A.  That is correct.**
15   Q.  Okay.  But you weren't there, and you
16  didn't observe the surgery?
17   **A.  That is correct.**
18   Q.  So you are just saying that at some point,
19  it just decided to fold over on itself?
20   **A.  That is the defect of the device, yes.**
21   Q.  Okay.  Do you agree that a hysterectomy at
22  the time of a mesh implant can increase the risk of
23  mesh exposure?
24   **A.  That has been shown in studies, yes.**
25   Q.  Do you have any opinions about the

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 712 of 924 PageID #: 218519

Page 1218

1 implanting doctor in terms of -- I mean, did you
2 read his deposition?
3 **A. Yes.**
4 Q. Do you agree with me that he was very
5 inexperienced with respect to these procedures?
6 MS. BEYEA-SCHROEDER: Objection. Form.
7 Foundation. Go ahead.
8 **THE WITNESS: Sitting here right now, I don't**
9 **think I can answer that question.**
10 BY MS. MANNO:
11 Q. As recently as ▮▮▮▮ of 2014,
12 Ms. ▮▮▮▮▮▮▮ has noted improvement in terms of
13 dyspareunia and pelvic pain, correct?
14 MS. BEYEA-SCHROEDER: Objection. Form.
15 **THE WITNESS: That is correct.**
16 BY MS. MANNO:
17 Q. In ▮▮▮ 2014, Ms. ▮▮▮▮▮▮ is diagnosed
18 with having a pea-sized nodule on the right side of
19 her vagina, do you know what I'm talking about, by
20 a midwife?
21 **A. Not that I recall specifically.**
22 Q. Okay. So just so I'm clear, in your mind,
23 when you were coming to the conclusion of the cause
24 of her pelvic pain, dyspareunia, bleeding and the
25 problems releasing urine, let's take them -- let's

Page 1219

1 just -- I want you to tell me the things that you
2 ruled out for each, okay?
3 So let's talk about the pelvic pain and
4 dyspareunia. What did you -- when you talk to me
5 about a differential diagnosis, what did you
6 consider and then discard?
7 MS. BEYEA-SCHROEDER: Objection. Form.
8 **THE WITNESS: Well, I considered and discarded**
9 **endometriosis.**
10 BY MS. MANNO:
11 Q. Okay.
12 **A. Chronic trigonitis.**
13 Q. That's it?
14 **A. Those are the most significant things from**
15 **her medical history.**
16 Q. What about the hysterectomy?
17 **A. She had a 4.7-by-3.4-by-0.7-centimeter**
18 **piece of contracted, eroded, banded, deformed mesh**
19 **removed from her vagina.**
20 Q. How did you rule out the hysterectomy, or
21 did you rule it out as contributing?
22 **A. I would say that if the hysterectomy**
23 **contributed in any sense to the pain that she's**
24 **currently having from a 4-by-3-by-1-centimeter band**
25 **of contracted, eroded, deformed piece of mesh being**

Page 1220

1 taken out is minimal.
2 Q. Okay. So it could contribute, but in a
3 minimal way?
4 MS. BEYEA-SCHROEDER: Objection.
5 **THE WITNESS: Minimal.**
6 BY MS. MANNO:
7 Q. Okay. Anything else you ruled out?
8 **A. That was what was from her history.**
9 Q. Okay. What about the problems releasing
10 urine, what did you consider and rule out?
11 **A. The trigonitis, her current kidney stones**
12 **as obstructing her bladder.**
13 Q. Could that cause problems releasing urine,
14 kidney stones?
15 **A. If there's a kidney stone that's in her**
16 **bladder obstructing the urethra, yes.**
17 Q. Okay. And when is the last -- how do you
18 test to see if someone has a kidney stone?
19 **A. An X-ray study. If I remember correctly,**
20 **Dr. Norton did a cystoscopy at the same time or**
21 **related to her treatment in 2012 and did not see**
22 **any kidney stones in the bladder.**
23 Q. So how long does it take kidney stones to
24 form?
25 **A. Well, she hadn't had a kidney stone in a**

Page 1221

1 while so --
2 Q. Right.
3 **A. How long does it take a kidney stone to**
4 **form?**
5 Q. I mean, if I look in ▮▮▮▮ and someone
6 doesn't have a kidney stone, could I look in ▮▮▮▮
7 and they have a kidney stone?
8 **A. That is correct, but she would have to**
9 **have had enough of a size of a kidney stone that**
10 **once it got through the ureters, which are much**
11 **narrower than the urethra to get into the bladder,**
12 **get big enough that it obstructed the urethra.**
13 Q. How long of a period of time would you
14 expect something like that to take?
15 **A. Well, since she didn't have a -- symptoms**
16 **of a kidney stone being passed through the ureter,**
17 **I would find it very exceedingly unlikely that she**
18 **has a kidney stone that's obstructing her bladder.**
19 Q. What symptoms would somebody be describing
20 that a kidney stone is going through their ureter?
21 **A. Groin pain, nausea and vomiting.**
22 Q. Is that always the case?
23 **A. If it's -- sometimes you can have a very**
24 **small kidney stone that passes asymptomatically,**
25 **but the characteristic pain with a kidney stone is**

Page 1222

1  **groin pain or colicky pain, CVA tenderness, flank**
2  **pain.**
3     Q.  Did you say colicky?
4     **A.  Yeah.**
5     Q.  Okay.  I just think of babies when you say
6  colicky.
7     **A.  And that's kind of a crampy intermittent**
8  **pain, which is colicky.**
9     Q.  Okay.
10    **A.  It's like constant.**
11    Q.  Is it possible to have a kidney stone pass
12 down into your bladder and all you've thought or
13 that you've experienced is some cramping?
14    **A.  Yes.**
15    Q.  If you -- does a kidney stone ever resolve
16 on itself -- by itself?
17    **A.  Well, it gets passed.**
18    Q.  Okay.  But the issue is when it gets too
19 big, then it potentially interferes with urination?
20    **A.  Well, if it gets too big and it's still in**
21 **the ureters, it blocks the ureters and needs to be**
22 **treated.  Very rarely do -- I mean, I think I've**
23 **seen maybe four bladder stones in my entire career,**
24 **but I've seen numerous -- I see kidney stones half**
25 **a dozen times a year.**

Page 1223

1     Q.  Okay.  So if you have a stone in your
2  kidney, can that just hang out there for a long
3  time?
4     **A.  Sure.**
5     Q.  And if it is in your kidney, you don't
6  really notice anything in terms of pain, can that,
7  though, cause you to have problems releasing your
8  urine and you really don't even know why?
9     **A.  No.**
10    Q.  Why is that?
11    **A.  Well, because it's in your kidney, and**
12 **your bladder is what's releasing urine.**
13    Q.  So really there's not going to be any --
14 unless the stone has passed to your bladder, you're
15 not -- I mean, when it goes down the ureter, it's a
16 different type of scenario, right?  Like you'll
17 have the groin pain.  But when it's in your kidney
18 and it's not yet moving down, are you saying that
19 those are generally asymptomatic?
20    **A.  Yes, because it's a very wide portion.**
21 **It's what's called the renal pelvis, and so it's a**
22 **much wider portion than funnels down into a tube**
23 **called the ureter that goes down into the bladder.**
24    Q.  Okay.  So say you had the kidney stone.
25 It passes through the ureter.  And you have just

Page 1224

1  cramping, and it gets into your bladder.  Can it be
2  in your bladder for a period of time where you
3  don't really have any other symptoms except for
4  urinary issues?
5     MS. BEYEA-SCHROEDER:  Objection.
6     **THE WITNESS:  You would probably have recurrent**
7  **bladder infections.**
8  BY MS. MANNO:
9     Q.  Okay.  What else did you rule out other
10 than you said the trigonitis, recurrent kidney
11 stones you've ruled out for her problems releasing
12 urine?  Anything else that you ruled out?
13    **A.  Those are the things that were in her**
14 **medical history.**
15    Q.  Would you agree with me that dyspareunia
16 was a known complication and risk of the Avaulta
17 Plus implantation?
18    MS. BEYEA-SCHROEDER:  Objection.  Go ahead.
19    **THE WITNESS:  Dyspareunia?**
20 BY MS. MANNO:
21    Q.  Yes.
22    **A.  Yes.**
23    Q.  Erosion?
24    **A.  Yes.**
25    Q.  Pelvic pain?

Page 1225

1     **A.  Pain, yes.**
2     Q.  In terms of her panic attacks, what did
3  you rule out in terms of why she's having panic
4  attacks?
5     **A.  What did I rule out?  Well --**
6     Q.  I mean, you've --
7     **A.  -- panic attacks are situational.  There**
8  **are things that lead to a panic attack.  She states**
9  **that the situation that leads to her panic attack**
10 **is intercourse and the anticipation of pain that**
11 **she's going to have with intercourse.  I think it**
12 **is a very short differential diagnosis to that**
13 **because, again, panic attacks are situational.**
14    Q.  So would you, though, expect then that
15 since -- as of ▓▓▓ 2014 that she's reporting that
16 she's much improved and less painful than previous
17 exams, and it would follow that she's having less
18 panic attacks?
19    MS. BEYEA-SCHROEDER:  Objection.  Foundation.
20    **THE WITNESS:  I think she would be the best one**
21 **to answer that question.**
22    MS. MANNO:  All right.
23    **THE WITNESS:  Why don't we take five minutes,**
24 **and then we can do Jeff's.**
25    THE VIDEOGRAPHER:  We're off the record.  The

Page 1226

1  time is 3:45 p.m.
2      (Whereupon, a short break was
3          taken.)
4      THE VIDEOGRAPHER:  We're back on the record.
5  The time is 4:04 p.m.
6      MS. BEYEA-SCHROEDER:  Doctor, I just have one
7  question for you.
8              EXAMINATION
9  BY MS. BEYEA-SCHROEDER:
10     Q.  It seemed like when you were asked
11  questions about the standard of care, you indicated
12  that you may not have opinions on the standard of
13  care.  And looking at Exhibit 69, which is your
14  expert report, you do have opinions about the
15  standard of care listed on Page 10.  Can you
16  explain what you meant earlier?
17     **A.  Well, I opined that the surgery was**
18  **performed within the standard of care.  I stated**
19  **that any discussion about whether or not**
20  **Ms. ▮▮▮▮▮▮ would be an appropriate -- what the**
21  **appropriate therapy was would be between her and**
22  **Dr. Gatherum, but yes, I did state about whether or**
23  **not the standard of care was met in this case in my**
24  **report.**
25     MS. BEYEA-SCHROEDER:  Thank you very much,

Page 1227

1  Doctor.
2          FURTHER EXAMINATION
3  BY MS. MANNO:
4      Q.  Well, to be clear, you were talking about
5  the standard of care in the actual implantation,
6  correct?
7      MS. BEYEA-SCHROEDER:  Objection.  I'm not sure
8  I'm following your question.
9      **THE WITNESS:  That was also in the report, yes.**
10  BY MS. MANNO:
11     Q.  My question was were you opining as to the
12  propriety or whether -- of the choice to perform
13  the procedures?
14     **A.  And what procedure was performed.  That is**
15  **between the doctor and the patient.**
16     Q.  You're not opining as to the standard of
17  care with respect to that issue?
18     **A.  Well, the standard of care would be what**
19  **the doctor and the patient decided.  That's what a**
20  **reasonably qualified physician would do with the**
21  **same or similar patient.**
22     Q.  Well, I mean, a doctor and a patient could
23  agree to perform some surgery that was not proper,
24  right?
25     **A.  Well, doing surgery for prolapse is within**

Page 1228

1  **the standard of care.  Whether or not you do**
2  **surgery prior to trying conservative measures is**
3  **within the standard of care.  So what you're saying**
4  **is, you know, what was the order, how should it**
5  **have been done.  That is the decision between the**
6  **doctor and the patient.**
7      Q.  Do you have a belief or an opinion about
8  whether more conservative measures should have been
9  tried first?
10     **A.  Do I have an opinion?  I have opinions**
11  **about that.  You know, yes, I do nonsurgical**
12  **therapy all the time.  In this case, was it a**
13  **deviation of the standard of care to offer the**
14  **patient surgery to treat prolapse?  No, it was not.**
15     Q.  So now you do have an opinion about that?
16     **A.  As I say, the -- what order things would**
17  **be done, that is up to the doctor and the patient,**
18  **but doing surgery for prolapse is within the**
19  **standard of care, okay?  Doing surgery before**
20  **trying conservative measures is within the standard**
21  **of care.**
22     Q.  Is it within the standard of care for
23  somebody with the demographics and history of
24  Ms. ▮▮▮▮▮▮
25     **A.  Again --**

Page 1229

1      MS. BEYEA-SCHROEDER:  Objection.  Form.
2  Foundation.
3      **THE WITNESS:  -- that is a discussion with the**
4  **patient.**
5  BY MS. MANNO:
6      Q.  Okay.  But I guess I'm unclear.  Either
7  you are opining that this decision of
8  Ms. ▮▮▮▮▮▮ and her doctor was within the
9  standard of care or it's between the two of them.
10     **A.  Well, it is within the standard of care to**
11  **offer surgery to a patient --**
12     Q.  Okay.
13     **A.  -- irrespective of the age of the patient.**
14     Q.  Do you believe that in this case that more
15  conservative options should have been tried first?
16     MS. BEYEA-SCHROEDER:  Objection.  Form.
17  Foundation.  Go ahead.
18     **THE WITNESS:  My opinions about that -- I am of**
19  **the opinion that nonsurgical therapy should always**
20  **be tried before surgery, okay?  That is my opinion**
21  **in general.  In this case, the standard of care was**
22  **met because, you know, surgery is within the**
23  **standard of care to offer for prolapse.  It is**
24  **within the standard of care to do surgery without**
25  **trying conservative measures.**

Page 1230

1  BY MS. MANNO:
2      Q.  And I just want to revisit then when
3  you're talking about the implantation, and I think
4  we talked about this last time, I think you said,
5  and I'm summarizing, yes, you have seen patients
6  that you believe that the implantation of mesh was
7  done -- like there was too much tensioning of mesh
8  in some of the patients that you have seen after
9  the fact, right?
10     **A.  Right, due to contraction of the mesh.**
11     Q.  Well, I think I said to you but
12  Dr. Rosenzweig, can you also tell me that you have
13  seen patients in which you think that the initial
14  placement was with too much tension.  I think you
15  agreed with me.
16     **A.  That is correct.  I've seen patients that**
17  **have come in very shortly after surgery that had**
18  **obstructed voiding, yes.**
19     Q.  And I think I said to you well, but
20  nowhere ever in these op reports do you see hi, I'm
21  Dr. So and so, and I placed the mesh too tight or I
22  did it improperly or not in accordance with the
23  IFUs, and you said yes.  I'm just going based on
24  whatever it says in the operative report.  Do you
25  remember?

Page 1231

1      MS. BEYEA-SCHROEDER:  Objection.  Form.
2  Foundation.
3      **THE WITNESS:  That is a very short paraphrasing**
4  **of that long discussion.**
5  BY MS. MANNO:
6      Q.  Is my paraphrasing incorrect?
7      MS. BEYEA-SCHROEDER:  Objection to form.
8      **THE WITNESS:  You know, doctors talk about how**
9  **they tension the mesh, which is a valid way of**
10 **tensioning it.**
11 BY MS. MANNO:
12     Q.  Okay.  Right, but I think what my point
13  was to you is you are judging and opining about
14  whether or not a particular implantation was done
15  within the standard of care when you are just
16  basing it on medical records provided by the person
17  doing the implanting, correct?
18     MS. BEYEA-SCHROEDER:  Objection.  Form.  Go
19  ahead.
20     **THE WITNESS:  That is correct.**
21 BY MS. MANNO:
22     Q.  Which could be incorrect?
23     MS. BEYEA-SCHROEDER:  Objection.  Form.
24  Foundation.  I'm not sure if I'm following which
25  one is incorrect.  The placement or the operative

Page 1232

1  report?
2      MS. MANNO:  The report.
3      MS. BEYEA-SCHROEDER:  Objection.
4      **THE WITNESS:  I have no way of knowing how --**
5  **whether the operative report is correct or**
6  **incorrect.**
7      MS. MANNO:  Okay.
8      **THE WITNESS:  Should we go off the record for a**
9  **second while we switch places?**
10     MS. MANNO:  Sure.
11     THE VIDEOGRAPHER:  We're off the record.  The
12  time is 4:10 p.m.
13         (Whereupon, a short break was
14         taken.)
15     THE VIDEOGRAPHER:  We're back on the record.
16  The time is 4:13 p.m.
17         (Whereupon, Deposition Exhibit
18         Nos. 71-73 were marked for
19         identification.)
20 BY MS. MANNO:
21     Q.  Okay, Doctor.  We're moving on to
22  plaintiff, ████████  And for the record, we
23  have your highlighted report as Exhibit 71?
24     **A.  That is correct.**
25     Q.  The disc containing all your materials as

Page 1233

1  72 and the clean report as 73?
2      **A.  That is correct.**
3      Q.  All right.  So let's talk about ████
4  ████ ████ ████ had quite a lot of conditions
5  in her prior medical history, did she not?
6      **A.  That is correct.**
7      Q.  Okay.  And so I'll just take you through
8  the ones I have.  If I'm missing anything, please
9  feel free to include those.
10         So irritable bowel syndrome, we heard you
11  talk about that previously.  You know what, in
12  fact, before we go to the past medical history, it
13  makes more sense for you to describe to me her
14  current complaints.
15     **A.  Her complaint complaints are dyspareunia**
16 **and continued urinary symptoms.**
17     Q.  And when you say urinary symptoms, what
18  does that mean for Ms. ████
19     **A.  That she is having dysuria and urgency and**
20 **urinary retention.**
21     Q.  You said retention and what else?
22     **A.  Dysuria and urgency.**
23     Q.  And retention or just urgency?
24     **A.  Dysuria, urinary retention and urinary**
25 **urgency.**

Page 1234

1    Q.   Okay.  So in terms -- is she complaining
2  of all of those things currently?
3    A.   That is correct.
4    Q.   Okay.  And so let's talk about then the
5  IBS.  Can IBS cause dyspareunia, dysuria, urinary
6  retention or urinary urgency?
7    A.   Irritable bowel syndrome, again, we talked
8  about that earlier, is -- can be complaints of
9  abdominal bloating, alternating constipation and
10  diarrhea.  While -- when the patient has abdominal
11  bloating, irritation of their colon, they could
12  have some dyspareunia.  It would be more of an
13  episodic dyspareunia.
14      If the patient has constipation, it could
15  also make that difficult for them to empty their
16  bladder while they're having constipation.  Usually
17  when they're having their diarrhea symptoms, they
18  are going to have less symptoms of difficulty
19  emptying their bladder.
20    Q.   Meaning everything is emptying, both urine
21  as well as feces?
22    A.   That is correct.
23    Q.   Okay.  Now, what about can it affect
24  having dysuria?
25    A.   Usually not.

Page 1235

1    Q.   Why not?
2    A.   Why not?
3    Q.   Yes.
4    A.   Well, if you're -- I mean, if you're
5  having constipation or diarrhea, that is going to
6  be separate from most of the time when you're
7  actually spending more of your time urinating.
8    Q.   So other than what you have alleged that
9  is causing Ms. ████ dysuria, what else causes
10  dysuria?
11    A.   Dysuria is pain with urination.  Dysuria
12  can be caused by a urinary tract infection.  It can
13  be caused by chronic irritation inside the bladder.
14    Q.   What else?
15    A.   Those are the main things.
16    Q.   Stones?
17    A.   In the urethra?
18    Q.   Any type of stones.
19    A.   No.  A stone in the upper urinary tract is
20  not going to cause dysuria unless there's bacteria
21  associated with it.  Then she would have an acute
22  cystitis, which is one of the reasons that causes
23  dysuria.
24    Q.   So we've got urinary tract infections,
25  chronic irritation in the bladder, acute cystitis?

Page 1236

1    A.   Which is the same thing.
2    Q.   Anything else?
3    A.   There are probably other things, but those
4  are the major causes of dysuria.
5    Q.   What about yeast infections?
6    A.   Vaginal infections can cause some dysuria.
7  You know, you can have yeast inside the urinary
8  tract.  Usually when you have a vaginal infection
9  like a yeast infection, you get pain not with
10  urinating, but pain when the urine hits the area of
11  irritation on the outside of the vagina called the
12  vulva.
13    Q.   Okay.  Now, the chronic irritation in the
14  bladder, I mean, does IBS cause chronic irritation
15  of the bladder?
16    A.   No.  IBS can be associated with chronic
17  irritation of the bladder, so IBS and painful
18  bladder syndrome are not infrequently coexisting in
19  the same patient.
20    Q.   Meaning they often coexist?
21    A.   That is correct.
22    Q.   IBS as well as chronic irritation?
23    A.   That is correct.
24    Q.   Okay.  So if you had somebody that was
25  diagnosed with IBS, what are the chances in terms

Page 1237

1  of percentage that they would have a chronic
2  irritation in their bladder?
3    A.   20, 25 percent.
4    Q.   And how do those two things interact with
5  interstitial cystitis?
6    A.   Well, that's what -- painful bladder
7  syndrome is part of the spectrum of interstitial
8  cystitis.
9    Q.   So just to bear this out, you said IBS
10  does not usually cause dysuria, but oftentimes you
11  can have IBS with the chronic irritation, which
12  does, in fact, cause the painful urination?
13    MR. LARRIMORE:  Objection.  Form.
14    THE WITNESS:  That is correct.
15  BY MS. MANNO:
16    Q.   Would any of those conditions of the
17  bladder, the chronic irritation, IBS also
18  potentially cause feelings of urgency?
19    A.   That would be associated with the chronic
20  irritation.
21    Q.   What about retention?
22    A.   That is less of a corollary.  Feelings of
23  incomplete emptying can be associated with chronic
24  irritation inside the bladder.
25    Q.   Okay.  And can you tell, based on your

Page 1238

1  review of the records, how long a period of time
2  Ms. ████ has had IBS?
3      MR. LARRIMORE: Objection. Form.
4      **THE WITNESS: I don't recall from her records**
5  **right now exactly how long she's had irritable**
6  **bowel syndrome.**
7  BY MS. MANNO:
8      Q.  You would agree with me that she testified
9  that prior to the implant, she got bladder
10  infections, urinary tract infections and kidney
11  infections; is that correct?
12      **A.  That is what she testified to.**
13      Q.  Okay.  And so when someone has a history
14  of that, is that something that can continue on
15  indefinitely?
16      MR. LARRIMORE: Objection. Form.
17      **THE WITNESS: Well, one of the things is that**
18  **with stress urinary incontinence, you can get a**
19  **funneling of the bladder neck, and there are**
20  **patients with stress urinary incontinence that have**
21  **a slightly higher incidence of urinary tract**
22  **infections. When you treat the stress urinary**
23  **incontinence, their frequent urinary tract**
24  **infections get better.**
25

Page 1239

1  BY MS. MANNO:
2      Q.  Okay.  But I think the question is when
3  you have somebody who has a history, though, of
4  urinary tract infections, bladder infections and
5  kidney infections, are those conditions which can
6  continue on indefinitely?
7      MR. LARRIMORE:  Objection.
8      **THE WITNESS: They can, but again, there's**
9  **usually a cause for those issues again, so there**
10  **are some times we can't find out what the cause is**
11  **of recurrent urinary tract infections.**
12  BY MS. MANNO:
13      Q.  Well, do you have an opinion as to what
14  caused Ms. ████ urinary tract infections,
15  bladder infections and kidney infections prior to
16  her implant?
17      **A.  Not that I saw in the records.**
18      Q.  Okay.  She had a laparoscopic -- is it
19  called -- you're going to have to translate this
20  for me -- BSO lysis of adhesions in 2004?
21      **A.  That is correct.**
22      Q.  What does that mean?
23      **A.  That means that they put a telescope in,**
24  **took out the tubes and ovaries and took out**
25  **adhesions.**

Page 1240

1      Q.  So is that referred to as sort of a
2  partial hysterectomy or not?
3      **A.  No.  What most people mean by a partial**
4  **hysterectomy is that they take out the uterus, and**
5  **they leave the tubes and ovaries behind.**
6      Q.  But this is sort of taking out everything
7  else?
8      **A.  Right.**
9      Q.  So it's referred to as a BSO?
10      **A.  That is correct.**
11      Q.  And then she also had a tubal ligation,
12  correct?
13      **A.  Prior, yes.**
14      Q.  And endometriosis?
15      **A.  That --**
16      Q.  Go ahead.
17      **A.  That is correct.**
18      Q.  And so is it fair to say that the previous
19  testimony that you have given about the potential
20  results of tubal ligations and endometriosis we can
21  also apply to this current deposition for
22  Ms. ████
23      MR. LARRIMORE: Objection. Form.
24      **THE WITNESS: That is correct.  Seeing that the**
25  **fact that she was 48 years old at the time of her**

Page 1241

1  **Align procedure and her ovaries had been removed,**
2  **it's unlikely that endometriosis would be**
3  **contributing to her current problems.**
4  BY MS. MANNO:
5      Q.  Okay.  But in terms of sort of your
6  general testimony that you provided as to what can
7  be caused by endometriosis, would that be the same
8  now?
9      **A.  That is correct.**
10      Q.  Ms. ████ is also a smoker?
11      **A.  That is correct.**
12      Q.  And based on your review, do you know how
13  much she smokes and for how long?
14      **A.  I don't recall that sitting here today.**
15      Q.  You know she's got a history of asthmatic
16  bronchitis?
17      **A.  That is correct.**
18      Q.  Left knee surgery and TMJ?
19      **A.  Yes.**
20      Q.  So TMJ is -- in terms of for a layperson
21  is what?
22      **A.  It's temporomandibular joint syndrome, so**
23  **pain in the jaw joint.**
24      Q.  Okay.  When a person has TMJ, is there any
25  correlation with TMJ and depression or anxiety?

1     MR. LARRIMORE: Objection. Form.
2     **THE WITNESS: One of the ideas is that people**
3  **get TMJ from grinding their teeth at night.**
4  **Grinding their teeth at night could be a**
5  **manifestation of anxiety, depression, panic**
6  **attacks.**
7  BY MS. MANNO:
8     Q.  Okay.  And a history of arthritis,
9  correct?
10    **A.  That is correct.**
11    Q.  How can arthritis, if it can, contribute
12  to dyspareunia or any urinary symptoms?
13    MR. LARRIMORE: Objection. Form.
14    **THE WITNESS: Arthritis might affect mobility,**
15  **which could make it more difficult for you to reach**
16  **the toilet in time so that if you have urgency, you**
17  **might leak, but the correlation between the two**
18  **would be tenuous at best.**
19  BY MS. MANNO:
20    Q.  Okay.  It may cause pain in joints, but
21  not necessarily within the pelvis.  Is that what
22  you're saying?
23    **A.  That is correct.**
24    Q.  Now, Ms. ██████ you would agree with me,
25  has a very long history of narcotic pain medication

1  use?
2     **A.  That is correct.**
3     Q.  And some of those medications being
4  Oxycodone, methadone, and is it Neurontin?
5     **A.  That is correct.**
6     Q.  Okay.  And methadone is used for people
7  trying to wean off heroin, correct?
8     MR. LARRIMORE: Objection. Form.
9     **THE WITNESS: Well, it's also a pain**
10  **medication, too.**
11  BY MS. MANNO:
12    Q.  Okay.  But -- and it's pretty strong would
13  you say?
14    **A.  Not as strong as narcotics, which is why**
15  **if someone is using it to wean off of narcotics,**
16  **they would switch to that because it has an easier**
17  **time to segue off of that than it is for other**
18  **narcotics.**
19    Q.  Okay.  So is the Oxycodone a narcotic?
20    **A.  That is correct.**
21    Q.  Okay.  So if somebody is taking Oxycodone
22  and methadone at the same time, would you consider
23  that combination to be very strong?
24    MR. LARRIMORE: Objection. Form.
25    **THE WITNESS: The Oxycodone is a very strong**

1  pain medication.
2  BY MS. MANNO:
3     Q.  Okay.  And so let's talk about the
4  potential side effects of -- well, before we go
5  there, what is Neurontin?
6     **A.  Neurontin or Gabapentin is a nerve**
7  **modulator.**
8     Q.  And what is it used to treat?
9     **A.  Pain.**
10    Q.  And what is your understanding of why
11  Ms. ████ was using these narcotic drugs,
12  Gabapentin, methadone, Neurontin prior to her
13  implant?
14    **A.  From my understanding, it was from her**
15  **back pain from a car accident that had been on and**
16  **off for years before her implant.**
17    Q.  Okay.  What about -- is that the only
18  reason that you believe that she used these drugs?
19    MR. LARRIMORE: Objection. Form.
20    **THE WITNESS: If you have another record that**
21  **you would like me to take a look at that that says**
22  **there are other reasons for her narcotic use --**
23  BY MS. MANNO:
24    Q.  What is your understanding as you sit here
25  now?

1     **A.  That it was from her back pain due to a**
2  **car accident several years before.**
3     Q.  Okay.  And so the use of narcotic pain
4  medications, particularly long term, can result in
5  what sort of side effects, if you know?
6     **A.  One is that you can get habituated to the**
7  **use.  It can cause constipation.**
8     Q.  Anything else?
9     **A.  I mean, there are a variety of other**
10  **causes of long-term pain medication use, but**
11  **habituation and constipation are the big ones you**
12  **worry about.**
13    Q.  What effect, if any, on the urinary tract?
14    **A.  There are patients that have -- that are**
15  **taking a very high dose of pain medication that**
16  **might not realize that their bladder is full.**
17    Q.  And so then they would leak?
18    **A.  They might leak.**
19    Q.  Okay.  Could it lead to feelings of
20  urgency then?
21    **A.  No.**
22    Q.  Because?
23    **A.  Well, that's the sensation that's being**
24  **suppressed is the urgency.**
25    Q.  Okay.  So if that's suppressed, then if

Page 1246

1  you had any symptom, I guess it would be leakage
2  before you knew that your bladder was full?
3  **A. That can happen, yes.**
4  Q. What about retention?
5  **A. That is a possibility of long, neglected,**
6  **not appreciating the symptoms of needing to void.**
7  Q. So if over time you don't appreciate the
8  need to void, that can ultimately lead to
9  retention?
10 **A. That can, yes.**
11 Q. Can you describe how?
12 **A. Well, your bladder is a very forgiving**
13 **organ, so that you can volitionally make your**
14 **bladder very large or very small. So that if you**
15 **are not perceiving the symptoms of urgency and the**
16 **desire to go to the bathroom, you will continually**
17 **have more and more inside your bladder that becomes**
18 **more and more difficult to evacuate.**
19 Q. Because the more full it is, it becomes
20 harder to evacuate.
21 **A. That is -- yes.**
22 Q. Okay. Same thing for Ms. ███    We
23 talked about the fibromyalgia. You're aware she
24 had that, correct?
25 **A. That is correct.**

Page 1247

1  Q. And so that can potentially lead to pelvic
2  pain, correct?
3  **A. We discussed that it's usually associated**
4  **with more peripheral discomfort.**
5  Q. In terms of describing dyspareunia, how
6  does Ms. ███ characterize how she is experiencing
7  dyspareunia?
8  **A. From my understanding, she described it as**
9  **a sharp, shooting, stabbing and tearing pain with**
10 **intercourse.**
11 Q. And where is that in your report?
12 **A. It is -- Mrs. ███ describes the pain in**
13 **her left lower quadrant of her abdomen and vaginal**
14 **region that radiates into her thigh and hip. It's**
15 **sharp, shooting and stabbing, tearing in quality,**
16 **and she's having pain with sexual intercourse.**
17 Q. What page are you on?
18 **A. Right above opinions on Page 2.**
19 Q. Okay. These painful symptoms led to pain
20 with sexual intercourse exacerbating all her other
21 symptoms?
22 **A. That is correct.**
23 Q. Do you have an opinion as to whether or
24 not Ms. ███ has become dependent on pain
25 medications --

Page 1248

1  MR. LARRIMORE: Objection. Form.
2  BY MS. MANNO:
3  Q. -- or I think your word was it causes
4  habituation. What did you say?
5  **A. Yes.**
6  Q. Do you have an opinion about that?
7  MR. LARRIMORE: Objection.
8  **THE WITNESS: No, I do not.**
9  BY MS. MANNO:
10 Q. You don't have an opinion?
11 **A. Whether or not she's habituated? I**
12 **didn't -- again, I didn't see that there was that**
13 **diagnosis in the medical records.**
14 Q. So you don't know her prescription
15 history, correct?
16 **A. That is correct.**
17 Q. So without knowing more about her
18 prescription history, would you say you're unable
19 to opine about whether or not she's -- when you say
20 habituation, I assume that means addicted to pain
21 medicine?
22 **A. That is correct, and that is a diagnosis**
23 **that someone would need to make that sees the**
24 **patient. I don't think you could just base it on**
25 **someone's medication -- their pharmacy history.**

Page 1249

1  Q. Okay. Do you believe that if you saw the
2  patient in person that you could be able to make
3  that diagnosis?
4  **A. I would be in a better position to make**
5  **that diagnosis, yes.**
6  Q. Okay. The migraines, I'm not sure if you
7  and I have had a patient where we've discussed
8  migraines. I'm not sure if you have, but how does
9  having migraines lead or contribute to complaints
10 about dyspareunia or any urinary symptoms?
11 MR. LARRIMORE: Objection. Form.
12 **THE WITNESS: We talked briefly about the fact**
13 **that patients that have pain syndromes prior to**
14 **mesh are more likely to have pain after mesh**
15 **implant, and migraines would fall under that**
16 **category.**
17 BY MS. MANNO:
18 Q. Okay. You say that she does have a
19 history of the chronic constipation prior to the
20 implant, correct?
21 **A. That is correct.**
22 Q. And so could that have been a result of
23 either the IBS, pain medications or a combination
24 thereof?
25 MR. LARRIMORE: Objection. Form.

Page 1250

1    THE WITNESS:  That is correct.
2  BY MS. MANNO:
3    Q.  When was she placed on hormone replacement
4  therapy and vaginal estrogen cream, if you know?
5    A.  I don't have that specifically outlined.
6    Q.  Do you know the date of her hysterectomy
7  in which she gets her uterus taken out?
8    A.  The exact date, no, but in 2004, she had
9  her hysterectomy.
10   Q.  So she has the BSO in 2004 and the
11  hysterectomy in 2004?
12   A.  That is my understanding, yes.
13   Q.  And do you find that to be unusual to have
14  that done in two different procedures?
15   A.  It's not uncommon --
16   MR. LARRIMORE:  Objection.
17   THE WITNESS:  -- to do one or the other and
18  then need to go back and do the first, particularly
19  when you're dealing with endometriosis.
20  BY MS. MANNO:
21   Q.  Okay.  So I know that you have previously
22  told me that a hysterectomy can result in
23  dyspareunia.  Would you say that a BSO could also
24  lead to dyspareunia separate and apart?
25   A.  No.

Page 1251

1    Q.  And why not?
2    A.  Well, because it's in a different
3  location.  Remember we talked about after the
4  uterus is taken out, the ovaries are further away
5  from the pelvis, and therefore, it would not be a
6  surgery that in and of itself would be associated
7  with dyspareunia.
8    Q.  It could be for pelvic pain more to the
9  sides, correct?
10   A.  It could be, but then you would be doing
11  that for an indication to try and treat the pelvic
12  pain.
13   Q.  Right.  But if you have the BSO and the
14  hysterectomy, I guess my question is can pain
15  result from a BSO?  Maybe it's not dyspareunia, but
16  it's pain within the pelvis.
17   A.  Yes, but more likely than not, it would
18  resolve pain than to create pain.
19   Q.  I understand.  There are many reasons to
20  have them taken out, but every time you're going in
21  the vagina and operating, you're risking potential
22  pain, correct?
23   A.  You're not going into the vagina.
24  Remember, she had this done laparoscopically, so
25  you're going through a telescope that's placed

Page 1252

1  underneath the belly button.
2    Q.  Okay.  All right.  So anytime you're going
3  in laparoscopically like that, though, couldn't a
4  possibility result of pelvic pain?
5    MR. LARRIMORE:  Objection.  Form.
6    THE WITNESS:  No, unless you're operating in
7  the pelvis.
8  BY MS. MANNO:
9    Q.  And so the tubes and ovaries would be in
10  the abdomen?
11   A.  Remember they're on the side walls because
12  the uterus was taken out.
13   Q.  Right.  I guess I'm trying to get -- like
14  we say pelvis.  We say abdomen.  Where's the
15  cut-off point?
16   A.  Usually where the pubic bone is would be a
17  good demarcator from abdomen to pelvis.
18   Q.  Okay.  Do some of your patients come in,
19  though, describing abdominal pain which really is
20  better described as pelvic pain and vice versa?
21   A.  Occasionally, yes.
22   Q.  Ms. ███ also suffered from GERD,
23  correct?
24   A.  That is correct.
25   Q.  And GERD stands for?

Page 1253

1    A.  Gastroesophageal reflux disorder.
2    Q.  And that can lead to heartburn, nausea,
3  correct?
4    A.  That is correct.
5    Q.  Can GERD affect anything with respect to
6  your urinary tract, frequency, urge, retention?
7    A.  Well, number one, you could get a more
8  alkalinized urine, which can be uncomfortable.
9  Two, you could be taking medication which could
10  irritate the bladder, but usually GERD is not
11  specifically associated with bladder
12  symptomatology.
13   Q.  So when you say the urine can become more
14  alkalinized --
15   A.  Right.
16   Q.  More alkaline in it?
17   A.  Yes.
18   Q.  And is that more acid?
19   A.  No.  It's the opposite.
20   Q.  Okay.  And so what is -- what is it?
21   A.  It's the pH of the urine.  Urine should be
22  of a pH of about 5, and if it gets up to around 7,
23  it could be more irritating.
24   Q.  And 7 would mean it has more alkaline in
25  it?

Page 1254

1    A.  That is correct.
2    Q.  So could that then result in dysuria?
3    A.  That is correct, and that's one of the
4  corollaries with the chronic irritation that we
5  talked about from various foods or beverages that
6  you're eating and drinking.
7    Q.  So even if you don't have diagnosed GERD,
8  you could have a higher pH to your urine?
9    A.  That is correct.
10   Q.  Ms. ____ also was diagnosed with vaginal
11  atrophy, correct?
12   A.  That is correct.
13   Q.  And do you know when she was first
14  diagnosed with it?
15   A.  Sitting here right now, no.
16   Q.  Okay.  She was put on Estrace cream?
17   A.  Yes.  And if you'd like to share with me
18  the date, then I could answer your previous
19  question.
20   Q.  Well, the idea is for you to give me the
21  date.
22   MR. LARRIMORE:  Well, we've been here all day.
23   MS. MANNO:  He keeps asking.
24  BY MS. MANNO:
25   Q.  Ms. ____ also complained in 2005, if you

Page 1255

1  know, that she complained of chronic abdominal pain
2  for as long as she can remember.  Symptoms worsened
3  after salpingo-oophorectomy surgery.  Are you aware
4  of that?
5    A.  That is correct.
6    Q.  So actually the removal of those things
7  didn't really help with that for her?
8    A.  Well, the abdominal part.
9    Q.  Correct.
10   A.  That is correct.
11   Q.  At some point, she also described urethral
12  itching, correct?
13   A.  That is correct.
14   Q.  So what is that as opposed to -- I mean,
15  just your urethra itches --
16   MR. LARRIMORE:  Objection.  Form.
17  BY MS. MANNO:
18   Q.  -- as opposed to like vaginal itching?
19   A.  Well, that's what she described, and yes,
20  sometimes there can be an irritation right at the
21  outside edge of the urethra that can lead to
22  itching.
23   Q.  Outside edge meaning where the urine comes
24  out?
25   A.  Yes.

Page 1256

1    Q.  Not at the midpoint?
2    A.  Not at the midpoint or at the bladder
3  neck.
4    Q.  Okay.  So if you have -- if you have GERD
5  and your pH is higher than it should be in your
6  urine --
7    A.  No.  I didn't say that all GERD has a
8  higher pH.
9    Q.  I know.  I'm just giving you the
10  background.  If you have GERD and that, in fact,
11  causes the pH of your urine to be higher than 5 or
12  even if you don't have GERD and your pH of your
13  urine is higher than 5, can that lead to urethral
14  itching and irritation?
15   A.  Irritation, yes.  Manifesting as itching,
16  no.
17   Q.  So what leads to urethral itching?
18   A.  There are a variety of things such as
19  candidiasis of the urethra, thinning of the
20  urethral epithelium from atrophy, irritation of the
21  Skene's gland, which is one of the glands that is
22  next to the urethra that could be blocked and
23  therefore, gets dilated.  So those would be some of
24  the main ones.
25   Q.  Okay.  So you agree that she presents to

Page 1257

1  the gynecologist who placed the sling in ____
2  2014, which was four years after the initial
3  placement, correct?
4    A.  That is correct.
5    Q.  And would you also agree that she had
6  79 office and/or hospital visits since her sling
7  visit and the request of her records before she
8  started complaining of any --
9    MR. LARRIMORE:  Objection.  Form.
10  BY MS. MANNO:
11   Q.  Of any symptoms related to her mesh?
12   A.  And the symptoms being the shooting,
13  stabbing pain inside of her vagina, pain with
14  intercourse and problems emptying?
15   Q.  Yep.
16   A.  That she had several visits, yes.
17   Q.  79?  Is that a yes?
18   A.  If you counted them up, I will take your
19  word for it.
20   Q.  Okay.  And do you also agree that not
21  until ____ of 2014 that she did not seek
22  treatment for dyspareunia throughout that entire
23  period of time?
24   A.  That is not described in the records, yes.
25   Q.  Meaning based on the records, you agree

Page 1258

1  that she did not report any complaints of
2  dyspareunia until ▓▓▓▓ of 2014?
3      MR. LARRIMORE: Objection. Form.
4      **THE WITNESS: I did not see any complaint in**
5  **the records before that, yes.**
6  BY MS. MANNO:
7      Q. So this sharp, stabbing pain that she
8  complains of then in her deposition, did you
9  interpret that as something that was prohibiting
10  her from having sex with her husband?
11     **A. I don't recall if she said that that**
12  **prohibited her from having intercourse or not.**
13     Q. Okay. Do you know when she filed her
14  lawsuit?
15     **A. No, I do not.**
16     Q. The leg symptoms that she talks about, do
17  you -- are you opining that her leg pain is caused
18  by her sling?
19     **A. I am not.**
20     Q. Are you aware of any bladder scans or
21  catheterized post-void residual urine
22  quantifications to assess her complaint of urinary
23  retention or incomplete emptying?
24     **A. No, I am not.**
25     Q. And even if any retention has been caused

Page 1259

1  by her sling placement, that is -- that was a known
2  risk, correct?
3      MR. LARRIMORE: Objection.
4      **THE WITNESS: Retention immediately after**
5  **surgery, yes. Delayed retention from mesh**
6  **contraction, degradation, deformation and chronic**
7  **foreign body reaction, chronic inflammation is not**
8  **in the IFU.**
9              (Whereupon, Deposition Exhibit
10              No. 74 was marked for
11              identification.)
12  BY MS. MANNO:
13     Q. Showing you 74, which is the IFU for
14  Ms. ▓▓▓▓ case, under adverse events on Page 5
15  has complications associated with the proper
16  implantation of the Align Urethral Support System
17  may include, but not limited to bullet point, No. 2
18  or dash 2 urinary retention, bladder outlet
19  obstruction and other voiding dysfunctions.
20         Where in that sentence does it say just
21  after the surgery?
22     **A. Well, it says these conditions may be**
23  **associated with overcorrection or too much tension**
24  **on the implant meaning at the time of implantation.**
25     Q. Okay.

Page 1260

1      **A. It doesn't say that this can happen --**
2  **start happening several years afterwards due to**
3  **mesh contraction, degradation, deformation or**
4  **chronic foreign body reaction.**
5      Q. Dr. Rosenzweig, you agree with me there
6  are two sentences in this bullet point, correct?
7      **A. That is correct.**
8      Q. The first one says urinary retention,
9  bladder outlet obstruction and other voiding
10  dysfunctions, period. That's a complete sentence,
11  right?
12     **A. That is correct.**
13     Q. And then it says these conditions may be
14  associated with overcorrection, too much tension
15  placed on the implant, correct?
16     **A. That is correct.**
17     Q. Does the sentence say these conditions are
18  only a result of overcorrection or too much tension
19  placed on the implant?
20     **A. No.**
21     MR. LARRIMORE: Objection.
22  BY MS. MANNO:
23     Q. Did you also learn, based on your review
24  of the records, that Ms. ▓▓▓▓ had what can be
25  described as a strained relationship with her

Page 1261

1  husband?
2      MR. LARRIMORE: Objection. Form.
3      **THE WITNESS: That specifically, I think, was**
4  **discussed in her deposition.**
5  BY MS. MANNO:
6      Q. Did you read that?
7      **A. That is correct.**
8      Q. Okay. And would you agree with me that
9  relationship factors or intimacy factors with your
10  spouse or significant other also play a role in the
11  frequency in which you have sex?
12     **A. That could, yes.**
13     Q. Could it also have -- at least play a
14  contributing factor to any pain that you might
15  experience during sex?
16     MR. LARRIMORE: Objection.
17     **THE WITNESS: Not specifically, no.**
18  BY MS. MANNO:
19     Q. You don't believe that any emotional
20  strain on a relationship could result in pain
21  during sex?
22     **A. It usually results in lack of desire to**
23  **have intercourse.**
24     Q. Okay. Could it also rise to the level,
25  though, of discomfort during the actual sex act?

Page 1262

1    A.  If the sex act is done involuntarily, then
2    I could see that that would lead to discomfort.
3        Q.  So one thing that is necessary for
4    comfortable sex is lubrication, correct?
5    **A.  That is correct.**
6        Q.  And when someone is emotionally -- there's
7    emotional strain or there is a lack of desire, but
8    you are having -- but you are in the situation of
9    having sex, might you have less lubrication?
10       MR. LARRIMORE:  Objection.
11   **THE WITNESS:  Not characteristically, no.**
12   BY MS. MANNO:
13       Q.  So you think that if a person really does
14   not want to have sex that the lubrication in their
15   vagina would be the same either way?
16       MR. LARRIMORE:  Objection.
17   **THE WITNESS:  Again, this kind of goes back to**
18   **if you're having intercourse less than**
19   **volitionally.  That might not be the same thing as**
20   **having a strain in the relationship.  So if you're**
21   **having intercourse without your complete volition,**
22   **that could impact lubrication just like it could**
23   **impact pain because you might not -- you know, you**
24   **might contract your pelvic floor muscles.  So in a**
25   **situation where you're having nonvolitional**

Page 1263

1    **intercourse for whatever the caveat is, that can**
2    **lead to a less than adequate lubrication and can**
3    **lead to pain.**
4    BY MS. MANNO:
5        Q.  And dyspareunia?
6    **A.  That is correct.**
7        Q.  So do you agree that in her ███ 2014
8    gynecologic exam, it was noted to be normal and
9    without pain on palpation?
10       MR. LARRIMORE:  Objection.
11       MS. MANNO:  Excuse me for just a second.  Can
12   you state your basis for the objections?  I mean,
13   is it to form?
14       MR. LARRIMORE:  That's what I said.
15       MS. MANNO:  You just keep saying objection.
16       MR. LARRIMORE:  I'm really sorry.  I'm trying
17   to -- sometimes I'm saying form.
18       MS. MANNO:  But it's like after every question,
19   so if there's really a form problem --
20       MR. LARRIMORE:  It's not after every question.
21       MS. MANNO:  Pretty much.
22       MR. LARRIMORE:  And I'm trying to be quiet so
23   I'm not interrupting you.
24       MS. MANNO:  That's fine, but it's like after
25   every question, and I just want to make sure if I

Page 1264

1    am --
2        MR. LARRIMORE:  I'm trying not to interrupt
3    your flow.  That's why I'm trying to speak quiet.
4        MS. MANNO:  So --
5        MR. LARRIMORE:  We can do the other way if
6    that's what you want.
7        MS. MANNO:  No.  I just think that you should
8    have a basis before you make an objection, not just
9    object.  If there's a problem with form, then we
10   should -- then I should fix it.
11   **THE WITNESS:  She did complain at that point**
12   **about vaginal pain, itching, incomplete emptying,**
13   **hesitancy, dyspareunia and dysuria.  That was her**
14   **complaint.**
15   BY MS. MANNO:
16       Q.  I'm sorry.  So I thought I said it was
17   noted to be normal and without pain on palpation
18   and examination.
19   **A.  That is what the physical exam showed.**
20       Q.  Okay.  I'm sorry.  So she goes in, and she
21   is complaining about pelvic pain and dyspareunia
22   orally?
23   **A.  That is correct.**
24       Q.  But once the medical exam is performed,
25   the doctor notes that it is normal and without pain

Page 1265

1    on palpation?
2    **A.  That's what the note states.**
3        Q.  So I asked you earlier about the Estrace
4    cream when it was prescribed, and you said, you
5    know, if you have a date for me.  So I am noting,
6    based on our expert's report, that it states it was
7    noted she was prescribed vaginal estrogen cream at
8    her 2014 visit with the gynecologist, but not
9    prior.
10   **A.  Okay.**
11       Q.  Any reason to quarrel with that?
12   **A.  No.**
13       Q.  So if she didn't have any estrogen cream
14   until 2014 and she had vaginal atrophy, then I am
15   assuming you're going to agree with me that can be
16   a contributing factor to dyspareunia?
17       MR. LARRIMORE:  Objection.  Form.
18   **THE WITNESS:  That is correct, but also, in**
19   **███   the exam was normal from what we -- our**
20   **prior discussion.**
21   BY MS. MANNO:
22       Q.  Although, Ms. ███ is complaining of
23   certain pains?
24   **A.  That is correct.**
25       Q.  Would you agree with me that after

Page 1266

1  menopause, there is -- I think you did tell me
2  this, and if you did, I'm sorry to ask you again,
3  but is there an increase in UTIs following
4  menopause?
5  **A. No. We talked about overactive bladders.**
6  Q. Okay. What about UTIs?
7  **A. There -- again, with thinning of the**
8  **urethra, there might be a greater opportunity for**
9  **bacteria to get up into the urethra. I would say**
10 **that discomfort with urination might be more**
11 **frequent after menopause than true urinary tract**
12 **infections.**
13  Q. Are antibiotics a cause of urinary tract
14  infections?
15  MR. LARRIMORE: Objection. Form.
16  **THE WITNESS: Are a cause?**
17  BY MS. MANNO:
18  Q. Well, maybe that's not the right word, but
19  do they increase the -- do they make you more
20  receptive to a UTI?
21  **A. They make you more receptive to a -- if**
22  **you do develop a bacterial infection, you're going**
23  **to have a really bad bacteria because you've**
24  **selected out the bacteria that are resistant to the**
25  **antibiotic in particular.**

Page 1267

1  Q. So isn't -- when a person is prescribed an
2  antibiotic, isn't there the normal warning label
3  that says, you know, it can cause a yeast
4  infection?
5  MR. LARRIMORE: Objection.
6  **THE WITNESS: That's different from a urinary**
7  **tract infection.**
8  BY MS. MANNO:
9  Q. Okay. Well, that's what I'm trying to
10  distinguish between the two. Antibiotics can cause
11  a yeast infection?
12  **A. That is correct.**
13  Q. How does that work?
14  **A. Well, remember we talked about the**
15  **lactobacillus inside the vagina. The antibiotics**
16  **can kill the lactobacillus, which is taking the**
17  **glycogen, which is part of the vaginal wall, making**
18  **acids and peroxides and allow the yeast to**
19  **overgrow, but you usually see that in women that**
20  **are premenopausal, antibiotics leading to yeast**
21  **infections.**
22  Q. So how does going through menopause change
23  that correlation?
24  **A. Well, you have less estrogen unless you're**
25  **on an estrogen supplementation, so the amount of**

Page 1268

1  **lactobacillus inside the vagina might start to**
2  **drop.**
3  Q. Okay. So in terms of the complaints of
4  dyspareunia, is it your opinion that there are any
5  contributing factors other than the mesh in terms
6  of her stated dyspareunia?
7  MR. LARRIMORE: Objection. Form.
8  **THE WITNESS: Are there other factors? I think**
9  **we discussed all the potential factors in our**
10  **discussion.**
11  BY MS. MANNO:
12  Q. Well, in your report, though, you
13  attribute it to the mesh, and so I'm asking you if
14  you attribute any parts of the dyspareunia?
15  **A. I think that I've answered all your**
16  **questions about various things that could correlate**
17  **with it. Her endometriosis, more likely than not,**
18  **is not contributing to her pain. Her vulvovaginal**
19  **atrophy in** ███ **when she was seen by her doctor**
20  **did not comment on vulvovaginal atrophy. Though,**
21  **she was placed on estrogen sometime after that.**
22  Q. Wait a minute, though. So does that mean
23  that you agree that potential vaginal atrophy
24  contributed to any complaints of dyspareunia?
25  **A. These are all the things that I've ruled**

Page 1269

1  **out because these are all things that could**
2  **potentially lead to dyspareunia, and this is why**
3  **I've ruled them out because at the time that she**
4  **was complaining of dyspareunia, it wasn't found**
5  **that she had significant vulvovaginal atrophy.**
6  Q. Well, wait a minute. Where does it say
7  that she didn't?
8  **A. Well, the exam in** ███ **of 2014 was**
9  **normal.**
10  Q. That's when she was prescribed the Estrace
11  cream?
12  **A. Right.**
13  Q. Do you believer the doctor prescribed it
14  when she didn't need it?
15  MR. LARRIMORE: Objection to form.
16  **THE WITNESS: He said the exam was normal, so**
17  **that the necessity -- I mean, that might have been**
18  **to see if this could help with some of her**
19  **symptoms.**
20  BY MS. MANNO:
21  Q. Well, what symptoms would vaginal estrogen
22  help with if she didn't have vaginal atrophy?
23  **A. With the vaginal atrophy. So maybe this**
24  **could help her pain, but it doesn't look like it**
25  **helped her pain.**

Page 1270

1   Q.   You just said there's no indication she
2 has vaginal atrophy, and then --
3   **A.   No.  The exam was normal.**
4   Q.   So when it says exam was normal, how do
5 you know -- would an exam be abnormal if someone
6 had vaginal atrophy?
7   **A.   Well, you would see vaginal atrophy.**
8   Q.   Okay.  So you said it was -- hang on a
9 second.
10   **A.   You were discussing that there was no pain**
11 **on the exam.**
12   Q.   On palpation?
13   **A.   Right.**
14   Q.   Right.  The reason I'm asking you this is
15 I've seen a lot of records in this litigation, and
16 I have never seen vaginal atrophy cause an exam to
17 be abnormal.
18   MR. LARRIMORE:  Objection.  Form.
19 BY MS. MANNO:
20   Q.   So I'm asking you when you see examination
21 is normal, in your mind, does that rule out vaginal
22 atrophy?
23   **A.   No.**
24   Q.   Okay.  So --
25   **A.   But that probably -- you know, the idea**

Page 1271

1 **was well, if she had some atrophy, let's give her**
2 **estrogen, but it didn't seem to help with the pain**
3 **that she was having, which ruled out vulvovaginal**
4 **atrophy as a cause of her dyspareunia.  I think we**
5 **were going -- the way this started is you were**
6 **asking me how I ruled out other causes of**
7 **dyspareunia.**
8   Q.   Right.
9   **A.   And since she was given Estrace, it didn't**
10 **change her dyspareunia.  That would rule out**
11 **vulvovaginal atrophy as a cause of her dyspareunia.**
12   Q.   Do you know whether she took the Estrace?
13   **A.   No.**
14   Q.   Okay.  So how do you know then if she
15 didn't take the Estrace that she had vaginal
16 atrophy?
17   **A.   Remember in          the doctor said that**
18 **the exam was normal.  That would mean that**
19 **vulvovaginal atrophy more likely than not didn't**
20 **cause her to have pain with intercourse.**
21   Q.   So if that doctor testified that she did,
22 in fact, have vaginal atrophy in        of 2014 --
23   **A.   Yes.**
24   Q.   -- even though the exam was noted as
25 normal, would that change your opinion?

Page 1272

1   **A.   No, because he didn't elicit the pain with**
2   **exam, so that must mean if he did note vulvovaginal**
3   **atrophy, that wasn't causing the pain that she was**
4   **experiencing.**
5   Q.   So if a person has vaginal atrophy that is
6 contributing or causing dyspareunia, you would be
7 able to replicate that during a physical exam?
8   **A.   Yes.**
9   Q.   Okay.  All right.
10   **A.   And I think we've talked about that**
11 **multiple times.**
12   Q.   Well, I didn't know that you could say for
13 sure that you could replicate in that type of
14 situation.
15   **A.   I think we already discussed that about a**
16 **month ago.**
17   Q.   Well, maybe it was with Tom.
18   **A.   No.**
19   Q.   What else did you rule out?
20 Endometriosis, atrophy, what else?
21   **A.   We talked about irritable bowel syndrome.**
22 **We talked about constipation.**
23   Q.   Anything else?
24   **A.   Those are the main parts of her medical**
25 **history.**

Page 1273

1   Q.   Okay.
2   **A.   And also her back pain.**
3   Q.   Okay.  And you're not attributing her back
4 pain to the mesh, are you?
5   **A.   No.**
6   Q.   In terms of the dysuria, what did you
7 consider other than the mesh and rule out?
8   **A.   That she does not have an acute cystitis,**
9 **and I have not seen any documentation of chronic**
10 **bladder pain that could not be precipitated by the**
11 **sling.**
12   Q.   Okay.  And in terms of her GERD, excuse
13 me, and any issues with the pH of her urine after
14 that, did you consider that and rule that out?
15   **A.   Yes.**
16   Q.   How?
17   **A.   Well, that is kind of an interesting**
18 **corollary, but I don't think that that is a**
19 **significant cause of her dysuria.**
20   Q.   Could it be a contributing factor?
21   **A.   Yes.**
22   Q.   What about the retention, what did you
23 consider and rule out?
24   **A.   In          her exam was normal, so that**
25 **it does not look like she's got pelvic floor spasm**

Page 1274

1  leading to her urinary retention, so more likely
2  than not, it's contraction, deformation of the
3  sling that is causing her urinary retention
4  symptoms.
5  Q.  Did you consider and rule anything out
6  with respect to retention?
7  A.  Endometriosis would not cause that.  GERD
8  would not cause that.  Irritable bowel syndrome
9  would not cause that.
10  Q.  Okay.  And again, we've been over that
11  about retention?
12  A.  Yes.
13  Q.  What about the urgency, what did you
14  consider and rule out?
15  A.  That -- the same things that we discussed
16  before were causing her urgency.
17  Q.  And again, the sling is not intended to
18  help with urge incontinence?
19  A.  That is correct.
20  MS. MANNO:  Any questions?
21  MR. LARRIMORE:  No.  Off the record then.
22  THE VIDEOGRAPHER:  We're off the record.  The
23  time is 5:04 p.m.
24        (Whereupon, a short break was
25        taken.)

Page 1275

1  THE VIDEOGRAPHER:  We're back on the record.
2  The time is 5:12 p.m.
3        (Whereupon, Deposition Exhibit
4        No. 75-77 were marked for
5        identification.)
6  BY MS. MANNO:
7  Q.  Okay, Doctor.  We're now moving on to
8  plaintiff, ████  And for the record,
9  your highlighted report is Exhibit --
10  A.  75.  The disc is 76, and the full report
11  is 77.
12  Q.  Okay.  Great.  So Ms. ████
13  again, this is not someone you have done an exam
14  on, correct?
15  A.  That is incorrect.
16  Q.  Oh, you did do an exam on Ms. ████
17  A.  That is correct.
18  Q.  Oh, I'm sorry.  Okay.  And what was the
19  date of your exam?
20  A.  ████ 19, 2014.
21  Q.  Based on everything you reviewed as well
22  as your independent medical examination, what is
23  Ms. ████ currently complaining of that she
24  attributes to the mesh?
25  A.  Worse urinary incontinence.  She has a

Page 1276

1  slower stream, and she has pain with intercourse.
2  Q.  So increased urinary incontinence, slower
3  stream and dyspareunia?
4  A.  That is correct.
5  Q.  Are those the entirety of her complaints
6  at this time?
7  A.  Vaginal pressure and vaginal pain.
8  Q.  You're reading that from your report?
9  A.  That is correct.
10  Q.  Which page?
11  A.  That is on Page 4 of my report,
12  dyspareunia, vaginal pressure, vaginal pain,
13  continued urinary incontinence.
14  Q.  Well, I guess what I'm trying to get at is
15  I understand she has complained of vaginal pressure
16  and tenderness.  The question is, though, is that a
17  current complaint?
18  A.  The vaginal pain?
19  Q.  You have after implant, Ms. ████
20  developed vaginal pressure, dyspareunia, tenderness
21  along the sling and recurrent urinary incontinence.
22  You at first told me that her current complaints
23  are urinary incontinence, slower stream and
24  dyspareunia.  I'm trying to get --
25  A.  And vaginal pain.

Page 1277

1  Q.  Well, I'm trying to get a sense of what
2  are her current complaints.  I understand that
3  she's had complaints along the way --
4  A.  Yes.
5  Q.  -- but what currently exists?  And that's
6  why I was directing your attention to your
7  examination to the extent that that's the most
8  recent information.
9  A.  Yes.
10  Q.  Just so I'm clear, increased urinary
11  incontinence, slower stream, dyspareunia and
12  vaginal pressure, slash, pain are the current
13  complaints?
14  A.  That is correct.
15  Q.  And is the pressure the pain, or are those
16  two different things?
17  A.  From my understanding, she complains of
18  both pain and pressure.
19  Q.  And can you be more specific with respect
20  to the area of vaginal pain that she complains of,
21  or is that the dyspareunia?
22  A.  She states that it's in her vagina.  It's
23  extremely sharp and stabbing.
24  Q.  And when does she experience that?
25  A.  That is intermittent.

Page 1278

1    Q.  Is it only with intercourse or on any
2  other occasion?
3    A.  It's with intercourse, but intermittent
4  with other occasions.
5    Q.  Did she tell you that during her exam?
6    A.  Yes.  She said that she had this pain for
7  about a week in ████ of 2013.  It was extremely
8  sharp and stabbing.
9    Q.  She said she had it for a week in ████ of
10  2013?
11    A.  Yes.
12    Q.  Okay.  But does she have it now?
13    A.  It hasn't -- it was not there the day that
14  I saw her, and that was the last time she
15  remembered it lasting as long as it did, so as I
16  said, it's intermittent.
17    Q.  So let me make sure I'm correct.  She sees
18  you ████ of 2014, but the last time that she
19  experienced this pain was in ████ of 2013?
20    A.  No.  That's when it lasted for a week.
21  The vaginal pain lasted for a week.
22    Q.  When is the last time when she comes in in
23  ████ of 2014 that she had any vaginal pain?
24    A.  I didn't ask her that specifically.  That
25  was just an episode that she remembered where it

Page 1279

1  lasted for a long period of time.
2    Q.  Okay.  But she does not report having this
3  on a frequent basis, does she?
4    A.  That is correct.
5    Q.  And did she give you any idea -- I know
6  she described it as sharp and stabbing.  Did she
7  tell you where?
8    A.  No, besides being inside of her vagina.
9    Q.  Right.  Any more specifics?
10    A.  No.
11    Q.  Okay.  So what did she describe as being
12  of a frequent complaint when you saw her?
13    A.  The pain with intercourse and the urinary
14  symptoms.
15    Q.  Did she describe dyspareunia to you on a
16  current and ongoing basis meaning every time she
17  has sex or an intermittent basis?
18    A.  From my understanding, it was on a
19  constant basis.
20    Q.  And that's based on what she told you?
21    A.  That is correct.
22    Q.  Did she tell you how often she's currently
23  having sex?
24    A.  No.
25    Q.  Okay.  So let's talk about her medical

Page 1280

1  history.
2      Tell me what sarcoidosis is.
3    A.  Sarcoidosis is a medical condition that
4  usually is associated with the lungs.
5    Q.  You don't have that listed in your report
6  as a prior -- as her prior medical history, do you?
7    A.  No, I do not.
8    Q.  Okay.  And what I understood, and this is
9  literally me just sort of looking it up, but that
10  it was -- it's an inflammatory disease?
11    A.  That is correct.
12    Q.  Abnormal collection of inflammatory cells?
13    A.  That is correct.
14    Q.  And any organ can be affected?
15    A.  That is correct, but mostly you see it in
16  the lungs.
17    Q.  Okay.  And it can continue after the
18  antigen or the initial infection clears?
19    A.  That is correct.
20    Q.  So let's -- is it possible to have
21  inflammatory disease, sarcoidosis in your pelvic
22  region?
23    A.  There probably is an exceedingly unlikely
24  possibility, which is why I didn't add it into the
25  medical history.

Page 1281

1    Q.  Okay.  If you did have it, though, in your
2  pelvic region, what would the symptoms be?
3    A.  I have been practicing gynecology for
4  25 years, and I haven't seen sarcoidosis in the
5  pelvis, so it would be just speculation on my part
6  what kind of symptoms the patient would have.
7    Q.  How do you test for sarcoidosis?
8    A.  It would be on a biopsy.
9    Q.  Pardon?
10    A.  It would be on a biopsy.
11    Q.  Okay.  Okay.  Ms. ████ also had IBS,
12  correct?
13    A.  That is correct.
14    Q.  Okay.  And you've previously testified
15  about the symptoms that can result from IBS and
16  testified generally about IBS.
17      MS. MANNO:  Do the parties stipulate or we
18  stipulate if you do that all prior general
19  testimony about IBS that Dr. Rosenzweig has given
20  is admissible for purposes of this deposition?
21      MR. BROWN:  So stipulated.
22  BY MS. MANNO:
23    Q.  Okay.  Fecal incontinence and
24  constipation, were you aware of her having those?
25    A.  That is correct.

Page 1282

1    Q.  Okay.  And based on your review of the
2  records, is this incontinence and constipation the
3  result of or a symptom of the IBS or different from
4  that if you can tell?
5    **A.  I don't think it would be possible to tell**
6  **because constipation and sometimes fecal soiling**
7  **can be part of irritable bowel.**
8    Q.  And they also can be unrelated, too?
9    **A.  They can also be unrelated, too, yes.**
10    Q.  Okay.  And any previous testimony that you
11  have given about incontinence and constipation as
12  it relates to IBS is similarly stipulated?
13    MR. BROWN:  So stipulated.
14  BY MS. MANNO:
15    Q.  Same thing with fibromyalgia.  The nerve
16  endings in the pelvis, I believe you've said it
17  generally leads to more generalized pain in the
18  pelvis?
19    **A.  No, generalized pain, but in the**
20  **peripheries, in the extremities.**
21    Q.  Can fibromyalgia manifest in the pelvic
22  area?
23    **A.  Again, I've taken care of a lot of**
24  **patients with fibromyalgia.  I haven't seen**
25  **patients that the only location where they come in**

Page 1283

1  **and say I have pelvic pain and I attribute it to**
2  **the fibromyalgia.**
3    Q.  Not the only place, but if somebody is
4  experiencing fibromyalgic pain elsewhere in the
5  body, can it also manifest in the pelvic area?
6    **A.  I would find it exceedingly unlikely.**
7    Q.  So is the pelvic area exempt?
8    **A.  There seems to be more of a characteristic**
9  **peripheral location to fibromyalgia, but I would**
10  **not say that any one area would be exempt.**
11    Q.  It's an issue of nerve endings, correct?
12    **A.  It's a chronically firing nerve ending,**
13  **that is correct.**
14    Q.  And nerve endings are in the pelvic area,
15  are they not?
16    **A.  That is correct.**
17    Q.  And where are they most -- are they
18  clustered anywhere in the pelvic area?
19    **A.  Well, the vagina has a very high number of**
20  **nerves.**
21    Q.  Okay.  And in various places.  I mean, you
22  can have some in the vagina.  You can also -- I
23  mean, you've talked about, you know, trocars going
24  through nerves, correct?
25    **A.  That is correct.**

Page 1284

1    Q.  So all of those nerves are subject to this
2  sort of firing, if you will, that you've talked
3  about if you're experiencing fibromyalgia, correct?
4    **A.  That is correct.**
5    Q.  Chronic fatigue, do you agree that
6  Ms. ███████ has a history of chronic fatigue?
7    **A.  Yes.**
8    Q.  And can chronic fatigue contribute in any
9  way to dyspareunia or vaginal pressure or pain?
10    **A.  Contribute?**
11    Q.  Or cause.
12    **A.  Cause, no.**
13    Q.  You hesitated.  Did I ask the wrong
14  question?  I mean, does it have any interplay at
15  all?
16    **A.  I mean, I could see how there could be**
17  **some association between fatigue and pain, but**
18  **specifically pelvic pain, I would find that highly**
19  **unlikely.**
20    Q.  How about pressure?
21    **A.  Would chronic fatigue cause pressure?**
22    Q.  Uh-huh.
23    **A.  In the pelvis?**
24    Q.  Uh-huh or vagina.
25    **A.  The same answer.**

Page 1285

1    Q.  So when someone has chronic fatigue, what
2  are their symptoms?
3    **A.  They're tired chronically.**
4    Q.  And that means they don't move around very
5  much?
6    **A.  No.  They're tired chronically.**
7    Q.  Okay.  Does that also mean that they hurt
8  anywhere?
9    **A.  With fatigue?**
10    Q.  Uh-huh.
11    **A.  No.  That would be a chronic pain.**
12  **Fatigue is just saying that they're tired.**
13    Q.  Okay.  What is HTN?
14    **A.  HTN, hypertension.**
15    Q.  Okay.  And we've talked about GERD?
16    **A.  That is correct.**
17    Q.  Okay.  And so to the extent you've
18  previously testified about symptoms of GERD, can we
19  stipulate that this is also applicable here?
20    MR. BROWN:  So stipulated.
21  BY MS. MANNO:
22    Q.  We talked about GERD and potential urinary
23  issues.  I don't think we talked about it, though,
24  with respect to whether it can cause a slower
25  stream.  Can GERD cause a slower stream?

Page 1286

1    A.   No.
2    Q.   What about IBS?
3    A.   Again, we talked about constipation and
4 IBS and the possibility that that could lead to,
5 with the constipation, a slower stream.
6    Q.   Okay.  We did not talk about -- and we did
7 talk about urinary incontinence with respect to
8 IBS, correct?
9    A.   We talked about the association of painful
10 bladder syndrome with IBS.
11   Q.   And then the association of that with
12 urinary incontinence, right?
13   A.   No.  We talked about that in association
14 with painful voiding.
15   Q.   Okay.  Well, then let me re-ask.
16        Can IBS -- can IBS lead to any
17 incontinence issues, contribute to any incontinence
18 issues?
19   A.   Stress urinary incontinence?
20   Q.   You've told me that Ms. ████ is
21 complaining of urinary incontinence?
22   A.   Yes.
23   Q.   What kind?
24   A.   She has urgency.  She states that she has
25 to hold above her pubic bone in order to get to the

Page 1287

1 bathroom in time.  She does not lose urine while
2 trying to get to the bathroom.  She denies stress
3 urinary incontinence.
4    Q.   Okay.  So urge incontinence?
5    A.   Yes.
6    Q.   Does IBS potentially cause or contribute
7 to urge incontinence?
8    A.   IBS can lead to or can be associated with
9 the painful bladder syndrome where you can have an
10 element of urgency and discomfort when urinating,
11 but specifically losing urine would be a very
12 unlikely association.
13   Q.   Okay.  Ms. ████ doesn't talk about
14 losing urine, though, correct?
15   A.   She does have urgency, yes.
16   Q.   I'm sorry.  I thought you said losing
17 urine.
18   A.   She has urgency, yes.
19   Q.   Okay.  And I thought you said she has to
20 run to the bathroom.
21   A.   Yes.
22   Q.   Okay.  So she's leaking?
23   A.   She does -- I might have said does not,
24 but she does lose urine while trying to get to the
25 bathroom, so she does have urge incontinence.

Page 1288

1    Q.   Okay.  I misheard you.
2    A.   I might have misspoken.  I'm glad we
3 cleared that up for the record.
4    Q.   Okay.  So she does leak sometimes on the
5 way to the bathroom?
6    A.   Yes.
7    Q.   But you still don't -- there's still
8 nothing about that that causes you to diagnose her
9 with stress urinary incontinence?
10   A.   That is correct.
11   Q.   Okay.  The fact that she had mild COPD and
12 asthma, can that contribute in any way to any of
13 the complaints that she has?
14   A.   Well, with COPD or chronic obstructive
15 pulmonary disease and asthma, you can increase
16 intraabdominal pressure, and that can lead to
17 stress urinary incontinence, which she's currently
18 not complaining of.
19   Q.   So a lot of that is coughing, correct?
20   A.   That is correct.
21   Q.   Putting more pressure on the bladder?
22   A.   That is correct.
23   Q.   And when you put pressure on the bladder
24 through coughing, can that lead to urge
25 incontinence?

Page 1289

1    A.   There is something called cough-induced
2 bladder instability where the cough provokes a
3 bladder contraction.
4    Q.   Okay.  And how would you test for that?
5    A.   Urodynamics.  You would see that the
6 patient coughs and then several seconds after the
7 cough, they have a bladder contraction, and that
8 causes them to have symptoms of either urgency, or
9 they actually leak.
10   Q.   And when were urodynamics performed on
11 Ms. ████?
12   A.   I did not perform urodynamics on
13 Mrs. ████ and I did not see that after her
14 surgery urodynamics were performed.
15   Q.   Okay.  So you can't say for sure whether
16 or not Ms. ████ has cough-induced bladder
17 instability, can you?
18   A.   That is correct.
19   Q.   Obesity can contribute to urinary
20 incontinence, correct?
21   A.   That is correct.
22   Q.   Urge?
23   A.   It's more associated with stress urinary
24 incontinence, but yes, there are studies that show
25 when patients lose weight, their urge and urge

Page 1290

1  symptoms can improve.
2      Q.  Can obesity affect the slower stream
3  issue?
4      A.  In and of itself, no.
5      Q.  In combination with something else?  I
6  mean, you said in and of itself, so I'm trying to
7  explore what you mean by that.
8      A.  Right.  If it's associated with diabetes,
9  then you could have a slow stream from the diabetic
10  impact on the bladder.
11      Q.  Okay.  Anything else that comes to mind?
12      A.  No.
13      Q.  All right.  Ms. _____ also has a
14  history of anxiety and depression.  To the extent
15  you've already testified about how that can
16  contribute to a variety of factors, can we also
17  stipulate that that is applicable here?
18      MR. BROWN:  So stipulated.
19  BY MS. MANNO:
20      Q.  We did not really talk about how
21  depression and/or anxiety could contribute to
22  incontinence issues.  I believe we were talking
23  about how it contributed to pain.
24          Can depression and anxiety contribute in
25  any way to having urge incontinence or a slower

Page 1291

1  stream?
2      A.  First of all, incontinence can lead to
3  depression.  Chronic conditions that are difficult
4  to treat can always increase the amount of anxiety
5  and depression that someone has.  Certain
6  medications, as we talked about before, can worsen
7  incontinence symptoms that are used to treat
8  depression.  And in and of itself, urge
9  incontinence associated specifically with
10  depression, there probably is some corollary
11  element, but causative, no.
12      Q.  So you're aware that Ms. _____ was
13  hospitalized for depression and suicidal thoughts
14  on _____ 14th of 2011, correct?
15      A.  That is correct.
16      Q.  About a week or a little over a week
17  before her implant, correct?
18      A.  That is correct.
19      Q.  Do you think it's within the standard of
20  care to perform this type of procedure with someone
21  who has had suicidal thoughts a week and a half
22  before?
23      MR. BROWN: Objection. Form. Calls for
24  speculation.
25      THE WITNESS:  I don't think that it's outside

Page 1292

1  the standard of care to perform surgery on a
2  patient who recently has had suicidal ideation.
3  BY MS. MANNO:
4      Q.  If someone -- would you agree with me that
5  if you have suicidal ideation, that's a pretty
6  severe form of depression at least at that time?
7      A.  I do not think that all suicidal ideation
8  is the result of depression, but I think there are
9  better people to opine about whether or not all
10  suicidal ideations are the direct result of
11  depression.
12      Q.  Do you know any physical manifestations
13  that can result from a person who is having
14  suicidal ideations like if a person is considering
15  suicide?
16      A.  Yes.
17      Q.  Are there any physical manifestations of
18  that that are different to depression, or -- do you
19  see what I'm trying to get at?  You don't look like
20  you do.
21      A.  No.
22      Q.  If somebody is considering suicide --
23      A.  Yes.
24      Q.  -- might that have any -- might, because
25  of that fact, somebody have any physiological

Page 1293

1  symptoms?
2      A.  Characteristically, no.
3      Q.  Okay.  Can it result in somebody not
4  taking good care of themselves?
5      A.  Usually suicidal ideation or suicide
6  attempts happen at the downward slope or the upward
7  slope from depression.  Usually when somebody is in
8  the throws of depression, they don't -- they lack
9  the motivation to actually try to commit suicide,
10  so if somebody is -- they might express suicidal
11  ideation, but they are much less likely to try to
12  commit suicide.
13      Q.  Okay.  I'm just asking you if a person is
14  at a place where they're having suicidal thoughts,
15  based on anything that you have read or in your
16  training and experience, would that result in
17  patients not taking care of themselves or their
18  health?
19      A.  Depression has many different
20  manifestations.  Someone with suicidal ideation
21  associated with depression or with other
22  psychological situations manifests in a variety of
23  different ways.  Being un -- there are
24  high-functioning depressed people that have
25  suicidal ideation, and you and I would probably

Page 1294

1 never notice by looking at them, so that I would
2 say that it's more of -- someone in the throws of
3 depression probably would not be, again,
4 contemplating suicide, but would be more likely not
5 to take care of themselves.
6 　Q. Okay. All right. Other than those prior
7 medical conditions that I've described, did you
8 consider any other of significance?
9 　A. Well, she had had a vaginal hysterectomy
10 converted to an abdominal hysterectomy. She had
11 breast augmentation, cholecystectomy, mediastinal
12 biopsy, umbilical hernia repair, liposuction and
13 colonoscopy.
14 　Q. What's a cholecystectomy?
15 　A. Taking the gallbladder out.
16 　Q. Where's the gallbladder?
17 　A. The gallbladder is sitting right
18 underneath the liver.
19 　Q. It's like we need a diagram of the human
20 body here.
21 　A. Yeah.
22 　Q. Okay. So when you take out the
23 gallbladder, what can be the potential symptoms or
24 side effects from that operation?
25 　A. In the pelvis?

Page 1295

1 　Q. Or anywhere. You tell me. Can it result
2 in pain anywhere?
3 　A. Sure.
4 　Q. Where?
5 　A. Underneath the liver where you're taking
6 the gallbladder out from.
7 　Q. Okay. Can that be persistent pain?
8 　A. Most gallbladders are done through a
9 laparoscopic incision, which is removed from the
10 pelvis. Obviously, there are a lot of things that
11 can happen with the cholecystectomy, which is
12 removing the gallbladder that we could sit around
13 and talk about for the next few hours, but have
14 nothing to do with Mrs. ▓▓▓▓▓▓ current
15 complaints.
16 　Q. Well, if her gallbladder was removed
17 through her pelvis -- you say they're often removed
18 through the pelvis?
19 　A. No. I said laparoscopically.
20 Laparoscopically is underneath the belly button.
21 　Q. You said pelvis. I know you did. You
22 did. We can have it read it back.
23 　A. I meant laparoscopically.
24 　Q. Well, you said laparoscopically, and then
25 at some point, you said through the pelvis. So is

Page 1296

1 the pelvis at play at all --
2 　A. No.
3 　Q. -- in the gallbladder removal surgery?
4 　A. No.
5 　Q. Okay. And do you have any information or
6 any literature that suggests that a gallbladder
7 removal in any form or fashion that it's removed
8 can result in pelvic pain?
9 　A. No.
10 　Q. Mediastinal biopsy, what's that?
11 　A. Well, most likely that was due to diagnose
12 her sarcoidosis. The mediastinum is the area in
13 between both the lungs, and so that's -- as I said
14 before from my understanding of sarcoidosis, one of
15 the more prevalent manifestations is in the lung.
16 In order to diagnose it, you take a biopsy, and
17 that's why she had a mediastinal biopsy.
18 　Q. Okay. The umbilical hernia repair, we
19 have not really talked about those. So when you
20 have an umbilical hernia repair, where do you go in
21 to perform that?
22 　A. Well, by definition, it's a hernia by the
23 belly button --
24 　Q. Okay.
25 　A. -- so you go in through the belly button

Page 1297

1 to repair it.
2 　Q. Okay. And would that have been a
3 procedure involving mesh?
4 　A. More likely than not, no, depending on the
5 size of the umbilical hernia. Usually they're
6 fairly small and can be taken care of without mesh.
7 　Q. As you sit here today, do you know whether
8 or not mesh was used for that?
9 　A. No.
10 　Q. Where did she have liposuction?
11 　A. I did not specifically look at the places
12 where they removed the fat from.
13 　Q. So I note that in ▓▓▓▓▓ of 2014, she had
14 a tummy tuck and medial thigh lift with the same
15 plastic surgeon who performed her earlier
16 liposuction. Were you aware of that?
17 　A. Yes. I have that in my report. In 2014,
18 she underwent elective plastic surgery.
19 　Q. Okay. So the medial thigh lift is not
20 liposuction. That's something different?
21 　A. That is correct.
22 　Q. And we talked about the tummy tuck
23 earlier?
24 　A. That is correct.
25 　Q. Any testimony that you previously gave

Page 1298

1  about a tummy tuck in terms of your general
2  opinions can we stipulate is applicable here as
3  well?
4     MR. BROWN:  Have we talked about tummy tucks
5  before?
6     MS. MANNO:  We did.
7     MR. BROWN:  So stipulated.
8  BY MS. MANNO:
9     Q.  Okay.  So you're aware that prior to her
10  implant, Ms. ▆▆▆ had a third-degree rectocele
11  and a second -- I'm sorry.  Third-degree cystocele
12  and second-degree rectocele, correct?
13     **A.  That is correct.**
14     Q.  Okay.  And so are you also aware that the
15  doctor, Dr. Cervone discussed with Ms. ▆▆▆
16  doing the cystocele repair and a sling and that
17  they would not include the rectocele because
18  Dr. Cervone preferred to, quote, do the cystocele
19  without doing the rectocele?
20     **A.  That is correct.**
21     Q.  So when you have a third-degree cystocele
22  and a second-degree rectocele, do you believe it's
23  in the standard of care to just leave the rectocele
24  alone?
25     **A.  If the rectocele is not causing**

Page 1299

1  **significant problems for the patient, it does not**
2  **need to be repaired.**
3     Q.  If you have an active rectocele and you
4  don't repair it, okay, and you say if you're not
5  experiencing symptoms, it's not bothering the
6  patient, I think, is what you just said, right?
7     **A.  Yes.**
8     Q.  What would the symptoms be of an untreated
9  rectocele?
10     **A.  Most likely none.  I mean, we already**
11  **talked about her chronic bowel symptomatology**
12  **that's due to irritable bowel syndrome, so if**
13  **the patient isn't complaining -- the most**
14  **characteristic symptom of prolapse is a feeling of**
15  **heaviness or bulge inside the vagina that gets**
16  **worse as the day goes on.**
17     Q.  Pressure?
18     **A.  Pressure.**
19     Q.  Okay.
20     **A.  If that is not being caused or if the**
21  **patient isn't complaining about that in that area,**
22  **then you don't necessarily have to repair a**
23  **prolapse just because you see it.**
24     Q.  Did you note that during the procedure
25  that Ms. ▆▆▆ also had a Kelly plication?

Page 1300

1     **A.  Yes.**
2     Q.  And just briefly tell us what a Kelly
3  plication is.
4     **A.  Well, Kelly plication is a part of the**
5  **procedure where sutures are placed around the**
6  **bladder neck in order to support the bladder neck**
7  **to get rid of a urethrocele.**
8     Q.  And sutures are used, correct?
9     **A.  That is correct.**
10     Q.  And so what are the potential side effects
11  or complications of a Kelly plication?
12     **A.  Well, it used to be used to treat stress**
13  **urinary incontinence, and one of the problems with**
14  **that is that it doesn't work.**
15     Q.  Recurrence?
16     **A.  That is correct.**
17     Q.  What about any pain symptoms?
18     **A.  Specifically from that, no.**
19     Q.  So you don't believe that Kelly apply
20  indications can cause pain?
21     **A.  I don't think Kelly plications cause pain**
22  **syndromes.  I think Kelly plications, you can have**
23  **pain immediately after surgery.**
24     Q.  You don't think you can have it on a
25  long-term basis?

Page 1301

1     **A.  No.**
2     Q.  Okay.  So is it your understanding that
3  Ms. ▆▆▆ goes through her procedure, catheter
4  is removed in ▆▆▆ of 2011, and there are no
5  further issues reported until ▆▆▆ of 2013?
6     **A.  That is correct.**
7     Q.  And that was a phone call in which she
8  complained of bladder pressure and excessive bowel
9  movements?
10     **A.  That is correct.**
11     Q.  Do you agree with me that the bladder
12  pressure could be caused by an untreated -- well,
13  bladder pressure and excessive bowel movements,
14  would you agree that the excessive bowel movements
15  can be caused by the IBS?
16     **A.  Yes.**
17     Q.  In terms of bladder pressure, you believe
18  that that was the mesh that was causing that or
19  something else in ▆▆▆ 2013?
20     **A.  I've concluded that the mesh is causing**
21  **her to have dyspareunia, pain in the vagina and the**
22  **urgency that she has.**
23     Q.  Okay.  But in terms of her complaint of
24  bladder pressure in ▆▆▆ of 2013, do you have an
25  opinion as to the cause of that?

Page 1302

1  A. No.

2  Q. So would you agree with me -- so

3  Ms. ████████ undergoes the sling procedure and the

4  Kelly plication at the same time?

5  A. Yes.

6  Q. Okay. And so she's basically undergoing

7  two procedures during the same operation for the

8  stress urinary incontinence?

9  A. A Kelly plication can be used to treat a

10  urethrocele, too.

11  Q. Okay. But it was treated -- it was used

12  to treat her SUI in this case, correct?

13  A. I don't remember in the operative report

14  if Dr. Cervone said that he's using the Kelly

15  plication to treat the SUI.

16  Q. So you don't know one way or the other

17  which it was used for?

18  A. Well, an anterior repair was done to treat

19  the cystocele, the Kelly plication to treat the

20  urethrocele and the midurethral sling to treat the

21  stress urinary incontinence.

22  Q. So I'm sorry. Where are you basing that

23  the Kelly plication was used to treat the

24  urethrocele?

25  A. The fact that she had a sling used to

Page 1303

1  treat the stress urinary incontinence.

2  Q. Okay. But is it possible that the doctor

3  was using both the Kelly plication and the sling

4  for SUI only?

5  A. I think you would have to ask Dr. Cervone

6  what he was using the Kelly plication for.

7  Q. Okay. Did you read his deposition?

8  A. Yes, I did.

9  Q. Okay. And so do you recall that he was

10  using it for SUI? I guess you don't.

11  A. Not sitting here right now do I recall

12  that part of his deposition.

13  Q. Okay. When you have both of those

14  procedures going on during the same operation, is

15  it, therefore, plausible that some degree of

16  voiding dysfunction would be expected afterwards?

17  A. Immediately afterwards, possibly.

18  Q. Do you believe that two antiincontinence

19  procedures in the same operation, assuming that it

20  was for SUI and not a urethrocele, departs from the

21  surgical standard of care?

22  A. No.

23  Q. You believe two operations or two

24  procedures to treat the same thing is within the

25  standard of care?

Page 1304

1  A. Well, one is at the bladder neck. One is

2  at the midurethra. So if you felt that there was

3  funneling at the bladder neck that was partially

4  responsible for the stress urinary incontinence,

5  that would be an indication for doing a Kelly

6  plication.

7  Q. Okay. And so could the Kelly plication in

8  and of itself, not -- I'm not talking about the

9  sling, but the Kelly plication, could that lead to

10  a slower stream and hesitancy?

11  A. No, because the sutures would dissolve

12  after a period of time, and there would be no

13  sutures left. You don't use permanent sutures to

14  do a Kelly-Kennedy plication.

15  Q. Even depending on how tight you did it?

16  A. Yes, because the sutures would dissolve.

17  Q. So once it's plicated, though, I mean, you

18  are tacking tissue. What are you doing with the

19  tissue when you are plicating?

20  A. Well, if you would like to break out his

21  operative report, we can talk about exactly where

22  he placed his suture.

23          (Whereupon, Deposition Exhibit

24          No. 78 was marked for

25          identification.)

Page 1305

1  THE WITNESS: So it states that the Kelly

2  plication sutures were used to reapproximate the

3  periurethral tissue, and additional Vicryl sutures

4  were used to further reduce the cystocele.

5  BY MS. MANNO:

6  Q. Okay. So can you tell me then exactly --

7  I mean, what I'm trying to get at is whether this

8  Kelly plication in and of itself could lead to a

9  slower stream. Let me take it one by one.

10         Could the Kelly plication lead to a slower

11  stream?

12  A. Immediately postoperatively, yes.

13  Q. Okay. And why is it that it cannot lead

14  to it on a longer-term basis?

15  A. Because the sutures that were used would

16  dissolve after a period of time.

17  Q. When it talks about the additional Vicryl

18  sutures used to further reduce the cystocele, so

19  where are those Vicryl sutures being added?

20  A. For the cystocele, that would be further

21  up around the bladder to bring the endopelvic

22  fascia together underneath the bladder to treat the

23  cystocele.

24  Q. Could the use of those Vicryl sutures then

25  lead to a slower stream potentially?

Page 1306

1   A.  For the cystocele repair?
2   Q.  Uh-huh.
3   A.  Unlikely.
4   Q.  What about for increased urinary
5   incontinence?
6   A.  For overactive bladder?
7   Q.  Let me back up for a second.  The Kelly
8   plication, let's take that, okay?
9   A.  Yes.
10   Q.  Could the Kelly plication procedure lead
11   to increased urge urinary incontinence?
12   A.  Possibly.
13   Q.  How so?
14   A.  You -- while the sutures are still there,
15   they can irritate the urethra and lead to
16   overactive bladder.
17   Q.  Lead to overactive bladder on a temporary
18   or more permanent basis or either?
19   A.  Temporary.
20   Q.  And what do you consider temporary?
21   A.  Until the Vicryl sutures dissolve, which
22   is about six to eight weeks after placement.
23   Q.  It says the vaginal epithelium was then
24   reapproximated with interrupted Vicryl sutures.  Is
25   that just at the incision?

Page 1307

1   A.  That is correct.
2   Q.  Did you know that Dr. Cervone testified
3   that his personal failure rate or basically
4   recurrence is 30 to 50 percent?
5   A.  For his --
6   Q.  His failure rate for recurrence.
7   A.  For recurrence of stress incontinence.
8   Q.  Did you read that he said it was between
9   30 and 50 percent?
10   A.  If that's what he testified to, that's
11   what he testified to.
12   Q.  Would you consider a 30 to 50 percent
13   failure rate to be excessive?
14   A.  I would find that be excessive.
15   Q.  Would you agree that all incontinence
16   procedures, mesh and non-mesh, can lead to a new
17   symptom such as nocturia?
18   A.  Yes.
19   Q.  Would you agree that antiincontinence
20   procedures, mesh and non-mesh, can lead to urgency
21   as a new symptom?
22   A.  Yes.
23   Q.  What about an increase in day or nighttime
24   frequency?
25   A.  Yes.

Page 1308

1   Q.  And again, I know you're going to hit me
2   over the head, but slings are not meant to deal
3   with urge incontinence, correct?
4   A.  I think we've already established that.
5   Q.  I just want to make sure we get it on this
6   dep.
7   A.  Okay.
8   Q.  Would you agree with me -- and if you need
9   to look at the IFU, let me know.  But would you
10   agree that the IFUs for the Align S sling --
11   Ms. ████████ had the Align S sling?
12   A.  That is correct.
13   Q.  Okay.  It states that quote, due to
14   anatomical distortion that could be caused by
15   pelvic organ prolapse, if the patient requires
16   cystocele repair, it should be performed prior to
17   the implantation of the suburethral sling.
18       Are you aware that it says that?
19   A.  Yes.
20   Q.  Okay.  And so here, though, are you aware,
21   based on the op report and the medical records that
22   you have reviewed, that Dr. Cervone first placed
23   the sling, adjusted the tension, then plicated, did
24   the Kelly plication and lastly did the cystocele
25   repair?

Page 1309

1   A.  That's the way the operative report would
2   read.
3   Q.  Okay.  And so if he disregarded the
4   instruction in the IFU, would you say that was not
5   within the standard of care?
6   MR. BROWN:  Objection to form.  Incomplete.
7   THE WITNESS:  I have -- while that might be the
8   preferable way to do the surgery, I think that
9   there is latitude that can be given in the IFU for
10   doing things differently.
11   BY MS. MANNO:
12   Q.  So Doctor, you have made a number of
13   statements where you are opining that somebody
14   followed -- that was within the standard of care
15   because they followed the IFU, and now you're
16   saying even if someone doesn't follow the IFU,
17   they're within the standard of care?
18   A.  Well, if they have a good reason not --
19   you know, to do things slightly differently.
20   Q.  Like what would be a good reason to do the
21   cystocele last in this situation?
22   A.  That would be for Dr. Cervone to discuss.
23   Q.  Because you're not aware of a good reason
24   to do that?
25   A.  He might have found for anatomic reasons

1  that it would be better to do the cystocele repair
2  first because it says for -- you know, in the
3  majority of anatomic reasons, it's better to do the
4  cystocele repair first and then put the sling in.
5  So he might have felt that because of anatomic
6  reasons, it was better to put the sling in first
7  and do the cystocele repair.
8      Q.  Like what sort of anatomic reasons I would
9  suggest to do it in contravention to the IFU?
10     A.  I think that would be a good question to
11  ask Dr. Cervone.
12     Q.  Do you agree that Ms. _____ current
13  complaint of pelvic pain, pressure and rectal
14  discomfort can be a symptom of her rectocele?
15     A.  The rectal pressure, yes.
16     Q.  You disagree that it can lead to pelvic
17  pain?
18     A.  There is a -- it can, but in
19  Mrs. _____ case when I palpated the sling,
20  the sling was tender, and it reproduced the
21  discomfort that she was having.
22     Q.  So let me read to you a paragraph from our
23  expert's report and get your thoughts on it.
24     A.  Okay.
25     Q.  With respect to the pelvic pain, pressure

1  and rectal discomfort, it says this could be
2  related to a reduction in vaginal caliber secondary
3  to the plication cystocele repair.  Do you agree
4  with that?
5      A.  I did not see any reduction in the vaginal
6  caliber, so I would disagree with that.
7      Q.  If you did see something that showed a
8  reduction in vaginal caliber, would that change
9  your opinion?
10     A.  If my exam showed, as we talked about
11  before, pain after anterior colporrhaphy is most
12  likely due to excessive removal of vaginal tissue
13  leading to a narrowing of the vagina.  I did not
14  feel that on pelvic exam.
15     Q.  Is that something that you would feel on
16  pelvic exam?
17     A.  Yes.
18     Q.  Okay.  It's not that you would really need
19  to know what was taken out, what tissue was taken
20  out during the procedure?
21     A.  If I hadn't examined the patient myself,
22  you might be able to opine about the amount of
23  vaginal tissue taken out, but when I examined her,
24  I didn't feel that the vagina was small or
25  shortened.

1      Q.  Okay.  She also or he also says a
2  midurethral sling is placed about two centimeters
3  inside the vagina and cannot account for, quote,
4  deep dyspareunia, nor can it reasonably be blamed
5  for rectal pain.  Do you agree with that statement?
6      A.  Deep dyspareunia can be due to levator
7  spasm.  When I examined her, I did not feel levator
8  spasm or levator tenderness.  The pain that I
9  elicited was when I pushed on the sling on the
10  right side greater than the left side.  That also
11  gave her the urge to urinate.
12     Q.  Okay.  So that would not be deep within
13  the vagina, correct?
14     A.  The pain that I elicited was when I
15  palpated on the sling.  It was not deep in the
16  vagina.
17     Q.  Okay.  Do you agree that it cannot be
18  reasonable to blame the sling for rectal pain?
19     A.  I do not attribute her rectal pain or
20  pressure to the sling.
21     Q.  Okay.  Do you agree that abdominoplasty
22  with a rectus muscle plication can result in
23  increased intraabdominal pressure?
24     A.  No.
25     Q.  Okay.  Why don't you agree with that?

1      A.  Because the pressure would be dissipated
2  in the rest of the abdomen.
3      Q.  Okay.  Ms. _____ had an abdominoplasty
4  after the sling procedure, and her plastic surgeon
5  noted that she made the plication, quote, as tight
6  as she could.  Does that change your mind?
7      A.  No.
8      Q.  Okay.  So just -- other than what we've
9  talked about already, were there any other
10  potential contributors to her increase in urinary
11  incontinence that you ruled out?
12     A.  I think we've already talked about all the
13  things that I've ruled out.
14     Q.  Okay.  What about with the slower stream,
15  anything that you considered and ruled out that we
16  haven't discussed?
17     A.  Not that we haven't discussed.
18     Q.  Dyspareunia, anything?
19     A.  Not that we haven't discussed.
20     Q.  And what about the vaginal pressure or
21  pain, anything you ruled out that we did not
22  previously discuss?
23     A.  As I talked about, when I pushed on the
24  sling, it caused her -- it reproduced her pain, so
25  that is the pain that I'm discussing.

Page 1314

1    Q.   Ms. ▓▓▓ has not had any revisions,
2    correct?
3    **A.   That is correct.**
4    Q.   Did she talk to you about having one?  I
5    know your role, but did she talk to you about
6    having one?
7    **A.   I -- again, I talked to her about what her**
8    **current -- what her former symptoms were, her**
9    **current symptoms were, did an exam, and I did not**
10   **discuss with her any opinions that I would have on**
11   **her treatment, and I do not remember that she**
12   **volunteered that she was planning on having any**
13   **surgery in the near future.**
14   Q.   You do not remember her saying that?
15   **A.   I do not recall her volunteering that.**
16   **Though, I would not ask about what is going on in**
17   **the future.**
18   Q.   And were you instructed not to ask those
19   questions or to talk with the patient about those
20   issues?
21   **A.   No.**
22   MR. BROWN:  Off the record.
23   THE VIDEOGRAPHER:  Off the record.  The time is
24   6:02 p.m.
25

Page 1315

1    (Whereupon, a short break was
2    taken.)
3    (Whereupon, Deposition Exhibit
4    Nos. 79-81 was marked for
5    identification.)
6    THE VIDEOGRAPHER:  We're back on the record.
7    The time is 6:11 p.m.
8    BY MS. MANNO:
9    Q.   Okay.  Doctor, let's move on to the case
10   of plaintiff, ▓▓ ▓▓▓  And for the
11   record, what is the exhibit number for your
12   highlighted report?
13   **A.   79.**
14   Q.   And the CD is?
15   **A.   80.**
16   Q.   And clean report is 81?
17   **A.   Yes.**
18   Q.   And what -- did you do an IME for ▓▓ ▓
19   ▓▓▓
20   **A.   That is correct.**
21   Q.   What date did you do that on?
22   **A.   ▓▓▓ 2014.**
23   Q.   Same day as the last case?
24   **A.   That is correct.**
25   Q.   Okay.  And as part of your IME, what did

Page 1316

1    you do?
2    **A.   I obtained a history that described what**
3    **her symptoms were like, what her age, gravity,**
4    **parity is, medications, past medical history, what**
5    **her symptoms were like prior to surgery, what her**
6    **symptoms were like prior to her mesh removal and**
7    **what her current symptoms are like.**
8    Q.   And are those current symptoms on the
9    middle of Page 10 of your report dyspareunia,
10   vaginal pain, vaginal spotting, discharge, pain
11   after urinating, urgency, frequency, urge
12   incontinence and worsening urinary incontinence?
13   **A.   That is correct.**
14   Q.   Okay.  Because that is based on your
15   footnote 99, see deposition of ▓▓▓ ▓▓
16   and independent medical examination of ▓▓▓
17   ▓▓▓
18   **A.   That is correct.**
19   Q.   Okay.  Is that the entirety of her
20   complaints as she attributes to the mesh?
21   **A.   That is correct.**
22   Q.   Okay.  You told you what medications she
23   was on.  What did she tell you?
24   **A.   She described the medications that she was**
25   **taking as Triamterene, hydrochlorothiazide, Zofran,**

Page 1317

1    diazepam and Crestor.
2    Q.   Okay.  And you are on Page --
3    **A.   I'm on my IME, which is at the back of**
4    **the --**
5    Q.   Okay.  Well, it says she is on
6    Triamterene, HCTZ.
7    **A.   That's hydrochlorothiazide.**
8    Q.   What is that for?
9    **A.   High blood pressure.**
10   Q.   Okay.  And what is Zofran for?
11   **A.   If I remember correctly, it's for her -- I**
12   **think it's for her GI symptoms.**
13   Q.   What GI symptoms?
14   **A.   Sitting here right now, I can't remember**
15   **what her -- why she's taking the Zofran.**
16   Q.   I'm sorry.  You said GI symptoms.  What
17   was your response?
18   **A.   I can't remember why she's on the Zofran.**
19   Q.   Do you know what Zofran treats?
20   **A.   Sitting here right now, no.**
21   Q.   Okay.  You know, I'm going to the
22   internet, but you can corroborate this or not,
23   okay?
24   **A.   Okay.**
25   Q.   So it says Zofran, I guess generic

Page 1318

1  ondansetron, blocks the actions of chemicals in the
2  body that can trigger nausea and vomiting, is used
3  to prevent nausea and vomiting caused by surgery or
4  by medicine to treat cancer.
5      **A.  Yes.**
6      Q.  Does this refresh your memory?
7      **A.  Yes.**
8      Q.  Okay.  And so when you say it was for her
9  GI symptoms, what symptoms do you recall it being
10  at least prescribed to treat?
11      **A.  Specifically if I remember correctly, she**
12  **has some GI upset, and that's why she was on that.**
13  **Anything more than that, I do not remember from the**
14  **IME that I did.**
15      Q.  Okay.  Do you know of any potential side
16  effects of that medication?
17      **A.  Not for the bladder.**
18      Q.  You don't know of any for the bladder, or
19  there are none for the bladder?
20      **A.  None that is specific to what we're going**
21  **to be talking about and none that I recall.**
22      Q.  Do you know that one of its side effects
23  happens to be difficulty with passing urine and
24  painful urination?
25      **A.  There are a variety of side effects that**

Page 1319

1  **are always listed for medications.  Her current**
2  **symptomatology does not go along with those side**
3  **effects.**
4      Q.  Well, you said she's got -- okay.
5      **A.  Besides shooting pain after urination.**
6      Q.  So difficulty with passing urine or
7  painful urination, here you have pain after
8  urinating?
9      **A.  That is correct.**
10      Q.  Okay.  What about loss of bladder control,
11  that would go along with urgency potentially,
12  frequency?
13      **A.  Could be.**
14      Q.  Urge incontinence?
15      **A.  Could be.**
16      Q.  Worsening urinary incontinence?
17      **A.  Could be.**
18      Q.  Okay.  What about diazepam, is that
19  Valium?
20      **A.  That is correct.**
21      Q.  And what are the -- what is that used to
22  treat for Ms. ███████
23      **A.  Usually anxiety.**
24      Q.  How long has she been on Valium?
25      **A.  That I don't remember.**

Page 1320

1      Q.  And what are the potential side effects of
2  Valium?
3      **A.  If you would like to pull out the PDR, we**
4  **could kind of list those, too.**
5      Q.  Do you know them offhand?
6      **A.  Not off the top of my head.**
7      Q.  Okay.  So this is actually a good time to
8  ask you in coming up with your differential
9  diagnoses --
10      **A.  Yes.**
11      Q.  -- did you look at all of the potential
12  medications that each patient was on to see whether
13  or not a side effect of those medications were
14  consistent with their complaints?
15      **A.  You know, being on a diuretic can increase**
16  **urinary frequency.  Being on a diazepam can**
17  **actually mitigate a lot of urinary symptoms, so**
18  **yes, I looked at those.**
19      Q.  Okay.  But like did you literally -- I
20  mean, for example, Zofran, you didn't seem to know
21  it off the top of your head.  When you were looking
22  at your differential diagnosis, did you --
23      **A.  But you have -- we will agree that while**
24  **there are a litany of potential interactions for**
25  **medications that if the -- if that doesn't happen**

Page 1321

1  **very frequently, then I would not add that into my**
2  **differential diagnosis.**
3      Q.  Okay.  But isn't it fair to say that you
4  could have one of your patients that does, in fact,
5  have a side effect of one of these medications?
6      **A.  That is correct.**
7      Q.  Crestor, is that high cholesterol?
8      **A.  That is correct.**
9      Q.  Are you aware off the top of your head of
10  side effects of Crestor?
11      **A.  Not as it relates to the bladder.**
12      Q.  You're not aware of the side effects as
13  they relate to the bladder?
14      **A.  That is correct.  I'm not aware of any**
15  **side effects that are related to the bladder.**
16      Q.  Okay.  Is it possible there are, and
17  you're just not aware of them?
18      **A.  There's always the possibility that there**
19  **are some side effects that are discussed in the PDR**
20  **that happen very infrequently that could be related**
21  **to any of the medications a patient is on.**
22      Q.  Okay.  What is Meniere's disease?
23      **A.  It is a middle ear disease.**
24      Q.  Okay.  And how does it manifest?  I mean,
25  like what are the symptoms of it?

Case 2:12-md-02327   Document 9075-1   Filed 01/10/20   Page 738 of 924 PageID #: 218545

Page 1322

1   A.  Feelings of vertigo and sometimes fine
2   motor deficits of the fingers, but mostly it's
3   vertigo.
4   Q.  Okay.  You say her medical history is
5   remarkable for Meniere's disease.  Did you think
6   that anything else was remarkable?
7   A.  Well, in my report, I talk about her
8   hyperlipidemia, her essential tremors and that she
9   had a tubal ligation, a laparoscopy for pelvic
10  pain, drainage of an ovarian cyst and lysis of
11  adhesions.
12  Q.  Okay.  I think we've talked about
13  potential symptoms results from tubal ligation,
14  adhesions.  What else did you mention just there?
15  A.  Ovarian cyst.
16  Q.  Ovarian cyst.
17  MS. MANNO:  Can we agree that his prior
18  testimony related to general symptoms and causation
19  with respect to those conditions are applicable
20  here as well?
21  MR. BROWN:  So stipulated.
22  BY MS. MANNO:
23  Q.  You're aware that she is a smoker,
24  correct?
25  A.  That is correct.

Page 1323

1   Q.  Do you know for how long and how much she
2   has smoked?
3   A.  No.
4   Q.  And what about a history of frequent UTIs?
5   A.  That was described in the records.
6   Q.  Okay.  And you know, frequent UTIs, are
7   some people more prone to UTIs than others?
8   A.  There are various factors that are
9   associated with frequent urinary tract infections
10  from some patients that have urinary tract
11  infections after intercourse.  Some have frequent
12  urinary tract infections because of poor hygiene.
13  The vast majority of the time we don't really find
14  an etiology for frequent urinary tract infections.
15  Q.  In Ms. ███████ case, can you tell,
16  based on the records, the cause of why she had
17  frequent UTIs?
18  A.  Not from what I saw in the records.
19  Q.  And once you have them, I mean, is it a
20  situation where once you have them, you're at
21  increased risk to have them continually?
22  A.  I think we discussed that earlier that
23  there is no -- the predisposing event becomes less
24  frequent.  So if you have less frequent
25  intercourse, you might be less -- predisposed to

Page 1324

1   having intercourse.  If you change your hygiene,
2   you will be predisposed to having less urinary
3   tract infections.  If there is something that is
4   obstructing your voiding, you would be less likely
5   to have frequent urinary tract infections.  If
6   you're colonized with a bad bacteria and you clear
7   that up, you would be less likely to have frequent
8   urinary tract infections.
9   Q.  So say that intercourse is your triggering
10  factor if you have consistently regular
11  intercourse, would you expect to see consistent
12  UTIs?
13  A.  Well, somebody would come to see a
14  physician who would probably recommend voiding
15  right before intercourse or maybe taking an
16  antibiotic after intercourse.
17  Q.  Okay.  But without those changes, would
18  you expect there to be any improvement?
19  A.  Possibly.  I mean, there's some patients
20  that get colonized with bacteria and then clear it
21  up for reasons, so I would say that, you know, the
22  patient might continue to have the same
23  symptomatology or might improve their
24  symptomatology.
25  Q.  Okay.  Ms. ███████ had a history of

Page 1325

1   overactive bladder, correct, in ███ of 2010?
2   A.  That is correct.
3   Q.  And I believe you've testified about this
4   before, but any symptoms of overactive bladder such
5   as urgency, frequency, urge incontinence, worsening
6   urinary incontinence, that has been your testimony
7   as potential results of overactive bladder,
8   correct?  Do you not understand my question?
9   A.  No.
10  Q.  Okay.  I was trying to do this quickly,
11  and maybe that doesn't make sense.  I thought that
12  you've previously testified that as a result of
13  having overactive bladder, a person can have
14  urgency, frequency.
15  A.  Okay.  That's not how you stated the
16  question the last time.
17  Q.  I'm sorry.  I'm getting a little tired.
18  Urge incontinence and worsening urinary
19  incontinence, are all those potentially things that
20  can result from overactive bladder?
21  A.  Potentially, yes.
22  Q.  And what are you aware of in terms of
23  Ms. ███████ prior history of episodic pelvic
24  pain?
25  A.  In ███ of 2009, she saw a Dr. Hinds

Page 1326

1 with a chief complaint of pain with intercourse.
2 She also had dysmenorrhea or pain with menstrual
3 periods. Dr. Hinds ultimately determined that she
4 had ovarian cysts, which were most likely causing
5 her pain with intercourse. He performed a
6 laparoscopy on ███████ 2009. Following the
7 laparoscopy, Mrs. ██████████ dyspareunia resolved.
8 Also, on ████ 2010, Dr. Hinds ruled out
9 interstitial cystitis.
10    Q. Okay. So I deposed a doctor who is -- I
11 think he sort of holds himself out in interstitial
12 cystitis, Dr. Jeff Proctor. Do you know who I'm
13 talking about?
14    A. I've heard the name.
15    Q. Interstitial cystitis is also sort of a
16 diagnosis a bit of exclusion. Would you agree?
17    A. Yes and no. I think there are certain --
18 unlike other disorders where there are physical
19 manifestations and characteristic symptomatology, I
20 think one can make the diagnosis of painful bladder
21 syndrome, interstitial cystitis in the majority of
22 patients without excluding everything else.
23    Q. So do you ever diagnose your patients with
24 interstitial cystitis?
25    A. Yes.

Page 1327

1    Q. And what do you look to in terms of making
2 that diagnosis?
3    A. Well, I use their history, their physical
4 exam, their urodynamic findings and cystoscopy.
5    Q. Okay. When you say you base it in part on
6 your physical exam, what part of your physical
7 exam? You know, what happens during your physical
8 exam that would lead you to believe that someone
9 may have interstitial cystitis?
10    A. Some of the more consistent findings,
11 tenderness along the urethra, tenderness on the
12 bladder to bladder palpation.
13    Q. Okay. And what about the cystoscopy would
14 lead you to believe that someone may have
15 interstitial cystitis?
16    A. The findings are increased vascularity,
17 petechial hemorrhages, squamous metaplasia of the
18 trigone, glomerulations, and ultimately one of the
19 more severe findings is Hunner's ulcers.
20    Q. What?
21    A. Hunner, H-u-n-n-e-r, apostrophe, s,
22 ulcers.
23    Q. Okay. What about the urodynamics results
24 would lead you to think that someone would have
25 interstitial cystitis?

Page 1328

1    A. When somebody has pain with bladder
2 filling, pain with urination. Urgency with filling
3 would be, also urodynamics findings consistent with
4 painful bladder syndrome, interstitial cystitis.
5 Small-capacity bladder would be more of an
6 end-stage finding.
7    Q. Okay. The laparoscopy with the aspiration
8 of the left ovarian cyst, the lysis of adhesions
9 and lancing of nabothian cysts, that's the cervical
10 cyst, correct?
11    A. That is correct.
12    Q. Look how much I'm learning today.
13       As a result of that procedure, what
14 symptoms can a person have?
15    A. What symptoms can they have?
16    Q. Yeah.
17    A. Resolution of their pain.
18    Q. Can it cause pain, that particular
19 procedure or those procedures?
20    A. It can -- well, a laparoscopy can cause
21 pain and adhesions around the laparoscopy site.
22 When you are -- depending on how you treat the
23 cysts, if there's material in there that's
24 irritating it and it gets out of the cyst, it can
25 cause pain, but usually one would expect, beside

Page 1329

1 the typical operative complications, that
2 someone's -- the surgery would resolve the symptoms
3 that you were doing the surgery for.
4    Q. If the cyst -- I don't know what you just
5 said, but if it basically -- what did you say?
6 Spread or parts of it?
7    A. Right. If the cyst is like a chocolate
8 cyst from endometriosis and you spill that, they
9 can be very irritating. Same thing if the cyst is
10 a dermoid that has fatty material in it, you can
11 create a significant degree of irritation in the
12 pelvis.
13    Q. So is that something that is temporary or
14 longer lasting?
15    A. If it's a chocolate cyst or a dermoid and
16 you rupture it, you can have a fairly long-lasting
17 discomfort.
18    Q. Do you know whether or not Ms. ████████
19 cysts were the chocolate, or what was the other one
20 you said?
21    A. Dermoid.
22    Q. Dermoid?
23    A. They were neither of those.
24    Q. All right. Sounds weird to say a
25 chocolate cyst.

Page 1330

1   A.   That's from endometriosis.  It looks like
2   chocolate when it comes out, yes.
3      Q.   All right.  So in terms of her pelvic
4   pain, would you agree that the exposure that she
5   had from her sling took several months to remove it
6   all?
7      A.   Several occasions to remove it.
8      Q.   Yes.  And it took several months to do it.
9   I don't mean the revision procedure itself took
10  several months, but it was a several-month period
11  before it was resolved, correct?
12     A.   She had an erosion that was removed that
13  was followed up by another surgical procedure to
14  remove mesh.
15     Q.   Okay.  And for how long a period of time
16  did that span?
17     A.   I'm trying to get you the exact dates.
18  Her first removal of mesh was ███ 2011, and her
19  second was ████ 2011.
20     Q.   Okay.  So it took several months for it to
21  finally all be removed, correct?
22     A.   Well, it wasn't all removed, but the
23  two --
24     Q.   The exposure?
25     A.   -- exposures to be taken care of, yes.

Page 1331

1      Q.   Okay.  And then in -- okay.  So that
2   removal, that second removal is on ████ of
3   2011, and that -- she was experiencing pain then
4   that she described as pelvic pressure, correct?
5      A.   Moderate pelvic pain.
6      Q.   Okay.  Did you -- were you aware that --
7   is it Dr. -- do you know who Dr. Brincat is?
8      A.   No.
9      Q.   Okay.  That he attributed that pain to
10  prolapse?
11     A.   I think that's a she.
12     Q.   Is it a she?  Okay.
13     A.   Yes.
14     Q.   So that she attributed it to prolapse?
15     A.   The pressure?
16     Q.   Uh-huh.
17     A.   Yes.
18     Q.   Do you disagree with that?
19     A.   The pressure would be different from
20  moderate pelvic pain.
21     Q.   And where did you get that it was termed
22  moderate pelvic pain?
23     A.   This is from Dr. Brincat's ████
24  chief complaint is moderate pelvic pain and vaginal
25  spotting.

Page 1332

1      Q.   Okay.  And then on ██████
2   Ms. █████ has an appointment where her old pain
3   is improved, but now right lower quadrant pain,
4   correct?
5      A.   That is correct.
6      Q.   And then in ████ of 2012, notation of
7   left ovarian cysts and a dense lesion on the right
8   ovary, calcifications in the endometrium, correct?
9      A.   That is correct.
10     Q.   All of those factors, separate and then
11  certainly together, can lead to pelvic pain,
12  correct?
13     A.   That is correct.
14     Q.   And then in ██████ of 2012, she
15  goes to Dr. Brian Hotujec, I think, for a --
16     A.   Well, we missed an important -- on
17  ████ 2012, she -- Dr. Brincat notes she's
18  unable to have intercourse and that there is a
19  higher resting tone in her levators bilaterally.
20     Q.   Higher resting tone?
21     A.   That is correct.
22     Q.   And what does that mean?
23     A.   Levator spasm.
24     Q.   Okay.  And then ████ Brian Hotujec
25  goes for a second opinion for pain.  She gets an

Page 1333

1   MRI, and there are -- what is a fund retroverted
2   uterus?
3      A.   A retroverted uterus means that it is
4   tilted backwards.
5      Q.   And why might that be?
6      A.   That is just a -- uteruses can be tipped
7   forward, backward.  Sometimes they're tipped
8   forward.  Sometimes they're tipped backward.  It
9   doesn't really mean anything.
10     Q.   So it's not an abnormal finding?
11     A.   It is a finding if someone were pregnant
12  and they had a sharply retroverted uterus, then
13  that could make it difficult for it to rise out of
14  the pelvis during pregnancy.  In and of itself,
15  it's not really a significant finding.
16     Q.   And multiple nabothian cysts?
17     A.   Those are on the cervix.
18     Q.   And those can cause pain, correct?
19     A.   No.
20     Q.   No?  Why not?  Why are you telling me that
21  ovarian cysts can cause pain and nabothian cysts
22  cannot?
23     A.   Well, nabothian cyst is caused by squamous
24  epithelium growing over the columnar cells of the
25  cervix, and they keep making their columnar --

Page 1334

1 their mucousy secretions. It is not uncommon to
2 see nabothian cysts. Occasionally they might be
3 uncomfortable upon palpation. It's the -- it's a
4 difference from seeing an ovarian cyst where you're
5 actually stretching the outer covering of the
6 ovary, which is painful. These are -- nabothian
7 cysts usually are about two to five millimeters in
8 size, and you're not stretching enough cervical
9 tissue to create discomfort.
10    Q. What about during sex?
11    A. During sex, it's -- again, even if you
12 push on it during an exam, they're not usually
13 uncomfortable.
14    Q. Okay. What about the 1.4-centimeter cyst
15 on the left uterus, could that lead to pain?
16    A. The left ovary.
17    Q. I'm sorry.
18    A. That is -- that's an awfully small cyst.
19    Q. Okay. What is the size of what you would
20 consider -- well, would you consider a
21 1.4-centimeter cyst able to cause pain?
22    A. I would find it exceedingly unlikely for a
23 1.4-centimeter cyst to cause pain.
24    Q. So how big do they have to get where you
25 would think there is a likelihood of causing pain?

Page 1335

1    A. Well, definitely a cyst over
2 10 centimeters is going to cause pain. 5 to
3 10 centimeters can cause the ovary to twist and
4 cause pain, so an ovarian cyst that is bigger than
5 1.4 centimeters and significantly bigger than 1.4
6 centimeters. Now, obviously, there are ovaries
7 that are of a normal size that can be tender for a
8 variety of different reasons. There could be very
9 large cysts that are completely asymptomatic.
10    Q. Okay. All right. So jumping forward to
11 ███████ 2012, is this the last time that there are
12 records for Ms. ███████ up until the time that
13 she sees you?
14    A. That is my understanding, yes.
15    Q. So she did not, to your knowledge, visit
16 any physicians complaining of any dyspareunia, pain
17 or any of the urinary symptoms from ████ ███
18 to ███████?
19    A. That is correct.
20    Q. Okay. So let me talk to you about high
21 tone pelvic floor dysfunction.
22    A. Yes.
23    Q. What is that?
24    A. Well, we were talking about the -- just
25 recently the levator muscles being -- having a high

Page 1336

1 tone meaning that the muscles are tight.
2    Q. And that's what you said can lead to
3 levator spasms?
4    A. No. That is the result of levator spasms.
5 The muscles are tight because they're spasmed.
6    Q. Okay. Is that the same thing as high tone
7 pelvic floor dysfunction?
8    A. We're probably kind of slicing various
9 parts of the same apple. We're talking pretty much
10 about the same thing and just using a different set
11 of terminology. Either the muscles are spasming or
12 the muscles are chronically retracted.
13    Q. Okay. So let me read to you a portion of
14 our expert's report, which might make this a little
15 bit more understandable.
16    A. Go ahead.
17    Q. So our expert notes that Ms. ███████ had
18 preexisting pelvic pain and dyspareunia. She had
19 the sling placed, was noted to have an exposure
20 that could be attributable to dyspareunia. It took
21 several months to eventually manage it by removing
22 all of it. With the sling removed, she turned into
23 having high tone pelvic floor dysfunction syndrome,
24 which is likely to cause pelvic pain and
25 dyspareunia. It is our expert's opinion that

Page 1337

1 Ms. ███████ has high tone pelvic floor
2 dysfunction and myofacial pain.
3       So do you agree with that?
4    A. Yes, but my opinion is that it's caused by
5 the retropubic sling.
6    Q. What are other causes for it?
7    A. Someone that has had prior pelvic floor
8 trauma.
9    Q. What else? When you say pelvic floor
10 trauma, what does that mean, or what could that
11 consist of?
12    A. Vaginal delivery, pelvic fracture.
13    Q. Anything else?
14    A. Sexual abuse.
15    Q. Anything else?
16    A. There are other things, but those are what
17 come to mind currently.
18    Q. Okay. Other than prior pelvic floor
19 trauma and the sling, what else could cause high
20 tone pelvic floor dysfunction and myofacial pain?
21    A. Prior pelvic floor trauma.
22    Q. That's it? That's the only one you've
23 given me. Anything else?
24    A. Something that is irritating the muscle
25 like a foreign body in muscle.

Page 1338

1  Q.  Something irritating which muscle?
2  **A.  The high-toned pelvic floor muscles.**
3  Q.  Okay.  Other than a foreign body, what
4  could cause such irritation?
5  **A.  Again, prior pain that is unremitting**
6  **leading to anticipation of pain can lead to a**
7  **patient with chronically contracted pelvic floor**
8  **muscles.**
9  Q.  Meaning you're worried about pain, so you
10  keep everything tight?
11  **A.  Yep.**
12  Q.  Did you rule out for Ms. ████████ this --
13  I know we talked about these before with respect to
14  a different plaintiff, but the, say it again,
15  coccygodynia?
16  **A.  Yes.  I didn't see anything that suggested**
17  **that she had any injury or irritation to her lower**
18  **spine or coccyx.**
19  Q.  What about pelvic floor tension myalgia?
20  **A.  I think that's what we're talking about.**
21  Q.  Is that what we're talking about?  It's
22  another word for that?
23  **A.  Yes.**
24  Q.  Okay.  Piriformis syndrome?
25  **A.  I didn't see anything that would lead to**

Page 1339

1  **piriformis syndrome.**
2  Q.  The levator ani spasm?
3  **A.  We're talking about the same thing.**
4  Q.  Okay.  And proctalgia fugax?
5  **A.  Right.  I didn't see anything that she had**
6  **had any kind of lower colon symptomatology.**
7  Q.  Okay.  Okay.  So -- just so I'm straight,
8  you agree that Ms. ████████ does have the high
9  tone -- high tone pelvic floor dysfunction,
10  myofacial pain.  You're saying that it's caused by
11  the retropubic sling, correct?
12  **A.  Yes.  I found that her -- she had**
13  **bilateral levator tenderness, a tender band on the**
14  **left side of the urethra, which is due to the**
15  **sling, and I did not appreciate any banding on the**
16  **right side.**
17  Q.  What size was the portion of the band?
18  **A.  I didn't measure the width of the band.**
19  Q.  Can you give me just a guesstimate how
20  much space we're talking about the band being?
21  **A.  Wide?**
22  Q.  And/or length.
23  **A.  Well, the length is the length that the**
24  **sling curls up underneath the urethra.  The width**
25  **was probably anywhere from half a centimeter to a**

Page 1340

1  **centimeter.**
2  Q.  Do you believe that if that portion was
3  excised, that that would take away the tenderness
4  for that area?
5  **A.  For that area, more likely than not.**
6  Q.  Are you attributing that tenderness in
7  that banded area of the sling to be causing the
8  dyspareunia and the vaginal pain?
9  **A.  That is correct and the levator spasm for**
10  **what we talked about earlier.**
11  Q.  Okay.  I'm just -- you told me earlier
12  that sort of on Page 8 of your report that these
13  were the currently complained symptoms?
14  **A.  That is correct.**
15  Q.  And so I'm trying to get a sense of -- for
16  the dyspareunia, the vaginal pain, pain after
17  urinating, is this banding what you're saying is
18  causing the pain after urinating?
19  **A.  That is correct.**
20  Q.  And how does that work?
21  **A.  Well, if you have a band that is pressing**
22  **on the urethra, it's going to cause pain with or**
23  **after urination.**
24  Q.  I was about to say why wouldn't it -- why
25  would it just be after?  Why would it not be with?

Page 1341

1  Did I step you?
2  **A.  It's the hour.  I mean --**
3  Q.  Perhaps you're punch drunk,
4  Dr. Rosenzweig.
5  **A.  We're not going to go there.  There can be**
6  **various explanations, you know, such as the urine**
7  **is passing over a fixed object.  It, you know, will**
8  **create a pressure phenomenon that's not perceived**
9  **until after the urine passes.  There could be a**
10  **variety of different explanations.**
11  Q.  Can you think of any other ones than the
12  one you just said?
13  **A.  Of why she has pain after urinating --**
14  Q.  And not during.
15  **A.  -- than during urination?**
16  Q.  That you're attributing to the mesh.  You
17  said the reason that she has pain after urination
18  is because of this tenderness caused by the banding
19  of the mesh.
20  **A.  That is correct.**
21  Q.  So I'm asking you in what sort of a
22  scenario are you attributing this pain after
23  urination because of the mesh that would not be
24  present during urination?
25  **A.  Right, because there isn't anything**

Page 1342

1  infectious inside the bladder that when urine
2  starts or is going through is causing irritation.
3  It's irritating at the urethra, so that would be
4  perceived later on in the voiding process.
5      Q. Could that also be because of what we
6  talked about earlier with respect to issues with
7  diet and your urine?
8      A. It could be, but I didn't see any
9  indication that she's got painful bladder syndrome.
10     Q. Can you have -- I know we talked about the
11  GERD. GERD is different, though, right?
12     A. Right.
13     Q. GERD is not necessarily always diagnosed,
14  is it?
15     A. Right.
16     Q. Okay. In terms of leakage, you would
17  agree with me that Ms. ▮▮▮▮▮ was having the
18  overactive bladder symptoms before the Align and
19  after the Align, correct?
20     A. That is correct.
21     Q. And the Align R does not treat overactive
22  bladder or urge incontinence?
23     A. That is correct.
24     Q. She also had a preexisting history of
25  alleged stress urinary incontinence, correct?

Page 1343

1      A. That is correct.
2      Q. Would you agree that there was no
3  objective evidence by physical exam or urodynamics
4  to support the stress urinary incontinence?
5      A. According to the AUGS and a study in the
6  New England Journal of Medicine, you do not need
7  urodynamics prior to surgical procedures to treat
8  stress urinary incontinence.
9      Q. Was there any objective evidence by
10  physical exam or urodynamics in Ms. ▮▮▮▮▮
11  case that supports her claim of stress urinary
12  incontinence?
13     A. Prior to her sling?
14     Q. Correct.
15     A. There was no urodynamics done prior to her
16  sling.
17     Q. Have there been any done after?
18     A. No.
19     Q. Okay. Because you said prior to her
20  sling. Was something done after her sling?
21     A. Well, you were saying did she have
22  urodynamic evidence of stress urinary incontinence
23  prior to her sling.
24     Q. Or after. Before or after are you aware
25  of any urodynamics testing?

Page 1344

1      A. I didn't see any in the records.
2      Q. Okay. What about any physical exam for
3  SUI?
4      A. If we could pull out the preoperative
5  report from Dr. Hinds, I would imagine he would
6  have described her symptoms of stress urinary
7  incontinence.
8      Q. Well, so let me ask you this, though. I
9  understand, you know, a doctor talking to a patient
10  and a patient reporting hi, you know, I have
11  increased leakage with coughing or sneezing, but is
12  there a physical exam other than urodynamics to
13  corroborate that?
14     A. It would be a standing stress test.
15     Q. Okay. Are you aware of any standing
16  stress test that was done on Ms. ▮▮▮▮▮
17     A. Sitting here right now, no, I don't recall
18  that.
19     Q. Okay. The complained of stress urinary
20  incontinence was resolved until the revision of the
21  sling, correct?
22     A. That is correct.
23     Q. And so it didn't return until after the
24  sling had been revised?
25     A. That is correct.

Page 1345

1      Q. So one of her current complaints is not a
2  history of infection after the implant; is that
3  correct?
4      A. Infection?
5      Q. Uh-huh.
6      A. Urinary tract infection? Vaginal
7  infection?
8      Q. Any type of infection.
9      A. Cerebrospinal fluid infection?
10     Q. Let's start with UTIs.
11     A. I haven't seen documentation of recurrent
12  urinary tract infections.
13     Q. So you're not expressing an opinion that
14  the implant of the Align in Ms. ▮▮▮▮▮ caused
15  any sort of UTIs, correct?
16     A. I don't see that in my report.
17     Q. Or any other type of kidney infection?
18     A. I don't see that in my report either.
19     Q. Okay. So if it's not in your report,
20  you're not expressing an opinion about it?
21     A. That is correct.
22     Q. For your -- you have previously testified
23  on a number of different occasions about how
24  smoking relates to healing and the healing process
25  for tissue, have you not?

Page 1346

1    A.  Yes.

2    Q.  Can we agree that prior testimony that

3  you've given about tissue response with respect to

4  smoking and smoking effects on the body are also

5  attributable here?

6    A.  To a smoker, yes.

7    MS. MANNO:  I think I'm done.  Can we go off

8  the record, though, for a couple minutes and just

9  let me make sure?

10   MR. BROWN:  That's certainly reasonable.

11   THE VIDEOGRAPHER:  We're off the record.  The

12  time is 6:54 p.m.

13          (Whereupon, a short break was

14          taken.)

15   THE VIDEOGRAPHER:  We're back on the record.

16  The time is 6:56 p.m.

17   MS. MANNO:  All right.  Thank you, Doctor.  I

18  don't have any more questions with respect to

19  Ms. ████████

20   MR. BROWN:  No questions.

21   THE VIDEOGRAPHER:  This concludes today's

22  deposition of Dr. Bruce Rosenzweig.  We're off the

23  record.  The time is 6:56 p.m.

24          (FURTHER DEPONENT SAITH NAUGHT.)

25

---

Page 1347

1  STATE OF ILLINOIS  )

2                     )   SS:

3  COUNTY OF C O O K  )

4          I, GINA M. LUORDO, a notary public within

5  and for the County of Cook County and State of

6  Illinois, do hereby certify that heretofore,

7  to-wit, on November 29, 2014, personally appeared

8  before me, at 77 West Wacker Drive, Chicago,

9  Illinois, BRUCE ROSENZWEIG, M.D., in a cause now

10  pending and undetermined in the United States

11  District Court for the Southern District of West

12  Virginia, In Re: C.R. BARD, INC., PELVIC REPAIR

13  SYSTEM PRODUCTS LIABILITY LITIGATION.

14          I further certify that the said BRUCE

15  ROSENZWEIG, M.D. was first duly sworn to testify

16  the truth, the whole truth and nothing but the

17  truth in the cause aforesaid; that the testimony

18  then given by said witness was reported

19  stenographically by me in the presence of the said

20  witness, and afterwards reduced to typewriting by

21  Computer-Aided Transcription, and the foregoing is

22  a true and correct transcript of the testimony so

23  given by said witness as aforesaid.

24          I further certify that the signature to

25  the foregoing deposition was not waived by counsel

---

Page 1348

1  for the respective parties.

2          I further certify that the taking of this

3  deposition was pursuant to notice and that there

4  were present at the deposition the attorneys

5  hereinbefore mentioned.

6          I further certify that I am not counsel

7  for nor in any way related to the parties to this

8  suit, nor am I in any way interested in the outcome

9  thereof.

10          IN TESTIMONY WHEREOF:  I have hereunto set

11  my hand and affixed my notarial seal this 3rd day

12  of December, 2014.

13

14

15

16

17  _____

18  NOTARY PUBLIC, COOK COUNTY, ILLINOIS

19  LIC. NO. 084-004143

20

21

22

23

24

25

---

Page 1349

1  TO: Karen Beyea-Schroeder

2  Re: Signature of Deponent Bruce Rosenzweig M.D., Vol. IV

3  Date Errata due back at our offices:  01/03/2015

4

5  Greetings:

6  The deponent has reserved the right to read and sign.
   Please have the deponent review the attached PDF

7  transcript, noting any changes or corrections on the
   attached PDF Errata.  The deponent may fill out the

8  Errata electronically or print and fill out manually.

9

10  Once the Errata is signed by the deponent and notarized,
    please mail it to the offices of Tiffany Alley (below).

11

12  When the signed Errata is returned to us, we will seal
    and forward to the taking attorney to file with the
    original transcript.  We will also send copies of the

13  Errata to all ordering parties.

14

15  If the signed Errata is not returned within the time
    above, the original transcript may be filed with the
    court without the signature of the deponent.

16

17

18  Please send completed Errata to:

19  Tiffany Alley Global Reporting & Video

20  730 Peachtree St. NE, Ste 470

21  Atlanta, GA 30308

22  (770) 343-9696

23

24

25

In Re: CR Bard 200      Bruce Rosenzweig M.D., Vol. IV      11/29/2014

Page 1350

1  ERRATA
2  I, the undersigned, do hereby certify that I have read the
   transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7  Procedure and/or OCGA 9-11-30(e), any changes in form or
   substance which you desire to make to your testimony shall
8  be entered upon the deposition with a statement of the
   reasons given for making them.  To assist you in making any
9  such corrections, please use the form below.  If additional
   pages are necessary, please furnish same and attach.
10
11 Page _____ Line _____ Change _____
12 _____
13 Reason for change _____
14 Page _____ Line _____ Change _____
15 _____
16 Reason for change _____
17 Page _____ Line _____ Change _____
18 _____
19 Reason for change _____
20 Page _____ Line _____ Change _____
21 _____
22 Reason for change _____
23 Page _____ Line _____ Change _____
24 _____
25 Reason for change _____

Page 1351

1  Page _____ Line _____ Change _____
2  _____
3  Reason for change _____
4  Page _____ Line _____ Change _____
5  _____
6  Reason for change _____
7  Page _____ Line _____ Change _____
8  _____
9  Reason for change _____
10 Page _____ Line _____ Change _____
11 _____
12 Reason for change _____
13 Page _____ Line _____ Change _____
14 _____
15 Reason for change _____
16 Page _____ Line _____ Change _____
17 _____
18 Reason for change _____
19
20 _____
            DEPONENT'S SIGNATURE
21
   Sworn to and subscribed before me this ___ day of
22 _____, _____.
23
   _____
24 NOTARY PUBLIC
25 My Commission Expires:_____

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

## $

**$1,500** 1025:2
**$10,000** 1025:3
**$750** 1025:2

## 0

**0** 1010:1,11
**0.1** 1115:10
**0.6** 1115:10

## 1

**1** 984:3 992:10
1041:8 1122:14
**1.4** 1335:5
**1.4-centimeter**
1334:14,21,23
**10** 992:10
1030:13 1057:7
1109:24
1226:15 1316:9
1335:2,3
**100** 996:13
1069:22
**102** 1071:1
**105** 1104:8
**11** 1143:22
**11/19/08** 1095:3
**11:20** 1066:14
**11:33** 1066:18
**11th** 1106:3
**12** 1005:23
1006:19 1105:5
1107:23 1108:3

1112:9
**12/13** 1106:14
**12:02** 1090:22
**12:25** 1091:1
**12th** 1007:5
1016:6 1018:10
1335:17
**13** 988:5 1108:23
**130** 1138:6
**14** 1053:14
1054:5 1057:9
1151:11
**14th** 1291:14
1335:18
**15** 1030:14
1053:13
1082:11
1210:14,16
**150** 1030:1,6
1144:25
**15th** 1093:18
**18** 1057:9 1071:1
1102:21
1105:12 1106:2
1107:25 1108:3
1112:1 1127:13
**19** 1140:17
1275:20
1315:22
**195** 1103:16
1104:6 1109:8
**1990** 1157:23
**1991** 1196:8
1198:3 1199:16
**1997** 1199:25

**1998** 1198:13
**19th** 1139:5
1140:12,15,16
1144:11
**1:17** 1130:11
**1:19** 1130:18
**1:53** 1155:6

## 2

**2** 1033:10
1247:18
1259:17,18
**2-0** 1010:13
**20** 1096:2,3
1127:7 1210:16
1237:3 1326:8
**20-week** 1089:7,
8
**200** 1030:3,6,15
**2000** 1045:24
**2001** 1181:5
**2002** 1168:19,21
1198:12
**2004** 1239:20
1250:8,10,11
**2005** 1254:25
**2007** 1209:13
**2008** 1114:17
**2009** 985:21
1032:17
1069:12
1123:10,11
1131:19
1325:25 1326:6
**2010** 1057:9

**1060:1** 1102:10
1325:1 1326:8
**2011** 998:11
1005:21,24
1006:19 1009:5
1034:18 1106:4,
8,14,17 1108:23
1180:17 1181:5
1188:3 1291:14
1301:4 1330:18,
19 1331:3
**2012** 1063:14
1105:12,25
1106:2 1108:1,3
1112:1 1220:21
1332:6,14,17
1335:11
**2013** 1068:19
1105:5 1107:23
1108:4 1180:17
1278:7,10,19
1301:5,19,24
**2014** 988:21
1045:22,25
1150:2 1218:11,
17 1225:15
1257:2,21
1258:2 1263:7
1265:8,14
1269:8 1271:22
1275:20
1278:18,23
1297:13,17
1315:22
**21** 1069:12
1106:4,8,17
1330:18
**23** 1005:21
1187:5,12

**24** 1079:12 1127:13

**24th** 1332:1

**25** 1040:19 1041:6 1044:20, 21 1105:25 1187:12 1237:3 1281:4 1332:17

**26** 987:13

**26th** 1102:10 1150:2

**27** 1131:19 1209:13

**27th** 1134:9

**29** 988:21 1045:22

**29th** 988:25

**2:06** 1155:13

**2:55** 1194:6

---

**3**

**3** 1093:1,4 1134:7 1136:17 1137:25 1161:7 1198:15 1204:25

**3/23/11** 1006:1

**30** 1027:21 1044:22 1046:14 1080:24 1174:10 1307:4, 9,12

**30th** 1332:24

**31** 1198:8

**31st** 1332:14

**35** 1104:8

**3:05** 1194:13

**3:45** 1226:1

---

**4**

**4** 984:3 1056:4 1143:5 1150:2 1276:11

**4-by-3-by-1-centimeter** 1219:24

**4.7-by-3.4-by-0.7-centimeter** 1219:17

**41** 1187:11

**42** 985:7 986:1

**43** 985:7,19

**44** 986:16,22

**45** 986:20,22 1046:16

**45-minute** 1009:22

**46** 987:5,7 1030:23 1031:25 1032:8

**47** 987:17

**48** 987:17 1240:25

**49** 1009:2

**4:04** 1226:5

**4:10** 1232:12

**4:13** 1232:16

---

**5**

**5** 1056:4 1081:5, 18,21 1082:11 1209:18 1210:9, 11 1253:22 1256:11,13 1259:14 1335:2

**50** 1103:13 1127:9 1307:4, 9,12

**50-52** 1031:2

**50-year-old** 1102:23

**51** 1031:12

**51.4** 1103:15

**52** 1031:19 1032:13

**53** 1031:17 1067:3,4

**53-55** 1066:20

**54** 1067:1

**55** 1067:1

**56** 1072:2

**57** 1091:11

**57-59** 1091:3

**58** 1091:12

**59** 1091:12

**5:04** 1274:23

**5:12** 1275:2

**5th** 1138:17

---

**6**

**6** 1106:10

1143:22

**60** 1123:6 1127:2,5

**61** 1130:24

**61-63** 1130:15

**62** 1130:25

**63** 1131:3

**64** 1091:9 1155:17

**64-66** 1155:10

**65** 1091:10 1149:7 1155:19

**66** 1155:21 1181:24

**67** 1194:17

**67-70** 1194:10

**68** 1194:17 1195:1

**69** 1194:18 1226:13

**6:02** 1314:24

**6:11** 1315:7

**6:54** 1346:12

**6:56** 1346:16,23

**6th** 1032:17

---

**7**

**7** 1148:13 1181:1,2,13 1253:22,24

**71** 1232:23

**71-73** 1232:18

**72** 1233:1

**73** 1233:1

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

**74** 1259:10,13

**75** 1275:10

**75-77** 1275:4

**76** 1275:10

**77** 1275:11

**78** 1304:24

**79** 1257:6,17 1315:13

**79-81** 1315:4

---

**8**

**8** 1081:5,21 1340:12

**8-millimeter** 1081:18

**80** 1148:20 1192:22 1315:15

**800** 1044:1

**81** 1315:16

**84** 1187:4,12

**86** 1187:5,12

**8th** 1331:23

---

**9**

**9** 988:5,24 1326:6 1330:19

**91** 1199:23

**99** 1316:15

**9:34** 984:2

**9th** 1331:2

---

**A**

**A's** 1117:19

**a.m.** 984:2 1066:14,18

**A1c** 1040:8

**ab** 1190:12

**abandon** 1082:16

**Abbott** 1127:11

**abdomen** 1022:13,19 1093:23 1158:18 1180:24 1182:6 1183:22 1185:4 1186:15 1187:3, 22 1188:16 1190:23 1193:17 1247:13 1252:10,14,17 1313:2

**abdominal** 1014:25 1021:3, 6,10 1092:21,22 1093:21 1094:5 1095:6 1096:7, 16,21 1099:22 1128:2 1129:4, 5,9 1151:23 1154:22 1155:2 1168:18,22 1169:8 1204:7 1234:9,10 1252:19 1255:1, 8 1294:10

**abdominoplasty** 1101:3 1312:21 1313:3

**abductor** 1128:20

**ability** 1037:17 1038:12

**able** 990:8 993:9 998:1 1004:8 1041:24 1047:11,24 1048:11 1062:15 1065:16 1073:6 1075:16 1081:2, 3,6 1108:19 1165:3 1171:21 1182:16 1184:7 1186:4 1189:5, 24 1200:23 1249:2 1272:7 1311:22 1334:21

**abnormal** 1068:14 1144:20 1145:4 1212:25 1270:5, 17 1280:12 1333:10

**abnormalities** 1153:3,5

**abnormality** 1145:1

**about** 989:5,8,11 996:19 998:10 999:2,4,9,12,24 1000:3,4,10 1004:25

1005:21,25 1007:2 1008:8 1010:22 1015:7 1016:2,4,5 1018:1,18,19 1019:16 1020:18 1024:9, 22 1025:5 1026:6 1029:14 1031:5 1033:17, 19 1034:9 1035:8 1037:18, 24 1038:17 1039:15 1049:9, 10 1052:11,19 1053:4,21 1054:8,22 1055:2,3,8,18, 21 1057:2 1058:5 1062:11 1063:16 1064:6 1065:19,23 1066:1 1067:22, 24 1069:1,6,9, 22 1070:1 1072:20,23 1076:5 1078:3,9 1080:6 1081:21 1083:24 1088:23 1092:5 1096:21 1097:5, 6,21 1111:2 1113:6,13, 1123:17 1124:7, 13,15 1125:13, 16,22 1129:18 1131:20,22 1132:1 1139:7 1140:5 1141:2 1143:6 1146:13

1148:9 1149:20
1151:5 1153:15
1154:10
1157:23 1158:8
1159:25
1160:12
1164:14,23
1165:11 1166:5,
9,18 1168:2,6,
23 1169:15
1173:11
1174:14
1177:12,16
1178:4 1179:16,
22,24 1180:5,19
1186:6,17
1187:16 1188:1,
3, 1189:22
1193:21
1196:25 1197:7,
8,20 1200:7,24
1201:6,9 1203:8
1206:11 1207:2
1208:5,7,20
1209:8,9
1210:8,9
1213:24
1215:23
1217:11,25
1218:19 1219:3,
5,16 1220:9
1226:11,14,19,
22 1227:4
1228:7,11,15
1229:18 1230:3,
4 1231:8,13
1233:3,11
1234:4,8,23
1236:5 1237:21
1240:19 1244:3,

17 1245:12
1246:4,23
1248:6,17,19
1249:10,12
1251:3 1253:22
1254:5 1258:16
1264:12,21
1265:3 1266:5,6
1267:14
1268:16
1272:10,15,21,
1273:22
1274:11,13
1278:7 1279:25
1281:15,16,19
1282:11
1283:23 1284:3,
20 1285:15,18,
22,23 1286:2,3,
6,7,9, 1287:13
1288:8 1290:15,
20,23 1291:6,16
1292:9 1295:13
1296:19
1297:22 1298:1,
4 1299:11,21
1300:17 1304:8,
21 1305:17
1306:4,22
1307:23
1311:10,22
1312:2 1313:9,
12,14,20,23
1314:4,5,7,16,
19 1318:21
1319:10,18
1322:7,12
1323:4 1325:3
1327:13,23
1334:7,10,14

1335:20,24
1336:10 1338:9,
13,19,20,21
1339:3,20
1340:10,24
1342:6,10
1344:2 1345:20,
23 1346:3

**above** 988:8
998:6 1181:2
1247:18
1286:25

**abscess** 1044:11,
12 1057:11,17
1059:2,3,8
1060:1 1061:20
1062:18,21
1209:22 1210:1
1211:24

**abscesses**
1050:20 1058:2,
25 1059:9
1060:3,17
1061:6

**absences**
1050:21

**absorbable**
1011:18

**abuse** 1337:14

**accident** 1244:15
1245:2

**accordance**
1230:22

**according**
1096:24 1343:5

**account** 1312:3

**accurately**
1190:17

**acid** 1092:23
1253:18

**acids** 1267:18

**act** 1261:25
1262:1

**actions** 1318:1

**active** 1140:1,12,
15 1299:3

**activities** 999:16
1188:8 1189:19,
21 1190:4,23
1191:5,6

**activity** 992:1,2,
3 995:13
1162:22
1190:12

**actual** 1069:6
1155:21 1227:5
1261:25

**actually** 993:1
999:15 1000:22
1032:7 1044:20,
21 1076:2,25
1078:4 1098:23
1103:25 1106:3,
15 1107:3,20
1159:1,22
1171:25
1189:15
1193:23
1198:11 1235:7
1255:6 1293:9
1320:7,17
1334:5

**acute** 1149:10
1196:2,4,9,13
1199:19,24,25
1235:21,25

1273:8

**ad** 1007:3
1058:17

**add** 1013:7
1031:23
1280:24 1321:1

**added** 1305:19

**addicted**
1248:20

**additional**
985:23 1005:19
1006:13
1007:18
1008:13 1029:1
1061:20 1305:3,
17

**adductor**
1128:20

**adenoids**
1134:10

**adequate**
1052:23 1053:9,
22 1055:9
1212:12 1263:2

**adhere** 1009:23

**adhesion** 1150:3

**adhesions**
1009:15,16
1092:21
1098:20
1134:25
1135:14 1136:2
1239:20,25
1322:11,14
1328:8,21

**adipose** 1109:25

**adjusted**

1308:23

**admissible**
989:14 1281:20

**admission**
1094:4

**adrenergic**
1160:4

**advanced**
1100:11

**adverse** 1259:14

**affect** 1101:20
1154:9 1234:23
1242:14 1253:5
1290:2

**affected** 1280:14

**affinity** 1162:25

**after** 986:19
994:1 998:18
1024:10,12
1027:18
1030:20
1041:13,16,17
1046:12 1057:7
1058:2 1061:16
1063:2 1068:12,
20 1072:18
1083:17
1088:24
1095:25
1099:13
1101:18 1102:4,
20,25 1103:7
1106:4 1108:23
1112:9 1113:24
1115:25
1125:23
1126:18,21

1127:6,7,10
1138:15,23
1140:3,23
1141:8,10,13
1142:21,24
1150:1,4
1196:11
1199:15
1203:24 1204:8,
11,17 1210:7
1212:5 1215:20
1216:8,22
1230:8,17
1249:14 1255:3
1257:2 1259:4,
21 1263:18,20,
24 1265:25
1266:11
1268:21
1273:13
1276:19
1280:17 1289:6,
13 1300:23
1304:12
1305:16
1306:22
1311:11 1313:4
1316:11 1319:5,
7 1323:11
1340:16,18,23,
25 1341:9,13,
17,22 1342:19
1343:17,20,24
1344:23 1345:2

**afterwards**
1011:15
1012:25
1030:24
1034:12
1080:24 1100:9

1260:2 1303:16,
17

**again** 985:1
986:6 996:2
998:5 1002:14
1017:7 1024:25
1026:18 1036:7
1041:6 1046:23
1051:3 1055:24
1082:6 1083:3,
18 1086:7
1088:9 1094:3
1109:16
1112:21 1113:4
1122:13 1124:2
1129:10
1135:16 1145:2
1154:5 1174:22
1179:6 1211:17
1225:13
1228:25 1234:7
1239:8,9
1248:12
1262:17 1266:2,
7 1274:10,17
1275:13
1282:23 1294:3
1308:1 1314:7
1334:11 1338:5,
14

**against** 1098:6,7
1204:18

**age** 1103:14
1110:16,24
1111:2,8
1205:11
1206:24,25
1207:16,19,20
1229:13 1316:3

In Re: CR Bard 200    Bruce Rosenzweig M.D., Vol. IV    11/29/2014

**aggressive** 1176:3 1206:1

**ago** 999:8 1020:5 1272:16

**agree** 984:21 995:23 996:8 1007:16 1016:15 1034:17 1050:10,11,24 1059:22 1060:9, 10,11 1076:7 1102:17 1103:7, 12 1105:24 1111:11 1126:23 1128:12,13 1149:16 1164:17,19 1165:2 1176:11 1184:16 1213:4, 5,6 1214:15 1217:21 1218:4 1224:15 1227:23 1238:8 1242:24 1256:25 1257:5, 20,25 1260:5 1261:8 1263:7 1265:15,25 1268:23 1284:5 1292:4 1301:11, 14 1302:2 1307:15,19 1308:8,10 1310:12 1311:3 1312:5,17,21,25 1320:23 1322:17 1326:16 1330:4

1337:3 1339:8 1342:17 1346:2

**agreeable** 984:15

**agreed** 1027:17, 25 1122:6 1230:15

**ahead** 1068:18 1069:20 1073:13 1074:18 1076:11 1082:8 1083:2 1087:5 1089:4 1090:12 1092:9 1094:2 1101:21 1107:22 1115:8 1116:11 1117:6, 21 1120:16,20, 25 1121:7 1123:22 1125:2, 6 1129:8 1134:18 1140:7, 25 1142:17 1143:13 1145:22 1149:2 1153:11 1154:24 1163:7 1164:9,21 1165:7 1166:14 1167:3,15 1170:12 1172:6 1173:9 1176:17 1181:24 1182:21 1184:10 1188:18 1193:10 1205:17

1206:21 1209:12 1218:7 1224:18 1229:17 1231:19 1336:16

**albeit** 1051:11

**Align** 1032:16, 21 1057:14 1060:2 1101:12, 13 1113:15 1131:18 1241:1 1259:16 1308:10,11 1342:18,19,21 1345:14

**alkaline** 1113:3 1253:16,24

**alkalinized** 1253:8,14

**all** 984:4,15 985:2 988:23 989:21 990:6,8 1000:6,23 1001:10 1004:12 1010:6 1016:14 1018:5 1019:12,24 1020:1 1022:15 1027:1,3,23 1030:17 1031:14 1032:5 1036:14 1039:9 1043:1,7,8,13, 16 1044:15 1050:17,24 1051:3,8,10 1052:21,24 1053:1 1055:2,

18 1056:7,23,25 1061:22 1066:23 1067:1, 21,23 1071:2,3 1072:23 1074:14 1075:11 1079:14 1090:20 1094:8 1100:5 1102:9, 15 1104:18 1114:4 1117:8 1119:1,14 1122:6,12,13,18 1124:5 1125:9 1127:19 1128:4 1129:6,15,22, 1131:25 1139:20 1147:8 1155:3 1159:11 1164:13 1168:12 1171:21 1175:20 1183:4 1192:10,19 1200:1 1202:9 1215:2,14 1222:12 1225:22 1228:12 1232:25 1233:3 1234:2 1247:20 1252:2 1254:22 1256:7 1268:9, 15,25 1269:1 1272:9 1281:18 1284:1,15 1290:13 1291:2 1292:7,9 1294:6 1296:1 1307:15

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

1313:12
1320:11
1325:19
1329:24 1330:3,
6,21,22 1335:10
1336:22
1346:17

**allegations**
1068:14

**allege** 1187:17
1188:23

**alleged** 1235:8
1342:25

**allow** 1029:22
1267:18

**allowed** 990:24
1029:13 1058:9

**allows** 1000:23

**almost** 998:22

**alone** 1298:24

**along** 999:18
1001:14 1006:3,
7 1019:24
1034:8 1037:3
1101:1 1102:12
1175:24
1177:20,22
1276:21 1277:3
1319:2, 1327:11

**alpha** 1160:4
1161:11,19
1162:5,10,23

**already** 1007:2
1018:22
1019:19 1020:2
1026:16 1027:6
1047:14
1084:23 1097:4

1105:14
1116:20
1121:22
1137:17,19
1163:22
1164:13 1185:8,
9 1186:17
1290:15
1299:10 1308:4
1313:9,12

**also** 984:21
986:19 991:2
992:25 993:3
994:16 996:8,9
997:7 1000:16
1001:17 1005:2
1006:4,13,18
1008:9 1017:7,
16 1021:18
1022:12
1023:10
1031:13 1041:8
1045:6 1059:24,
25 1061:2
1063:24 1064:2,
6 1076:20
1092:22 1093:9
1094:22,23
1095:8 1097:19
1099:17 1110:2,
12 1113:19,22
1114:23 1115:9,
21 1122:5
1131:11 1134:1
1138:19 1143:9
1147:4,10
1148:4 1154:8
1156:20 1158:4,
18,20 1162:7
1167:23

1174:25 1176:1,
1195:8 1196:12
1200:10
1206:13
1212:11 1215:7
1227:9 1230:12
1234:15
1237:17
1240:11,21
1241:10 1243:9
1250:23
1252:22
1254:10,25
1255:11 1257:5,
20 1260:23
1261:10,13,24
1265:18 1273:2
1281:11 1282:8,
9 1283:5,22
1285:7,19
1290:13,16
1298:14
1299:25 1312:1,
10 1326:2,8,15
1328:3 1342:5,
24 1346:4

**alterations**
1034:2

**alternating**
1234:9

**alternatives**
1206:4

**Although**
1265:22

**Altman** 1171:3
1172:13

**always** 1062:5
1074:13 1206:4
1221:22

1229:19 1291:4
1319:1 1321:18
1342:13

**am** 1043:12
1052:19
1054:23
1119:17
1141:19
1157:15
1181:21 1200:4
1208:2 1229:18
1258:19,24
1264:1 1265:5,
14

**amount** 1003:17
1020:24
1024:23
1025:25 1030:5
1067:22 1075:2
1142:6 1156:18
1171:4 1202:16
1203:2 1267:25
1291:4 1311:22

**ample** 1186:5

**ANA** 1144:13
1145:12,16,17

**anal** 1060:5,13

**analysis** 1206:14

**anatomic**
1077:11
1309:25 1310:3,
5,8

**anatomical**
1177:12
1308:14

**anatomically**
1214:22

anatomy
1078:14
1175:17 1177:9

and/or 1099:2
1123:25
1134:17 1172:4
1174:16 1196:7
1257:6 1290:21
1339:22

anesthesia
1211:7

angle 1009:17

angry 1138:18

ani 1339:2

anismus 1021:19

another 989:14,
16 990:4
1005:23
1014:16 1062:6
1070:22
1082:18
1086:16 1117:1
1119:20 1127:6
1145:2 1244:20
1330:13
1338:22

answer 1007:23
1023:20
1034:23 1035:2
1051:19 1066:2
1069:25 1070:3,
8,12 1071:2,13,
16 1122:2
1187:14,19
1188:6,20
1189:1,10,12,24
1193:4 1214:19
1218:9 1225:21

1254:18
1284:25

answered
1019:21
1055:17,25
1056:1,2
1268:15

answering
1054:11

answers 1190:1

anterior 1000:18
1008:23 1010:2
1013:12
1048:14
1073:15 1170:2
1172:3,16
1173:1,14
1177:16,17
1178:1,7,14
1179:1,5,7,8,15
1183:6,8 1190:3
1212:9,20
1213:14,15
1302:18
1311:11

anterior/
posterior
1183:23
1190:19

anteriorly
1009:14
1010:17 1157:8

anti 1162:4

antibiotic
1266:25 1267:2
1324:16

antibiotics
1196:19

1199:11,12
1209:7 1210:18,
21,24 1211:6
1266:13
1267:10,15,20

antibodies
1144:13

anticholinergic
1160:25

anticipate
1189:23

anticipation
1225:10 1338:6

antidepressant
1159:10

antidepressants
1159:5 1163:4

antigen 1280:18

antihypertension
1159:14

antiincontinence
1303:18
1307:19

antinuclear
1144:13

antiparasympath
etic 1160:18,24

antisympathetic
1162:2

anus 1154:20

anxiety 990:5
1035:7 1200:3,
8,12,13,16,20
1201:4 1241:25
1242:5 1290:14,
21,24 1291:4
1319:23

any 984:17,18,22
986:24 988:16
992:18 993:22
994:21,22
995:4,12,13
996:20 997:25
1002:20 1004:5
1005:15 1012:5
1028:15,25
1029:4,5,18
1032:25 1033:3,
8 1037:7,
1040:9 1041:2
1047:8 1048:12
1051:21,24
1052:4,11,19,21
1053:8,9,21,24
1054:1,3
1055:1,3,10
1056:11,12,13,
1057:16 1059:5,
7,15,17,18
1061:12,19
1064:4 1067:8
1068:2 1072:8
1074:7 1075:1
1076:12
1077:11
1079:16,24
1084:3,24
1088:8,16
1089:1,13
1090:15
1091:18,
1098:24
1101:10,17
1102:6 1108:10,
12,13 1113:1
1125:5,12
1132:16 1133:9,

14, 1134:15
1137:16,20
1142:7,14
1143:20,25
1144:3,4
1145:11
1150:19,20
1151:3 1152:7
1157:25 1158:4,
10,12,13
1168:23
1169:10
1171:13
1172:19,21
1175:18 1184:7
1191:16 1192:2,
5,6 1193:20
1197:14
1201:20,22
1202:14
1206:12 1213:9
1216:8 1217:25
1219:23
1220:22
1223:13 1224:3
1226:19
1235:18
1237:16
1241:24
1242:12
1245:13 1246:1
1249:10 1257:8,
11 1258:1,4,20,
25 1261:14,19
1265:11,13
1268:4,14,24
1273:9,13
1274:20 1278:1,
23 1279:5,9
1280:14

1283:10 1284:8,
14 1286:16,17
1288:12
1290:25
1292:12,17,24,
25 1294:8
1296:5,6,7
1297:25
1300:17 1311:5
1313:9 1314:1,
10,12 1318:15,
18 1321:14,21
1324:18 1325:4
1335:16,
1338:17 1339:6,
15 1341:11
1342:8 1343:9,
17,25 1344:1,2,
15 1345:8,15,17
1346:18

**anybody** 1059:1
1177:2 1192:18

**anymore** 994:24
1013:18

**anything** 992:15,
19 1002:25
1012:11 1013:7,
10,15,19
1014:25
1044:13
1052:11 1067:8
1073:23 1076:4
1077:14
1081:23 1084:3
1086:25
1087:19 1094:9,
21,24 1108:7,11
1111:21
1124:25

1135:23
1137:13
1144:25 1153:7
1154:3,14
1158:23
1168:17
1177:15 1192:7
1197:18,24
1199:15 1220:7
1223:6 1224:12
1233:8 1236:2
1245:8 1253:5
1272:23 1274:5
1290:11
1313:15,18,21
1318:13 1322:6
1333:9 1337:13,
15,23 1338:16,
25 1339:5
1341:25

**anytime** 1252:2

**anywhere**
1071:8 1082:11
1092:15 1179:4
1283:18 1285:8
1295:1,2
1339:25

**aorta** 1204:2

**apart** 1250:24

**apex** 1002:7
1177:24 1215:7

**apical** 1212:14,
18,21,24
1213:10,18
1214:7,23
1216:18

**apostrophe**
1327:21

**apparent** 1138:4

**apparently**
1061:16

**appear** 1106:20,
21

**appearances**
984:5

**appendectomy**
1134:11,24
1135:1,13,17

**appendicitis**
1134:25
1135:22

**appendix**
1135:18,21

**apple** 1336:9

**applicable**
1285:19
1290:17 1298:2
1322:19

**apply** 1240:21
1300:19

**appointment**
1332:2

**appreciate**
1065:2 1246:7
1339:15

**appreciating**
1246:6

**approach**
1128:15 1206:1

**appropriate**
1004:17
1085:12,14
1140:4 1226:20,
21



In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1243:14
1244:24 1247:8,
23 1252:20
1255:2,14,18
1256:15,18
1258:9 1260:25
1262:19 1271:4,
11,24 1275:21,
22 1278:15
1279:6,11
1280:6 1282:11
1291:6 1296:13
1297:7 1298:2
1299:16
1301:25
1307:17,21
1311:10 1313:5,
6, 1315:23,25
1316:20,25
1321:11,12
1322:20 1325:5,
7,12 1328:13
1331:4 1341:6

**ASCUS** 1144:6

**ask** 1002:2,24
1014:2 1028:21,
25 1029:3
1032:19,23
1044:5 1059:22
1067:6 1076:3
1099:20 1116:6,
25 1122:1
1126:2 1129:21
1132:15
1169:17 1172:1
1185:8 1188:9
1189:25 1213:4,
17,24 1266:2
1278:24
1284:13 1303:5

1310:11
1314:16,18
1344:8

**asked** 1019:20,
21 1037:8
1045:14
1055:15,25
1056:1 1094:9
1122:10
1123:16
1141:24 1142:5
1149:19 1158:8
1169:24 1185:9,
12 1188:19
1189:12
1226:10 1265:3

**asking** 1008:20
1014:4 1018:16
1019:13
1028:11 1030:4
1038:11
1041:21 1043:5,
14,21 1044:15
1051:14
1052:10 1054:7,
12,23,24
1055:1,7,18
1067:21
1108:18
1115:16
1122:21
1125:11
1148:18
1161:24
1170:14 1183:2
1185:13
1191:18
1201:15 1214:2,
16,21 1217:3
1254:23

1268:13
1270:14,20
1271:6 1293:13
1341:21

**aspect** 1015:10

**aspects** 1009:15
1043:16 1215:2

**aspiration**
1328:7

**assess** 1258:22

**assessed** 1095:12

**assessment**
1095:4 1194:2

**assistant**
1030:25

**associated**
989:25 992:8
994:1,12 997:17
1011:14
1012:24 1014:8
1047:4 1058:9
1064:1 1077:10
1083:6 1086:15
1087:25
1094:19 1101:2
1110:6 1113:7
1114:17
1117:12
1132:25
1133:12
1135:24
1141:16
1142:10
1143:25
1145:16,18
1152:12
1153:14
1154:16

1170:23 1171:5
1174:11 1176:2
1196:20 1198:1,
2 1235:21
1236:16
1237:19,23
1247:3 1251:6
1253:11
1259:15,23
1260:14 1280:4
1287:8 1289:23
1290:8 1291:9
1293:21 1323:9

**association**
1133:10
1284:17 1286:9,
11,13 1287:12

**assume** 1116:1
1248:20

**assuming**
1017:18
1265:15
1303:19

**asthma** 1288:12,
15

**asthmatic**
1241:15

**astute** 1177:7

**asymptomatic**
1089:9 1149:4
1203:12
1223:19 1335:9

**asymptomaticall
y** 1221:24

**at** 987:9 991:21
992:16 993:3,
10,13, 996:20
1000:5 1001:17,

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

19,23 1002:7,
11,20 1003:4
1007:7,9,12
1010:9 1014:24
1015:14
1017:13
1020:12
1025:23 1029:5,
1031:24 1040:6,
10 1042:2
1047:1,15
1052:21 1055:2
1060:22 1067:6
1071:3 1073:19
1074:7,11,22
1078:4 1079:14,
20 1080:10,16,
19 1081:12
1083:3 1084:9,
13 1085:17
1095:8 1097:2,7
1098:1,18
1101:12 1103:1
1104:11,21
1105:6,20
1109:7 1112:1
1114:12,13
1115:21 1116:8
1117:9,10,12
1122:6 1123:23
1124:1 1125:5,
12 1126:25
1128:4 1129:6,
25 1138:22
1139:7 1140:18
1142:9 1145:2,9
1147:16 1156:9,
16 1158:4
1159:1,11
1162:1 1164:3

1165:18
1166:12
1167:13 1169:1
1171:15 1174:3
1175:11,21
1176:1 1177:23
1178:6,9 1179:1
1182:19 1184:6
1192:15
1195:20,21
1198:7 1199:21
1202:17,19
1203:3 1205:11
1208:1,25
1210:3 1211:4,
11,15,17,23
1212:10
1213:13 1216:4,
8 1217:18,21
1220:20
1226:13
1240:25 1242:3,
4,18 1243:22
1244:21
1255:11,20
1256:1,2
1259:24
1261:13
1264:11 1265:7
1269:3 1276:6,
14,22 1284:14
1292:6,19
1293:6,14
1294:1 1295:25
1296:1 1297:11
1302:4 1304:1,
2,3 1305:7
1306:25 1308:9
1317:3 1318:10
1320:11,18,22

1323:20 1342:3

**atrophic** 1105:6
1128:3 1129:5

**atrophy** 991:1,
19,20,25 992:5,
9,13 994:19,22
995:16,20,24
996:7 1045:9
1103:10 1105:2,
14,21 1106:20
1107:13,17,21,
25 1108:1,4,8,
25 1109:1,9,10
1110:2,5,6
1111:12,15,16
1113:7 1133:4
1254:11
1256:20
1265:14
1268:19,20,23
1269:5,22,23
1270:2,6,7,16,
22 1271:1,4,11,
16,19,22
1272:3,5,20

**atrophying**
1104:12
1106:23

**attach** 1083:20

**attached**
1073:15
1083:13,22
1084:23 1085:3,
6,8,20,23
1086:2 1174:6
1204:5

**attachment**
1073:19

**attack** 1200:17
1225:8,9

**attacking**
1156:15

**attacks** 1195:9
1200:13,21
1201:6 1208:15
1225:2,4,7,13,
18 1242:6

**attempted**
1070:13

**attempts** 1293:6

**attending**
1040:19

**attention** 985:14
1066:24 1277:6

**attorney** 1026:2
1067:17

**attorneys** 1122:3

**attributable**
1147:11
1336:20 1346:5

**attribute**
1021:21
1268:13,14
1283:1 1312:19

**attributed**
1331:9,14

**attributes**
1195:5 1275:24
1316:20

**attributing**
1273:3 1340:6
1341:16,22

**atypical** 1144:7

**augmentation**
1294:11

**AUGS** 1343:5

**autoimmune** 1144:19 1145:9, 11,15,18

**Avaulta** 996:24, 25 1000:17 1073:6 1198:7 1204:25 1209:3 1212:17,19 1213:14,15 1215:4,24 1224:16

**average** 1076:9 1103:14 1127:11

**avoid** 1140:8 1188:7 1189:18

**avoiding** 1188:7 1189:18

**aware** 993:23 994:14 1021:1,5 1023:15,20 1033:7,14 1040:9 1041:2, 12 1042:14,18 1045:11 1091:24,25 1092:6 1098:21 1105:1 1108:17 1132:16 1133:14,15 1157:22,25 1158:10 1164:15 1170:17 1171:13 1200:1, 4 1204:24 1205:6 1246:23 1255:3 1258:20

1281:24 1291:12 1297:16 1298:9, 14 1308:18,20 1309:23 1321:9, 12,14,17 1322:23 1325:22 1331:6 1343:24 1344:15

**away** 1009:24 1010:4 1024:13 1058:2 1061:11 1070:13 1079:10 1089:6 1103:4 1204:15 1251:4 1340:3

**awfully** 1334:18

---

## B

**B-u-i** 1092:2

**babies** 1222:5

**baby** 1152:24

**back** 997:5,24 1066:17 1074:12 1077:25 1083:21 1086:8, 9 1089:16 1090:25 1092:7, 25 1093:3,12 1094:23 1095:5 1100:11 1112:7 1127:16 1128:1 1129:4,10 1130:2,17 1144:23 1154:2 1194:12

1202:15 1226:4 1244:15 1245:1 1250:18 1262:17 1273:2, 3 1275:1 1295:22 1306:7 1315:6 1317:3 1346:15

**backflow** 1197:15

**background** 1154:4 1256:10

**backward** 1333:7,8

**backwards** 1333:4

**bacteria** 1062:1, 6,10,19 1063:7 1114:20 1115:19 1117:12,15,17, 18,23,25 1118:7,11,12, 13,15,18,24 1119:2,4 1148:11 1149:5, 8 1197:6,8,16, 21 1235:20 1266:9,23,24 1324:6,20

**bacterial** 1266:22

**bacteroides** 1062:16

**bacteruria** 1149:4

**bad** 992:9 1030:18

1144:10 1266:23 1324:6

**baldness** 1159:13

**balloon** 1073:18, 19,20 1075:8

**band** 1046:19,23 1047:3,5,12 1048:18,21,23, 24 1049:16,23 1050:4 1065:13 1216:2 1219:24 1339:13,17,18, 20 1340:21

**banded** 1219:18 1340:7

**banding** 1012:9 1192:6 1339:15 1340:17 1341:18

**Bard** 1029:17 1052:22 1053:8 1054:1,4 1055:2,11,18 1056:7 1084:14 1192:15

**Bard's** 1005:3 1059:21

**base** 1011:23 1073:19 1196:10 1210:11 1248:24 1327:5

**based** 993:20 998:11 999:19 1003:25 1015:18 1018:24

1034:18
1043:13 1084:5
1089:1 1103:2
1119:23
1132:22 1142:2
1151:7 1159:21
1163:14 1166:7
1180:15
1192:12
1194:25
1205:10
1207:15,19
1217:3,12
1230:23
1237:25
1241:12
1257:25
1260:23 1265:6
1275:21
1279:20 1282:1
1293:15
1308:21
1316:14
1323:16

**basically**
1012:10 1049:2
1089:24
1096:11
1197:21
1204:13 1302:6
1307:3 1329:5

**basin** 999:10

**basing** 993:18
1012:4 1037:12
1071:19 1084:1
1085:10 1098:8
1141:18,19
1172:10
1231:16

1302:22

**basis** 1028:10
1150:7 1172:5
1263:12 1264:8
1279:3,16,17,19
1300:25
1305:14
1306:18

**Bates** 1123:1

**bathroom**
1030:19
1195:14
1246:16 1287:1,
2,20,25 1288:5

**bear** 1214:22
1237:9

**bearing** 1214:8

**because** 989:25
994:18,25
1002:7 1003:19
1005:20,22
1011:14
1012:17,24
1013:6,19
1015:9,12
1026:10,18
1029:22 1037:8
1038:24 1039:2
1048:21
1056:18 1058:8,
21, 1060:24
1070:9 1078:1,
14 1079:25
1081:9 1083:8
1084:9 1085:11
1087:23
1098:17
1103:20
1111:12

1112:21
1113:14
1114:11 1115:6,
24 1116:6,8
1117:18 1118:6,
9,23,25 1119:18
1126:25
1135:24
1144:25 1145:3
1162:22
1166:17 1167:9
1171:21
1172:20 1176:9
1180:2,6,19
1183:3,24
1190:10 1192:9
1204:15 1208:9
1210:2 1211:22
1214:4 1223:11,
20 1225:13
1229:22
1243:16
1245:22
1246:19 1251:2
1252:11
1266:23 1269:1,
3 1272:1 1282:6
1292:24
1298:17
1299:23
1304:11,16
1309:15,23
1310:2,5 1313:1
1316:14
1323:12 1336:5
1341:18,23,25
1342:5 1343:19

**become** 1062:17
1095:21
1112:18

1247:24
1253:13

**becomes** 989:13
1022:3 1106:23
1199:14
1211:23
1246:17,19
1323:23

**before** 985:18
989:7 993:5
996:1 998:10,
999:12 1003:16
1010:23
1021:18
1023:10,16
1028:14
1037:18 1046:8,
15 1047:6,14
1049:9 1051:18
1052:6,14
1054:9 1057:24
1058:5 1063:19,
25 1085:2
1086:18
1095:16,24
1097:4,12
1099:20
1106:23
1107:20
1113:10
1123:16 1124:3
1129:18
1130:23 1137:5
1158:19
1169:16,20
1170:14
1177:15
1181:12
1184:18 1189:5
1198:18

1210:20
1215:22
1217:11
1228:19
1229:20
1233:12 1244:4,
16 1246:2
1257:7 1258:5
1264:8 1274:16
1291:6,17,22
1296:14 1298:5
1311:11
1324:15 1325:4
1330:11
1338:13
1342:18
1343:24

**beforehand**
1052:8

**begin** 1050:23
1074:10
1106:22

**beginning** 984:3
1065:9 1069:22
1122:6 1195:20,
21

**behalf** 1032:10

**behind** 995:6
997:18 1017:25
1097:1 1098:11
1099:15
1142:19 1159:8
1180:12
1183:11,16
1185:3 1186:15
1191:14 1240:5

**being** 1060:17
1073:2 1076:16,
17 1078:10,12

1102:25 1112:9
1116:18 1133:4
1139:12 1145:8
1148:9,11
1157:16 1159:9
1161:22 1165:3,
20 1167:21
1179:23 1183:9
1189:11,12
1203:19 1204:4
1219:25
1221:16 1243:3
1245:23
1257:12 1279:8,
11 1293:23
1299:20
1305:19 1318:9
1320:15,16
1335:25
1339:20

**belief** 1228:7

**believe** 993:19
1003:11
1006:22 1011:9
1062:22,
1069:23 1082:1,
4 1094:25
1123:14
1124:21,24
1147:18 1153:8
1184:23
1205:10,12
1217:2 1229:14
1230:6 1244:18
1249:1 1261:19
1282:16
1298:22
1300:19
1301:17
1303:18,23

1325:3 1327:8,
14 1340:2

**believer** 1269:13

**belly** 1089:9
1100:10,12,14
1252:1 1295:20
1296:23,25

**below** 1003:15
1180:23 1182:5,
25 1183:21
1187:2,21

**belt** 1182:12

**benefit** 1128:6

**Berger** 1069:14
1075:15 1076:2,
4 1082:1
1084:25
1089:15

**Berger's**
1069:14

**Bernard** 1033:4

**beside** 989:1
997:9 1101:1
1328:25

**besides** 989:11
1129:15 1198:3
1279:8 1319:5

**best** 1007:8
1045:20 1082:3
1164:23 1165:8
1188:2 1225:20
1242:18

**beta** 1161:7

**better** 1039:22
1076:3 1115:1,
11,25 1119:21
1120:5 1186:12

1196:19 1199:7
1211:16
1214:14
1238:24 1249:4
1252:20 1292:9
1310:1,3,6

**between** 997:11
1016:21 1035:2
1044:25
1060:12 1108:2
1112:15
1115:22 1116:4
1124:20
1133:16
1151:24
1154:18 1166:9,
10,25 1170:22
1215:5 1226:21
1227:15 1228:5
1229:9 1242:17
1267:10
1284:17
1296:13 1307:8

**beverage**
1198:23

**beverages**
1113:3 1196:22
1198:24 1254:5

**BEYEA-
SCHROEDER**
984:24 1027:22
1029:10
1055:12 1067:3,
10,15,19
1068:18
1069:19
1072:11
1073:13
1074:18

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1075:10
1076:11 1082:8
1083:2 1085:18
1086:13 1087:4,
13,18 1089:4
1090:12 1091:9,
11 1092:9,25
1093:3,8 1094:2
1101:21
1105:11 1106:9
1107:22 1109:3
1110:4 1114:1
1115:8 1116:11
1117:6,21
1118:20
1119:10,
1120:16,20,25
1121:7,21
1122:5,10,25
1123:3,8,12,22
1125:2,6,22
1126:24
1128:10 1129:8
1130:23
1134:18 1140:7,
25 1142:17
1143:13
1145:22
1146:18,21
1149:2 1152:23
1153:11
1154:24
1155:16 1156:2,
4 1163:7,16
1164:21 1165:6
1166:14 1167:2,
15 1170:12
1171:9 1172:6
1173:9 1176:17
1181:1,13,17,19

1182:21 1184:1,
9 1187:8
1188:18 1189:8
1190:7 1191:2
1192:11,21
1193:3,10
1194:14
1200:22
1201:17,24
1205:16 1206:3,
17,20 1207:13
1208:3 1209:11
1213:21
1214:18,24
1216:23 1218:6,
14 1219:7
1220:4 1224:5,
18 1225:19
1226:6,9,25
1227:7 1229:1,
16 1231:1,7,18,
23 1232:3

**big** 1080:12
1081:1 1100:24
1221:12
1222:19,20
1245:11
1334:24

**bigger** 1103:18
1104:2 1335:4,5

**biggest** 1171:2

**bilateral** 1096:8
1339:13

**bilaterally**
991:17 1065:18
1332:19

**biopsy** 1281:8,10
1294:12
1296:10,16,17

**bit** 1004:11
1009:20 1065:6
1070:1 1075:17
1092:12
1166:17
1173:24 1209:8
1326:16
1336:15

**bladder** 1003:16
1042:19 1044:7,
16 1045:3
1046:15,16
1068:11,20
1069:6,8,11
1070:6,10,13,
18,21,25
1071:9,11,17
1072:6,8,17,24
1073:2,7,12,14,
17,18,21
1074:1,4,10,11,
13,14,16,25
1075:7,13,15,
16,20,21
1076:1,7,9,16,
22 1077:1,7,9,
16,20 1078:7,
16,22,24,25
1079:2,11,14,19
1080:16,20
1081:11,20
1082:3,6,10,13,
15,23,24 1083:4
1085:11 1086:6,
7,8,11,15,16
1087:1,7,9,11,
25 1088:1
1089:18,21,23,
25 1090:4,7
1111:5,6,8,23

1112:6,10,14,
17,18,19,24
1113:1,8,9,16,
22 1114:6,12,
20,24 1115:5,
11,22,23
1116:3,13
1119:12,15,19,
21,22 1120:4
1158:21
1160:13,15,16,
18,20,22,25
1161:7,8
1177:23 1178:8,
9 1193:8,14,17,
18,19,23
1196:10,18,20,
25 1197:3,10,
1198:22 1199:2,
13,21 1215:6
1220:12,16,22
1221:11,18
1222:12,23
1223:12,14,23
1224:1,2,7
1234:16,19
1235:13,25
1236:14,15,17,
18 1237:2,6,17,
24 1238:9,19
1239:4,15
1245:16 1246:2,
12,14,17
1253:10,11
1256:2 1258:20
1259:18 1260:9
1286:10 1287:9
1288:21,23
1289:2,3,7,16
1290:10 1300:6

1301:8,11,13, 17,24 1304:1,3 1305:21,22 1306:6,16, 1318:17,18,19 1319:10 1321:11,13,15 1325:1,4,7,13, 1326:20 1327:12 1328:1, 4,5 1342:1,9,18, 22

**bladders** 1044:21,23 1073:4 1111:3 1113:6,19 1121:11 1132:3, 4,5 1160:24 1192:23 1266:5

**blame** 1312:18

**blamed** 1312:4

**Blau** 1137:25 1138:1,16 1139:25 1140:14

**bleeding** 1068:14 1088:4, 15,22 1195:6 1208:12 1212:6 1218:24

**bloating** 1234:9, 11

**blocked** 1256:22

**blocks** 1222:21 1318:1

**blood** 1037:19, 20 1038:2,7,25 1040:6,14,22,24

1041:8,10,13,16 1099:14 1137:13,16 1144:23,24 1166:3 1168:8, 12,13 1204:2 1211:15 1317:9

**blown** 1073:19

**blunted** 1103:19 1104:3

**body** 999:14,17 1001:2,7 1002:15 1016:10 1017:2, 12, 1020:13 1037:24,25 1047:22 1048:10 1049:1 1060:25 1116:17 1117:25 1118:1, 10 1120:2 1123:24 1127:21 1153:4 1191:9,22 1259:7 1260:4 1283:5 1294:20 1318:2 1337:25 1338:3 1346:4

**body's** 1037:16 1038:12

**bone** 1158:17 1180:12,13,23 1182:5,11,12,25 1183:1,12,13, 16,21 1185:3 1186:16 1187:2, 21 1188:15 1189:7 1191:14

1252:16 1286:25

**bony** 1153:24

**Bormes** 1033:4 1051:23

**borrow** 1182:1

**both** 990:17 999:16 1001:5 1005:22 1007:7 1028:9 1045:23 1046:10 1071:5 1072:19 1077:22 1089:17,20 1096:12 1110:25 1175:15,19 1178:11 1179:17 1212:8, 23 1234:20 1277:18 1296:13 1303:3, 13

**bothering** 1299:5

**bottom** 1084:10

**bowel** 989:25 990:3 1021:25 1141:3 1151:19, 22 1152:5,8 1154:17 1155:1 1160:9,10,12 1233:10 1234:7 1238:6 1272:21 1274:8 1282:7 1299:11,12 1301:8,13,14

**bowels** 1151:16

**boyfriend** 1034:5

**Bradford** 1006:2 1007:7,14 1014:3 1016:24 1020:22

**brain** 1112:16

**Braun's** 1127:8

**breadth** 990:24 1006:5 1017:18

**break** 987:9 1030:19,20 1066:15 1090:23 1130:12 1194:7 1213:1 1226:2 1232:13 1274:24 1304:20 1315:1 1346:13

**breast** 1294:11

**brevis** 1128:20

**Brian** 1332:15, 24

**bridge** 1215:5

**briefly** 1095:16 1249:12 1300:2

**Brincat** 1331:7 1332:17

**Brincat's** 1331:23

**bring** 1020:13 1040:21 1044:1 1305:21

**broad** 1038:16 1125:12



1152:14,15,22,
25 1153:2
1154:18 1156:7,
15,17,19
1158:12,24
1159:21,23
1161:20,23
1162:14 1163:4,
24 1164:4
1165:17,19
1166:6 1168:13
1169:8,18,20,22
1170:1 1172:19
1173:23
1174:11,25
1176:14
1179:23 1180:2
1182:1,13,17
1183:18,24
1184:15 1185:6,
20 1188:7
1189:15,18
1194:4 1195:3
1196:7,18
1197:8,16
1198:1 1199:8
1203:6 1206:5
1209:8 1214:7,
22 1215:23
1216:1,8,18
1217:22 1218:9
1221:23 1223:2,
6 1224:1
1225:24
1226:15
1230:12 1234:5,
8,23 1235:12
1236:6,7,16
1237:11,23,25
1238:14,18

1239:5,8
1240:20 1241:6
1242:11 1245:4,
6,7 1246:3,8,10,
11,13 1247:1
1250:22
1251:14 1253:2,
5,8,13 1255:2,
20,21 1256:13
1260:1,24
1263:1,2,11
1264:5 1265:15
1267:3,10,16
1277:19
1280:14,17
1281:15 1282:4,
7,8,9,21 1283:5,
22 1284:8
1285:18,24,25
1286:16 1287:8,
9 1288:12,15,
16,24 1289:17,
19 1290:1,2,15,
16,24 1291:2,4,
6 1292:13
1293:3 1294:23
1295:1,7,11,22
1296:8 1297:6
1298:2 1300:20,
22,24 1301:15
1302:9 1304:21
1305:6 1306:15
1307:16,20
1309:9 1310:14,
16,18 1312:4,6,
1317:22 1318:2
1320:15,16
1322:17
1323:15
1325:13,

1326:20
1328:14,15,18,
20,24 1329:9,
10,16 1332:11
1333:6,18,21
1335:3,7 1336:2
1338:6 1339:19
1341:5,11
1342:10 1346:2,
7

**can't** 1012:19
1025:9 1026:10
1027:4,10
1028:16
1043:25 1055:3
1084:22
1099:19
1112:22
1115:15
1116:10 1122:2
1138:19 1148:4
1167:18 1169:6
1195:12,13
1198:10 1201:6
1239:10
1289:15
1317:14,18

**canal** 1060:5

**cancer** 1318:4

**candidiasis**
1256:19

**cannot** 1003:7
1043:25
1060:22 1101:8
1117:11 1148:3
1171:18
1182:19
1185:24
1305:13 1312:3,

17 1333:22

**capacious**
1017:24

**capriciousness**
1020:15

**car** 1244:15
1245:2

**cardinal**
1098:12,18

**care** 1015:20,22
1036:6 1082:5
1102:9 1205:15
1206:14
1226:11,13,15,
18,23 1227:5,
17,18 1228:1,3,
13,19,21,22
1229:9,10,21,
23,24 1231:15
1282:23
1291:20 1292:1
1293:4,17
1294:5 1297:6
1298:23
1303:21,25
1309:5,14,17
1330:25

**career** 1222:23

**Carolina**
1066:10,11

**carried** 1010:5

**Cartmell**
1026:12
1027:16,23,24

**case** 989:14,17
992:7 993:16
995:24 996:14
1005:5 1011:16



1201:16,21
1235:9,22
1236:4 1245:10
1248:3 1256:11
1271:6 1289:8
1337:6

**causing** 1057:17
1138:3 1152:5,7
1174:1 1177:9
1186:18,24
1235:9 1272:3,6
1274:3,16
1298:25
1301:18,20
1326:4 1334:25
1340:7,18
1342:2

**caveat** 1263:1

**cavity** 995:11
1203:10

**CC** 1046:16

**CD** 986:14,17
1019:23
1031:13 1067:1
1315:14

**ceasing** 1112:5

**Celexa** 1158:4,
12 1159:5
1162:8,21

**cells** 1037:20
1038:2,25
1103:18 1144:7,
1168:9 1280:12
1333:24

**cellulitis**
1209:14,19,25
1210:6 1211:13,
21 1212:1

**center** 999:13
1057:21
1112:16

**centimeter**
1115:10
1339:25 1340:1

**centimeters**
1046:19,
1049:24 1138:6
1335:2,3,5,6

**cephalad** 1178:9

**Cerebrospinal**
1345:9

**certain** 997:16
1012:12
1013:18 1020:5
1054:22
1074:11 1113:4
1161:6 1176:16
1206:24,25
1215:7 1265:23
1291:5 1326:17

**certainly**
1169:18
1170:10
1332:11
1346:10

**certainty** 1117:3
1183:19

**cervical** 1009:24
1328:9 1334:8

**cervix** 1002:9
1062:1,3
1097:1,10,12,
13,16,19,25
1098:5,11
1099:4 1143:24
1164:6 1169:1,

4,7,11 1333:17,
25

**Cervone**
1298:15,18
1302:14 1303:5
1307:2 1309:22
1310:11

**cesarean**
1096:15

**cessation**
1095:24,25

**chance** 1003:18,
21 1005:3
1014:7 1098:14,
17

**chances** 1098:19
1190:5 1236:25

**change** 1024:20
1039:25
1099:13
1137:18 1168:9
1181:25
1267:22
1271:10,25
1311:8 1313:6
1324:1

**changes** 1324:17

**changing**
1199:12

**characteristic**
1221:25 1283:8
1299:14
1326:19

**characteristicall
y** 1262:11 1293:2

**characterize**
1247:6

**check** 1040:8

**checked** 1070:23

**chemicals**
1318:1

**chest** 1100:21
1101:6

**chief** 1326:1
1331:24

**child** 1198:6,13,
18

**childbirth**
1024:10,12
1125:23

**chlamydia**
1062:2,6,7

**chlamydial**
1062:12

**chocolate**
1329:7,15,19,25
1330:2

**choice** 1206:15
1207:11
1227:12

**cholecystectomy**
1294:11,14
1295:11

**cholesterol**
1321:7

**chromic** 1010:1,
11 1011:16,24
1012:6,11,15,18
1013:5 1014:6
1015:17

**chronic** 987:22
988:13 989:5
990:3,7 996:21,
23 997:2 1001:7



1311:11

**columnar**
1333:24,25

**combination**
1249:23 1290:5

**combined**
1077:6

**come** 998:13
1102:16 1112:7
1142:20
1188:13
1195:19
1230:17
1252:18
1282:25
1324:13
1337:17

**comes** 1034:8
1086:7,8,9
1141:3 1189:15
1255:23
1278:22
1290:11 1330:2

**comfortable**
1262:4

**coming** 995:9
1049:17
1065:12
1076:25 1078:4,
9,13 1174:17
1176:22 1177:1,
19 1180:16
1195:17
1204:16
1218:23 1320:8

**comment**
1268:20

**commit** 1293:9,
12

**common**
1073:11 1127:4
1188:13,17
1189:4 1210:7

**comparative**
1171:21,23

**compare**
1170:22

**compared**
1172:12

**compensate**
1153:4

**complain**
1264:11

**complained**
1092:6,
1138:16,17
1149:25
1168:21
1254:25 1255:1
1276:15 1301:8
1340:13
1344:19

**complaining**
988:23 1029:6
1068:11,24
1131:9 1150:10
1158:15
1182:18 1234:1
1257:8 1264:21
1265:22 1269:4
1275:23
1286:21
1288:18
1299:13,21
1335:16

**complains**
1139:6 1258:8
1277:17,20

**complaint**
988:16 1105:24
1108:20 1150:6
1177:13
1233:15 1258:4,
22 1264:14
1276:17
1279:12
1301:23
1310:13 1326:1
1331:24

**complaints**
987:21 988:11,
20 1030:8,10,12
1037:9 1050:6,7
1057:1,6
1063:17 1068:5
1088:8,10
1091:21,24
1094:18 1130:2
1131:8 1150:20
1151:4 1152:1
1158:14,24
1195:4 1200:11
1233:14,15
1234:8 1249:9
1258:1 1268:3,
24 1276:5,22
1277:2,3,
1288:13
1295:15
1316:20
1320:14 1345:1

**complete**
1074:14
1260:10

1262:21

**completely**
1074:1 1089:9
1100:13 1101:8
1132:5 1147:13
1203:11 1335:9

**complex** 1008:3
1035:2 1162:24

**compliance**
1108:7,10
1111:21,25

**complicated**
1209:5

**complication**
1060:20,22
1069:24
1172:22
1224:16

**complications**
1059:10 1060:3
1062:20,22,24
1082:25 1127:2,
3,5,9 1141:7
1259:15
1300:11 1329:1

**component**
1070:24 1162:2

**compound**
1159:16

**compromised**
1064:13,15,24
1065:7,9

**concentration**
1202:5

**concern** 1078:8

**concerned**
1070:5 1082:2

1180:19

**concerning**
1076:5

**conclude**
1184:20

**concluded**
1029:5 1130:4
1301:20

**concludes**
1346:21

**conclusion**
1058:13
1085:10
1218:23

**conclusively**
1108:19

**condition**
1021:22 1034:1,
8,10 1035:8
1061:25
1112:13 1132:2
1197:20 1280:3

**conditions**
1022:5 1035:3
1112:25
1114:11 1147:9
1200:6 1233:4
1237:16 1239:5
1259:22
1260:13,17
1291:3 1294:7
1322:19

**condyloma**
1143:23 1144:1

**confused** 1013:8

**confuses**
1037:20
1038:24

**confusing**
1038:4,5,8

**confusion**
1168:8

**connected**
999:24 1000:1

**connection**
997:11 1060:12

**connections**
1215:5

**connects** 1058:7

**consent** 1052:5,
7,12,18,23
1053:9,17
1055:9,21
1056:6,16,18,
21,22 1206:12

**consented**
1183:25 1189:3

**consequence**
1213:12

**conservative**
1205:14 1206:2
1207:21 1228:2,
8,20 1229:15,25

**consider** 996:20
1184:25 1185:7,
19 1219:6
1220:10
1243:22 1273:7,
14,23 1274:5,14
1294:8 1306:20
1307:12
1334:20

**consideration**
998:4 1050:18
1051:4 1129:24

**considered**
1082:12
1099:23
1147:17 1219:8
1313:15

**considering**
1207:20
1292:14,22

**consist** 1337:11

**consistent** 986:6
1046:20
1107:12 1137:7
1151:25
1320:14
1324:11
1327:10 1328:3

**consistently**
997:25 1324:10

**constant** 997:21
1222:10
1279:19

**constipation**
990:4 1021:19,
23 1151:24
1152:3 1154:18
1234:9,14,16
1235:5 1245:7,
11 1249:19
1272:22
1281:24 1282:2,
6,11 1286:3,5

**consultation**
1093:19

**consulting**
1029:11

**contact** 1005:14
1091:18
1203:25

**contain** 1075:1
1121:19

**contained**
1047:20
1056:24

**containing**
1031:13
1232:25

**contains** 1047:9

**contemplating**
1294:4

**contents** 999:11

**continually**
1246:16
1323:21

**continuation**
984:11

**continue**
1006:25
1082:24
1093:17 1128:1
1203:9 1238:14
1239:6 1280:17
1324:22

**continued**
1041:5 1045:17
1064:8 1106:6
1136:25
1233:16
1276:13

**continues**
1045:19
1110:16,22
1203:5

**continuing**
1082:22 1212:4

**contract** 1079:8

1160:17 1161:1, 12 1215:13 1262:24

**contracted**
1160:21 1191:9, 21 1214:4,17 1219:18,25 1338:7

**contractility**
1111:5,7

**contracting**
1081:12,14

**contraction**
1047:21 1048:9 1121:11 1127:20 1174:23 1192:6 1215:13 1230:10 1259:6 1260:3 1274:2 1289:3,7

**contractions**
1112:17

**contraindicated**
1013:23 1206:25

**contravention**
1310:9

**contribute**
1036:12 1051:15 1145:20 1220:2 1242:11 1249:9 1284:8,10 1286:17 1287:6 1288:12 1289:19 1290:16,21,24

**contributed**
1219:23 1268:24 1290:23

**contributing**
991:19 993:10 995:21,25 1033:20 1037:6 1051:10 1088:7, 15 1143:11 1163:4 1193:20 1219:21 1241:3 1261:14 1265:16 1268:5, 18 1272:6 1273:20

**contributor**
991:4 993:15,17 996:2 1184:23

**contributors**
1313:10

**contributory**
998:2,7,8 1012:15 1114:5 1129:23 1130:5, 6

**control** 1039:13, 22 1040:23,24, 25 1111:4,6 1142:8 1170:21 1319:10

**controlled**
1039:22 1168:7, 13

**convention**
1041:7

**conversion**
1103:17,21

1109:11 1110:1

**converted**
1294:10

**coordinates**
999:14

**COPD** 1288:11, 14

**Cope** 1212:7,24

**copies** 986:8 1028:13,15

**copy** 986:4 987:10 1008:17 1027:12 1028:17 1030:25 1031:9, 17 1032:13 1069:18 1130:25 1131:3 1155:18 1181:20 1194:15,18

**core** 999:13

**corollaries**
1254:4

**corollary** 998:24 1111:14 1166:6 1237:22 1273:18 1291:10

**correct** 984:12 985:16,17,25 986:5,9,10,14, 15,18 988:2,3,7 989:2,3 993:7,8 995:2 996:11,13 998:20 999:21 1000:9 1001:13 1002:1,17,22

1003:14,22 1004:2,21 1007:18 1008:13,14 1010:20,21,25 1011:1,2,3,5,7 1012:8,20 1013:14 1014:5, 14,15,18 1015:25 1016:3 1017:10,19,20, 23 1018:4,8 1019:5,6 1020:17, 1021:20 1022:11 1026:7, 14,25 1027:2,7 1028:23 1031:10,16,18 1032:17,18 1035:12,14 1036:21,22 1037:14 1039:24 1040:1, 25 1041:1 1044:17,19 1045:5,8,9,10, 12 1046:4 1047:6 1049:3 1053:5 1057:4, 5,12 1063:14, 15,19,20,23,24 1064:5,10,13, 1065:14 1066:3 1067:4,11,25 1068:3 1071:20 1074:6,17,19, 22,23 1075:3,5 1083:16 1086:2, 3 1088:6,13

1090:6,8,9,11,
13,16,17,19
1091:16,17,19,
20,23 1094:12
1095:4,10,11,14
1096:12,13,18,
19 1097:3
1104:24 1105:2,
10,22 1106:14,
15,17,18
1107:7,14,21
1113:10,25
1114:2 1115:3
1118:16 1120:2,
3,6,9,10,12,13,
14,15 1121:8,17
1130:21,
1133:22,23,25
1134:1,2,13,14
1135:11,12
1136:19
1137:24
1139:13,14,23
1140:20 1143:3,
4 1144:2,14
1145:10 1146:6,
9 1149:18,23
1150:16
1151:10,14,16,
17,20 1152:9
1156:24 1157:9,
12,24 1158:2,6
1163:13,20,21
1164:8 1165:17
1167:25
1168:16 1169:9,
13,19 1170:4
1171:24
1172:17,18
1173:7 1176:18,

24 1178:5,20
1179:3 1182:8
1183:15 1184:8
1194:2,3,22,23
1195:2 1196:3
1198:16,19
1200:12,17,21
1201:11,14,16,
18 1202:20
1204:23 1205:1,
2,4 1208:13,14,
16,17 1210:4,5,
17 1212:3
1217:14,17
1218:13,15
1221:8 1227:6
1230:16
1231:17,20
1232:5,24
1233:2,6
1234:3,22
1236:21,23
1237:14
1238:11
1239:21
1240:10,12,17,
24 1241:9,11,17
1242:9,10,23
1243:2,5,7,20
1246:24,25
1247:2,22
1248:15,16,22
1249:20,21
1250:1 1251:9,
22 1252:23,24
1253:3,4
1254:1,3,9,11,
12 1255:5,9,10,
12,13 1257:3,4
1259:2 1260:6,

7,12,15,16
1261:7 1262:4,5
1263:6 1264:23
1265:18,24
1267:12
1274:19
1275:14,17
1276:4,9
1277:14
1278:17 1279:4,
21 1280:11,13,
15,19 1281:12,
13,25 1283:11,
13,16,24,25
1284:3,4
1285:16 1286:8
1287:14
1288:10,19,20,
22 1289:18,20,
21 1291:14,15,
17,18 1297:21,
24 1298:12,13,
20 1300:8,9,16
1301:6,10
1302:12 1307:1
1308:3,12
1312:13 1314:2,
3 1315:20,24
1316:13,18,21
1319:9,20
1321:6,8,14
1322:24,25
1325:1,2,8
1328:10,
1330:11,21
1332:4,5,8,9,12,
13,21 1333:18
1335:19
1339:11 1340:9,
14,19 1341:20

1342:19,20,23,
25 1343:1,14
1344:21,22,25
1345:3,15,21

**corrected** 1181:8

**correction**
1181:3

**correctly**
1022:25
1040:14
1041:15
1042:16
1045:14 1048:4
1068:10
1072:14 1202:1
1215:3 1220:19
1318:11

**correlate**
1268:16

**correlates**
1158:13

**correlation**
1124:19 1166:8,
10,25 1201:8
1241:25
1242:17
1267:23

**corroborate**
1317:22
1344:13

**Cortisone**
1033:12

**cosmetic** 1128:2
1129:4

**couch** 1077:5

**cough** 1289:2,7

**cough-induced**

1289:1,16

**coughing** 1138:8 1159:23 1288:19,24 1344:11

**coughs** 1289:6

**could** 993:15 995:21 1003:3 1007:8 1009:19 1012:15 1014:18 1021:14,15 1023:19 1024:16,17,19 1039:4,6 1040:24 1042:3 1060:11 1062:13 1073:1, 22 1078:13 1081:22 1083:7 1084:16 1086:11,21 1087:11 1094:23,25 1099:22 1101:20 1107:6, 19 1109:24 1121:20 1124:21 1134:16,23 1135:13,14,15 1136:24 1137:1 1138:5 1139:15, 17,18 1141:25 1142:2 1143:9, 15,16 1144:18 1145:19 1153:8, 12 1154:4,8,16 1155:1,2,4

1158:9 1176:8 1182:17 1196:16,17,24 1197:19 1198:20 1199:5 1201:22 1202:13 1203:11,12 1204:9 1206:6 1215:24 1220:2, 13 1221:6 1231:22 1234:11,14 1242:4,15 1245:19 1248:24 1249:2, 22 1250:23 1251:8,10 1253:7,9,23 1254:2,8,18 1256:22 1261:12,13,20, 24 1262:2,22 1268:16 1269:1, 18,24 1272:12, 13 1273:10,20 1284:16 1286:4 1290:9,21 1301:12 1304:7, 9 1305:8,10,24 1306:10 1308:14 1311:1 1313:6 1319:13, 15,17 1321:4,20 1333:13 1334:15 1335:8 1336:20 1337:10,19 1338:4 1341:9 1342:5,8 1344:4

**couldn't** 1084:10 1252:3

**counsel** 984:5,14

**counted** 1257:18

**couple** 985:23 995:18 1346:8

**course** 999:18

**court** 984:6 987:2 1009:18

**covered** 1000:19

**covering** 1334:5

**cramping** 1222:13 1224:1

**crampy** 1222:7

**cranky** 1028:3

**cream** 1045:7 1103:3 1104:21 1106:14 1108:13,23 1250:4 1254:16 1265:4,7,13 1269:11

**create** 1006:17 1251:18 1329:11 1334:9 1341:8

**created** 1063:6

**creates** 999:10 1197:15

**Crestor** 1317:1 1321:7,10

**criticism** 1122:17

**criticisms** 1051:21 1052:4

**cross-linked** 1000:25

**cross-linking** 1001:1

**cross-reactivity** 1162:9

**cryptoglandular** 1060:4

**crypts** 1060:13

**cues** 1038:17

**cuff** 993:20 1002:11,21 1097:7,11,18 1098:15 1141:2 1142:22 1209:3, 6,9,14,19 1210:3,6 1211:13,16,17 1212:1,15,16 1214:9

**culture** 1148:10, 12,13,17,19 1149:15

**cultures** 1148:21

**cure** 1063:23

**curl** 1215:9

**curls** 1339:24

**current** 987:21 988:11 992:16 1050:6,7 1057:1 1061:21,22 1063:17 1065:23 1068:5 1088:8,10 1091:21 1130:2 1131:8 1149:20 1150:5 1195:4



1016:6 1018:7, 10 1105:12 1106:2,3,4,8,17 1107:25 1108:3, 23 1112:1 1326:6 1335:11, 17

**decided** 1227:19

**decision** 1083:1 1228:5 1229:7

**decrease** 995:14 1003:17 1014:7 1020:14,19 1074:25 1098:6, 16,19 1099:11 1210:19

**decreasing** 1098:13

**deep** 1312:4,6, 12,15

**deeper** 1003:15 1080:6

**defecate** 1138:13

**defect** 1214:4 1215:16 1216:15,19,25 1217:3,20

**defective** 1215:11

**defense** 1141:23

**deficiencies** 1124:5,8

**deficient** 1123:20

**deficits** 1322:2

**defining** 1128:8

**definitely** 1070:8 1099:10 1335:1

**definition** 1117:22 1149:9 1296:22

**definitively** 1069:11 1071:17 1119:8

**deform** 1215:12 1216:3,4,13

**deformation** 1047:24 1048:9 1121:12 1174:23 1215:12,17 1216:8,20 1259:6 1260:3 1274:2

**deformed** 1191:8,23 1213:6 1214:4, 15 1216:12 1219:18,25

**degradation** 1047:21 1121:11 1127:21 1259:6 1260:3

**degraded** 1191:11,21

**degrading** 1192:6

**degree** 991:2,5 994:7,10 996:3 1006:17 1117:2 1165:13,24 1183:19 1303:15

1329:11

**degrees** 1157:13 1164:18

**dehiscence** 1123:25 1141:2

**delay** 1039:6 1142:15

**delayed** 1011:18 1139:2 1142:9 1215:24 1259:5

**delays** 1001:1

**delivered** 1198:13

**deliveries** 1198:9,11

**delivery** 1337:12

**demarcator** 1252:17

**demographics** 1228:23

**denied** 1037:11

**denies** 1287:2

**dense** 1001:17 1006:7 1007:12 1332:7

**densely** 1008:3

**dep** 1308:6

**departs** 1303:20

**depend** 1004:20 1135:22 1203:17

**dependent** 1168:6 1247:24

**depending** 1080:2,12 1129:11

1134:25 1168:7 1175:25 1178:23 1297:4 1304:15 1328:22

**depends** 1004:12 1022:15 1036:14 1039:9 1081:24 1143:2 1162:25 1168:12 1173:6

**deployed** 1084:18

**DEPONENT** 1346:24

**deposed** 1186:4 1326:10

**deposition** 984:4,11,19 985:1,3,6,24 986:2,3,21 987:3,6,16 989:13,16 1009:1 1027:19 1028:1,14 1029:24 1031:1, 20 1032:10 1052:16,17 1066:19 1069:14 1071:22 1072:1 1084:4 1086:1 1091:2 1123:5 1130:14 1131:1 1150:12 1155:9 1180:22 1186:13 1187:4, 188:11 1192:14 1194:9

In Re: CR Bard 200    Bruce Rosenzweig M.D., Vol. IV    11/29/2014

1197:8 1218:2
1232:17
1240:21 1258:8
1259:9 1261:4
1275:3 1281:20
1303:7,12
1304:23 1315:3
1316:15
1346:22

**depositions**
986:7 1025:3
1028:5 1117:9
1155:19

**depressed**
1034:22
1138:18
1293:24

**depression**
1033:17,19,20,
25 1034:6,7,19
1035:7,11
1133:24
1156:21
1157:23
1158:11
1161:16
1164:19,20,24
1165:3,5,9,12,
13,19,22
1166:2,6,11,18,
23 1195:10
1200:2,9,11,16,
19 1201:5
1241:25 1242:5
1290:14,21,24
1291:3,5,8,10,
13 1292:6,8,11,
18 1293:7,8,19,
21 1294:3

**dermoid**
1329:10,15,21,
22

**descending**
1022:18

**describe** 987:20
1024:5 1126:3,5
1156:7 1188:14
1189:6 1195:3
1233:13
1279:11,15

**described** 985:2
1004:13
1020:11
1023:14,17,19
1046:8,9,11
1049:20
1051:18 1052:2,
9 1088:12
1127:10 1135:8
1136:4,21
1137:5 1157:16
1176:10
1180:16
1183:15
1184:22
1203:16
1204:22 1205:5,
9 1247:8
1252:20
1255:11,19
1257:24
1260:25 1279:6
1294:7 1316:2,
24 1323:5
1331:4 1344:6

**describes** 1006:2
1151:15 1182:4
1247:12

**describing**
1038:3 1050:18
1056:23
1076:16
1182:11
1183:12,20
1193:16
1203:21
1221:19 1247:5
1252:19

**description**
1019:11,12
1075:13
1157:15
1189:13
1190:16

**designed**
1212:19

**desire** 1246:16
1261:22 1262:7

**Despite** 1212:13

**detach** 1098:12

**detachment**
1073:16

**determine**
1029:25 1040:3
1117:1 1165:9
1182:16,18

**determined**
1030:7 1203:19
1326:3

**Detrol** 1042:18
1044:4,7,14,16

**develop** 1039:4,7
1060:16 1083:7
1095:22 1135:3,
6 1143:23
1153:2 1185:21

1201:5 1266:22

**developed**
1044:11,12
1058:1 1061:6
1115:20,22
1119:19
1159:16 1179:7,
8 1276:20

**developing**
1127:20

**develops** 1056:5

**deviation**
1015:21
1228:13

**device** 1136:14,
15 1217:20

**diabetes** 1033:10
1037:15,16
1038:1,12,21
1039:10,11,12,
14,16,18,21
1040:3 1041:4
1050:13 1051:9
1057:16,22,23
1058:9 1059:10
1060:3,14,20
1061:13,16
1144:23
1167:24 1168:1,
2,3,7,11 1290:8

**diabetic** 1039:18
1040:20
1168:15 1290:9

**diagnose** 1288:8
1296:11,16
1326:23

**diagnosed**
1021:18

1022:22
1023:11 1024:3
1069:11 1105:1,
7,20 1109:13
1114:7,9,10
1147:19,22
1151:18
1196:11
1197:23,25
1209:14
1211:12
1218:17
1236:25 1254:7,
10,14 1342:13

**diagnoses**
1320:9

**diagnosis** 998:5
1144:9 1147:24
1149:16
1199:24 1219:5
1225:12
1248:13,22
1249:3,5
1320:22 1321:2
1326:16,20
1327:2

**diagram**
1294:19

**diamond** 1016:3,
9,15,17,21,25
1020:12

**diaphragm**
1058:7 1174:4,6
1175:2

**diarrhea**
1151:24 1152:3
1154:18
1234:10,17
1235:5

**diazepam**
1317:1 1319:18
1320:16

**didn't** 990:11
992:6 993:1
1032:4,19
1034:15 1038:4
1058:18
1059:17
1060:16 1063:1
1064:2,6 1076:4
1099:20 1104:7
1114:25
1121:18
1135:23 1136:4
1137:10 1139:3
1142:22
1181:12
1191:17 1198:2
1202:25 1211:4
1213:9 1217:16
1221:15
1248:12 1256:7
1265:13 1269:7,
14,22 1271:2,9,
15,19 1272:1,12
1311:24
1320:20
1338:16,25
1339:5,18
1342:8 1344:1,
23

**diet** 1199:12
1342:7

**difference**
1016:21,23
1170:22 1334:4

**different**
1017:11 1019:4

1024:17
1026:13
1035:21
1039:15
1048:12
1049:13 1054:3
1068:17 1073:2,
21 1075:18
1082:19
1101:25 1111:3
1121:2 1128:16,
17 1144:9
1160:5 1168:1
1173:16,20
1174:3 1180:2
1196:21
1199:14
1223:16
1250:14 1251:2
1267:6 1277:16
1282:3 1292:18
1293:19,23
1297:20
1331:19 1335:8
1336:10
1338:14
1341:10
1342:11
1345:23

**differential**
1219:5 1225:12
1320:8,22
1321:2

**differentiate**
1182:13

**differentiating**
1200:15

**differently**
1309:10,19

**difficult** 1004:11
1034:3 1039:12
1085:5 1136:1,3
1147:13
1165:25
1242:15
1246:18 1291:3
1333:13

**difficulties**
1038:1 1051:25

**difficulty** 1139:8
1158:21
1234:18
1318:23 1319:6

**dilated** 1256:23

**dilating** 1164:6

**dimensions**
1020:24

**direct** 1070:20
1189:12,13
1292:10

**directed** 1104:11

**directing** 1277:6

**directors**
1192:15

**disagree** 1056:2
1059:22
1060:10 1069:9
1127:24
1128:12,14
1129:3,15
1142:4 1310:16
1311:6 1331:18

**disappear**
1011:17

**disarticulated**
1097:14

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

**disc** 984:3
986:13 1091:10,
12 1131:1
1134:5 1154:6
1155:19
1194:17
1232:25
1275:10

**discard** 1219:6

**discarded**
1219:8

**discharge**
1060:7 1101:11
1140:5 1316:10

**disclosed**
1123:15

**discomfort**
991:23 1141:14
1164:5 1184:21
1247:4 1261:25
1262:2 1287:10
1310:14,21
1311:1 1329:17
1334:9

**discuss** 993:1
1023:19 1064:2
1313:22
1314:10

**discussed** 993:1
1002:18
1047:14 1052:6
1063:24 1130:1
1174:6 1247:3
1249:7 1261:4
1268:9 1298:15
1313:16,17,
1321:19
1323:22

**discussing**
1270:10
1313:25

**discussion**
1092:12
1144:24
1205:21 1206:7
1226:19 1229:3
1231:4 1265:20
1268:10

**disease** 994:10
1035:4,7
1061:24,25
1062:9 1077:11
1099:8,10
1145:5,6
1156:11,13
1280:10,21
1288:15
1321:22,23
1322:5

**dismissing**
1119:14

**disorder** 990:6
1132:10,11,12
1133:1 1135:4,
17 1144:19
1145:9 1156:14
1253:1

**disorders**
1039:16 1113:4
1145:11,15,
1326:18

**disregarded**
1309:3

**disrupt** 1142:14

**disrupted**
1137:15,17

**disrupting**
1137:16

**disruption**
1098:18

**disrupts** 1136:15

**dissect** 1004:1
1073:10

**dissected**
1009:24 1010:4

**dissecting**
1003:19,20
1070:14

**dissection**
1003:9 1004:11
1073:5

**dissipated**
1313:1

**dissolvable**
1012:1

**dissolve**
1304:11,
1305:16
1306:21

**distal** 1072:16
1076:22
1077:19 1078:7
1197:9

**distend** 1074:4,
5,7

**distended**
1075:7

**distinguish**
1267:10

**distinguishing**
1044:25

**distortion**
1308:14

**diuretic** 1320:15

**diverticulitis**
989:23 1021:9
1022:2,3,4,15,
23

**diverticulosis**
989:23 1021:9,
24 1022:2,4,16

**diverticulum**
990:2 1059:13

**divulge** 1029:12

**doctor** 985:14
987:20 1006:21
1009:18 1021:1
1024:21
1028:25 1031:5
1032:16
1052:10
1056:20
1066:23
1106:20
1127:16,19
1129:3 1156:7
1184:6, 1185:7
1192:5 1194:20
1207:10,24
1215:20 1218:1
1226:6 1227:1,
15,19,22
1228:6,17
1229:8 1232:21
1264:25
1268:19
1269:13
1271:17,21
1275:7 1298:15
1303:2 1309:12
1315:9 1326:10
1344:9 1346:17

**doctor-patient** 1065:24

**doctors** 1074:24 1180:19 1231:8

**document** 1054:24

**documentation** 1108:16 1273:9 1345:11

**documented** 1094:17 1143:7 1184:3,12

**documents** 1043:14 1054:20,21 1117:8 1192:14

**doing** 1002:8 1007:25 1008:2 1012:11 1040:20 1070:8 1073:5 1080:15, 19 1085:14 1096:21 1099:11 1102:12 1114:16 1159:10 1164:5 1178:1 1190:3, 12 1203:3 1214:9 1227:25 1228:18,19 1231:17 1251:10 1298:16,19 1304:5,18 1309:10 1329:3

**done** 994:9 1003:10

1014:19 1015:24 1018:19 1019:5, 7 1030:21 1040:10 1041:3, 6,9 1042:1,9,10 1044:2 1051:22 1073:5 1082:4 1090:1 1100:4, 7,8 1101:24 1122:14 1136:9, 13 1142:7 1163:15 1172:16 1176:1, 4,23 1183:9 1206:5 1213:13 1228:5,17 1230:7 1250:14 1251:24 1262:1 1275:13 1295:8 1302:18 1343:15,17,20 1344:16 1346:7

**dose** 1161:15 1162:17 1245:15

**doses** 1162:1

**doubt** 1107:23

**Douglas** 1005:8

**down** 990:8 1002:21 1009:15,19 1017:2 1038:18 1049:17 1051:6, 8 1058:11 1061:2 1063:7 1068:13 1100:5 1118:25 1148:14

1160:10 1185:4 1193:16 1195:13 1204:4, 16 1210:19 1213:1,20 1214:8,22 1215:6 1222:12 1223:15,18,22, 23

**downward** 1293:6

**dozen** 1222:25

**Dr** 984:4,11 1005:6 1006:2 1007:7,14 1014:3 1016:24 1020:22 1031:20 1032:10,14 1042:25 1043:20 1053:2 1055:13 1069:14 1075:15 1076:2, 4 1082:1 1084:25 1089:15 1092:1 1093:19 1095:2 1114:16 1121:25 1125:8 1126:12 1127:1 1137:25 1138:1, 16 1139:25 1140:14 1144:12 1146:8 1147:16 1148:15 1150:1 1184:17 1185:8 1186:2 1202:16

1206:7 1208:20, 21 1209:1,13 1212:6,7,10,11, 24 1217:8 1220:20 1226:22 1230:12,21 1260:5 1281:19 1298:15,18 1302:14 1303:5 1307:2 1309:22 1310:11 1325:25 1326:3, 8,12 1331:7,23 1332:15,17 1341:4 1344:5 1346:22

**drafted** 1186:25

**drain** 1077:8

**drainage** 1322:10

**drained** 1051:6, 7 1079:11

**draw** 1058:13

**drawing** 1144:22

**Drie** 1005:6,8

**drinking** 1196:22 1254:6

**drop** 1268:2

**drug** 1159:4 1163:1

**drugs** 1161:6 1244:11,18

**drunk** 1341:3

**due** 994:2 996:16,24 1002:4 1017:22

1030:8,13
1093:10
1096:14
1110:23,24
1111:7,8
1119:22
1152:13 1154:7
1156:14 1165:3
1167:17
1177:18
1183:22
1184:19,21
1190:6 1196:17,
19,24 1198:20
1212:1 1230:10
1245:1 1260:2
1296:11
1299:12
1308:13
1311:12 1312:6
1339:14

**duloxetine**
1161:13

**duly** 985:10

**during** 988:25
1008:19
1045:15
1065:16 1074:8,
14 1076:10
1186:13 1197:7
1204:19 1217:6
1261:15,21,25
1272:7 1278:5
1299:24 1302:7
1303:14
1311:20 1327:7
1333:14
1334:10,11,12
1341:14,15,24

**dysfunction**
1124:22 1125:1,
14,15 1128:5
1129:7 1167:5
1185:1,2,19,21,
25 1186:7
1303:16
1335:21 1336:7,
23 1337:2,20
1339:9

**dysfunctional**
1088:4,14,21

**dysfunctions**
1259:19
1260:10

**dysmenorrhea**
1326:2

**dyspareunia**
987:22 988:13
989:5,8,9,17
990:7,18 993:6,
11,19 994:7,12
995:4 996:5,15,
22 999:4,25
1000:2,7
1011:4,14,21
1012:6,16,25
1033:21 1034:3
1037:10 1060:8
1068:6,15
1086:22 1087:3
1088:11
1090:10
1091:22 1097:5,
22 1098:4,17
1106:3,5
1116:16
1125:13,15
1127:3,16

1129:17
1131:10
1134:17,19
1145:21
1149:20,25
1150:13,17,21
1151:1,4,9
1166:12 1167:1,
6,13 1169:18
1170:1,19,23
1171:4,7,16
1172:4,11,22
1173:2,5
1174:16
1204:10
1208:16
1218:13,24
1219:4 1224:15,
19 1233:15
1234:5,12,13
1242:12 1247:5,
7 1249:10
1250:23,24
1251:7,15
1257:22 1258:2
1263:5 1264:13,
21 1265:16
1268:4,6,14,24
1269:2, 1271:4,
7,10,11 1272:6
1276:3,12,20,24
1277:11,21
1279:15 1284:9
1301:21 1312:4,
6 1313:18
1316:9 1326:7
1335:16
1336:18,20,25
1340:8,16

**dysplastic**
1144:10

**dysuria** 1131:11
1148:16
1149:14,22
1233:19,22,24
1234:5,24
1235:9,10,11,
20,23 1236:4,6
1237:10 1254:2
1264:13 1273:6,
19

------

### E

**each** 986:8
1024:23
1032:11
1039:18
1051:14 1167:6
1187:15 1219:2
1320:12

**ear** 1321:23

**earlier** 991:18
1000:3 1005:18
1034:9 1107:3
1109:5 1125:16
1149:19
1157:16
1165:11 1168:6
1170:5 1174:7,9
1176:10 1180:4
1203:8 1206:11
1226:16 1234:8
1265:3 1297:15,
23 1323:22
1340:10,11
1342:6

**early** 1106:19

1140:22
1141:12,15,16,
24 1142:9,10
1156:16
1212:23

**easier** 1043:17
1092:13
1243:16

**easy** 988:10

**eating** 1196:22
1254:6

**eddy** 1197:15

**edge** 1255:21,23

**effect** 1133:7
1161:21
1162:14,18,20
1320:13 1321:5

**effectively**
1037:21 1038:6

**effects** 1057:16
1119:1 1158:8,
11,23 1159:12
1161:13 1244:4
1245:5 1294:24
1300:10
1318:16,22,25
1319:3 1320:1
1321:10,12,15,
19 1346:4

**effluvium** 995:9

**effuse** 1072:18
1077:21

**eight** 1053:15
1054:6 1064:23
1212:7 1215:20,
21 1216:4
1217:9 1306:22

**either** 1025:6
1053:7 1055:8
1078:14
1126:17
1136:14
1143:10 1162:8
1180:15 1202:4
1229:6 1249:23
1262:15 1289:8
1306:18
1336:11
1345:18

**elaborate**
1173:23

**elective** 1297:18

**element** 997:7
1139:19
1287:10
1291:11

**elevated** 1037:20

**elicit** 1123:24
1272:1

**elicited** 1312:9,
14

**elicits** 990:16

**eloquently**
1180:21

**else** 1062:13
1077:6,8
1094:21,24
1100:23
1152:19 1157:5
1179:4 1220:7
1224:9,12
1233:21 1235:9,
14 1236:2
1240:7 1245:8
1272:19,20,23

1290:5,11
1301:19 1322:6,
14 1326:22
1337:9,13,15,
19,23

**elsewhere**
1283:4

**elucidated**
1186:12

**elucidating**
1177:1

**emotional**
1068:16
1261:19 1262:7

**emotionally**
1262:6

**employees**
1192:14

**emptied** 1074:2

**empty** 1074:10
1132:5 1234:15

**emptying**
1139:20
1158:21
1161:25 1163:5
1193:22
1195:12
1234:19,20
1237:23
1257:14
1258:23
1264:12

**end** 1153:24
1197:9

**end-stage** 1328:6

**ended** 1142:24

**ending** 1283:12

**endings** 1282:16
1283:11,14

**endometrial**
995:12,14
1134:12
1203:10

**endometrioma**
1202:14

**endometriosis**
994:4,11,13,17,
19 995:5,7
1202:15,16,22
1203:1,3,5,7,11,
13,18,19 1219:9
1240:14,20
1241:2,7
1250:19
1268:17
1272:20 1274:7
1329:8 1330:1

**endometrium**
994:22,23
1169:2 1332:8

**endopelvic**
1305:21

**engage** 1167:1

**engaging** 1191:6

**England** 1171:3
1343:6

**enough** 1087:8
1104:10
1114:19
1144:10
1184:20 1201:8
1221:9,12
1334:8

**enter** 985:19
1032:2

entering 1065:24

enterococcus 1062:16

entire 1015:5 1222:23 1257:22

entirety 1276:5 1316:19

entrapment 1126:17

entries 985:23

Epidemiologic 1110:14

episode 1278:25

episodic 1234:13 1325:23

episodically 1152:20

epithelial 1110:7 1113:6

epithelium 1003:22 1079:6, 25 1080:2 1081:13 1106:20 1107:4, 6,19 1111:14 1118:25 1120:11 1209:21 1256:20 1306:23 1333:24

eroded 1219:18, 25

erosion 987:24 988:14 989:1 996:25 1001:9,

14 1003:18 1006:3 1010:8 1015:10 1044:13 1051:4 1063:10 1091:22 1105:7, 15 1115:18,20 1116:8,16,17 1119:19,20 1120:7 1127:3, 15 1141:17 1142:11 1191:16 1224:23 1330:12

erosions 1113:19 1114:23 1115:17 1119:11 1121:10,14 1141:23 1192:19

essential 1322:8

established 1308:4

Estrace 1108:22 1254:16 1265:3 1269:10 1271:9, 12,15

estrogen 995:13 1045:7 1103:3, 18,21,22,24,25 1106:14 1108:13 1109:6, 11,18 1111:12 1250:4 1265:7, 13 1267:24,25 1269:21 1271:2

etcetera 1055:18

etiology 994:17 996:5 1021:17 1039:16 1323:14

evacuate 1246:18,20

evaluated 1128:13 1185:24

evaluation 1126:4,6 1128:7 1193:25

even 1000:24 1002:14 1006:6 1012:10 1029:13 1039:20 1042:5 1047:7 1055:4 1075:11 1081:3, 12 1090:3 1101:9 1117:15 1150:10 1151:11 1154:5 1164:3 1214:6 1223:8 1254:7 1256:12 1258:25 1271:24 1304:15 1309:16 1334:11

event 1059:11 1083:5 1171:22 1323:23

events 1050:18 1059:16 1060:24

1259:14

eventually 1195:19 1336:21

ever 994:13 1003:24 1006:10 1007:21 1022:22 1029:4 1069:11 1147:19 1177:2 1222:15 1230:20 1326:23

every 1028:14 1035:8 1052:14 1054:13 1074:21 1081:7 1086:14 1093:11 1141:23 1251:20 1263:18,20,25 1279:16

everything 986:8 989:12 1043:21 1106:13 1121:16 1194:24 1234:20 1240:6 1275:21 1326:22 1338:10

everywhere 1117:25 1132:20

evidence 1059:17 1114:21 1144:3

1202:14 1213:9
1343:3,9,22

**evidencing**
1067:8

**evisceration**
1142:25

**exacerbating**
1247:20

**exact** 1003:4
1004:9 1020:23
1021:17
1023:13
1041:18 1042:2,
23 1054:9,13
1057:24
1080:10 1105:3
1132:1 1177:12
1188:10
1193:24
1198:10 1250:8
1330:17

**exactly** 990:19
1008:18 1009:8
1022:23
1023:18 1024:8
1041:10,24,25
1042:3,10
1045:17
1176:22 1177:1,
8 1182:9
1183:17
1195:12,14
1197:12
1216:11 1238:5
1304:21 1305:6

**exaggerated**
1049:8

**exam** 988:22

990:14,21
991:13,24 992:3
994:20 1017:17
1024:18
1045:21 1046:6,
17 1049:22
1065:16 1068:1
1105:13
1107:12,16
1108:2 1109:14
1139:9 1167:19
1176:23
1183:14,25
1184:3,4,12
1189:3, 1192:5
1263:8 1264:19,
24 1265:19
1269:8,16
1270:3,4,5,11,
16 1271:18,24
1272:2,7
1273:24
1275:13,16,19
1278:5 1311:10,
14,16 1314:9
1327:4,6,7,8
1334:12 1343:3,
10 1344:2,12

**examination**
985:12 999:7,20
1089:1 1117:4
1146:8 1176:15
1194:22 1226:8
1227:2 1264:18
1270:20
1275:22 1277:7
1316:16

**examined**
985:10 1311:21,
23 1312:7

**examining**
1025:8

**example** 1044:3
1051:12
1117:16
1320:20

**exams** 1180:15,
20 1185:23
1225:17

**exceedingly**
992:5 1035:1
1085:5 1087:15,
20 1169:14
1221:17
1280:23 1283:6
1334:22

**Excellent** 1126:9
1131:5 1189:25

**except** 993:25
1013:18
1059:19 1130:1
1224:3

**excess** 1070:4
1093:22
1126:17
1213:11

**excessive**
1049:11 1301:8,
13,14 1307:13,
14 1311:12

**excise** 1020:21

**excised** 1020:22
1340:3

**excising** 1179:9

**excision** 1063:13
1106:16 1107:9

**excluding**

1326:22

**exclusion**
1147:24
1326:16

**excreted** 1077:9

**excuse** 1001:20
1011:13
1078:24
1084:11 1106:4
1108:3 1135:9
1150:2 1196:24
1200:13
1213:14
1263:11
1273:12

**exempt** 1283:7,
10

**exhausted**
1207:22

**exhibit** 985:6,19
986:1,16,21,25
987:6,16
1031:1,11
1066:19 1072:1
1091:2 1122:24
1123:2,5
1130:14,24
1155:9 1181:24
1194:9,17
1195:1 1226:13
1232:17,23
1259:9 1275:3,9
1304:23 1315:3,
11

**exhibits**
1155:15,17

**exists** 1107:17
1277:5

exit 1179:21

expect 994:7
1002:3, 1076:16
1081:20 1101:2
1112:6 1134:15
1135:9 1145:25
1225:14
1324:11,18
1328:25

expected 993:12
1070:5 1303:16

experience 991:7
993:21 998:18
1003:25 1012:5
1034:11,21
1107:3 1117:7
1124:18
1126:12,15
1132:21
1133:11
1165:13,20
1172:14 1179:4
1187:20
1192:13 1201:2,
9 1210:12
1261:15
1277:24
1293:16

experienced
1022:20
1059:25
1166:12
1168:19
1222:13
1278:19

experiences
1012:6

experiencing
1171:16

1173:17
1174:20
1175:14,19
1176:13
1187:18
1188:24 1247:6
1283:4 1284:3
1299:5 1331:3

expert 985:16
1014:4 1029:11
1059:21 1125:9
1141:23
1155:18,21
1184:15
1208:19
1213:24
1215:15
1226:14
1336:17

expert's 1126:7
1213:25 1265:6
1310:23
1336:14,25

expertise 1036:5

experts 1142:3

experts' 1005:3

explain 1007:1
1024:7 1186:5
1193:3 1226:16

Explained
1138:3

explains 1089:20

explanations
1341:6,10

explant 1001:25
1005:18
1006:12,16
1046:13

1064:11
1114:14,16
1115:25 1116:4

explantation
1117:13

explanted
1058:3

explanting
1008:12
1114:19

explore 1290:7

explored
1184:25

exposed 1047:8
1120:18,23

exposing
1014:16

exposure
1050:23 1051:2,
1106:17 1120:7,
9 1141:17
1217:23 1330:4,
24 1336:19

exposures
1330:25

expound
1034:24

expounding
1035:1

express 1055:8
1166:21
1293:10

expressed
1213:15

expressing
1055:21
1345:13,20

extension
1084:17 1147:3

extensive
1007:6,11
1008:5 1019:2
1080:3 1087:6
1088:1

extensively
1061:7

extent 989:13
1007:19
1032:24 1056:4
1121:19
1165:16 1277:7
1285:17
1290:14

external 1143:21

externus
1128:19

extremely
1277:23 1278:7

extremities
1282:20

extruding
1047:8

extrusion
1003:21
1050:15 1105:9
1141:17

eyes 1077:13,14

---

F

---

fact 989:11
991:14 993:19,
25 1001:8
1011:24
1012:17

Case 2:12-md-02327   Document 7925-1   Filed 04/19/29   Page 786 of 229 PageID #: 213592



1063:9

**finally** 1051:7 1063:4 1330:21

**find** 988:10 998:6 1004:9 1051:24 1059:6, 7 1062:15,19 1076:4 1117:11 1148:25 1159:21 1167:18 1189:10 1211:5, 7 1221:17 1239:10 1250:13 1283:6 1284:18 1307:14 1323:13 1334:22

**finding** 1073:7 1077:3,12 1107:16 1109:14 1211:19 1328:6 1333:10,11,15

**findings** 1072:6 1076:20 1107:12 1184:22 1327:4, 10,16,19 1328:3

**finds** 1006:6

**fine** 987:4,11 1028:3 1070:22 1263:24 1322:1

**finger** 990:24 991:12,24 1006:5 1017:17, 18 1084:11,17

**fingers** 1322:2

**finish** 1007:1,5 1044:2 1054:15, 17 1055:4

**finishing** 1214:18

**firing** 997:21 1133:6 1283:12 1284:2

**firm** 1026:13

**first** 985:10 1000:11 1001:15,18,25 1002:23 1005:17,18 1006:12 1007:10,12 1028:1 1051:6 1072:7,23 1075:11 1079:5 1084:11 1086:6 1105:24 1106:12,24 1107:11,24 1115:18,22 1116:4 1131:25 1132:15 1142:21 1159:9 1175:20 1178:14 1181:10 1198:13,18 1205:14 1228:9 1229:15 1250:18 1254:13 1260:8 1276:22 1291:2 1308:22 1310:2,

4,6 1330:18

**fish** 1197:13,16

**fistula** 1083:8 1086:19,21

**five** 1026:25 1027:1,3 1067:9, 1095:23,25 1100:21 1101:7 1102:4 1127:6,7 1128:16,17 1138:23 1155:4 1225:23 1334:7

**fix** 1264:10

**fixed** 1075:17,20 1341:7

**flank** 1222:1

**flashes** 1095:23

**flat** 1101:8 1217:9,12

**flattening** 1107:1

**flight** 1030:22

**floor** 996:21,24 997:2 999:9,11, 15 1001:10 1011:11 1015:19 1024:11 1124:22,25 1125:14,15,17 1126:3, 1128:5, 6,18,24 1129:7, 14 1152:10,13, 25 1153:1,3,9, 13 1185:1,2,19 1186:10 1262:24

1273:25 1335:21 1336:7, 23 1337:1,7,9, 18,20,21 1338:2,7,19 1339:9

**flow** 1041:23 1042:11 1137:14,17 1264:3

**fluctuate** 1151:24

**fluctuating** 1154:17

**fluid** 1070:4 1075:1,2,7 1081:15 1210:1 1345:9

**focus** 1065:21

**fold** 1081:10 1213:12 1216:19 1217:5, 7,19

**folded** 1213:7 1214:3 1216:22 1217:10

**folding** 1212:22

**folds** 1107:1,2 1216:17,24

**Foley** 1075:11 1089:22 1090:3

**follow** 1061:15 1107:6 1117:18 1225:17 1309:16

**follow-up** 1041:2 1043:24

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1127:18

**followed**
1041:14
1061:18
1309:14,15
1330:13

**following**
1034:16 1041:3
1102:13
1107:18
1170:19
1171:14
1172:23 1227:8
1231:24 1266:3
1326:6

**follows** 985:11

**food** 1113:3
1168:22
1198:23

**foods** 1196:21
1198:24 1254:5

**footnote** 1316:15

**foramen**
1084:13,16
1085:22

**foreign** 1001:7
1002:15
1047:22 1048:9
1060:25
1116:17
1123:24
1127:21 1191:9,
22 1259:7
1260:4 1337:25
1338:3

**foresee** 1102:6

**forget** 1028:7

**forgive** 1017:15
1163:23

**forgiving**
1246:12

**form** 984:22
998:23 1007:24
1014:12
1019:20
1023:22
1034:13
1035:22
1053:12
1075:10
1082:19 1087:4,
13 1109:3
1110:4 1165:6
1166:15 1167:2
1184:9 1189:8
1190:7 1191:2
1192:21
1200:22
1205:16 1206:3,
20 1207:13
1208:3 1209:11
1213:21
1214:24 1215:4
1216:23 1218:6,
14 1219:7
1220:24 1221:4
1229:1,16
1231:1,7,18,23
1237:13 1238:3,
16 1240:23
1242:1,13
1243:8,24
1244:19 1248:1
1249:11,25
1252:5 1255:16
1257:9 1258:3
1261:2 1263:13,

17,19 1264:9
1265:17
1266:15 1268:7
1269:15
1270:18
1291:23 1292:6
1296:7 1309:6

**format** 986:11,
13

**formation**
1048:11
1062:18
1174:23

**formed** 1005:20
1006:8 1053:4
1054:22

**former** 1314:8

**forming** 1209:22

**forms** 1215:7

**Forrest** 1148:15

**forward** 1071:3
1333:7,8
1335:10

**found** 990:13
999:6 1001:17
1006:18 1007:6,
10,11,19 1008:6
1011:15 1044:3
1058:10 1061:9
1063:8 1107:20
1114:16 1124:5
1159:14
1192:22
1217:10 1269:4
1309:25
1339:12

**foundation**
1087:5,14

1109:4 1165:7
1167:3 1189:9
1190:8 1191:3
1192:11
1201:24
1206:21
1207:14 1208:4
1209:12
1213:22
1214:25 1218:7
1225:19 1229:2,
17 1231:2,24

**four** 1012:3
1096:14
1100:21 1101:7
1102:4 1128:17
1140:9 1167:4,6
1198:9 1222:23
1257:2

**fourchette**
1006:7

**fracture** 1337:12

**frame** 1125:3
1216:5

**France** 1098:10

**frankly** 1207:9

**free** 1034:25
1233:9

**freeing** 1009:16

**frequency**
1068:11
1185:20 1253:6
1261:11
1307:24
1316:11
1319:12
1320:16 1325:5,
14

**frequent**
1095:22 1170:8
1238:23
1266:11 1279:3,
12 1323:4,6,9,
11,14,17,24
1324:5,7

**frequently**
1030:11 1062:1
1087:24
1097:23 1321:1

**from** 985:21
988:1,4,6
994:20,21 996:9
1005:1 1009:11,
16,24 1010:4,7
1017:12
1018:15
1020:24 1021:2
1026:12,15
1036:6 1038:13
1040:17,18
1042:11 1043:7
1045:2 1046:20,
24 1048:12,22
1049:13,17,24
1052:1 1054:3
1059:12,21
1060:20 1062:1,
2,10,21 1063:4,
18 1064:1
1065:9,12
1070:13,18
1073:1,20
1077:8 1082:9,
11 1085:25
1087:12
1095:18
1097:14 1113:2
1115:20

1118:23 1121:2
1124:23 1126:7,
17 1127:1
1135:7,21
1136:25
1137:14,23
1140:13
1141:21
1147:14,24
1150:25 1151:9
1153:19 1154:5,
15 1158:8
1166:23 1169:5,
18,19 1170:1
1172:11
1173:17 1174:8,
16,17,18,21
1175:1,4,15,19
1176:22 1177:1,
19 1179:1,5,7,8,
23 1180:3,16,
1182:17
1183:21 1185:4,
15 1186:14
1191:12
1193:16 1197:8
1199:10
1200:16 1203:1,
13 1204:2,7,15,
16,21 1205:23
1214:8,23
1219:14,19,24
1220:8 1235:6
1238:4 1242:3
1244:14,15
1245:1 1247:8
1251:5,15
1252:17,22
1254:5 1256:20
1258:10,12

1259:5 1265:19
1267:6 1276:8
1277:17
1279:18
1281:15 1282:3
1290:9 1292:13
1293:7 1294:24
1295:6,9
1296:14
1297:12
1300:18
1303:20
1310:22
1322:13
1323:10,18
1325:20 1329:8
1330:1,5
1331:19,23
1334:4 1335:17
1339:25 1344:5

**front** 1018:20
1019:18 1031:8
1041:24

**fugax** 1154:10
1339:4

**fulcrum** 1057:21

**full** 989:25
1106:9 1168:3
1209:4 1213:20
1245:16 1246:2,
19 1275:10

**function** 999:13
1194:2

**functioning**
1186:11

**fund** 1333:1

**fundoplication**
1092:19

**funneling**
1238:19 1304:3

**funnels** 1223:22

**further** 995:12
1055:25
1065:19 1066:1
1119:3 1121:11,
14 1139:25
1227:2 1251:4
1301:5 1305:4,
18,20 1346:24

**future** 1314:13,
17

---

**G**

**Gabapentin**
1244:6,12

**gain** 1109:20
1166:3

**gained** 1129:10

**gait** 1153:2,5

**Galis** 1147:16

**gallbladder**
1092:20
1294:15,16,17,
23 1295:6,12,16
1296:3,6

**gallbladders**
1295:8

**gastritis** 1124:13

**Gastroesophagea**
**l** 1253:1

**Gatherum**
1202:16 1206:7
1209:1,13
1212:6,11,24

1217:8 1226:22

**gave** 1064:23
1140:2 1181:19
1188:20 1189:1
1297:25
1312:11

**general** 984:17
985:3 990:22
998:14 1050:16
1064:23
1067:17
1122:10,21
1132:3 1201:25
1229:21 1241:6
1281:18 1298:1
1322:18

**generalized**
991:22 1126:20
1132:19 1146:5
1282:17,19

**generally**
1024:22 1097:7
1132:15
1223:19
1281:16
1282:17

**generic** 1317:25

**GERD** 1252:22,
25 1253:5,10
1254:7 1256:4,
7,10, 1273:12
1274:7 1285:15,
18,22,25
1342:11,13

**get** 985:19
987:10 990:24
991:11 995:7
1004:9,16

1012:7,9
1017:17 1022:7
1027:12,
1028:16
1029:19
1030:21
1034:15
1036:19 1040:6
1041:7 1047:15
1065:22 1077:7
1079:5 1080:3,9
1086:19
1087:11
1088:21 1093:6
1101:4,7,13
1103:10
1104:14
1105:18
1110:19
1111:13,16,17
1115:1 1121:25
1122:1,20
1129:1 1135:7
1136:3 1137:21
1154:18
1156:17
1157:21
1160:13
1161:18
1162:14 1163:2
1165:18
1169:20,22
1173:2 1174:8,
24,25 1175:10
1179:19 1180:2
1181:9 1196:18
1197:17 1204:7
1205:22 1208:8,
19 1215:8
1221:11,12

1236:9 1238:18,
24 1242:3
1245:6 1252:13
1253:7 1266:9
1276:14,24
1277:1 1286:25
1287:2,24
1292:19 1305:7
1308:5 1310:23
1324:20
1330:17
1331:21
1334:24
1340:15

**gets** 1001:2
1002:23
1003:14
1016:22
1038:14
1222:17,18,20
1224:1 1250:7
1253:22
1256:23
1299:15
1328:24
1332:25

**getting** 1028:3
1040:16
1067:23
1101:12 1116:7
1178:11 1197:6
1211:16
1325:17

**GI** 1317:12,13,
16 1318:9,12

**Giddes** 1066:4,8

**give** 989:24
991:6 994:7
1008:17 1019:8

1025:9 1036:5
1038:17
1065:25
1084:24,25
1085:1 1110:7
1135:2 1144:21
1145:23,24
1160:17 1161:2
1171:20
1172:19
1182:25 1185:3
1189:24 1190:1
1193:23
1210:18
1254:20 1271:1
1279:5 1339:19

**given** 984:17
1040:4,5
1102:19
1106:13 1186:4
1189:12
1210:23 1211:5
1240:19 1271:9
1281:19
1282:11 1309:9
1337:23 1346:3

**giving** 1027:23
1189:13 1256:9

**glad** 1064:14
1288:2

**gland** 1134:10
1256:21

**glands** 1256:21

**global** 1014:19
1015:9,12

**glomerulations**
1327:18

**glycogen**

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1267:17

**go** 1024:13
1026:18
1040:12
1043:17 1044:1
1058:18
1060:14
1068:18
1069:20
1070:10 1071:3
1073:13
1074:18
1076:11
1077:25 1082:8
1083:2 1085:11
1087:5 1089:4,
6,8 1090:12
1092:9 1094:2
1101:21
1103:15
1107:22
1110:16,22
1115:8 1116:11
1117:6,21
1120:16,20,25
1121:7 1122:12
1123:22 1125:2,
6 1127:16
1129:8 1130:9,
20 1134:18
1140:7,25
1142:17
1143:13
1145:22 1149:2
1153:11
1154:24 1155:3
1156:1 1163:7
1164:9,21
1165:4,7
1166:14 1167:3,

15 1170:12
1172:6 1173:9
1174:2,3
1176:17
1177:15
1181:24
1182:21 1184:9
1187:14
1188:18
1193:10 1194:4
1195:13 1197:8
1205:16
1206:21
1209:12 1218:7
1224:18
1229:17
1231:18 1232:8
1233:12
1240:16 1244:4
1246:16
1250:18
1296:20,25
1319:2,11
1336:16 1341:5
1346:7

**goes** 995:10,20
1071:1 1079:10
1137:14 1156:4
1158:18 1185:4
1187:22
1188:16 1204:2
1212:10
1223:15,23
1262:17
1264:20
1299:16 1301:3
1332:15,25

**going** 992:7,23
996:19 1001:5
1006:17,18

1008:1,4
1009:23
1011:17 1014:6
1025:13
1026:18
1027:12
1030:23,24
1040:21
1053:20 1056:3
1067:7,9
1069:13
1070:10
1073:11
1075:12
1076:15
1078:19,21
1079:19 1080:5
1081:15 1082:5
1085:21
1089:16 1090:4
1093:6 1099:10
1101:22,23
1104:12
1107:20
1109:15,17
1110:1,19
1111:16,17
1126:7 1127:14
1128:16,22,25
1129:1,13
1144:23 1145:5,
6 1152:18
1153:21 1154:5
1160:13
1166:16 1169:2
1174:24 1175:1
1176:7 1177:23
1178:9 1180:19,
24 1181:9
1182:6,10,24

1183:11,18
1185:3 1186:14
1187:3 1188:9
1190:10,13,14,
17 1191:4,6,8,
11,12,13
1197:11 1203:9
1204:7,14
1213:23 1215:1,
8,9 1221:20
1223:13
1225:11
1230:23
1234:18 1235:5,
20 1239:19
1251:20,23,25
1252:2 1265:15
1267:22 1271:5
1283:23
1303:14 1308:1
1314:16
1317:21
1318:20 1335:2
1340:22 1341:5
1342:2

**gone** 1011:19
1026:16 1100:8
1116:20
1121:22 1124:5

**gonococcal**
1062:12

**gonorrhea**
1062:2,5,7

**good** 1000:23
1096:5 1252:17
1293:4 1309:18,
20,23 1310:10
1320:7

In Re: CR Bard 200      Bruce Rosenzweig M.D., Vol. IV      11/29/2014

**got** 1011:10 1016:14 1032:4 1040:17 1101:15 1103:3 1112:21 1115:11 1148:5 1198:21 1206:11 1213:9 1221:10 1235:24 1238:9 1241:15 1273:25 1319:4 1342:9

**gotten** 1101:19 1115:25 1119:21 1120:4 1160:14 1191:19

**gracilis** 1128:19

**grade** 1204:25

**granulation** 1049:10,11

**gravity** 1316:3

**Great** 1010:19 1131:5 1275:12

**greater** 1003:21 1165:13,16,20, 24 1266:8 1312:10

**greatly** 1034:12, 21

**grinding** 1242:3, 4

**groin** 1094:23 1221:21 1222:1 1223:17

**group** 1026:11

**groups** 1128:17 1174:4

**grow** 1080:1

**growing** 1079:7 1333:24

**grows** 1048:1

**growth** 1159:16, 18

**guard** 1210:10

**guess** 1004:19 1005:18 1019:12 1047:15 1104:10 1107:15 1179:14 1187:15 1229:6 1246:1 1251:14 1252:13 1276:14 1303:10 1317:25

**guesstimate** 1339:19

**guide** 1084:14

**guys** 1028:6 1055:4 1181:9

**gynecologic** 1263:8

**gynecologist** 1257:1 1265:8

**gynecology** 1212:21 1281:3

**gyroscope** 999:12

---

# H

**H-u-f-f-e-y** 985:15

**H-u-n-n-e-r** 1327:21

**habituated** 1245:6 1248:11

**habituation** 1245:11 1248:4, 20

**hair** 1159:16,17 1166:4

**half** 1045:18 1139:7 1222:24 1291:21 1339:25

**Hall** 1156:2,3

**Halloween** 1026:21

**hand** 1100:25 1181:13

**hands** 1004:14 1055:5

**hang** 999:3 1004:22 1005:25 1012:1 1050:22 1093:15 1223:2 1270:8

**hangs** 1199:6 1216:18

**happen** 1039:9 1082:11 1083:5 1087:24 1099:19 1140:21

1141:25 1142:2 1216:8 1246:3 1260:1 1293:6 1295:11 1320:25 1321:20

**happened** 1046:11,12 1050:19 1051:11 1070:2 1171:22

**happening** 1104:14 1260:2

**happens** 995:3 1028:4,8 1097:23 1099:13 1204:3 1210:9 1215:15 1318:23 1327:7

**happy** 1064:18

**hard** 1020:5 1063:1 1172:20 1205:3

**harder** 1175:11 1246:20

**has** 987:22,24 989:20,21,22 990:21 991:5,8 996:2,3 997:2, 12 998:16 1000:13 1002:19 1003:23 1004:13 1034:10 1035:23 1036:15 1037:7 1038:21 1043:1

Case 2:16-md-02327 Document 7025-1 Filed 01/13/20 Page 742 of 249 PageID #: 113598



Case 2:16-md-02327   Document 7525-1   Filed 01/19/20   Page 794 of 229 PageID #: 213597



In Re: CR Bard 200    Bruce Rosenzweig M.D., Vol. IV    11/29/2014

**himself** 1326:11

**Hinds** 1325:25 1326:3,8 1344:5

**hip** 1036:15,21, 23 1037:2,4,6 1143:16 1146:10 1147:3, 10,15 1247:14

**hips** 1036:16 1143:7,9,12

**his** 984:16 1005:15 1007:16 1008:15 1019:23 1052:16 1093:1, 1095:4 1106:10 1114:17 1130:25 1131:3 1186:13,21 1193:4 1202:7 1214:14,18 1217:13 1218:2 1303:7,12 1304:20,22 1307:3,5,6 1322:17

**history** 985:21 989:22 990:4 998:16 1015:18 1046:7 1088:3, 14 1094:22 1105:5 1134:4,9 1138:7 1143:6 1153:7 1154:15 1156:8,20, 1157:22 1163:20 1168:23 1193:8,

19 1196:1, 1200:2,8 1201:12 1219:15 1220:8 1224:14 1228:23 1233:5, 12 1238:13 1239:3 1241:15 1242:8,25 1248:15,18,25 1249:19 1272:25 1280:1, 6,25 1284:6 1290:14 1316:2, 1323:4 1324:25 1325:23 1327:3 1342:24 1345:2

**hit** 1204:19 1308:1

**hits** 1236:10

**hold** 1215:6,7 1286:25

**holding** 1055:5 1181:20

**holds** 1326:11

**hole** 1071:7,14 1079:8,9 1080:6,10,12

**honest** 1032:7

**hope** 1028:21

**hormone** 1102:19 1250:3

**hormones** 994:18 1104:21

**hospital** 1042:11 1257:6

**hospitalization**

1057:10

**hospitalized** 1291:13

**host** 1113:20,21

**hot** 1095:22,23

**Hotujec** 1332:15,24

**hour** 1025:2 1080:23 1341:2

**hours** 1024:23 1025:18,21 1026:8 1064:23 1077:24 1079:12 1295:13

**house** 1065:5,8

**housekeeping** 1131:4

**how** 990:9 991:6, 993:9 997:12 1007:8,12 1012:2 1017:11 1018:9,12 1019:7 1020:22 1024:5 1025:6, 18,20,22 1026:3,8,15 1027:3,20 1029:16,20 1030:7 1033:24 1034:9 1035:21 1037:15 1038:17 1039:3, 10 1040:7 1045:13 1048:18 1054:3 1058:13,22 1061:15,18

1066:1 1080:2, 12 1081:1 1099:25 1100:1 1101:19 1108:22 1109:19 1115:4, 15 1116:7,25 1117:17 1118:7, 17 1122:20 1126:2,5 1134:25 1135:15,18,20 1151:5 1160:23 1162:12 1168:6, 7 1172:3,21 1173:11 1178:23 1179:19,21 1181:12 1182:13,16,17 1183:15 1186:11 1188:4 1189:15 1191:18 1193:7, 13 1195:11 1197:8 1203:15 1205:5 1216:2, 11,13,16,24 1217:4 1219:20 1220:17,23 1221:3,13 1228:4 1231:8 1237:4 1238:1,5 1241:12,13 1246:11 1247:5, 6 1249:8 1267:13,22 1270:4 1271:6, 14 1273:16 1279:22 1281:7



1066:21 1072:3
1091:4 1123:7
1130:16
1194:11
1232:19
1259:11 1275:5
1304:25 1315:5

**idiopathic**
1112:24

**IFU** 1074:21
1122:12,16,17,
22,25 1123:4
1124:6,8
1206:22 1207:5
1259:8,13
1308:9 1309:4,
9,15,16 1310:9

**IFUS** 1121:6,
1122:18
1230:23
1308:10

**imagine** 1344:5

**IME** 1065:21
1068:2 1315:18,
25 1317:3
1318:14

**immediate**
1039:5 1169:21

**immediately**
1039:8 1041:3
1102:24 1104:7
1126:18 1259:4
1300:23
1303:17
1305:12

**immobilized**
1133:4

**immune** 1060:4
1156:14

**immuno** 1060:15

**immunologic**
1050:14

**impact** 999:16
1035:5,6
1037:16 1038:3,
8,12,22 1110:2
1262:22,23
1290:10

**impacted** 1039:3

**implant** 995:12,
15 1001:12,19,
22 1002:23
1003:2 1021:7,
19 1023:11,16
1024:1,4
1035:11
1036:21
1040:11 1041:4,
14 1050:11
1057:14 1059:2
1074:17
1085:11
1089:17 1092:8
1094:1,21,24
1101:12,14,15,
19,20,22 1109:8
1113:15
1131:16
1138:15
1156:23,24
1166:9 1217:22
1238:9 1239:16
1244:13,16
1249:15,20
1259:24
1260:15,

1276:19
1291:17
1298:10 1345:2,
14

**implantation**
1126:21 1127:6
1216:9,22
1217:6 1224:17
1227:5 1230:3,6
1231:14
1259:16,24
1308:17

**implanted**
1102:5 1118:18

**implanting**
1218:1 1231:17

**implants**
1003:12 1121:6
1203:11

**important**
1003:12 1004:8,
15 1043:16,21,
25 1044:6
1078:2 1128:23
1332:16

**improperly**
1230:22

**improve**
1013:10,15,20
1014:11
1109:15
1159:22 1290:1
1324:23

**improved**
1225:16 1332:3

**improvement**
1109:21 1112:2
1115:5 1150:18

1218:12
1324:18

**inability** 991:11
1138:21

**inadequate**
1052:23
1053:10 1055:9

**incidence**
1110:15,21
1171:7 1238:21

**incised** 1009:14

**incision** 1016:3,
25 1017:1
1020:12,24
1048:22
1098:16
1100:23,24
1101:1 1142:13,
16,22 1177:25
1178:3,8,13,16,
19 1179:2
1183:4 1209:5
1295:9 1306:25

**incisional**
1100:18

**incisions**
1016:18,19
1178:12,21

**inciting** 1059:11

**include** 1044:6
1233:9 1298:17

**including** 1127:3
1192:18
1196:21
1198:22

**incomplete**
1139:19
1195:12

1258:23
1264:12 1309:6

**incontinence**
987:25 988:15
1044:9,18,25
1045:1,2,4
1046:10,11
1050:9 1057:3
1063:19,21,23
1064:1,3,7,8
1090:16 1095:9
1102:14 1110:3,
13,15,16
1113:12
1131:15 1138:7
1139:1 1159:2,
24 1161:15
1238:18,20,23
1274:18
1275:25 1276:2,
13,21,23
1277:11
1281:23 1282:2,
11 1286:7,12,
17,19,21
1287:3,4,7,25
1288:9,17,25
1289:20,24
1290:22,25
1291:2,7,9
1300:13 1302:8,
21 1303:1
1304:4 1306:5,
11 1307:7,15
1308:3 1313:11
1316:12
1319:14,16
1325:5,6,18,19
1342:22,25
1343:4,8,12,22

1344:7,20

**inconvenient**
1205:8

**incorporated**
984:19

**incorrect**
1231:6,22,25
1232:6 1275:15

**incorrectly**
1017:14

**increase** 995:14
1076:17 1099:2,
16 1110:13
1190:5 1217:22
1266:3,19
1288:15 1291:4
1307:23
1313:10
1320:15

**increased**
1001:6,7
1050:14 1051:1
1095:9 1113:24
1276:2 1277:10
1306:4,11
1312:23
1323:21
1327:16
1344:11

**increasing**
1110:24

**incredibly**
1125:11

**indefinitely**
1238:15 1239:6

**independent**
1275:22
1316:16

**indicate** 1003:1
1108:12
1184:22
1197:19
1202:10

**indicated** 1011:9
1014:22
1226:11

**indicating**
1124:25

**indication**
1093:24
1102:18 1184:7
1211:1 1251:11
1270:1 1304:5
1342:9

**indications**
1300:20

**indicative**
1145:12
1197:24
1199:15

**individual**
1025:16 1026:2
1039:18 1117:1

**individually**
1025:17 1051:1

**individuals**
1049:7

**inexperienced**
1218:5

**infected** 1022:3
1062:18
1120:19

**infection**
1037:22
1038:14
1047:23 1051:5

1057:19,22
1058:8,14,23
1059:19 1061:1
1063:12
1114:22
1115:14,21
1116:2,10
1117:3,20,23
1118:8,19
1119:5,9,23
1120:24 1121:2,
20 1124:1,2
1135:20,24
1139:18
1148:15,24
1149:1,10,13
1191:10,20,24
1196:5,12,18,
23,24 1197:22
1199:21,25
1209:6,10,20
1210:2 1235:12
1236:8,9
1266:22 1267:4,
7,11 1280:18
1345:2,4,6,7,8,
9,17

**infections**
1039:4 1057:23
1063:3,25
1114:18
1120:15 1121:3,
5,9 1123:16
1192:20,24
1197:1,2 1224:7
1235:24 1236:5,
6 1238:10,11,
22,24 1239:4,5,
11,14,15
1266:12,14

1267:21 1323:9,
11,12,14
1324:3,5,8
1345:12

**infectious**
1342:1

**inferior** 1084:12,
15

**infertility**
1201:13,16,21
1202:2,10

**inflames**
1078:25 1086:5

**inflammation**
1047:23
1048:10 1062:4
1123:25
1145:24,25
1191:10,23
1259:7

**inflammatory**
994:9 1061:23,
25 1062:9
1156:13
1280:10,12,21

**information**
992:18 1028:24
1029:1,12
1031:14
1065:23
1122:13 1150:9
1184:20 1201:9
1277:8 1296:5

**informed**
1052:5,7,12,18,
22 1053:8,17
1055:9,21
1056:6,16,18,

21,22 1206:12

**infrequent**
1171:11
1172:12
1173:14

**infrequently**
1236:18
1321:20

**infundibulopelvi
c** 1204:1

**ingredient**
1160:1 1161:20
1162:6,17,18

**ingrowth**
1000:24
1047:17

**initial** 1001:12
1005:1 1051:22
1062:8 1085:17
1181:25
1230:13 1257:2
1280:18

**initially** 1083:22

**injections**
1033:13

**injured** 1079:15
1082:23

**injures** 1078:25
1086:5

**injuries** 1088:2

**injury** 1078:15
1086:11 1087:1,
6,8 1088:1
1154:8 1338:17

**innocuous**
1083:5

**inside** 990:24
991:12 999:18
1000:16 1002:5
1015:13
1017:19
1021:24 1049:9,
14 1070:18
1077:25
1081:10 1107:1,
2 1135:6
1235:13 1236:7
1237:24
1246:17
1257:13
1267:15 1268:1
1279:8 1299:15
1312:3 1342:1

**instability**
1289:2,17

**instance** 997:8
1178:18

**instances** 997:10

**instead** 995:8
1204:3

**instructed**
1314:18

**instruction**
1309:4

**instructions**
1052:2 1101:11
1140:5 1213:16

**instrument**
1070:17

**insulin** 1033:12

**insulin-
dependent**
1168:14

**intact** 1139:11

**intake** 1168:22
1198:23

**integration**
1047:11,25
1048:8

**intend** 1055:7
1056:13

**intended** 1076:3
1274:17

**intention** 1215:4

**intentionally**
1207:8

**interact** 1237:4

**interaction**
1035:2

**interactions**
1160:8 1320:24

**intercourse**
989:22 1034:4
1105:25 1128:3
1129:6 1140:9
1141:14,16,24
1142:9,10,21,23
1151:12 1195:7,
9 1200:14
1204:19
1208:11 1212:5
1225:10,11
1247:10,16,20
1257:14
1258:12
1261:23
1262:18,21
1263:1 1271:20
1278:1,3
1279:13
1323:11,25

1324:1,9,11,15,
16 1326:1,5
1332:18

**interest** 1166:5,
8,11,21,24
1167:5,8,12,17

**interested**
1100:1

**interesting**
1273:17

**interferes**
1222:19

**intermittent**
997:13,15,21
1126:11,19
1128:8 1150:23
1222:7 1277:25
1278:3,16
1279:17

**internal** 1038:3,
8 1192:14

**internet** 1317:22

**internus** 1152:18

**interplay**
1284:14

**interpret** 1258:9

**interpreted**
1164:10

**interrupt**
1116:22 1264:2

**interrupted**
992:22 1049:21
1306:24

**interrupters**
1010:1

**interrupting**
1263:23

**interstitial**
1237:5,7
1326:9,11,15,
21,24 1327:9,
15,25 1328:4

**intimacy** 1261:9

**intimately**
1086:15

**into** 998:4
1003:14
1004:16
1044:11,12
1050:17 1051:3,
6 1058:11
1061:2 1062:3
1064:16
1065:24 1073:9
1075:7 1077:1,7
1078:22 1086:9
1109:11
1116:18 1119:2
1129:24
1143:16
1160:13
1161:23 1169:2
1183:22 1185:4
1186:16 1189:4
1191:13
1193:17 1204:4
1205:23
1206:11 1208:8
1211:23
1221:11
1222:12
1223:22,23
1224:1 1247:14
1251:23 1266:9
1280:24 1321:1
1336:22

**intraabdominal**
1023:2 1288:16
1312:23

**introitus**
1046:20,25
1050:1

**invented**
1159:12,13

**inverse** 1016:3,9,
25

**inverted** 1016:10

**invoice** 1025:15,
16,23

**invoices** 1025:10
1027:5,8,13
1028:15 1067:7

**involuntarily**
1262:1

**involuntary**
1160:6

**involved** 1033:1
1036:15

**involving**
1055:11 1297:3

**irregular**
1156:20

**irregularities**
1197:14

**irrespective**
1124:3 1207:4
1229:13

**irritable**
1151:19,21
1152:5 1154:17
1233:10 1234:7
1238:5 1272:21
1274:8 1282:7

1299:12

**irritants** 1111:9

**irritate** 1190:13
1253:10
1306:15

**irritated** 1079:7

**irritating**
1114:20 1199:2
1253:23
1328:24 1329:9
1337:24 1338:1
1342:3

**irritation** 1071:5
1079:17,20
1080:4 1089:17,
20 1090:1,4
1113:1,2
1123:23 1124:1
1129:2,17
1153:16
1196:10,20
1198:21
1203:12,14
1234:11
1235:13,25
1236:11,13,14,
17,22 1237:2,
11,17,20,24
1254:4 1255:20
1256:14,15,20
1329:11 1338:4,
17 1342:2

**ischial** 1084:15

**isn't** 1039:16,17
1074:1 1079:19
1110:10 1267:1,
2 1299:13,21
1321:3 1341:25

Case 2:16-md-02327   Document 7025-1   Filed 11/19/20   Page 791 of 229 PageID #: 119994



1169:17
1171:14,22
1172:5 1175:20
1179:19,24
1180:5 1181:9
1187:13 1188:9
1189:25
1191:18 1192:9,
17 1196:9
1197:19 1199:6,
19 1201:8,15
1203:2 1205:11
1207:5,19
1209:2 1215:9,
15 1216:18,21
1217:12,18,19
1218:22 1219:1
1222:5 1223:2,
25 1226:6
1230:2,23
1231:15 1233:7,
23 1237:9
1248:24
1255:15 1256:9
1259:20
1262:22
1263:11,15,25
1264:7,8 1270:1
1277:10
1278:25 1280:9
1281:5 1285:12
1293:13
1298:23 1299:6,
23 1300:2
1306:25 1308:5
1313:8 1321:17
1322:14 1329:4
1333:6 1335:24
1336:10 1339:7,
19 1340:11,25

1341:12 1346:8

_____

**K**

_____

**Kathryn**
1126:12

**keep** 1009:21
1028:13,15
1055:4 1118:10
1263:15
1333:25
1338:10

**keeps** 1254:23

**Keith** 984:20,25
985:5 986:24
987:9 998:23
1006:25
1007:24 1009:4
1014:12
1019:20,24
1020:3 1023:8,
22 1025:13
1026:3 1027:18,
21 1028:9
1030:19,23
1031:19,22,25
1032:3,6
1034:13
1035:22
1053:12 1054:5
1055:13,24

**Kelly** 1299:25
1300:2,4,11,19,
21,22 1302:4,9,
14,19,23
1303:3,6
1304:5,7,9
1305:1,8,10
1306:7,10

1308:24

**Kelly-kennedy**
1013:17
1304:14

**keloid** 1049:1

**keloids** 1049:12

**Kerry** 1095:2

**ketoacidosis**
1057:10

**key** 1192:14

**kidney** 1196:12
1220:11,14,15,
18,22,23,25
1221:3,6,7,9,16,
18,20,24,25
1222:11,15,24
1223:2,5,11,17,
24 1238:10
1239:5,15
1345:17

**kidneys** 1077:8
1118:14

**kill** 1267:16

**kind** 988:10
992:3 999:12
1007:3 1011:21
1021:13 1040:6
1043:18
1049:13
1079:16
1143:20 1144:4,
22 1154:8
1197:13 1222:7
1273:17 1281:6
1286:23 1320:4
1336:8 1339:6

**kinds** 1198:24

**Kirkman** 1095:3

**kit** 1082:23

**knee** 1241:18

**knees** 1100:21
1101:6

**knew** 1052:8
1246:2

**know** 992:11
995:20 997:6,23
998:9 1000:18
1003:6 1004:13,
25 1005:6,13
1016:22 1018:6,
16 1019:7,14,
19, 1020:22
1021:14,21
1022:12,20
1023:3,10
1024:8,21
1025:18,20
1027:9,13
1032:4,25
1035:4,10,15
1036:11
1040:16,22
1041:10,20,22
1042:5,21
1043:6,9,18,23
1044:1 1045:6,
13 1048:1,6,25
1053:2 1056:24
1058:20,22
1059:15 1066:4,
6,8 1068:23
1069:14
1071:16
1077:12,23
1078:9 1081:11
1082:3,9

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

1083:24 1086:4,
8,14 1088:25
1089:12,15,24
1091:19 1092:1
1095:15
1096:20
1098:22,24
1101:9 1103:17
1104:11
1107:16,25
1112:24
1115:17
1116:22 1117:1,
5 1119:6 1122:3
1123:18 1125:8
1126:13
1127:19 1133:4,
9 1137:7 1138:1
1141:20 1145:7
1147:21
1149:19 1151:8
1152:22
1157:15 1158:7,
22 1169:16
1171:1,22
1172:20
1173:25 1174:2
1176:22 1177:8,
15 1180:17
1181:12
1182:14
1185:15
1190:21 1200:7
1201:12
1206:11
1208:21 1211:1,
2,9 1214:16,21
1215:22,23,25
1216:2 1217:8,
9,12 1218:19

1223:8 1228:4,
11 1229:22
1231:8 1233:11
1236:7 1241:12,
15 1245:5
1248:14 1250:4,
6,21 1254:13
1255:1 1256:9
1258:13
1262:23 1265:5
1267:3 1270:5,
25 1271:12,14
1272:12 1279:5
1283:23
1292:12
1295:21 1297:7
1302:16 1307:2
1308:1,9
1309:19 1310:2
1311:19 1314:5
1317:19,21
1318:15,18,22
1320:5,15,20
1323:1,6
1324:21
1326:12 1327:7
1329:4,18
1331:7 1338:13
1341:6,7
1342:10 1344:9,
10

**knowing** 1232:4
1248:17

**knowledge**
1335:15

**known** 1056:23
1059:9 1064:3,8
1074:17 1090:8
1113:23

1120:13,24
1121:6 1123:15,
16,20 1213:12
1224:16 1259:1

---

## L

---

**L-5** 1134:5
1154:7

**lab** 1041:23
1042:11

**label** 1267:2

**laborious** 1188:8
1189:19,21
1190:4,12,22

**lack** 1166:5,11,
21,24 1167:5,8,
12,16 1212:20
1261:22 1262:7
1293:8

**lacking** 1052:12

**lactobacillus**
1267:15,16
1268:1

**laid** 1217:9,12

**Lakemaker**
1033:4

**lancing** 1328:9

**laparoscopic**
1134:11
1136:13,24
1239:18 1295:9

**laparoscopically**
1251:24 1252:3
1295:19,20,23,
24

**laparoscopy**

1092:19 1322:9
1326:6, 1328:7,
20,21

**large** 1081:6
1087:8 1246:14
1335:9

**LARRIMORE**
1237:13 1238:3,
16 1239:7
1240:23 1242:1,
13 1243:8,24
1244:19 1248:1,
7 1249:11,25
1250:16 1252:5
1254:22
1255:16 1257:9
1259:3 1260:21
1261:2,16
1262:10,16
1263:10,14,16,
20,22 1264:2,5
1265:17
1266:15 1267:5
1268:7 1269:15
1270:18
1274:21

**last** 985:24
988:6,12,24
1002:13 1017:8
1020:11
1024:22 1040:8
1053:15
1063:11 1096:1
1135:15 1140:2
1143:5 1209:24
1220:17 1230:4
1278:14,18,22
1309:21
1315:23

1325:16
1335:11

**lasted** 1278:20,
21 1279:1

**lasting** 1278:15
1329:14

**lastly** 1308:24

**late** 1095:24

**later** 993:6
1032:2 1044:11,
12 1060:22
1077:23
1078:10
1100:16
1102:21
1104:22 1139:7
1201:22 1342:4

**lateral** 1076:15
1175:9 1204:18

**laterally** 1010:6

**latest** 988:19

**latitude** 1309:9

**laugh** 1125:8

**law** 1026:13

**lawsuit** 1258:14

**laxity** 1094:5

**lay** 1100:20
1101:8

**layer** 1000:20
1006:8

**layering** 1079:6

**laymen's**
1010:16
1037:19

**layperson**
1024:5,8

1076:14
1095:17
1103:23
1241:20

**lead** 1001:6
1006:18 1008:1,
5 1010:24
1011:2,4 1017:5
1021:23
1024:16 1034:2,
6 1062:18
1087:3,9
1094:23 1111:2
1113:19 1121:9
1132:3,4
1134:16,23
1135:14
1143:19
1153:13
1191:12
1193:15 1204:9
1225:8 1245:19
1246:8 1247:1
1249:9 1250:24
1253:2 1255:21
1256:13 1263:2,
3 1269:2
1286:4,16
1287:8 1288:16,
24 1291:2
1304:9 1305:8,
10,13,25
1306:10,15,17
1307:16,20
1310:16 1327:8,
14,24 1332:11
1334:15 1336:2
1338:6,25

**leading** 1092:22
1112:13

1123:25 1124:2,
16 1152:25
1267:20 1274:1
1311:13 1338:6

**leads** 1021:25
1048:16
1121:12
1134:24 1153:8
1173:5 1225:9
1282:17

**leak** 1044:21,23
1059:12
1245:17,18
1288:4 1289:9

**leakage** 1086:23
1091:22
1135:21 1138:5
1159:22 1161:4
1246:1 1342:16
1344:11

**leaking** 1287:22

**lean** 1132:13

**learn** 1260:23

**learning** 1328:12

**least** 1058:10
1063:6,8,9
1103:2 1109:7
1114:12,13
1156:9 1169:1
1174:3 1182:19
1184:6 1261:13
1292:6 1318:10

**leave** 1082:16
1097:25
1098:11
1099:15 1169:7
1240:5 1298:23

**leaving** 1097:16
1098:5 1099:4

**led** 993:12
1001:10,15
1114:22
1135:17
1197:21
1212:22
1247:19

**left** 1046:16,25
1049:24 1072:7
1084:11
1089:19
1093:11
1097:10 1134:6
1169:5 1202:17
1203:1 1241:18
1304:13
1312:10 1328:8
1332:7 1334:15,
16 1339:14

**leg** 997:5,24
1134:6 1258:16,
17

**legs** 1065:6
1143:8

**length** 993:14
1108:13
1121:19
1339:22,23

**lengthy** 1208:10

**lesion** 1332:7

**less** 1006:5
1011:19,25
1012:6,9
1081:21
1095:22
1097:23

1112:18 1141:6
1161:4 1170:8
1199:14
1204:18
1225:16,17
1234:18
1237:22 1262:9,
18 1263:2
1267:24
1293:11
1323:23,24,25
1324:2,4,7

**lesser** 1162:21,
22 1165:16

**let** 991:3 1002:2,
24 1029:3
1042:25 1044:2
1054:15,17
1055:13
1059:20
1064:19,22
1071:2 1116:6,
15 1122:3
1126:2 1128:1
1129:21
1132:15
1161:18
1184:14 1187:7
1278:17
1286:15 1305:9
1306:7 1308:9
1310:22
1335:20
1336:13 1344:8
1346:9

**let's** 985:14,19
986:16,19
987:13 999:2
1000:10,11

1004:24 1008:8
1018:1 1023:6
1030:17 1031:5
1033:19
1066:23 1069:1
1080:20 1086:4
1091:6 1117:16
1130:9,
1131:20,22
1155:3 1159:17,
23 1166:20
1169:15
1174:13,14
1177:16
1218:25 1233:3
1234:4 1244:3
1271:1 1279:25
1280:20 1306:8
1315:9 1345:10

**levator** 989:20
996:17 999:9
1010:6,10
1011:8,12,13,22
1012:9,22
1015:6,14,17
1018:2 1023:11,
16,25 1024:4,
10,12,15
1046:18 1058:5
1065:17
1125:20,23
1173:4 1174:7,
8,25 1175:3,7,8
1176:2,3,9
1177:4 1180:10,
11 1312:6,7,8
1332:23
1335:25 1336:3,
4 1339:2,13
1340:9

**levators** 1332:19

**level** 991:7,9
1040:15 1041:8,
10,13 1049:18
1111:25 1176:8
1177:23 1178:9
1261:24

**levels** 1103:22,
24 1145:17

**lied** 1059:24

**life** 1125:12

**life-threatening**
1141:4,6

**lifestyle** 1034:2

**lifetime** 1199:6

**lift** 1212:15
1297:14,19

**lifting** 1138:13

**ligament** 1204:1
1212:16 1214:9

**ligaments**
1098:12,13,18,
19 1204:15
1209:2

**ligation** 1134:12
1135:2,3,5
1136:6,12,24
1137:4,15,23
1164:13,14
1240:11 1322:9,
13

**ligations**
1136:14
1240:20

**like** 994:4
995:16,19
998:22 1006:25

1008:17
1009:11,13
1010:23 1014:9
1018:13,18
1019:8,13,16
1023:13,18
1033:21 1040:9
1041:18 1042:2,
22 1046:8
1048:21,23
1054:25 1065:4
1070:22
1073:18
1077:12
1080:11
1081:10
1083:12
1092:10
1093:17
1100:11 1101:6,
18 1102:21
1103:10,23
1106:13
1108:15 1115:9
1133:5 1135:18
1137:11
1138:10 1144:1,
22 1146:10
1150:25
1152:17
1161:21
1165:12
1167:21 1172:2
1176:15
1180:20 1181:3,
11 1187:22
1189:14
1190:25 1192:7
1197:11,
1204:13,20

1205:6 1207:19, 23 1221:14 1222:10 1223:16 1226:10 1230:7 1236:9 1244:21 1252:3,13 1254:17 1255:18 1262:22 1263:18, 1269:24 1273:25 1292:14, 1294:19 1309:20 1310:8 1316:3,5,6,7 1320:3,19 1321:25 1329:7 1330:1 1337:25

**likelihood** 1014:10 1334:25

**likely** 998:17 1006:15 1007:17 1008:1, 4 1011:20 1012:9 1035:17 1036:19 1042:13 1047:3 1060:7 1063:5 1078:17 1099:18 1105:10 1108:2 1119:18 1126:21 1129:19 1133:2 1136:1,9 1156:14 1157:20

1165:22 1174:18 1192:12 1193:5, 14 1201:5 1204:19 1210:25 1212:22 1249:14 1268:17 1271:19 1274:1 1293:11 1294:4 1296:11 1297:4 1299:10 1311:12 1324:4, 7 1326:4 1336:24 1340:5

**limited** 1036:18 1078:1 1143:7 1259:17

**limiting** 1056:7

**line** 1048:23 1071:1 1098:16 1177:20 1179:2 1181:4 1187:5, 12 1208:8

**lines** 1139:10

**lining** 990:3 995:17 1089:25 1110:7 1111:17

**liposuction** 1294:12 1297:10,16,20

**list** 1042:17 1111:9 1320:4

**listed** 988:24 1226:15 1280:5 1319:1

**litany** 1320:24

**literally** 1101:6 1280:9 1320:19

**literature** 993:22,24 1059:18 1082:10 1083:4 1117:8 1119:24 1131:2 1172:15 1210:13 1296:6

**litigation** 1029:5,17,18 1030:2 1052:22 1270:15

**little** 993:24 1004:11 1009:19 1070:1 1075:17 1092:12 1160:15 1166:17 1173:23 1209:8 1291:16 1325:17 1336:14

**liver** 1118:13 1294:18 1295:5

**localized** 998:18 1118:9 1126:19 1132:20 1209:21,23

**located** 1037:3

**location** 990:17 1023:14 1060:6 1177:12 1251:3 1282:25 1283:9

**locations** 1077:10 1102:1

**locomotion** 999:17 1128:24

**logic** 1142:19

**long** 1012:2 1014:17 1025:6 1027:20 1035:2 1045:13 1061:15,18 1088:3 1108:22 1111:9 1123:18 1135:15 1164:7 1171:15,20 1196:7 1220:23 1221:3,13 1223:2 1231:4 1238:1,5 1241:13 1242:25 1245:4 1246:5 1255:2 1278:15 1279:1 1319:24 1323:1 1330:15

**long-lasting** 1329:16

**long-term** 1013:16,20 1014:11 1121:2, 9,12 1164:10 1169:22 1170:9 1172:5 1245:10 1300:25

**longer** 995:15 1012:3 1101:9 1115:24 1133:2 1149:24 1151:8 1329:14

**longer-term** 1305:14

Case 2:12-md-02327 Document 7225-1 Filed 11/19/18 Page 595 of 924 PageID #: 163536



manage 1336:21

management
1094:6 1127:14
1205:24

mandarin
1070:15

manifest
1102:24 1104:7
1113:18
1153:25
1201:22
1203:15
1282:21 1283:5
1321:24

manifestation
1035:3 1036:15
1039:17 1062:8
1063:11
1143:21 1153:2
1242:5

manifestations
1035:24 1036:9
1165:23 1166:2
1292:12,17
1293:20
1296:15
1326:19

manifested
997:12 1058:24
1063:10

manifesting
1097:7 1192:1
1256:15

manifests
1022:13 1045:2
1165:24
1293:22

manipulator
1089:23

MANNO
984:10,14,21
985:1,13 987:4,
11,12,13,19
999:1 1007:2,15
1008:7 1009:6
1010:14
1014:13
1019:22 1020:1,
7,8 1023:9,24
1027:20 1028:2,
11,19 1029:15
1031:4,21,23
1032:2,4,13,15
1034:14 1046:1
1053:19 1054:7,
10 1055:6,20
1056:2,9,10
1066:22 1067:5,
12,17,20
1068:22
1069:18,21
1072:4,13,15
1073:24
1074:20
1075:22
1076:19
1080:14
1082:20
1083:10
1085:24
1086:20
1087:10,16,21
1089:11
1090:14,20
1091:5,10,
1092:14 1093:2,
5,14 1094:7

1102:2 1105:16
1106:11 1108:5
1109:12 1110:9
1114:3 1115:12
1117:14,24
1118:21
1119:13 1120:1,
17,22 1121:4,
15,24 1122:8,15
1123:2,10,13
1124:9 1125:4,
7,24 1126:1
1127:23
1128:11
1129:20 1130:9,
19 1131:5,6
1134:21
1140:10 1141:5
1143:1,18
1146:3,20,23
1147:1 1149:11
1153:6,18
1155:3,14,23
1156:1,3,6
1163:11,18
1165:1,10
1166:19
1167:10,20
1170:16
1171:12 1172:9
1173:12
1176:19 1181:6,
15,18,22,23
1182:22 1184:5,
13 1187:10
1188:21
1189:16
1190:20
1192:16 1193:1,
6,12 1194:4,19

1201:1,19
1202:6 1205:19
1206:10,18
1207:3,17
1208:6 1209:16
1214:1,20
1215:18 1217:1
1218:10,16
1219:10 1220:6
1224:8,20
1225:22 1227:3,
10 1229:5
1230:1 1231:5,
11,21 1232:2,7,
10,20 1237:15
1238:7 1239:1,
12 1241:4
1242:7,19
1243:11 1244:2,
23 1248:2,9
1249:17 1250:2,
20 1252:8
1254:23,24
1255:17
1257:10 1258:6
1259:12
1260:22 1261:5,
18 1262:12
1263:4,11,15,
18,21,24
1264:4,7,15
1265:21
1266:17 1267:8
1268:11
1269:20
1270:19
1274:20 1275:6
1281:17,22
1282:14
1285:21



15,25 1266:1
1271:6 1273:13
1276:22
1278:17 1280:2,
9 1286:15,20
1292:4 1295:1
1301:11 1302:2
1305:6,9 1306:7
1308:1,8,9
1310:22
1335:20
1336:13
1337:23
1339:19
1340:11
1342:17 1344:8
1346:9

**mean** 990:10
991:25 998:21
1002:12 1004:1
1006:15 1007:1
1008:21 1013:8,
1015:16 1019:4,
23 1024:1,2,16
1025:22
1030:11 1036:2
1038:13
1039:10,14
1041:21 1047:5,
19 1057:20
1060:21
1062:24
1063:17,21
1065:1 1068:9
1072:25
1076:23 1077:2,
12,14,18
1079:10 1082:2
1089:1,23
1102:3 1103:6,

23 1108:11
1109:16
1110:10 1111:9
1114:13 1120:8,
18 1122:1
1124:24
1125:12,13
1136:7 1140:19
1144:15,18,19,
20 1145:4
1146:16,18,21
1162:11 1164:4,
18 1173:22
1175:18
1176:12 1179:2,
15 1189:3
1190:21,24
1199:4 1204:12
1205:25 1208:8
1209:23
1211:14
1213:19 1218:1
1221:5 1222:22
1223:15 1225:6
1227:22
1233:18 1235:4
1236:14
1239:22 1240:3
1245:9 1253:24
1255:14
1263:12
1268:22
1269:17
1271:18 1272:2
1283:21,23
1284:14,16
1285:7 1290:6,7
1299:10
1304:17 1305:7
1320:20

1321:24
1324:19 1330:9
1332:22 1333:9
1337:10 1341:2

**meaning** 1034:3
1097:25 1109:7
1135:18
1138:10 1144:1
1162:16
1167:12
1195:16,19
1202:7 1236:20
1255:23
1257:25
1259:24
1279:16 1336:1
1338:9

**means** 1017:18
1024:6 1047:12,
25 1070:9
1093:21
1095:17
1112:24
1114:15
1116:17 1144:7
1148:22,23
1149:5 1239:23
1248:20 1285:4
1333:3

**meant** 1063:22
1085:15 1181:5
1226:16
1295:23 1308:2

**measure** 1089:7
1339:18

**measures**
1228:2,8,20
1229:25

**mechanism**
1058:4 1176:9

**mechanisms**
1118:10

**medial** 1297:14,
19

**median** 1127:11

**mediastinal**
1294:11
1296:10,17

**mediastinum**
1296:12

**medical** 994:21
1033:9 1035:8
1046:7 1053:3
1075:24 1089:1
1092:4 1094:6,
1102:18
1108:12
1109:21 1117:2
1125:10 1134:3
1143:6 1155:19
1156:8,22
1163:19
1176:15,23
1183:19 1187:8
1189:3, 1192:5,
15 1194:22
1196:1 1200:6
1219:15
1224:14
1231:16 1233:5,
12 1248:13
1272:24
1275:22
1279:25 1280:3,
6,25 1294:7
1308:21 1316:4,
16 1322:4

**medication**
1044:8 1108:21
1112:10,11
1114:12
1144:21
1158:25
1159:14
1160:18
1161:14
1162:12
1242:25
1243:10 1244:1
1245:10,15
1248:25 1253:9
1318:16

**medications**
1042:17
1050:14
1060:15 1158:1,
9, 1159:11,20
1243:3 1245:4
1247:25
1249:23 1291:6
1316:4,22,24
1319:1 1320:12,
13,25 1321:5,21

**medicine**
1159:18 1171:3
1248:21 1318:4
1343:6

**medicines**
1158:23 1160:1

**mellitus** 1167:24
1168:1,3

**memory**
1043:10,13
1057:9 1141:21
1188:3 1318:6

**men** 1159:15

**Meniere's**
1321:22 1322:5

**menopausal**
1088:19
1102:24
1110:17,21
1111:8

**menopause**
1088:22,24
1096:18
1102:21 1103:8,
14 1104:4
1110:12,24
1266:1,4,11
1267:22

**menorrhagia**
1094:20

**menses** 1095:24,
25

**menstrual** 995:9
1326:2

**menstruation**
995:8

**mention** 1105:13
1108:1,10
1322:14

**mentioned**
1050:25
1051:15

**merely** 1212:16
1214:8

**mesh** 987:24
988:14 989:1
993:4 998:12,13
1001:5 1002:15
1004:4 1006:8
1008:13,24

1010:4,6,7
1029:4,7,17,18
1030:2,9,13
1044:12 1047:2,
4,7,9,13,18,20
1048:3,5,7,11,
13,20 1050:15
1051:11
1058:20,21
1059:2,3
1061:16
1062:23
1070:24 1072:8,
18 1073:6
1077:22
1082:15,16,17,
23 1083:13,17,
20,22,25
1084:18,23
1085:3,6,8,10,
16,20,21,23
1086:2,10,12,
15,17 1087:2
1102:5 1105:7
1106:17 1107:9
1114:19
1115:11,18
1116:17
1117:11,15,17,
19,23 1118:18,
23 1119:1,3,4,
20,23 1120:2
1121:3,6,11
1126:16 1127:2,
6,9,20,21
1128:16,22,25
1141:16
1142:10 1171:5,
23 1172:12
1178:2 1186:23

1190:10,13,17
1191:4,8,21
1192:2,10,18,24
1195:5 1197:1
1208:10 1209:4
1212:2,9,17,22,
25 1213:6,12
1214:3,5,15
1215:2,17,21
1216:1,11,15,20
1217:22,23
1219:18,25
1230:6,7,10,21
1231:9 1249:14
1257:11 1259:5
1260:3 1268:5,
13 1273:4,7
1275:24 1297:3,
6,8 1301:18,20
1307:16,20
1316:6,20
1330:14,18
1341:16,19,23

**mesh-augmented**
1170:24

**met** 1207:10
1226:23
1229:22

**metaplasia**
1327:17

**methadone**
1243:4,6,22
1244:12

**method** 1003:4

**methods**
1205:14 1206:2

**methotrexate**
1033:12 1051:9



8,10,20 1336:21

**more** 991:11,22,
23 993:13
994:12 997:4
998:14,17
1004:11
1006:15 1007:9,
12 1008:1,3,4,5
1011:17
1015:12
1017:24
1022:17,25
1023:1 1028:18
1030:7,10,11
1034:12,16,21
1035:23
1036:19
1039:12
1040:13 1047:3
1069:6 1070:13
1076:8 1078:17
1080:6 1084:24
1087:6 1103:19,
20 1104:3,11
1105:10 1108:2,
14 1109:17,25
1111:8,17
1119:4,17,20
1120:21
1126:10,20,21
1129:12
1132:15,20,25
1133:1,2,6
1135:25 1136:1,
3, 1137:16
1146:1,4
1159:16
1160:21
1162:16
1165:18,21,22

1176:25
1180:21
1190:16
1192:12 1193:5,
14 1200:20
1201:5 1204:6,
17,21,22
1210:25 1228:8
1229:14
1233:13
1234:12 1235:7
1242:15
1246:17,18,19
1247:4 1248:17
1249:14 1251:8,
17 1253:7,13,
16,18,23,24
1266:10,19,21
1268:17
1271:19 1274:1
1277:19 1279:9
1282:17 1283:8
1288:21
1289:23 1294:2,
4 1296:15
1297:4 1306:18
1318:13 1323:7
1327:10,19
1328:5 1336:15
1340:5 1346:18

**most** 990:12
1006:9 1007:20
1035:17 1037:1
1042:13
1044:19,22
1062:1 1063:5
1073:3 1114:13
1127:4 1128:7
1129:19 1136:9
1156:14

1157:20
1174:18 1179:7
1211:22
1219:14 1235:6
1240:3 1277:7
1283:17 1295:8
1296:11
1299:10,13
1311:11 1326:4

**mostly** 1132:25
1280:15 1322:2

**motility** 1202:5

**motion** 991:23

**motivation**
1293:9

**motor** 1112:25
1113:4 1114:8
1132:10,11
1322:2

**mouth** 1118:2

**move** 1030:17
1062:2 1070:18
1073:20
1075:15 1082:6,
12 1089:24
1205:23
1215:19 1285:4
1315:9

**moved** 1073:1
1075:16
1204:15

**movement**
1150:25

**movements**
1301:9,13,14

**moves** 1076:8
1086:6

**moving** 1194:20
1223:18
1232:21 1275:7

**MRI** 1333:1

**much** 996:4
1007:9,12
1011:17,19
1020:21,22
1027:3 1039:12
1071:21
1109:19
1126:21
1135:20,25
1158:8 1161:21
1165:20 1173:3,
11 1179:9
1221:10
1223:22
1225:16
1226:25 1230:7,
14 1241:13
1259:23
1260:14,18
1263:21 1285:5
1293:11 1323:1
1328:12 1336:9
1339:20

**mucosa** 1009:14,
23 1022:1
1049:14,15

**mucousy** 1334:1

**multiple** 1060:1,
15 1098:23
1131:22,23
1132:2,9,17
1133:12 1148:5
1201:16
1272:11
1333:16

In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

**muscle** 996:21,
24 997:2
1010:12
1011:11,12,13
1014:24
1015:19
1020:14 1022:1
1079:8 1081:14
1124:22 1128:5,
16,17,18,19,20,
21,22,25
1129:1,14
1146:12
1152:18
1153:13 1174:4,
5,7,25 1175:7
1176:9 1185:1,
2,19 1186:7
1190:11,17,25
1191:5,7,13
1312:22
1337:24,25
1338:1

**muscles** 990:15
991:17 996:18
999:9,10,15,17
1010:6,10
1012:9 1024:11
1058:6 1065:17
1128:23 1133:5
1147:6 1152:13,
16,25 1153:1,3
1173:5 1175:3,8
1180:10,11
1186:10
1190:12,13,15
1191:7,8
1262:24
1335:25 1336:1,
5,11,12 1338:2,

8

**muscularis**
1077:1

**musculoskeletal**
1126:22

**must** 1177:6
1184:18 1272:2

**myalgia** 1152:11
1153:9 1338:19

**myofacial**
1337:2,20
1339:10

**N**

**nabothian**
1168:25
1169:13 1328:9
1333:16,21,23
1334:2,6

**name** 1092:1
1098:22 1168:3
1326:14

**names** 1030:4
1033:3 1098:24

**narcotic** 1242:25
1243:19
1244:11,22
1245:3

**narcotics**
1243:14,15,18

**narrow** 989:21
1017:8 1038:18

**narrowed**
1017:22
1179:12

**narrower**

1221:11

**narrowing**
996:16 1000:4
1017:2,5
1179:11
1311:13

**native** 1008:8,15
1009:9 1010:2,
17,23 1012:14
1157:7 1159:16
1169:18,19
1170:1,19,23
1171:8,15
1172:11
1174:15
1175:25
1190:14
1214:13

**nature** 1126:22
1132:1 1137:6,7
1138:9 1207:2

**NAUGHT**
1346:24

**nausea** 1221:21
1318:2,3

**nauseam** 1007:3
1058:17

**near** 1041:13
1084:12
1086:10
1314:13

**necessarily**
1063:22
1104:15
1109:16 1112:8
1242:21
1299:22
1342:13

**necessary**
1262:3

**necessitated**
1078:10

**necessity**
1269:17

**neck** 1072:17
1076:22
1077:20 1078:7
1177:23 1178:9
1238:19 1256:3
1300:6 1304:1,3

**need** 986:25
1004:18
1007:22
1019:12
1030:19
1104:20,23
1149:8,9
1184:25 1185:7,
18 1211:6
1213:1 1246:8
1248:23
1250:18
1269:14
1294:19 1299:2
1308:8 1311:18
1343:6

**needed** 1001:9
1015:14

**needing** 1246:6

**needle** 1083:13,
14,25 1084:14,
18,23 1086:2

**needs** 1175:11
1213:13
1222:21

**negative** 1145:3

**neglected** 1246:5

**neighborhood** 1127:13

**neither** 1329:23

**nerve** 1126:17 1146:11 1162:10 1244:6 1282:15 1283:11,12,14

**nerves** 997:20 1133:6,7 1163:1 1283:20,24 1284:1

**nervous** 1160:6

**neurologic** 1111:4 1112:13 1114:11

**neuron** 1112:25 1113:4 1114:8 1132:10,11

**Neurontin** 1243:4 1244:5, 6,12

**never** 1005:10 1024:4 1028:7 1056:25 1072:13 1091:18 1116:19 1130:21 1140:1 1159:3 1270:16 1294:1

**new** 1034:7 1060:21 1079:6 1080:1 1095:12 1161:5 1171:3 1185:15

1307:16,21 1343:6

**next** 997:24 1015:11 1086:12 1087:2 1130:8 1155:3 1256:22 1295:13

**nice** 1019:18

**nidus** 1057:18, 21 1059:18

**night** 1242:3,4

**nighttime** 1307:23

**Nissen** 1092:19

**nobody** 997:19 1013:17 1183:24

**nocturia** 1307:17

**nodule** 1218:18

**non-mesh** 1166:9 1307:16, 20

**noncompliance** 1108:10

**nondepressed** 1165:14

**none** 1048:3 1185:23 1299:10 1318:19,20,21

**noninsulin** 1168:5,10

**noninsulin-dependent** 1167:24

1168:15

**nonresponsive** 1053:20 1065:10 1215:19

**nonsurgical** 1205:24 1228:11 1229:19

**nonvolitional** 1262:25

**nor** 1312:4

**normal** 1038:7 1047:10,25 1048:8 1049:10 1095:19 1100:12 1106:21 1112:8 1139:2 1188:12 1263:8 1264:17, 25 1265:19 1267:2 1269:9, 16 1270:3,4,21 1271:18,25 1273:24 1335:7

**normally** 1045:3 1047:16

**North** 1066:10

**Norton** 1220:20

**Nos** 985:7 986:22 987:17 1031:2 1066:20 1091:3 1130:15 1194:10 1232:18 1315:4

**notable** 1105:6

**notation** 1332:6

**notch** 1084:14

**note** 1072:9 1077:17,18 1089:13 1092:15 1111:19,20, 1138:24 1272:2 1297:13 1299:24

**noted** 1046:17 1070:24 1071:5, 1072:6,18 1077:21 1089:17,19 1093:20 1105:4 1107:11,24 1112:1,2 1113:11 1138:17 1139:25 1146:8, 23 1147:4 1200:5,10 1202:13,16 1203:2 1205:7 1218:12 1263:8 1264:17 1265:7 1271:24 1313:5 1336:19

**notes** 1264:25 1336:17

**nothing** 1085:25 1148:22 1202:9 1288:8 1295:14

**notice** 986:2 987:1 994:20 1002:25 1031:20 1223:6 1294:1

Case 2:12-md-02327   Document 7025-1   Filed 04/19/19   Page 516 of 924 PageID #: 213621





In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

| | | | |
|---|---|---|---|
| 20 1037:12,15, | 1104:1,10,18, | 25 1173:23 | 1237:25 |
| 23 1042:18 | 19,25 1105:8 | 1174:12,20 | 1238:13 1239:2, |
| 1044:5,8 1046:5 | 1106:12,16,19 | 1175:10,15,25 | 18 1241:5,24 |
| 1048:16 | 1107:5,15 | 1176:5,11 | 1242:8,20 |
| 1049:19,21 | 1108:6,11,24 | 1177:2,6,14 | 1243:6,12,19,21 |
| 1050:10 | 1110:10,23 | 1178:22 | 1244:3,17 |
| 1051:12 | 1111:10,19 | 1179:13,22 | 1245:3,19,25 |
| 1054:20 | 1112:4 1113:13, | 1180:4,14 | 1246:22 |
| 1055:24 | 20 1115:4,13 | 1181:7 1182:1,4 | 1247:19 1249:1, |
| 1056:15 1057:1 | 1118:25 | 1183:2,6 | 6,18 1250:21 |
| 1058:20 | 1119:14 | 1185:15 | 1252:2,18 |
| 1059:21,23 | 1120:23 1121:5 | 1187:12 | 1253:20 |
| 1061:12,23 | 1122:16,19 | 1189:17 | 1254:16 1256:4, |
| 1062:20 | 1126:8 1130:7, | 1191:18 | 25 1257:20 |
| 1063:13 1064:6 | 20 1131:7,16, | 1195:25 | 1258:13 |
| 1068:4,13,23 | 20,25 1132:19 | 1196:13,23 | 1259:25 1261:8, |
| 1069:1,2,3,7,9, | 1133:9 1134:7 | 1198:14,17 | 24 1264:20 |
| 13,23 1070:1,7, | 1136:6,22 | 1199:3 1200:10, | 1265:10 1266:6 |
| 11,20 1071:10, | 1137:20,25 | 15,19 1201:7 | 1267:9 1268:3 |
| 15,23 1072:5, | 1138:15,20 | 1203:5,14,21 | 1270:8,24 |
| 20,22 1073:9,17 | 1139:3,5,22,24 | 1204:20 | 1271:14 1272:9 |
| 1075:6 1076:20 | 1140:3,17 | 1205:10 1207:4, | 1273:1,3,12 |
| 1078:18,23 | 1142:4,12 | 1208:7,18,20 | 1274:10 1275:7, |
| 1079:13,18 | 1145:11 | 1209:17,19 | 12,18 1278:12 |
| 1080:6,15,21 | 1146:15 | 1210:3,10,15 | 1279:2,11,25 |
| 1083:17,23 | 1147:16,25 | 1211:9,12,20,25 | 1280:8,17 |
| 1085:9,25 | 1148:9,25 | 1212:4,10 | 1281:1,11,14,23 |
| 1086:4,25 | 1150:5,8,14,24 | 1213:8 1215:21 | 1282:1,10 |
| 1087:22 1088:7, | 1151:2,7,11,15, | 1216:10 | 1283:21 1285:7, |
| 18 1090:5,7 | 25 1152:6,10 | 1217:15,21 | 13,15,17 |
| 1092:1,4,24 | 1153:7,21 | 1218:22 1219:2, | 1286:6,15 |
| 1093:5,15,24 | 1154:3,10,14 | 11 1220:2,7,9, | 1287:4,13,19,22 |
| 1094:8,21,24 | 1155:24 | 17 1222:5,9,18 | 1288:1,4,11 |
| 1095:8,15 | 1156:23 1157:1, | 1223:1,24 | 1289:4,15 |
| 1096:6 1097:4, | 4,7,18 1161:9, | 1224:9 1228:19 | 1290:11 1293:3, |
| 16 1098:5,21 | 17 1162:2,13 | 1229:6,12,20 | 13 1294:6,22 |
| 1099:1,25 | 1163:19 | 1231:12 1232:7, | 1295:7 1296:5, |
| 1100:15 1101:4, | 1165:15 1166:1 | 21 1233:7 | 18,24 1297:2,19 |
| 17 1102:8,17 | 1168:23 | 1234:1,4,23 | 1298:9,14 |
| 1103:1,6 | 1170:10 1171:6, | 1236:13,24 | 1299:4,19 |

1301:2,23
1302:6,11
1303:2,7,9,13
1304:7 1305:6,
13 1306:8
1308:7,13,20
1309:3 1310:24
1311:18 1312:1,
12,17,21,25
1313:3,8,14
1315:9,25
1316:14,19,22
1317:2,5,10,21,
23,24 1318:8,15
1319:4,10,18
1320:7,19
1321:3,16,22,24
1322:4,12
1323:6 1324:17,
25 1325:10,15
1326:10 1327:5,
13,23 1328:7
1330:15,20
1331:1,6,9,12
1332:1,24
1334:14,19
1335:10,20
1336:6,13
1337:18 1338:3,
24 1339:4,7
1340:11
1342:16
1343:19 1344:2,
15, 1345:19

**old** 1103:13
1198:8 1240:25
1332:2

**once** 994:18
995:3,11,12
1016:22 1022:6

1024:11
1028:15,24
1061:10 1062:9
1070:23 1071:3
1073:5,19
1079:14
1096:16
1100:25
1103:12
1109:13
1118:25
1135:10
1136:16
1150:14 1203:8
1221:10
1264:24
1304:17
1323:19,20

**ondansetron**
1318:1

**one** 987:15 988:9
989:10,15,16
990:24 991:11,
24 996:12
997:13,23,25
998:9 999:3
1003:13
1004:22
1005:18,25
1006:1,5
1007:7,8,9,10
1009:23
1011:15 1012:5
1014:23 1015:8,
10 1017:17,18
1018:5 1024:25
1030:7,10
1035:19,23
1039:16,17
1040:21 1043:1

1046:19,24
1049:23
1054:14
1055:22
1061:14
1063:13 1069:5
1070:3,19
1074:24 1083:7
1086:1,16
1089:18
1090:20 1096:1
1098:21
1099:25
1103:16
1105:18
1109:24 1111:4,
5 1114:22
1123:1 1126:20
1127:6 1130:9
1145:3 1147:5,
16 1157:18
1161:12
1164:23 1165:8
1167:6 1169:1,
19 1171:2
1172:25
1173:13 1174:4
1181:14
1184:25 1185:7,
18 1186:6
1198:9 1200:5,
10 1214:14
1225:20 1226:6
1231:25
1235:22
1238:17 1242:2
1245:6 1250:17
1253:7 1254:3
1256:21 1260:8
1262:3 1283:10

1296:14
1300:13
1302:16 1304:1
1305:9 1314:4,6
1318:22 1321:4,
5 1326:20
1327:18
1328:25
1329:19
1337:22
1341:12 1345:1

**one's** 1034:2
1166:4

**one-centimeter**
990:22

**one-half-pack-
per-day** 1045:16

**one-time**
1205:12

**ones** 1030:12
1055:2 1127:9
1171:2 1233:8
1245:11
1256:24
1341:11

**ongoing** 1203:6
1279:16

**only** 990:24
1015:12
1020:16,21
1022:7 1023:15
1036:8 1044:20
1061:8 1065:15
1085:1 1093:24
1099:23
1114:22
1128:23 1139:6
1149:8 1156:18,

23 1169:8,13
1170:6 1176:3
1203:18,24
1205:11
1244:17
1260:18 1278:1
1282:25 1283:3
1303:4 1337:22

**onset** 1126:18,20
1141:16

**onto** 1159:3
1181:21

**op** 1084:3,10
1085:25
1230:20
1308:21

**open** 1100:24

**opening** 990:23
1017:6,8,21
1020:15,16
1161:1

**opens** 1141:2

**operated**
1040:19

**operating**
1040:13,21
1077:25
1251:21 1252:6

**operation**
998:19 1102:14
1116:5 1173:18
1294:24 1302:7
1303:14,19

**operations**
1084:2 1102:15
1303:23

**operative**
1008:18

1009:12
1018:13,20
1019:8,17
1071:20,23
1072:5 1123:24
1136:5,20,21
1217:13
1230:24
1231:25 1232:5
1302:13
1304:21 1329:1

**opine** 1007:14
1152:4 1184:15
1200:23 1201:6,
9 1248:19
1292:9 1311:22

**opined** 1172:25
1206:24
1226:17

**opines** 1184:17

**opining** 1152:7
1206:14 1207:9
1208:5 1211:25
1227:11,16
1229:7 1231:13
1258:17
1309:13

**opinion** 989:4
1000:8,13
1001:11,21
1004:20,25
1014:6 1044:13
1053:7 1055:1,8
1057:13
1138:20
1192:17 1193:2
1207:24
1208:10 1212:7
1213:25 1214:3

1216:10,21
1217:4 1228:7,
10,15 1229:19,
20 1239:13
1247:23 1248:6,
10 1268:4
1301:25 1311:9
1336:25 1337:4
1345:13,20

**opinions** 984:15,
17 1051:21
1052:11,19,21
1053:4,21
1054:22
1055:21 1056:5,
12,13,16
1065:25 1069:4
1101:10 1181:2
1206:12 1207:2
1214:15
1217:25
1226:12,14
1228:10
1247:18 1298:2
1314:10

**opportunity**
1186:5 1212:12
1266:8

**opposed** 989:16
1214:9 1255:14,
18

**opposite** 1070:21
1133:7 1160:8
1193:24
1253:19

**options** 1207:21
1229:15

**orally** 1264:22

**order** 1040:12
1109:20
1138:11,13
1201:9 1228:4,
16 1286:25
1296:16 1300:6

**ordinary**
1139:22

**organ** 1246:13
1280:14
1308:15

**organic** 1112:12

**orifices** 1072:16
1076:21
1077:19

**original** 1159:20

**other** 984:22
988:16 989:9
990:13 992:18
997:9 998:16
1001:4 1004:5
1007:23
1008:12 1029:7
1030:9 1034:5
1035:19
1055:22 1059:5,
7 1060:23
1061:3 1062:10,
1070:19 1086:1
1091:24
1093:11
1103:10
1106:22
1114:10
1129:15
1131:11 1134:3
1138:8 1145:11,
15 1153:10,12
1155:20

1159:19
1166:24
1167:11
1190:24 1197:2,
7 1202:5,14
1205:13
1207:10,22
1224:3,9 1235:8
1236:3 1243:17
1244:22 1245:9
1247:20
1250:17
1259:19 1260:9
1261:10 1268:5,
8 1271:6 1273:7
1278:2,4
1293:21 1294:6,
8 1302:16
1313:8,9
1326:18
1329:19 1337:6,
16,18 1338:3
1341:11
1344:12
1345:17

**others** 1026:11
1323:7

**our** 985:14
1066:23 1073:4
1115:15
1117:25 1118:1,
4,15 1126:7
1144:23
1184:14
1208:19 1265:6,
19 1268:9
1310:22
1336:14,17,25

**out** 989:6,9,18

990:6,10,13
992:6,24 993:9
994:25 995:9
998:1,13 999:23
1003:3 1006:16
1008:12 1010:6
1012:19
1023:13
1028:16,21
1030:5 1036:24
1037:5 1040:25
1041:18
1060:23
1061:10 1063:8
1077:18
1081:15
1083:21 1085:4
1089:5 1092:21
1099:10,17
1101:23
1102:13 1104:5
1107:1 1114:4
1117:11
1119:20
1129:22 1136:4,
8,11 1137:12,15
1139:22 1141:3
1145:2 1156:15,
17 1159:21
1169:12 1172:1
1174:13
1185:24 1186:6
1193:7 1195:17,
19 1197:6,10
1203:9 1211:5
1216:18 1219:2,
20,21 1220:1,7,
10 1223:2
1224:9,11,12
1225:3,5 1237:9

1239:10,24
1240:4,6 1250:7
1251:4,20
1252:12
1266:24 1269:1,
3 1270:21
1271:3,6,10
1272:19 1273:7,
14,23 1274:5,14
1294:15,22
1295:6 1304:20
1311:19,20,23
1313:11,13,15,
21 1320:3
1326:8,11
1328:24 1330:2
1333:13
1338:12 1344:4

**outcome**
1013:16
1014:11

**outer** 1334:5

**outlet** 1259:18
1260:9

**outlined** 1250:5

**outpouching**
990:2 1021:25

**output** 1078:2

**outset** 1067:6

**outside** 1037:25
1049:1 1236:11
1255:21,23
1291:25

**ovarian** 1093:12
1099:21 1134:1
1135:3 1137:5
1150:15
1322:10,15,16

1326:4 1328:8
1332:7 1333:21
1335:4

**ovaries** 1095:7
1096:11,17
1097:9 1099:2,
9,14,15,17,18
1102:13,25
1104:5,9
1203:25 1204:3,
8,14,17 1239:24
1240:5 1241:1
1251:4 1252:9
1335:6

**ovary** 1134:12
1137:14
1202:17 1203:1,
19,20,22 1332:8
1334:6,16
1335:3

**over** 993:5
1006:8 1030:1
1040:7 1044:1
1058:17,
1070:18
1075:15,16
1079:7 1084:14
1086:6 1095:16
1103:11
1104:14 1105:8
1111:6 1112:17
1116:20
1121:22 1122:6,
12,13 1124:5
1181:11
1216:19,22
1217:19 1246:7
1274:10
1291:16 1308:2

1333:24 1335:1
1341:7

**overactive**
1042:19 1044:7,
16,21,23
1111:3,22
1112:6,10,14,
19,23 1113:5,8,
9,16,19,22
1114:5,11,24
1115:5,11,22,23
1116:3,12
1119:11,15,19,
21,22 1120:4
1121:10 1132:3,
4 1192:23
1266:5 1306:6,
16,17 1325:1,4,
7,13,20
1342:18,21

**overcorrection**
1017:5 1173:4
1259:23
1260:14,18

**overdoing**
1190:25

**overfiring**
997:20

**overgrow**
1267:19

**overlap** 1173:22
1174:13
1175:17

**overscars** 1049:2

**oversuppression**
1111:5

**overweight**
1156:10

**overwhelming**
996:15

**own** 1012:5
1039:19 1109:2,
6,11,17
1216:22,24

**Oxycodone**
1243:4,19,21,25

---

**P**

---

**p.m.** 1090:22
1091:1 1130:11,
18 1155:6,13
1194:6,13
1226:1,5
1232:12,16
1274:23 1275:2
1314:24 1315:7
1346:12,16,23

**pack** 1045:18

**page** 988:4,5,24
1069:22 1071:1
1084:11 1093:1,
4 1106:10
1134:7 1136:17
1137:25 1143:5
1148:13
1151:11
1180:25 1181:2,
13 1187:4,12
1198:15
1209:17
1226:15
1247:17,18
1259:14
1276:10,11
1316:9 1317:2
1340:12

**pages** 1044:1

**paid** 1043:2

**pain** 987:25
988:15 989:22,
24 990:1,7,16,
18,20 991:2,5,7,
9,20 992:1,8
993:13 994:1,18
996:5,9,16
997:3,4,5,7,8,
12,15,17,23,24,
25 998:3,12,14,
15,17,18 1000:7
1011:2,11
1012:16,25
1014:7,18
1015:19 1021:3,
6,10,11,16
1033:21
1034:10,11,16,
21 1035:3,9
1036:8,13,16,
19,21,23,24
1037:2,3,6,7,10,
11 1050:8
1057:2 1065:12,
15 1068:6,15
1086:22 1087:3
1088:11
1090:10
1091:21 1092:7,
11,17,22,25
1093:3,11,23,25
1094:5,10,15,
18,19,23,25
1095:5 1097:6,
20,22 1098:3,6
1099:3,11,17,
21,22,23
1100:16,17,18

1101:1,2
1121:13
1124:11,16,20
1126:15,20
1127:4,15
1128:1,2,9
1129:1,4,11
1130:2 1131:10
1132:13,16,18,
19,25 1133:3,9,
12,17 1134:6,
16,19,23
1135:7,8,14,15
1136:24 1137:8,
11,18,21
1138:4,17
1139:8 1143:6,
7,9,10,11,16,
1145:20 1146:1
1147:3,10
1149:21 1150:4,
13,22,23,25
1151:5,9,12,23
1152:12,25
1153:23,25
1154:12,19,21,
22,23,25
1155:1,2
1158:16,17,19
1163:24
1164:11
1165:13,20,24
1167:7,18,19
1168:18,22
1169:14,17,21,
22,25 1170:1,7,
9,18,23 1171:7,
17 1172:4,11,23
1173:2,5,13,15,
16,17,25

1174:2,11,13,
15,17,20,24
1175:1,4,14,16,
19,24 1176:7,
13,21,22
1177:1,9,18
1178:25 1179:5,
6,8,22 1180:3,
16,22 1181:4
1182:5,16,18,25
1183:19,20
1184:8,18,24
1185:3,22
1186:1,13,17,
18,22,24
1187:2,15,16,
19,20 1188:5,7,
14,22 1189:6,
14,18 1190:6
1191:12 1192:1
1193:9,15
1195:6,7
1201:23
1202:11
1203:16,20
1204:7,20,22
1208:11,12
1212:6 1218:13,
24 1219:3,23
1221:21,25
1222:1,2,8
1223:6,17
1224:25 1225:1,
10 1235:11
1236:9,10
1241:23
1242:20,25
1243:9 1244:1,
9,15 1245:1,3,
10,15 1247:2,9,

12,16,19,24
1248:20
1249:13,14,23
1251:8,12,14,
16,18,22
1252:4,19,20
1255:1 1257:13
1258:7,17
1261:14,20
1262:23 1263:3,
9 1264:12,17,
21,25 1268:18
1269:24,25
1270:10 1271:2,
20 1272:1,3
1273:2,4,10
1276:1,7,12,18,
25 1277:12,15,
18,20 1278:6,
19,21,23
1279:13
1282:17,19
1283:1,4
1284:9,17,18
1285:11
1290:23 1295:2,
7 1296:8
1300:17,20,21,
23 1301:21
1310:13,17,25
1311:11 1312:5,
8,14,18,19
1313:21,24,25
1316:10 1319:5,
7 1322:10
1325:24 1326:1,
2,5 1328:1,2,17,
18,21,25 1330:4
1331:3,5,9,20,
22,24 1332:2,3,

11,25 1333:18,
21 1334:15,21,
23,25 1335:2,4,
16 1336:18,24
1337:2,20
1338:5,6,9
1339:10 1340:8,
16,18,22
1341:13,17,22

**painful** 1087:9,
11, 1105:25
1128:3 1129:6
1135:4 1139:6,
7,16 1143:24
1147:5 1167:8,9
1225:16
1236:17 1237:6,
12 1247:19
1286:9,14
1287:9 1318:24
1319:7 1326:20
1328:4 1334:6
1342:9

**pains** 1265:23

**palpable**
1046:19,21
1047:12 1048:2
1050:3,4

**palpate** 990:19
1174:1

**palpated**
1084:16
1310:19
1312:15

**palpating**
1176:15

**palpation** 1263:9
1264:17 1265:1

1327:12 1334:3

**panic** 1195:8
1200:13,17,20
1201:5 1208:15
1225:2,3,7,8,9,
13,18 1242:5

**pannus** 1093:21

**pap** 1144:6

**paper** 1114:17

**papers** 1053:2
1116:20

**papilloma**
1143:22

**paragraph**
988:7,8,12,24
1106:9 1134:8
1139:24 1143:5
1146:7 1148:14
1181:4 1310:22

**paraphrasing**
1180:20 1231:3,
6

**parasympathetic**
1160:7,9,14,16

**Pardon** 1093:2
1146:20 1281:9

**parity** 1316:4

**Parkinson's**
1113:5 1114:9

**part** 990:4
1004:15
1014:19 1017:8
1021:14,15
1073:16
1093:22
1114:13
1139:21 1142:5

1153:24
1154:12,19,21
1158:17 1177:8,
16 1180:24
1182:6,19
1183:21
1186:15 1187:3,
21 1193:16
1209:24 1237:7
1255:8 1267:17
1281:5 1282:7
1300:4 1303:12
1315:25 1327:5,
6

**partial** 1240:2,3

**partially**
1060:10 1213:5
1304:3

**particular** 986:9
1012:13
1021:22
1024:23
1039:20
1060:19
1077:11
1124:19
1134:16
1231:14
1266:25
1328:18

**particularly**
1064:10,12
1131:24 1173:1
1210:17 1245:4
1250:18

**parties** 1281:17

**partner** 1202:7

**parts** 1156:22

1160:5 1268:14
1272:24 1329:6
1336:9

**pass** 1070:22
1076:10
1083:12
1085:17 1086:6
1222:11

**passage** 1061:1
1072:7

**passed** 1221:16
1222:17
1223:14

**passes** 1221:24
1223:25 1341:9

**passing** 1318:23
1319:6 1341:7

**past** 1134:9,16,
22 1158:3
1172:25
1233:12 1316:4

**path** 1051:5

**pathologic**
1144:8

**pathology**
1020:25 1192:2

**patient** 998:16
1002:3 1011:10
1013:21
1023:25
1030:12
1036:17
1038:21 1039:4,
5,7 1040:21
1053:9 1056:19
1061:15,21
1077:24
1082:17

1095:22
1112:10 1133:2
1138:6 1139:1
1142:23 1143:2
1145:19
1147:13 1177:7,
8 1205:22
1227:15,19,21,
22 1228:6,14,17
1229:4,11,13
1234:10,14
1236:19
1248:24 1249:2,
7 1289:6 1292:2
1299:1,6,13,21
1308:15
1311:21
1314:19
1320:12
1321:21
1324:22 1338:7
1344:9,10

**patient's**
1024:11 1072:9
1076:21
1077:17,19
1084:20
1178:10
1207:16,19

**patients** 997:15,
16 998:11
1021:15
1034:20 1036:6
1037:1 1044:20,
22 1057:25
1061:5,7,12,
1065:22 1089:6
1127:14,18,20
1132:17,22,24
1140:8 1142:19

1166:10
1171:20
1172:21
1174:10
1177:11
1185:20
1188:13
1189:15
1190:21
1192:23 1201:4
1210:18 1230:5,
8,13,16 1238:20
1245:14
1249:13
1252:18
1282:24,
1289:25
1293:17 1321:4
1323:10
1324:19
1326:22,23

**patients'**
1124:20

**pause** 991:3
1195:20,21

**Paxil** 1158:3,11
1159:5 1162:8

**pay** 1028:21

**PDR** 1320:3
1321:19

**pea-sized**
1218:18

**pee** 1197:9

**pelvic** 987:24
988:15 990:18
994:9 996:15,
21,23 997:2,7,
11,12 998:15,18



**perforation**
1059:12 1069:7, 8,10 1071:6,22
1072:6 1076:10, 18 1078:19,20
1081:6 1083:5, 14 1089:19

**perforations**
1082:10 1090:7

**perform** 1009:9
1011:12 1068:1
1117:4 1194:21
1209:1 1212:12, 14 1227:12,23
1289:12
1291:20 1292:1
1296:21

**performance**
1074:14

**performed**
1003:1,5
1008:9,22
1016:2 1017:4
1052:2 1071:4
1084:6,7,8,20
1085:16 1100:2
1150:3 1214:12
1226:18
1227:14
1264:24
1289:10,14
1297:15
1308:16 1326:5

**performing**
1015:17
1051:25
1085:15
1138:11,12
1205:22

1212:13

**Perhaps** 1341:3

**peri** 994:6

**perianal** 1059:25
1060:2

**periappendiceal**
1135:20

**perimenopausal**
1095:20 1104:4

**perimenopause**
1095:13,17

**perineal** 1016:10
1017:2,12,13
1020:12

**perineoplasty**
1018:11,18
1019:2 1020:9

**perineorrhaphy**
1017:3

**perineum**
1010:11

**period** 1039:5
1089:10
1095:18 1115:2
1136:13
1138:24
1169:21
1212:23
1221:13 1224:2
1238:1 1257:23
1260:10 1279:1
1304:12
1305:16
1330:10,15

**periods** 1093:11
1095:19,21
1102:23

1156:21 1326:3

**peripheral**
1103:17,20
1110:1 1247:4
1283:9

**peripheries**
1282:20

**perirectal**
1010:5,8
1044:11
1050:20 1051:6
1057:10 1058:2, 6,12,24 1059:2, 3,8,9 1060:13, 17 1061:2,6
1063:4

**peritoneal**
995:11 1203:10

**peritoneum**
1145:25

**periurethral**
1305:3

**permanency**
1013:11

**permanent**
1304:13
1306:18

**peroxides**
1267:18

**persistent**
987:24 988:15
1050:8 1057:2
1065:11
1131:10
1149:21 1150:7
1203:6 1295:7

**person** 1026:2
1039:20

1047:16,17
1048:3,5 1117:2
1118:19
1127:17
1175:12 1189:2
1231:16
1241:24 1249:2
1262:13 1267:1
1272:5 1292:13, 14 1325:13
1328:14

**person's** 1040:3
1048:13

**personal** 1307:3

**personally**
1068:1 1074:9
1091:15

**pertinent** 1033:8
1134:3 1156:7, 21 1196:1
1200:6

**pessary** 1205:7, 12

**petechial**
1327:17

**Petri's** 1127:1

**PFM** 1185:21,25

**PFMS** 1185:24

**ph** 1253:21,22
1254:8 1256:5, 8,11,12 1273:13

**pharmacy**
1248:25

**phenomenon**
1341:8

**phone** 1301:7

**phrase** 1021:13

**physical** 990:14
999:19 1105:5
1165:23 1166:1
1184:22
1264:19 1272:7
1292:12,17
1326:18 1327:3,
6,7 1343:3,10
1344:2,12

**physically**
1188:8 1189:19,
21 1190:4,22

**physician**
1040:19
1180:18
1227:20
1324:14

**physicians**
1033:1,4 1212:8
1335:16

**physiological**
1292:25

**picks** 1060:25

**piece** 1117:11
1219:18,25

**piriformis**
1146:8,11,12,
16,19,22,
1338:24 1339:1

**place** 995:17
997:25 1004:4
1042:23
1060:25
1065:15 1070:9
1071:11
1072:19
1077:22

1083:19
1086:10 1090:3
1097:10
1100:12 1119:2
1173:16 1179:2,
1203:18 1209:4
1283:3 1293:14

**placed** 998:13
1000:16 1015:8
1048:7 1060:18
1070:17,23
1078:11
1083:17,22,25
1084:14,21
1101:25
1131:19
1179:17
1183:11 1198:8
1209:3 1212:25
1230:21 1250:3
1251:25 1257:1
1260:15,19
1268:21 1300:5
1308:22 1312:2
1336:19

**placement** 993:4
996:24 1005:1
1072:8 1082:14
1086:10
1126:16
1204:25
1230:14
1231:25 1257:3
1259:1 1306:22

**places** 997:9
1118:1 1232:9
1283:21
1297:11

**placing** 1070:3

1178:2

**plaintiff** 985:15
986:9 1024:24
1029:4 1030:8
1032:5,6,9
1091:6 1130:20
1131:21
1155:24
1232:22 1275:8
1315:10
1338:14

**plaintiff's**
986:25 1031:19
1122:3

**plaintiffs** 984:18
1029:20
1067:23

**plane** 1003:14
1004:9,17

**planning**
1314:12

**plaques** 1036:9

**plastic** 1100:8
1102:15 1129:9
1297:15,18
1313:4

**plate** 1048:10
1174:23

**plausible**
1303:15

**play** 991:21
1261:10,13
1296:1

**playing** 1043:18

**please** 984:7
1233:8

**plicate** 1178:7

**plicated** 1009:25
1010:9 1304:17
1308:23

**plicating**
1304:19

**plication** 1008:9,
16 1009:9
1015:6,15,17
1176:3 1183:9
1299:25 1300:3,
4,11 1302:4,9,
15,19,23
1303:3, 1304:6,
7,9,14 1305:2,8,
10 1306:8,10
1308:24 1311:3
1312:22 1313:5

**plications**
1011:13,22
1012:23
1013:17
1300:21,22

**Plus** 1000:17
1209:3 1215:24
1224:17

**point** 996:20
1031:24 1047:1
1058:10 1063:6
1071:3 1074:12
1075:4 1081:12
1105:21
1109:14
1110:20 1116:9
1117:10 1145:2
1147:16 1216:8
1217:18
1231:12
1252:15
1255:11

1259:17 1260:6
1264:11
1295:25

**pointing** 1077:18

**points** 1172:7

**poking** 1097:13

**polypropylene**
1000:15 1001:3
1006:10
1007:21 1008:4

**polypropylene-
based** 1000:19

**Pomeroy**
1136:12

**poor** 1083:8
1190:25
1323:12

**pop** 1082:14
1142:22

**pore** 1000:23

**portion** 1084:12,
13,16,17
1136:11 1162:7
1177:22 1178:6
1216:18
1223:20,22
1336:13
1339:17 1340:2

**portions** 1184:14
1208:19

**position** 1051:15
1100:20 1102:4
1104:22
1206:13 1249:4

**positioning**
1101:18

**positive** 1144:13,
22 1145:12,16
1148:17,19,21
1149:15

**positivity**
1145:17

**possibilities**
1141:25 1142:1
1189:11

**possibility** 995:5
996:6 1050:15
1078:20
1143:15
1147:17 1163:9,
15,17 1246:5
1252:4 1280:24
1286:4 1321:18

**possible** 995:25
1069:8 1071:6,
22 1075:2
1087:17,19
1089:18
1107:17
1170:13,15
1222:11
1280:20 1282:5
1303:2 1321:16

**possibly** 1036:17
1129:10
1143:16 1190:9
1191:4 1202:13
1303:17
1306:12
1324:19

**post** 995:5

**post-ablation**
1135:5

**post-op** 1194:1

**post-tubal**
1135:2

**post-void**
1046:13 1194:1
1258:21

**posterior**
1000:18 1006:3,
7 1008:23
1013:11,13
1018:10,17
1019:1,5
1020:18
1084:12 1170:2
1172:3,17
1173:4 1174:14,
18 1175:5,9,13,
16,21,24
1182:14,20,24
1183:5 1190:2
1213:14

**posteriorly**
1010:3,18
1157:8

**postmenopausal**
994:6, 995:16
1089:10
1103:19 1104:7

**postoperative**
994:12 1039:5
1041:7 1138:24
1169:21 1209:6
1212:23

**postoperatively**
1006:10
1100:22
1305:12

**postpartum**
1136:13

**postulated**
1141:15

**potential** 996:22
1078:15
1094:14 1097:5,
19 1099:3
1100:2,15,17
1103:9 1114:4
1119:15
1129:23 1130:5
1131:23 1141:7
1193:8 1201:20
1240:19 1244:4
1251:21 1268:9,
23 1285:22
1294:23
1313:10
1318:15 1320:1,
11,24 1322:13
1325:7

**potentially**
1034:20,23
1071:13
1078:12,25
1090:18
1097:21 1098:1
1110:25 1130:6
1137:9 1143:11
1147:2 1153:13
1157:19
1165:12 1190:5,
24 1193:20
1199:6 1222:19
1237:18 1247:1
1269:2 1287:6
1305:25
1319:11
1325:19,21

**potentiate**

1037:22

**pound** 1109:24

**pounds** 1103:16
1104:6, 1109:8,
24

**practically**
1000:23

**practice**
1163:10,12
1166:7 1172:25
1185:23

**practicing**
1281:3

**practitioner**
1168:21

**pre-
hysterectomy**
1137:21

**pre-implant**
1021:2 1033:8
1092:4 1133:24
1137:20

**preceded**
1059:16

**precipitated**
1273:10

**predisposed**
1323:25 1324:2

**predisposing**
1323:23

**prednisone**
1033:12
1051:10

**preexisting**
998:22,24
1336:18
1342:24

**preferable**
1309:8

**preferred**
1298:18

**pregnancy**
1089:8 1333:14

**pregnant** 1198:8
1333:11

**premenopausal**
1267:20

**preoperative**
1093:19 1344:4

**preparation**
1181:11

**prescribed**
1035:16
1108:23,25
1265:4,7 1267:1
1269:10,13
1318:10

**prescription**
1108:16
1248:14,18

**presence** 1118:6

**present** 985:22
1060:20
1113:10 1162:3,
7 1184:18
1341:24

**presentation**
1127:12

**presented**
1144:12
1184:19

**presents** 1256:25

**pressing** 1340:21

**pressure** 990:1
1021:24
1100:22
1138:19,21
1166:3 1212:25
1213:11,19,20
1214:7,22
1215:2,8,9,10
1276:7,12,15,20
1277:12,15,18
1284:9,20,21
1288:16,21,23
1299:17,18
1301:8,12,13,
17,24 1310:13,
15,25 1312:20,
23 1313:1,20
1317:9 1331:4,
15,19 1341:8

**pretty** 1059:7
1071:21
1164:20 1216:5
1243:12
1263:21 1292:5
1336:9

**prevalence**
1110:15,21

**prevalent**
1296:15

**prevent** 1318:3

**previous** 984:16,
18 985:3 1054:5
1091:22
1096:14 1134:3
1169:24 1206:1
1225:16
1254:18
1282:10

**previously** 985:2
1031:25 1045:6
1136:23
1207:21
1233:11
1250:21
1281:14
1285:18
1297:25
1313:22
1325:12
1345:22

**prior** 993:2
1001:22 1021:6
1023:25
1035:11
1036:20 1037:8
1041:9,11,16
1053:14
1060:16,17
1063:21 1071:6
1072:8 1074:7
1075:19 1088:4
1089:18 1092:7,
16 1093:25
1094:1,21,24
1105:14
1107:16
1114:14 1124:6,
7,10 1137:11
1156:8 1163:19
1195:25 1200:6
1204:24 1228:2
1233:5 1238:9
1239:15
1240:13
1244:12
1249:13,19
1265:9,20
1280:6 1281:18

Bruce Rosenzweig M.D., Vol. IV

1294:6 1298:9
1308:16 1316:5,
6 1322:17
1325:23 1337:7,
18,21 1338:5
1343:7,13,15,
19,23 1346:2

**Privileged**
1029:10

**probably** 992:12
998:10 999:11
1009:22
1014:17
1022:24 1030:2,
13 1095:15
1106:6,25
1127:18,19
1138:12
1153:22
1181:20
1210:15 1224:6
1236:3 1270:25
1280:23
1291:10
1293:25 1294:3
1324:14 1336:8
1339:25

**problem**
1095:12
1100:25 1114:8
1181:22 1202:3,
4,10 1263:19
1264:9

**problems** 998:17
1044:9 1048:4
1068:7,8
1088:12
1127:15
1131:12,13

1151:15
1158:16,20
1193:21,22
1195:7,11
1208:12
1218:25 1220:9,
13 1223:7
1224:11 1241:3
1257:14 1299:1
1300:13

**procedure**
1004:15
1007:17
1008:19
1012:14
1013:24
1038:13
1040:20
1051:25 1052:1
1064:4,9,11
1069:2,6 1074:8
1075:4 1077:24
1082:7,14,17,
18,19,22,25
1084:5 1085:15
1088:5 1090:2
1113:10,24
1136:10 1140:4
1156:10,24
1169:12,15
1173:6 1207:12
1227:14 1241:1
1291:20 1297:3
1299:24 1300:5
1302:3 1306:10
1311:20 1313:4
1328:13,19
1330:9,13

**procedures**
1074:17 1102:9

1134:23
1138:25
1141:13
1172:23 1190:6
1198:4 1218:5
1227:13
1250:14 1302:7
1303:14,19,24
1307:16,20
1328:19 1343:7

**process** 1001:1
1023:2 1038:22
1052:5,12,23
1055:9 1056:17
1077:11
1079:23 1087:2
1100:19
1139:21 1145:5,
6 1206:13
1342:4 1345:24

**processes**
1035:4,5 1053:9
1055:22

**proctalgia**
1154:10 1339:4

**Proctor** 1326:12

**produce**
1027:14,18
1103:25

**product**
1000:15,19
1215:16

**products**
1206:23 1207:1

**progression**
1103:9

**progressive**
1109:10

**prohibited**
1258:12

**prohibiting**
1258:9

**prolapse**
1097:22
1098:14
1213:10,18,20
1214:7 1227:25
1228:14,18
1229:23
1299:14,23
1308:15
1331:10,14

**prolapsing**
1098:2,3

**prominent**
1179:7

**promise** 1028:6
1050:22 1122:3
1159:2

**prone** 1323:7

**pronounced**
1034:16

**pronouncing**
1072:13
1133:19

**proper** 1047:17
1227:23
1259:15

**properly**
1186:11

**prophylactic**
1210:18,21,23
1211:6

**propriety**
1227:12

prospective
1003:24 1142:8
1170:21

protective
1118:10

protocol 1112:9

proven 1003:24
1142:9

provide 1028:6

provided 986:7
1028:25
1231:16 1241:6

providing
1206:12

provokes 1289:2

psoriatic
1033:11
1035:17,20,24
1036:7,9,12

psychological
1035:3,5,6
1293:22

pubic 1180:12,
13 1182:11
1183:1,12,16,21
1185:3 1191:14
1252:16
1286:25

pubovesical
1009:24

pull 1003:3
1023:13
1041:18
1042:23 1043:8
1187:7 1320:3
1344:4

pulled 1071:4

1084:18

pulmonary
1288:15

punch 1341:3

puncture
1079:10
1080:16,17
1081:1,4,7,13,
14,18 1087:12

punctured
1071:17
1080:20

punctures
1087:23,24

purpose
1055:19,20

purposes 985:2
1281:20

push 1070:13
1186:22
1334:12

pushed 1312:9
1313:23

put 990:1 1001:8
1030:23
1043:16
1051:15
1055:13 1073:6,
9 1074:12
1077:25
1083:18
1100:22
1115:15 1128:4
1129:6 1155:14
1161:23 1171:1
1186:25
1190:14 1214:7,
22 1217:8

1239:23
1254:16
1288:23 1310:4,
6

puts 1109:17
1178:14
1190:15

putting 1058:21
1213:20
1288:21

_____

## Q

quadrant
1247:13 1332:3

quadriceps
1147:6

qualified
1227:20

quality 1247:15

quantifications
1258:22

quarrel 1265:11

question
1002:24
1006:11 1009:8
1015:16
1023:15
1038:16,18
1043:24
1048:16
1052:25 1053:6
1055:4,16,17
1056:1 1064:21
1069:23 1070:7,
11 1071:10,15
1078:3,6 1088:9
1104:10

1107:15
1122:11,22
1132:1 1136:16
1142:6 1164:10
1165:18
1187:17,24
1188:4,12,20,25
1189:13,23
1190:1 1206:19
1214:6 1218:9
1225:21 1226:7
1227:8,11
1239:2 1251:14
1254:19
1263:18,20,25
1276:16
1284:14
1310:10 1325:8,
16

questions
1054:11
1072:20 1122:1
1147:16
1226:11
1268:16
1274:20
1314:19
1346:18,20

quick 1030:19
1079:25 1181:3

quicker 1012:10

quickly 1011:17
1041:9 1090:5
1169:17
1216:12
1325:10

quiet 1263:22
1264:3

**quit** 1165:3

**quite** 1072:16
1076:21
1077:19
1087:24
1094:11
1100:19
1208:10 1233:4

**quote** 1021:10
1039:22
1075:25
1210:19
1298:18
1308:13 1312:3
1313:5

**quoted** 1188:10

### R

**radiate** 1143:16

**radiates** 1247:14

**randomized**
1003:24 1142:8
1170:21

**rapidly** 1039:25

**rare** 1171:8
1211:18

**rarely** 1169:14,
1222:22

**rate** 1024:22
1025:1 1307:3,
6,13

**rather** 1041:9
1146:1 1147:12

**re-ask** 1286:15

**reach** 1242:15

**reacting** 1163:1

**reaction** 1001:8
1006:9,17
1007:20
1047:22
1048:10
1123:24
1127:21 1191:9,
22 1259:7
1260:4

**reacts** 1162:13

**read** 1009:11
1018:15
1059:20
1069:13 1084:3
1089:2 1094:11,
13,14 1125:9
1126:7 1184:14
1187:1 1208:18
1217:4 1218:2
1261:6 1293:15
1295:22 1303:7
1307:8 1309:2
1310:22
1336:13

**reading** 988:1,4,
6 1007:10
1009:19
1018:25 1076:4
1276:8

**ready** 1067:24

**realize** 1245:16

**really** 995:4
998:21 1004:19
1010:15 1013:6,
7,18,19 1014:11
1015:16 1024:1
1028:16
1029:19
1039:15,18

1104:22
1115:14
1116:10,25
1120:8 1135:23
1144:15 1150:5
1171:20
1176:21
1201:15
1204:21
1205:11
1211:22 1223:6,
8,13 1224:3
1252:19 1255:7
1262:13
1263:16,19
1266:23
1290:20
1296:19
1311:18
1323:13 1333:9,
15

**realm** 1141:25
1142:1 1189:11

**reapproximate**
1014:24 1305:2

**reapproximated**
1010:12
1306:24

**reapproximation**
1018:3

**reason** 986:24
1004:5 1007:22
1056:15 1058:4
1063:5 1109:6
1166:24 1173:2
1190:9 1202:2
1244:18
1265:11
1270:14

1309:18,20,23
1341:17

**reasonable**
1116:1 1117:2
1183:18
1184:24
1312:18
1346:10

**reasonably**
1227:20 1312:4

**reasons** 989:15
994:3 998:5
1000:6 1081:16
1113:21
1190:25
1198:22
1199:14
1201:21
1244:22
1251:19
1309:25 1310:3,
6,8 1324:21
1335:8

**reattach** 1098:15

**reattached**
1209:2 1212:16

**reattaching**
1214:8

**recall** 992:20
1029:2 1045:16
1083:15 1103:3,
5 1108:14
1171:18
1218:21 1238:4
1241:14
1258:11 1303:9,
11 1314:15
1318:9,21

1344:17

**received** 986:4

**recent** 1144:12
1277:8

**recently** 1218:11
1292:2 1335:25

**receptive**
1266:20,21

**receptor** 1161:7

**receptors**
1111:13 1161:8
1162:13,19,20

**recognize**
1032:19,25
1033:3

**recognized**
1185:22

**recollection**
1042:1 1045:20

**recommend**
1324:14

**recommendation**
1207:12

**recommended**
1207:25

**record** 984:1,6,
10 985:18
1029:19
1030:24 1032:9,
25 1064:22
1066:13,17,24
1090:21,25
1123:8 1130:10,
17,24 1155:5,
12,14,17
1185:12 1187:9
1194:4,5,12,15

1225:25 1226:4
1232:8,11,15,22
1244:20
1274:21,22
1275:1,8 1288:3
1314:22,23
1315:6,11
1346:8,11,15,23

**records** 986:12
994:21 1002:25
1020:4 1025:7
1041:19,20
1042:23 1043:2,
8,15 1053:3
1064:19 1089:1
1102:18 1105:4
1108:10,12
1125:1,10
1131:1 1168:17
1177:14
1194:25
1197:19 1206:9
1211:4 1231:16
1238:1,4
1239:17
1248:13 1257:7,
24,25 1258:5
1260:24
1270:15 1282:2
1308:21 1323:5,
16,18 1335:12
1344:1

**rectal** 1310:13,
15 1311:1
1312:5,18,19

**rectocele**
1157:11,14,17
1298:10,12,17,
19,22,23,25

1299:3,9
1310:14

**rectovaginal**
1044:10

**rectum** 1003:16
1022:17 1154:2,
19 1155:1
1215:6

**rectus** 1014:24
1174:5 1190:11
1191:13
1312:22

**recurrence**
1057:3 1064:7
1188:2 1300:15
1307:4,6,7

**recurrent**
1044:10
1050:19,20
1058:1 1061:6
1062:8 1063:3
1090:15
1113:18
1121:10
1124:13 1128:2
1129:4 1224:6,
10 1239:11
1276:21
1345:11

**red** 1049:3

**reduce** 1305:4,
18

**reduction**
1311:2,5,8

**referred** 1029:4
1240:1,9

**referring** 1021:4
1042:5 1061:13

1107:18

**reflected** 1027:5

**reflective**
1190:17

**reflux** 1092:23
1253:1

**refractory**
1094:6

**refraining**
1207:8

**refresh** 1318:6

**refreshes** 1057:8

**regard** 1024:9
1056:6 1122:11

**regarding**
1052:4

**regardless**
1059:5 1073:10
1099:4 1110:17

**regards** 987:2
1055:15,16

**region** 1134:6
1154:7 1247:14
1280:22 1281:2

**regular** 1324:10

**rehash** 1122:7

**reinoculate**
1115:19 1119:4

**reiterate** 988:10

**relate** 1037:16
1321:13

**related** 1036:17
1057:14
1062:23
1126:15 1137:5
1196:15,16

Case 2:10-md-02327   Document 7025-1   Filed 01/19/20   Page 384 of 229 PageID #: 213639



**replicate** 1272:7, 13

**report** 984:17 985:16 986:20 987:14 988:2,9, 25 991:16 1003:3 1008:18, 20 1009:12 1016:8 1018:14, 20 1019:9,10, 17,21,22 1020:11,25 1021:8 1022:24 1023:17,23 1025:7 1031:9, 17 1032:14 1033:8 1036:20 1043:16,21,22, 23 1044:4 1050:17 1051:13 1059:21 1064:23 1066:25 1067:2 1069:5 1071:21, 24 1072:5 1083:11 1084:3, 10 1085:25 1091:7,12,13 1092:15,18 1093:1,4,25 1094:10 1096:24 1103:2 1106:10 1111:20 1121:16 1126:8 1130:25 1131:3 1134:7 1136:5, 21 1140:13 1155:18,22

1168:18 1172:4 1180:25 1184:15 1186:25 1188:10 1192:2 1194:16,18 1208:9,19 1211:7,8 1217:13 1226:14,24 1227:9 1230:24 1232:1,2,5,23 1233:1 1247:11 1258:1 1265:6 1268:12 1275:9, 10 1276:8,11 1279:2 1280:5 1297:17 1302:13 1308:21 1309:1 1310:23 1315:12,16 1316:9 1322:7 1336:14 1340:12 1344:5 1345:16,18,19

**reported** 1011:10 1037:13 1112:5 1170:18 1210:12 1301:5

**reporter** 984:6 1009:18

**reporting** 1015:19 1112:4 1140:11,14 1141:22 1144:12 1225:15

1344:10

**reports** 1005:4 1151:12 1166:25 1230:20

**reposition** 1082:13 1085:5, 7

**repositioned** 1085:2

**repositioning** 1085:19

**represent** 1122:23

**reproduce** 1065:16 1167:21 1183:24 1184:8

**reproduced** 990:20 1184:2 1310:20 1313:24

**reproducible** 1184:21

**reproductive-age** 1149:6

**reputation** 1005:15

**request** 1257:7

**require** 1198:4

**required** 1109:20

**requires** 1308:15

**requiring** 1060:1 1209:6

**research** 1044:2

1098:10 1133:14 1142:7

**resection** 1134:13

**reset** 1112:15

**residual** 1046:13 1194:1 1258:21

**resistance** 1058:11 1063:6, 8,9

**resistant** 1266:24

**Resolution** 1328:17

**resolve** 1024:12 1109:2 1115:1 1199:5,9,10 1222:15 1251:18 1329:2

**resolved** 989:2 1061:16 1150:4, 18 1151:12 1326:7 1330:11 1344:20

**resolving** 1209:14 1211:13 1212:1

**respect** 984:16 1022:6 1029:17 1038:10 1051:22 1058:18,20,22 1068:4 1087:1 1104:25 1111:21,22 1122:9,16,17,18 1123:20 1144:16 1152:8

1168:18 1197:1
1207:11 1218:5
1227:17 1253:5
1274:6 1277:19
1285:24 1286:7
1310:25
1322:19
1338:13 1342:6
1346:3,18

**respond** 1094:15

**responds**
1215:25

**response** 987:1
1005:4 1054:19
1079:16 1094:8
1103:19 1104:3
1317:17 1346:3

**responsible**
1116:2 1304:4

**responsiveness**
984:23

**rest** 1019:24
1073:17
1097:14 1313:2

**resting** 1332:19,
20

**result** 996:9
1014:18 1017:1,
16 1029:6
1033:25 1051:9
1059:3 1079:1,
23 1082:25
1086:11 1097:5,
19 1124:11
1136:25 1145:4
1147:2 1158:9,
12, 1163:24
1165:19 1168:8

1170:1 1179:23
1208:15 1245:4
1250:22
1251:15 1252:4
1254:2 1260:18
1261:20
1281:15 1282:3
1292:8,10,13
1293:3,16
1295:1 1296:8
1312:22
1325:12,20
1328:13 1336:4

**resulted** 1006:13
1135:1 1139:15
1150:18
1173:15

**resulting**
1036:23
1172:11
1178:25
1202:10

**results** 1013:20
1044:18
1174:16
1240:20
1261:22
1322:13 1325:7
1327:23

**resume** 1140:5

**resumed** 1212:5

**resumption**
1139:2 1141:15

**retained** 1055:10

**retention**
1161:23
1233:20,21,23,
24 1234:6

1237:21 1246:4,
9 1253:6
1258:23,25
1259:4,5,18
1260:8 1273:22
1274:1,3,6,11

**retracted**
1070:12
1083:18
1336:12

**retrograde**
995:8

**retropubic**
1032:21 1037:9
1058:1 1059:19
1060:6 1061:5
1174:3,8,10,21
1175:13 1176:6
1179:16,24
1180:5,7
1183:10,17,22
1190:18 1337:5
1339:11

**retropubically**
1101:23

**retroverted**
1333:1,3,12

**return** 1344:23

**returned** 1106:5
1172:21

**reverse** 1197:11

**review** 1005:3
1018:22 1025:1,
2 1045:15
1052:1 1117:7
1192:13 1238:1
1241:12
1260:23 1282:1

**reviewed**
1020:1,4
1029:21 1030:1,
6 1031:14
1043:1,14
1056:8 1105:23
1117:9 1131:2
1155:20
1194:25
1275:21
1308:22

**reviewing**
1025:7

**revised** 1344:24

**revising** 1065:19

**revision** 1005:23
1006:20
1015:12 1330:9
1344:20

**revisions** 1314:1

**revisit** 1230:2

**rheumatoid**
1033:10
1035:17,19,25
1036:6,11
1145:13

**rid** 1001:2
1300:7

**ridge** 1212:8
1215:21

**right** 1001:19
1003:7,19
1009:15 1012:7
1013:16
1014:21
1016:14 1021:4
1026:23
1030:17

1034:15
1037:25 1043:9,
18 1044:15
1046:22 1049:1,
1050:2 1065:8
1066:23 1071:2
1074:5 1080:22,
25 1084:20
1086:9,12
1087:2 1090:20
1096:23 1097:8
1098:25 1101:5,
14 1102:3
1103:4 1105:12
1107:9 1118:1
1133:18,19
1135:20
1137:10
1140:18 1141:9,
11 1142:13
1144:23
1153:20 1155:3
1157:18 1161:3,
19 1164:13
1171:2,19
1175:22 1178:4
1179:16,17,24
1180:1 1181:2
1182:10,15
1186:18
1187:22
1188:12,16,25
1197:12
1199:22 1200:1
1202:9 1204:14
1212:9 1216:6
1218:8,18
1221:2 1223:16
1225:22
1227:24 1230:9,

10 1231:12
1233:3 1238:5
1240:8 1247:18
1251:13 1252:2,
13 1254:15
1255:20
1260:11
1266:18
1269:12
1270:13,14
1271:8 1279:9
1286:12 1290:8,
13 1294:6,17
1299:6 1303:11
1312:10
1317:14,20
1324:15 1329:7,
24 1332:3,7
1335:10 1339:5,
16 1341:25
1342:11,12,15
1346:17

**rigid** 1070:17

**rise** 1261:24
1333:13

**risk** 1051:1,16
1064:3 1074:17,
25 1076:10,18
1090:8 1099:3,
11,16 1113:24
1120:13,24
1121:1,2,6,12,
14 1123:15,16,
20 1128:4
1129:6 1217:22
1224:16 1259:2
1323:21

**risking** 1251:21

**risks** 1056:23
1064:8 1082:21,
25 1098:6
1141:12

**road** 1197:11

**Rogaine**
1159:12,16

**role** 1261:10
1314:5

**room** 1040:13,22
1077:25

**Rosenquist**
1150:1

**Rosenzweig**
984:4,12 985:9
1031:20
1032:10
1042:25
1043:20 1053:2
1055:13
1121:25 1125:8
1184:17
1230:12 1260:5
1281:19 1341:4
1346:22

**Rosenzweig's**
1032:14

**rubber** 1048:24

**rugae** 1106:25
1107:17

**rule** 987:13
989:5 993:9
998:1 1012:19
1036:23,24
1037:5 1185:24
1186:6 1193:7
1219:20,21
1220:10 1224:9

1225:3,5
1270:21
1271:10
1272:19 1273:7,
14,23 1274:5,14
1338:12

**ruled** 989:9,18,
19 990:6,9
1060:23 1219:2
1220:7 1224:11,
12 1268:25
1271:3,6
1313:11,13,15,
21 1326:8

**ruling** 990:13
1114:4 1129:22

**run** 1041:25
1116:10 1117:4
1287:20

**rupture** 1329:16

---

**S**

**S-1** 1134:5
1154:7

**S-j-o** 1145:14

**sacral** 1112:16

**said** 989:13
990:10 991:18
996:1 1002:13
1007:20
1012:21 1018:6
1020:4 1025:20
1028:14
1030:12
1033:15 1038:4,
25 1052:14,16
1053:13,16

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1054:5,9,13
1057:24 1061:4
1071:13,21
1079:23
1083:17
1086:18
1113:21
1123:17
1146:23
1149:20
1159:17
1163:22
1169:16,20
1170:5,8,13
1174:12 1180:4
1186:21
1188:11
1215:15
1224:10 1230:4,
11,19,23
1233:21 1237:9
1258:11
1263:14
1264:16 1265:4
1269:16 1270:1,
8 1271:17
1278:6,9,
1287:16,19,23
1290:6 1295:19,
21,24,25
1296:13 1299:6
1302:14 1307:8
1317:16 1319:4
1329:5,20
1336:2 1341:12,
17 1343:19

**SAITH**  1346:24

**Salpingo**  1096:9

**salpingo-
oophorectomy**
1096:8,10
1099:12 1255:3

**same**  1005:22
1037:25 1046:3
1048:5,6
1053:14 1054:9,
13 1057:24
1067:22 1097:2,
12 1099:7
1101:13 1105:6
1122:7 1123:4
1127:16
1139:24 1146:7
1162:14
1173:16 1175:6,
18 1177:25
1178:11,16,19
1179:17 1188:1,
11 1197:16
1213:13
1220:20
1227:21 1236:1,
19 1241:7
1246:22
1262:15,19
1282:15
1284:25
1297:14 1302:4,
7 1303:14,19,24
1315:23
1324:22 1329:9
1336:6,9,10
1339:3

**samples**  1140:1

**sandwich**
1000:21

**sarcoidosis**

1280:2,3,21
1281:4,7
1296:12,14

**saw**  988:21
992:17 1045:23
1046:2,5 1095:2
1130:21
1136:20
1162:15
1239:17 1249:1
1278:14
1279:12
1323:18
1325:25

**say**  988:13
992:11,12
995:18 1002:14
1006:21 1007:8
1008:18
1012:12,13
1017:7 1022:12,
24 1025:6
1027:9 1038:4
1041:24
1043:20
1047:16
1049:25
1050:16
1051:13 1053:2,
3,14 1059:1
1065:6 1067:22
1068:8 1080:20
1082:5,15
1086:4 1087:20,
22 1094:1
1098:14
1117:16,17
1122:25
1123:23
1132:21

1135:13
1136:17 1137:3,
25 1139:20
1140:17
1143:14
1147:17,25
1148:3,5,13
1149:21 1154:5
1165:21,25
1171:22 1175:4,
12 1177:3,7,10
1178:25 1181:5
1190:10
1191:17
1195:11,23
1201:4 1203:14
1210:13
1211:19
1212:10
1216:12
1219:22 1222:3,
5 1223:24
1228:16
1233:17
1240:18
1243:13 1248:4,
18,19 1249:18
1250:23
1252:14
1253:13 1256:7
1259:20 1260:1,
17 1266:9
1269:6 1272:12
1283:1,10
1289:15 1294:2
1295:17 1309:4
1318:8 1321:3
1322:4 1324:9,
21 1329:5,24
1337:9 1338:14





In Re: CR Bard 200     Bruce Rosenzweig M.D., Vol. IV     11/29/2014

**several-millimeter** 1081:4

**several-month** 1330:10

**severe** 987:23 988:14 992:4,12 1006:9,16 1007:20 1024:19 1039:11,12 1109:9 1134:25 1147:12 1164:20 1165:19,21 1292:6 1327:19

**severity** 1039:9 1135:22 1164:23 1165:9

**sex** 1140:6,21 1141:7,9,12 1166:5,8,11,13, 21,24 1167:1,9, 12,14,17 1258:10 1261:11,15,21, 25 1262:1,4,9, 14 1279:17,23 1334:10,11

**sexual** 992:2,3 1034:4 1167:5 1247:16,20 1337:14

**sexually** 1140:1, 12,15

**shallowly** 1003:20

**share** 1254:17

**sharp** 1180:22 1182:4 1183:20 1186:14 1187:1, 20 1247:9,15 1258:7 1277:23 1278:8 1279:6

**sharply** 1333:12

**she's** 990:17 991:2 1000:6 1012:18 1061:21 1068:10 1077:18 1085:4 1088:19 1106:13,15 1107:20 1109:13,17 1114:15 1140:13,14 1141:9 1148:5 1150:20,22 1151:18 1168:5 1182:11 1183:12,20,25 1186:13 1213:9 1219:23 1225:3, 11,15,16,17 1238:5 1241:15 1247:16 1248:11,19 1273:25 1277:3 1287:22 1288:17 1302:6 1317:15,18 1319:4 1332:17 1342:9

**sheet** 1041:23 1042:11

**sheets** 1067:7

**shooting** 1180:23 1182:5 1183:20 1186:14 1187:2, 20 1191:12 1193:16 1247:9, 15 1257:12 1319:5

**short** 1034:23 1038:18 1066:15 1130:12 1194:7 1216:5 1225:12 1226:2 1231:3 1232:13 1274:24 1315:1 1346:13

**short-term** 1139:1 1170:7

**shortened** 1179:12 1311:25

**Shortening** 1179:10,11

**shortly** 1164:3 1230:17

**shot** 1098:1

**should** 1042:6 1047:11,24 1048:2,11,14,22 1060:20 1079:10,11 1081:3,6 1082:16 1118:23 1128:13 1207:25 1213:15

**shoulder** 997:24

**shoulders** 1143:8

**shouldn't** 1137:21

**show** 1023:18 1092:10 1108:15 1127:1, 2,5,7,22 1174:9 1289:24

**showed** 1127:8, 10,11 1144:6 1159:2 1196:9 1264:19 1311:7, 10

**showing** 1215:15 1259:13

**shown** 1110:14 1129:16 1217:24

**shows** 1194:1 1199:16

**shrink** 1088:24

**sic** 1051:15

**side** 1002:24 1046:22,25 1049:24 1050:2 1070:14,19 1073:1,20,21 1084:20 1089:18 1093:11 1158:8, 10,23 1159:12

1214:12 1228:4, 8 1229:15,19 1232:8 1253:21 1256:5 1264:7, 10 1308:16

1175:9 1204:5,
6,16,18,22
1218:18 1244:4
1245:5 1252:11
1294:24
1312:10
1318:15,22,25
1319:2 1320:1,
13 1321:5,10,
12,15,19
1339:14,16

**sides** 1028:9
1071:5 1072:19
1077:22
1089:17,20
1096:12 1251:9

**sigmoid**
1022:18,25
1154:20

**sign** 1125:13

**significance**
1144:8,17
1294:8

**significant** 992:7
993:17 994:7,10
995:22 996:2,3,
4 999:16 1008:2
1014:7 1034:4
1135:24 1136:2
1138:4,7,10
1219:14
1261:10 1269:5
1273:19 1299:1
1329:11
1333:15

**significantly**
1335:5

**similar** 1084:19

1138:9 1159:4,6
1227:21

**similarly**
1034:20
1282:12

**simple** 991:24
1007:25

**simplistic** 1039:1

**since** 985:24
1041:23
1098:14
1137:10 1150:8
1157:23 1181:5
1184:17
1210:25
1225:15 1257:6
1271:9

**single** 1028:14
1039:17
1178:13

**sit** 999:11 1101:6
1147:25 1148:3,
4 1244:24
1295:12 1297:7

**site** 1071:6
1101:1 1123:24
1124:1 1328:21

**sits** 1182:12
1195:13

**sitting** 1003:7
1086:16
1118:11,12,13
1133:18 1151:1
1218:8 1241:14
1254:15
1294:17
1303:11
1317:14,20

1344:17

**situation**
1004:12
1007:13 1045:4
1049:20
1051:16
1057:25
1065:23 1196:6
1225:9 1262:8,
25 1272:14
1309:21
1323:20

**situational**
997:16 1225:7,
13

**situations**
1293:22

**six** 1012:3
1140:9 1142:23
1306:22

**six-month**
1140:18

**six-pack** 1190:11

**six-week**
1140:19

**size** 1000:23
1080:17 1081:4
1089:7,8 1221:9
1297:5 1334:8,
19 1335:7
1339:17

**Sjögren's**
1145:14

**Skene's** 1256:21

**skill** 1004:20
1173:8

**skin** 1036:8

1084:19 1100:5,
6

**slash** 1277:12

**slicing** 1336:8

**slightly** 1238:21
1309:19

**sling** 1032:17,22
1046:9,21
1047:12 1058:3,
15 1059:19
1060:2,6,16,17
1061:9,10
1063:12,22
1064:4,9,12
1065:20
1082:10 1083:4
1101:25
1113:10,24
1114:22
1115:13,19,21
1116:2 1121:6
1126:17
1129:13,16
1131:18 1140:4
1141:9,10
1152:5,7,18
1153:10 1157:3
1173:17 1174:1,
9,21,24,25
1175:1,13,16,21
1176:6,8
1178:4,15
1179:13,14,16,
23 1180:7,9
1183:10,11,17,
23 1184:18,19,
22 1185:5
1186:16,18,22,
23 1190:18

1257:1,6
1258:18 1259:1
1273:11 1274:3,
17 1276:21
1298:16 1302:3,
20,25 1303:3
1304:9 1308:10,
11,17,23
1310:4,6,19,20
1312:2,9,15,18,
20 1313:4,24
1330:5 1336:19,
22 1337:5,19
1339:11,15,24
1340:7 1343:13,
16,20,23
1344:21,24

**slings** 1058:1,9
1061:5 1063:22
1064:1,24
1114:18
1120:13 1174:2,
3,11 1180:3,5
1308:2

**slope** 1293:6,7

**slow** 1009:19
1039:8 1158:21
1160:9 1163:5
1193:22 1290:9

**slower** 1276:1,2,
23 1277:11
1285:24,25
1286:5 1290:2,
25 1304:10
1305:9,10,25
1313:14

**small** 990:23
1006:6 1079:10
1080:9 1081:3

1087:12,23
1106:17 1141:3
1156:18
1157:16,17,18
1162:14 1163:8
1202:16 1203:2
1221:24
1246:14 1297:6
1311:24
1334:18

**Small-capacity**
1328:5

**smiling** 1189:22

**smoke** 1045:17

**smoked** 1323:2

**smoker** 1045:11,
16 1050:12
1133:22
1241:10
1322:23 1346:6

**smokes** 1241:13

**smoking**
1345:24 1346:4

**smooth** 1048:14

**snapshot** 1040:7

**sneezing** 1138:8
1159:23
1344:11

**soiling** 1282:6

**somebody**
1034:10
1078:23
1108:24
1176:20
1221:19
1228:23
1236:24 1239:3

1243:21 1283:3
1292:22,25
1293:3,7,10
1324:13 1328:1

**somehow**
1057:14
1068:16 1076:8
1086:5 1198:21

**someone** 997:22
1024:3,10
1034:21
1036:15 1048:8
1073:10
1076:16 1104:4,
8 1109:10
1113:22 1116:8
1118:18
1152:24 1153:1
1167:12
1168:10
1173:17
1178:13 1190:2
1210:13,19
1220:18 1221:5
1238:13
1243:15
1248:23 1262:6
1270:5 1275:13
1285:1 1291:5,
20 1292:4
1293:20 1294:2
1309:16 1327:8,
14,24 1333:11
1337:7

**someone's**
1035:5,6
1248:25 1329:2

**sometime** 1108:2
1268:21

**sometimes**
1004:6,8,10
1024:9 1100:10,
12 1135:2
1143:23
1144:18,19,20
1187:19
1190:23
1196:16 1199:7
1221:23
1255:20
1263:17 1282:6
1288:4 1322:1
1333:7,8

**son** 1016:20

**soon** 1141:7

**sorry** 984:14
992:22 1009:18,
21 1016:7,14
1038:5 1044:24
1049:21
1057:20
1089:16 1093:8
1106:7 1122:21
1146:24
1150:14,19
1160:20 1162:5
1164:12
1166:20
1169:23
1174:12
1264:16,20
1266:2 1275:18
1287:16
1298:11
1302:22
1317:16
1334:17

**sort** 1019:14

1037:24 1040:2
1048:25
1051:12
1070:20 1084:2
1101:11 1102:3
1113:23
1132:19
1147:11,23
1151:25 1158:9
1161:21
1172:19
1176:23
1203:22
1206:15 1214:9
1240:1,6 1245:5
1280:9 1284:2
1310:8 1326:11,
15 1340:12
1341:21
1345:15

**sound** 1126:10

**sounds** 1014:9
1054:25
1204:20
1207:23
1329:24

**source** 1128:8

**sources** 1175:19
1184:24

**South** 1066:10

**space** 1051:7
1058:6,12
1060:13 1061:2
1085:23
1101:24
1339:20

**span** 1330:16

**spasm** 996:24

997:2 1011:13
1024:10,12,15
1125:18 1129:1
1153:13 1174:8
1175:1,7
1176:2,9 1177:4
1273:25 1312:7,
8 1332:23
1339:2 1340:9

**spasmed** 1336:5

**spasming**
1336:11

**spasms** 996:22
1011:11
1015:19
1023:12,16,25
1024:4 1068:12,
20 1125:23
1193:8,14,17,
19,23 1336:3,4

**speak** 1042:7,8
1052:7,20,24
1053:1,22
1054:20,21
1064:19 1264:3

**speaks** 1052:8,9,
16,17,18
1053:17
1054:24
1056:18,21

**specific** 984:18
985:3 1015:7
1030:1 1043:15,
19 1068:13
1076:5 1109:22
1124:4 1126:19
1129:12
1155:20
1168:22

1176:14
1177:11
1188:19,20,25
1189:1 1200:18
1277:19
1318:20

**specifically**
992:20 1020:23
1032:1,21
1042:2 1102:22
1103:5 1108:9
1111:2 1122:11
1126:16 1189:6
1211:4 1218:21
1250:5 1253:11
1261:3,17
1278:24
1284:18
1287:11 1291:9
1297:11
1300:18
1318:11

**specificity**
1188:14

**specifics** 1018:19
1019:17
1052:15 1279:9

**spectrum** 1237:7

**speculating**
1023:4,5
1041:21 1211:3

**speculation**
1281:5 1291:24

**speculum** 1006:6

**speed** 1160:10

**spend** 1026:9
1106:12

**spending** 1235:7

**spent** 1024:23
1025:6,19,21,25
1067:8,22

**sperm** 1202:4

**spill** 1329:8

**spine** 1153:24
1338:18

**spoke** 999:8

**spoken** 989:7

**spontaneously**
1217:5

**sporadic** 1181:5
1188:6 1189:17

**sporadically**
1150:10

**spot** 1171:1

**spotting** 1316:10
1331:25

**spouse** 1261:10

**Spread** 1329:6

**squamous**
1049:13,15
1144:7,9
1327:17
1333:23

**stabbing**
1186:14 1247:9,
15 1257:13
1258:7 1277:23
1278:8 1279:6

**stability** 999:17

**stages** 1106:19
1156:16

**stand** 1124:6

**standard**
1015:20,22
1082:5,12
1102:8 1206:14
1226:11,12,15,
18,23 1227:5,
16,18 1228:1,3,
13,19,20,22
1229:9,10,21,
23,24 1231:15
1291:19 1292:1
1298:23
1303:21,25
1309:5,14,17

**standing**
1344:14,15

**stands** 1252:25

**stapling** 1092:20

**start** 994:18
1095:21
1130:23
1156:15
1187:24,25
1260:2 1268:1
1345:10

**started** 985:19
1045:17 1063:7
1094:8 1108:4
1166:17 1188:1,
2 1257:8 1271:5

**starting** 1060:4
1147:14
1177:23

**starts** 994:19
1104:14 1134:8
1342:2

**state** 990:21
991:16 1021:8

1037:2 1108:19
1123:1 1167:17
1183:18
1226:22
1263:12

**stated** 989:15
992:16 998:6
1031:25
1068:19 1069:4
1083:11 1106:4
1180:18,21
1226:18 1268:6
1325:15

**statement**
1043:13
1073:10
1083:24
1172:10 1312:5

**statements**
1309:13

**states** 1006:4
1042:24 1068:5
1086:1 1092:11
1094:4 1098:11
1103:15 1150:4
1158:16
1180:22 1225:8
1265:2,6
1277:22
1286:24 1305:1
1308:13

**stating** 988:16
1142:1 1176:13

**status** 1035:6
1111:8

**stay** 1084:20
1156:19

**stays** 1011:24

1099:7

**stenographic**
984:6

**stent** 1078:10

**stents** 1077:25

**step** 1008:13
1014:23
1085:12 1341:1

**steps** 1008:18
1019:11 1084:2
1085:14

**sterilized**
1116:19

**still** 995:17
1001:3 1014:23
1016:4,20
1032:24
1061:21
1075:12
1081:19
1097:12
1102:23
1110:21 1120:2
1139:19
1140:17 1214:7
1222:20 1288:7
1306:14

**stimulate**
1160:4,16

**stimulates**
1161:6

**stimulation**
1156:19 1160:3,
9,10 1161:11

**stipulate**
1281:17,18
1285:19
1290:17 1298:2

**stipulated**
1281:21
1282:12,13
1285:20
1290:18 1298:7
1322:21

**stomach** 1092:20

**stone** 1220:15,
18,25 1221:3,6,
7,9,16,18,20,24,
25 1222:11,15
1223:1,14,24
1235:19

**stones** 1094:22
1196:12
1220:11,14,22,
1222:23,24
1224:11
1235:16,18

**stop** 1082:6
1116:15

**storers** 1103:24,
25

**straight** 1161:18
1339:7

**strain** 1261:20
1262:7,20

**strained** 1260:25

**straining**
1138:8,10

**strangely**
1054:12

**stream** 1139:9
1158:20,21
1161:25 1163:5
1193:21 1276:1,
3,23 1277:11
1285:25 1286:5

1290:2,9 1291:1 1304:10 1305:9, 11,25 1313:14

**strenuous** 1188:8 1189:19, 21 1190:4,22 1191:6

**streptococcus** 1062:16

**stress** 1035:7 1044:8,25 1046:10 1050:8 1057:3 1064:7 1113:12 1131:15 1138:25 1159:1, 24 1161:14 1238:18,20,22 1286:19 1287:2 1288:9,17 1289:23 1300:12 1302:8, 21 1303:1 1304:4 1307:7 1342:25 1343:4, 8,11,22 1344:6, 14,16,19

**stretching** 1334:5,8

**strike** 1215:19

**stroke** 1114:10

**strokes** 1113:5

**strong** 1014:10 1243:12,14,23, 25

**studied** 1170:18

**studies** 1098:23 1110:14

1129:18 1132:23 1159:10,21 1163:14 1170:17 1171:13 1174:9 1289:24

**study** 998:11 1034:18 1098:21 1127:1, 8,11 1159:15 1170:25 1171:3 1172:13 1186:22 1220:19 1343:5

**studying** 1133:16

**stuff** 1007:3

**stylet** 1070:15

**sub-category** 1161:5,10

**subclinical** 1047:23 1058:8, 14,23 1063:25 1113:17 1114:18,21 1115:14,20 1116:2,9 1117:3,20,23 1119:8,23 1121:9 1191:10, 20,23 1192:19, 23 1196:17,23, 24 1197:1,2,22 1198:20

**subject** 1284:1

**submandibular** 1134:10

**submit** 1183:14

**suburethral** 1308:17

**such** 992:4 994:3,9 997:5 1036:9 1059:11 1112:12 1113:2, 4 1122:2 1133:4 1153:15 1159:12 1185:24 1188:14 1256:18 1307:17 1338:4 1341:6

**sudden** 1180:23 1182:5 1183:20 1187:1,20

**suffer** 1154:4,15

**suffered** 1021:2 1252:22

**suffering** 1063:18 1068:16

**suffers** 1151:9 1195:8

**sufficiency** 1056:6

**sugar** 1037:19 1038:7 1040:6, 15,22,24 1041:8,10,16 1144:23,24 1168:12,13

**suggest** 992:19 1154:4,15 1310:9

**suggested** 1338:16

**suggesting** 1060:19

**suggests** 1296:6

**SUI** 1149:22 1159:8 1160:2, 21 1161:22 1302:12,15 1303:4,10,20 1344:3

**suicidal** 1291:13, 21 1292:2,5,7, 10,14 1293:5, 10,14,20,25

**suicide** 1292:15, 22 1293:5,9,12 1294:4

**summarize** 1009:13 1165:15

**summarizing** 1106:13 1230:5

**superior** 1076:15

**supplemental** 987:15

**supplementation** 1267:25

**supply** 1025:13 1204:2

**support** 993:23 1076:13 1212:18,20,21, 25 1259:16 1300:6 1343:4

**supportive**

In Re: CR Bard 200                Bruce Rosenzweig M.D., Vol. IV                11/29/2014

1215:5

**supports** 1343:11

**supposed** 1027:22 1074:1 1084:7,8 1215:3,12,13,14

**suppressed** 1245:24,25

**suppression** 1060:4

**supracervical** 1096:20,25 1097:23

**suprapubic** 1139:8

**sure** 995:19 1023:3 1024:24 1041:4 1042:3 1048:18 1066:9 1070:23 1072:18 1075:1 1077:21 1083:23 1085:9 1088:10 1101:4 1105:3,19 1111:20 1115:4 1118:17 1123:3 1171:1 1175:23 1182:2 1223:4 1227:7 1231:24 1232:10 1249:6, 8 1263:25 1272:13 1278:17 1289:15 1295:3 1308:5 1346:9

**surface** 1049:18

1079:6 1080:4

**surgeon** 1004:20 1173:8,11 1205:22 1297:15 1313:4

**surgeons** 1100:8 1102:15

**surgeries** 993:2 1001:9,12 1002:14 1007:8 1014:25 1060:1 1073:25 1124:10 1134:16

**surgery** 996:25 997:1 998:13 1001:15,16,18, 24 1003:4 1005:17,22,23 1006:13,19 1008:1,3,6 1014:17,20 1015:4,5,9,11, 12 1016:1 1018:3,5,9,10 1021:7 1034:17 1038:20,22 1041:6,9,11,16 1046:9,12 1051:22 1052:1 1057:8 1059:13 1061:8 1068:12, 21 1069:12,24 1074:9,15 1075:20 1085:13,15 1089:17 1090:8 1101:19 1102:5 1103:14 1106:5

1115:23 1126:18 1128:3 1129:5,9 1137:12 1138:24 1150:1, 4,8 1151:13 1176:1 1205:13 1208:1,25 1212:5,8,11,12 1215:21 1217:16 1226:17 1227:23,25 1228:2,14,18,19 1229:11,20,22, 24 1230:17 1241:18 1251:6 1255:3 1259:5, 21 1289:14 1292:1 1296:3 1297:18 1300:23 1309:8 1314:13 1316:5 1318:3 1329:2,3

**surgical** 1003:3 1004:15 1008:19 1038:13 1040:20 1090:2 1098:18 1102:20 1103:8 1110:12 1121:1 1134:9,22 1205:24 1303:21 1330:13 1343:7

**surgically** 1022:8

**surprise** 1075:8

**surprised** 1063:17,20 1104:6

**surrounding** 1048:20

**susceptible** 1200:20

**suspected** 1148:15

**suspended** 1214:23

**suspension** 1209:1 1212:15, 22 1213:13 1214:10,12

**suture** 1010:11, 13 1011:17,18, 20,24 1012:7, 11,18 1013:1,2 1015:8,17 1084:21 1087:7 1139:10 1177:20 1179:2 1304:22

**sutures** 1010:1, 10,20,24 1012:1,15 1013:5 1019:14 1190:15 1300:5, 8 1304:11,13,16 1305:2,3,15,18, 19,24 1306:14, 21,24

**swear** 984:7

**swell** 1079:13, 14,19

**swelling** 1079:17,21

swells 1079:22

swim 1197:21

swimming 1197:13

switch 1232:9 1243:16

sworn 984:9 985:10

sympathetic 1160:7,10,25 1161:6,10,11, 19,20 1162:5

sympathomimeti c 1160:3 1162:10,23

symptom 1024:14 1110:3 1158:12 1246:1 1282:3 1299:14 1307:17,21 1310:14

symptomatic 995:15 1094:4 1112:18 1165:4 1199:14 1211:23

symptomatology 1143:25 1253:12 1299:11 1319:2 1324:23,24 1326:19 1339:6

symptomology 1104:8

symptoms 1024:17 1029:6 1046:8 1088:16 1102:24 1103:9

1110:8 1111:18 1112:3,6 1114:17 1115:6 1131:23 1146:16 1149:6, 9,12 1151:21 1152:5 1203:6 1205:11 1221:15,19 1224:3 1233:16, 1234:17,18 1242:12 1246:6, 15 1247:19,21 1249:10 1255:2 1257:11,12 1258:16 1269:19,21 1274:4 1279:14 1281:2,6,15 1285:2,18 1289:8 1290:1 1291:7 1293:1 1294:23 1299:5, 8 1300:17 1314:8,9 1316:3,5,6,7,8 1317:12,13,16 1318:9 1320:17 1321:25 1322:13,18 1325:4 1328:14, 15 1329:2 1335:17 1340:13 1342:18 1344:6

syndrome 1021:11 1087:9, 11,25 1099:18 1135:3,5 1137:4 1145:14

1151:19,22 1154:17 1233:10 1234:7 1236:18 1237:7 1238:6 1241:22 1272:21 1274:8 1286:10 1287:9 1299:12 1326:21 1328:4 1336:23 1338:24 1339:1 1342:9

syndromes 998:12 1249:13 1300:22

system 1156:15 1160:6 1162:10, 23 1259:16

systemic 1102:19

---

T

---

table 1065:5,6

tacking 1304:18

take 990:9 1000:11 1006:16 1030:20 1043:7 1099:9,17 1115:1 1117:11 1127:22 1136:11 1137:15 1155:4 1166:20 1173:3 1189:20 1198:25 1202:15 1203:9 1218:25

1220:23 1221:3, 14 1225:23 1233:7 1240:4 1244:21 1257:18 1271:15 1294:5, 22 1296:16 1305:9 1306:8 1340:3

taken 994:25 1042:14,18 1044:4 1045:7 1066:16 1089:5 1090:24 1104:5 1119:20 1129:24 1130:13 1155:8 1169:12 1194:8 1220:1 1226:3 1232:14 1250:7 1251:4,20 1252:12 1274:25 1282:23 1297:6 1311:19,23 1315:2 1330:25 1346:14

taking 992:15,19 1008:12 1009:15 1035:11 1036:6 1050:13 1085:4 1102:12 1108:7, 12 1109:1 1111:22 1112:5 1114:12,15 1115:24 1137:12 1157:25 1158:2, 4 1206:5,13



1310:20 1335:7 1339:13

**tenderness** 987:23 988:13 991:12,15,17 996:4,17 999:5, 7,23 1000:5 1011:6 1046:18 1047:1 1049:23 1050:3 1125:20 1210:2 1222:1 1276:16,20 1312:8 1327:11 1339:13 1340:3, 6 1341:18

**tends** 995:16 997:4 1000:25 1133:6

**tense** 1152:13, 16,25

**tension** 1126:18 1152:10 1153:9 1230:14 1231:9 1259:23 1260:14,18 1308:23 1338:19

**tensioning** 1230:7 1231:10

**tenuous** 1242:18

**term** 1014:17 1018:9 1064:15 1065:3 1123:18 1126:4 1164:7 1171:10,15,20 1196:7 1209:25 1245:4

**termed** 1331:21

**terminal** 1153:24

**terminology** 1075:24 1336:11

**terms** 989:4 1002:2 1009:9 1010:16 1012:4 1021:5 1033:8 1034:19 1037:15 1046:6 1050:23 1051:16 1079:4 1085:12 1086:25 1096:6 1100:15 1103:9 1123:21 1134:8 1136:6 1158:7 1163:19 1171:14 1172:1 1187:14,15 1200:2 1204:13 1206:15 1216:11 1218:1, 12 1223:6 1225:2,3 1234:1 1236:25 1241:5, 20 1247:5 1268:3,5 1273:6,12 1298:1 1301:17, 23 1325:22 1327:1 1330:3 1342:16

**test** 1116:10 1117:3 1144:20 1145:1,4,12 1147:23 1220:18 1281:7

1289:4 1344:14, 16

**tested** 1041:13 1145:8

**testified** 985:11 1005:2,19 1007:2 1010:22 1082:2 1108:21 1109:5 1121:23 1124:3 1186:21 1238:8,12 1271:21 1281:14,16 1285:18 1290:15 1307:2, 10,11 1325:3,12 1345:22

**testify** 1029:14, 23 1055:14 1093:18 1164:23

**testifying** 1191:15 1194:24

**testimony** 984:16 985:21 1025:4 1064:24 1124:6,7 1141:22 1142:2 1150:11 1168:9 1169:24 1180:15 1240:19 1241:6 1281:19 1282:10 1297:25 1322:18 1325:6 1346:2

**testing** 1041:2 1343:25

**tests** 1040:2,9 1041:25

**than** 984:22 991:11,23 993:14 1006:5, 15 1007:9,23 1008:1,4,12 1011:18,20,25 1028:18 1029:7 1030:9 1034:21 1035:25 1036:19 1040:13 1047:3 1049:14 1076:8 1078:17 1097:24 1101:9 1103:19 1107:3 1108:2 1119:18 1120:21 1136:1, 1153:10 1158:19 1161:15 1165:14 1168:1 1175:11 1183:10 1190:18 1192:12 1193:5, 15 1210:25 1221:11 1224:10 1225:16 1235:8 1251:17,18 1256:5,11,13 1262:18 1263:2 1266:11 1268:5, 17 1271:19 1273:7 1274:2 1294:6 1297:4

1312:10 1313:8
1318:13 1323:7
1335:4,5
1337:18 1338:3
1340:5 1341:11,
15 1344:12

**Thank** 1006:24
1051:20
1072:13 1093:7
1123:12 1182:3
1226:25
1346:17

**their** 998:13
999:18 1034:15
1036:18 1037:3,
4,21 1038:6
1039:19 1040:6,
8,22 1041:10
1049:7 1062:2
1077:13
1089:10
1102:24 1104:4,
5,9 1108:25
1112:11
1142:22 1153:1,
3,4,5 1177:8
1178:24
1188:14 1189:6,
14 1190:5
1192:24
1207:11,12
1221:20
1234:11,15,17,
19 1237:2
1238:23 1242:3,
4 1245:16
1248:25
1262:14 1285:2
1289:25
1293:17

1320:14
1324:23 1327:3,
4 1328:17
1333:25 1334:1

**them** 990:10
1012:22 1013:4,
8 1027:5,6,23
1028:21
1043:23
1065:25 1066:1
1068:2 1098:24
1113:21
1171:18 1172:4,
22 1174:13
1209:2 1210:14
1218:25 1229:9
1234:15
1251:20
1257:18
1258:12 1269:3
1289:8 1294:1
1320:5 1321:17
1323:19,20,21

**themselves**
1042:7,8
1052:20,24
1053:1,18,23
1054:20,21
1064:20
1072:17
1076:22
1077:20 1293:4,
17 1294:5

**Theoretically**
1083:7

**theorized**
1003:23

**theory** 995:6
997:18,19

**therapy** 1103:4
1226:21
1228:12
1229:19 1250:4

**there's** 998:9
1006:3 1014:10
1022:23
1047:17,19
1056:4,5
1059:13
1071:22
1097:12
1098:10
1099:12
1103:17 1108:1
1109:14
1113:20
1115:18
1117:15 1118:6
1120:24 1145:7
1149:3 1164:18
1175:12,15
1176:21 1184:6
1195:20,21
1197:14 1210:1,
2 1215:10,16
1216:17
1220:15
1223:13
1235:20 1239:8
1262:6 1263:19
1264:9 1270:1
1288:7 1321:18
1324:19
1328:23

**thereafter**
1164:3

**therefore** 993:15
1028:16 1034:6

1037:21
1052:18
1072:17
1077:21
1081:12,15
1098:13 1109:8
1111:17
1114:21 1116:9,
1117:19
1128:25 1175:2
1178:8 1190:12
1202:3 1213:10
1216:1 1251:5
1256:23
1303:15

**thereof** 1249:24

**thermostat**
1112:15

**they'll** 1028:17

**they're** 1022:7
1043:23
1061:22 1078:6,
7 1109:1 1115:2
1122:1 1171:16
1175:19
1177:13
1179:17
1197:13 1210:8
1234:16,17
1252:11 1285:3,
6,12 1293:14
1295:17 1297:5
1309:17 1333:7,
8 1334:12
1336:5

**they've** 1024:4
1142:20

**thicken** 1001:4

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

**thicker** 1049:3

**thickest** 1003:17

**thickness** 1003:8,9 1209:4

**thigh** 1297:14,19

**thin** 1048:23

**thing** 989:10
990:12 998:9
1001:4 1009:22
1011:15
1020:10
1043:15,19
1053:14,15
1054:9,13
1061:8 1069:5
1078:2 1079:5
1129:12 1141:1
1162:24
1184:25 1185:7,
18 1188:11
1236:1 1246:22
1262:3,19
1282:15
1303:24 1329:9
1336:6,10
1339:3

**things** 988:9,24
989:19 992:4,23
996:13 997:14
999:25 1001:5
1003:13 1028:6
1033:21
1043:22
1050:25
1051:14
1052:19
1054:22
1072:14
1089:24

1094:11,13
1100:25
1103:16
1106:24 1111:4
1113:2 1129:22
1133:3 1152:17
1153:15
1192:10
1196:21
1215:14 1219:1,
14 1224:13
1225:8 1228:16
1234:2 1235:15
1236:3 1237:4
1238:17 1255:6
1256:18
1268:16,25
1269:1 1274:15
1277:16
1309:10,19
1313:13
1325:19
1337:16

**think** 986:24
988:8 992:10,25
993:16 996:23
998:10 1002:12
1003:23
1004:10 1005:1,
19 1007:13
1009:7, 1013:22
1014:1 1015:3,7
1016:2,5
1022:22
1027:16
1031:25
1033:14
1037:18
1043:24 1044:5
1049:9 1051:25

1052:6 1064:22
1069:10 1076:2,
12 1078:2
1080:17 1082:2,
21 1084:25
1099:21 1102:8,
11 1105:20
1109:19,22
1112:20
1121:22
1122:12,13
1124:2 1131:21
1136:16 1141:8,
14 1146:4
1164:22 1165:8
1170:6 1172:8
1180:20,21
1181:19
1185:12 1186:2,
7,11 1188:10
1189:2 1197:7
1199:20 1203:1
1205:20,25
1213:23
1214:13 1218:9
1222:5,22
1225:11,20
1230:3,4,11,13,
14,19 1231:12
1239:2 1248:3,
24 1261:3
1262:13 1264:7
1266:1 1268:8,
15 1271:4
1272:10,15
1273:18 1282:5
1285:23
1291:19,25
1292:7,8 1299:6
1300:21,22,24

1303:5 1308:4
1309:8 1310:10
1317:12 1322:5,
12 1323:22
1326:11,17,20
1327:24
1331:11
1332:15
1334:25
1338:20
1341:11 1346:7

**thinned** 992:6

**thinner** 1103:20

**thinness** 1107:4

**thinning** 991:5
1105:9 1107:5,
19 1111:7,13
1256:19 1266:7

**third-degree** 1298:10,11,21

**Thomas** 1033:4
1051:22

**though** 995:23
1000:24
1014:10
1040:25 1047:5
1048:17
1050:11 1059:9
1068:24
1073:25 1080:7
1081:13
1082:21
1100:15
1104:11 1113:9
1140:18
1142:13 1150:8
1160:12
1161:17 1163:3

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1176:12
1178:20 1189:2
1204:24 1216:5
1217:3 1223:7
1225:14 1252:3,
19 1261:25
1268:12,20,22
1271:24
1276:16 1281:1
1285:23
1287:14
1304:17
1308:20
1314:16
1342:11 1346:8

**thought** 1016:7
1020:1 1149:24
1159:7,25
1169:24
1181:18
1222:12
1287:16,19
1325:11

**thoughts**
1208:19
1291:13,21
1293:14
1310:23

**three** 1026:17,
20,22 1057:25
1059:24 1061:4
1198:9

**through** 990:9
992:23 995:9,10
1002:14
1003:21
1019:13 1022:1
1026:16,18,20
1043:17 1047:2

1051:8 1058:21
1062:3 1070:10
1071:4 1076:25
1078:4,9,13,21
1083:18
1084:15
1085:11,22
1086:24
1097:13
1120:11 1125:9
1128:16,22,25
1129:14
1135:21 1141:3
1158:18 1174:2,
3 1175:1
1178:16
1180:24 1182:6
1187:3,15,22
1188:17
1190:11,14,15,
17 1191:4,8,13
1221:10,16,20
1223:25 1233:7
1251:25
1267:22
1288:24 1295:8,
17,18, 1296:25
1301:3 1342:2

**throughout**
993:14 1084:19
1257:22

**throw** 1141:8

**throws** 1293:8
1294:2

**Thursday**
1040:25

**Thus** 1212:17

**thyroid** 1156:14,
15,16,17,18,19

**tied** 1097:17

**tight** 1146:8,18,
21,23 1161:2
1230:21
1304:15 1313:5
1336:1,5
1338:10

**tightened**
1017:22

**tightening**
987:23 988:14
999:5

**tilted** 1333:4

**time** 984:2,22
985:24 992:16
993:4 1001:17,
23 1002:13
1024:22
1025:25 1027:3
1040:10
1044:19
1060:16,22
1062:11,17
1063:1 1066:14,
18 1067:7,8,22
1074:7,12
1078:4 1080:19
1082:11
1090:22 1091:1
1095:8,20
1097:2 1101:13
1102:15
1103:11
1104:14 1105:4,
6 1106:1,13
1107:8 1108:13
1109:7 1112:1
1115:2,21
1117:10,12

1125:3,5,
1127:12,22
1130:11,18
1136:10
1138:22 1149:7
1155:6,13
1156:9 1158:5
1164:3 1166:12
1167:13 1176:1
1181:10 1188:1
1194:6,13
1198:7 1199:21
1202:17,20
1205:3,11
1208:1,25
1210:9,21
1212:11
1213:14 1216:5
1217:22
1220:20
1221:13 1223:3
1224:2 1226:1,5
1228:12 1230:4
1232:12,16
1235:6,7 1238:1
1240:25
1242:16
1243:17,22
1246:7 1251:20
1257:23
1259:24 1269:3
1274:23 1275:2
1276:6 1278:14,
18,22 1279:1,16
1287:1 1292:6
1302:4 1304:12
1305:16
1314:23 1320:7
1323:13
1325:16

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

1330:15 1335:11, 1346:12,16,23

**times** 995:19 1039:21 1062:19 1074:4 1087:24 1105:18 1198:9 1222:25 1239:10 1272:11

**tipped** 1333:6,7, 8

**tired** 1285:3,6,12 1325:17

**tissue** 999:3 1000:11,14,24 1004:9 1005:19 1006:8 1008:9, 16 1009:9 1010:2,3,7,17, 23 1012:14 1047:2,9,10,17, 18,20 1048:1,5, 6,8,13,19,20 1049:10,11, 1079:17,20,22 1104:13 1105:9 1106:22 1157:7 1169:19 1170:1, 20,23 1171:8,15 1172:12 1190:14 1209:21,22 1214:13 1215:25 1304:18,19 1305:3 1311:12, 19,23 1334:9

1345:25 1346:3

**tissues** 1002:17 1079:14

**TMJ** 1241:18, 20,24,25 1242:3

**today** 1026:6,24 1027:19 1056:14 1147:25 1148:3, 5 1181:11 1241:14 1297:7 1328:12

**today's** 986:3 1346:21

**together** 996:10 1000:22 1001:5, 10 1020:13 1026:11 1027:1 1032:5,8 1050:25 1077:14 1098:15 1100:7 1305:22 1332:11

**toilet** 1242:16

**told** 1054:16 1056:19,20 1065:22 1088:11 1142:20 1276:22 1286:20 1316:22 1340:11

**Tom** 1027:25 1066:4,9 1272:17

**tone** 1185:21 1190:25 1332:19,20 1335:21 1336:1, 6,23 1337:1,20 1339:9

**tonsils** 1134:10

**too** 1003:20 1006:6 1020:21 1031:24 1065:3 1115:11 1140:21 1141:7, 12,24 1161:21 1173:3 1179:9 1205:25 1222:18,20 1230:7,14,21 1243:10 1259:23 1260:14,18 1282:8,9 1302:10 1320:4

**took** 998:4 1042:21 1044:14 1050:17 1051:3 1060:25 1061:10 1092:21 1115:6 1144:21 1239:24 1271:12 1330:5, 8,9, 1336:20

**top** 993:13 1002:9 1042:22 1058:6 1080:2 1086:16 1118:12, 1180:13

1211:16 1216:19 1320:6, 21 1321:9

**total** 1025:25 1026:1 1029:16 1053:7 1095:6 1096:7,16,21 1097:24 1136:17

**totally** 1212:17

**touch** 990:15

**touching** 1048:7

**tougher** 1049:3

**towards** 1012:16 1163:5 1178:10 1193:20

**track** 1024:25 1058:11 1117:18

**tracked** 1171:19

**tract** 1063:5,8, 1083:9 1139:18 1148:15,23 1149:1,10,13 1196:5,11 1199:25 1235:12,19,24 1236:8 1238:10, 21,23 1239:4, 11,14 1245:13 1253:6 1266:11, 13 1267:7 1323:9,10,12,14 1324:3,5,8 1345:6,12

**traditional** 1212:21

training 1293:16

transcripts 1131:1

transition 1095:18

translate 1239:19

transobturator 1128:15 1129:13,16 1131:18 1152:4 1179:14 1180:3

trauma 1198:2 1337:8,10,19,21

traumatic 1154:8

travel 1063:7

treat 1066:1 1086:17 1138:25 1157:10 1159:24 1160:23 1161:14,16 1228:14 1238:22 1244:8 1251:11 1291:4, 7 1300:12 1302:9,12,15, 18,19,20,23 1303:1,24 1305:22 1318:4, 10 1328:22 1342:21 1343:7

treated 1015:9 1044:8 1116:3 1222:22 1302:11

treating 1033:1

treatment 1109:15 1159:1, 8,20 1206:15 1220:21 1257:22 1314:11

treatments 1159:19

treats 1317:19

tremors 1322:8

trial 984:22 1003:24 1025:3 1029:23,24

trials 1142:8 1170:22

Triamterene 1316:25 1317:6

triangle 1010:3 1016:10,16,18, 21,25 1020:12

tricking 1038:2, 4

tricky 1207:6

tried 1043:15 1140:1 1207:22 1228:9 1229:15, 20

tries 1086:7

trigger 1318:2

triggering 1324:9

triggers 997:17

trigone 1327:18

trigonitis 1196:9,14,

1198:17 1199:4, 17,20,24 1219:12 1220:11 1224:10

trocar 1070:12 1074:16 1076:10 1081:4 1082:13 1083:12,20,21 1084:1 1085:3, 4,7,17,20,21

trocars 1070:3 1076:14 1083:19 1283:23

true 1043:4 1110:10 1266:11

truly 997:19

trusting 1028:20

try 1082:6 1205:7 1251:11 1293:9,11

trying 991:24 999:22 1009:21 1010:15 1016:20 1047:15 1116:25 1153:4 1163:2 1165:18 1172:1 1173:3 1175:10 1178:7 1193:3 1195:9, 18 1200:14 1205:12,13 1206:1 1207:6 1228:2,20

1229:25 1243:7 1252:13 1263:16,22 1264:2,3 1267:9 1276:14,24 1277:1 1287:2, 24 1290:6 1292:19 1305:7 1325:10 1330:17 1340:15

tubal 1134:11 1135:1,5 1136:6,12,13,24 1137:4,15,23 1164:13,14 1240:11,20 1322:9,13

tube 1136:12,15 1223:22

tuberosity 1084:15

tubes 995:10 1062:3,4,10 1096:11,17 1099:2,9 1136:7,19,23 1239:24 1240:5 1252:9

tuck 1097:2 1099:25 1100:1, 3,4,16 1101:5, 12,24 1102:12, 16 1297:14,22 1298:1

tucks 1100:9 1298:4

tummy 1097:2

1099:25 1100:1,
3,4,9,16 1101:5,
12,24 1102:12,
16 1297:14,22
1298:1,4

**turn** 985:14
1060:22
1066:23 1091:6

**turned** 1145:2
1336:22

**turnover** 1080:1

**turns** 1211:23

**twice** 1171:4

**twist** 1335:3

**two** 1000:21
1001:9,12
1026:5,6,8,24
1032:7,11
1046:19,
1049:24
1059:20 1096:1
1101:25
1104:21
1114:23
1115:17
1119:11
1124:10
1126:21
1127:10 1149:7
1157:18 1160:5
1169:1 1174:3
1178:12,21
1229:9 1237:4
1242:17
1250:14 1253:9
1260:6 1267:10
1277:16 1302:7
1303:18,23

1312:2 1330:23
1334:7

**type** 1013:1,23
1033:10 1049:5,
6 1064:4
1132:20
1135:15
1143:22
1168:10
1184:24 1196:6
1205:13
1223:16
1235:18
1272:13
1291:20 1345:8,
17

**types** 1158:23
1159:11 1160:1
1206:16

**typical** 1049:12
1079:16
1106:25 1107:2
1138:23,24
1177:7 1329:1

**typically** 993:19
1028:4

---

**U**

**Uh-huh** 1058:16
1072:12
1081:25 1132:8
1182:23 1197:5
1284:22,24
1285:10 1306:2
1331:16 1345:5

**ulcers** 1327:19,
22

**ultimately**
1001:16
1086:22 1246:8
1326:3 1327:18

**ultrasound**
1093:10

**umbilical** 993:2
1294:12
1296:18,20
1297:5

**un** 1293:23

**unable** 1332:18

**unaware**
1150:19 1151:3

**unclear** 1140:13
1229:6

**uncomfortable**
1022:9,10,13
1100:19 1253:8
1334:3,13

**uncommon**
1073:7 1146:2
1210:8 1211:19
1250:15 1334:1

**under** 1040:22
1072:6 1206:23,
25 1210:16
1249:15
1259:14

**underactive**
1132:4

**undergoes**
1106:16 1107:8
1302:3

**undergoing**
1302:6

**underlying**

1128:4 1129:7
1209:20

**underneath**
1049:16 1079:9
1252:1 1294:18
1295:5,20
1305:22
1339:24

**understand**
992:14 1036:5
1054:19 1056:9
1062:13
1105:17 1116:7
1118:22
1127:17 1145:7
1147:9 1204:12
1205:23
1209:24 1217:2
1251:19
1276:15 1277:2
1325:8 1344:9

**understandable**
1126:11
1336:15

**understanding**
1036:4 1050:5
1084:1 1108:6
1177:11 1209:9
1244:10,14,24
1247:8 1250:12
1277:17
1279:18
1296:14 1301:2
1335:14

**understands**
997:19

**understood**
1143:10
1150:14 1280:8

In Re: CR Bard 200          Bruce Rosenzweig M.D., Vol. IV          11/29/2014

**underwent**
1006:19
1297:18

**undetermined**
1144:8

**unfortunately**
1000:21
1117:10

**United** 1103:15

**unless** 992:4
1040:22 1059:6
1073:15 1089:5
1112:12
1211:23
1223:14
1235:20 1252:6
1267:24

**unlike** 1326:18

**unlikely** 1012:17
1087:15,20
1137:2,3
1213:11
1221:17 1241:2
1280:23 1283:6
1284:19
1287:12 1306:3
1334:22

**unnatural**
1102:4

**unnecessary**
1014:1

**unquote** 1021:10

**unreasonable**
1102:11

**unrelated**
1060:5 1282:8,9

**unremitting**

**until** 984:21
985:22 1084:16
1257:21 1258:2
1265:14 1301:5
1306:21
1335:12 1341:9
1344:20,23

**untreated**
1299:8 1301:12

**unusual** 1073:3
1075:25 1076:5
1077:3,6 1139:3
1170:10
1250:13

**up** 995:10
1007:5 1009:16,
21 1022:18,19
1038:14
1049:15 1055:5
1059:7 1060:22
1061:1,7
1062:2,3
1073:20
1079:11
1082:17
1086:18 1089:8
1096:1 1100:11,
24,25 1101:6
1102:13
1110:16,22
1118:10 1127:2,
5,7,10,22
1138:5,14
1141:2 1142:24
1160:11,15
1166:17 1174:9
1178:23
1180:12 1183:9,

11 1210:13
1215:6,7
1228:17
1253:22
1257:18 1280:9
1288:3 1305:21
1306:7 1320:8
1324:7,21
1330:13
1335:12
1339:24

**upcoming**
1054:6

**updated** 985:21

**upon** 1034:24
1334:3

**upper** 999:14,17
1112:25 1113:4
1114:8 1132:9,
11 1168:22
1235:19

**upset** 1318:12

**upstream**
1197:13,17,21

**upward** 1293:6

**ureter** 1078:11
1221:16,20
1223:15,23,25

**ureteral** 1072:10
1076:21
1077:17,19

**ureters** 1076:25
1077:7,9
1078:1,4,10,13,
22 1221:10
1222:21

**urethra** 1046:22
1111:7,13,16

1161:1,12
1178:6 1197:9,
14 1220:16
1221:11,12
1235:17
1255:15,21
1256:19,22
1266:8,9
1306:15
1327:11
1339:14,24
1340:22 1342:3

**urethral**
1111:14,16
1113:6 1255:11
1256:13,17,20
1259:16

**urethrocele**
1300:7 1302:10,
20,24 1303:20

**urethrovesical**
1009:17

**urge** 1044:18
1045:1,4
1046:11 1050:8
1057:3 1063:18,
21,23 1064:1,3,
8 1095:9
1110:3,8,13,14,
16 1111:18
1112:3 1114:17
1131:14
1149:22 1253:6
1274:18 1287:4,
7,25 1288:24
1289:22,
1290:25 1291:8
1306:11 1308:3
1316:11

1319:14 1325:5, 18 1342:22

**urgency** 1111:2 1185:20 1233:19,22,23,25 1234:6 1237:18 1242:16 1245:20,24 1246:15 1274:13,16 1286:24 1287:10,15,18 1289:8 1301:22 1307:20 1319:11 1325:5, 14 1328:2

**urinary** 987:25 988:15 1044:9,25 1046:10 1068:6,8,11,15 1088:12 1090:15 1110:3, 13 1131:14 1138:25 1139:18 1148:15,23 1149:1,9,12,22 1158:16,20 1159:2,22,24 1161:14,23 1185:20 1193:21 1196:5, 11 1199:25 1224:4 1233:16, 17,20,24 1234:5,6 1235:12,19,24 1236:7 1238:10, 18,20,21,22,23

1239:4,11,14 1242:12 1245:13 1249:10 1253:6 1258:22 1259:18 1260:8 1266:11,13 1267:6 1274:1,3 1275:25 1276:2, 13,21,23 1277:10 1279:13 1285:22 1286:7, 12,19,21 1287:3 1288:9,17 1289:19,23 1300:13 1302:8, 21 1303:1 1306:4,11 1313:10 1316:12 1320:16,17 1323:9,10,12,14 1324:2,5,8 1325:6,18 1335:17 1342:25 1343:4, 8,11,22 1344:6, 19 1345:6,12

**urinate** 1138:11, 19,21 1195:18 1312:11

**urinated** 1046:14

**urinating** 1205:3 1235:7 1287:10 1316:11 1319:8 1340:17,18 1341:13

**urination** 1139:6,8,16 1195:22 1222:19 1235:11 1237:12 1266:10 1318:24 1319:5, 7 1328:2 1340:23 1341:15,17,23, 24

**urine** 1046:13 1075:12 1077:8 1078:1,3,9,12, 21 1086:23 1113:3 1139:9 1148:10,12,13, 16,19,20 1149:1,5,15 1195:8,11,17 1208:13 1218:25 1220:10,13 1223:8, 1224:12 1234:20 1236:10 1253:8, 13,21 1254:8 1255:23 1256:6, 11,13 1258:21 1273:13 1287:1, 11,14,17,24 1318:23 1341:6, 9 1342:1,7

**urodynamic** 1327:4 1343:22

**urodynamics** 1289:5,10,12,14 1327:23 1343:3,

7,10,15,25 1344:12

**urogenital** 1058:7 1174:4,6 1175:2

**urogynecologic** 1126:3 1128:6

**urogynecologist** 1128:14

**us** 987:20 990:9 1043:17 1046:6 1122:3 1156:7 1194:2 1195:3 1300:2

**use** 1012:11 1013:1 1019:14 1052:3 1082:18 1108:22 1136:14 1159:17,24 1191:5 1197:16 1206:23 1213:16 1243:1 1244:22 1245:3, 7,10 1304:13 1305:24 1327:3

**used** 1011:16,20 1012:18 1013:2, 17 1064:14,18 1159:9 1161:14 1171:10 1243:6 1244:8,18 1291:7 1300:8, 12 1302:9,11, 17,23,25 1305:2,4,15,18 1318:2 1319:21

**using** 1010:1,20,

24 1014:6
1065:2,4 1120:7
1123:4 1178:18
1243:15
1244:11
1302:14 1303:3,
6, 1336:10

**usually** 989:24
991:23,25
992:11 994:1,2,
8 997:13,15
1011:18 1013:2
1020:13
1033:25 1080:4
1109:2 1110:6
1136:14 1137:5
1170:6 1177:20
1178:13 1188:7
1189:18
1196:19 1198:1
1199:9 1211:6
1234:16,25
1236:8 1237:10
1239:9 1247:3
1252:16
1253:10
1261:22
1267:19 1280:4
1293:5,7 1297:5
1319:23
1328:25 1334:7,
12

**uterine** 995:17
1088:4,14,21
1089:23
1093:20 1135:7
1168:24

**uterosacral**
1098:13,19

1209:2 1214:11
**uterus** 995:11,17
1062:3 1089:5
1097:15 1135:6
1136:2,3
1137:12,14,16
1138:3 1157:5,6
1203:9 1204:4
1206:5 1240:4
1250:7 1251:4
1252:12 1333:2,
3,12 1334:15
**uteruses** 1333:6
**UTI** 1149:17
1266:20
**UTIS** 1068:15
1090:18 1266:3,
6 1323:4,6,7,17
1324:12
1345:10,15

---

### V

---

**vagina** 989:21
990:14,16,23,25
991:6,12 992:5
993:14 996:16,
17 999:18
1002:5,7,10,
1003:15,17
1006:4 1015:13
1017:6,9,19,21,
24 1049:7,9,18
1063:10
1073:15
1086:24
1097:11 1107:1,
2 1111:15
1116:18 1118:4,

15,24 1131:10
1141:3 1158:18
1173:3,11
1174:19 1175:6,
9 1177:22,24
1179:9,10,11,12
1180:24 1182:7
1183:5,10,22
1185:4 1186:16
1187:3,23
1188:17
1191:14
1193:17 1212:9,
18 1214:23
1215:8 1219:19
1236:11
1251:21,23
1257:13
1267:15 1268:1
1277:22 1279:8
1283:19,22
1284:24
1299:15
1301:21
1311:13,24
1312:3,13,16

**vaginal** 987:23
988:13 991:19,
20 992:9 993:3,
20 994:5 995:20
999:5 1002:21
1003:18,22
1006:4 1007:25
1009:16 1010:8
1014:17 1019:3
1020:15,19,21,
24 1037:10
1038:20,22
1045:9 1049:14
1051:8 1060:7

1074:9,15
1097:7,11,18
1098:15
1103:10
1104:12 1105:1,
9,14,21
1106:14,19,20,
22 1107:4,5,13,
16,19,21,25
1108:1,4,8,25
1109:1,9,10
1110:2,5
1111:12 1113:7
1118:24
1120:11
1129:17
1135:25
1136:17 1139:9,
12 1142:24
1145:20
1149:21
1156:25 1157:4
1169:3,5,6
1186:1 1202:17
1209:3,4,6,9,14,
19,21 1210:3,6,
21 1211:13,17,
25 1212:13,15,
16,20 1214:10
1236:6,8
1247:13 1250:4
1254:10
1255:18
1264:12 1265:7,
14 1267:17
1268:23
1269:21,22,23
1270:2,6,7,16,
21 1271:15,22
1272:5 1276:7,

12,15,18,20,25
1277:12,20
1278:21,23
1294:9 1306:23
1311:2,5,8,12,
23 1313:20
1316:10
1331:24
1337:12 1340:8,
16 1345:6

**vaginally** 1136:4
1198:13

**vaginitis** 1105:6
1128:3 1129:5

**valid** 1231:9

**Valium** 1319:19,
24 1320:2

**Valsalva** 1138:5,
11,12,13

**values** 1042:3,6,
8

**Van** 1005:6,8

**variety** 996:9
1024:17
1039:15
1081:16
1094:11,13
1111:3 1113:8
1145:15
1152:17
1196:20
1198:22
1199:13 1245:9
1256:18
1290:16
1293:22
1318:25 1335:8
1341:10

**various** 989:8
990:15 1077:10
1153:15 1254:5
1268:16
1283:21 1336:8
1341:6

**varying** 1164:18

**vascularity**
1327:16

**vast** 997:7
1037:1 1062:11,
17 1110:20
1112:23
1127:13 1130:1
1142:6 1323:13

**vault** 1006:4
1009:16
1139:10,12
1212:15
1213:13
1214:10

**verified** 1138:5

**versa** 1160:22
1252:20

**version** 1037:19
1038:18
1091:12,13
1155:21 1181:9

**versus** 1039:23
1048:4,19
1049:11 1142:9
1151:1 1156:2
1160:21
1166:11
1170:24
1175:21
1196:14

**vertigo** 1322:1,3

**very** 989:20,21
990:23 993:24
994:17 998:7
1012:17
1013:18
1018:19
1034:23
1036:18
1038:16 1039:1
1043:15
1048:23
1054:11,23
1065:9 1069:19
1072:9,24
1075:23,25
1076:5,8,17
1077:16 1086:8
1126:19
1128:23 1162:1,
23 1163:8
1165:25
1169:22 1172:8,
24 1177:7
1182:4 1187:1,
20 1188:6,7,19,
20,25 1189:1,
12,13,17,18,20
1190:3,22
1200:17,18
1218:4 1221:17,
23 1222:22
1223:20
1225:12
1226:25
1230:17 1231:3
1242:25
1243:23,25
1245:15
1246:12,14

1283:19 1285:4
1287:11 1321:1,
20 1329:9
1335:8

**Vesicare**
1111:22,25
1112:2,3,5
1114:14 1115:1,
7,24 1116:4
1140:2

**vesicovaginal**
1083:8 1086:19,
21

**via** 1080:18
1209:4 1212:21

**vibrant** 1039:7

**vice** 1160:22
1252:20

**Vicodin**
1035:13,15

**Vicryl** 1010:9,13
1011:20 1013:2
1305:3,17,19,24
1306:21,24

**video** 984:3

**VIDEOGRAPH
ER** 984:1
1045:24
1066:13,17
1090:21,25
1130:10,17
1155:5,12
1194:5,12
1225:25 1226:4
1232:11,15
1274:22 1275:1
1314:23 1315:6
1346:11,15,21

virginal 1006:6

Virginia 1029:14

virtually 1074:21

virus 1143:19,22

vis-a-vis 1131:24

visible 1080:18 1081:19 1106:23

visit 988:25 1140:2 1199:16 1257:7 1265:8 1335:15

visits 1257:6,16

visualize 1081:2

void 1246:6,8

voiding 1131:11, 13 1194:2 1230:18 1259:19 1260:9 1286:14 1303:16 1324:4, 14 1342:4

volition 1262:21

volitionally 1246:13 1262:19

volume 984:3 1046:14

voluminous 1142:6

volunteered 1314:12

volunteering 1314:15

vomiting

1221:21 1318:2, 3

vulva 1051:7 1063:9 1236:12

vulvar 1044:12 1050:20 1063:4

vulvovaginal 990:25 991:1,25 992:5,13 996:7 1268:18,20 1269:5 1271:3, 11,19 1272:2

---

**W**

Wagstaff 1026:12,15

wait 991:3 1160:20 1164:12 1268:22 1269:6

waive 984:21

walk 1024:20 1177:3 1189:4

wall 1002:21 1006:3 1020:19, 21 1022:1 1048:15 1051:8 1073:15 1093:21 1128:2 1129:5 1174:18 1175:5,9 1183:5 1191:7 1204:6, 16,18 1212:20 1267:17

walls 1252:11

Wang 1114:16 1192:22

waning 1199:8

want 1004:9 1007:5 1018:15 1024:24 1029:19 1031:23 1034:24 1037:23 1040:6 1043:12 1044:5 1056:24 1069:5, 18 1070:9 1085:7,9 1105:3,19 1106:12 1111:1 1122:12,23 1123:3 1155:14 1165:17 1178:23 1187:14 1207:5 1208:7,18 1213:4 1219:1 1230:2 1262:14 1263:25 1264:6 1308:5

wanted 1075:15 1083:23 1092:5 1108:15

wants 1210:13

warning 1267:2

warts 1144:1,3

wasn't 990:8 1030:13 1075:16 1115:6 1197:25 1269:4 1272:3 1330:22

water 1138:6

Wave 1056:4

waxing 1199:8

way 990:10 1005:3,15 1017:3 1022:7 1024:20 1047:8 1053:7 1055:8 1062:2 1070:21 1074:9 1078:21 1079:1 1084:5 1086:1 1094:15 1100:4,5 1126:2 1129:21 1142:15 1167:11 1176:21,25 1177:3 1179:6,8 1197:11,16 1220:3 1231:9 1232:4 1262:15 1271:5 1277:3 1284:9 1288:5, 12 1290:25 1302:16 1309:1, 8

ways 1019:4 1074:24 1293:23

we'll 995:19 1027:18 1029:24 1030:20 1032:2 1064:19,22 1067:21 1151:5

we're 984:1 996:19 1009:22 1024:24 1026:6, 18 1027:22 1030:21 1032:24 1055:3

1062:11
1066:13,17
1067:7,9,23
1071:19
1090:21,25
1111:1 1120:7
1122:6 1124:4
1130:10,17
1155:5,12
1168:9 1170:19
1178:4 1179:24
1194:5,12
1216:4 1225:25
1226:4 1232:11,
15,21 1274:22
1275:1,7 1315:6
1318:20 1336:8,
9 1338:20,21
1339:3,20
1341:5 1346:11,
15,22

**we've** 1002:18
1026:16
1047:13 1052:6
1055:2 1066:25
1067:1 1095:15
1097:4 1105:8
1113:13
1121:22 1122:5
1127:10
1129:18,25
1131:21
1164:13 1168:2
1186:17
1191:19
1217:11
1235:24 1249:7
1254:22
1274:10
1285:15 1308:4

1313:8, 1322:12

**weak** 1158:20
1161:25 1163:5
1193:21

**wean** 1112:10
1243:7,15

**Webster**
1144:12 1146:8

**wedge** 1100:5

**week** 1011:19,25
1142:22 1278:7,
9,20,21
1291:16,21

**weeks** 1012:3
1041:14 1139:7
1140:9 1212:8
1215:20,22
1216:4 1217:9
1306:22

**weighs** 1104:5

**weight** 1103:16
1109:17,19
1124:20
1129:10 1166:3
1289:25

**weird** 1329:24

**well** 987:14
988:21 989:7,19
990:12 992:3,25
996:23 997:13
999:8 1000:15
1001:14
1003:25
1006:15,
1007:25
1008:22
1009:14 1010:7
1012:12

1013:10 1014:4
1017:3,22
1018:7 1020:10
1021:5,13,23
1022:6 1025:25
1030:1,10
1032:6 1033:25
1035:13 1036:3
1037:14
1038:11 1040:5,
12,18 1043:20
1044:5,7
1047:10
1048:21
1050:25 1054:7
1057:18
1058:20 1059:6
1060:11 1063:1,
3 1065:4
1067:15 1073:9,
14 1075:23
1076:24
1077:16,23
1079:5 1083:3
1086:14
1090:15 1094:3,
5,17 1095:18
1096:5,15
1099:8 1100:4
1101:22
1106:24
1110:19 1111:1,
20 1112:23
1113:17 1114:7
1115:9 1116:12
1121:5 1123:17
1125:5 1126:2
1129:21 1132:9,
15 1133:8,22
1134:24 1137:4

1139:17
1141:20
1142:12
1144:17
1146:23
1148:13,20
1150:8,22
1152:24 1154:6,
12,16,25
1158:15 1159:9
1162:12
1165:17 1169:4
1171:25
1173:22,25
1174:12,22
1175:20 1177:6,
15 1179:6
1182:17 1185:2
1191:18
1195:15 1196:8,
16 1198:7
1203:8,17,24
1205:21
1207:18
1208:15 1211:2
1213:23 1214:2,
11 1215:1,10,
15,23 1216:15,
24 1219:8
1220:25
1221:15
1222:17,20
1223:11 1225:5
1226:17 1227:4,
18,22,25
1229:10
1230:11,19
1234:21 1235:4
1236:22 1237:6
1238:17

1239:13 1243:9
1244:4 1245:23
1246:12 1251:2
1253:7 1254:20,
22 1255:8,19
1259:22
1266:18 1267:9,
14,24 1268:12
1269:6,8,21
1270:7 1271:1
1272:12,
1273:17
1275:21
1276:14 1277:1
1283:19
1286:15
1288:14 1294:9
1295:16,24
1296:11,22
1298:3 1300:4,
1301:12
1302:18 1304:1,
20 1309:18
1317:5 1319:4
1322:7,20
1324:13 1327:3
1328:20
1330:22
1332:16
1333:23
1334:20 1335:1,
24 1339:23
1343:21 1344:8

**well-aware**
1020:3

**well-controlled**
1039:10,11,23
1040:4,7 1041:5
1168:14

**well-elucidated**
1172:8

**Wellbutrin**
1158:3,12
1159:5 1162:8,
21

**went** 1026:20
1058:2,17
1061:10 1063:4
1123:17

**were** 985:7
986:22 987:17
991:20 992:23
998:1 999:18
1000:3,4
1008:19
1010:10
1023:15 1029:6
1032:5 1033:7,
14 1034:9
1040:7 1041:25
1042:1,4,9,10,
14,18 1045:11
1046:8,9
1049:22
1051:10 1053:9,
22 1057:2,6
1061:7 1065:16
1066:20
1072:16
1076:21
1077:19
1080:15 1090:8,
10 1092:6
1102:3 1121:5
1123:16
1125:22
1130:15
1135:14

1139:10
1141:23 1150:3,
18 1155:10,16
1157:13,22,25
1159:15
1164:14
1165:11 1168:6
1170:14
1179:13,15
1194:14 1212:1
1218:23
1224:13
1226:10 1227:4,
11 1232:18
1270:10 1271:5
1274:16 1275:4
1281:24
1289:10,14
1290:22
1297:16 1305:2,
4,15 1313:9
1314:8,9,18
1316:3,5,6
1320:13,21
1326:4 1329:3,
19,23 1331:6
1333:11
1335:24
1340:13
1343:21

**weren't** 1048:19
1159:20
1217:15

**West** 1029:14

**what's** 995:7
1020:13
1035:19
1053:17
1056:20

1070:16
1146:11
1172:15
1186:24 1206:8
1223:12,21
1294:14
1296:10

**whatever**
1207:22
1230:24 1263:1

**whenever**
1190:22

**Where's**
1252:14
1294:16

**whereupon**
984:8 985:6
986:21 987:6,16
1031:1 1066:15,
19 1072:1
1090:23 1091:2
1123:5 1130:12,
14 1155:7,9
1194:7,9 1226:2
1232:13,17
1259:9 1274:24
1275:3 1304:23
1315:1,3
1346:13

**whether** 994:21
999:23 1003:8
1006:21
1012:13
1014:22 1015:8,
10 1036:11
1040:3 1041:12
1043:6 1051:14
1052:10,11,22
1053:6,8,22

Case 2:10-md-02327   Document 7025-1   Filed 01/19/20   Page 224 of 224 PageID #: 213667



In Re: CR Bard 200      Bruce Rosenzweig M.D., Vol. IV      11/29/2014

1064:18,24
1075:23 1077:5
1078:18 1081:9,
16 1087:22
1088:18
1094:15
1108:17,22
1111:2 1127:17
1129:14 1132:6,
7 1137:3
1160:17
1162:20
1171:10 1173:2
1181:24
1183:18 1190:9,
16 1196:18
1199:14
1205:20
1210:18 1223:8,
10 1225:3,23
1235:1,2
1243:14
1244:10 1251:1
1264:3 1269:2
1277:6 1280:24
1296:17
1305:13
1312:25
1317:15,18
1318:12
1323:16 1333:5,
20 1340:24,25
1341:13

**wide** 1006:5
1223:20
1339:21

**wider** 1223:22

**widespread**
997:4,17

**width** 1339:18,
24

**will** 984:5,6
985:1 986:13
1002:16
1003:15,20
1020:14
1021:23
1022:24
1027:13,14,16
1028:17 1034:6
1036:5 1042:8
1052:7 1055:24
1057:22
1071:23 1074:4,
10,12 1079:5,8,
20 1080:1
1084:25 1085:1
1086:19,23
1091:7 1097:14,
17 1098:12
1099:18
1100:10
1101:11 1104:3
1111:11,13
1112:15 1122:3
1124:6 1126:10
1127:22
1144:21
1145:23 1149:7
1159:3 1160:9,
10 1161:20
1167:8,17
1186:4,12
1199:9 1206:8
1207:1 1213:2,
19 1246:16
1257:18 1284:2
1320:23 1324:2
1341:7

**with** 984:16
985:19 986:6,7
987:1 988:9
989:22,25
990:2,14 991:5,
6,23,24 992:8
994:12,25
995:23 996:8
997:14,17,22
998:13 999:14
1000:1,17,19
1005:14,15
1006:16
1007:19 1010:1,
9,11,12
1011:14,21
1012:6,14,24
1013:4 1014:8
1019:23,24
1020:7,11
1021:19
1023:11 1024:3,
9 1025:13
1026:11
1027:25 1028:4
1029:17
1030:21
1033:12 1034:4,
17 1036:6
1037:3 1038:1
1039:20 1044:1,
10,14 1046:20
1047:4,18
1048:3,9,17
1050:19,24
1051:22 1053:9
1055:4 1056:5
1058:7,9,18,20,
1059:22 1060:9
1061:15 1064:1

1065:12 1068:4,
11 1069:19,24
1070:2,15
1072:7 1073:5
1074:10,16
1075:11 1077:5,
6, 1079:11
1082:14,22,24
1083:6,12
1084:11 1085:2,
6,7,21 1086:16
1087:1,25
1089:3 1090:2,3
1093:19
1094:10,19
1095:7,12
1096:17
1097:23,24
1100:5 1101:2,
6,17,20 1102:5,
6,12,13,17
1103:7,12
1104:25 1105:1,
7,21,24 1107:12
1108:7,20
1109:13 1110:6,
16 1111:11,21,
25 1114:7,9,10,
18 1115:19
1117:12 1119:4
1121:18 1122:8,
11,16,17,18,22
1123:20 1124:4
1125:14
1126:20,23
1128:12,25
1131:1 1132:22,
25 1133:10,12
1134:6,12
1135:24 1136:2,

9,10, 1137:15
1138:5,7,25
1139:8 1141:14,
16 1142:4,10,24
1143:7,25
1145:16,18
1146:2 1147:3,
19,22 1148:24
1149:16
1150:13
1151:12,16,18,
25 1152:8,12
1153:14
1154:16
1155:19
1156:16
1159:22
1160:21
1161:22 1162:9,
13,15,21,24
1163:1 1164:17,
19 1165:2
1166:6,18
1168:10,18,22
1170:23 1171:5,
7 1173:1,3
1174:11,23
1176:2,6,11
1183:18
1184:19
1185:10,20
1188:14
1192:23
1193:22
1194:17 1195:6
1196:11,19,20
1198:1, 1200:2
1202:3,4
1203:10,25
1206:7 1208:11

1209:1 1210:14
1211:12,18,21
1212:4 1213:5
1215:24 1218:4,
5,18 1221:25
1222:19
1224:15
1225:11
1227:17,20
1228:23 1229:3
1230:14,15,22
1235:11,21
1236:9,16,25
1237:4,11,19,23
1238:8,18,20
1241:25
1242:24 1247:4,
9,16,20 1250:19
1251:7 1253:5,
11 1254:4,10,
14,17 1255:7
1257:13
1258:10
1259:15,23
1260:5,14,25
1261:8, 1264:9
1265:8,11,15,25
1266:7,10
1268:17
1269:18,22,23
1271:2,20
1272:1,17
1273:13 1274:6,
18 1276:1
1277:19 1278:1,
3,4 1279:13
1280:4 1282:15,
24 1285:9,24
1286:5,7,10,11,
14 1287:8

1288:9,14
1289:23 1290:5,
8 1291:9,20
1292:4 1293:20,
21 1295:11,
1297:14
1298:15
1300:13
1301:11 1302:2
1304:18
1306:24 1308:3,
8 1310:25
1311:4,6
1312:5,22,25
1313:14
1314:10,19
1318:23 1319:2,
6,11 1320:8,14
1322:19 1323:9
1324:6,20
1326:1,2,5,23
1328:1,2,3,7
1331:18
1336:22 1337:3
1338:7,13
1340:22,25
1342:6,17
1344:11
1345:10 1346:3,
18

**Withagen's**
998:11 1034:18

**withholding**
1056:16

**within** 1011:19
1027:20
1037:24
1039:20 1047:9
1071:8 1077:23

1079:12
1080:23 1082:5
1110:11
1142:21
1143:12 1149:7
1205:14 1212:7
1216:11
1226:18
1227:25 1228:3,
18,20,22
1229:8,10,22,24
1231:15
1242:21
1251:16
1291:19
1303:24 1309:5,
14,17 1312:12

**without** 985:4
992:1,2 1004:17
1047:18
1048:13 1075:6
1109:15,21
1205:13 1206:1,
5 1229:24
1248:17
1262:21 1263:9
1264:17,25
1297:6 1298:19
1324:17
1326:22

**witness** 984:7,8,
13 998:24
1007:4,25
1009:5,21
1023:23
1027:25
1029:13
1030:20
1035:23
1045:25

1053:13 1054:8
1067:4,11
1068:19
1072:12
1073:14
1074:19
1075:11
1076:12 1082:9
1083:3 1085:19
1086:14 1087:6,
15,19 1089:5
1090:13
1092:10 1093:6,
9 1094:3
1101:22
1105:12
1107:23 1110:5
1114:2 1115:9
1116:12 1117:7,
22 1119:11,17
1120:21 1121:1,
8,22 1123:11,23
1125:3 1126:25
1129:9 1134:19
1140:8 1141:1
1142:18
1143:14
1145:23 1149:3
1152:24
1153:12
1154:25 1155:4
1163:8,17
1164:22 1165:8
1166:16 1167:4,
16 1170:13
1171:10 1172:7
1173:10
1176:18 1181:2
1182:20 1184:2,
11 1188:19

1189:10 1190:9
1191:4 1192:12,
22 1193:5,11
1200:23
1201:18,25
1205:18 1206:4,
22 1207:15
1208:5 1209:13
1213:23 1215:1
1216:24 1218:8,
15 1219:8
1220:5 1224:6,
19 1225:20,23
1227:9 1229:3,
18 1231:3,8,20
1232:4,8
1237:14 1238:4,
17 1239:8
1240:24 1242:2,
14 1243:9,25
1244:20 1248:8
1249:12 1250:1,
17 1252:6
1259:4 1261:3,
17 1262:11,17
1264:11
1265:18
1266:16 1267:6
1268:8 1269:16
1291:25 1305:1
1309:7

**woman** 994:6,16
996:2 1096:16
1175:18
1176:12
1189:20

**women** 997:6
1103:18,20
1104:2 1110:11,
20 1149:6

1166:7 1167:16
1172:2,5
1206:23,25
1267:19

**women's**
1159:22

**won't** 1014:11,
17 1183:14

**wondering**
1075:24
1158:22
1161:17

**word** 1049:6
1120:7 1135:10
1153:22 1162:7
1170:14 1248:3
1257:19
1266:18
1338:22

**words** 998:16
1103:10
1106:22 1187:4
1195:15

**work** 1013:9
1014:17 1165:4
1167:11
1267:13
1300:14
1340:20

**worked** 1059:6
1061:7

**working** 996:10
1026:1 1133:7

**works** 1162:12

**world** 1177:17

**worried** 1338:9

**worry** 1141:1

1245:12

**worse** 1051:16
1103:11
1104:14
1137:21
1158:19 1199:7
1275:25
1299:16

**worsen** 1034:7
1035:8 1057:23
1058:10 1291:6

**worsened** 1255:2

**worsening**
1316:12
1319:16 1325:5,
18

**worth** 1064:24

**wouldn't**
1029:22
1051:11 1065:6
1077:8 1085:12,
13 1137:7,13,18
1193:15
1210:14
1340:24

**wound** 1039:6
1079:10
1084:12
1123:25 1124:1

**wow** 1159:17

**write** 990:8

**writing** 1025:7

**written** 1053:17

**wrong** 1016:15
1047:7 1049:6
1150:24 1162:6
1181:14

1284:13

**X**

**X-ray** 1022:24 1220:19

**Xanax** 1035:11

**Y**

**yeah** 1029:20 1071:2 1181:15 1200:5 1222:4 1294:21 1328:16

**year** 1123:9 1198:6 1222:25

**years** 1040:19 1041:6 1095:24, 25 1096:1,2 1103:13 1104:22 1110:11 1126:21 1127:6, 7,10 1198:8 1240:25 1244:16 1260:2 1281:4

**yeast** 1236:5,7,9 1267:3,11,18,20

**Yep** 1257:15 1338:11

**yet** 1055:3 1056:8 1083:13, 25 1085:16 1183:14 1223:18

**you'd** 987:4

996:8 1008:17 1018:13, 1041:18 1042:22 1254:17

**you'll** 1223:16

**you're** 988:1,6 992:7 993:23 996:12 999:24 1002:8,9, 1003:19,20 1009:19 1012:8 1014:4,9 1015:7 1016:4 1017:17 1020:3 1023:20 1024:8 1025:23 1027:12 1028:20 1037:12 1038:1, 2 1039:14 1040:16 1042:5 1043:1,14,18 1048:7,17 1053:24 1054:11 1056:7 1060:21 1061:13 1063:17 1073:5, 11 1085:10,19 1090:1,4 1098:21 1099:4, 10 1103:1 1104:12 1105:19 1110:1, 17,19,23 1111:15,17 1115:13 1120:18 1125:9, 11 1137:16,22 1138:13 1147:9

1150:20 1154:17 1160:12 1161:22,24 1164:5 1166:16 1170:6 1174:24 1175:15,20 1176:7,15 1178:1,3,7,11 1185:10 1186:19 1187:17,18 1188:22,23 1189:22 1191:6, 15 1192:9 1195:17 1196:22 1201:7 1203:9,21 1204:7,12,13, 18,24 1207:15, 23 1211:25 1213:23 1215:1 1223:14 1227:16 1230:3 1235:4,6 1239:19 1242:22 1246:23 1248:18 1250:19 1251:20,21,23, 25 1252:2, 1254:6 1262:18, 20,25 1265:15 1266:22 1267:24 1273:3 1276:8 1284:3 1291:12 1295:5 1298:9 1299:4 1308:1 1309:15,

23 1321:12,17 1322:23 1323:20 1324:6 1334:4,8 1338:9 1339:10 1340:17 1341:3, 16 1345:13,20

**you've** 986:17 989:12,18 1010:22 1025:6 1027:8 1043:2 1055:10,15 1067:22 1082:23 1088:10 1091:18 1097:6 1101:19 1102:5 1105:23 1112:21 1125:1, 9 1172:16 1187:1 1189:5 1217:4 1222:12, 13 1224:11 1225:6 1266:23 1281:14 1282:16 1283:23 1284:2 1285:17 1286:20 1290:15 1325:3, 12 1337:22 1346:3

**Young** 1149:6

**yours** 1066:25 1068:16

**yourself** 1101:18

**Z**

**Zofran**  1316:25
  1317:10,15,18,
  19,25 1320:20
**Zweig**  984:13,14

# EXHIBIT K

In The Matter Of:

*In Re: CR Bard 200*

---

*Bruce Rosenzweig, M.D., Vol. V*

December 18, 2014

---

**Tiffany Alley Global Reporting & Video**

730 Peachtree Street NE

Suite 470

Atlanta, GA 30308

770.343.9696

www.tiffanyalley.com



IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


IN RE:  C.R. BARD, INC., PELVIC REPAIR MDL NO. 2187
SYSTEM PRODUCTS LIABILITY LITIGATION


THIS DOCUMENT RELATES TO ALL CASES IN MDL 2187 AND SPECIFICALLY
TO:

KATHY SPOHN v. C.R. BARD, INC.          Case No. 2:13-cv-30512

AMY STEWART v. C.R. BARD, INC.          Case No. 2:13-cv-06937

YOLUNDA SURITA v. C.R. BARD, INC.       Case No. 2:13-cv-09501

SAMIRA TAYLOR v. C.R. BARD, INC.        Case No. 2:14-cv-01987

TONI WILKERSON v. C.R. BARD, INC.       Case No. 2:12-cv-03565



VIDEOTAPED DEPOSITION OF BRUCE ROSENZWEIG, M.D.

VOLUME 5

December 18, 2014

1:49 p.m. to 3:56 p.m

GREENBURG TRAURIG LLP

77 West Wacker Drive, Suite 3100

Chicago, Illinois 60601

GINA M. LUORDO, CSR, RPR, CRR

License No:  084-004143

.

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 871 of 924 PageID #: 213678
Case 2:10-md-02187 Document 752-10 Filed 06/2019 Page 4 of 924 PageID #: 100806

In Re: CR Bard 200      Bruce Rosenzweig, M.D., Vol. V      12/18/2014

Page 1475

```
 1     APPEARANCES:
 2     CLARK LOVE HUTSON
 3     BY:  MR. WILLIAM W. LUNDQUIST
 4        440 Louisiana Street, Suite 1600
 5        Houston, Texas  77002
 6        (713) 757-1400
 7        wlundquist@triallawfirm.com
 8             Representing the Plaintiffs;
 9
10     GREENBERG TRAURIG, LLP
11     BY:  MR. THOMAS J. MAZZIOTTI
12        3333 Piedmont Road, NE, Suite 2500
13        Atlanta, Georgia  30305
14        (678) 553-2101
15        mazziottit@gtlaw.com
16             Representing the Defendant.
17
18
19
20
21
22
23
24
25     Also Present:  Ms. Kelly Woods - Videographer
```

Page 1476

```
 1               I N D E X
 2     WITNESS                      EXAMINATION
 3     BRUCE ROSENZWEIG, M.D.
 4       By Mr. Mazziotti            1478
 5
 6
 7
 8             E X H I B I T S
 9     NUMBER  DESCRIPTION              PAGE
10     No. #82  Rule 26 Expert Report for    1480
11         Kathy Spohn
12     No. #83  Rule 26 Expert Report for    1503
13         Amy Stewart
14     No. #84  Rule 26 Expert Report for    1522
15         Yolunda Surita
16     No. #85  Rule 26 Expert Report for    1536
17         Samira Taylor
18     No. #86  Rule 26 Expert Report for    1546
19         Toni Wilkerson
20
21
22
23
24
25
```

Page 1477

1    THE VIDEOGRAPHER:  We are on the record, and
2 the time is approximately 1:49 p.m.  This is the
3 beginning of disc 1 for the video deposition of
4 Bruce Rosenzweig, M.D.  Would counsel please
5 identify themselves and who they represent for the
6 record.
7    MR. LUNDQUIST:  Will Lundquist on behalf of
8 plaintiffs, Kathy Spohn, Amy Stewart, Yolunda
9 Surita, Samira Taylor and Toni Wilkerson.
10    MR. MAZZIOTTI:  And Tom Mazziotti on behalf of
11 C.R. Bard.
12    THE VIDEOGRAPHER:  Will the court reporter
13 please swear in the witness.
14        (Whereupon, the witness was
15        sworn.)
16    MR. MAZZIOTTI:  Good afternoon, Dr. Rosenzweig.
17 Let me reintroduce myself.  I'm Tom Mazziotti.  I
18 represent C.R. Bard in this litigation.  Before we
19 get started, Will, same stipulations as far as what
20 we've been -- from the last depositions?
21    MR. LUNDQUIST:  Sure.  Absolutely.
22    MR. MAZZIOTTI:  I guess we'll just say on the
23 record all objections except those going to the
24 form of the question and the responsiveness of the
25 answer will be reserved until first use if that is

Page 1478

1 agreeable.
2    MR. LUNDQUIST:  Absolutely.
3    MR. MAZZIOTTI:  And all the formalities are
4 waived.
5       BRUCE ROSENZWEIG, M.D.,
6 having been first duly sworn, was examined and
7 testified as follows:
8       EXAMINATION
9 BY MR. MAZZIOTTI:
10    Q.  Dr. Rosenzweig, we're here to talk about
11 just five plaintiffs today, so what I propose to do
12 is just talk about what you did in preparation for
13 your deposition today and then go through each of
14 the plaintiffs.
15    Can you tell me -- let's start off with
16 what you did to prepare for today.
17    **A.  I reviewed medical records of the cases,**
18 **depositions that are available and had a meeting**
19 **with counsel.**
20    Q.  How many meetings did you have with
21 counsel?
22    **A.  One.**
23    Q.  And that was just this afternoon?
24    **A.  That is correct.**
25    Q.  As far as the documents, I take it you

Page 1479

1 went back and looked at your Rule 26 reports for
2 each of the plaintiffs?
3    **A. That is correct.**
4    Q. Was there anything that stands out now
5 that you wish to change or modify that -- last
6 time, for example, we stumbled across a typo or
7 something like that, before I get going?
8    **A. Right. There are a couple of notations**
9 **that I made in reports such as when -- that**
10 **Mrs. Stewart had an abdominal hysterectomy and the**
11 **size of the mesh explant from Mrs. Surita from the**
12 **▆▆▆▆▆ 2011. Even though it's described**
13 **later in the report, I just moved it up so it would**
14 **be easier to find. And then in Ms. Wilkerson, I**
15 **think it is, I've crossed out recurrent urinary**
16 **tract infections, bladder infections and recurrent**
17 **incontinence as one of the problems that I think is**
18 **related to the mesh.**
19    Q. Okay. As far as the reports, you said you
20 moved something up in one of these reports. Did
21 you go back and retype and move it up or --
22    **A. No. I just handwrote it. And you're**
23 **getting -- again, as we did the last time, we're**
24 **going to mark these as exhibits. You're going to**
25 **be able to get them.**

Page 1480

1    Q. Perfect.
2    **A. There's no other real notes that are in**
3 **there.**
4    Q. Okay. Well, then let's go ahead and talk
5 about Kathy Spohn or Spohn, S-p-o-h-n --
6    **A. Okay.**
7    Q. -- and your opinions about her first.
8 We'll mark as Exhibit No. 82 your Rule 26 report
9 for Ms. Spohn, and I see you've got highlights on
10 that, right?
11    **A. That's correct.**
12        (Whereupon, Deposition Exhibit
13        No. 82 was marked for
14        identification.)
15 BY MR. MAZZIOTTI:
16    Q. That's just to help refresh your memory to
17 go through your opinions?
18    **A. To make things a little bit easier for us**
19 **to get through them where the important things are**
20 **in the report, yes.**
21    Q. Now, with regard to Ms. Spohn, I assume,
22 based on your report, you didn't physically examine
23 her?
24    **A. That is correct.**
25    Q. Some of the plaintiffs you did, however,

Page 1481

1 right?
2    **A. That is correct.**
3    Q. Was there a particular reason why some
4 plaintiffs you examined and others you did not?
5    **A. I was asked to examine those plaintiffs.**
6    Q. Do you know why you were asked to examine
7 certain plaintiffs?
8    **A. I think it was the decision of the**
9 **attorneys.**
10    Q. Were there any plaintiffs that you asked
11 to examine?
12    **A. That I didn't examine?**
13    Q. No. As you were reviewing records, were
14 there any of the plaintiffs that you asked to
15 physically evaluate?
16    **A. No.**
17    Q. All right. For Ms. Spohn, what is your
18 understanding as to her indications to have an
19 implant?
20    **A. She had an Avaulta Plus posterior implant,**
21 **and the indications were a grade 4 enterocele and a**
22 **grade 2 rectocele.**
23    Q. My understanding also is that prior to her
24 implant, she also had occasional pain with
25 intercourse?

Page 1482

1    **A. That is correct.**
2    Q. As far as what -- how her quality of life
3 was before the implant, did the rectocele impact
4 that?
5    **A. She testified that she experienced**
6 **discomfort and pressure in the vagina, but not**
7 **pain. Specifically what she testified to about the**
8 **impact of her quality of life, I think her**
9 **deposition testimony and what's reflected in the**
10 **medical records can speak for themselves.**
11    Q. Now, as far as her quality of life and her
12 indications, you do not criticize the surgeon for
13 implanting the Avaulta, the decision to implant the
14 Avaulta, correct?
15    **A. That is correct.**
16    Q. Prior to Ms. Spohn having the implant, she
17 had discussions with her surgeon about the implant,
18 right?
19    **A. That is correct.**
20    Q. And his name is Dr. Robert Sterling just
21 to refresh your memory. Do you know what risks and
22 benefits Dr. Sterling reviewed with Ms. Spohn?
23    **A. That is both in the medical records, in**
24 **his deposition and in her deposition. And as we've**
25 **discussed in prior depositions, I think those will**

Page 1483

1 speak for themselves.
2    Q.  Based on your review, is there certain
3 information you believe that Dr. Sterling did
4 not -- that Dr. Sterling knew about, but did not
5 relay to Ms. Spohn prior to the implant?
6    **A.  That he knew about and did not disclose?**
7    Q.  Correct.
8    **A.  Not that I'm aware of.**
9    Q.  For example, is there something that you
10 believe Dr. Sterling should have told Ms. Spohn,
11 but did not do so?
12   **A.  Not that I'm aware.**
13   Q.  So no criticisms about the informed
14 consent that Dr. Sterling provided to Ms. Spohn?
15   **A.  That is correct.**
16   Q.  Now, as far as the surgery itself, it took
17 place on ████████ 2008.  Is that your
18 understanding?
19   **A.  That is correct.**
20   Q.  The surgery had no complications, correct?
21   **A.  That is correct.**
22   Q.  And it was uneventful?
23   **A.  That is correct.**
24   Q.  From my review of the records, it looks
25 like the prolapse they attributed mostly to the

Page 1484

1 enterocele.  Is that your understanding?
2    **A.  Yes.**
3    Q.  Similar questions from before.  As far as
4 the actual surgery itself, I understand you have no
5 criticisms of Dr. Sterling?
6    **A.  That is correct.**
7    Q.  As far as his training and experience, do
8 you have any criticisms about that?
9    **A.  No, and it looks like he did have a**
10 **proctor with him during that procedure.**
11   Q.  Do you know whether or not Dr. Sterling
12 had an opportunity to review the IFU for the
13 Avaulta?
14   **A.  I don't specifically recall what he**
15 **testified to in his deposition about whether or not**
16 **he specifically looked at the IFU or when the last**
17 **time he looked at the IFU, and so whatever he**
18 **testified to will speak for itself.**
19   Q.  Okay.  Okay.  Whatever his understanding
20 based -- as to the risks and benefits and what he
21 understood the IFU to mean, you just defer to his
22 testimony on that?
23   **A.  That is correct.**
24   Q.  As far as Ms. Spohn's recovery, in the
25 records, it indicates it was complicated by vaginal

Page 1485

1 atrophy?
2    **A.  On ████████ 2008, she was diagnosed with**
3 **pelvic pain and postmenopausal atrophic vaginitis.**
4    Q.  Well, vaginal -- strike that.
5       Is it your opinion that the Avaulta caused
6 vaginal atrophy?
7    **A.  One of the things that we do know from**
8 **what's in the literature is that pelvic floor mesh**
9 **can lead to an entity called stress shielding.**
10 **That's from work that was done in Pam Moalli's lab**
11 **that can lead to muscle atrophy and vaginal**
12 **atrophy.  So an element of thinning of the vagina**
13 **can be due to the stress shielding from pelvic**
14 **floor mesh.**
15   Q.  Is it your opinion that in Ms. Spohn's
16 case that it is due to the mesh itself?
17   **A.  The thinning of the vagina or the erosion**
18 **that she --**
19   Q.  The thinning of the vagina.
20   **A.  Well, a component of that can be due to**
21 **her menopausal status.  At the time of the implant,**
22 **she was 52 years of age, so that in 2008, she would**
23 **have or when this was diagnosed, more likely than**
24 **not, she was menopausal, so both of those factors**
25 **could lead to a thinning of the vagina.**

Page 1486

1    Q.  When you say both of those factors, do you
2 mean the --
3    **A.  Stress shielding and the menopausal**
4 **status.**
5    Q.  Do you have an opinion which is more
6 likely to have contributed to the vaginal atrophy?
7    **A.  That was diagnosed?**
8    Q.  Correct.
9    **A.  I would say that both had a contributing**
10 **factor.  I cannot state which had a -- as of**
11 **████████ 2008, which one was contributing more to**
12 **her vaginal atrophy.**
13   Q.  Certainly can't say to a reasonable degree
14 of medical certainty or medical probability that
15 the mesh was the cause of the vaginal atrophy,
16 correct?
17   **A.  That is correct.**
18   Q.  As far as her postoperative course, it
19 appears that it went well until -- the first
20 complaints were not until ████████ of 2008?
21   **A.  That is correct.**
22      MR. LUNDQUIST:  Form for the record.
23 BY MR. MAZZIOTTI:
24   Q.  The incisions were healing well after the
25 surgery, right?

Page 1487

1    A.  That is correct.
2    Q.  There's a reference in ▮▮ of 2008 that
3  the vagina is shortened.  Is that -- is it your
4  understanding that was attributed to the mesh, or
5  is that just a part of her anatomy?
6    A.  I do not opine that in Mrs. Spohn's case
7  that the mesh was leading to her mildly shortening
8  of her vaginal vault.
9    Q.  So you're not weighing in one way or the
10  other on that?
11    A.  That is correct.
12    Q.  What are some of the other causes for
13  vaginal shortening?
14    A.  One of the causes could be excising too
15  much vagina during the hysterectomy.  The other
16  could be having a vaginal incision to place the
17  mesh.  Hers was only mildly shortened, and we don't
18  really have a clear indication prior to surgery
19  whether or not that observation was there prior to
20  surgery.
21    Q.  What are, if any -- what are, if any, the
22  long-term complications related to a vaginal
23  shortening?
24    A.  Again, it all depends on how severe the
25  shortening is.  Shortening could lead to pain with

Page 1488

1  intercourse.  It could change the relationships
2  with the bladder and the rectum, but if something
3  is not placed inside the vagina, a shortened vagina
4  in most women would not be appreciated.
5    Q.  Generally speaking, a shortened vagina
6  does not cause long-term complications for a woman?
7    A.  Aside from what we talked about before,
8  that would be correct.
9    Q.  Well, what you referenced before, though,
10  the potential complications, what percentage of
11  women that have vaginal shortening develop those
12  complications?
13    A.  Again, it all depends on the severity.  I
14  mean, what's noted here is mild shortening of her
15  vagina.  I would say that the majority of those
16  women would be asymptomatic.
17    Q.  As far as vaginal atrophy, that can also
18  lead to or cause painful intercourse?
19    A.  We've discussed that, yes.
20    Q.  I think you said vaginal shortening can
21  also cause painful intercourse?
22    A.  That is also correct, but a more severe
23  form of vaginal shortening.
24    Q.  Okay.  Not mild?
25    A.  That is correct.

Page 1489

1    Q.  Okay.  I understand.
2    In ▮▮ 2008, the medical records
3  indicate that Ms. Spohn denied having painful
4  intercourse?
5    A.  That is what the records state, and
6  Mrs. Spohn, again, in her deposition stated that at
7  that point, she was complaining of dyspareunia.
8    Q.  So she disagrees with what's in her
9  medical records?
10    A.  That is correct.
11    Q.  Her medical records also indicate that she
12  had a normal vaginal exam in ▮▮▮ 2008?
13    A.  That is correct.
14    Q.  In a situation like this where the
15  plaintiff's deposition differs from the medical
16  records, do you weigh in as to which version of the
17  facts support your opinion?
18    A.  In certain instances where there's an
19  overwhelming amount of data that -- you know,
20  possibly one recollection versus what is documented
21  in the medical records would be more likely than I
22  would weigh in.  Again, I think that we have
23  information that she was complaining about rectal
24  pressure, rectal pain.  Whether that was perceived
25  as dyspareunia, whether she started to develop more

Page 1490

1  pain with intercourse later and she remembered it
2  earlier, I think that at this point, I would state
3  that that was her recollection.
4    What's in the records is what's in the
5  records, and I would not weigh in on which is more
6  likely at this point.  I do think there's later on
7  more evidence that she was complaining of
8  dyspareunia and that there were findings that I
9  would agree with that.
10    Q.  Later Ms. Spohn develops, looks like, mesh
11  exposure?
12    A.  That is correct.
13    Q.  And they excised at least what they could
14  of the mesh?
15    A.  That is correct.
16    Q.  One of the physicians, I think it was a
17  colorectal surgeon, attributed the pain to pelvic
18  muscle spasm syndrome?
19    A.  That is correct.
20    Q.  Do you disagree with that assessment or
21  that opinion?
22    A.  Well, I would not disagree that she had
23  pelvic muscle spasm.  The etiology of that is mesh
24  going through muscle.
25    Q.  Explain that to me.

Page 1491

1    A.  Well, at the time of explant, we see that
2  the mesh was actually in the iliococcygeal muscle.
3  When it was placed, it was placed close to the
4  ischial spine, and it separated from where it was
5  implanted to being lower down in the pelvic floor
6  muscles.  This is an indication of mesh
7  contraction.
8        Also, we know that the more proximal arms
9  can be going through pelvic floor muscles.  A
10  permanent polypropylene mesh that undergoes
11  degradation, contraction, inflammation, chronic
12  foreign body reaction can irritate muscles.
13    Q.  Okay.  Are there other causes for pelvic
14  floor muscle spasms?
15    A.  Yes, there can be.
16    Q.  What, in your experience, are other causes
17  for pelvic floor muscle spasms?
18    A.  Muscle trauma.
19    Q.  From?
20    A.  Let's say a vaginal delivery where there
21  was a significant size of the baby, forceps being
22  used, a significant episiotomy was done, patients
23  that have pelvic floor trauma such as a fractured
24  pelvis, if there is a medical condition that
25  specifically impacts the muscles of the pelvic

Page 1492

1  floor such as finding endometriosis in the muscles
2  of the pelvic floor.  I think there have been one
3  or two case reports of that being diagnosed, but it
4  would be a specific trauma to the muscles that
5  would lead to pelvic muscle spasm.  Now, there are
6  some patients that develop a reactive pelvic muscle
7  spasm due to longstanding pelvic pain.
8    Q.  Now, Ms. Spohn also had a forceps-assisted
9  delivery, correct?
10    A.  That is correct.
11    Q.  Did you rule that out as the cause of
12  pelvic pain or pelvic floor muscle spasms?
13    A.  Yes, because that was several decades
14  before this finding of pelvic muscle spasm.  I
15  would have anticipated, and I did anticipate, that
16  that would have subsided over the time between the
17  delivery and the mesh implant.
18    Q.  In your experience, have you had patients
19  that had a forceps delivery, no symptoms of pelvic
20  floor muscle spasms, but later on developed them?
21    A.  Yes, but they had a traumatic event to
22  their pelvic floor muscles that precipitated the
23  pelvic floor muscle spasm.
24    Q.  You also saw that Ms. Spohn had a child
25  that was over 10 pounds?

Page 1493

1    A.  That is correct.
2    Q.  Is that also a potential factor for pelvic
3  floor muscle spasms, a child that size?
4    A.  That is correct at the time around
5  delivery.
6    Q.  Same question as far as your ruling that
7  out.  How did you rule out her having a child over
8  10 pounds?
9    A.  How did I rule out --
10    Q.  How did you rule out that's the cause of
11  the pelvic muscle spasms?
12    A.  Because of the time between that delivery
13  and when the pelvic muscle spasm was diagnosed.  It
14  would be -- within a reasonable degree of medical
15  certainty, an event that would happen post delivery
16  and that if it was an ongoing process, that would
17  have been known much earlier.  She had an event
18  that we know that there was mesh bundling, that the
19  mesh contracted, that there was an erosion that was
20  diagnosed, mesh was excised, and therefore, those
21  are more likely causes of pelvic muscle spasm than
22  a remote forceps delivery or a remote vaginal
23  delivery of a large infant.
24    Q.  Your opinion attributing the pelvic muscle
25  spasms and the pain to the mesh and the mesh

Page 1494

1  erosion, is that because of the timing of when the
2  mesh was implanted and the excisions?
3    A.  That is correct, and also the deformation
4  that the mesh underwent, the contraction that the
5  mesh underwent, which we know brought it from being
6  close to the ischial spines into the ischial
7  coccygeal muscles, which was noted by Dr. Nihara at
8  the time of mesh removal, that that would have a
9  significant impact.
10    Q.  When you say deformation of bundling, is
11  that what Dr. Nihara said?
12    A.  Dr. Nihara testified that he did not
13  recall seeing bundling or bunching, but what is
14  being described is -- in the records is bundling
15  and bunching.
16    Q.  If I understand you, the physician,
17  Dr. Nihara did not say bundling, but the
18  description in the medical records is such that
19  it's your opinion it actually was bundling?
20    A.  That is correct.
21    Q.  What specifically -- when you say the
22  description, what description are you referring to
23  that indicates there was bundling?
24    A.  That there are descriptions in the records
25  where it says banding of mesh.  There's description

Page 1495

1 that says bundling of mesh, and therefore, that
2 description tells me that there was deformation of
3 the mesh.
4     Q. What is your understanding as far as
5 Ms. Spohn's current complaints?
6     A. Mrs. Spohn's current complaints is that
7 she's having pelvic pressure, pelvic pain and
8 dyspareunia. She's also having rectal pressure and
9 rectal pain.
10    Q. As far as the dyspareunia, you mentioned
11 earlier that she was having occasional -- strike
12 that.
13        As far as the dyspareunia, the medical
14 records indicated that she was having occasional
15 dyspareunia prior to the implant. What was that
16 due to?
17    A. There are several things that that could
18 have been due to. That could have been due to the
19 menopausal status, the pelvic organ prolapse that
20 she was diagnosed with, but I don't think a
21 specific etiology was ever attributed to that
22 symptomatology.
23    Q. Did you rule out vaginal atrophy as the
24 cause of her current dyspareunia?
25    A. That is correct. It could be having an

Page 1496

1 impact on her dyspareunia, but it looks as though
2 more likely than not, she had some element of
3 vaginal atrophy preimplant and was only having
4 occasional dyspareunia, not just vaginal atrophy,
5 post implant, post erosion, post excision, and her
6 dyspareunia is more consistent and more severe. So
7 there was a change in the dyspareunia that she's
8 complaining of.
9     Q. What was that change? When you say there
10 was a change in her dyspareunia, what are you
11 referring to?
12    A. She states that intercourse is so painful.
13 It's like a sharp stabbing knife. It's
14 excruciatingly painful since her implant. So we
15 have a difference in the severity, a difference in
16 the frequency of the dyspareunia since the mesh
17 implant.
18    Q. And dyspareunia is identified on the IFU
19 as a potential complication of an Avaulta implant,
20 correct?
21    A. That is correct.
22    Q. As far as the development of dyspareunia,
23 the instance of developing dyspareunia with a mesh
24 implant is about the same as developing dyspareunia
25 with a native tissue repair; is that true?

Page 1497

1     MR. LUNDQUIST: Object to form.
2     THE WITNESS: There's newer studies that are
3 coming out that suggest that there might be a
4 higher incidence of dyspareunia with pelvic floor
5 mesh compared to native tissue repair.
6 BY MR. MAZZIOTTI:
7     Q. Which studies are you referring to?
8     A. The Altman study. There's another study
9 that talks about a higher incidence of dyspareunia,
10 but I would agree with you that a number of the
11 older studies said that there was somewhat of an
12 equivalence in the rate of dyspareunia between the
13 two.
14    Q. There's more literature historically that
15 has the incidence of dyspareunia with native tissue
16 repair being approximately equal to the development
17 of dyspareunia with mesh implants, true?
18    MR. LUNDQUIST: Form.
19    THE WITNESS: That is true, but the newer
20 studies might have more robust data sets.
21 BY MR. MAZZIOTTI:
22    Q. And you mentioned Altman. Which other
23 study are you referring to that may be more robust?
24    A. I can't recall the name of the author
25 right now.

Page 1498

1     Q. Okay. As far as Ms. Spohn's complaints of
2 abdominal and pelvic pain or pressure, could that
3 be related to an abscess or a cyst?
4     A. An abscess where and a cyst where?
5     Q. I thought I saw somewhere in the records a
6 reference to that, but I may be incorrect.
7     A. I don't recall seeing any reference to an
8 abscess or a cyst. That would be easy to diagnose
9 and rather easy to treat with a simple drainage of
10 the abscess or the cyst.
11    Q. Is her pain localized, her abdominal and
12 pelvic pain localized to a specific area to your
13 knowledge, or is it more general?
14    A. I would say that whatever she testifies to
15 about where the exact location of her pain is would
16 speak for itself. I don't recall what her exact
17 testimony is regarding the localization of her pain
18 currently.
19    Q. To your knowledge, has Ms. Spohn sought
20 any medical treatment in the last two years for her
21 painful intercourse?
22    A. To my knowledge, no.
23    Q. How about for her other complaints like
24 the abdominal pelvic pain and pressure?
25    A. To my knowledge, I don't know if she's had

Page 1499

1  any treatment since _____ of 2012.
2      Q.  As far as a recurrence of a prolapse,
3  that's a known complication of an having Avaulta
4  implant, correct?
5      A.  That is correct.
6      Q.  As far as what you recommend going
7  forward, the continuum of care, let's talk about
8  that.  You mention, I believe, five or six months
9  to five years of continuum of care?
10     A.  That is correct.
11     Q.  And what is that based on?
12     A.  My clinical experience, the literature
13  that shows that there's -- can be -- all of her
14  mesh has not been removed, so she has continuing
15  risk of developing either future erosion, pain,
16  other complications of the mesh.  So therefore,
17  more likely than not, she will need to be followed
18  for a time to see if there will be either recurrent
19  problems or new problems that are developed.
20     Q.  As we sit here today, you cannot state to
21  a reasonable degree of medical certainty or
22  reasonable degree of medical probability if
23  Ms. Spohn will develop complications?
24     A.  Well, based on several studies, including
25  the Abbott study, when a patient has one surgery to

Page 1500

1  treat mesh complications, 60 to 70 percent of the
2  time they require an additional surgery to treat
3  mesh-related complications.
4      Q.  Specifically as it relates to Ms. Spohn,
5  are you saying she's got a 60 to 70 percent chance
6  of developing complications?
7      MR. LUNDQUIST:  Object to form.
8      THE WITNESS:  Based on the fact that she's had
9  a prior explant, yes.
10  BY MR. MAZZIOTTI:
11     Q.  Okay.  The physical therapy you recommend,
12  what specifically are you referring to?
13     A.  Well, physical therapy has been shown to
14  be helpful for the treatment of pelvic pain and
15  dyspareunia associated with pelvic floor mesh
16  complications.
17     Q.  Does vaginal atrophy also cause pelvic
18  pain?
19     A.  Yes.  We've discussed that.
20     Q.  We talked about it in the context of
21  dyspareunia.  I just want to make sure with regard
22  to pelvic pain.
23     A.  Right.  Vaginal atrophy in and of itself
24  usually does not cause pelvic pain unless there's
25  something inside the vagina.

Page 1501

1      Q.  How about a shortened vagina, can that be
2  perceived as pelvic pain or pressure?
3      A.  In and of itself, no, particularly a mild
4  vaginal shortening.  If it's a severe vaginal
5  shortening and there's pressure from the bladder
6  pushing on the rectum or the rectum pushing on the
7  bladder, that can lead to intermittent discomfort
8  or pressure.
9      Q.  Is it your understanding that Ms. Spohn
10  has pelvic pain -- well, strike that.
11         When does Ms. Spohn have this pelvic pain?
12     A.  However Ms. Spohn described it during her
13  deposition, I think that is when and the severity
14  and the location when she has her pelvic pain.
15     Q.  Ms. Spohn had a recurrence of the
16  prolapse.  Is that your understanding?
17     A.  From my understanding, she has a
18  recurrence of her rectocele.
19     Q.  Can that cause mesh erosion?
20     A.  A recurrent -- of the prolapse, I would
21  say more likely than not, no.
22     Q.  And why is that?
23     A.  And why is that?
24     Q.  Correct.  Why do you say no?  What is the
25  basis of that?

Page 1502

1      A.  Well, I would say that the theory would be
2  that there would be undue pressure on the vagina
3  due to the prolapse.  I don't see that unless there
4  was a severe recurrence of the prolapse where the
5  prolapse was actually hanging outside the vagina
6  for the majority of the time, that that would lead
7  to a vaginal erosion.
8      Q.  You also indicate counseling for Ms. Spohn
9  and her husband, right?
10     A.  That is correct.
11     Q.  And that's something -- I think you've
12  said counseling for each of the plaintiffs in this
13  case and their spouses, right?
14     A.  That is correct.
15     Q.  Is there any evidence that Ms. Spohn
16  developed any permanent injury to nerves, anything
17  like that?
18     A.  I have not seen any direct evidence that
19  any of the major nerves in the pelvis have been
20  injured.
21     Q.  On Page 8 where you -- this is where you
22  talk about this continuum of care.  For each of
23  these modalities or therapies, physical therapy,
24  counseling, biofeedback therapy, nerve block and
25  trigger point injections and/or Botox therapy for

Page 1503

1 her chronic vaginal pain, are you saying she needs
2 each of those or to be evaluated for those?
3 **A. To be evaluated for those.**
4 Q. Okay. Let's go ahead and move on to
5 Ms. Stewart.
6 **A. All right.**
7 Q. All right. First questions --
8 **A. Do you want to mark this?**
9 Q. Yeah, I do actually. I'm going to follow
10 probably a similar pattern. And if you need to
11 take a break to take a look at your report to
12 refresh your memory between plaintiffs, let me
13 know.
14         (Whereupon, Deposition Exhibit
15         No. 83 was marked for
16         identification.)
17 BY MR. MAZZIOTTI:
18 Q. Exhibit 83 is going to be your Rule 26
19 report for Ms. Stewart. Is that your signature? I
20 should have done that for the previous one, but I'm
21 assuming each of them, that's your signature at the
22 end?
23 **A. Yes. Yes, sir.**
24 Q. Okay. What is your understanding as to
25 the indications for her being implanted? And in

Page 1504

1 this case, it's the Align S.
2 **A. She had urinary incontinence described as**
3 **a mixed urinary incontinence.**
4 Q. And this was affecting her daily life?
5 MR. LUNDQUIST: Form.
6 **THE WITNESS: However she described that in her**
7 **deposition, I would say that speaks for itself.**
8 BY MR. MAZZIOTTI:
9 Q. Okay. As far as the decision to implant
10 her with an Align S, I'm assuming you have no
11 criticisms of the surgeon for that?
12 **A. Dr. Burson, no.**
13 Q. Did you recognize -- as we go through
14 today, maybe I'll just ask it now. Do you
15 recognize any of the physicians that when you were
16 reviewing those records, either the surgeons or the
17 treating physicians?
18 **A. Recognized them?**
19 Q. Their names.
20 **A. Some of them I've seen their names before**
21 **in this litigation. I don't know them personally.**
22 Q. Okay. Exactly. That's what I'm getting
23 at. You don't have any professional knowledge of
24 any of the physicians?
25 **A. No. I'll help you ask better questions.**

Page 1505

1 Q. Okay. Thank you.
2     What's your understanding as to
3 Ms. Stewart's current complaints?
4 **A. Ms. Stewart has dysuria, pelvic pain due**
5 **to pelvic floor muscle spasm and incomplete bladder**
6 **emptying.**
7 Q. Ms. Stewart does not complain of painful
8 intercourse, right?
9 **A. Not that I saw in the medical records.**
10 Q. She did have prior abdominal pain before
11 the implant?
12 **A. That is correct.**
13 Q. She had prior pelvic pain before the
14 implant?
15 **A. That is correct, which precipitated her**
16 **abdominal hysterectomy in 2004.**
17 Q. Even after her abdominal hysterectomy in
18 2004, she had complaints of abdominal pain, right?
19 **A. That is correct.**
20 Q. She had multiple visits to the hospital
21 complaining of abdominal and pelvic pain?
22 MR. LUNDQUIST: Form.
23 **THE WITNESS: She had a history of left lower**
24 **quadrant pain, kidney stones and ureteral stones,**
25 **yes.**

Page 1506

1 BY MR. MAZZIOTTI:
2 Q. I believe you're referring to a ▮▮▮▮▮
3 2008 admission or note, and it says associated with
4 abdominal and pelvic pain?
5 **A. Yes.**
6 Q. She had abdominal adhesions, right?
7 **A. That is correct.**
8 Q. And had to have those removed?
9 **A. That is correct.**
10 Q. As well as endometriosis?
11 **A. That is correct.**
12 Q. That also affects or can cause abdominal
13 pain?
14 **A. That is correct, when it's active.**
15 Q. What did you rule out as the cause of
16 Ms. Stewart's abdominal and pelvic pain other than
17 the Align?
18 **A. Well, specifically I have opined that it**
19 **is the pelvic pain that is due to the Align.**
20 Q. Okay.
21 **A. Now, she had a history of endometriosis,**
22 **but she had her uterus and her ovaries removed.**
23 **That should cease any new endometriosis from being**
24 **implanted on the pelvis since the most frequent**
25 **cause of endometriosis is what's called retrograde**

In Re: CR Bard 200        Bruce Rosenzweig, M.D., Vol. V        12/18/2014

Page 1507

1  menstruation. If you take out the uterus, you can
2  no longer have retrograde menstruation. You remove
3  the ovaries, and the endometriosis that's present
4  does not undergo cyclic stimulation from ovarian
5  hormones, and so therefore, most of the, if not all
6  of the endometriosis becomes quiescent. So
7  therefore, you should not have recurrence of pelvic
8  or abdominal pain from endometriosis after the
9  treatment with a bilateral oophorectomy. So
10  because of that, I ruled out endometriosis as a
11  cause.
12        She does have myalgias, myositis. She
13  does have chronic irritation of her bladder, and
14  those can be caused by what we've discussed
15  earlier. The chronic inflammation, chronic foreign
16  body reaction, degradation, deformation of mesh
17  going through the urogenital diaphragm, which is
18  attached to the pelvic floor muscles, particularly
19  the levator muscles.
20     Q.  You mentioned before endometriosis, once
21  that's removed, she should not have any abdominal
22  pain, correct?
23     MR. LUNDQUIST:  Form.
24  BY MR. MAZZIOTTI:
25     Q.  Related to the endometriosis.

Page 1508

1     MR. LUNDQUIST:  Form.
2     THE WITNESS:  More likely than not, yes.
3  BY MR. MAZZIOTTI:
4     Q.  How do you explain the fact that after she
5  had the removal -- the hysterectomy, the removal of
6  the endometriosis, the removal of the abdominal
7  adhesions, and this is prior to the implant, she's
8  complaining of abdominal and pelvic pain?
9     A.  She might have developed new adhesions
10  from the hysterectomy and the removal of the
11  ovaries.
12     Q.  In this particular case, did you rule that
13  out as the cause of her ongoing pelvic pain?
14     A.  Yes, because it seemed to be an
15  intermittent nature, and her pelvic pain that she's
16  describing now seems to be more constant, and it's
17  also associated with pelvic floor muscle pain and
18  her bladder irritation.
19     Q.  I want to make sure I understand. First
20  you're attributing -- you're not attributing any
21  abdominal pain complaints to the Align, correct?
22     A.  That is correct.
23     Q.  As far as the pelvic pain, you attribute
24  it to the Align as opposed to her other medical
25  conditions because the quality of the pain is more

Page 1509

1  constant?
2     A.  That is correct. I will agree that
3  there's a component that could be due to pelvic
4  adhesions and old pelvic endometriosis.
5     Q.  Is there a way to break that down any
6  further other than it contributes?
7     A.  No.
8     Q.  So as far as her pelvic pain, you
9  attribute it to the Align, the pelvic adhesions,
10  and did you say endometriosis?
11     MR. LUNDQUIST:  Form.
12     THE WITNESS:  Well, again, that could have a
13  minimal effect because she had endometriosis. The
14  endometriotic implants more likely than not have,
15  quote, unquote, birthed themselves out because the
16  ovaries have been removed, however, if -- there
17  might still be a few quiescent endometriotic
18  implants, so that would still be in my differential
19  diagnosis, but I do not feel that that is a likely
20  cause of her current pelvic pain.
21  BY MR. MAZZIOTTI:
22     Q.  I think there's a reference to childhood
23  trauma and a history of domestic violence. Did you
24  see that in the medical records?
25     A.  Yes.

Page 1510

1     Q.  Did that have any -- did that contribute
2  at all to Ms. Stewart's pelvic pain?
3     A.  That she had in the past or currently?
4     Q.  In the past that currently affects her.
5     A.  No. You're asking about the pelvic pain,
6  so we're just talking about her current pelvic
7  pain?
8     Q.  Correct.
9     A.  In my clinical experience, patients that
10  have suffered abuse and trauma will have a
11  worsening perception of their pain, but in and of
12  itself, that history will not cause pelvic pain.
13     Q.  Dr. Jarnagin referenced levator myalgias?
14     A.  That is correct.
15     Q.  He attributes her pain to that condition,
16  correct?
17     A.  That is correct.
18     Q.  Do you disagree -- I assume you disagree
19  with that opinion?
20     A.  No. I've already discussed that I think
21  that the levator muscles are irritated due to the
22  mesh going through the urogenital diaphragm, which
23  is attached to the levator muscles.
24     Q.  Dr. Jarnagin also states that he does not
25  believe the implant causes the pain. Did you read

Page 1511

1   that?
2     A.   That is correct.
3     Q.   Do you agree with that opinion?
4     A.   No, because the mesh is going through the
5   urogenital diaphragm, which is a muscular fascial
6   connection that is attached to the levator muscle.
7   When the mesh degrades, contracts, sets up a
8   chronic foreign reaction, chronic inflammation,
9   it's going to irritate the muscles around it and
10  can irritate the levator muscles.
11    Q.   Is there a way to observe what you just
12  said about this irritation with the levator
13  muscles?
14    A.   A way to observe it?
15    Q.   Right.  Why does -- explain your opinion.
16  When you say that it's the mesh, yet Dr. Jarnagin
17  does not believe it's the mesh, is there a way to
18  physically examine the plaintiff or the patient to
19  rule out one way or the other what the cause is?
20    MR. LUNDQUIST:  Object to form.
21    THE WITNESS:  Well, obviously, if the mesh was
22  removed, we could be able to see both pathologic
23  and microscopic on SCM characteristics of the mesh.
24  If the mesh is pushed on and the patient says that
25  reproduces the pain, that's characteristic that

Page 1512

1   that is the cause of the pain.
2   BY MR. MAZZIOTTI:
3     Q.   Here's my confusion.  Are you saying that
4   the pain is caused by the mesh because the mesh was
5   implanted in the area?  Because there's other
6   explanations for the pain, right?
7     MR. LUNDQUIST:  Form.
8     THE WITNESS:  We're talking about the levator
9   muscle spasm.
10  BY MR. MAZZIOTTI:
11    Q.   Correct.
12    A.   There are no other causes of levator
13  muscle spasm.  It's not endometriosis.  It's not
14  adhesions.  It's not levator muscle trauma.  So
15  that is due to a foreign body that is chronically
16  in muscle groups that are being described as being
17  irritated.
18    Q.   Would you expect to see some mesh exposure
19  then?
20    A.   No.
21    Q.   So it's the chronic foreign body response
22  that's causing this myalgia?
23    A.   Or the degradation or chronic inflammation
24  or deformation.
25    Q.   Why do you say there's degradation and

Page 1513

1   deformation?
2     A.   Well, you were asking me about what --
3   beside the chronic foreign body reaction, mesh
4   degradation can also cause irritation of the
5   muscles.  Deformation can also cause that and also
6   contraction.  So we know that mesh degrades.  We
7   know that mesh contracts.  We know that mesh has a
8   chronic foreign body reaction that does not go
9   away, and we know that there's chronic inflammation
10  associated with it.  All of those things can
11  irritate the muscle.
12    Now, you focused on one.  I'm saying there
13  are other possibilities, too, not just the chronic
14  foreign body reaction.
15    Q.   In Ms. Stewart's case, do you have an
16  opinion as to the ones you've identified that may
17  be causing the myalgias?
18    A.   Which is the most likely out of those four
19  defects in the product?
20    Q.   Not necessarily which one.  Which ones,
21  plural?  What is your opinion?
22    A.   I would say all of those are equally
23  likely.
24    Q.   Where is the reference to degradation or
25  deformation?

Page 1514

1     A.   Again, the mesh has not been removed, so
2   we can state from looking at the literature, my
3   clinical experience, looking at the internal
4   documents and what has been discussed in
5   depositions from the scientists at Bard that all of
6   those processes are going on.
7     Q.   Wouldn't that be true with other patients
8   as well then?
9     A.   That is correct.
10    Q.   How come some would be -- like Ms. Stewart
11  be symptomatic and others not?
12    A.   There are patients that react differently.
13  They react at a different time, so that some can
14  stay asymptomatic.  So mesh contracts at different
15  rates in different patients.  It degrades at
16  different rates in different patients.  The chronic
17  foreign body reaction can be -- and the chronic
18  inflammation can be at different severity in
19  different patients.  So some might have a very
20  slower reacting mesh with a much lower chronic
21  foreign body reaction, chronic inflammation.  That
22  does -- that can change based on factors that we
23  don't know about.
24    Q.   And you would agree there are experts out
25  there that disagree with contraction and

Page 1515

1  deformation and degradation of the mesh, correct?
2  **A.  I think there is a body of literature that**
3  **talks about degradation, contraction, chronic**
4  **foreign body reaction that doesn't go away, chronic**
5  **inflammation, subclinical infection that supports**
6  **that theory.**
7  Q.  And I don't want to revisit the general
8  portion, but you will at least concede there's also
9  a body of literature that contradicts that?
10  **A.  There is some literature that would opine**
11  **differently.**
12  Q.  Ms. Stewart also in her notes -- in a 2014
13  exam, there's an indication that she had
14  significant vaginal atrophy.  Did you see that?
15  **A.  If you have that one, I know that -- yes,**
16  **▇▇▇▇▇▇ ▇ 2014, it's described as that there is**
17  **vaginal atrophy.  I don't know if the word --**
18  **that's why I was kind of stumbling on the word**
19  **significant, but yes, vaginal atrophy was**
20  **described, and she was prescribed a medication for**
21  **that.**
22  Q.  Can vaginal atrophy of that -- strike
23  that.
24      Can vaginal atrophy lead to vaginal
25  scarring and discharge?

Page 1516

1  **A.  Discharge, yes.  Scarring, no.**
2  Q.  Ms. Stewart had surgical menopause at 33,
3  but did not have hormone replacement therapy,
4  right?
5  **A.  That is correct.**
6  Q.  And that can reduce estrogen levels?
7  **A.  That is correct.**
8  Q.  And that can also lead to vaginal atrophy?
9  **A.  That is correct.**
10  Q.  I assume you also did not examine
11  Ms. Stewart, right?
12  **A.  That is correct.**
13  Q.  You mentioned on Page 6 of your report,
14  and it was in reference to pelvic pain, that, in
15  fact, this type of pelvic pain does not generally
16  occur in the absence of mesh.  What I'm curious to
17  know is when you say this type of pelvic pain, what
18  specifically are you referring to?
19  **A.  The muscle irritation, the levator muscle**
20  **tenderness and spasm and the myositis and**
21  **inflammation.**
22  Q.  So absent mesh, typically you don't have
23  pain in that area?
24  **A.  No.  Absence of mesh, you don't have a**
25  **chronic foreign body reaction, chronic**

Page 1517

1  **inflammation, degradation, contraction and**
2  **deformation of mesh that leads to irritation of the**
3  **muscles.**
4  Q.  Can you have levator muscle myalgias or
5  myalgia without mesh?
6  **A.  We discussed that from what are some of**
7  **the other causes in the prior part of this**
8  **deposition, yes.**
9  Q.  Refresh my memory.  I'm confused.
10  **A.  Okay.  Remember we talked about muscle**
11  **trauma due to forceps deliveries, vaginal birth.**
12  Q.  Got it.  I may have -- I know I asked you.
13  I'm not sure if I got an answer, and if so, I
14  apologize.  Did you have an explanation for the
15  complaints of pelvic pain after endometriosis and
16  the removal of the abdominal adhesions and prior to
17  the implant?
18  MR. LUNDQUIST:  Form.
19  **THE WITNESS:  Yes.**
20  BY MR. MAZZIOTTI:
21  Q.  What was that?
22  **A.  And I think we talked about that there**
23  **could be adhesions that were there.**
24  Q.  That's right.  In your report on Page 6 in
25  the second full paragraph towards the bottom, you

Page 1518

1  mention that she will suffer from long-term risk of
2  future erosion and pain, the possibility of future
3  erosion, dyspareunia and pain.
4      Are you saying to a reasonable degree of
5  medical certainty or medical probability that she's
6  going to develop erosion?
7  **A.  Erosion is based on the long-term studies**
8  **showing that erosion can happen up to 17 years**
9  **after.  I would say that pain is most likely.**
10  **Erosion and dyspareunia are less likely.**
11  Q.  I understand, generally speaking, the
12  literature that we had referenced and talked about
13  before, but specifically as it relates to this
14  patient or this plaintiff, you cannot state to a
15  reasonable degree of medical certainty or medical
16  probability that she will develop erosion?
17  MR. LUNDQUIST:  Form.
18  BY MR. MAZZIOTTI:
19  Q.  Correct?
20  **A.  That is correct.**
21  Q.  And you cannot state to a reasonable
22  degree of medical certainty or medical probability
23  that she will develop dyspareunia?
24  **A.  Well, with her levator spasm and painful**
25  **muscles, I would say that is likely, yes.**

Page 1519

1  Q.  Do you hold that opinion to a reasonable
2  degree of medicine, too?
3  **A.  Yes.**
4  Q.  In Ms. Stewart's case, do you believe that
5  the mesh should be removed?
6  **A.  Currently, no.  I think I would try**
7  **conservative therapy such as trigger point**
8  **injections, Valium suppositories prior to removal**
9  **of the retropubic sling.**
10  Q.  What do trigger point injections do?
11  **A.  Trigger point injections are a combination**
12  **of both a long-acting steroid and a long-acting**
13  **analgesic, and what they do is they calm down the**
14  **myositis and decrease the pain associated with the**
15  **myositis and the muscle spasm to help break the --**
16  **and I think we probably talked about this, the gate**
17  **control theory of chronic pain, which is that the**
18  **longer pain has been there, the gate that controls**
19  **centralization and supratentorial recognition of**
20  **the pain gets closed so the patient has a lower**
21  **threshold or, excuse me, a higher threshold for**
22  **reporting severe pain.**
23  Q.  Similar question from before.  There's no
24  evidence that Ms. Stewart has sustained any
25  permanent nerve injury; is that correct?

Page 1520

1  **A.  That is correct.**
2  Q.  Have you had an opportunity to review any
3  of the defense expert Rule 26 reports?
4  **A.  No, I have not.**
5  Q.  Do you know who the defense experts are?
6  **A.  No, I do not.**
7  Q.  Do you know who Kathryn Arendt is?
8  **A.  Spell the last name.**
9  Q.  A-r-e-n-d-t.
10  **A.  That name sounds familiar, but pretty much**
11  **in this litigation, all names are starting to sound**
12  **familiar.**
13  Q.  And I'm just going to -- I'm going to run
14  through the list of urogynecology experts
15  defendants have identified or Bard has identified.
16  Let me know if you recognize any of these names.
17  Matthew Clark?
18  **A.  The name sounds familiar.**
19  Q.  Tanaz Ferzandi?
20  **A.  No.**
21  Q.  Carol Glowacki?
22  **A.  Name sounds familiar.**
23  Q.  Nathan Guerrette, G-u-e-r-r-e-t-t-e?
24  **A.  That name sounds familiar, but I think**
25  **it's because we talked about him in another**

Page 1521

1  deposition.
2  Q.  Thomas Guidice?
3  **A.  No.**
4  Q.  Adam Holzberg?
5  **A.  No.**
6  Q.  Michael Kennelly?
7  **A.  No.**
8  Q.  Joseph Maccarone?
9  **A.  That name sounds familiar.**
10  Q.  But you don't know?
11  **A.  No, I don't know these -- they're not**
12  **people that I know specifically, but their names**
13  **are familiar.**
14  Q.  Stephanie Molden?
15  **A.  No.**
16  Q.  Douglas Van Drie?
17  **A.  The name sounds familiar.**
18  Q.  Michael Vardy?
19  **A.  No.**
20  Q.  And Peter Rosenblatt?
21  **A.  That name is very familiar, yes.**
22  Q.  But as far as knowing them professionally,
23  you don't know them?
24  **A.  No.**
25  Q.  Those are all the questions for

Page 1522

1  Ms. Stewart.  Let's put her aside.
2  **A.  Should we do Surita, and then we'll take a**
3  **break?**
4  MR. LUNDQUIST:  Sure, if you want to keep
5  going.
6  MR. MAZZIOTTI:  I can keep going if you want
7  to, and we can take a break.
8  (Whereupon, Deposition Exhibit
9  No. 84 was marked for
10  identification.)
11  BY MR. MAZZIOTTI:
12  Q.  What we've marked as, I think it's
13  Exhibit 84, is plaintiff, Yolunda Surita's Rule 26
14  report that you prepared, right?
15  **A.  That is correct.**
16  Q.  I'll put that in my notes here.  All
17  right.  For Ms. Surita, what is your understanding
18  as to her indications to have the Avaulta and the
19  Align?
20  **A.  She had an Avaulta Solo and a**
21  **transobturator Align for a grade 2 cystocele and**
22  **urethral hypermobility and stress urinary**
23  **incontinence.**
24  Q.  Now, prior to her implant, she had been
25  disabled since 2001 for her depression.  Did you

Page 1523

1   see that?
2     A.  Yes.
3     Q.  She had been diagnosed with a bipolar
4   condition?
5     A.  That is correct.
6     Q.  She had endometriosis?
7     A.  That is correct.
8     Q.  There's indications that she had
9   medicine-seeking behavior?
10    MR. LUNDQUIST:  Form.
11    THE WITNESS:  Specifically I don't recall
12  seeing those exact words in the medical records.
13  BY MR. MAZZIOTTI:
14    Q.  Did you read in the medical records where
15  physicians declined to give her any further
16  prescriptions for pain medicine or specifically
17  Xanax?
18    A.  I do have a recollection of that, yes.
19    Q.  And she had been diagnosed with chronic
20  back pain as well?
21    A.  That is correct.
22    Q.  Prior to her receiving the implant, do you
23  have any criticisms of the informed consent that
24  the surgeon, Dr. Floyd provided?
25    A.  No.

Page 1524

1     Q.  Did you see where Dr. Floyd went over
2   further conservative treatment options?
3     A.  Yes.
4     Q.  Did you see that Ms. Surita had tried
5   Kegel exercises, but they were not helping?
6     A.  I recall that there was some mention of
7   that in the record, yes.
8     Q.  And Dr. Floyd went over the surgical
9   options in detail with her?
10    A.  That is correct.
11    Q.  As far as the informed consent that
12  Dr. Floyd provided, he discussed that after the
13  implant, the incidence of continuing incontinence
14  being 10 to 15 percent?
15    MR. LUNDQUIST:  Form.
16    THE WITNESS:  If I recall correctly, he
17  described that.
18  BY MR. MAZZIOTTI:
19    Q.  Is that accurate that after an implant
20  that the -- that there's continuing incontinence in
21  10 to 15 percent of the times?
22    A.  Are you talking about the obturator sling
23  specifically or the combination?
24    Q.  We'll start first with the obturator sling
25  and then the combination.

Page 1525

1     A.  I would not argue with a 10 to 15 percent
2   failure rate from a stress incontinence product.
3   Also we do know that there is de novo urgency and
4   overactive bladder that can cause leaking, so that
5   might actually be a conservative number, 10 to
6   15 percent.
7     Q.  How about with both the Avaulta and the
8   Align?
9     A.  We do know that there is a higher
10  incidence of stress incontinence associated with
11  the placement of POP mesh compared to native tissue
12  repair.  We went over that in detail in our
13  previous depositions, so I would say that that
14  would not be out-of-line information to give to the
15  patient.
16    Q.  Prior to her implant, Dr. Floyd discussed
17  that she could have recurrence or have urgency
18  after the implant?
19    MR. LUNDQUIST:  Form.
20    THE WITNESS:  What is described in the medical
21  records, in his deposition and her deposition speak
22  for themselves.
23  BY MR. MAZZIOTTI:
24    Q.  Okay.  You would defer then to what
25  Dr. Floyd and Ms. Surita testified to about the

Page 1526

1   informed consent?
2     A.  That is correct.
3     Q.  Do you have any criticisms about what
4   Dr. Floyd should have provided to Ms. Surita, but
5   did not?
6     A.  No, I do not.
7     Q.  As far as the surgery itself, it was
8   uneventful, right?
9     A.  That is correct.
10    Q.  No complications?
11    A.  That is correct.
12    Q.  No criticisms about Dr. Floyd's surgical
13  skill, right?
14    A.  That is correct.
15    Q.  He appears adequately trained and
16  experienced?
17    A.  From what is described in the records and
18  his deposition, yes.
19    Q.  As far as the recovery, at least at the
20  initial stages, Ms. Surita was doing well?
21    A.  That is correct.
22    Q.  No complications?
23    A.  She did on ████ ████ present with a bloody
24  discharge and some dyspareunia.
25    Q.  As far as the incisions, they were clean

Page 1527

1  and intact and looked good?
2  **A.  At the time of the surgery, yes.**
3  Q.  And in the recovery period?
4  **A.  That is correct.**
5  Q.  If I understand correctly, as far as the
6  stress urinary incontinence, from that standpoint,
7  the sling was effective?
8  **A.  That is correct.**
9  Q.  In ▮▮▮ of 2011, there is a note about
10 erosion, and the physician at that point discussed
11 the revision to potential risk.  Is that your
12 understanding?
13 **A.  Yes, and that was accomplished on ▮▮▮**
14 **2011.**
15 Q.  As part of the discussion, the risks that
16 were discussed were further erosion, recurrence of
17 cystocele, infection, bleeding, fistula, painful
18 intercourse and need for additional surgery?
19 **A.  Again, what is described in the records**
20 **and the depositions and in the informed consent**
21 **speaks for themselves.**
22 Q.  Are you going to weigh in whether or not
23 Ms. Surita understood what the potential
24 complications with the mesh revisions are?
25 **A.  I think Mrs. Surita has described that in**

Page 1528

1  **her deposition, so no, I'm not going to weigh in.**
2  Q.  After the mesh revision procedure, it
3  looks like she did not complain of intercourse.  Is
4  that your understanding?
5  MR. LUNDQUIST:  Form.
6  **THE WITNESS:  She did not complain of**
7  **intercourse?**
8  BY MR. MAZZIOTTI:
9  Q.  I'm sorry.  Did not complain of painful
10 intercourse.  I forgot a word there.
11 MR. LUNDQUIST:  Form.
12 **THE WITNESS:  Not until the ▮▮▮ of**
13 **2011 when she complained of discharge with recent**
14 **sexual activity and reports that her boyfriend**
15 **noted irritation during intercourse.**
16 BY MR. MAZZIOTTI:
17 Q.  In ▮▮▮ of 2012, ▮▮ ▮▮ I've got a
18 reference that she denied pain with intercourse?
19 **A.  ▮▮▮ but that was after her second**
20 **surgical procedure.  But yes, on that date, she**
21 **denied dyspareunia.**
22 Q.  Okay.  And then again in ▮▮▮ of 2013,
23 she denied dyspareunia or bleeding after
24 intercourse, correct?
25 MR. LUNDQUIST:  Form.

Page 1529

1  **THE WITNESS:  That is correct.**
2  BY MR. MAZZIOTTI:
3  Q.  What is your understanding as to her
4  current complaints?
5  **A.  She's complaining of pelvic pain and**
6  **dyspareunia.**
7  Q.  Do you have any notes that -- medical
8  notes that describe dyspareunia since 2013?
9  **A.  No, but in her deposition, she states that**
10 **she's currently experiencing a lot of pain.  She's**
11 **experiencing bladder leakage and the inability to**
12 **enjoy sexual intercourse.  She states that she's**
13 **currently experiencing pain and bleeding during or**
14 **before intercourse that affects her relationship.**
15 Q.  Do you have any records to support that
16 statement, medical records?
17 **A.  No, I do not.**
18 Q.  Do you know what the cause of her painful
19 intercourse is?
20 **A.  Currently if she is complaining of painful**
21 **intercourse like she stated in her deposition, it**
22 **would be due to the mesh.**
23 Q.  And what did you rule out?
24 **A.  Well, I did not see anything in her**
25 **medical history.  She did have a prior**

Page 1530

1  **hysterectomy, but on her later exams, there was no**
2  **significant vaginal atrophy or pelvic relaxation,**
3  **so those would be the conditions that I ruled out.**
4  Q.  As far as the pelvic pain, what did you
5  rule out?
6  **A.  Again, the conditions that we talked about**
7  **previously, prior hysterectomy, vaginal atrophy,**
8  **recurrence of her prolapse.**
9  Q.  Did Ms. Surita have pelvic pain prior to
10 the implant?
11 **A.  I think we discussed earlier her prior**
12 **medical complaints.  She had arthritis, depression,**
13 **anxiety and a history of pelvic pain, but she noted**
14 **that the pain that she had prior to the implant was**
15 **different from the pain that she's currently having**
16 **now.**
17 Q.  What is the difference in the pain?
18 **A.  She states that prior to the implant was**
19 **more like a menstrual cramp.  She currently**
20 **describes it as experiencing a lot of pain, so the**
21 **pain that she describes is of a different**
22 **continuity and severity.**
23 Q.  So is it -- that's what you base your
24 opinion that the pelvic pain is related to the mesh
25 is because of the continuity and the severity?

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. V          12/18/2014

Page 1531

1    A.  And that it started after the implant,
2  yes, and was associated with three erosions that
3  required three surgical procedures.
4    Q.  Okay.  In Ms. Surita's case, even had she
5  elected to do a Burch procedure, there's still a
6  percentage of patients that have dyspareunia
7  afterwards, correct?
8    MR. LUNDQUIST:  Form.
9    THE WITNESS:  There is an association between
10  the Burch procedure and dyspareunia.  It is -- in
11  my experience and reviewing the literature, it
12  happens exceedingly infrequent, and it does not
13  have the same degree of severity.
14  BY MR. MAZZIOTTI:
15    Q.  How about pelvic pain?  Is there an
16  association for someone like Ms. Surita undergoing
17  a Burch procedure and developing pelvic pain
18  afterwards?
19    MR. LUNDQUIST:  Form.
20    THE WITNESS:  Same answer as before.
21  BY MR. MAZZIOTTI:
22    Q.  With regard to the --
23    A.  Dyspareunia, that is correct.
24    Q.  Both pelvic pain and dyspareunia are known
25  complications of the sling implant, correct?

Page 1532

1    A.  The transobturator sling that she has?
2    Q.  Correct.
3    A.  Yes.
4    Q.  And it's also -- they're also known
5  complications for the Avaulta Anterior Solo?
6    A.  That is correct.
7    Q.  As far as what you recommend for the
8  future -- well, strike that.
9      As far as Ms. Surita and what's going to
10  happen in the future, you're not saying to a
11  reasonable degree of medical certainty or medical
12  probability that she will have to undergo surgery?
13    A.  She's had three prior surgeries, so more
14  likely than not, based on what we see in the
15  literature, she will need to undergo another
16  surgery.  All the mesh has not been removed.
17    Q.  And what specific surgery are you
18  referring to?
19    A.  Either an explant surgery to remove the
20  remainder of the pelvic floor mesh or to remove the
21  transobturator sling.
22    Q.  Ms. Surita is not complaining of stress
23  urinary incontinence, correct?
24    A.  That is correct.
25    Q.  And she does not have a prolapse, correct?

Page 1533

1    A.  That is correct.
2    Q.  As far as future surgeries, will there be
3  more than one?
4    A.  More likely than not, yes.
5    Q.  How many do you believe?
6    A.  That I can't say.
7    Q.  And these future surgeries, are they
8  inpatient?  Outpatient?
9    A.  A POP mesh removal would be an inpatient
10  procedure.  The removal of the transobturator mesh,
11  if it removed just the vaginal portion, that could
12  be done as an outpatient.  If it's a complete
13  explant of an obturator sling, that would require
14  an inpatient stay.
15    Q.  Can you state to a reasonable degree of
16  medical certainty whether or not it's going to have
17  to be a complete replacement or not?
18    A.  It does not look like she is currently
19  having obturator symptoms, so I would say that a
20  vaginal procedure to remove the sling would be what
21  she would need.
22    Q.  There's no evidence that she suffered any
23  type of nerve damage, correct?
24    A.  That is correct.
25    Q.  In your report on Page 9 in the second

Page 1534

1  full paragraph, somewhat below the middle, you
2  mention because of the possibility of additional
3  surgeries, scarring may occur, and it can lead to
4  nerve damage and new dyspareunia.
5      Are you holding that opinion to a
6  reasonable degree of medical certainty?
7    A.  Well, there is a difference between major
8  nerve damage and just irritating the wealth of
9  nerves in the vagina.  So the small nerves in the
10  vagina that are just branches of the bigger
11  nerves -- there's no evidence of big nerve injury,
12  okay, but there could be -- you know, the smaller
13  branches that are being irritated, that's leading
14  to her pain.  So any future surgery has the same
15  risk of irritating those nerves.
16    Q.  As we sit here today, you don't know
17  whether or not it will lead to any type of pain, do
18  you?
19    A.  Well, we do know from explant data that
20  nerves do grow through the mesh, and so that if the
21  mesh is taken out, those nerves are going to be cut
22  and traumatized.
23    Q.  We don't know if any of those nerves,
24  however, will cause a sensation of pain, right?
25    A.  More likely than not, they will.

Page 1535

1  Q.  And what's that based on?
2  A.  That when you cut a nerve, it's going to
3  have a quiescent time, and then once it reawakens,
4  it will be painful.
5  Q.  On the next page, Page 10, you state a
6  suture-based repair would have been an appropriate
7  treatment for Ms. Surita's pelvic organ prolapse.
8  Would it have been as effective in treating the
9  prolapse?
10  A.  The studies, and I think we've talked
11  about this already, show that while there is a
12  difference in objective success, the subjective
13  success is the same between a mesh and native
14  tissue repair.  The risk of reoperation for
15  prolapse is the same between mesh and native tissue
16  repair.  So while the patient may have a lesser,
17  quote, unquote, objective outcome, the patients are
18  just as satisfied, and there isn't a risk of
19  prolapse surgery increased over mesh for native
20  tissue repair.  There is an increased new risk from
21  pelvic floor mesh compared to native tissue repair
22  for increased surgery, and that's due to the
23  complications of mesh.
24  MR. MAZZIOTTI:  Okay.  Why don't we take a
25  break.  I think I'm finished with Ms. Surita.

Page 1536

1  THE VIDEOGRAPHER:  We are going off the record
2  at 3:11 p.m.  This is the end of disc No. 1.
3  (Whereupon, a short break was
4  taken.)
5  THE VIDEOGRAPHER:  We are going back on the
6  record at 3:21 p.m.  This is the beginning of disc
7  No. 2.
8  (Whereupon, Deposition Exhibit
9  No. 85 was marked for
10  identification.)
11  BY MR. MAZZIOTTI:
12  Q.  Okay, Doctor.  What we've marked for you
13  is your Rule 26 report for Ms. Taylor in this case
14  as Exhibit 85.  I'll have to look.  I may or may
15  not have brought with me the supplemental report,
16  but I think it just talks about you reviewed the
17  deposition of Dr. Gruber?
18  A.  That is correct.
19  Q.  As far as Ms. Taylor, what was your
20  understanding as to the indications for her being
21  implanted with an Align S?
22  A.  She had stress urinary incontinence.
23  Q.  I noted in your report something to the
24  effect that she didn't -- it didn't really affect
25  her daily life.  Here we go, Page 4.  If you look

Page 1537

1  at the bottom, it says, for example, her
2  incontinence and pelvic pain did not impact her
3  quality of life before the implant, specifically
4  incontinence.  And if the Align was for the stress
5  urinary incontinence, do you have any criticisms
6  about her being a surgical candidate for the
7  implant?
8  A.  No.
9  Q.  Why is that?
10  A.  Well, she's complaining of the symptoms
11  and agreed to the surgical procedure.  It might not
12  have been -- you know, the degree of bother, that
13  is something that both her and the doctor talk
14  about, and it would be up to her and the doctor to
15  decide whether that would be an indicated
16  procedure.  So I mean, even if it doesn't have a
17  significant impact on their daily life, it might be
18  enough of a bother that you would want it
19  corrected.
20  Q.  Okay.  So you don't criticize the surgeon
21  for implanting the Align?
22  A.  That is correct.
23  Q.  What is your understanding -- what is your
24  understanding of her current complaints?
25  A.  She's currently complaining of urinary

Page 1538

1  incontinence and the pelvic pain.
2  Q.  Of course, the urinary incontinence is a
3  known complication even if you have an Align
4  implanted, right?
5  MR. LUNDQUIST:  Form.
6  THE WITNESS:  That is a -- it's known that the
7  Align might not treat the incontinence or that the
8  incontinence can recur to people that perform the
9  procedures, yes.
10  BY MR. MAZZIOTTI:
11  Q.  As far as her incontinence, is it stress
12  urinary incontinence, or is it urge incontinence?
13  What is your understanding?
14  A.  She's having frequency and urgency.
15  Q.  Okay.  And the Align is not intended to
16  treat frequency and urgency, correct?
17  A.  That is correct.
18  Q.  Is it your opinion that the Align is the
19  cause of the frequency and the urgency?
20  A.  Yes.
21  Q.  And what's that based on?
22  A.  We've, I think, in my general causation
23  deposition went over the basis for those opinions.
24  Q.  Specifically, though, for Ms. Taylor, what
25  is the Align doing that's causing the urgency and

Page 1539

1 the frequency?
2   A.  As I discussed in my general causation
3 report, the Align can have a subclinical infection,
4 which is associated with de novo urge
5 symptomatology.  It can undergo mesh contraction,
6 which could lead to de novo urge symptoms and urge
7 incontinence.
8   Q.  Is there any evidence of a subclinical
9 infection with Ms. Taylor?
10   A.  No.  That's why they're subclinical.  You
11 don't have the same symptoms of a -- over a
12 clinical infection.
13   Q.  Wouldn't it show up, though, with lab
14 tests?
15   A.  No.
16   Q.  How do you rule out other causes then if
17 there's nothing objectively indicating an
18 infection?
19   A.  Well, she had a vaginal hysterectomy and
20 bilateral salpingo-oophorectomy at the time of her
21 Align procedure.  That could be a contributor, but
22 the vast majority of patients that I've seen in my
23 experience don't develop de novo urge symptoms just
24 from a hysterectomy and bilateral
25 salpingo-oophorectomy.

Page 1540

1   Q.  I can't recall.  Do you currently treat
2 patients coming in with complications with mesh?
3   A.  That is correct.
4   Q.  Did you rule out the postmenopausal status
5 as the cause of the frequency and urgency?
6   A.  Postmenopausal status can contribute to
7 frequency and urgency.  At the time of her surgery,
8 she was 51 years old, which, more likely than not,
9 would have put her in the perimenopausal period so
10 that if she was going to have significant frequency
11 and urgency from her from menopause, it would have
12 predated her sling surgery, so that helped me rule
13 out menopausal status as a significant contributor
14 to her current frequency and urgency.
15   Q.  Now, as far as the pelvic pain, she had
16 significant pre-implant complaints of pelvic pain,
17 right?
18   A.  She states that prior to her implant, she
19 had severe lower abdominal cramps during her
20 menstrual periods.
21   Q.  How did you rule out that as a cause of
22 pelvic pain?
23   A.  Well, because that would be resolved once
24 the uterus was taken out.
25   Q.  As far as the surgery on ██ ██ 2011 or

Page 1541

1 the implant, there was no complications, correct?
2   A.  That is correct.
3   Q.  And it went uneventful?
4   A.  That is correct.
5   Q.  I assume no criticisms of the surgeon,
6 Dr. Gruber?
7   A.  That is correct.
8   Q.  Do you have any criticisms of any of her
9 follow-up care?
10   A.  No.
11   Q.  Ms. Taylor doesn't currently complain of
12 dyspareunia?
13   A.  Currently, no.
14   Q.  Could pelvic floor muscle dysfunction be a
15 cause of her complaints of pain?
16   A.  Well, as we discussed earlier, pelvic
17 floor muscle dysfunction can be caused by the mesh
18 going through the urogenital diaphragm, which is
19 attached to the levator muscles, which would cause
20 pelvic floor muscle dysfunction, and that could be
21 a cause of her pain, yes.
22   Q.  But there's other causes of pelvic floor
23 dysfunction -- pelvic floor muscle dysfunction
24 other than mesh, right?
25   A.  We've discussed those, yes.

Page 1542

1   Q.  Did you rule out that specifically for
2 Ms. Taylor?
3   A.  Yes.
4   Q.  And how so?
5   A.  Well, her hysterectomy more likely than
6 not would not cause pelvic floor muscle
7 dysfunction, and her deliveries, her three vaginal
8 deliveries were remote from the time that she had
9 her current complaints, and therefore, I did not
10 see anything beside the mesh going through the
11 urogenital diaphragm connected to the levator
12 muscles as a potential cause of pelvic floor muscle
13 spasm.
14   Q.  As far as her current complaints, are you
15 basing that on her deposition or her medical
16 records?
17   A.  Her deposition.
18   Q.  Similar to questions I asked earlier,
19 based on her medical records, she denies, let me
20 see how she put it, incontinence ██████ 2011?
21   A.  She reported some urinary urgency in the
22 morning and a tingling sensation when voiding.
23   Q.  In ███████ of 2011, she was
24 voiding without difficulty and denied retention,
25 correct?

Page 1543

1   A.  That is correct.
2   Q.  With regard to her hysterectomy, you
3 mentioned that would have treated, so to speak, the
4 pain associated with her menstrual cycle.  Was that
5 100 percent true?
6   A.  Yes.
7   Q.  There's absolutely no way her menstrual
8 cycle and the complaints of pain as a result of
9 that would repeat itself after a hysterectomy?
10   A.  No.
11   Q.  As far as the subclinical infection, is
12 there a way to treat that through antibiotics?
13   A.  No.  It was shown in Dr. Wang's study that
14 mesh removal would be the treatment for that.
15   Q.  So in Ms. Taylor's case, are you
16 recommending that she have surgery to remove the
17 mesh or not?
18   A.  If medical therapy does not help with her
19 urgency and frequency, then a mesh removal would be
20 able to be helpful for that.  In Dr. Wang's study,
21 it was curative in up to 80 percent of patients.
22   Q.  Could her pain be due to neuropathic pain
23 after the surgery, the hysterectomy?
24   A.  That could be possible.
25   Q.  How do you rule that out?

Page 1544

1   A.  Well, for a hysterectomy to cause
2 neuropathic pain, a simple abdominal hysterectomy
3 would not be or a vaginal hysterectomy would not be
4 in the location of the pudendal nerve or the
5 obturator nerve.  That would be more of a
6 radical-type hysterectomy or an extensive
7 hysterectomy associated with extensive
8 endometriosis or ovarian cancer, something of that
9 nature.  So I would rule that out by the simple
10 nature of her hysterectomy, not a radical
11 hysterectomy.
12   Q.  As far as what you recommend for the
13 future, the continuum of care, this seems to be the
14 same as the other ones.  The physical therapy, is
15 that for pain?
16   A.  That is correct and also for the frequency
17 and urgency.
18   Q.  How about the counseling?
19   A.  That is correct.
20   Q.  That's for the pain?
21   A.  That can be for the pain, yes.
22   Q.  What else would it be for?
23   A.  Any disruption that the discomfort is
24 causing in her relationships with her family
25 members or her friends, counseling could be helpful

Page 1545

1 for that.
2   Q.  Did Ms. Taylor voice that there was any
3 disruption in her relationship as a result of pain
4 or urgency?
5   A.  Not that I recall.
6   Q.  So you can't state to a reasonable degree
7 of medical certainty whether or not she's going to
8 need counseling, correct?
9   A.  That is correct.
10   Q.  How about the biofeedback therapy, what
11 would that be for?
12   A.  The frequency, the urgency and the pain.
13   Q.  The nerve block and trigger point
14 injections, I'm assuming for the pain?
15   A.  That is correct.
16   Q.  How about the Botox therapy?
17   A.  I don't think that she would be a
18 candidate for Botox therapy.
19   Q.  So at least we can remove that as part of
20 the continuum of care?
21   A.  That is correct.
22   Q.  Do you also believe that the continuum of
23 care needs to be six months to five years?
24   A.  It all depends on how easily treated her
25 symptomatology is.  If her symptomatology does

Page 1546

1 not -- is not easily remedied, then it would be a
2 long-term follow-up, yes.
3   Q.  Do you have any medical records for
4 Ms. Taylor after 2011?
5   A.  Not that I have seen before I drafted my
6 report or after.
7   Q.  Okay.  So as far as what he's been -- to
8 the extent she's gone back to a medical provider to
9 make complaints, we just don't know one way or the
10 other what's in those records?
11   A.  That is correct.
12     (Whereupon, Deposition Exhibit
13     No. 86 was marked for
14     identification.)
15 BY MR. MAZZIOTTI:
16   Q.  Let's go to the last one here,
17 Ms. Wilkerson.  I think we have marked
18 Ms. Wilkerson's Rule 26 report as 86.  Is that what
19 you have?
20   A.  That is correct.
21   Q.  Great.  All right.  Let me get to her
22 report here.  It looks like Ms. Wilkerson has an
23 Align.  Is that what you have?
24   A.  That is correct.
25   Q.  Implanted ▮▮ ▮▮ 2010?

Page 1547

1  A. That is correct.
2  Q. Based on her history, she had tried
3  conservative treatment with Kegel exercises, right?
4  A. Yes.
5  Q. And those were ineffective?
6  A. From what I recall in the records, yes.
7  Q. And she had worsening incontinence?
8  A. That is correct.
9  Q. Frequency and nocturia?
10 A. That is correct.
11 Q. Stress urinary incontinence?
12 A. That is correct.
13 Q. And a grade 2 to 3 cystocele?
14 A. Yes.
15 Q. Does the Align treat a cystocele?
16 A. No.
17 Q. So that just wasn't -- that wasn't severe
18 enough to warrant intervention at that time?
19 A. She underwent a native tissue repair for
20 her cystocele.
21 Q. Okay. Was that effective?
22 A. I have not seen in the records that she
23 has had a recurrence of her cystocele.
24 Q. Do you know if she's had any complications
25 as a result of the native tissue repair?

Page 1548

1  A. Not that I have seen.
2  Q. Same questions as before. I'm assuming no
3  criticisms of the decision to move forward with the
4  Align implant?
5  A. That is correct.
6  Q. No criticisms as to the informed consent
7  the surgeon provided to Ms. Wilkerson?
8  A. That is correct.
9  Q. The surgery on ▮▮▮ ▮▮ 2010 implanting
10 the Align, that also was uneventful?
11 A. Yes.
12 Q. There were no complications with the
13 surgery?
14 A. Yes.
15 Q. I assume no criticisms of the surgeon?
16 A. That is correct.
17 Q. After the surgery, it appears that her
18 incontinence at least initially resolved?
19 A. Yes.
20 Q. What is your understanding as to her
21 current complaints?
22 A. She currently complains of pelvic pain due
23 to levator muscle and obturator muscle tenderness,
24 dyspareunia and bladder pain.
25 Q. As far as her current complaints, the

Page 1549

1  dyspareunia we talked about that before, that is a
2  known complication of a mesh implant, right?
3  MR. LUNDQUIST: Form.
4  THE WITNESS: Yes. To the doctors that are
5  implanting it, yes.
6  BY MR. MAZZIOTTI:
7  Q. The pelvic pain, is that a known
8  complication?
9  MR. LUNDQUIST: Form.
10 THE WITNESS: Of an Align implant?
11 BY MR. MAZZIOTTI:
12 Q. Correct.
13 A. Yes, to the doctors that are implanting
14 it.
15 Q. And recurrent urinary incontinence, that's
16 a known complication as well, correct?
17 MR. LUNDQUIST: Form.
18 THE WITNESS: Yes, to the doctors who are
19 implanting it.
20 BY MR. MAZZIOTTI:
21 Q. When you say to the doctors who are
22 implanting it, what do you mean?
23 A. That it's a known complication to the
24 physicians, yes.
25 Q. Okay. And it's up to the physicians

Page 1550

1  whether or not they have that discussion with their
2  patients?
3  A. That is correct.
4  Q. Okay. So whether or not Ms. Wilkerson was
5  aware of those particular risks depends on her
6  discussions with the physician?
7  A. And those are what are described in her
8  deposition, his deposition and in the medical
9  records.
10 Q. Okay. And you would defer to that?
11 A. That is correct.
12 Q. As far as Ms. Wilkerson's medical history,
13 she had an ectopic pregnancy, correct?
14 A. That is correct.
15 Q. And kidney stones?
16 A. Yes.
17 Q. And a second ureter off the right kidney?
18 A. Duplication of the ureters, yes.
19 Q. Would that have an impact on her current
20 complaints of pelvic pain?
21 A. No.
22 Q. Why is -- we'll start first with the
23 ureter off the right kidney.
24 A. Yes. The vast majority of the time those
25 are asymptomatic.

Page 1551

1    Q.   Okay.  Ectopic pregnancies, any long-term
2    complications for that?
3    **A.   The only long-term complication would be a**
4    **recurrent ectopic pregnancy.**
5    Q.   How about the kidney stones, is there
6    any -- I guess is that a contributor factor, her
7    history of kidney stones with her current
8    complaints of pelvic pain?
9    **A.   If she had a current kidney stone, that**
10   **would lead to pelvic and groin pain while the**
11   **kidney stone is being passed.**
12   Q.   Otherwise, no pain?
13   **A.   That is correct.**
14   Q.   On Page 4 for the ████ 2012 visit to
15   Dr. Vandever, towards the bottom of that paragraph,
16   it states there was small pink polypoid tissue at
17   the right vaginal apex that is very tender to
18   palpation and friable with Q-tip manipulation and
19   right-sided, is it levator ani spasm, and
20   tenderness that was likely causing the dyspareunia.
21   Is that related to the mesh?
22   **A.   The levator spasm, yes.  The polypoid**
23   **tissue at the vaginal apex, no.  That would be**
24   **granulation tissue from her hysterectomy.**
25   Q.   The polypoid tissue, would that cause the

Page 1552

1    pain at all?
2    **A.   That could be tender, which is what is**
3    **described, but once it's treated, it will no longer**
4    **be tender.**
5    Q.   Similarly to what we discussed before
6    about the levator, I know I'm mispronouncing it,
7    spasm, that's caused by the mesh which is causing
8    the dyspareunia?
9    **A.   Yes.  Dr. Vandever noted on his ████**
10   **2014 that there was tenderness along the levator**
11   **muscles and the obturator internus muscle.  That**
12   **with an obturator sling is where the mesh is going**
13   **through.**
14   Q.   Okay.  Is there any indication that
15   Ms. Wilkerson has any permanent nerve injury?
16   **A.   Permanent nerve injury?**
17   Q.   Correct.
18   **A.   There could be nerve irritation.  There**
19   **could be -- there is evidence of muscle irritation**
20   **from the mesh going through the muscle, but I do**
21   **not see any chronic nerve damage.**
22   Q.   The next paragraph indicates that
23   Dr. Vandever noted the chronic bladder symptoms
24   were consistent with interstitial cystitis.  Are
25   you attributing the chronic bladder symptoms to the

Page 1553

1    mesh?
2    **A.   With the pelvic floor spasm, that can lead**
3    **to chronic irritation of the bladder; however, I**
4    **think that in Mrs. Wilkerson's case, the levator**
5    **spasm, the obturator internus muscle pain**
6    **reproducing her pelvic floor pain is the**
7    **significant pain that is due to the mesh.**
8    Q.   You lost me there.  I'm referring, and
9    simply put in context if you'd like, on Page 4
10   where it talks about chronic bladder symptoms and
11   the interstitial cystitis --
12   **A.   Yes.**
13   Q.   -- is that specifically the chronic
14   bladder symptoms, or are you saying that's related
15   to the levator symptoms or the levator spasms?
16   **A.   Well, yes, because her mesh was removed**
17   **from underneath her urethra.  So if the mesh was**
18   **still there, I would attribute that to causing her**
19   **bladder symptoms.  Since the mesh has been removed,**
20   **but the mesh is still in the obturator internus**
21   **muscles, I would say that it is less likely that**
22   **the prior mesh was causing her bladder symptoms,**
23   **but the mesh still in the obturator internus muscle**
24   **is what's causing the levator -- obturator internus**
25   **muscle pain and the levator spasms.**

Page 1554

1    Q.   The next paragraph refers to Dr. Scott
2    Thompson at a pain clinic, and he's evaluating her
3    for lower back pain, bilateral hip pain, groin pain
4    and lower extremity pain.  Are you relating those
5    complaints of pain to the mesh, or is that
6    something that's different?
7    **A.   The hip and groin pain can be due to the**
8    **obturator sling.  Back pain has been associated**
9    **with obturator slings.  With the obturator internus**
10   **muscle being irritated, the muscles of the**
11   **obturator space, including the adductor brevis, the**
12   **adductor magnus and the gracilis muscle are more**
13   **likely than not irritated, too, which would be**
14   **leading to groin pain and perceived as hip pain.**
15   Q.   Okay.  So you're stating to a reasonable
16   degree of medica certainty that the complaints of
17   lower back pain, bilateral hip pain, groin pain and
18   lower extremity pain are due to the mesh implant?
19   **A.   That is correct.**
20   Q.   Did Ms. Wilkerson identify specifically
21   where the pelvic pain was, or was it more
22   generalized?
23   **A.   I know that when Dr. Vandever pushed on**
24   **the obturator internus muscle, it reproduced her**
25   **pain.  There was also pain in the anterior vaginal**

Page 1555

1 wall. Beside describing the hip pain, the groin
2 pain and the vaginal pain, I don't specifically
3 recall if she stated any other specific location
4 for her pain.
5      Q. I'm not sure I understand your last
6 answer. It's probably me. What's your
7 understanding -- I'm just going to ask it again,
8 and maybe I can -- the second round I'll understand
9 it better.
10      What's your understanding as to the pain
11 that Ms. Wilkerson described, the location of it?
12      A. I've described that we -- when she saw
13 Dr. Scott Thomas (sic) on ███ ██ 2014, she
14 described bilateral hip pain and groin pain. When
15 she saw Dr. Vandever on ███ ██ when he pushed
16 on the obturator internus muscle, it reproduced the
17 pain that she had, and she had pain in the anterior
18 vaginal wall when the anterior vaginal wall was
19 pushed on. Anything more specific than those
20 complaints, I have not seen any more specific
21 location. That is the description that best
22 describes where her pain is located right now.
23      Q. It appears Ms. Wilkerson had some erosion?
24      A. That is correct.
25      Q. And as we mentioned, that's a known

Page 1556

1 complication?
2      MR. LUNDQUIST: Form.
3      THE WITNESS: To the implanting surgeon, yes.
4 BY MR. MAZZIOTTI:
5      Q. In this particular case, the implanting
6 surgeon specifically discussed that with
7 Ms. Wilkerson?
8      A. Again, those records speak for themselves.
9      Q. You don't recall one way or the other?
10      A. Those records speak for themselves.
11      Q. As far as what you recommend in the future
12 for Ms. Wilkerson, let's talk about that.
13      First, do you have any opinion as to what
14 procedures or surgeries Ms. Wilkerson will have to
15 undergo in the future?
16      A. Well, obviously, she has a specific
17 trigger point where the mesh is going through the
18 obturator internus muscle, so trigger point
19 injections, nerve block and Botox would all be
20 therapies that could be helpful and would be
21 helpful for her symptomatology.
22      Q. Go ahead. I'm sorry.
23      A. Biofeedback, physical therapy and
24 counseling would also be indicated for her. If
25 those therapies are not effective, then an explant

Page 1557

1 of the mesh from the obturator internus muscles and
2 the obturator space would become necessary.
3      Q. Based on the literature you've relied on
4 in the past today, do you have an opinion to a
5 reasonable degree of medical certainty whether or
6 not she's going to have to have an explant?
7      A. Yes. Looking at the literature, with
8 specific point tenderness that is described by
9 Dr. Vandever's examination, more likely than not,
10 that mesh will have to be removed from the
11 obturator internus muscle. It depends on -- if the
12 therapy will alleviate the groin pain, then a full
13 groin dissection would become unnecessary, but with
14 the symptomatology that she's having now, it looks
15 as though she will need to have a future surgery.
16      Q. Do you know when that will occur?
17      A. No.
18      Q. And you also mention this continuum of
19 care anywhere from five months to six years?
20      A. Six months to five years.
21      Q. I'm sorry. Six months to five years.
22      MR. MAZZIOTTI: I'll take a quick break. I
23 think I'm just about finished.
24      THE VIDEOGRAPHER: Okay. We are going off the
25 record at 3:54 p.m.

Page 1558

1      (Whereupon, a short break was
2      taken.)
3      THE VIDEOGRAPHER: We are going back on the
4 record at 3:55 p.m.
5      MR. MAZZIOTTI: Dr. Rosenzweig, I want to thank
6 you for your time. Those are all the questions I
7 have.
8      THE WITNESS: Thank you.
9      MR. LUNDQUIST: We'll reserve ours until the
10 time of trial. Thank you, Doctor.
11      THE VIDEOGRAPHER: We are going off the record
12 at 3:56 p.m. This is the end of disc No. 2 and the
13 conclusion of this deposition.
14      (FURTHER DEPONENT SAITH NAUGHT.)
15
16
17
18
19
20
21
22
23
24
25

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 892 of 924 PageID #: 213699
Case 2:12-md-02327 Document 7262-10 Filed 11/13/2019 Page 25 of 924 PageID #: 186829

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. V          12/18/2014

Page 1559

```
 1   STATE OF ILLINOIS  )
 2                      )   SS:
 3   COUNTY OF C O O K  )
 4           I, GINA M. LUORDO, a notary public within
 5   and for the County of Cook County and State of
 6   Illinois, do hereby certify that heretofore,
 7   to-wit, on December 18, 2014, personally appeared
 8   before me, at 77 West Wacker Drive, Chicago,
 9   Illinois, BRUCE ROSENZWEIG, M.D., in a cause now
10   pending and undetermined in the United States
11   District Court for the Southern District of West
12   Virginia, In Re: C.R. BARD, INC., PELVIC REPAIR
13   SYSTEM PRODUCTS LIABILITY LITIGATION.
14           I further certify that the said BRUCE
15   ROSENZWEIG, M.D. was first duly sworn to testify
16   the truth, the whole truth and nothing but the
17   truth in the cause aforesaid; that the testimony
18   then given by said witness was reported
19   stenographically by me in the presence of the said
20   witness, and afterwards reduced to typewriting by
21   Computer-Aided Transcription, and the foregoing is
22   a true and correct transcript of the testimony so
23   given by said witness as aforesaid.
24           I further certify that the signature to
25   the foregoing deposition was not waived by counsel
```

Page 1560

```
 1   for the respective parties.
 2           I further certify that the taking of this
 3   deposition was pursuant to notice and that there
 4   were present at the deposition the attorneys
 5   hereinbefore mentioned.
 6           I further certify that I am not counsel
 7   for nor in any way related to the parties to this
 8   suit, nor am I in any way interested in the outcome
 9   thereof.
10           IN TESTIMONY WHEREOF:  I have hereunto set
11   my hand and affixed my notarial seal this 22nd day
12   of December, 2014.
13
14
15
16
17           _____
18           NOTARY PUBLIC, COOK COUNTY, ILLINOIS
19           LIC. NO. 084-004143
20
21
22
23
24
25
```

Page 1561

```
 1   TO: William Lindquist
 2   Re: Signature of Deponent Bruce Rosenzweig, M.D., Vol. V
 3   Date Errata due back at our offices:  1/30/2015
 4
 5   Greetings:
 6   The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
     transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the
     Errata electronically or print and fill out manually.
 9
     Once the Errata is signed by the deponent and notarized,
10   please mail it to the offices of Tiffany Alley (below).
11
     When the signed Errata is returned to us, we will seal
12   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of the
13   Errata to all ordering parties.

     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     court without the signature of the deponent.
16
17
18   Please send completed Errata to:
19   Tiffany Alley Global Reporting & Video
20   730 Peachtree St. NE, Ste 470
21   Atlanta, GA 30308
22   (770) 343-9696
23
24
25
```

Page 1562

```
 1   ERRATA
 2   I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that
 3
 4   ___ There are no changes noted.
 5   ___ The following changes are noted:
 6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
 7   Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
 8   be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
 9   such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change _____
12                                _____
13   Reason for change _____
14   Page _____ Line _____ Change _____
15                                _____
16   Reason for change _____
17   Page _____ Line _____ Change _____
18                                _____
19   Reason for change _____
20   Page _____ Line _____ Change _____
21                                _____
22   Reason for change _____
23   Page _____ Line _____ Change _____
24                                _____
25   Reason for change _____
```

In Re: CR Bard 200      Bruce Rosenzweig, M.D., Vol. V      12/18/2014

Page 1563

```
 1   Page _____ Line _____ Change _____
 2   _____
 3   Reason for change _____
 4   Page _____ Line _____ Change _____
 5   _____
 6   Reason for change _____
 7   Page _____ Line _____ Change _____
 8   _____
 9   Reason for change _____
10   Page _____ Line _____ Change _____
11   _____
12   Reason for change _____
13   Page _____ Line _____ Change _____
14   _____
15   Reason for change _____
16   Page _____ Line _____ Change _____
17   _____
18   Reason for change _____
19
20   _____
              DEPONENT'S SIGNATURE
21
     Sworn to and subscribed before me this ___ day of
22   _____, _____.
23
     _____
24   NOTARY PUBLIC
25   My Commission Expires:_____
```

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. V          12/18/2014

**1**

**1** 1477:3 1536:2

**10** 1492:25
1493:8 1524:14,
21 1525:1,
1535:5

**100** 1543:5

**13** 1479:12
1527:13

**15** 1524:14,21
1525:1,6

**17** 1518:8

**19th** 1526:23

**1:49** 1477:2

**1st** 1542:23

**2**

**2** 1481:22
1522:21 1536:7
1547:13
1558:12

**20** 1483:17
1555:13

**2001** 1522:25

**2004** 1505:16,18

**2008** 1483:17
1485:2,22
1486:11,20
1489:2,12
1506:3

**2010** 1546:25
1548:9

**2011** 1479:12
1527:9,14

1528:13
1540:25
1542:20,23
1546:4

**2012** 1499:1
1528:17
1551:14

**2013** 1528:22
1529:8

**2014** 1515:12,16
1552:10
1555:13

**21st** 1528:12

**22** 1542:20

**24** 1551:14

**26** 1479:1 1480:8
1503:18 1520:3
1536:13
1540:25
1546:18 1552:9

**26th** 1555:15

**28** 1546:25
1548:9

**3**

**3** 1547:13

**33** 1516:2

**3:11** 1536:2

**3:21** 1536:6

**3:54** 1557:25

**3:55** 1558:4

**3:56** 1558:12

**4**

**4** 1481:21

1515:16
1536:25
1551:14 1553:9

**5**

**51** 1540:8

**52** 1485:22

**6**

**6** 1516:13
1517:24

**60** 1500:1,5

**7**

**70** 1500:1,5

**8**

**8** 1485:2 1486:11
1502:21

**80** 1543:21

**82** 1480:8,13

**83** 1503:15,18

**84** 1522:9,13

**85** 1536:9,14

**86** 1546:13,18

**8th** 1528:17,19

**9**

**9** 1533:25

**9th** 1489:2

**A**

**A-r-e-n-d-t**
1520:9

**Abbott** 1499:25

**abdominal**
1479:10 1498:2,
11,24 1505:10,
16,17,18,21
1506:4,6,12,16
1507:8,21
1508:6,8,21
1517:16
1540:19 1544:2

**able** 1479:25
1511:22
1543:20

**about** 1478:10,
12 1480:5,
1482:7,17
1483:4,6,13
1484:8,15
1488:7 1489:23
1496:24 1497:9
1498:15,23
1499:7 1500:20
1501:1 1502:22
1510:5,6
1511:12 1512:8
1513:2 1514:23
1515:3 1517:10,
22 1518:12
1519:16
1520:25
1524:22 1525:7,
25 1526:3,12
1527:9 1530:6
1531:15

In Re: CR Bard 200          Bruce Rosenzweig, M.D., Vol. V          12/18/2014

1535:11 1536:16 1537:6, 14 1544:18 1545:10,16 1549:1 1551:5 1552:6 1553:10 1556:12 1557:23

**abscess** 1498:3, 4,8,10

**absence** 1516:16,24

**absent** 1516:22

**absolutely** 1477:21 1478:2 1543:7

**abuse** 1510:10

**accomplished** 1527:13

**accurate** 1524:19

**across** 1479:6

**active** 1506:14

**activity** 1528:14

**actual** 1484:4

**actually** 1491:2 1494:19 1502:5 1503:9 1525:5

**Adam** 1521:4

**additional** 1500:2 1527:18 1534:2

**adductor** 1554:11,12

**adequately** 1526:15

**adhesions** 1506:6 1508:7,9 1509:4,9 1512:14 1517:16,23

**admission** 1506:3

**affect** 1536:24

**affecting** 1504:4

**affects** 1506:12 1510:4 1529:14

**after** 1486:24 1505:17 1507:8 1508:4 1517:15 1518:9 1524:12, 19 1525:18 1528:2,19,23 1531:1 1543:9, 23 1546:4,6 1548:17

**afternoon** 1477:16 1478:23

**afterwards** 1531:7,18

**again** 1479:23 1487:24 1488:13 1489:6, 22 1509:12 1514:1 1527:19 1528:22 1530:6 1555:7 1556:8

**age** 1485:22

**agree** 1490:9 1497:10 1509:2 1511:3 1514:24

**agreeable** 1478:1

**agreed** 1537:11

**ahead** 1503:4 1556:22

**Align** 1504:1,10 1506:17,19 1508:21,24 1509:9 1522:19, 21 1525:8 1536:21 1537:4, 21 1538:3,7,15, 18,25 1539:3,21 1546:23 1547:15 1548:4, 1549:10

**all** 1477:23 1478:3 1481:17 1487:24 1499:13 1503:6, 7 1507:5 1510:2 1513:10,22 1514:5 1520:11 1521:25 1532:16 1545:24 1546:21 1552:1 1556:19 1558:6

**alleviate** 1557:12

**along** 1552:10

**already** 1510:20 1535:11

**also** 1481:23,24 1488:17,21,22 1489:11 1492:8, 24 1493:2 1494:3 1495:8 1500:17 1502:8 1506:12 1508:17

**agreed** 1537:11

1510:24 1513:4, 5 1515:8,12 1516:8,10 1525:3 1532:4 1544:16 1545:22 1548:10 1554:25 1556:24 1557:18

**Altman** 1497:8, 22

**amount** 1489:19

**Amy** 1477:8

**analgesic** 1519:13

**anatomy** 1487:5

**and/or** 1502:25

**ani** 1551:19

**another** 1497:8 1520:25 1532:15

**answer** 1477:25 1517:13 1531:20 1555:6

**anterior** 1532:5 1554:25 1555:17,18

**antibiotics** 1543:12

**anticipate** 1492:15

**anticipated** 1492:15

**anxiety** 1530:13

**any** 1481:10,14 1484:8 1487:21

Case 2:40-md-02327 Document 7282-10 Filed 05/30/19 Page 29 of 924 PageID #: 146938



In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. V     12/18/2014

1529:13

**block** 1502:24
1545:13
1556:19

**bloody** 1526:23

**body** 1491:12
1507:16
1512:15,21
1513:3,8,14
1514:17,21
1515:2,4,9
1516:25

**both** 1482:23
1485:24 1486:1,
9 1511:22
1519:12 1525:7
1531:24
1537:13

**bother** 1537:12,
18

**Botox** 1502:25
1545:16,18
1556:19

**bottom** 1517:25
1537:1 1551:15

**boyfriend**
1528:14

**branches**
1534:10,13

**break** 1503:11
1509:5 1519:15
1522:3,7
1535:25 1536:3
1557:22 1558:1

**brevis** 1554:11

**brought** 1494:5
1536:15

**Bruce** 1477:4
1478:5

**bunching**
1494:13,15

**bundling**
1493:18
1494:10,13,14,
17,19,23 1495:1

**Burch** 1531:5,
10,17

**Burson** 1504:12

---

## C

**C.R.** 1477:11,18

**called** 1485:9
1506:25

**calm** 1519:13

**can** 1478:15
1482:10 1485:9,
11,13,20
1488:17,20
1491:9,12,15
1499:13 1501:1,
7,19 1506:12
1507:1,14
1511:10 1513:4,
5,10 1514:2,13,
17,18, 1515:22,
24 1516:6,8
1517:4 1518:8
1522:6,7 1525:4
1533:15 1534:3
1538:8 1539:3,5
1540:6 1541:17
1544:21
1545:19 1553:2
1554:7 1555:8

**can't** 1486:13
1497:24 1533:6
1540:1 1545:6

**cancer** 1544:8

**candidate**
1537:6 1545:18

**cannot** 1486:10
1499:20
1518:14,21

**care** 1499:7,9
1502:22 1541:9
1544:13
1545:20,23
1557:19

**Carol** 1520:21

**case** 1485:16
1487:6 1492:3
1502:13 1504:1
1508:12
1513:15 1531:4
1536:13
1543:15 1553:4
1556:5

**cases** 1478:17

**causation**
1538:22 1539:2

**cause** 1486:15
1488:6,18,21
1492:11
1493:10
1495:24
1500:17,24
1501:19
1506:12,15,25
1507:11
1508:13
1509:20
1510:12

1511:19 1512:1
1513:4,5 1525:4
1529:18
1534:24
1538:19 1540:5,
21 1541:15,19,
21 1542:6,12
1544:1 1551:25

**caused** 1485:5
1507:14 1512:4
1541:17 1552:7

**causes** 1487:12,
14 1491:13,16
1493:21
1510:25
1512:12 1517:7
1539:16
1541:22

**causing** 1512:22
1513:17
1538:25
1544:24
1551:20 1552:7
1553:18,22,24

**cease** 1506:23

**centralization**
1519:19

**certain** 1481:7
1483:2 1489:18

**Certainly**
1486:13

**certainty**
1486:14
1493:15
1499:21 1518:5,
15,22 1532:11
1533:16 1534:6
1545:7 1554:16

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 899 of 924 PageID #: 213706
Case 2:12-md-02327 Document 7252-10 Filed 01/30/19 Page 832 of 924 PageID #: 188398

In Re: CR Bard 200      Bruce Rosenzweig, M.D., Vol. V      12/18/2014

1557:5

**chance** 1500:5

**change** 1479:5
1488:1 1496:7,
9,10 1514:22

**characteristic**
1511:25

**characteristics**
1511:23

**child** 1492:24
1493:3,7

**childhood**
1509:22

**chronic** 1491:11
1503:1 1507:13,
15 1511:8
1512:21,23
1513:3,8,9,13
1514:16,17,20,
21 1515:3,4
1516:25
1519:17
1523:19
1552:21,23,25
1553:3,10,13

**chronically**
1512:15

**Clark** 1520:17

**clean** 1526:25

**clear** 1487:18

**clinic** 1554:2

**clinical** 1499:12
1510:9 1514:3
1539:12

**close** 1491:3
1494:6

**closed** 1519:20

**coccygeal** 1494:7

**colorectal**
1490:17

**combination**
1519:11
1524:23,25

**come** 1514:10

**coming** 1497:3
1540:2

**compared**
1497:5 1525:11
1535:21

**complain** 1505:7
1528:3,6,9
1541:11

**complained**
1528:13

**complaining**
1489:7,23
1490:7 1496:8
1505:21 1508:8
1529:5,20
1532:22
1537:10,25

**complains**
1548:22

**complaints**
1486:20 1495:5,
6 1498:1,23
1505:3,18
1508:21
1517:15 1529:4
1530:12
1537:24
1540:16
1541:15 1542:9,
14 1543:8

1546:9 1548:21,
25 1550:20
1551:8 1554:5,
16 1555:20

**complete**
1533:12,17

**complicated**
1484:25

**complication**
1496:19 1538:3
1549:2,8,16,23
1551:3 1556:1

**complications**
1483:20
1487:22 1488:6,
10,12 1499:16,
23 1500:1,3,6,
16 1526:10,22
1527:24
1531:25 1532:5
1535:23 1540:2
1541:1 1547:24
1548:12 1551:2

**component**
1485:20 1509:3

**concede** 1515:8

**conclusion**
1558:13

**condition**
1491:24
1510:15 1523:4

**conditions**
1508:25 1530:3,
6

**confused** 1517:9

**confusion**
1512:3

**connected**
1542:11

**connection**
1511:6

**consent** 1483:14
1523:23
1524:11 1526:1
1527:20 1548:6

**conservative**
1519:7 1524:2
1525:5 1547:3

**consistent**
1496:6 1552:24

**constant**
1508:16 1509:1

**context** 1500:20
1553:9

**continuing**
1499:14
1524:13,20

**continuity**
1530:22,25

**continuum**
1499:7,9
1502:22
1544:13
1545:20,22
1557:18

**contracted**
1493:19

**contraction**
1491:7,11
1494:4 1513:6
1514:25 1515:3
1517:1 1539:5

**contracts** 1513:7
1514:14

**contradicts**
1515:9

**contribute**
1510:1 1540:6

**contributed**
1486:6

**contributes**
1509:6

**contributing**
1486:9,11

**contributor**
1539:21
1540:13 1551:6

**control**  1519:17

**controls**  1519:18

**correct**  1478:24
1479:3 1480:11,
24 1481:2
1482:1,14,15,19
1483:7,15,19,
20,21,23
1484:6,23
1486:8,16,17,21
1487:1,11
1488:8,22,25
1489:10,13
1490:12,15,19
1492:9,10
1493:1,4
1494:3,20
1495:25
1496:20,21
1499:4,5,10
1501:24
1502:10,14
1505:12,15,19
1506:7,9,11,14
1507:22

1508:21,22
1509:2 1510:8,
14,16,17 1511:2
1512:11 1514:9
1515:1 1516:5,
7,9,12 1518:19,
20 1519:25
1520:1 1522:15
1523:5,7,21
1524:10 1526:2,
9,11,14,21
1527:4,8
1528:24 1529:1
1531:7,23,25
1532:2,6,23,24,
25 1533:1,23,24
1536:18
1537:22
1538:16,17
1540:3 1541:1,
2,4,7 1542:25
1543:1 1544:16,
19 1545:8,9,15,
21 1546:11,20,
24 1547:1,8,10,
12 1548:5,8,16
1549:12,16
1550:3,11,13,14
1551:13
1552:17
1554:19
1555:24

**corrected**
1537:19

**correctly**
1524:16 1527:5

**could**  1485:25
1487:14,16,25
1488:1 1490:13

1495:17,18,25
1498:2 1509:3,
12 1511:22
1517:23
1525:17
1533:11
1534:12 1539:6,
21 1541:14,20
1543:22,24
1544:25 1552:2,
18,19 1556:20

**counsel**  1477:4
1478:19,21

**counseling**
1502:8,12,24
1544:18,25
1545:8 1556:24

**couple**  1479:8

**course**  1486:18
1538:2

**court**  1477:12

**cramp**  1530:19

**cramps**  1540:19

**criticisms**
1483:13 1484:5,
8 1504:11
1523:23 1526:3,
12 1541:5,8
1548:3,6,15

**criticize**  1482:12
1537:20

**crossed**  1479:15

**curative**  1543:21

**curious**  1516:16

**current**  1495:5,
6,24 1505:3
1509:20 1510:6

1529:4 1537:24
1540:14 1542:9,
14 1548:21,25
1550:19 1551:7,
9

**currently**
1498:18 1510:3,
4 1519:6
1529:10,13,20
1530:15,19
1533:18
1537:25 1540:1
1541:11,13
1548:22

**cut**  1534:21
1535:2

**cycle**  1543:4,8

**cyclic**  1507:4

**cyst**  1498:3,4,8,
10

**cystitis**  1552:24
1553:11

**cystocele**
1522:21
1527:17
1547:13,15,20,
23

---

**D**

**daily**  1504:4
1536:25
1537:17

**damage**  1533:23
1534:4,8
1552:21

**data**  1489:19
1497:20



**different**
1514:13,14,15,
16,18,19
1530:15,21
1554:6

**differential**
1509:18

**differently**
1514:12
1515:11

**differs** 1489:15

**difficulty**
1542:24

**direct** 1502:18

**disabled** 1522:25

**disagree**
1490:20,22
1510:18
1514:25

**disagrees** 1489:8

**disc** 1477:3
1536:2,6
1558:12

**discharge**
1515:25 1516:1
1526:24
1528:13

**disclose** 1483:6

**discomfort**
1482:6 1501:7
1544:23

**discussed**
1482:25
1500:19
1507:14
1510:20 1514:4
1517:6 1524:12

1525:16
1527:10,16
1530:11 1539:2
1541:16,25
1552:5 1556:6

**discussion**
1527:15 1550:1

**discussions**
1482:17 1550:6

**disruption**
1544:23 1545:3

**dissection**
1557:13

**doctor** 1536:12
1537:13,14
1558:10

**doctors** 1549:4,
13,18,21

**documented**
1489:20

**documents**
1478:25 1514:4

**doing** 1526:20
1538:25

**domestic**
1509:23

**done** 1485:10
1491:22
1503:20
1533:12

**Douglas** 1521:16

**down** 1509:5
1519:13

**Dr** 1477:16
1478:10
1482:20,22
1483:3,4,10,14

1484:5,11
1494:7,11,12,17
1504:12
1510:13,24
1511:16
1523:24 1524:1,
8,12 1525:16,25
1526:4,12
1536:17 1541:6
1543:13,20
1551:15 1552:9,
23 1554:1,23
1555:13,15
1557:9 1558:5

**drafted** 1546:5

**drainage** 1498:9

**Drie** 1521:16

**due** 1485:13,16,
20 1492:7
1495:16,18
1502:3 1505:4
1506:19 1509:3
1510:21
1512:15
1517:11
1548:22 1554:7,
18

**duly** 1478:6

**Duplication**
1550:18

**during** 1484:10
1487:15
1501:12
1528:15
1529:13
1540:19

**dysfunction**
1541:14,17,20,

23 1542:7

**dyspareunia**
1489:7,25
1495:8,10,13,
15,24 1496:1,4,
6,7,10,16,18,22,
23,24 1497:4,9,
12,15,17
1500:15,21
1518:3,10,23
1526:24
1528:21,23
1529:6,8
1531:6,10,23,24
1534:4 1541:12
1548:24 1549:1
1551:20 1552:8

**dysuria** 1505:4

---

E

**each** 1478:13
1479:2 1502:12,
22 1503:2,21

**earlier** 1490:2
1493:17
1495:11
1507:15
1530:11
1541:16
1542:18

**easier** 1479:14
1480:18

**easily** 1545:24
1546:1

**easy** 1498:8,9

**ectopic** 1550:13
1551:1,4

**effect** 1509:13
1536:24

**effective** 1527:7
1535:8 1547:21
1556:25

**either** 1499:15,
18 1504:16
1532:19

**elected** 1531:5

**element** 1485:12
1496:2

**else** 1544:22

**emptying** 1505:6

**end** 1503:22
1536:2 1558:12

**endometriosis**
1492:1 1506:10,
21,23,25
1507:3,6,8,10,
20,25 1508:6
1509:4,10,
1512:13
1517:15 1523:6
1544:8

**endometriotic**
1509:14,17

**enjoy** 1529:12

**enough** 1547:18

**enterocele**
1481:21 1484:1

**entity** 1485:9

**episiotomy**
1491:22

**equal** 1497:16

**equally** 1513:22

**equivalence**

1497:12

**erosion** 1485:17
1493:19 1494:1
1496:5 1499:15
1501:19 1502:7
1518:2,3,6,7,8,
10,16 1527:10,
16 1555:23

**erosions** 1531:2

**estrogen** 1516:6

**etiology** 1490:23
1495:21

**evaluate** 1481:15

**evaluated**
1503:2,3

**evaluating**
1554:2

**even** 1479:12
1505:17 1531:4
1537:16 1538:3

**event** 1492:21
1493:15,17

**ever** 1495:21

**evidence** 1490:7
1502:15,18
1519:24
1533:22
1534:11 1539:8
1552:19

**exact** 1498:15,16
1523:12

**Exactly** 1504:22

**exam** 1489:12
1515:13

**examination**
1478:8 1557:9

**examine** 1480:22
1481:5,6,11,12
1511:18
1516:10

**examined**
1478:6 1481:4

**example** 1479:6
1483:9 1537:1

**exams** 1530:1

**exceedingly**
1531:12

**except** 1477:23

**excised** 1490:13
1493:20

**excising** 1487:14

**excision** 1496:5

**excisions** 1494:2

**excruciatingly**
1496:14

**excuse** 1519:21

**exercises** 1524:5
1547:3

**Exhibit** 1480:8,
12 1503:14,18
1522:8,13
1536:8,14
1546:12

**exhibits** 1479:24

**expect** 1512:18

**experience**
1484:7 1491:16
1492:18
1499:12 1510:9
1514:3 1531:11
1539:23

**experienced**

1482:5 1526:16

**experiencing**
1529:10,11,13
1530:20

**expert** 1520:3

**experts** 1514:24
1520:5,14

**explain** 1490:25
1508:4 1511:15

**explanation**
1517:14

**explanations**
1512:6

**explant** 1479:11
1491:1 1500:9
1532:19
1533:13
1534:19
1556:25 1557:6

**exposure**
1490:11
1512:18

**extensive**
1544:6,7

**extent** 1546:8

**extremity**
1554:4,18

---

**F**

---

**fact** 1500:8
1508:4 1516:15

**factor** 1486:10
1493:2 1551:6

**factors** 1485:24
1486:1 1514:22



In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. V     12/18/2014

1534:1 1557:12

**further** 1509:6
1523:15 1524:2
1527:16
1558:14

**future** 1499:15
1518:2 1532:8,
10 1533:2,7
1534:14
1544:13
1556:11,
1557:15

---

### G

**G-u-e-r-r-e-t-t-e**
1520:23

**gate** 1519:16,18

**general** 1498:13
1515:7 1538:22
1539:2

**generalized**
1554:22

**generally** 1488:5
1516:15
1518:11

**get** 1477:19
1479:7,25
1480:19
1546:21

**gets** 1519:20

**getting** 1479:23
1504:22

**give** 1523:15
1525:14

**Glowacki**
1520:21

**go** 1478:13
1479:21 1480:4,
17 1503:4
1504:13 1513:8
1515:4 1536:25
1546:16
1556:22

**going** 1477:23
1479:7, 1490:24
1491:9 1499:6
1503:9,18
1507:17
1510:22 1511:4,
9 1518:6
1520:13 1522:5,
6 1527:22
1528:1 1532:9
1533:16
1534:21 1535:2
1536:1,5
1540:10
1541:18
1542:10 1545:7
1552:12,20
1555:7 1556:17
1557:6,24
1558:3,11

**gone** 1546:8

**good** 1477:16
1527:1

**got** 1480:9
1500:5 1517:12,
13 1528:17

**gracilis** 1554:12

**grade** 1481:21,
22 1522:21
1547:13

**granulation**

1551:24

**Great** 1546:21

**groin** 1551:10
1554:3,7,14,17
1555:1,14
1557:12,13

**groups** 1512:16

**grow** 1534:20

**Gruber** 1536:17
1541:6

**Guerrette**
1520:23

**guess** 1477:22
1551:6

**Guidice** 1521:2

---

### H

**handwrote**
1479:22

**hanging** 1502:5

**happen** 1493:15
1518:8 1532:10

**happens** 1531:12

**has** 1497:15
1498:19
1499:14,25
1500:13
1501:10,14,17
1505:4 1513:7
1514:1,4
1519:18,20,24
1520:15
1527:25 1532:1,
16 1534:14
1546:22
1547:23

1552:15
1553:19 1554:8
1556:16

**having** 1478:6
1487:16 1489:3
1495:7,8,11,14,
25 1499:3
1530:15
1533:19
1557:14

**he's** 1546:7
1554:2

**healing** 1486:24

**help** 1480:16
1504:25
1519:15
1543:18

**helped** 1540:12

**helpful** 1500:14
1543:20
1544:25
1556:20,21

**helping** 1524:5

**here** 1478:10
1488:14
1499:20
1534:16
1536:25
1546:16,22

**Here's** 1512:3

**Hers** 1487:17

**higher** 1497:4,9
1519:21 1525:9

**highlights**
1480:9

**him** 1484:10
1520:25

**hip** 1554:3,7,14, 17 1555:1,14

**his** 1482:20,24 1484:7,15,19, 1525:21 1526:18 1550:8 1552:9

**historically** 1497:14

**history** 1505:23 1506:21 1509:23 1510:12 1529:25 1530:13 1547:2 1550:12 1551:7

**hold** 1519:1

**holding** 1534:5

**Holzberg** 1521:4

**hormone** 1516:3

**hormones** 1507:5

**hospital** 1505:20

**how** 1478:20 1482:2 1487:24 1493:7,9,10 1498:23 1501:1 1508:4 1514:10 1525:7 1531:15 1533:5 1539:16 1540:21 1542:4, 20 1543:25 1544:18 1545:10,16,24 1551:5

**however** 1480:25 1501:12 1504:6

1509:16 1534:24 1553:3

**husband** 1502:9

**hypermobility** 1522:22

**hysterectomy** 1479:10 1487:15 1505:16,17 1508:5,10 1530:1,7 1539:19,24 1542:5 1543:2, 9,23 1544:1,2,3, 6,7,10,11 1551:24

---

**I**

**I've** 1479:15 1510:20 1528:17 1539:22 1555:12

**identification** 1480:14 1503:16 1536:10 1546:14

**identified** 1496:18 1513:16 1520:15

**identify** 1477:5 1554:20

**IFU** 1484:12,16, 17,21 1496:18

**iliococcygeal**

1491:2

**impact** 1482:3,8 1494:9 1496:1 1537:2,17 1550:19

**impacts** 1491:25

**implant** 1481:19,20,24 1482:3,13,16,17 1483:5 1485:21 1492:17 1495:15 1496:5, 14,17,19,24 1499:4 1504:9 1505:11,14 1508:7 1510:25 1517:17 1522:24 1523:22 1524:13,19 1525:16,18 1530:10,14,18 1531:1,25 1537:3,7 1540:18 1541:1 1548:4 1549:2, 10 1554:18

**implanted** 1491:5 1494:2 1503:25 1506:24 1512:5 1536:21 1538:4 1546:25

**implanting** 1482:13 1537:21 1548:9 1549:5,13,19,22 1556:3,5

**implants** 1497:17 1509:14,18

**important** 1480:19

**inability** 1529:11

**incidence** 1497:4,9,15 1524:13 1525:10

**incision** 1487:16

**incisions** 1486:24 1526:25

**including** 1499:24 1554:11

**incomplete** 1505:5

**incontinence** 1479:17 1504:2, 3 1522:23 1524:13,20 1525:2,10 1527:6 1532:23 1536:22 1537:2, 4,5 1538:1,2,7, 8,11,12 1539:7 1542:20 1547:7, 11 1548:18 1549:15

**incorrect** 1498:6

**increased** 1535:19,20,22

**indicate** 1489:3, 11 1502:8

**indicated**



**Kegel** 1524:5
1547:3

**Kennelly** 1521:6

**kidney** 1505:24
1550:15,17,23
1551:5,7,9,11

**kind** 1515:18

**knew** 1483:4,6

**knife** 1496:13

**know** 1481:6
1482:21
1484:11 1485:7
1489:19 1491:8
1493:18 1494:5
1498:25
1503:13
1504:21 1513:6,
7,9 1514:23
1515:15,
1516:17
1517:12 1520:5,
7,16 1521:10,
11,12,23
1525:3,9
1529:18
1534:12,16,19,
23 1537:12
1546:9 1547:24
1552:6 1554:23
1557:16

**knowing**
1521:22

**knowledge**
1498:13,19,22,
25 1504:23

**known** 1493:17
1499:3 1531:24
1532:4 1538:3,6

1549:2,7,16,23
1555:25

---

## L

**lab** 1485:10
1539:13

**large** 1493:23

**last** 1477:20
1479:5,23
1484:16
1498:20 1520:8
1546:16 1555:5

**later** 1479:13
1490:1,6,10
1492:20 1530:1

**lead** 1485:9,11,
1487:25
1488:18 1492:5
1501:7 1502:6
1515:24 1516:8
1534:3,17
1539:6 1551:10
1553:2

**leading** 1487:7
1534:13
1554:14

**leads** 1517:2

**leakage** 1529:11

**leaking** 1525:4

**least** 1490:13
1515:8 1545:19
1548:18

**left** 1505:23

**less** 1518:10
1553:21

**lesser** 1535:16

**let** 1477:17
1503:12
1520:16
1542:19
1546:21

**let's** 1478:15
1480:4 1491:20
1499:7 1503:4
1522:1 1546:16
1556:12

**levator** 1507:19
1510:13,21,23
1511:6,10,12
1512:8,12,14
1516:19 1517:4
1518:24
1541:19
1542:11
1548:23
1551:19,22
1552:6,10
1553:4,15,24,25

**levels** 1516:6

**life** 1482:2,8,11
1504:4 1536:25
1537:3,17

**like** 1479:7
1483:25 1484:9
1489:14
1490:10
1496:13
1498:23
1502:17
1514:10 1528:3
1529:21
1530:19
1531:16
1533:18
1546:22 1553:9

**likely** 1485:23
1486:6 1489:21
1490:6 1493:21
1496:2 1499:17
1501:21 1508:2
1509:14,19
1513:18,23
1518:9,10,25
1532:14 1533:4
1534:25 1540:8
1542:5 1551:20
1553:21
1554:13 1557:9

**list** 1520:14

**literature** 1485:8
1497:14
1499:12 1515:2,
9,10 1518:12
1531:11
1532:15 1557:3,
7

**litigation**
1477:18
1504:21
1520:11

**little** 1480:18

**localization**
1498:17

**localized**
1498:11,12

**located** 1555:22

**location** 1498:15
1501:14 1544:4
1555:3,11,21

**long-acting**
1519:12

**long-term**
1487:22 1488:6



In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. V     12/18/2014

**meeting** 1478:18

**meetings** 1478:20

**members** 1544:25

**memory** 1480:16 1482:21 1503:12 1517:9

**menopausal** 1485:21,24 1486:3 1495:19 1540:13

**menopause** 1516:2 1540:11

**menstrual** 1530:19 1540:20 1543:4, 7

**menstruation** 1507:1,2

**mention** 1499:8 1518:1 1524:6 1534:2 1557:18

**mentioned** 1495:10 1497:22 1507:20 1516:13 1543:3 1555:25

**mesh** 1479:11,18 1485:8,14,16 1486:15 1487:4, 7,17 1490:10, 14,23 1491:2,6, 10 1492:17 1493:18,19,20, 25 1494:2,4,5,8, 25 1495:1,3

1496:16,23 1497:5,17 1499:14,16 1500:1,15 1501:19 1507:16 1510:22 1511:4, 7,16,17,21,23, 24 1512:4,18 1513:3,6,7 1514:1,14,20 1515:1 1516:16, 22,24 1517:2, 1519:5 1525:11 1527:24 1528:2 1529:22 1530:24 1532:16,20 1533:9,10 1534:20,21 1535:13,15,19, 21,23 1539:5 1540:2 1541:17, 24 1542:10 1543:14,17,19 1549:2 1551:21 1552:7,12,20 1553:1,7,16,17, 19,20,22,23 1554:5,18 1556:17 1557:1, 10

**mesh-related** 1500:3

**Michael** 1521:6, 18

**microscopic** 1511:23

**middle** 1534:1

**might** 1497:3,20 1508:9 1509:17 1514:19 1525:5 1537:11,17 1538:7

**mild** 1488:14,24 1501:3

**mildly** 1487:7,17

**minimal** 1509:13

**mispronouncing** 1552:6

**mixed** 1504:3

**Moalli's** 1485:10

**modalities** 1502:23

**modify** 1479:5

**Molden** 1521:14

**months** 1499:8 1545:23 1557:19,20,21

**more** 1485:23 1486:5,11 1488:22 1489:21,25 1490:5,7 1491:8 1493:21 1496:2, 6 1497:14,20,23 1498:13 1499:17 1501:21 1508:2, 16,25 1509:14 1530:19 1532:13 1533:3, 4 1534:25 1540:8 1544:5 1554:12,21 1555:19,20 1557:9

**morning** 1542:22

**most** 1488:4 1506:24 1507:5 1513:18 1518:9

**mostly** 1483:25

**move** 1479:21 1503:4 1548:3

**moved** 1479:13, 20

**much** 1487:15 1493:17 1514:20 1520:10

**multiple** 1505:20

**muscle** 1485:11 1490:18,23,24 1491:2,14,17,18 1492:5,6,12,14, 20,23 1493:3, 11,13,21,24 1505:5 1508:17 1511:6 1512:9, 13,14,16 1513:11 1516:19 1517:4, 10 1519:15 1541:14,17,20, 23 1542:6,12 1548:23 1552:11,19,20 1553:5,23,25 1554:10,12,24 1555:16 1556:18 1557:11

**muscles** 1491:6, 9,12,25 1492:1,



1491:13 1498:1 1500:11 1503:4, 24 1504:9,22 1505:1 1506:20 1517:10 1525:24 1528:22 1531:4 1534:12 1535:24 1536:12 1537:20 1538:15 1546:7 1547:21 1549:25 1550:4, 10 1551:1 1552:14 1554:15 1557:24

**old** 1509:4 1540:8

**older** 1497:11

**once** 1507:20 1535:3 1540:23 1552:3

**one** 1478:22 1479:17,20 1485:7 1486:11 1487:9,14 1489:20 1490:16 1492:2 1499:25 1503:20 1511:19 1513:12,20 1515:15 1533:3 1546:9,16 1556:9

**ones** 1513:16,20 1544:14

**ongoing** 1493:16 1508:13

**only** 1487:17 1551:3

**oophorectomy** 1507:9

**opine** 1487:6 1515:10

**opined** 1506:18

**opinion** 1485:5, 15 1486:5 1489:17 1490:21 1493:24 1510:19 1511:3, 15 1513:16,21 1519:1 1530:24 1534:5 1538:18 1556:13 1557:4

**opinions** 1480:7, 17 1538:23

**opportunity** 1484:12 1520:2

**opposed** 1508:24

**options** 1524:2,9

**organ** 1495:19 1535:7

**other** 1480:2 1487:10,12,15 1491:13,16 1497:22 1498:23 1506:16 1508:24 1509:6 1511:19 1512:5, 12 1513:13 1517:7 1539:16 1541:22,24

1544:14 1546:10 1555:3 1556:9

**others** 1481:4 1514:11

**Otherwise** 1551:12

**our** 1525:12

**ours** 1558:9

**out** 1479:4,15 1492:11 1493:7, 9,10 1495:23 1497:3 1506:15 1507:1,10 1508:13 1509:15 1511:19 1513:18 1514:24 1529:23 1530:3, 5 1534:21 1539:16 1540:4, 13,21,24 1542:1 1543:25 1544:9

**out-of-line** 1525:14

**outcome** 1535:17

**outpatient** 1533:8,12

**outside** 1502:5

**ovarian** 1507:4 1544:8

**ovaries** 1506:22 1507:3 1508:11 1509:16

**over** 1492:16,25

1493:7 1524:1,8 1525:12 1535:19 1538:23 1539:11

**overactive** 1525:4

**overwhelming** 1489:19

---

**P**

**p.m.** 1536:2,6 1557:25 1558:4, 12

**page** 1502:21 1516:13 1517:24 1533:25 1535:5 1536:25 1551:14 1553:9

**pain** 1481:24 1482:7 1485:3 1487:25 1489:24 1490:1, 17 1492:7,12 1493:25 1495:7, 9 1498:2,11,12, 15,17,24 1499:15 1500:14,18,22, 24 1501:2,10, 11,14 1503:1 1505:4,10,13, 18,21,24 1506:4,13,16,19 1507:8,22 1508:8,13,15, 17,21,23,25

1509:8,20 1510:2,5,7,11, 12,15, 1511:25 1512:1,4,6 1516:14,15,17, 23 1517:15 1518:2,3,9 1519:14,17,18, 20,22 1523:16, 20 1528:18 1529:5,10,13 1530:4,9,13,14, 15,17,20,21,24 1531:15,17,24 1534:14,17,24 1537:2 1538:1 1540:15,16,22 1541:15,21 1543:4,8,22 1544:2,15,20,21 1545:3,12,14 1548:22,24 1549:7 1550:20 1551:8,10,12 1552:1 1553:5, 6,7,25 1554:2,3, 4,5,7,8,14,17, 18,21,25 1555:1,2,4,10, 14,17,22 1557:12

**painful** 1488:18, 21 1489:3 1496:12,14 1498:21 1505:7 1518:24 1527:17 1528:9 1529:18,20 1535:4

**palpation** 1551:18

**Pam** 1485:10

**paragraph** 1517:25 1534:1 1551:15 1552:22 1554:1

**part** 1487:5 1517:7 1527:15 1545:19

**particular** 1481:3 1508:12 1556:5

**particularly** 1501:3 1507:18

**passed** 1551:11

**past** 1510:3, 1557:4

**pathologic** 1511:22

**patient** 1499:25 1511:18,24 1518:14 1519:20 1525:15 1535:16

**patients** 1491:22 1492:6,18 1510:9 1514:7, 12,15,16,19 1531:6 1535:17 1539:22 1540:2 1543:21 1550:2

**pattern** 1503:10

**pelvic** 1485:3,8, 13 1490:17,23 1491:5,9,13,17,

23,25 1492:2,5, 6,7,12,14,19,22, 23 1493:2,11, 13,21,24 1495:7,19 1497:4 1498:2, 12,24 1500:14, 15,17,22,24 1501:2,10,11,14 1505:4,5,13,21 1506:4,16,19 1507:7,18 1508:8,13,15, 17,23 1509:3,4, 8,9,20 1510:2,5, 6,12 1516:14, 15,17 1517:15 1529:5 1530:2, 4,9,13,24 1531:15,17,24 1532:20 1535:7, 21 1537:2 1538:1 1540:15, 16,22 1541:14, 16,20,22,23 1542:6,12 1548:22 1549:7 1550:20 1551:8, 10 1553:2,6 1554:21

**pelvis** 1491:24 1502:19 1506:24

**people** 1521:12 1538:8

**perceived** 1489:24 1501:2 1554:14

**percent** 1500:1,5

1524:14,21 1525:1,6 1543:5,21

**percentage** 1488:10 1531:6

**perception** 1510:11

**Perfect** 1480:1

**perform** 1538:8

**perimenopausal** 1540:9

**period** 1527:3 1540:9

**periods** 1540:20

**permanent** 1491:10 1502:16 1519:25 1552:15,16

**personally** 1504:21

**Peter** 1521:20

**physical** 1500:11,13 1502:23 1544:14 1556:23

**physically** 1480:22 1481:15 1511:18

**physician** 1494:16 1527:10 1550:6

**physicians** 1490:16 1504:15,17,24

1523:15
1549:24,25

**pink** 1551:16

**place** 1483:17
1487:16

**placed** 1491:3

**placement**
1525:11

**plaintiff** 1511:18
1518:14
1522:13

**plaintiff's**
1489:15

**plaintiffs** 1477:8
1478:11,14
1479:2 1480:25
1481:4,5,7,10,
14 1503:12

**please** 1477:4,13

**plural** 1513:21

**Plus** 1481:20

**point** 1489:7
1490:2,6
1502:25 1519:7,
10,11 1527:10
1545:13
1556:17,18
1557:8

**polypoid**
1551:16,22,25

**polypropylene**
1491:10

**POP** 1525:11
1533:9

**portion** 1515:8
1533:11

**possibilities**
1513:13

**possibility**
1534:2

**possible** 1543:24

**possibly** 1489:20

**post** 1493:15
1496:5

**posterior**
1481:20

**postmenopausal**
1485:3 1540:4,6

**postoperative**
1486:18

**potential**
1488:10 1493:2
1496:19
1527:11,23
1542:12

**pounds** 1492:25
1493:8

**pre-implant**
1540:16

**precipitated**
1492:22
1505:15

**predated**
1540:12

**pregnancies**
1551:1

**pregnancy**
1550:13 1551:4

**preimplant**
1496:3

**preparation**
1478:12

**prepare** 1478:16

**prepared**
1522:14

**prescribed**
1515:20

**prescriptions**
1523:16

**present** 1507:3
1526:23

**pressure** 1482:6
1489:24 1495:7,
8 1498:2,24
1501:2,5,8
1502:2

**pretty** 1520:10

**previous**
1503:20
1525:13

**previously**
1530:7

**prior** 1481:23
1482:16,25
1483:5 1487:18,
19 1495:15
1500:9 1505:10,
13 1517:7,16
1519:8 1522:24
1523:22
1525:16
1529:25 1530:7,
9,11,14,18
1532:13
1540:18
1553:22

**probability**
1486:14
1499:22 1518:5,
16,22 1532:12

**probably**
1503:10
1519:16 1555:6

**problems**
1479:17
1499:19

**procedure**
1484:10 1528:2,
20 1531:5,10,17
1533:10,20
1537:11,16
1539:21

**procedures**
1531:3 1538:9
1556:14

**process** 1493:16

**processes** 1514:6

**proctor** 1484:10

**product** 1513:19
1525:2

**professional**
1504:23

**professionally**
1521:22

**prolapse**
1483:25
1495:19 1499:2
1501:16,20
1502:3,4,5
1530:8 1532:25
1535:7,9,15,19

**propose** 1478:11

**provided**
1483:14
1523:24
1524:12 1526:4
1548:7

**provider** 1546:8

**proximal** 1491:8

**pudendal** 1544:4

**pushed** 1511:24
1554:23
1555:15,19

**pushing** 1501:6

**put** 1522:1,16
1540:9 1542:20
1553:9

## Q

**Q-tip** 1551:18

**quadrant**
1505:24

**quality** 1482:2,8,
11 1508:25
1537:3

**question**
1477:24 1493:6
1519:23

**questions** 1484:3
1503:7 1521:25
1542:18 1548:2
1558:6

**quick** 1557:22

**quiescent** 1507:6
1509:17 1535:3

**quote** 1509:15
1535:17

## R

**radical** 1544:10

**radical-type**
1544:6

**rate** 1497:12
1525:2

**rates** 1514:15,16

**rather** 1498:9

**react** 1514:12,13

**reacting** 1514:20

**reaction** 1491:12
1507:16 1511:8
1513:3,8,14
1514:17,21
1515:4 1516:25

**reactive** 1492:6

**read** 1510:25
1523:14

**real** 1480:2

**really** 1487:18
1536:24

**reason** 1481:3

**reasonable**
1486:13
1493:14
1499:21,22
1518:4,15,21
1519:1 1532:11
1533:15 1545:6
1554:15 1557:5

**reawakens**
1535:3

**recall** 1484:14
1494:13
1497:24 1498:7,
16 1523:11
1524:6,16
1540:1 1545:5
1547:6 1555:3
1556:9

**receiving**
1523:22

**recent** 1528:13

**recognition**
1519:19

**recognize**
1504:13,15
1520:16

**Recognized**
1504:18

**recollection**
1489:20 1490:3
1523:18

**recommend**
1499:6 1500:11
1532:7 1544:12
1556:11

**recommending**
1543:16

**record** 1477:1,6,
23 1486:22
1524:7 1536:1,6
1557:25 1558:4,
11

**records** 1478:17
1481:13
1482:10,23
1483:24
1484:25 1489:2,
5,9,11,16,21
1490:4,5
1494:14,18,24
1495:14 1498:5
1504:16 1505:9
1509:24
1523:12,14
1525:21
1526:17

1527:19
1529:15,
1542:16,19
1546:3,10
1547:6,22
1550:9 1556:8,
10

**recovery**
1484:24
1526:19 1527:3

**rectal** 1489:23,
24 1495:8,9

**rectocele**
1481:22 1482:3
1501:18

**rectum** 1488:2
1501:6

**recur** 1538:8

**recurrence**
1499:2 1501:15,
18 1502:4
1507:7 1525:17
1527:16 1530:8
1547:23

**recurrent**
1479:15,16
1499:18
1501:20
1549:15 1551:4

**reduce** 1516:6

**reference** 1487:2
1498:6,7
1509:22
1513:24
1516:14
1528:18

**referenced**
1488:9 1510:13

Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 916 of 924 PageID #: 213723
Case 2:12-md-02327 Document 9252-10 Filed 01/10/19 Page 49 of 924 PageID #: 216558

In Re: CR Bard 200                     Bruce Rosenzweig, M.D., Vol. V                     12/18/2014

1518:12

**referring** 1494:22 1496:11 1497:7, 23 1500:12 1506:2 1532:18 1553:8

**refers** 1554:1

**reflected** 1482:9

**refresh** 1480:16 1482:21 1503:12 1517:9

**regard** 1500:21 1531:22 1543:2

**regarding** 1498:17

**reintroduce** 1477:17

**related** 1479:18 1487:22 1498:3 1507:25 1530:24 1551:21 1553:14

**relates** 1500:4 1518:13

**relating** 1554:4

**relationship** 1529:14 1545:3

**relationships** 1488:1 1544:24

**relaxation** 1530:2

**relay** 1483:5

**relied** 1557:3

**remainder**

1532:20

**remedied** 1546:1

**Remember** 1517:10

**remembered** 1490:1

**remote** 1493:22 1542:8

**removal** 1494:8 1508:5,6,10 1517:16 1519:8 1533:9,10 1543:14,19

**remove** 1507:2 1532:19, 1533:20 1543:16 1545:19

**removed** 1499:14 1506:8, 22 1507:21 1509:16 1511:22 1514:1 1519:5 1532:16 1533:11 1553:16,19 1557:10

**reoperation** 1535:14

**repair** 1496:25 1497:5,16 1525:12 1535:6, 14,16,20,21 1547:19,25

**repeat** 1543:9

**replacement** 1516:3 1533:17

**report** 1479:13 1480:8,20,22 1503:11,19 1516:13 1517:24 1522:14 1533:25 1536:13,15,23 1539:3 1546:6, 18,22

**reported** 1542:21

**reporter** 1477:12

**reporting** 1519:22

**reports** 1479:1, 9,19,20 1520:3 1528:14

**represent** 1477:5,18

**reproduced** 1554:24 1555:16

**reproduces** 1511:25

**reproducing** 1553:6

**require** 1500:2 1533:13

**required** 1531:3

**reserve** 1558:9

**reserved** 1477:25

**resolved** 1540:23 1548:18

**response** 1512:21

**responsiveness** 1477:24

**result** 1543:8 1545:3 1547:25

**retention** 1542:24

**retrograde** 1506:25 1507:2

**retropubic** 1519:9

**retype** 1479:21

**review** 1483:2, 24 1484:12 1520:2

**reviewed** 1478:17 1482:22 1536:16

**reviewing** 1481:13 1504:16 1531:11

**revision** 1527:11 1528:2

**revisions** 1527:24

**revisit** 1515:7

**right** 1479:8 1480:10 1481:1, 17 1482:18 1497:25 1500:23 1502:9, 13 1503:6,7 1505:8,18 1506:6 1511:15



Case 2:12-md-02327 Document 9075-1 Filed 01/10/20 Page 918 of 924 PageID #: 213725
Case 2:12-md-02327 Document 9252-1 Filed 01/30/19 Page 81 of 924 PageID #: 213725

In Re: CR Bard 200                    Bruce Rosenzweig, M.D., Vol. V                    12/18/2014

1529:12

**sharp** 1496:13

**she's** 1495:7,8
1496:7 1498:25
1500:5,8
1508:7,15
1529:5,10,12
1530:15
1532:13
1537:10,25
1538:14 1545:7
1546:8 1547:24
1557:6,14

**shielding**
1485:9,13
1486:3

**short** 1536:3
1558:1

**shortened**
1487:3,17
1488:3,5 1501:1

**shortening**
1487:7,13,23,25
1488:11,14,20,
23 1501:4,5

**should** 1483:10
1503:20
1506:23 1507:7,
21 1519:5
1522:2 1526:4

**show** 1535:11
1539:13

**showing** 1518:8

**shown** 1543:13

**shows** 1499:13

**sic** 1555:13

**signature**

1503:19,21

**significant**
1491:21,22
1494:9 1515:14,
19 1530:2
1537:17
1540:10,13,16
1553:7

**similar** 1484:3
1503:10
1519:23
1542:18

**Similarly** 1552:5

**simple** 1498:9
1544:2,9

**simply** 1553:9

**since** 1496:14,16
1499:1 1506:24
1522:25 1529:8
1553:19

**sir** 1503:23

**sit** 1499:20
1534:16

**situation**
1489:14

**six** 1499:8
1545:23
1557:19,20,21

**size** 1479:11
1491:21 1493:3

**skill** 1526:13

**sling** 1519:9
1524:22,24
1527:7 1531:25
1532:1,21
1533:13,20
1552:12 1554:8

**slings** 1554:9

**slower** 1514:20

**small** 1534:9
1551:16

**smaller** 1534:12

**Solo** 1522:20
1532:5

**someone**
1531:16

**somewhat**
1497:11 1534:1

**somewhere**
1498:5

**sorry** 1528:9
1556:22
1557:21

**sought** 1498:19

**sound** 1520:11

**sounds** 1520:10,
18,22,24
1521:9,17

**space** 1554:11
1557:2

**spasm** 1490:18,
23 1492:5,7,14,
23 1493:13,21
1505:5 1512:9,
13 1516:20
1518:24
1519:15
1542:13
1551:19,22
1552:7 1553:2,5

**spasms** 1491:14,
17 1492:12,20
1493:3,11,25
1553:15,25

**speak** 1482:10
1483:1 1484:18
1498:16
1525:21 1543:3
1556:8,10

**speaking** 1488:5
1518:11

**speaks** 1504:7
1527:21

**specific** 1492:4
1495:21
1498:12
1532:17 1555:3,
19,20 1556:16
1557:8

**specifically**
1482:7 1484:14,
16 1491:25
1494:21 1500:4,
12 1516:18
1518:13
1521:12
1523:11,16
1524:23 1537:3
1538:24 1542:1
1553:13
1554:20 1555:2
1556:6

**Spell** 1520:8

**spine** 1491:4

**spines** 1494:6

**Spohn** 1477:8
1480:5,9,21
1481:17
1482:16,22
1483:5,10,14
1489:3,6
1490:10 1492:8,

24 1498:19
1499:23 1500:4
1501:9,11,12,15
1502:8,15

**Spohn's** 1484:24
1485:15 1487:6
1495:5,6 1498:1

**spouses** 1502:13

**stabbing**
1496:13

**stages** 1526:20

**standpoint**
1527:6

**stands** 1479:4

**start** 1478:15
1524:24
1550:22

**started** 1477:19
1489:25 1531:1

**starting** 1520:11

**state** 1486:10
1489:5 1490:2
1499:20 1514:2
1518:14,21
1533:15 1535:5
1545:6

**stated** 1489:6
1529:21 1555:3

**statement**
1529:16

**states** 1496:12
1510:24 1529:9,
12 1540:18
1551:16

**stating** 1554:15

**status** 1485:21
1486:4 1495:19

1540:4,6,13

**stay** 1533:14

**Stephanie**
1521:14

**Sterling**
1482:20,22
1483:3,4,10,14
1484:5,11

**steroid** 1519:12

**Stewart** 1477:8
1479:10 1503:5,
19 1505:4,7
1514:10
1515:12 1516:2,
11 1519:24
1522:1

**Stewart's** 1505:3
1506:16 1510:2
1513:15 1519:4

**still** 1509:17,18
1531:5 1553:18,
20,23

**stimulation**
1507:4

**stipulations**
1477:19

**stone** 1551:9,11

**stones** 1505:24
1550:15 1551:5,
7

**stress** 1485:9,13
1486:3 1522:22
1525:2,10
1527:6 1536:22
1537:4 1547:11

**strike** 1485:4
1495:11

1501:10
1515:22 1532:8

**studies** 1497:2,7,
11,20 1499:24
1518:7 1535:10

**study** 1497:8,23
1499:25
1543:13,20

**stumbled** 1479:6

**stumbling**
1515:18

**subclinical**
1515:5 1539:3,
8,10 1543:11

**subjective**
1535:12

**subsided**
1492:16

**success** 1535:12,
13

**such** 1479:9
1491:23 1492:1
1494:18 1519:7

**suffer** 1518:1

**suffered** 1510:10
1533:22

**suggest** 1497:3

**supplemental**
1536:15

**support** 1489:17
1529:15

**supports** 1515:5

**suppositories**
1519:8

**supratentorial**
1519:19

**sure** 1500:21
1508:19
1517:13 1522:4
1555:5

**surgeon**
1482:12,
1490:17
1504:11
1523:24
1537:20 1541:5
1548:7,15
1556:3,6

**surgeons**
1504:16

**surgeries**
1532:13 1533:2,
7 1534:3
1556:14

**surgery** 1483:16,
20 1484:4
1486:25
1487:18,20
1499:25 1500:2
1526:7 1527:2,
18 1532:12,16,
17,19 1534:14
1535:19,22
1540:7,12,25
1543:16,23
1548:9,13,17
1557:15

**surgical** 1516:2
1524:8 1526:12
1528:20 1531:3
1537:6,11

**Surita** 1477:9
1479:11 1522:2,
17 1524:4
1525:25 1526:4,

20 1527:23,25 1530:9 1531:16 1532:9,22 1535:25

**Surita's** 1522:13 1531:4 1535:7

**sustained** 1519:24

**suture-based** 1535:6

**swear** 1477:13

**sworn** 1477:15 1478:6

**symptomatic** 1514:11

**symptomatology** 1495:22 1539:5 1545:25 1556:21 1557:14

**symptoms** 1533:19 1537:10 1539:6, 11, 1552:23,25 1553:10,14,15, 19,22

**syndrome** 1490:18

— T —

**take** 1478:25 1503:11 1507:1 1522:2,7 1535:24 1557:22

**taken** 1534:21 1536:4 1540:24

1558:2

**talk** 1478:10,12 1480:4 1499:7 1502:22 1537:13 1556:12

**talked** 1488:7 1500:20 1517:10,22 1518:12 1519:16 1520:25 1530:6 1535:10 1549:1

**talking** 1510:6 1512:8 1524:22

**talks** 1497:9 1515:3 1536:16 1553:10

**Tanaz** 1520:19

**Taylor** 1477:9 1536:13,19 1538:24 1539:9 1541:11 1545:2 1546:4

**Taylor's** 1543:15

**tell** 1478:15

**tells** 1495:2

**tender** 1551:17 1552:2,4

**tenderness** 1516:20 1548:23 1551:20 1552:10 1557:8

**testified** 1478:7 1482:5,7

1484:15,18 1494:12 1525:25

**testifies** 1498:14

**testimony** 1482:9 1484:22 1498:17

**tests** 1539:14

**than** 1485:23 1493:21 1496:2 1499:17 1501:21 1506:16 1508:2 1509:6, 1532:14 1533:3,4 1534:25 1540:8 1541:24 1542:5 1554:13 1555:19 1557:9

**thank** 1505:1 1558:5,8,10

**their** 1492:22 1502:13 1504:19,20 1510:11 1521:12 1537:17 1550:1

**them** 1479:25 1480:19 1492:20 1503:21 1504:18,20,21 1521:22,23

**themselves** 1477:5 1482:10 1483:1 1509:15 1525:22 1527:21 1556:8,

10

**theory** 1502:1 1515:6 1519:17

**therapies** 1502:23 1556:20,25

**therapy** 1500:11,13 1502:23,24,25 1516:3 1519:7 1543:18 1544:14 1545:10,16,18 1556:23 1557:12

**there's** 1487:2 1489:18 1490:6 1494:25 1497:2, 8,14 1499:13 1500:24 1501:5 1509:3,22 1512:5,25 1513:9 1515:8, 13 1519:23 1523:8 1524:20 1531:5 1533:22 1534:11 1539:17 1541:22 1543:7

**therefore** 1493:20 1495:1 1499:16 1507:5, 7 1542:9

**they're** 1521:11 1532:4 1539:10

**things** 1480:18, 19 1485:7 1495:17

In Re: CR Bard 200     Bruce Rosenzweig, M.D., Vol. V     12/18/2014

1513:10

**think** 1479:15,17
1482:8,25
1488:20
1489:22 1490:2,
6,16 1492:2
1495:20
1501:13
1502:11
1509:22
1510:20 1515:2
1517:22 1519:6,
16 1520:24
1522:12
1527:25
1530:11
1535:10,25
1536:16
1538:22
1546:17 1553:4
1557:23

**thinning**
1485:12,17,19,
25

**Thomas** 1521:2
1555:13

**Thompson**
1554:2

**though** 1479:12
1488:9 1496:1
1538:24
1539:13
1557:15

**thought** 1498:5

**three** 1531:2,3
1532:13 1542:7

**threshold**
1519:21

**through** 1478:13
1480:17,19
1490:24 1491:9
1504:13
1507:17
1510:22 1511:4
1520:14
1534:20
1541:18
1542:10
1543:12
1552:13,20
1556:17

**time** 1477:2
1479:6,23
1484:17
1485:21 1491:1
1492:16 1493:4,
12 1494:8
1499:18 1500:2
1502:6 1514:13
1527:2 1535:3
1539:20 1540:7
1542:8 1547:18
1550:24 1558:6,
10

**times** 1524:21

**timing** 1494:1

**tingling** 1542:22

**tissue** 1496:25
1497:5,15
1525:11
1535:14,15,20,
21 1547:19,25
1551:16,23,24,
25

**today** 1478:11,
13,16 1499:20
1504:14

1534:16 1557:4

**told** 1483:10

**Tom** 1477:10,17

**Toni** 1477:9

**too** 1487:14
1513:13 1519:2
1554:13

**took** 1483:16

**towards** 1517:25
1551:15

**tract** 1479:16

**trained** 1526:15

**training** 1484:7

**transobturator**
1522:21 1532:1,
21 1533:10

**trauma** 1491:18,
23 1492:4
1509:23
1510:10
1512:14
1517:11

**traumatic**
1492:21

**traumatized**
1534:22

**treat** 1498:9
1500:1,2
1538:7,16
1540:1 1543:12
1547:15

**treated** 1543:3
1545:24 1552:3

**treating** 1504:17
1535:8

**treatment**

1498:20 1499:1
1500:14 1507:9
1524:2 1535:7
1543:14 1547:3

**trial** 1558:10

**tried** 1524:4
1547:2

**trigger** 1502:25
1519:7,10,11
1545:13
1556:17,18

**true** 1496:25
1497:17,19
1514:7 1543:5

**try** 1519:6

**two** 1492:3
1497:13
1498:20

**type** 1516:15,17
1533:23
1534:17

**typically**
1516:22

**typo** 1479:6

—————

**U**

**undergo** 1507:4
1532:12,15
1539:5 1556:15

**undergoes**
1491:10

**undergoing**
1531:16

**underneath**
1553:17

**understand**

1484:4 1489:1 1494:16 1508:19 1518:11 1555:5, 8

**understanding** 1481:18,23 1483:18 1484:1, 19 1495:4 1501:9,16,17 1503:24 1505:2 1522:17 1527:12 1528:4 1529:3 1536:20 1537:23,24 1538:13 1548:20 1555:7, 10

**understood** 1484:21 1527:23

**underwent** 1494:4,5 1547:19

**undue** 1502:2

**uneventful** 1483:22 1526:8 1541:3 1548:10

**unless** 1500:24 1502:3

**unnecessary** 1557:13

**unquote** 1509:15 1535:17

**until** 1477:25 1486:19,20 1528:12 1558:9

**up** 1479:13,20, 21 1511:7 1518:8 1537:14 1539:13 1543:21 1549:25

**ureter** 1550:17, 23

**ureteral** 1505:24

**ureters** 1550:18

**urethra** 1553:17

**urethral** 1522:22

**urge** 1538:12 1539:4,6,23

**urgency** 1525:3, 17 1538:14,16, 19,25 1540:5,7, 11,14 1542:21 1543:19 1544:17 1545:4, 12

**urinary** 1479:15 1504:2,3 1522:22 1527:6 1532:23 1536:22 1537:5, 25 1538:2,12 1542:21 1547:11 1549:15

**urogenital** 1507:17 1510:22 1511:5 1541:18 1542:11

**urogynecology** 1520:14

**us** 1480:18

**use** 1477:25

**used** 1491:22

**usually** 1500:24

**uterus** 1506:22 1507:1 1540:24

---

## V

**vagina** 1482:6 1485:12,17,19, 25 1487:3,15 1488:3,5,15 1500:25 1501:1 1502:2,5 1534:9,10

**vaginal** 1484:25 1485:4,6,11 1486:6,12,15 1487:8,13,16,22 1488:11,17,20, 23 1489:12 1491:20 1493:22 1495:23 1496:3, 4 1500:17,23 1501:4 1502:7 1503:1 1515:14, 17,19,22,24 1516:8 1517:11 1530:2,7 1533:11,20 1539:19 1542:7 1544:3 1551:17, 23 1554:25 1555:2,18

**vaginitis** 1485:3

**Valium** 1519:8

**Van** 1521:16

**Vandever** 1551:15 1552:9, 1554:23 1555:15

**Vandever's** 1557:9

**Vardy** 1521:18

**vast** 1539:22 1550:24

**vault** 1487:8

**version** 1489:16

**versus** 1489:20

**very** 1514:19 1521:21 1551:17

**video** 1477:3

**VIDEOGRAPH ER** 1477:1,12 1536:1,5 1557:24 1558:3, 11

**violence** 1509:23

**visit** 1551:14

**visits** 1505:20

**voice** 1545:2

**voiding** 1542:22, 24

---

## W

**waived** 1478:4

**wall** 1555:1,18

**Wang's** 1543:13, 20

**want** 1500:21 1503:8 1508:19 1515:7 1522:4,6 1537:18 1558:5

**warrant** 1547:18

**wasn't** 1547:17

**way** 1487:9 1509:5 1511:11, 14,17,19 1543:7,12 1556:9

**we'll** 1477:22 1480:8 1522:2 1524:24 1550:22 1558:9

**we're** 1478:10 1479:23 1510:6 1512:8

**we've** 1477:20 1482:24 1500:19 1507:14 1522:12 1535:10 1536:12 1538:22 1541:25

**wealth** 1534:8

**weigh** 1489:16, 22 1490:5 1527:22 1528:1

**weighing** 1487:9

**well** 1485:4,20 1486:19,24 1488:9 1490:22 1491:1 1499:24 1500:13 1501:10 1502:1

1506:10,18 1509:12 1511:21 1513:2 1514:8 1518:24 1526:20 1529:24 1532:8 1534:7,19 1537:10 1539:19 1540:23 1541:16 1542:5 1544:1 1556:16

**went** 1479:1 1486:19 1524:1, 8 1525:12 1538:23 1541:3

**were** 1481:6,10, 13,21 1486:20, 24 1490:8 1504:15 1513:2 1517:23 1524:5 1526:25 1527:16 1542:8 1547:5 1548:12 1552:24

**what's** 1482:9 1485:8 1488:14 1489:8 1490:4 1505:2 1506:25 1532:9 1535:1 1538:21 1546:10 1553:24 1555:6, 10

**whatever** 1484:17,19 1498:14

**whereupon** 1477:14

1480:12 1503:14 1522:8 1536:3,8 1546:12 1558:1

**whether** 1484:11,15 1487:19 1489:24,25 1527:22 1533:16 1534:17 1537:15 1545:7 1550:1,4 1557:5

**which** 1486:5,10, 11 1489:16 1494:5, 1497:7, 22 1505:15 1507:17 1510:22 1511:5 1513:18,20 1519:17 1539:4, 6 1540:8 1541:18,19 1552:2,7 1554:13

**while** 1535:11,16 1551:10

**who** 1520:5,7 1549:18,21

**why** 1481:3,6 1501:22,23,24 1511:15 1512:25 1515:18 1535:24 1537:9 1539:10 1550:22

**Wilkerson** 1477:9 1479:14

1546:17,22 1548:7 1550:4 1552:15 1554:20 1555:11,23 1556:7,12,14

**Wilkerson's** 1546:18 1550:12 1553:4

**will** 1477:7,12, 19, 1482:25 1484:18 1499:17,18,23 1509:2 1510:10, 12 1515:8 1518:1,16,23 1532:12,15 1533:2 1534:17, 24,25 1535:4 1552:3 1556:14 1557:10,12,15, 16

**wish** 1479:5

**with** 1478:15,19, 20 1480:21 1481:24 1482:17,22 1484:10 1485:2 1487:25 1488:2 1489:8 1490:1, 9, 1495:20 1496:23,25 1497:4,10,15,17 1498:9 1500:15, 21 1504:10 1506:3 1507:9 1508:17 1510:19 1511:3, 12 1513:10

1514:7,20,25
1518:24
1519:14 1523:3,
19 1524:9,24
1525:1,7,10
1526:23
1527:24
1528:13,18
1531:2,22
1535:25
1536:15,21
1539:4,9,13
1543:2,4,18
1544:7,24
1548:3,12
1550:1,6,22
1551:7,18
1552:12,24
1553:2 1554:9
1556:6 1557:7,
13

**within** 1493:14

**without** 1517:5
1542:24

**witness** 1477:13,
14 1497:2,19
1500:8 1504:6
1505:23 1508:2
1509:12
1511:21 1512:8
1517:19
1523:11
1524:16
1525:20 1528:6,
12 1529:1
1531:9,20
1538:6 1549:4,
10,18 1556:3
1558:8

**woman** 1488:6

**women** 1488:4,
11,16

**word** 1515:17,18
1528:10

**words** 1523:12

**work** 1485:10

**worsening**
1510:11 1547:7

**Wouldn't**
1514:7 1539:13

---

**X**

---

**Xanax** 1523:17

---

**Y**

---

**Yeah** 1503:9

**years** 1485:22
1498:20 1499:9
1540:8 1545:23
1557:19,20,21

**yet** 1511:16

**Yolunda** 1477:8
1522:13

**you'd** 1553:9

**you're** 1479:22,
24 1487:9
1506:2 1508:20
1510:5 1532:10
1554:15

**you've** 1480:9
1502:11
1513:16 1557:3